# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>        Plaintiff,<br><br>     vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>        Defendants. | CASE NO. 12-cv-00630-LHK |

**EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BASIS FOR OPINIONS .................................................................................... 1

    A.   Qualifications ........................................................................................... 1

    B.   Level Of Ordinary Skill in the Art .......................................................... 3

III.    LEGAL STANDARDS ...................................................................................... 4

    A.   Person of Ordinary Skill in the Art ......................................................... 4

    B.   Legal Standard for Claim Construction ................................................... 4

    C.   Legal Standard for Patentability .............................................................. 8

    D.   Legal Standard for Prior Art.................................................................... 8

    E.   Legal Standard for Anticipation .............................................................. 9

    F.   Legal Standard for Obviousness .............................................................. 9

    G.   Legal Standard for Written Description and Enablement ...................... 13

    H.   Legal Standard for Indefiniteness .......................................................... 13

    I.   Legal Standard for Priority Date ............................................................ 14

    J.   Incorporation By Reference ................................................................... 15

IV.     TECHNOLOGY BACKGROUND .................................................................. 15

    A.   Portable Touchscreen Devices .............................................................. 16

        1.   Virtual Keyboards In The Art .................................................... 18

        2.   Other Text Entry Methods In The Art........................................ 21

        3.   The Text Entry Methods In The Art Were Not Limited to English ........... 22

    B.   User Interface Design............................................................................. 22

    C.   Text Replacement In The Prior Art........................................................ 25

        1.   Spell Checking in Word Processors ........................................... 25

        2.   12-Key Text Input ...................................................................... 27

        3.   U.S. Patent No. 5,818,437 ("Grover") ...................................... 28

        4.   U.S. Patent No. 6,011,554 ("King '554") ................................. 30

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

5. U.S. Patent No. 6,307,548 ("Flinchem").................................................... 30

6. U.S. Patent Nos. 6,801,190 ("the '190 patent"), 7,088,345 ("the '345 patent"), 7,277,088 ("the '088 patent"), 7,880,730 ("Robinson") ................................................................................. 31

7. U.S. Patent Nos. 7,030,863 ("Longe '863"), 7,920,132 ("Longe '132"), U.S. Patent App. Publ'n No. 2006/0274051 ("Longe '051") ................................................................................. 37

8. U.S. Patent No. 6,822,585 ("Ni")....................................................... 38

9. U.S. Patent No. 7,119,794 ("Kong")................................................... 38

10. U.S. Patent No. 8,136,050 ("Sacher").............................................. 39

11. U.S. Patent App. Publ'n Nos. 2004/0140956 ("Kushler '956") and 2007/0040813 ("Kushler '813")................................................ 40

12. U.S. Patent App. Publ'n No. 2006/0206815 ("Pathiyal")..................... 41

D. Text Completion In The Prior Art ................................................................ 42

1. POBox ................................................................................................ 42

2. U.S. Patent App. Publ'n No. 2006/0265648 ("Rainisto")..................... 44

3. U.S. Patent App. Publ'n No. 2007/0061753 ("Ng") and Int'l Patent Publ'n No. WO 2005/008899 A1 ("Xrgomics")................................. 46

4. TextPlus ............................................................................................. 50

E. Text Expansion In The Prior Art ................................................................ 55

1. Instant Text Mobile ........................................................................... 55

F. Handwriting and Voice Recognition Correction In The Prior Art.................... 56

1. U.S. Patent No. 5,964,640 ("Capps")................................................. 57

2. U.S. Patent App. Publ'n No. 2005/0192802 ("Robinson '802") ............... 57

3. U.S. Patent App. Publ'n No. 2006/0149551 ("Ganong") ..................... 58

4. U.S. Patent App. Publ'n No. 2006/0269138 ("Williamson '138") and U.S. Patent No. 7,130,798 ("Williamson '786").................... 60

V. THE '172 PATENT ............................................................................................. 60

A. '172 Patent Generally ...................................................................................... 60

B. Asserted Claim ................................................................................................. 67

C. Other Claims .................................................................................................... 67

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

D.    File History ....................................................................................... 69

    1.    March 30, 2010 Office Action ................................................. 70

    2.    August 30, 2010 Response ...................................................... 70

    3.    November 29, 2010 Final Office Action .................................. 70

    4.    January 31, 2011 Request for Reconsideration ........................ 71

    5.    February 18, 2011 Office Action ............................................. 71

    6.    July 18, 2011 Amendment ...................................................... 72

    7.    October 24, 2011 Notice of Allowance ................................... 73

E.    Priority Date ...................................................................................... 73

VI.    SUMMARY OF OPINIONS ........................................................................ 79

VII.    CLAIM CONSTRUCTION .......................................................................... 79

A.    Plain and Ordinary Meaning of Terms Not Construed ......................... 80

    1.    "Portable Electronic Device With A Touch Screen And A Keyboard" .............................................................................. 80

VIII.    ANTICIPATION OF CLAIM 18 OF THE '172 PATENT ........................... 82

A.    U.S. Patent No. 7,880,730 ("Robinson") ........................................... 82

    1.    Claim 18 .................................................................................. 88

IX.    OBVIOUSNESS OF CLAIM 18 OF THE '172 PATENT ........................... 97

A.    Scope and Content of The Prior Art (First *Graham* Factor) ................... 99

    1.    U.S. Patent No. 5,953,541 ("King") ...................................... 99

    2.    U.S. Patent No. 7,880,730 ("Robinson") ............................... 103

    3.    Int'l Patent Publ'n No. WO 2005/008899 A1 ("Xrgomics")................... 108

    4.    Toshiyuki Masui, *POBox: An Efficient Text Input Method for Handheld and Ubiquitous Computers*, Proc. of the Int'l Symp. on Handheld and Ubiquitous Computing 289 (1999) ("POBox") ................. 112

    5.    TextPlus .................................................................................. 114

    6.    Text Replacement In The Prior Art .......................................... 120

    7.    Text Completion In The Prior Art ............................................ 133

    8.    Text Expansion In The Prior Art .............................................. 137

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

9.      Handwriting and Voice Recognition Correction In The Prior Art............ 139

10.     Because the Combinations of the Asserted Claim Limitations are
        Obvious and Do Not Yield Unpredictable Results, the References
        Discussed Above Render the Asserted Claim Obvious in
        Combination with the Knowledge of a Person of Ordinary Skill in
        the Art.................................................................................................... 143

11.     The Combination of Elements in the '172 Patent is Predictable.............. 148

12.     The Combination of Elements in the '172 Patent Does Not Yield
        Any Unpredictable or Unexpected Results ................................................ 149

13.     A Person of Ordinary Skill in the Art Would Have Been Motivated
        to Pursue the Claimed Combinations Through Trends and Market
        Forces ...................................................................................................... 150

B.      Limitation-By-Limitation Analysis of Claim 18 of the '172 Patent Including
        Differences, if Any (Second *Graham* Factor)........................................ 151

1.      U.S. Patent No. 7,880,730 ("Robinson") Renders Claim 18 of the
        '172 Patent Invalid As Obvious .............................................................. 152

2.      U.S. Patent No. 5,953,541 ("King") Renders Claim 18 of the '172
        Patent Invalid As Obvious....................................................................... 154

3.      The Combination of Robinson with Xrgomics Renders Claim 18 of
        the '172 Patent Invalid as Obvious ......................................................... 175

4.      The Combination of Robinson with POBox Renders Claim 18 of the
        '172 Patent Invalid as Obvious ............................................................... 182

5.      The Combination of Robinson with TextPlus Renders Claim 18 of
        the '172 Patent Invalid as Obvious ......................................................... 187

6.      The Combination of King with Xrgomics Renders Claim 18 of the
        '172 Patent Invalid as Obvious ............................................................... 192

C.      Level of Ordinary Skill in the Pertinent Art (Third *Graham* Factor).................. 198

D.      Secondary Considerations Support A Finding Of Obviousness (Fourth
        *Graham* Factor)..................................................................................... 199

1.      No Commercial Success of the Claimed Subject Matter ......................... 200

2.      No Praise and Acclaim for the Claimed Subject Matter .......................... 200

3.      No Skepticism Concerning the Claimed Subject Matter .......................... 200

4.      No Copying .............................................................................................. 201

5.      Numerous Non-Infringing Alternatives Were and Are Readily
        Available ................................................................................................. 202

6.      No Teaching Away from the Claimed Subject Matter.............................. 202

7.   No Long Felt Need for the Claimed Subject Matter ................................. 203

X.   Other comments ............................................................................................. 203

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

## LIST OF REPORT APPENDICES AND EXHIBITS

| Number | Description |
|---|---|
| Appendix 1 | List of materials considered |
| Appendix 2 | Curriculum Vitae of Daniel Wigdor, Ph.D. |
| Exhibit 1 | Invalidity Claim Chart for Robinson |
| Exhibit 2 | Invalidity Claim Chart for King |
| Exhibit 3 | Invalidity Claim Chart for Robinson in combination with Xrgomics |
| Exhibit 4 | Invalidity Claim Chart for Robinson in combination with POBox |
| Exhibit 5 | Invalidity Claim Chart for Robinson in combination with TextPlus |
| Exhibit 6 | Invalidity Claim Chart for King in combination with Xrgomics |
| Exhibit 7 | Video #1 of D. Wigdor Operating a Handspring Treo 90 running TextPlus 5.7 |
| Exhibit 8 | Video #2 of D. Wigdor Operating a Handspring Treo 90 running TextPlus 5.7 |

HIGHLIGHT CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

292.    I have applied these principles, as well as the other legal understandings set out in this Report, in reaching my opinions regarding obviousness for these stand-alone references. My opinions are set forth as a narrative below and are further supported by the claim charts attached to this report as Exhibits 1-6.[8]

A.    **Scope and Content of The Prior Art (First *Graham* Factor)**

293.    The first *Graham* factor, "the scope and content of the prior art," demonstrates that claim 18 of the '172 patent is obvious. As set forth in detail below, each limitation of claim 18 of the '172 patent is disclosed by the following stand-alone references:

- U.S. Patent No. 7,880,730 ("Robinson"); and
- U.S. Patent No. 5,953,541 ("King").

294.    As further set forth in detail below, each limitation of claim 18 of the '172 patent is rendered invalid as obvious by:

- the combination of Robinson and Xrgomics;
- the combination of Robinson and POBox;
- the combination of Robinson and TextPlus; and
- the combination of King and Xrgomics.

295.    I first address the scope and content of the specific prior art references I rely on for my limitation-by-limitation analysis. I then provide a more general overview of the scope and content of the prior art at the time of the alleged invention.

1.    **U.S. Patent No. 5,953,541 ("King")**

296.    U.S. Patent No. 5,953,541 ("King") is entitled "Disambiguating System For Disambiguating Ambiguous Input Sequences By Displaying Objects Associated With The Generated Input Sequences In The Order of Decreasing Frequency Of Use." SAMNDCA630-

---

[8]    The invalidity claim charts attached hereto as Exhibit 1-6 set forth excerpts from the prior art that renders obvious the asserted claim[s]. The claim charts generally provide detailed excerpts from the art itself, and the claim charts are not intended to limit or supplant in any way the analysis contained in this report.  Rather, the charts and report together comprise my opinion.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

00095072. The named inventors are Martin T. King, Dale L. Grover, Clifford A. Kushler and Cheryl A. Grunbock. The patent is assigned to Tegic Communications, Inc. King was filed January 24, 1997, and issued September 14, 1999. Because King issued before the alleged invention of the '172 patent, I understand that King is prior art to the '172 patent's asserted claim.

297.    The King specification describes "Portable computer 52 contains a reduced keyboard 54 implemented on a touchscreen display 53." *See* King at 8:48-49.

298.    The King specification defines "keyboard" as "includ[ing] any input device having defined areas including a touch screen having defined areas for keys, discrete mechanical keys, etc." *See* King at 8:49-53.

299.    The King specification describes that "As a user enters a keystroke sequence using the keyboard, text is displayed on the computer display 53. Two regions are defined on the display to display information to the user. An upper text region 66 displays the text entered by the user and serves as a buffer for text input and editing. A selection list region 70, located below the text region, provides a list of words and other interpretations corresponding to the keystroke sequence entered by the user. At the right-hand end of the selection list region 70, a special region 72 is designated for displaying the unambiguous spelling interpretation of the current keystroke sequence." *See* King at 9:12-23.

300.    The King specification goes on to describe that "Since individual keys have multiple meanings, keystroke sequences are ambiguous as to their meaning. As the user enters data, the various keystroke interpretations are therefore displayed in multiple regions on the display to aid the user in resolving any ambiguity. A selection list 76 of possible interpretations of the entered keystrokes is provided to the user in the selection list region 70." *See* King at 9:56-63.

301.    The King specification further describes that "The first entry 78 in the selection list is selected as a default interpretation and displayed in the text region 66 at an insertion point 88." *See* King at 9:63-65.

302.    The King specification further describes that "As keys are entered, a vocabulary module look-up is simultaneously performed to locate words that have matching keystroke sequences. The words identified from the vocabulary module are displayed to the user in selection

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

list 76. The words are sorted according to frequency of use, with the most commonly used words listed first." *See* King at 10:15-21.

303.   An illustration of a portable computer with keyboard, touch screen display, selection list and text display region is shown in Figure 1A of Robinson:



304.   The King specification describes that "each sequence of keystrokes on the data keys 56 is also simultaneously interpreted as unambiguously specifying a string of alphabetic characters using the direct-pointing specification method. The data keys 56 contain up to three letters that are arranged in a row on the top of each key. Each letter is located in a different region on the key. For each keystroke on one of the data keys 56, the direct-pointing specification method interprets each keystroke as unambiguously specifying the particular letter closest to the exact point in the touchscreen key where the stylus or fingertip was lifted from the key." *See* King at 12:5-14.

305.   The King specification elaborates, describing "The example shown in FIG. 1A is based on the assumption that each key was tapped near its center, resulting in the direct-pointing

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

interpretation 'bhe' (the character string formed by the characters in the centers of the three keys ABC GHI DEF) being displayed as entry 83 in region 72 of the selection list region 70." *See* King at 12:20-26.

306.    The King specification then describes "unambiguous keys are grouped into sets of adjacent keys, with each group representing a larger key which is possibly ambiguous by virtue of including more than one underlying key. The result is two keyboards, comprised of an ambiguous keyboard overlaid on an unambiguous keyboard, on which each keystroke may be simultaneously interpreted as a keystroke on one of the overlaid keys, and as an unambiguous keystroke on one of the underlying keys. In an alternate embodiment, a special key may be provided to toggle between a keyboard layout based on a set of ambiguous data keys, and an alternate keyboard which consists of a larger number of unambiguous data keys, each of which is proportionately smaller and contains only a single letter." *See* King at 5:51-64.

307.    The King specification describes "Alternatively, following entry of the keystroke sequence corresponding to the desired word, the user may select the desired word from the selection list simply by touching it." King at 11:20-23.

308.    The King specification also provides an example, describing "In FIG. 5J, the user has noticed that the intended word 'aid' does not appear, and has selected the word 'age' for editing by double-tapping it. Since the word 'age' has been explicitly selected, it appears in a dotted-line box both in the selection list and in the text area." King at 28:25-30.

309.    The King specification continues this example, describing "FIG. 5K shows the result of the user tapping 'aid' which appears in the selection list in FIG. 5J. The boxed word 'age' in the text output area is immediately replaced with the selected word 'aid', which is displayed as normal text in the output area with no special boxing or formatting." King at 28:38-43.

310.    The King specification also describes "whenever the system is in a mode such as this explicit Numeric mode in which a keystroke on one of the data keys 56 results in the selection of an unambiguous character which is to be output to the text area, any object in the selection list which is implicitly or explicitly selected at the time of the keystroke is first output to the text area at the insertion point 88." King at 12:60-67.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172**

311.    The King specification goes on to describe "Choosing a character from Symbols mode generates an explicit and unambiguous character. Generating such a character has the effect of implicitly accepting the current provisionally accepted text for output at the insertion point." King at 22:30-33.

## 2.    U.S. Patent No. 7,880,730 ("Robinson")

312.    U.S. Patent No. 7,880,730 ("Robinson") is entitled "Keyboard System With Automatic Correction." SAMNDCA630-00942638. The named inventors are B. Alex Robinson, Michael R. Longe, David Jon Kay and Gordon Robert Waddell. The patent is assigned to Tegic Communications, Inc. Robinson was filed September 11, 2007, and issued February 1, 2011. Robinson is a continuation of application No. 11/090,464, filed on March 25, 2005, which issued as U.S. Patent No. 7,277,088, which is a division of application No. 10/775,483, filed on February 9, 2004, which issued as U.S. Patent No. 7,088,345, which is itself a continuation of application No. 09/580,319, filed on May 26, 2000, which issued as U.S. Patent No. 6,801,190. Based on the filing dates of the '088, '345 and '190 patents to which the Robinson claims priority, all of which pre-date the filing date and alleged conception date of the '172 patent, I understand that the Robinson is prior art to the '172 patent's asserted claim.

313.    The Robinson specification describes "a reduced auto-correcting keyboard system 100 formed in accordance with the present invention is depicted incorporated in a palmtop portable computer 102. Portable computer 102 contains a reduced keyboard 105 implemented on a touch screen display 103, which is used to generate text to be output to text display region 104." *See* Robinson at 14:53-58.

314.    The Robinson specification defines "keyboard" to include "any input device having defined areas including, but not limited to, a touch sensitive screen having a defined area containing a plurality of defined locations associated with characters, a touch sensitive screen having defined areas for keys, discrete mechanical keys, or membrane keys." *See* Robinson at 13:23-29.

315.    An illustration of a portable computer with keyboard, touch screen display, and text display region is shown in Figure 1A of Robinson:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172



**FIG. 1A**

316.    The Robinson specification further describes use with various touch screen input methods. The Robinson specification describes tap events and stroke events which can be used on a touch screen display. *See, e.g., id.* 21:62 – 22:9. These stroke events "can then be processed by using a stroke recognition system using techniques that are well known in the art." *See, e.g., id.* at 22:9-11.

317.    The Robinson specification describes "As a user enters a keystroke sequence using the keyboard, text is displayed on the computer display 103. Two overlapping regions are defined on the display each of which display information to the user. An upper output text region 104 displays the text entered by the user and serves as a buffer for text input and editing. A word choice list region 150, which in a preferred embodiment shown in FIG. 1B is super-imposed on top of the text region 104, provides a list of words and other interpretations corresponding to the keystroke sequence entered by a user." *See* Robinson at 15:59-66.

318.    The Robinson specification continues by discussing "The Default word 160 ('text' in the example of FIG. 1B) is the word from the vocabulary modules determined to have the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

lowest value of the matching metric (that is, the more likely the word corresponds to the user's intention), and in a preferred embodiment, is shown at the bottom of the word choice list, nearest to the auto-correcting keyboard region 106." *See* Robinson at 18:12-18.

319.   The Robinson specification further describes "[A] word is constructed by identifying the character nearest each contact point and composing a word consisting of the sequence of identified characters. This 'Exact Type' word is then presented as a word choice in the word selection list." *See* Robinson at 17:48-52.

320.   An illustration of the two overlapping regions is shown in Figure 1B of Robinson:



*FIG. 1B*

321.   The Robinson specification describes "The space key is outside of the auto-correcting keyboard region 106, and thus can be unambiguously associated with a specific function. The space key acts to accept the default word 'text' 541 and enters the word 'text' 542 in the text output region 104 at the insertion point 107 in the text being generated where the cursor was last positioned." *See* Robinson at 33:10-16.

322.   The Robinson specification also describes "This word may then be selected in the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

1    usual manner by, for example, touching it in the word selection list." Robinson at 17:52-54.

2         323.    The Robinson specification additionally describes "When no current input sequence

3    exists, a contact on the Edit Word key 114 causes the system to establish a current input sequence

4    consisting of the coordinate locations associated with the letters of the word that contains the

5    insertion point cursor 107 or is immediately to the left of this cursor in the output text region 104.

6    The result is that this word is 'pulled in' to the system creating a word choice list in which the word

7    appears both as the Default word 160 and the Exact Type word 154." *See* Robinson at 18:48-56.

8         324.    Robinson describes certain embodiments in which the highest ranked candidate

9    object is presented at the text insertion point:

10             Preferably, the selection component identifies the highest ranked
               candidate object and presents the identified object at the text
11             insertion point in the text display area on the output device.

12   *Id.* at 7:35-38.

13        325.    The Robinson specification describes several components which together comprise

14   a processor coupled to a user input device. *See, e.g., id.* at 3::44-67. The first of these components,

15   the distance value component, "calculates a set of distance values between the contact locations

16   and the known coordinate locations corresponding to one or a plurality of characters within the

17   auto-correcting keyboard region" for each "determined contact location in the input sequence of

18   contacts." *See, e.g., id.* at 3:46-52. The second, the word evaluation component, "identifies one or

19   a plurality of candidate objects in memory, and for each of the one or a plurality of identified

20   candidate objects, evaluates each identified candidate object by calculating a matching metric

21   based on the calculated distance values and the frequency of use associated with the object, and

22   ranks the evaluated candidate objects based on the calculated matching metric values." *See, e.g.,*

23   *id.* at 3:53-61. The third, the selection component, "identif[ies] one or a plurality of candidate

24   objects according to their evaluated ranking" and "present[s] the identified objects to the user,

25   enabling the user to select one of the presented objects for output to the text display area on the out

26   device." *See, e.g., id.* at 3:62-67.

27        326.    Robinson provides further description in its claims:

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

6. A text entry system, comprising:

(a) a user input device comprising an auto-correcting keyboard region comprising a plurality of the characters of a character set, wherein locations having known coordinates in the auto-correcting keyboard region are associated with corresponding character set members, wherein user interaction with the user input device within the auto-correcting keyboard region determines a location associated with the user interaction and wherein the determined interaction location is added to a current input sequence of contact locations;

(b) a memory containing a plurality of objects, wherein each object comprises a string of one or more character set members;

(c) an output device with a text display area; and

(d) a processor coupled to the user input device, memory, and output device, said processor comprising:

(i) a distance value calculation component which, for each determined interaction location in the input sequence of interactions, calculates a set of distance values between the interaction locations and the known coordinate locations corresponding to one or more character set members within the auto-correcting keyboard region;

(ii) an object evaluation component which, for a generated input sequence, evaluates at least one candidate object in memory by calculating a matching metric based on the calculated distance values for the object; and ranks the evaluated candidate objects based on the calculated matching metric values; and

(iii) a selection component which presents said at least one candidate object to the user according to its ranking, and enables the user to select among presented objects for output to the text display area on the output device.

11. The system of claim 6, wherein the object evaluation component determines, for each determined interaction location in each input sequence of interaction locations, the closest known location corresponding to a character set member, and constructs an exact typing object composed of said determined corresponding character set members in the order corresponding to the input sequence of interaction locations.

12. The system of claim 11, wherein the selection component presents said exact typing object at the text insertion point in the text display area on the output device.

Robinson at 35:9-43; 36:1-7; 36:8-10. These claims disclose that a processor in a user input device has three components: a distance value calculation component, an object evaluation component, and a selection component. *Id.* at 35:9-43. Robinson discloses that the distance value calculation component "calculates a set of distance values" between each interaction point and known key locations in an input device; the object valuation component then calculates a matching metric based on the calculated distance values to generate a list of candidate objects for an input

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

sequence; and the selection component then presents those candidate objects to the user and enables selection. *Id.* Robinson also discloses that the object evaluation component also constructs a representation of what the user actually typed called an exact typing object which is composed of the closest character location on the input device for each input in an input sequence. *Id.* at 36:1-7. This exact typing object is displayed in the text display area by the selection component. *Id.* at 36:8-10.

### 3.  Int'l Patent Publ'n No. WO 2005/008899 A1 ("Xrgomics")

327.   International Patent Publication No. WO 2005/008899 A1 ("Xrgomics") is entitled "Letter and Word Choice Text Input Method for Keyboards and Reduced Keyboard Systems." SAMNDCA630-06405638. The Xrgomics reference was published on January 27, 2005 from international application No. PCT/SG2004/000190 filed on June 30, 2004. Xrgomics was published more than one year before the filing date of the '172 patent. It is my understanding that Xrgomics is therefore prior art to the '172 patent.

328.   The Xrgomics specification describes a method for entering text by providing letter or word choices. *See* Xrgomics at Abstract. The Xrgomics specification describes that the Xrgomics input system "can be used to enhance any existing text input system, even reduced keyboard systems." *See id.*

329.   The Xrgomics specification describes a device for providing word choices:

> An application for the invention would be for small, medium devices like mobile devices, PDAs, handhelds, Pocket PCs, mobile phones, tablet PCs or even virtual keyboards or any devices that uses screen-based or pen-based inputting. FIG. 1 shows how an on-screen implementation of a choice window 14 with word choices 16 could look like on a handheld device 10 with a virtual keyboard 12. FIG. 1 a shows how an on-screen implementation of a choice window 56 could look like with word choices 58 on a display 50, that can be either a normal display or touch screen display. The display 50 is used in conjunction with a normal keyboard 54. The keyboard 54 is usually linked to a computing processor 52 and the display 50, to which the text inputting appears, is on a separate screen 50 which is linked to the same computing processor 52.

*Id.* at 14-15. This user interface is depicted in Figure 1 of Xrgomics:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

330.    The Xrgomics specification describes this interface in further detail: "There are several mechanisms in our invention to make choice method more effective by enhancing the efficiency of choice selection. When a user keys in text as per normal, the text will appear on the display together with any choice that is appropriate (e.g. letter choice, word choice or both)." *Id.* at 24.

331.    The Xrgomics specification further describes another word choice user interface: "FIG. 5 shows how letter choice and word choice with a predetermined window or display area of two rows could look like on a touch screen or screen input surface in accordance with an embodiment of the invention." *Id.* at 11. This is depicted in Figure 5:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

1
2
3
4
5
6
7
8
9
10
11
12
13



14   332.   The Xrgomics specification goes on to describe Figure 5 in additional detail:

15   FIG. 5 shows how letter choice 256 and word choice 254 with a
16   predetermined window or display area of two rows could look like
      on a touch screen or screen input surface of a handheld device 250
17   that consist of a virtual keyboard 252. Scroll button 260 enables
      user to see more choices if they are not all able to fit into the one
18   row while the current text inputted 262 is shown in the
      predetermined window as well so as to minimise the amount of
19   look-up 258 a user needs to do to monitor/track his text entry.
20         These simple basic elements of the choice window to
      efficiently present letter and word choice and the current inputted
21   text, occupies little space and yet can be applied to virtually all text
      input systems and devices. By offering the current inputted text to
22   be displayed near the input keys and choices allows the user to
      concentrate on only one part of the screen (one focus of attention)
23   to input text thus making text entry easier and more efficient. Also,
      the scroll button allows for more choices to be displayed that can
24   normally be fitted into the limited space of the choice window.

25   *Id.* at 25.

26   333.   The Xrgomics specification also describes a user interface for a reduced keyboard:

27   "FIG. 6 shows how an on-screen reduced keyboard system with letter or word choice could look

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

like on a touch screen or screen input surface in accordance with an embodiment of the invention."

*Id* at 11. This is depicted in Figure 6 of Xrgomics:



334.    The Xrgomics specification goes on to describe Figure 6 in additional detail:

> FIG. 6 shows how the multi-character keys 352 of the TenGO™ reduced keyboard 358 with letter choice 356 shown in a predetermined window 354 could look like on a touch screen or screen input interface of a handheld device 350.
>         Every reduced keyboard system will have its own method of unambiguous text entry to enter text that is not present in the disambiguating word library or to enter individual characters. Examples of the more conventional unambiguous text input methods of multi-tap, two-keystroke or multiple-stroke interpretation, and scribing are described in U.S. Pat. No. 6,011,554 and 6,307,549 and Singapore patent application 200300895-0 for reduced keyboard systems. When a character is unambiguously entered using such methods for a reduced keyboard system, the letter choice method can be used to provide letter choices of accented, diacritic or special variants of the inputted character. This makes keying-in of accented characters much simpler for reduced keyboard system.

*Id.* at 27-28. The Xrgomics specification describes "[e]very reduced keyboard will have its own

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

method of unambiguous text entry to enter text not present in the disambiguating word library or to enter individual characters." *Id.* at 27. The Xrgomics specification identifies the reduced keyboard systems described in U.S. Patent Nos. 5,818,437, 5,945,928, 5,953,541, 6,011,554, 6,286,064 and 6,307,549, which it incorporates by reference. *Id.* at 2, 27.

335. The Xrgomics specification also describes use with a conventional keyboard:

> One of the easiest and most powerful selection tools is the use of a screen input interface for choice selection. This allows direct selection of the choice. Using a screen input interface for selection is not new and has been used in solutions like WordLogic and Microsoft® virtual keyboard. Selection on a screen input interface is used by default because the virtual keyboard itself is on a screen input interface. In our invention, we can use the screen input interface for choice selection even for keyboards or input systems that do not reside on the screen input interface. This we term as a hybrid text input system as shown in FIG. 1a where a conventional keyboard 54 is used in concert with a screen input interface 50 for choice selection and also in FIG. 7 with hard-keys 426 and screen input choices 422 and 424.

*Id.* at 26.

336. The Xrgomics specification describes "[b]y selecting the choice, either the letter last inputted is replaced by the choice (i.e. if a letter choice was selected) or the entire text inputted is replaced by the choice (i.e. if a word choice was selected) (**selection**). If after selection, a different choice is selected (e.g. a wrong selection was made), the new choice will replace the previous choice (**correction**)." *Id.* at 24 (emphasis in original). The Xrgomics specification describes that selection using the screen input interface, the touch screen, can be used with a reduced keyboard system as well. *Id.* at 29.

### 4. Toshiyuki Masui, *POBox: An Efficient Text Input Method for Handheld and Ubiquitous Computers*, Proc. of the Int'l Symp. on Handheld and Ubiquitous Computing 289 (1999) ("POBox")

337. *POBox: An Efficient Text Input Method for Handheld and Ubiquitous Computers* is a paper by Toshiyuki Masui published in the Proceedings of the International Symposium on Handheld and Ubiquitous Computing at page 289 and in volume 1707 of Lecture Notes in Computer Science in 1999 ("POBox"). SAMNDCA630-00094800. This paper was written in 1999, and was presented in Germany by its sole author, Toshiyuki Masui. Deposition of Toshiyuki

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

disclosed by claim 18 of the '172 patent. At best, that claim is directed to an implementation of a particular graphical user interface for providing alternatives during text input. Each of the prior art references described in detail herein and comprising the explicit combinations described below satisfies those alleged points of novelty.

425.    Indeed, the only differences, albeit trivial, between those prior art references and claim 18 of the '172 patent is the location(s) on the display screen that the text entered by the user is displayed, the location(s) on the display screen that alternatives to the entered text is displayed, and the manner in which those alternatives are chosen for insertion into the text entry area. But as set forth herein, those references each disclose similar principles for implementing a graphical user interface for providing alternatives during text input, and combining that information with the knowledge of a person of ordinary skill in the art at the time of the alleged invention would have rendered claim 18 obvious.

## 1.    U.S. Patent No. 7,880,730 ("Robinson") Renders Claim 18 of the '172 Patent Invalid As Obvious

426.    I incorporate by reference my discussion of the Robinson reference in the anticipation section (*See* paragraphs 248-286).

427.    As set forth above, it is my opinion that the Robinson reference anticipates claim 18 of the '172 patent. I would also opine, in the alternative, that to the extent any such limitations of claim 18 are found not to be explicitly or inherently disclosed, then such limitation(s) would have been obvious to a person of ordinary skill in the art at the time of the alleged invention based on the Robinson reference and the disclosures in the '172 patent.

> *a first area of the touch screen display that displays a current character string being input by a user with the keyboard; and*
>
> *the current character string in the first area is replaced with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;*
>
> *the current character string in the first area is replaced with the suggested replacement character*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

*string if the user performs a gesture on the suggested replacement character string in the second area; and*

*the current character string in the first area is kept if the user performs a gesture in the second area on the current character string or the portion thereof displayed in the second area.*

428.    To the extent that one argues that Robinson does not disclose displaying the Exact Typing word in the upper output text region while a user is entering that text with a keyboard, it would have been obvious to a person of ordinary skill in the art to use the system disclosed by the Robinson reference to display the Exact Typing object in the upper output text region in addition to the word choice list region as the user is entering text with the keyboard. For example, a person of ordinary skill in the art could use the upper output text region, which is a buffer for text input, to display the Exact Typing object as it is being entered with a keyboard. This change would provide additional feedback to the user about the entire contents of the upper output text region and allow them to shift their eyes to the word choice list only when the Exact Typing object did not match their intended word.

429.    Additionally, Robinson describes an editing functionality that allows a user to edit previously entered words in an input stream. *See, e.g.,* Robinson at 18:48-56. Robinson describes the user placing a cursor on, or to the right of a word in the text entry area and pressing an "Edit Word" key. *See, e.g., id.* This causes the system to establish an input sequence consisting of the word indicated by the cursor, creating a word choice list in which that word appears as both the Default and Exact Type word. *See, e.g., id.* To the extent that one argues that Robinson does not disclose displaying current character string – the Exact Typing word – in the upper output text region while the user is entering text with a keyboard, it would have been obvious to a person of ordinary skill in the art to use the Edit Word functionality described in Robinson to implement a word choice list where the Exact Typing word is present in both the upper output text region and the word choice list, given that this would already be the case when editing. Such a change would have been obvious to a person of ordinary skill in the art.

430.    Further, in the prosecution history of the '172 patent, the Examiner rejected some

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

of the claims of the '172 patent as anticipated by Longe '051. *See, e.g.,* APLNDC630-0000053991. As described above, Longe '051 is "related to" the same '190 patent as the Robinson reference. Specifically, Longe '051 is a continuation-in-part of the application which issued as Longe '863, which is itself a continuation-in-part of the '190 patent. Similarly, Robinson is a continuation of the application which issued as the '088 patent, which is itself a division of the application which issued as the '345 patent, which is itself a continuation of the application which issued '190 patent. Thus, both Longe '051 and Robinson derive from the same source: the '190 patent. While the claims of these two references differ, the specifications of each provide the same teachings to a person of ordinary skill in the art. The Examiner stated that Longe '051 discloses that "[t]he current character string is displayed twice; the full character string is displayed behind the word choice list ... and also in the word choice list." *Id.* at APLNDC630-0000053994. The Examiner's understanding of the disclosure of Longe '051, and therefore in this regard the Robinson reference, is consistent with my opinion of the disclosure of the Robinson reference. To the extent that one argues that the Robinson reference does not disclose displaying the current character string – the Exact Typing word – in the upper output text region when the user is entering text with a keyboard, the Examiner's statements in the file history regarding Longe '051 support my opinion that it would have been obvious to a person of ordinary skill in the art. The Examiner's understanding of Longe '051 supports my conclusion that a person of ordinary skill in the art would understand Robinson, at a minimum, implicitly discloses a current character string in a first area.

> ### 2.   U.S. Patent No. 5,953,541 ("King") Renders Claim 18 of the '172 Patent Invalid As Obvious

431.   I understand that Apple alleges that a person of ordinary skill in the art would conclude that King teaches away from the alleged invention disclosed in claim 18 of the '172 patent.   Apple's Supplemental Responses to Samsung's Interrogatories (Nos. 1, 5, 7, 8, 10, 14, 15, 25, 26, 27, 39, and 41) at 178 ("Further, a person of ordinary skill in the art would conclude that King teaches away from the invention disclosed in claim 18."). For the reasons discussed below, in my opinion Apple is incorrect. Indeed, in my opinion a person of ordinary skill in the art

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

would conclude that, rather than teaching away, King renders the asserted claim of the '172 patent invalid as obvious.

432.     I understand that when evaluating whether a prior art references teaches away, the nature of the teaching is highly relevant and must be weighed in substance. Furthermore, I understand that a prior art reference's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives where such disclosure does not criticize, discredit, or otherwise discourage the solution claimed.

433.     In my opinion, King does not teach away from claim 18 of the '172 patent.   As explained in more detail below, King teaches displaying a default interpretation in a text area. *See, e.g.,* King at 9:63-65. This default interpretation is either kept or replaced depending on whether a user presses a delimiter, *see, e.g., id.* at 22:30-33, or selects a word from a selection list, *see, e.g., id.* at 28:38-43. King discloses that the selection list includes a direct pointing interpretation, which is an interpretation of a user's actual keystrokes on the touchscreen. *See, e.g., id.* at 12:5-14; 12:20-26. In other words, King discloses a system in which the interpretation of the user's actual keystrokes is presented in a selection list along with other suggested replacements, and the most likely of those replacements is displayed in the text being entered, where it is accepted if the user presses a delimiter or replaced if the user makes a choice from the selections list.   This is not a system which is in "direct opposition to claim 18 of the '172 patent" as Apple claims. *See* Apple's Supplemental Responses to Samsung's Interrogatories (Nos. 1, 5, 7, 8, 10, 14, 15, 25, 26, 27, 39, and 41) at 178. Indeed, the end result if the user performs one of the actions claimed in claim 18 of the '172 patent (activating a key on a keyboard associated with a delimiter, performing a gesture on a current character string in a second area, performing a gesture on a replacement character string in a second area), is the same in both King and the '172 patent. In other words, King discloses, just as in claim 18 of the '172 patent, that if a user activates a key associated with a delimiter or selects a default interpretation from a second area, the default interpretation is displayed in the first area. Similarly, King discloses, just as in claim 18, that if a direct pointing interpretation from a second area, the direct pointing interpretation is displayed in the first area. Nowhere does King criticize, discredit, or otherwise discourage the approach claimed in the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

asserted claim of the '172 patent. *See generally* King. Instead, King discloses a text entry system which differs in only trivial ways from the alleged invention set forth in claim 18 of the '172 patent, as will be described in additional detail below. Accordingly, in my opinion King does not teach away from the asserted claim of the '172 patent.

434.    It is my opinion that to the extent any limitations of claim 18 are found not to be explicitly or inherently disclosed in King, then such limitation(s) would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of the '172 patent based on King and the disclosures of the '172 patent.

**(a)**    **King Discloses a Direct-Pointing Interpretation as the Current Character String**

*A graphical user interface on a portable electronic device with a keyboard and a touch screen display, comprising:*

435.    In my opinion, there is nothing new or non-obvious in this limitation and a person of ordinary skill in the art would have been aware of the use of keyboards and touch screens in a portable electronic device. More particularly, a person having ordinary skill in the art at the time of the alleged invention would have been aware of portable electronic devices, keyboards (both virtual and physical), and touch screen displays. Thus, at a minimum this claim limitation would have been obvious to a person of ordinary skill in the art at the time of the alleged invention.

436.    I understand that Apple disputes that King discloses this limitation of claim 18. Apple's Supplemental Objections and Responses to Samsung's Interrogatories (Nos. 1, 5, 7, 8, 10, 14, 15, 25, 26, 27, 39, and 41) at 177-178 ("King fails to disclose all of the limitations of claim 18."). For the reasons enumerated below, it is my opinion that Apple is incorrect.

437.    I understand that this element of claim 18 is called the "preamble." I also understand that the preamble of a patent claim may or may not be limiting depending on certain legal principles as well as the court's construction of the claim. I understand that the court determines whether or not the preamble is limiting. In any event, as set forth below, it is my opinion that King discloses the language set forth in the preamble.

438.    Under Apple's apparent interpretation of "a portable electronic device with a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

keyboard and a touch screen display", the reduced keyboard disambiguating system depicted in Figure 1A of King meets this limitation. In particular, King discloses a portable electronic device with a touch screen display, described as a portable computer. *See, e.g.,* King at 8:48-49. King also discloses a keyboard implemented on that touch screen. *See, e.g., id.* King therefore discloses a graphical user interface on a portable electronic device with a keyboard and a touch screen display. This is depicted in Figure 1A of King:



439.    Under Apple's apparent interpretation of "portable electronic device with a keyboard and a touch screen display" it is my opinion that King discloses this limitation of claim 18 of the '172 patent. *See, e.g., id.* at 8:48-49. Further, King discloses a separate keyboard with mechanical keys. *See, e.g., id.* at 8:49-53. Accordingly, it is my opinion that King discloses this limitation under its plain and ordinary meaning as well.

> *a first area of the touch screen display that displays a current character string being input by a user with the keyboard; and*

440.    In my opinion, there is nothing new or non-obvious in this limitation and a person of ordinary skill in the art would have been aware of the use of an area of a touch screen display for displaying a current character string being input by a user with a keyboard. More particularly, a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

person having ordinary skill in the art at the time of the alleged invention would have been aware of touch screen displays and regions or areas thereof, character strings composed of characters selected by a user from a keyboard (both virtual and physical), and displaying character strings in a defined area on a screen. Thus, at a minimum this claim limitation would have been obvious to a person of ordinary skill in the art at the time of the alleged invention.

441. I understand that Apple disputes that King discloses this limitation of claim 18. Apple's Supplemental Objections and Responses to Samsung's Interrogatories (Nos. 1, 5, 7, 8, 10, 14, 15, 25, 26, 27, 39, and 41) at 177-178 ("King fails to disclose all of the limitations of claim 18."). For the reasons enumerated below, it is my opinion that Apple is incorrect.

442. Under the direct-pointing interpretation, King discloses a first area of the touch screen display that displays not a current character string but a suggested replacement character string being input by a user with the keyboard. In particular, King discloses that an upper text region displays the text entered by the user. *See, e.g.,* King at 9:12-23. This region serves as a buffer for text input and editing. *See, e.g., id.* The upper text region is a first area of the touch screen display. As the user enters text, the keystroke interpretations are displayed in multiple areas of the display – including the upper text region – to help resolve ambiguity. *See, e.g., id.* at 9:56-63. The first entry in the selection list is selected as a default interpretation and is displayed in the text region. *See, e.g., id.* at 9:63-65. In Figure 1A, above, the default interpretation "age" is displayed in the text region. *See, e.g., id.* at Fig. 1A. The word "age" is merely one of the interpretations of the string entered by the user with the virtual keyboard, which is also interpreted as the actual key sequence "bhe". *See, e.g., id.* at 12:20-26. Accordingly, King discloses that a text entry area displays a replacement string that is being entered by a user with a keyboard. The first area (under the pointing interpretation) is depicted in Figure 1A (I have indicated the default interpretation in the text entry area in red on the figure):

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

1

2

3

4

5

6

7

8

9

10

11



12    443.    King also discloses displaying a current character string. In particular, King

13  discloses that an interpretation of a user's actual keystroke sequence is determined using a direct

14  pointing method. *See, e.g.,* King at 12:5-14. This direct pointing method interprets each key as

15  having up to three unambiguous portions. *See, e.g., id.* This actual key sequence interpretation is

16  displayed in the selection list along with other interpretations. *See, e.g., id.* at 12:20-26.   The

17  direct pointing interpretation is depicted in Figure 1A (I have indicated the current character string

18  under the direct-pointing interpretation in red on the figure):

19

20

21

22

23

24

25

26

27

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172



444.   To the extent that one argues that King does not disclose displaying a current character string in a first area of a touch screen display, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to rely on the disclosure in King to display the actual key sequence interpretation instead of the default interpretation in the text region prior to selection of one of the interpretations by any of the methods disclosed by King.

> a second area of the touch screen display separate
> from the first area that displays the current character
> string or a portion thereof and a suggested
> replacement character string for the current
> character string; wherein;

445.   In my opinion, there is nothing new or non-obvious in this limitation and a person of ordinary skill in the art would have been aware of the use of separate areas of a touch screen display, as well as an area for displaying a current character string and one or more replacement character strings. More particularly, a person having ordinary skill in the art at the time of the alleged invention would have been aware of touch screen displays and regions or areas thereof, character strings composed of characters selected by a user from a keyboard (both virtual and physical), using algorithms to develop lists of alternates to the entered character string, presenting lists of alternates on a screen in the form of a pop-up display, a list displayed along one edge of a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

text entry such as between the text entry area and a keyboard, or otherwise, and displaying character strings in a defined area on a screen. Thus, at a minimum this claim limitation would have been obvious to a person of ordinary skill in the art at the time of the alleged invention.

446.    I understand that Apple disputes that King discloses this limitation of claim 18. Apple's Supplemental Objections and Responses to Samsung's Interrogatories (Nos. 1, 5, 7, 8, 10, 14, 15, 25, 26, 27, 39, and 41) at 177-178 ("King fails to disclose all of the limitations of claim 18."). For the reasons enumerated below, it is my opinion that Apple is incorrect.

447.    King discloses a second area of the touch screen display separate from the first area that displays the current character string or a portion thereof and a suggested replacement character string for the current character string. In particular, King discloses a selection list that is displayed between a text region and a keyboard. *See* King at 9:17-23. The selection list described in King provides interpretations of the keystroke sequence entered by a user, sorted by frequency of use. *See, e.g., id.* at 10:15-21. One of the interpretations presented in the selection list is a direct pointing interpretation, displayed on the far right of the selection list. *See, e.g., id.* at 12:20-26. This direct pointing interpretation is an interpretation of the user's actual keystrokes on the touchscreen. *See, e.g., id.* at 12:5-14. King's selection list therefore includes both an actual key sequence interpretation as well as multiple alternatives, provided by a vocabulary module based on the ambiguous interpretation of a keystroke sequence. This actual key sequence interpretation is a current character string, and the other words presented in the selection list are suggested replacement character strings. The selection list is presented in a second area of the touch screen display, separate from the text region. The direct pointing interpretation and default interpretation are depicted in Figure 1A (I have indicated the direct pointing interpretation and default interpretation in the selection list in red on the figure):

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

448.   To the extent that one argues that King does not disclose displaying a current character string in a second area of a touch screen display, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to rely on the disclosure in King to compose an actual key sequence interpretation using an unambiguous text entry method and display that interpretation in the selection list.

> the current character string in the first area is
> replaced with the suggested replacement character
> string if the user activates a key on the keyboard
> associated with a delimiter;

449.   In my opinion, there is nothing new or non-obvious in this limitation and a person of ordinary skill in the art would have been aware of replacing a string with another string when a delimiter is pressed. More particularly, a person having ordinary skill in the art at the time of the alleged invention would have been aware of character strings composed of characters selected by a user from a keyboard (both virtual and physical), using algorithms to develop lists of alternates to the entered character string, and selecting one of those alternates when a user pressed a delimiter. Thus, at a minimum this claim limitation would have been obvious to a person of ordinary skill in the art at the time of the alleged invention.

450.   I understand that Apple disputes that King discloses this limitation of claim 18.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

Apple's Supplemental Objections and Responses to Samsung's Interrogatories (Nos. 1, 5, 7, 8, 10, 14, 15, 25, 26, 27, 39, and 41) at 177-178 ("King fails to disclose all of the limitations of claim 18."). For the reasons enumerated below, it is my opinion that Apple is incorrect.

451.    King discloses that the suggested replacement character string in the first area is accepted if the user activates a key on the keyboard associated with a delimiter. In particular, King describes a Symbols mode, which replaces the keys on the keyboard corresponding to alphabetical letters with other symbols. *See, e.g.,* King at 22:30-33. This Symbols mode is depicted in Figure 1D of King:



*Fig. 1D*

The keys displayed in the Symbols mode keyboard correspond to punctuation and a Space key, all of which are delimiters. *See, e.g., id.* at Fig. 1D. King discloses that selecting any one of the characters from the Symbols mode keyboard implicitly accepts the current text provisionally displayed at the insertion point for output. *See, e.g., id.* at 22:30-33. The text provisionally displayed is any object in the selection list which is implicitly or explicitly selected at the time of the Symbols mode key press. *See, e.g., id.* at 12:60-67; *see also* 9:63 – 10:4 ("The first entry 78 in the selection list is selected as a default interpretation and displayed in the text region 66 at an insertion point 88. In the preferred embodiment, this entry is displayed with a solid-line box drawn around it both in the selection list 76 and at the insertion point 88. The formatting establishes a visual relationship between the insertion point object and the selection list, and signifies that this

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

object is implicitly selected."). The text provisionally displayed is shown in Figure 1A (I have indicated the default interpretation in the text area in red on the figure):



452.    King also discloses that a user can select any of the other words in the selection list to cause the string displayed in the text region to be replaced. *See, e.g., id.* at 11:20-23. In particular, a user can select a desired word from the selection list by touching it. *See, e.g., id.* When a word is being edited, whether during text entry or by a user selecting a specific word for editing, that word is displayed in the text region and the selection list surrounded by a box. *See, e.g., id.* at 28:25-30. When a user selects any of the other words in the list, the word in the text region is immediately replaced with the selected word. *See, e.g., id.* at 28:38-43. King thus discloses replacement of the suggested replacement string displayed in the first area with an alternative replacement character string displayed in the second area if the user selects the alternative replacement character string with a gesture.

453.    To the extent that one argues that King does not disclose displaying a current character string in a first area of a touch screen display, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to rely on the disclosure in King to display the actual key sequence interpretation instead of the default interpretation in the text region prior to selection of one of the interpretations by any of the methods disclosed by King. Further, it

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

would have been obvious to one of ordinary skill in the art to apply the other teachings of King to use any of the keys from the Symbols mode keyboard to cause an actual key sequence interpretation of the keystroke sequence displayed in a text region to be replaced by a default interpretation displayed in a selection list.

> *the current character string in the first area is*
> *replaced with the suggested replacement character*
> *string if the user performs a gesture on the suggested*
> *replacement character string in the second area; and*

454.     In my opinion, there is nothing new or non-obvious in this limitation and a person of ordinary skill in the art would have been aware of replacing a string when a choice is selected from among a list of choices using a gesture. More particularly, a person having ordinary skill in the art at the time of the alleged invention would have been aware of touch screen displays and regions or areas thereof, character strings composed of characters selected by a user from a keyboard (both virtual and physical), using algorithms to develop lists of alternates to the entered character string, presenting lists of alternates on a screen in the form of a pop-up display, displaying character strings in a defined area on a screen, selecting an alternate from among a list using a gesture, and replacing a previously displayed character string with a selected character string. Thus, at a minimum this claim limitation would have been obvious to a person of ordinary skill in the art at the time of the alleged invention.

455.     I understand that Apple disputes that King discloses this limitation of claim 18. Apple's Supplemental Objections and Responses to Samsung's Interrogatories (Nos. 1, 5, 7, 8, 10, 14, 15, 25, 26, 27, 39, and 41) at 177-178 ("King fails to disclose all of the limitations of claim 18."). For the reasons enumerated below, it is my opinion that Apple is incorrect.

456.     King discloses the suggested replacement character string in the first area is kept if the user performs a gesture on the suggested replacement character string in the second area. In particular, as shown in Figure 1A, the selection list displays multiple alternatives, and a user can select a desired word from the selection list by touching it. *See, e.g.,* King at 11:20-23. When a word is being edited, whether during text entry or by a user selecting a specific word for editing, that word is displayed in the text region and the selection list surrounded by a box. *See, e.g., id.* at

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

28:25-30. When a user selects any of the other words in the list, the word in the text region is immediately replaced with the selected word. *See, e.g., id.* at 28:38-43. The user can also select the provisionally displayed word and continue typing. *See, e.g., id.* at 27:29-32. King thus discloses accepting the suggested replacement character string displayed in the first area if the user performs a gesture on the suggested replacement character string in the second area. The provisionally displayed text, the default interpretation, is shown in Figure 1A (I have indicated the default interpretation in the selection list and the text entry area in red on the figure):



457.    King also discloses the suggested replacement character string in the first area is replaced with an alternative replacement character string if the user performs a gesture on a replacement character string in the second area. In particular, as shown in Figure 1A, the selection list displays multiple alternatives, and a user can select a desired word from the selection list by touching it. *See, e.g.,* King at 11:20-23. When a word is being edited, whether during text entry or by a user selecting a specific word for editing, that word is displayed in the text region and the selection list surrounded by a box. *See, e.g., id.* at 28:25-30. When a user selects any of the other words in the list, the word in the text region is immediately replaced with the selected word. *See, e.g., id.* at 28:38-43. King thus discloses replacement of the string displayed in the first area with a replacement character string displayed in the second area if the user performs a gesture on a

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

replacement character string in the second area. An example of another word a user could select is shown in Figure 1A (I have indicated another interpretation in red on the figure):



458.   To the extent that one argues that King does not disclose displaying a current character string in a first area of a touch screen display, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to rely on the disclosure in King to display the actual key sequence interpretation instead of the default interpretation in the text region prior to selection of one of the interpretations by any of the methods disclosed by King. Further, it would have been obvious to one of ordinary skill in the art to apply the other teachings of King to cause an actual key sequence interpretation of the keystroke sequence displayed in a text region to be replaced by a default interpretation displayed in a selection list if the user touches on the default interpretation in the selection list.

> the current character string in the first area is kept if the user performs a gesture in the second area on the current character string or the portion thereof displayed in the second area.

459.   In my opinion, there is nothing new or non-obvious in this limitation and a person of ordinary skill in the art would have been aware of keeping a string when that string is selected from among a list of choices using a gesture. More particularly, a person having ordinary skill in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

the art at the time of the alleged invention would have been aware of touch screen displays and regions or areas thereof, character strings composed of characters selected by a user from a keyboard (both virtual and physical), using algorithms to develop lists of alternates to the entered character string, including in lists of alternatives the string entered by a user, presenting lists of alternates on a screen in the form of a pop-up display, displaying character strings in a defined area on a screen, selecting an alternate from among a list using a gesture, and keeping a previously displayed character string when a copy of that string is selected from a list of choices. Thus, at a minimum this claim limitation would have been obvious to a person of ordinary skill in the art at the time of the alleged invention.

460.    I understand that Apple disputes that King discloses this limitation of claim 18. Apple's Supplemental Objections and Responses to Samsung's Interrogatories (Nos. 1, 5, 7, 8, 10, 14, 15, 25, 26, 27, 39, and 41) at 177-178 ("King fails to disclose all of the limitations of claim 18."). For the reasons enumerated below, it is my opinion that Apple is incorrect.

461.    King discloses the suggested replacement character string in the first area is kept if the user performs a gesture in the second area on the character string or the portion thereof displayed in the second area. In particular, as shown in Figure 1A, the selection list displays multiple alternatives, and a user can select a desired word from the selection list by touching it. *See, e.g.,* King at 11:20-23. When a word is being edited, whether during text entry or by a user selecting a specific word for editing, that word is displayed in the text region and the selection list surrounded by a box. *See, e.g., id.* at 28:25-30. When a user selects any of the other words in the list, the word in the text region is immediately replaced with the selected word. *See, e.g., id.* at 28:38-43. Selecting the copy of the string already displayed in the text region, however, would cause that word to be accepted. King thus discloses keeping the string displayed in the first area if the user performs a gesture on that string displayed in the second area.

462.    King also discloses that the suggested replacement character string in the first area is replaced by the current character string or the portion thereof displayed in the second area if the user performs a gesture on the current character string or portion thereof in the second area. In particular, as shown in Figure 1A, the selection list displays multiple alternatives, and a user can

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

select a desired word from the selection list by touching it. *See, e.g., id.* at 11:20-23. When a word is being edited, whether during text entry or by a user selecting a specific word for editing, that word is displayed in the text region and the selection list surrounded by a box. *See, e.g., id.* at 28:25-30. When a user selects any of the other words in the list, the word in the text region is immediately replaced with the selected word. *See, e.g., id.* at 28:38-43. An actual key sequence interpretation using a direct pointing method is one of the alternatives presented in the selection list for selection. *See, e.g., id.* at 12:20-26. This character string can therefore be selected from the selection list as well, causing the word in the text region to be replaced. King thus discloses replacement of the string displayed in the first area with a current character string displayed in the second area if the user performs a gesture on the current character string in the second area. The direct pointing interpretation, and the default interpretation it would replace if selected, are shown in Figure 1A (I have indicated the direct pointing interpretation in the selection list and the default interpretation in the text area in red on the figure):



463. To the extent that one argues that King does not disclose displaying a current character string in a first area of a touch screen display, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to rely on the disclosure in King to display the actual key sequence interpretation instead of the default interpretation in the text region

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

prior to selection of one of the interpretations by any of the methods disclosed by King. Further, it would have been obvious to one of ordinary skill in the art to apply the other teachings of King to cause an actual key sequence interpretation of the keystroke sequence displayed in a text region to be kept if the user touches on the actual key sequence interpretation in a selection list.

**(b)**    **King Discloses a Default Interpretation as the Current Character String**

464.    In an alternative interpretation of King, the Default Interpretation of the keystroke sequence entered by the user is the current character string. In my opinion, King renders obvious claim 18 of the '172 patent under this interpretation as well.

*a first area of the touch screen display that displays a current character string being input by a user with the keyboard; and*

465.    King discloses a first area of the touch screen display that displays a current character string being input by a user with the keyboard. In particular, King discloses that an upper text region displays the text entered by the user. *See, e.g.,* King at 9:12-23. This region serves as a buffer for text input and editing. *See, e.g., id.* The upper text region is a first area of the touch screen display. As the user enters text, the keystroke interpretations are displayed in multiple areas of the display – including the upper text region – to help resolve ambiguity. *See, e.g., id.* at 9:56-63. The first entry in the selection list is selected as a default interpretation and is displayed in the text region. *See, e.g., id.* at 9:63-65. In Figure 1A, above, the default interpretation "age" is displayed in the text region. *See, e.g., id.* at Fig. 1A. The word "age" is an interpretation of the string entered by the user with the virtual keyboard, and is therefore a current character string.. *See, e.g., id.* at 12:20-26. Accordingly, King discloses that a text entry area displays a current character string that is being entered by a user with a keyboard. The default interpretation in a text entry area is depicted in Figure 1A (I have indicated the default interpretation in the text area in red on the figure):

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172



*a second area of the touch screen display separate from the first area that displays the current character string or a portion thereof and a suggested replacement character string for the current character string; wherein;*

466.    King discloses a second area of the touch screen display separate from the first area that displays the current character string or a portion thereof and a suggested replacement character string for the current character string. In particular, King discloses a selection list that is displayed between a text region and a keyboard. *See* King at 9:17-23. The selection list described in King provides interpretations of the keystroke sequence entered by a user, sorted by frequency of use. *See, e.g., id.* at 10:15-21. The first entry in the selection list is a default word that is also posted in the text entry area. *See id.* at 10:24-28. King's selection list therefore includes both a default interpretation as well as multiple alternatives, provided by a vocabulary module based on the possible interpretations of a keystroke sequence. This default interpretation is a current character string, and the other words presented in the selection list are suggested replacement character strings. The selection list is presented in a second area of the touch screen display, separate from the text region. The selection list is depicted in Figure 1A (I have indicated the selection list in red on the figure):



> *the current character string in the first area is replaced with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;*

467.   King discloses that the current character string in the first area is kept if the user activates a key on the keyboard associated with a delimiter. In particular, King describes a Symbols mode, which replaces the keys on the keyboard corresponding to alphabetical letters with other symbols. *See, e.g.,* King at 22:30-33. This Symbols mode is depicted in Figure 1D of King:





The keys displayed in the Symbols mode keyboard correspond to punctuation and a Space key, all

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

of which are delimiters. *See, e.g., id.* at Fig. 1D. King discloses that selecting any one of the characters from the Symbols mode keyboard implicitly accepts the current text provisionally displayed at the insertion point for output. *See, e.g., id.* at 22:30-33. The text provisionally displayed is any object in the selection list which is implicitly or explicitly selected at the time of the Symbols mode key press. *See, e.g., id.* at 12:60-67; *see also* 9:63 – 10:4 ("The first entry 78 in the selection list is selected as a default interpretation and displayed in the text region 66 at an insertion point 88. In the preferred embodiment, this entry is displayed with a solid-line box drawn around it both in the selection list 76 and at the insertion point 88. The formatting establishes a visual relationship between the insertion point object and the selection list, and signifies that this object is implicitly selected."). The text provisionally displayed is shown in Figure 1A (I have indicated the default interpretation in the text area in red on the figure):



468.    To the extent that one argues that King does not disclose replacing the current character string displayed in the first area with a suggested replacement character string when a user activates a delimiter key, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to apply the other teachings of King to cause the default interpretation to be replaced by another, more likely, interpretation, if a delimiter is pressed.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

> *the current character string in the first area is*
> *replaced with the suggested replacement character*
> *string if the user performs a gesture on the suggested*
> *replacement character string in the second area; and*

469.    King discloses the current character string in the first area is replaced with the suggested replacement character string if the user performs a gesture on the suggested replacement character string in the second area. In particular, as shown in Figure 1A, the selection list displays multiple alternatives, and a user can select a desired word from the selection list by touching it. *See, e.g.,* King at 11:20-23. When a word is being edited, whether during text entry or by a user selecting a specific word for editing, that word is displayed in the text region and the selection list surrounded by a box. *See, e.g., id.* at 28:25-30. When a user selects any of the other words in the list, the word in the text region is immediately replaced with the selected word. *See, e.g., id.* at 28:38-43. King thus discloses replacement of the current string displayed in the first area with a replacement character string displayed in the second area if the user performs a gesture on a replacement character string in the second area. An example of another word a user could select is shown in Figure 1A (I have indicated another interpretation in red on the figure):



> *the current character string in the first area is kept if*
> *the user performs a gesture in the second area on the*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

*current character string or the portion thereof*
*displayed in the second area.*

470.    King discloses the current character string in the first area is kept if the user performs a gesture in the second area on the character string or the portion thereof displayed in the second area. In particular, as shown in Figure 1A, the selection list displays multiple alternatives, and a user can select a desired word from the selection list by touching it. *See, e.g.,* King at 11:20-23. When a word is being edited, whether during text entry or by a user selecting a specific word for editing, that word is displayed in the text region and the selection list surrounded by a box. *See, e.g., id.* at 28:25-30. When a user selects any of the other words in the list, the word in the text region is immediately replaced with the selected word. *See, e.g., id.* at 28:38-43. Selecting the copy of the string already displayed in the text region would cause that word to be accepted. King thus discloses keeping the current character string displayed in the first area if the user performs a gesture on that string displayed in the second area. The default interpretation which the user can select in a selection list to be kept in the text area is depicted in Figure 1A:



### 3.    The Combination of Robinson with Xrgomics Renders Claim 18 of the '172 Patent Invalid as Obvious

471.    To the extent that any of the limitations of the asserted claim of the '172 patent are not disclosed by the Robinson reference, a person of ordinary skill in the art would have been

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

motivated to combine Robinson with the Xrgomics reference to attain the benefits and expected outcome of a current character string displayed in a first area of a touch screen display which can be replaced or kept if a user performs certain actions. More specifically, a person of ordinary skill in the art combining those references would have relied on the ability to select one of a current character string or selected replacement character string from a word choice list disclosed by one or more of Robinson and Xrgomics, the ability to select a replacement character string from a word choice list for output when a user selects a key on a keyboard associated with a delimiter disclosed by Robinson, and the current character string displayed in both a text entry area and word choice list disclosed by one or more of Robinson and Xrgomics. Consequently, the combination of those references would have provided the benefits of a current character string displayed in a first area of a touch screen display which can be replaced or kept if a user performs certain actions.

472.    A person of ordinary skill in the art developing a text entry system would have looked to the text entry systems available for the portable device operating systems at the time, such as Palm and Windows Mobile. A person of ordinary skill in the art would be familiar with the developers who were creating software for use on these devices for the purposes of text entry. One example of a well-known developer was Tegic Communications, the assignee of the Robinson reference. A person of ordinary skill in the art would have been aware of the text entry systems developed by Tegic Communications, including the Robinson reference. A person of ordinary skill in the art would have been equally aware of or sought out text entry systems developed by others in the field, such as Xrgomics and its TenGO software. Indeed, Xrgomics describes an embodiment that utilizes the keyboard system of U.S. Patent Nos. 5,181,437, 5,953,541, and 6,011,554, among others, all of which are assigned to Tegic Communications. *See* Xrgomics at 9. Further, the systems described in the Robinson and Xrgomics references are both systems for "enhanced text entry" on portable electronic devices. *See* Xrgomics at 1 ("This invention relates to using letter and word choices to enhance text input especially on screens with sensors, sensor pads or pen based inputting on any keyboard systems or arrangement of characters."); Robinson at Abstract ("There is disclosed an enhanced text entry system which

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

determines one or more alternate textual interpretations of each sequence of inputs detected within a designated auto-correcting keyboard region."). A person of ordinary skill in the art would thus have considered both references when attempting to solve the same problem.

473.    The combination of Robinson and Xrgomics renders invalid as obvious claim 18 of the '172 patent.

474.    The explicit details as to why Robinson alone anticipates each limitation of asserted claim 18 of the '172 patent is set forth in paragraphs 248-286 above as well as in the claim chart in Exhibit 1, all of which I incorporate by reference here. In addition, I provide below a narrative of my opinions for the Xrgomics reference as it relates to claim 18. In view of this analysis, it is my opinion that the combination of Robinson with Xrgomics renders invalid as obvious claim 18 of the '172 patent.

(a)    **Claim 18**

*A graphical user interface on a portable electronic device with a keyboard and a touch screen display, comprising:*

475.    The Xrgomics reference discloses "portable electronic device with a keyboard and a touch screen display" under Apple's apparent interpretation of that term. *See, e.g.,* Xrgomics at 15-16 ("FIG. 1 shows how an on-screen implementation of a choice window 14 with word choices 16 could look like on a handheld device 10 with a virtual keyboard 12."); *see also* Xrgomics, Fig. 1. Further, the Xrgomics reference discloses use with "any text input or virtual text input system", which includes a keyboard separate from a touchscreen. *See, e.g.,* Xrgomics at 7. It is therefore my opinion that the Xrgomics reference discloses a "portable electronic device with a keyboard and a touch screen display" under its plain and ordinary meaning of that term as well. *See, e.g., id.* ("The keyboard in the embodiments can be any text input system or virtual text input system."). Accordingly, the combination of Robinson and Xrgomics renders this limitation of claim 18 of the '172 patent invalid as obvious.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

*a first area of the touch screen display that displays a current character string being input by a user with the keyboard; and*

*a second area of the touch screen display separate from the first area that displays the current character string or a portion thereof and a suggested replacement character string for the current character string; wherein;*

476.    To the extent one argues that the Robinson reference does not disclose the limitation a first area of the touch screen display that displays a current character string being input by a user with the keyboard, that limitation is disclosed by the Xrgomics reference, and the combination of the Robinson reference and the Xrgomics reference renders claim 18 obvious.

477.    Xrgomics discloses a first area of a touch screen display that displays a current character string being input by a user with the keyboard. Figure 5 of Xrgomics depicts a user interface with a word choice list that displays the "current text inputted" in the word choice list as well as in the text entry area:



*Id.* at 25. I have identified in red the word "deva", numbered 258, depicted in the text entry area. This word is a current character string in a first area.

-178-
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*the current character string in the first area is replaced with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;*

*the current character string in the first area is replaced with the suggested replacement character string if the user performs a gesture on the suggested replacement character string in the second area; and*

*the current character string in the first area is kept if the user performs a gesture in the second area on the current character string or the portion thereof displayed in the second area.*

478.    Similarly, to the extent one argues that the Robinson reference does not disclose the limitations (1) the current character string in the first area is replaced with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter; (2) the current character string in the first area is replaced with the suggested replacement character string if the user performs a gesture on the suggested replacement character string in the second area; or (3) the current character string in the first area is kept if the user performs a gesture in the second area on the current character string or the portion thereof displayed in the second area, the combination of the Robinson reference and Xrgomics discloses those limitations of claim 18 and renders claim 18 obvious as well because Xrgomics discloses a first area of the touch screen display that displays a current character string being input by a user with the keyboard, as described above.

479.    Xrgomics discloses the current character string in the first area is replaced with the suggested replacement character string if the user performs a gesture on the suggested replacement character string in the second area. Figure 5 of Xrgomics depicts a user interface with a word choice list:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

1
2
3
4
5
6
7
8
9
10
11
12



13 *Id.* at 25. I have identified in red the current character string "deva" and a suggested replacement

14 character string "devastating."

15      480. Xrgomics discloses selecting a choice causes the entire text inputted to be replaced

16 by a selected word. *See id.* at 24. The user can also then make a different choice, causing the

17 previously selected choice to be replaced. *See id.* These choices, such as the word "devastating" in

18 Figure 5, can be selected through the use of a screen input interface, in other words, pressing the

19 word on a touch screen. *See id.* at 26. Xrgomics discloses that this selection process can be used

20 both for unambiguous and for reduced keyboard systems. *Id.* at 29. Selecting the suggested

21 replacement character string "devastating" therefore causes the current character string in the text

22 entry area to be replaced.

23      481. Further, Xrgomics discloses the current character string in the first area is kept if

24 the user performs a gesture in the second area on the current character string or the portion thereof

25 displayed in the second area. Figure 5 of Xrgomics also depicts a user interface with a word choice

26 list that displays the "current text inputted" in the word choice list as well as in the text entry area:

27
28

 **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172



*Id.* at 25. Xrgomics describes a display area of two rows that are implemented on a touch screen display, one of which contains a copy of the current text inputted. *Id.* I have identified in red the current character string "deva" in both the text entry area and the predetermined area containing word choices.

482.    Xrgomics discloses selecting a choice causes the entire text inputted to be replaced by a selected word. *See id.* at 24. These choices, which include the word "deva" in Figure 5, can be selected through the use of a screen input interface, in other words, pressing the word on a touch screen. *See id.* at 26. Xrgomics discloses that this selection process can be used both for unambiguous and for reduced keyboard systems. *Id.* at 29. Selecting the current character string "deva" therefore causes the current character string in the text entry area to be kept.

483.    It is my opinion that the Xrgomics reference discloses "the current character string in the first area is kept". As described above, Figure 5 of the Xrgomics reference depicts a user interface where a current character string is displayed in both a first area (a text entry area) and second area (a word choice list). *See, e.g., id.* at 25; Fig. 5. Xrgomics also discloses that a user can select the entries in the word choice list. *See, e.g., id.* at 24. Doing so causes "the entire text

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

inputted [to be] replaced by the choice." *See, e.g., id.* Even though selecting a current character string would replace the string with itself, the string would be "kept" from the user's perspective. Accordingly, the combination of Robinson and Xrgomics renders claim 18 of the '172 patent obvious.

**4.    The Combination of Robinson with POBox Renders Claim 18 of the '172 Patent Invalid as Obvious**

484.    To the extent that any of the limitations of the asserted claim of the '172 patent are not disclosed by the Robinson reference, a person of ordinary skill in the art would have been motivated to combine Robinson with the POBox reference to attain the benefits and expected outcome of a current character string displayed in a first area of a touch screen display that can be replaced or kept if a user performs certain actions. More specifically, a person of ordinary skill in the art combining those references would have relied on the ability to select one of a current character string or selected replacement character string from a word choice list disclosed by one or more of Robinson and POBox, the ability to select a replacement character string from a word choice list for output when a user selects a key on a keyboard associated with a delimiter disclosed by Robinson, and the current character string displayed in both a text entry area and word choice list disclosed by one or more of Robinson and POBox. Consequently, the combination of those references would have provided the benefits of a current character string displayed in a first area of a touch screen display which can be replaced or kept if a user performs certain actions.

485.    A person of ordinary skill in the art developing a text entry system would have looked to the text entry systems available for the portable device operating systems at the time, such as Palm and Windows Mobile. A person of ordinary skill in the art would be familiar with the developers who were creating software for use on these devices for the purposes of text entry. One example of a well-known developer was Tegic Communications, the assignee of the Robinson reference. A person of ordinary skill in the art would have been aware of the text entry systems developed by Tegic Communications, including the Robinson reference. A person of ordinary skill in the art would have been equally aware of or sought out text entry systems developed by others in the field, such as Toshiyuki Masui and his POBox software. Indeed, the

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172

1

2

3   DATED:   August 12, 2013                   _____

4                                             Daniel Wigdor

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING INVALIDITY OF U.S. PATENT NO. 8,074,172