# EXHIBIT 3

**THE HON MR JUSTICE FLOYD**
Approved Judgment

*HTC v Apple*



Neutral Citation Number: [2012] EWHC 1789 (Pat)

Case No: HC11 C02826 & HC11 C02703 & HC11 C03080

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**PATENTS COURT**

Royal Courts of Justice
Rolls Building, EC4A 1NL
Date: 04/07/2012

Before :

**THE HON MR JUSTICE FLOYD**

- - - - - - - - - - - - - - - - - - - -

Between :

HC11 C02826
HC11 C02703

| | |
|---|---|
| **HTC EUROPE CO. LTD** | **Claimant** |
| - and - | |
| **APPLE INC.** | **Defendant** |
| **(a company incorporated under the laws of the State of California)** | |

And between :

HC 11 C03080

| | |
|---|---|
| **APPLE INC.** | **Claimant/Part 20 Defendant** |
| - and - | |
| **HTC CORPORATION** | |
| **(a company incorporated under the laws of the Republic of China)** | **Defendant/Part 20 Claimant** |

**Richard Meade QC, Daniel Alexander QC, Michael Tappin QC, Andrew Lykiardopoulos, James Abrahams and Isabel Jamal** (instructed by **Powell Gilbert**) for the **HTC parties**
**Simon Thorley QC, Guy Burkill QC and Joe Delaney** (instructed by **Freshfields, Bruckhaus Deringer**) for **Apple Inc.**

Hearing dates: April 19-20, 23, 25-27, 30, and May 1-3, 8-10, 12 2012.
**Approved JudgmentI direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.**

THE HON MR JUSTICE FLOYD

*Christopher Floyd.*

**SAMNDCA630-06271984**

SAMNDCA630-06271985

*HTC v Apple*

**Mr Justice Floyd :**

**Introduction**

1.      These three actions concern four patents owned by Apple Inc. ("Apple"): European
        Patents Nos. 2 098 948; 2 964 022; 2 059 868; and 1 168 859. For convenience I will
        refer to the patents by the last three digits of their numbers. Two of the actions
        (HC11C02703 and HC11C02826) were commenced by HTC Europe Co. Ltd (a UK
        company) as applications for revocation of the 022, 868 and 859 patents. In response,
        Apple sued HTC Corporation, a Taiwanese company, in a third action (HC11C0380)
        for infringement of those patents and the 948 patent.   HTC Corporation
        counterclaimed for revocation of the 948 patent. I will refer to HTC Europe Co. Ltd
        and HTC Corporation together as "HTC".  The trial of the actions therefore proceeded
        as if Apple were claimant and HTC defendant, with Apple opening the case and
        calling its evidence first.  The evidence was called in three tranches: first 948, then
        022 and 868, and finally 859.  I heard some final speeches before the evidence on 859
        was called. Mr Burkill QC argued the cases for Apple on 948 and 859, opposed by Mr
        Tappin QC for HTC on 948 and Mr Alexander QC for HTC on 859.   Mr Thorley QC
        for Apple and Mr Meade QC for HTC argued the cases on 022 and 868.  Apple's
        junior counsel was Mr Delaney; HTC's were Mr Lykiardopoulos, Mr Abrahams and
        Ms Jamal. I am extremely grateful to all counsel and solicitors for their highly skilled
        presentation of these cases. I shall have something to say about the time estimates for
        the hearing at the end of this judgment.

**Legal principles**

2.      *Construction.* In *Kirin Amgen v TKT* [2005] RPC 9 the House of Lords explained that
        the determination of the extent of protection only involves asking what a person
        skilled in the art would have understood the patentee to have used the language of the
        claim to mean.  Guidelines to assist the court in construing the patent are summarised
        by the Court of Appeal in *Virgin Atlantic v Premium Aircraft* [2010] FSR 10 at
        paragraph 5.

3.      *Novelty.* The law is set out in the speech of Lord Hoffmann in *Synthon v SKB* [2006]
        RPC 10 at [22].  To deprive a claim of novelty, the prior document must contain clear
        and unmistakeable directions to do or make something which falls within the scope of
        that claim, and the disclosure must be enabling in the relevant sense.

4.      *Obviousness.* In *Conor v Angiotech* [2008] UKHL 49; [2008] RPC 28 at [42] Lord
        Hoffmann approved the following statement by Kitchin J in *Generics (UK) Ltd v H
        Lundbeck A/S* [2007] RPC 32 at [72]:

                "The question of obviousness must be considered on the facts
                of each case. The court must consider the weight to be attached
                to any particular factor in the light of all the relevant
                circumstances. These may include such matters as the motive to
                find a solution to the problem the patent addresses, the number
                and extent of the possible avenues of research, the effort
                involved in pursuing them and the expectation of success."

**SAMNDCA630-06271986**

5.   It is convenient to address the question of obviousness by using the structured approach explained by the Court of Appeal in *Pozzoli v BDMO* [2007] EWCA Civ 588; [2007] FSR 37.  This involves the following steps:

> "(1)(a) Identify the notional 'person skilled in the art'.
>
> (b) Identify the relevant common general knowledge of that person.
>
> (2) Identify the inventive concept of the claim in question or, if that cannot readily be done, construe it.
>
> (3) Identify what, if any, differences exist between the matter cited as forming part of the "state of the art" and the inventive concept of the claim or the claim as construed.
>
> (4) Ask whether, when viewed without any knowledge of the alleged invention as claimed: do those differences constitute steps which would have been obvious to the person skilled in the art or do they require any degree of invention?"

6.   *Common general knowledge.*  In relation to information in documents, the Court of Appeal in *General Tire  v Firestone* [1972] RPC 457, noted at pages 482-3 the statement of Luxmoore J in *British Acoustic Films* that:

> "A piece of particular knowledge as disclosed in a scientific paper does not become common general knowledge merely because it is widely read, and still less because it is widely circulated. Such a piece of knowledge only becomes general knowledge when it is generally known and [accepted without question] by the bulk of those who are engaged in the particular art; in other words, when it becomes part of their common stock of knowledge relating to the art" (square brackets added)

7.   Whilst the Court of Appeal was not prepared to endorse the words *"accepted without question"* in the above citation, they were content with *"generally regarded as a good basis for further action"*.

8.   Both Mr Thorley and Mr Burkill reminded me of the considerations which apply in the case of an attack on lack of inventive step which starts from the common general knowledge alone, without reference to any particular citation. I set out some of these considerations in *ratiopharm v Napp* [2009] RPC 11 at [155] to [159].

9.   *Added subject matter.*  In *Vector Corp v Glatt Air Techniques Ltd* [2007] EWCA Civ 805, [2008] RPC 10, Jacob LJ approved his own earlier statement (as Jacob J) in *Richardson-Vicks' Patent* [1995] RPC 568 at 576 where he summarised the rule against added matter in a single sentence:

> "I think the test of added matter is whether a skilled man would, upon looking at the amended specification, learn

SAMNDCA630-06271987

anything about the invention which he could not learn from the unamended specification."

10. Although this simple principle has been much elaborated in its application to particular types of amendment between application and granted patent, it is sufficient for the issue which arises in the present case. I would only add that it is always important to bear in mind that a claim may be broadened so as to *cover* additional subject matter without necessarily *disclosing* anything new.

11. *Excluded subject matter.* Article 52 of the European Patent Convention, which is given effect to by section 1(2) of the Patents Act 1977 provides:

> "(1) European patents shall be granted for any inventions which are susceptible of industrial application, which are new and which involve an inventive step.
>
> (2) The following in particular shall not be regarded as inventions within the meaning of paragraph 1:
>
> …
>
> (c) … programs for computers;
>
> (d) presentations of information.
>
> (3) The provisions of paragraph 2 shall exclude patentability of the subject-matter or activities referred to in that provision only to the extent to which a European patent application or European patent relates to such subject-matter or activities as such."

12. The law on this topic has been explained in two decisions of the Court of Appeal: *Aerotel v Telco Holdings and Macrossan's Application* [2006] EWCA Civ 1371; [2007] RPC 7 and *Symbian v Comptroller General of Patents* [2009] RPC 1.

13. In *Aerotel* the Court of Appeal set out a four step approach to deciding cases where the exclusions from patentability were engaged:

> "(1) properly construe the claim
>
> (2) identify the actual contribution;
>
> (3) ask whether it falls solely within the excluded subject matter;
>
> (4) check whether the actual or alleged contribution is actually technical in nature".

14. At [43] - [44] in *Aerotel*, Jacob LJ cites with apparent approval a submission made by counsel for the Comptroller as to how one identified the actual or alleged contribution for the purposes of steps (2), (3) and (4). It involves asking what the inventor has really added to human knowledge:

SAMNDCA630-06271988

"The second step—identify the contribution—is said to be more problematical. How do you assess the contribution? Mr Birss submits the test is workable—it is an exercise in judgment probably involving the problem said to be solved, how the invention works, what its advantages are. What has the inventor really added to human knowledge perhaps best sums up the exercise. The formulation involves looking at substance not form—which is surely what the legislator intended.

Mr Birss added the words "or alleged contribution" in his formulation of the second step. That will do at the application stage—where the Office must generally perforce accept what the inventor says is his contribution. It cannot actually be conclusive, however. If an inventor claims a computer when programmed with his new program, it will not assist him if he alleges wrongly that he has invented the computer itself, even if he specifies all the detailed elements of a computer in his claim. In the end the test must be what contribution has actually been made, not what the inventor says he has made."

15.     In *Gemstar TV Guide International v Virgin Media* Ltd [2009] EWHC 3068 (Ch) at [37], Mann J left open the question of the appropriate "baseline" for the purposes of determining the contribution: was it any cited prior art, or only common general knowledge? Although I did not hear full argument on this point, it seems to me that the baseline is defined by any item of prior art admissible for a novelty attack.  As the quotation from *Aerotel* makes clear, the contribution which the English jurisprudence requires the court to consider is the actual addition to human knowledge, not the "alleged" contribution which one would discern from a reading of the patent specification.  If it were the latter, then I can conceive of an argument along the lines that the skilled person would assess the alleged contribution in the light of his own common general knowledge.  Once one is assessing a real contribution, however, it would seem odd not to take account of the whole, real state of the art (that is to say ignoring the deemed state of the art for novelty purposes under section 2(2) of the Act).  The exercise of determining the contribution should in principle be the same as that involved in determining the difference between the prior art and the inventive concept for the purposes of obviousness.  To ignore, as Apple invited me to do, the state of the art which does not form part of the common general knowledge seems to me to be entirely artificial, not least because the concept of common general knowledge is not a concept which appears in the Act or the EPC.  Such a distinction would mean that an invention which was not novel nevertheless made a contribution to human knowledge, because the novelty destroying document was not part of the common general knowledge. I do not think that is what the cases, or the EPC, intended.

16.     In *Symbian* the Court of Appeal commended, at [48] onwards, the guidance given in a number of prior English and EPO authorities on the meaning of the term "technical" for the purposes of applying the computer program exclusion. However the Court of Appeal declined to formulate any "bright line" test for what did and for what did not amount to a technical contribution in this field. Each case had to be decided by

SAMNDCA630-06271989

reference to its own particular facts and features, bearing in mind the guidance given in the decisions mentioned.

17.   In *AT&T Knowledge Ventures* [2009] EWHC 343 (Pat), Lewison J (as he then was) helpfully analysed the guidance to be obtained from the authorities on the Court of Appeal's recommended reading list. He agreed with the Court of Appeal that it was impossible to define the meaning of "technical" in this context but considered that there were a number of signposts to what amounted to a relevant technical effect. These he set out at [40]:

> "i) whether the claimed technical effect has a technical effect on a process which is carried on outside the computer;
>
> ii) whether the claimed technical effect operates at the level of the architecture of the computer; that is to say whether the effect is produced irrespective of the data being processed or the applications being run;
>
> iii) whether the claimed technical effect results in the computer being made to operate in a new way;
>
> iv) whether there is an increase in the speed or reliability of the computer;
>
> v) whether the perceived problem is overcome by the claimed invention as opposed to merely being circumvented."

18.   There is less authority on the question of presentations of information.  In *Gemstar* Mann J said:

> "what achieves patentability is some real world technical achievement outside the information itself".

19.   Whilst the European Patent Office has at times appeared to take a different view on this area of the law, the parties are agreed for present purposes that I am bound by and should apply the principles laid down in these cases.

20.   The present case involves the computer programs and presentations of information (as such) exclusions.

**The 948 patent**

21.   948 is entitled "Touch event model".  It has a priority date of 4th March 2008.  In broad terms it is concerned with computer devices with inputs which are multi-touch enabled, that is to say they are capable of responding to more than one touch at the same time.

**Technical background**

22.   Although multi-touch devices of various kinds had been known since the early 1980s, they had become popular commercially a few years before the priority date.  Amongst the commercial devices was the MERL DiamondTouch system and the iPhone 1.  The

SAMNDCA630-06271990

of the software does not have any real world effect on the way the device performs. It was common ground that one could not tell whether or not any given device was using the invention.

96.     The second point, that the method applies at the operating system level is correct. But not every method which operates at this level will be patentable. This signpost derives from the first of the *IBM* cases T 0006/83 referred to by Lewison J at [21], a case concerned with a network of computers. At [6] the Board referred to "*features ... not concerned with the nature of the data and the way in which the particular application program operates on them*" as being patentable. In my judgment the invention of 948 is precisely concerned with the way in which the software operates on the data, namely the touch events.

97.     The third point, that the claimed technical effect results in the computer working in a new way, by presenting a new API to the developer in which touch events are sent selectively, is not correct. The computer is not working in a new way in any relevant sense. There is merely a redistribution of the data processing within the device.

98.     Next, there is no evidence of an increase of speed or reliability of the computer. Finally, I do not regard the last point as persuasive in a case where the problem solved is entirely within the computer.

99.     I conclude that the invention, at least as claimed in claims 1 and 2, is not patentable because it is a computer program as such.

**The 022 Patent**

100.    The 022 patent is entitled "Unlocking a device by performing gestures on an unlock image". It has a priority date of 23rd December 2005. In broad terms it is concerned with the provision of a user interface on a touch screen device which enables the user to change the state of the device by, for example, dragging an image over the screen. The invention has been commercialised by Apple as the "slide to unlock" feature of its iPhone, which users of such devices encounter on first use.

**Technical background**

101.    Human computer interaction, or HCI, is a science that encompasses the requirements, design, implementation and evaluation of computer systems for human use. The science of HCI involves some understanding of human psychology.

102.    Computers had been able to recognise human input via touch for many years before the priority date. Touch pads are touch-sensing devices which are separate from the computer's visual display. Touch screens allow the user to input directly by touching the screen, at points defined by the graphic information on the screen. This is achievable by a variety of different technologies, the details of which are irrelevant to the decision on this patent. The input in either case can be by a stylus or pen, or by a finger or hand.

103.    Some direct touch inputs involve more than just placing the finger or stylus on the relevant graphic on the screen, but allow the input to be interpreted by the movement

SAMNDCA630-06272006

of the finger or stylus. Thus graphic objects can be dragged over the screen by touching them, and maintaining contact whilst moving them to other locations.

**The witnesses on 022 and 868**

104.   On this patent and on 868, Apple called Professor David Keyson. Professor Keyson is a Professor of Industrial Design Engineering at Delft University of Technology, in the Netherlands. He has been a professor there for 12 years. Professor Keyson is an expert in the field of HCI. His first degree was in political and social sciences, but he then obtained a Master's degree in Ergonomics from Loughborough University in 1987, and a PhD in Perception and Technology from Eindhoven University of Technology in 1996. His dissertation was on Touch in User Interface Navigation. Between finishing his Master's degree and starting his PhD, Professor Keyson worked as a human interface engineer at Xerox in the department of Industrial Design and Human Interface. He also worked, during his PhD studies, at the Institute for Perception Research.

105.   Despite Professor Keyson's obvious experience in the field, I did not find him to be a very helpful expert witness. I have come to this conclusion for the following reasons. Firstly, in my judgment, Professor Keyson had his eye so firmly on the issues in the case that he found it difficult to respond clearly and fairly even to simple technical questions. Whatever the reasons for this, which I do not need to enquire into further, the end result was unhelpful. Secondly, it was clear to me that he was not as familiar with the contents of the cited prior art documents (particularly in the 868 case) as I would expect an expert to be. This was particularly clear in the case of the Lira citation against 868. If an expert has misunderstood the teaching of a prior document, which in my judgment Professor Keyson had, then his views as to whether something is obvious in the light of it are likely to be flawed. Thirdly, in advancing Apple's case on some issues he made factual errors. Thus, for example, he said that HTC devices constantly checked x and y co-ordinates to see whether a threshold was reached. This was incorrect. He also appeared to have an incorrect understanding of the way in which the Arc unlock feature of some of the HTC devices worked, and was reluctant to confirm the way in which they functioned. I think he made these mistakes because he was over-enthusiastic about advancing Apple's case, and less concerned with getting the basic facts correct. In the course of all this he lost objectivity. I have treated Professor Keyson's evidence with caution as a result.

106.   On this patent and 868, HTC called Professor Saul Greenberg, a professor in the Department of Computer Science and an adjunct professor in the Department of Psychology at the University of Calgary. His first degree was in microbiology and immunology, but he subsequently obtained the degrees MSc and PhD in Computer Science at Calgary. He has studied and researched full time in the field of Computer Science since 1981.

107.   In his expert report, Professor Greenberg said that he was aware of Apple products, as one would expect him to be, and that he had owned an iPhone since late 2010/early 2011 and an iPad since mid-2011. In paragraph 90 he said that an obvious addition to one of the items of prior art, the Neonode phone cited against 022, would be to incorporate a slider to the user interface. He added that he had made that suggestion without seeing the 022 patent. Mr Thorley said this was a misleading thing to have said, given that he had seen an implementation of 022 in the iPhone and iPad.   I do

not think that is a fair criticism when Professor Greenberg's report is read as a whole. It was relevant to record that Professor Greenberg had made the suggestion without knowing what the case was about. How much weight to attach to that fact when one adds the fact, which he had disclosed at the forefront of his report, that he had owned an iPad and an iPhone is another matter. Overall I found Professor Greenberg to be a balanced, careful and knowledgeable witness.

**The skilled addressee and common general knowledge**

108.   There was no significant dispute about the identity of the skilled person in the case of the 022 patent. The 022 patent is addressed to a worker in the field of HCI who has a graduate degree in a subject within or concerned with the field of user interface design and about three years of industry experience. The skilled person would be working as part of a wider team of people having the necessary experience in hardware and electronics with whom he or she would interact as necessary.

109.   The skilled person would be familiar with touch screen devices that were more sophisticated than simple point and click devices. There were a number of pen-based personal digital assistants (PDAs) on the market before the priority date. These included the Palm Pilot series, the Apple Newton and the IBM Simon. The skilled person would be familiar with these.

110.   The skilled person would be wholly familiar with mouse-based techniques for input used in operating systems such as Windows. These included the sliding image used in the scroll bar in those systems. Many mouse based user-interaction techniques had been carried across into the PDA devices on the market at the priority date. Thus the devices which used the Windows CE platform, widely used on PDAs at the priority date, used similar sliders and scroll bars on their user interfaces to those found in mouse-based systems. They were made available to developers through Windows Visual Studio which could be used to develop Windows CE applications for PDAs.

111.   The problem of accidental touches and accidental activation in touch screen devices was well known at the priority date. The problem of accidental activation while the device is not intended to be in use could be dealt with by the device locking up after detecting inactivity for a given period, or by the user locking the device manually. The use of physical controls such as buttons and slider toggles to transition a device from a lock state to an unlock state was common general knowledge by the priority date. Commercial examples of portable touch screen devices which used a mechanical slider to operate a keylock function were the Compaq Tablet PC TC1000 and the Dell™ Axim™ X50. Another example of a keylock function activated by a physical slider (albeit on a touch device rather than a touch screen devices) was the Apple iPod.

112.   It was also common general knowledge, as Dr Keyson accepted, that touch screen devices could be unlocked using the screen itself by way of a code. This was a feature of the HP Jornada.

113.   A commercial example of a touch screen device which used a combination of buttons to activate a keylock function was the Palm Treo 600 phone. Using this feature deactivated the physical buttons and screen items.

114.    "Feedback" in the context of HCI means the provision of information to the user that his or her input is being recognised by the system. Thus, in text systems, the user gets immediate feedback that his letter has been typed. Likewise, with mouse systems, the user gets feedback via the cursor of the movement of the mouse. In touch systems the object under the touch reacts to the touch and its movement. The skilled person would have known at the priority date that a good general principle of interface design was to provide continuous feedback to the user for every user action. The textbooks showed, and the experts agreed, that feedback was a known and fundamental concept of good design. Nevertheless the amount of, and design of the appropriate feedback to be used would be decided on a case by case basis.

115.    HTC submitted that the Plaisant citation was part of the common general knowledge. I deal with this suggestion in context below.

**The specification and claims of 022**

116.    The specification of the 022 patent explains at [0003], by way of background, that touch screens are becoming increasingly popular for use as displays and as user input devices on portable devices such as mobile telephones and personal digital assistants (PDAs). According to the specification, a problem associated with such touch screens is the unintentional activation or deactivation of functions due to unintentional contact with the touch screen. The specification explains that the portable devices themselves, the touch screens and applications running on the devices may be locked in various ways, for example upon entering an active phone call, after a predetermined idle time, or upon manual locking by a user.

117.    The specification acknowledges several well known methods for unlocking touch screen devices and applications running on them. These include pressing a predefined set of buttons simultaneously or sequentially, or entering a password. A prior publication is referred to which discloses unlocking a touch screen upon detecting touches on predetermined areas in a given order. These methods are said to have disadvantages in that the button pressing may be hard to perform, and creating, memorising and recalling passwords may be burdensome. The specification sets itself the object of a more efficient, user friendly procedure for:

> "transitioning such devices, touch screens and/or applications between user interface states (e.g. from a user interface state for a first application to a user interface state for a second application, between user interface states in the same application, or between locked and unlocked states."

118.    The specification also points out that there is a need for *"sensory feedback to the user regarding progress towards satisfaction of a user input condition that is required for the transition to occur"*: in plainer language, feedback to tell you how you are getting on.

119.    Although other passages of the specification are relevant, the invention claimed is best understood by reference to the description commencing at [0048] under the rubric "Unlocking a Device via Gestures". In the embodiments described, the device is changed from a locked to an unlocked state by making and maintaining contact

SAMNDCA630-06272009

with the touch screen in a predefined gesture.  Paragraph [0051] includes the following as to the meaning of "gesture":

> "As used herein, a gesture is a motion of the object/appendage making contact with the touch screen. For example, the predefined gesture may include a contact of the touch screen on the left edge (to initialize the gesture), a horizontal movement of the point of contact to the opposite edge while maintaining continuous contact with the touch screen, and a breaking of the contact at the opposite edge (to complete the gesture)."

120.    The specification explains at [0036] that the device described has a contact/motion module which detects contact with the touch screen and contains components for performing various operations related to the detection of contact, such as determining if there is movement of the contact, and tracking the movement across the touch screen and determining if the contact has been broken. The specification explains that determining movement of the point of contact *may* include determining speed, velocity and/or acceleration of the point of contact.

121.    At [0050] the specification explains the concept of "visual cues". These provide hints or reminders of the unlock action to the user. The visual cues may be textual or graphical or any combination thereof. The visual cues may be triggered by particular user actions, such as, for example, the user touching a locked touch screen.

122.    The specification also explains that the device may also display an "unlock image" – see [0058]. An unlock image is a graphical, interactive, user interface object with which the user interacts in order to unlock the device. For example the user may drag the unlock image in a predefined manner to complete unlocking. At [0062], it is explained that in some embodiments the unlock action includes performing a predefined gesture with respect to the unlock image. Thus an unlock action may involve the user making contact with the unlock image, performing a predefined gesture while maintaining contact with the screen and thereby dragging the unlock image to a location which satisfies certain unlock criteria – see [62]. The location which satisfies the unlock criteria may be defined narrowly or broadly – for example it may be a particular marked location, or a quadrant of the touch screen – see [0063].

123.    Paragraphs [0064] and [0065] are of particular significance to the argument on construction, so I set them out below:

> "[0064] In some embodiments, the interaction includes dragging the unlock image to a predefined location on the touch screen. For example, the unlock action may include dragging the unlock image from one corner of the touch screen to another corner of the touch screen. As another example, the unlock action may include dragging the unlock image from one edge of the touch screen to the opposite edge. The emphasis here is on the final destination of the unlock image (and of the finger). Thus, the user can drag the unlock image from its initial location along any desired path. As long as the unlock image reaches the predefined location and is released at that location, the device is unlocked. It should be appreciated that

SAMNDCA630-06272010

the predefined location may be, as described above, defined narrowly or broadly and may be one or more particular locations on the touch screen, one or more regions on the touch screen, or any combination thereof.

[0065] In some other embodiments, the unlock action includes dragging the unlock image along a predefined path. For example, the unlock action may include dragging the unlock image clockwise along the perimeter of the touch screen (the path being the perimeter of the touch screen), from one of the corners and back. As another example, the unlock action may include dragging the unlock image from one edge of the touch screen to the opposite edge in a linear path. The emphasis here is on the path along which the unlock image (and the finger) moves. Because of the emphasis on the path, the final location to which the unlock image is to be moved may be defined broadly. For example, the unlock action may be to drag the unlock image from its initial location, along the predefined path, to any spot within a predefined region on the touch screen. The predefined path may include one or more straight lines or lines with twists and turns."

124.  These paragraphs are drawing a contrast between giving emphasis to the destination and giving emphasis to the path. In the former case the user may choose *any* desired path provided he or she reaches the destination. In the latter case the user must follow the *predefined* path to reach a destination which may be defined broadly.

125.  The invention is further explained by reference to Figures 4(a) and 4(b) which I reproduce below:

SAMNDCA630-06272011



Figure 4A



Figure 4B

126.   In Figure 4A, a device 400 has a touch screen display 408. The touch screen display is showing an unlock image 402 and visual cues. The unlock image has a built-in arrow to indicate the direction of movement. The visual cues include a channel 404 indicating the path of the gesture or movement along which the unlock image must be dragged. It is said that the channel is similar to the groove along which a slider switch moves. The cues also include one or more additional arrows 406 indicating the direction of the gesture or movement. The arrows may be animated. The right hand end of the channel is the predefined location to which the unlock image must be moved in order to unlock the device. It is stressed that the visual clues are merely exemplary and that more or fewer may be used.

127.   The claims relied on by Apple are, firstly, the independent claim 1, 6 and 18, which are respectively a method claim, a device claim and a claim to a computer program product. Apple also rely on method claim 5 (and corresponding device claim 17) and device claim 9. No one suggested that claims 6 and 18 added anything to claim 1, or that claim 17 added anything to claim 5. Claims 1, 5 and 9 read as follows, with some additional numerals for reference purposes:

128.   Claim 1:

   (i)     A computer implemented method of controlling a portable electronic device

   (ii)    comprising a touch-sensitive display,

   (iii)   comprising detecting contact with the touch-sensitive display while the device is in a user interface lock state;

   (iv)    transitioning the device to a user-interface unlock state if the detected contact corresponds to a predefined gesture;

    (v)    and maintaining the device in a user-interface lock state if the detected contact does not correspond to the predefined gesture,

    (vi)   characterised by moving an unlock image along a predefined displayed path on the touch sensitive display in accordance with the contact,

    (vii)  wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device.

129.    Claim 5:

    (i)    The computer-implemented method of claim 1, further comprising:

    (ii)   displaying a first unlock image and a second unlock image on the touch-sensitive display while the device is in a user-interface lock state; and

    (iii)  wherein transitioning the device to a user interface unlock state comprises: transitioning the device to a first active state corresponding to the first unlock image if the detected contact corresponds to a predefined gesture with respect to the first unlock image; and

    (iv)  transitioning the device to a second active state distinct from the first active state if the detected contact corresponds to a predefined gesture with respect to the second unlock image.

130.    Claim 9:

    (i)    The portable electronic device of claim 6 wherein the predefined displayed path is a channel.

**Construction**

*"gesture"*

131.    Reading the expert evidence in this case, one might reasonably have come to the conclusion that there was to be a significant dispute about the meaning of the word "gesture". Thus Apple's expert, Professor Keyson, maintained that in the field of human-computer interaction, the term gesture had a specific meaning. In particular, if a device was only processing and responding to actions based on the current x,y coordinates of a graphical object, without taking into account the movement pattern, this would not constitute gestural human-computer communication. However, in opening the case Mr Thorley QC - perhaps sensitive to the impact this construction would have on Apple's case of infringement - made it clear that he was not contending that that definition applied in the context of the present case. He recognised, in my judgment correctly, that in the context of the 022 patent the term gesture was used more broadly. There was no requirement that the device should take account of any particular characteristic of the movement beyond its position. In my judgment this is quite clear from [0036] and [0051] of the specification, to which I have referred above.

*"a predefined gesture"*

132.    This term appears in both features (iv) and (v) of claim 1, in the context of the phrase *"if the detected contact corresponds [or does not correspond] to a predefined gesture"*. Both sides agree that what makes a gesture "predefined" is that the device

**SAMNDCA630-06272013**

has stored in it the required characteristics of the gesture which will unlock the device if the user's input matches it. HTC also accept that it is possible to build in room for error, in that the device may be arranged to accept a class of gestures. Thus the device may be arranged so that, if the predefined path is a horizontal gesture, the user will still unlock the screen with a slightly curved gesture. HTC maintain, however, that that there comes a point where the class of gestures is so widely defined that there ceases to be *a* predefined gesture at all.

133. Apple, on the other hand, submit that a predefined gesture is any gesture which the device will recognise as triggering the unlock function.

134. In my judgment, Apple are right about this point. HTC's construction places more weight on the word "a" than it can possibly bear. The argument loses any force it might have had once it is accepted that the claim admits of more than one gesture. I can see no practical reason why the patentee would want to limit the scope of his claims to any particular width of the class of gesture which might unlock the device.

*"predefined displayed path"*

135. The context of this term is also important: the claim requires *"moving an unlock image along a predefined displayed path on the touch sensitive display in accordance with the contact"*.

136. HTC contend that this feature requires the device to define a specific path which the unlock image must follow. They submit that the requirement is not satisfied by merely providing a start and end point, leaving the user to determine the route to be followed between them. They submit that this is clear from the contrast drawn in [0064] and [0065]. HTC submit, further, that the requirement that the path be displayed means what it says, the required route of the unlock image must be visibly marked. They also submit that a displayed path is a more developed concept than a visual cue. An arrow indicating a direction of movement such as arrow 406 in Figure 4A is not a displayed path. On the other hand the channel 404 is an example of a displayed path (as well as being a visual clue).

137. Apple submit that the expression means a path which is (1) recognised by the device by reference to its start and end points and (2) displayed to the user. They submit that [0064] and [0065] are not describing separate, mutually exclusive embodiments, but a spectrum of mechanisms that could embody the invention. They submit that the use of the word "emphasis" in those paragraphs is consistent with this understanding.

138. I think it is clear from the context that the patentee is using the term "predefined ... path" to indicate a requirement for a specific path, stored in the device. A path has start and end points and defines a route between them – it does not leave the user free to choose any route he likes for the path of the unlock image. If the device is neutral as to the path to be followed by the unlock image between the start and end points, then there is no predefined path.

139. Further, and as an additional requirement, the predefined path must be displayed. It follows from my view as to the meaning of "predefined path" that it is not sufficient merely to display the start and end points. A display of the path to be followed must be provided. What amounts to a sufficient display of the predefined path is better

considered in the context of concrete examples. These are, after all, ordinary English words. In a rural context, a signpost pointing across an unmarked field does not display a path, even if one can see another signpost on the other side. On the other hand, a series of posts with arrows on them extending across the field may be a sufficient display of the path to be followed.

*"in accordance with the contact"*

140.   HTC also sought to extract something from these additional words. They do not go as far as to suggest that the finger must engage the unlock image, but they submit that, reading the claim as a whole, there must be a relationship between the contact, the gesture, the path and the motion of the unlock image. This point only has significance in connection with one of the alleged infringements, the Arc unlock, and I will return to the point in that context.

*"user interface lock state" and "transitioning to a user interface unlock state"*

141.   The "user interface lock state" is explained at [0045] to be a state where the device is powered on and operational but ignores most, if not all input. It is clear however that the lock state is not one in which the device only responds to one type of input. For example claim 5 expressly requires the device to be capable of transitioning from the unlock state to two different active states, dependent on different gestures, i.e. different inputs. Moreover, [0045] also makes clear that the device in the lock state *"may respond to a limited set of user inputs"* including, in addition to transitioning the device to an unlock state, powering the device off.

142.   The term "unlock", and the more cumbersome "transitioning to a user interface unlock state", plainly cover changing the device from the lock state, to one where normal input is allowed. But the specification makes it clear that the term is being used more broadly than this. Thus, at [0075], it states:

> "In some embodiments, the lock/unlock feature may apply to specific applications that are executing on the device 400 as a whole. In some embodiments, an unlock gesture transitions from one application to another, for example, from a telephone application to a music player or vice versa."

143.   Similarly, [0005] refers to unlocking applications. [0045] says that the "lock state" may be used, amongst other things, to prevent unintentional activation of functions on the device.

144.   Thus, in my judgment, an arrangement where certain functions, and only those functions, can be activated by a limited set of user inputs will involve a lock state. Effecting any one of those inputs so that the application can function normally will involve transitioning the device to an unlock state.

*"Channel"*

145.   Claim 9 requires the predefined displayed path to be a channel. At [0067] the patent describes the channel in Figures 4A and 4B as *"similar to a groove along which a slider switch slides"*.

**SAMNDCA630-06272015**

146.   Mr Thorley submitted, in my judgment somewhat optimistically, that the channel in the claim admitted of a certain amount of lateral freedom during the longitudinal movement, in contrast to a strictly defined groove. I do not think that this is the meaning that the skilled reader would attribute to the phrase. The displayed channel in the claim can be of any width, provided it remains recognisably a channel. I cannot see any technical reason why the skilled addressee would wish to exclude from the claim narrow channels, similar to the digital sliders with which he would already be familiar, or mechanical slider switches, nether of which provide for lateral movement. The passage at [0067] is intended, in my judgment, to draw the analogy with a mechanical slider switch which travels in a closely defined groove, not to distinguish from it.

**Infringement**

147.   The relevant model names and numbers of HTC's devices which are accused of infringement are identified in the Product and Process Description ("PPD"). They are all mobile telephones with touch sensitive screens, with the exception of the HTC Flyer which is a portable tablet computer with a touch sensitive screen. The distinction between phones and tablets does not matter. For present purposes it is enough to state that the various devices are distinguished by reference to their use of one of three different types of unlock mechanism. The type of unlock mechanism used is dependent on the version of software which is installed on them. These three mechanisms are:

i)   the Arc unlock,

ii)   the Ring unlock, and

iii)   the Icon mechanism.

All three mechanisms are said to infringe the independent claims 1, 6 and 18. In addition, the icon mechanism is alleged to infringe claims 5 and 17.

*The Arc unlock*

148.   In its resting state, the locked screen in the Arc unlock mechanism looks like this:

SAMNDCA630-06272016



149.   The name of the operator, the time and the date are displayed on the Arc.  Touching the screen at any location results in the date, time and operator name disappearing and the words "Screen locked" with a small padlock appearing on the Arc.  In addition the words "Drag down to unlock" appear, with a set of three chevrons appearing on either side of the wording.  The three chevrons are animated, so that the top chevron appears first, followed by the second and then by the third.  The chevrons increase in intensity, so that the second is brighter than the first, and so on.  The figure below shows the state of the screen once the third chevron has appeared:



150.   To unlock the Arc lock screen, the user must perform a gesture which results in moving the Arc towards the bottom of the display.  For example, the gesture can be initiated by touching down in the centre of the Arc and then moving vertically downwards, dragging the Arc, to unlock the device.  Equally the device can be unlocked by touching down on the left hand end of the arc and dragging down in a

SAMNDCA630-06272017

diagonal movement to the bottom right hand corner of the screen. However there is no requirement in either case that the user lands on the Arc. The user can start the gesture in the area of the screen anywhere above the Arc and drag his/her finger down the screen towards the Arc. Once the finger passes over the Arc, the Arc is 'picked up' and the user can then drag the Arc downwards (i.e. below its starting position) in order to unlock the device. The Arc cannot be moved upwards. The chevrons move downwards with the Arc.

151. The movement of the Arc is determined by the y-coordinate of the touch only. When the user lifts his or her finger off the screen, two conditions must be satisfied for the device to unlock:

    i)     the point at which the user landed on the screen must be above, approximately, the point at which the lower black arc meets the sides of the screen;

    ii)     the distance the Arc has travelled in the y-direction from the point at which the user touched on and that at which he or she lifts off must exceed a set threshold. If the user lands on the display above the Arc, and picks it up, then the distance is measured from the top of the Arc.

If the conditions are satisfied, then the Arc continues to move on the display, and disappears from view.

*Infringement - Arc unlock*

152. It is sufficient to focus on the features of the claim which HTC submit are not present. Firstly, they say that the Arc unlock does not involve a predefined gesture. They say that the range of gestures which will unlock the device is too great to be described correctly as a predefined gesture. I am not persuaded by this point, which turns largely on the issue of construction which I have decided. There is a class of predefined gestures, albeit a large one, which conform to the unlocking criteria of Arc unlock mechanism.

153. Secondly, HTC submit that the unlock image, in this case the Arc, is not moved along a predefined displayed path in accordance with the contact. The Arc is not a free-moving object. The path of its movement is determined by the software. The path which the Arc has to follow in order to unlock has a start and end point and is recognised by the device. I therefore consider that the Arc, which for these purposes is an unlock image, is moved along a predefined path.

154. It is here that HTC submit that the requirement for the unlock image to be moved "in accordance with the contact", requires more of a connection between the movement of the finger and the movement of the unlock image than is present in the Arc unlock mechanism. They draw attention to the fact that although the image moves along a strictly regulated path, the contact does not. In my judgment, this argument is reading too much into "in accordance with the contact". The movement of the Arc is directed by the contact. Monitoring an aspect of the movement of the contact determines the movement of the Arc. This is enough for movement of the Arc to be said to be in accordance with the contact.

SAMNDCA630-06272018

155. The critical question on this accused device is whether the predefined path is "displayed". Apple maintain that the displayed chevrons, coupled with the words which appear on the screen "Drag down to unlock" amount to a sufficient display of the path. They submit that the user would understand that he or she should drag their finger down between the chevrons. HTC submit that the chevrons are merely indicating direction, not a path. They point to the fact that the chevrons move with the Arc and are part of the unlock image, rather than a display of the path which it is to follows.

156. I have come to the conclusion that the instructions on the screen, coupled with the chevrons are sufficient indication to the user of a path which the Arc must be dragged along to amount to a displayed path. Professor Greenberg accepted that the natural inclination of the user would be to run his finger between the chevrons. It follows that the user is given a sufficient indication of the path the unlock image should follow. I am not persuaded that the fact that the chevrons move prevents them displaying a path.

157. It follows that if the patent is valid, the Arc unlock mechanism would infringe claim 1. The same is true of claim 6 and 18 which are also alleged to be infringed.

*The Ring unlock*

158. The Ring lock screen has a grey ring displayed in the centre of the bottom edge of the screen. Approximately one third to one half of the Ring is visible above the bottom edge of the screen. There is a semi-transparent 'arc' across the bottom of the display behind the ring. Four application icons appear above the ring.

159. A touch landing on, within or in the area immediately surrounding the Ring results in the application icons disappearing. If the user 'lifts off' without moving the Ring from its starting location, the application icons reappear, and the words "Pull the ring to unlock" appear. The figure below shows the Ring Lock Screen immediately after the touch has been 'lifted off':



SAMNDCA630-06272019

160.  A touch landing elsewhere on the screen and lifting off also causes the words "Pull the ring to unlock" to appear. At the same time, the Ring moves upwards from the bottom of the screen until one half to two thirds of the Ring is displayed above the bottom edge of the screen. The Ring then moves back down to its starting position. Immediately after the Ring moves back down, white lines are seen radiating outwards from the Ring in a ripple effect. The combined effect is to draw the user's attention to the Ring.

161.  To unlock the screen the user makes a touch anywhere within the Ring or the area immediately surrounding it, and then, drags the Ring which follows the touch. To unlock the device, the bottom of the inside edge of the device must be visible above the bottom of the screen. If this criterion is satisfied the Ring appears to grow until it covers the whole of the screen, and the screen unlocks. If the criterion is not satisfied, the Ring reverts to its original position. Thus if the Ring is pulled sideways, the device does not unlock.

*Infringement - Ring unlock*

162.  The points taken by HTC in relation to the Ring unlock are similar to those I have dealt with under Arc unlock. They say, firstly, that the range of gestures permitted with Ring unlock is too broad to be a predefined gesture. I do not accept this submission for the same reasons as in relation to the Arc unlock feature. It is correct that the device accepts a broad range of gestures, but on the approach I have taken, this does not avoid infringement.

163.  Secondly, HTC submit that there is no predefined displayed path. No separate point arises on "in accordance with the contact", because in the case of Ring unlock the ring, which is an unlock image, moves directly under the user's finger. Unlike the Arc, however, the Ring is a free moving object. Whilst the required start of the route is defined, and the end point is very broadly defined, the device is neutral as to the route taken between the two. On the approach which I have taken to what amounts to a predefined path, the Ring unlock mechanism does not satisfy this feature.

164.  If I am wrong about whether there is a predefined path, I should consider whether there is a displayed path. Apple submitted that the legend "Pull the ring to unlock" coupled with the initial up and down movements of the ring and the ripple effect were adequate to display a path.

165.  Perhaps recognising the difficulty with this argument, Professor Keyson suggested that the manual provided with the phone assisted the user to understand the path. I do not think that instructions in the manual form a legitimate part of determining whether a path is displayed. Further, Professor Keyson sought to rely on the presence of the light coloured arc beneath the Ring as indicating a direction to pull. Neither point was adopted by Apple in their final submissions. In my judgment they were right to ignore these points made by Professor Keyson, which demonstrated the unbalanced approach he took to the issues.

166.  It is fair to point out that Professor Greenberg was prepared to accept that the combination of indicia was sufficient to display to the user that the Ring should be pulled in an upward direction. But in my judgment this is a long way away from establishing that there is a displayed path. The user is not shown the point to which

SAMNDCA630-06272020

he must drag the Ring, or anything except the very broadest indication of direction, always assuming he interprets the various signals in that way. The Ring unlock feature does not have a displayed path. It therefore does not infringe claim 1, 6 or 18.

*The icon mechanism*

167.   The icon mechanism operates by dragging an application icon into the ring to activate the application in question, directly from the lock screen. A touch landing on or in the area immediately surrounding any one of the application Icons results in the Ring moving up from the bottom of the screen towards the application icon which has been touched, until approximately three quarters of the Ring is displayed. The centre of the Ring turns a dark grey colour and a lighter grey shape appears in the centre of the Ring representing the application. The sequence of images below shows this behaviour, using the phone icon:



168.   When the user lifts off, the words "drag icon into ring to activate" appear. At the same time, the image representing the application moves back to its starting position and the Ring moves back down to its starting position. Immediately after the Ring moves back down, white lines are seen radiating outwards from the Ring in a ripple effect.

169.   To unlock the Ring lock screen, the user must make contact with the application icon or the area immediately surrounding it and drag the application image into a drop area. The user can move the image in any pattern on the screen before lifting off in the drop area. There is a drop area for each of the four application images. Each drop area is a rectangular area defined by x and y co-ordinates and includes some of, but not necessarily all of the Ring, and an area outside the Ring that is near to the particular application icon. If the icon is dropped in the drop area, the device unlocks and the ring behaves as in the Ring unlock case.

*Infringement - Icon mechanism*

**SAMNDCA630-06272021**

170.  The parties' arguments as to whether there was a predefined gesture were the same, and lead me to the same conclusion as for the previous devices.

171.  Apple submitted that there was a predefined displayed path because the Ring moves towards the icon and the icon moves towards the Ring, whilst a silhouette of the icon appears within the Ring. In my judgment, as for the Ring unlock mechanism, because the icon may be moved along any path between its starting and finishing points, there is no predefined path. There is also no displayed path. The visual cues are, in my judgment, too vague to amount to a displayed path.

172.  It follows that the icon mechanism does not infringe claims 1, 6 or 18. Although it is common ground that the icon mechanism has the additional features of claims 5 and 17, those claims are dependent on earlier claims, and are therefore not infringed for the same reasons.

**German and Dutch decisions on construction and infringement of 022.**

173.  HTC drew my attention to a number of decisions on the corresponding European patent (DE) against manufacturers of devices which also use the Android operating system, Samsung and Motorola.

174.  In *Apple Inc. v Samsung Electronics GmbH and another,* a decision of 2nd March 2012, Judges Voss, Tochtermann and Schmidt sitting in the seventh civil chamber of the Mannheim Regional Court in Germany (Landgericht Mannheim) thought that:

> "it can no longer be considered a predefined gesture "along a predefined path" … within the meaning of the patent in suit when the position-related movement of the unlock image [can be] chosen at will by the user in its entirety between the starting contact point and the end of the contact on the touch sensitive display."

175.  My conclusions on the proper construction of "predefined path" are consistent with those reached by the Mannheim court. They further held that:

> "The predefined path … is displayed within the meaning of the patent if the precise position-related progression of the movement of the unlock image (still) necessary for unlocking is as such visualised by the user."

176.  Whilst there may be scope for argument as to what is a sufficiently precise visualisation of the movement, I believe my conclusions are also broadly consistent with this finding by the Mannheim court.

177.  In *Apple Inc. v Motorola Mobility Inc.*, a decision of 16th February 2012, Judges Guntz, Pichlmaier and Kopacek sitting in the seventh civil chamber of the Landgericht München, had to consider three separate embodiments of a Motorola phone. Two of these were held to use an unlocking mechanism with a predefined displayed path on the basis that there was a sufficient visual indication of the path to be followed, and the unlock image moved along a stored path. The third embodiment was held not to infringe. Here the user must either drag an inner circle to the contour

of the outer circle and then lift his finger from the touch screen upon reaching the contour, or he can first touch a padlock symbol and immediately thereafter any point outside the outer circle to bring about unlocking. The court's reasoning at pages 30 to 31 of the translation is again broadly consistent with my own.

178.  I am told that at a hearing on 4th April 2012 there was a first oral hearing in the Landgericht München in Apple's claim against HTC on the 022 patents. The views expressed by the court on that occasion were provisional and there is no written judgment. The court expressed the view that the devices in issue in the present action, which were also in issue in the German proceedings, did not infringe because of the variety of the movements of the image which lead to unlock. I have come to a different view from the Landgericht München in relation to Arc unlock. However as there is no reasoned judgment from the court, the information supplied to me about this hearing does not cause me to reconsider my view.

**Validity**

179.  HTC relies upon lack of novelty over a document referred to as Hyppönen, obviousness over a document and video called Plaisant and a prior phone called Neonode, added matter and excluded subject matter. An argument that the invention was obvious in the light of common general knowledge alone was not pursued at trial.

*Hyppönen disclosure*

180.  Hyppönen is PCT Application number WO/038569. It was published on 8th May 2003. The invention disclosed is of a method and apparatus for selecting a password applicable in particular to mobile devices which lack a physical keyboard, including stylus driven PDAs. The specification contains a discussion of the balance which needs to be struck between ensuring that the device is secure, and enabling relatively easy use.

181.  In the embodiment of Hyppönen on which attention was focused, a user selects a value by selecting a graphically displayed element from a stored set on a graphical user interface. This is done by means of a graphically displayed representation of a slider on a touch sensitive display operated by a stylus.  For each position of the slider, the value corresponding to that position is displayed to provide visual feedback to the user. Once selected, the value chosen is hidden from view.

182.  Figure 2 gives an idea of the interface:

SAMNDCA630-06272023



(a)          (b)          (c)

## Figure 2

183.   The user selects the values by operating each slider from a starting point until the value corresponding to his password is displayed. Figure 2(a) shows the starting position. In Figure 2(b) the displayed values are names of cities, and the user has selected Toronto as corresponding to his password. Figure 2(c) shows the display after the first and second values have been chosen. Once the user has selected all the sliders corresponding to the password, the device will respond to the entry of the password appropriately. As the device must be switched on to display this interface, the response to the successful insertion of the password must be to transition the device from a locked to an unlocked state.

*Anticipation by Hyppönen*

184.   In their closing skeleton Apple submitted that Hyppönen lacked three of the features of claim 1, and accordingly did not deprive that claim of novelty. These features were that there was no predefined gesture (features (iv) and (v)), there was no predefined displayed path (feature (vi)), and the user does not interact with an unlock image in order to unlock the device (feature (vii)).

185.   HTC's case depends on looking at the movement of the final slider, the user having correctly entered the relevant component of the password for all the sliders up to that point. What is then required to unlock the device is that the user touch on the slider and drag it to the point at which the final component of the password is displayed.

186.   In my judgment, this final movement of the slider complies with the requirements of features (iv) and (v). The device is unlocked by the user performing a gesture. If the gesture corresponds to the user moving the slider from the starting point to the correct value, then the device will unlock. It is true that the class of gestures which may potentially unlock the device is wider than a single gesture. Thus, depending on the initial starting point of the slider, the gesture may be downward or upward. Moreover any of the sliders could be used to input the last component of the password, so the gesture may be performed at various different locations. However, consistently with the view I have taken on construction, and applied when dealing with infringement, the fact that the device may be programmed to accept a broad class of gestures does not take it outside the scope of the claim.

187.    Rather less straightforward is the question of whether the unlock image is moved along a predefined displayed path. Plainly the unlock image, the slider handle, can be, and is moved along a path which is displayed. Mr Thorley submits that the random starting point of the slider, coupled with the absence of any teaching as to the direction in which the slider needs to move to achieve unlocking, and the absence of a displayed endpoint means that there is no predefined displayed path.

188.    In deciding the issue of infringement of the Arc unlock device, I came to the conclusion that the directional signage and instructions in the alleged infringing device were adequate for there to be a displayed path. I did not think that the absence of a displayed end point was fatal to there being a path. The visual indicators were sufficient to show a path which the unlock image had to follow. It was not a necessary part of that finding that directional indicators were necessary for there to be a displayed path at all. Other means of indicating the existence of a path could be adequate.

189.    The argument based on the disclosure of Hyppönen does not raise the question of whether there is a predefined displayed path at all: there plainly is. In the 022 patent's terms it is a channel. Moreover, at all points during the unlock procedure the unlock image remains on this predefined displayed path. The argument raises a different question, namely whether the predefined displayed path must *also* convey directional and end point information, or whether it is enough to present the user with an unlock image on a path, leaving it up to him to find the end point is by moving the unlock image along it.

190.    I agree with HTC that there is nothing in the meaning of "predefined displayed path" to exclude the Figure 2 mechanism of Hyppönen. It is true that this amounts to a less user friendly unlocking mechanism than the depicted embodiments of 022. But, as [0045] makes clear, the locked state may also be being used to prevent unauthorised use. In these circumstances one may not wish to display to the user the direction or end point of the required movement on the displayed path. Moreover, as HTC also submit, the Hyppönen mechanism does provide a degree of user-friendliness as compared with simple memory based password systems. I can see no reason why the reader of 022 would think that the patentee was seeking to exclude embodiments which deliver such advantages.

191.    Finally, it seems plain to me that the unlock image, the slider "handle" in Hyppönen, is a graphical, interactive user-interface object with which a user interacts in order to unlock the device. Apple submitted that what the user did was to move the sliders in order to make a selection from the words appearing above them. That is true, but whilst doing so the user is interacting with the slider to unlock the device.

192.    It follows that Hyppönen is an anticipation of claim 1, 6 and 18. Apple submit that Hyppönen's slider is not a channel, as required by claim 9. This argument turns on Apple's construction of channel, which I have rejected. It follows that claim 9 is also not novel in the light of Hyppönen.

**Plaisant disclosure**

193.    The citation which has been referred to in this trial as Plaisant is a video and accompanying paper dating from 1992 by Catherine Plaisant and Daniel Wallace.

**SAMNDCA630-06272025**

Because of this cross-reference, it was common ground that it was legitimate to read the paper together with the disclosure of the video.

194. Catherine Plaisant was a member of the HCI department at the University of Maryland. The co-author, Daniel Wallace was, at the time that the underlying research was done, a graduate psychology student in the Psychology Department at the same university. The skilled person would have regarded these disclosures as coming from an authoritative source. The video describes the results of a usability study of six different toggle switches to control two state (on/off) devices on a touch screen. The work was conducted in collaboration with a company which specialised in the development and marketing of integrated entertainment, security and climate control systems for homes and offices. The control of these multiple devices is effected through touch screen interfaces.

195. Plaisant explains that computer based toggle switches can be confusing in a variety of ways. One type of confusion to which she refers is that between state of activation and the label for possible action. Thus the user may not readily appreciate whether the label "ON" indicates the state of the device (i.e. already "ON") or a button to press to switch it on (i.e. currently "OFF"). Another type of confusion is uncertainty as to what to do to activate the device. She gives the example of a slider where only touches to the end of the slider were possible but "sliding" is not permitted.

196. The toggles which were the subject of the usability study are illustrated in Figure 2 of the Plaisant paper (as well in the video). They are referred to as the one-button, words, two-button, rocker, slider and lever. I show this figure below:



197. The operation of the slider toggle is described as follows:

> "*Slider toggle:* in this toggle a sliding/dragging movement is required to change the position of the yellow pointer from one side of the toggle to the other. A simple three step animation shows the movement of the pointer along the slide. If the device is ON the pointer is on the ON side. Users can then grab the pointer and slide it to the other side. If the finger is

**SAMNDCA630-06272026**

released before reaching the other side the pointer springs back
to its previous position. "

198.   Plaisant explains that the usability testing showed that the toggles which pushed were
preferred over the toggles that slid.  She thought this was possibly explained by the
fact that sliding was more complex than simply touching.   They also noticed that
sliders were more difficult to implement.  The usability test brought to light some
imperfections in their slider design.  However, all subjects (spontaneously or after one
trial) successfully used sliding motions to manipulate the toggles.  The paper
continues:

> "Even if sliders were not preferred, the fact that users used
> them correctly is encouraging since many other controls can be
> designed using sliding motions. Another advantage of the
> sliding movement is that it is less likely to be done
> inadvertently therefore making the toggle very secure (the
> finger has to land on and lift off the right locations). This
> advantage can be pushed further and controls can be designed
> to be very secure by requiring more complex gestures (e.g. a U
> or W shape slider can be used for a 2 or 3 setting control
> respectively)."

199.   The Plaisant video shows a number of slider switches organised into an array, each
controlling a separate function:



*Was Plaisant CGK?*

200.   Whilst I have no doubt that the skilled person would have regarded Plaisant as a
reliable and authoritative document, I am, on balance, not persuaded that it was
common general knowledge at the priority date. I accept that the work was presented
at one of the most important conferences on HCI, the CHI 1992 conference, that it
came from an influential group and that some teachers, such as Professor Greenberg,
referred their pupils to it and included it in the video materials available as part of the
Open Video Project. The work was certainly widely known and shown, widely read
and viewed and widely published.  To hold that the entire contents of the paper and
video were part of the common general knowledge requires something more.

201.  Plaisant was referred to in two editions of a text book by Shneiderman and Plaisant before the priority date, but reference to it was removed in the 2005 edition.  Given the large volume of material similar to Plaisant that was available, I am not satisfied that the skilled person, faced with a problem in the field of HCI design at the priority date, would necessarily find his way to this material.  I conclude that it is not common general knowledge.

*Obviousness over Plaisant*

202.  I have identified the skilled person and the common general knowledge he or she would possess.  I have also determined the inventive concept of 022 by construing the claims: neither side volunteered any more pithy paraphrase.  The first difference between the disclosure of Plaisant and the inventive concept of claim 1 of 022 lies in the fact that Plaisant does not disclose the use of her slider toggles in a portable electronic device (feature (i)).

203.  A second difference between Plaisant and the inventive concept of 022 is that it is not accurate to describe what is done in Plaisant as transitioning a device between a user-interface lock state and a user-interface unlock state.  I have indicated above that these terms have a quite extended meaning in the 022 patent, including unlocking an application and transitioning the device from one functionality to another.  Nevertheless, this difference also forms part of the gap between Plaisant and the inventive concept of claim 1.

204.  Apple maintained that there was a third difference, namely that the gesture disclosed in Plaisant was "a poor implementation of a gesture".  By this they meant it was safe but not user friendly.  Even if correct, this is not a difference between the disclosure of Plaisant and the inventive concept, which extends to any gesture.  If correct, it might be a factor which the skilled person might have in mind if deciding whether to adopt Plaisant's sliders, and will need to be considered at that stage.

205.  Having identified such differences as there are, it is of course necessary, for the purpose of the next stage of the inquiry, to forget about the differences and to ask only what if anything it is obvious for a skilled person to do in the light of Plaisant.

206.  HTC argue as follows. Firstly they say it would be obvious to the skilled person that the Plaisant sliders could be used on other devices, including portable devices. Secondly they say that the fact that Plaisant speaks of turning devices on and off, whereas 022 refers to lock/unlock of a user interface, is a trivial difference.  Thirdly they say that the skilled person would know that accidental activation was a problem with touch screen portable devices.  Reading Plaisant with this problem in mind the skilled reader would see an obvious way of dealing with accidental activation.

207.  Apple contend that the starting point for considering obviousness in the present case is to provide an intuitive, user friendly graphical unlock means which avoids the possibility of unintentional activation of functions through touching the screen.  The common general knowledge way of providing this was through some form of mechanical keylock function.  Apple go on to build on the fact that HTC no longer pursue their attack based on common general knowledge alone.  As the common general knowledge already provided sliders, such as those used in the Windows CE operating system, the only additional disclosure in Plaisant was of the use of these

known sliders to provide on/off functionality, which did not make the invention obvious. The removal of the reference to Plaisant from the Shneiderman and Plaisant book meant that the authors themselves no longer regarded it as relevant to any problem. Finally the problem of accidental activation has been known for some years, yet Plaisant's on/off slider had not to anyone's knowledge been implemented on a portable device for any purpose.

208. Professor Greenberg's evidence in his first report included this:

"73. Catherine Plaisant's goal was "to select a usability-tested/error-free toggle and to better understand some of the problems and issues involved in the design of controls for a touchscreen environment" (page 667, column 2, lines 9-12 of the Plaisant Paper). The Plaisant Prior Art is merely describing a transition from one user-interface state to another. Transitioning a device from a lock state to an unlock state is simply one particular example of such a state change. In Catherine Plaisant's implementation, she has chosen to label these two states as "on/off", but the labels do not matter: her work applies equally to transitions between any two states, including "lock/unlock". Catherine Plaisant's goal also applies to any underlying functionality whose user-interface state change is controlled by toggle switches.

74. Consequently, at the level of the graphical user interface, there is no difference between the Plaisant Prior Art and the '022 Patent. It would have been obvious and trivial to the Skilled Person at the '022 Priority Date to use and implement the techniques described in the Plaisant Prior Art to transition a device from a locked to an unlocked state."

209. I am not prepared to accept that, in the 022 patent's terms, Plaisant actually discloses a change from one *user interface* state to another. However, that aside, I accept Professor Greenberg's evidence that the skilled person would see the general applicability of the toggles for changing the state of a device. Although it was suggested to Professor Greenberg in cross-examination that the focus of Plaisant was only on on/off switches, he plainly remained of the view set out in these paragraphs.

210. Professor Keyson pointed out in his second report that Plaisant does not disclose a transition from a user interface lock state to a user interface unlock state. The actual user interface shown in Plaisant is always unlocked. This amounts to saying that Plaisant's toggles are not controlling the lock unlock state of the Plaisant user interface, which I have already accepted is correct: they are controlling the state of the relevant devices.

211. Professor Keyson's reasons why he thought that the invention was not obvious in the light of Plaisant drew heavily on his interpretation of the term "gesture". He plainly had in mind some more developed definition of what amounted to a gesture, which is not the definition adopted by the 022 patent, or a definition which Apple themselves in the end felt able to embrace. Professor Keyson also thought that the fact that the specific embodiments of 022 only showed one-way unlocking, whereas Plaisant

showed two way toggles, amounted to a relevant difference. This too is wrong, as the claims of 022 do not exclude a two-way toggle switch. Professor Keyson also drew attention to the fact that a HP Jornada pocket PC had a touch screen which could be activated by tapping the screen. Users were warned of the dangers of accidental activation while sliding the device into its protective pouch. A slider based unlock mechanism would have avoided the need for this warning, but was not implemented in the HP Jornada, or any other device before the Apple iPhone.

212. In my judgment the invention of claim 1 would be obvious to the skilled person in the light of the disclosure of Plaisant. I think the evidence of Professor Greenberg is a more realistic reflection of the approach of a skilled person to that disclosure than the evidence of Professor Keyson, which was, as I have indicated, based on misconceptions as to the nature of the inventive concept. The skilled person would readily understand that Plaisant toggle switches could be used to control the state of a device, including a user interface state within the meaning of the 022 patent. Given that it is generally known that the screen will accept input to lock and unlock the device, I can see no technical reason why the skilled person would not implement a Plaisant toggle to control locking and unlocking. The skilled person would appreciate that the slider toggle would have advantages over the on/off toggles, as it would provide protection against accidental activation of the toggle itself, as Plaisant explains. Professor Keyson was constrained to accept that if it came down to choosing one of the switches, the slider would be one of the preferable ones.

213. Turning to the points advanced by Apple, firstly, I do not accept that Plaisant's sliders would have been perceived as poor forms of gesture by the skilled person at the time. All the users managed to use them successfully. The use of sliders of the Windows CE variety was part of the common general knowledge. In addition they would be seen as easy to implement. Secondly, the skilled person would have no difficulty in visualising the lock/unlock functionality as a switch analogous to the common general knowledge mechanical switch for protecting the iPod, or the sliders used to lock touch screens. Thirdly, I do not think that much can be built, as Apple seek to do, on HTC's abandonment of their case based on common general knowledge. Mr Thorley submitted that Professor Keyson's evidence was that he could not see any benefit in the disclosure of Plaisant, when slider controls were already in use in commercial touch screen products. However, I did not gain the impression that this was what Professor Keyson was saying in the passage of evidence relied on. His evidence was that, given the Windows CE sliders, he would see no reason to go and look for the slider in Plaisant. That is a different question. HTC's obviousness case assumes, as they are entitled to, that the skilled reader faced with the known problem is reading Plaisant with interest. I cannot see how it can be said that Plaisant teaches nothing new: the Windows CE sliders did not draw the analogy with mechanical on/off sliders in the graphic way that Plaisant does.

214. Mr Thorley also relied on the following passage of cross-examination of Professor Greenberg:

> Q. It was appreciated by 2005 that sliders of this nature [i.e. Plaisant] did have a place in touchscreen device ----
>
> A. I would say it would be one of the things that could be considered when making design choices, yes.

Q. It was considered, was it not?  It had been considered?

A. It certainly had been considered in this article, yes.

Q. No, it had been considered in the Palm environment we looked at with -- it was looked at with Professor Keyson.

A. So maybe I should explain what I mean by "considered"?

Q. Yes, of course.

A. We are talking about a skilled person who has to decide what features they want to implement on their touchscreen, in this case on the touchscreen device, be it portable or not, depending on -- sorry, be it portable or not.  A person in that role, their job is not to just blindly say, "Here is one technique and we will apply it".  Their job is to consider the interface as a whole.  Part of their job and part of, in fact, the majority, a large part of what they have to do is to consider all the interaction techniques at their disposal and to make choices between them.  So one could consider a broad variety of interaction techniques and then choose one which best fits, for example, the kind of interface they have, the kinds of things being done on it, the other aspects of the interface in terms of consistency, other kinds of tasks the person is performing, the context of use and so on.  There are many, many decisions or many factors that a person would have to make.  So when I say "considered", I mean that the skilled person would be considering this amongst one of the many other options.

215.    I did not think that Professor Greenberg's explanation of "considered" really took Apple's case anywhere.  It is of course relevant to the assessment of obviousness that there may be a number of possible avenues for the skilled person to go down. However, Professor Greenberg was not, in this passage, qualifying his evidence about the obvious avenue to go down from Plaisant.  It was not suggested to him that the other options to which he referred in the course of explaining what he meant by "considered" would eclipse the obviousness of taking the step from Plaisant to the patent.

216.    Finally, whatever may have been the reason for the removal of the Plaisant material from the Shneiderman and Plaisant textbook, I do not think that the evidence showed that the skilled reader would reject the teaching of Plaisant as lacking relevance at the priority date.  The work comes from a stable to which great attention would be paid. The video shows how well the toggles work.

217.    Beyond this, Apple's case of non-obviousness is based on asking the forensic question "if it was so obvious, why was it not done before"?   Professor Greenberg ventured the suggestion that the invention came at a time when screens were becoming more robust, so that covers were no longer needed.  The need to consider how to deal with a touchscreen without a cover was therefore not such a longstanding one.   I accept that explanation.  In any case I am wholly unable to see how the idea

of implementing Plaisant's slider in a portable device to control locking or unlocking could be said to require an inventive step.

*Neonode disclosure*

218.   The Neonode N1 was a mobile telephone launched in July 2004 in Sweden and by November 2004 in other European countries. The N1 incorporated a touch screen which was locked when the phone was not in use.

219.   A number of versions of the unlock screen were incorporated into the phone. The first, referred to as the "text" screen had an image of a padlock and the words "Right sweep to unlock" displayed below it thus:



220.   In late 2004 the text lockscreen was replaced with the "arrow" lockscreen. In this screen the text was replaced with a lighter coloured arrow, seen faintly in the following picture adjacent the user's thumb:



221.   A third variation, the N1M, was launched at a later date, which is in dispute. The design was altered again by replacing the arrow with 3 small chevrons pointing from left to right. I was not persuaded that HTC had discharged the onus of proving that the chevron version was made available to the public by the priority date. The evidence of Mr Gustaffson, put in by Civil Evidence Act Notice, seemed to me to leave considerable doubt as to when this third version was made available. He could not himself remember, and the documentary support he relied on was ambiguous.

*Obviousness over Neonode*

SAMNDCA630-06272032

222.   I have dealt with the inventive concept, the skilled person and the common general knowledge. HTC rely principally on the arrow unlock feature of Neonode. The only difference between the disclosure afforded by the Neonode arrow unlock feature and the inventive concept of claim 1 is the absence of an unlock image with which the user interacts and which is moved along the predefined displayed path (feature (vi) and (vii)). The sole question is therefore whether it was obvious to add these features to Neonode, without knowledge of the invention.

223.   The evidence showed that the Neonode was regarded as an innovative design when it was launched. Aspects of the design of its graphical user interface were, however, the subject of criticism at the time. I am satified on the evidence that the skilled team would appreciate that the arrow unlock feature suffered from a lack of feedback.

224.   HTC's case is that it did not require invention to improve the user interface by providing an unlock image in the form of a cursor which the user could drag along the unlock arrow.

225.   Professor Greenberg's evidence supported HTC's case. His evidence in his first report was the following:

> "89. Upon observing the Chevrons Unlock Feature and the Text Unlock Feature I noted that a number of obvious modifications could be made to improve upon them. For example, neither unlock feature provides the user with any feedback. It would be routine, and part of the standard design process, to provide some form of object on the user interface with which the user can interact, in conjunction with feedback, so that the user knows that progress has been made towards unlocking and/or whether they are carrying out the correct action.
>
> 90. The chevrons and the text "Right sweep to unlock" provide no more than an indication of the direction in which the swipe should be made. The Skilled Person would view it as a straightforward improvement to place a feature on the user interface, the visual affordances and constraints of which were such that the userwould know clearly what they had to do to unlock the touch screen and in which specific part of the screen they had to make the required input. One possible obvious addition that I put forward to PG (before seeing the '022 Patent) that would address all of the above suggestions in this and the preceding paragraph would be to add some sort of slider to the user interface, where the user would have to drag an object/handle along a slider in order to unlock the touch screen."

226.   Professor Greenberg was cross examined on the basis that he had not formed, and was incapable of forming, an objective opinion on the subject having seen the implementation of the invention in the iPhone. I have mentioned this point above when dealing with the witnesses. Professor Greenberg, rejected this suggestion:

SAMNDCA630-06272033

> "A. Again, I can only restate that I was putting myself in the shoes of somebody in 2005, this is a really, really basic improvement on a device, there is nothing unusual about that at all. The fact that I had an iPhone, yes I had an iPhone. Would it have changed my opinion at all if I had not? No. That is -- I will stay firm on that. That is what it is."

227.   Professor Keyson's answer to this evidence centred on three main points. Firstly, he pointed out that although the provision of feedback was well known, the form which that feedback takes needs to be decided. Secondly, he said that he was not aware of any products on the market prior to Neonode which had a swipe gesture and gave visual interactive feedback. Thirdly, he observed that, despite a series of modifications to their user interface, Neonode did not implement the improvement.

228.   Professor Keyson found it extremely difficult to address the question of whether it would have been obvious to provide an unlock image, at points more or less refusing to do so. I have re-read this passage of his evidence, and found little or nothing in the evidence which assists Apple's case.

229.   I consider that it would be obvious to the skilled team, faced with the lateral-swipe arrow unlock of Neonode, that it could be improved by the provision of feedback. The skilled team would be aware that visual feedback for a lateral gesture could be provided by the extremely familiar sliders from his common general knowledge, such as the Windows CE slider.

230.   It is true that this simple improvement was not done by Neonode. This is a secondary consideration which may in some circumstances support a case of inventiveness. On its own, which it would be in this case, it is of little weight.

231.   Claim 1 is obvious in the light of Neonode.

**Sub-claims**

232.   HTC maintain that claims 5 and 9 are obvious over Neonode and Plaisant.

233.   In my judgment claim 9 is plainly obvious over Plaisant: Plaisant discloses a channel, and the channel would form part of the obvious implementation of Plaisant.

234.   Claim 5 adds the feature that the device can be moved to a variety of different unlocked states from the locked state. Beyond the initial unlock screen, Neonode disclosed the use of three swipe gestures in order to unlock different applications: the start menu, the keyboard menu and the tools menu. Once it is accepted that claim 1 is obvious in the light of Neonode, it seems to me that claim 5 is obvious as well. The skilled person would readily see the applicability of the swipe-with-feedback to unlocking a plurality of applications.

**Added matter**

235.   The added matter objection to 022 is put so clearly in HTC's skeleton argument that I will quote it verbatim:

"The application as filed discloses the use of a pre-defined path (see [0069]).

The teaching of a pre-defined <u>displayed</u> path is at [0071]. This teaching refers to figures 4A-4B which include visual cues which display a channel 404 indicating the path of the gesture/movement along which the unlock image 402 is to be dragged. Para. [0071] teaches only the use of a channel as the visual cue to display the pre-defined path.

The rest of the teaching and the figures also only disclose the use of channel as a visual cue to display the pre-defined path. Nowhere in the application as filed is there a disclosure of displaying a predefined path by means other than a channel.

Yet in the 022 patent as granted, claim 1 is not so limited and covers *any* pre-defined displayed path (whether or not a channel). There is no basis for this in the application as filed. In the patent as granted, the fact that the pre-defined displayed path is a channel has been relegated to claim 9.

Claims 1 and 6 and the dependent claims (other than claim 9) add matter."

236.   I think the answer can be put with equal conciseness. It is a tenet of the argument that both documents contain a disclosure of a predefined displayed path. Both documents disclose a channel, and both parties agree that a channel is a predefined displayed path. For there to be added matter, therefore, the granted patent must disclose a predefined displayed path other than a channel. It is true that claim 1 of the granted patent covers a predefined displayed path other than a channel. However, it is not possible in my judgment for the skilled person to obtain any clear or unmistakable direction from the disclosure of the granted patent as to what displayed paths there might be, other than channels.   On this subject, the reader of the granted patent would be no better informed than the reader of the application as filed.   The added matter objection therefore fails.

**Excluded subject matter**

237.   I can deal with this briefly in the light of my findings thus far.   If I am wrong about anticipation, and there is some contribution to the art, the contribution lies in the way in which the user interacts with the computer, providing more feedback than Neonode, or applying Plaisant's switch to unlocking the screen of a portable device.

238.   HTC put their case based on excluded subject matter primarily in relation to the contribution over Neonode.   They say that the contribution is merely visual information about where the contact point is on the path at any given moment. A swipe gesture across the screen will unlock the prior art device.   The contribution is the mere presentation of information about how that gesture is progressing. The claimed device and the patented device both work in the same way.   All that has changed, according to HTC, is that the device is now programmed to provide visual

information to the user. Thus the contribution is either a computer program as such or the presentation of information as such.

239.   Apple contend that the contribution is more than this. They submit that, compared to Neonode, it is not simply a matter of giving the user more information about how to unlock the device, but it provides a better, more secure device. They rely on what Professor Keyson said:

> Q. What 022 gives you by way of the unlock image and its associated channel, that you do not get from Neonode, is that the user is given some information about what to do and whether they are doing it successfully.
>
> A. Among other things, yes.
>
> Q. What are the other things?
>
> A. I just explained that in my previous ----
>
> Q. You mean their anxiety, that sort of thing?
>
> A. It is providing an incremental path that you can start off slowly and understand so it is a very secure way of -- I mean secure in the sense it is secure from a user experience viewpoint, so it is an easy to understand way that it is a very simple way to do it and yet it is a very safe way so it is not going to copy accidentally an unintentional thing, and it teaches me how to do this sweep gesture so it creates this common understanding. So it is not just about for that moment, that unlock, it is teaching me about how to use the product as a whole, it is teaching me what a gesture is, it is teaching me about a sweep gesture which I can then apply later through the interface. The teaching experience, let us say, is not specifically limited only to the unlock mechanism.

240.   Apple also rely on what Professor Greenberg said in cross-examination:

> Q. Would it be fair to say that the specific embodiment of 022 provides a more intuitive user interface than was provided by Neonode?
>
> A. Yes, that is fair.
>
> Q. It is a better way of providing an unlock mechanism to avoid the consequences of accidental touches than is provided by Neonode?
>
> A. Yes, that is correct.

241.   I think Professor Keyson was reading far too much into the contribution of 022. Nevertheless, I think there was a contribution here which went beyond a computer program as such or the mere presentation of information. There is a sense in which

SAMNDCA630-06272036

multiple sub-claims. Both parties filed voluminous expert evidence, generally three reports from each of three pairs of independent experts. The parties wished to cross-examine the opposing experts on this extensive material. The parties also estimated that the court could get on top of this material in two days, later collapsed to a day and a half because of a need for an expert to return to the United States. This time estimate was also completely unrealistic. A longer time estimate for reading does not cost the parties anything. In the result the trial had to be interrupted to allow me more time to read and understand this material. This is highly disruptive.

361. The court will always be sympathetic to attempts by parties to resolve patent disputes with strict limits as to the number of citations and claims, the evidence which may be adduced, and the time which is to be taken in court with cross examination and speeches. Very careful consideration needs to be given to match reading time estimates and trial estimates to the way in which the case is in fact being conducted.

362. Finally, this is a case where there should plainly have been a pre-trial review in accordance with the guidance in the Chancery Guide. The guidance in paragraph 3.20 is only mandatory in the case of cases lasting more than 10 days, but applies in other cases where the circumstances warrant it. The parties have appreciated that the present case would last 10 days or more. Moreover, and in any event, the circumstances of the present case plainly warranted a pre-trial review.

**Overall conclusions**

363. My principal conclusions are as follows:

    i)   **948**

        a)   948 is not infringed by the HTC devices;

        b)   Claim 1 (but not claim 2) of 948 is invalid for obviousness over common general knowledge;

        c)   Claims 1 and 2 are invalid for excluded subject matter.

    ii)  **022**

        a)   Claims 1, 6 and 18 of 022 are infringed by the Arc mechanism, but 022 is not infringed by the other unlock mechanisms;

        b)   Claims 1, 6, 9 and 18 of 022 are anticipated by Hyppönen;

        c)   Claims 1 and 9 (but not claim 5) of 022 are obvious in the light of Plaisant;

        d)   All the claims of 022 are obvious in the light of Neonode;

        e)   022 is not invalid for excluded subject matter.

    iii) **868**

        a)   868 is not infringed by the HTC devices;

**SAMNDCA630-06272061**

b)    868 is valid over Lira;

c)    868 is not invalid for excluded subject matter.

iv)    **859**

a)    All the claims of 859 are invalid over Arabic TDoc;

b)    All the claims of 859 are invalid over the Hagenuk MT900;

c)    If 859 had been valid it would have been infringed by the HTC devices;

d)    859 is not invalid for excluded subject matter.

364.    I will hear counsel on the details of the order to be drawn up to reflect these findings.

SAMNDCA630-06272062