1   QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
2   Charles K. Verhoeven (Bar No. 170151)
    charlesverhoeven@quinnemanuel.com
3   Kevin A. Smith (Bar No. 250814)
    kevinsmith@quinnemanuel.com
4   50 California Street, 22nd Floor
    San Francisco, California 94111
5   Telephone: (415) 875-6600
    Facsimile: (415) 875-6700
6
    Kevin P.B. Johnson (Bar No. 177129)
7   kevinjohnson@quinnemanuel.com
    Victoria F. Maroulis (Bar No. 202603)
8   victoriamaroulis@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
9   Redwood Shores, California 94065
    Telephone: (650) 801-5000
10  Facsimile: (650) 801-5100

11  William C. Price (Bar No. 108542)
    williamprice@quinnemanuel.com
12  865 South Figueroa Street, 10th Floor
    Los Angeles, California  90017-2543
13  Telephone:  (213) 443-3000
    Facsimile:  (213) 443-3100
14
    Attorneys for SAMSUNG ELECTRONICS
15  CO., LTD., SAMSUNG ELECTRONICS
    AMERICA, INC. and SAMSUNG
16  TELECOMMUNICATIONS AMERICA, LLC

17                  UNITED STATES DISTRICT COURT

18          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

19
    APPLE INC., a California corporation,          CASE NO. 12-CV-00630-LHK (PSG)
20
                    Plaintiff,                     **SAMSUNG'S OPPOSITION TO APPLE
21                                                 INC.'S MOTION TO EXCLUDE
                    vs.                            CERTAIN UNRELIABLE AND
22                                                 IMPERMISSIBLE SAMSUNG EXPERT
                                                   TESTIMONY**
    SAMSUNG ELECTRONICS CO., LTD., a
23  Korean business entity; SAMSUNG
    ELECTRONICS AMERICA, INC., a New              **REDACTED VERSION OF
24  York corporation; SAMSUNG                     DOCUMENT SOUGHT TO BE SEALED**
    TELECOMMUNICATIONS AMERICA,
25  LLC, a Delaware limited liability company,     Date:  January 23, 2014
                                                   Time:  1:30 p.m.
26                  Defendants.                    Place: Courtroom 8, 4th Floor
                                                   Judge: Honorable Lucy H. Koh
27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.   Dr. Chevalier Properly Took Licenses Into Account; Apple's Criticisms Go to
     Weight Not Admissibility ...................................................................................................... 1

     A.   Apple Improperly Seeks To Exclude Market Evidence of Patent Values ................ 1

     B.   Dr. Chevalier Appropriately Reviewed the Universe of Produced Licenses
          and Considered Different Groups of Licenses for Different Purposes .................... 2

     C.   Apple's Expert, Case Law and Other Authorities Confirm that Dr.
          Chevalier's Analysis Is Proper ................................................................................. 6

     D.   Apple's Argument Would Eviscerate the *Georgia-Pacific* Standard ...................... 7

     E.   The Case Law Apple Cites Is Inapposite ................................................................. 8

     F.   ███████████████████████████ .................................................. 9

     G.   Dr. Chevalier Properly Accounted for Apple's Offer to License Smartphone
          Feature Patents to Samsung .................................................................................... 10

II.  There is No Basis to Exclude Dr. Kearl's Damages Opinions Regarding The '239,
     '757 and '449 Patents. ......................................................................................................... 12

III. Dr. Kearl's Valuations of the '596 and '087 Patents Are Likewise Reliable .................... 16

IV.  Dr. Schonfeld Should Not Be Precluded from Offering Testimony on the '757 and
     '239 Patents ......................................................................................................................... 17

     A.   Apple Should Not Be Permitted to Circumvent the Instruction of the Court
          by Turning *Daubert* Motions into Additional Claim Construction
          Proceedings ............................................................................................................. 17

     B.   Apple Improperly Seeks Construction of The Terms "At Least One Zone
          Specific Storage and Interface Device" and "Updated in Relation To" From
          The '757 Patent ....................................................................................................... 18

     C.   Apple Improperly Seeks Further Construction Of "Zone Specific Storage
          and Interface Device," And Improperly Seeks A Finding of Non-
          Infringement of the '757 Patent .............................................................................. 19

     D.   Apple Improperly Seeks Further Construction of "Means For Capturing,
          Digitizing, and Compressing At Least One Composite Signal" From The
          '239 Patent ............................................................................................................... 19

     E.   Apple Improperly Seeks Construction Of Numerous Means Plus Function
          Terms From the '239 Patent .................................................................................... 20

V.    There Is No Basis To Exclude Dr. Rinard's Demonstrative Exhibits Under
      *Daubert*................................................................................................................. 21

VI.   The Court Should Not Exclude Testimony About Apple's Prior Positions........................ 24

# TABLE OF AUTHORITIES

**Page**

### Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns., Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ...................................................................................4, 7

*Bazemore v. Friday*,
  478 U.S. 385 (1986) ....................................................................................................16

*Broadcom Corp., v. Emulex Corp.*,
  2011 WL 11025895 (C.D. Cal. Dec. 13, 2011) .........................................................7, 8

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
  2012 WL 5451567 (W.D. Pa. Nov. 7, 2012) ................................................................10

*Dataquill Ltd. v. High Tech Comp. Corp.*,
  887 F. Supp. 2d 999 (S.D. Cal. 2001) ...........................................................................9

*Eolas Technologies Inc. v. Microsoft Corp.*,
  399 F.3d 1325 (Fed. Cir. 2005) ...................................................................................22

*Ericsson Inc. v. D-Link Sys. Inc.*,
  2013 WL 4046225 (E.D. Tex. Aug. 6, 2013) ...............................................................10

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) ...................................................................................22

*Finjan, Inc. v. Symantec Corp.*,
  10-C 2013 WL 5302560 (D. Del. Sept. 19, 2013) .......................................................23

*Gen Probe Inc. v. Becton Dickinson & Co.*,
  2012 WL 9335913 (S.D. Cal. Nov. 26, 2012) ...............................................................4

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) .........................................................3, 4, 5, 7, 10, 11

*Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*,
  2007 WL 6215929 (D. Kan. Dec. 19, 2007) ................................................................11

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) .....................................................................................16

*HTC Corp. v. Tech. Props., Ltd.*,
  2013 WL 4787509 (N.D. Cal. Sept. 6, 2013) ..............................................................10

*Internet Machs., LLC v. Alienware Corp.*,
  2013 WL 4056282 (E.D. Tex. June 19, 2013) ...............................................................7

*Interwoven, Inc. v. Vertical Computer Sys.*,
  2013 WL 3786633 (N.D. Cal. July 18, 2013) ................................................................4

*Island Intellectual Prop. LLC v. Deutsche Bank AG*,
  2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) ..............................................................4

*LaserDynamics, Inc. v Quanta Computer Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)...............................................................3, 8, 9, 10

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012)..................................................................16

*Lucent Techs., Inc. v. Gateway Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)..........................................................................7, 9

*Multimedia Patent Trust v. Apple Inc.*,
  2012 WL 5873711 (S.D. Cal. Nov. 20, 2012) ......................................................5, 7

*Phillip M. Adams & Assocs. v. Winbond Elecs. Corp.*,
  2010 WL 3743677 (D. Utah Sept. 20, 2010) ...........................................................5

*Putnam v. Henkel Consumer Adhesives, Inc.*,
  2007 WL 4794115 (N.D. Ga. Oct. 29, 2007) .........................................................11

*Quimby v. U.S.*,
  107 Fed. Cl. 126 (Fed. Cl. 2012)..........................................................................15

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) .................................................................16

*ResQNet.com, Inc. v. Lansa, Inc.* (Fed. Cir. 2010)
  594 F.3d at 869 ...............................................................................................8, 9

*Ricoh Co., Ltd. v. Quanta Computer, Inc.*,
  2010 WL 1233326 (W.D. Wis. Mar. 23, 2010) .......................................................7

*SSL Servs., LLC v. Citrix Sys., Inc.*,
  2013 WL 1680075 (E.D. Tex. Apr. 17, 2013) .........................................................7

*TV Interactive Data Corp. v. Sony Corp.*,
  929 F. Supp. 2d 1006 (N.D. Cal. 2013) ..................................................................8

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
  2007 WL 704525 (N.D. Ill. Mar. 1, 2007) ..............................................................2

*Utah Medical Products, Inc. v. Graphic Controls Corp.*,
  350 F.3d 1376 (Fed. Cir. 2003)..............................................................................9

*Versata Software, Inc. v. Internet Brands, Inc.*,
  902 F. Supp. 2d 841 (E.D. Tex. 2012) ..................................................................23

*Versata Software, Inc. v. SAP Am., Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013).......................................................................23, 24

*In re Zyprexa Products Liability Litigation*,
  2008 WL 2696916 (E.D.N.Y. July 02, 2008) .........................................................15

**Statutes**

Fed. R. Evid. 702..................................................................................................................25

Fed. R. Evid. 703............................................................................................................11, 12

**Miscellaneous**

7 *Chisum on Patents*, § 20.07[2][b] ....................................................................................2

Eli Cohen, "Applying Best-Worst Scaling to Wine Marketing,
   *Int'l J. of Wine Bus. Res.,* 21:1 (2009)......................................................................12

Tim Coltman, "Best-Worst Scaling Approach to Predict Customer Choice for 3PL Services,"
   *J. of Bus. Logistics*, 32(2) (2011) ...............................................................................13

John Gaito, "Measurement Scales and Statistics:  Resurgence of an Old Misconception,"
   *Psychological Bulletin*, 87:3 (1980)............................................................................14

Michael Garver, "A Maximum Difference Scaling Application for Customer Satisfaction
   Researchers," *Int'l J. of Market Res.* 51:4 (2009) ......................................................12

Steven Goodman, "Best-Worst Scaling: A Simple Method to Determine Drinks
   and Wine Style Preferences," *Int'l Wine Mktg. Symp.*(2005)......................................13

Jack Horne, "How Anchored Tradeoffs Reveal Customer Preferences,"
   *White Paper of Market Strgs. Int'l* (July 2012) ...........................................................12

Fred N. Kerlinger, *Foundations of Behavioral Research* (1973)...........................................15

M. Kolassa, "Pharmaceutical Pricing Principles," in  *Pharmaceutical Marketing*: *Principles,
   Environment,  and Practice* (2002)  ...........................................................................16

Johan Lagerkvist, "Anchored vs. Relative Best-Worst Scaling,"
   *Food Quality and Preference* (2012) .........................................................................12

Jordan Louviere, "An Introduction to the Application of (Case 1) Best-Worst Scaling,"
   *Int'l J. of Res. in Marketing* 30 (2013) .....................................................................12

Paul McCullough, "Is Max/Diff Really All That,"
   *Marketing Research*, 22:3 (2010).............................................................................12

Bryan Orme, "Using Calibration Questions to Obtain Absolute Scaling in MaxDiff,"
   *Sawtooth Software European Conf.* (2009).................................................................12

Pyndick and Rubenfield,
   *Microeconomics* (2008)...........................................................................................16

Richard Razgaitis,
   *Valuation and Dealmaking of Technology-Based Intellectual Property* (2009)........................6

L.L. Thurstone, "A Law of Comparative Judgment," *Psychological Review* (1927).....................12

Wendy Umberger, "Using Best-Worst Scaling to Determine Market Channel Choice,"
*Agricultural & Applied Econ. Assn. Meeting* (July 2010) ........................................................14

Paul Vellemen, "Nominal, Ordinal, Interval, and Ratio Typologies Are Misleading",
*The American Statistician*, 47:1 (1993)......................................................................................14

Christopher Wolf, "Dairy Farmer Policy Preferences,"
*J. Agric. & Resource Econs.* 38:2 (2013)...................................................................................13

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.     Dr. Chevalier Properly Took Licenses Into Account; Apple's Criticisms Go to Weight Not Admissibility**

      **A.     Apple Improperly Seeks To Exclude Market Evidence of Patent Values**

As set forth in Samsung's *Daubert* motion, Apple's damages analysis rejects all actual licensing transactions in favor of a misused and poorly-designed conjoint survey.  (Dkt. 806-3 at 1-14.)  The results of that survey, and the astronomical numbers it generates, could only appear plausible if one ignored the actual licenses that smartphone companies have entered into.  Apple's expert, Dr. Vellturo, considers <u>no</u> license agreement <u>ever</u> entered into by <u>anybody</u> to be relevant to reasonable royalty.  Apple seeks to exclude all licensing evidence because its damages case depends on creating a fantasy world in which every single smartphone license that has ever been entered into is disregarded. Apple's desire to hide all such transactions from the jury tells the Court everything it needs to know about the soundness of its damages theory.

Consistent with this approach, this motion seeks to bar any consideration of all licenses by Samsung's economist, Dr. Judy Chevalier.  Unlike Apple's expert Dr. Vellturo, who is essentially a full time testifying expert, retained by Apple 10-12 times (Vellturo Depo. at 10:25-11:12, Ex. OO to the Declaration of Michael Fazio, filed concurrently herewith ("Fazio Dec.")), Dr. Chevalier is a tenured professor at Yale Business School, who previously held teaching positions at the University of Chicago and Harvard.  (Chevalier Rpt. Ex. 1, Ex. A to Fazio Dec.)  For three years she chaired the Yale Committee on Cooperative Research, which oversees the office that licenses Yale's intellectual property.  (*Id.,* Fazio Dec. Ex. A; Chevalier Dep. Tr. at 20:11-21:1, Fazio Dec. Ex. B.)

As shown in Dr. Chevalier's Exhibit 97, her review of licenses yielded royalty numbers which are consistent with the four independent "Income Approaches" she also employed.  (Chevalier Rpt. Ex. 97, Fazio Dec. Ex. C.)  These "checks" confirmed that her selection of comparable licenses was appropriate and factually grounded.  The actual licensing agreements also show that Dr. Vellturo's conjoint survey-based damages numbers are completely fantastical.[1]  The jury should not be presented

---

[1]                     numbers are ███████████████████████████████  The $40.10 per smartphone royalty Dr. Vellturo asserts is reasonable (footnote continued)

1    with Dr. Vellturo's numbers at all, but if it is, Samsung must be permitted to show what really

2    happens in the marketplace.

### B.    Dr. Chevalier Appropriately Reviewed the Universe of Produced Licenses and Considered Different Groups of Licenses for Different Purposes

Apple suggests that Dr. Chevalier's report relies on irrelevant licenses.  An accurate review of Dr. Chevalier's work, however, makes clear that she carefully examined the produced licenses and that her calculations relied on only those that are usefully comparable.

As a starting point, Dr. Chevalier presents the ███ licenses produced.  Material terms of these licenses are summarized in Exhibits 69-73 of her report.[2]  Dr. Chevalier used this larger set of licenses for one affirmative purpose – to establish industry practices regarding the form of licenses.  All these licenses were appropriately considered for this purpose.  They reflect the preferences and licensing practices of both Apple and Samsung. ████████████████████████████████████ ███ are the industry norm. (Dkt. 806-6, Ex. A-1 ¶¶ 298-99.)  Industry licensing practices are relevant in determining the likely form of royalty.  *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 2007 WL 704525, *2 (N.D. Ill. Mar. 1, 2007) ("While *Georgia-Pacific* does indicate that the patents to which we may look to determine a reasonable royalty rate must be 'comparable,' courts have often interpreted this factor broadly.  While eSpeed's patents do not relate to graphical user interfaces or order entry for electronic trading, they do relate to the futures trading industry, and therefore, may be of assistance in determining  a reasonable royalty  rate.")  (internal  citations  omitted); 7 *Chisum on Patents*, § 20.07[2][b] ("Courts give weight to the licensing customs in the industry and actual licenses on comparable patents in determining both the royalty rate and the base for the reasonable royalty.")  Dr. Chevalier did not use any cross-licenses, larger portfolio licenses, or any Apple in-licenses (other than the Apple-HTC license, discussed below) to inform her royalty rate.

_____

f ██████████ s Apple is asserting is ████ ████ ██████████ contained in recent ████████ for rights to 20 or fewer patents. (Dkt. 806-6, Ex. A-1 ¶ 9, Ex. 79.)  His roughly $1 billion claim for the use of five patents for less than two years is greater than ███████ ████████████████ (Dkt. 806-6, Ex. A-1 ¶ 326.)  This is precisely why Apple seeks to exclude *all* licenses from the jury's view.

    2    kt. 806-6████████████████████████████████████ ████████████████████████████████ Ex. 73,█████████████████████████

1    Apple can only criticize Dr. Chevalier because she "showed her work," *i.e.*, showed how she

2    reached her conclusions.  This is in sharp contrast to Apple's expert, Dr. Vellturo, whose entire

3    analysis ███████████ produced by Samsung is the following single sentence: "I have reviewed

4    the licenses that Samsung has produced in this matter and determined that none is informative as to

5    royalties that Samsung would agree to pay Apple for licenses to the Asserted Patents." (Vellturo Rpt.

6    ¶ 453-457, Fazio Dec. Ex. D.)  Dr. Chevalier did the opposite – she surveyed the produced materials,

7    explained which licenses were instructive on the reasonable royalty rate and why she did not rely on

8    others.[3]  Samsung invites the court to compare Dr. Chevalier's analysis and Dr. Vellturo's.  Dr.

9    Chevalier's analysis is careful and thorough.  (Dkt. 806-6, Ex. A-1 at ¶¶ 294-409 & Exs. 69-85.)  Dr.

10   Vellturo simply dismissed all evidence that is inconsistent with the large numbers he advocates.

11   (Vellturo Rpt. ¶ 453-457, Fazio Dec. Ex. D.)  *See LaserDynamics, Inc. v Quanta Computer Inc.,* 694

12   F.3d 51, 80-81 (Fed. Cir. 2012) (granting *Daubert* challenge where plaintiff's expert failed to consider

13   comparable licensing evidence inconsistent with his damages calculations).

14       Dr. Chevalier took multiple steps to exclude licenses likely to be irrelevant:[4]

15   •    She excluded all portfolio cross-licenses from consideration (Dkt. 806-6, Ex. A-1
16        ¶ 324)

17   •    She excluded all licenses conveying rights to more than 20 patents (*Id.* at ¶ 326)

18   •    She excluded all licenses in which Samsung was not the licensee (*Id.* at ¶¶ 328-329)

19   •    She excluded all licenses that did not convey U.S. patent rights (*Id.* at ¶ 329, Ex. 79)

20   •    She excluded all licenses entered into prior to 2007 (*Id.* at ¶ 330)

21       After this winnowing, she examined the terms of the ██ remaining agreements.[5]  In assessing

22   the comparability of these ██ agreements, Dr. Chevalier considered (1) the parties to the transaction

23   and their relative bargaining strength, as instructed by *Georgia-Pacific* factor 5 (adjusting upward for

24   the extent of competition between Apple and Samsung when appropriate); (2) the date of the

25   [3]  Dr. Chevalier expressly considered the factors the Federal Circuit has indicated are relevant to
26   this inquiry.  Dkt. 806-6, Ex. A-1 ¶ 304 & n.693.
     [4]  Dkt. 806-6, Ex. A-1 ¶¶ 303-334, 368, 371-372, Exs. 69-85.
27   [5]  Dkt. 806-6, Ex. A-1 Exs. 84, 85. Apple's motion largely cites to Dr. Chevalier's preliminary
     exhibits, which show licenses she specifically did not rely on in calculating a reasonable royalty. (*See,*
28   *e.g.*, Mot. at 1:23-25, 7:19-21.)

1   transaction, existing and projected market conditions and the relative market success of the products at

2   that time; (3) the nature and scope of rights transferred, as instructed by *Georgia-Pacific* factor 3,

3   focusing on non-exclusive licenses with U.S. rights.[6]

4          This small subset of licenses shows what Samsung has been willing to pay for individual

5   patents or small groups of patents used in smartphones and tablets.  *Georgia-Pacific* expressly

6   contemplates that experts will do precisely what Dr. Chevalier did – review licenses and decide which

7   bear on the hypothetical negotiation.  *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.

8   Supp. 1116 (S.D.N.Y. 1970), mod. and aff'd, 446 F.2d 295 (2d Cir. 1971).  Apple is free to challenge

9   this work on cross examination, but it should not be excluded.

10         The Federal Circuit recently made clear that Apple's arguments go to weight, not

11   admissibility, in *ActiveVideo Networks*.  *ActiveVideo Networks, Inc. v. Verizon Commc'ns., Inc.*, 694

12   F.3d 1312 (Fed. Cir. 2012) (affirming denial *Daubert* motion).  Verizon argued that ActiveVideo's

13   expert improperly relied on certain license agreements as "royalty benchmarks" because they "did not

14   involve the patents-in-suit and did not cover any of the technologies in the case."  *Id.* at 1333.  The

15   Federal Circuit held that "Verizon's disagreements are with the conclusions reached by ActiveVideo's

16   expert and the factual assumptions and considerations underlying those conclusions, not his

17   methodology" and such "disagreements go to the weight to be afforded the testimony and not its

18   admissibility."  *Id.*   The Circuit explained that "[t]he degree of comparability of the [] license

19   agreements as well as any failure on the part of ActiveVideo's expert to control for certain variables

20   are factual issues best addressed by cross examination and not by exclusion."  *Id.*; *see also*

21   *Interwoven, Inc. v. Vertical Computer Sys.*, 2013 WL 3786633, *11 (N.D. Cal. July 18, 2013) ("Any

22   concern as to the degree of comparability between an existing and hypothetical license may be

23   addressed through cross-examination.");  *Gen Probe Inc. v. Becton Dickinson & Co.*, 2012 WL

24   9335913, *3 (S.D. Cal. Nov. 26, 2012) ("Gen–Probe may highlight the technological and economic

25   distinctions at trial. Similarly, concerns about the effect litigation might have had on these licenses

26   'are better directed to weight, not admissibility.'");  *Island Intellectual Prop. LLC v. Deutsche Bank*

27

28   ――――――――――――――――――
     [6] Dkt. 806-6, Ex. A-1 ¶¶ 322-334, 366-409, Exs. 79-85.

1    *AG*, 2012 WL 526722, *4-5 (S.D.N.Y. Feb. 14, 2012) (same); *Phillip M. Adams & Assocs. v.*

2    *Winbond Elecs. Corp.*, 2010 WL 3743677, *3 (D. Utah Sept. 20, 2010) (denying *Daubert* motion,

3    finding that the parties "divergent views on what patents are comparable to the patents in suit and,

4    therefore, what are licenses are comparable" are "the types of matters that are properly developed in

5    cross-examination."); *Multimedia Patent Trust v. Apple Inc.*, 2012 WL 5873711, *7 (S.D. Cal. Nov.

6    20, 2012) (similar).

7             Apple asserts that Dr. Chevalier "does not even say, much less show, that any of these

8    [███████████████] agreements are economically or technologically comparable." (Mot. at 6:9-11.)

9    Again, Apple misleadingly cherry-picks from the report.  For each of the license agreements she

10   ultimately used to calculate a reasonable royalty, Dr. Chevalier considered many relevant terms,

11   including economic terms (the payments due under the licenses, the geography of the license, the term

12   of the license and the number of smartphone units covered by the license) and technological terms (the

13   technology covered by the license, the patents licensed and the technological nature of the products

14   the license applied to).  (Dkt. 806-6, Ex. A-1 Exs. 72, 85.)  Apple may disagree with her conclusions

15   regarding comparability or the depth of her analysis, but that is a matter for cross-examination.[7]  (*See*

16   *supra*.)  Dr. Chevalier's analysis of the licenses is robust, especially when compared to Dr. Vellturo's

17   one sentence.[8]

18            While Dr. Chevalier does not rely on the larger universe of ███ party licenses in calculating

19   the reasonable royalty, she did refer to them to show that the steps taken to winnow them down were

20   reasonable and do not materially impact the range of values.  Dr. Chevalier should be permitted to

21   show that her analysis did not unfairly skew the results.

22   _____

23        [7]   While Apple argues that Dr. Chevalier did not rely on technical experts or fact witnesses to
     establish comparability, Apple cites no authority that in order for an expert to conclude a license is
24   comparable for purposes of her analysis she must rely on fact witness or expert testimony.
          [8]   Apple claims Dr. Chevalier' improperly allocates the value of the patents contained in multiple
25   patent lice███████████████████████████████████████████████████████████████████████████████
     ██████████████████
26   ██████████████████████  (Vellturo VirnetX Report at ¶ 219, Fazio Dec. Ex. J), it would be the very
     rare patent that was dramatically more valuable than any other.  But more importantly, Dr. Chevalier's
27   analysis is far more complex than Apple suggests.  The licensing data that Dr. Chevalier considers is
     just one portion of her analysis, which incorporates numerous market and income approaches and
28   takes into account the fifteen *Georgia-Pacific* factors.

The licenses are also relevant for another reason.  The cornerstone of Apple's case is that the patents it is asserting are important to "ease of use."  Apple executives have repeatedly testified that every aspect of a smartphone contributes to "ease of use" and that one cannot begin to separate out the component parts of the "ease of use" concept.  (Sinclair Apr. 4, 2012 Dep. Tr. at 47:17-25, 52:2-8, 58:13-59:14, Fazio Dec. Ex. E; Rangel June 25, 2013 Dep. Tr. at 43:9-21, Fazio Dec. Ex. F; Schiller July 23, 2013 Dep. Tr. at 305:9-306:17, 312:15-313:21, Fazio Dec. Ex. G; Joswiak Apr. 17, 2012 Dep. Tr. at 22:15-23:9, Fazio Dec. Ex. H; Joswiak July 9, 2013 Dep. Tr. 23:2-25:13, Fazio Dec. Ex. I.)  If that is true, then every aspect of smartphones is important to consumers and it would have been improper for Dr. Chevalier not to look broadly at the produced license covering many features before winnowing down the licenses to a smaller set in calculating the royalty.

**C.      Apple's Expert, Case Law and Other Authorities Confirm that Dr. Chevalier's Analysis Is Proper**

Apple's own expert has previously relied on licenses he acknowledged were not precisely comparable, as Apple complains Dr. Chevalier did here. ██████████ ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████ ████████████████████████ ████████████████████

███████████(Vellturo VirnetX Report ¶ 219, Fazio Dec. Ex. J (emphasis added).) ██████████

███████████████████████████████████████████████████████

█████████████████████████████ Although Apple now argues that Dr. Chevalier should not be permitted to consider licenses for "technology that generally differs somewhat" (Mot. at 4:7-10), Dr. Vellturo had no problem relying on licenses for technologies "not closely related or comparable."  Other authors have agreed with Drs. Chevalier and Vellturo that agreements related to the broad technological category can be instructive.  *See* Richard Razgaitis, *Valuation and Dealmaking of Technology-Based Intellectual Property* (2009) at 92, Fazio Dec. Ex. K ("In many cases, applying the market valuation approach leads to numerous, say a dozen or more, agreements in the same broad technology category but no one of which, for different reasons, is exactly or near exactly comparable.  In this circumstance, one may yet be able to estimate a royalty range from this

1   family of agreements.").  Apple should not be permitted to exclude a methodology accepted in the

2   literature which its own expert has recently employed on Apple's behalf.

3         **D.    Apple's Argument Would Eviscerate the *Georgia-Pacific* Standard**

4         Consideration of comparable license agreements is expressly contemplated by the G*eorgia-*

5   *Pacific* test.  *Georgia-Pacific Corp.*, 318 F. Supp. at 1119-20.  Experts routinely consider licenses

6   with varying degrees of comparability and courts routinely reject arguments that such analysis was

7   improper.  *See, e.g.*, *Broadcom Corp., v. Emulex Corp.*, 2011 WL 11025895, * 6 (C.D. Cal. Dec. 13,

8   2011) (finding that expert's use of comparable license was not improper, finding it sufficient that the

9   expert represented it was comparable only "in contribution to the performance of the overall product

10  at issue"); *Internet Machs., LLC v. Alienware Corp.*, 2013 WL 4056282, *14 (E.D. Tex. June 19,

11  2013) (finding that expert "properly relied upon the disputed license agreements" as "the testimony

12  and evidence established that the licenses covered the same general field of technology at issue" and

13  "[a]lthough the licenses did not directly cover the patented technology, they are sufficiently

14  comparable to the technology at issue"); *SSL Servs., LLC v. Citrix Sys., Inc.*, 2013 WL 1680075, *4-5

15  (E.D. Tex. Apr. 17, 2013); *Ricoh Co., Ltd. v. Quanta Computer, Inc.*, 2010 WL 1233326, *9-10 (W.D.

16  Wis. Mar. 23, 2010); *see also ActiveVideo Networks,* 694 F.3d at 1333(rejecting argument that expert

17  should have been excluded for considering allegedly non-comparable licenses, holding that assertions

18  regarding the "degree of comparability . . . are factual issues best addressed by cross examination and

19  not by exclusion").

20        According to Apple, if the technology "differs somewhat" from that at issue, the license is not

21  "comparable." (Mot. at 4:7-10.)  Apple cites no authority for this.  If this were the law, only licenses

22  that actually involve the patents in suit would be potentially technologically comparable.  This would

23  collapse *Georgia-Pacific* factor 2 (rates paid by licensee for use of other patents comparable to patents

24  in suit) into factor 1 (royalties received by the patentee for licensing the patents in suit).  *Georgia-*

25  *Pacific*, 318 F. Supp. at 1120.  This is contrary to established law.  "[U]nder Federal Circuit precedent,

26  a patentee may rely on licenses that are different from the hypothetical agreement as long as they are

27  not 'radically different.'" *Multimedia Patent Trust*, 2012 WL 5873711, at *7; *see also Lucent Techs.,*

28  *Inc. v. Gateway Inc.*, 580 F.3d 1301, 1327-28 (Fed. Cir. 2009) (rejecting reliance on "radically

1    different" licenses); *Broadcom*, 2011 WL 11025895, at*6 (rejecting post trial argument that expert's

2    reliance on comparable license was not proper, explaining that as presented to the jury, the license

3    "cannot be considered vastly or radically different from the patents in suit").

4         **E.    The Case Law Apple Cites Is Inapposite**

5         Apple does not cite a single case where a court concluded that an expert should not be

6    permitted to look at *any* real world licensing evidence in reaching a conclusion as to a reasonable

7    royalty.[9]   In contrast to the situation here, in several of the cases Apple cites the court excluded

8    *plaintiff's* expert testimony where the expert inflated damages numbers by ignoring probative

9    licensing evidence – often of the patents at issue – in favor of more attenuated licenses.  (Mot. at 3-4.)

10   That is precisely what Apple's damages expert, Dr. Vellturo, has done (Dkt. 802-3 at 14-15) and it is

11   <u>not</u> what Dr. Chevalier has done.  Instead, Apple is criticizing Dr. Chevalier for incorporating licenses

12   into her analysis at all.

13        In *LaserDynamics*, the Federal Circuit found that plaintiff's expert relied on "irrelevant

14   [license] evidence to the exclusion of the many licenses expressly for" the patents at issue and that

15   doing so "served no purpose other than to [] 'increase the reasonable royalty rate above rates more

16   clearly linked to the economic demand for the claimed technology.'"  694 F.3d at 80.  In contrast to

17   Dr. Chevalier, LaserDynamics's expert chose to rely on cherry-picked licenses, while ignoring

18   LaserDynamics' "long history of licensing" the patent at issue in order to hike up the damages

19   number. *Id.* at 80-81 (finding his opinion "cannot be reconciled with the actual licensing evidence").

20   Here, Dr. Chevalier considered both comparable licenses ███████████████████████

21   ███

22        Similarly, in *ResQNet.com, Inc. v. Lansa, Inc.,* the plaintiff's expert relied on "licenses with no

23   relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels."

24   594 F.3d 860, 870 (Fed. Cir. 2010).  Once again, he relied on these licenses while ignoring two largely

25   inconsistent licenses for the patents in suit.  *Id.*  Again, the court found that "[t]he inescapable

26   ───────────────
        [9] While Apple may point to *TV Interactive*, in that case, the district court granted plaintiff's motion
27   *in limine* to exclude defendant's expert's reference to certain licenses after the expert himself admitted
     they were not comparable.  *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1015-16
28   (N.D. Cal. 2013).  Dr. Chevalier made no such admission.

1   conclusion is that Dr. David used unrelated licenses on marketing and other services – licenses that

2   had a rate nearly eight times greater than the straight license on the claimed technology in some cases

3   – to push the royalty rate up into double figures." *Id.*

4       *Lucent* involved an appeal of a post-trial JMOL after a jury found for the plaintiff and awarded

5   damages.  580 F.3d at 1308.  In a limited and fact-bound ruling, the court held that three "radically

6   different" license agreements and other agreements that were inadequately explained to the jury were

7   insufficient to support the reasonable royalty award.  *Id.* at 1327-28.  Importantly, the court did not

8   hold that the licenses were improperly admitted or that, with further explanation to the jury, they

9   might not be a sufficient basis for the award.  *Id.* at 1325.  *Lucent* is inapplicable here, where Dr.

10  Chevalier's report makes clear the nature of the licenses considered and, in any event, they are simply

11  part of a comprehensive analysis.

12      In *Utah Medical Products, Inc. v. Graphic Controls Corp.,* the Circuit merely held the district

13  court did not abuse its discretion in excluding certain "expert testimony and evidence of license

14  agreements."  350 F.3d 1376, 1385 (Fed. Cir. 2003).  The district court concluded the licensing

15  evidence at issue had not been shown to be "in any way comparable" to the patent at issue and thus

16  was "not relevant to the facts of this case."  *Id.*  The Circuit's opinion contains no discussion of the

17  specifics of the licenses or the manner in which they were used, and thus it provides no guidance here.

18  In *DataQuill*, the district court excluded testimony because while the expert had provided a sufficient

19  factual basis for his conclusion that the technology was comparable, unlike Dr. Chevalier (Dkt. 806-6,

20  Ex. A-1 ¶¶ 326, 329, 331, Exs. 79, 84), his report contained "*no analysis at all* of the economic

21  differences between the [comparable licenses] and the license reached at the hypothetical negotiation."

22  *Dataquill Ltd. v. High Tech Comp. Corp.,* 887 F. Supp. 2d 999, 1023 (S.D. Cal. 2001) (emphasis

23  provided).

24      **F.**   ████████████████████████████████████████

25  ███████████████████████████████████████████████████████████████████

26  ███████████████████████████████████████████████████████   "Actual

27  licenses to the patented technology are highly probative as to what constitutes a reasonable royalty[.]"

28  *LaserDynamics,* 694 F.3d at 79 (cited by Apple, Mot. at 3); *see also ResQNet*, 594 F.3d at 869 ("The

1    first *Georgia-Pacific* factor requires considering past and present royalties received by the patentee

2    'for the licensing of the patent in suit, proving or tending to prove an established royalty.") (alterations

3    omitted); *HTC Corp. v. Tech. Props., Ltd.,* 2013 WL 4787509, *2 (N.D. Cal. Sept. 6, 2013) (where the

4    license at issue included the "very same patents" being asserted in the present litigation but also

5    conferred broader intellectual property or geographic rights, "so long as this broader scope is

6    accounted for, the agreements may still be properly considered.") ███████████████

7    ████████████████████████████████   *LaserDynamics*, 694 F.3d at 79-81.  Indeed,

8    as this Court recently recognized, the Apple -- HTC license is "highly probative" and likely "one of

9    the most informative [] pieces of evidence."  (Oct. 17, 2013 NDCA I Hrg. Tr. at 129:17-21, 131:23-

10   25, Fazio Dec. Ex. L.)

11         In any event, ████████████████████████████   could only go to

12   weight, not admissibility.  As Judge Grewal recently held in *HTC*, arguments about the flaws of an

13   expert's use of licenses which involve the patents at issue "can be drawn out through vigorous cross-

14   examination."  2013 WL 4787509, at *2; *see also Carnegie Mellon Univ. v. Marvell Tech. Group,*

15   *Ltd.*, 2012 WL 5451567, *3 (W.D. Pa. Nov. 7, 2012) ("[T]he differences in features between the Intel

16   Agreement and the hypothetical license (including the fact that it pertained to only one of the patents-

17   in-suit) are more appropriately addressed by way of cross-examination than through exclusion.");

18   *Ericsson Inc. v. D-Link Sys. Inc.*, 2013 WL 4046225, *16-17 (E.D. Tex. Aug. 6, 2013) (rejecting

19   defendant's argument that it was entitled to JMOL because the licensing evidence Ericsson presented

20   was not comparable as the licenses were not "limited to the asserted patents, and several licenses had a

21   worldwide scope," holding such arguments are "more appropriate for cross-examination").

22         **G.    Dr. Chevalier Properly Accounted for Apple's Offer to License Smartphone**
              **Feature Patents to Samsung**

23         Apple seeks to exclude Dr. Chevalier's consideration of Apple's offer to license smartphone

24   feature patents to Samsung, including at least one of the patents-in-suit, arguing this evidence is

25   inadmissible under Rule 408.  (Mot. at 9-10.)[10]  This is not a *Daubert* issue – if Apple wants to

26

27   ────────────────
          [10] Apple also takes issue with the manner in which Dr. Chevalier used this information in her
28   analysis.  (Mot. at 10.)  Without citation to any case law, Apple claims that the adjustments Dr.
          (footnote continued)

1   exclude certain evidence at trial, it can move *in limine*.  There is no basis to hold that Dr. Chevalier's

2   opinions do not meet the *Daubert* threshold because she considered probative evidence that the

3   *Georgia-Pacific* test instructs should be considered.  *Heartland Surgical Specialty Hosp. LLC v.*

4   *Midwest Div. Inc.*, 2007 WL 6215929, *5 n.9 (D. Kan. Dec. 19, 2007) ("By its terms,

5   the *Daubert* opinion applies only to the qualifications of an expert and the methodology or reasoning

6   used to render an expert opinion. *Daubert* generally does not, however, regulate the underlying facts

7   or data that an expert relies on when forming her opinion.") (internal citation omitted).  Indeed,

8   Apple's experts in the prior action discussed Apple's offer to license and the parties' related

9   negotiations in their reports.  (Corrected Musika Report, ¶¶ 174-175, Fazio Dec. Ex. M, Davis Report,

10   ¶¶ 186-189, Fazio Dec. Ex. N.)

11        Rule 408 does not create an absolute bar to an expert's use of an offer to license between the

12   parties in her reasonably royalty analysis.  Here, the offer is merely a data point used in Dr.

13   Chevalier's *Georgia-Pacific* analysis and thus Rule 408 is not implicated. *See, e.g., Putnam v. Henkel*

14   *Consumer Adhesives, Inc.*, 2007 WL 4794115, *4 (N.D. Ga. Oct. 29, 2007) ("The terms of Rule 408

15   do not apply to the use of the DW royalty rate by Mr. Tanger. Mr. Tanger has included the rate among

16   the eleven Henkel licensing agreements that he considered in his analysis. [] The settlement between

17   Henkel and DW is not being offered to prove liability or the invalidity or amount of any claim. It is

18   simply used as a data point.  As such, Rule 408 does not bar its admission.")  Moreover, experts are

19   entitled to rely on inadmissible evidence in reaching their conclusions, even if the Court ultimately

20   excludes some aspects of the evidence. Fed. R. Evid. 703 ("If experts in the particular field would

21   reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be

22   admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the

23   proponent of the opinion may disclose them to the jury only if their probative value in helping the jury

24   Chevalier made to her analysis (*see, e.g.*, Dkt. 806-6, Ex. A-1 Exs. 74, 75) based on the information
from Apple's offer to license was somehow improper and her opinion to the extent it accounts for this
25   information should be excluded.  (*Id.*)  That is not how *Daubert* works.  Apple may not exclude
Samsung's rebuttal damages testimony because it believes  that her analysis is shaky.  That is an issue
26   for cross-examination. (*See supra.*)  Apple also claims that Dr. Chevalier "ignores" testimony from
Apple's licensing witness. (Mot. at 10.)  Not so.  At deposition, Dr. Chevalier made clear she had
27   reviewed testimony from Dr. Teksler testimony regarding the licensing negotiations between Apple
and Samsung.  (Chevalier Dep. Tr. at 282:22-283:11, Fazio Dec. Ex. B.)
28

1    evaluate the opinion substantially outweighs their prejudicial effect.")  Rule 703 expressly protects an

2    expert's opinions even if they rely on inadmissible evidence.[11]

3    **II.**

4

5

6

7    Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
     Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

8

9

10

11

12

13

14

15

16   [11] Moreover, both documents at issue were entered into evidence in the NDCA I trial.  Aug. 10,
17   2012 NDCA 1 Trial Tr. 1958:17-1959:17, 1968:20-1969:14, Fazio Dec. Ex. O. That the Court made a
     limiting instruction in that trial does not require exclusion of Dr. Chevalier's opinions because she
18   considered these documents.[12]

19

20

21

22

23   Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
     Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

24

25

26

27

28

1

2

3

4

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

21

22

23

24

25

26

27

28

Case No. 12-CV-00630-LHK (PSG)
SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO EXCLUDE EXPERT TESTIMONY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO EXCLUDE EXPERT TESTIMONY

1

2

3

4

5

6

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

25

26

27

28

**III.**

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

1

2

3

4
Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

5

6

7

8

9

10

11

12   **IV.**

13

14

15

16
Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

17

18

19

20

21

22

23

24

25

26

27
23

28

1

2

3

4

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding Withdrawal

5
of Daubert Issues related to Samsung's Patents, D.I. 1145

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding

27
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO EXCLUDE EXPERT TESTIMONY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

18   **V.      There Is No Basis To Exclude Dr. Rinard's Demonstrative Exhibits Under *Daubert*.**

19   Apple's motion to exclude demonstrative exhibits under *Daubert* is both misplaced and overreaching.

20   The relevant prior art references here are the prior art software programs, WAIS and AppleSearch.

21   (Rho Decl. ISO Apple's Motion for Summary Judgment, Oct. 10, 2013 ("Rho Decl.") Ex. D-1 (Rinard

22

23   _____

24

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung's Patents, D.I. 1145

25

26

27

28

Case No. 12-CV-00630-LHK (PSG)
SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO EXCLUDE EXPERT TESTIMONY

1    Opening Report) at ¶¶ 300-339, Ex. 9, ¶¶ 411-427, Ex. 1.)[26]  Dr. Rinard opined that "the contents of

2    the free-WAIS-sf 2.0.65 distribution invalidate the asserted claims of the '959 patent" and that "the

3    AppleSearch version 1.5 software [] invalidates the asserted claims of the '959 patent."  (Rho Decl.

4    Ex.D-1 (Rinard Opening Report) at ¶¶ 484, 490.  For each of these software programs, Dr Rinard

5    analyzed the source code underlying the program, identifying particular "program instructions for a

6    computer to perform a particular process" in that code.[27]  (Rho Decl. Ex. D-1 (Rinard Opening

7    Report) at Ex. 9 [analyzing WAIS], Ex. 1 [analyzing AppleSearch].)  Dr. Rinard also analyzed other

8    documentation describing the operation of these prior art software programs, such as user guides,

9    confirming his understanding of these "program instructions" was correct.  (*Id*.)  Consistent with that

10   detailed analysis, Dr. Rinard installed, configured, and used the software "to perform the steps

11   outlined in claims 24 and 25 of the '959 patent, thereby verifying [that free-WAIS-sf 2.0.65 and

12   AppleSearch version 1.5] contain the claimed program instructions."  (Rho Decl. Ex.D-1 (Rinard

13   Opening Report) at Ex. 9, pg. 1 Ex. 1, pg. 2.)

14          Apple's motion suggests Dr. Rinard cannot demonstrate prior art at trial unless he uses a

15   software installation that was perfectly preserved for use over a decade later.  This is false, as is plain

16   from Apple's failure to present any authority precluding software demonstratives under Daubert.  As

17   set forth in more detail in Samsung's Opposition to Apple's Motion for Partial Summary Judgment,

18   the asserted claims cover software with the capability to perform certain functions; whether and when

19   those capabilities were used is irrelevant.  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197,

20   1205 (Fed. Cir. 2010).  Where the capabilities of a given piece of vintage software are at issue, courts

21   regularly permit experts to demonstrate that software's capabilities by installing and running the

22   software.  For example, in *Eolas Technologies Inc. v. Microsoft Corp.*, 399 F. 3d 1325 (Fed. Cir.

23   2005), the Federal Circuit reversed the district court's grant of judgment as a matter of law that the

---

[26] Apple's reference to the preliminary injunction phase, and to an exhibit used for another patent with a different set of claim limitations, is inapposite.  The preliminary injunction proceedings did not consider any analysis by Dr. Rinard, or consider the specific claims of the '959 patent being asserted —claims from a patent that was not considered during the preliminary injunction phase.

[27] Apple's expert, Dr. Snoeren, agrees that "instructions" include source code.  (Fazio Dec. Ex. PP (Snoeren Opening Report) at ¶ 92 ("The instructions found in a computer readable medium are generally written by a programmer as source code."))

1    prior art did not anticipate the asserted patents where the defendant corroborated analysis of code's

2    "capability" by demonstrating the software for the jury.  *Id.* at 1329.  Similarly, in *Versata Software,*

3    *Inc. v. Internet Brands, Inc.*, 902 F. Supp. 2d 841 (E.D. Tex. 2012) the District Court upheld a jury

4    verdict finding a patent anticipated based in part on a demonstration of prior art software's capabilities

5    and testimony describing how that configuration was consistent with contemporaneous descriptions of

6    the software's capabilities.  *Id.* at 847.  Likewise, in *Finjan, Inc. v. Symantec Corp.*, 10-CV-593

7    (GMS), 2013 WL 5302560 (D. Del. Sept. 19, 2013), the Court upheld a finding of invalidity based in

8    part on a demonstration of the prior art "SWEEP-InterCheck" software an expert displayed at trial.[28]

9    *Id.* at *17.

10         The Federal Circuit allowed similar demonstrations in the analogous context of infringement

11   analysis. In *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261-63 (Fed. Cir. 2013), the

12   Federal Circuit rejected an argument, similar to the one made by Apple here, complaining that the

13   plaintiff's expert's configuration of the software for a demonstration system "chang[ed] and

14   modif[ied] a noninfringing product into an infringing product."  *Id.* at 1262.  The Federal Circuit

15   rejected this argument, finding that the expert's demonstration system was the "most telling evidence"

16   of the capabilities of the accused software.  *Id.* at 1261.  By demonstrating the software,

17   "the expert confirmed his theories that the accused software was capable of performing the claimed

18   functionality by making the software perform the function without modifying the software." *Id.* at

19   1262.  Moreover, Apple does not, and cannot, allege that Dr. Rinard modified the WAIS or

20   AppleSearch software at issue in his demonstration of the capabilities of that software.

21         Dr. Rinard's demonstrative exhibits faithfully show the capabilities of prior art software as the

22   software existed prior to the filing of the '959 Patent.  Notably, in its *Daubert* motion, Apple does not

23   challenge the adequacy or propriety of Dr. Rinard's analysis of the "instructions" in the software itself

24

25   [28]  "In view of the foregoing, the court finds that there was substantial evidence in the record, via Mr.
     Klausner and Dr. Hruska's testimony and Sophos' demonstration, that SWEEP-InterCheck meets each
26   of the limitations of the asserted claims. The jury heard from both sides' experts and was within its
     right to determine which opinion was credible as to anticipation. The court will not, therefore, grant
27   JMOL and overturn the jury's invalidity verdict with respect to the #194 Patent." *Finjan, Inc. v.
     Symantec Corp.*, 10-CV-593 (GMS), 2013 WL 5302560 at *20 (D. Del. Sept. 19, 2013)

28

SAMSUNG'S OPPOSITION TO APPLE'S MOTION TO EXCLUDE EXPERT TESTIMONY

1    or his mapping of those instructions to the functionality recited in the claims—just Dr. Rinard's

2    demonstration of those instructions by running them on a computer.  Indeed, Apple's true complaint

3    seems to be that the demonstrative exhibits to Dr. Rinard's report are **too** convincing, and that

4    demonstrations the software instructions in operation would clearly invalidate the asserted claims of

5    the '959 patent.  This is not a valid basis to preclude Dr. Rinard's opinions, or to preclude the use of

6    demonstrative exhibits that simply show prior art software in operation.  Tellingly, Apple presents no

7    authority where a Court has precluded demonstrative exhibits under *Daubert* in similar circumstances.

8    Apple's failure to cite any relevant authority speaks volumes.  As described above, this type of

9    demonstrative is regularly considered by jurors to aide their analysis of software capabilities, and

10   indeed may be the "most telling evidence" of such capabilities.  *Versata Software, Inc.*, 717 F.3d at

11   1261.  Apple's motion to exclude Dr. Rinard's opinions should be denied.[29]

12   **VI.    The Court Should Not Exclude Testimony About Apple's Prior Positions**

13          Apple improperly attempts to use a *Daubert* motion to preclude Samsung's experts from

14   testifying about the opinions Apple's experts have expressed in prior litigation.  While Apple's

15   requested relief is not limited to Dr. Chevalier, it appears that Apple's primary concern is hiding from

16   the jury that its damages methodology in prior cases is at odds with Dr. Vellturo's analysis here.

17   Apple's request is improper and baseless.  Apple fails to cite any authority supporting its position that

18   an expert can, much less should, be precluded from pointing to positions the opposing party's experts

19   have taken when undertaking a similar analysis.

20          Dr. Chevalier shows in her report how following the Musika/Davis valuation methodology

21   here would yield a lower per-unit royalty than even her per unit number assuming no design-arounds

22   are available – to say nothing of Dr. Vellturo's inflated calculation.  (Dkt. 806-6, Ex. A-1 at ¶¶ 343-

23   347, Chevalier Rpt. Ex. 97, Fazio Dec. Ex C)  According to Apple, inconsistencies between Dr.

---

24   [29]    At best, these complaints regarding prior art demonstratives should be handled by way of
     pretrial evidentiary objections –just as they were in the last case.  (*See* Fazio Dec. Ex. QQ (Apple v.
25   Samsung, Case No. 11-cv-1846, Dkt. No 1774) at 5 (allowing Apple's prior art demonstrative to be
     presented to the jury by Apple's expert "if Apple is able to present relevant, admissible evidence such
26   that a reasonable jury could find that the iBook is prior art").)   Apple's attempt to avoid the same
     pretrial objection process the parties used in the last case, and instead challenge Samsung's expert on
27   *Daubert* grounds for using the same methodology Apple's own expert employed in the prior case, is
     impermissible.  Apple's complaints should be handled as an evidentiary objection before trial.
28

1   Vellturo's current damages approach and the ones Apple and Dr. Vellturo have employed in prior

2   patent litigation, including in this Court against Samsung, are not relevant.  (Mot. at 24-25.)  Apple

3   again fails to cite any authority supporting this argument.  Apple also argues that even if relevant,

4   Rule 403 requires exclusion.  (*Id.* at 25.)  If granted, Apple's request would allow it to attack Dr.

5   Chevalier's methodology and the evidence on which she relies to support her opinions (*id.* at 3-11),

6   while hiding from the jury the fact that Apple's own damages experts have used the same

7   methodology and considered the same evidence in prior patent litigation when providing a reasonable

8   royalty opinion.  *That* would be prejudicial.

9          Apple took positions in prior litigation that are wildly inconsistent with the damages approach

10  Dr. Vellturo has set forth here (and more consistent with Dr. Chevalier's approach).  *Daubert* is not a

11  mechanism for shielding relevant evidence from the fact-finder except where such evidence is

12  scientifically unreliable.  Apple makes no argument that Dr. Chevalier's recognition of Apple's prior

13  positions is properly excluded under Rule 702 and *Daubert*.

14         Even more improper is Apple's broad-brush effort to preclude *all* of Samsung's experts from

15  making reference to any testimony by Apple witnesses given in any other litigation.  The Court should

16  weigh objections to admission of any such testimony at the time it is offered, not in the abstract as

17  Apple seeks.  This is not a proper *Daubert* motion but rather is properly addressed through the

18  ordinary process of objecting to testimony.

19  DATED:  November 1, 2013                    QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP
20

21                                     By____ */s/ Victoria F. Maroulis*_____

22                                          Charles K. Verhoeven
                                            Kevin P.B. Johnson
23                                          Victoria F. Maroulis
                                            William C. Price
24                                          Michael L. Fazio

25                                          Attorneys for
26                                          SAMSUNG ELECTRONICS CO., LTD.,
                                            SAMSUNG ELECTRONICS AMERICA, INC.,
27                                          and SAMSUNG TELECOMMUNICATIONS
                                            AMERICA, LLC
28

## ATTESTATION

I, Michael L. Fazio, am the ECF User whose ID and password are being used to file this Declaration.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Victoria F. Maroulis has concurred in this filing.


Dated:  November 1, 2013                          By:        */s/ Michael L. Fazio*

                                                            Michael L. Fazio