# EXHIBIT C

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

APPLE INC., a California Corporation,

      Plaintiff (Counterclaim-Defendant),

    v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG ELECTRONICS
AMERICA, INC., a New York corporation;
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC, a Delaware limited liability
company,

      Defendants (Counterclaim-Plaintiffs).

Civil Action No. 12-cv-00630-LHK

**REBUTTAL EXPERT REPORT OF**

**DAVID REIBSTEIN**

**September 13, 2013**

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

6.      INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

**C.      Qualifications**

7.      I am the William Stewart Woodside Professor, and Professor of Marketing at the Wharton School of Business at the University of Pennsylvania. I have been teaching Marketing classes at the graduate level for more than 25 years. Classes that I have taught include Marketing Strategy and Marketing Research in the Wharton MBA Program, as well as Competitive Marketing Strategy, Marketing Metrics, Pricing Strategies, and various other programs for Wharton's Executive Education Program. I am currently teaching the Introductory Marketing classes for first-year MBA students at Wharton and for Wharton's Executive MBA Program. Over the course of my teaching career, I have been honored with more than 30

5

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

teaching awards. For several years I was the Vice Dean of the Wharton School of Business at the University of Pennsylvania and the Director of the Graduate Division.

8.    My research focuses on competitive marketing strategies, marketing metrics, and product line decisions, among other issues. My research on competitive marketing strategies addresses competitors' reactions to marketing actions, offering companies insight into ways to anticipate these reactions and use them to develop effective strategies. I have authored or co-authored over 40 articles which have been published in top-tier academic journals including *Marketing Science*, *Journal of Marketing Research*, *Journal of Consumer Research, Harvard Business Review, Ma rketing Le tters, Journal  of Marketing,* and the *International Journal of Research in Marke ting*. I am also the author or co-author of numerous books and chapters in books on subjects including competitive marketing strategy, global branding, and marketing performance measurement, among others. I have published numerous papers on conjoint analysis, including several papers evaluating the validity and reliability of conjoint analysis. I have also applied conjoint analysis in practice through consulting engagements with major corporations.

9.    I have been on the Board of the American Marketing Association for the last several years, most recently the Chairman and I remain on the Executive Committee of the Board. I am a former Executive Director of the Marketing Science Institute, and consult extensively on marketing issues with companies worldwide, including GE, Pfizer, Johnson & Johnson, Google, British Airways, Rohm and Haas, and many others. Topics on which I have

6

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

been asked to consult in the past include marketing strategy, marketing resource allocation, marketing metrics, sales force planning and incentives, branding, product line extensions, marketing research, and other marketing activities.

10.      I received my Ph.D. from Purdue University and B.S. and B.A. degrees from the University of Kansas. In 2005, I received the John S. Day Distinguished Alumni Academic Service Award from Purdue University's Krannert School of Management, an honor given to a graduate whose service within the academic community reflects the spirit and service of former Krannert Dean John Day. More details on my qualifications can be found in my curriculum vita in Exhibit 1.

**D.      Compensation**

11.      INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

**E.      Evidence Considered**

12.      INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

204.    INTENTIONALLY OMITTED FROM
        EXHIBIT/RECORD

    **4.**    *Professor Hauser's conjoint study failed to account for the real-world process used by consumers to make purchase decisions when faced with incomplete information involving complex products.*

205.    Consumers regularly buy products where competing alternatives vary

dramatically in terms of scope and complexity. As the complexity of the product and/or the

---

[258] Exhibit 12 (Chicago-1 Respondent 1).
[259] Exhibit 12 (Chicago-2 Respondent 4).

131

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

number of market alternatives increases, so does the level of effort required for the consumer to research and evaluate the choices fully. When choice complexity reaches a certain level, consumers begin to use simplifying heuristics. The exact simplification that is employed may vary, but the common element is that consumers consider less than the full range of features or product choices in making a decision. This simplification process is a characteristic of real decisions made in real markets with complex products.[260]

206.    The academic literature on market research refers to a set of these heuristics as non-compensatory decision processes. In a compensatory decision process, a product that does not have the most desired level of one feature can *compensate* for it with another feature. In a non-compensatory process, a product may be completely eliminated from further consideration because it does not have a certain feature level regardless of the other features the product might have. According to one author:

> In [...] consumers' choice strategies, one assumes that consumers make tradeoffs between all the relevant attributes of a product and form overall evaluations of each alternative. Such decision rules are termed *compensatory* because good features of an alternative can compensate for the bad. If we listen to people describing how they make choices, however, a very different picture emerges. People talk about eliminating alternatives because of objectionable attributes and picking an alternative not because it has the best overall evaluation, but because it is the best on the most important

---

[260] Shocker, D., Ben-Akiva, M., Boccara, B., and P. Nedungadi, "Consideration Set Influences on Consumer Decision-Making and Choice: Issues, Models, and Suggestions," *Marketing Letters* 2, no. 3 (1991): 185.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

attribute. Even the most casual examination of consumers' verbal reports indicates that decisions are based, at least in part, on noncompensatory strategies that do not involve tradeoffs. Supporting evidence for the use of such heuristics pervades the literature, including studies using information display boards (e.g., Bettman and Jacoby 1976; Lussier and Olshavsky 1979; Payne 1976), eye movements (Russo and Dosher 1983), and even in-store verbal protocols (Payne and Ragsdale 1978).[261]

207.   One way that consumers use simplifying heuristics is to use a two-stage decision process whereby they screen on certain features, such as brand or other prominent product features, as a way to limit the set of products they ultimately consider in the purchase decision. Professor Hauser has described this phenomenon as follows:

The basic idea is that when choosing to make a purchase, consumers use at least a two-stage process. That is, consumers faced with a large number of brands use a simple heuristic to screen the brands to a relevant set called the consideration set (Alba and Chattopadhyay 1985). Purchase or consumption decisions are then made from brands in this set (see hypotheses in Belonax and Mittelstaedt 1978; Howard and Sheth 1969; Parkinson and Reilly 1979; see also a related discussion in Wright 1975). […] For our purposes, we are most concerned that at any given consumption occasion consumers do not consider all of the brands available (e.g., there are more than 30 shampoos and more than 160 autos available), but rather consider seriously a much smaller set-a median of four shampoos (Urban 1975) or two to five

---

[261] Johnson, E., Meyer R., and S. Ghose, "When Choice Models Fail: Compensatory Models in Negatively Correlated Environments," *Journal of Marketing Research* 26 no. 3 (1989): 255.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

autos (Gronhaug 1973/1974; Hauser, Urban, and Roberts 1983; Ostlund 1973).[262]

208.    According to Professor Hauser, products may have "must have" features, such as brand, that may be so important that consumers may not actually consider products without these features, regardless of what other smaller features the product may possess. In a 2006 article, he wrote:

> In each of these cases the managerial challenge is to identify the "must have" (or "must not have") features that determine the consideration sets of consumers. Must-have features are non-compensatory in the sense that a product with must-have features is preferred to a product without these must-have features even if the product without the must-have features is better on all other features. The identification of must-have features is related to the conjoint-analysis goal of identifying the most important features…[263]

209.    One example of a determining factor (and simplifying heuristic) in the purchase decision is brand. For example, one third party analysis found the presence of an anti-Apple bias among some smartphone consumers. One analyst noted that Apple was a "very polarizing brand, generating high levels of both positivity and negativity" among smartphone users.[264] Another

---

[262] Hauser, J. and B. Wernerfelt, "An Evaluation Cost Model of Consideration Sets," *Journal of Consumer Research* 16, no. 4 (1990): 393.
[263] Hauser, J., Dahan, E., Yee, M. and J. Orlin, ""Must Have" Aspects vs. Tradeoff Aspects in Models of Consumer Decisions," *Proceedings of the Sawtooth Software Conference* (2006): 169-170. While "must have" features are not strictly incompatible with an additive utility framework (e.g., when the feature partworths follow a geometric series), "must have" features are compatible with a simplifying heuristics framework.
[264] SAMNDCA11086731.

134

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

analyst noted that "consumers tend to enter the purchase process with a strong disposition towards or away from Apple/iPhone, and not many people change their minds without strong, usually personal influences."[265]

210.    Professor Hauser, in his prior research, noted that simplifying heuristics were more likely to be used in cases with complex products with numerous features. For example, in a 2010 article, he wrote:

> In complex product categories, research suggests that at least some consumers use noncompensatory decision processes when evaluating many products and/or products with many features (e.g., Payne, Bettman, and Johnson 1988, 1993).[266]

211.    In a 2009 article, he similarly noted:

> For complex technical business-to-business products, such as a high speed printer, in which there are relatively few alternatives, we might expect a buying center to evaluate all alternatives using a full-information compensatory decision process. On the other hand, in a category such as GPSs in which there are many alternatives, many features, and much information available (on the Internet) from a variety of sources, we might expect consumers to use a cognitively-simple screening heuristic to balance search/evaluation cost with the value of a higher-value "best" product.[267]

---

[265] APLNDC630-0000124145.

[266] Hauser, J., Toubia, O., Evgeniou, T., Befurt, R., and D. Dzyabura, "Disjunctions of Conjunctions, Cognitive Simplicity, and Consideration Sets," *Journal of Marketing Research* 47 (2010): 486.

[267] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009):211.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

212.    In fact, Professor Hauser's prior research reports that consumers use simplifying heuristics when purchasing smartphones.[268] In one article he wrote:

> Noncompensatory methods are slightly better in unfamiliar categories (e.g., smart phones, global positioning systems). Research suggests that approximately one-half to two-thirds of the respondents are fit better with noncompensatory than compensatory methods and that the percentage is higher when respondents are asked to evaluate more profiles.[269]

213.    In his course materials, Professor Hauser noted:

> As an illustration, we tested lexicographic processing on a survey to 15.810 students last year. Each student was asked to choose from a set of 32 SmartPhones that varied on 16 aspects. There were no constraints on how the choice was made. Of these students, 92% used a non-compensatory (lexicographic) process.[270]

214.    Professor Hauser's own conjoint study involving GPS devices illustrates the inconsistency in results when assuming a compensatory instead of a non-compensatory decision process:

> On average the Magellan brand had higher partworths, thus in any additive-partworth market simulator a switch from Garmin to Magellan would improve market share. However, when non-compensatory models were estimated, the researchers found that

---

[268] Yee, M., Dahan, E., Hauser, J., and J. Orlin, "Greedoid-Based Noncompensatory Inference," *Marketing Science* 26, no. 4 (2007).

[269] Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011): 117-118.

[270] J. Hauser, "Note on Consumer Behavior," *MIT Sloan Courseware* (2005): 5.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> 12% of the respondents screened on brand and, of those, 82% preferred Garmin. For the other 88% (100% – 12%), brand had no impact on consideration. If this model was correct (and it did predict a holdout task better), then a switch from Garmin to Magellan would reduce market share – exactly the opposite of that predicted by an additive-partworth model.[271]

215.    Professor Hauser has both observed that the underlying decision process for smartphones is non-compensatory and that the assumption of compensatory instead of a non-compensatory decision process matters.[272] This is consistent with information gleaned from my parallel pretest of his survey. My results indicate that consumers do use non-compensatory simplifying heuristics when shopping for smartphones. For example, one respondent stated:

> Q:    If you can go back for a second. No biggie, but I have a couple questions at this point. Exercise number 16, how easy or difficult did you find this one?
>
> A:    This one was a little more difficult because what I basically narrowed in on for all the ones previously were my two biggest things that I wanted, which were WiFi calling and Voice to Text. Usually if I had WiFi calling it had all the other options, which three-way is also a big thing for me. There wasn't any that had WiFi that didn't have three-way. On this one there wasn't an option available for WiFi and Voice to Text. So I went with one and hit WiFi. I currently don't have either of those options. And I feel like I text just fine without it.

---

[271] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216.

[272] J. Hauser, "Note on Consumer Behavior," *MIT Sloan Courseware* (2005): 5; Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Q:    Did your decision-making process change from the first time you did it through to the 16th time? Did it change at all?

A:    Yeah. I think - yeah, it did. When I had a bunch to go I realized that if I used the same decision-making process that I used the first couple of times for the next 12 that we'd probably be here until it was dark outside.

Q:    How so?

A:    Because I systematically went through and I thought about for the first couple I thought about how I use my phone and I thought about what each of these options meant, if I would use them, how much I would use them, would I miss not having them. And also - so that whole process kind of allowed me to pick a phone. I was a little more confident in those decisions. When I had a bunch left and I wanted to do it a little quicker, I narrowed in what I really wanted, and I also thought more about what my phone currently has. I think I mentioned that at some point I kind of forgot to remember that first decision making - the first couple of options, you know, what does my phone currently do because it does give you some of these things already, so it's - they're all on here so it makes it look like if you get a really empty one, it kind of makes it feel like I'm getting a crappy phone if I get that one. But that might not be the case if your phone might already have all the other capabilities, looking at personal signature, Quick Links I already have, three-way calling I already have. So it's-.[273]

216.    Another respondent stated:

Q:    Did your decision-making process change at all across the 16 choice process?

---

[273] Exhibit 21 (Philadelphia: Respondent 5).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

A:   It did because at first I was looking at - my main thing I was looking for was WiFi. If something was missing WiFi - I don't know if you noticed, I was always looking for the WiFi and that made a major factor and of course, price. I went to the top priced first because I always think that that's the best, the higher the price, but as you see with the last phone, the cheapest phone, happened to be the one I chose and some things I can live without, and I knew that, but some features, like the pen, I don't like the pen. I mean the Voice to Text, I use it, but I like Skype, not Skype, Slate. I'm really a fan of that and screen size is important, also. When they were too small, that made me very hesitant because I don't like a real tiny screen, either, and also the camera was important to me. Now, these features -

Q:   But did your process change? Did you find that the process or -

A:   I noticed that throughout them all, I was pretty consistent on picking the same type of phone. I did notice that regardless of price or anything, I was going for certain things and if it didn't have it, I immediately went to the next phone regardless of price.[274]

217.   According to another respondent:

A:   My thing, the more I thought about it, and thought about what I was using, probably the most important thing to me is the screen size. So I looked at the two top screen sizes and then went from there and went on the price.

Q:   When you think about, you know, the 16 times that you did it, do you feel that your decision making process changed throughout the 16 times or did it stay pretty consistent? Or something else?

---

[274] Exhibit 21 (Philadelphia: Respondent 6).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> A:   I think my thing are the size, the price, and I was going more over what I would buy. You know, whether it had this or whether it didn't have this wasn't as important to me as the size and the price.[275]

218.   Another respondent stated:

> A:   But I keep clicking on - because for the purpose of the survey, there's nothing in here that would make or break whether or not, hypothetically, I would buy this phone. Honestly, when you go to the store, it comes down to this shuffle of features anyway, and the price range, so.
>
> Q:   OK.
>
> A:   Ultimately, this is what you end up doing at the store. Halfway through here. On the Voice to Text feature is one of my sticking points, for deciding. And for the price here, I would say I would sacrifice it, because you could always get a program that does it. So it's something you can add as a feature later.[276]

219.   In sum, Professor Hauser has conducted research which describes smartphones as complex products due to the large number of choices and the vast number of features available on each device. His research further finds that a large share of respondents (92% in the case of smartphones) may use some form of non-compensatory decision processes when faced with complex products, as in the present case. Professor Hauser's own research has also shown that not accounting for a non-compensatory decision process, when one exists, can lead to results that

---

[275] Exhibit 21 (Phoenix: Respondent 8).
[276] Exhibit 21 (Philadelphia: Respondent 4).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

are, as he says, "exactly the opposite of that predicted by an additive-partworth model," such as the additive-partworth model he assumed in this case.[277]

220.    Yet, despite the findings in his academic publishing, Professor Hauser provides no evidence that he even considered whether any non-compensatory decision process could be at work in estimating the extent to which Samsung sales may have been driven by the patented functionalities. Professor Hauser's use of a choice-based conjoint is based on an underlying assumption of a compensatory decision process, which in his own writings, he suggests may be inappropriate in situations involving complex products. If, as the evidence indicates, the purchase decision process used to purchase smartphones and tablets exhibits non-compensatory characteristics, then Professor Hauser's conjoint analysis, which fails to take that into account, is flawed and unreliable, and may lead to results that are "exactly the opposite" of those that actually exist.[278]

5.    ***Professor Hauser failed to account for the fact that respondents do not make their marketplace choices independently of word-of-mouth and other social effects.***

221.    Even had Professor Hauser accounted for the manner in which consumers account for features in complex products, he would still be missing key drivers of the complex decision

---

[277] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216.

[278] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

process. The actual purchase decision process for smartphones is influenced by factors beyond straightforward product characteristics, such as gigabytes of storage memory or screen size. Factors such as a desire to have the "latest and greatest" smartphone or the model phone selected by one's peer group illustrates this complexity. According to one market survey, 59 percent of Android buyers rank having the newest smartphone model currently available as one of the top two most important features in purchasing a smartphone.[279] Other evidence suggests that the desire to obtain the "newest" smartphone is one reason that consumers purchased an Android smartphone over the iPhone 5.[280]

222. Moreover, the model phone selected by one's peer group also is a factor that is considered in the purchase decision. It has been shown that smartphones are network goods.[281] A network good is one where the value a consumer derives from the product increases as the number people in their network who adopt the product increases. Professor Hauser did not include any attribute in his surveys related to the smartphones or tablets selected by the respondent's peer group. This could have significant impacts on the choices made by the respondent.

---

[279] Deposition of Art Rangel, April 5, 2012, at Exhibit 4, at 17.
[280] APLNDC630-0001315480.
[281] Sundsøy, P., Bjelland, J., Canright, G., and K. Engo-Mønsen, "Product Adoption Networks and Their Growth in a Large Mobile Phone Network," *IEEE Advances in Social Network Mining and Analysis* (2010); Bjelland, J., Canright, G., Engo-Mønsen, K., and P. Sundsøy, "A Social Network Study of the Apple vs. Android Smartphone Battle," *Proceedings of the 2012 International Conference on Advances in Social Networks Analysis and Mining* (2012).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

6.      *Professor Hauser's failure to account for critical aspects associated with the purchase of complex products renders his analysis unreliable.*

223.    Ultimately, Professor Hauser's analysis is based on the assumption that respondents would care about and be extraordinarily well-informed about the functionalities associated with the patented features. In fact, the evidence suggests the contrary. Smartphone consumers have limited means by which to understand the granular distinctions associated with the patented functionalities and academic research suggests that consumers do not employ the type of systematic feature comparison upon which his conjoint analysis is based. In effect, Professor Hauser has skipped steps by assuming that the patented functionalities would have entered into consumer purchase decisions without haven taken any meaningful steps to verify that such was the case. Given evidence to the contrary, his analysis does not provide a meaningful basis by which to make inferences about actual marketplace behavior.

7.      *The reliability of the o utput gener ated by Professor Haus er's surve y is undermined by risks of survey fatigue and overly taxing choice tasks.*

224.    INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

---

[282] Galesic, M. and M. Bosnjak. "Effects of Questionnaire Length on Participation and Indicators of Response Quality in a Web Survey," *Public Opinion Quarterly*, 73 no. 2 (2009): 349-360.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

[a]INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

David Reibstein

# EXHIBIT D

1          UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3             SAN JOSE DIVISION
4    ------------------------------X
     APPLE INC., a California
5    corporation,
6                   Plaintiff,
                             Case No. 12-cv-00630
7            VS.
8    SAMSUNG ELECTRONICS CO., LTD.,
     A Korean corporation; SAMSUNG
9    ELECTRONICS AMERICA, INC., a
     New York corporation; SAMSUNG
10   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
11   liability company,
12                  Defendants.
     ------------------------------X
13
14
15          VIDEOTAPED DEPOSITION
16                   OF
17             JOHN HAUSER
18      Friday, September 27, 2013
19          200 Park Avenue
20          New York, New York
21
22
23   Reported by:
     AYLETTE GONZALEZ, CLR
24   JOB NO. 66029
25

1    INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

11:39

11        Q.   My question is two-part then.  Did

12   you seek to identify the most important

13   features to use as distraction features?

14             MR. TORCHIA:  Objection; form,

15        asked an answered.                        11:39

16             You can respond.

17        A.   As I said, I -- before we do the

18   conjoint analysis, we don't know how important

19   they are.  That's what conjoint analysis does,

20   it measures how important they are.  So we      11:39

21   make some guesses.  And had we guessed wrong

22   and had those distraction features been all

23   unimportant features, we may have had to redo

24   the study.

25             But that wasn't the case.  Those      11:39

Page 80

1   distraction features did have some reasonable

2   importance, so they were valid distraction

3   features.

4         Q.   I'm not asking whether or not they

5   had some importance based on the results of          11:39

6   your survey.  I'm asking, was it your

7   intention to identify as distraction features

8   the most important features of the phone?

9             MR. TORCHIA:  Objection; form,

10            asked and answered.                         11:40

11        A.   You -- to -- the conjoint analysis

12   to study -- to figure out what's most

13   important, not a -- you just can't go to the

14   website and say they promoted this, they

15   promoted that; therefore, this is important      11:40

16   and that isn't.  That -- that's not -- that's

17   not really a valid way of doing that analysis.

18   So why would I do an invalid study?

19        Q.   I'm not asking you to do an invalid

20   study.  What I'm asking you is, was it -- did   11:40

21   you attempt to identify the most important

22   features to purchasers of Samsung accused

23   products and use those as distraction

24   features?

25            MR. TORCHIA:  Objection to form;     11:40

1        asked and answered.

2        A.   I -- without doing a preference

3   study, you can't do it, you can't identify the

4   most important features.  That's what the

5   preference study does.  So I wouldn't -- I                    11:41

6   wouldn't have done it because it's not

7   something that would have been done.

8            What I did is, I made some

9   judgments based upon what we found out there,

10  that these studies -- these distraction                       11:41

11  features would be of some reasonable

12  importance.

13        Q.    INTENTIONALLY OMITTED FROM EXHIBIT/
                RECORD

                                                                  11:41

1    INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

22        Q.   You did not review any consumer

23   research from Apple or Samsung that identified

24   features smartphone purchasers identified as

25   important to them when selecting the              17:48

1   distracted features, correct?

2          MR. TORCHIA:  Objection to the

3      form.

4      A.   Well, the answer to your question

5   as asked is, yes, I did review market research      17:48

6   from Apple.

7      Q.   Where is it on your reliance

8   materials?

9      A.   I didn't do it for this case.

10     Q.   Did you consider that market             17:48

11  research material when selecting your

12  distraction features in this case?

13     A.   I did not -- that's not -- I don't

14  need to choose the most important features.

15  And what I do need to do is to have, in the       17:48

16  end, features that have some reasonable

17  importance such that they act as distraction

18  features.

19     Q.   All I'm trying to do if you relied

20  on something, like a consumer research study,      17:49

21  report or anything, I want to put it in front

22  of you and ask you about it.  If you didn't

23  rely on that, I don't need to ask you.

24         That's why I'm asking; did you rely

25  on any consumer research for identifying the       17:49

Page 307

1   distraction features you included in your

2   survey?

3            MR. TORCHIA:  Objection to form.

4       A.   To the best of my knowledge, we

5   have listed -- we've done our best to list          17:49

6   everything that I relied upon.  And my

7   understanding is that either you've been given

8   that or that you can attain it from public

9   sources.

10           So, I think the answer to your            17:49

11  question is I relied upon what I relied upon.

12  If it's not listed, then I didn't rely upon

13  it.  It doesn't mean I don't know about it,

14  but it's not something that I relied upon.  I

15  listed everything that I relied upon.              17:50

16           INTENTIONALLY OMITTED FROM EXHIBIT/
             RECORD

                                                        17:50

1          MR. TORCHIA:  Thank you,

2     Dr. Hauser.  I have nothing.

3          THE VIDEOGRAPHER:  It's 6:13 p.m.

4     We're going off the record.

5          (Whereupon, at 6:13 p.m., the

6     Examination of this Witness was

7     concluded.)

8

9

          _____

10                 JOHN HAUSER

11

12     Subscribed and sworn to before me

13     This _____ day of _____, 2013.

14

          _____

15          NOTARY PUBLIC

16

17

18

19

20

21

22

23

24

25

Page 325

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK        )

                             :  SS.:

4    COUNTY OF RICHMOND       )

5

6            I, AYLETTE GONZALEZ, a Notary Public

7    for and within the State of New York, do

8    hereby certify:

9            That the witness, JOHN HAUSER, whose

10   examination is hereinbefore set forth was

11   duly sworn and that such examination is a

12   true record of the testimony given by that

13   witness.

14           I further certify that I am not

15   related to any of the parties to this action

16   by blood or by marriage and that I am in no

17   way interested in the outcome of this matter.

18           IN WITNESS WHEREOF, I have hereunto

19   set my hand this 27th day of September, 2013.

20

21        _____

                AYLETTE GONZALEZ

22          (Notary Public No. 01G06228612

             Expiration date:  9/27/2014)

23

24

25

# EXHIBIT H

1          IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4   APPLE, INC., a California         )
    corporation,                      )
5                                     )
                    Plaintiff,        )
6                                     ) Case No.
                                      ) 12-cv-00630-LHK (PSG)
7              vs.                    )
                                      ) Volume 1
8   SAMSUNG ELECTRONICS CO., LTD., a  )
    Korean corporation; SAMSUNG       )
9   ELECTRONICS AMERICA, INC., a New  )
    York corporation and SAMSUNG      )
10  TELECOMMUNICATIONS AMERICA, LLC, a)
    Delaware limited liability        )
11  company,                          )
                                      )
12                                    ) Pages 1 to 311
                    Defendants.       )
13  _____)

14

15

16

17

18          VIDEOTAPED DEPOSITION OF ALEX SNOEREN

19                San Diego, California

20          Wednesday, September 25, 2013

21

22

23

24  Reported by:
    ELIZABETH BORRELLI, CSR No. 7844, CCLL, CLR
25  JOB NO. 65775

Page 265

1    present in Claim 20, it seems to me that according          17:13

2    to the definition you just provided that would

3    necessitate that it -- the scope is -- is narrow.

4        Q.   And specifically one could design a system

5    that practices Claim 11 but does not practice Claim        17:13

6    20, correct?

7        A.   Again, you're asking a hypothetical.  I'm

8    not sure that -- whether one could or could not in

9    the abstract.  But again to sort of get to your very

10   logical question, because there are additional            17:13

11   constraints it's -- it's within the realm of

12   possibility that you could meet a subset of those

13   constraints.  But the practical question of whether

14   any particular system does or doesn't, you know,

15   we'd have to talk about concrete.  But in the             17:14

16   abstract, yes, that seems possible.

17       Q.   Do you think that the inventors of the 414

18   patent came up with the basic concept of background

19   synchronization?

20            MR. BUROKER:  Objection.  Vague.               17:14

21   Incomplete hypothetical.

22   BY MR. PAK:

23       Q.   Let me see if I can clarify the question.

24            Do you believe that the inventors of the

25   414 patent were the first in the world to invent the      17:14

Page 266

1   concept of background synchronization, where a            17:14

2   synchronization would take place without

3   interrupting the user interface?

4           MR. BUROKER:  Objection.  Vague.

5           THE WITNESS:  So my understanding of the          17:15

6   invention within 414 is that the invention speaks to

7   particular combination of functionality, including

8   background synchronization, including this software

9   synchronization component architecture, including

10  the particular data class, specialization and so        17:15

11  forth.  I do believe and I have opined in my reports

12  that they invented those -- those complaints --

13  those components.

14          I think that a number of those concepts

15  were understood to one skilled in the art at the        17:15

16  time; however, the particular combination of those

17  represents a novel invention in this instance.

18          [Reporter requests clarification.]

19          THE WITNESS:  In this instance.

20  BY MR. PAK:                                              17:16

21    Q.   In fact, you've seen in prior art systems

22  that Dr. Chase has identified that actually do

23  perform background synchronization without

24  interrupting the user experience, correct?

25          MR. BUROKER:  Objection.  Vague.               17:16

Page 269

1    tied behind my back with respect to just looking at          17:18

2    the device or prodding the device or something like

3    that.  I wouldn't want to speculate whether someone

4    could determine each one of these characterizations

5    through our means.                                            17:19

6    BY MR. PAK:

7        Q.   If somebody said this product is using

8    background synchronization.  I can synchronize my

9    device with another device in the background without

10   interrupting the user experience, that high level          17:19

11   description alone would not tell you whether that

12   system was practicing the specific implementation

13   techniques claimed in Claim 20, correct?

14           MR. BUROKER:  Objection.  Incomplete

15   hypothetical.                                                 17:19

16           THE WITNESS:  Again, Claim 20 has a number

17   of limitations.  The high level description you just

18   provided me doesn't speak to the details of these

19   particular limitations, so to the extent that your

20   hypothetical that you just provided to me didn't            17:19

21   speak to each one of these, I would say that no, I

22   can't do an infringement analysis based on your

23   hypothetical description.

24   BY MR. PAK:

25       Q.   And looking at Claim 20, specifically it's        17:19

Page 277

1   figure out what his purpose was.  I'm just asking          17:37

2   you as the technical expert, if I gave you this

3   description of background synching from Dr. Hauser's

4   report, based on that description alone, you cannot

5   tell me whether Claim 20 is being practiced or not,       17:37

6   true?

7       A.   Again, I did not use this paragraph in

8   determining infringement analysis.  This paragraph

9   is a layperson's description.  This paragraph does

10  not fully describe some of the details that would be       17:38

11  evident in any particular implementation of this

12  hypothetical.

13      Q.   Therefore, you cannot tell me, based just

14  on this highly level description in Dr. Hauser's

15  report of background synching, whether each and           17:38

16  every element of Claim 20 would be satisfied, true?

17      A.   Again, I didn't try to do that.  I don't

18  propose to try and do that right now.  This was not

19  the paragraph that I used for that analysis.

20      Q.   Take the time.  It's not a very long           17:38

21  paragraph.  Take a look at it.  You tell me right

22  now whether you think, as a technical expert, you

23  could take what is described here and what's

24  described here alone to make a determination that

25  all the elements of Claim 20 are satisfied?             17:38

Page 278

1        MR. BUROKER:  Objection.  Incomplete          17:38

2   hypothetical.

3        THE WITNESS:  I don't believe that the

4   timeframe we have here with this set of information

5   that I could conduct a proper infringement analysis.    17:39

6   I did not.  I'm offering no opinions on whether this

7   hypothetical would infringe.

8        However, your specific question to me is,

9   as I sit here today, looking at this paragraph, do I

10  accuse this hypothetical thing of infringing?  And     17:39

11  my answer is I don't have an opinion about whether

12  that would infringe or not.

13  BY MR. PAK:

14      Q.   Let's be specific.  What do you think is

15  required by Claim 20?                                   17:40

16      A.   So Claim 20 says the storage medium, as in

17  Claim 11, wherein the synchronization software

18  component is configured to synchronize structured

19  data of a first data class and other synchronization

20  software components are configured to synchronize      17:40

21  structured data of other corresponding data classes.

22      Q.   Do you understand the concept of

23  antecedent basis with respect to claims?

24      A.   I apologize.  It's late in the day.  If

25  you could give me a definition of that.                17:40

Page 309

1

2

3

4

5

6

7

8          I, ALEX SNOEREN, do hereby declare under

9     penalty of perjury that I have read the foregoing

10    transcript; that I have made any corrections as

11    appear noted, in ink, initialed by me, or attached

12    hereto; that my testimony as contained herein, as

13    corrected, is true and correct.

14          Executed this _____ day of

15    _____, 20_____, at

16    _____, _____.

17             (City)                    (State)

18

19

20

21

22             _____

               ALEX SNOEREN

23             Volume 1

24

25

1    STATE OF CALIFORNIA          )

                                  )     ss.

2    COUNTY OF LOS ANGELES        )

3

4           I, Elizabeth Borrelli, Certified Shorthand

5    Reporter, Certificate No. 7844, for the State of

6    California, hereby certify:

7           I am the deposition officer that

8    stenographically recorded the testimony in the

9    foregoing deposition;

10          Prior to being examined the deponent was

11   first duly sworn by me;

12          The foregoing transcript is a true record

13   of the testimony given;

14          Before completion of the deposition,

15   review of the transcript [x] was [ ] was not

16   requested.  If requested, any changes made by the

17   deponent (and provided to the reporter) during the

18   period allowed are appended hereto.

19

20   Dated: 9/26/13

21

22

23                      _____

                         ELIZABETH BORRELLI, CSR 7844

24

25

# EXHIBIT K

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | Case No.    11-cv-01846-LHK |
| Plaintiff, | **EXPERT REPORT OF JULIE L. DAVIS, CPA (AS OF 8/23/2013)** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

SUBJECT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

2

3

4

5

6                        **6.       The Hypothetical Negotiation**

7           193.    After consideration of the information discussed above, Mr. Musika performed a

8    hypothetical negotiation analysis.  Mr. Musika concluded that the hypothetical negotiation would

9    take place in June 2010, just prior to the date of first infringement by Samsung.  I agree.  It is

10   reasonable to assume that Apple and Samsung would negotiate at that time for all the intellectual

11   property asserted by Apple in the amended complaint, whether issued or not.  Samsung would be

12   interested in obtaining rights to all intellectual property necessary for it to sell all the infringing

13   products.  Mr. Musika therefore assumed that this negotiation would cover all the infringing

14   products (whether or not they had been introduced as of June 2010).  I agree with this approach

15   and have used it when evaluating reasonable royalties.

16          194.    INTENTIONALLY OMITTED FROM EXHIBIT/RECORD

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16   Dated:  August 23, 2013
17                                              
18                                                    JULIE L. DAVIS
19
20
21
22
23
24
25
26   INTENTIONALLY OMITTED FROM EXHIBIT/RECORD
27
28

EXPERT REPORT OF JULIE L. DAVIS, CPA **(as of 8/23/2013)**
Case No. 11-cv-01846-LHK

110

# EXHIBIT P

# Errata to Todd C. Mowry, Ph.D. Transcript – 4/24/12

*Apple Inc. v. Motorola* – Case No. 11-cv-8540

| Page/Line | Description of Changes | Reason |
|---|---|---|
| 11:2 | change "VOSI" to "VLSI" | transcription error |
| 38:15 | change "and" to "of" | transcription error |
| 47:11 | change "and" to "in" | transcription error |
| 51:4 | change "TextView.setText ()" to "TextView.setText()" | transcription error |
| 55:2 | change "base" to "space" | transcription error |
| 55:11 | change "in" to "and" | transcription error |
| 55:21 | change "base" to "space" | transcription error |
| 56:20 | change "base" to "space" | transcription error |
| 58:18 | change "separating" to "operating" transc | ription error |
| 59:1 | change "satisfy" to "that" | transcription error |
| 62:14 | change "rest didn't" to "resident" transc | ription error |
| 65:5 | change "promises" to "processes" transcrip | tion error |
| 68:10 delete | "is" | remove |
| 68:15 | change "stock" to "stack" | transcription error |
| 70:21 | change "as" to "else" | transcription error |
| 73:23 | change "when the" to "when it" | transcription error |
| 79:19 | change "cosign" to "cosine" | transcription error |
| 79:20 | change "cosign" to "cosine" | transcription error |
| 80:4 | change "co-signs" to "cosines" transc | ription error |
| 80:6 | change "signs" to "sines" | transcription error |

Highly Confidential - Attorneys' Eyes Only

APLNDC630-0001914460

| 90:1 | change "cosign" to "cosine" | transcription error |
|---|---|---|
| 91:13 | change "cosign" to "cosine" | transcription error |
| 91:16 | change "co-signs" to "cosines" transc | ription error |
| 91:18 | change "co-signs" to "cosines" transc | ription error |
| 91:20 | change "co-signs" to "cosines" transc | ription error |
| 93:1 | change "cosign" to "cosine" | transcription error |
| 93:7 | change "cosign" to "cosine" | transcription error |
| 93:10 | change "cosign" to "cosine" | transcription error |
| 94:2 | change "cosign" to "cosine" | transcription error |
| 94:13 | change "cosign" to "cosine" | transcription error |
| 94:16 | change "cosign" to "cosine" | transcription error |
| 94:17 | change "cosign" to "cosine" | transcription error |
| 100:10 | change "that" to "there" transcription | error |
| 101:4 | change "cosign" to "cosine" | transcription error |
| 101:9 | change "cosign" to "cosine" | transcription error |
| 101:16 | change "cosign" to "cosine" | transcription error |
| 102:9 | change "cosign" to "cosine" | transcription error |
| 102:9 | change "co-signs" to "cosines" transcription | error |
| 102:15 | change "cosign" to "cosine" | transcription error |
| 102:19 | change "cosign" to "cosine" | transcription error |
| 102:22 | change "cosign" to "cosine" | transcription error |
| 109:16 | change "rewritten" to "written" transcription | error |
| 112:20 | change "nuance" to "nuanced" | transcription error |

*Page* 2 of 4

Highly Confidential - Attorneys' Eyes Only

|  |  |  |
|---|---|---|
| 120:8 | change "message activity" to "MessageActivity" | transcription error |
| 120:8 | change "LinkifyaddLinks" to "Linkify.addLinks" | transcription error |
| 120:10 | change "setIntents" to "setIntent" transcription | error |
| 121:18 | change "composed message activity" to "ComposeMessageActivity" | transcription error |
| 121:18 | change "LinkifyaddLinks" to "Linkify.addLinks" transcription | error |
| 121:23 | change "LinkifyaddLinks" to "Linkify.addLinks" transcription | error |
| 123:6-7 | change "composed message activity" to "ComposeMessageActivity" | transcription error |
| 123:12-13 change | "composedmessageactivity" to "ComposeMessageActivity" | transcription error |
| 123:18 | change "LinkifyaddLinks" to "Linkify.addLinks" transcription | error |
| 123:22 | change "composemessageactivity" to "ComposeMessageActivity" | transcription error |
| 123:23 | change "composemessageactivity" to "ComposeMessageActivity" | transcription error |
| 127:5 | change "routine" to "routines" transcription | error |
| 127:16 | change "addIntents" to "adds Intents" | transcription error |
| 129:3-4 | change "Get Hit Test Result" to "getHitTestResult" | transcription error |
| 131:7 | change "Browser activity" to "BrowserActivity" transcription | error |
| 131:9 | change "Browser activity" to "BrowserActivity" transcription | error |
| 133:3 | change "start" to "startActivity" transcription | error |
| 142:4 | change "intent" to "Intent" | transcription error |
| 142:8 | change "context" to "Context" transcription | error |
| 143:8 | change "and" to "an" | transcription error |

*Page 3 of 4*

| 143:11 | change "past" to "passed" | transcription error |
|--------|---------------------------|---------------------|
| 143:16 | change "explicit" to "implicit" | transcription error |
| 161:2 | change "item tag" to "itemTag" | transcription error |
| 165:22 | change "or" to "are" | transcription error |
| 165:24 | change "or the" to "or – the" | transcription error |
| 168:3 | change "was" to "has" | transcription error |
| 190:2 | change "on" to "in" | transcription error |
| 190:8 | change "Patton" to "patent" | transcription error |

In addition, please see the attached declaration of June 4, 2012, which corrects elements of my testimony from page 38 to 119 of this transcript.

Date: 6/6/12             Signature:

*Page 4 of 4*

Highly Confidential - Attorneys' Eyes Only