# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California corporation, | Case No. 12-cv-00630 |
| Plaintiff, | **EXPERT REPORT OF JOHN R. HAUSER,** |
| v. | **August 11, 2013** |
| SAMSUNG ELECTRONICS CO., LTD., A Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

**\*\*CONFIDENTIAL – CONTAINS MATERIAL DESIGNATED AS CONFIDENTIAL – PURSUANT TO A PROTECTIVE ORDER\*\***

**UNITED STATES DISTRICT COURT**

# Table of Contents

I.      Introduction and Qualifications .............................................................................. 3

II.     Assignment .......................................................................................................... 5

III.    Summary of Opinions ......................................................................................... 6

IV.     Overview of Methodology .................................................................................. 7

        A.   Choosing Among Different Products.......................................................... 10

        B.   Choosing Whether or Not to Buy .............................................................. 17

        C.   Hierarchical Bayes for Choice-Based Conjoint ........................................ 19

V.      Survey Design and Administration ..................................................................... 21

        A.   Pretesting................................................................................................... 23

        B.   Identifying the Sample .............................................................................. 25

        C.   Survey Methodology.................................................................................. 27

        D.   Survey Implementation ............................................................................. 34

VI.     Estimation of Partworths .................................................................................... 41

        A.   Testing the Fit and Predictive Ability of the Model ................................. 45

        B.   Consumers Positively Value the Patent-Related Features ......................... 50

VII.    The Effect of the Patent-Related Features on Consumers' Willingness to Buy................. 54

VIII.   The Price Premium for the Patent-Related Features ........................................ 62

## I.     Introduction and Qualifications

1.     My name is John R. Hauser. I am the Kirin Professor of Marketing at the MIT Sloan School of Management at the Massachusetts Institute of Technology ("MIT"). I have served MIT in a number of capacities, including Group Head of Marketing, Research Director of the Center for Innovation in Product Development, Co-Director of the International Center for Research on the Management of Technology, and Area Head for Management Science at MIT. The Management Science Area at the MIT Sloan School of Management includes, among other groups, the Marketing Group, the Information Technologies Group, and the Statistics Group. The principal focus of my research and teaching at MIT has been in the areas of marketing management, new product and service development, customer satisfaction, marketing research, and competitive marketing strategy. Specifically, my research includes the evaluation of consumer decision-making, product and service development, websites and advertising designed around customers' cognitive styles, determination of relative feature preferences and implicit product valuations, and demand forecasts.

2.     I am the co-author of two textbooks, *Design and Marketing of New Products* and *Essentials of New Product Management*, as well as over eighty articles and papers, including articles on various methods used to determine the importance of product features in consumer decision-making. I have developed market research techniques that enable marketing researchers, experts, and managers to predict the value of individual features in both existing and hypothetical products. These methods have been employed numerous times by academic researchers, as well as practitioners from major international corporations.[1]

---

[1]     See, among others, Toubia, Olivier, John Hauser and Rosanna Garcia (2007), "Probabilistic Polyhedral Methods for Adaptive Choice-Based Conjoint Analysis: Theory and Application," *Marketing Science*, 26, 5, (September-October), pp. 596–610; Urban, Glen L., and John R. Hauser (2004), "'Listening-In' to Find and Explore New Combinations of Customer Needs," *Journal of Marketing*, 68, 2, (April), pp. 72–87; Griffin, Abbie and John R. Hauser (1993), "The Voice of the Customer," *Marketing Science*, 12, 1, (Winter), pp. 1–27; and Hauser, John R., Olivier Toubia, Theodoros Evgeniou, Rene Befurt, and Daria Dzyabura (2010), "Disjunctions of Conjunctions, Cognitive Simplicity and Consideration Sets," *Journal of Marketing Research*, 47, (June), pp. 485–496.

3.      I have served as editor-in-chief of *Marketing Science* and have held senior editorial positions with *Management Science*, the *Journal of Marketing Research*, and the *Journal of Product Innovation Management*. I have received numerous awards for excellence in research and teaching in Marketing and was recognized by the American Marketing Association with the Paul D. Converse Award for "outstanding contributions to marketing scholarship."[2] In 2001, I received the Parlin Award, which is "the oldest and most distinguished award in the [marketing research] field," according to the American Marketing Association.[3] In 2011, I received the Churchill Lifetime Achievement Award of the American Marketing Association for contributions to marketing research. In 2013, I was awarded the Buck Weaver award by the INFORMS Society of Marketing Science, for lifetime contributions to the theory and practice of marketing science.[4] I am a Fellow of the Institute for Operations Research and Management Science ("INFORMS") and an Inaugural Fellow of the INFORMS Society of Marketing Science. I am the President-elect of the INFORMS Society of Marketing Science (a board-level position). I have also served as a Trustee of the Marketing Science Institute.

4.      I have served as an expert witness or offered consulting services in numerous litigations, including, but not limited to, cases on trademark and patent infringement, copyright infringement, intellectual property, market research, survey design, consumer confusion and false advertisement, product confusion, claims substantiation, and Lanham Act cases. Most of this expert testimony has involved surveys and other market research to measure consumers' attitudes, beliefs, and intentions. In these prior matters, I have been called upon to project what consumer behavior would have been under different market

---

[2]      "The Paul D. Converse Awards," American Marketing Association, http://www.marketingpower.com/Community/ARC/Pages/Career/Awards/Converse.aspx, (visited on August 10, 2013); "Previous Recipients," 18th Paul D. Converse Marketing Symposium, http://business.illinois.edu/converse/previous.html, (visited on August 10, 2013).

[3]      "2009 Charles Coolidge Parlin Marketing Research Award," American Marketing Association, January 14, 2009, http://www.marketingpower.com/ResourceLibrary/Pages/MarketingThoughtLeaders/MarketingThoughtLeaders11409/Parlin_Marketing_Research_Award.aspx, visited on August 10, 2013; "Charles Coolidge Parlin - Marketing Research Award," American Marketing Association, http://www.marketingpower.com/Calendar/Pages/CharlesCoolidgeParlinAward.aspx, (visited on August 10, 2013).

[4]      "AMS Co-Founder John Hauser Receives Lifetime Achievement Award", PRWeb, http://www.prweb.com/releases/2013/8/prweb10989760.htm, (visited on August 10, 2013).

scenarios, to measure the importance and value of product features, to measure the impact of rumors, to evaluate marketing research with respect to advertising claims, and to investigate the potential for customer confusion.

5.    I have provided survey evidence that has been used to estimate the relative value of product features, for example, in both antitrust cases and in patent infringement cases. I have advised major corporations, including American Airlines, Chrysler Corporation, Fidelity Investments, Ford, General Motors, IBM, Polaroid, Proctor & Gamble, and Xerox. My professional qualifications are described in my curriculum vita, which is attached as Exhibit A. A list of cases in which I have testified within the last four years at deposition or trial is attached as Exhibit B.

6.    The subject area headings in this report are intended to assist the reader and no inference should be drawn from the use or omission of any wording or description in these headings.

## II.    Assignment

7.    I was asked by counsel for Plaintiff, Apple Inc. ("Apple"), to design and conduct two surveys—one for smartphones and one for tablets—to determine what effect, if any, the features associated with the patents at issue have on Samsung consumers' willingness to buy Samsung smartphones and tablets.[5] I was also asked to determine the price premium, if any, that Samsung consumers are willing to pay for the features associated with the patents at issue. For smartphones, I was asked to test the following patents: US 5,946,647 (the "'647 Patent"), US 6,847,959 (the "'959 Patent"), US 8,074,172 (the "'172 Patent"), 8,014,760 (the "'760 Patent"), and US 7,761,414 (the "'414 Patent"). For tablets, I was asked to test the following patents: US 8,046,721 (the "'721 Patent"), the '647 Patent, the '959 Patent, the '172 Patent and the '414 Patent.[6]

---

[5]    In this report, I collectively refer to Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung Telecommunications America, LLC as "Samsung."

[6]    I understand that the '721 Patent is alleged to be infringed by Samsung smartphones as well as Samsung tablets. In order to better balance the number of patent-related features tested in each survey, I did not test the '721 Patent for smartphones.

8.      In undertaking this assignment, I relied on my extensive expertise in developing, testing, and analyzing surveys and in interpreting qualitative and quantitative research about consumer attitudes, intentions, preferences, and behavior.

9.      Part of the survey work for this investigation was performed under my direction by Applied Marketing Science, Inc. ("AMS"). Since 1989, AMS has conducted market research and surveys designed to gauge consumers' wants and needs for new products in dozens of industries. Since 1994, AMS has been conducting surveys to support expert testimony in litigation. I am a Senior Consultant, Board Member, and Co-Founder of AMS. I am a minority stockholder in AMS, but I do not receive any compensation from AMS that is directly tied to this case. Working under my direction, Cornerstone Research ("Cornerstone") performed part of the survey design and empirical analysis supporting my opinions in this report.

10.     My rate of compensation for this task is $800 per hour. My compensation is not contingent upon the outcome of this dispute.

11.     My work is ongoing; I may update and revise my results and conclusions as I review additional data and information. A complete list of materials I have considered to date in connection with this particular assignment is included as Exhibit C. To the extent that I review additional information, I will supplement this list.

## III.     Summary of Opinions

12.     I designed and conducted two separate surveys—one for smartphones and one for tablets—to determine the effect that removing the features related to the patents at issue in this case has on Samsung consumers' willingness to buy Samsung smartphone or tablet devices. I also used these surveys to determine what price premium, if any, Samsung consumers are willing to pay for these patent-related features. For smartphones, I tested the '647 Patent, the '959 Patent, the '172 Patent, the '760 Patent, and the '414 Patent. For tablets, I tested the '721 Patent, the '647 Patent, the '959 Patent, the '172 Patent, and the '414 Patent.

13.     After careful review of the results of these surveys, including sensitivity analyses and robustness checks described in detail below, it is my opinion that the model of consumer behavior I use provides reliable and substantial information explaining consumers' choices in regard to the features tested for both smartphones and tablets.

14.     The choice simulation results that I have obtained and the robustness checks that I have performed demonstrate that, for both smartphones and tablets, the patent-related features at issue in this case, whether individually or collectively, have substantial effects on Samsung consumers' willingness to buy the relevant Samsung products. My analysis of the data also finds that, on average, Samsung consumers place substantial positive value on the patent-related features at issue in this case.

15.     Finally, I understand that the exhibits to my report and underlying data have been provided to Christopher Vellturo, Ph.D. I further understand from Dr. Vellturo that he is utilizing the data and findings from my conjoint studies in order to estimate how demand for certain smartphones and tablets is impacted when product features I considered in my conjoint studies are removed from those devices. I also understand that those devices have prices and screen sizes within or close to the ranges in my conjoint studies. In my opinion, it is appropriate to use the data and findings from my studies for such an application.

## IV.     Overview of Methodology

16.     The basic survey methodology that I selected is known as web-based conjoint analysis. Conjoint analysis is a tool that enjoys wide use in the field of marketing research. It was introduced to the field of marketing research in 1971 and is generally recognized by marketing science academics and industry practitioners to be the most widely studied and applied form of quantitative consumer preference measurement. It has been shown to provide valid and reliable measures of consumer preferences, and these preferences have

been shown to provide valid and reliable forecasts of what consumers will do (or would have done) under scenarios related to those measured.[7]

17. For example, under the auspices of MIT's Virtual Consumer Initiative, my colleagues and I undertook large-scale tests of the validity of web-based conjoint analysis. Predictions were highly accurate, predicting future choices consumers would make in a subsequent test with real money at stake and predicting what would happen in the marketplace. One of the scientific papers discussing the validity test received two highly prestigious awards as the best paper in the marketing sciences literature for 2003 (awarded in 2004) and for the best paper based on a dissertation (awarded in June 2005).[8] Another one of my scientific papers was a finalist for the best paper in 2002 in the *Journal of Product Innovation Management* and still a third paper was a finalist for the best contribution to the practice of marketing research in 2003.[9] Many successful products, including automobiles, hotel chains, the EZ Pass system, HMOs, and cameras, have been developed using conjoint analysis.[10]

18. The general idea behind conjoint analysis is that consumers' preferences for a particular product are driven by the features or descriptions of the features embodied in that product. The features included in the survey are organized into *feature categories*. This is typical practice in conjoint analysis: consumers are presented with different hypothetical products as options (also known as "profiles"), which are constructed based on the

---

[7] Hauser, John R. and Vithala Rao (2004), "Conjoint Analysis, Related Modeling, and Applications," *Advances in Marketing Research: Progress and Prospects*, Jerry Wind and Paul Green, Eds., (Boston, MA: Kluwer Academic Publishers), pp. 141–168.

[8] Toubia, Olivier, Duncan I. Simester, John R. Hauser, and Ely Dahan (2003), "Fast Polyhedral Adaptive Conjoint Estimation," *Marketing Science*, 22, 3, (Summer), pp. 273–303.

[9] Dahan, Ely and John R. Hauser (2002), "The Virtual Customer," *Journal of Product Innovation Management*, 19, 5, (September), pp. 332–354; Toubia, Olivier, John R. Hauser, and Duncan Simester (2004), "Polyhedral Methods for Adaptive Choice-based Conjoint Analysis," *Journal of Marketing Research*, 41, 1, (February), pp. 116–131.

[10] Green, Paul E., Abba M. Krieger, and Yoram Wind (2001), "Thirty Years of Conjoint Analysis: Reflections and Prospects," *Interfaces*, 31, 3, (May–June), pp. S53–S76. Hauser, John R. and Vithala Rao (2004), "Conjoint Analysis, Related Modeling, and Applications," *Market Research and Modeling: Progress and Prospects,* Jerry Wind and Paul Green, Eds., (Boston, MA: Kluwer Academic Publishers), pp. 141–168.

feature categories (also known as "attributes").[11] For example, in one of the classic articles in the conjoint area, Lenk, DeSarbo, Green, and Young (1996) studied computer purchases of MBA students using the feature categories of telephone service hot line, RAM, screen size, CPU speed, hard disk size, CD ROM/multimedia, cache, color of unit, availability, warranty, bundled productivity software, money back guarantee, and price.[12] In another study, storage format, LCD screen size, optical zoom, camera resolution, low-light sensitivity, and price were used as attributes for camcorders.[13]

19. In the smartphone survey I conducted here, I included the following feature categories: (i) data accessibility; (ii) call initiation and screening; (iii) input assistance; (iv) screen size; (v) camera; and (vi) price. In the tablet survey I conducted here, I included the following feature categories: (i) data accessibility; (ii) lock screen interface; (iii) input assistance; (iv) screen size; (v) connectivity; and (vi) price. Each of the feature categories included in the smartphone and tablet surveys takes on one of four different *levels*. For example, in the smartphone survey, the screen size category takes one of the following four levels: (1) 4.0", (2) 4.8", (3) 5.0", or (4) 5.5". In some cases, levels consist of various features. For example, the camera feature category takes on one of the following four levels: (1) Panorama, (2) Panorama and Best Photo, (3) Panorama, Best Photo, and Smile Shot, or (4) Panorama, Best Photo, Smile Shot, and Buddy Photo Share.

20. There are different forms of conjoint analysis.[14] For this assignment, I used a form of conjoint analysis known as Choice-Based Conjoint ("CBC") analysis. In CBC, consumers are shown products generated as different combinations of levels of the

---

[11]   See, for example, Vithala Rao (2008), "Developments in Conjoint Analysis," *Handbook of Marketing Decision Models,* B. Wierenga, Ed., (Boston, MA: Springer Science and Business Media), pp. 23–49.

[12]   Peter J. Lenk, Wayne S. DeSarbo, Paul E. Green, and Martin R. Young (1996), "Hierarchical Bayes Conjoint Analysis: Recovery of Partworth Heterogeneity from Reduced Experimental Designs," *Marketing Science*, 15, 2, pp. 173–191.

[13]   Min Ding, Young-Hoon Park, and Eric T. Bradlow (2009), "Barter Markets for Conjoint Analysis," *Marketing Science*, 55, 6, pp. 1003–1017. For other examples of feature categories for different products, see Dahan, Ely and John R. Hauser (2002), "The Virtual Customer," *Journal of Product Innovation Management*, 19, 5, (September), pp. 332–354;

[14]   Examples of conjoint approaches include Ratings Based (or Full Profile) Conjoint Analysis, Choice-Based Conjoint Analysis, Adaptive Conjoint Analysis, and Self-Explicated Conjoint Analysis. See Vithala Rao (2008), "Developments in Conjoint Analysis," *Handbook of Marketing Decision Models,* B. Wierenga, Ed., (Boston, MA: Springer Science and Business Media), pp. 23–49.

---

feature categories. Respondents are shown these products in sets (called the "choice sets" or "choice tasks") and are asked to choose the product that they most prefer among the alternatives presented. I chose to show respondents four products in each choice set. I have used four-product choice sets in other applications, including award-winning academic articles and in litigation.[15] I have found the data to be both reliable and valid.

21.    In the smartphone and tablet surveys I conducted here, respondents are asked whether they would buy the product that they chose at the indicated price. In making that choice, respondents are asked to take into account other options in the market (other smartphone options in the smartphone survey and other tablet options in the tablet survey) that might influence their purchase decision.[16]

22.    I now discuss how the choices respondents make in response to each question are used to understand consumer demand for the features included in the survey; as well as how consumer demand for the features drives consumer demand for the product.

    A.    *Choosing Among Different Products*

23.    Conjoint analysis provides respondents with realistic choices among hypothetical products that vary simultaneously on multiple feature categories. This realism enhances the predictive ability, and hence, reliability and validity of the conjoint analysis task. Furthermore, because multiple feature categories are varying simultaneously, the task does not cause the respondent to focus artificially on a single feature category. By avoiding such a focus, conjoint analysis minimizes any demand artifacts that might be induced. A demand artifact is akin to a leading question.[17] A multi-feature-category task

---

[15]   See, for example, Toubia, Olivier, John R. Hauser, and Duncan Simester (2004), "Polyhedral Methods for Adaptive Choice-based Conjoint Analysis," *Journal of Marketing Research*, 41, 1, (February), pp. 116–131; Toubia, Olivier, John Hauser and Rosanna Garcia (2007), "Probabilistic Polyhedral Methods for Adaptive Choice-Based Conjoint Analysis: Theory and Application," *Marketing Science*, 26, 5, (September–October), pp. 596–610. TiVo Inc. v. Echostar Communications Corp. et al., Case No. 2:04-CV-1-DF, United States District Court for the Eastern District of Texas, Marshall Division.

[16]   Jeff D. Brazell, Christopher G. Diener, Ekaterina Karniouchina, William L. Moore, Válerie Séverin, and Pierre-Francois Uldry (2006), "The no-choice option and dual response choice designs," *Marketing Letters*, 17, 4, (December), p. 256; Christopher G. Diener, Bryan Orme, Dan Yardley, "Dual Response 'None' Approaches: Theory and Practice," *2006 Sawtooth Software Conference Proceedings*, pp. 157–167.

[17]   Demand artifacts are aspects of the study that influence research results based on the chosen procedure rather than based on the phenomenon under study. For a discussion of demand artifacts, see, e.g., Sawyer, Alan G.

discourages respondents from guessing that the researcher is interested in a particular feature category, which would, in turn, cause the respondent to believe that the researcher is "demanding" a particular response. A multi-feature-category conjoint analysis task is likely to be more reliable and valid than a task in which the consumer trades off only a single feature category (or a single feature) and price as would be the case in methods such as contingent valuation.

24. CBC analysis is consistent with economic and consumer-behavior theories of approximate utility maximization. That is, if a researcher could measure all features that varied and could account for each and every other factor that might influence the consumer, then consumer-behavior theory says that consumers would choose the product that maximizes their utility. In conjoint analysis, utility is modeled as having an observed component that is due to the feature categories being varied and an unobserved component that is due to the impact of unobserved factors. The observed utility is the sum of the partial contributions of each feature category and price (the effect of price is negative). The partial contribution of a level of a feature is known as a "partworth." These partworths are estimated from the respondents' natural choices by established statistical methods.

25. Partworths measure, in units of utility, the *relative* partial contribution of a feature. For example, if the partworth for a smartphone screen size of 4.0" is 1.2 units of utility and the partworth for a smartphone screen size of 4.8" is 3.0 units of utility, then one can say that the respondent gets 1.8 more units of utility from a smartphone with a 4.8" screen than he or she would have gotten from a smartphone with a 4.0" screen. (1.8 = 3.0 − 1.2). Similarly, if the partworth for a smartphone screen size of 5.5" is 2.1 units of utility, then the respondent prefers the 4.8" screen size to the 5.5" screen size and the relative change in utility is 0.9 units (0.9 = 3.0 − 2.1).

26. I estimated the partworths for different levels of feature categories included in the two surveys from respondents' choices. I first provide a conceptual example of how this is

(1975), "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, 1, 4, (March), pp. 20–30; Shimp, Terence A., Eva M. Hyatt, and David J. Snyder (1991), "A Critical Appraisal of Demand Artifacts in Consumer Research," *Journal of Consumer Research*, 18, 3, (December), pp. 273–283.

done. Imagine a study is conducted to measure the incremental value of a digital video recorder (DVR) as part of a satellite television service. The first step would be to create different hypothetical products, each describing a possible satellite television service. For ease of exposition, the example below has only five feature categories—DVR or not, network, number of channels, number of premium packages, and price. In a real conjoint task, the levels in these five categories would all vary across different products and the consumer would choose among different products. Instead, for ease of exposition, many levels in the illustrative example do not vary; the only levels that vary are the DVR and number of channels categories. Now imagine that the consumer is asked to make a choice among only these two services. In Table 1A below, the respondent prefers a service with a DVR even though it includes fewer channels than the alternative service, only 120 channels rather than 180. This choice alone indicates that this consumer prefers having a DVR with 120 channels to the addition of 60 additional channels. He or she may still prefer the DVR to the addition of even more channels. This finding is called an inequality constraint because the difference in the partworths between having a DVR and not having a DVR is larger than the difference in partworths between 120 and 180 channels.

## Table 1A: Conjoint Analysis—Basic Concept
### Prefers DVR with 120 channels to no DVR with 180 channels

|                    | Product 1  | Product 2  |
|--------------------|------------|------------|
| Includes DVR       | Yes        | No         |
| Network            | Dish       | Dish       |
| Number of Channels | 120        | 180        |
| Premium Packages   | 3          | 3          |
| Price              | $20        | $20        |
|                    | Chosen     | Not Chosen |

Confidential—Contains Material Designated as Confidential—Pursuant to a Protective Order

27.   Now consider another consumer who is given the same choice exercise and who chooses the service without the DVR but with the 180 channels. This situation is depicted in Table 1B below. The second consumer prefers having an addition of 60 channels above and beyond 120 channels to having a DVR. In this inequality constraint, the difference in partworths between 180 channels and 120 channels is greater than the difference in partworths between having a DVR and not having a DVR.

### Table 1B: Conjoint Analysis—Basic Concept
### Prefers no DVR with 180 channels to DVR with 120 channels

|  | Product 1 | Product 2 |
| --- | --- | --- |
| Includes DVR | Yes | No |
| Network | Dish | Dish |
| Number of Channels | 120 | 180 |
| Premium Packages | 3 | 3 |
| Price | $20 | $20 |
|  | Not Chosen | Chosen |

28.   Now imagine giving a respondent 16 such choice tasks—similar to the methodology in the surveys described herein for smartphones and tablets—where, in each choice task, he or she is asked to choose among four "products" each representing a different type of satellite television service. Every choice task results in three inequality constraints because the chosen product is preferred to each of the other three available products. An inequality constraint is akin to a data point. Therefore, a single respondent's choices among four products result in 48 data points. When aggregated over a large number of respondents, the CBC exercise generates a rich set of data from which to estimate the partworths. For example, when aggregated over 500 respondents, the sample exercise described above gives $48 \times 500 = 24{,}000$ data points.

29.  Suppose that the five feature categories used in the above example each had four levels (for example, the levels for Number of Channels were 80, 120, 180, and 220 channels). Because partworths are relative, three (rather than four) partworths need to be estimated. Thus, with five categories and four levels, $3 \times 5 = 15$ partworths need to be estimated. The large number of data points (24,000) is more than adequate to estimate statistics (medians, means, covariances, etc.) for the 15 partworths. Market-level estimates of median (or mean) values and the market-level variation are statistically precise.

30.  Using information from consumer-behavior theory makes these estimates even more precise. For example, consumer-behavior theory indicates that preferences are monotonic in price: all else equal, people prefer to pay less than to pay more. Thus, the partworth of paying $8 has to be at least as large as the partworth of paying $20. This information also takes the form of inequality constraints and can be thought of as "prior information" in the academic literature.[18] Ignoring this information and consumer-behavior theory would result in estimating a model that does not use all of the available data. Such a model would be a less reliable description of consumer behavior and a less reliable summary of the available data. The importance of incorporating available consumer-behavior theory in this manner has been recognized in marketing research studies. For example, Allenby, Arora, and Ginter (1995) write that:

> "In summary, we often have prior knowledge about the part-worths in conjoint studies. Failure to use this prior knowledge in estimation frequently results in part-worths that violate the known structure. … In addition, we demonstrate that the proposed methodology [a Bayesian approach to constrained part-worth estimation] results in part-worth estimates that are more accurate than other approaches across a variety of conditions."[19]

---

[18]  See, for example, Allenby, Greg, Neeraj Arora, and James Ginter (1995), "Incorporating Prior Knowledge into the Analysis of Conjoint Studies," *Journal of Marketing Research*, 32, 2, pp. 152–162. ("Researchers often possess prior information about the partworths, such as the order and range restrictions of product attribute levels. It is known, for example, that consumers would rather pay less for a specific product given that all other product attribute levels are unchanged.")

[19]  Allenby, Greg, Neeraj Arora, and James Ginter (1995), "Incorporating Prior Knowledge into the Analysis of Conjoint Studies," Journal of Marketing Research, 32, 2, pp. 152–162, at p. 161. For another example, see Boatwright, Peter, Robert McCulloch, and Peter Rossi (1999), "Account-Level Modeling for Trade Promotion: An Application of a Constrained Parameter Hierarchical Model," *Journal of the American Statistical Association*, 94, 448, (December), pp. 1063–1073.

31. The illustrative DVR example also shows why I focus my subsequent analysis on market-level information. In the analysis of the data, partworths vary by consumer because some consumers value DVRs highly and some do not. However, the goal is to summarize this variation with a relatively small number of statistics. That is, it is statistically more precise to base the interpretations on the 24,000 data points along with information from consumer-behavior theory rather than attempt to focus on the 15 partworths for a single respondent using 48 data points plus consumer-behavior theory. The following example illustrates the difference between market-level and individual-consumer level statistics. The same conceptual idea applies to the data from a conjoint analysis exercise.

32. The precision based on a population versus the precision based on a single respondent is best illustrated with probability theory. To make this distinction more clear, I focus on a simple probabilistic outcome—the flip of a coin. The same principle applies to the data collected in the conjoint analysis survey. Suppose that a study is designed to estimate the probability that a coin flips to heads by observing two independent flips per consumer. If the coin is really a fair coin, the probability of heads is 0.50. Observing 500 consumers, each flipping the same coin twice, results in 1,000 flips. The estimated probability of heads is very likely very close to 0.50, based on the mean or median of the outcomes of 1,000 coin flips. In fact, the expected mean (and median) is 0.50 and the 95% confidence interval is $0.50 \pm 0.03$. This result is at the market level. However, at the level of the individual respondent, because there are only a small number of observations possible for an individual respondent, the estimated probability of heads for an individual respondent is not as precise. Specifically, the only possible outcomes are HH, HT, TH, and TT— each equally likely with a fair coin.[20] Thus, for approximately 25% of the consumers, the estimated probability of heads would be 1.00, and for approximately 25% of the consumers, such probability would be 0.00. Only for approximately half of the consumers, the estimated probability would be 0.50. The estimates are unbiased because the average outcome is still 0.50 ($0.50 = (1.00 + 2 \times 0.50 + 0.00) \div 4$). However, these estimates, which are the best for a single respondent, are much less precise than the estimates based on the full sample of all 500 consumers ($0.50 \pm 0.03$). As this example

---

[20]    Head = H, Tail = T.

shows, while estimates based on a small number of observations for each individual may be less precise, the individual-respondent estimates aggregate to a highly precise estimate of the market-level probability that one can rely upon. The same logic applies to conjoint analysis. Using 24,000 inequality constraints, plus consumer behavior theory, gives precise estimates at the market level even if the estimates and predictions for a particular consumer may not be as statistically precise.

33.    Before I address the estimation of partworths, I provide one more example to show the power of the market-based approach. Suppose that there are two types of coins, neither fair. (A fair coin is equally likely to come up head or tail.) Coin A returns a head with probability 0.60 and Coin B returns a head with probability 0.40. (If each respondent is given one of the two coins with equal probability, and I choose a respondent randomly, then, *a priori*, a head is returned with probability 0.50). Now suppose I observe a respondent flip two heads and I want to estimate what type of coin the respondent has. If a particular respondent had Coin A, he or she would have gotten two heads 36% of the time because $0.36 = 0.60 \times 0.60$. If the respondent had Coin B, he or she would have gotten two heads only 16% of the time because $0.16 = 0.40 \times 0.40$. Thus, if I observe HH, it is more likely the consumer has Coin A than Coin B. The likelihood is about 70%.[21] In other words, by observing the outcomes of the flips, I gain information about the likely type of coin, which I do not observe directly. This is analogous to how partworths are estimated. I observe choices and the choices enable me to infer the partworths that led to those choices. In this example, as in the prior coin-flipping example, I could infer more precisely the distribution of Coin A vs. Coin B using data from the entire market than I could by attempting to make estimates for each and every respondent. Market-level data is accurate, valid, and precise. Individual-respondent data is also accurate and valid, but not nearly as precise.

---

[21]    According to Bayes' Theorem: 0.692 (or about 70%) = $0.36 \div (0.36 + 0.16)$. See Gelman, Andrew, John Carlin, Hal Stern, and Donald Rubin (2004), *Bayesian Data Analysis*, Second Edition, (Chapman & Hall), at pp. 7–9.

### B.    Choosing Whether or Not to Buy

34.    Responses from the choice exercises described in Tables 1A and 1B enable me to evaluate the effect on consumer demand of including or not including particular features in particular products. In the example in Tables 1A and 1B, the levels that differ are DVR vs. no DVR and 180 channels vs. 120 channels. Consider the following example. Imagine that a satellite television provider wanted to explore ways in which to expand its customer base and wanted to test the effect on consumer demand of adding the DVR feature, adding more channels, or adding premium packages. To answer this question using the tools of conjoint analysis, one would once again create hypothetical products with varying feature categories, as in the earlier example. In each choice task, the respondent is first asked to choose among four products. However, one must also ask the respondent whether or not he or she would buy his or her preferred product as compared to other choices that he or she might have in the marketplace. As in the example in Tables 1A and 1B, these choice questions are repeated over 16 choice tasks. Each choice task includes two questions: (1) the respondent is asked to choose among the shown products and (2) the respondent is asked whether or not he or she would purchase the chosen product in the marketplace. The answers to these questions allow one to evaluate consumer demand for a product and how it is affected by consumer demand for different features.

Confidential—Contains Material Designated as Confidential—Pursuant to a Protective Order

**Table 2: Basic Concept for Market Demand**
**Respondent is asked whether he or she would buy the preferred product**

|                    | Product 1 | Product 2 |
|--------------------|-----------|-----------|
| Includes DVR       | Yes       | No        |
| Network            | Dish      | Dish      |
| Number of Channels | 120       | 180       |
| Premium Packages   | 3         | 3         |
| Price              | $20       | $20       |

Question 1: Which product do you choose between the two?

Answer 1: Product 1

Question 2: Would you or would you not buy the product that you chose above at the indicated price?

Answer 2: Yes, I would buy the product above.

35. Consider the hypothetical example presented in Table 2. Suppose that when a respondent is asked to choose between the two options, he or she chooses the "product" shown in the first column, again corresponding to a particular type of satellite television service. (Note that in the actual smartphone and tablet surveys I provide four options, not two.) The product includes the DVR feature and 120 channels. In the second question, the respondent is asked whether or not he or she would actually buy this product at the price specified if it were available in the marketplace. The answer to this second question provides another data point, or inequality constraint. The data point provides information about the necessary attraction of a product (i.e., how many and what features it must have) so that the particular respondent would buy it.

36. I ask the second question for each of the 16 choice sets faced by every respondent. If I had 500 respondents I would ask this question 16 × 500 times for a total of 8,000 additional inequality constraints that I can use to estimate market demand. The data from the set of second questions can be used to estimate the necessary attractiveness for a

respondent to purchase a product (at the given price) in the marketplace. Technically, I estimate a partworth, sometimes called the "outside option," to quantify the minimum level of attractiveness. The lower this partworth, the more likely the respondent will be to buy the product he or she chose in the choice-set question. Like the partworths of the levels of feature categories, partworths for attractiveness (the outside option) may vary across respondents. The probabilistic arguments discussed above also apply to the attractiveness partworths. Using all of the data from all respondents, I obtain very precise estimates of the distribution of the attractiveness partworth.

### C.    Hierarchical Bayes for Choice-Based Conjoint

37.    I use a well-known, well-tested, and widely-used method to estimate the distribution of partworths that best describe the first- and second-stage choices that I observe among the 507 consumers in the smartphone survey and the 459 consumers in the tablet survey. The statistical method is known as Hierarchical Bayes for Choice-Based Conjoint analysis ("HB CBC"). HB CBC is commonly used in both academic and industry conjoint analyses. I and other researchers have used the HB CBC approach in academic research.[22]

38.    As in the Coin A vs. Coin B example, HB CBC analysis uses survey data on respondents' choices (both first- and second-stage), combined with prior information from consumer-behavior theory to estimate the posterior distribution of partworths for the respondents.[23] The "posterior" distribution in Bayesian models refers to the current state of knowledge about all uncertain quantities in a Bayesian analysis.[24] The "hierarchy" part of HB CBC

---

[22]    For surveys of academic research on HB CBC, see, for example, Allenby, Greg M., and Peter E. Rossi (2003), "Perspectives Based on 10 Years of HB in Marketing Research," Sawtooth Software Research Paper Series. Rossi, Peter E. and Greg M. Allenby (2003), "Bayesian Statistics and Marketing," *Marketing Science*, 22, 3, (Summer), pp. 304–328. Hauser, John R. and Vithala Rao (2004), "Conjoint Analysis, Related Modeling, and Applications," Advances in Market Research and Modeling: Progress and Prospects, Jerry Wind and Paul Green, Eds., (Boston, MA: Kluwer Academic Publishers), pp. 141–168.

[23]    In the Coin A vs. Coin B example, the prior belief was that the coins were equally likely. I could have used other prior beliefs. For example, if I knew that 80% of the coins in the population were of the A-type, then I would have been more confident that the HH came from an A-type than a B-type. I would have estimated that there was a 90% chance that the coin was on an A-type. In HB CBC, weakly-informative priors are used such that the priors have little impact on the final estimates. The consumer-behavior-theory constraints play an analogous role to prior information.

[24]    Technically, the posterior distribution is proportional to the product of the prior density and the likelihood.

means that the statistical model of the estimation allows variation (or heterogeneity) and correlation across partworths of different respondents when deriving the distribution of partworths across all respondents. Because of the variation and correlation, the distribution of partworths for a subset of respondents is informed by the data of choices by all respondents whose choices are used in the estimation. I use HB CBC estimation to derive the distribution of partworths across all these respondents (as a sample from the consumer population). That distribution and related statistics, such as the average or median partworths, shares, or fit and validation measures, are statistically precise. I report statistical confidence bounds when appropriate.

39.   Analogous to the coin-flipping example, HB CBC estimation enables me to obtain more precise estimates of market-level distributions from less-precise individual-respondent-level estimates. HB CBC partworth estimates are best suited for calculating statistics at the market level, such as the average or median value of certain variables of interest, and for simulating the overall, aggregate behavior of the market. This is what I use the HB CBC estimates for in this report.

40.   As explained above, the HB CBC method has proven to provide reliable and valid conjoint analysis estimates of partworths.  It is an appropriate method used to obtain the distribution of partworths across consumers when there are a moderate number of choice sets in the choice task. In the smartphone and tablet studies described in this report, I chose to use 16 choice tasks—a number that I have used in both academic studies and studies about which I have testified in litigation. Using 16 choice tasks enables me to appropriately balance the number of questions in the survey with the number of partworths for which I need to estimate market-level statistics. In my experience, using 16 choice tasks limits respondent wear-out.[25]

41.   Because HB CBC estimation is based directly on consumer choices and accounts for heterogeneity in consumers' preferences, it is, in my opinion, an ideal method to

---

[25]   If too many questions were asked of a respondent, then the respondent might "wear out," that is, response errors might increase as the respondent tires. In addition to limiting the number of questions in the choice task to minimize wear out, I pretested the questionnaire to assure that respondents did not experience wear out and I was satisfied that they did not.

summarize the effect, if any, of the various features of consumer electronic devices such as smartphones and tablets on consumers' willingness to buy these devices, as well as the price premium that consumers are willing to pay for such features. As explained in Sections VII and VIII below, I have estimated the effect, if any, that removing one or more patent-related features from a Samsung smartphone or tablet has on consumers' willingness to buy that product, and the price premium that Samsung consumers are willing to pay for each of these patented features.

## V.    Survey Design and Administration

42.    To develop the questionnaire, I first consulted with counsel to identify the smartphone and tablet features related to the patents I was asked to test. In order to explain these features to survey respondents, I used a short name for each feature within a feature category, a brief description of that feature, and a short video animation of that feature. I understand from counsel that the description of each patent-related feature fairly represents how the corresponding patented innovation is used in practice by Samsung in its accused smartphones and tablets. The brief descriptions and animations were tested and then shown to respondents, as discussed below in Section V.D. For the smartphone survey, these tested patents and the short names of related features were as follows:

- '647 Patent, with related feature "Quick Links"
- '959 Patent, with related feature "Universal Search"
- '172 Patent, with related feature "Automatic Word Correction"
- '760 Patent, with related feature "Missed Call Screen Management"
- '414 Patent, with related feature "Background Syncing"

43.    For the tablet survey, the tested patents and the short names of related features were as follows:

- '721 Patent, with related feature "Slide to Unlock"
- '647 Patent, with related feature "Quick Links"
- '959 Patent, with related feature "Universal Search"

- '172 Patent, with related feature "Automatic Word Correction"

- '414 Patent, with related feature "Background Syncing"

44. I instructed Cornerstone to research the features of Samsung smartphones and tablets that were discussed in press reviews and Samsung's public marketing materials. See Exhibit D. Under my direction, Cornerstone performed this research and briefed me so that I could select the feature categories and levels associated with each category to be used in the conjoint analysis. The research was also informative about what consumers perceive as a reasonable range for the various smartphone and tablet features. This understanding of ranges helped me identify the appropriate levels of the feature categories to include in the survey.

45. I selected the following six feature categories to be included in CBC for smartphones: (a) data accessibility, (b) call initiation and screening, (c) input assistance, (d) screen size, (e) camera, and (f) price. I selected the following six feature categories to be included in CBC for tablets: (a) data accessibility, (b) lock screen interface, (c) input assistance, (d) screen size, (e) connectivity, and (f) price. The data accessibility, call initiation and screening, input assistance, and lock screen interface categories were designed to incorporate the patent-related features as well as related distraction features so as to disguise the purpose of the survey. The screen size, camera, and connectivity feature categories, and the features they incorporate, are included only for distraction purposes. Below, I discuss the language that was used to present the patent-related and other features to respondents. I detail how the language was chosen.

46. In the surveys, all features other than the chosen functionalities and feature categories were held constant. The chosen functionalities and feature categories were sufficiently independent among themselves and sufficiently independent from feature categories and features that were "held constant" that an additive utility model was appropriate.[26] Brand (say Samsung or Apple) is not a feature category that varies in the first question of the conjoint analysis because all products presented to the consumers were hypothetical *Samsung* smartphones or tablets. In the smartphone survey, respondents were instructed:

---

[26] I review tests of independence in later paragraphs.

"Please choose your most preferred Samsung smartphone among the four below." Respondents were also instructed that each product has "all other features on [their] most recent Samsung smartphone[s]." In the tablet survey, respondents were instructed: "Please choose your most preferred Samsung tablet computer among the four below." Respondents were also instructed that each product has "all other features on [their] most recent Samsung tablet computer[s]."

47.    The questionnaires were programmed into a PC-based software system designed for administering and analyzing such questionnaires.[27] The final questionnaires that respondents were asked to complete are shown in Exhibit E (smartphones) and Exhibit F (tablets). Respondents answered these questions in the web survey via their computers. Exhibit G (smartphones) and Exhibit H (tablets) show reproductions of the computer screens. These are examples of the types of screens that respondents viewed. Some questions, such as the choice task, were chosen based on algorithms that included appropriate randomization to avoid order effects. In each choice task for each respondent, the levels of the feature categories were generated randomly, subject to order and level balancing using standard methods.

   A.    Pretesting

48.    Questionnaires should use language that respondents find easy to understand and relevant to the questions that are being asked. If the questions of interest are ambiguous or otherwise unclear, the results of the survey may be impacted due to guessing or misunderstanding on the part of respondents. To maximize the clarity of the questionnaire, it is useful to gain insight into, for example, how potential respondents think about issues relevant to the target of the study, the extent to which potential respondents are aware of those issues, and the vocabulary used by potential respondents regarding the study target. Therefore, prior to administering the final survey, it is important to evaluate (or "pretest") the proposed series of questions with a small sample of "the same type of respondents who would be eligible to participate in the full-scale

---

[27]    I used Sawtooth Software's SSI Web Version 7.0 package, which is a well-known and widely used software system for these types of applications.

survey."[28] Such pretests help assess the potential for, and remove or minimize, demand artifacts and help ensure that all survey questions were understood as intended.[29]

49.     In June and July, 2013, at my direction, experienced interviewers from AMS pretested the smartphone and tablet survey animations and questionnaires with a total of 39 people in the United States.[30] I have worked with these interviewers before, participated in their training, and provided instructions on how to carry out these pretests. I also personally listened to some pretest interviews for both surveys. To qualify for a smartphone pretest interview, the interviewee was required to be a user of a Samsung smartphone; to qualify for a tablet pretest interview, the interviewee was required to be a user of a Samsung tablet. The goal of this evaluation was to ensure that respondents could understand the proper intent of the questions and answer them appropriately. These responses were used solely for pretesting and are not included in the final survey results.

50.     The pretest interviews themselves are verbal debriefs of pretest respondents after the respondents have viewed the animations and answered the survey questions.[31] The interviewers ask respondents a number of questions so as to facilitate a productive discussion, but respondents are encouraged to offer comments and opinions beyond these questions. The interviewers tested that respondents understood the written and audiovisual description of each feature; that they did not have difficulty with the questions and instructions; that they understood the choice exercise they were asked to perform; and that they looked at all or almost all of the features in making their choices.

---

[28]   Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 388–389.

[29]   Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 387–389.

[30]   The smartphone pretest involved 23 respondents. In the Phase I pretest, 12 respondents were asked specific questions about the scripts and animations that explained the patent-related and distraction features. In the Phase II pretest, 11 respondents were asked questions to identify any potential demand artifacts or lack of comprehension. See Exhibit I1. The tablet pretests involved an additional 16 respondents. In the Phase I pretest, 4 respondents were asked specific questions about the scripts and animations for the connectivity feature category. In the Phase II pretest, 12 respondents were asked questions to identify any potential demand artifacts or lack of comprehension. See Exhibit I2. I also conducted a separate set of post-tests that tested comprehension of the second stage conjoint question and the incentive alignment language. See discussion below.

[31]   See, for example, Urban, Glen L., and John R. Hauser (1980), *Design and Marketing of New Products*, (Englewood Cliffs, NJ; Prentice-Hall, Inc.), p. 179.

The interviewers' notes from the pretests can be found in Exhibit I. Information from pretesting helped with the design of instructions and in resolving any technical issues with the animations and audio used in the surveys. Based on the findings from the pretests, I am confident that the phrasing of the questionnaires was comprehensible and minimized the potential for guessing.

51.     Finally, at my direction, the interviewers also explicitly tested for demand artifacts, asking respondents about their beliefs about the sponsor and purpose of the surveys. No demand artifacts were detected in the final phrasing and layout of the questions. Respondents did not find the questions to be leading and respondents were not able to guess that any particular result was desired by the survey designer. In particular, respondents were asked a question about the purpose of each survey—"What do you think might be the purpose for conducting this survey?" This question was used to test if there was any demand-artifact from respondents' (correct) speculations on the purpose of the surveys. The results showed that none of the respondents were able to identify that the surveys were sponsored by Apple, or that the surveys were to be used in a litigation context.

## B.     Identifying the Sample

52.     Potential respondents for the two surveys were identified through Research Now, a company that has pre-recruited potential respondents who have indicated their willingness to participate in market research surveys. Research Now is a well-established international market research service firm that maintains an invitation-only panel of over 6 million panelists worldwide.[32] Research Now manages about 2,000 projects per month for a variety of clients.[33]

53.     I have worked with Research Now on a number of other projects and have found them to be consistently reliable and a high quality supplier of qualified survey respondents. Research Now is a member of several organizations that promote reliability and quality

---

[32]    Research Now, Panels, at http://www.researchnow.com/en-US/Panels.aspx, (visited on August 10, 2013).

[33]    Research Now Panel Quality: Our Values, at http://www.researchnow.com/en-US/~/media/578E9AB322D5491CA61005CF64005C54.ashx, (visited on August 10, 2013).

standards, including the American Marketing Association ("AMA") and Council of American Survey Research Organizations ("CASRO").[34] Research Now automatically checks new panelists for duplicate email addresses at the time for registration. Following initial registration, there are additional checks to identify fraudulent panelists and there is a regular review of member data to validate identities of panel members.[35] As part of the panel recruitment process, all panel members complete a questionnaire that includes basic demographic information (age, gender, etc.). In addition, panel members have the option to answer questions about their personal habits and behaviors (e.g., drinking habits, cell phone usage).

54.     Using this information, Research Now was able to target survey invitations to people who had indicated that they own smartphones and tablets. Respondents received an initial e-mail invitation and one e-mail reminder. See Exhibit J. The invitation included a link to the actual survey, which was hosted on a website maintained by AMS.[36] This link contained an embedded identification number that assured that only invited respondents could answer the survey and that each respondent could complete the survey only once.[37] After clicking on the link from the email invitation, respondents were prompted to a browser window with a CAPTCHA challenge to ensure that responses were not computer-generated.[38] After completing the CAPTCHA challenge, respondents moved to the survey.

---

[34]   Research Now Industry Associations, http://www.researchnow.com/en-US/AboutUs/IndustryInvolvement.aspx, (visited on August 10, 2013). Research Now also complies with the ICC/ESOMAR International Code of Marketing and Social Research Practice. See Research Now, Panels, at http://www.researchnow.com/en-US/Panels.aspx, (visited on August 10, 2013).

[35]   Research Now Panel Quality: Our Values, at http://www.researchnow.com/en-US/~/media/578E9AB322D5491CA61005CF64005C54.ashx, (visited on August 10, 2013).

[36]   AMS programmed and hosted the survey.

[37]   If a respondent was taking the survey on a tablet, smartphone, or any electronic device other than a desktop or laptop computer, he or she was screened and terminated, but was encouraged to start the survey again on a laptop or desktop computer. This restriction was added because tablets, smartphones, and other handheld devices generally have insufficient screen size to view this survey's content without extensive scrolling. In the case of the tablet survey, respondents who attempted to fill out the survey using a tablet were also sent a second invitation with a reminder that they must take the survey on a desktop or laptop computer.

[38]   A CAPTCHA challenge refers to a program that protects websites against "bots" (i.e., computer-generated responses) by generating and grading tests that humans can pass, but current computer programs cannot. The acronym CAPTCHA stands for Completely Automated Public Turing Test To Tell Computers and Humans

55.   The security steps described above ensure that only panel members receive invitations, that the survey is not answered by a "bot," and that the survey taker cannot take the survey more than once. In addition, Research Now is a reputable panel provider which itself employs security procedures.[39] To provide further validation, each respondent's age and gender were compared to values for those respondents in the panel provider's database. Any respondents whose stated age and gender did not match the values in the database were terminated from the survey.

56.   Respondents who qualified and completed the survey were awarded $15 in e-Rewards (Research Now) currency. In my experience, honoraria are common in conjoint survey research and do not influence the accuracy of the responses. Furthermore, respondents were informed that one in 20 respondents would be selected at random to win the option for cash and a smartphone or a tablet. As explained further below, this opportunity is part of what the marketing field calls "incentive alignment" and helps ensure that respondents provide high quality responses.[40]

### C.   Survey Methodology

57.   In designing and implementing the survey, I followed standard scientific methods to maximize the reliability of the survey instrument. My survey design adopted the scientific guidelines for surveys conducted for academic, commercial, and litigation

---

Apart. See, e.g., "CAPTCHA: Telling Humans and Computers Apart Automatically," CAPTCHA, http://www.captcha.net/, (visited on August 10, 2013).

[39]   Research Now uses several techniques to identify legitimate respondents. They have an extensive panel member verification process, and use "Digital Fingerprinting" to ensure that multiple responses are not obtained from the same computer. They also use "Geo-IP Validation" to identify the geographic location of the respondent. If there is a discrepancy between the targeted location of the survey and the location of the respondent's computer, the respondent is blocked from taking the survey. See, http://www.researchnow.com/en-US/Panels/PanelQuality/ResearchIntegrity.aspx, (visited on August 5, 2013).

[40]   For examples of academic studies using incentive alignment in conjoint analysis, see Ding, Min, Rajdeep Grewal, and John Liechty (2005), "Incentive-Aligned Conjoint Analysis," *Journal of Marketing Research*, 42, 1, (February), pp. 67–82; Ding, Min (2007), An Incentive-Aligned Mechanism for Conjoint Analysis, *Journal of Marketing Research*, 44, 2, (May), pp. 214–223; Ding, Min, John R. Hauser, et al. (2011), Unstructured Direct Elicitation of Decision Rules, *Journal of Marketing Research*, 48, 1, (February), pp. 116–127.

purposes.[41] I describe my methodology in greater detail below. For the full sequence of survey questions, see Exhibit E and Exhibit F.

58. **Double-blind design.** It is standard survey practice to avoid indicating the sponsor and/or purpose of the survey to ensure respondents' objectivity. According to the *Reference Manual on Scientific Evidence*, "the survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses. Explicit clues could include a sponsor's letterhead appearing on the survey; implicit clues could include reversing the usual order of the *yes* and *no* response boxes on the interviewer's form next to a crucial question, thereby potentially increasing the likelihood that no will be checked." (emphasis in original; footnote omitted). The goal of the survey design is to make the respondent "blind" to the sponsor and purpose of the survey.[42]

59. The design and administration of my survey can be characterized as blind to the respondent (as evidenced by the pretests). Because the survey was administered via the Internet, respondents were not exposed to human interviewers, thereby eliminating the possibility of an interviewer communicating the sponsor or purpose of the survey and influencing the outcome (intentionally or not). An Internet-based survey avoids demand artifacts that might be induced by means of intonation or facial expressions during the delivery of particular questions or answers. An Internet-based survey removes, or at least greatly diminishes, any "interviewer bias" which may arise from the desire of the respondents to please, displease, or impress the interviewer. (One might say that the computer was blind to the outcome; hence the study was double-blind.)

60. **Introductory/screener questions.** Introductory or "screener" questions help to identify members of the target population and determine whether respondents meet the criteria (qualify) for inclusion. In drafting introductory questions, I was careful not to convey

---

[41]   See, e.g., many of the recommendations in Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, pp. 359–423.

[42]   See, e.g., Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 410–411.

information that would influence responses to the main survey or otherwise provide respondents with information that otherwise would not occur to them.[43]

61.     The inclusion of unrelated answer options in closed-ended respondent qualification questions serves to distract respondents from an item of interest.[44] Such questions and answer options help to conceal from the respondents the intention of the survey and to minimize the potential for demand artifacts. For example, if a survey is conducted to determine whether respondents might be interested in a particular movie, the survey can ask the respondent to select the movies in which he or she is interested, providing a set of movie options including the movie of interest. The other movies within the option set would help mask the target of the survey, and would therefore serve to distract the respondent from the purpose of the study. In the smartphone survey, to restrict the sample to the target group, i.e., owners of the Samsung smartphones, I asked respondents in Question S7 "In the past twelve months, which of the following brands of smartphones have you personally owned?" To minimize demand artifacts, I provided unrelated options such as Apple, Blackberry, HTC, LG, Motorola, Nokia, and Sony Ericsson, in addition to Samsung. Analogous questions were used in the tablet questionnaire.

62.     I also used low-incidence screening questions as well as logic links between screening questions to identify and filter professional survey takers, if any, who, in order to increase their chances of earning award points, might not answer the questions, especially screening questions, truthfully. For example, in Question S7b, if a respondent indicated that he owned more than three Samsung smartphones in the past 12 months, which is less likely for a normal respondent, he would be asked Question S7c, "In the past 12 months, which, if any, of the following brands of portable GPS have you personally owned?" The respondent would be terminated if he again selected more than three brands of portable

---

[43]   See, for example, Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, pp. 359–387, at pp. 386–387; Smith, D. M., N. Schwarz, T. R. Roberts, and P. A. Ubel (2006), "Why are you calling me? How study introductions change response patterns," *Quality of Life Research*, 15, pp. 621–630.

[44]   "Closed-ended" questions provide the respondent with a set of potential responses (answer options) from which to choose. These are distinct from "open-ended" questions, which allow the respondent to formulate his/her own answers. For a discussion of closed-ended and open-ended questions, see Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 391–394.

GPS devices in Question S7c. This is because it is unlikely that a normal respondent would own both more than three Samsung smartphones *and* more than three brands of portable GPS devices in the past 12 months. The respondent would also be terminated if he did not indicate that he owned a portable GPS device in the past 12 months in Question S6, but selected one or more brand of portable GPS devices in Question S7c. Such filter mechanisms reduced the chance that the survey results would include professional survey takers.

63.   Respondents were also required to have owned at least one of the Samsung products at issue within the last 12 months. Because respondents were allowed to select more than one product from the list of products at issue, they were also asked to indicate the most recently purchased product. This product was designated as the "most recent" product for the remainder of the survey.[45] Respondents were also required to have played a role in the decision to purchase their most recent Samsung product. Respondents' answers to these questions allowed me to include only appropriate respondents in the survey. Screening statistics are reported in Exhibit K.

64.   In addition, participants could not be employed by (or have a member of their household who was employed by) a consumer electronics seller, a marketing or market research firm, a public relations firm, or an advertising agency. These screens are standard security questions and do not bias the results.

65.   **Filters.** To avoid influencing respondents' answers and survey results and to minimize answers from uninformed respondents, carefully designed surveys include "filters." Filters are questions and/or answer options that eliminate respondents who are not relevant or who do not have opinions.[46]

66.   I used full-filters in my survey questions and answer options. Appropriate questions in my survey included the option of "Don't know/Unsure." For example, in Question S7d I

---

[45]   Smartphone survey: "QS7b. Which one of the following Samsung smartphones that you owned was purchased most recently? This will be referred to as your most recent Samsung smartphone for the rest of this survey."

[46]   Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 389–391.

ask respondents "Which <u>one</u> of the following Samsung smartphones that you owned was <u>purchased most recently</u>?" Respondents that selected "Don't Know/Unsure" were terminated. By employing filters, I avoided asking questions of respondents that might not be relevant and asking respondents to express a belief when the respondent had none or was not sure.

67.    **Rotation of answer options.** In closed-ended questions with several answer options, respondents might be more likely to choose an option simply because it is first or last on the list. Such phenomena are known as "order effects."[47] To avoid order effects, I rotated answer options so that different respondents see the options in different orders and any possible order effects cancel out across respondents. There are standard exceptions to the rotation rules. For example, certain options—such as "Other," "None of the above," and "Don't know / Unsure"—always come last in order for the question to preserve logical flow. Another exception to answer rotation occurs when answer options come in a certain logical order, such as those for age brackets. In such circumstances, answer options are usually not rotated.

68.    I rotated answer options in the introductory questions and closed-ended filter questions, where it was appropriate. For example, in Question S7 (smartphone questionnaire) I asked the respondents "In the past twelve months, which of the following brands of smartphone have you personally owned?" I rotated the order of the various brands of smartphone so that Samsung (the brand of interest) was not appearing first or last for all respondents.

69.    **Incentive alignment.** Data used in conjoint analysis is generally collected in hypothetical settings, such as the two surveys conducted in this matter. Respondents in these surveys are rewarded for their participation, usually by a fixed amount, such as the $15 e-Rewards in the surveys described here. The respondents in a survey can be provided with further incentives to make choices consistent with their true preferences via use of mechanisms that tie the rewards they get to the choices they make in the survey. This is

---

[47]    For a discussion of order effects, see Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, pp. 359–423, at pp. 395–396.

known as "incentive alignment." Recent research suggests that incentive alignment may result in great respondent involvement, low boredom, and high data quality with strong external validity such as when paired with estimating marketplace attractiveness.[48]

70.   In the two surveys in the instant matter, I incorporated a mechanism to ensure that the respondents' answers are incentive aligned. The respondents in the smartphone survey were advised that: (i) 1 in every 20 respondents would be picked at random to win the option of receiving a free smartphone as a prize, (ii) the smartphones offered to the winning respondents would be based on the choices each winning respondent made in the survey with regard to feature categories that varied in the survey, (iii) the features with regard to feature categories that did not vary in the survey would be chosen to be as close as feasible to those of the smartphone they otherwise would have chosen in the marketplace, (iv) if the smartphone offered to a winning respondent was priced less than $300 and if the respondent chose the offered smartphone, the respondent would also get the difference in cash. The tablet survey includes a similar mechanism that consists of offering an option to receive a tablet to 1 in every 20 respondents, where the option would be based on the respondents' choices in the survey. If the tablet offered to the winning respondent was less than $600 and the respondent chose it, the respondent would get the difference in cash. Specifically, for smartphones, respondents were told (emphasis in the original):

> "We want to reward you for thinking carefully about the choices that you make in this survey. Therefore, **we will randomly pick 1 out of every 20 respondents who take this survey and pay for their next smartphone**. If you are one of the lucky respondents, you will be offered a free smartphone under the following conditions:
>
> - If you wish to participate in the free smartphone offer, you will please volunteer to tell us about your top-choice smartphone when you decide to replace your existing smartphone with a new smartphone under a new contract.

---

[48]   For examples of academic studies using incentive alignment in conjoint analysis, see Ding, Min, Rajdeep Grewal, and John Liechty (2005), "Incentive-Aligned Conjoint Analysis," *Journal of Marketing Research*, 42, 1, (February), pp. 67–82; Ding, Min (2007), An Incentive-Aligned Mechanism for Conjoint Analysis, *Journal of Marketing Research*, 44, 2, (May), pp. 214–223; Ding, Min, John R. Hauser, et al. (2011), Unstructured Direct Elicitation of Decision Rules, *Journal of Marketing Research*, 48, 1, (February), pp. 116–127.

- We will then offer you a free smartphone based on your top-choice smartphone as well as the choices that you make in this survey. Except for the phone features that will vary in this survey, the free smartphone we offer you (based on your responses in this survey) will match your top-choice smartphone as closely as possible.

- If the free smartphone we offer you is priced less than $300 under contract, you will get the difference in cash. For example, if the market price of the smartphone that we offer you is $199 under contract, you will receive that smartphone plus $101 in cash ($300 - $199 = $101), if you accept the offer. If you chose to reject the offer, you forgo the reward.

- **Because your answers will determine the smartphone that we offer, it is in your best interest to think hard about the questions and answer them to reflect your preferences. Therefore, please think carefully when:**

  o **Choosing your most preferred smartphone among the alternatives shown;**

  o **Deciding whether or not to actually buy that smartphone given the availability of other smartphones in the market."**

71.    The incentive alignment mechanism I incorporated in the surveys further provides incentives for the respondents to think hard about the questions in the survey and answer the questions to reflect the respondents' true preferences because the respondents' answers determine the reward option they would get, should they be chosen to receive an option on a new smartphone. I instructed AMS to conduct interviews to investigate whether the respondents understood the explanation of the incentive alignment mechanism presented to them. Experienced AMS interviewers conducted interviews with 17 respondents.[49] I participated in several of the interviews. The interview results demonstrate that the respondents understood that the rewards they would get would be based on their preferences as reflected in their answers to survey questions. (See Exhibit L.)

---

[49]   This included fourteen respondents to the smartphone survey and three respondents to the tablet survey. See Exhibit L.

D.   *Survey Implementation*

72.   Once respondents passed through the screening questions, they had to go through an animation and audio test to ensure that they would be able to view the animation and hear the audio during the conjoint exercise. If their computer and internet connection passed the test, they were introduced to the features and feature category levels used in the conjoint analysis.

73.   In order to obtain reliable data from a conjoint exercise, it is important to have clear descriptions of the features and feature category levels. The specific technical descriptions of the patent-related features were provided to me by counsel. I have not reviewed or interpreted the patent claims myself and do not have a professional opinion on that matter.

74.   The specific language used to describe the Background Syncing, Universal Search, and Automatic Word Correction patent-related features included in the smartphone [tablet] survey was as follows:

- **Background Syncing.** The Background Syncing feature allows you to continue to use an app while data related to that app that is stored on your smartphone [tablet] synchronizes with data stored elsewhere, such as on a remote computer. For example, you can access and edit data, such as the list of contacts on your smartphone [tablet], even as your phone [tablet] is sending data for those contacts to your work computer. Without this feature, you would have to wait to use an app, for example the contacts app, while the data for the app is synchronizing with a remote computer, and that wait may be long or short.

- **Universal Search.** Universal Search lets you use a single search to find information from different sources of information, for example data stored on your smartphone [tablet] as well as information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find good results tailored to each source. For example, when you type "George" in a single search box, the feature searches the Internet for "George," which might yield web pages about George Washington, and at the same time searches for "George" stored on your smartphone [tablet], which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files. Without Universal Search, you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application.

- **Automatic Word Correction.** As you type, your smartphone [tablet] displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. The Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday." Without this feature, pressing space or period would retain your original text, "birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself.

75.   The Quick Links and Missed Call Screen Management patent-related features were described as follows in the smartphone survey:

- **Quick Links.** When you are viewing text on your smartphone (for example in an email), the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder. Without this feature, if you wanted to take various actions, like calling or texting a number, you would have to manually identify and select the exact text that might be data to take actions on.

- **Missed Call Screen Management.** The Missed Called Screen Management feature allows you to return a missed call or respond to the caller by listing the missed calls and providing you with two interactive areas to take further action. If you touch one area, such as the picture of the missed caller, John Doe, you call John Doe back. If you touch the other area, such as John Doe's name or phone number, then the feature takes you to a new screen that displays all of John Doe's contact information. From the new screen, you can call John Doe, text him, or email him. Without two areas you would have to remember to use different gestures to take different actions—like tapping John Doe's entry on the missed calls list to call him back but swiping his entry to view his contact information.

76.   Finally, the Quick Links and Slide to Unlock patent-related features were described as follows in the tablet survey:

- **Quick Links.** When you are viewing text on your tablet (for example in an email), the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to

choose among multiple actions to perform on that data. For example, this feature will automatically detect an email address displayed in an email, and if you press and hold the email address, it will offer you multiple actions such as sending an email to the address or copying the address. Without this feature, if you wanted to take various actions, like sending an email, you would have to manually identify and select the exact text that might be data to take actions on.

- **Slide to Unlock.** The Slide to Unlock feature prevents unintentional unlocks by unlocking your tablet only when you slide an image, using one continuous motion, from a specific spot on the lock screen to another specific spot on the screen. Without this feature, you would have to unlock your device using other techniques, for example by swiping the lock screen from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely.

77.     For determining the descriptions of the distraction functionalities, I instructed Cornerstone to review Samsung documents, such as product manuals, and materials from third-party sources, such as product reviews, to determine how these features are explained to consumers. I then worked with Cornerstone to create descriptions for distraction features that are consistent with the descriptions in these materials. The resulting descriptions and sample source materials for each feature are presented in Exhibit D. For example, in the smartphone survey, the description for the Best Photo functionality is:

> "The Best Photo feature allows you to automatically capture eight photos of whatever you are taking a picture of so that you can choose the best single photo to keep. For example, if you want to have a picture of a hot air balloon, the Best Photo feature will take eight successive photos automatically so that you can select the one photo of that hot air balloon that you feel is best and discard the rest."

78.     This description is consistent with Samsung's How-To Guides for Samsung Galaxy S III:

> "You can also enable a feature called Best photo. The Best photo option will capture eight photos and select the best one. To turn the Best photo feature on, touch on at the top-left of the screen.
>
> Aim the camera at your subject and touch the area you want to focus on. When the focal point turns green, touch and hold the camera shutter button. Your camera will capture eight images in quick succession, thanks to its zero shutter lag. You will be taken to a review screen, and you will be shown the best picture first. You can touch and hold the thumbnails to

> add more shots to the Best photo list. Selected pictures will appear with a thumbs-up icon. When you have marked all of the Best shots, touch Done to save those pictures to the album and discard the rest."[50]

79.   To enhance respondents' understanding of features and the different levels within that feature category, I used both visual descriptions (icons) and carefully tested animations.[51] I directed Cornerstone Research and AMS to work with a graphics firm that designed icons and animations (with audio) for each feature.[52] The scripts of audio voiceovers used in these animations were the same as the feature descriptions discussed above. I personally provided input as to the precise nature of the animations and the content of the audio, i.e. the descriptions of the features. Pretesting showed that respondents found these animations to be useful and easy to understand. I personally listened to some of these pretests to ensure that they were conducted professionally and with care. In order to avoid demand artifacts, I presented all of the features visually. For this survey, I chose to include animations for all features, not just patent-related features.

80.   Before beginning the conjoint choice tasks, the respondents viewed the descriptions of the various features and feature category levels, including animations and graphics. Price was always the first feature category presented. The order of presentation for the other five feature categories in each survey was randomized across respondents. In order to ensure that they understood the conjoint tasks, respondents were also shown a tutorial animation after they had been presented with the animations explaining the features in the levels of each feature category. The following sequence for the presentation of feature categories was chosen within the tutorial animation for the smartphone survey: (a) price, (b) camera, (c) data accessibility, (d) screen size, (e) call initiation and screening, and (f) input assistance. The following sequence was chosen for the tutorial animation for the tablet survey: (a) price, (b) connectivity, (c) data accessibility, (d) screen size, (e) lock screen interface, and (f) input assistance. These sequences were chosen to minimize any

---

[50]   Samsung How-To Guides for Samsung Galaxy S III at http://www.samsung.com/us/support/SupportOwnersFAQPopup.do?faq_id=FAQ00048004&fm_seq=52144, (visited on July 29, 2013).

[51]   A good conjoint design makes use of graphics. See, for example, Selove, Matthew, and John R. Hauser (2011), "The Strategic Importance of Predictive Uncertainty in Conjoint Design," Working Paper.

[52]   Impact Trial Consulting was hired for the purpose of doing the animations and audio.

order effects which may arise. (As described in subsequent paragraphs, feature categories and levels were randomized in the actual choice tasks.)

81.     The sequence of presentation for the levels within each feature category was standardized for each feature category. For feature categories that were composites of multiple features, each feature was introduced in the order in which it appears within the feature category levels. For example, within the camera feature category, all levels included the panorama feature, so the panorama feature was then introduced first. For price and screen size, all four levels were introduced at the same time.

82.     After being introduced to the features and levels of feature categories, and viewing the tutorial animation, respondents were introduced to the conjoint task and shown a series of 16 screens (choice tasks) containing four alternative smartphone (or tablet) options that were described by combinations of the feature category levels. The order in which all feature categories, except price, were listed was randomized across respondents (e.g., for some respondents camera would appear at the bottom and for other respondents screen size would appear at the bottom). Price always appeared at the top, just as it does in many product comparison websites.[53] However, for any given respondent, the order of feature categories was the same across the 16 choice tasks. Levels of feature categories included in each smartphone or tablet were randomized within and across the 16 choice tasks for each respondent.

83.     Respondents were also shown a seventh feature category while making their choices. This category was labeled "With all other features on your most recent Samsung smartphone [tablet computer]" and did not vary across products (i.e. it was presented with the same description across the four options available to the respondent in the first stage of each choice task). These instructions were provided to focus respondents on making relative choices holding all other potential levels of feature categories of

---

[53]   For example, see a comparison of the Samsung Galaxy S III and Samsung Galaxy S 4 at the AT&T Wireless website (http://www.att.com/shop/wireless/devices/comparephone.html?sku=sku6580454&sku=sku6100225, visited on August 4, 2013); a comparison of the Samsung Galaxy S III and Samsung Fascinate at the CNET website (http://reviews.cnet.com/4504-6452_7-0.html?id=35326382&id=34129372, visited on August 4, 2013)), or a comparison of various tablets at the Staples website (http://www.staples.com/sbd/cre/marketing/technology-research-centers/tablets/compare-tablets.html, visited on August 5, 2013).

smartphones [tablets] constant so that choices are being made with "all else equal." Any additional impact of factors not included in the survey is captured mathematically by a term in each respondent's utility. This term is often referred to as the "residual term" in the literature. The additive nature of the utility function further assures independence. (I describe tests for higher level interactions in a subsequent paragraph.)

84.   For each set of four alternative smartphones in a choice task, respondents were asked: "Please choose your most preferred Samsung smartphone [tablet computer] among the four below." By focusing respondents on the four products provided to them, the survey was designed with the goal that respondents would not make comparisons, at this first-question stage, with other devices available in the marketplace.

85.   For each choice task, respondents were also presented with a second question. They were instructed as follows: "In answering this question, you may wish to consider the availability of other smartphone [tablet computer] options in the market that may influence your purchase decision, including smartphones [tablet computers] by other manufacturers or other Samsung smartphones [tablet computers]. Given the Samsung smartphone [tablet computer] you chose as your most preferred among the alternatives shown, would you buy it at the indicated price?" (Emphasis in original.) They then had the option to choose either (a) "Yes, I would buy the smartphone [tablet computer] above," or (b) "No, I would not buy the smartphone [tablet computer] above."

86.   This second question is designed to estimate the minimum level of attractiveness necessary for respondents to purchase the smartphone or tablet, that is, to choose not to choose among the options (this is also known as the "no-choice" option).[54] Under my direction, the interviewers at AMS tested 17 respondents on their comprehension of this question. I participated in some of these interviews and am confident that respondents properly understood the question. Findings from these interviews are presented in Exhibit L.

---

[54]   Jeff D. Brazell, Christopher G. Diener, Ekaterina Karniouchina, William L. Moore, Válerie Séverin, and Pierre-Francois Uldry (2006), "The no-choice option and dual response choice designs," *Marketing Letters*, 17, 4, (December).

87.     As discussed above, each choice in the first portion of a choice task by each respondent provides three inequality constraints because the chosen product is preferred to each of the other three products. The choice in the second portion of a choice task provides an additional inequality constraint for a total of four inequality constraints. Sixteen sets of questions give 64 inequality constraints. For "N" respondents, there are 64 × N inequality constraints in groups of 64. For example, with N = 500, there are 32,000 inequality constraints. The inequality constraints derived from respondent choices, combined with the inequality constraints from consumer-behavior theory, are used by HB CBC to estimate the market-level distributions of partworths.[55] The products in the choice task were chosen randomly in such a way to ensure that they were order and level balanced. The designs were highly efficient in that the designs provided estimates of partworths with high precision.[56]

88.     Following these sixteen choice tasks, the survey was concluded. A total of 671 respondents completed the smartphone survey beginning on July 6, 2013, and ending on July 15, 2013. A total of 607 respondents completed the tablet survey beginning on July 18, 2013 and ending on July 30, 2013. The completion rate was 98.5% and 99.1% for the smartphone and tablet surveys respectively.[57] Details are provided in Exhibit K.

89.     Earlier I discussed screener questions to help include only appropriate respondents in the survey. Prior to estimating partworths, I set additional criteria to consider removing

---

[55]   Technically, this is a Bayesian procedure in which the best update of the partworths are obtained based on the data. This means that I represent all of the information about the partworths, including the means, medians, covariances, and other statistics. For brevity I refer to these complicated descriptions as simply the estimates of the partworths.

[56]   The efficiencies for both the smartphone and tablet surveys were 100%. For more technical descriptions see Sawtooth Software Technical Paper (2008), "The CBC System for Choice-Based Conjoint Analysis." Sawtooth Software Research Paper (2000), "An Overview and Comparison of Design Strategies for Choice-Based Conjoint Analysis." Efficiencies were 100% for the complete-enumeration randomized designs.

[57]   Smartphones: Out of the total 73,632 participants invited for the smartphone survey, 11,840 began the survey, resulting in a response rate of 16.1%. Out of the total 11,840 participants who began the smartphone survey, 173 chose to terminate the survey themselves, resulting in a completion rate of 98.5%. Out of the total 11,840 participants who started the smartphone survey, 671 passed through the screening questions and qualified for the choice tasks, resulting in an incidence rate of 5.7%. Tablets: Out of the total 62,301 participants invited for the tablet survey, 14,757 began the survey, resulting in a response rate of 23.7%. Out of the total 14,757 participants who began the tablet survey, 130 chose to terminate the survey themselves, resulting in a completion rate of 99.1%. Out of the total 14,757 participants who started the tablet survey, 607 passed through the screening questions and qualified for the choice tasks, resulting in an incidence rate of 4.1%.

respondents who may not have paid sufficient attention during the sixteen choice tasks. Such data screening is common and standard practice to ensure that the final sample is reliable. Specifically, I used the following criteria to consider removing respondents in order to enhance the reliability of the survey:

- Straight-lining: if a respondent chose the same option (e.g., the first option or the last option) for at least 15 of the 16 choice tasks.

- Devices owned: if a respondent indicated that they owned a total of five or more (Samsung and other) smartphones [tablets].

- Non-valid Samsung smartphone [tablet]: if an otherwise qualified respondent also indicated that he or she had a Samsung smartphone [tablet] that was not among the options presented (i.e. together with an infringing Samsung product, the respondent also chose the "Other" option in QS7b), but entered a non-valid Samsung smartphone [tablet] name when prompted to specify.

- Fast respondents: if a respondent was among the fastest 10% of the respondents in terms of the time taken to complete the choice exercises.

- Slow respondents: if a respondent was among the slowest 10% of the respondents in terms of the time taken to complete the choice exercises or if the respondent completed the survey more than five hours after starting it.

90.     After applying these criteria, a sample of 507 respondents was obtained for smartphones and a sample of 459 respondents was obtained for tablets. The results that follow are based on these samples.


## VI.     Estimation of Partworths

91.     I estimate distributions of partworths for the levels of feature categories of smartphones and tablets using software developed by Sawtooth Software, Inc. The software uses a Hierarchical Bayes procedure that analyzes the data to obtain the best possible estimate of the distribution of partworths given the data.[58]

---

[58]     Sawtooth Software HB CBC Module for Hierarchical Bayes Estimation, Version 5.

92.     The two surveys provide a wealth of information (inequality constraints) regarding the distribution of relative partworths for the different levels of each feature category. In the following paragraphs I illustrate the data for the smartphone and tablet surveys using the example in Table 3 below. For ease of illustration, this example asks a respondent to choose between two smartphones rather than among four smartphones as in the actual smartphone survey. Suppose a respondent chooses between the two smartphones in Table 3. The respondent's choice of Smartphone 1 indicates that he or she prefers the bundle of feature-levels that describe Smartphone 1 relative to the bundle of feature-levels that describe Smartphone 2.

### Table 3: A Hypothetical Respondent's Choices

|  | Smartphone 1 | Smartphone 2 |
|---|---|---|
| Price | $99 | $49 |
| Camera | Panorama | Panorama, Best Photo |
| Data Accessibility | Notification Bar, Background Syncing, Quick Links | Notification Bar, Background Syncing |
| Screen Size | 5.0" | 4.8" |
| Call Initiation and Screening | Three-Way Calling, Reject Call with Message | Three-Way Calling, Reject Call with Message |
| Input Assistance | Copy-Paste, Voice to Text | Copy-Paste, Voice to Text |
| With all other features on your most recent smartphone | All other features on your most recent smartphone | All other features on your most recent smartphone |

Question 1: Please choose your most preferred Samsung smartphone

Answer 1: Smartphone 1

Question 2: In answering this question, you may wish to consider the availability of other smartphone options in the market that may influence your purchase decision, including smartphones by other manufacturers or other Samsung smartphones. Given the Samsung smartphone you chose as your most preferred among the alternatives shown, would you buy it at the indicated price?

Answer 2: Yes

93.    The two smartphones in Table 3 differ in their levels of price, camera, data accessibility, and screen size. In this illustration, the two smartphones do not differ on call initiation and screening and on input assistance.[59] Consumer behavior theory suggests that, all else

---

[59]    In the smartphone and tablet surveys, the levels of all feature categories were varied.

equal, the respondent would prefer the $49 price of Smartphone 2 to the $99 price of Smartphone 1. A respondent's preference of one of the smartphones over the other in terms of the camera category will depend on whether the respondent values the Best Photo feature. Similarly, the respondent's preference of one product over another will also depend on whether they value the Quick Links feature, on whether they prefer a 5.0" screen or a 4.8" screen, and how much they value paying a lower price. Because Smartphone 1 was chosen over Smartphone 2, the corresponding inequality constraint indicates that the combination of the Quick Links feature and going from a 4.8" to a 5.0" screen was more important to this respondent than having the Best Photo feature and paying $49 instead of $99. If the choice is among four products instead of two, the information about relative partworths would be substantially more. Even more information is gained when the respondent makes 16 such choices. The fact that the hypothetical respondent chose that he or she would actually buy Smartphone 1 also provides an additional relative partworth inequality that indicates that the particular combination of features that made up Smartphone 1 has sufficient attractiveness to be purchased when compared to all other smartphones, including other Samsung smartphones, in the marketplace.

94.    In both the smartphone and tablet surveys, a product is characterized by six feature categories. Each feature category has four levels, which implies three *relative* partworths per feature category. Thus, I need to estimate 18 relative partworths (i.e., 6 feature categories × 3 relative partworths for each) to describe preferences for the smartphone or tablet products included in the survey. I also need to estimate an additional relative partworth for the minimum level of attractiveness. This is a total of 19 partworths. Consistent with Bayesian methods, I "sample" from the (posterior) distribution of the partworths using Bayes' Rule. [60] I use summary statistics to describe either the distribution or the implications of the distribution. For example, I can obtain estimates for the median partworths, the mean partworths, or the variation over the population in those partworths. To calculate the mean partworths, there are 19 means—one mean for each

---

[60]    See Gelman, Andrew, John Carlin, Hal Stern, and Donald Rubin (2004), *Bayesian Data Analysis*, Second Edition, (Chapman & Hall), at pp. 7–9.

partworth. To calculate the covariance of the partworths over the population of consumers, there are 171 covariances and 19 variances.[61] The data from the smartphone and tablet surveys are sufficient to estimate this number of parameters with reasonable precision based on the approximately 32,000 inequality constraints (smartphone survey) or 29,000 inequality constraints (tablet survey) from the respondents' answers to the choice tasks combined with constraints from consumer behavior theory.[62] For example, consumer behavior theory predicts that, when comparing Smartphone 1 to Smartphone 2 in Table 3, it was natural to assume that the respondent would prefer paying a lower price to paying a higher price. I incorporate this information into the estimation using routine options in the Sawtooth Software HB estimation software.

### A.    Testing the Fit and Predictive Ability of the Model

95.    Based on the number of inequality constraints from the conjoint surveys, I expect reasonably precise estimates of the market-level partworth distributions.[63] I confirm this expectation by testing the predictive ability of the model.

96.    An analogy may be helpful to understand the relationship of the number of parameters and the number of "data points." Consider the following simple example from classical linear regression. Suppose information is available on the height of children of a certain age and the heights of their parents. One can fit a regression model that predicts the height of each child using the heights of his or her parents, based on the average relationship between the heights of parents and children within the observed sample. This average relationship could then be used to make predictions about the heights of *other* children if one was given information on the heights of these children's parents. These predictions would not be perfectly accurate, but if the initial sample was large, we would expect them to be right on average. If the model had instead been estimated on data for a single child, the model would perfectly fit the data within this sample of one. For

---

[61]    There are $19^2$ elements in a covariance matrix of which 19 are variances and $19 \times 18$ are covariances. However, a covariance matrix is symmetric, hence there are only $(19 \times 18) \div 2 (= 171)$ unique covariances.

[62]    Smartphones: 507 respondents imply 32,448 inequality constraints. Tablets: 459 respondents imply 29,376 inequality constraints.

[63]    Technically, I obtain reasonably precise estimates of the parameters that describe those distributions, such as medians, means, and covariances. For simplicity I refer to these as the market-level partworth distribution.

example, if the child's height was 6 feet and the parents' heights were 5 feet each, the model would perfectly fit the data, predicting that every child should be exactly 20% taller than his or her parents. Estimated on a sample of one, the model would always fit the observed sample perfectly. Yet this model may be of limited use in predicting out of sample, because the relationship between that particular child's height and his or her parents' heights may not be representative of the broader population.

97.    More generally, in classical linear regression one can fit 10 data points perfectly when 10 parameters are to be estimated (and get a fit $R^2$ of 1.0, i.e., perfectly fit the variation in the observed sample). However, estimating 10 parameters from 10 data points would exploit random variation and, hence, overfit the observed data, which usually leads to a model that predicts poorly out of the observed sample. One would be more confident in the regression if it were fit with fewer parameters (say an intercept and a slope) and if it were developed based on prior theory, even if the regression fit the data less well (had a lower $R^2$). One way to check for overfitting is to test the model's predictive ability out of sample. For example, the model can be estimated (fitted) only on a subset of the available data. The data that is not used in the estimation is referred to as the "holdout" data. The test would be to check how well the parameters estimated with the fit data predict behavior in the remaining holdout data. If the model overfits the "estimation" data,[64] it would not predict well on the holdout data.

98.    For the purpose of checking the predictive ability of the model I use in this case, I re-estimated the model three separate times. Each time, I used data on only 15 choice tasks from each respondent and held out one choice task per respondent for validation testing. I did this for the fourth, eighth, and twelfth choice tasks. I calculated the fit of the model based on the 15 choice tasks used in estimation (estimation sample). Using the same parameters (without re-estimating) I calculated the predictive ability of the model for the

---

[64]    Estimation data are also called "calibration data."

held-out choices. I calculated two standard statistics, the "percent uncertainty explained" (also known as $U^2$) and the "hit rate."[65]

99.  $U^2$ is the more technical of the two statistics. It represents the percentage of uncertainty that is explained by the model.[66] A model that predicts perfectly every choice (which of the four products is chosen and whether the respondent indicates that they would or would not buy the chosen product) would have a $U^2$ of 1.00. A model that does no better than chance would have a $U^2$ of 0.00.[67] When the fourth, eighth, or twelfth choice tasks were held out in the smartphone survey, the fit $U^2$ was 0.42.[68] These fit $U^2$ numbers were 0.50 across the three holdout scenarios for the tablet-survey model. These statistics imply that the model does very well in explaining substantial information about consumers' choices.

100.  To test whether the model can be used successfully to predict consumer behavior, I examined the ability of the model to predict choices made in choice tasks that were held out. Once again this $U^2$ calculation reflects the predictive ability of the model for both the choice among the four products presented and the choice of whether or not to buy the chosen product. The average $U^2$ statistic for the holdout choice tasks in the smartphone survey was 0.22 (compared to 0.42 for the estimation samples); in the tablet survey it was 0.25 (compared to 0.50 for the estimation samples). Because $U^2$ statistics for the holdout samples, which were *not* used to estimate the model, indicate the model correctly predicts

---

[65]  Although I mechanically use respondent-level estimates to obtain each respondent's contribution to $U^2$ or hit rate, it is the market-level statistics on which I focus, consistently with arguments advanced elsewhere in this report.

[66]  Hauser, John R. (1978), "Testing the Accuracy, Usefulness, and Significance of Probabilistic Choice Models: An Information-Theoretic Approach", *Operations Research*, 26, 3 (May–June), pp. 406–421.

[67]  In this case, the null model assumes that each of the four products and the decision to not choose one of the four products provides equal utility to the respondent.

[68]  In calculating $U^2$ for the estimation sample it is appropriate to adjust for the degrees of freedom in the model. This is appropriately conservative because it *lowers* the $U^2$ value. In an HB model, I need to estimate the degrees of freedom as affected by the hierarchical constraints. This is a technical calculation involving the Deviation Information Criterion (DIC). I adjust the degrees of freedom by lowering the likelihood value by the degrees of freedom and then computing a $\rho^2$ fit statistic. See Hardie, Bruce G., Eric J. Johnson, and Peter S. Fader (1993), "Modeling Loss Aversion and Reference Dependence Effects on Brand Choice," *Marketing Science*, 12, 4, (Fall), pp. 378–394. Because Hauser (1978) demonstrates that $\rho^2$ is numerically equal to $U^2$ this correction for degrees of freedom can also be used for $U^2$ while retaining the intuitive interpretation of $U^2$. See my backup for calculations.

consumer choices with substantial probability even out of sample, the HB CBC model can form a reliable basis for forecasts and predictions of consumer behavior. Therefore, it is not the case that the HB CBC model is "over-fitting" by generating accurate predictions for the data included in the estimation while predicting poorly out of sample.

101.    For the reasons stated above, it is my opinion that the model provides reliable and substantial information explaining consumers' choices with respect to the smartphone and tablet patent-related features at issue. Indeed, the $U^2$ statistics for both the estimation and holdout samples are similar in magnitude to $U^2$ values reported in research published in academic journals.[69]

102.    The second statistic that I examine in the holdout analyses is the hit rate. The hit rate is a more intuitive measure. It reports the frequency with which the model predicts respondents' choices to be the most likely choices in the choice task. This includes a respondent's first choice of which among four products they prefer, as well as the second choice of whether or not to buy that product. If the model correctly picks the chosen product and the decision of whether or not to buy in every choice task for every respondent, then the model would have a hit rate of 1.00. If the model *never* picked the chosen product or the choice of whether or not to buy, the model would have a hit rate of 0.00. For the smartphone survey I find an average hit rate of 0.82 in the estimation sample and 0.52 in the holdout samples.[70] For the tablet model, these numbers are 0.85 and 0.53 respectively. Once again, the observation to be made is that (a) these statistics indicate that the model does very well in correctly predicting consumer choices, and (b) they are high for both the estimation and holdout samples, indicating that the model's

---

[69]    For example, a study estimates different specifications of a model and finds $U^2$ ranging between 0.22 and 0.48. See Guadagni, Peter, and John Little (1983), "A Logit Model of Brand Choice Calibrated on Scanner Data," *Marketing Science*, 2, 3, pp. 203–238.

[70]    For example, in the smartphone survey, the model predicted that the option actually chosen among the four options was the most likely to be chosen in 0.63 of holdout choice tasks across all respondents. It also correctly predicted whether a respondent would choose whether or not to buy in 0.61 of holdout choice tasks across all respondents. The model correctly predicted both choices in 0.52 of holdout choice tasks across all respondents.

results can be used to reliably predict consumer behavior and estimate consumers' relative willingness to buy products with or without the patents at issue.[71]

103. As explained above, the model I use to estimate partworths for smartphones and tablets incorporates information about consumer behavior. For example, consumer-behavior theory teaches that preferences are monotonic for price: all else equal, people prefer to pay less than to pay more. Ignoring this information and consumer-behavior theory would result in estimating a model that does not use all of the available data. Such a model would be a less reliable description of consumer behavior and a less reliable summary of the available data.

104. Indeed, when I estimate the model without incorporating available information about consumer behavior, I find that this specification does not statistically predict as well as the one that *does* use available information in predicting consumer behavior.[72] This evidence is consistent with my decision to use a model that is based on data that is available from the sample of respondents. Therefore, in my opinion, the model that I use is the most appropriate model because it predicts consumer behavior more reliably and because it is consistent with consumer-behavior theory.[73]

---

[71] Note that the calculation of hit rate uses information at the individual respondent level. The statistic itself, however, is at the aggregate level and accurately interpretable. Furthermore, there is no natural way to correct the estimation hit rate for degrees of freedom, hence, it is natural to expect some drop off in the predictive tests.

[72] $U^2$ is 0.19 for smartphones and 0.22 for tablets in the holdout samples for the model that does not incorporate available information about consumer behavior, which are lower than $U^2$ of 0.22 and 0.25 respectively in the holdout samples for the model that I use. It is good empirical practice to do a logical check on models that do not expect to predict as well. A model that does not use all of the available data may overfit the estimation sample when it attempts to adjust parameters to match the limited data. Parameters that are estimated on a model that ignores data may not predict as well as parameters estimated on the model that uses all available data.

[73] After estimating partworths, I also considered whether adding interactions between different attributes would do a better job in the estimation. For tablets, I find that adding interactions to the model would harm its ability to reliably predict consumer behavior. For both smartphones and tablets, I find that the model with added interactions has negative $U^2$ in the holdout samples; in other words it overfits the data that it is used to estimate, and it predicts less well than chance in the holdout sample. Therefore the model that incorporates information about consumer behavior but does not include interactions is the most appropriate model to use for predicting consumer behavior and calculating the price premiums associated with smartphone or tablet features.

B.      *Consumers Positively Value the Patent-Related Features*

105.    Table 4 summarizes the statistics about the distribution of partworths for the three feature categories that contain the patent-related features included in the smartphone survey across all respondents used in the estimation. (The statistics about the distribution of partworths for price, screen size, camera, and minimum level of attractiveness are presented in Exhibit M.)

## Table 4: Partworth Distribution
## of Patent-Related Smartphone Features

| | Average Market Level Mean | Average Market Level Heterogeneity (Standard Deviation) |
|---|---|---|
| **Data Accessibility** | | |
| Notification Bar | –31.11 | 31.31 |
| Notification Bar and Background Syncing | –8.55 | 24.11 |
| Notification Bar, Background Syncing, and Quick Links | 11.75 | 24.61 |
| Notification Bar, Background Syncing, Quick Links, and Universal Search | 27.92 | 28.04 |
| **Call Initiation and Screening** | | |
| Three-Way Calling | –53.42 | 37.73 |
| Three-Way Calling and Reject Call with Message | –9.95 | 27.34 |
| Three-Way Calling, Reject Call with Message, and Missed Call Screen Management | 20.37 | 27.31 |
| Three-Way Calling, Reject Call with Message, Missed Call Screen Management, and Wi-Fi Calling | 43.01 | 38.82 |
| **Input Assistance** | | |
| Copy-Paste | –55.25 | 38.88 |
| Copy-Paste and Voice to Text | –9.37 | 29.97 |
| Copy-Paste, Voice to Text, and Automatic Word Correction | 25.05 | 31.20 |
| Copy-Paste, Voice to Text, Automatic Word Correction, and S Pen | 39.57 | 33.27 |

106.    This distribution of the partworths is estimated precisely. The relative partworths, i.e., the differences between partworths of different levels of a feature category, indicate the value (in units of utility) of switching between different levels of these feature categories. For example, Table 4 indicates that, on average, smartphone-survey respondents value switching from "Notification Bar and Background Syncing" to "Notification Bar, Background Syncing, and Quick Links" by 11.75 – (–8.55) = 20.30 units of utility. It is

these *relative* partworths that are used in predicting consumer behavior and that can be used to estimate the price premium consumers are willing to pay for a particular feature.[74] As explained below, the higher the relative partworth associated with a particular feature, the greater the effect of adding or removing the feature on consumers' willingness to buy the product. Moreover, the higher the relative partworth for a particular feature, the higher the price premium consumers are willing to pay for inclusion of that feature in a product.

107.   Based on the mean partworths reported in Table 4, it is my opinion that, on average, respondents in the smartphone survey place positive value on the patent-related features I tested.

- In the smartphone survey, the average partworth (–8.55) for "Notification Bar and Background Syncing" is higher than the average partworth (–31.11) for "Notification Bar." This indicates that, on average, respondents value the difference between these levels, which is Background Syncing.

- In the smartphone survey, the average partworth (11.75) for "Notification Bar, Background Syncing, and Quick Links" is higher than the average partworth (–8.55) for "Notification Bar and Background Syncing." This indicates that, on average, respondents value the difference between these levels, which is Quick Links.

- In the smartphone survey, the average partworth (27.92) for "Notification Bar, Background Syncing, Quick Links, and Universal Search" is higher than the average partworth (11.75) for "Notification Bar, Background Syncing, and Quick Links." This indicates that, on average, respondents value the difference between these levels, which is Universal Search.

- In the smartphone survey, the average partworth (20.37) for "Three-Way Calling, Reject Call with Message, and Missed Call Screen Management" is higher than the average partworth (–9.95) for "Three-Way Calling and Reject Call with Message." This indicates that, on average, respondents value the difference between these levels, which is Missed Call Screen Management.

---

[74]   The reported mean partworths in Tables 4 and 5 are zero centered with respect to the average partworth across different levels of the corresponding feature category, i.e., the zero-centered partworths of different levels of the same feature category sum up to zero. For example, suppose a feature category has four levels, with partworth estimates of 2, 4, 6 and 8. The average partworth would be 5 and the zero-centered partworths would be -3, -1, 1 and 3. So if the partworth estimate associated with a certain level of a feature category is below the average partworth across different levels of the feature category, the zero-centered partworth of that feature level would be negative.

- In the smartphone survey, the average partworth (25.05) for "Copy-Paste, Voice to Text, and Automatic Word Correction" is higher than the average partworth (–9.37) for "Copy-Paste and Voice to Text." This indicates that, on average, respondents value the difference between these levels, which is Automatic Word Correction.

108.    Table 4 also reports the variation of partworths over the market for the feature categories that include patent-related features.[75] (The corresponding variation statistics for price, camera, and screen size are presented in Exhibit M, along with estimates of their respective mean partworths.) This variation summarizes the heterogeneity in partworths across respondents; the higher these standard deviations, the more the partworths vary across respondents. Because partworths vary across respondents, the HB CBC model takes into account that different respondents value the various features differently.[76] For example, in the smartphone survey, the standard deviation for "Three-Way Calling and Reject Call with Message" (27.34) was smaller than the standard deviation for "Three-Way Calling, Reject Call with Message, Missed Call Screen Management, and Wi-Fi Calling" (38.82). This implies that there is greater variation in the partworths for the latter than there is for the former.

109.    Similarly, Table 5 summarizes the statistics about the distribution of partworths for the three feature categories that contain the patent-related features included in the tablet survey across all respondents used in the estimation. (The statistics about the distribution of partworths for price, screen size, connectivity, and minimum level of attractiveness are presented in Exhibit M.)

---

[75]    This variation over the market should not be confused with the precision by which I estimate the means and standard deviations. For example, the standard errors of the estimated population means are given in Exhibit M and are interpreted differently than the standard deviations that represent population heterogeneity.

[76]    For example, one respondent may value input assistance features very highly (the difference in partworths between different levels of the input assistance category may be large), while another respondent may be particularly price sensitive (the difference in partworths between different price levels may be very large).

## Table 5: Partworth Distribution
## of Patent-Related Tablet Features

| | Average Market Level Mean | Average Market Level Heterogeneity (Standard Deviation) |
|---|---|---|
| **Data Accessibility** | | |
| Status Bar | –31.49 | 29.36 |
| Status Bar and Background Syncing | –7.65 | 21.91 |
| Status Bar, Background Syncing, and Quick Links | 12.82 | 23.41 |
| Status Bar, Background Syncing, Quick Links, and Universal Search | 26.32 | 25.49 |
| **Lock Screen Interface** | | |
| Lock Screen Display Customization | –17.39 | 24.31 |
| Lock Screen Display Customization and Lock Screen Shortcuts | –6.58 | 23.06 |
| Lock Screen Display Customization, Lock Screen Shortcuts, and Multiple Lock Screen Widgets | 5.79 | 20.85 |
| Lock Screen Display Customization, Lock Screen Shortcuts, Multiple Lock Screen Widgets, and Slide to Unlock | 18.18 | 26.30 |
| **Input Assistance** | | |
| Copy-Paste | –48.72 | 38.50 |
| Copy-Paste and Voice to Text | –9.89 | 26.25 |
| Copy-Paste, Voice to Text, and Automatic Word Correction | 14.56 | 26.68 |
| Copy-Paste, Voice to Text, Automatic Word Correction, and S Pen | 44.05 | 38.40 |

110.    Based on the mean partworths reported in Table 5, it is my opinion that, on average, respondents in the tablet survey place positive value on the patent-related features I tested.

- In the tablet survey, the average partworth (–7.65) for "Status Bar and Background Syncing" is higher than the average partworth (–31.49) for "Status Bar." This indicates that, on average, respondents value the difference between these levels, which is Background Syncing.

- In the tablet survey, the average partworth (12.82) for "Status Bar, Background Syncing, and Quick Links" is higher than the average partworth (–7.65) for "Status Bar and Background Syncing." This indicates that, on average, respondents value the difference between these levels, which is Quick Links.

- In the tablet survey, the average partworth (26.32) for "Status Bar, Background Syncing, Quick Links, and Universal Search" is higher than the average partworth (12.82) for "Status Bar, Background Syncing, and

Quick Links." This indicates that, on average, respondents value the difference between these levels, which is Universal Search.

- In the tablet survey, the average partworth (18.18) for "Lock Screen Display Customization, Lock Screen Shortcuts, Multiple Lock Screen Widgets, and Slide to Unlock" is higher than the average partworth (5.79) for "Lock Screen Display Customization, Lock Screen Shortcuts, and Multiple Lock Screen Widgets." This indicates that, on average, respondents value the difference between these levels, which is Slide to Unlock.

- In the tablet survey the average partworth (14.56) for "Copy-Paste, Voice to Text, and Automatic Word Correction" is higher than the average partworth (−9.89) for "Copy-Paste and Voice to Text." This indicates that, on average, respondents value the difference between these levels, which is Automatic Word Correction.

111.    In summary, the HB CBC model passes standard statistical tests of fit and predictive ability, which supports my opinion that it is appropriate to use the estimated partworths to forecast consumer behavior, estimate respondents' relative willingness to buy products with and without the patent-related features I tested, and calculate the price premium that consumers are willing to pay for these patent-related features. Based on my analysis as set forth herein and on the data described in the exhibits to this report, it is my opinion that, on average, respondents in both the tablet and smartphone surveys place a substantial value on the patent-related features included in the two surveys. In the next two sections, I quantify consumers' willingness to buy products with and without these patent-related features and calculate the price premium that consumers are willing to pay for these patent-related features.

## VII.    The Effect of the Patent-Related Features on Consumers' Willingness to Buy

112.    In this section, I describe a series of choice simulations based on the HB CBC partworth estimates. The simulations calculate how consumers' overall willingness to buy a smartphone or a tablet is affected by removing one or more of the patent-related features I tested. Consumers' willingness to buy is simulated using the predicted choice of all survey respondents between buying and not buying a product. I also note, as I have done earlier in this report, that my sample consists of owners of Samsung smartphones or

tablets. My estimates are therefore not designed to measure the share of Samsung products in the overall market for all smartphones or tablets. Rather, my surveys provide estimates of how the willingness of *Samsung* consumers to buy Samsung smartphones and tablets *changes* based on removing one or more of the patent-related features I tested.

113.    I used standard procedures in the Sawtooth Software HB CBC software to run the choice simulations. Market simulations using HB CBC partworth estimates are often used by firms to simulate what would happen if a new product were introduced to a market, or if a firm decided to change a feature or features of an existing product. Forecasts based on such market simulations are sufficiently accurate that firms routinely make decisions based on the results of these simulations.[77] To predict the respondents' choices in the simulation, I apply an approach commonly used in marketing research called "Randomized First Choice ("RFC") Simulation." Under RFC, a consumer chooses the product that gives him or her highest utility among the available choices (i.e., the first choice), where the consumer's utility from a product is calculated as the sum of the estimated partworths for the features provided by the product plus random draws of the unobserved components in the utility.[78] The consumer will choose the product if it is sufficiently attractive, that is, if the utility he or she gets from choosing the product is larger than the utility (partworth) of not choosing (choosing the "outside option"). Alternatively, one can also use a related methodology, commonly called "First Choice ("FC") Simulation."[79]

---

[77]    For example, see Orme, B (2010), "Chapter 10: Market Simulators for Conjoint Analysis," *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, Second Edition, (Madison, Wis.: Research Publishers LLC).

[78]    The Sawtooth Software HB estimation includes a standard option to perform RFC. The software assumes that the random perturbations on the partworths of each attribute follow a standard Gumbel distribution and the additional random perturbations at the product level also follow a Gumbel distribution.

[79]    In FC simulation, a consumer's utility from each product is calculated as the sum of the estimated partworths for the product's features. In RFC simulation, additional random perturbations are added to the estimated partworths and their sum. Therefore, when I do not add random perturbations to derive my estimates of the parameters of interest, it follows that the RFC simulation reduces to the FC simulation. On average, the baseline and but-for shares of various products do not change substantially between the two methods. Both the FC and RFC approaches are valid and provide reliable estimates at the aggregate level and, when used appropriately, at the aggregate level, the random draw introduced by RFC helps account for any imprecision and enhances predictive accuracy. Like other statistics, the individual-level estimates obtained by either method are less precise and any use of these calculations at the individual level must appropriately account for the relative precision of the estimates. One must be careful not to misuse the random perturbations. The random

114. To calculate the effect of removing a particular feature has on consumers' willingness to buy a product, I first perform a baseline choice simulation. In this scenario, I construct a baseline product that includes *all* of the features included the survey and use the HB CBC partworth estimates to simulate whether or not consumers choose to buy that baseline product. It is important to account for the fact that whether or not consumers would choose to buy the baseline product may vary depending on the levels of all feature categories. As such, and using smartphones as an example, in constructing the baseline smartphone, I first determine a price level (say $199) and a screen size (say 4.8"), and then add all the features included in the data accessibility, call initiation and screening, input assistance, and camera categories.[80] I then use the RFC simulations to infer the share of consumers who would buy this smartphone. I refer to the fraction of consumers who buy this smartphone as the baseline share. The results for smartphones are presented in Table 6 below. For example, 72% of respondents would be willing to buy a baseline smartphone with a screen size of 4.8" for $199. Similarly, in constructing a baseline tablet, I first determine a price level (say $449) and a screen size (say 10.1"), and then add all the features included in the data accessibility, input assistance, connectivity, and lock screen interface categories.[81]

---

perturbations are used to account for all unobserved effects and are normal and proper in statistical analysis. However, if one were to compare, say, a change in price with all else equal, and if one were to include the random perturbations, then the interpretation must recognize the unobserved effects. This is in part why, when I compute willingness-to-buy, I compare to a baseline where both the but-for calculations and the baseline calculations consistently use FC or RFC. One way to diagnose proper use is to compare for consistency of predictions from FC to predictions from RFC.

[80] For example, given that the price is $199 and the screen size is 4.8", the baseline smartphone has the following features: Background Syncing ('414), Quick Links ('647), Universal Search ('959), Missed Call Screen Management ('760), Automatic Word Correction ('172), Notification Bar, Three Way Calling, Reject Call with Message, Wi-Fi Calling, Copy-Paste, Voice to Text, S Pen, Panorama, Best Photo, Smile Shot, and Buddy Photo Share.

[81] For example, given that the price is $449 and the screen size is 10.1", the baseline tablet has the following features: Background Syncing ('414), Quick Links ('647), Universal Search ('959), Slide to Unlock ('721), Automatic Word Correction ('172), Status Bar, Lock Screen Display Customization, Lock Screen Shortcuts, Multiple Lock Screen Widgets, Copy-Paste, Voice to Text, S Pen, Wi-Fi, GPS, AllShare Play, and IR Blaster.

**Table 6: Baseline Willingness to Buy for Smartphones with All Features**

| Price | Screen Size | | | |
|---|---|---|---|---|
| | 4.0" | 4.8" | 5.0" | 5.5" |
| $49 | 72% | 83% | 90% | 88% |
| $99 | 70% | 82% | 88% | 86% |
| $149 | 63% | 76% | 83% | 81% |
| $199 | 58% | 72% | 80% | 77% |
| $249 | 52% | 66% | 75% | 72% |
| $299 | 46% | 59% | 68% | 65% |

115.    Then I calculate this willingness to buy share again, but this time for a product that includes all of the same features as in the baseline product *except* the patent-related features being tested. For example, in order to test the impact of removing Background Syncing from the baseline smartphone, I construct a second smartphone with the same price level ($199), screen size (4.8"), and all the features included in the data accessibility, call initiation and screening, input assistance, and camera categories, except for Background Syncing.[82] I refer to the share of consumers who choose to buy this second smartphone as the but-for share.[83] The results for the scenario where Background Syncing is removed are presented in Table 7 below. Specifically, 64% of respondents would be willing to buy the second smartphone discussed above, with a screen size of 4.8" and all features except Background Syncing, for $199.

---

[82]    For example, given that the price is $199 and the screen size is 4.8", and I want to test the effect of removing Background Syncing ('414) from the baseline smartphone, the but-for smartphone has the following features: Quick Links ('647), Universal Search ('959), Missed Call Screen Management ('760), Automatic Word Correction ('172), Notification Bar, Three Way Calling, Reject Call with Message, Wi-Fi Calling, Copy-Paste, Voice to Text, S Pen, Panorama, Best Photo, Smile Shot, and Buddy Photo Share.

[83]    I consider products that include all but the tested features whether or not the tested features were the marginal feature in the highest level of a feature category. For example, consider a test for the effect of Missed Call Screen Management on consumers' willingness to buy. The smartphone used to simulate the but-for share without Missed Call Screen Management will include the Wi-Fi Calling feature.

**Table 7: But-for Share for Smartphones
with All Features Except Background Syncing**

| Price | Screen Size | | | |
|---|---|---|---|---|
| | 4.0" | 4.8" | 5.0" | 5.5" |
| $49 | 64% | 77% | 86% | 83% |
| $99 | 62% | 76% | 84% | 82% |
| $149 | 55% | 69% | 78% | 75% |
| $199 | 50% | 64% | 73% | 70% |
| $249 | 44% | 57% | 67% | 64% |
| $299 | 38% | 51% | 59% | 57% |

116.  The difference between the baseline and but-for shares provides an estimate of the percentage of Samsung consumers who would buy a smartphone with the tested features (Background Syncing in this example) but not without it. For example, as seen in Tables 6 and 7 above, the baseline share for a smartphone with a screen size of 4.8" and a price of $199 (and other features) is 72%. The but-for share for the same smartphone without the Background Syncing patent-related feature is 64%. In this example, the absence of the Background Syncing feature lowers willingness to buy by 8% (8% = 72% − 64%). Another way to present these results is to say that the change in the share is 11% (11% = (72% − 64%) ÷ 72%). The corresponding estimates of the percentage decline in willingness to buy resulting from removing the Background Syncing feature is presented for all different screen size and price combinations in Table 8 below.

**Table 8: Percentage Decline in Willingness to Buy
for Smartphones without the Background Syncing Feature
(Baseline Share minus But-for Share Divided by Baseline Share)**

| Price | Screen Size | | | |
|-------|------|------|------|------|
|       | 4.0" | 4.8" | 5.0" | 5.5" |
| $49   | 11%  | 7%   | 4%   | 5%   |
| $99   | 11%  | 7%   | 5%   | 5%   |
| $149  | 12%  | 9%   | 7%   | 7%   |
| $199  | 13%  | 11%  | 8%   | 9%   |
| $249  | 15%  | 13%  | 11%  | 11%  |
| $299  | 17%  | 15%  | 13%  | 13%  |

117.   I have replicated Tables 6, 7, and 8 on the first page of Exhibit N1. That page then
includes all the calculations relevant to determining the effect of removing the
Background Syncing patent-related feature on Samsung consumers' demand for
smartphones. Specifically, it includes the baseline share of a smartphone with the patent-
related feature (Table 6), the but-for share of a smartphone otherwise identical but
without the feature (Table 7), and the resulting percentage decline in share upon removal
of the patent-related feature (Table 8).[84]

118.   The remaining four pages of Exhibit N1 present similar results for the four other patent-
related features tested in the smartphone survey:

- **Quick Links ('647):** For the price and screen size combinations presented
  in Exhibit N1, the percentage decline in willingness-to-buy upon removal
  of the Quick Links patent-related feature ranges from 5% (for 5.0" or 5.5"
  smartphones at $49, or 5.0" smartphones at $99) to 16% (for 4.0"
  smartphones at $299).

---

[84]   Note that one could use the same simulation data to calculate the percentage *increase* in share upon *adding* the
patent-related feature to the smartphone.

- **Universal Search ('959):** For the price and screen size combinations presented in Exhibit N1, the percentage decline in willingness-to-buy upon removal of the Universal Search patent-related feature ranges from 3% (for 4.8", 5.0", or 5.5" smartphones at $49, or 5.0" or 5.5" smartphones at $99) to 12% (for 4.0" smartphones at $299).

- **Missed Call Screen Management ('760):** For the price and screen size combinations presented in Exhibit N1, the percentage decline in willingness-to-buy upon removal of the Missed Call Screen Management patent-related feature ranges from 7% (for 5.0" or 5.5" smartphones at $49, or 5.0" smartphones at $99) to 24% (for 4.0" smartphones at $299).

- **Automatic Word Correction ('172):** For the price and screen size combinations presented in Exhibit N1, the percentage decline in willingness-to-buy upon removal of the Automatic Word Correction patent-related feature ranges from 10% (for 5.0" or 5.5" smartphones at $49, or 5.0" smartphones at $99) to 26% (for 4.0" smartphones at $299).

119. Similar results showing the impact of removing patent-related features from tablets, one feature at a time, on consumers' willingness to buy these products are presented in Exhibit N2.

- **Background Syncing ('414):** For the price and screen size combinations presented in Exhibit N2, the percentage decline in willingness-to-buy upon removal of the Background Syncing patent-related feature ranges from 5% (for 10.1" tablets at $199) to 23% (for 7.0" tablets at $549 or $599).

- **Quick Links ('647):** For the price and screen size combinations presented in Exhibit N2, the percentage decline in willingness-to-buy upon removal of the Quick Links patent-related feature ranges from 4% (for 10.1" tablets at $199 or $249) to 23% (for 7.0" tablets at $549 or $599).

- **Universal Search ('959):** For the price and screen size combinations presented in Exhibit N2, the percentage decline in willingness-to-buy upon removal of the Universal Search patent-related feature ranges from 2% (for 10.1" tablets at $199, $249, or $299) to 16% (for 7.0" tablets at $599).

- **Slide to Unlock ('721):** For the price and screen size combinations presented in Exhibit N2, the percentage decline in willingness-to-buy upon removal of the Slide to Unlock patent-related feature ranges from 1% (for 10.1" tablets at $199) to 14% (for 7.0" tablets at $549 or $599, or 7.7" tablets at $599).

- **Automatic Word Correction ('172):** For the price and screen size combinations presented in Exhibit N2, the percentage decline in willingness-to-buy upon removal of the Automatic Word Correction

patent-related feature ranges from 6% (for 10.1" tablets at $199 or $249) to 24% (for 7.0" tablets at $549 or $599, or 7.7" tablets at $599).

120. In the above analysis, I evaluate the effect of removing each patent-related feature individually. The same methodology can be used to evaluate the effect of removing different *combinations* of patent-related features. One can test the impact of removing any two, any three, any four, or all five of the patent-related features included in the smartphone survey. There are 26 scenarios in total, one for each combination with at least two of the five patent-related features.

121. The results of these different scenarios for the patent-related features tested in the smartphone survey are presented in Exhibit O1, with each scenario appearing on a separate page of the exhibit. Consider the following two examples:

- Scenario 1 evaluates the decline in willingness to buy resulting from the simultaneous removal of *all five* of the patent-related features included in the smartphone survey: Background Syncing, Quick Links, Universal Search, Missed Call Screen Management, and Automatic Word Correction. The resulting percentage decline in willingness-to-buy ranges from 43% (for 5.0" or 5.5" smartphones at $49) to 74% (for 4.0" smartphones at $299).

- Scenario 7 evaluates the decline in willingness to buy for smartphones resulting from the simultaneous removal of all three patent-related features in the data accessibility feature category: Background Syncing, Quick Links, and Universal Search. The resulting percentage decline in willingness-to-buy ranges from 15% (for 5.0" smartphones at $49) to 43% (for 4.0" smartphones at $299).

122. The corresponding willingness-to-buy results for different combinations of the five patent-related features tested in the tablet survey are presented in Exhibit O2. This exhibit also includes a set of 26 scenarios, each evaluating the effect of removing some combination of five, four, three, or two patent-related features at a time. Like the smartphone results, the tablet willingness-to-buy results are calculated at different combinations of screen size and price.

123. Note that when I calculate the effect of collectively removing a number of features in one of the scenarios presented in Exhibits O1 and O2, the results may be different than what one would conclude from adding up the corresponding effects of each individual patent-

related feature being tested, as they appear in Exhibits N1 and N2. In my opinion, if one is testing for the collective effect of removing multiple features, it is more reliable and appropriate to measure this collective effect directly, as described in Exhibits O1 and O2, instead of adding up the individual effects described in Exhibits N1 and N2.

124.    These choice simulation results and robustness checks demonstrate that, for both smartphones and tablets, the patent-related features at issue in this case, whether individually or collectively, have significant effects on Samsung consumers' willingness to buy these relevant Samsung products.

## VIII.   The Price Premium for the Patent-Related Features

125.    I also estimate the price premium, if any, consumers are willing to pay for features associated with the patents I tested in the two surveys. Specifically, I ran a market simulation using the HB CBC partworth estimates to determine how Samsung consumers trade off price and these patent-related features. For the purposes of estimating the price premium, I use the term "market simulation" in a specific way. In price premium calculations, I test how the respondents in my sample, which are all owners of Samsung smartphones or tablets, choose between Samsung products with the patent-related features and Samsung products without these features, at varying prices. I calculate a price premium that provides a specific metric of the extent to which Samsung consumers' demand is driven by features associated with the patents I tested. My calculations of a price premium should not be confused with the calculation of a but-for price in the actual marketplace. Such calculations require additional data and additional analysis.

126.    I used the same standard procedures in the Sawtooth Software HB CBC to run the market simulations that I used in my earlier willingness-to-buy analysis. In the price-premium market simulation for each patent-related feature, I consider a scenario with two alternative product options: one option includes the patent-related feature, while the second one does not. Features in all other feature categories (except price) are held at the same level in the two products (e.g., both products have the same features in feature

categories such as screen size, camera, or connectivity).[85] The market simulation uses the HB CBC partworth estimates to predict the number of respondents who would choose each of the two products when the first product (the one with the patent-related feature) is offered at a higher price than the second product (the one without the patent-related feature). The price-premium simulations increase the price of the product with the patent-related feature until the price reaches a level at which the model predicts that the market is indifferent between the two products, i.e., 50% of the respondents will choose each of the two products. The difference between the two prices that results in equal market shares is the price premium. To predict each respondent's choice among the two products in the market simulation, I apply the RFC methodology discussed earlier. All discussion of RFC, including when and how it can be used, applies to price premium calculations.

127.   When estimating the price premium consumers are willing to pay for features associated with a patent, it is important to account for the fact that the price premium may vary depending on the initial price level of the two products. This is because consumers' price sensitivity may vary over different price ranges. For example, consumers' utility may drop by 20 units if a smartphone's price increases from $99 to $149 but only by 5 units if the price increases from $49 to $99. This difference in price sensitivity makes intuitive sense as a consumer who is evaluating a $99 phone may be willing to spend more to get additional features, but a consumer who is evaluating a $199 smartphone may be less willing to spend as much. This is consistent with the well-established "prospect theory" of consumer behavior, for which Daniel Kahneman received a Nobel Prize in Economics in 2002.[86] The existence of reference prices has also been documented in the academic literature using real world data.[87] Because of the variation in consumers' price sensitivity

---

[85]   In this two product simulation, the levels of other feature categories do not affect the consumer's choice as long as they are held constant between the two products.

[86]   See Kahneman, Daniel, and Amos Tversky (2000), "Prospect Theory: An Analysis of Decision under Risk," in *Choices, Values, and Frames*, Daniel Kahneman and Amos Tversky, Eds., (Cambridge University Press), at pp. 32–34 and http://www.nobelprize.org/nobel_prizes/economics/laureates/2002/press.html (visited on March 20, 2012).

[87]   See, for example, Hardie, Bruce, Eric Johnson, and Peter Fader (1993), "Modeling Loss Aversion and Reference Dependence Effects on Brand Choice," Marketing Science, 12, 4, (Autumn), pp. 378–394; and Kalyanaram, Gurumurthy, and Russell Winer (1995), "Empirical Generalizations from Reference Price Research," *Marketing Science*, 14, 3, Special Issue on Empirical Generalizations in Marketing, pp. G161–G169.

over different price ranges, the estimated price premium will also vary over different price ranges.

128.     The actual average and median price respondents in the smartphone survey reported they paid for their Samsung devices was approximately $175.[88] The corresponding average and median price respondents in the tablet survey reported they paid for their Samsung devices was approximately $350. In my market simulations, I use as the starting point the prices closest to the average price the respondents paid for their devices. Specifically, I use $149 as the starting point for the smartphone simulations and $299 as the starting point for the tablet simulations. These base prices generally yield a more conservative (i.e., lower) estimate for the price consumer consumers are willing to pay for the patent-related features.[89]

129.     The resulting price premium for the patent-related features tested in each of the two surveys are presented in Table 9 below, which is also presented as Exhibit P. For example, as shown in the smartphone column, if a smartphone without the Background Syncing feature is priced at $149, the market simulation predicts that the price premium that consumers are willing to pay for the Background Syncing patent-related feature is $69. In other words, the price of an otherwise identical smartphone that has the Background Syncing patent-related feature could be $69 higher and the median respondent would be indifferent between the two products. The price premiums respondents are willing to pay for the other patent-related features in smartphones range from $44 to $102. The price premiums respondents are willing to pay for the five patent-related features tested in the tablet survey range from $32 to $63.

---

[88]   Note that this is the upfront price respondents paid for their smartphones, many of them as part of a new two year contract. In the survey, respondents were instructed that they were buying a new smartphone as part of a new two-year contract. In other words, consumers are instructed to take into account the full cost of service. This is typically significantly higher over the course of two years than the initial price of the phone. For example, see the informational graphic showing the total cost of an iPhone 5 *and* service over the course of two years to be $2,020 for T-Mobile, $2,120 for Sprint, $2,360 at AT&T, and $2,600 at Verizon; Thomas Gryta, "T-Mobile to Sell iPhone April 12," *The Wall Street Journal*, March 26, 2013, at http://online.wsj.com/article/SB10001424127887324105204578384482319259430.html, (visited on August 10, 2013).

[89]   Note that price premiums cannot be calculated using the highest price levels included in the survey ($299 for smartphones and $599 for tablets), since there are no partworths for price levels higher than these. The highest levels can only be used as the base of the simulations if I were to extrapolate beyond the price levels that I have surveyed. That would be inappropriate and speculative, because such levels have not been tested.

## Table 9: Price Premium for Patent-Related Features
## Market Simulation Approach

| | Base price without patent-related feature | |
|---|---|---|
| Patent-Related Feature | Smartphones, $149 | Tablets, $299 |
| Background Syncing ('414) | $69 | $62 |
| Quick Links ('647) | $56 | $56 |
| Universal Search ('959) | $44 | $33 |
| Automatic Word Correction ('172) | $102 | $63 |
| Missed Call Screen Management ('760) | $87 | Not tested |
| Slide to Unlock ('721) | Not tested | $32 |

130.    As a robustness check, I have also calculated the price premium associated with each patent-related feature based on how consumers trade off the partworths associated with a feature with those associated with price.[90] This partworths trade-off calculation yields

---

[90]    In the partworths trade-off approach, I calculate the median price premium across respondents. In other words, half of the respondents are willing to pay a higher price premium and half are willing to pay a lower price premium. The calculation compares the partworth change associated with changing the price to the partworth change associated with a product feature change and uses the comparison to impute the price premium that consumers would be willing to pay for the product feature. Specifically, the method first calculates the amount of utility gained by having the feature of interest. Suppose that we gain 20 units of utility from Background Syncing. We now examine how much utility the consumer can "buy" with an increased price. Suppose that the consumer only loses 10 units of utility by going from $149 to $299. We would then know that the consumer would pay at least $150 for Background Syncing. To see how much more we would have to examine the next price range (if it was asked in the survey.) Now suppose the consumer loses more than 50 units of utility by going from $149 to $299. Then we know the consumer would be willing to pay at most $150 for Background Syncing. We can get an estimate of what the consumer would be willing to pay by linear interpolation in the range, in this case (20/50) of the $150 range. Such interpolation is most consistent when we use medians. If the change in price has to move beyond the measured range in order to "buy" units of utility, then we need to take the new range into account. Any price change above the highest measured partworths would require extrapolation and would be inappropriate and speculative. These calculations are illustrative. I performed these calculations using the estimated distribution of partworths for the market. The HB CBC estimation provides 10,000 samples from the distribution of partworths. For each of these samples, I computed the median price premium for the market. I then computed an overall market-level price premium by taking the median of the 10,000 sample median price premiums. As explained in the earlier coin-flipping examples, reporting the price

Confidential—Contains Material Designated as Confidential—Pursuant to a Protective Order

price premium estimates that are similar to what I estimate using the main market simulation method described above. The results can be seen in Table 10 below, and are reported in Exhibit Q.

### Table 10: Price Premium for Patent-Related Features
### Partworths Trade-Off Approach

| Patent-Related Feature | Base price without patent-related feature | |
| --- | --- | --- |
| | Smartphones, $149 | Tablets, $299 |
| Background Syncing ('414) | $74 | $65 |
| Quick Links ('647) | $60 | $58 |
| Universal Search ('959) | $47 | $34 |
| Automatic Word Correction ('172) | $117 | $67 |
| Missed Call Screen Management ('760) | $100 | Not tested |
| Slide to Unlock ('721) | Not tested | $34 |

131.    These market simulation and partworths trade-off results show that, for both smartphones and tablets, Samsung customers are willing to pay a substantial price premium for each of the features associated with the patents I tested.[91]

---

premium for an individual respondent would not be sufficiently precise. However, the overall, market-level price premium is sufficiently precise.

[91]    I calculate price premiums for each patent-related feature individually. One can calculate price premiums for combinations of patent-related features collectively. As explained above, the appropriate way to calculate the collective effect on willingness to buy of a combination of different features is to calculate this effect directly, as opposed to adding up the individual effects. The same holds for the price premium calculated for each feature. Also as explained earlier, it is inappropriate and speculative to extrapolate price premium estimates beyond the price ranges tested within the surveys, whether a price premium is calculated for an individual feature or for a combination of features.

132.   Finally, I understand that the exhibits to my report and underlying data have been provided to Christopher Vellturo, Ph.D. I further understand from Dr. Vellturo that he is utilizing the data and findings from my conjoint studies in order to estimate how demand for certain smartphones and tablets is impacted when product features I considered in my conjoint studies are removed from those devices. I also understand that those devices have prices and screen sizes within or close to the ranges in my conjoint studies. In my opinion, it is appropriate to use the data and findings from my studies for such an application.


                                                           Signed on August 11, 2013


                                                           John R. Hauser, Sc. D.

# EXHIBIT B

EXHIBIT G

## Introduction 1

Thank you for your willingness to participate in our study. The responses you give to these questions are very important to us. If you don't know an answer to a question or if you are unsure, please indicate this by choosing the DON'T KNOW / UNSURE option. It is very important that you not guess.

Your answers will be kept in confidence. The results of this study will not be used to try to sell you anything.

This survey should take about 30-45 minutes to complete.

When you are ready to get started, please click the "NEXT" button.

**NEXT**

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

## Captcha

G523U2

Please enter the code exactly as it appears in the image above, and then click "NEXT" to continue.

** code is case sensitive **

**NEXT**

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

## QS1

What type of electronic device are you using to complete this survey?

*(Select one only)*

○ Tablet computer (e.g., Apple iPad, Kindle Fire, Samsung Galaxy Tab)
○ Smartphone (e.g., iPhone, Android, Blackberry)
○ Desktop computer
○ Laptop computer
○ Other mobile or electronic device

**NEXT**

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

1

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## QS2

In which state do you live?

*(Select one only)*

<--select one-->

**NEXT**

Copyright © 2013, Applied Marketing Science, Inc.

0% [▮▮▮▮▮▮▮▮▮▮] 100%
% complete

## QS3

Are you...?

*(Select one only)*

○ Male
○ Female
○ Prefer not to say

**NEXT**

Copyright © 2013, Applied Marketing Science, Inc.

0% [▮▮▮▮▮▮▮▮▮▮] 100%
% complete

## QS4

Into which of the following categories does your age fall?

*(Select one only)*

○ Under 15
○ 15 - 19
○ 20 - 34
○ 35 - 49
○ 50 - 64
○ 65+
○ Prefer not to say

**NEXT**

Copyright © 2013, Applied Marketing Science, Inc.

0% [▮▮▮▮▮▮▮▮▮▮] 100%
% complete

## QS5

Do you or does any member of your household work for any of the following types of companies or in any of the following industries?

*(Select all that apply)*

- ☐ A company that makes or sells automotive parts
- ☐ A company that makes or sells home appliances
- ☐ A public relations or advertising agency
- ☐ A company that makes or sells consumer electronics
- ☐ A marketing or market research firm
- ☐ None of the above

**NEXT**

Copyright © 2013, Applied Marketing Science, Inc.

0%  100%
% complete

## QS6

In the **past 12 months** which, if any, of the following have you personally owned?

*(Select all that apply)*

- ☐ Desktop computer
- ☐ Blu-ray player
- ☐ Laptop computer
- ☐ Portable GPS
- ☐ Tablet computer
- ☐ Smartphone
- ☐ Portable MP3 player
- ☐ Video game player
- ☐ None of the above

**NEXT**

Copyright © 2013, Applied Marketing Science, Inc.

0%  100%
% complete

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## QS7



In the **past 12 months**, which of the following brands of smartphones have you personally owned?

*(Select all that apply)*

- [ ] Motorola (Razr M, Droid Razr, etc.)
- [ ] LG (Motion, G2X, etc.)
- [ ] Sony Ericsson (Xperia, Vivaz, etc.)
- [ ] Samsung (Galaxy Note II, Galaxy S III, etc.)
- [ ] Nokia (Lumia 620, Lumia 920, etc.)
- [ ] BlackBerry (Z10, Curve, etc.)
- [ ] HTC (One, Desire, etc.)
- [ ] Apple (iPhone 5, iPhone 4S, etc.)
- [ ] None of the above

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%　　100%
% complete

## QS7a

In the **past 12 months**, which, if any, of the following brands of desktop or laptop computers have you personally owned?

*(Select all that apply)*

- [ ] Dell (Inspiron, Latitude, XPS, etc.)
- [ ] ASUS (Zenbook, Transformer, Eee Box, etc.)
- [ ] Acer (Aspire, Iconia, etc.)
- [ ] HP (Pavilion, Envy, Spectre, etc.)
- [ ] Lenovo (ThinkPad, IdeaPad, IdeaCentre, etc.)
- [ ] Apple (MacBook Air, MacBook Pro, iMac, etc.)
- [ ] Other. Please specify: _____
- [ ] None of the above

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%　　100%
% complete

Confidential – Contains Material Designated as Confidential – Pursuant to a Protective Order

EXHIBIT G

## QS7b

Now we are going to ask you about one of the brands of smartphones you have owned. In the **past 12 months**, which specific model(s) of **Samsung** smartphones have you personally owned?

*(Select all that apply)*

- Acclaim
- Admire
- Admire 4G
- ATIV Odyssey
- Axiom
- Captivate Glide
- Conquer 4G
- Continuum
- Dart
- DoubleTime
- Droid Charge
- Exhibit 4G
- Exhibit II 4G
- Express
- Focus 2
- Focus Flash
- Focus S
- Galaxy Appeal
- Galaxy Attain 4G
- Galaxy Discover
- Galaxy Exhilarate
- Galaxy Metrix 4G
- Galaxy Nexus
- Galaxy Note
- Galaxy Note II
- Galaxy Precedent
- Galaxy Prevail
- Galaxy Proclaim
- Galaxy Reverb

- Galaxy Rugby Pro
- Galaxy Rush
- Galaxy S II
- Galaxy S II Epic 4G Touch
- Galaxy S II 4G
- Galaxy S II Skyrocket
- Galaxy S III
- Galaxy S Aviator
- Galaxy S Blaze
- Galaxy S Lightray
- Galaxy S Relay 4G
- Galaxy Stellar
- Galaxy Stratosphere
- Galaxy Stratosphere II
- Galaxy Victory 4G
- Gravity Smart
- Illusion
- Indulge
- Nexus S
- Nexus S 4G
- Replenish
- Repp
- Rugby Smart
- Sidekick 4G
- Transfix
- Transform Ultra
- Vitality
- Other. Please specify: _____
- Don't know / Unsure

[ NEXT ]

Copyright © 2013, Applied Marketing Science, Inc.

0% ▭▭▭▭▭▭ 100%
% complete

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## QS7c

In the **past 12 months**, which, if any, of the following brands of portable GPS have you personally owned?

*(Select all that apply)*

- [ ] Celestron (reTrace, CoursePro, etc.)
- [ ] Garmin (núvi, eTrex, etc.)
- [ ] TomTom (VIA, Start, etc.)
- [ ] Rand McNally (IntelliRoute, Foris, etc.)
- [ ] Magellan (RoadMate, eXplorist, etc.)
- [ ] Other. Please specify: [                    ]
- [ ] None of the above

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬ 100%
% complete

## QS7d

Which <u>one</u> of the following Samsung smartphones that you owned was <u>purchased most recently</u>? This will be referred to as your most recent Samsung smartphone for the rest of this survey.

*(Select one only)*

- ○ Acclaim
- ○ Admire
- ○ Dart
- ○ Droid Charge
- ○ Exhibit II 4G
- ○ Galaxy Appeal
- ○ Galaxy Attain 4G
- ○ Galaxy Exhilarate
- ○ Galaxy S II Skyrocket
- ○ Galaxy S Lightray
- ○ Don't know / Unsure

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬ 100%
% complete

6

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## QS7e



Thinking of your most recent Samsung smartphone, to what degree were you involved in the decision to select the product?

*(Select one only)*

○ You had <u>no involvement in the decision</u> to select this product (i.e., you received it from someone else, or you simply purchased it but did not have any input into the choice of the model or features)

○ You were <u>involved in the decision</u> to select this product but <u>did not purchase</u> it yourself (i.e., you may have specified the brand or model you desired or specified the key features you desired, but someone else bought it)

○ You were the <u>primary decision maker</u> in the selection of this product <u>and purchased</u> it for yourself or someone else

○ Don't know / Unsure

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%  ▬▬▬ 100%
% complete

## QS7f

Approximately how much did it cost to buy your most recent Samsung smartphone, excluding sales tax? Please give your best estimate.

*Please include only the cost of the phone. **Do not include the cost of optional accessories or monthly service fees associated with your wireless service provider (for example, AT&T, Verizon, or Sprint).** If your phone was free as part of a wireless service contract, please enter $0.*

*(Enter a whole number)*

$ [          ]

☐ Don't know / Unsure

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%  ▬▬▬ 100%
% complete

EXHIBIT G

## QS8

Before the survey begins, it is important to verify that you are able to see and hear videos that will be presented to you. Please click on the button to open the video/audio test tool and then type the word you heard in the box below.

**Note:** The video/audio test tool will appear in a pop-up window.

- If you can't <u>see</u> the video/audio test tool, it may be because the pop-up window with the tool is hidden behind your current browser window.

- If you can't <u>hear</u> the video/audio test tool, then please make sure your speakers are turned on and the volume is up.

Click to see video/audio test tool

What word did you hear?

*(Type the exact word you heard.)*

*Please click the button above to see the video/audio test tool before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.

0%  ▬▬▬▬▬▬▬▬▬  100%
% complete

## Introduction 2

Now imagine that **your current contract with your service provider has ended and you are in the market to buy a new smartphone** to replace your most recent Samsung smartphone.

The following questions will involve a series of exercises. In each exercise, you will make **two** choices.

- First, **you will be shown different Samsung smartphones.** You will be asked to **choose a Samsung smartphone that you most prefer.**

- After you make your choice, you will be asked whether you would buy **the Samsung smartphone that you chose.**

For purposes of these exercises, you should assume:

- The smartphone that you choose will come with a new **two-year contract.**

- Monthly phone/data plan fees are <u>NOT</u> included in the purchase price of the **smartphone that is listed in the exercise,** but all types of phone/data plans are available through the wireless service provider of your choice (for example, AT&T, Verizon, or Sprint).

Click "NEXT" to continue.



Copyright © 2013, Applied Marketing Science, Inc.

0%  ▬▬▬▬▬▬▬▬▬  100%
% complete

8

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## Introduction 2a

We want to reward you for thinking carefully about the choices that you make in this survey. Therefore, **we will randomly pick 1 out of every 20 respondents who take this survey and pay for their next smartphone.** If you are one of the lucky respondents, you will be offered a free smartphone under the following conditions:

- If you wish to participate in the free smartphone offer, you will please volunteer to tell us about your top-choice smartphone when you decide to replace your existing smartphone with a new smartphone under a new contract.

- We will then offer you a free smartphone based on your top-choice smartphone as well as the choices that you make in this survey. Except for the phone features that will vary in this survey, the free smartphone we offer you (based on your responses in this survey) will match your top-choice smartphone as closely as possible.

- If the free smartphone we offer you is priced less than $300 under contract, you will get the difference in cash. For example, if the market price of the smartphone that we offer you is $199 under contract, you will receive that smartphone plus $101 in cash ($300 - $199 = $101), if you accept the offer. If you chose to reject the offer, you forgo the reward.

- Because your answers will determine the smartphone that we offer, it is in your best interest to think hard about the questions and answer them to reflect your preferences. Therefore, please think carefully when:

  - Choosing your most preferred smartphone among the alternatives shown;

  - Deciding whether or not to actually buy that smartphone given the availability of other smartphones in the market.



Copyright © 2013, Applied Marketing Science, Inc.

0%  �no  100%
% complete

9

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## Introduction 2b

Next, you will be shown descriptions of features that may be present in the Samsung smartphones that you will be asked to choose from. You will be shown videos of these features to help you understand them better.

**Note:** Each video will appear in a pop-up window. Please do not close the pop-up window until the video has finished playing.

- If you can't **see** the video, it may be because the pop-up window with the video is hidden behind your current browser window.

- If you can't **hear** the video, then please make sure your speakers are turned on and the volume is up.

Click "NEXT" to continue.



Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬▬ 100%
% complete

## Introduction 3

The Samsung smartphones that will be shown to you include one or more features within each of the following categories:

1. Price
2. Data Accessibility
3. Screen Size
4. Camera
5. Input Assistance
6. Call Initiation and Screening

In addition to features within each of the above categories, please assume that the Samsung smartphones you will be shown will have all the other features on your most recent Samsung smartphone.

**We will now introduce you to the features that will vary in the Samsung smartphones that you will be asked to choose from.**



Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬▬ 100%
% complete

EXHIBIT G

## Price Introduction

The Samsung smartphones you will choose from vary in **Price**.

Click "NEXT" to view the video of this feature. This description and video will be available for you to review throughout the exercises.

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬ 100%
% complete

## Price Description

Please click on any of the four Price icons to view an animation describing this feature. You can also read the description of the feature below.



Price $49

Price $99

Price $149

Price $299

**Price.** The price of the smartphone with a 2-year service contract could be $49, $99, $149, or $299. Monthly data and cellular plan fees are NOT included in the price of the smartphone. You can enter the 2-year service contract with the wireless service provider of your choice (for example, AT&T, Verizon, or Sprint).

*Please click the icon above to watch the video before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬ 100%
% complete

EXHIBIT G

## Data Accessibility Introduction



The Samsung smartphones you will choose from vary in **Data Accessibility** features. They include one or more of the following features: **Notification Bar, Background Syncing, Quick Links,** and **Universal Search**.

Click "NEXT" to view videos explaining each of these features. These descriptions and videos will be available for you to review throughout the exercises.

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0% [====        ] 100%
% complete

## Data Accessibility- Feature 1 (Notification Bar)

**Please click on the Notification Bar icon to view an animation describing this feature.** You can also read the description of the feature below.



Notification Bar

**Notification Bar.** You can access the Notification Bar by dragging down from the top of the screen. This feature allows you to quickly review any new notifications received by your smartphone, as well as to quickly access certain configuration settings, such as adjusting volume or turning off Wi-Fi. Without this feature, new notifications received by your smartphone would appear in a pop-up window, and you would be able to access configuration settings only by navigating to the "Settings" app on your device.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.

0% [====        ] 100%
% complete

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## Data Accessibility- Feature 2 (Background Syncing)

Please click on the Background Syncing icon to view an animation describing this feature. You can also read the description of the feature below.



Background
Syncing

**Background Syncing.** The Background Syncing feature allows you to continue to use an app while data related to that app that is stored on your smartphone synchronizes with data stored elsewhere, such as on a remote computer. For example, you can access and edit data, such as the list of contacts on your smartphone, even as your phone is sending data for those contacts to your work computer. Without this feature, you would have to wait to use an app, for example the contacts app, while the data for the app is synchronizing with a remote computer, and that wait may be long or short.

*Please click the icon above to watch the video before proceeding.*

Copyright @ 2013, Applied Marketing Science, Inc.



## Data Accessibility- Feature 3 (Quick Links)

Please click on the Quick Links icon to view an animation describing this feature. You can also read the description of the feature below.



Quick Links

**Quick Links.** When you are viewing text on your smartphone (for example in an email), the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder. Without this feature, if you wanted to take various actions, like calling or texting a number, you would have to manually identify and select the exact text that might be data to take actions on.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.



EXHIBIT G

## Data Accessibility- Feature 4 (Universal Search)

Please click on the Universal Search icon to view an animation describing this feature. You can also read the description of the feature below.



### Universal Search

**Universal Search.** Universal Search lets you use a single search to find information from different sources of information, for example data stored on your smartphone as well as information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find good results tailored to each source. For example, when you type "George" in a single search box, the feature searches the Internet for "George," which might yield web pages about George Washington, and at the same time searches for "George" stored on your smartphone, which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files. Without Universal Search, you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.

0%　━━━━━━━━━━　100%
% complete

## Data Accessibility Summary

In summary, each Samsung smartphone you will choose from comes with **Data Accessibility** with one or more of the following features: **Notification Bar, Background Syncing, Quick Links,** and **Universal Search.**








| Notification Bar | Background Syncing | Quick Links | Universal Search |



**NEXT**

Copyright © 2013, Applied Marketing Science, Inc.

0%　━━━━━━━━━━　100%
% complete

EXHIBIT G

## Call Initiation and Screening Introduction



The Samsung smartphones you will choose from vary in **Call Initiation and Screening** features. They include one or more of the following features: **Three-Way Calling, Reject Call with Message, Missed Call Screen Management, and Wi-Fi Calling**.

Click "NEXT" to view videos explaining each of these features. These descriptions and videos will be available for you to review throughout the exercises.

[ NEXT ]

Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬ 100%
% complete

## Call Initiation and Screening- Feature 1 (Three-Way Calling)

Please click on the Three-Way Calling icon to view an animation describing this feature. You can also read the description of the feature below.



Three-Way
Calling

**Three-Way Calling.** Three-Way Calling allows you to set up a conference call with two other callers. When on a call with one person, you can touch "add call" to place your first call on hold. Once you call a second person, you can touch "merge calls" to talk with both people at the same time.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬ 100%
% complete

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## Call Initiation and Screening- Feature 2 (Reject Call with Message)



Please click on the Reject Call with Message icon to view an animation describing this feature. You can also read the description of the feature below.



### Reject Call with Message

**Reject Call with Message.** The Reject Call with Message feature allows you to reject a phone call and simultaneously send a text message to that caller. When receiving a call, your smartphone will display the "Answer" button so that you can take the call as well as a "Reject" button so that you can reject the call and a "Reject call with message" button so that you can reject the call while at the same time sending a text message. This text message can either be a pre-stored text message, such as "I'll call you later," or a message you can then create. Without this feature, you would have only the "Answer" and "Reject" buttons, and if you wanted to send the caller a text message, you would have to separately compose one after rejecting the call by using your text messaging app.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2011 Applied Marketing Science, Inc.

0%  ▬▬▬▬▬▬▬▬▬  100%
% complete

## Call Initiation and Screening- Feature 3 (Missed Call Screen Management)



Please click on the Missed Call Screen Management icon to view an animation describing this feature. You can also read the description of the feature below.



### Missed Call Screen Management

**Missed Call Screen Management.** The Missed Called Screen Management feature allows you to return a missed call or respond to the caller by listing the missed calls and providing you with two interactive areas to take further action. If you touch one area, such as the picture of the missed caller, John Doe, you call John Doe back. If you touch the other area, such as John Doe's name or phone number, then the feature takes you to a new screen that displays all of John Doe's contact information. From the new screen, you can call John Doe, text him, or email him. Without two areas you would have to remember to use different gestures to take different actions—like tapping John Doe's entry on the missed calls list to call him back but swiping his entry to view his contact information.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2011 Applied Marketing Science, Inc.

0%  ▬▬▬▬▬▬▬▬▬  100%
% complete

16

EXHIBIT G

## Call Initiation and Screening- Feature 4 (Wi-Fi Calling)

Please click on the Wi-Fi Calling icon to view an animation describing this feature.
You can also read the description of the feature below.



### Wi-Fi Calling

**Wi-Fi Calling.** Wi-Fi Calling allows you to make phone calls and send messages over a
Wi-Fi network when you are in areas of poor reception. You can make phone calls and
send text messages over a Wi-Fi network in the same way as you do on a cellular
network. Calls made and text messages sent over Wi-Fi count towards your monthly
voice and data plan just like when you are on a cellular network.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬▬ 100%
% complete

## Call Initiation and Screening Summary

In summary, each Samsung smartphone you will choose from comes with **Call
Initiation and Screening** with one or more of the following features: **Three-Way
Calling, Reject Call with Message, Missed Call Screen Management, and Wi-Fi
Calling.**



NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬▬ 100%
% complete

17

EXHIBIT G

## Input Assistance Introduction

The Samsung smartphones you will choose from vary in **Input Assistance** features. They include one or more of the following features: **Copy-Paste, Voice to Text, Automatic Word Correction, and S Pen**.

Click "NEXT" to view videos explaining each of these features. These descriptions and videos will be available for you to review throughout the exercises.



Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬▬ 100%
% complete

## Input Assistance- Feature 1 (Copy-Paste)

**Please click on the Copy-Paste icon to view an animation describing this feature.** You can also read the description of the feature below.



Copy-Paste

**Copy-Paste.** The Copy-Paste feature allows you to copy and paste text on your device. To use this feature, you touch and hold a word to select it. You can also select more text by dragging the anchor points at either end of the selected word. Then, you can select "Copy" to copy the text you selected. Touching and holding anywhere else in a text field will then allow you to select "Paste" to paste in your selected text.

*Please click the icon above to watch the video before proceeding.*



Copyright © 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬▬ 100%
% complete

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## Input Assistance- Feature 2 (Voice to Text)

Please click on the Voice to Text icon to view an animation describing this feature. You can also read the description of the feature below.



**Voice To Text**

**Voice to Text.** The Voice to Text feature allows you to enter text using your voice instead of typing it on your smartphone. You can tap the microphone icon on your keyboard and speak the words you want to type. Your device will then transcribe your spoken words into written text for you, for example in a text message or email. Without this feature, you would have to type all of the text you wanted to enter on your smartphone.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

## Input Assistance- Feature 3 (Automatic Word Correction)

Please click on the Automatic Word Correction icon to view an animation describing this feature. You can also read the description of the feature below.



**Automatic Word Correction**

**Automatic Word Correction.** As you type, your smartphone displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. The Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday." Without this feature, pressing space or period would retain your original text, "birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

19

Confidential – Contains Material Designated as Confidential – Pursuant to a Protective Order

EXHIBIT G

## Input Assistance- Feature 4 (S Pen)



Please click on the S Pen icon to view an animation describing this feature. You can also read the description of the feature below.



S Pen

**S Pen.** With the S Pen feature your smartphone comes with a stylus, or electronic pen. In addition to the finger gestures you normally use on your smartphone, this feature gives you the option to use the stylus to navigate menus and enter information. For example, you can write directly in the calendar application of your device as if you are handwriting on a paper calendar.

*Please click the icon above to watch the video before proceeding.*

Copyright © 2013, Applied Marketing Science, Inc.

0%  ████████  100%
% complete

## Input Assistance Summary

In summary, each Samsung smartphone you will choose from comes with **Input Assistance** with one or more of the following features: **Copy-Paste, Voice to Text, Automatic Word Correction, and S Pen.**

   

| Copy-Paste | Voice To Text | Automatic Word Correction | S Pen |



Copyright © 2013, Applied Marketing Science, Inc.

0%  ████████  100%
% complete

Confidential – Contains Material Designated as Confidential – Pursuant to a Protective Order

EXHIBIT G

## Screen Size Introduction

The Samsung smartphones you will choose from vary in **Screen Size**.

Click "NEXT" to view the video of this feature. This description and video will be available for you to review throughout the exercises.



Copyright @ 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬ 100%
% complete

## Screen Size Description

**Please click on any of the four Screen Size icons to view an animation describing this feature.** You can also read the description of the feature below.



Size 4.0″

Size 4.8″

Size 5.0″

Size 5.5″

**Screen Size.** The diagonal length of the screen could be 4.0 inches, 4.8 inches, 5.0 inches, or 5.5 inches.

*Please click the icon above to watch the video before proceeding.*

Copyright @ 2013, Applied Marketing Science, Inc.

0% ▬▬▬▬▬ 100%
% complete

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## Camera Introduction

The Samsung smartphones you will choose from vary in **Camera** features. They include one or more of the following features: **Panorama, Best Photo, Smile Shot, and Buddy Photo Share**.

Click "NEXT" to view videos explaining each of these features. These descriptions and videos will be available for you to review throughout the exercises.



Copyright @ 2013, Applied Marketing Science, Inc.

0%  100%
% complete

## Camera- Feature 1 (Panorama)

Please click on the Panorama icon to view an animation describing this feature. You can also read the description of the feature below.



Panorama

**Panorama.** The Panorama feature allows you to take wide-angle, panoramic camera shots that cannot be contained in a single frame. You can point your device's camera in the direction in which you want to begin your panoramic shot, and when the first frame you want is fully within the green square on the screen, you can take the picture, and then move the camera over to take the next part of the panoramic shot. You can repeat this process up to eight times, moving the camera one frame over in each case. The Panorama feature then automatically stitches together the different photos you have taken to form one single panoramic image.

*Please click the icon above to watch the video before proceeding.*



Copyright @ 2013, Applied Marketing Science, Inc.

0%  100%
% complete

22

EXHIBIT G

## Camera- Feature 2 (Best Photo)

Please click on the Best Photo icon to view an animation describing this feature. You can also read the description of the feature below.



**Best Photo**

**Best Photo.** The Best Photo feature allows you to automatically capture eight photos of whatever you are taking a picture of so that you can choose the best single photo to keep. For example, if you want to have a picture of a hot air balloon, the Best Photo feature will take eight successive photos automatically so that you can select the one photo of that hot air balloon that you feel is best and discard the rest.

*Please click the icon above to watch the video before proceeding.*



Copyright © 2013, Applied Marketing Science, Inc.

0%  ▬▬▬▬ 100%
% complete

## Camera- Feature 3 (Smile Shot)

Please click on the Smile Shot icon to view an animation describing this feature. You can also read the description of the feature below.



**Smile Shot**

**Smile Shot.** The Smile Shot feature allows you to capture pictures while your subjects are smiling. For example, if you are taking a photo of a child, Smile Shot enables your smartphone's camera to detect when the child is smiling, and to then take a photo at that moment. Without this feature, you would need to exactly time when you take the photo if you want to capture your subjects when they are smiling.

*Please click the icon above to watch the video before proceeding.*



Copyright © 2013, Applied Marketing Science, Inc.

0%  ▬▬▬▬ 100%
% complete

23

EXHIBIT G

## Camera- Feature 4 (Buddy Photo Share)

Please click on the Buddy Photo Share icon to view an animation describing this feature. You can also read the description of the feature below.



Buddy Photo Share

**Buddy Photo Share.** The Buddy Photo Share feature allows you to tag and share pictures with individuals listed in your contacts. For example, when you take a picture using your smartphone, this feature will automatically place a yellow box around each face it detects in that picture. You can then tap each box to tag that face as one of your existing contacts, and then tap the face of your contact to choose to email or message the picture to that contact. You can also tap the Send button on the upper right to email the picture to all the contacts tagged in the picture. Without this feature, you would have to manually send your photos to your contacts.

*Please click the icon above to watch the video before proceeding.*

Copyright @ 2013, Applied Marketing Science, Inc.

0%  ▬▬▬▬▬▬  100%
% complete

## Camera Summary

In summary, each Samsung smartphone you will choose from comes **with a Camera** with one or more of the following features: Panorama, Best Photo, Smile Shot, and **Buddy Photo Share.**



NEXT

Copyright @ 2013, Applied Marketing Science, Inc.

0%  ▬▬▬▬▬▬  100%
% complete

24

EXHIBIT G

## Introduction 4



The following video will walk you through an example of the choice exercise you will be asked to do in this survey. **Please click on the button below to view the video.**

Click to view the video

*The Next button will appear after you view the video*

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

## Introduction 5

Next, you will begin the choice exercises. Click the "NEXT" button to get started.

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

## Conjoint (x 16 choices)



(1/16)

**Please choose your most preferred Samsung smartphone among the four below.**
At any point you may click on the label of each feature category, on the left, to view an animation describing the features within that feature category.

In answering this question, you may wish to consider the availability of other smartphone options in the market that may influence your purchase decision, including smartphones by other manufacturers or other Samsung smartphones.

Given the Samsung smartphone you chose as your most preferred among the alternatives shown, would you buy it <u>at the indicated price</u>?

Choose by clicking one of the buttons below. Then, click the <u>arrow</u> at the bottom to continue.



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT G

## Final Page

Click **HERE** to complete the survey.



Powered by Sawtooth Software, Inc.

0% ▬▬▬▬▬▬▬▬▬▬▬▬▬ 100%

# EXHIBIT E

## Introduction 1



## Captcha



## QS1



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## QS2



In which state do you live?

*(Select one only)*

<--select one-->

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%                                          100%
% complete

## QS3

Are you...?

*(Select one only)*

○ Male
○ Female
○ Prefer not to say

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%                                          100%
% complete

## QS4

Into which of the following categories does your age fall?

*(Select one only)*

○ Under 15
○ 15 - 19
○ 20 - 34
○ 35 - 49
○ 50 - 64
○ 65+
○ Prefer not to say

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%                                          100%
% complete

EXHIBIT H

## QS5

Do you or does any member of your household work for any of the following types of companies or in any of the following industries?

*(Select all that apply)*

☐ A public relations or advertising agency
☐ A company that makes or sells home appliances
☐ A marketing or market research firm
☐ A company that makes or sells automotive parts
☐ A company that makes or sells consumer electronics
☐ None of the above

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

## QS6

In the **past 12 months** which, if any, of the following have you personally owned?

*(Select all that apply)*

☐ Portable MP3 player
☐ Tablet computer
☐ Video game player
☐ Blu-ray player
☐ Desktop computer
☐ Portable GPS
☐ Smartphone
☐ Laptop computer
☐ None of the above

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

## QS7

In the **past 12 months**, which of the following brands of tablet computers have you personally owned?

*(Select all that apply)*

☐ Amazon (Kindle Fire, etc.)
☐ Barnes & Noble (Nook Color, Nook HD, etc.)
☐ HP (TouchPad, etc.)
☐ Motorola (Xoom, Xoom 2, etc.)
☐ BlackBerry (Playbook, etc.)
☐ HTC (Flyer, etc.)
☐ Asus (Transformer, Transformer Prime, etc.)
☐ Apple (iPad, iPad2, the New iPad, etc.)
☐ Acer (Iconia A, Iconia W3, Iconia W7, etc.)
☐ Samsung (Galaxy Tab 10.1, Galaxy Tab 2 10.1, etc.)
☐ None of the above

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%  % complete  100%

3

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## QS7a

In the **past 12 months**, which, if any, of the following brands of desktop or laptop computers have you personally owned?

*(Select all that apply)*

- ☐ Acer (Aspire, Iconia, etc.)
- ☐ Lenovo (ThinkPad, IdeaPad, IdeaCentre, etc.)
- ☐ Dell (Inspiron, Latitude, XPS, etc.)
- ☐ Apple (MacBook Air, MacBook Pro, iMac, etc.)
- ☐ ASUS (Zenbook, Transformer, Eee Box, etc.)
- ☐ HP (Pavilion, Envy, Spectre, etc.)
- ☐ Other. Please specify: [_____]
- ☐ None of the above

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%  [████_____] 100%
% complete

## QS7b

In the **past 12 months**, which specific model(s) of **Samsung** tablet computers have you personally owned?

*(Select all that apply)*

- ☐ Galaxy Tab 7.0
- ☐ Galaxy Tab 7.0 Plus
- ☐ Galaxy Tab 7.7
- ☐ Galaxy Tab 8.9
- ☐ Galaxy Tab 10.1
- ☐ Galaxy Note 8.0
- ☐ Galaxy Note 10.1
- ☐ Galaxy Tab 2 7.0
- ☐ Galaxy Tab 2 10.1
- ☐ Other. Please specify: [_____]
- ☐ Don't know / Unsure

NEXT

Copyright © 2013, Applied Marketing Science, Inc.

0%  [████_____] 100%
% complete

4

EXHIBIT H

## QS7c



In the **past 12 months**, which, if any, of the following brands of portable GPS devices have you personally owned?

*(Select all that apply)*

- ☐ Magellan (RoadMate, eXplorist, etc.)
- ☐ Garmin (nüvi, eTrex, etc.)
- ☐ Celestron (reTrace, CoursePro, etc.)
- ☐ TomTom (VIA, Start, etc.)
- ☐ Rand McNally (IntelliRoute, Foris, etc.)
- ☐ Other. Please specify: _____
- ☐ None of the above

NEXT

Copyright © 2013. Applied Marketing Science, Inc.

0% ▬▬▬ 100%
% complete

## QS7d

Which <u>one</u> of the following Samsung tablet computers that you owned was <u>purchased most recently</u>? This will be referred to as your most recent Samsung tablet computer for the rest of this survey.

*(Select one only)*

- ○ Galaxy Tab 7.0 Plus
- ○ Galaxy Tab 7.7
- ○ Galaxy Tab 8.9
- ○ Galaxy Tab 10.1
- ○ Galaxy Note 8.0
- ○ Don't know / Unsure

NEXT

Copyright © 2013. Applied Marketing Science, Inc.

0% ▬▬▬ 100%
% complete

## QS7e

Thinking of your most recent Samsung tablet computer, to what degree were you involved in the decision to select the product?

*(Select one only)*

- ○ You were the <u>primary decision maker</u> in the selection of this product <u>and purchased</u> it for yourself or someone else
- ○ You were <u>involved in the decision</u> to select this product but <u>did not purchase</u> it yourself (i.e., you may have specified the brand or model you desired or specified the key features you desired, but someone else bought it)
- ○ You had <u>no involvement in the decision</u> to select this product (i.e., you received it from someone else, or you simply purchased it but did not have any input into the choice of the model or features)
- ○ Don't know / Unsure

NEXT

Copyright © 2013. Applied Marketing Science, Inc.

0% ▬▬▬ 100%
% complete

EXHIBIT H

## QS7f



## QS8



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

## Introduction 2

Now imagine that **you are in the market to buy a tablet computer** to replace your most recent Samsung tablet computer.

The following questions will involve a series of exercises. In each exercise, you will make **two** choices.

- First, **you will be shown different Samsung tablet computers**. You will be asked to **choose a Samsung tablet computer that you most prefer**.

- After you make your choice, you will be asked whether you would buy **the Samsung tablet computer that you chose**.

For purposes of these exercises, you should assume:

- Monthly data plan fees are <u>NOT</u> included in the purchase price of the tablet computer that is listed in the exercise.

Click "NEXT" to continue.

*The Next button will appear in just a moment*

Copyright © 2012, Applied Marketing Science, Inc.

0%  ▬▬▬▬▬▬  100%
% complete

## Introduction 2a

We want to reward you for thinking carefully about the choices that you make in this survey. Therefore, **we will randomly pick 1 out of every 20 respondents who take this survey and pay for their next tablet computer.** If you are one of the lucky respondents, you will be offered a free tablet computer under the following conditions:

- If you wish to participate in the free tablet computer offer, you will please volunteer to tell us about your top-choice tablet computer when you decide to replace your existing tablet computer with a new tablet computer.

- We will then offer you a free tablet computer based on your top-choice tablet computer as well as the choices that you make in this survey. Except for the tablet computer features that will vary in this survey, the free tablet computer we offer you (based on your responses in this survey) will match your top-choice tablet computer as closely as possible.

- If the free tablet computer we offer you is priced less than $600, you will get the difference in cash. For example, if the market price of the tablet computer that we offer you is $399, you will receive that tablet computer plus $201 in cash ($600 - $399 = $201), if you accept the offer. If you chose to reject the offer, you forgo the reward.

- Because your answers will determine the tablet computer that we offer, it is in your best interest to think hard about the questions and answer them to reflect your preferences. Therefore, please think carefully when:

  - Choosing your most preferred tablet computer among the alternatives shown;

  - Deciding whether or not to actually buy that tablet computer given the availability of other tablet computers in the market.

NEXT

Copyright © 2012, Applied Marketing Science, Inc.

0%  ▬▬▬▬▬▬  100%
% complete

7

Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## Introduction 2b



## Introduction 3



## Price Introduction



## Price Description



## Screen Size Introduction



EXHIBIT H

## Screen Size Description



## Input Assistance Introduction



## Input Assistance – Feature 1 (Copy Paste)



## Input Assistance – Feature 2 (Voice to Text)



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## Input Assistance – Feature 3 (Automatic Word Correction)



## Input Assistance – Feature 4 (S Pen)



## Input Assistance Summary



EXHIBIT H

## Connectivity Introduction



## Connectivity – Feature 1 (Wi-Fi)



## Connectivity – Feature 2 (GPS)



EXHIBIT H

## Connectivity – Feature 3 (AllShare Play)



## Connectivity – Feature 4 (IR Blaster)



## Connectivity Summary



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## Lock Screen Interface Introduction



## Lock Screen Interface – Feature 1 (Lock Screen Display Customization)



## Lock Screen Interface – Feature 2 (Lock Screen Shortcuts)



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## Lock Screen Interface – Feature 3 (Multiple Lock Screen Widgets)



## Lock Screen Interface – Feature 4 (Slide to Unlock)



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## Lock Screen Interface Summary



## Data Accessibility Introduction



## Data Accessibility – Feature 1 (Status Bar)



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## Data Accessibility – Feature 2 (Background Syncing)



## Data Accessibility – Feature 3 (Quick Links)



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## Data Accessibility – Feature 4 (Universal Search)



## Data Accessibility Summary



## Introduction 4



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

**Introduction 5**



Confidential - Contains Material Designated as Confidential - Pursuant to a Protective Order

EXHIBIT H

## Conjoint (x 16 choices)



In answering this question, you may wish to consider the availability of other tablet computer options in the market that may influence your purchase decision, including tablet computers by other manufacturers or other Samsung tablet computers.

Given the Samsung tablet computer you chose as your most preferred among the alternatives shown, would you buy it at the indicated price?

Choose by clicking one of the buttons below. Then, click the arrow at the bottom to continue.



EXHIBIT H

## Final Page



Click **HERE** to complete the survey.

# EXHIBIT F

1          UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3              SAN JOSE DIVISION
4    -------------------------------X
     APPLE INC., a California
5    corporation,
6                    Plaintiff,
                           Case No. 12-cv-00630
7          VS.
8    SAMSUNG ELECTRONICS CO., LTD.,
     A Korean corporation; SAMSUNG
9    ELECTRONICS AMERICA, INC., a
     New York corporation; SAMSUNG
10   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
11   liability company,
12                   Defendants.
     -------------------------------X
13
14
15           VIDEOTAPED DEPOSITION
16                   OF
17               JOHN HAUSER
18       Friday, September 27, 2013
19             200 Park Avenue
20           New York, New York
21
22
23   Reported by:
     AYLETTE GONZALEZ, CLR
24   JOB NO. 66029
25

Page 152

1    give the long answer after the short answer,

2    but I'm wondering if there's a short answer to

3    this question.

4              Did you compare any of the data and

5    results from your conjoint study in this case          13:58

6    to market share or price data from actual

7    sales --

8              MR. TORCHIA:  Objection --

9         Q.   -- in the market?

10             MR. TORCHIA:  Objection to the              13:58

11        form of the question; compound.

12        A.   I -- I believe I've answered that,

13   and I -- what you're asking me is, did I do --

14   did I misuse the model.  My model is not

15   developed to, say, get market share between          13:58

16   Apple and Samsung; and therefore, it would've

17   been totally inappropriate to do it;

18   therefore, I didn't do it.

19        Q.   Could you use the results of your

20   model to predict market share between Apple          13:58

21   and Samsung?

22        A.   No, that would be an inappropriate

23   use of the model.  Well, let's -- alone,

24   right?  The model could be used as inputs to

25   other analyses that have other -- other data          13:59

Page 153

1    and other flows in it.  So it's not that it

2    couldn't be done, but I haven't done that.

3            But to actually take my model just

4    to part words and predict how people who

5    bought Sam- -- whether people who bought          13:59

6    Samsung -- or who had bought Apple would have

7    bought Samsung, I can't predict if people --

8    whether people who bought Apple would have

9    bought Samsung with my model.

10        Q.   Or whether people who bought           13:59

11   Samsung would have bought Apple?

12        A.   What I can predict is, I can

13   predict they would not have bought the phone

14   they bought.  That's what I predict, and I'm

15   very confident in that.  Now --                   13:59

16        Q.   But beyond the fact that they would

17   not have bought the phone they bought, can you

18   allocate what phones they would have bought

19   instead in the actual marketplace?

20        A.   Do you mean did I or do you mean        14:00

21   could one do that?

22        Q.   Did you?

23        A.   I did not do that.

24        Q.   Did you consider for purposes of

25   your analysis any noncompensatory decision        14:00

Page 303

1    at the time the respondents completed the

2    survey?

3              MR. TORCHIA:  Objection to the

4         form of the question.

5         A.   I think that's somewhat orthogonal          17:44

6    to what we're trying to get at.  What we tried

7    to have in here is a realistic set of

8    distraction features, as well as price, as

9    well as dependent features.  And we wanted the

10   respondents to be making what they felt were       17:45

11   realistic choices amongst these options.

12              We fully recognize that when the

13   time comes, that some of these may not be on

14   the market and we're going to have to deal

15   with that.  Some of the features may not be       17:45

16   available.

17        Q.   You did not include any kind of

18   battery type as a distraction feature,

19   correct?

20        A.   We chose -- the purpose of a             17:45

21   distraction feature is just what it says,

22   distraction.  So battery type was not one of

23   the features that I used.

24        Q.   Mobile operating system was not one

25   of the distraction features, was it?             17:45

Page 304

1        A.   We can go through this one-by-one

2    if you'd like.  We chose certain distraction

3    features.  There could have been others, as I

4    believed distraction features that we had were

5    -- played the role that was appropriate.          17:46

6        Q.   The selection of distraction

7    features did not include an analysis of the

8    most promoted features on Samsung phones,

9    correct?

10              MR. TORCHIA:  Objection; form.          17:46

11       A.   What I needed in distraction

12   features is that features that would be, at

13   least of some level of importance that the

14   respondent would not experience.  Would not

15   realize that we were focusing on just a          17:46

16   certain set of patented features.  That --

17   that I wanted to avoid.  So these don't have

18   to be the most important features.  I have no

19   way of knowing that without a conjoint study

20   in the first place.  But I made some guesses    17:46

21   as to what would be the best distraction

22   features.

23       Q.   But in the context of your guesses

24   of what would be the best distraction

25   features, you did not consider any other        17:47

Page 305

1  consumer surveys, post-purchase research done

2  by Samsung or Apple or other studies to

3  determine the features most important to

4  purchasers of smartphone, correct?

5          MR. TORCHIA:  Objection to form.          17:47

6      A.   As I've indicated, the one thing of

7  importance is we'd have to have an importance

8  study to do that.  Just because -- just

9  because a feature is advised does not mean

10  it's the most important.                          17:47

11          I do not have to have the most

12  important features in as distraction features,

13  but I do have to have at least some of my

14  features having reasonable importance, which

15  they did.                                         17:47

16      Q.   Based on your guess?

17      A.   No.

18          MR. TORCHIA:  Objection to the

19      form of the question.

20      A.   No, based upon the results of the       17:47

21  survey.

22      Q.   You did not review any consumer

23  research from Apple or Samsung that identified

24  features smartphone purchasers identified as

25  important to them when selecting the             17:48

Page 306

1    distracted features, correct?

2             MR. TORCHIA:   Objection to the

3        form.

4        A.   Well, the answer to your question

5    as asked is, yes, I did review market research          17:48

6    from Apple.

7        Q.   Where is it on your reliance

8    materials?

9        A.   I didn't do it for this case.

10       Q.   Did you consider that market              17:48

11   research material when selecting your

12   distraction features in this case?

13       A.   I did not -- that's not -- I don't

14   need to choose the most important features.

15   And what I do need to do is to have, in the          17:48

16   end, features that have some reasonable

17   importance such that they act as distraction

18   features.

19       Q.   All I'm trying to do if you relied

20   on something, like a consumer research study,          17:49

21   report or anything, I want to put it in front

22   of you and ask you about it.  If you didn't

23   rely on that, I don't need to ask you.

24            That's why I'm asking; did you rely

25   on any consumer research for identifying the          17:49

Page 307

1  distraction features you included in your

2  survey?

3           MR. TORCHIA:  Objection to form.

4      A.   To the best of my knowledge, we

5  have listed -- we've done our best to list          17:49

6  everything that I relied upon.  And my

7  understanding is that either you've been given

8  that or that you can attain it from public

9  sources.

10          So, I think the answer to your            17:49

11  question is I relied upon what I relied upon.

12  If it's not listed, then I didn't rely upon

13  it.  It doesn't mean I don't know about it,

14  but it's not something that I relied upon.  I

15  listed everything that I relied upon.             17:50

16          Why do you keep asking me about

17  things I didn't rely upon.  I've been very

18  complete on what I relied upon.

19      Q.   Do you want me to answer that?

20      A.   I guess that's rhetorical.  I know       17:50

21  I'm not allowed to ask questions.

22      Q.   You are.  I just don't want your

23  client -- or your attorney objecting to your

24  question.

25          MR. TORCHIA:  You'll know if I            17:50

1          MR. TORCHIA:  Thank you,

2     Dr. Hauser.  I have nothing.

3          THE VIDEOGRAPHER:  It's 6:13 p.m.

4     We're going off the record.

5          (Whereupon, at 6:13 p.m., the

6     Examination of this Witness was

7     concluded.)

8

9


                   _____

10                      JOHN HAUSER

11

12    Subscribed and sworn to before me

13    This _____ day of _____, 2013.

14


      _____

15          NOTARY PUBLIC

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3     STATE OF NEW YORK        )
                               :  SS.:
4     COUNTY OF RICHMOND       )

5

6              I, AYLETTE GONZALEZ, a Notary Public

7     for and within the State of New York, do

8     hereby certify:

9              That the witness, JOHN HAUSER, whose

10    examination is hereinbefore set forth was

11    duly sworn and that such examination is a

12    true record of the testimony given by that

13    witness.

14             I further certify that I am not

15    related to any of the parties to this action

16    by blood or by marriage and that I am in no

17    way interested in the outcome of this matter.

18             IN WITNESS WHEREOF, I have hereunto

19    set my hand this 27th day of September, 2013.

20

21    _____

                    AYLETTE GONZALEZ

22            (Notary Public No. 01G06228612

               Expiration date:  9/27/2014)

23

24

25

# EXHIBIT J

Highly Confidential - Outside Attorneys' Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

APPLE INC., a California

corporation,

      Plaintiff,

vs.                              NO. 12-CV-00630-LHK

SAMSUNG ELECTRONICS CO., LTD.,

a Korean corporation; SAMSUNG

ELECTRONICS AMERICA, INC., a

New York corporation; SAMSUNG

TELECOMMUNICATIONS AMERICA,

LLC, a Delaware limited

liability company,

      Defendants.

                          /

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF STAN NG

PALO ALTO, CALIFORNIA

TUESDAY, JULY 2, 2013

REPORTED BY:

JANIS JENNINGS, CSR No. 3942, CLR, CCRR

62116

Highly Confidential - Outside Attorneys' Eyes Only

Page 136

1    I don't knows as part of it.  So that may have been

2    the reason that Miss Drance put "low" because she

3    just didn't know.

4        Q.   Did you think that the Note was an

5    innovative product?                              12:54:58

6        A.   No.

7        Q.   Do you think it created a category?

8        A.   No.

9        Q.   What do you think Samsung has done well in

10   the smartphone space?                            12:55:18

11       MR. STONE:  Objection.  Lacks foundation.

12       THE WITNESS:  Well, they've spent a lot of

13   money on marketing.  They create a lot of products.

14   BY MR. WATSON:

15       Q.   Anything else?                           12:55:37

16       A.   No.

17       MR. WATSON:  What number are we?

18       MR. STONE:  6.

19       MR. WATSON:  Let's mark Exhibit 6.

20       (Exhibit 6 was marked for identification    12:55:59

21       and attached hereto.)

22   BY MR. WATSON:

23       Q.   Have you seen this document before?

24       A.   I have.

25       Q.   Can you tell me what this is?            12:56:27

Highly Confidential - Outside Attorneys' Eyes Only

Page 156

1          I, STAN NG, do hereby declare under

2    penalty of perjury that I have read the foregoing

3    transcript; that I have made corrections as appear

4    noted, in ink, initialed by me, or attached hereto;

5    that my testimony as contained herein, as corrected,

6    is true and correct.

7          EXECUTED this _____ day of _____,

8    2013, at _____, _____.
                 (City)                    (State)

9

10

11

12

       _____

13                 STAN NG

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Outside Attorneys' Eyes Only

Page 157

1        I, JANIS JENNINGS, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4        That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were placed under oath; that a

8  verbatim record of the proceedings was made by me

9  using machine shorthand which was thereafter

10  transcribed under my direction; further that the

11  foregoing is an accurate transcription thereof.

12        I further certify that I am neither

13  financially interested in the action nor a relative

14  or employee of any attorney or any of the parties.

15        IN WITNESS WHEREOF, I have this date

16  subscribed my name.

17

18  Dated:  JULY 2, 2013

19

20

21

                    _____

22                        JANIS JENNINGS

23                        CSR No. 3942, CLR, CCRR

24

25

# EXHIBIT N

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                    **EXHIBIT 3**

# Damages Summary
# ($ millions)

| Damages Scenario | | Lost Profits | Reasonable Royalty | Total Damages |
|---|---|---|---|---|
| Four-Month Off the Market Lost Profits + Diminished Demand Lost Profits + Reasonable Royalties on Non-Lost-Profits Units | 1/ | $980.6 | $897.5 | $1,878.1 |
| Diminished Demand Lost Profits + Reasonable Royalties on Non-Lost-Profits Units | 2/ | $653.7 | $938.2 | $1,591.9 |
| Four-Month Off the Market Lost Profits + Reasonable Royalties on Non-Lost-Profits Units | 3/ | $455.2 | $967.4 | $1,422.7 |
| Reasonable Royalties on All Infringing Units | 4/ | - | $1,024.0 | $1,024.0 |

Sources/Notes:
1/ Exhibit 19
2/ Exhibit 17
3/ Exhibit 21
4/ Exhibit 31

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT R

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

1

2

3

APPLE INC., a California corporation,

4

Plaintiff,

5

vs.

6

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

7

8

9

10

Defendants.

11

CASE NO. 12-cv-00630-LHK

12

**REBUTTAL EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING
NONINFRINGEMENT OF U.S. PATENT NO. 5,946,647**

INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

**E.**     **Apple's Characterization of the Patented Feature is Misleading**

        **1.**     **Prof. Hauser**

108.     Samsung has asked me to review a portion of the Expert Report of John R. Hauser related to the his description of the '647 patent. Dr. Hauser describes the purported invention of the '647 patent as follows:

> **Quick Links.** When you are viewing text on your smartphone (for example in an email), the Quick Links feature automatically detects

38

HIGHLY CONFIDENTIAL   OUTSIDE ATTORNEYS'
EYES ONLY   SOURCE CODE

1

2

3

4

5

> certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder. Without this feature, if you wanted to take various actions, like calling or texting a number, you would have to manually identify and select the exact text that might be data to take actions on.

6

(Hauser Report, Ex. E.)

7

8

9

10

11

12

13

14

15

109. Dr. Hauser's description is incorrect. At base, Dr. Hauser does not accurately represent how features are realized in the underlying software, which is the entire core of the '647 patent. Instead, Dr. Hauser's survey question is directed to finding out the value of a particular feature and user function on a smart phone. There is no indication to the user that the same functions can be present on the phone without, for instance, using an "analyzer server" or the claimed "linking." In other words, Dr. Hauser's survey does not address the underlying composition of the software that provides the accused functionality. Dr. Hauser's survey does not even attempt to measure the value of the claimed invention, because it asks only about a function, not about a system.

16

17

18

19

20

21

22

110. Moreover, even if it were correct for Dr. Hauser to look only at functionality and not software, his description is highly misleading. Users of the accused functionality are not aware whether structures are being "detected" for instance, even if they are aware that they can take actions on structures. As I set forth at length in my noninfringing alternatives section, the functionality in question can be provided to the user without even detecting the structure, or by detecting it only after a user has made a selection of the structure. Accordingly, Dr. Hauser's description of a device without the accused function is wrong.

23

24

INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

25

26

27

28

39

HIGHLY CONFIDENTIAL   OUTSIDE ATTORNEYS' EYES ONLY   SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

DATED:  September 13, 2013

_____

Kevin Jeffay

303