# EXHIBIT C
## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC., a California Corporation,<br><br>   Plaintiff (Counterclaim-Defendant),<br><br><br> v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>   Defendants (Counterclaim-Plaintiffs). | Civil Action No. 12-cv-00630-LHK |

**REBUTTAL EXPERT REPORT OF**

**DAVID REIBSTEIN**


**September 13, 2013**

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Willingness to Buy Accused Samsung Tablets**

|  | Percentage Decline | |
|---|---|---|
|  | Low | High |
| Background Syncing | 5% | 23% |
| Quick Links | 4% | 23% |
| Universal Search | 2% | 16% |
| Slide to Unlock | 1% | 14% |
| Automatic Word Correction | 6% | 24% |
| All Features | 28% | 76% |

37.     Professor Hauser also concluded that Samsung consumers would be willing to pay a substantial price premium in order to obtain the patent-related features.[79] Below, I have shown these price premiums at prices that are closest to the actual average prices that respondents in the surveys reported that they paid for their Samsung smartphones and tablets.[80]

---

[79] Hauser Report, at ¶129.
[80] Hauser Report, at ¶128. The actual average prices that respondents in the surveys reported that they paid for their Samsung smartphones and tablets were $175 and $350, respectively.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

### WTP Price Premiums Associated with Tested Features

| | Base Price (Without Patent-Related Features) | |
| --- | --- | --- |
| | Smartphone $149 | Tablet $299 |
| Background Syncing | $69 | $62 |
| Quick Links | $56 | $56 |
| Universal Search | $44 | $33 |
| Automatic Word Correction | $102 | $63 |
| Missed Call Screen Management | $87 | N/A |
| Slide to Unlock | N/A | $32 |
| Total | $358 | $246 |

## IV. Analysis of Hauser Report

### A. Professor Hauser's Analysis is Unreliable for Predicting Marketplace Outcomes Because His Surveys Did Not Accurately Inform Respondents About the Difference Between the Patented Features and Samsung's Non-infringing Alternatives.

#### 1. *Professor Hauser's surveys provided respondents with inaccurate descriptions of the patented features that overstated their advantages relative to the non-infringing alternatives.*

38.     As part of his survey, Professor Hauser provided definitions of each of the tested features. These definitions were disclosed to respondents in the surveys in separate videos for each feature.[81] These descriptions overstate the benefits of the patented features relative to alternatives that were available to Samsung. The descriptions lead the respondent to believe that

---

[81] Hauser Report, at Exhibits G and H.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

having the patented functionalities is necessarily preferred to not having them (i.e., that the absence of the patented features necessarily involves some kind of sacrifice). In addition, these descriptions do not provide the respondent with all, or even the best alternative, non-infringing functionalities that were available to Samsung.

39.     For example, Professor Hauser provided the following description of the Automatic Word Correction feature in his smartphone and tablet survey:

> **Automatic Word Correction.** As you type, your smartphone [tablet] displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. The Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday." Without this feature, pressing space or period would retain your original text, "birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself.[82]

40.     Professor Hauser's text description and video demonstration related to this feature are flawed in several respects. First, they use leading and biasing language to suggest to the respondent that the alternative functionality is clearly inferior to the patented functionality. For example, the use of the clause "you would need to" rather than the more neutral "you would"

---

[82] Hauser Report, at ¶74.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

suggests to the respondent that the alternative requires additional effort or burden. It is my experience that such leading and biasing language tends to inflate the value of the difference between two tested levels by suggesting to the respondent that one is clearly inferior.

41.     Another problem with Professor Hauser's description is that it leads the respondent to believe that without the patented functionality, there is no way to have any Automatic Word Correction feature on your device. The description suggests that any change of the original text to the suggested text would have to be done manually rather than automatically (i.e., by selecting the suggested text yourself). In fact, I understand that one alternative that was available to Samsung was very similar to the patented functionality except that the suggested text is not displayed in a separate box alongside the text box that displays what you actually typed.[83] With this alternative, the suggested text would not be displayed until it replaces the original text when the user presses period or space. To undo the text replacement, you could select the original text from the second text area.

42.     This alternative, which I understand was available to Samsung, is similar to the Auto Correct feature in Microsoft Word. Microsoft describes its Auto Correct feature as follows:

> You can use the AutoCorrect feature to do the following:
> **Automatically detect and correct typos and misspelled words**

---

[83] Expert Report of Dr. Daniel Wigdor Concerning Non-Infringement of U.S. Patent No. 8,074,172, September 13, 2013 ("Wigdor Report"), at ¶42.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Damn You Auto Correct, an entire site dedicated to the auto correct's failures.[92]

47.     Clearly, there are multiple outcomes that are possible with this feature – mostly positive, but some negative. To more accurately describe this feature, Professor Hauser could have used a description that did not lead the respondent to believe that it always resulted in replacement of text that was meant to be replaced.[93] Unlike the description used in Professor Hauser's survey, a more balanced description would not have suggested that the feature's impact on the user was always necessarily positive, but rather that a positive outcome was one possibility.

48.     As an example, I have provided alternative descriptions of the Automatic Word Correction feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above.[94] In these descriptions, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if he or she was unable to have the patented feature, as is suggested by Professor Hauser's description. My description seeks to avoid leading the respondent to think that the

---

[92] http://www.businessinsider.com/how-to-fix-iphone-auto-correct-2012-2?op=1 (viewed September 13, 2013).
[93] In fact, I myself have experienced the negative side of this feature on many occasions by sending messages with words that I had never meant to type. In these situations, the Automatic Word Correction feature automatically inserted the wrong text, without me noticing.
[94] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

patented feature is necessarily preferred over the alternative – which is something Professor Hauser did not do in his description.

49.     Presenting the non-infringing alternative as a separate feature with its own advantages, albeit different, than the advantages associated with the patented feature, is important because this most closely mirrors the real world purchase environment that would have existed if Samsung could not use the patented feature. That is, if Samsung could not offer the patented feature, it would market the alternative feature in a positive light, similar to how it would market the patented feature. Samsung would never describe the alternative feature in terms of what it could not do relative to other features that Samsung could not offer.

50.     In my alternative descriptions, below, I have identified how they differ from Professor Hauser's descriptions. Version 1 is a description of the patented feature. Version 2 is a description of one of Samsung's non-infringing alternatives.

> **Automatic Word Correction (Version 1).** As you type, your smartphone [tablet] displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. ~~The~~ <u>This version of</u> the Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday."

> **Automatic Word Correction (Version 2).** ~~Without this feature, pressing space or period would retain your original text, "birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself.~~ <u>As you type, your smartphone</u>

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> would have to wait to use an app, for example the contacts app, while the data for the app is synchronizing with a remote computer, and that wait may be long or short.[95]

53.     There are several problems with this description and the corresponding video. First, the use of the term "Background Syncing" itself is misleading, because the term "Background Data" often is used in Android to refer to an app's ability to send and receive data *while the app is not running*, a feature not contemplated by the '414 patent.[96] The user manuals for the accused Samsung devices specify that when "Background Data" is enabled under "General Sync Settings," "all accounts can sync, send and receive data *at any time*, in the background."[97] Therefore, the use of the term "Background Syncing" to refer to the feature allegedly made possible by the '414 patent overstates the scope of the feature by implying that it includes the ability of the phone or tablet to synchronize data for an application even when that application is not running. As discussed below in this Report, my parallel pretest of Professor Hauser's survey confirms that users did in fact misinterpret the scope of "Background Syncing" in this manner.

54.     Second, by telling respondents that, without this feature, they "would have to wait to use an app," Professor Hauser is incorrectly leading respondents to believe that they would

---

[95] Hauser Report, at ¶74.
[96] Expert Report of Jeffrey Chase, Ph.D. Regarding Noninfringement of the Asserted Claims of U.S. Patent No. 7,761,414 ("Chase Report"), at ¶52.
[97] *See, e.g.*, SAMNDCA630-00920057.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

necessarily be deprived of using an application when they otherwise wanted to use it. In fact, I understand that one non-infringing alternative that Samsung could have implemented would have involved automatically syncing the device at an opportune time, such as upon the user exiting the application or switching to another application.[98] In this case, the user's ability to use an application would not be affected at all (i.e., the user would not have to "wait to use an app," as stated in the Hauser description).[99]

55.     I understand that another non-infringing alternative available to Samsung would have been completely "under the hood" and, therefore, would not have involved any visible change in functionality to the user.[100] This alternative would allow users to make changes to an application, but rather than immediately saving these changes on the local database, they would save them to a transaction log, which would synchronize them with a remote database.[101] Once the remote database is synchronized, then the local database would be updated or synchronized from the remote database rather than directly from the user's inputs into the application.[102]

56.     Another problem with Professor Hauser's description is that it suggests that the wait while syncing "may be long or short" but does not define what a long or short wait is in terms of actual elapsed time, or how frequently the wait would be long versus short. This

---

[98] Chase Report, at ¶187.
[99] Chase Report, at ¶¶190-191.
[100] Chase Report, at ¶¶192-196.
[101] Chase Report, at ¶¶192-196.
[102] Chase Report, at ¶¶192-196.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

information is critical in order for a respondent to be able to accurately determine the value of the patented feature versus the non-infringing alternative. The alternative functionality shown in Professor Hauser's video involves the task of updating a contact's name and then having that change synchronize with a remote source. The elapsed time in the video from when the change is saved until when the device finally responds to input is over four seconds.[103] Without more information, respondents are left to believe that this kind of a wait is typical without the Background Syncing feature.

57.     A further problem with Professor Hauser's video demonstrating the "Background Syncing" is that it depicts a local edit to a contact being synchronized with a remote device immediately after the edit is saved. I understand that in actuality, the Samsung products accused in this investigation would not schedule synchronization to take place until at least 30 seconds after the edit was saved. Therefore, Professor Hauser's survey provides users with an incorrect explanation of how synchronization takes place in the accused devices. This suggests that users do not receive instant sync operations, which would make the first non-infringing alternative discussed above more acceptable, where automatic synchronization of the device occurs at an opportune time, such as upon the user exiting the application or switching to another application.

---

[103] Backup to Expert Report of John R. Hauser, dated August 11, 2013 ("Hauser Report Backup").

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

58.     I have provided, as examples, alternative descriptions of the Background Syncing feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above.[104] In these descriptions, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if it was unable to have the patented feature. In my descriptions, below, I have identified how they differ from Professor Hauser's descriptions. Version 1 is a description of the patented feature. Version 2 is a description of the non-infringing alternative.

> **Background Syncing (Version 1).** ~~The~~ This version of the Background Syncing feature allows you to continue to use an app while data related to that app that is stored on your smartphone [tablet] synchronizes with data stored elsewhere, such as on a remote computer. For example, you can access and edit data, such as the list of contacts on your smartphone [tablet], ~~even~~ as your phone [tablet] is sending data for those contacts to your work computer.

> **Background Syncing (Version 2).** ~~Without this feature, you would have to wait to use an app, for example the contacts app, while the data for the app is synchronizing with a remote computer, and that wait may be long or short.~~ This version of the Background Syncing feature allows your smartphone [tablet] to synchronize data related to an app that is stored on your smartphone [tablet] with data stored elsewhere, such as on a remote computer, once you switch to a different app or when you stop using your smartphone [tablet]. For example, data from your

---

[104] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. As noted previously, another non-infringing alternative is "under the hood" and would not have a discernible effect on user experience. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> list of contacts will be synchronized with your work computer automatically and in the background after you switch to another app, such as your email, or when you stop using your smartphone [tablet].

59.     This is a very different presentation of Samsung's non-infringing alternative version of the Background Syncing feature than the one presented by Professor Hauser. It provides a more accurate and complete description of an alternative available to Samsung by making clear that the user is not inconvenienced by having to wait to use an application, but rather it is the synchronization that might have to undergo a brief delay. This language more clearly identifies the difference between the patented feature and the non-infringing alternative, and as a result, is much less biasing to the respondent.

60.     The description in Professor Hauser's surveys related to the Quick Links feature is also problematic. The smartphone survey provided the following description of this feature:

> **Quick Links.** When you are viewing text on your smartphone (for example in an email), the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder. Without this feature, if you wanted to take various actions, like

41

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> calling or texting a number, you would have to manually identify
> and select the exact text that might be data to take actions on.[105]

61.     Professor Hauser's description is faulty in several ways. First, both the text description and video do not clarify within which applications the Quick Links functionality would be available. Respondents may assume that Quick Links functionality is universally available in all applications on the smartphone. It is my understanding, however, that this is not the case. I understand that Apple's devices similarly only use this feature in certain applications.[106] I understand that this functionality is only accused in Samsung's Browser and Messenger applications.[107] I understand that it is not accused in any email application present on Samsung's devices – notwithstanding the fact that the example used by Professor Hauser in his description is of the email application.[108]

62.     I further understand that Professor Hauser's description of the alternative that Samsung would have used if it could not use this feature is inaccurate. In his description, Professor Hauser suggested that, without the patented feature, users "would have to manually

---

[105] Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.

[106] Mowry Report, at ¶¶300-305.

[107] Rebuttal Expert Report of Dr. Kevin Jeffay Concerning Noninfringement of U.S. Patent No. 5,946,647 ("Jeffay Report"), at ¶¶138-140.

[108] Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

identify and select the exact text that might be data to take actions on."[109] I understand that this is not the case. For example, I understand that one non-infringing alternative that was available to Samsung would allow the user, not the system, to detect an instance of a structure of interest.[110] The user would visually detect the structure on the display and point to the structure on the screen by pressing their finger to the screen and releasing their finger. After the user has pressed and released the screen, only then does the software begin to interpret the user's action. The software would attempt to find and  identify the structure that the user detected and then display a fixed menu of processing options that is not based on the structure the user detected or that the system identified.

63.     With this alternative, the system would display the same menu of processing actions no matter what structure the user detected.[111] The user interaction, specifically, the user's detecting structures of interest, is exactly the same as in the present accused Browser application(s).[112] While the menu of processing options would be different than in the accused devices (because the menu would be the same for all detected structures), I note that such a menu would add additional value not presently found in the accused devices, such as presenting an email processing option for a user-detected phone number to enable the user to send an email to

---

[109] Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.
[110] Jeffay Report, at ¶¶510-511.
[111] Jeffay Report, at ¶¶518-521.
[112] Jeffay Report, at ¶¶150-153.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

the person or organization associated with the phone number if that phone number were in the user's contacts database.

64. I have provided, for illustrative purposes, alternative descriptions of the Quick Links feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above and are less biasing.[113] I again have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if it was unable to have the patented feature, as is suggested by Professor Hauser's description. Version 1 is a description of the patented feature. Version 2 is a description of the non-infringing alternative.

> **Quick Links (Version 1).** When you are viewing text on your smartphone (for example in an email), this version of the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder. enables you to perform a particular gesture on a piece of text, such as a phone number or email address, which then allows you to take certain actions on the selected text. For example, if you press and hold a phone number, it will offer you the ability to take certain actions on that phone number, such as dialing the number or adding it to your contacts folder.

---

[113] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> **Quick Links (Version 2).** ~~Without this feature, if you wanted to take various actions, like calling or texting a number, you would have to manually identify and select the exact text that might be data to take actions on.~~ When you are viewing text on your smartphone, this version of the Quick Links feature enables you to perform a particular gesture on a piece of text, such as a phone number or email address, which then allows you to take a universal set of actions on the selected text, such as dialing, emailing, copying, and selecting, regardless of what type of text is selected. For example, if you press and hold a phone number, it will offer you the ability to take a set of actions, such as dialing that phone number, e-mailing the person to whom the phone number belongs, or adding the phone number to your contacts folder.

65.     This is a very different presentation of the alternative version of the Quick Links feature than the one used by Professor Hauser. It provides a more complete and less biasing description of an alternative feature available to Samsung. Among other things, the description makes clear that the non-infringing alternative involves no more of a laborious task than the patented feature in that, in both cases, the user can act on text without difficulty. This description more accurately identifies the distinction between the two features and, therefore, is less biasing to the respondent.

66.     Professor Hauser's description of the Universal Search feature is similarly problematic. The smartphone and tablet surveys provided the following description of this feature:

> **Universal Search.** Universal Search lets you use a single search to find information from different sources of information, for example data stored on your smartphone [tablet] as well as information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find

45

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

searching locally and on the Internet is an "example" of Universal Search, rather than what, I understand, to be a requirement.

68.     Moreover, I understand that Professor Hauser's suggestion that, in order to search the Internet, you would have to do so in a browser and, in order to search an application, such as your Contacts, you would have to do so in that application, is incorrect.[117] I have been informed that searching the Internet and the application could still be performed without having to separately open the browser and each application. For example, one alternative that was available to Samsung was the use of a single search box with a single field to enter the search term and separate options to trigger a local search or an Internet search.[118] In this case, the search could still be conducted using a single search field, represented by a widget on the home screen of the device, as is done with many of the accused devices.

69.     Another problem with Professor Hauser's definition is that it refers to "different rules of thumb for searching the different sources in order to find good results tailored to each source."[119] Professor Hauser's description suggests that having different rules of thumb is a distinct advantage, but it fails to provide the respondent with any information regarding what the

---

[117] Samsung's Further Supplemental Responses to Apple's First, Third, and Tenth Sets of Interrogatories, July 15, 2013, at 174-175 (Interrogatory Nos. 4, 5, 6, 8, 20, 23, 24, 27, 29, 45).
[118] Samsung's Further Supplemental Responses to Apple's First, Third, and Tenth Sets of Interrogatories, July 15, 2013, at 174-175 (Interrogatory Nos. 4, 5, 6, 8, 20, 23, 24, 27, 29, 45); Rebuttal Expert Report of Martin Rinard, Ph.D. Regarding Infringement of Claims 24 and 25 of U.S. Patent No. 6,847,959, at ¶¶320-321.
[119] Hauser Report, at ¶74.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

advantages might be. For example, no information is given regarding what the specific rules of thumb are and why they might lead to a better search result. Further, Professor Hauser also provides no information regarding the level of the incremental improvement in the search results if a rule of thumb is used, and whether the improvement would even be noticed by consumers. It is not clear from the video in Professor Hauser's survey how "rules of thumb" are being used, if at all, or how the search results would be different if the same search was run using no "rules of thumb." Without this information, the respondent is not provided adequate information to make an educated choice regarding the value of this feature.

70.     I have provided, as examples, alternative descriptions of the Universal Search feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above.[120] As with the Background Syncing and Quick Links features discussed above, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if it was unable to have the patented feature, as is suggested by Professor Hauser's description. Version 1 is a description of the patented feature. Version 2 is a description of the non-infringing alternative.

> **Universal Search (Version 1).** <u>This version of the</u> Universal Search <u>feature</u> lets you use a single search to ~~find~~ <u>retrieve</u> information from ~~different sources of information, for example~~

---

[120] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

~~data stored on~~ your smartphone [tablet] as well as information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find ~~good~~ results tailored to each source. For example, when you type "George" in a single search box, the feature searches the Internet for "George," which might yield web pages about George Washington, and at the same time searches for "George" stored on your smartphone [tablet], which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files.

**Universal Search (Version 2).** ~~Without Universal Search, you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application.~~ <u>This version of the Universal Search feature lets you enter your search terms in a single search box and gives you the option of clicking one of two buttons to either search information from data stored on your smartphone [tablet] or search information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find results tailored to each source. For example, when you type "George" in a single search box, this feature allows you to either search the Internet for "George," which might yield web pages about George Washington, or to separately search for "George" stored on your smartphone [tablet], which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files.</u>

71.     This is a very different presentation of Samsung's non-infringing alternative version of the Universal Search functionality than the one used by Professor Hauser. It provides a more complete and less biasing description of an alternative feature available to Samsung. Among other things, it makes it clear to the respondent that performing searches is no more difficult or time-consuming with the non-infringing alternative than the patented feature, as the user does not need to separately go to the browser to search the Internet and to each specific

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

application to search the application, as is erroneously suggested in Professor Hauser's description.

72.    I understand that the Missed Call Screen Management description in Professor Hauser's surveys also overstates the benefits of the patented functionality over the non-infringing alternative. Professor Hauser provided the following description of this feature in his smartphone survey:

> **Missed Call Screen Management.** The Missed Called Screen Management feature allows you to return a missed call or respond to the caller by listing the missed calls and providing you with two interactive areas to take further action. If you touch one area, such as the picture of the missed caller, John Doe, you call John Doe back. If you touch the other area, such as John Doe's name or phone number, then the feature takes you to a new screen that displays all of John Doe's contact information. From the new screen, you can call John Doe, text him, or email him. Without two areas you would have to remember to use different gestures to take different actions—like tapping John Doe's entry on the missed calls list to call him back but swiping his entry to view his contact information.[121]

73.    Professor Hauser's text description and video demonstration is flawed in several ways. First, the use of the clause "you would have to remember to use different gestures" rather than the more neutral "you would use different gestures" suggests to the respondent that the alternative requires additional effort or burden over the patented functionality. This, too, is the

---

[121] Hauser Report, at ¶75.

50

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

techniques, for example by swiping the lock screen from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely.[125]

79.     There are problems with Professor Hauser's text description and video demonstration of this feature. As with many of the other descriptions discussed above, this description uses leading and biasing language to suggest to the respondent that the alternative functionality is clearly inferior to the patented functionality. For example, the use of the clause "you would have to" rather than the more neutral "you would" suggests to the respondent that the alternative requires additional effort or burden.

80.     Additionally, Professor Hauser's use of the clause "which may make unintentional unlocks more likely" in describing the alternative feature is unbalanced. It describes the disadvantage of the alternative functionality without a comparable statement about the disadvantage of the patented functionality. To make the statements more balanced, Professor Hauser either could have omitted that phrase or made a comparable statement regarding a potential disadvantage of the patented feature, such as indicating that the more restrictive motion with the patented feature "may make unlocking the device more difficult."

81.     Moreover, Professor Hauser's description telling respondents that the non-infringing alternative "may make unintentional unlocks more likely" does not provide

---

[125] Hauser Report, at ¶76.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

respondents adequate information to be able to make an informed decision regarding the impact of this shortcoming.[126] Professor Hauser does not tell respondents the probability that the alternative would, in fact, make unintentional unlocks more likely. He also does not define what he means by "more likely." There is a big difference between the alternative causing an unintentional unlock once a month versus once a day. In my experience, surveys should equip respondents with all the information needed to make an educated choice regarding the alternatives.

82.     I have provided illustrative alternative descriptions of the Slide to Unlock feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above.[127] As with the other features discussed above, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if it was unable to have the patented feature. Version 1 is a description of the patented feature. Version 2 is a description of the non-infringing alternative.

> **Slide to Unlock (Version 1).** ~~The~~ This version of the Slide to Unlock feature ~~prevents~~ helps to prevent unintentional unlocks by unlocking your tablet only when you slide an image, using one

---

[126] I also understand that Apple has presented no evidence that the non-infringing alternative is more likely to result in accidental unlocks. Expert Report of Saul Greenberg, Ph.D., Regarding Noninfringement of the Asserted Claim 8 of U.S. Patent No. 8,046,721, September 13, 2013 ("Greenberg Report"), at ¶¶203, 459.

[127] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

continuous motion, from a specific spot on the lock screen to another specific spot on the screen.

**Slide to Unlock (Version 2).** This version of the Slide to Unlock feature helps to prevent unintentional unlocks by unlocking your tablet only when you swipe ~~Without this feature, you would have to unlock your device using other techniques, for example by swiping~~ the lock screen, starting from any desired spot, a minimum distance, in any direction ~~from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely~~.

83.     This is a very different presentation of the non-infringing alternative version of the Slide to Unlock feature. It is more accurate than the description used in Professor Hauser's tablet survey because it makes clear to the respondent that, like the patented feature, the alternative also helps to prevent unintentional unlocks. The description also avoids vague and biasing language regarding the possibility of making unintentional unlocks more likely.

2.     ***The choice tasks shown to respondents taking the surveys incorrectly suggested that products without a patented feature would contain no alternative feature at all.***

84.     After showing the videos describing all of the features and levels included in each survey, Professor Hauser presented respondents with a series of 16 tables each describing four different hypothetical products from which respondents were to choose their most preferred smartphone or tablet. Each of the four columns of this table represented a different product. Each

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

99.     While Professor Hauser did conduct a pretest in this case, there are several reasons why his pretest was inadequate for purposes of determining whether respondents understood the functionality of the patented features and how this functionality differed from Samsung's non-infringing alternatives. First, he did not provide a video of the pretest or provide transcripts with the detailed responses of the respondents. Not having this material precludes those that did not participate in the pretest (on the administration side) from directly evaluating whether respondents actually understood the features and what their understanding was regarding the advantages of the features over Samsung's non-infringing alternatives.

100.     Second, Professor Hauser's pretest also was inadequate for purposes of determining whether respondents understood the question, features, levels, or tasks put before them because of the format of the questions. The questions used by Professor Hauser are presented as closed-ended questions. Examples of these questions are provided below.

> [RESPONDENT VIEWS VIDEO] Upon viewing this video, do you feel like you understand the Smartphone feature called [All Name of Feature] that is described in the video?
>
> ☐  Yes [Go to 1A]
> ☐  No [Go to Q2]
> ☐  Unsure [Go to Q2][142]

---

Research Seminar in Marketing," *MIT Sloan School of Management* (2011).
[142] Hauser Report, at Exhibit I1.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Did you have difficulty understanding the questions and instructions?

☐ Yes
☐ No
☐ Unsure[143]

Did the animations help you to understand the various features of the Smartphones?

☐ Yes
☐ No
☐ Unsure[144]

101.   While the 23 respondents that took Professor Hauser smartphone pretest were deemed by the pretest moderator to have sufficient understanding as it relates to the three questions,[145] closed-ended questions, such as these, do not get at the heart of what needs to be determined – which is whether respondents accurately understood the distinction between the patented features and the non-infringing alternatives. Rather, these questions merely determine whether respondents "think" that they understood the questions and features. No information is gleaned regarding what their understanding was regarding the features and questions and

---

[143] Hauser Report, at Exhibit I1.
[144] Hauser Report, at Exhibit I1.
[145] For 11 of the 12 respondents who were asked the first question, the yes box was checked for each video; and for each of 11 respondents who were asked the second and third questions, the no box was checked for the second question and the yes box was checked for the third question. *See* Hauser Report, at Exhibit I1.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

whether this understanding was accurate. To get at this, one would need open-ended questions, which Professor Hauser does not appear to have used.[146]

102.     While the use of open-ended questions is not necessarily preferred to closed-ended questions in every situation, they are especially useful when you are asking subjects to explain things in their own words and when you are not trying to quantify results. Researchers have specifically stated that the "perhaps most important use of open questions is in pretesting questions when the investigator wants to explore many dimensions of a topic and is unsure exactly what questions to ask. Extensive use of open questions with small samples may allow the investigator to develop better closed questions which, when used on larger samples, will yield the best results."[147] Furthermore, one author concluded:

> The main advantage of open questions is that they allow respondents to answer in their own frames of reference, entirely uninfluenced by any specific alternatives suggested by the interviewer. They also reveal what is most salient to respondents, what things are foremost in their minds. Closed questions do not permit this.[148]

---

[146] *See* Hauser Report, at Exhibit I1 and I2. For both the smartphone and tablet surveys, Professor Hauser provided the closed-ended pretest questionnaire for the evaluation of videos and dry-run of the programmed survey. He provided handwritten pretest interview notes but did not provide transcripts, videos, or audio files of the pretest interviews.

[147] N. Bradburn, "Response Effects," in Rossi, P., Wright, J., and A. Anderson (Eds.), *Handbook of Survey Research* (San Diego: Academic Press, 1983): 302.

[148] P. Sheatsley, "Questionnaire Construction and Item Writing," in Rossi, P., Wright, J., and A. Anderson (Eds.), *Handbook of Survey Research* (San Diego: Academic Press, 1983): 206.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

103.   In order to determine if respondents appropriately understood the patented features and non-infringing alternatives that were the subject of Professor Hauser's survey, I conducted my own parallel pretest of Professor Hauser's smartphone survey. To do so, I closely replicated Professor Hauser's survey by using his smartphone survey questionnaire, the screenshots of his programmed survey, and the same graphics and feature demonstration videos that were used in his survey.[149]

104.   I worked with Schlesinger Associates ("Schlesinger"), a well-known and well-respected market research firm, to perform the pretest.[150] I asked Schlesinger to identify respondents for the pretest using the same screening questions used by Professor Hauser in his survey.[151] Consistent with Professor Hauser's survey, respondents were recruited from a panel of participants that expressed a willingness to participate in market research. I developed a pretest questionnaire, to be used by Schlesinger, based upon open-ended questions that were clear, easy

---

[149] See Hauser Report at Exhibit Es and G, and  Backup to Expert Report of John R. Hauser, dated August 11, 2013. The smartphone survey questionnaire and screen shots of the programmed survey are Exhibits E and G, respectively. Graphics, including feature image icons, and feature demonstration videos were provided in backup materials.

[150] http://www.schlesingerassociates.com/our_purpose/professional_affiliations.aspx (viewed September 4, 2013). Schlesinger is a member of several organizations that promote reliability and quality standards, including the American Marketing Association ("AMA") and the Council of American Survey Research Organizations ("CASRO").

[151] Exhibit 9.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

to understand, and neutral.[152] I asked Schlesinger to administer this questionnaire to 26 respondents across three different cities.[153]

106.    Prior to the interviews, I provided input into the training and instruction of the moderator regarding how to administer the questionnaire. I personally watched some of the interviews as they were being conducted and asked that all of the interviews with each of the respondents be video recorded for my subsequent review.[154] I also asked that a written transcript of each interview be prepared for my later study. These materials allowed me to thoroughly assess the perceptions of those that participated in my parallel pretest.

106.    As part of my parallel pretest of Professor Hauser's survey, I invited qualified respondents to come into a local Schlesinger test facility location in Phoenix, Philadelphia, and Chicago and to complete a replicated version of Professor Hauser's smartphone conjoint study. Respondents were initially screened by telephone using the same screening criteria that Professor Hauser utilized in his smartphone survey. The pretest began with respondents being informed that the purpose of the pretest study was to obtain comments on a survey related to smartphones,

---

[152] Exhibit 10.
[153] Twenty-nine respondents participated in the pretest interviews, of which three respondents were dropped, resulting in a final sample of 26 respondents. Two respondents, Chicago-1 Respondent 5 and Chicago-2 Respondent 1, were dropped because they failed to complete at least half of the questions associated with the third choice exercise task in the time allotted for the qualitative interview. One additional respondent, Phoenix Respondent 3, was dropped because he did not own a Samsung smartphone in the past 12 months.
[154] It is standard practice in the industry to record in-person interviews.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

109.    Out the outset, it is worth noting that, both in Professor Hauser's pretest and in my parallel pretest, when asked if they understood the features and if the video descriptions were helpful, respondents generally responded affirmatively.[155] This notwithstanding, my parallel pretest of Professor Hauser's surveys revealed that, when probed with open-ended questions, a substantial portion of respondents did not understand the patented features and how they were different from Samsung's non-infringing alternatives. It is clear to me, based upon my review of the pretest videos and transcripts, that a significant number of the respondents in the pretest were confused about the features. They were unable to describe the patented features or the non-infringing alternatives shortly after presentation of the written and video descriptions of the features used in Professor Hauser's survey. Even after prompting, many respondents were unable to describe what features would be present if the products did not possess the patented functionalities.[156]

110.    For example, confusion or misunderstanding was evident regarding the Automatic Word Correction feature, as the following exchange reflects:

> Q:    And the Automatic Word Correction, tell me what that icon means?

---

[155] *See, e.g.*, Hauser Report, at ¶51, at Exhibit I. *See also* Parallel Pretest Transcripts for Philadelphia, Phoenix, Chicago-1, and Chicago-2.

[156] In fact, of the 26 respondents, only two respondents clicked on the link to play an animation again during the choice exercise task. Among the two respondents, one respondent, Chicago-1 Respondent 2, clicked on the Screen Size video while viewing the first choice exercise task. Another respondent, Philadelphia Respondent 5, clicked on the Quick Links video on the first choice exercise task and after the third choice exercise task.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

140.    The lack of understanding demonstrated in these excerpts is far from anomalous. The table below shows that respondents exhibited confusion or a lack of understanding across all features at issue.[172]

| | Total Number of Respondents | Respondents That Exhibit Lack of Understanding Regarding Hauser Description | |
| --- | --- | --- | --- |
| | | Number of Respondents | Percent of Total |
| Missed Call Screen Management | 26 | 24 | 92% |
| Automatic Word Correction | 26 | 18 | 69% |
| Background Syncing | 26 | 22 | 85% |
| Quick Links | 26 | 25 | 96% |
| Universal Search | 26 | 4 | 15% |
| Any Features | 26 | 26 | 100% |

141.    As the table shows, among the 26 respondents, 24 demonstrated confusion or failed to identify functionality critical to the Missed Call Screen Management feature; 18 demonstrated confusion or failed to identify functionality critical to the Automatic Word Correction feature. Twenty-two of the 26 respondents demonstrated a clear lack of understanding of the Background Syncing feature and 25 demonstrated confusion regarding the Quick Links feature. Among the 26 respondents, four demonstrated confusion or failed to identify functionality critical to the Universal Search feature. Every single respondent exhibited

----

[172] Exhibit 11.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

inability to determine what not "buying a phone" represents. Recall that each respondent faces 16 choice tasks with two choices each. The first choice, or "internal choice," involves selecting the most preferred of four hypothetical smartphone alternatives. The second choice, or "external choice," elicits whether or not the respondent "would buy" the smartphone or tablet selected among the four considered in the immediately preceding internal choice.[181]

150.    The implications of the second choice to "buy or not" depends critically on the instructions given to survey respondents in making that choice. In describing that choice, Professor Hauser instructed respondents that they "may wish to consider the availability of other smartphone options in the market that may influence your purchase decision…" and expressly stated that they should consider "smartphones by other manufacturers *or other Samsung smartphones*."[182] However, Professor Hauser does not inquire further into what may have motivated a respondent's decision "not to buy" when faced with the second external option choice. As a result, Professor Hauser is unable to characterize what, among a variety of different alternatives, is represented by respondents' selections to "not buy" the preferred hypothetical alternative.

151.    One possibility is that respondents select "not to buy" the preferred internal option because newer, more preferred alternatives were available in July 2013, when Professor Hauser

---

[181] *See, e.g.*, Hauser Report, at Exhibits E and F.
[182] *See, e.g.*, Hauser Report, at Exhibit E.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

conducted his surveys. Recall that respondents were screened based on owning accused devices, some of which have been on the market since June 15, 2011 and the most recent of which was introduced on November 29, 2012.[183] Further, recall that respondents were instructed to assume that, unless otherwise specified, the hypothetical smartphones (or tablets) encountered in the first choice task had all the "other features on your most recent Samsung smartphone (tablet computer)."[184]   A respondent from my own parallel pretest observed the dated nature of the hypothetical phones presented in the first internal choice task:

> Q:     Did you feel that the smart phone options that they were giving you, that they were realistic?
>
> A:     Yeah, for the most part.
>
> Q:     Tell me - say more about that. "For the most part."
>
> A:     Because some of these new phones now are much more tech - they have a lot more new advances. I think this was about two years old as far as technology-wise. My phone is already pretty much considered outdated. At the same time, I had a majority of what they were offering.[185]

152.    Thus, selecting "not to buy" the preferred choice among the hypothetical alternatives may simply reflect a preference to upgrade to a more recently introduced smartphone (or tablet).   In terms of the eight percent differential referenced above, removing Background Syncing may simply reflect a reordering of the accused device in the presence of newer models.

---

[183] Opening Expert Report of Christopher A. Vellturo, August 12, 2013 ("Vellturo Report"), at Exhibit 13-B.
[184] Hauser Report, at Exhibits E and F.
[185] Exhibit 12 (Phoenix: Respondent 6).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

It does not imply a preference for a good on the market at the time the accused device was purchased.

153.    A second possibility is that respondents select "not to buy" the preferred hypothetical option because it does not measure up to the actual marketplace alternative that they presumably know best, the accused device that they actually own. This is especially relevant in the context of estimating the but-for share upon which Professor Hauser's diminished sales predictions are founded. This but-for WTB share is predicated on whether or not a respondent would buy a device modeled after the accused device, but without a specific feature.  In that case, it is only natural to assume that a respondent's "not buy" selection could very well be motivated by the fact that they already have a better smartphone and would not actually want to buy something inferior, or by their understanding that the "not buy" selection includes the option to buy that same phone with the feature at the same price because it is actually currently available on the market.

154.    The absurdity of not accounting for the accused device as a driving factor in the "not buy" selections is reflected in careful consideration of the baseline and but-for shares in the context of removing Background Syncing from an accused device. As noted above, with respect to $199 smartphones with 4.8" screens, Professor Hauser's predicted baseline share is 72 percent and the predicted but-for share is 64 percent. Because the accused device is among those available in the marketplace, Professor Hauser's 64 percent but-for share prediction is fairly interpreted as saying that 64 percent of survey respondents prefer the accused device without

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Background Syncing to the actual accused device with Background Syncing. The implication is that those 64 percent do not associate Background Syncing with any benefits at all.[186]

155.    More importantly, however, in terms of determining the impact that Background Syncing had on sales of the accused devices is the inference regarding the eight percent difference between the baseline and but-for shares. One cannot presume, as Professor Hauser does, that the eight percent would prefer some device *other than the accused device* to the but-for device (i.e., the accused device with Background Syncing removed). The eight percent may simply reflect preferences for the accused device over a hypothetical one without Background Syncing.  Professor Hauser's characterization of the outside option does not allow him to assess how different real world alternatives stack up to one another (e.g., the accused device versus actual marketplace alternatives).

156.    Ultimately, Professor Hauser's predictions regarding the impact of removing patented features are dependent on the assumption that the difference between his baseline and but-for WTB calculations reflect people choosing not to buy the accused devices. However, he fails to account for the extent to which that difference reflects survey respondents' preferences for 1) devices that were not available at the time they purchased their accused devices and 2) accused Samsung devices that were preferred to the hypothetical ones presented in the survey.

---

[186] In effect Professor Hauser has constructed a choice task that results in a market basket of competing products that includes both the accused and non-infringing alternatives of each Samsung phone. Such a market basket is unusable in measuring any damages in this case. *See* Exhibit 13.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Because he cannot account for these two factors, Professor Hauser is unable to identify respondents who might have bought an *alternative to the accused Samsung device* that was *available at the time* they purchased the accused device had it not incorporated any of the patented functionalities. Other criticisms aside, this renders his analysis ill-suited to predict the impact that removal of the patented features would have on sales of the accused devices.

C.   **Professor Hauser's Conjoint Analysis is Unreliable for Predicting the Sales Impact of the Patented Features Because it Presupposes That Consumers Would Have Been Aware of the Patented Features, the Non-infringing Alternatives, and the Extent to Which Phones and Tablets in the Marketplace Possessed These Features.**

1.   *Unlike in the real world, Professor Hauser's surveys educated respondents about the patented features and whether smartphones or tablets possessed these features.*

157.   Professor Hauser devoted a substantial portion of the surveys to purportedly teaching respondents about the patented features and how they were different from Samsung's next best alternative.[187] This was done through three different media or methods: videos, text, and icons. In effect, Professor Hauser created a set of "super consumers" equipped with much more information about detailed aspects of smartphones and tablets than the vast majority of consumers in the marketplace. Consumers in the real world would not have access to the same tutorial given by Professor Hauser prior to making their purchase decisions.

---

[187] Hauser Report, at Exhibits G and H.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

158.    This was confirmed by my parallel pretest of Professor Hauser's survey. Many of these consumers noted that they learned a lot about the features in the surveys and that they wished that they had received this information when they purchased their smartphones.[188] For example, one respondent noted:

> Q:    You commented that you learned some things about smartphones tonight. Anything you can add to that - about anything that you learned about smartphones?

> A:    I learned about the three-way calling which I didn't know. I learned it had other features with the pen and it also with the email - the email, the mobile phone and the address all in one and you can pull them up - I learned that, which I didn't know, which I may have. So certain things on the phone I learned that I didn't know.

> Q:    Anything else that stood out to you that you feel you learned?

> A:    I learned it has a lot of good features on the phone. So it has features for certain people that - I don't need this, I don't need that. But those that want - I want this, I want that - it had all the features. It had those features for what you feel that you use in your daily life with the phone.[189]

159.    Another respondent stated:

> Q:    Got it. Did you feel that you learned anything new about smartphones from taking the survey?

---

[188] This is consistent with evidence from Professor Hauser's own pretest. Professor Hauser's notes from the interviews stated that, according to one respondent: "The last two features taught her something new she did not realize." *See* Hauser Report, at Exhibit I1.
[189] Exhibit 14 (Philadelphia: Respondent 7).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

A:      Yeah. I probably won't pick up the directions again, because it did give me a very good description.

Q:      Was there - what - anything in particular that you feel you learned from this?

A:      Yeah. The icon thing. I learned to investigate the features I have on my phone.

Q:      Got it.

A:      Because, I probably don't know half of what I have.[190]

160.     According to another respondent:

Q:      Did you feel that you learned anything new about smartphones from the survey?

A:      Yeah, I do.

Q:      Like what?

A:      Learned some different-what different things mean, like tapping a picture would bring it up to call the person, instead of just sliding it-you know, and doing it something like that. So, I think I picked up a few things that were-

Q:      Anything else that you remember, that you feel you learned?

A:      Well, that there's a lot of phones out there.[191]

161.     Another respondent stated:

Q:      Did you feel that you learned anything new about smartphones from the survey?

A:      Yes. Like you say -

---

[190] Exhibit 14 (Philadelphia: Respondent 2).
[191] Exhibit 14 (Phoenix: Respondent 2).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Q:   Tell me more.

A:   I'll probably go play with my phone now and see what some of that stuff is, because I see it on there, but I just never know what it is and I've never had any use for it, so it'd be nice to know if it's there. [192]

162.   According to another respondent:

Q:   I love it. [CROSSTALK] It's perfect. The - do you feel that - well, I know you did but I have to ask the question anyway and then we'll follow through. Do you feel you learned anything about smartphones from the survey?

A:   Oh yes, I did. I can't wait to go and start opening mine and looking going, does mine do this? 'Cause I don't know.

Q:   Anything in particular that stood out to you that you learned? I know you mentioned things, you know, along the way.

A:   I would love to know if mine has the smile feature. I don't know if that's even come out yet, you know. And I know mine has the WiFi, but I don't know what all it does on there. It'll be kind of interesting to see.

Q:   Anything else that you kind of learned aside from some of the features?

A:   I think that was about it. Some of the different features that mine might have. [193]

---

[192] Exhibit 14 (Phoenix: Respondent 7).
[193] Exhibit 14 (Phoenix: Respondent 8).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## 2. *Respondents demonstrate substantial insensitivity to price.*

232.    An underlying conceptual premise of any demand analysis is that consumers do not prefer higher prices. Economic theory and common sense tell us that consumers would prefer to receive the same good at a lower price versus a higher price, all else equal. Conjoint analyses, such as that conducted by Professor Hauser, treat price as a feature of the product, similar to screen size or other physical dimensions of the product. The different price levels tested within the conjoint analysis are associated with individual partworth utility estimates. For the price term to have validity, it would be expected that with each increasing level of price, the partworth utility estimate is constantly decreasing. Professor Hauser refers to this condition as monotonicity, or the property that as the price increases, the partworth always moves in one direction, downward.

233.    Underlying Professor Hauser's estimates of the willingness to pay for the patented features is a comparison of the partworth utilities of the patented feature and the partworth utilities of the price (again, tested as just another feature).[294] Conceptually, what Professor Hauser is measuring is how much negative utility from the price feature would be needed to balance out the positive utility of the patented feature. This tradeoff exercise concept makes clear that Professor Hauser must have a negative utility associated with price, and a positive utility

---

[294] Professor Hauser calculates the overall willingness to pay value utilizing a simulation procedure, but conceptually it is just a comparison of utility on the price term and the patented feature term.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

associated with the patented feature if he hopes to compute a meaningful willingness to pay value.

234.    To guarantee this is the case, Professor Hauser externally imposes the assumption in his conjoint analysis that consumers prefer to pay less rather than more (i.e., that preferences are monotonic in price). His rationalization for doing this is that incorporating prior information known about consumer behavior makes his model estimates more precise and that ignoring this information would result in a model that does not use all of the available data.[295] According to Professor Hauser, a model that does not use all of the available data "would be a less reliable description of consumer behavior and a less reliable summary of the available data."[296]

235.    To evaluate the impact of Professor Hauser's monotonicity assumption regarding price, I looked at the results generated by Professor Hauser's model when the monotonicity constraint is removed. Specifically, I examined the partworths associated with price that resulted from Professor Hauser's model estimation at the different test prices to determine if the partworths associated with higher prices were less than partworths associated with lower prices. This would be the case if Professor Hauser's monotonicity assumption was borne out (i.e., that prices are monotonic) in the actual choices made by respondents (if respondents preferred lower prices to higher prices).

---

[295] Hauser Report, at ¶¶30, 103.
[296] Hauser Report, at ¶103.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

236.    Re-estimation of Professor Hauser's smartphone model without the monotonicity constraint suggests that Professor Hauser's assumption masks substantial price insensitivity reflected in the survey responses. As the table below illustrates, 346 out of the 507 respondents that participated in Professor Hauser's smartphone survey appear to have a positive preference for a higher price at some level.[297] This means that 68 percent of the respondents that took the survey, for whatever reason, made choices that were consistent with an irrational preference for higher prices. This phenomenon appears to have been present at all price levels. This widespread insensitivity to price suggests that the survey responses are not reflective of the actual marketplace environment that Professor Hauser purports to analyze.[298]

---

[297] Exhibit 25.  *See also*, Exhibits 27 and 28.
[298] Respondents are considered insensitive to price changes if, absent the imposed monotonicity constraint, they prefer higher prices to lower prices.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## Price Sensitivity Analysis – Smartphones

| Price Change | Total Number of Respondents | Number of Respondents Insensitive to Price Change | Percent of Respondents Insensitive to Price Change |
|---|---|---|---|
| $49 vs. $99 = $50 | 507 | 263 | 52% |
| $49 vs. $149 = $100 | 507 | 181 | 36% |
| $49 vs. $299 = $250 | 507 | 70 | 14% |
| $99 vs. $149 = $50 | 507 | 142 | 28% |
| $149 vs. $299 = $150 | 507 | 60 | 12% |
| Any | 507 | 346 | 68% |

237.    Re-estimation of Professor Hauser's tablet model without the monotonicity constraint generates similar results. As the table below shows, 194 out of the 459 respondents that participated in Professor Hauser's tablet survey appear to be insensitive to price at some level.[299] This means that 42 percent of the respondents that took the survey, for whatever reason, did not make choices consistent with Professor Hauser's monotonicity assumption (i.e., did not prefer lower prices to higher prices). This phenomenon appears to have been present at all price levels and further suggests that the survey responses are not reflective of the actual marketplace environment that Professor Hauser purports to analyze.

---

[299] Exhibit 26.

151

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Price Sensitivity Analysis – Tablets**

| Price Change | Total Number of Respondents | Number of Respondents Insensitive to Price Change | Percent of Respondents Insensitive to Price Change |
|---|---|---|---|
| $199 vs. $299 = $100 | 459 | 145 | 32% |
| $199 vs. $449 = $250 | 459 | 56 | 12% |
| $199 vs. $599 = $400 | 459 | 27 | 6% |
| $299 vs. $449 = $150 | 459 | 53 | 12% |
| $449 vs. $599 = $150 | 459 | 39 | 8% |
| Any | 459 | 194 | 42% |

## F.     The Defects in Professor Hauser's Conjoint Analysis Are Confirmed by the Marketplace Predictions It Generates.

### 1.     *Professor Hauser's survey analysis is implausible with respect to the amount respondents value just the features incorporated in the survey.*

238.     Professor Hauser's survey generates implausible results related to the amounts respondents value just the features incorporated in the survey. In the table below, I summarize the willingness to pay price premiums associated with each of the individual smartphone features in the context of a phone with a price of $149.[300] As this table shows, the sum of the willingness to pay price premiums for the patent-related features is $358 and the sum of the willingness to

---

[300] The $149 base price reported for smartphones was selected, consistent with Professor Hauser's Exhibit P. *See* Hauser Report, at Exhibit P. Willingness to pay must be calculated at a specific price point as each price level is associated with a different parameter estimate and thus the willingness to pay will vary by the chosen base price.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

prediction tool to estimate the impact of removing a feature from a phone, even though the tool does a poor job of predicting phone choices of the survey respondents.[320]

3.     ***Predictions generated by Professor Hauser's analysis related to the composition of Samsung sales differ substantially from actual marketplace outcomes.***

248.     The unreliability of Professor Hauser's choice predictions are further revealed when measured against the actual composition of Samsung's smartphones sales. Exhibit 34 summarizes a second extension of the choice exercises conducted by Professor Hauser. This analysis compares the relative demand for four Samsung smartphones implied by Professor Hauser's analysis with the actual relative demand based on Samsung's historical sales. The four phones examined include the Galaxy S III, the Galaxy S II, the Galaxy Note II, and the Galaxy Nexus (comprised of the features they included when each was first released).[321] I have summarized the results of this analysis in the table below.[322]

---

[320] Exhibit 32 presents a comparable summary of tablet predictions, and the results are similar. In particular, the prediction tool does a poor job distinguishing between the Galaxy Note 10.1 and the Galaxy Tab 2 10.1.
[321] Exhibit 33. *See also*, Exhibit 23.
[322] Exhibit 34.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Relative Smartphone Demand – Top Four Samsung Models**

| Model | Based on Hauser Prediction | Based on Actual Units Sold | Based on Respondents' Purchases |
|---|---|---|---|
| Galaxy S III | 29% | ▮ | 61.5% |
| Galaxy S II | 16% | ▮ | 19.4% |
| Galaxy Note II | 40% | ▮ | 9.7% |
| Galaxy Nexus | 16% | ▮ | 9.4% |
| Total | 100% | 100% | 100% |

249.    As this table shows, the RFC prediction tool relied on by Professor Hauser suggests that the Galaxy Note II would account for a 40 percent share, the Galaxy S III would account for a 29 percent share, the Galaxy S II would account for a 16 percent share, and the Galaxy S Nexus would account for a 16 percent share. This is very different from the relative shares implied by actual, historical sales of these phones since the last of them was introduced.[323] In contrast to the predictions generated by Professor Hauser's analysis, Samsung's Galaxy S III



250.    A similar comparison can be made of the relative demand for these smartphones implied by Professor Hauser's analysis and the relative demand implied by the phones actually

---

[323] The Galaxy Note II was released between October 24, 2012 and November 29, 2012. *See* Vellturo Report, at Exhibit 13-B.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

owned by the respondents taking Professor Hauser's survey. As the table above shows, the relative demand for the four smartphones implied by the number of phones owned by the respondents is at odds with the predictions implied by Professor Hauser's model. In contrast to the predictions generated by Professor Hauser's analysis, █████████████████████████████████

251.    These comparisons demonstrate the lack of reliability of Professor Hauser's analysis for purposes of predicting the purchase decisions made by those that bought the accused devices.[324]

**4.      *A simple feature counting model explains respondents' choices at least as well as Professor Hauser's model which is based on the unique functionality of each patented feature.***

252.    To further assess the reasonableness of Professor Hauser's conjoint analysis, I tested an alternative model, based on different assumptions, to determine if it better explains the responses generated from Professor Hauser's survey compared to the model put forth by Professor Hauser. In my alternative model, I employed a single simplifying assumption regarding consumer preferences – that individual consumers value equally each of the individual feature levels among the Data Accessibility, Call Initiation and Screening, Input Assistance and

---

[324] Exhibit 36 presents a comparable analysis for two tablets. *See also*, Exhibit 35.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

a model, such as this, with all of its shortcomings discussed above, in either in my academic work or my work in industry.

## V.    Conclusion

265.    My opinions may change before trial if additional information from any of the parties-in-suit or their experts becomes available.  I, therefore, reserve the right to supplement my report accordingly.

*Dave Reibstein*

David Reibstein

# EXHIBIT D
## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

|  |  |
|---|---|
| APPLE INC., a California corporation,<br><br>    Plaintiff,<br><br>  vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>    Defendants. | CASE No. 12-cv-00630-LHK |

**EXPERT REPORT OF JUDITH A. CHEVALIER, PH.D.**

**SEPTEMBER 13, 2013**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

65.     "Vertical product differentiation" is used to describe a situation in which all consumers would prefer a product with a given attribute.[160]  For example, for smartphones, everything else equal, all consumers (likely) would prefer a product with longer battery life.   If two products were available at equivalent prices and all other features were equivalent, we would expect consumers to choose the product with the longer battery life.[161]  However, consumer heterogeneity generally still plays a role in determining the market position of products that differ in vertical quality dimensions.  For example, different consumers will differ in their willingness to pay for better battery life.  When comparing smartphones with a different mix of features, some consumers will put more weight on the battery life of the phone and some consumers will put less weight on the battery life; consumers who put little weight on the battery life will be willing to buy a phone with shorter battery life if the phone has other features that the consumer views as more desirable.

66.     For smartphones, there are myriad vertical and horizontal product characteristics that affect consumer demand for the products.  As detailed below, the availability and relative importance of smartphone characteristics have changed over time.  And, as in many technologically evolving industries, some product features are desired by so many consumers and offered by so many providers that they eventually become expected or standard features of the products.[162]  Firms compete to introduce new product varieties that contain new features that

---

[160] *See, e.g.,* Pepall, Lynne, Daniel J. Richards, and George Norman, Industrial Organization: Contemporary Theory & Practice, 3rd ed, Thomson South-Western, 2005, at 133.

[16] ███████████████████████████████████████████████████████████████████

     *See, e.g.,* Giachetti, Claudio and Gianluca Marchi, (2010) "Evolution of firms' product strategy over the life cycle of technology-based industries: A case study of the global mobile phone industry, 1980–2009," *Business History*, 52(7) 1123–1150. ("Because some of the most requested features by consumers, such as SMS, no longer distinguished mobile vendors, consumers purchased phones that suited their different lifestyles.")  Theo Downes-LeGuin of consulting firm Market Strategies reported in a June 2010 email to Apple that "[c]ertain features that even a year ago were considered advanced have become commonplace requirements."  APLNDC630-0000124145-46, at 45.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

some consumers will value highly.  As the overall market expands, introducing products that contain features that will only be desired by a subset of consumers becomes more attractive.[163] In effect, as the market expands, the number of varieties expands so that consumers can buy products that are more tailored to each consumer's particular demand.  The literature in competitive strategy, marketing, and economics refers to this process as the "product lifecycle" or "industry lifecycle."[164]  While this is a descriptive term that may not characterize all markets, it provides a useful description of market evolution in the smartphone marketplace.[165]

67.      Among the elements that impact consumer choice in the smartphone marketplace are: (1) characteristics and behavior of the carrier; (2) operating system characteristics, including the integration with the device and the availability of applications and other ecosystem characteristics enabled by the operating system; (3) marketing efforts to enhance brand reputation; (4) device-specific characteristics, such as capabilities, hardware characteristics, and physical characteristics; and (5) retail price.  The importance these factors on consumer choice is highlighted in research studies conducted by and for both Apple and ███████████████ ███████████████████████████████████████████████ ██████████████████████████████ nalyses of securities analysts, promotional and instructional materials created by the manufacturers, and product reviews authored by consumers and professional reviewers.

---

[163] *See, e.g.,* Klepper, S. (1996). "Entry, Exit, Growth, and Innovation Over the Product Life Cycle," *American Economic Review*, 86(3), 562–583; and Abernathy, W.J., & Utterback, J.M. (1978) "Patterns of Innovation in Technology," *Technology Review*, 80(7), 40-47.

[164] *See, e.g.,* Klepper, S. (1996) "Entry, Exit, Growth, and Innovation Over the Product Life Cycle," *American Economic Review*, 86(3), 562–583; and Abernathy, W.J., & Utterback, J.M. (1978) "Patterns of Innovation in Technology," *Technology Review*, 80(7), 40-47.

[165] For a discussion of the relevance of product/industry lifecycle models to the mobile phone industry from 1980 to 2009, *see* Giachetti, Claudio and Gianluca Marchi, (2010) "Evolution of firms' product strategy over the life cycle of technology-based industries: A case study of the global mobile phone industry, 1980–2009," *Business History*, 52(7) 1123–1150.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

with a 7.9-inch screen, emulating the competition which had previously introduced smaller

tablets earlier.[309]  Pricing also has been an important component of tablet competition, with the

more successful Apple competitors undercutting the iPad's price.[310]

## IV.   The Features Enabled by the Patents-at-Issue are a Small Part of the Accused Products and their Operating Systems

107.    The functionality protected by patents-at-issue constitute only a small part of the

overall software functionality in the accused products, and software functionality itself represents

just a portion of the features of the accused devices.  Indeed, the evidence indicates that specific

software features are typically insignificant in driving demand for the accused products.  This is,

in part, because other phone characteristics (such as size, screen size, battery life, display

definition, storage capacity, camera type, price, and connectivity) matter more, but also, in part,

because the operating systems ("OSs") underlying these products contain a significant number of

features which are continually upgraded with additional features.  The total number of features

and capabilities embodied in smartphones is ever expanding.

108.    A careful review of product manuals, third-party product reviews, consumer

reviews, and Samsung's advertising shows that the functionalities related to the patents-at-issue

are a small subset of the total features of the products-in-suit and/or that they were not a point of

emphasis in consumer purchase decisions.  As demonstrated below, few customers indicate that

specific software features motivated their purchase.  Notably, most reviews and advertisements

---

Instead, I found a device that meets the same needs yet offers increased portability."
http://gigaom.com/2011/01/21/why-i-just-dumped-the-ipad-hint-size-matters/ (viewed 9/12/2013).
[309] http://www.apple.com/pr/library/2012/10/23Apple-Introduces-iPad-mini.html;
http://www.apple.com/ipad/compare/ (both viewed 9/12/2013).  Screen sizes are measured diagonally.
[310] For example, compare Exhibit 26A, with the average 2012 accused Samsung tablet price of $330, to Exhibit 65E,
with the average 2012 U.S. iPad price of approximately $500.  In addition, an ███████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████ SAMNDCA630-07416541-601, at 582 (Benner Exhibit 9).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

are silent on the patented elements.  Instead, features such as screen size, battery life, and camera are more important drivers of demand.

### A.    Smartphones and Tablets Are Extraordinarily Complex Products with Hundreds If Not Thousands of Features and Distinct Functionalities

109.    As discussed above, smartphones and tablets are extraordinarily complex and sophisticated devices.  Manufacturers compete in part by incorporating a myriad of new features in new generations of both hardware and operating systems.  The abundance of features is reflected in Apple press releases announcing the release of new versions of iOS (its smartphone and tablet operating system) where they regularly highlight the inclusion of as many as 200 new features.[311]  For example:

- "iPhone 3GS includes the new iPhone OS 3.0, the world's most advanced mobile operating system with over 100 new features..."[312]

- "iPhone 4 comes with iOS 4, the newest version of the world's most advanced mobile operating system, which includes over 100 new features and 1500 new APIs for developers." [313]

- "With the launch of iPhone 4S also comes the launch of iOS 5, the world's most advanced mobile operating system with over 200 new features…"[314]

- "iPhone 5 comes with iOS 6, the world's most advanced mobile operating system with over 200 new features…"[315]

- "iOS 7 is completely redesigned with an entirely new user interface and over 200 new features…"[316]

---

[311] Exhibit 38 provides a more comprehensive summary of Apple press releases accompanying new iOS releases.
[312] https://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html (viewed 9/12/2013).
[313] http://www.apple.com/pr/library/2010/06/07Apple-Presents-iPhone-4.html (viewed 9/12/2013).
[314] http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html (viewed 9/12/2013).
[315] http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5.html (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

the eyes of the company or consumers. These aspects are better captured in the promotional

materials and product reviews, which I analyze and discuss below.

### B. Individual Operating Software Features do not appear to Motivate Customers to Purchase Smartphones and Tablets

113.    Individual software features alone do not typically motivate the purchase of

smartphones and tablets.[323]  The lack of demand driven by individual software features is

reflected in many Apple customer surveys, which show broader explanations for the purchase of

an iPhone.[324]  Summarized in Exhibit 40, examples of these surveys reveal that the combination

of music, email, games and apps was most commonly the primary motivator—followed by a

general preference for Apple products.

114.    Nevertheless, demand for a particular iPhone feature or capability was identified

by between 16 and 28 percent of respondents as the primary basis factor in the purchasing

decision.[325]  Specific features identified as motivation for a purchase included broader features,

such as iCloud, Facetime or Siri (rather than individual user interface elements).[326]  Hardware

features such as the weight of the device and characteristics of the camera typically were more

important than the broad software features that were identified.  In the most recent survey (Q2

2013), for example, 1,007 of the 6,194 people surveyed (16.3 percent) pointed to a specific

feature as a primary motivation for purchase and, of those, fewer than 60 listed the most recent

---

[323] An Apple document discusses that in some cases, one feature may help drive a purchase decision, but it references larger, non-software elements, "Surprising how 1 feature can convince them to purchase a certain model (tips them over)...4G, door on power outlet, and missing that one feature on iPhone, iPhone feature advantages may be more 'Hidden' or discovered through use"; "if they latch on to 1 feature, no investigation regarding quality of feature..." APLNDC630-0000127433-38.
[324] *See e.g.*, Exhibit 40.
[325] Exhibit 40, row [9] and [16]
[326] Exhibit 41.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

operating system (iOS 6) as the most important feature.[327]  Many more pointed to other items

such as the "8 megapixel camera with improved optics" and battery life.

115.    Samsung buyers, too, indicate limited preference for specific software

functionality.



No specific software features other than

"mail" were listed.  Again, the lack of attention given to granular aspects of specific software

functionality suggests that any individual software elements, particularly individual convenience

functionalities, are less likely to motivate demand.

116.    In sum, many surveys assessing the reasons for product purchase have been

produced by the parties in this matter.  These contemporaneous business documents collectively

illustrate that individual granular software elements are rarely examined.  That is because

individually they are often difficult for customers to observe, and not as important as larger

elements or the overall user experience. The importance of individual product features to Apple

generally, was summed up by Phil Schiller in this way:[330]

> In Apple, we create a very unique product unto ourselves. We always have. And
> so we think the sum total experience we create for customers is what matters more
> because we can create a very unique experience, and some commodity feature

---

[327] $(115*.07)+(452*.05)+(440*.06)=57.05$
[328]
[32]                                                    at 20 (SAMNDCA630-07395533-77, at 52).
[330] Deposition of Phil Schiller, July 23, 2013, at 194.

features.[540]  The estimates are captured in Professor Hauser's willingness to buy calculations.[541]

Specifically, Professor Hauser calculates a "baseline" willingness to buy share for a given phone

and a "but-for" willingness to buy share for that same phone without some combination of the

patented features.  The difference between the baseline and "but-for" shares, according to

Professor Hauser, represents Samsung customers whose purchase of the accused devices

depended on the associated patented features.

218.    These willingness to buy calculations are informed by the collection of two types

of choice responses from survey respondents.[542]  In taking the surveys, individual respondents

face 16 choice tasks with two choices each.[543]  The first is an "internal choice" for which they

pick among four hypothetical configurations of Samsung smartphones or tablets (designed to

mimic some Samsung phones (or tablets) available during the damages period at roughly the

prices at which those phones (or tablets) were sold).[544]  Immediately after respondents make the

"internal choice" they are presented with a second "external choice" or "outside option choice"

in which they indicate whether or not they would buy the smartphone or tablet they selected in

their previous response at the indicated price.[545]

219.    The language used by Professor Hauser, however, is extremely difficult to

interpret:

> In answering this question, you may wish to consider the availability of other
> smartphone [tablet computer] options in the market that may influence your
> purchase decision, including smartphones [tablet computers] by other
> manufacturers or other Samsung smartphones [tablet computers].  Given the

---

[540] Vellturo Report, at 5-6
[541] Hauser Report, at 56-62.
[542] Hauser Report, at 7-17.
[543] Hauser Report, at 17.
[544] Each respondent is presented with 16 choice screens. Hauser Report, at 17.
[545] Hauser Report, at Exhibit E.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Samsung smartphone [tablet computer] you chose as your most preferred among the alternatives shown, would you buy it at the indicated price? [546]

220.     Because Professor Hauser's survey does not reveal what caused a respondent to select the outside option, it is not appropriate to assume, as he does, that it was solely because of the absence of a patented feature.   For example, consider a respondent who answers in the survey that s/he is willing to buy the "baseline smartphone" for $199 with a 4.8 inch screen that includes the entire set of product features described in the survey.   If that respondent answers that s/he is unwilling to buy the "baseline smartphone" for $199 with a 4.8 inch screen if one of the patented features is removed, that consumer is considered "unwilling to buy" due to the patent feature removal.

221.     However, the outside option that is described in the survey includes "other smartphone options in the market… including…other Samsung smartphones."[547]   Thus, this includes the "baseline smartphone" that the respondent previously selected.  It can also include the respondent's actual smartphone.   Indeed, it can also include improved smartphones available in the marketplace that were not available when the respondent purchased his or her original smartphone. Thus by definition, the respondent would be better off picking the outside option when faced with a phone with missing features—even if the features were not particularly valuable.

222.     Rather than reflecting the choice that consumers would make in the "but for" world in which the patented features were removed from all accused Samsung smartphones and tablets, the "outside option" construct used by Professor Hauser essentially allows the respondent to choose between a Samsung product without the patented features and the identical Samsung product with the patented features.   This experiment tells us nothing about whether the same

---

[546] Hauser Report, at Exhibit E, at 21; and Exhibit F, at 18-19.
[547] Hauser Report, at Exhibit E, at 21; and Exhibit F, at 18-19.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumer would have bought a Samsung phone with a few features removed if the Samsung

phone that they actually purchased was not available.

### C. Professor Hauser's Analysis Generates Predictions That Differ Substantially From Actual Marketplace Outcomes

#### 1. Predictions Differ Substantially from Actual Marketplace Outcomes

223.    The unreliability of Professor Hauser's choice predictions are revealed when

measured against the actual composition of Samsung's smartphones sales.  Exhibit 54A

summarizes an extension of the choice exercises conducted by Professor Hauser on

smartphones.[548]  In particular, Exhibit 54A reflects predicted purchase shares associated with a

choice among four leading Samsung smartphones: the Samsung Galaxy S II, Galaxy S III,

Galaxy Note II and Galaxy Nexus.  The prediction shares reflected in Exhibit 54A use the same

methodology employed by Professor Hauser in developing his willingness to buy estimates and,

as a result, reflect Professor Hauser's estimates of the underlying preferences respondents have

for various configurations of Samsung smartphones.[549]

224.    As Exhibit 54A shows, the predictions generated by Professor Hauser's analysis

differ greatly from actual marketplace outcomes.  Professor Hauser's analysis suggests the Note

II would account for a share of 40 percent, the Galaxy S III a share of 29 percent, and the Galaxy

S II and Nexus with 16 percent shares each. ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Thus, Professor Hauser's

analysis suggests, for example, that the Galaxy Note II would outsell the Galaxy S III when,

---

[548] Exhibit 54B presents a comparable summary of tablet predictions, and the results are similar.  In particular, he does a poor job distinguishing between the Galaxy Note 10.1 and the Galaxy Tab II 10.1
[549] Details underlying these calculations are described in the Hauser Exhibits.

instead ██████████████████████████████████████████████████████[50]

This highlights the lack of reliability of Professor Hauser's analysis for purposes of predicting the purchase decisions made by those that bought the accused devices.

### 2. Predictions Differ Substantially from Survey Respondent Ownership

225. The unreliability of Professor Hauser's choice predictions are further revealed when measured against respondents' own actual purchase history. Among the respondents in Professor Hauser's survey that report owning the four smartphones reflected in Exhibit 54A, 61.5 percent own the Galaxy S III, 19.4 percent own the Galaxy Note II, 9.7 percent own the Galaxy S II and 9.4 percent own the Galaxy Nexus. ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ This further demonstrates the lack of reliability of Professor Hauser's analysis for purposes of predicting the purchase decisions made by those that bought the accused devices.

### 3. Professor Hauser's Survey Generates Implausible Results

226. The unreliability of Professor Hauser's analysis is further demonstrated in the implausible results related to the amounts respondents are purported to value the features incorporated in the survey. In Exhibit 55A, I summarized the willingness to pay price premiums associated with each of the individual smartphone features in the context of a phone with a price of $149.[551] As this exhibit shows, Professor Hauser's analysis predicts that the amount consumers would be willing to pay for the six patented features on an individual basis totals $358. The corresponding figure for the full set of features in his analysis is $1,125. This amount is over seven times greater than the price of the reference phone.

---

[550] Note that 71.4/20.4 = 3.5.
[551] Professor Hauser's willingness to pay price premiums depend on the device prices incorporated in his analysis. *See, e.g.,* Hauser Report, at Tables 9 and 10 and the accompanying discussion.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

resulting combined royalty for all six patents is $42.64 per unit (and royalties on the '647, '414 and '959 patents alone sum to $35.65 per unit).[649]

### B.    Velluturo Reasonable Royalty Assessment Involves Either a Double Counting or a Back Door Collection of Apple's Lost Profits

278.    A patent holder who is able to establish liability for patent infringement is entitled to no less than "a reasonable royalty for the use made of the invention by the infringer."[650]  Reasonable royalty damages are, therefore, the statutory minimum, or, as described by the Court of Appeals for the Federal Circuit ("CAFC"), "the floor below which damages shall not fall."[651]

279.    The consideration of the profits that the patent holder makes on products that compete with the infringing product is *inappropriate* in the context of a reasonable royalty damages determination. That is, reasonable royalty damages are appropriate on sales where the patent holder is unable or unwilling to demonstrate that the infringing sales caused the patent holder to lose sales and, therefore, profits.[652]  Accordingly, reasonable royalty damages are only for infringing sales that were *not* lost by the patent holder.[653]  Under these circumstances, there are no patent holder profits that were displaced.

---

[649] His conclusion is per unit royalties of $12.49 for the '647 patent, $15.03 for the '414 patent, $8.13 for the '959 patent, $1.61 for the '721 patent, $2.84 for the '172 patent, and $2.54 for the '760 patent.   The total royalty is $40.10 without the '760 patent.

[650] 35 U.S.C. § 284.

[651] *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed. Cir. 1983).

[652] *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1576 (Fed. Cir. 1995) (Nies, dissenting in part) ("[W]here a patentee is not entitled to lost profits damages, lost profits may not, in effect, be awarded by merely labeling the basis of the award a reasonable royalty."). *See also*, "The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition," Federal Trade Commission, March 2011 ("The Evolving IP Marketplace"), at 20, 167-68, 172-73 available at http://www.ftc.gov/os/2011/03/110307patentreport.pdf ("The law must be flexible in allowing the patentee to prove its lost profits in order to provide adequate compensation.  But a patentee who has failed or chosen not to do so should not be allowed to use unproven arguments of direct losses to inflate a reasonable royalty award beyond what a willing licensee would pay.")

[653] The Evolving IP Marketplace, at 172 ("Concerns about compensating unproven lost profits damages should not be allowed to inflate a reasonable royalty damage award . . . .").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

280.    As discussed above, Dr. Vellturo ultimately does not use his (flawed) calculations of Samsung's maximum willingness to pay to license the patents-in-suit for his reasonable royalty calculations.  Instead, the proffered Vellturo royalty amounts are identical to his "Apple's willingness to accept" figures—or in other words, Apple's expected lost profits from granting a license to Samsung.  The Vellturo Report summarized the various steps that were undertaken to estimate these minimum per unit royalties that Apple would have been willing to accept.[654] Importantly, they include "determin[ing] the portion of Samsung's incremental sales [from a license] that would remain at Apple in the event that Apple does not license Samsung to the Asserted Patents" and "Assess[ing] the incremental profit per unit Apple would expect to lose that applies to each expected Apple foregone sale."[655]   In essence, Dr. Vellturo is saying that one key input to determining the reasonable royalty here is the profits that Apple would expect to lose on sales by granting a license to Samsung.[656]

281.    This is almost the same calculus (replacing ex-post lost profits with expected lost profits) that Dr. Vellturo undertook in his lost profits analysis.  I illustrate this in Exhibit 67.  As the exhibit shows, after removing the ecosystem impact step of the reasonable royalty calculation (to be discussed further below), the steps involved in calculating Dr. Vellturo's lost profits and reasonable royalty are virtually identical, with the main difference being that 1) Dr. Vellturo removes the '959 patent from lost profits calculation and 2) Dr. Vellturo's "reasonable royalty" calculation is based on Apple's "expected lost profits" prior to infringement whereas Dr. Vellturo's "lost profits" calculation is based on Apple's "actual lost profits."

---

[654] Vellturo Report, at 166-7.
[655] Vellturo Report, at 166-7.
[656] He defines this as a "key consideration" and "guiding principal" in the negotiation.  Vellturo Report, at 128.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

282.     The result is that, if the Court were to find lost profits were appropriate, Dr. Vellturo's rate would effectively represent a double counting of lost profits.[657]  And, in the event that the Court were to find that lost profits were not appropriate, Dr. Vellturo's royalty calculation would represent an inappropriate back-door claim for lost profits.[658]

### C.     Vellturo's Assessment of Apple Willingness to Accept and Samsung Willingness to Pay Includes Many Errors

283.     In addition to the fundamental flaw of double counting (or inappropriately trying to collect) lost profits through his reasonable royalty calculation, Dr. Vellturo's royalty calculations are plagued with other errors and overstatements.  Since many of these errors are very similar to those that I have already discussed in my critique of Dr. Vellturo's lost profits calculation above, I only briefly mention some of them here.

284.     Both Dr. Vellturo's analyses of Apple's willingness to accept and Samsung's willingness to pay:  1) start with overstated profit amounts for Apple and Samsung; 2) apply Professor Hauser's unsound conjoint results to estimate the percentage of profits lost or at stake; 3) use the wrong expected percentage of displaced sales flowing to Apple/or to Samsung's other products; 4) overestimate the relevant time Samsung would be off the market to implement a design-around; and 5) include speculative future damages as part of the current royalty. Specifically, some examples of these errors include:

---

[657] This is especially true in that these are units that Dr. Vellturo himself claims Apple would not have made in his lost profits scenario.  Apple is not entitled to base a reasonable royalty on unproven losses of profit on units its own expert concedes it never would have made.  Yet, Dr. Vellturo essentially "double counts" his lost profits.  He claims lost profits on units (he believes) Apple would have sold in absence of Samsung's infringement, and claims lost profits again on the units he says Apple would not have sold, by calling it "willingness to accept."

[658] A reasonable royalty scenario is appropriate because Apple has not or cannot prove entitlement to lost profits. That is, it has failed to prove that it incurred any lost sales. As a result, Apple's incremental profits are irrelevant and any royalty would make Apple better off.  That is because those units subject to a royalty are those on which Apple would not have earned any profits.   Yet, Dr. Vellturo essentially "back doors" a lost profits calculation in his royalty-only analysis.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

compensate Apple is approximately $5.9 million if all patents asserted by Apple in this matter are found to be valid, enforceable, and infringed.  The market, income, and cost approaches further demonstrate the unreasonableness of the conclusions presented in the Vellturo Report.


_____

JUDITH A. CHEVALIER

# EXHIBIT I

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED



Δ π EXHIBIT 12

Deponent.

Date._____ Rptr._____

WWW.DEPOBOOK.COM

APLNDC630-0001313179

Highly Confidential - Attorneys' Eyes Only

# Samsung's brand update
## (based on external industry information)

John Brown
Mgr. corporate market intelligence team
December, 2012

APLNDC630-0001313180

Highly Confidential - Attorneys' Eyes Only

# Samsung's advertising and promotion campaigns are driving a rise in brand recognition

- Samsung's aggressive mobile advertising in the fourth quarter is resonating across the entire Samsung brand as consumer brand recall is on the rise.

- The Galaxy S III advertising has driven most brand recall, while Apple's iPhone 5 advertising has been above the category norm.

- Samsung's rising brand has allowed it become a product of consideration in the media player market, a category that it has had little success in the past.

- Although they are still a small player in the media player market, increasing their presence in this space provides Samsung the opportunity to build a halo effect with other Samsung CE products within the younger demographics.

- Samsung is using aggressive bundling of tablets with many of their branded product categories (washing machines, cameras, phones and even their NaviBot vacuum) in an attempt to gain tablet share in many markets.

- If successful, these aggressive bundling and advertising campaigns could lead to a change in the market share landscape for both tablets and mobile phones for the fourth quarter of 2012.

- If these practices lead to share gains in the fourth quarter, the big question is will it come at the expense of smaller market players, Apple or a combination of both.

Highly Confidential - Attorneys' Eyes Only

APLNDC630-0001313181

# Samsung's outspending all others in advertising

It is estimated that Samsung spent $4B globally on advertising in 2012, which dwarfs the spend of some major brands around the world. This increase in spend over 2011 has raised its brand recognition globally and has allowed them to be in the consideration set of consumers in our key markets of music players, PCs, tablets and mobile phones.



**Samsung Electronics Marketing Expenses**

Source: Asymco.com - http://www.asymco.com/2012/11/29/the-cost-of-selling-galaxies/

APLNDC630-0001313182

Highly Confidential - Attorneys' Eyes Only

APLNDC630-0001313183

Highly Confidential - Attorneys' Eyes Only

APLNDC630-0001313184



Highly Confidential - Attorneys' Eyes Only

APLNDC630-0001313185

Highly Confidential - Attorneys' Eyes Only

APLNDC630-0001313186

# Samsung's international holiday promotions aim to increase its global brand and market share

Highly Confidential - Attorneys' Eyes Only

# Samsung is attempting to boost UK tablet sales with free promotions

Combining free Galaxy Tabs with all products from phones to digital cameras has the potential to increase their sales into the channel and potentially sell-through for the holiday quarter.

**Series 9 and Galaxy Tab Promotion**

Get a FREE Galaxy Tablet worth £199 when you buy a Samsung Series 9 with Windows® 7





**Samsung Smart TV Promotion – Free Galaxy 2 Tablet**




APLNDC630-0001313187

Highly Confidential - Attorneys' Eyes Only

# Samsung has expanded the UK bundle practice across the European continent

Whether with washing machines, cameras or iRobot, Samsung is giving away tablets across the continent to stimulate holiday sales.



Bundled tablet promotions

Source: Apple, European 3P team

APLNDC630-0001313188

Highly Confidential - Attorneys' Eyes Only

# Samsung is also very aggressive with tablet promotions in Latin America

Samsung is being aggressive in advertising tablet bundles in all channels from CE stores to department stores across all of Latin, particularly in the key Apple markets of Mexico and Chile.

Chile - Buy Samsung TV get Galaxy Note 10" for free



Chile - Buy Samsung Notebook get Galaxy Note 7" for free



Mexico - Buy Galaxy Note 10" get Galaxy 2 for free



APLNDC630-0001313189

Highly Confidential - Attorneys' Eyes Only

APLNDC630-0001313190

Highly Confidential - Attorneys' Eyes Only

APLNDC630-0001313191

Highly Confidential - Attorneys' Eyes Only



TM and © 2012 Apple Computer, Inc. All rights reserved.

APLNDC630-0001313192

Highly Confidential - Attorneys' Eyes Only

# EXHIBIT O

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                                                                          EXHIBIT 19-A

## Apple's Lost Profits Summary
## (Four-Month Off the Market Lost Profits + Diminished Demand Lost Profits  + Reasonable Royalties on Non-Lost-Profits Units)
See Damages Period Below 1/

| | | 2011 | | | | | | | | 2012 | | | | | | | | | | 2013 | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | Total |
| **Total Units Sold - Smartphones 2/** | | | | | | | | | | | | | | | | | | | | | | | | | | |

**Units Eligible for Lost Profits**
- Admire
- Captivate Glide
- Conquer 4G
- Dart
- Exhibit II 4G
- Galaxy Nexus
- Galaxy Note
- Galaxy Note II
- Galaxy Rugby Pro
- Galaxy S II
- Galaxy S II Epic 4G Touch
- Galaxy S II Skyrocket
- Galaxy S III
- Illusion
- Stratosphere
- Transform Ultra

**Total Units Eligible for LP**

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                          EXHIBIT 19-A

## Apple's Lost Profits Summary
(Four-Month Off the Market Lost Profits + Diminished Demand Lost Profits  + Reasonable Royalties on Non-Lost-Profits Units)
See Damages Period Below 1/

|  | 2011 | | | | | | | 2012 | | | | | | | | | | | | | 2013 | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | | Total |
| **Total Units Sold - Tablets 2/** | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**Units Eligible for Lost Profits**
| Galaxy Note 10.1 | | | |
| Galaxy Tab II 10.1 | | | |
| **Total Units Eligible for LP** | | | |



Apple's Total Lost Profits ($)          980,633,199

**Sources/Notes:**
1/ Damages calculated from product launch for the '647 Patent, and February 8, 2012 for other asserted patents.
2/ Smartphones & Tablets - Exhibit 10.
3/ Smartphones - Exhibit 12, Tablets - Exhibit 12-A.
4/ Smartphones - Exhibit 16, Tablets - Exhibit 16-A.

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT P

Confidential Attorneys' Eyes Only

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                   SAN JOSE DIVISION
4    APPLE, INC., a California          )
     corporation,                       )
5                                       )   CASE NO.
                      Plaintiff,        )   12-CV-00630-LHK
6                                       )
7               vs.                     )
                                        )
     SAMSUNG ELECTRONICS, CO., LTD.,  )
8    a Korean corporation; SAMSUNG     )
     TELECOMMUNICATIONS AMERICA,       )
9    LLC, a Delaware limited           )
     liability company,                )
10                                      )
                      Defendants.       )
11   -------------------------------)
12           * * *ATTORNEYS' EYES ONLY* * *
13        CONFIDENTIAL VIDEOTAPED DEPOSITION
14                       OF
15            CHRISTOPHER VELLTURO, PH.D.
16               New York, New York
17               September 25, 2013
18
19
20
21
22
23   Reported by:
24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 66028

Confidential Attorneys' Eyes Only

Page 93

1    Samsung has made as a result of Samsung's      12:12:04:27

2    alleged utilization of functionality covered by

3·   those claims?

4        A.    I'm not absolutely sure what you mean

5    by certain terms in your question, but I believe12:12:16:24

6    the answer is yes.

7        Q.    All right.  Is there -- just I want to

8    make sure there's no lack of communication here.

9              What's the uncertainty?

10       A.    Well, because what I do is I evaluate 12:12:27:09

11   two states of the world.  I evaluate the state

12   of the world as it is -- as it actually existed

13   and then I evaluate the state of the world where

14   Samsung doesn't infringe, and I evaluate

15   Samsung's sales in those two states of the world12:12:45:12

16   and identify that the difference between those

17   two are the sales that Samsung would not have

18   made in the absence of the patented feature.

19       Q.    So, as to the first part of that, the

20   sales that Samsung would not have made, that's  12:13:05:27

21   based on you just told me the delta, the

22   difference between the sales they actually

23   made --

24       A.    Right.

25       Q.    -- and the sales they would have made 12:13:15:12

Confidential Attorneys' Eyes Only

Page 94

1    if they weren't using the claims that's the    12:13:16:18

2    subject of this case; is that correct?

3        A.    Right, that's part 1 and part 2.    I

4    got confused because part 1 is the actual sales.

5        Q.    Right.    And the quantitative basis for 12:13:24:27

6    that analysis in identifying that delta is

7    Professor Hauser's study?

8        A.    Right, the -- the parameters I need,

9    some of the parameters I need to do that

10   calculation are derived from the results of    12:13:51:15

11   Professor Hauser's survey.

12       Q.    Let's focus on the but-for world.

13       A.    Okay.

14       Q.    That is, the world where Samsung is

15   not using the technology which Apple claims    12:14:02:24

16   Samsung uses and which is the subject of this

17   case.    Are you with me so far?

18       A.    Yes.

19       Q.    Those numbers as to how many sales

20   Samsung would have made in the but-for world are 12:14:19:00

21   based on Professor Hauser's analysis, correct?

22       A.    No, I wouldn't agree with that as

23   posed.

24       Q.    All right.    Well, tell me how I'm

25   wrong.                                          12:14:30:18

Confidential Attorneys' Eyes Only

Page 95

1    A.    Well, what Professor Hauser's survey  12:14:31:03

2  identifies is percentage changes and willingness

3  to buy, and I use that information to evaluate

4  percentage changes in sales, and part of what I

5  do is I take that percentage change and apply it  12:14:55:27

6  to units that I have collected to get the number

7  of units that would be affected.

8    Q.    So the -- the information that you

9  take from Professor Hauser is changes in

10  willingness to buy, and that's expressed in      12:15:13:00

11  terms of percentage of sales, percentage of

12  market, or what?

13    A.    What -- what arrives from Professor

14  Hauser's work is a percentage change in

15  willingness to buy, and that arrives for        12:15:35:12

16  multiple phone and I think tablet

17  configurations, different screen sizes, for

18  example, and different price points.

19    Q.    And you apply that --

20    A.    Can I finish or --                       12:16:00:09

21    Q.    Go ahead.

22    A.    I'm actually really not -- I hate to

23  say this but I'm really not even close to

24  finishing, so --

25    Q.    Let me withdraw the question.            12:16:06:21

Confidential Attorneys' Eyes Only

Page 99

```
 1     A.    Sure.  Yes.                          12:20:21:21
 2          Q.    What other quantitative information do
 3     you use regarding reduction in sales other than
 4     what's provided by Professor Hauser?
 5          A.    Well, as I said, one needs to have the12:20:30:27
 6     base unit sales with which to apply that
 7     percentage to get a number of units.  So I used
 8     that data, that quantitative data.  I have
 9     quantitative data on the price points and the
10     screen sizes of the products that allows me to  12:20:47:27
11     map them together, so that would be additional
12     quantitative data.
13          There are issues about what I do with
14     the linearization technique, but that's more
15     manipulating data than adding additional data.  12:21:04:18
16     So I think those are the principal elements.
17          Q.    Do you have any quantitative data that
18     you use other than the, what you referred to as
19     the output from Professor Hauser and the actual
20     sales information?                             12:21:20:00
21          A.    Literally in the computations, no, but
22     I do also have the "willingness to pay"
23     information from Professor Hauser's survey.
24     While that doesn't factor into the math, I
25     certainly took that into consideration in       12:21:36:27
```

Confidential Attorneys' Eyes Only

Page 100

1   evaluating the results I was using.          12:21:38:18

2        Q.   Do you reduce, in doing the work that

3   you do and coming up with the -- your

4   projections in the but-for world, do you apply

5   any reductions to Samsung's sales other than   12:22:02:06

6   those that result from the application of

7   Professor Hauser's willingness to buy data?

8        A.   There are some adjustments I make to

9   those numbers, yes, that don't come from the

10  Hauser survey.                               12:22:37:15

11       Q.   So I'm referring to reductions in

12  Samsung's sales.  Are there some additional

13  reductions to Samsung's sales which are not the

14  result of the application of Professor Hauser's

15  "willingness to buy" output?                 12:22:51:06

16            MR. THOMASCH:  Objection.  Asked and

17       answered.

18       A.   Right, so there are adjustments, but

19  I'm not sure any of them would qualify as

20  additional reductions.  I don't think so, but  12:23:02:24

21  I'm not absolutely sure.

22       Q.   So what are those reductions that you

23  have in your head that you are not sure if they

24  qualify?

25            MR. THOMASCH:  Objection to form.   12:23:12:15

Confidential Attorneys' Eyes Only

Page 103

1   Court rejects Professor Hauser's analysis and   12:26:03:27

2   decides that it's unfounded or cannot be relied

3   on, then to the extent that your opinions rely

4   on Professor Hauser's analysis, your opinions

5   would be unfounded as well; would you agree with12:26:16:12

6   that?

7           MR. THOMASCH:  Objection.  Calls for a

8       legal conclusion.

9           You may answer.

10  A.    I mean, I'm not sure I understand the 12:26:24:15

11  question.  Tautologically speaking, if inputs

12  that I rely upon are determined to be

13  unreliable, then given that those inputs have

14  been found to be unreliable and I'm using those

15  inputs, I would be using, by definition,       12:26:46:21

16  unreliable inputs.

17  Q.    Fair enough.  Your opinions concerning

18  the profits that Apple has lost are based upon

19  Professor Hauser's analysis, correct?

20          MR. THOMASCH:  Objection to form.    12:27:03:27

21  A.    In part.

22  Q.    And if Professor Hauser's analysis is

23  found to be unfounded or unreliable, then your

24  opinions regarding Apple's lost profits

25  similarly are unreliable and unfounded, correct?12:27:16:27

Confidential Attorneys' Eyes Only

Page 104

1           MR. THOMASCH:  Objection.  Misstates  12:27:20:06
2      the testimony, but asked and answered.
3      A.    In their entirety?  No.
4      Q.    In what respects would your opinions
5      still be reliable and have a basis if Dr.    12:27:31:12
6      Hauser's opinions are found to be unreliable and
7      unfounded?
8      A.    And you're focusing on the lost
9      profits?
10      Q.    Yes, your calculation of lost profits.12:27:45:12
11      A.    Well, there are aspects of lost
12      profits that relate to, colloquially speaking,
13      the blackout periods, which are the periods in
14      which Samsung has not redesigned and yet still
15      is infringing and for which damages still    12:28:06:12
16      accrue.  Those lost profit damages are not
17      dependent on Professor Hauser's survey results
18      directly.
19      Q.    But your other lost profits damages
20      opinions are dependent upon Dr. Hauser's results12:28:24:03
21      and opinions, correct?
22      A.    Yes, Dr. Hauser's results are a
23      necessary input to those calculations, as my
24      report currently stands, with respect to the
25      diminished demand aspect of lost profits.    12:28:42:09

Confidential Attorneys' Eyes Only

Page 160

1   you just identified that you say you looked at   14:34:14:00

2   have on your reasonable royalty damages

3   calculation?

4      A.   Well, in the end, I ultimately found

5   them for -- for various reasons that differed   14:34:24:24

6   from license to license, I found they provided

7   me some insight into the structure that I would

8   have anticipated for the hypothetical licenses

9   here, both offensive and defensive.

10        It provided some indication on that   14:34:52:18

11   front. Beyond that, I determined that when

12   properly understood and evaluated, that they

13   didn't shed a lot more insight.

14      Q.   So, in terms of the quantum, the

15   amount of the reasonable royalty that you   14:35:09:00

16   arrived at, would it be true to say that the

17   licenses that you looked at and which you just

18   identified did not have any impact on the amount

19   of the reasonable royalty that you thought was

20   appropriate?   14:35:26:18

21        MR. THOMASCH: Objection to form. You

22     may answer.

23      A.   I don't think I would characterize it

24   that way.

25      Q.   Is it true that those licenses you   14:35:32:00

Confidential Attorneys' Eyes Only

Page 161

1   looked at did inform your decision about what    14:35:36:03

2   the appropriate -- the amount of the appropriate

3   reasonable royalty would be in this case?

4       A.    Right.  My review of those licenses

5   factored into my ultimate royalty rate, but they14:35:47:09

6   were factored in by not changing the rate.

7   That's where I'm struggling with your question.

8       Q.    They were factored in by not changing

9   the rate.

10      A.    So I assessed them and I took my        14:36:03:12

11  assessments and determined whether that

12  assessment -- whether that assessment warranted

13  changes to the royalty rate that I had derived

14  previously, and I found that there wasn't

15  material information in those licenses that      14:36:20:03

16  would have that effect.

17      Q.    Did you use the income approach in

18  this case, that is to say, looking at the delta

19  in income generated by use of licensed

20  technology?                                      14:36:36:06

21      A.    That's one of the things I would have

22  looked at.

23      Q.    And did that have any impact on the

24  quantum, the amount of the reasonable royalty

25  that you thought was appropriate in this case?  14:36:43:09

Confidential Attorneys' Eyes Only

Page 163

1  2012?                                              14:37:57:24

2          MR. THOMASCH:   177.

3      A.    November 2012, that is correct.

4      Q.    And the hypothetical negotiation that

5  you posit in your analysis that Apple and      14:38:23:03

6  Samsung would have engaged in would have taken

7  place between June and December of 2011; is that

8  correct?

9      A.    Right, the negotiations, plural, as I

10 recall, that's the approximate date of those    14:38:41:03

11 hypothetical negotiations.

12     Q.    ███████████████████████

███████████████████████████████████████

███  ███  ████████████████████████████

███  ███████████████████████████  ████████████

███  ██████████

17     Q.    ██████████████████████████

███  ███████████  ████████████

███  ███  ████████████

███  ███  ████████  ███████████████  ████████████

███  ███████████████████████████████

███  ███████████████

███  ███  ██████████████

███  ███  █████████████████████████████

███  █████████████████████████  14:39:23:21

Confidential Attorneys' Eyes Only

Page 166

1 ██████████████        ███████████

█ ████  ███  ███████████████████

█ █████        ████████████████████

█ ████  ███████████████████        ███████████

█ ████████████████████████████

█ █████████████████████████

█ ███████████

8        MR. THOMASCH:  Objection to form.

9        ███  █████████████████████

█ ████████████████████████████        ███████████

█ ██████████████

12    Q.    In doing your reasonable royalty

13 analysis that you did in this case, you take

14 into account Apple's lost profits?

15    A.    In the reasonable royalty assessment? 14:42:36:18

16    Q.    Yes, sir.

17    A.    It would be their anticipated lost

18 profits as of the time of the negotiation.

19    Q.    And in fact, you say -- what you say

20 is that the reasonable royalty amount turns out 14:42:47:03

21 to be -- you believe is the minimum acceptable

22 rate to Apple, correct?

23    A.    Right.  I compute a minimum acceptable

24 rate to Apple, and then after I have completed

25 my analysis, the reasonable royalty rate resides14:43:02:18

Confidential Attorneys' Eyes Only

Page 167

1    in that level.                                    14:43:05:06

2        Q.    So you compute a minimum acceptable

3    rate to Apple, you do some analysis, and at the

4    end of your analysis, you conclude that the

5    reasonable royalty is the minimum acceptable    14:43:15:00

6    rate to Apple, true?

7            MR. THOMASCH:  Objection to form.

8        A.    I mean, there are elements of truth in

9    that, but it's not entirely accurate.

10       Q.    Well, in fact, you believe that the --14:43:28:12

11   what your opinion as to what -- you believe the

12   reasonable royalty amount is the minimum

13   acceptable rate to Apple, correct?

14       A.    Right, the value that I computed as a

15   conservatively low minimum acceptable rate to   14:43:51:09

16   Apple was what ultimately ended up being my

17   reasonable royalty assessment.

18       Q.    Right.  And the minimum acceptable

19   rate, according to your analysis, is the

20   incremental profits Apple would expect to forgo 14:44:04:00

21   as a result of the license, correct?

22       A.    It's what they would have expected for

23   a time period going forward in terms of losses

24   expressed as a loss per Samsung infringing unit.

25       Q.    In other words, Apple -- profits Apple14:44:40:18

Confidential Attorneys' Eyes Only

Page 168

1    would lose because it didn't sell devices --    14:44:43:00

2    because it would lose sales to Samsung as a

3    result of the license, correct?

4        A.    Expected, not actual.

5        Q.    Right.  And you arrive at that -- I    14:44:57:03

6    mean, your input on that, the way the -- the

7    incremental sales that Apple would lose to

8    Samsung, you get that from Professor Hauser's

9    analysis, correct?

10            MR. THOMASCH:  Objection.  Form.    14:45:16:12

11       A.    Right, there are -- there are inputs I

12   take from Professor Hauser in doing that

13   analysis.

14       Q.    Well, Professor Hauser measured,

15   purports to measure, how many more phones and    14:45:25:15

16   other devices Samsung would sell because they

17   used the patents under a license, correct?

18       A.    No, that's not what Professor Hauser

19   is doing.

20       Q.    Doesn't Professor Hauser measure how    14:45:36:06

21   many more phones Samsung sells as -- would sell

22   as a result of the use of the claimed Apple

23   patented technology?

24       A.    No, that's not what -- that's not what

25   Professor Hauser does.    14:45:48:15

Confidential Attorneys' Eyes Only

Page 174

1    tell me what it is.                              14:51:52:15

2         A.    So in my reasonable royalty analysis,

3    which is what we're talking about, I am

4    assessing marketplace dynamics, and some of that

5    would -- would be reflected in quantitative data 14:52:08:03

6    I received.

7              I've got charts in my report that show

8    relative changes in shares among various players

9    in phones and tablets, and that factors into my

10   analysis.  That one -- that one comes to mind as 14:52:25:00

11   I sit here.

12        Q.    You say, "...marketplace dynamics and

13   some of that would be reflected in quantitative

14   data I received."  When you said that --

15        A.    Right.                                14:52:46:15

16        Q.    -- just now, what is that quantitative

17   data?

18        A.    There would be data that I collected

19   and plotted in studies on various measures of

20   market shares and how those changed over time.  14:52:58:06

21        Q.    So in arriving at, as I understand it,

22   the minimal acceptable rate to Apple, which you

23   conclude is the reasonable royalty amount, is

24   the incremental profits Apple expected to forgo

25   as a result of the license, correct?            14:53:28:12

Confidential Attorneys' Eyes Only

Page 175

1     A.    The expected incremental profits it   14:53:30:15

2   would expect it would not earn if it granted a

3   license; that it would earn if it didn't grant

4   the license for a certain period of time.

5     Q.    With that modification, my statement   14:53:42:15

6   is correct?

7     A.    Yes.

8     Q.    And the source for your information

9   concerning the Apple devices that would not be

10  sold as a result of the Samsung license, are you14:54:02:21

11  with me so far?

12    A.    Again, expected, but I'm with you so

13  far.

14    Q.    All right.   Expected, that it's

15  expected sales Apple would not make as a result 14:54:11:24

16  of licensing Samsung, that again is based upon

17  Professor Hauser's analysis?

18          MR. THOMASCH:   Objection to form.   You

19      may answer.

20    A.    That's one of the inputs, yes.      14:54:21:27

21    Q.    What other inputs besides that,

22  besides Professor Hauser's?

23    A.    Well, there's everything else I

24  identified in my report that factored into my

25  assessment of reasonable royalty.        14:54:35:00

Confidential Attorneys' Eyes Only

Page 180

1       A.    Okay, so there's no --              15:00:17:15

2       Q.    Okay?  It's all thrown out.  Then your

3    reasonable royalty opinion is baseless, correct?

4             MR. THOMASCH:  Objection to form.

5       Argumentative.  You may answer.           15:00:24:15

6       A.    Well, that, that basis for my

7    calculations by construction becomes baseless.

8    Whether that irretrievably infects the entire

9    analysis, it might, but I'm not sure about that.

10      Q.    Well, the only data input you have on 15:00:54:00

11   willingness to buy is from Professor Hauser,

12   correct?

13      A.    That's correct.

14      Q.    And if you don't have input on

15   willingness to buy -- strike that.            15:01:05:00

16            Data on willingness to buy is

17   essential for your reasonable royalty analysis,

18   correct?

19      A.    I wouldn't quite characterize it that

20   way, no.  It's an important part of what I     15:01:14:06

21   ultimately did, but if you're asking me what I

22   would have done if I hadn't had that, that's a

23   different question.

24      Q.    No, I'm asking you where you are now,

25   given what you now have done, isn't it true that15:01:26:03

Confidential Attorneys' Eyes Only

Page 181

1  if you didn't have Professor Hauser's          15:01:29:24
2  willingness to buy data, you wouldn't have a
3  basis for your reasonable royalty opinion that
4  you have given so far?
5          MR. THOMASCH:  Objection.  Asked and  15:01:40:18
6      answered.  Argumentative.
7          You may answer.
8      A.    Well, if you take one of the bases
9  away, then I -- I'm really struggling with the
10 question.  Again, it seems tautological.  I      15:01:56:24
11 mean, the idea is that, in my actual
12 determination of my opinions, I collected
13 information and interpreted it in the context of
14 my receipt of Professor Hauser's results.
15          In a world where I'm asked to assess  15:02:16:09
16 that royalty and I'm assumed to have never
17 gotten or to not have or to not be able to rely
18 upon Professor Hauser's survey, would my royalty
19 determination in that instance be baseless?  And
20 the answer is I don't know because I haven't    15:02:34:21
21 been faced with that constraint.
22     Q.    So your reasonable royalty opinion as
23 it exists now, it's Professor -- data on
24 willingness to buy is an essential part of your
25 opinion as it exists in its present form,       15:02:51:24

Confidential Attorneys' Eyes Only

Page 182

1    correct?                                          15:02:55:06

2            MR. THOMASCH:  Objection.  Just asked

3        and answered.

4        A.    As it currently exists, the model

5    requires certain inputs, and one of those inputs15:03:02:18

6    is at present derived from Professor Hauser's

7    results.

8        Q.    And included specifically his results

9    regarding willingness to buy, true?

10           MR. THOMASCH:  Objection to form.    15:03:21:21

11       A.    Yes.

12       Q.    In doing your reasonable royalty

13   analysis, have you taken into account any offer

14   to license that Apple made to Samsung?

15       A.    I was aware of those offers at the    15:03:44:09

16   time I reached my opinions, so I took them into

17   consideration.

18       Q.    And how did they factor into the

19   calculation of the reasonable royalty that you

20   have opined on?                                  15:03:58:00

21       A.    Oh, I ultimately found they weren't

22   directionally probative.

23       Q.    So did the real-world offers that --

24   to license that Apple made to Samsung factor

25   into the reasonable royalty number that you have15:04:16:03

Confidential Attorneys' Eyes Only

Page 183

1    opined on?                                              15:04:19:15

2              MR. THOMASCH:  Objection to form.

3         A.    I considered those licenses.  So, as

4    part of my formation of my opinions, I took them

5    into consideration, but in the end, given their 15:04:30:12

6    inapt nature, I gave them essentially no weight.

7         Q.    So they did not impact the number in

8    any way up or down, is that true?

9         A.    I'm not really sure how to answer

10   that.  My -- my consideration of the appropriate15:04:54:09

11   reasonable royalty rate gave very little weight

12   to those Apple interactions with Samsung.

13        Q.    Did it -- did your consideration of

14   that nudge the number up or down or in any

15   direction?                                             15:05:16:03

16        A.    It didn't nudge the number.

17        Q.    Is your -- in your report anywhere is

18   there any reference to the offer to license that

19   Apple made to Samsung?

20        A.    Yes.                                        15:05:34:03

21        Q.    Where is that?  Can you find that?

22        A.    Well, it's not explicitly in the -- in

23   the text or the body of the report, but in my

24   documents considered, that would have been one

25   of the documents considered.                           15:05:46:18

Confidential Attorneys' Eyes Only

Page 184

1    Q.    But in terms of the -- you do not    15:05:48:15

2  address that in either the report you have

3  provided us or in the exhibits to the report, is

4  that true?

5         MR. THOMASCH:  Objection to form.    15:05:59:09

6    A.    I considered it, gave it essentially

7  no weight, which indicate -- and so it doesn't

8  appear as a bases for my opinions in the text or

9  other exhibits.

10    Q.    Why did you give it no weight?    15:06:13:15

11    A.    ███████████████████████████████

██  ██████████████████████████████████

██  ████████████████████████████████████

██  ████████████████████████████████

██  █████  █████████████████████  ████████████

██  ████████████████████████████████

██  ███████████████████

██    ███  ██████████████████████

██  ████████████████

20         MR. THOMASCH:  Objection to form.    15:07:00:06

21    A.    I'm sorry, didn't what?

22    ███  ████████████████████████

██  ███████████████████████████████

██  ███████

25    A.    Well, the document I'm thinking of is 15:07:08:00

Confidential Attorneys' Eyes Only

Page 305

1    you to in any respect question your reliance on 18:38:08:03

2    Professor Hauser's work?

3        A.    No.

4        Q.    Did you do anything to test the

5    reasonableness of Dr. Hauser's conclusions from 18:38:19:24

6    the -- his conjoint survey?

7            MR. THOMASCH:  Objection to form.

8        A.    From a formal statistical standpoint,

9    no, I did not do that.  Of course, I would have

10   looked at his results and -- and considered them18:38:46:24

11   in the context of the other evidence I had

12   collected in the case to see if it led to

13   fundamentally different conclusions that would

14   cause me concern.  So I would have done that,

15   and nothing -- nothing came out of that        18:39:05:06

16   exercise.

17       Q.    Let me use your word.  Did you do

18   anything to test the reasonableness of the

19   results that Professor Hauser's conjoint study

20   yielded?                                        18:39:23:24

21           MR. THOMASCH:  Objection to form.

22       A.    I didn't do any additional statistical

23   tests on Professor Hauser's work, and on a more

24   general level that, given that Professor

25   Hauser's work was one of the inputs I relied    18:39:38:06

Confidential Attorneys' Eyes Only

Page 306

1    upon, I would have considered that input      18:39:42:09

2    relative to the evidence I had on the other

3    inputs to see if there were some gross

4    inconsistencies that might suggest robustness or

5    accuracy issues in the results from Dr. Hauser, 18:39:56:24

6    and in doing that I didn't see anything that

7    raised red flags for me.

8         Q.    You responded, among other things, in

9    terms of a statistical study and you indicated

10   you didn't do anything from a statistical      18:40:13:12

11   standpoint.

12            Did you do anything at all from a

13   standpoint -- did you do anything, any check

14   involving quantitative analysis of the results

15   of Professor Hauser's conjoint study?         18:40:30:09

16            MR. THOMASCH:   Objection.   Asked and

17      answered.

18        A.    I don't think I would characterize the

19   tests I undertook as quantitative.

20        Q.    So the answer is no?                18:40:46:18

21        A.    The answer is no.

22        Q.    Did you take the Hauser survey

23   yourself, the survey that he had participants

24   complete?

25        A.    Did I fill it out?                  18:40:54:21

Confidential Attorneys' Eyes Only

Page 307

1    Q.    Yes, sir.                                        18:40:56:03

2    A.    I did not fill it out.

3          MR. QUINN:   Okay.   We'll designate

4    this attorney's eyes only, the entire

5    transcript, and with that, we've concluded   18:41:07:03

6    the deposition.

7          MR. THOMASCH:   All right.   Thank you,

8    Dr. Vellturo.

9          THE VIDEOGRAPHER:   The time is 6:42

10   P.M.  We're going off the record.            18:41:19:24

11                       oOo

12

13

14

15                                                18:41:20:27

16

17

                   _____

                   CHRISTOPHER VELLTURO, PH.D.

18

19   Subscribed and sworn to

     before me this    day

20   of      2013.                                18:41:20:27

21

     _____

22

23

24

25

Confidential Attorneys' Eyes Only

Page 308

1                                                          18:41:20:27

2                              CERTIFICATE

3       STATE OF NEW YORK )

                              :   ss

4       COUNTY OF NEW YORK)

5            I, Kathy S. Klepfer, a Registered

6       Merit Reporter and Notary Public within and

7       for the State of New York, do hereby

8       certify:

9            That CHRISTOPHER VELLTURO, PH.D., the

10      witness whose deposition is herein before

11      set forth, was duly sworn by me and that

12      such deposition is a true record of the

13      testimony given by such witness.

14           I further certify that I am not

15      related to any of the parties to this action

16      by blood or marriage and that I am in no way

17      interested in the outcome of this matter.

18           In witness whereof, I have hereunto

19      set my hand this 25th day of September 2013.

20

21           ------------------------------

             KATHY S. KLEPFER, RPR, RMR, CRR, CLR

22

23

24

25

# EXHIBIT Q
## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Apple Inc. v. Samsung Electronics Co., LTD., et al.

## Linearized and Combined Impacts on Demand of Removing Patented Features Implied by Conjoint Results
## Accused Smartphones, by Device and Patent

| Device | Actual Screen Size 1/, 2/ | Actual Price 3/, 4/ | Closest Conjoint Result Screen Size | Closest Conjoint Result Price | Cumulative Impact of Individual Patents on Demand 5/ | 414 | 647 | 959 | 760 | 721 | 172 | Combined Impact of 414, 647, & 959 8/, 9/ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Admire | 3.5 | ■ | 4.0 | $99 | 50.71% | 8.40% | 7.09% | 4.73% | 10.44% | 6.88% | 13.17% | 26.95% |
| Captivate Glide | 4.0 | ■ | 4.0 | $99 | 50.71% | 8.40% | 7.09% | 4.73% | 10.44% | 6.88% | 13.17% | 26.95% |
| Conquer 4G | 3.5 | ■ | 4.0 | $49 | 49.46% | 8.21% | 6.98% | 4.46% | 10.08% | 6.94% | 12.79% | 26.14% |
| Dart | 3.1 | ■ | 4.0 | $49 | 39.42% | 8.83% | 7.51% | 4.79% | 10.83% | 7.46% | | 26.14% |
| Galaxy Exhibit II 4G | 3.7 | ■ | 4.0 | $49 | 49.46% | 8.21% | 6.98% | 4.46% | 10.08% | 6.94% | 12.79% | 26.14% |
| Galaxy Nexus | 4.7 | ■ | 4.8 | $149 | 46.17% | 7.39% | 6.14% | 3.99% | 8.98% | 7.11% | 12.56% | 25.23% |
| Galaxy Note | 5.3 | ■ | 5.5 | $249 | 46.47% | 8.78% | 7.25% | 5.10% | 11.17% | | 14.17% | 29.13% |
| Galaxy Note II | 5.5 | ■ | 5.5 | $299 | 40.26% | 10.93% | 8.87% | 6.62% | 13.84% | | | 33.86% |
| Galaxy Rugby Pro | 4.0 | ■ | 4.0 | $99 | 34.57% | 9.47% | 8.00% | 5.34% | 11.77% | | | 26.95% |
| Galaxy S II AT&T | 4.3 | ■ | 4.0 | $149 | 55.11% | 9.01% | 7.95% | 5.59% | 11.51% | 6.66% | 14.39% | 30.29% |
| Galaxy S II T-Mobile | 4.5 | ■ | 4.8 | $149 | 46.17% | 7.39% | 6.14% | 3.99% | 8.98% | 7.11% | 12.56% | 25.23% |
| Galaxy S II Epic 4G Touch | 4.5 | ■ | 4.8 | $149 | 46.17% | 7.39% | 6.14% | 3.99% | 8.98% | 7.11% | 12.56% | 25.23% |
| Galaxy S II Skyrocket | 4.5 | ■ | 4.8 | $149 | 46.17% | 7.39% | 6.14% | 3.99% | 8.98% | 7.11% | 12.56% | 25.23% |
| Galaxy S III | 4.8 | ■ | 4.8 | $199 | 34.13% | 9.49% | 7.88% | 5.30% | 11.46% | | | 28.91% |
| Illusion | 3.5 | ■ | 4.0 | $99 | 40.46% | 9.05% | 7.64% | 5.10% | 11.25% | 7.42% | | 26.95% |
| Stratosphere | 4.0 | ■ | 4.0 | $99 | 50.71% | 8.40% | 7.09% | 4.73% | 10.44% | 6.88% | 13.17% | 26.95% |
| Transform Ultra | 3.5 | ■ | 4.0 | $49 | 49.46% | 8.21% | 6.98% | 4.46% | 10.08% | 6.94% | 12.79% | 26.14% |

Linearized Impact on Demand of Removing the Patented Feature 6/, 7/

Sources/Notes:
1/ Screen Size is measured diagonally in inches.
2/ Source: Exhibit 7
3/ Actual Prices are retail prices net of available rebates with commitment to a two-year contract and averaged over damages period, based on historical terms offered by major carriers.
4/ Source: Exhibit 13-B Historical Pricing of Accused Smartphones
5/ The Cumulative Impact on Demand is calculated by multiplying the percentages of demand remaining for a device after removing each patented feature individually, then subtracting the cumulative result from 100%.
6/ Impact on Demand of Removing the Patented Feature for each patent and product has been linearized so as to sum to the Cumulative Impact (see Vellturo Report,  ¶¶  313-314).  The Linearized Impact on Demand for each patent is calculated by multiplying the Cumulative Impact on Demand by the patent's share of the sum of the individual patents' impact on demand for each device.
7/ Strict Impact on Demand of Removing the Patented Feature, by device and patent: Exhibit 13-A.
8/ Combined Impact of 414, 647, & 959 refers to the impact on demand of removing the three patented features together.
9/ Source: Expert Report of John Hauser, August 11, 2013, Exhibit O1 at 7.

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT S
# ˙REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| APPLE INC. <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC. AND SAMSUNG TELECOMMUNICATIONS AMERICA, LLC | Case No. 12-cv-00630-LHK |

**REBUTTAL EXPERT REPORT OF JEFFREY CHASE, PH.D**
**REGARDING NONINFRINGEMENT OF THE ASSERTED CLAIMS OF**
**U.S. PATENT NO. 7,761,414**

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE

████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

C.1.     Hauser Report.

(a)     *Description of Patented Technology*

46.     Dr. Hauser's survey included the following description of "Background Syncing":



Background Syncing

> The Background Syncing feature allows you to continue to use an app while data related to that app that is stored on your [smartphone/tablet] synchronizes with data stored elsewhere, such as on a remote computer. For example, you can access and edit data, such as the list of contacts on your [smartphone/tablet], even as your phone is sending data for those contacts to your work computer.  Without this feature, you would have to wait to use an app, for example the contacts app, while the data for the app is synchronizing with a remote computer, and that wait may be long or short.

(Hauser Report Exs. E & G (smartphone), F & H (tablet).)

47.     As discussed in greater detail in section XI of this Report, the functionality described above by Dr. Hauser was well known and practiced prior to the purported invention of the '414 patent.  The '414 patent did not enable "background syncing" as a new feature in data processing systems.   Moreover, the term "background syncing" was well known and used in the

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE

prior art long before the purported invention of the '414 patent. Indeed, years before the '414 patent, the phrase "background sync" was used to connote the same functionality described by Dr. Hauser as a supposedly novel feature of the '414 patent. (*See infra* section XI.)

48. I also note that Dr. Hauser's description of "background syncing" relates only a single "app" and data class and therefore at best describes only claim 11 of the '414 patent. Dr. Hauser provides no description of the limitations of asserted claim 20 of the patent, and makes no attempt to measure the value to users of claim 20.

49. In my opinion, Dr. Hauser's description of "background syncing" overstates the alleged invention of the patent with respect to the asserted claims. First, Dr. Hauser's suggestion that the alleged patented invention may be reduced to the concept of "background syncing" is inconsistent with Dr. Snoeren's analysis of the '414 patent. As described in Dr. Snoeren's report, claim 11 of the '414 patent describes a specific implementation that requires the computer system to execute concurrently (i) a first thread for a user interface that allows users to access and edit data in a database, and (ii) a second thread for synchronization provided by a software component that causes retrieval and storage of the data in that database, with the two threads both active during some overlapping time interval. These concepts are not captured by Dr. Hauser's simplistic analysis. Dr. Hauser fails to mention, much less measure, the value of the implementation details recited in the '414 patent, including the use of "software components" for synchronization, the use of "databases " for storage, or the use of a thread other than a "non-synchronization processing thread" to provide a user interface. The survey instead measures the value of prior art functionality, not the alleged value of any allegedly novel implementations of "background syncing."

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE

50.     To the extent Dr. Hauser suggests that the alleged patented invention requires the user to be able to access and edit local data throughout the ***entire*** duration of synchronization, I disagree.  The asserted claims do not require that the user maintain the ability to edit data throughout the entire synchronization process.  To the contrary, the patent explicitly discloses that while the synchronization processing thread has locked the local database, the user interface may "present an alert to the user that *the system cannot accept changes until synchronization is complete*."  ('414 patent at fig. 13A (emphasis added); *see id.* at 25:40-47.)

51.     In any event, as discussed in sections VII-VIII of this Report, the accused apps themselves do not allow a user to access and edit data throughout the entirety of a synchronization process, nor does Dr. Snoeren contend that they do.  Therefore, to the extent that Dr. Hauser's description suggests that "background syncing" as taught by the '414 patent requires continuous access to the user interface and the ability to access and edit data throughout a synchronization, the Accused Products cannot infringe the asserted claims.

52.     Moreover, Dr. Hauser's use of the term "background synchronization" is misleading, as the Accused Products themselves use the term "[b]ackground data" with respect to synchronization settings to refer to an application's ability to send and receive data in the background, even when the application ***itself*** is not running.  (*See, e.g.*, SAMNDCA630-00920057 ("General Sync Settings:  Background Data – When enabled, all accounts can sync, send, and receive data ***at any time,*** in the background."); Samsung, Verizon Wireless Galaxy Nexus FAQ:  Restricting Data Usage, available at http://www.samsung.com/us/support/faq/FAQ00045376/46026 ("Background data usage occurs ***when the app is closed***.") (emphasis added).)  To the extent that Dr. Hauser's use of the term "background synchronization" suggests that the purported invention of the patent includes

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE

"background" synchronization of data for an application while that application is closed and its user interface is not running—*i.e.*, **multitasking** during synchronization—Dr. Hauser's description of synchronization in the "background" overstates the scope of the asserted claims.

53.    Dr. Hauser's description also omits multiple limitations of claim 11, including the requirement that the products synchronize data between first and second "databases," and that the product include a "synchronization software component" that both "provides" a "synchronization processing thread" and is "configured to synchronize the structured data from the first database with the structured data from [the] second database."  ('414 patent cl. 11.) Dr. Hauser's description therefore fails to capture the value of any such alleged points of novelty, and instead captures significant prior art to the claimed invention.  (*See infra* section XI.)

54.    I further disagree with Dr. Hauser's statement that "without [the background syncing] feature, you would have to wait to use an app, for example the contacts app, while the data for the app is synchronizing with a remote computer."  First, as discussed in greater detail below in ¶¶ 58-59, the Accused Products ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████Because the asserted claims of the patent would necessarily not be practiced in this case,  removing the alleged inventive "background syncing" feature of the claims would result in no change in user functionality.

55.    Moreover, Dr. Hauser's statement arbitrarily omits prior art that performed "background synchronization" as defined by Dr. Hauser, and ignores alternative technologies disclosed by Samsung and recognized to be non-infringing by Dr. Snoeren.  For instance, neither

EXPERT REPORT OF J. CHASE REGARDING NONINFRINGEMENT OF '414 PATENT

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE

the "Offline Mode Syncing" nor the "Disabling Editing of Local Database Through User

Interface" alternatives described in section IX of this Report would require the user to "wait" at

any point during the synchronization process.

56.     In addition, it is misleading for Dr. Hauser's survey to state that any "wait may be

long or short."  This statement is unsupported by any analysis in the reports of Dr. Hauser, Dr.

Vellturo or Dr. Snoeren.  I note that, as discussed in greater detail in ¶¶ 61-62 below, the

Accused Products may ███████████████████████████████████████

████████████████████████████████████████████████

(b)     *Video Demonstration*

57.     Dr. Hauser's survey also included a video demonstration illustrating his

description of "background syncing."  I have reviewed this video and express my opinions

below.



58.     First, I disagree with the video's suggestion that the Accused Products ██████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████   ████████  ████████████████

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE



59.   Moreover, Android ████████████████████████████████

60.   As discussed above, the video does not describe the use of "databases" or "synchronization software components," and therefore fails to describe accurately the disclosure of the patent.

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE



61.     Finally, Dr. Hauser's video improperly suggests that if "background synchronization" were not enabled, the user would have to wait several seconds after saving a local change before he or she could continue to use the app's user interface.  As noted above in ¶¶ 58-59, the Accused Products ███████████████████████████████████ ████████████████████████████████████   The video's depiction of a "wait" also does not take into account prior art that performed "background synchronization" as defined by Dr. Hauser, and arbitrarily ignores alternative technologies disclosed by Samsung and recognized to be non-infringing by Dr. Snoeren.

62.     To test the assumptions in Dr. Hauser's video, I analyzed the length of actual synchronization operations performed in the Contacts, Calendar, and Gmail applications on a wi-fi -enabled Samsung Galaxy S III phone running Android 4.1.2.[4]   These operations were recorded by connecting the debugging-enabled phone, with "Sync Manager" tracing enabled via Developer Options in the Settings application, to a laptop computer with the Android Developer Tools bundle installed.  The Android System Trace or Systrace tool was used through the

---

[4]   The synchronization operations recorded were initiated by (i) editing a contact in Contacts, (ii) editing an appointment in Calendar, and (iii) marking a mail message as read in Gmail. The accounts tested contained 5 mail messages, 5 contacts, and 5 appointments.

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE

Android Debug Monitor to trace synchronization activity per the settings above.  The resulting

trace files displayed the duration of each Sync Adapter's ████████  ████████████

████████████████████████████████████████████

████████████████████████████████  ████████████████

████████  ████████████  ████████████

████████████████████████████  ████  ████████  ████████

████  ████████████████████████████These calls bracket the entire execution

of the accused "synchronization processing thread."  The traces, which are included in Exhibit 1

to my Report, demonstrate that the video significantly overstates the length of any wait for the

synchronization activity depicted.[5]

- Synchronization in Contacts using an Outlook.com account over Exchange ActiveSync took between 95 and 193 ms, with an average length of 123 ms;

- Synchronization in Contacts using a Google account took between 681 and 1330 ms, with an average length of 916 ms;

- Synchronization in Calendar using an Outlook.com account over Exchange ActiveSync took between 385 and 584 ms, with an average length of 469 ms;

- Synchronization in Calendar using a Google account took between 974 and 1570 ms, with an average length of 1228 ms; and

- Synchronization in Gmail took between 1155 and 1696 ms, with an average length of 1373 ms.

---

[5]  Each test was recorded for 45 seconds.  While these tests confirmed that ████████████ ████████████ note that the start time of the attached traces corresponds to the first call to *Trace.traceBegin* in the code —*e.g.*, the beginning of the synchronization—not the time that recording was initiated in Android Developer Tools.  In certain traces, multiple synchronization operations are displayed.  In traces for the Calendar app an unrelated thread associated with Activity.java appears due to an apparent error in the SysTrace tool.

EXPERT REPORT OF J. CHASE REGARDING NONINFRINGEMENT OF '414 PATENT

ATTORNEYS' EYES ONLY – CONTAINS SOURCE CODE

Date: September 13, 2013

_____

Jeffrey S. Chase