# EXHIBIT T

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>   Plaintiff,<br><br>  vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>   Defendants. | CASE NO. 12-cv-00630-LHK<br><br><br>**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE** |

**REBUTTAL EXPERT REPORT OF MARTIN RINARD, PH.D.
REGARDING NONINFRINGEMENT OF
CLAIMS 24 AND 25 OF U.S. PATENT NO. 6,847,959**

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

**XI.    COMMENTS ON THE HAUSER REPORT'S AND VELLTURO REPORTS' DESCRIPTIONS OF THE ASSERTED PATENTS AND ACCUSED TECHNOLOGY**

524.    I have reviewed the August 11, 2013 Expert Report of John R. Hauser (the "Hauser Report") as well as its exhibits.  I have also reviewed the survey referenced in the Hauser Report and reviewed the video relating to the '959 patent in that survey.  For the reasons

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

identified below, I believe that the survey inaccurately and misleadingly described both the scope of the asserted claims of the '959 patent and the functionality of the Accused Products.

525.    The Hauser Report names the '959 patent "patent-related feature" "Universal Search." (Hauser Report, ¶ 74.) The Hauser Report, as well as the associated survey, describes Universal Search as follows:

> "**Universal Search.** Universal Search lets you use a single search to find information from different sources of information, for example data stored on your smartphone [tablet] as well as information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find good results tailored to each source. For example, when you type "George" in a single search box, the feature searches the Internet for "George," which might yield web pages about George Washington, and at the same time searches for "George" stored on your smartphone [tablet], which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files. Without Universal Search, you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application."

(*Id.*)

526.    Initially, this description is ambiguous and confusing as to the meaning of the word "source[s]." "Sources" is not a term used in the '959 patent. Claim 24 of the '959 speaks both of a "plurality of heuristics" and of locating information on both the Internet and on local storage media, but neither the patent specification nor the claims references any "source" or "sources." To the extent that this description is intending to capture concepts in the '959 patent, it is not clear why terms that appear in the patent would not more accurately describe the alleged invention.

527.    The term "source" is also ambigious in this description. The first sentence identifies "data stored on your smartphone [tablet]" and "information found on the Internet" as sources. (Hauser Report, ¶ 74: "sources of information, for example data stored on your

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

smartphone [tablet] as well as information found on the Internet.")  But the last sentence appears to imply that each application is a source.  (Hauser Report, ¶ 74: "you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application.") This ambiguity could lead a reader or listener to misinterpret the scope of the asserted claims in this case. For example, if a reader or listener understands "source" to describe individual applications, the reader or listener might believe that "Universal Search" would include a search technique that searches multiple applications, even if the applications were all local to the device, which is clearly outside the scope of the asserted claims. I note that the Opening Snoeren Report seems to equate "sources" with the claimed "locations."  (Opening Snoeren Report, ¶ 89: "it enhances the ease of use by allowing the user to input a single query and have that query searched across multiple data sources, including both the local device and the Internet"; Opening Snoeren Report, ¶ 6: "The '959 Patent is directed to the general problem of efficiently locating information across varying information sources, e.g., information stored locally on a device as well as information remotely available on the Internet.")

528.    The final sentence of this description of Universal Search reads "[w]ithout Universal Search, you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application." (Hauser Report, ¶ 74.)  This sentence is false both when compared to the description's scope of Universal Search and as a description of the scope of claim 24 of the '959 patent.  First, without Universal Search as defined in the Hauser Report, there are other methods to search multiple information sources with a single search.  For instance, the Hauser Report's description of Universal Search states that "Universal Search used different rules of thumb for searching the

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

different sources." (*Id.*)  Accordingly, one method to perform a multi-source search without the Hauser Report's Universal Search is to use no rules of thumb, or only a single rule of thumb. Another method to perform a multi-source search without infringing claim 24 of the '959 patent is to employ rules of thumb that consist solely of constraint satisfaction parameters.  (Opening Snoeren Report, ¶ 98.)  If "sources" refers to the Opening Snoeren Report's accused heuristics, another way to search multiple sources without infringing the asserted claims of the '959 patent would be to use multiple heuristics to search multiple sources, but, for any given search, only search local storage media or the Internet, but not both in the same search.  I understand that Apple has conceded that searching only local storage media, or only the Internet, does not infringe any of the asserted claims.  (*See* Opening Snoeren Report, ¶ 350: "While [an Internet-only Google Search Application] design may avoid literal infringement of claim 24 of the '959 Patent"; Apple's July 15, 2013 Interrogatory Responses at 150: arguing Sherlock does not anticipate claim 24 because "the references cited by Samsung describe Sherlock as providing one window for searching the internet and another window for find file, where there is never a single input provided to both.")

529.    As noted above, the final sentence of this description of Universal Search reads "[w]ithout Universal Search, you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application."  (Hauser Report, ¶ 74.)  This statement gives the false impression that the only possible alternative design to the alleged invention described in the claims is what the Opening Snoeren Report described as the "Eighth Alleged Alternative," that is, "remove the Quick Search Box and replace it with each application having its own search user interface."  (Opening Snoeren Report, ¶ 332.)  But the Opening Snoeren Report acknowledges that there are ten other

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

alternatives.   (*See* Opening Snoeren Report, ¶¶ 322-35.)  In particular, as described above, searching all of the information stored on the device with a single search would not infringe the asserted claims of the '959 patent.

530.   The Hauser Report's description of Universal Search says that the feature "searches the Internet for 'George,' which might yield web pages about George Washington." (Hauser Report, ¶ 74.)  This does not accurately describe either the video displayed in connection with the survey or the accused functionality identified in the Opening Snoeren Report.  The video shows, not "web pages about George Washington," but rather a suggestion that the user perform a Google search for George Washington.  (*See* Opening Snoeren Report, ¶ 150: "The Google Suggestion provider is used to query Google's servers for search suggestions based on content from Google's search engine on the Internet. . .  When a user selects a search suggestion a web search for that suggestion is triggered.")  I note that, in some cases, the device may display a so-called "navsuggest," which is a link to a web site, but is not itself a web site or web page. (June 28, 2013 Bringert Deposition at 179:11-19.)  The Opening Snoeren Report mentions navsuggests only in tangential footnotes, and is not asserting that navsuggests are part of the infringing functionality.  (Opening Snoeren Report at p. 47, fn. 25; p. 48, fn. 27; p. 61, fn. 66.)

531.   This description of Universal Search mentions "rules of thumb," invoking a part of the Court's construction of "heuristic algorithm," but it omits the second part of that construction, "does not consist solely of constraint satisfaction parameters."  (Opening Snoeren Report, ¶ 98.)  Because of this, this description is therefore broader in scope than the claims of the '959 patent.  Further, it is not apparent from the video whether any rule of thumb is being employed whatsoever.  The video displays only a single contact ("George Adams") and a single musical artist ("George Michael") in response to the "Ge" query:

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**



If there were only a single contact and a single musical artist matching that query, then a search

algorithm based only on constraint satisfaction parameters would be able to provide this output,

without the need to resort to any non-constraint rule of thumb.

532.    The description of Universal Search does not comport with Snoeren's

infringement accusations against the Google Search Application.  This description alleges that

"Universal Search uses different rules of thumb for searching the different sources," presumably

referring to the smartphone and Internet sources references in the preceding sentence.  But the

Opening Snoeren Report does not allege that the Accused Products employ a rule of thumb to

search the Internet.   (Opening Snoeren Report, ¶ 255: "The Web module further locates

information on the Internet as required by Claim 24"; Opening Snoeren Report, ¶ 268: "The

Google Content Provider further locates information on the Internet as required by Claim 24";

Opening Snoeren Report, ¶ 290: "The Google Content Provider further locates information on

the Internet as required by Claim 24.")  Accordingly, this description of Universal Search does

not accurately describe the accused feature, according to the Opening Snoeren Report.

533.    This description of Universal Search does not limit Universal Search to only

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

searches of information both in local storage media and on the Internet.  Instead, the description states "Universal Search lets you use a single search to find information from different sources of information, ***for example*** data stored on your smartphone [tablet] as well as information found on the Internet."  (Hauser Report, ¶ 74 (emphasis added).)  In other words, the survey does not limit its description of Universal Search to searches of both local storage media and the Internet, but rather implies that any search of different sources of information would quality as a Universal Search.  That is not consistent with the scope of claim 24.  As discussed above with respect to Section VIII, there are a number of non-infringing methods to use a single search to find information in multiple sources.  This description instead describes Universal Search as encompassing all methods of using a single search to find information in multiple sources.  This is not consistent with the scope of claim 24.

534.    I note that the description of Universal Search does not appear to attempt to describe the feature of dependent claim 25.

535.    Dr. Hauser's survey includes a video that Dr. Hauser claims to demonstrate the operation of the accused feature.  The functionality disclosed in this video was present in the prior art.  The videos attached to this report are exemplary illustrations of the functionality that Dr. Hauser asserts is covered by claim 24 of the '959 patent.  These videos are exemplary illustrations only, and I may rely on other demonstrations of the same prior art as support for my opinions in this case.

INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

Name

Sept. 13, 2013

Date

# EXHIBIT U

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

**Before the Honorable Lucy H. Koh**
**Federal District Court Judge**

| | |
|---|---|
| APPLE, INC, a California corporation, Plaintiff<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, Defendants. | CASE NO. 12-CV-00630-LHK |

**REBUTTAL EXPERT REPORT OF SAUL GREENBERG, PH.D., REGARDING NONINFRINGEMENT OF THE ASSERTED CLAIM 8 OF U.S. PATENT NO. 8,046,721**

REBUTTAL EXPERT REPORT OF S. GREENBERG RE: NONINFRINGEMENT OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

B.1.        Apple's expert did not survey users regarding the '721 Patent on smart phones.

199.   Dr. Hauser's survey results on the '721 patent are limited to tablets, and therefore inapplicable to smartphones.  Dr. Hauser did not include the "slide to unlock" (keyguard UI) feature for the '721 patent in the smart phone survey, instead only asking participants of the tablet survey about the feature (though Apple has not accused any Samsung tablets).  It appears that in calculating the damages for the '721 patent, Apple's expert, Christopher Vellturo, simply applied the tablet survey results to smartphones.  (*See* Expert Report of Chris Vellturo p. 104, FN506: "The 'slide to unlock' Accused Feature associated with the '721 Patent was studied only in the tablet survey.  (Conversation with Dr. John Hauser.)  For this patent only, I therefore apply survey results from the tablet survey to smartphones.")

200.   The size of the touch-screen and form-factor of the hardware are significant concerns in designing any user interface.   A UI may be suitable for a phone, but can be wholly unsuitable for a tablet, and vice versa.

B.2.        Apple's expert did not survey users regarding the accused functionalities of the "Tongue/No Dot" devices.

201.   Apple's damages experts did not survey any users on the accused functionalities of the Tongue/No Dot devices.  Dr. Hauser only surveyed tablet users on screen unlocking (i.e., the keyguard UI), which is not an accused feature for any of the devices Apple has grouped as the "Tongue/No Dot" devices (the Captivate Glide, Exhibit II 4G, Galaxy S II, Galaxy S II Skyrocket, and Galaxy S II Epic 4G Touch).  Apple only accused the "Tongue/No Dot" devices for the incoming call functionality, and sliding to view missed calls/texts, but did not accuse screen unlocking (i.e., the keyguard screen).  Therefore, even if the tablet survey results were applicable to smartphones, Dr. Hauser's survey results are inapplicable to the Captivate Glide, Exhibit II 4G, Galaxy S II, Galaxy S II Skyrocket, and Galaxy S II Epic 4G Touch.

REBUTTAL EXPERT REPORT OF S. GREENBERG RE: NONINFRINGEMENT OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

B.3.          Apple's expert does not fairly represent  potential and actual non-infringing alternatives

202.    With regard to Dr. Hauser's tablet survey, the description of the non-infringing alternatives are misleading.  The survey's characterization is flawed in several ways.  Dr. Hauser's survey description is reproduced below:

Please click on the Slide to Unlock icon to view an animation describing this feature. You can also read the description of the feature below.



Slide to Unlock

Slide to Unlock. The Slide to Unlock feature prevents unintentional unlocks by unlocking your tablet only when you slide an image, using one continuous motion, from a specific spot on the lock screen to another specific spot on the screen. Without this feature, you would have to unlock your device using other techniques, for example by swiping the lock screen from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely.



**Figure 17.  Hauser Survey on Slide to Unlock Functionality**

203.    First, the survey question is misleading. There is no evidence that the non-infringing alternative is more likely to result in accidental unlocks—for example, if it requires an extremely long swipe, it is much less likely to unlock than the allegedly infringing unlock mechanism demonstrated in Dr. Hauser's survey.

204.    Second, the non-infringing alternative is described in a confusing, inaccurate, and contradictory manner.  As shown above in Figure 17, Dr. Hauser describes the non-infringing alternative as "swiping the lock screen from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely." In my opinion, swiping "from any random spot on the screen to any other random spot" contradicts that the second random spot must be "far enough away."  It is a completely inaccurate description of how the non-infringing alternatives operate—a user reading this description is likely to believe there is no consistency in the user interface, and that the unlock mechanism requires a swipe of a

REBUTTAL EXPERT REPORT OF S. GREENBERG RE: NONINFRINGEMENT OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

different length each time.  Several alternate embodiments are available, for example, from a fixed location to any particular location so long as the distance exceeds a certain amount, or from any particular spot to a fixed location.  The spots do not have to be random to avoid practicing claim 8.

205.   Third, the animation of the non-infringing alternative is ambiguous as to whether there is any visual feedback given by the tablet.  Although the demonstration video shows a glowing ripple under the point of user's contact (shown below), it is unclear whether this represents the user touching the screen, or the screen showing a ripple and providing visual feedback of the gesture.  The survey does not make it clear that a device may provide visual feedback without infringing the claim.  Numerous non-infringing alternatives also provide visual feedback without infringing the claim.  In terms of implemented examples, the Glass Unlock mechanism shows the screen moving with the user's touch, the Circle Unlock mechanism animates a padlock from the locked clasp to the unlocked clasp as the user drags his or her finger, and the Ripple Unlock mechanism shows a visual effect applied to the point of contact.  All of these mechanisms provide visual feedback to the user that his or her touches are being interpreted and are leading towards successful unlocking, and do not infringe claim 8.



**Figure 18.  Dr. Hauser's Depiction of the Unlock Operation of the Non-Infringing Alternative**

REBUTTAL EXPERT REPORT OF S. GREENBERG RE: NONINFRINGEMENT OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

206. Fourth, whereas the survey shows a tablet with text and visual cues on the screen for the patented functionality, it merely shows a blank screen for the non-infringing alternative, as shown below.



**Figure 19.  Lock Screen of the '721 Patent**



**Figure 20.  "Lock Screen" of the Non-Infringing Alternative**

207. Such an image of the non-infringing alternative is misleading because it gives no indication whatsoever that the device is locked, nor does it provide any visual cues as to how the user should unlock the device.  A device may include visual cues and visual feedback without infringing claim 8 of the '721 patent.  The survey does not make it clear that visual cues may be included in the non-infringing alternative.

208. Fifth, the survey's depiction of the non-infringing alternative is inconsistent with the depiction of the allegedly infringing implementation with regard to ***unpatented features***.  In Figure 19, depicting the patented functionality, the device displays the current time/date and a lock indicator prior to unlocking, as well as visual cues during unlocking.  In contrast, the non-infringing alternative in Figure 20 above shows a completely blank screen.  Many users will be confused as to whether the device is even ready to accept user input (since there is no time/date displayed) or whether the device is locked (since there is no lock status indicator displayed).  The

02198.51981/5518224.2

REBUTTAL EXPERT REPORT OF S. GREENBERG RE: NONINFRINGEMENT OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

omission of these features reduces the appeal and usability of the non-infringing alternative.  The survey does not make it clear that these features may be included without infringing the claim.



**Figure 21.  Dr. Hauser's Depiction of the Unlock Operation of the '721 Patent**

209.   Finally, Dr. Hauser's survey describes the non-infringing alternative in a manner that makes it appear mutually exclusive with other features.  For example, the description of the lock screen shortcuts ("you could add shortcuts to apps such as your camera and email service.  To activate one of these shortcuts from the lock screen simply select the app's icon and drag it upward") is contradictory to the description of the non-infringing alternative.  It is confusing whether these shortcuts will work when using the non-infringing alternative.  Similarly, the description of the multiple lock screen widgets feature ("you have access to up to five different lock screens . . . to switch between your lock screens, you would simply swipe the lock screen to the left or right") suggests that the usability of this feature would be reduced by the alternative to slide to unlock.  For example, a user could believe that the device may inadvertently unlock when sliding between lock screens.

INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

Date: September 13, 2013

Saul Greenberg

REBUTTAL EXPERT REPORT OF S. GREENBERG RE: NONINFRINGEMENT OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

# EXHIBIT V

1   INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

2

3

4

5

6

7

8

9

10

11

12

13

14   **D.**    **Apple's Characterization of the Patented Feature Is Misleading**

15   41.    I was asked to review a portion of the Expert Report of Prof. John Hauser related to

16   the his description of the '172 patent. Prof. Hauser describes the purported invention of the '172

17   patent as follows:

18   **Automatic Word Correction.** As you type, your smartphone
     displays text you typed in a text box, and at the same time provides
19   suggested replacement text in a separate box alongside the text box
     that displays what you actually typed. The Automatic Word
20   Correction feature allows you to automatically replace your original
     text with suggested text when, for example, you press space to move
21   on to the next word you want to type, or you press period to end the
     sentence. For example, if you type "birfday" and then press space or
22   period, you will automatically replace it with "birthday." Without
     this feature, pressing space or period would retain your original text,
23   "birfday"; if you want to replace your original text, you would need
     to select the suggested "birthday" yourself.
24

25   Hauser Report at Exh. E. I find the description of the patent contained in Prof. Hauser's survey to

26   be inconsistent with the asserted claim, because Prof. Hauser's description omits the limitations of

27   claim 18 that relate to user interaction with the second area, namely "the current character string in

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the first area is replaced with the suggested replacement character string if the user performs a gesture on the suggested replacement character string in the second area" and "the current character string in the first area is kept if the user performs a gesture in the second area on the current character string or portion thereof displayed in the second area." Indeed, Prof. Hauser's description does not reference gestures in the "separate box" at all.

42.     Moreover, I find that he failed to account for non-infringing alternatives to the '172 patent in his survey, which I understand Samsung had identified in response to interrogatory 29, and which I discuss in detail below. Prof. Hauser's survey does not account for one alternative, which Prof. Cockburn agrees is non-infringing in paragraph 450 of his report, in which (using Prof. Hauser's example), "birthday" is shown in a text box after you've typed "birfday", even before a space or period is selected. In this non-infringing alternative, selecting a space or period would still cause "birthday" to be displayed in the text box, and selecting "birfday" from the selections in a separate box would cause it to replace "birthday" and be displayed in the text box. This is not contemplated by Prof. Hauser's description. Thus I do not believe his survey accurately presented takers with a comparison of the patented feature to the non infringing alternatives.

43.     I was also asked to review a portion of the Expert Report of Dr. Chris Vellturo related to the his description of the '172 patent. Dr. Vellturo describes the purported invention of the '172 patent as follows:

> I understand that the Patented Invention of the '172 Patent allows users to replace text they typed with automatically recommended text when, for example, they press a delimiter, such as the space key, to move on to the next word they want to type or enter a period to end a sentence. I understand that this Patented Invention makes it easier and faster for a user to enter words and other text using the touchscreen keyboard because typographical errors are automatically corrected.

Vellturo Report at ¶ 93. I find the description of the patent contained in Dr. Vellturo's Report to be inconsistent with the asserted claim for the same reasons described above with respect to Prof. Hauser's survey. Moreover, I find that he failed to account for non-infringing alternatives to the '172 patent in his survey, which I understand Samsung had identified in response to interrogatory 29, and which I discuss in detail below, again for the same reasons described above with respect to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Prof. Hauser's survey. Thus I do not believe his Report accurately evaluates the patented feature or

2   the non infringing alternatives.

3   INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

4

5

6

7

8

9

10

11

12

13   INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   18.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING
NON-INFRINGEMENT OF U.S. PATENT NO. 8,074,172

INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   DATED:   September 12, 2013                    _____

21                                                  Daniel Wigdor

22

23

24

25

26

27

28

**HIGHLY CONFIDENTIAL   ATTORNEYS' EYES ONLY**
EXPERT REPORT OF DR. DANIEL WIGDOR CONCERNING
NON-INFRINGEMENT OF U.S. PATENT NO. 8,074,172

# EXHIBIT W

1        IN THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4  APPLE, INC., a California      )
   corporation,                )

5                       )

              Plaintiff,     )

6                     ) Case No.
                     ) 12-cv-00630-LHK (PSG)

7        vs.             )
                     ) Volume 1

8  SAMSUNG ELECTRONICS CO., LTD., a  )
   Korean corporation; SAMSUNG     )

9  ELECTRONICS AMERICA, INC., a New  )
   York corporation and SAMSUNG     )

10  TELECOMMUNICATIONS AMERICA, LLC, a)
   Delaware limited liability     )

11  company,               )
                     )

12                     ) Pages 1 to 311
           Defendants.     )

13  _____)

14

15

16

17

18       VIDEOTAPED DEPOSITION OF ALEX SNOEREN

19           San Diego, California

20        Wednesday, September 25, 2013

21

22

23

24  Reported by:
   ELIZABETH BORRELLI, CSR No. 7844, CCLL, CLR

25  JOB NO. 65775

Page  24

1          THE WITNESS:  Again, to the extent that I          10:24

2  was ask to provide an opinion regarding whether a

3  particular Apple product practiced a particular

4  claim or claims of a given patent, I provided an

5  opinion on that particular matter.  And, as with all          10:24

6  the opinions in my report, I attempted to provide an

7  explanation of the basis of how I formed the

8  opinions expressed in the report.  That's not to say

9  that I may have additional opinions regarding

10  addition any Apple products, additional patents,          10:24

11  additional claims, but to the extent that I was

12  asked for a particular product, particular claim and

13  so forth, to the best of my ability, I've attempted

14  to explain the basis of my opinion, yes.

15  BY MR. PAK:          10:24

16      Q.   And with respect to those issues, those

17  opinions are complete and full explanations as set

18  forth in the expert reports, correct?

19          THE WITNESS:  Again, full explanation, we

20  could -- you know, we can talk for a very long time.          10:25

21  I attempted to provide a sufficient explanation of

22  how I formed those opinions and the basis for my

23  opinions.

24  BY MR. PAK:

25      Q.   All I'm getting at, sir, is with respect          10:25

Page 309

1

2

3

4

5

6

7

8          I, ALEX SNOEREN, do hereby declare under

9     penalty of perjury that I have read the foregoing

10    transcript; that I have made any corrections as

11    appear noted, in ink, initialed by me, or attached

12    hereto; that my testimony as contained herein, as

13    corrected, is true and correct.

14          Executed this _____ day of

15    _____, 20_____, at

16    _____, _____.

17              (City)                    (State)

18

19

20

21

22              _____

                ALEX SNOEREN

23              Volume 1

24

25

1   STATE OF CALIFORNIA          )

                                 )     ss.

2   COUNTY OF LOS ANGELES        )

3

4           I, Elizabeth Borrelli, Certified Shorthand

5   Reporter, Certificate No. 7844, for the State of

6   California, hereby certify:

7           I am the deposition officer that

8   stenographically recorded the testimony in the

9   foregoing deposition;

10          Prior to being examined the deponent was

11  first duly sworn by me;

12          The foregoing transcript is a true record

13  of the testimony given;

14          Before completion of the deposition,

15  review of the transcript [x] was [ ] was not

16  requested.  If requested, any changes made by the

17  deponent (and provided to the reporter) during the

18  period allowed are appended hereto.

19

20  Dated: 9/26/13

21

22

23                          _____

                            ELIZABETH BORRELLI, CSR 7844

24

25

# EXHIBIT X

Page 1

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4

5    APPLE, INC., a California       )
     corporation,                    )
6                                     )
                         PLAINTIFF,  )
7            VS.                      )   12-cv-00630-LHK
                                      )
8    SAMSUNG ELECTRONICS, CO., LTD,)
     a Korean business entity;       )   VOLUME I
9    SAMSUNG ELECTRONICS AMERICA,    )
     INC., a New York corporation;  )
10   SAMSUNG TELECOMMUNICATIONS       )
     AMERICA, LLC, a Delaware        )
11   limited liability company,      )
                        DEFENDANTS.  )
12   _____)

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16    VIDEOTAPED DEPOSITION OF ANDREW COCKBURN, Ph.D.

17           LOS ANGELES, CALIFORNIA

18         THURSDAY, SEPTEMBER 26, 2013

19

20

21

22

23   REPORTED BY:

24   CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR, RSA

25   JOB NO.: 66065

Highly Confidential Attorneys Eyes Only

Page 155

1  respect to their anticipation for the value of the

2  mechanisms described in claim 18 of the '172 patent,

3  this would be a good survey question to establish

4  their understanding of the value of autocorrect

5  functionality.                                      01:36

6      Q.    Now, you just testified that this would

7  be a good survey question.  On what do you base your

8  opinion that this would be a good survey question?

9      A.    I'm not an expert in the development of

10 the broad user surveys.  However, I do understand    01:36

11 that when surveying users, their perceptions of

12 particular -- particular interactions in particular,

13 it's important that you focus their attention on the

14 key values without overcomplicating the question

15 that you ask.                                        01:37

16     Q.    And you said you thought this would be a

17 good survey question to survey users on the value of

18 autocorrect functionality; is that right?

19     A.    That's correct.

20     Q.    You would agree with me that the '172      01:37

21 patent doesn't cover all means of autocorrect

22 functionality?

23     A.    That's correct.

24     Q.    And so there could, in fact, be

25 autocorrect without practicing the '172 patent?      01:37

Page 156

1      A.      That's correct.

2      Q.      With that understanding, do you think

3  that the final statement in the survey, "Without

4  this feature, pressing space or period would retain

5  your original text, birfday; if you want to replace      01:37

6  your original text, you would have need to select

7  the suggested 'birthday' yourself" is accurate?

8      A.      Is what about that sentence accurate?

9      Q.      Well, first, do you believe the sentence

10  that begins "Without this feature suggests to the      01:37

11  user that without the feature described in the

12  preceding sentences of the survey question that they

13  would not have autocorrect functionality in their

14  device"?

15      A.      It does not necessarily imply the      01:38

16  absence of autocorrect functionality.

17      Q.      How does it not imply the absence of

18  autocorrect functionality when it states that

19  without the feature that you would retain the

20  misspelled word and you would have to replace the      01:38

21  word by selecting it yourself?

22      A.      It strongly implies that there will be

23  another mechanism associated with the selection of

24  birthday.  Given that the user has been described as

25  entering birfday, yet the available -- yet the word      01:38

Highly Confidential Attorneys Eyes Only

Page 157

1    birthday is available to the user, there is a form

2    of autocorrection available to the user rather than

3    autocorrection being absent.

4        Q.    How does it suggest that there is a form

5    of autocorrection available to the user?            01:38

6        A.    Sorry.  A form of correction.  I

7    shouldn't have said -- a form of autocorrection.

8        Q.    So it does suggest that autocorrection

9    is not available to the user; that there is a means

10   of correction, but it is not autocorrection.        01:38

11       A.    That's correct.

12       Q.    So isn't it the case that this question

13   suggests that without the feature described above

14   that autocorrection is not present in the device?

15            MR. LYON:  Objection.  Vague.  Asked and    01:39

16   answered.

17       A.    Autocorrection functionality takes a

18   wide range of different forms.  As we've seen from

19   -- as is evident from the vast array of prior

20   literature asserted.  A strict interpretation of    01:39

21   autocorrection would accept -- would describe the

22   device implicitly inserting on the user's behalf a

23   corrected word.  Other forms of autocorrection will

24   also allow the user -- would present options to the

25   user and allow them to make a selection.            01:39

Highly Confidential Attorneys Eyes Only

Page 160

1    '172 patent.

2         A.    Claim 18 the first area includes that --

3    that -- your description.  It also includes a

4    current character string in that first area.

5         Q.    So claim 18 requires a first area that      01:42

6    shows a current character string as it's being

7    input.  We agree on that.

8         A.    Yes.

9         Q.    And claim 18 of the '172 patent also

10   requires a second area that shows the current          01:43

11   character string and a suggested replacement

12   character string; is that correct?

13        A.    That's imprecise.  It requires a current

14   character string or a portion thereof and a

15   suggested replacement character string.                01:43

16        Q.    Okay.  So claim 18 of the '172 patent

17   requires a current character string or a portion

18   thereof and a suggested replacement character

19   string?

20        A.    Can you repeat the start of your            01:43

21   question?  Sorry.

22        Q.    Claim 18 of the '172 patent requires in

23   that it display the current character string or a

24   portion thereof and a suggested replacement

25   character string in the second area.                   01:43

Highly Confidential Attorneys Eyes Only

Page 161

1       A.      That's correct.

2       Q.      Okay.  And where in Dr. Hauser's

3   description does it describe a second area -- a

4   second area displaying both the current character

5   string and the suggested replacement character      01:43

6   string?

7       A.      It does not.

8       Q.      Okay.  Do you think that would be an

9   important element to the user?

10      A.      It's an important part of the invention   01:44

11  disclosed in the '172 patent.  It has certain

12  benefits to the user.  Dr. Hauser's description

13  encapsulates the broad interpretation of the claim.

14      Q.      What do you mean by "the broad

15  interpretation of the claim"?                        01:44

16      A.      Without going into the precise details

17  of every element of the patent's limitations, it

18  describes to people responding to the survey the key

19  elements of the interaction in a manner that is

20  readily understood by the respondents to the survey.  01:44

21      Q.      Wouldn't you agree that the precise

22  elements of the user interface are important to the

23  benefits of the user interface design?

24              MR. LYON:  Objection.  Vague.

25      A.      Yes.  The response to that depends on     01:45

Highly Confidential Attorneys Eyes Only

Page 170

1    would infringe the '172 patent?

2         MR. LYON:  Objection.  Mischaracterizes

3    testimony.  Argumentative.

4         A.    I would understand, as a scientist and

5    as a user interface designer, that there are certain    01:55

6    circumstances under which the '172 patent clearly

7    teaches that it would be unnecessary to display the

8    current character string in two areas.

9         Q.    Are those taught in claim 18?

10        A.    Implicitly, yes.                              01:55

11        Q.    You would agree with me that claim 18

12   explicitly requires a current character string in

13   two areas?

14        A.    That is the language of the claim.  Yes.

15        Q.    Do you think that a user of portable         01:56

16   electronic devices would find it important to their

17   use that there be a current character string in two

18   areas?

19        A.    In certain circumstances, yes.

20        Q.    Do you think that the display of the         01:56

21   current character string in two areas is as

22   beneficial as an aspect of claim 17 -- of claim 18

23   of the '172 patent as the automatic replacement of a

24   misspelled word upon the selection of a delimiter?

25        A.    This is a contextually sensitive            01:56

Highly Confidential Attorneys Eyes Only

Page 171

1    question.   There are different times of which

2    different components of the limitations of claim 18

3    are valuable to users.

4         Q.     But the display of the current character

5    string in two areas is not described in Professor        01:56

6    Hauser's survey; correct?

7         A.     It is not.

8         Q.     And Professor Hauser's statement about

9    the result of not having the patented feature does

10   not address the requirement of claim 18 that there       01:57

11   be a current character string in two areas?

12        A.     It does not specifically do so.  That's

13   correct.

14               (Exhibit Cockburn 7 marked for

15                identification.)                             01:58

16        Q.     So that you have in front of you we have

17   just handed you what we've marked as Exhibit 7, and

18   this is a U.S. Patent No. 8,046,721.

19               Is this the '721 patent that we referred

20   to before?                                               01:58

21        A.     It is.  Yes.

22        Q.     So while we have -- I wanted to get that

23   in front of you while we were talking about

24   Professor Hauser's report.

25               And I think if you turn to page 36.  If       01:59

Highly Confidential Attorneys Eyes Only

Page 262

1  STATE OF CALIFORNIA    )

2                         ) SS

3  COUNTY OF LOS ANGELES )

4

5

6

7

8

9

10        I, the undersigned, declare under penalty

11  of perjury that I have read the foregoing

12  transcript, and I have made any corrections,

13  additions or deletions that I was desirous of

14  making; that the foregoing is a true and correct

15  transcript of my testimony contained therein.

16        Executed this _____ day of _____,

17  20__, at _____, _____.

18        (City)     (State)

19

20

21

22        _____

23        ANDREW COCKBURN, Ph.D.

24

25

# EXHIBIT Z

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

APPLE INC., a California corporation,

                    Plaintiff,

        v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

                    Defendants.

CASE NO. 12-cv-00630-LHK

**EXPERT REPORT OF DR. ALEX C.
SNOEREN CONCERNING U.S. PATENT
NOS. 6,847,959 AND  7,761,414**

**HIGHLY CONFIDENTIAL—OUTSIDE
ATTORNEYS' EYES ONLY—SOURCE
CODE**

**GOOGLE'S HIGHLY CONFIDENTIAL—
OUTSIDE ATTORNEYS' EYES ONLY—
SOURCE CODE**

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

### 9. Ninth Non-infringement Contention

INTENTIONALLY OMITTED FROM RECORD/EXHIBIT

## I. Use by Apple of The '414 Patented Technology

525.     I have been asked to evaluate whether Apple practices claim 11 of the '414 Patent in iOS version 6.1.  It is my opinion that version 6.1 of iOS practices claim 11 of the '414 Patent.  In forming my opinion I relied on the source code Apple made available in the following directory: Source\Additional_Samsung630_Off_21030605\1055-Samsung_Sync_14038700\6.1\

526.     Version 6.1 of iOS provides a number of applications including a Calendar and Contacts application.  Each of those applications provides a user-level non-synchronization processing thread that enables the user to access and edit structured data.  The contacts and calendar applications both store information in a SQLite database on the iPhone that enables a user to access and edit contact information in that contact database.

---

[96] The contention to which Samsung is referring is addressed above as the Third Non-infringement Contention.

Gibson, Dunn
& Crutcher LLP

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

527.   Version 6.1 of iOS also provides separate synchronization software components for each applications that provide a separate synchronization processing thread that operates concurrently with the non-synchronization processing thread for contacts and calendars that synchronizes structured data from the SQLite databases on the iPhone with structured data in a remote database.

528.   I understand that the Address Book functionality described here has been in iOS since at least version 4.0 and the Calendar functionality since iOS version 5.0.  See Apple Developer: ABSource Reference *available at* http://developer.apple.com/library/ios/documentation/AddressBook/Reference/ABSourceRef_iPhone OS/ABSourceRef_iPhoneOS.pdf *produced at* APLNDC630-0001911803; Apple Developer: EKSource Reference *available at* http://developer.apple.com/library/ios/documentation/EventKit/Reference/EKSourceClassRef/EKSou rceClassRef.pdf *produced at* APLNDC630-0001911812.

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

1

2      I declare under penalty of perjury that the foregoing is true and correct.

3

4   Dated:   August 12, 2013

5                           Alex C.  Snoeren

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT REPORT  OF DR. ALEX SNOEREN
CONCERNING U.S. PATENT NOS. 6,847,959 AND
7,761,414         197

# EXHIBIT AA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

APPLE INC., a California corporation,

              Plaintiff,

    v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

              Defendants.

CASE NO. 12-cv-00630-LHK

**REBUTTAL EXPERT REPORT OF DR.
ALEX C. SNOEREN CONCERNING U.S.
PATENTS NOS.  6,847,959 AND 7,761,414**

**HIGHLY CONFIDENTIAL—OUTSIDE
ATTORNEYS' EYES ONLY—SOURCE
CODE**

627.     Finally, Dr. Chase makes several arguments and refers to documents relating to Apple's practice of the '414 Patent in the context of his "secondary considerations" analysis. *See* CR, ¶¶ 869-884; 886-887; 891; 895-898; 904.   While it is my opinion that iOS 6.1 practices claim 11 and therefore Apple does practice the '414 Patent, I do not have an opinion as to whether Apple practices claim 20. *See* Snoeren Report, ¶¶ 525-528.  In any event, none of the documents Dr. Chase cites suggest that the particular combination of elements in claim 20 was obvious as of either the filing or invention date.

**D.     CLAIM 20 IS ADEQUATELY DESCRIBED IN THE '414 PATENT**

628.     In a single paragraph near the end of the report, Dr. Chase offers what appears to be a conditional opinion that claim 20 may be invalid because the "concurrently with" limitation is not adequately described.  Specifically, the Chase Report states "Moreover, it is my opinion that there is no support in the written description in the patent for a narrow definition of 'concurrently with' that requires such an analysis of OS-level thread scheduling." CR, ¶ 908.  Of course, as the Chase Report acknowledges, the Court has construed the term "concurrently with" and there is no mention of OS-level thread scheduling in that construction.  Accordingly, it is not clear if Dr. Chase is, in fact, offering an invalidity opinion on this basis.

629.     In any event, I disagree that the "concurrently with" limitation lacks an adequate written description in the '414 Patent. *See, e.g.,* '414 Patent, 2:18-63, 24:43-25:48 (describing this limitation).  The Chase Report offers no analysis to the contrary.

**E.     RESPONSE TO "ADDITIONAL COMMENTS" SECTION OF THE CHASE REPORT**

630.     Dr. Chase does not offer any opinions in this section, but rather states that he may change his opinion, may rely on visual aids at trial, may use exhibits, compiled versions of source code, and additional hardware or software for demonstrative purposes.  I understand that Apple may object to use of some of what Dr. Chase lists, but regardless, I reserve the right to comment or offer an opinion on any of the foregoing if Dr. Chase is permitted to do so.

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

Dated:   September 13, 2013

Alex C.  Snoeren

EXPERT REPORT  OF DR. ALEX SNOEREN
CONCERNING U.S. PATENT NOS. 6,847,959 AND
7,761,414                                              207

# EXHIBIT A

## EXHIBIT A

This Exhibit includes a list of documents I have reviewed in preparing my report (in addition to those identified in my Opening Expert Report).  In preparing my report I have also reviewed the documents cited or referenced in my report and the exhibits thereto.  I reserve the right to rely upon any additional information or materials that may be provided to me or that are relied upon by any of Samsung's experts or witnesses, if called to testify or to give additional opinions regarding this matter.

## A. PATENTS AND CASE DOCUMENTS

| Description |
| --- |
| U.S. Patent No. 7,761,414, July 20, 2010 |
| U.S. Patent No. 6,847,959, January 25, 2005 |
| U.S. Patent No. 8,086,604, December 27, 2011 |
| Prosecution History for United States Patent No. 7,761,414, filed January 7, 2007 |
| Prosecution History for United States Patent No. 8,086,604, filed January 5, 2000 |
| Prosecution History for United States Patent No. 6,847,959, filed January 5, 2000 |
| Joint Claim Construction and Prehearing Statement Pursuant to Patent Local Rule 4-3, filed November 9, 2012 [Dkt. 300] |
| Apple Inc.'s Opening Claim Construction Brief Pursuant to Patent Local Rule 4-5, filed December 21, 2012 [Dkt. 333] |
| Samsung's Opening Claim Construction Brief, filed December 21, 2012 [Dkt. 335] |
| Apple Inc.'s Responsive Claim Construction Brief Pursuant to Patent Local Rule 4-5, filed January 25, 2013 [Dkt. 350] |
| Samsung's Responsive Claim Construction Brief Pursuant to Patent Local Rule 4-5, filed January 25, 2013 [Dkt. 352] |
| Apple Inc.'s Amended Opening Claim Construction Brief Pursuant to Patent Local Rule 4-5, filed February 7, 2013 [Dkt. 356] |
| Apple Inc.'s Reply Claim Construction Brief Pursuant to Patent Local Rule 4-5, filed February 8, 2013 [Dkt. 362] |
| Samsung's Responsive Claim Construction Brief Pursuant to Patent Local Rule 4-5, filed February 8, 2013 [Dkt. 363] |
| Order Construing Disputed Claim Terms of U.S. Patent Nos. 5,579,239; 5,666,502; 5,946,647; 7,577,757; 7,756,087; 7,761,414; 8,014,760, filed April 10, 2013 [Dkt. 447] |

| Description |
| --- |
| Case Management Order, filed April 24, 2013 [Dkt. 471] |
| Samsung's Reduction of Invalidity References, filed July 8, 2013 [Dkt. 671] |

**B.  DISCOVERY DOCUMENTS and PRODUCTS**

| Description |
| --- |
| Apple's Infringement Contentions for the '959 and '414 Patents |
| Apple's Supplemental Response to Samsung's Interrogatory Nos. 2 and 3 |
| Expert Report of Jeffrey Chase, Ph.D Regarding the Invalidity of the Asserted Claims of the U.S. Patent '414 dated August 12, 2013 |
| iPod Mini |
| Powerbook G4 running Mac OS X 10.4.3 |
| Samsung's Invalidity Contentions for the '959 and '414 Patents |
| Samsung's Further Supplemental Responses to Apple's First, Third and Tenth Set of Interrogatories (Interrogatory Nos. 4, 5, 6, 8, 20, 23, 24, 27, 29, 45), July 15, 2013 |

**C. DEPOSITION TRANSCRIPTS & EXHIBITS**

| Description |
| --- |
| Deposition Transcript of Yan Arrouye dated April 27, 2012 and Exhibits |
| Deposition Transcript of Yan Arrouye dated May 14, 2013 and Exhibits |
| Deposition Transcript of David Bienvenu dated July 3, 2013 and Exhibits |
| Deposition Transcript of Eric Bivona dated July 3, 2013 and Exhibits |
| Deposition Transcript of Jamie Carbonell dated May 2, 2013 and Exhibits |
| Deposition Transcript of David Casseres dated May 29, 2013 and Exhibits |
| Deposition Transcript of Stephen Capps dated June 21, 2013 and Exhibits |
| Deposition Transcript of Gordon Freedman dated July 25, 2013 and Exhibits |
| Deposition Transcript of Norbert Fuhr dated July 12, 2013 and Exhibits |
| Deposition Transcript of Nobert Govert dated July 15, 2013 and Exhibits |

| |
|---|
| Deposition Transcript of Gary Hall dated July 11, 2013 and Exhibits |
| Deposition Transcript of Scott Herz dated March 14, 2013 and Exhibits |
| Deposition Transcript of Matthew Holloway dated May 29, 2013 and Exhibits |
| Deposition Transcript of Miguel de Icaza dated July 2, 2013 and Exhibits |
| Deposition Transcript of Brewster Kahle dated July 25, 2013 and Exhibits |
| Deposition Transcript of Michael Kobb dated July 18, 2013 and Exhibits |
| Deposition Transcript of Sean Luke dated June 20, 2013 and Exhibits |
| Deposition Transcript of Kenneth McLeod dated July 12, 2013 and Exhibits |
| Deposition Transcript of Keith Mortensen dated May 10, 2013 and Exhibits |
| Deposition Transcript of Ulrich Pfeifer dated July 14, 2013 and Exhibits |
| Deposition Transcript of Nathaniel Polish dated April 3, 2012 and Exhibits |
| Deposition Transcript of Jeffrey Stedfast dated July 3, 2013 and Exhibits |
| Deposition Transcript of Dan Winship dated July 11, 2013 and Exhibits |

## D. DOCUMENTS

| Description |
|---|
| Expert Report of John Hauser dated August 11, 2013 |
| C/Net, Apple Scraps Newton (Feb. 27, 1998) available at http://news.cnet.com/Apple-scraps-Newton/2100-1001_3-208551.html |
| GNOME Dev Center:  Hash Tables, available at https://developer.gnome.org/glib/2.36/glib-Hash-Tables.html |
| https://developer.apple.com/library/mac/documentation/CoreFoundation/Conceptual/CFPropertyLists/CFPropertyLists.html |
| http://www.ibm.com/developerworks/library/j-jtp0730/index.html; http://www.codeproject.com/ Articles /6863/Windows-Thread-Pooling-and-Execution-Chaining |
| A Little History of the World Wide Web available at http://www.w3.org/History.html |
| U.S. Patent No. 5,926,808, July 20, 1999 |
| U.S. Patent No. 6,000,000, December 7, 1999 |
| U.S. Patent No. 6,005,565, December 21, 1999 |

| Description |
| --- |
| U.S. Patent No. 5,855,015, December 29, 1998 |
| U.S. Patent No. 6,834,276, December 21, 2004 |
| U.S. Patent No. 7,506,006, March 17, 2009 |
| U.S. Patent No. 7,653,614, January 26, 2010 |
| U.S. Patent Application Publication No. 2004/0139235, October 31, 2003 |

### E. DISCOVERY DOCUMENTS

| DOCUMENTS FOUND AT THE FOLLOWING BATES NUMBERS |
| --- |
| ACM (SAMSUNG) 00000049 |
| APLNDC630-0000163544 |
| APLNDC630-0000163586-97 |
| APLNDC630-0000163621-23 |
| APLNDC630-0000283687-98 |
| APLNDC630-0000283700 |
| APLNDC630-0000283707-08 |
| GOOG-NDCAL630-00062048 |
| GOOG-NDCAL630-00065439 |
| GOOG-NDCAL630-00065478 |
| GOOG-NDCAL630-00065560 |
| IEEE_APPSAM0002-23 |
| KAHLENDCA630-00000167 |
| KAHLENDCA630-00000221 |
| KAHLENDCA630-00000522 |
| KAHLENDCA630-00000531-32 |
| KAHLENDCA630-00000594-95 |
| LUKENDCA630-00000280-81 |
| LUKENDCA630-00000285 |
| LUKENDCA630630PHYS6 |
| MSFT-00630-000198-204 |
| MSFT_CODE00000001-0003251 |
| PFEIFERNDCA63-0000487 |
| PFEIFERNDCA63-0000566 |
| PFEIFERNDCA63-0001976 |
| PFEIFERNDCA63-0004210 |
| PFEIFERNDCA63-0004380 |
| PQ000016 |
| PQ000033 |

| DOCUMENTS FOUND AT THE FOLLOWING BATES NUMBERS |
|---|
| PQ000062-65 |
| PQ000078 |
| PQ000091 |
| SAMNDCA630-05349929 |
| SAMNDCA630-07216825 |
| SAMNDCA630-07216829 |
| SAMNDCA630-00003841 |
| SAMNDCA630-00822302-03 |
| SAMNDCA630-04524944 |
| SAMNDCA630-00821974 |
| SAMNDCA630-00936989-91 |
| SAMNDCA630-00937057 |
| SAMNDCA630-06279877 |
| SAMNDCA630-06438998 |
| 630OFFAPLESOURCECODE_007735 |

1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

12
13
14
15
16
17
18
19

| | |
|---|---|
| APPLE INC., a California corporation, | Case No.    11-cv-01846-LHK |
| Plaintiff, | **EXPERT REPORT OF JULIE L. DAVIS, CPA** |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | |
| Defendants. | |

20
21
22
23
24
25
26
27
28

SUBJECT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the patented technology.  Calculation of cost and income reference points is a widely accepted method when valuing intellectual property.[286]

191.    I have examined the manner in which Mr. Musika calculated cost value reference points, which were described in paragraphs 162 to 167 of his Original Expert Report and in **Exhibits 39-S** to **39.4-S**.  Mr. Musika prepared a calculation of the gross profits that Samsung would lose if it were forced to remove the infringing products that would be the subject of a hypothetical negotiation.  Mr. Musika converted these losses to a per unit amount and allocated these amounts among the basket of intellectual property rights that Apple asserted in the amended complaint.  I find Mr. Musika's analysis to be well-reasoned and robust.  As such, I have considered these reference points when examining the results of a hypothetical negotiation based on the factors described below.

192.    I have also examined the manner in which Mr. Musika calculated income value reference points, which are described in paragraphs 182 to 190 of his Original Expert Report and in **Exhibits 41-S** to **41.5-S**.  Mr. Musika prepared an analysis of the difference in profitability between the iPad and iPhone and Apple's other products and an analysis of the profitability of the Samsung products.  Mr. Musika revised these amounts downward to calculate a measure of economic value added associated with Apple's intellectual property.  Mr. Musika also converted a valuation of Apple's brand from a well-known brand consulting firm, Interbrand, into a measure of profitability.  Mr. Musika then allocated the resulting measure of economic value added among the basket of intellectual property rights that Apple asserted in the amended complaint.  Again, I find Mr. Musika's analysis to be well-reasoned and robust.  As such, I have considered these reference points when examining the results of a hypothetical negotiation based on the factors described below.

---

[286]  AICPA Practice Aid 99-2, Valuing Intellectual Property & Calculating Infringement Damages, (1999), pp. 38 to 42.

brand.[336] He further testified regarding how other third-party studies recognized the importance of these elements to the iPhone's success and consumer appeal.[337] His testimony confirms my opinions regarding the per unit design patent royalty rate, the hypothetical negotiation between the parties, and the factors that would be considered in it, including at least the discussion regarding factors 4, 5, 10, and 13.

257.   The foregoing evidence confirms the accuracy of Mr. Musika's opinions and further supports the opinions regarding reasonable royalties that I have stated in this report.

## IX.   POSSIBLE REVISION

258.   I intend to review any new information provided after the production of this report and would supplement this report if asked to do so.

259.   I intend to read or attend the deposition of Mr. Wagner and intend to respond to any criticisms that he raises regarding my analysis.

Dated: June 24, 2013

_____
JULIE L. DAVIS

---

[336] Russell Winer Trial Testimony, dated Aug. 7, 2012, pp. 1498:19-1508:16.

[337] Russell Winer Trial Testimony, dated Aug. 7, 2012, pp. 1525:7-1528:21; PX36: Gravity Tank, Touch Portfolio (SAMNDCA00191811–SAMNDCA00191987).

# EXHIBIT CC

Apple Inc. v. Samsung Electronics Co., LTD., et al.                    **EXHIBIT 41.2-S**

## Per Unit Reference Rate Calculations for Smartphones and Tablets Combined

| Calculation Steps | Apple | | Samsung | |
|---|---|---|---|---|
| Per unit rate for utility patents | | | | |
| Average Product Selling Price | $ 625.28 | 1/ | $ 348.01 | 2/ |
| x  Value of Intangibles | 4.9% | 3/ | 1.2% | 3/ |
| =  Per Unit Rate | $ **31.00** | 4/ | $ **4.00** | 4/ |
| | | | | |
| Per unit rate for design patents, trade dress, and trademarks | | | | |
| Average Product Selling Price | $ 625.28 | 1/ | $ 348.01 | 2/ |
| x  Value of Brand/Design Rate | 3.9% | 5/ | 2.6% | 5/ |
| =  Per Unit Rate | $ **24.00** | 6/ | $ **9.00** | 6/ |

**Sources/Notes:**

1/  Average Product Selling Price for Apple is a weighted average of Apple iPhone and iPad ASPs. The worldwide ASPs are calculated between Q3 FY2010 and Q2 FY2012 for smartphones and Q1 FY2011 and Q2 FY2012 for tablets and are weighted by the respective units sold into the U.S. during those time periods (see Exhibits 32-S and 33-S).

2/  Average Product Selling Price for Samsung is a weighted average of Samsung smartphone and tablet ASPs. The worldwide ASPs are calculated between Q2 2010 and Q1 2012 for smartphones and Q4 2010 and Q1 2012 for tablets and are weighted by the respective units sold into the U.S. during the same time period (see Exhibits 37-S and 38-S).

3/  Value of Intangibles includes the iPhone and iPad combined for Apple, and the Accused Products combined for Samsung (see Exhibit 41.3-S).

4/  The Per Unit Rate for Utility Patents is calculated by multiplying the ASP by the Value of Intangibles. Rounded to the nearest dollar.

5/  See Exhibit 41.3-S.

6/  The Per Unit Rate for Design Patents and Trade Dress is calculated by multiplying the ASP by the Value of Brand/Design rate. Rounded to the nearest dollar.

Submitted Under Seal; Highly Confidential;
Outside Counsel Eyes' Only