# EXHIBIT A-1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

APPLE INC., a California corporation,

      Plaintiff,

    vs.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

      Defendants.

CASE No. 12-cv-00630-LHK

# EXPERT REPORT OF JUDITH A. CHEVALIER, PH.D.

## SEPTEMBER 13, 2013

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

I.      Assignment and Introduction ................................................................................. 1

        A.      Qualifications ................................................................................................ 1

        B.      Assignment ................................................................................................... 2

        C.      Executive Summary ...................................................................................... 3

        D.      Detailed Summary of Conclusions ............................................................... 5

        E.      Materials Relied Upon ................................................................................ 13

        F.      Compensation ............................................................................................. 14

II.     Background ......................................................................................................... 14

        A.      Parties at Issue ........................................................................................... 14

                1.      Apple ................................................................................................. 14

                2.      Samsung ............................................................................................ 15

        B.      Accused Products ....................................................................................... 16

                1.      Smartphones ..................................................................................... 16

                2.      Tablets .............................................................................................. 18

        C.      Patents-at-Issue ......................................................................................... 19

                1.      The '647 Patent [Links for Structures] ............................................ 20

                2.      The '959 Patent [Unified Local & Internet Search] ......................... 20

                3.      The '414 Patent [Asynchronous Data Synchronization] .................. 21

                4.      The '760 Patent [Missed Call Management] .................................... 21

                5.      The '721 Patent [Image Unlock] ...................................................... 22

                6.      The '172 Patent [Word Recommendations] ..................................... 23

        D.      Marketplace at Issue .................................................................................. 23

                1.      The Smartphone and its Evolution .................................................... 24

                2.      Overview of iOS and Android .......................................................... 28

                3.      Smartphone Manufacturer Leadership Has Shifted Over Time .............. 30

                4.      The Tablet Marketplace Shares Similarities with the Smartphone
                        Marketplace ...................................................................................... 37

III.    Many Factors Contribute to Smartphone and Tablet Purchase Decisions ...................... 39

        A.      Purchases are Linked to Carrier Preferences ............................................. 42

i

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

| | B. | Operating System Preference is a Factor in Consumer Purchase Decisions ........ 47 |
|---|---|---|
| | C. | Brand Image and its Promotion Matter to Many Customers ............................... 52 |
| | D. | Device-Specific Differentiation Impacts Consumer Choice................................ 58 |

IV.   The Features Enabled by the Patents-at-Issue are a Small Part of the Accused Products and their Operating Systems .................................................................................................... 68

|   |   |   |
|---|---|---|
| A. | Smartphones and Tablets Are Extraordinarily Complex Products with Hundreds If Not Thousands of Features and Distinct Functionalities ...................................... 69 |
| B. | Individual Operating Software Features do not appear to Motivate Customers to Purchase Smartphones and Tablets ...................................................................... 72 |
| C. | Marketplace Evidence Indicates that the Patented Features Are Not a Discernible Driver of Demand for the Accused Products ........................................................ 75 |

|   |   |   |
|---|---|---|
| | 1. | Samsung's Online Materials Do Not Emphasize the Functionalities Protected by Any of the Apple Patents ...................................................... 75 |
| | 2. | Samsung's Television/Video Advertising Does Not Highlight the Functionalities Associated with any of the Apple Patents........................ 77 |
| | 3. | Patented Functionalities Account for Negligible Attention in Product Reviews............................................................................................ 79 |
| | 4. | Patented Functionalities Account for Negligible Attention in Consumer Reviews............................................................................................ 85 |
| | 5. | The Functionalities Associated with Apple Patents-In-Suit Received Limited Attention When First Introduced by Apple................................ 85 |

|   |   |   |
|---|---|---|
| D. | Conclusions......................................................................................... 90 |

V.   The Vellturo Report Overstates the Importance of the Patents-at-Issue, Relying on Qualitative Evidence that Pertains to Features Significantly Broader than the Patents and Includes Elements that are Non-infringing ...................................................................... 91

|   |   |   |
|---|---|---|
| A. | Ease of Use is More Than the Patents-In-Suit .................................................... 92 |
| B. | Vellturo Expands the Footprint of the Patents by using Qualitative Evidence that Largely Describes Non-Patented Features ......................................................... 103 |
| C. | Dr. Vellturo Improperly Discounts Many of Samsung's Available Design-Around Alternatives ...................................................................................................... 110 |

|   |   |   |
|---|---|---|
| | 1. | The '647 Patent ....................................................................... 112 |
| | 2. | The '959 Patent ....................................................................... 113 |
| | 3. | The '414 Patent ....................................................................... 115 |
| | 4. | The '760 Patent ....................................................................... 116 |
| | 5. | The '721 Patent ....................................................................... 118 |
| | 6. | The '172 Patent ....................................................................... 120 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

VI.   The Vellturo Report Lost Profits Conclusion Relies Entirely on a Flawed Conjoint Analysis Performed by Another Expert ................................................................... 121

  A.   Professor Hauser's Analysis is Based on Inaccurate Descriptions That Overstate The Patented Functionality (Relative To Non-Infringing Alternatives) ............. 122

  B.   Professor Hauser Relies on an Erroneous Assumption to Estimate the Number of People who Purchased the Accused Devices Because of Apple's Patented Technology ............................................................................................................. 128

  C.   Professor Hauser's Analysis Generates Predictions That Differ Substantially From Actual Marketplace Outcomes ........................................................................... 131

    1.   Predictions Differ Substantially from Actual Marketplace Outcomes ... 131

    2.   Predictions Differ Substantially from Survey Respondent Ownership .. 132

    3.   Professor Hauser's Survey Generates Implausible Results ................... 132

    4.   Professor Hauser's Analysis Suggests that Demand for Each of the Individual Patented Features Dramatically Exceeds the Demand for Even the Most Popular Apps ............................................................................ 135

VII.  Lost Profits are not Warranted Because there is No Discernible Link between the Patented Functionality and Sales ................................................................................. 136

VIII. Critical Flaws Further Inflate the Vellturo Report Lost Profit Figures ......................... 139

  A.   Blackout Period ........................................................................................... 139

  B.   Conjoint Flaws ............................................................................................ 141

  C.   Vellturo's Mor-Flo Approach Overstates Apple Lost Sales .............................. 142

  D.   Dr. Vellturo's Incremental Profit Rates for Apple Are Overstated ................... 148

  E.   Dr. Vellturo's Capacity Analysis Fails to Account for Apple Supply Shortages 151

IX.   Vellturo Report Royalty Analysis "Double Counts" Lost Profits and Contains Other Errors that Lead to An Overstated Reasonable Royalty Starting Point ....................... 156

  A.   Overview of Vellturo's Reasonable Royalty Analysis ...................................... 157

  B.   Vellturo Reasonable Royalty Assessment Involves Either a Double Counting or a Back Door Collection of Apple's Lost Profits ................................................. 158

  C.   Vellturo's Assessment of Apple Willingness to Accept and Samsung Willingness to Pay Includes Many Errors ......................................................................... 160

  D.   Failure to Consider Units for Which Apple has Previously Sought Damages ... 164

  E.   Vellturo Consideration of Other *Georgia Pacific* Factors ................................. 164

X.    Reasonable Royalty Analysis ................................................................................ 165

  A.   Overview of Reasonable Royalty Calculations ................................................ 165

    1.   Date of Hypothetical Negotiation ........................................................ 166

    2.   Parties to the Negotiation .................................................................. 167

B.    Reasonable Royalty Analysis ............................................................ 167

    1.    Form of the Royalty .................................................... 168

    2.    Royalty ....................................................................... 170

        a)    Overview .......................................................... 170

        b)    Market Approach ............................................. 170

            (1)    Licensing Practices in the Telecommunications Industry
                ............................................................ 171

            (2)    Quantitative Analysis.................................... 173

                (a)    Agreements Involving the Patents-in-Suit    173

                (b)    Offers to License the Patents-in-Suit    177

                (c)    Other Apple and Samsung License Agreements  179

                (d)    Summary of Market Approaches    184

        c)    Income Approach .............................................. 185

            (1)    Overview of the Analytical Approach ........... 185

            (2)    Profitability as a Measure of Value ............... 186

            (3)    Apple's Inconsistency Across Lawsuits ........ 190

            (4)    Alternative Measures Using Features ............ 192

            (5)    Reasonableness Check with Apps ................. 193

            (6)    Summary of Income Approaches.................... 195

        d)    Cost Approach .................................................. 196

        e)    Qualitative Factors .......................................... 199

XI.    Conclusions........................................................................................ 213

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## I.    Assignment and Introduction

### A.    Qualifications

1.    I am the William S. Beinecke Professor of Economics and Finance at the Yale University School of Management.  I also hold a joint courtesy appointment at the Yale Department of Economics.  I received my undergraduate degree in Economics from Yale University in 1989 and my Ph.D. in Economics from the Massachusetts Institute of Technology in 1993.  I was an assistant professor in the Department of Economics at Harvard University from 1993 to 1994.  I was a faculty member at the University of Chicago Graduate School of Business from 1994 to 2001, reaching the rank of full professor in 1999.  I have been a faculty member at the Yale University School of Management since 2001.  I am a Research Associate at the National Bureau of Economic Research.  From 2007 to 2009, I was the Deputy Provost for Faculty Development at Yale University.

2.    At Yale University, I teach courses in competitive strategy at the MBA level including a course entitled "Technology Strategy."  This course helps students understand strategic issues that arise in high-technology industries.  I also teach a course entitled "Business, Public Policy and the Information Economy" at the undergraduate level, although I have previously taught a version of this course at the MBA level.  This course examines copyright, antitrust, and regulatory issues in telecommunications and broadcasting.  At Yale University, I am also a former member and Chair of the University's Committee on Cooperative Research, a committee that oversees the University's patenting and licensing policies.

3.    My research interests include corporate finance and applied industrial organization, and I have published numerous articles in these areas in the American Economic Review; Journal of Political Economy; The Journal of Industrial Economics; The Journal of Law

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and Economics; The Journal of Law, Economics, & Organization; Quarterly Journal of Economics; Journal of Marketing Research; and The Journal of Finance, among others.  In 1999, I received the Elaine Bennett Research Prize, a prize for excellence in research by a woman economist given every two years by the Committee on the Status of Women in the Economics Profession of the American Economic Association.

4.      I am a former co-editor of the American Economic Review, The Rand Journal of Economics, and The B.E. Journal of Economic Analysis and Policy.  I have previously served as an associate editor of The Journal of Finance, The Quarterly Journal of Economics, the Journal of Economic Perspectives, and the RAND Journal of Economics, among others.  I was a member of the Advisory Board of Quantitative Marketing and Economics and a former member of the Editorial Board of The Journal of Industrial Economics.  I was an elected member of the Executive Committee of the American Economic Association and have served on the Nominating Committee and the Honors and Awards Committee of the American Economic Association.  In 2006, I was elected to the American Academy of Arts and Sciences.

5.      My curriculum vitae, which is attached as Exhibit 1, gives more biographical details and lists my writings.  Exhibit 2 specifies the testimony that I have given in the past four years as an expert witness.

**B.      Assignment**

6.      I have been retained on behalf of Samsung Electronics Company, Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Telecommunications America, LLC ("STA") (collectively, "Samsung").  Apple Inc. ("Apple") has alleged that Samsung has infringed five U.S. patents.  The patents-at-issue, listed on the table below are, U.S. Patent

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

numbers 5,946,647 (the "'647 Patent"), 6,847,959 (the "'959 Patent"), 7,761,414 (the "'414 Patent"), 8,046,721 (the "'721 Patent"), and 8,074,172 (the "'172 Patent").[1]

| U.S. Patent Number | Issue Date | Title |
|---|---|---|
| 5,946,647 (the "'647 Patent") | 8/31/1999 | System and method for performing an action on a structure in computer-generated data |
| 6,847,959 (the "'959 Patent") | 1/25/2005 | Universal interface for retrieval of information in a computer system |
| 7,761,414 (the "'414 Patent") | 7/20/2010 | Asynchronous data synchronization amongst devices |
| 8,046,721 (the "'721 Patent") | 10/25/2011 | Unlocking a device by performing gestures on an unlock image |
| 8,074,172 (the "'172 Patent") | 12/6/2011 | Method, system, and graphical user interface for providing word recommendations |

7.      I have been asked to calculate the appropriate damages remedy in this matter assuming validity and infringement of the asserted patents.  I have also been asked to comment on the Opening Expert Report of Christopher A. Vellturo, Ph.D., dated August 12, 2013 (the "Vellturo Report").[2]

## C.      Executive Summary

8.      I have concluded the following:

- Many factors other than operating system software contribute to smartphone and tablet purchase decisions.  The features enabled by the patents-at-issue are a small part of the accused products and their operating systems, which have hundreds if not thousands of features.  The Vellturo Report overstates the importance of the patents-at-issue, relying

---

[1] Amended Complaint for Patent Infringement, August 31, 2012 ("Complaint"), at ¶ 12.  The patent number 8,014,760 (the "'760 patent") was dropped from the case a few days prior to the filing of my report.  Stipulation and Order Regarding Dismissal of Claims, September 9, 2013.  Although I no longer include a damages calculation for that patent, references to and discussion of '760 patent and the "six" asserted patents still remain in the text and certain exhibits.
[2] As the Vellturo Report relies on the Expert Report of John R. Hauser, dated August 11, 2013 (the "Hauser Report"), I also comment on the Hauser Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

on qualitative evidence that discusses features significantly broader than the patents and includes elements that are not protected by the patents. Its lost profits and reasonable royalty conclusions hinge entirely on a flawed conjoint analysis performed by another expert, Dr. John Hauser.

- Lost profits are not warranted because there is no demonstrated link between the patented functionality and sales. These functionalities do not themselves discernibly drive any demand for the Samsung accused products or meaningfully influence the ease of use of the Samsung accused products.

- The Vellturo Report contains numerous errors and significantly overstates the appropriate quantum of damages here. Critical flaws, including an over-reliance on the flawed conjoint results, the use of an unsupported "blackout period," an improper assessment of Apple's share of displaced units, and an overstatement of Apple profitability, inflate the Vellturo Report lost profits figures. Additionally, the Vellturo Report royalty analysis "double counts" lost profits and contains numerous errors.

- The appropriate measure of damages in this case is a reasonable royalty. Use of a number of accepted valuation methods, including the market, income and cost approaches, and a *Georgia Pacific* analysis, indicates a reasonable royalty for Samsung to compensate Apple is approximately $5.9 million if all patents asserted by Apple in this matter are found to be valid, enforceable, and infringed.[3] The market, income, and cost approaches further demonstrate the unreasonableness of the conclusions presented in the Vellturo Report.

---

[3] *See* Exhibit 4. This damages amount assumes that Samsung would have been able to offer acceptable non-infringing alternatives by the end of March 2012 for all of the patents-at-issue. My conclusions can be adjusted to account for the removal of certain products, fewer patents, or a different design-around period. As I discuss later in this report, this amount can be adjusted downward or upward to take into account different assumptions regarding Samsung design-around options, depending on the Court's finding regarding their availability and acceptability.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### D.  Detailed Summary of Conclusions

9.  My detailed conclusions are as follows:

- ***Many factors other than operating system software contribute to smartphone and tablet purchase decisions.*** Demand for complex products such as smartphones and tablets is multi-faceted.  The device software is only one factor in the smartphone or tablet purchase decision.  Carrier sales effort, marketing effort by manufacturers, hardware features of the device, price, and the operating system ecosystem all impact consumer choice.   In the current marketplace, the many differentiated products made available from hardware manufacturers cater to diverse consumer preferences.  Samsung has succeeded in this market by offering differentiated products, with a wide variety of devices including large-screen smartphones and low-priced smartphones, marketing them aggressively, and effectively engaging carriers in the promotion process.   Despite the fact that Samsung's devices have software features that are similar to the devices of other Android manufacturers, Samsung has been substantially more successful due to hardware differentiation, marketing, and pricing.

- ***The features enabled by the patents-at-issue are a small part of the accused products and their operating systems.*** The patents-at-issue constitute only a small part of the software of the accused products, and the software is itself only one attribute of the accused devices.  Specific software features themselves are typically insignificant in driving demand for the accused products.  This is, in part, because other phone characteristics (such as size, screen size, battery life, display definition, storage

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

capacity, camera type, price, and connectivity) matter more, but also, in part, because the operating systems ("OSs") underlying these products are continually upgraded with additional features.  The total number of features and capabilities in current popular smartphones is ever expanding, and individual customers regularly fail to observe numerous features.  A careful review of Samsung promotional material, third-party product reviews, and consumer reviews, shows that the functionalities related to the patents-at-issue reflect only a very small portion of the features and benefits of the accused devices (on the order of a fraction of a percent) and that they were not a point of emphasis in consumer purchase decisions.  Notably, promotional material and reviews typically failed to refer to the patented elements.  Instead, features such as screen size, battery life, and connectivity are more important drivers of demand.

- ***The Vellturo Report overstates the importance of the patents-at-issue, relying on qualitative evidence that pertains to features significantly broader than the patents and includes elements that are not protected by the patents***.  Despite the above-described marketplace realities, the Vellturo Report contends that demand for Samsung's accused products "is significantly influenced by the [software] features afforded by the Asserted Patents,"[4] and claims that demand for accused products would decrease by as much as 55% without the accused elements[5] "even if customers may not be aware of the specific technology that enabled that [accused] functionality."[6]  To him, the success of Samsung's products is and was largely dependent on access to just six patents, as they are assumed to be indispensable to offering a product that many

---

[4] Vellturo Report, at 59.
[5] Vellturo Report, at Exhibit 13 (Galaxy S II AT&T).  *See also*, Vellturo Report, at Exhibit 13-A.
[6] Vellturo Report, at 60.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

customers would consider "easy to use."  Yet nowhere does Dr. Vellturo independently examine all of the factors that contribute to "ease of use."   Dr. Vellturo's conclusion that the asserted patents play an important role in demand is based on an unsound analysis of qualitative document evidence, in which he equates broader references to functionality as evidence of demand for the specific patented functionality.  He does not examine whether a product without the patented elements (and with alternative configurations) would be viewed as easy to use.  Moreover, Dr. Vellturo proffers no evidence that customers are even aware of (or value) the existence of many of the product features related to the patented elements at the time of purchase other than through his flawed qualitative summary of the evidence.  Dr. Vellturo, himself, provides no clear link between the patents-at-issue and customer demand for Samsung's accused products.

- ***The Vellturo Report damages calculations hinge entirely on a flawed analysis performed by another expert.***  The only quantitative basis for demand from the patents-at-issue is taken from a conjoint analysis performed by Professor John Hauser.[7]  But Professor Hauser's analysis suffers from several important flaws.  The Hauser analysis includes overly broad and inaccurate descriptions of the accused functionalities which enhance the respondent's awareness of, and consequently valuation of, the features-at-issue.  Further it uses a misleading statement regarding the "outside option" alternatives from which it derives its results.   As a result, it generates predictions that differ

---

[7] Vellturo Report, at 91-2. *See also*, Hauser Report, at Exhibit P and Q.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

significantly from marketplace realities.[8]  Examination of the Hauser conjoint analysis

results demonstrates truly incredible implications. The Hauser model inaccurately

predicts actual marketplace purchasing, suggests willingness to pay prices many times

the price of an entire product, and suggests the features-at-issue are many times more

valuable than the most successful apps.  As a result, by using the output from this

analysis, Dr. Vellturo vastly overstates the importance of the patents-at-issue and

exaggerates damages.

- ***Lost profits are not warranted because there is no discernible link between the
  patented functionality and sales of the accused devices***. As described above, the
  patented functionalities reflect only a very small share of functionalities and benefits
  provided by the accused devices.  The patented functionalities are rarely, if at all,
  addressed by Samsung third-party media sources and customers in describing the
  benefits of the accused devices.  Dr. Vellturo describes the benefits of the patented
  features, but does not disentangle those benefits from features not protected by the
  patents-at-issue.  Further, Dr. Vellturo fails to provide any independent assessment of
  the weight consumers place on the patented functionalities relative to all the rest of the
  benefits provided by the accused devices.  He relies only on wholly unreliable
  predictions provided by another expert, but these results do not provide any meaningful
  basis to determine if sales of the accused devices depend in any way on the patented
  functionalities.  Based on my review, there is no discernible link between the patented

---

[8] I understand that these flaws in the Hauser conjoint analysis, and others, are detailed by Professors Erdem and
Reibstein.  *See* Expert Report of Tulin Erdem, September 13, 2013 and Expert Report of David Reibstein,
September 13, 2013.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

functionalities and sales of the accused products.  Accordingly, lost profit damages are not appropriate.

- ***Fundamentally flawed assumptions further inflate the Vellturo Report lost profits figures.*** Setting aside the concern that Samsung's use of the technologies at issue did not have a discernible effect on Apple's sales, there are critical errors in Dr. Vellturo's lost profit calculation methodology.

  - First, a large portion of Dr. Vellturo's lost profits stem from a time period when he assumes Samsung would have been out of the market in order to develop non-infringing alternatives to the patented functionalities.  Dr. Vellturo considers all accused units produced during this "blackout" period to be available for a lost profits calculation.  This "blackout" period is, however, "hold-up" damages related to marketplace exclusion, not Apple lost profits from Samsung's use of the patented-invention.  Furthermore, Dr. Vellturo appears to overstate the length of the period, especially in light of Samsung's apparent ability to remove and update certain software features at issue quickly.  Moreover, Dr. Vellturo compounds the "hold-up" amount by having Samsung commence its "blackout" many months after the first infringement of the asserted patents—in effect rewarding Apple for its failure to notify Samsung of its alleged infringement.

  - Second,  for the period subsequent to the "blackout" period, Dr. Vellturo uses the estimates from Professor Hauser's conjoint study to estimate the Samsung units that were sold but would not have been sold in the "but for" world in which

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Samsung had implemented design-arounds.  As mentioned, above, these figures are implausible and result from numerous study design flaws.

- Third, Dr. Vellturo then uses a "Mor-Flo" analysis to convert the number of Samsung units that would have instead been captured by Apple in the "but for" world.  Dr. Vellturo's calculation, however, ignores the fact that, having expressed a preference for an Android device with various features (by choosing the accused Samsung product), a disproportionate share of these consumers in the "but-for" world likely would have instead purchased an alternative Android device with similar features rather than an Apple device.

- Fourth, Dr. Vellturo calculates the profits that Apple would have achieved on lost sales using an estimate of Apple's average incremental profits.  This overstates the relevant profits, as, for example, he uses worldwide profits rather than the relevant U.S. profits and he includes the higher profit rates from various Apple products (such as $399, 64GB iPhones) that likely would not have increased in sales in the absence of Samsung's smartphones, which are all priced below $299 to consumers.


- ***The Vellturo Report royalty analysis "double counts" lost profits and contains numerous additional errors.*** Dr. Vellturo relies on what he refers to as an "Edgeworth Box" royalty analysis.  In doing so, he essentially conducts a second lost profits analysis in disguise.  Despite acknowledging that reasonable royalty damages "are due on sales of Samsung's Accused Products where Apple does not claim [or prove] lost

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

profits due to lost sales,"[9] Dr. Vellturo's construct is premised on the presumption that "royalties under such a license must account for the losses of sales…that Apple would have anticipated from granting such a license."[10]  Double-counting lost profits through the royalty construct represents a clear error.  Moreover, the "losses of sales" used to calculate the royalty are again driven by the inflated results from the Hauser conjoint analysis.  Further compounding these errors are other mistakes, including the use of inflated incremental profits (from the accused and allegedly displaced products) and a speculative gross-up using flawed repurchase estimates to account for possible future sales.

- ***Using of a number of accepted valuation methods, including the market, income and cost approaches, indicates a reasonable royalty should be approximately $5.9 million through February 2013***.  In contrast to Dr. Vellturo, whose quantitative damages conclusions rest on Professor Hauser's conjoint analysis, I have employed several approaches for measuring royalty damages for this case—the "Market" approach, the "Income" approach, and the "Cost" approach as well as an assessment of the *Georgia Pacific* factors.   Specifically, these include: (1) an analysis of the market evidence produced in this matter such as actual license agreements agreed to by Apple in licensing the patents-in-suit, and offers for license agreements made by Apple to Samsung; (2) an analysis of the incremental benefits provided by the patents and of the value ascribed to bundles of features that include the patented features such as in operating system upgrades, (3) an analysis of the design-around costs of the patented

---

[9] Vellturo Report, at 123.
[10] Vellturo Report, at 123.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

elements, and (4) consideration of qualitative factors, including the assumption that the patents-in-suit are valid, enforceable, and infringed, the nature of competition between Apple and Samsung, and the contribution to the accused products of many patents not at issue in this matter.  Together, the appropriate measure of damages is a lump sum royalty of approximately $5.9 million.  This figure is based on the assumption that in the context of a royalty negotiation, Samsung would have been in a position to design-around each of these patents-in-suit by the end of March 2012.[11]  The royalty payments for each patent are listed below:

| Patent-at-Issue | Total Royalty Amount | Number of Accused Units (Through February 2013) |
|---|---|---|
| '647 Patent | $3.1 million | |
| '959 Patent | $0.8 million | |
| '414 Patent | $0.8 million | |
| '721 Patent | $0.7 million | |
| '172 Patent | $0.7 million | |

- ***The market, income and cost approaches further demonstrate the unreasonableness of the Velluro Report conclusions.*** For example, the $42.64 per unit royalty[13]

---

[11] This damages amount assumes that Samsung would have been able to offer acceptable non-infringing alternatives by the end of March 2012 for all of the patents-at-issue.  My conclusions can be adjusted to account for the removal of certain products, fewer patents, or a different design-around period.  As I discuss later in this report, this amount can be adjusted downward or upward to take into account different assumptions regarding Samsung design-around options, depending on the Court's findings regarding their availability and acceptability.  I illustrate possible alternatives to this amount using different design-around assumptions in Exhibit 98.

[12] This figure excludes units from versions of accused products which were identified as non-infringing in the Expert Report of Dr. Alex Snoeren Concerning U.S. Patent Nos. 6,847,959 and 7,761,414, August 12, 2013 (the "Snoeren Report"), at Exhibit 5.  I include a tabulation of those units in Exhibit 4C, and I can adjust my calculations to include them, should it be necessary.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

proffered by Dr. Vellturo is significantly higher than any market approach evidence,

and in particular is:



- o   Roughly ▆▆▆▆ the highest per-unit rate contained in recent ▆▆▆▆▆▆▆▆
  ▆▆▆▆▆▆▆▆▆▆▆▆.[16]

The Vellturo conclusion is also inconsistent with the income approach evidence, as it

is:

- o   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ on many of its accused
  products.

- o   Inconsistent with any notion that Samsung may need to pay for other technology
  (including other Apple technology), as it represents more than ▆▆▆▆▆▆▆
  ▆▆▆▆▆▆▆▆▆▆▆▆.[18]

- o   Wholly inconsistent with the approach advanced by Apple experts Mr. Musika
  and Ms. Davis, which split all of the product profitability across seven other
  patents.[19]

### E.   Materials Relied Upon

10.   In undertaking my analyses, I have relied on information from a variety of sources

including:  the Complaint; interrogatory responses filed by the parties-in-suit; information

produced by the parties in this litigation; deposition testimony; information from publicly-

available sources such as company SEC filings, third-party product reviews, industry trade press,

---

[13] This royalty is for smartphones, and includes the sum of the per unit rates for six patents.  The royalty amount excluding the '760 patent is $40.10 per smartphone.  Vellturo Report, at Exhibit 30. Dr. Vellturo's rate for tablets is $31.99 per unit.  Vellturo Report, at Exhibit 30-A.

[14] *See, e.g.*, Exhibit 76.

[15] *See, e.g.*, Exhibit 75.

[16] *See, e.g.*, Exhibit 79

[17] *See, e.g.*, Exhibit 86.

[18] *See, e.g.*, Exhibit 26A. Uses ▆▆▆▆ as the operating profit.

[19] Supplemental Expert Report of Terry L. Musika, CPA, May 8, 2012; Expert Report of Julie L. Davis, CPA, June 24, 2013.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

company websites and press releases, and other expert reports.  These materials are listed in Exhibit 3.

11.     Should additional information be made available to me, I reserve the right to update my opinions accordingly.

**F.     Compensation**

12.     I am compensated at the rate of $850 per hour for time I incur on this matter.  In addition, I receive compensation based on the professional fees of Analysis Group, Inc., a financial and economic consulting firm, which has provided research support, created exhibits, and assisted in preparation of this report under my direction and supervision.  My compensation is not contingent on my findings or on the outcome of this case.

## II.     Background

**A.     Parties at Issue**

**1.     Apple**

13.     Apple was incorporated in California in 1977 as a manufacturer of personal computers.[20]  In October 2001, Apple expanded its product portfolio to include iPod-branded portable digital media players.[21]  It launched its first phone product, the iPhone, in June 2007.[22] In its 10-K, Apple describes its current product and services offerings as including "iPhone, iPad, Mac, iPod, Apple TV, a portfolio of consumer and professional software applications, the iOS and OS X operating systems, iCloud, and a variety of accessory, service, and support offerings."[23]

---

[20] Apple Inc. Form 10-K for the fiscal year ended September 29, 2012 ("Apple 2012 10-K"), at 1.
[21] http://www.apple.com/pr/products/ipodhistory/.
[22] http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html; http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores html (all viewed 9/12/2013).
[23] Apple 2012 10-K, at 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

not presented *any* quantitative reasonableness checks as to whether Professor Hauser's estimates of willingness to pay for the accused features make economic sense. The result is that Dr. Vellturo's royalty rate remains economically irrational.

289.    At roughly $42.64 per unit, his royalty rate would disgorge much of Samsung's profits on this product line, regardless of all of the other drivers of product line value. As I show below, the $42.64 per unit royalty is an order of magnitude above what legitimate economic approaches to determining a reasonable royalty indicate is reasonable. Many of these approaches have been endorsed by Dr. Vellturo in expert work he has performed with Apple in the past, but were not viewed by him to be "relevant" in this matter.[674]

## X.    Reasonable Royalty Analysis

### A.    Overview of Reasonable Royalty Calculations

290.    I have approached my estimation of a reasonable royalty in a way that is consistent with the methodology described in *Georgia-Pacific Corp. v. United States Plywood Corp.* and other case precedents. One of the most common tools used in reasonable royalty analyses is the "hypothetical negotiation" construct, which frames the analysis using a hypothetical arm's length negotiation for a license to practice the patent(s)-at-issue between a willing patent owner (here, Apple) and a willing potential licensee (here, Samsung) at the point of first alleged infringement.[675] This construct is reflected in *Georgia-Pacific* Factor 15. In

---

[674] *See, e.g.* ███████████████████████████████████ Furthermore, Apple's previous assertion of the '647 patent against HTC also shows Dr. Vellturo's excessiveness—a case in which Apple sought ████████████████. *See*, APPLE, INC. and NeXT SOFTWARE INC.,v. MOTOROLA, INC., and MOTOROLA MOBILITY, INC., Opinion and Order, May 22, 2012, at 17-19. *See also*, APPLE, INC. and NeXT SOFTWARE INC.,v. MOTOROLA, INC., and MOTOROLA MOBILITY, INC., Opinion and Order, June 22, 2012, at 23-4, discussing the availability of design-arounds for the '647 patent.

[675] *See Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) ("A 'reasonable royalty' contemplates a hypothetical negotiation between the patentee and the infringer at a time before the infringement began."). *See also*, *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983); *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

applying the hypothetical negotiation construct in the analysis of reasonable royalty damages, it

is assumed that the negotiation is conducted under the following assumptions:

> 1. the patent is known to be valid and enforceable at the time infringement commences;
>
> 2. the patent is known to be infringed;
>
> 3. the patent holder is willing to issue a license;
>
> 4. the licensee is willing to take a license; and
>
> 5. the appropriate relevant business facts (even subsequent to the point of negotiation) are deemed known to both parties.[676]

### 1.       Date of Hypothetical Negotiation

291.    According to the Federal Circuit, the date of a hypothetical negotiation is the date

at which infringement of a valid and enforceable patent first occurred.[677]  In this case, the earliest

of the patents-in-suit to issue did so in August 1999.[678]  The first commercial sale of an accused

product occurred in June 2011.[679]  Thus, the earliest date of the hypothetical negotiation for the

patents-at-issue is June 2011.

---

negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement. In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme. The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed."). In *Lucent*, the CAFC suggested that the hypothetical negotiation construct was an *alternative* to "the analytical method" (which focuses on the allocation of an infringer's profits attributable to the accused products) in the assessment of reasonable royalty.  *See Lucent v. Gateway*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009).  In this report, information derived from the various valuation methodologies, including the analytical method, is used in the context of the hypothetical negotiation construct to determine a reasonable royalty.

[676] *See* Paul M. Janicke, *Contemporary Issues in Patent Damages*, 42 AM. UNIV. L.R. 691, 722-24 (Spring 1993). *See also*, *Innogenetics, N.V. v. Abbott Labs.*, 578 F. Supp. 2d 1079 , 1093-94 (W.D. Wis. 2007) ("In calculating the amount of a reasonable royalty, the jury has to pretend that the parties sat down and negotiated a reasonable royalty before the day that defendant began its infringement of the plaintiff's patent.  Unlike a real negotiation, this hypothetical negotiation assumes that the infringer must agree to some amount of royalty payment; it does not have the option of walking away from the table. The jury must put itself in the shoes of the parties and look at the relevant circumstances as they were at the time the negotiations would have taken place. The reasonable royalty calculus assesses the relevant market as it would have developed before and absent the infringing activity." (*Internal citations omitted*))

[677]  *See Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993).

[678] Exhibit 23.

[679] Exhibits 26A-26J.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

292.     Each of the asserted patents has a different issue date.  The '647, '959 and '414 patents pre-date the first accused sale.[680]  Thus I have assumed the hypothetical negotiation for these patents would have occurred in or around June 2011.  The remaining patents issued in late 2011, between three and six months after what would have been the first negotiation.   Strict application of the hypothetical negotiation construct would suggest negotiation for the '760 patent on September 6, 2011, for the '721 patent on October 25, 2011, and for the '172 patent on December 6, 2011.  Dr. Vellturo and I appear to be in agreement regarding the hypothetical negotiation dates.[681]

### 2.        Parties to the Negotiation

293.     The parties to the hypothetical negotiation are the patent holder at the time of first alleged infringement and the alleged infringer(s).  For purposes of this report, I have assumed that the hypothetical negotiation would take place between Apple (the owner of the patents-in-suit) and Samsung.   Dr. Vellturo and I appear to be in agreement regarding the parties to the negotiation.[682]

### B.        Reasonable Royalty Analysis

294.     To estimate a reasonable royalty here, I first determine the appropriate form of a royalty-bearing license.  To the extent that the license involves a running royalty, I then determine the appropriate royalty base – *i.e.,* the measure of allegedly infringing activity – to which a reasonable royalty should be applied.  I next consider quantitative valuation methodologies that are commonly used by economists to determine the value of an asset or a fair or reasonable fee that a user should pay for access to that asset, which are commonly referred to

---

[680] The patents issued on 8/31/1999, 1/25/2005, and 7/20/2010, respectively. *See* Exhibit 23.
[681] Vellturo Report, at 124.
[682] Vellturo Report, at 123.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

as the Market Approach, the Income Approach, and the Cost Approach.[683]  Lastly, I choose the appropriate reasonable royalty for the patents-in-suit after considering both quantitative and qualitative evidence concerning the value contributed by the patents-in-suit, drawn, in large part, from and consistent with those factors identified in *Georgia-Pacific*.[684]

### 1.      Form of the Royalty

295.    For most real-world licenses, and almost all reasonable royalty damages awards, compensation is provided by one or both of a lump-sum payment and a running royalty fixed to the quantity or revenues associated with the manufacture, shipment, use, or sale of the products at issue.

296.    A lump-sum typically involves a one-time payment, the magnitude of which is not necessarily directly tied to the extent of alleged usage of the technology at issue by the alleged user/infringer.  A running royalty is a percentage of sales or a fee per unit, tied directly to how often the licensed invention is used by or incorporated into products of the licensee.

297.    The appropriate form of a reasonable royalty depends on several considerations, including the licensing practices of the patent holder, the alleged infringer, and the relevant industry; the nature of the benefits provided by the patented technology; and the availability and nature of the alleged infringer's design-around options.  In the present case, the appropriate form of a reasonable royalty is a lump-sum based on the licensing practices of both Apple and Samsung.

---

[683] *See, e.g.,* Shannon P. Pratt, Robert F. Reilly and Robert P. Schweihs, *Valuing a Business:  The Analysis and Appraisal of Closely Held Companies*, 149-258 (McGraw Hill 2000) ("Pratt, *et al.* (2000)"); Gordon V. Smith and Russell L. Parr, *Valuation of Intellectual Property and Intangible Assets*, 151-173 (John Wiley & Sons 2000) ("Smith and Parr (2000)"); Robert F. Reilly and Robert P. Schweihs, *Valuing Intangible Assets*, 95-202 (McGraw-Hill 1999) ("Reilly and Schweihs (1999)").

[684] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

298. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

299. ████████████████████████████████████████

███████████████████████ As summarized in Exhibits 71 and 72, ███████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

300.     A lump sum license also is supported by economic considerations.  In particular, the agreement would be for a naked license without ongoing support or benefits.  As such, it would not be important to structure the license with a running royalty in order to provide Apple

---

[685] Exhibit 69.
[686] Exhibit 70.
[687] ████████████████████████████████████████
████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

an ongoing incentive to help commercialize Samsung's products.  In addition, Samsung would have sought a lump sum payment to avoid having to pay incremental license fees for future successes due to its own efforts.  Finally, a lump sum would avoid the need to audit ongoing sales of products.[689]

301.   Although Dr. Vellturo and I differ in this conclusion, to facilitate comparison between our opinions, I express many of my calculations on a per unit basis.[690]  Since lump-sum payments typically contemplate the expected use by the licensee, conversion from a per unit figure to a lump sum is possible using the level of infringing activity alleged here.[691]

### 2.   Royalty

#### a)   Overview

302.   As noted above, three methodologies that are commonly used to value assets and to determine a fair or reasonable fee that a user should pay for access to those assets provide insight into an appropriate royalty.  These methodologies are the Market Approach, the Income Approach, and the Cost Approach.[692]  I describe the evidence from these Approaches in the sections below.  I then determine the appropriate reasonable royalty for the patents-in-suit after considering both quantitative and qualitative evidence concerning the value contributed by the patents-in-suit, drawn, in large part, from factors identified in *Georgia Pacific*.

#### b)   Market Approach

303.   Using a Market Approach, an appropriate price for the use of the patents-at-issue can be identified through the examination of the terms of licenses and other transactions

---

[689] *See, e.g.*, Choi, Jay Pil, "Technology Transfer with Moral Hazard*," International Journal of Industrial Organization, 19 (2001), 249–266*.

[690] Dr. Vellturo argued for a ███████████████████████████████████████████████████
███████████████  APL630DEF-WHVX0000591883-592072, at 983.

[691] *See, e.g.*, Watrous Deposition, at 42.

[692] *See, e.g.,* Pratt, *et al.* (2000), Smith and Parr (2000), Reilly and Schweihs (1999).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

involving comparable technology, which can identify terms that prudent parties would (or should) accept in a hypothetical negotiation.

304.    In considering the application of the Market Approach, the Federal Circuit has emphasized that the amount of weight to be given to any particular license depends on the degree of comparability with the terms of the hypothetical license.[693]  This view recognizes that past licenses or transactions can differ from a hypothetical transaction in many important respects. My analysis below (in both the Market Approach and *Georgia Pacific* Factors analysis) incorporates the Court's guidance, including factors such as:

- parties to the transaction;

- time of the transaction;

- nature of the technology at issue;

- nature and scope of the rights transferred;

- existing and projected market conditions at the time of the transaction;

- strength of the asset/IP transferred;

- availability and costs of design-around; and

- relative bargaining strength of the parties.

### (1)    Licensing Practices in the Telecommunications Industry

305.    In application of the Market Approach, it is useful to consider the general licensing practices in the marketplace to provide context for the licenses that are being evaluated. The telecommunications industry is characterized by multi-function products and rapidly

---

[693] *See ResQNET.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("This court has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit."). *See also*, *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009) ("[A] lump-sum damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers, one of which is arguably in the ballpark of the jury's award, particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

evolving technology, with a correspondingly wide range of intellectual property held by numerous parties (some of which do not practice the technology).[694]

306.     As technology has evolved, the number of patents related to each generation of cellular communications technology has grown considerably.  One study examining the Wideband Code Division Multiple Access ("WCDMA") standard as of December 2008, for example, found that over 1,800 patent families, held by over 50 owners, were essential to implementing the standard, and that thousands more patents were claimed to be essential.[695]  As of early 2012, there were an estimated 356,000 patents related to 3G technologies held by various IP holders, less than 1 percent of which were declared essential to those standards.[696]  One analyst commenting on the Apple and Samsung litigations estimated that smartphones can embody as many as 250,000 patents due to the wide range of communications and computing technologies they utilize.[697]

307.     Given the large number of patents that can and do contribute to a cellular communications product, numerous licensing arrangements between marketplace participants have resulted.  Both Apple and Samsung have engaged in such licensing activities.  As summarized in Exhibits 69 and 71, █████████████████████████████████████

---

[694] *See, e.g.*, Eric Stasik, "Royalty Rates And Licensing Strategies For Essential Patents On LTE (4G) Telecommunication Standards," *les Nouvelles*, September 2010, ("Stasik (2010)"), at Table 1; "Review of Patents Declared as Essential to WCDMA Through December, 2008," Fairfield Resources International, January 6, 2009 ("Fairfield 2009"), at Table 5; "Analysis of Patents Declared as Essential to GSM as of June 6, 2007," Fairfield Resources International, December 31, 2007 ("Fairfield 2007"), at 8; Rudi Bekkers & Joel West, "The Limits to IPR Standardization Policies as Evidenced by Strategic Patenting in UMTS," *Telecommunications Policy*, Vol. 33 (2009) ("Bekkers & West (2009)"), at Table 5 and Figure 3.

[695] Fairfield 2009, at 1, 8-9, Table 5. Such counts of patents essential to one standard with which a product is compliant reflect the total amount of IP that a designer or manufacturer of that product may be required to access. Such counts, however, do not include, for example, patents that are essential to other standards with which the product is compliant and may not include patents that cover other elements of the product, such as, in the case of mobile phones, the battery or camera.

[696] Sascha Segan, "Infographic: Smartphone Patent Wars Explained," *PC Mag*, January 19, 2012, available at http://www.pcmag.com/article2/0,2817,2399098,00.asp (viewed 9/12/2013).

[697] Steve Lohr, "Apple-Samsung Patent Battle Shifts to Trial," *The New York Times*, July 29, 2012; Steve Lohr, "A Bull Market in Tech Patents," *The New York Times*, August 16, 2011.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████

███████████████████████████[698]   Rights to a fewer number of patents tend

to command lower compensation.[699] ████████████████████████████████

████████████████████████████████████████████

██████[700].

### (2)   Quantitative Analysis

308.     In using the Market Approach,[701] the most useful and informative transactions

and proposed transactions are those that cover the technology at issue or something reasonably

close.  Other transactions may be associated with a variety of different elements of value and

may be of somewhat less guidance as to the outcome of the hypothetical negotiation.

### (a)   Agreements Involving the Patents-in-Suit

309.     It is my understanding that the patents-at-issue have been licensed by Apple in a

transaction with HTC.[702]  On November 11, 2012, Apple and HTC entered into a license and

---

[698] Exhibits 75 and 76.

[699] Individual patents do not convey as many rights as do portfolio licenses, especially because a license to only one patent of many does not prevent future disputes between the parties to the license.  In this way portfolio licensing can benefit the licensee (or both parties in the case of a portfolio cross-license) by allowing the licensee the freedom to design and manufacture future products without need to incur the costs associated with negotiating and acquiring additional patent rights or the costs associated with future patent infringement litigations.  As a result, rights to individual patents or small groups of patents tend to command lower royalty payments than to licenses to larger groups of patents. *See, e.g.*, U.S. Department of Justice & Federal Trade Commission, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007), at 60. ████████████████ ██████████████████████████████████████████ APLNDC-WH0000683605-11. *See also*, Exhibit 70.

[700] I discuss some of these in the following sections.

[701] The application of the Market Approach in determining reasonable royalty damages is described in *Georgia-Pacific* Factor 1 ("The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty"); *Georgia-Pacific* Factor 2 ("The rates paid by the licensee for the use of other patents comparable to the patent in suit"); and *Georgia-Pacific* Factor 12 ("The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions").  *Georgia-Pacific*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

[702]████████████████████████████████ *See* APL-ITC796-0000010041-79 and APLNDC-X0000007220-355.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



310.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



311. ████████████████████████████████████████

███████████████████████████████████ ██ ██

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

312. ████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████

313. ████████████████████████████████████████

████████████████████████████████████████
█████████████████████████████████████
█████████████████████████ ███████████
████████████████ ████████████████████
████████████████████████████████

---

[707] ██████████████████████████████████████████████ Vellturo Report, at 179.  *See also* Vellturo Report, at 175-176.

[708] Vellturo Report, at 179.  *See also* Vellturo Report, at 175-176.

[709] *See* APLNDC00010886-903.

[710] At the time of that proposal, Samsung was roughly half to two-thirds the size of Apple in the smartphone marketplace, whereas HTC, has been roughly one-fifth to one-third the size of Apple in the smartphone marketplace. See e.g., Oppenheimer 2011 Handset Guidebook, at 25; 2012 Handset Guidebook, at 24; Oppenheimer 4Q12 Wireless Snapshot, at 25; and APLNDC00010886-903, at 896.   However, Samsung's patent portfolio has been acknowledged to be substantially more valuable than that of HTC.  RBC Capital Markets, "Communications Equipment Smartphone IP: Clash of the Titans," September 28, 2011 characterizes HTC as "without a strong patent portfolio to protect themselves," while Samsung is described as having "strong wireless communications (including LTE) and related implementation patents."  Among the top six smartphone vendors and two smartphone OS providers recognized by RBC Capital Markets, Samsung was one of the top four incumbents with the largest patent portfolios.  Specifically, RBC Capital Markets estimated that of Samsung's 45,000 U.S. patents, more than half related to mobile communications, some (or the majority) of which may be part of industry standards.  By comparison, HTC only has 300 U.S. patents (excluding S3 patents acquired in July 2011).  According to the China

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

314. 

315.

Post, HTC's market value declined by nearly NT $900 billion over the April 2011-August 31, 2011 period, and that HTC's patent portfolio was "weak." *See* "Niche markets vital to HTC comeback: analysts," *The China Post*, September 3, 2012.  Available at: http://www.chinapost.com.tw/print/353004 htm (viewed 9/5/2013).

711

712

   In Apple's ITC complaint against HTC filed in March 2010, Apple accused HTC phones including the T-Mobile G1 (which came out in October 2008), and the HTC Hero (which came out in October 2009). *See, e.g.*, http://arstechnica.com/apple/2010/03/apples-itc-complaint-names-htc-phones-10-other-patents/ (viewed 9/12/2013); http://reviews.cnet.com/t-mobile-g1/ (viewed 9/12/2013); http://reviews.cnet.com/smartphones/htc-hero-sprint/4505-6452_7-33770450.html (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



316.

317.

**(b)    Offers to License the Patents-in-Suit**

318.    Although offers to license technology are not the same as consummated agreements, they too can provide insight into the value of the underlying technology.  I

---

<sup>714</sup>

<sup>715</sup>

This approach removes multiple patents with the same description.

<sup>717</sup> *See, e.g.*, Expert Report of Julie Davis, June 24, 2013, at Exhibit 41.1-S; Supplemental Expert Report of Terry L. Musika, CPA, May 8, 2012, at Exhibit 41.1-S.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



319.

320.

321.

[718] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, Response to Interrogatory 19, at 21.
[719] APLNDC00010886–903.
[720] APLNDC00010886–903, at 900.
[721] Deposition of Boris Teksler, 3/16/2012, at 59-72. See also, APLNDC00010886-903.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



723

(c)     Other Apple and Samsung License Agreements

322.

These also demonstrate the payments Samsung has been willing to make for access to individual patents or portfolios of patents used by its smartphones and tablets.  These can be useful in assessing the reasonableness of the results from other valuation approaches.[725]

323.

[726]  I have summarized these agreements in Exhibits 69 and 70.  Samsung has

---

[722] *See* S-ITC-000085099.

[723] the option to license just Samsung's declared essential patents at a rate of 2.4% of sales;

[725] I note that in the VirnetX v. Apple matter, Dr. Vellturo noted that other licenses which did not contain comparable technology were still "…informative as to the form of license and amount of the reasonable royalty." APL630DEF-WHVX0000591883-592072, at 2003-2004.

[726] Samsung's Second Set of Requests for Production of Documents and Things, Request for Production No. 92; Samsung's Fourteenth set of Requests for Production of Documents and Things, Requests for Production Nos. 827, 829, 831, 833.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

describes as responsive for the request for licenses related to standards-essential patents or the

Samsung patents-in-suit.[727]  I have summarized these agreements in Exhibits 71 and 72.

324.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████  Because of the variety of factors that

differentiate many of these agreements from the hypothetical negotiation, they provide limited

guidance here.

325.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

326.  As discussed above, licenses for portfolios of patents tend to provide more

extensive rights ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  ████████████████████

█████████████████████████████████████████████

---

[727] Samsung's Objections and Responses to Apple's Fourth Set of Interrogatories, Interrogatory No. 33; Samsung's Further Supplemental Responses to Apple's Second and Third sets of Interrogatories (Interrogatories Nos. 15, 17, 20, 24, 26, 29), Interrogatory 17.
[728] ████████████████████████████████████  See Exhibit 79.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



327.     Nevertheless, many of these agreements are illustrative of the amounts Apple and

Samsung are willing to pay for patent rights.  For example:



---

[729] Vellturo Report, at 196 and Exhibit 31.  Dr. Vellturo's royalty excluding the '760 patent is roughly $968 million.

[730] APLNDC-WH0000536321-331 and Lipman, Melissa.  "Emblaze Targets Apple over iPhone Video App," *Law 360.* December 2, 2009.  *Available at* http://www.law360.com/articles/136946/emblaze-targets-apple-over-iphone-video-app (viewed 9/12/2013)

[731] APLNDC-WH0000536214-20 and Thomson United States SEC Form 20-F dated June 3, 2005 at p. 138. Available at: http://www.sec.gov/Archives/edgar/data/1080259/000117099705000025/form20f htm

[732] APLNDC-WH0000536400-409 and Zapata, Ron.  "Caller ID Patent Holder is Sour on Apple's iPhone." *Law360.* February 25, 2008.  *Available at:* http://www.law360.com/articles/48118/caller-id-patent-holder-is-sour-on-apple-s-iphone (viewed 9/12/ 2013).

[733] APLNDC-WH0000536237-251 and Krazit, Tom.  "Apple settles patent suit over iPhone visual voice mail," *CNet.* June 16, 2008.  *Available at:* http://news.cnet.com/8301-13579_3-9969909-37.html (viewed 9/12/ 2013) and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



328.    To better reflect the circumstance surrounding the hypothetical negotiation in this

matter, it is also instructive to examine that subset of licenses in which Samsung is the licensee.

This is relevant because ███████████████████████████████████████████

████████████████████  However, as the accused sales are only certain Samsung

smartphones and tablets sold in the U.S., and ███████████████████████████

---

Krazit, Tom.  "Apple, AT&T sued over iPhone's visual voice mail," *CNET News*, December 3, 2007.  *Available at*: http://news.cnet.com/8301-13579_3-9828078-37.html (viewed 9/12/ 2013). ████████████████████
███████████
     APLNDC-WH0000536307-320 and Lipman, Melissa.  Apple, SanDisk Settle Texas MP3 Patent Spat. Law 360, January 26, 2009.  *Available at:* http://www.law360.com/articles/84475/apple-sandisk-settle-texas-mp3-patent-spat (viewed 9/12/2013)
[735] SAMNDCA630-07603708-20.
[736] SAMNDCA630-07603397-430.
[737] SAMNDCA630-07603890-99; Zapata, Ron, "Apple's iPhone Tapped In Suit Over Keyboard Patent,"Law 360. August 3, 2007.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

█████████████████████████████████ will still likely overstate the appropriate

compensation for just the products-at-issue.

329.    As shown in Exhibit 79, there are ████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ █ ████████████████ [738]

330.    As an additional refinement, ██████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████

331.    It is possible to adjust these ████████████████████████ to make

them more comparable to the extent of use in this matter.  To do so, one must estimate the

expected number of units to be sold during the agreement term.[739]  I have illustrated the likely

per unit amounts associated with these agreements in Exhibit 84.   As the exhibit shows, most of

these ████████████████████████████████████████████

█████████████████████████ ███████████████████████████

█████████████████████████████████████████████████

███████████████████████ █

---

[738] I illustrate these payments in Exhibit 80.
[739] For this illustration, I conservatively have used ████████████████████████████
████████████████ *See* Exhibits 84 and 85.
Exhibit 85.

332.   The ███████████████████████████████████████████
███████████████████████   ███████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████   ██████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████

333.   ███████████████████████████████████████████████████
███████████████████████████████ [743]  In Exhibits 69-72, I summarize

these.  As the exhibit shows, with the exception of ███████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████ [744]  It appears that Samsung

███████████████████████████████████████████████████████████
█████████████████████████████ [745]

**(d)   Summary of Market Approaches**

[741] SAMNDCA630-07603523-45 █████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████   For example, Immersion software combined with
"actuators," such as motors, allows sensations like the feel of a button click when pressing a virtual button. It makes
the product feel more real and can improve the user experience, particularly for people not used to touch screens."
http://news.cnet.com/8301-1035_3-57573025-94/samsung-gets-touchy-feely-with-immersion-haptics-tech/ (viewed
9/12/2013).
[742] SAMNDCA630-07603523-45, at 25-28.
[743] Dr. Vellturo and I appear to be in agreement that licenses with royalties based on a percentage of selling price are
less relevant here.
[744] █████████████████████████████████████████████████████████
██████████████████
I include those with a maximum royalty cap in the lump sum agreement analysis.

184

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

334.    As described above, various licenses and proposals provide insight into the appropriate rates for the patents-in-suit.



- Relevant licenses entered into by Samsung [redacted]

[redacted][746]

c)    **Income Approach**

335.    The Income Approach provides a systematic framework for estimating the price to be paid for certain intellectual property based on the value of benefits derived from use of the subject technology.  The goal of any licensing negotiation is for the parties to find a mutually agreeable way to "share" the benefits from making, using, or selling products embodying the technology at issue.  The owner of the technology is entitled to compensation for the portion of the benefits of the product or process that is due to the intellectual property.  The licensee should retain certain benefits derived from other attributes of the product or process that incorporate the technology at issue.  The licensee should also be compensated for assuming the business risks associated with manufacturing, using or selling the product that embodies the particular technology.

(1)    **Overview of the Analytical Approach**

---

[746] Using the 100th and 95th percentiles.  Exhibit 79.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

336.    The Incremental Income/Analytical Approach is one of the most common Income Approaches. The first component of this analysis is identification of the profits for the products that incorporate the patented technology at issue. The next step is an attempt to isolate the portion of that profit due to the patents-at-issue (apart from the other elements of value), in many cases by subtracting the return associated with the next best alternative.[747] Any profits generated on products utilizing the patented technology that are in excess of the next best alternative represent an amount up to which the licensee should be willing to pay for access to the technology.

### (2)    Profitability as a Measure of Value

337.    Ideally, the performance of one product line that practices the patents-in-suit is compared to that of a product line that does not practice the patented technology but is otherwise identical.  This comparison should be made between two products that would be equally acceptable to the purchaser.  In other words, the comparison product should be able to be sold in place of the infringing product without a loss of sales.  I could not make such a comparison here because, among other reasons, I am not aware of a completely non-infringing, yet otherwise identical, product line for Samsung's accused products that are currently available for sale.

338.    It appears that the various design-around options described previously would have no discernible impact on sales or profitability when compared to the accused models.  This is supported, in part, by the observation that the Galaxy S III which does not incorporate either the "image unlock" or "word recommendations" patents is more profitable and more popular than

---

[747] This method was endorsed in *TWM Mfg. Co., Inc. v. Dura Corp., et al.*, 789 F.2d 895 (Fed. Cir. 1986).  *See also,* Gordon V. Smith and Russell L. Parr, <u>Valuation of Intellectual Property and Intangible Assets</u> 238-48 (3rd ed. 2000).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

previous phone versions (such as the Galaxy S II) which are alleged to embody those patents.[748]

Thus, at least for those two patents, the analytical approach provides some insight.    It suggests

the '172 patent and '721 patent values are negligible, as the non-infringing product is more

profitable than, and as equally salable as, the infringing one.

339.    Dr. Vellturo's analysis suggests that a significant portion of the profit (and

accused product success) derives from the benefits of the asserted patents.  For example, using

his Samsung willingness to pay calculations, Dr. Vellturo suggests that roughly ███████████

████████████████████████████████████████████████████████ is due to the patents-

at-issue.[749]  Thus, he ascribes ████████ of incremental value to just the six patents, before making

other adjustments to arrive at a royalty rate.  Using the average incremental profitability from all

of the accused products, however, is misguided.[750]

340.    Each accused product contains vastly different hardware, keyboards, screen sizes,

and versions of operating software.  As a consequence, there is tremendous variation in profits

across the accused products.[751]  This profit variation does not derive from the use of the patents-

in-suit, but instead draws from other non-patented elements.[752]  For example ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ [753]

---

[748] Exhibit 86. ████████████████████████████████████████████████████
████████████████████ *See also*, Exhibit 26A.
[749] Vellturo Report, at Exhibit 26.
[750] As I describe later in this report, these margins overstate the relevant profitability. For example, the average profitability figures used by Dr. Vellturo include profits from products not accused of certain patents.
[751] For example ████████████████████████████████████████████████████
████████████████████████████████████████████████ *See* Exhibits 26A, 86 - 88.
[752] This is also apparent when considering the relative success of HTC's Android products, which despite using the patents-in-suit through the same Android operating system, have had nowhere near the same recent marketplace success. Exhibits 13, 14, and 15.
[753] Exhibit 86.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Comparing the ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ a difference attributable to features and benefits unrelated to the patents-at-issue.  Such

differences demonstrate that these phones have significant value that is not explicitly tied to the

patents-at-issue and using an average profit figure vastly overstates the patented contribution,

particularly when applied to Professor Hauser's unsound survey results.

341.     Instead of using product profit data which clearly incorporates far more than the

patents-in-suit, Dr. Vellturo could have focused on the value of the operating system of the

accused devices, which is the component of the product that incorporates the accused

features.  This is consistent with the approach suggested in many recent cases, in which the

smallest salable unit practicing a patent is analyzed to determine the value of the patent's

contribution.[754]  It is my understanding, however, that the Android operating system is open

source—and is provided at no charge to its users.  Accordingly, the market price of the Android

operating system itself is $0.   Apple, on the other hand, has (1) in the past, charged for operating

system upgrades for certain products;[755] and (2) estimates, for GAAP accounting purposes, the

market price of operating system upgrades related to its iPhone and iPad products.[756]   Using

---

[754] *See, e.g., Cornell University v. Hewlett-Packard Co.,* 609 F.Supp.2d 279 (N.D.N.Y. 2009).

[755] Prior to 2010, Apple charged iPod Touch users $10 to upgrade to the next version of the operating system, including updates to the iPod Touch versions of the iOS 2.0 and iOS 3.0 operating systems that are used by some of Apple's practicing products in this matter. http://appleinsider.com/articles/09/06/25/upgrade_fee_sees_few_ipod_touch_users_updating_to_3_0_software;  http://www.macworld.com/article/1134502/ipodtouch html (viewed 9/12/2013).  Of note, it was reported that only a small fraction of iPod Touch users actually purchased upgrades for $10 per unit, indicating that many iPod Touch buyers did not value the incremental functionality provided by the OS upgrade.  http://appleinsider.com/articles/09/06/25/upgrade_fee_sees_few_ipod_touch_users_updating_to_3_0_ software (viewed 9/12/2013).

[756] According to Apple's SEC filings, software upgrade rights sold with each iPhone and iPad have varied from $10 to $25 over time.  *See* Exhibit 91. As part of its process of creating its periodic financial filings, Apple has been required to account for a portion of the revenue generated on sales of certain of its products, including iPhones and iPads as deferred revenue to account for the fact that as part of the sales of these products, customers purchase

Apple's operating system upgrade as a proxy for Android suggests a value of an entire operating system upgrade (which includes more than one hundred new software features) of between $10 and $25.[757]

342.     As discussed previously, according to Apple, each iOS upgrade provides users with over 100 or 200 new features.[758]  Assuming the $10 to $25 reflects the price of a single upgrade with 100 new features, the average value per feature would amount to $0.10 to $0.25. For an upgrade of 200 new features, the range would be $0.05 to $0.125 per feature.[759]  In fact, the lack of discussion in reviews and press releases of the accused features (opposed to other features) suggests they may be relatively less valuable than average.  These amounts are significantly below Dr. Vellturo's estimates that suggests each feature to be worth from $4.40

---

"unspecified and specified software upgrade rights and non-software services that are attached to hardware and software products." Apple Form 10-K for the Fiscal Year Ended September 24, 2011, at 48. To determine the appropriate amount of revenue to be deferred and allocated on a straight line basis "over the estimated lives of each of these devices, which range from 24 to 48 months," Apple determines "the best estimate selling price ('ESP')" of the unspecified and specified software upgrade rights and non-software services, which, according to Apple, "reflect[s] the Company's best estimates of what the selling prices of elements would be if they were sold regularly on a stand-alone basis."  Apple Form 10-K for the Fiscal Year Ended September 24, 2011, at 27.  Apple's 2011 Form 10-K also noted:

> …the Company has concluded that if it were to sell upgrade rights or access to the non-software services on a standalone basis, including those rights and services attached to iOS devices, Mac and Apple TV, the selling prices would be relatively low. Key factors considered by the Company in developing the ESPs for software upgrade rights include prices charged by the Company for similar offerings, market trends for pricing of Mac and iOS compatible software, the Company's historical pricing practices, the nature of the upgrade rights (e.g., unspecified and when-and-if-available), and the relative ESP of the upgrade rights as compared to the total selling price of the product. The Company may also consider, when appropriate, the impact of other products and services, including advertising services, on selling price assumptions when developing and reviewing its ESPs for software upgrade rights and related deliverables. The Company may also consider additional factors as appropriate, including the pricing of competitive alternatives if they exist and product-specific business objectives. When relevant, the same factors are considered by the Company in developing ESPs for offerings such as the non-software services; however, the primary consideration in developing ESPs for the non-software services is the estimated cost to provide such services over the estimated life of the related devices, including consideration for a reasonable profit margin. Apple Form 10-K for the Fiscal Year Ended September 24, 2011, at 49.

[757] Exhibit 91.
[758] *See* Exhibit 38.
[759] This calculation conservatively assumes that the entire revenue amount is profit.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

(the '959 patent) to $13.85 (the '172 patent)[760], and collectively more than $42— roughly 2 to 5 times the price of the entire operating system upgrade.[761]

### (3)    Apple's Inconsistency Across Lawsuits

343.    Apple's damages experts from a prior litigation between Apple and Samsung addressed the total value of intellectual property in smartphone and tablets.  Julie Davis and Terry Musika both concluded that _all_ of the intangible value (not including brand and design) was $31 per unit in Apple products, and $4 per unit in Samsung products.[762]  This value was then allocated across various asserted patents in that matter to determine a value for each patent.  Although I do not agree with this methodology or its conclusions, I find that Apple's experts are being entirely inconsistent with each other when evaluating the profits (and relevant royalty) for Samsung's smartphones.

344.    Dr. Velluturo argues at least ███ n profits in Samsung's phone comes from just six patents; Mr. Musika/Ms. Davis concluded that the entire profit associated with _all_ intellectual property in Samsung's phones was limited to $4.  Further, the Musika/Davis approach implied that all of the $4  in value was attributable to 7 utility patents (not at issue in this matter) allegedly used in Samsung's products, including the Galaxy S II, which is also accused in this matter.[763]  Apple's approach if consistently applied here would suggest that there is no value from the patents-at-issue.  In other words, given that all of the intangible value was assigned to those 7 patents, there is no value left to be assigned to the patents-at-issue.

---

[760] Equals 3.99% x $110.25; and 12.56% x $110.25.  Values are before adjustments.  _See_ Velluturo Report, at Exhibit 26.

[761] In the VirnetX v. Apple matter, Dr. Velluturo used information related to OS prices to inform the royalty. APL630DEF-WHVX0000591883-592072, at 1989-1995.

[762] Expert Report of Julie Davis, June 24, 2013, at 86.  _See also_, Supplemental Expert Report of Terry L. Musika, CPA, May 8, 2012, at Exhibit 41.2-S.

[763] Expert Report of Julie Davis, June 24, 2013, at Exhibit 41.1-S; Supplemental Expert Report of Terry L. Musika, CPA, May 8, 2012, at Exhibit 41.1-S. _See also_ Exhibit 92.

345.    Even if Apple's previous damages experts were to correct their methodology to include all of the intellectual property required to manufacture and sell the accused Samsung products—not just the patents that are asserted in that particular litigation—Dr. Vellturo's results would still appear excessive.  This correction is an obvious one.  Suppose there are just two patents in a phone which has an intangible value of $4.   One cannot logically say the value of the first patent is $4, and then later say the value of the other patent is $4 in another context.  This is double counting.  Instead, the value of the two patents must add to $4.

346.    More generally, this correction to the Musika/Davis analysis suggests that the value of the intangibles must be apportioned to all of the intellectual property required to produce a smartphone.[764]  When one considers all of the intellectual property required by smartphones that would be captured by the intangible value, each patent becomes noticeably less valuable.  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████  Recognizing that smartphones and tablets require many thousands of patents indicates an even lower value for each patent.[766]

347.    This illustration clearly demonstrates that Dr. Vellturo's purported smartphone royalty of more than $42 for just six patents is disproportionately high, given Apple's assertion that the total intangible value in Samsung's phone is less than $4.

---

[764] *See* Exhibit 92.
[765] *See, e.g.*, APLNDC00001103-1125, at 14-18.  *See* Exhibit 92.
[766] 3,500 patents are identified in APLNDC00001103-1125, at 5.  Assuming only 400 patents were necessary, implies a value of roughly $0.01 per patent.  Using a smaller number of patents, rather than the whole portfolio is consistent with the notion that all patents do not have the same value.  *See, e.g.*, N. van Zeebroeck, "The Puzzle of Patent Value Indicators," *CEB Working Paper No*. 07/023, April 2009., at 3-4; Mark Schankerman, "How Valuable is Patent Protection?  Estimates By Technology Field," RAND Journal of Economics, 29.1 (Spring 1998), 77-107, at 77; Zvi Griliches,"Patent Statistics as Economic Indicators: A Survey," Journal of Economic Literature, XXVIII (December 1990), 1661-1707, at 1682.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### (4) Alternative Measures Using Features

348.    The royalties resulting from the various approaches described above, while much lower than those proposed by Dr. Vellturo, are consistent with the royalties implied by attributing the value of a smartphone or tablet to its enumerated features.  Specifically, I illustrate the Vellturo calculations of Samsung's willingness to pay, replacing the Hauser conjoint results with relative feature mentions from my analysis and review of surveys, as well as making other corrections to the Vellturo calculations.

349.    First, I start with the average operating profit of the accused smartphones and tablets.  As discussed above, a license is a way to share the benefits from making, using, or selling products embodying the technology at issue.  Fully loaded operating profits are the best measure of that value, particularly in light of Apple's allegation that essentially Samsung's entire current smartphone and tablet business line uses the patents-at-issue.[767]  These profits represent the benefit that Samsung should share.  In Exhibit 93, I show these profits for the accused smartphones.  Note that as certain products are not accused of infringing various patents, the average operating profit differs for each inquiry ██████████████████████████████ ██████████████

350.    Next, I allocate these profits to the various identified smartphone features using the relative mentions from professional reviews which range for these patents from 0.0 percent to 0.5 percent.  I also perform an allocation using the relative mentions from consumer reviews that range from 0.0 percent to 0.2 percent.  As my review methodology over-included feature

---

[767] Although Samsung's Galaxy S4 is not at issue in this litigation, I understand that Apple has accused that product of infringement as well.  See e.g., Apple Inc.'s List of Accused Products Pursuant to Court Order of April 24, 2013, May 13, 2013, at 1, and http://www.bloomberg.com/news/2013-06-27/apple-can-t-add-galaxy-s4-to-samsung-patent-lawsuit html (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

mentions related to the asserted functionality, this illustration overstates the value associated with the patents-in-suit.

351.    Exhibit 93 shows that allocating value in this way suggests that the various asserted functionalities tend to be worth as little as $0.00 and as much as $0.41 per smartphone. These rates overstate the value for each patent, as they equate functionality of an entire feature (which on average encompasses more than one patent) to a single patent.  In addition, because the profits per tablet are essentially zero, the relative share of value associated with the patents-at-issue would also be essentially zero.[768]

### (5)    Reasonableness Check with Apps

352.    To further assess the reasonableness of these approaches, I examine data from the mobile apps marketplace.  Mobile applications are designed to provide specific functionalities to mobile devices, and the availability of apps, in a general sense, is viewed by consumers as an important factor in their device purchasing decisions.[769]  Apps, in some ways, are useful indicia of the value smartphone customers place on software functionality for their devices.

353.    Apps are designed to run on specific operating systems, and developers may design apps on multiple platforms.  Android and Apple iOS are the two dominant mobile app platforms, accounting for 51 percent and 40 percent of total global app downloads in Q1 2013, respectively.[770]  Apple apps are sold exclusively through the Apple iOS store.  Android Apps are

---

[768] Many reports have shown that Samsung has resorted to giving away its tablets, despite the use of the patents-in-suit. *See, e.g.,* http://news.cnet.com/8301-30685_3-20061487-264 html (viewed 9/12/2013); http://techcrunch.com/2011/08/18/this-isnt-going-to-end-well/ (viewed 9/12/2013).

[769] *See, e.g.,* APLNDC630-0000149470-605, at 480, 597; Rangel Deposition Volume 1, Exhibit 5, at 18.

[770] http://techland.time.com/2013/04/16/ios-vs-android/ (viewed 9/12/2013).  Additional app platforms include Microsoft and BlackBerry.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

predominantly sold through the Google Play store, but additional apps stores, including Amazon, GetJar, Slide ME, F-Droid, and Appoke also sell Android Apps.[771]

354.    The vast majority of Android App downloads are for "free apps", and there is substantial variation in the popularity of apps across different categories.  According to estimates of U.S. downloads in the Google Play store provided by Priori Data,[772] in February 2013 the most popular free app (Google Play services) was downloaded 69.5 million times.  The most popular paid app (Swiftkey) was downloaded 260,900 times.  Collectively, the ten most popular free apps were downloaded 122.2 million times compared to 490,700 downloads for the ten most popular paid apps, and downloads for the 50 most popular free apps totaled 168.9 million compared to 760,600 downloads for the 50 most popular paid apps.[773]

355.    Exhibit 95 summarizes estimates of cumulative downloads and payments for leading apps from their launch date through May 2013.[774]  Swiftkey, the most popular productivity app, which had been downloaded an estimated 3.7 million times since it first launched on the Google Play store, with estimated download revenues of $17.5 million.  Based on the estimates in Exhibit 95, cumulative downloads for Swiftkey account for approximately 5 percent of Android smartphone users.  This app is significantly more popular than the 2nd highest

---

[771] http://www.digitaltrends.com/mobile/android-app-stores/ (viewed 9/12/2013).

[772] Priori is a mobile app data provider that publishes intelligence reports, performs custom data projects, and engages in select third party data partnerships.  Priori data are collected in partnership with XYO, which previously provided free app download reports offered by Priori before shifting its focus towards an app recommendation services.  *See*, http://prioridata.com/about-us/ (viewed September 12, 2013); http://xyo.net/app-downloads-reports (viewed September 12, 2013).

[773] Exhibit 94.  These data exclude apps with in-app purchases.  In-app purchases allow users to purchase upgrades, extra features, or other "virtual goods" within the app.  In-app purchases are especially prominent among games, where users can purchase extra lives and access to extra levels, among other things.  Priori estimates that in May 2013, 5 percent of Android apps and 2 percent of downloads in the U.S. included apps that allowed for in-app purchases.  *See*, "Country Insights Report: USA Android Platform," Priori AppMarket Reports, May 2013, at 4.

[774] Estimated downloads are calculated from estimates of Google Play, paid app downloads in the U.S.  *See*, Exhibit 95.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

grossing app which has estimated download revenue of $8 million.  Across the top 100 Android apps, the median revenue is roughly $0.5 million and the average is roughly $1.2 million.[775]

356.    Relative to the estimated number of Android smartphone users, the cumulative number of downloads for these popular paid apps is small in the context of total device ownership.  Only 9 of these top 100 apps have been downloaded by more than 1 percent of Android users.[776]  This is consistent with the observation that specific individual software features are of limited importance to many smartphone users.  Dr. Vellturo's analysis implies that had the features-at-issue been apps, they would be among the most popular paid apps ever.

357.    I use this app data to illustrate the average price paid across all Android users for each of the top 25 apps over the relevant period.  As I show in Exhibit 95, the highest value app yields approximately $0.24 per smartphone, the 2nd highest value app yields $0.11, and the 25th highest value app yields $0.02.    These rates are consistent with the per unit payments associated with the other income approaches discussed above and also with the license rates described previously.

### (6)    Summary of Income Approaches

358.    As described above, various income approaches provide insight into the appropriate rates for the patents-in-suit.

- The Analytical Approach suggest the '172 patent and '721 patent have nominal value.

- Operating software upgrade prices suggest values of $0.05 to $0.25 per feature, per product.

- Apple's Case I approach suggests no more than $0.14 per patent, per product.

---

[775] Exhibit 95.
[776] Exhibit 95.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Alternative approaches using product features tend to show values between $0.00 and $0.41, per smartphone, per feature.

- Analysis of apps indicates no more than $0.24 per patent, per unit, and likely between $0.02 and $0.11 per patent, per unit.

### d) Cost Approach

359.    The Cost Approach involves an examination of the costs required to construct or purchase an alternative technology that performs the same function as the patented technology, but which does not infringe the patent or patents-in-suit.[777]  The cost to develop and implement a non-infringing alternative technology is also called "design-around cost."  According to the Cost Approach, a user of certain patented technology would pay no more for access to that technology than its avoided costs.

360.    Many times a Cost Approach focuses on avoided out-of-pocket capital expenditures.  However, such examinations tend to underestimate the true value of assets, including intellectual property assets.  The "economic" facts that need to be considered include the costs of unsuccessful design attempts, the period of the design-around, and the going forward impacts of the alternative involving, for example, the cost associated with implementing and distributing the alternative technology.

361.    Dr. Vellturo has acknowledged that the presence of design-around alternatives would reduce the royalty rate in his calculations.[778]  For example, in his royalty analysis, Dr. Vellturo assumes it would take Samsung 4 or 5 months to successfully have implemented certain alternatives in its accused products.[779]  Doing so reduces the rate that would have otherwise be

---

[777] Reilly and Schweihs (1999), at 97.
[778] See, e.g., Vellturo Report, at Exhibit 27.
[779] See, e.g., Vellturo Report, at Exhibit 27.

paid (under Dr. Vellturo's construct) by as much as almost 90 percent.[780]  This is because Dr.

Vellturo correctly recognizes that Samsung would have been unwilling to pay a royalty after it

had been able to design-around the patents-in-suit.

362.    Samsung contends that, as of the point of the hypothetical negotiations it could

have had available, non-infringing, commercially acceptable alternatives for each of the patents-

in-suit.[781]  For two of the patents-in-suit (the '721 and '172 patents), Samsung introduced

phones with non-infringing alternative functionalities prior to the damages period.[782]

363.



---

[780] Dr. Vellturo assumes that the royalty will be proportionally reduced to the fraction of time to design-around relative to the product life of 36 months.  Vellturo Report, at Exhibit 27.
[781] *See, e.g.*, Samsung's Response to Apple's Interrogatory No. 29.
[782] For the '721 patent, one such design was the "glass unlock" used as the first-screen unlocking mechanism in the Galaxy S II; for the '172 patent, one such design was the Samsung keyboard available in the Dart.  *See* Rebuttal Expert Report of Saul Greenberg, Ph.D Regarding Noninfringement of the Asserted Claim 8 of U.S. Patent No. 8,046,721, at ¶¶ 438-440; Rebuttal Expert Report of Dr. Daniel Wigdor Concerning Non-Infringement of U.S. Patent No. 8,074,172, at ¶¶ 156-158.
[783] Lockheimer Deposition, at Exhibit 4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



According to Samsung witness Hyunjung Lee, the implemented non-infringing alternative that was used in the non-accused releases of the Galaxy S III took 104 hours to design and implement and the implemented non-infringing alternative used in the non-accused releases of the Admire and Transform Ultra took only 4 hours to implement.[784]

364.   These estimates are generally consistent with the opinions of

---

[784] *See* Lee Deposition at 165:10-169:24; 76:1-77:22 and Exhibit 22.

[786] *See* Samsung's Further Supplemental Responses to Apple's First, Third, and Tenth Sets of Interrogatories, July 15, 2013, at 197.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

365.    Samsung would only be willing to pay a royalty during the period in which it needed the patented technology.  One way to express this concept is that Samsung would be willing to pay a royalty during the number of months it took to design-around the patents, but it would pay nothing after the alternative was implemented.[787]  The royalty payment can be adjusted to account for the relative portion of the period for which a design-around was not feasible.  Thus, the ability to design-around the patent(s) would suggest that in a hypothetical negotiation Samsung would be willing to pay less over the full time period in which Samsung is alleged to have made infringing sales.  To the extent that the Court finds Samsung's alternatives to be acceptable and available, the royalty payment should be reduced to reflect the infringing activity in the relevant period that a license would have been required.

### e)    Qualitative Factors

366.    In addition to the quantitative evidence, qualitative factors should be (and are) considered to account for differences between the Market, Income and Cost approaches and the hypothetical negotiation.  I discuss relevant qualitative factors below, which emanate from *Georgia-Pacific*.[788]

> *Georgia Pacific Factor 1 – The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.*

367.    There is no established royalty for the patents-in-suit.  The licenses (and offers to license) that include the patents-in-suit have been considered in the Market Approach.  ███████ ██████████████████████████████████████████████  Adjusting the payment terms to reflect some of the facts of the hypothetical negotiation with Samsung, a royalty to the patents-in-suit

---

[787] For example, assume the royalty for use of certain technology was determined to be $1 per unit.  Samsung would pay the $1 per unit on all units until the point it could implement its alternative, at which point it would no longer owe a royalty.  If the alternative was implemented midway through the period (and sales were evenly distributed), this would indicate an effective rate of $0.50 per unit over the entire time period.

[788] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ This factor provides no additional guidance.

*Georgia Pacific Factor 2 – The rates paid by the licensee for the use of other patents comparable to the patent in suit.*

368.   As I noted in the Market Approach, Samsung produced ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████

369.   This provides no further guidance, as it was subsumed in the Market Approach.

*Georgia Pacific Factor 3 – The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.*

### (1)   IP Covered by License

370.   All else equal, a license that includes rights to a variety of patents, copyrights and knowhow is more valuable than one that does not (*i.e.*, a "naked" license). The hypothetical license construct used to assess reasonable royalty damages presumes a naked license that provides the licensee (*i.e.*, the alleged infringer) with permission to practice the patents-in-suit. It does not provide for the transfer of any know-how, technical assistance or any other intellectual property rights from the patent holder/licensor to the alleged infringer/licensee.

371.   As many of the produced agreements were ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



To help account for this difference, as described in the Market Approach, I reviewed the terms of agreement with 20 or fewer patents.  This group is more indicative of a license to the patents-at-issue than the ███████████████

372.    Furthermore, ███████████████████████████████

███████████████████████████████

███████████████    To help account for this difference, as described in the Market Approach, I adjusted certain agreements to reflect a per unit rate that can be applied to ████ ████████

### (2)    Exclusivity

373.    The hypothetical license construct used to assess reasonable royalty damages presumes a non-exclusive license, as it is intended to provide the hypothetical licensee only with the right to use the technology at issue and not, for example, the right or ability to prevent other parties from practicing the technology. [789]  Moreover, the patent owner cannot and should not be effectively constrained by the hypothetical license from suing or licensing any other party it deems appropriate under its patents.

374.    As a general matter, the existing licenses produced by the parties involved the

███████████████████████████████████

---

[789] In *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333 (D. Del. 1994), the court noted that "[a] patent owner may recover as a measure of damages the royalty rate established by prior actual licenses for acts comparable to those engaged in by the infringer without authority." *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1343 (D. Del. 1994). In its decision, the court drew a parallel between the hypothetical license and a non-exclusive license, noting that "[t]he rights needed by Amoco to use [the infringing] process are similar to the rights granted to the ... licensees" which was a "non-exclusive license." *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1344 (D. Del. 1994). The court also wrote that "[t]he rights infringed by Amoco were similar or 'comparable' to the rights granted under the standard license." *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1344 (D. Del. 1994).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

████████████████████   As a result, this has no incremental effect on the reasonable royalty rate here.

### (3)   Legal Strength of IP

375.   A patent that has been judged valid, enforceable, and infringed, or that has been readily acknowledged by the industry as such, is generally worth more than a patent for which these issues are still in doubt.  In the hypothetical negotiation construct, it is appropriate to assume that the patents-in-suit are valid, enforceable, and infringed, and that both parties are aware of these facts.  In contrast, the existing licenses produced by the parties in this proceeding were not, as a general matter, negotiated under conditions where the patents-in-suit had been conclusively found to be valid, enforceable, or infringed.  One exception is that at least one of the patents licensed by HTC were found to have been infringed by HTC.[790]

376.   This difference in legal strength between the hypothetical license and the bulk of the quantitative market evidence considered in this report suggests that the rates reflected in the existing licenses would tend to underestimate the appropriate royalty that should emerge from a hypothetical negotiation of the type that we are analyzing here.

> *Georgia Pacific Factor 4 – The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.*

377.   A hypothetical negotiation is assumed to be conducted in an environment in which the patent holder is essentially required to grant the alleged infringer permission to

---

[790] One article explained, "In a deal that caught industry watchers by surprise, Apple and HTC agreed Saturday to dismiss all their pending lawsuits and to cross license 'current and future patents' for the next decade -- thereby ending more than two and a half years of acrimony and litigation… [HTC] already lost one patent fight with Apple at the U.S International Trade Commission (ITC), leading to a temporary ban on the sale in the U.S. of two of its newest phones." *See* tech.fortune.cnn.com/2012/11/11/what-were-the-terms-of-the-apple-htc-settlement/ (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

practice the patents-in-suit in exchange for compensation adequate for the alleged infringer's

unauthorized use of the patents-in-suit.

378.    In the present case, ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ ██

379.    Apple's licensing approach is reflected in some of the existing licenses already

considered, such as the 2012 HTC license.  As such, this has no additional effect on the royalty

considered here in that context. ████████████████████████████████

████████████████████████████████████████████

> *Georgia Pacific Factor 5 – The commercial relationship between the licensor and
> the licensee, such as, whether they are competitors in the same territory in the
> same line of business; or whether they are inventor and promoter.*

380.    When licensing a direct competitor, a licensor may demand a relatively high

royalty rate because, by granting a license, the licensor risks losing sales and market presence to

the licensee.  Apple, the hypothetical licensor here, competes directly with Samsung.

381.    Around the point of the hypothetical negotiations, Samsung and third party

documents showed that "the US market [was] becoming a two horse race between Apple and

Samsung."[792]  Market share data confirms that both Apple and Samsung were among the

---

[791] Apple Inc.'s Second Supplemental Objections and Responses to Samsung's Interrogatories To Apple Relating to Apple Inc.'s Motion for Preliminary Injunction (No.4), at 4-5.
[792] "STA Competitive Situation Paradigm Shift: HQ CFO," Feb. 16, 2012, SAMNDCA11545927, at -934.  *See also*, Chloe Albanesius, "Smartphone Loyalty Runs Deep, Especially Among the Apple Faithful," PCMag.com, November 25, 2011 (http://www.pcmag.com/article2/ 0,2817,2396879,00.asp (viewed 9/12/2013); Tanzina Vega & Brian X. Chen, "Samsung-Apple Fight Moves to Marketing," N.Y. Times, Sept. 18, 2012, http://www.nytimes.com/2012/09/19/business/media/samsung-apple-fight-moves-to-the-marketing-arena html (viewed 9/12/2013); "BEAT APPLE: Apple vs Samsung Consumer Insights," Dec. 9, 2011, SAMNDCA10389445, at -446, -448.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

marketplace leaders throughout the relevant period.[793]   Samsung internal documents confirm that its goal was to become the marketplace leader, surpassing Apple,[794] and recent Samsung advertising campaigns appeared to target the iPhone.[795]

382.   Samsung's growth and threat to Apple had not gone unnoticed by Apple. ██████

████████████████████████████████████████████████████████████

████████████████████ [796]

383.   ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████   As such, this factor has no additional effect on the royalty

considered from those documents.   ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

> *Georgia Pacific Factor 6 – The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.*

384.   In some instances, sales of products embodying the patented technology enhance the sales of related goods and services.  The existence of such sales, referred to as tag-along or convoyed sales, increases the value of the protection provided by the hypothetical license.

---

[793] *See, e.g.*, Exhibits 13 to 15.

[794] *See, e.g.*, "GS Choi Visit to STA," Sept. 20, 2011, SAMNDCA00258674, at -686; "STA 2012 Winning Strategy," Aug. 2011, S-ITC-500056374, at -376.

[795] Deposition of Todd Pendleton, Transcript, July 19, 2013, at 65, 76. See also, "Disrupt Summary," Sept. 17, 2012, SAMNDCA630-06698295, at -296; *See* also, Email, dated Sept. 17, 2012, SAMNDCA630-07584645, at -646-647.

[796] "iPhone Offsite," Jan. 17, 2013, APLNDC630-0001467518, at -534; See, e.g., Deposition of Phil Schiller, July 23, 2013, at 160;  Deposition of Greg Joswiak, April 17, 2012, at 33; Deposition of Stan Ng, July 2, 2013, at 18, 65.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

385.    For Apple and Samsung, the sale of phones can result in the sale of accessories, such as chargers and cases, but ███████████████████████████████████████ ██████████████████████████████████.[797] There is also the ability to generate revenue by the sales of applications for the phones.  Although this is part of Apple's business strategy, I understand that Samsung does not share in the revenues of apps sold on its products,[798] thus minimizing its importance in Samsung taking a license here.

386.    Lastly, the data suggest that brand loyalty in the smartphone marketplace can result in the continued purchase of future smartphones ████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████.[799] To the extent that the patents-in-suit enhance the experience of these customers, resulting in a higher likelihood of a repeat buy in the future, there would be upward pressure on the royalty rate.  However, I have seen no evidence in this matter which shows the patents themselves will promote these additional purchases (and, to the extent that future Samsung products included the technology at issue, royalties would be paid on those products too).  Thus, there is no additional impact here.

*Georgia Pacific Factor 7 – The duration of the patent and the term of the license.*

---

[797] ████████████████████████████████████████████████████ ██████████ APLNDC630-Y00000014. ████████████████████████████ SAMNDCA630-06642238.xlsx and Exhibit 9.

[798] One article explains that "Google gives 70% of an app's revenue to the developer. It gives 25% of that revenue to the carrier. It keeps just 5% for itself."  None is left for Samsung. http://www.businessinsider.com/google-play-store-revenue-2013-6.  Another source confirms the 70/30 split with the developer of the app receiving 70% of the payment, and the remaining 30% being split between the distribution partner and operating fees (to Google).  *See* https://support.google.com/googleplay/android-developer/answer/112622?hl=en (viewed 9/12/2013).

[799] ███████████████████████████████████████████████████████ SAMNDCA630-07424610-622, at 615. ███████████████████ AMNDCA00265791-848, at 804.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

387.    The first of the patents-in-suit to expire is the '647 patent, which will be on February 1, 2016.   The last to expire will be the '172 patent, on June 7, 2030.[800] Accordingly, at the time of the hypothetical negotiation in 2011, the patents-in-suit collectively would have retained a significant portion of their patent lives.  Although I have not seen evidence that the useful life of the patented technology is expected to end prior to the expiration of the patents-in-suit, given the rapid advance in telecommunications and the frequent changes within the smartphone marketplace, the economic life of these patents likely will be for a shorter period of time.

388.    Nevertheless, the negotiation here would be for the use of the patents-at-issue in the accused products, at most through the patent lives.  As the extent of use is specifically captured in my analysis of per unit rates, this factor provides no additional guidance.  To the extent that the quantum of accused sales increases between the date of this report and trial, I expect that my royalty conclusion will change to reflect that additional use.

> *Georgia Pacific Factor 8 – The established profitability of the product made under the patent; its commercial success; and its current popularity.*

389.    As a general matter, greater commercial success of the accused products will tend to increase the amount that should be paid for access to the patents-at-issue.  In the present case, the determination of the commercial success and popularity of the accused products can be assessed based on their actual market acceptance (*i.e.*, sales and profitability).

390.    

---

[800] The expiration dates of the other patents are: the '959 patent on 1/5/20; the '414 patent on 2/25/27; the '760 patent on 8/1/29; and the '721 patent on 12/23/25.  *See* Vellturo Exhibit 6.
[801] Exhibit 26A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

391.    The profitability of the products was reflected in certain agreements analyzed in the Market Approach, such as the HTC agreement and Apple proposal ██████████ ████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ The product profitability is expressly accounted for in the Income Approach.  Thus, this factor is neutral here relative to those data.

> *Georgia Pacific Factor 9 – The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;*
>
> *and*
>
> *Georgia Pacific Factor 10 – The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.*

392.    The utility and nature of the patents-at-issue have been described previously in this report.  The commercial embodiments of these inventions have provided some advantage over the previous methods, and do result in some incremental benefit to the users of smartphones and tablets.  This has been captured in the Income Approach.  However, Samsung contends that the value of these technologies are more limited, as it has numerous ways that it could have provided similar functionality to its products by designing around the patents.   In this respect, the Income approach overstates the value, and this factor would suggest a lower outcome.

---

[802] Profitability varies across specific models of accused products.
[803] Exhibit 26A  See Deposition of Joonkyo (Joseph) Cheong, June 24, 2013, at 85-96 and SAMNDCA630-06642237.xlsx.
[804]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

393.    Similarly, the Market Approach evidence shows a range of values associated with various licensed technologies.  Part of the basis for determination of the amount of payments is the value of the technology relative to other options the licensee possesses.  Higher rates tend to suggest greater benefits and fewer alternatives; lower rates often indicate the opposite.

> *Georgia Pacific Factor 11 – The extent to which the infringer has made use of the patent; and any evidence probative of the value of that use.*

394.    As Exhibit 26A shows, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ [805]

395.    As I based my royalty damages explicitly on Samsung's extent of use, this factor provides no additional guidance here.

> *Georgia Pacific Factor 12 – The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the patent or analogous patents.*

396.    I have not seen information regarding a customary split of profit within the smartphone or tablet businesses. To the extent that there is such a convention, it is already subsumed in the Market Approach.  Thus, this factor has a neutral effect on the outcome of the hypothetical negotiation.

> *Georgia Pacific Factor 13 – The portion of the realizable profit that should be credited to the invention as distinguished from non-patentable elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.*

397.    I understand that Apple contends that all of the patents-in-suit are required to offer a competitive smartphone or tablet product, and that without such features, a phone would not be acceptably easy to use to many buyers.  However, as discussed in detail above, a large

---

[805] *See* Exhibits 8, 9, and 26A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

number of features are included in smartphones and tablets.  These products are advanced mobile computing devices that include a multitude of features such as email, internet access, multimedia functions (music, video, gaming, etc.), cameras, and other advanced applications.[806]  Each of these product categories requires various other technologies and features that incorporate other patented inventions.

398.    For example, ensuring compatibility among wireless devices and other necessary wireless infrastructure requires coordination of technical specifications through so-called "standards-essential" patented technologies.[807]  As such, compliance with each generation of mobile communications standards requires that marketplace participants, including handset manufacturers, have access to thousands of patented technologies.[808]

399.    In addition, the products are comprised of many components, ranging from cameras, batteries, GPS, and applications (such as video, music and internet)



One analyst estimated that smartphones can embody as many as 250,000 patents due to the wide range of communications and computing technologies they utilize.[810]

---

[806] *See, e.g.,* Oppenheimer 2012 Handset Guidebook, at 93.
[807] Standards-essential patents are those disclosing technologies that are necessary for market participants to employ in their devices to comply with standards and ensure interoperability with the mobile communications networks.
[808] One study examining the WCDMA (3G) standard as of December 2008 found that over 1,800 patent families, held by over 50 owners, were essential to implementing the standard, and that thousands more patents were claimed to be essential.  Fairfield Resources International, January 6, 2009, at 1, 8-9, Table 5.  As of September 2010, the number of LTE essential patents was said to be 1,941.  Quies, Peter, "Valuing Standard Essential Patents: An Examination of Announced FRAND Royalty Rates for LTE," December 2012, available at http://www.americanbar.org/content/dam/aba/publications/litigation_committees/intellectual/012413-valuing-standard-essential-patents-memo.authcheckdam.pdf (viewed 9/12/2013).  A December 2011 study counted 2,999 patents declared essential to LTE to the European Telecommunications Standards Institute ("ETSI").  "Evaluation of LTE Essential Patents Declared to ETSI," December 2011, available at http://cybersoken.com/research/pdf/lte01EN.pdf  (viewed 9/12/2013).
[809] See Exhibit 72.
[810] Steve Lohr, "Apple-Samsung Patent Battle Shifts to Trial," *The New York Times*, July 29, 2012; Steve Lohr, "A Bull Market in Tech Patents," *The New York Times*, August 16, 2011.

400.    Furthermore, operating systems software technology itself incorporates many features and inventions beyond those taught by the patents-in-suit.  Although I understand that the patents-in-suit are directed to six features, there are still many other product features embedded in the operating system unrelated to Apple's asserted technology.[811]

401.    On balance, this factor suggests downward pressure on the royalty relative to the Income Approach, but as it is incorporated in some of the allocation methodologies, this impact is mitigated.  However, this does support the notion that Samsung would not be willing to pay a large percentage of its profits for access to just this technology, as it needs to maintain the ability to pay for/develop other technology and receive compensation for its other non-patented product features, manufacturing process, and business risks.

*Georgia Pacific Factor 14 – The opinion of qualified experts.*

402.    I am aware of the opinions of Dr. Kevin Jeffay (concerning the '647 patent), Martin Rinard, Ph.D. (concerning the '959 patent), Jeffrey Chase, Ph.D. (concerning the '414 patent), Saul Greenberg, Ph.D. (concerning the '721 patent), Daniel Wigdor (concerning the '172 patent), Professor Erdem, Professor Foster, and Professor Reibstein, and they are reflected in my analysis above.  These do not provide additional impact on the royalty.

*Georgia Pacific Factor 15 – The amount that a willing licensor would have agreed to accept, and that a willing licensee would have agreed to pay at the time the infringement began.*

403.    This factor subsumes much of what I have discussed previously.

404.    Evidence from the Market Approach provides guidance to the outcome of a negotiation for a license to each of the patents-in-suit (before consideration of qualitative factors that should influence the agreed-upon royalty).  For example, ████████████████████████

---

[811] Exhibits 38, 39, and 44. *See also*, the previous discussion in this report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

[813]

405.     The Income Approach also provides guidance.  The analytical approach suggest the '172 patent and '721 patent have nominal value.  Operating software upgrade prices suggest values of $0.05 to $0.25 per feature, per product.   Apple's previous approach suggests no more than $0.14 per patent, per product.  Alternative approaches using product features tend to show values no more than $0.41, per feature, per smartphone. An analysis of apps indicates no more than $0.24 per patent, per unit, and likely between $0.02 and $0.11 per patent, per unit.

406.     The Cost Approach suggests that to the extent that the Court finds Samsung's alternatives to be acceptable and available, the royalty payment should be adjusted downward.

407.     I have considered qualitative factors that should influence the agreed-upon royalty in my analysis of the *Georgia-Pacific* factors.  Although some factors provide upward pressure and others provide downward pressure, this analysis generally suggests upward pressure relative to the royalty payments considered under the Market and Income Approaches.   The presumption of validity, enforceability, and infringement (*Georgia-Pacific* Factor 3); the observation that Apple tends to avoid licensing its technology generally (*Georgia-Pacific* Factor 4); and the competitive relationship between Apple and Samsung (*Georgia-Pacific* Factor 5) all provide upward pressure on the royalty.  Downward pressure is applied, in part, because manufacturing

---

[812] Using the 95th percentile.  Exhibit 79.
[813] Using the 100th and 95th percentiles.  Exhibit 79.

211

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and selling a mobile phone or tablet requires more than just the technology at issue here (*Georgia-Pacific* Factor 13).

408.     Based on my analysis of the evidence from the Market Approach and Income Approach and application of the *Georgia-Pacific* factors, a lump sum royalty for sales through February 2013 could be as much as ███████████████████████████ This amount, however, fails to account a critical factor in any license negotiation: the incentive to design around the patented technologies in order to avoid a royalty payment and the ability to do so.  Should the Court find Samsung's design-around options to be available and acceptable alternatives, the royalty amount should be adjusted downward.  This is supported by analysis of *Georgia-Pacific* Factors 9 and 10, which suggests downward impact from the relatively minor improvements provided by the asserted patents.  As I discuss in the Cost Approach, the royalty payment could be reduced to reflect the infringing activity in the relevant period that a license would have been required.  Assuming that Samsung would have been able to offer acceptable non-infringing alternatives by the end of March 2012 for all of the patents-at-issue, a lump sum royalty for sales through February 2013 would be roughly $5.9 million.[815]  This amount can be adjusted downward or upward, as shown in Exhibit 98, to take into account different assumptions regarding Samsung design-around options, depending on the Court's finding regarding their availability and acceptability.

409.     Should the Court find that only certain patents are valid, enforceable, and infringed, damages would be lower and should be applied to units for each patent the Court deems relevant.[816]

---

[814] Exhibit 4 and Exhibit 98.  Should accused sales continue past February 2013, my analysis can be adjusted.
[815] Exhibit 4 and Exhibit 98.
[816] Exhibit 98.  My conclusions can be adjusted to account for the removal of certain products or fewer patents.  *See* Exhibits 99A through 99R.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## XI.    Conclusions

- Many factors other than operating system software contribute to smartphone and tablet purchase decisions.   The features enabled by the patents-at-issue are a small part of the accused products and their operating systems, which have hundreds if not thousands of features.   The Vellturo Report overstates the importance of the patents-at-issue, relying on qualitative evidence that discusses features significantly broader than the patents and includes elements that are not protected by the patents.   Its lost profits and reasonable royalty conclusions hinge entirely on a flawed conjoint analysis performed by another expert, Professor Hauser.

- Lost profits are not warranted because there is no demonstrated link between the patented functionality and sales.   These functionalities do not themselves discernibly drive any demand for the Samsung accused products or meaningfully influence the ease of use of the Samsung accused products.

- The Vellturo Report contains numerous errors and significantly overstates the appropriate quantum of damages here.   Critical flaws, including an over-reliance on the flawed conjoint results, the use of an unsupported "blackout period," an improper assessment of Apple's share of displaced units, and an overstatement of Apple profitability, inflate the Vellturo Report lost profits figures.    Additionally, the Vellturo Report royalty analysis "double counts" lost profits and contains numerous errors.

- The appropriate measure of damages in this case is a reasonable royalty.   Use of a number of accepted valuation methods, including the market, income and cost approaches, and a *Georgia Pacific* analysis, indicates a reasonable royalty for Samsung to

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

compensate Apple is approximately $5.9 million if all patents asserted by Apple in this

matter are found to be valid, enforceable, and infringed.  The market, income, and cost

approaches further demonstrate the unreasonableness of the conclusions presented in the

Vellturo Report.


_____

JUDITH A. CHEVALIER

# CHEVALIER EXHIBIT 69

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

EXHIBIT 69

LICENSE AGREEMENTS
APPLE CROSS LICENSES

| # | Licensor | Licensee | | | | Effective | Lump Sum | Running | | | | | | |
|---|----------|----------|--|--|--|-----------|----------|---------|--|--|--|--|--|--|
| [1] | International Business Machines Corporation ("IBM") | Apple Computer, Inc. | | | | | | | | | | | | |
| [1a] | International Business Machines Corporation ("IBM") | Apple Computer, Inc. | | | | | | | | | | | | |
| [2] | Motorola, Inc. | Apple Computer, Inc. | | | | | | | | | | | | |

Page 1 of 9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 69**

**LICENSE AGREEMENTS
APPLE CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [3] | Tietze Telefonaktiebolaget Microelectronic GmbH ("Ericsson") | Apple Computer, Inc. | | | | | | | | | | | |
| [4] | Microsoft Corporation | Apple Computer, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 69**

**LICENSE AGREEMENTS**
**APPLE CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [5] | International Business Machines Corporation ("IBM") | Apple Computer, Inc. | | | | | | | | | | | |
| [5a] | International Business Machines Corporation ("IBM") | Apple Computer, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 69**

**LICENSE AGREEMENTS**
**APPLE CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [6] | Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") | Apple Computer, Inc. | | | | | | | | | | | |
| [7] | VoiceAge Corporation and Nokia Corporation | Apple Computer, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 69**

**LICENSE AGREEMENTS**
**APPLE CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Generally | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [8] | Unova, Inc. | Apple Computer, Inc. | | | | | | | | | | | |

Page 5 of 9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 69**

**LICENSE AGREEMENTS**
**APPLE CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Generally | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [9] | Creative Technology, Ltd.; Creative Labs, Inc. ("Creative") | Apple Computer, Inc. | | | | | | | | | | | |
| [10] | Telefonaktiebolaget LM Ericsson (Publ) ("Ericsson") | Apple Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 69**

**LICENSE AGREEMENTS**
**APPLE CROSS LICENSES**

| # | Licensor | Licensee | Effective | Lump Sum | Running | | | | | | | | |
|---|----------|----------|-----------|----------|---------|--|--|--|--|--|--|--|--|
| [11] | Siemens Aktiengesellschaft ("Siemens") | Apple Inc. | | | | | | | | | | | |
| [12] | Fuji Xerox Co. ("Fuji") | Apple, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 69**

**LICENSE AGREEMENTS**
**APPLE CROSS LICENSES**

| # | Licensor | Licensee | | | | Effective | Lump Sum | Running | |
|---|----------|----------|--|--|--|-----------|----------|---------|--|
| [13] | Nokia Corporation | Apple Inc. | | | | | | | |
| [14] | NEC Corporation | Apple Inc. | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 69**

**LICENSE AGREEMENTS**
**APPLE CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Ro alt | Ro alt Base | Technology | Licensed Patents | Licensed Products | Geo ra h | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|----------------|-------------|------------|------------------|-------------------|----------|------|--------|
| [15] | Elan Microelectronics Corp. ("Elan") | Apple, Inc. | | | | | | | | | | | |
| [16] | HTC America, Inc.; HTC Corporation; S3 Graphics Co., Ltd. (collectively, "HTC") | Apple, Inc. | | | | | | | | | | | |

# CHEVALIER
# EXHIBIT 70

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS
APPLE AS LICENSEE**

| # | Licensor | Licensee | Effective | Lump Sum | Running | | | | | | | | |
|---|----------|----------|-----------|----------|---------|---|---|---|---|---|---|---|---|
| [1] | MPEG LA, L.L.C. (License Administrator); Individual Licensors: Compaq Computer Corp, Koninklijke Philips Electronics, N.V., Matsushita Electric Industrial Co., Ltd., Sony Corporation, Toshiba Corporation | Apple Computer, Inc. | | | | | | | | | | | |
| [2] | Thomson Consumer Electronics Sales GmbH ("TCE") | Apple Computer, Inc. | | | | | | | | | | | |
| [2a] | Thomson Licensing, S.A. | Apple Computer, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [3] | AT&T Corporation; Dolby Laboratories Licensing Corporation; France Telecom; Fraunhofer Gesellschaft zur Foerderung der angewandten Forschung e.V.; Nokia Corporation; Koninklijke Philips Electronics N.V.; Sony Corporation (collectively, "Licensors") | Apple Computer, Inc. | | | | | | | | | | | |
| [4] | Trevor Blumenau | Apple Computer, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Effective | Lump Sum | Running |
|---|----------|----------|-----------|----------|---------|
| [5] | Audio MPEG, Inc. ("Audio MPEG"); and Società Italiana per lo Sviluppo Dell 'Elettronica, S.I.S.V.EL. S.P.A on behalf of patent owners Koninklijke Philips Electronics N.V., U.S. Philips, France Telecom and Télédiffusion de France acting through the France Telecom R&D, BRW (Bayerische Rundfunkwerbung GmbH), and IRT (Institut fur Rundfunktechnik GmbH) ("SISVEL") | Apple Computer, Inc. | | | |
| [5a] | Audio MPEG, Inc. ("Audio MPEG"); and Società Italiana per lo Sviluppo Dell 'Elettronica, S.I.S.V.EL. S.P.A on behalf of patent owners Koninklijke Philips Electronics N.V., U.S. Philips, France Telecom and Télédiffusion de France acting through the France Telecom R&D, BRW (Bayerische Rundfunkwerbung GmbH), and IRT (Institut fur Rundfunktechnik GmbH) ("SISVEL") | Apple Computer, Inc. | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [5b] | Audio MPEG, Inc. and SISVEL, S.p.A. Inc. | Apple Computer, Inc. | | | | | | | | | | | |
| [5c] | Audio MPEG, Inc. and SISVEL, S.p.A. Inc. | Apple Computer, Inc. | | | | | | | | | | | |
| [6] | Advanced Audio Devices, LLC; ("AAD") SP Technologies, LLC ("SPT") | Apple Computer, Inc. | | | | | | | | | | | |
| [7] | InterDigital Group | Apple Inc. | | | | | | | | | | | |
| [8] | Premier International Associates, LLC ("Premier") | Apple, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Generally | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [9] | Global Patent Holdings, LLC ("GPH") | Apple Inc. | | | | | | | | | | | |
| [10] | Burst.com Inc. ("Burst") | Apple Inc. | | | | | | | | | | | |
| [11] | Morris Reese | Apple Inc. | | | | | | | | | | | |
| [12] | SP Technologies, LLC | Apple Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [13] | Klausner Technologies, Inc.; Judah Klausner ("Klausner") | Apple Inc. | | | | | | | | | | | |
| [14] | Media Digital Corporation | Apple Inc. | | | | | | | | | | | |
| [15] | Atmel Corporation | Apple, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS
APPLE AS LICENSEE**

| # | Licensor | Licensee | Effective | Lump Sum | Running | | | | | | | | |
|---|----------|----------|-----------|----------|---------|---|---|---|---|---|---|---|---|
| [16] | Negotiated Data Solution LLC ("NDS") | Apple Inc. | | | | | | | | | | | |
| [17] | Frances E. Morris; Morris Family Trust; Elizabeth A. Morris Child's Trust; Michael K. Morris Child's Trust; David K. Morris Child's Trust (collectively, "Morris") | Apple Inc. | | | | | | | | | | | |
| [18] | Cloakworks, Inc.; David R. Wallace ("Cloakworks") | Apple Inc. | | | | | | | | | | | |
| [19] | RPX Corporation | Apple Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS
APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [20] | RPX Corporation | Apple Inc. | | | | | | | | | | | |
| [21] | WIAV Solutions, LLC | Apple Inc. | | | | | | | | | | | |
| [22] | Texas MP3 Technologies Ltd.; Texas MP3 Technologies Management LLC ("Texas MP3") | Apple Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS
APPLE AS LICENSEE**

| # | Licensor | Licensee | Effective | Lump Sum | Running | | | | |
|---|----------|----------|-----------|----------|---------|---|---|---|---|
| [23] | Traffic Information, LLC ("Traffic") | Apple Inc. | | | | | | | |
| [24] | Accolade Systems LLC; Share PC, Inc.; G&H Nevada-Tek, Michael L. Gough; Paul L. Hickman ("Accolade") | Apple Inc. | | | | | | | |
| [25] | Holfeich Patent Licensing, LLC ("HPL") | Apple Inc. | | | | | | | |
| [26] | Fractus, SA | Apple Inc. | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS
APPLE AS LICENSEE**

| # | Licensor | Licensee | | Effective | Lump Sum | Running | | | | | | | | |
|---|----------|----------|---|-----------|----------|---------|---|---|---|---|---|---|---|---|
| [27] | MSTG, Inc. | Apple Inc. | | | | | | | | | | | | |
| [28] | Roszak Figa (d/b/a Abraham & Son) ("Figa") | Apple Inc. | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Generally | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [29] | SPH America, LLC | Apple Inc. | | | | | | | | | | | |
| [30] | SPH America, LLC | Apple Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS
APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Generally | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [31] | SPH America, LLC | Apple Inc. | | | | | | | | | | | |
| [32] | SPH America, LLC & Dr. Chamgoon Park | Apple Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | | | Effective | Lump Sum | Running |
|---|----------|----------|---|---|-----------|----------|---------|
| [33] | WiAV Networks, LLC | Apple Inc. | | | | | |
| [34] | Mosec Holding AG | Apple Inc. | | | | | |
| [35] | Haystack Alley, LLC | Apple Inc. | | | | | |
| [36] | Technology Properties Limited ("Technology Properties") | Apple, Inc. | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

EXHIBIT 70

LICENSE AGREEMENTS
APPLE AS LICENSEE

| # | Licensor | Licensee | | Effective | Lump Sum | Running | | | | | | |
|---|----------|----------|---|-----------|----------|---------|---|---|---|---|---|---|
| [37] | Intellect Wireless, Inc.; Daniel A. Henderson | Apple Inc. | | | | | | | | | | |
| [38] | ADC Technology Inc. | Apple Inc. | | | | | | | | | | |
| [39] | University of Southern California | Apple, Inc. | | | | | | | | | | |
| [40] | Digicom Inc. & Dr. Kamilo Feher | Apple, Inc. | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [41] | Lady Kensington LLC | Apple Inc. | | | | | | | | | | | |
| [42] | Statue Ventures, LLC | Apple Inc. | | | | | | | | | | | |
| [43] | TurnBridge Wells, LLC | Apple Inc. | | | | | | | | | | | |
| [44] | Tsem, LLC; Chuang Li; Jinx Lin-Li | Apple Inc. | | | | | | | | | | | |
| [45] | Rovi Corporation | Apple Inc. | | | | | | | | | | | |
| [46] | Minerva Industries, Inc.; Ki H Kim | Apple Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS
APPLE AS LICENSEE**

| # | Licensor | Licensee | Effective | Lump Sum | Running | | | | |
|---|----------|----------|-----------|----------|---------|---|---|---|---|
| [47] | EMG Technology, LLC; Elliot Gottfurcht; Grant Gottfurcht; Marlo Longstreet ("EMG") | Apple Inc. | | | | | | | |
| [48] | I.O. IP of Delaware, LLC ("I.O.") | Apple Inc. | | | | | | | |
| [49] | Typhoon Touch Technologies, Inc.; Raymond Tellini | Apple Inc. | | | | | | | |
| [50] | Digitude Innovations LLC ("Digitude") | Apple Inc. | | | | | | | |
| [50a] | Digitude Innovations LLC ("Digitude") | Apple Inc. | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [51] | Koninklijke Philips Electronics N.V. ("Philips") | Apple Inc. | | | | | | | | | | | |
| [52] | Koninklijke Philips Electronics N.V. ("Philips"), and Sharp Corporation ("Sharp") | Apple Inc. | | | | | | | | | | | |
| [53] | Round Rock Research, LLC ("Round Rock") | Apple, Inc. | | | | | | | | | | | |
| [54] | Multi-Format, Inc. | Apple, Inc. | | | | | | | | | | | |
| [55] | Bandspeed, Inc. | Apple Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS'EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Generally | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [56] | Pleasant View, LLC | Apple, Inc. | | | | | | | | | | | |
| [57] | Advanced Video Technologies LLC ("AVT") | Apple, Inc. | | | | | | | | | | | |
| [58] | Jazzy Hill, LLC | Apple, Inc. | | | | | | | | | | | |
| [59] | Trey Run, LLC | Apple, Inc. | | | | | | | | | | | |
| [60] | MasterObjects, Inc. | Apple, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [61] | Eolas Technologies Incorporated | Apple, Inc. | | | | | | | | | | | |
| [62] | Samsung Electronics Co., Ltd | Apple, Inc. | | | | | | | | | | | |
| [63] | Affinity Labs of Texas, LLC ("Affinity") | Apple, Inc. | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 70**

**LICENSE AGREEMENTS**
**APPLE AS LICENSEE**

| # | Licensor | Licensee | | | Effective | Lump Sum | Running | | | | | | |
|---|----------|----------|---|---|-----------|----------|---------|---|---|---|---|---|---|
| [64] | Personal Audio, LLC; James D. Logan; & Charles G. Call ("Personal Audio") | Apple, Inc. | | | | | | | | | | | |
| [65] | LG Electronics | Apple, Inc. | | | | | | | | | | | |
| [66] | Panasonic Corporation; Panasonic Corporation of North America | Apple, Inc. | | | | | | | | | | | |

# CHEVALIER EXHIBIT 71

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [1] | | | | | | | | | | | | | |
| [1a] | | | | | | | | | | | | | |
| [2] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [3] | | | | | | | | | | | | | |
| [34] | | | | | | | | | | | | | |
| [35] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [3c] | | | | | | | | | | | | | |
| [4] | | | | | | | | | | | | | |
| [5] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [5a] | | | | | | | | | | | | | |
| [6] | | | | | | | | | | | | | |
| [7] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [8] | | | | | | | | | | | | | |
| [9] | | | | | | | | | | | | | |
| [10] | | | | | | | | | | | | | |



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

LICENSE AGREEMENTS
SAMSUNG CROSS LICENSES

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | | | | | | | Effective | Lump Sum | Running | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [14] | | | | | | | | | | | | | | |
| [15] | | | | | | | | | | | | | | |
| [16] | | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | | | | | | | | Effective | Lump Sum | Running | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [17] | | | | | | | | | | | | | | | | | |
| [18] | | | | | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | | | | | | Effective | Lump Sum | Running | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [19] | | | | | | | | | | | | | |
| [20] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS'EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [23] | | | | | | | | | | | | | |
| [23a] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS
SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [24] | | | | | | | | | | | | | |
| [25] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

LICENSE AGREEMENTS
SAMSUNG CROSS LICENSES

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [26] | | | | | | | | | | | | | |
| [27] | | | | | | | | | | | | | |
| [27a] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS
SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [28] | | | | | | | | | | | | | |
| [29] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [30] | | | | | | | | | | | | | |
| [31] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS**
**SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [32] | | | | | | | | | | | | | |
| [33] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 71**

**LICENSE AGREEMENTS
SAMSUNG CROSS LICENSES**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [34] | | | | | | | | | | | | | |
| [35] | | | | | | | | | | | | | |

Notes & Sources
Euros converted to dollars using exchange rate from Bloomberg on effective date.

# CHEVALIER
# EXHIBIT 72

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS
SAMSUNG AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | | | | | | | | | | | | | |
| [1a] | | | | | | | | | | | | | |
| [2] | | | | | | | | | | | | | |
| [3] | | | | | | | | | | | | | |
| [4] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS**
**SAMSUNG AS LICENSEE**

| # | | | Effective | Lump Sum | Running | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [5] | | | | | | | | | | | |
| [6] | | | | | | | | | | | |
| [7] | | | | | | | | | | | |
| [8] | | | | | | | | | | | |
| [9] | | | | | | | | | | | |
| [10] | | | | | | | | | | | |
| [11] | | | | | | | | | | | |

Page 2 of 17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS
SAMSUNG AS LICENSEE**



| # | | Effective | Lump Sum | Running | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [12] | | | | | | | | | | | |
| [13] | | | | | | | | | | | |
| [14] | | | | | | | | | | | |
| [15] | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

EXHIBIT 72

LICENSE AGREEMENTS
SAMSUNG AS LICENSEE

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [16] | | | | | | | | | | | | | |
| [17] | | | | | | | | | | | | | |
| [18] | | | | | | | | | | | | | |
| [19] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS
SAMSUNG AS LICENSEE**



| # | | | | | | | | Effective | Lump Sum | Running | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [20] | | | | | | | | | | | | | | | | |
| [21] | | | | | | | | | | | | | | | | |
| [22] | | | | | | | | | | | | | | | | |
| [23] | | | | | | | | | | | | | | | | |
| [24] | | | | | | | | | | | | | | | | |

Page 5 of 17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

LICENSE AGREEMENTS
SAMSUNG AS LICENSEE

| # | Licensee | Licensor | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [25] | | | | | | | | | | | | | |
| [26] | | | | | | | | | | | | | |
| [27] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS
SAMSUNG AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [28] | | | | | | | | | | | | | |
| [29] | | | | | | | | | | | | | |
| [30] | | | | | | | | | | | | | |
| [31] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

EXHIBIT 72

LICENSE AGREEMENTS
SAMSUNG AS LICENSEE

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [32] | | | | | | | | | | | | | |
| [33] | | | | | | | | | | | | | |
| [34] | | | | | | | | | | | | | |
| [35] | | | | | | | | | | | | | |
| [36] | | | | | | | | | | | | | |
| [37] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

LICENSE AGREEMENTS
SAMSUNG AS LICENSEE

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Generality | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [38] | | | | | | | | | | | | | |
| [39] | | | | | | | | | | | | | |
| [40] | | | | | | | | | | | | | |
| [41] | | | | | | | | | | | | | |
| [42] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS**
**SAMSUNG AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [43] | | | | | | | | | | | | | |
| [43a] | | | | | | | | | | | | | |
| [43b] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS**
**SAMSUNG AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [44] | | | | | | | | | | | | | |
| [45] | | | | | | | | | | | | | |
| [46] | | | | | | | | | | | | | |

Page 11 of 17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS**
**SAMSUNG AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Generally | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [47] | | | | | | | | | | | | | |
| [48] | | | | | | | | | | | | | |
| [49] | | | | | | | | | | | | | |
| [50] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS
SAMSUNG AS LICENSEE**

| # | Licensee | Licensor | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [51] | | | | | | | | | | | | | |
| [52] | | | | | | | | | | | | | |
| [53] | | | | | | | | | | | | | |
| [54] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS
SAMSUNG AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [55] | | | | | | | | | | | | | |
| [56] | | | | | | | | | | | | | |
| [57] | | | | | | | | | | | | | |
| [58] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

EXHIBIT 72

LICENSE AGREEMENTS
SAMSUNG AS LICENSEE

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [59] | | | | | | | | | | | | | |
| [60] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS
SAMSUNG AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [61] | | | | | | | | | | | | | |
| [62] | | | | | | | | | | | | | |
| [63] | | | | | | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 72**

**LICENSE AGREEMENTS**
**SAMSUNG AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [54] | | | | | | | | | | | | | |

Notes & Sources
Euros converted to dollars using exchange rate from Bloomberg on effective date.

# CHEVALIER EXHIBIT 73

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 73**

**LICENSE AGREEMENTS**
**GOOGLE AS LICENSEE**

| # | Licensor | Licensee | Agreement Title | Effective Date | Lump Sum Payment | Running Royalty | Royalty Base | Technology | Licensed Patents | Licensed Products | Geography | Term | Source |
|---|----------|----------|-----------------|----------------|------------------|-----------------|--------------|------------|------------------|-------------------|-----------|------|--------|
| [1] | | | | | | | | | | | | | |

# CHEVALIER EXHIBIT 74

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 74**

# CHEVALIER EXHIBIT 75

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 75**



# CHEVALIER EXHIBIT 76

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 76**

# CHEVALIER EXHIBIT 77

HIGHLY CONFIDENTIAL   ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 77**

**PATENTS REFERENCED IN APPLE-SAMSUNG NEGOTIATION DOCUMENT**

| Patent | Title | Same Title As Another Patent? |
|--------|-------|-------------------------------|

HIGHLY CONFIDENTIAL   ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 77**

**PATENTS REFERENCED IN APPLE-SAMSUNG NEGOTIATION DOCUMENT**

| Patent | Title | Same Title As Another Patent? |
|--------|-------|-------------------------------|

# CHEVALIER EXHIBIT 78

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER
**EXHIBIT 78**

# CHEVALIER EXHIBIT 79

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 79**



# CHEVALIER
# EXHIBIT 80

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 80**

# CHEVALIER EXHIBIT 81

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 81**



# CHEVALIER EXHIBIT 82



# CHEVALIER
# EXHIBIT 83



# CHEVALIER EXHIBIT 84



# CHEVALIER
# EXHIBIT 85

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 85**

**SUMMARY OF ESTIMATED PER UNIT LUMP SUM PAYMENTS IN SAMSUNG LICENSE AGREEMENTS**

| Ref # | Sheet # | Sheet | Licensor | Licensee | Effective Date | Number of U.S. Patents | Term | Lump Sum | Estimated U.S. Samsung Smartphone Units Sold During Term | Lump Sum/ Units Sold |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [61] | Samsung as Licensee | | | | | | | | |
| 2 | [22] | Samsung as Licensee | | | | | | | | |
| 3 | [28] | Samsung as Licensee | | | | | | | | |
| 4 | [29] | Samsung as Licensee | | | | | | | | |
| 5 | [33] | Samsung as Licensee | | | | | | | | |
| 6 | [20] | Samsung as Licensee | | | | | | | | |
| 7 | [19] | Samsung as Licensee | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 85**

**SUMMARY OF ESTIMATED PER UNIT LUMP SUM PAYMENTS IN SAMSUNG LICENSE AGREEMENTS**

| Ref # | Sheet # | Sheet | Licensor | Licensee | Effective Date | Number of U.S. Patents | Term | Lump Sum | Estimated U.S. Samsung Smartphone Units Sold During Term | Lump Sum/ Units Sold |
|---|---|---|---|---|---|---|---|---|---|---|
| 8 | [48] | Samsung as Licensee | | | | | | | | |
| 9 | [18] | Samsung as Licensee | | | | | | | | |
| 10 | [37] | Samsung as Licensee | | | | | | | | |
| 11 | [27] | Samsung as Licensee | | | | | | | | |
| 12 | [23] | Samsung as Licensee | | | | | | | | |
| 13 | [52] | Samsung as Licensee | | | | | | | | |
| 14 | [55] | Samsung as Licensee | | | | | | | | |
| 15 | [40] | Samsung as Licensee | | | | | | | | |
| 16 | [34] | Samsung as Licensee | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 85**

**SUMMARY OF ESTIMATED PER UNIT LUMP SUM PAYMENTS IN SAMSUNG LICENSE AGREEMENTS**

| Ref # | Sheet # | Sheet | Licensor | Licensee | Effective Date | Number of U.S. Patents | Term | Lump Sum | Estimated U.S. Samsung Smartphone Units Sold During Term | Lump Sum/ Units Sold |
|---|---|---|---|---|---|---|---|---|---|---|
| 17 | [64] | Samsung as Licensee | | | | | | | | |
| 18 | [46] | Samsung as Licensee | | | | | | | | |
| 19 | [25] | Samsung as Licensee | | | | | | | | |
| 20 | [62] | Samsung as Licensee | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 85**

**SUMMARY OF ESTIMATED PER UNIT LUMP SUM PAYMENTS IN SAMSUNG LICENSE AGREEMENTS**

| Ref # | Sheet # | Sheet | Licensor | Licensee | Effective Date | Number of U.S. Patents | Term | Lump Sum | Estimated U.S. Samsung Smartphone Units Sold During Term | Lump Sum/ Units Sold |
|---|---|---|---|---|---|---|---|---|---|---|
| 21 | [49] | Samsung as Licensee | | | | | | | | |
| 22 | [31] | Samsung as Licensee | | | | | | | | |
| 23 | [30] | Samsung as Licensee | | | | | | | | |
| 24 | [57] | Samsung as Licensee | | | | | | | | |
| 25 | [17] | Samsung as Licensee | | | | | | | | |
| 26 | [39] | Samsung as Licensee | | | | | | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 85**

**SUMMARY OF ESTIMATED PER UNIT LUMP SUM PAYMENTS IN SAMSUNG LICENSE AGREEMENTS**

| Ref # | Sheet # | Sheet | Licensor | Licensee | Effective Date | Number of U.S. Patents | Term | Lump Sum | Estimated U.S. Samsung Smartphone Units Sold During Term | Lump Sum/ Units Sold |
|---|---|---|---|---|---|---|---|---|---|---|
| 27 | [58] | | | | | | | | | |
| 28 | [59] | | | | | | | | | |
| 29 | [42] | | | | | | | | | |
| 30 | [53] | | | | | | | | | |
| 31 | [41] | | | | | | | | | |
| 32 | [36] | | | | | | | | | |
| 33 | [50] | | | | | | | | | |
| 34 | [56] | | | | | | | | | |
| 35 | [47] | | | | | | | | | |

Notes & Sources
From Exhibits 72 and 84.
Number of U.S. Patents represents at least the number of U.S. patents being licensed in each agreement.
The Number of U.S. Patents in the license agreements between Dolby and Samsung (Ref #4) from http://www.sec-the-forest.com/DocumentRecall.act?docId=1msdji.gp69xna98&orgId=8x (viewed 9/11/2013).
Estimated US Samsung Smartphone Units Sold During Term from APLNDC-Z0000000001, APLNDC630-0001318384-87, APLNDC630-0001319732-38. Units for all years after 2012 assumed to be equal to units from 2012. Term of each license agreement is limited to six years when longer or unspecified.

Page 5 of 5