UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT A-3

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

APPLE INC., a California Corporation,

       Plaintiff (Counterclaim-Defendant),

    v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG ELECTRONICS
AMERICA, INC., a New York corporation;
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC, a Delaware limited liability
company,

       Defendants (Counterclaim-Plaintiffs).

Civil Action No. 12-cv-00630-LHK

## REBUTTAL EXPERT REPORT OF
## DAVID REIBSTEIN

## September 13, 2013

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Price

1) $199
2) $299
3) $449
4) $599

28.     The products presented to the respondents as part of the first stage of the surveys were intended to represent hypothetical Samsung smartphones or tablets.[52] Respondents were asked to assume that in addition to the various features and levels shown in each choice task, each of the four hypothetical smartphones or tablets had all other features and levels that were on their most recent Samsung smartphone or tablet.[53] Respondents were informed that one in twenty respondents would be selected at random to win the option of receiving a smartphone or tablet and that the smartphone or tablet offered to the winning respondent would be based on the choices each winning respondent made in the surveys with regard to the feature categories in the surveys.[54]

29.     Using each of the respondent's choices in the first part of his conjoint study (where respondents are asked to choose among four hypothetical products), Professor Hauser estimated the contribution of each level within a feature category relative to the other levels of

---

[52] Hauser Report, at ¶46.
[53] Hauser Report, at ¶46.
[54] Hauser Report, at ¶70. Respondents were also told that the features with regard to other features not in the survey would be as close as possible to those of the smartphone or tablet they otherwise would have chosen in the marketplace. Respondents were informed that if the smartphone or tablet offered to a winning respondent was priced below $300 and $600 respectively, and if the respondent chose the offered smartphone or tablet, the respondent would also get the difference in cash.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> Damn You Auto Correct, an entire site dedicated to the auto correct's failures.[92]

47.     Clearly, there are multiple outcomes that are possible with this feature – mostly positive, but some negative. To more accurately describe this feature, Professor Hauser could have used a description that did not lead the respondent to believe that it always resulted in replacement of text that was meant to be replaced.[93] Unlike the description used in Professor Hauser's survey, a more balanced description would not have suggested that the feature's impact on the user was always necessarily positive, but rather that a positive outcome was one possibility.

48.     As an example, I have provided alternative descriptions of the Automatic Word Correction feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above.[94] In these descriptions, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if he or she was unable to have the patented feature, as is suggested by Professor Hauser's description. My description seeks to avoid leading the respondent to think that the

---

[92] http://www.businessinsider.com/how-to-fix-iphone-auto-correct-2012-2?op=1 (viewed September 13, 2013).
[93] In fact, I myself have experienced the negative side of this feature on many occasions by sending messages with words that I had never meant to type. In these situations, the Automatic Word Correction feature automatically inserted the wrong text, without me noticing.
[94] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

34

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

patented feature is necessarily preferred over the alternative – which is something Professor Hauser did not do in his description.

49.     Presenting the non-infringing alternative as a separate feature with its own advantages, albeit different, than the advantages associated with the patented feature, is important because this most closely mirrors the real world purchase environment that would have existed if Samsung could not use the patented feature. That is, if Samsung could not offer the patented feature, it would market the alternative feature in a positive light, similar to how it would market the patented feature. Samsung would never describe the alternative feature in terms of what it could not do relative to other features that Samsung could not offer.

50.     In my alternative descriptions, below, I have identified how they differ from Professor Hauser's descriptions. Version 1 is a description of the patented feature. Version 2 is a description of one of Samsung's non-infringing alternatives.

> **Automatic Word Correction (Version 1).** As you type, your smartphone [tablet] displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. ~~The~~ This version of the Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday."

> **Automatic Word Correction (Version 2).** ~~Without this feature, pressing space or period would retain your original text, "birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself.~~ As you type, your smartphone

35

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> [tablet] displays text you typed in a text box. This version of the Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday." In this version of Automatic Word Correction, the suggested text does not appear in a separate box but rather appears when it replaces the original text.

51.     This is a very different presentation of a non-infringing alternative version of the Automatic Word Correction feature than the one used by Professor Hauser in his surveys. It presents the alternative in a positive light, as something that the user gets, rather than has to settle for if he or she was unable to obtain the patented feature. It also makes clear that the alternative allows for automatic, rather than just manual word correction when using the devices.

52.     I understand that the description used by Professor Hauser related to the Background Syncing feature also does not accurately describe the feature allegedly made possible by the '414 patent. Professor Hauser provided the following description of this feature in his smartphone and tablet survey:

> **Background Syncing.** The Background Syncing feature allows you to continue to use an app while data related to that app that is stored on your smartphone [tablet] synchronizes with data stored elsewhere, such as on a remote computer. For example, you can access and edit data, such as the list of contacts on your smartphone [tablet], even as your phone [tablet] is sending data for those contacts to your work computer. Without this feature, you

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> Q:      So we're not necessarily clear on that one then?
>
> A:      Right.[162]

121.    In this case, based on the name of the feature, the respondent appears to believe that Background Syncing enables a phone to search for local network connections as the user moves among locations. The respondent fails to understand the key aspect of Professor Hauser's description of this feature, which has to do with being able to use an application while a synchronization is occurring. This level of confusion among respondents that have just listened to the video descriptions and read the text descriptions of the patented features suggests that there is a fatal problem with Professor Hauser's descriptions themselves and/or that the nature of the features and Samsung's alternatives are too subtle and nuanced for respondents to understand.

122.    My parallel pretest revealed similar misunderstanding regarding the Quick Links feature. One respondent stated:

> Q:      Quick Links, tell me what that icon means to you.
>
> A:      Quick Links, that's where it's detecting phone numbers, like in your e-mail address and stuff. You basically click on it, like on the phone number or on the e-mail too and compose the e-mail or call.
>
> Q:      If your phone does not have the Quick Links icon, what would you be doing instead?

---

[162] Exhibit 8 (Chicago-2: Respondent 6).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**6.**      ***Professor Hauser's failure to account for critical aspects associated with the purchase of complex products renders his analysis unreliable.***

223.     Ultimately, Professor Hauser's analysis is based on the assumption that respondents would care about and be extraordinarily well-informed about the functionalities associated with the patented features. In fact, the evidence suggests the contrary. Smartphone consumers have limited means by which to understand the granular distinctions associated with the patented functionalities and academic research suggests that consumers do not employ the type of systematic feature comparison upon which his conjoint analysis is based. In effect, Professor Hauser has skipped steps by assuming that the patented functionalities would have entered into consumer purchase decisions without haven taken any meaningful steps to verify that such was the case. Given evidence to the contrary, his analysis does not provide a meaningful basis by which to make inferences about actual marketplace behavior.

**7.**      ***The reliability of the output generated by Professor Hauser's survey is undermined by risks of survey fatigue and overly taxing choice tasks.***

224.     Researchers have shown that a typical survey should last no more than 30 minutes, and that surveys lasting longer than 30 minutes are highly susceptible to respondent fatigue.[282] When respondents become fatigued, they pay less attention to the task in front of them

---

[282] Galesic, M. and M. Bosnjak. "Effects of Questionnaire Length on Participation and Indicators of Response Quality in a Web Survey," *Public Opinion Quarterly*, 73 no. 2 (2009): 349-360.

143

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

and increase their response speed as the survey length increases.[283] Specifically, responses to questions positioned later in the survey tend to be quicker, with less consideration given to the task, and more uniform than responses to questions positioned near the beginning of the survey.[284] Thus, data quality can suffer as survey length increases. Because in Professor Hauser's survey, his choice exercise with 16 tasks is at the very end of the survey, it is susceptible to quicker and poorer quality responses.

225.    For each respondent in Professor Hauser's survey, I reviewed statistics for how long it took for the respondent to complete the survey from start to finish. Professor Hauser indicated that he dropped the fastest 10 percent and slowest 10 percent of respondents, among other criteria, in order to eliminate respondents with potentially low response quality. This resulted in a final sample of 507 respondents for smartphones and 459 for tablets.[285] With respect to the final smartphone sample, the mean completion time was 61 minutes and median completion time was 38 minutes.[286] Of the 507 respondents in Professor Hauser's smartphone sample, 455 completed the survey in more than 30 minutes.[287] Further, 62 completed the survey

---

[283] Krosnick J., and S. Presser, "Question and Questionnaire Design," in Marsden, P. and J. Wright (eds.), *Handbook of Survey Research*, 2nd edition, (Bingley, UK: Emerald Group Publishing Limited, 2010): 292.

[284] Galesic, M. and M. Bosnjak. "Effects of Questionnaire Length on Participation and Indicators of Response Quality in a Web Survey," *Public Opinion Quarterly*, 73 no. 2 (2009): 349-360.

[285] Hauser Report, at ¶¶89-90.

[286] Exhibit 22.

[287] Exhibit 22. Results are comparable for the tablet survey with 433 of 459 respondents completing in greater than 30 minutes and 89 of 459 completing in more than 60 minutes.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

in more than 60 minutes.[288] Such completion times suggest respondent fatigue may have influenced the responses to the choice tasks encountered at the end of the smartphone survey.

226.   Concerns are compounded by the complexity of the choice tasks. After reviewing background information and the feature descriptions, which lasts a minimum of 15 minutes given the lengths of the videos, each respondent faced 16 choice tasks. Each of these choice tasks involved four phones that included a total of 18 specific levels of features each.[289] Thus, after accounting for a minimum of 15 minutes spent on the screening questions, the introduction text, the feature descriptions and videos, and choice exercise tutorial, respondents that finished in 30 minutes would have had only 15 minutes to process 32 choices (16 inside choices and 16 outside choices) covering the 1,152 features (18*4*16). Even if a respondent spent the entire 15 minutes on the 16 choice exercise tasks, this would imply that each choice exercise task was completed in less than one minute.

227.   Research has shown that consumers take two or more weeks to research phones, visit three or more different brand websites, and on average conduct seven searches online before making a purchase.[290] This raises further concerns that respondents did not have time to process their choices sufficiently. Together, the design and complexity of Professor Hauser's survey may

---

[288] Exhibit 22.
[289] Hauser Report, at Exhibit G.
[290] 2013 Google Wireless Shopper Study, at 11.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

have been excessively demanding by 1) requiring too much time to take the survey and 2) providing too little time to address the survey's complexity.

### E. The Responses Generated by Professor Hauser's Survey Are Not Reflective of the Actual Marketplace Environment That Professor Hauser Purports to Analyze

#### 1. *Professor Hauser's survey generated numerous irrational responses.*

228.    A fundamental assumption of conjoint analysis, including the one applied by Professor Hauser in the present case, is that respondents make rational decisions that are consistent with economic theory. Specifically, it is assumed that respondents seek to maximize their utility by selecting choices with features they value, and trade off with price, as well as compare against their outside option (choosing to buy nothing or something else in the market). As a test of the reliability of Professor Hauser's estimates, I examined the choices respondents made in the survey itself, to evaluate if the survey responses were consistent with the underlying premises of conjoint analysis.

229.    Specifically, I examined the responses generated by the 267 respondents that reported owning a Samsung Galaxy S III.[291] My analysis examined whether there was evidence of irrational choices made by these respondents. In particular, I looked to see if any of these respondents ever indicated that they would buy a less preferred smartphone than the Galaxy S

---

[291] Exhibit 23.

146

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## Price Sensitivity Analysis – Tablets

| Price Change | Total Number of Respondents | Number of Respondents Insensitive to Price Change | Percent of Respondents Insensitive to Price Change |
|---|---|---|---|
| $199 vs. $299 = $100 | 459 | 145 | 32% |
| $199 vs. $449 = $250 | 459 | 56 | 12% |
| $199 vs. $599 = $400 | 459 | 27 | 6% |
| $299 vs. $449 = $150 | 459 | 53 | 12% |
| $449 vs. $599 = $150 | 459 | 39 | 8% |
| Any | 459 | 194 | 42% |

**F.** **The Defects in Professor Hauser's Conjoint Analysis Are Confirmed by the Marketplace Predictions It Generates.**

**1.** *Professor Hauser's survey analysis is implausible with respect to the amount respondents value just the features incorporated in the survey.*

238.    Professor Hauser's survey generates implausible results related to the amounts respondents value just the features incorporated in the survey. In the table below, I summarize the willingness to pay price premiums associated with each of the individual smartphone features in the context of a phone with a price of $149.[300] As this table shows, the sum of the willingness to pay price premiums for the patent-related features is $358 and the sum of the willingness to

---

[300] The $149 base price reported for smartphones was selected, consistent with Professor Hauser's Exhibit P. *See* Hauser Report, at Exhibit P. Willingness to pay must be calculated at a specific price point as each price level is associated with a different parameter estimate and thus the willingness to pay will vary by the chosen base price.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

pay price premiums for all the modeled conjoint features is $1,125,[301] an amount seven times greater than the price of the reference phone.[302]

_____

[301] As Professor Hauser suggests in his report, the willingness to pay for individual features is not strictly additive because correlation between participant's valuation of individual features and varying price sensitivity outside of the modeled conjoint price range may result in the aggregate willingness to pay to be either higher or lower than the sum of the willingness to pay estimates for the individual features. For example, at a reference price of $49, the willingness to pay for the Quick Links feature is $96 and the willingness to pay for the Universal Search feature is $82, but the willingness to pay for both features is $142, which is less than the sum of the two individual features ($178). On the other hand, at a reference price of $149, the willingness to pay for the Automatic Word Correction feature is $102 and the willingness to pay for the S-Pen feature is $38, but the willingness to pay for both features is over $150, which exceeds the sum of the individual willingness to pay estimates ($140). I cannot perform this exact calculation for all features jointly because their joint willingness to pay amounts quickly exceeds the range of prices presented in Professor Hauser's survey. While the willingness to pay for individual features is not perfectly additive, the order of magnitude of the presented willingness to pay amounts clearly suggest that the willingness to pay for the entire set of features is unreasonably large.
[302] This is based on a $149 priced phone with a 5.0" screen.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

a model, such as this, with all of its shortcomings discussed above, in either in my academic work or my work in industry.

**V.    Conclusion**

265.    My opinions may change before trial if additional information from any of the parties-in-suit or their experts becomes available.  I, therefore, reserve the right to supplement my report accordingly.

David Reibstein