**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# EXHIBIT A-4

Confidential - Attorneys' Eyes Only

Page 1

1            UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                   SAN JOSE DIVISION
4      CONFIDENTIAL ATTORNEYS' EYES ONLY TRANSCRIPT
5    ------------------------------------------x
6    APPLE INC., a California
7    Corporation,
8                        Plaintiff,
9        -against-                    Civil Action No.
10   SAMSUNG ELECTRONICS CO., LTD,    12-CV-00630-LKH
11   a Korean business entity;
12   SAMSUNG ELECTRONICS AMERICA,
13   INC., a New York corporation;
14   SAMSUNG TELECOMMUNICATIONS
15   AMERICA, LLC, a Delaware
16   limited liability company,
17                        Defendants.
18   ------------------------------------------x
19              VIDEOTAPED DEPOSITION OF:
                DAVID J. REIBSTEIN, Ph.D.
20              Friday, September 27, 2013
                 Philadelphia, Pennsylvania
21                7:42 a.m. - 4:04 p.m.
22
23              Reported in stenotype by:
        ---- Rich Germosen, CCR, CRCR, CRR, RMR ----
24           NCRA & NJ Certified Realtime Reporter
             NCRA Realtime Systems Administrator
25                  Job No. 66331

Confidential - Attorneys' Eyes Only

Page 2

1  Videotaped Deposition of DAVID J. REIBSTEIN,
2  Ph.D., taken in the above-entitled matter before RICH
3  GERMOSEN, Certified Court Reporter, (License No.
4  30XI00184700), Certified Realtime Court Reporter-NJ,
5  (License No. 30XR00016800), NCRA Registered Merit
6  Reporter, NCRA Certified Realtime Reporter, Certified
7  LiveNote Reporter, NCRA Realtime Systems Administrator,
8  and a Notary Public, taken at the offices of BALLARD
9  SPAHR, LLP, 1735 Market Street, 51st Floor,
10 Philadelphia, Pennsylvania 19103-7599, on Friday,
11 September 27, 2013, commencing at 7:42 a.m.

Page 3

1  APPEARANCES:
2
3
4  GIBSON DUNN & CRUTCHER
5  Attorneys for the Plaintiffs
6      200 Park Avenue
7      New York, New York  10166
8  BY:   DANIEL THOMASCH, ESQ.
9
10
11
12 GIBSON DUNN & CRUTCHER
13 Attorneys for the Plaintiffs
14     333 South Grand Avenue
15     Los Angeles, California  90071
16 BY:   JORDAN BEKIER, ESQ.

Page 4

1  APPEARANCES: (CONT'D.)
2
3
4  QUINN EMANUEL URQUHART & SULLIVAN
5  Attorneys for the Defendants
6      865 South Figueroa Street
7      Los Angeles, California  90017
8  BY:   SCOTT WATSON, ESQ.
9
10
11
12
13 ALSO PRESENT:
14     LARRY MOSKOWITZ, Legal Video Specialist
15     SHANKAR IYER, Cornerstone Research

Page 5

1       IT IS HEREBY STIPULATED AND AGREED, by
2  and between the attorneys for the respective parties
3  herein, that filing and sealing be and the same are
4  hereby waived.
5       IT IS FURTHER STIPULATED AND AGREED
6  that all objections, except as to the form of the
7  question, shall be preserved to the time of trial.
8       IT IS FURTHER STIPULATED AND AGREED
9  that the within deposition may be signed and sworn
10 to before any officer authorized to administer an
11 oath, with the same force and effect as if signed
12 and sworn to before the officer before whom the
13 within deposition was taken.

Confidential - Attorneys' Eyes Only

Page 194

```
 1   attributed to Samsung specifically because they           01:10
 2   had the disputed features.
 3           What he ended up doing is he looked
 4   at the attributes that existed on the Samsung
 5   phones and he tried to fit it with the particular         01:11
 6   attributes that were used within the Hauser model.
 7   Similar to what it is that I did on that one study
 8   that you were asking me about, where I was looking
 9   at the projections within the -- Professor
10   Hauser's sample, as well as projections in the            01:11
11   overall marketplace, he, in some cases, had to
12   look at phones that were not exactly the four
13   options that were available, and I did exactly the
14   same translation that he did, and so he might
15   look, for example -- an example that I gave you,          01:11
16   he might look at a phone that was five point one
17   inches and say:  "Well, that's close enough.  The
18   closest one that exists is five point zero, and I
19   did actually the exact mapping that Dr. Vellturo
20   did.                                                      01:12
21       Q.  To put terminology and reports
22   together, could you look at the Vellturo report in
23   the -- I'm sorry, the Hauser report, my mistake,
24   sir, the Hauser report that's in front of you, in
25   the body of the report itself, on Page 65 or 67,          01:12
```

Page 195

```
 1   in the bottom right-hand side.                            01:12
 2       A.  Page 65 --
 3       Q.  Yes.
 4       A.  -- of 67 you said?
 5       Q.  Right.  I'm looking specifically                  01:13
 6   for Table 9.  Are you familiar with Table 9?
 7       A.  I am familiar with Table 9.
 8       Q.  And is Table 9 some of the
 9   willingness to pay data that was derived from --
10   by Dr. Hauser from his study or is it something          01:13
11   else?
12       A.  I'm familiar with it.  I'm going to
13   do just a quick scan of what it is that he says
14   right here.
15       Q.  Sure.                                             01:13
16       A.  And this is the data that I was
17   referring to.
18       Q.  When you use the term --
19       A.  This is an example of the data that
20   I was referring to, because what he's looking at         01:14
21   is one specific, you know, price level for each of
22   the phones, as well as the tablets.
23       Q.  Okay.  And so just to take this
24   example -- which is not the totality of his
25   willingness to pay data; correct?                        01:14
```

Page 196

```
 1       A.  Correct.                                          01:14
 2       Q.  If we look at this example for
 3   smartphones, it's looking at price premiums for
 4   various patent-related features in a one hundred
 5   and forty-nine dollar smartphone; correct?               01:14
 6       A.  That is my understanding of this.
 7       Q.  Okay.  And background syncing is --
 8   identified the '414 patent with a value of
 9   sixty-nine dollars.
10           Do you see that?                                  01:14
11       A.  I do see that.
12       Q.  And can you just tell me what you
13   understand Dr. Hauser is attempting to depict with
14   that sixty-nine dollars?
15       A.  So my understanding of what                       01:15
16   Dr. Hauser is trying to depict from this is that
17   people would prefer a smart -- a smartphone that
18   has background syncing, and all the other
19   features, to one that doesn't have background
20   syncing, until you raise the price, and as you           01:15
21   raise the price from one forty-nine, the
22   preference for the phone with the background
23   syncing goes down, and the preference for one
24   without background syncing, that tradeoff that
25   customers are willing to make, goes up, and you          01:15
```

Page 197

```
 1   have to continue that process until you get to           01:15
 2   sixty-nine dollars, and when they are both at --
 3   excuse me.  When you have added sixty-nine dollars
 4   to that one hundred and forty-nine dollar price,
 5   it's at that point that consumers from his survey       01:15
 6   are indifferent between those two.
 7       Q.  All right.  So when the more
 8   expensive phone is sixty-nine dollars more than
 9   the less expensive phone, but the more expensive
10   phone includes the '414 feature, then consumers         01:16
11   would break evenly in their preferences between
12   those two options?
13       A.  That's right.
14       Q.  All right.  And that, as you've
15   just described it, is how the survey respondents        01:16
16   valued the feature; correct?
17       A.  They were never asked, "How do you
18   value the feature?"  So when you say that's how
19   the survey respondents value the feature, this is
20   the result of the analysis from the Hauser survey.      01:16
21       Q.  Indeed, also derived from the
22   partworths of the particular feature; correct?
23       A.  That is correct.
24       Q.  And thank you for your
25   clarification.  My question was not that clear.         01:16
```

50 (Pages 194 to 197)

Confidential - Attorneys' Eyes Only

Page 198

1  Q. Do you understand Dr. Hauser to be
2  making any prediction about whether or not that
3  sixty-nine dollar price premium would be seen in
4  the real world?
5  A. I do not believe that he makes any
6  prediction as to whether or not it would be seen
7  in the real world.
8  Q. Is it my understanding that in
9  your -- when we talked about your buckets of
10  criticism, one related to willingness to pay, and
11  you said, as I wrote it down, but not purporting
12  to quote you, your testimony is a matter of
13  record --
14  A. Right.
15  Q. -- that the values -- the
16  willingness to pay values are so unrealistic that
17  they, in fact, in effect, didn't make sense to you
18  or show that there was a red flag.
19  Do you recall that?
20  A. I do recall that and I would be
21  glad to repeat it.
22  Q. Well, and what I'm wondering about
23  is, when you say it's an unrealistic value, are
24  you saying that it's unrealistic because in the
25  real world, there would not be a sixty-nine dollar

Page 199

1  differential between what people would actually
2  pay for a phone with and without the '414
3  attribute?
4  A. That's not the basis of why it is
5  that I say that.
6  Q. Okay. What is the basis for saying
7  that the values are unrealistic and what does
8  unrealistic mean in that context?
9  A. So what I'm referring to there, and
10  I'll do it individually, but then I want to do it
11  in aggregate. Individually, this -- and let's
12  just deal with the specific number that you turn
13  to in Table 9 of Professor Hauser's report. This
14  is saying that people, in essence, would be
15  willing to pay up to sixty-nine dollars for
16  background syncing. That's not to say that they
17  have to or that that's what's in the marketplace,
18  but they'd be willing to pay up to sixty-nine
19  dollars before they would say, "No, don't give me
20  background syncing."
21  So it sort of is a way of giving a
22  financial value for the existence of that feature,
23  and I'm going to point out it's the existence of
24  that feature versus an alternative of a
25  non-infringing alternative which would also do

Page 200

1  background syncing. So I'm willing to pay
2  sixty-nine dollars more.
3  Now, my comment about --
4  Q. Can I interrupt you there to
5  clarify?
6  A. You certainly may, but I want to
7  get -- continue.
8  Q. I don't mean to cut you off at all.
9  I just want to see if I can understand. It's a
10  long answer.
11  Do I correctly infer from your
12  statement that, in effect, as you increase the
13  price point of the phone with the '414 attribute,
14  instead of the non-infringing alternative
15  attribute, fewer people would prefer it relative
16  to the lower price point. When you reached a
17  sixty-nine dollar premium, it would now be that
18  the group as a whole was indifferent, some people
19  presumably would have reached that change in
20  decision at much less than sixty-nine and some
21  people maybe would pay even a higher than
22  sixty-nine dollar premium, sixty-nine becomes the
23  average for all respondents; is that correct?
24  A. That is, that is my understanding.
25  Q. And just to clarify, that's what I

Page 201

1  thought you were saying, and now I didn't mean to
2  cut you off.
3  A. Okay.
4  Q. But what else is important to you?
5  A. So what I was going to continue to
6  say, excuse me, is that in my -- and now I'm going
7  to offer personal opinion, I would be surprised,
8  and I think it is unreasonable for us to assume,
9  that people would be willing to pay sixty-nine
10  dollars more on average -- to your most recent
11  point, would be willing to pay sixty-nine dollars
12  more for that particular feature, but making it a
13  little bit clearer is not looking just at that
14  one, but if we look at the aggregation across
15  these, knowing what it is that people pay for a
16  cell phone, a smartphone in the first place, and
17  we start adding all of those up across all the
18  features, we're not talking about features like
19  whether it has a camera or not. We're not talking
20  about features about whether or not you can make a
21  phone call or not. We're not talking about
22  clarity of sound on the phone. We are not talking
23  about the ability to send E-mail. We're talking
24  about these features which I have characterized as
25  not necessarily the prime dimensions that

Page 202

1  customers make a decision about whether to buy a                    01:22
2  phone, and they are paying in this case a hundred
3  and forty-nine dollars for a phone and here this
4  is to suggest, "I'd be willing to pay almost fifty
5  percent more," fifty percent more would be                          01:22
6  seventy-five dollars.  "I'd be willing to pay
7  almost fifty percent more to have that one
8  particular feature of background syncing."  That
9  seems unreasonable to me, but in the aggregate,
10 looking at them, the sum of all these, across the                   01:22
11 attributes that are tested by Professor Hauser,
12 are a willingness to pay in excess of a thousand
13 dollars, and I'm referring to not just -- we can
14 take the five attributes that he presents here,
15 and I offer in my report the sum of these five,                     01:23
16 which happens to be significantly greater than
17 what they're already paying for the phone, and
18 then when we take the other attributes that he's
19 included in his -- throughout this particular
20 study, not to mention those in Case 1, it adds to                   01:23
21 more than an increment of a thousand dollars.  And
22 I find that to be unreasonable.
23     Q.   Have you, yourself, worked with
24 willingness to pay numbers in the past?
25     A.   I have worked with willingness to                          01:23

Page 203

1  pay numbers.                                                        01:23
2     Q.   And in a situation where you
3  aggregate willingness to pay numbers, are they
4  sub-additive, super-additive or neither?
5     A.   They are not directly additive.  In                        01:23
6  particular there may be some interactions in
7  particular that occur with them, but it certainly
8  is directionally implying that, and it would be
9  hard to imagine that what it is that is suggested
10 here is that it's sixty-nine dollars for                            01:24
11 background syncing, and again, I'm looking at
12 Exhibit 9.  It's a hundred and two dollars for
13 automatic word correction, but if it was automatic
14 word correction and background syncing, it still
15 does not add up to more than a hundred and two.                     01:24
16 These would continue to be additive, but may not
17 be additive in the absolute level of what it is.
18     Q.   In other words, it may be
19 sub-additive --
20     A.   And as a result --                                         01:24
21     Q.   -- is that correct?
22     A.   That is correct, but it is
23 directionally that it's going to be more than what
24 any one of these are, and the inference is it
25 would be significantly more.                                        01:25

Page 204

1     Q.   Is it your understanding that                               01:25
2  Dr. Hauser drew any inference that this is what
3  people would pay in the real world marketplace to
4  obtain that additional feature?
5     A.   It is my understanding that he                              01:25
6  hasn't said anything about what happens in the
7  real world, and that's part of my concern, but the
8  inference -- and you asked what is the inference
9  of Professor Hauser's report, and the inference is
10 people would be willing to pay in the real world,                   01:25
11 not that they actually do, and he doesn't report
12 what it is that people actually do pay, but he is
13 reporting what it is that they would be willing to
14 pay, and he is not doing this as an academic
15 exercise, what it is they'd be willing to pay in                    01:25
16 the real world.
17     Q.   Does it consider competition and
18 supply and pricing in the real world?
19     A.   It does include competition.  It
20 does not -- this is actually sort of devoid of                      01:26
21 supply.
22     Q.   It's one side of a demand curve?
23     A.   And it is not looking at -- you
24 mean the supply and demand curve or the demand
25 curve?                                                              01:26

Page 205

1     Q.   I'm sorry.  I do mean it looks at                           01:26
2  one side of a supply and demand curve?
3          MR. WATSON:  Hang on.  And,
4  Counsel, I'd ask that you -- I know you're not
5  intending to cut the witness off, but I do think                    01:26
6  in fairness to him you should let him finish his
7  answer.
8          MR. THOMASCH:  No desire to.
9  BY MR. THOMASCH
10    Q.   I apologize to the extent that I                            01:26
11 have.
12         Is it one side of a supply and
13 demand curve?
14    A.   We can take a complete economics
15 book and it's one component of that.  If we're                      01:26
16 going to talk about a supply and demand curve,
17 this is really referring to the demand curve.
18    Q.   And if you wanted to study what
19 consumers, regardless of their preferences, would
20 have to spend to obtain their preferred choice in                   01:27
21 the real word, you would need to consider the
22 supply side curve, would you not?
23    A.   We're talking about a product
24 category which only in the introduction phase are
25 there ever cases of people having limited supply                    01:27

Page 206

1  and the ability to go ahead and order that and                01:27
2  have the products placed on order and then supply
3  come to them subsequently.  So I don't think the
4  supply side is going to be a major issue per se
5  here, although I'm sure you can concoct some           01:27
6  particular examples where that may be a bigger
7  issue.
8      Q.  Does the supply curve also state at
9  what price suppliers would be prepared to supply
10 the marketplace in competition with each other?   01:27
11     A.  So, first of all, again, I'm going
12 to say that I'm here and what I've been asked to
13 do is offer some opinion about the Hauser report,
14 and the Hauser report does not say anything about
15 the supply curve and does not get into that        01:28
16 domain.
17         MR. WATSON:  I'll object as beyond
18 the scope.
19     Q.  At least for now let's put aside
20 Dr. Hauser's report.                               01:28
21         Let's put in front of us your
22 report.  Flip to Exhibit 2.
23     A.  Exhibit 2?
24     Q.  Actually, let's go back to Exhibit
25 1 for a moment, which is your CV; correct?        01:29

Page 207

1      A.  It is.                                            01:29
2      Q.  I'll just ask you to go to Page 21
3  where there is a list of litigation-related
4  consulting work in the last five years.
5          Would the answer to this question          01:29
6  be any different if it was the last ten years?
7          MR. WATSON:  Vague and ambiguous.
8  You're referring to the top part of --
9          MR. THOMASCH:  Yes, I'm only
10 looking at the litigation-related consulting work.   01:29
11     Q.  You've got four items identified
12 over the last five years, and I asked if we put
13 our point of reference back ten years, would we
14 pick up additional cases?
15     A.  It probably would, yes.                   01:30
16     Q.  As you sit here today, can you
17 identify which cases would be in that window that
18 are not disclosed here?
19     A.  If we said the last ten years, I
20 don't think I could do that today.  I'd have to go  01:30
21 back and look through my records and see if there
22 are others that I can pull up.
23     Q.  None of those, however, involved
24 offering opinions that were directly or indirectly
25 related to a lost profits analysis in a patent      01:30

Page 208

1  infringement case; is that correct?                   01:30
2      A.  None of the cases in the past ten
3  years --
4      Q.  Yes.
5      A.  -- involve that?  And again, I'd      01:30
6  have to go back and look at my records, but I
7  believe the answer is no.
8      Q.  In fact, the answer to my question
9  do you mean it's, yes, that there are no such
10 cases in the last ten years?                   01:30
11     A.  Yes, there are no such cases in the
12 last ten years to the best of my knowledge.
13     Q.  To the best of your recollection as
14 you sit here now, have you ever testified with
15 respect directly or indirectly about a lost    01:31
16 profits analysis in a patent infringement case?
17     A.  So I'm trying to think back to a
18 case or two that I did previously that might have
19 dealt with a copyright infringement which is
20 different than a patent, but related.          01:31
21     Q.  Fair enough.  But to save us time,
22 we won't go into different matters.
23     A.  Good.
24     Q.  Have you ever -- without regard to
25 the context in litigation, have you ever been  01:31

Page 209

1  retained as an expert in litigation prior to this       01:31
2  case in which your primary assignment was to
3  review marketing surveys or conjoint studies and
4  offer opinions on surveys or studies done by
5  others?                                            01:32
6      A.  Yes.
7      Q.  And does that include some or all
8  of the cases identified at Page 21 of your CV?
9      A.  That does not include any of the
10 cases that have occurred within the last five   01:32
11 years.
12     Q.  Okay.  And can you tell me when
13 that would have occurred?
14     A.  Not without going back and
15 reviewing my records and having to work on that 01:32
16 for good.
17     Q.  Okay.  Have you ever been an expert
18 in a litigation in which you, personally,
19 directed, oversaw or performed a conjoint study?
20     A.  Yes.                                    01:32
21     Q.  And is that also far enough back
22 that you'd have to refresh your memory?
23     A.  Far enough back that I'd have to go
24 back and review my records.
25     Q.  All right.  When were you retained    01:32

Page 306

1  and the supply side to have an opinion?  03:53
2      A.   In this particular case to fully
3  understand what some of their motivation might
4  have been and I will --
5          MR. WATSON:  There is no question  03:53
6  pending.
7          THE WITNESS:  Okay.
8      Q.   In the testing of consumer
9  behavior, a subject that you're very familiar
10 with, do you recognize that tests can be run at  03:54
11 different stages including at the consideration
12 stage and at the decision stage?
13     A.   When you say tests, you are
14 referring to?
15     Q.   Surveys.  03:54
16     A.   Surveys?
17     Q.   Yes.
18     A.   Surveys could be run in various
19 stages.
20     Q.   And are consideration stage and  03:54
21 decision stage stages that you're familiar with?
22     A.   They are stages that I'm familiar
23 with as a consumer as well as a researcher.
24     Q.   Do you have any understanding of
25 whether Dr. Hauser's conjoint study was aimed at  03:54

Page 307

1  the consideration stage, in this case was aimed at  03:54
2  the consideration stage or the decision stage?
3      A.   It is my belief that Dr. Hauser's
4  survey is aimed at the decision stage.
5      Q.   In citing to literature by  03:55
6  Dr. Hauser in your expert report, did you consider
7  whether or not the cited literature related to
8  discussions by Dr. Hauser of the consideration
9  stage or the decision stage?
10     A.   So I must confess.  I don't know  03:55
11 what specific pieces of Dr. Hauser's literature
12 you are referring to that I have referenced and so
13 there is several things that he did, has reported
14 on in his and some of his previous work that are
15 referring to the decision stage and there are some  03:55
16 that are at the consideration stage.
17     Q.   Would it be preferable in your mind
18 to --
19     A.   Excuse me.
20     Q.   Would it be preferable in your mind  03:56
21 to make reference to Dr. Hauser's articles that
22 relate to the decision stage in connection with a
23 critique of his work in this case?
24     A.   One would not be able to get to the
25 decision stage if one cannot make it through the  03:56

Page 308

1  consideration stage.  It is often the case when  03:56
2  we're thinking about use of a conjoint, it is
3  focused on the decision stage, but there are many
4  times when a conjoint study is being used we're
5  going to give people a set of choices and it  03:56
6  certainly happens within the conjoint that
7  Professor Hauser does that some of those products
8  and options that were presented would not even be
9  considered and that what one is doing is leaping
10 over that particular stage and sort of subsuming  03:56
11 it within the decision stage and that is, in
12 essence, what it is that was done here.
13     Q.   Do you have an opinion as you sit
14 here today as to whether decision-making
15 heuristics are more commonly employed at the  03:57
16 consideration stage or at the decision stage?
17     A.   Heuristics they would use?  I don't
18 know that I have a strong opinion on that right
19 now.
20     Q.   Would you look quickly at  03:57
21 Paragraphs 232 to 237 of your report.  We'll
22 finish up.
23     A.   Okay.  And I appreciate you trying
24 to be expeditious here because of my flight.
25     Q.   I am.  03:57

Page 309

1      A.   232?  03:57
2      Q.   Paragraph 232 to 237.  This relates
3  to caption, Respondents demonstrates substantial
4  insensitivity to price.  Are you familiar with
5  this portion of your report?  03:58
6      A.   I am familiar with this portion of
7  the report.
8          And given our time limits, I'm not
9  going to have a chance to review it in its
10 entirety right now.  03:58
11     Q.   I understand.  Let me circle back
12 on one quick question.  The identification of
13 prior Hauser articles to incorporate by reference
14 or by footnote into your report, was that done by
15 Analysis Group?  03:58
16     A.   So I had asked the Analysis Group
17 on my behalf to look at some of the work that
18 Hauser has done, Professor Hauser has done.
19     Q.   Did you provide them with the
20 specific studies to look at or did they undertake  03:58
21 that?
22     A.   What it is that I was able to do,
23 and they certainly could have figured out well
24 without me, is to be able to look at his vitae,
25 which is available online, and which was available  03:58

Confidential - Attorneys' Eyes Only

Page 310

1  in his report.                                      03:58
2      Q.   Turning back to the section
3  beginning at Page 148 Paragraph 232, just the
4  heading tells you that respondents demonstrate
5  substantial insensitivity to price.  Is that       03:59
6  consistent with your recall of your analysis of
7  the Hauser study?
8      A.   That is consistent.
9      Q.   Is there a way to determine whether
10 the results that are discussed here were            03:59
11 statistically significant?
12     A.   What it is that it is that we see,
13 and I'm going to turn you to Page 151, is that
14 sixty-eight percent of the respondents
15 demonstrated some price insensitivity, and let me   03:59
16 be clear what it is that I am referring to here,
17 and that is that for some of the individuals, if
18 we take away the imposed constraint that Professor
19 Hauser inserted in the Sawtooth analysis when he
20 did the analysis which required that the partworth  04:00
21 be greater for forty-nine dollars than it is for
22 one forty-nine and for one forty-nine or
23 ninety-nine versus one forty-nine and one
24 forty-nine versus ninety-nine, he required this
25 monotonicity and if we take away that constraint    04:00

Page 311

1  for sixty-eight percent of the subjects there were  04:00
2  some occasions where there was some insensitivity
3  or intransitivity.  That's there.
4      Q.   Okay.  I want to --
5      A.   So just to be clear, sixty-eight           04:00
6  percent is a significant number and a
7  statistically significant number.
8      Q.   That's what I'm quickly asking you
9  about.  You did a reestimation.  Is it possible to
10 do a formal statistical analysis of whether you're  04:00
11 reestimation is statistically significant?
12     A.   It is possible to do a formal
13 analysis as to whether or not sixty-eight percent
14 is statistically greater than zero.
15     Q.   Whether all of your analysis was           04:01
16 statistically significant, that could have been
17 done.  Am I correct that your view is that it
18 wasn't necessary to do because it was facially
19 obvious?
20     A.   It is correct that it is facially          04:01
21 obvious that sixty-eight percent, but the data are
22 available to you and to Professor Hauser and could
23 easily go through and determine the sixty-eight
24 percent is significantly greater than zero.
25     Q.   I understand.                              04:01

Page 312

1      A.   Okay.                                     04:01
2      Q.   You haven't done it, have you?
3      A.   I haven't done that.
4      Q.   Is it true that some of your
5  pretest respondents showed price insensitivity?    04:01
6      A.   What I will tell you is that I did
7  not estimate, and you know this from my previous
8  comments, I have not gone through and estimated
9  partworths with respect to each of my pretest
10 respondents.                                        04:02
11     Q.   So you don't know how the price
12 insensitivity of that group compares to the price
13 insensitivity of Dr. Hauser's response?
14     A.   I did not estimate any of the
15 partworths per se.                                  04:02
16          So may I interrupt right here, and
17 I apologize.  As you know and I had mentioned from
18 the very beginning --
19     Q.   You don't need to make a speech.
20          MR. WATSON:  We're --                     04:02
21     Q.   I was about to say I have no
22 further questions and I thank you for your time.
23     A.   Okay.  Thank you.  Thank you very
24 much.  I was --
25     Q.   I assured you all day I was going         04:02

Page 313

1  to get you out of here on time and notwithstanding  04:02
2  long answers, I did.
3      A.   Okay.  So thank you very much.
4          MR. WATSON:  And, Counsel, I don't
5  know that any of the testimony implicates AEO, but  04:02
6  certainly the reports that are marked does contain
7  AEO materials, so I think out of an abundance of
8  caution, we should mark the entire transcript, for
9  at least now, attorneys' eyes only.
10         MR. THOMASCH:  Let's do it for at          04:03
11 least now.
12         MR. WATSON:  Right.
13         MR. THOMASCH:  I'm not sure that
14 that may not be causing us more problems, but
15 obviously it does -- we're not losing any           04:03
16 protection to reports.
17         MR. WATSON:  That's my only
18 concern.
19         MR. THOMASCH:  And I share that
20 concern with you.  I don't want to over-designate   04:03
21 to cause a problem to either side.
22         MR. WATSON:  Fair enough.
23         THE WITNESS:  So are we
24 officially --
25         MR. THOMASCH:  We are now off the          04:03

Page 314

```
1   record and, again, I thank you for your time.        04:03
2         THE WITNESS:  Okay.  Thank you very
3   much.  And I really appreciate you respecting my
4   time constraint as I do have a flight I have to
5   catch.                                              04:03
6         MR. THOMASCH:  I understand that.
7         THE VIDEOGRAPHER:  We're going off
8   the record.  The time is 4:04 p.m.  This is the
9   end of Tape 5.
10        (Time noted:  4:04 p.m.)
11
12        _____
            DAVID J. REIBSTEIN, Ph.D.
13
14  Subscribed and sworn to before me
15  this _____ day of _____ 2013.
16
17
    _____
18  Notary Public
    My Commission Expires:
19
20  /
21  /
22
23
24
25
```

Page 315

```
1              C E R T I F I C A T E
    STATE OF PENNSYLVANIA )
2                         ) :ss.
    COUNTY OF PHILADELPHIA)
3         I, RICH GERMOSEN, a Certified Court
4   Reporter, New Jersey Certified Realtime Court
5   Reporter, NCRA Certified Realtime Reporter, NCRA
6   Registered Merit Reporter, and Notary Public, do
7   hereby certify:
8         That DAVID J. REIBSTEIN, Ph.D., the
9   witness whose deposition is hereinbefore set forth,
10  having been duly sworn by a Notary Public, and that
11  such deposition is a true record of the testimony of
12  said witness.
13        I further certify that I am not related
14  to any of the parties to this action by blood or
15  marriage, and that I am in no way interested in the
16  outcome of this matter.
17        IN WITNESS WHEREOF, I have hereunto set
18  my hand this 27th day of September, 2013.
19
20  _____
    RICH GERMOSEN, CCR, CRCR, CRR, RMR, CLR
21  LICENSE NO. 30XI00184700
    LICENSE NO. 30XR00016800
22
23
24
25
```

Page 316

```
1            I N D E X
2   WITNESS              EXAMINATION
3   DAVID J. REIBSTEIN, Ph.D.
4    BY MR. THOMASCH         7,183
5
6   AFTERNOON SESSION         183
7
8
9          E X H I B I T S
10  DESCRIPTION            PAGE
11  Exhibit 1, multipage document    28
12  entitled rebuttal expert
13  report of David Reibstein,
14  September 13th, 2013, not
15  bearing Bates stamps.
16
17  Exhibit 2, multipage document    50
18  entitled expert report of
19  John R. Hauser, August 11th,
20  2013, not bearing Bates
21  stamps.
22
23
24
25
```

Page 317

```
1   PRODUCTION OF DOCUMENTS AND/OR INFORMATION
2         Page Line
3         (none)
4
5   DIRECTION TO WITNESS NOT TO ANSWER
6         Page Line
7         (none)
8
9   QUESTIONS MARKED FOR LATER RULING
10        Page Line
11        (none)
```