**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# EXHIBIT A-7

Highly Confidential Attorneys Eyes Only

1              UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                   SAN JOSE DIVISION
4
5   APPLE, INC., a California      )
    corporation,                    )
6                                   )
                     PLAINTIFF, )
7           VS.                     )   12-cv-00630-LHK
                                    )
8   SAMSUNG ELECTRONICS, CO., LTD,)
    a Korean business entity;       )   VOLUME I
9   SAMSUNG ELECTRONICS AMERICA,   )
    INC., a New York corporation; )
10  SAMSUNG TELECOMMUNICATIONS      )
    AMERICA, LLC, a Delaware        )
11  limited liability company,     )
                     DEFENDANTS. )
12  _____)
13
14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15
16    VIDEOTAPED DEPOSITION OF ANDREW COCKBURN, Ph.D.
17               LOS ANGELES, CALIFORNIA
18             THURSDAY, SEPTEMBER 26, 2013
19
20
21
22
23  REPORTED BY:
24  CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR, RSA
25  JOB NO.: 66065

Highly Confidential Attorneys Eyes Only

Page 2

September 26, 2013
8:55 a.m.

Videotaped Deposition of Andrew Cockburn, Ph.D., taken on behalf of Defendant, held at the offices of Gibson Dunn & Crutcher, 333 S. Grand Avenue, Los Angeles, California, before Christy A. Cannariato, CSR #7954, RPR, CRR, RSA.

Page 3

APPEARANCES

ON BEHALF OF PLAINTIFF APPLE, INC.:
   GIBSON, DUNN & CRUTCHER
   BY: H. MARK LYON, ESQ.
   1881 PAGE MILL ROAD
   PALO ALTO, CALIFORNIA  94304

ON BEHALF OF DEFENDANT SAMSUNG:
   QUINN EMANUEL URQUHART & SULLIVAN
   BY:  ANASTASIA FERNANDS, ESQ.
   BY:  ROBERT KANG, ESQ.
   51 MADISON AVENUE
   NEW YORK, NEW YORK 10010

ALSO PRESENT:
CHRIS JORDAN, TSG REPORTING, INC.

Page 4

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MS. FERNANDS | 7 |

EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Cockburn 1 | Rebuttal Expert Report of Professor Andrew Cockburn | 13 |
| Exhibit Cockburn 2 | Corrected Rebuttal Expert Report of Professor Andrew Cockburn | 16 |
| Exhibit Cockburn 3 | Expert Report of Professor Andrew Cockburn | 26 |
| Exhibit Cockburn 4 | United States Patent 8,074,172 | 33 |
| Exhibit Cockburn 5 | United States Patent 5,953,541 | 47 |

Page 5

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Cockburn 6 | Expert Report of John R Hauser, 8/11/13 | 153 |
| Exhibit Cockburn 7 | United States Patent 8,046,721 | 171 |
| Exhibit Cockburn 8 | Opening Expert Report of Christopher A. Vellturo, Ph.D. | 188 |
| Exhibit Cockburn 9 | United States Patent 7,880,730 | 228 |

QUESTIONS INSTRUCTED NOT TO ANSWER

(None)

Highly Confidential Attorneys Eyes Only

Page 150

1    Q.    Okay.  So other than the pragmatic
2    consideration because it has to be portable, you
3    would agree that claim 18 does not limit the size of
4    the electronic device?
5    A.    Other than the pragmatic limitations,     12:52
6    yes I would agree.
7    Q.    So you would agree that claim 18 could
8    cover portable electronic devices with both very
9    small screens and larger screens?
10   A.    Yes.                                      12:52
11   Q.    Now, it's your opinion that claim 18
12   covers portable electronic devices using a virtual
13   keyboard; correct?
14   A.    Using a virtual keyboard and/or a
15   physical keyboard.                              12:53
16   Q.    So you would agree that claim 18 does
17   include physical keyboards?
18   A.    It could, yes.
19   Q.    Now, accepting your opinion for this
20   discussion that the portable electronic device of   12:53
21   claim 18 could have a virtual keyboard, it does not
22   specify the size of that virtual keyboard in claim
23   18, does it?
24   A.    No, it does not.
25   Q.    So a larger device such as a tablet    12:53

Page 151

1    could have a larger virtual keyboard?
2    A.    Correct.
3    Q.    Would the size of the virtual keyboard
4    affect the efficiency of the text entry?
5    A.    In claim 18?  Specifically in claim 18    12:53
6    or in text entry in general?
7    Q.    In text entry in general, would the size
8    of the keyboard affect the efficiency of the text
9    entry?
10   A.    In certain contexts, yes.                 12:54
11   Q.    In what context?
12   A.    For instance, if the user is required to
13   enter text using one hand, then the magnitude of
14   movement increases as the size of the keyboard
15   increases.  So larger movements take longer time.    12:54
16   Q.    Does the size of the keyboard affect
17   accuracy of text entry on a virtual keyboard?
18   A.    It could, although I have the earlier
19   concern that accuracy and speed trade off against
20   one another.                                      12:54
21   Q.    In your opinion, does the size of the
22   keyboard affect the need for autocorrect
23   functionality?
24   A.    Is this limited to any particular form
25   factor of --                                      12:54

Page 152

1    Q.    Start without limitation to form factor.
2    In your opinion does the size of the keyboard for
3    text entry, a virtual keyboard for text entry affect
4    the need one way or the other for auto correction?
5    A.    The need for auto correction is a term    12:55
6    I'm concerned about.  The merits of auto correction
7    certainly vary with the size of the keyboard.
8    Q.    Okay.  So let me reword the question,
9    because perhaps it was bad.
10       In your opinion, does the -- do the      12:55
11   benefits of auto correction change if -- with the
12   size of the keyboard?
13   A.    They can.
14   Q.    In what ways?
15   A.    The incidence of error may increase with    12:55
16   a smaller keyboard.  However, the desirability of
17   including autocorrect is more or less constant
18   across the size of the keyboard.
19   Q.    And do you agree that at a minimum claim
20   18 includes physical keyboards as well?           12:56
21   A.    Yes.
22   Q.    Do you have any opinion as to whether
23   errors are less common with physical keyboards?
24   A.    It's a complex question again due to
25   primarily due to the speed/accuracy tradeoff.     12:56

Page 153

1         MS. FERNANDS:  Go off the record?
2         MR. LYON:  (Nods head up and down.)
3         THE VIDEOGRAPHER:  This marks the end of
4    disc No. 2.  We're off the record.  The time is
5    12:56.                                            12:56
6         (Recess.)
7         THE VIDEOGRAPHER:  This marks the
8    beginning of Disk No. 3.  We're back on the record.
9    The time is 1:33.
10        MS. FERNANDS:  Can we mark the next      12:33
11   exhibit, please.
12        THE REPORTER:  This is 6.
13        (Exhibit Cockburn 6 marked for
14         identification.)
15   Q.    BY MS. FERNANDS:  You have just been      12:34
16   handed what we've marked as Cockburn Exhibit 6.  And
17   it's a document entitled, Expert Report of
18   John R. Hauser.  Do you see that?
19   A.    I do.  Thanks.
20   Q.    You have reviewed the Hauser report; is    01:34
21   that correct?
22   A.    I have.
23   Q.    Did you review the survey questions that
24   Professor Hauser used for his surveys?
25   A.    I did.                                  01:34

Highly Confidential Attorneys Eyes Only

Page 154

1   Q.   If you turn to page 35 of what we've
2   marked as Exhibit 6, the Hauser report.
3        Do you see that at the top of that page,
4   a bullet with the bold words Automatic Word
5   Correction?                                01:34
6   A.   Yes.
7   Q.   And do you have an understanding as to
8   whether that section called Automatic Word
9   Correction was intended to describe the subject
10  matter of claim 18 of the '172 patent?     01:35
11  A.   I believe it was intended for that
12  purpose.  Yes.
13  Q.   That it was intended for that purpose?
14  A.   To cover the '172 patent and claim 18
15  included in the 172.  Yes.                 01:35
16  Q.   Does the description there that begins
17  Automatic Word Correction on page 35 of the Hauser
18  report accurately reflect the subject matter of
19  claim 18 in your opinion?
20  A.   Let me just review it for a moment.   01:35
21  Thank you.
22       In a broad manner, yes.
23  Q.   What do you mean "in a broad manner,
24  yes"?
25  A.   For the purpose of surveying users with 01:36

Page 155

1   respect to their anticipation for the value of the
2   mechanisms described in claim 18 of the '172 patent,
3   this would be a good survey question to establish
4   their understanding of the value of autocorrect
5   functionality.                             01:36
6   Q.   Now, you just testified that this would
7   be a good survey question.  On what do you base your
8   opinion that this would be a good survey question?
9   A.   I'm not an expert in the development of
10  the broad user surveys.  However, I do understand 01:36
11  that when surveying users, their perceptions of
12  particular -- particular interactions in particular,
13  it's important that you focus their attention on the
14  key values without overcomplicating the question
15  that you ask.                              01:37
16  Q.   And you said you thought this would be a
17  good survey question to survey users on the value of
18  autocorrect functionality; is that right?
19  A.   That's correct.
20  Q.   You would agree with me that the '172  01:37
21  patent doesn't cover all means of autocorrect
22  functionality?
23  A.   That's correct.
24  Q.   And so there could, in fact, be
25  autocorrect without practicing the '172 patent? 01:37

Page 156

1   A.   That's correct.
2   Q.   With that understanding, do you think
3   that the final statement in the survey, "Without
4   this feature, pressing space or period would retain
5   your original text, birfday; if you want to replace 01:37
6   your original text, you would have need to select
7   the suggested 'birthday' yourself" is accurate?
8   A.   Is what about that sentence accurate?
9   Q.   Well, first, do you believe the sentence
10  that begins "Without this feature suggests to the 01:37
11  user that without the feature described in the
12  preceding sentences of the survey question that they
13  would not have autocorrect functionality in their
14  device"?
15  A.   It does not necessarily imply the      01:38
16  absence of autocorrect functionality.
17  Q.   How does it not imply the absence of
18  autocorrect functionality when it states that
19  without the feature that you would retain the
20  misspelled word and you would have to replace the 01:38
21  word by selecting it yourself?
22  A.   It strongly implies that there will be
23  another mechanism associated with the selection of
24  birthday.  Given that the user has been described as
25  entering birfday, yet the available -- yet the word 01:38

Page 157

1   birthday is available to the user, there is a form
2   of autocorrection available to the user rather than
3   autocorrection being absent.
4   Q.   How does it suggest that there is a form
5   of autocorrection available to the user?    01:38
6   A.   Sorry.  A form of correction.  I
7   shouldn't have said -- a form of autocorrection.
8   Q.   So it does suggest that autocorrection
9   is not available to the user; that there is a means
10  of correction, but it is not autocorrection. 01:38
11  A.   That's correct.
12  Q.   So isn't it the case that this question
13  suggests that without the feature described above
14  that autocorrection is not present in the device?
15       MR. LYON:  Objection.  Vague.  Asked and 01:39
16  answered.
17  A.   Autocorrection functionality takes a
18  wide range of different forms.  As we've seen from
19  -- as is evident from the vast array of prior
20  literature asserted.  A strict interpretation of  01:39
21  autocorrection would accept -- would describe the
22  device implicitly inserting on the user's behalf a
23  corrected word.  Other forms of autocorrection will
24  also allow the user -- would present options to the
25  user and allow them to make a selection.    01:39

Highly Confidential Attorneys Eyes Only

Page 158

1      So I think it is reasonable to describe
2  a system interpreting the user's input and
3  presenting alternatives to the user for easy
4  selection to be a form of autocorrection.
5      Q.   So is it your opinion, then, that in the      01:40
6  three alternatives that we discussed earlier where
7  the selecting a delimiter does not replace the word
8  but suggestions are shown in a suggestion bar
9  underneath, that that is a form of autocorrection?
10     A.   I think that is -- that's -- that's      01:40
11  reasonable.  A strict interpretation of
12  autocorrection would be that the correction is made
13  implicitly on the user's behalf.
14     Slightly further away from that
15  interpretation, the autocorrection feature can make      01:40
16  the alternatives available to the user for their
17  direct selection.  The absence of auto -- any form
18  of autocorrection would mean the system took no
19  action in assisting the user in correcting their
20  errors.                       01:40
21     Q.   So you would agree with me that claim 18
22  of the '172 patent describes a very specific user
23  interface presentation of the suggested words and
24  the autocorrect functionality?
25     A.   Your question refers to the      01:41

Page 159

1  presentation, which I would interpret as being the
2  output behavior of the device.  I agree that it
3  describes output behavior.  I would not say it is
4  very specific, which I think was your term.  But it
5  also describes other features of the interactive      01:41
6  behavior.
7     Q.   Now, I believe you've expressed the
8  opinion in your reports that it is possible to judge
9  whether something infringes claim 18 of the '172
10  patents merely by operating the device; correct?      01:41
11     A.   Yes.  That's correct.
12     Q.   So what, other than what is shown in the
13  user interface of the device, is relevant to the
14  '172 patent if you can judge infringement by
15  operating the device?                   01:42
16     A.   I believe you're pursuing an objection
17  to my interpretation of "presentation."  You used
18  the word "presentation."  I said presentation
19  involves display of informational output of
20  information to the user.  The '172 patent in      01:42
21  contrast clearly involves user input as well as
22  presentation of output.
23     Q.   And the '172 patent requires that there
24  be both a first area that displays text input as it
25  is being input; right?  Claim 18 specifically of the      01:42

Page 160

1  '172 patent.
2     A.   Claim 18 the first area includes that --
3  that -- your description.  It also includes a
4  current character string in that first area.
5     Q.   So claim 18 requires a first area that      01:42
6  shows a current character string as it's being
7  input.  We agree on that.
8     A.   Yes.
9     Q.   And claim 18 of the '172 patent also
10  requires a second area that shows the current      01:43
11  character string and a suggested replacement
12  character string; is that correct?
13     A.   That's imprecise.  It requires a current
14  character string or a portion thereof and a
15  suggested replacement character string.      01:43
16     Q.   Okay.  So claim 18 of the '172 patent
17  requires a current character string or a portion
18  thereof and a suggested replacement character
19  string?
20     A.   Can you repeat the start of your      01:43
21  question?  Sorry.
22     Q.   Claim 18 of the '172 patent requires in
23  that it display the current character string or a
24  portion thereof and a suggested replacement
25  character string in the second area.      01:43

Page 161

1     A.   That's correct.
2     Q.   Okay.  And where in Dr. Hauser's
3  description does it describe a second area -- a
4  second area displaying both the current character
5  string and the suggested replacement character      01:43
6  string?
7     A.   It does not.
8     Q.   Okay.  Do you think that would be an
9  important element to the user?
10     A.   It's an important part of the invention      01:44
11  disclosed in the '172 patent.  It has certain
12  benefits to the user.  Dr. Hauser's description
13  encapsulates the broad interpretation of the claim.
14     Q.   What do you mean by "the broad
15  interpretation of the claim"?      01:44
16     A.   Without going into the precise details
17  of every element of the patent's limitations, it
18  describes to people responding to the survey the key
19  elements of the interaction in a manner that is
20  readily understood by the respondents to the survey.      01:44
21     Q.   Wouldn't you agree that the precise
22  elements of the user interface are important to the
23  benefits of the user interface design?
24     MR. LYON:  Objection.  Vague.
25     A.   Yes.  The response to that depends on      01:45

Highly Confidential Attorneys Eyes Only

Page 162

1  substantial contextual factors.  These elements will
2  have important influence on the user's interaction.
3  Designers will very, very carefully consider and
4  contemplate how these elements should be pieced
5  together.  But in the survey question, if you were    01:45
6  to essentially dump all of those limitations on a
7  survey respondent, I -- that would be -- I would
8  state -- although I'm not an expert in survey
9  design, I would have thought that that would be a
10 very good way to confuse the respondents to the    01:45
11 survey.
12    Q.   Do you think that it would not confuse
13 the respondents to the survey to omit important
14 elements of the claim in describing the patented
15 invention?    01:46
16       MR. LYON:  Objection.  Mischaracterizes
17 statements.  Argumentative.
18    A.   Sorry, can you repeat the question,
19 please.
20    Q.   Well, I believe you said it was your    01:46
21 opinion that it would confuse the survey takers if
22 you were to fully describe the claimed invention;
23 correct?
24    A.   If you were to present to everyday users
25 of these devices the precise stipulation of the    01:46

Page 163

1  patent's limitations of claim 18, I strongly suspect
2  that most of the respondents would not be able to
3  interpret or understand the survey question.
4     Q.   You think that a survey taker would not
5  understand that there was a second area that showed    01:46
6  both the input text and a suggested replacement
7  text?
8     A.   I think you would need to substantially
9  rephrase the patent language precisely stipulated in
10 the claim to make it clear to the respondents what    01:46
11 -- how this might be instantiated.
12    Q.   You would agree with me that the survey
13 question itself refers to providing suggested
14 replacement text.
15    A.   Yes, it does.    01:47
16    Q.   So some of this language from the patent
17 was directly transferred into the survey question?
18    A.   Some of it is.  Key elements, yes.
19    Q.   Did Dr. Hauser speak with you prior to
20 conducting this survey?    01:47
21    A.   I have never spoken with Dr. Hauser.
22    Q.   You have never had any conversation with
23 Dr. Hauser?
24    A.   No.
25    Q.   You had no input whatsoever in the    01:47

Page 164

1  survey question?
2     A.   None.
3     Q.   He didn't ask you what were the key
4  elements of the claim 18 of the '172 patent?
5        MR. LYON:  Objection.  Asked and    01:47
6  answered.
7     A.   None.
8     Q.   We discussed earlier some noninfringing
9  alternatives; correct?
10    A.   Correct.    01:48
11    Q.   And one of those noninfringing
12 alternatives we called the Dart alternative?
13    A.   Yes.
14    Q.   And in the Dart alternative, the
15 suggested replacement is added in -- is input in the    01:48
16 text area as you're typing; correct?
17    A.   The suggested replacement is inserted
18 directly into the output area as the user types.
19 Yes.
20    Q.   So with respect to the Dart alternative,    01:48
21 the user would not have to select the correct
22 spelling themselves in using the Dart alternative.
23 That would be automatically replaced for them?
24    A.   Under the assumption that the predictive
25 engine gets the user's intention correct, yes.    01:48

Page 165

1     Q.   So Dr. Hauser's survey question that
2  without the patented feature then the user would
3  have to replace -- would need to select the
4  suggested replacement themselves would be incorrect?
5        MR. LYON:  Objection.  Vague.    01:49
6     A.   Sorry, I just don't understand the
7  question.  Incorrect with respect to what?
8     Q.   Well, what is your understanding of the
9  purpose of the final statement in Dr. Hauser's
10 survey?    01:49
11    A.   From the semicolon forward?
12    Q.   No, the, "Without this feature, the
13 final sentence.
14       MR. LYON:  Objection.  Lacks foundation.
15    Q.   Let me ask the question again.    01:49
16 Do you have an understanding of the
17 purpose of the final sentence of the Auto Word
18 Correction description in Dr. Hauser's survey?
19    A.   Yes, I do.
20    Q.   And what is your understanding?    01:49
21    A.   That without that feature, pressing
22 space or period would retain your original text.
23    Q.   My question was:  Do you have an
24 understanding of the purpose of the final sentence
25 in this description?    01:49

Highly Confidential Attorneys Eyes Only

Page 166

1    A.   It's to describe the absence of a
2  particular feature to survey respondents.
3    Q.   And do you think that that is a fair
4  description of the absence of the particular
5  feature?                                    01:50
6    A.   Yes.
7    Q.   You would agree with me that there are
8  alternatives where pressing space would keep the
9  suggested text in, for instance, the Dart
10 alternative instead of -- instead of keeping a   01:50
11 misspelled text?
12   A.   There are a vast multitude of
13 alternative ways of instantiating some form of
14 autocorrect functionality.
15   Q.   So it is not the case that in all    01:50
16 circumstances, without the feature described
17 previously in this description, that the user would
18 have to select the suggested replacement themselves
19 rather than having the system do it autocorrect?
20        MR. LYON:  Objection.  Mischaracterizes.  01:50
21 Calls for speculation.
22   A.   Can you repeat the question, please.
23   Q.   So isn't it the case that there are
24 alternatives in which the user does not have to
25 suggest -- the user does not have to suggest the   01:51

Page 167

1  suggested replacement themselves that also do no
2  have the described feature of the '172 patent?
3    A.   That's correct.  There are a vast
4  multitude of alternative ways of instantiating some
5  form of autocorrect.  If you were to survey    01:51
6  respondents and attempt to encapsulate all of those
7  alternative methods in a single question, you would
8  -- you would baffle your respondents.
9    Q.   Do you think that autocorrect is an
10 important feature of claim 18 of the '172 patent?   01:51
11        MR. LYON:  Objection.  Vague.  Lacks
12 foundation.
13   A.   Some form of autocorrect is a component
14 of claim 18.  And, yes, it is important.
15   Q.   Okay.  Do you think that the survey    01:52
16 question suggesting that autocorrect would be the
17 feature that was not present in the claimed
18 invention were not practiced is a fair assessment of
19 the alternatives to the claimed invention?
20        MR. LYON:  Objection.  Mischaracterizes    01:52
21 the document.  Incomplete hypothetical.  Vague.
22   A.   I think the final sentence demonstrates
23 that there is some form of autocorrection available
24 to the user, in particular the system is described
25 as having interpreted the user's input of "birfday"   01:52

Page 168

1  resulting in the suggestion "birthday" that is then
2  available for selection.
3    Q.   And it's your opinion that putting those
4  suggestions somewhere and having them available for
5  selection is autocorrection?                01:52
6    A.   It is a form of autocorrection.  The
7  system has automated a facility that assists the
8  user in correcting their erroneous text.
9    Q.   To infringe claim 18 of the '172 patent,
10 the system has to display the current character    01:53
11 string in two areas; correct?
12   A.   Yes.
13   Q.   And so if the system did not display the
14 current character string in two separate areas, it
15 would not infringe claim 18 of the '172 patent?    01:53
16   A.   That's broadly correct, although there
17 would be circumstances in which the teachings of the
18 '172 patent would encourage designers to believe
19 that there were exceptions to the permanent and
20 consistent requirement to always display the current   01:54
21 character string in two areas.
22   Q.   With respect to claim 18 -- well, step
23 back.
24        What's your understanding of what is
25 required for infringement?                     01:54

Page 169

1    A.   A device or artifact must meet every
2  limitation of the claim.
3    Q.   And claim 18 of the '172 patent requires
4  a current character string in two areas; correct?
5    A.   That's correct.                      01:54
6    Q.   So to infringe claim 18, there would
7  have to be a current character string in two areas?
8    A.   At some point, yes.
9    Q.   So to have a noninfringing alternative
10 to claim 18 would be to display the current    01:54
11 character string in only one area?
12        MR. LYON:  Objection.  Incomplete
13 hypothetical.  Calls for a legal conclusion.
14   A.   I'm not a lawyer.  I find it -- I don't
15 know the bounds under which a device must always or    01:55
16 sometimes adhere to the exact teachings of a claim.
17   Q.   You have offered opinions in this case
18 as to infringement of the '172 patent; right?
19   A.   I have.  Yes.
20   Q.   So you have an opinion as to what    01:55
21 infringes the '172 patent.
22   A.   Yes.
23   Q.   And you cannot tell me, as you sit here
24 today, whether in your opinion a device that did not
25 display a current character string in two areas    01:55

Highly Confidential Attorneys Eyes Only

Page 170

1  would infringe the '172 patent?
2       MR. LYON: Objection. Mischaracterizes
3  testimony. Argumentative.
4     A.    I would understand, as a scientist and
5  as a user interface designer, that there are certain    01:55
6  circumstances under which the '172 patent clearly
7  teaches that it would be unnecessary to display the
8  current character string in two areas.
9     Q.    Are those taught in claim 18?
10    A.    Implicitly, yes.                01:55
11    Q.    You would agree with me that claim 18
12 explicitly requires a current character string in
13 two areas?
14    A.    That is the language of the claim. Yes.
15    Q.    Do you think that a user of portable    01:56
16 electronic devices would find it important to their
17 use that there be a current character string in two
18 areas?
19    A.    In certain circumstances, yes.
20    Q.    Do you think that the display of the    01:56
21 current character string in two areas is as
22 beneficial as an aspect of claim 17 -- of claim 18
23 of the '172 patent as the automatic replacement of a
24 misspelled word upon the selection of a delimiter?
25    A.    This is a contextually sensitive    01:56

Page 171

1  question. There are different times of which
2  different components of the limitations of claim 18
3  are valuable to users.
4     Q.    But the display of the current character
5  string in two areas is not described in Professor    01:56
6  Hauser's survey; correct?
7     A.    It is not.
8     Q.    And Professor Hauser's statement about
9  the result of not having the patented feature does
10 not address the requirement of claim 18 that there    01:57
11 be a current character string in two areas?
12    A.    It does not specifically do so. That's
13 correct.
14       (Exhibit Cockburn 7 marked for
15       identification.)                01:58
16    Q.    So that you have in front of you we have
17 just handed you what we've marked as Exhibit 7, and
18 this is a U.S. Patent No. 8,046,721.
19       Is this the '721 patent that we referred
20 to before?                        01:58
21    A.    It is. Yes.
22    Q.    So while we have -- I wanted to get that
23 in front of you while we were talking about
24 Professor Hauser's report.
25       And I think if you turn to page 36. If    01:59

Page 172

1  you turn to page 36 of the Hauser report, which is
2  Cockburn Exhibit 6 now.
3     A.    Yes. Thank you.
4     Q.    At the top of page 36 do you see the
5  description of Slide to Unlock?            01:59
6     A.    Yes.
7     Q.    Have you reviewed that description
8  before?
9     A.    I have. Can I just take a moment to
10 review again?                    01:59
11       Yes. Thank you.
12    Q.    And is it your understanding that the
13 description with the header Slide to Unlock in the
14 Hauser report was intended to describe the subject
15 matter of claim 8 of the '721 patent?        02:00
16    A.    Of the '721 patent including claim 8.
17 Yes.
18    Q.    Does Dr. Hauser's description accurately
19 describe the subject matter of claim 8 in your
20 opinion?                        02:00
21    A.    For the purpose of surveying
22 respondents, yes, I believe it does.
23    Q.    And you have qualified "as for the
24 purpose of surveying respondents." Does
25 Dr. Hauser's description of the Slide to Unlock    02:01

Page 173

1  capture all of the elements of claim 8 of the '721
2  patent?
3       MR. LYON: Objection. Vague.
4     A.    For the -- for the purpose of the
5  survey, yes, it does. It captures the critical    02:01
6  components of the claim. It's not specific with
7  respect to the visual cues, but I think the general
8  understanding is communicated.
9     Q.    So it's not specific with respect to
10 visual cues. There's no mention of visual cues, is    02:01
11 there, in Dr. Hauser's description.
12    A.    There is not.
13    Q.    And there's no mention of visual cues to
14 -- that communicate a direction of movement of the
15 unlock image required to unlock the device, is    02:02
16 there.
17    A.    There is not. But I think it would be
18 hard for respondents to the survey to be unaware of
19 an instantiation of slide to unlock. So this
20 description I would understand to be extremely    02:02
21 likely to cause the respondents to think of a
22 particular embodiment of this invention that
23 includes all of the features of claim 8 of the '721
24 patent.
25    Q.    If a survey is trying to assess whether    02:02

Highly Confidential Attorneys Eyes Only

Page 174

1  a particular function is important to a user, is it
2  fair to assume that the users will think of
3  particular embodiments in their assessment of the
4  survey question?
5     A.   By "users" you mean survey respondents?   02:03
6     Q.   Survey respondents.
7     A.   Can you repeat the question, please.
8     Q.   Yes. If a survey is trying to assess
9  whether a particular functionality is important, is
10 it fair to assume that a survey respondent is going   02:03
11 to think of particular embodiments that they're
12 aware of absent the survey question in forming the
13 survey question?
14    A.   This is highly contextual -- the answer
15 is necessarily contextual. If there is a particular   02:03
16 instantiation that is very strongly suggested --
17 particularly well known instantiation that is very
18 strongly suggested by a survey question, I think it
19 is extremely likely, although I'm not an expert in
20 survey design, that the respondents would conjure up   02:03
21 that particular instantiation in contemplating the
22 merits of what's described in the survey question.
23    Q.   And the particular instantiation here is
24 the slide to unlock that Dr. Wigdor refers to -- I'm
25 sorry -- Dr. Greenberg refers to as the key guard   02:04

Page 175

1  functionality; right?
2     A.   I recall Dr. Greenberg referring to key
3  guard functionality. I was unaware that he used it
4  specifically to describe the Apple functionality,
5  but I will accept that he does.   02:04
6     Q.   I did not mean to imply that. I'm
7  sorry. My question was bad if that's what I
8  implied. Strike that.
9          With respect to the purpose of the
10 unlock that is described here, the particular   02:04
11 instantiation that you think the survey questions
12 have in mind would be the Slide to Unlock at the
13 screen that appears when functionality of the device
14 is not available; is that correct?
15         MR. LYON: Objection. Vague.   02:05
16 Incomplete hypothetical.
17    Q.   Well, let me rephrase it again.
18         What particular instantiation do you
19 think the user had in mind?
20    A.   I think the respondents, if that's what   02:05
21 you mean, had in mind the iPhone and the iPad.
22    Q.   Okay. And the Slide to Unlock on the
23 iPhone, what is the purpose of the Slide to Unlock
24 on the iPhone?
25    A.   It is to unlock the device.   02:05

Page 176

1     Q.   Now, you understand that the survey was
2  constructed in a way to suggest functionality on
3  Samsung devices?
4     A.   Correct.
5     Q.   Why do you believe that the survey   02:05
6  takers when being told that they were assessing
7  Samsung devices would assume the instantiation on
8  the iPhone?
9     A.   There were two components to this
10 question. The first is describing one   02:05
11 instantiation, and the second without this feature
12 is describing a second instantiation.
13    Q.   But in your opinion I believe you said
14 that you thought that the user -- that the survey
15 taker would think that the first description was   02:06
16 describing the iPhone.
17    A.   I believe it would. Actually, the
18 question did direct them to the tablet. So more
19 precisely they're likely to think of the Slide to
20 Unlock on an iPad.   02:06
21    Q.   But the question was formed in the
22 context of a Samsung tablet; correct?
23    A.   The question was formed by Dr. Hauser in
24 that -- in that context, yes.
25    Q.   Now, you noted that the question was   02:06

Page 177

1  formed in the context of the tablet. Dr. Hauser did
2  not ask the survey question with respect to phones,
3  did he?
4          MR. LYON: Objection. Lacks foundation.
5     A.   The text -- sorry. Can you repeat the   02:07
6  question?
7     Q.   You mentioned that the survey question
8  refers to tablets. Are you aware of Dr. Hauser
9  conducting any survey with respect to the Slide to
10 Unlock functionality where the question was directed   02:07
11 at phones?
12    A.   Specifically the words of this question
13 are directed at a tablet; however, I understand that
14 the Slide to Unlock functionality is consistent
15 across the iDevices, the iOS devices.   02:07
16         So I think it would be -- I think it's
17 reasonable to anticipate that the respondents would
18 be contemplating both in their response.
19    Q.   So you think that for purposes of a
20 survey that it is appropriate to describe   02:07
21 functionality on an tablet form factor and then
22 apply that to a phone form factor?
23    A.   That question again depends very
24 strongly on context. User interfaces will commonly
25 vary substantially between different sizes and form   02:08

Highly Confidential Attorneys Eyes Only

Page 178

1  factors of devices.  However, functionality such as
2  Slide to Unlock is well known and understood to be
3  consistent across devices.  That's possible in this
4  particular user interface context, because the
5  interfaces not displaying profuse amount of          02:08
6  functionality to the user at the time.
7         Therefore, the visual presentation can
8  be limited to just the one or few controls available
9  to the user.
10     Q.   Now, in your infringement opinions         02:08
11  concerning the '721 patent --
12     A.   Yes.
13     Q.   -- you opine that certain functionality
14  of some Samsung phones, such as Slide to Answer,
15  text messaging, and missed calls infringe the '721   02:08
16  patent; is that correct?
17     A.   Can you repeat the question, please.
18  Sorry.
19     Q.   In your infringement --
20     A.   Yes.                                         02:08
21     Q.   -- opinions concerning the '721 patent,
22  it is your opinion that certain functionalities such
23  as slide to answer, slide to view text messaging,
24  and also to see missed calls, that those
25  functionalities infringed the '721 patent.           02:09

Page 179

1     A.   That's correct.  Yes.
2     Q.   Does Dr. Hauser's survey speak to any of
3  those functionalities?
4     A.   Speak to?  Yes, I believe it does.  It's
5  a -- the question directs users to contemplating an   02:09
6  interaction where they can unlock the device in a --
7  by interacting with an image using a continuous
8  motion from a specific spot to another specific spot
9  on the screen.  So, yes, I believe it does.
10     Q.   To your survey taker who you believe        02:09
11  would have pictured the Apple instantiation of Slide
12  to Unlock, would the survey taker picturing the
13  Apple instantiation of Slide to Unlock understand
14  that Slide to Unlock meant also Slide to Answer the
15  phone?                                               02:10
16     A.   I don't think that would have been
17  foremost in their mind.  No.
18     Q.   And would that survey taker that in your
19  opinion would be thinking of the known Apple Slide
20  to Unlock functionality have understood that this    02:10
21  description of Slide to Unlock could also be
22  describing slide to view your text messages?
23     A.   Sorry -- well, it's very difficult to
24  broadly categorize what the users -- what different
25  respondents to this survey -- their experience with  02:10

Page 180

1  various devices, their understanding of their
2  behavior.  For instance, if a Samsung owner was
3  responding to the survey question, they want to
4  picture the interactions that they're most familiar
5  with.                                                 02:11
6         So if they're familiar with I believe
7  it's an Admire device that uses Slide to Answer, and
8  Slide to Unlock is a general unlocking mechanism,
9  then they're going to picture in their mind whatever
10  is most familiar to them.  And such a respondent    02:11
11  would understand Slide to Unlock as being capturing
12  both Slide to Answer and Slide to Unlock.
13     Q.   Do you think the survey taker would
14  understand the statement, "Without this feature you
15  would have to unlock your device using other        02:11
16  techniques to encompass the slide to answer, slide
17  to view missed text messages, and slide to see
18  missed call functionalities"?
19     A.   Again, it really depends on the prior
20  experience of the respondents.                      02:12
21     Q.   So the level of understanding of this
22  question by a respondent would depend on the
23  experience of the respondent?
24     A.   The general understanding of the
25  question would be readily interpreted by all        02:12

Page 181

1  respondents, I believe.  The specific instantiation,
2  the likelihood of them picturing this functionality
3  for the purpose of slide to answer, slide to respond
4  to e-mail message, text message, and so on, that
5  would depend on their prior experience.             02:12
6     Q.   Do each of Slide to Unlock, Slide to
7  Answer, and slide to view missed calls have the same
8  context?
9     A.   Do each --
10         MR. LYON:  Objection.  Vague.               02:12
11     Q.   Do they have the same context?
12         MR. LYON:  Objection.  Vague.
13     A.   Yes.  Sorry.  My answer is -- my answer
14  "yes" is not yes, I agree.  My answer "yes" is I
15  understand the question or I understand the question 02:13
16  is so broad that it's almost unanswerable.
17         Context here is tremendously overloaded.
18  I believe the question is substantially meaningless.
19     Q.   Do you think that slide to answer, slide
20  to view missed call functionality, and slide to     02:13
21  unlock are all of the same level of importance to
22  users of the device?
23     A.   This is a tremendously contextual
24  question again.  If you have an emergency call
25  coming in, it's enormously important that you are   02:13

Highly Confidential Attorneys Eyes Only

Page 182

1  able to unlock the device to answer that call
2  quickly.  So there can be tremendous value
3  associated with, say, slide to answer.
4       There can also be, you know, countless
5  times a day the requirement to slide to unlock the   02:14
6  device.  So the sum total of value of having that
7  easily available is substantial.  So equating the
8  value of these functions across broad types of uses
9  for broad user types is very difficult.
10     Q.   Have you ever personally designed a       02:14
11 survey for -- to assess the features of user
12 interface design?
13     A.   I have frequently used questionnaires,
14 tight and very short questionnaires to be
15 distributed to participants at the end of a formal  02:14
16 usability study.  Normally these will include at
17 least the NASA TLX, which is a task load index
18 developed by NASA.
19      So, yes, I do use questionnaire
20 questions at the end of rigorous -- my rigorous    02:15
21 studies, but broad dissemination of surveys of this
22 type I have little to no expertise.
23     Q.   You see that with respect to Slide to
24 Unlock Dr. Hauser -- Dr. Hauser's survey ends with
25 the sentence, "Without this feature you would have  02:15

Page 183

1  to unlock your device using other techniques, for
2  example by swiping the lock screen from any random
3  spot on the screen to any other random spot that was
4  far enough away which may make unintentional unlocks
5  for likely."                                        02:15
6       Do you see that?
7      A.   I do.
8      Q.   And do you think that is a fair
9  representation of the noninfringing alternatives to
10 the Slide to Unlock functionality?                 02:16
11     A.   It provides one example, and it is a --
12 it is representative of at least one of the examples
13 of the noninfringing alternatives proposed by
14 Samsung.
15     Q.   Have you seen any data as to whether the   02:16
16 use of all of the noninfringing alternatives -- any
17 -- strike that.
18      Is it your opinion that all of the
19 noninfringing alternatives to the '721 patent make
20 unintentional unlocks more likely?                 02:16
21     MR. LYON:  Objection.  Vague.
22     A.   Sorry, I would need to go through them
23 one by one.  Certainly some of them make
24 unintentional unlocks more likely.
25     Q.   Do you have any data as to how much more  02:16

Page 184

1  likely?
2      A.   Very little data, although I have seen
3  concerns expressed by Samsung's designers based on
4  reports from their users that there are problems
5  with unintentional unlocks.                        02:17
6      Q.   Do you have any understanding whether
7  those concerns were expressed at a time before the
8  distance of the Swype was increased?
9      MR. LYON:  Objection.  Vague.
10 Incomplete hypothetical.  Lacks foundation.        02:17
11     A.   Can you repeat the question, please.
12     Q.   Well, with respect to swiping -- swiping
13 to unlock from any point to any other nonspecified
14 point, would you agree with me that unintentional
15 unlocks become more likely if the distance of the  02:17
16 Swype is increased?  Pardon me.  I misspoke there.
17      Would you agree with me that
18 unintentional unlocks become less likely when the
19 distance of the Swype is increased?
20     A.   Again, that's a very difficult question   02:17
21 to answer.  For instance, the case where the user
22 inserts their hand into a pocket controlling
23 distance is going to make very little difference to
24 the probability of the accidental activation of the
25 touch screen because the magnitude of movement of  02:18

Page 185

1  the hand in the pocket is really substantial with
2  respect to the size of the display.
3       So certain forms of accidental contacts
4  would be reduced by increasing the length of the
5  acquired gesture.  Other forms of accidental       02:18
6  contacts will not.
7      Q.   So with respect to Dr. Hauser's survey
8  question that stated that without the feature it may
9  make unintentional unlocks more likely, do you think
10 that would be relevant to the survey taker how much  02:18
11 more likely the unintentional unlocks might be?
12     A.   I think this returns to the issue of my
13 understanding of survey design is that it's critical
14 that you encapsulate the key components of the issue
15 or concern that you're wanting your respondents to  02:19
16 respond to.
17      There are trade offs between becoming --
18 between increasing the amount of specificity in your
19 survey question and the likelihood that your
20 respondents may fail to understand the nuances of  02:19
21 the description that you're providing in your survey
22 question.
23     Q.   If unintentional unlocks are more likely
24 from the noninfringing alternatives, but if they are
25 only more likely 1 percent of the time, would that  02:19

47

Page 258

1  entry on mobile devices. The exact combination
2  critically influences the user's efficiency and the
3  resultant effectiveness of the user interface. So
4  the prior art demonstrates the complexity of
5  assembling previously known elements into a complete   04:16
6  user interface.
7      Q.  So it's your opinion that with respect
8  to the claims of the '172 patent it's the exact
9  combination of those precise design elements that
10 are critical to the efficiency of the design?   04:16
11         MR. LYON:  Objection. Vague. Compound.
12     A.  With respect to the '172 patent, the
13 combination of elements of various claims of the
14 '172 patent do influence the user's effectiveness
15 and efficiency in text entry.   04:17
16         MR. LYON:  Good time for a break?
17         MS. FERNANDS:  Sure.
18         THE VIDEOGRAPHER:  Off the record. The
19 time is 4:17.
20         (A discussion was held off the record.)   04:17
21         (Proceedings adjourned.)
22
23
24
25

Page 259

1            CERTIFICATE
2
3  STATE OF CALIFORNIA    )
4                         )SS.:
5  COUNTY OF LOS ANGELES  )
6
7      I, CHRISTY A. CANNARIATO, a Certified
8  Shorthand Reporter within and for the State
9  of California, do hereby certify:
10     That Andrew Cockburn, Ph.D., the
11 witness whose deposition is hereinbefore
12 set forth, was duly sworn by me and that
13 such deposition is a true record of the
14 testimony given by such witness.
15     I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage; and that I am
18 in no way interested in the outcome of this
19 matter.
20     IN WITNESS WHEREOF, I have hereunto
21 set my hand this 27th day of September,
22 2013.
23
24     _____
25     CHRISTY A. CANNARIATO, CSR #7954

Page 260

1        ERRATA SHEET FOR THE TRANSCRIPT OF:
2
3  CASE NAME: Apple v. Samsung (Case No: 12-CV-00630-LHK)
4  DEP. DATE: September 26, 2013
5  DEPONENT: Andrew Cockburn, Ph.D.
6
7  Pg. Ln.  Now Reads    Should Read  Reason
8  __ ___  _____  _____  _____
9  __ ___  _____  _____  _____
10 __ ___  _____  _____  _____
11 __ ___  _____  _____  _____
12 __ ___  _____  _____  _____
13 __ ___  _____  _____  _____
14 __ ___  _____  _____  _____
15 __ ___  _____  _____  _____
16 __ ___  _____  _____  _____
17 __ ___  _____  _____  _____
18 __ ___  _____  _____  _____
19 __ ___  _____  _____  _____
20 __ ___  _____  _____  _____
21 __ ___  _____  _____  _____
22 __ ___  _____  _____  _____
23 __ ___  _____  _____  _____
24 __ ___  _____  _____  _____
25

Page 261

1         ERRATA (Cont'd)
2  Pg. Ln.  Now Reads    Should Read  Reason
3  __ ___  _____  _____  _____
4  __ ___  _____  _____  _____
5  __ ___  _____  _____  _____
6  __ ___  _____  _____  _____
7  __ ___  _____  _____  _____
8  __ ___  _____  _____  _____
9  __ ___  _____  _____  _____
10 __ ___  _____  _____  _____
11 __ ___  _____  _____  _____
12 __ ___  _____  _____  _____
13 __ ___  _____  _____  _____
14 __ ___  _____  _____  _____
15 __ ___  _____  _____  _____
16 __ ___  _____  _____  _____
17 __ ___  _____  _____  _____
18 __ ___  _____  _____  _____
19 __ ___  _____  _____  _____
20 __ ___  _____  _____  _____
21 __ ___  _____  _____  _____
22 __ ___  _____  _____  _____
23
24     _____
25     Signature of Deponent