# EXHIBIT A-9

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| _____ )<br>                                    )<br>APPLE INC.                          )<br>                                    )<br>Plaintiff,                          )<br>                                    )<br>vs.                                 )<br>                                    )<br>SAMSUNG ELECTRONICS CO., LTD.,      )<br>SAMSUNG ELECTRONICS AMERICA,        )<br>INC., SAMSUNG                       )<br>TELECOMMUNICATIONS AMERICA,         )<br>LLC                                 )<br>                                    )<br>Defendants.                         )<br>                                    )<br>_____ )  | CASE NO.12-cv-00630-LHK |

# OPENING EXPERT REPORT OF
# CHRISTOPHER A. VELLTURO, PH.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████

████████████████████████████████

265.    I understand that if Samsung contends that in the "but for" world it would have introduced non-infringing substitutes that were not on the market in the real world, then it is Samsung's burden to provide evidence as to the availability and acceptability of the theoretical, non-infringing alternatives that it contends would have allowed Samsung to retain its real world infringing sales.  I have reviewed Samsung's interrogatory responses in this case, and I have not seen any evidence that Samsung's theoretical non-infringing alternatives would have been available to Samsung at the time of infringement, or that they would have been acceptable substitutes for the Accused Products.

266.    I have nonetheless made an effort to investigate all of Samsung's proposed non-infringing alternatives myself.  After I reviewed Samsung's interrogatory responses, I conducted interviews with Apple's technical experts Professor Andrew Cockburn, Dr. Todd Mowry, and Professor Alex C. Snoeren.  Apple's experts explained that each of Samsung's proposed alternatives that are actually non-infringing were unavailable at the time of infringement, have significant drawbacks over the accused technology, or both.  Apple's technical experts explained that in many cases, these alternatives would decrease a device's ease of use, which, as I discussed above, is central to consumer demand and commercial success.  My specific understandings as to the nature of each of Samsung's proposed non-infringing alternatives, based on these conversations with Apple's technical experts, are described in **Exhibit 11**.

### c.  **Samsung's Conduct with Respect to Its Alleged Non-Infringing Alternatives**

267.    Samsung's conduct with respect to certain of its proposed non-infringing alternatives is instructive as to their degrees of availability and acceptability ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ Where Samsung

has implemented a proposed alternative, I have considered the facts and circumstances

───────────────────────

██ ██████████████████████████████████████████

purported alternatives implemented by Samsung where it has done so in at least one product, or posited by Samsung in interrogatory responses where it has not.[503]

281.    It was not, of course, possible for Dr. Hauser to test in his surveys all of the 50-odd different "alternatives" that Samsung has posited.  Given that, to my knowledge, Samsung has never contended that any one of their alleged "alternatives" was more acceptable than another, it is my opinion that Dr. Hauser's approach was both reasonable and provides a valuable metric for assessing the impact of non-infringing alternatives.

282.    Dr. Hauser's research allows me to estimate the percentage reduction in the share of customers who would purchase a product with the Patented Features but would not purchase a comparably equipped product with non-infringing alternatives in place of each of the Accused Features or any combination of Accused Features.  In this report, I refer to these reductions in share as changes in consumers' "Willingness to Buy" a product based on the presence or absence of the relevant features.[504]  Essentially, the survey results allow me to measure the contraction in demand (graphically, a leftward shift of the demand curve) for a product associated with removing one or more Accused Features and placing in its stead the posited non-infringing alternative.

283.    The survey results allow me to estimate changes in Willingness to Buy over a wide range of prices ($49 to $299) paid by consumers for their smartphones upon commencing (or renewing) cellular service contracts.  The result further allows me to evaluate the difference in the Willingness to Buy effect for smartphone and tablet screen sizes.[505]  The fact that the surveys cover ranges of price and screen size and the fact that separate surveys were performed for smartphones and tablets substantially enrich my analysis, as the data show that effects of

---

[503] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, May 2, 2013, pp. 105-131, Objections and Response to Interrogatory No. 29.

[504] As is typical in surveys performed for conjoint analysis, a variety of product features were studied in addition to the Accused Features.

[505] For convenience, I refer to the prices consumers pay upon commencing a contract for a new smartphone and the prices they pay upon purchasing tablets as the "retail prices" of these devices.

Accused Features on Willingness to Buy vary depending on the price of the device and its screen size and on whether the device is a smartphone or a tablet.[506]

284.    Dr. Hauser's research demonstrates that there are significant numbers of Samsung customers who do not find the posited non-infringing alternatives acceptable.[507]  The following illustrative Table 2, based on the responses to Dr. Hauser's survey, reports the estimated average percentages of Samsung customers who would not have purchased Samsung's accused smartphones and tablets if the Accused Features were replaced with non-infringing alternatives, assuming the smartphones and tablets had screen sizes of 4.8 inches and 10.1 inches, and prices of $149 and $499, respectively.

| Table 2 | | |
|---|---|---|
| **Willingness to Buy Accused Features** | | |
| **Estimated Average Reductions in Purchases of Accused Products with Non-Infringing Alternatives in Place of Accused Features[508]** | | |
| **Patent** | **Smartphones** (Retail price: $149; Screen Size: 4.8") | **Tablets** (Retail price: $499; Screen Size: 10.1") |
| '414 | 9% | 14% |
| '647 | 8% | 12% |
| '959 | 5% | 6% |
| '760 | 11% | Not Applicable |
| '721 | 9% | 6% |
| '172 | 16% | 15% |

[506] The "slide-to-unlock" Accused Feature associated with the '721 Patent was studied only in the tablet survey.  (Conversation with Dr. John R. Hauser.)  For this patent only, I therefore apply survey results from the tablet survey to smartphones.

[507] Dr. Hauser's research also demonstrates that the patented inventions play a material role in demand for the Samsung smartphones.

[508] Expert Report of John R. Hauser, Aug. 11, 2013, Exhs. N1, N2.  The result shown for the '721 Patent in smartphones is estimated from the results of the survey Dr. Hauser performed regarding tablets. See **Exhibit 13**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

285.     The survey results also show that the cumulative impact on Willingness to Buy of replacing combinations of Accused Features, e.g., the Accused Features covered by the '414, '647, and '959 Patents collectively, with non-infringing alternatives exceeds the sum of the effects of replacing these Accused Features individually.  This is an economically sensible result, as the competitive positioning of, say, a phone that purports to be a high-end smartphone may be only modestly affected if it lacks one or two expected features but substantially affected if it lacks multiple expected features.  Because the survey provides actual data showing the impact of removing more than one feature, I use that data, rather than simply adding the individual values, when determining lost profits damages for products that infringe more than one patent.

286.     Table 3 illustrates –for smartphones and tablets with screen sizes of 4.8 inches and 10.1 inches, and prices of $149 and $499, respectively, as in Table 2 – the fact that the effect on demand of removing combinations of Accused Features exceeds the sum of the effects of removing features individually.

| Table 3 | | |
|---|---|---|
| **Willingness to Buy Accused Features ("WtB")** | | |
| **Estimated Average Reductions in Purchases of Accused Products with Non-Infringing Alternatives in Place of Accused Features[509]** | | |
| **Patents** | **Smartphones** (Retail price: $149; Screen Size: 4.8") | **Tablets** (Retail price: $499; Screen Size: 10.1") |
| **'414, '647, '959** | | |
| '414 | 9% | 14% |
| '647 | 8% | 12% |
| '959 | 5% | 6% |
| Sum of Individual Reductions in WtB | 22% | 32% |
| Combined Effect | 25% | 34% |

---

[509] Expert Report of John R. Hauser, Aug. 11, 2013, Exh. N1 at 1-3, Exh. N2 at 1-3, Exh.O1 at 7, and Exh. O2 at 7.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

287.    The impact of the absence of acceptable non-infringing substitutes for the patented inventions among a significant portion of Samsung customers is understated by Dr. Hauser's survey because the survey does not consider the time required to implement the non-infringing alternatives.  Thus the survey does not account for the fact that, as detailed in Section III.B.4.a below, a quantifiable minimum amount of time ("design-around period") would be required to implement a non-infringing alternative to each Accused Feature.  During these design-around periods, Samsung could not have sold its Accused Products without infringing one or more Asserted Patents and would thus have had to remove the feature immediately or stop selling the Accused Products.

288.    As I explain under *Panduit* Factor 4 in Section III.B.4.b below, with these data and industry data on the shares of smartphones sold by different manufacturers I am able to quantify reliably a conservatively low estimate of Apple's lost profits, consistent with a "market share apportionment" approach for determining lost profits damages in a market in which both non-infringing and infringing products compete with those of the patentee.[510]

### e.  Conclusion

289.    The analysis provided above indicates that Samsung's proposed non-infringing alternatives were not acceptable to at least a significant subset of Samsung customers with respect to each of Apple's Asserted Patents. Thus, *Panduit* Factor 2 is established with respect to each Asserted Patent.

290.    For all patents with the exception of the '647 patent, I compute lost profits based on the amount of time that Samsung would be off the market in order to remove the patented feature or implement a design change. Any effort by Samsung to do so would necessarily take some time.  Samsung's ▮▮▮▮▮▮ own history in attempting to design around Apple's patents, discussed above in Section III.B.2.c, indicates that a design alteration in response to a patent infringement claim requires time to: 1) conceive of a design change after obtaining notice of a patent, 2) time to implement the design change, 3) time to introduce the change throughout

---

[510] *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1577, 12 U.S.P.Q.2d 1026, 1028 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990).

customers in the "but for" world, and are thus candidates for a lost profits consideration.  I also account for and assess lost profits for Samsung customers during the period in which Samsung would be off the market to remove the infringing feature, as described below.

294.    For the '172, '721, and '760 Patents, I assess lost profits damages for the period when Samsung would be entirely off the market during the time required to implement a design change, as described above, but I do not otherwise assess lost profits on a portion of sales after that period ends ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████        In this context, with respect to all of the patents with the exception of the '647,[513] there remains the question as to what period (immediately after the date Samsung was put on notice of its infringement but prior to the implementation of the (inferior) claimed non-infringing design) Samsung would be unable to sell any accused product, since no alternative would have yet been available.  I discuss my treatment of this question below.

295.    All damages for units sold outside the blackout period for these patents are assessed using a reasonable royalty approach.

### 3. *Panduit* Factor 3: Manufacturing/Marketing Capability to Exploit Demand

296.    Establishing this *Panduit* Factor requires a determination that Apple had sufficient manufacturing and marketing capacity to make the sales it lost to Samsung's Accused Products. Note that this analysis naturally relates to an evaluation of the "but for" world— that is, "but for" Samsung's infringement, would Apple (facing the demand from carriers and consumers inherent in the "but for" world) have been able to plan for and accommodate the additional demand it would have faced, given such additional demand would have been anticipated to exist absent Samsung's conduct.  Fundamentally, this assessment evaluates whether any inherent barrier to

---

[513] I do not include the '647 in this analysis because Samsung had notice of that patent before infringement began.  Consequently the starting point of any "off the market" period would predate the damages period in this case.

capacity expansion would have existed that would have left Apple unable to meet additional demand, even if such additional demand were anticipated well in advance.[514]

297.    To evaluate this question, I have studied a capacity analysis conducted by Apple that is set forth in reports[515] that were marked as exhibits and discussed at the depositions of Mr. Mark Buckley, Apple's Finance Analyst, and Mr. Rory Sexton, Apple's Vice-President of Supply and Demand Management,[516] and have discussed Apple's capacity during the damages period with Mr. Sexton.[517]

298 

---

[514] Of course, should the ability to meet this additional demand have required additional expenditures (on, say additional plant or equipment) beyond those historically disbursed by Apple, such expenditures would be reflected in the incremental costs deducted from lost revenues to asses lost profits.

[515] "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 3, APLNDC630-Y00003612; "iPhone Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 4, APLNDC630-Y00003613; "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 5, APLNDC630-0001120880; "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 6, APLNDC630-0001120881.

[516] "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 3, APLNDC630-Y00003612; "iPhone Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 4, APLNDC630-Y00003613; "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 5, APLNDC630-0001120880; "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 6, APLNDC630-0001120881; "iPhone Supply and Sales," 2010-2012, Deposition of Mark Buckley, Jul. 9, 2013, Exh. 20, APLNDC630-Y00003613.  Conversation with Rory Sexton.

[517] Conversation with Rory Sexton.

[518] APLNDC630-Y00003612; APLNDC630-Y00003613; APLNDC630-0001120880; APLNDC630-0001120881.  As Mr. Sexton explained during his deposition, ▮▮▮▮▮▮▮▮ Deposition of Rory Sexton, June 28, 2013, at 133:19-23.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

four months.  Should Samsung prove a different duration of these blackout periods, my analyses can be adjusted accordingly.[526]

308.   During the blackout period, *all* of Samsung's accused sales become candidates for lost profits, and Samsung has no acceptable alternative forms of its accused products to provide to any of its customers for those products.[527]  Note that this period applies in the event *any* patent is found valid and infringed and a blackout period is assumed—this includes the patents that were actually designed around by Samsung ███████████████████████████████████████
███████████████████████████████████

309.   There is one exception to the modeling provisions put forward here with respect to the '647 patent.  I do not seek off the market lost-profits for that patent because I understand that Samsung had prior notice of infringement of that patent (with respect to earlier infringing products that are not at issue in this case) on August 4, 2010, more than nine months before the first Accused Product was introduced.

310.   In sum, the Samsung accused sales that are candidates for Apple lost profits consist of the following:

- During a "blackout period" (presently assessed as being either one or four months from the infringement notice date in different scenarios), Samsung is unable to produce and sell any accused devices, and thus all of its accused unit sales are candidates for Apple lost profits;[528] and

- For the period subsequent to any blackout period, Samsung accused sales that are candidates for lost profits reflect the demand diminution associated with each claimed alternative as reflected in Dr. Hauser's conjoint studies. ███
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

[526] ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████

[527] Note that my model allows Samsung to still retain some of these customers through its non-accused devices, as specified in the market share allocation methodology detailed below.

[528] Again, this blackout date applies only once, and is not repeatedly considered as multiple patents are found valid and infringed.  Also, this consideration is suspended for the '647 patent, which has an earlier date at which the "but for" world commences.

### (3) Diminution in Samsung Sales of Accused Products With Non-Infringing Designs Implemented

311.    To determine the diminished sales at Samsung in the "but for" world that are candidates for lost profits at Apple during periods where the claimed alternatives would have been implemented and commercialized by Samsung, I utilize results of the survey and conjoint analysis conducted by Dr. Hauser.[529]  As mentioned in my discussion of *Panduit* Factor 2 above, Dr. Hauser's survey and conjoint analysis allow me to estimate demand curves for the Accused Products with the Accused Features and with non-infringing alternatives in their stead and effectively observe the shifts in those demand curves associated with replacing an Accused Feature with a non-infringing alternative (*i.e.*, the decreases  in Willingness to Buy Samsung's Accused Products) at any given price level, among those who have historically been Samsung smartphone and tablet owners.  This allows me to estimate the diminished unit sales Samsung would have faced by replacing Accused Features with non-infringing alternatives for each Asserted Paten █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████

312.    In my opinion, the appropriate measure of Samsung's loss of unit sales from replacing Accused Features with non-infringing alternatives is the distance of the leftward shift in the demand curve for each Accused Product derived from the conjoint analysis, holding the price at which it was sold to consumers fixed at its actual historical level.[530]  This is because prices to consumers of devices such as smartphones and tablets are typically set at "focal" price



[530] Strictly speaking, this statement refers to the inverse demand curve, in which quantity is represented as the independent variable and price as the dependent variable.  This corresponds to the standard textbook graphical depiction of a demand curve, which makes it convenient to describe demand curves in this manner.  In reality, suppliers of differentiated products such as smartphones and tablets consider prices and quantities jointly, along with promotional efforts, in seeking to maximize profits.

levels (such as $199 or $299).[531]  Within the range of possible price changes relevant to my analysis, suppliers of these devices would expect to generate too small an increase in unit sales by reducing their prices from these focal levels to offset the loss of revenue per unit and would, thus, leave prices unchanged.[532]

313.    In assessing the impact on Willingness to Buy of removing <u>more</u> than one Accused Feature, I also adjust for the overlap in demand reductions associated with the absence of each individual feature (or reduction in the quality of the feature).  For example, if replacing a feature covered by one Asserted Patent with a non-infringing alternative at a given price level would reduce the share of Samsung customers who would purchase that product by 5% and replacing a feature covered by a second Asserted Patent with its non-infringing alternative would reduce the share who would purchase it by 3%, and the demand for each feature is not dependent on the presence of any other feature (that is, demand for the two features are independent), then replacing both Accused Features would reduce the share who would purchase it by 7.85% in total.[533]

---

[531] ███████████████████████████████

[532] Recognizing that the Accused Products were not as attractive without the Accused Features, Samsung might well seek to mitigate their losses by enhancing these products in other ways.  However, such enhancements would be costly and their effect on demand is entirely speculative; since there is no basis for expecting that they would materially reduce Samsung's losses, I do not attempt to estimate their impact.

[533] 100% - 5% = 95%; 100% - 3% = 97%; 95% X 97% = 92.15%; 100% - 92.15% = 7.85%. Note that, in this calculation, because the reduction in share of those who would purchase an Accused Product that is attributable to removal of any Accused Feature is expressed as a percentage, the absolute incremental reduction in units purchased due to removal of any Accused Feature will depend on the initial number of units used in the calculation.  As a result, the incremental reduction in units purchased associated with removal of any individual Accused Feature depends on the order in which Accused Features were removed.  Thus, when considering the impact of simultaneous removal of multiple Accused Features, only the total impact of removing the Accused Features is economically meaningful.  It is appropriate to calculate the incremental reduction in units purchased associated with removal of any individual Accused Feature only for the purpose of studying the impact of removing that Accused Feature, given a starting point in which Accused Products are assumed to embody a specific set of Accused Features.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

314.    Here too, I implement a conservative adjustment that simplifies the assessment of damages associated with different combinations of Accused Features:  I calculate the combined impact on Willingness to Buy of removing or replacing all the Accused Features in the manner just described (which adjusts for overlap) and attribute to each Asserted Patent a share of the combined impact on Willingness to Buy equal to its share of the sum of the individual impact on Willingness to Buy of each Asserted Patent.  This adjustment, which I refer to as a "linearization" of the weights given to each Asserted Patent, implies that the estimate of the effect on Willingness to Buy of the Accused Feature associated with any individual Asserted Patent that I use in my damages analysis will be less than it actually would have been unless all the Asserted Patents are found to be valid and infringed.[534]

315.    Because of the patent-specific and additive nature of the results derived from the conjoint analysis, I am able to adjust my calculation of the diminished unit sales had Samsung not infringed the Asserted Patents and implemented alternative designs, to reflect the fact that the Asserted Patents being infringed by Accused Products vary over time (because the notice date of the '647 Patent is earlier than that of the other Asserted Patents and because, at certain points during the damages period, Samsung has removed Accused Features from some of its Accused Products or introduced new products that do not embody the Accused Features).  (See **Exhibit 7**.)  For the same reasons, the results of the conjoint analysis can be used to recalculate damages as needed to address any outcome at trial regarding which Asserted Patents the Accused Products are found to have infringed.

316.    The results of Dr. Hauser's surveys provide an additional important data point that indicates that the demand-diminishing impact of removing the patented features associated with the '414, '647, and '959 patents and replacing them with the proposed design-arounds *collectively* is greater than the arithmetic sum of the effects of removing the three patents taken individually.  This result is unsurprising, as consumers who might be willing to live with the absence of one or two features are unwilling to purchase devices where several layers of functionality have been compromised.  I include this additional lost profits permutation in the calculations in the damages analyses of this Section.

---

[534] As discussed below, **Exhibits 13** and **14** provide the results of the linearization calculation. **Exhibits 13-A** and **14-A** provide the corresponding strict results.

Willingness to Buy vary with the price and screen size of the device in question.  In the next step of my damages analyses, I estimate the portion of the reductions in Samsung's sales reported in **Exhibit 10** that would have been made by Apple during the damages period.

### b.   Computation of Apple's Lost Sales

318.    In the previous Section, I estimated the sales of Accused Products that Samsung would not have made had it not infringed the Asserted Patents.  Adopting the language of the previous Sections, for convenience, I refer to these as Samsung's "diminished" sales but for infringement, or as "candidates" for lost profits.

319.    In this Section, I explain my method for estimating the share of Samsung's diminished sales that Apple would have made, which provides the unit sales that constitute lost sales at Apple caused by Samsung's infringement.  My method is known as an adjusted market-share based allocation (or "*Mor-Flo*" analysis, as it is based on the widely used method accepted by the Federal Circuit in *State Industries, Inc. v. Mor-Flo Industries, Inc.* ("*Mor-Flo*")).[536] Under this approach, diminished sales of the infringer in the "but for" world are removed from the market and apportioned among competing products in proportion to their relative market shares.  Of course, no sales are permitted to return to the accused Samsung devices, as customers by definition find such products unacceptable at prevailing prices.  In the present analysis, I apportion Samsung's foregone sales but for infringement among the remaining products in the market in proportion to their relative market shares as shown in **Exhibit 15**.[537]

320.    A central decision in implementing a "market" share allocation is, of course, which products to include in the "market" where, as here, there are significant points of differentiation among the products.  In my analysis, I have included all competing brands of smartphones and tablets.  This is a highly conservative assumption, for two reasons:

---

[536] *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1577 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990).

[537] I also perform a Mor-Flo analysis for tablets in **Exhibit 15-A**.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

- First, many of the products I am treating as alternatives that Samsung's customers could have purchased instead of the Accused Products employ the Android platform, and likely infringe Apple's patents.  With respect to the '414, '647, and '959 Patents, including all other Android suppliers' devices in the *Mor-Flo* analysis is especially conservative because the features covered by these patents are, as mentioned, embodied in the Android operating system and are thus common to Android suppliers' devices unless these suppliers specifically modify them, which, to my knowledge, has not occurred.[538]

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ee **Exhibit 7**.)  My allocation of accused sales to all other smartphone and tablet market participants thus accounts in a conservative manner for major consumer demand factors such as price and consumers' preferences for carriers, operating systems, brands, and other features of competing products.

321.    As mentioned, the parties are each required under a Court Order to reduce to 10 the number of products they are accusing before trial, and I will remove Accused Products from my damages calculations accordingly.  However, I understand that, in my assessment of damages based on what would have occurred "but for" infringement, Samsung Accused Products that are dropped before trial are not to be treated as being available to consumers for purchase instead of the Accused Products that remain in this case.  Accordingly, Samsung Accused Products that are dropped before trial are not included in my *Mor-Flo* analysis.[539]

---

[538] Conversation with Professor Alex C. Snoeren; Conversation with Dr. Todd C. Mowry.

[539] I have made one additional conservative assumption in my analysis. For the overwhelming majority of the damages period in this action, Samsung and Apple devices were available through each of the significant wireless providers in the U.S. – AT&T, Verizon, and Sprint. iPhone availability at Sprint began with the iPhone 4S in October, 2011 (http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html). iPhone availability at smaller participants (e.g. Virgin Mobile) began in 2012, and in April 2013 at T-Mobile (http://www.macworld.com/article/2032069/iphone-arrives-at-t-mobile-on-april-12.html).  As a conservative approach, I limit the share of units of Accused Products sold while iPhones were not offered by Sprint, T-Mobile, Metro PCS, and Boost that are subject to *Mor-Flo* allocation for lost profits consideration to 32%, based on market research which finds that 32% of smartphone buyers "select a phone first, then a carrier."  "Google Wireless Shopper Study," Apr. 2013, APLNDC630-0001504504, at -511. I assess no lost profits to Apple for Samsung sales to these carriers during the period when the iPhone is not available.  See **Exhibit 14-C**.

spanning Q3 2011 – Q2 2012.  I refer to this period as the baseline period for the reasonable royalty hypothetical negotiation.[664]

394.    With these understandings in place, I execute the following sequence of steps to evaluate Samsung's maximum willingness to pay (and a corresponding set for Apple's minimum willingness to accept in the next Section).  I list them briefly here and then provide details below.

1.  I estimate the percentage by which Apple and Samsung would have expected Samsung's unit sales of the Accused Products to decline if Samsung lacked a license to implement the Patented Inventions in the Accused Features;

2.  I make estimates of the time period the parties would have expected Samsung to need to come up with an acceptable design-around of the Asserted Patent in question, expressed as a share of the economic life of the Accused Products.  Those estimates benefit Samsung because they are based on the time it took Samsung, in the real world, to implement unacceptable (to many) and inferior design-arounds, as discussed above.  I then multiply the expected percentage decline of Samsung's sales during the design-around period by the share of the economic life of the Accused Products that the parties would have expected Samsung to require.  This generates the share of Samsung's total sales on which it would owe royalties under the license that are sales Samsung would not have expected to make if it did not obtain the license;

3.  I estimate Samsung's expected incremental profit per unit on its accused smartphones and tablets.[665] I then multiply the share of Samsung's total infringing unit sales represented by the units that Samsung would not have expected to make if it did not obtain a license by Samsung's expected incremental profit per unit for smartphones; the result of this calculation is Samsung's expected gain—expressed as dollars per unit of Accused Products—that would result from Samsung obtaining a license from Apple;

---

[664] The use, where contemporaneous information is inadequate, of relevant information that post-dates the hypothetical negotiation in assessing a reasonable royalty is well-established and is known as a "book of wisdom" approach (see, for example, *Lucent Technologies, Inc. v. Gateway, Inc*., 580 F.3d 1301, 1333-34 (Fed. Cir. 2009)).

[665] Consistent with standard licensing practice, I avoid undue complexity by studying the average incremental profitability of Samsung's smartphones and tablets, respectively, as two classes of products.  I do not seek to develop separate royalty rates for each Accused Product.

4.   I consider and estimate (as a percentage of the expected gain to Samsung just described) a lower bound on an additional consideration which reflects "ecosystem effects," *i.e.*, the value of incremental subsequent sales that Samsung would have expected to make as a result of its incremental initial sales that it expected to make under the posited hypothetical license;

5.   The additional profits associated with these ecosystem effects are then added on to Samsung's willingness to pay.  This is the maximum Samsung would have been willing to pay, expressed as a royalty rate.[666]

### (1) Step 1: Samsung's Contraction in Sales Absent a License

395.    As to the first step, my estimate of the percentage by which Apple and Samsung would have expected Samsung's unit sales of the Accused Products to decline if they lacked the access to the Patented Inventions for the Accused Features is based on results of Dr. Hauser's survey and conjoint analysis discussed above.  In the context of the hypothetical negotiation, I assume that Apple and Samsung would have applied an estimate for a "representative" product, rather than undertaking the laborious task of pinning down likely effects on various product lines Samsung was considering for commercial releases at that time.  In this context, the smartphone I have identified for this purpose is the Galaxy S II Epic 4G Touch, which has an intermediate screen size and typical retail price ███████████████████████████████ ████████████████████████████████████████ and which Apple accuses of infringing all the Asserted Patents.  As shown in **Exhibit 13**, the estimated percentages by which Samsung's sales would have declined absent access to the Asserted Patents for use in the Accused Features for this representative product are:

- 7.39% for the '414 Patent;
- 6.14% for the '647 Patent;
- 3.99% for the '959 Patent;
- 8.98% for the '760 Patent;
- 7.11% for the '721 Patent; and
- 12.56% for the '172 Patent.[667]

[666] The phrase "maximum willingness to pay," although often used by economists is actually a misnomer in the context of this case, as discussed below in paragraph 431.

[667] See **Exhibit 13**.

**(1) Step A-4: Effect of Samsung Licensed Device Sales on Apple Device Sales**

419.    The first Apple-specific task in assessing Apple's minimum acceptable royalty is to determine Apple's expectations as to its forgone sales and profits as a result of the additional sales that it expects Samsung to make under the license.  My estimate of the share of any sales of the Accused Products that Apple would have expected to make if it did not license Samsung is based on a share apportionment consideration based on share expectations as they would have been evaluated in mid-2011.[683]

**(2) Step A-5: Incremental Profit Per Unit on Apple Forgone Sales**

420.    Having identified the expected unit sales Apple would forgo by granting Samsung a license to the Asserted Patents, I next turn to estimating the incremental profit that Apple would have expected to lose on those forgone sales.  I am not aware of financial projections produced by Apple that contain estimates of the incremental profit per unit that Apple expected for iPhones and iPads or the total number of units of each Accused Product that Apple expected Samsung to sell during the damages period.  Therefore, I base my calculations as to Apple's incremental profits on actual historical data that I find to be in line with what the parties might reasonably have expected at the time of the hypothetical negotiation.[684]

---

[683] This differs markedly from the lost profits assessment above, where actual share data are used for apportionment.

[684] Consistent with my treatment of the parties' expectations thus far, I use the one-year period following the hypothetical negotiation.  When contemporaneous information is inadequate, the use of relevant information that post-dates the hypothetical negotiation in assessing a reasonable royalty is well-established and is known as a "book of wisdom" approach (see, for example, *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (Fed. Cir. 2009)).

### (3) Step A-6: Partial Valuation of Apple's Expected Losses Due to Ecosystem Effects

421.    My method of valuing Apple's expected losses due to ecosystem effects is the same as that for valuing the ecosystem effects of Samsung's expected gains of replacement units, which I discussed in detail above, with some different parameters to account for differences between customers' stickiness to Apple relative to Samsung.

422.    Detailed in **Exhibit 28**, my analysis proceeds in a manner similar to that described for Samsung in the previous Section.  Since not all iPhone owners will purchase another iPhone as their replacement device, ████████████████████████████████████████

423.    As with **Exhibit 25**, in the calculations in **Exhibit 28**, I take into account the inherent uncertainty of the smartphone/tablet business and the general discount such uncertainty implies as to the expected value of future sales by applying a discount factor over the expected economic life of the Accused Products and the subsequent period of two years over which I

---

685 ████████████████████████████████

evaluate ecosystem effects in the form of incremental replacement purchases.  For this purpose, I apply to Apple's expected changes in sales and profits (and expected base of sales upon which a royalty would be paid) an implicit discount rate of 12.75%,[686] which is derived from reported costs of capital estimated for large firms in the electronic computer industry as of mid-2011.[687]

424.    I perform steps (1) through (4) for smartphones in **Exhibit 27**.[688]  My valuation of ecosystem effects is highly conservative because it includes, for each iPhone on which Apple expects to forgo a sale as a result of its license to Samsung, only one lost replacement iPhone by the share of customers who would have made such a purchase.  Although there is other data, cited in Section III.C.2.a.(5),[689] showing that Apple's customers typically purchase a stream of Apple products and accessories to those products, determining the total number of those sales attributable to the initial lost sale of an iPhone to Samsung is exceedingly difficult.  Accordingly, my damages computations do not include any subsequent replacement purchases of smartphones or tablets (beyond the first smartphone replacement) or any of the other Apple devices, accessories, software, and content from the iTunes Store that Apple's customers typically purchase.[690]  The difficulty of estimating reliably the full amount of lost sales and profits from ecosystem effects was one of the main bases for my conclusion in my Original and Reply

---

[686] Weighted Average Cost of Capital for SIC 3571, Electronic Computers, MorningStar, as of June 30, 2011.

[687] Weighted Average Cost of Capital for SIC 3571, Electronic Computers, MorningStar, as of June 30, 2011.

[688] I provide a corresponding calculation for tablets in **Exhibit 27-A**.

[689] As explained above, I do not assume that every unit of Apple's lost sales would have led to a lost replacement sale.  Rather, I adjust for customers' "stickiness," i.e., their propensity to continue purchasing Apple products after they make an initial purchase of an Apple product.

[690] My exclusion of these related content and ecosystem sales should not be construed as an admission that Apple would not have considered these lost sales in considering an appropriate license fee.  Rather, the complexity of estimating such sales supports my previous opinion that Apple would suffer irreparable harm from Samsung's infringement due to demand complementarities between smartphones and related products.  Because of the demand complementarities between smartphones and related products, as well as the long-term effects associated with the loss of share in smartphones, there will be additional, incalculable harm to Apple in the form of both immediate and long-term reduced sales and profits with respect to related aspects of its business, including sales of digital media, applications and other devices/computers.

Declaration that Samsung's continued sale of the Galaxy Nexus would cause Apple irreparable harm.[691]

425.   An illustration of the harm to Apple that is not captured in my valuation of Apple's ecosystem effects is its lost sales of accessories generated by sales of smartphones and tablets.  Samsung strategic documents corroborate this relationship.  A Samsung strategy presentation states that "Smart Phones Drive Higher Accessory Purchases" and notes that Apple sold 50 million iPhones through the first quarter of 2010, which generated "~$7.5B in aftermarket accessories sales" in three years, *i.e.*, $150 per iPhone, and sold 450 thousand iPads in the first weekend following their release, which generated "~$54M in Accessory Sales,"[692] i.e., $120 per iPad.  Given potential timing differences between initial purchases of devices and subsequent purchases of accessories, I have not calculated Apple's total loss due to its inability to sell accessories to customers who purchased Samsung's Accused Products.  Calculations using Apple data, in which ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████  (See **Exhibits 29** and **29-A**.)

426.   Apple's willingness to grant a license to the Asserted Patents in this hypothetical context would not reflect the entire forgone expected revenue from such additional ecosystem-

---

[691] While Mr. Wagner expressed skepticism over the existence of convoyed sales or sales of other Apple products attributable to sales of iPhones and iPads (Wagner Declaration, ¶ 120) during the preliminary injunction phase of this matter, he expressed confidence that such sales could be quantified reliably.  In his declaration, Mr. Wagner stated: "an experienced damage expert can use studies that have been conducted about customer loyalty and churn to calculate how many of these customers will be repeat customers at both Samsung and Apple. Apple has demonstrated a propensity to gather the data that would be needed for these types of surveys, and it has the ability to retain survey experts to gather data that could be relied on if the data is not already in the record.  If Apple has lost any convoyed sales related to its lost sales, there will be evidence of the types of purchases Apple customers normally make, in what quantities, at what prices, and at what profit to Apple.  Apple has produced data on these types of convoyed sales …. [D]ata [already being gathered by Apple], as well as supplemental data that could be gathered from the types of surveys frequently conducted by Apple, could be used to calculate the lost profits on convoyed sales related to lost iPhone sales.  These are types of analyses that experienced damage experts perform all the time" (Wagner Declaration, ¶¶ 121-22); see also Deposition of Michael Wagner, Transcript, May 4, 2012, at 150-51.

[692] "2011 Smartphone Portfolio Strategy," May 2010, SAMNDCA00530591, at -612.

related sales, but only the incremental profit Apple anticipated from those sales.  Therefore, I multiply these additional ecosystem sales by Apple's expected incremental profit rate as derived above.

### (4) Step A-7: Conclusion on the Minimum Apple Would Have Been Willing to Accept

427.    My assessment of Apple's minimum acceptable royalty from Samsung for the rights to the Asserted Patents under a hypothetical negotiation in mid-2011 accounts for the incremental profits Apple would expect to forgo as a result of such a license.  Under this approach, Apple would compare these forgone profits to the royalties it would earn as a result of a per unit royalty assessed on all of Samsung's expected sales of accused products over the relevant lifetime.

428.    In Table 6, I provide the minimum per unit royalties that Apple would have been willing to accept, for each of the Asserted Patents, on Samsung's sales of smartphones and tablets.  These rates are averages calculated over the accused smartphones and tablets, respectively, to account for the fact that, as mentioned, the effects of Accused Features on Willingness to Buy varies with the retail prices and screen sizes of the Accused Products.  These averages allow me to avoid an undue degree of complexity in the royalty rate schedule, while accounting for the richness of the underlying data.

| Table 6<br>Minimum Royalties<br>Apple Would Have Been Willing to Accept<br>(Dollars Per Unit) | | |
|---|---|---|
| **Patent** | **Smartphones** | **Tablets** |
| '414 | ███████ | █████ |
| '647 | ███████ | █████ |
| '959 | ███████ | █████ |
| '760 | ███████ | -- |
| '721 | ███████ | -- |
| '172 | ███████ | -- |

the cross-license between Apple and Nokia, the license at issue in the hypothetical negotiation would be a one-way "naked" license of patents from Apple to Samsung.  Because the Apple-Nokia agreement involved the licensing of patents in both directions, the effective payment associated with any patent (or set of patents) flowing in a single direction cannot be directly observed or calculated.

437.    Moreover, Apple and Nokia entered into this agreement in June 2011—a time in which Nokia needed to "build from almost nothing to carve out success between the consistency of the iPhone and the flexibility of Android," as I discuss above in Section II.F.[700]  As such, Nokia was neither an actual nor a perceived future threat to Apple at the time of its cross-license with Apple.  The situation with Samsung was entirely different in 2011.  At that time, Samsung had already begun its ascent in the smartphone market and was seeking to continue this trajectory to achieve top-tier status alongside Apple.[701]  Apple, recognizing the substantial threat Samsung posed in what was becoming a two-player market, would have approached negotiations with Samsung in a very different manner and, in my opinion, would have negotiated a very different license with Samsung than it did with Nokia at that time.

### b.  Apple and HTC

438.    Apple and HTC America, Inc., HTC Corporation and S3 Graphics Co., Ltd ("HTC") entered into a "Patent License and Settlement Agreement" effective November 11, 2012.[702]  Under the agreement, the parties granted each other a fully-paid up, royalty-free, worldwide, nonexclusive, irrevocable, non-sublicensable, and nontransferable license to Apple's and HTC's patents, excluding Apple's design patents and nine of HTC's U.S. utility patents, and

---

[700] "For Once-Strong Smartphone Makers, 2011 Was the Year of New Beginnings," NPD, Dec. 13, 2011 (https://www.npd.com/wps/portal/npd/us/news/press-releases/pr_111213/).

[701] I discuss this critical point in time for Samsung above in Section II.F.

[702] "Apple-HTC Licensing Agreement," Nov. 11, 2012, APLNDC-Y0000408242, at -243. The agreement is valid for 10 years after the effective date.  "Apple-HTC Licensing Agreement," Nov. 11, 2012, APLNDC-Y0000408242, at -257.

It appears that Apple asserted the '647, '760, '721, and '172 patents against HTC.[704]



439

440

---

[703] "Apple-HTC Licensing Agreement," Nov. 11, 2012, APLNDC-Y0000408242, at -250-52.

[704] HTC's First Amended Answer, Affirmative Defenses, and Counterclaims to Defendant and Counterclaim Plaintiff Apple Inc.'s Counterclaims to First Amended Complaint, July 17, 2012, at pp. 22, 25; Notice of the Commission's Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order; Termination of the Investigation, at p. 2.



[705]

[706] "Apple-HTC License Agreement," Nov. 11, 2012, APLNDC-Y0000408242, at -244.



[707]

[708]

[709]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

178



. For this reason alone, this license provides no useful information proving, or tending to prove, an established royalty in this case.

441.    I conclude that this agreement provides no useful information proving or tending to prove an established royalty in this case also because, as with the Apple-Nokia agreement, [REDACTED]

[REDACTED][711]

442.    Finally, because the Apple and HTC agreement [REDACTED], it contains transfers of patent rights in addition to monetary considerations. In such scenarios, the effective "price" paid for a license in either direction is not directly observable and, thus, cannot be relied upon to assess royalties owed in a one-way, "naked" patent license, such as the hypothetical license between Apple and Samsung under consideration here.

---

[710] "Apple-HTC License Agreement," Nov. 11, 2012, APLNDC-Y0000408242, at -264.

[711] "Apple-HTC License Agreement, "Nov. 11, 2012, APLNDC-Y0000408242, at -243, -250-51.

precisely the task of determining the portion of the profit from the Accused Products that should be credited to the Patented Inventions as distinguished from non-patented elements. Since this was the analysis I set forth under *Georgia-Pacific* Factor 15, no further adjustment is required to account for the Factor now under consideration.

**Factor 14: The opinion testimony of qualified experts**

481.    I provide my testimony herein. As mentioned, I have considered the results of conjoint surveys performed under the direction of Dr. John Hauser, Apple's survey expert in this matter. I have also spoken with Dr. Hauser to clarify my understanding of his methods and opinions. Further, I have studied the expert reports of the damages experts retained by counsel for Apple and Samsung in the 1846 case. The results of my consideration of these expert reports and conversations are reflected in my analysis above. They give rise to no additional adjustment of my royalty assessment here.

**Factor 15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license**

482.    I considered this Factor, which corresponds to the Edgeworth Box concept I explained above, before considering the remaining Factors. No further consideration of this Factor is required here.

### 4.   Conclusions from the *Georgia-Pacific* Analysis and Reasonable Royalty Damages

483.    My analysis of the *Georgia-Pacific* Factors began with an analysis of Factor 15 based on the Edgeworth Box concept I explained earlier, from which I concluded that the benchmark rates for the Asserted Patents Apple's minimum willingness to accept since my Factor 15 analysis resulted in an inverted Edgeworth Box. This analysis accounted for a number of the considerations raised under *Georgia-Pacific*. Factors 3, 9, 10, 13, and 14 are neutral and did not indicate any adjustment to the benchmark royalty rates I developed under Factor 15.

Further, Factors 2 and 12 are neutral with respect to reasonable royalty rates, as I found no relevant information relating to these Factors.

484.     I found that the remaining *Georgia-Pacific* Factors all indicate an increase over the benchmark rates I derived under Factor 15.  Factors 2, 4, and 5 collectively indicate an increase in reasonable royalty rates over the benchmark rates, based on Apple's practice of not licensing patents to competitors (except in cross-licenses of patent portfolios or for pools of standards-essential patents) because of the risks to its brand and competitive positioning associated with granting such licenses.  Factor 6 also indicates an increase in rates, given the well-established, though difficult to quantify, impact of sales of mobile devices on sales of accessories, digital content, and computers.  Factor 8 indicates an increase in rates because not only have the Patented Inventions contributed to the commercial success of the Accused Products, but those products have garnered substantial profits.  Factor 11 also indicates an increase in rates because Samsung's use of the Patented Inventions has been so extensive that they are likely to have had a material effect on perceptions of Samsung's competitiveness with Apple.

485.     My analysis of the *Georgia-Pacific* Factors thus indicates reasonable royalties greater than the benchmark rates I determined through my consideration of the Edgeworth Box in Section III.C.2.  However, as discussed there, the Edgeworth Box based on Apple's minimum willingness to accept and Samsung's maximum willingness to pay at actual historical prices is inverted, i.e., the minimum Apple would accept exceeds the maximum Samsung would be willing to pay; it is only if Samsung were to raise its price significantly that the maximum Samsung would be willing to pay would exceed the minimum Apple would accept.  Despite the indication of my analysis of the *Georgia-Pacific* Factors that reasonable royalties should be greater than the benchmark rates, I conservatively limit reasonable royalty rates to the minimum Apple would have been willing to accept, consistent with the goal of compensating Apple for Samsung's infringement.

486.     The reasonable royalty rates I have determined through my analysis of the *Georgia-Pacific* Factors are applicable to sales of the Accused Products during the damages period to which lost profits do not apply.  My calculations account for which Asserted Patents each Accused Product is accused of infringing and for those instances in which an Accused Feature was removed from an Accused Product at a certain point.  These calculations result in

## VI.    CONCLUSION

501.    The analysis above is based on the information I have obtained to date.  I expect to supplement this report when Samsung produces updated financial information relating to the Accused Products.  Moreover, after Apple reduces its number of Asserted Patents to 5, I expect to supplement this report to set forth damages scenarios involving the infringement of those five patents.  I may also present the Court and the jury with demonstrative exhibits at trial to illustrate how these damages should be calculated if fewer than all Asserted Patents are found valid and infringed, if fewer than all products are found to infringe, or both, or, in that event, perform additional calculations, after any partial verdict of liability, to present that information. Additionally, I may supplement and adjust the above in the event additional facts come to light. Finally, I will provide the Court with whatever calculations are necessary to determine pre-judgment interest, post-judgment interest, attorneys' fees, costs, or any other remedy over and above Apple's base damages award.

August 12, 2013                                          Dr. Christopher A. Vellturo

---

with minimal effort.  Putting aside the accuracy of that position, if it were true, then Samsung would face little by way of hardship in avoiding infringement of Apple's Asserted Patents, whereas Apple faces substantial hardship due to Samsung's infringement, as discussed herein.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                          **EXHIBIT 11**

## Samsung's Proposed Non-Infringing Alternatives

| Patent | | Description of Alternative Asserted in Samsung's Supplemental Responses to Interrogatory No. 29 | My Understanding from Conversations with Technical Experts |
|--------|---|---|---|
| **647** | 1. | | This alternative would continue to infringe the '647 Patent, or, in one specific implementation that would not infringe, would be unacceptable for the reasons discussed in alternative #3, below. |
| | 2. | | This alternative does not allow for multiple actions to be executed upon a given structure, which is one of the explicit benefits of the '647 Patent. This limitation on functionality would be frustrating to users and would detract from the user experience. |
| | 3. | | This alternative would force users to memorize a different command for each action and manually determine which actions can be applied to a given structure. Shifting these tasks from the device to the user would likely frustrate the user and detract from the user experience. |
| | 4. | | This alternative was specifically highlighted as prior art that the patent was meant to improve upon. Restricting actionable structures to one type is a reduction in functionality that would detract from the user experience. |
| | 5. | | This alternative would continue to infringe the '647 Patent. |
| | 6. | | This alternative is simply a removal of the patented invention, which obviously cannot be considered a substitute. |
| | 7. | | This alternative would continue to infringe the '647 Patent. |

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 11

## Samsung's Proposed Non-Infringing Alternatives

| Patent | | Description of Alternative Asserted in Samsung's Supplemental Responses to Interrogatory No. 29 | My Understanding from Conversations with Technical Experts |
|---|---|---|---|
| **760** | 1. | | The overlapping displays would be more cognitively demanding or confusing to users who would now have to distinguish between the overlapping display windows, only one of which is active.  Additionally, the overlapping displays could result in the screen being cramped or visually cluttered, as a result of having too much information displayed on the device's limited screen size. |
| | 2. | | This alternative would require more taps in different areas to reach a result that the patented feature reaches in one tap, therefore making the alternative less efficient.  Relatedly, the increased number of taps would be more time-consuming for users. |
| | 3. | | This alternative would be more cognitively demanding and confusing to users, because it would require users to memorize and utilize different gestures for each action they wished to execute. |
| | 4. | | This alternative is essentially the same as #3, above, and therefore suffers from the same drawbacks. |
| | 5. | | This alternative it would require increased user input to achieve the same result as the patented invention; specifically, a user would have to execute multiple commands just to return a missed call.  In the patented invention, a user can return a missed call with one tap. |
| | 6. | | This alternative removes the ability of a user to quickly and conveniently return a missed call through non-telephonic means, such as e-mail or text messaging.  As with #5, above, this is simply a reduction in functionality and an inconvenience to users, who would have to now execute more commands to achieve the same result. |
| | 7. | | Tthis alternative suffers from the same drawbacks as #6, above. |

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                                    **EXHIBIT 11**

# Samsung's Proposed Non-Infringing Alternatives

| Patent | | Description of Alternative Asserted in Samsung's Supplemental Responses to Interrogatory No. 29 | My Understanding from Conversations with Technical Experts |
|--------|---|---|---|
| **414** | 1. | | This alternative would still infringe the '414 Patent. |
| | 2. | | Samsung's description of this alternative was too vague to understand, but if implemented in one manner that could be non-infringing, it would suffer from the same drawbacks as alternative #3, below. |
| | 3. | | This alternative would negatively impact the functionality of a device, preventing users from accessing data while that data was being synchronized, or, relatedly, preventing users from synchronizing data while they accessed the application that utilized that data. This lack of multi-tasking would detract from the user experience. |
| | 4. | | Implementation of this change would require significant software changes to software that Samsung may not have access to, and therefore may not be an available change for Samsung to implement. Even if Samsung could implement this alternative, however, the frequent transmittal of a transaction log would negatively affect a device's battery life and would therefore not be desirable. |
| | 5. | | This alternative would still infringe the '414 Patent. |

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Case 5:12-cv-00630-LHK   Document 1299-7   Filed 02/20/14   Page 32 of 35
Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 11

## Samsung's Proposed Non-Infringing Alternatives

| Patent | | Description of Alternative Asserted in Samsung's Supplemental Responses to Interrogatory No. 29 | My Understanding from Conversations with Technical Experts |
|---|---|---|---|
| **414 (cont.)** | 6. | | This alternative would result in the Calendar and Contacts applications completely losing their abilities to synchronize data with a remote data source. Moreover, this alternative would also limit which email services would be supported by a device, thus reducing the choices available to users and negatively affecting the user experience.<br><br>An additional implementation proposed by Samsung would remove the Mail, Gmail, Calendar, and Contacts applications from a device.  This would be a reduction in functionality that would obviously detract from the user experience.<br><br>Other implementations of this alternative would infringe the '414 Patent. |
| | 7. | | This alternative is essentially the same as #6, above, and would therefore suffer from the same drawbacks. |
| | 8. | | This alternative would prevent a user from being able to access their calendar, contacts, or email applications while that data was being synchronized.  This alternative could also result in applications being unpredictably blocked, because a user may not know when a device will be synchronizing data.  The lack of simultaneous access and synchronization would negatively impact the user experience. |
| | 9. | | This alternative would continue to infringe at least some claims of the '414 Patent.<br><br>Nonetheless, this alternative would prevent certain applications from being able to seamlessly synchronize data.  Moreover, this alternative could increase memory usage and therefore limit the processing power for certain processes to run on the device. |
| | 10. | | This alternative could freeze the user interface during synchronization, and therefore suffer the same drawbacks as #8, above. |

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                                          EXHIBIT 11

# Samsung's Proposed Non-Infringing Alternatives

| Patent | | Description of Alternative Asserted in Samsung's Supplemental Responses to Interrogatory No. 29 | My Understanding from Conversations with Technical Experts |
|---|---|---|---|
| 959 | 1. | | Samsung has not explained how it could index both the Internet and local storage, and such an alternative would not have been feasible. |
| | 2. | | Depending on how this alternative were implemented, it could infringe the '959 Patent.  If implemented in a non-infringing manner, however, this alternative would require either (a) multiple text fields for a given search query, or (b) the user to give certain constraints on searches.  Either method makes searching more burdensome and less efficient. |
| | 3. | | This alternative would require a user to utilize various search options and Boolean search operators to run searches.  Forcing the user to memorize and utilize new commands would place a heavier burden on the user. |
| | 4. | | This alternative would require a user to run multiple searches if she wanted to search both local and remote data sources.  This alternative completely lacks the convenience of being able to search across any data source with a single search query. |
| | 5. | | This alternative would suffer from the same effects and drawbacks as #2, above. |
| | 6. | | This alternative would continue to infringe the '959 Patent. |
| | 7. | | This alternative would prohibit a user from searching across all application data she wished to search.  Thus, multiple searches would be required, and the negative effects would be the same as discussed with respect to #4, above. |
| | 8. | | This alternative would require the user to run individual searches in each application she wished to search, and therefore would suffer from the same drawbacks as discussed with respect to #4, above. |
| | 9. | | This alternative would have the same consequences and drawbacks as discussed with respect to #4, above. |
| | 10. | | This alternative would have the same consequences and drawbacks as discussed with respect to #4, above. |
| | 11. | | This alternative would have the same consequences and drawbacks as discussed with respect to #4, above. |

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple Inc. v. Samsung Electronics Co., LTD., et al.                                              **EXHIBIT 11**

## Samsung's Proposed Non-Infringing Alternatives

| Patent | | Description of Alternative Asserted in Samsung's Supplemental Responses to Interrogatory No. 29 | My Understanding from Conversations with Technical Experts |
|---|---|---|---|
| **721** | 1. | | This alternative lacks visual cues to instruct a user how to unlock the device, and lacks visual cues to instruct a user that she is properly progressing towards unlocking the device.  Accordingly, users would be more likely to fail in their efforts to unlock the device. |
| | 2. | | This alternative would be prone to accidental unlocks.  Additionally, this alternative lacks the visual cues to instruct a user how to unlock the device.  Users would likely be frustrated in their failed attempts to unlock devices or if their phones were to accidentally unlock. |
| | 3. | | This alternative would also be prone to accidental unlocks.  Moreover, because this alternative lacks consistency in the manner a user unlocks a device, a user may have to vary their unlocking command each time. |
| | 4. | | If this alternative were implemented in a non-infringing manner by allowing a user to touch anywhere on the screen and then slide her finger in any direction, it would suffer from a number of drawbacks.  For example, allowing an unlock by touching anywhere and swiping anywhere would likely result in accidental unlocks.  Additionally, it appears this alternative would lack the visual cues discussed in #1, above. |
| | 5. | | This alternative could suffer from a number of drawbacks depending on how it were implemented.  For example, if a cover were used, additional bulk would be added to the device, making it less convenient to carry in a pocket or bag, or to hold in one's hand.  Additionally, certain unlock actions, like face detection, would be difficult to properly execute when a user is engaged in common activities like walking or jogging. |
| | 6. | | If this alternative were implemented in a non-infringing manner, the drawbacks are identical to those discussed in regard to #1, above. |
| | 7. | | This alternative is essentially the same as #4, above, and therefore suffers the same drawbacks. |

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple Inc. v. Samsung Electronics Co., LTD., et al.

EXHIBIT 11

## Samsung's Proposed Non-Infringing Alternatives

| Patent | | Description of Alternative Asserted in Samsung's Supplemental Responses to Interrogatory No. 29 | My Understanding from Conversations with Technical Experts |
|---|---|---|---|
| **172** | 1. | | This alternative, which requires a user to affirmatively correct her text by selecting a suggested replacement word, would likely cause a higher error rate when users type messages.  Without some form of auto-correction, a user's erroneously-typed text will be selected, instead of what a user likely intended to type. |
| | 2. | | This alternative is likely confusing to users, since the displayed text will change after each key a user presses in an attempt to predict what a user wants to type. |
| | 3. | | This alternative would likely be slower than the patented invention, because swipe-based typing tends to be slower than tap-based typing.  In addition users may be less accurate in swiping as compared to tapping.  Also, not being able to see what text has been entered is another drawback, because the user does not know whether the text she has already entered is correct or incorrect until after she has completed a word. |
| | 4. | | The first of two possible implementations of this alternative can detract from the user experience by forcing a user to split her focus between two separate areas of the screen, one for current character strings and one for suggested replacements.<br><br>In the second implementation of this alternative, one that lacks two separate areas, showing both the current and suggested text strings in the same area could visually overload that area and obstruct the text being typed. |

HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER