**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# EXHIBIT A-10

Confidential Attorneys' Eyes Only

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                  SAN JOSE DIVISION
4   APPLE, INC., a California         )
    corporation,                      )
5                                     )   CASE NO.
                   Plaintiff,         )   12 CV 00630 LHK
6                                     )
             vs.                      )
7                                     )
    SAMSUNG ELECTRONICS, CO., LTD.,   )
8   a Korean corporation; SAMSUNG     )
    TELECOMMUNICATIONS AMERICA,       )
9   LLC, a Delaware limited           )
    liability company,                )
10                                    )
                   Defendants.        )
11                                    )
12          * * *ATTORNEYS' EYES ONLY* * *
13         CONFIDENTIAL VIDEOTAPED DEPOSITION
14                        OF
15            CHRISTOPHER VELLTURO, PH.D.
16               New York, New York
17               September 25, 2013
18
19
20
21
22
23  Reported by:
24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25  JOB NO. 66028

Confidential Attorneys' Eyes Only

Page 2

September 25, 2013

Confidential videotaped deposition of
CHRIS VELLTURO, PH.D., held at Gibson, Dunn &
Crutcher, LLP, 200 Park Avenue, New York,
New York, before Kathy S. Klepfer, a
Registered Professional Reporter, Registered
Merit Reporter, Certified Realtime Reporter,
Certified Livenote Reporter, and Notary
Public of the State of New York.

Page 3

A P P E A R A N C E S:

GIBSON DUNN & CRUTCHER
Attorneys for Defendants
   200 Park Avenue
   New York, New York  10166
BY: DANIEL THOMASCH, ESQ.
   JORDAN BEKIER, ESQ.
   - and -
WILMER HALE
Attorneys for Apple
   950 Page Mill Road
   Palo Alto, California  94304
BY: RUSSELL TONKOVICH, ESQ.
   MICHAEL HEYISON, ESQ.

Page 4

A P P E A R A N C E S: (Cont'd.)

QUINN EMANUEL URQUHART & SULLIVAN
Attorneys for Defendant
   865 South Figueroa Street
   Los Angeles, California  90017
BY: JOHN QUINN, ESQ.
   SCOTT WATSON, ESQ.
   VALERIE LOZANO, ESQ.



ALSO PRESENT:
   JUSTIN N. McLEAN, Analysis Group
   CARLOS LOPEZ, Legal Video Specialist

Page 5

IT IS HEREBY STIPULATED AND
AGREED, by and between the attorneys for
the respective parties herein, that the
filing and sealing be and the same are
hereby waived.
    IT IS FURTHER STIPULATED AND
AGREED that all objections, except as to
the form of the question, shall be
reserved to the time of the trial.
    IT IS FURTHER STIPULATED AND
AGREED that the within deposition may be
sworn to and signed before any officer
authorized to administer an oath, with
the same force and effect as if signed
and sworn to before the Court.

Confidential Attorneys' Eyes Only

Page 118

1  been in the but-for world, that is to say where   12:46:37:12
2  Samsung was not practicing the Apple claims at
3  issue?
4      A.   I have a two-part answer to that.  One
5  is it would have been important to me to           12:46:50:09
6  understand the extent to which Professor
7  Hauser's conjoint studies accurately --
8  accurately predicted actual choices, and my
9  recollection is that he studies that as part of
10 his robustness check.  So that is something that   12:47:16:24
11 I think is relevant and I believe that was
12 conducted by Professor Hauser.
13         And then the second part would again
14 be, yes, that's important, but it's important in
15 a relative sense, not in an absolute sense.        12:47:36:09
16     Q.   Well, if you're -- if you're trying to
17 determine what the diminution in Samsung's sales
18 would have been if the Samsung accused devices
19 did not use the accused technology, you would
20 want to analyze that in terms of it comes as       12:47:55:24
21 close as possible to what the reactions of real
22 consumers would have been in the real
23 marketplace to the extent you can do that in
24 such a survey, correct?
25     A.   To the extent you can do that, but       12:48:09:18

Page 119

1  there are inherent complexities of doing that     12:48:11:09
2  that you need to be very careful to take account
3  of.
4      Q.   And you would expect that, in
5  designing and conducting this survey, Professor   12:48:20:00
6  Hauser would in fact be very careful, correct?
7      A.   I'm not --
8      Q.   To use your words?
9      A.   Can I see if this answers your
10 question, which is I'm --                          12:48:35:27
11     Q.   No, please answer my question.  Yes or
12 no.  If it can be fairly answered yes or no, you
13 would expect Professor Hauser to be very careful
14 in designing and conducting the survey?
15         MR. THOMASCH:  Objection to form.         12:48:48:06
16     A.   Yes, I would expect him to be very
17 careful.
18     Q.
19
20
21     A.
22
23
24
25

Page 120



10         MR. THOMASCH:  Objection to form.         12:50:17:24
11     A.   I don't, because that was not -- those
12 kinds of production line shifts weren't part of
13 the exercise I found was germane to studying the
14 availability of sufficient capacity to meet
15 demand here in the but-for world.                  12:50:35:00
16     Q.   Do you have any information whether or
17 not Apple -- Apple's production capacity for any
18 model of iPhone at any time was ever
19 constrained?
20     A.   Constrained in what way?                 12:51:06:06
21     Q.   Couldn't make enough of them.
22     A.
23
24
25

Page 121

1
2
3      Q.
4
5
6      A.
7
8      Q.
9
10
11
12     A.
13
14     Q.
15     A
16
17     Q.
18
19
20     A.
21
22     Q.
23     A.
24     Q.
25

Page 122

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2     A  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3     Q.  ▮▮▮▮▮▮▮▮▮
4     A.   I don't think that specifically
5  appears in my report, no.           12:53:20:18
6     Q.   Was it important to you to learn
7  whether Apple's production capability was ever
8  so constrained?
9     A.   It was relevant to me --
10        COURT REPORTER:  I'm sorry,       12:53:39:24
11  irrelevant?
12        THE WITNESS:  I'm sorry.  Fair enough.
13        It was relevant to me to have an
14  understanding of, when there were such
15  constraints at a general level, what the   12:53:56:03
16  nature of those constraints were and whether
17  that would have been relevant to a world
18  but-for infringement.  Because ultimately
19  what I care about is capacity in a but-for
20  world.  Actual capacity isn't what I'm   12:54:20:21
21  looking to establish in Panduit factor 3 of
22  the lost profits test.
23  BY MR. QUINN:
24     Q.   You said it was relevant to you to
25  have an understanding of when there were such  12:54:35:09

Page 123

1  constraints at a general level.  What did you   12:54:38:21
2  learn in that regard?
3     A.   Well, things I would have been
4  potentially concerned about is if there had been
5  an explosion or a fire at a facility or at some   12:54:52:24
6  downstream input supplier where there were not
7  available alternative sources of supply that
8  would have meant that even with the planning in
9  the but-for world that would have accounted for
10  expanded sales, because of factors that could   12:55:18:06
11  not be altered through a strategic choice by the
12  supplier, the constraint would have remained in
13  place.  Those are the kinds of issues that
14  capture my attention from a Panduit 3
15  standpoint.                         12:55:41:06
16     Q.   For the purpose of your work, did you
17  care whether or not there were ever periods
18  where Apple could not make enough mobile devices
19  to meet demand?
20     A.   Well, there would be characteristics   12:56:02:12
21  of the marketplace that that event would affect.
22     Q.   Can you answer the question yes or no?
23        MR. THOMASCH:  Objection.
24     A.   No, I can't answer yes or no.  I'm
25  sorry.  It affects multiple parts --       12:56:14:12

Page 124

1        MR. THOMASCH:  You can answer the   12:56:16:15
2  question.
3     A.   It affects multiple parts of my report
4  and it's a different answer for different parts.
5     Q.   All right.  So I would just like to   12:56:20:12
6  have question and answer.  All right?  So I'm
7  going to restate the question and I'd like you
8  to say no, that you can't answer it yes or no.
9  Because that's what I understand your testimony
10  is.                              12:56:32:03
11        MR. THOMASCH:  You don't actually get
12  to dictate his answer.
13        MR. QUINN:  I'm not inviting the
14  speech.  I get seven hours with the guy.
15        MR. THOMASCH:  If you can't answer it   12:56:38:21
16  yes or no, just indicate you can't answer it
17  yes or no and that will be responsive to Mr.
18  Quinn's concerns.
19        THE WITNESS:  Got it.
20  BY MR. QUINN:                       12:56:45:12
21     Q.   Can you answer the following question
22  yes or no:  Were you concerned in doing the work
23  that you did in this case where there were
24  periods of time when Apple did not have the
25  manufacturing capability to make enough phones  12:56:53:24

Page 125

1  to meet the demand?                  12:56:56:12
2     A.   I can't answer that question yes or
3  no.
4     Q.   Okay.  So go ahead and give your
5  non-yes-or-no answer.  Why can't you answer it   12:57:09:12
6  yes or no?
7     A.   Well, there are a lot of reasons why I
8  can't answer it yes or no.  First of all, that
9  is an issue I would have explored.  I'm not sure
10  I would characterize that as concern, which is   12:57:25:03
11  it's a factor to take into consideration.
12        Again, the important aspect of that is
13  whether that would have been a problem in a
14  world but for infringement.  That's point one.
15        Point two is, to the extent that      12:57:41:03
16  constraints led to reduced or truncated sales of
17  Apple products in the actual world, that that
18  would result in Apple having a lower share in
19  the periods where it was constrained, right?
20  And under my Mor-Flo distribution of Samsung's   12:57:58:18
21  lost sales and lost profits and the reasonable
22  royalty consideration, Apple's sales would be
23  truncated and that would be reflected in those
24  numbers.
25        So it would factor into those numbers.12:58:13:09

Confidential Attorneys' Eyes Only

Page 126

1  Now, understanding the exact underlying          12:58:17:00
2  reasoning is a little bit less important for
3  that point, but those would be accurately
4  reflected in the sales number would be something
5  I would want to take into consideration.         12:58:28:21
6      Q.   Do you believe it's reasonable to
7  assume that 40 percent of the purchasers of
8  Samsung Note smartphones or Galaxy 3 smartphones
9  would switch to an Apple product rather than a
10 large screened   a larger screened android       12:58:53:21
11 product made by another android manufacturer?
12      MR. THOMASCH:  Objection to form.
13      Under what set of circumstances?
14      Q.   You can answer.
15      A.   I can't.  I'm sorry, I don't   you     12:59:07:18
16 know, you're asking me if they would switch, and
17 I assume you mean switch from what they actually
18 did, and if there's   if you're telling me
19 there's no difference in the world between
20      I guess I'm not following.                  12:59:23:18
21      Q.   Under a Mor Flo analysis, you apply a
22 market share allocation to the lost Samsung
23 phones in the but for world, correct?
24      A.   Only to those Samsung accused devices.
25      Q.   Exactly, that would be                 12:59:41:18

Page 127

1      A.   That would, as I call it, be            12:59:44:09
2  candidates for a lost profits consideration.
3      Q.   All right.  So, in that context, do
4  you consider it reasonable in the real world
5  that some 40 percent of the purchasers of        12:59:54:27
6  Samsung Note smartphones would buy an Apple
7  device rather than some other larger screened
8  android device made by another manufacturer?
9      MR. THOMASCH:  Objection to the form
10     of the question.  It's internally            13:00:12:24
11     contradictory.
12     A.   I   I don't know the answer to that
13 question because that's not what my calculations
14 do, right?  And I was concerned and assessed the
15 reasonableness of my calculations, and what you  13:00:30:09
16 just described is not one of the calculations I
17 did.
18     Q.   Well, you apply an Apple   in your
19 Mor Flo analysis, you apply an Apple market
20 share, roughly 40 percent; is that correct?      13:00:40:21
21     A.   It varies between phones and tablets.
22     Q.   It varies device by device within the
23 phone category?
24     A.   No, I don't think it   I don't think
25 it varies by device in the phone category.       13:01:03:00

Page 128

1      Q.   All right.  So let's just focus on the 13:01:06:27
2  phone category.
3      A.   Okay.
4      Q.   The application of your Mor Flo
5  analysis in the phone category.  Because as I   13:01:13:09
6  understand it, correct me if I'm wrong, you
7  apply Apple market share of about 40 percent to
8  the lost Samsung phone   sales in the but for
9  world and assume that those sales would go to
10 Apple, correct?                                 13:01:32:15
11     A.   I don't think that's a correct
12 characterization.
13     Q.   Give me a correct characterization.
14     A.   So for the candidate products with the
15 candidate sales for lost profits, that is, the  13:01:56:27
16 sales that Samsung actually made that it
17 wouldn't have made absent infringement, so for
18 those sales I apportion a percentage of those to
19 Apple, and then a portion of them reflects
20 Apple's share of the smartphone marketplace    13:02:20:12
21 where that share reflects the removal of the
22 infringing Samsung phones from the denominator.
23     Q.   Right.  And you do that not on a
24 Samsung device by device basis, but using a
25 across the board for all Samsung devices        13:02:41:06

Page 129

1  percentage of Apple market share, correct?      13:02:45:27
2      A.   I apply an average to all the phones.
3  And again, as I said, I do it separately.  When
4  you say devices, I do it differently for
5  tablets.                                        13:02:55:21
6      Q.   We're talking about phones.
7      A.   Okay.  Well, you, I'm sorry, you said
8  devices.
9      Q.   Yeah.  No, fair.  You're right.
10     A.   If you want to use "devices" to mean   13:03:00:24
11 phones
12     Q.   You got me.
13     A.      for the rest of this deposition,
14 it's going to be tricky.
15     Q.   All right.  So, in that context, in   13:03:07:00
16 that context, sir, you assume that roughly 40
17 percent of the people who in the real world did
18 buy Samsung Note devices would buy Apple devices
19 if the Samsung was not infringing the patents at
20 issue, correct?                                 13:03:28:21
21     A.   No.
22     MR. THOMASCH:  Objection to form.
23     Q.   All right.  How am I wrong?
24     A.   Again, you're using as your base of
25 operations the total sales of Note phones, and  13:03:34:21

Confidential Attorneys' Eyes Only

Page 142

1  Q.  I mean, has Apple — I mean, is there   13:19:27:18
2  a known phenomenon that people will wait to buy
3  an iPhone until the new iPhone comes out, is
4  that a known phenomenon?
5  A.  That can happen.   13:19:40:27
6  Q.  And you're aware that does in fact
7  happen?
8  A.  To some degree, yes.
9  Q.  And do you have some reason to believe
10 that that doesn't happen with Samsung products?   13:19:48:12
11     MR. THOMASCH:  Objection to form.
12 A.  Well, at the — at the time of the
13 blackout periods here, the relative user loyalty
14 and predisposition and — I hate to use the
15 phrase — and the quasi rent situation that   13:20:12:03
16 would exist at Samsung customers would be far
17 more limited than it has been in more recent
18 times.
19 Q.  Is it true that your lost profits
20 calculations during blackout periods are not   13:20:29:12
21 dependent upon whether the allegedly infringing
22 features drove demand?
23 A.  Can I hear that question again?
24 Q.  Is it true that your lost profits
25 calculations during blackout periods are not   13:20:47:18

Page 143

1  dependent upon whether the allegedly infringing   13:20:50:21
2  features drove demand?
3      MR. THOMASCH:  Objection to form.
4  A.  That's not correct.
5  Q.  Could you explain?   13:20:57:18
6  A.  Well, I — I — I assess lost profits
7  in the circumstances where I've determined that
8  all four of the Panduit factors are met, and
9  those Panduit factors would relate to
10 establishing the significance of the patented   13:21:19:09
11 features in the demand for the products.  So
12 that's kind of a threshold point before I get to
13 the actual mechanics you are describing.
14 Q.  Is it your conclusion that nearly half
15 of the accused smartphones that Samsung has sold   13:21:53:27
16 were sold because of the inclusion of these five
17 patents?
18     MR. THOMASCH:  Objection to form.
19 A.  Well, speaking from recollection, I
20 believe, if I do the math — if you don't mind   13:22:20:12
21 me doing the math out loud?
22 Q.  I have no problem.
23 A.  ███████████████████████████
24 ███████████████████████████████
25 ███████████████████████████████

Page 144

1  ███████████████████████████████
2  ███████████████████████████████
3  ███████████████████████████████
4  ███████████████████████████████
5  ███████████████████████████████
6  ███████████████████████████████
7  ███████████████████████████████
8  ███████████████████████████████
9  ███████████████████████████████
10     MR. QUINN:  Should we take a lunch   13:23:31:27
11 break?
12     MR. THOMASCH:  Sure.
13     THE VIDEOGRAPHER:  The time is 1:24
14 P.M.  We're going off the record.
15     (Luncheon recess.)   13:23:39:06

Page 145

1      AFTERNOON SESSION   14:15:44:12
2      THE VIDEOGRAPHER:  The time is 2:17
3  P.M.  We're back on the record, video number
4  3.
5  C H R I S T O P H E R   V E L L T U R O, resumed   14:16:01:24
6   testified further as follows:
7      MR. THOMASCH:  John, before you start
8  your questioning, when you began your
9  deposition, you asked the witness if he
10 would check on something at lunch, which he   14:16:08:15
11 did as you requested, and if you would like
12 the information put on the record, I'll
13 if you would allow him to do so now.
14     MR. QUINN:  Thank you very much.
15 EXAMINATION BY (Cont'd.)   14:16:18:21
16 MR. QUINN:
17 Q.  You have got some information for us?
18 A.  I do.  So I have billings at QES on
19 this case, excluding the preliminary injunction
20 work, that account has been closed, it would   14:16:33:09
21 take me longer to get that information, but on
22 the assessment of damages in the case, QES has
23 billed about $1.15 million.
24 Q.  Thank you.  And at some point we would
25 like to have also the billings on the other   14:16:52:03

Confidential Attorneys' Eyes Only

Page 182

```
 1   correct?                           15:02:55:06
 2        MR. THOMASCH:  Objection.  Just asked
 3   and answered.
 4        A.   As it currently exists, the model
 5   requires certain inputs, and one of those inputs 15:03:02:18
 6   is at present derived from Professor Hauser's
 7   results.
 8        Q.   And included specifically his results
 9   regarding willingness to buy, true?
10        MR. THOMASCH:  Objection to form.  15:03:21:21
11        A.   Yes.
12        Q.   In doing your reasonable royalty
13   analysis, have you taken into account any offer
14   to license that Apple made to Samsung?
15        A.   I was aware of those offers at the   15:03:44:09
16   time I reached my opinions, so I took them into
17   consideration.
18        Q.   And how did they factor into the
19   calculation of the reasonable royalty that you
20   have opined on?                     15:03:58:00
21        A.   Oh, I ultimately found they weren't
22   directionally probative.
23        Q.   So did the real-world offers that --
24   to license that Apple made to Samsung factor
25   into the reasonable royalty number that you have 15:04:16:03
```

Page 183

```
 1   opined on?                          15:04:19:15
 2        MR. THOMASCH:  Objection to form.
 3        A.   I considered those licenses.  So, as
 4   part of my formation of my opinions, I took them
 5   into consideration, but in the end, given their 15:04:30:12
 6   inapt nature, I gave them essentially no weight.
 7        Q.   So they did not impact the number in
 8   any way up or down, is that true?
 9        A.   I'm not really sure how to answer
10   that.  My -- my consideration of the appropriate 15:04:54:09
11   reasonable royalty rate gave very little weight
12   to those Apple interactions with Samsung.
13        Q.   Did it -- did your consideration of
14   that nudge the number up or down or in any
15   direction?                          15:05:16:03
16        A.   It didn't nudge the number.
17        Q.   Is your -- in your report anywhere is
18   there any reference to the offer to license that
19   Apple made to Samsung?
20        A.   Yes.                      15:05:34:03
21        Q.   Where is that?  Can you find that?
22        A.   Well, it's not explicitly in the -- in
23   the text or the body of the report, but in my
24   documents considered, that would have been one
25   of the documents considered.         15:05:46:18
```

Page 184

```
 1        Q.   But in terms of the -- you do not    15:05:48:15
 2   address that in either the report you have
 3   provided us or in the exhibits to the report, is
 4   that true?
 5        MR. THOMASCH:  Objection to form.  15:05:59:09
 6        A.   I considered it, gave it essentially
 7   no weight, which indicate -- and so it doesn't
 8   appear as a bases for my opinions in the text or
 9   other exhibits.
10        Q.   Why did you give it no weight?  15:06:13:15
11        A
12
13
14
15
16
17
18        Q.
19
20        MR. THOMASCH:  Objection to form.  15:07:00:06
21        A.   I'm sorry, didn't what?
22        Q.
23
24
25        A.
```

Page 185

```
 1                                       15:07:10:21
 2        Q.   I'll withdraw -- I'll withdraw the
 3   term sheet.  Whatever you saw, I understood you
 4   to say that this offer, term sheet, whatever you
 5   want to call it
 6
 7                            Is that your understanding?
 8        MR. THOMASCH:  Objection to form.
 9   Misstates the evidence and the testimony.
10   You may answer.                     15:07:34:00
11        A
12
13
14
15
16
17
18
19
20
21
22
23
24        Q.   In assessing what Samsung would have
25   been willing to pay as a reasonable royalty, is  15:08:41:12
```

Page 186

1  it appropriate to take into account any      15:08:45:06
2  design around or alternative non infringing
3  design that Samsung could have implemented?
4      A.   That's a possibility, yes.
5      Q.   Is that something that would be     15:09:03:21
6  appropriate to take into account was my
7  question?
8      A.   I think it would be something that
9  would be appropriate to consider, but whether to
10 take it into account would depend on the nature 15:09:17:06
11 of the non infringing alternatives and the costs
12 and the level of understanding of certain
13 aspects and market information about those
14 alternatives.
15     Q.   You wouldn't expect Samsung to pay a 15:09:35:09
16 royalty more than it would cost them to do an
17 implement a non infringing alternative, would
18 you?
19     A.   I don't think you can say that as a
20 blanket statement, no.          15:09:49:15
21     Q.   Why not?
22     A.   Because in an ex ante consideration of
23 Samsung's incentives, what you just described
24 would presuppose that Samsung sitting at the
25 table would know that the design around could be 15:10:11:03

Page 187

1  implemented and would meet with a sufficient   15:10:15:12
2  degree   with a sufficient degree of consumer
3  acceptance that it would make sense to introduce
4  it into the marketplace, right?  And in reality,
5  there would have been uncertainty surrounding  15:10:33:03
6  that that creates an expectation adjustment on
7  the design around calculation that might need to
8  be taken into consideration.
9      Q.   Is it part of your expertise in your
10 role as an expert in this case to give opinions 15:10:59:15
11 regarding the feasibility of non infringing
12 alternatives that Samsung had available to it?
13         MR. THOMASCH:  Objection to form.
14     A.   And by that, by "feasibility," are you
15 referring to technical feasibility?  Financial  15:11:17:00
16 feasibility?
17     Q.   Let's start   I'm going to ask you
18 both.  Technical.  Financial.
19     A.   It's got different answers.
20     Q.   All right.  So go ahead.          15:11:27:18
21     A.   Which one do you want to do first?
22     Q.   Cost.  Financial.
23         I mean, are you here as part of your
24 duty as an expert and the opinions you intend to
25 give, are you going to give opinions on the    15:11:38:12

Page 188

1  financial feasibility of any non infringing    15:11:40:00
2  alternatives that Samsung has available to it?
3         MR. THOMASCH:  Objection to form.
4      A.   From a financial feasibility
5  standpoint, that is something I take into      15:11:50:15
6  consideration and that I am reaching opinions
7  on.
8      Q.   And which non infringing alternatives
9  are you giving opinions on from a financial
10 standpoint?                     15:12:02:12
11        MR. THOMASCH:  Objection to form.
12     A.   Well, again, what   what my exercises
13 are directed at is looking at the relative
14 difference between using the patented or accused
15 patented approach and the non infringing       15:12:13:12
16 alternative, and so wherever I'm considering
17 that assessment, what would be taken into
18 consideration there would be non infringing
19 alternatives that would be   that would inform
20 the hypothetical negotiation.            15:12:32:12
21     Q.   How about technical capability or
22 technical feasibility, are you here to give
23 opinions concerning the technical feasibility of
24 any non infringing alternative available to
25 Samsung?                        15:12:45:27

Page 189

1      A.   Sadly, I think you probably don't    15:12:55:06
2  characterize economics as technical, so assuming
3  that's not in your definition, that's it more
4  engineering and software type stuff, I'm not
5  here to give those opinions.             15:13:06:24
6      Q.   Do you know what the cost of OS
7  upgrades were when Apple used to sell them?
8      A.   Speaking from recollection, I seem to
9  recall an OS upgrade, one instance of one, at
10 $29.  I imagine there are others, but I don't   15:13:35:18
11 recall those numbers as I sit here.
12     Q.   And is it your understanding that that
13 OS upgrade covered hundreds of features?
14     A.   Which OS upgrade?  The $29.
15     Q.   Yes, the one you're thinking of.     15:13:51:09
16        MR. THOMASCH:  Objection to form.
17     A.   I remember, it's been a while, but I
18 remember there being some documents that I
19 reviewed that had those, some of those features
20 listed.  I don't remember it going into the    15:14:14:00
21 hundreds and.  I guess I might need a little
22 clarification as that I saw that not in the
23 context of this case.
24     Q.   Do you have an opinion concerning the
25 cost to Samsung of implementing any of the     15:14:26:15

Confidential Attorneys' Eyes Only

Page 306

1  upon, I would have considered that input  18:39:42:09
2  relative to the evidence I had on the other
3  inputs to see if there were some gross
4  inconsistencies that might suggest robustness or
5  accuracy issues in the results from Dr. Hauser,  18:39:56:24
6  and in doing that I didn't see anything that
7  raised red flags for me.
8      Q.  You responded, among other things, in
9  terms of a statistical study and you indicated
10 you didn't do anything from a statistical  18:40:13:12
11 standpoint.
12     Did you do anything at all from a
13 standpoint -- did you do anything, any check
14 involving quantitative analysis of the results
15 of Professor Hauser's conjoint study?  18:40:30:09
16     MR. THOMASCH:  Objection.  Asked and
17 answered.
18     A.  I don't think I would characterize the
19 tests I undertook as quantitative.
20     Q.  So the answer is no?  18:40:46:18
21     A.  The answer is no.
22     Q.  Did you take the Hauser survey
23 yourself, the survey that he had participants
24 complete?
25     A.  Did I fill it out?  18:40:54:21

Page 307

1     Q.  Yes, sir.  18:40:56:03
2     A.  I did not fill it out.
3     MR. QUINN:  Okay.  We'll designate
4  this attorney's eyes only, the entire
5  transcript, and with that, we've concluded  18:41:07:03
6  the deposition.
7     MR. THOMASCH:  All right.  Thank you,
8  Dr. Vellturo.
9     THE VIDEOGRAPHER:  The time is 6:42
10 P.M.  We're going off the record.  18:41:19:24
11     oOo
12
13
14
15              18:41:20:27
16
17
18     CHRISTOPHER VELLTURO, PH.D.
19 Subscribed and sworn to
   before me this    day
20 of       2013.         18:41:20:27
21

Page 308

1              18:41:20:27
2        CERTIFICATE
3  STATE OF NEW YORK )
              : ss
4  COUNTY OF NEW YORK)
5     I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9     That CHRISTOPHER VELLTURO, PH.D., the
10 witness whose deposition is herein before
11 set forth, was duly sworn by me and that
12 such deposition is a true record of the
13 testimony given by such witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18     In witness whereof, I have hereunto
19 set my hand this 25th day of September 2013.
20
21
        KATHY S. KLEPFER, RPR, RMR, CRR, CLR
22

Page 309

1              INDEX
2  TESTIMONY OF C. VELLTURO:              PAGE
3  Examination by Mr. Quinn                6
4
5  VELLTURO EXHIBITS:                    PAGE
6  Exhibit 1, Opening Expert Report of Christopher   56
7  A. Vellturo, Ph.D.
8  Exhibit 2, Exhibit 1, Opening Expert Report of    80
9  Christopher A. Vellturo, Ph.D. (with exhibits)
10 Exhibit 3, Rebuttal Expert Report of Christopher  226
11 A. Vellturo, Ph.D.
12 Exhibit 4, Expert Report of Christopher           288
13 Vellturo in VirnetX Inc. v. Cisco Systems, Inc.,
14 et al.