# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

### Before the Honorable Lucy H. Koh
### Federal District Court Judge

| | |
|---|---|
| APPLE, INC, a California corporation, <br><br> Plaintiff <br><br> vs. <br><br> SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, <br><br> Defendants. | CASE NO. 12-CV-00630-LHK |

## EXPERT REPORT OF REMY LIBCHABER REGARDING INTERPRETATION OF CONTRACTS UNDER FRENCH LAW

# I.      INTRODUCTION

My name is Rémy Libchaber. I am Professor of Law at the Paris I University (Panthéon-Sorbonne). I have held this position since 2001. Before my present appointment, I was a Professor of Law at the Paris XII University, and before that at Maine University, in Le Mans. My address is 12, rue François Millet, 75016 Paris.

I have taught French contract law, at both the undergraduate and graduate levels, and continue to do so for graduate students. I have published widely in the field of French contract law. I have been an editor of a number of chronicles on contract law: from 1995 to 2000 in the *Revue Dalloz*; from 2001 to 2009 in the *Repértoire du Notoriat Defrénois*; and since 20011 in the *Revue des contrats*. My curriculum vitae is attached as exhibit A to this report.

I have been asked by Samsung to provide my expert knowledge and opinion on the interpretation of contracts under French law, and in particular to interpret the obligations arising from membership in the European Telecommunications Standards Institute ("ETSI") and from the ETSI Intellectual Property Rights ("IPR") Policy.

## A.      Materials Reviewed

A list of the materials I have reviewed in preparing this declaration are attached as exhibit B.

## B.      Samsung's Declarations Do Not Give Rise to a License

In previous reports filed with the Court in case No. 11-cv-01846, I addressed the question of whether a license agreement could have resulted from Samsung's Declarations and from Apple's unilateral use of the patents at stake.

My opinion then was, and it has not changed, that this unilateral use of patents could not create license agreements recognised by French law. Several elements justified this opinion, including the following. First, a license agreement is a contract that can only exist in writing under French law (Article L. 613-8 of the French IP Code): no writing, no license! Furthermore, a license agreement requires

1   an agreement on different elements, such as the amount of the royalties, the
2   territorial apportioning, the duration... In the absence of these different elements,
3   there cannot be any license for lack of meeting of the wills. The absence of
4   determination of the royalties, in particular, is problematic, because a license
5   agreement is a variety of lease agreement, i.e. a contract whose formation cannot be
6   conceived without a prior determination of the price.

7       This opinion relied on an analysis of Samsung's Declarations, which do not
8   constitute, according to me, offers for contract which it would be sufficient for an
9   interested party to accept. Through the Declaration of Article, the Declarant
10  commits to be prepared to license it on FRAND terms. But, in order for a contract to
11  be formed, there is still a need for negotiations to be opened and then concluded by
12  the two parties together.

13      **C.**    **Canons of Construction of a Contract under French Law**
14          **1.**    **Principles of Judicial Interpretation**

15      Prior to the description of the canons of interpretation, it is important to say
16  that very early, the Supreme Court (*Cour de cassation*) decided that interpretation of
17  contracts was a privilege of first instance and appeal judges who are at liberty to
18  interpret a contract as they understand it; the *Cour de cassation* defers to these
19  tribunals except in the case of distortion of an obvious statement (Cass. Sections
20  réunies 2 February 1808, *Grands arrêts* No. 160 p. 153 (setting forth a position that
21  has remained consistent ever since).

22      The general principle of interpretation is stated by Article 1156 of the Civil
23  Code, the heart of interpretation principles in French contract law: "one must in
24  agreements seek what the common intention of the contracting parties was, rather
25  than pay attention to the literal meaning of the terms". The articles of the Civil Code
26  which follow Article 1156 provide examples of interpretation, which will be
27  referred to *infra*.

28

1  **D.     Cases of Ambiguity**

2      When a term is ambiguous, there are certain guidelines aiming to its

3  interpretation (Articles 1156 to 1164). Obviously, Article 1156 is of paramount

4  importance: if the research of the common intention of the parties is sufficient, its

5  content must certainly be followed.

6      Since the *Cour de cassation* does not control the way lower courts interpret

7  contracts, the respective importance of these different Articles has not been

8  specified in case-law.

9      But the majority of scholars are of the opinion that Article 1156 is the most

10  important article governing contract interpretation, because it specifies the notion of

11  interpretation, and because all the following Articles merely constitute applications

12  of Article 1156. This idea is set out in a very expressive manner in an important

13  textbook: "Placed at the beginning of the series, Article 1156 undeniably has the

14  value of a principle. The provision delivers a twofold message: interpreting a

15  contract consists before all of researching the will of the parties, of carrying out a

16  reasonable interpretation of the common intent of the parties, which can only be

17  discovered by replacing oneself in the circumstances where the parties were at the

18  time when they entered into the contract." (Fr. TERRE, PH. SIMLER et Y.

19  LEQUETTE, Les obligations, 10th ed., Dalloz 2009, No. 185, p. 190, No. 450, p.

20  466).

21      Another textbook explains this hierarchy between the provisions: "In reality,

22  only Article 1156 provides for a true rule ... The provisions that follow merely give

23  a few examples of implementation of this spirit of mind. They are merely 'recipes'

24  that can serve as a guide to the judge, but are not compulsory for him, because the

25  case-law refuses to recognise a binding nature to these indications: the judge that

26  steers away from them will not be reversed." (A. BENABENT, Droit des

27  obligations, 13th ed., Montchrestien 2012, No. 273, p. 213).

28

As a further confirmation, in the only existing detailed scholarly analysis of the provisions of Articles 1156 *et seq.*, the author treats Article 1156 as the main principle governing contract interpretation and views Articles 1157 *et seq.* as providing detailed advice to courts based upon this main principle. The author states that "Article 1156 constitutes the cornerstone of our system of subjective interpretation" (J. DUPICHOT, « Pour un retour aux textes : défense et illustration du "petit guide-âne" des articles 1156 à 1164 du Code civil », Mél. J. FLOUR, p. 179, and espec. No. 8, p. 187).

Thus, the Civil Code also gives additional guidance which may also lead to interpretation:

- Art. 1157 : "Where a clause admits of two meanings, one shall rather understand it in the one with which it may have some effect, than in the meaning with which it could not produce any";

- Art. 1158: "Terms which admit of two meanings shall be taken in the meaning which best suits the subject matter of the contract";

- Art. 1159: "What is ambiguous shall be interpreted by what is in use in the region where the contract was made".

Besides those limited guidelines, the main rule of interpretation is that of Article 1156: the search for the common intent of the parties is the main criterion for interpretation.

It is indeed extremely frequent that, to mention the content of a contract, the Court merely refers to "the interpretation of the common intent of the parties", without citing Article 1156 (Com. 16 April 2013, appeal No. 09-14.999; Soc. 30 November 2010, appeal No. 09-42726; Civ. 1, 6 February 2007, appeal No. 04-18.406; Soc. 23 October 2007, Bull. V, No. 172).

One will also note that, each time the Court relies upon another principle than that of researching the intents, it precisely cites the Article to which it refers,

1 between 1157 and 1164. Article 1156 is the only one that is so integral with the idea
2 of interpretation that the Court does not feel a need to cite it.

3    **E.    Practice for the Search of the Common Intent**

4        In searching for the parties' *common intention*, a judge may consider relevant
5 facts that are available as long as they precede the writing of the contract or shed
6 light on the parties' state of mind at that time. Such relevant facts may include pre-
7 contractual elements, such as offers, written discussions, or even former contracts
8 between the same parties.

9        Sometimes, contextual contractual elements can shed light on the meaning of
10 contractual language. Article 1161 of the French Civil Code thus provides that "All
11 the clauses of an agreement are to be interpreted with reference to one another by
12 giving to each one the meaning which results from the whole instrument."

13        In the majority of cases, a judge will be able to rely on documents prepared
14 by the parties, provided that the documents are contemporaneous with the drafting
15 of the contract. Thus, preparatory work relating to the agreement can be used. One
16 may consider in this respect exchanges between the drafters, whether they remain in
17 writing or recorded in some minutes. Similarly, the judge will be able to profitably
18 rely on documents that dismiss such provision or such drafting, which are also
19 highly significant. Those elements allow, although *a contrario*, a judge to reach
20 conclusions regarding the will of the writers.

21        Equally, in certain instances, discussions between parties concerning possible
22 amendments to the contract can be relevant insofar as they shed light on the way
23 they understand contractual terms.

24    **F.    Use of Testimony in Interpretation of Contractual Provisions**

25        Sometimes, parties to the contract file affidavits in support of their
26 interpretation of a contract. The value of these affidavits must be assessed with some
27 caution, although they may attempt to indicate the original will of the parties, they
28 do not constitute proof when unsubstantiated.

1      The treatment of affidavits has not been settled by the French Civil code, but

2 by the French Civil Procedure Code, in Articles 199 *et seq.*

3      A French judge may rely on declarations by individuals who may have a

4 helpful opinion regarding the dispute. In order for a declaration to be probative of

5 the will of the parties, however, the declarant must have been present during the

6 drafting of the contract.

7      The judge is always entitled to exclude an affidavit from consideration after

8 determining that the testimony is not credible, for example due to its indirect nature

9 (Civ. I, 18 October 1977, *Bull. I*, No. 374, p. 296).

10      In addition, it is a fundamental principle of French law that *No one is allowed*

11 *to constitute proof for himself!* This adage is embodied in various texts of the Code,

12 thus Articles 1329 and 1331. It implies that testimony purporting to present the

13 views of one of the parties to a contract cannot be given weight in interpreting such

14 contract (to this effect, Soc., 11 May 1999, *Bull. V*, No. 209, p. 153).

15      When the contract is old, French judges may consider affidavits of those who

16 have observed the implementation of the contract.

17      These affidavits are typically relied upon to identify contractual practices.

18 These practices are relevant if the judge considers that they refer to an intent which

19 is certain: "In order to interpret the common intention of the parties on the day of the

20 formation of the contract, the judge can refer to the subsequent behaviour of the

21 parties likely, of a nature to reveal such intent." (Civ. 1, 9 November 1993, *Bull. I*,

22 No. 317, p. 220; Civ. 3, 15 November 1972, *Bull. III*, No. 616, p. 453; Civ. 3, 5

23 February 1971, *Bull. III*, No. 89, p. 64, *D.* 1971.281, rap Cornuey).

24      With respect to the interpretation of ETSI's statutes, Professor Molfessis

25 considers that we are in presence of contracts, which is not challengeable. He

26 deduces therefrom that the understanding of the different clauses depends on their

27 clarity and that it is only in case of uncertainty that interpretation should be carried

28 out (Expert report of Professor Nicolas Molfessis, August 12 3013, § 11, p. 3).

1    In this task of interpretation, he considers that the judge can be guided by the

2  confrontation with other clauses, by internal deliberations of ETSI aiming at

3  implementing the provisions and by the testimony of directors or senior executives

4  of the association.

5    Internal deliberations of ETSI or testimony of directors or senior executives

6  of ETSI may be useful to the extent that they provide information regarding the

7  elements that have been described above as relevant to contractual interpretation

8  under French law.

### 1.  The Obligation to Negotiate Stemming from the ETSI IPR Policy

Clause 6.1 of the ETSI IPR Policy states: "When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS."

The ETSI IPR Policy therefore requires the Director-General of ETSI to request that patentees who have disclosed their standards essential patents declare that they are ready to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions (Art. 6).

1    When a patentee agrees to do so, he writes a Declaration which are in similar

2    terms, and states: "The SIGNATORY and/or its AFFILIATES hereby declare that

3    they are prepared to grant irrevocable licenses under the IPRs on terms and

4    conditions which are in accordance with clause 6.1 of the ETSI IPR Policy, in

5    respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL".

6    ## II.    WHAT IS THE NATURE OF SUCH AN OBLIGATION?

7    ### A.    Content of the Obligation

8    The language of the declaration is instructive: the patentee has stated that it

9    held patents, and that it is *prepared* to grant licenses — but not that it has already

10   granted licenses by the Declaration.

11   In other words, interested parties — expressly called: *those who seek licenses*

12   (Article 6.1 of ETSI IPR Policy) — must request a license from the patentee, and a

13   negotiation must follow with a view to agreeing a contract for a license on fair,

14   reasonable and non-discriminatory terms.

15   The patentee declares that, in principle, he is open to granting licenses,

16   subject to negotiations leading to meetings of will on FRAND terms. But no license

17   contract can result from the Declaration itself. The patentee has never declared that

18   he agreed to be bound by future contracts that would no longer depend on its

19   agreement, for the benefit of unidentified counterparties, and on terms (including

20   price), which have not been agreed.

21   Nevertheless, in my view, the Declaration is binding inasmuch as the patentee

22   has accepted to enter in negotiations, with no possibility to refuse related

23   discussions aiming to a possible license agreement on FRAND terms and

24   conditions.

25   As such, the ETSI declaration implies a readiness to negotiate, in good faith,

26   toward a FRAND license.

27   The declaration of Article 6-1 forbids any refusal to negotiate. The

28   negotiating phase must occur: not only because the legal provisions require it, but

1  also because this negotiation complies with the spirit of French law. It is only
2  through such a process that the parties are likely to move from an interested or
3  favourable position, to concrete and detailed meetings of the wills.

4      In declaring various patents as potentially relevant to a standard and that it is
5  prepared to license those patents on FRAND terms and conditions, the patentee
6  subject to ETSI's Declaration has accepted an obligation to negotiate in good faith,
7  in order to reach a FRAND agreement with whomever would be interested.

8      This Article is consistent with French law, which recognizes as a general
9  requirement of contractual negotiations that both parties negotiating a contract have
10 an obligation to negotiate in good faith.  As an important French textbook states:
11 "Pre-contractual period is placed under the double sign of freedom and good faith.
12 [...] The parties shall negotiate on a fair basis" (TERRÉ, SIMLER et LEQUETTE,
13 *Les obligations*, 10th ed., Dalloz 2009, No. 185, p. 190). The absence of any
14 precision pointing to the identity of the parties clearly implies that both are
15 concerned by this requirement of loyalty.

16     Art. 1104 of the Catala Project states:

17         "the parties are free to begin, continue and break off
            negotiations, but these must satisfy the requirements of
18         good faith. A break-down in negotiations can give rise to
            liability only if it is attributable to the bad faith or fault of
19         one of the parties".

20     The legal effect of the Declaration is twofold: the patentee can no longer
21 refuse to enter into negotiations to grant a license; it must negotiate the conditions of
22 the agreement on a fair basis in view of a specified target, namely a license on
23 FRAND terms and conditions.

24     The declarations set the target of the negotiation: a license on FRAND terms.

25     Given what has been said above concerning the obligation to (i) negotiate (ii)
26 in good faith, this means that the parties must, through their negotiation behavior,
27 demonstrate their willingness to enter into a license agreement on FRAND terms.

28

Expert Report of Remy Libchaber Regarding Interpretation of Contracts Under French Law

1   That obligation is incumbent on both the declarant and the prospective
2   licensee. For example, a known textbook indicates that "the only limit to the
3   principle of contractual freedom resides in the general duty of good faith and
4   loyalty", which is obviously incumbent on both parties (A. BÉNABENT, Les
5   obligations, 13th ed., No. 63, p. 49).

6   A recent decision from the Cour de cassation refers to "the loyalty that must
7   govern the relationship between the parties, not only during the contractual period,
8   but also during the pre-contractual period" (Civ. 2, 7 July 2011, Appeal No. 10-
9   23.064).

10  ETSI contemplates that the terms of a FRAND license, including the royalty
11  terms, are left up to the participants and to be determined during negotiations
12  between the parties.

13  For example, Section 2.2 of the "ETSI Guide to IPRs" dated November 30,
14  2011 provides the following: "Members do NOT have a duty to ... disclose within
15  the Technical Body the commercial terms for licenses for which they have
16  undertaken to grant licenses under FRAND terms and conditions. Any such
17  commercial terms are a matter for discussion between the IPR holder and the
18  potential licensee, outside of ETSI ..."

19  Similarly, Section 4.1 of the ETSI "Guide to IPRs" states: "Specific licensing
20  terms and negotiations are commercial issues between the companies and shall not
21  be addressed within ETSI. Technical Bodies are not the appropriate place to discuss
22  IPR Issues. Technical Bodies do not have the competence to deal with commercial
23  issues.

24  Members attending ETSI Technical Bodies are often technical experts who do
25  not have legal or business responsibilities with regard to licensing issues. Discussion
26  on licensing issues among competitors in a standards making process can
27  significantly complicate, delay or derail this process."

28

I also note that ETSI provides the following question and response on its website a "Guide to ETSI IPR FAQ":

> Question 4:
>
> Our company intends to manufacture GSM mobile stations. Can you tell me what license fee for all essential patents we will have to pay?
>
> Are you handling it, or do we have to contact all the patent holders separately?
>
> If we have to contact the companies separately, is there any guideline, e.g. x% of revenue as total license fee, since we are working on a business plan right now?
>
> Answer 4:
>
> It is the responsibility of each STANDARD user to contact directly the patent owner. ETSI is not in a position to provide guidelines for commercial negotiations...

Thus, it appears that the determination of FRAND terms and conditions, including the price term of the license agreement (which cannot be considered to be determined by way of reference to the FRAND principle), is left by the ETSI to the parties.

I understand that Dr. Walker contends that the ETSI IPR Policy requires that a member license its declared essential patents on a per-patent basis. Based on my review of the ETSI IPR Policy and other materials that I have reviewed, I have not seen any provision of the ETSI IPR Policy that supports this contention. I also note that Dr. Walker does not offer any evidence concerning the intent of the drafters of the ETSI IPR Policy in this respect, nor even provide any examples of the practices of ETSI members illustrating that it is the practice of ETSI members to license on a per-patent basis. Thus, I do not understand the basis for Dr. Walker's opinion with respect to this issue.

## B.   The Negotiation Process

As stated above, the ETSI declaration implies an obligation to negotiate, in good faith, toward a license on FRAND terms and conditions.

Expert Report of Remy Libchaber Regarding Interpretation of Contracts Under French Law

1   It is important to note that this obligation is incumbent not only on the
2   patentee, but also on the licensee, who must himself demonstrate his willingness to
3   enter into a license on FRAND terms and conditions and negotiate in good faith
4   toward that goal.

5   From the ETSI point of view, this willingness to enter into a license on
6   FRAND terms and conditions is the overarching obligation incumbent on each of
7   the parties.

8   It notably translates into an obligation, for both the patentee and the
9   prospective licensee, to bring their offers ever closer to the FRAND territory, and
10  not to insist, throughout the negotiation process, on imposing non-FRAND terms on
11  the other party.

12  In a commercial negotiation, it is classical that the parties initially make offers
13  that are more favorable to their interests than the agreement they expect or hope to
14  arrive to. Such behavior is not necessarily contrary to the patentee's obligations
15  under the ETSI Declarations. An opening proposal for negotiations is only a first
16  step, opening a round of discussions.

17  However, eventually, at some point in the negotiation process, when
18  confronted with a licensee who himself negotiates in good faith toward a FRAND
19  license, the patentee must make an offer that is FRAND.

20  **III.    ETSI IPR POLICY ARTICLE 4.1: TIMELY DISCLOSURE**

21  Article 4.1 of the *ETSI Intellectual Property rights policy* states: "Each
22  MEMBER shall use its reasonable endeavours to timely inform ETSI of
23  ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a
24  technical proposal for a STANDARD shall, on a bona fide basis, draw the attention
25  of ETSI to any of that MEMBER'S IPR which might be ESSENTIAL if that
26  proposal is adopted".

27

28

## A.   Meaning of the Word *Timely*

Starting from a textual analysis, synonyms of the term "timely" ordinarily given by dictionaries point towards the idea of adequacy, rather than regularity. For instance, *The Random House Dictionary*, unabridged edition for 1971, gives as current equivalent: occurring at a suitable time; seasonable; opportune; well-timed. It is therefore the responsibility of the patent owner to declare its patents at the adequate moment.

But in the spirit of the laws, when is the adequate moment, the right moment of public declaration of a patent as being essential or likely to become essential?

Before addressing the search for a meaning, one can already observe that if the adverb *timely* was referring to a specific point in time (either in terms of duration or by reference to another event such as the freeze of the standard) in the context of ETSI, the writers would have made the effort of defining it. Annex 6 thus presents a certain number of definitions, that one cannot miss: Article 15, entitled *Definitions* gives a list of essential terms as well as the corresponding definitions; Article 2, also entitled *Definitions*, refers to Article 15. Timely is not among these definitions.

From a legal aspect, we are in the presence of a question of interpretation: it is not about determining the literal meaning of a word, but about identifying the legal concept that it covers. It is therefore important to grasp what the adequate moment of disclosure of a patent is.

The surrounding language of Article 4.1 provides additional guidance as to what is meant by "timely." I note that this provision requires members to "use its *reasonable endeavours*" to disclose essential IPRs in a timely fashion. The following sentence also states that members "shall, *on a bona fide basis*, draw the attention of ETSI to any of that MEMBER'S IPR which might be ESSENTIAL if that proposal is adopted." "Bona fide" is Latin for "good faith."  The language of Article 4.1 thus focuses on the efforts made by the member and does not set forth a set term or deadline by which the disclosure must be made.

1    Language set forth in the *ETSI Guide on IPRs* is consistent with this
2  understanding of the language of Article 4.1.   In particular, Note 2 of Article 2
3  defines "intentional delay" as a situation in which "an ETSI Member has
4  deliberately withheld IPR disclosures significantly beyond what would be expected
5  from normal considerations of 'Timeliness'."   Note 3 of Article 2 states that
6  "intentional delay", where proven, should be treated as a breach of the IPR Policy
7  (Clause 14 of the ETSI IPR POLICY).   Thus, once again, ETSI focuses on the
8  members' intent rather than an objective measure of timeliness.   Indeed, the Guide
9  states that "Definitions for 'Timeliness' or 'Timely' cannot be agreed because such
10 definitions would constitute a change to the Policy'."   This statement supports the
11 conclusion that the ETSI IPR Policy does not set a particular term or deadline for
12 disclosure of IPRs.

13    Even in the section of the ETSI Guide on IPRs dedicated to calls for IPRs,
14 discussing "when and how" disclosure should be made (Article 2.3.3), the Guide
15 lists a number of different points in time when it can occur. This confirms that, in
16 the view of the drafters of the Guide, the notion of "timely" does not correspond to a
17 single abstractly defined point in time.   Once again, the Guide refers to the
18 obligations of the members in terms of their good faith efforts to disclose IPR:
19 *"May I remind Members of their obligations to use reasonable endeavours to*
20 *disclose any Essential IPR [related to this issue] in a timely fashion."*

21    In addition, Article 14 of the Annex 6 (ETSI IPR POLICY) states: "any
22 violation of the POLICY by a MEMBER shall be deemed to be a breach, by that
23 MEMBER, of its obligations to ETSI. The ETSI General Assembly shall have the
24 authority to decide the action to be taken, if any, against the MEMBER in breach, in
25 accordance with the ETSI Statutes".

26    Therefore, the ETSI IPR Policy contemplates that the General Assembly has
27 the authority to punish members for failing to comply with the ETSI IPR Policy,
28 including Article 4.1.

This is further confirmed by subsequent sections of the Guide:

> "Knowing who has contributed to the development of a standard may help identify IPRs Essential to that standard.
>
> If it becomes apparent that an IPR declaration/licensing undertaking is unlikely to be provided, the Technical Body Chairman should inform the Legal Advisor in the Secretariat, who will take the necessary action.
>
> Ultimately, it may be necessary for the Secretariat to invoke Clause 8.1 of the Policy"

This language confirms that, since the ultimate goal of disclosure is to first know who owns essential IPR and second obtain FRAND commitments from those owners, the sanction provided for an untimely disclosure falls within the ambit of ETSI bodies and not members.

## B.   Influence of Common Practice

According to Article 1135 of the Civil Code, "Agreements are binding not only as to what is therein expressed, but also as to all the consequences which equity, usage or statute give to the obligation according to its nature".

Independently of the exact meaning that the word *timely* could have had in the mind of the drafters, it is possible to proceed differently in the case of a criticism of the practice of a member in the disclosure of his patents: it suffices, in this respect, to ask ourselves whether he has respected the customs generally followed by the other members.

The more time that lapses from the time at which a contract was drafted, the more the interpretation rules are difficult to follow as one cannot go back to the original intentions. But one can also observe that implementation practices have progressively developed, which also impose themselves on the parties.

These practices have a real importance, not only from the point of view of the one that questions the timing of a member's disclosure of its IPR but also from the point of view of the entity disclosing IPR. This would take into account the fact that

1  ETSI has itself developed practices in its standardisation work, that can have an
2  impact on the time of disclosure.

3      To the extent that one can know the practices of disclosure of the different
4  members of the association, it will sometimes be easier to determine if a disclosure
5  is late with regard to the conducts of the other members rather than by reference to
6  an original ideal, which has perhaps never been respected by anyone.  It is an
7  ordinary way of reasoning in contractual liability to refer to standards of behaviour,
8  rather than to determined obligations. For instance, Articles 1729 and 1880 of the
9  Civil Code require that the lessee act as a "bon père de famille", which is the French
10 transcript of the roman *bonus paterfamilias*. Under Article 1927, the guardian must
11 give the "same attention to the goods deposited in his hands that he gives to his
12 own".

13     Thus, when an obligation cannot be fixed by an adequate reference, French
14 law often refers to standards, derived from practice.

15     This reasoning by reference notably presents the advantage of allowing to
16 determine if the practice of such member is not "timely" by comparing the timing
17 with the member making the accusations of delay. As such, it would be particularly
18 cynical to blame a member for the delays in disclosure that another member finds
19 acceptable itself, even if no one has ever blamed that member.

20     In this respect, it should be noted that, especially in the context of a collective
21 agreement, one way to approach the question of whether a party's behaviour is in
22 accordance with its obligations is to research whether the said behaviour meets the
23 collective expectations of other parties to the agreement. Often, where such is not
24 the case, the party's behaviour will be considered deficient, while it will not be
25 deemed to have this nature if it meets the collective expectations. A party cannot
26 expect other members to comply with a standard with which the party itself fails to
27 comply, and then ask for damages on this basis.

28

In a collective contract, despite the letter of the obligations, it seems quite obvious that collective expectations are mainly determined by common practice, since practice also makes a long-term contract by way of custom. Therefore, liability questions between members should be referred to such practices

## IV.   CONDITIONS FOR CONTRACTUAL LIABILITY UNDER FRENCH LAW

Rules for contractual liability are provided for by the French Civil Code, at Articles 1145 to 1152. They are complemented by important case law contributions.

### A.   Functioning Principles

In order to recover for breach of contract under French law, a claimant must prove the following:  (i) a breach by the debtor and (ii) harm to the creditor are both necessary.

To engage the liability of the debtor, it first belongs to the creditor of a contractual obligation to establish that it was not performed in a satisfactory manner (Art. 1147) – lack of performance, partial performance, or bad performance - and that this failure to perform is attributable to the debtor, i.e. that is does not result from fortuitous event, or from an event that would be foreign to the debtor (Art. 1148).

Insofar as these two basic conditions are met – a failure to perform, that is attributable to the debtor – his liability is incurred, in principle, which can lead to a compensation of the loss thus created by the creditor. This compensation is intended to replace the unsatisfactory performance.

But the creditor must also prove harm to his interests. In addition, the losses that a creditor can recover are limited.

Pursuant to the French construction, there is a double limit to the amount of damages. A creditor may only recover damages for breach of contract (i) that directly result from the failure to perform (Art. 1151), (ii) insofar as they could have been predicted during the formation of the contract (Art. 1150).

1    These limits to the damages that can be recovered differentiate contractual
2  liability from tort liability. Contrary to Articles 1382 *et seq.*, which govern tort
3  liability, contractual damages do not provide the creditor with full compensation for
4  his loss. In a very different way, the contractual field assumes performances coming
5  from professional partners, who must insure themselves against unfortunate
6  consequences of their performances. Consequently, damages under French law are
7  tied as closely as possible to the requirements of the contract by only compensating
8  for the *direct* consequences of the failure to perform, insofar as they are *predictable*
9  during the formation of the contract.

10    The requirement of predictability is in fact so important that it explains that
11  the compensable damage could be limited by the contract: that is the rationale of
12  different clauses having the function of adapting the terms of the liability.

13    **B.    A specific Fortuitous Case: the Fact of the Creditor**

14    If the creditor is not merely the victim of the failure to perform, but plays a
15  causal role in the intervention of the loss, this fact can constitute a partial
16  exoneration of the debtor's liability.

17    Indeed, from the perspective of the debtor whose liability is prosecuted, the
18  actions of the creditor constitute a form of external cause ("*cas fortuit*") explaining
19  the debtor's lack of performance. As a result, non-performance is not imputable to
20  the debtor of the obligation, since the creditor intervened in the process with an
21  active role.

22    Consequently there can be a partial exoneration of the loss, which is
23  sometimes presented as a share of liability, the creditor having collaborated to his
24  own damage. If the creditor is totally responsible for the failure that the debtor is
25  totally exonerated.  How can those principles be applied to the present case?

26    For Samsung's liability to be incurred it must have failed to comply with its
27  obligation: for instance, the company refused any negotiation intended to give rise
28  to a license.

1    The situation is less clear when the company is contacted and negotiations
2    open to try to determine the contractual elements of the license. For Samsung's
3    liability to be incurred, its behavior should show, in fact, a refusal to negotiate in
4    good faith toward a license on FRAND terms. As mentioned above, the obligation
5    to negotiate in good faith toward a FRAND license is incumbent on both parties to
6    the negotiation. If Apple failed to comply with this obligation, i.e. behaved in a
7    manner revealing its unwillingness to enter into a license on FRAND terms or did
8    not negotiate in good faith, then Samsung will not incur liability once it entered into
9    negotiations.

10   **C.    A Particular Loss: the Delay of the Debtor in the Performance**

11   It has been said before, in view of the failure to perform, that French law does
12   not make any distinction whether there was a total failure to perform, i.e. a lack of
13   performance, a partial performance, or only a bad performance. The delay in the
14   performance is precisely both considered as a bad performance and as a partial
15   failure to perform, the failure intervening in view of the provided time periods.

16   Delayed performance may constitute a ground for contractual liability, which
17   can carry an obligation to compensate. Article 1147 thus considers that: "the debtor
18   is ordered to pay damages, either because of the failure to perform an obligation, or
19   because of the delay in performance".

20   However, the conditions of the compensation will have to be specifically
21   established by the victim to take into account the specificities of this limited loss.

22   According the above mentioned principles, a delay in performance can only
23   carry the compensation up to the *direct* and *predictable* effects that it brought.

24   It is thus the responsibility of the creditor to prove the consequences that the
25   delay caused to show that these consequences were contemplated by the parties
26   when the contract was formed.

27   If the late performance entirely cured the consequences of the delay, then no
28   loss remains, and hence no liability

1    It is the creditor's obligation to prove the debtor's failure to perform its
2  contractual obligation. To the extent that the debtor's claim is based on the
3  creditor's delay, the creditor may show that the obligation was not performed within
4  the chronological limits provided for by the contract.

5    If a contractual term was provided for, either explicitly or implicitly, the
6  creditor bears the burden of proving that this term was exceeded by the debtor, who
7  performed after the deadline had expired.

8    In the absence of a contractual term providing a definite time in which a duty
9  is to be performed, the plaintiff must show that the time in which the creditor
10  performed the contractual obligation was unreasonable.  In the context of a breach
11  of a duty to an association, the practice of members of the association is an
12  important consideration to the determination of the reasonableness.

13  **V.    JURY INSTRUCTIONS**

14    I have reviewed the jury instructions suggested by Prof. Molfessis. These jury
15  instructions do not contain any erroneous elements. However, I believe that the
16  finder of fact could be provided with greater detail about the standards and
17  requirements of French law.

18    In my opinion, the following instructions provide that level of detail under the
19  applicable criteria under French law.

20    Jury Instructions concerning Clause 4 of the ETSI IPR
      Policy
21
      "The November 1997 ETSI IPR Policy provides:
22
      Each MEMBER shall use its reasonable endeavours to
23    timely inform ETSI of ESSENTIAL IPRs it becomes
      aware of. In particular, a MEMBER submitting a technical
24    proposal for a STANDARD shall, on a bona fide basis,
      draw the attention of ETSI to any MEMBER's IPR which
25    might be ESSENTIAL if that proposal is adopted.

26  In order to demonstrate breach of this contract provision, Apple must prove that all
27  of the conditions for performance of this obligation occurred, that Samsung did not
28

Expert Report of Remy Libchaber Regarding Interpretation of Contracts Under French Law

1  fulfill this obligation, that Apple was harmed, and that this harm was caused by
2  Samsung's failure to perform this obligation.

3       In order to demonstrate that Samsung did not fulfill its obligation, Apple must
4  demonstrate that Samsung did not use reasonable endeavours to timely inform ETSI
5  of the applications that issued as the '087 and/or '596 patent.   In making this
6  determination, you should take into account (i) whether Samsung made good faith
7  efforts to disclose the '087 and '596 patents, (ii) other ETSI members' practices in
8  terms of timing of disclosure of their patents and (iii) Apple's own practice in terms
9  of timing of disclosure of its patents.

10       In order to demonstrate that some harm was caused by Samsung's failure to
11  perform its obligation, Apple must demonstrate that, by reason of Samsung's failure
12  to comply with its obligation, Apple suffered harm.   Apple must then prove
13  cumulatively:

14   •    The existence and amount of the harm incurred

15   •    The fact that this harm is the direct and certain consequence of
16        Samsung's failure

17   •    This harm was foreseeable at the time when the contract was entered
18        into

19  Jury Instructions concerning the FRAND commitments:

20       "Samsung has submitted declarations to ETSI in which
        Samsung identified the '087 and '596 patents, or related
21      patents or applications, as IPRs that it believed may be
        considered essential to the UMTS standard. In those
22      declarations, Samsung declared that it would be prepared
        to grant irrevocable licenses under those IPRs on fair,
23      reasonable and nondiscriminatory ("FRAND") terms and
        conditions to the extent the IPRs remain essential to the
24      UMTS standard. In order to demonstrate breach of this
        provision, Apple must prove that all of the conditions for
25      performance of this obligation occurred, that Samsung did
        not fulfill this obligation, that Apple was harmed, and that
26      this harm was caused by Samsung's failure to perform this
        obligation.

27

28

In order to demonstrate that Samsung did not fulfill its obligation, Apple must demonstrate at least one of the three following facts:

- Samsung's negotiation behavior reveals its unwillingness to license its declared essential patents and/or to license them on FRAND terms and conditions

- None of Samsung's offers were on FRAND terms and conditions

- Samsung failed to behave as a good-faith negotiator

If any of these facts is demonstrated, Samsung may rebut a finding of liability by demonstrating at least one of the following two facts:

- Apple's negotiation behaviour reveals its unwillingness to take a license to Samsung's declared-essential patents on FRAND terms and conditions

- Apple did not act as a good-faith negotiator

To the extent that Apple does demonstrate liability, Apple must further prove the following regarding the harm it claims to have suffered:

- The existence and amount of the harm incurred

- The harm is the direct and certain consequence of Samsung's failure

- The harm was foreseeable at the time when the contract was entered into

If the jury finds that Samsung failed to comply with its obligations in the past, but did comply before the Court rules on this case by offering a retroactive license on FRAND terms, then Apple must demonstrate that the past failure caused a harm that was not cured by the more recent compliance. Such harm can only consist of the additional costs Apple would not have incurred if Samsung had complied with its obligations when it was required to do so."

## VI.   TRIAL EXHIBITS

If called as a witness at trial, I may rely on visual aids and demonstrative exhibits that demonstrate the bases of my opinions. Examples of these visual aids

1 and demonstrative exhibits may include, for example, interrogatory responses,
2 deposition testimony and deposition exhibits, as well as charts or diagrams.

3       Other than as referred to in this report, I have not yet prepared any exhibits
4 for use at trial as a summary or support for the opinions expressed in this report, but
5 I expect to do so in accordance with the Court's scheduling orders.

6 **VII.   PREVIOUS TESTIMONY AND COMPENSATION**

7       I have testified at my deposition in the previous case between Samsung and
8 Apple. I have not otherwise testified at a deposition or trial in the last four years.

9       I am being compensated at my usual rate of €600 for each hour of service that
10 I provide in connection with this case.  That compensation is not contingent upon
11 my performance, the outcome of this case, or any issues involved in or related to
12 this case.

13 **VIII. SUPPLEMENTATION OF OPINION**

14       I reserve the right to supplement my analysis in light of any critique of or
15 comments on my report or alternative opinions advanced by or on behalf of Apple.

16

17 Executed this 13th day of September, 2013 in Paris, France.

18

19

20                            Rémy Libchaber

21

22

23

24

25

26

27

28

# EXHIBIT 1

## *Curriculum Vitae*

### EXTRA-LEGAL EDUCATION

- High School Education at Lycée Janson de Sailly.

- June 1978: Baccalaureate, Series C, (*cum laude*).

- 1978-1980: H.E.C. preparatory school at Lycée Janson de Sailly.

- 1980-1983: Education at E.S.S.E.C. (Superior School of Economic and Commercial Sciences), at Cergy-Pontoise. Graduated in June 1983.

- 1980-1984: Degree in modern literature at Paris X University (Nanterre), (*magna cum laude*).

### LEGAL EDUCATION

- 1983-1984: Bachelor of Law at Paris X University (Nanterre), (*cum laude*).

- 1984-1985: Degree in Private Law at Paris X University (Nanterre), (*cum laude*).

- 1985-1986: Postgraduate Diploma in International private law and International commercial law, at Paris I University (Panthéon-Sorbonne) and Paris XI (Sceaux), (*cum laude*).

- 1986-1991: Doctorate Thesis at Paris I University (Panthéon-Sorbonne), under the direction of Pr. Mayer: "*Recherches sur la monnaie en droit privé*".

- 12 March 1991: *Viva voce* and accreditation to supervise research; with honour and congratulations of the jury.

- Obtaining LEVY-ULLMANN price.

### TEACHING ACTIVITIES

- 1985-1986: Principal teacher of Commercial Action in Commercial Action BTS (Superior Technician Diploma), at Lycée Le Rebours (Paris 13th).

- 1986-1989: Research Allocator at Paris I University (Panthéon-Sorbonne).

- 1990-1991: Mid-Time Teacher at Paris I University (Panthéon-Sorbonne).

- 1991-1992: Full-Time Teacher at Paris I University (Panthéon-Sorbonne).

- 1992-1993: Lecturer at Cergy-Pontoise University.

- 1993-1997: Teacher at Maine University; President of the private law chapter and Specialist committee.

- 1997-2001: Teacher at Paris-XII University.

- Since 2001: Teacher at Paris I University (Panthéon-Sorbonne).


PROFESSIONAL COLLABORATION

- 1992-1999: associate at CRIDON of Paris (Help Centre for documentation and notary information).

- 2000-2006: *of-counsel* at *CMS/Bureau Francis Lefebvre*, Neuilly/Seine.

- Since 2007: consultant at *Willkie Farr & Gallagher LLP*, Paris.

**Publications**

**Books**

- *Recherches sur la monnaie en droit privé*, Pref. P. MAYER, Bibl. dr. priv. 225, LGDJ 1992.

- Participation to *Avant-projet de réforme du droit des obligations et de la prescription*, dir. P. CATALA, La documentation française 2006, chap. V, « De l'extinction des obligations », p. 67 et 122.

- To be released in 2013 : L'*ordre juridique et le discours du droit. Essai sur les limites de la connaissance du droit*, LGDJ.

- In preparation : *L'ordre juridique français,* LGDJ.

**Articles**

1. « L'usufruit des parts de SICAV de capitalisation et les droits du conjoint survivant », *Bull. du Cridon de Paris* 1994.91.

2. « L'exception d'ordre public en droit international privé », *L'ordre public à la fin du XXe siècle*, Dalloz 1996, p. 65.

3. « Réflexions sur les engagements perpétuels et la durée des sociétés », *Revue des sociétés* 1995.437.

4. « Le portefeuille de valeurs mobilières : bien unique ou pluralité de biens ? », Actes du Colloque du 9 octobre 1995, *Répertoire Defrénois*, 1997. 65.

5. « L'euro et la théorie juridique de la monnaie au cours de la phase transitoire », *Les aspects juridiques du passage à l'euro*, Actes du séminaire de l'Université jean Moulin - Lyon III, 12 avril 1996, p. 1.

6. « L'usufruit des créances existe-t-il ? », *Revue trimestrielle de droit civil* 1997.615.

7. « L'argent, entre matière et mémoire », *Archives de philosophie du droit* 1997.115.

8. « Les créanciers du conjoint in bonis marié sous le régime de la communauté », in P. HOLL et R. LIBCHABER, *Communauté conjugale et procédure collective*, Les Éditions du Cridon 1998, p. 22.

9. « Le droit de propriété, un modèle pour la réparation des troubles du voisinage », *Mélanges Chr. MOULY*, Litec 1998, t. 1, p. 421.

10. « Les délais de grâce », in *L'apurement des dettes. Solution au surendettement*, sous la direction de Y. CHAPUT, Litec 1998, p. 329.

11. « La société, contrat spécial », *Mélanges M. JEANTIN*, Dalloz 1999, p. 281.

12. « Le juriste et ses objets. Trois exemples de construction en droit privé », *Revue Enquêtes* 1999, n° 7.

13. « La propriété », Libertés et droits fondamentaux, from the 5th ed., Dalloz 1999, updated each year.

14. « Demeure et mise en demeure en droit français », *Les sanctions de l'inexécution des obligations contractuelles*, dir. M. FONTAINE and G. VINEY, Bruylant and LGDJ 2001, p. 113.

15. « Pour une redéfinition de la notion de donation indirecte », *Rép. Defrénois* 2000.1409.

16. « Le dépôt d'actifs financiers », *Droit et Patrimoine*, May 2000, p. 89.

17. « La transmission de biens entre partenaires : les trois interprétations de l'art. 515-5, al. 2, C. civ. », *Bull. Pat.* 2001.

18. « Les articles 4 et 5 du Code civil, ou les devoirs contradictoires du juge civil », *Le titre préliminaire du Code civil*, Economica 2003, p. 143.

19. « Les droits nouveaux du conjoint survivant. Commentaire de la loi du 3 décembre 2001 », *Bull. Pat.* 2002. and *Bull. fiscal.* 2002.

20. « Pour un renouvellement de l'analyse des droits sociaux », *Mélanges Y. GUYON*, Dalloz 2003, p. 717.

21. « La recodification du droit des biens », Le Code civil 1804-2004. *Livre du Bicentenaire*, Dalloz and Litec 2004, p. 297.

22. « Une fiducie française, inutile et incertaine… », *Mélanges Ph. MALAURIE*, LGDJ 2005, p. 303.

23. « Réflexions sur le "désordre juridique français" », *Mél. A. DECOCQ*, LITEC 2004, p. 405.

24. « Réflexions sur les effets du contrat », *Mél. J.-L. AUBERT*, Dalloz 2005, p. 211.

25. « La notion de mariage, civil », *Mél. Ph. JESTAZ*, Dalloz 2006, p. 325.

26. « Le point sur l'interversion des prescriptions en cas de condamnation en justice », *Recueil Dalloz* 2006.254.

27. « Hommage à Philippe Malaurie, à l'occasion de la remise d'un liber amicorum », *Rép. Defrénois 2006*, Actualités p. 25.

28. « Droit des biens et droit savant : le double abandon du Code », in *Traditions savantes et codifications*, dir. Cl. OPHELE and Ph. REMY, Collection de la Faculté de droit et des sciences sociales de l'Université de Poitiers, LGDJ 2007

29. « La pensée économique de Jean Carbonnier : la monnaie », in *Hommage à Jean Carbonnier*, Dalloz 2007,

30.    « La vaine recherche des sûretés personnelles nouvelles : l'insaisissable porte-fort de l'exécution », RJDA 2006.787.

31.    « Un procès de presse : quatre réactions », *Commentaire* 2007.553.

32.    « Les aspects civils de la fiducie, dans la loi du 19 février 2007 », *Rép. Defrénois* 2007.1094 et 1194.

33.    « Une cession temporaire d'usufruit ? », *Rép. Defrénois* 2008.1656.

34.    « Variations autour d'un mariage annulé », *Commentaire* 2008.787.

35.    « L'impossible rationalité de l'ordre juridique », *Mél. Oppetit*, p. 505.

36.    « Retours sur l'affaire Polanski », *Commentaire* 2009.999.

37     « Conflits de lois dans l'espace et dans le temps en matière de prescription extinctive », in *La prescription extinctive. Études de droit comparé*, (dir. P. JOURDAIN and P. WERY), Bruylant 2010, p. 805.

38.    « Feu la théorie du patrimoine », *Bull. Joly* 2010, p. 316.

39.    « Les incertitudes de la notion de communauté », *Mél. CHAMPENOIS*, p. 583.

40.    « Circoncision, pluralisme et droits de l'homme », *D.* 2012.2044.

41.    « Les nouveaux rapports : l'attraction exercée par le contrat », in *Les nouveaux rapports de droit*, dir. E. JEULAND et S. MESSAÏ-BAHRI, IRJS Editions 2013, p. 51.

42.    « Des moyens et des fins en matière de contrat », *Mél. P. LE CANNU*, p.

**Case law Commentaries**

1.    Commentary under Com. 9 April 1991, *Revue des sociétés* 1991.746.

2.    Commentary under Com. 10 March 1992, *Revue des sociétés* 1992.732.

3.    Commentary under Com. 15 June 1993, *Revue des sociétés* 1994.730.

4.    Commentary under CJCE 14 September 1994, *Revue critique DIP* 1995.754.

5.    Commentary under Com. 4 July 1995, *Revue critique DIP* 1996.452.

6.    Commentary under AP, 18 June 1999, *D* 2000.248.

7.    Commentary under Civ. 3, 4 July 2001, D. 2001.151.

8.    Commentary under Civ. 1, 5 March 2002, , D. 2002.2555.

9.      Commentary under TGI Nanterre, 11 March 2002, *Rev. arb*. 2004.

10.     Commentary under Civ. 1, 30 June 2004, *Rev. arb*. 2005.645.

11.     Commentary under Paris, 30 June 2005, *Rev. arb*. 2006.687

12.     Commentary under Ch. mixte, 17 November 2006, and Civ. 1, 21 November 2006, *D*. 2007.842.

13.     Commentary under Civ. 1, 6 March 2007, *Revue critique DIP* 2007.784.

14.     Commentary under Civ. 3, 27 March 2008, *Bull. Joly 2008*, § 181, p. 852.

15.     Commentary under Com. 12 November 2008, *Bull. Joly 2009*, § 45, p. 234.

16.     Commentary under Civ. 3, 4 February 2009, *Bull. Joly 2009*, § 133, p. 667.

17.     Commentary under Com. 31 March 2009, *Bull. Joly 2009*, § 178, p. 873.

18.     Commentary under Com. 5 May 2009, *Bull. Joly 2009*, § 215, p. 234.

19.     Commentary under Com. 10 November 2009, *Revue des sociétés* 2010.99.

20.     Commentary under Civ. 1, 20 May 2010, *Bull. Joly* 2010, § 152, p. 727.

21.     Commentary under Civ. 1, 9 February 2011, *Bull. Joly* 2011, § 178, p. 1064.

22.     Commentary under CA Paris, 5 May 2011, *Bull. Joly* 2011. 761.

23.     Commentary under Com. 13 septembre 2011, *Bull. Joly* 2011.987.

24.     Commentary under Civ. 1, 4 novembre 2011, *D*. 2012.59.

25.     Commentary under Civ. 1, 20 septembre 2012, *Revue des sociétés* 2013.206.

26      Commentary under Com. 5 février 2013, *D*. 2013.1113.


**Quarterly Chronicle of Contract Law**

• In *Recueil Dalloz*, from 1995 to 2000, with L. AYNES, D. MAZEAUD and Ph. DELEBECQUE.

• In *Répertoire du Notariat Defrénois*, from 2001 to 2009, with J.-L. AUBERT†, and E. SAVAUX.

• In *la Revue des Contrats*, since 2011 (Legal regime of contractual obligations), first with D. MAZEAUD and Th. REVET, than J. KLEIN and M. LATINA.

**Biannual Chronicle of sources of law in internal law**

• In *la Revue trimestrielle de droit civil*, from 1997 to 2004, with N. MOLFESSIS.

**Articles of Repertory**

• « Effets de commerce et chèque en droit international privé », *Répertoire Dalloz de Droit international*, 1998.

• « Biens », *Répertoire Dalloz de Droit  civil*, 1997 ; 2nd ed. 2002 ; 3rd ed. 2009.

• « Gage » and « Gage de somme d'argent », Lamy Droit des sûretés, 2002.

**Reports and Preface**

• Report of: Suzanne LEQUETTE, *Le contrat-coopération. Contribution à la théorie générale du contrat*, Th. Paris II 2012, *Rev. trim. dr. civ*. 2012.588

• Preamble to Aude DENIZOT's thesis, *L'universalité de fait*, Fondation Varenne, LGDJ 2008.

• Report of: Frédéric DANOS, *Propriété, possession et opposabilité*, direction L. AYNES, Th. Paris I (Panthéon-Sorbonne) 2006, Rev. trim. dr. civ. 2007.

• Report of: Jean-Louis BERGEL, *Théorie générale du droit*, 4e éd., Dalloz 2003, *Rev. trim. dr. civ*. 2005.

• Report of: Mikhaïl XIFARAS, *La propriété*, Étude de philosophie du droit, coll. « Fondements de la politique », PUF 2004, Rev. trim. dr. civ. 2005.

• Report of: Madeleine CANTIN CUMYN, *L'administration du bien d'autrui*, Les Éditions Yvon Blais, Québec 2000, Rev. trim. dr. civ. 2001.

• Report of: Olivier BEAUD, *Le sang contaminé*, collection Béhémoth, P.U.F 1999, Rev. trim. dr. civ. 2000.

• Report of: Alain SERIAUX, LE DROIT : *une introduction*, Ellipses 1997, Rev. trim. dr. civ. 1998.

<u>**Exhibit B**</u>

**Materials Considered**

- ETSI IPR Policy, dated November 1997

- ETSI Guide on IPRs, dated November 2011

- ETSI IPR Policy FAQs, *available at* http://www.etsi.org/about/iprs-in-etsi/14-about/569-etsi-ipr-policy-faqs

- Samsung's declarations to ETSI, dated May 16, 2006, January 30, 2008, and May 5, 2010

- Professor Nicolas Molfessis's expert report, submitted by Apple on August 12, 2013

- Dr. Michael Walker's expert report, submitted by Apple on August 12, 2013