# Exhibit B
# (Submitted Under Seal)

Page 1

```
 1         UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3              SAN JOSE DIVISION
 4   -------------------------------X
     APPLE INC., a California
 5   corporation,
 6              Plaintiff,
                              Case No. 12-cv-00630
 7         VS.
 8   SAMSUNG ELECTRONICS CO., LTD.,
     A Korean corporation; SAMSUNG
 9   ELECTRONICS AMERICA, INC., a
     New York corporation; SAMSUNG
10   TELECOMMUNICATIONS AMERICA,
     LLC, a Delaware limited
11   liability company,
12              Defendants.
     -------------------------------X
13
14
15          VIDEOTAPED DEPOSITION
16                  OF
17              JOHN HAUSER
18      Friday, September 27, 2013
19            200 Park Avenue
20           New York, New York
21
22
23   Reported by:
     AYLETTE GONZALEZ, CLR
24   JOB NO. 66029
25
```

1       DATE: September 27, 2013

2       TIME: 10:08 a.m.

3

4

5    Videotaped Deposition of JOHN HAUSER,

6  held at the offices of GIBSON, DUNN &

7  CRUTCHER, LLP., 200 Park Avenue, New York,

8  New York  10166, pursuant to NOTICE,

9  before AYLETTE GONZALEZ, a Certified

10 LiveNote Reporter and Notary Public of the

11 State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:
 2
 3   GIBSON DUNN & CRUTCHER
 4   Counsel for Plaintiff
 5       200 Park Avenue
 6       New York, New York  10166
 7   BY:    PAUL TORCHIA, ESQ.
 8
 9
10
11   QUINN EMANUEL URQUHART & SULLIVAN
12   Counsel for Defendants
13       865 South Figueroa Street
14       Los Angeles, California  90017
15   BY:    KARA BORDEN, ESQ.
16   BY:    STEPHEN SWEDLOW, ESQ.
17   BY:    JOHN QUINN, ESQ.
18
19
20
21   ALSO PRESENT:
22       CARLOS LOPEZ, Videographer
23
24
25
```

1          THE VIDEOGRAPHER:  This is the
2     start of tape label number one of the
3     videotaped deposition of John Hauser
4     in the matter Apple, Inc. verses
5     Samsung Electronics Company, Ltd.
6          This deposition is being held at
7     200 Park Avenue, New York, New York,
8     on September 27, 2013, at
9     approximately 10:08 a.m.
10          My name is Carlos Lopez.  I am the                10:08
11     legal video specialist from TSG
12     Reporting, Inc.
13          The Court Reporter is Aylette
14     Gonzalez in association with TSG
15     Reporting.
16          Appearances are noted.
17          Will the Court Reporter please
18     swear in the witness.
19  J O H N   H A U S E R,
20     called as a witness, having been
21     duly sworn by a Notary Public,
22     was examined and testified as
23     follows:
24               ***************
25

1  will.
2         I mean, if there's no objection
3  anywhere, since I'm not an attorney, yes, I
4  can make that call.
5      Q.  How much time has Cornerstone                10:16
6  billed to this case?
7      A.  I don't know.
8      Q.  Do you have any personal objection
9  to sharing the information regarding how much
10 money AMS has billed on this case?                   10:16
11     A.  Do I have any personal objection?
12         Not that I can think of at this
13 point.
14     Q.  Do you have any personal objection
15 to objecting to sharing how much money               10:16
16 Cornerstone has billed on this case?
17     A.  Not that I can think of at this
18 point in time.
19     Q.  In your report, you stated that,
20 "the specific technical descriptions of the          10:17
21 patent related features were provided to me by
22 Counsel.  I have not reviewed or interpreted
23 the patent claims myself, and do not have a
24 professional opinion on that matter."
25     A.  I do not have a professional              10:17

Page 14

1  opinion on the matter, no.
2      Q.   I'm focusing more on the first part
3  the which said, "technical descriptions of the
4  features were provided to me by Counsel."
5           Is that correct?                                10:17
6      A.   Counsel described to me what the
7  patents were.  What -- what the patents do,
8  actually.
9      Q.   If you don't use the background
10 syncing patent, how do -- how does a phone                10:17
11 sync with its -- with the computer that's not
12 the phone?
13          MR. TORCHIA:  Objection to the
14      form of the question.
15     A.   So you're asking me to tell you,                 10:17
16 essentially, you know, how an engineer would
17 design this?
18     Q.   I'm asking you to tell me what is
19 the alternative, if you don't use the patent?
20          MR. TORCHIA:  Same objection.                    10:18
21     A.   Well, what I do know is that there
22 might be a way that it syncs with the computer
23 afterwards.  For example, if you get out of
24 the app, then it might sync or the app might
25 slow down.  I don't know the technical                    10:18

1    details.

2        Q.   You don't know the technical

3    details of how it would work without the

4    patented feature for background syncing; is

5    that correct?                                          10:18

6        A.   Well, we tried to do our best to

7    capture an example of what it might do in the

8    document.  Those questions were actually

9    worded very carefully.  There might be other

10   ways that an engineer might design.                    10:18

11       Q.   Did the attorneys write those words

12   or did you write those words?

13       A.   Well, these are -- let's be very

14   clear.  This process which Cornerstone, AMS

15   and I are developing words that we believe            10:19

16   that the customers here understand that

17   describe what the patented features do in the

18   customer's own words.  And these were

19   developed very carefully.  I had a hand in

20   that, yes.                                             10:19

21       Q.   When you say they were developed

22   very carefully, did you do any research to

23   develop the technical descriptions in the

24   customer's own words?

25            MR. TORCHIA:  Objection to the               10:19

1       form of the question.
2       A.   Could you be a little bit more
3  specific about what you mean by "research?"
4       Q.   Did you survey any consumers of
5  these products to determine how to describe          10:19
6  the technical features in consumer's own
7  words?
8       A.   Well, we did some pre-tests of the
9  words that we developed.  We certainly had a
10 number of people at AMS who were users of             10:19
11 phones involved in this process trying to
12 understand the process.
13           I'm also a user of phones.  I did
14 my best.  Cornerstone as well.  Phones in
15 general.  But we then pretested these to the          10:20
16 best of our ability.  We pretested them -- I'm
17 sorry; our descriptions to the best of our
18 ability.
19      Q.   What changes were made to the words
20 in the descriptions of the patented features          10:20
21 after the pre-tests?
22      A.   Well, this was a running pre-test
23 and some changes were made on the fly.  And I
24 actually did not capture those changes.  But
25 they were just changes in words so that the           10:20

Page 17

1    customer can understand it.
2        Q.    And that's what I'm wondering, what
3    were the changes in wording that were done
4    based on what you called a running pre-test?
5        A.    I don't recall all the details.                    10:20
6        Q.    What do you mean, running
7    pre-tests?
8        A.    Well, if you look at some of the
9    documents, there's some pre-tests, I think,
10   from June 14th and again on June 17th.  In       10:20
11   that time, we're working with the people who
12   developed the animations.
13            Now, I do want it very clear, it's
14   animations, plus wording, to get those -- you
15   know, any minor wording that the interviewers    10:21
16   thought or I thought because I listened to a
17   few of these.  By and large, the ones I
18   listened to, there weren't any hiccups.  Then
19   those words were changed.  I just did not
20   capture those.                                    10:21
21       Q.    Do you know whether or not any
22   words were changed for background syncing
23   based on the pre-tests?
24       A.    I don't recall which of the
25   features -- which of the patented features we    10:21

Page 62

1  analysis study.  But the conjoint analysis
2  study, if they were unaware of this feature
3  and, you know, now it's described to them, it
4  would probably have very little importance to
5  them.                                                          11:18
6      Q.  I think we're going to talk about
7  that at some length, but I'm asking a slightly
8  different question that doesn't include your
9  hypothetical.
10         Did you do anything to research the                    11:18
11 awareness of Samsung purchasers of accused
12 phones of the patented features at the time
13 they purchased their phone?
14     A.  I did the conjoint analysis study,
15 the conjoint analysis study allows me to infer  11:18
16 certain things about that.  I did not do a
17 study beyond the conjoint study.
18     Q.  What you said is that if -- because
19 your conjoint showed these patented features
20 mattered, then what, you're saying that that    11:19
21 would mean they were aware of it at the time
22 they've actually purchased their phone?
23         MR. TORCHIA:  Objection to the
24     form of the question.
25     A.  No, I -- what it -- what the          11:19

Page 63

1  conjoint study says specifically is that these
2  features are either important or unimportant
3  and we get a measure of importance.
4         Now, there's heterogeneity, and so
5  the -- the overall results take this                    11:19
6  heterogeneity into account.
7         I believe that that's a reasonable
8  way to do the analyses.  I don't think it's
9  particularly relevant to say, you know -- I
10 did not do an additional awareness study               11:19
11 beyond the conjoint study.
12    Q.   Here's my confusion:  My
13 understanding in your answer is that you
14 didn't do any awareness study at the time the
15 Samsung purchasers purchased the accused                11:20
16 product of any of these patented features;
17 isn't that correct?
18    A.   Well, I mean, that's where I think
19 we're disagreeing on some of the words.  I did
20 do the conjoint study.  The conjoint study              11:20
21 allows me to an infer certain things and, you
22 know, provides information, information now in
23 a technical sense.
24         I did not do an additional study
25 where I intercepted people right before the             11:20

Case 5:12-cv-00630-LHK   Document 1517-5   Filed 03/27/14   Page 13 of 18

Page 64

1  pur- -- the moment of truth and said are you

2  aware of X, Y and Z.

3      Q.   And you didn't do any other

4  research based upon market studies that had

5  been performed, consumer surveys either pre-                11:20

6  or post-purchase, or any other study to

7  determine the level of awareness of Samsung

8  purchasers of accused products of these

9  patented features at the moment of truth;

10 isn't that correct?                                          11:21

11           MR. TORCHIA:  Objection to form.

12     A.   Beyond the conjoint study, which

13 allows me to infer certain things, I -- and I

14 did not do any additional studies beyond the

15 conjoint study.  It's the only study I'm                    11:21

16 presenting in this case.

17     Q.   How does the conjoint study provide

18 any information to you about the consumers'

19 awareness of these features at the time they

20 purchased the accused products?                              11:21

21     A.   Well, these features clearly affect

22 choice.  I mean, that -- that's pretty clear

23 from its -- the conjoint analysis study.  I --

24 they -- they are features that matter, people

25 are willing to trade off real dollars for                    11:21

1  these.

2         And one -- again, it's a

3  probabilistic estimate, but one would assume

4  that if it's going to affect choice and it has

5  affected choice, which is what the conjoint      11:22

6  study does, many of these people would be very

7  aware of these features.

8     Q.   Is it -- are you saying that

9  because your conjoint measured value in these

10 attributes, that consumers must have been        11:22

11 aware of them before purchasing their device?

12        MR. TORCHIA:  Objection to the

13     form of the question; misstates

14     testimony.

15    A.   You're asking me -- and I said it's      11:22

16 sort of probabilistic.  I mean, can I infer

17 it?  I -- I can't tell the percentage that

18 it's zero, and I can't tell you the percentage

19 that it's 100 percent.  But it would make

20 sense that some people are aware of these        11:22

21 features.  I mean, they're important features

22 to people, they matter.

23        So no, but I can't give you that

24 exact percentage of how many people would be

25 aware of those features.                         11:23

1      Q.   But you -- but to be clear, you're
2  saying they're important features and they
3  matter based upon the results of your
4  conjoint; isn't that correct?
5      A.   Yes -- well, what I'm saying is the            11:23
6  conjoint analysis indicates that they're
7  important features, yes, the conjoint analysis
8  study.
9      Q.   But you have no way to identify the
10 percentage as zero, 100 or anywhere in between       11:23
11 of the purchasers of the accused Samsung
12 products that were aware of these features
13 before purchasing their product; isn't that
14 correct?
15          MR. TORCHIA:  Objection to form.            11:23
16     A.   I have not done that study, I don't
17 think it's particularly relevant here.  We
18 could play all over this, and if one were to
19 do -- you've got to be very careful as to how
20 you define awareness, whether it's aided or          11:23
21 unaided, that I think what we've shown is that
22 these features matter.  And also, what's also
23 very important is I have a control in them.
24     Q.   You have the what?
25     A.   I have a control in this study.             11:24

1   And we'll get to that at great length later.

2       Q.   If a consumer was unaware of a
3   feature in a product at the time of purchase,
4   how can that feature have had an impact on
5   their purchase decision?                           11:24
6           MR. TORCHIA:  Objection to the
7       form of the question.
8       A.   Well, it's actually a very
9   philosophical point, and it goes back to what
10  you mean by awareness.  And the question is,       11:24
11  could it have an affect?  Yes, it could have
12  an effect.  The reason it could is because it
13  could lead to an overall image of the phone
14  they've gotten from a number of different
15  places.  But I haven't done that study.            11:25
16      Q.   If I understand your -- your
17  testimony correctly, you're saying that
18  awareness is a philosophical question to some
19  extent, and the awareness could be part of the
20  overall attractiveness of the phone; is that       11:25
21  what you're saying?
22          MR. TORCHIA:  Objection to the
23      form of the question.
24      A.   Well, for example, this is again
25  speculating, it's going off on a different         11:25

1        MR. TORCHIA:  Thank you,
2  Dr. Hauser.  I have nothing.
3        THE VIDEOGRAPHER:  It's 6:13 p.m.
4  We're going off the record.
5        (Whereupon, at 6:13 p.m., the
6  Examination of this Witness was
7  concluded.)
8
9
          _____
10           JOHN HAUSER
11
12 Subscribed and sworn to before me
13 This _____ day of _____, 2013.
14
_____
15       NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25

1              C E R T I F I C A T E
2
3    STATE OF NEW YORK       )
                             :  SS.:
4    COUNTY OF RICHMOND      )
5
6         I, AYLETTE GONZALEZ, a Notary Public
7    for and within the State of New York, do
8    hereby certify:
9         That the witness, JOHN HAUSER, whose
10   examination is hereinbefore set forth was
11   duly sworn and that such examination is a
12   true record of the testimony given by that
13   witness.
14        I further certify that I am not
15   related to any of the parties to this action
16   by blood or by marriage and that I am in no
17   way interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto
19   set my hand this 27th day of September, 2013.
20
21         _____
              AYLETTE GONZALEZ
22          (Notary Public No. 01G06228612
             Expiration date:  9/27/2014)
23
24
25