# EXHIBIT C

1  JOSH A. KREVITT (CA SBN 208552)
   jkrevitt@gibsondunn.com
2  H. MARK LYON (CA SBN 162061)
   mlyon@gibsondunn.com
3  GIBSON, DUNN & CRUTCHER LLP
   1881 Page Mill Road
4  Palo Alto, California  94304-1211
   Telephone:  (650) 849-5300
5  Facsimile:  (650) 849-5333

6  MICHAEL A. JACOBS (CA SBN 111664)
   mjacobs@mofo.com
7  RICHARD S.J. HUNG (CA SBN 197425)
   rhung@mofo.com
8  MORRISON & FOERSTER LLP
   425 Market Street
9  San Francisco, California  94105-2482
   Telephone:  (415) 268-7000
10 Facsimile:  (415) 268-7522

   WILLIAM F. LEE (*pro hac vice*)
   william.lee@wilmerhale.com
   WILMER CUTLER PICKERING
     HALE AND DORR LLP
   60 State Street
   Boston, Massachusetts  02109
   Telephone:  (617) 526-6000
   Facsimile:  (617) 526-5000

   MARK D. SELWYN (CA SBN 244180)
   mark.selwyn@wilmerhale.com
   WILMER CUTLER PICKERING
     HALE AND DORR LLP
   950 Page Mill Road
   Palo Alto, California  94304
   Telephone:  (650) 858-6000
   Facsimile:  (650) 858-6100

11
12 *Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

13            UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
14                  SAN JOSE DIVISION

15 APPLE INC., a California corporation,

16            Plaintiff,

17      vs.

18 SAMSUNG ELECTRONICS CO., LTD.,
   a Korean business entity; SAMSUNG
19 ELECTRONICS AMERICA, INC., a
   New York corporation; SAMSUNG
20 TELECOMMUNICATIONS AMERICA,
   LLC, a Delaware limited liability
21 company,

22            Defendants.

23

Case No. 12-cv-00630-LHK (PSG)

APPLE INC.'S FURTHER
SUPPLEMENTAL OBJECTIONS AND
RESPONSES TO SAMSUNG'S
INTERROGATORIES NOS.  1, 2, 3, 5, 9,
10, 25, 26, 27, 39, 40, 41, 42, 49

HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY

24

25

26

27

28

burden of ascertaining the answer to this Interrogatory from the produced documents is substantially the same for Apple as for Samsung. Apple refers to such documents including those identified by bates number in Apple's Local Patent Rules Disclosures served on June 15, 2012; the April 4, 2013 deposition of Bas Ording; the April 13, 2012 deposition of Kenneth Kocienda; APLNDC630-0000149267; APLNDC630-0000024778-80; APLNDC630-0000024781-83; APLNDC0001334519-20; APLNDC630-0000024784-86; the following Director file that has been made available to Samsung for inspection: /Users/review/Desktop/Samsung Off/Data/Ording Bas 7091 20080220 1330/DOCS/P2 keyboard/word correct anim/word correct 01.dir

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Additional evidence supporting the reduction to practice of Apple's patents-in-suit includes, but is not limited to, the documents identified in the attached Appendices D and F.

In addition, Apple's contentions regarding the evidence that supports the reduction to practice of the patents-in-suit are the subject of expert opinions found in the following expert reports which are hereby incorporated by reference:

- Rebuttal Expert Report of Dr. Alex C. Snoeren Concerning U.S. Patent Nos. 6,847,959 And 7,761,414 dated August 12, 2013 and all exhibits, appendices, errata, and supplementations thereto
- Rebuttal Expert Report Of Dr. Todd C. Mowry Regarding Infringement Of U.S. Patent No. 5,946,647 dated August 12, 2013 and all exhibits, appendices, errata, and supplementations thereto
- Rebuttal Expert Report Of Professor Andrew Cockburn dated August 12, 2013 and all exhibits, appendices, errata, and supplementations thereto

**INTERROGATORY NO. 5:**

Separately for each claim of the APPLE PATENTS, identify each secondary consideration that YOU contend supports the non-obviousness of the invention(s) claimed (e.g., commercial success, long-felt need, commercial acquiescence, expressions of

- 45 –

skepticism, copying, teaching away, simultaneous development, failure of others, unexpected results, commercial acquiescence through acceptance of licenses, departure from acceptable principles of prior art, or acclaim by industry), and for each such alleged secondary consideration describe in detail the facts underlying the alleged secondary consideration.

**RESPONSE TO INTERROGATORY NO. 5:**

Apple objects to this Interrogatory as overly broad, unduly burdensome, vague, ambiguous, and as not reasonably calculated to lead to the discovery of admissible evidence, including but not limited to its use of the terms "simultaneous development," and "departure from  acceptable principles of prior art." Apple still further objects to this Interrogatory on the grounds and to the extent it is compound and comprises discrete subparts resulting in separate interrogatories, seeks a legal conclusion, and seeks expert opinion.

Subject to the foregoing General and Specific Objections, Apple responds as follows: The Apple products upon which Apple is relying as practicing the asserted claims of the asserted patents have experienced enormous commercial success. For example, it took Apple only 74 days to sell one million units of the original iPhone in 2007, only three days to sell one million units of the iPhone 3G, and only three days to sell 1.7 million units of the iPhone 4. See Decl. of Christopher Vellturo, PH.D. ("Vellturo Decl."), Feb. 8, 2012, Ex. 15 (Apple Announces iPhone 4 Sold 1. 7 Million in First Three Days, AppleInsider (June 28, 2010), http://www.appleinsider.com/articles/10/06/28/apple_announces_iphone_4_sold_1_7_million_in_first_three_days.html; see also Vellturo Decl., Ex. 13 (Kelly Hill, Apple's Show; AT&T's Details, RCR Wireless News, June 18, 2007) (quoting an industry analyst who noted that the "latent demand" for the iPhone "is something I don't think we're ever seen before."). The iPad similarly was a resounding commercial success upon its introduction. See, e.g., APLNDC-Y0000238573 (noting that "Apple sold 15 million iPads in nine months, created a mammoth new product category and started an industry of copycats.").

These Apple products have continued to sell exceptionally well. For example, in 2010, Apple sold nearly 40 million iPhones and over 7 million iPads, while in 2011, Apple sold over 72 million iPhones and over 32 million iPads. See Apple Inc. Form 10-K, Oct. 31, 2012, at 30. In fiscal year 2012, Apple sold over 125 million iPhone units and over 58 million iPad units. See id. at 30. Moreover, net sales of iPhone and related products and services were $80.5 billion in 2012, while net sales of iPad and related products and services were $32.4 billion in 2012. See id. at 31.

Apple's products practicing the claimed inventions have also achieved high praise and industry acclaim. For example, numerous industry observers have praised the iPhone's groundbreaking patented features. See, e.g., APLNDC0001244544-45 (naming the iPhone the "Invention of the Year"); APLNDC-Y0000147846-49 ("[T]he iPhone is still the most sophisticated, outlook-changing piece of electronics to come along in years."); APLNDCY0000142002-12 (naming the iPhone one of "ten gadgets that defined the decade"); APLNDC630-0000149197 (noting that while "many consider [Siri] the best voice recognition application in history," "its potential really lies in its ability to revolutionize the way we search the Internet, answer questions and consume information."). Apple's iPad has also been the subject of high acclaim from industry observers. See, e.g., Vellturo Decl., Ex. 16 (Walter S. Mossberg, Laptop Killer? Pretty Close, Wall St. J., Apr. 1, 2010, http://online.wsj.com/article/SB10001424052702304252704575155982711410678.html) ("After spending hours and hours with [the iPad], I believe this beautiful new touch-screen device from Apple has the potential to change portable computing profoundly, and to challenge the primacy of the laptop. It could even help, eventually, to propel the fingerdrive, multitouch user interface ahead of the mouse-driven interface that has prevailed for decades.").

Apple's products practicing the asserted claims of the asserted patents have also overcome significant skepticism from industry observers. For example, prior to the iPhone's

release, experts in the field and general users were skeptical of the iPhone's functionality and utility. See, e.g., APLNDC-Y0000238313 (noting that "[m]any analysts are skeptical on the appeal of an iPhone"); APLNDC-Y0000238318-19) ("for businesspeople the touch-sensitive screen without a physical button keyboard will be a challenge . . . We've learned and struggled for a few years here figuring out how to make a decent phone. PC guys are not going to just figure this out. They're not going to just walk in"). The iPhone's patented technological advances, however, overcame that initial disbelief. See, e.g., APLNDCY0000147593-597 (highlighting, inter alia, the iPhone's software, which "sets a new bar for the smart-phone industry," and noting that "[t]he iPhone's most controversial feature, the omission of a physical keyboard in favor of a virtual keyboard on the screen, turned out in our tests to be a nonissue, despite our deep initial skepticism . . . partly because of smart software that corrects typing errors on the fly"); APLNDC-Y0000147846-49 (calling the iPhone "revolutionary" and highlighting its innovative software, including the iPhone's advances in enabling touchscreen typing). The iPad also overcame significant initial skepticism from industry observers. See, e.g., APLNDC-Y0000238577-79, APLNDCY0000238580-82 ("Like a moth to a hot trend, Apple (AAPL) will fly into the netbook flame and get burned. The company will unveil a 10-inch touchscreen tablet computer sometime this year, say analysts. Not only does Apple want to showcase its design prowess, the company desperately needs a new hit to revitalize its computer line-up. . . . [B]eyond the core fan base, Apple will discover what other PC makers have known for a while: Consumers find big tablets hard to swallow.").

The success and novelty of Apple's products practicing the asserted claims of the asserted patents are evidenced also by the degree to which Apple's competitors have copied Apple's patented features. For example, following Apple's introduction of the technology of the patents at issue, Samsung quickly saw the value in that technology and copied it for use in its own products. See, e.g., SAMNDCA10175266 (Samsung internal executive-level email

- 48 –

identifying the iPhone "as the benchmark/goal for improvement in any of our products."); SAMNDCA00249929, at *959 (noting that a Samsung-designed smartphone lock screen "fared well against iPhone's lock screen" and that "[u]sers of iPhones rated the lock screen as similar to their current phones."); SAMNDCA10029586, at *603 (Samsung analysts recommending "an on-screen, gesture-based unlock" for Samsung phones similar to the iPhone); SAMNDCA00203880, at *915 (comparing screenshots of the iPhone performing the patented functionality of U.S. Patent 5,946,647 with screenshots of an older Samsung phone, which did not have the functionality at that time, and noting that "Improvement Directions" were to improve usability by providing Links for Web, Call, Email for memo contents that can be linked," just as in the iPhone.)

Apple's products practicing the asserted claims of the asserted patents also have succeeded where numerous other smartphone and electronic device manufacturers have failed. As industry observers have recognized, prior to the introduction of Apple's iPhone and iPad, no other company had deployed the patented technology at issue to achieve the commercial and technological success that Apple has achieved with its products. See, e.g., APLNDCY0000147593-597 ("'[s]mart phones' have had lousy software, confusing user interfaces and clumsy music, video and photo playback. And their designers have struggled to balance screen size, keyboard usability and battery life. . . . [T]he iPhone is, on balance, a beautiful and breakthrough handheld computer."); Vellturo Decl., Ex. 2 ("Dan Frommer, History Lesson: How the iPhone Changed SmartPhones Forever, Bus. Insider, June 6, 2011, http://www.businessinsider.com/iphone-android-smartphones-2011-6) ("As we look toward the future of mobile, it's important to remember how quickly and completely things can change. There's no better example of that than Apple's iPhone introduction in 2007, which totally flipped the mobile industry upside down. It changed everything about phones, forever, at a crucial point in their development."); id. Ex. 4 (Charles Arthur, Voice Recognition: Has It Come of Age?, The Guardian, Nov. 20, 2011,

http://www.guardian.co.ukltechnology/20111nov/20/voice-recognition-apple-siri) ("It's taken almost five years, but now multi-touch screens are everywhere . . . .").

Moreover, there is a clear nexus between the technology of the specific patents asserted in this litigation and the secondary considerations listed above. For example, the "slide-to-unlock" functionality disclosed in U.S. Patent No. 8,046,721 has been widely regarded as a direct contributor to the unique user experience associated with, and thus the commercial success of, Apple's iOS devices. It also was integral in enabling practical use of full-touchscreen devices, which might otherwise be prone to inadvertent user input. The "auto correct" functionality disclosed in U.S. Patent No. 8,074,172 similarly enabled the widespread adoption of the iPhone's touchscreen interface. It greatly enhanced the user experience associated with typing on a device without a physical keyboard, and in turn overcame significant skepticism from industry observers about such devices. The "data structures" functionality disclosed in U.S. Patent No. 5,946,647 has also directly contributed to the commercial success of Apple's iOS products and the products of Apple's competitors. The ability to perform functions on touchscreen devices simply by tapping data in an email, text message, or web page directly contributes to the ease of use associated with, and in turn the popularity of, those devices. The same is true for the functionality disclosed in U.S. Patent No. 8,014,760, which allows a user to perform functions relating to missed calls directly from a missed-call list. By eliminating the need for, e.g., cumbersome re-typing of phone numbers in order to call or send a text message to a contact who had previously called a user, this functionality makes call management far more efficient and has in turn become a popular and highly demanded feature of Apple's iPhone.

The functionality disclosed in U.S. Patent Nos. 6,847,959 and 8,086,604 also greatly contributes to the efficiency and ease of use of Apple's products. Indeed, this functionality is integral to Apple's highly popular Siri feature, which has contributed to the commercial success of iOS devices in large part because of its ability to search for diverse types of data in

- 50 –

different locations through a single interface. Similarly, the functionality disclosed in U.S. Patent No. 5,666,502, which enables a device to show different lists of information previously entered by a user depending on the application or form in which those lists are displayed, ensures that searches conducted on a device are far more relevant and data entry is more convenient across different applications. This too directly contributes to the usability, and thus the commercial success, of Apple's and other companies' products. Finally, the "asynchronous synchronization" feature disclosed in U.S. Patent No. 7,761,414 contributes to the success of smartphones and other devices by enabling information on a device, such as email, to be updated while a user is performing other tasks on the device. This greatly enhances the usability of the device, which would be far less appealing to consumers if it could not provide up-to-date information because it was simultaneously running a different application.

Discovery is still in its early stages and Apple is continuing to investigate. Apple reserves the right to supplement and/or amend its response as appropriate to this contention interrogatory. Apple's contentions regarding the evidence that supports that non-obviousness of the Apple Patents further will be detailed in its expert report(s) that will be served in accordance with the procedural schedule set forth in the Court's Case Management Order.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Subject to and incorporating its General Objections and its Specific Objections from Apple Inc.'s Objections and Responses to Samsung's First Set of Interrogatories with regard to Samsung's Interrogatory No. 5, Apple provides the following supplemental response:

The Apple products upon which Apple is relying as practicing the asserted claims of the asserted patents have experienced enormous commercial success. For example, it took Apple only 74 days to sell one million units of the original iPhone in 2007, only three days to sell one million units of the iPhone 3G, and only three days to sell 1.7 million units of the

- 51 –

iPhone 4. See Decl. of Christopher Vellturo, PH.D. ("Vellturo Decl."), Feb. 8, 2012, Ex. 15

(Apple Announces iPhone 4 Sold 1. 7 Million in First Three Days, AppleInsider (June 28,

2010),

http://www.appleinsider.com/articles/10/06/28/apple_announces_iphone_4_sold_1_7_millio

n_in_first_three_days.html; see also Vellturo Decl., Ex. 13 (Kelly Hill, Apple's Show;

AT&T's Details, RCR Wireless News, June 18, 2007) (quoting an industry analyst who

noted that the "latent demand" for the iPhone "is something I don't think we're ever seen

before."). The iPad similarly was a resounding commercial success upon its introduction.

See, e.g., APLNDC-Y0000238573 (noting that "Apple sold 15 million iPads in nine months,

created a mammoth new product category and started an industry of copycats.").

These Apple products have continued to sell exceptionally well. For example, in

2010, Apple sold nearly 40 million iPhones and over 7 million iPads, while in 2011, Apple

sold over 72 million iPhones and over 32 million iPads. See Apple Inc. Form 10-K, Oct. 31,

2012, at 30. In fiscal year 2012, Apple sold over 125 million iPhone units and over 58

million iPad units. See id. at 30. Moreover, net sales of iPhone and related products and

services were $80.5 billion in 2012, while net sales of iPad and related products and services

were $32.4 billion in 2012. See id. at 31.

Apple's products practicing the claimed inventions have also achieved high praise and

industry acclaim. For example, numerous industry observers have praised the iPhone's

groundbreaking patented features. See, e.g., APLNDC0001244544-45 (naming the iPhone

the "Invention of the Year"); APLNDC-Y0000147846-49 ("[T]he iPhone is still the most

sophisticated, outlook-changing piece of electronics to come along in years.");

APLNDCY0000142002-12 (naming the iPhone one of "ten gadgets that defined the

decade"); APLNDC630-0000149197 (noting that while "many consider [Siri] the best voice

recognition application in history," "its potential really lies in its ability to revolutionize the

way we search the Internet, answer questions and consume information."). Apple's iPad has

also been the subject of high acclaim from industry observers. See, e.g., Vellturo Decl., Ex. 16 (Walter S. Mossberg, Laptop Killer? Pretty Close, Wall St. J., Apr. 1, 2010, http://online.wsj.com/article/SB10001424052702304252704575155982711410678.html) ("After spending hours and hours with [the iPad], I believe this beautiful new touch-screen device from Apple has the potential to change portable computing profoundly, and to challenge the primacy of the laptop. It could even help, eventually, to propel the fingerdrive, multitouch user interface ahead of the mouse-driven interface that has prevailed for decades.").

Apple's products practicing the asserted claims of the asserted patents have also overcome significant skepticism from industry observers. For example, prior to the iPhone's release, experts in the field and general users were skeptical of the iPhone's functionality and utility. See, e.g., APLNDC-Y0000238313 (noting that "[m]any analysts are skeptical on the appeal of an iPhone"); APLNDC-Y0000238318-19) ("for businesspeople the touch-sensitive screen without a physical button keyboard will be a challenge . . . We've learned and struggled for a few years here figuring out how to make a decent phone. PC guys are not going to just figure this out. They're not going to just walk in"). The iPhone's patented technological advances, however, overcame that initial disbelief. See, e.g., APLNDCY0000147593-597 (highlighting, inter alia, the iPhone's software, which "sets a new bar for the smart-phone industry," and noting that "[t]he iPhone's most controversial feature, the omission of a physical keyboard in favor of a virtual keyboard on the screen, turned out in our tests to be a nonissue, despite our deep initial skepticism . . . partly because of smart software that corrects typing errors on the fly"); APLNDC-Y0000147846-49 (calling the iPhone "revolutionary" and highlighting its innovative software, including the iPhone's advances in enabling touchscreen typing). The iPad also overcame significant initial skepticism from industry observers. See, e.g., APLNDC-Y0000238577-79, APLNDCY0000238580-82 ("Like a moth to a hot trend, Apple (AAPL) will fly into the

- 53 –

netbook flame and get burned. The company will unveil a 10-inch touchscreen tablet computer sometime this year, say analysts. Not only does Apple want to showcase its design prowess, the company desperately needs a new hit to revitalize its computer line-up. . . .[B]eyond the core fan base, Apple will discover what other PC makers have known for a while: Consumers find big tablets hard to swallow.").  The success and novelty of Apple's products practicing the asserted claims of the asserted patents are evidenced also by the degree to which Apple's competitors have copied Apple's patented features. For example, following Apple's introduction of the technology of the patents at issue, Samsung quickly saw the value in that technology and copied it for use in its own products. See, e.g., SAMNDCA10175266 (Samsung internal executive-level email identifying the iPhone "as the benchmark/goal for improvement in any of our products."); SAMNDCA00249929, at *959 (noting that a Samsung-designed smartphone lock screen "fared well against iPhone's lock screen" and that "[u]sers of iPhones rated the lock screen as similar to their current phones."); SAMNDCA10029586, at *603 (Samsung analysts recommending "an on-screen, gesture-based unlock" for Samsung phones similar to the iPhone); SAMNDCA00203880, at *915 (comparing screenshots of the iPhone performing the patented functionality of U.S. Patent 5,946,647 with screenshots of an older Samsung phone, which did not have the functionality at that time, and noting that "Improvement Directions" were to improve usability by providing Links for Web, Call, Email for memo contents that can be linked," just as in the iPhone.)

Apple's products practicing the asserted claims of the asserted patents also have succeeded where numerous other smartphone and electronic device manufacturers have failed. As industry observers have recognized, prior to the introduction of Apple's iPhone and iPad, no other company had deployed the patented technology at issue to achieve the commercial and technological success that Apple has achieved with its products. See, e.g., APLNDCY0000147593-597 ("'[s]mart phones' have had lousy software, confusing user

interfaces and clumsy music, video and photo playback. And their designers have struggled functionality disclosed in U.S. Patent No. 8,014,760, which allows a user to perform functions relating to missed calls directly from a missed-call list. By eliminating the need for, e.g., cumbersome re-typing of phone numbers in order to call or send a text message to a contact who had previously called a user, this functionality makes call management far more efficient and has in turn become a popular and highly demanded feature of Apple's iPhone. The functionality disclosed in U.S. Patent Nos. 6,847,959 and 8,086,604 also greatly contributes to the efficiency and ease of use of Apple's products. Indeed, this functionality is integral to Apple's highly popular Siri feature, which has contributed to the commercial success of iOS devices in large part because of its ability to search for diverse types of data in different locations through a single interface. Similarly, the functionality disclosed in U.S. Patent No. 5,666,502, which enables a device to show different lists of information previously entered by a user depending on the application or form in which those lists are displayed, ensures that searches conducted on a device are far more relevant and data entry is more convenient across different applications. This too directly contributes to the usability, and thus the commercial success, of Apple's and other companies' products.

In addition, the "asynchronous synchronization" feature disclosed in U.S. Patent No. 7,761,414 contributes to the success of smartphones and other devices by enabling information on a device, such as email, to be updated while a user is performing other tasks on the device. This greatly enhances the usability of the device, which would be far less appealing to consumers if it could not provide up-to-date information because it was simultaneously running a different application.

Finally, the non-obviousness of the asserted patents is evidenced by the failed attempts of others to design around the inventions. For example, Apple asserted U.S. Patent No. 5,946,647 against HTC in ITC Inv. No. 337-TA-710, in which Android-based HTC smartphones were found to infringe. As explained in Apple's enforcement complaint in that

- 55 –

Apple's Further Supplemental Responses to Samsung's Interrogatories
Nos. 1, 2, 3, 5, 9, 10, 25, 26, 27, 39, 40, 41, 42, 49
Case No. 12-cv-00630-LHK (PSG)

investigation , filed June 4,2012, despite HTC's attempts to design around the invention, its devices still infringed. Also, despite the fact that Android-based devices infringe the '647 patent in substantially the same way, no competitor, including Samsung, has successfully designed around the claimed functionality. Similarly, Samsung has not successfully designed around the claimed functionality of U.S. Patent Nos. 5,666,502, 7,761,414, and 8,014,760.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Subject to and incorporating its General Objections and its Specific Objections from Apple Inc.'s Objections and Responses to Samsung's First Set of Interrogatories with regard to Samsung's Interrogatory No. 5, Apple provides the following second supplemental response:

Additional objective indicia establishing the non-obviousness of U.S. Patent No. 5,946,647 include, but are not limited to copying of the claimed invention, industry acceptance or recognition of the claimed invention, and a long-felt but unsolved need. For instance, after Apple announced the pending release of Data Detectors, a company named MacSpigot released a software package called "Data Ratchet." (MILLER00000897-900; MILLER00001070-75.) Data Ratchet "automatically and instantaneously extracts critical information from web pages, email, or any other text document" and claimed to be "an implementation of the 'Apple Data Detectors' information extraction design currently in development at Apple." Furthermore, acceptance by others of the '647 patent as evidenced by praise and recognition from the industry strongly supports non-obviousness. Such recognition can be found in documents produced by Samsung and/or Google discussing the importance of the Data Detectors functionality in Apple's devices. Before Apple's full release of the original Apple Data Detectors, Apple sought testers for prototype versions. After posting its need for such testers, Apple received well over 200 responses from consumers and programmers wishing to participate. (See WRIGHT00001033-1296.) People such as the

Systems Administrator of the NASA Ames Research Center (WRIGHT00001055), and university professors (WRIGHT00001033; WRIGHT00001062), all praised the technology. In addition, the '647 patent satisfied a long-felt need. For example, parsers for identifying structures in data were present in the art well before the invention of the '647 patent. So too were user interface menus. And since the advent of the graphical user interface, the computer industry has sought to improve user experience. Yet, in all that time, no one had invented the solution claimed in the '647 patent.

Additional objective indicia establishing the non-obviousness of U.S. Patent No. 8,046,721 include, but are not limited to, teaching away from the claimed invention, industry acceptance or recognition of the claimed invention, a long-felt but unsolved need, and copying of the claimed invention. Samsung's invalidity contentions alone demonstrate that the prior art at the time of the '721 taught away from the '721 invention. Namely, the '721 patent teaches a method of unlocking a touchscreen device that prevents accidental unlocking without the use of passcodes: "One problem associated with using touch screens on portable devices is the unintentional activation or deactivation of functions due to unintentional contact with the touch screen. . . . Creating, memorizing, and recalling passwords, codes, and the like can be quite burdensome. These drawbacks may reduce the ease of use of the unlocking process and, as a consequence, the ease of use of the device in general. Accordingly, there is a need for more efficient, user-friendly procedures for unlocking such devices, touch screens, and/or applications." ('721 Patent at 1:38-40, 52-58). In contrast, much of the prior art to which Samsung cites, even in its invalidity contentions, teaches using various forms of passcodes on a locked touchscreen device. See, e.g., International Patent Application No. WO 03/038569 A2 to Hypponen; Palm Gridlock; International Publication Number WO 01/77792 A2 to Juels et al.; U.S. Patent No. 7,395,506 to Tan et al.; U.S. Patent No. 8,352,745to McKeeth; U.S. Patent App. Pub. No. 2005/0253817 to Rytivaara; SAMNDCA630-04300850.

Additionally, throughout discovery, Samsung's document production has been littered with documents evidencing that it had accepted the '721 invention to the point of using the '721 invention, as embodied in Apple's slide-to-unlock on its iPad and iPhone, as the "industry standard" and the benchmark by which Samsung measured its own devices. See, e.g., S-ITC-010531269; S-ITC-010531265; S-ITC-001015073; S-ITC-001742947; SAMNDCA10940411; S-ITC-010671049; S-ITC-009302888; SAMNDCA10994757; SITC-010477381; S-ITC-010477376; S-ITC-500042803; SAMNDCA00249929; SAMNDCA11077704; SAMNDCA11083817; SAMNDCA20003761; S-ITC-010675987; SITC-010679472; SAMNDCA10990627.

Further, Samsung's own documents reveal that the '721 invention met the long-felt but unmet need of providing a user-friendly method of preventing accidental activation on touchscreen mobile devices. In fact, Samsung's documents reveal that customers constantly complained about accidental activation on their touchscreen devices, and that Samsung instructed that its employees to use a method similar to Apple's slide-to-unlock on its iPad and iPhone (embodiments of the '721 invention). See, e.g., S-ITC-006218603; SAMNDCA10940411; SAMNDCA630-04502419; SAMNDCA630-04502417; S-ITC-010625175; SAMNDCA630-04416663; S-ITC-000066261; S-ITC-001015073; S-ITC-007768891; S-ITC-001742947; SAMNDCA10940411; SAMNDCA11077704. Similarly, Samsung's own documents indicate that customers also complained about the lack of visual cues regarding how to unlock their touchscreen devices – a problem solved by the '721 patent. See, e.g., SAMNDCA11011980; S-ITC-010531269; S-ITC-010531265; S-ITC-010604225; SAMNDCA10990627; S-ITC-010679472; SAMNDCA11017648; S-ITC-010477381; S-ITC-010477376; SAMNDCA10145014.

Finally, Samsung's production is filled with evidence that it copied Apple's '721 claimed invention by copying its embodiment in Apple's slide-to-unlock on the iPad and iPhone. See, e.g., S-ITC-001015073; S-ITC-001742947; S-ITC-010671049; S-

ITC500042803; SAMNDCA11077704; SAMNDCA20003761; S-ITC-010675987; SAMNDCA10990627.

Additional objective indicia establishing the non-obviousness of U.S. Patent No. 8,074,172 ('172 patent) include, but are not limited to, teaching away from the claimed invention, a long-felt but unmet need, and commercial success. The '172 patent teaches the improvement and resolution of problems with methods of entering text through its user interface for providing word recommendations. Specifically, the '172 patent teaches particular graphical user interfaces for touch screen displays, that provide multiple ways of quickly identifying and accepting possible suggested replacements of their currently entered text – or of keeping that currently entered text in the main text field. See, e.g., '172 Patent at 1:63-2:12, cl. 18. The '172 patent filled a particular need in the art, as evidenced by the prior art cited by Samsung. Though that prior art claims to teach word recommendation or suggestion systems, they do so with fundamentally different input methods, input devices, and/or user interfaces. For example, the prior art Samsung cites includes 1) systems that show a suggested replacement string, not the current character string, in two locations; 2) systems that keep the current character string in the first area when a delimiter is selected; and 3) systems that (i) display the current character string and a suggested replacement string in one area and (ii) the current character string or a suggested replacement string is placed, for the first time, in the area of the display containing all of the text the user had previously entered, when the user selects the current character string or a suggested replacement string in said one area. See, e.g., U.S. Patent No. 5,953,541 to King; Int'l Pub. No. WO2005/008899; U.S. Patent No. 7,880,730; TextPlus; Toshiyuki Masui, PO Box: an Efficient Text Input Method for Handheld Ubiquitous Computers, Lecture Notes in Computer Science 1707 (1999).

In addition, Samsung devices, including those accused of infringing the '172 patent in this litigation, show that the invention disclosed in the '172 patent met the long-felt but

unmet need of providing a user-friendly user interface for word recommendations. This is evidenced by Samsung's inclusion of keyboards in its devices that practice the teachings of the '172 patent. See Apple's Infringement Contentions. The invention disclosed in the '172 patent, as implemented in Apple's iOS devices, was also praised when the iPhone was first introduced as enabling users of virtual keyboards to type accurately on a keyboard without tactile feedback, see APLNDC630-0001724690 at APLNDC630-0001724695, and has continued to receive acclaim and positive user feedback after its initial launch. See APLNDC630-0001728392; APLNDC630-1728770; APLNDC630-0001728784; APLNDC630-0001729255. Apple has also licensed the '172 patent to a number of different companies. See APLNDC0001221082-113; APLNDC-Y0000408242. The commercial success of the invention described in the '172 patent is another objective indicia of the nonobviousness of the patent.

Additional objective indicia establishing the non-obviousness of U.S. Patent No. 8,041,760 include, but are not limited to, teaching away from the claimed invention, industry acceptance or recognition of the claimed invention, a long-felt but unsolved need, and copying of the claimed invention. The '760 patent teaches a user interface for "respond[ing] to a missed call easily or to access information about prior calls easily" that does not require "memoriz[ing] multiple key sequences and menu hierarchies . . . [or] activating a desired pushbutton." ('760 Patent at Col. 2:1-14). But Samsung's own invalidity contentions show that the art at the time of the '760 patent taught away from the invention. Most of Samsung's cited prior art references disclose the use of pushbuttons or complicated menu hierarchies. *See, e.g.*, U.S. Patent No. 7,231, 229 to Hawkins, U.S. Patent No. 7,289,614 to Twerdahl, U.S. Patent App. Pub. No. 2006/0281449 to Kun, U.S. Patent App. Pub. No. 2006/0135197 to Jin, Windows Mobile 5.0, Windows Mobile 2003, TAKEphONE 2006, TealPhone.

Samsung's own documents reveal that the '760 invention met the long-felt but unsolved need for "more transparent and intuitive user interfaces for managing missed

Apple's Further Supplemental Responses to Samsung's Interrogatories
Nos.  1, 2, 3, 5, 9, 10, 25, 26, 27, 39, 40, 41, 42, 49
Case No. 12-cv-00630-LHK (PSG)

telephone calls." ('760 Patent at Col. 2:15-19). Several documents show that Samsung believed it was it was an important feature to return a call from a missed calls list with a single touch gesture, the invention embodied in the '760 patent. See, e.g., SAMNDCA630-04462640; SAMNDCA630-05730106; SAMNDCA630-05598268; SAMNDCA20008688.

Samsung's documents also evidence that it copied Apple's '760 claimed invention, as they show that Samsung believed the iPhone (an embodiment of the '760 invention) was an "improvement" over Samsung's own user interface designs. See SAMNDCA630-04462640; see also SAMNCA20008688.

Additional objective indicia establishing the non-obviousness of U.S. Patent No. 6,847,959 include, but are not limited to copying of the claimed invention, industry acceptance or recognition of the claimed invention, and a long-felt but unsolved need. For instance, Samsung wanted to ensure that its products included a universal search feature and so the Quick Search Box was announced as a new feature for Android 1.6 (SAMNDCA630-04322625). Furthermore, a user experience survey performed by Google GOOGNDCAL630-00012239) indicated that users liked and used the Quick Search Box (at *239).

Additionally, when the universal search feature was removed from the accused devices after the court granted a preliminary injunction requiring Samsung to remove the feature, users complained about the absence of universal search functionality. At least one such example of discontent is shown in Exhibit 2 to the deposition of Bjorn Bringert taken on June 28, 2013. Complaints such as these show the commercial success of the feature and users' disappointment when the feature was removed.

Additional objective indicia establishing the non-obviousness of U.S. Patent No. 7,761,414 include, but are not limited to copying of the claimed invention and a long-felt but unsolved need. For instance, Samsung notes the importance of having synchronization that allows a user to perform actions during synchronization. See, e.g., SAMNDCA630-06271606. Also, in an e-mail containing feature lists, Samsung lists as "mandatory" and

"must be supported for next device/platform" two key aspects of the '414 patent: "Access to Phonebook while sync is in progress" and "Edit functionality of phonebook while syncing." SAMNDCA630-06279877 at *879. Also, a Samsung presentation explains that customers do not like to have functionality locked while synchronization is occurring. See, e.g., SAMNDCA630-04408478 at *479, *483. Also, in an e-mail from a Samsung technical support engineer, he explains that a "key B2B retailer[]" was having difficulty with "GS2 ICS Exchange Sync" and was "considering changing to Apple product as exchange sync works without issues." SAMNDCA630-05896495 at *497. These documents demonstrate that Samsung recognized the importance of the patented features.

In addition, documents produced in discovery by Samsung and Google, its Android partner, demonstrate a systematic effort to monitor the patented features in the patents-insuit, copy those patented features and derive significant sales from those patented features. The significant sales of the patented features are demonstrated through the sales information provided by Samsung. Samsung's infringement of the patents in suit is demonstrated by Apple's Infringement Contentions and all of the evidence cited therein, including any amendments to those Infringement Contentions. All of such evidence is incorporated by reference herein as evidence to show infringement, long-felt need, failure of others, copying, failure to design around after notice of infringement, other indicia of non-obviousness and the importance of the patented features to Samsung, Google and customers. Additional documents supporting those contentions include, but are not limited to, the documents identified in the attached Exhibits A-G. Apple also incorporates by reference its responses and supplemental responses to Samsung's Interrogatory Nos. 10 and 39.

In addition, Samsung's infringement and failure to design around the patents-in-suit will be the subject of expert testimony and the forthcoming expert reports that are hereby incorporated by reference. Moreover, Samsung and Google continue to produce documents and continue to make witnesses available for deposition. Apple reserves the right to further

supplement its response based on such supplementation or additional information learned during such depositions.

Discovery is ongoing and Apple is continuing to investigate. Apple reserves the right to supplement and/or amend its response as appropriate to this contention interrogatory.

Apple's contentions regarding the evidence that supports that non-obviousness of the Apple Patents further will be detailed in its expert report(s) that will be served in accordance with the procedural schedule set forth in the Court's Case Management Order.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Additional evidence supporting Apple's contentions that the patents-in-suit are non-obvious includes, but is not limited to, the Samsung accused devices that Apple has made available for inspection and the documents identified in the attached Appendices A, B, C, D, E, and F. Apple also incorporates by reference its responses and supplemental responses to Samsung's Interrogatory Nos. 10 and 39.

In addition, Apple's contentions regarding the evidence that supports the non-obviousness of the Apple Patents, and Samsung's infringement and failure to design around the patents-in-suit are the subject of expert opinions found in the following expert reports which are hereby incorporated by reference:

- Expert Report of Dr. Alex C. Snoeren Concerning U.S. Patent Nos. 6,847,959 And 7,761,414 dated August 12, 2013 and all exhibits, appendices, errata, and supplementations thereto
- Initial Expert Report Of Dr. Todd C. Mowry Regarding Infringement Of U.S. Patent No. 5,946,647 dated August 12, 2013 and all exhibits, appendices, errata, and supplementations thereto
- Expert Report Of Professor Andrew Cockburn dated August 12, 2013 and all exhibits, appendices, errata, and supplementations thereto
- Rebuttal Expert Report of Dr. Alex C. Snoeren Concerning U.S. Patent Nos. 6,847,959 And 7,761,414 dated September 13, 2013 and all exhibits, appendices, errata, and supplementations thereto

- Rebuttal Expert Report Of Dr. Todd C. Mowry Regarding Infringement Of U.S. Patent No. 5,946,647 dated September 13, 2013 and all exhibits, appendices, errata, and supplementations thereto
- Rebuttal Expert Report Of Professor Andrew Cockburn dated September 13, 2013 and all exhibits, appendices, errata, and supplementations thereto

**INTERROGATORY NO. 9**

For EACH of the APPLE PATENTS, please set forth the royalty (expressed as a percentage to be applied to gross revenue in the case of a running royalty, AND expressed as a dollar amount in the case of a lump sum royalty, AND expressed as the royalty base) which APPLE believes is appropriate for a non-exclusive license to use such patent.

**RESPONSE TO INTERROGATORY NO. 9**

Apple objects to this Interrogatory as vague and ambiguous with respect to its use of terms including "applied" and "appropriate." Apple still further objects to this Interrogatory on the grounds and to the extent it is compound and comprises discrete subparts resulting in separate interrogatories, seeks a legal conclusion, and seeks expert opinion. Apple also objects that this Interrogatory seeks information that is either equally available to Samsung as to Apple, or that is entirely in Samsung's possession, custody, or control. Samsung has not yet produced discovery that Apple has requested that may contain information relevant to the response to this Interrogatory. Apple objects to this Interrogatory as premature. Discovery is still in its early stages and Apple is continuing to investigate. Apple has not yet completed its discovery and investigation of the facts relating to this contention interrogatory. Apple's contentions regarding the relevant damages award will be detailed in its expert report(s) that will be served in accordance with the procedural schedule set forth in the Court's Case Management Order.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9**

Apple's contentions regarding the relevant damages award may be found in the

– 64 –