# EXHIBIT 1

# Valuation of Patented Product Features*

Greg M. Allenby

*Fisher College of Business*

*Ohio State University*

Jeff Brazell

*The Modellers*

John R. Howell

*Smeal College of Business*

*Pennsylvania State University*

Peter E. Rossi

*Anderson School of Management*

*UCLA*

November 2013

**Abstract**

Ultimately, patents have value to the extent to which the product features enabled by the patents have economic value in the marketplace. That is, products which are enhanced by inclusion of patented features should generate incremental profits to the firm offering the enhanced product. Measures of incremental profits should be at the heart of damage estimates in patent litigation. Incremental profits can only be assessed by considering demand for products with patented features and contrasting that demand to demand for the same product without the patent feature. Profit calculations must be based on valid estimates of demand as well as assumptions about how competitive forces affect demand. This requires a set of equilibrium calculations in which profits are measured by considering the competitive response to introduction of the product with the enhanced feature. A special variety of survey analysis called conjoint analysis can be used to estimate demand. Recently, conjoint methods have been applied in the patent setting but the measures of value used are not based on equilibrium profits. The Willingness To Pay and Willingness To Buy methods used by conjoint practitioners do not measure the economic value of a patented product feature. We illustrate our method using the market for digital cameras and show that current methods can overstate the value of the patent.

Keywords: patent valuation, patent damages, competitive equilibrium, conjoint surveys, Bayesian methods.

---

*Rossi would like to acknowledge the Collins Chair, Anderson School of Management, UCLA for research funding. Allenby thanks the Fisher College of Business at Ohio State University for generous research support. All correspondence may be addressed to the authors at the UCLA, Anderson School of Management, 110 Westwood Plaza, Los Angeles, CA 90095; or via e-mail at perossichi@gmail.com.

1

Electronic copy available at: http://ssrn.com/abstract=2359003

# 1   Introduction

Many patents derive their primary value from the product features which are enabled by practicing the patent. For example, consider a patent which can be construed to cover the so-called "smart" gestures features of smartphone operating systems[1] (such as various ways of navigating and zooming in/out using finger swipes of various kinds). This patent only has value to the extent to which this feature is valued by consumers and not achievable by other methods with similar functionality which do not infringe the patent. This is nothing more than an application of the principle that demand elasticity (and hence market power) is driven by the extent to which competing products are substitutable for the focal product.

However, even in the case in which the product feature or functionality can only be achieved through practice of the patent, there is still a open question as to the market value of this product feature. Clearly, only a portion of the demand for this product can be attributed to the product feature. Even if there is no way to enable comparable smart gestures without infringing the product, only a portion of the total value of a smartphone should be ascribed to the patented feature. It is not just the lack of non-infringing alternatives that drives the value of the patented feature but also the extent of competition in the marketplace. If the focal product is in a "crowded" space of products, then margins in the industry will be lower and the profit generated by the addition of the patented feature will be lower than in a market with less competition.

A valid and economically coherent approach to patent valuation must be based on the economic value of the patent to the firms which practice it. That is, in a world in which the firm either owns or licenses the patent, the firm will enhance their products with feature (s) enabled by the patent. The value of these patented features will be determined both by the demand for these features by customers but also by cost and competitive considerations. If the patented feature is valued by customers and there are limited alternatives with the desired functionality, then the firm practicing the patent will achieve higher profitability then in a world without the patent. This incremental profit calculation must be at the heart of

---

[1]To take an example from recent patent litigation between Apple and Samsung (C 11-1846).

Electronic copy available at: http://ssrn.com/abstract=2359003

the patent valuation problem. Firms may earn incremental profits from patented product features either by charging a price premium or via increased sales or both. Profit calculations will, of course, consider both factors and incorporate them in a natural way.

A comparison between the world in which a firm practices the patent and a world without the patent must also consider the response of competing firms. That is, if the patented feature enhances demand for the product, we would expect higher profits than in the world without the patented feature enhancement. However, it would be a mistake to assume that other firms in the market would not adjust their prices in response to the introduction of a product enhanced by the patented feature. To take another example from consumer electronics, if Nikon introduces a new point and shoot camera that features a "professional" style swivel display panel and this feature is protected by a patent, then the other players in the digital point and shoot camera market (e.g. Sony, Panasonic, and Canon) will have no choice but to adjust their prices downward in response. This process of adjustment of prices (and, therefore, market shares) will result in a new industry equilibrium. The response of Nikon's competitors will lower the profits that are achievable from the introduction of the swivel display feature. Therefore, any calculation of the incremental profits which can be attributed to the introduction of a patented product feature must be based on a comparison of the industry equilibrium with and without the feature.

The process by which product features are enhanced or new feature are added is a form of product differentiation. Most consumer goods and services markets are not commodity like markets where standard perfectly competitive notions of equilibrium apply. Instead, there are typically a relatively small number of firms competing on the basis of non-identical or differentiated products. Patents play a vital role in the process of product differentiation as they are designed to enable the firm practicing the patent to establish some market power by offering a unique feature. For these reasons, equilibrium calculations should be based on equilibrium concepts defined for oligopolist markets with price competition and differentiated products. Practical methods for undertaking such equilibrium calculations have been introduced into the empirical I/O literature (see, for example, Berry, Levinsohn, and Pakes

3

(1995)), but, heretofore, have not been used for product feature valuation.

Our view is that the only sensible measure of value is the incremental profits that accrue to the firm with a valued patented feature. This concept can be applied both to the problem of valuation of a patent in the patent marketplace as well as to the problem of assessing damages due to patent infringement. It is well known that it is socially efficient to allow patents to be sold. This is one way of insuring that patents will be owned by firms whose products can benefit the most from the features enabled by the patent. The market clearing price for a patent must be based (along with considerations of the validity and enforcement costs) on the highest incremental value to firms practicing the patent. Again, the profit metric is the only sensible metric to establish value to the firm.

Assessment of damages from patent infringement has become a very high stakes problem without any clear and compelling theory of damages. While courts have rejected some methods (such as the entire product rule) which don't make any economic sense, there is no clear paradigm for damage calculations. Currently, there are two types of damages calculations: 1. a "reasonable" royalty calculation and 2. a lost profits. In a reasonable royalty analysis, some value is assessed for the product (typically based on adjustments of prevailing royalty rates, if relevant) and then a hypothetical bargaining session is assumed to take place between the licensee and licensor. Clearly, the value being split in the hypothetical negotiation is the least well defined aspect of this paradigm. Our approach would clearly define the total value which the patent can produce and does not require heroic assumptions regarding the applicability of other royalty rates.

For situations in which the patent holder practices the patent in their own product portfolio, a lost profits damages analysis is often conducted. A lost profits analysis hinges on some estimate of what the patent holder's product sales would be if the infringing products were taken off the market. From these lost sales, it is usually fairly straightforward to compute lost profits. The problem here is that there is no recognized and valid way of estimating the amount of lost sales. Certainly, any analysis which holds prices fixed will be misleading. During the period of infringement, the firm holding the patent will certainly adjust their prices

4

to respond to competition from the infringing products. Accounting for these changes in equilibrium prices must be a part of any valid lost profits analysis. Even if price adjustments were not accounted for, it is very difficult to use actual sales data to estimate what would have happened in the counterfactual world in which the infringing products were withdrawn from the marketplace. Thus, any valid lost profits methodology must incorporate an explicit model for the demand for product features as well as some notion of equilibrium.

We are at the early stage of using quantitative methods and demand analysis in patent valuation. Survey-based methods of calibrating demand systems are beginning to assume a role in some damage analyses (see, for example, Samsung V. Apple and Motorola V. Microsoft). One source of the appeal of survey methods has been the lack of useful marketplace data on the demand for products both with and without patented features. Typically, the marketplace data is only available for products with patented features (and, hence, the subject of the litigation) and not for these same products without the features. The attraction of survey-based methods is to simulate what demand would have been without patented product features. In this early work, only pure demand-based measures of product feature value have been used. For example, it is possible to compute the change in average Willingness To Pay (WTP) as a patented feature is added to a product. CWTP is a pure demand-based measure and is only indirectly related to incremental firm profits. In addition, average WTP can dramatically overstate the value of patents and result in upward biased demand estimates. Similarly, the so-called Willingness To Buy analysis of the gains/losses in market share attributed to patented product features is fundamentally flawed as it does not consider price response to the introduction of new products with the patented features.

In summary, we advocate using equilibrium outcomes (both price and shares) to determine the incremental economic profits that would accrue to a firm as a product is enhanced. In comparison, WTP measures will typically overstate the change in equilibrium price and profits and the WTB measure will overstate the change in equilibrium market share. We illustrate this using a conjoint survey for digital cameras and the addition of a swivel screen display as the object of the valuation exercise.

To compute equilibrium outcomes, we will have to make assumptions about cost, the nature of competition, and the set of competitive offers. Conjoint studies have to be designed with this in mind. In particular, greater care to include an appropriate set of competitive brands, handle the outside option appropriately, and estimate price sensitivity precisely must be exercised.

## 2   Defining and Measuring Demand for Product Features

Clearly, any valid paradigm for patent valuation must measure demand in the relevant market. The demand schedule facing any firm's product can be constructed from the distribution of preferences across the population of consumers. We take a characteristics view of products; that is, products are simply bundles of features or characteristics. Firms pick a particular bundle of features which can be thought of as a point in the space of possible product configurations. The competitive structure of the industry is defined not only by the number of competing products but also by the positions of those products in the characteristics or product feature space. Given a set of products with associated demand, a competitive equilibrium can be computed, enabling our valuation of patents as the incremental profits flowing to the firm offering a product with patented features.

We use a standard model for the demand for differentiated products. Each product is made up of a set of characteristics. Consumers choose only one product at any one purchase occasion and may elect to not purchase any product at all. A firm introduces a product into the marketplace by announcing a particular configuration of product features/characteristics and a price. The demand schedule facing this firm is the expected sales of the product given the price, configuration and the distribution of preferences across consumers. For example, a digital camera product might consist of a brand name (e.g. Sony), particular resolution (measured in megapixels), a particular level of zoom performance, a style of display (swivel screen or not), etc. The firm announces a price for this product. Consumers evaluate this product and compare it to other products in the marketplace. Each consumer makes a choice and these choices add up to total demand for the product. Each consumer is represented by

a specific utility function which is specified by a set of weights on the product characteristics. A choice model will predict the probability that a consumer will pick a specific product in a set of products based on the characteristics of each product and the weights which represent that consumer's preferences for features.

## 2.1   The Standard Choice Model for Differentiated Product Demand

The consumer faces a marketplace that consists of $J$ products each specified by a characteristics vector, $x_j$, and a price, $p_j$. If there are $k$ characteristics, then the characteristics vector specifies the specific values of each of the $k$ characteristics. In our example, $x_j = $ (Sony, 16 mp, 10x zoom, without swivel screen). Many characteristics have only a discrete set of possibly unordered values. For these characteristics (like the presence or absence of a swivel screen Display), we would introduce a set of binary indicator or dummy variables into the characteristics vector. For example, if there are four major brands in the market place, then four indicator $(0/1)$ variables[2] would be included in the characteristics vector.

The utility derived from the purchase and use of any product is modeled via what has become a standard random utility model (McFadden (1981)) for choice applications. The observed characteristics and price enter the utility for the $j$th brand in a linear fashion. An error term is introduced to account for unobserved factors which influence choice. The error term is often interpreted as representing unmeasured characteristics which influence choice-specific utility.

$$u_j = \beta' x_j - \beta_p p_j + \varepsilon_j \qquad (2.1)$$

$x_j$ is a $k \times 1$ vector of attributes of the product, including the feature that requires valuation. For mathematical convenience, it is assumed that the error terms have an extreme value type I or Gumbel distribution. Consumers are assumed to know the realization of the error term and simply choose the alternative with maximum total utility.

To derive the standard choice model, we must calculate the probability that the $j$th

---

[2]Unlike standard regression models, a characteristics model doesn't really have an intercept.

alternative has the maximum utility, employing the assumption that the error terms have a Gumbel distribution with a scale parameter of 1. That is, since we do not observe the error terms but only the deterministic portion of utility, there is an entire region of possible errors which are consistent with the choice of a specific alternative. To derive the choice probability, we have to integrate over this region of possible values of the errors using the joint distribution of the errors. The fact that the error terms have positive support (can take on, in theory, any value in the interval $(-\infty, \infty)$) means that any choice alternative is possible even if the deterministic portion of utility for that choice alternative is small relative all other alternatives. The Gumbel distribution produces a standard logit model for the choice of products.

$$\Pr(j) = \frac{\exp(\beta' x_j - \beta_p p_j)}{\sum_{j=1}^{J} \exp(\beta' x_j - \beta_p p_j)} \tag{2.2}$$

It should be noted that utility is measured only on an interval scale with an arbitrary origin. That is, the same number can be added to the utility of all $J$ alternatives without altering which alternative has maximum or the choice. This property is nothing more than the statement that only relative utility matters in choice models. We can arbitrary sign one of the product as the "base" alternative and express utility relative to this base alternative. In most situations, it is reasonable to assign the "outside" option as the base alternative. That is, one of the possibilities is that consumer decides not to purchase one of the $J$ products and spends his/her money on other types of goods. For example, not everyone has a point and shoot digital camera, in this model this is because the base utility for non-purchase is higher for some than the utility they obtain net of price. It is common, therefore, to assign a utility of 0 to the "outside" option. This means that the utility for each of the J products is expressed relative to the outside option of non-purchase. Thus, model with the outside option or possibility of non-purchase of any of the $J$ products can be written

$$\begin{aligned}
\Pr(j) &= \frac{\exp(\beta' x_j - \beta_p p_j)}{1 + \sum_{j=1}^{J} \exp(\beta' x_j - \beta_p p_j)} \\
\Pr(no\ purchase) &= \frac{1}{1 + \sum_{j=1}^{J} \exp(\beta' x_j - \beta_p p_j)}
\end{aligned} \tag{2.3}$$

8

Of course, most firms do not observe the choice decisions of individual consumers. Instead, firms face the aggregate demand for their products which is the sum of the quantities demanded of each possible consumer. In most product markets, there are a very large number of potential customers. It is well documented that consumers differ dramatically (Allenby and Rossi (1999)) in their preferences. In the context of our choice model, this means that consumers have very different utility weights, $\beta$. For example, some consumers are very price sensitive and regard all digital cameras as roughly equivalent in terms of performance/features. For these consumers, choice is a matter of locating the lowest priced alternative. Others may be less price sensitive and more loyal to specific brands. In terms of product features, some consumers assess little or no value to the patented feature, while others may accord it substantial value. The best way to think about this is that there is a continuum of preferences for any one characteristic rather than there are only a small number of "segments" or types of consumers. In this situation, the consumer population is best thought in terms of the distribution of preferences. The fact that there are a very large number of different types of consumers (each with different preferences) means that we can think of there being a continuous distribution of consumer preferences. This continuous distribution is represented by a density, $p(\beta, \beta_p)$. To "sum" over all possible consumers to create aggregate demand is the same as averaging the choice probabilities with respect to the density of consumer preferences.

$$Sales_j = M \times \int \Pr(j|\beta, \beta_p) \, p(\beta, \beta_p) \, d\beta d\beta p \qquad (2.4)$$

M is the total size of the market (the number of total potential customers). The choice probability averages over the distribution of preferences is the market share that the firm can expect to attain given the configuration of the product characteristics and price. In this model where consumers only buy at most one product, market share is equivalent to unit sales.

Product features have value to the extent to which consumers obtain utility from the feature. For example, if the first product characteristic is a patented product feature, then demand for that feature depends on the distribution of the first element of the $\beta$ vector over the population of potential customers. If most consumers place positive and "large" weight on

the patented feature, then the firm can increase sales by adding the feature while keeping price constant or maintain sales with a higher price. Economic valuation of any product feature will require estimation of the demand system given by (2.2) and (2.4).

## 2.2   Estimating Demand

We have seen that valuation of a product feature must be driven, on the demand side, by the utility weight accorded that feature and the distribution of these utility weights across individuals. Thus, a critical, but not the only, component of patent valuation is to estimate the demand system. In particular, we must estimate the distribution of utility weights for the patented product feature which requires observing demand for products with and without this particular feature. We should start by delineating the set of features which determine demand for this type of products or product category. This list might be very extensive. For example, new versions of a smartphone may incorporate changes to over 1000 different features, only some of which are we interested in valuing for patent purposes. If we could specify a list of the product features or characteristics, we would then, in an ideal world, conduct controlled experiments in which product features and prices are varied in according to a randomized orthogonal design. We would also like to observe individual demand or choice decisions. With this panel data structure (multiple observations for the same consumer), we could, in principle, estimate the utility weights for a sample of consumers. This would provide an estimate of the distribution of preference parameters and allow us to construct an estimate of aggregate demand. From this aggregate demand estimate, we could then undertake some sort of equilibrium analysis to compare firm profits with and without the patented feature.

From a practical point of view, the estimation of demand for patented features appears to require data not available to us. Typically, we have access only to aggregate sales or market share data for a small number of time periods. With a great deal of aggregate share data, it is possible, in principle, to estimate the distribution of utility weights but with only a number number of observations these estimates are apt to be unreliable. More importantly, we typically do not have access to data in which the same product (in terms of brand and

other relevant characteristics) is sold both with and without the patented feature. Without variation in the inclusion of the patented feature, no amount of data, at either the aggregate or consumer level, will allow us to estimate the utility weights accorded the patented feature.

In some cases, we can observed aggregate sales of a product in a time series in which the feature is added at some point during the time series. Again, we might consider using this time series variation as a way of identifying the value of the patented feature. However, such analysis must also control for other changes in the market such as the feature composition of competing brands. Moreover, for many consumer products, there is very little time series variation in prices. Without variation in prices, we will not be able to determine how consumers might trade off the utility they obtain for the patented feature against an increase in price. For example, consider the addition of the 4G feature to smartphones. There are times series of aggregate sales for smartphones both before and after the introduction of the 4G feature. However, the prices of smartphones do not vary much over time, making it difficult to determine what sort of price premium the 4G feature could command.

In observational data, we also face the problem of omitted product characteristics and price endogeneity (see, for example, Berry, Levinsohn, and Pakes (1995)). No matter what set of characteristics we able to measure and add to our demand model, one can always make the argument that there are omitted or unmeasured product characteristics which drive demand. If this is the case, then we might expect that firms set price, in part, with reference to these omitted characteristics. This means that prices are not exogenous and, typically, the utility weight on price, $\beta_p$, would be biased downward. In general, there may be unobserved drivers of demand which are correlated with price and, thus, we cannot use all of the variation in price (however small in the first place) to estimate the price coefficient.

In summary, standard observational data is inadequate for valuation of patented features for four reasons: 1. we often do not observe the same product with and without the patented feature, 2. we only have a short time series of aggregate data, 3. there is often little or no price variation, and 4. what price variation we observe may be confounded with unobserved or unmeasured product characteristic, resulting in various endogeneity biases.

To overcome the shortcomings of observational data, the only real option would be to collect experimental demand data at the consumer level. This might appear impractical in the context of patent litigation. It certainly would require time and a level of resources typically not available in the litigation process. Instead, we can employ a survey-based experimental method called conjoint analysis to conduct what amounts to controlled, but simulated experiments, on the consumer level. With modern Bayesian statistical methods, this data can be used to obtain estimates of the distribution of consumer preferences and aggregate demand that can then be used to compute a profit-based measure of product value.

## 2.3   Conjoint Surveys and Demand Estimation

While it may be impractical to conduct field experiments in which patented features are added and removed from products to assess demand, it is possible to devise a survey-based simulation which achieves the same end. In a choice-based conjoint survey, products are described as bundles of characteristics. A survey respondent is recruited (typically from an internet panel) and confronted with a sequence of choice tasks. In each task, the respondent is asked to choose from a menu of two to four hypothetical products described by their characteristics. Figure 1 shows a typical choice task from a survey designed to measure demand for digital cameras. The respondent is asked to choose between four hypothetical cameras and has the option not to purchase. Each hypothetical camera is described by seven characteristics. Each characteristic is described by a number of different values or levels. For example, price has four possibilities which are spread over the range from $79 to $379, while there are only two possibilities for the swivel screen feature (present or not). In addition, the respondent was given the option of electing not to purchase any of the products offered in each choice task screen.

The respondent is faced with a small number of choice tasks (in this survey there were 16 choice tasks or "screens"). The conjoint choice task is designed to simulate a marketplace in which products are described by their features. In making choices, respondents are reveal their preferences for each of the product characteristics (including the patented feature) in the same

| Scenario 1 of 16 | Camera 1 | Camera 2 | Camera 3 | Camera 4 | |
|---|---|---|---|---|---|
| Brand | Canon Powershot | Panasonic Lumix | Sony Cyber-shot | Nikon COOLPIX | |
| Megapixels | 16 | 16 | 16 | 16 | |
| Optical Zoom | 10x | 4x | 10x | 4x | |
| Video | Full HD Video (1080p) with Stereo Microphone | HD Video (720p) | HD Video (720p) | Full HD Video (1080p) with Stereo Microphone | None of these |
| Swivel Screen | No | Yes | No | Yes | |
| Wifi | Yes | Yes | No | Yes | |
| Price | $79 | $279 | $379 | $179 | |
| Which of these digital cameras do you prefer? | ⚫ | ⚫ | ⚫ | ⚫ | ⚫ |

*As a reminder, you can hover over the features to view the definitions.*

Figure 1: Conjoint Survey Choice Task Screen

way as they would in the marketplace. Thus, conjoint data is designed to measure preferences in the spirit of revealed preference theory. That is, we are not asking each respondent directly – what is the maximum you would be willing to pay for this camera or how important is feature A relative to feature B? Instead, we are deducing what these preferences are via simulated choice behavior. The assumption is that the preferences respondents reveal in the conjoint exercise are the same as the preferences which dictate behavior in the marketplace. There is a long history of successful application of conjoint methodology and surveys in the forecasting of demand for new products and in forecasting customer response to price changes (see Orme (2009) for many examples).

### 2.3.1   Conjoint Design

To undertake a rigorous conjoint survey for the purpose of estimating demand for patented features, the following criteria must be met:

- A representative sample must be used

- Major product features must be included in the design

- Product features/characteristics must be described in terms meaningful to the respondents

13

- A proper randomized experimental design must be used to select the combinations of characteristics and levels used in the conjoint survey

- The "outside" or "no choice" option must be included

- The major set of competitive brands must be included

**Sampling Procedure**

In any survey, we are extrapolating or projecting from the sample to the relevant population. In the application of conjoint surveys to patent valuation, the relevant population is the population of potential customers for the product category. The best way to insure representativeness for this population is to start with a representative sample of all consumers in the US and then screen this sample to those who are in the market for the products in consideration. The only sampling procedures that can guarantee representativeness are random sampling procedures. For example, if we have a list of all US residents, we would select respondents at random (each respondent is equally likely) for the screening portion of the survey.

Unfortunately, much survey work today is done with internet panels that are not random samples. An internet panel is a group of potential respondents who have indicated a willingness to take surveys using web-based methods. Invitation emails are sent to a random sample of the internet panel with a link to the survey. The problem with most internet panel providers is that the internet panelists are "harvested" via display ads and email lists. This what statisticians call a convenience sample, in that the sample is collected by any means necessary and is not designed to be representative of any population. The fact that only a random sample of the entire internet panel is invited does not mean that the final sample of screened respondents is a random sample of the population of potential customers. Yeager, Krosnick, Chang, Javitz, Levendusky, Simpser, and Wang (2011) document that non-random internet panels can yield biased estimates of population quantities. There are internet providers who attempt a close approximation to random samples. If at all possible, higher quality providers should be used.

14

If the survey sample is not obtained via high quality, screened random samples, then it is still possible to use the sample but only if checks for representativeness are made. The typical check that for representativeness is to compare the demographic characteristics of the pre-screened sample (this requires asking demographic questions prior to screening) with census-based demographics. This assures representativeness only if the product preferences of consumers are highly correlated with demographics. For example, we could find that our sample collected by non-scientific methods is representative on the basis of the sex demographic variable. That is, the sample proportion of women is the same as the population proportion. This doesn't, however, guarantee that the views of our sample with respect to a specific product feature are representative of the relevant population. This would only be true if preferences for the product feature are closely related to the sex of the consumer. Clearly, for most products, demographics cannot explain very much of the variation in brand and feature preferences. Our recommendation is that variables more closely related to the product category be used. For example, if we were doing a survey of smartphones, we might insert questions on ownership of smartphones by make or model and compare the market shares of our survey with those known in the US market.

Considerations of sample representativeness are critical to the reliability and generalizability of any survey, conjoint or otherwise. No survey evidence should be considered admissible or relevant unless evidence of representativeness is provided.

**Inclusion of Product Features**

The heart of the demand for product features is a specific of the relevant product characteristics. For many products, the numbers of features are so large it would seem impractical to ever attempt to partial out the portion of utility or demand which can be ascribed to any one feature. One reaction is that this makes any characteristics approach to demand impractical. However, the logit choice model of demand (2.3) has an important property called the Irrelevance of Irrelevant Alternatives (IIA) (see, for example, Train (2003)). This property implies that any set of characteristics which are constant across choice alternatives drop out of the

choice probabilities. For example, partition the characteristics vector into two parts, $(x_0, x_1)$. $x_0$ is varies across choice alternatives while $x_1$ does not.

$$\Pr(j) = \frac{exp\left(\beta_0' x_{0,j} + \beta_1' x_1\right)}{\sum_j exp\left(\beta_0' x_{0,j} + \beta_1' x_1\right)} = \frac{exp\left(\beta_0' x_{0,j}\right)}{\sum_j exp\left(\beta_0' x_{0,j}\right)} \tag{2.5}$$

The IIA property of logit[3] means that if consumers assume that only a subset of the characteristics are varies while all other characteristics are constant across choice alternatives, then we can construct valid demand estimates by testing only a subset of relevant product characteristics. This greatly enhances the power of a choice-based conjoint survey. In theory, as long as we assume the logit model of demand is correct, we only have to examine a subset of product features. We will have to instruct respondents to assume, in making their choices, that all other features are constant. This is common in conjoint surveys.

In contrast, aggregate demand modeling with observational data does not hold the unobserved characteristics constant across products. If we do not observe important product features, then we might find that prices are determined, in part, by the unobserved features, creating a so-called endogeneity bias problem. We would have to find variables, called instruments, that move prices but are uncorrelated with the unobserved characteristics. It can be difficult to identify such variables. In theory, this is not a problem in a conjoint survey because the respondents are specifically instructed to assume that all features/characteristics other than those varied in the survey are constant across alternatives.

Taken literally, the IIA property means we could conduct a conjoint survey with only two characteristics - the patented feature and price. In this extreme case, we are constructing a very unrealistic simulation of the marketplace.[4] For example, if one of the hypothetical products in the choice task has a very high price, it is difficult to expect that the respondents will "hold constant" other features. Their natural inclination is to assume that, perhaps, the high price indicates that this hypothetical product as very important features missing from other alternatives. This violation of the "hold constant" instruction is much less likely if other

---

[3]It should be noted that although we are assuming that IIA holds at the individual consumer level, this does not mean that IIA holds as a property of the aggregate demand system.

[4]As Orme (2009) puts it, "realism begets better data."

important features are included in the conjoint survey design. This means that, even though we may only wish to test a small number of patented features, we must include many of the other important features in the product. This, of course, does not mean you have to include all features of the product, a "generic" criticism of conjoint methods. All scientific models are abstractions which attempt to capture the important aspects of the problem. For example, when *Consumer Reports* provides comparisons of cars, smartphones, televisions, or other consumer products, they do not list all features, but, instead, concentrate on the important features. It is important to undertake research prior to the conjoint survey design to determine what are the major and most important features of the product.

There are cases in which conjoint designs have been used which only test patented product features and do not include other important product features. Not only does this invite the respondents to make attributions which are not correct but it also calls attention to the patented features. There is no doubt that can lead to an overstatement of feature value.

## Description of Features

A general principle of conjoint survey design is that the product characteristics must be defined in terms that are understandable and meaningful to the respondents. For example, smartphone battery capacity should be specified in terms of battery life in use rather than in units of capacity such as milliamperes. This is a particularly challenging problem with patented features. Patents often specify a very specific apparatus or, in the case of a method patents, a specific set of steps which must be undertaken to practice the patent. For example, it might be impossible to obtain a patent for a generic functionality such as transmitting pictures in emails, but there may be patents which describe a specific method for attaching a picture file to an email. A conjoint survey that construes this patented feature as "the ability to send pictures via email" would overstate the value of the patent. It may well be the case that it is possible to send pictures via email via a method which does not infringe upon the specific patent in question. If this non-infringing alternative provides the same functionality to the user, then there is no point in doing a conjoint survey. However, if alternatives to

17

the patent provide inferior functionality, then the conjoint survey must be designed to value this specific functionality. For example, if the patented technology provides greater speed or reliability of transmission, then the challenge in the conjoint survey is to describe diminished speed or reliability to the survey respondent.

For patent litigation, it is important the the conjoint survey relate as closely as possible to the actual specifications or construals of the patent. If there are non-infringing alternatives, then the conjoint survey must be designed to test the relative value of the patented feature to the non-infringing alternatives. Features and functionality must be describe to the respondent in simple and meaningful terms. This may involve the use of graphics and video descriptions. Certainly, the conjoint feature descriptions must be pre-tested (for a discussion on surveys and pre-testing see Sheatsley (1983)).

## Experimental Design

Conjoint surveys are properly viewed as experiments in which the products considered in the simulated choices are designed for maximum discrimination between features. Once a set of characteristics/features (called attributes in the conjoint literature) are selected, then the levels of these attributes must be selected. For example, if we include megapixels as a characteristics or attribute of digital cameras then we need to select the specific values (e.g. 10, 16, etc. mp). Given the set of attributes and the possible levels for each attribute, the conjoint design task then consists of "creating" hypothetical products as bundles of these attributes and specific levels. While this is a highly technical subject (see, for example, Box and Draper (1987), chapters 4 and 5), the central intuition is that we must vary each attribute independently of the other attributes in order to learn about the utility weights for each attribute. That is, we can't always have those products with the patented feature be priced more than those hypothetical products without the feature.

There are well-known and reliable ways of automatically generating choice tasks that will yield maximum informative and balanced choice task designs. It is this experimental design that makes conjoint surveys especially valuable as these designs create hypothetical

18

products with configurations that are designed for the purpose of revealing survey respondents preferences. In the real marketplace, we tend to see less independent variation of product features and price.

**The Outside Option**

In the real marketplace, not all potential customers purchase one of the available products. Although the penetration of digital cameras is high, not everyone has one. This means that, in order to be realistic, the conjoint study must include the "outside option" or "none-of-the-above" to allow respondents to opt-out of purchase. This is especially important in the evaluation of new product features. Firms invest in the development of new patented features in order to compete for customers not only with existing products but also with the hope of attracting new customers into the market. For example, the design features incorporated into the first iPad greatly expanded the market for tablet computers. If the outside option is not included in the conjoint study, then demand can only come at the expense of competing products with no growth in the overall market.

Practitioners of conjoint have found that it makes a difference how the "outside" option is included in the conjoint study. Just adding a column for "none of these" has been found to cause respondents to be overstate their purchase intentions (Brazell, Diener, Karniouchina, Moore, Severin, and Uldry (2006)). One possible explanation for this "over optimistic" behavior is that respondents don't pay sufficient attention to the price attribute. Another is that respondents sometimes feel awkward rejecting products they believe the conjoint survey designers has a personal stake in. It is common to use what is called a "dual response" mode of incorporating the outside option. In the choice task, respondents are forced to choose one option which is their preferred option. Then the respondents are asked explicitly if they would purchase their preferred product at the stated price.

**The Set of Competing Brands**

Our method of valuing a patented feature is to compute the incremental profits that the patent holder would earn from including the patented feature in their product. This depends on the structure of competition in the market. Competition is defined both by the number of competitors but also by the position of their products in the marketplace. Unless competing brands are included in the conjoint analysis, it will be impossible to make realistic estimates of the profits that can be realized from the patented feature.

This point seems to be lost on some involved in patent damages calculations. If a firm is accused of infringement, there is the natural inclination to focus on the value of the feature for the products accused of infringement. The evolution of thought in patent damages is that not all of the sales of the accused infringing products are due entirely to the contribution of the infringing feature. For this reason, the emphasis has been on decomposing the value of the feature in terms of what incremental sales are attributed to the infringement. This has contributed to the attraction to conjoint methods which offer the possibility of decomposing demand. However, it is clear that if the infringing products were removed from the market, the patent holder's products that practice the patent would only garner some of the sales of the infringing product. Furthermore, the prices in the market would be expected adjust to the withdrawal of the infringing products. Without a realistic demand system for all of the major brands in the market, it is not possible to calculate a meaningful new industry equilibrium for the world without the infringing products

In summary, conjoint surveys when properly designed, pre-tested and applied to representative samples can be used to estimate industry demand for patented product features. However, a proper valuation of patented features does not end with the production of conjoint data. This data must be analyzed to produce reliable estimates of aggregate demand for the relevant firms and we must undertake equilibrium calculations. Before we discuss equilibrium computations, we will briefly review some of the measures of product feature value used today and explain why these are not usable for patent valuation.

# 3   Willingness To Pay and Willingness To Buy

Valuation of product and product features is currently conducted via either a Willingness To Pay (WTP) or Willingness to Buy (WTB) analysis. A WTP analysis should be define as the monetary amount that I must compensate a consumer for the loss of product value. For example, WTP for a product is the amount on income I must give a consumer so that the consumer achieves the same utility from the product as without the product but with the extra income. WTP for a patented product feature can be defined as the difference in WTP for a product with the enhance feature minus the WTP for a product that is identical in every way except that the product no longer has the feature. Willingness to Buy is often defined as the increase in product sales or market share that can be obtained by the addition of the feature to an existing product but holding prices constant.

As such, the WTP and WTB measure cannot be measures of the market value of a product feature[5] as they do not directly relate to what incremental profits a firm can earn on the basis of the product feature. WTP and WTB can be calculated only on the basis of demand side information and are independent of costs or the competitive structure of the industry. That is to say, WTP will be the same no matter how strong the competition is for the focal firms customer base. WTB holds prices fixed and does not allow the industry to adjust to a new pricing equilibrium.

## 3.1   WTP

What is called "WTP" in the conjoint literature is one attempt to convert the part-worth of the focal feature, $f$, to the dollar scale. Using a standard dummy variable coding, we can view the part-worth of the feature as representing the increase in *deterministic* utility that occurs when the feature is turned on.[6] If the feature part worth is divided by the price

---

[5]Ofek and Srinivasan (2002) define what they call the "market value of an attribute improvement" as the amount by which a firm can raise price when the feature is added to a product and still command the same market share. This is a WTP measure, although slightly different than the average WTP measure in that the Ofek and Srinivasan MVAI measure is a slightly different sort of average and uses weighting.

[6]For feature enhancement, a dummy coding approach would require that we use the difference in part-worths associated with the enhancement in the "WTP" calculation.

coefficient, then we have converted to the ratio dollar scale. Some call this a WTP for the product feature.

$$\text{WTP} \equiv \frac{\beta_f}{\beta_p} \tag{3.1}$$

This WTP measure is often justified by appeal to the simple argument that this is the amount by which price could be raised and still leave the "utility" for choice alternative J the same when the product feature is turned on. Others define this as a "willingness to accept" by giving the completely symmetric definition as the amount by which price would have to be lowered to yield the same utility in a product with the feature turned off as with a product with the feature turned on. Given the assumption of a linear utility model and a linear price term, both definitions are identical.[7] In the literature (Orme (2001)), WTP is sometimes defined as the amount by which the price of the feature-enhanced product can be increased and still leave its market share unchanged. In a homogeneous logit model, this is identical to (3.1).

The WTP measure is properly viewed simply as a scaling device. That is, WTP is measured in dollars and is on a ratio scale so that valid inter and cross respondent comparisons can be made. However, the WTP is not a measure of Willingness To Pay as defined in economics literature. WTP is usually defined as the reservation price or maximum amount a customer would pay for a product. As such, WTP should properly be interpreted as an estimate of the change in WTP from the addition of the feature.

$$\Delta \text{WTP} = \text{WTP}_{f*} - \text{WTP}_f \tag{3.2}$$

Here $\text{WTP}_{f*}$ is the WTP for the product with the feature and $\text{WTP}_f$ is the WTP for the product without the feature. The measure of WTP used describe here is what is commonly used by conjoint practitioners and has been used to inform damages analyses in several patent case. However, this measure of WTP is not the standard measure of WTP for an enhanced choice set or an product innovation as defined in the economics literature (see Trajtenberg

---

[7]In practice, reference price effects often make WTA differ from WTP, see Viscusi and Huber (2012) but, in the standard economic model ,these are equivalent.

(1989)). In a companion paper (Allenby, Brazell, Howell, and Rossi (2013)), we compute the standard WTP measure which should be interpreted as a measure of the consumer surplus generated by feature enhancement. Of course, welfare or consumer surplus measures are not the same as incremental firm profits, the relevant measure for patented feature valuation.

## 3.2   WTB

In some analyses, product features are valued using a "Willingness To Buy" concept. WTB is the change in market share that will occur if the feature is added to a specific product.

$$WTB \equiv MS\left(j|p, A^*\right) - MS\left(j|p, A\right) \tag{3.3}$$

MS($j$) is the market share equation for product j. The market share depends on the entire price vector and the configuration of the choice set. (3.3) holds prices fixed as the feature is enhanced or added. The market share equations are obtained by summing up the logit probabilities over possibly heterogeneous (in terms of taste parameters) customers. The WTB measure does depend on which product the feature is added to (even a world with identical or homogeneous customers) and, thereby, remedies one of the defects of the pseudo-WTP measure. However, WTB assumes that firms will not alter prices in response to a change in the set of products in the marketplace as the feature is added or enhanced. In most competitive situations, if a firm enhances its product and the other competing products remain unchanged, we would expect the focal firm to be able to command a somewhat higher price, while the other firms' offerings would decline in demand and therefore, the competing firms would reduce their price.

## 3.3   Why WTP and WTB are Inadequate

Both WTP and WTB do not take into account equilibrium adjustments in the market as one of the products is enhanced by addition of a feature. For this reason, we cannot view pseudo-WTP as what a firm can charge for a feature-enhanced product nor can we view WTB as the market share than can be gained by feature enhancement. Computation of changes in the market equilibrium due to feature enhancement of one product will be required to develop

a measure of the economic value of the feature. In many cases, WTP will overstate the price premium afforded by feature enhancement and WTB will also overstate the impact of feature enhancement on market share. Equilibrium computations in differentiated product cases are difficult to illustrate by simple graphical means. In this section, we will use the standard demand and supply graphs to provide a informal intuition as to why WTP and WTB will tend to overstate the benefits of feature enhancement.

Figure 2 shows a standard industry supply and demand set-up.p.[8] The demand curve is represented by the blue downward sloping lines. "D" denotes demand without the feature and "D*" denotes demand with the feature. The vertical difference between the two demand curves is the change in WTP as the feature is added. We assume that addition of the feature may increase the marginal cost of production (note: for some features such as those created purely via software, the marginal cost will not change). The cost curves are marked as "C" and "C*", respectively. It is easy to see that, in this case, the change in WTP exceeds the change in equilibrium price.

The analogous situation is shown for WTB in figure 3. We have the same cost and demand curves, but we illustrate the WTB exercise which is to compute the change in quantity sold assuming prices do not change. WTB clearly overstates the changes in equilibrium quantity demanded. The figures show very clearly that both WTP and WTB are purely demand-based quantities which do not take into account changes in prices and costs as the feature is enhanced and a new industry equilibrium is achieved.

## 3.4   WTP in the Case of Heterogeneous Customers

Even in the case of homogeneous customers, we have seen that WTP should not be regarded as a proper measure of economic value. In the case of heterogeneous consumers, additional problems are associated with the WTP concept. In almost all choice-based conjoint settings, Hierarchical Bayes methods are used to estimate the choice model parameters. In the Hier-

---

[8]Here we consider the case of a competitive industry to provide an intuition for why WTP and WTB measure are not equilibrium quantities. In the case of imperfect competition or oligopoly, it is not possible to represent the equilibrium in this manner.



Figure 2: Difficulties with WTP



Figure 3: Difficulties with WTB

archical Bayes approach (see for example, chapter 5 and Appendix A of Rossi, Allenby, and McCulloch (2005)), each respondent may have different logit parameters, $\beta$ and $\beta_P$, and the complete posterior distribution is computed for all model parameters, including individual respondent level parameters. The problem, then, becomes how to summarize the distribution of WTP which is revealed via the HB analysis. The concept of WTP provides no guidance as to how this distribution should be summarized. One natural summary would be the expectation of WTP where the expectation is taken over the distribution of model parameters.

$$\mathbb{E}\left[\text{WTP}\right] = \int \frac{\beta_f}{\beta_p} p\left(\beta_f, \beta_p | Data\right) d\beta_f d\beta_p$$

However, there is no compelling reason to prefer the mean over any other scalar summary of the distribution of WTP. Some propose using a median value of WTP instead. Again, there are no economic arguments as to why the mean or median or any other summary should be preferred. The statistical properties of various summaries (e.g. mean vs. median) are irrelevant as we are not considering the sampling performance of an estimator but rather what is the appropriate summary of a population distribution. A proper economic valuation will consider the entire demand curve as well as competitive and cost considerations. Equilibrium quantities will involve the entire distribution via the first order conditions for firm profit-maximization. These quantities cannot be expressed as a function of the mean, median or any other simple set of scalar summaries of the distribution of WTP.

However, it is possible to provide a rough intuition as to why the mean of WTP may be a particularly poor summary of the distribution for equilibrium computations. It is the marginal rather than the average consumer that drive the determination of equilibrium prices. Exactly where, in the distribution of WTP, will the marginal customer be is determined by nature of the distribution as well as where supply factors that "slice" into the distribution of WTP. It is possible to construct cases where the average WTP vastly overstates the WTP of the marginal customer. This is one of the main points of Orme (2001). If the bulk of the market has a low value of WTP and there is a small portion of the market with extremely high WTP (the Howells in Orme's Gilligan's Island metaphor), then a profit maximizing firm may

set price much lower than average WTP so as to sell to the majority of potential customers who have relatively low WTP. There are situations where the greater volume from low WTP consumers outweighs the high margins that might be earned from the high WTP segment. In these cases, mean WTP will vastly overstate the price premium a firm will charge over cost for a product. It is more difficult, but possible, to construct similar scenarios for median WTP.

One of the major problems with using any measure of the central tendency of the distribution of WTP (either mean, median, or mode) is that this includes consumers whose WTP is insufficient to be in the market. That is, our surveys should qualify respondents to be in the "market" for the products (with a screening question such as "do you plan to buy a digital camera in the next six months). However, simply averaging WTP over all survey respondents averages in those whose WTP for the product as a whole is below the market price of any products (e.g. someone whose WTP for a digital camera is only $50 would not purchase any digital cameras offered in a conjoint survey). This is a downward bias for WTP computations.

Rather than debating whether a particular WTP computation is upward or downward biased for feature valuation, we should discard the WTP concept as simply not relevant for valuation of patented features and move on to a more sensible economic quantity.

## 4  Equilibrium Calculations

The value of a patent is ultimately derived from the profits that accrue to firms who practice the patent by developing products that utilize the patented technology. In fact, standard economic argument for allowing patent holders to sell their patents is that, in this way, patents will eventually find their way into the hands of those firms who can best utilize the technology to maximize demand and profits. For these reasons, we believe that the only sensible measure of the economic value of feature enhancement is the incremental profits that the patented feature will generate.

$$\Delta \pi = \pi \left( p^{eq}, m^{eq} | A^* \right) - \pi \left( p^{eq}, m^{eq} | A \right) \tag{4.1}$$

$\pi$ is the profits associated with the industry equilibrium prices and shares given a particular set of competing products which is represented by the choice set defined by the attribute matrix. $A^*$ refers to the set of competing products, one of which has been enhanced by addition of the patented feature; $A$ refers to the set of products without feature enhancement. This definition allows for both price and share adjustment as a result of feature enhancement, removing some of the objections to the WTP and WTB concepts.

In order to compute incremental profits as in (4.1), we will have to make assumptions about the demand for product features, costs and competitive structure. Finally, we will use the standard Nash price equilibrium concept to compute a equilibrium prices. Specifically, we will assume

1. Demand Specification: A standard heterogenous logit demand that is linear in the attributes (including price)

2. Cost Specification: Constant marginal cost

3. Single product firms

4. Feature Exclusivity: The feature can only be added to one product

5. No Exit: Firms cannot exit or enter the market after product enhancement takes place

6. Static Nash Price Competition

Assumptions 2, 3, 4 can be easily relaxed. Assumption 1 can be replaced by any valid or integrable demand system. Assumptions 5 and 6 cannot be relaxed without imparting considerable complexity to the equilibrium computations

The standard static Nash equilibrium in a market for differentiated products is a set of prices such that simultaneously satisfy all firms profit-maximization conditions. Each firm chooses price to maximize firms profits, given the prices of all other firms. These conditional demand curves are sometimes called the "best response" of the firm to the prices of other firms. An equilibrium, if it exists,[9] is a set of prices that is simultaneously the best response

---

[9]There is no guarantee that a Nash equilibrium exists for heterogeneous logit demand.

or profit maximizing for each firm given the others.

In a choice setting, the firm demand is

$$\pi\left(p_j | p_{-j}\right) = M\mathbb{E}\left[Pr\left(j | p, A\right)\right]\left(p_j - c_j\right).$$ (4.2)

M is the size of the market, $p$ is the vector of the prices of all $J$ firms in the market, $c_j$ is the marginal cost of producing the firms product. The expectation is taken with respect to the distribution of choice model parameters. In the logit case,[10]

$$\mathbb{E}\left[\Pr\left(j | p, A\right)\right] = \int \frac{\exp\left(\beta' a_j - \beta_p p_j\right)}{\sum_j \exp\left(\beta' a_j - \beta_p p_j\right)} p\left(\beta, \beta_p\right) d\beta d\beta_p.$$ (4.3)

The first order conditions of the firm are

$$\frac{\partial \pi}{\partial p_j} = \mathbb{E}\left[\frac{\partial}{\partial p_j} \Pr\left(j | p, A\right)\right]\left(p_j - c_j\right) + \mathbb{E}\left[\Pr\left(j | p, A\right)\right]$$ (4.4)

The Nash equilibrium price vector is a root of the system of nonlinear equations which define the F.O.C. for all $J$ firms. That is if we define

$$h\left(p\right) = \begin{bmatrix} h_1\left(p\right) = \frac{\partial \pi}{\partial p_1} \\ h_2\left(p\right) = \frac{\partial \pi}{\partial p_2} \\ \vdots \\ h_J\left(p\right) = \frac{\partial \pi}{\partial p_J} \end{bmatrix}$$ (4.5)

then the equilibrium price vector, $p^*$, is a zero of the function $h\left(p\right)$. There are computational issues in both evaluating the firm first order conditions and in computing the root of the system of equations given in (4.5). We refer the reader to Allenby, Brazell, Howell, and Rossi

---

[10]We do not include a market wide shock to demand as we are not trying to build an empirical model of market shares. We are trying to approximate the firm problem. In a conjoint setting, we abstract from the problem of omitted characteristics as the products we use in our market simulators are defined only in terms of known and observable characteristics. Thus, the standard interpretation of the market wide shock is not applicable here. Another interpretation is that the market wide shock represents some sort of marketing action by the firms (e.g. advertising). Here we are directly solving the firm pricing problem holding fixed any other marketing actions. This means that the second interpretation of the market wide shock as stemming from some unobservable firm action is not applicable here.

(2013) for details.

# 5   An Illustration Using the Digital Camera Market

To illustrate our proposed method for patent valuation and to contrast our method with standard WTP methods, we consider the example of the digital camera market. We designed a conjoint survey to estimate the demand for features in the point and shoot submarket. This is a consumer electronics category which is very similar to the product categories in which there has been patent litigation (smartphones, tablets, and gaming consoles).

   We considered the following seven features with associated levels:

1. Brand: Canon, Sony, Nikon, Panasonic

2. Pixels: 10, 16 mega-pixels

3. Zoom: 4x, 10x optical

4. Video: HD (720p), Full HD (1080p) and mike

5. Swivel Screen: No, Yes

6. WiFi: No, Yes

7. Price: $79-279

In this exercise, we chose the swivel screen feature as the focus of our analysis. This feature is illustrated in Figure 4. We consider the problem of valuing a patent which covers the swivel screen feature.[11]

   The conjoint design was a standard fractional factorial design in which each respondent viewed sixteen choice sets, each of which featured four hypothetical products. A dual response mode was used to incorporate the outside option. Respondents were first asked which of the four profiles presented in each choice task was most preferred. Then the respondent was

---

[11]We are not aware of a specific patent related to the swivel screen apparatus, but this feature is representative of many patented features.

asked if they would buy the preferred profile at the stated price. If no, then this response is recorded as the "outside option" or "none of the above." Respondents were screened to only those who owned a point and shoot digital camera and who considered themselves to be a major contributor to the decision to purchase this camera.

The survey was fielded to the Sampling Surveys International internet panel in August 2013. We received 501 completed questionnaires.[12] We recorded time to complete the conjoint portion of the survey. The median time to complete is 220 seconds or about 14 seconds per conjoint task. The 25th percentile is 151 seconds and the 75th percentile is 333 seconds. To check sensitivity to time spent on the survey, we conducted analyses deleting the bottom quartile of the respondents and found little change. It is a common and well-accepted practice to remove respondents who "straight-line" or always select the same option (such as the left most choice). The idea is that these "straight-liners" are not putting sufficient effort into the choice task. Of our 501 complete questionnaires, only 2 respondents displayed straight-line behavior and were eliminated. We also eliminated 6 respondents who always selected the same brand and two respondents who always selected the high price brand. Our reasoning is that these respondents did not appear to be taking the trade-offs conjoint exercise seriously. We also eliminated 23 respondents who always selected the outside option as their part-worths are not identified without prior information. Thus, our final sample size was 468 out of an original size of 501.

To analyze the conjoint data, we use a Bayesian hierarchical model and inference procedure. The hierarchical model we employed assumes that the conjoint price-worths are normally distributed. We can compute the posterior predictive distribution of part-worths as follows:

$$p\left(\beta|data\right) = \int \phi\left(\beta|\mu, V_\beta\right) p\left(\mu, V_\beta|data\right) d\mu \, dV_\beta \tag{5.1}$$

(5.1) reflects the influence of both the model (the normal random coefficient distribution) and

---

[12]This study was part of a wave of four other very similar conjoint studies on digital cameras each with the same screening criteria. For all studies in the wave, 16,185 invitations were sent to panelists, 6,384 responded. Of those who responded to the invitation, 2,818 passed screening and of those passing screening 2,503 completed the questionnaire. Thus, the overall completion rate is 89 per cent which is good by survey standards.

**LCD screen tilts and can be swung away from the camera body.**



Figure 4: Swivel Screen Attribute

the data through the posterior distribution of the normal hyper-parameters. The resulting distributions will be symmetric but of fatter tails that the normal. We also impose the constraint that the price coefficient is strictly negative.[13] For more information on Bayesian computations and hierarchical models, consult Rossi, Allenby, and McCulloch (2005).

Aggregate demand is found by taking the expectation of choice probabilities with respect to the distribution of preference parameters over the population. The distribution of the part-worths is the correct predictive distribution of preferences. In order to shed some light as to the substitution structures found in aggregate demand, we compute the posterior distribution of the market share elasticity matrix.

$$\frac{\partial MktShare(i)}{\partial lnp_j} = \frac{\partial}{\partial lnp_j} \int Pr\left(i|\beta\right) p\left(\beta|\mu, V_{beta}\right) d\beta \tag{5.2}$$

We note that the elasticities in (5.2) are functions of the normal distribution hyper-parameters. We average the elasticities with respect to draws from the posterior distribution of the hyper-parameter to obtain the posterior mean of these elasticities is presented in Table 1. These own price elasticities are quite reasonable and imply a reasonably high markup of about three times cost. The cross-price elasticities are also quite high, showing a high degree of substitution between these brands.

---

[13]See Allenby, Brazell, Howell, and Rossi (2013) for details.

| Price\Mkt Share | MktShare$_{Nikon}$ | MktShare$_{Canon}$ | MktShare$_{Sony}$ | MktShare$_{Panasonic}$ |
|---|---|---|---|---|
| $P_{Nikon}$ | -1.56 | .39 | .40 | .28 |
| $P_{Canon}$ | .37 | -1.79 | .53 | .44 |
| $P_{Sony}$ | .36 | .50 | -1.69 | .34 |
| $P_{Panasonic}$ | .34 | .55 | .46 | -1.73 |

Table 1: Posterior Mean of Aggregate Demand Elasticities

## 5.1   Changes in Equilibrium Prices and Shares

We have argued that economic value of a patented feature should be the incremental profits that accrue to the firm that practices the patent by incorporating the patented feature. Before showing changes in profits, we first explore changes in equilibrium prices and associated market shares. We can compute equilibrium prices with and without patented feature to provide an idea of how much of a price premium a firm can charge and how market shares will adjust in the new industry equilibrium.

Unlike the WTP computations, any equilibrium calculation will depend, as it should, on which brand and product configuration is being enhanced by addition of the patented feature. Here we consider the change in equilibrium outcomes from adding the swivel screen display to the Nikon base product (a Nikon brand camera with all attributes turned to their "lowest" value except, of course, price which is not constrained). The value conferred by the addition of the swivel screen with also depend on the configuration of other competing products. For illustration purposes only, we considered a competitive set that consists of three other brands (Canon, Nikon, and Panasonic) all similarly configured at the "base" level of attributes without the swivel screen feature. We set the marginal cost of product for all brands to be $75. When the swivel screen feature is added, marginal cost is increased by $5 to $80.

Table 2 presents the posterior means of the equilibrium prices computed with and without the swivel screen addition to the Nikon product. Adding the swivel screen gives the Nikon brand more effective market power relative to the other branded competitors who do not have the feature. Not only does Nikon find it optimal to raise price, the stronger competition and diminished value of the other brands forces them to lower prices in equilibrium.

Table 3 displays the equilibrium market shares for each of the four branded products and

|        | Nikon    | Canon    | Sony     | Panasonic |
|--------|----------|----------|----------|-----------|
| W/O SS | $211.44  | $188.44  | $173.68  | $182.40   |
| W SS   | $268.55  | $186.72  | $172.98  | $179.45   |
| Δ      | $57.11   | -$1.72   | -$0.70   | -$2.95    |

Table 2: Changes in Equilibrium Prices

|        | Nikon | Canon | Sony  | Panasonic | Outside Good |
|--------|-------|-------|-------|-----------|--------------|
| W/O SS | 10.7% | 13.0% | 13.1% | 10.2%     | 53%          |
| W SS   | 10.9% | 13.1% | 13.1% | 10.4%     | 52.5%        |

Table 3: Equilibrium Shares

the outside good calculated with and without the swivel screen display. Only very minor share changes are observed. The Nikon product with the swivel screen gains share, primarily from the outside alternative. As we have seen, the other brands reduce their prices in equilibrium, compensating for the greater desirability of the Nikon product. These share results are much different from a WTB analysis in which prices are not allowed to adjust. A WTB analysis will overstate the share gain for Sony from feature enhancement as the prices in a WTB analysis are not allowed to equilibrate in the new structure of competing products.

## 5.2   Changes in Equilibrium Profits

Our entire perspective on patent valuation is based on the incremental profits that accrue to a firm whose products include the patented feature. Obviously, the absolute dollar levels of profits depend on the size of the market. In order to present incremental profit in an interpretable manner, we will report the posterior distribution of the percentage change in profits. That is, we will again consider the addition of the swivel screen to the base Nikon product.

$$\%\Delta\pi = \frac{\pi_{\text{Nikon}}\left(p^{*}_{\text{SS}}\right) - \pi_{\text{Nikon}}\left(p^{*}_{\text{w/o SS}}\right)}{\pi_{\text{Nikon}}\left(p^{*}_{\text{w/o SS}}\right)}$$

To compute the posterior distribution of the percentage change in Nikon profits, we re-compute the price and share equilibria for each draw from the posterior distribution of the normal distribution hyper-parameters, $(\mu, V_{\beta})$. Figure 5 shows this posterior distribution

35

which is centered over about a 40 per cent increase in equilibrium profits due primarily to the price premium Nikon is now able to charge for the product. It should be emphasized that our equilibrium computations take into account the adjustments that will occur in the market after the introduction of the enhanced Nikon product. A 95 per cent posterior interval for per cent change in profit is quite wide, extending from about 26 per cent to 58 per cent. This reflects an important finding that, even with 500 respondents, we do not have a great deal of precision in the estimates of quantities relevant to patent valuation.

### 5.3   A Damages Point of View

The problem of calculating damages due to patent infringement can also be solved by application of our principle of economic valuation with incremental profits. Consider the case where Nikon owns the patent for the swivel screen technology. Sony infringes on this patent by introducing a Sony point of shoot camera with the same swivel screen feature. How has Nikon been injured by this act of infringement? The answer is clearly that Nikon is injured only to the extent that Nikon profits are lower than in the case where Sony does not infringe. Our demand models and equilibrium calculations allow us to calculate this loss of profits. Profits in the counterfactual where Sony does not infringe can be computed simply from the equilibrium prices and shares shown above. We then add the swivel screen to both the Nikon and Sony models and compute the associated price equilibrium. The percentage change in profits for Nikon represents the damages that can be attributed to the Sony infringement.

$$\%\Delta\pi_{Nikon} = \frac{\pi_{Nikon}\left(p^*_{\text{Nikon, Sony SS}}\right) - \pi_{Nikon}\left(p^*_{\text{Nikon only SS}}\right)}{\pi_{Nikon}\left(p^*_{\text{Nikon only SS}}\right)} \qquad (5.3)$$

Here the notation, $p^*$, refers to the equilibrium prices. These equilibrium computations take into account that if Sony were to infringe Nikon might be forced to lower prices which is often termed the problem of price erosion. In sum, this method take full account of all of the different ways in which Sony's infringement might harm Nikon.

Figure 6 shows how Nikon profits will decline in the face of stiffer competition from the



Figure 5: Posterior Distribution of Change in Nikon Equilibrium Profits from Addition of a Swivel Screen

Sony product with the infringing feature. The posterior mean is about a 13 per cent reduction in Nikon profits. When Sony adds the SS to its product, demand for the Sony product increases dramatically. If Nikon were to keep its price at the equilibrium price that would prevail with only the Nikon product having the swivel screen, then Nikon would lose significant share to Sony. However, we would not expect Nikon to simply stand by and not react to the more formidable competition from Sony. In response to the upgrade of the Sony product, Nikon would be forced to reduce price significantly. In the end, the new equilibrium results in Nikon reducing its price from \$268.55 to \$221.93 and maintaining about the same share as before the entry of the swivel screen Sony product. This illustrates the importance of undertaking equilibrium calculations rather than simply holding prices or shares constant.

## 5.4   WTP

As indicated in Section 3, the most common practice in product and feature valuation is a WTP analysis. We can easily use our digital camera data to reproduce this analysis for the swivel screen feature. WTP is a consumer-specific concept. Therefore, any WTP analysis for a set of consumers will have to summarize the distribution of WTP across consumers. A sensible summary would be to estimate the expected, or population average WTP, $\mathbb{E}[\text{WTP}]$. $\mathbb{E}[\text{WTP}]$ is the mean WTP across the population represented by our normal model of preferences.

$$\mathbb{E}[\text{WTP}|\mu, V_\beta] = \int \frac{\beta_f}{\beta_p} p(\beta_f, \beta_p | \mu, V_\beta) \, d\beta_f \, d\beta_p \tag{5.4}$$

To construct the posterior distribution of $\mathbb{E}[\text{WTP}]$, we use the draws from the posterior distribution of $(\mu, V_\beta)$. For each draw of the hyper-parameter, a very large number of draws are made from the Normal distribution of preferences (we used 10,000) to approximate the integral in (5.4). We do this for each draw from the posterior of the hyper-parameters to build up the posterior predictive distribution of the mean WTP.

Figure 7 shows the posterior distribution of the WTP. This distribution is centered over very large dollar values (mean of \$63.21 and median of \$62.80). There is a great deal of posterior uncertainty in the posterior in spite of the relatively large sample size (around 500)



Figure 6: Posterior Distribution of the Change in Nikon Profits from Sony Infringement

and the orthogonal design with prices varying from \$79 to \$279. This suggests that vastly more informative studies would be required if the WTP concept were required to produce precise estimates. Of course, larger and more informative data would not overcome the conceptual limitations of WTP as a method of valuation.

The WTP analysis provides an estimate of the expected WTP which is larger than the equilibrium price premium reported in Table 2, according with the intuition that this is apt to be the case for situations in which the WTP of the marginal consumer is different than the average WTP.[14]

## 5.5   WTB

There are two possible WTB analyses which are relevant to patent valuation. The value of the patent to the firm practicing the patent (under the assumption of no infringement) might be informed by a WTB analysis in which we measure the gain in market share for a firm that adds the patented feature to an existing product. WTB would be computed simply by enhancing the product while holding the prices constant. If we take the example of adding the swivel screen feature to a Nikon product, then we have already seen that the primary source of value in an equilibrium analysis is not the gain in share made possible by the patented feature, but rather the increased price premia. Figure 8 shows a WTB analysis for the simple case of the addition of the swivel screen to the Nikon product. The WTB analysis shows that a very large increase in Nikon market share of almost 5 percentage points. This is a misleading estimate for two reasons: 1. Nikon will not find it profit-maximizing to keep price constant when the swivel screen feature is added and 2. competing brands will adjust their prices downward. We have already seen that the change in equilibrium shares is minimal when these price adjustments are made.

The second WTB analysis which could be undertaken is one to examine the loss of Nikon market share when Sony enters the market with an infringing product. That is, we consider

---

[14]While the difference between the equilibrium price premium and average WTP is relatively small in this example, if you add the swivel screen feature to the Sony brand the price premia will only be about one half of the $\mathbb{E}[\text{WTP}]$ estimate.



Figure 7: Posterior Distribution of $\mathbb{E}\left[\text{WTP}\right]$ (\$)



Figure 8:  Posterior Distribution of Change in Nikon Share from Addition of the Swivel Screen Feature

the market share of the Nikon product in a market where all other competitors do not have the patented swivel screen feature and compare this with the market share of the Nikon product in a market where the Sony product also has the swivel screen feature. All share computations hold the price of the Nikon product constant at the equilibrium price that would prevail in the market prior to Sony infringement. In other words, Nikon does not respond by lowering price in the face of the Sony entry. This shows the flaw in the WTB analysis; it takes a static and non-equilibrium view. In recent, Apple V. Samsung litigation this method of an WTB analysis was employed. Figure 9 shows the posterior predictive distribution of the decline in Nikon share that can be attributed to the Sony infringement. The distribution is centered on about a 2 per cent decline in Nikon share. Equilibrium computations show no appreciable change in Nikon share because Nikon finds it optimal to lower its price in response to the Sony infringement as detailed in section 5.3.

## 6    Conclusions

Our perspective is that a patent for a product feature has value only to the extent to which firms can earn incremental profits from the addition of the patented feature. Incremental profits are determined not only by the value which individual consumers place on the patented feature but also on the nature and extent of competition in the relevant market. This means that in order to implement our economic paradigm for patent valuation, we will need to be able to estimate demand for product features and model competitive behavior. In many situations, observational data on the products, prices and quantity demanded will not be sufficient to estimate demand for patented features. In particular, the ideal data for demand estimation is consumer level data where product features are manipulated in an experimental fashion.

A conjoint survey attempts to simulate marketplace purchase behavior for a sample of consumers. Product features are manipulated according to an experimental design and the respondents are asked to choose from among hypothetical products define by product features. This eliminates many of the drawbacks of using observational data which is frequently

43



Figure 9: Posterior Distribution of Change in Nikon Share when Sony Infringes

insufficiently informative to be useful in patent valuation. However, conjoint studies must be designed specifically for demand and profit calculations. In particular, the set of competitive brands available in the marketplace must be included and the choice tasks must include the "outside option."

While conjoint studies have been used in recent patent litigation, we are not aware of any conjoint analysis which has been supplemented by the appropriate equilibrium and profit calculations. Instead, Willingness To Pay and Willingness To Buy analyses are performed. In many instances, these analyses are misleading and do not well-approximate the true value of the product feature. WTP and WTB will typically overstate the price and share effects from the introduction of a patented product feature.

We illustrate our approach with conjoint data obtained from a survey on digital cameras. We find that WTB analyses and, to a lesser extent, WTP analyses do overstate the value of patented feature.

Finally, while we have demonstrated that conjoint data can be used to value patented features, the demands are greater on the design and analysis of conjoint data if the data is to be used for patent valuation. We have shown that the standard size samples are inadequate to precisely estimate profit-based measures of patent value. Further, a conjoint study must be designed specifically for profit and equilibrium calculations. This imposes requirements not often met by in standard industry applications of conjoint.

# References

ALLENBY, G. M., J. D. BRAZELL, J. P. HOWELL, AND P. E. ROSSI (2013): "Economic Valuation of Product Features," Discussion paper, SSRN.

ALLENBY, G. M., AND P. E. ROSSI (1999): "Marketing Models of Consumer Heterogeneity," *Journal of Econometrics*, 89, 57–78.

BERRY, S., J. LEVINSOHN, AND A. PAKES (1995): "Automobile Prices in Market Equilibrium," *Econometrica*, 63(4), 841–890.

BOX, G. E. P., AND N. R. DRAPER (1987): *Empirical Model-Building and Response Surfaces*. John Wiley & Sons.

BRAZELL, J., C. DIENER, E. KARNIOUCHINA, W. MOORE, V. SEVERIN, AND P.-F. ULDRY (2006): "The No-Choice Option and Dual Response Choice Designs," *Marketing Letters*, 17(4), 255–268.

MCFADDEN, D. L. (1981): "Econometric Models of Probabilistic Choice," in *Structural Analysis of Discrete Choice*, ed. by M. Intrilligator, and Z. Griliches, pp. 1395–1457. North-Holland.

OFEK, E., AND V. SRINIVASAN (2002): "How Much Does the Market Value an Improvement in a Product Attribute," *Marketing Science*, 21(4), 398–411.

ORME, B. K. (2001): "Assessing the Monetary Value of Attribute Levels with Conjoint Analysis," Discussion paper, Sawtooth Software, Inc.

ORME, B. K. (2009): *Getting Started with Conjoint Analysis*. Research Publishers, LLC.

ROSSI, P. E., G. M. ALLENBY, AND R. E. MCCULLOCH (2005): *Bayesian Statistics and Marketing*. John Wiley & Sons.

SHEATSLEY, P. (1983): "Questionnaire Construction and Item Writing," in *Handbook of Survey Research*, ed. by P. H. Rossi, J. D. Wright, and A. B. Anderson, chap. 6, pp. 195–230. Academic Press, New York.

TRAIN, K. E. (2003): *Discrete Choice Methods with Simulation*. Cambridge University Press.

TRAJTENBERG, M. (1989): "The Welfare Analysis of Product Innovations, with an Application to Computed Tomography Scanners," *Journal of Political Economy*, 97(2), 444–479.

VISCUSI, W. K., AND J. HUBER (2012): "Reference-dependent Valuations of Risk: Why willingness-to-accept exceeds willingness-to-pay," *Journal of Risk and Uncertainty*, 44, 19–44.

YEAGER, D. S., J. A. KROSNICK, L. CHANG, H. S. JAVITZ, M. S. LEVENDUSKY, A. SIMPSER, AND R. WANG (2011): "Comparing the Accuracy of RDD Telephone Surveys and Internet Samples Conducted with Probability and Non-Probability Samples," *Public Opinion Quarterly*, 75(4), 709–747.