1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

        APPLE INC., A CALIFORNIA        )   C-12-00630 LHK
6       CORPORATION,                    )
                                        )   SAN JOSE, CALIFORNIA
7                  PLAINTIFF,           )
                                        )   APRIL 4, 2014
8             VS.                       )
                                        )   VOLUME 3
9       SAMSUNG ELECTRONICS CO., LTD.,  )
        A KOREAN BUSINESS ENTITY;       )   PAGES 498-756
10      SAMSUNG ELECTRONICS AMERICA,    )
        INC., A NEW YORK CORPORATION;   )
11      SAMSUNG TELECOMMUNICATIONS      )
        AMERICA, LLC, A DELAWARE        )
12      LIMITED LIABILITY COMPANY,      )
                                        )
13                 DEFENDANTS.          )
        _____ )

14

15

16            TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LUCY H. KOH
17            UNITED STATES DISTRICT JUDGE

18

19

20            APPEARANCES ON NEXT PAGE

21

22   OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR
                                  CERTIFICATE NUMBER 8074

24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

1

2       A P P E A R A N C E S:

3       FOR PLAINTIFF           MORRISON & FOERSTER
        APPLE:                  BY:  HAROLD J. MCELHINNY
4                                    RACHEL KREVANS
                                425 MARKET STREET
5                               SAN FRANCISCO, CALIFORNIA  94105

6

7                               WILMER, CUTLER, PICKERING,
                                HALE AND DORR
8                               BY:  WILLIAM F. LEE
                                60 STATE STREET
9                               BOSTON, MASSACHUSETTS  02109

10                              BY:  MARK D. SELWYN
                                950 PAGE MILL ROAD
11                              PALO ALTO, CALIFORNIA  94304

12

13      FOR SAMSUNG:            QUINN, EMANUEL, URQUHART & SULLIVAN
                                BY:  JOHN B. QUINN
14                                   WILLIAM PRICE
                                865 S. FIGUEROA STREET, FLOOR 10
15                              LOS ANGELES, CALIFORNIA  90017

16                              BY:  VICTORIA F. MAROULIS
                                     KEVIN B. JOHNSON
17                              555 TWIN DOLPHIN DRIVE
                                SUITE 560
18                              REDWOOD SHORES, CALIFORNIA  94065

19

20

21

22

23

24

25

1

2                         INDEX OF WITNESSES

3       PLAINTIFF'S

4       PHILIP SCHILLER
             CROSS-EXAM BY MR. PRICE (RES.)        P. 502
5            REDIRECT EXAM BY MR. MCELHINNY         P. 557

6

7       GREGORY CHRISTIE
             DIRECT EXAM BY MCELHINNY              P. 573
8            CROSS-EXAM BY MR. PRICE               P. 606

9

10      ANDREW COCKBURN
             DIRECT EXAM BY MR. MCELHINNY          P. 621
11           CROSS-EXAM BY MR. NELSON              P. 707

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              INDEX OF EXHIBITS

3                                    MARKED        ADMITTED

4        PLAINTIFF'S

5        PX 121                                    640
         PX 157                                    643
6        PX 119                                    646
         PX 230, 231, 232,                         656
7            234, 235, 236,
             239 & 241
8        PX 120                                    683
         PX 181                                    686
9        PX 232                                    690
         PX 168                                    698
10       PX 169                                    701

11

12       DEFENDANTS'

13       377                                       506
         444                                       507
14       445                                       509
         446                                       510
15       459                                       513
         418                                       518
16       407                                       521
         408A                                      525
17       498                                       532
         410                                       535
18       409                                       537
         405                                       543 & 544
19       489                                       549

20       JOINT

21       JX10                                      597
         JX 28B, 29B, 29D,                         652
22           32C, 33B,
             34C & 37A
23       JX 13                                     689
         JX 30A                                    690

24

25

```
1     SAN JOSE, CALIFORNIA                    APRIL 4, 2014

2                    P R O C E E D I N G S

3         (JURY OUT AT 9:09 A.M.)

4             THE COURT:  GOOD MORNING AND WELCOME.

5         WHERE IS MR. SCHILLER?

6             MS. KREVANS:  I'M GOING TO GET HIM RIGHT NOW.

7             THE CLERK:  READY FOR THEM?

8             THE COURT:  YES, PLEASE.

9         (JURY IN AT 9:09 A.M.)

10            THE COURT:  MR. SCHILLER, PLEASE TAKE A SEAT.

11        YOU'RE STILL UNDER OATH.

12        PLEASE START WITH THE CROSS.

13            MR. PRICE:  THANK YOU, YOUR HONOR.

14            THE COURT:  TIME IS 9:09.  GO AHEAD, PLEASE.

15                   CROSS-EXAMINATION (RESUMED)

16     BY MR. PRICE:

17     Q.   GOOD MORNING, MR. SCHILLER.

18     A.   GOOD MORNING.

19     Q.   AND WE WERE LAST HERE, ONE OF THE THINGS WE TALKED ABOUT

20     WAS EASE OF USE, AND ONE OF THE GRAPHS THAT HAD BEEN PUT UP BY

21     YOUR COUNSEL WAS PX 122A, AND I JUST WANT TO GET SOME

22     CLARIFICATION ON THIS.

23         DO YOU RECALL THIS GRAPH WHICH TALKED ABOUT HOW IMPORTANT

24     WERE EACH OF THE FOLLOWING FEATURES OR ATTRIBUTES IN YOUR

25     DECISION TO PURCHASE THE IPHONE?
```

1          AND THEN IT LISTED FOR EASE OF USE BEING VERY IMPORTANT,

2     SOMEWHAT IMPORTANT.  DO YOU RECALL THAT?

3     A.   YES.

4     Q.   AND JUST SO WE'RE CLEAR HERE, THE WAY THESE SURVEYS WERE

5     DONE IS, IS THAT CONSUMERS WERE GIVEN CHOICES, LIKE EASE OF

6     USE, BATTERY LIFE, SIRI, PERHAPS, OR SOME FEATURE, AND ASKED TO

7     CHECK WHETHER SOMETHING WAS IMPORTANT OR VERY IMPORTANT OR NOT

8     IMPORTANT?

9     A.   THEY WERE -- YES, THEY WERE ASKED EACH OF THESE QUESTIONS

10    INDIVIDUALLY, SO THIS WAS ONE QUESTION.  THEY WERE ASKED HOW

11    IMPORTANT IS EASE OF USE TO YOUR PURCHASE DECISION.

12    Q.   SO IF YOU HAD, LIKE, 76 PERCENT SAYING VERY IMPORTANT,

13    THAT DOESN'T MEAN THAT, THAT, YOU KNOW, 70 PERCENT DIDN'T SAY

14    SOMETHING ELSE WAS ALSO VERY IMPORTANT; RIGHT?

15    A.   NO, IT DOES NOT.

16    Q.   OKAY.  SO, FOR EXAMPLE, IF WE WANTED TO LOOK AT THE KIND

17    OF DOCUMENT THIS CAME FROM, IF YOU'D LOOK AT EXHIBIT 377 IN

18    YOUR BINDER, IT'S DX 377, AND YOU SEE -- TECHNICALLY IF YOU

19    LOOK AT THE SECOND PAGE, IT SAYS "IPHONE BUYER SURVEY, APPLE

20    MARKET RESEARCH ANALYSIS, FISCAL YEAR 13, QUARTER 2 ."

21          DO YOU SEE THAT?

22    A.   YES.

23    Q.   THAT'S THE KIND OF DOCUMENT THESE NUMBERS WERE TAKEN FROM;

24    CORRECT?

25    A.   YES.

1          MR. QUINN:  YOUR HONOR, MOVE EXHIBIT 377 INTO

2     EVIDENCE.

3          THE COURT:  ANY OBJECTION?

4          MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.  IT'S BEEN

5     ADMITTED UNDER SEAL, I BELIEVE, EXCEPT FOR PAGES THAT SHOULD BE

6     SHOWN IN THE COURTROOM.

7          (DEFENDANTS' EXHIBIT 377 WAS RECEIVED IN EVIDENCE.)

8     BY MR. PRICE:

9     Q.   AND LET ME SHOW YOU, AND MAKE SURE THIS IS NOT UNDER SEAL,

10    IF WE CAN LOOK AT .024, WHICH I BELIEVE IS NOT UNDER SEAL.

11         IS THAT CORRECT?

12         MR. MCELHINNY:  YES.

13         MR. PRICE:  .024 AS AN EXAMPLE.  MAYBE WE CAN BLOW

14    THIS UP A LITTLE BIT, KEN, JUST THE TOP PART.

15    Q.   YOU SEE IT SAYS, "IMPORTANCE OF FEATURES AND ATTRIBUTES IN

16    IPHONE 5.  DO YOU SEE THAT?

17    A.   YES.

18    Q.   AND IT INCLUDES THINGS LIKE EASE OF USE, 94 PERCENT,

19    BATTERY LIFE, 91.

20         SO, IN OTHER WORDS, THESE ADD UP TO WAY MORE THAN 100

21    PERCENT?

22    A.   CORRECT.

23         THE COURT:  LET ME INTERRUPT YOU ONE SECOND.  I'M

24    SORRY.

25         MR. PRICE:  SURE.

```
 1              THE COURT:  YOU WANT THE ENTIRE DX 37 ADMITTED;

 2   CORRECT?

 3              MR. PRICE:  YES, YOUR HONOR.

 4              THE COURT:  WHAT PART IS SEALED AND WHAT PART IS NOT

 5   SEALED?  I JUST WANT THE EXHIBIT LIST AT THE END OF THE CASE TO

 6   BE CLEAR.

 7              MR. MCELHINNY:  THE ENTIRE DOCUMENT IS SEALED.

 8              THE COURT:  OKAY.

 9              MR. MCELHINNY:  EXCEPT FOR THE SPECIFIC PAGES THAT

10   ARE SHOWN IN THE COURTROOM THAT I BELIEVE WE HAVE MET AND

11   CONFERRED AND WE UNDERSTAND WHICH PAGES COUNSEL INTENDS TO

12   SHOW.

13              THE COURT:  ALL RIGHT.  SO AT LEAST FOR ONE, THEN,

14   LET'S PUT ON THE RECORD WHAT THOSE PAGES ARE GOING TO BE JUST

15   SO THE EXHIBIT LIST IS CLEAR AT THE END OF THE TRIAL.

16              MR. PRICE:  RIGHT NOW, YOUR HONOR, SHOWING .024, I

17   WILL ALSO BE SHOWING .028 AND -- HANG ON ONE SECOND -- I THINK

18   THOSE MIGHT BE THE ONLY TWO PAGES ON THIS DOCUMENT.  IF THERE

19   ARE OTHERS, I'LL TELL THE COURT AT THE TIME.

20              THE COURT:  OKAY.  THANK YOU.  JUST LET IT BE STATED

21   ON THE RECORD.  THANK YOU.  JUST SO WE'RE ALL IN AGREEMENT AT

22   THE END OF THE CASE WHAT'S SEALED AND NOT SEALED.  THANK YOU.

23   GO AHEAD PLEASE.

24              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

25              THE COURT:  YES, 377 IS ADMITTED IN ITS ENTIRETY.
```

1     IT'S SEALED IN ITS ENTIRETY, EXCEPT FOR .024 AND .028 AND

2     WHATEVER OTHER PAGES MR. PRICE NEEDS.

3          (DEFENDANTS' EXHIBIT 377 WAS ADMITTED IN EVIDENCE.)

4          MR. PRICE:  THANK YOU, YOUR HONOR.

5          THE COURT:  OKAY.  THANK YOU.

6     BY MR. PRICE:

7     Q.   SO, MR. SCHILLER, GETTING BACK TO OUR DISCUSSION THEN ON

8     TUESDAY, WE WERE TALKING ABOUT HUNDREDS OF FEATURES THAT GO

9     INTO EASE OF USE.

10         DO YOU RECALL THAT?

11    A.   YES.

12    Q.   AND YOU UNDERSTAND THAT THIS CASE IS FOCUSSING ON, ON

13    PRODUCTS THAT WERE IN THE MARKET IN THE YEARS 2011, 2012, 2013,

14    AND SOME THAT ARE STILL ON THE MARKET?

15    A.   I'M NOT CERTAIN OF THE EXACT TIMEFRAMES OF EACH OF THE

16    PRODUCTS INVOLVED IN THE CASE.

17    Q.   OKAY.  WELL, LET ME ASK YOU THIS:  WITH EACH ITERATION, OR

18    EACH NEW VERSION OF THE IOS SOFTWARE THAT CAME OUT, THERE WERE

19    OTHER EASE OF USE FEATURES ADDED; CORRECT?

20    A.   I'M SORRY.  OTHER COMPARED TO WHAT?  I'M NOT SURE WHAT

21    YOUR QUESTION IS.

22    Q.   OH, THAN CAME BEFORE.

23         SO, FOR EXAMPLE, WE HAD AN SDX 2312 AS AN DEMONSTRATIVE,

24    AND THAT WAS THAT, THAT SHOWED ALL THE IPHONES AND THE DATES

25    THEY WERE IN THE MARKET.

1          AND SO WHAT I'M SAYING IS THAT WHEN APPLE WOULD COME OUT

2     WITH, FOR EXAMPLE, IF WE'RE GOING TO FOCUS ON PRODUCTS IN THE

3     MARKET IN 2011, 2012, 2013, 2014, FOR EXAMPLE, THE IPHONE 4

4     WHEN IT CAME OUT IN JUNE 2010, IT HAD A NEW OPERATING SYSTEM,

5     IOS; CORRECT?

6     A.   THERE WAS A NEW VERSION OF IOS IN 2010.  IT APPLIES ALSO

7     TO PREVIOUS PRODUCTS.  SO WHEN YOU SPEAK ABOUT IPHONE 4 HAVING

8     A NEW OPERATING SYSTEM, AGAIN, COMPARED TO WHAT?  IT'S A --

9     IT'S A CONFUSING QUESTION.

10    Q.   SURE.  BECAUSE WHAT YOU'RE SAYING IS THAT YOU COULD

11    DOWNLOAD SOME OF THAT OPERATING SYSTEM ONTO THE PRIOR PHONES;

12    CORRECT?

13    A.   ABSOLUTELY.

14    Q.   OKAY.  SO, FOR EXAMPLE, IF YOU LOOK AT EXHIBIT 444, IT

15    WASN'T UNCOMMON FOR APPLE TO INTRODUCE PRESS RELEASES WHEN IT

16    PUT OUT NEW PRODUCTS; CORRECT?

17    A.   YES, WE PUT OUT PRESS RELEASES.

18    Q.   AND EXHIBIT 444 IS ONE OF THEM; CORRECT?

19    A.   IT LOOKS LIKE ONE OF THEM.

20         MR. PRICE:  MOVE EXHIBIT 444 INTO EVIDENCE, YOUR

21    HONOR.

22         MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

23         THE COURT:  IT'S ADMITTED.

24    (DEFENDANTS' EXHIBIT 444 WAS ADMITTED IN EVIDENCE.)

25         THE COURT:  GO AHEAD, PLEASE.

1              MR. PRICE:  IF WE CAN SHOW THE TOP PARAGRAPH HERE.

2       Q.   SO IT STARTS, JUNE 7TH, 2010, APPLE TODAY IS PRESENTING

3       THE NEW IPHONE 4 FEATURES FACETIME.  DO YOU SEE THAT?

4       A.   YES.

5       Q.   AND IF WE GO ON DOWN, I WANT TO GET DOWN TO THE DISCUSSION

6       OF IOS, AND IT SAYS "IPHONE 4 COMES WITH IOS 4," AND THAT'S THE

7       OPERATING, SOFTWARE OPERATING SYSTEM; CORRECT?

8       A.   AT THAT TIME, YES.

9       Q.   AND THERE IT SAYS "THE NEWEST VERSION OF THE WORLD'S MOST

10      ADVANCED MOBILE OPERATING SYSTEM, WHICH INCLUDES OVER 100 NEW

11      FEATURES."

12           CORRECT?

13      A.   YES.

14      Q.   AND DID THESE FEATURES CONTRIBUTE TO EASE OF USE?

15      A.   SOME DO, YES.

16      Q.   DO YOU HAVE ANY ESTIMATE AS TO HOW MANY OF THESE OTHER

17      HUNDRED CONTRIBUTE TO EASE OF USE?

18      A.   NO, SIR.

19      Q.   ARE YOU AWARE OF TESTIMONY THAT EVERY FEATURE ON THE

20      IPHONE CONTRIBUTES TO EASE OF USE?

21      A.   IN SOME WAY MOST DO, YES.

22      Q.   OKAY.  AND IF YOU LOOK AT EXHIBIT 445, DO YOU RECOGNIZE

23      THIS AS BEING ONE OF THE PRESS ANNOUNCEMENTS CONCERNING THE

24      IPHONE 4S?

25      A.   YES.

1          MR. PRICE:  MOVE EXHIBIT 445 INTO EVIDENCE, YOUR

2     HONOR.

3          MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

4          THE COURT:  IT'S ADMITTED.

5     (DEFENDANTS' EXHIBIT 445 WAS ADMITTED IN EVIDENCE.)

6          THE COURT:  GO AHEAD, PLEASE.

7          MR. PRICE:  AND AGAIN IF WE LOOK AT THE FIRST

8     PARAGRAPH.

9     Q.   IT TALKS ABOUT IN 2011 APPLE INTRODUCED ANNOUNCING THE 4S,

10    AND IF YOU GO ON DOWN HERE WHERE IT SAYS WITH, "WITH THE LAUNCH

11    OF THE IPHONE 4S ALSO COMES THE LAUNCH OF IOS 5, THE WORLD'S

12    MOST ADVANCED MOBILE OPERATING SYSTEM, WITH OVER 200 NEW

13    FEATURES."

14         DO YOU SEE THAT?

15    A.   YES.

16    Q.   SO THAT'S 200 IN ADDITION TO THE HUNDRED THAT YOU HAD

17    BEFORE?

18    A.   CORRECT.

19    Q.   AND WHEN WE'RE TALKING ABOUT, JUST TO BE CLEAR, THIS

20    OPERATING SYSTEM, THE IOS, IOS IS NOT THE ONLY OPERATING SYSTEM

21    THAT EXISTS FOR MOBILE PHONES; CORRECT?

22    A.   YES.

23    Q.   ANDROID IS ANOTHER OPERATING SYSTEM THAT EXISTS FOR MOBILE

24    PHONES?

25    A.   YES.

1    Q.   AND IF WE COULD GO TO 446.  THIS IS APR ANNOUNCEMENT,

2    PRESS ANNOUNCEMENT FOR THE IPHONE 5; CORRECT?

3    A.   YES, IT IS.

4            MR. PRICE:  MOVE 446 INTO EVIDENCE.

5            MR. MCELHINNY:  OBJECTION, YOUR HONOR.

6            THE COURT:  IT'S ADMITTED.

7        (DEFENDANTS' EXHIBIT 446 WAS ADMITTED IN EVIDENCE.)

8            THE COURT:  GO AHEAD, PLEASE.

9    BY MR. PRICE:

10   Q.   AND IF WE CAN LOOK AT THE FIRST PARAGRAPH HERE.  THIS IS

11   DATED SEPTEMBER 12TH, 2012, AND IF WE CAN GO DOWN TO HERE WHERE

12   IT SAYS "IPHONE 5 COMES WITH IOS 6, THE WORLD'S MOST ADVANCED

13   MOBILE OPERATING SYSTEM WITH OVER 200 NEW FEATURES."

14        CORRECT?

15   A.   YES.

16   Q.   SO THAT'S 200 IN ADDITION TO THE HUNDRED, IN ADDITION TO

17   THE HUNDRED THAT WE'VE SEEN BEFORE?

18   A.   200 PLUS, 200 AND PLUS 100, YES.

19   Q.   OKAY.  AND IF I ASSUME BEFORE IPHONE 4 -- IF WE CAN PUT UP

20   SDX 2312 -- IF WE LOOK AT THE 3GS AND THE 3G AND THE ORIGINAL

21   IPHONE, THEY ALL HAD ALSO HUNDREDS OF FEATURES THAT CONTRIBUTED

22   TO EASE OF USE?

23   A.   YES.

24   Q.   OKAY.  SO -- AND IN THESE SURVEYS, THERE WAS NO ATTEMPT IN

25   THE SURVEYS TO DISTINGUISH AT ALL BETWEEN, OF THESE HUNDREDS

1    AND HUNDREDS OF FEATURES THAT CONTRIBUTED TO EASE OF USE, WHICH

2    WAS IMPORTANT AND WHICH WASN'T IMPORTANT?  THAT'S NOT PART OF

3    THESE SURVEYS; CORRECT?

4    A.   IN THE SURVEYS YOU'VE SHOWN THAT WE'RE TALKING ABOUT, THE

5    EASE OF USE QUESTION, WE DIDN'T ATTEMPT TO BREAK OUT THE

6    FEATURES WITHIN EASE OF USE ON THOSE QUESTIONS.

7    Q.   OKAY.  SO -- OH, BY THE WAY, WHEN WE LOOK AT EXHIBIT 446,

8    WHICH IS THE IPHONE 5, ONE OF THE FEATURES TALKED ABOUT AFTER

9    THE 200 NEW FEATURES INCLUDING, THERE'S A COLON, THE ALL NEW

10   MAPS APP.

11       DO YOU SEE THAT?

12   A.   YES.

13   Q.   AND YOU UNDERSTAND ONE OF THE ISSUES IN THIS CASE IS, IS

14   HOW CERTAIN FEATURES MIGHT AFFECT PURCHASING DECISIONS?  DO YOU

15   UNDERSTAND THAT'S AN ISSUE IN THIS CASE?

16   A.   I DON'T KNOW EXACTLY WHAT YOU'RE REFERRING TO, BUT

17   PURCHASING DECISIONS CERTAINLY MATTER A LOT IN THIS CASE, YES.

18   Q.   OKAY.  AND THIS MAPS APP WAS SOMETHING WHICH APPLE HAD,

19   HAD ADVERTISED AS BEING A NEW FEATURE OF IOS, IOS 6; CORRECT?

20   A.   NO, WE DID NOT DO ANY ADVERTISEMENTS OF THE MAPS FEATURE

21   IN IOS 6.

22   Q.   OKAY.  IT WAS -- IT WAS POINTED OUT, THOUGH, IN THE PRESS

23   RELEASE THAT WENT OUT INTRODUCING THE IPHONE 5; CORRECT?

24   A.   YES, IT'S IN THE PRESS RELEASE.

25   Q.   AND, IN FACT, THERE WAS SOME BAD PUBLICITY ABOUT THAT

1    APPLICATION; FAIR TO SAY?

2    A.   SURE.

3    Q.   AND SUCH THAT THE PRESIDENT -- CORRECT THAT -- THE CEO OF

4    APPLE ISSUED A LETTER APOLOGIZING FOR THAT APPLICATION NOT

5    MEETING APPLE'S STANDARDS?

6    A.   EXACTLY, YES.

7    Q.   AND IF YOU'D LOOK AT EXHIBIT 459, DO YOU RECOGNIZE THIS AS

8    A, A "NEW YORK TIMES" ARTICLE CONCERNING THAT APOLOGY BY THE

9    CEO OF APPLE, MR. TIM COOK?

10   A.   I DON'T RECOGNIZE THE ARTICLE.  I DON'T RECALL SEEING THIS

11   SPECIFICALLY.

12   Q.   OKAY.  LET ME SEE IF YOU RECOGNIZE A PORTION, AND, THAT

13   IS, IF YOU LOOK AT THE SECOND PAGE THERE IS A SECTION WHICH

14   SAYS "MR. COOK'S FULL LETTER FOLLOWS."

15        AND DO YOU SEE THAT PORTION?

16   A.   I DO.

17   Q.   OKAY.  AND YOU SAW MR. COOK'S LETTER BEFORE IT ACTUALLY

18   WENT OUT; CORRECT?

19   A.   YES.

20   Q.   OKAY.  AND SO THAT PORTION OF THIS DOCUMENT YOU ARE

21   FAMILIAR WITH?

22   A.   YES.

23        MR. PRICE:  YOUR HONOR, I WOULD LIKE TO INTRODUCE

24   INTO EVIDENCE A REDACTED VERSION OF 459, IN PARTICULAR 459.002,

25   BEGINNING WITH "MR. COOK'S FULL LETTER FOLLOWS" AND ENDING ON

1    459.003 WHERE IT SAYS "TIM COOK, APPLE CEO."

2              MR. MCELHINNY:  NO OBJECTION.

3              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

4        (DEFENDANTS' REDACTED EXHIBIT 459 WAS ADMITTED IN

5    EVIDENCE.)

6    BY MR. PRICE:

7    Q.   SO WE HAVE A TIMEFRAME.  THIS LETTER FROM MR. COOK CAME

8    OUT SOME TIME IN ABOUT SEPTEMBER OF 2012; IS THAT RIGHT?

9    A.   I BELIEVE SO.

10   Q.   AND IF WE CAN LOOK JUST AT THE LETTER, IT STARTS WITH "WE

11   STRIVE TO MAKE WORLD-CLASS PRODUCTS THAT DELIVER THE BEST

12   EXPERIENCE POSSIBLE TO OUR CUSTOMERS.  WITH THE LAUNCH OF OUR

13   NEW MAPS LAST WEEK, WE FELL SHORT ON THIS COMMITMENT."

14        BUT DID YOU ASSIST IN DRAFTING THIS LETTER?

15   A.   I REVIEWED IT.  I DIDN'T WRITE IT.

16   Q.   WAS YOUR INPUT SOUGHT ON IT?

17   A.   IT MAY HAVE BEEN.  I DON'T RECALL SPECIFICALLY.

18   Q.   AND IF WE GO TO THE SECOND PAGE OF THE LETTER, AND LET'S

19   LOOK AT THE NEXT TO THE LAST PARAGRAPH STARTING WITH WHILE,

20   "WHILE WE'RE IMPROVING MAPS, YOU CAN TRY ALTERNATIVES BY

21   DOWNLOADING MAP APPS FROM THE APP STORE LIKE BING, MAPQUEST,

22   AND WAZE OR USE GOOGLE OR NOKIA MAPS BY GOING TO THEIR WEBSITES

23   AND CREATING AN ICON ON YOUR HOME SCREEN TO THEIR WEB APP."

24        DO YOU SEE THAT?

25   A.   YES.

1    Q.   WHEN I SAID THAT THERE HAD BEEN SOME PUBLICITY ABOUT THIS,

2    DO YOU RECALL SOME OF THE PUBLICITY THAT PEOPLE WERE BEING

3    TAKEN TO THE MIDDLE OF THE DESERT AND JUST NOT GOING PLACES

4    THAT THEY WERE SUPPOSED TO GO?

5    A.   I BELIEVE THAT WAS A STORY IN AUSTRALIA, AND IT WASN'T

6    ONLY OUR MAPS.  OUR MAP PRODUCTS DID IT AS WELL.

7    Q.   BUT THE STORIES YOU DO RECALL WERE BEING CRITICAL OF

8    APPLE'S MAPS VERSION?

9    A.   YES.

10   Q.   AND DESPITE THIS PUBLICITY ON THIS FEATURE OF THE IPHONE,

11   THIS VERSION OF THE IPHONE SOLD OUT?

12   A.   YES, IT DID EXTREMELY WELL.

13   Q.   SO EVEN THOUGH THERE WAS EXTREME NEGATIVE PUBLICITY AND

14   SUGGESTIONS THAT CONSUMERS USE BING OR MAPQUEST OR WAZE OR

15   GOOGLE MAPS, IT DID NOT, TO YOUR KNOWLEDGE, HARM THE SALES OF

16   THE IPHONE?

17   A.   NO.  IN FACT, WHEN WE LOOKED AT IT, WE DISCOVERED THAT

18   MORE CUSTOMERS USED OUR MAPS PRODUCT AFTER THIS THAN GOOGLE'S

19   OR OTHER MAP PRODUCTS.  SO IT ACTUALLY TURNED OUT THAT MORE

20   CUSTOMERS USE THIS MAP PRODUCT AND PRETTY WELL.

21   Q.   NO SUCH THING AS BAD PUBLICITY?

22   A.   I WOULDN'T SAY THAT.

23        (LAUGHTER.)

24   BY MR. PRICE:

25   Q.   OKAY.  WELL, LET'S THEN TALK ABOUT WHAT DOES DRIVE THE

```
 1          SALES OF PHONES, PARTICULARLY IN THE TIMEFRAME 2011, 2012,

 2          2013.

 3                AND I'D LIKE YOU TO LOOK BACK AT EXHIBIT 377.  AND DO YOU

 4          RECALL THAT IN YOUR DIRECT EXAMINATION YOU WERE ASKED WHETHER

 5          OR NOT YOU THOUGHT ADVERTISING DROVE SALES?

 6          A.   CORRECT.

 7          Q.   AND IT'S YOUR UNDERSTANDING THAT YOU -- YOU UNDERSTOOD,

 8          BEFORE TESTIFYING THAT SAMSUNG'S POSITION, PART OF ITS POSITION

 9          IS THAT WHAT DROVE ITS SALES IN THIS PARTICULAR TIMEFRAME WAS

10          SOME FAIRLY CREATIVE ADVERTISING CAMPAIGNS?

11          A.   NO.  I HAVE NO IDEA WHAT SAMSUNG'S POSITION IS ON WHAT

12          DRIVES THEIR SALES.

13          Q.   SO YOU HAVE NOT -- HOW DO I ASK THIS?  SO WHEN YOU TOOK

14          THE STAND EARLIER THIS WEEK -- YEAH, THIS IS FRIDAY -- EARLIER

15          THIS WEEK, THEN YOU DIDN'T HAVE REALLY MUCH OF AN UNDERSTANDING

16          AS TO WHAT SAMSUNG'S EXPERTS OR WITNESSES WOULD TESTIFY AS TO

17          WHY THEY SOLD SO MANY SAMSUNG PHONES IN 2011, '12, '13?  YOU

18          DIDN'T -- YOU HAD NO UNDERSTANDING OF THAT?

19                MR. MCELHINNY:  OBJECTION, YOUR HONOR.  I THINK IT

20          WOULD BE APPROPRIATE TO EXPLAIN TO THE JURY ABOUT THE EXCLUSION

21          ORDER OF TESTIFYING WITNESSES.

22                THE COURT:  ARE THERE TESTIFYING WITNESSES,

23          PERCIPIENT WITNESSES IN THE COURTROOM?

24                MR. MCELHINNY:  NO.  BUT MR. SCHILLER WAS EXCLUDED

25          FROM THE COURT'S ORDER FROM BEING HERE.  HE WASN'T HERE FOR
```

1    OPENING.  HE HASN'T HEARD ANY OF THE TESTIMONY.

2            THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

3    BY MR. PRICE:

4    Q.  I'M NOT SUGGESTING YOU HEARD IT IN OPENING.

5    A.  NO, I DO NOT KNOW WHAT ANY EXPERT WITNESSES SAID ABOUT

6    SAMSUNG ABOUT ADVERTISING.

7    Q.  WELL, LET'S LOOK AT, AT THE IPHONE SURVEY, WHICH WAS

8    EXHIBIT 377, AND IF WE COULD PUT UP PAGE .028.

9            AND YOU SEE THIS, THIS WAS YOUR MARKETING DEPARTMENT THAT,

10   THAT DID THIS SURVEY; CORRECT?

11   A.  YES.

12   Q.  AND IF YOU LOOK AT IPHONE 5 PURCHASE INFLUENCERS.  DO YOU

13   SEE THAT?

14   A.  YES.

15   Q.  AND IT DIVIDES IT OUT BY COUNTRY?

16   A.  CORRECT.

17   Q.  AND, AGAIN, THIS DOESN'T PURPORT TO REFLECT WHAT

18   INFLUENCED ANDROID PURCHASERS, BUT WHAT INFLUENCED IPHONE

19   PURCHASERS; CORRECT?

20   A.  IPHONE 5 PURCHASERS, YES.

21   Q.  AND THERE IS A LINE HERE, IPHONE ADVERTISING?  DO YOU SEE

22   THAT?

23   A.  YES.

24   Q.  AND DO YOU SEE THE NUMBER 35 PERCENT?

25   A.  YES.

1    Q.   AND YOU'RE ALSO FAMILIAR WITH A CONCEPT CALLED BRANDING,

2    OR BRAND?

3    A.   YES.

4    Q.   OKAY.  AND PART OF WHAT THE MARKETING FOLKS DO, AS WELL AS

5    DO THESE SORT OF IPHONE SURVEYS, IS THEY LOOK AT THE

6    SIGNIFICANCE OF APPLE'S BRAND; CORRECT?

7    A.   I'M SORRY.  I DON'T KNOW WHAT YOU'RE REFERRING TO

8    SPECIFICALLY IN THE ABSTRACT HERE.

9    Q.   OKAY.  LET ME BE MORE SPECIFIC.

10        IF WE COULD LOOK AT EXHIBIT 418.  AND I'LL DRAW YOUR

11   ATTENTION TO THE SECOND PAGE, SMARTPHONE MARKET SURVEY, U.S.,

12   APPLE MARKET RESEARCH AND ANALYSIS, AND YOU SEE THERE'S A

13   JANUARY 2011 TIMEFRAME?

14        DO YOU SEE THAT?

15   A.   YES.

16   Q.   AND, AGAIN, THAT'S YOUR TEAM; CORRECT?

17   A.   IT'S MY TEAM THAT PUBLISHED THIS REPORT, YES.

18        MR. PRICE:  AND, YOUR HONOR, I MOVE EXHIBIT 418 INTO

19   EVIDENCE.

20        MR. MCELHINNY:  YOUR HONOR, NO OBJECTION.  THIS

21   DOCUMENT HAS BEEN FILED UNDER SEAL UNDER THE SAME UNDERSTANDING

22   THAT ONLY THE PAGES ACTUALLY SHOWN IN THE COURTROOM WILL BE

23   MADE PUBLIC.

24        THE COURT:  ALL RIGHT.  AND WHAT ARE THOSE PAGES?

25   THIS EXHIBIT IS ADMITTED.

1          (DEFENDANTS' EXHIBIT 418 WAS ADMITTED IN EVIDENCE.)

2               THE COURT:  WHAT ARE THE PAGES THAT WILL BE SHOWN?

3               MR. PRICE:  I'M GOING TO SHOW MR. SCHILLER, YOUR

4     HONOR, PAGE .20 AND PAGE .21.

5               THE COURT:  OKAY.  .20 AND .21.  ALL RIGHT.

6               MR. PRICE:  YEAH.  AND I MAY BE LATER SHOWING HIM TWO

7     OTHER PAGES.  AND WHEN WE COME TO THAT, I'LL CERTAINLY ALERT

8     YOU IF WE GET THERE.

9               THE COURT:  THANK YOU.

10          GO AHEAD, PLEASE.

11               MR. PRICE:  AND ACTUALLY, YOUR HONOR, I'M GOING TO

12     SHOW .002, WHICH JUST SHOWS THE TITLE.

13               THE COURT:  ALL RIGHT.

14               MR. PRICE:  SO IF WE CAN PUT THAT UP, KEN.

15          KEN IS KEN KOTARSKI WHO YOU SEE PUTS THINGS UP ON THE

16     SCREEN FOR ME.

17     Q.   SO THIS IS JANUARY 2011, APPLE MARKET RESEARCH AND

18     ANALYSIS, SMARTPHONE MARKET STUDY, U.S.

19          DO YOU SEE THAT?

20     A.   YES.

21     Q.   AND THEN IF WE LOOK AT .20, YOU SEE THERE'S A -- A PAGE OF

22     THIS WHICH SAYS "TRUST IN THE APPLE BRAND WAS THE MOST

23     FREQUENTLY MENTIONED REASON FOR BUYING AN IPHONE."

24          THAT WAS THE CONCLUSION OF YOUR MARKETING TEAM?

25     A.   YES.

1    Q.   AND IF WE COULD LOOK AT .21, HERE WE HAVE "APPLE BRAND WAS

2    THE MOST FREQUENTLY MENTIONED REASON FOR PURCHASING AN IPHONE,"

3    "TRUSTED THE APPLE BRAND."  DO YOU SEE THAT?

4    A.   YES.

5    Q.   AND THE N EQUALS 208 IS THE NUMBER OF PEOPLE WHO TOOK THE

6    SURVEY?

7    A.   CORRECT.

8    Q.   NOW, ON THE OTHER SIDE, ON THE RIGHT SIDE, YOU'VE GOT TOP

9    REASONS FOR BUYING AN ANDROID-BASED SMARTPHONE, AND N EQUALS

10   334; CORRECT?

11   A.   YES.

12   Q.   AND HOW DID -- DID YOUR FOLKS CONTACT PEOPLE WHO HAD

13   BOUGHT PHONES THAT USED THE ANDROID SOFTWARE?

14   A.   I DON'T KNOW THE EXACT METHODOLOGY OF HOW THESE PEOPLE

15   WERE SURVEYED.

16   Q.   OKAY.  AND HERE WE'VE GOT REASONS SUCH AS "WANTED TO STAY

17   WITH CURRENT SERVICE PROVIDER; PREFERRED A LARGER SCREEN, 41

18   PERCENT; TRUSTED THE GOOGLE BRAND."

19        DO YOU SEE THAT?

20   A.   YES.

21   Q.   NOW, PRIOR TO 2011 -- AND HERE AGAIN I'M TRYING TO FOCUS

22   ON THE MARKET IN 2011, 2012, 2013, AND PERHAPS PARTLY THROUGH

23   TODAY -- PRIOR TO 2011 AND THE RELEASE OF THE GALAXY S III,

24   SAMSUNG HAD NOT HAD A BRAND MARKETING CAMPAIGN; CORRECT?

25   A.   I DON'T KNOW.  YOU'D NEED TO ASK THEM.

1           BUT, AGAIN, SEE -- AGAIN, PLEASE BE CAREFUL.  THIS DOESN'T

2      SAY BRAND MARKETING.  IT SAYS TRUSTED THE APPLE BRAND.  I

3      ACTUALLY THINK THAT SUPPORTS WHAT I SAID ABOUT ADVERTISING.  TO

4      ME, THE WAY YOU UNDER -- YOU GET AN APPRECIATION FOR BRAND

5      IS --

6           MR. PRICE:  YOUR HONOR, I'M GOING TO MOVE TO STRIKE

7      AS NONRESPONSIVE.  THE QUESTION IS WHETHER OR NOT SAMSUNG HAD

8      DONE BRAND MARKETING.

9           THE COURT:  OVERRULED.  HE CAN FINISH HIS ANSWER.

10     BY MR. PRICE:

11     Q.   GO AHEAD.

12     A.   TO ME THE SINGLE BEST WAY TO HAVE AN APPRECIATION FOR

13     BRAND IS TO USE THE PRODUCT.  SO WHEN APPLE CUSTOMERS SAY THEY

14     TRUSTED THE BRAND, I THINK THAT OFTEN COMES FROM USING THE

15     PRODUCT, UNDERSTANDING THE APPEARANCES AND LIKING IT, AND THEN

16     YOU TRUST THE COMPANY.

17          SO TO ME THIS IS ACTUALLY SUPPORTIVE OF WHAT WE WERE

18     SPEAKING ABOUT EARLIER.

19     Q.   SO LET ME GET BACK TO MY QUESTION JUST TO MAKE SURE THAT

20     I'VE GOT YOUR ANSWER.  I ASKED:  ISN'T IT TRUE THAT PRIOR TO

21     2011 AND THE INTRODUCTION OF THE GALAXY S III, THAT SAMSUNG HAD

22     NOT DONE A BRAND MARKETING CAMPAIGN WITH RESPECT TO ITS PHONES?

23          AND I THINK YOUR ANSWER WAS YOU DIDN'T KNOW ONE WAY OR THE

24     OTHER.

25     A.   I DON'T KNOW WHAT SAMSUNG DID BEFORE 2011.

1    Q.   CERTAINLY BY THE END OF 2012, YOU BECAME AWARE THAT FOR

2    SOME REASON, SAMSUNG'S BRAND RECOGNITION WAS ON PAR WITH

3    APPLE'S?

4    A.   NO, I DON'T AGREE WITH THAT.

5    Q.   OKAY.  LET'S LOOK AT EXHIBIT 407, AND I'LL ASK YOU TO LOOK

6    AT PAGE 2 OF THAT, AND YOU SEE IT SAYS "SAMSUNG'S BRAND

7    UPDATE," IT LOOKS LIKE THE AUTHOR IS JOHN BROWN, MANAGER

8    CORPORATE MARKET INTELLIGENCE TEAM, DECEMBER 2012.

9        DO YOU SEE THAT?

10   A.   YES.

11   Q.   AND MR. BROWN REPORTED TO MR. RANGEL?

12   A.   YES.

13   Q.   AND MR. RANGEL REPORTED TO YOU?

14   A.   CORRECT.

15   Q.   SO THIS IS, AGAIN, COMING FROM YOUR TEAM?

16   A.   THIS DOCUMENT IS, YES.

17        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 407 INTO

18   EVIDENCE, AND IN PARTICULAR I'LL BE GOING TO PAGES 2, WHICH

19   WILL BE THE TITLE PAGE, AND PAGE 5.

20        MR. MCELHINNY:  NO OBJECTION TO THE ADMISSION, YOUR

21   HONOR.  THE DOCUMENT IS FILED UNDER SEAL, EXCEPT FOR THE TWO

22   PAGES THAT COUNSEL HAS REFERRED TO.

23        THE COURT:  THAT'S FINE.  IT'S ADMITTED AND SEALED

24   EXCEPT FOR PAGE .002 AND PAGE .005.

25        (DEFENDANTS' EXHIBIT 407 WAS ADMITTED IN EVIDENCE.)

```
 1            THE COURT:  GO AHEAD, PLEASE.

 2            MR. PRICE:  AND ACTUALLY, YOUR HONOR, I NEGLECTED TO

 3       MENTION ONE OF THE PAGES I'M TOLD WE MAY ALSO DISPLAY, BUT WE

 4       WANTED TO MAKE SURE, AND THAT'S PAGE 3.

 5            MR. MCELHINNY:  NO OBJECTION TO DISPLAYING PAGE 3.

 6            THE COURT:  SO THOSE THREE PAGES WILL NOT BE SEALED,

 7       .002, 3, AND 5.

 8         GO AHEAD, PLEASE.

 9       BY MR. PRICE:

10       Q.   SO HERE WE HAVE AGAIN WHAT WE SAID WAS DECEMBER 2002 --

11       2012, PARDON ME, DOCUMENT.

12            AND IF YOU GO TO THE NEXT PAGE, IT'S SAMSUNG'S -- WHICH IS

13       PAGE 3, KEN -- "SAMSUNG'S ADVERTISING AND PROMOTION CAMPAIGNS

14       ARE DRIVING A RISE IN BRAND RECOGNITION," AND THE FIRST POINT,

15       "SAMSUNG'S AGGRESSIVE MOBILE ADVERTISING IN THE FOURTH QUARTER

16       IS RESONATING ACROSS THE ENTIRE SAMSUNG BRAND AS CONSUMER BRAND

17       RECALL IS ON THE RISE."

18            AND IF WE COULD GO ON DOWN TO THE NEXT TO LAST BULLET

19       POINT, I WANT TO POINT OUT TO YOU, "IF SUCCESSFUL, THESE

20       AGGRESSIVE BUNDLING AND ADVERTISING CAMPAIGNS COULD LEAD TO A

21       CHANGE IN THE MARKET SHARE LANDSCAPE FOR BOTH TABLETS AND

22       MOBILE PHONES FOR THE FOURTH QUARTER OF 2012."

23            THIS WAS BEING REPORTED TO YOU BY THE END -- BY DECEMBER

24       OF 2012; IS THAT CORRECT?

25       A.   YES.  THIS IS A REPORT OF WHAT EXTERNAL SOURCES WERE
```

1    SAYING THAT MY TEAM COMPILED.

2    Q.   AND IF WE LOOK AT PAGE 5, 407.005, YOU SEE IT HAS

3    "SAMSUNG'S BRAND IMPRESSION IS JUST AS STRONG AS APPLE'S IN THE

4    U.S."

5         AND THEN IT SHOWS GRAPHICS HERE WITH SONY, APPLE, SAMSUNG.

6         DO YOU SEE THAT?

7    A.   I DO.

8    Q.   AND AS WITH MOST OF THESE STUDIES, THERE'S A -- YOU HEARD

9    OF A STATISTICAL MARGIN OF ERROR?

10   A.   SURE.

11   Q.   YEAH.  SO THIS IS IN THE END OF 2012.  IT'S AROUND THE

12   BEGINNING OF 2013 THEN, I WANT TO GO FORWARD TO THE NEXT MONTH,

13   THAT YOU BEGAN RECEIVING FROM YOUR TEAM REPORTS THAT GAVE YOU

14   GREAT CONCERN THAT SAMSUNG WAS GAINING NAME RECOGNITION IN THE

15   MARKET; IS THAT RIGHT?

16   A.   WELL, I NEED TO CAUTION YOU THAT THIS DOESN'T SAY GOOD OR

17   BAD.  IT JUST SAYS IMPRESSION, AND IMPRESSIONS CAN BE GOOD OR

18   BAD.

19        THERE ARE OTHER STUDIES THAT SHOW THE DRAMATIC DIFFERENCE

20   BETWEEN APPLE AND SAMSUNG'S BRAND BASED ON, ON -- AS A POSITIVE

21   ATTRIBUTE, ON THE VALUE OF IT.

22        SO THIS -- YOU CAN'T DRAW ANY CONCLUSION OTHER THAN

23   RECOGNITION, SOMEONE HAS HEARD THE NAME.  THAT DOESN'T MEAN

24   IT'S A GOOD OR BAD THING.

25   Q.   SO LET'S GO FORWARD THEN AND LET ME SEE IF YOU CAN ANSWER

1    THE QUESTION I JUST ASKED.  DO YOU RECALL THE QUESTION I JUST

2    ASKED?

3    A.   IF YOU CAN REPEAT IT.

4    Q.   I'M NOT SURE.  SO THIS IS DECEMBER 2012.  STARTING IN

5    JANUARY 2013, OR AT LEAST IN THAT TIMEFRAME, YOU BEGAN GETTING

6    REPORTS FROM YOUR MARKETING TEAM SUGGESTING THAT SAMSUNG WAS,

7    WAS GETTING BETTER REACTION THAN APPLE IN THE MARKETPLACE?

8    A.   AGAIN, I DON'T AGREE WITH THAT.  SO PERHAPS YOU CAN SHARE

9    WITH ME WHAT YOU'RE THINKING OF.

10   Q.   OKAY.  LET ME SEE IF WE CAN START WITH EXHIBIT 408A.  AND

11   DO YOU RECOGNIZE EXHIBIT 408A AS AN E-MAIL STRING BETWEEN,

12   AMONG OTHERS, YOU AND A GENTLEMAN NAMED JAMES VINCENT OF MEDIA

13   ARTS?

14   A.   YES.

15   Q.   AND LET ME GET SOME CONTEXT HERE.  YOU'D BEEN WORKING

16   WITH -- WELL, MEDIA ARTS WAS APPLE'S OUTSIDE ADVERTISING

17   AGENCY?

18   A.   YES.

19   Q.   AND HAD BEEN SO FOR, WHAT, 15 YEARS PLUS?

20   A.   SEVENTEEN NOW.

21   Q.   AND YOU WORKED WITH MR. VINCENT FOR ABOUT THAT SAME PERIOD

22   OF TIME?

23   A.   YES.

24   Q.   AT THE TIME THIS LETTER WAS WRITTEN, WAS MEDIA ARTS

25   APPLE'S SOLE ADVERTISING AGENCY?

1    A.   YES.

2    Q.   AND YOU WOULD HAVE ALMOST WEEKLY MEETINGS WITH MR. VINCENT

3    CONCERNING THE WORK THEY WERE DOING FOR APPLE?

4    A.   YES.

5            MR. PRICE:  SO, YOUR HONOR, IF WE COULD MOVE EXHIBIT

6    408A INTO EVIDENCE.

7            MR. MCELHINNY:  OBJECTION, YOUR HONOR.

8            THE COURT:  IT'S ADMITTED.

9        (DEFENDANTS' EXHIBIT 408A WAS ADMITTED IN EVIDENCE.)

10           THE COURT:  GO AHEAD, PLEASE.

11   BY MR. PRICE:

12   Q.   AND THE WAY THE E-MAILS WORK, LET'S LOOK TOWARD THE BACK

13    TO SEE WHAT THE FIRST ONE WAS TO YOU.

14       AND IF WE LOOK AT PAGE 004.  AND AT THE TOP OF THAT GO TO

15   THIS AREA HERE (INDICATING).  DO YOU SEE THERE'S AN E-MAIL,

16   IT'S WRITTEN BY YOU, MR. SCHILLER, WHERE IT SAYS "WE HAVE A LOT

17   OF WORK TO DO TO TURN THIS AROUND."

18       AND IT HAS A SITE AND THEN, "HAS APPLE LOST ITS COOL TO

19   SAMSUNG."

20       DO YOU SEE THAT?

21   A.   YES.

22   Q.   SO THIS IS AN ARTICLE WHICH YOU HAD ACTUALLY SOMEHOW

23    GOTTEN INTO POSSESSION OF AND WERE SENDING THIS OUT TO

24   MR. VINCENT ON JANUARY 25, 2013; CORRECT?

25   A.   YES.

1    Q.   AND THE PRECISE WORDS YOU USED TO HIM IS "WE HAVE A LOT OF

2    WORK TO DO TO TURN THIS AROUND."

3         DO YOU SEE THAT?

4    A.   I DO.

5    Q.   AND IF WE GO THEN TO HIS RESPONSE, AND I THINK THAT STARTS

6    ON PAGE 002 AROUND HERE, KEN, WHERE IT SAYS "ON JANUARY 26TH,"

7    THIS IS HIS RESPONSE.  ON JANUARY 26TH, JAMES VINCENT WROTE

8    "PHIL."  DO YOU SEE THAT?

9    A.   YES.

10   Q.   HE SAID "ABSOLUTELY.  WE FEEL IT, TOO, AND IT HURTS.  WE

11   UNDERSTAND THE TOTALLY CRITICAL NATURE OF THIS MOMENT.  THIS

12   PERFECT STORM OF FACTORS IS DRIVING A CHILLING NEGATIVE

13   NARRATIVE ON APPLE."

14        DO YOU SEE THAT?

15   A.   I SEE THAT.

16   Q.   YOU MENTIONED EARLIER THAT BRAND AWARENESS CAN BE POSITIVE

17   OR NEGATIVE.  DO YOU RECALL THAT?

18   A.   SURE.

19   Q.   AND IF WE GO DOWN HERE, IT TALKS ABOUT THERE BEING THREE

20   BIG AREAS TO DISCUSS AND ONE BEING A COMPANY-WIDE RESPONSE.

21        DO YOU SEE THAT?

22   A.   YES.

23   Q.   AND THEN ON THE NEXT PAGE STARTING AT THE TOP HERE, IT

24   TALKS ABOUT COMPANY BEHAVIOR, HOW SHOULD WE BEHAVE?  PRODUCT

25   ROADMAP, WHAT'S OUR NEXT INNOVATION, AND THERE IT SAYS BIGGER

1    SCREENS.

2         DO YOU SEE THAT?

3    A.   I DO.

4    Q.   AND PRODUCT CYCLES.  DO YOU UNDERSTAND WHAT PRODUCT CYCLES

5    REFERS TO?

6    A.   SURE.

7    Q.   AND WHAT DOES THAT REFER TO?

8    A.   WELL, THE CYCLE A PRODUCT GOES THROUGH IS WHEN YOU

9    INTRODUCE IT, WHILE IT'S IN THE MARKET, AND THEN WHEN YOU END

10   OF LIFE IT AND MOVE ONTO THE NEXT ONE.  THAT'S WHAT A PRODUCT

11   CYCLE MEANS.

12   Q.   AND APPLE HAD, HAD SORT OF A PRODUCT CYCLE OF COMING OUT

13   WITH NEW, NEW IPHONES EVERY YEAR OR SO?

14   A.   CORRECT.

15   Q.   AND SAMSUNG'S PRODUCT CYCLE HAD HAD A DIFFERENT MARKETING

16   STRATEGY IN COMING OUT WITH PHONES?

17   A.   I ASSUME SO.  I DON'T KNOW THEIR MARKETING STRATEGY.

18   Q.   WELL, YOU KNEW THAT SAMSUNG CAME OUT WITH MANY, MANY

19   PHONES IN A GIVEN YEAR?

20   A.   SURE.

21   Q.   AND IF WE LOOK AT SDX 2313, THAT'S A DEMONSTRATIVE.  WE

22   TRIED TO PUT DOWN HERE ON THE BOTTOM KIND OF THE PRODUCT CYCLE

23   OF IPHONES STARTING IN JUNE 2007 THROUGH SEPTEMBER 2012.

24        ARE THESE THE CORRECT APPROXIMATE DATES?  CAN YOU SEE?

25   A.   APPROXIMATELY.

CROSS SCHILLER (RES.)

```
 1    Q.   AND I'VE ALSO TRIED TO PUT -- THEY MENTION SCREEN SIZE,

 2    MR. VINCENT MENTIONED SCREEN SIZE, AND IS IT CORRECT THAT THE

 3    IPHONE SCREEN SIZE WAS DIAGONALLY 3.5 INCHES UNTIL SEPTEMBER

 4    2012 WHEN IT BECAME 4 INCHES WITH THE IPHONE 5?

 5    A.   YES.

 6    Q.   WHEREAS WITH RESPECT TO SCREEN SIZE, SAMSUNG HAD COME OUT

 7    WITH PHONES WITH LARGER SCREEN SIZES, BIGGER SCREEN SIZES?

 8    A.   ON SOME OF THEIR PRODUCTS, YES.

 9    Q.   SO IF WE CAN GO BACK THEN TO 408A.003 AND THAT TOP PART.

10    SO HE'S TALKING ABOUT PRODUCT ROADMAP, ADVERTISING, AND HERE HE

11    SAYS "APPLE BRAND SLIPPING."

12         DO YOU SEE THAT?

13    A.   I SEE THAT.

14    Q.   AND THEN HE TALKS ABOUT NEW SALES APPROACHES, YOU SAW

15    THAT?

16    A.   YES, UM-HUM.

17    Q.   HE, FURTHER ON DOWN -- LET'S GO DOWN JUST ANOTHER

18    PARAGRAPH, KEN, UNDER 2 -- WHERE HE SAYS "WE UNDERSTAND THAT

19    THIS MOMENT IS PRETTY CLOSE TO 1997 IN TERMS OF THE NEED FOR

20    ADVERTISING TO HELP PULL APPLE THROUGH THIS MOMENT.  WE GET

21    THAT AND ARE EXCITED BY THAT HUGE OPPORTUNITY."

22         IN FACT, HE WAS RECOMMENDING SOME SORT OF LIKE AN

23    EMERGENCY MEETING; CORRECT?

24    A.   I'M NOT SURE.  BUT AS YOU KNOW, I COMPLETELY DISAGREE THAT

25    THIS IS WRONG, AND I DON'T AGREE WITH HIS COMMENTS.
```

1    Q.   SO ALL OF MEDIA ARTS' BUSINESS WAS APPLE?  RIGHT?  YOU

2    WERE THEIR CUSTOMER?

3    A.   YES.

4    Q.   AND THE RESPONSE AT THE TOP OF .002 HERE THEN IS -- 02 IF

5    WE CAN, KEN, THANK YOU -- THIS BEGINS YOUR RESPONSE WHERE YOU

6    SAY THAT YOU ARE SHOCKED BY HIS RESPONSE?

7    A.   YES.

8    Q.   CORRECT?

9    A.   YES.

10   Q.   AND YOU KNEW THAT YOUR SHOCK WOULD HAVE A GREAT IMPACT ON

11   MR. VINCENT BECAUSE ALL OF THEIR BUSINESS CAME FROM APPLE?

12   A.   PERHAPS.

13   Q.   AND YOU WENT ON TO SAY IN THE THIRD PARAGRAPH, "THIS IS

14   NOT 1997.  NOTHING LIKE IT.  IN 1997, WE WERE SIX MONTHS FROM

15   OUT OF BUSINESS."

16        DO YOU SEE THAT?

17   A.   YES.

18   Q.   IN 1997, WHO WAS THE CEO OF APPLE?

19   A.   GIL AMELIO.

20   Q.   AND WHEN MR. VINCENT GOT THIS FROM YOU, HIS RESPONSE, THE

21   NEXT PAGE, 001 -- STARTING RIGHT THERE, AGAIN, AT THE BOTTOM,

22   RIGHT THERE -- WAS "PLEASE ACCEPT MY APOLOGIES."

23        CORRECT?

24   A.   YES.

25   Q.   AND THAT'S THE KIND OF RESPONSE YOU WOULD EXPECT GIVEN THE

1     FACT THAT APPLE'S HIS SOLE ACCOUNT?

2     A.   NO, THAT'S NOT IT AT ALL, NO.  HE -- HE APOLOGIZED AND THE

3     RESPONSE I EXPECT WAS AN HONEST RESPONSE OF WHAT HE THINKS.  I

4     ENCOURAGE MY TEAM TO SPEAK UP AND ALWAYS SAY WHAT THEY THINK

5     AND WHAT'S ON THEIR MIND AND NOT TO MAKE UP RESPONSES JUST TO

6     MAKE SOMEONE FEEL GOOD.  SO, NO, I BELIEVE THIS WAS HIS HONEST

7     RESPONSE.

8     Q.   JUST AS YOU MUST FEEL THEN THAT HIS FIRST RESPONSE TO YOU

9     ABOUT NEEDING A COMPANY-WIDE RESPONSE WAS AN HONEST RESPONSE?

10    A.   I THINK, AS I SAID, I THINK HE WAS MISTAKEN AND WE SPOKE

11    ABOUT IT AND EVEN HIS TEAM TOLD ME THAT HE THOUGHT HE WAS

12    MISTAKEN IN THAT.

13    Q.   BUT YOU THOUGHT THAT HIS E-MAIL, JANUARY 26TH, 2013, WAS

14    AN HONEST RESPONSE?

15    A.   I'M SORRY.  WHICH E-MAIL NOW ARE YOU REFERRING TO?

16    Q.   THE ONE BEGINNING AT PAGE .002 WHERE HE TALKS ABOUT THE

17    PERFECT STORM AND THEN GOES ON TO TALK ABOUT COMPANY BEHAVIOR

18    AND PRODUCT ROADMAP, ADVERTISING.  THAT WAS HIS HONEST

19    RESPONSE; CORRECT?

20    A.   I THOUGHT AT THE TIME THAT HE WAS LOOKING AT THE SITUATION

21    AS AN OPPORTUNITY TO DO SOME NEW INTERACTION AND START A LITTLE

22    BIT OF A DIFFERENT PROCESS IN ADVERTISING WHERE YOU GO OFF AND

23    TRY SOME TEST THINGS WITHOUT RUNNING THEM BY US, I ACTUALLY

24    SAID THAT, AND I DON'T THINK -- I KNEW THAT SORT OF WAS ONE OF

25    THE OUTCOMES OF WHAT HE WROTE, AND I THOUGHT THAT WAS INCLUDING

1    THE REAL SITUATION.  I EXPLAINED THAT CLEARLY.

2    Q.  NO, NO.  BEFORE I THOUGHT YOU SAID YOU EXPECTED HONEST

3    RESPONSES FROM HIM?

4    A.  I ALWAYS EXPECTED THAT.

5    Q.  THIS WAS AN HONEST RESPONSE TO YOU SENDING HIM THE

6    ARTICLE, "HAS APPLE LOST ITS COOL TO SAMSUNG"?

7    A.  I SENT HIM AN ARTICLE THAT SAID WE NEED TO TURN THIS

8    AROUND, AND BY "THIS" I MEANT THIS REPORTER'S SLANTED VIEWS OF

9    FACTS THAT I DIDN'T NECESSARILY BELIEVE.

10    HE WENT OFF ON A COMPLETELY DIFFERENT TANGENT ABOUT HOW TO

11    CHANGE MARKETING THAT I DON'T THINK ACTUALLY FIT THE SITUATION.

12    SO, YOU KNOW, THAT'S WHAT I THOUGHT.

13    Q.  OKAY.  I'M JUST ASKING YOU WHETHER OR NOT YOU THOUGHT THE

14    THINGS HE SAID THERE WERE HIS HONEST RESPONSE, AS YOU HAD SAID

15    HIS OTHER APOLOGY WAS HONEST?

16    A.  I THOUGHT IT WAS A CONFUSED RESPONSE.  I DON'T KNOW

17    WHETHER CONFUSED IS HONEST, BUT THAT'S WHAT I THOUGHT ABOUT IT.

18    Q.  OKAY.  WELL, HERE WE ARE AGAIN IN JANUARY 2013, MR. RANGEL

19    ALSO SENT YOU AN ARTICLE CONCERNING BASICALLY APPLE VERSUS

20    SAMSUNG'S PERCEPTION IN THE MARKETPLACE AROUND THE SAME TIME;

21    CORRECT?

22    A.  I DON'T RECALL.

23    Q.  LET ME SEE IF I CAN REFRESH YOUR MEMORY ON THAT.  EXHIBIT

24    498.  HAVE YOU FOUND THAT?

25    DO YOU RECOGNIZE THIS AS COMMUNICATIONS BETWEEN YOU AND

1        MR. RANGEL, WHO REPORTED TO YOU, CONCERNING AN ARTICLE HE HAD

2        SENT YOU FROM "FORTUNE MAGAZINE"?

3        A.   I DON'T RECALL THIS.

4        Q.   DO YOU SEE YOUR NAME ON THE "TO" AND "FROM" LIST?

5        A.   YES, I DO.

6        Q.   OKAY.  DO YOU HAVE ANY REASON TO DOUBT THIS IS A

7        COMMUNICATION BETWEEN YOU AND MR. RANGEL?

8        A.   NO, I DON'T.

9             MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 498 INTO

10       EVIDENCE.

11            MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

12            THE COURT:  IT'S ADMITTED.

13       (DEFENDANTS' EXHIBIT 498 WAS ADMITTED IN EVIDENCE.)

14            THE COURT:  GO AHEAD, PLEASE.

15       BY MR. PRICE:

16       Q.   IT LOOKS LIKE THIS IS REPEATED, THEY'RE REPEATED TWICE FOR

17       SOME REASON.  SO LET'S GO TO 498.008, WHICH IT LOOKS LIKE GETS

18       THIS STARTED OFF, AND IF WE CAN HIGHLIGHT FROM PHIL HERE ON

19       DOWN WHERE IT'S ART, "SENDING YOU THIS THING FROM 'FORTUNE,'

20       SAMSUNG'S ROAD TO GLOBAL DOMINATION, SOUTH KOREA'S SAMSUNG'S

21       PATENT RIVALS AND GUNNING FOR APPLE.  CAN ITS HOT STREAK LAST?"

22            DO YOU SEE THAT?

23       A.   I DO.

24       Q.   AND MR. RANGEL IS TALKING TO YOU ABOUT WORKING ON SOCIAL

25       MEDIA MONITORING?  DO YOU REMEMBER THAT?

1    A.   YES.

2    Q.   OKAY.  AND IN THIS DAY AND AGE, SOCIAL -- THERE ARE WAYS

3    OF COMMUNICATING WITH A CUSTOMER OTHER THAN JUST ADVERTISING;

4    CORRECT?

5    A.   THERE ALWAYS HAVE BEEN, YES.

6    Q.   AND THERE ARE WAYS TO LEARN WHAT THE CUSTOMERS ARE

7    THINKING OTHER THAN JUST SURVEYS; RIGHT?

8    A.   SURE.

9    Q.   OKAY.  AND THE ARTICLE TALKS ABOUT HOW WHEN THE IPHONE 5

10   WAS LAUNCHED, HOW THERE WERE FOLKS AT SAMSUNG WHO WERE

11   MONITORING THAT LAUNCH AND PREPARING A RESPONSE TO IT BY

12   MONITORING SOCIAL MEDIA; CORRECT?

13   A.   I BELIEVE SO.

14   Q.   OKAY.  AND WHAT MR. RANGEL SUGGESTS IS THAT, IS THAT

15   SOMETHING THAT IS NOT INCLUDED IN HIS RESEARCH PLAN BUT HE'S

16   THOUGHT ABOUT IS THE SOCIAL MEDIA MONITORING; CORRECT?

17   A.   CORRECT.

18   Q.   AND IN READING THE ARTICLE TO SEE WHAT HE WAS TALKING

19   ABOUT, YOU -- YOU KIND OF GOT THE UNDERSTANDING OF SAMSUNG'S

20   STRATEGY OF, OF KIND OF OUTSOURCING ITS, ITS SOFTWARE, BUT

21   CHOOSING TO INNOVATE IN THE SECTION OF HARDWARE.

22        DO YOU RECALL THAT?

23   A.   NO, I DON'T.  I DON'T RECALL THIS ARTICLE.  I CAN READ IT

24   IF YOU WANT.  I DON'T THINK THAT WOULD BE A GOOD USE OF TIME,

25   BUT I CAN IF YOU WANT ME TO.

1    Q.   YOU'RE RIGHT, IT'S NOT A GOOD USE OF TIME.  BUT IT'S IN

2    EVIDENCE.

3         IN ANY EVENT, YOUR RESPONSE TO THIS, I GUESS YOU TOLD --

4    GO TO THE NEXT PAGE, 007 -- MR. RANGEL THAT YOU THOUGHT PAYING

5    MONEY FOR SOCIAL MEDIA TRACKING TOOL WAS NUTS, YOU DO IT EVERY

6    DAY, AND THAT YOU THOUGHT THAT THE PEOPLE AT SAMSUNG WERE DOING

7    IT THEMSELVES.  THAT'S THE NEXT PAGE AT .008.  AND I THINK THE

8    GUYS AT SAMSUNG SAT AROUND A COFFEE TABLE WATCHING TWITTER AND

9    FACEBOOK FEEDS AND DIDN'T NEED TO PAY FOR ANYTHING IN THE

10   EXAMPLE BELOW.

11        DO YOU RECALL THAT?

12   A.   NOT SPECIFICALLY, BUT I SEE THAT.

13   Q.   DO YOU RECALL IN THE END MR. RANGEL ACTUALLY WAS ABLE TO

14   CONVINCE YOU THAT SAMSUNG WAS USING SOMEONE TO DO THIS AND THAT

15   YOU GAVE HIM PERMISSION TO GO AHEAD AND TELL HIM WHAT BUDGET HE

16   WANTED AND --

17   A.   NO, I DON'T THINK HE CONVINCED ME WHAT SAMSUNG WAS OR

18   WASN'T DOING.  HE SIMPLY WAS INTERESTED IN LOOKING AT WHETHER

19   SOME VENDORS FOR SOCIAL MEDIA MONITORING TOOLS AND WHETHER HE

20   COULD GO INVESTIGATE IT.  AND, YEAH, HE -- I WAS ABSOLUTELY

21   HAPPY WITH HIM LOOKING AT TOOLS.

22   Q.   AND YOU SAID LET ME KNOW WHAT THE TOOLS YOU LIKE DO AND

23   WHAT THEY COST, RIGHT?

24   A.   THAT'S RIGHT.

25   Q.   AT THIS POINT YOU'RE GETTING PRESSURE FROM CUSTOMERS AND

1    THE BOARD OF DIRECTORS TO RESPOND TO SAMSUNG'S MEDIA ADS;

2    RIGHT?

3    A.   NO, I DON'T THINK I'D GOTTEN PRESSURE, NO.

4    Q.   WELL, LET'S LOOK AT EXHIBIT 410.  AND YOU SEE 410 IS AN

5    E-MAIL EXCHANGE BETWEEN MR. COOK AND YOU?

6    A.   YES.

7            MR. PRICE:  MOVE EXHIBIT 410 INTO EVIDENCE.

8            MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

9            THE COURT:  IT'S ADMITTED.

10    (DEFENDANTS' EXHIBIT 410 WAS ADMITTED IN EVIDENCE.)

11            THE COURT:  GO AHEAD, PLEASE.

12    BY MR. PRICE:

13    Q.   AND AT THE BOTTOM THERE'S AN E-MAIL FROM A GENTLEMAN NAMED

14    VIC, IT LOOKS LIKE VIC D'AMATO, TO MR. COOK SAYING "WHY AREN'T

15    YOU FIGHTING BACK, SAMSUNG'S PHONES ARE HUGE?  YOU NEED TO

16    ATTACK THIS IN ADVERTISING."

17        AND MR. COOK THEN FORWARDED THAT TO YOU.

18    A.   YES, HE FORWARDED ALMOST EVERY COMMUNICATION THAT COMES

19    ACROSS HIS DESK ABOUT MARKETING SO I KNOW WHAT WAS SAID.

20    Q.   AND LET'S LOOK AT YOUR RESPONSE.  IF WE CAN GO UP THE PAGE

21    THERE STARTING HERE, WHICH IS "TIM."

22        SO THIS IS JANUARY 27, 2013.

23    A.   YES.

24    Q.   "WE MAY NEED TO START A SEARCH FOR A NEW AGENCY.  I'VE

25    TRIED HARD TO KEEP THIS FROM BEING THE SITUATION, BUT WE ARE

```
1     NOT GETTING WHAT WE NEED FROM THEM AND HAVEN'T BEEN FOR A

2     WHILE."

3     A.   YES.

4     Q.   THAT'S WHAT YOU WROTE TO YOUR BOSS; RIGHT?

5     A.   CORRECT.

6     Q.   AND YOU TALK -- YOU GO ON TO TALK ABOUT THAT YOU HAD YOUR

7     "TEAM PUT TOGETHER A PRESENTATION REMINDING THEM HOW GREAT THE

8     ENGINEERING IS BEHIND THE IPHONE 5 AND HOW WELL IT IS DOING

9     AGAINST ANDROID, (CONTRARY TO PUBLIC PERCEPTION.)"

10    A.   SURE.

11    Q.   SO THE PUBLIC PERCEPTION AT THIS POINT IS THAT ANDROID IS

12    DOING WELL AGAINST THE IPHONE 5?

13    A.   TO SOME, YES.

14    Q.   AND THEN TOWARD THE BOTTOM, "THEY DON'T SEEM TO ACCEPT

15    THAT FIRST AND FOREMOST THEY NEED TO DO A BETTER JOB FOR US

16    THIS YEAR."

17         DO YOU SEE THAT?

18    A.   I DO.

19    Q.   NOW, THIS IS DATED JANUARY 27TH?

20    A.   CORRECT.

21    Q.   LET ME SHOW YOU NOW EXHIBIT 409, WHICH IS A FEW DAYS

22    LATER.  THIS IS AN E-MAIL STRING BETWEEN YOU AND MR. VINCENT OF

23    MEDIA ARTS LABS WHO WAS YOUR OUTSIDE ADVERTISING AGENCY;

24    CORRECT?

25    A.   YES.
```

1            MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 409 INTO

2     EVIDENCE.

3            MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

4            THE COURT:  IT'S ADMITTED.

5        (DEFENDANTS' EXHIBIT 409 WAS ADMITTED IN EVIDENCE.)

6            THE COURT:  GO AHEAD, PLEASE.

7     BY MR. PRICE:

8     Q.   AND IF WE CAN LOOK AT THE FIRST E-MAIL, WHICH STARTS HERE

9     ON THE FIRST PAGE, ON JANUARY 31ST, AND IT'S FROM YOU TO

10    MR. VINCENT; CORRECT?

11    A.   YES.

12    Q.   AND YOU SAY HERE, "I WATCHED THE SAMSUNG PRE-SUPER BOWEL

13    AD THAT LAUNCHED TODAY.  IT'S PRETTY GOOD AND I CAN'T HELP BUT

14    THINK 'THESE GUYS ARE FEELING IT' (LIKE AN ATHLETE WHO CAN'T

15    MISS BECAUSE THEY ARE IN A ZONE) WHILE WE STRUGGLE TO NAIL A

16    COMPELLING BRIEF ON THE IPHONE."

17         YOU WROTE THAT; CORRECT?

18    A.   YES, I DID.

19    Q.   AND DOWN HERE AT THE BOTTOM YOU SAY, "SOMETHING DRASTIC

20    HAS TO CHANGE.  FAST."

21         RIGHT?

22    A.   CORRECT.

23    Q.   NOW, THE LAST TIME APPLE HAD A BRANDING CAMPAIGN WAS IN

24    1997, SOME 16 YEARS BEFORE THIS; CORRECT?

25    A.   YES.

1    Q.   AND THEN IN 2013, FOR THE FIRST TIME IN 16 YEARS, APPLE

2    LAUNCHED A BRANDING CAMPAIGN; CORRECT?

3    A.   IT'S -- IT'S NOT SO SIMPLE TO SAY IT THAT WAY.  WE HAD A

4    BRANDING CAMPAIGN THAT WE DID THIS PAST YEAR.

5         THERE ARE OTHER CAMPAIGNS, SOME PEOPLE CALL THEM BRANDING,

6    SOME PEOPLE DON'T.  IT GETS KIND OF VAGUE.  FOR EXAMPLE, OUR

7    IPOD, ITUNES WITH THE DANCING PEOPLE.  SOME PEOPLE CALL THAT

8    BRANDING.

9         BUT REALLY THE SIMPLEST BRANDING CAMPAIGN TO THINK OF IS

10   THEY'RE DIFFERENT AND THEN ONTO THIS ONE.  PEOPLE CERTAINLY

11   ARGUE ABOUT WHAT IS BRANDING AND WHAT ISN'T.  IT'S NOT WORTH

12   GETTING INTO BECAUSE IT'S SO VAGUE.

13   Q.   DID YOU, FOR THE FIRST TIME SINCE 1997, COMMENCE A

14   BRANDING CAMPAIGN IN 2013?

15   A.   BY MY TERMS.  PEOPLE GET VAGUE ABOUT WHAT'S A BRANDING

16   CAMPAIGN.

17   Q.   LET'S TALK ABOUT YOUR TERMS THEN.  BY YOUR TERMS FOR THE

18   FIRST TIME IN 16 YEARS IN 2013 APPLE LAUNCHED A BRANDING

19   CAMPAIGN; CORRECT?

20   A.   BY MY DEFINITION, YES.

21   Q.   AND ALL OF THESE EXCHANGES THAT WE'VE BEEN LOOKING AT HAVE

22   BEEN TALKING ABOUT A COMPETITOR OF APPLE'S, SAMSUNG, WHICH IS

23   HEADQUARTERED IN KOREA; CORRECT?

24   A.   YES, I'M TOLD.

25   Q.   AND THE BRANDING CAMPAIGN THAT YOU CAME OUT WITH WAS

1        "DESIGNED BY APPLE IN CALIFORNIA."

2     A.   YOU'RE ASSUMING SOME UNRELATED ITEMS THAT ARE MESSING UP

3     WHAT HAPPENED AND THE ORDER OF THINGS AND THE REASON.

4          SO THE CORRECT WAY TO DESCRIBE WHAT WE DID WAS -- YOU

5     KNOW, I'VE BEEN WORKING ON ADVERTISING FOR --

6               MR. PRICE:  I MOVE TO STRIKE AS NONRESPONSIVE BECAUSE

7     I'M ON THE CLOCK.

8               THE COURT:  OVERRULED.  HE'S TRYING TO ANSWER YOUR

9     QUESTION.

10         GO AHEAD.

11              THE WITNESS:  AND IN OCTOBER OF 2011 WHEN MR. JOBS

12    PASSED AWAY, I MOVED FROM BEING A MEMBER OF THE TEAM TO

13    ACTUALLY RUNNING THE ADVERTISING, AND I BEGAN TO LOOK AT WHAT

14    ADVERTISING WE WERE DOING AND WHAT I COULD DO TO RAISE THE BAR

15    AND MAKE IT BETTER.  THAT'S WHAT I WAS DOING.

16         AND IN -- SO I TOOK ABOUT A YEAR TO THE POINT WE'RE

17    TALKING ABOUT, THE END OF 2011, THE START OF 2012 TO DO THAT

18    ANALYSIS AND SPEAKING WITH MANY PROFESSIONALS ABOUT WHAT COULD

19    MAKE OUR ADVERTISING BETTER.

20         AND IN JUNE OF 2011, WE HAD A SUPER BOWL AD ABOUT THE MAC,

21    NOTHING TO DO THE IPHONE, THAT I WAS UNHAPPY ABOUT.

22         AND SO WHEN WE REFER TO THINGS HAVING NOT GONE WELL, THAT

23    I WASN'T PLEASE IT, IT WAS ACTUALLY A MAC CAMPAIGN THAT WAS THE

24    SOURCE OF MY FRUSTRATION.

25         AND I BEGAN A PROCESS TO TURN AROUND OUR ADVERTISING THAT

1    HAD NOTHING TO DO WITH THE SITUATION WITH SAMSUNG.  IT HAD TO

2    DO WITH RAISING THE BAR, AND I LOOKED AT EVERYTHING FROM

3    WHETHER WE SHOULD GET A NEW AGENCY TO -- WHETHER WE SHOULD HIRE

4    NEW RESOURCES INSIDE OF APPLE TO IMPROVE IT.

5        THE FACT THAT THERE'S ANY COMPETITION GOING ON ALSO WITH

6    SAMSUNG AT THE SAME TIME IS, IS HAPPENING, BUT THAT ISN'T WHAT

7    WAS BEHIND OUR ADVERTISING CHANGES AND THE THINGS I'M TALKING

8    ABOUT HERE.

9        I'M TALKING ABOUT IMPROVING THE ADVERTISING AT APPLE FOR

10   THE REASONS, AS I SAID, THAT I HAD BEEN RUNNING IT NOW FOR A

11   YEAR AND I WANTED TO MAKE IT BETTER.

12   BY MR. PRICE:

13   Q.   SO MY QUESTION WAS, IN 2013 WHEN YOU STARTED APPLE'S FIRST

14   BRAND CAMPAIGN SINCE 1997 --

15   A.   YES.

16   Q.   -- WAS THE NAME OF THE BRAND CAMPAIGN "DESIGNED BY APPLE

17   IN CALIFORNIA"?

18   A.   YES, IT WAS.

19   Q.   IF WE CAN GO BACK TO EXHIBIT 418, I WANT TO TALK A LITTLE

20   BIT MORE ABOUT WHY -- ABOUT PURCHASING DECISIONS, AND I WANT TO

21   CALL YOUR ATTENTION TO JUST A COUPLE MORE OF THOSE PAGES, AND

22   I'LL TRY TO DO THIS QUICKLY BECAUSE MY TEAM IS TELLING ME I

23   NEED TO.

24       AND IF WE LOOK AT 19, PAGE 19, AND YOU SEE THESE WERE TOP

25   REASONS FOR AN ANDROID -- FOR BUYING AN ANDROID AMONG THOSE WHO

1        EVEN CONSIDERED AN IPHONE.

2               DO YOU SEE THAT?

3                      MR. MCELHINNY:  JUST FOR YOUR RECORD, YOUR HONOR,

4        THIS PAGE IS NOW UNSEALED.

5                      THE COURT:  THAT'S FINE.  IT'S UNSEALED NOW.

6               GO AHEAD, PLEASE.

7                      THE WITNESS:  YES, I SEE THAT.

8        BY MR. PRICE:

9        Q.   AND RIGHT HERE IT SAYS "25 PERCENT OF RECENT ANDROID

10       BUYERS CONSIDERED IPHONE."

11              DO YOU SEE THAT?

12       A.   I DO.

13       Q.   WHICH MEANS THAT 75 PERCENT OF ANDROID BUYERS DIDN'T EVEN

14       CONSIDER AN IPHONE?  THAT'S THE MATH; RIGHT?

15       A.   I ACTUALLY WOULDN'T JUMP TO THAT CONCLUSION.  AGAIN, THIS,

16       THIS PIECE OF DATA ISN'T SUPPORTED BY THE RESEARCH RIGHT THERE

17       ON THIS CHART.  I DON'T KNOW WHERE THAT NOTE CAME FROM, AND SO

18       I DON'T KNOW WHETHER IT'S AS VALID AS THE OTHER DATA ON THE

19       CHART.

20       Q.   OKAY.  IT'S DATA THAT WAS PRESENTED TO YOU BY YOUR TEAM;

21       CORRECT?

22       A.   IT'S A NOTE.  THERE'S NO DATA PRESENTED.  I DON'T BELIEVE

23       THAT WAS PART OF THE SURVEY.  I DON'T KNOW WHERE THAT ARRIVED

24       FROM.

25       Q.   AND IF YOU LOOK AT THE TOP REASONS FOR BUYING AN ANDROID,

1    IT INCLUDED TRUSTING THE GOOGLE BRAND; RIGHT?

2    A.   I SEE THAT, YES.

3    Q.   AND PREFERRING A LARGER SCREEN; CORRECT?

4    A.   YES.

5    Q.   NOW, IN 2013, THERE WAS AN OFFSITE WHERE SOME OF THE TOP

6    PEOPLE FROM APPLE GOT TOGETHER TO TALK ABOUT -- LET ME GET THE

7    TITLE HERE -- TO TALK ABOUT, AMONG OTHER THINGS, WHAT WAS

8    DRIVING IPHONE SALES; CORRECT?

9    A.   I DON'T KNOW WHAT YOU'RE REFERRING TO.

10   Q.   IF YOU LOOK AT EXHIBIT 405, YOU SEE IT SAYS "IPHONE

11   OFFSITE, JANUARY 17, 2013."

12   A.   I DON'T KNOW WHAT THAT OFFSITE WAS.

13   Q.   YOU DID NOT ATTEND THE OFFSITE ON JANUARY 17TH, 2013, TO

14   TALK ABOUT MARKETING ANALYSIS?

15   A.   I DON'T RECALL.

16   Q.   OKAY.  ARE YOU SAYING YOU DIDN'T OR YOU JUST DON'T RECALL

17   ONE WAY OR THE OTHER?

18   A.   I DON'T KNOW WHAT THIS DOCUMENT IS REFERRING TO.  I DON'T

19   KNOW WHAT OFFSITE THIS IS.  I DON'T KNOW.

20   Q.   DO YOU RECOGNIZE THIS AS AN APPLE DOCUMENT?

21   A.   IT APPEARS TO BE.  I DON'T RECOGNIZE THE DOCUMENT.

22        MR. PRICE:  YOUR HONOR, I'M GOING TO MOVE INTO

23   EVIDENCE AT THIS POINT EXHIBIT 405.

24        MR. MCELHINNY:  LACKS FOUNDATION, YOUR HONOR.

25        THE COURT:  IT'S ADMITTED.

CROSS SCHILLER (RES.)

1          (DEFENDANTS' EXHIBIT 405 WAS ADMITTED IN EVIDENCE.)

2               THE COURT:  GO AHEAD.

3               MR. MCELHINNY:  YOUR HONOR, FOR THE RECORD, THERE ARE

4     SPECIFIC PAGES IN THIS DOCUMENT -- THIS IS THE OTHER SIDE OF

5     THE COIN -- THE DOCUMENT ITSELF IS PUBLIC, EXCEPT FOR SPECIFIC

6     PAGES WHICH I UNDERSTAND COUNSEL IS NOT GOING TO SHOW.

7               THE COURT:  OKAY.

8               MR. PRICE:  MY UNDERSTANDING, YOUR HONOR, IS WE'RE

9     GOING TO SHOW JUST THE JURY --

10              MR. MCELHINNY:  I'M SORRY, YOUR HONOR.  I MISSTATED.

11    THE ENTIRE DOCUMENT IS UNDER SEAL, AND THERE ARE PARTICULAR

12    PAGES THAT CANNOT EVEN BE SHOWN PUBLICLY.

13              THE COURT:  I'M CONFUSED.

14              MR. PRICE:  I THINK THAT'S RIGHT.  MY UNDERSTANDING

15    IS THAT .14 CAN BE SHOWN PUBLICLY, .32 CAN, .36 CANNOT.

16              MR. MCELHINNY:  THAT'S CORRECT.

17              THE COURT:  OKAY, WAIT.  .14 CAN?

18              MR. PRICE:  YEAH.

19              THE COURT:  AND .32 CAN?

20              MR. PRICE:  YES.

21              THE COURT:  BUT EVERYTHING ELSE IS SEALED.

22              MR. QUINN:  I THINK IT'S ALL SEALED --

23              THE COURT:  EVERYTHING IS SEALED EXCEPT FOR .14 AND

24    .32.

25         ALL RIGHT.  GO AHEAD, PLEASE.  IT'S ADMITTED.

```
 1              (DEFENDANTS' EXHIBIT 405 WAS ADMITTED IN EVIDENCE.)

 2      BY MR. PRICE:

 3      Q.  AND IF WE LOOK AT .14, IPHONE 5 EARLY BUYERS, "WHAT ONE

 4      THING WOULD YOU ADD TO OR CHANGE ABOUT THE IPHONE."

 5              DO YOU SEE LONGER BATTERY LIFE, IMPROVED BUILT-IN MAPS,

 6      BIGGER SCREEN.

 7              FIRST LET ME ASK YOU, WERE YOU FAMILIAR WITH THESE -- WITH

 8      THIS RESEARCH RESULT?

 9      A.  I DON'T RECALL THAT.

10      Q.  HOW ABOUT LET'S GO TO .32 THEN.  SUMMARY.  IT'S NOW A

11      SWITCHERS BATTLE; OUR BRAND EQUITY IS INFLUENTIAL TO BOTH

12      REPEAT IPHONE BUYERS AND ANDROID SWITCHERS; OUR INNOVATION

13      LEADERSHIP IS UNDER SEVERE ATTACK; BATTERY LIFE IS A

14      SIGNIFICANT CUSTOMER CONCERN; IN TWO YEARS, OUR TARGET ANDROID

15      SWITCHER WILL BE USED TO DISPLAY MUCH LARGER THAN 4-INCH.

16              WERE YOU AWARE OF THOSE CONCLUSIONS AS TO THAT?

17      A.  NO, I DON'T KNOW WHO WROTE THIS AND WHAT THEIR MOTIVATION

18      IS FOR SAYING THESE THINGS.

19      Q.  I'M NOW GOING TO SHOW TO YOU AND TO THE JURY, BUT NOT TO

20      THE PUBLIC, PAGE .36.

21              AND I'M JUST GOING TO SAY, YOU SEE THERE IS A SECTION

22      THERE THAT SAYS GOALS?

23      A.  I SEE THAT.

24      Q.  AND THERE IS A SECTION THAT TALKS ABOUT CHALLENGES?

25      A.  YES.
```

```
 1      Q.   AND YESTERDAY WE TALKED ABOUT INDUSTRY TRENDS, THAT YOU'VE

 2      NOTICED THERE WERE INDUSTRY TRENDS IN THE PAST.

 3           DO YOU SEE THERE THERE'S A SECTION THAT TALKS ABOUT

 4      INDUSTRY TRENDS?

 5      A.   YES, I SEE THAT.

 6           MR. PRICE:  WE CAN TAKE THAT DOWN, KEN, BECAUSE IT'S

 7      SHOWING ON MINE AS WELL.

 8      Q.   AND IF YOU'D LOOK NOW AT EXHIBIT 413, DO YOU SEE THIS IS

 9      FY '14 PLANNING OFFSITE IN CALISTOGA?

10      A.   I SEE THAT.

11      Q.   DID YOU ATTEND THAT?

12      A.   NO.  I'M TOLD THIS WAS A MEETING WITH A FEW SALESPEOPLE,

13      AND I HAD NOTHING TO DO WITH IT AND NEITHER DID ANYONE IN MY

14      MARKETING TEAM.

15      Q.   DO YOU RECOGNIZE IT AS AN APPLE DOCUMENT?

16      A.   YES.

17      Q.   AND IT'S YOUR UNDERSTANDING IT'S PLANNING AS TO HOW TO

18      FIGURE OUT HOW TO INCREASE SALES OF IPHONE?

19      A.   IT MAY BE.  AGAIN, I WASN'T PART OF THIS.

20           MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 413 INTO

21      EVIDENCE.

22           MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.  AGAIN,

23      THERE'S SEALING -- THIS DOCUMENT IS ENTIRELY FILED UNDER SEAL

24      AND THERE ARE PAGES, VERY FEW PAGES THAT CAN BE SHOWN, BUT I

25      DON'T KNOW WHAT COUNSEL INTENDS.
```

1              MR. PRICE:  MY UNDERSTANDING IS THAT WE MAY SHOW

2      .008, .014, AND .046.

3              MR. MCELHINNY:  WE HAVE A SHARED UNDERSTANDING THEN.

4              THE COURT:  OKAY.  .008?

5              MR. PRICE:  .014, .046.

6              THE COURT:  .046.  OKAY.  IT'S ADMITTED AND SEALED

7      WITH THE EXCEPTION OF THOSE THREE PAGES.

8          (DEFENDANTS' EXHIBIT 413 WAS ADMITTED IN EVIDENCE.)

9              THE COURT:  GO AHEAD, PLEASE.

10             MR. PRICE:  AND ACTUALLY IF WE CAN SHOW.008.

11     Q.   YOU SEE THERE ARE SOME GRAPHS THERE ABOUT GROWTH RATES

12     SLOWING?

13     A.   I SEE THAT.

14     Q.   AND .014, THERE IS AN ANALYSIS AS TO WHY.

15     A.   I THINK -- BY THE WAY, I THINK THAT'S A VERY MISLEADING

16     CHART, SO I DON'T -- I DON'T CERTAINLY WANT TO SUGGEST BY THE

17     FACT THAT I SAY I SEE IT I AGREE WITH IT, THAT IT'S CORRECT.

18     Q.   AND THIS INTERNAL APPLE DOCUMENT THAT TALKS ABOUT

19     STRONGEST DEMAND COMING FROM LESS EXPENSIVE AND LARGER SCREEN

20     SMARTPHONES, ABOUT CARRIERS -- THAT MEANS LIKE VERIZON, AT&T,

21     ET CETERA, CORRECT? -- HAVE STRONG INTEREST IN CAPPING IPHONE

22     DUE TO ONE OR MORE FACTORS -- CAPPING MEANS LIMITING THE SALES?

23     A.   CORRECT.

24     Q.   AND ONE OF THEM IS THE SUBSIDY PREMIUM THAT THE CARRIERS

25     ARE REQUIRED TO PAY?

1    A.   I DON'T AGREE THIS SLIDE IS CORRECT.  IT'S CORRECT THAT'S

2    WHAT THAT LINE SAYS.  I DON'T AGREE IT'S CORRECT.

3    Q.   AND THEN UNDER COMPETITION, YOU UNDERSTAND THAT'S THE

4    INSIGNIA FOR AN ANDROID?

5    A.   YES.

6    Q.   AND COMPETITORS HAVE DRASTICALLY IMPROVED THEIR HARDWARE

7    AND IN SOME CASES THEIR ECOSYSTEMS; RIGHT?

8    A.   NOT RIGHT.  I DON'T AGREE WITH THAT.

9    Q.   AND THAT THEY'RE SPENDING OBSCENE AMOUNTS OF MONEY ON

10   ADVERTISING.  DO YOU SEE THAT?

11   A.   I SEE THAT.

12   Q.   AND THEN IF WE COULD LOOK AT .046 OF THIS OFFSITE,

13   CONCLUSION, CONSUMERS WANTS WHAT WE DON'T HAVE.

14        WHERE DID THE GROWTH COME FROM?  LARGER THAN $300 AND

15   GREATER THAN 4 INCH SCREENS AND PHONES THAT COST LESS THAN

16   $300.

17        IS -- IS TODAY THE FIRST DAY YOU'VE SEEN, THE FIRST TIME

18   YOU'VE EVER SEEN THIS CONCLUSION FROM JANUARY -- I'M SORRY --

19   APRIL 2013 FOR THIS FISCAL YEAR '14 --

20   A.   WHEN YOU SAY "THIS CONCLUSION" --

21   Q.   -- PLANNING OFFSITE?

22   A.   WHEN YOU SAY "THIS CONCLUSION," I DON'T -- I DON'T THINK

23   THAT'S ACTUALLY THE DATA, AND I DON'T AGREE WITH THIS CHART.  I

24   THINK IT'S COMPLETELY MISLEADING AND WRONG.

25   Q.   IS THIS THE FIRST TIME YOU'VE SEEN THIS CHART OF THIS

1    FISCAL YEAR '14 PLANNING OFFSITE?

2    A.   THE FIRST TIME I SAW IT WAS AS PART OF THIS CASE, AND

3    THAT'S IT.  I HAD NEVER SEEN IT IN MY -- IN THE COURSE OF MY

4    WORK.

5              MR. PRICE:  AND, YOUR HONOR, IF I MAY ALSO SHOW PAGE

6    1, THE FIRST PAGE?

7              MR. MCELHINNY:  NO OBJECTION.

8    BY MR. PRICE:

9    Q.   THIS IS WHAT I'M TALKING ABOUT.  THIS IS THE DOCUMENT

10   WE'RE LOOKING AT; CORRECT?

11   A.   YES.  BUT THIS IS ONE SALES LEADER WHO PUT TOGETHER A

12   DOCUMENT FROM OTHER SALES LEADERS.  THIS IS NOT AN OFFICIAL

13   APPLE DOCUMENT WITH OUR STANCE IN TERMS OF WHAT WE THINK.

14   Q.   SO YOU'VE NOW IDENTIFIED THIS IS A ONE-PERSON DOCUMENT?

15   A.   ONE PERSON CREATED THIS, YES.

16   Q.   OKAY.  LET ME ASK YOU THEN ABOUT COMMUNICATIONS INVOLVING

17   JUST YOU.

18   A.   SURE.

19   Q.   AND I'D LIKE YOU TO TURN TO EXHIBIT 489, AND THIS IS AN

20   E-MAIL STRING THAT INVOLVES YOU, A MR. MICHAEL, AND FORGIVE ME

21   IF I MISPRONOUNCE THIS, T-C-H-A-O, AND MR. JOBS; CORRECT?

22   A.   THAT'S NOT WHAT I HAVE UNDER 489.

23   Q.   489.245.

24   A.   OH, SORRY.

25   Q.   489.245 AND .248.  DO YOU SEE THAT?

1    A.    YES.

2    Q.    AND YOU RECOGNIZE THIS AS AN E-MAIL STRING THAT INCLUDES

3    YOU, MR. TCHAO, AND MR. JOBS?

4    A.    THAT'S MR. TCHAO.

5    Q.    THANK YOU.  AND MR. JOBS?

6    A.    IT DOES INCLUDE THOSE PEOPLE, YES.

7    Q.    AND THIS IS AT THE END OF -- THIS IS THE END OF 2010,

8    OCTOBER 2010; CORRECT?

9    A.    YES.

10   Q.    AND WHAT'S HAPPENING IS THERE'S GOING TO BE A MEETING OF

11   THE TOP 100 PEOPLE IN APPLE TO TALK ABOUT, ABOUT STRATEGY GOING

12   FORWARD INTO 2011; CORRECT?

13   A.    YES.

14   Q.    AND HOW OFTEN DOES THIS, THIS MEETING TAKE PLACE OF THE

15   VERY TOP PEOPLE AT APPLE TO TALK ABOUT THE NEXT YEAR'S

16   STRATEGY?

17   A.    APPROXIMATELY ONCE A YEAR.

18         MR. PRICE:  AND IF WE CAN, YOUR HONOR, I'M GOING TO

19   ASK TO ADMIT INTO EVIDENCE 489.245 TO 248.

20         THE COURT:  ANY OBJECTION?

21         MR. MCELHINNY:  NO OBJECTION TO THOSE SPECIFIC PAGES,

22   YOUR HONOR.

23         THE COURT:  IT'S ADMITTED.

24    (DEFENDANTS' EXHIBIT 489 WAS ADMITTED IN EVIDENCE.)

25         THE COURT:  GO AHEAD, PLEASE.

1              MR. PRICE:  LET'S START WITH THE FIRST PAGE.

2              MR. MCELHINNY:  JUST TO NOTE FOR THE RECORD, YOUR

3     HONOR, IT'S NOT THOSE THREE PAGES THAT HAVE THE EXHIBIT NUMBER.

4     THE EXHIBIT, AT LEAST THAT I'VE GOT, IS HUNDREDS OF PAGES.

5              THE COURT:  THE ONLY ONES THAT ARE ADMITTED ARE 245

6     TO 248 OF DX 489.

7              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

8     BY MR. PRICE:

9     Q.  AND AT THE TOP HERE, IT SAYS -- LET'S GO DOWN TO THE

10    MIDDLE, IF WE CAN, TO STEVE.  SORRY, FROM THE TOP TO THE

11    MIDDLE.  FROM THE TOP DOWN TO WHERE IT SAYS STEVE.

12         SO HERE WE HAVE "FYI, DO NOT FORWARD."  THAT'S WHAT YOU

13    WROTE; CORRECT?

14    A.  YES.

15    Q.  SO YOU WERE SENDING THIS ON TO MR. TCHAO?

16    A.  TCHAO.

17    Q.  AND WHO IS HE?

18    A.  HE IS A, A V-P OF PRODUCT MARKETING FOR ME FOR IPAD.

19    Q.  AND IF WE NOW CAN -- IF WE CAN GO TO THE BOTTOM PART WHERE

20    IT STARTS FROM STEVE JOBS.  IF WE CAN GO RIGHT UP ABOVE THAT

21    FROM IT SAYS FROM STEVE JOBS, RIGHT HERE ON DOWN.

22         "HERE'S MY CURRENT CUT."  THIS IS FROM MR. JOBS.  THIS IS

23    HIS CUT AT THE AGENDA THAT WAS GOING TO TAKE PLACE AMONG THESE

24    TOP 100 EXECUTIVES; CORRECT?

25    A.  YES.

1    Q.   AND IF WE GO DOWN HERE WHERE IT SAYS "2011:  HOLY WAR WITH

2    GOOGLE.  ALL THE WAYS WE WILL COMPETE WITH THEM.  PRIMARY

3    REASON FOR THIS TOP 100 MEETING -- YOU WILL HEAR ABOUT WHAT

4    WE'RE DOING IN EACH PRESENTATION."

5         THAT'S WHAT HE WROTE AS PART OF THE AGENDA; CORRECT?

6         MR. MCELHINNY:  OBJECTION, YOUR HONOR, RELEVANCE TO

7    THIS CASE.

8         THE COURT:  OVERRULED.

9         GO AHEAD.  YOU MAY ANSWER.

10         THE WITNESS:  YES, THAT'S WHAT HE WROTE.

11    BY MR. PRICE:

12    Q.   SO THE 100 TOP PEOPLE WERE GOING TO HEAR AT EACH

13    PRESENTATION HOW APPLE WAS GOING TO PARTICIPATE OR START THIS

14    HOLY WAR WITH GOOGLE?

15    A.   WELL, ACTUALLY WHAT HE WAS DOING HERE WAS NOT NECESSARILY

16    SAYING THAT THAT'S WHAT WE WERE GOING TO PRESENT, BUT RATHER,

17    HE WAS GIVING THOSE OF US WHO WOULD PRESENT AN AGENDA, AND AS I

18    RECALL, HE DIDN'T THINK WE WERE THINKING AT ALL ABOUT GOOGLE

19    AND THEIR COMPETITION WITH US AT THE TIME.  IT WAS PUSHING US

20    TO MAKE SURE WE DID THINK ABOUT THAT WHEN WE PRESENTED.  THAT

21    WAS THE POINT OF WHAT HE WAS WRITING.

22    Q.   THE PRIMARY REASON FOR THIS TOP 100 MEETING CONCERNED THE

23    HOLY WAR WITH GOOGLE AND ALL THE WAYS THAT APPLE WOULD COMPETE

24    WITH THEM; CORRECT?

25    A.   AGAIN, THE -- THAT'S WHAT HE WROTE, AND HE WAS WRITING IT

1     TO CHALLENGE ALL OF US BECAUSE WE WEREN'T THINKING ABOUT GOOGLE

2     AND HE WANTED TO MAKE SURE WE WERE WHEN WE PRESENTED MANY OF

3     OUR PRODUCTS.

4     Q.   AND IT SAYS "2011:  YEAR OF THE CLOUD."

5     A.   YES.

6     Q.   I THINK YOU'VE TOLD US, I THINK ON TUESDAY, THAT IT WASN'T

7     UNTIL ABOUT AUGUST 2011 BEFORE APPLE PRODUCTS COULD SYNC

8     WITHOUT BEING PLUGGED INTO THE COMPUTER.  IS THAT RIGHT?

9     A.   WELL, WE COULD SYNC, BUT WE DID WIRED SYNCING.  AND I SAID

10    IN JUNE, WE INTRODUCED THAT IN JUNE OF 2011, THE ABILITY TO

11    MOVE FROM WIRED SYNCING TO WIRELESS.

12    Q.   SO THE WIRED MEANING THAT AS OF THIS DATE, 2010, IF YOU

13    WANTED TO SYNC, YOU HAD TO PLUG IN?

14    A.   YES.

15         BUT YOU PREFACED THIS WITH THE CLOUD.  IT HAS NOTHING TO

16    DO WITH THE CLOUD.

17    Q.   AND I UNDERSTAND THE DISTINCTION.  WE'LL TRY TO GET INTO

18    THAT IF I HAVE TIME, AND I PROBABLY -- I MAY NOT.

19         SO IF WE GO TO THE NEXT SECTION THEN, THE NEXT PAGE, WE

20    HAVE THIS FIRST PARAGRAPH HERE, P.C. AS HUB FOR ALL YOUR

21    DIGITAL ASSETS, CONTACTS, ET CETERA.

22         THAT'S REFERRING TO BASICALLY WHAT YOU WERE SAYING, YOU

23    HAD TO PLUG INTO THE P.C. TO SYNC ALL OF THESE ASSETS,

24    CONTACTS, CALENDARS, BOOKMARKS, ET CETERA; RIGHT?

25    A.   SO, AGAIN -- YES.  LET'S NOT CONFUSE THE PREVIOUS THING WE

```
 1      WERE TALKING ABOUT WITH THIS POINT, WHICH IS THAT APPLE HAD A

 2      STRATEGY CALLED THE DIGITAL HUB WHERE WE PLUGGED IN IPODS, FOR

 3      EXAMPLE, INTO YOUR MAC OR P.C. TO SYNC DATA.

 4      Q.   AND THAT DIGITAL HUB HAD TO MOVE, CENTER OF OUR UNIVERSE,

 5      MOVING FROM P.C. TO CLOUD; CORRECT?

 6      A.   THAT'S WHAT IT SAYS.

 7      Q.   AND APPLE IS IN DANGER OF HANGING ON TO OLD PARADIGM TOO

 8      LONG, THE INNOVATOR'S DILEMMA; CORRECT?

 9      A.   YES.

10      Q.   AND YOU WERE FAMILIAR WITH THE PHASE "INNOVATOR'S

11      DILEMMA;" CORRECT?  YES OR NO?

12      A.   I'VE HEARD OF IT.

13      Q.   AND THEN HE GOES ON TO SAY THAT GOOGLE AND MICROSOFT ARE

14      FURTHER ALONG IN THE TECHNOLOGY, AND HE SAYS THEY HAVEN'T

15      FIGURED IT OUT YET.

16           DO YOU SEE THAT?

17      A.   I SEE THAT.

18      Q.   NOW, IF YOU LOOK AT THE REST OF THIS PAGE, IT TALKS ABOUT

19      VARIOUS PRESENTATIONS THEN THAT HE WANTS TO BE MADE; CORRECT?

20      A.   YES.

21      Q.   NUMBER 2, STATE OF THE COMPANY, THERE IS A COMPARISON FROM

22      PETER AND TIM WITH GOOGLE AND SAMSUNG, HTC, MOTOROLA, AND RIM;

23      CORRECT?

24      A.   YES.

25      Q.   IF WE CAN GO TO THE NEXT PAGE, AND I WANT TO FOCUS HERE,
```

```
1        IF WE CAN, ON NUMBER 5.  I'M SORRY, PAGE .247.  SORRY.

2            IT REFERS TO SCOTT AND JOZ.  WHO DOES JOZ REFER TO?

3    A.   GREG JOSWIAK.

4    Q.   OWES.  WHAT'S HIS POSITION?

5    A.   HE'S THE VICE-PRESIDENT OF IPHONE PRODUCT MARKETING ON MY

6    TEAM.

7    Q.   AND IT SAYS "STRATEGY:  CATCH UP TO ANDROID WHERE WE ARE

8    BEHIND."

9            MR. JOBS WAS COMMUNICATING THAT THERE ARE, IN FACT, PLACES

10   WHERE ANDROID IS AHEAD OF APPLE AND IOS; CORRECT?

11   A.    NOT DEFINITIVELY.  AGAIN, THESE ARE JUST NOTES TO US AS

12   PRESENTERS ABOUT WHAT THINGS HE WANTED US TO WORK ON AT OUR

13   PRESENTATIONS, AND IT'S NOT A DEFINITIVE STATEMENT THAT THAT'S,

14   IN FACT, THE FACT.  IT'S THOSE THINGS HE WANTED US TO LOOK AT

15   AND DECIDE AND SOME THINGS WE COULD BE BEHIND ON AND SOME

16   THINGS WE MAY NOT.  IT WAS UP TO US AS PRESENTERS TO WORK ON

17   THESE.

18   Q.   SO WHEN HE WROTE "STRATEGY:  CATCH UP TO ANDROID WHERE WE

19   ARE BEHIND (NOTIFICATIONS, TETHERING, SPEECH)" YOU DIDN'T READ

20   THAT AS HIM SAYING "I THINK WE'RE BEHIND ON THAT AND WE NEED TO

21   FIGURE OUT HOW TO CATCH UP"?

22   A.    I READ THEM THAT AS HIM SAYING THAT THAT'S WHAT HE WANTED

23   TO WORK ON IN THE PRESENTATION, AND THEN AS WE WORKED ON IT, WE

24   WOULD ACTUALLY HAVE DIALOGUE ABOUT WHETHER THAT'S CORRECT OR

25   WHETHER THERE'S SOMETHING ELSE OR NOTHING AT ALL.
```

1           IT'S NOT DEFINITIVE.  IT'S HIS NOTES OF IDEAS OF THINGS TO

2      WORK ON IN THE PRESENTATION.

3      Q.   AND NOTIFICATIONS, DOES THAT REFER TO -- YOU KNOW, THERE'S

4      A -- NOW IN THE IPHONE OPERATING SYSTEM, YOU CAN GET

5      NOTIFICATIONS BY PULLING DOWN A SCREEN FROM THE TOP?  YOU'RE

6      AWARE OF THAT?

7      A.   THAT'S ONE WAY.  IT'S NOT THE ONLY WAY.

8      Q.   THAT'S ONE WAY THAT IT CURRENTLY CAN BE DONE; CORRECT?

9      A.   YES.

10     Q.   IT COULD NOT BE DONE THAT WAY AS OF THE TIME THIS WAS

11     WRITTEN; CORRECT?

12     A.   YOU GOT THEM AS THEY POPPED UP ON THE SCREEN RATHER THAN

13     PULLING THEM DOWN, YES.

14     Q.   AND ANDROID HAS A METHOD OF GETTING YOUR NOTIFICATIONS BY

15     PULLING THEM DOWN FROM THE TOP OF THE SCREEN?

16     A.   I DON'T KNOW THE EXACT METHODOLOGY THAT ANDROID USES.

17     Q.   IF WE CAN GO TO 6, THE NEXT ONE.  THERE'S A MOBILE ME

18     SECTION.

19          "STRATEGY:  CATCH UP TO GOOGLE CLOUD SERVICES AND LEAPFROG

20     THEM," AND LEAPFROG THEM YOU UNDERSTOOD MEANT LET'S GET AHEAD

21     OF THEM; CORRECT?

22     A.   YES.

23     Q.   AND THEN IT TALKS ABOUT ANDROID DEEPLY INTEGRATING CLOUD

24     SERVICES, WAY AHEAD OF APPLE IN CLOUD SERVICES FOR CONTACT,

25     CALENDARS, E-MAIL; CORRECT?

1    A.   AGAIN, HE WROTE THAT AS A NOTE.  I'M NOT SURE THE TEAM

2    CAME AWAY WITH THAT AS THE FEELING FROM THE PRESENTATION.  IT

3    WAS A NOTE OF, A STREAM OF IDEAS.  HE WAS PUTTING DOWN THINGS

4    HERE TO WORK ON FOR THE PRESENTATION.

5    Q.   LET'S GO BACK TO THE FIRST PAGE.

6         GOING FORWARD, HIGHLIGHT THIS FROM STEVE.  MY CURRENT

7    LIST, STEVE.

8         GOING FORWARD IN 2011, THE MOST IMPORTANT THING WAS TRYING

9    TO FIGURE OUT ALL OF THE WAYS APPLE WILL COMPETE WITH GOOGLE IN

10   ITS HOLY WAR WITH GOOGLE; RIGHT?  THAT'S THE PRIMARY REASON --

11   A.   WELL, YOU --

12   Q.   -- TO GET ALL OF THESE PEOPLE, TOP EXECUTIVES FROM APPLE;

13   CORRECT?

14   A.   WELL, YOU'RE MISQUOTING HIM.  YOU ADDED WORDS TO HIM AS

15   YOU SUMMARIZED HIM.  SO IT DOESN'T SAY THE PRIMARY REASON.  IT

16   DOESN'T SAY THE MOST IMPORTANT.

17        I THINK YOU HAVE TO READ WHAT HE WROTE, AND AGAIN, THESE

18   ARE NOTES TO US ON WHAT TO PULL TOGETHER FOR THE PRESENTATION.

19   Q.   SO THE BEST WAY TO READ THIS IS JUST TO, TO READ THE VERY

20   WORDS THAT HE WROTE?  YOU'LL AGREE WITH THAT?

21   A.   YES.

22   Q.   OKAY.

23        MR. PRICE:  NOTHING FURTHER, YOUR HONOR.

24        THE COURT:  ALL RIGHT.  TIME IS NOW 10:27.

25        DO YOU WANT TO GO A FEW MINUTES AND THEN TAKE OUR 10:30

1    BREAK?

2             MR. MCELHINNY:  YES, YOUR HONOR.

3             THE COURT:  OKAY.

4             MR. MCELHINNY:  CAN I GO 30 MINUTES?  NO, I'M SORRY.

5        (LAUGHTER.)

6             THE COURT:  NO.  SINCE WE STARTED AT 9:09, YOU CAN GO

7    13 MINUTES.  GO AHEAD.

8                    **REDIRECT EXAMINATION**

9    BY MR. MCELHINNY:

10   Q.   FIRST QUESTION.  EXPLAIN, PLEASE -- YOU WEREN'T ASKED THE

11   FOLLOW-UP QUESTION.  YOU SAID THE LAST DOCUMENT WE WERE JUST

12   LOOKING AT WAS A MESSAGE BECAUSE YOU WERE NOT THINKING ABOUT

13   GOOGLE.

14        CAN YOU EXPLAIN TO THE JURY WHAT YOU MEANT BY THAT?

15   A.   YES.  I RECALL AT THE TIME THAT MR. JOBS FELT THAT, ACROSS

16   THE DIFFERENT PRODUCT TEAMS, WE WEREN'T -- WE WERE FOCUSSING ON

17   OUR OWN WORK AND WE WEREN'T LOOKING HARD ENOUGH AT WHAT OTHERS

18   WERE DOING, AT WHAT GOOGLE OR SAMSUNG OR ANYONE ELSE WAS DOING.

19   WE WERE WORKING ON OUR IPHONES AND OUR IOS STRATEGIES, AND HE

20   WANTED TO MAKE SURE THAT WE REALIZED THAT THESE COMPETITORS ARE

21   OUT THERE AND WE TOOK THEM MORE SERIOUSLY THAN WE WERE.

22   Q.   IS GOOGLE A COMPETITOR AGAINST APPLE?

23   A.   OF COURSE.

24   Q.   IS SAMSUNG A COMPETITOR AGAINST APPLE?

25   A.   YES.

1    Q.   ARE YOU FIGHTING FOR SALES?

2    A.   SURE.

3    Q.   IF THEY GET SALES, DO YOU LOSE SALES?

4    A.   YES.

5    Q.   IF YOU GET SALES, DO THEY LOSE SALES?

6    A.   YES.

7    Q.   WOULD YOU SAY IT'S A HEAD-TO-HEAD COMPETITION?

8    A.   IT'S A COMPETITION, BUT I THINK THERE ARE MANY COMPETITORS

9    IN THE MARKET.

10            MR. MCELHINNY:  THANK YOU.  THIS WOULD BE A GOOD TIME

11   FOR A BREAK, YOUR HONOR.

12            THE COURT:  ALL RIGHT.  IT'S 10:28 -- NO, THE TIME IS

13   10:29.  ALL RIGHT.  LET'S GO AHEAD AND TAKE A 15 MINUTE BREAK.

14   THANK YOU.

15         PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

16         (JURY OUT AT 10:29 A.M.)

17            THE COURT:  ALL RIGHT.  THANK YOU.

18         (RECESS FROM 10:29 A.M. UNTIL 10:46 A.M.)

19         (JURY OUT AT 10:46 A.M.)

20            MR. PRICE:  YOUR HONOR, MAY WE HAVE A WORD ABOUT A

21   POTENTIAL EXHIBIT?

22            THE COURT:  OH, ALL RIGHT.  WHAT IS THAT?

23            MR. PRICE:  I WAS JUST HANDED BY MR. MCELHINNY A

24   DOCUMENT THAT'S PLAINTIFF'S EXHIBIT NUMBER 121.  IT'S A SAMSUNG

25   DOCUMENT, TRANSLATION.

```
 1        IT'S A DOCUMENT WHICH WAS NOT IDENTIFIED IN ANY

 2    DISCLOSURES FOR THIS WITNESS.  IT HASN'T BEEN A DOCUMENT

 3    IDENTIFIED FOR PURPOSES OF DETERMINING WHETHER ANYTHING SHOULD

 4    BE SEALED.

 5        MY UNDERSTANDING IS THAT IT WAS A FOR ATTORNEYS' EYES ONLY

 6    DOCUMENT PRODUCED AT ONE POINT.

 7        SPECIFICALLY, MY UNDERSTANDING FROM MR. MCELHINNY IS HE

 8    WANTS TO SHOW THE WITNESS PAGE 100, AND BY THAT I MEAN BATES

 9    PAGE 100 --

10        MR. MCELHINNY:  BATES PAGE 100.

11        MR. PRICE:  -- WHICH SHOULD BE A PAGE THIS WITNESS

12    HAS NEVER SEEN BEFORE.  IT INVOLVES THAT PAGE ON THE LEFT-HAND

13    SIDE, A PHONE WHICH IS NOT PART OF THIS CASE.

14        SO IT WOULD BE OBVIOUSLY PREJUDICIAL --

15        THE COURT:  I'VE ALREADY RULED ON THIS EXHIBIT,

16    HAVEN'T I, ON THE LOCK SCREEN?

17        MR. MCELHINNY:  YES, YOUR HONOR.

18        THE COURT:  SO --

19        MR. MCELHINNY:  IT WAS SHOWN IN OPENING.  IT'S A

20    PUBLIC DOCUMENT.

21        IT'S ALSO ON THE -- TO BE CLEAR -- I MEAN, I GAVE A --

22    COUNSEL DOESN'T KNOW WHAT I'M GOING TO DO WITH IT.

23        MR. PRICE:  TRUE.

24        MR. MCELHINNY:  I SIMPLY HANDED HIM A COPY OF IT.

25        IT IS ABSOLUTELY CLEAR THIS WITNESS HAS NEVER SEEN IT
```

1    BEFORE.  THAT'S ONE OF THE POINTS I WANT TO ESTABLISH.

2         BUT THIS PAGE IS UNSEALED.

3         THE DOCUMENT IS GOING TO BE USED WITH OUR EXPERT LATER

4    TODAY AND SAMSUNG HAS ALREADY TOLD US THEY DO NOT INTEND TO

5    SEAL THE ENTIRE DOCUMENT.

6         MR. PRICE:  YOUR HONOR, I'LL LET MS. MAROULIS SPEAK

7    TO THE SEALING ISSUE.

8         BUT FOR THIS WITNESS, THIS DOCUMENT IS IRRELEVANT.  THE

9    ONLY REASON TO SHOW IT TO HIM IS FOR HIM TO SAY "I'M SHOCKED,

10   SHOCKED I AM," AND HOW DO I CROSS-EXAMINE HIM BY SAYING THIS

11   PHONE ISN'T EVEN IN THE CASE, IT'S A DIFFERENT VERSION OF

12   ANDROID, IT'S NOT ACCUSED IN THIS CASE.

13        IT'S TOTALLY IRRELEVANT.  IT'S JUST TO GET A SHOCK VALUE

14   FROM THIS WITNESS WHOSE -- IT'S NOT HIS.  HE CAN'T AUTHENTICATE

15   IT.

16        THE COURT:  HAS THIS WITNESS --

17        MS. MAROULIS:  YOUR HONOR, IT'S --

18        THE COURT:  AS YOU CAN TELL, IF IT'S A SAMSUNG

19   DOCUMENT THAT WAS PRODUCED BY SAMSUNG, IT'S COMING IN.  IF IT'S

20   AN APPLE DOCUMENT THAT WAS PRODUCED BY APPLE, IT'S COMING IN

21   THE CASE.  THAT'S GOING TO BE UNIFORMLY APPLIED.  IF YOU

22   PRODUCED IT AND IT'S YOUR OWN DOCUMENT, IT'S COMING IN.

23        NOW, I GUESS THE QUESTION IS, WAS IT DISCLOSED AS TO THIS

24   WITNESS?

25        MS. MAROULIS:  NO, YOUR HONOR, IT'S NOT DISCLOSED AS

```
 1        TO THIS WITNESS.  THERE'S BEEN A RULE IN THE CASE, IF IT'S NOT

 2        DISCLOSED WITH THE WITNESS, IT CANNOT BE USED.

 3              THE COURT:  THAT IS CORRECT, MR. MCELHINNY.

 4              MR. MCELHINNY:  MAY I BE HEARD?

 5              THE COURT:  GO AHEAD.

 6              MR. MCELHINNY:  IT WAS NOT USED IN HIS DIRECT

 7        EXAMINATION.  HE WAS THEN EXAMINED ABOUT THE SUBJECT.  THIS IS

 8        REDIRECT.  YOU CAN'T DISCLOSE DOCUMENTS FOR REDIRECT BECAUSE

 9        YOU DON'T KNOW WHAT THE DIRECT IS GOING TO BE.

10            AND WHAT I INTEND TO CONFIRM WITH THIS WITNESS IS THAT

11        HE -- HE WAS ASKED QUESTIONS IN HIS DIRECT ABOUT READING THE

12        PATENTS AND WHETHER HE KNEW THE CLAIMS AND WHAT THE BASIS WAS

13        FOR COPYING, AND I -- I WANT TO -- I WANT TO ESTABLISH -- I

14        WANT TO ELIMINATE JURY CONFUSION ABOUT WHETHER APPLE EXECUTIVES

15        HAVE EVER SEEN THESE DOCUMENTS BEFORE AND ESTABLISH EXACTLY

16        WHAT MR. PRICE JUST SAID, WHICH IS THAT THEY HAVE NOT.

17              MS. MAROULIS:  YOUR HONOR, APPLE HAS NEVER USED

18        SAMSUNG DOCUMENTS WITH APPLE WITNESSES.  THIS WAS A COMPLETE

19        PREJUDICIAL SURPRISE.  WE DIDN'T HAVE A CHANCE TO BRIEF IT.

20              THE COURT:  I'M NOT GOING TO ALLOW THAT THIS -- ALLOW

21        THIS DOCUMENT TO BE USED WITH A WITNESS FOR WHOM THE EXHIBIT

22        WAS NOT DISCLOSED.

23            I WOULD ALLOW -- IF HE WANTS TO ASK A QUESTION OF WHETHER

24        HE'S EVER SEEN ANY OF THE SAMSUNG INTERNAL DOCUMENTS ABOUT

25        THEIR PRODUCT DESIGN, I THINK THAT'S FAIR BASED ON THE CROSS.
```

1              MR. MCELHINNY:  FINE ENOUGH, YOUR HONOR.

2              MR. PRICE:  AND YOUR HONOR, IT GOES BEYOND CROSS

3     BECAUSE THE QUESTION WAS WHETHER HE KNEW ABOUT THESE SPECIFIC

4     PATENT CLAIMS, AND I WAS VERY CAREFUL, AND WHETHER OR NOT THEY

5     WERE USED IN APPLE PRODUCTS, AND HE SAID NO, HE DIDN'T.  THAT'S

6     THE QUESTION.

7              MR. MCELHINNY:  THE -- I SUGGEST IT WOULD BE GOOD TO

8     HEAR THE QUESTIONS BEFORE WE START FIGHTING ABOUT WHAT THE

9     OBJECTIONS ARE TO THEM.

10         I MEAN, I -- I'M A BIG PROPONENT OF GIVING YOU NOTICE OF

11    ISSUES THAT ARE GOING TO COME UP.

12         BUT THEN THE POINT IS THAT YOU GET A QUESTION AND DECIDE

13    WHETHER OR NOT THE QUESTION IS OBJECTIONABLE.

14             MR. PRICE:  FROM WHAT HE'S REPRESENTED, HE'S TRYING

15    TO USE THIS WITNESS TO SHOW INFRINGEMENT BY SAMSUNG.  THIS

16    WITNESS HAS NO FIRST-HAND KNOWLEDGE OF THAT AT ALL.  HE MAY

17    HAVE BEEN TOLD THAT BY HIS ATTORNEYS.  HE MAY HAVE BEEN SHOWN

18    PATENTS.

19         BUT HE IS AN INCOMPETENT WITNESS TO TESTIFY AS TO THE

20    TOPIC MR. MCELHINNY WANTS TO ASK HIM ABOUT.

21             MR. MCELHINNY:  THAT'S NOT THE TOPIC AND I HAVE NO

22    INTENTION OF DOING THAT.

23             THE COURT:  YOU ASKED A NUMBER OF QUESTIONS OF THIS

24    WITNESS ABOUT COMPARISONS OF PRODUCTS FEATURES.  YOU ASKED THIS

25    WITNESS A NUMBER OF QUESTIONS COMPARING PRODUCT FEATURES

BETWEEN THE TWO PRODUCTS AND THE COMPETITION IN TERMS OF THE FEATURES OF THE PRODUCT.

I THINK IT'S RELEVANT AND WITHIN THE SCOPE OF REDIRECT, BUT I WILL NOT ALLOW THE USE OF THIS DOCUMENT.

MR. MCELHINNY: THANK YOU, YOUR HONOR.

BUT JUST ESTABLISHING, YOUR HONOR'S RULE IS THAT BOTH PARTIES NOW ARE REQUIRED TO ANTICIPATE DOCUMENTS THAT MAY BE USED ON REDIRECT, AND IF THEY DON'T DESIGNATE THOSE DOCUMENTS WITH THEIR INITIAL DISCLOSURES, THEY CANNOT BE USED ON REDIRECT EXAMINATION? THAT'S, AS I UNDERSTAND IT, THE RULE YOU'RE APPLYING HERE.

THE COURT: THAT IS CORRECT. YOU CERTAINLY HAVE HAD NOTICE OF THE DOCUMENTS THAT SAMSUNG WAS GOING TO USE IN CROSS AND YOU COULD HAVE ANTICIPATED -- ALL OF THE DOCUMENTS THAT WERE USED IN CROSS ARE ALL ONES THAT HAVE BEEN DISCLOSED TO WHICH YOU'VE ALREADY FILED OBJECTIONS TO WHICH THE COURT HAS ALREADY RULED.

SO IT'S UP TO THE PARTIES TO ANTICIPATE, BASED ON THE DOCUMENTS, WHAT QUESTIONS ARE GOING TO BE ASKED AND TO MAKE APPROPRIATE DESIGNATIONS.

MR. MCELHINNY: THANK YOU, YOUR HONOR.

THE COURT: OKAY. WHAT ELSE?

MR. MCELHINNY: I DON'T INTEND TO GIVE THE DOCUMENT TO THE WITNESS AND ASK HIM. I'M GOING TO REFER, FOR THE JURY, TO GIVE THE JURY CONTEXT, TO A SLIDE THAT WAS SHOWN DURING

```
1     OPENING.

2          MAY I HOLD THIS DOCUMENT UP TO REMIND THEM OF WHAT I'M

3     TALKING ABOUT?

4              THE COURT:  YOU'RE NOT GOING TO SHOW IT, YOU'RE JUST

5     GOING TO HOLD THE DOCUMENT UP?

6              MR. MCELHINNY:  THAT'S ALL I'M GOING TO DO SO THAT

7     THEY KNOW WHAT I'M TALKING ABOUT.

8              THE COURT:  I'M GOING TO ALLOW THAT.

9              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  LET'S BRING OUR JURY IN.

11         (JURY IN AT 10:52 A.M.)

12             THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

13     SEAT.  TIME IS NOW 10:53.

14         GO AHEAD, PLEASE.

15     BY MR. MCELHINNY:

16     Q.   THE GOOD THING ABOUT BREAKS IS THE QUESTIONS MULTIPLY.

17          BEFORE THE BREAK, I JUST ASKED YOU ABOUT COMPETITION

18     BETWEEN APPLE AND SAMSUNG.

19     A.   YES.

20     Q.   FROM APPLE'S PERSPECTIVE, IS THERE ANYTHING PARTICULARLY

21     IMPORTANT ABOUT THAT COMPETITION WHEN THE PERSON WHO IS MAKING

22     THE CHOICE IS THE FIRST TIME BUYER OF A SMARTPHONE?

23     A.   YES, OF COURSE.

24     Q.   AND WHY IS THAT?

25     A.   WELL, WHEN YOU'RE A FIRST TIME BUYER, YOU ARE, ARE GETTING
```

1    YOUR FIRST SMARTPHONE AND YOU'RE GOING TO BUILD KIND OF A

2    RELATIONSHIP WITH THAT DEVICE.  YOU'RE GOING TO USE THE

3    EXPERIENCE AND THAT WILL INFLUENCE THE OTHER THINGS YOU

4    PURCHASE, AS WELL AS YOUR FAMILY AND FRIENDS AND CO-WORKERS ARE

5    INFLUENCED BY THAT.

6    Q.    DIFFERENT SUBJECT.

7         YOU WERE SHOWN A DOCUMENT THAT WAS PUT INTO EVIDENCE,

8    WHICH IS DEFENDANTS' EXHIBIT 407, AND I'M GOING TO ASK YOU TO

9    LOOK, PLEASE, AT PAGE 4 OF THAT DOCUMENT, WHICH IS NOT ONE OF

10   THE PAGES YOU WERE SHOWN.

11   A.    YES, I SEE THAT.

12   Q.    CAN YOU TELL ME, FIRST, JUST TO -- THE DOCUMENTS WENT BACK

13   AND FORTH IN YEARS, SO LET'S SET THE DATE.

14        WHAT WAS THE DATE OF THIS DOCUMENT?

15   A.    THIS DOCUMENT WAS PUBLISHED BY MY TEAM IN DECEMBER OF

16   2012.

17   Q.    AND WHAT DOES THIS GRAPH SHOW US AS OF DECEMBER 2012?

18   A.    IT SHOWS MARKETING EXPENSES AS REPORTED BY DIFFERENT

19   COMPANIES, APPLE AS WELL AS SAMSUNG AND OTHER COMPANIES, FOR

20   DIFFERENT ANNUAL PERIODS.

21        AS YOU SEE, THE ANNUAL PERIODS GO FROM 2009 UP UNTIL 2012

22   FOR EACH OF THE COMPANIES LISTED.

23   Q.    AND WHAT WAS THE LATEST INFORMATION THAT APPLE HAD AS OF

24   THIS DATE ABOUT HOW MUCH SAMSUNG WAS SPENDING ON MARKETING

25   EXPENSES?

REDIRECT SCHILLER

1    A.   AT THIS POINT, THIS CHART SHOWS IT IS A NUMBER JUST UNDER

2    $12 BILLION.

3    Q.   I'M SORRY?

4    A.   $12 BILLION.

5    Q.   SO HOW DO YOU GET TO THE BILLIONS, PLEASE, SIR?

6    A.   AS YOU SEE ON THE BOTTOM, THERE ARE, IT SAYS 12,000

7    MILLION, AND THAT'S WHAT THAT IS.

8    Q.   OKAY, THANK YOU.

9         SIR -- YOU CAN TAKE THAT DOWN -- YOU WERE SHOWN AN APOLOGY

10   LETTER FROM MR. COOK ABOUT THE MAPPING APPS.

11        DO YOU RECALL THAT?

12   A.   YES, I DO.

13   Q.   AND THERE WAS A REFERENCE IN THERE PARTICULARLY TO APPLE'S

14   HIGH STANDARDS.

15        DO YOU RECALL THAT?

16   A.   YES, I DO.

17   Q.   CAN YOU EXPLAIN THAT FOR US, PLEASE.

18   A.   IT'S BEEN MY EXPERIENCE IN MY YEARS AT APPLE THAT WE'RE

19   HELD TO A UNIQUE STANDARD BY OUR CUSTOMERS AND MANY IN THE

20   PUBLIC.  MY BELIEF IS THAT OFTEN THINGS THAT WE DO THAT ARE

21   GOOD ENOUGH FOR OTHER COMPANIES ISN'T GOOD ENOUGH FOR APPLE AND

22   WE'RE HELD TO A HIGHER STANDARD.

23        AND I DON'T THINK THAT'S UNFAIR.  I THINK THAT'S GREAT

24   THAT PEOPLE THINK THAT WAY ABOUT US AND EXPECT MORE FROM APPLE

25   THAN MOST COMPANIES.

REDIRECT SCHILLER

1    Q.   AND IS THERE AN INTERNAL EXPECTATION ABOUT STANDARDS FOR

2    APPLE PRODUCTS?

3    A.   ABSOLUTELY.  WE HAVE A VERY HIGH INTERNAL STANDARD FOR

4    OURSELVES, AND, AND IT'S ALWAYS GETTING HIGHER.

5         I MEAN, THAT'S PART OF MAKING THINGS BETTER IS PEOPLE CAN

6    READ THESE DOCUMENTS AND THINK WE'RE UPSET ABOUT SOMETHING, BUT

7    IT'S ACTUALLY THAT WE NEED TO KEEP PUSHING OURSELVES.  OUR

8    CUSTOMERS WANT THAT AND IT'S HOW WE CONTINUALLY EXCEED THEIR

9    EXPECTATIONS OF APPLE.

10   Q.   I WANT TO SWITCH SUBJECTS AGAIN AND TALK ABOUT, IS IT

11   MEDIA ARTS LAB?  IS THAT CORRECT?

12   A.   YES.

13   Q.   AND MR. VINCENT?

14   A.   CORRECT.

15   Q.   AGAIN, THE CHRONOLOGY MAY HAVE GOTTEN A LITTLE JUMBLED.

16   HOW LONG HAS MEDIA ARTS LAB BEEN AN ADVERTISING AGENCY FOR

17   APPLE?

18   A.   IN THE RECENT STINT, WE STARTED WORKING WITH THEM AGAIN IN

19   2000 -- EXCUSE ME -- IN 1997 AND HAVE BEEN CONTINUALLY WORKING

20   WITH THEM SINCE THEN.  SO ABOUT 17 YEARS.

21   Q.   AND THEY REPORT DIRECTLY TO YOU SINCE WHEN?

22   A.   SINCE THE FALL OF 2011.

23   Q.   AND WHAT IS MR. VINCENT'S RELATIONSHIP VIS-À-VIS YOU IN

24   THIS REPORTING RELATIONSHIP?

25   A.   MR. VINCENT IS RESPONSIBLE FOR RUNNING MEDIA ARTS

REDIRECT SCHILLER

1    LABORATORIES AND SO HE WORKS WITH ME AS WE MANAGE ALL OF THE

2    PROJECTS WE DO TOGETHER.

3    Q.   AND HOW LONG HAVE YOU BEEN PERSONALLY WORKING WITH

4    JAMES VINCENT?

5    A.   FOR 17 YEARS APPROXIMATELY.

6    Q.   DOES HE -- TODAY DOES HE HOLD THE SAME POSITION?

7    A.   YES.

8    Q.   IS MEDIA ARTS LAB TODAY APPLE'S ADVERTISING AGENCY?

9    A.   YES, IT IS.

10   Q.   SIR, YOU WERE SHOWN A SERIES OF E-MAILS OVER, CHARITABLY,

11   I WOULD SAY WITHIN ONE MONTH IN 2013.

12       DO YOU RECALL THAT?

13   A.   YES.

14   Q.   SIR, IN THE 17 YEARS THAT YOU'VE BEEN WORKING WITH

15   MR. VINCENT, WAS THAT THE ONLY TIME THAT YOU EXPRESSED

16   UNHAPPINESS WITH HIS WORK?

17   A.   NO, NOT AT ALL.

18   Q.   DO YOU HAVE STANDARDS FOR YOUR ADVERTISING AGENCY?

19   A.   OF COURSE I DO, YES.

20   Q.   DO YOU HAVE STANDARDS FOR YOUR LAWYERS?

21       (LAUGHTER.)

22           MR. MCELHINNY:  NEVER MIND.  I WITHDRAW THAT

23   QUESTION.

24   Q.   AND SO IT'S CLEAR, WHO IS YOUR ADVERTISING AGENCY TODAY?

25   A.   MEDIA ARTS LABORATORIES.

```
 1      Q.   AND WHO IS IN CHARGE OF THAT RELATIONSHIP FROM THEIR

 2      PERSPECTIVE?

 3      A.   JAMES VINCENT?

 4      Q.   IS HE HONEST?

 5      A.   YES.

 6      Q.   DO YOU RESPECT HIS OPINIONS?

 7      A.   OF COURSE I DO.

 8      Q.   DO YOU ALWAYS AGREE WITH HIS OPINIONS?

 9      A.   NO, I DO NOT.

10      Q.   DO YOU KEEP IT SECRET IN YOUR HEART WHEN YOU DISAGREE WITH

11      HIM?

12      A.   NO.  I BELIEVE I'M PRETTY OUTSPOKEN.

13      Q.   SIR, YOU WERE SHOWN AN EXHIBIT, OR AT LEAST PART OF AN

14      EXHIBIT, DX 498.  IF YOU CAN FIND THAT IN YOUR BINDER?

15      A.   YES.

16           THE COURT:  FOR THE RECORD, I WANT TO SAY THAT FOR

17      DX 407, PAGE .004 HAS BEEN UNSEALED.

18           MR. MCELHINNY:  THANK YOU, YOUR HONOR.

19      Q.   LOOK AT DX 498.  DO YOU HAVE THAT DOCUMENT?

20      A.   YES.

21      Q.   AND AGAIN, WHAT IS THE DATE OF THAT DOCUMENT?

22      A.   JANUARY 31ST, 2013.

23      Q.   LET ME SHOW YOU A PART THAT YOU WEREN'T SHOWN, WHICH IS IF

24      YOU GO TO PAGE 9, PLEASE, AND IF YOU LOOK AT THE BOTTOM

25      PARAGRAPH, AND I WANT TO FOCUS YOU ON THE SECOND SENTENCE THERE
```

```
 1        WHERE IT SAYS "APPLE HAS SUED THE COMPANY FOR PATENT

 2   INFRINGEMENT, AND THE PHONE MAKERS WILL PROBABLY BE EMBROILED

 3   IN LITIGATION FOR YEARS TO COME."

 4        DO YOU SEE THAT?

 5   A.   I DO.

 6   Q.   THIS IS 2013.  DO YOU KNOW HOW LONG THAT LITIGATION HAS

 7   BEEN PENDING AS OF THIS DATE?

 8             MR. PRICE:  OBJECTION.  RELEVANCE.

 9             THE WITNESS:  I BELIEVE --

10             THE COURT:  OVERRULED.

11        GO AHEAD.  YOU CAN ANSWER.

12             THE WITNESS:  I'M SORRY.  I BELIEVE A COUPLE YEARS.

13   BY MR. MCELHINNY:

14   Q.   THANK YOU.

15        SIR, ONE LAST LITTLE SERIES OF QUESTIONS.  IF YOU CAN

16   REMEMBER BACK TO TUESDAY AT THE BEGINNING OF YOUR

17   CROSS-EXAMINATION, YOU WERE ASKED A SERIES OF QUESTIONS ABOUT

18   THE PATENTS AND PATENT CLAIMS.

19        DO YOU REMEMBER THAT?

20   A.   YES, I DO.

21   Q.   HAD WE AT ANY TIME ASKED YOU TO TAKE THE PATENT CLAIMS AND

22   READ THEM ON SAMSUNG PRODUCTS?

23   A.   NO, YOU DID NOT.

24   Q.   HAVE -- DO YOU HAVE ACCESS TO INTERNAL SAMSUNG RESEARCH

25   AND DEVELOPMENT DOCUMENTS?
```

REDIRECT SCHILLER

```
 1     A.   NO, I DO NOT.

 2     Q.   IN CONNECTION WITH THIS CASE AND YOUR TESTIMONY TODAY,

 3     HAVE YOU EVER BEEN SHOWN INTERNAL SAMSUNG RESEARCH AND

 4     DEVELOPMENT DOCUMENTS?

 5     A.   NO, I HAVE NOT.

 6     Q.   DO YOU EXPECT THAT SAMSUNG IS BEING SHOWN YOUR INTERNAL

 7     RESEARCH AND DEVELOPMENT DOCUMENTS?

 8          MR. PRICE:  OBJECTION.  RELEVANCE.

 9          THE COURT:  OVERRULED.

10          THE WITNESS:  I DON'T KNOW.  I WOULD HOPE NOT.

11     BY MR. MCELHINNY:

12     Q.   OKAY.  THE JURY WILL RECALL -- YOU WEREN'T HERE FOR

13     OPENING; RIGHT?

14     A.   NO, I WAS NOT.

15     Q.   WE KEPT YOU OUT OF THE COURTROOM SO YOU WOULDN'T SEE

16     ANYTHING THAT'S HAPPENED IN THIS CASE; CORRECT?

17     A.   CORRECT.

18     Q.   THE JURY WILL RECALL THAT DURING OPENING, I SHOWED THEM A

19     SAMSUNG INTERNAL RESEARCH AND DEVELOPMENT DOCUMENT AND I SHOWED

20     THEM A PARTICULAR PAGE, WHICH WAS PAGE 100 OF THIS DOCUMENT.

21          HAVE YOU EVER SEEN THIS DOCUMENT BEFORE?

22     A.   NO, I HAVE NOT.

23     Q.   IN ANY OF THE OPINIONS YOU EXPRESSED ABOUT COPYING OR THE

24     SIMILARITY, DID YOU HAVE THE ADVANTAGE OF HAVING SEEN ACTUAL

25     RESEARCH AND DEVELOPMENT DOCUMENTS FROM SAMSUNG?
```

```
 1        A.    NO, I HAVE NOT.

 2              MR. MCELHINNY:  NOTHING FURTHER, YOUR HONOR.

 3              THE COURT:  ALL RIGHT.  TIME IS NOW 11:02.

 4         GO AHEAD, PLEASE, WITH ANY RECROSS.

 5              MR. PRICE:  NO QUESTIONS, YOUR HONOR.

 6              THE COURT:  ALL RIGHT.  THEN MAY THIS WITNESS BE

 7    EXCUSED, AND IS IT SUBJECT TO RECALL OR NOT?  MR. PRICE, DO YOU

 8    WANT HIM SUBJECT TO RECALL?

 9              MR. PRICE:  ACTUALLY, YOUR HONOR, HE IS ON OUR LIST

10    AND WE WOULD LIKE HIM SUBJECT TO RECALL.

11              THE COURT:  ALL RIGHT.  YOU ARE EXCUSED, BUT IT IS

12    SUBJECT TO RECALL.

13         ALL RIGHT.  PLEASE CALL YOUR NEXT WITNESS.

14              MR. MCELHINNY:  WE'RE MAKING A TRANSITION.  IF YOU

15    CAN GIVE US JUST A SECOND, YOUR HONOR?

16              THE COURT:  YES.  I'M NOT COUNTING YOUR TIME.

17              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

18              THE COURT:  LET ME RETURN THIS PX 121.

19              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

20         (PAUSE IN PROCEEDINGS.)

21              THE COURT:  ALL RIGHT.  ARE YOU READY?

22              MR. MCELHINNY:  YES, YOUR HONOR.

23              THE COURT:  PLEASE BRING YOUR NEXT WITNESS UP,

24    PLEASE.

25              MR. MCELHINNY:  AT THIS TIME APPLE CALLS
```

1    MR. GREG CHRISTIE.

2            THE CLERK:  WOULD YOU STEP UP HERE, PLEASE.

3            THE WITNESS:  HERE?

4            THE CLERK:  YEAH, THAT'S FINE.

5        **(GREGORY NICHOLAS CHRISTIE, PLAINTIFF'S WITNESS, SWORN.)**

6            THE WITNESS:  I DO.

7            THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

8        PULL THE MICROPHONE TOWARDS YOU AND STATE YOUR NAME AND

9    SPELL IT, PLEASE.

10           THE WITNESS:  MY NAME IS GREGORY NICHOLAS CHRISTIE,

11   G-R-E-G-O-R-Y, N-I-C-H-O-L-A-S, C-H-R-I-S-T-I-E.

12           THE COURT:  ALL RIGHT.  TIME IS NOW 11:05.  GO AHEAD,

13   PLEASE.

14           MR. MCELHINNY:  THANK YOU.

15                       **DIRECT EXAMINATION**

16   BY MR. MCELHINNY:

17   Q.   GOOD MORNING, MR. CHRISTIE.

18   A.   GOOD MORNING.

19   Q.   CAN YOU TELL THE JURY, PLEASE, WHAT YOUR CURRENT JOB TITLE

20   IS.

21   A.   I'M A VICE-PRESIDENT AT APPLE.

22   Q.   AND ARE YOU CONNECTED WITH A PARTICULAR DIVISION AT APPLE?

23   A.   YES.  I'M ON THE HUMAN INTERFACE TEAM.

24   Q.   HUMAN INTERFACE TEAM?

25   A.   YES, HUMAN INTERFACE.

```
 1    Q.   APPROXIMATELY HOW LONG HAS APPLE HAD SOMETHING THAT IT
 2    CALLS THE HUMAN INTERFACE TEAM?
 3    A.   AS LONG AS I CAN REMEMBER.
 4    Q.   OKAY.  AND WHAT DOES THAT MEAN?  WHAT IS THE HUMAN
 5    INTERFACE TEAM?
 6    A.   HUMAN INTERFACE REFERS TO THE LAYER OF SOFTWARE THAT A
 7    CUSTOMER OR USER INTERACTS WITH.  IT'S EVERYTHING YOU SEE ON
 8    THE SCREEN.  IT'S EVERYTHING THAT THEY -- EVERYTHING THAT THEY
 9    TOUCH IN THE CASE OF A TOUCHSCREEN, OR EVERYTHING THEY CLICK ON
10    WITH A MOUSE.
11         IT'S ALSO DESCRIBED AS LOOK AND FEEL.  IT'S THE WAY
12    SOFTWARE LOOKS, THE GRAPHIC DESIGN OF IT, AS WELL AS HOW IT
13    INTERACTS, WHAT HAPPENS WHEN YOU DO THINGS.  THAT'S WHAT HUMAN
14    INTERFACE IS.
15         I'M SORRY.  AM I TOO FAR FROM THE MIKE?
16    Q.   MR. CHRISTIE, HOW LONG HAVE YOU PERSONALLY BEEN EMPLOYED
17    AT APPLE?
18    A.   MORE THAN 18 YEARS.
19    Q.   AND AS OF THE BEGINNING OF THIS YEAR, WHO WAS YOUR
20    IMMEDIATE SUPERVISOR?  TO WHOM DID YOU REPORT?
21    A.   CRAIG FEDERIGHI.
22    Q.   AGAIN, AS OF THE BEGINNING OF THIS YEAR, APPROXIMATELY HOW
23    MANY PEOPLE REPORTED TO YOU AT APPLE?
24    A.   IT WAS IN THE LOW 30S.
25    Q.   DURING ANY OF THE TIME THAT YOU'VE BEEN AT APPLE, HAS YOUR
```

```
 1        WORK INVOLVED WRITING SOFTWARE?

 2        A.   YES.  WHEN I FIRST HIRED INTO APPLE, I WROTE SOFTWARE.

 3        Q.   AND WAS THERE A TIME WHEN YOU EVENTUALLY MOVED OUT OF

 4        ACTUALLY WRITING SOFTWARE?

 5        A.   YES.  I WAS ALWAYS DOING SOME DESIGN IN ADDITION TO

 6        ACTUALLY WRITING CODE.  EVENTUALLY I MOVED MORE TO THE DESIGN

 7        SIDE AND MANAGING THE DESIGN TEAM.

 8        Q.   HELP US WITH THAT.  WHAT IS THE DIFFERENCE BETWEEN

 9        DESIGNING CODE AND WRITING CODE?

10        A.   WELL, WE DON'T REALLY DESIGN THE CODE.  WE'LL DO A VISUAL

11        DESIGN, A DESIGN OF THE WAY SOFTWARE SHOULD LOOK.  WE MIGHT DO

12        A DESCRIPTION OR A DEMONSTRATION, A MODEL OF HOW IT MIGHT WORK,

13        BUT IT'S NOT THE ACTUAL CODE THAT SHIPS IN THE PRODUCT.

14        Q.   SIR, HOW DID YOU PERSONALLY ACQUIRE YOUR SOFTWARE SKILLS?

15        A.   PRIMARILY SELF-TAUGHT.

16        Q.   WHAT DOES THAT MEAN, SELF-TAUGHT, SIR?  HOW DO YOU TEACH

17        YOURSELF HOW TO USE -- TO WRITE SOFTWARE?

18        A.   WELL, YOU LEARN BY DOING, AND THAT'S WHAT I DID FROM A

19        VERY EARLY AGE ON.

20        Q.   WHAT DO YOU MEAN BY "A VERY EARLY AGE," SIR?

21        A.   AROUND EIGHT YEARS OLD, I STARTED PLAYING WITH COMPUTERS.

22        Q.   TELL US ABOUT THAT.

23        A.   I'M SURE A LOT OF EIGHT YEAR OLDS PLAY WITH COMPUTERS

24        TODAY.  WHEN I WAS EIGHT, IT WAS 1973 AND IT WAS A DIFFERENT

25        ERA.
```

```
 1              I WAS -- I WAS LUCKY ENOUGH TO HAVE ACCESS TO A MAINFRAME

 2      SYSTEM WHEN I WAS VERY YOUNG.  MY FATHER WOULD ADMINISTER

 3      POST-GRADUATE PROGRAMS AT VARIOUS COLLEGE CAMPUSES THROUGHOUT

 4      THE U.S.  ONE OF THEM WAS AT DARTMOUTH.  DARTMOUTH IS WHERE

 5      BASIC COMPUTER PROGRAMMING LANGUAGE WAS INVENTED, AND THEY HAD

 6      PUBLIC TERMINAL ROOMS WHERE ANYONE FROM THE, YOU KNOW, THE

 7      COMMUNITY COULD COME IN AND USE THE COMPUTER.

 8           YOU WEREN'T IN THE ROOM WITH THE COMPUTER.  IT'S NOT LIKE

 9      TODAY WHERE YOU HAVE A COMPUTER IN YOUR POCKET OR ON YOUR DESK.

10      THIS WAS JUST A TERMINAL, A TELETYPE, A TYPEWRITER THAT WAS

11      ATTACHED TO THE COMPUTER THAT WAS IN ANOTHER ROOM.

12           SO IN THE SUMMER WHEN I WAS EIGHT AND SUBSEQUENT YEARS,

13      WHEN IT WAS RAINING OR IF I WAS JUST BORED, I WOULD GO TO THE

14      COMPUTER CENTER AND I WOULD GET A TEMPORARY LOG-IN OR PASSWORD

15      AND, YOU KNOW, WORK ON A COMPUTER TERMINAL THAT WAS THERE.

16           AND THERE WERE A COUPLE OTHER KIDS, BUT, YOU KNOW, IT WAS

17      MOSTLY COLLEGE STUDENTS DOING THEIR COURSE WORK AND WHATNOT.

18           BUT, YOU KNOW, THEY HAD LITTLE GAMES, BACKGAMMON, HANGMAN,

19      THERE WAS A SIMULATION OF THE 1975 WORLD SERIES AVAILABLE.

20           AND THERE WAS A TUTORIAL ON HOW TO PROGRAM AND THAT'S WHEN

21      I STARTED.

22      Q.   WHAT YEARS ARE WE TALKING ABOUT?

23      A.   STARTING THE SUMMER OF '73 CONTINUING ON EVERY YEAR SINCE

24      THEN FOR A FEW YEARS.

25      Q.   WHAT IS IT -- WHAT DO YOU MEAN BY A LARGE -- BY A
```

DIRECT CHRISTIE

1    MAINFRAME COMPUTER?

2    A.    A MAINFRAME COMPUTER IS, YOU KNOW, WHAT YOU MIGHT SEE IN A

3    '50S OR '60S MOVIE THAT FEATURES A COMPUTER.  IT'S A MACHINE

4    THAT WOULD OCCUPY AN ENTIRE ROOM AND IT WAS CLIMATE CONTROLLED,

5    IT WAS USUALLY ON AN ELEVATED FLOOR SO THAT PEOPLE COULD

6    SERVICE UNDERNEATH IT, LARGE TAPE DRIVES, YOU KNOW.

7         IT'S A, YOU KNOW, SORT OF WHAT WE WENT TO THE MOON WITH,

8    RIGHT, YOU KNOW, THOSE NASA COMPUTERS.  THAT'S WHAT A MAINFRAME

9    LOOKED LIKE.  IT WAS A BEAST.

10   Q.    HOW DID YOU MOVE FROM PLAYING HANGMAN TO TEACHING YOURSELF

11   HOW TO WRITE SOFTWARE?

12   A.    YOU KNOW, I HATE TO -- I CAN'T REMEMBER THE EXACT FIRST

13   MOMENT IT HAPPENED, BUT I WAS -- YOU KNOW, YOU COULD TYPE A

14   COMMAND LIST AND SEE WHAT WAS AVAILABLE TO DO ON THE COMPUTER,

15   AND ONE OF THE CHOICES WAS, YOU KNOW, LEARN.

16        SO I DID THAT AND, YOU KNOW, IT WAS A TUTORIAL COURSE ON

17   THE BASIC PROGRAMMING LANGUAGE.  AND, YOU KNOW, THAT INTRIGUED

18   ME.  I WAS A CURIOUS -- I WAS A CURIOUS KID.

19   Q.    DID THERE COME A TIME WHEN YOU ACTUALLY OWNED YOUR FIRST

20   PERSONAL COMPUTER?

21   A.    YES.

22   Q.    OKAY.

23   A.    I DIDN'T OWN A PERSONAL COMPUTER OF MY OWN UNTIL I WAS A

24   SOPHOMORE IN COLLEGE.  I -- I WAS TAKING A LOT OF COURSES THAT

25   REQUIRED A LOT OF PAPERS TO BE WRITTEN.  I WAS TIRED OF WAITING

1    IN LINE FOR THE USE OF ONE OF THE COLLEGE'S COMPUTERS IN ONE OF

2    THE COMPUTER CENTERS JUST TO TYPE MY PAPERS, SO I FELT LIKE I

3    NEEDED A COMPUTER TO FINISH MY WORK.

4        SO I ENDED UP PUTTING ONE TOGETHER MYSELF FROM PARTS THAT

5    I BOUGHT FROM VARIOUS COMPANIES.  AND I BOUGHT THE CASE FROM

6    ONE COMPANY AND THE MAIN BOARD FROM ANOTHER AND THE DISK DRIVES

7    AND THE CHIPS, I PLUGGED THE CHIPS IN MYSELF, YOU KNOW.  I GOT

8    IT WORKING.

9    Q.   I DID THAT, TOO.

10        HOW DID YOU COME TO KNOW APPLE'S PRODUCTS?

11   A.   THE FIRST TIME I HAD EVER HEARD OF APPLE, I THINK I WAS IN

12   JUNIOR HIGH.  SOME FRIENDS OF MINE, THEIR FAMILIES OR THEIR

13   PARENTS HAD PURCHASED AN APPLE, APPLE II COMPUTERS OR IIE OR

14   II+, WHATEVER THE CURRENT MODEL AT THAT TIME WAS.

15        AND IT WAS KIND OF FUNNY.  THEY WOULD TALK ABOUT IN SCHOOL

16   ABOUT HAVING A COMPUTER OR WORKING WITH A COMPUTER, AND FOR ME,

17   YOU KNOW, BEING A, YOU KNOW, AN EXPERIENCED 13 YEAR OLD, YOU

18   KNOW, COMPUTERS WERE OLD HAT.

19        AND, YOU KNOW, IT WASN'T A MAINFRAME, SO I WASN'T

20   PARTICULARLY IMPRESSED.

21        BUT, YOU KNOW, I GUESS I UNDERESTIMATED THE POWER OF THE

22   PERSONAL COMPUTER.

23   Q.   DID YOU EVENTUALLY ACQUIRE APPLE PRODUCTS?

24   A.   YEAH.  I GOT MY FIRST MAC IN 1991.  IT WAS A MACINTOSH

25   POWER BOOK, 140.  IT WAS ONE OF THE -- IT WAS THE MIDDLE MODEL

DIRECT CHRISTIE

 1     OF THAT FIRST SET OF POWER BOOKS, LAPTOP COMPUTERS BACK THEN.

 2     Q.   AND THEN WHAT WAS YOUR PROGRESSION?  WHAT WAS YOUR NEXT

 3     EXPERIENCE WITH AN APPLE PRODUCT?

 4     A.   I WAS -- I WAS INTO THE IDEA OF HAVING A MAC FOR A WHILE,

 5     AND IT WASN'T UNTIL I COULD ACTUALLY AFFORD ONE THAT I BOUGHT

 6     ONE.

 7          AND I WAS -- I WAS PRETTY IN TOUCH WITH WHAT APPLE WAS

 8     DOING.  I FOUND THEIR, THEIR COMPUTING EXPERIENCE SUPERIOR TO

 9     WINDOWS AT THE TIME AND, YOU KNOW, I WAS -- I WAS A PRETTY

10     QUICK CONVERT FROM THAT POINT ON.

11          AND IN MAY OF 1992, THEY ANNOUNCED AN INITIATIVE CALLED

12     NEWTON, OR NEWTON TECHNOLOGY, AND THEY DID THIS ANNOUNCEMENT

13     AND THEY DID A DEMONSTRATION AND I READ ABOUT IT IN THE PAPER

14     AT THE TIME AND IT WAS JUST -- IT JUST REALLY EXCITED ME.  IT

15     EXCITED ME FOR THE FUTURE OF WHAT COMPUTING COULD BE LIKE.

16     Q.   TELL US ABOUT WHAT THE NEWTON WAS, SIR.  REMIND US.

17     A.   NEWTON WAS, WAS AN EARLY ATTEMPT AT A, KIND OF AN

18     EXTREMELY AFFORDABLE, EXTREMELY INTIMATE COMPUTING EXPERIENCE

19     THAT DIDN'T HAVE A KEYBOARD AND DIDN'T HAVE A MOUSE.

20          IT WAS -- THE FIRST PRODUCT WAS CALLED MESSAGE PAD.  IT

21     WAS -- IT WAS MEANT TO BE POCKETABLE, WHICH IT WAS IF YOU HAD A

22     LARGE POCKET OR A COAT, AND IT USED A STYLUS FOR INPUT, AND IT

23     HAD SOFTWARE TO RECOGNIZE HANDWRITING.

24          AND THERE WAS -- THERE WAS NO DESKTOP, YOU KNOW, IN THE

25     WAY THERE IS ON YOUR MAC OR YOUR WINDOWS P.C. TODAY.  THERE WAS

1      NO FOLDERS, YOU KNOW, ICONS OF FOLDERS ON THE SCREEN.  THERE

2      WERE NO DOCUMENTS.

3            IT WAS JUST, YOU KNOW, IF YOU WANTED TO LOOK AT YOUR

4      ADDRESS BOOK, YOU OPENED THE ADDRESS BOOK APP AND THERE WAS NO

5      FILES, THERE WAS NO SAVING.

6            IT WAS JUST -- IT HAD THIS FEATURE CALLED THE INTELLIGENT

7      ASSISTANT WHICH COULD -- YOU KNOW, YOU COULD WRITE "LUNCH WITH

8      BOB" AND HIGHLIGHT IT AND TAP THE ASSIST BUTTON AND IT WOULD

9      SCHEDULE AN APPOINTMENT IN THE CALENDAR.

10           THERE WAS LOTS OF NEAT STUFF IN THERE, AND IT WAS JUST --

11     IT SEEMED TO BE A DEVICE, MORE THAN A COMPUTER, A COMPANION

12     MORE THAN A COMPUTER.

13           YOU KNOW, I ALREADY MENTIONED THERE WAS NO KEYBOARD AND NO

14     MOUSE.  IT WAS WITH YOU.

15           AND FOR WHATEVER REASON, THIS IDEA RESONATED WITH ME.  IT

16     REALLY JUST -- IT KIND OF TOOK HOLD OF ME, THIS IDEA THAT, YOU

17     KNOW, YOU COULD HAVE THIS KIND OF CAPABILITY WITH YOU AT ANY

18     TIME WITHOUT HAVING TO BE PLUGGED IN OR WITH JUST LIMITED

19     BATTERY LIFE.

20     Q.   DID YOU EVENTUALLY ACQUIRE A NEWTON?

21     A.   I DID.

22     Q.   HOW DID THAT HAPPEN?

23     A.   SO IT WAS A -- THE PROJECT WAS PUBLICLY ANNOUNCED IN MAY

24     OF 1992 --

25              MR. PRICE:  YOUR HONOR, AT THIS POINT I'M GOING TO

DIRECT CHRISTIE

```
1    OBJECT TO THE RELEVANCE.

2              THE COURT:  OVERRULED.

3    BY MR. MCELHINNY:

4    Q.  HOW DID YOU ACQUIRE YOUR NEWTON, SIR?

5    A.  IN AUGUST OF 1993, THE FIRST NEWTON PRODUCT, THE APPLE

6    MESSAGE PAD, WAS AVAILABLE FOR SALE AT BOSTON MACWORLD.  I WAS

7    LIVING IN LITCHFIELD, CONNECTICUT, L-I-T-C-H-F-I-E-L-D,

8    CONNECTICUT AND SO I WAS ABOUT TWO, TWO AND A HALF HOURS AWAY

9    FROM BOSTON.

10             AND THIS FIRST MESSAGE PAD, THIS FIRST NEWTON WAS FOR SALE

11   AND I WENT WITH SOME PEOPLE I KNEW TO MACWORLD BOSTON AND I

12   BROUGHT MY CHECKBOOK WITH ME AND I SPENT THE LAST $700 WE HAD

13   ON ONE OF THE FIRST ONES.

14   Q.  WHO'S THE "WE" IN THE "WE HAD"?

15   A.  MY WIFE AND I.

16   Q.  AT THE TIME YOU BOUGHT YOUR NEWTON, DID YOU BUY ANYTHING

17   ELSE AT THE TIME?

18   A.  YES.  I ALSO BORROWED AN ADDITIONAL 700 BUCKS OR SO FROM

19   THE PERSON WITH ME SO I COULD BUY THE SOFTWARE DEVELOPMENT KIT,

20   THE -- IT WAS CALLED THE, THE NEWTON TOOL KIT SO THAT I COULD

21   LEARN HOW TO PROGRAM FOR THE NEWTON DEVICE.

22             SO IT WAS -- IT WAS AN EXPENSIVE DAY FOR ME.

23   Q.  YOU SPENT $750 AND YOU BORROWED $750?

24   A.  ABOUT THAT MUCH, YEAH.

25   Q.  ARE YOU STILL MARRIED TO THE SAME WOMAN?
```

1     A.    YES.

2     Q.    HOW DID YOU COME TO WORK AT APPLE?

3     A.    I BEGAN TO LEARN TO PROGRAM THE NEWTON.  AT THAT TIME

4     THERE WAS NO, THERE WAS NO REALLY PUBLICLY ACCESSIBLE INTERNET.

5     THERE WAS SOME OTHER ON-LINE COMMUNITIES.  THERE WAS SOMETHING

6     CALLED COMPUSERVE.  I DON'T THINK AOL WAS AROUND EVEN YET.

7          BUT THIS COMPUSERVE WAS A LOT LIKE THE INTERNET IS TODAY,

8     ONLY IT WAS MUCH SMALLER IN SCOPE, AND THERE WERE FORUMS, OR

9     AREAS WHERE YOU WOULD, YOU KNOW, MEET OTHER PEOPLE, EXCHANGE

10    E-MAIL WITH ABOUT SIMILAR INTERESTS.

11         THERE WERE ALL SORTS OF INTERESTS, AND THERE WAS ONE OF

12    THESE FORUMS, THESE AREAS, FOR NEWTON DEVELOPMENT.  AND SO

13    THERE WAS A SMALL COMMUNITY, A SMALL DEVELOPER COMMUNITY.

14         I PUT SOME EARLY SMALL APPS AVAILABLE FOR DOWNLOAD ON

15    COMPUSERVE.  THAT WORK CAME TO THE ATTENTION OF THE LEADERS OF

16    THE NEWTON TEAM AND I HAD AN OPPORTUNITY TO MEET THEM, HAVE

17    LUNCH WITH.

18         IN MARCH OF '95, I STARTED CONTRACTING WITH APPLE ON THE

19    NEWTON TEAM TESTING SOFTWARE FOR THE NEXT VERSION OF THE NEWTON

20    THAT WAS SCHEDULED TO COME OUT.

21         THAT SUMMER I RECEIVED A SECOND CONTRACT TO ACTUALLY WORK

22    ON THE SOFTWARE SHIPPING IN THAT VERSION OF THE NEWTON

23    OPERATING SYSTEM.

24         BY DECEMBER OF THAT YEAR, I RECEIVED AN OFFER TO WORK FOR

25    APPLE FULL TIME, AND IN EARLY JANUARY MY WIFE AND I MOVED TO

1    CALIFORNIA AND I STARTED WORKING FOR APPLE.  SO JANUARY '96.

2    Q.   AND WHAT WAS YOUR FIRST JOB WHEN YOU WERE WORKING AT

3    APPLE?

4    A.   I THINK THE TITLE WAS SENIOR ENGINEER SCIENTIST II.  I WAS

5    WRITING CODE FOR THE NEWTON.  I WAS FIXING BUGS AND WRITING NEW

6    APPS FOR THE NEXT VERSION OF THE NEWTON THAT WAS COMING OUT.

7    Q.   WERE YOU AT APPLE WHEN THE IPHONE WAS DEVELOPED?

8    A.   I WAS.

9    Q.   AND WERE YOU PERSONALLY INVOLVED IN THE IPHONE DEVELOPMENT

10   PROJECT?

11   A.   YES.

12   Q.   WHAT WERE YOU DOING JUST BEFORE YOU GOT ON TO THE IPHONE

13   PROJECT?

14   A.   I WAS MANAGING THE HUMAN INTERFACE TEAM THAT WAS

15   RESPONSIBLE FOR THE DESIGN OF MAC OS 10, WHICH IS OUR DESKTOP

16   OPERATING SYSTEM.

17   Q.   HOW DID YOU FIRST GET INVOLVED IN THE IPHONE PROJECT?

18   A.   ONE DAY I WAS SITTING IN MY OFFICE --

19   Q.   MINDING YOUR OWN BUSINESS?

20   A.   MINDING MY OWN BUSINESS.

21   Q.   SORRY.

22   A.   TRYING TO LOOK BUSY AND SCOTT FORSTALL, WHO WAS MY MANAGER

23   AT THE TIME, CAME INTO MY OFFICE, HE SHUT THE DOOR BEHIND HIM,

24   AND HE ASKED ME, "HOW WOULD YOU LIKE TO DO A PHONE?"

25   Q.   DID HE SAY ANYTHING MORE ABOUT WHAT PHONE, KIND OF PHONE

1    HE HAD IN MIND?

2    A.    WELL, I SAID, "SURE, YOU BET," AND THEN HE STARTED TO

3    DISCUSS IT A BIT FURTHER.  IT WAS DESCRIBED TO ME AS A, A

4    SMALL, TOUCH-BASED PHONE.

5         IT WAS PRETTY GENERAL DESCRIPTION AT THAT TIME, BUT THE

6    IDEA WAS THAT IT WOULD BE TOUCH-BASED, IT WOULD BE A LARGE

7    SCREEN FOR A PHONE, BUT A VERY SMALL SCREEN COMPARED TO, YOU

8    KNOW, A DESKTOP COMPUTER, AND THAT MY TEAM SHOULD START WORKING

9    ON DESIGNS FOR IT IF WE WANTED TO WORK ON IT.

10   Q.    DID YOU OWN A CELL PHONE AT THE TIME?

11   A.    I DID.

12   Q.    TO YOUR KNOWLEDGE, WERE THERE ANY OTHER CELL PHONES

13   AVAILABLE AT THAT TIME THAT WERE TOUCHSCREEN ONLY WITHOUT A

14   PHYSICAL KEYBOARD?

15   A.    NOT TO MY KNOWLEDGE.  THERE WERE PHONES THAT HAD STYLUSES

16   AND, YOU KNOW, COULD TAKE LIMITED INPUT FROM A STYLUS,

17   SOMETIMES COMBINED WITH A PHYSICAL KEYBOARD.

18        BUT I DON'T RECALL A TOUCH-BASED -- AND WHEN I SAY TOUCH,

19   I MEAN THAT IT RESPONDED TO INPUT JUST FROM THE HUMAN FINGERS,

20   FROM HUMAN TOUCH, AND POTENTIALLY MORE THAN ONE AT A TIME AND

21   RATHER THAN HAVING TO USE A STYLUS OR SOME SPECIAL, YOU KNOW,

22   KIND OF PEN-LIKE THING TO INPUT ON TO THE SURFACE.

23   Q.    WHAT HAPPENED NEXT AFTER YOU AGREED TO BE ON THIS PROJECT?

24   WHAT -- HOW DID THE PROJECT DEVELOP?

25   A.    WE BEGAN REVIEWING THE WORK WITH FORSTALL, OTHER MEMBERS

1    OF THE SOFTWARE LEADERSHIP AT THE TIME, AND WITH STEVE ON A

2    REGULAR BASIS, SMALL DESIGNS, KIND OF BRAINSTORM IDEAS, TALK

3    ABOUT IDEAS, PUT TOGETHER A DESIGN DEMONSTRATION FOR THOSE

4    IDEAS, REVIEW THEM WITH, YOU KNOW, SCOTT AND STEVE AND THE REST

5    OF THE, THE REST OF THE TEAM.

6        AND THAT WENT ON FOR A FEW MONTHS LIKE THAT.

7    Q.  WHEN YOU MADE THESE PRESENTATIONS TO MR. JOBS, WHERE DID

8    THAT HAPPEN?  UNDER WHAT KIND OF CIRCUMSTANCES?

9    A.  THERE'S A ROOM ON THE SECOND FLOOR IN THE BUILDING I WORK

10   IN THAT WAS RESERVED AT THE TIME FOR A MEETING WITH STEVE.  IT

11   WAS, IT WAS A SMALL ROOM.  IT HAD SPECIAL SECURITY.  IT HAD A

12   PIN LOCK.  YOU HAD TO ENTER IN A NUMERICAL CODE TO BE ABLE TO

13   OPEN THE DOOR.  THERE ARE NO WINDOWS.

14       AND THAT'S WHERE MY TEAM HAD BEEN THE PREVIOUS FEW YEARS

15   REVIEWING DESIGNS FOR MAC OS 10, THE DESKTOP OPERATING SYSTEM.

16       SO IT WAS JUST KIND OF THIS, THIS DARK, DIRTY LITTLE ROOM

17   THAT WE USED TO WORK AND REVIEW IN.

18   Q.  YOU SAY THAT'S HOW IT WENT FOR A COUPLE OF MONTHS.  WHAT

19   OCCURRED AT THE AFTER A COUPLE OF MONTHS PERIOD?

20   A.  SO WE WOULD HAVE OUR REGULARLY SCHEDULED MEETINGS EVERY

21   TWO WEEKS OR EVERY THREE OR EVERY ONE, YOU KNOW, DEPENDING ON

22   OTHER THINGS THAT WERE GOING ON, AND IT WAS MOSTLY MAC OS 10

23   REVIEWS, AND THEN AT THE END OF THE MEETING WE WOULD, YOU KNOW,

24   SHOW WHERE WE WERE WITH THE PHONE PROJECT, YOU KNOW?

25       AND SO WE WOULD SHOW A SINGLE FEATURE DEMO, THIS IS WHAT

```
 1        THE KEYPAD FOR DIALING A PHONE NUMBER MIGHT BE LIKE HERE OR

 2    THIS MIGHT -- OR WHAT THE ADDRESS BOOK LIST COULD LOOK LIKE.

 3        WE WERE TRYING A LOT OF DIFFERENT THINGS AT THAT TIME AND

 4    IT WAS -- THE WORK WAS A LITTLE SPREAD OUT.  WE WERE EXPLORING

 5    MULTIPLE IDEAS AT THE SAME TIME, AND THAT WAS FINE EARLY ON.

 6        AFTER THE HOLIDAYS AND AFTER MACWORLD JANUARY OF THAT

 7    YEAR, OF THE NEXT YEAR, SO '95 -- OR 2005, EXCUSE ME, STEVE GOT

 8    PRETTY FRUSTRATED WITH WHAT HE PERCEIVED AS A LACK OF PROGRESS

 9    ON THE WORK.

10    Q.   HOW DID YOU BECOME AWARE THAT MR. JOBS WAS FRUSTRATED BY

11    THE LACK OF PROGRESS?

12    A.   HE TOLD US THAT HE WAS FRUSTRATED WITH THE LACK OF

13    PROGRESS.

14        (LAUGHTER.)

15    BY MR. MCELHINNY:

16    Q.   DID HE MAKE HIMSELF CLEAR?

17    A.   HE MADE HIMSELF PRETTY CLEAR.  I THINK HE MADE HIMSELF

18    MORE CLEAR TO SCOTT FORSTALL AFTER THIS PARTICULAR MEETING IN

19    EARLY FEBRUARY BECAUSE SCOTT CAME INTO MY OFFICE EITHER LATER

20    THAT AFTERNOON OR THE NEXT DAY, I DON'T REMEMBER WHICH, AND

21    SCOTT LET ME KNOW THAT STEVE HAD PRETTY MUCH HAD IT.  HE WAS

22    TIRED OF THE LACK OF PROGRESS, AND HE WANTED TO SEE --

23        MR. PRICE:  I'M GOING TO OBJECT AT THIS POINT BECAUSE

24    IT SOUNDS LIKE HEARSAY, SCOTT TELLING HIM WHAT STEVE SAID.

25        MR. MCELHINNY:  THIS IS WHAT -- IT'S NOT ADMITTED FOR
```

1    THE TRUTH OF IT.  THIS IS THE BACKGROUND.  THIS IS THE HISTORY.

2    THESE ARE THE FOUNDATIONAL FACTS TO THE INVENTIONS THAT WE'RE

3    ABOUT TO TALK ABOUT.

4            THE COURT:  ALL RIGHT.  OVERRULED.

5    BY MR. MCELHINNY:

6    Q.  DO YOU KNOW WHERE YOU WERE, I'M SORRY, BEFORE YOU WERE

7    INTERRUPTED?

8    A.  YES.  HE HAD HAD IT.  WE HAD UNTIL THE NEXT MEETING, WHICH

9    WAS TWO WEEKS AFTER THAT, TO PUT TOGETHER AN END TO END STORY,

10   A FULL DEMO THAT SHOWED, YOU KNOW, SOME OF THE DISCONNECTED

11   EXPERIENCES THAT WE HAD BEEN WORKING ON, WE HAD TO STITCH THEM

12   TOGETHER, WE HAD TO PRESENT A WHOLE STORY.

13           OTHERWISE THE PROJECT WOULD BE MOVED TO A DIFFERENT TEAM.

14   Q.  HOW DID YOU FEEL ABOUT THAT?

15   A.  I FELT A LITTLE BIT ANGRY.  I FELT LIKE WE WERE GOOD WORK

16   ON THE EXPLORATION.  I FELT LIKE, YOU KNOW, WE WERE MAKING

17   PROGRESS.

18           APPARENTLY WE WEREN'T COMMUNICATING THAT PROGRESS, SO I

19   TOOK THAT FEEDBACK.  I FELT, YOU KNOW, VERY COMPETITIVE.  I

20   DIDN'T WANT TO LOSE THIS PROJECT TO ANOTHER TEAM.  AND, YOU

21   KNOW, I FELT -- I FELT LIKE I REALLY WANTED TO, YOU KNOW, DO A

22   GOOD JOB ON THIS.  I WANTED TO GET THE TEAM IN THE RIGHT

23   DIRECTION, AND I WANTED US TO, YOU KNOW, DELIVER WHAT WAS BEING

24   ASKED FOR.

25   Q.  WHAT HAPPENED OVER THE NEXT TWO WEEKS?

1    A.   I GATHERED THE TEAM TOGETHER ALMOST IMMEDIATELY AFTER

2    TALKING WITH SCOTT, AND THERE WAS JUST A FEW OF US, ABOUT A

3    HALF DOZEN OR SO OF US, AND, YOU KNOW, RELAYED THE MESSAGE I

4    HAD RECEIVED AND TOLD THE TEAM I REALLY WANTED TO DO THIS

5    PROJECT, AND I KNOW THAT THEY FELT THE SAME WAY.

6         AND SO WE GOT TO WORK.  AND, YOU KNOW, PRETTY MUCH NOTHING

7    ELSE MATTERED FOR THE NEXT FEW WEEKS, NEXT TWO WEEKS.  GETTING

8    THIS, GETTING THIS TOGETHER, INDIVIDUAL DESIGNERS WERE GIVEN

9    VARIOUS PARTS TO WORK ON, ANOTHER MEMBER OF THE TEAM WAS IN

10   CHARGE OF STITCHING IT ALL TOGETHER AND MAKING IT ALL WORK.

11        AND EVERYBODY GOT BUSY AND WE GOT THE JOB DONE.

12   Q.   WHAT KIND OF HOURS WERE YOU WORKING DURING THIS TWO WEEK

13   PERIOD?

14   A.   CONTINUOUS.

15   Q.   DID YOU GIVE A DEMONSTRATION AT THE END OF THE TWO WEEKS

16   TO MR. JOBS?

17   A.   WE DID.

18   Q.   CAN YOU, TO THE BEST YOU CAN, CAN YOU SET THE PHYSICAL

19   SITUATION?  WHAT WAS IT THAT MR. JOBS WAS ACTUALLY LOOKING AT

20   WHEN HE SAW THE DEMONSTRATION?

21   A.   THE WAY THE DEMONSTRATION WAS SET UP, IT WAS IN A COUPLE

22   OF PIECES.  THERE WAS A, A LARGE TOWER MAC THAT WAS ACTUALLY

23   RUNNING THE DEMONSTRATION.  THIS WAS ATTACHED TO A DISPLAY SO

24   THAT ANYBODY IN THE ROOM COULD SEE WHAT WAS GOING ON.

25        AND ATTACHED TO THAT MAC ALSO WAS A DEVICE THAT WE CALLED

1    THE WALLABY.  IT WAS A SMALL PROTOTYPE, IT WAS PLASTIC, IT WAS

2    ABOUT THE SIZE AND SHAPE OF AN IPHONE, BUT IT HAD A CABLE, A

3    FAT CABLE THAT RAN BACK TO THE MACINTOSH.

4         AND THAT WALLABY HAD A DISPLAY AND IT HAD A PROTOTYPE OF

5    THE TOUCH INPUT SURFACE.

6         SO WE WOULD CREATE THESE DEMOS THAT WERE ACTUALLY RUNNING

7    ON THE MAC, BUT WOULD APPEAR, YOU KNOW, ON THE WALLABY.

8         SO YOU COULD HOLD IT IN YOUR HAND AND YOU COULD EVALUATE

9    WHAT IT LOOKED LIKE AND WHAT THE EXPERIENCE WAS LIKE EVEN

10   THOUGH IT WASN'T ACTUALLY RUNNING IN YOUR HAND.  IT WAS -- THE

11   PICTURE WAS DRAWN.

12        AND THEN AS I MENTIONED, THERE WAS THAT SECOND DISPLAY SO

13   THAT OTHERS IN THE ROOM COULD SEE WHAT WAS GOING ON AND TALK

14   ABOUT IT.

15   Q.   DID MR. JOBS COMMUNICATE TO YOU IN ANY WAY WHAT HIS

16   REACTION TO THIS DEMONSTRATION WAS?

17   A.   HE WAS -- HE WAS VERY EXCITED.  THIS WAS CLEARLY WHAT HE

18   HAD BEEN LOOKING FOR AND WHAT HE HAD BEEN ASKING FOR, AND --

19   AND HE GOT WHAT HE ASKED FOR.  HE THOUGHT -- HE THOUGHT IT WAS

20   GREAT WORK.

21   Q.   WHAT HAPPENED NEXT?

22   A.   WELL, WE ALL KIND OF EXHALED AND WE WENT THROUGH THE DEMO

23   AN ADDITIONAL TIME FOR STEVE.

24        SOMETIME IN THE NEXT DAY OR SO I RECEIVED A PHONE CALL.

25   STEVE WANTED TO SEE THE DEMO AGAIN.  SO I GATHERED TOGETHER A

1    FEW MEMBERS OF THE TEAM, WE WENT BACK TO THE ROOM, AND WE HAD

2    EVERYTHING ALL SET UP.

3         STEVE CAME BACK WITH BILL CAMPBELL, A MEMBER OF THE BOARD

4    OF DIRECTORS AT THE TIME, AND STEVE ASKED US TO GO THROUGH THE

5    DEMO WITH HIM.

6         WE SHOWED IT TO HIM AND HE TURNED TO STEVE AND SAID,

7    STEVE, THIS IS GOING TO BE BIGGER THAN THE MAC WAS.

8    Q.   WERE THERE ANY CHANGES IN YOUR WORK SITUATION OR SECURITY

9    AFTER THESE DEMONSTRATIONS?

10   A.   YES.  WE WERE TOLD NOT TO TALK ABOUT THIS WORK WITH

11   ANYBODY WHO WASN'T IN THAT ROOM, AND IT WASN'T BEFORE LONG THAT

12   SPECIAL BADGE ACCESS LOCKS WERE PUT ON THE DOORS AT EITHER END

13   OF MY TEAM'S HALLWAY.

14   Q.   DID YOU HAVE A CODE NAME FOR THIS PROJECT?

15   A.   AFTER IT BECAME MORE FULLY DEVELOPED, IT DEVELOPED A CODE

16   NAME AS WELL, AND IT WAS PURPLE.

17   Q.   SO THAT -- YOU'RE TALKING ABOUT YOUR TEAM IS THE HUMAN

18   INTERFACE TEAM; CORRECT?

19   A.   THAT'S CORRECT.

20   Q.   TO YOUR KNOWLEDGE, WERE THERE OTHER TEAMS AT APPLE WORKING

21   ON THE PHONE?

22   A.   YES.  THERE WERE A LOT OF DIFFERENT TEAMS WORKING ON

23   DIFFERENT ASPECTS OF THE PHONE.

24   Q.   CAN YOU GIVE US SOME EXAMPLES OF OTHER TEAMS THAT WERE

25   WORKING ON IT?

1    A.   WELL, THERE WAS OUR SOFTWARE DESIGN TEAM.  THERE WAS THE

2    INDUSTRIAL DESIGN TEAM WHICH, YOU KNOW, DESIGNED HOW -- THE

3    PHYSICAL ASPECTS OF THE PRODUCT.  I TALKED ABOUT SOFTWARE LOOK

4    AND FEEL.

5         THE INDUSTRIAL DESIGN TEAM IS RESPONSIBLE FOR THE HARDWARE

6    LOOK AND FEEL, THE SHAPE AND HOW THE DEVICE LOOKS AND ACTS IN

7    YOUR HAND.

8         THERE WERE SEVERAL SOFTWARE ENGINEERING TEAMS.  THERE WAS

9    THE UNDERLYING OPERATING SYSTEM TEAM.  THERE WERE TEAMS

10   DEVELOPING THE APPLICATIONS THAT RAN ON IT.  THERE WERE TEAMS

11   WORKING ON THE RADIOS TO TALK TO WI-FI AND TALK TO THE CELL

12   NETWORKS.  TEAMS WORKING ON THE SOFTWARE TO TALK TO THOSE

13   RADIOS.  TEAMS INVOLVED IN OPERATIONS AND MANUFACTURING, LATER

14   IN MARKETING AND SALES AND RETAIL.

15        I MEAN, THERE WERE -- THERE WERE A LOT OF TEAMS WORKING

16   ALL OVER THE COMPANY ON THIS, ON THIS PROJECT.

17   Q.   ON YOUR PARTICULAR TEAM, APPROXIMATELY HOW LARGE WAS YOUR

18   TEAM, THE HUMAN INTERFACE TEAM WORKING ON THE PROJECT?

19   A.   AT THAT TIME?

20   Q.   RIGHT.

21   A.   ABOUT A DOZEN PEOPLE, MAYBE 16.  SOMEWHERE IN THAT RANGE.

22   Q.   HAD ANY OF THOSE PEOPLE, TO YOUR KNOWLEDGE, EVER DESIGNED

23   A PHONE BEFORE?

24   A.   NO.  OUR EXPERTISE WAS IN DESIGNING COMPUTER DESKTOP

25   SOFTWARE.

```
1    Q.   OKAY.  SO WHEN DID THE SECURITY LOCKDOWN OCCUR?  WHAT

2    YEAR?

3    A.   VERY EARLY IN 2005.

4    Q.   NOW, WE KNOW THAT THE IPHONE WASN'T ANNOUNCED UNTIL

5    JANUARY 2007.  CORRECT?

6    A.   YES.

7    Q.   IF YOU HAD DONE THIS SUCCESSFUL DEMO IN 2005, WHAT

8    HAPPENED DURING -- WHY DID IT TAKE TWO YEARS TO GET TO THE

9    PRODUCT?

10   A.   WELL, THE DEMO WASN'T THE COMPLETE EXPERIENCE.  IT WAS A

11   SUBSET OF WHAT IPHONE COULD DO.  IT WAS -- AND IT WAS -- IT WAS

12   FUNCTIONING IN SO MUCH AS, YOU KNOW, THE GRAPHICS WERE ANIMATED

13   AND THE USER INTERFACE OF THE DEVICE WAS ILLUSTRATED.

14        BUT THERE WAS NO REAL DATA IT WAS TALKING TO.  IT WASN'T

15   EVEN RUNNING ON THE PHONE, AS I SAID.  IT WAS RUNNING ON A MAC.

16   JUST THE DISPLAY WAS RUNNING ON THIS PHONE-SHAPED WALLABY.

17        ALL OF THAT SOFTWARE HAD TO BE WRITTEN.  ALL OF THE

18   HARDWARE HAD TO BE CREATED.  WE WERE -- WE WERE -- YOU KNOW, WE

19   WERE A TEAM THAT BUILT OPERATING SYSTEMS AND DESKTOP AND LAPTOP

20   COMPUTERS AND IPODS AT THAT POINT.

21        AND THERE WAS A TON OF WORK THAT HAD TO GET DONE.  WE HAD

22   TO CREATE THE PHONE, CREATE THE OPERATING SYSTEM TO RUN ON THE

23   PHONE, CREATE THE APPLICATIONS THAT WOULD RUN ON THE INTERFACE

24   DESIGNS THAT WOULD RUN ON THE OPERATING SYSTEM RUNNING ON THIS

25   PHONE.  THERE WAS JUST A LOT WE HAD TO DO.
```

1    Q.   WHAT WAS IT LIKE TO BE WORKING ON THIS IPHONE DEVELOPMENT

2    PROJECT?

3    A.   IT WAS EXHAUSTING AND IT WAS EXCITING.

4    Q.   WAS IT SOMETHING MORE THAN A 9:00 TO 5:00 JOB FOR YOU?

5    A.   YES.

6    Q.   CAN YOU GIVE US SOME IDEA ABOUT THAT?

7    A.   FROM THAT FIRST DEMO IN FEBRUARY 2005 THROUGH THE

8    ANNOUNCEMENT IN JANUARY TO WHEN THE PRODUCT WAS ACTUALLY FOR

9    SALE IN JUNE OF 2007, IT WAS -- IT WAS PRETTY MUCH NON-STOP.

10   YOU HAD TO BE PREPARED TO DISCUSS ANY ASPECT OF WHAT YOU WERE

11   WORKING ON AT ANY TIME OF THE DAY, ANY DAY OF THE WEEK, ANY

12   WEEK OF THE MONTH, ANY MONTH OF THE YEAR.

13        IT WAS -- IF I SAY FULL TIME, I DON'T MEAN FULL TIME IN

14   THE 9:00 TO 5:00 SENSE.  IT WAS -- THAT WAS THE FOCUS OF AN

15   AWFUL LOT OF PEOPLE FOR A VERY LONG TIME.

16   Q.   AT WHAT POINT IN THE PROJECT DID THE INTERNET BROWSER GET

17   INTEGRATED INTO THE PHONE?

18   A.   IT WAS VERY EARLY ON.  I DON'T REMEMBER WHETHER IT WAS

19   FEATURED IN THE FEBRUARY DEMO OR WHETHER IT WAS QUICKLY ADDED

20   ON IN THE EARLY PART OF 2005, BUT THE PROMISE OF HAVING A FULL

21   WEB BROWSER IN A PORTABLE DEVICE THAT FIT IN YOUR POCKET THAT

22   HAD ACCESS TO A COMMUNICATIONS NETWORK WAS KIND OF TOO

23   INTERESTING TO PASS UP.

24   Q.   YOU USED THE EXPRESSION "A FULL WEB BROWSER."  WHAT DO YOU

25   MEAN BY THAT?

DIRECT CHRISTIE

1    A.   I MEAN A WEB BROWSER THAT WOULD LET YOU VIEW THE SAME WEB

2    PAGES THAT YOU VIEWED ON YOUR LAPTOP OR YOUR DESKTOP COMPUTER.

3         THERE WERE SOME OTHER PHONES ON THE MARKET AT THAT TIME

4    THAT GAVE YOU CONTENT FROM THE INTERNET, BUT IT WAS ALWAYS

5    SPECIALLY FORMATTED OR DUMBED DOWN SO THAT IT WOULD BE ABLE TO

6    BE DISPLAYED ON YOUR PHONE, OR YOU WOULD INTERACT WITH IT USING

7    YOUR PHONE KEYPAD.  YOU MIGHT SEE A LIST OF NEWS STORIES, FOR

8    EXAMPLE, THAT HAD DIGITS NEXT TO THEM, 1 THROUGH 10, AND YOU

9    WOULD HAVE TO LITERALLY PRESS THE MATCHING NUMBER ON YOUR PHONE

10   KEYPAD TO BE ABLE TO READ THAT STORY.

11        WE JUST -- WE WANTED IT TO BE A REGULAR WEB BROWSER.  YOU

12   SAW THE WEB PAGE, YOU KNOW, YOU MIGHT HAVE TO ZOOM IN TO SEE IT

13   ON THE IPHONE SIZE SCREEN, BUT THEN YOU COULD TAP ON ANY LINK

14   ON THE WEB PAGE THE WAY YOU DO ON A COMPUTER.

15   Q.   WAS IT DIFFICULT TO DESIGN THE USER-INTERFACE ASPECTS OF

16   THIS NEW PHONE?

17   A.   I THINK SO.

18   Q.   AND FOR THOSE OF US WHO DON'T HAVE THE EXPERIENCE OR THE

19   KNOWLEDGE THAT YOU DO, CAN YOU EXPLAIN FOR US WHAT THE

20   CHALLENGES WERE, SIR?

21   A.   ONE OF THE BIGGEST CHALLENGES IS THAT WE AIMED TO SELL

22   PRODUCTS TO PEOPLE WHO DON'T DO WHAT WE DO FOR A LIVING.  WE

23   CREATE PRODUCTS THAT WE HOPE THAT PEOPLE CAN USE EVEN IF THEY

24   HAVEN'T, YOU KNOW, SPENT THE GREATER PART OF THEIR LIVES

25   WORKING WITH COMPUTER SOFTWARE SYSTEMS.

1          WE WANT NORMAL PEOPLE, PEOPLE WITH, WITH BETTER THINGS TO

2     DO WITH THEIR LIVES THAN LEARN HOW A COMPUTER MIGHT WORK TO BE

3     ABLE TO USE THE PRODUCT AS WELL AS WE COULD WHEN WE WERE

4     DESIGNING IT.

5          WE ALSO NEEDED TO CREATE AN EXPERIENCE FOR PEOPLE WHO

6     AREN'T IN THE ROOM WHEN WE'RE DISCUSSING IT.  THAT'S PRETTY

7     HARD.  I MEAN, IT'S PRETTY HARD TO JUDGE WHETHER WHAT YOU HAVE

8     IS OBVIOUS.  IT'S HARD TO JUDGE WHETHER WHAT YOU HAVE WILL BE

9     INTUITIVE TO A CUSTOMER.

10          I TAKE THE CUSTOMER RELATIONSHIP REALLY SERIOUSLY, AND SO

11     DO A TON OF OTHER PEOPLE WHO DO THIS FOR A LIVING.  YOU KNOW,

12     THESE ARE PEOPLE THAT ARE SPENDING THEIR MONEY ON SOMETHING

13     YOU'VE CREATED.  I DON'T WANT TO WASTE A CUSTOMER'S TIME.  I

14     DON'T WANT THEM TO EVER PICK UP A PRODUCT AND SAY "I DON'T

15     UNDERSTAND HOW TO USE THIS.  I BOUGHT THIS THING, I WISH I KNEW

16     HOW TO USE IT BETTER."

17          I HATE IT WHEN I HEAR THAT, AND WE REALLY -- YOU KIND OF

18     HAVE AN EXCUSE WHEN YOU'RE DEALING WITH A DESKTOP COMPUTER.

19     IT'S A COMPUTER AND IT'S A -- YOU KNOW, IT'S A TECHNICAL

20     EXPERIENCE.

21          A PHONE SHOULD BE A PHONE AND IT SHOULD BE EASY, FAR

22     EASIER TO USE THAN ANY DESKTOP COMPUTER, AND WE WANTED IT TO BE

23     FAR EASIER TO USE THAN ANY OTHER PHONE AND DO MORE THAN ANY

24     OTHER PHONE.

25          AND SO FINDING THAT LINE BETWEEN WHAT CAPABILITIES DO YOU

DIRECT CHRISTIE

```
1    INCLUDE, HOW DO YOU EXPLAIN WHAT THE CAPABILITIES ARE TO A

2    NON-TECHNICAL PROFESSIONAL, AND HOW DO YOU ENABLE THOSE

3    NON-TECHNICAL PROFESSIONALS TO USE THOSE CAPABILITIES TAKES A

4    LOT OF WORK.

5    Q.   SIR, WHEN DID APPLE ANNOUNCE THE IPHONE?

6    A.   IN JANUARY 2007.

7    Q.   WERE YOU PRESENT AT THAT KEYNOTE ANNOUNCEMENT?

8    A.   YES, I WAS.

9    Q.   AND WHAT WAS IT LIKE FOR YOU, SIR?

10   A.   IT WAS -- IT WAS NERVE-RACKING.  YOU KNOW, WE ALL WANTED

11   IT TO GO PERFECTLY.  IT WAS -- YOU KNOW, THERE WAS A LOT OF

12   ANTICIPATION.  WE WERE HOPING WE WERE RIGHT.  WE WERE HOPING

13   THAT PEOPLE WOULD GET IT.  WE WERE HOPING THAT IT WOULD BE A

14   HUGE SUCCESS.

15   Q.   SIR, DURING THE DEVELOPMENT PERIOD FOR THE IPHONE, DID

16   APPLE COME UP WITH ANY INVENTIONS?

17   A.   I THINK SO.

18   Q.   DID APPLE TAKE ANY STEPS TO PRESENT TO -- I'M SORRY.

19        DID APPLE TAKE ANY STEPS TO PROTECT THOSE INVENTIONS?

20   A.   YES.  A LARGE NUMBER OF PATENT APPLICATIONS WERE FILED,

21   TRADEMARKS, COPYRIGHTS, THAT SORT OF THING.

22   Q.   DID YOUR TEAM INVENT ANY OF THE INVENTIONS THAT WERE

23   PRESENTED IN THE APPLE IPHONE?

24   A.   YES.

25   Q.   DO YOU PERSONALLY HAVE PATENTS IN YOUR NAME?
```

1    A.   YES.

2    Q.   ON HOW MANY DIFFERENT PATENTS DOES YOUR NAME APPEAR AS ONE

3    OF THE INVENTORS, APPROXIMATELY?

4    A.   I THINK IT'S ABOUT 100.

5    Q.   DO YOU HAVE A BINDER OF EXHIBITS IN FRONT OF YOU?  DID WE

6    GIVE YOU A BINDER?

7    A.   YEAH, I HAVE A SMALL BINDER HERE, YES.

8    Q.   ALL RIGHT.  CAN YOU OPEN IT, PLEASE, TO EXHIBIT JX 10?

9    CAN YOU TELL ME, WHAT DO YOU FIND THERE AT TAB JX 10?

10   A.   SORRY.  I'M GOING TO HAVE TO DO A DO-SI-DO WITH MY

11   GLASSES.

12       IT IS UNITED STATES PATENT NUMBER 8,046,721 B2 TITLED

13   "UNLOCKING A DEVICE BY PERFORMING GESTURES ON AN UNLOCK IMAGE."

14   Q.   ARE YOU ONE OF THE NAMED INVENTORS ON THAT PATENT?

15   A.   I AM.

16       MR. MCELHINNY:  YOUR HONOR, MOVE JX 10.

17       MR. PRICE:  NO OBJECTION.

18       THE COURT:  IT'S ADMITTED.

19   (JOINT EXHIBIT JX 10 WAS ADMITTED IN EVIDENCE.)

20       THE COURT:  GO AHEAD, PLEASE.

21   BY MR. MCELHINNY:

22   Q.   JUST AT THE HIGHEST LEVEL AND IN GENERALITY, CAN YOU TELL

23   US WHAT THIS INVENTION DEALS WITH, SIR?

24   A.   THE INVENTION DEALS WITH A METHOD OF MAKING THE IPHONE

25   AVAILABLE TO USE FROM A LOCKED STATE.  IT'S A SET OF

1    INSTRUCTIONS, HINTS, A SET OF INSTRUCTIONS AND AFFORDANCES THAT

2    ARE DISPLAYED.

3    Q.   CAN YOU SPELL AFFORDANCE FOR US?

4    A.   A-F-F-O-R-D-A-N-C-E-S.   AFFORDANCES.

5    Q.   WHAT IS AN AFFORDANCE?

6    A.   AN AFFORDANCE IS SOMETHING THAT YOU USE, SOMETHING THAT

7    YOU CAN SEE AND SOMETHING THAT YOU USE AND IT AFFORDS SOME

8    ACTION.  YOU CAN SAY THE HANDLE ON YOUR REFRIGERATOR IS AN

9    AFFORDANCE FOR OPENING THE REFRIGERATOR.

10   Q.   SO I'M SORRY --

11   A.   IT'S JUST A TERM WE USE.

12   Q.   TELL US AGAIN, JUST IN GENERAL TERMS, WHAT THE NATURE OF

13   YOUR INVENTION IS.

14   A.   IT'S HOW YOU UNLOCK THE PHONE.  IT'S HOW YOU MOVE THE

15   PHONE FROM A LOCKED, SAFE STATE TO AN UNLOCKED STATE WHERE YOU

16   CAN INTERACT WITH IT.

17   Q.   WHAT WAS THE PROBLEM THAT YOU GUYS WERE WORKING ON AT THE

18   TIME THAT YOU CAME UP WITH THE '721 INVENTION?

19   A.   THERE WERE A COUPLE OF PROBLEMS THAT WE WERE, THAT WE WERE

20   FOCUSSED ON AT THIS TIME.

21       VERY EARLY ON IN THE DEVELOPMENT OF THE IPHONE, WE WERE --

22   WE WEREN'T SURE THAT WE'D HAVE TO SHUT DOWN THE INPUT SURFACE.

23   YOU KNOW, WE -- SEVERAL OF US THOUGHT IT WOULD BE NEAT IF THE

24   PHONE WERE ALWAYS, YOU KNOW, READY TO USE, IF ALL YOU HAD TO DO

25   WAS TOUCH THE SCREEN AND IT WOULD LIGHT UP AND BE READY TO USE.

```
 1              IT TURNED OUT THAT WE COULDN'T MEET OUR POWER REQUIREMENTS

 2      IF WE HAD THE PHONE IN THAT ACTIVE OF A STATE, SO WE HAD TO

 3      RESORT TO A POWERED DOWN.

 4              IN EITHER EVENT, WE WERE WORRIED ABOUT ACCIDENTAL USE,

 5      POCKET DIALLING, THE PHONE GETTING SHUT DOWN ACCIDENTALLY, OR

 6      SINCE WE WERE GOING TO HAVE ALL THESE FEATURES ON THE PHONE,

 7      LIKE E-MAIL AND MESSAGING, WE WERE WORRIED THAT, YOU KNOW, MAIL

 8      COULD BE SENT ACCIDENTALLY OR DELETED ACCIDENTALLY OR THE PHONE

 9      WOULD ANSWER ITSELF SIMPLY BECAUSE THE TOUCH SURFACE -- YOU

10      KNOW, IF IT WAS LIKE, LIKE, THE TOUCH SURFACE AGAINST YOUR LEG

11      IN YOUR POCKET, WE WERE WORRIED THAT JUST, LIKE, YOU KNOW,

12      JOSTLING AROUND, MOVING AROUND WOULD TRIGGER THINGS ON THE

13      SCREEN.

14              SO WE KNEW WE HAD TO HAVE A LOCKED MODE, OR A LOCKED STATE

15      OF THE PHONE WHERE IT WOULDN'T LET YOU DO MOST THINGS EXCEPT

16      YOU COULD UNLOCK IT AND THEN THE WHOLE REST OF THE PHONE

17      EXPERIENCE WOULD BE AVAILABLE.

18      Q.    WERE THERE HUMAN INTERFACE ISSUES THAT YOU WERE ALSO

19      DEALING WITH --

20      A.    YEAH.

21      Q.    -- IN TERMS OF HOW THE PHONE WOULD PRESENT OR BE USED BY

22      THE USER?

23      A.    YES.  THIS IS ONE OF THE USER-INTERFACE ISSUES WE WERE

24      DEALING WITH.

25      Q.    OKAY.  WERE THERE DESIGN GOALS OR QUESTIONS THAT YOU WERE
```

1    LOOKING AT WHEN YOU WERE DOING THIS?

2    A.   YES.  WE WANTED TO MAKE THE METHOD USED TO UNLOCK, THE WAY

3    THE CUSTOMER WOULD DO IT, WE WANTED IT TO BE SOMETHING THAT

4    WOULD BE REALLY UNLIKELY TO HAPPEN ACCIDENTALLY.  SO JUST A

5    SINGLE TOUCH ON IT WOULD BE A BAD IDEA.

6         WE THOUGHT OF -- WE THOUGHT TO INTRODUCE SOME SORT OF

7    DEFINITE GESTURE.  WE KNEW WE WANTED TO HAVE SOME INSTRUCTION.

8    WE KNEW WE WANTED THE INTERFACE TO BE OBVIOUS TO THE CUSTOMER.

9    IT WOULD BE POSSIBLY THE FIRST EXPERIENCE EVEN IN A RETAIL

10   ENVIRONMENT.  THEY'RE DECIDING WHETHER THEY WANT TO BUY IT.

11   THEY PICK UP THIS IPHONE, YOU KNOW, IT WOULD BE VERY BAD IF

12   THEY LOOKED AT THE PHONE THAT THEY HAD HEARD SO MUCH ABOUT AND

13   THEY LOOK AT IT AND SAY "I CAN'T FIGURE OUT HOW TO USE THIS.  I

14   DON'T KNOW HOW TO UNLOCK IT.  IT'S LOCKED."

15        AT THE SAME TIME, WE KNEW THAT PEOPLE WOULD BE UNLOCKING

16   THEIR PHONE, YOU KNOW, TENS OR HUNDREDS OF TIMES A DAY, SO WE

17   DIDN'T WANT THE INSTRUCTION TO BE, YOU KNOW, INSULTING OR TALK

18   DOWN TO THE CUSTOMER.

19        WE DIDN'T WANT IT TO BE CUMBERSOME, SOMETHING THAT THEY

20   WOULD GROW TIRED OF AFTER A WHILE.

21        THESE WERE SOME OF THE, OF THE -- TWO ENDS PULLING AT THE

22   SAME ROPE THERE.

23   Q.   DID THE GRAPHICS THAT YOU ENDED UP USING PROVIDE AN

24   INDICATION TO THE USER OF THE DIRECTION TO MOVE THE IMAGE IN

25   ORDER TO UNLOCK THE PHONE?

1    A.   YES, YES.  THERE WERE A COUPLE OF ELEMENTS.  ONE IS THAT

2    THE DEVICE YOU USE, THAT THERE'S A -- ON THE ORIGINAL IPHONE,

3    WHEN THIS APPLICATION WAS FILED, THERE WAS A METAL RENDERED --

4    A BUTTON ON THE SCREEN THAT WAS RENDERED AS THOUGH IT WERE MADE

5    OF METAL AND IT WAS SITTING AT ONE END OF A CONTAINER, AND SO

6    THE OTHER SIDE OF THE CONTAINER PROVIDED THAT HINT.

7         THERE WERE WORDS ON THE SCREEN THAT SAID SLIDE TO UNLOCK.

8    AND THERE WAS AN ANIMATION ON THOSE WORDS, A LIGHTING EFFECT

9    THAT WOULD PROCEED FROM LEFT TO RIGHT, WHICH WAS THE SAME

10   DIRECTION THAT THE CUSTOMER HAD TO MOVE THEIR FINGER.

11        AND ON THE BUTTON ITSELF WAS AN ARROW POINTING FROM LEFT

12   TO RIGHT.

13   Q.   SIR, AS THE MANAGER OF THE HUMAN INTERFACE GROUP, HOW

14   IMPORTANT DID YOU CONSIDER THIS PARTICULAR INVENTION?

15   A.   I CONSIDERED THIS TO BE PRETTY IMPORTANT.

16   Q.   AND WHY DO YOU SAY THAT?

17   A.   AS I MENTIONED BEFORE, IT WAS VERY LIKELY THAT THIS WOULD

18   BE A CUSTOMER'S FIRST RETAIL EXPERIENCE, LOOKING AT A PHONE,

19   DECIDING ON WHETHER TO BUY ONE.

20        IT WAS ALSO THE FIRST THING THEY'D SEE WHEN THEY BOUGHT

21   IT, THEY TOOK IT HOME AND THEY'D PLUG IT IN, THE BATTERY

22   CHARGES, IT COMES ON AND IT'S GOING TO SIT THERE SAYING SLIDE

23   TO UNLOCK.  SO THIS WAS -- THIS WAS THE CUSTOMER'S FIRST

24   EXPERIENCE.

25        IT'S ALMOST LIKE SETTING THE TABLE BEFORE A MEAL.  PEOPLE

1    UNLOCK AND USE THEIR PHONES HUNDREDS OF TIMES A DAY NOW.  THIS

2    IS -- THAT'S A LOT OF TIMES.  I MEAN, THAT'S A LOT OF TIME THAT

3    HUMAN BEINGS SPEND PERFORMING THIS ACTION, UNLOCKING IT.

4        WE WANTED IT TO BE EASY, WE WANTED IT TO BE OBVIOUS.  BUT

5    WE ALSO WANTED IT TO WORK WELL.

6    Q.   SIR, STARTING FROM SCRATCH WITH NO IDEAS TO COMING UP WITH

7    THE IDEA TO DESIGNING IT TO WRITING THE CODE TO INTEGRATING IT,

8    APPROXIMATELY HOW LONG WOULD YOU SAY, HOW MUCH TIME WAS SPENT

9    ON THIS PARTICULAR FEATURE?

10   A.   IT'S HARD TO SAY.  IT'S HARD TO -- IT'S HARD TO REMEMBER,

11   AND IT'S HARD TO REALLY ISOLATE TIME ON THIS ONE PARTICULAR

12   FEATURE.  WE WERE LOOKING AT A LOT OF THINGS ALL AT THE SAME

13   TIME.

14       I THINK WE WENT BACK AND FORTH OVER THIS DESIGN AND

15   EVALUATING THE LIMITATIONS FOR WEEKS, IF NOT MONTHS.

16   Q.   DID -- ONCE YOU CAME UP WITH THIS CONCEPT, DID YOU FIND

17   OTHER USES FOR IT IN THE IPHONE?

18   A.   YES.  ONE OF THE -- I MENTIONED BEFORE ONE OF THE, ONE OF

19   THE PROBLEMS WE WERE TRYING TO SOLVE WAS, YOU KNOW, THE PHONE

20   ANSWERING ITSELF JUST BECAUSE SOMETHING BUMPED UP AGAINST IT,

21   SO WE USED A SIMILAR SLIDE METHOD TO ANSWER AN INCOMING PHONE

22   CALL WHEN THE PHONE WAS LOCKED.

23       THE WAY YOU POWER DOWN THE IPHONE IS YOU PUSH AND HOLD ON

24   A POWER BUTTON AND HOLD IT UNTIL SLIDE TO POWER DOWN

25   CONFIRMATION APPEARS.

1         AGAIN, IF THE PHONE WAS JAMMED UP AGAINST SOMETHING IN

2    YOUR POCKET OR YOUR BAG, THAT WOULD PRESS THE POWER BUTTON.  WE

3    DIDN'T WANT TO ACCIDENTALLY SHUT IT OFF, SO YOU HAVE TO CONFIRM

4    THAT.

5         EXCUSE ME.

6    Q.   SIR, AT THE KEYNOTE ADDRESS IN 2007, DID MR. JOBS

7    DEMONSTRATE THIS PARTICULAR FEATURE?

8    A.   YES, HE DID.

9    Q.   LET ME SHOW YOU AN EXCERPT FROM PLAINTIFF'S EXHIBIT 118A,

10   WHICH IS IN EVIDENCE.

11        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

12   BY MR. MCELHINNY:

13   Q.   SIR, DO YOU REMEMBER WHERE YOU WERE WHEN THE IPHONE FIRST

14   CAME ON SALE?

15   A.   YES.

16   Q.   AND WHERE WAS THAT?

17   A.   I WAS AT WORK.

18   Q.   AND CAN YOU TELL US ABOUT THAT?

19   A.   THE IPHONE WENT ON SALE IN JUNE OF 2007.  I WENT TO WORK

20   THAT DAY.  A BUNCH OF THE TEAM MEMBERS LIVE IN THE CITY, THEY

21   STAYED IN THE CITY OR THEY LEFT WORK EARLY TO GO TO THE CITY TO

22   GO TO THE BIG APPLE STORE IN SAN FRANCISCO AND BE PRESENT AT

23   THE HYSTERIA.

24        BY THE DAY WE LAUNCHED, SOME PEOPLE HAD BEEN WAITING IN

25   LINE AT VARIOUS STORES FOR DAYS TO BE ONE OF THE FIRST TO

1    PURCHASE.

2         MYSELF AND ANOTHER TEAM MEMBER WENT TO A SUPERMARKET, WE

3    BOUGHT A FEE BOTTLES OF DECENT CHAMPAGNE, AND WE BROUGHT IT

4    BACK TO CAMPUS TO SHARE IT WITH SOME OTHER MEMBERS OF THE TEAM

5    THAT ALSO WERE AT WORK THAT DAY, SO WE HAD A TOAST.

6         AND LATER THAT EVENING I WENT HOME AND PICKED UP MY FAMILY

7    AND WE DROVE AROUND TO THE PARKING LOTS OF VARIOUS AT&T STORES

8    WHERE THE PHONE WAS FOR SALE.

9         WE SAW OTHER TEAM MEMBERS, APPLE EMPLOYEES, AT THE STORES

10   HANGING OUT, WATCHING.

11        AND PEOPLE WERE LINED UP AROUND THESE BUILDINGS JUST

12   WAITING TO BUY THE FIRST IPHONE.

13        AND THEN MY FAMILY AND I WENT OUT TO DINNER.

14   Q.   HOW DID YOU FEEL WHEN YOU SAW PEOPLE LINED UP AROUND THE

15   BLOCK WAITING TO BUY THIS PRODUCT THAT YOU HAD WORKED SO HARD

16   ON?

17   A.   IT WAS ASTONISHING.  YOU KNOW, FOR AT LEAST ONE DAY WE

18   WERE A HUGE SUCCESS, AND IT HAD ALL BEEN, YOU KNOW, HOPEFULLY

19   WORTH IT.

20   Q.   MR. CHRISTIE, IS IT TRUE THAT AT THE REQUEST OF THE APPLE

21   PUBLIC RELATIONS GROUP, YOU TOLD THIS INVENTION STORY TO TWO

22   REPORTERS LAST WEEK?

23   A.   I TOLD PART OF IT, YES.

24        MR. PRICE:  OBJECTION.  RELEVANCE, YOUR HONOR.  MOVE

25   TO STRIKE.

```
1              MR. MCELHINNY:  I WILL STIPULATE TO THAT, YOUR HONOR.

2              THE COURT:  ALL RIGHT.

3    BY MR. MCELHINNY:

4    Q.  SIR --

5         (DISCUSSION OFF THE RECORD BETWEEN PLAINTIFF'S COUNSEL.)

6    BY MR. MCELHINNY:

7    Q.  SIR, HAVE WE SHOWN YOU ANY SAMSUNG RESEARCH AND

8    DEVELOPMENT DOCUMENTS IN CONNECTION WITH THIS CASE?

9    A.  NOT THAT I RECALL.

10   Q.  HAVE WE ASKED YOU TO BE A PATENT LAWYER AND READ THE

11   CLAIMS OF YOUR PATENT ON SAMSUNG INVENTIONS?

12   A.  UM, I -- I WOULDN'T BE A VERY GOOD LAWYER, NO.

13   Q.  OKAY.  I WOULD BE A GREAT SOFTWARE PROGRAMMER, BUT I CHOSE

14   NOT TO DO THAT.

15        OTHER THAN LAST WEEK AND TODAY, IS THIS THE FIRST TIME

16   YOU'VE EVER TOLD THIS STORY PUBLICLY?

17   A.  YES.

18              MR. MCELHINNY:  NOTHING FURTHER, YOUR HONOR.

19              THE COURT:  ALL RIGHT.  TIME IS NOW 11:53.

20              MR. PRICE:  YOUR HONOR, CAN WE MOVE STUFF AROUND?

21              THE COURT:  YES.  I'M NOT COUNTING THIS TOWARDS YOUR

22   TIME.

23              MR. PRICE:  THANK YOU.

24              THE COURT:  AND WE'LL JUST GO UNTIL NOON AND THEN

25   TAKE A LUNCH BREAK.
```

```
1              MR. PRICE:  THANK YOU.
2              MR. LEE:  YOUR HONOR, THESE ARE THE LOZENGES WE WERE
3       DISTRIBUTING THE OTHER DAY.
4              THE COURT:  OKAY, THAT'S FINE.
5              THE WITNESS:  YEAH, THE WATER IS NOT HELPING.
6              MR. PRICE:  IF YOU WANT TO TAKE THE NOON BREAK NOW,
7       THAT'S FINE WITH ME, TOO.
8              THE COURT:  I'M SORRY?
9              MR. PRICE:  IN FACT, IF YOU WANT TO TAKE THE NOON
10      BREAK NOW, THAT'S FINE WITH ME, TOO.
11             THE COURT:  IT'S A LITTLE BIT -- I ONLY HAVE 11:53.
12      LET'S GO AHEAD.
13             MR. PRICE:  OKAY.
14                      CROSS-EXAMINATION
15      BY MR. PRICE:
16      Q.  GOOD MORNING, STILL --
17      A.  STILL.
18      Q.  -- MR. CHRISTIE.
19          YOU -- WE'VE HEARD A LOT ABOUT THE STORY ABOUT THE
20      DEVELOPMENT OF THE IPHONE AND THAT PREMIER IN 2007.  AND THAT
21      WAS A PRETTY EXCITING TIME FOR YOU?
22      A.  IT WAS.
23      Q.  YEAH.  AND YOU SAID THAT THE IPHONE, YOU SAID AT LEAST
24      THAT DAY, SOMETHING, YOU THOUGHT IT WAS GOING TO BE SUCCESSFUL.
25          IN FACT, IT'S BEEN PHENOMENALLY SUCCESSFUL?
```

1    A.    I THINK SO.

2    Q.    AND WHEN YOU WERE TALKING ABOUT DEVELOPING THIS HUMAN

3    INTERFACE, YOUR PART OF IT, YOU DIDN'T TAKE IT UPON YOURSELF,

4    FOR EXAMPLE, TO GO BACK AND SEE WHAT WE'VE HEARD IS THE PRIOR

5    ART; CORRECT?

6    A.    NOT IN PARTICULAR, NO.

7    Q.    FOR EXAMPLE, YOU SAID YOU WEREN'T AWARE OF PRIOR TOUCH

8    PHONES WHEN YOU WERE GIVEN THIS ASSIGNMENT.

9          DO YOU RECALL THAT?

10   A.    YES.

11   Q.    AND SO, FOR EXAMPLE -- HOWEVER, YOU ACTUALLY DON'T KNOW

12   ONE WAY OR ANOTHER WHETHER OR NOT THERE WERE PRIOR TOUCH

13   PHONES?

14   A.    THAT'S CORRECT.

15   Q.    AND WHAT WE'RE HERE TALKING ABOUT IN THIS TRIAL, IT'S YOUR

16   UNDERSTANDING, ARE FIVE KINDS OF SPECIFIC PATENT CLAIMS.

17         DO YOU UNDERSTAND THAT?

18   A.    YES.

19   Q.    REGARDING PRODUCTS THAT WERE IN THE MARKET NOT IN 2007,

20   BUT IN 2011, '12, '13, AND PERHAPS TO THE PRESENT, SOME FOUR

21   YEARS AFTER THAT PRESENTATION.

22         DO YOU UNDERSTAND?

23   A.    I UNDERSTAND WHAT YOU'RE SAYING.

24   Q.    AND ARE YOU AWARE THAT APPLE IN THIS CASE, IN TERMS OF

25   ROYALTY, THE AMOUNT THEY'RE CLAIMING IN ROYALTY, THAT THE SLIDE

1      TO UNLOCK FEATURE AMOUNTS TO ONE HALF OF 1 PERCENT OF THE

2      AMOUNT THAT APPLE IS CLAIMING IN ROYALTY?

3      A.   I WASN'T AWARE.  I WASN'T AWARE OF THAT.

4      Q.   WELL, YOUR DEPOSITION WAS TAKEN IN THIS CASE; CORRECT?

5      A.   THAT'S TRUE.

6      Q.   AND IT'S -- IT'S TRUE THAT YOU PERSONALLY DON'T HAVE ANY

7      KNOWLEDGE AS TO WHAT IMPACT APPLE'S SLIDE TO UNLOCK HAS HAD ON

8      APPLE'S SALES; CORRECT?

9      A.   CORRECT.

10     Q.   AND YOU, YOU DON'T KNOW WHAT IMPACT SOME OTHER COMPANY'S

11     SLIDE TO UNLOCK FEATURE HAS HAD ON ANY OTHER COMPANY'S SALES;

12     CORRECT?

13     A.   NO.

14     Q.   IS THAT CORRECT?

15     A.   YES, THAT'S CORRECT.

16     Q.   YEAH, I APOLOGIZE.  THAT WAS KIND OF A DOUBLE NEGATIVE.

17          AND YOUR HUMAN INTERFACE TEAM, AS FAR AS YOU'RE AWARE,

18     HASN'T CONDUCTED ANY RESEARCH TO SEE IF ANY PARTICULAR

19     USER-INTERFACE FEATURE DRIVES DEMAND FOR THE SALES OF A

20     PRODUCT; CORRECT?

21     A.   WE DON'T CONDUCT RESEARCH INTO SALES ON THE HUMAN

22      INTERFACE TEAM.

23          WE TAKE PART IN DESIGNING FEATURES THAT WE KNOW WILL

24     SOMETIMES END UP IN ADS OR BE FEATURED IN A KEYNOTE.

25          SO I THINK ALL OF THAT COMBINES TO, YOU KNOW, DRIVE

1      THINGS.

2              BUT WE DON'T DO ANY STUDIES ABOUT IT, NO.

3      Q.   RIGHT.  I MEAN, SO WHAT YOU'RE SAYING IS TO THE EXTENT

4      THAT YOU MIGHT HAVE SEEN SOMETHING IN A COMPETITOR'S KEYNOTE,

5      OR IN SOMETHING THAT THEY'D ADVERTISED, THAT MIGHT GIVE YOU

6      SOME FEELING AS TO WHETHER OR NOT A PARTICULAR FEATURE IS

7      IMPORTANT OR NOT?

8      A.   NOT FOR THE COMPETITORS.  I WAS TALKING ABOUT OUR OWN

9      PRODUCTS.

10     Q.   OH, OKAY, YOUR OWN PRODUCTS.

11     A.   YEAH.

12     Q.   GREAT.  AND I WANT TO SEE IF I CAN BE SURE AS TO HOW THE

13     INVENTION THAT YOU'RE TALKING ABOUT THAT WAS PRESENTED IN

14     2007 -- I THINK WE SAW A VIDEO.

15             MAYBE WE CAN PUT UP -- CAN WE PUT UP JUST A SCREEN SHOT OF

16     THAT?  LET'S SEE IF I HAVE THAT HERE.  THE VIDEO KIND OF GOES

17     FAST.

18             LET'S SEE.  IT'S -- I GUESS WE'VE GOT PDX 23.  ANY WAY WE

19     CAN PUT THAT UP, KEN, AND KIND OF SHOW IT?

20             SO WHAT APPLE CUSTOMERS SAW WAS A SCREEN WHERE YOU

21     DESCRIBED THIS AREA HERE WHICH KIND OF HAD AN ARROW; CORRECT?

22     A.   YES.

23     Q.   AND IT LOOKS LIKE THERE'S A TRACK HERE?

24     A.   YES.

25     Q.   AND THEN THE IDEA IS THAT YOU WOULD SLIDE THIS ALONG THIS

```
1      TRACK IN ORDER TO UNLOCK THE PHONE?

2      A.   THIS IS A STILL IMAGE; CORRECT?

3      Q.   YES.

4      A.   YEAH.  SO THEY'VE -- THE ANIMATION WITH THE TEXT, THE TEXT

5      AND THE ANIMATION IS MISSING FROM THIS.

6      Q.   OKAY.

7      A.   THIS SLIDE TO UNLOCK.

8      Q.   OKAY.  SO THERE'S --

9      A.   INFORMATIVE TEXT, AS WELL AS THE ANIMATION THAT PROCEEDS

10     FROM LEFT TO RIGHT ACROSS.

11     Q.   OKAY.  SO IF WE DO THE ANIMATION -- CAN YOU DO THE

12     ANIMATION?  I WANT TO MAKE SURE WE --

13     A.   THERE WE GO.

14     Q.   SO THERE'S THAT SLIDE TO UNLOCK, AND THEN YOU TAKE YOUR

15     FINGER AND YOU GO ALONG THAT TRACK; IS THAT RIGHT?

16     A.   YOU TAKE YOUR FINGER AND YOU MOVE THE IMAGE ALONG THE

17     TRACK, YES.

18     Q.   AND THAT WAS THE WAY SLIDE TO UNLOCK WAS PRESENTED ON ALL

19     OF APPLE'S IPHONES UP UNTIL IOS 7?

20     A.   IOS 7 STILL DOES SLIDE TO UNLOCK.

21     Q.   I UNDERSTAND THAT, SIR.

22          BUT I'M TALKING ABOUT DOING IT WHERE YOU HAVE A TRACK --

23     MAYBE WE CAN GO TO THE STILL IMAGE NOW -- WHERE YOU HAVE THIS

24     TRACK AND THAT YOU CAN SLIDE THIS ONLY ALONG THIS PARTICULAR

25     TRACK.  I MEAN, THAT'S THE WAY IT WAS DONE UP UNTIL IOS 7;
```

1    CORRECT?

2    A.   YES.  YOU STILL SLIDE AN IMAGE IN ONLY ONE DIRECTION TO

3    UNLOCK AN IOS 7.  THERE'S JUST, YOU KNOW, YOU'RE SLIDING A

4    DIFFERENT IMAGE.

5    Q.   AND YOU COULDN'T -- AND MAYBE WE'LL GET TO THAT AFTER WE

6    GET A BREAK, BUT ON ALL OF THE SLIDE TO UNLOCK IPHONES THAT WE

7    HAD UNTIL IOS 7 -- AND BY THE WAY, WHEN DID IOS 7 COME OUT?

8    A.   THIS PAST -- THIS PAST FALL IT SHIPPED.

9    Q.   OKAY.  SO FROM 2007 UNTIL 2013?

10   A.   '13.

11   Q.   OKAY.  SO FOR THOSE SIX YEARS OR SO, COULD YOU MOVE THIS

12   IMAGE, YOU KNOW, UP AND DOWN OR ANYWHERE OUTSIDE OF THIS,

13   OUTSIDE OF THIS TRACK?

14   A.   NO.

15   Q.   AND IN TERMS OF ONE OF THE THINGS YOU WANTED TO ADDRESS

16   WAS, YOU KNOW, PREVENTING THE ACCIDENTAL DIALLING OR ANSWERING?

17   A.   POCKET DIALLING, YES.

18   Q.   YEAH.  IN TERMS OF TURNING THE PHONE OFF -- ON, I'M

19   SORRY -- THE FIRST THING YOU HAD TO DO IN ALL THE APPLE PHONES

20   IS TO PUSH A BUTTON AT THE BOTTOM OF THE PHONE; RIGHT?

21   A.   I'M NOT FOLLOWING YOU.

22   Q.   I MEAN, APPLE HAS THIS --

23   A.   THE PHONE -- IS THE PHONE ON?  AS YOU'RE DESCRIBING IT, IS

24   THE PHONE ON ALREADY?

25   Q.   LET'S ASSUME THE PHONE IS OFF IN THE SLEEP MODE --

1    A.    OKAY.

2    Q.    -- BECAUSE YOU'RE DONE USING IT.

3          AND THERE'S THIS KIND OF ICONIC HOME BUTTON THAT'S AT THE

4    BOTTOM OF ALL APPLES; CORRECT?

5    A.    YES, WE -- YES, WE HAVE A SINGLE HOME BUTTON, AND THERE'S

6    ALSO THE POWER BUTTON.

7          THE COURT:  IT'S 12:02.  LET'S GO AHEAD AND TAKE A

8    BREAK UNTIL 1:05.  I'M SORRY TO INTERRUPT YOUR EXAMINATION, BUT

9    IT'S 12:02.  LET'S GO AHEAD AND TAKE OUR LUNCH BREAK.

10         PLEASE DON'T RESEARCH OR DISCUSS THE CASE WITH ANYONE.

11         ALL RIGHT.  THANK YOU.  BE BACK AT 1:05.

12         MR. MCELHINNY:  THANK YOU, YOUR HONOR.

13   (JURY OUT AT 12:02 P.M.)

14         THE COURT:  THANK YOU ALL.

15   (THE LUNCH RECESS WAS TAKEN FROM 12:03 P.M. TO 1:06 P.M.)

16

17

18

19

20

21

22

23

24

25

```
 1                          AFTERNOON SESSION

 2          (COURT CONVENED AT 1:06 P.M.)

 3              THE COURT:  OKAY.  WELCOME BACK AND GOOD AFTERNOON.

 4          I'VE REVIEWED WHAT -- OH, PLEASE TAKE A SEAT -- I'VE

 5      REVIEWED WHAT YOU FILED THIS MORNING AND WITH REGARD TO THE

 6      MOTION FOR CURATIVE ACTION REGARDING THE -- WHETHER APPLE

 7      PRACTICES THE PATENT OR NOT, THAT IS DENIED.

 8          BUT I DO HAVE A QUESTION WITH REGARD TO THE PERMANENT

 9      INJUNCTION.

10          CORRECT ME IF I'M WRONG, BUT I UNDERSTAND THAT FROM THE

11      LAST TRIAL, MY RECOLLECTION IS THAT THAT INFORMATION DID COME

12      IN, AND PERHAPS IT WAS MORE CONSISTENT WITH APPLE'S THEORY OF

13      THE CASE.

14              MR. LEE:  NO.  ACTUALLY, YOUR HONOR, TWO THINGS.  TO

15       GO BACK TO THE 1846, THE FIRST TRIAL BEFORE THE DAMAGES

16       RETRIAL.

17              THE COURT:  YES, SURE.

18              MR. LEE:  IT DID NOT COME IN.  THERE WAS A PORTION OF

19       THE CASE THAT WAS DEPENDENT UPON THE CLAIMS THAT SAMSUNG HAD

20       BREACHED THE FRAND OBLIGATION BY SEEKING AN INJUNCTION.  I

21       THINK THAT'S WHAT YOUR HONOR IS RECALLING.

22          AND THERE HAD BEEN SOME MOTION PRACTICE ON IT.

23          BUT IT WAS NEVER LITIGATED AT THE TRIAL AND THE INJUNCTION

24      NEVER CAME INTO THE TRIAL.

25          FOR THE DAMAGES RETRIAL, YOUR HONOR ACTUALLY STRUCK A
```

1    PORTION OF JULIE DAVIS'S REPORT ON THE PERMANENT INJUNCTION

2    BECAUSE YOU SAID THAT WAS AN ISSUE FOR YOUR HONOR, NOT FOR THE

3    DAMAGES RETRIAL.

4        SO I THINK --

5            THE COURT:  WELL, THAT ALL HAD TO DO WITH IRREPARABLE

6    HARM.

7            MR. LEE:  YES, YES.  BUT I THINK, YOUR HONOR, WHAT

8    YOU'RE RECALLING IS THERE WAS SOME MOTION PRACTICE IN THE

9    SUMMARY JUDGMENT TIME PERIOD THAT ADDRESSED THE CLAIM

10   PREDICATED UPON THE SEEKING OF INJUNCTIVE RELIEF, BUT

11   ULTIMATELY THAT WAS NEVER SOUGHT.

12       AND SO THE FIRST JURY HEARD NOTHING ABOUT A PERMANENT

13   INJUNCTION ONE WAY OR ANOTHER.

14           THE COURT:  LET ME ASK SAMSUNG, HOW WOULD EVIDENCE

15   COME IN, ADMISSIBLE EVIDENCE, AS TO APPLE'S REQUEST FOR A

16   PERMANENT INJUNCTION?  WHICH WITNESS WOULD BE TESTIFYING TO

17   THAT AND WHAT WOULD BE THEIR FOUNDATION?

18           MS. MAROULIS:  YOUR HONOR, WE WOULD BE QUESTIONING

19   DR. VELLTURO REGARDING THAT, AND IN PRESENTING THE OPENING WE

20   RELIED ON THE COURT'S RULINGS REGARDING THE SLIDES BEING

21   PERMISSIBLE AND US BEING ABLE TO PRESENT THIS TO THE JURY.

22           THE COURT:  HOW IS IT COMING IN THROUGH DR. VELLTURO?

23   DOES HE HAVE ANY KNOWLEDGE OF THAT?  WHAT ARE YOU ASKING HIM,

24   "DID YOU READ THE COMPLAINT?  IS THAT STATED IN THE COMPLAINT?"

25   IS THAT THE QUESTION?  IF IT'S NOT A BASIS OF HIS THEORY --

1           MR. LEE:  IT'S NOT A BASIS -- WE WOULD NEVER ELICIT

2    IT FROM DR. VELLTURO.  IT'S NOT A BASIS OF HIS THEORY.  SO IT

3    WOULD ONLY BE CROSS-EXAMINATION.  I DON'T THINK THERE'S ANY

4    BASIS FOR IT TO BE RELEVANT.

5           (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

6           MS. MAROULIS:  YOUR HONOR, WE MIGHT ALSO ELICIT IT

7    THROUGH ONE OF OUR FACT WITNESSES WHO IS INVOLVED IN PRODUCT

8    STRATEGY AND PRODUCT PLANNING.

9           THE COURT:  I DON'T SEE HOW THAT'S RELEVANT.

10          MR. LEE:  I DON'T THINK IT'S RELEVANT, YOUR HONOR.

11          MS. MAROULIS:  IT IS RELEVANT INSOFAR AS THEY'LL BE

12   ASKED ABOUT COMPETITION, AND THERE WILL BE A LOT OF QUESTIONS,

13   FOR EXAMPLE, MR. DENISON, ANOTHER WITNESS, HOW THEY SEE APPLE

14   AND WHAT IS THE STATE OF COMPETITION.  AND WE SHOULD BE ABLE TO

15   ASK IF APPLE IS SEEKING THIS REQUEST.

16          THE COURT:  ALL RIGHT.  THEN IT'S EXCLUDED.

17       NOW, THE ONLY QUESTION IS, YOU KNOW, THE FJC VIDEO ALREADY

18   SAID THAT A PATENT OWNER HAD A RIGHT TO EXCLUDE OTHERS FROM

19   MAKING, USING OR SELLING A PATENTED PRODUCT.

20       I'M INCLINED NOT TO GIVE ANY CURATIVE INSTRUCTION.  I

21   THINK JUST GIVING A CURATIVE INSTRUCTION THAT SAYS "YOU ARE NOT

22   TO CONSIDER APPLE'S REQUEST FOR A PERMANENT INJUNCTION IN YOUR

23   VERDICT ON LIABILITY OR DAMAGES WOULD JUST HIGHLIGHT THE

24   ISSUE."

25          SO -- BUT LET ME HEAR FROM YOU.

```
 1              MR. LEE:  YOUR HONOR, I THINK GIVEN WHERE WE ARE NOW,

 2       IF YOU WERE GOING TO EXCLUDE THE EVIDENCE, I DON'T THINK

 3       THERE'S A NEED FOR A CURATIVE INSTRUCTION NOW BECAUSE WE

 4       SHOULDN'T HEAR ABOUT IT.

 5              AND THEN WHEN WE GET TO THE CHARGING CONFERENCE AT THE

 6       END, IF WE THINK THERE'S AN APPROPRIATE INSTRUCTION, WHY DON'T

 7       WE PROPOSE IT TO YOUR HONOR THEN?

 8              BUT I THINK IF WE CAN GO THROUGH THE NEXT THREE WEEKS OF

 9       THE EVIDENCE WITHOUT THIS COMING UP, THAT'LL BE GOOD FORWARD

10       PROGRESS.

11              THE COURT:  WELL, I DON'T, AT THIS POINT, SO ANYTHING

12       OTHER THAN A VERY SHORT, SIMPLE SENTENCE THAT SAYS "YOU ARE NOT

13       TO CONSIDER APPLE'S REQUEST FOR A PERMANENT INJUNCTION IN YOUR

14       VERDICT ON LIABILITY OR DAMAGES."

15              I THINK THAT WOULD SUFFICE.  BUT I WILL LEAVE THAT ISSUE

16       FOR OUR JURY INSTRUCTION CONFERENCE, AND IF YOU ALL PROPOSE

17       UPDATED JURY INSTRUCTIONS AT A LATER TIME, YOU CAN INCLUDE YOUR

18       PROPOSAL AT THAT TIME.

19              MR. LEE:  OKAY.  AND THE REASON, YOUR HONOR, I WAS

20       SAYING IT WAS BETTER TO BE HELD THEN, IF YOU'RE JUST READING

21       THE COMPLAINTS AND THE COUNTERCLAIMS, THEY HAVE AN INJUNCTION

22       REQUEST AGAINST US, TOO, ON THEIR AFFIRMATIVE PATENTS.  THE

23       INSTRUCTION WILL PROBABLY BE SOMETHING, TO THE EXTENT THAT

24       EITHER PARTY HAS SOUGHT AN INJUNCTIVE RELIEF, YOU'RE NOT TO

25       CONSIDER IT.  BUT WE'LL WORK SOMETHING OUT.
```

1           MS. MAROULIS:  YES, YOUR HONOR.

2           THE COURT:  OKAY.  ALL RIGHT.

3           MS. MAROULIS:  THANK YOU.

4           MR. MCELHINNY:  ON -- THE ONE PART OF OUR MOTION THAT

5      YOU HAVEN'T ADDRESSED IS ON THE PRACTICING THE PATENTS.

6           THE COURT:  YES.

7           MR. MCELHINNY:  MAY WE HAVE A CONTINUING OBJECTION SO

8      THAT I DON'T HAVE TO STAND UP AND OBJECT TO EVERY QUESTION

9      ABOUT DO YOU PRACTICE THE PATENTS?

10          THE COURT:  THAT'S FINE.  I THINK THIS ISSUE IS

11     PRESERVED FOR APPEAL.

12          MR. MCELHINNY:  THANK YOU, YOUR HONOR.

13          THE COURT:  ALL RIGHT.  THEN LET'S GO AHEAD AND BRING

14     IN OUR JURY.

15          (JURY IN AT 1:11 P.M.)

16          THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

17     SEAT.

18          TIME IS NOW 1:12.

19          GO AHEAD, PLEASE.

20     BY MR. PRICE:

21     Q.   GOOD AFTERNOON.  MR. CHRISTIE, I THINK ON YOUR DIRECT

22     EXAMINATION, DID YOU SAY THAT YOU YOURSELF ARE NAMED AS AN

23     INVENTOR ON ABOUT 100 PATENTS?

24     A.   YES.

25     Q.   HOW ABOUT YOUR TEAM?  HOW MANY PATENTS FOR YOUR HUMAN

1    INTERFACE TEAM ARE WE TALKING ABOUT THAT YOU THINK HAVE COME

2    OUT OF THAT TEAM?

3    A.   I -- I DON'T KNOW.

4    Q.   WOULD IT BE ALSO, DO YOU THINK, IN THE HUNDREDS?

5    A.   I WOULD THINK SO.

6    Q.   OKAY.  SO JUST OUT OF YOUR TEAM, THERE ARE HUNDREDS UPON

7    HUNDREDS OF PATENTS RELATING TO USER INTERFACE.

8    A.   YES.

9    Q.   AND YOU'RE HERE TODAY TESTIFYING ABOUT ONE PARTICULAR

10   PATENT AND THE PATENT CLAIM UPON WHICH YOU ARE AN INVENTOR;

11   CORRECT?

12   A.   I'M HERE TO ANSWER YOUR QUESTIONS.

13   Q.   BUT THERE'S ONLY ONE -- IN TERMS OF THE PRODUCTS AT ISSUE

14   HERE AND THE PATENT CLAIMS AT ISSUE IN THIS CASE, THERE'S ONLY

15   ONE PATENT CLAIM IN THIS CASE UPON WHICH YOU ARE NAMED AS AN

16   INVENTOR; CORRECT?

17   A.   YES.

18   Q.   AND I WANT TO SHOW YOU A -- IT'S EXHIBIT JX 35N.  I'M

19   GOING TO USE IT AS A DEMONSTRATIVE.  I'LL REPRESENT TO YOU IT'S

20   THE GALAXY S III PHONE.

21   A.   OKAY.

22   Q.   HAVE YOU SEEN IT BEFORE?

23   A.   NOT TO MY SPECIFIC RECOLLECTION, NO.

24   Q.   HAVE YOU SEEN A GALAXY S III PHONE BEFORE?

25   A.   I'M SURE I HAVE.

1    Q.   AND YOU'LL AGREE THAT YOU DON'T BELIEVE THAT YOU INVENTED

2    ALL WAYS TO UNLOCK A SCREEN?

3    A.   I'M SURE THERE ARE LOTS OF WAYS TO UNLOCK A SCREEN, YEAH.

4    Q.   AND IF WE COULD LOOK AT THE GALAXY S III, THIS IS A PHONE

5    THAT'S IN THIS CASE, BUT IT IS -- IT IS NOT ACCUSED OF

6    INFRINGING THE SLIDE TO UNLOCK PATENT.  OKAY?

7        AND YOU SEE THERE'S A -- THERE WILL BE A RIPPLE EFFECT

8    HERE WHEN I GO ACROSS THE SCREEN.

9        CAN YOU FOLKS SEE THAT?  WAS I IN YOUR WAY?

10       DO YOU SEE THE RIPPLE EFFECT THAT OPENED THE SCREEN?  DO

11   YOU SEE THAT?

12   A.   I SAW THE RIPPLE EFFECT, YES.

13   Q.   AND YOU SAW THAT IT UNLOCKED THE SCREEN?

14   A.   YES.

15   Q.   AND ARE YOU AWARE THAT -- AGAIN, THIS PHONE IS NOT BEING

16   ACCUSED OF INFRINGING THE SLIDE TO UNLOCK.

17       THERE ARE NINE PHONES THAT ARE ACCUSED OF INFRINGING

18   VARIOUS PATENTS IN THIS CASE, AND THIS ONE IS -- IS IT YOUR

19   UNDERSTANDING THIS ONE HAS OUTSOLD ALL OF THE OTHER PHONES

20   COMBINED?

21   A.   I DIDN'T KNOW THAT.

22       MR. PRICE:  NOTHING FURTHER, YOUR HONOR.

23       THE COURT:  ALL RIGHT.  TIME IS NOW 1:15.

24   ANY REDIRECT?

25       MR. MCELHINNY:  NO REDIRECT FOR MR. CHRISTIE, YOUR

1      HONOR.

2              THE COURT:  ALL RIGHT.  IS HE EXCUSED SUBJECT TO

3      RECALL OR NOT SUBJECT TO RECALL?

4              MR. PRICE:  NOT SUBJECT.

5              MR. MCELHINNY:  HE'S FREE, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  THEN YOU'RE NOT SUBJECT TO

7      RECALL, AND YOU MAY BE EXCUSED.

8          (PAUSE IN PROCEEDINGS.)

9              MR. MCELHINNY:  APPLE CALLS PROFESSOR ANDREW

10     COCKBURN.

11             THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

12         **(PLAINTIFF'S WITNESS, ANDREW COCKBURN, WAS SWORN.)**

13             THE WITNESS:  I DO.

14             THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

15         AND WOULD YOU STATE YOUR NAME, PLEASE, AND SPELL IT.

16             THE WITNESS:  ANDREW JEREMY GAVIN COCKBURN.

17             MR. MCELHINNY:  EXCUSE ME.  WE'VE ALL LEARNED THROUGH

18     HARD EXPERIENCE THAT YOU HAVE TO HAVE THAT MICROPHONE UP YOUR

19     NOSE ALMOST.

20             THE WITNESS:  YEAH.  A-N-D-R-E-W, J-E-R-E-M-Y,

21     G-A-V-I-N, C-O-C-K-B-U-R-N.

22             THE COURT:  ALL RIGHT.  TIME IS NOW 1:18.  GO AHEAD,

23     PLEASE.

24             MR. MCELHINNY:  THANK YOU.

25     ///

**DIRECT EXAMINATION**

1

2    BY MR. MCELHINNY:

3    Q.   PROFESSOR COCKBURN, WHAT DO YOU DO FOR A LIVING, SIR?

4    A.   I'M A PROFESSOR OF COMPUTER SCIENCE AND SOFTWARE

5    ENGINEERING AT THE UNIVERSITY OF CANTERBURY, CHRISTCHURCH, NEW

6    ZEALAND.

7    Q.   ANOTHER THING WE'VE LEARNED OVER HARD EXPERIENCE IS THAT

8    WHEN THE COURT REPORTER ASKS YOU TO REPEAT YOUR ANSWER, IT

9    MEANS YOU ARE SPEAKING TOO FAST.

10   A.   OKAY.

11   Q.   OKAY.  WE HAVE PUT PDX 11 UP ON THE SCREEN.

12        HOW LONG HAVE YOU BEEN TEACHING COMPUTER SCIENCE?

13   A.   I'VE BEEN A FACULTY MEMBER IN THAT DEPARTMENT FOR 21

14   YEARS, AND PRIOR TO THAT, I DID SOME TUTORING AS A PH.D.

15   STUDENT AND UNDERGRADUATE.

16   Q.   WHAT IS YOUR PERSONAL EDUCATIONAL BACKGROUND?

17   A.   I HAVE AN HONOR'S DEGREE IN COMPUTER SCIENCE, A BACHELOR'S

18   DEGREE FROM THE UNIVERSITY OF YORK IN ENGLAND, AND A PH.D. IN

19   COMPUTER SCIENCE FROM THE UNIVERSITY OF STIRLING IN SCOTLAND.

20   Q.   DO YOU PERSONALLY HAVE A FIELD OF INTEREST OR A FOCUS

21   WITHIN THE FIELD OF COMPUTER SCIENCE?

22   A.   YES, I DO.

23   Q.   AND CAN YOU TELL US WHAT IT IS?

24   A.   IT'S THE AREA OF HUMAN COMPUTER INTERACTION, WHICH IS

25   ESSENTIALLY THE SAME CONCERNS MR. CHRISTIE WAS TALKING ABOUT

1   THIS MORNING, MAKING COMPUTERS EASIER TO USE, MORE EFFECTIVE TO

2   USE, FASTER TO DO YOUR TASKS, AND MORE ENJOYABLE.

3   Q.   IN ADDITION TO YOUR ACADEMIC CAREER, HAVE YOU EVER

4   CONSULTED WITH CORPORATE ENGINEERING CLIENTS?

5   A.   YES, I HAVE, SEVERAL TIMES.

6   Q.   CAN YOU GIVE US EXAMPLES, PLEASE?

7   A.   TWO EXAMPLES WOULD BE I VISITED IBM ALMADEN JUST DOWN THE

8   ROAD HERE FOR A COUPLE OF MONTHS IN 2006, AND I WORKED FOR

9   SEVERAL YEARS WITH LOGITECH, THEIR R&D DIVISION, IN FREMONT AND

10  THEIR ISLAND LABS.  THE ISLANDS OFF THE COAST OF GREAT BRITAIN.

11  Q.   ANOTHER THING WE'VE LEARNED IS ONE OF US TALKS FUNNY, ALL

12  RIGHT?

13  A.   SORRY.  MY VOICE IS A BIT HUSKY.  I'M SORRY.

14  Q.   DO YOU, BY THE WAY -- WHILE WE'RE THINKING ABOUT IT, DO

15  YOU NEED LOZENGES?  WE'VE GOT LOTS.

16       HAVE YOU WRITTEN ANY PROFESSIONAL PUBLICATIONS IN YOUR

17  FIELD?

18  A.   YES, OVER A HUNDRED IN THE FIELD OF HUMAN INTERROGATORIES

19  ACTION.

20  Q.   HAVE ANY OF THEM APPEARED IN PEER REVIEWED JOURNALS?

21  A.   ALL OF THEM HAVE BEEN IN PEER REVIEWED JOURNALS, ALL

22  CONFERENCES.  CONFERENCES ARE A COMMON VENUE FOR PUBLICATION IN

23  COMPUTER SCIENCE.

24  Q.   AND NOW THAT I'VE ASKED YOU THAT QUESTION, TELL US WHAT IS

25  A PEER REVIEWED JOURNAL?

1    A.   IT'S AN ARTICLE THAT HAS UNDERGONE PEER REVIEW, WHICH

2    MEANS YOU SUBMIT IT TO A VENUE FOR PUBLICATION, AND PEER

3    MEMBERS OF THE RESEARCH COMMUNITY ASSESS THE CONTENT OF THAT

4    MATERIAL AND DETERMINE ITS WORTHINESS IN BEING PUBLISHED IN

5    THAT VENUE.

6    Q.   DO YOU SIT ON THE EDITORIAL BOARDS OF ANY PROFESSIONAL

7    JOURNAL?

8    A.   YES, I DO.  I'M CURRENTLY ON THE EDITORIAL BOARD OF THE

9    ACM TRANSACTIONS ON COMPUTER HUMAN INTERACTION, WHICH IS WIDELY

10   REGARDED AS EITHER THE TOP OR ONE OF THE TOP TWO JOURNALS IN

11   THE FIELD.

12   Q.   HELP ME WITH ACM TRANSACTIONS?

13   A.   ACM IS THE ASSOCIATION OF COMPUTER AND MACHINERY.  IT'S

14   THE LARGEST ASSOCIATION FOR COMPUTER SCIENTISTS ESSENTIALLY,

15   AND TRANSACTIONS IS JUST THE BEGINNING OF THE NAME OF THE

16   JOURNAL.

17   Q.   HAVE YOU WON ANY PROFESSIONAL AWARDS FOR YOUR WORD?

18   A.   YES, I HAVE.  A QUITE A FEW.

19   Q.   CAN YOU TELL US ABOUT THEM, PLEASE?

20   A.   ONE WOULD BE IN 2009 I RECEIVED WHAT'S CALLED THE CHRIS

21   WALLACE AWARD, THE OUTSTANDING RESEARCH CONTRIBUTION IN

22   COMPUTER SCIENCE, AND THAT WAS FOR THE PERIOD 2005 TO 2007, AND

23   IT'S AN AUSTRALIAN AWARD, AUSTRALIA PLUS NEW ZEALAND.

24        MR. MCELHINNY:  YOUR HONOR, WE OFFER PROFESSOR

25   COCKBURN AS AN EXPERT WITNESS IN COMPUTER SCIENCE AND HUMAN

1    COMPUTER INTERACTIONS.

2              MR. NELSON:  DAVID NELSON.  NO OBJECTION, YOUR HONOR.

3              THE COURT:  OKAY.  SO IT'S COMPUTER SCIENCE AND

4    HUMAN --

5              MR. MCELHINNY:  -- COMPUTER INTERACTIONS.

6              THE COURT:  OKAY.  THANK YOU.  SO CERTIFIED.

7    BY MR. MCELHINNY:

8    Q.   PROFESSOR, WHAT ASSIGNMENT DID WE ASK YOU TO UNDERTAKE IN

9    CONNECTION WITH THIS LITIGATION?

10   A.   YOU ASKED ME TO REVIEW SEVERAL DOCUMENTS AND DEVICES AS

11   NECESSARY TO DETERMINE WHETHER THOSE DEVICES INFRINGE ON

12   CERTAIN PATENTS AND SIMILAR RELATED MATTER.

13             THE COURT:  YOU KNOW, I THINK WE HAVE TOO MANY CELL

14   PHONES ON.  THE REALTIME IS DOWN.

15        CAN WE HAVE -- IF YOU DON'T NEED YOUR CELL PHONE, CAN YOU

16   PLEASE TURN IT OFF?

17             MR. MCELHINNY:  MINE IS NOT ON, YOUR HONOR.

18             THE COURT:  OKAY.  THANK YOU.  GO AHEAD.

19             MR. MCELHINNY:  DO YOU NEED TO RESTART IN ORDER TO

20   GET --

21             THE COURT:  I DO, BUT GO AHEAD.  I DON'T WANT TO HOLD

22   UP QUESTIONING.

23             MR. MCELHINNY:  OKAY.

24   BY MR. MCELHINNY:

25   Q.   WHICH PATENTS HAVE YOU STUDIED AT OUR REQUEST, SIR?

1    A.   THE '721 PATENT, OR SLIDE TO UNLOCK PATENT, AND THE '172

2    PATENT FOR AUTOMATIC WORD CORRECTION.

3    Q.   WERE THERE PARTICULAR CLAIMS WITHIN THOSE PATENTS THAT WE

4    ASKED YOU TO LOOK AT?

5    A.   YES, THERE WERE.

6    Q.   AND WHAT WERE THOSE?

7    A.   THERE WAS CLAIM 8 OF THE '721 PATENT AND CLAIM 18 OF THE

8    '172.

9    Q.   WHAT TYPES OF MATERIALS DID YOU REVIEW IN ORDER TO

10   UNDERTAKE THE STUDY WE ASKED YOU TO TAKE ON?

11   A.   I REVIEWED THE PATENT AND THE PATENT HISTORY, I REVIEWED A

12   LARGE SET OF DEVICES, SAMSUNG USER MANUALS AND SPECIFICATIONS

13   FOR THOSE DEVICES, AND INTERNAL SAMSUNG DOCUMENTS THAT WERE

14   PRODUCED AS PART OF THIS CASE.

15   Q.   WHEN YOU SAY "DEVICES," WHAT ARE YOU TALKING ABOUT?

16   A.   MOBILE PHONES.

17   Q.   AND WHEN YOU SAY "SAMSUNG INTERNAL DOCUMENTS," ARE YOU

18   TALKING ABOUT THE RESEARCH AND DEVELOPMENT DOCUMENTS THAT I'VE

19   BEEN WAVING AROUND?

20   A.   THAT'S CORRECT, YES.

21   Q.   DID YOU DELEGATE YOUR WORK ON THIS CASE TO ANYONE ELSE?

22   A.   NO.  I DID ALL OF THIS WORK MYSELF.

23   Q.   ARE YOU FAMILIAR WITH THE WORD -- THE TERM "SOURCE CODE"?

24   A.   YES, I AM.

25   Q.   WHAT IS SOURCE CODE?

DIRECT COCKBURN

1    A.   SOURCE CODE IS THE SET OF INSTRUCTIONS THAT ARE ON A

2    COMPUTING DEVICE THAT ENABLE IT TO BECOME OPERATIVE IN SOME

3    WAY.  SO THE INSTRUCTIONS TO DETERMINE THE BEHAVIOR OF THE

4    DEVICE, AND THAT'S SOFTWARE.

5    Q.   IN FORMING YOUR OPINIONS AS TO WHETHER OR NOT SAMSUNG

6    INFRINGED THE '721 AND 7 -- AND '172 PATENTS, DID YOU REVIEW

7    ANY SAMSUNG SOURCE CODE?

8    A.   NO.  THESE PATENTS ADDRESS THE BEHAVIOR OF THE DEVICE AT

9    ITS USER INTERFACE, AND THEY DO NOT SPEAK TO ANY PARTICULAR

10   REQUIREMENT IN THE FORM OF INSTRUCTIONS.  ANY INSTRUCTIONS

11   WOULD DO.

12   Q.   AT ANY POINT IN YOUR WORK IN THIS CASE, HAVE YOU LOOK AT

13   SAMSUNG'S SOURCE CODE?

14   A.   YES, I HAVE.  IN RESPONSE TO PROFESSOR GREENBERG'S,

15   SAMSUNG'S EXPERT, SOME OF HIS ARGUMENTS, I THEN INSPECTED

16   SOURCE CODE.

17   Q.   DID YOUR INSPECTION OF SOURCE CODE CHANGE ANY OF YOUR

18   OPINIONS THAT YOU FORMED?

19   A.   NOT AT ALL.

20   Q.   ARE YOU BEING COMPENSATED FOR THE WORK THAT YOU'VE DONE IN

21   THIS CASE?

22   A.   YES, I AM.

23   Q.   AT WHAT RATE, SIR?

24   A.   MY RATE IS 575 NEW ZEALAND DOLLARS AN HOUR, WHICH IS ABOUT

25   490 U.S.

1    Q.   OKAY.  LET'S START WITH THE '721 SLIDE TO UNLOCK PATENT.

2    THIS IS JX 10.

3         CAN YOU GIVE US A HIGH-LEVEL DESCRIPTION OF THE INVENTION

4    THAT IS DESCRIBED IN CLAIM 8 OF THE '721 PATENT?

5    A.   YES.  AS MR. CHRISTIE THIS MORNING DESCRIBED IT, IT

6    DESCRIBES A USER FRIENDLY METHOD TO UNLOCK A PORTABLE

7    TOUCHSCREEN DEVICE THAT HAS BEEN LOCKED IN ORDER TO AVOID

8    ACCIDENTAL ACTIVATION OF THE FUNCTIONS ON THAT DEVICE.

9    Q.   HAVE YOU REACHED A CONCLUSION AS TO WHETHER THE SAMSUNG --

10   WHETHER CERTAIN SAMSUNG PHONES INFRINGE CLAIM 8 OF THE '721

11   PATENT?

12   A.   YES, I HAVE.

13   Q.   AND WHAT IS YOUR CONCLUSION?

14   A.   THE ACCUSED DEVICES INFRINGE ON CLAIM 8.

15   Q.   IF YOU WOULD -- YOU MUST HAVE A NUMBER OF BINDERS UP

16   THERE.  IF YOU WOULD LOOK IN VOLUME 1 AND FIND JX 10.

17   A.   THANK YOU.

18   Q.   AND THE JURY CAN FOLLOW ALONG IF THEY'D LIKE BECAUSE THEY

19   HAVE A COPY IN THEIR NOTEBOOKS.

20        WHAT IS THIS DOCUMENT?

21   A.   THIS IS THE '721 PATENT, OR SLIDE TO UNLOCK PATENT.

22   Q.   IN THE '721 PATENT, WHERE DO WE FIND CLAIM 8?

23   A.   IT'S ON THE FINAL PAGE, AND IT SPANS COLUMNS 19 AND 20.

24   Q.   SO WE'VE PUT THAT UP ON THE BOARD.  FIRST, A LITTLE

25   DEFINITION.  IF I USE THE PHRASE "ELEMENTS OF A CLAIM," WILL

```
1     YOU KNOW WHAT I'M REFERRING TO?

2     A.   YES, I WILL.

3     Q.   AND WHAT WILL -- WHAT DEFINITION WOULD WE BE USING?  WHAT

4     ARE THE ELEMENTS OF A CLAIM?

5     A.   THE ELEMENTS OF A CLAIM ARE THE INDIVIDUAL REQUIREMENTS OF

6     THE CLAIM, WHAT NEEDS TO HAPPEN IN ORDER TO SATISFY THE CLAIM

7     AS A WHOLE.

8          AND YOU CAN SEE THEM ON THE BOARD THERE.  EACH ONE IS

9     SEPARATED BY A SEMICOLON OR A PUNCTUATION MARK, AND EACH BEGINS

10    ON A NEW LINE.

11    Q.   AND WHERE, WHERE DO WE FIND THE ELEMENTS THAT MAKE UP

12    CLAIM 8?

13    A.   WELL, CLAIM 8 IS WHAT'S CALLED A DEPENDENT CLAIM.  IF WE

14    LOOK AT THE LANGUAGE AT THE BOTTOM OF THE BOARD THERE, WE SEE

15    CLAIM 8 BEGINS WITH THE DEVICE OF CLAIM 7, AND WHAT THAT MEANS

16    IS YOU NEED TO READ ALL OF THE ELEMENTS OF CLAIM 7 AND THE

17    ELEMENTS OF CLAIM 8 TOGETHER AS A SINGLE UNIT IN ORDER TO

18    DETERMINE INFRINGEMENT.

19    Q.   ARE YOU FAMILIAR WITH ANOTHER TERM "CLAIM CONSTRUCTION"?

20    A.   YES, I AM.

21    Q.   AND WHAT DO YOU UNDERSTAND CLAIM CONSTRUCTION TO MEAN IN

22    THIS CONTEXT?

23    A.   IT MEANS THAT THE COURT MAY APPLY A SPECIFIC MEANING TO

24    TERMS THAT ARE USED IN THE CLAIM.

25    Q.   AND IN THIS CASE HAS JUDGE KOH DEFINED THE MEANINGS OF ANY
```

1      OF THE TERMS IN CLAIM 8 OF THE '721 PATENT?

2      A.   NO, NO.  THE COURT HAS MADE NO SUCH RULING.

3      Q.   SO IN THE ABSENCE OF A CLAIM CONSTRUCTION, WHAT IS YOUR

4      UNDERSTANDING AS TO HOW YOU DETERMINE THE MEANING OF THE PATENT

5      CLAIM LANGUAGE?

6      A.   YOU APPLY PLAIN AND ORDINARY UNDERSTANDING FOR SOMEONE

7      SKILLED IN THE ART.

8      Q.   HAVE YOU AN OPINION AS TO WHAT WOULD BE THE DEFINITION FOR

9      THIS PATENT OF A PERSON OF ORDINARY SKILL IN THE ART?

10     A.   I'VE EXPRESSED THE OPINION THAT IT'S SOMEBODY WITH A

11     BACHELOR'S DEGREE OR EQUIVALENT IN COMPUTER SCIENCE; AND, TWO,

12     TWO OR MORE YEARS OF EXPERIENCE IN DESIGNING AND/OR

13     IMPLEMENTING USER INTERFACES.

14     Q.   AND JUST TO JUMP AHEAD OF OURSELVES, WOULD YOU USE THAT

15     SAME DEFINITION AS A PERSON OF ORDINARY SKILL IN THE ART FOR

16     THE '172 PATENT?

17     A.   YES, I WOULD.

18     Q.   OKAY.  DID YOU USE THE PLAIN MEANING OF THE CLAIM LANGUAGE

19     WHEN YOU FORMED YOUR OPINION AS TO INFRINGEMENT IN THIS CASE?

20     A.   YES, I DID.

21     Q.   OKAY.  WITH THAT BACKGROUND, CAN YOU PLEASE GIVE US AN

22     OVERVIEW OF THE CLAIM ELEMENTS OF CLAIM 8 OF THE '721 PATENT?

23     A.   CERTAINLY.  WHAT I'VE DONE HERE IS BREAK THE ELEMENTS OF

24     THE CLAIM DOWN INTO TWO MAJOR UNITS.

25          SO THAT'S THE FIRST UNIT THERE, AND WE'LL STEP THROUGH THE

1    REMAINDER.

2         BUT FIRST THE HIGHLIGHTED SECTION IN YELLOW THERE REALLY

3    DESCRIBES THE STUFF ASSOCIATED WITH THE COMPUTING DEVICE.  SO

4    IT HAS, AS YOU SEE ON THE FIRST LINE, IT'S A PORTABLE

5    ELECTRONIC DEVICE; IT MUST HAVE A TOUCH-SENSITIVE DISPLAY; IT

6    NEEDS MEMORY, WHICH IS USED TO STORE DATA AND SOFTWARE SOME OF

7    YOU MAY BE FAMILIAR WITH THE TERM RAM, YOU'VE HEARD RAM ON

8    DEVICES, THAT'S JUST ONE OF SEVERAL FORMS OF MEMORY; IT NEEDS A

9    PROCESSOR AND A PROCESSOR IS NECESSARY TO EXECUTE INSTRUCTIONS

10   IN ORDER TO GIVE A DEVICE ITS BEHAVIOR.  IF YOU DON'T HAVE A

11   PROCESSOR, THE INSTRUCTIONS CAN'T, CAN'T BE EXECUTED IN ANY

12   WAY.

13        AND THERE NEEDS TO BE ONE OR MORE MODULES STORED IN

14   MEMORY, AND MODULES ARE JUST SOFTWARE COMPONENTS, AND SOFTWARE

15   COMPONENTS ARE JUST A FORM OF INSTRUCTIONS.

16        SO THAT'S THE DESCRIPTION OF THE DEVICE, AND WE CAN SEE ON

17   THE RIGHT-HAND SIDE A FIGURE FROM THE SPECIFICATION TO THE

18   PATENT THAT POINTS TO A DEVICE THAT'S EXEMPLARY OF THIS, AND IT

19   HAS A TOUCHSCREEN, AS WE SEE AT THE TOP OF THAT FIGURE.

20             MR. MCELHINNY:  YOUR HONOR, FOR THE RECORD, WE'RE

21   LOOKING AT PDX 18.

22   Q.   CAN YOU TAKE US TO THE NEXT ELEMENT, PLEASE.

23   A.   THE NEXT ELEMENT --

24   Q.   I'M SORRY.  I HAVE TO DO THIS FOR THE RECORD.  USING PDX

25   19.

DIRECT COCKBURN

1    A.   THE NEXT ELEMENT DESCRIBE -- WELL, THE NEXT SERIES OF

2    ELEMENTS ACTUALLY DESCRIBE WHAT THE DEVICE DOES IN RESPONSE TO

3    USER INPUT.  SO IT BEGINS HERE DETECTING A CONTENT WITH A

4    TOUCH-SENSITIVE DISPLAY AND A FIRST PREDEFINED LOCATION

5    CORRESPONDING TO AN UNLOCK IMAGE.  IT'S HARD TO PUT THAT

6    CLEARER, BUT IF IT HELPS WE'VE GOT FIGURE 5 ON THE RIGHT THERE

7    THAT SHOWS A FINGER COMING IN AND TOUCHING THE IMAGE AT A

8    PREDEFINED LOCATION.  SO IT'S AT A POSITION ON THE SCREEN.

9         THAT IMAGES CONTAINS A RIGHTWARDS POINTING ARROW.  THAT'S

10   GOING TO BE THE UNLOCK IMAGE.

11   Q.   CAN YOU GO ON USING PDX 20 TO THE NEXT ELEMENT?

12   A.   THIS ONE CONSISTS OF A LOT OF LANGUAGE.  I'LL CUT TO THE

13   CHASE.

14        IT DESCRIBES CONTINUOUSLY MOVING THAT UNLOCK IMAGE IN

15   ACCORDANCE WITH THE CONTACT.  SO AS THE CONTACT MOVES ACROSS

16   THE TRACK THAT YOU SEE THERE, THE IMAGE WILL MOVE WITH THE

17   CONTACT.

18   Q.   USING PDX 21, CAN WE GO ON TO THE NEXT ELEMENT, PLEASE.

19   A.   THE NEXT ELEMENT IS TO UNLOCK THE HANDHELD ELECTRONIC

20   DEVICE IF THE UNLOCK IMAGE IS MOVED FROM ITS FIRST PREDEFINED

21   LOCATION TO A PREDEFINED UNLOCK REGION.

22        NOW, WHAT WE SEE ON FIGURE 5D ON THE RIGHT THERE IS A

23   DEVICE THAT HAS BECOME UNLOCKED.  SO THAT SERIES OF ICONS YOU

24   SEE ON THE DISPLAY, ALTHOUGH IT COULD BE CONFUSED FOR A MOBILE

25   PHONE DIALLING INTERFACE, IT'S NOT.  EACH OF THESE IS LABELED

```
 1        APP 1, APPLE 2, AND SO ON.  SO THIS IS THE HOME SCREEN OF THE

 2        DEVICE.  THE DEVICE HAS BECOME UNLOCKED AT THIS POINT AND THE

 3        FUNCTIONALITY IS AVAILABLE.

 4        Q.   AND, FINALLY, USING PDX 22, CAN YOU DESCRIBE -- DISCUSS

 5        THE ADDITIONAL ELEMENT THAT'S CONTAINED IN CLAIM 8?

 6        A.   CERTAINLY.  THIS DESCRIBES WHAT ARE DESCRIBED AS VISUAL

 7        CUES TO COMMUNICATE A DIRECTION OF MOVEMENT OF THE UNLOCK IMAGE

 8        REQUIRED TO UNLOCK THE DEVICE, AND WE SEE IN THE IMAGE, THE

 9        EXEMPLARY IMAGE, 5A, THAT THERE'S SEVERAL VISUAL CUES THERE.

10        THERE'S THE IMAGE ITSELF WITH THE RIGHTWARDS POINTING ARROW AND

11        THERE'S THE TRACK.  SO THAT SHOWS THE DIRECTION THAT THE IMAGE

12        NEEDS TO BE USED TO UNLOCK.

13        Q.   YOU USE THE PHRASE HERE TO UNLOCK THE DEVICE.

14             WHAT DOES THAT MEAN IN THE CONTEXT OF THIS PATENT?

15        A.   THE PATENT SPECIFICATION IS VERY CLEAR ON WHAT UNLOCKING

16        MEANS.

17        Q.   LET ME INTERRUPT YOU FOR A MINUTE.  WHEN YOU SAY "THE

18        PATENT SPECIFICATION," WHAT ARE YOU TALKING ABOUT?

19        A.   THE SPECIFICATION IS THE SET OF -- IT'S THE DOCUMENT, THE

20        MAIN BODY, IF YOU LIKE, OF THE DOCUMENT.  IN THE -- PRIOR TO

21        THE OPENING THERE WAS SOME INSTRUCTIONAL MATERIAL TO THE JURY.

22        IT DESCRIBED HOW THERE'S AN ABSTRACT AND THE SERIES OF FIGURES,

23        A LARGE AMOUNT OF TEXT, AND THEN THE CLAIMS.

24             SO REALLY THE SPECIFICATIONS IS EVERYTHING BUT THE CLAIMS.

25        IT'S THE DESCRIPTION OF THE INTENDED EMBODIMENTS OF THE PATENT.
```

```
 1    Q.  OKAY.  ONE OTHER THING.  AS AN EXPERT, HAVE YOU BEEN

 2    PERMITTED TO SIT THROUGH THE TRIAL SO FAR?

 3    A.  I HAVE.  I'VE SEEN, I THINK, EVERYTHING.  EVERYTHING

 4    YOU'VE SEEN, I'VE SEEN.

 5    Q.  OKAY.  BACK TO MY QUESTION THEN.  WHAT DOES IT MEAN TO

 6    UNLOCK THE DEVICE IN THE CONTEXT OF THIS PATENT?

 7    A.  WELL, I THINK THE PLAIN AND ORDINARY MEANING IS

 8    SUFFICIENT.  BUT IF CLARIFICATION IS REQUIRED, THE

 9    SPECIFICATION CLEARLY STATES THAT WHEN THE DEVICE IS LOCKED, A

10    PREDEFINED SET OF ACTIONS IS UNAVAILABLE THE DEVICE WILL IGNORE

11    MOST, IF NOT ALL, INPUT.

12    Q.  IS THERE ONLY ONE KIND OF UNLOCKING?

13    A.  NO.  AGAIN, THE SPECIFICATION IS VERY CLEAR THAT UNLOCKING

14    CAN BE USED IN ALTERNATIVE CIRCUMSTANCES, SO --

15    Q.  GO AHEAD.

16    A.  ONE EXAMPLE IS SLIDING TO ANSWER A TELEPHONE CALL.

17    Q.  LET'S GET -- SO, MR. LEE, CAN WE HAVE FIGURES 7A, 7B, 7C

18    OF JX 10, PLEASE.

19        CAN YOU USE THESE TO EXPLAIN THAT.

20    A.  YES.  MAY I USE A LASER POINT TO --

21    Q.  SURE.

22    A.  I HAVE A LASER POINTER HERE THAT I'LL USE TO HIGHLIGHT

23    SOMETHING.

24    Q.  ARE YOU GOOD WITH THOSE?

25    A.  IT APPEARS I AM.
```

1    Q.   OKAY.  SO WE HAVE THE DEVICES DESCRIBED HERE IN FIGURE 7A.

2    IF YOU CAN READ THAT TEXT, IT SAYS "INCOMING CALL FROM JOHN

3    DOE."

4         SO THIS IS THE DEVICE, IT'S DESCRIBED IN THE LANGUAGE OF

5    THE CLAIM -- IN THE LANGUAGE OF THE SPECIFICATION AS BEING IN A

6    LOCKED STATE AT THIS POINT.

7         THEN -- LET ME GO OVER, WE HAVE FIGURE 7B.  SO DETECTION

8    OF CONTACT -- SORRY -- OCCURRED HERE, WE HAVE CONTINUOUS

9    MOVEMENT IN ACCORDANCE WITH THE CONTACT HERE, AND AT THIS POINT

10   THE USER HAS ALMOST FINISHED TRAILING THE UNLOCK IMAGE TO THE

11   END OF THE TRACK.  AND THERE IS A SUBSEQUENT IMAGE, 17, WHERE

12   THE DEVICE BECOMES UNLOCKED.

13        SO THIS IS VERY CLEARLY DESCRIBED AS ANSWERING A CALL

14   BEING A FORM OF SLIDE TO UNLOCK.

15   Q.   WHEN YOU READ THIS PATENT, PROFESSOR, DID YOU HAVE ANY

16   DIFFICULTY AT ALL IN UNDERSTANDING THE DIFFERENCE BETWEEN A

17   LOCKED STATE AND AN UNLOCKED STATE?

18   A.   NO.

19   Q.   HAVE YOU LOOKED AT IPHONES AS PART OF WHAT WE'VE ASKED YOU

20   TO DO IN THIS CASE?

21   A.   YES, I HAVE.

22   Q.   AND DO YOU HAVE AN OPINION ABOUT WHETHER IPHONES THAT YOU

23   HAVE REVIEWED PRACTICE CLAIM 8 OF THE '721 PATENT?

24   A.   YES, I DO.

25   Q.   HAVE YOU PREPARED A DEMONSTRATIVES VIDEO TO SHOW THIS FOR

1   US?

2   A.   YES.  THIS VIDEO SHOWS THE ELEMENTS OF THE CLAIM AND THE

3   VERY FAMILIAR INTERACTIONS TO MOST OF US.

4   Q.   THIS IS PDX 23.

5        (VIDEO PLAYED IN OPEN COURT.)

6            THE WITNESS:  SURE.  IF WE COULD BEGIN THE VIDEO

7   PLAYING, THERE'S THE UNLOCK IMAGE AND VISUAL CUES SHOWING THE

8   USER WHAT TO DO, DETECTION OF CONTACT, CONTINUOUS MOVEMENT, AND

9   UNLOCKING.

10       SO THE ICON MOVED FROM A PREDEFINED REGION -- SORRY -- A

11  PREDEFINED LOCATION TO A PREDEFINED REGION AND THE DEVICE

12  BECAME UNLOCKED.

13  BY MR. MCELHINNY:

14  Q.   TELL US ABOUT THE IPHONE'S SLIDE TO ANSWER FUNCTION.

15       (VIDEO PLAYED IN OPEN COURT.)

16           THE WITNESS:  THERE'S ANOTHER VIDEO HERE WE CAN

17  WATCH.  IT'S AN EXTREMELY SIMILAR INTERACTION.  IF WE START THE

18  VIDEO, THE DEVICE IS LOCKED.

19  BY MR. MCELHINNY:

20  Q.   PDX 24.

21  A.   CONTACT, CONTINUOUS WITH IT, MOVING IT TO A REGION, AND

22  THE DEVICE BECOMES UNLOCKED.

23  Q.   IN YOUR OPINION, DOES THE IPHONE THAT'S AVAILABLE TODAY

24  RUNNING IOS 7 PRACTICE CLAIM 8 OF THE '721 PATENT?

25  A.   YES, IT DOES.

DIRECT COCKBURN

1    Q.   OKAY.  AND DOES IT ALSO PRACTICE THE SLIDE TO ANSWER

2    FUNCTION IN IOS 7?

3    A.   YES, IT DOES.  BOTH ARE FORMS OF SLIDE TO UNLOCK.

4    Q.   WHY WAS THERE A NEED FOR APPLE TO PROVIDE AN UNLOCK

5    MECHANISM FOR THE IPHONE?

6    A.   I PREPARED A SLIDE DESCRIBING IT, BUT YOU REALLY HEARD IT

7    FROM MR. CHRISTIE THIS MORNING.

8    Q.   I'M SORRY.  THIS IS PDX 25.

9    A.   THIS IS THE POCKET, MY DEPICTION OF THE POCKET DIAL

10   PROBLEM.  YOU HAVE CLOTHING MATERIAL PRESSING ON BUTTONS, HANDS

11   ENTERING POCKETS, HANDS ENTERING PURSES, BRUSHING AGAINST A

12   LEG, ANY OF THESE THINGS COULD CAUSE ACCIDENTAL ACTIVATION OF

13   FUNCTIONS.

14   Q.   DID PHONE DESIGNERS TRY TO SOLVE THIS POCKET DIALLING

15   PROBLEM BEFORE THE IPHONE EXISTED?

16   A.   YES.

17   Q.   CAN YOU GIVE US AN EXAMPLE?

18   A.   THE NEXT SLIDE SHOWS AN EXAMPLE THAT I HAVE BEEN VERY

19   FRUSTRATED WITH.  THIS WAS A NOKIA --

20   Q.   I'M SORRY TO KEEP DOING THIS FOR YOU.  BUT THIS IS PDX 26?

21   A.   THIS IS A NOKIA N800 DEVICE THAT I OWNED.  WHAT WAS

22   REQUIRED TO UNLOCK, IT WAS ENTIRELY UNINTUITIVE, BUT HAVING

23   LOOKED AT THE MANUAL, I UNDERSTOOD THAT I NEEDED TO FIRST PRESS

24   THAT BUTTON, WHICH I COULDN'T DO WITH MY FINGER BECAUSE IT WAS

25   SLIGHTLY RECESSED, I HAD TO USE MY FINGERNAIL, AND THEN --

DIRECT COCKBURN

1    Q.   SLOWLY, SLOWLY.  SORRY.

2    A.   AND THEN I NEEDED TO ROTATE THE DEVICE AND PRESS THIS

3    OTHER BUTTON ON THE FRONT FACE.

4    Q.   YOU GET TO FLY HOME TO NEW ZEALAND.  I HAVE TO DEAL WITH

5    THE COURT REPORTER, OKAY?  SO WE'LL GO SLOW.

6         PROFESSOR, AS AN EXPERT IN THE FIELD OF COMPUTER SCIENCE

7    AND HUMAN COMPUTER INTERACTION, WHAT IS YOUR VIEW AS TO THE

8    IMPORTANCE OF APPLE'S PATENTED SLIDE TO UNLOCK INVENTION?

9    A.   IT'S A CRITICAL FEATURE TO GET CORRECT AS THIS IS THE

10   INITIAL INTERACTION WITH THE DEVICE.

11   Q.   ARE THERE IMPORTANT BENEFITS OF APPLE'S SLIDE TO UNLOCK

12   INVENTION AS IT'S DESCRIBED IN CLAIM 8?

13   A.   VERY MUCH SO.

14   Q.   CAN YOU GIVE US A LIST?

15   A.   SURE.

16   Q.   USING PDX 29.

17   A.   SO I IDENTIFIED FIVE BENEFITS, CRITICAL BENEFITS

18   ASSOCIATED WITH THIS INVENTION.

19        THE FIRST IS REALLY THAT IT HAS TO WORK.  IT HAS TO

20   SUCCEED IN PREVENTING ACCIDENTAL ACTIVATION BY MISTAKE.

21        BUT YET IT NEEDS TO BE SOMETHING THAT'S EASY TO DO, BUT

22   NOT SO EASY THAT IT CAN OCCUR BY ACCIDENT, AND IT SUCCEEDS IN

23   THAT.

24        SECOND, IT HAS TO BE HIGHLY LEARNABLE, OR INTUITIVE.  THE

25   USER NEEDS TO BE ABLE TO UNDERSTAND IMMEDIATELY WHAT YOU NEED

```
 1        TO DO TO UNLOCK THIS DEVICE THE VERY FIRST TIME YOU TURN IT ON,

 2        AND MR. CHRISTIE REFERRED TO THAT THIS MORNING.

 3             THIRD, IT HAS TO BE EFFICIENT, AND IT IS.  EFFICIENCY HERE

 4        REALLY CONCERNS HOW LONG IT TAKES TO DO THIS.  AS MR. CHRISTIE

 5        SAID, THIS IS SOMETHING PEOPLE DO HUNDREDS OF TIMES A DAY.  AND

 6        WITH A GLANCE AT THE DEVICE AND A SWIPE ACROSS THE SURFACE OF

 7        THE DISPLAY, YOU CAN UNLOCK THE DEVICE IN A FRACTION OF A

 8        SECOND.

 9             FOURTH, VERY IMPORTANTLY AGAIN, IT INTRODUCES A GESTURE

10        THAT MAY BE USEFUL FOR MANY PURPOSES ON THE DEVICE.  SO IT'S

11        POSSIBLE THAT USERS WILL NOT UNDERSTAND THAT THE GESTURE TO

12        INTERACTION, SWIPES AND SO ON, WILL BE USED ELSEWHERE IN THE

13        INTERACTIVE DEVICE.

14             SO BY HAVING THE SWIPING GESTURE USED AT THE GATEWAY TO

15        INTERACTION, THE VERY FIRST THING YOU DO WITH THE DEVICE, IT'S

16        MUCH MORE LIKELY THAT USERS WILL ANTICIPATE THAT GESTURES CAN

17        BE USED ELSEWHERE ON THE DEVICE.

18             AND, FINALLY, AGAIN, ALL OF THESE ARE CRITICAL ELEMENTS,

19        BUT THE FINAL ONE IS THAT IT'S REALLY ENJOYABLE TO USE.  THIS

20        IS SOMETHING THAT'S FUN, ENGAGING, AND DELIGHTFUL.  YOU STROKE

21        THE DEVICE IN ORDER TO UNLOCK IT.

22   Q.   YOU MENTIONED AT THE BEGINNING THAT YOU REVIEWED INTERNAL

23        SAMSUNG DOCUMENTS PRODUCED IN THIS CASE; CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   WERE ANY OF THOSE DOCUMENTS THAT YOU REVIEWED RELEVANT IN
```

```
 1      FORMING YOUR VIEW ABOUT THE BENEFITS OF APPLE'S SLIDE TO UNLOCK

 2      FUNCTION AS DESCRIBED IN CLAIM 8?

 3      A.   YES.  I'VE SEEN MANY DOCUMENTS THAT CONFIRMED THAT SAMSUNG

 4      AGREES WITH THESE BENEFITS.

 5      Q.   LET'S SEE IF WE CAN MAKE OUR CHRONOLOGY CLEAR.

 6           IN TERMS OF THE CHRONOLOGY, WERE THESE DOCUMENTS THAT YOU

 7      REVIEWED CREATED BEFORE OR AFTER THE INTRODUCTION OF THE

 8      IPHONE?

 9      A.   THESE DOCUMENTS WERE ALL AFTER THE INTRODUCTION OF THE

10      IPHONE.

11      Q.   AND WERE THESE DOCUMENTS CREATED BEFORE OR AFTER THE

12      INTRODUCTION OF THE ACCUSED SAMSUNG PHONES?

13      A.   THESE DOCUMENTS WERE ALL BEFORE THE INTRODUCTION OF THE

14      ACCUSED PHONES.

15      Q.   IF YOU LOOK IN YOUR BINDER, PLEASE, AT PX 121.

16      A.   THANK YOU.

17      Q.   JUST LOOKING, CAN YOU TELL ME WHAT THAT DOCUMENT IS?

18      A.   IT'S A TRANSLATION OF USABILITY EVALUATION RESULTS OF A

19      DEVICE CALLED THE VICTORY FROM MAY 2010, AND IT'S PRODUCED BY

20      THE SOFTWARE VERIFICATION GROUP WITHIN SAMSUNG.

21      Q.   DID YOU SAY MAY 2010?

22      A.   THAT'S CORRECT.

23      Q.   AND IS THIS ONE OF THE INTERNAL SAMSUNG DOCUMENTS THAT

24      WERE PRODUCED IN THIS CASE THAT YOU RELIED UPON IN FORMING YOUR

25      OPINIONS?
```

1    A.   YES, IT IS.

2              MR. MCELHINNY:  YOUR HONOR, I MOVE PX 121.

3              MR. NELSON:  NO OBJECTION, YOUR HONOR.

4              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

5         (PLAINTIFF'S EXHIBIT PX 121 WAS ADMITTED IN EVIDENCE.)

6              THE COURT:  GO AHEAD, PLEASE.

7    BY MR. MCELHINNY:

8    Q.   SO WHAT ARE WE SEEING ON THE SCREEN HERE, PROFESSOR?

9    A.   THIS IS THE FIRST PAGE.  I BASICALLY READ THIS A SECOND

10   AGO.  IT'S USABILITY EVALUATION RESULTS FOR A DEVICE THAT'S

11   CODE NAMED THE VICTORY, AND IT'S BY THE SOFTWARE VERIFICATION

12   GROUP.

13   Q.   AND CAN YOU TELL ME WHAT THE WORD "TRANSLATION" MEANS IN

14   THE UPPER LEFT-HAND CORNER?

15   A.   THIS WAS ORIGINALLY IN KOREAN, AND IT'S BEEN TRANSLATED

16   INTO ENGLISH.

17   Q.   CAN YOU TELL ME WHAT THE WORD "CONFIDENTIAL" IN THE UPPER

18   RIGHT-HAND CORNER REFERS TO?

19   A.   I GUESS, I GUESS SAMSUNG DOESN'T WANT THIS TO BE SEEN BY

20   OTHERS.

21   Q.   IF YOU WOULD LOOK, PLEASE, AT PAGE 27, AND BY THAT I'M

22   TALKING ABOUT THE NUMBER THAT WE HAVE PUT ON IT AT THE BOTTOM

23   OF THE PAGE AS OPPOSED TO THE INTERNAL NUMBER IN THE DOCUMENT.

24   A.   THANK YOU.

25   Q.   OKAY?  IS THIS ONE OF THE PAGES THAT YOU FOUND RELEVANT TO

1    YOUR DETERMINATION OF THE ISSUES HERE?

2    A.   YES, IT IS.

3    Q.   AND CAN YOU WALK US THROUGH THE RELEVANCE OF THIS PAGE?

4    A.   SURE.  THE FIRST ROUND BULLET POINT AT THE TOP OF THE

5    PAGE, IT'S DESCRIBING A PROBLEM WITH VICTORY PHONE.

6    Q.   LET ME INTERRUPT YOU.  WHAT IS THE VICTORY PHONE?

7    A.   IT'S A CODE NAME FOR A SAMSUNG UPCOMING DEVICE.

8    Q.   OKAY.  THANK YOU.

9    A.   IT SAYS "ON MANY OCCASIONS, USER IS UNABLE TO UNLOCK (THE

10   SCREEN) WHILE HOLDING THE DEVICE IN ONE HAND AND TOUCHING (IT)

11   WITH THUMB."

12        AND IT CONTRASTS THIS WITH THE IPHONE AND SAYING THAT THE

13   IPHONE "CAN UNLOCK EASILY AT ONE GO BY SLIDING A FIXED

14   DISTANCE."

15   Q.   AND DOES THIS PAGE RECOMMEND ANY ACTION TO BE TAKEN FOR

16   IMPROVEMENT?

17   A.   YES, IT DOES.  AT THE BOTTOM OF THE PAGE, THERE'S A

18   DIRECTION FOR IMPROVEMENT, WHICH IS TO "MODIFY DEFAULT

19   UNLOCKING METHOD SO AS TO ALLOW EASY UNLOCKING WITH ONE MOTION,

20   BY MAKING THE TOUCH DISTANCE CLEAR SUCH AS WITH SLIDING OR

21   MOVING A PUZZLE PIECE."

22   Q.   JUST TO TAKE ALL OF THE SURPRISE OUT OF THIS, ARE WE GOING

23   TO SEE A SAMSUNG PHONE THAT UNLOCKS BY MOVING A PUZZLE PIECE?

24   A.   YES, WE WILL.

25   Q.   OKAY.  IS IT POSSIBLE TO MAKE THE TOUCH DISTANCE CLEAR

DIRECT COCKBURN

1    WITHOUT MAKING THE DIRECTION OF MOVEMENT REQUIRED TO UNLOCK THE

2    PHONE CLEAR?

3    A.   YES, I BELIEVE IT IS.

4    Q.   OKAY.  IN THIS ILLUSTRATION HERE, WHAT COMPANY IS

5    PROVIDING THE DIRECTION FOR IMPROVEMENT?  IS THIS GOOGLE OR

6    SAMSUNG?

7    A.   THIS IS A SAMSUNG COMPARISON OF THE VICTORY PHONE WITH THE

8    IPHONE.

9    Q.   OKAY.  IF YOU LOOK AT PAGE 100, PLEASE.

10   A.   THANK YOU.

11   Q.   WHAT, IF ANYTHING, DID YOU FIND SIGNIFICANT ABOUT THIS

12   PAGE?

13   A.   THIS IS CRITICIZING THE VICTORY MECHANISM FOR ALLOWING THE

14   DEVICE TO BECOME UNLOCKED TOO EASILY.  SO THE SQUARE BULLET

15   POINT AT THE TOP OF THE PAGE SAYS "THE SCREEN LOCK GETS

16   UNLOCKED WITH A SLIGHT FLICK MOTION AT LCD-ON."

17        THIS IS COMPARED WITH THE IPHONE THAT SAYS "IT IS HANDLED

18   THROUGH SLIDING."

19        AND ON THE RIGHT-HAND SIDE, ALONG SIDE THE IPHONE, IT SAYS

20   THE IPHONE'S "UNLOCKING STANDARD IS PRECISE AS IT IS HANDLED

21   THROUGH SLIDING, AND IT ALLOWS PREVENTION OF ANY WRONG MOTION."

22   Q.   AND WHAT WAS THE DIRECTION OF IMPROVEMENT?

23   A.   THE DIRECTION OF IMPROVEMENT, I'LL READ IT, IT SAYS "SAME

24   AS IPHONE, CLARIFY THE UNLOCKING STANDARD BY SLIDING."

25   Q.   SAMSUNG DOCUMENT OR GOOGLE DOCUMENT?

1      A.    SAMSUNG DOCUMENT.

2      Q.    SIR, WOULD YOU LOOK AT PAGE PX 157 IN YOUR BINDER.  DO YOU

3      HAVE IT?

4      A.    I HAVE IT.

5      Q.    CAN YOU TELL ME WHAT IS PX 157?

6      A.    THIS IS ANOTHER USABILITY TEST RESULT COMPARING THIS TIME

7      A DEVICE CODE NAMED THE AMETHYST WITH THE IPHONE.

8      Q.    IS THIS -- I'M SORRY.

9      A.    IT'S FROM MARCH 2010.

10     Q.    MARCH 2010.  IS THIS ONE OF THE DOCUMENTS YOU RELIED UPON

11     IN FORMING YOUR OPINIONS?

12     A.    YES, IT IS.

13            MR. MCELHINNY:  YOUR HONOR, I MOVE PX 157.

14            MR. NELSON:  NO OBJECTION, YOUR HONOR.

15            THE COURT:  ALL RIGHT.  IT'S ADMITTED.

16     (PLAINTIFF'S EXHIBIT PX 157 WAS ADMITTED IN EVIDENCE.)

17            THE COURT:  GO AHEAD, PLEASE.

18     BY MR. MCELHINNY:

19     Q.    IS THIS THE COVER PAGE THAT YOU GOT YOUR INFORMATION FROM?

20     A.    YES, IT IS.

21     Q.    OKAY.  IF YOU WOULD TURN, PLEASE, TO, AGAIN, OUR LAWYER'S

22     NUMBER, PAGE 19 OF THIS DOCUMENT.

23     A.    THANK YOU.

24     Q.    IS THIS A PAGE YOU FOUND SIGNIFICANT IN YOUR ANALYSIS?

25     A.    YES, IT IS.

1    Q.  CAN YOU WALK US THROUGH THIS, PLEASE.

2    A.  THE VERY TOP, THE TITLE FOR THE PAGE, AGAIN, IS ADDRESSING

3    THE SCREEN LOCK FUNCTION, AND THIS TIME IT'S CONCERNED WITH THE

4    INTUITIVENESS OF UNLOCKING THIS DEVICE, WHICH WAS THE SECOND OF

5    THE BENEFITS THAT I IDENTIFIED, IF YOU REMEMBER, THE

6    LEARNABILITY.

7         THE BLUE SQUARE BULLET POINT SAYS "NOT ALWAYS SHOW GUIDE

8    ARROW ON LOCK SCREEN."

9         AND THE AMETHYST IN THE NEXT BULLET POINT, "IF USER DIDN'T

10   TOUCH ICON, HE CAN'T KNOW HOW TO UNLOCK."

11        SO IF THE USER DOESN'T KNOW WHAT TO DO --

12   Q.  CAN YOU SHOW US THAT ON THE PICTURE THERE?

13   A.  SURE.  THE VERY LEFT-HAND PICTURE, THAT'S WHAT IT LOOKS

14   LIKE UNTIL THE USER TOUCHES THE DISPLAY, SO THEY DON'T KNOW

15   WHAT TO DO FROM THERE.  THEY TOUCH THE DISPLAY AND THEN THEY

16   SEE THIS TRACK APPEAR.

17   Q.  OKAY.  THANK YOU.  GO AHEAD.

18   A.  THIS IS CONTRASTED AGAIN BACK TO THE TOP, THE IPHONE

19   BULLET POINT NEAR THE TOP, "WHENEVER THE SCREEN IS TURNED ON,

20   IT ALWAYS SHOWS GUIDE TEXT."

21   Q.  AND THE DIRECTION FOR IMPROVEMENT?

22   A.  THE DIRECTION FOR IMPROVEMENT IS IT "IT CAN MAKE USER BE

23   EASY TO UNLOCK, IF LOCK SCREEN ALWAYS SHOWS GUIDE TEXT OR ARROW

24   LIKE THE IPHONE."

25   Q.  HOW, IF AT ALL, DOES THIS PAGE RELATE TO THE BENEFIT CHART

```
1     THAT YOU SHOWED US?

2     A.   IT'S THE SECOND OF THE BULLET POINT THAT IS IDENTIFIED,

3     THE LEARNABILITY OR THE INTUITIVENESS OF THE METHOD IS CRITICAL

4     TO GET RIGHT.

5     Q.   LET'S LOOK AT THE NEXT PAGE OF THIS DOCUMENT, PAGE 20.

6     A.   THANK YOU.

7     Q.   WHAT, IF ANYTHING, ABOUT THIS PAGE DID YOU FIND

8     SIGNIFICANT?

9     A.   THIS IS CONFIRMING THAT SAMSUNG IS CONCERNED ABOUT THE

10    AESTHETIC INTEGRITY, OR THE -- HOW MUCH YOU LIKE OR ENJOY USING

11    THE TECHNIQUE, WHICH WAS THE FIFTH OF THE BENEFITS I

12    IDENTIFIED.

13        SPECIFICALLY --

14    Q.   WALK US THROUGH THIS SO THAT WE UNDERSTAND IT?

15    A.   THE BLUE BULLET POINT, SQUARE BULLET POINT IS CRITICIZING

16    THE AMETHYST'S MECHANISM BECAUSE THE LOCK ICON'S MOVEMENT IS

17    JOLTY.  SO THE NEXT BULLET POINT SAYS AMETHYST, "WHEN MAKE LOCK

18    ICON MOVE, IT DOESN'T MOVE SMOOTHLY."

19        WHICH IS COMPARED WITH THE IPHONE AS "LOCK ICON'S MOVEMENT

20    IS SMOOTH."

21        UNDERNEATH THE PICTURE OF THE ICON ON THE RIGHT, IT SAYS

22    "ICON'S MOVEMENT IS CONTINUOUS."

23        COMPARED WITH, ON THE LEFT, "ICON'S MOVEMENT IS NOT

24    CONTINUOUS" FOR THE AMETHYST.

25    Q.   AND THE RECOMMENDATION?
```

1      A.   THE DIRECTION FOR IMPROVE IS TO "MAKE ANIMATION EFFECT BE

2      SMOOTH AND CONTINUOUS LIKE THE IPHONE."

3      Q.   DOES THIS HAVE ANY RELATION TO THE SPECIFIC CLAIM LANGUAGE

4      IN THE PATENT THAT WE'RE TALKING ABOUT?

5      A.   YES, IT DOES.  WE SAW CONTINUOUS MOVEMENT IN ACCORDANCE

6      WITH THE CONTACT IN THE CLAIM.

7      Q.   WOULD YOU LOOK IN YOUR BINDER, PLEASE, AT PX 219?

8      A.   THANK YOU.

9      Q.   DO YOU HAVE IT?

10     A.   YES, I DO.

11     Q.   AND CAN YOU TELL ME WHAT PX 219 IS, PLEASE?

12     A.   THIS IS A TRANSLATION OF A VERY SIMILAR DOCUMENT.  IT'S

13     FOR A DEVICE THIS TIME CODE NAMED THE KEPLER, AND IT'S A

14     USABILITY EVALUATION REVIEW RESULT BY THE SAME GROUP, THE

15     SOFTWARE VERIFICATION GROUP FROM MAY 2010.

16     Q.   IS THIS A SAMSUNG, INTERNAL SAMSUNG DOCUMENT THAT YOU

17     RELIED UPON IN FORMING YOUR OPINIONS?

18     A.   YES, IT IS.

19          MR. MCELHINNY:  YOUR HONOR, I MOVE PX 219.

20          MR. NELSON:  EXCUSE ME.  THAT WAS 219?

21          MR. MCELHINNY:  YES, SIR.

22          MR. NELSON:  THAT'S FINE, YOUR HONOR.  NO OBJECTION.

23          THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

24     (PLAINTIFF'S EXHIBIT PX 219 WAS ADMITTED IN EVIDENCE.)

25          THE COURT:  GO AHEAD, PLEASE.

```
1        BY MR. MCELHINNY:

2        Q.   KEPLER IS K-E-P-L-E-R; IS THAT RIGHT?

3        A.   THAT'S CORRECT.

4        Q.   AND THE DATE OF THIS IS MAY 3RD, 2010?

5        A.   YES.

6        Q.   LET'S TURN TO PAGE 14 OF THIS DOCUMENT.

7        A.   OKAY.

8        Q.   IS THIS ONE OF THE PAGES THAT YOU FOUND SIGNIFICANT?

9        A.   YES, IT IS.

10       Q.   AND CAN YOU WALK US THROUGH THE SIGNIFICANCE, PLEASE?

11       A.   AGAIN, IT'S CONFIRMING THAT SAMSUNG IDENTIFIES THE

12       BENEFITS THAT IDENTIFIED.  IT CONCERNS INTUITIVENESS OR THE

13       EASE OF LEARNING OF THE TECHNIQUE, AND THE SQUARE BULLET POINT

14       NEAR THE TOP SAYS USERS CANNOT EASILY RECOGNIZE THE UNLOCK

15       METHOD, HINDERS INITIAL USABILITY.

16       Q.   WHAT DOES IT TELL US ABOUT THE IPHONE?

17       A.   IT CONTRASTS THAT WITH THE IPHONE WHICH "INTUITIVELY

18       INDICATES THE DIRECTION AND LENGTH TO MOVE WHEN UNLOCKING ON

19       THE LOCK SCREEN."

20       Q.   AND HOW DOES THIS RELATE TO THE BENEFITS THAT YOU

21       IDENTIFIED FOR US?

22       A.   THIS IS HOW EASY IT IS TO INITIALLY UNDERSTAND HOW TO USE

23       THE DEVICE, THE SECOND OF MY POINTS, LEARNABILITY.

24       Q.   SO DID SAMSUNG RECOMMEND THE DIRECTION OF IMPROVEMENT IN

25       THIS DOCUMENT?
```

1     A.   YES.  AT THE BOTTOM, CONSISTENT WITH THE OTHER DOCUMENTS,

2     THIS IS DIRECTION FOR IMPROVEMENT, WHICH IS TO "PROVIDE A HINT

3     ON THE LOCK SCREEN ABOUT THE DIRECTION AND LENGTH OF TOUCH WITH

4     AN ARROW, AND ALSO DISPLAY AN EXPLANATION ABOUT THE SCREEN

5     UNLOCKING METHOD IN TEXT," LIKE THE IPHONE.

6     Q.   PROFESSOR, IF YOU WOULD TURN, PLEASE, IN YOUR BINDER TO

7     EXHIBIT PX 119.

8     A.   OKAY.

9     Q.   WHAT IS THAT DOCUMENT, SIR?

10    A.   THIS IS A DOCUMENT BY SAMSUNG DESIGN EUROPE ENTITLED

11    MIEUX, EMOTIONAL UX.

12    Q.   IS THAT A DOCUMENT YOU RELIED UPON IN FORMING YOUR OPINION

13    IN THIS CASE?

14    A.   YES, IT IS.

15              MR. MCELHINNY:  YOUR HONOR, I MOVE TO ADMIT PX 119.

16              MR. NELSON:  JUST ONE POINT OF CLARIFICATION, YOUR

17    HONOR.  THIS WASN'T CITED IN THE OPENING REPORT.  IT WAS IN THE

18    REBUTTAL REPORT.

19              THE COURT:  IT'S OVERRULED.  IT'S ADMITTED.

20              MR. NELSON:  OKAY.  THANK YOU, YOUR HONOR.

21        (PLAINTIFF'S EXHIBIT PX 119 WAS ADMITTED IN EVIDENCE.)

22    BY MR. MCELHINNY:

23    Q.   CAN WE SEE -- CAN WE SEE THE COVER, PLEASE?

24        ALL RIGHT.  REMIND US WHAT THIS IS.

25    A.   IT'S A DOCUMENT THAT CONCERNS MAKING THE INTERACTION ON

1    SAMSUNG DEVICES EMOTIONAL, SO MAKING EMOTIONAL UX, THAT IS

2    EMOTIONAL USER EXPERIENCE.

3    Q.   LET'S TURN TO PAGE 11 OF THE DOCUMENT.

4    A.   OKAY.

5    Q.   IS THIS A PAGE THAT YOU FOUND SIGNIFICANT IN FORMING YOUR

6    OPINIONS?

7    A.   YES, IT IS.

8    Q.   AND CAN YOU EXPLAIN THE SIGNIFICANCE OF THIS PAGE FOR US?

9    A.   SURE.  IT CONFIRMS AGAIN THAT SAMSUNG IDENTIFIES THE SAME

10   SET OF BENEFITS AND ADVANTAGES THAT I DID.  IN PARTICULAR, IN

11   THIS CASE IT'S THE FIFTH ONE, THE SENSE OF FUN OR ENJOYABILITY.

12       IT CONTRASTS TWO SAMSUNG SOLUTIONS AT THE TOP, A TWO-STEP

13   PROTECTIVE UNLOCK MECHANISM, THAT'S THE FIRST DASHED BULLET

14   POINT, AND A LOCK IDLE SCREEN THAT GIVES TEXT INFORMATION HOW

15   TO UNLOCK, BUT IS NOT APPEALING.

16       AND IT CONTRASTS THIS WITH THE IPHONE ON THE LAST COUPLE

17   OF LINES IDENTIFYING THE IPHONE USERS FIND IT FUN TO SWIPE THE

18   IPHONE.

19   Q.   AND HOW DOES THAT RELATE TO YOUR KEY BENEFITS LIST?

20   A.   IT'S MY ARGUMENT THAT IT'S FUN TO SWIPE.

21   Q.   THANK YOU.  PROFESSOR, IN REVIEWING SAMSUNG'S DEVELOPMENT

22   DOCUMENTS, DID YOU FORM AN OPINION AS TO WHETHER SAMSUNG

23   INTENTIONALLY COPIED THE SLIDE TO UNLOCK FEATURE FROM APPLE'S

24   IPHONE?

25   A.   YES, I DID.

1    Q.   AND WHAT IS YOUR OPINION?

2    A.   I SAW THESE DOCUMENTS AND A GREAT MANY IN ADDITION TO THIS

3    AND MY CONCLUSION IS THAT THEY COPIED.

4    Q.   LET'S TALK ABOUT NOW INFRINGEMENT SPECIFICALLY.

5         YOU HAVE TOLD US THAT SOME ACCUSED PHONES INFRINGE THIS

6    PATENT IN YOUR VIEW; CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   CAN YOU TELL US THE PRODUCT NAMES OF THE SAMSUNG PHONES

9    THAT INFRINGE IN YOUR OPINION?

10   A.   YES, I CAN.  I HAVE A SLIDE THAT SUMMARIZES THEM.

11   Q.   THIS IS PDX 14A, YOUR HONOR.

12   A.   SO THESE ARE THE PRODUCT LINES AND THE CODE NAMES

13   ASSOCIATED WITH THEM.

14   Q.   CAN YOU JUST WALK US THROUGH THE CHART, PLEASE.

15   A.   YES.  THE ADMIRE, GALAXY NEXUS, GALAXY SII, GALAXY SII

16   EPIC 4G TOUCH, GALAXY SII SKYROCKET, AND STRATOSPHERE.

17   Q.   YOU HAVE A COLUMN THAT SAYS PRODUCT.  CAN YOU TELL US WHAT

18   THAT IS?

19   A.   THESE ARE CODE NAMES OF THE EXHIBITS.

20   Q.   THE NUMBERS FOR THE EXHIBITS THAT ARE GOING TO BE IN

21   EVIDENCE HOPEFULLY IN THIS CASE; RIGHT?

22   A.   THAT'S CORRECT.

23   Q.   OKAY.  AND IS THAT ALSO TRUE FOR USER MANUALS THAT YOU

24   HAVE THERE?

25   A.   YES, EACH OF THESE DEVICES HAS A USER MANUAL THAT

```
 1        INSTRUCTS THE USER WHAT TO DO WITH IT.

 2        Q.   AND THESE ARE THE EXHIBIT NUMBERS THAT HAVE BEEN GIVEN TO

 3        THOSE MANUALS?

 4        A.   YES.

 5        Q.   AND THE SAME IS TRUE FOR THE PRODUCT SPECIFICATION?

 6        A.   CORRECT.

 7        Q.   DO YOU HAVE A BUNCH OF PHONES IN FRONT OF YOU?

 8        A.   I DO.  I HAVE A WIDE ARRAY.

 9        Q.   ALL RIGHT.  DO YOU HAVE THE PHONES IN FRONT OF YOU THAT

10        YOU BELIEVE INFRINGE CLAIM 8 OF THE PATENT?

11        A.   YES, I DO.

12        Q.   AND, AGAIN, FOR THE RECORD, CAN YOU WALK US THROUGH THOSE

13        PHONES?

14        A.   SURE.  THIS ONE HERE IS THE ADMIRE, JX 28B, SOFTWARE

15        VERSION EH02;

16             THIS ONE IS THE GALAXY NEXUS, JX 29B, SOFTWARE IMPEP 76K;

17             GALAXY NEXUS, JX 29D, SOFTWARE JRO030;

18             GALAXY SII, JX 32C, SOFTWARE UCC6;

19             GALAXY SII EPIC 4G TOUCH, JX 33B, EL29, SOFTWARE;

20             STRATOSPHERE, JX 37A, SOFTWARE EI2;

21             AND GALAXY SII SKYROCKET, JX 34C, SOFTWARE UCKJ2.

22                  MR. MCELHINNY:  YOUR HONOR, I'D MOVE THE ADMISSION OF

23        JX 28B, JX 29B, JX 29D, JX 32C, JX 33B, JX 34C, AND JX 37A.

24                  MR. NELSON:  NO OBJECTION, YOUR HONOR.

25                  THE COURT:  ALL RIGHT.  THOSE ARE ALL ADMITTED.
```

```
 1              (JOINT EXHIBITS JX 28B, JX 29B, JX 29D, JX 32C, JX 33B,

 2      JX 34C, AND JX 37A WERE ADMITTED IN EVIDENCE.)

 3              THE COURT:  GO AHEAD, PLEASE.

 4      BY MR. MCELHINNY:

 5      Q.   DO THE PHONES THAT YOU HAVE JUST IDENTIFIED INCLUDE ALL OF

 6      THE VARIATIONS OF BEHAVIOR IN SAMSUNG'S PHONE THAT, IN YOUR

 7      VIEW, INFRINGE CLAIM 8 OF THE '721 PATENT?

 8      A.   YES, THEY DO.

 9      Q.   ARE THERE ADDITIONAL ACCUSED PHONES THAT HAVE THE SAME

10      PRODUCT NAMES BUT USE DIFFERENT SOFTWARE OR HAVE A DIFFERENT

11      PHONE CARRIER THAN THE SEVEN YOU HAVE INTRODUCED JUST NOW?

12      A.   YES, THERE ARE.

13      Q.   TELL US HOW YOU IDENTIFIED THE ADDITIONAL ACCUSED CARRIER

14      AND SOFTWARE VERSIONS?

15      A.   SURE.  SAMSUNG, IN RESPONSE TO INTERROGATORY 41, PRODUCED

16      A CHART AND I USED THAT CHART.

17      Q.   OKAY.  IF YOU LOOK IN YOUR BINDER, PLEASE, FOR THE CHART

18      THAT SAYS SAMSUNG'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO

19      APPLE'S SIXTH SET OF INTERROGATORIES, NUMBER 41.  DO YOU HAVE

20      THAT IN FRONT OF YOU?

21      A.   YES, I DO.

22      Q.   HOW DID YOU USE THAT CHART?

23      A.   THAT CHART IDENTIFIES THE VARIOUS PRODUCT LINES, CARRIERS,

24      SOFTWARE VERSIONS, AND DATES OF RELEASE FOR THOSE SOFTWARE

25      VERSIONS.
```

DIRECT COCKBURN

1    Q.   AND BY LOOKING AT THAT CHART, COULD YOU DETERMINE WHICH

2    PHONES INFRINGED?

3    A.   I COULD DETERMINE WHICH PHONES I NEEDED TO INSPECT TO LOOK

4    FOR INFRINGEMENT.

5    Q.   EXPLAIN THAT TO US.

6    A.   OKAY.  SAMSUNG HAS TOLD US THAT -- WELL, THEY'VE MARKED IN

7    THIS CHART CERTAIN VERSIONS OF THE SOFTWARE WITH AN ASTERISK,

8    AND THOSE VERSIONS MARKED WITH AN ASTERISK WERE THOSE THAT

9    WERE -- THAT THEY IDENTIFIED AS INFLUENCING THE FUNCTIONALITY,

10   THE ACCUSED FUNCTIONALITY IN SOME WAY.

11       SO BETWEEN THE LAUNCH AND THE FIRST VERSION MARKED WITH AN

12   ASTERISK, SAMSUNG WAS TELLING US THAT ALL THOSE DEVICES BEHAVED

13   EXACTLY THE SAME WAY IN TURN -- WITH RESPECT TO ACCUSED

14   FUNCTIONALITY.

15   Q.   AND DID YOU TEST THEM TO MAKE SURE THAT THAT WAS TRUE?

16   A.   YES, I TESTED AT LEAST ONE PHONE IN EACH OF THOSE RANGES.

17   Q.   CAN YOU TELL US, FOR THE RECORD, SPECIFICALLY WHICH PHONES

18   YOU DETERMINED INFRINGED CLAIM 8?

19   A.   YES.  I'LL DO IT WITH RESPECT TO DATES.

20   Q.   OKAY.

21   A.   OKAY.  SO WALKING THROUGH THE CHART, FOR THE GALAXY SII

22   SKYROCKET, THE DATES GO FROM THE 24TH OF OCTOBER 2011 THROUGH

23   THE 16TH OF FEBRUARY 2012.

24   Q.   PROFESSOR, FOR THIS PART, YOU HAVE TO GO EVEN SLOWER.

25   A.   OKAY.  FOR THE GALAXY SII EPIC 4G TOUCH, THE DATES GO FROM

1      THE 10TH OF AUGUST 2011, TO THE 10TH OF JULY, 2012.

2          ON ROW THREE FOR THE GALAXY SII, THE DATES GO FROM THE

3      20TH OF SEPTEMBER 2011, THROUGH TO THE 7TH OF MAY 2012.

4          FOR THE GALAXY SII ON ROW FIVE, THE DATES GO FROM THE 19TH

5      OF SEPTEMBER 2011, TO THE 17TH OF JUNE 2012.

6          FOR THE STRATOSPHERE, IT'S FROM THE 5TH OF OCTOBER 2011,

7      TO THE 21ST OF AUGUST 2012.

8          FOR THE ADMIRE, IT'S FROM THE 4TH OF AUGUST 2011, TO THE

9      12TH OF JULY 2012.

10          FOR THE GALAXY NEXUS, IT'S FROM THE 5TH OF APRIL 2012,

11      THROUGH TO THE 28TH OF JANUARY 2013.

12          AND THAT'S IT.

13      Q.   ALL RIGHT.  AGAIN, YOU ARE READING -- YOU ARE LOOKING AT

14      AND GETTING THIS INFORMATION FROM A CHART THAT WAS GIVEN TO US

15      BY SAMSUNG AND SWORN TO UNDER OATH; IS THAT CORRECT?

16      A.   THAT'S CORRECT.

17      Q.   OKAY.

18          MR. MCELHINNY:  YOUR HONOR, I'LL NOTE HERE THAT AT

19      THE END I'M GOING TO MOVE THE ADMISSION OF THAT CHART.  THERE

20      IS A DISPUTE ABOUT WHETHER IT SHOULD BE READ TO THE JURY AS AN

21      INTERROGATORY OR MOVED IN AS AN EXHIBIT, AND WE DON'T NEED

22      TO -- I'M PREPARED TO TAKE THAT UP LATER IF THAT'S OKAY.

23          THE COURT:  THAT'S FINE.

24          MR. MCELHINNY:  THANK YOU.

25      Q.   YOU MENTIONED PREVIOUSLY THAT YOU REVIEWED SAMSUNG USER

1    MANUALS AND SPECIFICATIONS AS PART OF YOUR INFRINGEMENT

2    ANALYSIS.

3    A.   YES, I DID.

4    Q.   CAN YOU TELL US HOW YOU USED THOSE DOCUMENTS?

5    A.   THOSE DOCUMENTS CONFIRMED PRIMARILY THE PRESENCE OF THE

6    DEVICE-BASED ELEMENTS OF THE CLAIM THAT I WALKED THROUGH

7    EARLIER, THE PRESENCE OF TOUCHSCREENS AND SO ON.

8         THEY ALSO PROVIDE INSTRUCTIONS FOR SLIDING TO UNLOCK.

9    Q.   CAN YOU TURN, IN YOUR BINDER, PLEASE, TO PX 230.

10   A.   OKAY.

11   Q.   WHAT IS PX 230?

12   A.   THIS IS A USER MANUAL FOR THE SAMSUNG ADMIRE.

13   Q.   CAN YOU LOOK AT PX 231, PLEASE?  WHAT IS THAT?

14   A.   IT'S A USER GUIDE FOR THE GALAXY NEXUS.

15   Q.   232, PX 232, PLEASE?

16   A.   IT'S A USER MANUAL FOR THE GALAXY NOTE.

17   Q.   PX 234, PLEASE.

18   A.   IT'S A USER MANUAL FOR THE GALAXY SII.

19   Q.   PX 235, PLEASE.

20   A.   IT'S A USER GUIDE FOR THE GALAXY SII EPIC 4G TOUCH.

21   Q.   PX 236, PLEASE.

22   A.   IT'S A USER MANUAL FOR THE GALAXY SII SKYROCKET.

23   Q.   AND PX 239, PLEASE?

24   A.   IT'S THE USER MANUAL FOR THE SAMSUNG STRATOSPHERE.

25   Q.   AND THEN FINALLY, COULD YOU LOOK AT PX 241, PLEASE.

1    A.   YES.  IT'S A SET OF -- IT'S A COMPILATION OF

2    SPECIFICATIONS FOR A SERIES OF SAMSUNG DEVICES.

3    Q.   THE ONES THAT WE'VE ACCUSED IN THIS CASE?

4    A.   YES.

5         MR. MCELHINNY:  THANK YOU.

6    YOUR HONOR, I WOULD MOVE PX 230, 231, 232, 234, 235, 236,

7    239, AND 241.

8         THE COURT:  OKAY.  ANY OBJECTION.

9         MR. NELSON:  NO OBJECTION, YOUR HONOR.

10        THE COURT:  ALL RIGHT.  THEY'RE ADMITTED.

11   (PLAINTIFF'S EXHIBITS PX 230, 231, 232, 234, 235, 236,

12   239, AND 241 WERE ADMITTED IN EVIDENCE.)

13   BY MR. MCELHINNY:

14   Q.   PROFESSOR, DO THESE USER GUIDES ASSIST CUSTOMERS IN USING

15   FEATURES THAT INFRINGE CLAIM 8 OF THE '721 SLIDE TO UNLOCK

16   PATENT?

17   A.   YES, THAT'S THEIR PURPOSE.  WELL, THAT AND INSTRUCTING THE

18   USER HOW TO INTERACT WITH THE DEVICE AS A WHOLE.

19   Q.   WHAT IS YOUR CONCLUSION ABOUT WHETHER OR NOT THE PHONE

20   CARRIER AND SOFTWARE VERSIONS YOU HAVE IDENTIFIED INFRINGE

21   CLAIM 8 OF THE '721 SLIDE TO UNLOCK PATENT?

22   A.   ALL OF THEM INFRINGE.

23   Q.   CAN YOU SUMMARIZE YOUR REASONS FOR YOUR OPINION THAT THE

24   ACCUSED SAMSUNG PHONES INFRINGE THE APPLE PATENT?

25   A.   SURE.  I HAVE A SLIDE PREPARED TO ASSIST US.

1    Q.   THIS IS PDX 31.

2    A.   THE FIRST THING I DID WAS TO FORM FOUR PRODUCT LINES OF

3    THE, OF THE DEVICES, AND WITHIN EACH OF THOSE PRODUCT LINES,

4    THEIR BEHAVIOR WITH RESPECT TO INFRINGEMENT IS ESSENTIALLY

5    IDENTICAL.  IT'S SIMILAR ACROSS ALL, BUT IT'S IDENTICAL WITHIN

6    EACH OF THOSE PRODUCT LINES.

7         AND I THEN COMPARED THE OBSERVABLE BEHAVIOR ON THOSE

8    DEVICES WITH THE CLAIM ELEMENTS.

9         SO I'VE GOT A CHART THAT SUMMARIZES THE CLAIM ELEMENTS,

10   AND I'LL GO THROUGH FROM LEFT TO RIGHT --

11   Q.   BUT BEFORE -- OKAY.  GO AHEAD.  FINISH.

12   A.   LOOKING AT EACH OF THESE PRODUCT LINES IN TURN.

13   Q.   LET ME MAKE SURE I UNDERSTAND.

14        YOU BELIEVE THAT EVERY ONE OF THE PHONES LISTED HERE

15   INFRINGES CLAIM 8 OF '721 PATENT; CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   BUT YOU'VE PUT THEM IN FOUR DIFFERENT GROUPS?

18   A.   THAT'S CORRECT.

19   Q.   AND WHAT IS THE BASIS OF THE DIFFERENT GROUPING?

20   A.   AS I SAID, THEY'RE ALL VERY SIMILAR ACROSS GROUPS, BUT

21   WITHIN GROUPS, THEY'RE ESSENTIALLY IDENTICAL, WHICH IS HIGHLY

22   SURPRISING FOR SOME OF THE GROUPS, THERE'S ONLY ONE DEVICE IN

23   THERE, LIKE THE ADMIRE.  BUT SAY THE SII GROUP, WHERE THERE'S

24   MORE THAN ONE PRODUCT LINE, THE BEHAVIOR OF THE GRAPHICS IS

25   MORE OR LESS IDENTICAL ACROSS THEM.

1    Q.   LET'S MAKE SURE I UNDERSTAND.  THE GRAPHICS FOR EACH OF

2    THESE FOUR IS SLIGHTLY DIFFERENT; CORRECT?

3    A.   YES.

4    Q.   BUT YOU STILL THINK IT INFRINGES?

5    A.   CORRECT.

6    Q.   I'M SORRY?

7    A.   CORRECT.

8    Q.   BUT IN COLUMN 2, YOU'VE GOT ONE, TWO, THREE -- ONE, TWO,

9    THREE -- ONE, TWO, THREE PHONES AND THE GRAPHICS FOR THOSE ARE

10   THE SAME; IS THAT RIGHT?

11   A.   YES.

12   Q.   OKAY.  AND NOW YOU'RE GOING TO SHOW US INFRINGEMENT; IS

13   THAT RIGHT?

14   A.   CORRECT.

15   Q.   YOU MENTIONED YOU HAVE A CHART OR A CHECKLIST BOARD.

16   A.   YEAH.

17   Q.   SO THIS IS PDX 54.  CAN YOU TELL ME WHAT WE'RE LOOKING AT

18   HERE?

19   A.   OKAY.  SO THESE ARE, IN THE LEFT-HAND COLUMN, THESE ARE

20   THE ELEMENTS OF THE CLAIM THAT MUST BE MET FOR INFRINGEMENT TO

21   BE OBSERVED.

22        AND ON THE RIGHT-HAND SIDE, I'VE GOT A COLUMN FOR EACH OF

23   THOSE PRODUCT LINES, THE ADMIRE, GALAXY SII DEVICES,

24   STRATOSPHERE, AND GALAXY NEXUS.

25        THE ELEMENTS OF -- I RAN THEM A TO I, AND THE ELEMENTS

```
 1      A TO E ARE THOSE ONES CONCERNED WITH THE DEVICE THAT I

 2      MENTIONED EARLIER, PORTABLE ELECTRONIC DEVICE, TOUCHSENSITIVE

 3      DISPLAY, MEMORY, PROCESSORS, AND SOFTWARE MODULES.  THERE'S NO

 4      ARGUMENT FROM --

 5      Q.   LET ME JUST INTERRUPT YOU FOR A MINUTE.  THESE ELEMENTS

 6      THAT YOU'VE GOT NOW, YOU'VE GOT LETTERS TO HELP US LOOK AT

 7      THEM.  THEY'RE THE SAME ELEMENTS THAT WE SAW IN THE CLAIM

 8      ELEMENTS ITSELF FOR CLAIMS 7 AND 8 TOGETHER, RIGHT?

 9      A.   THEY ARE EXACTLY THE SAME.

10      Q.   AND NOW YOU'VE ADDED LETTERS TO THEM?

11      A.   YES.

12      Q.   AND YOU'RE GOING TO APPLY THAT TEST TO EACH OF THE FOUR

13      GROUPS OF PHONES?

14      A.   CORRECT.

15      Q.   OKAY.  LET'S GO?

16      A.   OKAY.  SO FOR A TO E, THERE'S NO ARGUMENT THAT THESE

17      ELEMENTS ARE NOT MET BY ANY OF THE DEVICES.  SAMSUNG AGREES.

18      SO WE CAN JUST PLACE CHECK BOXES IN ALL OF THOSE ELEMENTS.

19      Q.   WHY IS THERE NO DISPUTE ABOUT THEM?

20      A.   ANY COMPUTING DEVICE REQUIRES SOFTWARE, PROCESSORS,

21      MEMORY.

22           THEN ALL OF THESE DEVICES CLEARLY HAVE A TOUCH-SENSITIVE

23      DISPLAY, AND CLEARLY THEY'RE ALL PORTABLE ELECTRONIC DEVICES.

24      Q.   OKAY.  LET'S LOOK AT THE ADMIRE.

25      A.   WE'LL GO DOWN THE COLUMN, AND WHAT I'VE DONE IS
```

1    ABBREVIATED.  JUST FOR EXPEDIENCY, TO MAKE THINGS QUICK, I'VE

2    ABBREVIATED THOSE ELEMENTS TO IDENTIFY, DETECT A CONTACT,

3    CONTINUOUSLY MOVE, UNLOCK, AND VISUAL CUES.

4    Q.   SO THE RED LETTER IS YOUR ABBREVIATION FOR THE FULL TERM

5    OF THE CLAIM?

6    A.   EXACTLY.

7    Q.   OKAY.

8    A.   IF WE LOOK AT THE ADMIRE, I HAVE A VIDEO PREPARED.

9    Q.   LET'S SEE, THAT SHOULD BE PDX 30.  NO, IT'S NOT, IT'S PDX

10   33?

11   A.   SORRY.  I'M GOING TO USE MY LASER POINTER HERE.  WHAT YOU

12   CAN'T SEE IN THIS VIDEO, ALTHOUGH YOU CAN SEE IT IN THE IMAGES,

13   MAYBE THE MEMBERS OF THE JURY CAN SEE IT, THERE'S ACTUALLY A

14   VERY SMALL ARROW AT THE TIP OF THIS ITEM HERE POINTING

15   RIGHTWARDS.  SO IT'S VERY CLEAR, WHEN YOU'RE HOLDING --

16   Q.   WHEN YOU SAY "THIS ITEM HERE," YOU'RE TALKING ABOUT THE

17   GREEN CIRCLE WITH THE LOCK INSIDE IT?

18   A.   NO, JUST TO THE RIGHT OF IT THERE'S A LITTLE GRAY ARROW.

19   CAN THE MEMBERS OF THE JURY SEE?

20   Q.   I HAVE TO PUT THIS IN WORDS.  ARE YOU SAYING THAT JUST TO

21   THE RIGHT OF THE GREEN CIRCLE WITH THE LOCK INSIDE THERE IS A

22   LITTLE GRAY ARROW?

23   A.   CORRECT.

24   Q.   THANK YOU.

25   A.   OKAY.  SO THAT'S ONE OF THE VISUAL CUES WE'LL SEE.

1  Q.   WHICH IS THE VISUAL CUE?

2  A.   THE LITTLE GRAY ARROW IS A VISUAL CUE SHOWING THE

3  DIRECTION OF MOVEMENT THAT'S REQUIRED TO UNLOCK.

4       WHAT WE'RE GOING TO SEE WHEN WE PLAY THIS THROUGH IS

5  DETECTION OF CONTACT, CONTINUOUS MOVEMENT OF THE ICON IN

6  ACCORDANCE WITH THE CONTACT, UNLOCKING THE DEVICE, AND WE'LL

7  SEE SOME MORE VISUAL CUES AS WE GO.

8       SO LET'S PLAY IT THROUGH ONCE, AND THEN WE'LL BREAK IT

9  DOWN.

10      OKAY.  AND WE'LL STEP THROUGH THAT AGAIN.

11      (VIDEO PLAYED IN OPEN COURT.)

12       THE WITNESS:  SO THERE'S THE DETECTION OF CONTACT.

13  AT THE POINT OF CONTACT THERE WAS AN ICON OVER HERE ON THE

14  RIGHT-HAND SIDE.  IT WAVED OUT OF THE WAY TO SUGGEST TO THE

15  USER THE DIRECTION THAT THEY NEEDED TO MOVE.  AND THAT LITTLE

16  GREEN DOT APPEARED, WHICH IS ANOTHER VISUAL CUE TELLING THE

17  USER WHERE THEY NEED TO GO IN ORDER TO UNLOCK THE DEVICE.

18      NEXT, THAT'S CONTINUOUS MOVEMENT IN ACCORDANCE WITH

19  MOVEMENT OF A DETECTED CONTACT.

20      AND NEXT WE HAVE UNLOCKING THE DEVICE.

21      SO IF WE GO BACK TO THE CHART, WE CAN -- WE'VE SEEN

22  DETECTION OF CONTACT, CONTINUOUS MOVEMENT OF THE IMAGE IN

23  ACCORDANCE WITH THE CONTACT, WE SEE UNLOCKING THE DEVICE, AND

24  WE'VE SEEN A MULTITUDE OF VISUAL CUES.

25  BY MR. MCELHINNY:

1    Q.   SO WHAT IS YOUR OPINION CONCERNING THE ADMIRE PHONE?

2    A.   THE ADMIRE PHONE CLEARLY INFRINGES.  THERE'S A --

3    Q.   YOU MENTIONED EARLIER THAT SAMSUNG RETAINED -- I'M SORRY.

4    I INTERRUPTED YOU.  WHAT WERE YOU GOING TO SAY?

5    A.   I DO HAVE ANOTHER VIDEO PREPARED.

6    Q.   OKAY.

7    A.   I WAS GOING TO SHOW THE ADMIRE INFRINGING IN A DIFFERENT

8    CASE.

9    Q.   ALL RIGHT.  LET'S DO THAT.  THIS IS PDX 34?

10   A.   SO WE PREPARED A VIDEO.  WE HAVE AN INCOMING CALL,

11   DETECTION OF CONTACT, CONTINUOUS MOVEMENT, UNLOCKING.

12   Q.   AND IN YOUR VIEW, THE SLIDE TO ANSWER FUNCTION IN THE

13   ADMIRE, DOES THAT ALSO INFRINGE CLAIM 8 OF THE '721 PATENT?

14   A.   THAT SLIDE TO ANSWER FUNCTIONALITY IS VERY, VERY CLEARLY

15   DESCRIBED IN THE PATENT.  SO THAT IS ANOTHER FORM OF

16   INFRINGEMENT.

17   Q.   THAT'S WHAT WE SAW WHEN WE SEE FIGURE 7, IS THAT WHAT YOU

18   SHOWED US?

19   A.   CORRECT.

20   Q.   OKAY.  IN THIS CASE, TO YOUR KNOWLEDGE, HAS SAMSUNG

21   RETAINED AN EXPERT TO TESTIFY THAT THERE IS NO INFRINGEMENT IN

22   THE '721 PATENT?

23   A.   YES, THEY HAVE.

24   Q.   OKAY.  WHAT'S THAT EXPERT'S NAME?

25   A.   PROFESSOR GREENBERG.

1    Q.   OKAY.  DID PROFESSOR GREENBERG, DOES PROFESSOR GREENBERG

2    AGREE WITH YOUR CONCLUSION THAT THE ADMIRE INFRINGES THE SLIDE

3    TO UNLOCK PATENT?

4    A.   NO.

5    Q.   AND ON WHAT DOES -- WHERE IS THE DISAGREEMENT?

6    A.   HE PROVIDES TWO ARGUMENTS FOR NON-INFRINGEMENT.

7    Q.   AND WHAT ARE THEY?

8    A.   THE FIRST IS THAT SLIDE TO ANSWER IS NOT A FORM OF SLIDING

9    TO UNLOCK.

10        AND THE SECOND IS THAT THE DEVICE APPLIES SOMETHING THAT

11   HE CALLS THE DELTA X CORRECTION.

12   Q.   DELTA X?

13   A.   (NODS HEAD UP AND DOWN.)

14   Q.   OKAY.  LET'S TAKE THE FIRST ARGUMENT.  WHAT IS YOUR VIEW

15   ABOUT WHETHER SLIDING TO ANSWER -- I'M SORRY.  HE SAYS SLIDING

16   TO ANSWER IS NOT SLIDE TO UNLOCK?

17   A.   THAT'S CORRECT.

18   Q.   OKAY.  AND HOW DO YOU FEEL ABOUT THAT?

19   A.   I SAY THAT'S WRONG.  I SAY IT'S VERY CLEARLY TAUGHT BY THE

20   PATENT AND AS THE NEXT SLIDE AGAIN SHOWS.

21        SO HERE'S THE LANGUAGE THIS TIME OF THE SPECIFICATION OF

22   THE PATENT IN ASSOCIATION WITH THE IMAGES.

23   Q.   ALL RIGHT.  WE'RE LOOKING AT PDX 36.  YOU'VE GOT, IT LOOKS

24   LIKE, QUOTATIONS OF LANGUAGE THERE; IS THAT RIGHT?

25   A.   THAT'S RIGHT.

1    Q.   WHERE DOES THAT COME FROM?

2    A.   THIS IS FROM THE SPECIFICATION TO THE PATENT.

3    Q.   AND CAN YOU TELL FROM THIS SLIDE WHERE IN THE PATENT THE

4    JURY CAN FIND THAT SPECIFIC LANGUAGE?

5    A.   I ACTUALLY CAN'T SEE IT BUT --

6    Q.   CAN YOU SEE IT ON YOUR SCREEN?

7    A.   COLUMN 15, LINE 41 TO COLUMN 16, LINE 8.

8    Q.   AND THAT'S WHERE THEY WOULD FIND THE LANGUAGE THAT'S

9    QUOTED HERE?

10   A.   CORRECT.

11   Q.   I'M SORRY.  I'M JUST DOING THIS FOR THE RECORD.  GO AHEAD.

12   EXPLAIN WHAT THE CHART IS?

13   A.   SO THE LANGUAGE AT THE TOP SAYS, IN FIGURE 7A, WHICH WE

14   SEE AT THE BOTTOM LEFT, THE DEVICE 700 IS LOCKED AND HAS

15   RECEIVED AN INCOMING CALL.

16        AND IN THE FIGURE WE SEE THE TEXT, INCOMING CALL FROM JOHN

17   DOE.

18        SEVERAL LINE LATER, THE SPECIFICATION TO THE PATENT, IN

19   THE NEXT BOX DOWN, THE SECOND BOX AT THE TOP OF THE PAGE SAYS

20   THE DEVICE 700 TRANSITIONS TO THE UNLOCKED STATE ONCE THAT

21   IMAGE HAS BEEN SWEPT.

22   Q.   SO IN YOUR VIEW IS SLIDE TO UNLOCK TO ANSWER A CALL

23   COVERED BY THIS PATENT?

24   A.   IT'S CRYSTAL CLEAR.

25   Q.   OKAY.  LET'S TAKE THE SECOND ARGUMENT, THE ONE YOU SAID

THE DELTA X ARGUMENT. CAN YOU EXPLAIN THAT?

MR. NELSON: I'M SORRY, YOUR HONOR. I'M GOING TO OBJECT. IT'S PRE-REBUTTAL. IT'S OUTSIDE OF THE SCOPE OF HIS REPORT. IT'S OBVIOUSLY NOT CONTAINED IN HIS REPORT.

MR. MCELHINNY: IT'S CONTAINED IN HIS REBUTTAL REPORT.

MR. NELSON: IT'S NOT CONTAINED IN HIS REBUTTAL REPORT. THAT WAS ON INVALIDITY.

THE COURT: ALL RIGHT. THE OBJECTION IS SUSTAINED. WHY DON'T WE GO AHEAD AND TAKE OUR BREAK NOW ANYWAY.

MR. MCELHINNY: THANK YOU, YOUR HONOR.

THE COURT: THE TIME IS 2:16 BY THIS CLOCK. LET'S TAKE A 15 MINUTE BREAK.

PLEASE DON'T RESEARCH OR DISCUSS THE CASE. SEE YOU BACK AT 2:30.

(JURY OUT AT 2:17 P.M.)

THE COURT: YOU MAY STEP DOWN.

OKAY. THE RECORD SHOULD REFLECT THE JURORS HAVE LEFT THE COURTROOM. WE HAVE A PROBLEM.

PLEASE TAKE A SEAT.

I DON'T HAVE LIVENOTE. I CAN'T LOOK AT THE TRANSCRIPT. SO WHATEVER IS GOING ON IN THIS COURTROOM IS PREVENTING ME FROM DOING MY JOB. IF THIS CONTINUES THEN I'M GOING TO REQUIRE EVERYONE TO SUBMIT THEIR PHONE TO THE METAL DETECTORS ON THE FIRST FLOOR.

1        IF YOU HAVE A PHONE THAT'S TURNED ON RIGHT NOW, I WANT YOU

2    TO STAND UP RIGHT NOW, WHETHER YOU ARE IN THE WELL, OUT IN THE

3    COURTROOM.  WHO'S GOT A PHONE THAT'S ON RIGHT NOW?  STAND UP,

4    PLEASE.

5        WHO HAS A PHONE?  WHO ELSE HAS EITHER A PHONE ON, A LAPTOP

6    ON?  BECAUSE YOU ARE PREVENTING ME FROM DOING MY JOB HERE.  WHO

7    ELSE?  ANYONE ELSE?  WHO ELSE UP IN THE WELL?  ANYONE ELSE HAVE

8    A PHONE ON?

9        BECAUSE I HAVEN'T BEEN ABLE TO HAVE A TRANSCRIPT TODAY.

10   THAT IS PREVENTING ME FROM DOING MY JOB, OKAY?  IF I CANNOT DO

11   MY JOB, THEN I'M SORRY, I'M GOING TO HAVE TO HAVE YOU SUBMIT

12   YOUR ELECTRONIC MATERIALS.  WE'LL BE LIKE SUPERIOR COURT AND

13   YOU SUBMIT ALL YOUR ELECTRONICS AT THE METAL DETECTOR.

14       SO SOME PEOPLE I LOOK AT YOU, AND YOU JUST LOOK LIKE

15   YOU'RE SCROLLING THROUGH YOUR E-MAILS.  IF THAT'S THE CASE, I'M

16   GOING TO ASK YOU, CAN YOU PLEASE GO TO THE OVERFLOW ROOM?

17       IF YOU NEED ELECTRONICS FOR YOUR JOB, THAT'S FINE.

18       BUT IF YOU'RE JUST KIND OF CASUALLY HANGING OUT GOING

19   THROUGH YOUR E-MAILS, I'M GOING TO ASK YOU AT THIS TIME, IF YOU

20   WOULD PLEASE DO IT IN THE OVERFLOW ROOM BECAUSE I CAN'T DO MY

21   JOB HERE WITHOUT THE TRANSCRIPT.  OKAY?

22       SO LET ME ASK OF YOU ALL STANDING UP, WHO NEEDS THE ACCESS

23   TO AN ELECTRONIC DEVICE FOR YOUR JOB AND WHO OF YOU IS JUST

24   KIND OF SCROLLING THROUGH PERSONAL E-MAILS.

25       ON THE RIGHT SIDE, I ASSUME YOU'RE NOT MEDIA BECAUSE

1    YOU'RE NOT WITH THE -- THE POWER STRIP IS ON THE LEFT.  ARE YOU

2    ALL WITH MEDIA OR NOT?

3         SO WHY ARE YOU USING YOUR ELECTRONIC DEVICES?  SOME OF YOU

4    LOOK LIKE YOU'RE READING E-MAILS THIS MORNING.  I'VE BEEN

5    WATCHING YOU.  OKAY?

6         IF YOU'RE JUST HERE TO READ YOUR E-MAILS, CAN I ASK YOU

7    PLEASE TO STEP OUTSIDE AND GO TO THE OVERFLOW ROOM?  YOU CAN

8    STILL HEAR, YOU CAN STILL WATCH THE WITNESSES.  WHAT DO YOU ALL

9    NEED YOUR PHONES ON FOR?  ALL RIGHT.  DO ALL OF YOU NEED YOUR

10   PHONES ON FOR WORKING OR WHATEVER YOUR JOB IS HERE?  NO?

11             AUDIENCE MEMBER:  NO.  I'LL TURN IT OFF.

12             THE COURT:  OKAY.  I'M GOING TO TRY TO HAVE MY

13   COMPUTER SET BACK UP DURING THIS BREAK.  IF THIS SHUTS OFF

14   AGAIN, THEN I WILL NOT ALLOW ELECTRONIC DEVICES IN THE

15   COURTROOM.  OKAY?

16        I'M SORRY TO HAVE TO DO THIS, BUT I HAVE TO DO MY JOB AND

17   IF YOU'RE PREVENTING ME FROM DOING MY JOB, THEN I'M NOT GOING

18   TO ALLOW YOU TO HAVE ELECTRONIC DEVICES.  I HOPE THAT DOESN'T

19   BECOME NECESSARY.

20        SO I'M ASKING YOU FOR YOUR COOPERATION.  THIS IS PROBABLY

21   ABOUT THE 25TH TIME WE'VE SAID THIS WEEK THAT IF YOU'RE NOT

22   USING YOUR PHONES, WE REALLY NEED YOU TO TURN IT OFF.

23        I'M NOT GOING TO ASK AGAIN, OKAY, BECAUSE I JUST NEED TO

24   DO MY JOB HERE.

25             SO THANK YOU VERY MUCH.  WE'RE GOING TO HAVE A BREAK UNTIL

1    2:30.

2            MR. MCELHINNY:  YOUR HONOR, AFTER THE BREAK, WHEN YOU

3    COME BACK IN, COULD I HAVE ONE MINUTE TO DISCUSS THIS LAST

4    OBJECTION WHEN YOU COME BACK?

5            THE COURT:  WHY DON'T WE DO THAT RIGHT NOW.

6            MR. MCELHINNY:  OKAY.  THE WAY THE PROCESS WORKS,

7    YOUR HONOR, IS WE FILE A REPORT, THEY FILE AN OPPOSITION TO

8    THAT REPORT.  WE FILE A REPORT ON INFRINGEMENT, THEY FILE A

9    REPORT ON NON-INFRINGEMENT AND INVALIDITY, AND OUR REBUTTAL

10   REPORT GOES ONLY TO THE VALIDITY ISSUES.

11       SO UNDER THE WRITTEN REPORTS, THERE IS NO OPPORTUNITY TO

12   RESPOND TO THEIR NON-INFRINGEMENT ARGUMENTS.  THERE'S NO -- IT

13   NEVER COMES OUT IN A REPORT.

14       SO IN ORDER TO BE ABLE TO ADDRESS THOSE, THERE'S TWO WAYS

15   TO DO IT.  ONE IS TO DO IT NOW AND THE OTHER IS TO DO IT AS

16   PURE REBUTTAL, TO HAVE OUR WITNESS SIT IN THE AUDIENCE AND

17   LISTEN TO THE TESTIMONY AND COME BACK AND REBUT WHAT HE HEARD

18   IN THE COURTROOM.

19       I TOOK IT FROM THE LAST TRIAL THAT WAS NOT THE WAY YOU

20   PREFERRED TO DO IT.  WE'LL DO IT EITHER WAY THAT IS.

21       BUT THE ARGUMENT THAT IT'S NOT IN HIS WRITTEN REPORT WHEN

22   THERE IS NO WRITTEN REBUTTAL REPORT ON INFRINGEMENT IS -- IT

23   GIVES US NO CHANCE EVER TO ARGUE THEIR NON-INFRINGEMENT

24   ARGUMENTS BY OUR EXPERT.

25            THE COURT:  WELL, WHAT YOU'RE SAYING IS THAT HE NEEDS

```
 1          TO REBUT WHAT SAMSUNG'S EXPERT WILL SAY?

 2               MR. MCELHINNY:  YES.

 3               THE COURT:  SO HE SHOULD DO THAT ON REDIRECT.

 4               MR. MCELHINNY:  THANK YOU, YOUR HONOR.

 5               THE COURT:  VERSUS PREEMPTIVELY DOING IT ON DIRECT.

 6               MR. MCELHINNY:  THANK YOU, YOUR HONOR.  WELL, ON

 7     REBUTTAL AFTER HE'S HEARD THE WITNESS.  IT CAN'T BE REDIRECT

 8     BECAUSE HE WON'T HAVE HEARD THE EXPERT YET.  THAT'S THE -- I'M

 9     NOT -- I'M JUST TRYING TO MAKE SURE WE'VE GOT THE TERMINOLOGY

10     CORRECT.

11               MR. NELSON:  YOUR HONOR, I DON'T HAVE -- WHATEVER YOU

12     THINK IS MOST EFFICIENT IS FINE.  I JUST NEED TO UNDERSTAND

13     WHAT THE GROUND RULES ARE.

14               MR. MCELHINNY:  YEAH.

15               MR. NELSON:  BECAUSE WHEN WE GET DOWN THE ROAD, I

16     DON'T WANT TO HAVE THE SAME ISSUE COME UP.  I UNDERSTAND

17     COUNSEL'S ISSUE WITH THE WAY REPORTS ARE DONE.

18          OFTENTIMES IN TRIAL -- I MEAN, FRANKLY, THE EXPERTS GET UP

19     THERE, THEY MAKE THEIR ARGUMENTS, AND IT'S SOMETHING FOR THE

20     JURY TO DECIDE WHO TO BELIEVE.

21          SO FOR AN EXPERT TO IMPROMPTU OFFER PREVIOUSLY

22     NON-DISCLOSED TESTIMONY IS SOMEWHAT PROBLEMATIC BECAUSE I DON'T

23     HAVE NOTICE OF THAT.

24          BUT IF THAT'S WHAT WE'RE GOING TO DO, I DON'T -- WHATEVER

25     YOU THINK IS MOST EFFICIENT, I'M PERFECTLY ON BOARD WITH THAT.
```

```
 1            THE COURT:  ALL RIGHT.  SO YOU'RE FINE WITH HIM

 2    GIVING HIS EXPLANATION FOR WHY HE DISAGREES WITH DR. GREENBERG

 3    NOW?

 4            MR. NELSON:  IF YOU'RE GOING TO ALLOW HIM TO PROVIDE

 5    SUCH TESTIMONY, I'M FINE WITH HIM DOING IT NOW JUST AS OUR

 6    EXPERTS WOULD DO THE SAME.

 7            THE COURT:  RIGHT.  WHATEVER, WHATEVER RULE WOULD BE

 8    APPLIED TO BOTH SIDES.

 9            MR. NELSON:  CORRECT, YOUR HONOR.

10            THE COURT:  ALL RIGHT.  IF YOU HAVE NO OBJECTION TO

11    IT -- I THOUGHT YOU DID HAVE AN OBJECTION TO IT, SO I WAS GOING

12    TO REQUIRE IT TO BE DONE LATER, BUT IF YOU HAVE NO OBJECTION TO

13    IT, I ASSUME, MR. MCELHINNY, YOUR SIDE HAS NO OBJECTION TO IT,

14    THEN THAT'S THE WAY WE'LL DO IT FROM NOW ON.

15            MR. MCELHINNY:  THANK YOU, YOUR HONOR.

16            MR. NELSON:  OKAY.  THANK YOU, YOUR HONOR.

17            MR. MCELHINNY:  I'M SORRY.  2:30.

18            THE COURT:  2:30.  THAT'S RIGHT.  THANK YOU.

19        (RECESS TAKEN AT 2:23 P.M. UNTIL 2:31 P.M.)

20            MR. MCELHINNY:  SOME OF THE YOUNGER SMART PEOPLE ON

21    MY TEAM REALIZED WE ACTUALLY HAVE A BUNCH OF CELL PHONES IN

22    THIS CASE THAT ARE ON, SO HIS EXAMPLES WERE ON.  WE'VE TURNED

23    THOSE OFF.  BUT THERE ARE A BUNCH OF CELL PHONES IN THE

24    COURTROOM THAT ARE OBVIOUSLY EXHIBITS.  BUT WE'VE NOW TURNED

25    THOSE OFF.
```

```
 1              THE COURT:  OKAY.  WELL, THIS ACTUALLY WENT OFF

 2    EARLIER, SO I DON'T KNOW WHAT TRIGGERED IT.

 3              MR. MCELHINNY:  OH, OKAY.

 4              THE COURT:  IF I SEE ANYONE WHO I THINK IS JUST

 5    FACEBOOKING OR WHATEVER, I'M GOING TO ASK THEM TO STEP OUTSIDE,

 6    OKAY, BECAUSE I'VE BEEN WATCHING A NUMBER OF PEOPLE WHO WERE

 7    CLEARLY DOING THEIR OWN PERSONAL E-MAILS.  I CAN SEE YOU.  IF

 8    YOU DO IT AGAIN, I'M JUST GOING TO ASK YOU TO LEAVE.  YOU CAN

 9    GO TO THE OVERFLOW ROOM.  OKAY?

10         ALL RIGHT.  LET'S GET GOING.

11         (JURY IN AT 2:32 P.M.)

12              THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

13    SEAT.

14         TIME IS NOW 2:32.  GO AHEAD, PLEASE.

15    BY MR. MCELHINNY:

16    Q.   PROFESSOR, BEFORE THE BREAK, WE WERE GOING TO TALK ABOUT

17    THE DELTA X ARGUMENT.  CAN YOU EXPLAIN TO US WHAT THAT IS,

18    PLEASE?

19    A.   SURE.

20    Q.   LET'S LOOK AT PDX 38.

21    A.   SO THE DELTA X ARGUMENT IS THAT THE IMAGE DOES NOT MOVE

22    CONTINUOUSLY WITH THE FINGER.  THIS IS PROFESSOR GREENBERG'S

23    ARGUMENT.

24         ACTUALLY, THE PURPOSE OF THE DELTA X CORRECTION THAT

25    YOU'LL SEE IN THE SECOND OF THESE VIDEOS IS TO MAKE SURE THAT
```

1    THE FINGER OR THE POINT OF CONTACT AND THE IMAGE THAT LIES

2    UNDERNEATH ARE LINED UP FOR CONTINUOUS MOVEMENT IN ACCORDANCE

3    WITH THE CONTACT.

4        SO THERE'S TWO RESPONSES TO THE CONTENTION.  WE'LL SEE THE

5    FIRST IN THIS.

6        IN THIS VIDEO, THE USER IS GOING TO PLACE THEIR FINGER

7    SQUARELY ON THE MIDDLE OF THE UNLOCK IMAGE.  AND WHAT YOU'LL

8    SEE IS THAT THERE IS NO DELTA X CORRECTION.  THERE IS NO

9    JUMPING OR SNAPPING OF THE ICON WITH THE FINGER.  SO DELTA X

10   CORRECTION, CONTACT, IMAGE LEAPS TO THE FINGER.  OKAY?

11       SO HERE, THOUGH, THE USER PRESSES THE FINGER SQUARELY ON

12   THE CENTER OF THE ICON.  THERE'S NO LEAP, THERE'S NO SNAP.  SO

13   THE LIMITATION IS VERY CLEARLY MET.

14   Q.   LET'S MAKE SURE WE -- SO ON AN ADMIRE PHONE, IF THE PERSON

15    PUTS THEIR FINGER DIRECTLY ON THE MIDDLE OF THE ICON, THERE IS

16    NO DELTA X?

17   A.   THE DELTA X APPLIES IS ZERO.

18   Q.   SO THAT NON-INFRINGEMENT ARGUMENT GOES AWAY?

19   A.   YES.

20   Q.   LET'S LOOK AT THE DELTA X, PDX 39A?

21   A.   IN THE SECOND VIDEO, WE'LL SEE THE DELTA X APPLIED, AND

22   WHAT YOU'LL SEE IS THE FINGER COMES DOWN, MAKES CONTACT WITH

23   THE UNLOCK IMAGE, AND YOU'LL SEE THE IMAGE JUMP A LITTLE BIT TO

24   LINE UP WITH THE FINGER.  AND THEN CONTINUOUS MOVEMENT IN

25   ACCORDANCE WITH THE CONTACT OCCURS.

1          SO WATCH.  DID YOU SEE IT, JUST A LITTLE SNAP.

2          BUT NOW WE HAVE CONTINUOUS MOVEMENT IN ACCORDANCE WITH THE

3     CONTACT.

4          SO THE LIMITATION EITHER WAY IS SATISFIED.

5          IF I CAN JUMP OFF TO THE CHART THAT I HAVE.

6     Q.   SURE.  I THINK WE'VE ONLY DONE THE ADMIRE.

7     A.   I WANTED TO POINT OUT ONE MORE THING.

8          SO IN BETWEEN THE DETECTION OF THE CONTACT AND THE

9     CONTINUOUS MOVEMENT, WE'VE SEEN CONTINUOUS MOVEMENT IN

10    ACCORDANCE WITH THE CONTACT, WE'VE SEEN DETECT A CONTACT.  IT'S

11    PERFECTLY LEGITIMATE -- A DEVICE CAN DO ANY STEPS IN HERE AND

12    STILL SATISFY THE LIMITATIONS OF THE CLAIM.

13         SO IT MIGHT MAKE A BEEP, IT MIGHT BUZZ, OR IT MIGHT SNAP

14    TO THE FINGER.

15         THAT'S STILL SATISFYING THE LIMITATIONS OF THE CLAIM.  IT

16    JUST NEEDS TO MEET EACH OF THOSE ELEMENTS.

17    Q.   LET'S LOOK -- THEN LET'S GO BACK TO OUR OTHER CHART AND

18    LOOK AT THE GALAXY SII DEVICES.

19    A.   WE'LL LOOK AT THE OTHER ONE.

20    Q.   THIS IS PDX 40?

21    A.   I THINK YOU'LL SEE THE LIMITATIONS ARE MET.  SO IF YOU SEE

22    THE VIDEO, CONTINUOUS CONTACT, IN ACCORDANCE WITH THE CONTACT,

23    AND UNLOCKING THE DEVICE.  THERE WERE ALSO, I FORGOT TO MENTION

24    AT THE START OF THE VIDEO, SEVERAL VISUAL CUES, IF WE CAN

25    RETURN TO THE START, THE VISUAL CUES TOOK THE FORM OF THAT

```
 1        LITTLE GRAY ARROW AGAIN POINTING RIGHT, AND THE SLIDING AWAY OF

 2        THE ICON ON THE RIGHT-HAND SIDE OF THE SCREEN.  SO MULTIPLE

 3        VISUAL CUES COMMUNICATING THE DIRECTION OF MOVEMENT REQUIRED TO

 4        UNLOCK THE DEVICE.

 5        Q.   SO LET'S GO BACK TO YOUR CHART.

 6        A.   WE'VE ALREADY FILLED IN THE DEVICE ELEMENTS AND WE CAN

 7        JUST GO DOWN TO DETECTION OF CONTACT, YES; CONTINUOUS MOVEMENT,

 8        YES; UNLOCKING, YES, AND VISUAL CUES.

 9        Q.   AND THAT BEHAVIOR IS THE SAME FOR ALL OF THE PHONES IN THE

10        GALAXY THAT YOU HAD ACCUSED IN THAT COLUMN; CORRECT?

11        A.   IT'S VERY -- THERE ARE OTHER FORMS OF SLIDING TO UNLOCK,

12        THERE'S ANSWERING A CALL, SLIDING TO RETRIEVE MISSED MESSAGES

13        AND SO ON, BUT THEY -- THEY LOOK MORE OR LESS IDENTICAL.

14        Q.   OKAY.  DOES PROFESSOR GREENBERG AGREE WITH YOU ABOUT

15        INFRINGEMENT OF THE GALAXY SII DEVICES?

16        A.   HE MAKES TWO ARGUMENTS AGAINST INFRINGEMENT, SO, NO, HE

17        DOESN'T AGREE WITH ME.

18        Q.   WHAT ARE THOSE?

19        A.   THEY'RE THE SAME ARGUMENTS THAT WE SAW BEFORE, THAT

20        SLIDING TO ANSWER IS NOT A FORM OF UNLOCKING, AND THAT A DELTA

21        X CORRECTION MAY BE APPLIED.

22        Q.   AND YOU STILL DISAGREE?

23        A.   I DISAGREE FOR THE SAME REASONS.

24        Q.   THEN LET'S LOOK AT THE STRATOSPHERE.

25        A.   SO THE STRATOSPHERE HAS A SLIGHTLY DIFFERENT VISUAL
```

1     APPEARANCE.  THIS TIME WE'LL HAVE DETECTION OF CONTACT WITH

2     THAT PUZZLE PIECE, AND WE'LL HAVE THOSE, THERE ARE VISUAL CUES

3     THERE IN THE MISSING PUZZLE PIECE CLEARLY COMMUNICATES TO THE

4     USE OF DIRECTION THAT THAT IMAGE NEEDS TO MOVE.

5     Q.   LET ME FOCUS CUSS ON THAT.  EXPLAIN, WHAT IS THE VISUAL

6     CUE HERE?

7     A.   THE VISUAL CUE YOU SEE, YOU'VE GOT A JIGSAW PIECE THERE ON

8     THE LEFT AND YOU'VE GOT A MISSING PUZZLE PIECE OVER ON THE

9     RIGHT.  SO THIS PROVIDES A STRONG CUE TO THE USER THAT THEY

10    NEED TO, AS THE TEXT SAYS BLOW, FIT PUZZLE TO UNLOCK, MULTIPLE

11    FORMS OF VISUAL CUES.

12        AND ONCE THE PUZZLE PIECE HAS CONTINUOUSLY MOVED WITH THE

13    FINGER TO REACH THE MISSING PUZZLE PIECE, THE DEVICE BECOMES

14    UNLOCKED.  SO WE CAN JUST PLAY THE VIDEO THROUGH ONCE.  THERE

15    WE GO.

16    Q.   DOES PROFESSOR GREENBERG DISAGREE ON THE SLIDE TO UNLOCK

17    MOVING THE PUZZLE PIECE?

18    A.   IN PROFESSOR GREENBERG'S REPORT, THERE WAS NO

19    NON-INFRINGEMENT CONTENTION FOR THAT.

20    Q.   OKAY.  LET ME MAKE SURE I'M CLEAR.  YOU WERE HERE FOR THE

21    OPENING?

22    A.   YES, I WAS.

23    Q.   DID YOU SEE SAMSUNG'S LAWYER PUT HIS FINGER ON THE PUZZLE

24    PIECE AND SAY YOU COULD MOVE IT UP HERE AND ALL AROUND, AND,

25    THEREFORE, IT DOESN'T INFRINGE?

1    A.   I DID.

2    Q.   IS THAT ARGUMENT SUPPORTED BY HIS EXPERT, DR. GREENBERG?

3    A.   NO.

4    Q.   WHAT IS PROFESSOR GREENBERG'S ARGUMENT?

5    A.   THAT THAT INTERACTION THAT WE JUST SAW, SLIDING TO THE

6    HOME SCREEN, THERE'S NONE.

7         THIS -- A VERY SIMILAR INTERACTION IS USED WITH THE

8    SLIDING TO ANSWER, AND HE HOLDS THE SLIDE TO ANSWER NOT BEING A

9    FORM OF UNLOCK ARGUMENT.

10   Q.   ALL RIGHT.  LET'S LOOK AT THE FOURTH COLUMN THEN, THE

11   GALAXY NEXUS?

12   A.   YES.

13   Q.   I'M SORRY.  LET'S DO THE BOXES FOR THE STRATOSPHERE.

14   A.   OKAY.

15   Q.   THE STRATOSPHERE INFRINGES THE CLAIMS?

16   A.   YES, IT DOES.

17   Q.   ALL RIGHT.  GALAXY NEXUS.

18   A.   AGAIN, THERE'S A VIDEO HERE.  THE GRAPHICS.

19   Q.   PDX 44.

20   A.   WHAT WE'LL SEE HERE IS THE USER MAKING CONTACT WITH THE

21   UNLOCK IMAGE, THE IMAGE WILL ANIMATE, IT'LL CHANGE ITS

22   REPRESENTATION SLIGHTLY.  IT'LL THEN MOVE CONTINUOUSLY WITH THE

23   FINGER, AND IT'LL UNLOCK WHEN IT REACHES THE UNLOCK REGION.

24        SO THAT'S ONE FORM OF THE GALAXY NEXUS.  THERE'S ANOTHER

25   FORM THAT WE'LL SEE IN THE VIDEO ON THE RIGHT THIS TIME.

1   Q.   PDX 46?

2   A.   THE IMAGE CHANGES SLIGHTLY.  IT'S DIFFICULT TO SEE ON THE

3   RIGHT-HAND VERSION, BUT THERE'S A SPOTLIGHT EFFECT ON THE DOTS

4   IN THE BACKGROUND I THINK YOU'LL SEE.  THAT'S THE IMAGE

5   CHANGING FROM ONE VISUAL REPRESENTATION TO ANOTHER.

6   Q.   AND CAN YOU RUN THROUGH YOUR BOXES, PLEASE, AND TELL US

7   ABOUT INFRINGEMENT?

8   A.   SURE.  SO WE SAW DETECTION OF THE CONTACT, CONTINUOUS

9   MOVEMENT IN ACCORDANCE WITH THE CONTACT, UNLOCKING THE DEVICE,

10  AND VISUAL CUES WERE THERE IN THAT THE PADLOCK APPEARED ON THE

11  RIGHT-HAND SIDE TELLING THE USER WHICH WAY TO GO.  THERE ARE

12  ADDITIONAL VISUAL CUES, TOO.

13  Q.   DOES PROFESSOR GREENBERG AGREE WITH YOUR ANALYSIS AS TO

14  THE GALAXY NEXUS?

15  A.   NO.  HE MAKES ONE ARGUMENT FOR NON-INFRINGEMENT.

16  Q.   AND WHAT IS THAT?

17  A.   HE ARGUES THAT BECAUSE THE IMAGE CHANGES ITS, ITS

18  APPEARANCE, THAT THAT MEANS THAT IT CAN'T BE THE SAME IMAGE

19  THAT THE CONTACT WAS DETECTED ON AND THAT CONTINUOUSLY MOVED.

20  Q.   LET'S GO BACK TO THE SLIDE AND ILLUSTRATE IT, GO BACK TO

21  THE VIDEO THAT ILLUSTRATED IT.

22  A.   SURE.  OKAY.  SO WE'LL SEE CONTACT OCCURRING ON THE CIRCLE

23  IN BOTH CASES, IT CHANGES TO A SLIGHTLY LARGER CIRCLE, AND ON

24  THE RIGHT THE IMAGE CHANGES TO THAT SPOT LIKE THAT YOU CAN JUST

25  SEE UNDERNEATH THE FINGER AND ON THE RIGHT OF THAT.  OKAY.

1    Q.   AND BECAUSE OF THAT CHANGE PROFESSOR GREENBERG SAYS

2    THERE'S NO INFRINGEMENT HERE?

3    A.   THAT'S CORRECT.

4    Q.   DO YOU AGREE WITH THAT?

5    A.   NO, I DON'T.

6    Q.   AND WHY NOT?

7    A.   TWO REASONS.  FIRST, IF WE LOOK AT THE CLAIM LANGUAGE

8    ITSELF --

9    Q.   SO THAT'S PDX 47, I THINK.

10   A.   THIS IS HOW THE CLAIM ITSELF DESCRIBES THE UNLOCK IMAGE.

11   IT SAYS "WRITTEN THE UNLOCK IMAGE --" IT'S A BIT OF A MOUTHFUL,

12   "THE UNLOCK IMAGE IS A GRAPHICAL, INTERACTIVE USER-INTERFACE

13   OBJECT WITH WHICH THE USER INTERACTS.

14        SO ANYBODY WITH COMPUTING EXPERIENCE OR SOMEBODY SKILLED

15   IN THE ART UNDERSTANDS THE GRAPHICAL INTERACTIVE OBJECT IS JUST

16   ONE OF THESE THINGS THAT YOU SEE IN THE INTERFACE THAT YOU

17   INTERACT WITH.  SOMETIMES THE JURY MAY BE FAMILIAR WITH THE

18   BOLD BUTTON IN MICROSOFT WORD.  I HAVE AN ANIMATION OF THIS.

19   Q.   PDX 48.

20   A.   SORRY.  IF YOU JUST HOLD FOR A SECOND, THE BOLD BUTTON IS

21   THE B SITTING THERE, THAT IS A GRAPHICAL USER INTERFACE OBJECT

22   WITH WHICH THE USER INTERACTS.  IT'S A SINGLE THING THAT YOU

23   USE TO DO STUFF IN A USER INTERFACE.

24        BUT IF WE WATCH WHAT HAPPENS WHEN THE USER INTERACTS WITH

25   IT, IT ACTUALLY CHANGES ITS REPRESENTATION.

1          SO THIS MAY BE -- THIS BOLD BUTTON THAT'S A GRAPHICAL USER

2     INTERFACE OBJECT MAY CONSIST OF MULTIPLE IMAGES OR GRAPHICS

3     PROCESSING, BUT IT'S STILL A SINGLE USER INTERFACE OBJECT WITH

4     WHICH THE USER INTERACTS.  THAT'S COMMON SENSE AND CERTAINLY

5     COMMON SENSE TO SOMEONE OF ORDINARY SKILL.

6          AND, FURTHERMORE, IF WE TURN TO THE SPECIFICATION --

7     Q.   SO YOU SAID THERE WERE TWO REASONS YOU DISAGREE?

8     A.   THIS IS THE SECOND REASON.

9     Q.   THE SECOND ONE, OKAY, THE SPECIFICATION?

10    A.   COMMON SENSE, ORDINARY SKILL INTERPRETATION.

11    Q.   CAN WE HAVE COLUMN 12, LINES 40 TO 47, PLEASE, MR. LEE.

12    A.   THIS IS HOW THE SPECIFICATION DESCRIBES SOME OF THE

13    PROPERTIES THAT ARE POSSIBLE FOR THE UNLOCK IMAGE.  IT SAYS

14    "THE UNLOCK IMAGE MAY BE ANIMATED.  FOR EXAMPLE, THE ARROW ON

15    THE UNLOCK IMAGE MAY APPEAR AND DISAPPEAR IN A PULSE-LIKE

16    MANNER."

17         SO IT'S TEACHING THAT THE VISUAL REPRESENTATION OF THE

18    UNLOCK IMAGE CAN CHANGE.  AND THAT MAY REQUIRE GRAPHICS

19    PROCESSING.  IT MAY REQUIRE MULTIPLE IMAGES TO DO IT.  BUT IT'S

20    STILL A GRAPHICAL USER INTERFACE OBJECT WITH WHICH THE USER

21    INTERACTS.

22    Q.   LET'S MOVE ON TO ANOTHER SUBJECT.

23         ARE YOU AWARE THAT IN CONNECTION WITH THE DAMAGES ARGUMENT

24    SAMSUNG TAKES THE POSITION THAT THERE ARE ALTERNATIVE WAYS TO

25    DO THIS INVENTION THAT WILL BE NON-INFRINGING BUT ALSO WILL BE

1    ACCEPTABLE TO THE CONSUMER?

2    A.   YES.

3    Q.   AND HAVE YOU ANALYZED THAT AS PART OF YOUR REPORT?

4    A.   I HAVE.

5    Q.   LET'S TAKE THAT TERM ACCEPTABLE NON-INFRINGING

6    ALTERNATIVE.   WHAT DOES THAT PHRASE MEAN TO YOU?

7    A.    IT MEANS THAT THE PROPOSED ALTERNATIVE NEEDS TO MEET THE

8    BENEFITS AND ADVANTAGES OF THE TEACHINGS OF THE CLAIMS IN THE

9    PATENT.

10   Q.   AND DID SAMSUNG ACTUALLY PROVIDE A, A LIST OF THE

11   ALTERNATIVES THAT THEY THOUGHT WOULD BE BOTH NON-INFRINGING AND

12   ACCEPTABLE?

13   A.   YES.   IT STARTED WITH A LONG LIST.

14   Q.   CAN WE SEE PDX 55?   AND THIS IS THE LIST THAT SAMSUNG

15   PROVIDED?

16   A.   THIS IS THE LONG LIST, YES.

17   Q.   AND WHY DO YOU CALL IT THE LONG LIST?

18   A.   THEIR EXPERT MAINTAINED THREE OF THEM.

19   Q.   SO LET'S SEE.   PROFESSOR GREENBERG, IN HIS REPORT, TALKS

20   ABOUT WHICH OF THESE?

21   A.   THE FIRST THREE, GLASS UNLOCK, CIRCLE --

22   Q.   BUT NOT THE LAST FOUR?

23   A.   NOT THE LAST FOUR.

24   Q.   SO LET'S TALK ABOUT THE ONES THAT HE MAY OR MAY NOT TALK

25   ABOUT.

```
 1            IN YOUR OPINION, ARE ANY OF THESE THREE PROPOSED

 2     ALTERNATIVES ACCEPTABLE NON-INFRINGING ALTERNATIVES TO THE

 3     SLIDE TO UNLOCK FEATURE OF CLAIM 8 OF THE '721 PATENT?

 4     A.    THEY ALL FAIL TO MEET THE BENEFITS AND ADVANTAGES OF CLAIM

 5     8.

 6     Q.    LET'S GO THROUGH YOUR REASONING.  LET'S LOOK AT THE FIRST

 7     ONE, GLASS UNLOCK.

 8            DOES GLASS UNLOCK PROVIDE ALL OF THE BENEFITS OF THE

 9     PATENTED INVENTION?

10     A.    NO.  I HAVE A VIDEO THAT EXPLAINS WHAT IT IS AND WHY IT

11     LACKS IT.

12     Q.    OKAY.  THAT'S PDX 59.

13     A.    SO --

14     Q.    GO AHEAD.

15     A.    SO IN GLASS UNLOCK, WHAT THE USER CAN DO OR WHAT THE USER

16     DOES AND WHAT THE DEVICE DOES IS IT DETECTS A CONTACT ANYWHERE

17     ON THE SCREEN, AND THE USER CAN SLIDE OR SWIPE IN ANY

18     DIRECTION.

19            AND ONCE THEY'VE MOVED FAR ENOUGH, THE DEVICE BECOMES

20     UNLOCKED.

21            THE REASON THIS FAILS TO MEET THE BENEFITS AND ADVANTAGES

22     IS, FIRST OFF, IT DOESN'T PREVENT ACTIVATION BY MISTAKE.  BY

23     ALLOWING SWIPE ANYWHERE TO ANYWHERE THAT'S LONG ENOUGH --

24     Q.    I'M SORRY.  ON THE LEFT HERE, YOU HAVE YOUR LIST OF

25     BENEFITS OF THE INVENTION; IS THAT RIGHT?
```

```
 1    A.   THANK YOU, YES.  SO THE FIRST OF MY BENEFITS OF THE

 2         INVENTION WAS PREVENTS ACTIVATION BY MISTAKE.

 3              BUT PUTTING YOUR HAND INTO A POCKET CAN EASILY SWIPE

 4    ACROSS THE LENGTH OF THE DEVICE OR THE WIDTH OF THE DEVICE AND

 5    UNLOCK ACCIDENTALLY.

 6              AND WE'VE SEEN SAMSUNG DOCUMENTS THAT REFER TO THAT AS A

 7    PROBLEM OF THIS FORM OF UNLOCKING.

 8    Q.   YOU ACTUALLY SAW A SAMSUNG DOCUMENT -- HAVE YOU SEEN --

 9    I'M SORRY.  ARE YOU THROUGH WITH THIS?

10    A.   YES, I AM.

11    Q.   HAVE YOU SEEN INTERNAL SAMSUNG DOCUMENTS THAT REFER TO

12    THIS GLASS UNLOCK SOLUTION?

13    A.   YES, I HAVE.

14              MR. NELSON:  OBJECTION, YOUR HONOR.  THIS IS OUTSIDE

15    THE SCOPE OF HIS REPORT.  HE DOESN'T CITE ANY OF THESE

16    DOCUMENTS IN SUPPORT OF HIS OPINIONS IN HIS REPORT.

17              MR. MCELHINNY:  THIS IS THE SAME -- I MEAN, IT'S JUST

18    THE SAME ISSUE.  IT'S A TIMING ISSUE.

19              THE COURT:  OVERRULED.

20         GO AHEAD, PLEASE.

21    BY MR. MCELHINNY:

22    Q.   AND DID ANY OF THOSE DOCUMENTS PROVIDE SUPPORT FOR YOUR

23    CONCLUSION ABOUT GLASS UNLOCK?

24    A.   YES, THEY DID.

25    Q.   WOULD YOU OPEN YOUR BINDER, PLEASE, TO PX 120.  WHAT IS
```

1        120, SIR?

2        A.   IT'S A TRANSLATION OF SOME USABILITY EVALUATION RESULTS

3        FOR A DEVICE CODE NAMED THE BEHOLD3.

4        Q.   AND IS THIS ONE OF THE DOCUMENTS YOU RELIED UPON IN

5        FORMING YOUR OPINION?

6        A.   IT IS.

7                MR. MCELHINNY:  YOUR HONOR, I MOVE PX 120.

8                MR. NELSON:  NO OBJECTION, YOUR HONOR.

9                THE COURT:  ALL RIGHT.  IT'S ADMITTED.

10       (PLAINTIFF'S EXHIBIT PX 120 WAS ADMITTED IN EVIDENCE.)

11               THE COURT:  GO AHEAD, PLEASE.

12       BY MR. MCELHINNY:

13       Q.   LET'S LOOK AT THE COVER.  THIS IS THE DOCUMENT WE'RE

14       REFERRING TO?

15       A.   THAT'S CORRECT.

16       Q.   DATED MAY 10TH, 2010?

17       A.   YES.

18       Q.   WOULD YOU LOOK AT PAGE 28, PLEASE.

19       A.   I HAVE IT.

20       Q.   AND WHAT DOES THIS TELL US ABOUT GLASS UNLOCK, SIR?

21       A.   THE FIRST BULLET POINT, THE SQUARE BULLET POINT AT THE TOP

22       SAYS "SLIDE UNLOCKING METHOD HAS HIGH PROBABILITY OF

23       MALFUNCTION."

24       Q.   AND WHAT DID --

25       A.   AND THE BULLET POINT FOR BEHOLD3 BLOW SAYS "UNINTENTIONAL

DIRECT COCKBURN

```
 1      UNLOCK BECAUSE THE SLIDING ACTION WORKS ON ANY PART OF THE

 2      SCREEN."

 3          THIS IS CONTRASTED WITH THE IPHONE WHICH SAYS "LOCK UNDONE

 4      ONLY WHEN SLIDING ACTION IS APPLIED TO A SPECIFIC BUTTON."

 5      Q.   AND EXPLAIN TO US THE DIRECTION OF IMPROVEMENT THERE?

 6      A.   WELL, THE DIRECTION OF IMPROVEMENT SAYS TO CONVERT TO AN

 7      UNLOCKING METHOD THAT WORKS ONLY IN A SPECIFIC AREA, AND IT

 8      SAYS THAT THE BEHOLD3 PROVIDES THE FOLLOWING LOCK SCREENS, THE

 9      FIRST ONE BEING SWEEP GLASS, WHICH IS THE ONE DEPICTED ON THE

10      LEFT.

11      Q.   AND THE RECOMMENDATION IS TO CHANGE THAT AWAY FROM WHAT IT

12      WAS?

13      A.   YES, TO AVOID ACCIDENTAL UNLOCKING.

14      Q.   THANK YOU.

15          LET'S GO TO THE SECOND PROPOSAL, IF WE CAN GO BACK TO THE

16      CHART OF SAMSUNG'S, 55, PLEASE.  PDX 55, PLEASE.  THAT'S NOT

17      WHAT I WANT.

18          LET'S NOT WASTE TIME.  WHAT IS THE SECOND OF THE

19      PROPOSALS?

20      A.   THE SECOND OF THE PROPOSALS WAS CIRCLE UNLOCK.  AND MOVE

21      FORWARD TWO SLIDES.

22      Q.   OKAY.  AND HAVE YOU ANALYZED CIRCLE UNLOCK TO SEE IF IT

23      WOULD BE AN ACCEPTABLE NON-INFRINGING ALTERNATIVE?

24      A.   I HAVE.

25      Q.   WHAT IS YOUR CONCLUSION?
```

1    A.    THAT'S IT -- DEPICTED THERE WE HAVE CIRCLE UNLOCK AND MY

2    BENEFITS AND ADVANTAGES ON THE LEFT.

3    Q.    ON PDX 61?

4    A.    WHAT HAS CIRCLE UNLOCKS IS, AGAIN, THE USER CAN TOUCH

5    ANYWHERE ON THE TOUCHSCREEN DISPLAY, AND IF THEY MOVE OUTSIDE

6    THE LARGEST CIRCLE THAT'S JUST VISIBLE ON YOUR MONITORS, THAT

7    WILL UNLOCK THE DEVICE.

8         SO THE USER CAN GO FROM ANY LOCATION IN ANY DIRECTION FAR

9    ENOUGH AND THE DEVICE WILL UNLOCK.

10        SO THAT ALLOWS ACCIDENTAL ACTIVATION.

11        BUT IN ADDITION THE CUE IS REALLY AMBIGUOUS.  IT'S HARD

12   FOR THE USER TO KNOW WHAT THEY'RE EXPECTED TO DO IN ORDER TO

13   UNLOCK THIS DEVICE.

14   Q.    DID YOU REVIEW SAMSUNG INTERNAL DOCUMENTS THAT DISCUSSED

15   THE PRO'S AND CON'S OF THIS PARTICULAR SOLUTION?

16   A.    YES, I DO.

17   Q.    IF YOU WOULD LOOK IN YOUR BINDER, PLEASE, AT PX 181.

18   A.    OKAY.

19   Q.    WHAT DO YOU -- WHAT DO YOU HAVE BEFORE YOU IN PX 181?

20   A.    THIS IS A SERIES OF E-MAIL COMMUNICATIONS BETWEEN SAMSUNG

21   PERSONNEL.

22   Q.    AND DID YOU RELY ON THAT DOCUMENT IN FORMING YOUR

23   OPINIONS?

24   A.    YES, I DID.

25             MR. MCELHINNY:  YOUR HONOR, I MOVE PX 181.

```
 1              THE COURT:  ANY OBJECTION, MR. NELSON.

 2              MR. NELSON:  NO OBJECTION, YOUR HONOR.

 3              THE COURT:  IT'S ADMITTED.

 4          (PLAINTIFF'S EXHIBIT PX 181 WAS ADMITTED IN EVIDENCE.)

 5              THE COURT:  GO AHEAD, PLEASE.

 6      BY MR. MCELHINNY:

 7      Q.   SO WHAT IS THE SUBJECT OF THIS E-MAIL, PROFESSOR?

 8      A.   IT CONCERNS ISSUES REGARDING USABILITY THAT ARE BEING

 9      IDENTIFIED BY ONE OF THE CARRIERS OF THE DEVICE.

10      Q.   WHAT CARRIER ARE WE TALKING ABOUT?

11      A.   IT'S VERIZON, VERIZON WIRELESS.

12      Q.   AND IF YOU LOOK AT THE BOTTOM OF PAGE 4 AND PAGE 4 OF THIS

13      DOCUMENT, IS THIS WHAT WE'RE TALKING ABOUT IN TERMS OF

14      SIGNIFICANCE?

15      A.   YES, IT IS.

16      Q.   CAN YOU WALK US THROUGH IT, PLEASE?

17      A.   IF WE TURN TO THE TOP OF THE NEXT PAGE, THERE'S A SENTENCE

18      THERE THAT BEGINS "HOWEVER, VZW," WHICH IS VERIZON WIRELESS,

19      "SHOWED NEGATIVE RESPONSE TOWARDS OUR COMPANY'S CIRCLE LOCK

20      PLAYING THE ROLE OF THE VISUAL CUE."

21      Q.   SO LET'S TALK ABOUT THE THIRD PROPOSAL, WHICH IS RIPPLE

22      UNLOCK, WHICH I THINK WE SAW WITH MR. CHRISTIE THIS MORNING.

23      IS THAT RIGHT?

24      A.   YES.

25      Q.   EXPLAIN TO US WHAT RIPPLE UNLOCK IS, PLEASE.
```

1    A.   WELL, AS WE SAW THIS MORNING, RIPPLE UNLOCK ALSO ALLOWS

2    THE USER TO MOVE FROM ANYWHERE TO ANYWHERE ON THE SCREEN, AND

3    IT'S, THEREFORE, PROVIDED THAT THEY MOVE FAR ENOUGH, THE DEVICE

4    WILL UNLOCK, AND THEREFORE, IT DOESN'T PREVENT ACTIVATION BY

5    MISTAKE.

6    Q.   EXPLAIN THAT TO US?

7    A.   IF YOU CAN MOVE IN ANY DIRECTION FROM ANYWHERE TO ANYWHERE

8    JUST BY PUTTING IT -- AGAIN, PUTTING YOUR HAND INTO THE POCKET

9    WHERE THE DEVICE WILL SWIPE ACROSS THE DEVICE AND CAN

10   ACCIDENTALLY UNLOCK IT.

11   Q.   TO SUMMARIZE, WHAT IS YOUR OPINION AS TO WHETHER OR NOT

12   SAMSUNG'S, ANY ONE OF SAMSUNG'S THREE PROPOSALS WOULD BE AN

13   ACCEPTABLE NON-INFRINGING ALTERNATIVE?

14   A.   ALL OF THEM LACK THE BENEFITS AND ADVANTAGES OF THE CLAIM

15   8 OF THE '721 PATENT.

16   Q.   WE'VE SEEN A COUPLE OF R&D DOCUMENTS THAT SAY MOVE FROM

17   THIS DESIGN TO ANOTHER DESIGN.

18        WHAT DOES THAT INVOLVE WHEN YOU MOVE FROM ONE DESIGN TO

19   ANOTHER DESIGN?

20   A.   IT INVOLVES MAKING SOME CHANGE TO THE DESIGN IN ORDER TO

21   IMPROVE IT, ELIMINATE THE PROBLEMS THAT EXIST IN THE PREVIOUS

22   VERSION.

23   Q.   AND BASED ON YOUR EXPERIENCE, APPROXIMATELY HOW LONG DOES

24   THAT TAKE TO MAKE THAT KIND OF A CHANGE?

25   A.   WELL, THERE ARE SEVERAL STEPS THAT YOU NEED TO TAKE, AND

 1    WE HAVE MR. CHRISTIE REFERRING TO SOME OF THESE.  YOU NEED TO

 2    COME UP WITH ALTERNATIVE DESIGNS TO SEE IF THEY CAN -- TO SEE

 3    IF THEY'RE A GOOD IDEA OR NOT.  YOU NEED TO IMPLEMENT THOSE

 4    DESIGNS, AND THEN USABILITY TEST THEM, AND THAT CAN BE TIME

 5    CONSUMING.

 6         HAVING DONE THAT, YOU NEED TO COMMUNICATE WITH THE

 7    CARRIERS, WHO ARE RESPONSIBLE FOR DISSEMINATING THESE TO THE

 8    END USERS, AND MAKE SURE THAT THE CARRIERS ARE GOING TO BE

 9    HAPPY ABOUT THESE ALTERATIONS.

10         SO SEVERAL MONTHS.

11    Q.   SIR, LATER IN THE TRIAL WE'RE GOING TO BE HEARING, AND

12    WE'VE HEARD ABOUT HIM, BUT WE'RE GOING TO BE HEARING FROM THE

13    FAMOUS PROFESSOR HAUSER FROM M.I.T.

14         HAVE YOU READ HIS EXPERT REPORT?

15    A.   I HAVE.

16    Q.   AND DID YOU REVIEW A DESCRIPTION OF THE SLIDE TO UNLOCK

17    FEATURE IN THE SURVEY THAT HE PERFORMED?

18    A.   YES, I DID.

19    Q.   DID THAT DESCRIPTION, IN YOUR VIEW, PROVIDE AN ACCURATE

20    SUMMARY OF A USER'S EXPERIENCE OF SLIDE TO UNLOCK ACCORDING TO

21    CLAIM 8 OF THE '721 PATENT?

22    A.   IT PROVIDES A GOOD DESCRIPTION FOR THE PURPOSE OF

23    SURVEYING SURVEY RESPONDENTS.

24    Q.   THANK YOU.  NOW WE'LL MOVE ON FROM THE '721 TO THE '172

25    AUTOMATIC WORD CORRECTION PATENT.

1          IF YOU WOULD LOOK IN YOUR BINDER, PLEASE, TO JX 13.

2     A.   THANK YOU.

3     Q.   WHAT IS JX 13?

4     A.   IT IS THE '172 PATENT THAT I'VE BEEN REFERRING TO AS

5     AUTOMATIC WORD CORRECTION.

6          MR. MCELHINNY:  YOUR HONOR, I'D MOVE JX 13.

7          THE COURT:  ANY OBJECTION?

8          MR. NELSON:  NO OBJECTION, YOUR HONOR.

9          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

10         (JOINT EXHIBIT JX 13 WAS ADMITTED IN EVIDENCE.)

11         THE COURT:  GO AHEAD, PLEASE.

12    BY MR. MCELHINNY:

13    Q.   AGAIN, IS THERE ANY DISPUTE LEFT IN THIS CASE WHATSOEVER

14    ABOUT WHETHER OR NOT THE ACCUSED SAMSUNG PHONES INFRINGE THIS

15    PATENT?

16    A.   NO.  THE COURT HAS ALREADY RULED THAT THE ACCUSED DEVICES

17    DO INFRINGE ON CLAIM 18 OF THE '172.

18    Q.   AND WHAT ARE THE ACCUSED DEVICES THAT INFRINGE THIS

19    PATENT?

20    A.   IT'S ALL OF THE DEVICES I INTRODUCED EARLIER, PLUS ONE

21    MORE, WHICH IS THE GALAXY NOTE.

22    Q.   DO YOU HAVE A GALAXY NOTE IN FRONT OF YOU?

23    A.   I DO.

24    Q.   AND WHAT IS THE EXHIBIT NUMBER ON THE GALAXY NOTE?

25    A.   THIS IS JX 13A, GALAXY NOTE WITH SOFTWARE UCLA 1.

1              MR. MCELHINNY:  YOUR HONOR, MOVE EXHIBIT JX 30A.

2              MR. NELSON:  NO OBJECTION, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

4         (JOINT EXHIBIT JX 30A WAS ADMITTED IN EVIDENCE.)

5              THE COURT:  GO AHEAD, PLEASE.

6    BY MR. MCELHINNY:

7    Q.   WHEN WE INCLUDE THE PHONES THAT YOU IDENTIFIED EARLIER AND

8    THIS ADDITIONAL PHONE, DO WE HAVE ALL OF THE VARIATIONS AND

9    BEHAVIOR OF PHONES THAT INFRINGE CLAIM 18 OF THE '172 PATENT?

10   A.   YES.

11   Q.   WOULD YOU LOOK IN YOUR BINDER, PLEASE, AT TAB 232.

12   A.   THANK YOU.

13   Q.   WHAT DO YOU FIND THERE?

14   A.   THIS IS A USER MANUAL FOR THE GALAXY NOTE.

15   Q.   AND DID YOU REFER TO THIS USER GUIDE IN DOING YOUR

16   ANALYSIS?

17   A.   YES, I DID.

18              MR. MCELHINNY:  YOUR HONOR, I MOVE PX 232.

19              MR. NELSON:  NO OBJECTION, YOUR HONOR.

20              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

21         (PLAINTIFF'S EXHIBIT PX 232 WAS ADMITTED IN EVIDENCE.)

22              THE COURT:  GO AHEAD, PLEASE.

23   BY MR. MCELHINNY:

24   Q.   SIR, IN YOUR OPINION, IS THE GALAXY NOTE USER GUIDE THAT

25   ASSISTS CUSTOMERS IN USING FEATURE THAT IS INFRINGE CLAIM 17 OF

1    THE '172 AUTO CORRECT PATENT?

2    A.    CLAIM 18.

3    Q.    SORRY, CLAIM 18 OF THE '172 AUTO CORRECT PATENT.

4    A.    YES.

5    Q.    CAN YOU USE PDX 65, PLEASE, TO GIVE US AN OVERVIEW OF

6    CLAIM 18 OF THE '172 PATENT?

7    A.    SURE.  THIS IS A RATHER FEARSOME SET OF CLAIM ELEMENTS.

8          SO RATHER THAN GO THROUGH THE LANGUAGE, I'VE PREPARED A

9    SLIDE, AN ANIMATION THAT DEMONSTRATES THE CLAIM.

10   Q.    THAT SHOULD BE PDX 66, 67, AND 68.

11   A.    SO WHAT WE SEE HERE IS A FIGURE FROM THE SPECIFICATION,

12   THIS IS FIGURE 4D, AND IT SHOWS A DEVICE WITH TEXT ENTRY

13   OCCURRING.

14         SO WHAT THE CLAIM REQUIRES IS, IF WE STEP FORWARD ONE, IT

15   REQUIRES A FIRST AREA, AND THIS FIRST AREA WILL CONTAIN THE

16   TEXT THAT THE USER HAS ALREADY ENTERED AND SOME MORE.

17         NEXT, IT ALSO REQUIRES A SECOND AREA ON THE DISPLAY.

18         AND IF WE STEP FORWARD, AND IMPORTANTLY, THE CURRENT

19   CHARACTER STRING, WHICH IS THE WORD THAT THE USER IS CURRENTLY

20   TYPING, SO WE NEED TO REMEMBER THAT, CURRENT CHARACTER STRING,

21   IS THE WORD THE USER IS CURRENTLY TYPING, IT NEEDS TO APPEAR IN

22   BOTH THAT FIRST AREA AND IN THE SECOND AREA.

23   Q.    ALL RIGHT.  USING PDX 64, 65, AND 76, CAN YOU MOVE FORWARD

24   HERE?

25   A.    OH, WE MISSED SOMETHING THERE.  WE STILL ARE MISSING ONE

DIRECT COCKBURN

1    SLIDE, AND I'LL JUST BRIEFLY DESCRIBE IT.  THE SECOND AREA ALSO

2    NEEDS TO CONTAIN A SUGGESTED REPLACEMENT STRING.  OKAY.

3        SO WE NEED TWO AREAS, THE FIRST DISPLAY AREA, A SECOND

4    DISPLAY AREA.  THE FIRST AREA AND THE SECOND AREA MUST CONTAIN

5    A COPY OF THE WORD THE USER IS CURRENTLY TYPING, AND THE SECOND

6    DISPLAY AREA MUST ALSO CONTAIN A SUGGESTED REPLACEMENT STRING.

7    Q.   CAN I HAVE PDX 68, PLEASE.

8    A.   OKAY.  THERE'S THE SUGGESTED REPLACEMENT STRING.

9        NOW, IF YOU HAVE REALLY GOOD EYES, YOU'LL BE ABLE TO TELL

10   THAT THE WORD THAT THE USER HAS CURRENTLY TYPED, SO THE CURRENT

11   CHARACTER STRING, IS C-A-E, AND IT'S DISPLAYED IN THOSE TWO

12   AREAS, AND THE SUGGESTED REPLACEMENT STRING IS C-A-R.

13       BUT I'M GOING TO MAGNIFY THOSE IN THE NEXT SLIDE.

14       OKAY.  SO IT IS MUCH EASIER TO SEE NOW.  WE'VE GOT CAE,

15   CURRENT CHARACTER STRING IN FIRST AND SECOND AREA, AND WE GOT

16   CAR AS THE SUGGESTED REPLACEMENT STRING IN THE SECOND AREA.

17       SO NOW WE'LL SEE WHAT HAPPENS IN THE REMAINING ELEMENTS OF

18   THE CLAIM.

19       IF WE PLAY THE NEXT ONE, WHEN THE USER PRESSES A

20   DELIMITER -- NOW, A DELIMITER IS A PUNCTUATION MARK FOR A SPACE

21   CHARACTER, SO SOMETHING THAT TERMINATES A WORD -- WHEN THE USER

22   PRESSES THE SPACE BAR, THE SUGGESTED REPLACEMENT STRING

23   REPLACES THE CURRENT CHARACTER STRING IN THAT FIRST AREA.

24       SO C-A-E WAS REPLACED WITH C-A-R.

25       NEXT, UNWINDING THAT ACTION, IF THE USER, IF WE WATCH THE

```
 1    ANIMATION, IF THE USER TAPS ON THE SUGGESTED REPLACEMENT

 2    STRING, THAT ALSO HAS THE SAME EFFECT OF REPLACING THE CURRENT

 3    CHARACTER STRING.

 4         AND, FINALLY, UNWINDING THAT ACTION AGAIN, IF THE USER

 5    TAPS ON THE CURRENT CHARACTER STRING IN THE SECOND AREA, IT

 6    REPLACES THE -- SORRY.  VERY IMPORTANT AREA THERE.  IT KEEPS

 7    THE CURRENT CHARACTER STRING IN THE FIRST AREA.  SO CAE IS

 8    BEING KEPT IN THAT CASE.

 9    Q.   HAVE YOU PREPARED A VIDEO THAT ILLUSTRATES THIS INFRINGING

10    BEHAVIOR ON ONE OF THE PHONES FOUND TO INFRINGE?

11    A.   YES, I HAVE.

12    Q.   IS THAT PDX 77?

13    A.   YES.

14    Q.   AND IS THIS THE SAMSUNG SKYROCKET DEVICE?

15    A.   IT IS.

16    Q.   OKAY.

17    A.   SO WHAT WE'LL SEE HERE IS THIS IS THE FIRST DISPLAY AREA

18    THAT IS THE LARGE SQUARE AREA NEAR THE MIDDLE OF THE DISPLAY,

19    THAT'S THE FIRST AREA.

20         IF YOU LOOK AT THE PROTECTOR FOR A SECOND, THE SECOND AREA

21    IS GOING TO APPEAR IN THIS AREA.  IT'S CURRENTLY NOT DISPLAYED.

22         AND WHAT WE'LL SEE WHILE THE USER IS TYPING IS THAT THE

23    CURRENT CHARACTER STRING IS DISPLAYED IN BOTH AREAS.

24         SO IF WE PLAY THIS FORWARD A LITTLE BIT, THE USER TYPES

25    R-H-Y-T, AND NOW, OF COURSE, YOU SEE R-H-Y-T IS IN THAT FIRST
```

 1    DISPLAY AREA.  AND IN THE SECOND DISPLAY AREA OVER ON THE

 2    RIGHT, R-H-Y-T, I'M HIGHLIGHTING IT WITH MY GREEN LASER POINTER

 3    IF YOU NEED IT.  SO THAT'S THE CURRENT CHARACTER STRING IN TWO

 4    AREAS.

 5         ALONG SIDE R-H-Y-T IN THE SECOND AREA IS T-H-U-R, WHICH IS

 6    THE CURRENT SUGGESTED REPLACEMENT STRING.

 7         OKAY.  KEEP TYPING.  R-H-Y-M, SO THE USER HAS MISSPELLED

 8    THE WORD RHYTHM WITH RHYTHYM, AND WE SEE CURRENT CHARACTER

 9    STRING IN TWO AREAS AND THE CORRECTED SUGGESTED REPLACEMENT

10    STRING HIGHLIGHTED IN BLUE THERE.

11         NOW THE USER WILL PRESS A DELIMITER, THE SPACE BAR.  AND

12    WHAT'S HAPPENED IS THE SUGGESTED REPLACEMENT STRING, THE

13    CORRECTLY SPELLED RHYTHM, REPLACES THE INCORRECT RHYTHYM IN THE

14    FIRST AREA.  THOSE ARE THE ELEMENTS OF THE CLAIM.  THOSE ARE

15    THE CLAIM.

16    Q.   WHAT ARE THE KEY BENEFITS OF USING THIS INVENTION?

17    A.   YES.  I'VE GOT A SLIDE THAT SUMMARIZES THOSE.

18    Q.   THAT'S PDX 80.

19    A.   THE KEY BENEFITS ARE THAT THIS METHOD ALLOWS THE USER TO

20    TYPE FLUIDLY AND EFFICIENTLY.  THEY CAN CONCENTRATE ON WHAT IT

21    IS THEY ARE TRYING TO TYPE AND RELY ON THE SYSTEM TO

22    AUTOMATICALLY CORRECT ANY MINOR TYPING ERRORS THEY MAKE ON

23    THEIR BEHALF.

24         SO IF THEY MISS ONE OF THESE SMALL KEY CHARACTERS, THEN

25    THE SYSTEM WILL FIX IT FOR THEM.

1          THAT'S THE FIRST BENEFIT.

2          THE SECOND BENEFIT IS THAT IT'S LOW DISTRACTION.  SO THE

3     REALLY IMPORTANT FIRST AREA OF THE DISPLAY WHERE IT CONTAINS

4     THE MESSAGE YOU'RE COMPOSING, IT'S NOT CLUTTERED UP WITH OTHER

5     INFORMATION THAT MIGHT OBSCURE THE TEXT YOU'RE WRITING.

6          THE THIRD BENEFIT IS THAT WHEN YOU WANT TO DEAL WITH ONE

7     OF THE ALTERNATIVES PROVIDED BY THE SYSTEM, YOU HAVE A SINGLE

8     AREA THAT YOU CAN GO TO ASSERT THOSE ALTERNATIVES.

9          AND, FURTHERMORE, BECAUSE IT'S A SEPARATE AREA, THIS AREA

10    CAN BE CLOSE TO THE KEYBOARD SO YOU DON'T NEED TO MOVE YOUR

11    FINGERS VERY FAR AWAY.  YOU CAN MAKE THOSE SELECTIONS RAPIDLY.

12         AND, FINALLY, IF YOU WANT TO OVERRIDE THE SYSTEM'S

13    SUGGESTION, SO IF YOU THINK THAT THE SYSTEM IS SUGGESTING A

14    WORD THAT YOU ACTUALLY DON'T WANT, YOU WANT TO KEEP YOUR

15    MISSPELLED WORD, LIKE IT'S MY SURNAME AND THE SYSTEM HAS NEVER

16    LEARNED MY SURNAME, I CAN TYPE WHAT I INTEND AND SAY, NO, I

17    WANT TO KEEP THAT WORD.

18    Q.   SIR, DO IPHONES, THE IPHONES THAT YOU'VE LOOKED AT,

19    PRACTICE CLAIM 18 OF THE '172 PATENT?

20    A.   NO.

21    Q.   AND WHAT IN THE IPHONE IS DIFFERENT FROM CLAIM 18?

22    A.   THE KEY DIFFERENCE IS THAT THE IPHONE METHOD DOES NOT HAVE

23    A SECOND AREA THAT CONTAINS THE CURRENT CHARACTER STRING.

24    Q.   IN CONNECTION WITH THE '172 PATENT, HAS SAMSUNG PROVIDED A

25    LIST OF WHAT IT BELIEVES WOULD BE, OR AT LEAST CLAIMS WOULD BE

```
 1     ACCEPTABLE NON-INFRINGING ALTERNATIVES?

 2     A.   YES, IT HAS.

 3     Q.   AND, FIRST OF ALL, LET ME ASK THIS QUESTION:  IS THE --

 4     HAVE THEY LISTED THE WAY THE IPHONE DOES IT AS ONE OF THEIR

 5     ACCEPTABLE NON-INFRINGING ALTERNATIVES?

 6     A.   NO, THEY HAVE NOT.

 7     Q.   OKAY.  DO YOU HAVE THEIR LIST?

 8     A.   YES, I DO.

 9     Q.   IS THAT PDX 81?

10     A.   YES.

11     Q.   DO -- WHAT IS YOUR OPINION AS TO WHETHER ANY OF THESE

12     WOULD BE AN ACCEPTABLE NON-INFRINGING ALTERNATIVE?

13     A.   ALL OF THESE ALTERNATIVES LACK THE BENEFITS AND ADVANTAGES

14     OF THE '172 PATENT, CLAIM 18.

15     Q.   SO LET'S DO THE FIRST ONE, WHICH IS DISPLAY SUGGESTION IN

16     THE TEXT AREA.

17          CAN YOU EXPLAIN THAT TO US?

18     A.   SURE.  WHAT HAPPENS WITH THIS ALTERNATIVE IS THAT FOR

19     EVERY CHARACTER THAT THE USER TYPES, THE SUGGESTION CAN CHANGE

20     COMPLETELY.

21          SO I HAVE A VIDEO SHOWING THIS ALTERNATIVE.  OKAY.

22          NOW, AGAIN, THIS IS GOING TO BE A LITTLE BIT HARD TO

23     FOLLOW, SO WE'LL PAUSE IT AS WE GO.

24          WHAT'S GOING TO HAPPEN, THE USER IS GOING TO TYPE OUT THE

25     WORD RHYTHM, AND THE FIRST DISPLAY AREA IS GOING TO BE SHOWING
```

1    THE TEXT THAT THE USER HAS ENTERED.  SO IF YOU KEEP YOUR EYES

2    UP THERE WHERE THE -- ON YOUR MONITORS, IF YOU PREFER, WHERE

3    THE TEXT IS APPEARING, I'LL READ OUT THE CHARACTERS THAT THE

4    USER PRESSES ON THE KEYBOARD.

5          READY?  R-H-Y-T-H-Y-M.

6    Q.   WAS THIS METHOD ACTUALLY USED IN ANY PARTICULAR SAMSUNG

7    PHONE?

8    A.   YES, IT WAS.

9    Q.   WHAT PHONE WAS THAT?

10   A.   AT LEAST THE DART PHONE.

11   Q.   YOU WERE HERE FOR THE OPENING AT SAMSUNG AND DO YOU

12   REMEMBER SAMSUNG'S COUNSEL SAID THEY HAD A PERFECTLY GOOD OTHER

13   METHOD OF DOING IT THAT IN THE DART PHONE, IT WOULD PROVIDE THE

14   SAME BENEFITS AS OUR INVENTION?

15   A.   I HEARD THAT, YES.

16   Q.   OKAY.  DID YOU AGREE WITH THAT, SIR?

17   A.   NO, I DID NOT.

18   Q.   AND WHAT IS YOUR VIEW ABOUT WHETHER OR NOT THAT METHOD

19   PROVIDES THE BENEFITS THAT YOU LOOKED AT?

20   A.   THIS, THIS METHOD DOES NOT PROVIDE THE BENEFITS PRIMARILY

21   BECAUSE IT, IT GIVES A VERY JARRING EXPERIENCE TO THE USER.

22   THEY SEE A -- THEY TYPE ONE CHARACTER AND THEY CAN SEE A

23   COMPLETELY DIFFERENT SET OF CHARACTERS APPEARING IN THE

24   DISPLAY.

25   Q.   LET'S SHOW THE VIDEO ONE MORE TIME.

1    A.   R-H-Y-T-H-Y-M.

2    Q.   OKAY.  DID YOU SEE ANY INTERNAL SAMSUNG DOCUMENTS TALKING

3    ABOUT THIS DART METHOD OF PROVIDING AUTO CORRECT?

4    A.   YES, I DID.

5    Q.   IF YOU LOOK IN YOUR BINDER, PLEASE, AT PLAINTIFF'S EXHIBIT

6    168.

7    A.   OKAY.

8    Q.   WHAT DO YOU HAVE AT PLAINTIFF'S EXHIBIT 168, SIR?

9    A.   THIS IS A TRANSLATION OF INTERNAL SAMSUNG COMMUNICATIONS

10   CONCERNING REQUESTS, OR USABILITY CONCERNS FROM ONE OF THE

11   CARRIERS, T-MOBILE.

12   Q.   AND IS THIS ONE OF THE DOCUMENTS YOU RELIED UPON IN

13   FORMING YOUR OPINIONS?

14   A.   YES, IT IS.

15            MR. MCELHINNY:  YOUR HONOR, MOVE EXHIBIT PX 168.

16            MR. NELSON:  NO OBJECTION, YOUR HONOR.

17            THE COURT:  IT'S ADMITTED.

18        (PLAINTIFF'S EXHIBIT PX 168 WAS ADMITTED IN EVIDENCE.)

19            THE COURT:  GO AHEAD, PLEASE.

20   BY MR. MCELHINNY:

21   Q.   SO LET'S LOOK AT THE BOTTOM OF PAGE 4.

22        WELL, FIRST LET'S STOP RIGHT HERE.  EXPLAIN TO US HOW THE

23   DOCUMENT IS WORKING, PROFESSOR.  THIS IS PAGE -- THIS IS PAGE

24   4.  WHAT HAVE WE GOT HERE.

25   A.   WE GOT AN E-MAIL THAT BEGINS WITH HELLO, THIS IS SIP

```
 1        TEAM'S YUNGJEAONG CHOI.  THE CARRIER ISSUES BELOW CONSIST

 2        MAINLY OF SAMSUNG'S IME'S U/I RELATED ISSUES.  SO THAT MEANS

 3        INPUT METHODS, USER INTERFACE RELATED ISSUES.

 4            SO IT'S, IT'S THE CARRIER, T-MOBILE, HAS RAISED CONCERNS

 5        ABOUT THE INPUT METHOD, THE TEXT INPUT METHOD.

 6        Q.   ALL RIGHT.  AND THEN TAKE US TO WHEREVER YOU WANT TO BE

 7        THAT RELATES TO WHAT WE'VE JUST BEEN TALKING ABOUT, BOTTOM OF

 8        PAGE 7, I THINK.

 9        A.   MIDDLE OF PAGE 7.

10        Q.   OKAY.

11        A.   SO WHAT WE SEE IN THIS SECTION OF THE TABLE, ON THE LEFT

12        ARE THE USABILITY ISSUE THAT'S BEING RAISED IS SUGGESTING WORDS

13        WHILE TAPPING.  SO IT'S LOOKING AT WHAT HAPPENS WHILE THE USER

14        TAPS.

15        Q.   AND THAT'S IDENTIFIED AS AN ISSUE?

16        A.   YES, IT'S AN USER INTERFACE ISSUE THAT THE CARRIER WANTS

17        ADDRESSED.

18            AND IT'S COMPARING ALTERNATIVE IME'S, INPUT METHODS.

19            AND THE NEXT COLUMN ACROSS SAYS "SHOWS WORD IN SUGGESTION

20        BAR BUT DOES NOT CHANGE IN THE TEXT FIELD UNTIL USER ACCEPTS OR

21        HITS SPACE."

22            SO THIS IS THE INFRINGING METHOD.

23        Q.   BUT NOT THE DART METHOD?

24        A.   NOT THE DART METHOD.

25        Q.   OKAY.
```

1    A.   IN THE NEXT COLUMN, WE MOVE ACROSS TO THE DART METHOD AND

2    IT SAYS "SHOWS WORD IN SUGGESTION BAR AND UPDATES IN THE TEXT

3    FIELD, LEADING TO A SOMEWHAT JARRING EXPERIENCE."

4    Q.   AND WHAT'S THE RESOLUTION OF THIS ISSUE, SIR?

5    A.   THE RESOLUTION, THE LANGUAGE OF THE RESOLUTION AT THE TOP

6    OF THE NEXT CELL MATCHES THE WORDS EXACTLY FOR THE INFRINGING

7    METHOD, WHICH IS "SHOW WORD IN SUGGESTION BAR BUT DO NOT CHANGE

8    IN TEXT FIELD UNTIL USERS ACCEPTS OR HITS SPACE."

9    Q.   REJECTED DART METHOD, GO TO THE INFRINGING METHOD?

10   A.   EXACTLY.

11   Q.   THANK YOU.

12        LET'S LOOK AT THE SECOND PROPOSED NON-INFRINGING

13   ALTERNATIVE.

14   A.   OKAY.  SO THIS ALTERNATIVE, WHAT IT DOES IS IT KEEPS THE

15   CURRENT CHARACTER STRING INSTEAD OF REPLACING IT WHEN THE USER

16   HITS A DELIMITER.  SO YOU PRESS THE SPACE BAR AND YOU KEEP THE

17   ERROR THAT YOU MADE.

18   Q.   AND WHAT'S YOUR VIEW AS TO WHETHER OR NOT THIS PROVIDES

19   THE BENEFITS THAT WE HAVE IN PDX 81?

20   A.   YEAH, IT LACKS THE BENEFITS AND ADVANTAGES, PRIMARILY

21   BECAUSE THE USER NOW NEEDS TO MANUALLY CORRECT ANY ERROR THAT

22   THEY MAKE.  SO THEY'RE TYPING ON THIS POTENTIALLY TINY

23   KEYBOARD, ANY SMALL SLIP THEY MAKE, THEY NEED TO BACK UP AND

24   FIX THEMSELVES, OR FIX THEMSELVES IN SOME WAY.

25   Q.   DID YOU SEE ANY INTERNAL SAMSUNG DOCUMENTS THAT RELATES TO

```
1     THIS DELIMITER OR REJECTS THE SUGGESTION?

2     A.   YES, I DID.

3     Q.   IF YOU LOOK IN YOUR BINDER AT PX 169.  I'M SORRY.

4          WAS THIS ALTERNATIVE THAT WE'RE TALKING ABOUT ACTUALLY

5     USED IN A SAMSUNG PHONE?

6     A.   YES, IT WAS.

7     Q.   AND DO YOU RECALL WHICH ONE IT WAS?

8     A.   IT WAS USED IN THE -- AT LEAST IN THE GALAXY S III.

9     Q.   OKAY.  NOW PX 169, PLEASE.

10    A.   I HAVE THAT.

11    Q.   WHAT IS 169?

12    A.   IT'S A TRANSLATION OF -- A DOCUMENT CONCERNING REQUESTS

13    FOR REVISION FROM VERIZON.  SO IT'S THE VOICE OF CONSUMER

14    REVIEW RESULT IS THE TITLE.

15    Q.   IS THAT A DOCUMENT YOU RELIED UPON?

16    A.   YES, IT IS.

17            MR. MCELHINNY:  YOUR HONOR, MOVE PX 169.

18            MR. NELSON:  NO OBJECTION, YOUR HONOR.

19            THE COURT:  IT'S ADMITTED.

20       (PLAINTIFF'S EXHIBIT PX 169 WAS ADMITTED IN EVIDENCE.)

21            THE COURT:  GO AHEAD, PLEASE.

22    BY MR. MCELHINNY:

23    Q.   SO VOC IN THIS TITLE IS VOICE OF CONSUMER; IS THAT RIGHT?

24    A.   YES, OR VOICE OF CUSTOMER, ONE OR THE OTHER.

25    Q.   ALL RIGHT.  LET'S LOOK AT THE TOP OF PAGE 4.  WHAT, IF
```

1    ANYTHING, DOES THIS TELL US ABOUT SAMSUNG'S SECOND PROPOSED

2    ALTERNATIVE?

3    A.   IT'S A USABILITY COMPARATIVE EVALUATION RESULT.  SO

4    THEY'RE LOOKING AT DIFFERENT METHODS FOR TEXT ENTRY, AND THEN

5    AS A RESULT OF THAT ANALYSIS THEY'VE IDENTIFIED 16 ITEMS FOR

6    IMPROVEMENT THAT ARE UNDER DISCUSSION WITH THEIR R&D AND DESIGN

7    TEAMS.

8        AND THE FOURTH ITEM IN THIS TABLE IS RELEVANT TO US.

9    Q.   OKAY.

10   A.   IT IDENTIFIES "NO FEATURE RECOMMENDED WORD USING SPACE,"

11   AND THE EXAMPLE THEY HAVE IS EXAMPLE -- IS EXACTLY THE PROBLEM

12   WE'RE IDENTIFYING, WHEN "STUDEN" IS TYPED TO ENTER "STUDENTS,"

13   THEN THE WORD "STUDENTS" APPEARS AS A RECOMMENDED WORD, BUT

14   "STUDEN" IS ENTERED WHEN PRESSING SPACE.

15       SO THIS IS SAYING ON THE DELIMITER, THE ERROR THAT THE

16   USER MADE IS BEING KEPT.

17   Q.   AND IS THAT A GOOD THING OR A BAD THING?

18   A.   IT'S A BAD THING.

19   Q.   ALL RIGHT.

20   A.   THEY'VE IDENTIFIED IT AS A USABILITY ISSUE FOR IT TO BE

21   ADDRESSED.

22   Q.   OKAY.  LET'S GO BACK TO PDX 81.  AND WHAT WAS THE THIRD

23   POSSIBLE ALTERNATIVE THAT SAMSUNG LISTED?

24   A.   THE THIRD ALTERNATIVE, NO CHARACTERS APPEAR UNTIL FINGER

25   LIFTS.  SO THIS IS REALLY ADDRESSED AT TEXT ENTRY TECHNIQUES

```
 1        WHERE THE USER DRAGS THEIR FINGER ACROSS THE KEYBOARD.

 2             SO IF YOU WANT TO ENTER, SAY, THE WORD "THE" YOU PUT YOUR

 3        FINGER DOWN ON THE T, YOU DRAG YOUR FINGER OVER H, YOU DRAG

 4        YOUR FINGER UP TO E, AND THEN YOU LIFT YOUR FINGER AND AT THAT

 5        POINT YOU GET TO SEE THE TEXT THE USER IS TRYING TO ENTER.

 6        PRIOR TO THAT, PRIOR TO THAT, THERE'S NO REAL FEEDBACK ON WHAT

 7        CHARACTERS YOU'VE ENTERED.

 8        Q.   DO YOU HAVE A VIDEO ON THAT?

 9        A.   I DO.

10        Q.   PDX 85?

11        A.   SO SEE IF YOU CAN GUESS WHAT THE USER HAS CURRENTLY

12        ENTERED.

13        Q.   I'M GOING FOR RHYTHYM.

14             OH.

15        A.   OKAY.  SO NO FEEDBACK UNTIL LIFTING THE FINGER.

16        Q.   AND DOES THIS ALTERNATIVE PROVIDE THE BENEFITS OF CLAIM

17        18?

18        A.   NO, IT DOES NOT.

19        Q.   AND WHY IS THAT?

20        A.   FIRST OFF, THERE'S A LACK OF FEEDBACK.  SO THE USER IS

21        LIKELY TO LOSE CONFIDENCE IN THE MIDDLE OF A LONG WORD THAT

22        THEY'VE -- WHETHER THEY'VE COMPLETED THIS ADEQUATELY OR NOT.

23             BUT ALSO IT'S LIKELY TO BE SLOW.  THIS TECHNIQUE IS

24        LIKELY TO BE SLOW BECAUSE IT FAILS TO ALLOW THE USER TO

25        IMPLEMENT MORE THAN ONE FINGER.
```

1    Q.   IF YOU LOOK AT EXHIBIT IN YOUR BINDER PX 219, WHICH IS

2    ALREADY IN EVIDENCE.

3    A.   THANK YOU.

4    Q.   AND IF YOU LOOK AT PAGE 104.

5    A.   OKAY.

6    Q.   DOES THAT TELL US SOMETHING ABOUT THIS PROPOSED METHOD?

7    A.   YES, IT DOES.

8    Q.   AND CAN YOU WALK US THROUGH IT SO WE SEE IT?

9    A.   THE VERY TITLE IT SAYS "EFFICIENCY, SWIPE INPUT."

10        SO THE SWIPE KEYBOARD IS ONE OF THESE KEYBOARDS THAT

11   ALLOWS THE USER TO MAKE THE GESTURE OVER THE KEYS, TO DRAG

12   ACROSS THE KEYS.

13        AND THE LEADING BULLET POINT, THE SQUARE BULLET POINT SAYS

14   "OVERALL USEFULNESS AND USABILITY IS LACKING COMPARED TO KEYPAD

15   INPUT."

16        FOR THE KEPLER, IT SAYS "TIME CONSUMPTION IS LONGER

17   COMPARED TO KEYPAD INPUT, BUT IT CONTAINS A FUN FACTOR."

18        AND THE IPHONE, "ALTHOUGH LACKING A FUN FACTOR, IT SHOWS

19   BETTER RESULTS IN USEFULNESS AND USABILITY."

20   Q.   SIR, IS THIS A SAMSUNG DOCUMENT OR A GOOGLE DOCUMENT?

21   A.   IT'S A SAMSUNG DOCUMENT.

22   Q.   WHAT IS SAMSUNG'S FOURTH ALTERNATIVE LISTED ON PDX 86?

23   A.   THE FOURTH ALTERNATIVE IS TO SHOW THE CURRENT CHARACTER

24   STRING ONLY IN A MENU.

25   Q.   AND EXPLAIN THAT TO US?

1     A.   WELL, THERE WOULD BE SEVERAL WAYS YOU COULD PRESENT THIS

2     TO THE USER.

3          BUT IT'S LIKELY THAT THE MENU IS GOING TO BE SOMEWHERE

4     THAT THE USER NEEDS TO MOVE THEIR FINGER TO AWAY FROM THE

5     KEYBOARD IN ORDER TO SELECT THE WORD THAT THEY WANT TO ENTER.

6          AND THIS IS GOING TO REQUIRE MOVING YOUR FINGER AWAY FROM

7     THE KEYBOARD, WHICH IS GOING TO BE SLOW, TO KEEP YOUR CORRECTLY

8     TYPED WORD.

9     Q.   SO IN YOUR OPINION WOULD THIS BE AN ACCEPTABLE

10    NON-INFRINGING ALTERNATIVE?

11    A.   NO.

12    Q.   I'M SORRY.  YOU SAID IT, BUT WHY NOT?

13    A.   ONE, IT'S SLOW; AND, TWO, THE MENU COULD EASILY INCLUDE

14    THE TEXT OR HIDE THE TEXT THAT YOU'VE BEEN TYPING.

15    Q.   IN YOUR OPINION, HAS SAMSUNG SUGGESTED ANY ACCEPTABLE

16    NON-INFRINGING ALTERNATIVE TO THE PATENTED METHOD?

17    A.   NO.

18    Q.   SAME QUESTION I ASKED YOU ON THE OTHER ONE.  GIVEN THE

19    PROCESS, HOW LONG DO YOU THINK IT WOULD TAKE TO MOVE FROM ONE

20    DESIGN TO THE OTHER?

21    A.   THE PROCESS IS THE SAME AS I TESTIFIED BEFORE, DESIGN,

22    IMPLEMENTATION, USER TESTING, NEGOTIATION WITH CARRIERS AND

23    RELEASE.  SO I WOULD ANTICIPATE MONTHS.

24    Q.   SAME QUESTION THAT I ASKED YOU BEFORE.  IN PROFESSOR

25    HAUSER'S SURVEY DID HE ALSO TEST THE AUTO CORRECT FEATURE

```
1    THAT'S SHOWN IN CLAIM 18 OF THE '172 PATENT?

2    A.   YES, HE DID.

3    Q.   AND DID YOU REVIEW PROFESSOR HAUSER'S SURVEY QUESTION THAT

4    WAS USED TO DESCRIBE THE AUTO CORRECT FEATURE?

5    A.   I DID.

6    Q.   AND DID YOU THINK THAT THAT WAS AN ACCEPTABLE SURVEY

7    QUESTION TO USE TO TEST THE VALUE OF AN AUTO CORRECT

8    FUNCTIONALITY IN CLAIM 18?

9    A.   IT WAS A GOOD QUESTION FOR THE PURPOSE IT WAS PUT TO.

10   Q.   WHAT ARE THE OVERALL CONCLUSIONS THAT YOU FORMED IN

11   CONNECTION WITH YOUR WORK IN THIS CASE, SIR?

12   A.   WELL, WITH THE '721, THE DEVICES CLEARLY INFRINGE AND

13   THERE WAS SUBSTANTIAL EVIDENCE OF COPYING.  AND THE '172,

14   INFRINGEMENT HAS ALREADY BEEN DETERMINED AND THE ALTERNATIVES

15   PRESENTED BY SAMSUNG LACK THE BENEFITS AND ADVANTAGES OF THE

16   CLAIMS.

17        MR. MCELHINNY:  PROFESSOR, THANK YOU VERY MUCH FOR

18   YOUR TIME.

19        NOTHING FURTHER.

20        THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:19.  LET'S

21   GO AHEAD AND START AND JUST GO TO 3:30 WHEN WE'LL TAKE A TEN

22   MINUTE BREAK.  OKAY.

23        MR. NELSON:  OKAY.  THANK YOU, YOUR HONOR.

24        THE COURT:  I'LL GIVE YOU A MINUTE TO GET SET UP,

25   MR. NELSON.
```

1             MR. NELSON:  GREAT.  THANK YOU.

2        (PAUSE IN PROCEEDINGS.)

3             MR. NELSON:  MAY I PROCEED, YOUR HONOR?

4             THE COURT:  GO AHEAD, PLEASE.  THE TIME IS NOW 3:20.

5             MR. NELSON:  I BETTER INTRODUCE MYSELF SINCE I WAS

6    SHOWING UP AS MR. SCHWARTZ ON THE LIVENOTE, WHATEVER YOU CALL

7    IT.

8                          **CROSS-EXAMINATION**

9    BY MR. NELSON:

10   Q.   I'M DAVE NELSON.  I'M ONE OF THE LAWYERS FOR SAMSUNG IN

11   THIS CASE.

12        I DON'T THINK WE'VE MET BEFORE, HAVE WE?

13   A.   WE HAVE NOT.

14   Q.   ALL RIGHT.  IT'S A PLEASURE TO MEET YOU, SIR?

15   A.   YOU, TOO.

16   Q.   LET'S GO TO THE '721 PATENT FIRST.  I THINK YOU WERE

17   CALLING THAT THE SLIDE TO UNLOCK, RIGHT?

18   A.   THAT'S CORRECT.

19   Q.   OKAY.  CAN WE PUT UP CLAIM 8?  IT'S JX 10, I BELIEVE, IS

20   THE NUMBER ON THE '721 PATENT.  THERE YOU GO.

21        SO YOU TALKED ABOUT THIS A LITTLE BIT ON YOUR DIRECT

22   TESTIMONY; RIGHT?

23   A.   YES.

24   Q.   OKAY.  NOW, LET ME JUST SET SOME PARAMETERS HERE AND SEE

25   IF WE CAN GET SOME AGREEMENT.

1           SO THIS CLAIM THAT WE SET OUT, ALL THE ELEMENTS AT CLAIM

2      7, PLUS THAT ELEMENT OF CLAIM 8, THAT'S WHAT'S DEFINED IN THE

3      PROPER WAY HERE, RIGHT?

4      A.   FOR THAT CLAIM, YES.

5      Q.   FOR CLAIM 8, FOR THE '721 PATENT, THAT'S THE ONLY CLAIM

6      WE'RE HERE FOR; RIGHT?

7      A.   THAT'S RIGHT.

8      Q.   OKAY, GOOD.  SO THAT WOULD BE KIND OF LIKE A DEED OF LAND;

9      RIGHT?

10     A.   OKAY.

11     Q.   I MEAN, THAT WORKS FOR YOU?

12     A.   SURE.  I'M NOT SURE IT'S NEW ZEALAND TERMINOLOGY, BUT

13     THAT'S OKAY.

14     Q.   OKAY.  MONTANA TERMINOLOGY.

15          SO THE -- IN A DEED OF LAND, YOU DESCRIBE WHAT YOUR

16     PROPERTY IS, RIGHT?

17     A.   SCOPE OF OWNERSHIP, I UNDERSTAND WHAT YOU'RE GETTING AT.

18     Q.   YEAH, SO EXACTLY WHERE THE LINES ARE AND THE BOUNDARIES

19     ARE, THAT KIND OF THING; IS THAT RIGHT?

20     A.   YES.

21     Q.   SO YOU'VE GOT TO HAVE EVERY SINGLE ONE OF THESE ELEMENTS

22     IN THERE IN ORDER TO INFRINGE THAT CLAIM; CORRECT?

23     A.   CORRECT.

24     Q.   SO IF EVEN ONE THING IS MISSING, YOU DON'T INFRINGE;

25     RIGHT?

1    A.   CORRECT.

2    Q.   SAME THING, IF YOU'VE GOT YOUR BOUNDARIES IN THE LAND AND

3    SOMEBODY IS OUTSIDE OF THAT, THEY'RE NOT ON YOUR LAND; RIGHT?

4    A.   YES.

5    Q.   EVEN IF THE LAND YOU'RE ON KIND OF LOOKS LIKE YOUR LAND;

6    RIGHT?

7    A.   THAT'S CORRECT.

8    Q.   RIGHT.  OKAY.

9         SO DID IT SURPRISE YOU THAT DURING THE OPENING STATEMENT

10   THAT APPLE'S COUNSEL NEVER, NEVER EVEN SHOWED THE CLAIM OF THIS

11   PATENT, OR, FRANKLY, ANY OF THE PATENTS?

12   A.   NO, IT DIDN'T SURPRISE ME.

13   Q.   OKAY.  BUT THAT'S WHAT WE'RE HERE FOR, RIGHT, THIS IS A

14   PATENT CASE?

15   A.   YES.

16   Q.   AND THERE'S FIVE PATENTS, FIVE CLAIMS THAT WE'RE HERE TO

17   CONSIDER; RIGHT?

18   A.   I -- I'M THE EXPERT ON '721.

19   Q.   ON TWO?

20   A.   AND THE '172.  MY KNOWLEDGE OF THE OTHER PATENTS THAT ARE

21   ASSERTED HERE --

22   Q.   THAT'S A FAIR POINT, SIR.  LET'S STICK TO THOSE TWO.

23        SO FOR PURPOSES OF LOOKING AT INFRINGEMENT, WE'RE GOING TO

24   LOOK AT THIS CLAIM HERE, RIGHT?

25   A.   FOR THE '721, YES.

1    Q.   FOR THE '721.  AND FOR PURPOSES OF INVALIDITY LATER WHEN

2    WE ADDRESS THAT, WE'RE GOING TO LOOK AT THIS CLAIM; RIGHT?

3    A.   I'M NOT SURE EXACTLY WHERE YOU'RE GOING HERE BECAUSE

4    THERE'S MORE THINGS THAT YOU NEED TO LOOK AT THAN JUST THE

5    CLAIM TO DETERMINE INFRINGEMENT.  FOR INSTANCE, YOU NEED TO

6    LOOK AT THE ACCUSED DEVICES.

7    Q.   UNDERSTOOD.  BUT IN TERMS OF DEFINING WHAT IT IS YOU NEED

8    TO COMPARE IT TO, IT'S THIS CLAIM?  THAT'S WHAT'S IMPORTANT;

9    RIGHT?

10   A.   YES.

11   Q.   OKAY, GOOD.  SO LET'S TALK ABOUT SOME OF THE THINGS I

12   THINK YOU AGREE DON'T INFRINGE THIS CLAIM, ALL RIGHT?

13        NOW, LET'S FIRST TALK ABOUT -- AND IF WE COULD HAVE SDX

14   10, IT'S A DEMONSTRATIVE, WE HAVE A LITTLE VIDEO ABOUT THE

15   NOTE.

16        SO THE NOTE, THAT'S ONE YOU DON'T ACCUSE, RIGHT, IN TERMS

17   OF THE UNLOCK SCREEN.

18   A.   FOR THE '721, CORRECT.  THAT IS NOT ACCUSED.

19   Q.   CORRECT.  SO LET'S JUST SEE NOW.  I'M GOING TO RUN THIS

20   VIDEO, TURN THAT ON.  SO GO AHEAD, YOU TOUCH THE SCREEN, AND

21   THEN YOU MOVE OUTSIDE OF THE CIRCLE; RIGHT?

22   A.   YES.

23   Q.   THAT DOESN'T INFRINGE?

24   A.   THAT'S CORRECT.

25   Q.   AND IT DOESN'T INFRINGE AT LEAST ONE OF THE REASONS IS

1    BECAUSE YOU CAN TOUCH ANYWHERE ON THE SCREEN, RIGHT?

2    A.   THAT'S RIGHT, FROM ANYWHERE TO ANYWHERE YOU DO IT FROM.

3    Q.   EXACTLY.  YOU DON'T MOVE FROM A FIRST PREDEFINED AREA TO A

4    SECOND PREDEFINED AREA; RIGHT?

5    A.   CORRECT.

6    Q.   SO THE NOTE, THAT WAS A PHONE THAT WAS ACTUALLY SOLD BY

7    SAMSUNG; RIGHT?

8    A.   YES.

9    Q.   OKAY.

10   A.   YES.

11   Q.   AND IT WAS RELEASED, I THINK, SOME TIME AFTER -- AROUND

12   JANUARY OF 2012; IS THAT RIGHT?

13   A.   I DON'T KNOW.  I WANT TO CHECK THE INTERROGATORY RESPONSE

14   TO REPLY TO THAT WITH ANY CONFIDENCE.

15   Q.   YEAH.  THERE WAS -- ON THAT ONE, AND I DON'T KNOW -- DID

16   YOU GIVE HIM A BINDER OF THE -- SO THERE'S, THERE'S ACTUALLY --

17   IF WE GO THROUGH ON YOUR PDX 14, THAT WAS THE SLIDE TO UNLOCK

18   ACCUSED DEVICE.

19        YOU CAN PUT THAT UP IF YOU HAVE IT.

20        SO THESE WERE THE PRODUCTS THAT YOU WERE ACCUSING OF

21   INFRINGING CLAIM 8 OF THE '721 PATENT; RIGHT?

22   A.   THAT'S CORRECT.

23   Q.   OKAY.  SO WHEN I HEARD YOU -- LET'S JUST SET THE GALAXY

24   NEXUS ASIDE FOR A MOMENT.

25        THE ADMIRE, GALAXY SII AND THE OTHERS, THOSE WERE ALL

1      RELEASED PRIOR TO THE TIME THE PATENT ISSUED; RIGHT?

2      A.   I'D NEED TO GO THROUGH AND CHECK THE DATES CAREFULLY, SO I

3      CAN'T REALLY RESPOND TO THAT WITH CONFIDENCE UNLESS YOU LET ME

4      CHECK THE DATES.

5      Q.   OKAY.  YOU DON'T REMEMBER AS YOU SIT HERE?

6      A.   NO.

7      Q.   YOU GAVE US THE DATES SO -- AND THE PATENT ISSUED OCTOBER

8      25TH, 2011; RIGHT?

9      A.   YES.

10     Q.   ALL RIGHT.  NOW, ON THE GALAXY NEXUS, I THINK I HEARD YOU

11     SAY THAT IT WAS RELEASED IN APRIL OF 2012.  IS THAT RIGHT?

12     A.   AGAIN, I'LL NEED TO CHECK.  I HAVEN'T MEMORIZED ALL OF

13     THESE DATES.

14     Q.   YOU DON'T REMEMBER.

15          NOW, IF YOU -- IF YOU LOOK -- AND I NEED A BINDER, TOO.

16     MINE IS OVER HERE.

17          DO YOU SEE A TAB IN YOUR BINDER IT SAYS ROG RESPONSES?

18     A.   YES, I HAVE IT.

19     Q.   SO THEN IF YOU GO TO PAGE 26 -- THESE ARE ACTUALLY APPLE'S

20     INTERROGATORY RESPONSES; RIGHT?

21     A.   YES.

22     Q.   SO IF YOU LOOK AT THE NEXUS HERE, YOU SEE A PUBLIC RELEASE

23     IN THE UNITED STATES ON NOVEMBER 17TH, 2011?

24     A.   SORRY.  WE'RE ON PAGE 26?

25     Q.   IT'S ACTUALLY RIGHT ON THE TOP OF PAGE 27.

1    A.   OKAY.  WHAT DID YOU SAY THE DATE WAS?

2    Q.   NOVEMBER 17TH, 2011?

3    A.   YES.

4    Q.   DOES THAT SOUND RIGHT TO YOU?

5    A.   I WANT TO GO BACK TO THE CHART.  I'M HAPPY -- IT'LL JUST

6    TAKE A MOMENT.  SO I'D BE GOING BY THE DATA I WAS GIVEN BY

7    SAMSUNG IN THE CHART.

8    Q.   OKAY.  THAT'S WHAT I WAS GETTING AT.  SO IT SEEMS LIKE WE

9    HAVE -- ON THAT ONE, WE HAVE A LITTLE BIT OF DISCREPANCY IN THE

10   DATES, FOR THE NEXUS; RIGHT?

11   A.   I'M NOT GOING TO CONFIRM UNLESS YOU LET ME HAVE A CHECK.

12   Q.   OKAY.  YEAH, I THINK IT WAS -- YOU CAN LOOK, BUT I DON'T

13   WANT TO TAKE THE TIME.  I THINK IT WAS APRIL 2012.  I'M JUST

14   TRYING TO SET THAT ONE ASIDE BECAUSE IT SEEMS LIKE THERE'S A

15   LITTLE BIT OF CONFUSION AS TO WHEN THAT ONE WAS ACTUALLY

16   RELEASED?

17   A.   IT MIGHT BE FASTER IF I DO ACTUALLY CHECK AND I CAN TELL

18   YOU.

19   Q.   OKAY.  GO AHEAD.  GO AHEAD, SIR.

20   A.   THE DATES I SAID FOR THE GALAXY NEXUS WERE THE 5TH OF

21   APRIL, 2012 TO THE 28TH OF JANUARY 2013.

22   Q.   OKAY.  SO WE HAVE SOMETHING WE'RE GOING TO NEED TO CLEAR

23   UP WITH THE DATE ON THAT PARTICULAR ONE?

24   A.   SURE.

25   Q.   BUT ON THE REST WE'RE AT LEAST TALKING ABOUT, THE REST

1    THAT YOU'RE ACCUSING UNDER THE CLAIM 8 OF THE '721 PATENT,

2    THOSE ARE ALL RELEASED PRIOR TO THIS LAWSUIT BEING FILED

3    CERTAINLY; RIGHT?

4    A.   SO THE FILE -- THE SUIT WAS FILED IN FEBRUARY?

5    Q.   FEBRUARY OF 2012?

6    A.   OKAY.  AND, AGAIN, I'M NOT GOING TO CONFIRM THAT NONE OF

7    THOSE DEVICES GO TO 2012, FEBRUARY 2012.

8    Q.   I'M TALKING ABOUT THEIR INITIAL RELEASE DATE?

9    A.   AH, INITIAL RELEASE DATE, YES.

10   Q.   OKAY.  GOOD, WE'RE ON THE SAME PAGE THERE.

11        NOW, LET'S TALK ABOUT ANOTHER ONE, THE RIPPLE.  YOU TALKED

12   ABOUT THAT ON DIRECT.  YOU AGREE THE RIPPLE DOESN'T INFRINGE;

13   RIGHT?

14   A.   THAT'S CORRECT.

15   Q.   AND IN FACT -- AND LET'S SHOW THAT JUST SO WE CAN REMIND

16   EVERYBODY.  THAT'S SDX 2032, IT'S A DEMONSTRATIVE.  I HAVE THE

17   UNLOCK SCREEN ON THE RIPPLE.

18        CAN WE PUT THAT UP, SIR.  MR. KOTARSKI.

19        SO, AGAIN, YOU AGREE THAT THE UNLOCK SCREEN THAT WE CALL

20   THE RIPPLE DOESN'T INFRINGE; CORRECT?

21   A.   I AGREE.

22   Q.   AND, AGAIN, THAT'S BECAUSE YOU CAN START FROM ANYWHERE AND

23   GO TO ANYWHERE; CORRECT?

24   A.   AT LEAST THAT REASON, YEAH.

25   Q.   YEAH, MAYBE OTHERS, BUT AT LEAST THAT?

1    A.   YEAH.

2    Q.   NOW, YOU'RE AWARE THAT THE RIPPLE IS ON -- IS USED ON THE

3    GALAXY S III; RIGHT?

4    A.   THAT'S CORRECT, I'M AWARE OF THAT.

5    Q.   AND THAT CAME OUT SOME TIME IN 2012; ISN'T THAT RIGHT?

6    A.   YES.

7    Q.   NOW, THE RIPPLE -- OR EXCUSE ME.  THE S III, YOU AGREE

8    THAT THAT WAS A COMMERCIAL SUCCESS; RIGHT?

9    A.   YES.

10   Q.   IN FACT, IT'S A FLAGSHIP PHONE FOR SAMSUNG; RIGHT?

11   A.   POSSIBLY SAMSUNG REFERS TO IT THAT WAY.

12   Q.   NOW, JUST SO WE CAN PUT SOME PARAMETERS ON THIS, YOU

13   TALKED ABOUT SEVERAL MODELS OF PHONES THAT YOU BELIEVE HAVE

14   SOME SCREEN, WHETHER IT'S THE SLIDE TO ANSWER OR THE UNLOCK

15   SCREEN THAT YOU BELIEVE INFRINGES; RIGHT?

16   A.   SORRY.  I MISSED ONE WORD IN YOUR QUESTION.

17   Q.   OKAY.  I DON'T KNOW WHICH WORD, SO I'LL HAVE TO START

18   OVER.

19   A.   THE UNLOCK SCREEN, IT WAS PROBABLY --

20   Q.   SCREEN.  S-C-R-E-E-N, YEAH.

21   A.   OKAY.

22   Q.   OKAY.  SO YOU -- THERE WERE SEVERAL.  WE WENT THROUGH

23   THEM, YOU HAD FOUR CATEGORIES, YOU HAD THE ADMIRE, THE GALAXY

24   NEXUS, THE S II PHONES, AND THE STRATOSPHERE; RIGHT?

25   A.   YEAH.

1    Q.   NOW, DURING OPENING STATEMENT, COUNSEL SAID THERE WERE 37

2    MILLION INFRINGING SALES THAT APPLE WAS ACCUSING IN THIS CASE;

3    IS THAT RIGHT?

4    A.   THAT'S CORRECT.

5    Q.   OKAY.  SO OF THE PHONES THAT YOU'RE ACCUSING HERE DO YOU

6    HAVE ANY IDEA HOW MUCH OF THAT 37 MILLION THEY REPRESENT?

7    A.   I'M SORRY.  WHAT REPRESENT, THE INFRINGING PHONES?

8    Q.   RIGHT.

9    A.   UM --

10   Q.   SO THE UNIVERSE IS 37 MILLION.  WHAT I'M TRYING TO GET --

11   YOU NAMED THOSE FOUR CATEGORIES.  HOW MANY SALES OF THOSE?  DO

12   YOU HAVE ANY IDEA?

13   A.   I'M NOT A DAMAGES EXPERT.  I'M A TECHNICAL EXPERT.

14   Q.   OKAY.  SO YOU DIDN'T LOOK AT THAT.  YOU HAVE NO IDEA HOW

15   MUCH THOSE SOLD RELEVANT TO, FOR EXAMPLE, THE S III, WHICH WE

16   KNOW DOESN'T INFRINGE THE '721 PATENT; RIGHT?

17   A.   I DON'T KNOW.

18   Q.   NOW, YOU TALKED ABOUT -- AND I WANT TO JUST STICK ON THE

19   RIPPLE SCREEN HERE -- THE GALAXY S III YOU DON'T ACCUSE OF

20   INFRINGING EITHER THE '721 OR THE '172 PATENT; CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   SO THE RIPPLE FROM THE GALAXY S III, YOU SAID THAT YOU

23   DIDN'T THINK THAT THAT WAS AN ACCEPTABLE ALTERNATIVE; RIGHT?

24   A.    I SAID I LIKE THE BENEFITS AND ADVANTAGES OF THE TEACHINGS

25   OF THE '721 PATENT.

1    Q.   OKAY.  BUT YOU THINK IT'S ACCEPTABLE, RIGHT?

2    A.   I UNDERSTAND THE LEVEL OF ACCEPTABILITY WOULD MEET THE

3    REQUIREMENT OF ACCEPTABILITY IS THAT IT MEETS THE BENEFITS AND

4    ADVANTAGES.

5    Q.   OKAY.  WELL, THE S III HAS SOLD A LOT OF UNITS; RIGHT?

6    A.   CORRECT.

7    Q.   AND THE S III DOESN'T INFRINGE CLAIM 8 OF THE '721 PATENT;

8    RIGHT?

9    A.   THAT'S CORRECT.

10   Q.   AND WHEN YOU WENT THROUGH AND SAID YOU DIDN'T THINK IT WAS

11   ACCEPTABLE, I DIDN'T SEE YOU CITING ANYTHING SAYING, OH, WAIT A

12   MINUTE, THIS IS HARD TO UNLOCK, RIGHT?

13   A.   NO, I DIDN'T.

14   Q.   YOU DIDN'T CITE ANY EVIDENCE OF THAT?

15   A.   SORRY, SORRY.  I CITED EVIDENCE OF SOMETHING THAT IS

16   HIGHLY EQUIVALENT TO THE RIPPLE UNLOCK TECHNIQUE, TECHNIQUES

17   THAT ALLOW YOU TO SWIPE FROM ANYWHERE TO ANYWHERE, EXACTLY THE

18   SAME WAY AS RIPPLE UNLOCK ALLOWS YOU TO SLIDE FROM ANYWHERE TO

19   ANYWHERE.

20   Q.   OKAY.

21   A.   AND THESE ARE CRITICIZED BY SAMSUNG'S INTERNAL DOCUMENTS.

22   Q.   OKAY.  SO IN YOUR REPORT WHEN YOU CRITICIZE THE RIPPLE

23   DESIGN AS AN ALTERNATIVE, YOU DIDN'T CITE TO ANY EVIDENCE THAT

24   CUSTOMERS WERE COMPLAINING THAT IT WAS HARD TO UNLOCK; RIGHT?

25   A.   EQUIVALENT METHODS HAVE PROBLEMS WITH ACCIDENTAL

1    ACTIVATION.  HARD TO UNLOCK?  THERE ARE MANY INTERNAL DOCUMENTS

2    THAT ARE REFERRING TO POOR CUES, C-U-E-S.

3    Q.   MY QUESTION IS A LITTLE BIT DIFFERENT.  LET'S STEP BACK

4    AND ESTABLISH SOME PARAMETERS.

5         YOU HAD TO DO A REPORT IN THIS CASE PUTTING FORTH ALL YOUR

6    INFRINGEMENT OPINIONS, AND LET'S JUST STICK WITH THE '721

7    PATENT, RIGHT?

8    A.   YEAH.

9    Q.   AND YOU HAD TO PUT ALL YOUR OPINIONS IN THERE TO DISCLOSE

10   THEM TO US; RIGHT?

11   A.   YES.

12   Q.   AND YOU WERE SUPPOSED TO PUT ALL YOUR SUPPORT IN THERE,

13   YOU UNDERSTAND THAT?

14   A.   YES.

15   Q.   SO YOU WENT THROUGH AND YOU HAD ACCESS TO ALL THE

16   DOCUMENTS AND EVERYTHING THAT YOU DISCUSSED WHEN YOU DID THAT

17   REPORT; RIGHT?

18   A.   YES.

19   Q.   SO MY QUESTION TO YOU IS, IN YOUR REPORT YOU DIDN'T CITE

20   TO ANY EVIDENCE THAT SAID CUSTOMERS WERE COMPLAINING THAT THE

21   RIPPLE DESIGN IN THE GALAXY S III WAS DIFFICULT TO UNLOCK;

22   RIGHT?

23   A.   THE RIPPLE DESIGN SHARES EXACTLY THE SAME MECHANICS, IF

24   YOU LIKE, OF UNLOCKING.  SO YOUR QUESTION IS DID I CITE TO

25   ANYTHING SPECIFICALLY ABOUT THE RIPPLE?  NO, I DID NOT.

1          HOWEVER, IT'S EASY TO UNDERSTAND, GIVEN THAT THE MECHANICS

2     OF UNLOCKING RIPPLE ARE EXACTLY THE SAME AS THE MECHANISMS OF

3     UNLOCKING THE OTHER TECHNIQUES THAT I'VE SEEN SAMSUNG'S

4     DOCUMENTS CRITICIZE, IT'S VERY EASY TO GENERALIZE.

5     Q.   OKAY.  SO YOU'RE GENERALIZING.  YOU DON'T HAVE ANY

6     EVIDENCE FROM CUSTOMERS, WE HAVE MILLIONS AND MILLIONS OF SALES

7     OF THE S III OUT THERE; RIGHT?

8     A.   CORRECT.

9     Q.   AND YOU HAD ACCESS TO ALL THAT INFORMATION; RIGHT?

10    A.   IT'S NOT -- I ASSUME I HAD ACCESS TO IT, BUT IT'S NOT

11    SOMETHING I WOULD HAVE TURNED TO AS I'M NOT A DAMAGES EXPERT.

12          THE COURT:  I'M SORRY TO INTERRUPT YOU.  THE TIME IS

13    NOW 3:35.  LET'S GO AHEAD AND TAKE A TEN MINUTE BREAK.  THIS

14    WILL BE OUR LAST BREAK OF THE DAY.  WE'LL TAKE A BREAK UNTIL

15    3:45 AND WE'LL CONCLUDE TODAY AT 4:30.  I'M SORRY TO INTERRUPT

16    YOUR EXAMINATION.

17          MR. NELSON:  NO PROBLEM, YOUR HONOR.

18          THE COURT:  LET'S TAKE OUR LAST BREAK OF THE DAY.

19    AGAIN, PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

20        (JURY OUT AT 3:36 P.M.)

21          THE COURT:  YOU MAY STEP DOWN.  LET'S GO AHEAD AND

22    TAKE OUR BREAK.  THANK YOU.

23          MR. NELSON:  THANK YOU, YOUR HONOR.

24          MR. MCELHINNY:  YOUR HONOR, I DO HAVE THE ONE EXHIBIT

25    ISSUE I'D LIKE TO RAISE.

```
 1                THE COURT:  OKAY.  WHAT'S THE ISSUE?

 2                MR. MCELHINNY:  MAY I HAND THIS UP, PLEASE?

 3                THE COURT:  OKAY.

 4                MS. MAROULIS:  CAN I SEE THAT, COUNSEL?

 5                MR. MCELHINNY:  YES.

 6                MS. MAROULIS:  WHAT IS IT?

 7                MR. MCELHINNY:  THIS IS ROGATORY ANSWER, SAMSUNG

 8      INTERROGATORY ANSWER 41, EXHIBIT A.

 9                THE COURT:  WHAT'S THE ISSUE WITH THIS DOCUMENT?

10                MR. MCELHINNY:  THE ISSUE THAT -- THE PLAINTIFF --

11      THE WITNESS USED IT IN ORDER TO GET HIS DATES, HE PUT THE

12      INFORMATION INTO THE RECORD.

13           BECAUSE IT'S AN INTERROGATORY, THE QUESTION OF HOW IT GETS

14      ADMITTED IS UP IN THE AIR.  IT NEEDS TO BE ADMITTED.

15           WE TOOK THE POSITION THAT BECAUSE, IF YOU LOOK AT THE DATA

16      ON THAT CHART, THAT READING THAT TO THE JURY WOULD BE

17      COMPLETELY USELESS.

18           AND SO RATHER THAN READ CHART A, WHICH HAS ALL THESE DATES

19      AND CHANGES, THAT WE WANTED TO ADMIT IT AS A PHYSICAL DOCUMENT

20      SO THE JURY COULD JUST LOOK AT IT AS OPPOSED TO HAVING IT READ

21      TO THEM AND SAMSUNG OBJECTS TO THAT.

22                MS. MAROULIS:  YOUR HONOR, IN THIS CASE WE'VE ALWAYS

23      READ IN INTERROGATORY RESPONSES AND RFA'S.  IT'S A STANDARD

24      PROCEDURE IN TRIAL.  SO WE JUST APPLIED THE SAME TO THIS.  IT'S

25      NOT AN EXHIBIT SO IT SHOULD NOT BE IN EVIDENCE.
```

1              MR. MCELHINNY:  IT WOULD BE COMPLETELY

2     INCOMPREHENSIBLE.

3              THE COURT:  IT WOULD BE INCOMPREHENSIBLE.  PREVIOUS

4     INTERROGATORY RESPONSES THAT HAVE BEEN READ HAVE BEEN TEXT, AND

5     THIS IS JUST A SERIES OF CHARTS.  I'M NOT SURE HOW THIS COULD

6     ALL BE READ INTO THE RECORD OF -- IT'S THE CHARTS, SO IT'S

7     GOING TO BE ADMITTED.

8              MS. MAROULIS:  IF YOUR HONOR IS INCLINED TO ADMIT

9     THIS, WE WOULD ASK IF WE BE GIVEN A SIMILAR OPPORTUNITY SO THEY

10    ALSO CAN SUBMIT TO THE JURY.

11             THE COURT:  THAT'S FINE.

12             MS. MAROULIS:  AND THIS IS GOING TO BE DONE UNDER

13    SEAL BECAUSE IT'S SOURCE CODE RELATED INFORMATION.

14             THE COURT:  DO YOU HAVE ANY OBJECTION TO SEALING

15    THAT?

16             MR. MCELHINNY:  I HAVE NO OBJECTION TO SEALING IT,

17    YOUR HONOR.

18             THE COURT:  OKAY.

19             MR. MCELHINNY:  WE HAVE MARKED IT AS PX 300.

20             THE COURT:  THIS SAYS PTX.  IS THAT --

21             MR. MCELHINNY:  THEN IT'S MISMARKED.  IT SHOULD BE

22    PX 300.

23             THE COURT:  PX, ALL RIGHT.  SO YOU'RE GOING TO

24    INTRODUCE IT, WHAT, ON REDIRECT?

25             MR. MCELHINNY:  I COULD DO THAT OR I COULD DO IT

1      RIGHT NOW, YOUR HONOR.  HE'S READ THE INFORMATION OUT OF --

2              THE COURT:  YOU'RE NOT GOING TO DO IT IN THE MIDDLE

3      OF MR. NELSON'S CROSS.

4              MR. MCELHINNY:  I'LL DO IT ON REDIRECT.  THANK YOU,

5      YOUR HONOR.

6              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

7              MS. MAROULIS:  THANK YOU, YOUR HONOR.

8          (RECESS FROM 3:39 P.M. UNTIL 3:46 P.M.)

9          (JURY IN AT 3:46 P.M.)

10             THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

11         THE TIME IS NOW 3:47.

12         GO AHEAD, PLEASE, MR. NELSON.

13             MR. NELSON:  THANK YOU, YOUR HONOR.

14     Q.   OKAY.  SO LET'S GET BACK TO THE S III.  WE WERE TALKING

15     ABOUT THE S III.

16         NOW, THE S III YOU DON'T ACCUSE, YOU AGREE IT DOESN'T

17     INFRINGE THE '721 PATENT; RIGHT?

18     A.   THAT'S CORRECT.

19     Q.   AND YOU'RE NOT AWARE OF A SINGLE CONSUMER COMPLAINT SAYING

20     THAT THE UNLOCK SCREEN ON THE S III WAS HARD TO USE; RIGHT?

21     A.   THAT'S CORRECT, WITH THE CAVEAT THAT I EXPLAINED BEFORE

22     THE BREAK.

23     Q.   YEAH.  RIGHT.  AND I'M STICKING WITH CONSUMERS.

24         AND YOU'RE NOT AWARE OF A SINGLE CONSUMER COMPLAINT FROM A

25     USER OF AN S III, A GALAXY S III, SAYING THAT THEIR PHONE HAD

1    ACCIDENTALLY POCKET DIALLED; RIGHT?

2    A.   NOT THAT I CAN RECALL AT THE MOMENT, NO.  BUT THE S III IS

3    NOT ACCUSED OF INFRINGEMENT.

4    Q.   NO, I KNOW IT'S NOT ACCUSED OF INFRINGING.  BUT I'M TRYING

5    TO GET TO THIS ACCEPTABILITY ISSUE.  YOU UNDERSTAND, RIGHT?

6    A.   OKAY.

7    Q.   RIGHT?

8    A.   OKAY.

9    Q.   AND PART OF BEING ACCEPTABLE, YOU DETERMINE WHETHER

10   SOMETHING IS ACCEPTABLE IS IF PEOPLE BUY IT; RIGHT?

11   A.   RIGHT.  BUT IN THE MARKETPLACE, APPLE HAS A CONSUMER

12   ADVANTAGE OVER THE SOLUTIONS USED BY SAMSUNG'S PRODUCTS.  THEY

13   OWN THE BEST WAYS OF UNLOCKING THESE DEVICES.

14   Q.   OKAY.  SO LET'S TALK ABOUT ANOTHER ONE YOU AGREE DOESN'T

15   INFRINGE, ALL RIGHT?  AND LET'S GO -- THAT'S THE -- IT'S --

16   IT'S THE UNLOCK SCREEN OF THE S II DESIGNS, OKAY?  I DON'T

17   THINK YOU TALKED ABOUT THAT.  YOU TALKED ABOUT ANSWERING THE

18   CALL, BUT NOT THE UNLOCK SCREEN, RIGHT, IN YOUR DIRECT?

19   A.   SO THESE ANSWERING CALL METHODS THAT ARE ACCUSED WITH THE

20   S II, THEY ARE UNLOCKING METHODS.

21   Q.   UNDERSTOOD.  I'M TALKING ABOUT THE TOP LEVEL UNLOCK

22   SCREEN?

23   A.   UNLOCK TO THE HOME SCREEN?

24   Q.   CORRECT?

25   A.   YES, THAT'S CORRECT, THEY'RE NOT ACCUSED.

1    Q.   SO LET'S PULL UP SDX 2026.  SO WE HAVE HERE, THIS IS THE

2    EXAMPLE OF THE S II; RIGHT?  AND THIS IS THE TOP LEVEL SCREEN,

3    RIGHT, TO UNLOCK TO THE HOME SCREEN.

4         NOW LET'S RUN FORWARD.  OKAY?

5         SO YOU AGREE THAT DOESN'T INFRINGE CLAIM 8 OF THE '721

6    PATENT; CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   OKAY.  AND, AGAIN, YOU CAN -- THERE'S NO PREDEFINED FIRST

9    AREA TO TOUCH, RIGHT?

10   A.   ANYWHERE TO ANYWHERE, YES.

11   Q.   OKAY.  SO, NOW, LET'S JUST EVEN STICK -- YOU GAVE THE

12   RELEASE DATE FOR THE NEXUS AS AUGUST OF 2012, OR EXCUSE ME,

13   APRIL OF 2012, RIGHT?

14   A.   THAT SOUNDS RIGHT.

15   Q.   LET'S JUST STICK WITH THAT.

16   A.   OKAY.

17   Q.   I MEAN, WE'VE GOT AN ISSUE THERE, BUT THAT WOULD BE THE

18   LATEST RELEASE OF ANY OF THE ONES YOU ACCUSE, RIGHT, UNDER THE

19   DATES YOU GAVE?

20   A.   INITIAL RELEASE?  BECAUSE THERE'S INITIAL -- THE CHART

21   REFERS TO LAUNCH AND MAINTENANCE RELEASES.  SO I'M NERVOUS

22   ABOUT WORDING IT RELEASE BECAUSE THERE WERE SEVERAL MAINTENANCE

23   RELEASES OF SOFTWARE.

24   Q.   I'M TALKING ABOUT THE INITIAL AVAILABILITY OF THE PHONE IN

25   THE UNITED STATES?

1      A.   THE LAUNCH.

2      Q.   RIGHT, THE LAUNCH.  THAT TERMINOLOGY WORKS?

3      A.   YES.

4      Q.   SO THEN THE LATEST LAUNCH THAT YOU HAVE, EVEN WITH THE

5      DISCREPANCY THAT WE HAVE FOR THE NEXUS IS APRIL 2012; RIGHT?

6      A.   OKAY.

7      Q.   SO THAT'S TWO YEARS AGO, RIGHT?

8      A.   YES.

9      Q.   SO THERE'S NO PHONES RELEASED THAT YOU'VE ACCUSED, RIGHT,

10     UNDER THE '721 PATENT?

11     A.   SORRY, NO NEW PHONES RELEASED SINCE THAT DATE.

12     Q.   CORRECT?

13     A.   CORRECT, FOR CLAIM 8 OF THE '721.

14     Q.   CLAIM 8 OF THE '721 PATENT.  SO FOR TWO YEARS AT LEAST,

15     MAYBE EVEN GOING BACK EARLIER TO JANUARY OF 2012, SAMSUNG HAS

16     BEEN SELLING PHONES IN THE UNITED STATES, NONE OF WHICH YOU

17     ACCUSE OF INFRINGEMENT IN TERMS OF RELEASED PHONES OF

18     INFRINGEMENT OF CLAIM 8 OF THE '721 PATENT; RIGHT?

19     A.   THAT'S CORRECT.

20     Q.   OKAY.  SO THIS MAY BE PATENTLY OBVIOUS AT THIS POINT, BUT

21     YOU'RE NOT SAYING THAT CLAIM 8 OF THE '721 PATENT CLAIMS ALL

22     WAYS OF UNLOCKING A PHONE; RIGHT?

23     A.   THAT'S CORRECT.

24     Q.   NOW, LET'S TALK ABOUT SOME OF THIS COPY, THESE COPYING

25     ALLEGATIONS YOU'RE MAKING.

1       A.    OKAY.

2       Q.    ALL RIGHT.  SO, FIRST OF ALL, YOU SHOWED THE IPHONE,

3    RIGHT, AND HOW THE VERSION OF THE IPHONE YOU LOOKED AT THAT YOU

4    SHOWED HAD A TRACK, AND THE ICON YOU INTERACT WITH AND YOU STAY

5    ON THE TRACK; RIGHT?

6       A.    SO BY LOOKED AT, YOU'RE REFERRING SPECIFICALLY TO THE

7    VIDEO WE SHOWED?

8       Q.    YES.  I DON'T REMEMBER THE PDX NUMBER.

9       A.    OKAY.

10      Q.    BUT I'M JUST REMINDING YOU OF THAT.  WE'RE ON THE SAME

11   PAGE.

12          SO THAT -- AND THAT IS THE UNLOCK, GENERALLY SPEAKING,

13   THAT'S THE UNLOCK METHOD THAT'S BEEN USED IN ALL THE IPHONES

14   YOU LOOKED AT UP UNTIL IOS 7; RIGHT?

15      A.    IOS 7 USES THE SAME CLAIMED METHOD.

16      Q.    RIGHT.  BUT IT DOESN'T HAVE A TRACK?

17      A.    THE GRAPHICAL APPEARANCE IS SLIGHTLY DIFFERENT, YEAH.

18      Q.    OKAY.  SO GOING BACK TO THE TIME WHEN SOME OF THE

19   DOCUMENTS THAT YOU LOOKED AT, AND WE'LL TALK ABOUT THAT IN A

20   MINUTE, THE PATENT HADN'T ISSUED; RIGHT?

21      A.    ON WHAT DATE?  SORRY.

22      Q.    THE DOCUMENTS THAT YOU, YOU SHOWED US DURING YOUR DIRECT

23   WERE FROM 2010; RIGHT?

24      A.    SORRY.  I'M TRYING TO RECALL.  THERE WAS AT LEAST ONE

25   DOCUMENT THAT IS FROM AUGUST 2012, AND I'M TRYING TO RECALL

1      WHICH PATENT THAT'S CONNECTED TO.

2            BUT I KNOW AT LEAST ONE OF THE DOCUMENTS WE REFERRED TO

3      WAS FROM AUGUST OF 2012, SO I'M CAUTIOUS ABOUT AGREEING WITH

4      THAT STATEMENT.

5      Q.   OKAY.  SO LET'S, LET'S PUT UP PX 121 THEN FIRST.

6            OKAY.  SO WE LOOKED AT THIS DOCUMENT ON DIRECT, AND I

7      THINK IT WAS PAGE 27 PERHAPS THAT WE LOOKED AT.  IS THAT RIGHT?

8      CAN WE GO TO -- YES.  WE LOOKED AT THIS PAGE.

9            SO THIS IS A COMPARISON OF VICTORY TO IPHONE.  DO YOU SEE

10     THAT?

11     A.   YES.

12     Q.   NOW, YOU'RE AWARE THAT THE PHONE THAT'S DISCUSSED IN THIS

13     DOCUMENT WAS NEVER ACTUALLY RELEASED; RIGHT?

14     A.   NO, I'M NOT AWARE OF THAT.

15     Q.   YOU'RE NOT AWARE ONE WAY OR THE OTHER?

16     A.   WELL, I WOULD UNDERSTAND THIS IS A DESIGN OF THE PHONE

17     THAT IS INTENDED TO BE RELEASED.  THE CODE NAME MAY HAVE

18     CHANGED, BUT IT'S EXTREMELY LIKELY THAT THIS ENDED UP IN

19     PRODUCT IN SOME WAY.

20     Q.   DO YOU HAVE ANY EVIDENCE AS TO WHICH PRODUCT IT IS?

21     A.   WELL, COMMON SENSE SAYS YOU DESIGN PHONES THAT YOU INTEND

22     TO RELEASE AT SOME POINT.

23     Q.   BUT YOU DON'T ALWAYS RELEASE THEM; RIGHT?

24     A.   THAT'S TRUE.

25     Q.   NOW, THE -- WHAT'S BEING COMPARED TO HERE IS THE IPHONE;

1     CORRECT?

2     A.    YES.

3     Q.    AND THE IPHONE WITH A TRACK AND AN ICON THAT STAYS IN THE

4     TRACK; RIGHT?

5     A.    YES.

6     Q.    ALL RIGHT.  SO NOW -- AT THIS POINT IN TIME, BY THE DATE

7     OF THIS DOCUMENT, THE PATENT HAD ISSUED; CORRECT?

8     A.    CORRECT.

9     Q.    SO YOU DIDN'T CITE THE PATENT AS ANY EVIDENCE OF COPYING;

10    CORRECT?

11    A.    THAT'S CORRECT, NOT THE LANGUAGE OF THE PATENT ITSELF.

12    Q.    RIGHT.  SO YOU'RE NOT TALKING ABOUT ANYBODY COPYING THE

13    PATENT; CORRECT?

14    A.    THAT'S CORRECT.

15    Q.    YOU'RE TALKING ABOUT LOOKING AT THE IPHONE; RIGHT?

16    A.    YES.

17    Q.    SO NOW LET'S GO TO PDX 31.  AND LET'S TAKE THE

18    STRATOSPHERE.  THE STRATOSPHERE YOU HAVE IT ON THERE AS JX 37A;

19    RIGHT?

20    A.    OKAY.

21    Q.    THAT'S THE EXHIBIT NUMBER FOR THE RECORD.

22          NOW, I HAVE A VIDEO OF AN UNLOCKED USER OF THE

23    STRATOSPHERE.  SO CAN WE CALL UP SDX 2035?

24          AND SO THIS IS THE HOME SCREEN OF THE STRATOSPHERE; RIGHT?

25    A.    I RECALL THAT THE LOCK SCREEN OF THE STRATOSPHERE, NOT THE

1        HOME SCREEN.

2        Q.   OKAY, THE LOCK SCREEN.

3             ALL RIGHT.  SO NOW LET'S RUN THIS AND MOVE FORWARD.

4             YOU SEE THERE YOU CAN -- THERE'S NO TRACK.  YOU CAN MOVE

5        IT.  YOU CAN COMPLETE FREEDOM OF MOVEMENT; RIGHT?

6        A.   I SEE THAT.

7        Q.   AND YOU CAN -- YOU AGREE WITH THAT?  THAT'S CONSISTENT

8        WITH YOUR EXAMINATION OF THE STRATOSPHERE?

9        A.   THAT'S CORRECT.

10       Q.   AND YOU COME IN AND DROP THE PIECE IN FROM THE BOTTOM;

11       CORRECT?

12       A.   YES.

13       Q.   FROM THE TOP; CORRECT?

14       A.   WELL, YOU HAVE TO START AT THE PREDEFINED LOCATION AND YOU

15       HAVE TO FINISH AT THE PREDEFINED REGION.

16       Q.   I'M TALKING ABOUT TO DROP IT IN -- THERE'S A PLACE WHERE

17       YOU PUT THE PUZZLE PIECE; RIGHT?  THAT'S HOW THAT WORKS?

18       A.   THAT'S RIGHT.  THERE'S A PREDEFINED UNLOCK REGION.

19       Q.   RIGHT.  BUT WHAT I'M SAYING IS THERE IN THE STRATOSPHERE,

20       YOU COULD DROP IT INTO THAT PLACE FROM THE TOP; CORRECT?

21       A.   YOU HAVE TO MOVE IT.  BY DROP IN, YOU'RE -- THAT'S AN

22       AMBIGUOUS TERM.  YOU HAVE TO DRAG IT TO THE PREDEFINED UNLOCK

23       REGION.

24       Q.   YOU CAN DRAG IT THERE FROM THE TOP; RIGHT?

25       A.   THAT'S CORRECT.

1    Q.   YOU CAN DRAG IT FROM THE SIDE, RIGHT?

2    A.   WELL, YOU HAVE TO START AT THE PREDEFINED LOCATION AND YOU

3    HAVE TO FINISH AT THE PREDEFINED REGION.

4    Q.   BUT YOU CAN TAKE ANY PATH TO GET THERE?

5    A.   THAT'S CORRECT.

6    Q.   RIGHT?  AND THIS PUZZLE PIECE LOOKS LIKE A PUZZLE PIECE;

7    RIGHT?

8    A.   YES.

9    Q.   DOESN'T LOOK LIKE ANYTHING THE IPHONE; RIGHT?

10   A.   IT HAS VISUAL DISTINCTION FROM THE IPHONE.  THE GRAPHICS

11   ARE NOT THE SAME.

12   Q.   YEAH.  AND YOU DON'T HAVE A TRACK AND YOU'VE GOT FREEDOM

13   OF MOVEMENT AND YOU'VE GOT ALL THOSE THINGS; RIGHT?

14   A.   CORRECT.

15   Q.   BUT YOU'RE SAYING THAT THIS IS COPIED FROM THE IPHONE?

16   A.   THE DOCUMENT WE JUST HAD ON THE BOARD A FEW SECONDS AGO

17   WAS REFERRING TO THE REQUIREMENT TO HAVE A PREDEFINED LOCATION.

18   SO THAT WAS THE LANGUAGE ASSOCIATED WITH THE IPHONE, A SPECIFIC

19   AREA.

20        THIS HAS THOSE FEATURES.

21   Q.   SO I THINK ANYTHING THAT UNLOCKED TO A PREDEFINED LOCATION

22   IS COPIED FROM THE IPHONE?

23   A.   NO, NO.  WE NEED TO MATCH EVERY ELEMENT OF THE CLAIM AS WE

24   WENT THROUGH.

25   Q.   RIGHT.  BUT WE JUST ESTABLISHED YOU'RE NOT SAYING THAT

1    ANYTHING WAS COPIED FROM THE PATENT; RIGHT?

2    A.   I HAVE NO DIRECT EVIDENCE THAT THEY COPIED FROM THE

3    PATENT.

4    Q.   SO NOW LET'S TALK ABOUT -- LET'S GO TO PDX 31 AGAIN AND

5    TALK ABOUT THE ADMIRE.

6        AND YOU SHOWED THE ADMIRE WHERE YOU DRAG THE UNLOCK

7    ACROSS; CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   NOW, YOU'RE AWARE THAT THE, THE UNLOCK SCREEN THAT WE'RE

10   LOOKING AT HERE THAT YOU SHOWED US, THAT WAS DESIGNED BY

11   GOOGLE; RIGHT?

12   A.   THE SOFTWARE THAT I WAS DIRECTED TO COMES -- SUBSEQUENT TO

13   MY REPORT WAS SAMSUNG'S SOFTWARE, AND THIS RUNS ON A SAMSUNG

14   DEVICE.

15   Q.   UNDERSTOOD.  BUT YOU -- LET'S TALK A LITTLE BIT ABOUT

16   ANDROID.  YOU UNDERSTAND THAT ANDROID IS OPEN SOURCE -- EXCUSE

17   ME -- SOFTWARE THAT WAS DEVELOPED BY GOOGLE; CORRECT?

18   A.   WELL, THAT'S INCOMPLETE.  THE PEOPLE WHO DEVELOP DEVICES

19   THAT USE THE OPEN SOURCE ANDROID SOFTWARE SKIN IT, THEY MODIFY

20   THE SOFTWARE IN A VARIETY OF WAYS TO MAKE IT SUIT THEIR NEEDS.

21   Q.   THEY CAN, RIGHT?

22   A.   THEY CAN.  AND IN THE SOFTWARE THAT I INSPECTED FOR THIS

23   DEVICE, IT WAS PRESENTED TO ME AS SAMSUNG SOFTWARE.

24   Q.   RIGHT, SAMSUNG WOULD GO, AND WE TALKED ABOUT THIS, GO AND

25   DOWNLOAD THE SOFTWARE FROM THE PUBLICLY AVAILABLE CITE FOR

1    ANDROID SOURCE SOFTWARE; CORRECT?

2    A.   YES, AND MODIFY THE DESIGNS AND THE BEHAVIORS.

3    Q.   WELL, THAT'S WHAT I WANT TO TALK ABOUT.  YOU DON'T

4    ACTUALLY HAVE ANY EVIDENCE, YOU DIDN'T CITE ANY EVIDENCE IN

5    YOUR REPORT THAT SAMSUNG MODIFIED THE ANDROID SOFTWARE THAT

6    THEY GOT FROM GOOGLE WITH RESPECT TO THIS UNLOCK SCREEN;

7    CORRECT?

8    A.   I WAS DIRECTED TO INSPECT SOURCE CODE AS A RESULT OF YOUR

9    EXPERT'S COMMENTS, AND THAT SOURCE CODE WAS SAMSUNG SOURCE

10   CODE.

11   Q.   RIGHT.  AND YOU DIDN'T COMPARE IT TO THE ANDROID SOURCE

12   CODE; CORRECT?

13   A.   NO, I DID NOT.

14   Q.   SO YOU DON'T ACTUALLY HAVE ANY IDEA WHERE THE SOURCE

15   CODE -- WHERE THIS UNLOCK SCREEN THAT YOU ACCUSE IN THE ADMIRE

16   CAME FROM; CORRECT?

17   A.   NO.  I SIMPLY NOTED THAT I REVIEWED SAMSUNG'S SOURCE CODE,

18   AND THIS OPERATES ON A SAMSUNG DEVICE.

19   Q.   AND, IN FACT, YOU DIDN'T RELY ON SOURCE CODE FOR ANY OF

20   YOUR INFRINGEMENT OPINIONS; CORRECT?

21   A.   THAT'S CORRECT.  THE PATENT DOES NOT GO TO ANY PARTICULAR

22   METHOD FOR IMPLEMENTING THE INSTRUCTIONS.

23   Q.   RIGHT.  AND YOU DIDN'T RELY ON THE SOURCE CODE FOR YOUR

24   COPYING OPINIONS; CORRECT?

25   A.   THAT'S CORRECT.

1    Q.   NOW, LET'S TALK ABOUT THE GALAXY NEXUS.

2         NOW, HERE YOU HAVE THAT AS JX 29; RIGHT?

3    A.   OKAY.

4    Q.   NOW, THE UNLOCK SCREEN THAT YOU ACCUSE IN THE GALAXY

5    NEXUS, YOU'RE AWARE THAT WAS DESIGNED BY GOOGLE; RIGHT?

6    A.   YES.

7    Q.   OKAY.  UNEQUIVOCALLY --

8    A.   SORRY.  CAN I REVISE THAT?

9         I'M AWARE THAT THE SOURCE CODE IS GOOGLE'S SOURCE CODE.

10   THE DESIGN, I CAN'T SPEAK TO THE DESIGN.  I HAVE NO KNOWLEDGE

11   ON THAT.

12   Q.   RIGHT.  AND YOU DON'T HAVE ANY EVIDENCE THAT SAMSUNG WENT

13   TO GOOGLE AND HAD ANY INPUT IN THE DESIGN OF THE UNLOCK SCREEN,

14   DO YOU?

15   A.   I HAVE NO DIRECT EVIDENCE OF THAT.  HOWEVER, THEY'RE VERY

16   CLOSE PARTNERS, SO I WOULD NOT BE SURPRISED IF IT HAD OCCURRED.

17   Q.   RIGHT.  BUT YOU WOULD HAVE LOOKED FOR THAT IN CONNECTION

18   WHEN YOU WERE PUTTING YOUR OPINIONS TOGETHER IN THIS CASE;

19   RIGHT?

20   A.   YES.

21   Q.   AND YOU DIDN'T CITE ANY OF THAT EVIDENCE IN YOUR REPORT;

22   RIGHT?

23   A.   I'M UNAWARE OF ANY OF THAT DIRECT EVIDENCE.

24   Q.   GOOD.  NOW, SIMILARLY, WITH THE GALAXY SII, AND THIS IS

25   THE ANSWERING THE CALL SCREEN; RIGHT?

1    A.    YES.

2    Q.    AND THAT'S WHAT YOU ACCUSE THERE, BECAUSE WE ALREADY --

3    YOU DON'T ACCUSE THE TOP LEVEL GLASS UNLOCK; RIGHT?

4    A.    THAT'S CORRECT.  BUT THERE'S MORE THAN JUST THE ANSWERING

5    THE CALL SCREEN.  THERE'S ALSO -- ACTUALLY, THAT VERSION WE SEE

6    RIGHT THERE, THAT'S A MISSED MESSAGE, NOT ANSWERING THE CALL.

7         SO THERE'S A FEW FLAVORS OF INFRINGEMENT ON THE S III.

8    Q.    BUT, AGAIN, ALL OF THOSE FLAVORS THAT YOU ACCUSE WERE

9    DESIGNED BY GOOGLE; CORRECT?

10    A.    I CAN'T SPEAK TO THAT.  I WAS DIRECTED TO SOURCE CODE, AND

11    IT WAS SAMSUNG'S SOURCE CODE THAT I INSPECTED FOR THESE

12    DEVICES.

13    Q.    OKAY.  BUT, AGAIN, SIMILAR QUESTION TO WHAT WE HAD WITH

14    THE GALAXY NEXUS.  YOU DIDN'T CITE ANY EVIDENCE THAT SAMSUNG

15    HAD INPUT INTO THAT DESIGN WITH GOOGLE; CORRECT?

16    A.    I HAVE NO EVIDENCE EITHER WAY.

17    Q.    OKAY.  AND YOU HAVEN'T CITED A SINGLE GOOGLE DOCUMENT

18    SAYING THAT GOOGLE COPIED THE IPHONE; CORRECT?

19    A.    NO, I HAVEN'T.

20    Q.    OKAY.  AND YOU HAVEN'T CITED A SINGLE LINE OF TESTIMONY

21    FROM ANYBODY FROM GOOGLE, ANY ENGINEER FROM GOOGLE SAYING THAT

22    GOOGLE COPIED THE IPHONE; RIGHT?

23    A.    I REMEMBER ONE LINE IN MY REPORT THAT REFERRED TO GOOGLE

24    ENGINEERS LOOKING AT THE IPHONE.  THAT'S IT.

25    Q.    OKAY.  BUT YOU DON'T HAVE ANY -- NOTHING YOU CITE SAYING

1    THAT GOOGLE COPIED THE UNLOCK SCREEN FROM THE IPHONE; RIGHT?

2    A.    NO.  I'M DIRECTED AT SAMSUNG PRODUCTS AND WHERE I WAS

3    DIRECTED TO SOURCE CODE, IT WAS SAMSUNG'S SOURCE CODE, EXCEPT

4    FOR THE GALAXY NEXUS, WHICH WAS GOOGLE SOURCE CODE.

5    Q.    NOW, LET'S TALK ABOUT A COUPLE MORE OF THESE DESIGNS THAT

6    YOU ACCUSE.  AND LET'S SPECIFICALLY TALK ABOUT THAT NEXUS.

7         NOW, THE FIRST ONE -- YOU UNDERSTAND THAT THE NEXUS, I

8    THINK YOU ACTUALLY SHOWED THAT, THAT THERE'S TWO DIFFERENT

9    VERSIONS OF ANDROID THAT WERE RELEASED ON THE NEXUS; IS THAT

10   RIGHT?

11   A.    IT'S AT LEAST TWO.

12   Q.    YEAH, AT LEAST TWO.  BUT THE TWO YOU ACCUSE, ONE OF THEM

13   IS WHAT'S CALLED ICE CREAM SANDWICH; RIGHT?

14   A.    YEAH.

15   Q.    AND ANOTHER ONE CALLED JELLY BEAN?

16   A.    YES.

17   Q.    THE ANDROID, THEY -- ALL THE MAJOR RELEASES OF ANDROID,

18   THEY NAME IT AFTER SOME SWEETS; RIGHT?

19   A.    YEAH.

20   Q.    SO LET'S TALK ABOUT THE ICE CREAM SANDWICH VERSION FIRST.

21   A.    OKAY.

22   Q.    NOW, I WANT TO PUT BACK UP CLAIM 7 AND 8 BECAUSE WE NEED

23   TO SEE THE ELEMENTS OF CLAIM 7 TO KNOW WHAT CLAIM 8 IS DOING;

24   RIGHT?

25   A.    YES.

 1    Q.   OKAY.  SO LET'S PUT THAT BACK UP.  THIS IS THE PROPERTY IN

 2    THE CASE, RIGHT?  THIS IS WHAT WE'VE GOT TO SEE AND WHETHER

 3    THERE'S INFRINGEMENT; RIGHT?

 4    A.   I THINK THE WORD IS PROPERTY.  YOU SAID PROPERTY IN THAT

 5    SENSE.

 6    Q.   YEAH.

 7    A.   OKAY.

 8    Q.   SORRY.  OUR ACTIONS --

 9    A.   OCEANS APART.

10    Q.   OUR ACTIONS DON'T NECESSARILY JIBE.

11         ALL RIGHT.  SO I WANT TO FOCUS IN ON THE ICE CREAM

12    SANDWICH VERSION OF THE GALAXY NEXUS, AND I WANT TO DO IT

13    SPECIFICALLY WITH RESPECT TO THE LANGUAGE HERE.

14         YOU SEE YOU'VE GOT "TO DETECT A CONTACT WITH A

15    TOUCH-SENSITIVE DISPLAY AT A FIRST PREDEFINED LOCATION

16    CORRESPONDING TO AN UNLOCK IMAGE"; RIGHT?

17    A.   YES.

18    Q.   NOW, THE NEXT ONE SAYS "TO CONTINUOUSLY MOVE THE UNLOCK

19    IMAGE ON A TOUCH-SENSITIVE DISPLAY IN ACCORDANCE WITH MOVEMENT

20    ON THE DETECTED CONTACT."

21         DO YOU SEE THAT?

22    A.   I DO.

23    Q.   SO YOU UNDERSTAND WHERE IT SAYS TO CONTINUOUSLY MOVE THE

24    UNLOCK IMAGE, THAT'S A REFERENCE BACK TO THE SAME UNLOCK IMAGE

25    THAT'S REFERRED TO FOR THE FIRST PREDEFINED LOCATION; CORRECT?

1    A.   THAT'S CORRECT.  AND THERE'S TWO THINGS THAT YOU'RE

2    OMITTING HERE.  THE FIRST IS THE FINAL PART THAT YOU HAVE NOT

3    HIGHLIGHTED OF THE ELEMENT THAT BEGIN "TO CONTINUOUSLY MOVE."

4    IT FINISHES "WHEREIN THE UNLOCKED IMAGE IS A GRAPHICAL,

5    INTERACTIVE USER-INTERFACE OBJECT."

6         SO THIS IS JUST LIKE THE BOLD BUTTON AND ANYONE OF

7    ORDINARY SKILL IN THE ART UNDERSTANDS THAT SOMETHING LIKE A

8    BOLD BUTTON, AN INTERACTIVE OBJECT, CAN CHANGE IN ITS VISUAL

9    PRESENTATION.

10   Q.   OKAY, GREAT.  THE BOLD -- YOU SHOWED THAT EXAMPLE, AND THE

11   BOLD OBJECT, THE B STAYS THERE, RIGHT, AND IT GETS HIGHLIGHTED,

12   IT GETS BOLD?

13   A.   THAT'S RIGHT.  BUT IT'S ACTUALLY SEVERAL IMPLEMENTATION

14   LEVEL IMAGES, ALL GRAPHICS PROCESSING THAT IS USED TO CAUSE

15   THAT VISUAL CHANGE.  SO THE ONE OBJECT IS COMPOSED OF A

16   MULTITUDE OF IMAGES OR GRAPHICS PROCESSING.

17   Q.   MY QUESTION IS SIMPLER THAN THAT.  WHEN YOU CLICK ON THE B

18   FOR THE BOLD IN MICROSOFT WORD, IN YOUR EXAMPLE, THE B DOESN'T

19   GO AWAY; RIGHT?

20   A.   THAT'S CORRECT.  AND THE SPECIFICATIONS TO THIS CLAIM

21   SIMPLY SAY THAT THE IMAGE CAN APPEAR OR DISAPPEAR OR BE

22   ANIMATED.

23   Q.   WELL, IT SAYS THE ARROW CAN BE ANIMATED ON THE IMAGE.

24   THAT'S THE PART YOU LOOKED AT BEFORE; RIGHT?

25   A.   THAT'S CORRECT.

```
 1      Q.   OKAY.  IT DOESN'T SAY THE IMAGE CAN DISAPPEAR; RIGHT?

 2      A.   THE IMAGE SUBSTANTIALLY IS THE ARROW.

 3      Q.   WELL, IT'S MORE THAN THAT.  IT'S -- IN THE EXAMPLE THAT

 4      YOU SHOWED, THERE'S A CIRCLE WITH AN ARROW IN IT; RIGHT?

 5      A.   THAT'S PART OF THE IMAGE.

 6      Q.   YEAH?

 7      A.   WHAT THE SPECIFICATION IS SAYING IS THAT THE IMAGE CAN BE

 8      ANIMATED AND -- SO THAT'S THE BEGINNING OF THAT SECTION OF

 9      THE -- IT'S COLUMN 12, LINES 40 TO 43, AND IT STIPULATES THAT

10      THE IMAGE CAN BE ANIMATED.

11      Q.   RIGHT, I GET IT.  BUT IT DOESN'T SAY THE IMAGE CAN

12      DISAPPEAR, RIGHT?

13      A.   YES, IT DOES.  THAT'S WHAT IT'S SAYING.  IT CAN CHANGE IN

14      A PULSE-LIKE MANNER.

15      Q.   IT'S -- THE WORD "DISAPPEAR" ISN'T THERE; RIGHT?

16      A.   THE WORD "DISAPPEAR:  IS THERE.

17      Q.   THE WORD "DISAPPEAR" IS THERE?

18      A.   THE WORD "DISAPPEAR" IS THERE.

19      Q.   IN COLUMN 12, IN THE PART THAT YOU PUT UP THERE, IF WE PUT

20      IT UP THERE, WE'RE GOING TO FIND THE WORD "DISAPPEAR"?

21      A.   LET'S PUT IT UP THERE AND TEST MY MEMORY.  LET'S PUT IT UP

22      THERE.

23      Q.   IT'S -- AND THAT'S THE PART THAT I TALKED ABOUT BEFORE,

24      RIGHT?  IT SAYS THE ARROW MAY APPEAR AND DISAPPEAR; RIGHT?

25      A.   IT'S CHARACTERIZED -- IT'S AN EXAMPLE OF THE ANIMATION
```

1    THAT THE CLAIM IS DESCRIBING.  SORRY, IT'S AN EXAMPLE OF THE

2    ANIMATION THAT THAT SECTION OF THE SPECIFICATION IS DESCRIBING.

3    Q.   OKAY.  SO LET'S PUT IT UP THERE, JUST SO WE'RE ALL ON THE

4    SAME PAGE?

5    A.   SURE.

6    Q.   SO IT'S COLUMN 12, I BELIEVE IT STARTS AT LINE 40.

7         CAN YOU BLOW THAT UP?  SO HERE IT SAYS IN SOME EMBODIMENTS

8    THE ARROW AND THE ARROW ON THE UNLOCK IMAGE, RIGHT?

9    A.   THIS IS EXEMPLARY.  IT'S CLEAR WHAT'S BEING TAUGHT HERE.

10   Q.   I UNDERSTAND.  WE'RE JUST TALKING ABOUT THIS EXAMPLE,

11   THAT'S ALL I'M TALKING ABOUT RIGHT NOW BECAUSE THAT'S THE ONE

12   YOU POINTED US TO, RIGHT?

13   A.   YEAH.

14   Q.   OKAY, GOOD.  THEN IT SAYS, "FOR EXAMPLE, THE ARROW ON THE

15   UNLOCK IMAGE MAY APPEAR AND DISAPPEAR IN A PULSE-LIKE MANNER

16   AND THE ARROWS MAY EMANATE FROM ONE OF THE END CHANNELS."

17        DO YOU SEE THAT?

18   A.   YES.

19   Q.   IT DOESN'T SAY THE UNLOCK IMAGE MAY APPEAR AND DISAPPEAR;

20   RIGHT?

21   A.   THE UNLOCK IMAGE IS SUBSTANTIALLY COMPOSED IN THESE

22   EXAMPLES.  IF WE FLIP TO FIGURE 4B THAT I'M REFERRING TO,

23   YOU'LL SEE WHAT I MEAN.

24   Q.   THIS IS WHAT YOU DIRECTED ME TO; RIGHT?

25   A.   YEAH.

1    Q.   IT SAYS THE ARROW ON THE UNLOCK IMAGE 402, RIGHT?

2    A.   YES.  AND IF WE REMEMBER FIGURE 4B, THERE WAS A CIRCLE

3    WITH A BIG ARROW INSIDE IT.  THE ARROW IS THE UNLOCK IMAGE.

4    Q.   AND IF WE GO BACK TO 4B -- WELL, THE ARROW IS NOT THE

5    UNLOCK IMAGE.  THE CIRCLE IS THE IMAGE, RIGHT?

6    A.   IT'S SAYING THE IMAGE CAN BE ANIMATED.

7    Q.   OKAY.  LET'S GO BACK TO FIGURES 4A AND 4B.

8         THIS IS 402.  IT'S POINTING TO THE CIRCLE; RIGHT?

9    A.   IT'S POINTING TO THE CIRCLE, INCLUDING THE ARROW.  THIS IS

10   JUST EXEMPLARY OF THE, OF WHAT THE IMAGE CAN CONSIST OF.

11   Q.   OKAY.  NOW, LET'S GO TO THE NEXUS AND LET'S DO THE ICE

12   CREAM SANDWICH ONE FIRST.

13        AND THIS ONE IS SDX 2020, RIGHT?

14        JUST FOR THE RECORD, I HAVE TO REMEMBER TO PUT THOSE IN.

15        SO THIS IS THE GALAXY NEXUS, RIGHT?  SO LET'S RUN THIS

16   FORWARD, AND WHAT WE'RE GOING TO SHOW IS SOMEBODY DOING THE

17   UNLOCK ON THIS ONE.  OKAY?

18   A.   SURE.

19   Q.   OKAY.  GO AHEAD AND RUN IT.

20        OKAY.  DO YOU SEE THERE, NOW LET'S GO -- CAN WE GO BACK TO

21   THE BEGINNING?  THERE, RIGHT.

22   A.   YEAH.

23   Q.   THE UNLOCK IMAGE DISAPPEARED; RIGHT?

24   A.   NO.  IT JUST CHANGES FORM.

25   Q.   IT CHANGES FORM TO SOMETHING ELSE?  RIGHT?

1    A.    YES.

2    Q.    THAT'S NOT --

3    A.    IT'S STILL A GRAPHICAL USER INTERFACE OBJECT THAT THE USER

4    IS MANIPULATING.

5    Q.    OKAY.  BUT LET'S GO BACK TO THE CLAIM, BECAUSE YOU TOLD

6    ME, RIGHT, YOU AGREE WITH ME ALL THE ELEMENTS HAVE TO BE THERE,

7    IT'S NOT JUST SOMETHING THAT LOOKS LIKE MY LAND; RIGHT?

8    A.    YEAH.

9    Q.    OKAY.  SO HERE IT SAYS "A PREDEFINED LOCATION

10   CORRESPONDING TO AN UNLOCK IMAGE," AND TO CONTINUOUSLY MOVE THE

11   UNLOCK IMAGE ON THE TOUCH-SENSITIVE SCREEN; RIGHT?

12   A.    AND IF WE LOOK AT THE END OF THAT ELEMENT, IT DEFINES WHAT

13   THE UNLOCK IMAGE IS.  IT IS A GRAPHICAL INTERACTIVE USER

14   INTERFACE OBJECT.  SO THIS IS SOMETHING THE USER CAN MANIPULATE

15   IN ORDER TO UNLOCK THE DEVICE.

16   Q.    UNDERSTOOD.  BUT IT DOESN'T SAY IT'S AN OBJECT THAT CAN GO

17   AWAY AND BECOME A DIFFERENT OBJECT; RIGHT?

18   A.    THE SPECIFICATION IS INTERPRETING WHAT CAN HAPPEN HERE,

19   AND IT SAYS THE IMAGE CAN BE ANIMATED.

20   Q.    AND THAT'S THAT PART OF THE SPECIFICATION WE JUST WENT

21   THROUGH?

22   A.    WE'RE BACK TO THAT, YEAH.

23   Q.    OKAY, GOOD.  SO NOW LET'S LOOK AT THE JELLY BEAN VERSION.

24   AND THIS WILL BE SDX 2021.  THIS IS THE NEXUS STILL, IT'S

25   JUST THE NEXT VERSION --

1    A.    SURE.

2    Q.    -- OF ANDROID.

3          SO NOW IF WE DO THAT, SO THERE THE UNLOCK IMAGE, IT

4    COMPLETELY DISAPPEARS; RIGHT?

5    A.    NO.  IT SIMPLY APPEARS THAT WAY BECAUSE THE CONTRAST AND

6    BRIGHTNESS ON THAT DISPLAY IS SO LOW.

7          BUT IF THE MEMBERS OF THE JURY CAN PROBABLY SEE THE

8    SPOTLIGHT THAT'S MOVING WITH THE FINGER.

9    Q.    WELL, BUT THIS IS THE UNLOCK IMAGE; RIGHT?  THAT'S WHAT

10   YOU'RE SAYING THE UNLOCK IMAGE IS?

11   A.    IT CHANGES ITS REPRESENTATION, IN THE SAME WAY, IN A VERY

12   DIRECT EQUIVALENT MANNER TO THE PREVIOUS EXAMPLE.  IT CHANGES

13   INTO A CIRCLE.  SO WE START WITH A CIRCLE, WE FINISH WITH A

14   CIRCLE THAT'S A SPOTLIGHT ONTO DOTS.

15   Q.    IT CHANGED IT INTO A DIFFERENT IMAGE?

16   A.    IT'S STILL A GRAPHICAL INTERACTIVE OBJECT WITH WHICH THE

17   USER INTERACTS.

18   Q.    BUT A DIFFERENT GRAPHICAL INTERFACE OBJECT WITH WHICH THE

19   USER INTERACTS; RIGHT?

20   A.    NO.  THE SPECIFICATION SAYS THAT THE IMAGE CAN CHANGE IN

21   ITS REPRESENTATION AND THAT'S WHAT WE SEE HERE.

22   Q.    AGAIN, YOU'RE TALKING ABOUT THAT PART THAT WE JUST READ?

23   A.    YES, IT'S VERY CLEAR.

24   Q.    OKAY.  ALL RIGHT.  SO NOW LET ME TALK ABOUT THIS SURVEY

25   FROM A DR. JOHN HAUSER.

1     A.    SURE.

2     Q.    SO YOU SAID YOU REVIEWED THAT REPORT; RIGHT?

3     A.    YES, I DID.

4     Q.    BUT YOU DIDN'T HAVE ANY INPUT AT ALL ON THE SURVEY

5     QUESTIONS; RIGHT?

6     A.    THAT'S CORRECT.

7     Q.    NOBODY EVER SPOKE TO YOU BEFORE THAT SURVEY WAS DONE ABOUT

8     WHAT THAT SURVEY QUESTION WOULD BE; RIGHT?

9     A.    THAT'S CORRECT.

10    Q.    AND AT LEAST AT THE TIME OF YOUR DEPOSITION YOU ACTUALLY

11    HAD NEVER SPOKEN WITH DR. HAUSER; ISN'T THAT RIGHT?

12    A.    I HADN'T SPOKEN TO DR. HAUSER UNTIL YESTERDAY EVENING, AND

13    IT WAS JUST THE NICETIES.

14    Q.    OKAY.  SO YOU'VE NEVER TALKED TO HIM ABOUT HIS DESCRIPTION

15    OF THE PATENT THAT YOU'RE APPLE'S EXPERT TO COME AND TESTIFY

16    ON; RIGHT?

17    A.    NO.  I'VE COMMUNICATED WITH THE ATTORNEYS ON THE CASE

18    OBVIOUSLY ABOUT MY UNDERSTANDING, BUT NEVER DIRECTLY TO

19    DR. HAUSER.

20    Q.    OKAY.  BUT YOU DIDN'T -- WELL, I CAN GO BACK TO IT.  YOU

21    HAD NO INPUT WHATSOEVER INTO THE SURVEY QUESTION; RIGHT?

22    A.    I -- WELL, I CAN'T -- I CAN'T GUARANTEE THAT'S THE CASE

23    BECAUSE I'VE COMMUNICATED WITH THE ATTORNEYS, THE ATTORNEYS

24    HAVE COMMUNICATED TO DR. HAUSER.  SO I HAVE NEVER HAD DIRECT

25    COMMUNICATION WITH DR. HAUSER, BUT IT'S CERTAINLY REASONABLE

1    THAT IT HAPPENED THROUGH INTERMEDIARIES.

2    Q.   OKAY.  WELL, AT LEAST AT THE TIME OF YOUR DEPOSITION IN

3    THIS CASE, YOU DIDN'T THINK YOU HAD ANY INPUT INTO THE SURVEY

4    QUESTION; RIGHT?

5    A.   NO DIRECT INPUT, THAT'S CORRECT.

6    Q.   SO LET'S PUT UP, FOR THE '721 PATENT, THE HAUSER SURVEY

7    QUESTION.  I THINK IT'S PARAGRAPH 76.  HERE WE GO.

8        SO THIS IS THE ONE YOU'RE TALKING ABOUT, THE ONE YOU

9    REVIEWED?

10   A.   THIS IS ONE OF THE ONES I REVIEWED.

11   Q.   I'M JUST TALKING ABOUT FOR THE '721 PATENT.

12   A.   OKAY.

13   Q.   YOU REVIEWED THE ONE FOR THE '172 PATENT AS WELL; RIGHT?

14   A.   YES.

15   Q.   WE'LL GET THERE IN A MINUTE.  SO HERE IT SAYS "THE SLIDE

16   TO UNLOCK FEATURE PREVENTS UNINTENTIONAL UNLOCKS BY UNLOCKING

17   YOUR TABLET"; CORRECT?

18   A.   YES.

19   Q.   YOU AGREE THAT'S GOING TO PUT IN PEOPLE'S MIND A TABLET;

20   RIGHT?

21   A.   YES.

22   Q.   NOT A PHONE, RIGHT?

23   A.   YES.

24   Q.   AND ALL THE EXAMPLES YOU GAVE IN TERMS OF THE DRAWBACKS

25   AND BENEFITS, THOSE ARE ALL IN CONNECTION WITH A PHONE; RIGHT?

1    A.    THAT'S CORRECT.  WELL, NO, ACTUALLY.  THEY PLAY EQUALLY

2    WELL TO A TABLET.  THEY WERE PROVIDED DIRECTLY WITH RESPONSE TO

3    PHONES.

4    Q.    OKAY.  LET'S PUT UP PDX 25.  SO THIS IS ONE OF YOUR

5    SLIDES; RIGHT?

6    A.    YEAH.

7    Q.    IN FACT, THIS WAS THE ONE WHERE YOU WERE TRYING TO SHOW

8    THE PROBLEM THAT WAS SOLVED BY THE '721 PATENT; RIGHT?

9    A.    IT'S EXEMPLARY.

10   Q.    THE TABLET DOESN'T FIT IN YOUR POCKET, DOES IT?

11   A.    IT FITS IN A PURSE AND YOUR HAND GOES INTO THE PURSE OR A

12   BRIEFCASE.  IT'S THE SAME PROBLEM.

13   Q.    YOU MAKE CALLS ON YOUR TABLET?

14   A.    ACCIDENTAL ACTIVATION OF FUNCTIONS.

15   Q.    BUT IT SAYS POCKET DIAL PROBLEM; RIGHT?

16   A.    IT'S EXEMPLARY.

17   Q.    OKAY.  BUT THERE'S NO POCKET DIAL PROBLEM WITH A TABLET;

18   RIGHT?

19   A.    THAT'S ACCIDENTAL ACTIVATION OF FUNCTIONS.

20   Q.    OKAY.  ALL RIGHT.  SO LET'S GO BACK TO THE HAUSER REPORT.

21        SO HERE -- AND WE LOOKED AT CLAIM 8, WE CAN PUT IT BACK UP

22   THERE IF WE NEED TO -- CLAIM 8 REQUIRES VISUAL CUES; RIGHT?

23   A.    YES.

24   Q.    THERE'S NOTHING ABOUT VISUAL CLUES HERE IN THE HAUSER

25   SURVEY; RIGHT?

1    A.   WHAT'S IMPORTANT TO UNDERSTAND IS THAT THERE WERE VIDEOS

2    THAT ACCOMPANIED THIS TEXTUAL DESCRIPTION AND THE VIDEOS

3    CONTAINED THE TEXTUAL DESCRIPTION BEING READ OUT TO THE

4    RESPONDENTS, AND THE VIDEOS, IN COMBINATION WITH THE TEXT, ARE

5    CRYSTAL CLEAR ABOUT THE FEATURES THAT ARE BEING EXAMINED.

6    Q.   THERE'S -- MY QUESTION IS VERY SIMPLE.  THERE'S NO MENTION

7    OF VISUAL CLUES IN DR. HAUSER'S DESCRIPTION; CORRECT?

8    A.   IN THE -- WELL, THAT'S A MISREPRESENTATION BECAUSE THE

9    VIDEOS WERE PART OF THE DESCRIPTION.

10   Q.   OKAY.  SO YOU -- YOU HAVE YOUR DEPOSITION IN FRONT OF YOU.

11   A.   YES.  AT THE TIME OF MY DEPOSITION, I HAD NOT SEEN THE

12   VIDEOS.  I SAW THE VIDEOS ABOUT A WEEK AGO.

13   Q.   OKAY.  SO THAT'S SOMETHING YOU DIDN'T HAVE ANY INPUT IN?

14   A.   I HAD NO INPUT IN, NO DIRECT INPUT INTO IT.

15   Q.   ALL RIGHT.  YOU DIDN'T SIGN OFF ON THOSE, DIDN'T LOOK AT

16   THEM BEFOREHAND, NONE OF THAT; RIGHT?

17   A.   NO.

18   Q.   AND THE HAUSER SURVEY HERE AT THE END ALSO SAYS, "WITHOUT

19   THIS FEATURE, YOU WOULD HAVE TO UNLOCK YOUR DEVICE USING OTHER

20   TECHNIQUES," AND THEN I'LL SKIP DOWN HERE, "WHICH MAY MAKE

21   UNINTENTIONAL UNLOCKS MORE LIKELY."  RIGHT?

22   A.   YES.

23   Q.   IT DOESN'T SAY HOW MUCH MORE LIKELY?

24   A.   MORE.

25   Q.   MORE LIKELY; RIGHT?

1    A.    YEAH, THAT'S RIGHT.

2    Q.    BUT WE KNOW THAT THE GALAXY, OR EXCUSE ME -- YEAH, THE

3    GALAXY S III, RIGHT?

4    A.    OKAY.

5    Q.    WE TALKED ABOUT THAT ONE BEFORE, THAT DOESN'T INFRINGE;

6    RIGHT?

7    A.    THAT'S RIGHT.

8    Q.    AND WE ALSO ESTABLISHED THAT YOU DON'T HAVE ANY

9    INFORMATION FROM CONSUMERS, NOT A SINGLE ONE IN ALL THOSE

10   MILLIONS OF SALES, WHERE SOMEBODY SAID "MY PHONE UNLOCKED

11   ACCIDENTALLY," RIGHT?

12   A.    I PRODUCED A LOT OF DOCUMENTS THAT SAY THAT PEOPLE WERE

13   CONCERNED ABOUT THAT, THE CARRIERS WERE CONCERNED ABOUT IT --

14   IS THIS SPECIFICALLY ABOUT THE S III?

15   Q.    CORRECT, THIS IS SPECIFICALLY ABOUT THE S III.

16   A.    YEAH.  THE MECHANISMS OF UNLOCKING, AS I SAID EARLIER, ARE

17   EXACTLY THE SAME FOR THE S III AS THEY ARE FOR THE OTHER

18   VERSIONS HAVE THAT WERE -- THAT HAD THIS PROBLEM.

19   Q.    RIGHT.  BUT I'M TALKING ABOUT CONSUMERS, THE PEOPLE WHO

20   BUY THE PHONES.  WE TALKED ABOUT THIS EARLIER --

21   A.    CARRIERS ARE A CONSUMER.

22   Q.    WELL, THE PEOPLE -- AND THEY ULTIMATELY SELL THE PHONES TO

23   PEOPLE; RIGHT?

24   A.    YES.

25   Q.    THEY DON'T TAKE AND BUY A MILLION PHONES AND JUST PUT THEM

1    IN THEIR STORE; RIGHT?

2    A.   ACTUALLY, THAT'S UNCLEAR TO ME.  I THOUGHT THEY WOULD.

3    Q.   THEY SELL THEM TO PEOPLE; RIGHT?

4    A.   EVENTUALLY.  BUT THE CARRIERS ARE PURCHASING THIS AND THE

5    CARRIERS WERE CONCERNED.

6    Q.   YOU -- WE TALKED ABOUT THIS EARLIER, RIGHT?  WITH THE

7    GALAXY S III AND THE RIPPLE SCREEN, YOU HAVEN'T CITED A SINGLE

8    PIECE OF EVIDENCE WHERE A CONSUMER COMPLAINED THAT THEIR PHONE

9    UNLOCKED ACCIDENTALLY; RIGHT?

10   A.   IF WE'RE EXCLUDING CARRIERS AS BEING A FORM OF CONSUMER,

11   THEN, YES, I HAVE NOT.

12   Q.   OKAY.  SO HERE WHAT THE HAUSER SURVEY, IT DOESN'T TALK

13   ABOUT THE GALAXY S III METHOD AS BEING AN ALTERNATIVE; RIGHT?

14   A.   NO.  BUT THE VIDEO SHOWED VERY CLEARLY A FORM OF

15   UNLOCKING.

16   Q.   YEAH, A FORM OF UNLOCKING?

17   A.   THE PHONES ARE UNLOCKING.

18   Q.   A FORM OF UNLOCKING THAT YOU DIDN'T SIGN OFF ON BEFORE THE

19   SURVEY; RIGHT?

20   A.   THAT'S CORRECT, I DIDN'T SEE THE SURVEY BEFORE THEN.

21   Q.   NOW, LET'S TALK ABOUT THE 172 FOR A MOMENT.  SO I THINK

22   YOU TESTIFIED TO THIS.  CLAIM 18 OF THE '172 PATENT, THE IPHONE

23   DOESN'T PRACTICE IT; RIGHT?

24   A.   THAT'S CORRECT.

25   Q.   AND THE IPAD DOESN'T PRACTICE IT; RIGHT?

1    A.    THAT'S CORRECT.

2    Q.    NOW, LET'S TAKE A LOOK AT THE -- AT HOW THE IPHONE WORKS

3    JUST AS AN EXAMPLE TO MAKE SURE WE'RE ON THE SAME PAGE, SDX

4    2126.

5         NOW LET'S GO AHEAD AND RUN THIS FORWARD.

6         THIS SHOULD BE AN EXAMPLE OF OUR FAMILIAR TYPING A MESSAGE

7    HERE.

8         SO WHAT WE JUST SAW HERE, THAT DOESN'T MEET CLAIM 18;

9    RIGHT?

10   A.    THAT'S CORRECT.

11   Q.    AND THAT'S BECAUSE IF WE PUT UP CLAIM 18 OF EXHIBIT JX 13

12   FOR A MOMENT, I THINK YOU SAID THIS, BUT THIS REQUIRES THAT A

13   FIRST AREA CONTAIN THE CURRENT STRING THAT YOU'RE TYPING;

14   RIGHT?

15   A.    THAT'S CORRECT.  AND YOU -- AND THE IPHONE MATCHES THAT.

16   Q.    UNDERSTOOD.  BUT I'M GETTING TO THE NEXT PART.

17   A.    SURE.

18   Q.    OKAY.  AND SO -- AND THEN A SECOND AREA DISPLAYS SEPARATE

19   FROM THE FIRST AREA THE CURRENT CHARACTER STRING YOU'RE TYPING,

20   OR A PORTION THEREOF, AND A SUGGESTED REPLACEMENT; RIGHT?

21   A.    THAT'S RIGHT.

22   Q.    OKAY.  SO THE IPHONE DOESN'T DO THAT?

23   A.    CORRECT.

24   Q.    BECAUSE IT JUST HAS A SECOND REPLACEMENT IN A LITTLE BULB

25   RIGHT NEXT TO THE TEXT; RIGHT?

1       A.   YES.

2       Q.   OKAY.  NOW, YOU -- SO IT DOESN'T PRACTICE THIS CLAIM 18;

3    RIGHT?

4       A.   AGREED.

5       Q.   YOU THINK IT'S ACCEPTABLE; RIGHT?

6       A.   I THINK IT'S OUTSTANDING.

7       Q.   IT'S OUTSTANDING, BUT IT DOESN'T PRACTICE CLAIM 18?

8       A.   THAT'S CORRECT.

9       Q.   SO NOW LET'S TALK ABOUT THE DART.  I JUST WANT TO SHOW

10   THAT.

11          AND YOU AGREE THAT WHAT WE'VE BEEN REFERRING TO, I THINK

12   YOU TALKED ABOUT IT ON DIRECT, THE DART KEYBOARD DOESN'T

13   INFRINGE; RIGHT?

14      A.   THAT'S CORRECT.

15      Q.   AND YOU'RE AWARE THAT THAT WAS IN SOME OF THE GALAXY S III

16   RELEASES; RIGHT?

17      A.   YES, I AM.  THEY REPLACED IT.

18      Q.   EXCUSE ME?

19      A.   THEY REPLACED IT.

20      Q.   BUT IT WAS IN THERE; RIGHT?

21      A.   IT WAS.

22      Q.   AND YOU DON'T ACCUSE THE S III OF INFRINGEMENT; RIGHT?

23      A.   CORRECT.

24      Q.   IN FACT, YOU DON'T ACCUSE THE S III OF INFRINGEMENT FOR

25   ANY IMPLEMENTATION OF ANY KEYBOARD THAT'S IN THE S III; RIGHT?

1    A.   THAT'S CORRECT.

2    Q.   AND THAT'S SOLD MILLIONS AND MILLIONS OF UNITS?

3    A.   THAT'S CORRECT.

4    Q.   OKAY.  SO NOW LET'S TALK ABOUT THE DART.  LET'S JUST SHOW

5    THIS REAL QUICKLY SO THAT WE'RE ALL ON THE SAME PAGE.

6         AND THIS IS SDX 2127.

7         SO LET'S GO FORWARD AND RUN THAT FORWARD.

8         SO NOW THE DART, THAT DOESN'T MEET THE CLAIM, RIGHT,

9    BECAUSE THE TEXT THAT YOU'RE TYPING DOESN'T APPEAR IN THE FIRST

10   AREA; RIGHT?

11   A.   THE SUGGESTION CONTINUALLY APPEARS IN THE TEXT AREA.

12   Q.   RIGHT.  AND WE JUST LOOKED AT THE CLAIM, THE CLAIM

13   REQUIRES THAT WHAT YOU'RE TYPING MUST APPEAR IN THE FIRST AREA;

14   RIGHT?

15   A.   THAT'S RIGHT, AND THE SECOND AREA.

16   Q.   WHAT?

17   A.   AND THE SECOND AREA.

18   Q.   EXACTLY.  IN BOTH AREAS?

19   A.   YEP.

20   Q.   SO NOW LET'S TALK ABOUT DR. HAUSER'S SURVEY ON THE '172.

21        NOW, AGAIN, WE TALKED ABOUT THIS A MINUTE AGO.  YOU DIDN'T

22   HAVE ANY INPUT INTO THIS SURVEY REGARDING THE '172 PATENT

23   BEFORE IT WAS DONE; RIGHT?

24   A.   I THINK WE ESTABLISHED THAT.

25   Q.   YEAH.  WE WERE TALKING ABOUT THE '721.  I JUST WANT TO --

1    A.   OH, SORRY.  I HAD NO INPUT.

2    Q.   SO SAME STORY WITH RESPECT TO THE '172?

3    A.   YES.

4    Q.   NOW, LET'S LOOK AT -- WELL, THE HAUSER REPORT.  IT'S

5    PARAGRAPH 74.  CAN WE PULL THAT UP, AUTO WORD CORRECTION.

6    PERFECT.

7         SO THIS IS THE -- YOU'VE LOOKED AT IT SINCE, THOUGH,

8    RIGHT?

9    A.   I HAVE, AND I'VE SEEN THE VIDEOS THAT ACCOMPANY THE TEXT.

10   Q.   OKAY.  BUT AT THE TIME OF YOUR DEPOSITION, YOU HADN'T SEEN

11   THE VIDEOS?

12   A.   I HAD NOT SEEN THE VIDEOS, NO.

13   Q.   ALL RIGHT.  SO HERE WHAT IT SAYS IS YOU TYPE ON YOUR

14   SMARTPHONE, YOUR SMARTPHONE DISPLAYS TEXT, YOU TYPE IN THE TEXT

15   BOX, AND AT THE SAME TIME IT PROVIDES SUGGESTED REPLACEMENT

16   TEXT IN A SEPARATE BOX ALONGSIDE THE TEXT BOX THAT DISPLAYS

17   WHAT YOU ACTUALLY TYPE.

18        DO YOU SEE THAT?

19   A.   YES.

20   Q.   SO HERE, AND THEN IF WE CONTINUE, THE AUTOMATIC WORD

21   CORRECTION FEATURES ALLOWS YOU TO AUTOMATICALLY REPLACE YOUR

22   ORIGINAL TEXT WITH SUGGESTED TEXT, FOR EXAMPLE, YOU PRESS THE

23   SPACE TO MOVE ON TO THE NEXT WORD YOU WANT TO TYPE, OR YOU

24   PRESS THE PERIOD, RIGHT?

25   A.   YES.

1    Q.   THIS DOESN'T ACTUALLY EVEN SAY THAT YOU NEED TO HAVE THE

2    TEXT THAT YOU'RE TYPING IN THE FIRST AREA AND IN THE SECOND

3    AREA ALONG WITH THE SUGGESTED REPLACEMENT; RIGHT?

4    A.   WELL, THIS WAS READ TO THE RESPONDENTS IN ACCOMPANIMENT

5    WITH THE VIDEO AND THE VIDEO WAS CRYSTAL CLEAR ABOUT THE

6    BEHAVIOR, THE INFRINGING BEHAVIOR.

7    Q.   THEY DIDN'T SEE THE PATENT; RIGHT?

8    A.   THEY DIDN'T SEE THE PATENT.

9    Q.   OKAY.  SO THIS DESCRIPTION HERE DOESN'T TALK ABOUT THE

10   TEXT THAT YOU'RE TYPING BEING IN A FIRST AREA AND A SECOND

11   AREA; RIGHT?

12   A.   THE TEXT DOES NOT, BUT THE VIDEO VERY CLEARLY SHOWS THAT.

13   Q.   SO THIS TEXT, THAT ACTUALLY WOULD DESCRIBE THE IPHONE,

14   TOO; RIGHT?

15   A.   THE TEXT WOULD.  THE VIDEO WOULD NOT.

16   Q.   OKAY.  SO THE TEXT WOULD DESCRIBE THE IPHONE AND THE

17   IPHONE DOESN'T INFRINGE CLAIM -- IT'S NOT COVERED, IT DOESN'T

18   PRACTICE, WHATEVER YOU WANT TO SAY, CLAIM 18; RIGHT?

19   A.   THE TEXT WAS READ TO THE RESPONDENTS IN ASSOCIATION WITH

20   THE VIDEO, AND THE VIDEO MAKES IT VERY, VERY CLEAR WHAT'S BEING

21   DESCRIBED.

22   Q.   OKAY.  SO NOW IT SAYS HERE AT THE BOTTOM, WITHOUT THIS

23   FEATURE, PRESSING SPACE OR PERIOD WOULD RETAIN YOUR ORIGINAL

24   TEXT BIRFDAY.  IF YOU WANT TO REPLACE YOUR ORIGINAL TEXT, YOU

25   WOULD NEED SELECT THE SUGGESTED BIRTHDAY YOURSELF; CORRECT?

1    A.   YES.

2    Q.   SO WHAT THAT'S TELLING YOU IS IF YOU DON'T HAVE THIS

3    PATENTED FEATURE, YOU CAN'T DO AUTO CORRECT; RIGHT?

4    A.   NO, THAT'S NOT CORRECT.

5    Q.   WELL, IT SAYS WITHOUT THAT, YOU HAVE TO REPLACE THE

6    ORIGINAL TEXT YOURSELF; RIGHT?

7    A.   AND THERE'S A VIDEO THAT SHOWS THE WORD SITTING THERE THAT

8    THE USER CAN SELECT.  IT'S DESCRIBED IN THE LATTER S III

9    METHOD, THE ONE THAT REPLACED THE DART TECHNIQUE.

10   Q.   OKAY.  SO ACCORDING TO YOU THEN THEY SHOULDN'T HAVE BEEN

11   LOOKING AT THE TEXT AND THE DESCRIPTIONS AND JUST WATCHED THE

12   VIDEO BECAUSE THE DESCRIPTIONS ARE WRONG; RIGHT?

13   A.   NO, THAT'S NOT THE CASE.  THE TEXT WAS AVAILABLE FOR

14   READING.  IT WAS ALSO READ TO THE RESPONDENTS WHILE THEY

15   WATCHED THE VIDEO.

16        THE VIDEO MAKES THE ELEMENTS OF THE INTERFACE CRYSTAL

17   CLEAR TO THE RESPONDENTS, CRYSTAL CLEAR.

18   Q.   SO YOU SEEM TO KNOW A LOT MORE ABOUT THIS SURVEY THAN YOU

19   DID AT THE TIME OF YOUR DEPOSITION; RIGHT?

20   A.   THAT'S CORRECT.  I --

21   Q.   YOU DIDN'T PROVIDE ANY OF THIS IN YOUR REPORT; RIGHT?

22   A.   CORRECT.  I HAD NOT SEEN THE VIDEOS AT THAT TIME.

23   Q.   RIGHT.  YOU HADN'T SEEN IT, HADN'T DONE -- AND YOU WEREN'T

24   THERE AT THE SURVEY; RIGHT?

25   A.   NO.

1    Q.   YOU DON'T HAVE ANY IDEA HOW PEOPLE REACTED TO THIS VIDEO;

2    RIGHT?

3    A.   I ACTUALLY RAN MYSELF THROUGH PART OF THE SURVEY TWO WEEKS

4    AGO OR SO, AND IT IS IMMENSELY CLEAR WHAT'S INTENDED.

5         THE COURT:  THE TIME IS 4:31.  I'D LIKE TO GO AHEAD

6    AND RECESS FOR THE DAY.  SORRY TO INTERRUPT THE EXAMINATION.

7         BUT WE'LL CONTINUE ON MONDAY.

8         MR. NELSON:  OKAY.

9         THE COURT:  MONDAY, TUESDAY, FRIDAY 9:00 TO 4:30.  NO

10   TRIAL WEDNESDAY AND THURSDAY.  SO SAME SCHEDULE AS THIS PAST

11   WEEK.

12        PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

13        ALL RIGHT.  THANK YOU.  WE'LL SEE YOU ON MONDAY MORNING AT

14   9:00 A.M.

15        PLEASE LEAVE YOUR JURY BINDERS IN THE JURY ROOM.

16        (JURY OUT AT 4:32 P.M.)

17        THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

18        LET ME JUST GIVE YOU YOUR TIME TOTALS SO FAR IF THAT WOULD

19   BE HELPFUL.

20        OKAY.  SO SO FAR ADDING YESTERDAY AND TODAY, APPLE HAS

21   USED 4 HOURS, 72 MINUTES YESTERDAY AND 2 HOURS AND 48 MINUTES

22   TODAY.

23        SAMSUNG HAS USED 3 HOURS AND 3 MINUTES, 29 MINUTES

24   YESTERDAY AND 2 HOURS AND 34 MINUTES TODAY.

25        OKAY?

1          I ALSO WANTED TO ASK IF YOU'RE GOING TO LODGE YOUR

2    DEMONSTRATIVES AGAIN LIKE DURING THE LAST TWO TRIALS, OR WHAT

3    DO YOU -- I THINK THAT FOR APPEAL, EVEN THOUGH THE

4    DEMONSTRATIVES ARE NOT BEING ADMITTED AND WON'T BE PART OF THE

5    ADMITTED EXHIBITS FOR THE CLERK'S OFFICE, I DO THINK WE NEED TO

6    HAVE A RECORD OF WHAT DEMONSTRATIVES WERE SHOWN TO THE JURORS.

7          MS. MAROULIS:  YES, YOUR HONOR.  WE'RE KEEPING TRACK,

8    AND WE'LL RECONCILE THE LIST AT THE END OF THE TRIAL.

9          THE COURT:  OKAY.  AND THEN DO YOU WANT TO JUST LODGE

10   THOSE AT THE END OF TRIAL FOR THE RECORD?

11         MS. MAROULIS:  YES, YOUR HONOR.

12         MR. MCELHINNY:  WE DO, YOUR HONOR.

13         THE COURT:  THAT'S FINE.

14      OKAY.  ANYTHING ELSE FOR TODAY?

15         MR. MCELHINNY:  I -- NO.  NO, NOT REALLY.  SORRY.

16         THE COURT:  OKAY.  ALL RIGHT.  WELL, THEN, HAVE A

17   NICE WEEKEND.  I'LL SEE EVERYBODY ON MONDAY AT 9:00.  THANK

18   YOU.

19         MR. MCELHINNY:  THANK YOU, YOUR HONOR.

20         MR. NELSON:  THANK YOU, YOUR HONOR.

21         (WHEREUPON, THE EVENING RECESS WAS TAKEN.)

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  APRIL 4, 2014

22

23

24

25