1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

APPLE INC., A CALIFORNIA          )   C-12-00630 LHK
6  CORPORATION,                     )
                                    )   SAN JOSE, CALIFORNIA
7              PLAINTIFF,           )
                                    )   APRIL 7, 2014
8          VS.                      )
                                    )   VOLUME 4
9  SAMSUNG ELECTRONICS CO., LTD.,   )
   A KOREAN BUSINESS ENTITY;        )   PAGES 757-1025
10 SAMSUNG ELECTRONICS AMERICA,      )
   INC., A NEW YORK CORPORATION;    )
11 SAMSUNG TELECOMMUNICATIONS        )
   AMERICA, LLC, A DELAWARE         )
12 LIMITED LIABILITY COMPANY,        )
                                    )
13              DEFENDANTS.          )
   _____  )

14

15

16          TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE LUCY H. KOH
17         UNITED STATES DISTRICT JUDGE

18

19

20        APPEARANCES ON NEXT PAGE

21

22 OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, CRR
                                CERTIFICATE NUMBER 8074

24

25     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

1

2     A P P E A R A N C E S:

3     FOR PLAINTIFF          MORRISON & FOERSTER
      APPLE:                 BY:  HAROLD J. MCELHINNY
4                                 RACHEL KREVANS
                             425 MARKET STREET
5                            SAN FRANCISCO, CALIFORNIA  94105

6

7                            WILMER, CUTLER, PICKERING,
                             HALE AND DORR
8                            BY:  WILLIAM F. LEE
                             60 STATE STREET
9                            BOSTON, MASSACHUSETTS  02109

10                           BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
11                           PALO ALTO, CALIFORNIA  94304

12

13    FOR SAMSUNG:           QUINN, EMANUEL, URQUHART & SULLIVAN
                             BY:  JOHN B. QUINN
14                                WILLIAM PRICE
                             865 S. FIGUEROA STREET, FLOOR 10
15                           LOS ANGELES, CALIFORNIA  90017

16                           BY:  VICTORIA F. MAROULIS
                                  KEVIN B. JOHNSON
17                           555 TWIN DOLPHIN DRIVE
                             SUITE 560
18                           REDWOOD SHORES, CALIFORNIA  94065

19

20

21

22

23

24

25

1

2                              INDEX OF WITNESSES

3      PLAINTIFF'S

4      **ANDREW COCKBURN**
              CROSS-EXAM BY MR. NELSON (RES.)        P. 772
5              REDIRECT EXAM BY MR. MCELHINNY          P. 778

6      **THOMAS DENIAU**
              DIRECT EXAM BY MR. MUELLER             P. 787
7              CROSS-EXAM BY MR. NELSON               P. 803
              REDIRECT EXAM BY MR. MUELLER           P. 809

8

9      **TODD MOWRY**
              DIRECT EXAM BY MS. KREVANS             P. 818
              CROSS-EXAM BY MR. NELSON               P. 892
10             REDIRECT EXAM BY MS. KREVANS           P. 923

11     **MARK ALEXANDER SNOEREN**
              DIRECT EXAM BY MS. KREVANS             P. 927
12             CROSS-EXAM BY MR. NELSON               P. 999

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          INDEX OF EXHIBITS

3                                    MARKED      ADMITTED

     PLAINTIFF'S
4
     300                                          782
5    233 & 237                                    837
     175                                          857
6    146                                          878
     116                                          882
7    107                                          883
     106                                          889
8    238                                          961
     110                                          962
9    7                                            965
     172                                          982
10   115                                          991
     103 & 104                                    994
11
     DEFENDANT'S
12

13   JOINT

14   647                                          825
     28C, 29A, 29C, 29E, 29G,                     836
15   29H & 29I, 30A-C, 31A-C,
     32A, 32B, 32D, 32E & 32F,
16   33A, 33C, 35A-J, 35L & 35M,
     37A-B
17   4                                            936
     36A - E                                      990
18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    APRIL 7, 2014

 2                        P R O C E E D I N G S

 3        (JURY OUT AT 9:06 A.M.)

 4            THE COURT:  GOOD MORNING AND WELCOME.

 5       YOU HAD AN ISSUE ON THE SOURCE CODE?

 6            MR. MCELHINNY:  WE DO, YOUR HONOR.

 7            THE COURT:  WHAT IS THAT?  PLEASE TAKE A SEAT.

 8            MS. KREVANS:  YOUR HONOR, HERE'S THE ISSUE, AND THIS

 9       IS A LITTLE BIT OF A SURPRISE TO ME, FRANKLY.

10        WE HAVE THREE EXHIBITS ON THE JOINT EXHIBIT LIST WHICH ARE

11       COMPILATIONS OF SOURCE CODE FILES.  THEY ARE 50, 51, AND 53.

12       THERE'S A FOURTH ONE, 52, WHICH IS APPLE SOURCE CODE NOT AT

13       ISSUE IN THIS MORNING'S BROUHAHA.

14        THESE ARE JOINT EXHIBITS.  THEY WERE AGREED TO BY THE

15       PARTIES.  PER THE COURT'S ORDER, NOTHING WAS TO BE ON THE JOINT

16       EXHIBIT LIST BOTH PARTIES DIDN'T AGREE WOULD BE ADMITTED.

17        THE PARTIES ENGAGED IN A PROCESS IN WHICH THEY AGREED THAT

18       BECAUSE THIS CODE WAS VERY CONFIDENTIAL --

19            THE COURT:  53 IS NOT CONFIDENTIAL.  THAT'S PUBLICLY

20       AVAILABLE.  IT'S ON THE WEBSITE.

21            MS. KREVANS:  YES.

22            THE COURT:  SAMSUNG BROUGHT ITS MOTION THIS MORNING

23       TO SEAL JX 53, SO --

24            MS. KREVANS:  RIGHT.  I WAS GETTING TO THAT, YOUR

25       HONOR.  THE CODE IN 50 AND 51 IS CONFIDENTIAL.
```

1          THE COURT:  OKAY.

2          MS. KREVANS:  THAT -- AND ALSO BECAUSE IT'S

3    CUMBERSOME, THAT THE PARTIES WOULD GIVE ONE ANOTHER LISTS OF

4    THE FILES THEY WANTED INCLUDED IN THESE EXHIBITS.

5          THE COURT:  OKAY.

6          MS. KREVANS:  AND THE PARTY WHOSE CODE IT WAS WOULD

7    ACTUAL BUILD THE EXHIBIT.

8        THE LISTS HAVE ALL BEEN DONE.  THEY'VE BEEN AGREED TO FOR

9    EXHIBITS 50, 51, AND 53 SEVERAL WEEKS AGO.  THERE'S NO DISPUTE

10   ABOUT WHAT'S IN THE EXHIBIT.  THERE'S NO DISPUTE IT'S ON THE

11   EXHIBIT LIST.  THERE'S NO DISPUTE THAT IT'S ADMISSIBLE.

12       WE INTEND TO OFFER JX 50, 51, AND 53 INTO EVIDENCE THIS

13   MORNING AND THERE SHOULD BE NO OBJECTION BECAUSE THEY'RE ON THE

14   JOINT EXHIBIT LIST AND THEIR CONTENTS HAD BEEN AGREED TO LONG

15   AGO.

16       THERE'S A SECOND, SEPARATE ISSUE ABOUT 50 AND 51 --

17          THE COURT:  YESTERDAY I DENIED SAMSUNG'S OBJECTION TO

18   53.

19          MS. KREVANS:  YEAH.  BUT THERE'S A SEPARATE ISSUE

20   ABOUT THESE EXHIBITS, WHICH IS THEY'RE QUITE VOLUMINOUS AND, IF

21   PRINTED OUT, WOULD FILL THE JURY ROOM, PROBABLY FILL TWO JURY

22   ROOMS.

23          THE COURT:  OKAY.

24          MS. KREVANS:  AND ALSO FOR 50 AND 51, AND LATER ON

25   WHEN WE GET TO THE APPLE ONE, 52, WE'LL HAVE THIS AS WELL,

1       THEY'RE CONFIDENTIAL.

2           SOME PORTIONS OF EACH OF OUR TEAMS HAVE BEEN DISCUSSING

3       FOR A COUPLE OF WEEKS, BECAUSE OF THESE CONFIDENTIALITY ISSUES

4       AND ALSO HOW VOLUMINOUS THEY ARE, WHAT IS THE BEST WAY TO

5       ACTUALLY GIVE THESE EXHIBITS TO THE JURY WHEN WE GET TO THE END

6       OF THE TRIAL.

7           THAT'S A SEPARATE ISSUE FROM THE FACT THAT THEY'RE

8       ADMISSIBLE AND SHOULD COME INTO EVIDENCE, WHICH WAS AGREED TO

9       WHEN WE PUT THEM ON THE JOINT EXHIBIT LIST.  THOSE DISCUSSIONS

10      HAVE NOT PROGRESSED TO A FINAL AGREEMENT.

11          AND IN THE MEANTIME, WHAT I HAVE DISCOVERED THIS MORNING

12      FROM MS. MAROULIS IS THAT SAMSUNG IS NOW TAKING THE POSITION

13      THAT THEY -- THAT 50 AND 51 AND 53, IN FACT, EVEN THOUGH

14      THEY'RE ON THE JOINT EXHIBIT LIST, DO NOT COME INTO EVIDENCE

15      AND THAT THIS DISCUSSION WE'VE BEEN HAVING ABOUT -- THAT WAS MY

16      REACTION, TOO.

17          THE COURT:  THEY'RE COMING IN.  PLEASE DON'T WASTE

18      ALL OF OUR TIME BY OBJECTING TO THAT.

19          MS. MAROULIS:  YOUR HONOR, THE PARTIES HAD BEEN

20      DISCUSSING THAT ONLY THE PRINTED PORTIONS OF THE CODE WOULD BE

21      SUBMITTED TO THE JURY AND WE'VE BEEN HAVING THIS DISCUSSION FOR

22      A COUPLE OF WEEKS.

23          APPLE ITSELF HAS OBJECTED TO OUR JOINT EXHIBITS BECAUSE --

24          THE COURT:  ALL RIGHT.  WHY DON'T WE -- YOU KNOW, I

25      DIDN'T REALIZE THIS WAS GOING TO BE A LONG THING.  WHY DON'T WE

```
 1        DEAL WITH THIS OVER LUNCH?

 2            THE JOINT STIPULATION ON THE VICTORY PHONE, THAT'S BEEN

 3        GRANTED.

 4            I REVIEWED WHAT YOU FILED THIS MORNING AS FAR AS SEALING.

 5        THAT LOOKED APPROPRIATE.  I WAS GOING TO GRANT THAT UNLESS --

 6        DID APPLE HAVE ANY OBJECTIONS TO WHAT SAMSUNG FILED THIS

 7        MORNING?

 8                MS. KREVANS:  NO, YOUR HONOR.

 9                THE COURT:  ALL RIGHT.  I'LL GO AHEAD AND GRANT THAT

10        ORDER ON THE MOTION TO SEAL.

11            LET'S HAVE A LONGER DISCUSSION LATER.  MAYBE AT -- IS THIS

12        GOING TO COME UP DURING --

13                MS. KREVANS:  LUNCH IS TOO LATE, YOUR HONOR, BECAUSE

14        THIS COMES UP FIRST WITH PROFESSOR MOWRY WHO'S COMING ON THIS

15        MORNING.

16            CAN I TELL JUST BRIEFLY TELL YOU WHAT I THINK THE PROBLEM

17        HERE IS?

18                MS. MAROULIS:  YOUR HONOR, MAY I ADDRESS THAT?

19        BECAUSE MS. KREVANS MADE A NUMBER OF STATEMENTS THAT WE

20        DISAGREE WITH.

21                THE COURT:  OKAY.  THE WHOLE DEFENSE IS THAT THIS IS

22        GOOGLE SOURCE CODE AND NOT SAMSUNG, SO THE GOOGLE SOURCE CODE

23        IS COMING IN.  OKAY?

24            NOW, WHAT IS THE ISSUE?  JUST WHICH PORTIONS ARE GOING TO

25        BE PHOTOCOPIED AND PRINTED FOR THE JURORS?
```

```
 1              MS. MAROULIS:  THE ISSUE --

 2              MS. KREVANS:  MS. MAROULIS, MAY I FINISH?

 3         THE ISSUE IS HOW TO GIVE IT TO THE JURY.  WE PROPOSED THAT

 4    THE WHOLE EXHIBIT WOULD BE PUT ON SECURE COMPUTERS AND GIVEN TO

 5    THE JURY AND THAT, IN ADDITION, EACH PARTY COULD PRINT OUT SOME

 6    REASONABLE NUMBER OF PAGES THAT THE JURY WOULD ALSO HAVE ON

 7    PAPER AND WHAT GOT PRINTED OUT COULD BE DECIDED SOME TIME

 8    BEFORE THE END OF THE TRIAL.

 9         WHAT WE JUST FINALLY LEARNED THIS MORNING FROM SAMSUNG IS

10    THAT THEIR POSITION IS ACTUALLY THAT NOTHING COMES INTO

11    EVIDENCE UNLESS IT'S PRINTED OUT, AND ONLY CERTAIN THINGS CAN

12    BE PRINTED OUT, AND THAT ALL HAS TO BE DECIDED AT SOME POINT TO

13    BE DETERMINED.

14         BUT IT LOOKS LIKE WHAT THEY'RE TRYING TO DO IS HAVE IT BE

15    DECIDED AFTER WE PUT OUR WITNESS ON SO THEY CAN THEN SAY THE

16    EXHIBIT DOESN'T COME IN AND IT CAN'T GO TO THE JURY.

17         AND THAT CAN'T BE RIGHT.  IT'S A JOINT EXHIBIT.

18              MS. MAROULIS:  YOUR HONOR, OUR POSITION SIMPLY IS

19    THAT APPLE WANTS TO INTRODUCE A HUNDRED THOUSAND PAGES OF CODE.

20    IT'S A HIGHLY CONFIDENTIAL CODE.

21         WE PROPOSED TO THEM OVER THE LAST TWO WEEKS THAT WE

22    ISOLATE AHEAD OF THE WITNESS THE PORTIONS THAT THEY WANT TO

23    INTRODUCE AND ONLY THOSE PORTIONS GO TO THE JURY, BECAUSE WHAT

24    THEY WANT IS THEY WANT TO PUT FOUR LAPTOPS OF HIGHLY SECRET,

25    CONFIDENTIAL CODE AND HAVE IT SITTING IN THE JURY ROOM AND ON
```

```
 1    APPEAL.

 2         AND WE BELIEVE THAT ONLY THAT CODE THAT IS DISCUSSED WITH

 3    THE WITNESS OR PRESENTED TO THE WITNESS IN SOME FORM SHOULD BE

 4    PRINTED AND SENT TO THE JURY, BOTH FOR ADMISSIBILITY PURPOSES

 5    AND FOR THE PURPOSE OF SAFEGUARDING THESE HIGHLY CONFIDENTIAL

 6    MATERIALS.

 7         AND WE MADE OUR POSITION KNOWN THROUGHOUT TO APPLE, AND

 8    NEITHER MS. KREVANS NOR I WERE ON THOSE CALLS, BUT WE CONFERRED

 9    WITH OUR TEAMS AND THAT'S OUR POSITION.

10         MS. KREVANS:  MR. SELWYN WAS ON THOSE CALLS SO HE CAN

11    ADDRESS THAT.

12         BUT I THINK WHAT WE'RE HEARING HERE IS AN ATTEMPT TO KEEP

13    PART OF THESE JOINT EXHIBITS OUT OF THE RECORD.  IT WOULD BE

14    FINE WITH US TO DO ANYTHING REASONABLE TO KEEP THESE THINGS

15    SEALED.

16         BUT THE WHOLE THING SHOULD COME IN.

17         THE COURT:  ALL RIGHT.  THIS IS WHAT WE'RE GOING TO

18    DO.  YOU'RE GOING TO PUT THIS ON CD OR DVD, THE WHOLE THING.

19         MS. KREVANS:  UM-HUM.  I THINK IT'S BIG ENOUGH IT

20    NEEDS TO BE ON A DRIVE.

21         THE COURT:  I DON'T THINK THE JURY IS GOING TO ASK

22    FOR A COMPUTER SO THEY CAN SCROLL THROUGH THAT MUCH CODE.  IT

23    WOULD SURPRISE ME.  WE'LL GIVE THEM THE CD AND WE'LL GIVE OUT

24    PRINTED VERSIONS OF WHATEVER IS ACTUALLY GOING TO BE RELIED ON.

25    WE'LL WAIT AND SEE IF THE JURY COMES BACK AND SAYS WE ACTUALLY
```

1      WILL WANT THE WHOLE CODE SET AND GIVE US A COMPUTER.

2          I'M NOT GOING TO GO AHEAD AND PUT A COMPUTER IN THE

3      DELIBERATION ROOM WITH THE ENTIRE CODE SET.  I THINK THAT

4      DOESN'T MAKE SENSE.  SEE IF THEY ASK FOR IT.  I DOUBT -- I

5      WOULD BE VERY SURPRISED IF THEY DID.

6          SO YOU'RE JUST GOING TO PRINT OUT AND GIVE WHATEVER -- I

7      ASSUME THAT'S NOT VOLUMINOUS, THE FILES THAT ARE ACTUALLY GOING

8      TO BE TESTIFIED TO BY ANY OF THE EXPERTS.

9          MS. KREVANS:  IT DEPENDS ON THE EXPERT AND -- THE

10     QUESTION JUST, YOUR HONOR, IS THEN WHEN WE CAN MAKE THOSE PRINT

11     OUTS.  AS LONG AS WE CAN DO IT BEFORE THE END OF THE TRIAL,

12     WE'RE FINE WITH THAT.

13         I THINK WHAT SAMSUNG IS TRYING TO MANEUVER HERE IS SOMEHOW

14     WE HAVE TO, TODAY, IDENTIFY EVERY PAGE THAT WE MIGHT WANT TO

15     PRINT FOR THE JURY AND KEEP EVERYTHING ELSE OUT OF EVIDENCE.

16         THE COURT:  THAT'S FINE.  THE ACTUAL EVIDENCE WILL BE

17     THE DVD WITH THE FULL SET OF CODE.

18         MS. MAROULIS:  YOUR HONOR --

19         THE COURT:  I THINK IT MIGHT BE HELPFUL ON APPEAL TO

20     HAVE A PRINTED COPY OF WHAT WAS ACTUALLY TESTIFIED TO, SO I'M

21     FINE WITH THAT BEING PROVIDED AT THE END OF THE DAY OR BY THE

22     NEXT MORNING.

23         MS. KREVANS:  OKAY.

24         THE COURT:  WHATEVER WAS RELIED UPON ON THE RECORD.

25         MS. KREVANS:  ALL RIGHT.

```
 1            THE COURT:  IS THAT OKAY?

 2            MS. MAROULIS:  YOUR HONOR, OUR -- THAT'S GOOD, YOUR

 3    HONOR.

 4        BUT OUR OBJECTION WAS BROADER TO ADMISSIBILITY, BECAUSE IF

 5    THEY'RE NOT GOING TO HAVE THEIR EXPERT TALK AT ALL ABOUT THE

 6    CODE, HAVING THIS CODE IN THE JURY ROOM OR FOR RECORD ON APPEAL

 7    IS MEANINGLESS BECAUSE THIS IS NOT A CODE THAT ANY WITNESS

 8    WOULD HAVE RELIED ON.

 9        SO WE SHOULD ONLY BE ADMITTING EXHIBITS THAT ARE PROPERLY

10    ADMITTED WITH A PARTICULAR WITNESS, AND WHAT I UNDERSTAND IS

11    HAPPENING IS THAT THE PARTIES DESIGNATED CODE, THE PARTIES

12    LATER WERE GOING TO NARROW THE CODE AS TO WHAT THE EXPERTS ARE

13    ACTUALLY GOING TO TALK ABOUT, AND THAT WILL GO TO THE JURY.

14        WHAT I UNDERSTAND APPLE IS TRYING TO DO IS TO PUT ON THIS

15    ENORMOUS AMOUNT OF SOURCE CODE THAT NO ONE IS GOING TO TALK

16    ABOUT SO LATER THEY CAN REFERENCE IT IN JMOL'S OR APPEAL OR

17    WHATEVER FORMAT, AND IT DOESN'T SEEM APPROPRIATE BECAUSE IT'S

18    NOT GOING TO BE EVIDENCE THAT WAS PRESENTED TO THE JURY AND

19    CONSIDERED AND EXPLAINED BY THE EXPERTS ON THE STAND.

20            MS. KREVANS:  YOUR HONOR, THIS HAS BEEN ON THE JX

21    LIST ALL ALONG.  THE LISTS OF THE FILES THAT ARE INCLUDED HAS

22    BEEN SETTLED FOR SEVERAL WEEKS.

23        THIS IS JUST AN AMBUSH TO TRY TO KEEP EVIDENCE THAT WE

24    PROPERLY IDENTIFIED OUT OF THE RECORD.  WE ARE HAPPY --

25            THE COURT:  WELL, NO.  YOU KNOW WHAT?  I AGREE,
```

```
 1    BECAUSE I'VE SEEN THIS HAPPEN IN THIS CASE OVER THE LAST THREE

 2    YEARS TOO MANY TIMES.  YOU PUT IN A LOT OF STUFF, YOU ONLY RELY

 3    ON A CERTAIN AMOUNT, ON APPEAL YOU SAY "OH, THIS WAS IN THE

 4    RECORD AS WELL" EVEN THOUGH IT NEVER CAME UP BEFORE.  SO I'M

 5    NOT GOING TO ALLOW THAT.  I THINK THAT'S A VALID POINT.

 6        WHATEVER IT IS THAT YOU'RE GOING TO USE, ONLY THAT IS

 7    GOING TO BE PRINTED AND GIVEN TO THE JURORS.

 8        MS. KREVANS:  OKAY.  BUT THEN, YOUR HONOR, THE

 9    QUESTION IS, WHEN DO WE NEED TO IDENTIFY THOSE BATES NUMBERS?

10        THE COURT:  YOU SHOULD DO IT WHEN YOU IDENTIFY WHAT

11    YOU'RE GOING TO USE WITH THE WITNESS, SO 48 HOURS IN ADVANCE SO

12    THEY CAN BE PROPERLY OBJECTED TO.

13        MS. KREVANS:  OKAY.  THIS WAS A JOINT EXHIBIT, YOUR

14    HONOR, SO THERE WAS NO POSSIBLE OBJECTION AND SO WE DIDN'T GIVE

15    THEM PAGE NUMBERS BECAUSE IT WAS A JOINT EXHIBIT.

16        MS. MAROULIS:  YOUR HONOR, THAT'S NOT THE CASE.  THE

17    JOINT EXHIBITS ARE OBJECTED TO AS WELL.

18        THE COURT:  ALL RIGHT.  I'LL MAKE AN EXCEPTION FOR

19    TODAY.  FOR TODAY THAT RULE DOESN'T APPLY.

20        BUT FROM THIS DAY GOING FORWARD, YOUR DISCLOSURE OF THE

21    EXACT FILE NAMES, PATH NAMES, NEEDS TO BE DISCLOSED 48 HOURS IN

22    ADVANCE OF USE, ALONG WITH ALL OF YOUR OTHER DISCLOSURES OF

23    WHAT'S GOING TO BE USED WITH THAT WITNESS.

24        MS. KREVANS:  TO BE CLEAR, WE DID GIVE THEM THE FILE

25    NAMES AND PATH NAMES.  WHAT WE HAVEN'T GIVEN THEM IS THE BATES
```

1    NUMBERS OF THE PRINT OUTS WHERE THAT ACTUALLY APPEARS, AND IT'S

2    THE BATES NUMBERS THAT CONTROL, IF WE PRINT IT OUT, WHAT GOES

3    TO THE JURY.

4            MS. MAROULIS:  BUT THE FILE NAME ITSELF CAN BE

5    HUNDREDS OF THOUSANDS OF PAGES, SO WE NEED TO PRINT OUT THE

6    ACTUAL CODE, AND WE WILL -- GOING FORWARD, WE'LL DO THAT.

7            THE COURT:  I'M MAKING AN EXCEPTION FOR TODAY, SINCE

8    THIS RULE WASN'T ESTABLISHED UNTIL THIS MORNING.

9        BUT FROM THIS TIME FORWARD, PLEASE PRINT OUT AND GIVE THE

10   DISCLOSURE TO THE OTHER SIDE.

11           MS. KREVANS:  WE MAY HAVE TO GIVE IT TO THEM TO PRINT

12   BECAUSE SOME OF THIS CODE WE ARE ACTUALLY LITERALLY NOT ALLOWED

13   TO PRINT.  I'M NOT ALLOWED TO LOOK AT THE GOOGLE CODE.  THAT'S

14   HOW STRICT THE ORDER IS.

15           MS. MAROULIS:  GOOGLE -- WE WILL OBVIOUSLY PRINT WHAT

16   IS REQUESTED AHEAD OF TIME.

17           THE COURT:  SO WHAT'S THE DISTINCTION BETWEEN THE

18   GOOGLE CODE THAT'S OPEN SOURCE CODE AND AVAILABLE PUBLICLY ON

19   THE WEBSITE AND THEN WHATEVER ELSE --

20           MS. KREVANS:  THERE ARE THREE SETS OF CODE ON THE

21   SAMSUNG SIDE OF THE CASE THAT ARE, THAT MIGHT BE AT ISSUE.  ONE

22   SET IS NOT REALLY THE SET THAT'S AT ISSUE IS THE PUBLIC VERSION

23   OF ANDROID SOURCE CODE.  ANYBODY CAN DOWNLOAD IT.  THAT'S

24   EXHIBIT 53, NO ISSUE AT ALL.

25           THE COURT:  THAT'S EXHIBIT 53.

```
1              MS. KREVANS:  JX 53.  THEN THERE'S WHAT'S BEING

2    PRODUCED BY GOOGLE, WHICH IS GOOGLE PROPRIETARY CODE THAT RUNS

3    ON THE SAMSUNG CODE.  IT'S CODE THAT SAMSUNG ITSELF DOES NOT

4    HAVE POSSESSION OF.  IT'S GOOGLE CONFIDENTIAL CODE.

5              THE COURT:  AND WHAT'S THAT NUMBER?

6              MS. KREVANS:  THAT IS JX 50 --

7              MS. MAROULIS:  51.

8              THE COURT:  OKAY.

9              MS. KREVANS:  THEN THERE IS CODE THAT RUNS ON THE

10   PHONES THAT WAS PRODUCED BY SAMSUNG AND THAT IS PROPRIETARY TO

11   SAMSUNG AND SO THAT CODE IS IN SAMSUNG'S POSSESSION --

12             THE COURT:  AND THAT IS JX 50?

13             MS. KREVANS:  THAT IS JX 50.

14             THE COURT:  OKAY.  AND 52 IS APPLE?

15             MS. KREVANS:  52 WE'LL GET TO LATER.  THAT'S APPLE'S

16   CODE.

17             THE COURT:  OKAY.

18             MS. KREVANS:  SO THE TWO ARE CONFIDENTIAL, ONE IS

19   NOT.

20             THE COURT:  AND 52 IS PROPRIETARY AS WELL?

21             MS. KREVANS:  THAT'S -- 52, APPLE'S IS PROPRIETARY,

22   YES.

23             THE COURT:  YEAH, OKAY.  ALL RIGHT.  WELL, WHEN YOU

24   MAKE YOUR SEALING REQUEST, IF YOU JUST SAY, "OH, IT'S CODE,

25   THEREFORE IT MUST BE SEALED," AS WAS DONE THIS WEEKEND, AS YOU
```

1    CAN SEE, I'M NOT GOING TO SEAL IT.  YOU DO NEED TO SPECIFY

2    BECAUSE I NEED TO KNOW, WHAT IS OPEN SOURCE CODE, WHAT IS

3    AVAILABLE AND WHAT IS PROPRIETARY?

4            MS. KREVANS:  YEAH.

5            THE COURT:  OKAY.  GOOD.  I DID JUST WANT TO CLARIFY

6    ON THE RECORD, THE PRELIMINARY INJUNCTION WAS ACTUALLY

7    MENTIONED IN APPLE FIRST TRIAL AT TRIAL TRANSCRIPT 2 AT PAGE

8    822.  IT WAS ACTUALLY RAISED BY SAMSUNG.

9            AND CERTAINLY BORIS TEKSLER TESTIFIED REPEATEDLY THAT

10   APPLE WAS NOT -- HAD A STRONG DESIRE NOT TO LICENSE APPLE'S

11   UNIQUE USERS EXPERIENCE I.P.

12           REGARDLESS, THE RULING IS GOING TO REMAIN THE SAME.

13           ALL RIGHT.  LET'S GO AHEAD THEN, PLEASE.

14           (JURY IN AT 9:19 A.M.)

15           THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

16   SEAT.

17           ALL RIGHT.  MR. NELSON, PLEASE CONTINUE WITH YOUR

18   CROSS-EXAMINATION OF DR. COCKBURN.

19           **(PLAINTIFF'S WITNESS, ANDREW COCKBURN, PREVIOUSLY SWORN.)**

20           THE COURT:  YOU ARE STILL UNDER OATH, SIR.  THE TIME

21   IS NOW 9:20.  GO AHEAD, PLEASE.

22                       **CROSS-EXAMINATION (RESUMED)**

23   BY MR. NELSON:

24   Q.   GOOD MORNING, SIR.

25   A.   GOOD MORNING.

1       Q.   I JUST HAVE A FEW MORE QUESTIONS FOR YOU.  CAN WE PUT UP

2    PX 121 AND PAGE 27 OF THAT DOCUMENT.

3            GO TO THE FIRST PAGE FIRST.  THIS, YOU REMEMBER WE TALKED

4    ABOUT THIS SOME ON FRIDAY?

5       A.   YES, I DO.

6       Q.   YOU TALKED ABOUT IT ON DIRECT.  WE TALKED ABOUT IT A

7    LITTLE BIT ON CROSS, THIS VICTORY USABILITY EVALUATION

8    DOCUMENT?

9       A.   YES.

10      Q.   OKAY, GOOD.  SO LET'S GO TO PAGE 27.

11           AND WE TALKED ABOUT THIS COMPARISON PAGE.  YOU RECALL

12   THAT?

13      A.   YES, I DO.

14      Q.   AND WE HAD A DISCUSSION ABOUT WHETHER THIS WAS A RELEASED

15   PRODUCT OR NOT.  DO YOU REMEMBER?

16      A.   THAT'S CORRECT.

17      Q.   OKAY.  SO YOUR COUNSEL ACTUALLY POINTED OUT TO ME OVER THE

18   WEEKEND THAT THE PRODUCT WAS RELEASED, BUT NOT ACCUSED IN THE

19   CASE, SO IT'S OKAY IF I -- WE WORKED OUT A STIPULATION, JUST SO

20   WE'RE ALL ON THE SAME PAGE.

21      A.   OKAY.

22      Q.   SO I CAN READ THAT TO YOU.  OKAY, GOOD.

23           IS THAT ALL RIGHT, YOUR HONOR.

24               THE COURT:  GO AHEAD, PLEASE.

25               MR. NELSON:  ALL RIGHT.  SO IT IS STIPULATED THAT THE

1      VICTORY IS SAMSUNG'S INTERNAL PRODUCT NAME FOR THE EPIC 4G

2      PHONE.  IT'S A MODEL NUMBER SPH-D700.

3            AND IT'S ACTUALLY A RELEASED PRODUCT SOLD BY SAMSUNG

4      BEGINNING IN JULY 2010.  THE EPIC 4G PHONE IS NOT AN ACCUSED

5      PRODUCT IN THIS CASE.

6      Q.   ALL RIGHT.  SO THEN WITH RESPECT TO THAT, IN THIS VICTORY,

7      THIS COMPARISON WE TALKED ABOUT, THE PRODUCT THAT'S BEING

8      DISCUSSED HERE, THE DEVELOPMENT, THAT'S NOT ACCUSED IN THIS

9      CASE; RIGHT?

10     A.   THAT'S CORRECT.  I -- FROM MY RECOLLECTION, I THINK I SAID

11     I WOULD BE EXTREMELY SURPRISED IF IT WASN'T RELEASED

12     EVENTUALLY.

13     Q.   NO, NO, I REMEMBER.  BUT IT'S NOT ACCUSED IN THIS CASE;

14     RIGHT?

15     A.   THAT'S CORRECT.

16     Q.   OKAY.  AND, IN FACT, YOU TALKED ABOUT SEVERAL OF THESE

17     PRODUCT COMPARISON DOCUMENTS, I RECALL, ON YOUR DIRECT, PTX

18     119, PX 120, 121, 157, AND 219.

19            DO YOU REMEMBER THAT?

20     A.   YES, I DO.

21     Q.   OKAY.  I DIDN'T HEAR ANY TESTIMONY FROM YOU THAT THOSE

22     COMPARABILITY STUDIES OR THOSE COMPARISON STUDIES CONCERNED

23     PRODUCTS THAT WERE ACCUSED OF INFRINGING THE '721 PATENT IN

24     THIS CASE.

25            RIGHT?

1    A.   WELL, CONCERN COULD BE INTERPRETED IN A FEW WAYS.  I THINK

2    WHAT I SAID WAS THESE ARE PRECURSORS DESIGNS AND YOU'D EXPECT

3    THE ACTUAL DESIGNS ULTIMATELY MADE INTO PRODUCT.

4    Q.   RIGHT.  BUT FOR THOSE PARTICULAR PRODUCTS THAT YOU LOOKED

5    AT, THOSE ARE NOT PRODUCTS THAT YOU ACCUSE OF INFRINGING THE

6    '721 PATENT IN THIS CASE?

7    A.   THAT'S CORRECT.

8    Q.   NOW, LET'S PULL UP PX 168.

9         SO HERE -- WE CAN BLOW THAT UP MAYBE A LITTLE BIT.

10        SO YOU RECALL YOU TALKED ABOUT THE -- THIS E-MAIL ON YOUR

11   DIRECT TESTIMONY CONCERNING THE DART KEYBOARD?  DO YOU REMEMBER

12   THAT?

13   A.   THAT'S CORRECT, YES.

14   Q.   NOW, THE DART KEYBOARD, JUST SO WE'RE CLEAR, THAT WAS A

15   KEYBOARD THAT WAS ACTUALLY ON A PHONE CALLED THE DART THAT

16   SAMSUNG RELEASED SOME TIME IN 2011; IS THAT RIGHT?

17   A.   WELL, THE DART METHOD HAS BEEN IMPLEMENTED ON SEVERAL

18   DEVICES, INCLUDING THE S III.

19   Q.   RIGHT, EXACTLY.  BUT ORIGINALLY THAT'S WHERE IT CAME FROM?

20   A.   I -- I COULDN'T TESTIFY THAT THAT WAS ITS ORIGIN.  IT

21   COULD HAVE EXISTED IN PRIOR DEVICES, TOO.

22   Q.   OKAY.

23   A.   I KNOW IT EXISTED ON THE DART.

24   Q.   ON THE SAMSUNG DART?

25   A.   YES.

1      Q.   AND THAT WAS RELEASED, THE SAMSUNG DART WAS RELEASED SOME

2      TIME MAYBE LIKE JUNE 2011.  DOES THAT SOUND RIGHT?

3      A.   IT SOUNDS RIGHT.  I'D WANT TO CHECK MY CHART.

4      Q.   OKAY.  WELL, LET'S JUST WORK WITH THAT.

5           SO THEN IF WE LOOK AT THE DATE OF THIS E-MAIL, RIGHT UP

6      THERE ON THE TOP, YOU SEE IT'S APRIL 27TH, 2012; RIGHT?

7      A.   YES.

8      Q.   SO THAT'S AFTER THE DART'S RELEASED?

9      A.   YES.

10     Q.   OKAY.  SO NOW LET'S, LET'S GO TO THAT SECOND PAGE OF THE

11     DOCUMENT.  AND CAN YOU BLOW UP THE --

12          MR. KOTARKSI:  WHICH PART?

13     BY MR. NELSON:

14     Q.   WELL, WE DON'T NEED TO DO THAT NOW.  LET'S JUST -- SO YOU

15     SAID IT WAS ON THE S III; RIGHT?

16     A.   THAT METHOD WAS USED ON THE S III, YES.

17     Q.   RIGHT, THE DART WAS ON THE S III KEYBOARD THAT WAS

18     ACTUALLY RELEASED; CORRECT?

19     A.   WELL, THE DART METHOD THAT CHANGES THE WORD ON EVERY

20     CHARACTER PRESS WAS ON THE S III.

21     Q.   RIGHT.  AND THE S III WAS RELEASED IN JUNE 2012; RIGHT?

22     A.   YES.

23     Q.   AND THE DART METHOD, THAT KEYBOARD, WAS ON THERE FOR A

24     WHILE; RIGHT?

25     A.   YES.

1    Q.   SEVERAL MONTHS AT LEAST?

2    A.   I THINK IT WAS THREE MONTHS.

3    Q.   YEAH, DEPENDS UPON THE CARRIER, MAYBE A LITTLE LONGER;

4    RIGHT?

5    A.   POSSIBLY.

6    Q.   YEAH.  AND THE S III WAS COMMERCIALLY SUCCESSFUL; RIGHT?

7    A.   THAT'S CORRECT.

8    Q.   AND SO DURING THAT THREE, THREE- TO SIX-MONTH PERIOD,

9    WHATEVER IT WAS FOR THE PARTICULAR CARRIER, YOU WOULD EXPECT

10   THAT A LOT OF THOSE UNITS WERE SOLD?

11   A.   YES.

12   Q.   AND THE -- IN FACT, THE S III WAS SAMSUNG'S MOST

13   SUCCESSFUL PHONE IN THE UNITED STATES EVER; RIGHT?

14   A.   I DON'T KNOW, BUT I WOULDN'T BE SURPRISED IF THAT WERE THE

15   CASE.

16   Q.   OKAY.  SO, NOW, WITH RESPECT TO THAT DART KEYBOARD THEN

17   THAT WAS USED ON THE S III, YOU'RE NOT AWARE OF ANY CUSTOMER

18   COMPLAINTS, YOU KNOW, COMING BACK FROM PEOPLE THAT USED IT, YOU

19   DIDN'T CITE ANY OF THAT IN YOUR REPORT; RIGHT?

20   A.   NO, I THINK THAT'S INCORRECT.  THIS DOCUMENT THAT YOU JUST

21   REFERRED ME TO, THIS IS COMPLAINTS FROM T-MOBILE, WHO WERE A

22   CUSTOMER FOR THE S III, AND THEY CRITICIZED IT AS JARRING.

23   Q.   RIGHT.  THAT'S THE DOCUMENT FROM APRIL 2012; RIGHT?

24   A.   YES.

25   Q.   AND THE S III WAS RELEASED IN JUNE 2012?

1    A.   TWO MONTHS LATER.

2    Q.   RIGHT.  AND IT HAD THE DART KEYBOARD ON THERE; RIGHT?

3    A.   CORRECT.

4    Q.   AND IT WAS COMMERCIALLY SUCCESSFUL; RIGHT?

5    A.   YES.

6         MR. NELSON:  OKAY.  I DON'T HAVE ANY FURTHER

7    QUESTIONS FOR YOU, SIR.  THANK YOU VERY MUCH.

8         THE COURT:  ALL RIGHT.  THE TIME IS NOW 9:27.  GO

9    AHEAD WITH ANY REDIRECT.

10                   **REDIRECT EXAMINATION**

11   BY MR. MCELHINNY:

12   Q.   SIR, LET'S SEE IF WE CAN STRAIGHTEN OUT THE CHRONOLOGY

13   HERE.

14        MR. LEE, COULD YOU PUT PX 121 ON THE BOARD, PLEASE.

15        AND, PROFESSOR, DO YOU HAVE OUR BINDER OF DIRECT EXHIBITS

16   IN FRONT OF YOU?

17   A.   YES, I DO.

18   Q.   COULD YOU OPEN IT UP TO JX 10, PLEASE.

19   A.   THANK YOU.

20   Q.   JX 10 IS THE '721 PATENT; CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   NOW, IN YOUR CROSS-EXAMINATION, COUNSEL ASKED YOU SOME

23   QUESTIONS ABOUT COPYING THE PATENT.  DO YOU REMEMBER THAT?

24   A.   YES, I DO.

25   Q.   AND THEN HE JUST ASKED YOU SOME QUESTIONS ABOUT WHETHER OR

1     NOT THIS WAS AN ACCUSED PRODUCT IN THIS CASE, THE VICTORY;

2     CORRECT?

3     A.   THAT'S CORRECT.

4     Q.   ALL RIGHT.  LET'S SEE IF WE CAN GET THE CHRONOLOGY

5     STRAIGHT NOW.

6          WHEN WAS THE ORIGINAL APPLICATION THAT EVENTUALLY LED TO

7     THE ISSUANCE OF THE '721 PATENT?  IN WHAT YEAR WAS THAT

8     APPLICATION FILED?

9     A.   IT WAS 2005.  THE ORIGINAL PATENT WAS 2005.

10    Q.   SO IN 2005, APPLE AND -- THE INVENTORS FILED AN

11    APPLICATION FOR A PATENT ON SLIDE TO UNLOCK; IS THAT CORRECT?

12    A.   CORRECT.

13    Q.   WHEN THE IPHONE WAS ANNOUNCED IN 2007, DID IT HAVE THE

14    SLIDE TO UNLOCK FEATURE ON IT?

15    A.   YES, IT DID.

16    Q.   OKAY.  THE COPYING DOCUMENTS, INCLUDING THIS ONE THAT YOU

17    LOOKED AT AND CONCLUDED THAT THERE WAS COPYING IN THIS CASE,

18    WHAT IS IT EXACTLY THAT SAMSUNG WAS COPYING FROM?

19    A.   THEY WERE COPYING THE IPHONE.

20    Q.   OKAY.  AND THEN WE SAW THAT THE VICTORY -- WE JUST HEARD,

21    FROM THE CORRECTION, THE STIPULATION THAT WAS PUT IN, THAT THE

22    VICTORY WAS RELEASED IN 2010; CORRECT?

23    A.   CORRECT.

24    Q.   AND IT IS NOT ACCUSED IN THIS CASE; CORRECT?

25    A.   THAT'S CORRECT.

1     Q.    WHEN DID THE PATENT ACTUALLY ISSUE?

2     A.    OCTOBER 25, 2011.

3     Q.    2000 -- I'M SORRY.  SO THE PATENT ISSUES IN 2011; CORRECT?

4     A.    YES.

5     Q.    SO YOU CALLED THE VICTORY -- YOU USED THE WORD A PRECURSOR

6     DESIGN.  WHAT DID YOU MEAN TO SAY WHEN YOU SAID THAT?

7     A.    WELL, WHEN YOU'RE DESIGNING USER INTERFACES, YOU NEED TO

8     STUDY THE EFFECTIVENESS OF THAT USER INTERFACE.  SO THAT'S WHAT

9     SAMSUNG WERE DOING, EXAMINING THE EFFECTIVENESS OF THEIR USER

10    INTERFACE IN COMPARISON WITH THE BEST COMPETITOR.

11          SO AS A RESULT OF THAT ANALYSIS, YOU MIGHT CHANGE SOME

12    FEATURES, BUT SUBSTANTIALLY THE DEVICE IS THE SAME DEVICE

13    THAT'S ULTIMATELY RELEASED.

14    Q.    AND THIS PHONE WAS RELEASED BEFORE THE PATENT ACTUALLY

15    ISSUED; CORRECT?

16    A.    YES.

17    Q.    IN THIS CASE, THE PHONES THAT WE WERE ACCUSING WERE ALL

18    RELEASED AFTER THE PATENT ISSUED; CORRECT?

19    A.    THAT'S CORRECT.

20    Q.    AND DO THEY HAVE THE SAME SLIDE TO RELEASE --

21          MR. NELSON:  OBJECTION, YOUR HONOR.  THAT ACTUALLY

22    MISSTATES THE RECORD.

23          THE COURT:  OVERRULED.

24          GO AHEAD, PLEASE.

25

```
 1        BY MR. MCELHINNY:

 2        Q.   I'M SORRY.  LET ME BE CLEAR.  THE PATENTS THAT WE ARE

 3        ACCUSING IN THIS CASE, WE'RE ACCUSING FOR SALES THAT HAPPENED

 4        AFTER THE PATENT ISSUED; CORRECT?

 5        A.   I THINK YOU MISPHRASED THE QUESTION.  YOU SAID THE PATENTS

 6        THAT WERE RELEASED.  I THINK YOU MEANT THE DEVICES.

 7        Q.   YOU'RE RIGHT.  LET ME GO A LITTLE SLOWER.

 8             IN THIS CASE, THE SALES THAT WE ARE SAYING ARE INFRINGING

 9        OCCURRED AFTER THE PATENT ISSUED; CORRECT?

10        A.   YES.

11        Q.   AND IS THE SLIDE TO RELEASE FEATURE THAT IS IN THE PHONES

12        THAT WE ARE ACCUSING -- IN THE SALES -- IN THE PHONES THAT

13        WE'RE ACCUSING IN THIS CASE, IS IT THE SAME SLIDE TO RELEASE

14        FEATURE THAT WAS IN THE ORIGINAL IPHONE?

15        A.   YES.

16        Q.   IS IT THE SAME SLIDE TO RELEASE FEATURE THAT SAMSUNG

17        COPIED IN ALL OF THE DOCUMENTS THAT YOU LOOKED AT?

18        A.   YES.

19                  MR. NELSON:  OBJECTION.  LEADING, YOUR HONOR.

20                  MR. MCELHINNY:  LET'S MOVE TO A NEW SUBJECT.

21                  THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

22        BY MR. MCELHINNY:

23        Q.   SIR, IF YOU LOOK AT, I THINK IT'S NOW THE FIRST TAB OF

24        YOUR BINDER YOU SHOULD HAVE A DOCUMENT, IF I'VE GOT -- IF I'M

25        RIGHT HERE -- WHICH YOU IDENTIFIED ON YOUR DIRECT EXAMINATION
```

```
 1        AS THE ANSWER TO AN INTERROGATORY FILED UNDER OATH BY SAMSUNG.

 2            DO I HAVE THE RIGHT DOCUMENT?

 3        A.   YES, YES, YOU DO.

 4        Q.   AND THIS IS THE ONE THAT HAS THE CHART ATTACHED TO IT THAT

 5        YOU USED TO READ OUT THE RELEASE DATES; IS THAT RIGHT?

 6        A.   THAT'S CORRECT.

 7        Q.   OKAY.  WE'VE NOW MARKED THAT CHART.  I'M SORRY.  WE'VE NOW

 8        MARKED SAMSUNG'S THIRD SUPPLEMENTAL OBJECTIONS AND RESPONSES TO

 9        APPLE'S SIXTH SET OF INTERROGATORIES, NUMBER 41, AND THE

10        ATTACHED CHART AS PLAINTIFF'S EXHIBIT 300.

11            AND IS THAT THE DOCUMENT THAT YOU RELIED UPON, GIVEN TO US

12        BY SAMSUNG, THAT GAVE YOU THE RELEASE DATES OF THE VARIOUS

13        SOFTWARE VERSIONS?

14        A.   YES, IT IS.

15            MR. MCELHINNY:  I MOVE, YOUR HONOR, PLAINTIFF'S

16        EXHIBIT 300.

17            MR. NELSON:  NO OBJECTION.  I THINK WE WORKED OUT THE

18        SEALING ISSUES WITH THAT, YOUR HONOR.  SO SUBJECT TO THAT,

19        THAT'S FINE.

20            THE COURT:  YES.  I ISSUED AN ORDER SEALING ONLY

21        PAGES 5 THROUGH 17.  OKAY?  PAGES 1 THROUGH 4 ARE NOT SEALED.

22            MR. NELSON:  EXACTLY.  THANK YOU, YOUR HONOR.

23            THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.  IT'S

24        ADMITTED.  I'M SORRY, IT IS ADMITTED.

25            (PLAINTIFF'S EXHIBIT 300 WAS ADMITTED IN EVIDENCE.)
```

1          MR. MCELHINNY:  MR. LEE, COULD YOU PLEASE -- COULD

2     YOU DARK THE SCREENS.

3          COULD YOU PUT UP JUST FOR THE JURY THE FIRST PAGE OF THE

4     CHART -- LET'S SEE -- YEAH, THE FIRST PAGE OF THE CHART WHICH

5     IS ATTACHMENT A.

6          DOES THE JURY HAVE THAT?

7     Q.   PROFESSOR, THIS IS A LITTLE TRICKY.  THIS IS SEALED, SO I

8     DON'T WANT YOU TO READ THE CONTENTS INTO THE RECORD.  BUT NOW

9     THAT THE JURY HAS IT IN FRONT OF THEM, CAN YOU JUST EXPLAIN TO

10    US HOW YOU USED THIS CHART WHEN YOU WERE DETERMINING WHAT THE

11    RELEASE DATES OF THE SOFTWARE WERE THAT YOU WERE ACCUSING OF

12    INFRINGING THIS PATENT?

13    A.   SURE.  OKAY.  SO, MEMBERS OF THE JURY, LOOK AT THE CHART,

14    THERE'S A FIRST ROW WITH HEADERS, OKAY?  THE -- THERE'S AN

15    IDENTIFIER FOR PRODUCT LINES, AND THEN THERE'S AN IDENTIFIER

16    FOR CARRIERS, OKAY?

17         SO THAT -- YEAH, IT'S IN BRACKETS THERE.

18         AFTER THAT, THERE'S A SERIES OF COLUMNS THAT IDENTIFY WHEN

19    THE DEVICE FIRST APPEARED AND WHEN THE SOFTWARE WAS RELEASED,

20    MODIFICATIONS TO THE SOFTWARE WERE RELEASED.

21         SO IF WE WALK THROUGH THAT ENLARGED AREA, YOU'LL SEE

22    THERE'S A DEVICE IDENTIFIED, AND YOU'VE HEARD THAT DEVICE NAMED

23    A FEW TIMES ALREADY; THERE'S THEN A CODE IN THE NEXT COLUMN,

24    AND THAT CODE IDENTIFIES THE CARRIER VERSION; AND THEN YOU'LL

25    SEE UNDERNEATH EACH OF THE VERSIONS OF THE SOFTWARE, THERE'S A

1    DATE AVAILABLE, AND THERE'S A CODE FOR THE VERSION OF THE

2    SOFTWARE.

3         NOW, IF YOU WALK ALONG TO THE THIRD OF THOSE RELEASES

4    ENUMERATED AS NUMBER 2, YOU'LL SEE A DATE THAT HAS AN ASTERISK

5    ON IT.  SO THAT'S IN FEBRUARY.  OKAY?  YEAH, THANKS FOR

6    POINTING.

7         THAT ASTERISK IS IMPORTANT, AND THE DESCRIPTION OF THE

8    ASTERISK IS HIGHER UP, AND I'LL JUST LEAVE YOU A CHANCE TO READ

9    THAT IF YOU CAN.

10        ESSENTIALLY WHAT THE ASTERISK DOES IS IT SAYS WHEN THE

11   SOFTWARE IS CHANGED IN SUCH A WAY THAT IT HAS AN EFFECT, OR

12   COULD HAVE AN EFFECT ON SOME OF THE ACCUSED FUNCTIONALITY.

13        SO THE VERSIONS THAT ARE NOT ASTERISKED, SO IF THERE'S NO

14   ASTERISK, THAT MEANS SAMSUNG'S TELLING APPLE THAT IN TERMS OF

15   THE ACCUSED FUNCTIONALITY, ALL OF THOSE DEVICES ARE THE SAME.

16   OKAY?

17        DID YOU FOLLOW THAT?  SOME GAIN, SOME LOST.

18   Q.   AND THEN IN ADDITION, ONCE YOU HAD THE PARAMETERS, YOU

19   TESTED EACH OF THE SOFTWARES, CORRECT, TO MAKE SURE THAT THEY

20   SHOWED THE INFRINGING BEHAVIOR?

21   A.   THAT'S CORRECT.

22   Q.   OKAY.  FINAL SUBJECT.

23        MR. LEE, COULD I HAVE UP ON THE SCREEN, PLEASE, PDX 31.

24        PROFESSOR, YOU USED THIS CHART AS PART OF YOUR

25   INFRINGEMENT ANALYSIS AND YOU SHOWED US THE FOUR DIFFERENT

1     FAMILIES OF PHONES THAT YOU BROKE THE ACCUSED DEVICES INTO.

2          DO YOU REMEMBER THAT?

3     A.   YES.

4     Q.   WHO MAKES THOSE PHONES?

5     A.   THEY'RE ALL SAMSUNG PHONES.

6     Q.   WHAT COMPANY SELLS THOSE PHONES IN THE UNITED STATES OF

7     AMERICA?

8     A.   SAMSUNG DOES.

9     Q.   AND WHO MAKES THE PROFIT FROM SELLING THOSE PHONES?

10    A.   I ASSUME SAMSUNG DID.

11          MR. MCELHINNY:  NOTHING FURTHER, YOUR HONOR.

12          THE COURT:  ALL RIGHT.  THE TIME IS NOW 9:36.

13     IS THERE ANY RECROSS, MR. NELSON?

14          MR. NELSON:  NOTHING FURTHER FROM ME, YOUR HONOR.

15          THE COURT:  ALL RIGHT.  NOW, IS THIS WITNESS EXCUSED

16    SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

17          MR. NELSON:  WELL, I THINK HE -- IT'S UP TO THEM

18    BECAUSE IT WOULD BE THEIR REBUTTAL CASE.  NOT FROM ME.

19          MR. MCELHINNY:  WE MAY CALL HIM ON REBUTTAL.  THAT'S

20    OUR CHOICE.  SO HE SHOULD BE RELEASED.

21          MR. NELSON:  YEAH, THAT'S WHAT I MEAN.  I DON'T KNOW

22    WHO YOU'RE ASKING.  FOR ME, I DON'T NEED HIM ANY MORE, YOUR

23    HONOR.

24          THE COURT:  ALL RIGHT.  THEN I'M JUST GOING TO EXCUSE

25    HIM NOT SUBJECT TO RECALL.

```
 1              MR. MCELHINNY:  I MAY BE CONFUSING THIS.  IF THERE'S

 2      A REBUTTAL, WE MAY CALL HIM, BUT I DON'T NEED HIM UNDER A COURT

 3      ORDER TO BE HERE.

 4              THE COURT:  OKAY.  THEN I'M RELEASING HIM.

 5              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

 6              THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.  AND YOU MAY

 7      STEP DOWN.

 8              MR. MCELHINNY:  MAY WE HAVE A MOMENT TO SET UP FOR

 9      OUR NEXT WITNESS?

10              THE COURT:  SURE.

11              MR. LEE:  YOUR HONOR, THE NEXT WITNESS WILL BE

12      MR. DENIAU AND MR. MUELLER.  JOSEPH MUELLER IS GOING TO DO THE

13      EXAMINATION, AND IT'LL JUST TAKE US A SECOND TO GET SET UP.

14              THE COURT:  THAT'S FINE.

15              MR. LEE:  CAN WE RECLAIM SOME OF THIS?

16              THE COURT:  YOU WANT TO CLEAN UP THE WITNESS STAND?

17              MR. LEE:  YES.

18              THE COURT:  YES, PLEASE.  AND WE HAVE THE PHOTOS.

19          (PAUSE IN PROCEEDINGS.)

20              THE COURT:  ALL RIGHT.  ARE WE READY TO GO?

21              MR. MUELLER:  WE ARE, YOUR HONOR.

22              THE COURT:  OKAY.  MS. PARKER BROWN, WOULD YOU PLEASE

23      SWEAR IN THE WITNESS.

24              THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

25          (PLAINTIFF'S WITNESS, THOMAS DENIAU, SWORN.)
```

```
 1                    THE WITNESS:  I DO.

 2                    THE CLERK:  HAVE A SEAT, PLEASE.

 3                    MR. MUELLER:  YOUR HONOR, MAY I PROCEED.

 4                    THE COURT:  GO AHEAD, PLEASE.

 5                    THE CLERK:  PLEASE STATE YOUR NAME, PLEASE, AND SPELL

 6       IT.

 7                    THE WITNESS:  SORRY.

 8                    THE COURT:  STATE YOUR NAME, PLEASE, AND SPELL IT.

 9                    THE WITNESS:  MY NAME IS TIM DENIAU.  T-H-O-M-A-S,

10       D-E-N-I-A-U.

11                    THE COURT:  ALL RIGHT.  TIME IS --

12                    THE CLERK:  STATE YOUR NAME.

13                    MR. MUELLER:  MY NAME IS JOE MUELLER, M-U-E-L-L-E-R.

14                    THE COURT:  ALL RIGHT.  TIME IS NOW 9:39.  GO AHEAD,

15       PLEASE.

16                    MR. MUELLER:  THANK YOU, YOUR HONOR.

17                            DIRECT EXAMINATION

18       BY MR. MUELLER:

19       Q.   CAN YOU PLEASE TELL US WHERE YOU LIVE?

20       A.   I LIVE IN FRANCE.

21       Q.   WHAT IS YOUR PRIMARY LANGUAGE?

22       A.   FRENCH.

23       Q.   BUT DO YOU SPEAK ENGLISH?

24       A.   YES, I DO.

25       Q.   DO YOU WORK FOR APPLE?
```

1     A.   YES, I WORK FOR APPLE IN PARIS.

2     Q.   AND WHAT IS YOUR POSITION AT APPLE?

3     A.   I AM SOFTWARE ENGINEER.

4     Q.   I'D LIKE TO GO BACK A BIT FIRST.  WHICH UNIVERSITY DID YOU

5     ATTEND?

6     A.   I ATTENDED THE ECOLE POLYTECHNIQUE, WHICH IS SPELLED

7     E-C-O-L-E SPACE POLYTECHNIQUE IN PARIS, IN FRANCE.

8     Q.   AND, MR. DENIAU, WHAT TYPE OF SCHOOL IS THE ECOLE

9     POLYTECHNIQUE?

10    A.   IT IS ONE OF THE TOP UNIVERSITIES FOR SCIENCE IN FRANCE.

11    Q.   AND WHAT DID YOU STUDY AT THE ECOLE POLYTECHNIQUE?

12    A.   SCIENCE AND MORE SPECIFICALLY, COMPUTER SCIENCE.

13    Q.   NOW, IS THAT YOUR FIRST EXPERIENCE WITH COMPUTERS AT

14    UNIVERSITY?

15    A.   NO.  I FIRST STUDIED USING A MAC PLUS WHEN I WAS SIX OR

16    SEVEN.

17    Q.   THAT WAS AN APPLE MAC PLUS?

18    A.   YES.

19    Q.   AND, MR.  DENIAU, WHEN DID YOU BEGIN COMPUTER PROGRAMMING?

20    A.   I THINK I BEGAN PROGRAMMING AT EIGHT OR NINE.

21    Q.   EIGHT OR NINE YEARS OLD?

22    A.   YES.

23    Q.   PROGRAMMED EVER SINCE?

24    A.   YES.

25    Q.   DID YOU RECEIVE ANY DEGREES FOR YOUR STUDIES AT THE ECOLE

DIRECT DENIAU

1    POLYTECHNIQUE?

2    A.   YES.  I RECEIVED A COUPLE OF DEGREES.  THE SYSTEM IS A BIT

3    DIFFERENT IN FRANCE, BUT IT WOULD BE THE EQUIVALENT IN THE U.S.

4    TO A MASTER OF SCIENCE AND MASTER OF ENGINEERING.

5    Q.   MASTER OF SCIENCE AND MASTER OF ENGINEERING?

6    A.   YES.

7    Q.   AFTER RECEIVING YOUR MASTER'S DEGREES, WHAT DID YOU DO

8    NEXT?

9    A.   I STUDY AT AN INTERNSHIP AT APPLE.

10   Q.   AND THIS WAS IN WHAT YEAR?

11   A.   2009.

12   Q.   AND WHERE -- WHICH GROUP WAS THIS INTERNSHIP AT APPLE IN?

13   A.   IT WAS AT THE DATA DETECTORS.

14   Q.   NOW, SIR, I'M GOING TO RETURN TO DATA DETECTORS IN JUST A

15   MOMENT, BUT HAVE YOU HELD ANY POSITIONS AT APPLE SINCE THAT

16   FIRST INTERNSHIP?

17   A.   YES.  AFTER MY INTERNSHIP I GOT FULL TIME IN THAT GROUP.

18   Q.   FULL TIME AS A?

19   A.   SOFTWARE ENGINEER.

20   Q.   AND DO YOU CONTINUE TO BE A SOFTWARE ENGINEER AT APPLE

21   TODAY?

22   A.   YES.

23   Q.   LET'S TALK ABOUT DATA DETECTORS.  COULD YOU BEGIN BY

24   EXPLAINING TO THE JURY WHAT ARE DATA DETECTORS?

25   A.   DATA DETECTORS IN THE APPLE TECHNOLOGY, WHICH SCANS YOUR

1      E-MAILS, TEXT MESSAGES OR ANY KIND OF TEXTURE, ANYTHING WITH

2      TEXT, TO FIND INTERESTING THINGS IN THEM, SUCH AS DATES, PHONE

3      NUMBERS, ADDRESSES, AND SO ON.

4           AND IT LETS YOU DO INTERESTING THINGS WITH THEM.  FOR

5      EXAMPLE, YOU MIGHT RECEIVE AN E-MAIL SAYING YOU HAVE AN

6      APPOINTMENT TOMORROW AT 2:00 AT SOME PLACE IN CUPERTINO, AND

7      THE DATA DETECTORS WILL DETECT BOTH THE DATE AND THE ADDRESS

8      AND EITHER LET YOU SHOW THAT IN A MAP OR ADD IT TO YOUR

9      CALENDAR.

10     Q.   SO DATA DETECTORS CAN IDENTIFY DATA?

11     A.   YES.

12     Q.   AND PROVIDE OPTIONS?

13     A.   YES.

14     Q.   NOW, WHEN DID YOU BEGIN WORK ON DATA DETECTORS?  WAS IT

15     WHEN YOU FIRST ARRIVED AT APPLE?

16     A.   YES.  I BEGAN WORKING WITH DATA DETECTORS DURING MY

17     INTERNSHIP, AND I CONTINUED WORKING WITH DATA.

18     Q.   AT THAT TIME WHEN YOU FIRST ARRIVED AT APPLE, DID APPLE

19     HAVE DATA DETECTION SOFTWARE IN PLACE?

20     A.   YES, THAT SHIPPED A FEW YEARS BEFORE THE MAC.

21     Q.   NOW, OTHER FOLKS AT APPLE HAD DESIGNED THAT SOFTWARE?

22     A.   YES.

23     Q.   DID YOU FAMILIARIZE YOURSELF WITH IT?

24     A.   OF COURSE.  OF COURSE.  I HAD TO STUDY THE CODE BASE.

25     Q.   THE CODE BASE?

1    A.   YES, IN ORDER TO MAKE IMPROVEMENTS TO IT.

2    Q.   AND WAS THAT DATA DETECTION SOFTWARE ABLE TO IDENTIFY

3    DIFFERENT TYPES OF DATA?

4    A.   YES.

5    Q.   PROVIDE OPTIONS TO THE USER FOR THOSE TYPES OF DATA?

6    A.   YES.

7    Q.   WHAT ARE YOUR CURRENT RESPONSIBILITIES FOR DATA DETECTORS?

8    A.   I AM RESPONSIBLE FOR THE DATA DETECTORS DEVELOPMENT ON

9    IOS.

10   Q.   AND SIR WHAT IS IOS?

11   A.   IOS IS A SOFTWARE WHICH HOLDS AN UPPER MOBILE DEVICES,

12   INCLUDING IPHONES, IPADS, AND IPAD TOUCHES.

13   Q.   AND WHICH VERSIONS OF IOS HAVE YOU PERSONALLY WORKED ON?

14   A.   I WORKED ON IOS 5, 6, AND 7.

15   Q.   AND TODAY, SIR, WHAT TYPES OF APPLE PRODUCTS USE DOCUMENT

16   DESTRUCTION POLICY?

17   A.   MOST OF APPLE'S PRODUCTS USE DATA DETECTORS.  MACS USE IT,

18   IPHONES USE IT, IPADS USE IT.  IPOD TOUCHES ALSO.

19   Q.   SIR, I'D LIKE YOU TO WALK US THROUGH AN EXAMPLE.  AND HAVE

20   YOU PREPARED A VIDEO TO ASSIST THE JURY?

21   A.   YES, I HAVE.

22   Q.   SO LET'S PUT ON THE SCREEN IF WE COULD, PLEASE, PDX 89.3.

23   AND, SIR, WHAT DO WE SEE HERE?

24   A.   SO HERE WE SEE AN IPAD SHOWING AN E-MAIL WITH SHIPMENT

25   DETAILS.

DIRECT DENIAU

1    Q.   AND THIS APPEARS TO BE AN E-MAIL FROM AN ONLINE STORE; IS

2    THAT RIGHT?

3    A.   YES.

4    Q.   HOW DO IPADS RECEIVE E-MAILS?

5    A.   THEY RECEIVE IT OVER WIRELESS OR CELLULAR.

6    Q.   OR CELLULAR NETWORKS?

7    A.   YES.

8    Q.   AND THEY PRESENT THE E-MAIL TO THE USER?

9    A.   YES.

10   Q.   LET'S TAKE A CLOSER LOOK AT THIS E-MAIL IF WE COULD.  WHY

11   ARE CERTAIN WORDS IN BLUE AND UNDERLINED?

12   A.   SO THE WORDS IN BLUE ARE THE WORDS THAT, THAT DATA

13   DETECTORS HAVE IDENTIFIED AS BEING INTERESTING FOR THE USER.

14   THEY WERE NOT IN BLUE WHEN THE MAIL WAS SENT.  THE DATA

15   DETECTORS ADDED THE BLUE LINKS TO LET THE USER USE THE DATA.

16   Q.   DATA DETECTORS IDENTIFIED THAT DATA?

17   A.   YES.

18   Q.   HIGHLIGHTED IT FOR THE USER?

19   A.   YES.

20         MR. MUELLER:  YOUR HONOR, IF WE COULD JUST DIM THE

21   LIGHTS A LITTLE BIT, WOULD THAT BE OKAY?

22         THE COURT:  THAT'S FINE.

23   BY MR. MUELLER:

24   Q.   SO I'M GOING TO USE A LASER POINTER TO TAKE THESE ONE BY

25   ONE, AND JUST SO THE WRITTEN RECORD IS CLEAR, I'M GOING TO READ

```
1    THE TEXT AND THEN ASK YOU WHAT IT IS.  IS THAT OKAY?

2    A.   YES.

3    Q.   SO FIRST RIGHT HERE WE SEE GIFTSY.COME.  WHAT IS THAT?

4    A.   THIS IS A WEBSITE ADDRESS WHICH, AGAIN, WAS NOT UNDERLINED

5    IN THE ORIGINAL E-MAIL, BUT DATA DETECTORS HAVE IDENTIFIED,

6    HAVE IDENTIFIED THAT IT WAS A WEBSITE ADDRESS AND MADE IT INTO

7    A LINK TO LET YOU VISIT THAT WEBSITE.

8    Q.   AND WHICH SOFTWARE SPECIFICALLY IDENTIFIED THIS AS A

9    WEBSITE?

10   A.   THE DATA DETECTORS FRAMEWORK.

11   Q.   DATA DETECTORS FRAMEWORK SOFTWARE?

12   A.   YES.

13   Q.   WHERE IS THAT DATA DETECTORS FRAMEWORK SOFTWARE KEPT IN

14   THE IPAD?

15   A.   IN THE IPAD'S MEMORY.

16   Q.   NEXT, SIR, DO YOU SEE IN THE MIDDLE OF THIS E-MAIL IT SAYS

17   2040 VALLEJO STREET, SAN FRANCISCO, CALIFORNIA 94123.  WHAT IS

18   THAT?

19   A.   THIS IS A MAILING ADDRESS WHICH THE DATA DETECTORS HAVE

20   RECOGNIZED AND TURNED INTO A LINK FOR YOU TO USE THIS ADDRESS.

21   Q.   DATA DETECTORS IDENTIFIED IT AS A MAILING ADDRESS?

22   A.   YES.

23   Q.   NEXT, SIR, DO YOU SEE THERE'S A NUMBER 1-800-222, IT

24   APPEARS TO BE 6050.

25        WHAT IS THAT?
```

1    A.   IT IS A PHONE NUMBER WHICH THE DATA DETECTORS HAVE

2    IDENTIFIED AS WELL, AND TURNED INTO A LINK FOR YOU TO CALL THE

3    PHONE NUMBER.

4    Q.   SAME SOFTWARE IDENTIFIED IT?

5    A.   YES.

6    Q.   AND, FINALLY, SIR, DO YOU SEE WHERE IT SAYS SUPPORT AT

7    GIFTSY.COM, GIFTSY.COM?  DO YOU SEE THAT?

8    A.   YES, IT IS AN E-MAIL ADDRESS WHICH HAS BEEN IDENTIFIED AS

9    DATA DETECTORS AS WELL.

10   Q.   DATA DETECTORS IDENTIFIED FOUR DIFFERENT TYPES OF

11   STRUCTURES IN THIS E-MAIL?

12   A.   YES.

13   Q.   NOW, ARE THERE ANY OTHER TYPES OF DATA THAT THE APPLE DATA

14   DETECTORS SOFTWARE CAN IDENTIFY?

15   A.   SURE.  FOR EXAMPLE, YOU DON'T HAVE HERE ANY DATES, BUT IF

16   THERE WAS, FOR EXAMPLE, LET'S MEET TOMORROW AT 2:00, THAT WOULD

17   IDENTIFY IT AND TURN IT INTO.

18   Q.   I'M SORRY, IF THIS SAID LET'S MEET TOMORROW AT 2:00, DATA

19   DETECTORS COULD IDENTIFY THAT AS A DATE?

20   A.   YES.  AND TURN IT INTO A LINK AS WELL.  AND WE CAN

21   IDENTIFY, FOR EXAMPLE, TRACKING NUMBERS.

22   Q.   TRACKING NUMBERS FROM FEDEX, FOR EXAMPLE?

23   A.   YES.

24   Q.   NOW, WE'RE LOOKING HERE, SIR, AT AN E-MAIL IN WHICH DATA

25   DETECTORS HAS IDENTIFIED CERTAIN STRUCTURES.  ARE THERE ANY

1    OTHER TYPES OF APPLICATIONS WITH WHICH THE APPLE DATA DETECTORS

2    WORK?

3    A.   YES.   ANY APPLICATION ON THE IPHONE CAN USE DATA

4    DETECTORS, BUT SHIPPED WITH THE IPHONE AND IPAD YOU HAVE, FOR

5    EXAMPLE, NOTES AND MESSAGES FOR YOUR TEXT MESSAGES.

6    Q.   TEXT MESSAGES IS ANOTHER EXAMPLE?

7    A.   YES.

8    Q.   AND NOTES.

9         NOW, LET'S GO BACK TO THIS E-MAIL, AND IF WE COULD

10   CONTINUE PLAYING THE VIDEO.   AND IF, SIR, YOU COULD LET US KNOW

11   WHAT WE SEE HERE.

12   A.   SO HERE THE USER PRESSES ON THE MAILING ADDRESS AND YOU

13   CAN SEE THAT A POP-UP MENU COMES UP WITH A LIST OF ACTIONS THAT

14   YOU CAN TAKE WITH THIS MAIN ADDRESS.

15   Q.   SO THE USER PRESSED THE MAILING ADDRESS?

16   A.   YES.

17   Q.   AND THE POP-UP MENU APPEARED?

18   A.   YES.

19   Q.   NOW, HOW DOES THE SYSTEM KNOW WHICH OPTIONS TO INCLUDE IN

20   THIS POP-UP MENU?

21   A.   THERE'S A DIFFERENT LIST OPTIONS FOR EACH TYPE OF

22   STRUCTURE.   SO IF YOU HAVE A MAILING ADDRESS, YOU GET THE THREE

23   OPTIONS.   BUT IF YOU HAVE A DIFFERENT TYPE OF DATA, YOU GET A

24   DIFFERENT LIST OF OPTIONS.

25   Q.   DIFFERENT OPTIONS ARE THE DIFFERENT STRUCTURES?

1    A.   YES.

2    Q.   WHAT SOFTWARE CREATES THIS POP-UP MENU?

3    A.   THE DATA DETECTORS FRAMEWORK GENERALLY LISTS THE OPTIONS

4    THAT ARE AVAILABLE FOR THE STRUCTURE, AND THE USER INTERFACE

5    KITS.

6    Q.   THE USER INTERFACE KIT, WHERE IS THAT SOFTWARE KEPT IN THE

7    IPAD?

8    A.   IN THE IPAD'S MEMORY AS WELL.

9    Q.   IN MEMORY AS WELL?

10   A.   YES.

11   Q.   NOW, HOW DOES THE USER SELECT AN OPTION FROM THIS POP-UP

12   MENU?

13   A.   THE USER HAS TO TAP ONE OF THE LINKS.

14   Q.   AND WHAT SOFTWARE IS USED FOR THAT SELECTION PROCESS?

15   A.   THE USER INTERFACE KIT AS WELL.

16   Q.   THE USER INTERFACE KIT AS WELL?

17   A.   YES.

18   Q.   AND, AGAIN, THAT'S KEPT IN MEMORY?

19   A.   YES.

20   Q.   IN THE USER SELECTS ONE OF THESE OPTIONS, WHAT HAPPENS?

21   A.   SO IF YOU TAP ONE OF THE ACTIONS, THEN THE DATA DETECTORS

22   TAKE THE MAIN ADDRESS THAT YOU TAPPED ON AND PERFORMS THE

23   STATED ACTION WITH IT.

24   Q.   SO LET'S TAKE A LOOK AT THESE THREE OPTIONS.  THE FIRST

25   ONE IN THE POP-UP MENU IS COPY.  WHAT IS THAT?

1     A.   IT LETS YOU COMPLETE THE MAILING ADDRESS AND USE IT LATER

2     ON, YOU KNOW, TO MAIL OR ANYTHING.

3     Q.   THE SECOND OPTION IS ADD TO CONTACTS.  WHAT IS THAT?

4     A.   IT LETS YOU ASSOCIATE THE MAILING ADDRESS WITH ONE OF YOUR

5     ADDRESS BOOK ENTRIES, LIKE ONE OF YOUR CONTACTS.

6     Q.   THE FINAL ONE, SIR, IS OPEN IN MAPS.  WHAT IS THAT?

7     A.   YOU CAN USE IT TO SHOW THAT THIS ADDRESS IS IN YOUR MAP SO

8     THAT YOU KNOW HOW TO GET THERE.

9     Q.   SO LET'S CONTINUE THE VIDEO.  AND, AGAIN, THIS IS PDX

10    89.3.

11         WHAT DO WE SEE HERE, SIR?

12    A.   SO THE USER TAPS OPEN IN MAPS, AND THE MAPS APPLICATION

13    OPENS AND YOU CAN SEE THAT IT IS SHOWING THE ADDRESS THAT THE

14    USER TAPPED ON.

15    Q.   AND WHAT APPLICATION, OR WHAT SOFTWARE GENERATES THIS MAP?

16    A.   THE MAP APPLICATION.

17    Q.   THE MAP APPLICATION?

18    A.   YES.

19    Q.   WHERE IS THAT KEPT IN THE IPAD?

20    A.   IN THE IPAD'S MEMORY.

21    Q.   NOW, I SEE HERE AN ADDRESS IN THE MIDDLE OF THE PAGE.

22    WHERE DOES THAT COME FROM?

23    A.   SO THIS ADDRESS IS THE ADDRESS THAT THE USER TAPPED ON IN

24    THE E-MAIL.  SO THE DATA DETECTORS TOOK THE ADDRESS FROM THE

25    E-MAIL AND SENT IT TO THE MAPS APPLICATION TO GENERATE THIS

1    MAP.

2    Q.   DATA DETECTORS IDENTIFIED THAT ADDRESS, GAVE IT TO THE

3    MAPS PROGRAM?

4    A.   YES.

5    Q.   LET'S GO TO PDX 89.4.

6         AND, SIR, TELL US WHAT WE SEE HERE AS THE VIDEO CONTINUES?

7    A.   SO HERE THE USER PRESSES ON THE E-MAIL ADDRESS, AND YOU

8    CAN SEE THAT THE MENU POPS UP AS WELL, BUT WITH A DIFFERENT

9    LIST OF FUNCTIONS SHOWING MAPS IS GONE AND IT'S REPLIED WITH

10   NEW MESSAGE.

11   Q.   SO THIS IS A DIFFERENT STRUCTURE, THE E-MAIL ADDRESS; IS

12   THAT RIGHT?

13   A.   YES.

14   Q.   DIFFERENT OPTIONS IN THE MENU?

15   A.   YES.

16   Q.   WHAT GENERATED THIS LIST OF OPTIONS?

17   A.   THE DATA DETECTORS FRAMEWORK GENERATED IT.

18   Q.   IS THERE A DIFFERENT LIST OF OPTIONS FOR POP-UP MENU FOR

19   EACH OF THESE?

20   A.   YES.  FOR E-MAIL YOU HAVE NEW MESSAGE INSTEAD OF SHOWING

21   MAPS; AND FOR, LET'S SAY DATES, YOU CAN HAVE SHOW IN YOUR

22   CALENDAR OR CREATE NEW EVENT.

23   Q.   THAT WOULD BE FOR A DATE?

24   A.   YES.

25   Q.   DIFFERENT MENU FOR WEB ADDRESSES?

1    A.   YES.

2    Q.   DIFFERENT MENU FOR PHONE NUMBERS?

3    A.   YES.

4    Q.   DIFFERENT MENU FOR TRACKING NUMBERS?

5    A.   YES.

6    Q.   LET'S CONTINUE THE VIDEO IF WE COULD.  AND, SIR, WHAT DO

7    WE SEE HERE?

8    A.   SO HERE THE USER TAPS ON NEW MESSAGE AND YOU GET A NEW

9    SHEET POPPING UP WHICH LETS YOU SEND AN E-MAIL TO THIS E-MAIL

10   ADDRESS.  IT IS ALREADY FILLED IN.

11   Q.   WHAT PROGRAM DISPLAYS THIS E-MAIL MESSAGE?

12   A.   THE MAIL FRAMEWORK.

13   Q.   THE MAIL FRAMEWORK?

14   A.   YES.

15   Q.   WHERE IS THAT STORED IN THE IPAD?

16   A.   IN THE IPAD'S MEMORY AS WELL.

17   Q.   AND I BELIEVE YOU'VE ALREADY MENTIONED THIS, BUT THE "TO"

18   LINE IS ALREADY FILLED IN; IS THAT RIGHT?

19   A.   YES.  THE DATA DETECTORS TOOK THE E-MAIL ADDRESS FROM THE

20   LINK THAT THE USER TAPPED ON AND SENT IT TO THE MAIN FRAMEWORK

21   TO SEND THE E-MAIL TO.

22   Q.   NOW, SIR, YOU'VE DESCRIBED SEVERAL TYPES OF SOFTWARE.

23   WHAT HARDWARE COMPONENT DO THOSE RUN ON?

24   A.   THEY ALL RUN ON THE IPAD'S APPLICATION PROCESSOR, WHICH IS

25   ALSO CALLED THE CPU.

1    Q.   THE APPLICATIONS PROCESSOR, OR CPU?

2    A.   YES.

3    Q.   THAT'S CENTRAL PROCESSING UNIT?

4    A.   YES.

5    Q.   HOW DOES THE APPLICATIONS PROCESSOR ACCESS THESE PROGRAMS

6    FROM MEMORY?

7    A.   THE CPU AND THE MEMORY ARE CONNECTED TO EACH OTHER.

8    Q.   THEY'RE CONNECTED TO EACH OTHER?

9    A.   YES.

10   Q.   NOW LET'S TAKE A LOOK AT PDX 89.1, AND BEFORE WE GET

11   THERE, THIS HAS ALL BEEN THE IPAD.  I'D LIKE TO ASK YOU ABOUT

12   THE IPHONE.

13        WHAT DO WE SEE HERE?

14   A.   SO WE CAN SEE THE SAME E-MAIL BUT SHOWED ON AN IPHONE

15   INSTEAD OF AN IPAD.

16   Q.   SO IN PDX 89.1 WE SEE THAT SAME GIFTSY.COM E-MAIL?

17   A.   YES.

18   Q.   BUT IT'S ON THE IPHONE?

19   A.   YES.

20   Q.   LET'S CONTINUE THE VIDEO IF WE COULD AND, SIR, TELL US

21   WHAT WE SEE?

22   A.   SO HERE THE USER TAPS THE MAILING ADDRESS AND YOU CAN SEE

23   A DIFFERENT -- YOU CAN SEE THE SAME LIST OF FUNCTIONS AS

24   BEFORE, BUT IT IS PRESENTED IN A SLIGHTLY DIFFERENT WAY BECAUSE

25   THE SCREEN IS SMALLER.

1    Q.   THE SCREEN IS SMALLER?

2    A.   YES.

3    Q.   OTHERWISE THE OPTIONS ARE THE SAME?

4    A.   YES.

5    Q.   LET'S CONTINUE THE VIDEO IF WE COULD.

6         WHAT DO WE SEE HERE, SIR?

7    A.   THE USER MAPS THE MAPS AND THE MAP APPLICATION OPENS AND

8    SHOWS THE MAP OF THIS ADDRESS.

9    Q.   SHOWS THAT SAME MAP WE SAW ON THE IPAD?

10   A.   YES.

11   Q.   LET'S GO TO 89, PDX 89.2, PLEASE.  AND IF WE COULD RUN THE

12   VIDEO.

13        WHAT DO WE SEE?

14   A.   THE USER TAPS THE E-MAIL ADDRESS.

15   Q.   POP-UP MENU APPEARS?

16   A.   YES.

17   Q.   LET'S CONTINUE THE VIDEO.

18        WHAT DO WE SEE, SIR?

19   A.   AND WE SEE AGAIN THE E-MAIL SHEET POPPING UP AND READY TO

20   SEND AN E-MAIL TO THAT ADDRESS.

21   Q.   SAME AS IN THE IPAD VERSION?

22   A.   YES, JUST PRESENTED IN A SLIGHTLY DIFFERENT WAY.

23   Q.   NOW, YOU'VE DISCUSSED SEVERAL TYPES OF SOFTWARE.  CAN YOU

24   GIVE US A SENSE OF THE AMOUNT OF COMPUTER CODE WE'RE TALKING

25   ABOUT?

1      A.    ABOUT TENS OF THOUSANDS OF LINES OF CODE.

2      Q.    TENS OF THOUSANDS OF LINES OF CODE?

3      A.    YES.

4      Q.    WHY IS SO MUCH CODE REQUIRED?

5      A.    BECAUSE THIS IS VERY COMPLICATED TO ACCURATELY IDENTIFY SO

6      MANY DIFFERENT TYPES OF SEARCHES IN SO MANY DIFFERENT LANGUAGES

7      WHICH POPS UP, LIKE 20 LANGUAGES.  SO YOU HAVE TO DETECT

8      ADDRESSES AND PHONE NUMBERS AND SO ON IN ALL THESE DIFFERENT

9      CONTEXTS.

10     Q.    NOW, SIR, YOU'VE WALKED US THROUGH EXAMPLES OF THE IPAD

11     AND THE IPHONE.  HAVE YOU ALSO WORKED ON A PRODUCT CALLED THE

12     IPOD TOUCH?

13     A.    SURE.

14     Q.    WHAT IS IT?

15     A.    IPOD TOUCH IS SIMILAR TO THE IPHONE, BUT IT DOES NOT HAVE

16     ANY CELLULAR CONNECTIVITY.

17     Q.    ARE THERE ANY DIFFERENCES AMONG THE DATA DETECTION

18     SOFTWARE IN THE IPAD, IPHONE, AND IPOD TOUCH?

19     A.    THE VERY PRINCIPALS ARE ALWAYS THE SAME.  SO THE USER

20     INTERFACE HAS TO BE DIFFERENT BECAUSE OF THE SIZE, AND ALSO YOU

21     CAN GET SLIGHTLY DIFFERENT LIST OF OPTIONS ON DIFFERENT

22     DEVICES.

23          FOR EXAMPLE, IPOD TOUCHES AND IPADS HAVE THE SOURCE CODE,

24     SO IF YOU TAP A PHONE NUMBER, YOU ONLY GET TO THE CODE.

25     Q.    BUT THE CORE PRINCIPALS ARE THE SAME?

1        A.   YES.

2                    MR. MUELLER:  THANK YOU, SIR.  NO FURTHER QUESTIONS.

3                    THE COURT:  ALL RIGHT.  THE TIME IS NOW 9:58.

4            YOU KNOW, I'M GOING TO ASK THAT EVERYONE TURN OFF YOUR

5        CELL PHONE BECAUSE I'VE LOST THE TRANSCRIPT AT 9:30.  SO

6        THERE'S JUST TOO MANY CELL PHONES ON IN THE COURTROOM.  IF YOU

7        WOULD PLEASE TURN THEM OFF, OR IF YOU NEED TO USE IT, WOULD YOU

8        PLEASE GO TO THE OVERFLOW ROOM WHERE YOU WILL BE ABLE TO HEAR

9        EVERYTHING, YOU WILL BE ABLE TO SEE THE WITNESS.

10           I'M GOING TO ASK EVERYONE TO TURN OFF YOUR CELL PHONES,

11       PLEASE.  I'LL HAVE TO WAIT AND NOT GET A TRANSCRIPT UNTIL OUR

12       BREAK AT 10:30.

13           ALL RIGHT.  EVERYONE PLEASE TURN OFF YOUR CELL PHONES.

14           THANK YOU.

15           TIME IS NOW 9:59.  GO AHEAD, PLEASE.

16                   MR. NELSON:  THANK YOU, YOUR HONOR.  MAY I PROCEED?

17                   THE COURT:  PLEASE.

18                          **CROSS-EXAMINATION**

19       BY MR. NELSON:

20       Q.   GOOD MORNING, SIR.

21       A.   GOOD MORNING.

22       Q.   MY NAME IS DAVE NELSON.  I'M ONE OF THE ATTORNEYS FOR

23       SAMSUNG.

24       A.   OKAY.

25       Q.   OKAY.  SO LET ME JUST ASK YOU A FEW QUESTIONS.

1            OH, SHE'S BRINGING YOU SOME BOOKS SO I PROBABLY SHOULDN'T

2       ASK UNTIL YOU HAVE THEM.

3            SO YOU DON'T REVIEW PATENTS AS PART OF YOUR WORK; RIGHT?

4       A.   NO, I DON'T.

5       Q.   AND YOU HAVEN'T REVIEWED THE '647 PATENT; RIGHT?

6       A.   WELL, I HAVE REVIEWED IT WHILE PREPARING FOR MY TESTIMONY.

7       Q.   OH, YOU REVIEWED IT SINCE YOUR DEPOSITION?

8       A.   YES.  I LOOKED AT IT AT MY DEPOSITION TIME, BUT I READ IT

9       WHILE PREPARING FOR MY TESTIMONY.

10      Q.   OKAY.  SO LET'S -- LET'S JUST EXPLAIN A LITTLE BIT.  THE

11      DEPOSITION, THAT'S SOMETHING WHERE WE, SAMSUNG, HAVE THE

12      OPPORTUNITY TO ASK YOU QUESTIONS ABOUT WHAT YOU KNOW; RIGHT?

13      A.   YES.

14      Q.   AND THAT OCCURRED ABOUT A YEAR AGO?

15      A.   IT OCCURRED IN JULY LAST YEAR.

16      Q.   YEAH.  SO TEN, TEN MONTHS, NINE MONTHS, SOMETHING LIKE

17      THAT.

18           SO AS OF THE TIME OF YOUR DEPOSITION, YOU HADN'T READ THE

19      '647 PATENT; RIGHT?

20      A.   NO.

21      Q.   BUT YOU'VE READ IT SINCE?

22      A.   YES.

23      Q.   AND DID APPLE'S COUNSEL ASK YOU TO READ IT?

24      A.   WELL, YOU KNOW, I HAD -- I GOT DEPOSED ON IT, SO I THOUGHT

25      IT WAS INTERESTING TO KNOW WHAT IT WAS ABOUT BECAUSE I WAS

1    SHOWN IT DURING MY DEPOSITION.  SO I THOUGHT, WHAT IS THIS?

2    AND I READ IT.

3    Q.   RIGHT.  BUT YOU'RE NOT HERE TESTIFYING ABOUT THE '647

4    PATENT; RIGHT?

5    A.   NO, I'M NOT.

6    Q.   NOW, LET'S TALK A LITTLE BIT ABOUT THE WORK YOU DID ON

7    IOS.

8         THE FIRST WORK YOU DID WAS ON IOS 5; IS THAT RIGHT?

9    A.   YES.

10   Q.   AND THAT WAS RELEASED, WHAT, 2010?  DOES THAT SOUND ABOUT

11   RIGHT?

12   A.   2011 I THINK.

13   Q.   2011?

14   A.   I THINK SO, YES.

15   Q.   SO YOU DIDN'T WORK ON IOS 4; RIGHT?

16   A.   NO, I DID NOT.

17   Q.   AND YOU DIDN'T WORK ON IOS 3; RIGHT?

18   A.   NO.

19   Q.   AND IF I -- YOU DIDN'T WORK ON IOS 2?

20   A.   NO, I STARTED IN 2009, AND THIS IS WHEN IOS 3 WAS

21   RELEASED.

22   Q.   SO THEN YOUR WORK, AS I UNDERSTAND IT, THE FIRST WORK YOU

23   DID ON IOS 5 WAS ON MOBILE SAFARI; IS THAT RIGHT?

24   A.   YES.

25   Q.   AND THAT'S THE BROWSER; IS THAT RIGHT?

1    A.    YES.

2    Q.    SO WE DIDN'T -- IN YOUR EXAMPLES, WE DIDN'T LOOK AT ANY OF

3    THE BROWSER FUNCTION IN SAFARI; RIGHT?

4    A.    NO.  WE LOOKED AT THE, WE LOOKED AT THE FUNCTIONALITY AS

5    IT EXISTS IN MOST APPLICATIONS.  MAIL, NOTES, AND ANY APPS FROM

6    THE APPS STORE.  MOBILE SAFARI IS DIFFERENT.

7    Q.    OKAY.  SO -- BUT WHAT YOU DID -- YOUR FIRST WORK ON SAFARI

8    WAS TO CHANGE WHAT SAFARI DETECTED IN TERMS OF STRUCTURES;

9    RIGHT?

10   A.    YES.

11   Q.    AND THAT WAS SO THAT THE WEB PAGES WOULD LOAD FASTER; IS

12   THAT RIGHT?

13   A.    BOTH TO LOAD FASTER AND DETECT PHONE NUMBERS MORE

14   ACCURATELY.

15   Q.    SO, IN FACT, THAT'S THE CHANGE THAT YOU MADE, RIGHT, TO

16   MOBILE SAFARI IS THAT IT ONLY DETECTS PHONE NUMBERS; RIGHT?

17   A.    IT'S ALREADY DETECTING THE PHONE NUMBERS, AND I IMPROVED

18   THE APPLICATION AND MADE IT BETTER.

19   Q.    RIGHT.  SO IT WOULDN'T DETECT STREET ADDRESSES, RIGHT?

20   A.    NO.  BUT MAIL AND APPS, TOO.

21   Q.    UNDERSTOOD.  BUT MOBILE SAFARI DIDN'T DETECT STREET

22   ADDRESSES OR, LIKE, THE WEBSITE THAT YOU LOOKED AT IN YOUR

23   EXAMPLE; RIGHT?

24   A.    ON IOS, IT DOESN'T, NO.

25   Q.    AND YOU MADE THAT CHANGE IN ORDER -- ONE OF THE REASONS

1    YOU SAID WAS IN ORDER TO IMPROVE THE LOADING SPEED OF THE WEB

2    PAGE; RIGHT?

3    A.   YES.

4    Q.   LIKE, 2 TO 3 PERCENT IT IMPROVED THE LOADING SPEED IS

5    ABOUT RIGHT?

6    A.   SO I THINK YOU'RE REFERRING TO MY DEPOSITION.  2 TO 3

7    PERCENT IS THE TIME DETECTS IF YOU ADD THE WORK TO THE

8    DETECTORS, INCLUDE STREET ADDRESSES AND DATES AND SO ON.  IF

9    YOU ADD ALL OF THIS TO MOBILE SAFARI, IT TAKES 2 TO 3 PERCENT.

10        AND THE WORK I DID WAS TO MAKE THE PHONE NUMBER DETECTION

11   AND -- WHICH IS 20 TIMES AS FAST AS THIS.

12   Q.   SO TAKING OUT THE DETECTION OF THE OTHER STRUCTURES

13   BESIDES PHONE NUMBERS, THAT IMPROVED THINGS 2 TO 3 PERCENT,

14   THAT'S WHAT YOU'RE SAYING?

15   A.   YES.

16   Q.   NOW, LET ME JUST TALK ABOUT IOS 3.  SO YOU DIDN'T WORK ON

17   IOS 3; RIGHT?

18   A.   NO.

19   Q.   AND YOU'RE NOT FAMILIAR WITH THE IOS 3 CODE; RIGHT?

20   A.   NOT WITH THE CODE, NO.

21   Q.   RIGHT.  AND YOU DIDN'T WORK ON IOS 4; RIGHT?

22   A.   NO.

23   Q.   AND YOU'RE NOT FAMILIAR WITH THE IOS 4 CODE; RIGHT?

24   A.   I'M -- I MEAN, THE CODE IS QUITE SIMILAR TO THE -- THE

25   DATA DETECTORS CODE IS SIMILAR WITH 3, 4, 5.  IT CHANGES, OF

```
 1        COURSE, THERE ARE CHANGES, BUT IF YOU ASK ME TO REVIEW THE IOS
 2        4 CODE, I THINK I AM CAPABLE OF DOING THAT.
 3        Q.   YEAH.  SO YOU -- WE'LL GO BACK AND WE'LL TALK ABOUT THAT
 4        DEPOSITION AGAIN.  DO YOU REMEMBER?
 5        A.   YES.
 6        Q.   SO -- NOW, LET ME ASK YOU AGAIN, ARE YOU FAMILIAR WITH THE
 7        CODE THAT WAS USED, FOR INSTANCE, IN IOS 4 THAT YOUR CODE
 8        REPLACED, THAT'S YOUR CODE THAT YOU WORKED ON FOR MOBILE
 9        SAFARI?
10        A.   THE IOS 4 CODE THAT I WORKED ON?
11        Q.   YES.
12        A.   NO.  IT WAS CODING, WEB CODE, WEB KITS THAT I'M NOT
13        FAMILIAR WITH, AND, OF COURSE, I HAD TO REPLACE IT.  SO I
14        LOOKED BRIEFLY AT IT.  BUT I CAN'T EXPLAIN IT, THE WORKINGS OR
15        ANYTHING.
16        Q.   AND SAME THING, I'M ASSUMING YOU DIDN'T LOOK AT THE
17        EARLIER VERSION EITHER, LIKE IOS 3; RIGHT?
18        A.   NO.
19        Q.   ALL RIGHT.  I HAVE NO FURTHER QUESTIONS.  THANK YOU.
20             THE COURT:  ALL RIGHT.  THE TIME IS NOW 10:05.  IS
21        THERE ANY REDIRECT?
22             MR. MUELLER:  YES, BRIEFLY, YOUR HONOR.
23             THE COURT:  OKAY.
24        /  /  /
25
```

```
1                         REDIRECT EXAMINATION

2        BY MR. MUELLER:

3        Q.   JUST A FEW QUESTIONS, MR. DENIAU.

4             I'M TAKE YOU BACK TO THE EXISTING DATA DETECTORS SOFTWARE

5        AT APPLE WHEN YOU ARRIVED AT APPLE.

6             DO YOU HAVE THAT IN MIND?

7        A.   YES.

8        Q.   AND IN PARTICULAR, THE DATA DETECTION SOFTWARE FOR E-MAIL

9        AND OTHER APPLICATIONS.

10            DO YOU HAVE THAT IN MIND?

11       A.   YES.

12       Q.   WAS THAT SOFTWARE CAPABLE OF IDENTIFYING DIFFERENT TYPES

13       OF DATA STRUCTURES?

14       A.   YES.

15       Q.   WAS THAT SOFTWARE CAPABLE OF PROVIDING THE USER WITH

16       MULTIPLE OPTIONS FOR EACH STRUCTURE?

17       A.   YES.

18                 MR. MUELLER:  THANK YOU.  NO FURTHER QUESTIONS.

19                 THE COURT:  ALL RIGHT.  TIME IS NOW 10:06.  IS THERE

20       ANY RECROSS?

21                 MR. NELSON:  NOTHING, YOUR HONOR.

22                 THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

23       AND IS HE SUBJECT TO RECALL OR NOT?

24                 MR. MUELLER:  NO, YOUR HONOR, I DON'T BELIEVE SO.

25                 THE COURT:  NO RECALL?
```

1              MR. NELSON:  NO, YOUR HONOR.

2              THE COURT:  ALL RIGHT.  THEN YOU MAY BE EXCUSED.

3              MR. MUELLER:  THANK YOU, YOUR HONOR.

4              MR. NELSON:  YOUR HONOR, WE CAN PROBABLY TALK ABOUT

5     IT AT THE BREAK, I HAVE A QUESTION ABOUT THAT ISSUE WE TALKED

6     ABOUT FRIDAY AFTERNOON IN TERMS OF THE ORDERING.  REMEMBER THE

7     REBUTTAL STUFF?

8              THE COURT:  YES.

9              MR. NELSON:  DO YOU WANT TO DO THAT AT THE BREAK OR

10    DO YOU WANT TO DO IT NOW?

11             THE COURT:  WELL --

12             MR. NELSON:  PROBABLY BETTER AT THE BREAK.

13             THE COURT:  LET ME -- YOU KNOW, I WOULD LIKE TO TAKE

14    A FIVE MINUTE BREAK.  I HAVE HAD NO TRANSCRIPT MOST OF THIS

15    MORNING, WHICH IS FRUSTRATING.  IT WOULD BE VERY HELPFUL FOR ME

16    TO HAVE A TRANSCRIPT.

17         SO WHY DON'T WE TAKE A FIVE MINUTE BREAK RIGHT NOW, AND

18    WE'LL TAKE ANOTHER FIVE MINUTE BREAK AT 11:00 O'CLOCK SO WE CAN

19    TRY TO RESTART THE REAL TIME.

20         ALL RIGHT.  WHY DON'T WE TAKE A TEN MINUTE BREAK NOW.

21    THANK YOU.  IT'S 10:07.  COME BACK IN TEN MINUTES.  THANK YOU.

22         (JURY OUT AT 10:08 A.M.)

23             THE COURT:  THE RECORD SHOULD REFLECT THAT THE JURORS

24    HAVE LEFT THE COURTROOM.

25         YOU MAY TAKE A SEAT.

REDIRECT DENIAU

```
 1        HOW MANY FOLKS HAVE A CELL PHONE ON NOW?  ANYONE?  NO ONE

 2   HAS A CELL PHONE TURNED ON?  OKAY.  BECAUSE I'M -- I'M AT A

 3   LOSS BECAUSE THIS IS HAPPENING EVERY DAY.

 4        IF THIS CONTINUES TO BE A PROBLEM, I'M ONLY GOING TO ALLOW

 5   10 PEOPLE WHO ARE NOT IN THIS CASE, MAYBE A TOTAL OF 20, AND

 6   EVERYONE ELSE IS GOING TO HAVE TO WATCH IT IN THE OVERFLOW ROOM

 7   WHERE YOU CAN HEAR EVERYTHING, THEY HAVE TWO MONITORS, ONE THAT

 8   HAS THE WITNESS, ONE THAT HAS THE EXHIBITS.  I'M SORRY.  I JUST

 9   HAVE TO DO MY JOB, AND I DON'T HAVE A TRANSCRIPT, AND THIS IS

10   HAPPENING EVERY DAY NOW.

11        SO WE'RE GOING TO REBOOT IT NOW, BUT IF IT SHUTS DOWN

12   AGAIN, THEN I'M GOING TO ASK PEOPLE TO LEAVE AND WE'LL ONLY

13   HAVE A MAXIMUM OF 20 PEOPLE IN HERE WHO ARE NOT ON THE CASE AND

14   EVERYONE ELSE WILL HAVE FULL ACCESS BY WATCHING IT IN THE

15   OVERFLOW ROOM.

16        I'M SORRY TO HAVE TO DO THIS, BUT I CAN'T DO MY JOB

17   WITHOUT A TRANSCRIPT, AND THERE ARE JUST TOO MANY DEVICES LIVE

18   RIGHT NOW THAT WE CAN'T FUNCTION.

19        SO WHAT'S YOUR QUESTION?  AND THEN I'D LIKE TO SHUT THE

20   SYSTEM DOWN AND TRY TO RESTART IT.

21            MR. NELSON:  SURE, YOUR HONOR.  SO WE TALKED ABOUT,

22   YOU KNOW, ON FRIDAY AFTERNOON --

23            THE COURT:  YES.

24            MR. NELSON:  -- THIS ISSUE ABOUT THE ORDER ON KIND OF

25   LIKE A PREBUTTAL I WOULD CALL IT.
```

```
 1                THE COURT:  OKAY.
 2                MR. NELSON:  AND, YOU KNOW, I HAD SAID AT THAT TIME
 3     THAT, WELL, YOU KNOW, WHATEVER WAS MORE EFFICIENT.  BUT AFTER
 4     WATCHING WITH THE FIRST WITNESS, I DON'T THINK THE WAY WE'RE
 5     DOING IT WORKS VERY WELL BECAUSE -- SO, FOR EXAMPLE, THERE'S A
 6     NUMBER OF OPINIONS, YOU KNOW, IN TERMS OF NON-INFRINGEMENT
 7     OPINIONS OR NON-INFRINGING ALTERNATIVES THAT OUR EXPERTS WON'T
 8     BE ADDRESSING.  WE NEED TO STREAMLINE THE CASE.  WE HAVE A
 9     CERTAIN AMOUNT OF TIME.
10                AND I THINK IT'S VERY CONFUSING FOR THE JURY TO HEAR ABOUT
11     THINGS THAT OUR EXPERTS AREN'T EVEN GOING TO PRESENT AND THEN
12     PERHAPS BE LEFT WITH THE, REALLY I THINK THE FALSE IMPRESSION
13     THAT WE'RE ABANDONING THINGS.  I DON'T THINK THAT'S REALLY
14     FAIR.
15                AND IT SHOULD -- AND I DIDN'T KNOW HOW THIS WAS GOING TO
16     GO, I APOLOGIZE.  WE SHOULD HAVE TALKED ABOUT IT ON FRIDAY.
17     BUT HAVING SEEN IT LIVE, I THINK IT IS CONFUSING AND MISLEADING
18     FOR THE JURY TO GO THROUGH AND SAY THEY DROPPED THIS ARGUMENT
19     AND THEY DID THIS AND THAT MIGHT FORCE ME WITH MY EXPERTS TO
20     ADDRESS ADDITIONAL THINGS AND TAKE ADDITIONAL TIME THAT WE
21     WOULDN'T OTHERWISE BECAUSE WE'RE TRYING TO STREAMLINE THE CASE
22     WITHIN THE ALLOTTED TIME.
23                SO I THINK IT WOULD BE BETTER IF THEIR FOLKS CAME BACK,
24     YOU KNOW, IN REBUTTAL LIKE WE TALKED ABOUT AND THEN THEY CAN
25     ADDRESS WHATEVER IT IS THAT THEY WANT TO ADDRESS AT THAT POINT
```

```
 1        IN TIME, YOU KNOW, IF THAT'S THE WAY WE'RE GOING TO DO IT.  BUT

 2        OTHERWISE I THINK IT GETS REALLY CONFUSING.

 3                 THE COURT:  DO YOU WANT TO BE HEARD ON THAT?

 4                 MR. MCELHINNY:  I DIDN'T THINK THERE WAS ANY

 5        CONFUSION.  WE -- I MEAN, WE DID AGREE WITH THIS.  WE'VE NOW

 6        PREPARED OUR EXAMINATIONS BASED ON AN AGREEMENT, A STIPULATION

 7        BASICALLY TO YOUR HONOR, AND THEY DIDN'T TELL US THIS.  I MEAN,

 8        WHY AM I GETTING SANDBAGGED BY THIS IN THE COURT AS OPPOSED TO

 9        A MEET AND CONFER PROCESS BEFORE?

10        BUT I THINK THIS ACTUALLY IS QUITE A LOGICAL WAY.  IT IS

11        THE WAY WE DID IT, YOU KNOW, IN THE FIRST TRIAL.

12        WE HAD --

13                 THE COURT:  WELL --

14                 MR. MCELHINNY:  WE HAVE ISSUES THAT --

15                 THE COURT:  WHY DON'T WE DO THIS:  I'M NOT GOING TO

16        ALLOW IT AFTER TODAY, BUT IF YOU'VE ALREADY PREPARED YOUR

17        WITNESSES ON THE ASSUMPTION OF WHAT WAS AGREED TO LAST FRIDAY,

18        THEN I THINK IT'S FAIR NOT TO HAVE TO REVERSE COURSE RIGHT NOW

19        THREE MINUTES BEFORE THEY'RE ABOUT TO CALL THEIR EXPERT,

20        DR. MOWRY.

21        BUT AFTER TODAY, I'M FINE.

22                 MR. NELSON:  OKAY.  I MEAN, THEY COULD JUST LEAVE

23        THAT PART OUT, BUT IT'S -- BUT, I MEAN, I UNDERSTAND WHAT

24        YOU'RE SAYING.

25                 THE COURT:  I'M JUST CONCERNED THAT THEY MAY HAVE
```

1        PREPARED OVER THE WEEKEND BASED ON WHAT YOU AGREED TO.

2                MR. NELSON:  YEAH.

3                THE COURT:  AND HOW I ADOPTED WHAT YOU ALL AGREED TO.

4                MR. NELSON:  YEAH.

5                THE COURT:  BUT GOING FORWARD -- I DON'T KNOW.  WHO

6        WOULD THAT AFFECT?  THAT WOULD AFFECT DR. MOWRY AND I THINK WE

7        HAVE --

8                MR. MCELHINNY:  AND SNOEREN TODAY, YOUR HONOR.

9                THE COURT:  WELL, I MEAN, SNOEREN PROBABLY WILL NOT

10       BE -- WILL HE EVEN BE COMING ON TODAY?  PROBABLY NOT.

11               MR. MCELHINNY:  WELL, WE DON'T KNOW.  THAT'S

12       DETERMINED BY CROSSES, SO WE -- WE'RE PREPARED TO PUT HIM ON

13       TODAY.  WE DON'T KNOW WHETHER WE'LL GET TO HIM TODAY.

14               THE COURT:  WELL, I THINK AS FAR AS MR. SNOEREN, YOU

15       CAN TALK TO HIM OVER THE LUNCH BREAK.  SO I WILL ALLOW IT AS TO

16       DR. MOWRY, BUT NOT AS TO DR. SNOEREN AND ANY EXPERTS AFTER

17       THAT, OR ANY OTHER WITNESSES AFTER THAT.

18               MR. NELSON:  OKAY.

19               THE COURT:  OKAY.

20               MR. NELSON:  THANK YOU, YOUR HONOR.

21               MR. MCELHINNY:  JUST TO MAKE SURE I UNDERSTAND YOUR

22       HONOR'S RULING, SO ON THE DIRECT CASE --

23               THE COURT:  UM-HUM.

24               MR. MCELHINNY:  -- AFTER DR. MOWRY, OUR EXPERTS WILL

25       NOT ADDRESS -- WILL NOT PREVIEW WHAT THEIR NON-INFRINGEMENT

```
 1    DEFENSES ARE.

 2              THE COURT:  YES.

 3              MR. MCELHINNY:  THERE'S -- HOW DOES THAT GO FOR

 4    NON-INFRINGING ALTERNATIVES?  IS THAT GOING TO BE A, A -- IN

 5    THE CASE-IN-CHIEF OR IS THAT GOING TO BE A REBUTTAL ISSUE?

 6    SEE, I THINK THAT OVERLAPS.

 7              THE COURT:  WELL, I THINK WHOEVER HAS THE BURDEN

 8    SHOULD BE ABLE TO GO FIRST AND SAMSUNG HAS THE BURDEN ON

 9    NON-INFRINGING ALTERNATIVES.

10         SO IF YOU HAVE THE BURDEN, FOR EXAMPLE, ON YOUR

11    AFFIRMATIVE CASE, IT SHOULD ONLY BE INFRINGEMENT, BOTH DIRECT

12    AND INDIRECT, AND WILLFULNESS.

13         AND THEN SAMSUNG SHOULD COME BACK WITH, YOU KNOW,

14    INVALIDITY, THEIR AFFIRMATIVE CASE.  THEY CAN ALSO REBUT

15    INDIRECT AND DIRECT INFRINGEMENT AND WILLFULNESS.

16              MR. MCELHINNY:  AND THEN WE WILL HAVE A CHANCE, ON

17    REBUTTAL, TO ADDRESS THOSE ARGUMENTS?

18              THE COURT:  YES.

19              MR. MCELHINNY:  THANK YOU.

20              MR. NELSON:  EXCEPT FOR THE TWO, LIKE, DR. MOWRY

21    THAT'S GOING TO DO IT ALREADY AND MR. -- DR. COCKBURN THAT

22    ALREADY DID IT.  WE'RE NOT GOING TO HEAR IT AGAIN ON REBUTTAL;

23    RIGHT?  BECAUSE THAT WOULD BE, LIKE, THEY GET TO DO IT TWICE.

24              THE COURT:  COME ON.  YOU AGREED TO THIS.

25              MR. NELSON:  I KNOW, BUT --
```

```
 1              THE COURT:  YOU SAID ON THE RECORD THAT YOU WERE FINE

 2      WITH DOING IT THIS WAY SO NOW FOR YOU TO SAY, NO, NO, NO, NOW

 3      THOSE EXPERTS ARE PRECLUDED FROM COMING BACK ON REBUTTAL AND

 4      ADDRESSING THAT.

 5              MR. MCELHINNY:  YOUR HONOR, I'M --

 6              THE COURT:  I THINK I'M DONE.  I'M DONE.  OKAY.

 7              MR. MCELHINNY:  I'M GOING TO ACCEPT HIS PROPOSAL.

 8      THIS IS MY ATTEMPT TO REACH COMPROMISE.  WE WILL CHANGE

 9      DR. MOWRY AS WELL.  WE WILL DO OUR AFFIRMATIVE CASE AND BRING

10      THEM BACK ON REBUTTAL.  WE WILL ADOPT COUNSEL'S NEW PROPOSAL

11      AND DO IT THAT WAY.

12              THE COURT:  ALL RIGHT.  BUT YOU'RE NOT PRECLUDED IN

13      BRINGING DR. COCKBURN BACK FOR REBUTTAL.

14              MR. NELSON:  NO, NO, NO THAT'S NOT WHAT I WAS SAYING

15      AT ALL, YOUR HONOR.

16              MR. MCELHINNY:  I'M SORRY.  I'M DOING WHAT I CAN TO

17      MAKE IT EASY HERE.

18              MR. NELSON:  NO, IT'S ALL FINE.  IT'S ALL FINE.

19              THE COURT:  OKAY.  WELL, BE CAREFUL WHAT YOU AGREE

20      TO, BECAUSE YOU MIGHT GET IT AND NOW YOU'RE GOING TO HAVE TO

21      BACKTRACK.  SO --

22              MR. NELSON:  I UNDERSTAND, YOUR HONOR.

23              THE COURT:  ALL RIGHT.  SO WE'RE JUST GOING TO GO --

24      IF YOU HAVE THE AFFIRMATIVE CASE AND YOU HAVE THE BURDEN, YOU

25      GO FIRST.  AND THE OTHER SIDE HAS TO WAIT UNTIL THEIR
```

```
1        OPPORTUNITY TO REBUT AND BRING ON THEIR DEFENSE OF THE CASE.

2              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

3              THE COURT:  OKAY.  ALL RIGHT.  THAT'S WHAT WE'LL DO

4      FOR DR. MOWRY ON.

5          ALL RIGHT.  LET'S SHUT DOWN THE SYSTEM, PLEASE AND SEE IF

6      WE CAN RESTART IT.  THANK YOU.

7          (RECESS FROM 10:08 A.M. UNTIL 10:23 A.M.)

8          (JURY IN AT 10:23 A.M.)

9              THE COURT:  ALL RIGHT.  PLEASE TAKE A SEAT.

10         PLEASE CALL YOUR NEXT WITNESS, PLEASE.

11             MS. KREVANS:  APPLE CALLS PROFESSOR TODD MOWRY, YOUR

12     HONOR.

13         (PLAINTIFF'S WITNESS, TODD MOWRY, WAS SWORN.)

14             THE WITNESS:  I DO.

15             THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

16             MR. NELSON:  YOUR HONOR, IS IT OKAY IF I MOVE OVER

17     HERE BECAUSE I CAN'T SEE THE WITNESS WITH THE BOARD?

18             THE COURT:  YOU ALL CAN SIT -- THAT'S YOUR TABLE.  I

19     MEAN, YOU ALL CAN SIT WHEREVER YOU'D LIKE.

20             MR. NELSON:  WITH OBJECTING, I DIDN'T KNOW IF YOU

21     WANTED ME TO BE HERE.  THAT'S ALL.

22             THE COURT:  NO.  YOU SIT WHEREVER YOU'D LIKE.

23             MR. NELSON:  OKAY.  THANK YOU.

24             MS. KREVANS:  YOUR HONOR, MAY I APPROACH THE WITNESS

25     AND GIVE HIM THE LASER POINTER.
```

1              THE COURT:  THAT'S FINE.

2              MS. KREVANS:  IN CASE YOU NEED THIS, PROFESSOR MOWRY.

3              THE COURT:  WOULD YOU SWEAR HIM IN, PLEASE.

4              THE CLERK:  HE WAS.

5              THE COURT:  OKAY.  DID HE SPELL HIS NAME.

6              THE CLERK:  NOT YET.

7              THE WITNESS:  TODD, T-O-D-D, CARL, C-A-R-L, MOWRY,

8       M-O-W-R-Y.

9              THE COURT:  ALL RIGHT.  TIME IS 10:25.  GO AHEAD,

10      PLEASE.

11                       **DIRECT EXAMINATION**

12      BY MS. KREVANS:

13      Q.   GOOD MORNING, PROFESSOR MOWRY.  WOULD YOU PLEASE INTRODUCE

14      YOURSELF TO THE JURY?

15      A.   I'M A PROFESSOR IN THE COMPUTER SCIENCE DEPARTMENT

16      APPOINTMENT CARNEGIE MELLON UNIVERSITY IN PITTSBURGH,

17      PENNSYLVANIA, AND I LIVE THERE IN PITTSBURGH WITH MY WIFE AND

18      THREE VERY ACTIVE BOYS.

19      Q.   AND WHAT'S THE FOCUS OF YOUR WORK AT CARNEGIE MELLON?

20      A.   I DO RESEARCH ON WAYS TO MAKE COMPUTERS FASTER AND EASIER

21      TO USE, AND I ALSO TEACH COURSES ON HOW TO DESIGN COMPUTERS AND

22      COMPUTER SOFTWARE.

23      Q.   WHEN DID YOU FIRST GET INTRODUCED TO COMPUTERS?

24      A.   INTERESTINGLY ENOUGH, IT HAPPENED AT CARNEGIE MELLON

25      UNIVERSITY WHEN I WAS A HIGH SCHOOL STUDENT IN THE SAME

1    BUILDING WHERE I LATER BECAME PROFESSOR.

2         I WAS THERE FOR A SUMMER SCIENCE PROGRAM, AND THAT'S WHERE

3    I DISCOVERED -- I WAS INTRODUCED TO COMPUTERS.  BEFORE THAT I

4    WANTED TO BE A MEDICAL DOCTOR, BUT I DECIDED THAT COMPUTERS

5    WERE MY PASSION AND THAT'S WHAT I STUDIED.

6    Q.   WHERE DID YOU THEN GO TO COLLEGE?

7    A.   I WENT TO THE UNIVERSITY VIRGINIA WHERE I MAJORED IN

8    ELECTRICAL ENGINEERING, AND I STUDIED COMPUTER ENGINEERING AND

9    TOOK A LOT OF COMPUTER SCIENCE CLASSES.

10   Q.   AND DID YOU DO ANY WORK, ACTUAL PAID EMPLOYMENT, IN THE

11   COMPUTER SCIENCE FIELD WHILE YOU WERE IN COLLEGE?

12   A.   YES.  I GREW UP IN A SMALL TOWN OUTSIDE OF PITTSBURGH, AND

13   THE MAIN EMPLOYER IN THAT TOWN WAS THE STEEL MILL WHERE MY

14   FATHER WORKED.  AND SO MY SUMMER JOB WAS I WOULD PUT ON MY

15   HARDHAT AND STEEL TOED BOOTS AND WALK DEEP INTO THE STEEL MILL

16   EVERY DAY TO WRITE SOFTWARE TO CONTROL THE HEAVY MACHINERY IN

17   THE STEEL MILL.

18   Q.   WHILE YOU WERE A COLLEGE STUDENT?

19   A.   YES.

20   Q.   OKAY.  WHEN DID YOU GRADUATE?

21   A.   1988.

22   Q.   WHAT DID YOU DO THEN?

23   A.   THEN I CAME DIRECTLY TO STANFORD WHERE I GOT A MASTER'S

24   DEGREE AND A PH.D. IN ENGINEERING.

25   Q.   OKAY.  COULD YOU PUT UP THE SLIDE OF PROFESSOR MOWRY'S

1      BACKGROUND.  THANK YOU.

2          TELL US ABOUT WHAT YOU STUDIED AT STANFORD AND WHAT YOU

3      FOCUSSED YOUR PH.D. THESIS ON.

4      A.   I STUDIED COMPILERS, OPERATING SYSTEMS AND COMPUTER

5      ARCHITECTURE, AND MY PH.D. RESEARCH WAS ON A NEW WAY TO

6      RECOGNIZE PATTERNS IN APPLICATION SOFTWARE WHERE A COMPILER

7      COULD AUTOMATICALLY START MOVING DATA CLOSE TO THE CPU BEFORE

8      IT WAS NEEDED, WHICH MADE THE SOFTWARE RUN MUCH FASTER.

9      Q.   AND WHEN DID YOU FINISH YOUR PH.D.?

10     A.   1994.

11     Q.   WHAT DID YOU DO THEN?

12     A.   I ACCEPTED A JOB AT THE UNIVERSITY OF TORONTO AS A

13     PROFESSOR IN THE DEPARTMENT OF ELECTRICAL AND COMPUTER

14     ENGINEERING.

15     Q.   AND DID YOU DO ANY WORK WITH -- IN INDUSTRY WHILE YOU WERE

16     STUDDING AT STANFORD FOR YOUR PH.D.?

17     A.   YES, I DID.  I WORKED ONE DAY A WEEK IN THE VALLEY AT WHAT

18     WAS ORIGINALLY A START-UP COMPANY CALLED MIPS COMPUTER SYSTEMS,

19     WHICH WAS LATER PURCHASED BY SILICON GRAPHICS, AND I WAS IN A

20     GROUP THERE THAT WAS STUDYING HOW TO DESIGN THE NEXT GENERATION

21     OF MICROPROCESSORS.

22     Q.   WHEN YOU WE WANT TO THE UNIVERSITY OF TORONTO, YOU WENT

23     THERE -- YOU WERE THERE FOR THREE AND A HALF YEARS; IS THAT

24     RIGHT?

25     A.   YES, OR FOUR WINTERS AS I SOMETIMES REFER TO IT.

1     Q.   WHAT DID YOU DO AT THE UNIVERSITY OF TORONTO?

2     A.   I DID RESEARCH AGAIN ON HOW TO MAKE COMPUTERS FASTER USING

3     PARALLEL PROCESSING AND OTHER THINGS AND COMPILERS, AND I ALSO

4     TAUGHT COURSES ON COMPUTER SYSTEMS, TOPICS.

5     Q.   AND WHEN DID YOU COME TO CARNEGIE MELLON?

6     A.   IN 1997.

7     Q.   WHAT KINDS OF CLASSES DO YOU TEACH AT CARNEGIE MELLON?

8     A.   I TEACH CLASSES ON COMPILERS, OPERATING SYSTEMS, PARALLEL

9     PROCESSING, AND COMPUTER ARCHITECTURE, AND ALSO A COURSE ON

10    COMPUTER SYSTEMS IN GENERAL FOR OUR SOPHOMORES.

11    Q.   AND WHAT HAS BEEN THE FOCUS OF YOUR RESEARCH SINCE 1997

12    WHEN YOU JOINED THE FACULTY OF CARNEGIE MELLON?

13    A.   I WORK BOTH ON NEW WAYS TO DESIGN COMPUTER SYSTEMS, BOTH

14    SOFTWARE AND HARDWARE TO MAKE THEM FASTER AND MORE RELIABLE,

15    AND I ALSO HAD A PROJECT BUILDING, TRYING TO BUILD A NEW KIND

16    OF MATERIAL THAT WOULD ALLOW A NEW TYPE OF USER INTERFACE

17    THAT'S FAIRLY RADICAL AND SOME PEOPLE CHARACTERIZE IT AS BEING

18    LIKE THE STAR TREK HOLLOW DECK.

19    Q.   NOW, THERE WAS A POINT WHERE YOU TOOK A SABBATICAL FROM

20    CARNEGIE MELLON; RIGHT?

21    A.   YES.   FROM 2004 TO 2007, INTEL ASKED ME TO BE THE DIRECTOR

22    OF THEIR RESEARCH LAB ON THE CARNEGIE MELLON CAMPUS, SO I

23    WORKED THERE FOR THREE YEARS.

24    Q.   SO INTEL ACTUALLY HAS A LAB THAT'S LOCATED AT PITTSBURGH,

25    CARNEGIE MELLON?

1    A.   YES, THAT'S RIGHT.

2    Q.   ARE YOU ALLOWED TO TALK ABOUT THE WORK YOU DID AND

3    DIRECTED AT THE INTEL LAB AT CARNEGIE MELLON?

4    A.   YES, THEIR UNIVERSITY LABS ARE ALL OPEN AND WE CAN TALK

5    ABOUT ANYTHING WE DO THERE.

6    Q.   WHAT KIND OF WORK, WHAT KIND OF RESEARCH WENT ON UNDER

7    YOUR DIRECTION AT THE INTEL LAB?

8    A.   THE RESEARCH WAS VERY MUCH LIKE MY OWN RESEARCH.  THERE

9    WERE ABOUT 20 RESEARCHERS IN THE LAB, AND I OVERSAW THE

10   TECHNICAL DIRECTION OF THEIR RESEARCH.  SO THE PROJECTS

11   INCLUDED NEW WAYS TO TAKE ADVANTAGE OF THE COMPILER, THE

12   OPERATING SYSTEM AND THE HARDWARE TO MAKE THINGS MORE RELIABLE.

13        AND ALSO WE WERE WORKING ON THIS USER INTERFACE PROJECT

14   THAT I MENTIONED EARLIER.

15   Q.   COULD YOU TELL US A LITTLE BIT ABOUT THE FOCUS OF YOUR

16   RESEARCH TODAY?

17   A.   I'M CONTINUING TO WORK ON SIMILAR TOPICS AND RIGHT NOW I'M

18   FOCUSSED VERY MUCH ON PARALLEL SOFTWARE AND HOW TO TAKE

19   ADVANTAGE OF MULTICORE PROCESSORS.

20   Q.   NOW, AS A COLLEGE PROFESSOR, I KNOW YOU'RE EXPECTED TO

21   PUBLISH.  ABOUT HOW MANY PUBLICATIONS DO YOU HAVE?

22   A.   ROUGHLY 60 PAPERS IN JOURNALS AND CONFERENCES.

23   Q.   COULD YOU TELL US A LITTLE BIT ABOUT SOME OF YOUR

24   PROFESSIONAL ACTIVITIES?

25   A.   I'M THE EDITOR IN CHIEF ON A JOURNAL CALLED "ACM

1    TRANSACTIONS ON COMPUTER SYSTEMS."

2    Q.   WHAT IS "THE JOURNAL OF ACM TRANSACTIONS ON COMPUTER

3    SYSTEMS"?

4    A.   "ACM" IS THE ASSOCIATION FOR COMPUTER MACHINERY.  IT'S THE

5    MAIN PROFESSIONAL SOCIETY FOR PEOPLE IN THE FIELD OF COMPUTER

6    SCIENCE.  AND "ACM TRANSACTIONS ON COMPUTER SYSTEMS" IS THE

7    FLAGSHIP JOURNAL IN THE FIELDS OF OPERATING SYSTEMS, COMPILERS,

8    AND COMPUTER ARCHITECTURE, AND THOSE ARE MY RESEARCH AREAS.

9    Q.   IS IT AN HONOR TO BE ASKED TO BE THE EDITOR IN CHIEF OF

10   THAT JOURNAL?

11   A.   YES, IT IS, BECAUSE THE PEOPLE LOOK FOR SOMEONE WHO'S NOT

12   JUST A TECHNICAL LEADER IN THE FIELD BUT FOR SOMEONE WHO THEY

13   THINK HAS GOOD JUDGMENT.

14   Q.   WHAT OTHER KINDS OF RECOGNITION HAVE YOU GOTTEN FOR YOUR

15   PROFESSIONAL WORK?

16   A.   I RECEIVED BEST, A NUMBER OF BEST PAPER AWARDS FOR MY

17   PAPERS.  AND I ALSO RECEIVED A SLOAN FELLOWSHIP FROM THE SLOAN

18   FOUNDATION, AND ALSO THE TR 100 AWARD FROM M.I.T. TECHNOLOGY

19   REVIEW MAGAZINE.

20   Q.   AND ARE YOU AN INVENTOR ON ANY PATENTS?

21   A.   YES.  I'M AN INVENTORY ON FIVE PATENTS.

22   Q.   AND WHAT WORK DO THOSE PATENTS FLOW FROM?

23   A.   MOST OF THEM CAME FROM MY WORK AT MIPS AND SILICON

24   GRAPHICS AND THEY INVOLVE WAYS TO MAKE COMPUTERS FASTER.

25            MS. KREVANS:  YOUR HONOR, WE OFFER PROFESSOR MOWRY AS

1      AN EXPERT IN COMPUTER SCIENCE, INCLUDING COMPUTER PROGRAMMING,

2      ARCHITECTURE, OPERATING SYSTEMS, USER INTERFACES, AND PATTERN

3      ANALYSIS.

4              MR. NELSON:  NO OBJECTION, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  THEN HE'S SO CERTIFIED.

6      BY MS. KREVANS:

7      Q.   PROFESSOR MOWRY, WERE YOU RETAINED BY APPLE IN THIS

8      LITIGATION?

9      A.   YES, I WAS.

10     Q.   WHAT WAS THE ASSIGNMENT YOU WERE ASKED TO DO?

11     A.   I WAS ASKED TO GIVE AN OPINION ON WHETHER OR NOT CERTAIN

12     SAMSUNG PRODUCTS INFRINGE THE '647 PATENT, AND ALSO ON WHETHER

13     CERTAIN CLAIMS OF THE '647 PATENT ARE VALID.

14     Q.   SO TODAY WE'RE GOING TO FOCUS JUST ON YOUR INFRINGEMENT

15     ANALYSIS, OKAY?

16     A.   CORRECT.

17     Q.   WHAT CLAIM OF THE '647 PATENT DID YOU ANALYZE?

18     A.   CLAIM 9.

19     Q.   WERE YOU COMPENSATED FOR THE TIME YOU SPENT ON THIS

20     ANALYSIS?

21     A.   YES, I WAS.

22     Q.   AT WHAT RATE?

23     A.   AT MY USUAL CONSULTING RATE, WHICH IS ABOUT $500 AN HOUR.

24     Q.   AND ABOUT HOW MANY HOURS HAVE YOU SPENT WORKING ON THIS

25     CASE SO FAR?

```
1     A.   OVER THE LAST TWO AND A HALF YEARS, IT'S BEEN A TOTAL OF

2     ABOUT 700 HOURS.

3     Q.   WHY SO MUCH TIME?

4     A.   THERE WERE MANY ACCUSED PRODUCTS AND MANY CONFIGURATIONS

5     OF SOFTWARE, AND I WANTED TO MAKE SURE I DID A VERY THOROUGH

6     AND COMPLETE JOB GIVEN THE SERIOUSNESS OF THE ISSUE.

7     Q.   OKAY.  COULD YOU TURN TO THE DOCUMENT THAT'S AT THE TAB

8     MARKED JX 1 IN YOUR BINDER.

9     A.   YES.

10    Q.   WHAT IS JX 1?

11    A.   THIS IS THE '647 PATENT.

12         MS. KREVANS:  OKAY.  YOUR HONOR, WE MOVE JX 1 INTO

13    EVIDENCE.

14         MR. NELSON:  NO OBJECTION, YOUR HONOR.

15         THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

16       (JOINT EXHIBIT 1 WAS ADMITTED IN EVIDENCE.)

17         THE COURT:  GO AHEAD, PLEASE.

18         MS. KREVANS:  COULD WE SEE SLIDE 3, MR. LEE.

19    Q.   COULD YOU JUST EXPLAIN TO THE JURY THE BASIC FACTS ABOUT

20    THE PATENT THAT WE CALL '647, WHICH FOR THE RECORD THE FULL

21    PATENT NUMBER IS 5,946, 647?

22    A.   THE INVENTORS OF THE PATENT ARE JAMES MILLER, THOMAS

23    BONURA, BONNIE NARDI, AND DAVID WRIGHT FROM APPLE COMPUTER, AND

24    THE PATENT WAS FILED ON FEBRUARY 1ST, 1996.

25    Q.   AND THE OWNER?
```

1        A.    THE OWNER IS APPLE COMPUTER.

2        Q.    AT A GENERAL LEVEL, WHAT DOES THE INVENTION OF THE '647

3   PATENT RELATE TO?

4        A.    IT RELATES TO MAKING IT MUCH EASIER TO TAKE ADVANTAGE OF

5   THE USEFUL BITS OF DATA AND TEXT MESSAGE -- AND TEXT DOCUMENTS,

6   LIKE E-MAIL MESSAGES AND THINGS LIKE THAT THAT SOMEONE MIGHT

7   RECEIVE, THINGS LIKE PHONE NUMBERS, POSTAL ADDRESSES, E-MAIL

8   ADDRESSES.

9        Q.    NOW, THIS PATENT APPLICATION WAS FILED IN FEBRUARY,

10   FEBRUARY 1ST, 1996.  SO WE HAVE TO PUT OUR MINDS BACK TO

11   UNDERSTAND THE EVENTS WE'RE FACING TO THE 1995-'96 TIME PERIOD.

12        DID YOU EXPLAIN TO THE JURY WHAT WERE SOME OF THE PROBLEMS

13   THAT THE INVENTORS OF THE '647 PATENT WERE TRYING TO SOLVE BACK

14   IN 1995 AND BEGINNING OF 1996 WHEN THEY PUT THIS TOGETHER?

15        A.    PEOPLE WERE STARTING TO USE E-MAIL MORE AND MORE

16   FREQUENTLY.  SO WE HAD MORE AND MORE E-MAIL COMING INTO OUR IN

17   BOXES AND OFTEN YOU WOULD GO BACK THROUGH YOUR E-MAIL MESSAGES

18   AND BE TRYING TO FIND SOMETHING LIKE A DATE OR A PHONE NUMBER

19   OR AN ADDRESS THAT YOU NEEDED FOR SOME REASON, AND IT WAS

20   DIFFICULT BOTH TO FIND THESE THINGS, BUT THEN TO ALSO DO

21   SOMETHING WITH THEM, BECAUSE ONCE YOU FOUND IT, YOU'D HAVE TO

22   USE YOUR MOUSE AND CAREFULLY COPY AND PASTE THIS, THE PHONE

23   NUMBER DIGITS OR WHATEVER IT WAS OUT OF THE DOCUMENT AND THEN

24   USUALLY CLOSE OUT THAT PROGRAM, OPEN UP ANOTHER PROGRAM, AND

25   THEN PASTE THOSE -- THAT TEXT INTO SOME OTHER PROGRAM.

```
1              AND THAT WAS A VERY TEDIOUS AND DISRUPTIVE PROCESS FOR A

2       USER.

3       Q.   WHY WAS IT A TEDIOUS AND DISRUPTIVE PROCESS FOR A USER,

4       LOOKING AT A DOCUMENT SUCH AS AN E MAIL, WHEN THAT KIND OF

5       INFORMATION WAS IN THERE?

6       A.   YOU HAVE TO USE THE MOUSE TO VERY CAREFULLY SELECT THE

7       BEGINNING AND END OF WHAT YOU'RE TRYING TO FIND ONCE YOU FIND

8       IT, AND THEN HAVING TO CLOSE OUT OR MINIMIZE THE THING YOU'RE

9       IN AND THEN GO OPEN UP SOME OTHER PROGRAM AND FIND THAT JUST,

10      IT'S VERY JUST DISRUPTIVE AND ANNOYING THAT YOU HAVE TO GO

11      THROUGH SO MANY STEPS TO DO THAT.

12      Q.   WHAT OTHER PROBLEMS DID THE INVENTORS IDENTIFY AS THINGS

13      THEY WERE TRYING TO SOLVE WITH THEIR INVENTION?

14      A.   THE INVENTORS ALSO POINTED OUT THAT ALTHOUGH THERE WERE

15      SOME SYSTEMS BACK THEN THAT COULD FIND ONE PARTICULAR TYPE OF

16      STRUCTURE, SAY, FOR EXAMPLE, A PHONE NUMBER AND DO ONE

17      PARTICULAR THING WITH IT, SUCH AS DIAL THE PHONE NUMBER, THERE

18      WEREN'T SYSTEMS THAT COULD FIND MULTIPLE KINDS OF STRUCTURES

19      AND OFFER MULTIPLE ACTIONS FOR THEM.

20      Q.   COULD WE SEE COLUMN 1 OF THE '647 PATENT, MR. LEE.

21              NOW, IF THE MEMBERS OF THE JURY WANT TO READ THE PATENT

22      AND SEE THIS DESCRIPTION OF THE PROBLEMS THAT THEY WERE TRYING

23      TO SOLVE FOR THEMSELVES, WHERE WOULD THEY LOOK IN THE PATENT?

24      A.   IT BEGINS IN THE PARAGRAPH AROUND LINES 13 WHERE IT SAYS

25      THAT, YOU KNOW, IN A TYPICAL DAY, IN THE MIDDLE IT SAYS, FOR
```

 1      EXAMPLE, "A USER MAY RECEIVE EXTENSIVE FILES FROM

 2      WORD-PROCESSING PROGRAMS AND E-MAIL THAT CONTAIN SEVERAL OF

 3      THESE STRUCTURES."

 4           AND ABOVE THAT IT SAYS THAT STRUCTURES ARE THINGS, SUCH AS

 5      PHONE NUMBERS, E-MAIL ADDRESSES, POST-OFFICE ADDRESSES, AND ZIP

 6      CODES AND DATES.

 7      Q.   AND THIS IS IN A SECTION CALLED BACKGROUND OF THE

 8      INVENTION?

 9      A.   YES.   THIS IS WHERE THEY'RE DESCRIBING WHAT THE STATE OF

10      THE ART WAS AT THE TIME AND THE PROBLEM THAT THEY'RE TRYING TO

11      SOLVE.

12      Q.   OKAY.   COULD WE LOOK AT THE BOTTOM OF THE COLUMN 1 GOING

13      OVER TO THE TOP OF COLUMN 2, MR. LEE, STARTING AT LINE 66.

14           THANK YOU.   WHAT DID THE INVENTORS SAY ABOUT HOW THEY

15      PROPOSED TO SOLVE THESE PROBLEMS?

16      A.   THEY SAID WHAT WAS NEEDED WAS A NEW INVENTION WHERE IF YOU

17      HAD A SYSTEM THAT COULD AUTOMATICALLY FIND THESE THINGS, LIKE

18      PHONE NUMBERS, E-MAIL ADDRESSES AND SO ON, AND ALSO

19      AUTOMATICALLY ASSOCIATE DIFFERENT CHOICES AND THINGS YOU COULD

20      DO WITH THEM, WHICH THEY CALL ACTIONS.

21           SO, FOR EXAMPLE, FOR A PHONE NUMBER, YOU MIGHT WANT TO

22      DIAL THE PHONE NUMBER WITH A DIALER WITH THE DIGITS FILLED IN

23      ALREADY OR WE MIGHT WANT TO ADD IT TO OUR CONTACT LIST.

24           AND WE ALSO WANTED A USER INTERFACE SO THESE THINGS CAN

25      APPEAR SO THE USER CAN SELECT ONE OF THESE CHOICES AND THEN

1      MAKE IT JUST OCCUR AUTOMATICALLY.

2      Q.   OKAY.   YOU'VE USED THE WORD "STRUCTURE" A FEW TIMES, AND I

3      SEE IT NOW HERE IN THE SPECIFICATION OF THE PATENT.

4           CAN YOU TELL US WHAT THE WORD "STRUCTURE" MEANT IN THE

5      CONTEXT OF THIS PATENT IN 1996?

6      A.   THEY DEFINE THAT IN COLUMN 1 OF THE PATENT.   THEY GAVE

7      EXAMPLES OF STRUCTURES IN THE PARAGRAPH THAT WE WERE LOOKING AT

8      EARLIER.   THEY SAY THEY'RE THINGS LIKE E-MAIL ADDRESSES, PHONE

9      NUMBERS, AND DATES.

10          AND IN THE PARAGRAPH AFTER THAT, THEY'RE EVEN MORE

11     CONCRETE AND THEY SAY THAT A STRUCTURE IS AN INSTANCE OF A

12     PATTERN.

13          SO, FOR EXAMPLE, FOR A PHONE NUMBER, YOU CAN WRITE DOWN A

14     PATTERN AND SAY WE'RE LOOKING FOR THREE DIGITS, A DASH, AND

15     THEN FOUR DIGITS, AND THERE MIGHT ALSO BE A PHONE NUMBER WITH

16     AN AREA CODE IN FRONT OF IT.   SO THERE MIGHT BE THREE DIGITS

17     BEFORE THAT AND MAYBE SOME PARENTHESES.

18          SO YOU CAN CREATE A SET OF PATTERNS THAT DESCRIBE THE

19     DIFFERENT THINGS AND THEN THE SYSTEM WILL LOOK FOR MATCHES TO

20     THOSE IN A DOCUMENT.

21          SO A STRUCTURE TECHNICALLY IS A SPECIFIC SET OF DIGITS OR

22     CHARACTERS FROM, SAY, AN E-MAIL MESSAGE THAT MATCH THE PATTERN.

23     Q.   AND DID THE INVENTORS OF THE '647 PATENT, IN FACT --

24     EXCUSE ME.   DID THE INVENTORS OF THE '647, IN FACT, IN THEIR

25     APPLICATION, DISCLOSE AND PROPOSE A SYSTEM THAT SOLVED THIS

1      PROBLEM?

2      A.   YES, THEY DID.

3      Q.   OKAY.  COULD YOU TURN NOW TO FIGURES 5, 6, AND 7 OF THE

4      '647 PATENT.

5           NOW, WE'VE PUT THOSE ON A SLIDE TOGETHER.  COULD YOU WALK

6      US THROUGH WHAT THE INVENTORS WERE ILLUSTRATING WITH FIGURES 5,

7      6, AND 7 FROM THEIR PATENT.

8      A.   THIS IS A SEQUENCE OF FIGURES THAT ILLUSTRATE WHAT THE

9      USER EXPERIENCES WHEN THEY USE THE '647 INVENTION.

10          ON THE LEFT IN FIGURE 5 WE SEE AN EXAMPLE OF AN E-MAIL

11     MESSAGE THAT A PERSON'S RECEIVED, AND IT HAS CONTACT

12     INFORMATION IN IT.  IT HAS A PHONE NUMBER, A POSTAL ADDRESS, AN

13     E-MAIL ADDRESS, AND SO ON.

14          AND THEN WHEN THE PERSON WHO WROTE THE E-MAIL MESSAGE

15     COMPOSED IT, THEY DIDN'T DO ANYTHING SPECIAL TO ANY OF THOSE

16     THINGS, THEY JUST WROTE IT AS REGULAR TEXT.

17          AND IN FIGURE 6 WE SEE WHEN YOU RECEIVE THIS MESSAGE, THE

18     INVENTION HAS AUTOMATICALLY DETECTED THESE DIFFERENT THINGS AND

19     IN THIS CASE IT'S HIGHLIGHTED THEM BY DRAWING BOXES AROUND

20     THEM.  SO NOW IT'S EASY TO SEE THAT THESE THINGS ARE THERE.

21          AND THEN IF THE USER WANTED TO DO SOMETHING WITH ONE OF

22     THEM, FOR EXAMPLE, IF THEY WANTED TO DO SOMETHING WITH THE

23     PHONE NUMBER, IF THEY SELECT THE PHONE NUMBER, THEY MIGHT SEE

24     SOMETHING LIKE WHAT'S SHOWN IN FIGURE 7 WHERE NOW A BOX HAS

25     APPEARED IN THE MIDDLE OF THE SCREEN, WHICH WE CALL A POP-UP

1    MENU, AND IT HAS TWO DIFFERENT OPTIONS AND THINGS THAT YOU

2    COULD DO WITH THOSE SPECIFIC PHONE NUMBER DIGITS.

3    Q.   AND IT'S A LITTLE HARD TO READ HERE.  WHAT ARE THE TWO

4    OPTIONS THAT THIS SHOWS IN THIS EXAMPLE?

5    A.   IT SHOWS CALL THE NUMBER OR PUT IN ELECTRONIC TELEPHONE

6    BOOK.

7    Q.   OKAY.  IN THIS EXAMPLE THAT YOU'VE SHOWN US, THE

8    ELECTRONIC DOCUMENT THAT THE USER HAD ON THEIR COMPUTER

9    HAPPENED TO BE AN E-MAIL.  WAS THE INVENTION THAT WAS DESCRIBED

10   IN THE '647 PATENT LIMITED TO E-MAIL, ELECTRONIC DOCUMENTS?

11   A.   NO.  THAT PARAGRAPH WE LOOKED AT EARLIER SAID THAT THIS

12   JUST REFERS TO ANY TYPE OF TEXT DOCUMENT.  IT GAVE E-MAIL

13   ADDRESS AS ONE EXAMPLE.

14   Q.   OKAY.  PUTTING YOUR MIND BACK TO 1996, HOW IMPORTANT AT

15   THAT TIME WAS THE SOLUTION THAT THE '647 PATENT CONTRIBUTED TO

16   THIS FIELD?

17   A.   I THINK IT WAS VERY IMPORTANT AND INNOVATIVE BECAUSE IT

18   MADE IT MUCH EASIER TO GO THROUGH YOUR E-MAIL, FIND THESE TYPES

19   OF THINGS, AND TAKE ADVANTAGE OF THEM WITHOUT HAVING TO GO

20   THROUGH ALL THESE TEDIOUS STEPS OF HAVING TO CAREFULLY COPY AND

21   PASTE THINGS OUT OF, SAY, AN E-MAIL OR SOME OTHER DOCUMENT INTO

22   SOME OTHER PROGRAM.

23        SO IT MADE LIFE MUCH BETTER FOR THE USER.

24   Q.   NOW, TODAY WE'RE IN 2014.  IS THIS AN INVENTION THAT'S

25   PAST ITS TIME?

1    A.   ACTUALLY, I THINK IT'S AN INVENTION THAT WAS WAY AHEAD OF

2    ITS TIME BECAUSE ALTHOUGH IT'S -- IT WAS INCONVENIENT AT A

3    DESKTOP COMPUTER TO USE A MOUSE TO COPY AND PASTE SOMETHING, IT

4    IS EXTREMELY INCONVENIENT WITH A SMARTPHONE TO TRY TO COPY AND

5    PASTE TEXT BECAUSE OUR FINGERS AND THUMBS ARE SO MUCH LARGER

6    THAN THE TEXT THAT YOU'RE TRYING TO HIGHLIGHT.  SO ANYONE WHO'S

7    TRIED TO DO THIS REALIZES HOW INCONVENIENT THAT IS.

8         ALSO, THERE ARE SO MANY MORE THINGS THAT WE WANT TO DO,

9    THAT WE CAN DO WITH THESE TYPES OF INFORMATION ON A PHONE.  FOR

10   EXAMPLE, WE CAN OPEN UP A GPS-BASED MAPPING PROGRAM TO GET

11   DIRECTIONS.  WE CAN MAKE PHONE CALLS AND SO ON.  WE CAN SEND

12   TEXT MESSAGES.

13        SO I THINK THE INVENTION IS EVEN MORE USEFUL TODAY.

14        IN FACT, I FIND IT INVALUABLE MYSELF, IF I'M RUNNING LATE

15   TO TAKE THE KIDS TO A BIRTHDAY PARTY OR I'M ON MY WAY TO A

16   MEETING, I HAVE TO TRY TO FIND AN ADDRESS OR DIRECTIONS OR CALL

17   SOMEBODY, I CAN JUST USE MY THUMB AND PRESS ON SOMETHING, A

18   MENU POPS UP AND I PRESS SOMETHING ELSE AND THEN I'M DOING

19   WHATEVER I WANT TO DO.

20   Q.   LET'S TURN TO YOUR SPECIFIC INFRINGEMENT OPINIONS.

21        YOU SAID YOU ANALYZED WHETHER OR NOT A NUMBER OF SAMSUNG

22   DEVICES INFRINGED CLAIM 9 OF THE '647 PATENT.

23        WHAT WAS THE CONCLUSION THAT YOU CAME TO?

24   A.   MY CONCLUSION WAS THAT THE ACCUSED DEVICES DO INFRINGE

25   CLAIM 9 OF THE '647 PATENT.

1    Q.   OKAY.  COULD WE SEE SLIDE 6, PLEASE, MR. LEE.

2         AND WHAT IS SET OUT ON SLIDE 6?

3    A.   THESE ARE THE NINE ACCUSED DEVICES THAT I BELIEVE INFRINGE

4    THE '647 PATENT.

5    Q.   AND CAN YOU JUST TELL THE JURY WHICH ONES THEY ARE?

6    A.   THEY ARE THE ADMIRE, THE GALAXY NEXUS, THE GALAXY NOTE,

7    GALAXY NOTE 2, GALAXY S II, S II EPIC 4G TOUCH, GALAXY S II

8    SKYROCKET, GALAXY S III, AND STRATOSPHERE.

9    Q.   WAS THERE A TENTH DEVICE THAT YOU ANALYZED THAT YOU

10   CONCLUDED DID NOT INFRINGE?

11   A.   YES.  I ALSO LOOKED AT TABLETS, BUT THE DEVICES THAT I

12   EXAMINED I CONCLUDED DID NOT INFRINGE THE '647 PATENT.

13   Q.   OKAY.  COULD WE SEE SLIDE 7.

14        COULD YOU SUMMARIZE FOR THE JURY THE DOCUMENTS THAT YOU

15   REVIEWED AND THE THINGS THAT YOU DID IN ORDER TO COMPLETE YOUR

16   INFRINGEMENT ANALYSIS.

17   A.   I BEGAN WITH THE '647 PATENT ITSELF, AS WELL AS THE FILE

18   HISTORY, WHICH IS THIS DIALOGUE BETWEEN THE INVENTORS AND THE

19   PATENT OFFICE IN ORDER TO FULLY UNDERSTAND THE PATENT.

20        I ALSO OPERATED EACH OF THE ACCUSED DEVICES AND EACH OF

21   THE DIFFERENT SOFTWARE CONFIGURATIONS TO SEE HOW THEY WORKED,

22   AND I FOCUSSED IN PARTICULAR ON THE TEXT MESSAGING PROGRAM AND

23   THE WEB BROWSER PROGRAM.

24        I ALSO REVIEWED -- WHEN YOU BUY A PHONE YOU GET A USER

25   MANUAL AND A SPECIFICATION THAT TELL YOU HOW TO USE THE PHONE

1    AND GIVE YOU SOME MORE DETAILS ABOUT WHAT'S IN THE PHONE, AND I

2    REVIEWED THOSE.

3         I ALSO REVIEWED THE DEPOSITION TESTIMONY OF ENGINEERS FROM

4    SAMSUNG, GOOGLE, AND ALSO THE TESTIMONY OF THE INVENTORS.

5         I ALSO REVIEWED SOURCE CODE, AND THIS INCLUDED THE SAMSUNG

6    PROPRIETARY CODE THAT RUNS ON THE PHONES, AS WELL AS THE

7    ANDROID OPEN SOURCE CODE THAT PARTS OF IT ARE BASED ON.

8         AND I REVIEWED THE PUBLICLY AVAILABLE DOCUMENTATION THAT

9    GOOGLE PROVIDES THAT EXPLAINS EXACTLY HOW ANDROID WORKS.

10        AND THEN FINALLY, I ALSO REVIEWED THE RESPONSES THAT

11   SAMSUNG PROVIDED DURING THE DISCOVERY PROCESS.

12        MS. KREVANS:  YOUR HONOR, AT THIS TIME I WOULD MOVE

13   THE ADMISSION OF, PER THE COLLOQUY THIS MORNING, OF JX 50, 51,

14   AND 53, AND WE WILL PROVIDE THE COURT AND SAMSUNG WITH BATES

15   NUMBERS, OR FILE NAMES IF WE DON'T HAVE BATES NUMBERS, OF THE

16   PORTIONS OF THOSE EXHIBITS THAT WE WANT TO PUT INTO THE RECORD

17   RELATING TO THE TESTIMONY OF THIS WITNESS.

18        MR. NELSON:  PURSUANT TO OUR DISCUSSION, NO

19   OBJECTION, YOUR HONOR.

20        THE COURT:  OKAY.  WELL, I'M NOT GOING TO SAY WHAT

21   EXACTLY IS ADMITTED UNTIL THAT GETS IDENTIFIED.  OKAY?

22        MS. KREVANS:  OKAY.  YOUR HONOR, IS THERE A DEADLINE

23   THAT YOU WANT US TO GET IT TO YOU BY?

24        THE COURT:  I'D LIKE IT AS SOON AS POSSIBLE, SO

25   ACTUALLY TELL ME WHEN CAN YOUR TEAM GET IT DONE.

```
 1              MS. KREVANS:  WE CAN CERTAINLY DO IT BY TOMORROW

 2    MORNING.

 3              THE COURT:  OKAY.  WELL, IT'S NOT BEING ADMITTED

 4    UNTIL I SEE IT.  OKAY?

 5    BY MS. KREVANS:

 6    Q.  DID YOU LOOK AT THE PHYSICAL EXAMPLES OF THE SAMSUNG

 7    PHONES THAT YOU ANALYZED?

 8    A.  YES, I DID.

 9              MS. KREVANS:  OKAY.  YOUR HONOR, AT THIS TIME I WOULD

10    MOVE INTO EVIDENCE, FOR THE ADMIRE, JX 28C; FOR THE NEXUS,

11    JX 29A, C, E, G, H, AND I; FOR THE NOTE, JX 30A, B, AND C; FOR

12    THE NOTE 2, JX 31A, B, AND C; FOR THE GALAXY SII, JX 32A, B, D,

13    E, AND F; FOR THE GALAXY SII EPIC 4G TOUCH, JX 33A AND C; FOR

14    THE GALAXY SII SKYROCKET JX 34A, B, AND D; FOR THE

15    GALAXY S III, JX 35A THROUGH M, BUT WITH THE EXCEPTION OF K SO

16    IT'S A THROUGH J, AND THEN L AND M; AND FOR THE STRATOSPHERE,

17    JX 37A AND B.

18              THE COURT:  I'M TRYING TO GET ALL THESE OFF THE

19    TRANSCRIPT, SO GIVE ME A MINUTE, PLEASE.

20         (PAUSE IN PROCEEDINGS.)

21              THE CLERK:  THE LETTERS AGAIN FOR 34?

22              MS. KREVANS:  I'M SORRY.

23              THE CLERK:  THE LETTERS AGAIN FOR 34?

24              MS. KREVANS:  A, B, AND D.

25              THE CLERK:  THANK YOU.
```

DIRECT MOWRY

```
1              THE COURT:  SO FOR 35, IT SKIPS K AND CONTINUES WITH

2       L AND M?

3              MS. KREVANS:  EXACTLY, YOUR HONOR.

4              THE COURT:  AND THEN 37A AND B.

5         ALL RIGHT.  ANY OBJECTION?

6              MR. NELSON:  NO OBJECTION, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  THESE ARE ADMITTED.

8         (JOINT EXHIBITS JX 28C, JX 29A, C, E, G, H, AND I; JX 30A,

9       B, AND C; JX 31A, B, AND C; JX 32A, B, D, E, AND F; JX 33A AND

10      C; JX 34A, B, AND D; JX 35A-J, AND THEN L AND M; AND, JX 37A

11      AND B WERE ADMITTED IN EVIDENCE.)

12             THE COURT:  GO AHEAD, PLEASE.

13      BY MS. KREVANS:

14      Q.   PROFESSOR MOWRY, YOU MENTIONED USER MANUALS.  HAVE YOU

15      REVIEWED THE DOCUMENTS THAT HAVE BEEN MARKED AS PLAINTIFF'S

16      EXHIBIT 230 TO 237 AND PLAINTIFF'S EXHIBIT 239?

17      A.   YES, I HAVE.

18      Q.   ARE THOSE THE USER MANUALS THAT YOU REFERRED TO?

19      A.   YES.

20             MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

21      PLAINTIFF'S EXHIBIT 233 AND 237 INTO EVIDENCE.

22             THE COURT:  PX 233 AND 237.

23         ALL RIGHT.  ANY OBJECTION?

24             MR. NELSON:  NO OBJECTION, YOUR HONOR.

25             THE COURT:  IT'S ADMITTED.
```

```
 1              (PLAINTIFF'S EXHIBITS PX 233 AND 237 WERE ADMITTED IN

 2       EVIDENCE.)

 3                   THE COURT:  GO AHEAD, PLEASE.

 4       BY MS. KREVANS:

 5       Q.   HOW DID YOU USE THE USER MANUALS IN YOUR ANALYSIS,

 6       PROFESSOR MOWRY?

 7       A.   I READ THE PORTIONS IN PARTICULAR THAT RELATED TO HOW YOU

 8       USE THE PHONE FOR TAKING ADVANTAGE OF LINKS AND THINGS IN, SAY,

 9       A MESSAGING, TEXT MESSAGING PROGRAM AND THE WEB BROWSER.

10       Q.   SO DID THESE USER MANUALS, EACH OF THEM, TELL SAMSUNG

11       PHONE USERS HOW TO USE THIS DATA DETECTION FEATURE?

12       A.   YES, THERE WAS DISCUSSION OF HOW TO USE THAT KIND OF

13       THING, YES, THAT'S CORRECT.

14       Q.   OKAY.  COULD WE LOOK AT EXHIBIT 237, PAGE 823, MR. LEE.

15              AND COULD YOU SHOW US THE CODE THAT'S IN GREEN NEAR THE

16       BOTTOM OF THE PAGE.

17              COULD YOU POINT OUT TO THE JURY THE PART OF THIS PAGE

18       THAT'S AN EXAMPLE OF ONE OF THE THINGS THAT SAMSUNG DIRECTS ITS

19       CUSTOMERS TO DO WITH ITS PHONES?

20       A.   YES.  THE, THE MIDDLE AND BOTTOM SENTENCES, FOR EXAMPLE,

21       TALK ABOUT WITHIN A TEXT MESSAGE, IT HAS DETECTED A WEB URL,

22       AND IN THE BOTTOM A PHONE NUMBER.

23              SO, FOR EXAMPLE, ON THE BOTTOM SENTENCE, IT SAYS IF A

24       MESSAGE CONTAINS A PHONE NUMBER, IF YOU TAP THE MESSAGE AND TAP

25       THE PHONE NUMBER, YOU CAN DIAL THE NUMBER OR ADD IT TO YOUR
```

1     CONTACTS.

2          SO YOU CAN DO MULTIPLE THINGS WITH THE DETECTED PHONE

3     NUMBER.

4     Q.   OKAY.  THIS IS THE USER MANUAL FOR THE GALAXY S III?

5     A.   THAT'S CORRECT.

6     Q.   ARE THERE SIMILAR INSTRUCTIONS IN OTHER USER MANUALS?

7     A.   YES, THAT'S CORRECT.

8     Q.   YOU MENTIONED SPECIFICATIONS.  ARE THE SPECIFICATIONS YOU

9     REVIEWED IN THE EXHIBIT THAT HAS BEEN MARKED AS PX 241?

10    A.   YES, THAT'S CORRECT.

11          MS. KREVANS:  AND, YOUR HONOR, 241 IS ALREADY IN

12    EVIDENCE.

13    Q.   YOU MENTIONED DISCOVERY RESPONSES.  DID YOU REVIEW A

14    DISCOVERY RESPONSE THAT HAD INFORMATION ABOUT WHICH SOURCE CODE

15    WAS ON WHICH OF THESE NINE PHONES AT VARIOUS POINTS IN TIME?

16    A.   I DID, YES.

17          MS. KREVANS:  OKAY.  AND THAT'S THE DOCUMENT THAT'S

18    ALREADY BEEN ADMITTED, YOUR HONOR, AS PX 300.

19    Q.   DID YOU REVIEW A TABLE IN THAT DOCUMENT AND RELY ON IT TO

20    DETERMINE WHICH SOURCE CODE WAS ON WHICH PHONE AT WHAT POINT IN

21    TIME?

22    A.   YES, THAT'S CORRECT.

23    Q.   OKAY.  COULD WE SEE SLIDE 11.

24          WHAT HAVE YOU SUMMARIZED IN YOUR SLIDE 11,

25    PROFESSOR MOWRY?

```
 1      A.   THE ANDROID OPERATING SYSTEM, THERE WERE DIFFERENT

 2      RELEASES OF THE SOFTWARE, AND THE MAJOR RELEASES HAVE INTERNAL

 3      DESSERT THEME CODE NAMED THAT GOOGLE GIVES TO THEM.

 4           SO THE CODE NAMES ARE GINGERBREAD, ICE CREAM SANDWICH, AND

 5      JELLY BEAN, AND THESE ACTUALLY REFER TO COLLECTIONS OF

 6      DIFFERENT RELEASES.

 7           SO, FOR EXAMPLE, GINGERBREAD IS ALL OF THE VERSION NUMBERS

 8      THAT BEGIN WITH 2.3 AND THEN THEY CAN HAVE OTHER DIGITS AFTER

 9      THAT, 2.3.1 AND SO ON, AND THAT'S, THAT'S WHAT THE -- THAT'S

10      WHAT THIS TABLE IS ILLUSTRATING.

11      Q.   AND YOU MENTIONED GOOGLE.  ARE ALL OF THESE RELEASES,

12      RELEASES THAT SAMSUNG INFORMED YOU IN DISCOVERY ARE ACTUALLY

13      RUNNING ON SAMSUNG PHONES?

14      A.   THAT'S CORRECT.

15      Q.   OKAY.  THERE ARE SUBVERSIONS MENTIONED ON THIS SLIDE.

16      WERE THERE DIFFERENCES ACROSS SUBVERSIONS THAT TURNED OUT TO BE

17      RELEVANT TO YOUR ANALYSIS?

18      A.   NO.  FOR THE PURPOSES OF ANALYZING INFRINGEMENT OF THE

19      '647 PATENT, THERE WERE NO DIFFERENCES BETWEEN THE SUBVERSIONS

20      THAT AFFECTED MY ANALYSIS.

21      Q.   OKAY.  LET'S LOOK AT THE '647 PATENT AND CLAIM 1, AND I

22      HAVE IT UP ON A BOARD HERE.

23           YOU ALSO HAVE THE PATENT UP THERE IN YOUR BINDER AT JX 1.

24      A.   YES.

25      Q.   I THINK I MIGHT BE BETWEEN YOU AND THE BOARD,
```

```
 1        PROFESSOR MOWRY.  SORRY ABOUT THAT.  I HAVE TO PUT IT IN A

 2     PLACE WHERE THE JURORS CAN SEE IT.

 3            WE'VE ADDED LETTERS AND NUMBERS TO THE CLAIM JUST TO MAKE

 4     IT EASIER WHAT WE'RE REFERRING TO.  JUST TO BE CLEAR, THOSE

 5     DON'T APPEAR IN THE ORIGINAL.

 6            LET ME FIRST ASK YOU, HAS THE COURT GIVEN US ANY

 7     DEFINITIONS OF ANY OF THE TERMS IN CLAIM 9 OF THE '647 PATENT?

 8     A.   YES, THE COURT DEFINED ONE TERM, WHICH IS "ACTION

 9     PROCESSOR."

10     Q.   OKAY.  WHAT WAS THE DEFINITION THAT THE COURT GAVE US FOR

11     THAT TERM?

12     A.   THE DEFINITION IS IT'S A "PROGRAM ROUTINE OR ROUTINES THAT

13     PERFORM A SELECTED ACTION ON THE DETECTED STRUCTURE."

14     Q.   DID YOU USE THAT DEFINITION FOR ALL PURPOSES IN YOUR

15     ANALYSIS IN THIS CASE?

16     A.   YES, I DID.

17     Q.   FOR THE OTHER WORDS IN THIS CLAIM FOR WHICH THE COURT DID

18     NOT GIVE US A DEFINITION, WHAT DID YOU DO?

19     A.    FOR THE OTHER -- FOR THE OTHER WORDS, I USED THE PLAIN AND

20     ORDINARY MEANING FOR A PERSON SKILLED IN -- A PERSON OF

21     ORDINARY SKILL IN THE ART IN 1996, WHICH WAS THE YEAR THAT THE

22     PATENT WAS FILED.

23     Q.   OKAY.  AND WHAT WAS YOUR VIEW ABOUT THE KIND OF

24     QUALIFICATIONS AND EDUCATION THAT A PERSON OF ORDINARY SKILL IN

25     THE FIELD OF THIS INVENTION WOULD HAVE HAD IN 1996?
```

1        A.   THEY WOULD HAVE HAD EITHER A BACHELOR'S DEGREE IN COMPUTER

2        SCIENCE OR EQUIVALENT TRAINING, AND THEY WOULD HAVE HAD TWO

3        YEARS OF EXPERIENCE IN THE FIELD.

4        Q.   OKAY.  I KNOW THAT THE JURY HAS HEARD ABOUT THIS A LITTLE

5        BIT FROM A PRIOR WITNESS.

6             YOU ANALYZED CLAIM 9 AND YOU SAID CLAIM 9 DEPENDS ON

7        CLAIM 1.  DOES THAT MEAN IN ORDER TO INFRINGE CLAIM 9, A DEVICE

8        HAS TO MEET EVERY LIMITATION OF BOTH CLAIM 1 AND CLAIM 9?

9        A.   THAT'S CORRECT.

10       Q.   AND THAT'S HOW YOU DID YOUR INFRINGEMENT ANALYSIS?

11       A.   YES, THAT'S RIGHT.

12       Q.   DID YOU FIND THAT EACH OF THE NINE SAMSUNG PHONES THAT YOU

13       SHOWED US ON YOUR SLIDE EARLIER MET EACH AND EVERY ELEMENT SET

14       OUT IN BOTH CLAIM 1 AND CLAIM 9?

15       A.   YES, I DID.

16       Q.   ONE OF THE THINGS YOU SAID YOU DID WHEN YOU DID YOUR

17       INFRINGEMENT ANALYSIS IS TO LOOK AT THE ACTUAL DEVICES TO SEE

18       HOW THEY WORKED.

19            HAVE YOU PREPARED VIDEOS TODAY TO SHOW THE JURORS HOW

20       EXEMPLARY DEVICES WORK WHEN THEY PERFORM THE FUNCTIONS THAT YOU

21       BELIEVE INFRINGES THE PATENT?

22       A.   YES, I HAVE.  I HAVE FOUR VIDEOS.

23       Q.   OKAY.  COULD WE LOOK AT SLIDE 13, AND CAN YOU EXPLAIN TO

24       THE JURY WHY, FOR NINE DEVICES, YOU HAVE FOUR VIDEOS?

25       A.   YES.  FIRST, THERE ARE TWO DIFFERENT APPLICATIONS.

1        THERE'S THE TEXT MESSAGING APPLICATION CALLED MESSAGING, AND

2        THE WEB BROWSER, CALLED BROWSER.

3             AND THEN IT TURNS OUT THAT WITHIN THE APPLICATIONS, FOR

4        EACH APPLICATION, THERE WAS A POINT WHERE BETWEEN SOME MAJOR

5        ANDROID RELEASES, THE SAMSUNG SOFTWARE HAD SOME CHANGES THAT

6        AFFECTED SOME DETAILS OF MY ANALYSIS WHEN I WAS DESCRIBING THE

7        RELATIONSHIP BETWEEN THE SOFTWARE -- THE PHONE AND THE PATENT

8        CLAIM ELEMENTS.

9             SO WHAT I'VE DONE IS I GROUPED THEM TOGETHER INTO

10       EQUIVALENT GROUPINGS AND I CHOSE ONE REPRESENTATIVE PHONE FROM

11       EACH GROUPING.

12            SO IF YOU UNDERSTAND THE BEHAVIOR OF THESE FOUR PHONES

13       RUNNING THESE SPECIFIC APPLICATIONS, THEN YOU UNDERSTAND ALL --

14       THE BROWSER AND MESSAGING ON ALL OF THE ACCUSED DEVICES.

15       Q.   OKAY.  LET ME JUST MAKE SURE WE'RE CLEAR ABOUT ONE THING.

16            YOU SAID THERE'S BOTH BROWSER AND MESSAGING.  ARE THOSE

17       TWO DIFFERENT APPLICATIONS, EACH OF WHICH APPEARS ON ALL NINE

18       OF THE ACCUSED PHONES?

19       A.   THAT'S RIGHT, BOTH OF THOSE APPLICATIONS APPEAR ON ALL

20       NINE OF THE PHONES.

21       Q.   AND YOU ANALYZED EACH OF THOSE APPLICATIONS SEPARATELY TO

22       SEE IF, IN THAT APPLICATION, THERE WAS INFRINGING BEHAVIOR?

23       A.   THAT'S CORRECT.

24       Q.   OKAY.  WHEN YOU SAY THAT YOU FOUND THAT EACH OF THESE NINE

25       PHONES INFRINGED CLAIM 9 OF THE '647 PATENT, DID YOU FIND THAT

```
 1        INFRINGEMENT INDEPENDENTLY FOR EACH OF THE MESSAGING

 2        APPLICATION AND THE BROWSER APPLICATION?

 3        A.   THAT'S CORRECT.

 4        Q.   OKAY.  SO DID YOU DO YOUR ANALYSIS ONLY ON THE THREE

 5        PRODUCTS THAT WE SEE ON SLIDE 13?

 6        A.   NO.  I ANALYZED ALL OF THE PRODUCTS IN ALL OF THE

 7        DIFFERENT CONFIGURATIONS, BUT I -- THROUGH THAT ANALYSIS, I

 8        DISCOVERED THAT MANY OF THEM WERE EFFECTIVELY IDENTICAL FOR MY

 9        PURPOSES OF UNDERSTANDING THE RELATIONSHIP OF THE PATENTS, SO

10        THAT'S WHY I, FOR THE SAKE OF BREVITY, I CAN JUST PRESENT

11        THESE.

12        Q.   OKAY.  BEFORE YOU SHOW US THE VIDEOS, LET ME ASK AN

13        INTRODUCTORY QUESTION.

14             COULD YOU TELL IF THESE PHONES INFRINGE CLAIM 9 JUST BY

15        OPERATING THE PHONES AND LOOKING AT THINGS LIKE THE USER MANUAL

16        AND THE SPECIFICATIONS?

17        A.   THERE ARE CERTAIN THINGS WHERE IT'S EASY TO TELL WHETHER A

18        PARTICULAR CLAIM ELEMENT IS MET JUST BY LOOKING AT WHAT THE

19        PHONE DOES AND LOOKING AT THE SPECIFICATION.

20             IN PARTICULAR, THE HARDWARE CLAIM ELEMENTS, A, B, C, AND

21        D, JUST FROM RUNNING THE PHONE AND FROM THE SPECIFICATION, YOU

22        CAN TELL THAT IT SATISFIES THESE, THESE THINGS.

23             AND, IN FACT, THERE'S NO REAL DISAGREEMENT ABOUT THAT FROM

24        SAMSUNG AS I UNDERSTAND IT.

25             THE OTHER ELEMENTS INVOLVE SOFTWARE AND YOU CAN ACTUALLY
```

1    SEE THE BEHAVIOR OF THAT SOFTWARE WHEN YOU OPERATE THE PHONE,

2    BUT TO CONFIRM THAT BEHAVIOR, THAT THERE WAS SOMETHING REAL AND

3    IT WASN'T JUST MAGIC OR SMOKING MIRRORS, I ACTUALLY LOOKED AT

4    THE SOFTWARE OR EACH OF THE PHONES TO ANALYZE THE PARTS THAT

5    INVOLVE SOFTWARE.

6    Q.   OKAY.  LET'S LOOK FIRST AT THE VIDEOS THAT YOU MADE

7    ILLUSTRATING THE INFRINGING BEHAVIOR IN THE MESSAGING

8    APPLICATION, AND THE FIRST ONE WILL BE THE SAMSUNG GALAXY S III

9    PHONE RUNNING JELLY BEAN CODE, AND THE PHONE THAT YOU ACTUALLY

10   USED TO MAKE THIS VIDEO HAS -- IS JX 35 I.

11        AND I'VE PUT IT UP THERE IN FRONT OF YOU.

12   A.   YES.

13   Q.   OKAY.  COULD YOU WALK US THROUGH YOUR VIDEO AND TELL US

14   WHAT WE'RE GOING TO SEE AND TAKE US THROUGH IT.

15   A.   WHAT WE'RE ABOUT TO SEE IS THE USER WILL OPEN UP THE TEXT

16   MESSAGING PROGRAM, AND WE'RE GOING TO LOOK AT A TEXT MESSAGE.

17        SO THIS IS JUST AN EXAMPLE MESSAGE, AND WHEN SOMEONE SENT

18   IT TO THIS PHONE, THEY ENTERED AN E-MAIL ADDRESS AND A PHONE

19   NUMBER JUST AS NORMAL TEXT.

20        BUT NOW WHAT YOU SEE IS THEY'RE SHOWN IN BLEW AND THEY'RE

21   UNDERLINED, AND THAT'S THE RESULT OF THE STRUCTURES BEING

22   DETECTED AND HIGHLIGHTED SO NOW IT'S EASY FOR A USER TO SEE

23   THEM.

24        IF WE CONTINUE FORWARD, IF THE USER PRESSES ON THE E-MAIL

25   ADDRESS, THEY SEE A POP-UP MENU APPEAR WHERE NOW FOR THAT

```
1     SPECIFIC E-MAIL ADDRESS, WE HAVE SOME OPTIONS AND THING WE CAN

2     DO WITH IT.

3          WE CAN SEND -- OPEN UP -- WE CAN LAUNCH OUR E-MAIL PROGRAM

4     TO START COMPOSING A MESSAGE TO THIS E-MAIL ADDRESS.  WE COULD

5     START SENDING AN INSTANT MESSAGE TO THEM.  WE CAN ADD TO OUR

6     CONTACT LIST.

7          SO IF WE CONTINUE FORWARD WITH THE USER THEN CHOOSES TO

8     SEND AN E-MAIL.  YOU CAN SEE THAT IT'S AUTOMATICALLY LAUNCHED

9     THE E-MAIL PROGRAM AND IT'S FILLED IN THAT E-MAIL ADDRESS,

10    JDOE@WORK.COM IS IN THE "TO" FIELD.

11    Q.   OKAY.  MR. LEE, COULD YOU TAKE US BACK TO THE START OF

12    THIS VIDEO AGAIN, JUST BACK TO THE BEGINNING BEFORE YOU STARTED

13    IT ALL.

14         AND DO THE FIRST STEP WHERE WE SEE THE MESSAGE.

15         YOU MENTIONED THAT THESE STRUCTURES WERE HIGHLIGHTED.

16    DOES THE CLAIM OF THE '647 PATENT ACTUALLY REQUIRE THAT THE

17    STRUCTURES BE HIGHLIGHTED?

18    A.   CLAIM 9 DOES NOT.

19    Q.   OKAY.

20    A.   THAT'S OPTIONAL.  IT'S NOT A REQUIREMENT OF THE CLAIM.

21    Q.   BUT JELLY BEAN HAPPENS TO DO THAT SO WE SEE IT ON THIS

22    DEVICE?

23    A.   IT DOES FOR THE MESSAGING PROGRAM, THAT'S CORRECT.

24    Q.   OKAY.  LET'S LOOK AT THE SECOND VIDEO YOU MADE FOR THE

25    MESSAGING APPLICATION.  THIS ONE WAS DONE WITH THE SAMSUNG
```

1      ADMIRE.  THAT IS JX 28C, AND THIS ONE IS RUNNING GINGERBREAD

2      CODE; RIGHT?

3      A.   THAT'S RIGHT.

4      Q.   OKAY.  TAKE US THROUGH THIS.

5      A.   SO, AGAIN, WE'LL OPEN UP THE TEXT MESSAGING PROGRAM AND

6      WE'LL SEE THE SAME EXAMPLE MESSAGE.  THE USER INTERFACE IS

7      SLIGHTLY DIFFERENT.

8           NOW YOU SIMPLY PRESS ANYWHERE ON THAT PARTICULAR MESSAGE,

9      SO IF THE USER DOES THAT, WHAT IT'LL DO IS -- IF WE CAN MOVE

10     THE VIDEO FORWARD -- IF YOU PRESS ON THE MESSAGE, NOW YOU GET

11     ONE POP-UP MENU THAT'S COMBINED ALL OF THE OPTIONS FOR ALL OF

12     THE STRUCTURES WITHIN THE MESSAGE.  SO THERE WAS BOTH AN E-MAIL

13     ADDRESS AND A PHONE NUMBER AND WE SEE OPTIONS LIKE SEND E-MAIL

14     TO THAT E-MAIL ADDRESS OR CALL THAT PHONE NUMBER.

15          NOW THE USER CAN CHOOSE ANY OF THESE, FOR EXAMPLE, SEND

16     E-MAIL TO JDOE@WORK.COM, AND SIMILARLY, WE SEE THE OTHER

17     EXAMPLES ARE OPEN THE E-MAIL PROGRAM AND THAT E-MAIL ADDRESS IS

18     FILLED IN AT THE ADDRESS FOR COMPOSING THE MESSAGE TO.

19     Q.   OKAY.  YOU SAID YOU ALSO MADE TWO VIDEOS SHOWING HOW THESE

20     PHONES USE CLAIM 9 OF THE '647 PATENT IN THE BROWSER

21     APPLICATION.

22          LET'S LOOK AT THE FIRST ONE, AND THIS IS PDX 16.  THIS IS

23     A VIDEO OF THE SAMSUNG GALAXY NEXUS, WHICH IS EXHIBIT JX 29C,

24     RUNNING CODE --

25     A.   ICE CREAM SANDWICH.

1        Q.   -- ICE CREAM SANDWICH?

2        A.   YES.  IT'S ALMOST LUNCH TIME.

3             OKAY.  NOW, THIS ONE WE'VE OPENED THE WEB BROWSER AND

4    WE'RE GOING TO NAVIGATE TO A WEB PAGE WHICH HAPPENS TO HAVE A

5    NUMBER OF PHONE NUMBERS ON IT.

6             AND THERE'S NOTHING SPECIAL ABOUT HOW THESE PHONE NUMBERS

7    WERE STORED, THEY'RE JUST REGULAR TEXT.  THEY WEREN'T

8    HYPERLINKS BEFORE.

9             BUT NOW THE BROWSER HAS DETECTED THESE AND THE BROWSER,

10   WHEN YOU PRESS ON ONE OF THESE PHONE NUMBERS -- IF WE CAN MOVE

11   FORWARD -- YOU SEE THAT THE PHONE NUMBER IS DETECTED AND

12   HIGHLIGHT AND HAD NOW A POP-UP MENU APPEARS WHERE YOU HAVE

13   OPTIONS FOR THE PHONE NUMBER.  WE CAN LAUNCH THE DIALER AND

14   HAVE IT FILL IN THE DIGITS.  WE CAN ADD IT TO OUR CONTACT LIST.

15            SO IF THE USER CHOOSES THE FIRST OPTION, YOU SEE THAT THE

16   DIALER IS NOW OPENED UP AND THOSE DIGITS APPEAR ALREADY FILLED

17   IN, IN THE PHONE DIALER.  SO THAT WAS THE FIRST WITH OF THE

18   BROWSER VIDEOS.

19       Q.   OKAY.  AND THEN LET'S LOOK AT THE LAST VIDEO.  AND WHAT IS

20   THIS?

21       A.   THIS IS THE GALAXY S III RUNNING JELLY BEAN, AND WE'RE

22   GOING TO LOOK AT IT RUNNING ITS VERSION OF THE WEB BROWSER.

23            SO WE'LL OPEN UP A BROWSER AGAIN AND GO TO THAT SAME WEB

24   PAGE, WE'LL ZOOM IN SO IT'S EASIER TO SEE, AND NOW THE USER

25   WILL PRESS ON THE PHONE NUMBER AND YOU'LL SEE THE PHONE NUMBER

1    IS HIGHLIGHTED AND A POP-UP MENU APPEARS, AND NOW FOR THAT

2    PHONE NUMBER, WE HAVE SIMILAR -- THE SAME ACTUALLY, I THINK

3    SEVERAL OPTIONS, WE CAN DIAL THE PHONE NUMBER.  SO IF WE CHOOSE

4    THAT OPTION, IT LAUNCHES THE PHONE DIALER AND WE SEE THAT THE

5    DIGITS ARE FILLED IN ALREADY.

6    Q.   OKAY.  LET'S GO BACK TO THE CLAIM FOR A MOMENT.

7         YOUR HONOR, YOU SAID YOU WANTED TO TAKE ANOTHER --

8              THE COURT:  NO, LET'S KEEP GOING.  IS THAT ALL RIGHT?

9    CAN WE KEEP GOING?

10             MS. KREVANS:  OKAY.

11             THE COURT:  THANK YOU.

12   BY MS. KREVANS:

13   Q.   COULD YOU EXPLAIN TO THE JURY WHICH ELEMENTS OF THE CLAIM

14   YOU CAN NOW CONFIRM, BEFORE YOU EVEN LOOKED AT THE CODE, YOU

15   CAN CONFIRM ARE INFRINGED AND WHY?

16   A.   YES.  JUST BY OPERATING THE PHONE AND LOOKING AT -- JUST

17   FROM OPERATING THE PHONE, WE KNOW THAT, FOR EXAMPLE, ELEMENT A

18   IS MET BECAUSE IT HAS AN INPUT DEVICE.  EACH PHONE WAS ABLE TO

19   RECEIVE A TEXT MESSAGE AND BROWSE TO A WEB PAGE USING ITS

20   NETWORK INPUT DEVICE.  SO WE CAN CHECK THAT ONE OFF.

21        WE ALSO OBSERVED AN OUTPUT DEVICE.  IT HAD A SCREEN WHICH

22   WE COULD SEE.

23        AND THEY -- WE CAN -- WE KNOW THAT BECAUSE THEY WERE

24   OPERATING, THEY WERE EXECUTING SOFTWARE.  WE KNOW THAT THERE

25   WAS A PROCESSING UNIT, WHICH IS D, AND ALSO A MEMORY BECAUSE WE

1    NEED THOSE THINGS IN ORDER TO EXECUTE THE SOFTWARE.

2         AND WE CAN -- IN FACT, THE SPECIFICATIONS GIVE DETAILS ON

3    EXACTLY WHAT HARDWARE DEVICES CORRESPOND TO EACH OF THESE

4    THINGS.

5         SO WE KNOW THESE THINGS ARE MET ALREADY EVEN BEFORE WE

6    LOOK AT SOFTWARE.

7    Q.   OKAY.  ELEMENT E SAYS "WHEREIN THE USER INTERFACE ENABLES

8    SELECTION OF AN ACTION BY CAUSING THE OUTPUT DEVICE, THE

9    SCREEN, TO DISPLAY A POP-UP MENU OF LINKING ACTIONS."  WE SAW

10   POP-UP MENUS.  SHOULD WE CHECK OFF E NOW?

11   A.   THE REASON NOT TO DO THAT IS IT SAYS IT'S A POP-UP MENU OF

12   LINKED ACTIONS, AND WE HAVE TO MAKE SURE THERE'S LINKED ACTIONS

13   AND TO CONFIRM THAT, WE'LL GET THE SOFTWARE FIRST.

14   Q.   OKAY.  LET'S TURN THEN TO YOUR ANALYSIS OF THE CODE.

15        OKAY TO SHOW THESE SLIDES?  IT'S THE SLIDES WE DISCLOSED

16   AND THAT WE TALKED ABOUT THE CODE, WHICH IS THE BASE THAT WE

17   DISCUSSED.

18             MR. NELSON:  I THINK WE'RE OKAY UNTIL WE GET TO 44.

19             MS. KREVANS:  SO YOU'LL --

20             MR. NELSON:  I'LL LET YOU KNOW.

21             MS. KREVANS:  SO WHICH IS THE ONE YOU DON'T WANT TO

22   HAVE?

23             MR. NELSON:  44, 45, 46.

24             MS. KREVANS:  44, 45, 46.

25             MR. NELSON:  AND 16, 17, AND 18.

1            MS. KREVANS:  AND 16, 17, 18.

2    Q.   ALL RIGHT.  LET'S START WITH -- LET ME BACK UP.

3            HAVE YOU PREPARED A SERIES OF SLIDES THAT ILLUSTRATE YOUR

4    ANALYSIS OF THE CODE THAT IS RUNNING ON EACH OF THESE SAMSUNG

5    PHONES FOR THE MESSAGING APPLICATION AND BROWSER APPLICATION

6    FOR EACH OF JELLY BEAN, ICE CREAM SANDWICH, AND GINGERBREAD

7    THAT WILL SHOW THE OPERATION OF THE CODE TO PERFORM ELEMENTS

8    C1, C2, C3, AND TO CONFIRM THE LINKED ACTIONS WHICH WE SEE IN

9    C2 AND D?

10   A.   YES, I HAVE.

11   Q.   OKAY.  LET'S LOOK AT THE FIRST SLIDE IN THE SERIES, 18A.

12   THIS IS A SLIDE ILLUSTRATING THE CODE FOR THE MESSAGING

13   APPLICATION FOR ELEMENT C1, THE ANALYZER SERVER.  THAT ELEMENT

14   REQUIRES AN ANALYZER SERVE FOR DETECTING STRUCTURES IN THE DATA

15   AND FOR LINKING ACTIONS TO THE DETECTED STRUCTURES.

16           THIS SLIDE TALKS ABOUT THE FIRST PART OF THAT, THE

17   DETECTING STRUCTURES?

18   A.   YES, THAT'S CORRECT.

19   Q.   COULD YOU WALK US THROUGH IT?

20   A.   SO I NOTICE IT'S NOT UP THERE.  IS IT ONLY FOR THE JURY,

21   OR AM I ALLOWED TO --

22           MS. KREVANS:  THIS SLIDE IS OKAY.

23           MR. NELSON:  YES.

24           THE WITNESS:  OKAY.  THE -- I WANT TO EXPLAIN THE

25   FORMAT OF WHAT'S SHOWN HERE.

1          SO I HAVE SOME BLUE BOXES AND THESE REFER TO PIECES OF THE

2     SOFTWARE, AND THE YELLOW LABEL AT THE TOP OF THE BOX IS THE

3     NAME OF WHAT COMPUTER SCIENTISTS CALL A CLASS, WHICH IS A

4     COLLECTION OF SOFTWARE WE CAN USE, AND IT ALSO IS TYPICALLY

5     ALSO THE FILE NAME.

6          SO WHEN I SAY CLASS, I'M REFERRING TO WHAT'S IN YELLOW.

7          AND WITHIN A CLASS, THERE ARE SUBROUTINE NAMES, AND WE SEE

8     THESE IN WHITE, AND THEY OFTEN HAVE PARENTHESES AT THE END.

9          SO I APOLOGIZE FOR LAPSING INTO COMPUTER SCIENTIST SPEAK

10    HERE FOR A LITTLE BIT.

11         BUT THE SOFTWARE THAT DETECTS STRUCTURES FOR MESSAGING IS

12    THE SAME IN ALL OF THE DIFFERENT VERSIONS OF THE PHONES.  IT

13    USES SOMETHING CALLED ADD LINKS, ADD LINKS METHOD WITHIN THE

14    LINKIFY CLASS, AND THIS IS DEFINED SPECIFICALLY TO FIND PHONE

15    NUMBERS, E-MAIL ADDRESSES AND SO ON.  AND TO DO THIS, IT USES

16    PRERECORDED PATTERNS FOR THESE THINGS.  THERE'S A PATTERN

17    ALREADY GENERATED FOR A PHONE NUMBER, THERE'S ONE FOR AN E-MAIL

18    ADDRESS, AND THESE ARE IN SOMETHING CALLED A PATTERN CLASS,

19    WHICH YOU SEE OVER ON THE RIGHT SIDE.

20         AND USING THE MATCHER METHOD WITHIN THAT CLASS, IT THEN

21    MAKES USE OF A BOX ON THE BOTTOM WHERE YOU SEE A MATCHER CLASS

22    AND IT FINDS METHOD.

23         SO THIS SOFTWARE WILL FIND PHONE NUMBERS AND E-MAIL

24    ADDRESSES, FOR EXAMPLE, IN A TEXT DOCUMENT, SUCH AS IN A TEXT

25    MESSAGE.  THIS IS HOW IT WORKS IN MESSAGING.

1    Q.   OKAY.  AND THIS IS THE CODE STRUCTURE THAT APPLIES TO ALL

2    OF JELLY BEAN, GINGERBREAD, AND ICE CREAM SANDWICH?

3    A.   THAT'S CORRECT.

4         MS. KREVANS:  OKAY.  MR. LEE, THE NEXT SLIDE I'M

5    GOING TO ASK YOU TO SHOW ONLY TO THE JURY.  IT IS 19A.

6    Q.   COULD YOU EXPLAIN, PROFESSOR MOWRY, WHAT YOU -- WHAT THE

7    JURY CAN SEE ON SLIDE 19A?

8    A.   THIS IS AN EXCERPT FROM THE ACTUAL CODE FROM -- THAT I WAS

9    SHOWING IN THE -- ON THE PREVIOUS SLIDE.  AND AT THE TOP WHAT

10   YOU CAN SEE IS A DESCRIPTION OF WHAT THE SOFTWARE DOES WRITTEN

11   IN ENGLISH.  THIS IS FROM THE CODE ITSELF WHERE THE PROGRAMMERS

12   WRITE THIS DOWN IS TO THAT OTHER PARAMETERS CAN FIGURE OUT WHAT

13   IT DOES.

14        AND IN THE LOWER BOX, YOU CAN SEE DETAILS OF THE SOFTWARE.

15   YOU CAN SEE IT LOOKING FOR PATTERNS, THE KINDS OF PATTERNS I

16   JUST DESCRIBED.

17   Q.   AND THE DESCRIPTION OF THE TOP THAT'S IN WHAT YOU CALLED

18   REGULAR ENGLISH, THAT'S WHERE IT SAYS LINKIFY, TAKE A PIECE OF

19   TEXT AND A REGULAR EXPRESSION AND TURNS ALL OF THE REGEX

20   MATCHES IN THE TEXT INTO CLICKABLE LINKS?

21   A.   THAT'S CORRECT.

22   Q.   AND THE CODE THAT YOU'RE SHOWING DOWN BLOW IS THE CODE

23   THAT DOES THAT?

24   A.   YES, THAT'S RIGHT.

25   Q.   OKAY.  AND WHAT HAVE YOU HIGHLIGHTED ON THE SLIDE AND WHAT

```
 1    HAVE YOU UNDERLINED?

 2    A.   I'VE HIGHLIGHTED THE FACT THAT THIS, THIS COMPUTER

 3    SUBROUTINE IS ABLE TO LOOK FOR WEB URL'S, E-MAIL ADDRESSES AND

 4    PHONE NUMBERS.  AND IT'S CHECKING IF THE USER, IF THE SOFTWARE

 5    IS SPECIFIED TO LOOK FOR THAT TYPE OF PATTERN, THAT IT'S

 6    LOOKING UP A PRERECORDED PATTERN THAT -- WHICH YOU CAN SEE ON

 7    THE RIGHT SIDE.

 8         AND IT'S, IN THE UNDERLYING PART IS THE NAME OF A

 9    PROCEDURE WHICH IS THEN CALLED A COMPUTER SUBROUTINE WHICH THEN

10    GOES OFF AND ACTUALLY FINDS THIS PATTERN IN THE TEXT.

11    Q.   AND THAT'S THE PART YOU'VE UNDERLINED IN RED?

12    A.   THAT'S CORRECT.

13    Q.   OKAY.  COULD YOU LOOK AT SLIDE 20.

14         COUNSEL, COULD I PERHAPS ASK YOU TO WRITE DOWN FOR ME THE

15    LIST OF SLIDES THAT YOU WANT ME ONLY TO SHOW TO THE JURY.

16              MR. NELSON:  YES.

17              MS. KREVANS:  AND 20 IS OKAY?

18              MR. ERWINE:  20 IS NOT OKAY.

19              MS. KREVANS:  SO 20 I SHOULD SHOW JUST TO THE JURY.

20    WHY DON'T I SHOW ALL OF THE SLIDES JUST TO THE JURY SINCE THIS

21    IS PROPRIETARY CODE AND THAT WAY WE DON'T HAVE TO CHECK EACH

22    ONE.

23         MR. LEE, COULD YOU SHOW SLIDE 20 ONLY TO THE JURY.

24    Q.   COULD YOU EXPLAIN TO THE JURY WHAT YOU'VE SET OUT IN --

25    I'M SORRY, I HAVE TO ASK, YOUR HONOR, WHEN THE WITNESS WALKS
```

1      THROUGH THE SLIDE, HE'S GOING TO SAY THE NAMES OF THE RELEVANT

2      CLASSES, FILE PATHS, AND CODE AND ROUTINE NAMES.

3           I NEED TO KNOW WHETHER SAMSUNG WANTS TO SEAL THE COURTROOM

4      GIVEN THAT THIS IS PROPRIETARY CODE OR WHETHER HE CAN DO THAT

5      IN OPEN COURT?

6           MR. NELSON:  HE CAN SAY THE NAMES, YOUR HONOR.

7           THE COURT:  OKAY.  THANK YOU.

8           MS. KREVANS:  THANK YOU.

9      Q.   PROFESSOR MOWRY, COULD YOU EXPLAIN TO THE JURY -- WE'RE

10     NOW ON THE SECOND PART OF ELEMENT C2 -- I'M SORRY, C1, LINKING

11     ACTIONS TO THE DETECTED STRUCTURES BECAUSE YOU'VE ALREADY

12     DETECTED THE STRUCTURES; RIGHT?

13     A.   YES.

14     Q.   COULD YOU EXPLAIN THE CODE IN THE MESSAGING APPLICATION

15     FOR LINKING ACTIONS TO THE DETECTED STRUCTURES?

16     A.   YES.  SO THIS IS THE CASE WHERE THERE'S A DIFFERENCE

17     BETWEEN SOME DIFFERENT VERSIONS OF THE SOFTWARE.  SO THE SCREEN

18     IS DIVIDED INTO THE LEFT-HAND SIDE AND THE RIGHT-HAND SIDE.

19          AND STARTING ON THE LEFT SIDE, YOU CAN SEE WHICH VERSION

20     THAT'S FOR ON THE TOP.  FOR THAT VERSION, FOR THOSE VERSIONS OF

21     THE PHONES, THE -- WITHIN THE COMPOSED MESSAGE ACTIVITY CLASS,

22     THERE'S A METHOD CALLED ADD CALL AND CONTACT MENU ITEMS, AND

23     THIS IS A ROUTINE THAT CAN CONSTRUCT THE SET OF CHOICES THAT

24     THE USER GETS IN THE POP-UP MENU.  FOR EXAMPLE, FOR A PHONE

25     NUMBER, THERE'S CERTAIN THINGS YOU CAN DO FOR A PHONE NUMBER,

1    FOR AN E-MAIL ADDRESS, THERE'S ANOTHER SET OF THINGS YOU CAN DO

2    FOR IT.

3        AND WHAT -- AND THE REST OF THE LEFT-HAND SIDE IS SHOWING

4    SOME MORE DETAIL ABOUT HOW THIS WORKS.  IN PARTICULAR, IT USES

5    AN OBJECT IN ANDROID CALLED AN INTENT OBJECT, WHICH I CAN TALK

6    MORE ABOUT IN A MINUTE, AND THAT IS A WAY TO RECORD WHAT YOU

7    WANT TO HAVE HAPPEN WHEN YOU LAUNCH ANOTHER PROGRAM.

8        SO WHAT IT RECORDS IN IT ARE THE ACTUAL EITHER PHONE

9    NUMBER, THE E-MAIL ADDRESS, IT PUTS THE ACTUAL CHARACTERS INTO

10   IT, AND IT ALSO PUTS SOME OTHER INFORMATION THAT WILL TELL

11   ANDROID WHAT -- THAT IT WANTS TO LAUNCH, SAY, THE DIALER AND

12   FILL IN PARTICULAR DIGITS.

13       IN THE MIDDLE BOX WE SEE THAT THE WAY THAT THAT GETS

14   RECORDED WITH THE CHOICE IN THE POP-UP MENU IS THROUGH A

15   PROCEDURE CALLED SET INTENT WITHIN MENU ITEM PPL CLASS, AND

16   WITHIN THAT, SO THAT IF THE USER PICKS A PARTICULAR OPTION,

17   THAT INFORMATION WILL BE PASSED TO ANOTHER PROCEDURE SHOWN ON

18   THE BOTTOM, WHICH IS CALLED START ACTIVITY, AND THAT IS THE

19   LAUNCHER.  THAT KNOWS HOW TO LAUNCH ANOTHER PROGRAM.  SO I JUST

20   DESCRIBED THE LEFT-HAND SIDE OF THE SCREEN.

21       THE RIGHT-HAND SIDE OF THE SCREEN IS FOR THE REMAINING

22   VERSIONS OF THE SOFTWARE.

23       THE CODE IS STRUCTURED DIFFERENTLY.  SO YOU'LL SEE IT

24   LOOKS A LITTLE DIFFERENT, AND THERE ARE SOME DIFFERENT NAMES IN

25   SOME OF THE BOXES.  OVERALL IT ACCOMPLISHES A VERY SIMILAR

1      THING.  IT BEGINS WITH A METHOD CALLED SHOW LINKS CONTEXT MENU,

2      WHICH IS IN THE MESSAGE LIST ITEM CLASS.

3          AND WHAT THAT DOES, IT'S SIMILAR TO WHAT I DESCRIBED

4      BEFORE, IT CREATES THE SET OF CHOICES FOR THE POP-UP MENU FOR

5      THIS PARTICULAR TYPE OF STRUCTURE, LIKE A PHONE NUMBER OR AN

6      E-MAIL ADDRESS.

7          AND THEN THAT AGAIN USES AN INTENT OBJECT, LIKE I

8      DESCRIBED BEFORE, AND RECORDS IT SO THAT IT WILL GET PASSED IN

9      TO START ACTIVITY TO LAUNCH WHATEVER YOU WANT TO LAUNCH IF YOU

10     ACTUALLY CHOOSE ONE OF THOSE OPTIONS FROM THE POP-UP MENU.

11     Q.   AND WHAT ARE THE -- WHAT IS THE OTHER ELEMENT YOU SET OUT

12     ON THIS PAGE UNDER THE HANDLER, LINK ACTION CHOOSER ACTION, AND

13     CONTEXT IMPL CLASSES?

14     A.   THOSE ARE -- SO THE HANDLER MESSAGE UNDER HANDLER KNOWS

15     WHAT TO DO WHEN THE USER ACTUALLY CHOOSES A -- MAKES A CHOICE

16     IN A POP-UP MENU.  SO A MENU WILL BE DISPLAYED BY THE USER

17     INTERFACE, AND IF THEY ACTUALLY PICK SOMETHING, THEN THE

18     HANDLER MESSAGE IS CALLED.

19         AND THEN IT IN TURN CAUSES SOFTWARE TO CALL THE EXECUTE

20     SUBROUTINE WITHIN THE LINK ACTION CHOOSER.ACTION CLASS, AND

21     THAT CONSTRUCTS AN INTENT OBJECT AND CAUSES SOFTWARE TO CALL

22     THE START ACTIVITY METHOD IN CONTEXT IMPL.

23     Q.   OKAY.  YOU MENTIONED SOMETHING CALLED INTENT OBJECTS.

24     COULD YOU LOOK AT PX 175 IN YOUR BINDER.

25     A.   YES.

1     Q.   WHAT IS PX 175?

2     A.   THIS IS A PUBLIC, PUBLICLY AVAILABLE DOCUMENT FROM THE

3     ANDROID DEVELOPER'S WEBSITE THAT DESCRIBED EXACTLY WHAT AN

4     INTENT OBJECT IS AND HOW TO USE IT.

5     Q.   NOW, YOUR ANALYSIS OF THE PROPRIETARY CODE THAT'S ACTUALLY

6     RUNNING ON SAMSUNG'S PHONES, WHAT'S THE RELEVANCE OF THIS

7     DOCUMENT FROM THE PUBLIC ANDROID DEVELOPER WEBSITE TO THE

8     PRIVATE CODE RUNNING ON SAMSUNG PHONES?

9     A.   THE PROPRIETARY CODE IS BUILT ON TOP OF THE OPEN SOURCE

10    CODE.  SO SOME THINGS ARE MODIFIED IN THE PROPRIETARY CODE, BUT

11    OTHER PARTS OF THE OPEN SOURCE CODE ARE JUST USED DIRECTLY.

12         AND THIS IS A COMPONENT OF THE OPEN SOURCE CODE THAT IS

13    JUST USED AS IT IS DESCRIBED IN THE PUBLIC VERSION IN THE, IN

14    THE OPEN COURSE VERSION.

15              MS. KREVANS:  YOUR HONOR, WE MOVE PX 175.

16              MR. NELSON:  NO OBJECTION, YOUR HONOR.

17              THE COURT:  IT'S ADMITTED.

18         (PLAINTIFF'S EXHIBIT PX 175 WAS ADMITTED IN EVIDENCE.)

19              THE COURT:  GO AHEAD, PLEASE.

20    BY MS. KREVANS:

21    Q.   OKAY.  MR. LEE, COULD YOU SHOW US SLIDE 21.  THANK YOU.

22         COULD YOU EXPLAIN TO THE JURY WHAT THIS ANDROID DEVELOPER

23    DOCUMENT SAYS ABOUT THESE INTENT OBJECTS WHICH ARE ALSO USED IN

24    THE PROPRIETARY CODE RUNNING ON THE SAMSUNG PHONES?

25    A.   YES.  THE DOCUMENT -- SO FIRST OF ALL, IN THE

1    ANDROID-SPEAK, THE WORD "ACTIVITY" REFERS TO A PROGRAM.  SO,

2    FOR EXAMPLE, TEXT MESSAGING IS AN ACTIVITY, THE DIALER IS

3    ANOTHER ACTIVITY.

4         AND IN THE TOP BOX IT'S SAYING THAT AN INTENT IS USED WITH

5    START ACTIVITY TO LAUNCH SOME OTHER ACTIVITY.  A PROGRAM WANTS

6    TO OPEN ANOTHER PROGRAM, IT USES AN INTENT OBJECT.

7         IN THE MIDDLE BOX, IT SAYS THE MOST SIGNIFICANT USE OF THE

8    INTENT IS IN LAUNCHING ACTIVITIES, AND IT CAN BE THOUGHT OF AS

9    THE GLUE BETWEEN ACTIVITIES.  IT'S WHAT ALLOWS TEXT MESSAGING

10   TO LAUNCH THE DIALER, FOR EXAMPLE.

11   Q.   AND AT THE BOTTOM, WE JUST SEE AN EXAMPLE OF AN INTENT

12   STRUCTURE?

13   A.   YES, THAT'S RIGHT, UM-HUM.

14   Q.   OKAY.  SO WE'VE NOW SEEN THE ANALYZER SERVER ELEMENT AS IT

15   RELATES TO MESSAGING.

16        AND IF WE GO BACK TO THE CLAIM, CAN WE CHECK OFF THIS BOX,

17   C1, RIGHT NOW?

18   A.   WE COULD, BECAUSE EACH OF THE ACCUSED DEVICES DOES RUN

19   TEXT MESSAGING.

20   Q.   OKAY.  DID YOU ALSO ANALYZE TO SEE WHETHER THIS ANALYZER

21   SERVER ELEMENT DETECTED STRUCTURE IN THE DATA AND THE LINKING

22   ACTIONS AND STRUCTURES WAS MET FOR THE MESSAGING APPLICATION?

23   A.   THE BROWSER.

24   Q.   I'M SORRY, THE BROWSER APPLICATION?

25   A.   YES, I DID FOR THE BROWSER AS WELL.

1    Q.   OKAY.  LET'S LOOK AT YOUR SLIDE 23.  AND, AGAIN, LET'S

2    SHOW THAT ONLY TO THE JURY, MR. LEE.

3         THIS IS THE BROWSER APPLICATION, THE FIRST PART OF THE C1,

4    DETECTING STRUCTURES.

5         COULD YOU JUST BRIEFLY WALK US THROUGH THIS CODE.

6    A.   AGAIN, THE SCREEN IS SPLIT INTO TWO HALVES, AND THE EACH

7    HALF REPRESENTS ALL THE PHONES IN THAT CONFIGURATION THAT ARE

8    MADE THE SAME WAY.

9         ON THE LEFT HALF, WE SEE FOR THOSE VERSIONS OF THE PHONE,

10   THE ROUTINES THAT FIND E-MAIL ADDRESSES, PHONE NUMBERS, AND

11   POSTAL ADDRESSES ARE THE FIND PARTIAL E-MAIL, FIND PARTIAL

12   NUMBER, AND FIND PARTIAL ADDRESS METHODS WITHIN THE CACHE

13   BUILDER CLASS.

14   Q.   AND THAT IS FOR GINGERBREAD AND ICE CREAM SANDWICH?

15   A.   YES.

16   Q.   FOR JELLY BEAN ON THE RIGHT, WHAT DO WE HAVE?

17   A.   THIS SOFTWARE HAS BEEN RESTRUCTURED A BIT.  IT AGAIN FINDS

18   PHONE NUMBERS, E-MAIL ADDRESSES, AND POSTAL ADDRESSES, BUT THE,

19   THE -- LIKE I SAID, THE SOFTWARE HAS BEEN REORGANIZED AND SO

20   THE NAMES ARE A LITTLE DIFFERENT.

21        FOR E-MAIL -- SORRY.  FOR PHONE NUMBERS AND E-MAIL

22   ADDRESSES, THE ROUTINES ARE CALLED FIND PARTIAL NUMBER AND FIND

23   PARTIAL E-MAIL, AND THAT'S IN THE PHONE E-MAIL DETECTOR CLASS,

24   WHICH IS WHAT COMPUTER SCIENTISTS CALL THE CHILD CLASS OF THE

25   CONTENT DETECTOR CLASS.

```
 1        TO FIND POSTAL ADDRESSES, THE ROUTINE IS CALLED FIND

 2   CONTENT IN THE ADDRESS DETECTOR CLASS, WHICH IS ALSO A CHILD,

 3   C-H-I-L-D, CLASS OF THE CONTENT DETECTOR CLASS.

 4   Q.   OKAY.  SO THAT WAS THE DETECTING STRUCTURES PART OF C1 FOR

 5   THE BROWSER.

 6        COULD WE SEE, ON THE JURORS' SCREENS ONLY, MR. LEE, SLIDE

 7   24.

 8        AND CAN YOU EXPLAIN FOR THE BROWSER THE STRUCTURE OF THE

 9   CODE THAT LINKS ACTIONS TO THE DETECTED STRUCTURES.

10   A.   YES.  TO -- WHEN A SELECTION OF A PARTICULAR STRUCTURE HAS

11   HAPPENED, FOR EXAMPLE, FOR A PHONE NUMBER, IF THAT'S THE

12   STRUCTURE THAT THE USER HAS SELECTED, THEN THERE'S A METHOD

13   CALLED, THAT WE SEE ON THE TOP LEFT HERE, ON CREATE CONTEXT

14   MENU WITHIN BROWSER ACTIVITY, AND THIS CONSTRUCTS THE SET OF

15   CHOICES FOR WHAT THE USER CAN DO WITH, FOR EXAMPLE, THE PHONE

16   NUMBER.

17        AND IT RECORDS AND BUILDS AN INTENT OBJECT, LIKE THE ONE

18   THAT YOU SEE ILLUSTRATED ON THE SCREEN, FOR, IN THAT CASE,

19   DIALLING A PARTICULAR PHONE NUMBER OR LAUNCHING THE DIALER TO

20   FILL IN THOSE DIGITS.

21        AND ON THE LEFT -- ONCE IT'S BUILT THOSE, IT RECORDS IT

22   WITH THAT CHOICE USING THE SET IN SENT METHOD IN MENU ITEM IMPL

23   CLASS, SUCH THAT IF THE USER ACTUALLY CHOOSES ANY SPECIFIC

24   CHOICE, THAT PARTICULAR INTENT OBJECT GETS PASSED IN AS THE

25   INPUT TO THE START ACTIVITY METHOD IN THE CONTEXT IMPL CLASS,
```

1    AND THAT WILL CAUSE THE LAUNCHING TO OCCUR.

2    Q.   OKAY.  IN YOUR OPINION THEN, DO ALL THE ACCUSED PRODUCTS

3    ALSO SATISFY C1, THE ANALYZER SERVER ELEMENT, USING ALL THREE

4    CODE VERSIONS FOR THE BROWSER APPLICATION?

5    A.   YES, THEY DO.

6    Q.   SO WE CAN GO AHEAD AND CHECK OFF C1?

7    A.   CORRECT.

8    Q.   OKAY.  LET'S MOVE TO ELEMENT C2, THE USER INTERFACE

9    ENABLING SELECTION OF A DETECTED STRUCTURE AND A LINKED ACTION.

10        COULD YOU, USING -- LET'S START WITH THE MESSAGING

11   APPLICATION AND SHOW SLIDE 26 ONLY TO THE JURY, MR. LEE,

12   STARTING WITH GINGERBREAD CODE AND EXPLAIN HOW THE ACCUSED

13   PRODUCTS RUNNING GINGERBREAD SATISFY LINK C2.

14   A.   SO AFTER LINKIFY HAS FOUND THE STRUCTURES, LIKE PHONE

15   NUMBERS AND E-MAIL ADDRESSES, IN ORDER FOR THEM TO APPEAR

16   HIGHLIGHTED WITH THE BLUE COLOR AND THE UNDERLINE, WHAT IT DOES

17   IS FOR EACH OF THEM, IT CREATES AN OBJECT CALLED A URL SPAN

18   OBJECT, AND THAT'S DONE BY THE APPLY LINK METHOD WITHIN THE

19   LINKIFY CLASS, AND IT MAPS THAT ONTO -- IT ASSOCIATES IT WITH

20   THE CHARACTERS IN THE TEXT MESSAGE FOR EACH DETECTED STRUCTURE.

21        AND AT THAT POINT IT CAUSES THEM TO APPEAR BLUE AND

22   UNDERLINED.  SO THAT'S WHAT WE SEE ILLUSTRATED ON WHAT YOU --

23   ON THE SCREEN THAT YOU SEE.

24   Q.   OKAY.  AND WHAT HAPPENS WHEN A USER ACTUALLY TOUCHES THIS

25   TEXT MESSAGE?

1    A.   THEN, IF WE CAN MOVE TO THE NEXT SLIDE, THEN THE USER

2    INTERFACE NEEDS TO DISPLAY THE POP-UP MENU THAT THE ANALYZER

3    SERVER HAS CONSTRUCTED AND THE METHODS THAT DO THAT ARE ADD

4    CALL AND CONTACT MENU ITEMS FROM THE COMPOSE MESSAGE CLASS,

5    WHICH IN ORDER TO DISPLAY, IT CALLS TWO METHOD, THEY'RE BOTH

6    CALLED SHOW, AND THEY ARE IN -- ONE IS IN THE CONTEXT MENU

7    BUILDER CLASS AND THE OTHER IS IN THE ALERT DIALOGUE CLASS.

8         AND AT THIS POINT THE POP-UP MENU WILL APPEAR AND THE USER

9    CAN CHOOSE AN OPTION.

10   Q.   AND IS THAT HOW DEVICES THAT RUN ON THE GINGERBREAD CODE

11   SATISFY C2?

12   A.   YES.

13   Q.   OKAY.  WHAT ABOUT THE DEVICES THAT RUN ON ICE CREAM

14   SANDWICH AND JELLY BEAN.  CAN WE SEE SLIDE 28, JURY ONLY,

15   MR. LEE.

16   A.   IT BEGINS EXACTLY THE SAME WAY.  AFTER LINKIFY HAS FOUND

17   THE STRUCTURES, IT CREATES A URL SPAN OBJECT, ASSOCIATES IT

18   WITH EACH OF THESE EXACT CHARACTERS AND THEN THEY SHOW UP IN

19   BLUE AND UNDERLINED AS YOU SEE ILLUSTRATED HERE.

20   Q.   LET ME, BEFORE WE MOVE ON TO THE NEXT SLIDE, LET ME

21   CLARIFY ONE THING.  THOSE OF US WHO DON'T KNOW A LOT ABOUT

22   COMPUTER SCIENCE, WHEN WE SEE THE LETTERS URL, WE THINK A LINK

23   TO A WEB PAGE.  IS THIS ONLY LINKS TO WEB PAGES HERE?

24   A.   THAT'S A GOOD QUESTION.  NO, THAT IS FOR ANYTHING.  IT'S

25   FOR E-MAIL ADDRESSES AND PHONE NUMBERS.  IT JUST HAPPENS TO BE

1    CALLED URL SPAN PERHAPS FOR HISTORICAL REASONS.

2    Q.   OKAY.  SO I INTERRUPTED YOU.  YOU JUST EXPLAINED THE APPLY

3    LINK AND URL SPAN.  YOU WERE ABOUT TO TELL US WHAT HAPPENS WHEN

4    THE USER ACTUALLY TOUCHES THE TEXT MESSAGE IN ICE CREAM

5    SANDWICH AND JELLY BEAN CODE.

6    A.   YES.  IN THIS CASE, THEY CAN TOUCH A SPECIFIC STRUCTURE,

7    FOR EXAMPLE, THEY CAN TOUCH AN E-MAIL ADDRESS, AND AT THAT

8    POINT WE -- THE USER INTERFACE IS GOING TO DISPLAY THE POP-UP

9    MENU FOR E-MAIL, THAT SPECIFIC E-MAIL ADDRESS, AND THE CODE

10   THAT DOES THIS IS SHOWING, ILLUSTRATED ON JURY SCREEN, THE ON

11   TOUCH METHOD AND ON TOUCH LISTENER IS EXECUTED WHEN THEY ARE

12   DOING THIS, AND THAT CALLS -- WELL, IT CAUSES THE SHOW LINKS

13   CONTEXT MENU METHOD WITHIN MESSAGE LIST ITEM TO EXECUTE, AND

14   THAT WILL DISPLAY THE POP-UP MENU BY WAY OF THE SHOW METHOD

15   WITHIN THE ALERT DIALOGUE CLASS.

16        AND NOW THIS POP-UP MENU IS VISIBLE ON THE SCREEN AND THE

17   USER CAN CHOOSE SOMETHING FROM THE POP-UP MENU.

18   Q.   NOW, YOU MENTIONED A LITTLE BIT EARLIER THIS MORNING THAT

19   THIS PROPRIETARY CODE THAT RUNS ON THE SAMSUNG PHONES HAS AS A

20   STARTING POINT THE OPEN SOURCE ANDROID CODE, BUT IN A NUMBER OF

21   RESPECTS IT'S BEEN MODIFIED.

22        WAS IT MODIFIED IN ICE CREAM AND JELLY BEAN FOR THE

23   MESSAGING APPLICATION?

24   A.   YES.

25   Q.   WHAT WAS THE MODIFICATION?

1    A.   IF YOU LOOK AT THE OPEN SOURCE CODE, STARTING IN ICE CREAM

2    SANDWICH AND IN JELLY BEAN, THE OPEN SOURCE TEXT MESSAGING

3    PROGRAM FOR ANDROID WAS MODIFIED RELATIVE TO GINGERBREAD

4    BECAUSE INSTEAD OF OFFERING MULTIPLE ACTIONS FOR A STRUCTURE,

5    AS IT DOES IN GINGERBREAD, STARTING WITH ICE CREAM SANDWICH,

6    THE OPEN SOURCE CODE ONLY OFFERS ONE ACTION FOR A PHONE NUMBER

7    OR FOR A DETECTED STRUCTURE.

8    Q.   SO JUST TO BE CLEAR, IF SOMEONE WENT TO THE ANDROID

9    WEBSITE AND THEY DOWNLOADED THE FREE OPEN SOURCE VERSION OF ICE

10   CREAM SANDWICH OR JELLY BEAN AND THEY USED THE CODE THAT DOES

11   THIS FUNCTION, WHEN YOU TOUCH SOMETHING LIKE A PHONE NUMBER,

12   YOU WOULD ONLY GET ONE OPTION, NOT MULTIPLE OPTIONS?

13   A.   THAT'S CORRECT.

14   Q.   WHAT'S THE MODIFICATION THAT WAS MADE FOR THE PHONES

15   THAT'S PROPRIETARY THAT RUNS ON THE SAMSUNG PHONES?

16   A.   WELL, WITHOUT DESCRIBING -- WITHOUT GOING INTO DETAIL

17   ABOUT THE CODE, WE ACTUALLY OBSERVED THIS IN THE VIDEOS.  YOU

18   SAW THAT WHEN YOU -- IN FACT, YOU SEE IT ON THE SCREEN THAT

19   YOU'RE LOOKING AT RIGHT NOW, THE JURY DOES.

20       THERE ARE MULTIPLE ACTIONS FOR THE DETECTED STRUCTURES.

21   FOR EXAMPLE, FOR A DETECTED PHONE NUMBER, THERE ARE THREE

22   OPTIONS WITH WHAT YOU CAN DO WITH THAT AND ANYONE WHO HAS ONE

23   OF THE PHONES CAN OBSERVE THIS JUST BY OPERATING THE PHONE.

24   Q.   OKAY.  SO AT THIS POINT, COULD WE GO AHEAD AND JUST CHECK

25   C2 BASED ON THE MESSAGING APPLICATION AND HOW IT RUNS ON EACH

1        OF THESE NINE PHONES?

2        A.   YES, WE COULD.

3        Q.   BUT YOU WENT AHEAD AND LOOKED AT THE BROWSER, TOO?

4        A.   I DID.

5        Q.   OKAY.  WAS THIS ELEMENT C2, THE USER INTERFACE ENABLING

6        SELECTION OF A DETECTED STRUCTURE AND A LINKED ACTION ALSO

7        SATISFIED BY EACH OF THESE NINE PHONES WITH RESPECT TO THE

8        BROWSER APPLICATION?

9        A.   YES, THAT'S CORRECT.

10       Q.   OKAY.  COULD WE SHOW SLIDE 34 TO THE JURY.  YOU'RE

11       STARTING HERE WITH A SLIDE THAT ILLUSTRATES GINGERBREAD AND ICE

12       CREAM SANDWICH.  I'M SORRY.  SLIDE 30.  I APOLOGIZE, MR. LEE.

13       A.   SO THIS BEGINS, THERE ARE DIFFERENT NAMES HERE COMPARED TO

14       WHAT WE SAW WITH MESSAGING, BUT IT DOES SOMETHING VERY

15       FAMILIAR.

16           IT IS GOING TO CREATE A NEW OBJECT FOR EVERY STRUCTURE

17       THAT'S FOUND AND ASSOCIATED WITH THOSE CHARACTERS SO THAT AS

18       YOU PRESS AND HOLD ON THAT STRUCTURE, THERE WILL BE A

19       BACKGROUND COLOR THAT WILL APPEAR TO HIGHLIGHT IT.

20           SO YOU CAN SEE THAT ON THE ILLUSTRATION THAT WE SAW

21       EARLIER IN THE VIDEOS.

22           BUT IN THIS CASE THE OBJECT THAT'S CREATED IS CALLED HTML

23       ANCHOR ELEMENT, AND IT'S ANALOGOUS TO WHAT WE SAW EARLIER IN

24       THE OTHER CODE.

25           BUT THEN -- AND THEN THE METHOD THAT USES THIS IS CALLED

1        BUILD FRAME FROM THE CACHE BUILDER PLUS.

2            SO THAT'S THE FIRST PART OF THE USER INTERFACE.

3    Q.   OKAY.  WHEN YOU SAY PRESS AND HOLD, YOU'RE TALKING ABOUT A

4    USER PUTS THEIR FINGER DOWN ON THE SPOT ON THE PHONE AND LEAVES

5    IT DOWN?

6    A.   THAT'S CORRECT.

7    Q.   NOT JUST A TAP?

8    A.   YEAH, NOT JUST A TAP.  PRESS AND HOLD.

9    Q.   IS THERE ANOTHER TERM THAT'S USED IN THE ANDROID CODE FOR

10   AN ACTION WHEN A USER PUTS THEIR FINGER DOWN AND LEAVES IT

11   DOWN?

12   A.   IT'S CALLED A LONG PRESS.

13   Q.   A LONG PRESS?

14   A.   A LONG PRESS.

15   Q.   OKAY.  ALL RIGHT.  BACK TO YOUR SLIDE 30.

16       WHAT HAPPENS IN THE CODE AFTER THE ROUTINE YOU'RE SHOWING

17   HERE RUNS WHEN THE USER PUTS THEIR FINGER DOWN AND LEAVES IT

18   THERE?

19   A.   OKAY.  IF WE CAN GO TO THE NEXT SLIDE.

20   Q.   SO SLIDE 31?

21   A.   SO THE NEXT PART OF THE USER INTERFACE IS TO DISPLAY THE

22   POP-UP MENU WITH THE CHOICES OF THINGS THAT YOU CAN DO WITH

23   THAT SPECIFIC STRUCTURE.

24       AND THE ANALYZER SERVER HAS BUILT THIS SET OF CHOICES AND

25   NOW IT'S DISPLAYED TO THE USER USING METHODS, THREE METHODS,

1    ALL OF THEM ARE CALLED SHOW, BUT THEY'RE IN THREE DIFFERENT

2    CLASSES.

3          ONE IS CONTEXT MENU BUILDER, ANOTHER ONE IS MENU DIALOGUE

4    HELPER, AND FINALLY ALERT DIALOGUE.

5          AND WITH THESE ROUTINES, THE POP-UP MENUS APPEAR ON THE

6    SCREEN AND NOW THE USER CAN MAKE A CHOICE THAT POP-UP MENU.

7    Q.   OKAY.  SO NOW WE COULD CHECK OFF C2 AGAIN FOR THE BROWSER

8    APPLICATION RUNNING GINGERBREAD AND ICE CREAM SANDWICH.

9          WHAT ABOUT PHONES THAT RUN ON JELLY BEAN CODE?  CAN WE SEE

10   SLIDE 32, PLEASE, MR. LEE?

11         THIS LOOKS A LITTLE MORE COMPLICATED.  COULD YOU BRIEFLY

12   WALK US THROUGH IT?

13   A.   IT IS MORE COMPLICATED.  BUT ON JELLY BEAN, THE CODE WAS

14   RESTRUCTURED.  WHAT HAPPENS HERE IS THAT AT THE TIME -- BEFORE

15   THE USER TOUCHES THE SCREEN, THE STRUCTURES, LIKE PHONE

16   NUMBERS, HAVE NOT YET BEEN DETECTED.

17         WHEN THE USER'S FINGER FIRST TOUCHES THE SCREEN, IT

18   IMMEDIATELY BEGINS DETECTING THE STRUCTURES.

19         AND THEN WHEN IT'S FINISHED DETECTING THE STRUCTURES,

20   THERE'S THE HIT TEST METHOD WITHIN WEB VIEW CORE.CPP, THAT

21   TAKES THAT RESULT, IT CALLS CREATE JAVA OBJECT, WHICH YOU SEE

22   ON YOUR SCREEN FROM THE ANDROID HIT TEST RESULT CLASS, TO GET

23   SOMETHING BACK THAT IT CAN THEN STORE IN A VARIABLE -- IN A

24   VARIABLE LOCATION CALLED M INITIAL HIT TEST RESULT IN THE WEB

25   VIEW CLASSIC CLASS.

1          SO NOW IT HAS STORED THE RESULT OF WHAT IT'S DETECTED, BUT

2    IN THE MEANTIME THE USER HAS NOT YET HELD DOWN THE FINGER LONG

3    ENOUGH TO MAKE A SELECTION WITH PRESS AND HOLD.

4          ONCE THEY HAVE, THEN THE -- IN THE BOTTOM, NEAR THE BOTTOM

5    MIDDLE OF THE SCREEN, THERE'S A METHOD CALLED ON CREATE CONTEXT

6    MENU FROM THE BROWSER ACTIVITY CLASS.  THAT CALLS THE METHOD

7    WITH THE SAME NAME IN THE CONTROLLER CLASS, WHICH GOES BACK TO

8    A WEB VIEW CLASSIC CLASS AND LOOKS UP THE RESULT THAT WAS

9    STORED THERE EARLIER USING THE HIT TEST RESULT INTERFACE.  SO

10   NOW THE USER INTERFACE KNOWS, AT THE TIME YOU'RE SELECTING

11   SOMETHING, IT KNOWS WHAT YOU'RE SELECTING.

12   Q.   OKAY.  SO WE'RE CLEAR, WE'RE IN ELEMENT C2, IT'S A USER

13    INTERFACE ENABLING SELECTION OF A DETECTED STRUCTURE AND A

14    LINKED ACTION.

15         JUST -- YOU JUST WALKED US THROUGH A LOT OF COMPLICATED

16   TECHNICAL STUFF.  I WANT TO BE SURE WE'RE ALL CLEAR.

17         WHEN THE USER FIRST PUTS THEIR FINGER DOWN, WHAT HAPPENS?

18   A.   WHEN THEY FIRST PUT THEIR FINGER DOWN --

19   Q.   IN THE JELLY BEAN CODE?

20   A.   YES, IN THE JELLY BEAN CODE.  ACTUALLY, I HAVE THAT.  I

21   DON'T KNOW IF YOU WANT TO SHOW IT.

22   Q.   LET'S JUST USE THIS SLIDE.  OKAY.

23   A.   OKAY.  SO WHEN THEY FIRST PUT THEIR FINGER DOWN, JELLY

24   BEAN IMMEDIATELY STARTS LOOKING AT -- WELL, FIRST THEY'VE ONLY

25   TOUCHED A PARTICULAR PIXEL, A PARTICULAR POINT ON THE SCREEN,

1      AND IT HAS TO FIGURE OUT IF THE THING UNDER THEIR FINGER IS

2      ANYTHING INTERESTING.  SO IT STARTS LOOKING TO SEE, IS THERE A

3      PHONE NUMBER HERE?  IS THERE A POSTAL ADDRESS HERE?  WHAT'S

4      UNDER THEIR FINGER?

5           AND IT DOES THAT VERY QUICKLY BECAUSE COMPUTERS RUN

6      QUICKLY.

7      Q.   AND THAT'S THE DETECTING?

8      A.   YES, THAT'S THE DETECTION PART, WHICH IS PART OF THE

9      ANALYZER SERVER, YES.

10     Q.   OKAY.

11     A.   AND THEN IT FINDS WHATEVER IS THERE, IF THERE'S SOMETHING

12     THERE.  AND IF THERE IS SOMETHING THERE, IT REMEMBERS THAT.

13          MEANWHILE, TIME GOES BY.  THE USER EVENTUALLY IS HOLDING

14     DOWN LONG ENOUGH THAT IT BECOMES A SELECTION THROUGH A PRESS

15     AND HOLD, AND AT THAT POINT IT LOOKS UP WHAT'S UNDER YOUR

16     FINGER AND SEES, OH, IS IT A PHONE NUMBER?  IS IT ON E-MAIL

17     ADDRESS, FOR EXAMPLE?

18     Q.   SO JUST, AGAIN FOR THOSE OF US WHO AREN'T COMPUTER

19     PROGRAMMERS, WHEN THE USER FIRST PUTS THEIR FINGER DOWN, IS

20     THERE SOME SORT OF TIMER GOING ON INSIDE THE DEVICE TO SEE HOW

21     LONG THEY LEAVE IT DOWN?

22     A.   THAT'S EXACTLY RIGHT.  AS SOON AS THEY TOUCH THE SCREEN,

23     THE SOFTWARE SETS A TIMER, AND WHEN THIS TIMER GOES OFF, IF

24     THEY'VE CONTINUED TO HOLD THEIR FINGER DOWN IN PLACE, MORE OR

25     LESS, WHEN THE TIMER GOES OFF, IT SAYS, OKAY, YOU'VE HELD IT

1    LONG ENOUGH THAT YOU'VE ACTUALLY MADE A SELECTION THROUGH PRESS

2    AND HOLD.

3    Q.   AND IS THE, IS THE PERIOD WHERE THE TIMER GOES OFF, THAT

4    IS, ENDS AND IT SAYS, OKAY, YOU'VE HELD YOUR FINGER DOWN LONG

5    ENOUGH THAT I, THE PHONE, THINK THAT YOU WANT TO SELECT

6    SOMETHING, DOES THAT HAPPEN AFTER IT'S FINISHED DETECTING THE

7    STRUCTURE?

8    A.   THAT'S CORRECT.

9         THE COURT:  EXCUSE ME ONE SECOND.  WE'RE GOING TO

10   BREAK AT NOON FOR LUNCH, BUT WOULD YOU LIKE TO TAKE A BRIEF

11   FIVE MINUTE BREAK TO USE THE RESTROOM OR ANYTHING ELSE?

12        NO?  YOU WANT TO KEEP GOING.  ALL RIGHT.  THANK YOU.  GO

13   AHEAD, PLEASE.

14   BY MS. KREVANS:

15   Q.   OKAY.  STILL ON YOUR SLIDE 32, PROFESSOR MOWRY, I SEE ON

16   THE PHONE THAT YOU'VE ILLUSTRATED HERE, THERE ARE EIGHT OR NINE

17   DIFFERENT PHONE NUMBERS SHOWN ON THE PAGE?

18   A.   YES.

19   Q.   IN THIS JELLY BEAN APP, COULD THE USER -- YOU SHOW THEM

20   PUTTING THEIR FINGER ON THE TOP ONE.  COULD THEY HAVE SELECTED

21   ANY OF THEM?

22   A.   YES, THEY COULD HAVE SELECTED ANY OF THOSE PHONE NUMBERS

23   JUST BY PUTTING THEIR FINGER ON ANY OF THEM.

24   Q.   OKAY.  DOES CLAIM 9 OF THE '647 PATENT, THIS LANGUAGE HERE

25   IN C2, DOES IT REQUIRE THAT ALL OF THE STRUCTURES THAT APPEAR

1    ON THIS SCREEN, ON THIS USER INTERFACE, BE DETECTED BEFORE THE

2    USER MAKES A SELECTION?

3    A.    NO, IT DOES NOT.

4    Q.    HOW MANY STRUCTURES DOES IT REQUIRE BE DETECTED BEFORE THE

5    USER MAKES THEIR SELECTION?

6    A.    JUST THE ONE THAT THEY'RE SELECTING.  IT SAYS SELECTION OF

7    A DETECTED STRUCTURE.

8    Q.    EARLY IN THIS CASE, POP-UP MENU, DID YOU GIVE A

9    DECLARATION WHICH ADDRESSED WHETHER OR NOT CLAIM 9 REQUIRES

10   THAT EVERY ONE OF THE DETECTED -- EVERY ONE OF THE DISPLAYED

11   STRUCTURES ON A PAGE HAS TO BE DETECTED?

12   A.    YES, I DID DO A -- I DID HAVE A DECLARATION EARLIER IN THE

13   CASE, THAT'S CORRECT.

14   Q.    AND WHAT DID YOU SAY ABOUT THIS ISSUE OF WHETHER EVERY

15   DISPLAYED STRUCTURE HAD TO BE DETECTED AT THE TIME?

16   A.    WELL, I WAS WRITING A SET OF, A WHOLE SECTION IN THAT

17   DECLARATION WHERE I WAS TALKING ABOUT A SPECIFIC ISSUE ABOUT

18   WHAT USER SELECTION MEANT, AND I WAS SAYING THAT SELECTION

19   MEANT THAT YOU WERE CHOOSING ONE THING OUT OF A SET OF -- ONE

20   STRUCTURE OUT OF A SET OF STRUCTURES.

21         AND IT TURNS OUT THAT I WROTE MY LANGUAGE A LITTLE

22   IMPRECISELY BECAUSE I INCLUDED THE WORD "DETECTED STRUCTURE"

23   WHEN IT ACTUALLY DIDN'T NEED TO BE THERE, BECAUSE THE POINT I

24   WAS MAKING DIDN'T DEPEND ON WHETHER I SAID DETECTED STRUCTURE.

25   SO I WAS -- I WASN'T PAYING ATTENTION TO THAT.

1          LATER, WHEN I SUBMITTED MY -- A LATER REBUTTAL EXPERT

2     REPORT, I WAS GOING BACK AND REVISING THINGS AND I NOTICED THAT

3     THAT SENTENCE, IF YOU PULL IT OUT OF CONTEXT, IT DOES NOT

4     ACCURATELY REFLECT THE REQUIREMENTS OF CLAIM 9.

5          SO I FIXED THAT SENTENCE SO THAT IT COULD STAND ON ITS OWN

6     AND BE CORRECT AS OPPOSED TO ONLY WORKING IN THAT CONTEXT AT

7     THE POINT I WAS MAKING EARLIER IN THE DECLARATION.

8     Q.   OKAY.  NOW, WE HAVEN'T ACTUALLY FINISHED YOUR, YOUR

9     EXPLANATION HERE ABOUT WHAT HAPPENS IN THE BROWSER APPLICATION

10    WITH DEVICES RUNNING JELLY BEAN FOR THIS USER INTERFACE

11    ELEMENT.  WHEN THE PERSON PUTTING THEIR FINGER DOWN AND HOLDS

12    IT DOWN ON ANY OF THESE PHONE NUMBERS, WHAT HAPPENS.

13    A.   WHEN THEY PUT IT DOWN -- OKAY.  THAT -- WHEN THEY PUT IT

14    DOWN AND HOLD IT DOWN -- WE'RE GOING TO THE NEXT.

15    Q.   CAN WE SEE SLIDE 33, MR. LEE?

16    A.   SO AS THEY HELD IT DOWN LONG ENOUGH AFTER THIS TIMER GOES

17    OFF, IT IS GOING TO THEN DISPLAY THE POP-UP MENU WITH THE SET

18    OF CHOICES FOR WHATEVER YOU CAN DO FOR THIS STRUCTURE YOU'VE

19    BEEN PRESSING ON.  SO, FOR EXAMPLE, FOR A PHONE NUMBER, YOU

20    WANT TO SEE THE THINGS YOU CAN DO WITH THE PHONE NUMBER, AND

21    THEN THE ROUTINES THAT DISPLAY THIS ARE ILLUSTRATED HERE.

22         SO ONE OF THEM IS ON CREATE CONTEXT MENU IN THE CONTROLLER

23    CLASS, AND THAT USES THE GET HIT TEST RESULT METHOD FROM THE

24    WEB VIEW CLASS, AND ALSO THE SHOW METHOD FROM THE MENU DIALOGUE

25    HELPER CLASS.

1          AND THESE ROUTINES WILL SHOW THE POP-UP MENU AND NOW THE

2    USER CAN SELECT ANY OF THOSE CHOICES FROM THE POP-UP MENU.

3    Q.   SO IN YOUR OPINION, DO EACH OF THESE PRODUCTS, WHETHER

4    THEY'RE RUNNING JELLY BEAN, GINGERBREAD OR ICE CREAM SANDWICH,

5    MEET ELEMENT C2 IN BOTH THE BROWSER AND THE MESSAGING

6    APPLICATIONS?

7    A.   YES, THEY DO.

8    Q.   OKAY.  LET'S MOVE TO ELEMENT C3, THE ACTION PROCESSOR FOR

9    PERFORMING THE SELECTED ACTION LINKED TO A SELECTED STRUCTURE.

10   COULD WE LOOK FOR THE JURY ONLY AT SLIDE 35, MR. LEE.

11         IS THIS ONE WHERE ALL THE DEVICES, NO MATTER WHAT CODE

12   THEY'RE RUNNING, BEHAVE THE SAME WAY?

13   A.   IT IS.  THIS IS THE SAME FOR ALL OF THEM.

14   Q.   OKAY.  COULD YOU EXPLAIN TO THE JURY WHAT PORTIONS OF THE

15   CODE ARE INVOLVED IN PERFORMING ELEMENT C3, THE ACTION

16   PROCESSING?

17   A.   YES.  THE SUBROUTINES THAT DO THIS ARE, FOR THE ACTION

18   PROCESSOR, ARE THE START ACTIVITY METHOD OF THE CONTEXT IMPL

19   CLASS, THE RESOLVE ACTIVITY METHOD OF THE INTENT CLASS, AND

20   ALSO THE RESOLVE ACTIVITY METHOD OF THE PACKAGE MANAGER CLASS.

21         AND THE WAY THAT THIS WORKS IS AS ILLUSTRATED ON YOUR

22   SCREEN FOR A PARTICULAR CHOICE IN THE POP-UP MENU, AN INTENT

23   OBJECT HAS BEEN STORED THAT DESCRIBED WHAT WAS SUPPOSED TO

24   HAPPEN IF YOU CHOSE THAT THING, THAT OPTION, AND THAT GETS

25   PASSED INTO START ACTIVITY WHICH MAKES USE OF THESE OTHER

1    ROUTINES AND WILL CAUSE THE LAUNCHING OR THE ACTION TO TAKE

2    PLACE.

3        Q.    AND THIS IS TRUE IN BOTH BROWSER AND MESSAGING?

4        A.    THAT'S CORRECT.

5        Q.    OKAY.  SO WE CAN NOW CHECK OFF ELEMENT C3?

6        A.    YES.

7        Q.    ALL RIGHT.  ALL WE HAVE LEFT NOW IS TO GO BACK AND CONFIRM

8    THE LINKED ACTIONS IN ELEMENT E.

9        A.    YES.

10       Q.    IS THAT RIGHT?

11       A.    YES.

12       Q.    OKAY.  COULD YOU PLEASE EXPLAIN HOW THE -- HOW YOU

13   CONFIRMED IN THE CODE THAT THE ACCUSED PRODUCTS ALSO SATISFY

14   ELEMENT E?

15       A.    WELL, WE'VE ALREADY -- WE SAW THAT THERE WERE POP-UP

16   MENUS, WE SAW THAT EVEN JUST LOOKING AT THE PHONE, AND WHEN I

17   WAS ANALYZING THE SECOND PART OF WHAT THE ANALYZER SERVER DOES,

18   THAT'S WHERE IT LINKS ACTIONS.

19            SO GIVEN THE CODE THAT IS, THAT IS -- GIVEN WHAT THE

20   SOFTWARE DOES TO LINK ACTIONS, THEN INDEED WHAT THE POP-UP MENU

21   IS DISPLAYING IS A MENU OF LINKED ACTIONS.  SO IT SATISFIES

22   PART E.

23       Q.    AND IS THAT TRUE FOR ALL THREE DIFFERENT CODE BASES?

24       A.    YES, THAT'S CORRECT.

25       Q.    AND TRUE FOR BOTH THE BROWSER AND THE MESSAGING

1    APPLICATIONS?

2    A.    YES.

3    Q.    OKAY.  SO WE CAN NOW CHECK OFF THE LAST BOX?

4    A.    CORRECT.

5    Q.    NOW, LET ME JUST ASK YOU, SHOULD WE ACTUALLY HAVE CHECKED

6    EACH OF THESE TWICE, ONCE FOR INFRINGEMENT BY BROWSER AND ONCE

7    FOR INFRINGEMENT BY MESSAGING?

8    A.    YES.

9    Q.    OKAY.  I WANT TO SWITCH TO ANOTHER TOPIC THAT WE TALKED

10   ABOUT AT THE BEGINNING OF THE EXAMINATION, AND THAT IS THE

11   IMPORTANCE OF THE INVENTION.

12        HAVE YOU SEEN EVIDENCE IN THIS CASE THAT SAMSUNG ITSELF

13   UNDERSTANDS THAT THE TECHNOLOGY OF THE '647 PATENT IS AN

14   IMPORTANT ASPECT OF THE USER EXPERIENCE FOR SMARTPHONE USERS?

15   A.    YES, I HAVE.

16   Q.    COULD YOU LOOK AT EXHIBIT 146 IN YOUR BINDER.

17        THANK YOU, MR. VINCENT.

18        WHAT IS EXHIBIT 146, PROFESSOR MOWRY?

19   A.    THIS IS A SAMSUNG DOCUMENT --

20        MR. NELSON:  OBJECTION.

21        THE WITNESS:  -- ENTITLED RELATIVE EVALUATION --

22        THE COURT:  OKAY.  ONE SECOND, PLEASE.  THERE'S BEEN

23   AN OBJECTION.

24        THE WITNESS:  I'M SORRY.

25        MR. NELSON:  THIS DOCUMENT IS NOT DISCLOSED OR

1        MENTIONED OR RELIED UPON IN HIS REPORT.

2                MS. KREVANS:  THAT'S NOT CORRECT, YOUR HONOR.

3                MR. NELSON:  IF YOU CAN POINT ME TO THAT, THAT'S

4        GREAT.

5                THE COURT:  OKAY.  WHY DON'T WE DO THIS, I KNOW WE'RE

6        GOING TO TAKE A BREAK, BUT I -- I SHOULD GIVE MS. SHORTRIDGE

7        ANOTHER BREAK.

8            LET'S JUST TAKE A BRIEF FEW MINUTE BREAK.  I'M GOING TO

9        ASK YOU TO PLEASE GO AHEAD AND GO TO THE DELIBERATION ROOM.

10           THE TIME IS NOW 11:46 -- SO WE CAN WORK THIS ISSUE OUT.

11           (JURY OUT AT 11:46 A.M.)

12               THE COURT:  OKAY.  LET'S JUST TAKE A MOMENT TO

13       STRETCH, ESPECIALLY MS. RODRIGUEZ AND MS. SHORTRIDGE.

14           (PAUSE IN PROCEEDINGS.)

15               THE COURT:  IS THERE AN ISSUE?

16               MR. NELSON:  NO.  IT'S GOOD ENOUGH, YOUR HONOR.

17               THE COURT:  OKAY.  ALL RIGHT.  THEN LET'S BRING THE

18       JURY BACK IN, PLEASE.

19               MR. NELSON:  THERE WILL BE -- I DON'T WANT TO DISCUSS

20       IT NOW, BUT JUST TO HIGHLIGHT, BEFORE HE GETS INTO SOME

21       TESTIMONY ABOUT OPINIONS REGARDING IOS 3.1, OR WHATEVER IT IS,

22       WE'RE GOING TO HAVE TO HAVE A LITTLE BIT OF A DISCUSSION.  WE

23       CAN DO THAT AFTER LUNCH, THOUGH.

24               MS. KREVANS:  THOSE OPINIONS WERE STRUCK BY A MOTION

25       THAT YOU GUYS BROUGHT, AND WE DON'T INTEND TO OFFER HIM TO GIVE

```
 1     ANY OPINIONS THAT HAVE BEEN STRUCK UNLESS, OF COURSE, YOU OPEN

 2     THE DOOR ON CROSS-EXAMINATION.

 3          THEY BROUGHT A MOTION TO PREVENT PROFESSOR MOWRY FROM

 4     TALKING ABOUT HIS OPINIONS THAT THE IPHONE ITSELF PRACTICES

 5     THIS INVENTION, AND THEY WON THAT MOTION.  SO, OF COURSE, I'M

 6     NOT GOING TO ASK HIM ABOUT THAT ON DIRECT.

 7          I SEE SOME OF THEIR CROSS EXHIBITS, IT LOOKS LIKE THEY

 8     WANT TO ASK HIM ON CROSS ABOUT APPLE DEVICES PRACTICING.  IF

 9     THEY DO, I THINK THAT OPENS THE DOOR AND ON REDIRECT I CAN ASK

10     HIM TO GIVE HIS OPINIONS.  BUT THEY'RE NOT GOING TO BE ON

11     DIRECT BECAUSE THERE WAS A MOTION AND THOSE PARAGRAPHS WERE

12     STRUCK FROM HIS REPORT.

13          MR. NELSON:  THERE WAS ONE PARAGRAPH LEFT THAT WAS

14     WHAT MY ISSUE WAS.  BUT IF YOU'RE SAYING --

15          THE COURT:  YOU KNOW WHAT?  I DON'T UNDERSTAND.  WE

16     WERE HERE THIS WEEKEND WORKING ON YOUR OBJECTIONS.  WHY ARE YOU

17     RAISING NEW OBJECTIONS NOW?  I GAVE YOU AN OPPORTUNITY TO BRIEF

18     THEM.  I GAVE YOU RULINGS ON THEM YESTERDAY.  WHY IS THERE

19     CONSTANTLY NEW ISSUES THAT YOU WANT TO RAISE A NEW OBJECTION?

20          MR. NELSON:  IT SOUNDS LIKE THERE'S NO ISSUE, YOUR

21     HONOR, BECAUSE THEY'RE NOT DOING THAT.

22          THE COURT:  ALL RIGHT.  LET'S BRING OUR JURY IN,

23     PLEASE.

24          I'M GOING TO START COUNTING YOUR TIME IF THIS KEEPS COMING

25     UP.  I'VE GIVEN YOU AN OPPORTUNITY TO BRIEF OBJECTIONS.  THAT'S
```

1    THE PLACE TO DO IT, NOT IN COURT.

2              MS. KREVANS:  THAT WAS THEIR OBJECTION, SO --

3              THE COURT:  OKAY.

4         (JURY IN AT 11:52 A.M.)

5              THE COURT:  ALL RIGHT.  TIME IS NOW 11:52.

6         GO AHEAD, PLEASE.

7    BY MS. KREVANS:

8    Q.   PLEASE TAKE A SEAT AGAIN, PROFESSOR MOWRY.

9         WE WERE AT EXHIBIT 146 IN YOUR BINDER.  THIS IS AN

10   INTERNAL DOCUMENT FROM SAMSUNG; IS THAT CORRECT?

11   A.   YES, THAT'S CORRECT.

12             MS. KREVANS:  OKAY.  YOUR HONOR, WE MOVE THE

13   ADMISSION OF PX 146.

14             THE COURT:  ANY OBJECTION?

15             MR. NELSON:  NO OBJECTION, YOUR HONOR.

16             THE COURT:  IT'S ADMITTED.

17        (PLAINTIFF'S EXHIBIT 146 WAS ADMITTED IN EVIDENCE.)

18   BY MS. KREVANS:

19   Q.   COULD YOU BRIEFLY EXPLAIN TO THE JURY WHAT EXHIBIT 146 IS,

20   PROFESSOR MOWRY?

21   A.   IT'S A SIDE-BY-SIDE COMPARISON FOR -- BETWEEN THE SAMSUNG

22   S1 PHONE AND THE IPHONE FOR A SET OF ABOUT 126 DIFFERENT

23   INDIVIDUAL USER INTERFACE -- USER EXPERIENCE -- SORRY, USER

24   EXPERIENCE ISSUES.

25   Q.   AND WHAT'S THE DATE OF THE DOCUMENT?

1      A.    MARCH 2ND, 2010.

2      Q.    AND THE S1 WAS A SAMSUNG PHONE IN DEVELOPMENT AT THE TIME?

3      A.    YES.

4      Q.    OKAY.  AND WE SEE ON THE SECOND PAGE OF THE DOCUMENT,

5      WHICH IS PAGE 3 OF THE EXHIBIT, THE TABLE OF CONTENTS.  IT SAYS

6      NEW UX USABILITY ISSUES.

7            UX IS USER EXPERIENCE?

8      A.    YES.

9      Q.    OKAY.  COULD YOU TURN TO PAGE 37 OF THE EXHIBIT.  YOU

10     MENTIONED THERE WERE A NUMBER OF ITEMS.

11           THIS IS ITEM NUMBER 31.  WOULD YOU EXPLAIN, JUST USING

12     THIS PAGE AS AN EXAMPLE, THE BASIC FORMAT OF THIS DOCUMENT.

13     A.    EACH PAGE LOOKS AT ONE SPECIFIC ISSUE OF USER EXPERIENCE

14     WITH THE IPHONE AND THE SAMSUNG PHONE, AND ALONG THE TOP IN

15     BLUE, YOU SAY A HEADLINE DESCRIBING THE PARTICULAR ISSUE.  IN

16     THIS CASE, IT'S LOOKING AT THE MEMO APPLICATION WHERE YOU CAN

17     STORE A MEMO ON YOUR PHONE.

18           AND THE ISSUE AT THE TOP IN BLUE, IT SAYS "WHEN A MEMO

19     CONTAINS URL, PHONE NUMBER OR E-MAIL, NO LINK IS PROVIDED."

20     Q.    SO LET'S JUST STOP THERE FOR A MOMENT.  A MEMO IS ONE KIND

21     OF ELECTRONIC DOCUMENT THAT A USER OF THE SAMSUNG PHONES CAN

22     STORE ON THEIR PHONE?

23     A.    THAT'S RIGHT.

24     Q.    OKAY.  WHAT'S SET OUT UNDER THAT STATEMENT IN BLUE, WHEN A

25     MEMO CONTAINS URL, PHONE NUMBER OR E-MAIL, NO LINK IS PROVIDED?

1      A.   RIGHT BELOW THAT, THERE'S A DESCRIPTION OF WHAT THE IPHONE

2      DOES AND WHAT THE S1 DOES.

3      Q.   WHAT DOES IT SAY ABOUT THE IPHONE?

4      A.   IT SAYS "A LINK FOR THE URL, PHONE NUMBER OR E-MAIL

5      ADDRESS IN THE MEMO IS PROVIDED THROUGH TAP OR LONG PRESS."

6      Q.   LONG PRESS BEING WHAT YOU TALKED ABOUT BEFORE WHERE

7      SOMEONE PUTTING THEIR FINGER DOWN AND LEAVES IT DOWN TO TELL

8      THE PHONE I WANT TO SELECT SOMETHING?

9      A.   THAT'S CORRECT.

10     Q.   OKAY.  WHAT DOES IT SAY ABOUT THE S1?

11     A.   IT SAYS "NO LINK FUNCTION IS PROVIDED AT ALL."

12     Q.   OKAY.  WHAT DO WE SEE ON THE SIDE BY SIDE IN THE MIDDLE OF

13     THE PAGE?

14     A.   HERE IT'S COMPARING SCREEN SHOTS FOR THE BEHAVIOR OF THE

15     IPHONE'S MEMO PROGRAM WHEN THERE ARE THESE TYPES OF STRUCTURES

16     AND THE BEHAVIOR OF THE SAMSUNG S1 ON THE RIGHT SIDE.

17     Q.   AND WHAT DO WE SEE ABOUT THE IPHONE ON THE LEFT?

18     A.   WELL, IT'S SHOWING A SEQUENCE OF THREE DIFFERENT SCREEN

19     SHOTS WHERE THE, THE -- IN THIS CASE IT'S A PHONE NUMBER THAT

20     THE USER HAD JUST ENTERED AS REGULAR TEXT THAT WAS DETECTED AND

21     BY LONG PRESSING, A POP-UP MENU APPEARED, A POP-UP MENU IS THE

22     SECOND SCREEN SHOT THAT'S PARTIALLY COVERED UP BY THE ONE IN

23     THE FRONT, AND THEN THE USER HAS APPARENTLY CHOSEN THE CALL

24     OPTION AND ON THE FRONT YOU CAN SEE THAT IT'S ABOUT TO LAUNCH

25     THE DIALER FOR THE PARTICULAR PHONE NUMBER.

1    Q.   OKAY.  AT THE BOTTOM OF THIS PAGE, THERE'S A SECTION THAT,

2    IN PINK ON THE LEFT SAYS DIRECTIONS FOR IMPROVEMENT.

3         WHAT WERE THE DIRECTIONS FOR IMPROVEMENT GIVEN ABOUT THE

4    S1 PHONE IN THIS DOCUMENT FROM 2010?

5    A.   THE SUGGESTION WAS TO ADOPT THE BEHAVIOR OF THE IPHONE.

6    IT SAYS "NEED TO IMPROVE USABILITY BY PROVIDING LINKS FOR MEMO

7    CONTENTS SUCH AS WEB, CALL AND E-MAIL, THAT CAN BE LINKED."

8    Q.   OKAY.  HAVE YOU SEEN ANY DOCUMENTS -- WELL, ACTUALLY, LET

9    ME BACK UP.

10        IS THIS THE ONLY DOCUMENT YOU SAW FROM SAMSUNG THAT HAD

11   THIS KIND OF INFORMATION IN IT SHOWING THAT SAMSUNG UNDERSTOOD

12   THE IMPORTANCE OF THESE -- THE INVENTION OF THE '647 PATENT?

13   A.   NO.  YOU SAY SEVERAL OTHER DOCUMENTS LIKE THIS.

14   Q.   OKAY.  HAVE YOU SEEN ANY DOCUMENTS FROM GOOGLE INDICATING

15   THAT GOOGLE UNDERSTOOD THE IMPORTANCE OF THE INVENTION OF THE

16   '647 PATENT?

17   A.   YES, I HAVE.

18   Q.   COULD YOU LOOK AT EXHIBIT 116 IN YOUR BINDER.

19   A.   YES.

20   Q.   WHAT IS EXHIBIT 116?

21   A.   THIS IS AN E-MAIL EXCHANGE BETWEEN SOME ENGINEERS AT

22   GOOGLE.

23   Q.   AND THE DATE OF THIS E-MAIL EXCHANGE?

24   A.   SEPTEMBER 17TH, 2007.

25        MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

1    PLAINTIFF'S EXHIBIT 116.

2              MR. NELSON:  NO OBJECTION, YOUR HONOR.

3              THE COURT:  IT'S ADMITTED.

4         (PLAINTIFF'S EXHIBIT 116 WAS ADMITTED IN EVIDENCE.)

5              THE COURT:  GO AHEAD, PLEASE.

6    BY MS. KREVANS:

7    Q.   WHAT'S THE GENERAL TOPIC OF THIS E-MAIL?

8    A.   THEY'RE TALKING ABOUT USER EXPERIENCE ISSUES, AND THE BULK

9    OF THE MESSAGE IS SOMETHING SENT FROM HELENA ROEBER, WHO'S A

10   USER EXPERIENCE RESEARCHER AT GOOGLE.

11   Q.   COULD YOU LOOK AT THE SECOND PAGE OF EXHIBIT 116 AT THE

12   PORTION UNDER THE HEADING UNIVERSAL ACTION ON TEXT OBJECTS?

13   AND IN PARENTHESES, PHONE NUMBERS, E-MAIL ADDRESSES, PHYSICAL

14   ADDRESSES.

15        WHAT'S SET OUT HERE IN THIS 2007 GOOGLE E-MAIL?

16   A.   IT'S SAYING THAT FOR THESE TEXT OBJECTS, WHICH IS THINGS

17   FOUND IN TEXT DOCUMENTS, LIKE PHONE NUMBERS, E-MAIL ADDRESSES

18   AND PHYSICAL ADDRESSES, IT SAYS "ONE OF OUR MOST POWERFUL

19   FEATURES IS THE INTERACTION OF TEXT OBJECTS, OTHER APPLICATIONS

20   ON THE PHONE.  FOR INSTANCE, USERS CAN SELECT A PHONE NUMBER,

21   AN E-MAIL ADDRESS OR A PHYSICAL ADDRESS AND IT WILL LAUNCH THE

22   DIALER, E-MAIL EDITOR OR MAPS RESPECTIVELY."

23   Q.   WHAT DOES IT SAY DOWN BELOW UNDER THE HEADING GENERIC

24   ACTIONS?

25   A.   IT GOES ON TO SAY THAT "IN ADDITION TO ACTING ON SPECIFIC

1    TEXT OBJECTS, IT WOULD BE GOOD TO HAVE A SET OF ACTIONS AND A

2    U/I SOLUTION THAT APPLY TO ALL OF THEM SUCH AS 'ADD TO ADDRESS

3    BOOK.'"

4         SO IN OTHER WORDS IT'S SAYING THAT YOU WANT TO HAVE

5    MULTIPLE OPTIONS FOR EACH OF THESE TYPES OF DETECTED

6    STRUCTURES.

7    Q.    AND THE DATE OF THIS E-MAIL IS 2007?

8    A.    YES, SEPTEMBER 2011.

9    Q.    ELEVEN YEARS AFTER THE INVENTION OF THE '647 PATENT?

10   A.    YES.

11   Q.    COULD YOU TURN TO EXHIBIT 107 IN YOUR BINDER.

12   A.    YES.

13   Q.    WHAT IS EXHIBIT 107?

14   A.    THIS IS A SAMSUNG DOCUMENT ENTITLED 2011/2012 UX ROADMAP,

15   WHICH STANDS FOR USER EXPERIENCE.

16        MS. KREVANS:  YOUR HONOR, WE OFFER EXHIBIT 107.

17        THE COURT:  ANY OBJECTION?

18        MR. NELSON:  NO, YOUR HONOR.

19        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

20   (PLAINTIFF'S EXHIBIT 107 WAS ADMITTED IN EVIDENCE.)

21   BY MS. KREVANS:

22   Q.    OKAY.  WHAT IS THE DATE OF THIS DOCUMENT?

23   A.    IT IS AUGUST 5TH, 2010.

24   Q.    AND WHAT'S THE GENERAL TOPIC OF THIS DOCUMENT?

25   A.    IT IS DISCUSSING PROPOSALS FOR PROJECTS TO IMPROVE THE

```
 1        USER EXPERIENCE ON SAMSUNG PRODUCTS.

 2        Q.    OKAY.  COULD YOU LOOK AT PAGE 52 OF THE EXHIBIT?

 3        A.    YES.

 4        Q.    WHAT IS SET OUT ON PAGE 52?

 5        A.    THIS IS A PROPOSAL FOR A PROJECT TO IMPROVE EASEABILITY OF

 6        THE SMART ORGANIZER.  THIS IS SOMETHING THAT CONTAINS THINGS

 7        LIKE YOUR CALENDAR, YOUR CONTACT LIST AND THAT TYPE OF THING.

 8             AND WE SEE IN THE BOTTOM LEFT THAT IT'S SUGGESTING A

 9        PROJECT SUCH THAT YOU CAN AUTOMATICALLY CREATE A CALENDAR ENTRY

10        BASED ON DETECTED CONTENT FROM A USER'S E-MAIL, AND THAT'S

11        ILLUSTRATED HERE.

12        Q.   AND --

13             THE COURT:  IT'S 12:01.  I'M SORRY TO INTERRUPT YOU.

14        BUT LET'S GO AHEAD AND TAKE OUR LUNCH BREAK NOW.

15             MS. KREVANS:  OKAY.

16             THE COURT:  ALL RIGHT.  WHY DON'T WE BREAK UNTIL 1:05

17        BECAUSE I HAVE ONE ISSUE TO TAKE CARE OF OUTSIDE YOUR PRESENCE.

18             SO IF YOU WOULD, PLEASE, YOU'RE EXCUSED FOR LUNCH.  PLEASE

19        DON'T DISCUSS OR RESEARCH THE CASE.  THANK YOU FOR YOUR

20        PATIENCE AND YOUR SERVICE.

21             (JURY OUT AT 12:01 P.M.)

22             THE COURT:  THE RECORD SHOULD REFLECT THE JURORS HAVE

23        LEFT THE COURTROOM.

24        YOU MAY STEP DOWN.

25             MAY I HAVE A COPY OF DR. MOWRY'S REPORT AND THE PARAGRAPH
```

1      THAT MIGHT BE IN DISPUTE SO WE CAN LOOK AT IT OVER THE LUNCH

2      BREAK IN CASE THERE IS AN ISSUE.

3              MS. KREVANS:  I THINK WE RESOLVED THE DISPUTE.  IT

4      WAS ABOUT THE EXHIBIT THAT'S NOT IN EVIDENCE.

5              THE COURT:  NO.  I THINK THERE MIGHT BE A DISPUTE AS

6      TO A PARAGRAPH AND WHETHER IT STATES THAT APPLE PRACTICES THE

7      '647.

8          IS THAT RIGHT?

9              MR. NELSON:  THAT'S CORRECT, YOUR HONOR.

10             THE COURT:  I'D LIKE -- WHAT IS THE NUMBER OF THAT

11     PARAGRAPH SO I CAN TAKE A LOOK AT IT OVER THE LUNCH BREAK?  AND

12     DOES ANYONE HAVE AN EXTRA COPY OF THE FULL REPORT?  OKAY.

13             MS. KREVANS:  I'M NOT GOING TO ASK HIM ANYTHING ABOUT

14     THE CONTENT OF THAT PARAGRAPH ON DIRECT, YOUR HONOR.  SO I'M

15     NOT SURE THAT THERE IS A DISPUTE.

16         MY POINT IS SIMPLY IF THEY GO INTO IT ON CROSS AND THEY

17     OPEN THE DOOR, THEN HE CAN TESTIFY TO HIS OPINIONS ABOUT APPLE

18     PRACTICING IT.  I'M NOT GOING THERE ON DIRECT.

19             THE COURT:  LET ME JUST HAVE THE REPORT.

20         MR. NELSON, CAN YOU TAKE A LOOK AT WHATEVER THEY GIVE ME

21     TO MAKE SURE THEY'RE OKAY.

22             MS. KREVANS:  I THINK HE NEEDS TO IDENTIFY THE

23     PARAGRAPH BECAUSE THIS WAS NEW TO ME.

24             THE COURT:  AND I WOULD LIKE AN IDENTIFICATION OF THE

25     PARAGRAPH SO YOU CAN LOOK AT IT OVER THE LUNCH BREAK.

```
 1              (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

 2              THE COURT:  AND WHAT'S THE CROSS EXHIBIT?

 3              (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

 4              MR. NELSON:  SO IT'S 298 AND 299, YOUR HONOR.

 5              THE COURT:  298 AND 299, OKAY.  AND MAY I HAVE THAT

 6      COPY?  MR. NELSON, ARE YOU OKAY WITH ME HAVING THAT COPY?  IT'S

 7      CLEAN?

 8              MR. NELSON:  YEAH, THAT'S FINE, YOUR HONOR.

 9              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  IF I CAN

10      TAKE THAT OVER THE LUNCH BREAK.

11          ANY OTHER PARAGRAPHS YOU NEED ME TO LOOK AT JUST IN CASE

12      JUST TO SAVE US TIME LATER?  ANYTHING ELSE THAT MIGHT BE COMING

13      UP?

14              MR. NELSON:  NO.  THAT'S THE ONLY ISSUE, YOUR HONOR.

15              THE COURT:  OKAY.  ALL RIGHT.  I'LL TAKE A LOOK AT

16      THIS OVER THE LUNCH BREAK.  THANK YOU.  LET'S COME BACK AT

17      1:05.

18              (THE LUNCH RECESS WAS TAKEN FROM 12:04 P.M. TO 1:07 P.M.)

19

20

21

22

23

24

25
```

| 1 | **AFTERNOON SESSION** |
|---|---|
| 2 | |
| 3 | (JURY IN AT 1:07 P.M.) |
| 4 | THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT. |
| 5 | TIME IS NOW 1:08. |
| 6 | GO AHEAD, PLEASE. |
| 7 | BY MS. KREVANS: |
| 8 | Q.   WHEN WE TOOK A BREAK BEFORE LUNCH, PROFESSOR MOWRY, YOU |
| 9 | RECALL WE WERE LOOKING AT EXHIBIT 107? |
| 10 | A.   YES. |
| 11 | Q.   COULD YOU REMIND THE JURORS WHAT EXHIBIT 107 WAS. |
| 12 | A.   THIS IS A SAMSUNG DOCUMENT.  IT IS THE 2011/2012 FOR UX |
| 13 | ROADMAP FOR USER EXPERIENCE, AND IT IS A SET OF PROPOSALS FOR |
| 14 | PROJECTS TO IMPROVE USER EXPERIENCE ON SAMSUNG PRODUCTS. |
| 15 | Q.   AND WE HAD JUST GONE TO PAGE 125 -- SORRY -- TO PAGE 52 OF |
| 16 | EXHIBIT 107 AND YOU WERE TELLING US WHAT YOU SAW ON THAT PAGE. |
| 17 | A.   YES.  IN THE BOTTOM LEFT CORNER, WE SEE THIS IS DESCRIBING |
| 18 | A PROPOSAL TO MAKE IT POSSIBLE TO ADD ENTRIES TO YOUR CALENDAR |
| 19 | DIRECTLY FROM CONTENT DISCOVERED IN SOMEONE'S E-MAIL. |
| 20 | AND IT'S ILLUSTRATING AN EXAMPLE OF THIS. |
| 21 | Q.   AND WHEN YOU SAY "IT'S ILLUSTRATING AN EXAMPLE OF THIS," |
| 22 | YOU'RE TALKING ABOUT THE PORTION OF THIS THAT'S SORT OF SHADED |
| 23 | AND STARTS WITH "SIMULATING COMPLEX ADAPTIVE SYSTEMS -- WHAT |
| 24 | CAN WE REALLY LEARN?"  AND THERE'S SOME THINGS POPPING UP OVER |
| 25 | THE TEXT? |

1    A.    YES.   THIS IS AN EXAMPLE OF AN E-MAIL MESSAGE ADVERTISING

2    A SEMINAR FROM DR. SIMON FRASER, AND WHAT IT'S DISCOVERED IS

3    PERCENT OF THE VALUE THE E-MAIL ADDRESS FOR SIMON FRASER, AND

4    ALSO THE TIME AND DATE OF THE SEMINAR.

5         SO WE SEE SOME DETECTED STRUCTURES, AND WE SEE TWO ACTIONS

6    ON THE DATE AND TIME TO PLACE IN THE ELECTRONIC CALENDAR OR TO

7    MAIL TO SECRETARY FOR SCHEDULING FOR THAT DATE.

8    Q.    OKAY.   OKAY.   HAVE YOU SEEN A FIGURE LIKE THE ONE THAT

9    WE'RE LOOKING AT RIGHT NOW FROM THIS INTERNAL SAMSUNG DOCUMENT

10   IN ANOTHER DOCUMENT?

11   A.    YES, I HAVE.

12   Q.    WOULD YOU GO TO PX 106 IN YOUR BINDER, PLEASE.

13   A.    YES.

14   Q.    WHAT IS EXHIBIT 106?

15   A.    THIS IS A PAPER WRITTEN BY THREE OF THE INVENTORS OF THE

16   '647 PATENT, AND THIS APPEARED ON JIM MILLER'S WEBSITE, WHICH

17   IS CALLED MIRAMONTES INTERACTIVE.

18        MS. KREVANS:   YOUR HONOR, WE MOVE FOR THE ADMISSION

19   OF 106.

20        MR. NELSON:   I'M GOING TO OBJECT ON FOUNDATIONAL

21   GROUNDS AND HEARSAY.   I UNDERSTOOD THE NEXT WITNESS WAS COMING

22   TO LAY THE FOUNDATION FOR THIS PARTICULAR DOCUMENT.

23        MS. KREVANS:   YOUR HONOR, THIS IS A DOCUMENT THAT

24   THIS WITNESS ANALYZED AND INCLUDED IN HIS EXPERT REPORT.   IT'S

25   A PRINTOUT FROM A PUBLICLY AVAILABLE WEBSITE.   IT'S PERFECTLY

1    APPROPRIATE FOR HIM TO DISCUSS IT LIKE ANY OTHER KIND OF

2    PUBLICATION AN EXPERT CAN DISCUSS.

3              MR.  NELSON:  WELL, YOUR HONOR, THERE'S STILL

4    FOUNDATIONAL ISSUES WITH THE DOCUMENT, AND IN TERMS OF THE

5    CITATION, I BELIEVE, TO 702, THE FACT THAT THE EXPERT CITED IT

6    DOESN'T MAKE IT ADMISSIBLE.

7         IT HAS TO BE OTHERWISE ADMISSIBLE, AND, THEREFORE,

8    PARTICULARLY WHEN THEY'VE ALREADY SAID THAT THEY'RE BRINGING IN

9    THE NEXT WITNESS TO ESTABLISH, YOU KNOW, TO ATTEMPT TO

10   ESTABLISH THE FOUNDATIONAL ASPECT BECAUSE THERE ARE SOME

11   SIGNIFICANT ISSUES WITH IT.

12             THE COURT:  OVERRULED.  GO AHEAD, PLEASE.  IT'S

13   ADMITTED.

14        (PLAINTIFF'S EXHIBIT 106 WAS ADMITTED IN EVIDENCE.)

15             MS. KREVANS:  THANK YOU, YOUR HONOR.

16   Q.   WHAT IS THE WEBSITE ON WHICH THIS VERSION OF THIS ARTICLE

17   WAS PUBLISHED?

18   A.   THIS IS A WEBSITE THAT, IT'S JIM MILLER'S, JAMES MILLER'S

19   WEBSITE, WHICH IS CALLED MIRAMONTES INTERACTIVE.

20   Q.   OKAY.  AND JAMES MILLER IS ONE OF THE INVENTORS OF THE

21   '647 PATENT?

22   A.   THAT'S RIGHT.  HE'S THE FIRST NAMED INVENTOR OF THE

23   PATENT.

24   Q.   AND WHAT WAS THE DATE OF THIS ARTICLE?

25   A.   MARCH 1998.

```
 1      Q.   OKAY.  AND THE TOPIC OF THE ARTICLE?

 2      A.   THIS IS AN ARTICLE ABOUT THE DATE BOOK, APPLE CALLS DATA

 3      DETECTORS TECHNOLOGY, WHICH IS THE TECHNOLOGY THAT LED TO THE

 4      '647 PATENT.

 5      Q.   OKAY.  COULD YOU LOOK AT THE THIRD PAGE OF EXHIBIT 106?

 6      A.   YES.

 7      Q.   AND, MR. LEE, COULD YOU BLOW UP THE FIGURE THAT'S SHOWN IN

 8      THE MIDDLE OF THE THIRD PAGE OF THIS 1998 ARTICLE FROM THE

 9      APPLE INVENTORS?

10           ARE WE LOOKING NOW -- I'M SORRY, MR. LEE.  JUST SO I CAN

11      BE SURE, ARE WE LOOKING AT PAGE 3 OF EXHIBIT 106?

12           OKAY.  WHAT DO WE SEE HERE, PROFESSOR MOWRY?

13      A.   WE SEE THE SAME IMAGE THAT WE SAW IN THE OTHER DOCUMENT.

14      THIS IS A SEMINAR ANNOUNCEMENT OF DR. SIMON FRASER GIVING A

15      SEMINAR AT THE APPLE LAB.

16      Q.   OKAY.  MR. LEE, CAN YOU SHOW US THIS PIECE OF THE APPLE

17      INVENTOR'S ARTICLE ON THE TOP OF THE SCREEN AND SHOW US THE

18      FIGURE THAT WAS IN THE SAMSUNG INTERNAL DOCUMENT ON THE BOTTOM

19      OF THE SCREEN.

20           ARE THESE THE SAME, PROFESSOR MOWRY?

21      A.   YES.

22      Q.   THE DIFFERENCE IS THAT IN THE PIECE OF THIS ARTICLE THAT

23      WAS PASTED INTO THE SAMSUNG DOCUMENT, THE TITLE "APPLE LABS

24      SEMINAR 52," AND THE FIGURE 1 LABEL AT THE BOTTOM, APPLE DATA

25      DETECTORS IN ACTION, THOSE WERE NOT PASTED INTO THE SAMSUNG
```

```
 1        INTERNAL DOCUMENT; RIGHT?

 2   A.   THAT'S CORRECT.

 3   Q.   OTHERWISE THEY'RE THE SAME?

 4   A.   YES.

 5   Q.   LET ME TURN TO A DIFFERENT TOPIC.

 6        PROFESSOR MOWRY, LATER IN THE TRIAL WE'RE GOING TO HEAR

 7   FROM ANOTHER APPLE EXPERT, A DR. HAUSER.  DID YOU REVIEW A --

 8   DO YOU UNDERSTAND THAT HE DID A SURVEY OF CONSUMERS ABOUT SOME

 9   OF THE FEATURES IN THE SAMSUNG ACCUSED PRODUCTS?

10   A.   YES, I'M AWARE OF THAT.

11   Q.   DID YOU REVIEW A DESCRIPTION THAT HE USED IN HIS SURVEY OF

12   THE INVENTION OF CLAIM 9 OF THE '647 PATENT?

13   A.   YES, I DID.

14   Q.   AND DID THAT DESCRIPTION, IN YOUR VIEW, PROVIDE AN

15   ACCURATE SUMMARY OF THE USER'S EXPERIENCE OF THE INVENTION OF

16   CLAIM 9 OF THE '647 PATENT?

17   A.   YES, IT DID.

18   Q.   OKAY.  JUST ONE FOLLOW-UP QUESTION TO SOMETHING YOU SAID

19   BEFORE LUNCH.  YOU USED THE TERM "PROPRIETARY CODE."  YOU WERE

20   TALKING ABOUT THE CODE RUNNING ON THE SAMSUNG PHONES.

21        IS THAT CODE THAT'S OWNED BY SAMSUNG?

22   A.   YES, THAT'S CORRECT.

23   Q.   AND IT'S PRIVATE TO SAMSUNG?

24   A.   YES.

25   Q.   EACH OF THE NINE ACCUSED PHONES THAT YOU'VE SHOWN ON YOUR
```

```
 1        SLIDE THAT YOU FOUND INFRINGED CLAIM 9, SAMSUNG MAKES THOSE

 2        PHONES?

 3        A.   THAT'S CORRECT.

 4        Q.   SAMSUNG CHOOSES WHAT SOFTWARE TO PUT IN THOSE PHONES?

 5        A.   YES, THAT'S MY UNDERSTANDING.

 6        Q.   AND IT'S SAMSUNG THAT SELLS THOSE PHONES IN THE

 7        UNITED STATES?

 8        A.   YES.

 9             MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:14.

11        (PAUSE IN PROCEEDINGS.)

12             MR. NELSON:  MAY I PROCEED, YOUR HONOR?

13             THE COURT:  YES, PLEASE.  TIME IS NOW 1:15.

14             MR. NELSON:  THANK YOU, YOUR HONOR.

15                         CROSS-EXAMINATION

16        BY MR. NELSON:

17        Q.   GOOD AFTERNOON, DR. MOWRY.

18        A.   GOOD AFTERNOON.

19        Q.   MY NAME IS DAVE NELSON.  I'M ONE OF THE ATTORNEYS FOR

20        SAMSUNG?

21        A.   YES.

22        Q.   COULD WE PUT UP CLAIM 9 OF THE '647 PATENT, PUT IT WITH

23        THE ELEMENTS OF CLAIM 1, PLEASE.

24             SO HERE YOU AGREE THAT IN ORDER FOR SOMETHING TO INFRINGE,

25        IT HAS TO HAVE ALL OF THE ELEMENTS; RIGHT?
```

```
1    A.   YES, THAT'S CORRECT.

2    Q.   SO IF EVEN ONE THING IS MISSING, THERE'S NO INFRINGEMENT;

3    RIGHT?

4    A.   YES, THAT'S CORRECT.

5    Q.   SO LET'S FOCUS ON THIS ANALYZER SERVER.  DO YOU SEE THAT?

6    A.   YES.

7    Q.   DO YOU SEE THE TERM "ANALYZER SERVER FOR DETECTING

8    STRUCTURES IN THE DATA, AND FOR LINKING ACTIONS TO THE DETECTED

9    STRUCTURES."  DO YOU SEE THAT?

10   A.   YES, I DO.

11   Q.   AND PART OF YOUR UNDERSTANDING OF AN ANALYZER SERVER IS

12   THAT IT'S A PIECE OF SOFTWARE TO BE USED ACROSS APPLICATIONS;

13   RIGHT?

14   A.   WELL, ACTUALLY, THE DEFINITION OF ANALYZER SERVER IS

15   IT'S -- IT'S GIVEN RIGHT HERE IN THE CLAIM LANGUAGE.  IT'S A

16   PIECE OF SOFTWARE THAT PERFORMS THESE FUNCTIONS.

17        BUT ONE WOULD PROBABLY -- IF YOU WERE BUILDING THIS TYPE

18   OF THING IN A PRODUCT, IT WOULD BE DESIRABLE TO BE ABLE TO BE

19   USED AND NOT HAVE TO WRITE ONE -- WRITE IT MANY, MANY DIFFERENT

20   TIMES.

21   Q.   RIGHT.  SO YOU'D BE USING IT ACROSS APPLICATIONS?  THAT'S

22   THE SERVER PART?

23   A.   THAT WOULD BE DESIRABLE.  LIKE I SAID, IT'S NOT IN THE

24   CLAIM LANGUAGE THAT IT DOES THAT, BUT THAT WOULD BE DESIRABLE.

25   Q.   OKAY.  SO YOU LOOKED AT THE PROSECUTION HISTORY AS WELL,
```

1      DIDN'T YOU, IN THIS AS WELL?

2      A.   YES.

3      Q.   AND CAN WE LOOK AT JOINT TRIAL EXHIBIT 2, PAGE 87, THE

4      FIRST PARAGRAPH OF THAT.  FIRST FULL PARAGRAPH, YEAH.

5           AND FIRST, JUST FOR SOME BACKGROUND TO MAKE SURE THAT

6      WE'RE ON THE SAME PAGE, WHEN I SAY "PROSECUTION HISTORY," WE

7      ALL GET USED TO USING THE SAME TERMS OVER AND OVER AGAIN.

8           THIS IS LIKE A RECORD OF THE BACK AND FORTH WITH THE

9      PATENT OFFICE TO GET THE PATENT; RIGHT?

10     A.   YES.

11     Q.   OKAY.  SO YOU MAKE CLAIMS AND THE PATENT OFFICE WILL COME

12     BACK AND THEN YOU MAKE SOME STATEMENTS BACK TO THEM JUST

13     GENERALLY?

14     A.   YES.

15     Q.   SO HERE ON THE BOTTOM, YOU SEE THE '647 INVENTORS, THEY

16     DESCRIBE THEIR INVENTION AS A SYSTEM-WIDE SERVICE, RIGHT?  "IN

17     ADDITION, APPLICANTS' INVENTION IS A SYSTEM-WIDE SERVICE THAT

18     CAN BE USED TO ENABLE COOPERATING SYSTEMS TO DETECT

19     RECOGNIZABLE STRUCTURES IN THEIR DATA"; RIGHT?

20     A.   THIS WASN'T -- THIS WAS SUBMITTED TO ME BY APPLE, YES.  I

21     DON'T KNOW IF THE INVENTORS WROTE THIS.  I ACTUALLY BELIEVE

22     THAT THE APPLE ATTORNEYS WROTE THIS.

23     Q.   ON BEHALF OF THE APPLE INVENTORS; RIGHT?

24     A.   YES.

25     Q.   OKAY, GREAT.

```
 1              SO THEN JUST HERE, IF I UNDERSTAND YOUR TESTIMONY ON

 2    DIRECT, YOU CLAIM THAT THE ACCUSED APPLICATIONS USE SOMETHING

 3    CALLED A SHARED LIBRARY AS THE ANALYZER SERVER; RIGHT?

 4    A.   IT IS A SHARED LIBRARY IMPLEMENTATION OF THE ANALYZER

 5    SERVER, YES, THAT'S CORRECT.

 6    Q.   WE'LL TALK ABOUT THE SPECIFICS IN A MINUTE.  I THINK YOU

 7    HAD A SLIDE HERE THAT'LL MAKE IT EASIER.  I'LL PUT THAT BACK UP

 8    FOR US.

 9              BUT THE TERM "SHARED LIBRARY" NEVER APPEARS IN THE '647

10    PATENT?

11    A.   INDEED, NO TERM THAT DISCUSSES THE SPECIFIC DETAILS OF HOW

12    AN ANALYZER SERVER IS INVENTED.  THE CLAIMS JUST DESCRIBE WHAT

13    THE ANALYZER SERVER DOES.

14    Q.   AND THERE'S NO CODE IN THE '647 PATENT; RIGHT?

15    A.   NO.  DO YOU MEAN THERE'S NO SOURCE CODE IN THE

16    SPECIFICATION?  IS THAT WHAT YOU'RE REFERRING TO?

17    Q.   RIGHT?

18    A.   YES, THAT'S CORRECT.

19    Q.   SO YOU'RE AWARE THAT ONE OF THE NAMED INVENTORS ON THE

20    PATENT WAS -- I THINK YOU PUT THIS UP, WE CAN PUT IT BACK UP IF

21    YOU NEED TO REFRESH YOUR RECOLLECTION -- BUT A GENTLEMAN NAMED

22    DR. THOMAS BONURA; IS THAT CORRECT?

23    A.   YES.

24    Q.   NOW, YOU'RE AWARE THAT DR. BONURA TESTIFIED THAT AN

25    ANALYZER SERVER IMPLEMENTATION WAS, IN TRUTH, A DIFFERENT KIND
```

CROSS MOWRY

1    OF IMPLEMENTATION THAN A SHARED LIBRARY IMPLEMENTATION; RIGHT?

2    A.   NO, I DON'T BELIEVE THAT'S CORRECT.

3    Q.   OKAY.  SO YOU HAVE IN FRONT OF YOU SOME DEPOSITION

4    TESTIMONY, AND YOU'LL SEE THE 12-11-2012 DEPOSITION OF

5    DR. BONURA?

6    A.   IS THERE A NUMBER FOR THIS?  WHICH ONE IS IT?

7    Q.   IT SHOULD BE THE ONE -- WELL, THERE'S ONE THAT HAS JUST

8    DEPOSITION TESTIMONY IN IT.  THEY ARE A COLOR CODE.  IT'S

9    GREEN.

10   A.   OKAY, GREEN.  ALL RIGHT.  I'M WITH YOU.

11   Q.   SO I WANT YOU TO LOOK AT PAGE 168, AND --

12   A.   WHICH -- WHICH DEPOSITION?

13   Q.   IT'S DECEMBER 11TH, 2012.

14        MS. KREVANS:  YOUR HONOR, OBJECTION.  THIS -- HE'S

15   DIRECTING HIM TO TESTIFY THAT YOU HAVE ALREADY SUSTAINED AN

16   OBJECTION TO IN YOUR RULINGS ON THE OPENING SLIDES.

17        THE COURT:  WHAT WAS THE OPENING SLIDE OBJECTION?

18        MS. KREVANS:  I'M FINDING IT FOR YOU, YOUR HONOR.

19        (PAUSE IN PROCEEDINGS.)

20        MS. KREVANS:  IT WAS OBJECTED TO SLIDE 78.

21        THE COURT:  OKAY.

22        MS. KREVANS:  I DON'T KNOW IF YOU WANT ME TO PUBLISH

23   IT.  I CAN BRING YOUR HONOR A COPY OF THE OBJECTION.  I HAVE IT

24   IN MY HAND.

25        THE COURT:  I HAVE THE OBJECTIONS AS WELL.  GIVE ME

```
1        ONE MINUTE, PLEASE.

2              MS. KREVANS:  IT WAS --

3              THE COURT:  I SEE IT.

4              MS. KREVANS:  -- IT WAS ON PAGE 10 OF OUR OBJECTIONS.

5              THE COURT:  THAT OBJECTION WAS SUSTAINED, BUT THAT

6    REALLY HAD TO DO WITH AN OPENING SLIDE.

7          THE OBJECTION'S OVERRULED.

8          GO AHEAD, PLEASE.

9    BY MR. NELSON:

10   Q.   SO 168, LINE 7 -- OH, EXCUSE ME -- LINE 13, I APOLOGIZE,

11   TO LINE 25.

12        AND YOU SEE THE QUESTION THERE:

13        "QUESTION:  I UNDERSTOOD YOU TO TESTIFY WHEN I ASKED YOU

14   QUESTIONS ABOUT THIS THAT SHARED LIBRARY IMPLEMENTATION WAS

15   DISTINCT FROM A CLIENT SERVER IMPLEMENTATION; IS THAT CORRECT?"

16        DO YOU SEE THAT QUESTION?

17   A.   I SEE THAT.

18   Q.   AND THEN THE ANSWER:  "IT'S -- CONSTRUCTURALLY IT SHARES

19   SOME SIMILARITIES WITH CLIENT SERVER, BUT IN TRUTH IT'S A

20   DIFFERENT KIND OF IMPLEMENTATION, WHERE A LIBRARY IS LINKED TO

21   APPARENTLY THE APPLICATION."

22        DO YOU SEE THAT TESTIMONY?

23   A.   YES, I DO.

24   Q.   DR. MOWRY -- EXCUSE ME.  I'LL SLOW DOWN -- ALSO SAID THAT

25   A SEVERER WOULDN'T BE A SHARED LIBRARY; RIGHT?
```

1    A.   NO.  ACTUALLY ON THAT SAME PAGE THAT YOU WERE ON, IF YOU

2    GO UP ONE QUESTION FROM WHAT YOU JUST SHOWED ME, HE ACTUALLY

3    SAYS THAT HE'S IMPLEMENTING THE ANALYZER SERVER AS A SHARED

4    LIBRARY.

5    Q.   ACTUALLY, THAT DOCUMENT HE WAS REFERRING TO SOMETHING THAT

6    SOMEBODY ELSE WORKED ON; RIGHT?  DO YOU RECALL THAT?

7    A.   UM --

8    Q.   IN THAT QUESTION AND ANSWER, SOMETHING THAT ANOTHER

9    GENTLEMAN WORKED ON, NOT HIMSELF; RIGHT?

10   A.   DAVID WRIGHT, IS THAT WHAT YOU'RE TALKING ABOUT?

11   Q.   YES, DAVID WRIGHT?

12   A.   WELL, YES, THERE WAS AN E-MAIL EXCHANGE BETWEEN THE TWO OF

13   THEM WHERE THEY WERE DISCUSSING MULTIPLE IMPLEMENTATIONS OF

14   ANALYZER SERVER IN THE SHARED LIBRARY IMPLEMENTATION.

15   Q.   RIGHT.  AND YOU UNDERSTAND THE DATE OF THAT E-MAIL WAS

16   WELL AFTER THE PATENT WAS FILED; RIGHT?

17   A.   I -- WELL, I BELIEVE IT WAS IN -- AFTER THE PATENT WAS

18   FILED.  I THINK SO.

19   Q.   OKAY.  NOW, IF YOU COULD GO TO PAGE 107 OF MR.,

20   DR. BONURA'S DEPOSITION, LINES 16 TO 24.

21        DO YOU SEE THE QUESTION:

22        "QUESTION:  OKAY.  SO YOU SAY, 'I'M LOOKING INTO

23   IMPLEMENTING THE SERVER AS A SHARED LIBRARY RATHER THAN AS A

24   FIRST CLASS APPLICATION.'

25        "SO DO YOU HAVE AN UNDERSTANDING WHAT THAT SENTENCE

CROSS MOWRY

1      MEANS?"

2           DO YOU SEE THAT QUESTION?

3      A.   YES, I SEE THAT.

4      Q.   AND THEN THE ANSWER:  "NOT REALLY.  IT DOESN'T SOUND

5      LOGICAL, SINCE IF I WERE TALKED ABOUT A SHARED -- A SERVER IT

6      WOULDN'T BE A SHARED LIBRARY."

7           DO YOU SEE THAT?

8      A.   I DO SEE THAT.

9      Q.   AND YOU'RE AWARE OF THAT TESTIMONY?

10     A.   YES.

11     Q.   SO NOW LET'S PUT UP PDX 88.18 AND 88.23.  THOSE ARE TWO OF

12     YOUR DEMONSTRATIVE SLIDES.  AND I THINK THESE ARE ONES THAT

13     WE'RE NOT SUPPOSED TO PUT ON THE PUBLIC SCREENS.

14          WE CAN TALK ABOUT THE NAMES.  AND YOU GUYS -- YOU HAVE IT?

15               JURORS:  UH-HUH.

16     BY MR. NELSON

17     Q.   OKAY.  THANK YOU.

18          SO HERE -- LET'S JUST TALK ABOUT THE MESSAGING APPLICATION

19     FIRST.

20          THE SHARED LIBRARY YOU REFER TO AS THE ANALYZER SERVER WAS

21     LINKIFY; RIGHT?

22     A.   YES, LINKIFY IS THE CLASS, YES.

23     Q.   RIGHT.  AND THEN WITH RESPECT TO -- WELL -- SO THEN IF WE

24     GO TO YOUR OTHER EXHIBIT, DEMONSTRATIVE THAT'S 88.23, FOR THE

25     BROWSER APPLICATION, LET'S JUST START WITH GINGERBREAD AND ICE

1    CREAM SANDWICH.

2    A.   OKAY.

3    Q.   CACHE BUILDER IS WHAT YOU IDENTIFY AS AN ANALYZER SERVER;

4    RIGHT?

5    A.   IT'S THE PORTION FOR DETECTING STRUCTURES, TO THE ANALYZER

6    SERVER ALSO LINKS ACTIONS AND THERE WAS OTHER CODE FOR THAT.

7    Q.   RIGHT, BUT IN THAT CACHE BUILDER CLASS?

8    A.   NO.  THE OTHER PART OF THE ANALYZER SERVER IS NOT IN THE

9    CACHE BUILDER.

10   Q.   SO IT'S YET ANOTHER CLASS?  DO YOU REMEMBER WHAT THAT ONE

11   IS CALLED?

12   A.   NOT OFF THE TOP OF MY HEAD.  I -- I WOULD PROBABLY WANT TO

13   LOOK AT MY SLIDE.  I COULD ACTUALLY HAZARD A GUESS BUT --

14   Q.   IT'S NOT LINKIFY -- I'M SORRY.  ARE YOU DONE?

15   A.   YES.

16   Q.   IT'S NOT LINKIFY; RIGHT?

17   A.   NO.  LINKIFY DOESN'T LINK THE ACTIONS.

18   Q.   ALL RIGHT.  AND THEN FOR JELLY BEAN, THAT'S ANOTHER

19   VERSION, STILL WITH THE BROWSER APPLICATION?  THERE'S ONE

20   CALLED CONTENT DETECTOR; RIGHT?  AND THAT'S WHAT YOU'RE SAYING

21   IS THE ANALYZER SERVER?

22   A.   NO.  AGAIN, AS I SAID, THIS IS THE -- THIS IS THE -- THE

23   TITLE OF THIS IS THE PORTION OF THE ANALYZER SERVER THAT

24   DETECTS STRUCTURES, AND THIS IS THE CODE FOR THE PART OF IT

25   THAT DETECTS STRUCTURES.

CROSS MOWRY

1    Q.   SO THEN THERE'S AN ADDITIONAL PART THAT YOU SAY LINKS

2    ACTIONS; IS THAT RIGHT?

3    A.   YEAH, THE CLAIM LANGUAGE SAYS THAT THE ANALYZER SERVER HAS

4    TWO FUNCTIONS, SO I DESCRIBED BOTH OF THOSE FUNCTIONS.

5    Q.   RIGHT.  BUT THAT'S -- THAT ISN'T LINKIFY; RIGHT?

6    A.   THAT'S NOT LINKIFY.

7    Q.   AND IT'S NOT CACHE BUILDER?

8    A.   THAT'S CORRECT.

9    Q.   NOW, IN YOUR EXPERT REPORT, DID I UNDERSTAND YOU TO SAY

10   THAT THE LIBRARIES YOU IDENTIFY AS ANALYZER SERVERS ARE

11   GENERALLY AVAILABLE FOR DIFFERENT APPLICATIONS TO USE?

12   A.   IF YOU'RE QUOTING MY DOCUMENT, I MAY HAVE SAID THAT.

13        BUT I DON'T REMEMBER THE EXACT QUOTE OFF THE TOP OF MY

14   HEAD.

15   Q.   WELL, DO YOU AGREE WITH THAT?  SO LET'S JUST TAKE LINKIFY

16   FIRST?

17   A.   OKAY.

18   Q.   SO PART OF THE REASON YOU THINK LINKIFY -- YOU IDENTIFIED

19   LINKIFY AS AN ANALYZER SERVER IS YOU THINK IT'S GENERALLY

20   AVAILABLE FOR OTHER APPLICATIONS TO USE; RIGHT?

21   A.   NO, THAT'S NOT CORRECT.  I IDENTIFIED IT BECAUSE IT'S THE

22   THING THAT DETECTS STRUCTURES.

23   Q.   SO YOU DON'T CARE IF IT'S GENERALLY AVAILABLE FOR OTHER

24   APPLICATIONS TO USE?

25   A.   WELL, THERE'S A DIFFERENCE BETWEEN WHAT'S DESIRABLE AND

```
 1        WHAT'S REQUIRED BY THE CLAIMS.

 2             SO, FOR EXAMPLE, HIGHLIGHTING STRUCTURES THAT ARE DETECTED

 3        IS DESIRABLE, LIKE WHAT MESSAGING DOES, BUT IT'S NOT REQUIRED

 4        BY THE CLAIMS.

 5        Q.   SO HOW IS A SHARED LIBRARY A SERVER ROUTINE?

 6        A.   THE -- WELL, IT'S A -- IT'S PART OF THE ANALYZER SERVER

 7        AND AN ANALYZER SERVER CAN BE IMPLEMENTED IN A NUMBER OF

 8        DIFFERENT WAYS.  IT'S PEOPLE SKILLED IN THE ART UTILIZE THE

 9        WAYS THAT YOU CONNECT TOGETHER DIFFERENT COMPONENTS OF SOFTWARE

10        THAT CAN BE DONE A NUMBER OF DIFFERENT WAYS AND THAT'S ONE OF

11        THE WAYS YOU CAN CONNECT THINGS TOGETHER.

12        Q.   SO NOW CAN YOU -- YOU WERE DEPOSED AT LEAST ONE OTHER

13        TIME, APRIL 4TH, 2012; RIGHT?

14        A.   YES, THAT SOUNDS CORRECT.

15        Q.   NOW, CAN YOU LOOK AT THAT APRIL 4TH -- YOU SHOULD HAVE IT.

16        IT'S IN THE GREEN BINDER AGAIN.

17             APRIL 4TH, 2012, DEPOSITION AT PAGE 118 AND LINE 20.

18        A.   OKAY.

19        Q.   DO YOU SEE THAT, WHERE IT IS?  AND THEN THE ANSWER

20        CONTINUES TO 119, PAGE 3.

21        A.   UM-HUM.

22        Q.   AND YOU SEE THE QUESTION THERE, HOW IS THE SHARED LIBRARY

23        A SERVER ROUTINE?

24        A.   YES.

25        Q.   "ANSWER:  IT IS SOMETHING THAT IS DESIGNED TO BE USED BY A
```

CROSS MOWRY

```
 1      WIDE VARIETY OF APPLICATIONS.  IT'S NOT SOMETHING THAT IS --

 2      THAT A PROGRAMMER CUSTOM-BUILDS FOR THEIR OWN APPLICATION, BUT

 3      INSTEAD IT'S A UTILITY MEANT TO BE USED BY MANY APPLICATIONS,

 4      AND THAT'S THE CASE HERE."

 5          DO YOU SEE THAT?

 6      A.   I SEE.

 7      Q.   OKAY.  SO THAT WAS YOUR TESTIMONY IN RESPONSE TO THAT

 8      QUESTION I JUST ASKED YOU AT YOUR DEPOSITION; RIGHT?

 9      A.   THAT'S CORRECT, YES.

10      Q.   YOU AGREE WITH THAT?

11      A.   I'D HAVE TO LOOK AT THE WHOLE CONTEXT.  BUT, YES, YOU WERE

12      ASKING ABOUT A SEVERER ROUTINE.  YOU WEREN'T ASKING ABOUT AN

13      ANALYZER SERVER.  YOU WERE TALKING ABOUT A SERVER ROUTINE

14      GENERICALLY, I BELIEVE.

15      Q.   RIGHT.  THAT'S THE QUESTION I ASKED YOU, RIGHT?

16      A.   YEAH.  BUT JUST TO BE CLEAR, THAT SAYS SERVER, IT DOESN'T

17      SAY ANALYZER SERVER.

18      Q.   RIGHT.  BUT MY QUESTION EARLIER SAID THE SAME THING,

19      SERVER ROUTINE; RIGHT?

20      A.   THAT'S CORRECT.

21      Q.   SO -- NOW LET'S GO BACK TO PDX 88.18 AND 88.23.

22          AGAIN, YOU CAN'T PUT THESE ON THE PUBLIC SCREENS, BUT

23      LET'S PUT THEM UP ON OUR SCREENS.

24          ALL RIGHT.  SO YOU -- ONE OF THE THINGS YOU ACCUSE IS THE

25      MESSAGING APPLICATION; RIGHT?
```

1    A.    YES.

2    Q.    AND YOU SAY THAT LINKIFY IS THE ANALYZER SERVER; RIGHT?

3    A.    WELL, YOU KEEP PHRASING IT THAT WAY, BUT AS I SAID,

4    LINKIFY IS THE PART OF THE ANALYZER SERVER THAT DETECTS

5    STRUCTURES IN COOPERATION WITH THE OTHER CLASSES THAT I

6    MENTIONED ON THE SLIDE.

7         AND SO IT'S NOT ACCURATE TO SAY THAT LINKIFY IS THE

8    ANALYZER SERVER.

9    Q.    OKAY.  SO LINKIFY IS PART OF THE ANALYZER SERVER IS WHAT

10   YOU'RE SAYING?

11   A.    IT PERFORMS PART OF THE ANALYZER FUNCTIONALITY, THE PART

12   WHERE IT'S DETECTING STRUCTURES.

13   Q.    ALL RIGHT.  SO NOW LET'S PUT THAT DOWN AND LOOK AT THE --

14   AND JUST TAKE GINGERBREAD AND ICE CREAM SANDWICH.

15        FOR THAT SAME FUNCTION YOU POINT TO CACHE BUILDER; RIGHT?

16   A.    YES, THAT'S CORRECT.

17   Q.    SO CACHE BUILDER IS A DIFFERENT LIBRARY; RIGHT?  IT'S NOT

18   LINKIFY?

19   A.    ACTUALLY, LINKIFY CALLS INTO CACHE BUILDER THE WAY.  THAT

20   LINKIFY FINDS POSTAL ADDRESSES IS THAT IT CALLS INTO FIND

21   PARTIAL ADDRESS IN CACHE BUILDER.  SO THEY ARE CONNECTED IN

22   THAT WAY.

23   Q.    RIGHT.  BUT HERE THE PART THAT YOU ILLUSTRATED TO US WHEN

24   YOU'RE TRYING TO SHOW THE FUNCTIONS OF DETECTING STRUCTURES IN

25   THE ANALYZER SERVER, YOU CHOSE LINKIFY FOR THE BROWSER

1      APPLICATION AND CACHE BUILDER FOR THE GINGERBREAD AND ICE CREAM

2      SANDWICH AND THE BROWSER; RIGHT?

3      A.   YES, THAT'S CORRECT.

4      Q.   AND SIMILARLY WITH JELLY BEAN, FOR THAT SAME FUNCTION, YOU

5      CHOSE CONTENT DETECTOR; RIGHT?

6      A.   YES.   THE -- YES, THE THINGS ILLUSTRATED ON THE SCREEN

7      THAT THE JURY CAN SEE.

8      Q.   OKAY.   SO THEN FOR THE TWO APPLICATIONS THAT YOU ACCUSE,

9      MESSAGING AND THE BROWSER, YOU HAVE THREE DIFFERENT COMPONENTS

10     THAT PERFORM JUST THE DETECTING STRUCTURE OF WHAT YOU SAY IS

11     THE ANALYZER SERVER; RIGHT?

12     A.   WELL, THE CODE FOR JELLY BEAN IS BASICALLY A REWRITTEN,

13     RE -- JELLY BEAN IS A LATER RELEASE OF THE SOFTWARE.   SO THIS

14     IS EFFECTIVELY A REVISED VERSION OF WHAT WE SEE IN CACHE

15     BUILDER.   IT'S DIFFERENT SOFTWARE, BUT IT'S NOT LIKE SOME THIRD

16     PART THAT EXISTS SOMEWHERE ELSE.

17          I MEAN, THIS IS THE NEW AND IMPROVED VERSION OF THAT ON A

18     LATER RELEASE ON THE PHONE.

19          AS I SAID BEFORE, ACTUALLY, LINKIFY STILL CALLS INTO THIS

20     ROUTINE AS WELL TO FIND POSTAL ADDRESSES.

21     Q.   ALL RIGHT.   SO WE CAN PUT THAT DOWN.

22          THEN AT LEAST FOR THE GINGERBREAD AND ICE CREAM SANDWICH

23     BROWSER APPLICATION VERSIONS, AND YOU SAY ALL VERSIONS ON THE

24     MESSAGING APPLICATIONS USE LINKIFY FOR THIS FUNCTION; RIGHT?

25     A.   SORRY.   CAN YOU REPEAT THE QUESTION?

CROSS MOWRY

1    Q.   YEAH.  SO FOR GINGERBREAD AND ICE CREAM SANDWICH IN THE

2    BROWSER, YOU'VE IDENTIFIED CACHE BUILDER AS THE PART OF THE

3    ANALYZER, WHICH YOU'RE CALLING THE ANALYZER SERVER THAT DOES

4    DETECTION OF STRUCTURES; RIGHT?

5    A.   YEAH.  I IDENTIFIED THE SPECIFIC ROUTINES IN CACHE

6    BUILDER, YES.

7    Q.   RIGHT.  AND THEN FOR THE MESSAGING APPLICATION -- THIS IS

8    ACROSS ALL VERSIONS OF ANDROID THAT YOU ACCUSE, RIGHT?

9    A.   YES.

10   Q.   YOU IDENTIFIED LINKIFY; RIGHT?

11   A.   YEAH.  YOU KNOW, I THINK IN WHAT YOU JUST SAID, YOU -- YOU

12   CHARACTERIZED THIS AS THE ANALYZER SERVER, OR DID YOU SAY THE

13   PART OF THE ANALYZER SERVER THAT DETECTS STRUCTURES?

14   Q.   I SAID THE PART OF THE ANALYZER SERVER THAT DETECTS

15   STRUCTURES?

16   A.   OKAY.  YES, CORRECT.

17   Q.   SO THEN AT LEAST IN THOSE VERSIONS OF ANDROID THAT YOU'VE

18   IDENTIFIED, THE CACHE BUILDER IS NOT REUSED IN THE MESSAGING

19   APPLICATION; CORRECT?

20   A.   WELL, AS I SAID, IT ACTUALLY ADD LINKS CALLS INTO -- IT

21   CALLS INTO A PART OF CACHE BUILDER.  SO THERE'S A PART OF CACHE

22   BUILDER THAT IS REUSED IN LINKIFY.

23   Q.   SO LET ME CHANGE SUBJECTS A LITTLE BIT.  CAN WE PUT CLAIM

24   9 BACK UP HERE.

25        SO I WANT TO FOCUS IN ON THIS LANGUAGE -- OH, I HAVE A

1    POINTER -- A USER INTERFACE ENABLING THE SELECTION OF A

2    DETECTED STRUCTURE.

3         DO YOU SEE THAT?

4    A.   YES.

5    Q.   SO YOU AGREE THAT THE SELECTION OF A DETECTED STRUCTURE AS

6    WRITTEN IN THE CLAIM LIMITATION NECESSARILY REQUIRED THAT A

7    PARTICULAR DETECTED STRUCTURE CAN BE CHOSEN FROM A SET OF

8    DETECTED STRUCTURES; RIGHT?

9    A.   NO.  ACTUALLY, THAT WAS THE -- AS I DISCUSSED EARLIER,

10   THAT WAS A SENTENCE THAT I WROTE IN MY DECLARATION, BUT

11   ALTHOUGH IT WAS ACCURATE, IT WAS -- ALTHOUGH IT CONVEYED THE

12   POINT I WAS MAKING IN THE CONTEXT OF SELECTION ALONE, I

13   REALIZED LATER THAT WHEN YOU PULL THE SENTENCE OUT ON ITS OWN,

14   IT DOES NOT ACTUALLY ACCURATELY REFLECT THE CLAIM LANGUAGE.  SO

15   THAT'S WHY I REVISED THAT SENTENCE IN MY EXPERT REPORT.

16   Q.   OKAY.  I'LL GET TO THAT IN A MINUTE.

17        SO THEN LET'S, LET'S BACK UP ONE STEP THEN AND SEE IF

18   YOU'LL AGREE WITH THIS.

19        SO YOU'LL AGREE THAT THE PLAIN AND ORDINARY MEANING OF A

20   USER INTERFACE ENABLING THE SELECTION OF A DETECTED STRUCTURE

21   REQUIRES THE USER INTERFACE TO ENABLE SELECTION OF A STRUCTURE

22   BY THE USER AFTER THE STRUCTURE HAS ALREADY BEEN DETECTED;

23   RIGHT?

24   A.   YES, THE USER NEEDS TO BE ABLE TO -- AT THE TIME WHEN THE

25   USER IS SELECTING THE STRUCTURE, THE STRUCTURE NEEDS TO HAVE

CROSS MOWRY

```
 1        BEEN DETECTED.

 2        Q.   RIGHT.  ALREADY HAVE BEEN DETECTED; RIGHT?

 3        A.   THAT'S CORRECT.

 4        Q.   NOW, LET'S TALK ABOUT THIS DECLARATION THEN.  AND THIS WAS

 5        A DECLARATION THAT YOU SUBMITTED TO THE COURT ON MAY 15TH,

 6        2012; RIGHT?

 7        A.   SOUNDS CORRECT.

 8        Q.   AND WE CAN -- WE CAN PUT UP THE FIRST PAGE OF THAT AND THE

 9        SIGNATURE, IF YOU HAVE THAT.

10             AND THEN I THINK THE SIGNATURE HAS THE DATE.  IT SHOULD BE

11        AT THE VERY END.

12             SO THIS AT THE END, YOU SAY, "I DECLARE UNDER PENALTY OF

13        PERJURY THAT THE FOREGOING IS TRUE AND CORRECT."

14             RIGHT?

15        A.   YES.

16        Q.   AND THAT'S YOUR SIGNATURE?

17        A.   THAT IS.

18        Q.   SO LET ME SET THE STAGE HERE A BIT.  AS OF MAY 14TH, 2012,

19        THE VERSION OF ANDROID -- AND LET'S JUST TALK ABOUT THE BROWSER

20        APPLICATION -- WAS ICE CREAM SANDWICH; RIGHT?

21        A.   YES, I BELIEVE SO.

22        Q.   OKAY.  AND ICE CREAM SANDWICH AT THE TIME, ACCORDING TO

23        YOU, DETECTED MULTIPLE STRUCTURES AT ONE TIME ON A WEB PAGE;

24        RIGHT?

25        A.   YES, IT DID.
```

1    Q.   NOW, LET'S GO TO -- BUT AFTER THAT, JELLY BEAN CAME OUT.

2    YOU MENTIONED THAT; RIGHT?

3    A.   YES, JELLY BEAN WAS THE NEXT MAJOR RELEASE.

4    Q.   IT WAS, LIKE, JULY OF 2012; IS THAT RIGHT?

5    A.   COULD -- THAT COULD BE.

6    Q.   SUMMER?

7    A.   YEAH.

8    Q.   OKAY.  AND IN -- BUT IN THE JELLY BEAN BROWSER, NOW -- AND

9    I THINK YOU DESCRIBED THIS ON YOUR DIRECT EXAM -- THERE'S ONLY

10   ONE STRUCTURE, ACCORDING TO YOU, THAT'S EVER DETECTED AT A

11   TIME; RIGHT?

12   A.   YES.  IT'S THE ONE THAT THE USER IS SELECTING.

13   Q.   ALL RIGHT.  SO THE USER ACTUALLY HAS TO GO AND FIRST TAP

14   ON THE, THE PHONE NUMBER, FOR EXAMPLE; RIGHT?

15   A.   YES, THAT'S -- TOUCHING THE SCREEN IS WHAT TRIGGERS IT TO

16   START LOOKING TO SEE IF THERE'S SOMETHING UNDER YOUR FINGER.

17   Q.   RIGHT.  BUT THERE WAS A CHANGE BETWEEN ICE CREAM SANDWICH

18   AND JELLY BEAN AFTER THE TIME YOU SUBMITTED YOUR DECLARATION TO

19   THE COURT; RIGHT?

20   A.   THE JELLY BEAN IMPLEMENTS THINGS DIFFERENTLY FROM ICE

21   CREAM SANDWICH IN THE BROWSER.

22   Q.   RIGHT.

23   A.   WHICH IS -- YEAH.

24   Q.   MEANING -- I'M SORRY.  ARE YOU FINISHED?

25   A.   YEAH, I'M FINISHED.

CROSS MOWRY

1    Q.    SO IT ONLY DETECTS ONE STRUCTURE AT A TIME IN THE BROWSER;

2    RIGHT?

3    A.    THAT'S CORRECT.

4    Q.    SO NOW LET'S PUT UP PARAGRAPH 140 FROM YOUR DECLARATION.

5    THIS IS THE SAME MAY 14TH, 2012.

6          AND YOU SEE HERE, YOU SAY "THE SELECTION OF A DETECTED

7    STRUCTURE, AS WRITTEN IN THE CLAIM LIMITATION, NECESSARILY

8    REQUIRES THAT A PARTICULAR DETECTED STRUCTURE CAN BE CHOSEN

9    FROM A SET OF DETECTED STRUCTURES."

10         RIGHT?

11   A.    YES, THAT'S WHAT I WROTE.

12   Q.    SO THAT'S MORE THAN ONE; RIGHT?

13   A.    YOU MEAN SET?

14   Q.    YES.

15   A.    YES, SET MEANS MORE THAN ONE, YES.

16   Q.    RIGHT, A SET OF DETECTED STRUCTURES.  WHAT YOU'RE SAYING

17   HERE IS THE USER HAS GOT TO BE ABLE TO SELECT AN ALREADY

18   DETECTED STRUCTURE FROM A SET OF MULTIPLE DETECTED STRUCTURES;

19   RIGHT?

20   A.    ACTUALLY, WHAT I WAS SAYING, IF YOU LOOK AT THE FULL

21   CONTEXT, I WAS RESPONDING TO A PRIOR ART DISCUSSION FROM A

22   DIFFERENT EXPERT AND I WAS MAKING A SPECIFIC POINT, WHICH WAS

23   NOT ABOUT WHETHER MULTIPLE STRUCTURES NEED TO BE DETECTED AHEAD

24   OF TIME, BUT RATHER ABOUT THE MECHANICS OF SELECTION.

25   Q.    WELL, THAT'S GOOD.  SO THAT'S ACTUALLY WHERE I WANTED TO

CROSS MOWRY

```
 1        GO.

 2             SO -- BUT WHAT YOU JUST SAID IS NOT RIGHT, IS IT?

 3        A.   SORRY?  WHAT DID YOU SAY?

 4        Q.   OKAY.  LET'S LOOK RIGHT HERE.  SO YOU WERE TRYING TO

 5        DISTINGUISH FOR THE COURT A PIECE OF PRIOR ART; RIGHT?

 6        A.   I WAS RESPONDING TO DR. COHEN'S DECLARATION ABOUT PRIOR

 7        ART, YES.

 8             AND I THINK IF WE LOOK, LIKE I SAID, THERE'S A WHOLE SET

 9        OF PARAGRAPHS HERE WHERE I'M MAKING A PARTICULAR POINT.

10        Q.   UNDERSTOOD.  AND THIS PARTICULAR ONE IS ABOUT A PIECE OF

11        PRIOR ART CALLED SIDEKICK; RIGHT?

12        A.   YES, THAT'S CORRECT.

13        Q.   AND RIGHT HERE WHEN YOU SAY, "AT NO POINT DOES SIDEKICK

14        ALLOW A USER TO SELECT FROM A MULTIPLE OF DETECTED STRUCTURES,"

15        DO YOU SEE THAT?

16        A.   I DO.  THAT'S WHAT I WROTE.

17             BUT, IN FACT, THE POINT I WAS TRYING TO MAKE DID NOT

18        REQUIRE ME TO SAY DETECTED STRUCTURES.  I JUST INCLUDED SOME --

19        AN EXTRANEOUS WORD THERE WHICH, AS I SAID, DOES NOT, IN FACT,

20        ACCURATELY REFLECT WHAT THE CLAIM LANGUAGE REQUIRES.

21        Q.   OKAY.  SO LET'S LOOK AT THE CHANGE THAT YOU ACTUALLY MADE,

22        BECAUSE YOU HAVE A SIMILAR STATEMENT IN YOUR CURRENT EXPERT

23        REPORT, RIGHT, SIMILAR TO WHAT WE JUST LOOKED AT IN THAT FIRST

24        SENTENCE OF PARAGRAPH 140 FROM YOUR EARLIER DECLARATION; RIGHT?

25        A.   I BELIEVE SO, YES.
```

1    Q.   AND THIS WAS THE DECLARATION THAT WAS PREPARED UNDER

2    PENALTY OF PERJURY; RIGHT?

3    A.   THEY ALL ARE, I BELIEVE, YES.

4    Q.   SO LET'S LOOK AT SDX 2341.  SO HERE ON TOP I HAVE YOUR

5    STATEMENT FROM THE DECLARATION OF MAY 14TH, 2012, THAT WE JUST

6    LOOKED AT; RIGHT?

7    A.   YES, THAT'S CORRECT.

8    Q.   AND THEN IN YOUR EXPERT REPORT YOU MADE SOME CHANGES.  YOU

9    SAY, "FIRST, THE SELECTION OF A DETECTED STRUCTURE, AS WRITTEN

10   IN THE CLAIM LIMITATION, REQUIRES THAT A PARTICULAR DETECTED

11   STRUCTURE CAN BE CHOSEN FROM A SET OF STRUCTURES."

12       RIGHT?

13   A.   YES, THAT'S CORRECT.

14   Q.   SO NOW WHAT YOU'RE TRYING TO DO IS TO SAY, WELL, THE

15   PATENT CLAIM CAN COVER A SITUATION WHERE THERE'S ONLY ONE

16   DETECTED STRUCTURE AT A TIME; RIGHT?

17   A.   NO.  ACTUALLY, AS I SAID, IF YOU LOOK AT THE FULL CONTEXT

18   OF WHAT I WAS WRITING, I WASN'T MAKING A -- TRYING TO MAKE A

19   POINT ABOUT WHAT THE CLAIMS COVERED, BUT RATHER I WAS TRYING TO

20   MAKE A SPECIFIC POINT ABOUT THE USER BEING ABLE TO SELECT

21   SOMETHING OUT OF A PAGE OF MANY STRUCTURES.

22       AND SO I REALIZED, MONTHS LATER WHEN I WAS REVISING IT,

23   THAT THE WORD "DETECTED" DIDN'T NEED TO BE THERE TO MAKE MY

24   POINT.  AND, IN FACT, IT'S INCORRECT IF YOU PULL IT OUT OF

25   CONTEXT LIKE THIS, TO HAVE THE WORD DETECTED THERE.

CROSS MOWRY

1          AND I ALSO BELIEVE THE WORD "NECESSARILY," BECAUSE I

2    DECIDED NECESSARILY REQUIRES THE SAME THING, SO THE WORD

3    "NECESSARILY" WASN'T NEEDED, EITHER.

4    Q.   SIR, DID I JUST UNDERSTAND YOU TO SAY THAT YOU WEREN'T

5    TALKING ABOUT THE CLAIM LIMITATION?

6    A.   THE CONTEXT OF THIS SENTENCE IS A DISCUSSION ABOUT A

7    PARTICULAR PIECE OF PRIOR ART AND THE DIFFERENCES BETWEEN

8    ITS -- HOW THE USER INTERFACE ALLOWS SELECTION COMPARED TO THE

9    '647 PATENT.

10         BUT THIS SENTENCE SAYS -- WHEN YOU PULL THE SENTENCE OUT

11   LIKE THIS, YEAH, THAT'S WHAT THE SENTENCE SAYS AND THAT'S,

12   INDEED, THAT'S THE REASON WHY I FIXED THE SENTENCE BECAUSE WHEN

13   YOU PULL IT OUT OF CONTEXT LIKE THIS, THE ORIGINAL SENTENCE IS

14   INCORRECT.  SO THAT'S WHY I FIXED IT.

15   Q.   ALL RIGHT.  BUT IT SAYS RIGHT HERE, "WRITTEN IN THE CLAIM

16   LIMITATION," RIGHT?

17   A.   THAT'S WHAT IT SAYS.

18   Q.   SO NOW LET ME CHANGE TOPICS HERE AGAIN AND TOUCH ON -- YOU

19   TALKED DURING YOUR DIRECT ABOUT THE SURVEY FROM DR. HAUSER;

20   RIGHT?

21   A.   YES.

22   Q.   OKAY.  SO AT LEAST AS OF THE TIME OF YOUR DEPOSITION --

23   AND YOU HAD ANOTHER DEPOSITION IN THE CASE, SEPTEMBER 19TH,

24   2013?  DOES THAT SOUND RIGHT?

25   A.   YES, THAT'S CORRECT.

1     Q.   SO THAT'S AFTER ALL YOUR EXPERT REPORTS WERE PREPARED IN

2     THE CASE; IS THAT RIGHT?

3     A.   YES, I BELIEVE SO.

4     Q.   AT LEAST AS OF THAT TIME, YOU HAD NEVER SPOKEN TO

5     DR. HAUSER; RIGHT?

6     A.   THAT'S MY -- THAT'S MY RECOLLECTION, YES.  I BELIEVE I

7     HAVE NOT SPOKEN TO HIM AT THAT TIME.

8     Q.   RIGHT.  AND YOU DIDN'T WRITE THE DESCRIPTION FOR THE '647

9     PATENT; RIGHT?

10    A.   YOU MEAN IN DR. HAUSER'S SURVEY?

11    Q.   YES.  GOOD CLARIFICATION.

12    A.   OKAY.

13    Q.   YES, THANK YOU.

14    A.   YES, I DID NOT WRITE THE DESCRIPTION IN DR. HAUSER'S

15    SURVEY.

16    Q.   AND IN FACT, YOU HADN'T EVEN SEEN THE DESCRIPTION IN

17    DR. HAUSER'S SURVEY AS OF THE TIME OF YOUR DEPOSITION; RIGHT?

18    A.   I BELIEVE THAT'S CORRECT.

19    Q.   SO CAN WE PUT THAT --

20    A.   ACTUALLY, I DON'T REMEMBER WHETHER I'D SEEN IT OR NOT.  TO

21    BE HONEST, I THINK I MAY HAVE SEEN IT.  I'D HAVE TO GO BACK AND

22    REFRESH MY MEMORY.

23         BUT --

24    Q.   MAYBE THE DAY BEFORE IN PREPARATION FOR THE DEP OR

25    SOMETHING?

CROSS MOWRY

1    A.   I DON'T REMEMBER.  I THINK I MAY HAVE ACTUALLY SEEN IT

2    BEFORE.  I REMEMBER A DISCUSSION OF THIS IN THE DEPOSITION, AND

3    I COULD LOOK AT THAT AND REFRESH MY MEMORY ON WHETHER -- ON

4    WHAT IT WAS.

5    Q.   SO LET'S LOOK AT THAT DESCRIPTION, AND I THINK WE CAN SHOW

6    IT.  PAGE 32, I BELIEVE, OF PX 140.

7         AND HERE IN THIS DESCRIPTION, THERE'S NO MENTION OF AN

8    ANALYZER SERVER; RIGHT?

9    A.   WELL, IT DOES TALK ABOUT -- IT DOESN'T USE THE WORDS

10   "ANALYZER SERVER," BUT IT DESCRIBES THE FUNCTIONALITY OF THE

11   ANALYZER SERVER.

12        AND THIS IS INTENDED FOR WHAT A USER WOULD EXPERIENCE, SO

13   THIS DOES, I THINK, ACCURATELY CAPTURE THE EFFECT OF AN

14   ANALYZER SERVER THAT THE USER WOULD EXPERIENCE.

15   Q.   RIGHT.  AND WHEN YOU'RE REVIEWING THIS DESCRIPTION, YOU'RE

16   REVIEWING IT AS AN EXPERT IN THE FIELD, NOT AS A LAY PERSON

17   THAT'S LOOKING TO BUY A PHONE; RIGHT?

18   A.   LET'S SEE.  I -- I'M NOT ENTIRELY SURE.  ARE YOU ASKING AM

19   I AN EXPERT IN THE FIELD?

20   Q.   YEAH.

21   A.   OR AM I PERSON TAKING THE SURVEY?

22   Q.   NO.  YOU, AS YOU SIT HERE -- I THINK WE QUALIFIED, YOU'RE

23   AN EXPERT IN COMPUTER SCIENCE AND ARCHITECTURE AND SUCH; RIGHT?

24   A.   YES.

25   Q.   YOU DON'T THINK THAT THE FOLKS THAT WERE TAKING THE SURVEY

1    WERE EXPERTS IN COMPUTER ARCHITECTURE AND COMPUTER SCIENCE;

2    RIGHT?

3    A.   CORRECT.

4    Q.   AND THE VIDEO WITH THE, WITH DR. HAUSER'S SURVEY -- DID

5    YOU EVER SEE THAT?

6    A.   YES.

7    Q.   OKAY.  THAT DOESN'T SHOW AN ANALYZER SERVER; RIGHT?

8    A.   IT SHOWS THE EFFECT OF AN ANALYZER SERVER.  IN FACT, IT

9    FAIRLY WELL CAPTURES THE SEQUENCE OF FIGURES IN THE PATENT

10   ITSELF WHERE YOU SEE THE DETECTED STRUCTURES AND YOU SEE THE

11   POP-UP MENU AND YOU CAN LAUNCH.

12   Q.   THERE'S NO ARCHITECTURE SHOWN IN THAT VIDEO OR IN THIS

13   DESCRIPTION; RIGHT?

14   A.   WELL, FOR A USER SURVEY, I DON'T KNOW WHY A CUSTOMER WOULD

15   WANT TO KNOW ABOUT THAT.

16   Q.   RIGHT.  BUT WHEN YOU WENT THROUGH CHECKING OFF THE, YOU

17   KNOW, THE BOXES --

18   A.   YES.

19   Q.   -- WHEN YOU WERE GOING THROUGH THE ELEMENTS, THERE WERE

20   SEVERAL ELEMENTS WHERE YOU SAID, WELL, WE'VE GOT TO LOOK AT THE

21   CODE TO SEE HOW THIS IS IMPLEMENTED; RIGHT?

22   A.   YEAH.  THERE'S A DIFFERENCE BETWEEN LOOKING AT

23   INFRINGEMENT OF THE CLAIM ELEMENTS AND PRODUCING A USER SURVEY,

24   BECAUSE A USER SURVEY IS ABOUT THE USER EXPERIENCE.  SO THIS

25   CAPTURES WHAT THE USER WOULD EXPERIENCE WITH THE PATENT, I

1    BELIEVE.

2    Q.   RIGHT.  BUT YOU AGREE WITH ME, AT LEAST WE ESTABLISHED

3    ALREADY, THAT IF YOU DON'T USE AN ANALYZER SERVER, EVEN IF YOU

4    PERFORM ALL THE OTHER FUNCTIONS, YOU DON'T INFRINGE THE CLAIM;

5    RIGHT?

6    A.   WELL, YOU PROBABLY HAVE TO GIVE ME A SCENARIO WHERE IT WAS

7    DOING ALL THE THINGS DESCRIBED HERE, BUT NOT DOING THE

8    FUNCTIONALITY OF AN ANALYZER SERVER.

9         OR I MAY HAVE MISSED SOMETHING IN YOUR QUESTION.

10   Q.   WELL, THE ANALYZER SERVER IS A STRUCTURAL LIMITATION;

11   RIGHT?  YOU NEED TO HAVE AN ANALYZER SERVER THAT PERFORMS

12   FUNCTIONS; RIGHT?

13   A.   THAT'S CORRECT.

14   Q.   SO JUST HAVING THE FUNCTIONS THERE DOESN'T MEAN YOU HAVE

15   AN ANALYZER SERVER; RIGHT?

16   A.   IT'S DIFFICULT FOR ME TO THINK OF A SCENARIO WHERE THE

17   SOFTWARE IS PERFORMING THE FUNCTIONALITY OF THE ANALYZER

18   SERVER, BUT SOMEHOW THERE'S NOT REALLY SOFTWARE THERE

19   PERFORMING THE FUNCTIONALITY OF THE ANALYZER SERVER.

20        I GUESS I'M NOT FOLLOWING YOUR SCENARIO.

21   Q.   ALL RIGHT.  SO THEN THIS ALSO -- CLAIM 9 WE LOOKED AT HAS

22   A LIMITATION OF A POP-UP MENU THAT HAS LINKS -- OR EXCUSE ME,

23   THE ABILITY TO SELECT LINKED ACTIONS; RIGHT?

24   A.   YES, THAT'S CORRECT.

25   Q.   AND THAT WAS ANOTHER ONE WHERE YOU SAID YOU'D NEED TO

1    ACTUALLY LOOK AT THE CODE IN ORDER TO BE ABLE TO DETERMINE IF

2    THERE'S SOMETHING THERE; IS THAT RIGHT?

3    A.   YES, I SAID I WANTED TO LOOK AT THE CODE TO CONFIRM THAT,

4    YES, THAT'S CORRECT.

5    Q.   AND THERE'S NO MENTION OF A POP-UP MENU IN HERE; CORRECT?

6    A.   WELL, THE VIDEO THAT ACCOMPANIED THIS, WHEN THE USER TOOK

7    THE SURVEY, THEY SAW A VIDEO, AND THE VIDEO SHOWED A POP-UP

8    MENU AS I RECALL.

9    Q.   RIGHT.  BUT YOU COULD USE A PULL DOWN MENU AND YOU

10   WOULDN'T MEET THE POP-UP MENU LIMITATION OF CLAIM 9; RIGHT?

11   A.   ACTUALLY, I -- THERE ARE OTHER WAYS TO DO MENU, BUT AS I

12   SAID, MY RECOLLECTION WAS THAT DR. HAUSER'S VIDEO SHOWED A

13   POP-UP MENU.

14   Q.   AND YOU'VE ACTUALLY DISTINGUISHED A PIECE OF PRIOR ART

15   WITH RESPECT TO CLAIM 9 BY SAYING IT HAS A PULL DOWN MENU, NOT

16   A POP-UP MENU; RIGHT?

17   A.   I BELIEVE YOU'RE REFERRING TO THE PANDIT REFERENCE, AND

18   THERE WERE A NUMBER OF ISSUES WITH THAT, NOT JUST THAT.

19   Q.   RIGHT.

20   A.   I DON'T THINK -- I DIDN'T THINK I WAS -- I DIDN'T THINK I

21   WAS TALKING ABOUT VALIDITY ISSUES TODAY, BUT THAT'S FINE.

22   Q.   I'M NOT SAYING THAT -- AND WE'LL TALK ABOUT THAT LATER.

23   BUT THAT WAS ONE OF THE BASES, RIGHT, THAT IT HAD A PULL DOWN

24   MENU INSTEAD OF A POP-UP MENU; CORRECT?

25   A.   IT'S BEEN A NUMBER OF YEARS SINCE I WROTE THAT, SO I'D

1    HAVE TO GO LOOK IT UP.  I'D HAVE TO LOOK AT WHAT I SAID

2    EXACTLY.

3    Q.   SO NOW, IT'S NOT YOUR OPINION THAT GOOGLE COPIED THE

4    PATENTED '647 SYSTEM FROM APPLE; RIGHT?

5    A.   I -- I'M NOT EXPRESSING ANY OPINION ABOUT WHETHER GOOGLE

6    COPIED ANYTHING.

7    Q.   RIGHT.  YOU HAVEN'T OFFERED ANY OPINION?

8    A.   I'M NOT OFFERING AN OPINION ON THAT.

9    Q.   SO YOU'RE AWARE THAT, THAT THE ACCUSED BROWSER

10   FUNCTIONALITY, UP THROUGH ICE CREAM SANDWICH, AT LEAST THAT YOU

11   ACCUSE IN THIS CASE, THAT'S EXISTED IN THIS CASE SINCE AT LEAST

12   VERSION 1.5, WHICH THEY CALLED CUPCAKE; RIGHT?

13   A.   I HAVEN'T GONE BACK ALL THAT FAR IN ANALYZING VERSIONS OF

14   ANDROID, BUT THAT MAY BE TRUE.  I KNOW THAT ANDROID HAS HAD A

15   BROWSER FOR A LONG TIME.

16   Q.   YEAH.  SO IF YOU LOOK AT YOUR EXPERT REPORT IN THIS CASE,

17   IN PARAGRAPH 109 OF YOUR EXPERT REPORT, THIS IS THE ONE DATED

18   8-12-2013.

19        SO YOU SEE HERE WE HAVE, "IN ADDITION, GOOGLE CORPORATE

20   REPRESENTATIVES SUBMITTED DECLARATIONS AND TESTIFIED IN THIS

21   CASE THAT THE ACCUSED BROWSER FUNCTIONALITY HAS EXISTED IN

22   ANDROID SINCE AT LEAST VERSION 1.5 (CUPCAKE)."

23   A.   I SEE THAT.

24   Q.   "AND THAT THERE HAVE BEEN NO CHANGES IN THE ACCUSED

25   FUNCTIONALITY, AT LEAST THROUGH ANDROID VERSION 4.0 (ICE CREAM

CROSS MOWRY

```
 1        SANDWICH) THAT ARE RELEVANT TO INFRINGEMENT OF THE '647

 2        PATENT."

 3            DO YOU SEE THAT?

 4        A.   I SEE THAT.

 5        Q.   AND HERE AT THE END YOU STATE, "I AGREE THAT THERE ARE

 6        ACCUSED FUNCTIONALITY IN THE ACCUSED BROWSER PRODUCTS DOES NOT

 7        VARY ACROSS DROID OS VERSIONS."  RIGHT?

 8        A.   YES.

 9        Q.   SO CUPCAKE, YOU UNDERSTAND THAT WAS RELEASED APRIL 2009;

10        RIGHT?

11        A.   THAT COULD BE TRUE.  I DON'T KNOW THE DATE.  BUT I DON'T

12        HAVE ANY CONTRARY INFORMATION TO THAT.

13        Q.   SOUND ABOUT RIGHT?

14        A.   COULD BE, YEAH.  SURE.

15        Q.   SO LET'S LOOK AT PX 106.

16            NOW, FIRST, YOU TALKED ABOUT THIS DOCUMENT DURING YOUR

17        DIRECT; DO YOU RECALL?

18        A.   YES.

19        Q.   AND THIS DOCUMENT ACTUALLY CAME FROM A WEBSITE; ISN'T THAT

20        RIGHT?

21        A.   ACTUALLY -- WELL, IT'S A PRINTOUT FROM A WEBSITE, BUT IT

22        CAME FROM -- YES.  IT'S A DEPOSITION EXHIBIT I BELIEVE.

23        Q.   IT'S A PRINTOUT FROM A WEBSITE, IN OTHER WORDS, IT WAS

24        POSTED ON THIS MIRAMONTES INTERACTIVE WEBSITE; RIGHT?

25        A.   YES, THAT'S RIGHT.
```

1    Q.   SO HERE I JUST WANT TO CLEAR SOMETHING UP.  DO YOU SEE

2    WHERE IT'S MARKED "HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY"?

3    A.   YES, I SEE THAT.

4    Q.   THAT'S NOT RIGHT, IS IT?

5    A.   WHAT DO YOU MEAN THAT'S NOT RIGHT?

6    Q.   IT'S A PUBLIC DOCUMENT.  IT'S A PUBLICLY AVAILABLE

7    DOCUMENT.  DIDN'T YOUR COUNSEL SAY, IN RESPONSE TO AN

8    OBJECTION, THAT WAS A PUBLICLY AVAILABLE DOCUMENT?

9    A.   NO.  THAT -- THOSE -- THOSE WORDS THERE DON'T APPEAR ON

10   THE WEBSITE.  THERE ARE VARIOUS THINGS IN THE BOTTOM OF THIS

11   PICTURE THAT WERE ADDED AFTER IT WAS PRINTED OUT.  SO THAT WAS

12   NOT FROM THE WEBSITE.

13   Q.   RIGHT.  ON THE WEBSITE, THERE'S NOTHING THAT SAYS THIS IS

14   CONFIDENTIAL; RIGHT?

15   A.   THAT'S CORRECT.

16   Q.   OKAY.  AND THAT'S JUST SOMETHING LAWYERS STAMPED ON AFTER

17   THE FACT?

18   A.   I BELIEVE SO, YES.

19   Q.   NOW, IF WE LOOK AT, I BELIEVE IT'S THE SECOND PAGE OF THIS

20   DOCUMENT, CAN YOU HIGHLIGHT UP THERE.  YEAH, THAT'S PERFECT.

21   THANK YOU, MR. KOTARSKI.

22       SO THIS IS COPYRIGHT 2010; RIGHT?

23   A.   YEAH.  THE WAY THE WEBSITE WORKS IS WHATEVER DATE YOU

24   PRINT SOMETHING FROM IT, IT JUST PRINTS THE CURRENT YEAR.

25   Q.   AND NOW LET'S LOOK AT PX 107.  THAT'S ANOTHER ONE THAT YOU

```
 1     TALKED ABOUT.

 2          THIS IS THE UX ROADMAP.

 3     A.   YES.

 4     Q.   SO CAN WE LOOK AT THE DATE ON THE FIRST PAGE OF THAT

 5     DOCUMENT.  YEAH, YOU CAN'T -- MAYBE YOU CAN SEE IT BETTER ON

 6     THE SCREEN, RIGHT, DOES THAT -- THAT'S AUGUST 5TH OF 2010;

 7     RIGHT?

 8     A.   THAT'S WHAT IT LOOKS LIKE, YES.

 9     Q.   AND IF WE LOOK AT PX 146, I BELIEVE THAT'S THE OTHER ONE

10     THAT YOU TALKED ABOUT; CORRECT?  WE'LL PUT IT UP AND THEN YOU

11     CAN SEE.

12          YOU RECALL YOUR DISCUSSION OF THIS ON YOUR DIRECT?

13     A.   YES.

14     Q.   SO THERE'S A DATE RIGHT HERE, RIGHT, MARCH 2ND, 2010?

15     A.   YES.

16     Q.   SO THEN ALL OF THE DOCUMENTS YOU SHOWED US ARE DATED -- I

17     MEAN, THOSE DOCUMENTS ARE DATED IN 2010; CORRECT?

18     A.   THE THREE WE JUST TALKED ABOUT ARE, YES.

19          MR. NELSON:  THANK YOU, SIR.  I DON'T HAVE ANY

20     FURTHER QUESTIONS FOR YOU.

21          THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:57.  IS

22     THERE ANY REDIRECT?

23          MS. KREVANS:  BRIEFLY, YOUR HONOR.

24          THE COURT:  ALL RIGHT.  OKAY.  TIME IS NOW 1:57.  GO

25     AHEAD, PLEASE.
```

1                        **REDIRECT EXAMINATION**

2       BY MS. KREVANS:

3       Q.   IF WE COULD PUT THE CLAIM LANGUAGE BACK UP, MR. LEE.

4            PROFESSOR MOWRY, FOCUSSING ON THE ANALYZER SERVER ELEMENT,

5       DOES THE CLAIM LANGUAGE REQUIRE THAT IT BE IMPLEMENTED BY ANY

6       PARTICULAR CODE STRUCTURE?

7       A.   NO, IT DOES NOT.

8       Q.   OKAY.  MR. LEE, COULD WE PUT UP THE DECLARATION

9       THAT SAMSUNG'S COUNSEL ASKED PROFESSOR MOWRY ABOUT AND SHOW

10      PARAGRAPH 140 AGAIN.

11           DO YOU RECALL BEING ASKED ON CROSS SOME QUESTIONS ABOUT

12      THIS DECLARATION THAT YOU GAVE EARLIER IN THIS CASE?

13      A.   YES.

14      Q.   OKAY.  LET'S LOOK AT PARAGRAPH 140.  ON CROSS-EXAMINATION,

15      YOU WERE TRYING TO TELL COUNSEL FOR SAMSUNG THE POINT YOU WERE

16      ACTUALLY TRYING TO MAKE IN THIS PARAGRAPH.

17           HE NEVER ASKED YOU ABOUT THE SECOND AND THIRD SENTENCE TO

18      THE PARAGRAPH.

19           CAN YOU EXPLAIN TO THE JURY THE POINT YOU WERE TRYING TO

20      MAKE ABOUT WHAT THIS PIECE OF PRIOR ART CALLED SIDEKICK DID.

21      A.   YES, I'D BE HAPPY TO DO THAT.

22           SO IN SIDEKICK, IN, FOR EXAMPLE, OTHER ILLUSTRATIONS THAT

23      WE'VE SEEN OF SOMETHING LIKE THIS IN THE '647 PATENT, IF YOU

24      HAVE, SAY, A TEXT MESSAGE OR A WEB PAGE THAT HAS 100 STRUCTURES

25      ON IT, UNDER PHONE NUMBERS, AS A USER YOU CAN GO DIRECTLY TO

1     ANY ONE THAT YOU WANT TO GO TO AND SELECT IT.

2          BUT IN THE CASE OF SIDEKICK, WHAT IT DOES IS IT MARCHES

3     YOU THROUGH ONE AT A TIME FROM THE BEGINNING.  SO IT MAKES YOU

4     GO TO THE FIRST ONE AND YOU GET TO DECIDE, DO I WANT THAT OR

5     NOT.  AND THEN IT MOVES YOU TO THE SECOND ONE, AND IF YOU HAVE

6     A HUNDRED OF THEM, YOU CAN'T GO RIGHT TO THE ONE AT THE BOTTOM.

7     YOU HAVE TO GO THROUGH THEM ONE AT A TIME, AND IF YOU MAKE A

8     MISTAKE, YOU HAVE TO START ALL OVER AGAIN.

9          AND THAT WAS THE POINT THAT I WAS TRYING TO MAKE, WHICH IS

10    THAT TO BE, IN MY OPINION, TO BE SELECTING A STRUCTURE, YOU

11    HAVE TO BE ABLE TO CHOOSE ANY ONE OF THEM OUT OF A SET OF THE

12    STRUCTURES AND NOT HAVE THE SYSTEM FORCE YOU TO GO ONE AT A

13    TIME THROUGH EACH ONE IN TURN.  THAT WAS THE POINT I WAS MAKING

14    THERE.

15    Q.   OKAY.  THIRD TOPIC.

16         COULD WE PUT UP PX 106, MR. LEE.

17         PX 106 WAS THE 1998 ARTICLE BY THREE OF THE INVENTORS THAT

18    WAS POSTED ON THIS MIRAMONTES WEBSITE.

19         COUNSEL FOR SAMSUNG JUST ASKED YOU QUESTIONS ABOUT THE

20    DATE ON WHICH THIS ARTICLE WAS PRINTED OUT FOR A DEPOSITION

21    COMPARED TO SOME OTHER DATES OF DOCUMENTS IN THE CASE.

22         WAS PX 106, THIS ARTICLE, AVAILABLE ON THIS WEBSITE BEFORE

23    2010?

24    A.   YES, IT WAS.

25    Q.   HOW DO YOU KNOW THAT?

1    A.   I USED SOMETHING CALLED THE INTERNET ARCHIVE, IT'S ALSO

2    SOMETIMES CALL THE WAYBACK MACHINE.  WHAT IT DOES IS IT

3    COLLECTS SNAPSHOTS OF VARIOUS PAGES ON THE INTERNET.  IT'S BEEN

4    DOING THIS FOR OVER A DECADE.

5         SO YOU CAN GO BACK AND ENTER A PARTICULAR URL AND SEE WHAT

6    A WEB PAGE LOOKED LIKE FIVE YEARS AGO, TEN YEARS AGO.

7         AND I DID THAT FOR THIS WEB PAGE AND CONFIRMED THAT THERE

8    WERE COPIES OF IT.  IT HAD MULTIPLE SNAPSHOTS, ALMOST NEARLY

9    EVERY YEAR GOING BACK TO, I THINK, LIKE 1999.

10        MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

11        THE COURT:  ALL RIGHT.  THE TIME IS NOW 2:01.  ANY

12   RECROSS?

13        MR. NELSON:  NOTHING, YOUR HONOR.

14        THE COURT:  ALL RIGHT.  I'M ASSUMING THIS WITNESS IS

15   COMING BACK, SO I'LL JUST EXCUSE HIM SUBJECT TO RECALL.

16        IS THAT CORRECT?

17        MS. KREVANS:  YOUR HONOR, WE WILL BE CALLING THIS

18   WITNESS POTENTIALLY IN OUR REBUTTAL CASE, BUT ALSO GIVEN THE

19   ISSUE THAT AROSE THIS MORNING BEFORE COURT, WE HAVE ACTUALLY

20   PROVIDED PAGES FOR THIS WITNESS A COUPLE OF DAYS AGO TO SAMSUNG

21   WITH CODE FILES.  WE JUST CONFIRMED TO THEM THAT THAT'S

22   PRECISELY WHAT IT IS.

23        IF THERE'S A DISPUTE ABOUT THAT, AND I HOPE THERE WON'T

24   BE, WE MAY HAVE TO CALL THE WITNESS BACK TO SAY, YES, THESE ARE

25   THE FILES THAT I WAS TALKING ABOUT TODAY.

```
 1                    THE COURT:  I SEE.  SO IT WOULD BE SUBJECT TO RECALL?

 2                    MS. KREVANS:  I WOULD REQUEST, BECAUSE THE WITNESS

 3          HAS TRAVEL PLANS, THAT WE CAN CONFIRM THOSE THINGS SO THAT WE

 4          CAN BE SURE TONIGHT OR TOMORROW MORNING WHETHER THE WITNESS

 5          WILL NEED TO TESTIFY.

 6                    MR. NELSON:  WE'LL DO IT AS QUICKLY AS WE CAN.  I

 7          DON'T SEE A PROBLEM.

 8                    THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED SUBJECT

 9          TO RECALL.

10                    MS. KREVANS:  YOUR HONOR, CAN WE JUST HAVE A COUPLE

11          MINUTES TO MOVE BINDERS AND MOVE THINGS AROUND?

12                    THE COURT:  YES, GET SET UP.

13               (PAUSE IN PROCEEDINGS.)

14                    MS. KREVANS:  THESE ARE THE NEXT WITNESS PHOTOS.

15                    THE COURT:  OKAY, THANK YOU.

16               WHILE THEY'RE GETTING SET UP, IF ANYONE WOULD LIKE TO

17          STAND AND STRETCH, YOU'RE WELCOME TO DO SO.

18               (PAUSE IN PROCEEDINGS.)

19                    MS. KREVANS:  WE'RE GETTING THE EXHIBIT BINDERS, YOUR

20          HONOR.  WE JUST HAD THEM IN THE NEXT ROOM.

21               (PAUSE IN PROCEEDINGS.)

22                    MS. KREVANS:  I'M SORRY, YOUR HONOR.  THE USER

23          MANUALS ARE VERY BIG AND SO TO HAVE A SET OF EXHIBITS THAT HAVE

24          ALL THE USER MANUALS ARE VERY BIG.  SO WE'RE JUST BRINGING THEM

25          UP.
```

```
1              (PAUSE IN PROCEEDINGS.)

2              MS. KREVANS:  OKAY.  WE'RE GOOD, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  IT'S 2:08.  WHERE'S --

4              THE CLERK:  ALL WE NEED NOW IS A WITNESS.

5              MS. KREVANS:  OUR WITNESS IS RIGHT HERE PATIENTLY

6     WAITING.

7              APPLE CALLS PROFESSOR ALEX SNOEREN.

8         (PLAINTIFF'S WITNESS, ALEX SNOEREN, WAS SWORN.)

9              THE WITNESS:  I DO.

10             THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

11        AND PULL THE MICROPHONE TOWARDS YOU AND STATE AND SPELL

12    YOUR NAME, PLEASE.

13             THE WITNESS:  MY NAME IS MARK ALEXANDER CONNELL

14    SNOEREN.  M-A-R-K, A-L-E-X-A-N-D-E-R, C-O-N-N-E-L-L,

15    S-N-O-E-R-E-N.

16             THE COURT:  TIME IS 2:09.  GO AHEAD, PLEASE.

17                        DIRECT EXAMINATION

18    BY MS. KREVANS:

19    Q.   PROFESSOR SNOEREN, I NEED TO WARN YOU, YOU NEED TO KEEP

20    THAT MIKE CLOSE TO YOU.  YOU HAVE A SOFT VOICE.

21        COULD YOU START BY INTRODUCING YOURSELF TO THE JURY.

22    A.   SURE.  I'M A PROFESSOR OF COMPUTER SCIENCE AND ENGINEERING

23    AT THE UNIVERSITY OF CALIFORNIA SAN DIEGO WHERE I LIVE WITH MY

24    WIFE AND TWO SONS.

25    Q.   CAN YOU DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR US?
```

1    A.   ABSOLUTELY.  I HAVE TWO BACHELOR'S DEGREE FROM THE GEORGIA

2    INSTITUTE OF TECHNOLOGY, GEORGIA TECH, ONE IN APPLIED

3    MATHEMATICS AND ONE IN COMPUTER SCIENCE.

4        I ALSO HAVE A MASTER'S DEGREE IN COMPUTER SCIENCE FROM

5    GEORGIA TECH, AND MY PH.D. IS FROM M.I.T., THE MASSACHUSETTS

6    INSTITUTE OF TECHNOLOGY, AND IT'S IN ELECTRICAL ENGINEERING AND

7    COMPUTER SCIENCE.

8    Q.   AND WHEN DID YOU GET YOUR UNDERGRAD DEGREE, YOUR MASTER'S

9    AND YOUR PH.D.?

10   A.   I RECEIVED MY FIRST UNDERGRAD DEGREE IN 1996, THE NEXT ONE

11   IN 1997, THE MASTER'S DEGREE IN 1997, AND THE PH.D. I SUBMITTED

12   MY THESIS IN 2002, BUT THE WAY M.I.T. WORKS ONLY CONFERS

13   DEGREES A COUPLE TIMES A YEAR, SO IT WAS 2003.

14   Q.   AND WHAT WAS THE SUBJECT THAT YOU STUDIED AND RESEARCHED

15   FOR YOUR THESIS?

16   A.   MY THESIS IS ON MOBILE COMPUTING AND THE SUPPORT OF MOBILE

17   DEVICES ON THE INTERNET.

18   Q.   HOW LONG HAVE YOU BEEN TEACHING IN THE FIELD OF COMPUTER

19   SCIENCE, PROFESSOR SNOEREN?

20   A.   I ACTUALLY STARTED TEACHING MY FIRST YEAR ON CAMPUS AT

21   GEORGIA TECH.  SO AT THIS POINT IT'S BEEN 20 YEARS.

22   Q.   SO YOU STARTED TEACHING AS AN UNDERGRAD?

23   A.   YES.

24   Q.   DO YOU CONDUCT RESEARCH IN ADDITION TO YOUR TEACHING

25   RESPONSIBILITIES?

1    A.   I DO.  THAT'S ACTUALLY THE BULK OF MY POSITION AT U.C. SAN

2    DIEGO.

3    Q.   OKAY.  BEFORE WE TALK ABOUT YOUR RESEARCH, CAN YOU TELL US

4    A LITTLE BIT ABOUT THE KINDS OF COURSES THAT YOU TEACH AT U.C.

5    SAN DIEGO?

6    A.   I TEACH A VARIETY OF COURSES, UNDERGRADUATE AND GRADUATE,

7    IN OPERATING SYSTEMS AND NETWORKS AND MOBILE SYSTEMS.

8    Q.   AND WHAT'S THE FOCUS OF YOUR RESEARCH?

9    A.   MY RESEARCH IS ALSO SIMILARLY BROAD.  I FOCUS ON MOBILE

10   COMPUTING, WIRELESS NETWORKING, SECURITY, OPERATING SYSTEMS,

11   DISTRIBUTING SYSTEMS.

12   Q.   HOW LONG HAVE YOU BEEN AT U.C. SAN DIEGO?

13   A.   OVER 12 YEARS NOW.

14   Q.   OKAY.  CAN YOU TELL US A LITTLE BIT ABOUT WHAT YOU MEAN BY

15   THESE FIELDS YOU'VE DEFINED?  SO MOBILE SYSTEMS, WHAT DO YOU

16   MEAN BY THAT?

17   A.   MOBILE SYSTEMS IS JUST A BROAD FIELD OF DEALING WITH

18   DEVICES THAT PHYSICALLY MOVE.  SO LAPTOPS, SMARTPHONES, MOBILE

19   PHONES, SMALL LITTLE SENSORS, THAT SORT OF THING.

20   Q.   AND WHAT DID YOU MEAN BY NETWORKS AND NETWORK SYSTEMS?

21   A.   SO NETWORKS ARE JUST THE THINGS THAT CONNECT ALL OF THESE

22   DEVICES TOGETHER.  SO NETWORK SYSTEMS ARE SYSTEMS THAT RELY

23   UPON NETWORKS TO GET THEIR JOB DONE.

24   Q.   WHAT DID YOU MEAN BY DISTRIBUTIVE SYSTEMS?

25   A.   SO DISTRIBUTIVE SYSTEMS, TYPICALLY WHEN WE USE THAT TERM,

 1   WHAT WE MEAN IS SERVICES OR COMPUTING DEVICES THAT ARE ACTUALLY

 2   MADE OF MULTIPLE COMPONENTS THAT ARE SPREAD AROUND.  SO MAYBE

 3   MULTIPLE MACHINES IN A DATA CENTER OR MULTIPLE PHYSICAL

 4   LOCATIONS ACROSS THE PLANET AND DISTRIBUTE COMPUTING AND

 5   DISTRIBUTING SYSTEMS IS THE FOCUS ON HOW TO GET THOSE THINGS TO

 6   COORDINATE AND WORK TOGETHER, JUST LIKE GETTING AN ARMY TO WORK

 7   TOGETHER, TO GET A REALLY POWERFUL SERVICE REQUIRES A BUNCH OF

 8   MACHINES AND THEY HAVE TO WORK TOGETHER IN A COORDINATED

 9   FASHION.  SO TO SYNCHRONIZE THE DATA THAT THEY'RE RUNNING TO

10   GET THE JOB DONE.

11   Q.   AS A COLLEGE PROFESSOR, I KNOW YOU'RE EXPECTED TO PUBLISH.

12   HOW MANY PUBLICATIONS DO YOU HAVE?

13   A.   AT THIS POINT, I THINK IT'S SOMETHING OVER 85.

14   Q.   AND COULD YOU TELL US A LITTLE BIT ABOUT YOUR PROFESSIONAL

15   ACTIVITIES OUTSIDE THE TEACHING AND RESEARCH YOU DO AT

16   U.C. SAN DIEGO?

17   A.   ABSOLUTELY.  SO AS AN ACADEMIC, I'M OFTEN CALLED UPON TO

18   SERVE IN A REVIEWING CAPACITY.  SO I HELP FUNDING AGENCIES

19   REVIEW PROPOSALS AND GRANTS.

20        I HELP CONFERENCES AND JOURNALS SELECT PAPERS AS PART OF A

21   PEER REVIEW PROCESS TO PUBLISH.  AND SOMETIMES I'M ASKED BY

22   VARIOUS GOVERNMENTAL ORGANIZATIONS TO ASSIST.

23        IN THE PAST COUPLE OF YEARS, I'VE HELPED DEFENSE ADVANCED

24   RESEARCH PROJECTS ASSOCIATION, WE CALL IT DARPA, AND I SERVED

25   ON THE DEFENSE SCIENCE STUDY GROUP.

1    Q.   ARE YOU ALLOWED TO TALK AT ALL ABOUT THE WORK YOU DID IN

2    CONNECTION WITH THE DEFENSE STUDY GROUP FOR DARPA?

3    A.   A LOT OF IT IS CLASSIFIED, BUT I CAN TALK AT A HIGH LEVEL

4    ABOUT WHAT I DID.

5    Q.   OKAY.  COULD YOU TELL US A LITTLE BIT AT A HIGH LEVEL

6    ABOUT WHAT KINDS OF THINGS YOU WERE WORKING ON FOR DARPA?

7    A.   SURE.  SO AS PART OF THAT PROGRAM, THERE ARE ABOUT A DOZEN

8    ACADEMICS THAT ARE FLOWN AROUND THE COUNTRY AND SHOWN VARIOUS

9    MILITARY INSTALLATIONS, AND WE TALK TO THE TOP BRASS ABOUT THE

10   PROBLEMS THAT THEY HAVE IN GETTING THEIR MISSION DONE.

11       AND THEN WE FORM STUDY GROUPS TO FOCUS ON WHAT DO WE KNOW

12   ABOUT THE TECHNOLOGY AND WHAT WE DO IN RESEARCH THAT COULD HELP

13   THE MILITARY WITH THAT MISSION.

14       AND THE PROBLEM THAT WAS VERY APPARENT TO ME AND THAT WE

15   FOCUSSED ON IS THE MILITARY THESE DAYS HAS A TREMENDOUS ARRAY

16   OF SENSORS AND DATA ACQUISITION DEVICES AND THEY KNOW A LOT

17   ABOUT A LOT OF THINGS.  BUT THEY HAVE A HARD TIME IN THE MOMENT

18   SEARCHING THROUGH THAT INFORMATION AND FINDING OUT WHAT DO WE

19   KNOW ABOUT A PARTICULAR PERSON OR A PARTICULAR PLACE IN A

20   PLANET BECAUSE THEY KNOW THINGS ABOUT RADAR AND MICROPHONES AND

21   SATELLITES AND ALL THESE SORTS OF THINGS.  SO THE CHALLENGE OF

22   SEARCH IN TODAY'S MILITARY IS HUGE.

23       AND SO WE DID A STUDY PIECE TRYING TO HELP THEM UNDERSTAND

24   HOW THEY COULD ATTACK THAT PROBLEM.

25   Q.   DO YOU HAVE ANY PATENTS?

1      A.   I DO.  I'M A NAMED INVENTOR ON FOUR U.S. PATENTS.

2      Q.   WHAT'S THE WORK THAT LED TO YOUR BEING INVENTOR ON FOUR

3      PATENTS?

4      A.   SO OCCASIONALLY IN MY WORK I COLLABORATE WITH INDUSTRIAL

5      RESEARCHERS AND MY STUDENTS WORK WITH THEM AND SOMETIMES WHEN

6      WE DO THAT, WE END UP FILING A PATENT.

7           AND IN THESE CASES, THIS WAS ALL WORK WITH COMPANIES THAT

8      WORKED ON COMPUTER NETWORKING.

9                MS. KREVANS:  YOUR HONOR, WE WOULD OFFER DR. SNOEREN

10     AS AN EXPERT IN COMPUTER SCIENCE, DISTRIBUTING COMPUTER

11     SYSTEMS, SEARCH METHODS AND COMPUTER SYNCHRONIZATION.

12                THE COURT:  ANY OBJECTION?

13                MR. NELSON:  NO OBJECTION, YOUR HONOR.

14                THE COURT:  ALL RIGHT.  SO CERTIFIED.

15          GO AHEAD, PLEASE.

16     BY MS. KREVANS:

17     Q.   DR. SNOEREN, HAVE YOU BEEN RETAINED BY APPLE IN CONNECTION

18     WITH THIS LITIGATION?

19     A.   YES, I HAVE.

20     Q.   WHAT WAS THE ASSIGNMENT YOU WERE ASKED TO DO?

21     A.   I WAS GIVEN TWO PATENTS, AND I WAS ASKED TO DETERMINE

22     WHETHER OR NOT A PARTICULAR SET OF DEVICES INFRINGED CLAIMS

23     WITHIN THOSE PATENTS.

24     Q.   AND WHAT WERE THE TWO PATENTS THAT YOU WERE ASKED TO FOCUS

25     ON?

1    A.   WE LOCALLY REFER TO THEM AS THE '959 AND '414 PATENT.

2    Q.   SO WHAT'S THE '959 PATENT ABOUT AND WHAT CLAIM DID YOU

3    ANALYZE?

4    A.   SO I ANALYZED CLAIM 25 OF THAT PATENT, AND WE OFTEN CALL

5    THAT THE UNIVERSAL SEARCH PATENT.

6    Q.   AND WHAT ABOUT THE '414 PATENT?

7    A.   THE '414 PATENT, I ANALYZED CLAIM 20, AND THAT'S OFTEN

8    REFERRED TO AS THE BACKGROUND SYNCHRONIZATION PATENT.

9    Q.   WHAT PRODUCTS ARE THE PRODUCTS THAT YOU EVALUATED TO

10   DETERMINE WHETHER OR NOT THEY INFRINGE THOSE TWO CLAIMS?

11   A.   THERE ARE TEN OF THEM.  I ACTUALLY PREPARED A SLIDE SO

12   EVERYONE CAN SEE THEM.

13        SO I'LL JUST GO AHEAD AND READ THOSE SO WE'RE ALL CLEAR.

14   IT'S ADMIRE -- I'M SORRY.  THESE ARE ALL SAMSUNG PHONES.

15        SO THE ADMIRE, THE GALAXY NEXUS, THE GALAXY NOTE, THE

16   GALAXY NOTE 2, THE GALAXY S II, THE GALAXY S II EPIC 4G TOUCH,

17   THE GALAXY S II SKYROCKET, THE GALAXY S III, THE STRATOSPHERE,

18   AND THEN THE TABLET, THE TAB 2 10.1.

19   Q.   AND ARE YOU BEING COMPENSATED FOR THE TIME YOU SPENT ON

20   THIS CASE?

21   A.   YES, YES, MA'AM, I'M PAID FOR MY TIME.

22   Q.   AND WHAT'S THE RATE AT WHICH YOU'RE COMPENSATED?

23   A.   $400 AN HOUR, THE STANDARD RATE WHEN I ENTERED THIS

24   ENGAGEMENT WITH APPLE.

25   Q.   OKAY.  ABOUT HOW MANY HOURS HAVE YOU SPENT ON THE

1      ASSIGNMENT?

2      A.   AT THIS POINT, SOMETHING NORTH OF 500.

3      Q.   OKAY.  DID YOU REACH CONCLUSIONS REGARDING WHETHER THE TEN

4      SAMSUNG DEVICES, THE ADMIRE, THE NEXUS, THE NOTE, NOTE 2,

5      GALAXY S II, THE S II EPIC 4G TOUCH, THE G S SKYROCKET, THE

6      S III, THE STRATOSPHERE, AND THE TAB 2 10.1 INFRINGED CLAIM 25

7      OF THE '959 PATENT AND CLAIM 20 OF THE '414 PATENT?

8      A.   I DID.

9      Q.   WHAT WAS YOUR CONCLUSION?

10     A.   MY CONCLUSION WAS THAT ALL TEN DEVICES FOR BOTH ASSERTED

11     CLAIMS, THEY DID INFRINGE THAT CLAIM.

12     Q.   COULD YOU BRIEFLY DESCRIBE TO THE JURY WHAT MATERIALS YOU

13     LOOKED AT IN ORDER TO PERFORM YOUR ANALYSIS?

14     A.   ABSOLUTELY.  SO I USED THE DEVICES THEMSELVES.  I

15     CONSULTED THE MANUALS AND TECH SHEETS ABOUT THOSE DEVICES.

16          I ANALYZED THE SOURCE CODE THAT WAS USED TO IMPLEMENT

17     THOSE DEVICES, AND I'VE ALSO SEEN DOCUMENTATION ABOUT DESIGN

18     GOALS AND THAT SORT OF THING PROVIDED BY SAMSUNG.

19     Q.   AND WHAT SOURCE CODE DID YOU REVIEW?

20     A.   SO I REVIEWED SOURCE CODE THAT PROVIDES THE FUNCTIONALITY

21     FOR THESE PATENT CLAIMS, THE ACCUSED DEVICES THEMSELVES, THAT

22     SOURCE CODE WAS PROVIDED BY SAMSUNG AND SOME OF IT BY GOOGLE.

23     Q.   WHEN YOU SAY IT WAS PROVIDED BY SAMSUNG, ARE YOU REFERRING

24     TO PRIVATE CODE THAT BELONGS TO SAMSUNG THAT RUNS ON SAMSUNG'S

25     PHONES?

1    A.   YES, MA'AM.

2    Q.   OKAY.  WHEN YOU SAY SOME OF THE CODE WAS PROVIDED BY

3    GOOGLE, WHAT ARE YOU TALKING ABOUT?

4    A.   SAME SORT OF THING.  SO THIS IS CODE THAT MY UNDERSTANDING

5    IS PROPRIETARY TO GOOGLE.

6    Q.   SO THIS IS CODE THAT'S GOOGLE CODE THAT'S NOT AVAILABLE TO

7    THE PUBLIC?

8    A.   NOT TO MY KNOWLEDGE.

9    Q.   DID YOU ALSO LOOK AT SOME ANDROID CODE THAT IS AVAILABLE

10   TO THE PUBLIC?

11   A.   YES.

12   Q.   OKAY.  WHICH CODE DID YOU RELY UPON?

13   A.   WELL, I RELIED ON THE CODE THAT'S ACTUALLY IN THE PHONES,

14   SO THAT'S THE SAMSUNG CODE ITSELF, OR IN A COUPLE CASES AS

15   WE'LL SEE, IT'S CODE THAT, THAT THEY GOT FROM GOOGLE WHICH IS

16   ALSO IN THE SAMSUNG PHONES.

17   Q.   THE CODE THAT YOU RELIED UPON THAT WAS GOOGLE CODE RUNNING

18   ON THE SAMSUNG PHONES, WAS THAT A PUBLIC VERSION OF GOOGLE CODE

19   OR WAS THAT A PRIVATE VERSION THAT BELONGED TO GOOGLE RUNNING

20   ON SAMSUNG PHONES?

21   A.   THE LATTER, IT WAS PRIVATE GOOGLE CODE.

22   Q.   OKAY.  WOULD YOU LOOK AT JX 4 IN YOUR BINDER.  I'M SORRY.

23   YOU HAVE NINE BINDERS THERE.

24   A.   AND I HAVE PROFESSOR MOWRY'S BINDERS, TOO.

25   Q.   OKAY.  CAN WE HELP THE WITNESS WHICH BINDER HE SHOULD LOOK

1      AT.  VOLUME 1.

2      A.   I'M SORRY.  COULD YOU REMIND ME WHICH EXHIBIT?

3      Q.   JX 4.  IT SHOULD BE RIGHT IN THE FRONT?

4      A.   IT IS INDEED.

5      Q.   WHAT IS JX 4?

6      A.   JX 4 IS A COPY OF U.S. PATENT 6,847,959.  THIS IS THE

7      UNIVERSAL SEARCH, '959.

8            MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

9      JX 4.

10           MR. NELSON:  NO OBJECTION, YOUR HONOR.

11           THE COURT:  IT'S ADMITTED.

12      (JOINT EXHIBIT JX 4 WAS ADMITTED IN EVIDENCE.)

13           THE COURT:  GO AHEAD, PLEASE.

14           MS. KREVANS:  OKAY.  COULD WE SEE SLIGHT 4, MR. LEE.

15     Q.   PROFESSOR SNOEREN, COULD YOU JUST TELL THE JURY THE BASIC

16     FACTS ABOUT THE GENESIS OF THE '959 PATENT, WHEN IT WAS FILED,

17     WHO THE INVENTORS ARE, ET CETERA?

18     A.   SURE.  SO THE INVENTORS ARE YAN ARROUYE AND KEITH

19     MORTENSEN.  IT WAS ASSIGNED TO APPLE.  IT WAS FILED JANUARY 5TH

20     OF 2000.

21     Q.   OKAY.  SO IF WE WANT TO TALK ABOUT THE TIMEFRAME OF THE

22     INVENTION HERE, WE'RE TALKING ABOUT 1999 BASICALLY?

23     A.   EFFECTIVELY.

24     Q.   OKAY.  PUTTING YOUR MIND BACK TO 1999, WHAT WAS THE

25     PROBLEM THAT THE INVENTORS OF THIS PATENT IDENTIFIED AS THE

1      PROBLEM THEY WERE TRYING TO SOLVE?

2      A.   WELL, THE PATENT ACTUALLY DOES A PRETTY GOOD JOB OF IT BY

3      ITSELF IN COLUMN 1 IN THE BACKGROUND OF THE INVENTION, THE

4      INVENTORS ACTUALLY DESCRIBE THE CHALLENGE THEY HAD.

5           BUT IF YOU CAN REMEMBER BACK IN 1999, THE REAL ISSUE WAS

6      THAT THE APPLICATIONS WE HAD ON THE DEVICES BACK THEN STORED

7      LOTS OF DIFFERENT INFORMATION FOR US, EACH APPLICATION HAD

8      DIFFERENT TYPES OF INFORMATION.  SO YOU WOULD HAVE E-MAIL

9      APPLICATION, YOU MIGHT HAVE AN ADDRESS BOOK APPLICATION, THAT

10     SORT OF THING.

11          BUT THERE WASN'T A GOOD WAY TO LOOK THROUGH THE

12     INFORMATION ON DIFFERENT APPLICATIONS.  SO WHAT YOU'D HAVE TO

13     DO IS REMEMBER WHICH APPLICATION WAS I USING WHEN I WROTE DOWN

14     WHATEVER IT IS I'M LOOKING FOR, AND YOU HAVE TO GO TO THAT

15     APPLICATION, OPEN IT UP, AND IF YOU'RE LUCKY, THAT APPLICATION

16     HAD SOME SORT OF SEARCH FEATURE.

17          BUT IF YOU COULDN'T REMEMBER WHICH APPLICATION, OR IF THE

18     INFORMATION YOU WERE LOOKING FOR WAS ACTUALLY IN MULTIPLE

19     DIFFERENT APPLICATIONS ON YOUR COMPUTER, YOU HAD TO SORT OF

20     STEP THROUGH EACH ONE, ONE BY ONE TO TRY AND FIND WHAT YOU WERE

21     LOOKING FOR.

22     Q.   AND DID THE INVENTORS OF THE '959 PATENT PROPOSE A

23     SOLUTION TO THAT PROBLEM?

24     A.   ABSOLUTELY.

25     Q.   WHAT WAS THE SOLUTION THAT THEY PROPOSED?

1    A.   SO THE SOLUTION THEY PROPOSED, WHAT WE'RE TALKING ABOUT,

2    UNIVERSAL SEARCH, THEY HAD THIS IDEA THAT THEY WOULD JUST GIVE

3    THE USER THE ONE DIALOGUE BOX, OR EVEN THE ABILITY TO SPEAK TO

4    THE COMPUTER, AND JUST INDICATE WHAT THEY WERE SEARCHING FOR,

5    AND THEN THAT UNIVERSAL SEARCH FUNCTIONALITY WOULD GO OUT AND

6    ACTUALLY SEARCH A BUNCH OF DIFFERENT LOCATIONS, SOME ON THE

7    DEVICE AND SOME MAYBE EVEN ON THE INTERNET, TO TRY AND PROVIDE

8    THE BEST QUALITY RESULTS IT COULD FIND PERTAINING TO WHATEVER

9    THE USER WAS INTERESTED IN LOOKING FOR.

10   Q.   AND WHAT DID THE INVENTORS OF THE PATENT SAY WAS THE PIECE

11   OF THE INVENTION THAT ADDRESSED A GOOD WAY TO DO THOSE SEARCHES

12   IN THOSE DIFFERENT LOCATIONS?

13   A.   SO THEY USED A TECHNICAL TERM HERE, AND THE WORD THEY USED

14   IN THE PATENT IS CALLED HEURISTIC.  AND AS I'M SURE WE'LL GET

15   INTO, THE COURT HAS HELPFULLY DEFINED FOR US WHAT THAT MEANS,

16   BUT IT'S A RULE OF THUMB, OR JUST BASICALLY, YOU KNOW, A GOOD

17   IDEA.  IT'S NOT NECESSARILY PERFECT.  IT'S NOT OPTIMAL.  YOU

18   MAY NOT BE ABLE TO MAP OUT AND PROVE IT'S THE RIGHT THING TO

19   DO.  BUT SOMEBODY WHO'S FAMILIAR WITH THE TASK, THIS IS WHAT

20   THEY WOULD TRY AND DO.

21   Q.   COULD WE SEE SLIDE 14, MR. LEE.  IT SAYS THE COURT'S

22   DEFINITION OF HEURISTIC.  CAN YOU READ THAT TO THE JURY?

23   A.   ABSOLUTELY.  SO THE COURT HAS CONSTRUED THE WORD

24   "HEURISTIC" IN THE CONTEXT OF THIS CLAIM TO MEAN "SOME 'RULE OF

25   THUMB' THAT DOES NOT CONSIST SOLELY OF CONSTRAINT SATISFACTION

1    PARAMETERS."

2    Q.   AND DID YOU USE THE COURT'S DEFINITION OF HEURISTIC FOR

3    ALL OF YOUR WORK IN THIS CASE?

4    A.   I DID.

5    Q.   OKAY.  COULD WE LOOK AT FIGURE 2 OF THE PATENT.  DOES THIS

6    FIGURE ILLUSTRATE THE INVENTION OF CLAIM 25 IN THE '959 PATENT?

7    A.   IT DOES.  I ACTUALLY THINK IT'S ONE OF THE BETTER CLAIMS

8    IN THE PATENT TO HELP YOU REALLY GET AT THE ESSENTIALS.  IT

9    SORT OF DESCRIBES HOW THINGS WORK IN THE '959.

10   Q.   COULD YOU WALK THE JURY THROUGH WHAT'S SHOWN IN THIS

11   FIGURE?

12   A.   ABSOLUTELY.  SO ON THE TOP ROW, THERE ARE TWO BOXES.

13   YOU'LL SEE THE DIALOGUE BOX, AND THAT JUST MEANS THE BOX THAT

14   YOU TYPE INTO, OR A SPEECH PROCESSOR, SO THEY ENVISIONED BEING

15   ABLE TO TALK TO THIS DEVICE.

16       AND WHICHEVER ONE OF THOSE INPUTS WAS USED, THAT'S HOW THE

17   INFORMATION IDENTIFIER, AS THE PATENT CALLS IT, OR SEARCH KEY

18   WORD, GETS INTO THE BOX IN THE MIDDLE, AND THAT'S CALLED THE

19   RETRIEVAL MANAGER AND THAT'S THE FUNCTION THAT'S IN CHARGE OF

20   FINDING THE ANSWERS.

21       BUT THE WAY THAT IT FINDS THE ANSWERS IS IT ACTUALLY

22   ENGAGES THOSE BOXES THERE IN THE BOTTOM ROW, THOSE THINGS THAT

23   SAY PLUG-IN MODULES, AND EACH ONE OF THOSE MODULES IS GOING TO

24   BE RESPONSIBLE FOR SEARCHING A PARTICULAR LOCATION, SOME ON THE

25   DEVICE, SOME ELSEWHERE, AND EACH ONE OF THOSE MODULES IS WHERE

1    YOU'LL FIND THOSE HEURISTICS, THOSE SORTS OF RULES OF THUMB

2    THAT ARE GOING TO HELP DO A GOOD JOB FOR SEARCHING IN THAT

3    PARTICULAR LOCATION THAT THEY'RE RESPONSIBLE FOR.

4    Q.   IS THE -- IN THE INVENTION OF THIS PATENT, WOULD THE

5    HEURISTIC, THE RULES OF THUMB IN EACH OF THESE PLUG-IN MODULES

6    BE THE SAME?

7    A.   NO.  THE BEST WAY TO SEARCH A PARTICULAR LOCATION IS OFTEN

8    UNIQUE TO THAT PARTICULAR LOCATION.

9    Q.   CAN YOU EXPLAIN WHY?

10   A.   SURE.  SO, FOR INSTANCE, IF YOU'RE SEARCHING FOR

11   JOHN SMITH, THERE ARE PROBABLY MILLIONS OF JOHN SMITH'S IN THE

12   WORLD.  IF YOU'RE SEARCHING THE INTERNET, YOU PROBABLY WANT THE

13   MOST POPULAR ONE.

14       BUT IF YOU'RE SEARCHING YOUR CALENDAR OR YOUR CONTACTS,

15   YOU PROBABLY WANT TO KNOW, YOU KNOW, YOUR JOHN SMITH, AND IF

16   YOU ACTUALLY KNOW MULTIPLE ONES, YOU MIGHT WANT TO KNOW THE ONE

17   YOU TALKED TO MOST RECENTLY OR THE ONE WHO YOU HAVE AN

18   APPOINTMENT WITH IN AN HOUR.

19       SO THOSE RULES OF THUMB ARE NOT GOING TO BE THE SAME.

20   THEY'RE NOT GOING TO BE THE SAME QUALITY RESULTS.

21   Q.   WHAT IS THE NAME OF THE FEATURE IN EACH OF THE SAMSUNG

22   PHONES THAT YOU FOUND THAT INFRINGED CLAIM 25 OF THE '959

23   PATENT?

24   A.   WELL, IT'S CALLED THE QUICK SEARCH BOX, ALTHOUGH AS THE

25   VERSIONS OF ANDROID CHANGE AND SOFTWARE CHANGES A LITTLE BIT,

1     THE NAME SOMETIMES MOVES.  SO SOMETIMES IT'S REFERRED TO AS THE

2     QUICK SEARCH BOX, OR QSB.  SOMETIMES THEY'LL REFER TO IT AS THE

3     GOOGLE SEARCH APPLICATION, OR JUST SIMPLY GOOGLE SEARCH, OR

4     SOMETIMES EVEN THE GOOGLE SEARCH BOX.

5     Q.   NOW, YOU SAID YOU LOOKED AT CODE FOR EACH OF THE SAMSUNG

6     ACCUSED PRODUCTS.  WERE YOU HERE FOR SOME PORTION OF

7     PROFESSOR MOWRY'S TESTIMONY.

8     A.   I WAS.

9     Q.   SO HE EXPLAINED THE GINGERBREAD, JELLY BEAN, AND ICE CREAM

10    SANDWICH VERSIONS OF THE CODE THAT RUNS ON THE SAMSUNG

11    PRODUCTS.

12        DID YOU LOOK AT THOSE SAME THREE VERSIONS OF CODE THAT

13    RUNS ON THE SAMSUNG PRODUCTS?

14    A.   WELL, I LOOKED AT DIFFERENT CODE THAN DR. MOWRY, BUT, YES,

15    THE PHONES STILL HAD ALL THREE SAME VERSIONS OF ANDROID, YES.

16    Q.   OKAY.  AND DID YOU LOOK AT INFORMATION THAT WAS PROVIDED

17    BY SAMSUNG DURING DISCOVERY IN THIS CASE THAT TOLD YOU WHICH OF

18    THESE TEN DEVICES RAN WHICH OF THOSE THREE VERSIONS OF THE CODE

19    AT VARIOUS POINTS IN TIME?

20    A.   EXACTLY.

21    Q.   DID YOU PREPARE A SLIDE THAT, STARTING WITH THE

22    GINGERBREAD CODE, EXPLAINS TO THE JURY, AT A HIGH LEVEL, HOW

23    THE CODE THAT DOES THE UNIVERSAL SEARCH FUNCTION ON THESE

24    PHONES IS ORGANIZED?

25    A.   I DID.

1    Q.   OKAY.  COULD WE SEE, FOR THE JURY ONLY, SLIDE -- BECAUSE

2    WE'RE SHOWING SAMSUNG PROPRIETARY CODE -- 23.

3    A.   SO WHAT I'VE DONE HERE IS TO TRY AND GIVE A FIGURE THAT

4    EXPLAINS THE FUNCTIONALITY OF THE QUICK SEARCH BOX ON THE

5    GALAXY SII EPIC 4G TOUCH, WHICH IS ONE OF THE DEVICES THAT RUNS

6    GINGERBREAD.

7    Q.   OKAY.  WHY ARE WE TALKING HERE ABOUT -- YOU SAY E.G.

8    GALAXY S II EPIC 4G TOUCH.  WHAT DOES THAT MEAN?

9    A.   WHAT THAT MEANS IS FOR ALL THE ACCUSED DEVICES THAT RUN

10   GINGERBREAD, I LOOKED AT THE SOURCE CODE AND THEY ALL DO IT THE

11   SAME WAY.  SO I JUST PICKED ONE PARTICULAR PHONE TO TALK ABOUT

12   HERE.

13   Q.   SO IF YOU EXPLAIN TO US HOW THE GINGERBREAD CODE WORKS ON

14   THE GALAXY S II EPIC 4G TOUCH WITH RESPECT TO THE '959 PATENT,

15   WILL YOU THEN HAVE ALSO EXPLAINED TO THE JURY HOW IT WORKS ON

16   ALL OF THE PHONES WHEN THEY RUN ON GINGERBREAD?

17   A.   PRECISELY.

18   Q.   TABLET AS WELL?

19   A.   YES.

20   Q.   OKAY.  COULD YOU WALK US THROUGH THE CODE ARCHITECTURE

21   THAT YOU'RE SHOWING HERE?

22   A.   SURE.  SO AGAIN AT THE TOP YOU'LL SEE THAT SCREEN BOX,

23   THAT'S THE HOME SCREEN, THE USER INTERFACE, THE QUICK -- WHERE

24   THE BOX IS ON THE PHONE THAT THEN YOU CAN ACTUALLY ENTER IN

25   WHAT YOU'RE ACTUALLY SEARCHING.

1           AND THEN IT'LL PASS THAT INFORMATION, THAT INFORMATION IT

2      IDENTIFIES AND CALLS IT TO THE QUICK SEARCH BOX CODE ITSELF,

3      WHICH I CALLED UP THERE IN RED.

4           AND THEN THE QUICK SEARCH BOX IS GOING TO ENGAGE MULTIPLE

5      MODULES THAT ARE ACTUALLY GOING TO GO OUT AND APPLY THE

6      HEURISTICS AND SEARCH AT DIFFERENT LOCATIONS.

7           SO WHAT YOU SEE IN THE GINGERBREAD PHONES, I'VE CALLED OUT

8      TWO DIFFERENT HEURISTIC MODULES IN BLUE.  ONE IS THE CONTACTS

9      MODULE, THIS IS IN CHARGE OF SEARCHING YOUR CONTACTS AND THE

10     ADDRESS BOOK ON THE PHONE, AND THE OTHER IS CALLED THE WEB

11     MODULE, AND THIS IS IN CHARGE OF RETURNING SEARCH INFORMATION

12     THAT'S COLLECTED FROM LOCATIONS ON THE INTERNET.

13     Q.   COULD YOU LOOK, AND AGAIN PLEASE SHOW ONLY THE JURY,

14     MR. LEE, AT YOUR SLIDE 24.  YOU TITLED THIS QSB OPERATION FOR

15     ALL ICE CREAM SANDWICH AND JELLY BEAN DEVICES, E.G., MEANING

16     EXAMPLE, GALAXY NEXUS AND S III.

17          WHAT ARE YOU SHOWING HERE?

18     A.   JUST LIKE WE WERE BEFORE, THOSE ARE TWO PHONES, TWO

19     EXAMPLE PHONES, ONE RUNNING ICE CREAM SANDWICH, ONE RUNNING

20     JELLY BEAN, THAT WORK THE SAME WAY AND HAVE ALL THE SAME

21     FUNCTIONALITY AS THE OTHER ACCUSED DEVICES THAT RUN ON ICE

22     CREAM SANDWICH OR JELLY BEAN, AND IT TURNS OUT THAT THOSE TWO

23     VERSIONS OF ANDROID ACTUALLY WORK THE SAME WAY.  SO I JUST

24     PREPARED ONE CHART AND I CAN EXPLAIN IT ONCE BECAUSE IT APPLIES

25     ACROSS ALL OF THEM.

1    Q.   SO ONCE YOU HAVE EXPLAINED HOW THE ICE CREAM SANDWICH AND

2    JELLY BEAN DEVICES, JELLY BEAN CODE WORK ON THE GALAXY NEXUS

3    AND S III, WILL YOU HAVE EXPLAINED TO THE JURY HOW EACH OF THE

4    TEN ACCUSED DEVICES DOES THE UNIVERSAL SEARCH OF THE '959

5    PATENT WHEN IT IS RUNNING EITHER ICE CREAM SANDWICH OR JELLY

6    BEAN CODE?

7    A.   YES.

8    Q.   OKAY.  COULD YOU WALK US THROUGH THE CODE ARCHITECTURE AS

9    YOU'VE DEPICTED IT ON THIS SLIDE?

10   A.   SURE.  SO YOU'LL SEE THE FIGURE IS VERY MUCH THE SAME IN

11   THE SENSE THAT IT STARTS WITH THE USER INTERFACE HOME SCREEN

12   TEXT BOX THAT YOU TYPE YOUR SEARCH QUERY INTO, AND THEN IT

13   GIVES THAT INFORMATION TO THE QUICK SEARCH BOX FUNCTIONALITY,

14   WHICH IS GOING TO MANAGE THE SEARCH.

15       THE DIFFERENCE HERE IS THAT THE MODULES HAVE CHANGED A

16   LITTLE BIT IN THE NEWER VERSION OF ANDROID.  IT HAS MORE

17   FEATURES.

18       SO THE CONTACTS MODULE IS STILL THERE, IT STILL SEARCHES

19   YOUR LOCAL ADDRESS BOOK.  IT TURNS OUT THAT THESE NEWER PHONES

20   ACTUALLY ALLOW YOU TO STORE MUSIC INFORMATION ON YOUR PHONE.

21   SO THERE'S A MODULE THERE, GOOGLE PLAY AND MUSIC MODULE, WHICH

22   GO AND SEARCH THAT DATABASE OF INFORMATION.

23       AND THEN THERE'S A BROWSER MODULE, AND THIS ACTUALLY

24   FACTORS OUT SOME OF THE FUNCTIONALITY THAT WAS PREVIOUSLY IN

25   THAT WEB MODULE INTO ITS OWN SEPARATE MODULE.  IT LOOKS AT YOUR

1    BOOKMARKS, YOUR PLACES YOU'VE BEEN IN THE PAST.

2         AND THEN OVER THERE ON THE FAR RIGHT IS WHAT I'VE CALLED

3    THE GOOGLE MODULE, AND THIS IS THE HEURISTIC MODULE THAT ON

4    THESE VERSIONS OF THE PHONE PROVIDE THE INTERNET SEARCHING

5    APPLICATIONS.

6    Q.   DO YOU HAVE A VIDEO THAT WILL SHOW US, AS AN EXAMPLE, ONE

7    OF THE PHONES THAT RUNS GINGERBREAD DOING A SEARCH THAT

8    INFRINGES THE '959 PATENT?

9    A.   I DO.

10   Q.   OKAY.  THIS IS THE S II EPIC 4G TOUCH, THIS VIDEO.

11        WHAT ARE WE GOING TO SEE HERE?  IF WE CAN BRING UP THE

12   STILL.  THANK YOU.

13        (VIDEO PLAYING.)

14         THE WITNESS:  OKAY.  SO WHAT YOU'RE GOING TO SEE IS

15   THE USER HERE IS CURRENTLY ON THE INTERNET.  THEY'RE VIEWING A

16   HIKING WEBSITE FOR THE APPALACHIAN TRAIL.

17        SO THEY'RE GOING TO LEAVE THAT WEBSITE AND COME BACK LATER

18   TO THEIR PHONE AND THEY'RE GOING TO SAY I WANT TO FIND WHATEVER

19   I LOOKED AT ABOUT THE APPALACHIAN SEARCH WEBSITE.  SO THEY'RE

20   GOING TO PULL OPEN THE QUICK SEARCH BOX AND START TYPING

21   APPALACHIAN TRIAL AND IT STARTS WITH APP.

22        WHAT YOU'LL SEE IS AS THE USER IS TYPING, THE QUICK SEARCH

23   BOX IS ASKING ALL THE HEURISTIC'S MODULES, WHAT DO YOU KNOW

24   ABOUT A, AND APP AND SO FORTH, AND YOU'LL SEE RESPONSES COME

25   BACK FROM THE CONTACTS MODULE, AND IT KNOWS ABOUT A GUY NAMED

1    JOHN APPLESEED.  AND YOU'LL SEE RESULTS FROM THE WEB MODULE AND

2    WHAT IT'S DOING IS GOING OUT AND SEARCHING LOCATIONS ON THE

3    INTERNET, IN PARTICULAR IT'S TALKING TO A GOOGLE SEARCH

4    SUGGESTION SERVER, AND IT'S SUPPLYING THE RULE OF THUMB AND

5    IT'S GETTING BACK SUGGESTIONS FOR THINGS LIKE APPLE, POPULAR

6    THINGS THAT STARTS WITH APP.

7          YOU'LL NOTICE, THOUGH, WHEN HE STARTS TYPING A-P-P-A, THIS

8    PHONE HAS A HEURISTIC MODULE ON IT THAT KNOWS THAT THIS

9    PARTICULAR USER HAS A FAVORITE LOCATION ON THE INTERNET, HE

10   ACTUALLY WAS JUST AT THIS APPALACHIAN TRAIL THING, AND SO

11   YOU'LL ALSO SEE THAT IT'S GOING TO SUGGEST THIS VERY WEB PAGE

12   THAT THE USER WAS AT PREVIOUSLY.  SO THIS WAS THE INTERNET

13   LOCATION THAT THIS RULE OF THUMB SAYS, THIS USER HAS BEEN

14   THERE, MAYBE THAT'S WHAT THEY'RE INTERESTED IN.

15          MS. KREVANS:  OKAY.  LET'S SEE THE VIDEO.

16      (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

17          THE WITNESS:  SO THERE YOU CAN SEE THAT YOU HAVE THE

18   RESULTS FROM THE QUICK SEARCH BOX AND THE TOP ONE IS JOHN

19   APPLESEED THAT'S COMING FROM THE CONTACTS MODULE, IT'S THE

20   LOCAL DATABASE OF CONTACTS, AND THE ONE BELOW THOSE ARE COMING

21   FROM THE WEB MODULE AND IT'S BLENDING THE RESULTS FROM THE

22   GOOGLE SEARCH SUGGESTION SERVER, WHICH IS SUGGESTING APPLE, AND

23   IT'S USING THIS RULE OF THUMB SAYING THIS USER RIGHT HERE ON

24   THIS PHONE WAS AT THE APPALACHIAN TRAIL LOCATION ON THE

25   INTERNET, SO I'M GOING TO SUGGEST THAT AS WELL.

```
 1         BY MS. KREVANS:

 2         Q.   DID YOU ALSO PREPARE A VIDEO THAT RELATES TO PHONES THAT

 3         RUN ICE CREAM SANDWICH AND JELLY BEAN?

 4         A.   I DID.  AND, AGAIN, BECAUSE THEY ALL DO THE SAME THING, I

 5         DID ONE EXAMPLE OF THAT.

 6         Q.   OKAY.  COULD WE SEE THAT VIDEO, WHICH HAS BEEN PREPARED

 7         USING A GALAXY S III.

 8              (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

 9              THE WITNESS:  SO BEFORE WE PLAY IT, I PROBABLY SHOULD

10         JUST TELL YOU WHAT'S GOING TO HAPPEN BECAUSE IT'S A SLIGHTLY

11         DIFFERENT SCENARIO HERE.

12              SO HERE WHEN WE START, THE USER HASN'T BEEN TO THE

13         APPALACHIAN TRAIL WEBSITE AT ALL.  THEY JUST SHOWED UP WITH

14         THEIR PHONE.  SO THEY'RE GOING TO USE A QUICK SEARCH BOX AND

15         SEARCH FOR APPALACHIAN TRAIL.  THEY HAVEN'T BEEN TO THE

16         APPALACHIAN TRAIL WEBSITE YET SO THE QUICK SEARCH BOX, USING

17         THE RULES OF THUMB, ISN'T GOING TO THINK TO SUGGEST THAT.

18              AND SO YOU'RE GOING TO SEE JOHNNY APPLESEED AND YOU'RE

19         GOING TO SEE, YOU KNOW, APPLE AND SO FORTH.

20              ONCE HE GETS TO A-P-P-A, THEN EVEN THE GOOGLE SEARCH

21         SUGGESTION SERVER ON THE INTERNET STARTS THINKING, OKAY, MAYBE

22         IT'S APPALACHIAN TRAIL, AND THEN IT'LL SHOW UP.  SO THEN THE

23         USER CAN CLICK IT AND GO AND YOU CAN SEE THAT IT'S A LOCATION

24         ON THE INTERNET, THE APPALACHIAN TRAIL WEBSITE.

25              THEN THE USER IS GOING TO LEAVE THAT WEBSITE.  SO THIS IS
```

1    SORT OF LIKE WHAT WE STARTED IN THE PREVIOUS VIDEO.

2         THIS TIME, THOUGH, THE USER HAS GOT TO CALL JOHN, JOHN

3    APPLESEED.  SO HE'S GOING TO GO TO HIS PHONE AND HE'S GOING TO

4    TYPE IN A-P-P AND YOU'RE GOING TO SEE, WHAT'S THE PHONE GOING

5    TO SUGGEST?  IT'S GOING TO SUGGEST APPALACHIAN TRAIL.  IT'S

6    ALSO GOING TO SUGGEST JOHN APPLESEED, HERE.

7         THE POINT HERE, THESE ARE RULES OF THUMB.  THESE ARE

8    HEURISTICS.  IT'S NOT ALWAYS RIGHT, BUT YOU'LL SEE HOW IT'S

9    WORKING.

10             MS. KREVANS:  OKAY.  LET'S SEE THIS ONE.

11        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

12             THE WITNESS:  SO HERE AGAIN, HE HASN'T BEEN TO THE

13   APPALACHIAN TRAIL, SO THE PHONE DOESN'T KNOW TO SUGGEST THAT.

14   BY MS. KREVANS:

15   Q.   OKAY.  LET'S KEEP TYPING THEN.

16   A.   SO NOW HE'S GOT A CHANCE AND HE GOES AND HE CHECKS OUT THE

17   WEBSITE.

18   Q.   ALL RIGHT.  LET'S SEE HIM GO BACK OUT FROM THE WEBSITE.

19   SO KEEP RUNNING, MR. LEE.

20   A.   NOW, THE PHONE KNOWS HE'S BEEN TO THE APPALACHIAN TRAIL,

21   OH, MAYBE THAT'S WHAT HE WANTS.  BUT IT ALSO SUGGESTS JOHNNY

22   APPLESEED.  IN THIS CASE, THAT'S ACTUALLY WHERE HE WANTED TO GO

23   AND THAT'S LOCAL INFORMATION.

24   Q.   OKAY.  LET'S LOOK, NOW THAT YOU'VE DEMONSTRATED THE

25   PHONES, AT THE ACTUAL CLAIM OF THE PATENT.

1          COULD WE SEE CLAIM 25.  AND WE ALSO HAVE IT ON THE BOARD

2     RIGHT HERE.

3          AGAIN, WE'VE ADDED LETTERS TO THE CLAIMS SO IT'S EASY TO

4     KNOW WHICH PART OF IT WE'RE TALKING ABOUT.

5          CLAIM 25 IS A DEPENDENT CLAIM FROM CLAIM 24, AND SO OTHER

6     WITNESSES HAVE EXPLAINED THIS ALREADY, PROFESSOR SNOEREN, TO

7     INFRINGE THIS CLAIM, SOMEONE HAS TO DO EVERYTHING IN CLAIM 24

8     AND 25?

9     A.   EXACTLY.

10    Q.   SO WE HAVE TO GO ALL THE WAY FROM A TO F; IS THAT RIGHT?

11    A.   YES.

12    Q.   STARTING WITH A, DOES EVERY ONE OF THE TEN SAMSUNG

13    PRODUCTS HAVE A COMPUTER READABLE MEDIUM FOR LOCATING

14    INFORMATION FROM A PLURALITY OF LOCATIONS CONTAINING PROGRAM

15    INSTRUCTIONS?

16    A.   YES, THEY DO.

17    Q.   WHAT'S A MEDIUM?

18    A.   A MEDIUM IS JUST A FLASH MEMORY.

19    Q.   OKAY.  THIS WORD "PLURALITY," WHAT DOES THAT MEAN?

20    A.   IT'S JUST A FANCY WORD FOR MORE THAN ONE.

21    Q.   OKAY.  SO EVERY PLACE WE SEE PLURALITY, WE KNOW IT MEANS

22    MORE THAN ONE.

23         ELEMENT B.  DO THOSE PROGRAM INSTRUCTIONS INCLUDE PROGRAM

24    INSTRUCTIONS TO RECEIVE AN INFORMATION IDENTIFIER ON EVERY ONE

25    OF THE TEN DEVICES?

1    A.   YES, THEY DO.

2    Q.   WHAT'S THE INFORMATION IDENTIFIER?

3    A.   AGAIN, THE INFORMATION IDENTIFIER, THAT'S WHAT THE PATENT

4    IS CALLED IN THE SEARCH TERM, IN THE KEY WORDS THAT THE USER IS

5    TO LOOK FOR.

6    Q.   OKAY.  AND YOU SAW THAT HAPPENING IN THE CODE?

7    A.   YES.

8    Q.   OKAY.  WERE ALL OF THE COMPUTER INSTRUCTIONS YOU RELIED ON

9    FOR ALL OF THE REMAINING ELEMENTS, B THROUGH F, ON THE SAME

10   COMPUTER READABLE MEDIUM?

11   A.   YES.

12   Q.   ALL RIGHT.  LET'S LOOK AT ELEMENT C, PROVIDED SAID

13   INFORMATION IDENTIFIER TO MORE THAN ONE RULE OF THUMB, AS THE

14   COURT IDENTIFIED IT, TO MORE THAN ONE LOCATION WHICH INCLUDE

15   THE INTERNET AND LOCAL STORAGE MEDIA.

16       DID EACH OF THE TEN ACCUSED PRODUCTS MEET THIS LIMITATION?

17   A.   YES, THEY DO.

18   Q.   AND HOW DO YOU KNOW THAT?

19   A.   WELL, I USED THE DEVICES, AS WE SAW IN THE VIDEO, BUT I

20   ALSO ANALYZED THE SOURCE CODE THAT SAMSUNG USED ON EACH ONE OF

21   THE DEVICES TO MAKE SURE IT FUNCTIONED IN THAT WAY.

22   Q.   AND WHERE DID YOU FIND MORE THAN ONE HERE AS REQUIRED BY

23   ELEMENT C?

24   A.   SO IN THOSE SLIDES THAT WE SHOWED TO THE JURY, I FOUND IN

25   THE CASE OF GINGERBREAD TWO MODULES, THE CONTACTS MODULE AND

1    THE WEB MODULE, AND IN THE OTHER TWO VERSIONS THERE WERE FOUR.

2    EACH ONE OF THOSE MODULES IS A COMPLICATED PIECE OF SOFTWARE,

3    BUT IT HAS, IN THE QUICK SEARCH BOX, THESE THINGS CALLED

4    CORPORA, CORPUSES, IN DIFFERENT VERSIONS THEY'RE CALLED

5    SEARCHABLE SOURCES OR GOOGLE SOURCES AND THEN THOSE WRAP AROUND

6    SOME FUNCTIONALITY THAT GOOGLE CALLS THE CONTENT PROVIDER AND

7    THAT CONTENT PROVIDER IS THE FOLKS, THE HEURISTIC FUNCTIONALITY

8    WE'VE BEEN DESCRIBING.

9          THE COURT:  EXCUSE ME.  THE TIME IS 2:40.  LET'S GO

10   AHEAD AND TAKE OUR TEN MINUTE BREAK NOW.  ALL RIGHT.  PLEASE

11   DON'T RESEARCH OR DISCUSS THE CASE.

12         WE'LL SEE EVERYONE BACK IN TEN MINUTES.  THANK YOU.

13         (JURY OUT AT 2:41 P.M.)

14         THE COURT:  OKAY.  THANK YOU.  YOU MAY STEP DOWN.

15         (RECESS FROM 2:41 P.M. UNTIL 2:51 P.M.)

16         THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

17         TIME IS 2:51.  GO AHEAD, PLEASE.

18         MS. KREVANS:  THANK YOU, YOUR HONOR.

19   Q.   RIGHT BEFORE THE BREAK, PROFESSOR SNOEREN, I THINK YOU HAD

20   JUST FINISHED EXPLAINING TO US WHERE IN THE CODE YOU FOUND THE

21   PLURALITY OF HEURISTICS THAT RECEIVED THE INFORMATION

22   IDENTIFIER TO LOCATE INFORMATION IN THE MULTIPLE LOCATIONS,

23   INCLUDING THE INTERNET AND LOCAL STORAGE MEDIA.

24         IS THAT WHERE WE WERE?

25   A.   I THINK SO.

1    Q.   OKAY.  MY COLLEAGUES REMINDED ME AT THE BREAK THAT FOR YOU

2    I DON'T HAVE THAT NICE SLIDE THAT CHECKS THINGS OFF ON THE

3    MACHINE, SO WHY DON'T YOU JUST TELL ME RIGHT NOW WHAT I SHOULD

4    CHECK OFF ON THIS BOARD HERE.  WE'VE DONE --

5    A.   WE'VE DONE A.

6    Q.   OKAY.

7    A.   I THINK WE'VE DONE B.

8    Q.   OKAY.

9    A.   AND I THINK WE WERE JUST DISCUSSING C.

10   Q.   OKAY.  AND COULD YOU JUST REMIND US WHERE SPECIFICALLY IN

11   THE FRAMEWORK OF THE CODE RUNNING ON THESE TEN SAMSUNG DEVICES

12   YOU FOUND THESE PLURALITY OF HEURISTICS THAT LOCATE INFORMATION

13   ON THE INTERNET AND LOCAL STORAGE MEDIA?

14   A.   SURE.  SO THE GOOGLE QUICK SEARCH BOX USES THESE THINGS

15   THAT ARE CALLED CORPORA OR CORPUS, THOSE ARE SINGULAR AND

16   PLURAL, AND THE GINGERBREAD TERMINOLOGY, THE TERMINOLOGY

17   CHANGES A LITTLE BIT AS YOU MOVE ON FROM SEARCHABLE SOURCE OR

18   GOOGLE SOURCE.  BUT EACH ONE OF THOSE THINGS USES WHAT ARE

19   CALLED CONTENT PROVIDERS, WHICH ARE ABSTRACTED WITHIN THE

20   ANDROID FRAMEWORK TO ALLOW ACCESS TO FUNCTIONALITY AND OTHER

21   APPLICATIONS.

22        AND THOSE CONTENT PROVIDERS ARE WRAPPERS AROUND THE

23   HEURISTIC FUNCTIONALITY THAT WE'VE BEEN DESCRIBING.  SO THE

24   BLUE CIRCLES IN MY CHARTS, THOSE ARE ALL WRAPPED IN CONTENT

25   PROVIDERS AND ACCESSED BY THE QUICK SEARCH BOX THROUGH THE

1     CORPUS OR CORPORA OR SEARCHABLE SOURCE OR GOOGLE SOURCE.

2     Q.   OKAY.  THE SLIDE WE'RE LOOKING AT RIGHT NOW, WHICH IS

3     SLIDE 24, THAT'S THE ONE FOR ICE CREAM SANDWICH AND JELLY BEAN.

4          COULD WE SHOW THE JURY SLIDE 23 AGAIN.  THIS IS THE

5     ILLUSTRATION OF THE GINGERBREAD CODE, AND WHERE WOULD THE

6     HEURISTICS, THE RULES OF THUMB OF ELEMENT C BE LOCATED IN THIS

7     ARCHITECTURE?

8     A.   THOSE ARE THE BLUE CIRCLES, SO THE CONTACT MODULE AND THEN

9     THE WEB MODULE.

10    Q.   COULD YOU -- COULD YOU EXPLAIN TO US CONCEPTUALLY, IS

11    THERE A DIFFERENCE BETWEEN THE WAY THIS IS DONE IN GINGERBREAD

12    VERSUS THE WAY IT'S DONE IN JELLY BEAN AND ICE CREAM SANDWICH?

13    A.   CONCEPTUALLY NOT AT A HIGH LEVEL.  THERE ARE SOME LOW

14    LEVEL DISTINCTIONS ON HOW THESE MODULES BREAK UP THEIR

15    FUNCTIONALITY, AND SO IN THIS VERSION, THE WEB MODULE ACTUALLY

16    INCORPORATES FUNCTIONALITY THAT WE'LL SEE LATER IN THE BROWSER

17    MODULE AND FUNCTIONALITY THAT WE'LL SEE LATER IN THE MODEL

18    FUNCTIONALITY, OR THE GOOGLE MODULE.

19         BUT THE WAY THE QUICK SEARCH BOX DRIVES THESE MODULES AND

20    SO FORTH, THAT'S CONCEPTUALLY THE SAME IDEA.

21    Q.   DO YOU HAVE AN EXAMPLE YOU CAN SHOW THE JURY OF CODE THAT

22    RUNS ON THE SAMSUNG PHONES THAT IS ONE OF THESE HEURISTICS FOR

23    LOCATING INFORMATION ON THE INTERNET?

24    A.   YES.  I THINK I PREPARED A SLIDE TO DISCUSS THE HEURISTICS

25    FOR THE INTERNET LOCATION ON ICE CREAM SANDWICH AND JELLY BEAN.

1      Q.    OKAY.  CAN YOU EXPLAIN TO THE JURY THE SOURCE CODE THAT

2      YOU ARE SHOWING THEM THAT RUNS ON THE SAMSUNG PHONES?

3      A.    ABSOLUTELY.  SO THIS SOURCE CODE IS A LITTLE BIT DEEP IN

4      THE GUTS, AND SO THE TITLE THERE, I TRIED TO GIVE YOU A LITTLE

5      BIT OF UNDERSTANDING WHERE WE ARE, SO WE'RE IN THE GOOGLE

6      CONTENT PROVIDER CIRCLE, THE GOOGLE MODULE THAT WE WERE IN THE

7      CHART, AND IN THE IMPLEMENTATION THAT'S SOMETHING CALLED A WEB

8      SUGGEST SOURCE WITH LOCAL HISTORY, AND THE REAL RUBBER MEETS

9      THE ROAD IN THIS FUNCTION CALLED BLEND RESULTS, WHICH IS WHAT

10     YOU HAVE HERE.

11          AND THEN THERE'S THE CODE THAT ACTUALLY EXPLAINS HOW THE

12     RULE OF THUMB WORKS, HOW THE HEURISTIC IS IMPLEMENTED IN HERE.

13          AND WHAT I'D LIKE TO DO IS JUST STEP YOU THROUGH THE CODE,

14     IT'S JUST BASICALLY A THREE-STEP PROCESS, AND I DON'T RECALL IF

15     ANYBODY ELSE HAS MENTIONED THIS EARLIER, BUT IN SOURCE CODE, IF

16     YOU HAVE A LINE THAT STARTS WITH TWO SLASHES, THAT'S A COMMENT,

17     SO THAT'S JUST ENGLISH LANGUAGE THAT THE PROGRAMMER PUTS IN.

18          AND SO WE CAN JUST READ THE ENGLISH LANGUAGE HERE IN A WAY

19     THAT THEY HAVE THE CODE, ALTHOUGH I'VE CONFIRMED THAT THE CODE

20     DOES EXACTLY WHAT THE COMMENTS SAY.

21          SO THE FIRST SECTION, WHAT'S HAPPENED IS IT'S GONE OUT AND

22     IT'S CONSULTED THE GOOGLE SEARCH SUGGESTION SERVER ON THE

23     INTERNET AND IT'S GOTTEN SOME ANSWERS, BUT IT'S ALSO LOOKED AT

24     ITS OWN LOCAL MEMORY OF PLACES ON THE INTERNET THAT THIS SERVER

25     HAS -- THIS USER HAS SEARCHED FOR BEFORE.

1           AND IT SAYS, IF THERE ARE NO WEB SUGGESTIONS, IN OTHER

2      WORDS, IF GOOGLE DOESN'T HAVE ANY GOOD IDEAS FOR US, THEN SHOW

3      ALL HISTORY SUGGESTIONS WE HAVE.

4           OKAY.

5      Q.   AND "WE" MEANING WE, THE CODE?

6      A.   YEAH.  COMPUTER SCIENTISTS LIKE TO ANTHROPOMORPHIZE AND

7      PUT THEMSELVES IN THE BODY OF THE CODE, SO, YES, IT'S THE CODE.

8      Q.   SO THIS COMMENT DESCRIBING ONE OF THE RULES OF THUMB THAT

9      WORKS TO DO THIS INTERNET HEURISTIC?

10     A.   YES, IT'S PART OF THE RULE OF THEM HERE.

11     Q.   OKAY.  SHOW US SOME MORE OF THE RULE OF THUMB?

12     A.   OKAY.  SO ON THE OTHER HAND, IF IT COMES BACK WITH FEWER

13     WEB SUGGESTIONS, AND FEWER IS JUST ONE OF THESE RULE OF THUMB,

14     TOO, IF THERE'S NOT ENOUGH, FOR INSTANCE, IF THE QUERY IS LONG

15     OR COMPLEX, THEN ADD A HIGHER NUMBER OF HISTORY SUGGESTIONS.

16          SO, AGAIN, IT'S BLENDING WHAT I'M GETTING NOW FROM THE

17     INTERNET FROM PLACES THAT I'VE PREVIOUSLY BEEN ON THE INTERNET

18     AND IT'S TRYING TO FIGURE OUT, WELL, HOW DO I DO THIS.  AND SO

19     HERE'S ONE OPTION.

20          AND THEN THERE'S A THIRD OPTION, WHICH IS THERE ARE A

21     NORMAL NUMBER OF WEB SUGGESTIONS, ADD A MAXIMUM OF TWO HISTORY

22     ITEMS, SO A NORMAL, RULE OF THUMB, WHAT LOOKS TO BE THE RIGHT

23     NUMBER, AND I THINK WHAT DRIVES HOME THE POINT IS THAT NEXT

24     LINE DOWN WHICH SAYS NODE, THIS AND THE PREVIOUS "IF" STATEMENT

25     AND IT'S REFERRING TO THE CODE IN THE SECOND COMMENT, ARE

1      SOMEWHAT ARBITRARY.  AND IT IS.  THIS IS NOT MATHEMATICAL

2      PERFECT OPTIMUM ANSWER, THIS IS A RULE OF THUMB ABOUT WHAT THEY

3      THINK IS GOING TO PROVIDE THE BEST INTERNET EXPERIENCE TO THE

4      USER.

5      Q.    WHICH CODE BASE ARE WE LOOKING AT HERE?

6      A.    AGAIN, THIS IS GOOGLE PROPRIETARY CODE INSIDE THE GOOGLE

7      MODULE FOR ICE CREAM SANDWICH AND JELLY BEAN.

8      Q.    OKAY.  DOES THE WEB MODEL -- DOES THE WEB MODULE IN THE

9      SAMSUNG PRODUCTS, WHEN THEY RUN GINGERBREAD, ALSO HAVE A

10     HEURISTIC FOR LOCATING INFO -- INFORMATION ON THE INTERNET?

11     A.    YES, IT DOES.

12     Q.    AND HOW DID THAT WORK COMPARE TO WHAT YOU'VE JUST

13     ILLUSTRATED IN THIS ICE CREAM SANDWICH, JELLY BEAN CODE?

14     A.    SO THAT CODE IS GOING TO COMBINE PLACES THAT THE USER HAS

15     ACTUALLY PREVIOUSLY BROWSED USING THE WEB BROWSER AND

16     SUGGESTIONS THAT THE GOOGLE SEARCH SUGGESTION SERVER HAS

17     PRESENTED.

18     Q.    AND, AGAIN, DOES IT -- ARE THESE RULES OF THUMB WHICH LOOK

19     FOR INFORMATION IN MULTIPLE LOCATIONS IN THIS CASE IN THE

20     INVENTION?

21     A.    YES, AS THE PREAMBLE SAYS, THEY'RE LOCATING INFORMATION

22     FROM A PLURALITY OF LOCATIONS THROUGHOUT THE INTERNET AND IN

23     THE OTHER MODULES.

24     Q.    OKAY.  LET'S MOVE TO ELEMENT D OF THE CLAIM, DETERMINE AT

25     LEAST ONE CANDIDATE ITEM OF INFORMATION BASED UPON THE

```
 1          PLURALITY OF HEURISTICS.

 2               WHAT'S A CANDIDATE ITEM OF INFORMATION AS THIS CLAIM USES

 3      THE TERM?

 4      A.   SO THIS IS JUST ONE OF THE RESULTS THAT THE QUICK SEARCH

 5      BOX SUGGESTS, THE JOHNNY APPLESEED LINE OR THE APPALACHIAN

 6      TRAIL LINE.

 7      Q.   OKAY.  DID YOU LOOK AT THE CODE IN EACH OF THESE ACCUSED

 8      DEVICES TO SEE IF IT DETERMINED AT LEAST ONE, ONE PIECE OF

 9      INFORMATION TO PICK TO DISPLAY TO THE USER IN RESPONSE TO THIS

10      SEARCH WHICH WAS THE INFORMATION IDENTIFIER?

11      A.   I DID.

12      Q.   AND DID YOU FIND IT?

13      A.   I DID.

14      Q.   AND IS THAT IN THE CODE, RUNNING ON EVERY DEVICE?

15      A.   YES, MA'AM.

16      Q.   OKAY.  WE CAN CHECK OFF D?

17      A.   YES, MA'AM.

18      Q.   OKAY.  LET'S TALK ABOUT ELEMENT E.

19               ELEMENT E IS DISPLAY A REPRESENTATION OF SAID CANDIDATE

20      ITEM OF INFORMATION.

21               WHAT DOES THAT MEAN?

22      A.   THAT JUST MEANS TO SHOW THE USER WHAT WAS FOUND.

23      Q.   SO THIS IS WHAT WE SAW ON THE SCREEN IN YOUR VIDEOS WHERE,

24      AS THE USER WAS TYPING THINGS IN, SEARCH RESULTS SHOWED UP ON

25      THE SCREEN?
```

1    A.   EXACTLY.

2    Q.   AND I KNOW WE SAW IT ON THE SCREEN IN YOUR VIDEOS.  DID

3    YOU CONFIRM THAT THAT HAPPENS IN EVERY ONE OF THE TEN ACCUSED

4    DEVICES, NO MATTER WHICH CODE THEY'RE RUNNING?

5    A.   YES, MA'AM.

6    Q.   SO I CAN CROSS OFF E?

7    A.   YES, MA'AM.

8    Q.   OKAY.  LET'S TURN TO F, WHICH IS THE APPARENTLY ADDITIONAL

9    LIMITATION ADDED BY CLAIM 25, WHEREIN THE INFORMATION

10   IDENTIFIER IS APPLIED SEPARATELY TO EACH HEURISTIC.

11        SO WE KNOW THE INFORMATION IDENTIFIER IS THE SEARCH QUERY;

12   RIGHT?

13   A.   THAT'S CORRECT.

14   Q.   WHAT DOES IT MEAN TO SAY IT'S APPLIED SEPARATELY TO EACH

15   OF THESE RULES OF THUMB?

16   A.   THAT JUST MEANS THAT THE FUNCTIONALITY THAT'S DRIVING THE

17   SEARCH GIVES EACH HEURISTIC MODULE A CHANCE TO PROVIDE ANSWERS

18   BY ITSELF, AND THAT THE EXECUTION OR THE RESULTS THAT ONE OF

19   THE HEURISTIC MODULES IS GOING TO RETURN IS IN NO WAY GATED OR

20   BLOCKED OR DEPENDENT UPON THE PERFORMANCE OR THE RESULTS OF ANY

21   OF THE OTHER MODULES.

22   Q.   AND DID YOU LOOK AT THE CODE RUNNING ON ALL TEN OF THESE

23   DEVICES TO SEE WHETHER THE INFORMATION IDENTIFIER, THE SEARCH,

24   WAS APPLIED SEPARATELY TO EACH OF THESE RULES OF THUMB?

25   A.   I DID.

1    Q.   SO THE SEARCH RESULTS WERE NOT DEPENDENT IN ONE LOCATION

2    ON WHAT HAPPENED IN ANOTHER LOCATION?

3    A.   PRECISELY.

4    Q.   AND WHAT DID YOU FIND?

5    A.   I FOUND THAT IT WAS THERE FOR EACH OF THE TEN ACCUSED

6    DEVICES.

7    Q.   OKAY.  SO I SHOULD CROSS OFF ELEMENT F?

8    A.   YES, MA'AM.

9    Q.   OKAY.  NOW, YOU ISSUED AN INFRINGEMENT REPORT IN THIS CASE

10   THAT SET OUT YOUR OPINIONS ABOUT HOW EACH OF THE ACCUSED

11   DEVICES MET ELEMENTS A THROUGH F AS WE'VE NOW PUT THEM ON THE

12   BOARD?

13   A.   I DID.

14   Q.   OKAY.  DID YOU, AT SOME POINT, ISSUE AN ERRATA TO YOUR

15   REPORT?

16   A.   I DID.  IN FACT, I ISSUED TWO.

17   Q.   OKAY.  COULD YOU EXPLAIN WHY YOU ISSUED THE FIRST ONE.

18        AN ERRATA IS JUST A COLLECTION; RIGHT?

19   A.   YES.

20   Q.   WHY DID YOU ISSUE THE FIRST ONE?

21   A.   AS I WAS READING THE REPORT AFTER I SUBMITTED IT, I

22   DISCOVERED THAT THERE WAS A PARAGRAPH THAT A PERFECTLY

23   REASONABLE PERSON READING IT MIGHT HAVE HAD TROUBLE KNOWING

24   WHAT I MEANT.  SO I WAS TRYING TO CLARIFY THE LANGUAGE THAT I

25   USED TO MAKE SURE IT WAS CLEAR WHAT I WAS MEANING.

1    Q.   OKAY.  YOU SAID YOU ACTUALLY ISSUED TWO.  WHAT WAS IN THE

2    SECOND CORRECTION YOU ISSUED AND WHY DID YOU ISSUE IT?

3    A.   SO IN THE SECOND CORRECTION, AS YOU PUT IT, I READ THE

4    REPORT OF THE OTHER EXPERT IN THIS CASE, DR. RINARD, THAT

5    SAMSUNG HAS ASKED TO PROVIDE A REPORT, AND I NOTICED THAT IN

6    HIS REPORT, HE POINTED TO A COUPLE POINTS WITHIN THE SOURCE

7    CODE ANALYSIS OF MY REPORT THAT I HAD MISCHARACTERIZED EXACTLY

8    THE DETAILS OF HOW THAT WORKED.

9         AND IN LOOKING AT MY REPORT, I NOTICED THAT, YEAH, IN THAT

10   PARTICULAR ASPECT, WHICH DIDN'T REALLY BEAR ON ANY OF THESE

11   CLAIM LIMITATIONS, IT DIDN'T BEAR ON WHETHER OR NOT IT

12   INFRINGED, I DID ACTUALLY SLIGHTLY MISCHARACTERIZE WHAT WAS

13   GOING ON.

14        AND SO, AGAIN, JUST TO MAKE SURE EVERYBODY WAS CLEAR THAT

15   THERE WAS NO DISAGREEMENT AMONGST THE EXPERTS OF HOW THE

16   DEVICES WORK, I SUBMITTED AN ERRATA TO JUST CLEAR THAT UP.

17   Q.   SO YOU CREATED A DOCUMENT THAT JUST, IN A RED LINE, SHOWED

18   THE THINGS THAT YOU CHANGED?

19   A.   YEAH, I THINK IT HAD A COVER PAGE THAT EXPLAINED WHAT WAS

20   GOING ON, AND I JUST SUBMITTED ANOTHER COPY OF THE SOURCE CODE.

21   Q.   OKAY.  DID ANY OF THOSE CHANGES THAT YOU MADE IN YOUR RED

22   LINE, DID ANY OF THEM GO TO THE OPINIONS THAT YOU'VE EXPRESSED

23   TODAY?

24   A.   NO.

25   Q.   YOU DIDN'T CHANGE ANY OF YOUR OPINIONS WHEN YOU MADE THOSE

1    LITTLE CORRECTIONS?

2    A.   NO.

3    Q.   OKAY.  YOU SAID YOU LOOKED AT USER MANUALS AS PART OF YOUR

4    ANALYSIS.

5         DID THE USER MANUALS THAT YOU REVIEWED FOR THESE TEN

6    PRODUCTS TELL USERS ABOUT THE UNIVERSAL SEARCH APPLICATION THAT

7    YOU'VE SHOWN TO THE JURY AND HOW TO DO IT?

8    A.   THEY DID.

9    Q.   OKAY.  DID YOU REVIEW A USER MANUAL FOR THE TAB, THE

10   GALAXY TAB?

11   A.   I DID.

12   Q.   OKAY.  AND THAT'S EXHIBIT 238?  YOU CAN CHECK IF YOU'D

13   LIKE.

14   A.   I APOLOGIZE.

15   Q.   I SHOULD HAVE -- I SHOULD HAVE KNOWN THE VOLUME TO TELL

16   YOU.  THAT'S MY FAULT.

17   A.   YES, I HAVE IT HERE LISTED AS THE MANUAL FOR GALAXY

18   TAB 2 10.1.

19        MS. KREVANS:  OKAY.  YOUR HONOR, WE MOVE EXHIBIT 238

20   INTO EVIDENCE, PLEASE.

21        MR. NELSON:  NO OBJECTION, YOUR HONOR.

22        THE COURT:  IT'S ADMITTED.

23   (PLAINTIFF'S EXHIBIT 238 WAS ADMITTED IN EVIDENCE.)

24        THE COURT:  GO AHEAD, PLEASE.

25   BY MS. KREVANS:

1     Q.   YOU TALKED A LITTLE BIT AT THE START OF YOUR TESTIMONY

2     TODAY ABOUT WHY THIS UNIVERSAL SEARCH INVENTION WAS SOMETHING

3     THAT WAS VALUABLE.

4          HAVE YOU SEEN DOCUMENTS THAT WERE PRODUCED IN THIS CASE

5     THAT RELATE TO THE IMPORTANCE OF UNIVERSAL SEARCH AS A FEATURE

6     IN PRODUCTS LIKE SMARTPHONES?

7     A.   YES, MA'AM, I HAVE.

8     Q.   COULD YOU LOOK AT PX 110.  IT'S NOT GOING TO BE IN THE

9     SAME BINDER AS 238.

10    A.   I HAVE IT.

11    Q.   DO YOU HAVE IT THERE?

12    A.   YEAH, I THINK MY PREVIOUS BINDER WAS ALL PX 238.

13         YES, I HAVE PX 110 HERE.

14    Q.   WHAT IS PX 110?

15    A.   THIS IS A PRINTOUT OF THE GOOGLE MOBILE BLOG, ITS A

16    WEBSITE, DESCRIBING THE INTRODUCTION OF THE QUICK SEARCH BOX.

17              MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

18    PX 110.

19              MR. NELSON:  NO OBJECTION, YOUR HONOR.

20              THE COURT:  IT'S ADMITTED.

21         (PLAINTIFF'S EXHIBIT PX 110 WAS ADMITTED IN EVIDENCE.)

22              THE COURT:  GO AHEAD, PLEASE.

23    BY MS. KREVANS:

24    Q.   COULD WE LOOK AT THE FIRST PAGE OF PX 110.  WHAT DOES IT

25    SAY RIGHT AT THE START OF THE DOCUMENT, AND WHAT IS THE DATE?

1    A.   SO THE DATE LINE IS FRIDAY, OCTOBER 9TH, 2009, AND IT SAYS

2    "QUICK SEARCH BOX FOR ANDROID:   SEARCH YOUR PHONE AND THE WEB."

3    Q.   AND WHAT DOES -- HOW DOES THIS ANNOUNCEMENT ABOUT THE

4    INTRODUCTION OF THE QUICK SEARCH BOX FOR ANDROID BEGIN?

5    A.   WELL, IT BEGINS THAT "I'M HAPPY TO ANNOUNCE QUICK SEARCH

6    BOX (QSB) FOR ANDROID, A FAST AND VERSATILE NEW SYSTEM-WIDE

7    SEARCH EXPERIENCE, AVAILABLE RIGHT FROM YOUR PHONE'S HOME

8    SCREEN."

9    Q.   RIGHT UNDERNEATH THE PICTURE OF THE GOOGLE QUICK SEARCH

10   BOX, WHAT DID THIS ANNOUNCEMENT SAY ABOUT THE BENEFITS THAT

11   QUICK SEARCH BOX WAS GOING TO GIVE TO USERS?

12   A.   VERY SIMILAR TO THE PATENT, IT SAID "RATHER THAN GIVING

13   YOU ONE SEARCH BOX FOR THE WEB AND ANOTHER FOR YOUR PHONE,

14   QUICK SEARCH BOX PROVIDES ONE SINGLE SEARCH BOX TO LET YOU

15   SEARCH CONTENT ON YOUR PHONE, INCLUDING APPS, CONTACTS, AND

16   BROWSER HISTORY, AS WELL AS CONTENT FROM THE WEB, LIKE

17   PERSONALIZED SEARCH SUGGESTIONS, LOCAL BUSINESS LISTINGS," AND

18   SO ON.

19   Q.   COULD YOU TURN TO THE SECOND PAGE OF EXHIBIT 110 AND TELL

20   US WHAT THE END OF THIS POST SAYS, THIS ANNOUNCEMENT?

21   A.   RIGHT.  WELL, IT SAYS "FINALLY, ONE OF THE COOLEST THINGS

22   ABOUT QSB IS THAT IT'S NOT LIMITED TO SEARCHING WHAT WE THINK

23   IS USEFUL - 30 PARTY APPS CAN ALSO INCLUDE SUGGESTIONS IN THE

24   LIST, MAKING IT FASTER TO ACCESS THE CONTENT YOU WANT FROM

25   THOSE APPS, TOO."

```
1    Q.   AND WHAT DOES IT SAY AT THE VERY END OF THE ANNOUNCEMENT?

2    A.   "IT'S AVAILABLE IN ANDROID 1.6, SO CHECK IT OUT," AND

3    THAT'S A LINK TO DOWNLOAD, AND ENJOY.

4    Q.   AND RIGHT ABOVE THAT, THE SENTENCE THAT STARTS "WE HOPE"?

5    A.   "WE HOPE QUICK SEARCH BOX WILL CHANGE THE WAY YOU USE YOUR

6    ANDROID-POWERED PHONE BY SHORTENING THE TIME AND EFFORT IT

7    TAKES TO GET THE INFORMATION YOU WANT WHILE YOU'RE ON THE GO."

8    Q.   YOU CAN.   YOU CAN PUT THAT BINDER ASIDE FOR A MOMENT, BUT

9    NOT TOO FAR BECAUSE WE'LL NEED IT AGAIN, AND I WANT TO TURN NOW

10   TO THE '414 PATENT.

11        THIS IS THE SECOND PATENT YOU ANALYZED?

12   A.   YES, MA'AM.

13   Q.   OKAY.   DO YOU HAVE THAT BINDER THAT HAD JX 4 IN IT?

14   A.   SURE DO.

15   Q.   OKAY.   COULD YOU TURN TO TAB JX 7 IN THAT BINDER.

16   A.   I HAVE IT HERE.

17   Q.   WHAT IS JX 7?

18   A.   JX 7 IS A COPY OF UNITED STATES PATENT 7,761,414.

19   Q.   SO THIS IS THE SECOND PATENT YOU ANALYZED?

20   A.   YES, MA'AM, THIS IS THE BACKGROUND SYNC.

21             MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

22   JX 7.

23             MR. NELSON:  NO OBJECTION, YOUR HONOR.

24             THE COURT:  IT'S ADMITTED.

25        (PLAINTIFF'S EXHIBIT 7 WAS ADMITTED IN EVIDENCE.)
```

```
 1            THE COURT:  GO AHEAD, PLEASE.

 2    BY MS. KREVANS:

 3    Q.   COULD YOU PLEASE BRIEFLY EXPLAIN TO THE JURY WHAT THE

 4    PROBLEM WAS -- ACTUALLY, LET ME BACK UP.

 5            FIRST, CAN YOU JUST TELL THE JURY WHAT ARE THE SORT OF

 6    VITAL STATISTICS OF THE '414 PATENT?

 7    A.   SURE.  IT'S ASSIGNED TO APPLE AND IT WAS FILED

 8    JANUARY 7TH, 2007.

 9    Q.   AND WHAT WAS THE PROBLEM THAT THE INVENTOR OF THE '414

10    PATENT WAS TRYING TO SOLVE IN 2006 JUST BEFORE THIS PATENT WAS

11    FILED AT THE VERY BEGINNING OF 2007?

12    A.   SO THEY WERE STRUGGLING WITH THE ISSUE THAT IN THAT

13    TIMEFRAME, DEVICES WERE STARTING TO STORE MORE AND MORE

14    DIFFERENT TYPES OF INFORMATION.  SO PEOPLE WERE DOING MORE WITH

15    THESE SORTS OF DEVICES, AND SO THEY WOULD STORE NOT ONLY

16    CONTACTS INFORMATION, BUT CALENDAR INFORMATION, MAYBE RECIPES,

17    YOUR GROCERY LISTS, YOUR FAMILY BIRTHDAYS, THAT SORT OF THINGS.

18    SO LOTS OF DIFFERENT TYPES OF INFORMATION.

19            AND YOU ALSO PROBABLY HAD OTHER PLACES WHERE YOU KEPT THAT

20    SORT OF INFORMATION, AND YOU MIGHT MAKE CHANGES TO THAT

21    INFORMATION IN DIFFERENT LOCATIONS.

22            SO THAT PROCESS OF REFLECTING THOSE CHANGES THAT YOU MAKE

23    AT ONE PLACE ON ANOTHER COPY OF YOUR DATA IS CALLED

24    SYNCHRONIZATION.

25            SO THE PATENT REALLY TALKS ABOUT THE CHALLENGE OF ALLOWING
```

1    A USER TO USE THE DEVICE AND ACCESS AND EDIT THEIR DATA ON THAT

2    DEVICE, WHILE IN THE BACKGROUND, WITHOUT INTERRUPTING WHAT

3    THEY'RE DOING ON THE DEVICE, TO KEEP THAT INFORMATION

4    UP-TO-DATE WITH OTHER COPIES THEY MAY HAVE.

5         AND THE PATENT ALSO TALKS ABOUT HOW TO PROVIDE A FRAMEWORK

6    SO THAT IF YOU HAVE LOTS OF DIFFERENT TYPES OF INFORMATION ON

7    YOUR DEVICE, THEY ALL SORT OF DO THAT SEAMLESSLY IN A UNIFIED

8    FRAMEWORK, AND IMPORTANTLY, THAT THE PERFORMANCE OR THE ABILITY

9    TO SYNCHRONIZE ONE OF THEM DOESN'T REALLY LIMIT THE OTHER.

10   Q.   SO YOU SAID THIS IS AN INVENTION ABOUT YOU HAVE TWO

11   DEVICES, SAY A SMARTPHONE AND A COMPUTER, AND YOU WANT TO

12   SYNCHRONIZE DATA BECAUSE YOU'RE KEEPING THE SAME DATA ON BOTH

13   OF THEM?

14   A.   THAT'S CORRECT.

15   Q.   OKAY.  IT'S THE BEGINNING OF 2007.  IF A PERSON HAD TWO

16   SUCH DEVICES AT THE TIME, AN EARLY SMARTPHONE AND A HOME

17   COMPUTER, WHAT KINDS OF ISSUES COULD ARISE IF THEY WERE

18   CHANGING SOMETHING, FOR EXAMPLE, IN THEIR CONTACTS ON THEIR

19   SMARTPHONE WHILE THE SMARTPHONE WAS SYNCHRONIZING THE CONTACTS

20   INFORMATION WITH THE COPY OF CONTACTS ON THE COMPUTER AT HOME?

21   A.   WELL, TECHNICALLY WE CALL IT THE PROBLEM OF CONSISTENCY,

22   AND IF YOU DON'T DO IT RIGHT, YOU CAN GET CORRUPTION, AND

23   THAT'S JUST A FANCY WORD FOR YOU MAKE A MESS OF THE DATA.  IT

24   GETS STORED WRONG, IT COPIES THE WRONG THING, IT COPIES OVER

25   WHAT YOU WERE TRYING TO CHANGE, THAT SORT OF THING.

1    Q.   DID THE '414 PATENT INVENTION PROVIDE A SOLUTION TO THESE

2    PROBLEMS?

3    A.   YES, IT DID.

4    Q.   WHAT WAS THE SOLUTION?

5    A.   WELL, THE TERM WE USE FOR IT HERE IS BACKGROUND SYNC, BUT

6    IT PROVIDED A WAY TO ALLOW THE USER TO CONTINUE TO ACCESS AND

7    EDIT THEIR DATA WHILE IN THE BACKGROUND THE SYNCHRONIZATION WAS

8    OCCURRING.  AND IT, AGAIN, TO DO THIS NOT JUST FOR ONE TYPE OF

9    DATA, BUT FOR A NUMBER OF DIFFERENT TYPES OF DATA AND NOT HAVE

10   THOSE DATA BE DEPENDENT UPON EACH OTHER.

11   Q.   COULD YOU LOOK AT FIGURE 9 -- I'M SORRY.  I DON'T WANT TO

12   LOOK AT FIG 9.

13        COULD WE LOOK AT FIGURE 4 OF THE PATENT.

14   A.   YES, MA'AM.

15   Q.   OKAY.  CAN YOU BRIEFLY EXPLAIN -- LET ME FIRST ASK YOU,

16   THE CLAIM AT ISSUE HERE IS CLAIM 20.  DOES FIGURE 4 ILLUSTRATE

17   THE INVENTION OF CLAIM 20?

18   A.   FIGURE 4 ILLUSTRATES SORT OF THE ENVIRONMENT IN WHICH THE

19   ENTIRE PATENT SITS.  BUT WE CAN TALK ABOUT CLAIM 20 WITHIN THIS

20   FIGURE.

21   Q.   OKAY.  COULD YOU BRIEFLY WALK US THROUGH HOW THE JURY

22   SHOULD UNDERSTAND THIS FIGURE?

23   A.   SURE.  SO THE IMPORTANT THING ABOUT THIS FIGURE IS THAT

24   THERE ARE TWO HALVES.  SO YOU SEE THE VERTICAL LINE RIGHT IN

25   THE MIDDLE.  SO THERE ARE ACTUALLY TWO DEVICES HERE.  THERE'S

1        THE ONE ON THE LEFT, WHICH IT CALLS THE DEVICE, E.G., HANDHELD

2    COMPUTER, SO A SMARTPHONE, SAY; AND THEN THE ONE ON THE RIGHT,

3    AND IN THIS EXAMPLE, IT'S THE DESKTOP COMPUTER.

4        SO FOCUSSING ON THE LEFT-HAND SIDE, AGAIN, FOCUSSING ON

5    THE HANDHELD COMPUTER, WHAT IT'S SHOWING IS THREE DIFFERENT

6    COLUMNS OF THINGS THERE, AND YOU'LL SEE THAT EACH COLUMN

7    CORRESPONDS TO A DIFFERENT CLASS OF DATA, AND THAT'S JUST THE

8    PATENT'S LANGUAGE FOR DIFFERENT TYPES OF DATA, LIKE CALENDAR OR

9    CONTACTS OR RECIPES OR LISTS OR ANYTHING ELSE.

10       AND SO WITHIN THOSE COLUMNS, IT DESCRIBES DIFFERENT

11   PORTIONS OF THE FUNCTIONALITY AND HOW THEY INTERACT TOGETHER SO

12   THAT AT THE BOTTOM THERE, YOU SEE THE APPLICATION PROGRAMS,

13   THESE ARE THE THINGS THAT ALLOW YOU TO ACCESS AND EDIT THE

14   DATA.

15       AND THEN IN THE MIDDLE THEY'VE GOT THESE CALENDAR STORE,

16   CONTACTS STORE DB.  THESE ARE THE DATABASES THAT ACTUALLY STORE

17   THE DATA ON THE DEVICE.

18       AND THEN ON THE TOP ROW ARE THESE BOXES, THE DATA SOURCES,

19   AND THESE ARE -- IT'S THE PART OF THE FUNCTIONALITY THAT'S

20   GOING TO ALLOW THE DATA TO BE SYNCHRONIZED WITH THE RIGHT-HAND

21   SIDE OF THE FIGURE.

22   Q.   AND GENERALLY WHAT'S OVER ON THE RIGHT-HAND SIDE?

23   A.   AGAIN, THAT'S THE OTHER SIDE, THAT'S THE REMOTE DEVICE,

24   THE DESKTOP OR TODAY IT MIGHT BE A CLOUD SERVER.

25   Q.   OKAY.  WHEN YOU DID YOUR ANALYSIS OF WHETHER CLAIM 20 WAS

1    INFRINGED, DID YOU FIND ANY DIFFERENCE AMONG THE TEN ACCUSED

2    DEVICES IN TERMS OF HOW THE CODE OPERATED THAT WAS RELEVANT TO

3    BACKGROUND SYNCHRONIZATION FEATURES?

4    A.   NO.  AS FAR AS THE CLAIMS ARE CONCERNED, THE CODE IS THE

5    SAME.

6    Q.   DID YOU PICK A PRODUCT TO USE AS AN EXAMPLE FOR YOUR

7    ANALYSIS TODAY?

8    A.   I DID.  TODAY I PICKED THE S III, THE GALAXY S III.

9    Q.   OKAY.  IF YOU WALK US THROUGH YOUR INFRINGEMENT ANALYSIS

10   FOR THE GALAXY S III, WILL THAT ANALYSIS APPLY TO THE OTHER

11   NINE ACCUSED PRODUCTS FOR THE '414 PATENT?

12   A.   YES, MA'AM.

13   Q.   AND ARE THOSE TEN PRODUCTS THE SAME TEN PRODUCTS THAT YOU

14   ANALYZED FOR THE '959?

15   A.   YES, MA'AM.

16   Q.   OKAY.  WHAT CODE DID YOU LOOK AT FOR PURPOSES OF ANALYZING

17   INFRINGEMENT OF THE '414 PATENT?

18   A.   SO JUST LIKE THE '959, I LOOKED AT CODE THAT SAMSUNG

19   PROVIDED.  THIS IS THE SAMSUNG PROPRIETARY CODE THAT THEY SHIP

20   ON THEIR PHONES.

21   Q.   OKAY.  LET'S START WALKING THROUGH THE CLAIM, AND LET'S

22   JUST START RIGHT AT THE TOP.

23        A COMPUTER READABLE STORAGE MEDIUM CONTAINING EXECUTABLE

24   PROGRAM INSTRUCTIONS WHICH, WHEN EXECUTED, CAUSE A DATA

25   PROCESSING SYSTEM TO PERFORM A METHOD.

1          DID EACH OF THE TEN ACCUSED PRODUCTS HAVE SUCH A COMPUTER

2     READABLE STORAGE MEDIUM?

3     A.   YES, MA'AM, THEY DID.

4     Q.   AND WHERE DID YOU FIND THAT?

5     A.   AGAIN, THAT'S THE FLASH MEMORY THAT'S INSIDE THE PHONES.

6     Q.   OKAY.  SO I SHOULD CHECK THAT ONE OFF?

7     A.   YES, MA'AM.

8     Q.   ALL RIGHT.  ELEMENT B, THIS IS A MOUTHFUL AND HAS A COUPLE

9     OF TERMS THAT WE'RE GOING TO NEED TO EXPLAIN, "EXECUTING AT

10    LEAST ONE USER-LEVEL NON-SYNCHRONIZATION PROCESSING THREAD."

11         LET'S START WITH THE EASY PART.  WHAT IS USER-LEVEL

12    REFERRING TO?

13    A.   USER-LEVEL IS REFERRING TO THE FACT THAT IT'S JUST AN

14    APPLICATION THAT THE USER WOULD DEAL WITH AS OPPOSED TO, SAY,

15    THE OPERATING TESTIMONY ITSELF.

16    Q.   OKAY.  WHAT DOES NON-SYNCHRONIZATION MEAN?

17    A.   IT MEANS ANYTHING BUT SYNCHRONIZATION.

18    Q.   AND WHAT IS A PROCESSING THREAD?

19    A.   SO A PROCESSING THREAD IS THE WAY THAT COMPUTER

20    PROGRAMMERS THINK ABOUT ORGANIZING INSTRUCTIONS WITHIN A

21    COMPUTER.

22         SO AS YOU PROBABLY KNOW, COMPUTERS EXECUTE VERY, VERY,

23    VERY FAST.  BUT EACH INSTRUCTION IS ACTUALLY VERY, VERY SIMPLE.

24    IT'S JUST LIKE ADDING TWO NUMBERS, COPYING A PIECE OF DATA,

25    SOMETHING LIKE THAT.

```
 1              SO AS A COMPUTER PROGRAMMER, IF YOU WANT TO BE ABLE TO DO

 2       ANYTHING INTERESTING WITH A COMPUTER, YOU ACTUALLY HAVE TO PUT

 3       TOGETHER A VERY, VERY LONG SEQUENCE OF INSTRUCTIONS.

 4              AND SO COMPUTER PROGRAMMERS, WHEN THEY DO THAT, THEY PUT

 5       THEM INTO THIS THING THEY CALL A THREAD, WHICH IS JUST A

 6       SEQUENCE OF THOSE INSTRUCTIONS THAT ARE ALL GOING TO BE

 7       EXECUTED.

 8       Q.   AND WHY DO -- WHY DOES ORGANIZATION OF INSTRUCTIONS INTO

 9       THREADS HELP THE PROGRAMMER ACCOMPLISH WHAT THEY WANT?  WHY

10       WOULD A CLAIM CALL A THREAD OUT AS OPPOSED TO SAYING

11       INSTRUCTIONS?

12       A.   SURE.  WELL, IT'S THE UNIT OF ORGANIZATION.  AND SO, FOR

13       EXAMPLE, IF I COULD USE AN ANALOGY, WHEN YOU AND I HAVE A

14       CONVERSATION AS HUMAN BEINGS, AT THE BEGINNING OF THE

15       CONVERSATION, WE HAVE TO USE FULL NAMES AND COMPLETE

16       DESCRIPTIONS OF WHO WE'RE TALKING ABOUT OR WHAT WE'RE TALKING

17       ABOUT.

18              BUT AS THE CONVERSATION ROLLS ALONG, WE BUILD UP A CONTEXT

19       OF WHAT WE'VE BEEN TALKING ABOUT, AND TECHNICALLY WE USE THAT

20       SAME WORD CONTEXT, AND EVERY THREAD AS A CONTEXT WHICH ALLOWS

21       THE COMPUTER TO BE MORE EFFICIENT ABOUT EXECUTING EACH

22       INSTRUCTION AS IT GOES.

23              SO IN MY ANALOGY, AS WE'RE IN THE MIDDLE OF OUR

24       CONVERSATION, WE CAN START TALKING ABOUT THIS OR THAT OR HE OR

25       SHE AND WE'LL KNOW EXACTLY WHAT WE MEAN AND WE CAN MAKE A LOT
```

1    MORE PROGRESS QUICKLY.

2         WHEREAS IF SOMEONE WERE TO WALK IN, IN THE MIDDLE OF OUR

3    CONVERSATION, THEY WOULD BE COMPLETELY LOST.

4         SO BY ORGANIZING THE THREADS, THE COMPUTER IS MAKING MORE

5    EFFICIENT USE OF EACH ONE OF THOSE INSTRUCTIONS.

6    Q.   OKAY.  DID YOU FIND IN THE CODE RUNNING ON EACH OF THE TEN

7    ACCUSED INSTRUCTIONS AT LEAST INSTRUCTIONS FOR EXECUTING AT

8    LEAST ONE USER-LEVEL NON-SYNCHRONIZATION PROCESSING THREAD?

9    A.   YES, I DID.

10   Q.   OKAY.  IT GOES ON IN CLAIM ELEMENT B TO SAY "WHEREIN THE

11   AT LEAST ONE USER-LEVEL NON-SYNCHRONIZATION PROCESSING THREAD

12   IS PROVIDED BY A USER APPLICATION."

13        DID YOU FIND THAT THERE WERE USER APPLICATIONS THAT

14   PROVIDED PROCESSING THREADS THAT WERE NOT DOING

15   SYNCHRONIZATION?

16   A.   I DID.  THESE ARE YOUR CONTACTS, YOUR CALENDAR, YOUR

17   E-MAIL APPLICATION.

18   Q.   OKAY.  THIS GOES ON TO SAY THAT "THE USER APPLICATION

19   PROVIDES A USER INTERFACE TO ALLOW A USER TO ACCESS AND EDIT

20   STRUCTURED DATA IN A FIRST STORE ASSOCIATED WITH A FIRST

21   DATABASE."

22        DID YOU FIND THAT PORTION OF THE CLAIM ELEMENT IN EACH OF

23   THE ACCUSED DEVICES?

24   A.   I DID.

25   Q.   CAN YOU EXPLAIN TO US WHAT IT MEANS TO SAY A USER

1    APPLICATION WHICH PROVIDES A USER INTERFACE TO ALLOW A USER TO

2    ACCESS AND EDIT STRUCTURED DATA?

3    A.   SURE.  SO THE USER APPLICATION, AGAIN, JUST YOUR CALENDAR

4    APPLICATION, YOUR E-MAIL APPLICATION, THAT PROVIDES A USER

5    INTERFACE.  AND BY THAT IT JUST MEANS THAT SCREEN WHERE YOU

6    TYPE THINGS IN, AND THAT SCREEN AND THAT USER INTERFACE ALLOWS

7    THE USER TO ACTUALLY ACCESS THE DATA, TO VIEW IT OR EDIT IT BY

8    CHANGING IT OR TYPING IN.

9         THEN IT HAS THE FURTHER REQUIREMENT THAT DATA HAS TO BE

10   STRUCTURED.

11   Q.   WHAT IS STRUCTURED DATA WITHIN THE MEANING OF THIS PATENT?

12   A.   SO THE PATENT ACTUALLY HAS A COUPLE FIGURES ON THIS ISSUE,

13   BUT STRUCTURED DATA IS SIMPLY DATA THAT HAS A PARTICULAR FORMAT

14   SO THAT IT'S CLEAR WHAT THE DIFFERENT PIECES OF INFORMATION

15   ARE.

16   Q.   OKAY.  DID YOU FIND THAT THERE WAS DATA THAT WAS

17   STRUCTURED DATA THAT WAS BEING ACCESSED AND EDITED BY THE CODE

18   FOR THE USER INTERFACE IN THESE PHONES?

19   A.   I DID.  SO, FOR EXAMPLE, THE CALENDAR INFORMATION THAT HAS

20   A CERTAIN STRUCTURE ABOUT HOW MEDIA IS STORED, CONTACT

21   INFORMATION HAS A CERTAIN STRUCTURE ABOUT WHAT'S YOUR FIRST

22   NAME AND LAST NAME AND SO FORTH.  SO, YES.

23   Q.   THE LAST PIECE OF THIS, THE STRUCTURED DATA HAS TO BE "IN

24   A FIRST STORE ASSOCIATED WITH A FIRST DATABASE."

25        WHAT IS THAT?

1      A.   SO DATABASE IS JUST THE WAY THAT COMPUTERS STORE A GROUP

2      OF INFORMATION, AND IN A STRUCTURED -- WHEN YOU HAVE STRUCTURED

3      DATA, BY STORING IT IN A STRUCTURED DATABASE, IT ALLOWS YOU TO

4      HAVE VERY EFFICIENT ACCESS, SO YOU CAN FIND WHAT'S THE THIRD

5      CARD IN THE ROLODEX, OR WHAT'S THE FIFTH ENTRY IN TODAY'S

6      AGENDA.

7           A STRUCTURED DATABASE LETS YOU JUMP IN THERE AND ACT

8      EFFICIENTLY.  A STORE IS JUST A TECHNICAL TERM FOR A GROUP OF

9      DATA, AND ALL OF THE DATABASES IN THE ACCUSED DEVICES ARE

10     CALLED WHAT'S SQLITE DATABASES, AND THAT'S JUST A BRAND NAME,

11     BUT IT STORES THE DATA THINGS CALLED TABLES, WHICH ARE JUST

12     PIECES OF THE DATA.  SO THERE ARE FIRST STORES ASSOCIATED WITH

13     A FIRST DATABASE.

14     Q.   AND IN EACH OF THESE ACCUSED PRODUCTS, THE FIRST STORE

15     ASSOCIATED WITH THE FIRST DATABASE WAS ACTUALLY STORAGE ON THE

16     PHONE?

17     A.   EXACTLY.

18     Q.   OKAY.  HAVE WE WORKED ALL THE WAY THROUGH ELEMENT B?

19     A.   I THINK.  SO.

20     Q.   AND DID YOU FIND THAT EVERYTHING IN ELEMENT B WAS IN EACH

21     OF THE ACCUSED PRODUCTS?

22     A.   YES, MA'AM.

23     Q.   SO I CAN CHECK THAT ONE OFF?

24     A.   YES.

25     Q.   ALL RIGHT.  ELEMENT C, "EXECUTING AT LEAST ONE

REDIRECT MOWRY

1    SYNCHRONIZATION PROCESSING THREAD CONCURRENTLY WITH THE

2    EXECUTING OF THE AT LEAST ONE USER LEVEL NON-SYNCHRONIZATION

3    PROCESSING THREAD."

4        LET'S TAKE THIS ONE IN PIECES, TOO.  WHAT IS A

5    SYNCHRONIZATION PROCESSING THREAD?

6    A.    SO IT'S JUST ANOTHER THREAD, BUT THIS ONE ACTUALLY HAS TO

7    DO SOME SYNCHRONIZATION.

8    Q.    OKAY.  AND THIS AT LEAST ONE USER LEVEL

9    NON-SYNCHRONIZATION PROCESSING THREAD IN C, IS THAT THE THREAD

10   IN B?

11   A.    EXACTLY.

12   Q.    ALL RIGHT.  THE WORD "CONCURRENTLY," HAS THE JUDGE GIVEN

13   US A DEFINITION OF THIS WORD "CONCURRENTLY WITH"?

14   A.    YES, THE COURT HAS GIVEN US INSTRUCTION.

15   Q.    OKAY.  WHAT IS THE COURT'S CONSTRUCTION OF THE PHRASE

16   "CONCURRENTLY WITH"?

17   A.    SO AS IT SAYS ON THE SLIDE, THE COURT SAYS "CONCURRENTLY

18   WITH" MEANS "THE SYNCHRONIZATION THREAD AND THE

19   NON-SYNCHRONIZATION THREAD ARE BOTH ACTIVE DURING AN

20   OVERLAPPING TIME INTERVAL."

21   Q.    DID YOU USE THAT DEFINITION FROM THE COURT FOR YOUR

22   ANALYSIS IN THIS CASE?

23   A.    YES, MA'AM.

24   Q.    OKAY.  DID YOU FIND IN EACH OF THE TEN ACCUSED PRODUCTS

25   INSTRUCTIONS FOR EXECUTING AT LEAST ONE THREAD THAT DID

1    SYNCHRONIZATION IN AN OVERLAPPING TIME INTERVAL -- WHY DON'T

2    YOU KEEP THE CONSTRUCTION UP THERE -- DID YOU FIND IN EACH OF

3    THESE ACCUSED PRODUCTS INSTRUCTIONS FOR EXECUTING AT LEAST ONE

4    THREAD THAT DID SYNCHRONIZATION THAT WAS ACTIVE DURING

5    OVERLAPPING TIME INTERVAL WITH AT LEAST ONE NON-SYNCHRONIZATION

6    PROCESSING THREAD, A USER APPLICATION PROCESSING THREAD?

7    A.   YES, I DID.

8    Q.   AND CAN YOU EXPLAIN HOW IT CAN BE THAT TWO OF THESE

9    THREADS OF INSTRUCTIONS COULD BE ACTIVE DURING AN OVERLAPPING

10   TIME INTERVAL ON THESE PHONES?

11   A.   SURE.  SO COMPUTERS, WHEN THEY ONLY HAVE ONE PROCESSOR,

12   THEY CAN ACTUALLY ONLY EXECUTE ONE INSTRUCTION AT A TIME.

13        SO THEY CAN'T ACTUALLY DO MORE THAN ONE THING

14   SIMULTANEOUSLY, BUT ANYBODY WHO'S EVER USED A MODERN COMPUTING

15   DEVICE KNOWS THAT IT SURE SEEMS LIKE THEY'RE DOING LOTS OF

16   THINGS AT ONCE.

17        WHAT'S ACTUALLY GOING ON IS BECAUSE THE COMPUTER CAN DO

18   THINGS SO FAST, IT CAN HAVE A BUNCH OF DIFFERENT THINGS GOING.

19   SO A BUNCH OF THESE THREADS, AND THEY'RE ALTERNATIVE, THEY'RE

20   ALL MAKING PROGRESS ON THEIR EVENTUAL GOAL.  BUT THEY'RE TAKING

21   TURNS, JUST LIKE IN KINDERGARTEN, USING THE PROCESSOR.

22        AND SO ONE USES THE PROCESSOR FOR A LITTLE BIT AND THEN IT

23   SWITCHES.  AND THAT LITTLE BIT, WE'RE TALKING NANOSECONDS,

24   MICROSECONDS, MILLISECONDS.  AND THE ONES THAT AREN'T USING THE

25   PRODUCTS AT THIS VERY MOMENT, THEY MIGHT BE WAITING FOR

1      SOMETHING TO HAPPEN, LIKE THE USER INTERFACE THREAD SPENDS

2      ALMOST ALL ITS LIFE WAITING FOR THE USER.  BECAUSE FROM THE

3      POINT OF VIEW OF THE COMPUTER, THE USER IS INCREDIBLY SLOW.  SO

4      IT'S WAITING FOR THE USER.

5           SIMILARLY, THE SYNCHRONIZATION PROCESSING THREAD IS

6      COMMUNICATING WITH ANOTHER DEVICE, SO IT'S GOING TO BE SPENDING

7      A LOT OF ITS LIFE WAITING FOR THAT TO HAPPEN.

8           SO THERE'S PLENTY OF TIME FOR THEM TO TAKE TURNS USING THE

9      CPU WAITING FOR SOMETHING ELSE TO HAPPEN SO THEN THEY CAN GO

10     BACK TO THE CPU.

11          BUT AS WE'VE SEEN, COMPUTERS MAKE IT SEEM LIKE THIS IS

12     HAPPENING SIMULTANEOUSLY.  SO AS THE JUDGE HAS DEFINED FOR US,

13     OVER THAT OVERLAPPING TIME INTERVAL, BOTH OF THE THREADS ARE

14     ACTUALLY ACTIVE THE WHOLE TIME.

15     Q.   NOW, DID YOU FIND THAT THERE WAS THAT OVERLAPPING TIME

16      INTERVAL FOR THE SYNCHRONIZATION THREAD AND THE USER

17      APPLICATION THREAD IN ALL TEN ACCUSED DEVICES?

18     A.   I DID.

19     Q.   OKAY.  SO I SHOULD CHECK OFF ELEMENT C?

20     A.   YES, MA'AM.

21     Q.   ELEMENT D OF THIS CLAIM SAYS "WHEREIN AT LEAST ONE

22     SYNCHRONIZATION PROCESSING THREAD IS PROVIDED BY A

23     SYNCHRONIZATION SOFTWARE COMPONENT."

24          DID YOU LOOK AT THE CODE RUNNING ON EACH OF THESE DEVICES

25     TO SEE IF THERE WERE SYNCHRONIZATION SOFTWARE COMPONENTS WITHIN

1    THE MEANING OF THE CLAIM ON EACH DEVICE?

2    A.    I DID.

3    Q.    WHAT'S A SYNCHRONIZATION SOFTWARE COMPONENT?

4    A.    SO THAT'S A TERM FROM THE PATENT, AND IT USES IT FAIRLY

5    GENERALLY TO JUST MEAN A PIECE OF THE SOFTWARE THAT PROVIDES

6    THE SYNCHRONIZATION FUNCTIONALITY.

7    Q.    OKAY.  AND CLAIM ELEMENT D GOES ON TO SAY THAT THE

8    SYNCHRONIZATION SOFTWARE COMPONENT IS "CONFIGURED TO

9    SYNCHRONIZE STRUCTURED DATA FROM THE FIRST DATABASE WITH THE

10   STRUCTURES DATA FROM A SECOND DATABASE."

11         DID YOU FIND SYNCHRONIZATION SOFTWARE COMPONENTS ON EACH

12   OF THESE PHONES AND THE TABLET THAT WERE CONFIGURED TO

13   SYNCHRONIZE STRUCTURED DATA FROM THE FIRST DATABASE ON THE

14   PHONE OR TABLET WITH THE STRUCTURED DATA FROM THE SECOND

15   DATABASE SOMEWHERE ELSE?

16   A.    YES, MA'AM.

17   Q.    OKAY.  IF WE GO DOWN TO ELEMENT E, IT SAYS "WHEREIN THE

18   SYNCHRONIZATION SOFTWARE COMPONENT IS CONFIGURED TO SYNCHRONIZE

19   STRUCTURED DATA OF A FIRST DATA CLASS AND OTHER SYNCHRONIZATION

20   SOFTWARE COMPONENTS ARE CONFIGURED TO SYNCHRONIZE STRUCTURED

21   DATA OF OTHER CORRESPONDING DATA CLASSES."

22         WHAT DOES THAT MEAN?

23   A.    WELL, WHAT IT'S SAYING THERE IS YOU ACTUALLY HAVE GOT A

24   NUMBER OF THINGS.  YOU'VE GOT A SYNCHRONIZATION SOFTWARE

25   COMPONENT, THAT'S FROM PART B, THAT SYNCHRONIZES THE FIRST DATA

1      CLASS.  SO THAT'S ONE OF THEM.

2           AND THEN IT GOES ON TO SAY THAT THERE ARE OTHER

3      SYNCHRONIZATION SOFTWARE COMPONENTS, PLURAL.  SO THAT MEANS YOU

4      HAVE TO HAVE AT LEAST TWO MORE OF THOSE THINGS, AND THESE ARE

5      ALL THE THINGS FROM CLAIM D.

6           SO NOW WE HAVE THREE, AND IT SAYS PARTICULARLY THAT EACH

7      ONE OF THOSE THREE THINGS HAS TO BE CONFIGURED TO SYNCHRONIZE

8      STRUCTURED DATA OF A CORRESPONDING DATA CLASS, EITHER THE FIRST

9      DATA CLASS OR OTHER DATA CLASSES.  SO YOU'VE GOT THREE OF THESE

10     COMPONENTS, EACH ONE OF THEM CONFIGURED TO SYNCHRONIZE A

11     PARTICULAR DATA CLASS.

12     Q.   WHEN YOU SAY "DATA CLASS," DO YOU MEAN JUST A TYPE OF

13     DATA?

14     A.   YES, THE SAME WAY AS THE PATENT.

15     Q.   SO E-MAIL IS A DATA CLASS?

16     A.   YES, MA'AM.

17     Q.   CONTACTS IS A DATA CLASS?

18     A.   YES, MA'AM.

19     Q.   CALENDAR MIGHT BE A DATA CLASS?

20     A.   YES, MA'AM.

21     Q.   SO FIRST -- LOOK FIRST AT WHAT YOU FOUND FOR THE

22     SYNCHRONIZATION -- SYNCHRONIZATION SOFTWARE COMPONENTS ON THE

23     ACCUSED DEVICES.

24           DO YOU HAVE A SLIDE THAT ILLUSTRATES THAT?

25     A.   I DO.

```
 1    Q.   OKAY.  COULD WE SHOW SLIDE 43 ONLY TO THE JURY, PLEASE.

 2         WHAT HAVE YOU SET OUT ON SLIDE 43?

 3    A.   SO THE SOFTWARE -- THE SYNCHRONIZATION SOFTWARE COMPONENTS

 4    THAT I'VE FOUND ARE ALL CALLED SYNC ADAPTERS, AND THAT'S JUST

 5    THE NAME THAT THE ANDROID FRAMERS WERE USING, AND I FOUND SIX

 6    OF THEM.

 7         AND BECAUSE IN CLAIM 20 WE'RE TALKING ABOUT AT LEAST THREE

 8    DATA CLASSES, WHAT I'VE DONE IS I'VE ORGANIZED THOSE SIX

 9    SOFTWARE VERSIONS -- SORRY, YOU DID IT TO ME, TOO -- THOSE SIX

10    SYNCHRONIZATION SOFTWARE COMPONENTS INTO THREE COLUMNS WHERE

11    EACH COLUMN CORRESPONDS TO TWO DIFFERENT SYNC ADAPTERS THAT

12    BOTH WORK ON THAT SAME DATA CLASS.

13    Q.   OKAY.  SO YOU ACTUALLY FOUND SYNC -- SIX OF THESE THINGS

14    IN THE CODE WHICH THE CODE CALLS SYNC ADAPTERS?

15    A.   YES, MA'AM.

16    Q.   AND EACH OF THEM WAS A SYNCHRONIZATION SOFTWARE COMPONENT

17    CONFIGURED TO SYNCHRONIZE STRUCTURED DATA FROM A FIRST DATABASE

18    TO STRUCTURED DATA FROM A SECOND DATABASE?

19    A.   PRECISELY.

20    Q.   BUT TWO OF THEM WERE FOR CALENDAR DATA CLASS, TWO WERE FOR

21    CONTACTS, TWO WERE FOR MAIL?

22    A.   EXACTLY.

23    Q.   ALL RIGHT.  IS THERE ANY DISPUTE IN THIS CASE ABOUT

24    WHETHER THE GOOGLE CALENDAR SYNC ADAPTER IS A SYNCHRONIZATION

25    SOFTWARE COMPONENT ACCORDING TO ELEMENT D?
```

1     A.   I DON'T BELIEVE SO.

2     Q.   IS THERE ANY DISPUTE IN THIS CASE ABOUT WHETHER THE GOOGLE

3     CONTACTS SYNC ADAPTER IN THE CODE IS A SYNCHRONIZATION SOFTWARE

4     COMPONENT CONFIGURED TO SYNCHRONIZE ACCORDING TO CLAIM ELEMENT

5     D?

6     A.   I DON'T BELIEVE SO.

7     Q.   OKAY.  SO WE CAN GO AHEAD RIGHT NOW AND CROSS OFF ELEMENT

8     D BECAUSE WE HAVE AT LEAST ONE SYNCHRONIZATION SOFTWARE

9     COMPONENT, EVERYBODY AGREES?

10    A.   I THINK SO.

11    Q.   OKAY.  BUT GIVEN YOUR EXPLANATION OF E -- ACTUALLY WE HAVE

12    TWO.  IF WE'VE GOT AGREEMENT ABOUT GOOGLE CALENDAR AND GOOGLE

13    CONTACTS, WE CAN CHECK THOSE OFF, WE NEED TO FIND ONE MORE?

14    A.   THAT'S CORRECT.

15    Q.   AND IT HAS TO BE A DIFFERENT KIND OF DATA THAN THE FIRST

16    TWO?

17    A.   PRECISELY.

18    Q.   ALL RIGHT.  SO LET'S LOOK FIRST AT THE GMAIL SYNC ADAPTER.

19         WHY ARE THESE COMPONENTS IN THE CODE RUNNING ON THE

20    SAMSUNG PHONES CALLED SYNC ADAPTERS BY THE PERSON WHO WROTE THE

21    CODE?

22    A.   WELL, BECAUSE THE CODE UTILIZES THE ANDROID FRAMEWORK AND

23    THE ANDROID FRAMEWORK ACTUALLY HAS IN IT SUPPORT FOR THESE

24    THINGS CALLED SYNC ADAPTERS.

25         AND SO ALL THE ANDROID SYNC ADAPTERS WORK THE SAME WAY,

1    AND THIS IS THE WAY THAT THEY SUPPORT THIRD PARTY APPLICATIONS

2    TO USE THE SYNCHRONIZATION FUNCTIONALITIES THE PROGRAMMERS

3    WRITE FOR THE SYNC ADAPTER.

4    Q.   OKAY.  COULD YOU LOOK AT EXHIBIT 172 IN YOUR BINDER.

5    A.   I'M SORRY, WHAT NUMBER?

6    Q.   172.  IT SHOULD BE IN VOLUME 1.  RIGHT NEAR THE BACK.

7    IT'S SMALL.

8    A.   THANK YOU.  I'M SORRY.  I HAVE IT NOW.

9    Q.   WHAT IS EXHIBIT 172?

10   A.   EXHIBIT 172 IS A GOOGLE DOCUMENT THAT DESCRIBES THE

11   ARCHITECTURE OF SEVERAL OF THE GOOGLE SYNC ADAPTERS.

12             MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

13   PX 172.

14             THE COURT:  ANY OBJECTION?

15             MR. NELSON:  NO OBJECTION, YOUR HONOR.

16             THE COURT:  IT'S ADMITTED.

17        (PLAINTIFF'S EXHIBIT 172 WAS ADMITTED IN EVIDENCE.)

18             THE COURT:  GO AHEAD, PLEASE.  WE'RE GOING TO TAKE A

19   BREAK IN A COUPLE MINUTES.  OKAY?

20             MS. KREVANS:  OKAY.

21             THE COURT:  GO AHEAD, PLEASE.

22   BY MS. KREVANS:

23   Q.   WHAT DOES THIS DOCUMENT FROM GOOGLE SAY ABOUT THE FUNCTION

24   OF THE PIECES OF CODE COMING FROM THE ANDROID FRAMEWORK THAT

25   ARE CALLED SYNC ADAPTERS?

1    A.   SO IN THE THIRD BULLET DOWN IT DESCRIBES WHAT THE SYNC

2    ADAPTERS DO, AND I'M READING FROM THE DOCUMENT THAT SAYS

3    "HANDLES ALL," AND THAT'S ITALICIZED, "OF THE SYNC PROTOCOL

4    LOGIC."

5    Q.   AND DOES THIS DOCUMENT, WHICH GOES ON FOR SEVERAL PAGES,

6    DESCRIBE THE OPERATION OF ALL THE SYNC ADAPTERS THAT YOU

7    IDENTIFIED IN THE CODE THAT ACTUALLY IS RUNNING ON THE SAMSUNG

8    PHONES?

9    A.   YES, THE HIGH-LEVEL DESCRIPTION FROM THE FRONT -- THE

10   HIGH-LEVEL DESCRIPTION THAT I JUST READ FROM THE FRONT APPLIES

11   TO ALL OF THEM.

12   Q.   OKAY.  SO THE HIGH-LEVEL DESCRIPTION IN THIS GOOGLE

13   DOCUMENT, EXHIBIT 172, APPLIES TO ALL OF THE SYNC ADAPTERS THAT

14   YOU FOUND IN THE PROPRIETARY CODE THAT RUNS ON THE SAMSUNG

15   PHONES?

16   A.   PRECISELY.

17   Q.   OKAY.

18        YOUR HONOR, THIS WOULD BE A GREAT TIME FOR A BREAK BECAUSE

19   WE'RE ABOUT TO START ANOTHER TOPIC.

20        THE COURT:  ALL RIGHT.  LET'S GO AHEAD AND TAKE OUR

21   BREAK.  IT'S 3:34.  WE'RE GOING TO TAKE A BREAK UNTIL 3:45.

22   WE'LL END TODAY AT 4:30.  PLEASE DON'T RESEARCH OR DISCUSS THE

23   CASE.

24        (JURY OUT AT 3:34 P.M.).

25        THE COURT:  YOU MAY STEP DOWN.

```
 1                    THE WITNESS:  THANK YOU.

 2                    THE COURT:  THANK YOU ALL.

 3              (RECESS FROM 3:35 P.M. UNTIL 3:47 P.M.)

 4              (JURY IN AT 3:48 P.M.)

 5                    THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.  WE

 6         WILL BE ENDING AT 4:30.  TIME IS NOW 3:49.  GO AHEAD, PLEASE.

 7         BY MS. KREVANS:

 8         Q.   WE WERE TALKING BEFORE THE BREAK, PROFESSOR SNOEREN, ABOUT

 9         EXHIBIT 172, THIS DOCUMENT THAT DEFINED SYNC ADAPTERS AND

10         DISCUSSES HOW THEY HANDLE ALL OF THE SYNC PROTOCOL LOGIC.

11              DOES THE SYNC ADAPTER CODE IN EACH OF THE ACCUSED DEVICES

12         CALL THE PARTICULAR FUNCTIONS THAT YOU RELIED ON IN YOUR CODE

13         ANALYSIS?

14         A.   WELL, OTHER FUNCTIONS -- OTHER PARTS OF THE CODE CALL INTO

15         THAT SYNC ADAPTER USING THE SAME FUNCTION, YES, MA'AM.

16         Q.   AND WHAT'S THAT PERFORM?

17         A.   IT'S CALLED ON PERFORM SYNC.

18         Q.   OKAY.  DO YOU HAVE A SLIDE THAT SHOWS THE CODE FOR THE

19         GMAIL SYNC ADAPTER THAT IS THAT SYNCHRONIZATION SOFTWARE

20         COMPONENT THAT WAS THE ONE ON YOUR RIGHT WITH THE SLIDE WITH

21         THE SIX SYNC ADAPTERS?

22         A.   YES, THEY DO.

23         Q.   OKAY.  COULD WE SHOW TO THE JURY ONLY 91.18.

24              CAN YOU EXPLAIN TO THE JURY WHAT THIS CODE DOES AND HOW IT

25         RELATES TO YOUR OPINION?
```

1    A.    SURE.  SO THIS IS CODE FOR THE GMAIL SYNC ADAPTERS, THAT'S

2    THE TOP ONE ON THAT THIRD COLUMN, AND AS YOU CAN SEE, IT'S

3    CODE, THE TOP LINE THERE SAYS CLASS SYNC ADAPTER IMPL, AND

4    THAT'S PROGRAMMER EASE FOR THIS IS THE SYNC ADAPTER GUTS, AND

5    THEN YOU'LL SEE THERE ARE DOTTED LINES, BECAUSE WE JUMP DOWN TO

6    THE MIDDLE OF THE CODE, AND THERE'S A FUNCTION THAT'S CALLED ON

7    PERFORM LOGGED SYNC, AND THIS IS JUST GOOGLE'S VERSION OF THE

8    ON PERFORM SYNC FUNCTION.

9        AND INSIDE OF THAT FUNCTION, YOU'LL SEE THAT THIS IS WHERE

10   THE SYNC ADAPTER IS CONFIGURED TO SYNCHRONIZE THE GMAIL FOR

11   THIS PARTICULAR USER.

12       AND I THINK THERE ARE TWO LINES OF CODE, AND I APOLOGIZE

13   FOR POINTING TO YOU LINES OF CODE, BUT I THINK THEY'RE SIMPLE

14   ENOUGH HOPEFULLY THAT WE CAN GET THE POINT ACROSS, SO YOU CAN

15   SEE THOSE SLASHES, THOSE ARE COMMENTS AGAIN.

16       BUT THE LINE IMMEDIATELY BELOW THOSE SLASHES, IT CALLS THE

17   FUNCTIONS, IT SAYS MAIL ENGINE GET OR MAKE MAIL ENGINE SYNC,

18   AND THEN IT HAS AN OPEN PARENTHESES.

19       AND WHAT THAT OPEN PARENTHESES MEANS IS EVERYTHING AFTER

20   THAT IS WHAT WE CALL A PARAMETER.  THESE ARE THINGS YOU'RE

21   PASSING IN TO HELP CONFIGURE OR FIGURE OUT WHAT YOU WANT, AND

22   ONE OF THE THINGS IS CALLED, OR PASSES, IS THE VERY LAST ONE OF

23   THAT LAST LINE WHICH IS THE ACCOUNT DOT NAME.  SO THIS IS THE

24   PART OF THE CODE THAT'S CONFIGURING TO SYNCHRONIZE JUST THIS

25   USER'S MAIL.

```
 1            AND THEN THE NEXT IMPORTANT LINE IS TWO DOWN.  SO THERE'S

 2      A LINE THAT SAYS TRY, THAT MEANS EXACTLY WHAT YOU THINK, AND

 3      THEN THE LINE BELOW THAT IS THE CODE THAT ACTUALLY CAUSES THE

 4      SYNCHRONIZATION OF THAT USER'S MAIL, AND IT CALLS THE FUNCTION

 5      THAT'S CALLED PERFORM BACKGROUND SYNC.

 6      Q.    OKAY.  COULD WE GO BACK, MR. LEE, TO THE SLIDE THAT SHOWED

 7      THE SIX SYNC ADAPTERS.

 8            REMIND US WHICH ONE YOU JUST SHOWED US CODE FOR.

 9      A.    SO THAT WAS CODE FOR THE UPPER RIGHT, THE GMAIL SYNC

10      ADAPTER.

11      Q.    SO WE CAN CHECK THAT OFF.  DOES THAT MEAN THAT WE NOW HAVE

12      ENOUGH SYNCHRONIZATION SOFTWARE COMPONENTS THAT WE HAVE MET

13      ELEMENT E OF THE CLAIM?

14      A.    YES, MA'AM, IT DOES.

15      Q.    SO I CAN CHECK THAT OFF?

16      A.    YES, MA'AM.

17      Q.    ALL RIGHT.  WE HAVEN'T TALKED ABOUT THE BOTTOM ROW YET OF

18      YOUR SYNC ADAPTER GRAPHIC.  THIS IS SLIDE 43 THAT'S ON THE

19      SCREEN RIGHT NOW.

20            BRIEFLY, WHAT DO THE THREE SYNC ADAPTERS IN THE BOTTOM ROW

21      DO?

22      A.    SO THESE SYNC ADAPTERS SYNCHRONIZE THE SAME CLASSES OF

23      DATA, BUT WITH DIFFERENT SERVERS.  SO THE TOP ROW WOULD

24      SYNCHRONIZE WITH GOOGLE'S SERVERS, SO THE SERVERS THAT GOOGLE

25      HAS IN ITS DATA CENTERS.
```

 1          THE BOTTOM ONES USE THE MICROSOFT EXCHANGE PROTOCOL.  SO

 2     THIS IS PROBABLY WHAT YOU WOULD USE IF YOU HAVE E-MAIL AT YOUR

 3     OFFICE OR IN SOME OTHER CORPORATE ENVIRONMENT.  BUT THEY

 4     SYNCHRONIZE THE SAME CLASSES OF DATA.

 5     Q.   OKAY.  IF WE LOOK AT THE EXCHANGE MAIL SYNC ADAPTER, THAT

 6     IS THE SYNC ADAPTER IN THE MICROSOFT, THAT'S GOING TO TALK TO

 7     THE MICROSOFT SYSTEM ABOUT E-MAIL, WOULD THAT ALSO MAKE A THIRD

 8     SYNCHRONIZATION SOFTWARE COMPONENT IF FOR SOME REASON THE SYNC

 9     ADAPTER FOR GMAIL DIDN'T WORK?

10     A.   YES, MA'AM.  IT'S THE SAME DATA CLASS.

11     Q.   ALL RIGHT.  HAVE YOU ANALYZED THE CODE FOR THE EXCHANGE

12     MAIL SYNC ADAPTER TO SEE IF IT MEETS THE DEFINITION OF A

13     SYNCHRONIZATION SOFTWARE COMPONENT THAT'S CONFIGURED TO

14     SYNCHRONIZE ACCORDING TO THE CLAIM?

15     A.   I HAVE.

16     Q.   OKAY.  COULD WE SEE SLIDE 44, AND, AGAIN, ONLY SHOW THE

17     JURY.

18          WHAT IS THIS CODE THAT YOU'VE SET OUT ON YOUR SLIDE 44?

19     A.   SO THIS IS SIMILAR CODE THAT'S INSIDE OF THE EXCHANGE

20     E-MAIL SYNC ADAPTER, AND THERE ARE TWO FUNCTIONS HERE THAT ARE

21     IMPORTANT, AND THE ONE UP TOP.  I REALIZE IT'S VERY HARD TO

22     READ, BUT IT'S CALLED ON PERFORM SYNC.

23          SO THIS IS THE SAME FUNCTION THAT ALL SYNC ADAPTERS HAVE,

24     AND INSIDE THAT FUNCTION, THE LINE UNDER THE TRY, AGAIN, IT'S

25     JUST GOING TO CALL ANOTHER FUNCTION CALLED PERFORM SYNC, AND I

1      ACTUALLY HAVE THE CODE FOR THAT FUNCTION ALSO ON THE SLIDE.

2           SO IF WE JUMP INTO THE CODE FOR THE PERFORM SYNC, THAT

3      ALSO HAS TWO PARTS.  SO THE FIRST PART I'VE COLORED IT GREEN

4      AND CALLED IT OUT FOR YOU, AND I REMIND YOU THAT THE TWO

5      SLASHES, AGAIN, THAT'S A COMMENT, SO JUST IN PLAIN ENGLISH,

6      FIND THE E-MAIL PROVIDER ACCOUNT ASSOCIATED WITH THIS E-MAIL

7      ADDRESS.  SO HERE YOU CAN SEE THE SYNC ADAPTER IS CONFIGURED TO

8      SYNCHRONIZE THE E-MAIL FOR JUST THIS ONE ACCOUNT.

9           AND THEN BELOW THAT, WHICH I'VE CALLED OUT SEPARATELY

10     COLORED IN BLUE, AGAIN, THE COMMENTS.  SO THE TOP COMMENT SAYS

11     NOW FIND THE INBOX ASSOCIATED WITH THE ACCOUNT.  SO THIS IS

12     JUST THE INCOMING MAIL FOR THAT ACCOUNT.

13          AND THEN SORT OF DOWN IN THE MIDDLE THERE, AGAIN, AFTER

14     THE TRY, AND AFTER THE TRY YOU'LL SEE ANOTHER COMMENT, IT

15     STARTS WITH SLASHES, AND IT SAYS ASK FOR A SYNC FROM OUR SYNC

16     MANAGER.

17          AND THAT'S WHERE IT CAUSES THE SYNCHRONIZATION OF THAT

18     PARTICULAR DATA CLASS AS IT WAS CONFIGURED.

19     Q.    OKAY.  COULD YOU PUT BACK UP THE SLIDE, MR. LEE, WITH THE

20      SIX SYNC ADAPTERS.

21          CAN WE NOW CHECK OFF THE EXCHANGE MAIL SYNC ADAPTER ALSO

22     MEETS THE REQUIREMENTS OF THE CLAIM FOR A SYNCHRONIZATION

23     SOFTWARE COMPONENT THAT'S CONFIGURED TO SYNCHRONIZE?

24     A.    YES, MA'AM.

25     Q.    OKAY.  SO NOW WE FOUND INFRINGEMENT BOTH FOR THE WHOLE TOP

1    ROW OR WITH THE GOOGLE CALENDAR, GOOGLE CONTACTS, PLUS EXCHANGE

2    MAIL?

3    A.   YOU COULD DO IT THAT WAY TOO, YES.

4    Q.   ALL RIGHT.  DID YOU ALSO LOOK AT THE CODE FOR THE EXCHANGE

5    CALENDAR SYNC ADAPTER AND THE EXCHANGE CONTACTS SYNC ADAPTER?

6    A.   I DID.

7    Q.   AND CAN YOU EXPLAIN WHAT IT'S FRAMEWORK WAS USING THE

8    DESCRIPTION YOU'VE ALREADY GIVEN THE JURY FOR THE EXCHANGE

9    CALENDAR SYNC ADAPTER?

10   A.   SURE.  SO THE STRUCTURE IS QUITE SIMILAR ACROSS ALL THREE

11   OF THE EXCHANGE SYNC ADAPTERS, SO THE CODE HAS THE SAME SORT OF

12   STRUCTURE, IT DOES THE SAME THING, BUT CRITICALLY THE PART

13   WHERE WE SAW WHERE IT WAS CONFIGURED TO SYNCHRONIZE MAIL, IF

14   YOU LOOK AT THE CODE, IT'S DIFFERENT CODE AND IT'S CONFIGURED

15   TO SYNCHRONIZE CALENDAR OR IT'S CONFIGURED TO SYNCHRONIZE

16   CONTACTS AND THEN IT GOES ON AND CAUSES SYNCHRONIZATION TO

17   OCCUR.

18   Q.   ONE LAST THING ABOUT THE INFRINGEMENT ANALYSIS.  YOU

19   ANALYZED SOME TABLETS FOR YOUR INFRINGEMENT ANALYSIS IN THE

20   CASE; CORRECT?

21   A.   YES.

22   Q.   DID YOU LOOK AT EXHIBITS THAT HAVE BEEN MARKED AS JX 36,

23   A, B, C, D, AND E.  IT'S THE TABLETS THAT I HAVE IN MY HAND.

24        IF I COULD APPROACH, YOUR HONOR?

25            THE COURT:  YES.

```
1     BY MS. KREVANS:

2     Q.   ARE THOSE THE TABLETS YOU ANALYZED?

3     A.   THEY ALL HAVE STICKERS ON THE BACK THAT HELPS ME IDENTIFY

4     THEM.

5          BUT, YES, THESE ALL DO APPEAR TO BE THE TABLETS THAT I

6     ANALYZED, YES.

7               MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

8     JX 36A, B, C, D, AND E, WHICH ARE ACCUSED GALAXY TAB PRODUCTS

9     IN THE CASE.

10              THE COURT:  ANY OBJECTION?

11              MR. NELSON:  NO OBJECTION, YOUR HONOR.

12              THE COURT:  ALL RIGHT.  THOSE ARE ADMITTED.

13         (PLAINTIFF'S EXHIBIT JX 36A, B, C, D, AND E WERE ADMITTED

14    IN EVIDENCE.)

15              THE COURT:  SO THAT'S 36A, B, C, D, AND E?

16              MS. KREVANS:  CORRECT.

17              THE COURT:  OKAY.  AND ARE THOSE ALL TAB 2 10.1'S?

18              MS. KREVANS:  YES, YOUR HONOR.

19              THE COURT:  OKAY.  THANK YOU.

20    BY MS. KREVANS:

21    Q.   DR. SNOEREN, DID YOU SEE, IN THE COURSE OF YOUR WORK IN

22    THIS CASE, ANY DOCUMENTS THAT WERE SAMSUNG INTERNAL DOCUMENTS

23    FOCUSSED ON THE ISSUE OF BACKGROUND SYNC CAPABILITY ON MOBILE

24    PHONES?

25    A.   YES, MA'AM, I DID.
```

1    Q.   COULD YOU LOOK AT EXHIBIT 115, AND THAT SHOULD, AGAIN, BE

2    IN VOLUME 1 OF THOSE MANY BINDERS THAT WE'VE GIVEN YOU.

3    A.   THANK YOU.  I HAVE IT HERE.

4    Q.   WHAT IS EXHIBIT 115?

5    A.   SO THIS IS A TRANSLATION OF AN E-MAIL BETWEEN VARIOUS

6    SAMSUNG EMPLOYEES DATED NOVEMBER 5TH, 2009.

7             MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

8    115.

9             THE COURT:  ANY OBJECTION?

10            THE CLERK:  THAT'S 150?

11            MS. KREVANS:  115.

12            MR. NELSON:  NO OBJECTION, YOUR HONOR.

13            THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

14       (PLAINTIFF'S EXHIBIT 115 WAS ADMITTED IN EVIDENCE.)

15            THE COURT:  GO AHEAD, PLEASE.

16   BY MS. KREVANS:

17   Q.   BRIEFLY, WHAT IS EXHIBIT 115?  WHAT'S THE CONTENT OF THIS

18   DOCUMENT?

19   A.   WELL, IN THE E-MAIL IT HAS A CHART WHICH IS BASICALLY

20   LISTING DIFFERENT FEATURES THAT THEY'RE APPARENTLY CONSIDERING

21   FOR ONE OF THEIR PHONES.

22   Q.   AND THE PHONE THAT THEY WERE TALKING ABOUT IN THIS E-MAIL

23   IS NOT ONE OF THE ACCUSED PHONES IN THIS CASE?

24   A.   NO.  AT THE BEGINNING OF THE E-MAIL, THIS IS WITH RESPECT

25   TO SYNC CON 2.5 G MAYON.

1    Q.   SO THIS IS NOT A PHONE THAT WAS RUNNING ANY OF THE

2    VERSIONS OF THE ANDROID CODE THAT'S ON THE SAMSUNG PHONES THAT

3    ARE ACCUSED IN THIS CASE?

4    A.   I DON'T BELIEVE SO.

5    Q.   ALL RIGHT.  COULD YOU LOOK AT PAGE 2 OF THE EXHIBIT.  IF

6    WE COULD SHOW -- I'M SORRY.  IT'S PAGE 3 OF THE EXHIBIT,

7    MR. LEE.  I APOLOGIZE.  IF WE COULD SHOW THE BOTTOM TWO ROWS IN

8    THIS SORT OF PASTED TOGETHER CHART.

9         WHAT DOES THE SECOND ROW BOX SHOW, THE ONES ON THE TOP OF

10   THE SCREEN RIGHT NOW?

11   A.   AS YOU CAN SEE, THERE ARE A NUMBER OF CELLS, BUT STARTING

12   FROM THE LEFT, FIRST IT SAYS MANDATORY, AND THEN IT SAYS ACCESS

13   TO PHONEBOOK WHILE SYNC IN PROGRESS, AND THEN IT GOES ON TO SAY

14   USER MUST BE ABLE TO ACCESS PHONEBOOK TO MAKE M-O CALLS OR SEND

15   MESSAGES WHILE ANY TYPE OF SYNC IS IN PROGRESS.

16   Q.   AND WHAT DOES IT SAY TO THE RIGHT OF THAT IN THE COMMENT

17   THAT STARTS WITH DB?

18   A.   SO IT SAYS DB HAS A LIMITATION FOR CONCURRENT OPERATION.

19        AND I WOULD ASSUME BY DB IT MEANS DATABASE.

20   Q.   AND WHAT DOES IT SAY IN THE VERY FAR RIGHT COLUMN?

21   A.   IT SAYS THIS MUST BE SUPPORTED FOR NEXT DEVICE/PLATFORM.

22   Q.   LET'S LOOK AT THE ROW RIGHT UNDERNEATH THAT AND EXPLAIN

23   WHAT'S SET OUT IN THIS BOTTOM ROW ON THE PAGE?

24   A.   SO, AGAIN, STARTING FROM THE LEFT, IT SAYS MANDATORY.  IT

25   SAYS EDIT FUNCTIONALITY OF PHONEBOOK WHILE SYNCING.

1      Q.   AND I'M SORRY, MR. LEE.   COULD YOU PUT BACK UP THE BOTTOM

2      TWO-THIRDS SO WE CAN SEE BOTH OF THOSE AT THE SAME TIME?

3           SO THE ONE YOU JUST EXPLAINED WAS ACCESS TO THE PHONE

4      BOOK?

5      A.   THAT WAS THE FIRST ONE.

6      Q.   THIS WAS EDIT FUNCTIONALITY IN THE PHONEBOOK?

7      A.   YES, MA'AM.

8      Q.   WHAT'S THE DIFFERENCE BETWEEN EDIT AND ACCESS?

9      A.   WELL, I THINK THE PLAIN LANGUAGE IS ACCESS IS JUST VIEWING

10     AND EDITING MEANS ALLOWED TO MAKE CHANGES.

11     Q.   OKAY.   WHAT DOES IT SAY IN THE COLUMN TO THE RIGHT OF

12     WHERE IT SAYS EDIT FUNCTIONALITY OF PHONEBOOK WHILE SYNCING?

13     A.   USER MUST NOT ABLE TO EDIT, DELETE OR CREATE NEW CONTACT

14     WHILE SYNC IS IN PROGRESS.   THESE FIELDS MUST BE GRAYED OUT

15     AND/OR MADE INACCESSIBLE WHILE A SYNC IS IN PROGRESS, SORRY,

16     SYNC SESSION IS IN PROGRESS.

17     Q.   AND THEN TO THE RIGHT OF THAT AGAIN, IT SAYS DB HAS A

18     LIMITATION FOR CONCURRENT OPERATION?

19     A.   YES, MA'AM.

20     Q.   AND THEN TO THE RIGHT AGAIN, THIS MUST BE SUPPORTED FOR

21     NEXT DEVICE/PLATFORM?

22     A.   YES, MA'AM.

23     Q.   WHAT WOULD BE A REASON THAT A DESIGNER OF SOFTWARE ON THE

24     PHONE WOULD GRAY OUT THE EDIT FIELDS OF A USER INTERFACE WHILE

25     A SYNC WAS IN PROCESS?

1    A.   WELL, AS WE'VE DISCUSSED, SYNCHRONIZATION IS A TECHNICALLY

2    CHALLENGING THING TO GET RIGHT, AND IF YOU DON'T HAVE IT ALL

3    WORKING PROPERLY, ALLOWING AN APPLICATION TO EDIT THE DATA

4    WHILE IT'S BEING SYNCHRONIZED WOULD LEAD TO CORRUPTION.  SO IF

5    YOU HAVEN'T GOT THAT FIXED, ONE WAY TO AVOID THAT FROM EVER

6    HAPPENING IS NOT ALLOWING THE APPLICATION TO EDIT THE DATA.

7    Q.   AND IF THAT'S THE SOLUTION YOU HAVE TO FIND FOR THIS

8    TECHNICAL PROBLEM, WHAT DOES THAT MEAN TO THE USER OF PHONE?

9    A.   WELL, THAT OBVIOUSLY RESTRICTS WHAT THEY CAN DO ON THE

10   PHONE.

11   Q.   OKAY.  LET'S MOVE TO A DIFFERENT TOPIC.  EXHIBITS 103 AND

12   104 IN THE BINDER IN FRONT OF YOU, WHAT ARE THOSE TWO

13   DOCUMENTS?

14   A.   SO THOSE ARE COPIES OF ACADEMIC PUBLICATIONS THAT HAVE

15   APPEARED IN PEER REVIEWED VENUES THAT ARE AUTHORED BY THE

16   EMPLOYEES OF GOOGLE.

17   Q.   AND DID YOU RELY ON THESE TWO DOCUMENTS FOR PURPOSES OF

18   FORMING YOUR OPINIONS?

19   A.   YES, I DID.

20        MS. KREVANS:  WE MOVE THE ADMISSION OF 103 AND 104,

21   YOUR HONOR.

22        MR. NELSON:  NO OBJECTION, YOUR HONOR.

23        THE COURT:  THEY'RE ADMITTED.

24   (PLAINTIFF'S EXHIBIT 103 AND 104 WERE ADMITTED IN

25   EVIDENCE.)

```
 1                THE COURT:  GO AHEAD, PLEASE.

 2     BY MS. KREVANS:

 3     Q.   FOR WHAT INFORMATION DID YOU RELY ON EXHIBITS 103 AND 104,

 4     DR. SNOEREN?

 5     A.   WELL, IT SAYS IN THESE EXHIBITS THAT GOOGLE, IN ORDER TO

 6     STORE THE E-MAIL INFORMATION, GMAIL, THEY STORE IT IN A

 7     DATABASE.

 8          SO THIS IS -- WHEN I NEEDED TO DETERMINE WHETHER THE SYNC

 9     ADAPTER WAS SYNCHRONIZING FROM A FIRST DATABASE TO A SECOND

10     DATABASE, IN THE CASE OF THE GMAIL SYNC ADAPTER, THIS IS THE

11     SECOND DATABASE LOCATED IN THE GOOGLE SERVERS.

12     Q.   OKAY.  NEW TOPIC.

13          ARE YOU AWARE THAT ANOTHER APPLE EXPERT IN THIS CASE,

14     DR. HAUSER, CONDUCTED A SURVEY OF CONSUMERS OF SMARTPHONE AND

15     TABLET USERS?

16     A.   YES, MA'AM, I AM.

17     Q.   AND HAVE YOU REVIEWED THE DESCRIPTIONS THAT DR. HAUSER

18     GAVE TO THE PEOPLE WHO TOOK THE SURVEY OF THE UNIVERSAL SEARCH

19     FEATURE OF CLAIM 25 OF THE '959 PATENT AND THE BACKGROUND SYNC

20     FEATURE OF CLAIM 20 OF THE '414 PATENT?

21     A.   YES, MA'AM, I HAVE.

22     Q.   AND STARTING WITH CLAIM 25 OF THE '959 PATENT, DID THE

23     DESCRIPTION THAT DR. HAUSER GAVE THE PEOPLE WHO TOOK HIS

24     SURVEY, IN YOUR VIEW, PROVIDE AN ACCURATE SUMMARY OF THE USER

25     EXPERIENCE OF THE UNIVERSAL SEARCH FEATURE OF CLAIM 25?
```

1     A.   YES, MA'AM.

2     Q.   AND DID THAT DESCRIPTION, IN YOUR VIEW, PROVIDE AN

3     ACCURATE SUMMARY OF THE USER'S EXPERIENCE OF THE UNIVERSAL

4     SEARCH FEATURE -- I'M SORRY -- OF THE BACKGROUND SYNC FEATURE

5     OF CLAIM 20 OF THE '414 PATENT?

6     A.   YES, MA'AM.

7     Q.   OKAY.  I'M REMINDED BY ONE OF MY COLLEAGUES THAT I FORGOT

8     TO ASK YOU ABOUT ONE LITTLE DETAIL HERE.

9          THE BOTTOM ROW OF YOUR SYNC ADAPTERS IN THE '414 PATENT,

10    THE EXCHANGE CODE THAT'S GOING TO SYNCHRONIZE WITH THE

11    MICROSOFT SYSTEM, FOR A SERVER USING THE MICROSOFT SYSTEM, DO

12    THOSE EXCHANGE SERVERS ON THE OTHER DEVICE END OF THAT SYSTEM

13    ALSO STORE STRUCTURED DATA IN A DATABASE?

14    A.   YES, MA'AM, THEY DO.

15    Q.   OKAY.  I'M GOING TO GO BACK TO THE '959 PATENT FOR A

16    MOMENT.

17         YOU TALKED EARLIER ABOUT HOW ALL OF THE ACCUSED PRODUCTS

18    IN THIS CASE INFRINGE THE UNIVERSAL SEARCH, CLAIM 25 OF THE

19    '959 PATENT.

20         WAS THERE A PERIOD OF TIME DURING THIS CASE WHEN SAMSUNG

21    TEMPORARILY REMOVED THE UNIVERSAL SEARCH FEATURE THAT YOU FOUND

22    INFRINGING FROM THE PHONES THAT IT WAS PUTTING OUT TO CUSTOMERS

23    IN THE UNITED STATES?

24    A.   YES, IN FACT, THERE WAS.

25    Q.   AND ABOUT WHEN DID THAT HAPPEN?

1    A.   I BELIEVE IT WAS AROUND JULY OF 2012.

2    Q.   AND HOW DO YOU KNOW THAT IN NEW PHONES THAT THEY WERE

3    SELLING STARTING AROUND THE MIDDLE OF 2012 THEY TOOK OUT THE

4    UNIVERSAL SEARCH FEATURE THAT YOU FOUND INFRINGED CLAIM 25?

5    A.   I LOOKED AT THE SOURCE CODE THAT SAMSUNG PROVIDED FOR

6    THOSE PHONES.

7    Q.   AND HAVE YOU SEEN DOCUMENTS ABOUT WHETHER THERE WAS

8    CONSUMER OR COMMENTATOR REACTION TO THE REMOVAL OF UNIVERSAL

9    SEARCH?

10   A.   I HAVE.

11   Q.   AND WHAT DID YOU SEE IN THOSE DOCUMENTS?

12   A.   I SAW USERS CONFUSED AND IN SOME CASES COMPLAINING ABOUT

13   THE FACT THAT THE FUNCTIONALITY THEY WERE EXPECTING, IN

14   PARTICULAR THE ABILITY TO USE THE UNIVERSAL SEARCH OR THE QUICK

15   SEARCH BOX TO SEARCH LOCAL INFORMATION, JUST SEEMED TO BE

16   MISSING OR HAD BEEN TAKEN AWAY.

17   Q.   DID THERE COME A POINT ALSO IN 2012 WHEN SAMSUNG PUT THAT

18   UNIVERSAL SEARCH FEATURE BACK INTO THE CODE AND THE

19   FUNCTIONALITY OF THE PHONES THAT IT WAS SELLING IN THE

20   UNITED STATES?

21   A.   YES, MA'AM, THEY DID.

22   Q.   AND ABOUT WHEN DID THAT HAPPEN?

23   A.   IT APPEARS TO HAVE STARTED ABOUT OCTOBER 2012.

24   Q.   SO A FEW MONTHS LATER?

25   A.   YES, MA'AM.

```
 1    Q.   AND WHEN SAMSUNG PUT THE UNIVERSAL SEARCH FEATURE BACK IN

 2    NEW PHONES IT WAS SELLING IN THE FALL OF 2012, DID THEY ALSO DO

 3    SOMETHING TO GIVE THAT UNIVERSAL SEARCH FEATURE BACK TO

 4    CUSTOMERS WHO HAD BOUGHT PHONES THAT SUMMER AND EARLY FALL THAT

 5    DIDN'T HAVE IT WHEN THE PHONE WAS SOLD?

 6    A.   YES, MA'AM.  THEY PUT OUT A SOFTWARE UPDATE WHICH CHANGED

 7    THE FUNCTIONALITY OF THOSE PHONES.

 8    Q.   CHANGED THE FUNCTIONALITY OF THOSE PHONES HOW?

 9    A.   TO, AS YOU SAY, TO PUT BACK THE ABILITY TO SEARCH LOCALLY

10    AS WELL IN THEIR UNIVERSAL SEARCH BOX.

11    Q.   OKAY.  JUST A COUPLE FINAL QUESTIONS.

12         DOES SAMSUNG MAKE EACH OF THE NINE ACCUSED PHONES AND THE

13    ACCUSED TABLET IN THIS CASE?

14    A.   I BELIEVE SO.

15    Q.   DOES SAMSUNG CHOOSE WHAT SOFTWARE TO PUT ON THOSE PHONES

16    AND THOSE TABLETS?

17    A.   YES, MA'AM.

18    Q.   AND IS IT SAMSUNG THAT SELLS THEM IN THE UNITED STATES?

19    A.   YES, MA'AM.

20         MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

21         THE COURT:  ALL RIGHT.  THE TIME IS NOW 4:08.

22    (PAUSE IN PROCEEDINGS.)

23         MR. NELSON:  MAY I PROCEED, YOUR HONOR.

24         THE COURT:  OKAY.  LET'S GO.  IT'S 4:09.  GO AHEAD,

25    PLEASE.
```

```
 1                        CROSS-EXAMINATION

 2    BY MR. NELSON:

 3    Q.   GOOD AFTERNOON, DR. SNOEREN.

 4    A.   GOOD AFTERNOON, SIR.

 5    Q.   MY NAME IS DAVE NELSON.  I'M ONE OF THE ATTORNEYS FOR

 6    SAMSUNG.

 7    A.   NICE TO MEET YOU.

 8    Q.   NICE TO MEET YOU AS WELL.

 9         SO I JUST HAVE A FEW QUESTIONS FOR YOU HERE.  LET'S FIRST

10    TALK ABOUT CLAIM 25 OF THE '959 PATENT, OKAY?

11         THE -- WE HAVE IT UP HERE.  BUT YOU HAVEN'T OFFERED ANY

12    OPINIONS THAT APPLE PRACTICES, WHAT IS IT, CLAIM 25 OF THE '959

13    PATENT; RIGHT?

14    A.   THAT'S CORRECT.

15    Q.   AND GO TO CLAIM 20 OF THE '414 PATENT.  YOU HAVEN'T

16    OFFERED ANY OPINIONS THAT APPLE PRACTICES CLAIM 20 OF THE '414

17    PATENT; RIGHT?

18    A.   THAT'S CORRECT.

19    Q.   SO NOW LET'S GO TO, BACK -- WE CAN GO BACK TO THE '959

20    PATENT, CLAIM 25.  LET'S PUT THAT UP.

21         NOW, BEFORE I START TALKING ABOUT SOME OF THE CLAIM

22    LANGUAGE HERE, ONE OF THE PHONES THAT YOU IDENTIFIED WAS THE

23    GALAXY NEXUS PHONE; RIGHT?

24    A.   YES, SIR, THAT'S CORRECT.

25    Q.   AND WHEN YOU WENT THROUGH -- AND I'M TALKING ABOUT CLAIM
```

1    25 NOW OF THE '959 PATENT -- AND TALKED ABOUT YOUR INFRINGEMENT

2    OPINIONS, YOU SAID THAT FOR PURPOSES OF YOUR ANALYSIS, ALL THE

3    PHONES FUNCTION THE SAME; RIGHT?

4    A.   I THINK I SAID THAT FOR THE PURPOSES OF THE ANALYSIS THAT

5    ANY CHANGES DIDN'T MATTER FOR THAT INFRINGEMENT ANALYSIS, YES.

6    Q.   RIGHT, EXACTLY.

7         NOW, YOU'RE AWARE THAT THE GALAXY NEXUS RAN ANDROID CODE

8    THAT WAS PURE GOOGLE; RIGHT?

9    A.   I'M NOT SURE I'M AWARE OF THE COMPLETE PROVENANCE OF ALL

10   THE SOFTWARE, BUT I WILL BELIEVE YOU IF YOU SAY THAT.

11   Q.   RIGHT.  YOU'VE HEARD THE CONCEPT OF ANDROID EXPERIENCE,

12   GOOGLE EXPERIENCE PHONES?

13   A.   I HAVE.

14   Q.   OKAY.  AND YOU UNDERSTAND THAT THE GALAXY NEXUS WAS ONE OF

15   THESE GOOGLE EXPERIENCE PHONES?

16   A.   I BELIEVE IT'S MARKETED THAT WAY, YES.

17   Q.   RIGHT.  AND PART OF THE IDEA OF THAT IS YOU DON'T MAKE ANY

18   CHANGES TO THE SOFTWARE; CORRECT?

19   A.   I DON'T KNOW WHAT THE MARKETING AGREEMENTS OR REQUIREMENTS

20   MAY BE TO USE THAT BRAND.

21   Q.   OKAY.  NOW, IF WE GO TO THE '414 PATENT AND CLAIM 20 OF

22   THE '414 PATENT, SAME BASIC SET OF QUESTIONS.

23        WHEN YOU WENT THROUGH YOUR ANALYSIS OF, I THINK, THE TEN

24   ACCUSED DEVICES, YOU SAID THAT THEY FUNCTIONED ALL PRETTY MUCH

25   THE SAME FOR PURPOSES OF YOUR ANALYSIS; RIGHT?

1    A.   THAT'S FAIR, YES.

2    Q.   AND ONE OF THOSE TEN PHONES THAT YOU LOOKED AT, I GUESS

3    THERE WERE A COUPLE TABLETS IN THERE, TOO, BUT TEN DEVICES, WAS

4    THE GALAXY NEXUS; CORRECT?

5    A.   YES, SIR.

6    Q.   SO YOU DIDN'T FIND ANY DIFFERENCES FOR PURPOSES OF EITHER

7    THE '959 OR THE '414 BETWEEN THE GALAXY NEXUS AND ANY OF THE

8    OTHER PHONES YOU LOOKED AT; RIGHT?

9    A.   NO, I WOULDN'T SAY THAT.  I THINK THAT THERE ARE

10   DIFFERENCES IN PARTICULAR FOR THE CONTACTS PROVIDER.  I CALLED

11   OUT QUITE A NUMBER OF THEM.

12        BUT I THINK THE POINT THAT YOU WERE GETTING AT IS THEY ALL

13   DO INFRINGE BECAUSE THE FUNDAMENTALS UNDERNEATH THEM ARE ALL

14   THE SAME, YES, SIR.

15   Q.   NOW, LET'S GO BACK TO CLAIM 25 OF THE '959 PATENT.

16        AND I WANT TO FOCUS IN HERE ON THIS LANGUAGE OF A

17   PLURALITY OF HEURISTICS TO LOCATE INFORMATION.  OKAY?

18        SO DID I UNDERSTAND YOU TO SAY THAT YOU NEED TO HAVE MORE

19   THAN ONE HEURISTIC TO LOCATE INFORMATION FROM SOME SOURCE?  IS

20   THAT RIGHT?

21   A.   YES, I BELIEVE THAT'S WHAT PLURALITY MEANS, YES, SIR.

22   Q.   SO THEN IF WE GO FURTHER DOWN, THAT TELLS YOU THAT AT

23   LEAST ONE OF THOSE PLURALITY OF LOCATIONS HAS TO INCLUDE THE

24   INTERNET; RIGHT?

25   A.   SORRY.  I WAS CONFUSED BY THE HIGHLIGHTING.

1    Q.   YEAH, THE HIGHLIGHTING.   OKAY.   LET ME ASK THAT AGAIN JUST

2    SO IT'S CLEAR.

3         SO IF I PICK UP RIGHT WHERE I LEFT OFF THERE, IN THE

4    PLURALITY OF LOCATIONS WHICH INCLUDE THE INTERNET AND LOCAL

5    STORAGE MEDIA, RIGHT?

6    A.   YES, SIR, THAT'S WHAT THAT SAYS.

7    Q.   SO ONE OF THE PLACES THAT YOU HAVE TO LOCATE INFORMATION

8    IS FROM THE INTERNET; RIGHT?

9    A.   YES, SIR.

10   Q.   AND ANOTHER PLACE IS FROM LOCAL STORAGE MEDIA; CORRECT?

11   A.   YES.

12   Q.   NOW, LET'S PUT UP -- AND I THINK WE'LL JUST DO THIS WITH

13   THE JURY LIKE WE'VE BEEN DOING JUST SO WE'RE CLEAR -- I BELIEVE

14   IT'S PDX 91-24.

15   A.   I'M SORRY.   OH.

16   Q.   IS IT ON YOUR SCREEN?

17   A.   YES, IT IS.

18   Q.   OKAY, GREAT.

19        IF YOU NEED TO LOOK AT SOMETHING ELSE, JUST LET ME KNOW.

20   A.   IF IT WAS IN A BINDER, I DIDN'T SEE IT.   SO THAT'S OKAY.

21   Q.   OKAY, GREAT.

22        NOW, I DON'T -- OH, IT CAN'T BE UP THERE, BUT I CAN SEE IT

23   RIGHT HERE.

24        SO THE FIRST ONE ALL THE WAY OVER TO THE LEFT, YOU HAVE

25   WHAT YOU CALL -- AND I'M JUST GOING TO USE YOUR TERMINOLOGY

CROSS SNOEREN

```
 1    JUST BECAUSE IT'S ON THE SLIDE, IT'S EASIER -- THE BROWSER

 2    MODULE; RIGHT?

 3    A.   YES, SIR.

 4    Q.   THAT LOCATES JUST INFORMATION LOCALLY; CORRECT?

 5    A.   IT USES THE LOCAL DATABASE TO RETURN ITS INFORMATION, SIR.

 6    Q.   AND THE CONTACTS MODULE, SAME, THAT'S JUST LOCAL

 7    INFORMATION; RIGHT?

 8    A.   SO, YES, IT'S LOCATING INFORMATION ON THE LOCAL DATABASE,

 9    YES.

10    Q.   AND THEN THE GOOGLE PLAY MUSIC MODULE THAT YOU HAVE,

11    THAT'S JUST LOCAL; RIGHT?

12    A.   THAT'S JUST CONSULTING THE LOCAL DATABASE, THAT'S CORRECT.

13    Q.   AND THEN IF WE GO TO THE LAST ONE, THE GOOGLE MODULE, YOU

14    SAY THAT THAT'S INFORMATION FROM LOCAL DATABASE, AS WELL AS THE

15    INTERNET; RIGHT?

16    A.   WELL, I JUST WANT TO BE CLEAR.  IT'S ALL INFORMATION FROM

17    THE INTERNET, BUT SOME OF IT HAD BEEN PREVIOUSLY DOWNLOADED

18    INTO A LOCAL DATABASE, YES.

19    Q.   RIGHT.  BUT THAT'S -- THAT'S -- IF IT'S -- IF SOMETHING IS

20    LOOKING FOR THAT, INFORMATION THAT WAS PREVIOUSLY DOWNLOADED,

21    THAT'S LOOKING AT INFORMATION THAT'S STORED LOCALLY; CORRECT?

22    A.   WELL, I THINK THAT THEN THERE ARE SOME TECHNICAL DETAILS,

23    AND I AGREE TECHNICALLY THE INFORMATION IS LOCALLY ON THE

24    PHONE.

25         BUT I THINK THE PURPOSE OF THE GOOGLE MODULE IS TO LOCATE
```

1    INFORMATION ON THE INTERNET, AND AS PART OF ITS RULE OF THUMB,

2    IT THINKS THAT, WELL, IF YOU'VE BEEN THERE BEFORE, IT'S MORE

3    LIKELY THAT YOU'D BE INTERESTED IN IT.

4        SO IT USES THE LOCAL MEMORY OF WHERE YOU'VE BEEN BEFORE TO

5    HELP REFINE THE SET OF LOCATIONS ON THE INTERNET THAT IT'S

6    GOING TO RETURN TO YOU.

7    Q.   SO LET'S BREAK THAT DOWN A LITTLE BIT.

8        SO THE -- YOU'RE NOT SAYING THAT A HEURISTIC TO LOOK AT

9    INFORMATION THAT'S PREVIOUSLY BEEN RETRIEVED AND STORED FROM

10   THE INTERNET IS SEARCHING, LOCATING INFORMATION ON THE

11   INTERNET; RIGHT?

12   A.   WELL, I THINK IT DEPENDS ON WHAT THAT HEURISTIC IS

13   ACTUALLY DOING AND WHY IT'S DOING THAT.  IS IT TASKED TO LOOK

14   AT A PARTICULAR LOCATION?  OR WAS IT TASKED TO LOOK ON THE

15   INTERNET?

16       AND I DON'T KNOW ANY REASON WHY, AS PART OF FINDING

17   LOCATIONS ON THE INTERNET, IT CAN'T OPERATE ON LOCAL MEMORY

18   BECAUSE, AFTER ALL, A HEURISTIC HAS TO RUN ON THE DEVICE AND SO

19   ANY DATA IT LOOKS AT HAS GOT TO BE LOCAL IN ORDER FOR IT TO

20   COMPUTE ON IT.

21   Q.   SO YOU'RE NOT SAYING THAT -- YOU MENTIONED THE GOOGLE

22   SUGGESTION SERVER?

23   A.   YES, SIR, I DID.

24   Q.   SO YOU'RE NOT SAYING THAT ANYTHING THE GOOGLE SUGGESTION

25   SERVER DOES IS SOMETHING THAT YOU'RE CLAIMING MEETS THE CLAIMS;

1    RIGHT?

2    A.   WELL, TO BE CLEAR, IT'S USING INFORMATION THAT COMES BACK

3    FROM THAT TO HELP MEET THE CLAIMS.

4    Q.   YEAH, THAT'S THE PART I'M LOOKING AT.

5    A.   OKAY.

6    Q.   AND THAT'S WHAT I'M TRYING TO BREAK DOWN.

7         SO YOU HAVE INFORMATION, RESULTS, THAT ARE RETURNED FROM

8    THE, THE GOOGLE SEARCH SERVER; RIGHT?

9    A.   YES, SIR.

10   Q.   SO THOSE COME BACK TO THE PHONE?

11   A.   YES, SIR.

12   Q.   YOU'RE NOT ACCUSING THE FUNCTIONALITY OF THE GOOGLE SEARCH

13   SERVER; RIGHT?

14   A.   I THINK THAT'S FAIR.

15   Q.   SO NOW WHAT YOU'RE -- WHAT YOU'RE SAYING IS THAT THE

16   INFORMATION FROM THE INTERNET IS THE RESULTS THAT HAVE BEEN

17   RETURNED FROM THE GOOGLE SEARCH SERVER; RIGHT?

18   A.   YEAH, I THINK THAT'S REASONABLE, YES.

19   Q.   OKAY.  AND EVERYTHING ELSE YOU'RE SAYING IS LOCAL

20   INFORMATION; CORRECT?

21   A.   NO.  SO YOU COULD HAVE GOTTEN INFORMATION FROM THE

22   INTERNET PREVIOUSLY, NOT JUST AT THAT MOMENT.  AND SO I THINK

23   THAT -- MAYBE THAT'S THE CONFUSION, AND I APOLOGIZE.

24   Q.   WELL, NO, THAT'S THE PART THAT I'M ACTUALLY TRYING TO

25   CLARIFY.  SO I DON'T KNOW THAT IT'S NECESSARILY CONFUSION.  I'M

1        JUST TRYING TO GET AN UNDERSTANDING OF THIS.

2            SO THE -- BUT THE RESULTS THAT YOU'RE TALKING ABOUT THAT

3        MAY HAVE COME FROM THE INTERNET PREVIOUSLY, THOSE WOULD BE

4        STORED LOCALLY; RIGHT?

5        A.   THEY MAY BE STORED OTHER PLACES, TOO.  I'M NOT SAYING THAT

6        THEY'RE NOT.  BUT, YEAH, THERE'S -- AS PART OF THIS

7        IMPLEMENTING THE RULE OF THUMB, THE GOOGLE MODULE DOES KEEP

8        TRACK OF WHERE YOU'VE BEEN PREVIOUSLY SO IT CAN GIVE YOU BETTER

9        ANSWERS, ABSOLUTELY.

10       Q.   AND THAT INFORMATION IS STORED LOCALLY; CORRECT?

11       A.   YES.

12       Q.   SO THAT INFORMATION IS STORED LOCALLY.  THE INFORMATION

13       FROM THE GOOGLE SEARCH SERVER YOU'RE NOT ACCUSING THE

14       FUNCTIONALITY OF THE GOOGLE SEARCH SERVER FINDING INFORMATION

15       ON THE INTERNET; RIGHT?

16       A.   AND, AGAIN, I JUST WANT TO BE CLEAR.  I'M NOT TRYING TO BE

17       ARGUMENTATIVE.

18           I DO DEPEND ON THAT INFORMATION, BUT HOW THE GOOGLE SERVER

19       GOT IT, WHICH I THINK MAYBE WAS YOUR QUESTION, THAT'S A

20       SEPARATE ISSUE, YOU'RE CORRECT.

21       Q.   RIGHT.  SO THOSE ARE SIMPLY RESULTS THAT HAVE BEEN

22       RETURNED?

23       A.   FROM THE INTERNET, YES, SIR.

24       Q.   RIGHT.  BUT THE GOOGLE MODULE IS NOT GOING OUT ON THE

25       INTERNET AND FINDING THAT INFORMATION; CORRECT?

1    A.   I -- I APOLOGIZE.  I THOUGHT WE JUST SAID THIS.

2         SO THE GOOGLE SEARCH SUGGESTION SERVER IS ON THE INTERNET,

3    SO THE GOOGLE MODULE DID GO TO THE INTERNET TO TALK TO THE

4    GOOGLE SUGGESTION SERVER TO GET THOSE ANSWERS.  SO THOSE

5    ANSWERS WERE ON THE INTERNET, AND THE MODULE WENT AND GOT THEM

6    FROM THE INTERNET.

7    Q.   WELL, IT'S THE GOOGLE SEARCH SERVER THAT FOUND THE

8    INFORMATION; CORRECT?

9    A.   WELL, THE -- IT'S A LITTLE CONFUSING, AND I UNDERSTAND IT

10   AND I JUST WANT TO MAKE SURE THAT THE JURY IS FOLLOWING THIS AS

11   WELL.

12        YOU'RE RIGHT, THE GOOGLE SEARCH SERVER, AND I'M NOT SURE

13   ENTIRELY HOW IT ALL WORKS, BUT I THINK WE'VE ALL USED IT,

14   GOOGLE CRAWLS THE INTERNET AND COLLECTS INFORMATION, AND THAT

15   MAY BE WHAT YOU'RE REFERRING TO.

16        AND HOW THAT ALL WORKS IS, YOU'RE RIGHT, SEPARATE FROM

17   THIS PATENT AND THIS CLAIM.

18        THE ISSUE IS, ONCE IT'S GOT WHATEVER ANSWER IT'S GOING TO

19   GIVE YOU, WHETHER IT'S, YOU KNOW, WHO CARES WHAT IT IS, THAT

20   INFORMATION I THINK WE ALL STILL UNDERSTAND IS ON THE INTERNET.

21   IT'S ON A GOOGLE SEARCH SERVER ON THE INTERNET.

22        NOW, THE PHONE GOES AND TALKS TO THAT SEARCH SUGGESTION

23   SERVER.  SO THE PHONE GOES AND LOCATES INFORMATION ON THE

24   INTERNET.

25   Q.   WELL, IT SEES INFORMATION THAT THE GOOGLE SEARCH SERVER

```
1    GIVES IT, IS THAT WHAT YOU'RE SAYING, RIGHT?

2    A.   YEAH, YEAH, GOES AND TALKS TO THE GOOGLE SEARCH SERVER AND

3    GETS THE INFORMATION BACK.

4    Q.   BUT IT DIDN'T ACTUALLY DO THE SEARCHING OF THE INTERNET;

5    RIGHT?

6    A.   AH, OKAY.  SORRY.  GOT IT.

7         SO THE CLAIM DOESN'T HAVE TO SAY YOU SEARCHED THE

8    INTERNET, BECAUSE THAT'S A TALL TASK.  THAT'S IF GOOGLE IS SO

9    SUCCESSFUL.

10        THE CLAIM JUST REQUIRES THAT YOU HAVE TO GO SEARCH A

11   LOCATION ON THE INTERNET, AND SO THE LOCATION THAT THE GOOGLE

12   MODULE WAS TALKING TO IS THE GOOGLE SEARCH SUGGESTION SERVER,

13   WHICH IS ON THE INTERNET.

14   Q.   ALL RIGHT.  SO NOW LET'S TALK ABOUT -- BRIEFLY YOU

15   MENTIONED THE SURVEY FROM DR. HAUSER CONCERNING THE '959

16   PATENT?

17   A.   OKAY.

18   Q.   DO YOU RECALL THAT?

19   A.   YES, SIR.

20   Q.   YOU DIDN'T PROVIDE THE DESCRIPTION; CORRECT?

21   A.   NO, SIR.

22   Q.   AND YOU DIDN'T TALK TO DR. HAUSER ABOUT THAT SURVEY BEFORE

23   IT WAS DONE; CORRECT?

24   A.   NO, SIR.

25   Q.   NOW, LET'S MOVE ON AND LET'S TALK ABOUT THE '414 PATENT
```

1        FOR A MOMENT.

2              SO THE '414 PATENT, LET'S PUT UP CLAIM 11, AND I WANT TO

3        FOCUS IN ON THIS LANGUAGE IN THE LAST ELEMENT FIRST OF CLAIM 11

4        AND THEN WE'LL SEE WHERE IT CARRIES OVER INTO CLAIM 20.  OKAY?

5        A.   OKAY.

6        Q.   SO YOU SEE THAT THE -- AND WE CAN HIGHLIGHT THIS -- THERE

7        IS A REQUIREMENT OF A SYNCHRONIZATION SOFTWARE COMPONENT WHICH

8        IS CONFIGURED TO SYNCHRONIZE THE STRUCTURED DATA FROM THE FIRST

9        DATABASE WITH THE STRUCTURED DATA FROM THE SECOND DATABASE;

10       RIGHT?

11       A.   I DO.

12       Q.   AND THEN IF WE PICK UP IN CLAIM 20, IT SAYS WRITTEN THE

13       SYNCHRONIZATION SOFTWARE COMPONENT IS CONFIGURED TO SYNCHRONIZE

14       STRUCTURED DATA OF A FIRST CLASS AND OTHER SYNCHRONIZATION

15       COMPONENTS ARE CONFIGURED TO SYNCHRONIZATION STRUCTURED DATA OF

16       OTHER CORRESPONDING DATA CLASSES; RIGHT?

17       A.   YES, SIR.

18       Q.   SO YOU UNDERSTAND THAT TO MEAN THAT THERE HAS TO BE A

19       SYNCHRONIZATION SOFTWARE COMPONENT EACH FOR SYNCHRONIZING THREE

20       DIFFERENT DATA CLASSES; CORRECT?

21       A.   YES, SIR.

22       Q.   SO YOU AGREE THAT IF YOU ONLY HAVE TWO, YOU DON'T INFRINGE

23       THIS PATENT; RIGHT?

24       A.   YES.

25       Q.   THIS PATENT IS A SPECIFIC ARCHITECTURE FOR DOING

```
1    SYNCHRONIZATION; CORRECT?

2    A.   YES.

3    Q.   IN FACT, IT'S AN ARCHITECTURE THAT APPLE ITSELF, WITH

4    RESPECT TO CLAIM 20, ACCORDING TO YOUR OPINIONS IN THE CASE,

5    DOESN'T IMPLEMENT; RIGHT?

6    A.   WELL, AGAIN, I HAVEN'T FORMED ANY OPINIONS.  I WASN'T

7    ASKED TO ANALYZE THAT.

8    Q.   OKAY.  SO -- NOW, LET'S GO TO YOUR PDX 91.43.  AND

9    AGAIN -- YOU HAVE IT ON YOUR SCREEN; RIGHT?

10   A.   YES, SIR.

11   Q.   SO LET ME FOCUS HERE ON WHAT YOU HAVE AS DATA CLASS 3.

12   YOU HAVE GMAIL SYNC ADAPTER REFERENCED THERE, AND YOU HAVE AN

13   EXCHANGE MAIL SYNC ADAPTER REFERENCED THERE; RIGHT?

14   A.   I DO.

15   Q.   NOW, IN -- AND YOU AGREE THAT THE MAIL DATA IS ONE DATA

16   CLASS; CORRECT?

17   A.   WELL, SO I JUST WANT TO BE CLEAR.  AGAIN, I DON'T WANT TO

18   CONFUSE ANYBODY.

19        I'VE SHOWN THREE DIFFERENT COLUMNS OF DATA CLASS.  THE WAY

20   THAT THE GMAIL DATA IS STRUCTURED IS ACTUALLY SLIGHTLY

21   DIFFERENT THAN THE WAY THE EXCHANGE MAIL IS STRUCTURED.  BUT

22   THEY'RE BOTH MAIL AND THEY'RE ENTIRELY THE SAME FROM CALENDAR

23   AND CONTACTS.  SO THEY'RE BOTH, YOU KNOW, A THIRD CLASS WITH

24   RESPECT TO THOSE OTHER TWO.  I MEAN, WE COULD GET INTO TALKING

25   ABOUT THE VERY DETAILS OF THOSE TWO, AND IF YOU WANTED TO
```

1   SUGGEST THAT THEY WERE ACTUALLY TWO SEPARATE CLASSES WITHIN

2   THEMSELVES, ONE WAS THE GMAIL CLASS AND ONE WAS THE EXCHANGE

3   MAIL CLASS, THAT ACTUALLY PROBABLY COULD BE TRUE, TOO.  I MEAN,

4   THERE ARE SLIGHT DIFFERENCES IN THE STRUCTURE, BUT THEY'RE BOTH

5   MAIL AND THEY'RE CERTAINLY NOT CALENDAR CONTACTS.

6   Q.   RIGHT.  AND FOR PURPOSES OF YOUR OPINIONS IN THE CASE, YOU

7   TREATED THOSE AS A SINGLE DATA CLASS; RIGHT?

8   A.   I THINK IN MY REPORT I CALLED THEM OUT SEPARATELY.  I

9   THINK FOR THE PURPOSE OF THIS DEMONSTRATIVE, JUST BECAUSE I

10  DIDN'T WANT TO GET INTO ALL THE DETAILS -- WE'VE GOT LOTS OF

11  DETAILS -- YEAH, I WAS JUST TRYING TO BE EFFICIENT.

12  Q.   AND YOU'RE SAYING THAT THE SYNC ADAPTERS ASSOCIATED

13  WITH -- AND LET'S JUST TAKE THE GMAIL APPLICATION FIRST --

14  PERFORMS THE SYNCHRONIZATION FUNCTION FOR THE GMAIL MAIL DATA;

15  RIGHT?

16  A.   YES.

17  Q.   NOW, YOU -- IT'S YOUR OPINION THAT THE SYNCHRONIZATION

18  SOFTWARE COMPONENTS, IN THIS CASE THE SYNC ADAPTERS, NEED TO

19  PERFORM CERTAIN FUNCTIONS IN ORDER TO DO SYNCHRONIZATION;

20  RIGHT?

21  A.   YES, SIR.  THEY HAVE TO DO EXACTLY WHAT'S SPECIFIED IN THE

22  CLAIM LIMITATIONS.  THAT'S PART OF THE INFRINGEMENT ANALYSIS.

23  Q.   RIGHT.  AND YOU SAY THAT THOSE SYNC ADAPTERS DETERMINE

24  WHAT LOCAL DATA IS NEW; RIGHT?

25  A.   NO.  I'M NOT SURE THAT THAT'S REQUIRED IN THE CLAIM.

1    Q.   WELL, LET'S LOOK AT -- LET'S LOOK AT PARAGRAPH 423 OF YOUR

2    OPENING REPORT?

3    A.   SURE.  I'M SORRY.  DO I HAVE THAT HERE OR WILL YOU DISPLAY

4    THAT FOR ME?

5    Q.   YEAH, YOU DO.  IT SHOULD BE -- I BELIEVE IT'S IN THE WHITE

6    BINDER.  IT SHOULD BE THE TAB OF 8-12-2013 EXPERT REPORT.

7    A.   OKAY.  I HAVE IT, YES.

8    Q.   OKAY.  SO YOU SEE "THE SYNC ADAPTERS ASSOCIATED WITH EACH

9    APPLICATION PERFORM SYNCHRONIZATION FUNCTIONS FOR THE DATA

10   ASSOCIATED WITH THOSE APPLICATIONS, INCLUDING DETERMINING WHAT

11   LOCAL DATA IS NEW, SENDING NEW OR MODIFIED DATA TO THE REMOTE

12   SERVICE, AND RECEIVING NEW OR MODIFIED DATA FROM THE REMOTE

13   SERVICE," RIGHT?

14   A.   YES, I DO SAY THAT AND THAT'S ABSOLUTELY TRUE.

15   Q.   OKAY.  SO YOU -- AND WE'LL TAKE THE GMAIL SYNC ADAPTER.

16   IT'S YOUR OPINION FROM YOUR ANALYSIS THAT THE GMAIL SYNC

17   ADAPTER DOES ALL THREE OF THOSE THINGS; CORRECT?

18   A.   YES.

19   Q.   NOW, BUT ISN'T IT THE CASE THAT FOR GMAIL, THAT THE GMAIL

20   SYNC ADAPTER DOESN'T PERFORM THOSE OPERATIONS THAT WE JUST

21   LISTED THERE ITSELF?

22   A.   WELL, I MEAN, WE WENT THROUGH THE CODE WITH THE JURY AND

23   THEN AS THEY SAW, THE CODE IS FAIRLY CONCISE AND SO WHAT IT

24   DOES IS IT ACTUALLY, LIKE ALL CODE, CALLS OTHER FUNCTIONS TO DO

25   ALL OF THE VARIOUS DETAILS.

1          AND SO IT DOES ACTUALLY DO EACH ONE OF THOSE THINGS, AND I

2    DON'T THINK THERE'S ANY DISAGREEMENT AMONG THE EXPERTS ABOUT

3    HOW THAT WORKS.

4          BUT YOU'RE RIGHT IF WHAT YOU'RE OBSERVING IS THAT IT

5    ACTUALLY MAKES CALLS TO OTHER FUNCTIONS IN ORDER TO GET IT ALL

6    DONE, ABSOLUTELY.

7    Q.   RIGHT.  IT ACTUALLY CALLS INTO ANOTHER CLASS OF CODE;

8    RIGHT?

9    A.   I THINK THERE ARE MANY.  THAT'S THE WAY THE CODE WORKS.

10   Q.   ONE OF THEM, FOR EXAMPLE, IS THE MAIL ENGINE CLASS;

11   CORRECT?

12   A.   YES, SIR, THAT'S THE CODE THAT WE WERE JUST TALKING ABOUT

13   WITH THE JURY ABOUT.

14         AND, AGAIN, JUST SO WE'RE CLEAR, THAT SYNC ADAPTER CALLS

15   THAT CODE AND IT MAKES ALL THAT HAPPEN JUST LIKE THE DOCUMENT

16   THAT WE DISCUSSED ABOUT THE GOOGLE SPECIFICATION.  THAT'S HOW

17   SYNC ADAPTERS WORK.  THEY MAKE IT ALL HAPPEN.

18   Q.   SO YOU'RE SAYING THAT WHAT YOU'RE CALLING THE SYNC ADAPTER

19   CALLS SOMETHING ELSE IN ORDER TO ACCESS THE DATA; CORRECT?

20   A.   YES, SIR.  AND AGAIN, ALL ANDROID CODE, YOU KNOW, AT SOME

21   LEVEL IS CALLING SOMETHING ELSE TO ACTUALLY GET THE JOB DONE.

22   IT'S JUST DIFFERENT LEVELS OF DETAIL.

23   Q.   RIGHT.  AND SIMILARLY, YOU KNOW, THE MAIL ENGINE, NOT THE

24   GMAIL SYNC ADAPTER, WOULD IMPLEMENT THE HANDLING OF THE GMAIL

25   SERVER RESPONSES; RIGHT?  IN OTHER WORDS, TO BRING THE DATA

```
1    FROM THE REMOTE DATABASE TO THE LOCAL DATABASE; RIGHT?

2    A.   I'M SORRY.  I JUST LOST YOUR QUESTION THERE.  I APOLOGIZE.

3    Q.   YEAH.  IT WOULD BE -- WE JUST TALKED ABOUT CALLING IT A

4    MAIL ENGINE CLASS?

5    A.   YES, WE DID.

6    Q.   SO IT WOULD BE THAT SAME MAIL ENGINE CLASS, ACCORDING TO

7    YOUR ANALYSIS, THAT HANDLES THE SERVER RESPONSES FROM THE

8    REMOTE DATABASE; CORRECT?

9    A.   AGAIN, JUST AS WE WENT THROUGH WITH THE JURY, THE SYNC

10   ADAPTER CALLS IN THE MAILING CLASS TO DO THAT JOB, YOU'RE

11   EXACTLY RIGHT.

12   Q.   NOW, LET'S TALK ABOUT THE -- I'M GOING TO MOVE TO -- CAN I

13   KEEP GOING OR --

14              THE COURT:  YOU CAN GO ANOTHER MINUTE.  I HAVE 4:30,

15   BUT YOU CAN ASK ANOTHER QUESTION IF IT'S SHORT.

16              MR. NELSON:  I'M ACTUALLY MOVING TO A NEW TOPIC.

17              THE COURT:  OH, OKAY.  THEN WHY DON'T WE GO AHEAD AND

18   END HERE IF THAT'S OKAY.

19              MR. NELSON:  THAT'S OKAY, YOUR HONOR.

20              THE COURT:  ALL RIGHT.  IT'S 4:30 NOW.  LET'S GO

21   AHEAD AND BREAK FOR THE DAY.  THANK YOU FOR YOUR PATIENCE AND

22   YOUR RESEARCH -- YOUR SERVICE.

23        (LAUGHTER.)

24              THE COURT:  PLEASE DON'T RESEARCH THE CASE.  NO

25   RESEARCH.  NO DISCUSSION.
```

1          OKAY.  WE'LL SEE YOU TOMORROW MORNING AT 9:00.  THANK YOU.

2              THE WITNESS:  I THOUGHT YOU WERE THANKING ME.

3              THE COURT:  NO.

4          (JURY OUT AT 4:31 P.M.)

5              THE COURT:  THE JURORS HAVE LEFT THE COURTROOM.  YOU

6     MAY STEP DOWN.

7          OKAY.  LET ME GIVE EVERYONE TIME TOTALS.

8          PLEASE TAKE A SEAT.

9          AND THERE ARE A COUPLE OF ISSUES THAT I WANTED TO DISCUSS.

10         ALL RIGHT.  TODAY APPLE USED 3 HOURS AND 52 MINUTES, SO

11    APPLE IN TOTAL HAS USED 7 HOURS AND 52 MINUTES.

12         TODAY SAMSUNG USED 1 HOUR AND 20 MINUTES, SO IN TOTAL,

13    SAMSUNG HAS USED 4 HOURS AND 23 MINUTES.  OKAY?

14         SO THOSE ARE YOUR TIME TOTALS THUS FAR.

15         SO LET ME UNDERSTAND WHAT IS HAPPENING WITH THE SOURCE

16    CODE.  ARE YOU -- I'D LIKE TO JUST GET THIS WRAPPED UP AS

17    QUICKLY AS POSSIBLE.  I ASSUME YOU KNOW WHAT YOUR EXPERT RELIED

18    ON FOR THEIR TESTIMONY.  CAN'T YOU PRODUCE THAT TODAY?

19             MS. KREVANS:  WE DO KNOW, BUT IT'S A -- THAT IS THE

20    BIG UNIVERSE --

21             THE COURT:  OKAY.

22             MS. KREVANS:  -- THAT THEY'VE SAID THEY DON'T WANT

23    ALL COMING IN.  SO WE HAVE TRIED TO NARROW IT DOWN SOMEWHAT,

24    AND WE ACTUALLY HAD GIVEN A COUPLE DAYS AGO A LIST OF BATES

25    NUMBERS OF CODE FOR PROFESSOR MOWRY TO SAMSUNG.  I WAS THINKING

1    SO THAT THEY COULD TELL US THEY WANTED THE COURTROOM ACTUALLY

2    CLOSED FOR THAT, AND WE'RE JUST CHECKING TO MAKE SURE THAT

3    EVERYTHING ON THAT LIST IS THE RIGHT BATES NUMBERS, AND WE'RE

4    GOING TO BE ABLE TO CONFIRM THAT BY EARLY THIS EVENING TO

5    SAMSUNG.

6        AND SO WE SHOULD BE ABLE TO HAVE THAT, AND THAT'S THE

7    BATES NUMBERS FOR THE CODE FOR DR. MOWRY.

8        SO THEY ACTUALLY ALREADY HAVE THE LIST.  WE JUST NEED TO

9    CONFIRM IT.  IF IT'S GOING TO BE THE THING THAT GOES IN ON

10   PAPER, WE WANT TO MAKE SURE THAT'S RIGHT.  AND I TALKED ABOUT

11   THAT EARLIER WITH SAMSUNG, AND WE'RE HOPING WE CAN GET THAT

12   DONE THIS EVENING BECAUSE THE WITNESS IN THEORY IS ON A PLANE

13   TOMORROW MORNING.  I'D HATE TO HAVE HIM COME BACK JUST TO SAY

14   HERE'S SOME CODE.

15           THE COURT:  WHAT ABOUT DR. SNOEREN?

16           MS. KREVANS:  SO FOR DR. SNOEREN IT'S A LITTLE MORE

17   COMPLICATED BECAUSE THE CODE THAT HE RELIED ON IN SOME CASES IS

18   CODE THAT WE'RE NOT ACTUALLY ALLOWED TO HAVE OURSELVES UNLESS

19   IT'S PRINTED OUT FOR US BY SAMSUNG AND IN SOME CASES BY GOOGLE,

20   AND SO WE HAD GIVEN A LIST OF FILE NAMES TO SAMSUNG BECAUSE

21   WE -- WE HAVE A LITTLE BIT OF IT THAT WE ALREADY HAVE ON PAPER,

22   SO WE HAVE BATES NUMBERS AND WE'VE GOT THAT AND WE'LL HAVE THAT

23   BY THIS EVENING.

24       FOR A NUMBER OF IT, WE DON'T HAVE IT ON PAPER.  WE DON'T

25   HAVE BATES NUMBERS BECAUSE THERE'S NO PAPER, AND WE DON'T HAVE

1    ELECTRONIC COPIES.

2         SO PER YOUR INSTRUCTION THIS MORNING, WE SENT AN E-MAIL

3    THIS AFTERNOON TO SAMSUNG WITH THE LIST OF FILE NAMES AND PATH

4    NAMES BECAUSE ONLY THEY CAN ACTUALLY PRINT THE CODE, AND UNTIL

5    THEY PRINT IT, IT WON'T HAVE A BATES NUMBER AND IT CAN'T BE

6    DELIVERED ON PAPER TO THE COURT.  SO WE'LL HAVE TO RELY ON THEM

7    TO ACTUALLY PRINT OUT WHAT WE SENT THEM.

8         MS. MAROULIS:  YOUR HONOR, WE DID RECEIVE THE REQUEST

9    WHILE WE WERE IN THE COURTROOM, SO WE'RE GOING TO REVIEW THAT

10   AND TRY TO PRINT IT OUT AS FAST AS WE CAN AND CONFIRM EITHER

11   TONIGHT OR TOMORROW.  I'VE NOT BEEN ABLE TO LOOK AT IT BECAUSE

12   I'VE BEEN HERE IN COURT.

13        MS. KREVANS:  SO I THINK WE ACTUALLY SHOULD BE OKAY

14   BECAUSE BETWEEN THE BATES NUMBERS WE HAVE THAT WE'VE GIVEN, AND

15   I THINK WE HAVE ONE MORE LITTLE SET OF BATES NUMBERS TO LET

16   THEM KNOW ABOUT, BUT THEY'RE NOT NEW, AND THEN THE FILE NAMES

17   WE'VE GIVEN THEM WHERE THEY NEED TO PRINT IT FOR THE COURT

18   BECAUSE WE DON'T HAVE IT ELECTRONICALLY AT ALL, WE SHOULD BE

19   DONE.

20        I JUST NEED TO HEAR BACK FROM SAMSUNG WHETHER THERE'S ANY

21   QUESTION FROM THEM ABOUT WHAT WE GAVE THEM IN TERMS OF FILE

22   NAMES AND PATHWAYS FOR THEM TO PRINT.

23        THE COURT:  OKAY.  WELL, I'D LIKE YOU TO RESOLVE THIS

24   TODAY, MEET AND CONFER IN PERSON IF THERE'S ANY DISPUTE, AND

25   I'D LIKE, BY TOMORROW MORNING AT 7:30, FOR YOU TO FILE

1    SOMETHING HOPEFULLY SAYING YOU'RE IN AGREEMENT AND YOU'RE JUST

2    GOING TO STIPULATE TO THOSE EXHIBITS GOING IN.

3            MS. KREVANS:  AND I THINK FOR MOWRY, WE BASICALLY --

4    WE JUST HAVE TO PROOFREAD THE LIST OF BATES NUMBERS WE SENT

5    THEM A COUPLE DAYS AGO.  I DON'T KNOW WHAT SAMSUNG'S PROCESS IS

6    FOR PRINTING OUT THIS CODE WHERE ONLY THEY HAVE IT, AND,

7    THEREFORE, WE'VE GIVEN THEM THE FILE NAMES AND PATHWAYS.

8            MS. MAROULIS:  YOUR HONOR, WE UNDERSTOOD YOU WE NEED

9    TO MEET TODAY AND FILE SOMETHING BY TOMORROW MORNING, AND WE

10   WILL DO THAT.

11           THE COURT:  JUST RESOLVE THAT.

12       OKAY.  IF YOU CAN'T RESOLVE IT, THEN I'LL PROBABLY JUST

13   ALLOW THE FILE NAMES TO BE COPIED ON THE DVD AND HAVE THE FILE

14   NAME -- THE FILES ON THE DVD ADMITTED.

15       I THOUGHT THAT YOUR REQUEST, MS. KREVANS, EARLIER WAS TO

16   HAVE THE ENTIRE JX ADMITTED INTO EVIDENCE, WHICH I'M NOT GOING

17   TO DO.  BUT IF YOU CAN'T REACH AGREEMENT ON SPECIFIC PAGES, I'M

18   JUST GOING TO ALLOW THE FILE NAMES IN.  OKAY.  SO I HOPE YOU

19   CAN REACH AGREEMENT.

20           MS. MAROULIS:  I'M SURE WE WILL, YOUR HONOR.

21           THE COURT:  OKAY, GOOD.  I ACTUALLY DON'T HAVE ANY

22   COPIES OF ANY OF THE DEMONSTRATIVES.  IN PREVIOUS TRIALS YOU

23   PROVIDED THAT IN WITNESS BINDERS.  IF YOU COULD DO THAT GOING

24   FORWARD, THAT WOULD BE A GREAT HELP.

25           MS. KREVANS:  WE WILL DO THAT, YOUR HONOR.

```
1              THE COURT:  OKAY.  THANK YOU.

2         I HAD A QUESTION ABOUT -- NOT THAT WE HAVE TO DECIDE THE

3    VERDICT FORM NOW, BUT THE '647 DID RAISE AN ISSUE, AND THAT IS

4    THERE ARE, YOU KNOW, THREE JX 29B, D, AND F VERSIONS OF THE

5    NEXUS THAT ARE NOT ACCUSED, CORRECT, FROM WHAT WE WENT THROUGH

6    TODAY, JX 32C OF S II IS NOT ACCUSED, JX 32C FOR THE S II IS

7    NOT ACCUSED, JX 33B FOR THE EPIC 4G TOUCH IS NOT ACCUSED,

8    JX 34C IS SKYROCKET AND JX 35K OF THE S III.

9              MS. KREVANS:  YOUR HONOR, MAY I ASK, ARE YOU TAKING

10   THAT FROM WHAT I PUT IN TODAY?

11             THE COURT:  YES.

12             MS. KREVANS:  THE REASON I DID NOT PUT IN EVERY

13   MODEL --

14             THE COURT:  YES.

15             MS. KREVANS:  -- IS BECAUSE YESTERDAY WITH

16   PROFESSOR COCKBURN, A NUMBER OF THE MODELS HAD ALREADY BEEN

17   INTRODUCED.

18             THE COURT:  OKAY.

19             MS. KREVANS:  SO THEY WERE ALREADY IN EVIDENCE.  SO I

20   WAS SIMPLY PUTTING INTO EVIDENCE THE ACCUSED PHONES THROUGH

21   PROFESSOR MOWRY THAT HAD NOT PREVIOUSLY COME IN THROUGH

22   PROFESSOR COCKBURN BECAUSE HE LOOKED -- HE INTRODUCED A SMALLER

23   SUBSET OF PHONES.

24        AND THEN BECAUSE PROFESSOR MOWRY DIDN'T LOOK AT TABLETS,

25   THE LAST ACCUSED DEVICES TO GO IN WERE THE TABLETS THAT I JUST
```

```
 1        PUT IN --

 2                 THE COURT:  RIGHT.

 3                 MS. KREVANS:  -- THROUGH PROFESSOR SNOEREN.  SO IT

 4        WAS JUST -- THE ONLY REASON THOSE WERE SKIPPED IS BECAUSE THEY

 5        WERE ALREADY IN EVIDENCE.

 6                 THE COURT:  OKAY.  SO FOR THE VERDICT FORM AND WHAT

 7        YOU'RE ACTUALLY ACCUSING, YOU ARE ACCUSING THEN ALL VERSIONS

 8        OF -- I MEAN, THERE HAVE BEEN EXCLUSIONS EARLIER, YOU KNOW, THE

 9        PRIMARY JURY INSTRUCTIONS SAY ACCEPT CERTAIN RELEASES.

10            I WOULD LIKE THE VERDICT FORM TO BE REALLY CLEAR INSTEAD

11        OF JUST BROADLY GIVING THE TITLE OF A PRODUCT, LIKE S II, AND

12        JX 32.  IF THERE ARE CERTAIN VERSIONS OF JX 32 THAT ARE NOT

13        ACCUSED, I THINK THE VERDICT FORM NEEDS TO SPECIFY THAT IN CASE

14        THE JUROR, OR IF THE ENTIRE JURY WANTS TO ACTUALLY PLAY WITH

15        SOME OF THE PHONES THEMSELVES, IT WOULD BE HELPFUL FOR THEM TO

16        KNOW EXACTLY WHICH VERSIONS THEY'RE LOOKING AT FOR INFRINGEMENT

17        OR DAMAGES OR ANYTHING ELSE.

18                 MS. KREVANS:  WE'LL WORK ON GETTING A SPECIFIC LIST.

19            THERE WERE ALSO A COUPLE OF PHONES THAT WERE ORIGINALLY ON

20        THE JX LIST WHICH SOMEHOW, IN THE COURSE OF THE CASE,

21        INADVERTENTLY UPDATED AND SO WE'VE HAD TO TAKE THEM OFF.  BUT

22        THEY'RE DUPLICATES OF OTHER THINGS.

23                 MS. MAROULIS:  YOUR HONOR, I BELIEVE SAMSUNG'S

24        VERDICT FORM DOES DIFFERENTIATE BETWEEN THE VERSIONS, BUT WE'LL

25        CHECK.
```

1        THE COURT:  NO, IT ACTUALLY DOESN'T.  YOUR VERDICT

2    FORM DOESN'T EVEN HAVE A JX NUMBER MOST OF THE TIME, BUT THEN

3    LATER ON HAS A CERTAIN SECTION THAT HAS SPECIFIC RELEASE

4    NUMBERS AND NO DOT DESIGN AND SORT OF VERY SPECIFIC THINGS THAT

5    I WILL NEED TO ASK YOU ABOUT LATER BECAUSE I DON'T UNDERSTAND

6    WHAT THOSE MEAN.

7        I GUESS AT A MINIMUM I WOULD LIKE -- BECAUSE GOING THROUGH

8    YOUR PRETRIAL STATEMENT DOESN'T GIVE THIS LEVEL OF DETAIL, I

9    WOULD LIKE, AT A MINIMUM, A FILING OF WHAT EACH SIDE IS

10   ACCUSING, WHAT VERSIONS AND DO THEY CORRESPOND WITH SPECIFIC

11   JX VERSIONS OF A NUMBER.

12        MS. KREVANS:  WE WILL DO THAT, YOUR HONOR.

13        THE COURT:  DOES THAT MAKE SENSE?

14        MS. KREVANS:  YES.

15        THE COURT:  WHEN CAN YOU DO THAT?  IT WOULD JUST BE

16   HELPFUL FOR US GOING FORWARD IN KNOWING HOW TO RULE ON THE

17   EVIDENTIARY OBJECTIONS AND KNOWING HOW TO RULE ON THE CASE.

18   WHEN CAN YOU PROVIDE THAT?

19        MS. KREVANS:  WE WILL PROVIDE THAT BY WEDNESDAY

20   MORNING, YOUR HONOR.  WE WANT TO GO BACK AND CHECK EVERY PHONE

21   TO MAKE SURE, AND SOME OF THEM ARE NOW AT THE COURT.

22        I THINK WE CAN PUT THE LIST TOGETHER TONIGHT AND TRY TO

23   CHECK IT ON BREAKS TOMORROW BECAUSE EVERYTHING THAT'S BEEN

24   INTRODUCED WE NOW HAVE TO LEAVE HERE IN COURT, SO WE CAN'T WORK

25   ON THEM IN THE EVENINGS, PER THE COURT'S PRIOR INSTRUCTIONS.

```
1          SO WE HAVEN'T -- ALL THE DEVICES WE INTRODUCED TODAY --

2               THE COURT:  I GUESS I DON'T UNDERSTAND.  YOU STARTED

3    THE TRIAL WITHOUT KNOWING WHICH JX VERSIONS YOUR CLIENT IS

4    ACCUSING?  THAT MAKES NO SENSE TO ME.

5               MS. KREVANS:  NO, WE KNOW THAT, BUT WE WANT TO CHECK

6    THEM BACK BECAUSE WE WANT THE JX NUMBER ON THEM AND GIVE YOU A

7    LIST THAT IS ACCURATE BY JX NUMBER WITH THESE PHYSICAL

8    EXHIBITS.

9               THE COURT:  I STILL THINK THAT SHOULD HAVE BEEN DONE

10   BEFORE TRIAL, BUT IF YOU NEED TO DO IT, THAT'S FINE.

11        LET ME HEAR FROM SAMSUNG.  WHAT ABOUT YOU?

12        I WOULD JUST LIKE A VERY CLEAR -- NOW, WILL ALL OF YOUR

13   DIFFERENTIATIONS CORRESPOND WITH THE DIFFERENT VERSIONS OF THE

14   JX NUMBERS?

15              MS. MAROULIS:  I'M NOT SURE, YOUR HONOR.  LET ME JUST

16   CHECK.

17              THE COURT:  LIKE, CAN YOU CLEARLY DELINEATE, WE'RE

18   NOT ACCUSING, FOR EXAMPLE, JX 32C AND D, BUT WE ARE ACCUSING A,

19   B, AND E?

20              MS. KREVANS:  ABSOLUTELY, YOUR HONOR.

21              THE COURT:  OKAY.  CAN SAMSUNG MAKE THOSE

22   DISTINCTIONS WITH REGARD TO THE APPLE PRODUCTS?

23              MS. MAROULIS:  ABSOLUTELY, YOUR HONOR.

24        I WOULD POINT OUT, YOUR HONOR, FOR OUR PRODUCTS, IT'S

25   APPLE'S ACCUSATIONS SO THEY NEED TO CONFIRM WHICH ONES, BUT
```

1       WE'LL CONFER WITH THEM.

2              MS. KREVANS:  YOUR HONOR, THE ONE COMPLICATION HERE

3       IS NOT EVERY PHONE AND NOT EVERY VERSION IS ACCUSED OF

4       INFRINGING EVERY PATENT.

5              SO IT MAY BE THAT WE NEED TO MAKE A CHART THAT GOES TO THE

6       JURY BECAUSE THE LIST OF PHONES THAT ARE ACCUSED, FOR EXAMPLE,

7       THE '172 AND '721 PATENTS IS A SHORTER LIST THAN THE '647 AND

8       THE '647 LIST DOES NOT INCLUDE THE TABLETS.

9              SO WE HAVE A LIST OF ACCUSED DEVICES THAT'S COMPLETE, BUT

10      NOT EVERY ONE IS ACCUSED OF INFRINGING EVERY PATENT.

11             THE COURT:  SO IN THE VERDICT FORM WHERE YOU BREAK IT

12      DOWN BY PATENT, YOU SHOULD BE ABLE TO IDENTIFY THE EXACT

13      JX VERSIONS THAT ARE BEING ACCUSED OF EACH PATENT.

14             MS. KREVANS:  YES, THAT'S CORRECT, YOUR HONOR.  WE

15      CAN DO THAT BY PRESENTING IT IN CHART FORM.  THAT'S HOW WE DID

16      IT IN 1846 AS WELL.

17             THE COURT:  RIGHT.  WELL, THE CURRENT VERDICT FORM

18      PROPOSED BY APPLE JUST SAYS JX 29 AND DOESN'T SPECIFY WHICH

19      VERSIONS, AND SO THAT'S WHY I'M ASKING FOR THAT CLARIFICATION.

20             I DON'T WANT THE JURY TO BE MAKING ANY KIND OF ASSESSMENT

21      ON INFRINGEMENT OR DAMAGES ON VERSIONS THAT AREN'T EVEN

22      ACCUSED.  SO I'D LIKE THAT TO BE CLEAR.

23             MS. KREVANS:  WE WILL DO A NEW PROPOSED FORM THAT

24      CLARIFIES THAT, YOUR HONOR.

25             THE COURT:  OKAY.  SO WHEN AM I GOING TO GET YOUR NEW

```
 1     VERDICT FORMS?  YOU SAID WEDNESDAY MORNING?  THAT WOULD BE

 2     APRIL THE 9TH.

 3               MS. KREVANS:  IT WOULD BE APRIL 9TH, YOUR HONOR.

 4               THE COURT:  OKAY.  CAN I GET IT BY -- WHAT TIME?

 5               MS. KREVANS:  10:00 A.M.

 6               THE COURT:  THAT'S FINE.

 7          IS THAT OKAY WITH SAMSUNG?

 8               MS. MAROULIS:  YES, YOUR HONOR.

 9               THE COURT:  ALL RIGHT.  SO IF YOU COULD PLEASE GIVE

10     ME A NEW VERDICT FORM THAT SPECIFIES WHAT VERSIONS ARE BEING

11     ACCUSED FOR EACH PATENT, THAT WOULD BE HELPFUL.

12          NOW, ARE ANY OF THE PATENTS THAT ARE ASSERTED IN THIS CASE

13     CURRENTLY IN RE-EXAMINATION?

14               MS. MAROULIS:  YES, YOUR HONOR.  I BELIEVE '172 IS IN

15     RE-EXAMINATION, YOUR HONOR.

16               THE COURT:  OKAY.

17               MS. MAROULIS:  AND '647 AS WELL.

18               MS. KREVANS:  '647, YOUR HONOR, THE CLAIM THAT'S AT

19     ISSUE IN THIS CASE IS NOT IN RE-EXAM.

20          AS THE COURT MAY RECALL FROM THE MOTION IN LIMINE RULINGS,

21     THE CLAIM THAT'S AT ISSUE IN THIS CASE WAS ACTUALLY CONFIRMED

22     IN THE RE-EXAM.

23          THERE WERE SOME OTHER CLAIMS THAT WERE NOT, AND THERE'S AN

24     APPEAL ABOUT THOSE, BUT IT'S IRRELEVANT TO THIS CASE.

25          THE ONLY CLAIM IN THIS CASE THAT'S IN RE-EXAM IS CLAIM 18
```

1    OF THE '172 WHERE THERE IS SIMPLY AT THIS POINT JUST A

2    PRELIMINARY DECISION TO START RE-EXAMINATION AND NOTHING HAS

3    HAPPENED.

4          THE COURT:  OKAY.  SO YOU DON'T HAVE A FIRST OFFICE

5    ACTION ON THE '172?  DO YOU HAVE A FIRST OFFICE ACTION YET?

6          MS. MAROULIS:  IT'S DECLARED.  THE RE-EXAM WAS

7    DECLARED.  SO IT WAS GRANTED.

8          MS. KREVANS:  BUT NO FIRST OFFICE ACTION, BUT I'LL

9    CHECK THIS EVENING.

10          THE COURT:  OKAY.  ALL RIGHT.  WELL, WHEN THE TIME

11    COMES, I WOULD LIKE TO KNOW WHY YOUR PROPOSED VERDICT FORM IS

12    PREFERABLE TO THE OTHER SIDE'S, AND SO WE CAN DEAL WITH THAT IN

13    MORE DETAIL LATER.

14       ANYTHING ELSE THAT WE SHOULD COVER TODAY?

15          MS. MAROULIS:  NOT FOR SAMSUNG, YOUR HONOR.

16          MS. KREVANS:  NOT FOR APPLE, YOUR HONOR.

17          THE COURT:  OKAY.  THANK YOU.  I'M GOING TO RETURN

18    THE USER GUIDES TODAY.

19       (THE EVENING RECESS WAS TAKEN AT 4:43 P.M.)

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16         IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076

17

18

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

20

21         DATED:  APRIL 7, 2014

22

23

24

25