1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5

6    APPLE INC., A CALIFORNIA        )  C-12-00630 LHK
     CORPORATION,                    )
                                     )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,            )
                                     )  APRIL 8, 2014
8         VS.                        )
                                     )  VOLUME 5
9    SAMSUNG ELECTRONICS CO., LTD.,  )
     A KOREAN BUSINESS ENTITY;       )  PAGES 1026-1276
10   SAMSUNG ELECTRONICS AMERICA,    )
     INC., A NEW YORK CORPORATION;   )
11   SAMSUNG TELECOMMUNICATIONS      )
     AMERICA, LLC, A DELAWARE        )
12   LIMITED LIABILITY COMPANY,      )
                                     )
13             DEFENDANTS.           )
     _____ )

14

15

16            TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
17           UNITED STATES DISTRICT JUDGE

18

19

20           APPEARANCES ON NEXT PAGE

21

22   OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR
                                  CERTIFICATE NUMBER 8074

24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

1

2     A P P E A R A N C E S:

3     FOR PLAINTIFF          MORRISON & FOERSTER
      APPLE:                 BY:  HAROLD J. MCELHINNY
4                                 RACHEL KREVANS
                             425 MARKET STREET
5                            SAN FRANCISCO, CALIFORNIA  94105

6

7                            WILMER, CUTLER, PICKERING,
                             HALE AND DORR
8                            BY:  WILLIAM F. LEE
                             60 STATE STREET
9                            BOSTON, MASSACHUSETTS  02109

10                           BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
11                           PALO ALTO, CALIFORNIA  94304

12

13    FOR SAMSUNG:           QUINN, EMANUEL, URQUHART & SULLIVAN
                             BY:  JOHN B. QUINN
14                                WILLIAM PRICE
                             865 S. FIGUEROA STREET, FLOOR 10
15                           LOS ANGELES, CALIFORNIA  90017

16                           BY:  VICTORIA F. MAROULIS
                                  KEVIN B. JOHNSON
17                           555 TWIN DOLPHIN DRIVE
                             SUITE 560
18                           REDWOOD SHORES, CALIFORNIA  94065

19

20

21

22

23

24

25

UNITED STATES COURT REPORTERS

1

2                        INDEX OF WITNESSES

3      PLAINTIFF'S

4      MARK ALEXANDER SNOEREN
            CROSS-EXAM BY MR. NELSON (RES.)      P. 1030
5
       JUN WON LEE
6           VIDEOTAPED DEPOSITION PLAYED         P. 1044 &
                                                    1045
7
       JUSTIN DENISON
8           VIDEOTAPED DEPOSITION PLAYED         P. 1048

9
       TIMOTHY SHEPPARD
10          VIDEOTAPED DEPOSITION PLAYED         P. 1050

11
       NICK DICARLO
12          VIDEOTAPED DEPOSITION PLAYED         P. 1050

13
       RORY SEXTON
14          DIRECT EXAM BY MR. LEE               P. 1051
            CROSS-EXAM BY MS. MAROULIS           P. 1061
15
       JOHN HAUSER
16          DIRECT EXAM BY MR. BENNETT           P. 1074
            CROSS-EXAM BY MR. PRICE              P. 1126
17          REDIRECT EXAM BY MR. BENNETT         P. 1193
            RECROSS-EXAM BY MR. PRICE            P. 1196
18
       CHRISTOPHER VELLTURO
19          DIRECT EXAM BY MR. BENNETT           P. 1198

20

21

22

23

24

25

1

2                          INDEX OF EXHIBITS

3                                MARKED        ADMITTED

4      PLAINTIFF'S

5      50A, 51A & 53A                           1041
       132 (PAGES 1-16 & 23)                    1044
6      128                                      1058
       139 & 140                                1103
7      141                                      1117
       142                                      1210
8      222A                                     1216
       223A                                     1216
9      147                                      1220
       145                                      1223
10     149                                      1227
       214                                      1233
11     154                                      1235
       156                                      1237
12     196                                      1255
       163                                      1258

13

14

       DEFENDANTS'
15
       415                                      1069
16     411                                      1070
       451                                      1071
17     502                                      1133
       I                          1148          1149
18

19

20

21

22

23

24

25

```
1    SAN JOSE, CALIFORNIA                    APRIL 8, 2014

2                    P R O C E E D I N G S

3         (JURY OUT AT 9:03 A.M.)

4              THE COURT:  GOOD MORNING.

5         (JURY IN AT 9:04 A.M.)

6              THE COURT:  PROFESSOR SNOEREN, WOULD YOU PLEASE TAKE

7    THE WITNESS STAND?

8         GOOD MORNING, WELCOME BACK.  PLEASE TAKE A SEAT.

9         MR. NELSON, IF YOU WOULD PLEASE COME FORWARD.

10        DR. SNOEREN, YOU'RE STILL UNDER OATH.

11        (MARK ALEXANDER SNOEREN, PLAINTIFF'S WITNESS, WAS

12   PREVIOUSLY SWORN.)

13             MR. NELSON:  THANK YOU, YOUR HONOR.

14             THE COURT:  TIME IS NOW 9:04.

15        GO AHEAD, PLEASE.

16             MR. NELSON:  THANK YOU, YOUR HONOR.

17                   CROSS-EXAMINATION (RESUMED)

18   BY MR. NELSON:

19   Q.   GOOD MORNING, PROFESSOR SNOEREN.

20   A.   GOOD MORNING.

21   Q.   I HAVE A FEW MORE QUESTIONS FOR YOU.

22        YESTERDAY YOU SAID THAT SAMSUNG HAD REMOVED THE UNIVERSAL

23   SEARCH FEATURE IN I THINK IT WAS AROUND JULY OF 2012.

24        DO YOU REMEMBER THAT?

25   A.   YES, I DO.
```

1     Q.    AND THEN IT WAS PUT BACK IN A FEW MONTHS LATER, OCTOBER OF

2     2012.

3           DO YOU REMEMBER THAT?

4     A.    YES, I DO.

5     Q.    I JUST WANT TO PUT SOME CONTEXT ON THAT.  YOU'RE AWARE

6     THAT THAT FEATURE WAS REMOVED IN RESPONSE TO THIS COURT ISSUING

7     A PRELIMINARY INJUNCTION ON A DIFFERENT PATENT, NOT THE '959

8     PATENT; RIGHT?

9     A.    I'M ACTUALLY NOT AWARE OF WHY IT WAS REMOVED.  I WAS GIVEN

10    SOURCE CODE AND CONFIRMED IT WAS REMOVED.

11    Q.    OKAY.  SO CAN WE LOOK AT YOUR OPENING REPORT?  I THINK YOU

12    HAVE IT IN FRONT OF YOU.  AND THIS WOULD BE PAGE 55 AND 56.  IT

13    LOOKS LIKE IT'S NOTE 59.

14    A.    I THINK I HAVE IT HERE, SIR.

15    Q.    SO YOU SEE THERE IN YOUR REPORT YOU SAY, "I UNDERSTAND

16    THIS WAS DONE IN RESPONSE TO THE COURT HAVING ISSUED A

17    PRELIMINARY INJUNCTION BASED ON THE FACT THAT THE QSB WAS

18    LIKELY TO INFRINGE CLAIM 6 OF THE '604 PATENT."

19          DO YOU SEE THAT?

20    A.    YES, SIR, I DO.

21    Q.    DOES THAT REFRESH YOUR RECOLLECTION THAT THAT WAS REMOVED

22    IN RESPONSE TO A PRELIMINARY INJUNCTION REGARDING A DIFFERENT

23    PATENT THAT'S NOT ASSERTED IN THIS CASE ANYMORE?

24    A.    THAT DOES APPEAR TO BE WHAT IT SAYS.  I APOLOGIZE.

25    Q.    OKAY.  THANKS.

CROSS SNOEREN

```
1              NOW, YOU'RE ALSO AWARE THAT IT WAS PUT BACK IN, THE

2     UNIVERSAL SEARCH FEATURE, AFTER THE APPEALS COURT MODIFIED THAT

3     INJUNCTION, OR REVERSED IT; RIGHT?

4              MS. KREVANS:  OBJECTION, YOUR HONOR.  THERE'S NO

5     FOUNDATION IN THE RECORD FOR THIS, AND WHEN --

6              THE COURT:  OVERRULED.

7         GO AHEAD, PLEASE.

8              MS. KREVANS:  YOUR HONOR, IF I MAY?  THERE WAS A

9     PRIVILEGE INSTRUCTION GIVEN TO WITNESSES WHEN THEY WERE ASKED

10    ABOUT WHY IT WAS PUT BACK IN.

11             THE COURT:  OVERRULED.

12        GO AHEAD, PLEASE.

13    BY MR. NELSON:

14    Q.   SO DO YOU -- DO YOU REMEMBER THE QUESTION?

15    A.   I DO.  I'M JUST -- SINCE YOU BROUGHT THIS UP, I JUST WANT

16    TO CHECK MY REPORT BECAUSE THERE ARE SOME DETAILS THAT AREN'T

17    TECHNICAL FACTS OF THE SOURCE CODE, AND AS YOU POINTED OUT, MY

18    MEMORY IS A LITTLE HAZY.

19    Q.   UNDERSTOOD.  IF I CAN HELP YOU OUT HERE.  IF YOU LOOK AT

20    PARAGRAPH 317 OF YOUR REPORT -- ACTUALLY, I THINK IT'S 316.  IT

21    SAYS 317 IN MY NOTE, BUT THEN I SEE THAT REPRODUCED IS 316.

22    A.   YES, SIR, I SEE THAT.

23    Q.   YOU SEE HERE IT SAYS, "FURTHER, DESPITE RECEIVING A

24    VERSION OF THE QUICK SEARCH BOX" -- NOW, THE QUICK SEARCH BOX,

25    I THINK YOU SAID YESTERDAY THAT WAS THE UNIVERSAL SEARCH
```

1    FEATURE?

2    A.   THAT'S ONE OF THE NAMES, YES, SIR.

3    Q.   -- "FROM GOOGLE THAT ONLY SENDS THE QUERY TO GOOGLE TO

4    CONDUCT THE SEARCH FOR THE QUERY ON THE INTERNET, AFTER THE

5    PRELIMINARY INJUNCTION AGAINST THE QSB BASED ON THE '604 PATENT

6    WAS LIFTED."

7         DO YOU SEE THAT?

8    A.   YES, I DO.

9    Q.   DOES THAT REFRESH YOUR RECOLLECTION?

10   A.   YES, AND I THINK THOSE STATEMENTS ARE CONSISTENT.

11   Q.   YEAH.  AND IF YOU LOOK AT PARAGRAPH 350 OF YOUR REPORT,

12   YOU'LL SEE THERE AT THE BOTTOM OF PARAGRAPH 350 THAT IT WAS --

13   THE UNIVERSAL SEARCH FEATURE WAS PUT BACK IN WHEN THE COURT OF

14   APPEALS, I THINK YOU USED THE WORD MODIFIED, LIFTED THE

15   PRELIMINARY INJUNCTION ON THAT '604 PATENT; RIGHT?

16   A.   THAT IS WHAT IT SAYS, YES, SIR.

17   Q.   ALL RIGHT.  NOW, LET ME TALK ABOUT THE SURVEY OF

18   PROFESSOR HAUSER.  I THINK WE TALKED ABOUT IT A LITTLE BIT

19   YESTERDAY WITH RESPECT TO THE '959 PATENT, BUT I WANT TO TALK

20   ABOUT IT WITH RESPECT TO THE '414 PATENT.

21        IS THAT OKAY?

22   A.   YES, SIR.

23   Q.   GREAT.  SO SIMILAR TO THE '959 PATENT, YOU DIDN'T WRITE

24   THE DESCRIPTION FOR THE '414 PATENT THAT WAS USED WITH THE

25   SURVEY; CORRECT?

1   A.   NO, SIR, I DID NOT.

2   Q.   AND YOU DIDN'T REVIEW IT BEFORE THE SURVEY WAS PROVIDED;

3   CORRECT?

4   A.   NO, SIR.

5   Q.   I THINK WE DIDN'T HEAR THAT ONE.

6   A.   NO, SIR, I DID NOT.

7   Q.   SO CAN WE PUT UP PTX 140?  I THINK IT'S AT PAGE 31.

8   THAT'S THE DESCRIPTION OF THE BACKGROUND SYNCING.

9        SO WE TALKED YESTERDAY -- WHAT'S AT ISSUE HERE IS CLAIM

10  20, RIGHT, OF THE '414 PATENT?

11  A.   YES, SIR.

12  Q.   AND I THINK WE TALKED YESTERDAY THAT YOU UNDERSTAND THAT

13  CLAIM 20 REQUIRES SYNCHRONIZATION OF THREE, WE CALLED THEM DATA

14  CLASSES YESTERDAY; RIGHT?

15  A.   THAT'S CORRECT.

16  Q.   RIGHT, THREE DIFFERENT TYPES OF DATA; RIGHT?

17  A.   YES, SIR.  YES, SIR.

18  Q.   THE MICROPHONE SEEMS TO CUT IN AND OUT SOMETIMES.  SORRY

19  ABOUT THAT.

20       SO YOU AGREE THEN, FOR EXAMPLE, IF YOU ONLY SYNC ONE TYPE

21  OF DATA, THAT THERE'S NO INFRINGEMENT OF CLAIM 20; RIGHT?

22  A.   PRECISELY.  FOR INFRINGEMENT PURPOSES, THAT'S EXACTLY

23  RIGHT.

24  Q.   AND SIMILARLY, WITH RESPECT TO THE SYNCHRONIZATION

25  SOFTWARE COMPONENT, THAT'S THE SOFTWARE THAT'S RESPONSIBLE

```
1    FOR -- THAT WE TALKED ABOUT YESTERDAY FOR DOING THE ACTUAL

2    SYNCHRONIZATION; RIGHT?

3    A.   WELL, I THINK THERE WAS SOME DISCUSSION ABOUT THAT.

4         I WANT TO BE CLEAR, IT'S MY POSITION THAT I'VE IDENTIFIED

5    SYNCHRONIZATION COMPONENTS THAT CAUSE THE SYNCHRONIZATION TO

6    OCCUR, ABSOLUTELY.

7    Q.   NO, NO, I UNDERSTAND THAT.

8         BUT YOU -- THERE'S GOT TO BE THREE OF WHATEVER YOU'RE

9    TALKING ABOUT; RIGHT?

10   A.   AT LEAST THREE, YES.

11   Q.   AT LEAST THREE, ONE DIFFERENT ONE FOR EACH DATA CLASS;

12   RIGHT?

13   A.   PRECISELY.  YES, SIR.

14   Q.   SO EVEN IF YOU ONLY HAVE TWO, THERE'S NO INFRINGEMENT;

15   RIGHT?

16   A.   AGAIN, THERE NEED TO BE THREE ON THE DEVICE TO INFRINGE,

17   YES, SIR.

18   Q.   SO LET'S TAKE A LOOK AT THIS SURVEY OF DR. HAUSER.  SO

19   HERE DOESN'T IT ONLY REFER TO CONTACTS DATA IN THE SURVEY?

20   A.   WELL, I THINK IT'S SHOWING CONTACTS DATA AS AN EXAMPLE OF

21   A CLASS OF DATA.

22   Q.   RIGHT.  BUT IT DOESN'T SHOW ANY OTHER EXAMPLES; RIGHT?

23   A.   IN THE TEXT, IT JUST CALLS OUT CONTACTS AS ONE OF THE

24   EXAMPLES, THAT'S CORRECT.

25   Q.   RIGHT.  AND IT DOESN'T SAY --
```

```
1        IT'S OKAY, YOUR HONOR?  I -- I THOUGHT YOU WERE -- I'M

2   SORRY.

3            THE COURT:  GO AHEAD, PLEASE.

4            MR. NELSON:  OKAY.

5   Q.   THE -- AND IT DOESN'T TALK ABOUT ANY SYNCHRONIZATION

6   SOFTWARE COMPONENTS, HAVING ONE FOR EACH DATA CLASS; RIGHT?

7   A.   WELL, I THINK THIS WAS INTENDED FOR A LAY AUDIENCE, AND SO

8   YOU'RE RIGHT, IT DOESN'T HAVE THE TECHNICAL DETAILS OF THE

9   PATENT LANGUAGE, ABSOLUTELY.

10  Q.   SO YOU DON'T THINK THAT A LAY PERSON WOULD UNDERSTAND

11  THOSE TECHNICAL DETAILS?  IS THAT WHAT YOU'RE SAYING?

12  A.   WELL, I'VE TRIED TO EXPLAIN THEM HERE AND I DON'T KNOW IF

13  I'VE DONE A GOOD JOB, I APOLOGIZE, BUT THEY'RE PRETTY

14  COMPLICATED.

15  Q.   YEAH.  I MEANT IN THE CONTEXT OF THIS SURVEY.

16  A.   YOU KNOW, I'M NOT AN EXPERT ON SURVEY DESIGN, SO I'M NOT

17  REALLY SURE WHAT THE RIGHT WAY TO DO IT IS FOR A SURVEY.

18       BUT I THINK THAT I SAID YESTERDAY, I DO THINK THAT THIS

19  FAIRLY REPRESENTS THE, THE ACCUSED DEVICES AND WHAT THEY

20  ACTUALLY DO WHICH, AS WE'VE DISCUSSED, DOES INFRINGE THE CLAIM.

21  Q.   WELL, BUT ISN'T IT THE CASE THAT -- IF YOU'RE SAYING THAT

22  THE LAY PERSON IN THIS SURVEY WOULDN'T UNDERSTAND THOSE

23  UNDERLYING TECHNICAL DETAILS THAT WE TALKED ABOUT, THAT THIS

24  ISN'T DRIVING THEIR PURCHASE OF THESE PHONES; RIGHT?

25  A.   WELL, I THINK THERE WERE TWO PARTS.  SO THE FIRST ONE, I
```

1     THINK WHAT I SAID IS A LAY PERSON -- AND THEY'RE VERY SMART

2     PEOPLE, SO MANY OF THEM MIGHT -- BUT I THINK IN GENERAL, THE

3     TECHNICAL DETAILS IN THE PATENT LANGUAGE ARE INVOLVED AND

4     PROBABLY NOT THE BEST WAY TO CONVEY IT TO A LAY PERSON.

5          BUT THOSE DETAILS DO HAVE IMPACT ON HOW THE DEVICE WORKS.

6     THAT'S WHY THERE'S VALUE IN IT.

7          SO I THINK WHAT DR. HAUSER WAS TRYING TO DO HERE -- OR I

8     APOLOGIZE -- WHAT THIS TEXT WAS TRYING TO DO WAS TO CONVEY WHAT

9     A USER WOULD SEE FROM A DEVICE THAT DID, IN FACT, DO ALL OF

10    THOSE THINGS THAT THE PATENT SAYS THAT IT SHOULD DO.

11         AND THEN, I APOLOGIZE, YOU HAD A SECOND PART OF YOUR

12    QUESTION AND I HAVE FORGOTTEN IT.

13    Q.   SO -- BUT JUST TO THAT POINT, THE SURVEY ONLY REFERS TO

14    ONE EXAMPLE OF ONE DATA CLASS; RIGHT?

15    A.   YES.  THE CONTACTS EXAMPLE, YES.

16    Q.   SO A SURVEY PARTICIPANT COULD SEE THAT AND THEY WOULDN'T

17    EVEN BE SEEING SOMETHING THAT EMBODIES THE INVENTION; RIGHT?

18    A.   NO, I DON'T THINK THAT'S WHAT IT SAID.  THEY DID SEE A

19    VIDEO AND I THINK THE VIDEO AND THE TEXT DOES FAIRLY DESCRIBE

20    THE EMBODIMENT OF THE INVENTION.

21         I THINK THAT THE TEXT HERE IS JUST TRYING TO BE SHORT AND

22    IT TALKS ABOUT THAT ONE CONTACTS DATA CLASS AS YOU POINT OUT.

23    Q.   SO YOU THINK IF A PRIOR ART DEVICE DOES SOMETHING THAT'S

24    LIKE IN THE VIDEO THAT DR. HAUSER USES, THEN THAT WOULD

25    INVALIDATE THE PATENT?

1    A.   NO.  I'M SORRY.  SO THIS -- AS I THOUGHT I MENTIONED, BUT

2    JUST SO I'M CLEAR, THIS TEXT I DON'T THINK ANYBODY IS OFFERING

3    TO CONDUCT AN INFRINGEMENT ANALYSIS.  I DEFINITELY DIDN'T USE

4    THIS FOR INFRINGEMENT OR VALIDITY, AND I AGREE WITH YOU

5    COMPLETELY, THAT WOULD NOT BE A PROPER WAY TO CONDUCT

6    INFRINGEMENT OR VALIDITY.

7        I THINK THIS TEXT WAS JUST FOR THE USERS IN A SURVEY,

8    WHICH I DON'T THINK THEY WERE TRYING TO DO VALIDITY.

9    Q.   SO YOU COULDN'T USE THIS TEXT IS WHAT YOU'RE SAYING TO

10   DISTINGUISH WHAT'S CLAIMED IN CLAIM 20 OF THE '414 PATENT FROM

11   ALTERNATIVES; CORRECT?

12   A.   WELL, THAT'S A DIFFERENT QUESTION.

13       SO I THINK WHAT THIS TEXT IS TRYING TO DO IS CONVEY WHAT

14   THE DEVICES THAT IMPLEMENT CLAIM 20 WOULD LOOK LIKE.

15       NOW, I KNOW THAT THERE ARE OTHER SYSTEMS THAT TRY TO

16   IMPLEMENT FEATURES LIKE WHAT'S IN CLAIM 20 IN DIFFERENT WAYS,

17   AND THOSE ALTERNATIVES WOULD HAVE SOME IMPACTS AND, IN FACT, IN

18   MY REPORT I TALK ABOUT A NUMBER OF THOSE SORTS OF THINGS AND

19   WHY THOSE IMPACTS WOULD BE VISIBLE.

20       SO WHILE YOU'RE RIGHT, IT DOESN'T USE THE LANGUAGE OF THE

21   PATENT, WHAT IT DOES, IT, I THINK FAIRLY EFFECTIVELY, CONVEYS

22   HOW THE DEVICE WOULD OPERATE BECAUSE IT'S USING THE PATENT.

23       AND AS YOU SAY, IF YOU HAD A DEVICE THAT USED SOME OTHER

24   TECHNIQUE, IN MY OPINION AND AS I'VE EXPLAINED IN MY REPORTS,

25   AT LEAST FOR THE TECHNIQUES THAT SAMSUNG HAS TALKED ABOUT, THEY

1    HAVE SIDE EFFECTS THAT WOULD MAKE IT ACT TO THE USER

2    DIFFERENTLY.

3        Q.   OKAY.  NOW, BUT YOU AGREE THAT THE '414 PATENT DOESN'T

4    COVER ALL WAYS OF DOING BACKGROUND SYNCING; RIGHT?

5        A.   IN THE GENERAL USE OF THAT TERM AS OPPOSED TO WHAT THE

6    '414 MEANS BY IT, YES.

7        Q.   RIGHT.  IT'S A PARTICULAR ARCHITECTURE FOR DOING IT;

8    RIGHT?

9        A.   IT'S A PARTICULAR WAY TO PROVIDE THOSE SET OF FEATURES,

10   YES.

11       Q.   AND SIMILARLY WITH RESPECT TO THE '959 PATENT -- SWITCHING

12   BACK TO THE '959 PATENT, THAT'S UNIVERSAL SEARCH -- YOU'RE NOT

13   SAYING THAT CLAIM 25 OF THE '959 PATENT COVERS ALL WAYS OF

14   DOING UNIVERSAL SEARCH; RIGHT?

15       A.   NO.  AS WE WERE JUST DISCUSSING, IF YOU DON'T SEARCH

16   UNIVERSALLY -- IF YOU TURN OFF LOCAL SEARCH, FOR EXAMPLE, AS WE

17   WERE JUST DISCUSSING, IT'S NOT COVERED BY THE PATENT.

18           BUT AS WE DISCUSSED, IT'S NOT AS GOOD BECAUSE IT'S NOT

19   SEARCHING ALL THOSE PLACES.

20       Q.   RIGHT.  BUT THERE -- IT'S A PARTICULAR ARCHITECTURE FOR

21   DOING UNIVERSAL SEARCH IN CLAIM 25 OF THE PATENT; RIGHT?

22       A.   IT'S ONE PARTICULAR TYPE OF UNIVERSAL SEARCH.  THERE MAY

23   BE OTHERS, YES.

24           MR. NELSON:  THANK YOU VERY MUCH.  I DON'T HAVE ANY

25   OTHER QUESTIONS.

```
1            THE COURT:  ALL RIGHT.  THE TIME IS NOW 9:16.

2        IS THERE ANY REDIRECT FOR THIS WITNESS?

3            MS. KREVANS:  THERE IS NOT, YOUR HONOR.  HE MAY BE

4    CALLED IN REBUTTAL IN THE CASE, BUT THERE IS NO REDIRECT AT

5    THIS TIME.

6            THE COURT:  ALL RIGHT.  DO YOU WANT TO MOVE IN

7    JX 50A, 51A, AND 53A AT THIS TIME?

8            MS. KREVANS:  WE DO, YOUR HONOR.

9            THE COURT:  OKAY.  GO AHEAD, PLEASE.

10           MS. KREVANS:  YOUR HONOR, WE MOVE THE ADMISSION OF

11   JX 50A, 51A, AND 53A.  THE CONTENTS OF THOSE EXHIBITS ARE

12   DESCRIBED IN CHARTS THAT WERE SUBMITTED TO THE COURT THIS

13   MORNING.

14       BECAUSE 50A AND 51A CONTAIN CODE THAT IS CONFIDENTIAL TO

15   SAMSUNG, THEY WILL BE PROVIDING THE ACTUAL PAGES THAT EMBODY

16   THE EXHIBIT TO THE COURT AND, AT AN AGREED UPON TIME AT THE END

17   OF THE TRIAL WHEN WE CHECK THE OTHER EXHIBITS TO MAKE SURE

18   THEY'RE COMPLETE, WE'LL BE CHECKING THOSE AS WELL.

19       BUT WE HAVE A STIPULATION AS TO THE CONTENT THAT IS

20   REFLECTED IN THE FILING WITH THE COURT.

21           THE COURT:  OKAY.  SO JUST FOR MY OWN EXHIBIT LIST,

22   WHICH WITNESS -- ARE THESE ALL COMING IN UNDER DR. SNOEREN?

23           MS. KREVANS:  THEY ARE COMING IN THROUGH DR. MOWRY

24   AND DR. SNOEREN.

25           THE COURT:  OKAY.  ALL THREE?
```

```
1        MS. KREVANS:  I HAVE TO GO BACK AND CHECK THE LISTS
2    TO KNOW THAT FOR SURE.
3        THE COURT:  OKAY.  ALL RIGHT.  TELL ME, WHOSE CODE IS
4    50?  I KNOW 53 IS THE OPEN SOURCE -- OH, NO, YOU'RE NOT
5    OFFERING 53 AT THIS TIME.
6        MS. KREVANS:  50 IS SAMSUNG CODE, SAMSUNG PROPRIETARY
7    CODE; 51A -- I SHOULD SAY 50A IS SAMSUNG PROPRIETARY CODE; 51A
8    IS SOME GOOGLE PROPRIETARY CODE THAT RUNS ON SAMSUNG PHONES;
9    AND 53A IS PORTIONS OF OPEN SOURCE ANDROID CODE.
10       THE COURT:  I THOUGHT YOU WERE MOVING 51 AND 52.
11       MS. KREVANS:  NO.
12       THE COURT:  YOU'RE ALSO MOVING 53?
13       MS. KREVANS:  NOT 52 AT ALL.  52 IS APPLE CODE THAT'S
14   NOT AT ISSUE.
15       THE COURT:  OKAY.  SO 53A IS OPEN SOURCE GOOGLE CODE?
16       MS. KREVANS:  OPEN SOURCE GOOGLE CODE.
17       THE COURT:  OKAY.  AND 50A IS UNDER SEAL AND 51A IS
18   UNDER SEAL, BUT 53A IS NOT?
19       MS. KREVANS:  THAT'S CORRECT, YOUR HONOR.  AND THIS
20   IS A JOINT MOTION FOR ADMISSION BY STIPULATION.
21       THE COURT:  ALL RIGHT.  ALL THREE ARE ADMITTED.
22       (PLAINTIFF'S EXHIBITS 50A, 51A AND 53A WERE ADMITTED IN
23   EVIDENCE.)
24       THE COURT:  YOU CAN LET ME KNOW LATER WHICH WITNESS I
25   SHOULD ATTRIBUTE THEM TO.
```

1    MS. KREVANS:  OKAY.  I BELIEVE THE ANSWER IS

2  PROFESSOR MOWRY FOR 50A AND 53A, AND PROFESSOR SNOEREN FOR ALL

3  THREE.

4    THE COURT:  OKAY.  SO 50 AND 53A FOR PROFESSOR MOWRY,

5  AND THEN PROFESSOR SNOEREN FOR ALL THREE?

6    MS. KREVANS:  CORRECT, YOUR HONOR.

7    THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

8    MS. KREVANS:  ALL RIGHT.  MAY THE WITNESS STEP DOWN?

9    THE COURT:  YES.  AND HE IS EXCUSED NOT SUBJECT TO

10  RECALL.

11    MS. KREVANS:  NOT SUBJECT TO RECALL IN OUR

12  CASE-IN-CHIEF, YES, YOUR HONOR.

13    THE COURT:  OKAY.  YOU'RE EXCUSED.

14    MR. MCELHINNY:  GOOD MORNING, YOUR HONOR.

15    THE COURT:  GOOD MORNING.

16    MR. MCELHINNY:  NEXT WE'D LIKE TO DO A COUPLE OF VERY

17  SHORT READ INS OF STIPULATIONS AND INTERROGATORY RESPONSES AND

18  PLAY A COUPLE OF SHORT DEPOSITION CLIPS.

19    THE COURT:  ALL RIGHT.  AND YOU'RE GOING TO TELL ME

20  HOW THE VIDEO CLIPS ARE DIVIDED IN TERMS OF TIME BETWEEN THE

21  TWO PARTIES?

22    MR. MCELHINNY:  I WILL, YOUR HONOR, AND WE WILL THEN

23  FILE -- WE WILL ALSO FILE TRANSCRIPTS FOR THE CLIPS SO THAT

24  MS. SHORTRIDGE DOESN'T HAVE TO RECORD THE DEPOSITIONS.

25    THE COURT:  THAT'S FINE.

```
 1             GO AHEAD, PLEASE.

 2             MR. MCELHINNY:  FIRST, YOUR HONOR, I WOULD LIKE TO

 3      READ IN A STIPULATION AND ORDER REGARDING OWNERSHIP OF THE

 4      PATENTS.

 5             GOOD MORNING.

 6             JUROR:  GOOD MORNING.

 7             MR. MCELHINNY:  AT THE BEGINNING OF THE COURT -- AT

 8      THE BEGINNING OF THE TRIAL, THE COURT TOLD YOU THAT THERE WERE

 9      VARIOUS FACTS THAT WERE STIPULATED AMONG THE PARTIES, AND I'M

10      GOING TO READ YOU ONE OF THOSE FACTS RIGHT NOW.

11             STIPULATION NUMBER 1.  IT IS STIPULATED THAT AT ALL TIMES

12      RELEVANT TO THIS LAWSUIT, APPLE IS AND HAS BEEN BOTH OWNER AND

13      ASSIGNEE OF THE PATENTS IT IS ASSERTING IN THIS CASE.

14             AT THIS TIME, YOUR HONOR, I WOULD LIKE TO READ IN A

15      STIPULATED -- AN UNDISPUTED FACT FROM THE JOINT PRETRIAL

16      STATEMENT, UNDISPUTED FACT NUMBER 13.

17             UNDISPUTED FACT NUMBER 13.  APPLE INFORMED SAMSUNG

18      ELECTRONICS COMPANY OF THE '647 PATENT ON AUGUST 4TH, 2010, AND

19      APPLE'S LAWSUIT INFORMED EACH SAMSUNG ENTITY OF ALL OF APPLE'S

20      ASSERTED PATENTS ON FEBRUARY 8TH, 2012.

21             AT THIS TIME, YOUR HONOR, WE WOULD LIKE TO CALL

22      MR. JUN WON LEE BY DEPOSITION.

23             AT THE TIME OF HIS DEPOSITION, MR. LEE WAS THE DIRECTOR OF

24      LICENSING FOR SAMSUNG ELECTRONICS CORPORATION.

25             ALSO, BEFORE WE PLAY THIS, YOUR HONOR, IN THE DEPOSITION,
```

```
1    MR. LEE REFERS TO A DOCUMENT WHICH IS MARKED EXHIBIT 1 TO HIS

2    DEPOSITION.

3          WE WOULD LIKE TO MOVE IT SO THAT IT'S IN EVIDENCE SO THE

4    JURY KNOWS WHAT IT IS.  WE WOULD LIKE TO MOVE IT INTO EVIDENCE

5    AT THIS TIME AS PLAINTIFF'S EXHIBIT 132.

6              THE COURT:  ALL RIGHT.  IS THERE ANY OBJECTION?

7              MR. MCELHINNY:  I'M SORRY.  TO BE CLEAR, WE ARE ONLY

8    MOVING IN PAGES 1 TO 16 AND 23.

9              THE COURT:  ALL RIGHT.

10             MS. MAROULIS:  NO OBJECTION, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  THANK YOU.

12       GIVE ME THAT NUMBER ONE MORE TIME.

13             MR. MCELHINNY:  I WILL, YOUR HONOR.  IT'S PX 132,

14   PAGES 1 TO 16 AND 23.

15        SO THAT WHEN THEY REFER TO EXHIBIT 1 IN THIS DEPOSITION

16   CLIP, IF YOU'RE INTERESTED, YOU WILL FIND IT IN THE JURY ROOM

17   AS PLAINTIFF'S EXHIBIT 132.

18             THE COURT:  IT'S ADMITTED.

19        (PLAINTIFF'S EXHIBIT 132, PAGES 1-16 AND 23, WAS ADMITTED

20   IN EVIDENCE.)

21             MR. MCELHINNY:  THANK YOU, YOUR HONOR.

22             THE COURT:  OKAY.  THE TIME IS 9:23.

23        GO AHEAD.

24        (THE VIDEOTAPED DEPOSITION OF JUN WON LEE WAS PLAYED IN

25   OPEN COURT OFF THE RECORD.)
```

```
 1          MS. MAROULIS:  YOUR HONOR, MAY WE PLAY A BRIEF

 2    COUNTER-DESIGNATION?

 3          THE COURT:  YES.  SO DO YOU WANT ME TO JUST COUNT

 4    THAT TIME TO APPLE?  9:23 TO 9:27.  ACTUALLY -- SO 9:16 TO 9:27

 5    HAS COUNTED TO APPLE'S TIME.

 6       GO AHEAD, PLEASE.  IT'S 9:27.

 7          MS. MAROULIS:  YES, YOUR HONOR.  THE CLIP TIME IS 1

 8    MINUTE AND 20 SECONDS.

 9          THE COURT:  THANK YOU.

10          (THE VIDEOTAPED DEPOSITION OF JUN WON LEE WAS PLAYED IN

11    OPEN COURT OFF THE RECORD.)

12          THE COURT:  TIME IS 9:29.

13          MR. MCELHINNY:  AT THIS TIME, YOUR HONOR, I WOULD

14    LIKE TO LODGE AS PLAINTIFF'S EXHIBIT 3003 THE CLIP OF THE

15    DEPOSITION WE PLAYED.

16          THE COURT:  OKAY.  IS THAT THE WHOLE TRANSCRIPT OR

17    DOES SAMSUNG HAVE ITS OWN?

18          MR. MCELHINNY:  SAMSUNG WILL HAVE ITS OWN.

19          THE COURT:  ALL RIGHT.

20          MS. MAROULIS:  YOUR HONOR, WE'D LIKE TO LODGE DX 501,

21    PLEASE.

22          THE COURT:  OKAY.

23       GO AHEAD, PLEASE.

24          MR. MCELHINNY:  YOUR HONOR, AT THIS TIME I WOULD LIKE

25    TO READ SAMSUNG'S RESPONSE UNDER OATH TO APPLE'S -- TO
```

```
 1        INTERROGATORY NUMBER 4 OF APPLE'S FIRST SET OF INTERROGATORIES.

 2             THE QUESTION IS -- THE QUESTION THAT SAMSUNG WAS ASKED IS:

 3        DESCRIBE THE FACTS AND CIRCUMSTANCES SURROUNDING SAMSUNG'S

 4        KNOWLEDGE OF THE PRELIMINARY INJUNCTION PATENTS, INCLUDING, BUT

 5        NOT LIMITED TO, WHETHER OR NOT SAMSUNG WAS AWARE OF EACH OF THE

 6        PRELIMINARY INJUNCTION PATENTS PRIOR TO THE FILING OF THIS

 7        LAWSUIT.  WHEN SAMSUNG BECAME AWARE OF EACH OF THE PRELIMINARY

 8        INJUNCTION PATENTS, HOW SAMSUNG BECAME AWARE OF EACH OF THE

 9        PRELIMINARY INJUNCTION PATENTS, AND ANY EFFORTS MADE TO AVOID

10        INFRINGEMENT OF EACH OF THE PRELIMINARY INJUNCTION PATENTS, AND

11        IDENTIFY THE PERSONS MOST KNOWLEDGEABLE ABOUT THE RESPONSE TO

12        THIS INTERROGATORY, AND LOCATE AND IDENTIFY ALL DOCUMENTS WHICH

13        REFER OR RELATE TO THE FACTS AND ASSERTIONS IN THE RESPONSE OR

14        WHICH WERE REVIEWED IN PREPARING THE RESPONSE TO THIS

15        INTERROGATORY.

16             SAMSUNG'S ANSWER UNDER OATH WAS:  SAMSUNG BECAME AWARE OF

17        THE '647 PATENT IN APPROXIMATELY AUGUST 2010, IN CONNECTION

18        WITH PATENT DISCUSSIONS BETWEEN APPLE AND SAMSUNG, SEE BATES

19        PAGE DOCUMENT APLNDC00000388 TO APLNDC00000410.  SAMSUNG BECAME

20        AWARE OF THE '604, '721, AND '172 PATENTS IN FEBRUARY 2012, IN

21        CONNECTION WITH THE FILING OF THIS LAWSUIT.

22             AT THIS TIME, YOUR HONOR, I WOULD LIKE TO READ FURTHER

23        UNDISPUTED FACTS FROM THE JOINT PRETRIAL STATEMENT.

24             UNDISPUTED FACT NUMBER 2.  SAMSUNG ELECTRONICS COMPANY,

25        LIMITED (REFERRED TO INDIVIDUALLY HEREIN AS "SEC") IS A
```

```
 1      CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE

 2      COUNTRY OF KOREA HAVING ITS PRINCIPAL PLACE OF BUSINESS AT

 3      416 MAETAN-3DONMG, YEONGTONG-GU, SUWON-CITY, GYEONGGI-DO,

 4      KOREA 443-742.

 5              UNDISPUTED FACT NUMBER 3.  SAMSUNG TELECOMMUNICATIONS

 6      AMERICA, LLC (REFERRED TO INDIVIDUALLY HEREIN AS "STA") IS A

 7      CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE

 8      OF DELAWARE HAVING ITS PRINCIPAL PLACE OF BUSINESS AT

 9      1301 EAST LOOKOUT DRIVE, RICHARDSON, TEXAS 75082.

10              UNDISPUTED FACT NUMBER 4.  SAMSUNG ELECTRONICS AMERICA,

11      INC. (REFERRED TO INDIVIDUALLY HEREIN AS "SEA") IS A NEW YORK

12      CORPORATION WITH ITS PRINCIPAL PLACE OF BUSINESS AT

13      105 CHALLENGER ROAD, RIDGEFIELD PARK, NEW JERSEY 07660.

14              AND FINALLY, UNDISPUTED FACT NUMBER 5.  STA IS AN INDIRECT

15      SUBSIDIARY OF SEC.  SEA IS A SUBSIDIARY OF SEC.

16              MR. LEE:  YOUR HONOR, WE'RE GOING TO PLAY A FEW

17      ADDITIONAL CLIPS OF PRIOR TESTIMONY.  THE FIRST WILL BE THE

18      DEPOSITION TESTIMONY OF JUSTIN DENISON.  THERE WOULD BE TWO

19      PORTIONS, ONE BY -- HIS DEPOSITION BY VIDEO AND A READING OF

20      HIS TRIAL TESTIMONY.

21              THE FIRST IS THE DEPOSITION BY VIDEO.

22              LADIES AND GENTLEMEN, MR. DENISON IS THE CHIEF STRATEGY

23      OFFICER AT SAMSUNG TELECOMMUNICATIONS AMERICA.

24              THE COURT:  SO SHOULD THIS TIME BE ALL ATTRIBUTED TO

25      APPLE?
```

```
 1              MR. LEE:  THE VIDEO CLIP IS ALL ATTRIBUTABLE TO

 2    APPLE, AS WELL, YOUR HONOR, AS THE PORTION I'LL READ FROM THE

 3    TRIAL TESTIMONY.

 4              THE COURT:  THAT'S FINE.

 5              (THE VIDEOTAPED DEPOSITION OF JUSTIN DENISON WAS PLAYED IN

 6    OPEN COURT OFF THE RECORD.)

 7              MR. LEE:  YOUR HONOR, WE WILL LODGE AS PLAINTIFF'S

 8    EXHIBIT 3001 THIS VIDEO DEPOSITION CLIP, THE TRANSCRIPT OF THE

 9    VIDEO DEPOSITION CLIP.

10         AND THE NEXT PORTION, YOUR HONOR, IS FROM MR. DENNISON'S

11    TRIAL TESTIMONY, WHICH I'LL READ.  SINCE I ASKED THE QUESTIONS,

12    I'LL READ THE QUESTIONS AND ANSWERS IF THAT'S OKAY.

13              THE COURT:  GO AHEAD, PLEASE.

14              MR. LEE:  LADIES AND GENTLEMEN, THIS IS FROM

15    MR. DENNISON'S PRIOR TRIAL TESTIMONY.  SINCE I WAS ASKING THE

16    QUESTIONS, I'LL READ THE QUESTIONS AND THE ANSWERS.

17         "QUESTION:  GOOD MORNING, MR. DENISON.

18         "GOOD MORNING, LADIES AND GENTLEMEN.

19         "MR. DENISON, MR. QUINN JUST ASKED YOU SOME QUESTIONS

20    ABOUT COMPETING.  DO YOU REMEMBER THOSE?

21         "ANSWER:  SURE.

22         "QUESTION:  AND YOU SAID SAMSUNG WANTS TO COMPETE IN THE

23    MARKETPLACE; CORRECT?

24         "ANSWER:  THAT'S RIGHT.

25         "QUESTION:  NOW, THERE'S FAIR AND SQUARE COMPETITION AND
```

1    THAT'S WHAT YOU WERE TALKING ABOUT; CORRECT?

2        "ANSWER:  YES.

3        "QUESTION:  AND THERE'S ALSO COMPETING WHEN YOU'RE

4    INFRINGING ON SOMEONE'S INTELLECTUAL PROPERTY; CORRECT?

5        "ANSWER:  I ASSUME THERE'S SUCH A THING, YES.

6        "QUESTION:  WELL, MR. DENISON, ON FRIDAY AFTERNOON YOU

7    SHOWED THE JURY AND YOU TALKED TO THE JURY ABOUT ALL OF

8    SAMSUNG'S PATENTS.  DO YOU REMEMBER THAT?

9        "ANSWER:  I BELIEVE I HIGHLIGHTED OUR NUMBER 2 RANKING IN

10   PATENTS.

11       "QUESTION:  RIGHT.  AND WITH SOME DEGREE OF PRIDE?

12       "ANSWER:  YES.

13       "QUESTION:  AND IF SOMEONE WAS COMPETING WITH YOU BY

14   INFRINGING YOUR PATENTS, THAT'S NOT FAIR AND SQUARE

15   COMPETITION, IS IT, SIR?

16       "ANSWER:  NO, IT'S NOT.

17       "QUESTION:  RIGHT.  SO THERE'S A DIFFERENCE BETWEEN

18   COMPETING FAIRLY AND SQUARELY AND THERE'S A DIFFERENCE BETWEEN

19   COMPETING WITH SOMEONE BY TAKING THEIR INTELLECTUAL PROPERTY;

20   CORRECT?

21       "ANSWER:  YES."

22           MR. MCELHINNY:  AT THIS POINT, YOUR HONOR, WE WOULD

23    OFFER A SHORT DEPOSITION BY MR. TIMOTHY SHEPPARD.

24       AT THE TIME OF HIS DEPOSITION, MR. SHEPPARD WAS

25    VICE-PRESIDENT OF FINANCE AND OPERATIONS AT SAMSUNG

```
 1     TELECOMMUNICATIONS AMERICA.

 2          (THE VIDEOTAPED DEPOSITION OF TIMOTHY SHEPPARD WAS PLAYED

 3     IN OPEN COURT OFF THE RECORD.)

 4          MR. MCELHINNY:  YOUR HONOR, WE WOULD LIKE TO LODGE

 5     WITH THE COURT PLAINTIFF'S EXHIBIT 3004, WHICH IS THE

 6     DEPOSITION TRANSCRIPT THAT WAS JUST SHOWN OF MR. SHEPPARD.

 7          THE COURT:  THAT'S FINE.

 8          MR. MCELHINNY:  AND FINALLY, YOUR HONOR, WE WOULD

 9     LIKE TO PLAY A SHORT CLIP OF THE DEPOSITION OF

10     MR. NICK DICARLO.  MR. DICARLO, AT THE TIME OF HIS DEPOSITION,

11     WAS VICE-PRESIDENT OF PRODUCT PLANNING AND PRODUCT MARKETING

12     FOR SAMSUNG TELECOMMUNICATIONS AMERICA.

13          (THE VIDEOTAPED DEPOSITION OF NICK DICARLO WAS PLAYED IN

14     OPEN COURT OFF THE RECORD.)

15          MR. MCELHINNY:  AT THIS TIME, YOUR HONOR, I WOULD

16     LIKE TO LODGE WITH THE COURT PLAINTIFF'S EXHIBIT 3002, WHICH IS

17     THE TRANSCRIPT OF MR. DICARLO'S DEPOSITION.

18          THE COURT:  PLEASE GO AHEAD.

19          MR. MCELHINNY:  THANK YOU, YOUR HONOR.

20          THAT CONCLUDES OUR READING OF DEPOSITIONS.

21          MR. LEE:  YOUR HONOR, OUR NEXT WITNESS IS

22     RORY SEXTON.

23          THE COURT:  OKAY.  TIME IS 9:43.  I'LL GIVE YOU A

24     MINUTE TO GET SET UP.

25          MR. LEE:  OKAY.  THANK YOU.
```

1          THE COURT:  TIME IS -- THE CLOCK IS STOPPED.

2      (PAUSE IN PROCEEDINGS.)

3          THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

4      **(RORY SEXTON, PLAINTIFF'S WITNESS, WAS SWORN.)**

5          THE WITNESS:  I DO.

6                    **DIRECT EXAMINATION**

7  BY MR. LEE:

8  Q.   MR. SEXTON, WOULD YOU INTRODUCE YOURSELF TO THE JURY AND

9  SPELL YOUR NAME FOR THE REPORTER, PLEASE.

10 A.   MY NAME IS RORY SEXTON, R-O-R-Y, S-E-X-T-O-N.

11         THE COURT:  TIME IS NOW 9:45.  GO AHEAD, PLEASE.

12 BY MR. LEE:

13 Q.   COME UP A LITTLE CLOSER TO THE MICROPHONE.

14 A.   SURE.

15 Q.   CAN YOU TELL US WHERE YOU WORK?

16 A.   I WORK AT APPLE.

17 Q.   WHAT IS YOUR CURRENT POSITION?

18 A.   I'M THE VICE-PRESIDENT OF SUPPLY AND DEMAND MANAGEMENT.

19 Q.   YOU MAY HAVE TO MOVE JUST EVEN A COUPLE MORE INCHES UP.

20 OKAY?

21     NOW, TO HELP THE LADIES AND GENTLEMEN OF THE JURY

22 UNDERSTAND WHERE YOUR TESTIMONY FITS IN, ARE YOU HERE TO

23 TESTIFY ABOUT THE CAPACITY OF APPLE TO MANUFACTURE IPHONES AND

24 IPADS?

25 A.   I AM.

1      Q.   FOR THE PERIOD 2011 TO 2013?

2      A.   I AM.

3      Q.   WHEN DID YOU JOIN APPLE?

4      A.   I JOINED APPLE IN 2001.

5      Q.   AND WHAT POSITIONS HAVE YOU HELD AT APPLE?

6      A.   SINCE THEN I HAVE BEEN THE SENIOR MANAGER, DIRECTOR,

7      SENIOR DIRECTOR, AND VICE-PRESIDENT OF SUPPLY AND DEMAND

8      MANAGEMENT.

9      Q.   WHAT ARE -- AND YOUR CURRENT POSITION IS?

10     A.   VICE-PRESIDENT OF SUPPLY AND DEMAND MANAGEMENT.

11     Q.   AND YOUR DUTIES AND RESPONSIBILITIES IN THAT POSITION ARE?

12     A.   WE FORECAST DEMAND FOR THE COMPANY FOR OUR PRODUCTS UP TO

13     A PERIOD, AND WE PROVIDE A DEMAND SIGNAL TO OUR OPERATIONS

14     TEAMS AND TO OUR SUPPLIERS FOR THE AMOUNT OF PRODUCT WE WANT

15     THEM TO PRODUCE.

16     Q.   IS THERE SOME RELATIONSHIP BETWEEN WHAT YOUR GROUP DOES

17     AND APPLE'S MANUFACTURING OPERATIONS?

18     A.   VERY MUCH SO.  THE DEMAND SIGNAL WE GIVE TO THOSE TEAMS

19     DETERMINES HOW MUCH THEY PLAN FOR AND HOW MUCH THEY BUILD.

20     Q.   WHAT IS A DEMAND SIGNAL WHEN YOU USE THAT PHRASE?

21     A.   GOOD QUESTION.  WE SAY HOW MUCH WE WANT ON A MONTHLY AND A

22     WEEKLY BASIS OF OUR PRODUCTS, THE IPHONES AND IPADS AND THE

23     OTHER PRODUCTS AS WELL.

24     Q.   WHAT RESPONSIBILITIES HAVE YOU HAD FOR PLANNING FOR SUPPLY

25     AND DEMAND OF THE IPHONE AND IPAD?

1     A.   I'VE BEEN RESPONSIBLE WITH MY TEAM FOR PLANNING THOSE

2     SINCE THEY'VE LAUNCHED.

3     Q.   CAN YOU EXPLAIN TO US GENERALLY HOW APPLE'S OPERATIONS

4     GROUP IS ORGANIZED?

5     A.   SURE.   THE HEAD OF OPERATIONS, THE SENIOR VICE-PRESIDENT

6     IS JEFF WILLIAMS, AND THE KEY FUNCTIONS BENEATH HIM ARE AS

7     FOLLOWS:

8          IN THE PLANNING AREA, THAT'S MY TEAM, AND I WORK FOR

9     DEIDRE O'BRIEN, WHO HAS SALES AND OPERATION SUPPORT.

10         THEN THE PRODUCT OPERATIONS TEAM WHO'S RESPONSIBLE FOR

11    MANAGING OUR SUPPLIERS ARE -- THAT'S UNDER CHIP HILLS AND

12    SABIH KHAN.

13         THEN WE HAVE THE PROCUREMENT ORGANIZATION UNDER

14    DAN ROSCKES AND TONY BLEVINS.

15         AND THEN WE HAVE THE SERVICE OPERATION, OR APPLE CARE AS

16    WE CALL IT, UNDER TARA BUNCH.

17    Q.   HOW MANY EMPLOYEES WORK IN YOUR GROUP?

18    A.   APPROXIMATELY 550.

19    Q.   HOW MANY EMPLOYEES WORK IN THE TOTAL OPERATIONS GROUP?

20    A.   IT'S ABOUT 16,000 PEOPLE AT THE MOMENT.

21    Q.   COULD YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY,

22    IN GENERAL TERMS, HOW YOU GO ABOUT PLANNING FOR SUPPLY OF

23    IPHONE AND IPADS.

24    A.   SURE.   SO WE FIRST OF ALL START BY PREDICTING DEMAND OVER

25    A PERIOD OF TIME, AND WE DO THAT ON A WEEKLY AND MONTHLY BASIS

1    BY PRODUCT.

2          ONCE WE'VE DETERMINED THAT, WE THEN CREATE WHAT I CALLED

3    EARLIER A DEMAND SIGNAL WHERE WE SEND A REQUEST BY WEEK AND BY

4    PRODUCT TO EVERY SUPPLIER OR FACTORY THAT MAKES IPADS AND

5    IPHONES AND WE REQUEST, THIS IS WHAT WE WANT YOU TO PLAN FOR

6    AND BUILD TO.

7          AND THAT'S A CONSTANT, ONGOING THING.  WE DO THAT EVERY

8    WEEK AND WE ADJUST BASED ON WHAT WE SEE AND HAVE LEARNED.

9    Q.   HAS APPLE HAD THE FLEXIBILITY TO INCREASE IPHONE AND IPAD

10   SUPPLY WHEN DEMAND HAS BEEN HIGHER THAN YOU ANTICIPATED?

11   A.   YES, IT HAS.

12   Q.   AND HOW DO YOU DO THAT?

13   A.   WE LOOK AT THE CHANGE IN DEMAND AND WE ASK THE FACTORIES

14   FOR MORE THROUGH THIS DEMAND SIGNAL.

15   Q.   AND DO YOU BUILD IN YOUR PROCESS SOMETHING CALLED A

16   BUFFER?

17   A.   YES, WE DO.  AS WE PLAN FOR THE FUTURE, IN CREATING THIS

18   DEMAND SIGNAL, WE PLAN TO MEET THE HIGHEST DEMAND WE KNOW OF

19   OVER A THREE MONTH PERIOD, AND THEN WE ADD A ONE MONTH BUFFER

20   TO THAT.

21          SO FOR A THREE MONTH PERIOD, WE'LL PLAN FOUR MONTHS WORTH

22   OF SUPPLY, OR 33 PERCENT MORE.

23   Q.   WHAT IS THE PURPOSE OF THE BUFFER?

24   A.   WE KNOW PREDICTING DEMAND IS -- WE'RE WRONG.  WE COULD BE

25   WRONG.  SO WE HAVE FLEXIBILITY TO CHANGE WHEN WE'RE WRONG, WHEN

1     WE GET MORE DEMAND THAN WE THINK.

2     Q.   AND HOW LONG HAS IT BEEN THE CASE THAT YOU'VE HAD THIS ONE

3     MONTH BUFFER FOR EACH OF THE THREE MONTHS?

4     A.   WE'VE ALWAYS PLANNED TO HAVE A BUFFER AGAINST OUR

5     PREDICTED DEMAND FOR -- WE'VE ALWAYS DONE THAT FOR THE LAST

6     SEVEN OR EIGHT YEARS.

7     Q.   AND HOW OFTEN HAS APPLE INCREASED THE IPHONE OR IPAD

8     SUPPLY BY A MILLION OR TWO MILLION UNITS IN A GIVEN QUARTER?

9     A.   MANY TIMES.  MANY TIMES.

10    Q.   CAN YOU DO THAT WITH YOUR BUFFER?

11    A.   YES.  AND SOMETIMES WE, WE'LL ASK TO GO ABOVE THAT AS

12    WELL.

13    Q.   HOW ROUTINELY HAS APPLE INCREASED THE NUMBER OF IPHONES BY

14    ITS -- BY MANUFACTURING A MILLION TO TWO MILLION MORE UNITS IN

15    A QUARTER?

16          MS. MAROULIS:  OBJECTION, LEADING.

17    BY MR. LEE:

18    Q.   HOW OFTEN IS THE QUESTION.

19    A.   MANY TIMES.

20          THE COURT:  OVERRULED.

21       GO AHEAD, PLEASE.

22    BY MR. LEE:

23    Q.   AND FOR THE IPAD?

24    A.   THE SAME.

25    Q.   NOW, LET ME ASK YOU TO BE IMMODEST ON BEHALF OF YOUR GROUP

1    FOR A MINUTE.  HAS YOUR GROUP WON ANY AWARDS FOR ITS

2    MANUFACTURING AND SUPPLY CHAIN OPERATIONS?

3    A.   WE HAVE WON MANY AWARDS.  THE ONE THAT I RECALL IS THE

4    GARDENER AWARD.  THIS IS WHERE THEY AWARD THE TOP SUPPLY CHAINS

5    IN THE WORLD.  I THINK APPLE HAS BEEN RANKED NUMBER 1 FOR --

6    SINCE 2008 AT LEAST.

7    Q.   APPROXIMATELY HOW MANY IPHONES HAS APPLE MANUFACTURED IN

8    EACH OF THE LAST THREE YEARS?

9    A.   IPHONES IN THE LAST THREE YEARS?  SO IN 2011, IT WAS JUST

10   UNDER 94 MILLION.

11       THEN THE FOLLOWING YEAR, 2011, IT WAS JUST OVER 141

12   MILLION.

13       AND THEN LAST YEAR, IT WAS 161 MILLION.

14   Q.   AND IPADS?

15   A.   IN 2011, IT WAS 40 MILLION IPADS IS; AND THEN WE INCREASED

16   THAT TO 68 MILLION; AND THEN TO 75 MILLION.

17   Q.   COULD APPLE HAVE MANUFACTURED MORE OF EVERY IPHONE AND

18   IPAD MODEL SINCE 2011?

19   A.   OVER THE ENTIRE PERIOD, DEFINITELY.

20   Q.   WOULD APPLE HAVE BEEN ABLE TO MANUFACTURE AN ADDITIONAL

21   4 MILLION IPHONE UNITS BETWEEN AUGUST 2011 AND DECEMBER 2013?

22   A.   YES.

23   Q.   NOW, HAVE YOU EVER HAD BACKLOGS FOR THE IPHONE OR THE

24   IPAD?

25   A.   YES, ON MANY OCCASIONS, IN PARTICULAR WHEN WE LAUNCH A

 1    PRODUCT, THAT'S OUR HIGHEST DEMAND AND IT'S WHERE WE -- OUR

 2    ABILITY TO PRODUCE AND MANUFACTURE IS AT THE HARDEST, SO WE

 3    OFTEN HAVE A BACKLOG AT LAUNCHES.

 4    Q.    AND WHAT DOES APPLE DO TO RESPOND TO THE BACKLOGS?

 5    A.    WHEN WE LAUNCH, WE GET A VIEW OF HOW POPULAR THE PRODUCT

 6    IS GOING TO BE AND WE ADJUST OUR DEMAND SIGNAL TO OUR FACTORIES

 7    TO CREATE MORE, AND TYPICALLY THAT TAKES US ABOUT 13 WEEKS TO

 8    CATCH UP.  SOMETIMES WE GET IT RIGHT AND WE'RE OUT OF A BACKLOG

 9    STRAIGHT AWAY.  BUT WE HAVE HAD INSTANCES WHERE THAT'S NOT THE

10    CASE.

11    Q.    AND WHAT ALTERNATIVES ARE THERE FOR CUSTOMERS WHEN THESE

12    BACKLOGS EXIST AT THE TIME OF A LAUNCH?

13    A.    WELL, THERE'S TWO, TWO ALTERNATIVES.  ONE IS WE HAVE OTHER

14    PRODUCTS THAT ARE READILY AVAILABLE, OTHER MODELS OF IPHONES OR

15    IPADS.

16          WE'RE ALSO SHIPPING MILLIONS OF UNITS EVERY WEEK, SO WHILE

17    WE'RE IN CONSTRAINT, THERE'S STILL PRODUCT FLOWING AND THE --

18    SOME IS AVAILABLE.

19    Q.    OTHER MODELS?

20    A.    AND OF THE MODEL ITSELF.  WE'RE STILL SHIPPING A LOT OF

21    THAT.

22    Q.    LET ME SHOW YOU WHAT'S BEEN MARKED AS PTX 128.

23          AND MR. LEE, DON'T PUT IT ON THE SCREEN, IF YOU WOULD.

24          DO YOU HAVE IT?

25    A.    I DO.

1        Q.   DO YOU HAVE YOUR GLASSES?

2        A.   LET ME GET MY GLASSES.

3        Q.   WHAT IS IT?

4        A.   THIS IS A MODEL THAT WE'VE PUT SHOWING THAT SHOWS

5    APPLE'S -- WHAT WE'VE PRODUCED OVER THE LAST FOUR YEARS AND

6    WHAT WE'VE SOLD AND WHAT WE COULD HAVE PRODUCED IF WE'D

7    MAXIMIZED OUR PRODUCTION OVER THAT PERIOD OF TIME.

8        Q.   WHO PREPARED PTX 128?

9        A.   MY TEAM AND I.

10            MR. LEE:  YOUR HONOR, WE WOULD OFFER PTX 128.  THIS

11   IS UNDER SEAL, SO WE WOULD ONLY SHOW IT ON THE JURORS AND THE

12   COURT'S SCREENS.

13            THE COURT:  THAT'S FINE.

14        WHAT DOES THE "T" MEAN IN PTX?

15            MR. LEE:  PX.  I THINK IT WAS JUST MISLABELED.

16            MS. MAROULIS:  NO OBJECTION, YOUR HONOR.

17            THE COURT:  ALL RIGHT.  THAT'S ADMITTED AND IT'S

18   UNDER SEAL.

19        (PLAINTIFF'S EXHIBIT 128 WAS ADMITTED IN EVIDENCE.)

20            THE COURT:  GO AHEAD, PLEASE.

21   BY MR. LEE:

22        Q.   DO YOU SEE THAT ON THE SCREEN?

23        A.   I DO.

24        Q.   NOW, THERE ARE A NUMBER OF PAGES AND LOTS OF ENTRIES;

25   CORRECT?

1    A.   CORRECT.

2    Q.   JUST IN GENERAL TERMS, WOULD YOU JUST DESCRIBE FOR THE

3    LADIES AND GENTLEMEN OF THE JURY WHAT INFORMATION IS INCLUDED

4    ON THE CHART?

5    A.   SURE.  IT MIGHT BE BETTER TO GO TO THE SECOND PAGE.

6    Q.   SURE.

7    A.   THIS SUMMARY HAS FIVE SECTIONS TO IT.  THE FIRST SECTION

8    SHOWS HOW MANY UNITS WE, APPLE, ACTUALLY PRODUCED OF IPHONES ON

9    A MONTHLY BASIS FROM THE PERIOD FROM 2010 THROUGH 2013

10   CUMULATIVE.  SO HOW MANY WE ACTUALLY DID.

11        THE SECOND SECTION SHOWS HOW MANY WE COULD HAVE DONE IF WE

12   HAD USED ALL OF OUR MANUFACTURING CAPACITY THROUGH THAT PERIOD.

13   WHERE WE COULD NOT HAVE MADE MORE, WE'VE INCLUDED THAT IN HERE

14   AS WELL.

15        THE THIRD SECTION IS HOW MANY WE ACTUALLY SOLD TO OUR

16   CUSTOMERS.

17        AND THE FOURTH SECTION IS HOW MANY UNITS REMAINED UNSOLD

18   AT THE END OF EACH QUARTER OR MONTH.

19        SO YOU CAN SEE HERE IT RANGES FROM ONE AND A HALF MILLION

20   UP TO, YOU KNOW, NINE OR TEN AT TIMES.

21        AND THE LAST SECTION IS IF WE HAD USED ALL OF OUR

22   MANUFACTURING CAPABILITY AND TAKEN OUR SALES OFF LAUNCH, HOW

23   MANY WE WOULD HAVE HAD UNSOLD IF WE'D MAXIMIZED OUR

24   MANUFACTURING CAPABILITY.

25   Q.   NOW, IS THE DATA IN THIS TABLE IN THOUSANDS OF UNITS?

1    A.   IT'S IN THOUSANDS OF UNITS.

2    Q.   NOW, THERE ARE, IN THE COLLECTIVE SCHEDULES, IT APPEARS

3    THOUSANDS OF ENTRIES.

4    A.   THERE'S OVER 90,000 ENTRIES IN THE MODEL ITSELF.

5    Q.   NOW, IN PREPARING TO TESTIFY TO THE JURY, DID YOU

6    UNDERTAKE TO CONFIRM THE ACCURACY OF THE ENTRIES?

7    A.   I DID.

8    Q.   AND OF THE THOUSANDS OF ENTRIES, DID YOU IDENTIFY ANY THAT

9    REQUIRED CORRECTION?

10   A.   I IDENTIFIED FOUR CELLS FROM THE ENTRY FROM 2013, AND FIVE

11   REQUIRED THE CORRECTION.

12   Q.   AND THIS EXHIBIT INCLUDES THE CORRECTION?

13   A.   IT DOES.

14   Q.   AND IT WAS GIVEN TO SAMSUNG; CORRECT?

15   A.   CORRECT.

16   Q.   IS PX 128 AN ACCURATE SUMMARY OF WHAT APPLE MADE AND COULD

17   HAVE MADE FOR THE IPHONE AND THE IPAD BETWEEN 2011 AND 2013?

18   A.   IT IS.

19           MR. LEE:  NOTHING FURTHER, YOUR HONOR.

20           THE COURT:  TIME IS 9:56.

21       (PAUSE IN PROCEEDINGS.)

22           THE COURT:  OKAY.

23           MS. MAROULIS:  MAY I PROCEED, YOUR HONOR?

24           THE COURT:  YES, PLEASE.

25       9:56.  GO AHEAD.

1                          **CROSS-EXAMINATION**

2       BY MS. MAROULIS:

3       Q.   GOOD MORNING, MR. SEXTON.  HOW ARE YOU?

4       A.   GOOD MORNING.

5       Q.   I'M VICTORIA MAROULIS.  I'M ONE OF SAMSUNG'S ATTORNEYS.

6       I'LL ASK YOU A FEW QUESTIONS TODAY.

7            SIR, IPHONE AND IPADS ARE VERY POPULAR PRODUCTS; RIGHT?

8       A.   THEY ARE.

9       Q.   AND THERE'S A HIGH DEMAND FOR THESE PRODUCTS WHEN THE

10      PRODUCTS LAUNCH AS YOU TESTIFIED JUST A MINUTE AGO; RIGHT?

11      A.   THAT'S CORRECT.

12      Q.   AND BECAUSE OF THE POPULARITY OF APPLE'S PRODUCTS, THERE

13      ARE TIMES WHEN APPLE CANNOT PROVIDE ENOUGH PRODUCTS FOR EVERY

14      PERSON WHO WANTS TO BUY THAT PRODUCT AT LAUNCH, ISN'T IT?

15      A.   THAT'S CORRECT.

16      Q.   AND THE SAME IS TRUE FOR IPADS AND IPHONES; RIGHT?

17      A.   YES.

18      Q.   AND YOU ALWAYS TRY IN YOUR JOB TO CATCH UP TO THE DEMAND;

19      RIGHT?

20      A.   WE DO.

21      Q.   THAT'S THE WHOLE POINT OF THE DEMAND SIGNAL?

22      A.   THAT'S THE PURPOSE OF THE DEMAND SIGNAL.

23      Q.   AND IT COULD TAKE YOU THREE MONTHS TO CATCH UP TO THE

24      DEMAND; RIGHT?

25      A.   SOMETIMES WE DO IT MUCH FASTER THAN THAT, BUT, YEAH, 13

1    WEEKS FOR SOME MORE POPULAR MODES, THAT'S HOW LONG IT TAKES.

2    SOMETIMES A LITTLE BIT LONGER.

3    Q.   AND SOMETIMES IT'S LONGER BECAUSE IPHONE IS A COMPLEX

4    PRODUCT; RIGHT?

5    A.   YES.

6    Q.   IT HAS HUNDREDS OF FEATURES; RIGHT?

7    A.   THE PRODUCT HAS LOTS OF FEATURES, YES.

8    Q.   AND TIMES IT'S MORE THAN 13 WEEKS.  SOMETIMES IF APPLE

9    NEEDS TO INCREASE CAPACITY TO MEET DEMAND, IT COULD TAKE

10   BETWEEN 13 AND 26 WEEKS; IS THAT RIGHT?

11   A.   THE IPHONE 4 TOOK UP TO 26 WEEKS.  I THINK THAT'S MY

12   RECOLLECTION.

13   Q.   OKAY.  AND IF YOU WANT TO MOVE SOME MANUFACTURING CAPACITY

14   FROM ONE MODEL TO ANOTHER, THAT ALSO CAN TAKE UPWARDS OF 13 OR

15   MORE WEEKS; IS THAT RIGHT?

16   A.   SOMETIMES IT CAN TAKE THAT LONG.  IT DEPENDS ON WHAT WE'RE

17   MOVING TO AND WHERE.  IF WE'RE MOVING MEMORY CAPACITY, IT TAKES

18   NO TIME.  SO IT DEPENDS ON THE CIRCUMSTANCES.

19   Q.   OKAY.  AND SOMETIMES IT TAKES LONGER BECAUSE THERE ARE

20   DIFFERENT MANUFACTURING LINES TO MAKE DIFFERENT PRODUCTS.  YOU

21   CAN'T JUST MAKE DIFFERENT MODELS WITH THE SAME MANUFACTURING

22   LINES; IS THAT RIGHT?

23   A.   SOMETIMES IT CAN, YES.

24   Q.   AND WHEN YOU MOVE CAPACITY FROM ONE MODEL OF IPHONE TO

25   ANOTHER, THAT FIRST MODEL, THERE'S LESS CAPACITY TO MAKE THAT;

1    IS THAT RIGHT?

2    A.   IT REALLY DEPENDS ON WHAT WE'RE SWITCHING BETWEEN.  IF

3    IT'S MEMORY, NOT SO MUCH.  IF IT'S COLOR, MAYBE A LITTLE BIT

4    LONGER.  IT REALLY DEPENDS WHAT WE'RE TRYING TO SWITCH.

5    Q.   BUT SOMETIMES?

6    A.   SOMETIMES, YES.

7    Q.   YOU TESTIFIED THAT WHEN THERE ARE SHORTAGES, CUSTOMERS

8    HAVE ALTERNATIVES; RIGHT?

9    A.   YEAH.  THE ALTERNATIVES ARE OTHER MODELS, OR SOMETIMES

10   GOING TO A DIFFERENT PLACE TO BUY THEM AS WELL.

11   Q.   OKAY.  BUT THE ALTERNATIVE OF OTHER MODELS IS USUALLY THE

12   OLDER MODEL, RIGHT, NOT THE SAME NEWER MODEL THAT CUSTOMERS

13   WANT; CORRECT?

14   A.   SOMETIMES IT'S -- THE IPHONE 4 HAS BEEN CONSTRAINED WHEN

15   THE 4S AND 5 WERE AVAILABLE.

16   Q.   BUT AS A GENERAL MATTER, IT'S THE OLDER MODEL?

17   A.   IT'S GENERALLY AT LAUNCH WHERE THE NEWER MODEL IS

18   CONSTRAINED AND THE OLDER MODELS ARE AVAILABLE.

19   Q.   LET'S TALK ABOUT SOME OF THOSE SPECIFIC MODELS.  IPHONE 4S

20   WAS LAUNCHED IN OCTOBER 2011; RIGHT?

21   A.   THAT'S CORRECT.

22   Q.   AND THERE WAS A SHORTAGE OF IPHONE 4S WHEN IT LAUNCHED;

23   CORRECT?

24   A.   YEAH.  WE WERE UNABLE TO MEET DEMAND UNTIL DECEMBER.

25   Q.   OKAY.  THERE WAS WIDESPREAD PRESS COVERAGE OF THE

1    SHORTAGES; RIGHT?

2    A.   YES, THERE WAS.

3    Q.   AND YOU, IN YOUR CAPACITY AS VICE-PRESIDENT OF DEMAND AND

4    SUPPLY, WOULD FOLLOW SUCH PRESS COVERAGE; RIGHT?

5    A.   I DON'T SPEND A LOT OF TIME READING THE PRESS COVERAGE TO

6    BE HONEST.

7    Q.   VERY WELL.  LET'S TAKE A LOOK TOGETHER AT SDX 2350.  THIS

8    IS A "WALL STREET JOURNAL" ARTICLE, AND YOU WILL FIND IT IF YOU

9    LOOK AT THE FIRST TAB CALLED SEXTON DEMONSTRATIVES.

10   A.   CAN YOU HELP ME WITH THAT?  DX?

11   Q.   IT'S THE FIRST SLIDE IN YOUR BINDER.  IT WOULD BE SDX

12   2350.  ARE YOU THERE, SIR?

13   A.   IT SAYS WOULD-BE IPHONE CUSTOMERS, THAT ONE?

14   Q.   YES.  IT'S A "WALL STREET JOURNAL" ARTICLE THAT SAYS

15   "WOULD-BE IPHONE CUSTOMERS STILL FACING WEEKS-LONG WAITS."

16        DO YOU SEE WHERE IT SAYS THERE, "APPLE'S MANUFACTURING

17   ISN'T KEEPING PACE, THE CARRIERS POINT TO UNEXPECTEDLY STRONG

18   DEMAND FOR THE HANDSET"?

19   A.   IT TOOK US UNTIL DECEMBER TO CATCH UP IN DEMAND ON THE 4S.

20   Q.   OKAY.  THIS IS JUST ONE NEWSPAPER ARTICLE.  THERE ARE MANY

21   OTHERS LIKE THAT; RIGHT?

22   A.   I'M SURE THERE WERE.

23   Q.   OKAY.  NOW, ADDITIONALLY, IN JULY THROUGH SEPTEMBER 2012,

24   THERE WERE PERIODS IN WHICH APPLE COULDN'T SUPPLY ENOUGH

25   IPHONE 4 TO MEET EVERY CUSTOMER CARRIER REQUEST AS WELL?

```
1      A.   COULD YOU GIVE ME THAT PERIOD OF TIME AGAIN, PLEASE?

2      Q.   YES.  JULY THROUGH SEPTEMBER 2012.

3      A.   CORRECT.

4      Q.   OKAY.  SWITCHING NOW TO IPHONE 5.  IT LAUNCHED IN

5      SEPTEMBER 2012; RIGHT?

6      A.   YES, IT DID.

7      Q.   AND WHEN IT LAUNCHED, THERE WAS A SHORTAGE OF IPHONE 5 AS

8      WELL?

9      A.   WE WEREN'T ABLE TO MEET ALL IPHONE 5 DEMAND UNTIL PROBABLY

10     LATE NOVEMBER.

11     Q.   OKAY.  AND YOU'RE FAMILIAR WITH THE TERM "GATE" OR "GATED"

12     I THINK.

13     A.   I AM.

14     Q.   YEAH.  AND THAT MEANS THAT APPLE'S ABILITY TO PRODUCE

15     EVERYTHING IT WANTS OR CUSTOMERS WANT IS CONSTRAINED; RIGHT?

16     A.   YES.  ONCE WE LAUNCH AND FIND DEMAND IS EVEN HIGHER, WE

17     IMMEDIATELY ASK FOR MORE, AND IF WE CAN'T GET IT, WE'RE GATED.

18     Q.   UM-HUM.  AND THE IPHONE DEMAND WAS GATED, WASN'T IT,

19     IPHONE 5?

20     A.   IPHONE 5 SPECIFICALLY, YES.

21     Q.   RIGHT.  THE KEY GATE FOR IPHONE 5 WAS THE COMPLEXITY OF

22     MANUFACTURING SPECIFICALLY THE SUBCOMPONENTS; RIGHT?

23     A.   THERE WAS MANY FACTORS.  IT WAS A VERY DIFFICULT PRODUCT

24     TO MANUFACTURE.  BUT, YES, THE RAMPING AND THE COMPLEXITY WAS

25     THE KEY ISSUE.
```

1     Q.   OKAY.  AND ONCE AGAIN, THERE WAS A LOT OF PRESS COVERAGE

2     SURROUNDING THAT AND THE SUBCOMPONENT SHORTAGE; RIGHT?

3          LET'S TAKE A LOOK AT THE NEXT SLIDE IN YOUR BINDER, WHICH

4     IS SDX 2352.  DO YOU SEE THE "WALL STREET JOURNAL" ARTICLE,

5     "APPLE SHARES FALL INTO BEAR-MARKET TERRITORY"?

6               MR. LEE:  YOUR HONOR, WE OBJECT ON THE SAME BASIS

7     THAT WE OBJECTED TO THE SDX 2351.  WE THINK THAT WOULD APPLY TO

8     THIS AS WELL.

9               MS. MAROULIS:  YOUR HONOR, THIS IS NOT FOR THE TRUTH

10    OF THE MATTER ASSERTED.

11              MR. LEE:  YOUR HONOR SUSTAINED 2351, TO WHICH THAT

12    SAME ARGUMENT APPLIES.

13              THE COURT:  WHY DON'T YOU TAKE IT DOWN, PLEASE?

14         (PAUSE IN PROCEEDINGS.)

15              THE COURT:  2351 WAS FOR NOT, THE ENTIRE PERIOD,

16    DISCLOSED.  WAS THERE AN OBJECTION TO 2352.

17              MS. MAROULIS:  YOUR HONOR, IT WAS NOT OBJECTED TO.

18              MR. LEE:  WE DIDN'T USE IT, YOUR HONOR.  WE THOUGHT

19    ACTUALLY WHATEVER YOUR HONOR RULED APPLIED TO THESE AS WELL.

20              THE COURT:  IF YOU DIDN'T -- IF YOU DIDN'T FILE AN

21    OBJECTION, THEN IT'S OVERRULED.

22         GO AHEAD, PLEASE.

23              MS. MAROULIS:  OKAY.  LET'S GET THE SLIDE BACK UP,

24    KEN.  THANK YOU.

25    Q.   SO IF YOU TAKE A LOOK AT 2352, YOU SEE HERE THAT HON HAI

1        PRECISION INDUSTRY COMPANY CHAIRMAN TERRY GOU SAID PRODUCTION

2        OF THE IPHONE 5 IS DIFFICULT BECAUSE OF ITS DESIGN AND THAT

3        CONTRACT MANUFACTURING COMPANIES STILL CANNOT MEET THE QUALITY

4        STANDARDS OF ITS LARGEST CUSTOMER.  SUPPLY-CHAIN PROBLEMS HAVE

5        LED TO A LONG WAIT FOR THE IPHONE SINCE THEIR LATE-SEPTEMBER

6        LAUNCH ANALYSTS SAY.

7            IS THAT CONSISTENT WITH YOUR RECOLLECTION OF THE PRESS

8        COVERAGE?

9        A.  I THINK IT'S CONSISTENT WITH WHAT I SAID IS THAT IT WAS A

10       VERY COMPLEX PRODUCT TO MAKE, AND AS APPLE RAMPS UP ITS

11       PRODUCTION, WE WANT TO DO IT IN A HIGH QUALITY MANNER.  SO --

12              MR. LEE:  YOUR HONOR, I'M NOT SURE IF THIS IS BEING

13       OFFERED OR NOT, BUT COULD WE ASK FOR THE LIMITING INSTRUCTION

14       THAT THIS ISN'T BEING OFFERED FOR THE TRUTH OF WHAT'S ASSERTED?

15              THE COURT:  YES.  THIS IS NOT BEING OFFERED FOR THE

16       TRUTH OF WHAT'S CONTAINED IN THE ARTICLE.

17       BY MS. MAROULIS:

18       Q.  MR. SEXTON, WE'RE GOING TO LOOK AT SOME APPLE DOCUMENTS

19       THAT ARE CONFIDENTIAL, SO YOU WILL SEE IT AND THE JURY WILL SEE

20       IT, BUT NOT THE REST OF THE GROUP.

21              THE COURT:  ACTUALLY, NONE OF THESE ARE BEING

22       OFFERED.  THESE ARE JUST DEMONSTRATIVES.  THEY'RE NOT BEING

23       MOVED INTO EVIDENCE.

24              MS. MAROULIS:  CORRECT.

25       Q.  SIR, PLEASE TAKE A LOOK AT DX 415 IN FRONT OF YOU.  IT'S A

1      CONFIDENTIAL DOCUMENT, SO IT WILL NOT GO UP ON THE SCREEN.

2          DID YOU CREATE THIS SLIDE?

3      A.   I DID.

4      Q.   AND IF I MAY READ THE SLIDE, THIS SLIDE ADDRESSES SUPPLY

5      ISSUES IN QUARTER 2 OF 2013; IS THAT RIGHT?

6      A.   THAT'S CORRECT.

7      Q.   AND IT ADDRESSES SUPPLY ISSUES SPECIFICALLY IN JANUARY AND

8      FEBRUARY; IS THAT RIGHT?

9      A.   CORRECT.

10     Q.   AND IT SHOWS THAT THE SUPPLY WAS CONSTRAINED; CORRECT?

11     A.   WE ESTIMATED APPROXIMATELY 235 OF LOST SALES THROUGH --

12     Q.   SIR, YOU'RE NOT SUPPOSED TO READ IT.  IT'S CONFIDENTIAL.

13     A.   OH.

14     Q.   I JUST WANT YOU TO CONFIRM.  THANK YOU.

15         ALL RIGHT.  MOVING ON TO A DIFFERENT PRODUCT.

16         THERE WERE ALSO SHORTAGES OF IPAD MINI WHEN IT LAUNCHED IN

17     NOVEMBER OF 2012; IS THAT RIGHT?

18     A.   YES, THERE WAS.

19     Q.   AND APPLE COULD NOT MEET DEMAND UNTIL THE END OF 2012 ON

20     THAT PRODUCT; IS THAT RIGHT?

21     A.   CONSISTENT WITH SOME OF OUR POPULAR LAUNCHES, YEAH.

22         MS. MAROULIS:  YOUR HONOR, I MOVE DX 415 INTO

23     EVIDENCE.

24         MR. LEE:  NO OBJECTION.

25         THE COURT:  IT'S ADMITTED.

```
 1                 (DEFENDANTS' EXHIBIT 415 WAS ADMITTED IN EVIDENCE.)

 2                 THE COURT:  GO AHEAD, PLEASE.

 3      BY MS. MAROULIS:

 4      Q.   SIR, LET'S TAKE A LOOK AT DX 413, WHICH IS ALREADY IN

 5      EVIDENCE.  IT'S ALSO A SEALED CONFIDENTIAL DOCUMENT.  AND LET'S

 6      TAKE A LOOK AT PAGE 40 OF DX 413.

 7                 OKAY.  PLEASE CONFIRM FOR THE -- ARE YOU THERE, SIR?

 8      A.   NO, I'M NOT.  I'M TRYING TO GET IT.

 9      Q.   TAKE YOUR TIME.  THE PAGES ARE ON THE TOP RIGHT-HAND

10      CORNER OF THE DOCUMENT.

11      A.   THANK YOU.  THIS SAYS IPHONE 5 FLAWLESS LAUNCH.

12      Q.   THAT'S RIGHT.  SO I JUST NEED YOU TO CONFIRM THAT THIS

13      PAGE CONTAINS THE PERCENTAGE OF IN-STOCK RATES FOR ALL

14      AUTHORIZED LOCATIONS.

15      A.   OH, I HAD A DIFFERENT PAGE.  MY APOLOGIES.

16      Q.   NO, YOU WERE ON THE RIGHT PAGE.  IT'S -- THE SECOND ROW ON

17      THIS IS IN-STOCK RATES FOR ALL AUTHORIZED LOCATIONS.

18                 CAN YOU CONFIRM THAT'S THE CORRECT IN-STOCK RATE?

19      A.   LET ME JUST READ THIS HERE.  WE WOULD LIKE TO BE 100

20      PERCENT IN-STOCK.

21      Q.   OKAY.  AND THAT'S BECAUSE HAVING A FULL STOCK OF IPHONE

22      AND IPAD BEFORE LAUNCH WOULD BE -- IS IMPORTANT FOR THE LAUNCH;

23      RIGHT?

24      A.   WHETHER IT'S LAUNCH OR NOT, WE WANT TO HAVE AS MUCH

25      PRODUCT TO MEET OUR CUSTOMER DEMAND ALL THE TIME.
```

```
 1    Q.   BUT YOU DON'T ALWAYS HAVE THAT; RIGHT?

 2    A.   SOMETIMES WE -- DEMAND COMES IN MUCH HIGHER THAN WE EXPECT

 3    AND WE REACT TO IT.

 4    Q.   OKAY.  LET'S TAKE A LOOK AT DX 411, WHICH IS ALSO A

 5    CONFIDENTIAL DOCUMENT, AND LOOK AT PAGE 32.

 6         SIR, DOES PAGE 32 CONFIRM THE PERCENTAGE OF IN-STOCK RATES

 7    THAT IS SET AS A GOAL FOR THE LAUNCH?

 8    A.   WE ALWAYS WANT TO BE PERFECTLY IN-STOCK, SO THAT'S OUR

 9    GOAL ALL THE TIME.

10    Q.   ALL RIGHT.  BUT YOU'RE NOT ALWAYS MEETING THAT GOAL;

11    CORRECT?

12    A.   I WOULD SAY WE MEET IT THE VAST MAJORITY OF THE TIMES.

13    IT'S ONLY UNDER PRETTY SMALL CIRCUMSTANCES THAT WE DON'T.

14              MS. MAROULIS:  OKAY.  YOUR HONOR, I MOVE EXHIBIT 411

15    INTO EVIDENCE, AND MY UNDERSTANDING IS THAT APPLE IS SEALING

16    PORTIONS OF THIS EXHIBIT.

17              THE COURT:  ANY OBJECTION?

18              MR. LEE:  NO OBJECTION.

19              THE COURT:  IT IS ADMITTED.

20         (DEFENDANTS' EXHIBIT 411 WAS ADMITTED IN EVIDENCE.)

21              THE COURT:  GO AHEAD, PLEASE.

22    BY MS. MAROULIS:

23    Q.   SIR, GIVEN THE SHORTAGES AT ALMOST EVERY LAUNCH, SOME

24    CONSUMERS MAY GO TO ANOTHER PRODUCT WHEN THE PRODUCT THEY WANT

25    IS NOT AVAILABLE, RIGHT?
```

1     A.   THEY MAY DO.

2     Q.   OKAY.  AND SOME OF THOSE CONSUMERS WOULD GO AND BUY A

3     PRODUCT FROM ANOTHER MANUFACTURER; CORRECT?

4     A.   THEY MAY DO.

5     Q.   OKAY.  LET'S TAKE A BRIEF LOOK AT DX 451.  DO YOU

6     RECOGNIZE THAT, SIR, AS APPLE'S SUBMISSION TO THE UNITED STATES

7     SECURITIES AND EXCHANGE COMMISSION, FORM 10-K?

8     A.   I DON'T RECOGNIZE IT, BUT I KNOW WHAT IT IS.

9          MS. MAROULIS:  OKAY.  I MOVE THE 10-K FORM EXHIBIT,

10    DX 451, INTO EVIDENCE.

11         MR. LEE:  NO OBJECTION, YOUR HONOR.

12         THE COURT:  IT'S ADMITTED.

13    (DEFENDANTS' EXHIBIT 451 WAS ADMITTED IN EVIDENCE.)

14         THE COURT:  GO AHEAD, PLEASE.

15    BY MS. MAROULIS:

16    Q.   LET'S TAKE A LOOK AT DX 451, PAGE 9.  OKAY.  AND I WANT

17    YOU TO LOOK AT THE PARAGRAPH THAT STARTS WITH "SUBSTANTIALLY

18    ALL OF COMPANY'S HARDWARE PRODUCTS ARE MANUFACTURED BY

19    OUTSOURCING PARTNERS PRIMARILY LOCATED IN ASIA."

20    A.   I SEE THAT PARAGRAPH.

21    Q.   OKAY.  ISN'T IT CORRECT, SIR, THAT APPLE'S CAPACITY AND

22    ABILITY TO INCREASE CAPACITY IS GATED BY THE MANUFACTURER OF

23    SUBCOMPONENTS?

24    A.   IT CAN BE AT TIMES, YES.

25    Q.   OKAY.  AND IT'S TRUE THAT THE NUMBER OF UNITS THAT APPLE

1    CAN MAKE AT ANY GIVEN TIME DEPENDS ON HOW FAST THOSE

2    OUTSOURCING PARTNERS CAN KEEP PACE WITH THE PRODUCTION; IS THAT

3    RIGHT?

4    A.   IT'S, YEAH, HOW THEY REACT TO OUR DEMAND SIGNAL WE'VE

5    GIVEN THEM.

6    Q.   OKAY.  AND SOMETIMES THEY CANNOT REACT FAST ENOUGH; RIGHT?

7    A.   SOMETIMES THEY CAN'T, YEAH.

8    Q.   NOW, THE DOCUMENT THAT YOU REVIEWED WITH MR. LEE ON YOUR

9    DIRECT IS NOT AN ACTUAL APPLE DOCUMENT THAT EXISTED BEFORE THIS

10   LITIGATION; RIGHT?

11   A.   NO.  WE CREATED IT.

12   Q.   OKAY.  YOU CREATED IT SPECIFICALLY FOR THIS LITIGATION;

13   RIGHT?

14   A.   THAT'S CORRECT.

15   Q.   AT THE DIRECTION OF COUNSEL; RIGHT?

16   A.   THE REQUEST OF COUNSEL, YES.

17   Q.   AND THIS DOCUMENT REFLECTS WHAT APPLE COULD HAVE DONE, BUT

18   NOT WHAT APPLE ACTUALLY DID ALREADY; RIGHT?

19   A.   IT DOES REFLECT WHAT IT DID.

20   Q.   BUT IT ALSO REFLECTS WHAT APPLE COULD HAVE DONE.  IT'S

21   YOUR ASSUMPTIONS; RIGHT?

22   A.   IT'S WHAT OUR -- THE SECTION NUMBER 3 AND 4 WHERE IT SAYS

23   WHAT WE COULD HAVE DONE, THAT'S BASED ON OUR MANUFACTURING

24   LINES AT THE TIME, AND IF WE HAD FULLY UTILIZED THEM OVER THE

25   PERIOD OF TIME, THAT'S WHAT WE COULD HAVE DONE.

1    Q.    OKAY.  AND AGAIN, THIS DOCUMENT IS NOT ANYTHING YOU WOULD

2    HAVE FOUND IN APPLE'S FILES BEFORE THIS LITIGATION; RIGHT?

3    A.    THE DATA YOU WOULD HAVE.  IT CAME FROM ALL OF THE EXISTING

4    DATA.  BUT WE SPECIFICALLY PUT IT TOGETHER.

5              MS. MAROULIS:  THANK YOU, SIR.

6              THE COURT:  ALL RIGHT.  TIME IS 10:11.

7         ANY REDIRECT?

8              MR. LEE:  NO REDIRECT, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

10   AND IS IT SUBJECT TO RECALL OR NOT?

11             MR. LEE:  EXCUSED, NOT SUBJECT TO RECALL.

12             THE COURT:  DO YOU AGREE, MS. MAROULIS?

13             MS. MAROULIS:  YES, YOUR HONOR.

14             THE COURT:  ALL RIGHT, NO RECALL.

15        YOU ARE EXCUSED.

16             THE WITNESS:  THANK YOU.

17        (PAUSE IN PROCEEDINGS.)

18             THE COURT:  ARE YOU READY?

19             MR. MCELHINNY:  WE ARE, YOUR HONOR.

20             THE COURT:  ALL RIGHT.  LET'S GO.

21             MR. MCELHINNY:  APPLE WILL CALL AS ITS NEXT WITNESS

22   DR. JOHN HAUSER.

23        AND, YOUR HONOR, I WOULD LIKE TO INTRODUCE YOU TO MY

24   PARTNER, MR. JIM BENNETT, WHO WILL DO THE EXAMINATION.

25             THE COURT:  OKAY.  THANK YOU.

```
 1              MR. BENNETT:  GOOD MORNING, YOUR HONOR.  THANK YOU.

 2         GOOD MORNING, LADIES AND GENTLEMEN.

 3              (JOHN HAUSER, PLAINTIFF'S WITNESS, WAS SWORN.)

 4              THE WITNESS:  I DO.

 5              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

 6         AND STATE YOUR NAME, PLEASE, AND SPELL IT.

 7              THE WITNESS:  MY NAME IS JOHN HAUSER, H-A-U-S-E-R.

 8              THE COURT:  TIME IS 10:13.  GO AHEAD, PLEASE.

 9              MR. BENNETT:  THANK YOU, YOUR HONOR.

10                        DIRECT EXAMINATION

11    BY MR. BENNETT:

12    Q.   GOOD MORNING, DR. HAUSER.

13    A.   GOOD MORNING.

14    Q.   WOULD YOU PLEASE INTRODUCE YOURSELF TO THE LADIES AND

15    GENTLEMEN OF THE JURY?

16    A.   MY NAME IS JOHN HAUSER.  I'M A PROFESSOR AT M.I.T., SLOAN

17    SCHOOL OF MANAGEMENT.

18    Q.   DOCTOR, YOU'RE HERE THIS MORNING ACTING AS AN EXPERT ON

19    BEHALF OF APPLE?

20    A.   THAT'S CORRECT.

21    Q.   WHAT QUESTION HAVE YOU BEEN ASKED TO ANALYZE IN THIS CASE?

22    A.   I'VE BEEN ASKED TO DETERMINE IF THERE'S ANY EFFECT ON

23    DEMAND OF THE FEATURES ASSOCIATED WITH THE PATENTS, THE PATENTS

24    IN THIS CASE.

25    Q.   AND WHAT WAS THE METHOD YOU USED TO EVALUATE THAT
```

1    QUESTION?

2    A.   I USED THE METHOD CALLED CONJOINT STUDIES.  THAT'S TWO

3    CONSUMER SURVEYS, ONE FOR TABLETS AND ONE FOR SMARTPHONES.

4    Q.   AND BRIEFLY, DOCTOR, BECAUSE WE'RE GOING TO TURN TO IT,

5    WHAT IS A CONJOINT STUDY?

6    A.   A CONJOINT STUDY IS A METHOD TO DETERMINE DEMAND FOR

7    SPECIFIC FEATURES OF THE PRODUCT.

8    Q.   OKAY.  AND WHY IN THIS CASE DID YOU CHOOSE TO USE A

9    CONJOINT STUDY TO EVALUATE THE QUESTION THAT YOU HAVE LOOKED

10   AT?

11   A.   OH, IT'S WIDELY RECOGNIZED AS THE MOST USED METHOD FOR

12   QUANTIFYING CONSUMER DEMAND FOR PRODUCT FEATURES.

13        IT'S PARTICULARLY SUITED FOR BEING ABLE TO PARSE OUT THE

14   EFFECT OF THESE PRODUCT FEATURES, AND FOR THOSE REASONS, IT'S

15   BEEN USED BY THE INDUSTRY FOR OVER 40 YEARS TO DO EXACTLY THAT.

16   Q.   AND WHAT CONCLUSIONS DID YOU REACH FROM THE CONJOINT STUDY

17   YOU PERFORMED IN THIS CASE?

18   A.   I REACHED THE CONCLUSION THAT THE FEATURES ASSOCIATED WITH

19   THE PATENTS AT ISSUE IN THIS CASE HAVE A MEASURABLE IMPACT ON

20   CONSUMER DEMAND.

21   Q.   BEFORE WE GET TO THE DETAILS OF YOUR SURVEY, I'D LIKE TO

22   JUST GO OVER YOUR BACKGROUND, WHICH HAS ALREADY COME UP ON THE

23   SCREEN, I SEE, IN PDX 93.1.

24        LET'S START WITH YOUR EDUCATION.  CAN YOU DESCRIBE YOUR

25   EDUCATIONAL BACKGROUND STARTING WITH COLLEGE.

1    A.    STARTING IN COLLEGE, I RECEIVED A BACHELOR'S IN ELECTRICAL

2    ENGINEERING FROM M.I.T.; I THEN RECEIVED A MASTER'S IN

3    ELECTRICAL ENGINEERING AND MASTER'S IN CIVIL ENGINEERING, BOTH

4    FROM M.I.T.; AND, FINALLY, A DOCTORATE IN OPERATIONS RESEARCH.

5    OPERATIONS RESEARCH IS THE USE OF MATHEMATICS FOR ADDRESSING

6    BUSINESS PROBLEMS.

7    Q.    IT LOOKS LIKE YOU WERE SOMEWHAT BUSY IN 1973, SIR.

8    A.    YES, THAT'S THE CASE.

9    Q.    TO GET A -- AND YOU'VE TOLD US YOUR DOCTORATE IS IN, SIR?

10   A.    YES.  IT'S IN OPERATIONS RESEARCH.

11   Q.    OKAY.  WHAT IS OPERATIONS RESEARCH?

12   A.    IT'S REALLY USE OF MATHEMATICS TO ADDRESS BUSINESS

13   PROBLEMS.

14   Q.    TO OBTAIN YOUR DOCTORATE DEGREE, DID YOU WRITE A THESIS?

15   A.    YES, I DID.  IT WAS ABOUT 300 TO 400 PAGES, BUT IT -- IT

16   REALLY ADDRESSED UNDERSTANDING CONSUMER DEMAND FOR NEW

17   PRODUCTS.

18   Q.    AND FOR THOSE OF US WHO DON'T HAVE DOCTORATES, WHAT'S A

19   THESIS?

20   A.    WELL, IT'S A DOCUMENT THAT WE'RE ASKED TO WRITE IN ORDER

21   TO EARN OUR DOCTORATE.

22   Q.    NOW, SIR, TODAY ARE YOU A TEACHER?

23   A.    YES, I AM.

24   Q.    HOW LONG HAVE YOU BEEN A TEACHER?

25   A.    OH, I'VE BEEN A TEACHER SINCE 1975, ABOUT 40 YEARS.

1    Q.   AND, SIR, HAVE YOU PUBLISHED IN THE AREA OF MARKETING,

2    RESEARCH, AND CONSUMER SURVEYS?

3    A.   YES, I HAVE.

4    Q.   AND I THINK WE'VE BROUGHT UP ON THE SCREEN REFERENCE TO

5    TEXTBOOKS AND ARTICLES.  COULD YOU JUST DESCRIBE BRIEFLY THE

6    TEXTBOOKS THAT YOU'VE WRITTEN?

7    A.   WELL, THERE'S TWO TEXTBOOKS, THE DESIGN AND MARKETING OF

8    NEW PRODUCTS, AND ESSENTIALS OF NEW PRODUCT MANAGEMENT.

9         IN ADDITION, I'VE PUBLISHED PROBABLY OVER 90 ARTICLES ON

10   MARKETING RESEARCH AND CONSUMER SURVEYS.

11   Q.   AND HOW MANY OF THOSE 90 ARTICLES, EXCUSE ME, REFERENCED

12   ON THE SLIDE RELATE TO CONJOINT STUDIES, THE TYPE OF STUDY

13   YOU'VE DONE IN THIS CASE?

14   A.   OH, APPROXIMATELY 25 OR MORE.

15   Q.   NOW, SIR, HAS YOUR EXPERIENCE BEEN ENTIRELY IN THE

16   ACADEMIC FIELD?

17   A.   NO, IT HAS NOT.

18   Q.   CAN YOU GIVE US SOME EXAMPLES OF COMPANIES THAT YOU'VE

19   ADVISED ON MARKETING ISSUES?

20   A.   WELL, I'VE WORKED WITH COMPANIES SUCH AS AMERICAN

21   AIRLINES, GENERAL MOTORS, CHRYSLER, IBM, FIDELITY INVESTMENTS,

22   TIVO, AND A NUMBER OF OTHER COMPANIES.

23   Q.   HAS ANY OF YOUR WORK FOR THESE COMPANIES INVOLVED THE

24   DESIGN OR MARKETING OF NEW PRODUCTS?

25   A.   YES, IT HAS.  ALMOST ALL OF IT.

1    Q.   AND, SIR, BEFORE WE LEAVE YOUR BACKGROUND, AGAIN, AT THE

2    RISK OF EMBARRASSING YOU, HAVE YOU WON SOME LIFETIME

3    ACHIEVEMENT AWARDS FOR WORK IN THE MARKETING FIELD?

4    A.   YES, I HAVE.

5    Q.   AND DO THEY INCLUDE SOMETHING CALLED THE PARLIN AWARD?

6    A.   YES, IT DOES.

7    Q.   IS IT THE OLDEST AWARD GIVEN BY THE AMERICAN MARKETING

8    ASSOCIATION?

9    A.   YES, IT IS.

10   Q.   YOU MENTIONED THE CONJOINT STUDY IS WIDELY USED IN

11   INDUSTRY.  FOR HOW LONG HAS THAT BEEN THE CASE?

12   A.   OH, IT WAS DEVELOPED IN THE EARLY 1970S.  SO, AGAIN, FOR

13   OVER 40 YEARS IT'S BEEN USED BY INDUSTRY.

14   Q.   AND HOW MANY ACADEMIC PAPERS WOULD YOU ESTIMATE HAVE BEEN

15   WRITTEN ABOUT CONJOINT STUDIES?

16   A.   OH, WELL OVER A THOUSAND.

17   Q.   AND HAS RESEARCH BEEN PERFORMED THAT CONFIRMS THE ACCURACY

18   OF CONJOINT STUDIES?

19   A.   YES, IT HAS.

20   Q.   NOW, YOU MENTIONED THE USE OF CONJOINT STUDIES IN

21   INDUSTRY.  CAN YOU GIVE US SOME EXAMPLES -- AND WE CAN BRING UP

22   PDX 93.3 AT THIS POINT -- BUT CAN YOU GIVE US EXAMPLES OF

23   CORPORATIONS THAT HAVE USED THE TYPE OF CONJOINT ANALYSIS THAT

24   YOU'VE USED IN THIS CASE?

25   A.   YES, THERE ARE LITERALLY THOUSANDS OF COMPANIES THAT HAVE

1    USED CONJOINT STUDY TO DEVELOP FEATURES FOR NEW PRODUCTS AND TO

2    FORECAST DEMAND FOR NEW PRODUCTS, AND HERE ARE JUST A FEW OF

3    THEM.

4    Q.   OKAY.  AND GENERALLY WHAT -- WITHDRAW THAT.

5         CAN YOU GIVE THE JURY SOME EXAMPLES, SOME SPECIFIC

6    EXAMPLES OF CONJOINT STUDIES THAT HAVE BEEN PERFORMED IN

7    INDUSTRY, FOR INSTANCE, IN THE HOTEL INDUSTRY?

8    A.   YES.  FOR EXAMPLE, THE MARRIOTT CORPORATION HAS USED

9    CONJOINT ANALYSIS TO DEVELOP AMENITIES FOR HOTEL ROOMS, WHAT

10   THE HOTEL ROOM SHOULD LOOK LIKE, AND A WHOLE SERIES OF

11   DIFFERENT ASPECTS OF THE WHOLE HOTEL EXPERIENCE.

12   Q.   NOW, IT HAS BEEN SUGGESTED IN THIS CASE THAT CONJOINT

13   STUDIES CANNOT BE USED WHEN YOU HAVE A COMPLEX PRODUCT THAT HAS

14   A LOT OF FEATURES.

15        IS THAT A CORRECT STATEMENT?

16   A.   NO, IT IS NOT.

17   Q.   OKAY.  YOU REFER TO THE FACT THAT THE AUTOMOBILE COMPANIES

18   HAVE USED CONJOINT STUDIES OVER THE YEARS.  ARE AUTOMOBILES

19   COMPLEX PRODUCTS, SIR?

20   A.   YES, THEY'RE VERY COMPLEX.

21   Q.   AND IF WE CAN BRING UP PDX 93.4, CAN YOU GIVE US A LITTLE

22   MORE DETAIL ABOUT HOW CONJOINT ANALYSIS HAS BEEN USED BY THE

23   AUTOMOBILE INDUSTRY OVER THE YEARS?

24   A.   YES.  CONJOINT ANALYSIS HAS BEEN USED FOR ABOUT 40 YEARS,

25   SINCE THE EARLY 1970S.  SOME OF THE EXAMPLES THAT YOU CAN TALK

1    ABOUT ARE THE DESIGN OF THE BUMPER-TO-BUMPER WARRANTY, THE XM

2    SIRIUS RADIO, THE ONSTAR SYSTEM, AND MANY OTHER FEATURES AS

3    WELL.

4    Q.   SO THESE WERE FEATURES IN AUTOMOBILES THAT WERE EVALUATED

5    USING CONJOINT ANALYSIS?

6    A.   YES, THEY WERE, EVALUATED AND DEVELOPED.

7    Q.   AS PART OF THEIR INTRODUCTION INTO THE PRODUCT?

8    A.   YES.

9    Q.   HAVE YOU PERSONALLY CONSULTED WITH AUTOMAKERS?

10   A.   YES, I HAVE.

11   Q.   HAVE YOU USED CONJOINT ANALYSIS IN THAT WORK?

12   A.   YES, I HAVE.

13   Q.   AND WHAT TYPES OF FEATURES HAVE YOU STUDIED WITH CONJOINT

14   ANALYSIS IN THE AUTOMOBILE INDUSTRY?

15   A.   OH, THE TYPE OF FEATURES MIGHT BE AUTOMATIC PARKING

16   ASSISTING, ADAPTIVE CRUISE CONTROL, RIDE CONTROL, AND OTHER

17   ASPECTS OF AUTOMOBILES, OTHER FEATURES.

18   Q.   SIR, IN YOUR CAREER, HOW MANY CONJOINT SURVEYS HAVE YOU

19   PERSONALLY PERFORMED?

20   A.   OH, AT LEAST 20 YEARS.  SO PROBABLY 50 OR MORE.

21   Q.   AND HOW DOES THE METHODOLOGY THAT YOU HAVE USED WHEN DOING

22   CONJOINT SURVEYS FOR BUSINESS CLIENTS COMPARE WITH THE

23   METHODOLOGY THAT YOU ARE USING IN THIS CASE?

24   A.   OH, IT'S BASICALLY THE SAME.

25   Q.   SIR, HAVE YOU TESTIFIED PREVIOUSLY AS AN EXPERT ON THE

1       SUBJECT OF CONJOINT STUDIES AND CONSUMER PREFERENCES?

2       A.   YES, I HAVE.

3       Q.   AND CAN YOU TELL US THE NAMES OF SOME OF THE COMPANIES FOR

4       WHOM YOU'VE ACTED AS AN EXPERT IN LITIGATION?

5       A.   YES, I HAVE.  COMPANIES SUCH AS MICROSOFT, AMD, TIVO, XM

6       SIRIUS RADIO, AND OTHERS.

7       Q.   HAVE YOU PREVIOUSLY ACTED AS AN EXPERT WITNESS ON BEHALF

8       OF APPLE?

9       A.   YES, I HAVE.

10      Q.   SIR, IN THIS CASE HAVE YOU BEEN COMPENSATED FOR THE WORK

11      YOU'VE DONE?

12      A.   YES, I HAVE.

13      Q.   AND AT WHAT BASIS ARE YOU BEING COMPENSATED?

14      A.   BY THE HOUR.

15      Q.   IS YOUR COMPENSATION IN ANY WAY CONTINGENT ON THE OUTCOME

16      OF THIS CASE?

17      A.   NO, IT IS NOT.

18           MR. BENNETT:  YOUR HONOR, AT THIS TIME WE WOULD OFFER

19      DR. HAUSER AS AN EXPERT IN THE FIELD OF CONJOINT STUDIES,

20      CONSUMER SURVEYS, AND MARKETING RESEARCH AND ANALYSIS.

21           MR. PRICE:  NO OBJECTION.

22           THE COURT:  ALL RIGHT.  SO CERTIFIED.

23           MR. BENNETT:  THANK YOU, YOUR HONOR.

24      Q.   I WANT TO TALK A LITTLE BIT MORE ABOUT CONJOINT STUDIES

25      AND GET SOME BACKGROUND ON THAT SUBJECT.

1              ARE YOU FAMILIAR WITH THE TERM CHOICE-BASED CONJOINT

2    SURVEY OR STUDY?

3    A.   YES, I AM.

4    Q.   IS THAT A COMMONLY USED TERM TO REFER TO CONJOINT

5    ANALYSIS?

6    A.   YES, IT'S A COMMONLY USED TERM.  CONSUMERS ARE ASKED TO

7    MAKE CHOICES AMONG PRODUCT PROFILES.

8    Q.   OKAY.  AND HAVE YOU PREPARED A DEMONSTRATIVE THAT GIVES AN

9    EXAMPLE, SIMPLIFIED EXAMPLE, OF THE TYPE OF CHOICE THAT LIES AT

10   THE HEART OF CONJOINT SURVEYS?

11   A.   YES, I HAVE.

12   Q.   IF WE BRING UP 93.5, PLAINTIFF'S DEMONSTRATIVE 93.5, YOUR

13   HONOR.

14              THE COURT:  GO AHEAD, PLEASE.

15   BY MR. BENNETT:

16   Q.   DR. HAUSER, COULD YOU EXPLAIN TO THE LADIES AND GENTLEMEN

17   WHAT'S SHOWN HERE, WALK US THROUGH THIS?

18   A.   YES.  THIS, OF COURSE, IS A SIMPLIFIED EXAMPLE.  IMAGINE

19   THAT YOU'RE PURCHASING A TELEVISION, A SATELLITE TELEVISION

20   SERVICE, YOU'RE GOING TO PAY BY THE MONTH, OF COURSE, AND HERE

21   WE'VE JUST DESCRIBED A NUMBER OF FEATURES.

22       IF YOU LOOK DOWN THE LEFT, NETWORK, NUMBER OF CHANNELS,

23   PREMIUM CHANNELS, WHETHER OR NOT IT INCLUDES A DIGITAL VIDEO

24   RECORDER OR DVR, AND, OF COURSE, THE PRICE.

25       AND WE DESCRIBE TWO PROFILES, TWO ALTERNATIVE SATELLITE

1    TELEVISION SERVICES.  YOU'LL SEE THAT PROFILES 1 AND 2 BOTH

2    HAVE THE DISH NETWORK, BOTH HAVE THE SAME NUMBER OF CHANNELS,

3    120, BOTH HAVE THREE PREMIUM CHANNELS, THE DIFFERENCE IS THAT

4    PROFILE 1 HAS A DVR, PROFILE 2 DOES NOT.

5         HOWEVER, PROFILE 1 IS PRICED AT $40 PER MONTH, AND PROFILE

6    2 IS PRICED AT $35 A MONTH.

7         SO YOU WOULD SIMPLY BE ASKED TO CHOOSE, IF THESE WERE THE

8    ONLY TWO AVAILABLE, WHICH ONE WOULD YOU CHOSE?

9         AND SO IMAGINE THAT YOU CHOSE PROFILE 1.  CAN YOU PUT A

10   CHECKUP THERE.

11        WELL, THIS WOULD TELL ME THAT YOU'RE WILLING TO PAY AT

12   LEAST $5 PER MONTH EXTRA TO HAVE A DVR AS PART OF THE SATELLITE

13   TELEVISION SERVICE.

14   Q.   AND YOU SAID, I SAID AND YOU SAID THIS IS A SIMPLIFIED

15   ACTION.  CAN YOU ELABORATE A LITTLE BIT ON WHAT YOU MEAN BY

16   THAT, HOW THIS IS SIMPLIFIED?

17   A.   YES.  IN THIS SIMPLIFIED EXAMPLE, A CONSUMER WOULD FOCUS

18   JUST ON THE DVR.  SO IF WE CAN, IN A MORE REALISTIC EXAMPLE,

19   MANY OF THE FEATURES WOULD VARY, THE NUMBER OF CHANNELS MIGHT

20   BE DIFFERENT AND SO WOULD THE PREMIUM CHANNELS.

21   Q.   AND I THINK WE HAVE A DEMONSTRATIVE THAT DEMONSTRATES

22   THAT, IF WE BRING UP .7 -- OR WE HAVE ALREADY.  CAN YOU WALK US

23   THROUGH THAT, DR. HAUSER?

24   A.   YES.  THIS IS VERY SIMILAR, EXCEPT NOW WE'RE VARYING OTHER

25   FEATURES AS WELL, THE NUMBER OF CHANNELS IS DIFFERENT, THE

1      NUMBER OF PREMIUM CHANNELS IS DIFFERENT, AS WELL AS THE DVR AND

2      PRICE.

3           AND AT THIS POINT, THE CONSUMER, OR YOU WOULD HAVE TO MAKE

4      TRADEOFFS AMONG THESE FOUR FEATURES, AND THUS YOU WOULD REVEAL

5      TO ME THE TRADEOFFS THAT YOU ARE MAKING.  AND IF I ASK ENOUGH

6      QUESTIONS OF THESE, I CAN ZERO IN ON ANY OF THESE FEATURES.

7      Q.   AND I THINK WE HAVE ONE MORE SLIDE IN THIS SERIES, DOCTOR.

8      IF WE CAN BRING UP 93.8, PLAINTIFF'S DEMONSTRATIVE 93.8.

9           COULD YOU WALK US THROUGH THIS SLIDE AND EXPLAIN WHAT THIS

10     IS INTENDED TO ILLUSTRATE, SIR.

11     A.   YES.  THE FIRST QUESTION ASKS YOU SIMPLY, IF THESE WERE

12     THE ONLY TWO AVAILABLE, WHICH WOULD YOU CHOOSE?

13          BUT NOW I'M GOING TO ASK YOU, GIVEN THAT YOU'VE CHOSEN

14     PROFILE 1, WOULD YOU ACTUALLY CHOOSE THIS PROFILE?  WOULD YOU

15     ACTUALLY BUY IT IN THE MARKETPLACE?

16          SO I THINK WE CAN PUT A CHECK ON YES HERE -- THANK YOU --

17     YOU WOULD BE INDICATING TO ME NOT ONLY THAT YOU PREFERRED

18     PROFILE 1, BUT THAT YOU WOULD ACTUALLY BUY IT IN THE

19     MARKETPLACE.

20     Q.   OKAY.  AND IS THERE A TECHNICAL TERM THAT'S USED TO REFER

21     TO THE -- WHAT YOU CAN INFER OR THE DATA YOU CAN EXTRACT FROM

22     THAT INDICATION OF BUYING THERE?

23     A.   YES.  IT'S SIMPLY THAT YOU WOULD BE WILLING TO BUY,

24     WILLING TO BUY THIS PROFILE.

25     Q.   OKAY.  AND I THINK WILLINGNESS TO BUY IS A TERM WE'RE

1    GOING TO COME BACK TO IN YOUR TESTIMONY THIS MORNING.

2        CAN YOU JUST BRIEFLY EXPLAIN WHAT WILLINGNESS TO BUY

3    REFERS TO?

4    A.   WILLINGNESS TO BUY IS GOING TO ALLOW ME TO MEASURE THE

5    PERIOD OF TIME OF CONSUMERS WHO WOULD BUY A PARTICULAR PROFILE,

6    IN THIS CASE A SMARTPHONE OR A TABLET.

7    Q.   AND HOW DOES THE TERM "WILLINGNESS TO BUY" RELATE TO THE

8    SUBJECT OF CONSUMER DEMAND?

9    A.   WILLINGNESS TO BUY IS A MEASURE OF CONSUMER DEMAND.

10   Q.   OKAY.  DOCTOR, I'D LIKE NOW TO TURN TO THE SURVEY THAT YOU

11   PERFORMED IN THIS CASE AND WALK THE LADIES AND GENTLEMEN OF THE

12   JURY THROUGH THAT SURVEY.

13       SO WHY DON'T WE BRING UP PLAINTIFF'S DEMONSTRATIVE 93.9,

14   AND I'D LIKE TO START BY ASKING YOU, DOCTOR, JUST ABOUT THE

15   OVERALL METHODOLOGY OF YOUR SURVEY AND MAYBE YOU COULD WALK US

16   THROUGH THIS.

17       FIRST, WHAT MEDIUM WAS USED TO CONDUCT THE SURVEY?

18   A.   THIS WAS AN INTERNET SURVEY.

19   Q.   IS IT A STANDARD PRACTICE TO CONDUCT CONJOINT STUDIES VIA

20   THE INTERNET?

21   A.   YES.  TODAY IT'S PROBABLY THE MOST COMMONLY USED METHOD.

22   Q.   OKAY.  WHO WERE THE PERSONS WHO PARTICIPATED IN THIS

23   SURVEY?

24   A.   THE PEOPLE, THE CONSUMERS WHO WERE INVOLVED, WHO ACTUALLY

25   ANSWERED THE SURVEY WERE CONSUMERS WHO HAD OWNED SAMSUNG PHONES

1    AT ISSUE IN THIS CASE AND WHO WERE INVOLVED IN THE DECISION TO

2    BUY THOSE CELL PHONES, THE SMARTPHONES AND TABLETS.

3    Q.   RIGHT.  WE HAVE TO BE CLEAR ON THAT.  YOU CONDUCTED TWO

4    SURVEYS; IS THAT CORRECT?

5    A.   YES, ONE FOR SMARTPHONES AND ONE FOR TABLETS.

6    Q.   OKAY.  SO ON THE SURVEY METHOD HERE WHEN THERE'S A

7    REFERENCE TO SAMSUNG OWNERS, IT'S A REFERENCE TO BOTH

8    SMARTPHONES AND TABLETS; IS THAT CORRECT?

9    A.   YES, THAT'S CORRECT.

10   Q.   AND WHY DID YOU SURVEY SAMSUNG PHONE AND TABLET OWNERS?

11   A.   THOSE ARE THE RELEVANT OWNERS FOR HAVING PURCHASED THE

12   SMARTPHONES AND TABLETS AT ISSUE IN THE CASE.  IT WAS THE

13   RELEVANT SET OF CONSUMERS TO SURVEY.

14   Q.   OKAY.  AND HOW DID YOU IDENTIFY AND LOCATE THE INDIVIDUALS

15   WHO PARTICIPATED IN AND TOOK THE SURVEY?

16   A.   WELL, I BEGAN WITH A PANEL CALLED RESEARCH NOW OF

17   CONSUMERS WILLING TO TAKE SURVEYS ON THE INTERNET.

18       I RANDOMLY SAMPLED THEN FROM THAT PANEL AND BALANCED IT IN

19   U.S. CENSUS.  SO IT WAS NATIONWIDE AND A BALANCED SAMPLE.

20   Q.   OKAY.  AND THE PANEL CAME FROM, DID YOU SAY, RESEARCH NOW?

21   A.   YES, IT CAME FROM RESEARCH NOW.  I'VE WORKED WITH THEM

22   BEFORE.  THEY DO OVER A THOUSAND SURVEYS EACH MONTH.  MAJOR

23   CORPORATIONS RELY ON THE RESULTS FROM SURVEYS BASED UPON A

24   RESEARCH NOW PANEL.

25   Q.   THIRD BULLET ON THE SLIDE ON THE SCREEN REFERS, IT SAYS

1      PRE-TESTED.  WHAT DO YOU MEAN BY PRE-TESTED?

2      A.   WELL, BEFORE I EVER SENT THE SURVEY OUT TO CONSUMERS, I

3      ASKED OTHER CONSUMERS TO LOOK AT THE SURVEY AND LOOK AT THE

4      ANIMATIONS TO VERIFY THAT THEY UNDERSTOOD THE ANIMATIONS AND

5      THAT THEY UNDERSTOOD THE TASKS IN THE SURVEY.

6      Q.   AND WHO PERFORMED THE PRE-TESTING?

7      A.   THE PRE-TESTING WAS DONE AT MY DIRECTION BY EXPERIENCED

8      SURVEY RESEARCHERS AT APPLIED MARKETING SCIENCE.

9      Q.   AND HAVE YOU WORKED WITH THEM OVER THE YEARS?

10     A.   YES.  I WORKED WITH THEM FOR OVER 25 YEARS.  WE RECENTLY

11     HAD OUR 25TH ANNIVERSARY.

12          I DID HELP FOUND THEM.  I WAS A CO-FOUNDER, AND I REMAIN

13     ON THE BOARD OF DIRECTORS.

14     Q.   OKAY.  DID YOU HAVE ANY PERSONAL INVOLVEMENT IN THE

15     PRE-TESTING THAT AMS PERFORMED?

16     A.   YES, I DID.  I -- THESE INTERVIEWERS I KNOW AND I'VE

17     WORKED WITH, SO I PARTICIPATED IN THEIR TRAINING FOR THE

18     SURVEY, AND I LISTENED TO SOME OF THE INITIAL INTERVIEWS SO

19     THAT THEY WERE DOING THE PRE-TESTS AT MY DIRECTION.

20     Q.   OKAY.  AND WHAT DID THE PRE-TEST SHOW?

21     A.   WELL, THE PRE-TEST VERIFIED THAT CONSUMERS UNDERSTOOD THE

22     ANIMATIONS, THAT THEY WERE -- THEY UNDERSTOOD THE TASKS, AND

23     THAT THERE WERE NO, WHAT WE CALL, DEMAND ARTIFACTS.  IT'S A

24     TERM OF ART IN WHICH THE CONSUMERS COULD NOT GUESS THE PURPOSE

25     OF THE SURVEY.  IN FACT, THEY THOUGHT IT WAS BY SAMSUNG TO

```
 1        DESIGN FEATURES INTO SAMSUNG PHONES, MANY OF THEM DID.

 2             SO BASICALLY THERE WERE -- WE COULD DETECT NO DEMAND

 3        ARTIFACTS IN THE SURVEY.

 4                 THE COURT:  MR. BENNETT, IT'S 10:31.  CAN WE GO AHEAD

 5        AND TAKE OUR BREAK NOW.

 6                 MR. BENNETT:  YES, YOUR HONOR.

 7                 THE COURT:  ALL RIGHT.  SORRY TO INTERRUPT YOUR

 8        EXAMINATION.

 9             LET'S GO AHEAD AND TAKE A 15 MINUTE BREAK.  PLEASE DON'T

10        RESEARCH OR DISCUSS THE CASE.  THANK YOU.

11             (JURY OUT AT 10:31 A.M.)

12                 THE COURT:  OKAY.  THANK YOU.  GO AHEAD.  YOU MAY

13        STEP DOWN.

14                 THE WITNESS:  THANK YOU.

15                 THE COURT:  I'M GOING TO ASK IF YOU COULD TAKE THE

16        BINDERS FROM THE PREVIOUS WITNESSES SO THEY DON'T --

17                 MR. BENNETT:  SURE.

18                 THE COURT:  THANK YOU.

19                 MR. MCELHINNY:  YES, YOUR HONOR.  I HAVE THREE

20        ISSUES.

21                 THE COURT:  OKAY.

22                 MR. MCELHINNY:  TWO OF THEM I NEED TO TAKE UP NOW.

23        ONE WE COULD TAKE AT LUNCH BECAUSE IT IS FOR THE NEXT WITNESS.

24             BUT I HAVE AN INSTANT REPLY APPEAL OF YOUR HONOR'S TIME

25        RULING.
```

```
 1                THE COURT:  OKAY.

 2                MR. MCELHINNY:  YOU CHARGED US, AS WE UNDERSTAND IT,

 3        FROM 9:16 TO 9:27 THIS MORNING.

 4                THE COURT:  WHY DON'T I JUST TELL YOU EXACTLY WHAT I

 5        CHARGED.  9:16 TO 9:23 WAS EIGHT MINUTES FOR THE READING OF THE

 6        STIPULATIONS.  9:24 TO 9:27 WAS THE JUN WON LEE DEPOSITION,

 7        FOUR MINUTES.

 8           THE READING OF THE INTERROGATORIES, THE LODGING OF THE

 9        TRANSCRIPTS THE READING OF THE STIPULATED FACTS, THE DENISON

10        DEPOSITION AND TRIAL TESTIMONY WAS 9:29 TO 9:43, 15 MINUTES.

11           THE SEXTON DIRECT BY MR. LEE WAS 12 MINUTES FROM 9:45 TO

12        9:56.  IS THAT WHAT YOU HAVE AS THE TIME?

13                MR. MCELHINNY:  IT IS, BUT BY OUR TRACKING, THE FIRST

14        ENTRY, YOUR HONOR, 9:16 TO 9:27.

15                THE COURT:  YEAH, GO AHEAD.

16                MR. MCELHINNY:  THE FIRST FIVE MINUTES OF THAT WAS

17        ACTUALLY THE DISCUSSION OF THE ADMISSION OF THE SOFTWARE, AND I

18        THINK YOUR HONOR CAN CONFIRM IT IF YOU'RE INTERESTED BY LOOKING

19        AT YOUR --

20                THE COURT:  OKAY.  YOU'RE MOVING THOSE IN, YOUR

21        WITNESSES, MOWRY AND SNOEREN RELIED ON IT.  YOU DON'T GET TO

22        ADMIT EXHIBITS FOR FREE.  THOSE ARE EXHIBITS THAT YOUR EXPERTS

23        ALLEGEDLY RELIED ON YESTERDAY.

24                MR. MCELHINNY:  THANK YOU, YOUR HONOR.  MOVING ON TO

25        MY NEXT ISSUE.
```

```
 1              THE COURT:  ALL RIGHT.  WHAT IS IT?

 2              MR. MCELHINNY:  I WANT TO MAKE SURE THAT I -- THAT I

 3      UNDERSTOOD THE GROUND RULES.  YOUR HONOR, AS I --

 4              THE COURT:  IF YOU'RE MOVING IN EVIDENCE, WHETHER

 5      THAT'S TESTIMONY OR WHETHER THAT'S AN EXHIBIT, THAT'S COUNTING

 6      ON YOUR TIME.

 7              MR. MCELHINNY:  I'VE MOVED ON TO MY NEXT ISSUE.

 8      SORRY.

 9              THE COURT:  OKAY.

10              MR. MCELHINNY:  THE NEXT ISSUE IS, AS I UNDERSTAND

11      YOUR HONOR'S GROUND RULES, AND THAT WE GET THREE HIGH PRIORITY

12      OBJECTIONS, IRRESPECTIVE OF HOW MANY DOCUMENTS HAVE BEEN

13      DISCLOSED TO US.  AND THAT YOUR HONOR IS PREPARED TO RULE ON

14      ADDITIONAL OBJECTIONS IF THEY'RE RAISED TIMELY IN THE

15      COURTROOM.

16              THE COURT:  WHAT WAS YOUR OBJECTION?  I'M ASSUMING

17      YOU'RE TALKING ABOUT MR. SEXTON'S --

18              MR. MCELHINNY:  I WAS, YOUR HONOR.

19              THE COURT:  OKAY.  SO I GRANTED THE OBJECTION TO SDX

20      2351 BECAUSE SAMSUNG HAD MISLEADINGLY QUOTED WHAT WAS IN THE

21      "HUFFINGTON POST" ARTICLE.  WE DID NOT VERIFY THAT WHAT THEY

22      PUT ON THEIR DEMONSTRATIVE WAS ACTUALLY IN THE ARTICLE, AND THE

23      ARTICLE WAS NOT TIMELY DISCLOSED ON THEIR EXHIBIT LIST.  SO

24      THAT'S WHY THAT OBJECTION WAS SUSTAINED.

25              WHEN YOU SAID, OH, ALL THE SAME ARGUMENTS AS TO 2352, WHAT
```

```
1     WAS THE -- WHAT WAS THE --

2               MR. LEE:  YOUR HONOR, I DON'T HAVE IT RIGHT IN FRONT

3     OF ME, BUT EACH OF THE -- EACH OF THE DEMONSTRATIVES THAT WERE

4     BEING USED ARE DEMONSTRATIVES THAT ARE DERIVED FROM A 1006

5     EXHIBIT THAT WAS THE EXHIBIT.

6               THE COURT:  OKAY.

7               MR. LEE:  AND THE HIGH PRIORITY OBJECTION MADE, YOUR

8     HONOR, WAS THAT THE OBJECTION DIDN'T ACCURATELY REFLECT WHAT

9     WAS ON THE 1006 EXHIBIT OR THE ARTICLE.

10         AND THE SAME OBJECTION WOULD HAVE APPLIED TO THIS SECOND

11    DEMONSTRATIVE.

12         NOW --

13              THE COURT:  2350 -- OKAY.  WHAT IS YOUR OBJECTION TO

14    2352, BECAUSE WHEN YOU JUST SAY THE SAME AS 2351, THAT DOESN'T

15    GIVE ME AN INDICATION OF WHAT THAT IS.

16              MR. LEE:  YOUR HONOR, SINCE THEY DIDN'T OFFER IT AND

17    IT'S ALREADY GONE, THERE'S NO OBJECTION NOW.  I THINK

18    MR. MCELHINNY'S QUESTION IS TO A DIFFERENT, MAYBE A BROADER

19    ISSUE THAT MAY COME UP AGAIN, WHICH IS THAT IF WE OBJECT AND WE

20    USE ONE OF OUR THREE HIGH PRIORITY OBJECTIONS AND WE OBJECT TO

21    THREE THINGS AND YOUR HONOR RULES, IF THERE ARE ADDITIONAL

22    OBJECTIONS, LIKE HEARSAY, CAN WE MAKE THEM DURING THE COURSE OF

23    THE TRIAL SINCE WE'RE LIMITED TO THREE.

24         I THINK THAT'S THE ISSUE.

25              MR. MCELHINNY:  THAT WAS THE ISSUE.
```

1            THE COURT:  YES, YOU CAN MAKE THEM.

2        BUT UNDERSTAND, I'M TRYING TO KEEP THINGS MOVING.  SO IF

3    YOU JUST SAY, OBJECT, SAME THING AS 2351, THAT DOESN'T PUT ME

4    ON NOTICE.  SO I'M QUICKLY LOOKING FOR THE OBJECTIONS

5    YESTERDAY, I'M CONFIRMING MY RULING WAS TO SUSTAIN IT, I'M

6    CONFIRMING THE REASONS.

7        BUT IF YOU JUST SAY SAME AS 2351, THAT JUST DOESN'T GIVE

8    ME ENOUGH NOTICE, AND IF I NEED TO MAKE A SNAP JUDGMENT, WHICH

9    I'M GOING TO MAKE BECAUSE THIS JURY IS NOT GOING TO SIT AROUND

10   UNNECESSARILY, THEN I HAVE TO DO MY BEST WITH THE INFORMATION

11   THAT I HAVE.

12       SO IF YOU WANT TO MAKE A FURTHER OBJECTION, IT NEEDS TO BE

13   CLEARER SAYING, THE "WALL STREET JOURNAL" ARTICLE WAS NOT

14   TIMELY DISCLOSED ON SAMSUNG'S EXHIBIT LIST OR THE QUOTATION

15   THAT'S IN THE DEMONSTRATIVE DOES NOT ACCURATELY REFLECT WHAT IS

16   IN THAT "WALL STREET JOURNAL" ARTICLE, AND THEN WHAT I WILL

17   PROBABLY HAVE TO DO IS ASK SAMSUNG TO TAKE IT DOWN AND THEN I

18   WILL NEED TO VERIFY THAT BECAUSE THAT I CANNOT INDEPENDENTLY

19   VERIFY SITTING UP HERE RIGHT NOW.

20           MR. MCELHINNY:  THANK YOU, YOUR HONOR.

21           THE COURT:  I HAD THE TIME TO DO THAT VERIFICATION ON

22    THE "HUFFINGTON POST" AND THAT'S WHY YOUR OBJECTION WAS

23    SUSTAINED BECAUSE I DO THINK THAT WAS A MISLEADING QUOTATION

24    THAT'S NOT IN THAT ARTICLE.

25           MR. MCELHINNY:  THANK YOU, YOUR HONOR.  THAT WAS THE

```
1    CLARIFICATION THAT I WANTED.

2         MY THIRD ISSUE, AND WE CAN DO IT AT LUNCH, IS THAT FOR

3    MR. VELLTURO, SAMSUNG HAS DISCLOSED DX 403, WHICH IS THE HTC

4    LICENSE.  WE HAVE REFERRED THEM TO YOUR HONOR'S DAUBERT

5    RULINGS, YOUR HONOR IN LIMINE MOTIONS, WE'VE ASKED THEM TO

6    WITHDRAW IT.  THEY HAVE NOT.

7         AND SO OBVIOUSLY WE DON'T -- WE DON'T THINK IT'S

8    ADMISSIBLE.  YOUR HONOR HAS SAID THAT IT'S NOT PROBATIVE AND

9    THAT, IN THE DAUBERT MOTIONS, YOUR HONOR SAID THAT MR. VELLTURO

10   WAS NOT TO RELY ON IT.  WE DON'T UNDERSTAND WHY IT'S ON A CROSS

11   EXHIBIT DISCLOSURE, AND OBVIOUSLY IF THERE'S ATTEMPT TO USE IT,

12   WE WILL HAVE AN OBJECTION TO IT.

13        MR. QUINN:  YOUR HONOR, WE DO UNDERSTAND THE COURT'S

14   RULING WITH RESPECT TO DR. CHEVALIER'S RELIANCE ON THE HTC

15   LICENSE.

16        HOWEVER, DR. VELLTURO DID CONSIDER IT, HE DISCUSSES IT

17   EXTENSIVELY IN HIS REPORT, AND WE WANTED TO ASK HIM SOME

18   QUESTIONS ON IT.

19        THE COURT:  I'VE ISSUED TWO RULINGS ON HTC LICENSE

20   AND BOTH RULES EXCLUDED THAT LICENSE.

21        MR. MCELHINNY:  IN YOUR DAUBERT, YOU SPECIFICALLY

22   SAID DR. VELLTURO COULD NOT BE FAULTED FOR IGNORING THE HTC

23   LICENSE.

24        MR. QUINN:  SO --

25        THE COURT:  I THINK IT EVEN CAME UP IN THE PERMANENT
```

 1        INJUNCTION AS WELL.

 2                MR. MCELHINNY:  IT HAS, YOUR HONOR.

 3                THE COURT:  THREE TIMES.  I THINK IT EVEN CAME UP IN

 4        THE FEDERAL CIRCUIT'S PERMANENT INJUNCTION ORDER AS WELL.

 5                MR. MCELHINNY:  IT HAS, YOUR HONOR.

 6                MR. QUINN:  I UNDERSTAND THE COURT'S RULING, YOUR

 7        HONOR.

 8            MAYBE IF I CAN JUST HEAD OFF ANOTHER POTENTIAL ISSUE.

 9            I WOULD LIKE TO ASK DR. VELLTURO ABOUT THE OPINION GIVEN

10        IN THE CASE IN CHICAGO BEFORE JUDGE POSNER CONCERNING THE

11        APPROPRIATE LICENSE FOR ONE OF THE PATENTS, ONE OF THE CLAIMS

12        AT ISSUE AS BEING 60 CENTS I THINK IT WAS.

13            AND IN THE COURT'S DAUBERT RULING --

14                THE COURT:  OKAY.  LET'S JUST MAKE SURE.  THE HTC IS

15        NOT GOING TO COME UP WITH DR. VELLTURO, IS IT?  I THINK I'VE

16        RULED ENOUGH TIMES NOW THAT THIS SHOULD NOT BE AN ISSUE.  I

17        JUST WANT TO MAKE SURE.

18                MR. QUINN:  THAT IS UNDERSTOOD.  THAT'S NOT GOING TO

19        COME UP.

20                THE COURT:  OKAY.  THANK YOU.

21                MR. QUINN:  I'VE MOVED ON TO ANOTHER ISSUE.

22                THE COURT:  OKAY.

23                MR. QUINN:  I DON'T KNOW WHETHER APPLE WOULD SEE THIS

24        AS A PROBLEM OR NOT.

25                THE COURT:  OKAY.

1            MR. QUINN:  BUT THERE WAS BRIEFING, APPLE DID BRING A

2     MOTION TO EXCLUDE -- YOU KNOW, TO PRECLUDE US FROM GETTING INTO

3     OPINIONS OF APPLE'S EXPERTS EXPRESSED IN PAST CASES.  THAT WAS

4     ONE OF THE APPLE MOTIONS IN LIMINE.

5            THE COURT:  RIGHT.  AND I SUSTAINED IT AS TO THE

6     VIRNETX CASE LAST NIGHT.  YOU'RE REFERRING TO THE MOTOROLA CASE

7     IN CHICAGO?

8            MR. MCELHINNY:  THIS WAS YOUR MOTION IN LIMINE NUMBER

9     2, YOUR HONOR.

10           THE COURT:  OKAY.  LET ME JUST -- GIVE ME ONE MINUTE,

11    PLEASE, SO I CAN --

12           MR. QUINN:  I THINK THE DISCUSSION BEGINS AT PAGE 21

13    OF THE COURT'S ORDER GRANTING IN PART AND DENYING IN PART THE

14    DAUBERT MOTIONS.

15           THE COURT:  OKAY.  GIVE ME JUST ONE SECOND, PLEASE.

16    CAN YOU GIVE ME THAT PAGE NUMBER ONE MORE TIME, PLEASE.

17           MR. QUINN:  PAGE 21 --

18           THE COURT:  OKAY.

19           MR. QUINN:  --OF THE COURT'S ORDER GRANTING IN PART

20    AND DENYING IN PART CERTAIN EXPERT OPINIONS.

21           THE COURT:  OKAY.  GIVE ME JUST ONE SECOND, PLEASE.

22         (PAUSE IN PROCEEDINGS.)

23           THE COURT:  NOW, THIS RULING HAD TO DO WITH THE

24    APPLE V. SAMSUNG 11-1846 CASE.

25           MR. MCELHINNY:  I BELIEVE IT'S APPLE VERSUS MOTOROLA,

```
1          YOUR HONOR.

2               THE COURT:  NO.  WHAT I'M SAYING IS THE DAUBERT

3     MOTION, WHAT I WAS RULING ON --

4               MR. MCELHINNY:  YES, SORRY.

5               THE COURT:  -- WAS ALLOWING DR. CHEVALIER TO TESTIFY

6     THAT THE MUSIKA AND DAVIS METHODOLOGIES, ABOUT THEIR

7     METHODOLOGIES COMPARED TO DR. VELLTURO'S.  I DON'T THINK THAT

8     THIS ORDER DEALT WITH THE MOTOROLA CASE IN CHICAGO.

9               MR. MCELHINNY:  AND IF I CAN --

10              MR. QUINN:  I BELIEVE IT WAS REFERENCED IN THE

11    BRIEFING, YOUR HONOR, AND THEN WE -- WE DID INCLUDE A

12    REDACTED -- WE PROPOSED TO INCLUDE A REDACTED COPY OF

13    JUDGE POSNER'S OPINION ON THE EXHIBIT LIST.

14              THE COURT:  RIGHT, WHICH I EXCLUDED.

15              MR. QUINN:  AND YOUR HONOR DID EXCLUDE THAT.

16              THE COURT:  YES.

17              MR. QUINN:  SO WE UNDERSTAND THAT OPINION DOESN'T

18    COME IN.

19              BUT WHAT WE WOULD LIKE TO ELICIT IS THE TESTIMONY THAT

20    APPLE TOOK A POSITION IN A DIFFERENT CASE THAT ONE OF THE

21    CLAIMS IN SUIT HERE, THE APPROPRIATE LICENSE WAS, AND, AGAIN, I

22    CAN'T REMEMBER IF IT'S 60 CENTS OR 65 CENTS PER UNIT.

23              THE COURT:  NOW, I -- REMIND ME, WAS THERE A HIGH

24    PRIORITY OBJECTION AS TO THIS QUESTION?

25              MR. MCELHINNY:  THERE WAS NO DISCLOSURE AS TO THIS
```

1    QUESTION, YOUR HONOR.  THEY HAVEN'T DISCLOSED A DOCUMENT.  THIS

2    IS --

3                MR. QUINN:  WE'RE NOT USING A DOCUMENT, YOUR HONOR.

4                MR. MCELHINNY:  THIS IS A SURPRISE.

5                MR. QUINN:  SURPRISE, I WAS --

6                MR. MCELHINNY:  BECAUSE IT WAS NOT DISCLOSED.

7                MR. QUINN:  WELL, YOUR HONOR, I DON'T THINK THERE'S

8    ANY PROCEDURE FOR DISCLOSING QUESTIONS.  I MEAN, I WOULD.

9                MR. MCELHINNY:  IF I CAN GIVE YOU --

10               MR. QUINN:  I BROUGHT IT UP BECAUSE I WANTED TO MAKE

11   SURE THAT --

12               THE COURT:  OKAY.  LET ME ASK A QUESTION.  SO THIS

13   PARTICULAR ISSUE HAS NOT BEEN BRIEFED, OR HAS IT BEEN?

14               MR. MCELHINNY:  IT HAS, YOUR HONOR.  MOTION IN LIMINE

15   NUMBER 2, WHICH IS DOCKET 1398, AND SPECIFIC CITES ARE DOCKET

16   1411 AT PAGES 68 AND 69; AND ALSO IN THE 1846 CASE, SAMSUNG

17   MOVED TO EXCLUDE THIS ORDER AND YOUR HONOR GRANTED IT, AND

18   THAT'S AT 1846, DOCKET 1267 AT PAGE 2.

19               THE COURT:  ALL RIGHT.  WELL, LET -- WHY DON'T -- I

20   WOULD LIKE US TO TAKE A BREAK, AND I'D LIKE MS. SHORTRIDGE TO

21   HAVE A BREAK.

22      WHY DON'T -- I WILL GO BACK AND TAKE A LOOK AT THIS ISSUE.

23   UNFORTUNATELY, MY MOTION IN LIMINE WAS GRANT IN PART, DENY IN

24   PART, SO I'M GOING TO HAVE TO GO BACK AND LOOK.  I KNOW I

25   GAVE --

1            MR. MCELHINNY:  I CAN GIVE YOU --

2            THE COURT:  -- MORE EXPLICIT STATEMENTS ON THE

3     RECORD.

4            MR. MCELHINNY:  I CAN GIVE YOU A PIN CITE, YOUR

5     HONOR.  IT'S AT PAGE 69, LINES 15 TO 20, OF DOCUMENT --

6            THE COURT:  THAT'S IN THE TRANSCRIPT.

7            MR. MCELHINNY:  THIS IS AN ORDER, DOCKET 1411.

8            MR. QUINN:  IT'S RELATING TO THE POSNER -- I BELIEVE

9     THAT'S RELATING TO THE OPINION ITSELF, YOUR HONOR.

10           MS. MAROULIS:  YOUR HONOR EXCLUDED DX 449, WHICH WAS

11     THE REDACTED OPINION.

12           THE COURT:  RIGHT, I KNOW I DID THAT.

13        OKAY.  I WILL -- THANK YOU FOR RAISING THIS ISSUE.  LET ME

14     GO BACK AND TAKE A LOOK AT MY PREVIOUS RULINGS, OKAY?

15           MR. MCELHINNY:  THANK YOU, YOUR HONOR.

16           THE COURT:  ALL RIGHT.  THANK YOU.

17           MR. MCELHINNY:  WHAT TIME DO YOU WANT US BACK?

18           THE COURT:  TEN MINUTES.

19        AND DID WE CLEAN UP THE PREVIOUS EXHIBITS?  THANK YOU.

20        (RECESS FROM 10:43 A.M. UNTIL 10:57 A.M.)

21           THE COURT:  OKAY.  WELCOME BACK.  YOU CAN TAKE A

22     SEAT.

23        AT THE PRETRIAL CONFERENCE BACK ON MARCH 5TH, THIS EXACT

24     ISSUE WAS RAISED BY MR. JOHNSON.  THIS IS WITH REGARD TO DX

25     449.

1          THE QUOTE OF MR. JOHNSON IS, "THE ONLY POINT WE WANT FROM

2     THIS ORDER IS TO BE ABLE TO POINT OUT THAT FOR THE SAME PATENT

3     INVOLVED IN THIS CASE, THE '647 PATENT, THAT IN ANOTHER CASE

4     APPLE THOUGHT THE VALUATION OF THE PATENT WAS $0.60 AS OPPOSED

5     TO 12.49 HERE."

6          THIS IS DOCKET NUMBER 1411, PAGE 69, LINES 10 THROUGH 14.

7     AND THIS IS WHAT I STATED ON LINES 17 THROUGH 20.  "ALL RIGHT.

8     I UNDERSTAND THAT.  IT'S DIFFERENT ASSERTED CLAIMS, DIFFERENT

9     CLAIM CONSTRUCTIONS, DIFFERENT PRODUCTS, DIFFERENT DEFENDANTS,

10    DIFFERENT PARTY CIRCUMSTANCES, DIFFERENT IMPLEMENTATIONS OF THE

11    ACCUSED PRODUCTS, DIFFERENT NON-INFRINGING ALTERNATIVES, SO MY

12    RULING STILL STANDS."

13         SO I DID EXCLUDE THAT.  SO THAT WILL NOT BE A PERMISSIBLE

14    TOPIC FOR THIS TRIAL.

15         ALL RIGHT.  LET'S GO AHEAD AND BRING OUR JURY IN.

16         (JURY IN AT 10:58 A.M.)

17            THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

18    SEAT.

19         TIME IS NOW 10:58.  GO AHEAD, MR. BENNETT.

20            MR. BENNETT:  THANK YOU, YOUR HONOR.

21    Q.   DR. HAUSER, WHEN WE BROKE WE WERE LOOKING AT PDX 93.9,

22    WHICH IS ON THE SCREEN.  I'D LIKE TO ASK YOU, NOW THAT WE'VE

23    GONE THROUGH THE FIRST FEW POINTS HERE, I'D LIKE TO ASK YOU,

24    HOW MANY PEOPLE ACTUALLY PARTICIPATED IN EACH OF THE TWO

25    SURVEYS THAT YOU ADMINISTERED, THE PHONE AND THE TABLET SURVEY?

```
 1      A.   THE COMPLETED SAMPLE FOR THE SMARTPHONE SURVEY WAS 507

 2      CONSUMERS, AND FOR THE TABLET SURVEY IT WAS 459 SAMSUNG

 3      CONSUMERS.

 4      Q.   OKAY.  I'D LIKE NOW TO TURN TO, AND I THINK THE LADIES AND

 5      GENTLEMEN HAVE ALREADY HEARD ABOUT THIS, BUT I WANT TO TURN TO

 6      THE SUBJECT OF FEATURES YOU LOOKED AT AND TESTED IN THIS CASE.

 7           DID YOU, DR. HAUSER, TEST THE SO-CALLED FIVE PATENTED

 8      FEATURES, OR DID YOU INCLUDE THOSE FEATURES, DESCRIPTIONS OF

 9      THOSE FEATURES IN YOUR SURVEYS?

10      A.   YES, I DID.

11      Q.   AND WOULD YOU BRING UP 93.10.

12           AND THOSE ARE THE FIVE PATENTS FEATURES THE LADIES AND

13      GENTLEMEN OF THE JURY HAVE HEARD OF.  WHY DON'T YOU JUST READ

14      THEM INTO THE RECORD, REFERRING TO THE ICONS FROM THE UPPER

15      LEFT OVER AND THEN DOWN THE BOTTOM ROW.

16      A.   YES.  UNIVERSAL SEARCH, BACKGROUND SYNCING, QUICK LINKS,

17      AUTOMATIC WORD CORRECTION, AND SLIDE TO UNLOCK.

18           AND, OF COURSE, THE PEOPLE FILLING OUT THE SURVEY DID NOT

19      KNOW THAT THESE FEATURES WERE EITHER AT ISSUE OR PATENTED.

20      Q.   OKAY.  NOW, WHICH OF THESE FEATURES WERE TESTED IN THE

21      SMARTPHONE SURVEY?

22      A.   UNIVERSAL SEARCH, BACKGROUND SYNCING, QUICK LINKS, AND

23      AUTOMATIC WORD CORRECTION.

24      Q.   AND WHICH OF THE FEATURES WERE TESTED IN THE TABLET

25      SURVEY?
```

1    A.   I BELIEVE ALL OF THEM.

2    Q.   SO BETWEEN THE TWO SURVEYS THEY WERE ALL TESTED?

3    A.   THEY WERE ALL TESTED.

4    Q.   NOW, YOU SAID THAT THESE -- WERE THESE THE ONLY FEATURES

5    THAT WERE INCLUDED IN THE SURVEY TEST?

6    A.   NO, OF COURSE NOT.

7    Q.   LET US BRING UP PDX 93.11.  CAN YOU EXPLAIN TO THE LADIES

8    AND GENTLEMEN OF THE JURY WHAT IS SHOWN HERE?

9    A.   YES.  THERE WERE -- ACROSS THE TWO SURVEYS, THERE WERE 21

10   OTHER FEATURES.  WE'LL CALL THESE DISTRACTION FEATURES,

11   ALTHOUGH IN THIS CASE DISTRACTION IS A GOOD THING BECAUSE IT

12   ENSURES THAT THE CONSUMERS, THAT YOU WOULD NOT FOCUS

13   SPECIFICALLY ON THE PATENTS.

14        WE CAN SEE HERE THAT THERE ARE FOUR SCREEN SIZES; THERE

15   ARE FOUR FEATURES WITHIN A GROUP HERE FOR A CAMERA; AND THERE

16   ARE MANY OTHER EXAMPLES.  I'VE JUST ILLUSTRATED THREE HERE WITH

17   WI-FI, GPS, AND VOICE TO TEXT.

18   Q.   WE'LL SEE THIS LATER WHEN WE LOOK AT ONE OF THE PAGES FROM

19   THE SURVEY WHERE THE PARTICIPANTS ACTUALLY MADE CHOICES, BUT

20   WERE THESE FEATURES, THESE DISTRACTION FEATURES INCLUDED IN

21   VARIOUS WAYS AND VARIOUS AMOUNTS IN DIFFERENT PHONES FROM WHICH

22   THE CONSUMERS SELECTED?

23   A.   YES.  SOME OF THESE WERE IN THE TELEPHONE SURVEY, THE

24   SMARTPHONE SURVEY, AND SOME IN THE TABLET SURVEY.

25        BUT THERE'S NO DISTINGUISHING FROM YOUR STANDPOINT BETWEEN

1    THE PATENTED FEATURES AND WHAT WE'RE CALLING HERE DISTRACTION

2    FEATURES.

3    Q.   OKAY.  IS THAT A STANDARD PRACTICE IN CONJOINT STUDIES TO

4    INCLUDE DISTRACTION FEATURES?

5    A.   YES, IT IS.

6    Q.   NOW, DID YOU INCLUDE EACH AND EVERY SMARTPHONE FEATURE IN

7    THE SURVEY?

8    A.   NO, OF COURSE NOT.

9    Q.   AND WHY WAS THAT?

10   A.   WELL, 40 YEARS OF EXPERIENCE TELLS US THAT THAT'S NOT THE

11   NORMAL WAY THAT IT'S DONE.  FIRMS LIKE GENERAL MOTORS WOULD --

12   IF THEY'RE FOCUSSING ON FEATURES IN A COMPLEX AUTOMOBILE, THEY

13   WOULD FOCUS ON THOSE FEATURES THAT VARY.

14       IT JUST COULD NOT BE FEASIBLE TO HAVE HUNDREDS OF FEATURES

15   IN A CONJOINT SURVEY.

16   Q.   IF WE CAN BRING UP -- BEFORE WE DO THAT ACTUALLY, LET ME

17   ASK YOU TO LOOK, DOCTOR, AT PX 139 AND PX 140 WHICH I THINK

18   SHOULD BE UP THERE WITH YOU IN A BINDER.

19   A.   YES.  YES.

20   Q.   COULD YOU JUST TELL -- SAY FOR THE RECORD WHAT EXHIBIT

21   PX 139 IS.

22   A.   PX 139 IS A DISK, AND I BELIEVE IT CONTAINS THE ANIMATIONS

23   AND SURVEY SCREENS.  I'M NOT SURE.

24   Q.   NOW, WE'RE GOING TO LOOK AT SOME ANIMATIONS HERE SHORTLY.

25   WE DON'T HAVE TIME TO LOOK AT ALL OF THEM.  DOES THAT DISK

1    INCLUDE EVERY ANIMATION WHICH THE PARTICIPANTS IN BOTH THE

2    SMARTPHONE AND THE TABLET SURVEYS SAW?

3    A.   YES, ALL THE FEATURES WERE ANIMATIONS.

4    Q.   OKAY.  AND THESE ARE ANIMATIONS THAT DESCRIBE FEATURES; IS

5    THAT RIGHT?

6    A.   THAT'S CORRECT.

7    Q.   AND COULD YOU LOOK AT EXHIBIT, PLAINTIFF'S EXHIBIT 140 AND

8    TELL US WHAT THAT IS.

9    A.   140 CONTAINS SCREEN SHOTS FROM BOTH THE SMARTPHONE AND THE

10   TABLET SURVEY.

11   Q.   IS IT A COMPLETE SERIES OF SCREEN SHOTS THAT PARTICIPANTS

12   IN THE SURVEYS SAW?

13   A.   YES, EXCEPT FOR SOME RANDOMIZATION.

14   Q.   OKAY.

15        YOUR HONOR, WE WOULD AT THIS POINT MOVE EXHIBITS 139 AND

16   140 INTO EVIDENCE, OR OFFER THEM I SHOULD SAY.

17            MR. PRICE:  NO OBJECTION.

18            THE COURT:  THEY'RE ADMITTED.

19        (PLAINTIFF'S EXHIBITS 139 AND 140 WERE ADMITTED IN

20   EVIDENCE.)

21            THE COURT:  GO AHEAD, PLEASE.

22   BY MR. BENNETT:

23   Q.   NOW WE'RE GOING TO WALK THROUGH SOME SLIDES, BUT WITH

24   RESPECT TO EXHIBIT 140, IF THE LADIES AND GENTLEMEN OF THE JURY

25   IN THEIR DELIBERATION WANT TO LOOK AT EVERYTHING THAT WAS SHOWN

1      ON THE SCREENS, THEY WOULD BE INCLUDED IN EXHIBIT 140?

2      A.   YES, THAT'S CORRECT.

3      Q.   OKAY.  SO LET'S BRING UP EXHIBIT 93.12.  I'D LIKE NOW TO

4      TURN TO THE ACTUAL TAKING OF THE SURVEY, WHAT WOULD HAVE BEEN

5      EXPERIENCED BY A PARTICIPANT IN THE SURVEY.

6           COULD YOU JUST WALK -- USING THIS DEMONSTRATIVE,

7      DR. HAUSER, TELL US FIRST WHAT IS REFERRED TO BY SCREENING.

8      A.   YES.  I WOULD ASK YOU QUESTIONS, SUCH AS WHAT BRAND OF

9      PHONE DO YOU OWN?  WHAT PARTICULAR MODEL?  SO THAT IF YOU WERE

10     ONE OF THE OWNERS, I WOULD ASK YOU WHETHER YOU WERE INVOLVED IN

11     THE PURCHASING DECISION?  I WOULD ASK CERTAINLY YOUR AGE SO

12     THAT WE WANT TO KNOW YOUR AGE, BUT WE DON'T WANT TO UNDERAGE

13     PEOPLE TAKING THE SURVEY, AND QUESTIONS SUCH AS THAT SO THAT I

14     CAN GO FROM THE UNIVERSE OF PEOPLE IN THE RESEARCH NOW PANEL

15     THAT ARE ALREADY BALANCED DOWN TO THE RELEVANT CONSUMERS FOR

16     THE SURVEY.

17     Q.   AND DOES EXHIBIT 140 INCLUDE RIGHT AT THE OUTSET A SERIES

18     OF SCREENING QUESTIONS THAT WERE ASKED?

19     A.   YES, IT DOES.

20     Q.   NOW, THE SECOND BULLET SAYS INCENTIVE ALIGNMENT.  COULD

21     YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY WHAT

22     INCENTIVE ALIGNMENT REFERS TO?

23     A.   YES, INCENTIVE ALIGNMENT PROVIDES INCENTIVES FOR YOU TO

24     THINK HARD AND CAREFULLY ABOUT THESE QUESTIONS, TO MAKE THEM

25     REAL.  EVERYBODY WAS TOLD THAT 1 OUT OF 20 CONSUMERS WOULD

1    RECEIVE, IN THE SMARTPHONE SURVEY, A SMARTPHONE WORTH UP TO

2    $300, ACTUALLY OFFERED.

3         THE SMARTPHONE THAT WE WOULD OFFER TO YOU WOULD BE BASED

4    UPON THE ANSWER TO THE QUESTION.  SO EVERY TIME YOU'RE FACING A

5    CHOICE SCREEN, YOU KNOW THAT IF YOUR 1 IN 20, YOUR ANSWERS TO

6    THESE QUESTIONS WOULD DETERMINE WHICH SMARTPHONE IS OFFERED TO

7    YOU.

8         AND, OF COURSE, IF YOU THEN CHOSE THE SMARTPHONE THAT WAS

9    PRICED BELOW $300, WE'D PROVIDE THE CHANGE FROM $300.

10   Q.   NOW, THE THIRD BULLET REFERS TO FEATURE DESCRIPTIONS.  LET

11   ME BACK UP A SECOND.  IN EXHIBIT 140, IS THERE A PAGE THAT

12   DESCRIBES THE INCENTIVE ALIGNMENT THAT YOU JUST REFERRED TO?

13   A.   YES, IT'S DESCRIBED, THE OFFER AND THE SMARTPHONE OR THE

14   TABLET IN THE TABLET SURVEY.

15   Q.   AND AT SOME POINT AFTER WORKING THROUGH THE SURVEY, DID

16   THERE COME A POINT WHERE THE SURVEY PARTICIPANTS WOULD HAVE AN

17   OPPORTUNITY TO SEE WRITTEN AND ANIMATED DESCRIPTIONS OF THE

18   FEATURES BEING TESTED?

19   A.   YES, THAT'S CORRECT.

20   Q.   OKAY.  AND WE ARE GOING TO LOOK AT THOSE, AS I SAY, BUT

21   WERE ALL OF THE FEATURES, THE PATENTED FEATURES AND THE

22   DISTRACTION FEATURES THAT YOU REFERRED TO, WERE THEY ALL IN

23   THAT SERIES OF THE, OR THAT SEGMENT OF THE SURVEY, DESCRIBED IN

24   WRITING AND DESCRIBED IN AN ANIMATED VIDEO TO THE PARTICIPANTS?

25   A.   YES, THAT'S CORRECT.

1     Q.   AND HOW -- WAS THE SURVEY DESIGNED SO THAT THE SURVEY

2     PARTICIPANTS WOULD HAVE TO LOOK AT ALL THOSE ANIMATIONS BEFORE

3     THEY CAME TO THE CHOICE EXERCISE?

4     A.   YES.  THEY COULD NOT MOVE ON WITHOUT LOOKING AT THE

5     ANIMATIONS.

6     Q.   OKAY.  AND THEN THAT LAST BULLET REFERS -- I JUST TALKED

7     ABOUT CHOICE EXERCISE.  SO IS THAT WHAT THE LAST BULLET REFERS

8     TO?

9     A.   YES.  WE'LL SEE THE SCREEN IN A MOMENT, BUT THE KEY INPUT

10    IS THAT CONSUMERS ARE ASKED TO CHOOSE AMONG VARIOUS PROFILES OF

11    SMARTPHONES OR TABLETS.

12    Q.   WHAT I WANTED TO DO NOW IS WALK THROUGH THE DESCRIPTIONS

13    OF THE PATENTED FEATURES AND THEN ONE EXAMPLE DESCRIPTION THAT

14    WAS SHOWN OF THE DISTRACTION FEATURE.  I THINK WE'VE TAKEN ONE

15    OF THE CAMERA FEATURES FOR THAT.

16         SO WE'RE GOING TO WALK THROUGH A SERIES OF WRITTEN AND

17    ANIMATED DESCRIPTIONS OF THE FEATURES BEING TESTED.

18         I WANT TO ASK YOU THIS QUESTION AT THE OUTSET, DR. HAUSER.

19    YOU'RE NOT APPEARING HERE TODAY AS AN EXPERT ON PATENTED

20    TECHNOLOGY, ARE YOU?

21    A.   NO, I AM NOT.

22    Q.   AS WE WALK THROUGH THESE DESCRIPTIONS, AND BEFORE WE WALK

23    THROUGH THEM, WOULD YOU JUST EXPLAIN TO THE LADIES AND

24    GENTLEMEN OF THE JURY HOW THESE DESCRIPTIONS IN THE PATENT

25    FEATURES WERE DEVELOPED?

```
 1      A.   WELL, IT'S MY RESPONSIBILITY TO MAKE THE PATENTED

 2      DESCRIPTIONS CONSUMER FRIENDLY, AND THEY WOULD BE APPROPRIATE

 3      FOR A CONSUMER SURVEY.

 4           HOWEVER, I RELIED ON LAWYERS FOR THE TECHNICAL

 5      DESCRIPTIONS AND TO VERIFY THAT ANY CHANGES THAT I HAD MADE

 6      WERE CONSISTENT WITH THE TECHNICAL DESCRIPTIONS.

 7      Q.   SO WITH THAT, LET'S TURN TO THE VIDEO ANIMATIONS.

 8           AND, YOUR HONOR, WE'RE GOING TO RUN THROUGH A SERIES OF

 9      FIVE OF THEM, SO WE MIGHT WANT TO DIM THE COURT'S LIGHTS.

10           I THINK WE START WITH UNIVERSAL SEARCH.  IF WE COULD BRING

11      UP 93.14.

12           AND WHEN YOU CAME TO THIS POINT IN THE SURVEY, WOULD YOU

13      SEE A PAGE LIKE THIS, DR. HAUSER?

14      A.   YES, YOU WOULD.  THE -- YOU WOULD BE TOLD TO --

15              THE COURT:  MARTHA, I THINK THEY WANTED YOU TO DIM

16      THE LIGHTS.  THANK YOU.

17              THE WITNESS:  YOU WOULD BE ASKED TO CLICK ON

18      UNIVERSAL SEARCH ICON TO VIEW AN ANIMATION DESCRIBING THIS

19      FEATURE.  YOU CAN ALSO READ THE DESCRIPTION OF THE FEATURE

20      BELOW.

21      BY MR. BENNETT:

22      Q.   OKAY.

23      A.   SO IF WE CLICK ON IT.

24      Q.   BEFORE WE CLICK ON THE ANIMATED SEARCH, I WANTED TO

25      ESTABLISH SOMETHING, THE LADIES AND GENTLEMEN ARE GOING TO HEAR
```

1    A NARRATION ACCOMPANYING THE FILM OR THE ANIMATION; IS THAT

2    RIGHT?

3    A.   THAT'S CORRECT.

4    Q.   IS THAT NARRATION THAT WE'LL ALL BE LISTENING TO

5    MOMENTARILY A WORD-FOR-WORD READING OF THE DEFINITION, OR

6    DESCRIPTION OF UNIVERSAL SEARCH THAT WE SEE ON THE SCREEN?

7    A.   YES, THAT'S CORRECT.

8         MR. BENNETT:  ALL RIGHT.  MR. LEE, COULD WE PLAY THE

9    ANIMATION?

10   (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

11   BY MR. BENNETT:

12   Q.   AND LET ME ASK YOU THIS, THAT ANIMATION THAT WE JUST SAW,

13   WE'RE GOING TO LATER COME TO A CHOICE.  COULD A SURVEY

14   PARTICIPANT AT ANY POINT WHEN THEY WERE MAKING CHOICES BETWEEN

15   PHONES, WHICH WE'LL LATER GET TO, CLICK BACK?  DID THEY HAVE A

16   MEANS OF COMING BACK TO THAT ANIMATION IF THEY CHOSE?

17   A.   YES.  AT ANY POINT WHILE THEY'RE COMPLETING THE CHOICE

18   PAGE, THEY CAN CLICK ON AN AREA AND COME BACK AND SEE THE

19   ANIMATION AGAIN AS OFTEN AS THEY WOULD LIKE.  THEY'RE NOT ASKED

20   TO MEMORIZE THESE.

21   Q.   OKAY.  LET ME -- WHAT WE'D LIKE TO DO NOW IS PLAY, BRING

22   UP THE DESCRIPTION FOR BACKGROUND SYNC.

23        AND, AGAIN, WRITTEN DESCRIPTION, AND ARE WHAT WE ABOUT TO

24   HEAR ON THE ANIMATION A VERBATIM NARRATION OF THOSE WORDS?

25   A.   YES, IT'S A VERBATIM NARRATION.

```
 1              MR. BENNETT:  OKAY.  MR. LEE, CAN WE PLAY THAT

 2    NARRATION, PLEASE.

 3          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

 4              MR. BENNETT:  I THINK WE'RE NEXT GOING TO LOOK AT

 5    QUICK LINKS.  WHY DON'T WE JUST PLAY THAT ANIMATION.

 6          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

 7              MR. BENNETT:  AND THEN IF WE COULD, MR. LEE, BRING UP

 8    THE AUTO CORRECT.

 9          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

10    BY MR. BENNETT:

11    Q.   AND THEN THE LAST OF THE PATENTED FEATURES WAS SLIDE TO

12    UNLOCK, AND THAT WAS IN THE TABLET SURVEY, IS THAT RIGHT,

13    DOCTOR?

14    A.   YES, THAT WAS IN THE TABLET SURVEY ONLY.

15              MR. BENNETT:  CAN WE PLAY THAT, MR. LEE?

16          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

17    BY MR. BENNETT:

18    Q.   SO WE'VE NOW SEEN THE ANIMATION FOR ALL THE PATENTED

19    FEATURES; IS THAT RIGHT SIR?

20    A.   YES.

21    Q.   THERE WERE ALSO 21 DISTRACTION FEATURES?

22    A.   YES, THERE WERE.

23    Q.   WE'RE GOING TO LOOK AT AN EXAMPLE OF JUST ONE OF THOSE

24    BECAUSE THERE ARE TIME CONSIDERATIONS HERE, BUT COULD YOU TELL

25    US WHAT WE'RE LOOKING AT HERE?
```

1    A.   WE'RE LOOKING AT ONE OF THE DISTRACTION FEATURES, BUT,

2    AGAIN, CONSUMERS DON'T KNOW WHICH ARE WHICH.  THEY JUST KNOW

3    THEY'RE FEATURES.

4         SO HERE WE'RE GOING TO SEE ONE OF THE CAMERA FEATURES,

5    DISTRACTION FEATURES.

6              MR. BENNETT:  WHY DON'T WE PLAY THAT.

7         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

8              MR. BENNETT:  WE CAN BRING THE LIGHTS BACK UP NOW,

9    MS. BROWN.  THANK YOU.

10   Q.   DOCTOR, LET'S GO TO THE NEXT SLIDE, 93.27.

11        COULD YOU TELL US WHAT'S DEPICTED ON THIS SLIDE?

12   A.   YES.  THIS IS A CHOICE SCREEN WHERE CONSUMERS ARE ASKED TO

13   MAKE CHOICES AMONG FOUR SMARTPHONES.

14   Q.   OKAY.  AND WHY DON'T WE BRING UP THE TOP, SLIGHTLY ENLARGE

15   IT, OR SIGNIFICANTLY ENLARGE THE TOP THERE.

16        AND COULD YOU JUST EXPLAIN WHAT IS WRITTEN THERE, DOCTOR?

17   A.   YES.  THIS ASKED CONSUMERS, WOULD YOU PLEASE CHOOSE YOUR

18   MOST PREFERRED SAMSUNG SMARTPHONE AMONG THE FORE BELOW, AND IT

19   REMINDS THEM THAT THEY CAN CLICK ON THE LABEL, THE FEATURE

20   CATEGORY ON THE LEFT TO VIEW THE ANIMATION WITHIN THAT FEATURE

21   CATEGORY.

22   Q.   OKAY.  IF WE NOW CAN BRING OUT THE FOUR COLUMNS FROM THIS

23   PAGE, YOU'VE GOT FOUR PHONES THERE, EACH DESIGNATED 1, 2, 3, 4,

24   AND IN DIFFERENT COLORS.  IS THAT RIGHT?

25   A.   YES, THAT'S CORRECT.  WE SEE FOUR SMARTPHONES, A PURPLE,

1       PINK, YELLOW, AND BLUE ARE FOUR DIFFERENT SMARTPHONES HERE.

2       IT'S A COMMON FORMAT.  IT'S NOT UNLIKE THE WAY CONSUMERS

3       ACTUALLY DO COMPARE SMARTPHONES IF THEY GO TO THE WEB.

4            SO IF WE LOOK ALONG THE LEFT, WE CAN SEE THE FEATURE

5       CATEGORY IS LISTED, PRICE, CAMERA, CALL INITIATION, INPUT

6       ASSISTANCE, SCREEN SIZE AND DATA ACCESSIBILITY.

7            AND THEN EACH OF THESE SMARTPHONES ARE DESCRIBED BY THE

8       FEATURES THEY HAVE WITHIN EACH OF THOSE CATEGORIES.

9            SO YOU CAN SEE THAT THE CONSUMER HAS TO BASICALLY LOOK AT

10      THESE AND REMEMBER THEY HAVE INCENTIVES, THEY'RE GOING TO -- 1

11      IN 20 ARE ACTUALLY GOING TO GET A SMARTPHONE -- SO THEY'LL

12      THINK HARD ABOUT THIS, SO THEY'LL BE ASKED TO ACTUALLY CHOOSE

13      ONE OF THEM.

14           AND I THINK WE CAN PUT A CHECK HERE.  IS THAT POSSIBLE?

15      OH.

16      Q.   BEFORE WE -- GO BACK.  GO BACK BECAUSE I HAD A COUPLE OF

17      QUESTIONS HERE.

18           THE REFERENCE TO PRICE, THERE'S A REFERENCE TO PRICE UP AT

19      THE TOP.

20           DO YOU SEE THAT, DOCTOR.

21      A.   YES, THERE ARE PRICES AT THE TOP.  THERE ARE FOUR

22      DIFFERENT PRICES THAT THE SMARTPHONES VARY ON.

23      Q.   DO THOSE PRICES INCLUDE THE PRICE OF A CONTRACT THAT THE

24      CONSUMER WOULD TYPICALLY ENTER INTO WITH A CARRIER WHEN IT BUYS

25      A PHONE?

1    A.   NO, THESE DO NOT INCLUDE THE CONTRACT PRICE, BUT THE

2    CONSUMER WAS TOLD THAT THEY WOULD BE PURCHASING A SMARTPHONE

3    WITH A TWO YEAR CONTRACT, AND AT THE TIME OF THIS SURVEY, THESE

4    VARIED FROM ROUGHLY $2,000 TO $5,000 OVER A TWO YEAR CONTRACT.

5    Q.   AND THEN UNDER EACH OF THOSE FOUR PHONES, THERE ARE

6    DIFFERENT GROUPINGS OF ICONS WE LOOKED AT?

7    A.   YES, THAT'S CORRECT.

8    Q.   AND I THINK YOU STARTED TO DESCRIBE THIS, BUT WHAT ARE

9    THOSE -- WHAT'S THE SIGNIFICANCE OR PURPOSE OF THE DIFFERENT

10   GROUPINGS OF ICONS BETWEEN THE TWO FORMS, PHONES?  BETWEEN THE

11   FOUR PHONES, EXCUSE ME?

12   A.   WELL, EACH PHONE HAS A DIFFERENT SET OF INCREMENTAL

13   FEATURES ASSOCIATED WITH IT, AND THESE GROUPINGS MAKE IT EASY

14   FOR THE CONSUMER, AS YOU'RE FILLING OUT THIS SURVEY AND YOU'RE

15   MAKING THESE CHOICES, TO SEE WHAT FEATURES, INC. MENTAL

16   FEATURES ARE WITHIN EACH OF THE SMARTPHONES.

17   Q.   NOW, IN ADDITION TO ALL THE FEATURES THAT WERE DESCRIBED

18   FOR EACH OF THE PHONES BY THE ICONS, IF WE BLOW OUT THE BOTTOM

19   OF THAT PAGE, WERE THE SURVEY PARTICIPANTS TOLD TO ASSUME

20   SOMETHING ELSE ABOUT THE PHONES THAT THEY WERE PICKING BETWEEN?

21   A.   YES.  REMEMBER THAT THESE ARE ALL SAMSUNG SMARTPHONES AND

22   THEY -- THEY'RE TOLD TO ASSUME THAT ALL OTHER FEATURES, SUCH AS

23   BATTERY LIFE, THE CPU, OF COURSE THE BRAND AND OTHERS, DO NOT

24   VARY.

25        SO ALL FOUR OF THOSE SMARTPHONES HAVE EXACTLY THE

1    FEATURES, OTHER THAN THE ONE THAT IS WE ARE CHANGING, EXACTLY

2    THE FEATURES THAT THEY HAVE IN THEIR MOST RECENT SAMSUNG

3    SMARTPHONE.

4         SO THIS IS HOW WE HANDLE ALL THE OTHER FEATURES, WE JUST

5    DO NOT VARY THEM AMONG THE CHOICES.

6    Q.   SO IF YOU'RE TAKING THE SURVEY AFTER YOU'VE LOOKED AT IT

7    AND COMPARED THE FOUR PHONES, WHAT DO YOU DO AS A SURVEY TAKER?

8    A.   YOU SIMPLY TELL ME WHICH ONE THAT YOU WOULD CHOOSE.

9    Q.   OKAY.  AND I THINK WE HAVE EXAMPLES.  YOU DO THAT BY

10   CLICKING ON A COMPUTER WITH YOUR MOUSE OR WHATEVER; IS THAT

11   RIGHT?

12   A.   YES, THAT'S CORRECT.

13   Q.   OKAY.  NOW; THAT CHOICE WE JUST EXEMPLIFIED THERE, IS THAT

14   THE ONLY CHOICE A SURVEY TAKER MAKES ON THIS PAGE?

15   A.   NO, IT IS NOT.

16   Q.   LET'S BLOW OUT THE BOTTOM OF THE PAGE IF WE COULD.

17        DOCTOR, CAN YOU EXPLAIN WHAT'S SHOWN HERE AT THE BOTTOM OF

18   THE PAGE.

19   A.   LET'S FOCUS ON THE BOTTOM OF THE PAGE.  IT SAYS GIVEN THE

20   SAMSUNG PHONE THAT YOU JUST CHOSE AS YOUR MOST REFERRED

21   ALTERNATIVES, WOULD YOU BUY IT AT THE INDICATED PRICE, AND YOU

22   WOULD JUST BE ASKED TO TELL ME WHETHER OR NOT YOU WOULD BUY

23   THAT TELEPHONE, THAT SMARTPHONE.

24   Q.   IS THAT SECOND CHOICE, I THINK YOU HAVE AN EXAMPLE OF A

25   CHOICE, BUT DO THESE CHOICES MADE ON THE BOTTOM OF THE PAGE, DO

1    THEY FACTOR INTO YOUR WILLINGNESS TO BUY CALCULATIONS?

2    A.   YES, THESE ARE NECESSARY TO -- THESE ARE NECESSARY FOR ME

3    TO DO THE WILLINGNESS TO BUY CALCULATIONS.

4    Q.   NOW, IF WE FINALLY GO UP TO THE, BACK TO THE VERY TOP OF

5    THE PAGE, THERE'S AN INDICATION UP THERE -- MR. LEE CAN BLOW IT

6    UP -- I THINK IT SAYS 1 OUT OF 16, DID SURVEY PARTICIPANTS MAKE

7    ONE CHOICE BETWEEN FOUR PHONES WHEN THEY WERE TAKING THE

8    SURVEY?

9    A.   NO.  THEY ENCOUNTERED SIMILAR SCREENS.  THEY MADE 16

10   DIFFERENT CHOICES.

11   Q.   SO THEY HAD TO GO THROUGH 16 PAGES, PICK A PHONE, AND

12   INDICATE WHETHER OR NOT THEY WOULD BUY THAT PHONE?

13   A.   YES.  THEY DO THIS 16 TIMES.

14   Q.   AND DOES THAT PROCESS YIELD SIGNIFICANT DATA ABOUT THE

15   PREFERENCES OF THE INDIVIDUAL -- 507 PEOPLE IN THE SMARTPHONE

16   SURVEY EXAMPLE WHO TOOK THE SURVEY?

17   A.   YES.  IT GIVES A VERY LARGE AMOUNT OF DATA.

18   Q.   IF WE CAN BRING UP EXHIBIT 93, DEMONSTRATIVE 93.3 TWO, I

19   THINK YOU'VE PREPARED A DEMONSTRATIVE THAT ILLUSTRATES, A

20   SERIES OF DEMONSTRATIVES THAT ILLUSTRATE THE DATA.  WHAT'S

21   SHOWN HERE, DR. HOUSE?

22   A.   WELL, WHAT'S SHOWN HERE IS EACH RESPONDENT IS SHOWN 16

23   SCREENS AND ON EACH SCREEN THEY CHOOSE AMONG THE SMARTPHONES

24   AND THEN YOU WOULD TELL ME WHETHER OR NOT YOU WOULD BUY THE

25   SMARTPHONE YOU CHOSE.

1          EXAMINE SO THAT 16 SCREEN TIMES TWO, OR 32 CHOICES, YOU

2     CAN SEE HERE IT'S A SMALL AMOUNT OF CHOICE DATA.

3          IF WE THEN, SAY, HAVE 100 RESPONDENTS, WE GET THAT --

4     OKAY.  SORRY, 50 RESPONDENTS, THAT WOULD BE 1600 CHOICES.

5          AND IF WE HAD 507 RESPONDENTS, THAT WOULD BE OVER 16,000

6     CHOICES THAT WOULD BE MADE.

7          EXAMINE IT'S EVEN MORE THAN THAT SINCE WE KNOW THE FIRST

8     CHOICE IS PREFERRED TO THE SECOND, THIRD, AND FOURTH SMARTPHONE

9     ON THAT PAGE.

10    Q.   SO HOW DOES THIS -- IS THIS THE NUMBER OF CHOICES THAT

11    YOU, IN THE SMARTPHONE SURVEY, WERE YIELDED BY THE SURVEY

12    PROCESS?

13    A.   YES, OVER -- WELL, WELL OVER 16,000 -- I'M SORRY.  OVER

14    16,000 CHOICES WERE MADE.

15    Q.   AND IF I CAN CALL ALL THOSE CHOICES DATA, HOW DOES THAT

16    DATA REVEAL CONSUMER PREFERENCE AND CONSUMER DEMAND FOR

17    SPECIFIC FEATURES?

18    A.   WELL, RECALL THAT AS YOU'RE MAKING THESE CHOICES, YOU'RE

19    MAKING TRADE OFFS AMONG THESE FEATURES.

20         SO THOSE CHOICES REVEAL TO ME THE TRADE OFF THAT IS YOU'RE

21    MAKING AND ALLOW ME TO, TO DETERMINE HOW MUCH YOU VALUE EACH OF

22    THESE FEATURES.

23    Q.   ALL RIGHT.  YOU SAID REVEAL TO ME.  HOW DO YOU TAKE ALL

24    THAT DATA THAT YOU GATHERED FROM THE PEOPLE TAKING THE SURVEY

25    AND DETERMINE SUCH THINGS, SUCH THINGS AS A MEASUREMENT OF

```
 1        WILLINGNESS TO BUY?

 2        A.   WELL, IT IS A LOT OF DATA, SO WE DO USE A FAIRLY

 3        SOPHISTICATED COMPUTER PROGRAM, SOPHISTICATED ANALYSIS TO

 4        DEVELOP OUR UNDERSTANDING OR A DESCRIPTION OF THE TRADE OFFS

 5        THAT ARE BEING MADE.

 6        Q.   AND WHO'S THE MAKER OF THAT SOFTWARE THAT YOU USED?

 7        A.   SAWTOOTH SOFTWARE INCORPORATE.

 8        Q.   WHY DID YOU USE SAWTOOTH SOFTWARE?

 9        A.   THEY'RE THE INDUSTRY STANDARD, OFTEN CALLED THE GOLD

10        STANDARD IN THE INDUSTRY.

11        Q.   OKAY.  BASED ON THE STUDY YOU CONDUCTED, DID YOU COME --

12        WHAT ARE THE CONCLUSIONS YOU CAME TO ABOUT THE IMPACT OF THE

13        PATENTED FEATURES ON SAMSUNG CONSUMERS' DEMAND FOR SMARTPHONES

14        AND TABLETS?

15        A.   THE FEATURES ASSOCIATED WITH THE PATENTS HAVE A MEASURABLE

16        IMPACT ON CONSUMER DEMAND.

17        Q.   AND, DOCTOR, I'D LIKE YOU TO -- LET ME ASK YOU, DID YOU

18        PREPARE A DOCUMENT SUMMARIZING THE RESULTS OF YOUR TWO SURVEYS?

19        A.   YES, I DID.

20        Q.   IF YOU COULD LOOK AT PLAINTIFF'S EXHIBIT 141 IN YOUR

21        BINDER.  WOULD YOU LOOK AT THAT AND TELL US WHAT IT IS.

22        A.   THIS IS A SERIES OF TABLES DESCRIBING THE WILLINGNESS TO

23        BUY, THE IMPACT OF THE FEATURES ASSOCIATED WITH THE PATENTS ON

24        CONSUMER DEMAND.

25        Q.   AND DID YOU PERSONALLY CREATE THIS SUMMARY?
```

1     A.   YES, THIS WAS CREATED WITH THE HELP OF THE SOFTWARE.

2     Q.   AND DID YOU CALCULATE WILLINGNESS TO BUY FIGURES FOR EACH

3     OF THE PATENTED FEATURES IN THIS CASE?

4     A.   YES, I DID.

5     Q.   DID YOU ALSO CALCULATE SOMETHING CALLED WILLINGNESS TO PAY

6     FOR EACH OF THE PATENTED FEATURES IN THE CASE?

7     A.   YES, I DID.

8     Q.   AND ARE THOSE DATA REFLECTED IN THAT EXHIBIT 141?

9     A.   YES, THEY ARE.

10         MR. BENNETT:  YOUR HONOR, WE'D OFFER EXHIBIT 141 INTO

11    EVIDENCE.

12         THE COURT:  ANY OBJECTION?  I DON'T HAVE THOSE

13    EXHIBITS.

14       ANY OBJECTION.

15         MR. PRICE:  THERE'S NO OBJECTION.

16         THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

17       (PLAINTIFF'S EXHIBIT 141 WAS ADMITTED IN EVIDENCE.)

18         MR. BENNETT:  I'M SORRY, YOUR HONOR.

19         THE COURT:  THAT'S ALL RIGHT.  CAN SOMEBODY GET ME A

20    SET?

21         MR. BENNETT:  YES.  WE'LL DO THAT RIGHT NOW.

22         THE COURT:  GO AHEAD.  GO AHEAD WITH YOUR

23    EXAMINATION.

24         MR. BENNETT:  THANK YOU.

25    Q.   SO WHAT I'D LIKE TO TURN TO NOW, DOCTOR, IS HOW

1     WILLINGNESS TO BUY IS ACTUALLY CALCULATED FROM THE DATA.

2          HAVE YOU PREPARED A SERIES OF DEMONSTRATIVES THAT

3     DEMONSTRATE THAT?

4     A.   YES, I HAVE.

5     Q.   WHY DON'T WE BRING UP PDX 93.34.  THIS SAYS -- WHICH IS

6     TITLED WILLINGNESS TO BUY, AND UNDER THAT, THERE'S THE TWO

7     WORDS, BASELINE PHONE.

8          COULD YOU DESCRIBE TO THE LADIES AND GENTLEMEN OF THE JURY

9     WHAT YOU'RE REFERRING TO THERE AS A BASELINE PHONE AND HOW THAT

10    IS USED IN THE CALCULATION OF WILLINGNESS TO BUY.

11    A.   YES.  IF YOU RECALL, WILLINGNESS TO BUY WAS THE SET OF

12    CONSUMERS WHO WOULD BUY A PHONE WITH A PARTICULAR SET OF

13    FEATURES, AND IN THIS CASE, WE'RE INTERESTED IN THE CHANGE IF

14    WE TAKE AWAY THE PATENTED FEATURE.

15         SO WHAT WE'D LIKE TO DO IS TO COMPARE A PHONE WITH THE

16    FEATURE TO A PHONE WITHOUT THE FEATURE.  SO THE BASELINE PHONE

17    IS A PHONE THAT ACTUALLY HASUIKE THE FEATURE AT ISSUE.

18    Q.   SO I THINK WE CAN SHOW ON THIS DEMONSTRATIVE DID YOU THEN

19    BUILD, IF YOU WILL, THE BASELINE PHONE, OR A SERIES OF BASELINE

20    PHONES FOR PURPOSES OF YOUR ANALYSIS?

21    A.   YES, I DID.

22    Q.   MAKE WE CAN BRING THIS UP, AS MR. LEE BRINGS UP THE

23    GRAPHICS?

24    A.   YEAH.  SO A BASELINE PHONE IS A FULLY FEATURED PHONE THAT

25    HAS ALL OF THE PATENTED FEATURES ALL OF THE DISTRACTION

1      FEATURES -- WELL, THERE'S NOT 21 IN EACH SURVEY, BUT THERE IS

2      21 IN TOTAL.

3              AND OF COURSE IT ALSO HAS ALL OF THE OTHER FEATURES, SUCH

4      AS BATTERY LIFE, THAT THE CONSUMER HAS ON THEIR MOST RECENT

5      SAMSUNG SMARTPHONE.

6      Q.   REFERRING TO THAT BOX AT THE BOTTOM OF THE CHOICE PAGE

7      THAT SAID ASSUME ALL THESE PHONES HAVE, OTHERWISE HAVE ALL THE

8      FEATURES OF YOUR CURRENT SAMSUNG PHONE?

9      A.   YES, THAT'S CORRECT.

10     Q.   NOW, HOW MANY BASELINE PHONES IN YOUR DATA -- HOW MANY

11     BASELINE PHONES DID YOU CONSTRUCT IN YOUR ANALYSIS OF YOUR

12     SURVEY TO YIELD THE DATA IN 141?

13     A.   YES.  WE HAD ONE FOR EACH OF FOUR PRICES, AND ONE FOR

14     EACH -- I'M SORRY, SIX PRICES -- AND ONE FOR EACH OF FOUR

15     SCREEN SIZES, A TOTAL OF 24.

16     Q.   OKAY.  SO YOU HAD FOUR -- THAT COMBINATION OF PRICES AND

17     SCREEN SIZES YIELDS 24 DIFFERENT POTENTIAL COMBINATIONS; IS

18     THAT RIGHT?

19     A.   YES, THAT'S CORRECT.

20     Q.   AND YOU HAD A BASELINE PHONE THAT CORRESPONDED TO EACH

21     COMBINATION; IS THAT RIGHT?

22     A.   YES, THIS PARTICULAR ONE IS 199 DOLLARS AND THE FIVE INCH

23     SCREEN SIZE.

24     Q.   OKAY.  SO ONCE YOU HAVE A BASELINE PHONE, ONCE YOU'VE

25     DEFINED A BASELINE PHONE IN THIS MANNER, HOW IS THAT USED IN

1    THE CALCULATION OF WILLINGNESS TO BUY?

2    A.   WELL, WE HAD WE HAD THE SAMSUNG CONSUMERS AND WHAT THEY'RE

3    TELLING ME AS THEY COMPLETE THE SURVEY IS THAT SOME OF THEM

4    WOULD BE WILLING TO BAY THIS BASELINE PHONE AT THIS PRICE AND

5    THIS SCREEN SIZE, AND I THINK IN THIS CASE IT'S 80 PERCENT.  SO

6    80 WOULD AND THEN THE OTHER 20 WOULD NOT.

7    Q.   OKAY.  SO YOU TALKED EARLIER OF COMPARISONS.  HOW DO YOU

8    USE THIS BASELINE DATA, THE 80 PERCENT WOULD BUY THE BASELINE

9    PHONE TO DETERMINE WILLINGNESS TO BUY FOR A PATENTED FEATURE?

10   A.   WELL, THE BASELINE PHONE IS A SCIENTIFIC CONTROL NOW.

11   EXAMINE THEN WE HAVE ANOTHER PHONE, AND THE OTHER PHONE IS VERY

12   SIMILAR, EXCEPT IT DOES NOT HAVE, SAY, ONE OF THE PATENTED

13   FEATURES.

14       SO LET'S GO AHEAD AND PUT IN EVERYTHING BUT UNIVERSAL

15   SEARCH.  LET'S PUT IN DISTRACTION FEATURES.

16       AND OF COURSE THE PRICE, SCREEN SIZE, AND ALL OTHER

17   FEATURES ARE THE SAME.

18       SO IF WE PUT THOSE, OUR 100 SAMSUNG CONSUMERS UP THERE

19   AGAIN, IN THIS CASE WE MIGHT FIND THAT ONLY 76 PERCENT OF THEM

20   WOULD PURCHASE THE BASELINE PHONE.

21   Q.   OKAY.  HOW DO WE GET FROM -- SO CAN YOU PROCEED TO EXPLAIN

22   HOW YOU CALCULATE A WILLINGNESS TO BUY FIGURE FROM THESE TWO

23   DATA POINTS?

24   A.   YES.  YOU SEE THAT THERE'S A 4 PERCENT DIFFERENCE HERE,

25   BUT THAT'S 4 PERCENT ON THE BASE OF 80 PERCENT.

1        SO IT WOULD BE 80 MINUS 76 DIVIDED BY 80 PERCENT.

2        SO THAT 4 PERCENT IS A 5 PERCENT REDUCTION RELATIVE TO THE

3    BASE.

4    Q.   OKAY.  NOW, IF WE BRING UP EXHIBIT 93.51, IS THIS -- DOES

5    THIS DEMONSTRATIVE ACCURATELY SUMMARIZE DATA THAT'S INCLUDED IN

6    YOUR EXHIBIT 141 RELATING TO THE MEASUREMENTS OF WILLINGNESS TO

7    BUY ASSOCIATED WITH THE '959 UNIVERSAL SEARCH FEATURE?

8    A.   YES, IT DOES.  SO IF YOU LOOK AT THE FIVE INCH SCREEN SIZE

9    AND THE 199 DOLLARS PRICE, THAT'S THE SAME 5 PERCENT THAT I'VE

10   JUST ILLUSTRATED.

11   Q.   AND YOU'VE GOT 24 OTHER FIGURES HERE BECAUSE YOU, YOU

12   TESTED WILLINGNESS TO BUY IN THAT CONTEXT OF DIFFERENT

13   COMBINATIONS OF SCREEN SIZE AND PRICE?

14   A.   YES, THAT'S CORRECT.

15   Q.   WHAT'S THE RANGE OF WILLINGNESS TO BUY FIGURES SHOWN FOR

16   THE '959 PATENT ON THIS GRAPHIC?

17   A.   ON THIS GRAPHIC, IT VARIES FROM 3 PERCENT UP TO 12

18   PERCENT, AND 12 PERCENT BEING FOR THE SMALL SCREEN SIZE AND

19   HIGH PRICE.

20   Q.   OKAY.  AND DID YOU PERFORM SIMILAR CALCULATIONS FOR THE

21   OTHER FOUR PATENTED FEATURES IN THE CASE BESIDES UNIVERSAL

22   SEARCH?

23   A.   YES.  I CALCULATED SIMILAR TABLES FOR EACH OF THE FIVE

24   PATENTS.

25   Q.   AND THOSE FIGURES ARE ALL REFLECTED IN EXHIBIT 141?

1    A.   YES, THEY ARE.

2    Q.   AND CAN YOU GIVE US A SENSE OF THE RANGE OF THE

3    WILLINGNESS TO BUY CALCULATIONS THAT YOU DETERMINED FOR THE

4    OTHER PATENTED FEATURES.  JUST SET THE RANGE?

5    A.   YEAH.  IF I CAN RECALL, I THINK IT'S ABOUT 3 TO 26 PERCENT

6    FOR THE SMARTPHONE, AND FROM I THINK 1 TO 24 PERCENT FOR THE

7    TABLETS.

8    Q.   DID YOU ALSO DO WILLINGNESS TO BUY CALCULATIONS FOR

9    COMBINATIONS OF PATENTED FEATURES?

10   A.   YES, I DID.

11   Q.   OKAY.  AND COULD YOU EXPLAIN WHAT THAT MEANS, THE

12   CALCULATION OF WILLINGNESS TO BUY FOR COMBINATIONS OF FEATURES?

13   A.   YES.  FOR EXAMPLE, IF WE TOOK FOUR PATENTS OUT, WE CAN

14   DETERMINE WILLINGNESS TO BUY ALL FOUR OF THOSE PATENTS

15   SIMULTANEOUSLY.

16   Q.   AND HOW DID THE WILLINGNESS TO BUY FIGURES FOR

17   COMBINATIONS OF PATENTS COMPARE TO THE, THE RANGE OF VALUES YOU

18   DETERMINED FOR COMBINATIONS COMPARED TO INDIVIDUAL PATENTS?

19   A.   OH, NATURALLY THEY'RE HIGHER.  SOMETIMES SUBSTANTIALLY

20   HIGHER.

21   Q.   AND AGAIN, ARE ALL THOSE RESULTS REFLECTED IN EXHIBIT 141?

22   A.   YES, THEY ARE.

23   Q.   NOW, WE'VE BEEN LOOKING AT THE DATA WE STILL HAVE ON THE

24   SCREEN FROM UNIVERSAL SEARCH.  THIS IS FROM THE SMARTPHONE

25   SURVEY; IS THAT RIGHT?

1    A.   YES, THIS IS FROM THE SMARTPHONE SURVEY.

2    Q.   YOUR SURVEY ALSO TESTED TABLETS AS WELL; IS THAT RIGHT?

3    A.   YES.

4    Q.   AND HOW DID THE METHODOLOGY OF THAT SURVEY COMPARE WITH

5    THE METHODOLOGY FOR THE SMARTPHONES?

6    A.   OH, IT WAS BASICALLY THE SAME.

7    Q.   AND ARE THE WILLINGNESS TO BUY RESULTS FOR THE TABLET

8    SURVEY ALSO INCLUDED IN PLAINTIFF'S EXHIBIT 141?

9    A.   YES, THEY ARE.

10   Q.   YOU'RE GOING TO BE, DR. HAUSER, YOU'RE GOING TO BE

11   FOLLOWED BY DR. CHRISTOPHER VELLTURO WHO WILL BE ADDRESSING

12   ISSUES OF DAMAGES IN THIS CASE.

13        DO YOU UNDERSTAND DR. VELLTURO HAS USED, IN SOME WAY, YOUR

14   WILLINGNESS TO BUY NUMBERS IN HIS ANALYSIS?

15   A.   YES.  HE'S USED THE WILLINGNESS TO BUY NUMBERS IN HIS

16   CALCULATIONS.

17   Q.   NOW, YOU MENTIONED A SECOND SET OF RESULTS KNOWN AS

18   WILLINGNESS TO PAY.  WHAT IS WILLINGNESS TO PAY, DOCTOR?

19   A.   IF YOU RECALL BACK TO THE DVR EXAMPLE, WHEN YOU CHECKED

20   THAT YOU WOULD PURCHASE A -- OR YOU WOULD PREFER A DVR FOR THE

21   $5 MORE PER MONTH, THAT'S YOUR WILLINGNESS TO BUY THAT DVR, AT

22   LEAST THAT'S ONE DATA POINT THAT HELPS ME GET TO THAT.

23        SO THE WILLINGNESS TO BUY IS HOW MUCH YOU WOULD BE WILLING

24   TO BUY -- I'M SORRY -- WILLINGNESS TO PAY.  WILLINGNESS TO PAY

25   IS THE AMOUNT YOU WOULD BE WILLING TO PAY EXTRA FOR THAT

1      FEATURE INCREMENTALLY IN MAKING CHOICES AMONG ALTERNATIVE

2      SMARTPHONES.

3      Q.   AND IF WE CAN BRING UP PLAINTIFF'S EXHIBIT 93.53, DOES

4      THIS DEMONSTRATIVE ACCURATELY REFLECT THE WILLINGNESS TO PAY

5      FIGURES THAT YOU DETERMINED FROM YOUR STUDY?

6      A.   YES.  WE'VE BEEN TALKING ABOUT UNIVERSAL SEARCH, SO I

7      THINK THAT'S THE THIRD ONE DOWN.

8           WHAT THIS SAYS IS THAT THERE'S A PRICE PREMIUM OF $44.

9      THE CONSUMER WOULD BE WILLING TO PAY AN ADDITIONAL $44 TO HAVE

10     THAT FEATURE IN THE BASELINE PHONE.  OVER 24 MONTHS, THAT'S,

11     OH, ABOUT $2 PER MONTH.

12     Q.   NOW, YOU SHOW THESE FIGURES RANKING FROM 44 TO $102 ON

13     THIS DEMONSTRATIVE.

14          WHAT DO THESE NUMBERS INDICATE TO YOU ABOUT DEMAND FOR THE

15     PATENTED FEATURES?

16     A.   THEY'RE AN ADDITIONAL INDICATOR THAT THERE'S DEMAND FOR

17     THE PATENTED FEATURE.

18     Q.   OKAY.  ARE THE WILLINGNESS TO PAY FIGURES WE SEE HERE, ARE

19     THEY EQUIVALENT TO MARKET PRICES CONSUMERS WOULD ACTUALLY PAY

20     FOR THE FEATURES?

21     A.   NO, THEY'RE NOT.  THEY'RE JUST THE AMOUNT THAT PEOPLE

22     WOULD BE WILLING TO PAY.  THERE'S MANY OTHER CONSIDERATIONS

23     THAT WOULD GO INTO SETTING THE MARKET PRICE, AND THAT WOULD BE

24     A DIFFERENT STUDY.  YOU'D HAVE TO HAVE DIFFERENT SET OF

25     CONSUMERS, DIFFERENT SET OF -- A LOT OF DIFFERENT THINGS WOULD

1   GO INTO THAT, INTO SUCH A CALCULATION.

2       HERE IT'S JUST AN INDICATOR OF DEMAND.

3   Q.   AND CAN YOU JUST ADD THESE NUMBERS UP, THE WILLINGNESS TO

4   PAY FIGURES, IS IT APPROPRIATE TO JUST ADD THEM UP AND TALK

5   ABOUT AGGREGATE WILLINGNESS TO PAY?

6   A.   NO.  THAT WOULD BE INAPPROPRIATE.  THAT'S NOT HOW YOU CAN

7   INTERPRET THOSE NUMBERS.

8   Q.   OKAY.  AND IS THAT WELL KNOWN TO PEOPLE IN YOUR ART?

9   A.   YES.

10  Q.   DID DR. VELLTURO, TO YOUR KNOWLEDGE, DID HE USE

11  WILLINGNESS TO PAY NUMBERS IN HIS ANALYSIS TO CALCULATE

12  DAMAGES?

13  A.   NOT TO MY KNOWLEDGE, NO.

14  Q.   DOCTOR, DID YOU PERFORM ANY TESTS THAT VERIFIED THE

15  RELIABILITY OF THE RESULTS INCLUDED IN YOUR EXHIBIT 141 AND

16  PRESENTED HERE TODAY?

17  A.   YES, I DID.  I DID THE -- I USED STANDARD STATISTICAL

18  TESTS TO VERIFY THE RELIABILITY AND VALIDITY OF THE RESULTS.

19  Q.   AND WHAT DID YOU CONCLUDE FROM THE TESTS THAT YOU

20  PERFORMED?

21  A.   I CONCLUDED THAT THE RESULTS ARE RELIABLE AND VALID TO A

22  HIGH DEGREE OF SCIENTIFIC CERTAINTY; THAT THE CONSUMERS

23  ANSWERED THE QUESTIONS CAREFULLY AND CONSISTENTLY AND

24  INTELLIGENTLY IN DECIDING AMONG SMARTPHONES AND DECIDING

25  WHETHER OR NOT TO BUY THOSE SMARTPHONES.

```
1    Q.   SO LET ME JUST FINALLY ASK YOU, DOCTOR, COULD YOU BRIEFLY

2    SUMMARIZE THE CONCLUSIONS YOU'VE REACHED FROM THE WORK YOU'VE

3    DONE IN THIS CASE?

4    A.   YES.   THE FEATURES THAT WERE ENABLED BY THE PATENTS AT

5    ISSUE IN THIS CASE HAVE A MEASURABLE IMPACT ON CONSUMER DEMAND

6    FOR SAMSUNG TELEPHONES, SMARTPHONES AND TABLETS.

7              MR. BENNETT:  THANK YOU, DOCTOR.  I HAVE NO FURTHER

8    QUESTIONS.

9              THE COURT:  THANK YOU.

10        TIME IS NOW 11:38.

11             MR. PRICE:  YOUR HONOR, WHILE WE'RE SETTING UP, MAY I

12   REQUEST A VERY QUICK PERSONAL BREAK?

13             THE COURT:  YES, GO AHEAD.

14        (PAUSE IN PROCEEDINGS.)

15             MR. PRICE:  THANK YOU, YOUR HONOR.

16             THE COURT:  ALL RIGHT.  TIME IS 11:40.

17        GO AHEAD, PLEASE.

18             MR. PRICE:  THANK YOU.

19                         CROSS-EXAMINATION

20   BY MR. PRICE:

21   Q.   GOOD MORNING.

22        GOOD MORNING, FOLKS.

23   A.   GOOD MORNING.

24   Q.   SO PROFESSOR HAUSER, LET ME START A LITTLE BIT ABOUT YOUR

25   BACKGROUND.
```

1         YOU MENTIONED THAT YOU HAVE TESTIFIED A NUMBER OF TIMES

2    BEFORE; CORRECT?

3    A.   YES, I HAVE.

4    Q.   AND YOU'VE TESTIFIED AT DEPOSITION AND TRIAL SOMEWHERE

5    BETWEEN 50 TO 60 TIMES; IS THAT RIGHT?

6    A.   I BELIEVE THAT'S CORRECT OVER 40 YEARS, YES.

7    Q.   AND YOU TALKED ABOUT SOME OTHER COMPANIES YOU'VE WORKED

8    WITH IN CONNECTION WITH THIS CASE IN PARTICULAR -- WELL, YOU

9    TALKED ABOUT ONE AND THAT WAS -- I'M GOING TO USE THE

10   ABBREVIATION, AMS BECAUSE THAT'S WHAT I HAVE WRITTEN HERE,

11   THAT'S AMERICAN MARKETING -- TELL US WHAT THAT STANDS FOR.

12   A.   IT IS CALLED APPLIED MARKETING SCIENCE.

13   Q.   OKAY.  AND THAT'S A COMPANY THAT YOU CO-FOUNDED?

14   A.   YES, ABOUT 25 YEARS AGO.

15   Q.   AND STILL HAVE AN OWNERSHIP INTEREST IN?

16   A.   YES, I HAVE A SMALL OWNERSHIP -- I RETAIN A SMALL

17   OWNERSHIP, YES.

18   Q.   AND YOU ALSO WORKED WITH A COMPANY CALLED CORNERSTONE;

19   CORRECT?

20   A.   YES, THAT'S CORRECT.

21   Q.   AND DO YOU HAVE ANY ESTIMATE OF HOW MANY HOURS THIS

22   COMPANY YOU WORKED WITH, CORNERSTONE, WORKED IN THIS CASE?

23   A.   NO, I DO NOT.

24   Q.   DO YOU SEE BILLS FROM CORNERSTONE?

25   A.   NO, I DO NOT.

CROSS HAUSER

1    Q.   WHAT IS CORNERSTONE'S ROLE IN, IN ASSISTING YOU IN

2    PROVIDING TESTIMONY OR IN DOING REPORTS?

3    A.   WELL, I DON'T THINK THEY PROVIDE ANY TESTIMONY.

4         BUT THEY DO HELP ME CARRY OUT THE STUDY, HELP DESIGN IT,

5    THEY INTERFACE WITH THE LAWYERS, THEY -- YOU KNOW, IF I NEED TO

6    HAVE ANY DOCUMENTS DONE AND SUMMARIZED, THEY'LL GIVE ME THE

7    DOCUMENTS.  IT'S VARIOUS SUPPORT ROLES.

8    Q.   AND YOU'VE WORKED WITH THEM IN THE PAST?

9    A.   YES, I HAVE.

10   Q.   IT'S NOT UNUSUAL FOR YOU TO WORK WITH A COMPANY LIKE

11   CORNERSTONE IN ASSISTING YOU IN YOUR ANALYSIS; CORRECT?

12   A.   YES, THAT'S CORRECT.

13   Q.   NOW, LET ME TALK A LITTLE BIT ABOUT CONJOINTS.

14        AND YOU SAID THAT -- YOU MENTIONED THAT THERE WAS SOME

15   RESEARCH IN THE FIELD ON THE ACCURACY OF CONJOINT STUDIES.

16        OF COURSE, DIFFERENT CONJOINT STUDIES ATTEMPT TO, TO

17   ACCOMPLISH DIFFERENT THINGS SOMETIMES; CORRECT?

18   A.   YES.  THERE ARE VARIOUS MEANS.  YOU CAN DO CHOICE-BASED

19   CONJOINT, YOU CAN HAVE RATINGS-BASED CONJOINT, YOU CAN HAVE

20   PARTIAL PROFILE CONJOINT.  THERE'S A LOT OF DIFFERENT METHODS,

21   YES, THAT'S CORRECT.

22   Q.   AND DIFFERENT CONJOINT STUDIES HAVE DIFFERENT PURPOSES

23   SOMETIMES AS THEY'RE TRYING TO REACH DIFFERENT -- ANSWER

24   DIFFERENT QUESTIONS?

25   A.   YES.  DIFFERENT CONJOINT STUDIES CAN HAVE DIFFERENT

```
 1      PURPOSES.  SOMETIMES THEY'RE USED TO VALUE FEATURES.  SOMETIMES

 2      THEY'RE USED TO -- A VERY DIFFERENT TYPE OF STUDY TO GET AT

 3      MARKET SHARE.

 4          THERE ARE VARIOUS -- I MEAN, CONJOINT ANALYSIS IS USED

 5      QUITE A BIT.

 6      Q.  AND YOU SAY THAT SOME CONJOINT STUDIES ARE USED TO GET

 7      MARKET SHARE.  WHAT DO YOU MEAN BY THAT?

 8      A.  OH, IF I HAD A DIFFERENT PRODUCT AND, SAY, A SMALL NUMBER

 9      OF FEATURES IN A PRODUCT, I MIGHT USE IT TO FORECAST MARKET

10      SHARE.

11          IT'S A DIFFERENT TYPE OF STUDY.

12      Q.  SO, FOR EXAMPLE, IF YOU HAVE A PRODUCT AND -- YOU MIGHT

13      TRY TO PREDICT WHAT SHARE THAT PRODUCT WILL HAVE IN THE MARKET

14      COMPARED TO ITS COMPETITORS?

15      A.  THAT'S -- WELL, THERE'S A LOT OF ASSUMPTIONS YOU NEED TO

16      GO INTO THAT BEYOND WHAT WOULD BE HERE.  IT'S A DIFFERENT

17      STUDY.  IT COULD -- BUT PEOPLE USE IT FOR THAT, FOR THAT

18      PURPOSE.

19      Q.  I DON'T MEAN TO -- AND YOU'VE USED CONJOINT STUDIES FOR

20      THAT SORT OF PURPOSE?

21      A.  OCCASIONALLY.  BUT, YOU KNOW, USUALLY SIMPLER PRODUCTS.

22      Q.  PARDON?

23      A.  USUALLY SIMPLER PRODUCTS.

24      Q.  LET ME STOP BACK THEN.  YOU SAID THAT THE CONJOINT STUDY

25      THAT YOU PRESENTED INVOLVED, I THINK YOU SAID, TRADEOFFS ON
```

```
 1     FEATURES.  DO YOU RECALL USING THOSE WORDS?

 2     A.   WELL, TRADEOFFS AMONG FEATURES, YES, THAT'S CORRECT.

 3     Q.   AND LET ME ASK YOU IF YOU AGREE WITH THE FOLLOWING

 4     STATEMENT:  THAT TO UNDERTAKE A RIGOROUS CONJOINT SURVEY FOR

 5     THE PURPOSE OF ESTIMATING DEMAND FOR A PATENTED FEATURE, MAJOR

 6     PRODUCT FEATURES MUST BE INCLUDED IN THE SURVEY.

 7          DO YOU AGREE OR DISAGREE WITH THAT?

 8     A.   WELL, OF COURSE.  BUT YOU -- MANY TIMES YOU CANNOT

 9     DETERMINE WHETHER A FEATURE IS MAJOR OR NOT UNTIL AFTER YOU'VE

10     DONE THE SURVEY.

11     Q.   OKAY.  SO LET ME BREAK IT UP THEN.  YOU DO AGREE, HOWEVER,

12     WITH THE STATEMENT THAT TO UNDERTAKE A RIGOROUS CONJOINT SURVEY

13     FOR THE PURPOSE OF ESTIMATING DEMAND FOR A PATENTED FEATURE,

14     MAJOR PRODUCT FEATURES MUST BE INCLUDED?  YOU DO AGREE WITH

15     THAT PART OF THE STATEMENT; CORRECT?

16     A.   YES.

17     Q.   AND THEN YOU SAID THAT YOU'VE GOT TO FIGURE OUT WHAT ARE

18     THE MAJOR FEATURES TO BE INCLUDED; CORRECT?

19     A.   YES.  YOU DON'T HAVE TO HAVE ALL THE MAJOR FEATURES IN

20     THERE, BUT CERTAINLY YOU WOULD LIKE TO HAVE SOME FEATURES THAT

21     HAVE SOME MEASURABLE IMPACT ON CONSUMER DEMAND.

22     Q.   AND IN THIS CASE, YOU UNDERSTAND THAT ONE OF THE IMPORTANT

23     QUESTIONS IS WHETHER SAMSUNG WOULD LOSE CUSTOMERS TO APPLE?

24     YOU UNDERSTAND THAT'S ONE OF THE MAJOR QUESTIONS IN THIS CASE?

25     A.   YES, THAT'S CORRECT.
```

```
 1    Q.   AND BUYING A DIFFERENT MODEL OF THE PHONE IS A VERY

 2    DIFFERENT THING THAN BUYING A DIFFERENT BRAND OF PHONE;

 3    CORRECT?

 4    A.   IT'S A DIFFERENT THING, YES, OF COURSE.

 5    Q.   AND YOU HAVE AN UNDERSTANDING, OR FEELING -- WELL, FIRST

 6    OF ALL, LET ME ASK YOU THIS:  A LOT OF EXPERTS -- EXPERTS ARE

 7    ENTITLED TO STAY IN THE AUDIENCE AND LISTEN TO EVIDENCE.  I

 8    DON'T KNOW HOW LONG YOU'VE BEEN HERE.

 9         HAVE YOU BEEN LISTENING TO THE EVIDENCE IN THE TRIAL?

10    A.   I'VE HEARD A FEW, BUT NOT -- I WAS HERE THIS MORNING AND I

11    WAS HERE ONE OTHER DAY.

12    Q.   OKAY.  DID YOU HEAR MR. SCHILLER'S TESTIMONY?

13    A.   NO, I DID NOT.

14    Q.   OKAY.  DID YOU -- HAVE YOU PREVIOUSLY HEARD MR. SCHILLER

15    TESTIFY?

16    A.   DID HE TESTIFY IN ANOTHER TRIAL?

17    Q.   IN -- IN ANY OTHER PROCEEDING.

18    A.   I MAY HAVE.

19    Q.   AND IS IT YOUR UNDERSTANDING THAT IN THIS PARTICULAR

20    MARKET OVER THE LAST FEW YEARS THAT ONE OF THE BIGGEST DRIVERS

21    OF DEMAND IS BRAND?  DO YOU HAVE THAT UNDERSTANDING?

22    A.   WELL, BRAND IS ONE OF THE DRIVERS OF DEMAND, THAT'S

23    CORRECT.

24    Q.   AND, IN FACT, PREVIOUSLY WHEN YOU'VE DONE CONJOINT SURVEYS

25    INVOLVING MOBILE PHONES, YOU HAVE INCLUDED BRAND AS ONE OF THE
```

1    MAJOR PRODUCT FEATURES IN THE SURVEY; CORRECT?

2    A.   YES, IN A DIFFERENT TYPE OF STUDY.

3    Q.   AND -- BUT -- AND THE ONLY -- HOW MANY -- YOU'VE DONE --

4    NOT INCLUDING ASSOCIATED WITH APPLE, YOU'VE DONE HOW MANY

5    CONJOINT STUDIES INVOLVING MOBILE PHONES?

6    A.   I KNOW WE DID ONE FOR AN ACADEMIC PAPER.  THAT WAS -- THAT

7    WAS THE HONG KONG MARKET AND IT WAS, YOU'RE RIGHT, IT WAS

8    MOBILE PHONES, NOT SMARTPHONES.

9         I DON'T RECALL AT THIS POINT ANY OTHERS.

10   Q.   LOOK AT, IF YOU CAN LOOK IN THE BINDER --

11        IS THERE A CERTAIN COLOR TO THIS BINDER THAT HAS THE TAB?

12   BLUE.  IT'S A BLUE BINDER.

13        AND IF YOU LOOK AT TAB 5.

14   A.   AH, NOW I HAVE IT.

15   Q.   OKAY.  IS --

16        MR. BENNETT:  YOUR HONOR, NO -- THERE'S NO OBJECTION.

17        JUST TO BE CLEAR ON GROUND RULES, THIS HAS NOT BEEN MARKED

18   AS AN EXHIBIT.

19        MR. PRICE:  AND IT'S NOT GOING TO BE PRESENTED INTO

20   EVIDENCE.  I'M TRYING TO REFRESH HIS MEMORY AS TO HOW MANY

21   STUDIES HE'S DONE ON MOBILE PHONES.

22        THE COURT:  OKAY.  FOR MY RECORD, HOW SHOULD THIS BE

23   IDENTIFIED?  IF WE JUST SAY NUMBER 5 FROM THE BLUE BINDER,

24   YEARS FROM NOW WE'RE NOT GOING TO KNOW WHAT THAT WAS.

25        MR. PRICE:  THAT'S TRUE.  EXHIBIT NUMBER?

1                   MR. WATSON:  502.

2                   THE COURT:  502.  SO THIS IS DX 502, THAT'S NOT GOING

3       TO BE ADMITTED.

4              (DEFENDANTS' EXHIBIT DX 502 WAS MARKED FOR

5       IDENTIFICATION.)

6                   MR. PRICE:  JUST FOR IDENTIFICATION.

7       Q.   IF YOU SEE DX 502, IS THIS THE PARTICULAR CONJOINT YOU

8       WERE TALKING ABOUT?

9       A.   YES, THIS IS AN ACADEMIC ARTICLE I PUBLISHED IN THE

10      "JOURNAL OF MARKETING RESEARCH" WITH A NUMBER OF OTHER AUTHORS.

11      Q.   AND IF YOU LOOK AT TAB 4, WHICH WE'LL CALL EXHIBIT 503 FOR

12      IDENTIFICATION, DX 503 --

13      A.   I'M SORRY, TAB 4?

14      Q.   TAB 4.

15              AND DO YOU RECOGNIZE THIS AS ANOTHER CONJOINT ANALYSIS

16      THAT YOU WERE DOING THAT INVOLVED MOBILE PHONES?

17      A.   THIS IS A CONJOINT-LIKE STUDY, THAT'S CORRECT.  AND,

18      YOU'RE RIGHT, THIS IS AN ARTICLE THAT I PUBLISHED IN MARKING

19      SCIENCE, IT'S GOT A TITLE, "GREEDOID-BASED NONCOMPENSATORY

20      INFERENCE."  I APOLOGIZE.  THESE SOMETIMES HAVE COMPLICATED

21      TITLES.  BUT, YES, IT'S -- THE EXAMPLE HERE IS ON MOBILE

22      PHONES.

23      Q.   AND, IN FACT, IF YOU LOOK AT PAGE 537, FIGURE 4, YOU SEE

24      THAT AMONG THE PRODUCT FEATURES THAT YOU CHOSE WERE BRAND,

25      SIZE, OPERATING SYSTEM, KEYBOARD.

CROSS HAUSER

```
1              DO YOU SEE THAT?  THAT'S IN FIGURE 4 ON PAGE 537.
2       A.    YES.  OH, YES.  THESE VARY ON -- WELL, I HAVE TO
3       APOLOGIZE.  MY EYES ARE GETTING BAD.  BUT I DO RECALL BRAND WAS
4       IN THERE.
5       Q.    ALONG WITH OPERATING SYSTEM?
6       A.    ALONG WITH OPERATING SYSTEM, YES.
7       Q.    AND YOU KNOW, BASED UPON WHAT YOU'VE HEARD IN COURT AND
8       JUST REVIEWING THE LITERATURE, THAT IN THIS MARKET, BRAND, AND
9       OPERATING SYSTEM ARE TWO OF THE, IF NOT THE TWO HIGHEST,
10      DRIVERS OF DEMAND OF THE PRODUCT?  YES OR NO?
11      A.    I'M NOT SURE I HEARD THAT, BUT I CERTAINLY AGREE THAT
12      BRAND AND OPERATING SYSTEM ARE IMPORTANT.
13      Q.    AND IF WE -- IN FACT, IT'S YOUR UNDERSTANDING THAT THE
14      MARKET, AS IT EXISTS TODAY, THAT THE SAMSUNG BRAND IS BASICALLY
15      AS STRONG AS APPLE'S; CORRECT?
16      A.    IT'S MY UNDERSTANDING THAT SAMSUNG HAS A STRONG BRAND,
17      CORRECT, YES.
18      Q.    AND YOU'VE SEEN SURVEYS THAT HAVE SHOWN THAT, OF ANDROID
19      BUYERS, THAT ONLY 25 PERCENT OF THEM EVEN CONSIDERED BUYING AN
20      IPHONE?  YOU'VE SEEN THAT; CORRECT?
21      A.    I DON'T RECALL THAT PARTICULAR SURVEY.  CAN YOU SHOW IT TO
22      ME?
23      Q.    SURE.  LET ME SEE IF I CAN -- IT'S IN EVIDENCE.  IT'S
24      EXHIBIT 418.019.
25            THIS PART, YOUR HONOR, IS PUBLIC.
```

1          THE COURT:  OKAY.  GO AHEAD, PLEASE.

2     BY MR. PRICE:

3     Q.   TOP REASONS FOR BUYING AN ANDROID AMONG THOSE WHO

4     CONSIDERS IPHONE, AND YOU SEE THERE'S A NOTE HERE, "NOTE, 25

5     PERCENT OF RECENT ANDROID BUYERS CONSIDERED AN IPHONE."

6          DO YOU SEE THAT?  IT'S NOW IN YELLOW.

7     A.   OH, 25 PERCENT -- YES, I SEE THAT.

8     Q.   YOU SEE THAT?

9     A.   UM-HUM.

10    Q.   AND HAVE YOU SEEN THAT BEFORE?

11    A.   NOT THAT I RECALL.

12    Q.   SO YOU -- IN THIS CASE, YOU DIDN'T DESIGN A STUDY TO

13    PREDICT THE IMPACT OF BRAND ON CONSUMER DECISION MAKING;

14    CORRECT?

15    A.   NO, I DID NOT.

16    Q.   AND IN THIS CASE YOU DIDN'T DESIGN A STUDY TO DETERMINE

17    THE IMPACT OF OPERATING SYSTEM ON CONSUMER DECISION MAKING;

18    CORRECT?

19    A.   NO, I DID NOT.

20    Q.   AND YOU DIDN'T DO A CONJOINT STUDY TO DETERMINE THE IMPACT

21    OF, FOR EXAMPLE, THE SPEED OF THE PHONE, THAT IS, YOU KNOW,

22    WHETHER IT'S LTE AS OPPOSED TO SOME, YOU KNOW, PRIOR TECHNOLOGY

23    ON A CONSUMER'S DECISION OF BUYING A PHONE; CORRECT?

24    A.   NO, I DID NOT.

25    Q.   OR ON BATTERY LIFE; CORRECT?

 1    A.   NO.   THESE, OF COURSE, WERE IN THE ALL OTHER FEATURES HELD

 2    CONSTANT, BUT I DIDN'T BREAK THOSE OUT EXPLICITLY.

 3    Q.   AND WHEN YOU SAY "ALL OTHER FEATURES HELD CONSTANT," I'M

 4    ASKING YOU A DIFFERENT QUESTION.   THAT'S DIFFERENT THAN TESTING

 5    THE IMPACT OF DEMAND FOR MAJOR FEATURES; CORRECT?

 6    A.   WELL, IT -- I THINK THE FEATURES WE TESTED ENDED UP HAVING

 7    AN IMPACT ON DEMAND, SO I GUESS THAT COULD BE MAJOR.

 8         BUT HOLDING THE OTHERS CONSTANT, YOU'RE RIGHT, I CAN'T

 9    DETERMINE THE VALUE OF THE FEATURES THAT ARE DETERMINED THAT

10    ARE HELD CONSTANT.

11    Q.   AND OBVIOUSLY A SURVEY, ANY CONJOINT SURVEY CAN'T PREDICT

12    INFLUENCES OF ATTRIBUTES THAT AREN'T MEASURED IN THE SURVEY?

13    YOU'LL AGREE WITH THAT?

14    A.   THAT'S RIGHT, YES.   A CONJOINT STUDY WILL BE VERY GOOD AT

15    PREDICTING FEATURES THAT WE VARY.

16    Q.   SO YOUR SURVEY -- AND IN PARTICULAR IF WE CAN LOOK AT PAGE

17    1 -- LET ME FIND IT.   IT'S 140, EXHIBIT 140, PX 140, THAT I

18    THINK YOU TOLD THE JURY IS SORT OF A SUMMARY OF JURY.

19         BUT YOUR COUNSEL HAD THAT UP THERE.   IF WE NEED ANOTHER

20    COPY, WE CAN MAKE SURE WE GET YOU ONE.

21    A.   WHICH BINDER IS IT IN?

22    Q.   HAUSER DIRECT.   HAUSER DIRECT.

23    A.   OKAY, YES.

24    Q.   OKAY.   IF YOU LOOK AT EXHIBIT 140 -- AND WE CAN SHOW THE

25    FIRST PAGE SO WE CAN KIND OF GET AN ORIENTATION AS TO WHAT

```
 1      WE'RE TALKING ABOUT -- YOU TESTIFIED IN YOUR DIRECT THAT 140

 2      BASICALLY IS -- THESE ARE THE SCREEN SHOTS THAT A RESPONDENT

 3      WOULD HAVE SEEN THAT WAS TAKING THE SURVEY; CORRECT?

 4      A.   YES, THAT'S CORRECT.

 5      Q.   NOW, ACTUALLY, THIS -- HOW MANY PAGES IS THIS PARTICULAR

 6      DOCUMENT?

 7      A.   I DON'T KNOW.  I DIDN'T COUNT.

 8      Q.   OKAY.  WELL, AT THE BOTTOM, LUCKILY, SOMEBODY HAS PUT A

 9      NUMBER AT THE BOTTOM, AND IF YOU LOOK AT THE LAST PAGE, IT SAYS

10      PAGE 104 OF 104.

11      A.   THAT'S WHAT IT SAYS, YES.

12      Q.   AND THESE ACTUALLY DON'T INCLUDE ALL THE PAGES BECAUSE

13      THESE INCLUDE, WITH RESPECT TO WHAT THE CONSUMERS SAW IN THE

14      GRID OF CHOICES, JUST ONE OF 16 CHOICES FOR A PHONE AND THEN

15      FOR A SMARTPHONE; CORRECT?

16      A.   THAT'S CORRECT.

17      Q.   ALL RIGHT.  SO, FOR EXAMPLE, IF I CAN FIND IT HERE, AND IF

18      ANYBODY KNOWS, JUST CALL IT OUT.

19           MR. WATSON:  51.

20           MR. PRICE:  OKAY.  IF YOU LOOK AT PAGE 51.

21      A.   EXCUSE ME WHILE I GET TO THIS.

22      Q.   OKAY.  AND BLOW THIS UP.

23           SO WHEN THE JURY IS LOOKING AT THESE SCREEN SHOTS THAT THE

24      RESPONDENTS --

25      A.   EXCUSE ME.
```

1    Q.    YES.

2    A.    THANK YOU.

3    Q.    WHEN THE JURY IS LOOKING AT THESE SCREEN SHOTS THAT ARE IN

4    EXHIBIT 140 AND THEY SEE PAGE 51, THE RESPONDENT ACTUALLY SAW

5    ANOTHER 15 PAGES AFTER THAT?

6    A.    EXCUSE ME.  I JUST WANT TO POINT OUT THAT I THINK THAT 104

7    WAS THE TWO SURVEYS.

8    Q.    THAT'S TRUE.  THAT'S HOW MANY SURVEYS YOU TOOK?

9    A.    WHAT?

10   Q.    THAT'S HOW MANY SURVEYS YOU TOOK?

11   A.    YES.  BUT EACH RESPONDENT ONLY ANSWERED HALF OF THAT, ONE

12   OF THOSE SURVEYS.

13   Q.    OKAY.  SO LET'S DIVIDE IT UP.

14        SO THE BLUE -- LUCKILY THEY'RE COLOR CODED -- THE BLUE

15   ONES HERE ARE THE SMARTPHONE SURVEYS; RIGHT?

16   A.    YES, THAT'S CORRECT.

17   Q.    OKAY.  SO IF WE GO TO THE BLUE, THE LAST NUMBER ON BLUE IS

18   PAGE 52 OF 104.  DO YOU SEE THAT?

19   A.    YES, THE LAST ONE IS 52 AND THEY'RE COMPLETE.

20   Q.    AND THEN IF WE LOOK HERE AT 51 THEN -- GO BACK TO 51,

21   THERE WE GO -- WHAT THE CONSUMER SAW AT THIS POINT WAS THEN 15

22   OTHER GRIDS LIKE THIS FROM WHICH TO MAKE CHOICES; CORRECT?

23   A.    YES, THAT'S CORRECT.

24   Q.    AND THEN IF WE LOOK AT THE BOTTOM OF THIS PAGE, AT PAGE

25   51, DOWN HERE, YOU ASK, "IN ANSWERING THIS QUESTION," -- AND BY

1    "THIS QUESTION" IT'S REFERRING TO THE QUESTION DOWN HERE ON

2    "YES, I WOULD BUY THE SMARTPHONE ABOVE" OR, "NO, I WOULD NOT

3    BUY THE SMARTPHONE ABOVE."  RIGHT?

4    A.   YES, THAT'S CORRECT.

5    Q.   SO IT SAYS "IN ANSWERING THIS QUESTION, YOU MAY WISH TO

6    CONSIDER THE AVAILABILITY OF OTHER SMARTPHONE OPTIONS IN THE

7    MARKET THAT MAY INFLUENCE YOUR PURCHASE DECISION, INCLUDING

8    SMARTPHONES BY OTHER MANUFACTURERS OR OTHER SAMSUNG

9    SMARTPHONES."

10        CORRECT?

11   A.   YES.  THIS IS DESCRIBING WHAT WE CALL THE NO BUY OPTION.

12   Q.   AND PART OF THE NO BUY OPTION IS SOMEONE WROTE, "NO, I

13   WOULD NOT BUY THE SMARTPHONE ABOVE" IN THE GRID, ONE OF THE

14   OPTIONS WAS THAT THEY COULD BE CONSIDERING ANOTHER SAMSUNG

15   SMARTPHONE; CORRECT?

16   A.   YES, THAT'S CORRECT.

17   Q.   SO EARLIER I SAID THERE'S A -- I SAID THERE'S A DIFFERENCE

18   BETWEEN A QUESTION OF WHETHER OR NOT A BUYER WOULD CHANGE A

19   MODEL OF PHONE AS OPPOSED TO WHETHER THEY WOULD CHANGE A BRAND

20   OF PHONE.

21        DO YOU RECALL THAT QUESTION?

22   A.   WELL, OF COURSE THERE'S A DIFFERENCE BETWEEN THAT.

23   Q.   AND YOUR STUDY DOES NOT SAY WHETHER OR NOT, DOES NOT

24   MEASURE WHETHER OR NOT A CUSTOMER WOULD CHANGE THEIR BRAND OF

25   PHONE FROM SAMSUNG TO SOME OTHER PHONE; CORRECT?

1      A.   NO, I'M NOT MEASURING BRAND CHOICE.

2           THE COURT:  THE TIME IS NOON.  WHY DON'T WE GO AHEAD

3      AND TAKE OUR LUNCH BREAK NOW?

4           MR. PRICE:  SOUNDS GOOD.

5           THE COURT:  SORRY TO INTERRUPT YOUR EXAMINATION.

6           MR. PRICE:  IT'S A GOOD BREAK.

7           THE COURT:  ALL RIGHT.  LET'S TAKE OUR ONE HOUR LUNCH

8      BREAK.  WE'LL SEE YOU BACK AT 1:00.

9           PLEASE DON'T RESEARCH OR DISCUSS THE CASE.  THANK YOU.

10          (JURY OUT AT 12:01 P.M.)

11          THE COURT:  YOU MAY STEP DOWN.

12          THE WITNESS:  THANK YOU.

13          MR. PRICE:  THANK YOU FOR BREAKING, YOUR HONOR.

14          THE COURT:  ALL RIGHT.  UNFORTUNATELY, THE TRANSCRIPT

15     DIED AGAIN THIS MORNING, SO I'M GOING TO ASK PLEASE TO TURN OFF

16     YOUR CELL PHONES WHEN YOU COME BACK, AND IF YOU DO NEED TO KEEP

17     YOUR CELL PHONE ON, IF YOU WOULD PLEASE GO TO THE OVERFLOW

18     ROOM.  WE'VE NOW CHANGED THE VIDEO SO IT SHOWS THE WITNESS AND

19     IT ALSO SHOWS THE EXHIBITS AND HAS FULL AUDIO, SO YOU WON'T

20     MISS MUCH.

21          SO PLEASE, IF YOU'RE GOING TO COME IN, KEEP YOUR CELL

22     PHONES OFFER.

23          ALL RIGHT.  THANK YOU.  WE'LL SEE YOU BACK AT 1:00

24     O'CLOCK.

25          (THE LUNCH RECESS WAS TAKEN FROM 12:01 P.M. TO 1:03 P.M.)

```
 1                    AFTERNOON SESSION

 2           (JURY IN AT 1:02 P.M.)

 3                THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

 4           DO YOU NEED THE ADDITIONAL LINED PAPER NOW?

 5                JUROR:  WE'RE OKAY FOR NOW.

 6                THE COURT:  YOU'RE OKAY FOR NOW.  OKAY.  WE'LL GET IT

 7      DURING THE BREAK AND BRING IT TO YOU.

 8                TIME IS NOW 1:03.  GO AHEAD, PLEASE.

 9      BY MR. PRICE:

10      Q.   GOOD AFTERNOON.

11      A.   GOOD AFTERNOON.

12      Q.   SO, PROFESSOR HAUSER, I WANTED TO ASK YOU A QUESTION

13      WHICH -- A HYPOTHETICAL I'VE TALKED TO YOU ABOUT BEFORE IN SOME

14      PRIOR TESTIMONY.

15           AND DO YOU REMEMBER I WAS TALKING TO YOU ABOUT HOW YOU

16      WOULD APPROPRIATELY, GIVEN YOUR SKILLS, DETERMINE, YOU KNOW,

17      ALLOCATION AMONG MARKET SHARE IF THERE WERE -- IF A PARTICIPANT

18      WAS NO LONGER IN THE MARKET.

19           DO YOU RECALL THAT?

20      A.   YES, YES.

21      Q.   AND DO YOU REMEMBER THAT I, IN MY WORST WRITING, ASKED

22      YOU -- IF WE CAN USE THE ELMO, WE CAN MARK THIS AS EXHIBIT 504

23      FOR IDENTIFICATION -- ASKED YOU IF WE ASSUMED, FOR EXAMPLE,

24      THAT THERE WAS A MARKET SHARE DISTRIBUTION OF APPLE WITH 40

25      PERCENT AND MOTOROLA FOR 20 PERCENT AND SAMSUNG FOR 40 PERCENT,
```

```
1    AND THAT IF WE, FOR SOME REASON, THE MOTOROLA PHONES WERE NO

2    LONGER AVAILABLE, I ASKED YOU, YOU'LL RECALL, WHETHER OR NOT

3    YOU BELIEVED IT WOULD BE APPROPRIATE TO THEN SIMPLY DIVIDE THAT

4    20 PERCENT EVENLY BETWEEN APPLE AND SAMSUNG BECAUSE THEY BOTH

5    WERE -- THEY HAD 40 PERCENT.

6             MR. BENNETT:  OBJECTION.  SCOPE, YOUR HONOR.

7             THE COURT:  OVERRULED.

8         GO AHEAD.

9    BY MR. PRICE:

10   Q.   DO YOU REMEMBER THAT DISCUSSION?

11   A.   YES, I DO.

12   Q.   AND YOUR TESTIMONY WAS THAT, THAT GIVEN THE INFORMATION,

13   JUST THE INFORMATION I GAVE YOU AND GAVE THE JURY, THAT YOU

14   WOULD NOT DIVIDE THOSE MOTOROLA FOLKS EQUALLY; CORRECT?

15   A.   YES.  IF ALL I HAVE IS WHAT YOU'VE WRITTEN ON THAT SHEET

16   OF PAPER AND I HAVEN'T HAD A CHANCE TO STUDY THE MARKET, I

17   WOULD NOT MAKE A PROJECTION.

18   Q.   AND, IN FACT, YOU SAID THAT ONE THINGS YOU'D WANT TO DO,

19   ONE OF THE SPECIFIC THINGS YOU'D WANT TO DO TO COLLECT MORE

20   INFORMATION WOULD BE TO COLLECT INFORMATION ON BRAND.

21   A.   WHAT WAS THAT LAST WORD?

22   Q.   BRAND.

23   A.   OH, BRAND.

24   Q.   B-R-A-N-D.  I'M SORRY.

25   A.   OH.  YES, YES, OF COURSE.
```

1    Q.   OKAY.  AND YOU SAID THAT YOU HAVE DONE THAT SORT OF MARKET

2    SHARE ANALYSIS STUDY BEFORE IN CONNECTION WITH GM.

3    A.   WELL, YES, I'VE DONE FORECASTS FOR GENERAL MOTORS AT A

4    HIGH LEVEL, YES.

5    Q.   AND YOU TALKED ABOUT THE KIND OF STUDY YOU DID AS AN

6    ASSESSOR ANALYSIS?

7    A.   ASSESSOR IS PRIMARILY FOR FREQUENTLY PURCHASED PRODUCTS,

8    BUT, YES, I'VE BEEN INVOLVED AS ASSESSOR.

9    Q.   AND YOU'VE DONE INFORMATION ACCELERATION ANALYSIS IN THOSE

10   SITUATIONS TO SEE, YOU KNOW, HOW, YOU KNOW, YOU WOULD PREDICT

11   THE MARKET WOULD CHANGE IN A SITUATION SUCH AS THIS WHERE, SAY,

12   MOTOROLA WAS TAKEN OUT OF THE MARKET.

13   A.   YES, THERE ARE MANY STUDIES THAT HAVE BEEN DONE AND CAN BE

14   DONE.

15   Q.   AND JUST SO WE'RE CLEAR, IN THIS CASE YOU WEREN'T ASKED TO

16   AND YOU DID NO SUCH STUDY; CORRECT?

17   A.   NO, I DID NOT.

18   Q.   SORRY.  YOU NEED TO --

19   A.   I HAVE TO GET CLOSE.  THANK YOU.

20   Q.   OKAY.  WELL, LET ME ASK YOU THEN ABOUT THE STUDY ITSELF

21   THAT YOU DID DO.

22        AND I WANT TO REFER TO YOUR REPORT TO BEGIN WITH, AND IF

23   WE CAN -- DO YOU HAVE YOUR OWN REPORT IN FRONT OF YOU, YOUR

24   EXPERT REPORT?

25   A.   IS IT IN THE DOCUMENTS THAT YOU GAVE ME HERE?

1    Q.   IT MAY BE IN THE HAUSER DIRECT.

2            MR. WATSON:   IT SHOULD BE A SPIRAL BOUND.

3            MR. PRICE:   SPIRAL BOUND.   SPIRAL BOUND.   NOT ONE OF

4    THESE BIG CHUNKY THINGS BUT --

5            THE WITNESS:   YES, I'VE GOT THAT.

6    BY MR. PRICE:

7    Q.   GOT THAT?   OKAY.

8            AND IF YOU WOULD LOOK AT YOUR REPORT, PAGE 34, PARAGRAPH

9    73.   YOU STATE, "IN ORDER TO OBTAIN RELIABLE DATA FROM A

10   CONJOINT EXERCISE, IT IS IMPORTANT TO HAVE CLEAR DESCRIPTIONS

11   OF THE FEATURES AND FEATURE LEVEL CATEGORIES.   THE SPECIFIC

12   TECHNICAL DESCRIPTIONS OF THE PATENT-RELATED FEATURES WERE

13   PROVIDED TO ME BY COUNSEL.   I HAVE NOT REVIEWED OR INTERPRETED

14   THE PATENT CLAIMS MYSELF AND DO NOT HAVE A PROFESSIONAL OPINION

15   ON THAT MATTER."

16           NOW, LET ME ASK YOU A LITTLE BIT ABOUT THE IMPORTANCE OF

17   THE DESCRIPTION.

18           WHAT YOU WERE ASKING RESPONDENTS, WHAT YOU WERE DESCRIBING

19   TO RESPONDENTS WAS WHAT YOU BELIEVED WAS APPLE'S PATENT CLAIM,

20   OR AN IMPLEMENTATION OF THE APPLE PATENT CLAIM, AS OPPOSED TO

21   SOMETHING ELSE; CORRECT?

22   A.   YES.   THERE WAS ALWAYS A DESCRIPTION OF WHAT IT DID -- AS

23   YOU SAW IN THE VIDEOS, THERE WAS A DESCRIPTION OF WHAT IT DID

24   AND AN ALTERNATIVE.

25   Q.   AND IF YOU OVERSTATE, THAT IS, IF YOU OVERSTATED WHAT

1    APPLE'S PATENT CLAIM COVERED, IF YOU MADE IT TOO BROAD, THEN

2    THAT WOULD INCREASE, POTENTIALLY, THE VALUE THAT A RESPONDENT

3    WOULD GIVE TO THAT PATENT; CORRECT?

4    A.   WELL, THE SURVEY WOULD STILL BE ACCURATE RELATIVE TO THE

5    DESCRIPTIONS.

6         BUT I GUESS IF THE PATENT WAS DESCRIBED INCORRECTLY, THEN

7    THAT WOULD -- I WOULD HAVE TO RELY ON THE TECHNICAL EXPERTS FOR

8    THAT.

9    Q.   FOR EXAMPLE, IF WHAT WAS DESCRIBED TO THE RESPONDENTS WAS

10   THAT APPLE HAD THE ONLY METHOD OF BACKGROUND SYNCING SUCH THAT

11   THERE WOULD NOT BE A DELAY IN THE USE OF THE PHONE -- ARE YOU

12   WITH ME SO FAR?

13   A.   YES.

14   Q.   OKAY.  IF THAT WERE WHAT WERE DESCRIBED TO THESE

15   RESPONDENTS AND THAT, IN FACT, WAS BROADER THAN THE PATENT, IF,

16   IN FACT, APPLE DID NOT OWN ALL WAYS OF DOING THAT, THEN THAT

17   WOULD CAUSE THE RESPONDENTS TO GIVE A HIGHER VALUE TO THAT

18   PATENT; RIGHT?

19   A.   WELL, I THINK HERE WE HAVE TO INTERPRET HOW CLOSELY THE

20   DESCRIPTIONS RELATED TO THE PATENT, AND I'M NOT -- I'M NOT

21   MAKING THOSE INTERPRETATIONS.

22        BUT IF THE DESCRIPTIONS ARE OFF BY A LITTLE, THEN THE

23   NUMBERS WILL -- YOU KNOW, THE ESTIMATES WILL BE OFF BY A

24   LITTLE.  IF THEY'RE OFF BY A LOT, THE ESTIMATES WILL BE OFF BY

25   A LOT.  NOT ESTIMATES, MEASURES ACTUALLY.

1    Q.   SO, FOR EXAMPLE, IF A RESPONSIBLE DEPARTMENT WERE TOLD,

2    "USING APPLE'S PATENT, YOU WILL HAVE NO DELAY IF YOU DO

3    BACKGROUND SYNCING," OKAY?  "BUT IF YOU DON'T USE APPLE'S

4    PATENT, YOU WILL HAVE A DELAY."

5         ARE YOU WITH ME SO FAR?

6    A.   YES, I AM.

7    Q.   NOW, IF THEY'RE TOLD THAT AND, IN FACT, THAT'S FALSE, THAT

8    THERE ARE OTHER WAYS OTHER THAN APPLE'S PATENT CLAIMS SO THAT

9    THERE IS NO DELAY, THEN YOU'RE GOING TO HAVE A PRETTY BIG

10   OVERVALUATION OF THAT PATENT, AREN'T YOU?

11   A.   THE INTERPRETATION OF THE SURVEY RESULTS MIGHT BE

12   OVERVALUED, OF COURSE.

13   Q.   AND SO BECAUSE THIS IS A PATENT CASE, IT'S PARTICULARLY

14   IMPORTANT, IF YOU'RE VALUING THE PATENT, THAT YOU COMMUNICATE

15   TO THE RESPONDENTS, YOU KNOW, WHAT THE PATENT COVERS.  YOU

16   WOULD AGREE WITH THAT?

17        MR. BENNETT:  OBJECT.  VAGUE AS TO WHAT THE PATENT

18   COVERS.  IS HE TALKING ABOUT TECHNICAL OR A CONSUMER ORIENTED

19   DESCRIPTION?

20        THE COURT:  OVERRULED.

21     GO AHEAD.

22     YOU MAY ANSWER.

23        THE WITNESS:  CAN YOU ASK THAT AGAIN?

24        MR. PRICE:  BOY.

25   A.   I'M SORRY.  ALL THAT'S GOING BACK AND FORTH.

1    BY MR. PRICE:

2    Q.   THIS IS A CASE WHERE APPLE IS CLAIMING THAT CERTAIN PATENT

3    CLAIMS HAVE VALUE.  YOU UNDERSTAND THAT; CORRECT?

4    A.   YES, THAT'S CORRECT.

5    Q.   AND SO IT WOULD BE PARTICULARLY IMPORTANT TO ACCURATELY

6    CONVEY TO THE RESPONDENT WHAT THAT PATENT CLAIM COVERS AND WHAT

7    IT DOESN'T COVER; CORRECT?

8    A.   WELL, IT -- THE -- AGAIN, IT'S AN ISSUE OF WHETHER IT'S

9    TECHNICAL OR NOT.

10        BUT IT'S IMPORTANT TO DESCRIBE TO THE CONSUMERS WHAT THE

11   CONSUMERS WOULD REALIZE IS THE BENEFIT FROM THE PATENT.

12   Q.   AND THAT YOU'RE SAYING THAT THEY WOULD BENEFIT FROM THE

13   PATENT AND A WAY IN WHICH THEY WOULD NOT, THAT IS, THEY COULD

14   GET THE SAME BENEFIT SOMEWHERE ELSE, YOU'RE NOT GOING TO GET A

15   GOOD RESULT?

16   A.   I GET A RESULT.  WHETHER IT'S GOOD OR NOT, I'LL LEAVE THAT

17   UP TO YOU.

18        BUT IT'S AN ACCURATE DESCRIPTION OF A CONSUMER'S REACTION

19   TO THE VIDEOS I'VE SHOWN THEM.  IF THOSE VIDEOS, IF YOU CAN

20   ARGUE THAT THOSE DON'T REPRESENT THE PATENTS, THEN OF COURSE I

21   HAVE TO AGREE WITH YOU.

22   Q.   SO --

23   A.   REPRESENT WHAT THE CONSUMER SEES WITH THE PATENT.

24   Q.   SO LET ME ASK YOU THEN ABOUT THE, THE STUDY THAT YOU GAVE

25   THEM, AND YOU MENTIONED THAT YOU DID A PRE-TEST OF THE VIDEOS

1    TO MAKE SURE PEOPLE COULD UNDERSTAND THEM.  CORRECT?

2    A.   I ACTUALLY SAID VERIFY, BUT YES.

3    Q.   AND VERIFY, UNDERSTAND, SAME THING.  YOU WANT TO MAKE SURE

4    THEY UNDERSTAND WHAT WAS IN THE VIDEO AND THE ACCOMPANYING

5    TEXT; RIGHT?

6    A.   YES.  THE PRE-TEST WAS PART OF THE INFORMATION, PART OF

7    WHAT I RELIED UPON.

8    Q.   AND I THINK YOU SAID -- YOU ASKED ABOUT -- THAT'S NOT THE

9    SAME PEOPLE WHO TOOK THE ACTUAL STUDY, THIS IS A SMALLER

10   PRE-TEST GROUP; RIGHT?

11   A.   YOU'RE CORRECT.  THERE WERE 39 PEOPLE, AND THESE ARE NOT

12   OF THE 509, OR THE 4- I THINK IT WAS -59.

13   Q.   AND IF YOU LOOK AT YOUR REPORT, AND PARTICULARLY EXHIBIT I

14   TO YOUR REPORT.

15        YOU SEE THERE'S A SECTION THERE WHICH TALKS ABOUT THIS

16   PRE-TEST AND THE QUESTIONS THAT WERE ASKED ABOUT THE EVALUATION

17   OF VIDEOS; CORRECT?

18   A.   YES, THESE ARE PART OF THE QUESTIONS.

19   Q.   IN FACT, IS THIS FIRST PAGE A SCRIPT?

20   A.   WELL, THERE'S AN OPENING -- THERE'S MORE THAN THIS, OF

21   COURSE.

22   Q.   SO IF YOU LOOK AT THE ENTIRE I, EXHIBIT I, IS THAT ALL OF

23   THE INFORMATION THAT YOU ARE AWARE OF THAT EXISTS AS TO THE

24   QUESTIONS AND ANSWERS GIVEN IN CONNECTION WITH THE PRE-TEST?

25   A.   NO.

1       Q.   IS THERE OTHER DATA, OTHER VIDEOS, TAPE RECORDINGS?

2       A.   WELL, THERE'S -- THE QUESTIONS THAT YOU'RE REFERRING TO,

3       OF COURSE THERE'S THE NOTES THAT ARE A PART OF EXHIBIT I.

4            I'M SORRY.  I MISUNDERSTOOD YOUR QUESTION.

5            THERE'S ALSO, IN ADDITION TO THIS, THE VERBAL DEBRIEFS

6       THAT I RECEIVED FROM THE EXPERIENCED INTERVIEWS.

7                 MR. PRICE:  YOUR HONOR, IF I COULD MARK AS EXHIBIT

8       505, I THINK THAT'S NEXT, EXHIBIT I TO DR. HAUSER'S REPORT.

9            (DEFENDANTS' EXHIBIT I WAS MARKED FOR IDENTIFICATION.)

10      BY MR. PRICE:

11      Q.   AND IF WE COULD LOOK AT -- AND I MOVE THAT INTO EVIDENCE,

12      YOUR HONOR.

13                THE COURT:  ALL RIGHT.  ANY OBJECTION?

14                MR. BENNETT:  NO OBJECTION.

15                THE COURT:  ALL RIGHT.  IT'S ADMITTED.

16           (DEFENDANTS' EXHIBIT I WAS ADMITTED IN EVIDENCE.)

17                MR. PRICE:  SORRY.

18      Q.   FOR THE PRE-TEST, THESE WERE -- AT LEAST THE FIRST PAGE

19      TALKS ABOUT TELEPHONE INTERVIEWS; CORRECT?

20      A.   YES, THAT'S CORRECT.

21      Q.   REMOTE VIEWING OF THE VIDEOS, IN THIS CASE WITH SIX TO TEN

22      SAMSUNG PHONE USERS; RIGHT?

23      A.   THAT'S CORRECT.

24      Q.   AND THE RESPONDENT WOULD VIEW THE VIDEO AND UPON VIEWING

25      IT, THEY WOULD BE ASKED, "DO YOU FEEL LIKE YOU UNDERSTAND THE

1    SMARTPHONE FEATURE CALLED," FILL IN NAME OF FEATURE.  CORRECT?

2    A.   THAT'S WHAT IT SAYS, YES.

3    Q.   AND THEN YOU ASKED, DID OR DID NOT THE VIDEO SAY THAT, AND

4    THEN YOU FILL IN THE CONFIRMATION QUESTION, WHICH YOU HAVE ON

5    THE NEXT -- ON PAGE 3 HERE, WHICH IS WHAT THE, THE TEXT THAT

6    WENT WITH THE VIDEO.

7         IF WE CAN GO TO PAGE 3 VERY QUICKLY WHERE IT SAYS

8    CONFIRMATION STATEMENTS; CORRECT?

9    A.   YES, THESE ARE CONFIRMATION STATEMENTS.

10   Q.   NOW, OF COURSE YOU'VE BEEN IN THE COURT WHILE APPLE'S

11   EXPERTS, OR AT LEAST SOME OF THEM, HAVE EXPLAINED SOME OF THE

12   DETAILS OF THE PATENTS?

13   A.   I WAS HERE THIS MORNING AND ONE OTHER TIME, YES.

14   Q.   NOW, THE PEOPLE BEING ASKED THESE QUESTIONS, OTHER THAN

15   SEEING THE VIDEOS AND BEING READ THE CONFIRMATION STATEMENTS,

16   THAT'S KIND OF ALL THEY'VE BEEN TOLD ABOUT THE PATENTS;

17   CORRECT?

18   A.   THEY'RE NOT EVEN TOLD THEY'RE PATENTS.

19        BUT, YES, THEY SAW THE VIDEOS, THEY READ THE STATEMENT,

20   AND, YOU KNOW, WE'RE ASKING THEM QUESTIONS ABOUT THESE,

21   CORRECT.

22   Q.   AND ONE OF THE QUESTIONS THAT WERE ASKED WERE KIND OF YES,

23   NO, OR UNSURE, DID THE VIDEO SAY THIS?  DID YOU UNDERSTAND

24   THAT?  CORRECT?

25   A.   THOSE ARE SOME OF THE QUESTIONS.

1    Q.   NOW, ANYWHERE IN HERE DOES IT INSTRUCT ANY OF THE

2    INTERVIEWERS TO ASK THEM, OKAY, YOU SAY YOU UNDERSTOOD IT.

3    TELL ME WHAT YOU UNDERSTOOD?

4    A.   NO, WE DID NOT GIVE A MEMORY TEST.

5    Q.   WELL, IT'S NOT A MEMORY TEST.  IT'S -- YOU TEACH COURSES;

6    RIGHT?

7    A.   YES, YES, I DO.

8    Q.   AND YOU OFTEN TEACH CONCEPTS WHICH CAN BE COMPLICATED?

9    A.   I HOPE I EXPLAIN THEM SIMPLY.

10   Q.   THE SUBJECTS CAN BE COMPLICATED; CORRECT?

11   A.   THE SUBJECT CAN BE COMPLICATED.

12   Q.   AND AT THE END OF THE YEAR WHEN YOU'RE GRADING YOUR

13   STUDENTS, IF YOU WANT TO DETERMINE WHETHER OR NOT THEY REALLY

14   UNDERSTOOD WHAT YOU WERE TELLING THEM, YOU DON'T JUST ASK THEM,

15   DID YOU UNDERSTAND WHAT I SAID; CORRECT?

16   A.   CERTAINLY I -- CLASS PARTICIPATION COUNTS, LISTENING TO

17   HOW THEY REACT TO THE CONCEPTS AS I TEACH.  A LOT OF THESE

18   INPUTS -- REALLY LISTENING TO THE STUDENTS AND SEEING HOW THEY

19   REACT IS IMPORTANT.

20   Q.   YOU OFTEN, I WOULD THINK, ASK THEM WHAT DID YOU UNDERSTAND

21   ABOUT WHAT I JUST TOLD YOU?  WHAT'S YOUR UNDERSTANDING?

22   A.   WELL, ACTUALLY, I'M A SOCRATIC TEACHER, ALTHOUGH I DID A

23   FEW LECTURES AS WELL.  AND THERE -- YOU KNOW, I'M LISTENING TO

24   THEM AS THEY DISCUSS THESE CONCEPTS.

25   Q.   DO YOU GIVE TESTS WHERE YOU SAY, EXPLAIN THIS CONCEPT

1    WHICH I'VE BEEN TEACHING YOU ALL SEMESTER?

2    A.    NO.

3    Q.    YOU KNOW TEACHERS WHO DO THAT, THAT THEY ACTUALLY, INSTEAD

4    OF JUST ASKING THEIR STUDENTS DO YOU UNDERSTAND WHAT I SAID,

5    THEY ACTUALLY ASK THEM TO TELL THEM WHAT IS YOUR UNDERSTANDING?

6    A.    CERTAINLY IN SOME SUBJECTS TEACHERS GIVE TESTS.

7    Q.    WELL, IN ANY EVENT, IN THIS CASE WITH THESE PRE-TESTS,

8    THESE FOLKS WERE ASKED YES OR NO QUESTIONS, DID YOU UNDERSTAND?

9    THEY WERE NOT ASKED EXPLAIN TO ME YOUR UNDERSTANDING; CORRECT?

10   A.    NO, THEY WERE NOT ASKED TO EXPLAIN TO ME THEIR

11   UNDERSTANDING.

12   Q.    AND IN CONNECTION WITH, I THINK YOU SAID, THESE INTERVIEWS

13   THAT WERE CONDUCTED WITH THESE PRE-TESTS, EXHIBIT I CONTAINS

14   SOME NOTATIONS; CORRECT?

15   A.    YES, IT DOES.

16   Q.    AND, AGAIN, YOU KNEW IT'S IMPORTANT TO THE INTEGRITY OF

17   THE STUDY AND WHAT YOU WERE GOING TO PRESENT TO THIS JURY THAT

18   THE JURY UNDERSTAND WHAT THEY WERE BEING TOLD; CORRECT?

19   A.    I HOPE I WAS CLEAR ON THAT, YES.

20   Q.    AND SO IN CONNECTION WITH THESE CONVERSATIONS, YOU KNOW,

21   THAT TOOK PLACE WITH THESE PRE-TEST SUBJECTS, YOU KNOW, WERE

22   THEY RECORDED, THE AUDIO, SO THAT WE COULD LISTEN AND KIND OF

23   GET AN UNDERSTANDING AS TO WHETHER THEY UNDERSTOOD THE

24   CONCEPTS?

25   A.    NO, I DID NOT RECORD -- I DIDN'T RECORD THESE INTERVIEWS.

1    Q.   OR ANY VIDEO RECORDINGS, ANYTHING LIKE THAT, THAT WOULD

2    SHOW WHETHER OR NOT THESE FOLKS ACTUALLY UNDERSTOOD, YOU KNOW,

3    WHAT THEY WERE BEING TOLD?

4    A.   NO, THAT'S NOT MY STANDARD PROCEDURE.

5    Q.   WELL, LET'S GET INTO A LITTLE MORE DETAIL THEN AS TO THEN

6    WHAT YOU DID WITH THE ACTUAL SURVEY PARTICIPANTS, AND YOU

7    POINTED OUT THAT THERE WERE TWO SEPARATE SURVEYS, AND EXHIBIT

8    140 IS COLOR CODED BLUE FOR THE SMARTPHONES AND THEN KIND OF A

9    BURGUNDY FOR THE TABLETS; CORRECT?

10   A.   YES.

11   Q.   AND IF WE GO THROUGH THIS, THE FIRST --

12   A.   EXCUSE ME.  MAY I CATCH UP?

13   Q.   YES.  IT'S EXHIBIT 140.

14        GO TO THE FIRST, OH, LET'S SEE -- YOU'RE 22 PAGES INTO THE

15   SMARTPHONE SURVEY BEFORE THE RESPONDENT GETS TO THE FIRST

16   FEATURE THAT'S BEING INCLUDED IN THE TEST; IS THAT RIGHT?

17   A.   THAT'S NOT QUITE RIGHT.

18   Q.   OKAY.  I WANT TO BE QUITE RIGHT, SO TELL ME HOW I'M WRONG.

19   A.   WELL, THE ORDER IN WHICH THESE VIDEOS ARE SHOWN IS --

20   WELL, IT'S NOT COMPLETELY RANDOMIZED, BUT IT'S -- THERE'S A

21   CERTAIN AMOUNT OF RANDOMIZATION HERE SO THAT -- I'M TRYING TO

22   REMEMBER WHETHER PRICE ALWAYS CAME FIRST.

23        BUT THERE MAY HAVE BEEN OTHER VIDEOS BEFORE THIS.  LET ME

24   JUST CHECK.

25   Q.   OKAY.  WELL, THAT WASN'T WHAT I WAS ASKING YOU, SO YOU

1    DON'T NEED TO CHECK.  WE MIGHT GET BACK TO THAT.

2    A.   OKAY.

3    Q.   MY QUESTION, THOUGH, IS IN TAKING THIS SURVEY, THE

4    RESPONDENT IS GOING TO BE READING AND ANSWERING QUESTIONS FOR

5    ABOUT 21 PAGES BEFORE THEY COME TO WHATEVER IS THE FIRST VIDEO?

6    A.   LET'S CHECK THAT.

7    Q.   AND THE WAY YOU CAN DO THAT IS LOOK AT PAGE 22 OF 104 AND

8    COMPARE IT TO --

9    A.   YES, THERE ARE, I THINK, 14 SCREENING QUESTIONS PRIOR TO

10   GETTING TO THIS POINT.  THERE'S SOME PAGES THAT DESCRIBE YOU'RE

11   GOING TO SEE FEATURES, THERE'S THE INCENTIVE ALIGNMENT.

12        YES, SO THERE'S 21 SCREENS THAT THEY GO THROUGH.

13   Q.   AND BY THE WAY, THESE FOLKS ARE NOT BEING PAID, THE

14   RESPONDENTS, BY THE HOUR; CORRECT?

15   A.   NO.

16   Q.   I MEAN, THEY GET PAID THE SAME IF THEY FINISH THIS IN 40

17   MINUTES OR 30 MINUTES OR WHATEVER; CORRECT?

18   A.   YES, THAT'S CORRECT.

19   Q.   OKAY.  AND WHEN WE FINALLY GET TO THESE SCREENS, YOU HAVE,

20   IN THE SMARTPHONE SURVEY, THERE ARE 18 VIDEOS WITH TEXT

21   DESCRIPTIONS FOR THEM TO LOOK AT BEFORE THEY GET TO AN AREA

22   WHERE THEY START MAKING CHOICES; CORRECT?

23   A.   THAT'S CORRECT.

24   Q.   SO IN THIS EXAMPLE, FOR EXAMPLE, ON PAGE 22, IT STARTS

25   WITH PRICE AND YOU WOULD CLICK ON THIS ICON TO SHOW SOME

```
 1        ANIMATION; CORRECT?

 2        A.   WELL, IT SAYS ANY OF THE FOUR PRICE, ANY OF THEM, YOU'LL

 3        SEE THE ANIMATION.

 4        Q.   OKAY.  AND THEN AFTER THAT'S CLICKED, EVENTUALLY THERE

 5        WOULD BE SOMETHING HERE WHICH WOULD ALLOW YOU TO GO TO THE NEXT

 6        ONE, WHICH IN THIS CASE IS THREE-WAY CALLING.

 7             GO TO PAGE 24.

 8             AND THEN IF YOU CLICK ON THAT ICON, AND THEN THEY CAN READ

 9        THAT TEXT; CORRECT?

10        A.   YES, IF THEY CLICK ON THAT ICON, THEY'LL SEE A DESCRIPTION

11        OF THREE-WAY CALLING.

12        Q.   AND THEY WOULD KEEP DOING THAT FOR 18 VIDEOS FOR THE

13        SMARTPHONE; RIGHT?

14        A.   YES, PLUS A TUTORIAL.

15        Q.   AND THEN YOU TOLD US THAT THEY HAD THE OPTION OF GOING

16        BACK AND LOOKING AT THE VIDEO.

17        A.   ONCE THEY REACHED THE CHOICE SCREEN, YES.

18        Q.   AND, OF COURSE, YOU CAN KEEP TRACK OF THAT, YOU CAN KEEP

19        TRACK, IN YOUR SOFTWARE, OF EXACTLY WHETHER OR NOT THESE FOLKS,

20        ANYONE AT ALL, EVER WENT BACK AND LOOKED AT THE VIDEO AGAIN?

21        A.   WE CAN, YES.

22        Q.   AND SO TELL ME THEN EXACTLY OF THESE -- WAS IT 508?  DO I

23        HAVE THE RIGHT NUMBER DOWN?

24        A.   IT'S 507.

25        Q.   507, THANK YOU.
```

1           OF THE 507 PEOPLE WHO TOOK THIS SMARTPHONE SURVEY AND WENT

2      THROUGH THOSE 18 VIDEOS BEFORE THEY WERE THEN PRESENTED WITH 16

3      SCREENS, HOW MANY OF THOSE CLICKED BACK TO LOOK AT A VIDEO

4      AGAIN?

5      A.   I DON'T RECALL THE NUMBER.

6      Q.   IS THAT RECORDED SOMEWHERE?

7      A.   IT'S -- I DON'T KNOW IF I EVER SAW THE NUMBER.  IT COULD

8      BE GOTTEN FROM THE DATA PROBABLY.

9      Q.   WELL, CERTAINLY THEY'RE NOT PAID MORE MONEY IF THEY'RE

10     SPENDING MORE TIME TAKING THE SURVEY; CORRECT?

11     A.   NO, NO.  THEY HAVE AN INCENTIVE TO TAKE THE SURVEY, PLUS,

12     OF COURSE, THE INCENTIVE ALIGNMENT WHERE THEY RECEIVE A

13     SMARTPHONE, RECEIVE AN OFFER OF A SMARTPHONE.

14     Q.   SO LET'S THEN LOOK AT JUST A COUPLE OF THESE CLIPS SO WE

15     CAN SEE WHAT THE RESPONDENT SEES AND SEE, YOU KNOW, HOW IT

16     DESCRIBES APPLE'S PATENT AND THEN THE ALTERNATIVE.  OKAY?

17          I'M GOING TO START WITH BACKGROUND SYNCING.  AND THAT'S

18     DESCRIBED -- BY THE WAY, IF WE LOOK AT THE PAGE ON PAGE 31 OF

19     YOUR REPORT, 140.31, I GUESS, SO LET'S START THERE, SO WOULD

20     HAPPEN HERE IS THEY WOULD HAVE SOME TEXT AND THEN THEY COULD

21     CLICK THIS ICON TO THEN VIEW THE VIDEO; CORRECT?

22     A.   YES, THEY -- WELL, THEY ACTUALLY HAVE TO CLICK THE ICON.

23     Q.   NOW, WHO CREATED THE VIDEO?

24     A.   THIS WAS A PROFESSIONAL FIRM THAT CREATES VIDEOS.

25     Q.   WHO TOLD THAT FIRM WHAT TO PUT ON THE VIDEO?

CROSS HAUSER

1    A.   WELL, I HAD SOME INPUT TO MAKE IT CONSUMER FRIENDLY, BUT

2    THE TECHNICAL DESCRIPTIONS CAME FROM THE ATTORNEYS.

3    Q.   SO I WANT TO SHOW THAT VIDEO.  AND, FIRST OF ALL, LET ME

4    ASK YOU, YOU SAW IT JUST A COUPLE OF HOURS AGO.

5        DO YOU HAVE A RECOLLECTION IN GENERAL OF WHAT THE VIDEO

6    SHOWS?

7    A.   IN GENERAL, YES.

8    Q.   AND IT SHOWS USING THE CONTACTS VERSION OF THE PHONE;

9    CORRECT?  IS THAT RIGHT?

10   A.   IT SHOWS ONE ASPECT OF THE PHONE, YES.  I THINK IT MIGHT

11   HAVE BEEN THE CONTACTS.

12   Q.   OKAY.  TO ACTUALLY KNOW IF IT'S THAT, WOULD WE NEED TO

13   CLICK ON THE ICON AGAIN TO SEE IT?

14   A.   WHAT?

15   Q.   NEVER MIND.

16       SO WE'RE IN THE CONTACTS VERSION AND A PHONE NUMBER IS

17   BEING CHANGED; CORRECT?

18   A.   YES, THE PHONE NUMBER IS BEING CHANGED.

19   Q.   AND THEN THAT'S BEING SYNCED; CORRECT?

20   A.   IT'S BEING SYNCED.

21   Q.   AND WHAT THE VIDEO SHOWS IS THAT IF YOU'RE NOT USING

22   APPLE'S PATENTED CLAIM, THAT THE PERSON, FOR EXAMPLE, HAS TO

23   KEEP HITTING THAT, THAT PAGE FOUR TIMES BEFORE THEY CAN

24   ACTUALLY USE THE PAGE WHILE SYNCING?

25   A.   I'M SORRY.  I DON'T REMEMBER IF IT WAS FOUR TIMES.

1     Q.   OR -- WELL, LET'S FIND OUT.  LET'S GO AHEAD AND SEE IF WE

2     CAN SHOW THE VIDEO.

3               (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

4               MR. PRICE:  THREE.

5               (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

6               MR. PRICE:  IF WE CAN GET THE LIGHTS UP NOW.

7     Q.   NOW, WHO TOLD YOU THAT IF YOU DON'T USE APPLE'S PARTICULAR

8     PATENT CLAIM THAT YOU'RE GOING TO HAVE THAT LONG A WAIT BEFORE

9     YOU COULD USE THE CONTACTS PAGE?

10    A.   WELL, I WAS TOLD THAT THE WAIT MAY BE LONG OR SHORT WAS

11    THE REASON -- WAS A REPRESENTATIVE DESCRIPTION.

12    Q.   AND IF WE GO TO, BACK TO THE DESCRIPTION OF THE PAGE ON

13    BACKGROUND SYNCING, WHAT IS IN TYPE HERE IS THAT WITHOUT THIS

14    FEATURE -- AND YOU WHAT YOU MEANT TO CONVEY IS WITHOUT USING

15    APPLE'S SPECIFIC CLAIM; RIGHT?

16    A.   WELL, FROM A CONSUMER STANDPOINT, IT'S REALLY A FEATURE

17    I'M DESCRIBING TO THEM.  I'M NOT DOING -- USING TECHNICAL

18    LANGUAGE HERE.

19    Q.   BUT THE IDEA IS TO TRY AND MEASURE APPLE'S PATENTED CLAIM;

20    RIGHT?

21    A.   THAT'S THE ULTIMATE GOAL OF THIS, YES.

22    Q.   SO WITHOUT THAT, YOU WOULD HAVE TO USE AN APP, FOR

23    EXAMPLE, THE CONTACTS APP, WHILE THE DATA FOR THE APP IS

24    SYNCHRONIZING WITH THE REMOTE COMPUTER, AND THAT WAIT MAY BE

25    LONG OR SHORT.

CROSS HAUSER

```
 1          CORRECT?

 2     A.   YES, THAT'S CORRECT.

 3     Q.   SO CERTAINLY WHAT THE CONSUMER WOULD UNDERSTAND IS THAT

 4     UNLESS YOU USE APPLE'S PARTICULAR PROPERTY, THE CLAIM IN THEIR

 5     PATENT, THAT UNLESS YOU DO THAT, THERE'S GOING TO BE A WAIT OF

 6     SOME LENGTH OF TIME?

 7               MR. BENNETT:  OBJECT, YOUR HONOR.  OBJECTION.

 8     MISSTATES THE -- THE SURVEY DOESN'T SAY ANYTHING ABOUT APPLE

 9     AND ITS INVENTIONS AND THE QUESTIONS ARE CONTINUOUSLY --

10               THE COURT:  I DON'T HAVE A TRANSCRIPT BECAUSE THIS IS

11     SHUT DOWN, SO I WILL NEED MS. SHORTRIDGE TO READ THE QUESTION

12     BACK, PLEASE.

13               MR. PRICE:  I'LL ASK IT AGAIN TO SAVE TIME SINCE I'M

14     ON THE CLOCK.

15               THE COURT:  ALL RIGHT.  SO THEN THE OBJECTION IS

16     SUSTAINED.

17     BY MR. PRICE:

18     Q.   WITH THAT LIST FEATURE, THE BACKGROUND SYNCING THAT WAS

19     SHOWN -- LET ME BACK UP THIS WAY AND ADDRESS THE OBJECTION.

20          YOUR UNDERSTANDING IS THAT THIS PART, THE FIRST PART OF

21     THE PARAGRAPH IS SUPPOSED TO BE DESCRIBING SOMETHING THAT APPLE

22     ITSELF EXCLUSIVELY OWNS; RIGHT?

23     A.   MY UNDERSTANDING IS THAT THIS DESCRIPTION THAT'S PROVIDED

24     TO ME BY THE ATTORNEYS DESCRIBING THE PATENTED FEATURE, YES.

25     Q.   AND BY "THE PATENTED FEATURE," YOUR UNDERSTANDING IS IT'S
```

1    A PATENT CLAIM WHICH APPLE SAYS IT EXCLUSIVELY HAS THE RIGHT TO

2    DO?  YOU UNDERSTAND THAT PART?

3    A.   YEAH.  WELL, APPLE HAS THE PATENT TO DO THAT, CORRECT.

4    Q.   OKAY.  SO NOW, AS WE'VE TALKED ABOUT, THIS FEATURE IS

5    MEANT TO DESCRIBE APPLE'S PATENT CLAIM, AND WHAT YOU'RE TELLING

6    THE CONSUMER IS THAT WITHOUT USING APPLE'S PATENTED CLAIM,

7    THERE IS GOING TO BE SOME KIND OF WAIT, LONG OR SHORT, ALWAYS?

8    THAT'S WHAT THAT SAYS; RIGHT?

9    A.   WHAT I'M TELLING THE CONSUMERS, WITHOUT THIS FEATURE -- I

10   DON'T MENTION THE FACT THAT APPLE HAS A PATENT, BUT THE REST OF

11   WHAT YOU SAID I AGREE WITH.

12       IT DOES TELL THE CONSUMER IT WILL BE LONG OR SHORT.

13   Q.   IT DOESN'T SAY HOW LONG?

14   A.   NO.  SHORT -- MY UNDERSTANDING IS SHORT IS SOMETHING

15   NOTICEABLE, LONG IS ANNOYING.

16       BUT I THINK IT DEPENDS UPON THE IMPLEMENTATION OF THE

17   SYNCING, THE APP YOU'RE IN, ET CETERA.

18   Q.   AND IF THIS IS INCORRECT, THAT IS, IF THERE ARE WAYS OTHER

19   THAN USING APPLE'S PARTICULAR CLAIM IN ITS PATENT OF

20   SYNCHRONIZING WITHOUT CAUSING A WAIT, THEN THE DATA YOU GOT

21   HERE WOULD NOT BE USEFUL FOR EVALUATING OR VALUING APPLE'S

22   CLAIMED PATENT; CORRECT?

23   A.   YES.  THE SURVEY WOULD STILL BE CORRECT, BUT THE

24   INTERPRETATION OF IT AS A PATENT, YOU KNOW, IT -- THE

25   INTERPRETATION -- IF THE TECHNICAL EXPERTS AGREE THE

```
 1        INTERPRETATION IS WRONG, THEN I THINK I HAVE TO AGREE WITH

 2        THAT.

 3        Q.   OKAY.  SO LET'S LOOK AT ANOTHER EXAMPLE, THE TEXT

 4        CORRECTION, WHICH I THINK IS ON PAGE 140.46.

 5             NOW, FIRST OF ALL, HERE WE'RE LOOKING AT SOMETHING THAT'S

 6        CALLED AUTOMATIC WORD CORRECTION.

 7             WHO CHOSE THAT WORD TO DESCRIBE THIS FEATURE, AUTOMATIC

 8        WORD CORRECTION?

 9        A.   I DON'T KNOW IF I CHANGED IT OR NOT, BUT IT WAS

10        PROBABLY -- EITHER I CHANGED IT SLIGHTLY OR IT WAS PROVIDED TO

11        ME BY THE ATTORNEYS.

12        Q.   YOU HAVE NO IDEA WHETHER OR NOT THAT'S WHAT THE PATENT IS

13        ENTITLED, DO YOU?  WHETHER IT'S ENTITLED AUTOMATIC WORD

14        CORRECTION OR WORD SUGGESTION?

15        A.   NO.  I'M NOT A PATENT EXPERT.

16        Q.   OKAY.  AND IF WE LOOK AT THE VIDEO FOR THIS QUICKLY --

17             (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

18        BY MR. PRICE:

19        Q.   SO WHEN WE GET TO THE PART WHERE IT SAYS -- IF WE CAN GO

20        BACK, KEN, TO THE DESCRIPTION -- WHEN WE GET TO THE PART WHERE

21        IT SAYS "WITHOUT THIS FEATURE," DO YOU SEE THAT?

22        A.   YES, I SEE THAT.

23        Q.   YOU'RE NOW COMPARING THE FEATURE THAT YOU BELIEVE

24        ACCURATELY CONVEYS APPLE'S PATENT CLAIM TO A RESPONDENT;

25        CORRECT?
```

1    A.    I'M NOT MAKING A JUDGMENT AS TO THE PATENTED -- THE

2    PATENTED -- HOW CLOSE THIS CORRESPONDS TO THE PATENTED

3    FEATURES.

4         BUT I AM MAKING A CLAIM THAT I'M MEASURING THE DIFFERENCE

5    BETWEEN THE FIRST DESCRIPTION AND THE SECOND.

6    Q.    OKAY.  AND THIS SECOND DESCRIPTION, THE WAY TO DO IT --

7    WELL, ACTUALLY, THIS SUGGESTS THE ONLY OTHER WAY IS TO REPLACE

8    THE ORIGINAL TEXT BY SELECTING THE SUGGESTED TEXT ITSELF.

9    ISN'T THAT WHAT THAT SUGGESTS, THAT THAT'S THE ONLY OTHER WAY

10   OF DOING IT?

11   A.    YEAH.  IT SAYS WITHOUT THIS FEATURE, SOME DESCRIPTION, YOU

12   WOULD NEED TO SELECT THE BACKGROUND BIRTHDAY YOURSELF.

13   Q.    SO LET ME ASK YOU, I'M GOING TO USE AS A DEMONSTRATIVE,

14   THIS IS JOINT EXHIBIT 35N, THIS IS THE GALAXY S III.

15        ARE YOU FAMILIAR AT ALL WITH THAT PHONE?

16   A.    WELL, I'M AWARE OF THE S III, BUT, NO, I'VE NOT USED IT.

17   Q.    ARE YOU AWARE THAT IT'S ONE OF THE MOST SUCCESSFUL SAMSUNG

18   PHONES THAT'S EVER BEEN SOLD?

19   A.    I DON'T KNOW THAT, BUT IT'S -- I ACCEPT THAT, YES.

20   Q.    OKAY.  SO IF WE LOOK AT MESSAGING ON THIS, I WANT TO --

21   OH, LET'S GO TO SENDING AN E-MAIL.  AND LET ME GET OUT OF HERE.

22        REMIND ME, LIKE -- OKAY.  SHOW ME.

23        SCOTT WATSON, BY THE WAY.

24        AND ME ABOUT TO DO A PRATFALL.

25        OKAY.  THANK YOU.

1           SO ON THIS, YOU SEE -- AND BY THE WAY, I WANT YOU TO

2     ASSUME THIS IS, THIS IS NOT AN ACCUSED FEATURE ON THIS PHONE;

3     THAT IS, THAT THERE'S NO ACCUSATION THAT WHAT I'M ABOUT TO SHOW

4     YOU INFRINGES APPLE'S PATENT CLAIM.  OKAY?

5           SO IF I WROTE B-I-R-F-D-A-Y, OKAY, NOW, YOU SAW ME TYPE

6     B-I-R-F-D-A-Y, CORRECT?  DO YOU SEE THAT?

7     A.    YES, YOU DID IT PRETTY QUICKLY.  I'M SORRY.  I WAS

8     WATCHING WHAT WAS HAPPENING AT THE TOP, NOT AT THE BOTTOM.

9     Q.    AND THAT'S WHAT'S ACTUALLY DESCRIBED, AND YOU SEE UP HERE

10    THERE'S AN AUTOMATIC CORRECTION?  DO YOU SEE THAT?

11    A.    NO, I DON'T.

12    Q.    YOU DON'T?  OKAY.  LET'S TRY IT AGAIN.

13          I MIGHT HAVE TO HAVE SCOTT ONE MORE TIME.

14          SO LET'S ASSUME I WANT TO TYPE BIRTHDAY, BUT I TYPE B-I --

15    OOPS -- I-R-F -- OOPS -- B-I-R-F -- DO YOU SEE IT SAYS B-I-R-F

16    DOWN HERE?  WHAT I'M ACTUALLY TYPING IS DOWN HERE?

17    A.    YEAH.

18    Q.    AND THEN I HIT D-A-Y.

19    A.    SO YOU TYPED.  I'M SORRY.  YOU TYPED BIRTHDAY.

20    Q.    I TYPED BIRFDAY?

21    A.    YOU MISSPELLED IT.

22    Q.    I MISSPELLED IT, YEAH.  SOMETIMES IT HAPPENS.

23          AND YOU SEE IN THIS GALAXY S III THAT THAT IS

24    AUTOMATICALLY CORRECTED?

25    A.    YES.  BUT IT CORRECTED IT.  YOU DIDN'T HIT A SPACE OR

1    DELIMITER.

2    Q.   DIDN'T HAVE TO, DID I?

3    A.   THAT'S CORRECT.

4    Q.   WELL, THE ALTERNATIVE YOU GAVE THEM, HOWEVER, IN YOUR

5    STUDY WAS THAT TO CORRECT IT, I WOULD HAVE TO PUSH SOME, SOME

6    BUTTON DOWN HERE IN THE PREDICTIVE TEXT AREA.  ISN'T THAT WHAT

7    YOU TOLD YOUR RESPONDENTS THAT THE NON-INFRINGING ALTERNATIVE

8    WOULD REQUIRE YOU TO DO?

9    A.   YES.  MY UNDERSTANDING WAS THAT THE NON-INFRINGING

10   ALTERNATIVE WAS REPRESENTATIVE OF THE TYPE OF ALTERNATIVES THAT

11   SAMSUNG HAD PROPOSED AND THAT THE TECHNICAL EXPERTS WOULD

12   TESTIFY TO THAT.

13   Q.   OKAY.  SO IF, IN FACT, THIS WAS A NON-INFRINGING

14   ALTERNATIVE THAT WAS SOLD IN MILLIONS AND MILLIONS AND MILLIONS

15   OF PHONES, THEN YOU WOULD AGREE THAT YOU AT LEAST DID NOT

16   PRESENT THE RESPONDENTS WITH AT LEAST ONE NON-INFRINGING

17   ALTERNATIVE; CORRECT?

18   A.   YES.  I PRESENTED A REPRESENTATIVE NON-INFRINGING

19   ALTERNATIVE.

20   Q.   WELL, AND YOU DIDN'T PRESENT THEM WITH THE ONLY

21   NON-INFRINGING ALTERNATIVE -- WELL, DID YOU NOT PRESENT THEM

22   WITH A NON-INFRINGING ALTERNATIVE WHICH IS, IN FACT, AUTOMATIC?

23   A.   THIS IS -- MY UNDERSTANDING IS THERE'S A LOT OF SAMSUNG --

24   THAT SAMSUNG PROPOSED A LOT OF NON-INFRINGING ALTERNATIVES.

25   NATURALLY I COULDN'T TEST ALL OF THEM.  SO I -- MY

1    UNDERSTANDING IS THAT WE WERE -- I WAS PROVIDED WITH A

2    REPRESENTATIVE TYPE OF NON-INFRINGING ALTERNATIVE.

3    Q.   WHO TOLD YOU THAT WAS REPRESENTATIVE?

4    A.   OH, THIS WAS THE ATTORNEYS, AND I THINK THROUGH THE --

5    ULTIMATELY FROM THE TECHNICAL EXPERTS, MY UNDERSTANDING OF THE

6    TECHNICAL EXPERTS.

7    Q.   OKAY.  DID THEY COMPARE, LIKE, THE SALES VOLUME OF THE

8    SAMSUNG PHONES AND WHAT THE ALTERNATIVES WERE IN THERE TO COME

9    TO THAT?

10   A.   NO.  I'M RELYING ON THE JUDGMENTS OF THE TECHNICAL

11   EXPERTS.

12   Q.   OKAY.  BUT IF WE LOOK, THEN, THE NON-INFRINGING

13   ALTERNATIVE I SHOWED YOU, THOUGH, DOES EXACTLY WHAT THE PART

14   WITHOUT THIS, IT SAYS, EXCEPT IT DOESN'T SHOW THE MISTYPING IN

15   THE ORIGINAL TEXT AREA; CORRECT?

16   A.   EXCUSE ME.

17   Q.   IF YOU DON'T UNDERSTAND IT, THAT'S OKAY.  I'LL GO ON.

18   A.   WHAT?

19   Q.   IF YOU DON'T UNDERSTAND IT, THAT'S OKAY.  I'LL GO ON TO

20   THE NEXT QUESTION.

21   A.   NO, I UNDERSTAND IT.  I JUST WANTED TO REREAD THIS.

22   Q.   OKAY.

23   A.   YEAH, THERE WAS -- OF COURSE THERE'S A TECHNICAL

24   DESCRIPTION -- NOT THE TECHNICAL DESCRIPTION, BUT THE WORDS AND

25   THE VIDEO AND IT SHOWED A PERSON CHOOSING THAT.  SO THE

1       CONSUMER IS REACTING TO THAT ENTIRE STIMULUS.

2       Q.   LET ME ASK YOU ABOUT ONE MORE, AND THAT'S SLIDE TO UNLOCK,

3       WHICH IS 140.91, I BELIEVE.

4            AND LET'S GO AHEAD AND CLICK THIS, KEN, AND SHOW THE VIDEO

5       THAT THEY WERE SHOWN.

6            (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

7       BY MR. PRICE:

8       Q.   SO IN THE FIRST VIDEO WE SAW A LOCK GOING TO AN UNLOCK

9       ICON; CORRECT?  DO YOU RECALL THAT?

10      A.   WELL, YES, WE SAW A GRAPHICS OBJECT GOING FROM ONE SIDE TO

11      THE OTHER.

12      Q.   SO -- AND THEY WERE TOLD THAT THIS SECOND WAY OF DOING IT

13      MAY MAKE UNINTENTIONAL UNLOCKS MORE LIKELY.

14           DO YOU SEE THAT?

15      A.   YES, I SEE THAT.

16      Q.   OKAY.  AND, OF COURSE, SOME PEOPLE DON'T WANT TO

17      UNINTENTIONALLY HAVE THEIR PHONES UNLOCKED OR CALL PEOPLE OR

18      TEXT PEOPLE THEY DON'T INTEND TO; RIGHT?

19      A.   YES.  I'VE POCKET DIALLED BEFORE.  MY KIDS GIVE ME ALL

20      KINDS OF -- THEY TEASE ME WHEN I DO IT.

21      Q.   ARE YOU AWARE OF ANY DATA WHATSOEVER THAT SHOWS THAT THE

22      WAY SAMSUNG, SAMSUNG'S NON-INFRINGING ALTERNATIVE TO SLIDE TO

23      UNLOCK RESULTS IN A HIGHER PERCENTAGE OF ACCIDENTAL UNLOCKS?

24      ARE YOU AWARE OF ANY DATA AT ALL THAT SAYS THAT?

25      A.   I DIDN'T STUDY THAT.  I'M RELYING ON THE TECHNICAL EXPERTS

1    THROUGH THE ATTORNEYS FOR THIS, FOR THE FACT THAT THAT

2    STATEMENT IS ACCURATE.

3    Q.   OKAY.  SO YOU WOULD EXPECT THAT THERE WOULD BE SOME

4    EMPIRICAL DATA TO SUPPORT THAT STATEMENT, THE STATEMENT THAT

5    YOU MADE TO THOSE FOLKS TAKING THE SURVEY?

6    A.   I THINK DR. COCKBURN TESTIFIED ABOUT THAT, BUT THAT WAS A

7    FEW DAYS AGO SO, I'M SORRY, I DON'T REMEMBER THE DETAILS.

8    Q.   OKAY.  CAN WE GO BACK TO THE DESCRIPTION, KEN.

9         SO THE FEATURE HERE THAT'S BEING EMPHASIZED IS WHETHER OR

10   NOT THE METHOD MAKES UNINTENTIONAL UNLOCKS MORE LIKELY;

11   CORRECT?  THAT'S WHAT'S BEING KIND OF POINTED OUT TO THE PEOPLE

12   WHO WERE RESPONDING TO THIS; RIGHT?  CORRECT?

13   A.   THAT'S ONE PART OF THE STATEMENT, YES.  IT'S A DESCRIPTION

14   OF WHAT WOULD HAPPEN WITH -- IN THE EXAMPLE HERE.

15   Q.   LET ME SHOW YOU WHAT IS DX 345.  THIS IS AN IPHONE, AND --

16   ACTUALLY, LET'S START WITH JX 38.  I'M SORRY.

17        JX 38, AN IPHONE, WHICH I'LL REPRESENT TO YOU APPLE CLAIMS

18   PRACTICES THEIR PATENT CLAIM, OKAY?  AND YOU SEE IT HAS AN AREA

19   HERE WHERE YOU CAN SLIDE TO UNLOCK, THERE'S A TRACK?

20        DO YOU SEE THAT?

21   A.   YES, I SEE THAT.

22   Q.   AND THAT IF YOU TRY TO DO IT ANYWHERE ELSE ON THE PHONE,

23   IT DOES NOT SLIDE TO UNLOCK.

24        DO YOU SEE THAT?

25   A.   YES, I SEE THAT.

1    Q.   NOW I'M GOING TO SHOW YOU WHAT IS MARKED AS DX 345.  THIS

2    IS AN IPHONE WITH THE IOS 7 SOFTWARE, AND YOU SEE THIS ALLOWS

3    YOU TO SLIDE TO UNLOCK --

4             MR. BENNETT:  ACTUALLY, YOUR HONOR, I THINK THERE'S

5    AN OBJECTION ON THIS.  I THINK THERE'S AN ISSUE.

6             THE COURT:  THERE WAS, AND IT WAS SUSTAINED LAST

7    NIGHT.

8             MR. PRICE:  THAT WAS ON A DIFFERENT MATTER, THOUGH.

9    A DIFFERENT ISSUE.

10        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

11            MR. BENNETT:  THIS IS BEYOND THE SCOPE.

12            MR. PRICE:  IT WAS THE KEYBOARD, YOUR HONOR, NOT THE

13   UNLOCK.

14            THE COURT:  WHY DON'T YOU MOVE ON TO A DIFFERENT

15   MATTER AND I'LL CHECK THE ORDER.

16   BY MR. PRICE:

17   Q.   SO LET ME ASK YOU THIS:  DID YOU DO ANY ANALYSIS TO SEE

18   WHETHER OR NOT THERE WOULD BE A CONSUMER PREFERENCE OF --

19   BETWEEN DIFFERENT IMPLEMENTATIONS OF SLIDE TO UNLOCK ON ANY

20   APPLE PHONES?

21   A.   NO.  MY STUDY WAS WITH SAMSUNG CONSUMERS AND SAMSUNG

22   SMARTPHONES AND SAMSUNG TABLETS.

23   Q.   NOW, DO YOU, YOURSELF, HAVE ANY FAMILIARITY WITH SLIDE TO

24   UNLOCK FEATURES ON APPLE'S IPHONES?

25   A.   YES, I HAVE AN IPHONE.

1     Q.   AND YOU'VE HAD THEM OVER THE YEARS?

2     A.   YES, I'VE HAD IPHONES OVER THE YEARS.

3     Q.   OKAY.  IN YOUR ESTIMATION, HAVE THEY BECOME EASIER TO

4     UNLOCK?

5     A.   WELL, THEY HAVE THE THUMBPRINT THING NOW.

6     Q.   DO YOU USE THAT?

7     A.   MY PHONE HAS THE --

8               MR. BENNETT:  YOUR HONOR, THIS IS BEYOND THE SCOPE.

9               MR. PRICE:  YOUR HONOR, I'LL MOVE ON UNTIL WE'VE GOT

10    A RULING ON THE LAST OBJECTION, SO I'LL GO TO ANOTHER TOPIC

11    NOW.

12    Q.   NOW, AFTER SHOWING I GUESS 16 -- I THINK WE ESTABLISHED IT

13    WAS 16 VIDEOS WITH DESCRIPTIONS, AND WE FINALLY COME TO A SET

14    OF -- IS IT 16 PAGES WHICH SHOW VARIOUS CHOICES AMONG PHONES;

15    CORRECT?

16    A.   WELL, 16 VIDEOS AND THEN A TUTORIAL, AND AFTER THE

17    TUTORIAL, THEY THEN COME TO THE CHOICE SCREENS.

18    Q.   AND THE TUTORIAL DOESN'T, AGAIN, DESCRIBE THE FEATURES;

19    CORRECT?

20    A.   NO.  THE TUTORIAL DESCRIBES HOW, HOW -- BASICALLY IT'S A

21    TUTORIAL ON HOW TO ANSWER -- WELL, HOW TO GO ABOUT ANSWERING

22    THE QUESTIONS OR WHAT THE QUESTIONS ARE ASKING.  IT'S AN

23    ILLUSTRATION OF HOW TO ANSWER THE CHOICE SCREEN, WHAT THE

24    CHOICE SCREEN MEANS, THINGS LIKE THAT.

25    Q.   SO LET'S PUT UP THE CHOICE SCREEN, WHICH IS 140.51.

1        AND IF WE CAN LOAD THIS UP, KEN, SO THAT WE CAN SEE

2    WHAT -- PERHAPS SHOW WHAT THE RESPONDENT WAS BEING ASKED TO DO.

3    JUST FROM "PLEASE" DOWN TO HERE (INDICATING).  PLEASE BLOW IT

4    UP.

5        SO THIS CONSUMER ON THIS PAGE -- AND THIS WOULD BE ONE OF

6    16 PAGES; CORRECT?

7    A.   YES.  THEY ANSWER 16 CHOICE QUESTIONS.

8    Q.   SO THEY ARE GIVEN CHOICES OF PHONE 1 WITH THE FOLLOWING

9    CHARACTERISTICS THAT ARE IN THAT COLUMN; CORRECT?

10   A.   YES, A PRICE OF $49, IT HAS THREE-WAY CALLING.  I CAN READ

11   THE REST OF IT IF YOU'D LIKE.

12   Q.   BUT I JUST WANT TO SEE -- HOW THIS WORKS CONCEPTUALLY IS

13   THEY ARE PRESENTED WITH FOUR DIFFERENT PHONES WITH FOUR

14   DIFFERENT CONFIGURATIONS; CORRECT?

15   A.   YES, THAT'S CORRECT.

16   Q.   AND THEN THEY'RE ASKED, YOU KNOW, TO SELECT ONE OF THESE

17   GIVEN ALL OTHER FEATURES ON THEIR CURRENT SAMSUNG SMARTPHONE

18   BEING IN IT AS WELL; RIGHT?

19   A.   YES, KNOWING THAT WE'LL DETERMINE THE SAMSUNG SMARTPHONE

20   THAT WILL BE OFFERED TO THEM.

21   Q.   SO LET'S LOOK DOWN HERE.  THE -- THE ICONS THAT WE'RE

22   USING, ARE THEY ALMOST ALWAYS LOCATED IN THE SAME QUADRANT?

23       HERE'S WHAT I MEAN.  LOOK AT PHONE 2.  YOU'VE GOT

24   AUTOMATIC WORD CORRECTION HERE IN THIS QUADRANT.

25       DO YOU SEE THAT?

CROSS HAUSER

1    A.    YES.

2    Q.    AND THEN LET'S GO TO PHONE 3.  IF IT HAD AUTOMATIC WORD

3    CORRECTION, WOULD IT BE IN THAT QUADRANT?

4    A.    YES.

5    Q.    AND SO THE ICON YOU USE FOR THE NON-INFRINGING

6    ALTERNATIVE, THAT IS, WHAT HAS BEEN IDENTIFIED TO YOU BY APPLE

7    AS THE NEXT BEST ALTERNATIVE, THE ICON FOR THAT IS EMPTY SPACE?

8    A.    ACTUALLY, THE ICON FOR AUTOMATIC WORD PROTECTION -- NOT

9    PROTECTION, CORRECTION -- AUTOMATIC WORD CORRECTION INDICATES

10   THE ADVANTAGE OF THE DESCRIPTION SO THAT THEY'RE GIVEN THE

11   ALTERNATIVE.

12        SO IT'S THE INCREMENTAL ADVANTAGE.

13   Q.    IF WE CAN BLOW UP THESE TWO COLUMNS HERE, 2 AND 3, DOWN TO

14   WHERE IT HAS AUTOMATIC WORD CORRECTION.

15        AND SO WHEN A CONSUMER IS LOOKING AT THIS, THEY ARE

16   SUPPOSED TO, IN THE BACK OF THEIR MIND, KNOW THAT WHAT A BLANK

17   SPACE MEANS IS ANOTHER WAY OF DOING WORD CORRECTION THAT WAS

18   DESCRIBED IN A VIDEO THAT THEY SAW EARLIER IN THE STUDY?

19   A.    THAT "X" WAS NOT PART OF MY SURVEY.

20   Q.    WELL, IF THE RESPONDENT CHOSE PHONE 2 OVER PHONE 3, CHOSE

21   A PHONE WITH THIS ICON IN IT AS OPPOSED TO ONE WITHOUT THAT

22   ICON, THAT AFFECTS THE -- IS IT PART WORTH?  IS THAT THE WORD?

23   IS THAT THE VALUE OF THAT PARTICULAR FEATURE IN YOUR STUDY?

24   A.    WELL, YES.  YOU'RE GETTING INTO A TECHNICAL DESCRIPTION,

25   BUT PART WORTH IS A NUMBER THAT REPRESENTS THE PART VALUE OF,

1      IN THIS CASE, HAVING THE AUTOMATIC WORD CORRECTION VERSUS THE

2      NON-INFRINGING ALTERNATIVE.

3          SO IN THIS CASE, THE -- YOU WOULD HAVE A PART WORTH FOR

4      AUTOMATIC WORD CORRECTION IN PHONE 2, BUT NOT 3.

5      Q.   AND SO DON'T YOU THINK THAT -- LET'S GO BACK TO THE --

6      LET'S STAY HERE.  OKAY.

7          SOMEONE WHO'S LOOKING AT PHONE 2 AND PHONE 3 AND LOOKING

8      AT JUST THE ICONS, THEY MIGHT THINK, OH, PHONE 3 HAS NO WAY OF

9      EVEN GIVING ME A WORD SUGGESTION AT ALL BECAUSE THERE'S NO ICON

10     REPRESENTING THE SECOND BEST ALTERNATIVE?

11     A.   WELL, AS YOU'VE POINTED OUT, THEY'VE SEEN THESE VIDEOS AND

12     THE VIDEOS DESCRIBE IT AS HAVING THIS ADVANTAGE, WHICH IS THE

13     AUTOMATIC WORD CORRECTION.

14     Q.   AND SO YOU'RE RELYING ON THEIR MEMORY TO KNOW THAT WHERE

15     THERE'S A BLANK SPACE, THAT DOESN'T MEAN THERE'S NO WORD

16     CORRECTION AT ALL, BUT IT MEANS A SPECIFIC METHOD OF DOING IT

17     THAT WAS SET FORTH IN THE VIDEOS?

18     A.   WELL, IF THEY HAVE ANY QUESTION, THEY CAN GO BACK.

19         THIS IS VERY TYPICAL OF CONJOINT ANALYSIS AND APPROPRIATE.

20         AND ALSO, IT SORT OF IS A MIMICKING THE WAY SOME OF THESE

21     THINGS ARE SEEN ON THE WEB WHEN YOU COMPARE PRODUCTS.

22     Q.   LET ME ASK YOU ABOUT ANOTHER TOPIC, AND THAT IS SOMETHING

23     YOU SAID ABOUT WHEN YOU PRE-TESTED THIS, SOME PEOPLE THOUGHT

24     THIS WAS A TEST TO SEE WHETHER SAMSUNG WANTED TO ADD FEATURES

25     TO PHONES.

```
 1          DO YOU RECALL THAT?
 2     A.   WELL, ADD OR INCLUDE.  SOMETIMES YOU DO A CONJOINT STUDY
 3     TO DECIDE WHETHER TO INCLUDE AN EXISTING FEATURE.
 4     Q.   I'M JUST SAYING, WHEN YOU DID THE PRE-STUDIES OF PEOPLE
 5     WHO OWNED SAMSUNG PHONES, THAT SOME PEOPLE THOUGHT, OH, THIS IS
 6     A STUDY TO SEE, TO DETERMINE WHETHER OR NOT SAMSUNG SHOULD ADD
 7     CERTAIN FEATURES; CORRECT?
 8     A.   YES, THIS IS WHAT WE CALL DISGUISED WORK.  NO ONE KNOWS
 9     ANY OF THESE WERE PATENTS.  NO ONE THOUGHT IT WAS BEING DONE
10     FOR LITIGATION.
11          BASICALLY THEY THOUGHT IT WAS A REASONABLE SURVEY TO
12     DETERMINE HOW VALUABLE AND WHETHER OR NOT THESE FEATURES SHOULD
13     BE IN THE NEXT ITERATION OF SAMSUNG PHONES.
14     Q.   AND ONE OF THE THINGS YOU'RE TRYING TO MEASURE IN THIS,
15     YOU SAID, IS WHETHER, IN THE REAL WORLD, IN MAKING A PURCHASE
16     DECISION, WHETHER OR NOT THESE FIVE FEATURES THAT APPLE CLAIMS
17     TO OWN WOULD AFFECT A PURCHASING DECISION; CORRECT?
18     A.   WHAT I'M TRYING TO DETERMINE IS WHETHER THE ABSENCE OF ONE
19     OF THESE WOULD AFFECT THE PURCHASE DECISION, YES.
20     Q.   IN THE REAL WORLD, YOU MAKE A PURCHASING DECISION BASED
21     UPON A FEATURE ONLY IF YOU KNOW THAT THAT FEATURE IS ACTUALLY
22     IN THE PHONE; RIGHT?
23     A.   NOT NECESSARILY.  SOMETIMES THE FEATURE CAN LEAD TO AN
24     OVERALL IMAGE THAT THE PHONE WORKS, THAT IT WORKS WELL.
25          THERE'S INSTANCES -- FOR EXAMPLE, IF I'M BUYING AN
```

```
 1      AUTOMOBILE, IT'S A WHEELS ON THE CAR PROBLEM.  IF THE CAR HAS

 2      FOUR WHEELS, YOU KNOW, I'M NOT GOING TO NOTICE IT.  BUT IF THE

 3      CAR DOESN'T HAVE A WHEEL, I'M PROBABLY NOT GOING TO BUY IT.

 4           SO IT'S -- NO, I CANNOT -- I CANNOT TOTALLY AGREE WITH

 5      YOUR STATEMENT.

 6      Q.   OKAY.  WELL, LET'S PUT IT THIS WAY:  YOU HAD 500 PEOPLE IN

 7      THERE TAKING A SURVEY, THIS CONJOINT SURVEY; CORRECT?

 8      A.   WELL, 507, YES, CORRECT.

 9      Q.   THEY WERE ALL SAMSUNG PHONE OWNERS; CORRECT?

10      A.   YES, THEY HAD ALL OWNED SAMSUNG PHONES IN THE LAST 12

11      MONTHS.

12      Q.   THEY ALL HAD PHONES WHICH HAD SOME OF THESE FEATURES, SOME

13      OF THE ACCUSED FEATURES?

14      A.   YES, THAT'S CORRECT.

15      Q.   AND GETTING THIS GROUP TOGETHER, DID YOU ASK ANY OF THEM,

16      "ARE YOU AWARE THAT YOUR PHONE HAS THIS PARTICULAR FEATURE?"

17      A.   NO, I DID NOT ASK THAT QUESTION.

18      Q.   AND YOU WERE HERE, WERE YOU NOT -- WELL, LET ME ASK YOU

19      THIS.  LET ME ASK YOU TO ASSUME THIS:  ASSUME THAT IN THE

20      TIMEFRAME THAT WE'RE TALKING ABOUT IN TERMS OF DAMAGES IN THIS

21      CASE, ASSUME THAT THERE HAD BEEN TESTIMONY FROM MR. SCHILLER

22      THAT -- WELL, LET ME BE MORE SPECIFIC -- THAT BETWEEN, SAY,

23      JULY 2012 AND SEPTEMBER 2012, THAT 50 TO 60 PERCENT OF THE

24      PEOPLE BUYING SMARTPHONES HAD NEVER BOUGHT ONE BEFORE.

25           OKAY?  ARE YOU WITH ME SO FAR?
```

CROSS HAUSER

1    A.   OKAY.  SO WE'RE TO ASSUME THAT 50 TO 60 PERCENT OF THE

2    PEOPLE BUYING SMARTPHONES DURING THE PERIOD THAT WE'RE

3    INTERESTED IN --

4    Q.   THAT'S JULY --

5    A.   -- WERE FIRST-TIME BUYERS?

6    Q.   JULY 2011 TO SEPTEMBER 2012, NEVER BOUGHT A SMARTPHONE

7    BEFORE.  THEY HAD FLIP PHONES OR BASIC FEATURE PHONES.  OKAY?

8    A.   YES, I CAN ASSUME THAT.

9    Q.   OKAY.  YOU'D WANT TO KNOW HOW, WHETHER OR NOT -- IN ORDER

10   TO DETERMINE, YOU KNOW, WHETHER OR NOT THEY BOUGHT A PHONE

11   BECAUSE OF BACKGROUND SYNCING, RIGHT, YOU'D WANT TO KNOW

12   WHETHER THEY WERE EVEN AWARE THAT THE FEATURE EXISTED; RIGHT?

13   A.   WELL, AS I TESTIFIED JUST NOW, I -- IF THE PHONE WAS NOT

14   BACKGROUND SYNCING, IT'S THE TYPE OF THING THAT THEY WOULD

15   NOTICE AS THEY PICKED THIS PHONE UP.

16        REMEMBER, PEOPLE DO GO TO A STORE, THEY PICK IT UP, THEY

17   PLAY WITH IT.  IT'S THE TYPE OF FEATURE THAT WOULD BE IN THERE.

18   Q.   OH.  SO YOUR -- YOUR EXPERIENCE, YOUR EXPERT OPINION IS

19   THAT PEOPLE GO TO A STORE, PICK UP A PHONE, AND SEE HOW IT

20   SYNCS WITH THEIR COMPUTER AT HOME?

21   A.   NO, THAT'S NOT -- YOU'RE TURNING MY WORDS AROUND.  MAYBE I

22   MISSPOKE.

23        THESE ARE THE TYPES OF FEATURES -- IMAGINE IF IT DIDN'T DO

24   IT AND THAT YOU HAD TO HAVE A LONG WAIT.  SOME OF THIS WOULD BE

25   NOTICEABLE.  SOME OF THIS WOULD BE LOST, ET CETERA.

```
 1              BUT YOU'RE ABSOLUTELY RIGHT, I HAVE NOT STUDIED THAT.

 2       Q.   I GUESS YOU ANTICIPATED MY QUESTION.  YOU'RE TESTIFYING

 3       HERE ABOUT REAL WORLD CONSEQUENCES.  YOU DID NOT STUDY TO SEE

 4       WHETHER OR NOT FOLKS IN THE REAL WORLD WHO WERE IN THE MARKET

 5       FOR PHONES WERE AWARE EVEN THAT SPECIFIC SAMSUNG PHONES HAD

 6       THESE SPECIFIC FEATURES; CORRECT?

 7       A.   NO, I DID NOT DO THAT STUDY.

 8       Q.   IS SUCH A STUDY POSSIBLE?

 9       A.   YOU KNOW, I -- DO YOU WANT A LONG OR SHORT ANSWER?

10       Q.   OH, I WANT SHORT.

11            (LAUGHTER.)

12              THE WITNESS:  IT'S NOT CLEAR THAT STUDY IS POSSIBLE.

13       I CAN GIVE YOU AN EXPLANATION IF YOU'D LIKE.

14       BY MR. PRICE:

15       Q.   EXPLAIN IT TO HIM, TO SOMEONE ELSE.

16            IN ANY EVENT, IN THIS STUDY, YOU SPENT TIME PRE-TESTING TO

17       MAKE SURE PEOPLE UNDERSTOOD WHAT THE FEATURES WERE; CORRECT?

18       A.   YES, I PRE-TESTED.

19       Q.   AND THEN YOU SHOWED THEM VIDEOS AND TEXT DESCRIBING WHAT

20       THE FEATURES WERE; CORRECT?

21       A.   YES, I SHOWED THE VIDEOS AND TEXT.

22       Q.   YOU TOOK EFFORTS TO EDUCATE THE PEOPLE WHO TOOK THIS TEST

23       WHAT THESE FEATURES WERE; RIGHT?

24       A.   I WOULD NOT CHARACTERIZE THE SURVEY AS A TEST.

25       Q.   YOU TOOK EFFORTS TO EDUCATION THE PEOPLE WHO TOOK THIS
```

1    SURVEY WHAT THESE FEATURES WERE?

2    A.   NO.  I INTRODUCED THEM TO THE FEATURE DESCRIPTIONS.

3    Q.   THAT'S PART OF WHAT AN EDUCATIONAL PROCESS IS, ISN'T IT,

4    LIKE TELLING THEM, SHOWING THEM THE VIDEO, THAT WAS SO THEY

5    COULD LEARN WHAT THE PROCESS WAS?

6    A.   NO, I DON'T THINK THE PURPOSE WAS TO EDUCATE.  I THINK IT

7    WAS TO MAKE SURE THAT THEY UNDERSTOOD THE FEATURES I WAS

8    TALKING ABOUT.

9    Q.   SO YOU COULD HAVE GOTTEN JUST AS VALID A SURVEY, OR

10   RELIABLE A SURVEY, OH, SAY, WITHOUT SHOWING THEM VIDEOS?

11   A.   NO, I FELT I NEEDED TO SHOW -- I NEEDED -- WELL, THERE ARE

12   OTHER WAYS YOU CAN DESCRIBE THESE FEATURES.

13       BUT I FELT I SHOULD DESCRIBE THE FEATURES SO THAT WHEN

14   THEY'RE ANSWERING THE SURVEY, THEY KNOW WHAT THESE CHOICES

15   ENTAIL.

16   Q.   NOW, LET'S LOOK AT THEN WHAT ALL OF THIS COMES TO, THE

17   BOTTOM LINE, YOUR FINDINGS.

18       IF WE CAN PUT UP SDX 2411.

19       YOU CALCULATED A WILLINGNESS TO PAY ON A $149 PHONE WITH A

20   TWO YEAR CONTRACT OF ANOTHER 44 ON SEARCH; 56 ON THIS

21   PARTICULAR VERSION OF QUICK LINKS; 69 ON BACKGROUND SYNCING;

22   AND 102 ON AUTOMATIC WORD CORRECTION.

23       THOSE ARE YOUR CALCULATIONS; RIGHT?

24   A.   YES.  SO WE'RE ON THE SAME PAGE, WOULD YOU LIKE ME TO

25   EXPLAIN WHAT THOSE NUMBERS MEAN?

1     Q.    EXPLAIN THEM LATER.  I'M ASKING YOU WHETHER THOSE NUMBERS

2     ARE ACCURATE.

3     A.    THESE ARE ACCURATE WILLINGNESS TO PAY NUMBERS.  THEY

4     INDICATE WHAT ONE PERSON WOULD BE WILLING TO PAY FOR A PHONE

5     THEY WOULD HAVE FOR TWO YEARS FOR THE ADDITION OF THAT PATENTED

6     FEATURE.

7     Q.    AND THEN YOUR COUNSEL SHOWED --

8     A.    BUT IT'S NOT MARKET PRICE.

9     Q.    IT'S NOT MARKET PRICE BECAUSE THERE ARE OTHER FACTORS THAT

10    MIGHT GO INTO IT.

11          BUT WHAT THIS DOES SHOW, ACCORDING TO YOU, IS WHAT SOMEONE

12    WOULD BE WILLING TO PAY IF THEY HAD TO TO GET THIS FEATURE?

13    A.    YES.  IT SHOWS, FOR EXAMPLE, THEY WOULD BE WILLING TO PAY

14    ABOUT $2 A MONTH FOR A UNIVERSAL SEARCH, ABOUT $4 FOR AUTOMATIC

15    WORD CORRECTION.

16    Q.    OH.  SO YOU'RE CONVERTING THESE INTO PER MONTH PAYMENTS?

17    IS THAT WHAT YOU JUST DID?

18    A.    WELL, YOU KNOW, WHEN I BUY A CELL PHONE, YES, IT'S -- IF

19    I'M GOING TO BE USING THAT PHONE FOR THE NEXT 12 TO 24 MONTHS,

20    I CARE ABOUT THESE FEATURES.

21    Q.    AND WHEN YOU THINK OF THEM AS YOU'RE PAYING AN EXTRA $102

22    ON A $149 PHONE, YOU THINK MOST CONSUMERS THINK TO THEMSELVES,

23    "WELL, REALLY I'M JUST PAYING 12 INTO 102," SOMEWHERE AROUND 9

24    POINT SOMETHING -- I'M NOT SO GOOD -- THAT'S THE THOUGHT

25    PROCESS CONSUMERS GO THROUGH, YOU BELIEVE?

CROSS HAUSER

1    A.   WELL, WHAT I DO KNOW IS THAT THESE NUMBERS REPRESENT WHAT

2    PEOPLE TOLD ME THEY WERE WILLING TO PAY.

3         AND REMEMBER THAT WE'RE GOING TO BE OFFERING THEM A

4    SMARTPHONE, SO I BELIEVE -- I BELIEVE THESE NUMBERS ARE

5    CORRECT, YES.

6    Q.   MY QUESTION WAS DIFFERENT.  YOU THINK THAT PEOPLE DO WHAT

7    YOU JUST TRIED TO DO AND CONVERT IT TO A MONTHLY FIGURE TO

8    LOWER THE FIGURE SO IT DOESN'T SEEM TO BE AS MUCH?

9    A.   I WAS NOT TRYING TO LOWER THE FIGURES.  I WAS TRYING TO

10   PUT IT IN CONTEXT.

11   Q.   AND YOU WERE TALKING TO YOUR COUNSEL ABOUT, ABOUT YOUR

12   CALCULATIONS AS TO HOW MANY FEWER PEOPLE WOULD HAVE BOUGHT A

13   SAMSUNG PHONE IF IT LACKED CERTAIN FEATURES.

14        DO YOU RECALL GOING THROUGH SOME OF THOSE?

15   A.   YES.  WE WERE TALKING ABOUT THE WILLINGNESS TO BUY

16   NUMBERS.

17   Q.   AND IF WE LOOK AT -- I WANT TO MAKE SURE THE JURY

18   UNDERSTANDS WHAT YOU'RE SAYING.

19        LOOK AT SDX 2401.  ON THE GALAXY S II, YOU'RE SAYING THAT,

20   GIVEN YOUR NUMBERS, THAT 47 PERCENT FEWER PEOPLE WOULD HAVE

21   BOUGHT THE GALAXY S II IF IT HADN'T HAD THESE FEATURES, THE

22   QUICK LINKS AND UNIVERSAL SEARCH, THESE FOUR FEATURES?  47

23   PERCENT REDUCTION WAS YOUR FINDING?

24   A.   YES, THAT'S CORRECT.

25   Q.   AND I GUESS ON THE GALAXY S III, WHICH IS ACCUSED OF

1    HAVING THREE OF THESE FEATURES, AND THAT'S -- IS THAT SDX --

2    LET ME SEE YOU IF REMEMBER.  YOU'RE SAYING YOU DO.

3         YOU'RE SAYING ON THAT THAT 25 PERCENT FEWER PEOPLE WOULD

4    HAVE BOUGHT THAT PHONE?

5    A.   HOLD ON A SECOND.  THIS SLIDE IS INCORRECT.

6    Q.   IT'S NOT CORRECT?

7    A.   NO, IT'S NOT.

8    Q.   AND WHY ISN'T IT?  TELL ME AND I'LL TELL THEM TO CORRECT

9    IT IF I CAN IN REALTIME.

10   A.   OKAY.  RECALL THE BASE PHONE AND THE TEST, THE TEST PHONE

11   HAVE THE SAME PRICE.

12   Q.   AH, THE 199 AND 149?

13   A.   THAT'S RIGHT.  AND THE BASE PHONE HAD ALL FOUR FEATURES

14   SHOWN.

15   Q.   OKAY.  SO LET ME JUST ASK YOU -- I'LL COME BACK IF I NEED

16   TO.

17        LET'S ASSUME THAT'S A TYPO.  IS THAT CORRECT THEN?

18   A.   OKAY.  HAPPY TO DO THAT.

19   Q.   OKAY.  IF THAT'S A TYPO, THEN -- MAYBE YOU DON'T KNOW THAT

20   YOU'RE TAKING A 25 PERCENT REDUCTION IN THE NUMBER OF PEOPLE

21   WHO WOULD BUY THE S III?

22   A.   WELL, IF YOU CORRECT THAT TO 199 AND WE PUT THE -- WE MAKE

23   SURE WE'VE GOT THE RIGHT BASELINE PHONE IN THERE, THEN I

24   DON'T -- I HAVEN'T MEMORIZED ALL THE NUMBERS, BUT 25 PERCENT IS

25   A REASONABLE NUMBER HERE.

1    Q.   WHAT WE DO KNOW IS NOTHING IN YOUR STUDY AT ALL TELLS US

2    WHETHER OR NOT PEOPLE WHO WOULDN'T BUY ONE SAMSUNG PHONE WOULD

3    GO TO APPLE OR WHETHER OR NOT, BECAUSE OF OTHER DEMAND FACTORS,

4    THEY WOULD GO TO ANOTHER SAMSUNG PHONE?

5    A.   THAT'S CORRECT.   IT'S A REDUCTION IN DEMAND FOR THAT

6    PHONE.

7              MR. PRICE:  ONE MOMENT, YOUR HONOR.

8         (PAUSE IN PROCEEDINGS.)

9              MR. PRICE:  THANK YOU.

10             THE COURT:  DO YOU WANT TO TAKE A BREAK NOW SO WE CAN

11   RESOLVE THAT ISSUE AND THEN WE CAN COME BACK?

12             MR. PRICE:  THAT WOULD BE FANTASTIC.

13             THE COURT:  LET'S TAKE A BREAK NOW.  IT'S 2:10.  WHY

14   DON'T WE TAKE A 20 MINUTE BREAK BECAUSE THERE ARE TWO ISSUES

15   I'D LIKE TO RESOLVE.

16        SO IF YOU WOULD PLEASE, YOU MAY BE EXCUSED.  PLEASE DON'T

17   RESEARCH OR DISCUSS THE CASE.

18        (JURY OUT AT 2:10 P.M.)

19             THE COURT:  YOU MAY TAKE A SEAT.

20        SO WE HAVE TO DEAL WITH THE EVIDENTIARY OBJECTION, BUT I'D

21   ALSO LIKE TO -- SO I JUST CAN'T GET A TRANSCRIPT TODAY.  I'M

22   GOING TO ASK, DOES ANYONE HAVE THEIR CELL PHONES ON RIGHT NOW?

23   ANYONE IN THE COURTROOM?

24        AND I'D ALSO LIKE TO ASK IF WE CAN HAVE FEWER NUMBER OF

25   PHONES AND LAPTOPS IN THE WELL.

1            HOW MANY DOES EACH SIDE HAVE?  I COUNT ABOUT NINE.

2            MR. PRICE:  IN THE WELL?

3            THE COURT:  HOW MANY LAPTOPS?  EVERYONE IS -- IT

4     SEEMS LIKE EVERY SINGLE PERSON, YOU HAVE LARGE TEAMS, HAS A

5     LAPTOP ON.

6            DOES EVERYONE NEED ONE?  I DON'T KNOW WHAT EACH OF YOU

7     DOES.  I MEAN, DO YOU HAVE TO HAVE IT?

8            I MEAN, HOW MANY DOES EACH SIDE HAVE?  HOW MANY COMPUTERS

9     DO YOU HAVE?  I COUNT ABOUT NINE ON SAMSUNG AND ABOUT EIGHT ON

10    APPLE.  IS THAT RIGHT?

11            MR. MCELHINNY:  WE HAVE THREE COMPUTERS -- I MEAN,

12    THESE ARE OUR GRAPHICS AND REALTIME.  WE ONLY HAVE THREE

13    COMPUTERS IN ADDITION TO REALTIME, YOUR HONOR.  I'M SORRY.

14            MS. MAROULIS:  JUST ONE HERE.

15            THE COURT:  THERE ARE THREE ON THAT TABLE.

16            MR. WATSON:  THAT'S REALTIME, I THINK, YOUR HONOR.

17            MS. MAROULIS:  THAT'S REALTIME, YOUR HONOR.

18            THE COURT:  OKAY.  WHAT ABOUT THE OTHER ONE?  I MEAN,

19    THERE HAVE BEEN MORE THAN ONE UP.

20            MS. MAROULIS:  TWO EXHIBIT MONITORS AND THE REALTIME.

21            THE COURT:  NO, BUT SHE'S BEEN USING HERS.

22            MS. MAROULIS:  I ASKED HER TO SHUT IT DOWN.

23            THE COURT:  HOW MANY DO YOU HAVE THAT ARE UP?  HOW

24    MANY DOES EACH SIDE HAVE THAT ARE UP?  BECAUSE I COUNTED EIGHT

25    OR NINE FOR QUINN, EMANUEL FOR PEOPLE EARLIER THAT WERE USING

1      THEM.

2            IF YOU DON'T HAVE TO USE THEM, I'M GOING TO ASK YOU IF YOU

3      WOULD PLEASE -- I DON'T KNOW WHY EVERY PERSON NEEDS TO HAVE --

4            MR. MCELHINNY:  I THINK WE --

5            THE COURT:  -- COMPUTER ACCESS RIGHT NOW.

6            MR. MCELHINNY:  I'M NOT WORLD CLASS AT TECHNOLOGY,

7      BUT I THINK PART OF -- WE BROUGHT THE EXHIBITS UP AND THEY'RE

8      ON AND THEY'RE RIGHT THERE.

9            THE COURT:  WELL, I MEAN, IT SHUT DOWN THIS MORNING,

10     TOO, AND I DON'T THINK THERE WERE ANY THIS MORNING, SO IT

11     DOESN'T SEEM TO BE RELATED TO THAT.

12           I WOULD JUST ASK, IF FOLKS COULD SHARE TO THE EXTENT

13     POSSIBLE, AND NOT EVERY SINGLE INDIVIDUAL HAVE THEIR LAPTOPS ON

14     UNLESS YOU ABSOLUTELY NEED IT.  I'M HOPING EACH SIDE DOESN'T

15     NEED EIGHT OR NINE LAPTOPS UP.

16           MS. MAROULIS:  YOUR HONOR, WE SHUT DOWN EVERYTHING

17     BUT FOUR.  WE NEED TWO PARALEGAL ONES AND ONE PERSON IF THAT'S

18     OKAY.

19           THE COURT:  OKAY.  THANK YOU.  I'D LIKE, DURING THE

20     BREAK, TO HAVE THIS THEN RESTARTED.

21           AND I'M GOING TO AGAIN ASK EVERYONE IN OUR AUDIENCE,

22     PLEASE GO TO OUR OVERFLOW ROOM.  WE HAVE THE CAMERA NOW ON THE

23     WITNESS.

24           WE ALSO HAVE A MONITOR THAT SHOWS EVERYTHING THAT'S BEING

25     SHOWN ON THE MONITORS HERE EXCEPT FOR CONFIDENTIAL DOCUMENTS.

1        THERE'S COMPLETE AUDIO.  YOU CAN HEAR EVERYTHING.  YOU

2   WON'T MISS ANYTHING IF YOU'RE IN THE OTHER ROOM AND YOU CAN USE

3   UNLIMITED ELECTRONICS OVER THERE.  I WOULD ENCOURAGE PEOPLE TO

4   PLEASE GO.

5            MS. KREVANS:  YOUR HONOR, MAY I -- WE HAD ASKED YOU

6   AT THE ORIGINAL TRIAL, AND I THINK AT THE TIME YOU THOUGHT

7   THERE MIGHT HAVE BEEN SOME REASON YOU THOUGHT IT COULDN'T BE

8   DONE, BUT I THINK THE PARTIES WOULD BE HAPPY TO SPLIT THE COST

9   OF HAVING SOMEONE COME IN BETWEEN NOW AND FRIDAY AND PROVIDE AN

10  ACTUAL CABLE FROM THE COURT REPORTER'S SYSTEM TO A MONITOR FOR

11  YOU AND FOR US, AND THEN IF IT'S A HARD WIRE, YOU WON'T HAVE

12  THE PROBLEM.

13      I KNOW WE HAD TALKED ABOUT THIS IN 1846 WHEN THE PROBLEM

14  OCCURRED AND THERE WAS SOME, I THINK, ADMINISTRATIVE REASON WHY

15  IT COULDN'T BE DONE.

16      BUT IF WE GAVE YOU A DIFFERENT MONITOR SO WE WEREN'T

17  WIRING TO THE COURT'S COMPUTER SYSTEM, WE MIGHT BE ABLE TO FIX

18  THIS FOR YOU AND SAVE THE AGGREGATION, BECAUSE I THINK WE WOULD

19  ALL LIKE LIVENOTE AND WE KNOW THE COURT WOULD LIKE LIVENOTE,

20  TOO.

21           THE COURT:  HAS YOURS BEEN SHUTTING DOWN AS WELL?

22           MS. KREVANS:  ABSOLUTELY.  IT SEEMS TO WORK FOR ABOUT

23  HALF AN HOUR AND IT STOPS.

24           THE COURT:  AND THEN IT STOPS, YEAH.  I'VE NOTICED

25  THAT, TOO.

```
 1              SO IT WOULD ONLY BE A TEMPORARY -- LET ME -- I APPRECIATE

 2       THE OFFER.  LET ME CHECK WITH OUR I.T. PERSON AND MAKE SURE

 3       THERE'S NO ISSUE WITH THAT.  AS LONG AS IT'S TEMPORARY AND YOU

 4       TAKE IT BACK, I DON'T, AT THIS POINT, SEE A REASON WHY WE

 5       COULDN'T ACCEPT THAT ON A TEMPORARY BASIS, BUT LET ME CHECK

 6       WITH HIM.

 7              ALL RIGHT.  LET'S GO TO THE -- THE OBJECTION THAT WAS

 8       SUSTAINED WAS AS TO THE AUTO CORRECT '172 PATENT.  IT WAS NOT

 9       AS TO THE SLIDE TO UNLOCK '721 PATENT.

10              SO LET ME HEAR WHAT APPLE'S OBJECTION IS, BECAUSE IF IT'S

11       JUST RESURRECTING THE OBJECTION FROM LAST NIGHT, IT WOULD BE

12       OVERRULED.

13              AND IS THERE A DOCUMENT THAT IDENTIFIES THE NON-INFRINGING

14       ALTERNATIVES THAT APPLE BELIEVES WERE TIMELY DISCLOSED?

15              I GUESS THERE'S SOME DOCUMENT THAT I CAN CHECK.  IS IT AN

16       INTERROGATORY RESPONSE?  IS THERE A SPECIFIC EXPERT REPORT?

17       WHAT IS THERE SO THAT I CAN JUST HAVE A PLACE THAT I CAN LOOK

18       TO EASILY IN CASE THIS COMES UP AGAIN?

19                  MR. MCELHINNY:  THERE IS.  I CAN GET YOU A SPECIFIC

20       ONE.  DURING -- BOTH OF THESE CAME UP DURING DR. COCKBURN'S

21       DIRECT EXAMINATION.  HE WENT THROUGH THESE AND HE HAD A

22       SPECIFIC GRAPHIC FOR EACH OF THE PATENTS THAT SET FORTH THE

23       NON-INFRINGING ALTERNATIVES THAT SAMSUNG HAD SUGGESTED, AND

24       THEN HE WENT -- IF YOU REMEMBER, HE WENT THROUGH SOME OF THEM.

25                  I CAN GET YOU THE SPECIFIC GRAPHIC.  I CAN GET YOU COPIES
```

1           OF THE GRAPHICS, YOUR HONOR.

2                   MR. BENNETT:  YOUR HONOR, AT THE RISK OF BEING

3           CORRECTED, BECAUSE I DON'T KNOW THE ANSWER TO THIS, THE

4           OBJECTION WENT TO A QUESTION ABOUT AN IPHONE, AND I THINK I'VE

5           BEEN ADVISED THAT THE IPHONE WAS NEVER IDENTIFIED AS A

6           NON-INFRINGING ALTERNATIVE.

7                   THE COURT:  OKAY.  I DID NOT HAVE DR. COCKBURN'S

8           DEMONSTRATIVES, BUT IN MY NOTE, HE DISCUSSED THE GLASS UNLOCK,

9           THE CIRCLE UNLOCK, AND THE RIPPLE UNLOCK AND HE TESTIFIED THAT

10          THOSE ARE THE NON-INFRINGING ALTERNATIVES THAT SAMSUNG'S EXPERT

11          TESTIFIED ABOUT.

12                  MR. MCELHINNY:  RIGHT.  AND HE ALSO TESTIFIED THAT

13          SAMSUNG HAD NOT IDENTIFIED ANY IPHONE AS A NON-INFRINGING

14          ALTERNATIVE.

15                  THE COURT:  ALL RIGHT.  WHAT'S YOUR RESPONSE TO THAT?

16                  MR. PRICE:  THAT'S NOT WHY IT'S BEING OFFERED, YOUR

17          HONOR.

18              THE SURVEY -- THE GIST OF THAT PART OF THE SLIDE TO UNLOCK

19          IN THE SURVEY IS THAT IT'S EASIER TO UNLOCK ONE ALTERNATIVE

20          OVER THE OTHER.

21              AND THE QUESTION IS, IS THAT REALLY VALUABLE IN THE

22          MARKETPLACE?  WHAT'S THE REAL VALUE?

23              HE'S CONDUCTED A SURVEY.  IF I CAN SHOW THAT APPLE

24          ITSELF -- I'M NOT SAYING THIS IS A NON-INFRINGING

25          ALTERNATIVE -- IF APPLE ITSELF HAS GONE FROM ONE WAY OF SLIDE

1    TO UNLOCK, WHICH THEY SAY PRACTICES THE PATENT, TO ANOTHER WAY

2    OF SLIDING TO UNLOCK, WHICH THEY SAY PRACTICES THE PATENT, AND

3    THEY'RE VASTLY DIFFERENT IN TERMS OF HOW EASY THEY ARE TO

4    UNLOCK, I THINK I'M -- I WILL THEN ARGUE THAT, THAT THE REAL,

5    LIVE MARKETPLACE SHOWS THAT THE FEATURE HE IS TESTING, THAT IS,

6    HOW EASY IT IS TO UNLOCK, IS NOT SOMETHING THAT DRIVES SALES.

7    OTHERWISE APPLE WOULD HAVE NEVER SWITCHED.

8        SO THE ONLY PURPOSE IS TO SHOW THAT THE EASE OF UNLOCKING

9    IS NOT A PURCHASE DRIVER.  EVEN APPLE MUST THINK THAT BECAUSE

10   THEY'VE MADE THEIRS EASIER TO UNLOCK.

11         MR. MCELHINNY:  AND THIS GOES TO THE NATURE OF BOTH

12   OUR BEYOND THE SCOPE AND LACK OF FOUNDATION.  THIS IS THE WRONG

13   WITNESS.  WHAT HE HAS TESTIFIED SEVERAL TIMES IS HE RELIED UPON

14   THE LAWYERS AND THE TECHNICAL EXPERTS FOR THE TECHNOLOGICAL.

15       HE'S TESTIFIED ABOUT WHAT HIS SURVEY ACTUALLY WAS.

16       DR. COCKBURN WAS EXAMINED ON THIS AND EXAMINED ON THE

17   IOS 7 AND THE QUESTION OF WHETHER OR NOT THESE WERE -- AND ALL

18   OF THESE VARIOUS NON-INFRINGING ALTERNATIVES AND WHETHER THEY

19   WERE EASIER OR NOT EASIER.

20       BUT TO USE THIS WITNESS AS A FOIL TO RESURRECT THAT

21   EXAMINATION WHEN ALL HE'S TESTIFYING IS ABOUT WHAT HE'S

22   ACTUALLY TESTED -- AND HE DIDN'T TESTIFY ABOUT AN APPLE PHONE

23   AT ANY TIME IN HIS DIRECT, YOUR HONOR.  THAT'S NOT PART OF

24   ANYTHING HE EVER DID.

25         MR. PRICE:  BUT HE'S TESTIFYING ABOUT REAL WORLD

1          IMPLICATIONS OF HIS STUDY.

2                    MR. MCELHINNY:  ACTUALLY, THAT'S NOT TRUE.

3                    MR. PRICE:  HE SAID IN THE REAL WORLD FEWER PEOPLE

4          ARE GOING TO BUY SAMSUNG PHONES BECAUSE THEY ARE EASIER TO

5          UNLOCK THAN APPLE'S PATENTED FEATURE.

6                    THE COURT:  SO YOU'RE CONCEDING, MR. MCELHINNY, THAT

7          THE IOS 7 IS NOT A NON-INFRINGING ALTERNATIVE AND THAT'S NOT

8          WHY SAMSUNG IS OFFERING IT, BECAUSE THAT'S WHAT YOU EARLIER

9          REPRESENTED THAT -- I GUESS MR. BENNETT SAID THAT WAS A

10         NON-INFRINGING ALTERNATIVE THAT HAD NOT BEEN TIMELY DISCLOSED.

11                   MR. MCELHINNY:  I'M SORRY.  I THINK WE'RE BOTH RIGHT.

12         SAMSUNG HAS NEVER DISCLOSED THE IOS 7 AS A NON-INFRINGING

13         ALTERNATIVE.

14         APPLE'S POSITION IS THAT THE IOS 7 IS COVERED BY THIS

15         PATENT, AND THAT'S WHAT DR. COCKBURN TESTIFIED TO.

16         OUR POINT HERE IS THAT WE HAVE A WITNESS WHO DESCRIBED A

17         SURVEY HE ACTUALLY TOOK AND THE RESULTS OF THAT SURVEY.

18         WE HAVE ANOTHER WITNESS WHO'S GOING TO COME WHO TALKS

19         ABOUT THE REAL WORLD APPLICATIONS AND HOW THAT IS BEING USED.

20         BUT TO USE THIS WITNESS, WHEN WE WERE -- WE'VE BEEN TOLD

21         SPECIFICALLY THAT NON-INFRINGING ALTERNATIVES IS PART OF THEIR

22         CASE-IN-CHIEF, IT HAS TO COME IN IN THEIR CASE, AND TO BE

23         EXAMINING THIS WITNESS ABOUT A SUBJECT THAT HE DIDN'T TESTIFY

24         ABOUT, WHICH IS NON-INFRINGING ALTERNATIVES --

25                   THE COURT:  BUT THAT IS NOT A NON-INFRINGING

1    ALTERNATIVE.  THEY'RE SAYING IT ISN'T -- IT DOES PRACTICE THE

2    INVENTION.

3              MR. MCELHINNY:  NO.  HIS -- WHAT HE IS ARGUING TO

4    YOU -- WHAT HE IS TRYING TO ARGUE, USING THIS WITNESS, IS THAT

5    THERE ARE OTHER WAYS OUT THERE IN THE MARKETPLACE THAT CAN GET

6    THE SAME RESULT OF THESE FEATURES.

7              AND THEN THAT -- AND THE FACT THAT THE OTHER ONE THAT HE'S

8    USING IS, IN FACT, COVERED BY THE PATENT IS WHAT DOUBLES THE

9    CONFUSION OF THIS LINE OF QUESTIONING BECAUSE HE'S SUGGESTING

10   THAT IT SHOULD HAVE BEEN SHOWN TO THESE SURVEY TAKERS, BUT IT

11   SHOULDN'T HAVE BEEN SHOWN TO THE SURVEY TAKERS BECAUSE IT IS

12   COVERED BY THE PATENT.

13             MR. PRICE:  IT'S STILL -- I MIGHT NOT HAVE BEEN CLEAR

14   IN MY POINT.

15             HE'S SAYING THAT HIS SURVEY TELLS HIM THAT UP TO 14

16   PERCENT FEWER PEOPLE, IN THE REAL WORLD, WOULD HAVE BOUGHT THE

17   SAMSUNG TABLET BECAUSE IT DID NOT HAVE SLIDE TO UNLOCK IN A WAY

18   THAT MADE IT MORE DIFFICULT TO UNLOCK.

19             BECAUSE, REMEMBER, THE VIDEO IS -- THIS IS THE PATENTED

20   WAY AND THIS IS HOW SAMSUNG -- THIS IS A NON-INFRINGING

21   ALTERNATIVE AND IT MAKES IT EASIER TO UNLOCK.

22             HE IS SAYING THAT THAT CRITERIA, HOW EASY IS IT TO UNLOCK,

23   DRIVES CONSUMER CHOICE.  HE'S QUALIFIED IT FOR THE REAL WORLD,

24   AND I THINK AN APPROPRIATE RESPONSE TO THAT IS, IF THAT WERE

25   TRUE, IF THAT'S GOING TO DECREASE YOUR SALES BECAUSE YOUR PHONE

```
 1    BECOMES EASIER TO UNLOCK, YOU KNOW, THEN WHY WOULD APPLE GO

 2    FROM SOMETHING HARDER TO UNLOCK TO SOMETHING EASIER TO UNLOCK?

 3          AND IT DIDN'T DECREASE APPLE'S SALES.  SO WHAT IT'S

 4    SHOWING IS A REAL WORLD EXAMPLE OF HOW EASE OF UNLOCKING DOES

 5    NOT AFFECT SALES.

 6          IT'S DIRECTLY RELEVANT TO THIS WITNESS BECAUSE HE'S NOT

 7    GIVING JUST THEORETICAL TESTIMONY.  HE HAS GIVEN CONCLUSIONS AS

 8    TO THE REAL WORLD LOSS IN SALES BECAUSE SOMETHING IS EASIER TO

 9    UNLOCK.

10          MR. MCELHINNY:  THERE IS NO EVIDENCE IN THIS RECORD

11    THAT APPLE WENT FROM SOMETHING HARDER TO UNLOCK TO EASIER TO

12    UNLOCK.

13          IF THEY HAD WANTED TO TRY TO PROVE THAT, THEY COULD HAVE

14    TRIED TO PROVE THAT THROUGH ANY WITNESS WHO KNOWS ABOUT IT.

15          BUT THAT IS NOT THIS WITNESS'S EXPERTISE.  HE DIDN'T TALK

16    ABOUT APPLE PRODUCTS AT ALL.  IT'S COMPLETELY BEYOND THE SCOPE

17    AND IT'S TOTALLY CONFUSING TO THE JURY.

18          AND IT'S -- IT'S UNFAIR TO THIS WITNESS BECAUSE HE IS NOT

19    A TECHNICAL EXPERT ON EASE OF UNLOCK.  THAT WAS THE FOUNDATION

20    THAT DR. COCKBURN PROVIDED FOR HIM.

21          MR. PRICE:  YOUR HONOR, IF I MAY SAY, IF THIS WITNESS

22    CANNOT TELL THE JURY THAT THE IOS 7 IS EASIER TO UNLOCK BASED

23    UPON KNOWING THAT YOU'RE GOING FROM LEFT TO RIGHT ANYWHERE IN

24    THE SCREEN AS OPPOSED TO IN JUST ONE NARROW CHANNEL, THEN THAT

25    REFLECTS ON HIS CREDIBILITY.  IT'S RIDICULOUS TO THINK YOU NEED
```

1    AN EXPERT FOR THAT.

2              MR. MCELHINNY:  THIS IS A REALLY GOOD POINT.  THAT'S

3    WHY YOU NEED TECHNICAL EVIDENCE, BECAUSE IT IS NOT EASIER TO

4    UNLOCK.  YOU CANNOT GO FROM ANYWHERE TO ANYWHERE.

5         DR. COCKBURN WAS ASKED DIRECTLY, DOES IOS 7 COVER THIS,

6    THE PATENT COVER THIS?  AND HE SAID YES, AND THEY DIDN'T ASK

7    HIM ANY FURTHER QUESTIONS THAN THIS.

8         SO TRYING TO USE OUR SURVEY EXPERT TO PROVE A DISPUTED

9    TECHNICAL FACT ABOUT WHETHER IT'S EASIER TO UNLOCK IS BEYOND

10   THE SCOPE OF HIS DIRECT AND UNFAIR WITH THIS WITNESS AND LACKS

11   FOUNDATION AND CAN ONLY CONFUSE THIS JURY.  HE DOESN'T KNOW THE

12   TECHNOLOGY.  HE DOESN'T KNOW HOW IOS 7 WORKS TECHNICALLY.

13             THE COURT:  WELL, THE OBJECTION'S OVERRULED.

14        ALL RIGHT.  I THINK THAT'S IT.  LET'S GO AHEAD AND TAKE

15   OUR BREAK NOW.  BE BACK AT 2:30.

16             MR. PRICE:  IF YOU OVERRULED THE OBJECTION, IF I CAN

17   HAVE FIVE MORE MINUTES WITH HIM TO FINISH THAT?

18             THE COURT:  I'M SORRY?

19             MR. PRICE:  WITH THE OBJECTION OVERRULED, IF I COULD

20   THEN JUST FINISH THAT --

21             THE COURT:  YES.  I DIDN'T THINK THAT YOU HAD CLOSED,

22   OR COMPLETED YOUR CROSS.

23             MR. PRICE:  THANK YOU.

24        (RECESS FROM 2:24 P.M. UNTIL 2:32 P.M.)

25        (JURY IN AT 2:33 P.M.)

```
 1              THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

 2    SEAT.

 3         TIME IS NOW 2:33.  GO AHEAD, PLEASE.

 4    BY MR. PRICE:

 5    Q.   PROFESSOR HAUSER, VERY QUICKLY, WE HAD TO RESOLVE

 6    SOMETHING A SECOND AGO, AND I'M GOING TO SHOW YOU DX 345, WHICH

 7    IS AN IPHONE, AND JX 38.

 8         AND IF YOU LOOK AT JX 38 ON THE RIGHT, I'M GOING TO SHOW

 9    YOU THE SLIDE TO UNLOCK FEATURE.

10         DO YOU SEE THAT?

11    A.   YES, I DO.

12    Q.   OKAY.  AND DO YOU SEE THAT IF I TRY TO DO THAT SOMEWHERE

13    ELSE ON THE SCREEN, IT DOES NOT MANAGE TO UNLOCK THE PHONE?

14    A.   YES, I DO.

15    Q.   OKAY.  AND THEN DX 345, YOU SEE WHERE I DO SLIDE TO UNLOCK

16    THERE TO UNLOCK THE PHONE?

17    A.   YES, I DO.

18    Q.   AND YOU NOTICE THAT IF I DO THE SAME GESTURE UP, FURTHER

19    UP THE SCREEN, OR IN THE MIDDLE OF THE SCREEN, OR AT THE TOP OF

20    THE SCREEN, DO YOU SEE THAT?

21    A.   YES, I DO.

22    Q.   OKAY.  WOULD YOU BE ABLE TO CONCLUDE FROM THAT THAT APPLE

23    APPEARS TO HAVE GONE TOWARD A SYSTEM WHERE, IN FACT, IT'S

24    EASIER TO SLIDE TO UNLOCK THEIR PHONE?

25              MR. BENNETT:  OBJECT ON FOUNDATION, YOUR HONOR.
```

```
 1       BEYOND -- FOUNDATIONAL.  FOUNDATIONAL.

 2              THE COURT:  OKAY.  OVERRULED.

 3          GO AHEAD, PLEASE.

 4              THE WITNESS:  I'M SORRY.  CAN YOU REASK THAT?

 5       BY MR. PRICE:

 6       Q.  YEAH.  DOESN'T IT APPEAR TO YOU THAT APPLE ITSELF HAS

 7       SEEMED TO HAVE GONE FROM, TOWARD IT BEING EASIER TO SLIDE TO

 8       UNLOCK THEIR PHONES?

 9       A.  YOU CAN DO IT ANYPLACE ON THE SCREEN, BUT I DON'T KNOW IF

10       THAT'S EASIER.

11              MR. PRICE:  NOTHING FURTHER.

12              THE COURT:  ALL RIGHT.  TIME IS NOW 2:35.

13          IS THERE ANY REDIRECT?

14              MR. BENNETT:  VERY BRIEFLY, YOUR HONOR.

15                       REDIRECT EXAMINATION

16       BY MR. BENNETT:

17       Q.  HELLO, DR. HAUSER.

18       A.  GOOD AFTERNOON.

19              THE COURT:  2:36.  GO AHEAD, PLEASE.

20              MR. BENNETT:  THANK YOU, YOUR HONOR.

21       Q.  YOU WERE ASKED A SERIES OF QUESTIONS ABOUT THE PRECISE

22       SCOPE AND BOUNDS OF THE PATENT AND ALL OF THAT.

23          DO YOU RECALL THAT?

24       A.  YES, I DO.

25       Q.  AND WAS YOUR TEST DESIGNED TO TEST THE FEATURES THAT YOU
```

1    DESCRIBED?

2    A.   YES, MY TEST -- MY CONJOINT STUDY WAS DESIGNED TO TEST THE

3    FEATURES THAT WERE DESCRIBED TO CONSUMERS.

4    Q.   AND DOES YOUR TEST GIVE AN ACCURATE MEASUREMENT OF THE

5    FEATURES THAT YOU DESCRIBED, THE DEMAND FOR THE FEATURES THAT

6    YOU DESCRIBED IN YOUR TEST?

7    A.   YES, ACCURATE, RELIABLE, AND VALID.

8    Q.   NOW, YOU SAID AT THE OUTSET YOU'RE NOT A TECHNICAL EXPERT,

9    AND THESE NAMES HAVE COME UP, BUT YOU WERE SHOWN AND ASKED

10   QUESTIONS ABOUT SLIDE TO UNLOCK AND AUTO CORRECT.

11       DO YOU RECALL THAT?

12   A.   YES, THAT'S CORRECT.

13   Q.   AND YOU WERE HERE LAST FRIDAY WHEN DR. COCKBURN, APPEARING

14   AS APPLE'S TECHNICAL EXPERT, ADDRESSED THAT ISSUE?

15   A.   YES, I WAS.

16   Q.   AND HE ALSO ADDRESSED THE FEASIBILITY OF THE

17   NON-INFRINGING ALTERNATIVE THAT SAMSUNG WAS PROPOSING.

18       DO YOU RECALL THAT?

19   A.   YES, I DO.

20   Q.   AND YOU'RE AWARE THAT DR. MOWRY AND DR. SNOEREN HAVE

21   TESTIFIED IN THE CASE AS WELL?

22   A.   YES, I'M AWARE THEY'VE TESTIFIED.

23   Q.   AND THEY'RE THE TECHNICAL EXPERTS ON THE '647 AND '959

24   PATENTS; IS THAT RIGHT?

25   A.   I THINK SO, YES.

1    Q.   AND THERE'S BEEN TALK ABOUT BACKGROUND SYNC.  AGAIN, IS

2    DR. SNOEREN, I THINK, THE EXPERT ON THAT?

3    A.   I DON'T KNOW.  I THINK HE IS.

4    Q.   WITH RESPECT TO BACKGROUND SYNC AND THE QUICK LINKS

5    FUNCTIONS, ARE YOU AWARE OF ANY ALTERNATIVES THAT SAMSUNG IN

6    THE REAL WORLD HAS EVER ACTUALLY IMPLEMENTED TO THE PATENTED

7    TECHNOLOGY?

8    A.   NO, I'M NOT.

9         MR. PRICE:  LACK OF FOUNDATION, YOUR HONOR.

10   BY MR. BENNETT:

11   Q.   AND --

12        THE COURT:  OVERRULED.

13   BY MR. BENNETT:

14   Q.   NOW, THERE ARE EXPERTS ON THE SAMSUNG SIDE OF THE CASE WHO

15   ARE FROM YOUR FIELD OF EXPERTISE; IS THAT RIGHT?

16   A.   YES, THAT'S CORRECT.

17   Q.   YOU'RE AWARE OF THEIR -- YOU'VE READ THEIR REPORTS,

18   THEY'VE READ YOURS; IS THAT RIGHT?

19   A.   YES, THAT'S CORRECT.

20   Q.   AND SOME OF THEM ARE COLLEAGUES OF YOURS; IS THAT RIGHT?

21   A.   YES, THEY'RE COLLEAGUES.

22   Q.   AND YOU WERE ASKED A LOT OF QUESTIONS ABOUT YOUR CONJOINT

23   SURVEY, MAYBE SUGGESTING SOME CRITIQUE OF IT.

24        HAS ANY EXPERT THAT SAMSUNG HAS HIRED IN THIS CASE DONE A

25   CONJOINT SURVEY OF THEIR OWN?

1      A.   IN THIS CASE?

2      Q.   IN THIS CASE.

3           MR. PRICE:  OBJECTION, LACK OF -- I'M SORRY.

4           THE WITNESS:  NO.

5           MR. PRICE:  I DIDN'T HEAR THE FULL QUESTION.  GO

6      AHEAD.

7      BY MR. BENNETT:

8      Q.   HAS ANY EXPERT IN THIS CASE, ANY SURVEY EXPERT BY SAMSUNG,

9      TAKEN THE CRITIQUES OF YOUR SURVEY THAT THEY HAVE MADE AND USED

10     THEM AS A BASIS FOR THEIR OWN INDEPENDENT SURVEY?

11     A.   NOT THAT I'M AWARE OF.

12     Q.   OKAY.  SO AT THE END OF THE DAY, ARE YOU THE ONLY EXPERT

13     IN THIS CASE WHO HAS CONDUCTED A CONJOINT SURVEY THAT MEASURES

14     THE DEMAND ASSOCIATED WITH THE PATENTED FEATURES IN THIS CASE?

15     A.   I BELIEVE THAT'S CORRECT.

16          MR. BENNETT:  NOTHING FURTHER.

17          THE COURT:  ALL RIGHT.  THE TIME IS NOW 2:39.

18      IS THERE ANY RECROSS?

19          MR. PRICE:  JUST QUICKLY.

20                    **RECROSS-EXAMINATION**

21     BY MR. PRICE:

22     Q.   THAT'S BECAUSE SAMSUNG'S EXPERT SAYS A CONJOINT SURVEY

23     WOULD BE INAPPROPRIATE IN THIS PARTICULAR SITUATION.  YOU AGREE

24     THAT'S WHAT THAT EXPERT SAYS?

25     A.   I'M NOT QUITE SURE EXACTLY -- WELL, HE DOESN'T QUITE SAY

```
 1        THAT.

 2        Q.   HE SAYS THAT A CONJOINT SURVEY IN THIS MARKETPLACE, ON

 3        THESE FEATURES, WOULD BE MISLEADING AND LEAD TO ERRONEOUS

 4        RESULTS?

 5        A.   THAT'S WHAT HE SAYS.

 6        Q.   AND IF HE BELIEVES THAT, IT WOULD MAKE SENSE FOR HIM NOT

 7        TO CONDUCT SUCH A SURVEY, RIGHT, IF HE BELIEVES THAT?

 8        A.   IF HE BELIEVES THAT A CONJOINT ANALYSIS COULD NOT MEASURE

 9        A FEATURE IMPORTANCE, I WOULD BE SURPRISED AT THAT, BUT I GUESS

10        IF THAT'S WHAT HE SAYS, YES.

11                 MR. PRICE:  NO OTHER SURPRISES.

12                 THE COURT:  ALL RIGHT.  THE TIME IS 2:40.

13             ALL RIGHT.  MAY THIS WITNESS BE EXCUSED AND IS IT SUBJECT

14        TO RECALL OR NOT?

15                 MR. BENNETT:  YES, YOUR HONOR.

16                 THE COURT:  OKAY.  NOT SUBJECT TO RECALL.

17             YOU'RE EXCUSED, PLEASE.

18                 THE WITNESS:  THANK YOU.

19             (PAUSE IN PROCEEDINGS.)

20                 THE COURT:  OKAY.  PLEASE CALL YOUR NEXT WITNESS.

21                 MR. BENNETT:  THANK YOU, YOUR HONOR.

22             YOUR HONOR, APPLE CALLS DR. CHRISTOPHER VELLTURO.

23             **(CHRISTOPHER VELLTURO, PLAINTIFF'S WITNESS, WAS SWORN.)**

24                 THE WITNESS:  I DO.

25                 THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE?
```

```
 1            AND WOULD YOU STATE YOUR NAME, PLEASE, AND SPELL IT.

 2            THE WITNESS:  CHRISTOPHER ALLAN VELLTURO,

 3     C-H-R-I-S-T-O-P-H-E-R, A-L-L-A-N, V-E-L-L-T-U-R-O.

 4            THE CLERK:  THANK YOU.

 5            THE COURT:  OKAY.  TIME IS 2:42.

 6            MR. BENNETT:  THANK YOU, YOUR HONOR.
```

**DIRECT EXAMINATION**

```
 8     BY MR. BENNETT:

 9     Q.   DR. VELLTURO, WOULD YOU PLEASE INTRODUCE YOURSELF TO THE

10     JURY?

11     A.   I'M CHRIS VELLTURO.

12     Q.   AND, SIR, YOU'RE HERE TODAY AS AN EXPERT ON BEHALF OF

13     APPLE; IS THAT RIGHT?

14     A.   YES.

15     Q.   AND THE SUBJECT IS DAMAGES?

16     A.   THAT IS CORRECT.

17     Q.   LET US TURN TO YOUR BACKGROUND.  IF WE CAN BRING UP

18     PDX 92.1.

19            LET ME -- LET US WALK THROUGH THIS.  SIR, YOU HAVE A

20     DOCTORATE FROM WHAT UNIVERSITY AND IN WHAT FIELD?

21     A.   I HAVE A PH.D. IN ECONOMICS FROM M.I.T. IN CAMBRIDGE,

22     MASSACHUSETTS.

23     Q.   THERE'S AN INDICATION THAT YOU RECEIVED A BRADLEY

24     FELLOWSHIP, OR SERVED A BRADLEY FELLOWSHIP.  WHAT IS THAT?

25     A.   A BRADLEY FELLOWSHIP IS A FELLOWSHIP IN PUBLIC ECONOMICS
```

```
 1      GIVEN TO TWO ECONOMISTS EACH YEAR TO STUDY THE PUBLIC SECTOR

 2      AND POLICY ISSUES AIMED AT IMPROVING THE PUBLIC SECTOR.

 3      Q.   IS YOUR DOCTORATE IN A SPECIFIC FIELD OF ECONOMICS?

 4      A.   YES.

 5      Q.   WHAT IS THAT?

 6      A.   IT'S CALLED INDUSTRIAL ORGANIZATION.

 7      Q.   WHAT IS INDUSTRIAL ORGANIZATION?

 8      A.   IT'S THE STUDY OF HOW FIRMS COMPETE BASICALLY.

 9      Q.   AND COULD YOU DESCRIBE FOR THE LADIES AND GENTLEMEN YOUR

10      REMAINING EDUCATIONAL BACKGROUND.

11      A.   SURE.  I HAVE A BACHELOR OF SCIENCE DEGREE IN APPLIED

12      MATHEMATICS AND ECONOMICS FROM BROWN UNIVERSITY IN PROVIDENCE,

13      RHODE ISLAND.

14      Q.   YOUR BIOGRAPHY STATES THAT YOU ARE THE FOUNDER OF

15      QUANTITATIVE ECONOMIC SOLUTIONS, WHICH I'LL BE REFERRING TO AS

16      QES.

17           WHAT IS THE BUSINESS OF QES?

18      A.   IT'S A MICROECONOMIC CONSULTING FIRM, THAT IS, WE DEAL

19      WITH MARKETS AND SPECIFIC MARKET ISSUES, NOT BIG ISSUES LIKE

20      INFLATION AND UNEMPLOYMENT.

21           AND IT'S A CONSULTING FIRM THAT WORKS FOR VARIOUS

22      COMPANIES AND GOVERNMENT AGENCIES.

23      Q.   HOW MANY PEOPLE WORK AT QES?

24      A.   FIFTEEN.

25      Q.   HOW MANY OF YOUR -- HOW MANY OF YOUR EMPLOYEES HAVE
```

1     PH.D.'S OR ADVANCES DEGREES?

2     A.   EIGHT.

3     Q.   WHAT TYPE OF WORK GENERALLY DOES QES DO?

4     A.   WE DO -- SOMETIMES WE'LL DO LITIGATION WORK LIKE THIS.  WE

5     ALSO DO MORE GENERAL CONSULTING WORK TO SOLVE PROBLEMS THAT

6     COMPANIES HAVE OR SOMETIMES THE GOVERNMENTS WANT US TO LOOK

7     INTO.

8     Q.   OKAY.  AND WHAT TYPE OF WORK DO YOU DO PERSONALLY?

9     A.   I AM THE PRESIDENT AND FOUNDER OF THE FIRM, SO I AM KIND

10    OF THE LEADER OF THE VARIOUS PROJECTS THAT WE UNDERTAKE FOR

11    CLIENTS.

12    Q.   AND WHEN DID YOU FORM QES CONSULTING?

13    A.   OCTOBER 31ST, 2002.

14    Q.   AND FOR HOW LONG BEFORE YOU FORMED QES HAD YOU DONE

15    CONSULTING AND EXPERT WORK?

16    A.   BEFORE 2002, ABOUT 15 YEARS.

17    Q.   OKAY.  YOU SAY -- YOU REFER TO YOUR CONSULTING PRACTICE.

18    WHAT INVOLVEMENT HAVE YOU HAD IN CONSULTING WITH COMPANIES ON

19    INTELLECTUAL PROPERTY MATTERS?

20    A.   A LOT.  INTELLECTUAL PROPERTY IS AN AREA I SPEND A LOT OF

21    TIME ON.

22    Q.   HAVE YOU HAD EXPERIENCE INVOLVING INTELLECTUAL PROPERTY

23    LICENSING?

24    A.   YES.

25    Q.   FOR WHOM HAVE YOU DONE THAT TYPE OF WORK?

1     A.   FOR A VARIETY OF COMPANIES.  I'VE COME IN AND HELPED THEM

2     DESIGN THEIR LICENSING PROGRAMS WHERE THEY HAVE PATENTS AND

3     THEY WANT TO LICENSE THEM OUT, THEY'RE LOOKING FOR HOW BEST TO

4     DO THAT AND THEY NEED HELP IN ACTUAL NEGOTIATIONS.

5          I'VE DONE THAT FOR PROCTOR & GAMBLE; KIMBERLY CLARK

6     INVOLVING DISPOSABLE DIAPERS, ACTUALLY; AND I'VE DONE IT FOR

7     SOME MUCH SMALLER CLIENTS, LIKE MOUNT SINAI HOSPITAL IN

8     NEW YORK CITY.

9     Q.   NOW, YOU SAID QES DOES LITIGATION CONSULTING WORK.  CAN

10    YOU EXPLAIN WHAT THAT CONSISTS OF?

11    A.   WELL, IN PATENT CASES LIKE THIS WE'LL BE BROUGHT IN, OR

12    I'LL BE BROUGHT IN TO LOOK AT DAMAGES ISSUES, SUCH AS I'LL BE

13    DOING HERE.

14         BUT THERE ARE A VARIETY OF OTHER KINDS OF CASES WE WORK ON

15    AS WELL.  WE'RE REALLY COMPETITION ECONOMISTS AND THAT APPLIES

16    PRETTY BROADLY.

17    Q.   ON HOW MANY OCCASIONS HAVE YOU PROVIDED TESTIMONY IN COURT

18    ON THE MATTERS OF ECONOMICS AND COMPETITION?

19    A.   THIRTY, PROBABLY MORE THAN 30.

20    Q.   OKAY.  DO YOU HAVE EXPERIENCE AND EXPERTISE IN THE

21    CALCULATION OF DAMAGES IN PATENT CASES?

22    A.   I DO.

23    Q.   CAN YOU GIVE THE -- CAN YOU IDENTIFY FOR THE LADIES AND

24    GENTLEMEN SOME COMPANIES THAT HAVE RETAINED YOU TO DO THAT TYPE

25    OF WORK?

```
 1        A.   I'VE BEEN RETAINED BY COMPANIES SUCH AS AMAZON; MICROSOFT;

 2     THOMSON REUTERS, A BIG FINANCIAL COMPANY; PFIZER, A

 3     PHARMACEUTICAL COMPANY; AND THEN SOME VERY SMALL COMPANIES,

 4     LIKE MOUNT SINAI HOSPITAL; AND A COMPANY CALLED THE KNOT THAT

 5     ACTUALLY DOES ON-LINE BRIDAL REGISTRY SERVICES, THEY ACTUALLY

 6     HAD A PATENT AT ONE POINT AND I WORKED WITH THEM.

 7        Q.   HAVE YOU BEEN RETAINED IN THE PAST BY STANFORD UNIVERSITY?

 8        A.   YES, I HAVE.

 9        Q.   ARE ANY OF THE COMPANIES THAT YOU IDENTIFIED COMPETITORS

10     OF APPLE?

11        A.   AMAZON AND MICROSOFT ARE MOST DEFINITELY COMPETITORS OF

12     APPLE.

13        Q.   AND IN CASES IN WHICH YOU'VE OFFERED EXPERT OPINIONS OR

14     DONE EXPERT WORK ON PATENT CASES WHERE YOU'VE DONE THAT, HAVE

15     YOU OFFERED OPINIONS ON BEHALF OF PATENT HOLDERS AND PATENT

16     DEFENDANTS?

17        A.   YES.   PRETTY MUCH 50-50 ON EACH SIDE OF THOSE CASES.

18        Q.   HAVE YOU BEEN RETAINED PRIOR TO THIS CASE ON PRIOR

19     OCCASIONS BY APPLE?

20        A.   YES.

21        Q.   OKAY.   ON HOW MANY OCCASIONS?

22        A.   OVER THE LAST 15 YEARS, 15 OCCASIONS.   15 AND 15.

23        Q.   AND HOW MANY OF THOSE CASES INVOLVED PATENT RELATED

24     ISSUES?

25        A.   ALL OF THEM.
```

1    Q.   HAVE YOU DRAWN ON YOUR PRIOR WORK FOR APPLE IN THE WORK

2    YOU'VE DONE ON THIS MATTER?

3    A.   YES.

4    Q.   AND COULD YOU EXPLAIN HOW?

5    A.   SURE.  SO I'M FAMILIAR WITH THE PRODUCTS FROM PRIOR WORK.

6    I'M FAMILIAR WITH THE INDUSTRY FROM WORK I'VE DONE BEFORE.

7         BUT I'M ALSO FAMILIAR WITH A LOT OF THE FINANCIAL

8    INFORMATION THAT'S COMING IN IN THIS CASE BECAUSE I'VE SEEN

9    THOSE BEFORE AND I'VE HAD TO WORK WITH THEM PREVIOUSLY.

10   Q.   IS QES BEING COMPENSATED FOR YOUR AND THE FIRM'S WORK ON

11   THIS CASE?

12   A.   IT IS.

13   Q.   HOW DO YOU CHARGE FOR YOUR TIME?

14   A.   HOURLY.

15   Q.   OKAY.  WHAT'S YOUR PERSONAL RATE?

16   A.   MY PERSONAL RATE IS $700 AN HOUR.

17   Q.   IS THE COMPENSATION THAT YOU AND QES HAVE RECEIVED IN THIS

18   CASE IN ANY WAY CONTINGENT ON ITS OUTCOME?

19   A.   NO.

20   Q.   IN TERMS OF YOUR TESTIFYING BACKGROUND, IN TESTIFYING TO

21   TESTIFYING IN COURT PROCEEDINGS, HAVE YOU TESTIFIED BEFORE

22   GOVERNMENT AGENCIES?

23   A.   I HAVE.

24   Q.   CAN YOU JUST DESCRIBE WHICH?

25   A.   I DO A LOT OF WORK IN WHAT'S CALLED COMPETITION ECONOMICS,

```
 1    ANTITRUST, STUDYING HOW COMPETITION IS OR ISN'T WORKING, AND IN

 2    THAT CONTEXT I HAVE APPEARED BEFORE THE U.S. CONGRESS; THE

 3    DEPARTMENT OF JUSTICE; AND FEDERAL TRADE COMMISSIONS IN

 4    WASHINGTON D.C.; THE EUROPEAN COMMISSION, WHICH IS KIND OF LIKE

 5    THE DEPARTMENT OF JUSTICE, BUT IT'S IN BRUSSELS; CANADIAN

 6    COMPETITION AUTHORITY; COMPETITION AUTHORITIES IN AUSTRALIA,

 7    NEW ZEALAND, A FAIR NUMBER OF PLACES.

 8    Q.   OKAY.  THE RESUME ON THE SCREEN INDICATES THAT YOU ARE A

 9    LECTURER OR YOU HAVE BEEN A LECTURER AT BOSTON UNIVERSITY.

10    HAVE YOU TAUGHT COURSES AT B.U.?

11    A.   I AM.  I'M NOT ON THE FACULTY, BUT I'M ON THE CALL LIST.

12    WHEN THEY HAVE A SPOT AND THE PROFESSOR IS ON LEAVE, FOR

13    EXAMPLE, THEY'LL CALL ME AND SEE IF I CAN COME TEACH AND

14    SOMETIMES I DO.

15    Q.   WHAT COURSES HAVE YOU TAUGHT AT BOSTON UNIVERSITY?

16    A.   FOUNDATIONAL MICROECONOMICS, HOW SUPPLY AND DEMAND WORKS

17    BASICALLY.

18    Q.   AND TO WHO -- IS THIS UNDERGRADUATE OR GRADUATE COURSE?

19    A.   IT'S TO M.B.A. STUDENTS, GRADUATE STUDENTS.

20    Q.   SIR, HAVE YOU PUBLISHED IN THE AREA OF ECONOMICS?

21    A.   YES, I HAVE.

22    Q.   CAN YOU DESCRIBE GENERALLY THE PUBLICATION, WHAT YOU'VE

23    PUBLISHED IN THE AREA?

24    A.   IT GOES INTO TWO BROAD FIELDS.  I'VE STUDIED -- I'VE

25    PUBLISHED IN WHAT'S CALLED APPLIED REGULATION, I STUDIED
```

1    RAILROADS A LOT WHEN I WAS IN GRADUATE SCHOOL.  AND AFTER

2    THAT -- SO THERE ARE A NUMBER OF PUBLICATIONS ON THAT.

3         BUT I'VE ALSO PUBLISHED IN, MORE BROADLY IN INDUSTRIAL

4    ORGANIZATION, AND IN PARTICULAR MY SPECIALTY IS IN SOMETHING

5    CALLED DIFFERENTIATED PRODUCTS.

6    Q.   AND WHAT DOES THAT REFER TO?

7    A.   IT STARTS WITH DIFFERENT -- AND THAT REALLY TELLS YOU WHAT

8    YOU NEED TO KNOW.  SO DIFFERENTIATED PRODUCTS ARE PRODUCTS THAT

9    COMPETE WITH EACH OTHER, BUT ARE IDENTICAL TO EACH OTHER.  THEY

10   HAVE DIFFERENT FEATURES AND DIFFERENT CAPABILITIES.

11        SO THEY DON'T EXACTLY PROVIDE, YOU KNOW, COMPLETE EXACT

12   DUPLICATION OF EACH OTHER, BUT THEY ARE SIMILAR ENOUGH THAT

13   THEY'RE COMPETING AND THERE'S AN ENTIRE ASPECT OF INDUSTRIAL

14   ORGANIZATION THAT LOOKS RIGHT AT THAT ISSUE, AND THAT'S MY

15   SPECIALTY.

16   Q.   HOW DOES YOUR EXPERTISE IN THAT AREA RELATE TO THIS CASE?

17   A.   WELL, IT RELATES VERY DIRECTLY TO THIS CASE.  I MEAN,

18   THAT'S WHAT THESE PRODUCTS ARE.  THEY SERVE THE SAME BASIC

19   PURPOSES AS ONE ANOTHER, BUT THEY HAVE SOMEWHAT DIFFERENT

20   CAPABILITIES AND FEATURES AND THAT'S ONE OF THE KEY WAYS THEY

21   COMPETE WITH EACH OTHER.

22        MR. BENNETT:  YOUR HONOR, WE OFFER DR. VELLTURO AS AN

23   EXPERT WITNESS ON ECONOMICS AND FOR THE PURPOSE OF CALCULATING

24   PATENT DAMAGES.

25        MR. QUINN:  NO OBJECTION.

```
1              THE COURT:  ALL RIGHT.  HE'S SO CERTIFIED.

2         GO AHEAD, PLEASE.

3    BY MR. BENNETT:

4    Q.   DR. VELLTURO, AT A HIGH LEVEL, COULD YOU -- JUST TO FRAME

5    YOUR WORK AT THE OUTSET, WHAT IS THE PURPOSE OF AN AWARD OF

6    PATENT?  LET ME RESTATE THAT.

7         WHAT'S THE PURPOSE OF A DAMAGE AWARD IN PATENT CASES?

8    A.   IT'S TO COMPENSATE THE PATENTEE FOR THE USE OF THE PATENT

9    BY THE, OR PATENTS HERE, BY THE INFRINGER.

10   Q.   AND WHAT IS THE CAUSE OF HARM, WHAT'S THE HARM CAUSED IN A

11   PATENT CASE, THAT DAMAGES ARE INTENDED TO ADDRESS?

12   A.   THERE ARE TWO BASIC IDEAS BEHIND THAT.  ONE IS THAT A --

13   AN ACCUSED INFRINGER MAY, BY INFRINGING, TAKE SALES AWAY FROM

14   THE PATENTEE AND THE PATENTEE SUFFERED THOSE LOSSES.

15        BUT ALSO THE PATENTEE HAS USED -- I'M SORRY -- THE

16   INFRINGER HAS USED THE PATENTEE'S PATENTS IN A NON-AUTHORIZED

17   MANNER AND COMPENSATION IS OWED FOR THAT USE.

18   Q.   OKAY.  NOW, YOU USED THE TERM "ACCUSED INFRINGER."  FOR

19   PURPOSES OF YOUR TESTIMONY TODAY AND YOUR CALCULATION OF

20   APPLE'S DAMAGES, SAMSUNG IS, QUOTE-UNQUOTE, ACCUSED INFRINGER;

21   IS THAT RIGHT?

22   A.   YES.

23   Q.   OKAY.  AND AS A DAMAGES EXPERT, WHAT ASSUMPTIONS, IF ANY,

24   HAVE YOU MADE REGARDING THE INFRINGEMENT AND VALIDITY OF THE

25   FIVE ASSERTED APPLE PATENTS?
```

```
 1      A.   SO TO COMPUTE DAMAGES, I ASSUME THAT EACH OF THE PATENTS

 2      IS INFRINGED AND EACH OF THE PATENTS IS VALID.

 3           NOW, WITH RESPECT TO THE '172 PATENT, THAT'S ALREADY BEEN

 4      DETERMINED BY THE COURT, BUT EVEN FOR THE OTHERS, I ASSUMED

 5      INFRINGEMENT FOR THE PURPOSE OF MY CALCULATIONS.

 6      Q.   NOW, SIR, IN OUR DIALOGUE HERE TODAY YOU AND I ARE GOING

 7      TO BE REFERRING QUITE OFTEN TO UNITS OR ACCUSED UNITS OR

 8      INFRINGING UNITS.

 9           WHEN I USED THAT TERM, WHAT DO YOU UNDERSTAND I'M

10      REFERRING TO?

11      A.   A UNIT HERE WOULD BE A SAMSUNG SMARTPHONE, OR IN SOME

12      INSTANCES A SAMSUNG TABLET.

13      Q.   NOW, IN YOUR WORK, HAVE YOU IDENTIFIED -- AND THIS IS A

14      YES OR NO ANSWER -- THE NUMBER OF ACCUSED UNITS THAT SAMSUNG

15      SOLD BETWEEN AUGUST 2011 AND DECEMBER 31, 2013?

16      A.   YES.

17           MR. BENNETT:  YOUR HONOR, WE HAVE A CONFIDENTIAL

18      DEMONSTRATIVES, PDX 92.54, WHICH I WOULD ASK MR. LEE TO BRING

19      UP.  CONFIDENTIAL JUST FOR THE LADIES AND GENTLEMEN AND THE

20      COURT.

21           AND I THINK IT'S AGREED THAT DR. VELLTURO CAN REFER TO

22      THAT FIRST NUMBER AS SOMETHING NORTH OF A CERTAIN NUMBER AND

23      THE OTHER NUMBER WILL NOT BE SPOKEN.

24      Q.   DID YOU -- DR. VELLTURO, USING THE CONVENTION THAT'S BEEN

25      AGREED UPON, HOW MANY ACCUSED UNITS HAVE YOU DETERMINED IN THIS
```

1    CASE SAMSUNG SOLD DURING THE TIME I STATED, AUGUST 2011 THROUGH

2    THE END OF LAST YEAR?

3    A.   MORE THAN 37 MILLION UNITS.

4    Q.   OKAY.  AND THE LADIES AND GENTLEMEN HAVE ON THEIR SCREEN

5    THE MORE PRECISE NUMBER; IS THAT RIGHT?

6    A.   YES.

7    Q.   OKAY.  AND THAT MORE PRECISE NUMBER IS A NUMBER THAT YOU

8    HAVE VERIFIED?

9    A.   THROUGH DECEMBER 2013, CORRECT.

10   Q.   AND ALSO ON THE LADIES AND GENTLEMEN'S SCREEN IS A DOLLAR

11   NUMBER AND THAT'S THE REVENUES ASSOCIATED WITH THOSE ACCUSED

12   SALES; IS THAT RIGHT, SIR?

13   A.   THAT'S THE REVENUE THAT SAMSUNG HAS EARNED ON THOSE

14   ACCUSED UNITS.

15   Q.   NOW, THE NUMBERS THAT WE HAVE ON THIS GRAPHIC, WHAT IS THE

16   SOURCE OF THE INFORMATION ON SALES AND REVENUE OF ACCUSED

17   PRODUCTS FROM WHICH YOU DERIVE THOSE NUMBERS?

18   A.   SO THE UNITS AND THE DOLLARS WOULD COME FROM THE INTERNAL

19   ACCOUNTING RECORDS AND FINANCIAL RECORDS OF SAMSUNG.

20   Q.   AND YOU'VE REVIEWED -- YOU AND YOUR STAFF HAVE REVIEWED

21   THOSE RECORDS?

22   A.   YES.

23   Q.   LET ME ASK YOU THIS:  IS THERE ANY DISPUTE IN THIS CASE AS

24   TO WHETHER SAMSUNG TELECOMMUNICATIONS AMERICA, ALSO REFERRED TO

25   AS STA, SOLD MORE THAN 37 MILLION ACCUSED UNITS IN THE

1    UNITED STATES DURING THE TIME PERIOD INDICATED ON YOUR CHART?

2    A.   IT'S MY UNDERSTANDING THERE ISN'T A DISPUTE BETWEEN APPLE

3    AND SAMSUNG AS TO THAT NUMBER, THAT THEY AGREE THAT'S THE

4    NUMBER.

5    Q.   AND IS THERE --

6    A.   THAT THEY'RE ACCUSED.

7    Q.   IS THERE ANY DISPUTE THAT STA RECEIVED THOSE UNITS FROM

8    SAMSUNG ELECTRONICS CORPORATION, SEC, ITS ULTIMATE PARENT?

9    A.   NO.

10   Q.   OKAY.

11   A.   THERE'S NO DISPUTE.

12   Q.   AND, FINALLY, THE JURY HEARD THAT IN THE INTERROGATORY

13   ANSWERS, I BELIEVE THIS MORNING, BUT THAT THERE'S ANOTHER

14   SAMSUNG ENTITY, IT'S BEEN REFERRED TO, SAMSUNG ELECTRONICS

15   AMERICA, OR SEA.  DID SAMSUNG ELECTRONICS AMERICA, DID YOU

16   DETERMINE, SELL THE ACCUSED TABLETS IN THE UNITED STATES?

17   A.   YES, THEY SOLD TABLETS, NOT SMARTPHONES IN THE

18   UNITED STATES.

19   Q.   AND TO BE CLEAR, THE SALES THAT WE SEE REFLECTED ON THE

20   GRAPHIC ON THE SCREEN, DO THOSE SALES INCLUDE SMARTPHONES AND

21   TABLETS?

22   A.   YES, THEY ARE -- THEY'RE MOSTLY SMARTPHONES, BUT THERE ARE

23   SOME TABLETS IN THERE AS WELL.

24   Q.   NOW, DID YOU PREPARE AN EXHIBIT THAT PROVIDES SOME DETAIL

25   ON THE INFORMATION ON ACCUSED SALES BY PRODUCTS AND BY MONTH

1     FOR THE JURY?

2     A.   I DID.

3     Q.   LET ME ASK YOU TO LOOK AT -- TURN TO, AT THIS POINT,

4     CONFIDENTIAL EXHIBIT PX 142.

5     A.   YES, I'M THERE.

6     Q.   IS THIS A SUMMARY OF SAMSUNG'S SALES INFORMATION THAT YOU

7     PREPARED IN THE COURSE OF YOUR WORK IN THIS CASE?

8     A.   IT IS.

9           MR. BENNETT:  YOUR HONOR, I WOULD MOVE CONFIDENTIAL

10    EXHIBIT 1, PLAINTIFF'S EXHIBIT 142.

11          MR. QUINN:  NO OBJECTION.

12          THE COURT:  IT'S ADMITTED.

13    (PLAINTIFF'S EXHIBIT 142 WAS ADMITTED IN EVIDENCE.)

14          THE COURT:  GO AHEAD, PLEASE.

15          MR. BENNETT:  AND IF WE CAN BRING THAT UP JUST FOR

16    THE LADIES AND GENTLEMEN AND HER HONOR.

17    Q.   COULD YOU JUST SAY WHAT WE'RE LOOKING AT HERE,

18    DR. VELLTURO?

19    A.   WELL, THIS WOULD BE THE COVER PAGE OF THE EXHIBIT, WHICH

20    IS THE SUMMARY OF SAMSUNG SALES DATA THAT I AND MY STAFF AND

21    ANOTHER FIRM, AN ACCOUNTING FIRM, STOUT RISIUS ROSS, INC.,

22    HELPED ME COMPILE.

23    Q.   WHERE IN THIS DOCUMENT CAN THE JURY FIND THE MORE THAN 37

24    MILLION ACCUSED UNIT FIGURE THAT WE SAW ON THE PHOTOGRAPHIC

25    EARLIER?

1    A.   SO THE WAY THAT THIS DOCUMENT IS ORGANIZED IS GOING DOWN

2    THE ROWS OF THE DOCUMENTS WOULD BE THE ACCUSED PRODUCTS, AND

3    THEN GOING ACROSS IN THE COLUMNS WOULD BE MONTH BY MONTH, THE

4    NUMBER OF ACCUSED UNITS SOLD, AND THE DOLLAR REVENUE.

5         AND SO IF YOU GET ALL THE WAY TO THE END OF THE EXHIBIT,

6    AT THE BOTTOM RIGHT-HAND CORNER, YOU'LL HAVE THE TOTAL FOR ALL

7    THE PRODUCTS FOR ALL THE PERIODS.

8         AND IN THE VERY BOTTOM RIGHT-HAND CORNER UNDER UNITS AND

9    REVENUE TOTAL ALL THE WAY TO THE RIGHT, YOU CAN SEE THE TWO

10   NUMBERS THAT I SHOWED YOU IN THE SLIDE A COUPLE SLIDES BACK,

11   THE MORE THAN 37 MILLION AND THE REVENUE NUMBER I ALLUDED TO.

12   Q.   AND THE NUMBERS WE'RE LOOKING AT ARE ALL THROUGH

13   DECEMBER 31ST, 2013?

14   A.   ON THIS TABLE, THAT'S RIGHT.

15   Q.   OKAY.  AND HAS SAMSUNG CONTINUED TO SELL ACCUSED UNITS IN

16   THE UNITED STATES SINCE JANUARY 1ST?

17   A.   SOME OF THESE PRODUCTS CONTINUED TO BE SOLD INTO 2014.

18   Q.   HAS SAMSUNG PROVIDED YOU, THROUGH COUNSEL, THROUGH US, ANY

19   OF THE SALES INFORMATION RELATING TO THOSE SALES?

20   A.   NO.

21   Q.   DID YOU MAKE AN ATTEMPT TO ACCOUNT FOR THOSE UNITS IN YOUR

22   DAMAGES ESTIMATES?

23   A.   I DID.

24   Q.   HOW DID YOU DO THAT?

25   A.   SO I HAD THE MONTHLY DATA FOR EACH OF THE PRODUCTS, AS YOU

1    SAW BEFORE.  I WOULD HAVE LOOKED AT HOW THOSE SALES WERE

2    TRENDING OVER TIME.  I WOULD HAVE TAKEN INTO ACCOUNT WHERE THEY

3    WERE IN THEIR PRODUCT LIFECYCLE, WHETHER THEY'D JUST BEEN

4    INTRODUCED OR WERE KIND OF WINDING DOWN.

5         AND I USED THAT TO DO FORECASTING AND PROJECTING, NOT VERY

6    FAR, ONLY FOR THE NEXT FOUR MONTHS INTO THE END OF APRIL OF

7    THIS MONTH.

8         SO I COMPUTED THOSE FORECASTS FOR THE PRODUCTS THAT WERE

9    STILL BEING SOLD.

10   Q.   IF WE CAN BRING UP CONFIDENTIAL PLAINTIFF'S DEMONSTRATIVES

11   92.55.

12        DOING WHAT YOU JUST DESCRIBED, DR. VELLTURO, HAVE YOU

13   DETERMINED THE NUMBER OF SALES, INCLUDING PROJECTIONS FOR THE

14   FIRST FOUR MONTHS OF 2014, OF ACCUSED UNITS THAT -- ON WHICH

15   YOU'VE CALCULATED DAMAGES?

16   A.   YES.

17   Q.   IS THAT THE NUMBER THAT APPEARS UP TOP ON THE

18   DEMONSTRATIVE THAT THE JURY IS LOOKING AT?

19   A.   THAT'S RIGHT.  SO THE ADDITIONAL NUMBERS I FORECASTED

20   COULD BE THE DIFFERENCE BETWEEN THE UNIT NUMBER ON THIS CHART

21   AND THE NUMBER YOU SAW ON THE PREVIOUS CHART.

22   Q.   OKAY.  AND IS IT ON THE NUMBER SHOWN ON THIS CHART THAT

23   YOU CALCULATED DAMAGES?

24   A.   THAT'S CORRECT.

25   Q.   SO LET'S TURN TO THE ISSUE OF, PRELIMINARILY, THE DAMAGES.

1    AT A HIGH LEVEL, WHAT TYPES OF INJURY, IF ANY, HAVE YOU

2    CONCLUDED THAT APPLE HAS SUFFERED IN THIS CASE AS A RESULT OF

3    SAMSUNG'S ACCUSED SALES?

4    A.   THERE ARE TWO BROAD TYPES.  THERE ARE WHAT ARE CALLED LOST

5    PROFITS AND THERE ARE WHAT ARE CALLED REASONABLE ROYALTY

6    DAMAGES.

7    Q.   DO YOU HAVE AN OPINION REGARDING THE AMOUNT OF DAMAGES

8    THAT APPLE SHOULD RECEIVE BASED UPON THE ACCUSED UNITS?

9    A.   I DO.

10   Q.   AND WHAT IS THAT?

11   A.   THE TOTAL DAMAGES THAT APPLE SUSTAINED AS A RESULT OF

12   SAMSUNG'S INFRINGEMENT IS $2.191 BILLION.

13   Q.   AND IF WE COULD BRING UP PLAINTIFF'S EXHIBIT, PLAINTIFF'S

14   DEMONSTRATIVE EXHIBIT 92.2.  WHAT FORM DID THE DAMAGES THAT YOU

15   HAVE CALCULATED TAKE?

16   A.   TWO FORMS.  THE FIRST IS THAT APPLE, INDEED, LOST PROFITS

17   AS A RESULT OF SAMSUNG'S INFRINGEMENT.

18       AND THEN SAMSUNG WAS ALSO DUE REASONABLE ROYALTIES IN

19   ASSOCIATION WITH SAMSUNG'S INFRINGEMENT.

20   Q.   CAN YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY

21   THE KEY FACTORS THAT LEAD TO THE $2 BILLION OF DAMAGES YOU HAVE

22   CALCULATED?

23   A.   SURE.  SO I GOT -- I THINK OF IT ALONG FOUR KEY PIECES,

24   AND THE FIRST ONE IS THE SCALE OF THE INFRINGEMENT.

25       YOU'VE SEEN THE NUMBERS, BOTH THE DOLLARS AND THE

1     REVENUES.  IT'S A VERY LARGE MARKET, AND SAMSUNG HAS MADE A LOT

2     OF SALES INTO THAT MARKET.  SO THAT'S THE FIRST POINT.

3           THE SECOND POINT IS THAT THE INFRINGEMENT HERE SPANS THE

4     MIDDLE, BASICALLY AUGUST 2011 THROUGH THE END OF 2013 AND

5     THAT'S A TIME PERIOD WHERE THIS MARKET IS IN A PROFOUND STATE

6     OF CHANGE AND GROWTH BECAUSE SO MANY PEOPLE ARE COMING IN AND

7     BUYING SMARTPHONES.

8           SO IT'S A PARTICULARLY SIGNIFICANT PERIOD FOR SAMSUNG TO

9     HAVE BEEN INFRINGING AND TO HAVE COME IN AND COMPETED BY

10    INFRINGING WITH APPLE.

11          THE THIRD POINT REALLY IS THAT APPLE AND SAMSUNG HAVE BEEN

12    HEAD-TO-HEAD DIRECT COMPETITORS DURING THIS PERIOD, AND, IN

13    FACT, MOST OF THE OTHER COMPETITORS HAVE TAKEN A VERY SECONDARY

14    ROLE.  SO THEY'RE VERY DIRECT COMPETITORS.

15          AND THEN THE LAST ONE IS THAT THESE PATENTS RELATE

16    SIGNIFICANTLY TO THE USER EXPERIENCE AND EASE OF USE, WHICH IS

17    ONE OF THE CENTRAL ISSUES THAT SAMSUNG NEEDED TO DEAL WITH TO

18    BECOME COMPETITIVE AND BY INFRINGING THE PATENTS, THAT HELPED

19    THEM BECOME SIGNIFICANTLY MORE COMPETITIVE.

20          WHEN YOU PUT ALL THOSE FOUR TOGETHER, THAT HAD A DRAMATIC

21    EFFECT ON APPLE AND THE COMPENSATION, THEREFORE, IS

22    SUBSTANTIAL.

23     Q.   THANK YOU, SIR.

24          DOCTOR, CAN YOU GIVE THE LADIES AND GENTLEMEN AN IDEA OF

25    THE WORK THAT YOU AND YOUR FIRM HAVE DONE TO ALLOW YOU TO REACH

1    THE OPINIONS YOU'VE GIVEN?

2    A.   IT'S BEEN A LOT.  I PERSONALLY HAVE SPENT PROBABLY ABOUT

3    800 HOURS AT LEAST ON THIS CASE.  PEOPLE AT QES HAVE SPENT

4    ANOTHER 4,000 TO 5,000 HOURS ON THIS CASE.  IT'S BEEN A VERY

5    BIG UNDERTAKING.

6    Q.   AND WHAT DID YOU ALL DO WITH THOSE EXPENDITURES OF TIME?

7    A.   SO THERE WAS A LOT OF DATA TO COLLECT AND KEEP TRACK OF.

8    THAT WOULD BE A BIG EXERCISE.

9        THERE WERE AN EXTRAORDINARY NUMBER OF DOCUMENTS TO LOOK

10   AT, PUBLIC DOCUMENTS, DOCUMENTS FROM APPLE, DOCUMENTS FROM

11   SAMSUNG.

12       THERE WERE -- THERE WAS LOTS OF DEPOSITION TESTIMONY THAT

13   VARIOUS WITNESSES GAVE FROM BOTH SIDES THAT WAS RELEVANT TO

14   WHAT WE WERE DOING.

15       THERE WERE REPORTS TO WRITE.

16       AND SO IT WAS A BIG UNDERTAKING.

17   Q.   DOCTOR, HAVE YOU PREPARED A WRITTEN SUMMARY OF YOUR DAMAGE

18   CALCULATIONS FOR THE BENEFIT OF THE JURY?

19   A.   YES.

20   Q.   AND IF YOU LOOK AT PLAINTIFF'S CONFIDENTIAL EXHIBIT 222A.

21       AND THERE ARE A SERIES OF SEALED PAGES, YOUR HONOR.  11,

22   13, 15, 17, 21, 30, 31, 32, 34, 35, 39, 41, AND 42.

23       BUT I WOULD MOVE CONFIDENTIAL EXHIBIT 222A.

24           THE COURT:  ANY OBJECTION?

25           MR. QUINN:  NO OBJECTION.

```
 1                THE COURT:  ALL RIGHT.  IT'S ADMITTED.

 2           (PLAINTIFF'S EXHIBIT 222A WAS ADMITTED IN EVIDENCE.)

 3                THE COURT:  GO AHEAD, PLEASE.

 4      BY MR. BENNETT:

 5      Q.   COULD YOU JUST TELL THE LADIES AND GENTLEMEN WHAT EXHIBIT

 6      222A IS, DR. VELLTURO?

 7      A.   SO THE TITLE IS SUMMARY OF CHRISTOPHER VELLTURO'S DAMAGES

 8      CALCULATIONS.  SO THIS WOULD BE A SERIES OF TABLES.  IT RUNS

 9      ABOUT 20 -- 42 PAGES, AND THIS PROVIDES A LOT OF THE UNDERLYING

10      COMPUTATIONAL DETAILS AS TO HOW I ARRIVED AT THE DAMAGES

11      NUMBERS THAT I'M GOING TO BE TALKING ABOUT.

12      Q.   AND IF I COULD ASK YOU TO LOOK AT CONFIDENTIAL EXHIBIT

13      22 -- 223A, PLAINTIFF'S 223A, WHICH IS CONFIDENTIAL AND HAS

14      SEALED PAGES 5 THROUGH 8, 11 THROUGH 14, 17 THROUGH 20, 23

15      THROUGH 26, 29 THROUGH 32, AND 59 THROUGH 63.

16           I WOULD OFFER IT.

17                MR. QUINN:  NO OBJECTION.

18                THE COURT:  IT'S ADMITTED.

19           (PLAINTIFF'S EXHIBIT 223A WAS ADMITTED IN EVIDENCE.)

20                THE COURT:  GO AHEAD, PLEASE.

21      BY MR. BENNETT:

22      Q.   COULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT

23      THIS DOCUMENT IS, DR. VELLTURO?

24      A.   WELL, THE TITLE IS SUMMARY OF CHRISTOPHER VELLTURO'S

25      DAMAGES CALCULATIONS, AND IN PARENTHESES, ADDENDUM.
```

1    Q.   SO IF WE COULD BRING UP PLAINTIFF'S DEMONSTRATIVE 92.4,

2    I'D LIKE TO ASK YOU, DR. VELLTURO, AS AN INTRODUCTION HERE, CAN

3    YOU DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE JURY THE

4    ANALYTIC STEPS THAT YOU TOOK TO REACH THE CONCLUSIONS YOU'VE

5    COME TO IN THIS CASE?

6    A.   YES.   SO BEFORE I GET TO CALCULATING DAMAGES, ESPECIALLY

7    GIVEN THE NATURE OF THIS MARKET AND THE COMPETITIVE INTERACTION

8    BETWEEN THESE TWO COMPANIES, AS AN ECONOMIST, I REALLY HAVE TO

9    STUDY THE INDUSTRY AND THE MARKET TO FIGURE OUT HOW IT WORKS

10   AND WHERE COMPETITION BETWEEN THESE TWO PARTIES FACTORS INTO

11   THAT.

12        THEN THE SECOND THING I HAVE TO DO, OR THAT I CHOSE TO DO,

13   IS TO LOOK AT THE ROLE OF THE PATENTED TECHNOLOGIES, BECAUSE

14   ULTIMATELY THE IDEA HERE IS TO EVALUATE HOW SAMSUNG'S

15   INFRINGEMENT OF THESE PATENTS ALTERED THE COMPETITION BETWEEN

16   THESE TWO COMPANIES AND HOW THAT RESULTED IN DAMAGES TO APPLE.

17        SO THOSE ARE TWO REALLY FUNDAMENTAL STEPS I'VE GOT TO TAKE

18   BEFORE I GO INTO THE DAMAGES CALCULATION.

19   Q.   AND TURNING TO THE FIRST POINT YOU HAVE THERE, INDUSTRY

20   AND MARKET ANALYSIS, HOW DOES THE MARKET AND COMPETITIVE

21   RELATIONSHIP BETWEEN THE PARTIES INFORM YOUR DAMAGES ANALYSIS

22   REGARDING LOST SALES AND LOST PROFITS?

23   A.   WELL, LOST SALES AND LOST PROFITS IS IDENTIFYING THE

24   EXTENT TO WHICH, BY INFRINGING, SAMSUNG TOOK SALES THAT APPLE

25   WOULD HAVE MADE OTHERWISE.

1           AND SO THAT DIRECTLY RELATES TO WHAT'S THE NATURE OF

2      COMPETITION IN SMARTPHONES AND TABLETS AND HOW DID THESE

3      PATENTS AFFECT THAT.

4           SO IN THAT SENSE, DOING LOST PROFITS AND LOST SALES,

5      KNOWING HOW THE MARKET WORKS IS ESSENTIAL.

6      Q.   OKAY.  AND HOW DOES, HOW DOES THE INDUSTRY AND MARKET

7      ANALYSIS BEAR ON THE ISSUE OF REASONABLE ROYALTIES?

8      A.   SO REASONABLE ROYALTY, I THINK WE HEARD A LITTLE BIT ABOUT

9      THIS TO THIS POINT, REASONABLE ROYALTY IS LOOKING AT A LICENSE

10     NEGOTIATION FOR THESE PATENTS BETWEEN SAMSUNG AND APPLE AT THE

11     TIME OF FIRST INFRINGEMENT IN 2011.

12          AND TO UNDERSTAND WHAT THAT NEGOTIATION WOULD HAVE LOOKED

13     LIKE, I NEED TO KNOW WHAT THE MARKET WAS DOING AT THE TIME OF

14     THAT NEGOTIATION AND WHERE IT WAS HEADED.  AND SO STUDYING THE

15     INDUSTRY IS IMPORTANT.

16     Q.   YOU TALK ABOUT LICENSING NEGOTIATION.  WOULD THE ACTUAL

17     TERM, THE LEGAL TERM, IS THAT HYPOTHETICAL NEGOTIATION?

18     A.   RIGHT.  THAT DIDN'T HAPPEN.  THERE WAS NO LICENSE BETWEEN

19     THE PARTIES, AND SO I'M GOING TO CONSTRUCT A HYPOTHETICAL

20     NEGOTIATION FROM DATE OF FIRST INFRINGEMENT TO FIGURE OUT THAT

21     FIGURE.

22     Q.   NOW, LET ME ASK YOU, SIR, IF WE COULD REFER -- DRILLING

23     DOWN NOW INTO YOUR INDUSTRY AND MARKET ANALYSIS, IF WE CAN

24     BRING UP PDX 92.5.

25          COULD YOU EXPLAIN TO THE JURY WHAT THE KEY CONCLUSIONS

```
 1        YOU'VE REACHED FROM THE INDUSTRY AND MARKET ANALYSIS THAT YOU

 2        DID ARE?

 3        A.   SURE.  SO SOME OF THIS YOU'VE HEARD A BIT ABOUT BEFORE,

 4        BUT I'M GOING TO TAKE IT THROUGH A LITTLE MORE SYSTEMATICALLY

 5        BECAUSE THAT'S THE ANALYSIS I DID.

 6            THE IPHONE REALLY FUNDAMENTALLY CHANGED THE MARKET FOR

 7        CELLULAR TELEPHONE.  IT HAS BEEN A FEATURE PHONE MARKETPLACE

 8        WHERE HARDWARE WAS KIND OF THE KEY WAY THAT PEOPLE COMPETED,

 9        AND WHAT THE IPHONE DID IS IT CREATED, AS THE SECOND BULLET

10        POINT SAYS, A MARKET SHIFT, WHERE THE HARDWARE STILL MATTERS,

11        BUT THE SOFTWARE, THE USER INTERFACE, HOW THE CONSUMER

12        INTERACTED WITH THE PHONE BECAME FAR MORE IMPORTANT.

13            AND THE THIRD POINT IS THAT CREATED CHALLENGES FOR SAMSUNG

14        BECAUSE HISTORICALLY THEY WERE VERY STRONG IN HARDWARE, BUT NOT

15        STRONG IN THIS USER INTERFACE AND SOFTWARE PIECE, AND THEY

16        REALIZED THAT THEY HAD TO CHANGE TO TAKE ADVANTAGE OF A MARKET

17        THAT WAS ABOUT TO EXPLODE IN SMARTPHONES.

18            THE FOURTH POINT, AS I MENTIONED A COUPLE OF TIMES, IS

19        WHEN THIS INFRINGEMENT BEGINS AND THROUGHOUT MOST OF THE PERIOD

20        OF THE INFRINGEMENT, PEOPLE ARE BUYING THEIR FIRST SMARTPHONE,

21        NOT EVERYBODY, BUT AS YOU'LL SEE, A LOT OF PEOPLE ARE, AND IN

22        THIS MARKET, THAT FIRST SMARTPHONE PURCHASE IS SUPER IMPORTANT

23        BECAUSE AS YOU GET FAMILIAR AND START TO ADD THINGS THAT ARE

24        ASSOCIATED WITH YOUR PHONE, THE LIKELIHOOD YOU'RE GOING TO BUY

25        YOUR NEXT PHONE AND/OR YOUR NEXT TABLET OR OTHER DEVICES IN THE
```

```
 1    FUTURE IS GOING TO BE AFFECTED BY YOUR FIRST PURCHASE.  SO IT'S

 2    REALLY A KEY TIME.

 3         AND THE LAST POINT IS WHAT I OBSERVED DURING THIS KEY TIME

 4    IS THAT THIS MARKETPLACE HAS SHIFTED TO ONE WHERE IT REALLY IS

 5    APPLE AND SAMSUNG GOING HEAD-TO-HEAD, AND THE SAMSUNG DOCUMENTS

 6    ARE CLEAR THAT THEY'RE GOING DIRECTLY AFTER APPLE BUSINESS.

 7    Q.   YOU SAY THE SAMSUNG DOCUMENTS ARE CLEAR.  AS PART OF YOUR

 8    WORK IN THIS CASE, INCLUDING YOUR ANALYSIS OF THE MARKETPLACE,

 9    DID YOU HAVE AN OPPORTUNITY TO REVIEW INTERNAL SAMSUNG

10    DOCUMENTS THAT WERE MADE AVAILABLE, INTERNAL AND CONFIDENTIAL

11    SAMSUNG DOCUMENTS, THAT HAVE BEEN MADE AVAILABLE TO APPLE'S

12    COUNSEL IN THIS CASE?

13    A.   YES.

14    Q.   AND DID THOSE DOCUMENTS INFORM AND FORM A BASIS FOR YOUR

15    OPINION?

16    A.   THEY DID.

17    Q.   LET ME ASK YOU TO LOOK AT PLAINTIFF'S EXHIBIT 147 IN YOUR

18    BINDER.  IS THIS ONE OF THE INTERNAL SAMSUNG DOCUMENTS THAT YOU

19    REVIEWED AND RELIED UPON IN FORMING YOUR OPINIONS IN THIS CASE?

20    A.   IT IS.

21         MR. BENNETT:  MOVE EXHIBIT 147, YOUR HONOR.

22         MR. QUINN:  NO OBJECTION.

23         THE COURT:  IT'S ADMITTED.

24    (PLAINTIFF'S EXHIBIT 147 WAS ADMITTED IN EVIDENCE.)

25         THE COURT:  GO AHEAD, PLEASE.
```

1      BY MR. BENNETT:

2      Q.   SHOWING YOU THE FIRST PAGE OF EXHIBIT 147, DR. VELLTURO,

3      CAN YOU JUST TELL US GENERALLY WHAT THIS DOCUMENT IS?

4      A.   SO IT'S A SAMSUNG DOCUMENT, AS YOU CAN SEE IN THE TOP

5      RIGHT-HAND CORNER, AND IT'S TITLED "3G IPHONE U.S. MARKET

6      IMPACT."

7      Q.   THE DOCUMENT IS DATED JULY 2008.  WAS THAT 18 MONTHS AFTER

8      MR. JOBS' ANNOUNCEMENT AT THE MOSCONE CENTER EVENT OF THE

9      IPHONE?

10     A.   THAT'S CORRECT, AND IT'S ALSO ABOUT, A FEW MONTHS AFTER

11     THE INTRODUCTION OF THE SECOND GENERATION IPHONE, THE 3G.

12     Q.   OKAY.  AND DOES THE DOCUMENT -- DOES THE DOCUMENT SET

13     FORTH SAMSUNG'S EVALUATION OF THE EFFECT OF THE IPHONE ON THE

14     SMARTPHONE MARKET?

15     A.   IT DOES.

16     Q.   COULD WE TURN TO PAGE 2.  IS THAT EVALUATION CAPTURED ON

17     THIS PAGE?

18     A.   YES.

19     Q.   OKAY.  AND, MR. LEE, IF YOU CAN HIGHLIGHT UP TOP AND THEN

20     DOWN AT THE BOTTOM.

21          DR. VELLTURO, IF YOU COULD JUST BRIEFLY EXPLAIN WHAT, FROM

22     THIS DOCUMENT, IS SIGNIFICANT?

23     A.   WELL, IT'S GOT THIS BIG CHART IN THE MIDDLE, WHICH I'LL

24     EXPLAIN IN A SECOND.

25          BUT THE, THE LANGUAGE KIND OF TELLS YOU WHAT THE CHART IS

1    TRYING TO SAY, WHICH IS THAT THE 3G IPHONE IS REDEFINEING THE

2    U.S. MARKET DYNAMICS IS WHAT IT SAYS AT THE TOP.

3    Q.   AND IF WE LOOK DOWN BELOW, WOULD YOU READ THAT SENTENCE

4    THAT BEGINS "WHILE TRADITIONAL"?

5    A.   "WHILE TRADITIONAL OEM'S ARE BUSY FIGHTING EACH OTHER IN

6    THE FEATURE PHONE SPACE, APPLE IS BUSINESS MAKING THE CATEGORY

7    OBSOLETE."

8    Q.   A COUPLE OF TERMS THERE.  OEM'S, WHAT ARE OEM'S IN THIS

9    MARKETPLACE?  OR WHO ARE OEM'S?

10   A.   OEM STANDS FOR ORIGINAL EQUIPMENT MANUFACTURER.  IT

11   BASICALLY MEANS FEATURE PHONES, SAMSUNG -- YOU CAN SOME NAMES

12   THERE, HTC.  MOTOROLA IS THERE AS WELL.

13   Q.   YOU'VE USED THE TERM EARLIER "FEATURE PHONES."  CAN YOU

14   DEFINE THAT TERM FOR THE LADIES AND GENTLEMEN OF THE JURY.

15   A.   SO FEATURE PHONES ARE PHONES THAT TYPICALLY HAVE THE

16   PHYSICAL KEYBOARDS ON THEM, THEY SERVE PRIMARILY AS PHONES AND

17   THEY MAY HAVE SOME LIMITED INTERNET CONNECTIVITY, BUT IT'S

18   USUALLY EXTREMELY LIMITED, AND THEY HAVE VIRTUALLY NO

19   TOUCHSCREEN CAPABILITY.  THEY MAY HAVE A LITTLE, BUT IT'S QUITE

20   LIMITED.

21   Q.   AND DOES THIS SAMSUNG DOCUMENT ALSO ADDRESS THE HARDWARE

22   TO SOFTWARE SHIFT YOU DESCRIBED EARLIER?

23   A.   IT DOES.

24   Q.   MR. LEE, IF YOU COULD TURN US TO PAGE 13.

25        WILL YOU JUST WALK US THROUGH THE TOP PART OF THAT PAGE,

1       STARTING WITH CONCLUSION.

2       A.   SO THIS GOES TO THE SECOND POINT ON MY BULLET POINTS WE

3       SAW, THAT THERE WAS A SHIFT OCCURRING FROM HARDWARE COMPETITION

4       TO SOFTWARE-BASED COMPETITION, AND THE CONCLUSION HERE IS

5       SOFTWARE IS THE NEW VALUE DRIVER.  THAT'S WHAT SAMSUNG WAS

6       SAYING.

7       Q.   GO DOWN AND LOOK AT -- HIGHLIGHT THE NEXT SENTENCE THERE,

8       IF YOU COULD.

9            DR. VELLTURO, COULD YOU READ THAT?

10      A.   IT READS, "FOCUSSING ON HARDWARE IS A LOOSING," I THINK

11      THAT'S SUPPOSED TO BE LOSING, "PROPOSITION FOR DIRECT IPHONE

12      COMPETITION."

13      Q.   AND THE NEXT TWO LINES?

14      A.   "WHAT MAKES THE IPHONE UNIQUE IS SOFTWARE (APPLICATIONS)

15      AND SERVICES, BEAUTIFUL HARDWARE IS JUST A BONUS."

16      Q.   ALL RIGHT.  LET ME ASK YOU, DR. VELLTURO, TO LOOK AT

17      PLAINTIFF'S EXHIBIT 145 IN YOUR BINDER.

18      A.   YES, I'M THERE.

19      Q.   IS THIS A DOCUMENT FROM SAMSUNG'S FILES THAT YOU RELIED

20      UPON IN FORMING YOUR OPINIONS IN THIS CASE?

21      A.   IT IS.

22           MR. BENNETT:  MOVE EXHIBIT 145, YOUR HONOR.

23           MR. QUINN:  NO OBJECTION.

24           THE COURT:  IT'S ADMITTED.

25           (PLAINTIFF'S EXHIBIT 145 WAS ADMITTED IN EVIDENCE.)

```
1              THE COURT:  GO AHEAD, PLEASE.

2    BY MR. BENNETT:

3    Q.    SHOWING YOU THE FIRST PAGE OF EXHIBIT 145, CAN YOU TELL US

4    WHAT THIS IS?

5    A.    SO IT'S A LITTLE DIM, BUT IT IS A PRESENTATION CALLED

6    TOUCH PORTFOLIO ROLL OUT STRATEGY, RECOMMENDATION BASED ON

7    CONSUMER INSIGHT.

8    Q.    THE DOCUMENT UP TOP, IT'S HARD TO READ, BUT IT'S A

9    REFERENCE TO AN OUTFIT CALLED GRAVITY TANK.  WHAT IS GRAVITY

10   TANK?

11   A.    SO GRAVITY TANK IS AN OUTSIDE THIRD PARTY MARKET RESEARCH

12   FIRM THAT SAMSUNG HAS HIRED TO DO MARKET RESEARCH AND GENERATE

13   THIS REPORT.

14   Q.    DOES THIS REPORT PREPARED FOR SAMSUNG BY GRAVITY TANK,

15   LIKE THE EARLIER DOCUMENT WE LOOKED AT, ADDRESS THE EFFECT OF

16   THE IPHONE ON THE SMARTPHONE MARKET?

17   A.    IT DOES.  IT'S DOING IT AT A SOMEWHAT LATER DATE.  AS WE

18   SEE AT THE BOTTOM THERE, IT'S LATER ON IN 2008, ALTHOUGH THE

19   RESEARCH WAS DONE EARLIER.

20   Q.    AND IF WE TURN TO PAGE 20 IN THIS REPORT, DID GRAVITY TANK

21   NOTE SOME OF THE THINGS I THINK THE LADIES AND GENTLEMEN HAVE

22   ALREADY SEEN WHEN MR. SCHILLER WAS ON THE STAND ABOUT THE

23   ACCLAIM THE IPHONE WAS RECEIVING AND THE IMPACT THAT IT HAD?

24   A.    RIGHT.  GRAVITY TANK IS ASSEMBLING VARIOUS REVIEWS AND

25   STATEMENTS MADE BY REVIEWERS ABOUT THE IPHONE AND
```

1    CHARACTERIZING IT AS A REVOLUTION.

2    Q.   NOW, WAS THERE A SECTION IN THE GRAVITY TANK REPORT THAT

3    ALSO DISCUSSED THE IMPORTANCE OF THE USER INTERFACE IN THE

4    IPHONE?

5    A.   YES.

6    Q.   IF YOU CAN LOOK -- TURN TO PAGE 35 OF THE EXHIBIT.  AND

7    COULD YOU EXPLAIN WHAT APPEARS STARTING ARE THE TOP OF THAT

8    PAGE WHERE IT SAYS U/I, USER INTERFACE IN A BLOCK, AND THEN

9    NEXT TO THAT SAYS INTUITIVE EVERYWHERE.  CAN YOU READ THE

10   LANGUAGE UNDER THAT "WHILE IPHONE USERS"?

11   A.   ABSOLUTELY.  SO THERE ARE SEVERAL SLIDES IN THIS DECK.

12   IT'S ABOUT 175 SLIDES, AND THIS ONE STARTS OFF WITH "INTUITIVE

13   EVERYWHERE."

14       AND IT STATES, "WHILE IPHONE USERS COMMENT ON HOW EASILY

15   THEY CAME TO MASTER THE PHONE'S BASIC INTERFACE, THEY ALSO

16   NOTICE A DEPTH AND DETAIL OF DESIGN NOT FOUND IN MOST PHONES."

17   Q.   THERE'S A LITTLE COMMENT DOWN ON THE LOWER RIGHT THAT SAYS

18   "THOUGHTFUL THROUGHOUT."  CAN WE HIGHLIGHT THAT AND CAN YOU

19   READ THAT, DR. VELLTURO?

20   A.   IT SAYS "THOUGHTFUL THROUGHOUT.  SUBTLE CONTROLS FOR THOSE

21   WHO CARE AND ATTENTION TO DETAIL AROUND, 'UNIMPORTANT '

22   INTERACTIONS."

23   Q.   IS THE USER INTERFACE A FUNCTION OF HARDWARE OR SOFTWARE?

24   A.   THE USER INTERFACE IS GENERATED LARGELY BY THE SOFTWARE.

25   Q.   DOES THE GRAVITY TANK REPORT GO ON TO DESCRIBE THE

1    IMPORTANCE OF SOFTWARE IN THE IPHONE?

2    A.   YES.

3    Q.   IF WE TURN TO PAGE 44, CAN YOU TELL US WHAT'S SHOWN HERE?

4    A.   SO THIS IS SOMEWHAT OF A RESTATEMENT OF WHAT WE SAW ON THE

5    SAMSUNG DOCUMENT THAT CAME BEFORE THIS.  THIS IS GRAVITY TANK

6    INDICATING THAT BEYOND SIMPLY THE PRODUCT ITSELF, WHERE IT SAYS

7    IPHONE HAS UPSET THE BALANCE OF POWER IN MOBILE.

8    Q.   AND THEN DOWN ON THE LEFT IS A PHRASE, SHIFTS POWER, DO

9    YOU SEE THAT?

10   A.   I DO.  IT SAYS "SHIFTS POWER FROM HARDWARE TO SOFTWARE AND

11   PLATFORM," AND PLATFORM HERE WOULD BE THE IOS OPERATING SYSTEM.

12   Q.   SO HOW DID THE LAST TWO DOCUMENTS WE LOOKED AT, HOW DID

13   THEY RELATE TO YOUR MARKET ANALYSIS AND YOUR OPINIONS?

14   A.   WELL, THIS REALLY REENFORCES THE FIRST TWO POINTS, ONE

15   THAT THE IPHONE FUNDAMENTALLY DID CHANGE THE MARKET, AND THE

16   WAY IT CHANGED THE MARKET WAS PROVIDING THE USER INTERFACE, AND

17   YET, STILL, A HIGHLY FUNCTIONAL PHONE WHERE THE USER INTERFACE

18   BECAME THE KEY, HERE'S THIS PHRASE, DIFFERENTIATING

19   CHARACTERISTIC, THAT IS, THE THING THAT MADE THE IPHONE

20   SUCCESSFUL AND THE THING THAT THE OTHER PHONES DIDN'T HAVE.

21   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 149, DR. VELLTURO.  THIS

22   IS A FEBRUARY 11TH, 2010 E-MAIL STRING.  DO YOU HAVE IT?

23   A.   I'M SORRY, WHICH NUMBER?

24   Q.   149.

25   A.   YES, I SEE THAT.

1      Q.   IS THIS A SAMSUNG DOCUMENT THAT YOU REVIEWED AND RELIED

2      UPON IN REACHING YOUR OPINIONS IN THIS CASE?

3      A.   IT IS.

4      Q.   AN INTERNAL DOCUMENT PRODUCED TO THE LAWYERS IN THIS CASE?

5      A.   YES.

6            MR. BENNETT:  MOVE EXHIBIT 149, YOUR HONOR.

7            MR. QUINN:  I THINK IT'S IN, BUT WE HAVE NO OBJECTION

8      IF IT'S NOT.

9            THE COURT:  ALL RIGHT.  IT'S ADMITTED.

10         (PLAINTIFF'S EXHIBIT 149 WAS ADMITTED IN EVIDENCE.)

11           THE COURT:  GO AHEAD, PLEASE.

12     BY MR. BENNETT:

13     Q.   CAN WE JUST ORIENT OTHERS ON THIS DOCUMENT.  IF WE BLOW UP

14     THE E-MAIL DOWN THROUGH THE TITLE, SUMMARY OF EXECUTIVE LEVEL,

15     THAT LANGUAGE.

16          CAN YOU TELL US, JUST GIVE US AN OVERVIEW OF WHAT THIS

17     DOCUMENT IS --

18     A.   SO --

19     Q.   -- DR. VELLTURO?

20     A.   AS YOU CAN SEE IN THE TITLE, IT'S BEEN FORWARDED SEVERAL

21     TIMES AND THE TITLE OF IT IS "SUMMARY OF EXECUTIVE-LEVEL

22     MEETING SUPERVISED BY HEAD OF DIVISION, FEBRUARY 10TH," AND

23     THAT WOULD HAVE BEEN THE DAY BEFORE THIS WAS SENT.  SO IT'S

24     2010.  SO WE'VE GONE FORWARD A LITTLE MORE THAN A YEAR NOW FROM

25     THE LAST DOCUMENT.

1    Q.   AND WHO WAS THE HEAD OF SAMSUNG -- THE HEAD OF THE

2    DIVISION, IS THAT THE MOBILE PHONE DIVISION?

3    A.   THIS IS THE GLOBAL HEAD OF THE MOBILE PHONE DIVISION AT

4    SAMSUNG.

5    Q.   WHO WAS THAT IN FEBRUARY 2010?

6    A.   MR. J.K. SHIN.

7    Q.   AND WHAT -- WHAT DOES THE E-MAIL CONSIST OF, OR INCLUDE OR

8    DESCRIBE?

9    A.   SO THE E-MAIL IS A COLLECTION OF, OF VARIOUS PEOPLE'S

10   RESTATEMENTS OF WHAT MR. SHIN HAD TO SAY AT THIS MEETING ABOUT

11   WHERE SAMSUNG'S BUSINESS WAS GOING IN THE UNITED STATES.

12   Q.   DID THE, DOES MR. SHIN, IN THE REMARKS RELATED,

13   SPECIFICALLY TALK ABOUT THE MARKET IMPACT OF THE INTRODUCTION

14   OF THE IPHONE?

15   A.   YES, HE DOES.

16   Q.   AND ITS IMPACT ON SAMSUNG?

17   A.   YES.

18   Q.   IF WE TURN TO PAGE 3, IT'S REFERRING YOU TO THE LANGUAGE

19   THAT APPEARS A LITTLE BIT MORE THAN HALFWAY DOWN, ALL CARRIERS.

20       COULD YOU READ, STARTING THERE, AND WE'LL GO DOWN ABOUT

21   SIX LINES THROUGH -- CAN YOU START THERE, DR. VELLTURO?

22   A.   SURE.  AND RECALL, THIS IS -- THESE ARE INDIVIDUALS

23   REMEMBERING WHAT MR. SHIN WAS SAYING AT MEETINGS.  IN ESSENCE,

24   IT'S WHAT THEY RECALL MR. SHIN SAYING.

25       "ALL THE CARRIERS TELL ME, HEY, JK," J.K. SHIN, "YOUR

1    PHONES HAVE GREAT TECHNOLOGY PROMISE AND EVERYTHING'S GREAT.

2    BUT IT'S HARD TO SELL THEM AS HIGH-END PHONES.  THAT'S BECAUSE

3    WE SPENT ALL OF OUR SUBSIDY FUNDS ON THE IPHONE AND CAN'T GIVE

4    A PENNY IN SUBSIDY TO YOUR PHONES.  SO, OF COURSE, YOUR PHONES

5    WILL BE EXPENSIVE AND THEN IT FOLLOWS THAT THEY WON'T SELL.  I

6    HEAR THINGS LIKE THIS:  LET'S MAKE SOMETHING LIKE THE IPHONE."

7    Q.   MR. SHIN'S COMMENTS REFER TO CARRIERS, AND I THINK WE KNOW

8    THIS, BUT JUST TO BE CLEAR, WHO ARE THE -- IN THIS INDUSTRY,

9    WHO ARE THE CARRIERS?

10   A.   THEY'RE THE CELLULAR CARRIERS, AT&T, SPRINT, VERIZON,

11   T-MOBILE, THOSE LIKE THAT.

12   Q.   WHY ARE THEIR VIEWS SIGNIFICANT TO SAMSUNG?

13   A.   WELL, THEY'RE THE BIGGEST PURCHASERS OF SMARTPHONES AND

14   PHONES MORE GENERALLY.  THEY TURN AROUND AND PACKAGE THEM WITH

15   THEIR CELLULAR PLANS AND SELL THEM TO CONSUMERS.  SO THEY'RE

16   THE BIGGEST CUSTOMERS.

17   Q.   NOW, PER THE RECORDED REMARKS IN THIS EXHIBIT, DID

18   MR. SHIN ALSO REFER TO THE RESPONSE OF THE USER INTERFACE?

19   A.   YES.

20   Q.   OKAY.  COULD YOU TURN TO PAGE 4 AT THE TOP WHERE IT

21   BEGINS, "FOR GOODNESS SAKE."  AND IF WE GO RIGHT TO THE LAST

22   SENTENCE, "A UX THAT CAN BE" --

23   A.   I SEE THE LANGUAGE, YES.

24   Q.   WOULD YOU READ THAT FOR THE JURY?

25   A.   SO IT SAYS "A UX," WHICH IS USER EXPERIENCE, "THAT CAN BE

1    USED BY ANYONE FROM SIX YEAR OLDS TO SENIOR CITIZENS.  EASE OF

2    USE IS THE ANSWER."

3    Q.   NOW, IN THIS E-MAIL, OR IN THIS RECORDING OF HIS REMARKS,

4    DOES MR. SHIN COMPARE THE IPHONE USER INTERFACE TO THE USER

5    INTERFACE THEN IN SAMSUNG'S PHONES?

6    A.   YES.

7    Q.   COULD YOU TURN TO PAGE 6 OF THE DOCUMENT?

8    A.   YES.

9    Q.   FIVE LINES DOWN, "ALL THIS TIME," COULD YOU READ THAT,

10   STARTING THERE?

11   A.   ABSOLUTELY.  "ALL THIS TIME WE'VE BEEN PAYING ALL OUR

12   ATTENTION TO NOKIA, AND CONCENTRATED OUR EFFORTS ON THINGS LIKE

13   FOLDER, BAR, SLIDE, YET WHEN OUR UX IS COMPARED TO THE

14   UNEXPECTED COMPETITOR APPLE'S IPHONE, THE DIFFERENCE IS TRULY

15   THAT OF HEAVEN AND EARTH.

16       "IT'S A CRISIS OF DESIGN."

17   Q.   AFTER -- THE MEETING IN WHICH THESE REMARKS ARE RECORDED

18   IS IN FEBRUARY 2010; IS THAT RIGHT?

19   A.   THAT'S RIGHT.

20   Q.   AFTER THAT MEETING, DID YOU IDENTIFY DOCUMENTS IN

21   SAMSUNG'S FILES THAT COMPARED SAMSUNG'S PROTOTYPES THEN UNDER

22   DEVELOPMENT TO THE IPHONE?

23   A.   YES.

24   Q.   WHAT KIND OF DOCUMENTS DID YOU SEE GENERALLY?

25   A.   SO THERE WERE EVALUATION DOCUMENTS WHERE SAMSUNG WAS

1    LOOKING AT A SERIES OF PHONES THAT THEY WERE CONSIDERING

2    RELEASING AND COMPARING THEM FEATURE BY FEATURE TO THE EXISTING

3    IPHONE FEATURES.

4    Q.    AND I THINK THE LADIES AND GENTLEMEN HAVE SEEN IN

5    DR. COCKBURN AND DR. MOWRY'S TESTIMONY EXAMPLES OF THOSE KINDS

6    OF DOCUMENTS.

7         IF YOU LOOK AT EXHIBIT 146 IN EVIDENCE, WHICH CAME IN, I

8    BELIEVE, THROUGH DR. MOWRY YESTERDAY, IS THAT ONE OF THE

9    EXHIBITS THAT YOU SAW IN THIS TIMEFRAME?

10   A.    YES.

11   Q.    AND THIS DOCUMENT IS DATED MARCH 2, 2010; IS THAT RIGHT?

12   A.    RIGHT.  SO A LITTLE LESS THAN A MONTH AFTER THE CRISIS OF

13   DESIGN DOCUMENT WE WERE LOOKING AT.

14   Q.    AND IF WE BRING UP, JUST -- WE'RE NOT GOING TO GO THROUGH

15   THIS, BUT ONE PAGE IN THIS DOCUMENT THAT I THINK WAS PUBLISHED

16   YESTERDAY AS WELL, PAGE 37, IS THIS AN EXAMPLE OF THE TYPE OF

17   SIDE-BY-SIDE COMPARISON THAT THIS DOCUMENT CONSISTS OF?

18   A.    YEAH.

19   Q.    THIS IS ONE THAT RELATES TO QUICK LINKS THAT I BELIEVE

20   PROFESSOR MOWRY WENT THROUGH -- WHERE ARE WE? -- MONDAY.  OKAY.

21        SO HOW DID THESE EVENTS, UP THROUGH THE EARLY PART OF 2010

22   THAT YOU REVIEWED IN YOUR MARKET ANALYSIS, HOW HAVE THEY

23   INFORMED YOUR ANALYSIS?

24   A.    WELL, THIS GOES TO ONE OF THE KEY CONCLUSIONS THAT I

25   MENTIONED AT THE OUTSET, WHICH IS THAT WHAT SAMSUNG RECOGNIZED

1    IS THAT THE IPHONE HAD FUNDAMENTALLY CHANGED THE NATURE OF

2    COMPETITION TOWARDS THE USER INTERFACE AND SOFTWARE, AND THAT

3    SAMSUNG, UNDER ITS EXISTING APPROACH TO ITS PRODUCTS, WAS AT A

4    DISADVANTAGE.  IT DID NOT HAVE A PARTICULARLY ADVANCED USER

5    INTERFACE, AND THAT THE ANSWER TO THAT, TO REMAIN COMPETITIVE,

6    WAS TO MOVE TOWARDS A MORE ADVANCED USER INTERFACE AND TO HELP

7    DEVELOP THAT, THEY TURNED TO THE IPHONE.

8    Q.   IF WE CAN GO BACK TO THE FACE, THE COVER PAGE, THE FIRST

9    PAGE OF EXHIBIT 146, THE REFERENCE THERE TO EVALUATION REPORT

10   ON THE S1.  DID THE S1 ULTIMATELY COME TO BE RELEASED BY

11   SAMSUNG?

12   A.   YES, THAT WOULD BE THE S1, THE FIRST GALAXY PHONE.

13   Q.   WHEN WAS THAT PHONE INTRODUCED?

14   A.   LATER ON IN 2010.

15   Q.   LET ME TURN TO A RELATED TOPIC.  THE MARKET ITSELF.  HOW

16   WAS THE SIZE OF THE SMARTPHONE MARKET CHANGING IN THIS PERIOD

17   OF TIME, THE PERIOD OF TIME FOLLOWING THIS?

18   A.   SO AS WE MOVE OUT OF 2010 INTO 2011, THE SMARTPHONE -- I'M

19   SORRY.  THE IPHONE HAS DONE EXTREMELY WELL, BUT AS WITH MANY

20   TECHNOLOGICAL ADVANCES, THERE'S TIME OR A PERIOD WHERE PEOPLE

21   GET STARTED UP, WHERE PEOPLE ARE WORRIED ABOUT THE PHONE AND

22   ARE IN A BIT OF A WAIT AND SEE MODE.

23        THEN WHAT HAPPENS IS WHEN THE SMARTPHONES REALLY CATCH ON,

24   SUDDENLY A LOT OF PEOPLE WHO PREVIOUSLY HADN'T HAD ONE ARE

25   RUSHING OUT TO GET ONE.  THE DEMAND AND THE NUMBER OF SALES

```
 1    RAPIDLY ACCELERATED, AND IT ACCELERATES LARGELY BECAUSE THERE

 2    ARE PEOPLE THAT ARE COMING IN AND BUYING THEIR FIRST

 3    SMARTPHONE.

 4    Q.   IS THIS WHAT YOU REFERRED TO ON THE CHART YOU HAD UP

 5    EARLIER AS INFLUX OF NEW BUYERS, OR FIRST-TIME BUYERS?

 6    A.   YES, THAT'S THE IDEA IS THAT A LOT OF FIRST-TIME BUYERS

 7    ARE COMING IN RIGHT AROUND THIS PERIOD.

 8    Q.   LET ME ASK YOU TO LOOK AT PLAINTIFF'S EXHIBIT 214.  IS

 9    EXHIBIT 214 AN INTERNAL SAMSUNG DOCUMENT UPON WHICH YOU RELIED

10    IN FORMING YOUR OPINIONS IN THIS CASE?

11    A.   YES.

12         MR. BENNETT:  MOVE EXHIBIT 214, YOUR HONOR.

13         MR. QUINN:  NO OBJECTION.

14         THE COURT:  IT'S ADMITTED.

15    (PLAINTIFF'S EXHIBIT 214 WAS ADMITTED IN EVIDENCE.)

16         THE COURT:  GO AHEAD, PLEASE.

17    BY MR. BENNETT:

18    Q.   AND CAN YOU TELL US GENERALLY, THE FIRST PAGE UP THERE,

19    WHAT EXHIBIT 214 IS?

20    A.   IT'S A SAMSUNG DOCUMENT AND IT'S IDENTIFYING A VISIT THAT

21    GS CHOI IS GOING TO BE MAKING TO SAMSUNG TELECOMMUNICATIONS

22    AMERICA, STA.

23    Q.   DATED SEPTEMBER 2000 -- SEPTEMBER 20TH, 2011?

24    A.   YES.

25    Q.   AND THAT IS WITHIN A MONTH, LITERALLY, OF THE DATE OF
```

1    FIRST INFRINGEMENT IN THIS CASE?

2    A.   RIGHT.  THE FIRST ACCUSED PHONES, THE ADMIRE, IT CAME OUT

3    ABOUT A MONTH BEFORE THIS, AND THEN THERE ARE GOING TO BE

4    SEVERAL IMPORTANT LAUNCHES OF GALAXY S II PRODUCTS RIGHT AFTER

5    THIS BY SAMSUNG THROUGHOUT THE REMAINDER OF 2011.

6    Q.   AND DOES THIS INTERNAL SAMSUNG DOCUMENT ACKNOWLEDGE THIS

7    INFLUX OF NEW BUYERS PHENOMENON THAT YOU REFERRED TO?

8    A.   YES.

9    Q.   RETURN TO PAGE 8.  IF WE CAN LOOK AT PAGE 8, IF YOU JUST

10   POINT, IT'S NOT HARD TO FIND, COULD YOU JUST READ THE TOP OF

11   THE PAGE THERE?

12   A.   SO THE TOP OF THE PAGE IS "CARRIERS WILL COMPETE TO

13   CAPTURE THE 60 MILLION U.S. CONSUMERS WHO WILL BUY THEIR FIRST

14   SMARTPHONE IN 2012."

15   Q.   AND I THINK YOU REFERRED TO THIS EARLIER, BUT BRIEFLY, WHY

16   IS THAT STATEMENT SIGNIFICANT TO YOUR ANALYSIS IN THIS CASE?

17   A.   BECAUSE, OF COURSE, THIS IS THE TIME PERIOD WHERE THE

18   COMPETITION BETWEEN SAMSUNG AND APPLE'S ABOUT TO INTENSIFY

19   BECAUSE THE ACCUSED UNITS NOW ARE BEING LAUNCHED INTO THE

20   MARKETPLACE.

21        AND THE COMPETITION FOR FIRST-TIME BUYERS IS PARTICULARLY

22   IMPORTANT BECAUSE ONCE THEY BUY THEIR FIRST PHONE, THEY'RE VERY

23   LIKELY, IT'S NOT GUARANTEED, BUT THEY'RE VERY LIKELY TO MAKE

24   THEIR NEXT PURCHASE FROM A SIMILAR MANUFACTURER, AND MAYBE

25   POTENTIALLY EVEN BUY OTHER PRODUCTS AND SERVICES FROM THAT

1      MANUFACTURER, TOO.  SO THAT FIRST SALE IS ABSOLUTELY CRUCIAL.

2      Q.   THE CHART THAT YOU HAD UP EARLIER SPOKE OF HEAD-TO-HEAD

3      COMPETITION.  DO YOU RECALL THAT?

4      A.   YES.

5      Q.   DID YOU SEE IN SAMSUNG'S DOCUMENTS EVIDENCE REFLECTING

6      THAT THAT -- THAT THEIR VIEW OF THE MARKETPLACE, SAMSUNG'S VIEW

7      OF THE MARKETPLACE, WAS ONE IN WHICH IT WAS IN HEAD-TO-HEAD

8      COMPETITION WITH APPLE?

9      A.   YES, SHORTLY AFTER THAT, THAT'S WHERE SAMSUNG SEES THE

10     MARKET AS GOING.

11     Q.   AND IF YOU COULD TURN, DR. VELLTURO, TO PLAINTIFF'S

12     EXHIBIT 154, AND THAT IS A CONFIDENTIAL EXHIBIT INCLUDING

13     CONFIDENTIAL PAGES 5, 9, AND 10.

14         IS EXHIBIT 154 A DOCUMENT THAT YOU REVIEWED, AN INTERNAL

15     SAMSUNG DOCUMENT THAT YOU REVIEWED AND RELIED UPON IN FORMING

16     YOUR OPINIONS IN THIS CASE?

17     A.   YES, IT IS.

18              MR. BENNETT:  MOVE EXHIBIT 154, YOUR HONOR.

19              MR. QUINN:  NO OBJECTION.

20              THE COURT:  IT'S ADMITTED.

21         (PLAINTIFF'S EXHIBIT 154 WAS ADMITTED IN EVIDENCE.)

22              THE COURT:  GO AHEAD, PLEASE.

23     BY MR. BENNETT:

24     Q.   TELL US WHAT EXHIBIT 154 IS, DR. VELLTURO.

25     A.   AND I'M SORRY.  IS THIS A CONFIDENTIAL DOCUMENT?

1     Q.   IT IS, BUT THIS -- CAN YOU JUST --

2     A.   GENERALLY.

3     Q.   AT THE HIGHEST LEVEL?

4     A.   OKAY.  SO IT'S A SAMSUNG DOCUMENT THAT'S LOOKING AT WHAT'S

5     HAPPENED VERY RECENTLY.  THAT IS THE FIRST YEAR THAT'S

6     IDENTIFIED THERE, AND IT'S IDENTIFYING WHAT THEIR FORECAST IS

7     FOR THE NEXT YEAR, WHICH IS RIGHT BLOW THAT.

8     Q.   IF WE COULD BLOW UP CONFIDENTIAL PAGE 5, SO JUST FOR THE

9     JURY AND YOUR HONOR, MR. LEE CAN HIGHLIGHT THAT FIRST POINT 1.

10         DO YOU SEE THE BOLDED LANGUAGE THERE, DR. VELLTURO?

11         THIS IS CONFIDENTIAL, SO YOU CAN'T READ IT, BUT IS THAT

12    LANGUAGE THAT'S CONSISTENT WITH THE OPINIONS YOU'VE REACHED IN

13    THE CASE?

14    A.   IT IS.  THIS IS SAMSUNG'S VIEW OF WHAT'S BEEN HAPPENING IN

15    THE MARKET IN THE PREVIOUS YEAR.  YOU SEE THAT -- IF YOU LOOK

16    AT THE TITLE OF IT, IF YOU ZOOM BACK A LITTLE BIT, YOU CAN SEE

17    IT'S TALKING -- THANK YOU -- YOU CAN SEE IT'S TALKING ABOUT

18    WHAT HAS RECENTLY HAPPENED IN THE PRIOR YEAR.

19    Q.   IF WE TURN TO -- BRING UP PAGE 7, WHICH IS NOT SEALED, AND

20    BLOW UP THE TOP PART OF THAT CASE -- THAT PAGE, EXCUSE ME.

21         COULD YOU READ THE LANGUAGE YOU FOUND MOST RELEVANT THERE?

22    A.   WELL, HERE SAMSUNG IS IDENTIFYING THE NUMBER 1 TARGET FOR

23    ITS COMPETITIVE ACTIVITY IN THE NEXT YEAR, AND IT SAYS, "STA

24    HIGH-LEVEL INITIATIVES, BEAT APPLE."

25         AND THEN THE FIRST BULLET POINT UNDER THAT IS "BEATING

1    APPLE IS NUMBER 1 PRIORITY, (EVERYTHING MUST BE CONTEXT OF

2    BEATING APPLE)."

3    Q.   AND IF WE COULD BRING UP -- OR IF I COULD ASK YOU,

4    DR. VELLTURO, TO LOOK AT PLAINTIFF'S EXHIBIT 156 IN YOUR

5    BINDER.  IS THIS AN INTERNAL SAMSUNG DOCUMENT THAT YOU RELIED

6    ON IN FORMING YOUR OPINIONS?

7    A.   YES.

8         MR. BENNETT:  MOVE ITS ADMISSION.

9         MR. QUINN:  NO OBJECTION.

10        THE COURT:  IT'S ADMITTED.

11        (PLAINTIFF'S EXHIBIT 156 WAS ADMITTED IN EVIDENCE.)

12        MR. BENNETT:  BRING UP THE FIRST PAGE, MR. LEE.

13   Q.   GENERALLY WHAT DOES THIS DOCUMENT INVOLVE, DR. VELLTURO?

14   A.   SO THIS IS A SAMSUNG DOCUMENT THAT'S ASSESSING THE

15   COMPETITIVE SITUATION FOR SMARTPHONES IN THE UNITED STATES.

16   IT'S IDENTIFYING A PARADIGM SHIFT, OR A CHANGE IN HOW

17   COMPETITION IS WORKING.

18   Q.   DOES THE DOCUMENT INDICATE TO WHOM THIS REPORT WAS

19   SUBMITTED?

20   A.   RIGHT BLOW THE TITLE IT SAYS HQ CFO, THAT WOULD BE CHIEF

21   FINANCIAL OFFICER, SO SOME OF THE SENIOR PEOPLE AT SAMSUNG

22   TELECOMMUNICATIONS AMERICA.

23   Q.   AND IF LOOK ON THE LOWER RIGHT, WE SEE A BOX THERE, IT

24   SAYS OWNER, DO YOU SEE THAT, JUSTIN DENISON?

25   A.   DO I SEE THAT?

1    Q.   THE JURY HEARD SOME OF HIS DEPOSITION THIS MORNING.  WHO

2    IS MR. DENISON IN THIS TIME PERIOD, OR WHO WAS HE AT ANY TIME?

3    WHAT WAS HIS JOB?

4    A.   HE WAS ONE OF THE CENTRAL DIRECTORS OF MARKETING FOR

5    SMARTPHONES FOR SAMSUNG IN THE UNITED STATES.

6    Q.   IF YOU TURN TO PAGE 8 OF THE EXHIBIT --

7    A.   CAN I -- I JUST WANT TO POINT OUT THE DATE SO WE CAN

8    KEEP -- I'M TRYING TO DO THESE IN ORDER, AND THERE'S A

9    FEBRUARY 16, 2012.  SO WE'RE GOING INTO 2012 NOW.

10   Q.   THANK YOU.  EXCUSE ME.

11        THE COURT:  MR. BENNETT, IT'S 3:35.  I'M SORRY TO

12   INTERRUPT YOUR EXAMINATION, BUT SHOULD WE TAKE OUR BREAK NOW?

13        MR. BENNETT:  THAT'S FINE, YOUR HONOR.

14        THE COURT:  ALL RIGHT.  IT'S 3:35.  LET'S TAKE A TEN

15   MINUTE BREAK TO 3:45, AND THEN WE'LL FINISH UP AT 4:30 TODAY.

16        ALL RIGHT.  THANK YOU.  PLEASE DON'T RESEARCH OR DISCUSS

17   THE CASE.

18        YOU MAY STEP DOWN AFTER THE LAST JUROR LEAVES.

19        (JURY OUT AT 3:36 P.M.)

20        THE COURT:  THANK YOU.  LET'S TAKE OUR BREAK NOW.

21        (RECESS FROM 3:36 P.M. UNTIL END 3:46 P.M.)

22        (JURY IN AT 3:46 P.M.)

23        THE COURT:  DO ANY OF YOU NEED MORE PAPER TODAY, THIS

24   AFTERNOON?

25        JUROR:  NO, WE'RE GOOD.

```
 1              THE COURT:  OKAY.  MS. PARKER BROWN PUT A BUNCH OF

 2      PAPER IN THERE.  SO IF YOU NEEDED IT, WE COULD GIVE IT TO YOU

 3      NOW THIS AFTERNOON.  BUT IF NOT, OKAY.

 4          OKAY.  LET'S GO FORWARD, PLEASE.  EVERYONE TAKE A SEAT.

 5      WELCOME BACK.

 6              THE TIME IS NOW 3:46.  GO AHEAD, PLEASE.

 7              MR. BENNETT:  THANK YOU, YOUR HONOR.

 8      Q.   WE WERE LOOKING AT EXHIBIT 156.

 9              DR. VELLTURO, COULD YOU TURN TO PAGE 8 OF THE EXHIBIT, AND

10      JUST IF YOU COULD HIGHLIGHT THE LANGUAGE UP TOP THERE.

11              WOULD YOU READ THAT FOR THE JURY AND EXPLAIN ITS

12      SIGNIFICANCE TO YOU.

13      A.   "CONSOLIDATION AROUND 2 OS PLATFORMS.  U.S. MARKET

14       BECOMING TWO HORSE RACE BETWEEN APPLE AND SAMSUNG."

15              AND THE SIGNIFICANCE IS WHAT WE'VE BEEN TALKING ABOUT,

16      DEVELOPING AS OF LATE 2011, AND THAT IS THAT SAMSUNG AND APPLE

17      ARE BECOMING THE PRIMARY COMPETITORS TO ONE ANOTHER AND THAT

18      THE OTHER SMARTPHONE PROVIDERS ARE BECOME SECONDARY

19      COMPETITORS.

20      Q.   YOU KNOW THAT SAMSUNG HAS A DAMAGE EXPERT OF THEIR OWN

21      THAT'S GOING TO RESPOND TO YOU?

22      A.   YES.

23      Q.    IS IT SAMSUNG'S POSITION IN THIS CASE THAT THEY'RE -- EVEN

24      ASSUMING INFRINGEMENT -- ASSUMING THAT THE PATENTS IN THIS CASE

25      ARE VALID AND INFRINGED, HOW MANY SALES DOES SAMSUNG
```

```
 1    ACKNOWLEDGE IT CAUSED APPLE BY SELLING 37-PLUS MILLION

 2    INFRINGING PHONES?

 3    A.   ESSENTIALLY NONE, THAT NONE OF THEM CAME AT APPLE'S

 4    EXPENSE.

 5    Q.   OKAY.  DR. VELLTURO, WE'VE TALKED ABOUT -- YOU'VE

 6    MENTIONED, I THINK, LOOKING AT SOME OF THESE DOCUMENTS, MARKET

 7    SHARE AT CERTAIN POINTS.

 8         WHAT IS MARKET SHARE?

 9    A.   SO MARKET SHARE, WE LOOK AT TYPICALLY ONE COMPANY'S SHARE

10    OF THE TOTAL SALES OF A PRODUCT IN THE MARKET.

11    Q.   OKAY.  AND HAVE YOU ANALYZED THE SMARTPHONE MARKET SHARE

12    DURING THE TIME PERIOD THAT WE'VE BEEN LOOKING AT?

13    A.   YES.

14    Q.   OKAY.  HOW DID YOU GO ABOUT DOING THAT?

15    A.   I COLLECTED INFORMATION FROM A THIRD PARTY OUTSIDE DATA

16    SOURCE CALLED IDC.

17    Q.   AND IF WE BRING UP PLAINTIFF'S EXHIBIT 92.8,

18    DEMONSTRATIVE, WOULD YOU JUST WALK THE LADIES AND GENTLEMEN OF

19    THE JURY THROUGH THIS CHART, AND TELL US WHAT IT IS AND WHAT IT

20    REFLECTS, HOW IT REFLECTS WORK YOU'VE DONE?

21    A.   SO THE TITLE OF THE CHART IS "SAMSUNG U.S. SMARTPHONE

22    MARKET SHARE," AND SO WHAT THIS CHART IS DOING IS IT'S SHOWING

23    ACROSS THE BOTTOM A TIMELINE FROM THE BEGINNING OF 2007 THROUGH

24    THE END OF 2013.

25         AND THEN ALONG THE SIDE THERE, YOU CAN SEE THE SHARE
```

1        NUMBERS THAT RUN FROM 0 PERCENT TO 35 PERCENT, AND WHAT THIS

2        IS, IS IT'S IDENTIFYING FOR EACH TIME PERIOD WHAT PERCENTAGE OF

3        ALL SMARTPHONE SALES IN THE UNITED STATES SAMSUNG MADE.  SO

4        THAT'S THEIR SHARE.

5        Q.   OKAY.  AND, AGAIN, HOW DID YOU CONSTRUCT THIS CHART?

6        A.   SO THIS THIRD PARTY DATA COMPANY, IDC, THEY -- THIS IS

7        WHAT THEY DO FOR A LIVING.  THEY COLLECT DATA ON VARIOUS

8        ELECTRONIC DEVICES AND MARKET STATISTICS AND ALLOW PEOPLE LIKE

9        ME TO COMPUTE THESE KINDS OF TABLES.

10       Q.   NOW, IF WE CAN BRING UP -- HAVE YOU USED THIS CHART,

11       EXHIBIT 92.8, TO SUMMARIZE YOUR CONCLUSIONS AND SOME OF THE

12       THINGS WE'VE SEEN IN THE DOCUMENTS WE'VE BEEN THROUGH OVER THE

13       LAST 20 MINUTES?

14       A.   YES.

15       Q.   COULD YOU WALK THE JURY THROUGH THIS CHART AS YOU'VE BUILT

16       IT?

17       A.   SO -- THE CHRONOLOGY MOVES FROM LEFT TO RIGHT AND IT

18       STARTS RIGHT AT THE BEGINNING OF 2007 WITH THE ANNOUNCEMENT OF

19       THE IPHONE, AND WHAT YOU CAN SEE AT THAT POINT IS THAT

20       SAMSUNG'S SHARE OF SMARTPHONE SALES IS ABOUT 10 PERCENT.

21            OVER THE NEXT THREE YEARS, 2007, 2008, 2009, THE IPHONE

22       HAS SEVERAL SUCCESSFUL PRODUCT INTRODUCTIONS, THE 3G, THE 3GS,

23       AND SAMSUNG SHARE IS FALLING.  IT HAS FOUND ITS WAY BY THE END

24       OF 2009 TO ABOUT A 5 PERCENT SHARE.

25            AT THAT POINT, RIGHT AT THE BEGINNING OF 2010 ARE THE

1    DOCUMENTS THAT, THAT WE LOOKED AT EARLIER WHERE SAMSUNG WAS

2    RECOGNIZING THAT THERE'S A CRISIS AT THE FIRM, THAT THEY HAVE A

3    USER EXPERIENCE DISADVANTAGE THAT NEEDS TO BE RECTIFIED, AND

4    THEN AT THAT POINT THEY BEGIN THEIR EVALUATIONS OF THEIR

5    PROTOTYPE PHONES WITH THE IPHONE.

6         AT THAT POINT THEY BEGIN TO INTRODUCE THEIR GALAXY LINES

7    OF PHONES AND THEIR SHARE INCREASES.

8         AND CRITICALLY THEIR SHARE REALLY INCREASES SUBSTANTIALLY

9    AS WE GET INTO THE PERIOD OF 2011, '12, AND '13 WHICH IS,

10   AGAIN, THE PERIOD WHERE A LOT OF FIRST-TIME SMARTPHONE BUYERS

11   ARE COMING INTO THE MARKETS.  THESE ARE REALLY KEY CUSTOMERS

12   AND THE COMPETITION IS INTENSIFYING RIGHT AT THAT TIME.

13        AND THIS IS ALSO THE TIME WHERE SAMSUNG RECOGNIZES THAT

14   THE INDUSTRY HAS BASICALLY BECOME A TWO HORSE RACE BETWEEN

15   ITSELF AND APPLE AND THAT'S WHERE THE COMPETITION REALLY

16   RESIDES.

17        SO IN ESSENCE WHAT WE WENT THROUGH IN TERMS OF WHAT THE

18   DOCUMENTS SAID, THIS LINE IS SHOWING YOU EXACTLY THE SAME THING

19   BUT WITH THE NUMBERS.  SO WE'VE GOT THE DOCUMENTS AND THE

20   NUMBERS IN TERMS OF WHAT'S HAPPENING.

21   Q.   NOW, HAVE YOU ALSO IDENTIFIED ON THIS CHART -- IF YOU CAN

22   BRING IT UP, MR. LEE -- THE DATE OF -- WHAT'S REPRESENTED BY

23   WHAT MR. LEE JUST BROUGHT UP?

24   A.   SO THAT'S AUGUST -- THAT LINE IS PUT RIGHT ON THE CHART AT

25   AUGUST 2011, WHICH IS THE INTRODUCTION OF THE FIRST ACCUSED

1    PHONE IN THIS CASE, THE ADMIRE, AND ALSO FOR THAT REASON IT

2    WOULD BE THE TIME OF THIS HYPOTHETICAL NEGOTIATION WE'RE GOING

3    TO GET TO LATER ON.

4    Q.   AND JUST TO PREVIEW A LITTLE BIT, THAT'S A -- A

5    HYPOTHETICAL NEGOTIATION, YOU'RE GOING TO RENDER SOME OPINIONS

6    ABOUT THAT, BUT THE EFFECT OF THAT HYPOTHETICAL NEGOTIATION

7    WOULD BE APPLE WOULD BE SURRENDERING TO SAMSUNG ITS RIGHTS TO

8    PRACTICE FIVE VALID PATENTS THAT IT NEEDS?

9    A.   WELL, IT COULDN'T QUITE BE SURRENDERED.  IT WOULD BE

10   GIVING THEM, OR GIVING THEM THE RIGHTS TO USE THOSE PATENTS.

11   SO SAMSUNG WOULD NOW HAVE, UNDER THIS HYPOTHETICAL NEGOTIATION,

12   THE RIGHTS TO USE THE PATENTS, WHERE IN THE REAL WORLD NO SUCH

13   RIGHTS WERE GRANTED.

14   Q.   SO LET'S MOVE TO THE NEXT SUBJECT THAT YOU HAD IN YOUR

15   SERIES OF ANALYTIC STEPS.

16        IF WE GO TO PDX 92.9, ROLE OF THE PATENTED TECHNOLOGY.

17        WHAT DO YOU MEAN BY THAT PHRASE, "ROLE OF THE PATENTED

18   TECHNOLOGY"?

19   A.   SO THE DAMAGES HERE ARE ADEQUATE TO COMPENSATE FOR THE

20   INFRINGEMENT.  AND SO QUITE NATURAL LY, WHAT I WANT TO

21   UNDERSTAND IS THE ROLE THAT THESE INVENTIONS HAD IN HOW SAMSUNG

22   TURNS ITS BUSINESS AROUND AND WHAT EFFECT THAT HAD ON APPLE.

23   Q.   OKAY.  AND HOW WAS THE ROLE OF THE PATENTED TECHNOLOGY

24   RELEVANT TO YOUR LOST PROFITS ANALYSIS?

25   A.   WELL, LOST PROFITS HERE WOULD BE SALES APPLE LOST BECAUSE

1    OF SAMSUNG'S INFRINGEMENT.

2    Q.   AND HOW IS IT RELEVANT TO YOUR REASONABLE ROYALTY

3    ANALYSIS?

4    A.   BECAUSE AT THAT HYPOTHETICAL NEGOTIATION, THE PATENTS ARE

5    WHAT SAMSUNG WOULD BE GETTING RIGHTS TO AND THAT APPLE WOULD BE

6    GIVING IT RIGHTS TO AS PART OF THE NEGOTIATION AND THAT -- YOU

7    KNOW, THE NATURE OF THOSE PATENTED INVENTIONS MATTERS IN TERMS

8    OF THE VALUE OF THE RIGHTS.

9    Q.   AND WHAT DID YOU DO TO INFORM YOURSELF IN THIS AREA, ROLE

10   OF THE PATENTED TECHNOLOGIES?

11   A.   OH, A NUMBER OF THINGS.  I SPOKE WITH AND WORKED WITH THE

12   TECHNICAL EXPERTS WHO PRECEDED ME HERE; I STUDIED THE KINDS

13   OF -- I STUDIED DOCUMENTS AND ACTIVITIES AND ACTIONS THAT

14   SAMSUNG TOOK WITH RESPECT TO THESE PATENTS; AND THEN I ALSO

15   STUDIED THE NATURE OF THE AMOUNT OF INFRINGEMENT AND WHEN IT

16   HAPPENED BECAUSE THAT IS -- AS AN ECONOMIST, THAT TELLS ME

17   IMPORTANT THINGS.

18   Q.   LET'S START WITH THE PRODUCTS.  IF WE CAN LOOK AT

19   PLAINTIFF'S DEMONSTRATIVE 92.10, AND CAN YOU TELL US WHAT'S

20   SHOWN HERE?

21   A.   SO THESE ARE THE TEN ACCUSED PRODUCTS IN THE CASE, AND IT

22   IDENTIFIES THEIR DATES OF INTRODUCTION.  THERE ARE NINE

23   SMARTPHONES AND THE GALAXY TAB.

24        AND WHAT YOU CAN SEE IS THAT ONE, TWO, THREE, FOUR,

25   FIVE -- SIX OF THOSE PRODUCTS ARE INTRODUCED BETWEEN AUGUST AND

1    NOVEMBER 2011; AND THEN THE NOTE, THE S III, AND THE NOTE 2

2    COME ALONG IN 2012, ALONG WITH THE TAB IN THE MIDDLE OF 2012.

3    Q.   AND IF WE COULD BRING UP PDX 92.12, I THINK THIS CHART WAS

4    SHOWN IN OPENING STATEMENT.

5         CAN YOU ELABORATE, DR. VELLTURO, WHAT'S SHOWN HERE.

6    A.   SO THIS IS A TABLE THAT LISTS THE TEN PRODUCTS DOWN IN

7    ROWS THAT ARE ACCUSED, AND THEN GOING ACROSS IN EACH COLUMN

8    THERE'S AN IMAGE OF EACH OF THE FIVE PATENTS IN THIS CASE AND

9    WHAT AN X SIGNIFIES IS THAT THAT PRODUCT IS ACCUSED OF

10   INFRINGING THAT PATENT.

11   Q.   AND WE ALREADY TALKED ABOUT THE ENTITIES IN THIS CASE THAT

12   SOLD THE INFRINGING PHONES AND TABLETS.

13        I NEGLECTED TO ASK YOU A QUESTION ABOUT SEA, SAMSUNG

14   ELECTRONICS AMERICA, SEA.  WE ESTABLISHED EARLIER THAT THEY

15   SOLD THE ACCUSED INFRINGING TABLET.

16        DID THEY ACQUIRE THOSE ACCUSED INFRINGING TABLETS FROM

17   SAMSUNG ELECTRONICS CORPORATION?

18   A.   FROM SEC, THAT IS CORRECT.

19   Q.   NOW, YOU'RE NOT A TECHNOLOGY EXPERT; IS THAT CORRECT?

20   A.   CORRECT.

21   Q.   YOU'RE NOT OFFERING OPINIONS REGARDING INFRINGEMENT; IS

22   THAT CORRECT?

23   A.   ALSO CORRECT.

24   Q.   AS YOU'VE STATED, YOU DO ASSUME, AS IS TYPICAL FOR A

25   PERSON IN YOUR POSITION ACTING AS A DAMAGES EXPERT, YOU ASSUME

1    THE INFRINGEMENT AND VALIDITY OF THE PATENTS; IS THAT CORRECT?

2    A.   YES.

3    Q.   OKAY.  AND IF WE COULD BRING UP 92.21, COULD YOU JUST --

4    WERE YOU INTERESTED IN TRYING -- ATTEMPTS TO DETERMINE FROM AN

5    ECONOMIC PERSPECTIVE THE VALUE OF THE PATENTS?

6    A.   YES.

7    Q.   AND THE TECHNOLOGIES THAT THEY REFLECT?

8    A.   YES.

9    Q.   OKAY.  COULD YOU JUST EXPLAIN TO THE LADIES AND GENTLEMEN

10   OF THE JURY WHAT INDICATIONS OF VALUE YOU FOUND IN YOUR

11   ANALYSIS.

12   A.   WELL, I IDENTIFIED SIDE-BY-SIDE COMPARISONS THAT SAMSUNG

13   WAS DOING; I ALSO LOOKED AT THE EXTENT AND NATURE OF WHICH

14   SAMSUNG MADE ITS DECISION TO USE THE PATENTED FEATURE OVER

15   OTHER OPTIONS IN ONE INSTANCE.  THERE IS AN EPISODE OF REMOVAL

16   OF AN ACCUSED FEATURE AND ITS RESTORATION.  SO I STUDIED THAT

17   AND ITS ECONOMIC SIGNIFICANCE.

18       AND THEN IMPORTANTLY, I LOOKED AT THE EXTENT TO WHICH

19   SAMSUNG HAS CONTINUED TO USE THESE FEATURES, EVEN AS WE'VE BEEN

20   GOING THROUGH THIS PROCESS.

21   Q.   OKAY.  LET'S JUST GO, TRY TO DO THIS BY PATENT WALKING

22   THROUGH.  IF WE CAN BRING UP PDX 92.13.

23       YOU'VE BEEN HERE -- HAVE YOU BEEN HERE, DR. VELLTURO, FOR

24   THE ENTIRETY OF THE TRIAL?

25   A.   YES.

1    Q.   SO YOU WERE HERE FOR DR. COCKBURN'S TESTIMONY?

2    A.   I WAS.

3    Q.   OKAY.  AND YOU HEARD THE EVIDENCE HE PRESENTED ABOUT THE

4    SLIDE TO UNLOCK AND THE SIDE-BY-SIDE COMPARISONS THAT WERE DONE

5    THERE?

6    A.   YES.

7    Q.   YOU HEARD HIS OPINION THAT SAMSUNG COPIED?

8    A.   I DID.

9    Q.   NOW, AS TO THE '721 PATENT, DID SAMSUNG ACTUALLY AT ONE

10   POINT INTRODUCE A NON-INFRINGING VERSION, OR A DESIGN AROUND OF

11   THE PATENT?

12   A.   YES.

13   Q.   AND WHEN DID IT DO THAT?

14   A.   IN JUNE 2012.

15   Q.   AND HOW LONG WAS THAT AFTER APPLE FILED SUIT?

16   A.   APPLE FILED SUIT ON FEBRUARY 8TH, 2012.  SO FOUR MONTHS.

17   Q.   LET'S TURN NOW TO THE '172 PATENT.  AGAIN, DR. COCKBURN

18   ADDRESSED THIS PATENT LAST FRIDAY AND YOU WERE HERE FOR THAT;

19   CORRECT?

20   A.   YES.

21   Q.   AND IF WE CAN BRING UP PDX 92.15 BRIEFLY, WHICH IS ONE OF

22   THE DOCUMENTS DR. COCKBURN PUBLISHED.

23        AND THIS DOCUMENT, AS HE PUBLISHED IT TO THE JURY,

24   REFLECTED COMMENTS THAT CARRIERS WERE MAKING TO SAMSUNG ABOUT

25   THEIR -- THE FORM OF AUTO CORRECT THAT THEY'VE SUGGESTED AS AN

1    ALTERNATIVE IN THIS CASE.

2         WHAT SIGNIFICANCE DID CARRIER CRITICISMS OF PROPOSED

3    NON-INFRINGING ALTERNATIVES HAVE UPON YOUR OPINION?

4    A.   WELL, THEY'RE THE BIGGEST CUSTOMERS.  THEY'RE THE ONES

5    THAT ARE ACQUIRING THE MAJORITY OF THE PHONES AND THEN TURNING

6    AROUND AND USING THEM IN THEIR PACKAGES TO TRY AND COMPETE

7    AGAINST ONE ANOTHER OR OTHER BUSINESS, BASICALLY.

8         SO WHEN THEY'RE IDENTIFYING THAT THERE ARE SHORTCOMINGS IN

9    THE PRODUCT, THAT'S A BIG DEAL.

10   Q.   DID SAMSUNG INTRODUCE AT SOME POINT A PRODUCT THAT HAD AN

11   ALTERNATIVE TO THE '172 PATENT?

12   A.   YES.

13   Q.   AND WHEN DID IT DO THAT?

14   A.   THAT WOULD HAVE BEEN, AGAIN, IN JUNE OF 2012.

15   Q.   AFTER THE LAWSUIT WAS FILED?

16   A.   FOUR MONTHS AFTER, YES.

17   Q.   NOW, LET'S TURN TO THE '647 PATENT THAT'S BEEN REFERRED TO

18   AS QUICK LINKS.

19        IF WE CAN BRING UP 92.16.

20        AND YOU WERE HERE FOR DR. MOWRY'S TESTIMONY?  WAS IT

21   YESTERDAY?  WHENEVER IT WAS.

22   A.   YES.

23   Q.   YESTERDAY DR. MOWRY, AMONG OTHER THINGS, PRESENTED THIS

24   EXHIBIT WHICH IS ON THE SCREEN THAT SHOWED A SIDE-BY-SIDE

25   COMPARISON RELATING TO THE QUICK LINKS FUNCTIONALITY?

1      A.   I REMEMBER THIS, YES.

2      Q.   OKAY.  LET ME ASK YOU THIS:  ARE YOU AWARE THAT SAMSUNG IN

3      THIS CASE, THROUGH ITS ATTORNEYS, CLAIMS THAT IT HAS, OR HAS

4      ALTERNATIVES THAT IT COULD IMPLEMENT OR COULD HAVE IMPLEMENTED

5      TO THE '647 PATENT?

6      A.   YES.

7      Q.   WHAT, IF ANYTHING, HAVE YOU LEARNED ABOUT WHETHER SAMSUNG

8      ACTUALLY HAS, TO THIS DATE, IMPLEMENTED ANY ALTERNATIVE TO THE

9      '647 PATENT?

10     A.   SAMSUNG HAS NOT.

11     Q.   OKAY.  WHAT DID YOU LEARN IN THIS CASE ABOUT WHEN APPLE

12     MADE SAMSUNG AWARE OF THE '647 PATENT?

13     A.   I LEARNED THAT THAT WAS IN THE SUMMER OF 2010.

14     Q.   I THINK ACTUALLY THE LADIES AND GENTLEMEN SAW AN

15     INTERROGATORY ANSWER, OR A STIPULATION AND SOME DEPOSITION

16     TESTIMONY RELATING TO THAT THIS MORNING.

17          WHAT IS YOUR UNDERSTANDING OF WHEN THE LAST PRODUCT THAT

18     INCLUDES THE TECHNOLOGY EMBODIED IN THE '647 PATENT WAS SOLD IN

19     THE UNITED STATES BY SAMSUNG?

20     A.   THOSE PRODUCTS ARE STILL BEING SOLD TODAY.

21     Q.   OKAY.  AND HOW MANY OF THE, QUOTE, MORE THAN 37 MILLION

22     ACCUSED UNITS YOU'VE IDENTIFIED IN THIS CASE OR BASED YOUR

23     DAMAGE CALCULATIONS ON HAVE INCLUDED THAT TECHNOLOGY?

24     A.   ALL OF THEM.

25     Q.   WHY IS -- WHAT, TO YOU, IS THE SIGNIFICANCE OF SAMSUNG'S

1    CONTINUED USE OF THE TECHNOLOGY OF THE '647 PATENT THROUGH

2    TODAY?

3    A.   WELL, I RECOGNIZE THAT SAMSUNG HAS IDENTIFIED THAT THERE

4    ARE ALTERNATIVES THAT THEY FEEL WOULD BE ADEQUATE OR ACCEPTABLE

5    OR AS GOOD AS THE PATENTED TECHNOLOGY.

6         BUT WHAT I'VE OBSERVED IN THE ACTUAL MARKET IS THAT THAT

7    IS NOT HAPPENING, THAT THEY HAVE NOT INSTITUTED ANY OF THESE

8    ALTERNATIVES AND THAT THEY CONTINUE TO USE THE ACCUSED PRODUCT,

9    OR THE ACCUSED CAPABILITY.

10   Q.   AND IS THERE ANY ECONOMIC DOCTRINE THAT IS USED TO

11   DESCRIBE THIS KIND OF PHENOMENON OR THIS KIND OF CONDUCT?

12   A.   YES.  THIS IS -- THIS IS ACTUALLY A VERY IMPORTANT

13   ECONOMIC TOOL.

14   Q.   AND WHAT IS THAT?  WHAT'S THE DOCTRINE?

15   A.   IT'S CALLED THE LAW OF REVEALED PREFERENCE.

16   Q.   AND WHAT --

17   A.   GO AHEAD.  IT WAS ACTUALLY DEVELOPED IN THE 1930S BY THE

18   FOUNDER OF THE M.I.T. ECONOMICS DEPARTMENT, PAUL SAMUELSON, WHO

19   WON THE VERY FIRST NOBEL PRIZE AWARDED IN ECONOMICS FOR THIS

20   CONCEPT IN 1970.

21   Q.   AND WHAT IS THE DOCTRINE OF REVEALED PREFERENCE?

22   A.   WELL, LIKE SO MANY IMPORTANT DISCOVERIES, IT SOUNDS VERY

23   SIMPLE, BUT ACTUALLY PROVING ITS PRINCIPLES WAS A LITTLE MORE

24   CHALLENGING.  IT'S THAT WHEN YOU LOOK AT THE ECONOMIC DECISIONS

25   THAT PEOPLE MAKE AND THAT COMPANIES MAKE, WHAT THEY ACTUALLY DO

1    TELLS YOU SOMETHING IMPORTANT, AND WHAT IT TELLS YOU IS THAT

2    THEY BELIEVE THAT WHAT THEY ACTUALLY CHOOSE TO DO IS BETTER

3    THAN THE ALTERNATIVES THEY COULD HAVE SELECTED, OKAY?

4         SO IN SOME DEGREE IT IS ACTIONS SPEAK LOUDER THAN WORDS.

5         BUT REALLY FROM AN ECONOMIC STANDPOINT, WHEN I OBSERVE

6    SOMEONE DOING SOMETHING, AND DOING SOMETHING REPEATEDLY, EVEN

7    THOUGH THERE ARE CLAIMS THAT THERE ARE ALTERNATIVE WAYS TO DO

8    IT, IT TELLS ME THAT THEY FEEL AND BELIEVE THAT THEY ARE BETTER

9    OFF BY DOING WHAT THEY CONTINUE TO DO THAN THEY WOULD BE DOING

10   ANY OF THE ALTERNATIVES, AND THAT APPLIES QUITE A BIT IN THIS

11   CASE.

12   Q.   DOCTOR, HAVE YOU PREPARED A, WHAT IS A CONFIDENTIAL CHART

13   TO ILLUSTRATE THE OPERATION OF THIS CONCEPT AS YOU SEE IT IN

14   THIS CASE?

15   A.   YES.

16   Q.   OKAY.  IF WE COULD BRING UP, CONFIDENTIAL FOR THE JURY AND

17   HER HONOR, PDX 92.18.

18        COULD YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE JURY

19   WHAT YOU'VE ATTEMPTED TO SHOW IN THIS CHART?

20   A.   SO THIS IS A, A CHART THAT DEPICTS THE ACCUSED INFRINGING

21   SALES OF SAMSUNG.  AND WHAT IT DOES IS IT STARTS AT 0 IN 2011

22   WHEN INFRINGEMENT BEGINS, AND WHAT IT SHOWS YOU IS IT SHOWS YOU

23   FOR ANY GIVEN DATE THE NUMBER OF INFRINGING UNITS THAT HAVE

24   BEEN SOLD UP TO THAT DATE.

25        SO, FOR EXAMPLE, IF YOU GO ALL THE WAY TO THE END, IN

1    APRIL 2014, AND YOU LOOK AT THE TOP OF THE LINE AND YOU LOOK AT

2    WHERE THAT IS GOING ACROSS THE CHART, YOU CAN SEE IT'S RIGHT AT

3    THE TOTAL NUMBER OF INFRINGING UNITS THAT I PRESENTED RIGHT AT

4    THE BEGINNING.

5         SO THIS KIND OF GIVES YOU A TIMELINE OF WHEN INFRINGEMENT

6    TOOK PLACE AND HOW IT -- REALLY HOW SUBSTANTIAL IT GOT.

7    Q.   YOU PLOT HERE THE FILING OF THIS LAWSUIT IN FEBRUARY 2012,

8    AND THEN YOU PLOT TWO DATES RELATING TO RELEASE OF OTHER

9    SAMSUNG PHONES.  WHAT'S THE SIGNIFICANCE OF JUNE 2012 AND

10   OCTOBER 2012 DATES YOU'VE SHOWN HERE?

11   A.   SO THOSE ARE TWO VERY LARGE PRODUCT RELEASES THAT SAMSUNG

12   UNDERTOOK DURING THE PERIOD OF DAMAGES HERE, THE GALAXY S III

13   IN JUNE 2012, AND THE GALAXY NOTE 2 IN OCTOBER OF 2012.

14        AND WHAT'S OF SIGNIFICANCE HERE SPECIFICALLY TO THE '647

15   PATENT IS TWO THINGS:  ONE IS THOSE ARE VERY CLEAR

16   OPPORTUNITIES WHERE A NEW PHONE WAS BEING INTRODUCED TO MOVE TO

17   A NON-INFRINGING APPROACH TO THE '647 PATENT.

18        AND IF -- AND IF SAMSUNG SOUGHT TO ELIMINATE ITS POTENTIAL

19   EXPOSURE IN A CASE LIKE THIS AND IT HAD AN ALTERNATIVE THAT WAS

20   JUST AS GOOD AS THE PATENTED METHOD, IT WOULD HAVE MADE

21   ECONOMIC SENSE TO REVEAL A PREFERENCE FOR THEM TO HAVE DONE

22   THAT THERE.  BUT THEY DIDN'T.  THEY CONTINUED TO USE THIS

23   TECHNOLOGY, WHICH TELLS YOU BY REVEALED PREFERENCE, THAT THIS

24   TECHNOLOGY WAS BETTER FOR THEM THAN THE ALTERNATIVES THAT HAVE

25   BEEN IDENTIFIED.

1    AND A SECOND ITEM THAT TELLS ME THAT HERE AS WELL IS THAT

2    IN JUNE 2012, SAMSUNG ACTUALLY DID INTRODUCE ALTERNATIVES TO

3    THE '172 AND THE '721.  SO TO THE EXTENT THERE WERE

4    ALTERNATIVES THEY FELT THEY COULD LIVE WITH IN THEIR PRODUCT

5    INTRODUCTION, WE DO SEE THAT THEY DID DO THAT WITH RESPECT TO

6    THESE TWO PATENTS.

7    BUT WITH RESPECT TO THE '647, THEY HAVE NOT DONE THAT AND

8    I FIND THAT IMPORTANT.

9    Q.  DOES -- AS AN ECONOMIST, WHAT DO YOU BELIEVE THIS CHART

10   SAYS ABOUT THE VALUE OF OR DEMAND FOR THE TECHNOLOGIES COVERED

11   BY THE '647 PATENT?

12   A.  IT INDICATES TO ME THAT SAMSUNG IDENTIFIED THEM AS

13   IMPORTANT, AS AN IMPORTANT FEATURE THAT THEY NEEDED TO CONTINUE

14   TO USE TO REMAIN IN BUSINESS.

15   Q.  LET'S TURN TO THE '414 PATENT.  DID YOU IDENTIFY ANY

16   MATERIALS THAT INDICATED THAT THE ABILITY TO SYNC DATA IN THE

17   BACKGROUND WAS SIMILARLY VALUABLE?

18   A.  YES.

19   Q.  WHAT GENERALLY DID YOU SEE?

20   A.  WELL, I SEE CONDUCT AND OUTCOMES VERY SIMILAR TO WHAT WE

21   SEE FOR THE '647 PATENT.

22   Q.  OKAY.  DID YOU FIND -- DID YOU SEE DOCUMENTS AMONG THE

23   MATERIALS PRODUCED IN THIS CASE REGARDING THE BENEFITS

24   ASSOCIATED WITH THE '647 -- EXCUSE ME -- WITH THE '414 PATENT

25   AND THE DETRIMENTS ASSOCIATED WITH THE ABSENCE OF BACKGROUND

1      SYNCING?

2      A.   YES.

3      Q.   OKAY.  LET ME ASK YOU TO LOOK AT PLAINTIFF'S EXHIBIT 196.

4      IS EXHIBIT 196, DR. VELLTURO, A DOCUMENT THAT YOU REVIEWED AND

5      RELIED ON IN FORMING YOUR OPINIONS IN THIS CASE?

6      A.   YES.

7              MR. BENNETT:  MOVE EXHIBIT 196, YOUR HONOR.

8              MR. QUINN:  IT'S HEARSAY, YOUR HONOR.  IT'S NOT A

9      SAMSUNG DOCUMENT OR AN APPLE DOCUMENT.

10             THE COURT:  WHAT'S YOUR RESPONSE, MR. BENNETT?

11             MR. BENNETT:  IT'S NOT OFFERED FOR THE TRUTH, YOUR

12     HONOR.  IT'S OFFERED FOR THE VALUATIONS MADE IN THIS CASE AND

13     REFLECTED IN THE MEMO.

14             MR. QUINN:  BUT --

15             THE COURT:  THE VALUATIONS MADE IN WHAT MEMO?

16             MR. BENNETT:  IN THE E-MAIL.  IT'S --

17             THE COURT:  HOW IS THAT NOT -- YOU ARE OFFERING IT

18     FOR ITS TRUTH?

19             MR. BENNETT:  BECAUSE IT'S THE VALUATION ITSELF

20     THAT'S NOT THE TRUTH.  IT'S THE STATE OF MIND OF THE, IN THIS

21     CASE, GOOGLE PEOPLE WHO ARE LOOKING AT THIS FEATURE.

22             MR. QUINN:  IT DOESN'T EVEN SAY WHO IT IS.

23             THE COURT:  WELL, IT DOES SAY THE NAME ON THE FRONT

24     HELENA ROEBER AT GOOGLE.

25             MR. QUINN:  WELL, THERE'S A QUOTATION, YOUR HONOR.

1        IT'S NOT CLEAR WHO IS BEING QUOTED.

2               THE COURT:  STATE, MR. BENNETT, AGAIN, YOU'RE SAYING

3        IT'S NOT FOR ITS TRUTH, IT'S FOR WHAT?

4               MR. BENNETT:  IT'S NOT FOR ITS TRUTH.  IT'S AN

5        EVALUATION OF THE TECHNOLOGY MADE BY PEOPLE AT GOOGLE.

6               MR. QUINN:  THERE'S NO NON-TRUTH RELEVANCE TO THAT,

7        YOUR HONOR.

8               THE COURT:  WAS THERE ANYTHING ELSE, MR. BENNETT?

9               MR. BENNETT:  YOUR HONOR, THERE IS A STIPULATION IN

10       THE CASE THAT THE ONLY RESERVED OBJECTIONS ON DOCUMENTS LIKE

11       THIS ARE NOT ON GROUNDS OF HEARSAY AS TO THE DOCUMENT ITSELF

12       BUT ONLY FOR HEARSAY WITHIN A DOCUMENT.

13           IN ANY EVENT, YOUR HONOR, THIS IS NOT OFFERED FOR THE

14       TRUTH.

15              THE COURT:  I'M GOING TO OVERRULE THE OBJECTION, BUT

16       YOU ARE NOT TO CONSIDER THIS FOR THE TRUTH OF WHAT'S ASSERTED

17       IN THE DOCUMENT.

18              MR. BENNETT:  THANK YOU, YOUR HONOR.

19           (PLAINTIFF'S EXHIBIT 196 WAS RECEIVED IN EVIDENCE.)

20       BY MR. BENNETT:

21       Q.   DR. VELLTURO, COULD YOU JUST DESCRIBE WHAT THIS DOCUMENT

22       IS?

23       A.   SO THIS IS A GOOGLE DOCUMENT THAT'S DISCUSSING ANDROID

24       LATENCY SURVEY FINDINGS FROM SEPTEMBER 2009.

25       Q.   AND WHAT DOES LATENCY REFER TO?

1    A.   IT REFERS TO WHEN A DEVICE, HERE A SMARTPHONE, IS DOING

2    SOMETHING IN THE BACKGROUND.  SO IT'S NOT AVAILABLE TO BE USED

3    BY THE END USER.

4    Q.   AND UNDER THE HEADING TOP GMAIL ISSUES, CAN YOU READ

5    WHAT'S SHOWN THERE, OVERALL PHONES?

6    A.   "OVERALL PHONE SLOWS DOWN WHEN GMAIL SYNCS," WHICH IS THE

7    GOOGLE GMAIL CAPABILITY.

8    Q.   GO ON, "MANUALLY."

9    A.   "MANUALLY SYNCING TAKES TOO LONG AND IS MADE TO FEEL

10   LONGER BECAUSE SYNC PROGRESS ISN'T VISIBLE AND PARTIALLY SYNCED

11   CONTENT DOESN'T SHOW IMMEDIATELY."

12   Q.   AND COULD YOU READ THE QUOTE AT THE BOTTOM OF THE PAGE?

13   A.   SO WHAT'S BEING REPORTED IN THIS GOOGLE STATEMENT IS A

14   STATEMENT THAT "WHEN MY PHONE IS SYNCING IT'S BASICALLY A

15   USELESS BRICK.  ONCE THE SYNCING ICON TURNS ON I REALLY CAN'T

16   DO ANYTHING WITH MY PHONE EXCEPT TO WAIT FOR ANR'S,"

17   APPLICATION NOT RESPONDING.  "SAY, FOR EXAMPLE, I'M READING

18   E-MAIL IN THE GMAIL APP.  WHEN I REPLY TO AN E-MAIL, GMAIL GOES

19   AND SYNCS SO IT CAN SEND THAT E-MAIL.  I NOW CAN'T READ ANY

20   E-MAIL UNTIL THE SYNC IS COMPLETE WITHOUT HUGE LATENCY AND

21   ANR'S."

22   Q.   ALL RIGHT.  NOW, WITH RESPECT TO THE '414 PATENT, AGAIN,

23   IN DISCUSSION OF ALTERNATIVE TECHNOLOGIES TO IMPLEMENT

24   BACKGROUND SYNCING, ARE YOU AWARE OF ANY EVIDENCE IN THIS CASE

25   THAT SAMSUNG HAS AT ANY TIME, SINCE THE DATE OF FIRST

1      INFRINGEMENT OR THE FILING OF THIS LAWSUIT OR THE OTHER EVENTS

2      WE SAW POSTED ON YOUR REVEALED PREFERENCE CHARTS, IMPLEMENTED,

3      ACTUALLY IMPLEMENTED A NON-INFRINGING ALTERNATIVE TO THE

4      TECHNOLOGY OF THE '414 PATENT?

5      A.   I AM NOT AWARE OF ANY EVIDENCE THAT SAMSUNG HAS INTRODUCED

6      AN ALTERNATIVE.

7      Q.   AND WHAT SIGNIFICANCE DOES THAT HAVE TO YOU AS AN

8      ECONOMIST?

9      A.   WE'RE BACK TO REVEALED PREFERENCE, WHICH IS THAT THE

10     PROPOSAL IS THAT THERE ARE ACCEPTABLE NON-INFRINGING

11     ALTERNATIVES THAT SAMSUNG COULD HAVE IMPLEMENTED THAT ARE JUST

12     AS GOOD, BUT THAT HAS NOT HAPPENED AND THAT TELLS ME SOMETHING

13     AS AN ECONOMIST ABOUT THE ECONOMIC EQUIVALENCE IN TERMS OF

14     VALUE IN THOSE ALTERNATIVES, THAT IS, THEY'RE NOT EQUIVALENT.

15     Q.   OKAY.  LET'S TURN TO THE '959 PATENT.  AND I THINK YOU

16     ALLUDED TO THIS EARLIER, BUT WHAT -- LET ME REPHRASE THAT.

17          DID YOU LEARN THAT SAMSUNG REMOVED THE FEATURE, I THINK

18     IT'S CALLED QUICK SEARCH BOX, OF THE '959 PATENT AFTER THIS

19     LAWSUIT WAS FILED?

20     A.   YES.

21     Q.   WHEN DID IT REMOVE THE FEATURE?

22     A.   AUGUST 2012.

23     Q.   AND WHAT DO YOU MEAN BY -- WHEN YOU SAY "REMOVED THE

24     FEATURE," WHAT DO YOU MEAN BY THAT?

25     A.   THAT THE QUICK SEARCH BOX NO LONGER ALLOWED FOR A SINGLE

 1    SEARCH TO BE USED TO SEARCH LOCALLY ON THE PHONE AND TO SEARCH

 2    THE INTERNET.

 3    Q.    AND DID YOU SEE IN THE RECORD INDICATIONS OF CONSUMERS'

 4    REACTION WHEN UNIVERSAL SEARCH WAS REMOVED?

 5    A.    YES.

 6    Q.    WHAT DID YOU FIND?

 7    A.    THAT IT WAS NOTICED AND THAT WHEN IT WAS REINSTATED, THERE

 8    WAS RELIEF THAT IT HAD COME BACK TO ITS ORIGINAL FORM.

 9    Q.    LET ME ASK YOU TO TURN TO PLAINTIFF'S EXHIBIT 163.  IS

10    THIS A SAMSUNG INTERNAL DOCUMENT THAT YOU RELIED ON IN REACHING

11    YOUR OPINIONS?

12    A.    YES.

13              MR. BENNETT:  MOVE EXHIBIT 163 INTO EVIDENCE.

14              MR. QUINN:  NO OBJECTION.

15              MR. BENNETT:  CAN YOU TELL US WHAT EXHIBIT 163 --

16              THE COURT:  IT'S ADMITTED.

17         (PLAINTIFF'S EXHIBIT 163 WAS ADMITTED IN EVIDENCE.)

18              MR. BENNETT:  EXCUSE ME.

19    Q.    CAN YOU TELL US WHAT EXHIBIT 163 IS, DR. VELLTURO?

20    A.    EXHIBIT 163 IS AN INTERNAL SAMSUNG DOCUMENT FROM 2012

21    THAT'S DISCUSSING VARIOUS DATA THAT SAMSUNG COLLECTS ABOUT WHAT

22    PEOPLE ONLINE ARE TALKING ABOUT WITH RESPECT TO SAMSUNG PHONES.

23    AND IT WHAT'S CALLED SCRAPES THE INTERNET TO COLLECT

24    INFORMATION ABOUT SAMSUNG AND WHAT PEOPLE ARE TALKING ABOUT.

25    Q.    AND WHAT DOES THIS EXHIBIT REFLECT IN TERMS OF CONSUMER OR

1    INTERNET REACTION TO THE REMOVAL OF THE UNIVERSAL SEARCH

2    FEATURE FROM SAMSUNG PHONES IN THE SUMMER OF 2012?

3    A.   WELL, RIGHT AT THE VERY TOP, THE --

4    Q.   IF WE CAN HIGHLIGHT AND BLOW THAT UP, MR. LEE.

5    A.   YEAH, THE BUY LINE OF THE MEMO SAYS "THE CONVERSATION

6    YESTERDAY WAS BOOSTED BY THE AT&T GARNET RED DEVICE, WHICH IS

7    AVAILABLE FOR PRE-ORDER ON JULY 15TH.  ANOTHER TOP DISCUSSION

8    WAS ABOUT THE DISABLING THE UNIVERSAL SEARCH FOR SPRINT, WHICH

9    IS GETTING SOME NEGATIVE MENTIONS."

10   Q.   AND IF YOU LOOK AT PAGE 3 OF THE EXHIBIT, THE TOP HALF OF

11   THE PAGE UNDER THAT DIAGRAM, THERE'S A SECOND BULLET, IF WE

12   COULD BLOW THAT UP.

13   A.   YES.

14   Q.   COULD YOU READ WHAT'S RECORDED THERE, DR. VELLTURO?

15   A.   YES.  IT SAYS "A TOP DISCUSSION DRIVER INCLUDED NEWS THAT

16   SPRINT DISABLED UNIVERSAL SEARCH AND THE INCLUSION OF A 'DUMB

17   SEARCH FEATURE.'"  "DUMB SEARCH FEATURE" IN QUOTES.

18   Q.   NOW, THE JURY HAS HEARD THAT SAMSUNG RESTORED THIS FEATURE

19   IN THE LATTER SUMMER AND FALL OF 2012.

20        ARE YOU FAMILIAR WITH THAT TESTIMONY?

21   A.   YES.

22   Q.   LOOKING AT, AS AN ECONOMIST, WHY OR HOW IS THE RESTORATION

23   OF THAT FEATURE SIGNIFICANT TO YOU?

24   A.   WELL, I DON'T WANT TO SOUND LIKE A BROKEN RECORD, BUT THIS

25   IS REVEALED PREFERENCE AGAIN, WHICH IS IF YOU'VE INTRODUCED AN

1    ALTERNATIVE THAT IS, IN THEORY, JUST AS GOOD, THEN YOU WOULD

2    LEAVE IT THERE.  WHY WOULD YOU THEN NEED TO RESTORE THE OLD

3    CAPABILITY IF THE ONE THAT'S NOW IN PLACE IS JUST AS GOOD?

4         THE FACT THAT WHEN THE FIRST OPPORTUNITY AROSE, THEY

5    REINSTATED THE ACCUSED FUNCTIONALITY TELLS ME, AGAIN, THAT

6    SAMSUNG RECOGNIZED THAT IT WAS BETTER THAN WHAT THEY WERE DOING

7    IN THE INTERIM.

8    Q.  OUTSIDE OF THIS ECONOMIC PRINCIPLE, DID YOU FIND

9    INDICATIONS IN THE MARKETPLACE, INCLUDING REVIEWS AND SO FORTH,

10   THAT UNIVERSAL SEARCH -- RESTORATION OF UNIVERSAL SEARCH WAS A

11   POSITIVE THING IN THE MARKETPLACE?

12   A.  YES.

13   Q.  ASKING YOU TO LOOK AT EXHIBIT PX 137A, IS THIS A DOCUMENT

14   THAT YOU REVIEWED AND RELIED UPON IN FORMING YOUR OPINIONS IN

15   THIS CASE?

16   A.  YES.

17        MR. BENNETT:  MOVE IN EXHIBIT 137A, YOUR HONOR.

18        MR. QUINN:  WE DO OBJECT TO THIS.  IT'S HEARSAY AND

19   ALSO IMPROPERLY REDACTED.

20        MR. BENNETT:  YOUR HONOR, AS TO HEARSAY, IT'S THE

21   SAME ISSUE AS THE EARLIER DOCUMENT.  THIS IS A MARKET REACTION

22   COMMENT.

23        AND ON THE -- IT'S THE SAME ISSUE.  NOT OFFERED FOR THE

24   TRUTH.  IT'S RESPONSE IN THE MARKETPLACE EVIDENCING THE VALUE

25   OF THE UNIVERSAL SEARCH AND DEMAND FOR THE UNIVERSAL SEARCH

```
 1    FUNCTION.

 2          AND AS TO THE REDACTION, YOUR HONOR, THEY ARE COMMENTS AT

 3    THE BACK FROM INDIVIDUALS THAT ARE UNDER 403, THEY COMMENT ON

 4    LITIGATION BETWEEN THESE PARTIES AND THINGS OF THAT NATURE.

 5          MR. QUINN:  YOUR HONOR, THERE ARE SUBSTANTIVE

 6    COMMENTS THAT ALL HAVE BEEN REDACTED.

 7          THE COURT:  OKAY.  WHY DON'T WE DO THIS, WHY DON'T

 8    YOU WAIT ON THIS EXHIBIT UNTIL TOMORROW.

 9          MR. BENNETT:  THAT'S FINE.

10          THE COURT:  SINCE YOU'RE NOT GOING TO BE ABLE TO

11    FINISH WITH DR. VELLTURO TODAY, AND WE CAN TALK AT 4:30 AS TO

12    HOW WE'RE GOING TO PROCEED ON THIS EXHIBIT.

13          MR. BENNETT:  THAT'S FINE.

14          THE COURT:  OKAY.

15          MR. BENNETT:  THANK YOU, YOUR HONOR.

16          THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

17    BY MR. BENNETT:

18    Q.  SO LET'S, DR. VELLTURO, GO BACK IF WE CAN DO THE

19    DEMONSTRATIVE 92.8 FOR A MINUTE.  WE'VE BEEN THROUGH YOUR

20    ANALYSIS NOW OF THE ROLE OF THE PATENTED TECHNOLOGY.

21          WITH REFERENCE TO YOUR MARKET SHARE CHART AGAIN, CAN YOU

22    SUMMARIZE WHAT YOUR CONCLUSIONS ARE WITH RESPECT TO THE ROLE OF

23    THE PATENTED TECHNOLOGY IN RELATION TO THIS CASE?

24    A.  WELL, THE --

25    Q.  AND DAMAGES IN THIS CASE.
```

1    A.   ABSOLUTELY.  SO THIS CHART, AGAIN, IT SERVES AS A VERY

2    USEFUL GUIDE, WHICH IS THE CENTRAL IDEA BEHIND WHAT HAPPENED IN

3    THIS MARKETPLACE GENERALLY WITH RESPECT TO SAMSUNG IN

4    PARTICULAR, IS THAT AS THE MARKET MOVES TOWARDS PHONES WITH

5    BETTER USER INTERFACES AND USER EXPERIENCES, SAMSUNG WAS AT A

6    DISADVANTAGE.  AND IN ECONOMICS, BEING AT A DISADVANTAGE MEANS

7    LOSING SALES, AND HOW ONE DEALS WITH THAT IS ONE ELIMINATES THE

8    DISADVANTAGES TO REGAIN SALES.

9         AND THAT IS WHAT SAMSUNG LOOKED TO DO AND DID, STARTING IN

10   2010, 2011, AND A CENTRAL ASPECT OF THIS WAS IMPROVING THE USER

11   INTERFACE AND ALL OF THESE WERE IMPORTANT TO IMPROVING THAT AT

12   THIS TIME.  WHAT THAT INDICATES IS THAT THESE PATENTED

13   INVENTIONS WERE AN IMPORTANT PART OF THE STRATEGY THAT SAMSUNG

14   USED TO GET INTO THE TWO HORSE RACE WITH APPLE AND STAY THERE.

15        AND WHAT THAT MEANS IS THAT THOSE PATENTS WERE IMPORTANT

16   IN SAMSUNG GAINING SALES, AND THAT THAT WOULD COME

17   SIGNIFICANTLY AT APPLE'S EXPENSE.

18   Q.   SO IF WE CAN GO BACK TO OUR HOME PAGE HERE, PLAINTIFF'S

19   DEMONSTRATIVE 92.23, ARE WE NOW READY TO START THE THIRD

20   ANALYTIC STEP, CALCULATION OF DAMAGES?

21   A.   YES.

22   Q.   OKAY.  LET ME ASK YOU THIS, JUST SOME FOUNDATIONAL

23   MATTERS.

24        UNDER THE RELEVANT LEGAL FRAMEWORKS, IN WHAT PERIOD CAN

25   APPLE RECOVER DAMAGES IN THIS CASE?  OR WHAT PERIODS, I SHOULD

1    SAY, PERIOD OR PERIODS?

2    A.   THERE ARE TWO PERIODS.

3         FOR FOUR OF THE FIVE PATENTS, THE RELEVANT PERIOD BEGINS

4    ON FEBRUARY 8TH, 2012, WHICH IS THE FILING OF THIS LAWSUIT AND

5    CONTINUES TO THIS DAY AS I UNDERSTAND IT.

6         BUT FOR THE '647 PATENT, IT BEGINS WITH INFRINGEMENT BY

7    THE ADMIRE DEVICE IN AUGUST 2011.

8    Q.   AND WHY IS THAT?

9    A.   BECAUSE PRIOR TO AUGUST 2011, APPLE HAD MADE SAMSUNG AWARE

10   OF ITS BELIEF THAT SAMSUNG WAS INFRINGING AND USING THE '647

11   PATENT.  THAT WAS THE 2010 DOCUMENT.

12   Q.   ALL RIGHT.  COULD WE BRING UP PDX, CONFIDENTIAL PDX 92.28.

13        AND THIS IS CONFIDENTIAL BECAUSE OF THE NUMBER STATED UP

14   TOP THERE IN THE RED BOX.

15        I WANT YOU TO BE MINDFUL OF THAT, DR. VELLTURO, AND I WILL

16   BE AS WELL.

17        CAN YOU JUST EXPLAIN TO THE LADIES AND GENTLEMEN OF THE

18   JURY, FIRST OF ALL, YOU HAVE TWO REMEDIES ON THIS SLIDE.  WE'VE

19   TALKED ABOUT THIS BEFORE, LOST PROFITS AND REASONABLE

20   ROYALTIES.  IS THAT RIGHT?

21   A.   YES.

22   Q.   THE NUMBER OF PHONES DEPICTED AT THE TOP BY THOSE

23   GRAPHICS, IS THIS -- ARE YOU GOING TO USE THIS CHART TO WALK US

24   THROUGH HOW YOU HAVE CALCULATED DAMAGES IN THIS CASE?

25   A.   YES.  WE'LL BE COMING BACK TO THIS MANY TIMES.

1     Q.   IN THIS CASE, HAVE YOU CALCULATED MORE THAN ONE REMEDY FOR

2     ANY SINGLE UNIT, THAT IS, ANY SINGLE SMARTPHONE OR TABLET?

3     A.   NO.   EVERY SMART -- EVERY SAMSUNG ACCUSED UNIT GETS EITHER

4     A LOST PROFITS DAMAGES CALCULATION OR REASONABLE ROYALTY

5     DAMAGES CALCULATION.   NO UNIT GETS BOTH.   IT'S ONE OR THE

6     OTHER.

7     Q.   AND JUST TO PREVIEW, HOW ARE WE GOING TO DEPICT THAT, OR

8     HOW ARE YOU GOING TO DEPICT THAT ON THIS GRAPHIC AS WE WALK

9     THROUGH?

10    A.   WELL, THERE ARE IMAGES OF PHONES AT THE TOP, WHICH IS A

11    PICTURE THAT REPRESENTS THE NUMBER OF INFRINGING PHONES, AND

12    WHAT I'M GOING TO DO AS WE WALK THROUGH THIS ANALYSIS IS I'M

13    GOING TO TAKE THOSE PHONES AND SHOW YOU WHICH OF THE CATEGORIES

14    THEY GET APPLIED TO AND WHERE THE DAMAGES THEN ARE CALCULATED.

15         AND WHAT YOU'LL SEE IS I NEVER TAKE ANY OF THOSE PHONES

16    AND HAVE THEM DROP DOWN INTO MORE THAN ONE PLACE BECAUSE I'M

17    ONLY COUNTING DAMAGES ONCE FOR EACH PHONE.

18    Q.   HOW DID YOU KEEP TRACK OF THE NUMBER OF UNITS SHOWN ON

19    THIS CHART IN ORDER TO PROPERLY ASSIGN DAMAGES AND MAKE SURE

20    THAT YOU WEREN'T TAKING MORE THAN ONE REMEDY FOR ANY PARTICULAR

21    UNIT?

22    A.   MYSELF AND MY STAFF BUILT A DATABASE THAT TOLD US -- THAT

23    ALLOWED US TO TRACK EVERY INFRINGING SMARTPHONE -- AND,

24    REMEMBER, THERE ARE A FEW TABLETS AS WELL -- TRACKING WHEN THEY

25    WERE SOLD, WHO THEY WERE SOLD TO, AND DETAILED INFORMATION

```
 1   ABOUT THE PHONES THEMSELVES.  SO WE COULD TRACK THEM AND MAKE

 2   SURE THAT THEY WERE PROPERLY ACCOUNTED FOR IN THE CALCULATION.

 3   Q.   ALL RIGHT.  SO LOOKING AT THE CHART, LET'S LOOK FIRST AT

 4   THE CATEGORY OF LOST PROFITS.  I THINK YOU SAID THIS, BUT VERY

 5   BRIEFLY, WHAT'S THE PURPOSE OF AN AWARD OF LOST PROFIT DAMAGES?

 6   A.   SO WHAT LOST PROFITS EVALUATES AND COMPENSATES IS FOR IS

 7   IF, BY INFRINGING, SAMSUNG TOOK SALES AWAY FROM APPLE, THEN

 8   APPLE IS ENTITLED TO THE LOST PROFITS IT WOULD HAVE EARNED IF

 9   THOSE SALES HADN'T BEEN TAKEN AWAY BY SAMSUNG'S INFRINGEMENT.

10   SO THAT'S WHAT A LOST PROFIT IS.

11   Q.   IS THERE A TEST THAT YOU USE AND THAT'S GENERALLY USED IN

12   PATENT CASES TO EVALUATE WHETHER A SAMSUNG SALE QUALIFIES FOR

13   AN AWARD OF LOST PROFITS TO APPLE?

14   A.   THERE IS A TEST, AND I DID APPLY IT.

15   Q.   OKAY.  AND WHAT'S -- DOES THAT TEST HAVE A NAME?

16   A.   IT DOES.  IT'S CALLED THE PANDUIT TEST, P-A-N-D-U-I-T, AND

17   IT'S A COURT CASE FROM MANY YEARS AGO WHERE THE COURT LAID OUT

18   A FOUR-FACTOR TEST THAT SHOULD BE IDENTIFIED TO USE TO QUALIFY

19   FOR LOST PROFITS.

20   Q.   AND --

21   A.   AND I APPLIED THAT TEST HERE.

22   Q.   WHAT ARE THOSE FOUR FACTORS?

23   A.   THEY ARE DEMAND FOR THE PATENTED PRODUCTS; A CONSIDERATION

24   OF NON-INFRINGING ALTERNATIVES; WHETHER THE PATENTEE, HERE

25   APPLE, HAD ADEQUATE CAPACITY TO MEET THE EXTRA DEMAND
```

1    ASSOCIATED WITH THE LOST SALES; AND THEN THE AMOUNT OF PROFIT

2    THAT THE PATENTEE, HERE APPLE, WOULD HAVE EARNED ON THOSE LOST

3    SALES.

4         SO THOSE ARE THE FOUR PARTS.

5    Q.   WE'LL DEAL WITH THE OTHER ISSUES AS WE GO ALONG, BUT WHAT

6    DOES DEMAND REFER TO IN THE PANDUIT TEST?

7    A.   DEMAND REFERS TO ARE THERE SUBSTANTIAL SALES OF PRODUCTS

8    INCORPORATING THE PATENTED INVENTIONS.

9    Q.   NOW, LET'S FOCUS AGAIN ON CONFIDENTIAL EXHIBIT 92.28.

10        WHAT WAS THE FIRST STEP THAT YOU TOOK IN LOOKING AT LOST

11   PROFITS DAMAGES?

12   A.   WELL, THE FIRST STEP I TOOK IS I -- THE CONCEPT TIME OF

13   LOST PROFITS IS EVALUATING WHAT SAMSUNG'S SALES WOULD HAVE

14   LOOKED LIKE IF THEY HAD NOT PRACTICED THE PATENTS, AND

15   DETERMINING WHAT THEY WOULD HAVE DONE INSTEAD.  AND THAT HELPS

16   ME TO START THINKING ABOUT THE LOST PROFITS EXERCISE.

17   Q.   DID YOU, IN THIS CASE, IDENTIFY TWO FORMS OF LOST PROFITS

18   DAMAGES THAT APPLE HAS SUFFERED?

19   A.   RIGHT.  BY THINKING ABOUT HOW SAMSUNG WOULD HAVE RESPONDED

20   IF THEY COULDN'T INFRINGE ANY MORE, THAT LED TO TWO TYPES OF

21   DAMAGES THAT RELATE TO LOST PROFITS.

22   Q.   AND I THINK WE CAN SHOW THIS ON THE GRAPHIC.  YOU'RE

23   SHOWING FIRST SOMETHING CALLED OFF-THE-MARKET LOST PROFITS.

24   CAN YOU EXPLAIN WHAT OFF-THE-MARKET LOST PROFITS ARE?

25   A.   SO, AGAIN, IT HELPS TO THINK ABOUT THIS CHRONOLOGICALLY.

1    OFF-THE-MARKET LOST PROFITS REFLECTS THE FACT THAT RIGHT FROM

2    THE OUTSET WHEN INFRINGEMENT BEGINS, SAMSUNG, FROM THAT DATE

3    FORWARD, IS NO LONGER ALLOWED TO INFRINGE.

4         NOW, THERE WERE PRODUCTS THAT THEY INTRODUCED ON THAT

5    DATE, THE ADMIRE, AND PRODUCTS THEY INTRODUCED AFTER THAT DATE

6    WHERE THEY INCORPORATED THE PATENTED INVENTIONS WHERE NOW THEY

7    CAN'T INCORPORATE THOSE PATENTED INVENTIONS IN THIS CONSTRUCT.

8         SO WHAT I DO IS I IDENTIFY THE FACT THAT DURING THAT

9    PERIOD SAMSUNG COULDN'T INFRINGE THE PATENTS AND DIDN'T HAVE AN

10   ALTERNATIVE READY YET TO INTRODUCE THOSE LINES OF PRODUCTS.  SO

11   THEY WOULD HAVE DELAYED OR DEFERRED THOSE INTRODUCTIONS WHILE

12   THOSE ALTERNATIVES WERE BEING DEVELOPED AND WHILE YOU WERE

13   GETTING CARRIER APPROVAL FOR THEM.  SO THOSE ARE CALLED

14   OFF-THE-MARKET LOST PROFITS BECAUSE THE ACCUSED DEVICES AT

15   SAMSUNG AREN'T BEING SOLD DURING THAT PERIOD BECAUSE THEY ARE

16   DOING THEIR REDESIGN WORK.

17   Q.   AND WHAT IS IN THE SECOND CATEGORY OF LOST PROFITS DAMAGES

18   YOU CALCULATED?

19   A.   SO THESE ARE CALLED DIMINISHED DEMAND LOST PROFITS, AND

20   THESE START AFTER THAT PROPOSED DESIGN AROUND HAPPENS, AND WHAT

21   IT REFLECTS IS THAT NOW THAT SAMSUNG HAS IMPLEMENTED AN

22   ALTERNATIVE, THE ALTERNATIVE IS NOT AS GOOD AS THE PATENTED

23   CAPABILITY, AND, THEREFORE, IT'S GOING TO BE ABLE TO HOLD ON TO

24   SOME OF ITS SALES BUT NOT ALL OF THEM.

25        DIMINISHED DEMAND RECOGNIZES THAT SAMSUNG IS GOING TO HAVE

1    SOME LOSS OF SALES BECAUSE THEY'RE USING AN INFERIOR CAPABILITY

2    TO THE PATENTED CAPABILITY, AND DIMINISHED DEMAND IS GOING TO

3    CAPTURE THOSE LOSSES.

4    Q.   DO YOUR DIMINISHED DEMAND CALCULATIONS ASSUME THAT SAMSUNG

5    WOULD HAVE OR COULD HAVE DESIGNED AROUND A PATENT?  IS THAT

6    WHAT YOU'RE SAYING?

7    A.   THAT'S RIGHT.  THEY ASSUMED THAT DESIGN AROUNDS ARE PUT

8    INTO THE MARKET EVEN THOUGH THEY'RE NOT AS GOOD.

9    Q.   AND AGAIN WITH RESPECT TO THE '647 AND '414 PATENTS, IS

10   THERE ANY EVIDENCE THAT THEY ACTUALLY DESIGNED AROUND THOSE

11   PATENTS?

12   A.   NO.

13        THE COURT:  IT'S 4:30.  SORRY TO INTERRUPT YOUR

14   EXAMINATION.  LET'S GO AHEAD AND BREAK FOR THE DAY.

15        WE WILL NOT HAVE TRIAL TOMORROW OR THURSDAY, BUT WE WILL

16   BE BACK IN SESSION ON FRIDAY.  THE SAME TIME, 9:00 TO 4:30.  SO

17   WE'LL SEE YOU AT 9:00 O'CLOCK ON FRIDAY MORNING.  THANK YOU FOR

18   YOUR PATIENCE AND YOUR SERVICE.  PLEASE DON'T RESEARCH OR

19   DISCUSS THE CASE.

20        MR. BENNETT:  THANK YOU, YOUR HONOR.

21   (JURY OUT AT 4:31 P.M.)

22        THE COURT:  YOU MAY STEP DOWN.

23        THE WITNESS:  THANK YOU, YOUR HONOR.

24        THE COURT:  ALL RIGHT.  PLEASE TAKE A SEAT.  WE HAVE

25   A FEW ISSUES THAT WE CAN TAKE CARE OF, AND I ALSO WANTED TO

```
 1          GIVE YOU YOUR TIME TOTALS FOR TODAY.

 2              OKAY.  SO THUS FAR APPLE HAS USED A TOTAL OF 11 HOURS AND

 3     14 MINUTES.  TODAY YOU USED 3 HOURS AND 22 MINUTES.

 4              SAMSUNG HAS USED A TOTAL OF 6 HOURS AND 29 MINUTES, AND

 5     TODAY YOU USED 2 HOURS AND 6 MINUTES.

 6              OKAY.  SO THOSE ARE YOUR TIME TOTALS.

 7              I'M ALSO GOING TO ASK IF YOU WOULD, PLEASE, PROVIDE THE

 8     DEMONSTRATIVES THAT BOTH SIDES HAVE USED THUS FAR, BOTH IN

 9     OPENING AND FOR THE VARIOUS WITNESSES.  THEY DON'T NEED TO BE

10     IN SEPARATE BINDERS FOR EACH WITNESS.  IF YOU CAN JUST SUBMIT

11     ONE PERHAPS WITH TABS IN BETWEEN EACH WITNESS NAME.

12              WHEN CAN YOU PROVIDE THAT?  I THINK IT MAY BE HELPFUL IN

13     RULING ON MOTIONS AND OBJECTIONS GOING FORWARD JUST TO KNOW

14     WHAT'S BEEN USED AND PROVIDED IN THE CASE.

15              MS. MAROULIS:  WE CAN PROVIDE THEM TOMORROW MORNING

16      FOR THE ONES THAT ALREADY HAPPENED.

17              THE COURT:  ALL RIGHT.  THANK YOU.  CAN YOU DO THAT

18      AS WELL?

19              MS. KREVANS:  THAT WOULD BE FINE, YOUR HONOR.  SHOULD

20      WE DELIVER THEM TO CHAMBERS OR HOW WOULD YOU LIKE THEM?

21              THE COURT:  YOU CAN JUST DELIVER THEM TO --

22              MS. KREVANS:  I THINK SOMETIMES WHEN WE TAKE THEM TO

23      THE CLERK'S OFFICE, THEY DON'T ACTUALLY GET THEM TO YOU FAST.

24              THE COURT:  ALL RIGHT.  WHY DON'T YOU JUST DROP THEM

25      OFF THEN AT CHAMBERS TOMORROW AT LET'S SAY 10:00 O'CLOCK.  IS
```

```
1      THAT OKAY?

2                MS. KREVANS:  THAT WOULD BE FINE, YOUR HONOR.

3                THE COURT:  OKAY.  THANK YOU.

4                MR. MCELHINNY:  JUST TO REMIND YOUR HONOR, SOME OF

5      THOSE ARE UNDER SEAL.  SO THIS IS CHAMBERS COPIES, IT SHOULDN'T

6      MAKE ANY DIFFERENCE, BUT THEY WON'T BE MARKED SEPARATELY.

7                THE COURT:  WELL, YOU CAN EITHER SEGREGATE THEM AND

8      HAVE A SEALED VERSION AND KEEP THE UNSEALED VERSION SEPARATELY,

9      YOU COULD DO IT THAT WAY.

10               MR. MCELHINNY:  BUT YOU'RE JUST GOING TO USE -- THIS

11     IS FOR YOUR PERSONAL USE IN CHAMBERS.

12               THE COURT:  YES, YES.

13               MR. MCELHINNY:  OKAY.

14               THE COURT:  BUT I THINK IT WOULD BE HELPFUL TO KNOW.

15     WHY DON'T -- CAN YOU INCLUDE, AT THE BEGINNING, PERHAPS OF EACH

16     WITNESS WHICH OF THEIR DEMONSTRATIVES ARE SEALED?

17               MR. MCELHINNY:  WE CAN.

18               MS. KREVANS:  WE'LL DO THAT, YOUR HONOR.  WE'LL

19     EITHER PUT A LABEL ON THE SLIDE -- WE'LL DO ONE OR THE OTHER.

20               THE COURT:  OKAY.  WHATEVER IS -- WELL, LET'S REACH

21     AN AGREEMENT JUST SO IT'S A UNIFORM SYSTEM FOR BOTH SIDES.

22               MS. KREVANS:  I THINK WE ALREADY HAVE LABELS ON MANY

23     OF SLIDES SO I'D PREFER TO ADD LABELS.  I THINK IT SAVES

24     CONFUSION AS WELL IF THE SLIDE COMES OUT OF THE BINDER.

25               MS. MAROULIS:  YOUR HONOR, THAT'S NOT HOW WE'VE BEEN
```

```
1    LABELING SLIDES SO CAN WE DO THEM BY WITNESS.  WE'LL NEED TO

2    REDO THEM.  WE HAVE NUMBERS.

3              MS. KREVANS:  BY LABEL, I JUST MEANT PUTTING

4    "CONFIDENTIAL" ON THE BOTTOM OF THE SLIDE.

5              MS. MAROULIS:  CONFIDENTIAL IS FINE.

6              THE COURT:  OKAY.  SO FOR SEALING, IF YOU WOULD JUST

7    INCLUDE ON THE ACTUAL DEMONSTRATIVE WHETHER IT'S SEALED OR NOT,

8    SOME IDENTIFICATION.

9              MS. MAROULIS:  YES, YOUR HONOR.

10             THE COURT:  OKAY, GREAT.  NOW, I'D ALSO LIKE YOU TO

11   FILE EITHER TOMORROW OR THURSDAY, WHATEVER IS MORE CONVENIENT

12   FOR BOTH SIDES, A JOINT EXHIBIT LIST AS WE'VE DONE IN THE

13   PREVIOUS TWO TRIALS, JUST TO MAKE SURE THAT WE'RE ALL IN

14   AGREEMENT AS TO WHAT HAS BEEN ADMITTED, WHETHER THERE ARE ANY

15   LIMITING INSTRUCTIONS ATTACHED TO IT, WHAT HAS BEEN SEALED.

16        WHEN CAN YOU DO THAT?

17             MS. KREVANS:  WE ACTUALLY GAVE A COPY TODAY OF WHAT

18   WE THINK HAS BEEN ADMITTED THROUGH THE MIDDLE OF TODAY, AND WE

19   GAVE A COPY TO MS. PARKER BROWN AS WELL.  WE'LL UPDATE THAT AT

20   THE END OF THE DAY AND SEND IT OVER, AND AS LONG AS -- I THINK

21   WE SHOULD BE ABLE TO COME TO AGREEMENT VERY FAST ON WHAT WE

22   THINK HAPPENED AND WE CAN FILE AN UPDATED EXHIBIT LIST SETTING

23   OUT WHAT HAPPENED, INCLUDING LIMITING INSTRUCTIONS.

24             MS. MAROULIS:  YOUR HONOR, CAN WE HAVE UNTIL THURSDAY

25   MORNING JUST IN CASE?
```

```
 1              THE COURT:  THAT'S FINE.  WELL, WHY DON'T WE JUST SAY

 2    THURSDAY AT -- DO YOU WANT TO SAY THURSDAY AT 11:00 A.M.?

 3              MS. KREVANS:  THAT'S FINE, YOUR HONOR.

 4              THE COURT:  OKAY.  SO THURSDAY AT 11:00 A.M.  AND AS

 5    WE'VE DONE IN PREVIOUS TRIALS, YOU'LL HAVE A SECTION THAT

 6    PROVIDES THE LIMITING INSTRUCTION ASSOCIATED WITH THAT

 7    DOCUMENT.  I THINK ALSO IT MAY BE HELPFUL TO KEEP A COLUMN THAT

 8    SAYS WHETHER IT'S SEALED OR NOT AND WHAT PARTICULAR PAGES, JUST

 9    SO NO ONE MAKES A MISTAKE.

10              MS. MAROULIS:  YOUR HONOR, WE CAN JUST TAKE THE --

11    LIKE HOW IN THE FIRST CASE AND ADD THE COLUMN TO IT BUT USE THE

12    SAME FORMAT.

13              THE COURT:  YES, LET'S PLEASE DO THAT.  SO THURSDAY

14    AT 11:00.

15         ALSO, THIS JURY HAS GONE THROUGH ALL THE PAPER VERY

16    QUICKLY.  I APPRECIATE WHAT YOU ALL HAVE PROVIDED TODAY, BUT I

17    WOULD ASK THAT YOU BRING SOME MORE BECAUSE WE HAVE ANOTHER

18    POTENTIALLY FOUR WEEKS TO GO AND I THINK --

19              MS. KREVANS:  THREE WEEKS, YOUR HONOR.

20              THE COURT:  THEY SEEM TO BE AVID NOTE TAKERS, SO WE

21    MIGHT AS WELL.

22              MS. KREVANS:  WE WILL BRING MORE PAPER.

23              THE COURT:  OKAY, THANK YOU.  THEY MAY NEED IT FOR

24    DELIBERATIONS AS WELL.

25         OKAY.  I WOULD LIKE YOU TO GO AHEAD AND INSTALL THE WIRE.
```

1    I'M GOING TO DO MY CALENDARS TOMORROW AND THURSDAY DOWNSTAIRS

2    IN MY COURTROOM.  SO IF YOU COULD WORK OUT A TIME WITH

3    MS. PARKER BROWN, OR WHOMEVER IS GOING TO SET THAT UP, I WILL

4    GREATLY APPRECIATE THAT.

5              MS. KREVANS:  WE WILL DO -- WE TALKED TO

6    MS. SHORTRIDGE AND WE'LL COORDINATE WITH HER AS WELL, AND WE

7    HAVE A WAY TO CONTACT HER.  SO WE'LL FIND OUT FROM YOU WHAT'S

8    CONVENIENT, AND WE'LL TAKE CARE OF IT.

9              THE COURT:  OKAY.  LET'S TALK ABOUT THIS PDX 137A.

10   WHAT I WOULD LIKE IS TO SEE THE ACTUAL DOCUMENT UNREDACTED SO I

11   CAN COMPARE IT TO THE REDACTED VERSION.  AND I THINK IT MIGHT

12   BE HELPFUL, SINCE IT SOUNDS LIKE THIS TYPE OF ISSUE MIGHT

13   RECUR -- DO YOU ANTICIPATE IT COMING UP WITH ANY FURTHER

14   EXHIBITS FOR DR. VELLTURO?

15             MR. BENNETT:  REDACTION ISSUE, YOUR HONOR?

16             THE COURT:  WELL, BOTH IF IT'S A GOOGLE HEARSAY ISSUE

17   AS WELL AS REDACTIONS.

18             MR. BENNETT:  NOT -- NO, YOUR HONOR.  WE'RE THROUGH

19   THAT PART OF THE EXAM.

20             THE COURT:  OKAY.  THIS IS WHAT I'D LIKE.  AT LEAST

21   FOR PDX 137A, BECAUSE I DON'T THINK THAT WAS PREVIOUSLY

22   BRIEFED, IS THAT RIGHT?  I DON'T THINK IT WAS.

23             MR. QUINN:  NO, IT WAS NOT.

24             THE COURT:  OKAY.  WOULD YOU LIKE TO SUBMIT ONE PAGE

25   EACH SIDE?

```
 1              MR. QUINN:  THAT WOULD BE FINE, YOUR HONOR.

 2              THE COURT:  OKAY.  SO ONE PAGE EACH SIDE.  I'D ALSO

 3    LIKE TO SEE, PLEASE, THE ORIGINAL SO I CAN SEE WHAT THE

 4    REDACTIONS ARE.

 5          WHEN CAN YOU SUBMIT THAT?

 6              MR. BENNETT:  TOMORROW.

 7              THE COURT:  OKAY.  LET'S JUST SET A TIME SO THAT

 8    IT'S --

 9              MR. BENNETT:  NOON, YOUR HONOR.

10              THE COURT:  NOON TOMORROW.  THAT'S FINE.

11              MR. QUINN:  THAT'S FINE.

12              THE COURT:  OKAY.  ARE THERE ANY OTHER OBJECTIONS

13    THAT YOU ANTICIPATE WITH DR. VELLTURO?  I APPRECIATE YOU GIVING

14    ME THE HEADS UP ON THE HTC LICENSE AND ON THE MOTOROLA

15    LITIGATION.  IS THERE ANYTHING ELSE LIKE THAT SO THAT I CAN

16    LOOK IT UP IN ADVANCE AND NOT CAUSE YOU TO DELAY YOUR

17    PRESENTATIONS?  ANY OTHER ISSUES LIKE THAT?

18              MR. QUINN:  WE'RE IN A BIT OF BIND, YOUR HONOR, ON

19    THIS EXHIBIT THAT'S UP NOW.  IT'S A CONFIDENTIAL DEMONSTRATIVE,

20    AND IT'S A BUILD, IT'S AN ANIMATION.  SO WE DON'T HAVE A HARD

21    COPY OF IT.  WE CAN'T DISPLAY IT BECAUSE OTHERWISE PEOPLE

22    BEHIND US CAN SEE IT.  I DON'T KNOW WHETHER IT WOULD BE

23    POSSIBLE TO GIVE US PAPER COPIES OF THIS BUILD ITSELF.

24              MR. BENNETT:  I'M SURE WE CAN.

25              THE COURT:  ARE THESE ACTUALLY VIDEOS?
```

```
1              MR. BENNETT:  I CAN'T IMAGINE WE CAN'T DO THAT.

2              THE COURT:  ARE THESE THE VIDEOS YOU NEED?

3              MR. BENNETT:  IT'S A BUILD.  SO WE CAN GIVE

4    MR. QUINN, EXCUSE ME, THE PAGES THAT SHOW THE COMPLETE BUILD.

5              MR. QUINN:  YEAH.

6              THE COURT:  OKAY.  I'M JUST WONDERING IF, GOING

7    FORWARD, WHEN YOU DO YOUR 48-HOUR EXCHANGE, THAT YOU SHOULD

8    INCLUDE ANY FULL ANIMATIONS, ANY BUILDS, ANY --

9              MR. BENNETT:  WE DID THAT.

10             MR. QUINN:  THEY DID, YOUR HONOR.

11             THE COURT:  OKAY.

12             MR. QUINN:  IT'S JUST THAT WE CAN'T WATCH IT HERE IN

13   COURT.

14             THE COURT:  OH, I SEE.

15             MR. QUINN:  IT EXISTS IN ELECTRONIC FORM, AND WE

16   CAN'T TURN IT ON THE COMPUTER BECAUSE THE AUDIENCE.

17             THE COURT:  WE WILL SEE IT.  OKAY.  SO CAN WE JUST

18   SAY GOING FORWARD THAT I GUESS HARD COPIES OF BUILDS WILL BE

19   DISTRIBUTED WITH YOUR OBJECTIONS, IN ADDITION TO THE ANIMATIONS

20   AND WHATEVER YOU'RE PROVIDING EACH OTHER ON DVD OR CD?

21             MR. QUINN:  THAT WOULD BE GREAT.

22             MR. MCELHINNY:  MAY I HAND UP THE UNREDACTED VERSION

23   OF 137?

24             THE COURT:  YES, PLEASE.  DO YOU WANT TO TAKE A LOOK

25   AT IT, MR. QUINN?
```

1            MR. QUINN:  I HAVE IT.

2            THE COURT:  ALL RIGHT.  I JUST WANT TO GIVE YOU AN

3       OPTION.

4          ALL RIGHT.  THANK YOU.

5          OKAY.  WHAT ELSE?  ANYTHING ELSE?

6            MR. QUINN:  NOTHING ELSE FOR SAMSUNG, YOUR HONOR.

7            THE COURT:  ALL RIGHT.  ANYTHING ELSE FOR APPLE?

8       ANYONE AT APPLE?

9            MR. MCELHINNY:  NOTHING AT THIS TIME, YOUR HONOR.

10            THE COURT:  ALL RIGHT.  THANK YOU.  THEN I'LL SEE YOU

11       FRIDAY MORNING AT 9:00 O'CLOCK.

12          (THE EVENING RECESS WAS TAKEN AT 4:40 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                            CERTIFICATE OF REPORTERS

4

5

6

7           WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15                       _____

16                       IRENE RODRIGUEZ, CSR, CRR
                         CERTIFICATE NUMBER 8076
17

18                       _____

19                       LEE-ANNE SHORTRIDGE, CSR, CRR
                         CERTIFICATE NUMBER 9595
20

21                       DATED:  APRIL 8, 2014

22

23

24

25