1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA        )  C-12-00630 LHK
6  CORPORATION,                    )
                                   )  SAN JOSE, CALIFORNIA
7                 PLAINTIFF,       )
                                   )  APRIL 11, 2014
8            VS.                   )
                                   )  VOLUME 6
9  SAMSUNG ELECTRONICS CO., LTD.,  )
   A KOREAN BUSINESS ENTITY;       )  PAGES 1277-1549
10 SAMSUNG ELECTRONICS AMERICA,    )
   INC., A NEW YORK CORPORATION;   )
11 SAMSUNG TELECOMMUNICATIONS      )
   AMERICA, LLC, A DELAWARE        )
12 LIMITED LIABILITY COMPANY,      )
                                   )
13                DEFENDANTS.      )
   _____)

14

15

16           TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
17           UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22 OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, CRR
                                CERTIFICATE NUMBER 8074

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
           TRANSCRIPT PRODUCED WITH COMPUTER

1278

```
 1

 2      A P P E A R A N C E S:

 3      FOR PLAINTIFF        MORRISON & FOERSTER
        APPLE:               BY:  HAROLD J. MCELHINNY
 4                                RACHEL KREVANS
                             425 MARKET STREET
 5                           SAN FRANCISCO, CALIFORNIA  94105

 6

 7                           WILMER, CUTLER, PICKERING,
                             HALE AND DORR
 8                           BY:  WILLIAM F. LEE
                             60 STATE STREET
 9                           BOSTON, MASSACHUSETTS  02109

10                           BY:  MARK D. SELWYN
                             950 PAGE MILL ROAD
11                           PALO ALTO, CALIFORNIA  94304

12

13      FOR SAMSUNG:         QUINN, EMANUEL, URQUHART & SULLIVAN
                             BY:  JOHN B. QUINN
14                                WILLIAM PRICE
                             865 S. FIGUEROA STREET, FLOOR 10
15                           LOS ANGELES, CALIFORNIA  90017

16                           BY:  VICTORIA F. MAROULIS
                                  KEVIN B. JOHNSON
17                           555 TWIN DOLPHIN DRIVE
                             SUITE 560
18                           REDWOOD SHORES, CALIFORNIA  94065

19

20

21

22

23

24

25
```

1

2                           INDEX OF WITNESSES

3       PLAINTIFF'S

4

5       **CHRISTOPHER VELLTURO**
             DIRECT EXAM BY MR. BENNETT (RES.)        P. 1281
             CROSS-EXAM BY MR. QUINN                  P. 1327
6            REDIRECT EXAM BY MR. BENNETT             P. 1438

7

8       DEFENDANTS'

9       **HIROSHI LOCKHEIMER**
             DIRECT EXAM BY MR. QUINN                 P. 1467
10           CROSS-EXAM BY MS. KREVANS                P. 1527
             REDIRECT EXAM BY MR. QUINN               P. 1541

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

                                    MARKED        ADMITTED

PLAINTIFF'S

137B                                               1282
203                                                1311
196                                                1507
173                                                1522


DEFENDANTS'

404.006                                            1402
507                                  1404
500                                                1407
411                                                1419
327                                                1503
308                                                1516

```
 1    SAN JOSE, CALIFORNIA                    APRIL 11, 2014

 2                    P R O C E E D I N G S

 3         (JURY IN AT 9:05 A.M.)

 4              THE COURT:  WELCOME.  GOOD MORNING.  PLEASE TAKE A

 5    SEAT.  PLEASE GO AHEAD AND TAKE A SEAT.

 6         YOU ARE STILL UNDER OATH.

 7         (CHRISTOPHER VELLTURO, PLAINTIFF'S WITNESS, WAS PREVIOUSLY

 8    SWORN.)

 9              THE COURT:  GO AHEAD, PLEASE.  TIME IS 9:06.

10              MR. BENNETT:  THANK YOU, YOUR HONOR.  GOOD MORNING,

11    YOUR HONOR.

12         GOOD MORNING, EVERYBODY.

13                   DIRECT EXAMINATION (RESUMED)

14    BY MR. BENNETT:

15    Q.   GOOD MORNING, DR. VELLTURO.

16    A.   GOOD MORNING.

17    Q.   IF WE COULD BRING UP -- LET ME TRY TO REORIENT OURSELVES

18    HERE.  IF WE COULD BRING UP PLAINTIFF'S EXHIBIT 92.23.

19         I THINK WHEN WE BROKE ON TUESDAY AFTERNOON YOU HAD JUST

20    STARTED THAT SECTION OF YOUR OPINION THAT INVOLVES THE

21    CALCULATION OF DAMAGES.  IS THAT RIGHT, SIR?

22    A.   THAT'S RIGHT.

23    Q.   BEFORE WE GET BACK TO THE CALCULATION OF DAMAGES, I JUST

24    WANTED TO COVER A COUPLE OF ISSUES THAT WERE DEFERRED ON

25    TUESDAY REGARDING THE PATENTED TECHNOLOGY.
```

1          SIR, YOU SAID ON TUESDAY THAT SAMSUNG HAD REMOVED THE

2     UNIVERSAL SEARCH FEATURE FROM THESE PHONES IN THE SUMMER OF

3     2012.  IS THAT RIGHT?

4     A.   YES.

5     Q.   AND WAS THAT FEATURE RESTORED AT SOME POINT IN THE FALL OF

6     2012?

7     A.   YES.

8     Q.   AND UPON THE RESTORATION, WAS THERE SOME PUBLIC NOTICE OF

9     THAT?

10    A.   THERE WAS.

11    Q.   OKAY.  IF YOU CAN TURN IN YOUR BINDER TO PLAINTIFF'S

12    EXHIBIT 137B, IS THIS A PUBLIC ARTICLE ON WHICH YOU RELIED IN

13    FORMING YOUR OPINIONS IN THIS CASE?

14    A.   IT IS.

15              MR. BENNETT:  YOUR HONOR, WE WOULD MOVE EXHIBIT 137B.

16              THE COURT:  ANY OBJECTION?

17              MR. QUINN:  YOUR HONOR, THERE'S A PENDING ISSUE

18    BRIEFED THAT'S BEEN SUBMITTED ON THIS.

19              THE COURT:  CAN I -- I FILED --

20              MR. BENNETT:  YOU RULED ON THIS, YOUR HONOR.

21              THE COURT:  I ALREADY RULED ON IT.  137B IS ADMITTED.

22    I RULED LAST NIGHT.  IT'S ADMITTED.

23         (PLAINTIFF'S EXHIBIT 137B WAS ADMITTED IN EVIDENCE.)

24              THE COURT:  GO AHEAD, PLEASE.

25              MR. BENNETT:  THANK YOU, YOUR HONOR.

1    Q.   IT SAYS "TMO NEWS."  CAN YOU TELL US WHAT THIS DOCUMENT

2    IS, DR. VELLTURO?

3    A.   SO THIS IS AN INTERNET SITE THAT IS DEVOTED TO END USERS

4    OF T-MOBILE, ONE OF THE CELLULAR CARRIERS IN THE STATES.

5    Q.   AND DID THIS NEWS EDITION, OR EDITION OF THIS NEWS ARTICLE

6    COMMENT ON THE RESTORATION OF UNIVERSAL SEARCH IN SAMSUNG

7    PHONES?

8    A.   IT DID.  IT COMMENTED ON BOTH THE REMOVAL AND THE

9    RESTORATION.

10   Q.   AND IF WE LOOK AT THE PORTION ON THE SECOND PAGE, OR FIRST

11   PAGE WE'D LIKE TO BLOW UP.  COULD YOU READ FOR THE LADIES AND

12   GENTLEMEN OF THE JURY THAT LANGUAGE WE'VE BLOWN UP THERE?

13   A.   SO, AGAIN, THIS DOCUMENT IS FROM NOVEMBER 2012, SO THIS

14   IS -- THIS WOULD BE AFTER UNIVERSAL SEARCH HAD BEEN TAKEN OFF

15   AND REINSTATED.

16        AND IT READS, "LOCAL SEARCH ALLOWS FOR THE SEARCH APP TO

17   LOOK FOR FILES ON THE PHONE, LIKE CONTACTS OR APPS WHEN USERS

18   ATTEMPT A WEB SEARCH FROM THE PRE-LOADED SEARCH APP.  THIS IS

19   AN AWESOME FEATURE FOR ANDROID AND ITS REMOVAL BACK IN AUGUST

20   WAS DISHEARTENING.  SEEING IT RETURN IS WONDERFUL."

21   Q.   AND DID THIS ARTICLE INFORM IN ANY WAY YOUR OPINION ABOUT

22   THE ROLE OR VALUE OF THE PATENTED TECHNOLOGY IN THIS CASE?

23   A.   WITH RESPECT TO THE '959 UNIVERSAL SEARCH PATENT, YES.

24   Q.   LET ME ASK YOU A SERIES OF QUESTIONS REGARDING THE '414

25   PATENT IN THIS CASE, SOMETIMES REFERRED TO AS BACKGROUND SYNC.

1          ARE YOU AWARE THAT SAMSUNG CONTENDS IN THIS CASE THAT IT

2     COULD HAVE AVOIDED INFRINGEMENT OF THE '414 PATENT BY USING A

3     SINGLE THREAD OR SYNC ADAPTER RATHER THAN THREE SYNC ADAPTERS?

4     A.   YES, I'M AWARE OF THAT.

5     Q.   AND IN YOUR INVESTIGATION, WHAT DID YOU LEARN REGARDING

6     WHETHER SAMSUNG EVER ATTEMPTED TO IMPLEMENT THAT APPROACH?

7     A.   IT'S MY UNDERSTANDING THAT THEY HAVE NOT IMPLEMENTED THAT

8     APPROACH.

9     Q.   AND WHAT IS YOUR UNDERSTANDING AS TO WHETHER THAT APPROACH

10    OR CHANGE IN THEIR APPROACH WOULD BE WORKABLE?

11    A.   WELL, I'VE -- I'M NOT A TECHNICAL EXPERT, BUT I'VE

12    ADDRESSED THIS ISSUE BY DISCUSSING IT WITH PROFESSOR SNOEREN

13    AND HE INDICATED THAT THAT CHANGE WOULD REQUIRE A FAIRLY

14    FUNDAMENTAL CHANGE TO THE ARCHITECTURE ASSOCIATED WITH THE

15    SAMSUNG OPERATING SYSTEMS.

16    Q.   NOW, IF WE CAN GO BACK TO -- LET'S GO BACK TO THE

17    CALCULATION OF DAMAGES.

18          AND IF MR. LEE CAN BRING UP CONFIDENTIAL SLIDE 92.28.

19          AND I THINK THIS IS WHERE WE WERE WHEN WE BROKE ON

20    TUESDAY, SO LET ME REORIENT OURSELVES A LITTLE BIT MORE.

21          AND HAVING IN MIND THAT YOU'RE NOT TO VERBALIZE MANY OF

22    THE NUMBERS THAT APPEAR ON THIS CHART, DR. VELLTURO, WHAT'S

23    SHOWN AT THE TOP THERE, WITHOUT DESCRIBING THE NUMBER?

24    A.   SO WHAT'S SHOWN AT THE TOP IS THE NUMBER OF ACCUSED PHONES

25    IN THIS CASE, AND BELOW THAT IS AN IMAGE OF A PHONE, AND EACH

1    ONE OF THOSE INDIVIDUAL IMAGES IS JUST MEANT TO REPRESENT A

2    MILLION PHONES AS WE DO THESE CALCULATIONS.

3    Q.   AND WE'RE GOING TO -- JUST TO PREVIEW, WE'RE GOING TO MOVE

4    THOSE PHONES AROUND ON THE CHART AS YOU PUT VARIOUS ACCUSED

5    UNITS IN VARIOUS CATEGORIES OF DAMAGES.  IS THAT WHERE WE'RE

6    HEADED?

7    A.   RIGHT.  AS I SAID LAST TUESDAY, EACH PHONE -- AND REMEMBER

8    THERE ARE A FEW TABLETS IN HERE -- EACH PHONE IS GOING TO BE

9    MOVED INTO ONE CATEGORY AND BE COUNTED AS TO DAMAGES ONCE AND

10   ONLY ONCE.

11   Q.   BEFORE WE START DOING THAT, JUST A GENERAL QUESTION.  THE

12   ACCUSED UNITS, SMARTPHONES AND TABLETS SHOWN AT THE TOP OF THE

13   PAGE, THOSE ARE ALL THE INFRINGING SMARTPHONES AND TABLETS

14   ACCUSED; IS THAT RIGHT?

15   A.   YES.

16   Q.   DID STA AND SEA COLLECT ORDERS FOR THESE PRODUCTS FROM

17   CARRIERS AND CUSTOMERS IN THE UNITED STATES?

18   A.   YES.

19   Q.   DID SAMSUNG ELECTRONICS COMPANY, OR SEC, MANUFACTURE THOSE

20   UNITS?

21   A.   YES.

22   Q.   DID SAMSUNG ELECTRONICS COMPANY, OR SEC, DESIGN THOSE

23   UNITS?

24   A.   YES.

25   Q.   DID SEC, SAMSUNG ELECTRONICS COMPANY, SHIP THOSE UNITS TO

1    THE UNITED STATES FOR DELIVERY TO CUSTOMERS IN THE

2    UNITED STATES?

3    A.   YES.

4    Q.   AND IS THAT TRUE WITH RESPECT TO ALL OF THE ACCUSED UNITS,

5    THAT SERIES OF QUESTIONS I JUST ASKED YOU?

6    A.   IT IS.

7    Q.   SO I THINK ON FRIDAY YOU HAD DIVIDED THE LOST PROFITS

8    CATEGORY INTO THE TWO PIECES WE SEE HERE, OFF THE MARKET LOST

9    PROFITS AND DIMINISHED DEMAND LOST PROFITS.  IS THAT RIGHT?

10   A.   YES.

11   Q.   LET'S FOCUS ON THE OFF THE MARKET, THE FIRST CATEGORY YOU

12   HAVE THERE.

13        WHAT -- WHAT DOES THAT CATEGORY ADDRESS?

14   A.   SO I THINK WE TOUCHED ON THIS BRIEFLY ON TUESDAY, BUT LET

15   ME REORIENT US HERE.

16        WHAT THAT CAPTURES IS THAT FROM THE OUTSET OF INFRINGEMENT

17   FROM 2011, FROM THE VERY FIRST DAY, SAMSUNG IS NO LONGER

18   ALLOWED TO SELL PHONES THAT PRACTICE THE PATENTS IN THIS

19   DAMAGES CALCULATION.

20        AND SO THERE WOULD BE A TIME PERIOD WHERE, EVEN IF THEY

21   WERE TO DESIGN AROUND THE PATENTED INVENTIONS, THERE WOULD BE A

22   TIME WHERE THEY WOULD BE DOING THAT DESIGN AROUND AND GETTING

23   APPROVAL FROM THE CARRIERS, AND DURING THAT PERIOD, THEY WOULD

24   BE DEFERRING THE LAUNCHES OF THEIR PRODUCTS, SO THE ACCUSED

25   PRODUCTS WOULD BE, IN ESSENCE, OFF THE MARKET.

1        THAT'S WHAT THAT CATEGORY MEANS.

2   Q.   ALL RIGHT.  AND THEN TO START THIS EXERCISE, AND WITH

3   MR. LEE'S ASSISTANCE USING THE DEMONSTRATIVE, CAN WE SHOW HOW

4   MANY OF THE 37-PLUS MILLION UNITS AS SHOWN AT THE TOP OF THIS

5   SLIDE YOU INCLUDED ULTIMATELY IN YOUR CALCULATION OF OFF THE

6   MARKET LOST PROFITS?

7   A.   YES.

8   Q.   AND IF YOU SLIDE THAT NUMBER DOWN.

9        OF THE TOTAL ACCUSED UNITS -- LET ME ASK THIS -- WHAT

10  PERCENTAGE OF THE TOTAL ACCUSED UNITS DOES THAT NUMBER OF

11  PHONES THAT WE'VE SHOWN SLIDING DOWN ON THE SCREEN REPRESENT?

12  A.   I DON'T HAVE A CALCULATOR HANDY, BUT THE NUMBER IS ON THE

13  SCREEN AND WE SAW THE TOTAL NUMBER BEFORE.  IT'S SUBSTANTIALLY

14  LESS THAN 5 PERCENT.

15  Q.   OKAY.  AND LET ME ASK YOU, HOW DID YOU DETERMINE OR DECIDE

16  WHAT UNITS WERE INCLUDED IN THE OFF THE MARKET LOST PROFITS

17  CATEGORY?

18  A.   WELL, I IDENTIFIED THE NUMBER OF UNITS THAT WOULD HAVE

19  BEEN OFF THE MARKET -- THE NUMBER OF ACCUSED UNITS THAT WOULD

20  NO LONGER BE SOLD BECAUSE THEY WOULD HAVE BEEN OFF THE MARKET,

21  AND THEN I DID SOME ADDITIONAL ANALYSIS TO FIGURE OUT WHAT

22  PORTION OF THOSE REPRESENT LOST APPLE SALES.

23  Q.   WE'RE GOING TO BRING UP, AT THE BOTTOM OF THIS SLIDE, A

24  SERIES OF BOXES OR GRAPHICS FROM LEFT TO RIGHT TO WALK THROUGH

25  YOUR ANALYSIS HERE, JUST TO PREVIEW WHERE WE'RE GOING.

```
 1              AND LET ME START DOING THAT BY ASKING YOU, WHAT PATENTS

 2      DID YOU DETERMINE QUALIFIED FOR OFF THE MARKET LOST PROFITS

 3      DAMAGES?

 4      A.    THERE ARE THREE PATENTS:  THE '172, WHICH IS AUTO CORRECT;

 5      '721, WHICH IS SLIDE TO UNLOCK; AND '647, WHICH IS QUICK LINKS.

 6      Q.    AND WHY IS IT THOSE PATENTS AS OPPOSED TO THE '414 AND

 7      '959 QUALIFY FOR THOSE CATEGORY OF DAMAGES?

 8      A.    THE OTHER TWO PATENTS, BASED ON VARIOUS TIME ISSUES IN

 9      THIS CASE, THEY JUST DIDN'T QUALIFY.

10      Q.    HAVING IDENTIFIED THESE PATENTS, FOR WHAT TIME PERIODS DID

11      YOU CALCULATE OFF THE MARKET LOST PROFITS DAMAGES?

12      A.    AGAIN, GIVEN SOME OF THE SPECIFICS OF THIS CASE, THE TIME

13      PERIOD IS ACTUALLY DIFFERENT FOR EACH OF THE THREE PATENTS, AND

14      THEY ARE NOW LISTED ON THE SCREEN THAT'S IN FRONT OF THE JURY.

15              FOR THE '647 PATENT, THE DELAY PERIOD, OR THE OFF THE

16      MARKET PERIOD RUNS FROM AUGUST 19TH, 2011, TO DECEMBER 16TH

17      2011.

18              FOR THE SLIDE TO UNLOCK PATENT, IT RUNS FROM FEBRUARY 8TH,

19      2012, TO FEBRUARY 21ST, 2012.

20              AND FOR THE '172 AUTO CORRECT PATENT, IT RUNS FROM

21      FEBRUARY 8, 2012, TO APRIL 3RD, 2012.

22      Q.    AND WHAT FACTORS IN YOUR ANALYSIS LED TO THESE TIME

23      PERIODS BEING APPLICABLE PERIODS FOR OFF THE MARKET DAMAGES?

24      A.    RIGHT.  SO THERE ARE REALLY -- THERE ARE THREE PERIODS

25      THAT MATTER HERE.  ONE OF THEM IS THE DATE OF FIRST
```

1    INFRINGEMENT; ANOTHER ONE IS THE DATE IN WHICH DAMAGES ARE TO

2    BE COLLECTED IN THIS CASE, AS I THINK I MENTIONED TUESDAY, IT'S

3    DIFFERENT FOR THE '647 COMPARED TO THE OTHER PATENTS; AND THEN

4    THE THIRD ONE IS THE AMOUNT OF TIME IT WOULD HAVE TAKEN FOR

5    THIS REDESIGN TO TAKE PLACE AND THEN BE PUT INTO THE

6    MARKETPLACE.

7    Q.   AS TO TWO OF THE PATENTS, SAMSUNG ACTUALLY DID IMPLEMENT A

8    DESIGN AROUND; IS THAT CORRECT?

9    A.   YES, THE '721 AND THE '172 WERE DESIGNED AROUND LATER.

10   Q.   DID SAMSUNG EVER IMPLEMENT AN ALTERNATIVE FOR THE '647

11   PATENT DURING THE TWO AND A HALF YEAR DAMAGES PERIOD IN THIS

12   CASE?

13   A.   NO.

14   Q.   NOW, WE HAVE THAT NUMBER UP NEXT TO OFF THE MARKET, AND

15   THAT NUMBER IS -- LET ME JUST ASK YOU, DOES THAT NUMBER

16   REPRESENT ALL OF SAMSUNG'S SALES OF ACCUSED PRODUCTS DURING

17   THIS TIME PERIOD?

18   A.   IT DOES NOT.

19   Q.   COULD YOU EXPLAIN WHY THAT IS?

20   A.   SO THE NUMBER OF ACCUSED SALES THAT SAMSUNG MADE DURING

21   THESE PERIODS IS ACTUALLY ABOUT THREE AND A HALF TIMES THE

22   NUMBER YOU SEE ON YOUR SCREEN.

23        BUT IN MY ANALYSIS, I DETERMINED THAT NOT ALL OF THOSE

24   SALES WOULD HAVE BEEN GONE OVER AND BEEN APPLE'S SALES HAD

25   SAMSUNG NOT -- HAD SAMSUNG NOT MADE THEM, THEY WOULD HAVE GONE

1       OTHER PLACES AS WELL.

2       Q.   IF WE BRING UP THE NEXT PANEL?

3            WHAT REDUCTIONS IN YOUR ANALYSIS DID YOU MAKE THAT ACCOUNT

4       FOR WHAT YOU JUST DESCRIBED?

5       A.   SO I MADE -- I MADE TWO ADJUSTMENTS.  THE FIRST ONE IS I

6       TOOK THE INFRINGING SAMSUNG SALES AND I REDISTRIBUTED THEM

7       ACROSS THE REST OF THE SMARTPHONE MARKETPLACE, AND I DID THAT

8       BASED ON OTHER COMPETITORS' MARKET SHARES.  THAT WOULD INCLUDE

9       APPLE, NOKIA, HTC, AND, IN FACT, EVEN SOME OF THE OLDER SAMSUNG

10      MODELS.  SO THAT'S THE FIRST ADJUSTMENT I MADE.

11      Q.   OKAY.  AND I DIDN'T HEAR WHAT YOU SAID.  IN THAT

12      ADJUSTMENT, DO YOU ACTUALLY ALLOCATE SOME UNITS BACK TO SAMSUNG

13      AS WELL?

14      A.   I DID.  SAMSUNG HAS SOME NON-ACCUSED PHONES THAT GO INTO

15      THAT MARKET SHARE, SO SOME OF THE PHONES DO GO BACK TO THOSE

16      OLDER SAMSUNG MODELS.

17      Q.   IN MAKING THE MARKET SHARE ADJUSTMENT THAT YOU DESCRIBED,

18      WHAT SOURCE OF DATA DID YOU USE?

19      A.   I USED EXACTLY THE SAME DATA THAT I USED TO CREATE THAT

20      CHART ON TUESDAY, THE IDC DATA THAT COLLECTS INFORMATION ON THE

21      SMARTPHONE SALES ON A, I THINK IT'S ON A QUARTERLY BASIS FOR

22      THIS WHOLE PERIOD.

23      Q.   AND WE'VE PREVIOUSLY INTRODUCED PLAINTIFF'S EXHIBIT 222A,

24      WHICH IS A SUMMARY OF YOUR DAMAGE CALCULATIONS.

25           DOES THAT SUMMARY INCLUDE A SECTION THAT INCLUDES THE DATA

1    UPON WHICH YOU BASED YOUR MARKET SHARE ADJUSTMENT?

2    A.   IT DOES.

3    Q.   DOES THAT START AT PAGE 25 OF THAT EXHIBIT?

4    A.   IT DOES.  PAGE 25 SAYS "SUMMARY OF MARKET SHARE

5    INFORMATION," AND IT'S ON THE NEXT TWO PAGES.  BOTH THE

6    SMARTPHONES ARE THERE AND TABLETS ARE THERE, TOO.

7    Q.   NOW, DID YOU MAKE ANY FURTHER REDUCTIONS TO THE UNITS ON

8    WHICH YOU'RE CALCULATING LOST PROFITS BEFORE YOU COMPLETED YOUR

9    CALCULATIONS BEYOND THIS MARKET SHARE ADJUSTMENT?

10   A.   I DID.

11   Q.   AND WHAT FURTHER REDUCTION OR REDUCTIONS DID YOU MAKE?

12   A.   WELL, I MADE ANOTHER REDUCTION THAT REDUCED THE PORTION

13   THAT WOULD GO TO APPLE'S PRODUCTS BECAUSE SOME OF THE CARRIERS

14   DURING PART OF THE PERIOD THAT WE'RE STUDYING, THOSE CARRIERS

15   ACTUALLY DIDN'T CARRY IPHONES YET.

16        SO, FOR EXAMPLE, T-MOBILE DIDN'T HAVE IPHONES UNTIL THE

17   FALL OF 2013, AND SPRINT DIDN'T -- HAD IPHONES ONLY FOR A VERY

18   SHORT PERIOD.  THEY STARTED HAVING THEM IN OCTOBER OF 2011.

19        SO IN THE PERIODS WHERE THERE WEREN'T IPHONES AVAILABLE AT

20   THOSE CARRIERS, WHAT THAT MEANS IS THAT SOMEONE WHO'S GOING TO

21   BUY A SAMSUNG PHONE FROM ONE OF THOSE CARRIERS WOULD NOT ONLY

22   HAVE TO SWITCH TO BUY AN IPHONE, BUT WOULD HAVE TO SWITCH

23   CARRIERS TO BUY AN IPHONE, AND THERE IS EVIDENCE THAT SOME

24   PEOPLE DID THAT, BUT IT'S RELATIVELY FEW, AND SO I ACCOUNTED

25   FOR THAT AND GAVE APPLE FEWER UNITS.

1    Q.   NOW, THE MARKET SHARE AND THE CARRIER ADJUSTMENT THAT YOU

2    JUST DESCRIBED, AS A MATTER OF ECONOMICS, WHAT DO THOSE

3    ADJUSTMENTS ACCOUNT FOR?

4    A.   WELL, IT ACCOUNTS FOR THE FACT -- WE'RE BACK TO THIS

5    CONCEPT OF DIFFERENTIATED PRODUCTS.  THESE PRODUCTS ARE

6    DIFFERENT AND THEY HAVE DIFFERENT FEATURES AND THOSE FEATURES

7    APPEAL TO CUSTOMERS IN DIFFERENT WAYS.

8         AND SO WHAT THE MARKET SHARE CAPTURES IS THE IDEA THAT

9    SOME PEOPLE WILL STAY WITH THE SAMSUNG BRAND, SOME PEOPLE WILL

10   STAY WITH THE ANDROID OPERATING SYSTEM, AND SOME PEOPLE MAY

11   SIMPLY GO TO ANOTHER PHONE THAT'S NOT -- NOT EVERYONE FOLLOWS

12   AND DOES EXACTLY THE SAME THING WHEN THEY'RE NO LONGER BUYING A

13   SAMSUNG PHONE.

14        SO I ACCOUNT FOR BRAND AND OPERATING SYSTEMS THROUGH THE

15   OBSERVED CONDUCT OF THOSE CUSTOMERS IN THE MARKETPLACE.

16   Q.   ALL RIGHT.  AFTER YOUR MARKET SHARE CALCULATIONS AND

17   ADJUSTMENTS, WHAT WAS THE NEXT STEP IN YOUR OFF THE MARKET LOST

18   PROFITS CALCULATION?

19   A.   SO AT THIS POINT I'VE ACTUALLY IDENTIFIED THE NUMBER OF

20   LOST SALES THAT APPLE SUSTAINED.  THAT'S THE NUMBER ON THE

21   SCREEN IN FRONT OF YOU.

22        AND THE NEXT STEP IS TO DETERMINE THAT APPLE HAD, OR WOULD

23   HAVE THE CAPACITY TO MAKE THOSE SALES DURING THOSE PERIODS, AND

24   SO I DID A CAPACITY TEST.

25   Q.   AND HOW DID YOU EVALUATE THAT ISSUE?

1    A.   WELL, I WORKED WITH MR. SEXTON, WHO WAS, I BELIEVE, HERE

2    ON FRIDAY, AND HE PREPARED A SPREADSHEET THAT I BELIEVE WAS PUT

3    IN IN THIS CASE, AND I USED THAT TO EVALUATE THE AVAILABILITY

4    AND THE CAPACITY TO MAKE THESE SALES AT APPLE.

5    Q.   DID YOU MAKE ANY ADJUSTMENTS TO MR. SEXTON'S SCHEDULE?

6    A.   I DID.  I ACTUALLY BUILT IN SOME ADDITIONAL SAFEGUARDS,

7    MORE INVENTORY AND EMERGENCY STOCK, TO BE MORE CONSERVATIVE IN

8    TERMS OF WHETHER THE UNITS WERE THERE OR NOT.

9    Q.   AND AGAIN, IS THE ANALYSIS THAT YOUR -- ANALYSIS OF

10   CAPACITY INCLUDED IN YOUR PLAINTIFF'S EXHIBIT 222A, THE SUMMARY

11   OF YOUR DAMAGE CALCULATIONS?

12   A.   YES, IT IS.

13   Q.   IS THAT AT PAGE 29 THROUGH 32?

14   A.   YES.  AND AGAIN, IT DOES SMARTPHONES AND TABLETS.

15   Q.   AND DID YOU, AS A RESULT OF YOUR ANALYSIS, CONCLUDE THAT

16   APPLE COULD HAVE MADE THE ADDITIONAL NUMBER OF UNITS SHOWN NEXT

17   TO THE OFF THE MARKET LOST PROFITS LANGUAGE ON THE SCREEN?

18   A.   YES.

19   Q.   WHAT WAS THE FINAL STEP IN YOUR CALCULATION OF OFF THE

20   MARKET LOST PROFITS?

21   A.   WELL, THE DAMAGES APPLE SUSTAINED BECAUSE OF ITS LOST

22   UNITS WOULD BE ITS PROFITS ON THOSE LOST UNITS.  SO I HAVE THE

23   LOST UNITS, BUT I THEN NEED TO ESTIMATE WHAT THE LOST PROFITS

24   PER UNIT WAS AT APPLE TO GET THE TOTAL DOLLARS, AND THAT'S WHAT

25   I DID.

1    Q.   OKAY.  AND WHAT INFORMATION DID YOU USE TO DO THAT?

2    A.   I USED APPLE'S FINANCIAL STATEMENTS ABOUT ITS

3    PROFITABILITY ON ITS SMARTPHONES AND TABLETS.

4    Q.   AND IS THE INFORMATION AND THE ANALYSIS THAT YOU'VE

5    PERFORMED ON IT ALSO INCLUDED IN YOUR PLAINTIFF'S EXHIBIT 222A,

6    SPECIFICALLY AT PAGES 33 TO 35?

7    A.   YES, IT IS, FOR BOTH SMARTPHONES AND TABLETS.

8    Q.   SO HAVING EVALUATED ALL THE FACTORS THAT WE SEE AT THE

9    BOTTOM OF PDX 92.30 NOW, WHAT DID YOU CONCLUDE?

10   A.   SO I CONCLUDED THAT APPLE SUSTAINED LOST PROFITS DURING

11   THESE OFF THE MARKET PERIODS OF $507.5 MILLION.

12   Q.   DOCTOR, I'D LIKE NOW TO TURN TO THE DIMINISHED DEMAND

13   CALCULATION.  IF WE CAN ADVANCE -- IF WE CAN GO TO

14   DEMONSTRATIVE 92.34, CONFIDENTIAL DEMONSTRATIVE 92.34.

15       AND BEFORE WE WALK THROUGH THESE STEPS THAT YOU REACHED TO

16   CALCULATE THIS CATEGORY OF LOST PROFITS, COULD YOU REMIND THE

17   LADIES AND GENTLEMEN BRIEFLY WHAT YOU'RE ACCOUNTING FOR, WHAT

18   FORM OF INJURY OR DAMAGES YOU'RE ACCOUNTING FOR IN THIS

19   CALCULATION?

20   A.   SO WHAT THIS CALCULATION DOES IS IT LOOKS AT PERIODS WHERE

21   I ASSUME SAMSUNG HAS INTRODUCED AN ALTERNATIVE DESIGN TO THE

22   PATENTS AT ISSUE, BUT THAT THE ALTERNATIVE IS NOT AS GOOD.

23       SO WHAT THAT MEANS IS THAT APPLE -- THAT SAMSUNG STILL

24   HOLDS ON TO A LOT OF ITS SALES, BUT THERE ARE SOME THAT IT

25   LOSES BECAUSE THE ALTERNATIVE IS NOT AS GOOD, AND SOME OF

1    THOSE, AGAIN, RESULT IN LOST SALES TO APPLE, OR BECOME LOST

2    SALES TO APPLE.

3    Q.   ALL RIGHT.  AND AGAIN, WITH MR. LEE'S ASSISTANCE -- AND

4    THIS IS NOT A NUMBER THAT YOU SHOULD VERBALIZE -- BUT CAN WE

5    SHOW ON THE CHART HOW MANY UNITS YOU ACCOUNTED FOR IN THIS

6    CATEGORY?

7         DO YOU SEE THAT NUMBER THAT'S COME UP?  IS THAT ACCURATE?

8    A.   YES, THAT'S THE NUMBER THAT APPLIES IN THE DIMINISHED

9    DEMAND SCENARIO.  THOSE ARE THE NUMBER OF LOST SALES APPLE

10   LOST.

11   Q.   SO, AGAIN, DID YOU GO THROUGH A SERIES OF STEPS TO

12   CALCULATE WHAT THE LOST PROFITS WOULD HAVE BEEN ON THOSE UNITS?

13   A.   I DID.

14   Q.   OKAY.  AND WE'RE GOING TO USE THE SAME CONVENTION ON THE

15   GRAPHIC HERE TO DO THAT, SO LET'S WALK THROUGH THEM.

16        FIRST, FOR WHICH PATENTS DID YOU CALCULATE DIMINISHED

17   DEMAND LOST PROFITS?

18   A.   I CALCULATED IT FOR THREE PATENTS:  THE '959 UNIVERSAL

19   SEARCH PATENT; THE '647 QUICK LINKS PATENT; AND THE '414

20   BACKGROUND SYNC PATENT.

21   Q.   AND AGAIN, WHY THESE THREE PATENTS?  WHY DID YOU CALCULATE

22   DIMINISHED DEMAND LOST PROFITS FOR THESE THREE PATENTS?

23   A.   BECAUSE I OBSERVED THAT IN THE ACTUAL WORLD, SAMSUNG HAD

24   DESIGNED AROUND THE OTHER TWO AND FOUND THAT IT COULD LIVE WITH

25   THOSE ALTERNATIVES, SO I LIMITED THE DIMINISHED DEMAND JUST TO

1    THESE THREE.

2    Q.   BY THE OTHER TWO, YOU'RE REFERRING TO THE '172 AND '721

3    PATENTS?

4    A.   THAT'S RIGHT.

5    Q.   AND AS TO -- JUST TO REPEAT, AS TO THE '647 AND '414

6    PATENTS, DID SAMSUNG EVER IMPLEMENT A DESIGN AROUND?

7    A.   WITH RESPECT TO THE '647 AND THE '414, THEY HAVE NOT.

8    Q.   AND THE '959 PATENT IS THE PATENT AS TO WHICH SAMSUNG

9    REMOVED THE FEATURE, BUT THEN RESTORED IT IN THE SUMMER AND

10   FALL OF 2012?

11   A.   THAT'S RIGHT.

12   Q.   HOW IN YOUR CALCULATIONS DO YOU ADJUST FOR THE EFFECT OF

13   SAMSUNG'S IMPLEMENTATION OF ALTERNATIVES THAT OFFER LESS THAN

14   THE FULL FEATURES OR BENEFITS OF THE PATENT?

15   A.   ALL RIGHT.  SO HERE THE CONCEPT OF THE DIMINISHED DEMAND

16   IS HOW THE DEMAND WOULD BE AFFECTED IF THE PHONE DIFFERED

17   BETWEEN THE INFRINGING APPROACH THAT WAS ACTUALLY USED AND THE

18   ALTERNATIVE, AND THAT DISCREPANCY IS A DISCREPANCY THAT

19   PROFESSOR HAUSER WAS MEASURING AND IDENTIFYING IN HIS SURVEY,

20   SO I TURNED TO HIS NUMBERS TO DO THAT.

21   Q.   OKAY.  AND HOW WAS HIS -- WAS THAT SURVEY USEFUL TO YOU?

22   A.   PROFESSOR HAUSER PROVIDED ESTIMATES OF WHAT'S CALLED

23   WILLINGNESS TO BUY, WHICH LOOKED AT THE DIFFERENCE IN THE

24   WILLINGNESS OF ACTUAL SAMSUNG CUSTOMERS THAT WERE SURVEYED TO

25   CHANGE THEIR PURCHASE DECISION DEPENDING ON WHETHER THE

1    PATENTED INVENTION WAS THERE OR WHETHER THE ALTERNATIVE WAS

2    THERE, AND I USED THOSE PERCENTAGE CHANGES TO CAPTURE THIS

3    DIMINISHED DEMAND CONCEPT.

4    Q.   AND WE HEARD FROM DR. HAUSER ON TUESDAY, AND WE SAW THAT

5    THERE WERE TWO FIGURES THAT HE CALCULATED IN THIS CONJOINT

6    SURVEY, WILLINGNESS TO BUY AND WILLINGNESS TO PAY.

7         WHICH OF THOSE FIGURES DID YOU USE?

8    A.   I USED THE WILLINGNESS TO BUY FIGURES.

9    Q.   AND IF WE BRING UP ON THE SCREEN -- WHAT WERE THE

10   WILLINGNESS TO BUY PERCENTAGES THAT YOU USED IN YOUR

11   CALCULATIONS?

12   A.   SO FOR THE '959 PATENT, IT WAS 4.47 PERCENT; FOR THE QUICK

13   LINKS PATENT, IT WAS 6.87; AND FOR THE BACKGROUND SYNC, IT WAS

14   8.27.

15   Q.   OKAY.  AND HOW DID YOU SELECT THOSE SPECIFIC FIGURES?

16   A.   WELL, THOSE WERE ULTIMATELY DERIVED FROM SOME OF

17   PROFESSOR HAUSER'S WORK, BUT I MADE DOWNWARD ADJUSTMENTS BEFORE

18   I APPLIED THEM.

19   Q.   NOW, WE HEARD ON TUESDAY THAT DR. HAUSER DETERMINED

20   WILLINGNESS TO BUY FOR PATENTS INDIVIDUALLY.

21   A.   YES.

22   Q.   ARE YOU AWARE OF THAT TESTIMONY?

23        HE ALSO TESTIFIED THAT HE DETERMINED WILLINGNESS TO BUY --

24   COMBINED WILLINGNESS TO BUY TO FOR VARIOUS COMBINATIONS.  WHICH

25   OF HIS FIGURES DID YOU USE IN THESE CALCULATIONS YOU ARE

1    PRESENTING TO THE JURY, THE INDIVIDUAL WILLINGNESS TO BUY OR

2    THE ACCUMULATED WILLINGNESS TO BUY?

3    A.   I USED THE INDIVIDUAL WILLINGNESS TO BUY NUMBERS FOR EACH

4    PATENT.

5    Q.   DID YOU MAKE ANY ADJUSTMENTS TO DR. HAUSER'S NUMBERS

6    BEFORE YOU USED THEM IN YOUR CALCULATIONS?

7    A.   I DID.

8    Q.   WHAT ADJUSTMENT OR ADJUSTMENTS DID YOU MAKE?

9    A.   WELL, THE TECHNICAL NAME IS I LINEARIZED THEM, THAT'S THE

10   MATHEMATICAL CONCEPT, BUT WHAT I DID IS I RECOGNIZED THE FACT

11   THAT SOME OF THE PEOPLE THAT SHIFTED THEIR DEMAND, THAT IS,

12   WOULDN'T BUY THE PRODUCT BECAUSE ONE OF THE PATENTS WASN'T

13   THERE, MIGHT ALSO BE A PERSON THAT SHIFTED THEIR DEMAND FOR ONE

14   OF THE OTHER PATENTS.

15        SO I DIDN'T WANT TO ACCOUNT FOR PEOPLE SHIFTING THEIR

16   DEMANDS MORE THAN ONCE.

17        SO I UNDERTOOK A MATHEMATICAL CALCULATION TO MAKE SURE I

18   DIDN'T DO THAT, AND WHAT I DID IS I ACTUALLY REDUCED THE

19   NUMBERS FROM PROFESSOR HAUSER'S WILLINGNESS TO PAY NUMBERS BY

20   ABOUT 15 PERCENT.

21   Q.   AND YOU REFER TO THAT ADJUSTMENT YOU MADE AS

22   LINEARIZATION?

23   A.   YEAH, THAT'S THE MATHEMATICAL PRINCIPLE I APPLIED.

24   Q.   NOW, IF WE CAN GO -- USING AGAIN PDX 92.35, SIMILAR

25   QUESTION THAT I ASKED WITH RESPECT TO THE OFF THE MARKET LOST

1    PROFITS.

2         ARE YOU CALCULATING DIMINISHED DEMAND LOST PROFITS ON ALL

3    OF THE UNITS THAT SAMSUNG SOLD DURING THE INFRINGING PERIOD?

4    A.   NO.  I DO NOT HAVE ALL OF SAMSUNG'S LOST UNITS TRANSLATING

5    OVER TO APPLE LOST UNITS.

6    Q.   AND WHAT ADDITIONAL REDUCTIONS DID YOU MAKE, OR

7    ADJUSTMENTS?

8    A.   I MADE THE SAME ADJUSTMENTS HERE THAT I MADE IN THE

9    PREVIOUS CATEGORY.  I DID A MARKET SHARE ADJUSTMENT, AND I DID

10   A CARRIER ADJUSTMENT.  SO THOSE REDUCED THE NUMBERS FURTHER.

11   Q.   WITH RESPECT TO THE MARKET SHARE ADJUSTMENT WHICH WE'VE

12   COVERED EARLIER IN THE OFF THE MARKET DISCUSSION, WERE YOU HERE

13   FOR DR. HAUSER'S EXAMINATION ON TUESDAY WHERE MR. PRICE ASKED

14   DR. HAUSER WHETHER HIS CONJOINT STUDY ACCOUNTED FOR SUCH THINGS

15   AS BRAND AND OPERATING SYSTEM?

16   A.   I WAS HERE, YES.

17   Q.   DO YOUR CALCULATIONS ACCOUNT FOR BRAND AND OPERATING

18   SYSTEM AND THINGS LIKE THAT?

19   A.   YES.  THAT'S WHAT THE MARKET SHARE AND CARRIER ADJUSTMENTS

20   ACCOUNT FOR.

21   Q.   IN THE MANNER THAT YOU DESCRIBED A FEW MOMENTS AGO?

22   A.   RIGHT.

23   Q.   OKAY.  AFTER THE MARKET SHARE ADJUSTMENT, WHAT WAS THE

24   NEXT STEP YOU TOOK IN YOUR CALCULATIONS?

25   A.   WELL, IT'S GOING TO FOLLOW THE SAME SET WE DID BEFORE.  I

1    AGAIN LOOKED AT APPLE'S CAPACITY OVER THE PERIODS AND

2    DETERMINED THAT THEY HAD SUFFICIENT CAPACITY TO MAKE THE

3    ADDITIONAL SALES.

4    Q.   AND THEN THE FINAL STEP AGAIN?

5    A.   THE PER UNIT LOST PROFIT, SO I COULD TAKE THE NUMBER OF

6    UNITS APPLE LOST AND COME UP WITH A DOLLAR DAMAGE BY

7    MULTIPLYING THOSE TWO TOGETHER.

8    Q.   OKAY.  AND AS A RESULT OF THOSE STEPS, WHAT CONCLUSION DID

9    YOU REACH ABOUT THE AMOUNT OF DIMINISHED DEMAND LOST PROFITS IN

10   THIS CASE?

11   A.   SO DIMINISHED DEMAND LOST PROFITS SUSTAINED BY APPLE AS A

12   RESULT OF SAMSUNG'S INFRINGEMENT IS $559.6 MILLION.

13   Q.   AND BETWEEN THOSE TWO CATEGORIES OF LOST PROFITS FOR WHICH

14   WE'RE SHOWING UNITS ON THE SCREEN HERE, WHAT PERCENTAGE OF THE

15   TOTAL ACCUSED UNITS IN THIS CASE, THE 37 MILLION PLUS, ARE

16   ACCOUNTED FOR IN YOUR LOST PROFIT DAMAGES?

17   A.   SO THERE ARE TWO NUMBERS ON YOUR SCREEN, THE OFF THE

18   MARKET NUMBER -- I CAN'T SAY THESE OUT LOUD -- AND THE

19   DIMINISHED DEMAND NUMBER.

20       ADDING THOSE TOGETHER, APPROXIMATELY, WHAT YOU'LL SEE IS

21   THAT IT'S LESS THAN 10 PERCENT OF THE SAMSUNG ACCUSED UNITS

22   HAVE LOST PROFITS ASSOCIATED WITH THEM AT APPLE.  SO ABOUT 1 IN

23   10.

24   Q.   OKAY.  AND HOW DOES THAT LESS THAN 10 PERCENT FIGURE

25   COMPARE WITH APPLE'S OVERALL MARKET SHARE DURING THE RELEVANT

1    PERIOD?

2    A.   APPLE'S MARKET SHARE IN THE SMARTPHONES DURING THIS PERIOD

3    WAS IN THE RANGE OF ABOUT 35 TO 40 PERCENT, SOMETIMES HIGHER,

4    SOMETIMES LOWER.  THE 10 PERCENT IS MUCH LOWER.

5    Q.   SO DOES THAT CONCLUDE YOUR CALCULATION OF LOST PROFIT

6    DAMAGES?

7    A.   IT DOES.

8    Q.   OKAY.  LET'S TURN FINALLY NOW TO REASONABLE ROYALTIES, AND

9    AGAIN IF WE CAN GO BACK TO 92.4, WE SEE THERE REASONABLE

10   ROYALTIES DOWN ON THE BOTTOM.

11        WHAT IS -- AGAIN, JUST TO REORIENT US, WHAT IS THIS

12   CATEGORY OF DAMAGES?

13   A.   SO REASONABLE ROYALTIES IS THE FLOOR OR THE BOTTOM OF THE

14   DAMAGES APPLE CAN COLLECT BASED ON THE LAW, AND WHAT IT

15   REFLECTS IS A ROYALTY THAT SAMSUNG SHOULD HAVE BEEN PAYING, BUT

16   DIDN'T, FOR THE RIGHT TO USE THE PATENTS, EVEN ON THESE

17   REMAINING DEVICES.

18   Q.   AND WITH THE USE OF 92.40 -- AND AGAIN, DON'T VERBALIZE

19   THESE NUMBERS -- BUT CAN YOU -- WITH MR. LEE'S ASSISTANCE, CAN

20   WE SHOW HOW MANY UNITS ENDED UP IN YOUR CALCULATIONS IN THE

21   REASONABLE ROYALTY CATEGORY?

22   A.   SO THERE WERE -- ALL OF THE REMAINING UNITS THAT DIDN'T

23   GET LOST PROFITS FIND THEIR WAY DOWN TO REASONABLE ROYALTIES.

24        THERE'S A SMALL NUMBER FOR SLIGHT HOUSEKEEPING REASONS

25   THAT DON'T FIND THEIR WAY ALL THE WAY DOWN WHERE NO CALCULATION

1    IS DONE.

2         BUT FOR THE VAST MAJORITY, IT'S THE REMAINDER THAT GO INTO

3    THE REASONABLE ROYALTIES, AND YOU CAN SEE THAT NUMBER ON THE

4    SCREEN.

5    Q.   ALL RIGHT.  AND I THINK IF WE BRING UP PDX 92.41, BEFORE

6    WE GET INTO THE CALCULATION -- I THINK THE LADIES AND GENTLEMEN

7    SAW THIS IN OPENING STATEMENT -- BUT COULD YOU BRIEFLY EXPLAIN

8    THE CONCEPT BEHIND A ROYALTY IN A PATENT CASE LIKE THIS, A

9    REASONABLE ROYALTY DAMAGE AWARD I SHOULD SAY?

10   A.   OKAY.  SO A ROYALTY IS PAID WHEN ONE PERSON OR COMPANY

11   OWNS SOMETHING AND THE OTHER, ANOTHER COMPANY OR PERSON WANTS

12   TO USE IT.

13        SO, FOR EXAMPLE, IF SOMEONE OWNS A HOUSE AND SOMEONE ELSE

14   WANTS TO RENT IT, THAT RENT IS, IN A SENSE, A ROYALTY PAYMENT,

15   WHICH IS HERE'S WHAT I'M GOING TO PAY YOU ON A REGULAR BASIS TO

16   USE YOUR PROPERTY.

17        IF YOU WERE TO WRITE A SONG AND I WERE TO RECORD IT, I

18   NEED THE RIGHTS FROM YOU TO RECORD IT, AND I WOULD PAY YOU A

19   ROYALTY EVERY TIME SOMEONE BOUGHT THE SONG THAT I RECORDED OF

20   YOURS.  I WOULDN'T EXPECT A LOT OF MONEY COMING YOUR WAY ON

21   THAT ONE.

22        ON PATENTS IT'S THE SAME THING.  ON PATENTS, A COMPANY

23   OWNS THE PATENT AND SOMEONE ELSE WANTS TO USE IT AND, FOR THE

24   RIGHT TO USE IT, THEY WOULD PAY A ROYALTY.

25        NOW, THAT DIDN'T HAPPEN HERE, SO WE'VE GOT TO DO A

1    HYPOTHETICAL EXERCISE TO FIGURE OUT WHAT THAT NUMBER WOULD LOOK

2    LIKE.

3    Q.   AND THAT'S WHAT THE HYPOTHETICAL NEGOTIATION REFERS TO

4    THAT WE HEARD ABOUT?

5    A.   THAT'S RIGHT.

6    Q.   AND AGAIN, YOU'VE DISCUSSED THIS, BUT WHEN WOULD THAT

7    HYPOTHETICAL NEGOTIATION OCCUR?

8    A.   WHEN INFRINGEMENT BEGAN IN THIS CASE, WHICH IS

9    AUGUST/SEPTEMBER TIMEFRAME, 2011.

10   Q.   NOW, AS PART OF THAT, I'LL CALL IT CONSTRUCT OF THIS

11   HYPOTHETICAL NEGOTIATION, DID THE PARTIES FOR THAT NEGOTIATION,

12   WHO WOULD BE SAMSUNG AND APPLE -- IS THAT CORRECT?

13   A.   THAT'S RIGHT.

14   Q.   -- ARE THE PARTIES TO THAT NEGOTIATION PRESUMED TO ASSUME

15   THAT SAMSUNG HAS INFRINGED VALID PATENTS OWNED BY APPLE?

16   A.   YES.  THAT DISPUTE IS TAKEN OFF THE TABLE.  EVERYONE

17   UNDERSTANDS THAT THE PATENTS ARE VALID AND THAT WHAT SAMSUNG IS

18   GOING TO DO WITH THE PATENTS INFRINGES THE PATENTS.

19   Q.   OKAY.  WHAT OTHER ASSUMPTIONS DID YOU MAKE, OR ARE MADE BY

20   THE LAW REGARDING THE HYPOTHETICAL NEGOTIATION?

21   A.   WELL, WHAT -- ONE OF THE OTHER KEY ASSUMPTIONS IS, IN

22   ESSENCE, THERE HAS TO BE AN AGREEMENT, WHICH IS THAT THE

23   PARTIES CAN'T LEAVE THIS HYPOTHETICAL NEGOTIATION WITHOUT

24   HAVING RESOLVED ANY DIFFERENCES AND THAT THEY ACTUALLY ARE ABLE

25   TO COME UP WITH A NUMBER.

1    Q.   LET'S BRING UP, IF WE CAN, PDX 92.43.  AND THERE'S A LOT

2    OF WORDS ON HERE WHICH WE DON'T HAVE TIME TO SEE NOW AND YOU'RE

3    NOT GOING TO WALK THROUGH, BUT CAN YOU TELL THE LADIES AND

4    GENTLEMEN, DR. VELLTURO, WHAT IS ON THE SCREEN HERE WHICH WE

5    HAVE DESCRIBED AS ROYALTY CONSIDERATIONS, QUOTE,

6    GEORGIA PACIFIC FACTORS?

7    A.   SURE.  SO THE IDEA OF THIS REASONABLE ROYALTY FOR DAMAGES

8    IN PATENT CASES HAS OBVIOUSLY BEEN AROUND A LONG TIME, AND THIS

9    HYPOTHETICAL NEGOTIATION, THAT'S BEEN AROUND FOR A LONG TIME,

10   TOO.

11        BACK IN THE 1970S THERE WAS A COURT CASE INVOLVING

12   GEORGIA PACIFIC, A BIG PAPER COMPANY OUT OF ATLANTA, WHERE THE

13   COURT LAID OUT 15 FACTORS THAT IT FELT WERE RELEVANT AND

14   IMPORTANT TO STUDY TO COME UP WITH A REASONABLE ROYALTY RATE.

15        SO I USED ALL OF THOSE FACTORS HERE.  FORTUNATELY, THEY

16   CAN BE KIND OF PACKED DOWN INTO A HANDFUL OF CATEGORIES THAT

17   ENCOMPASS THEM ALL.  BUT I DID ALL OF THESE AND WE'RE GOING TO

18   GO THROUGH A SUMMARY OF THEM.

19   Q.   OKAY.  HAVE YOU PREPARED A SERIES OF GRAPHICS WHICH GROUP

20   THESE FACTORS INTO CATEGORIES, AS YOU SAID?

21   A.   YES.

22   Q.   OKAY.  LET'S -- IF WE CAN BRING UP PDX 92.45, THE FIRST

23   CATEGORY, IF WE BRING THAT UP, LICENSING CONSIDERATIONS.

24        LET ME ASK YOU THIS:  DID YOU IDENTIFY ANY EXISTING

25   LICENSE AGREEMENTS THAT WERE COMPARABLE TO THE LICENSE APPLE

```
1    WOULD PROVIDE TO SAMSUNG IN THE HYPOTHETICAL NEGOTIATION?

2    A.   NO.

3    Q.   LET'S MOVE TO THE NEXT FACTOR OR GROUP OF FACTORS, APPLE'S

4    PATENT POLICY.

5         WHAT IS THE NEXT CATEGORY AND HOW DOES IT AFFECT THE

6    REASONABLE ROYALTY?

7    A.   SURE.  SO SOME COMPANIES, WHEN THEY OBTAIN PATENTS, THEY

8    DON'T USE THEM TO WORK ON THEIR OWN PRODUCTS.  THEY ACTUALLY

9    TURN AROUND AND LICENSE THEM TO OTHERS.  HOSPITALS DO THAT A

10   LOT, FOR EXAMPLE.  UNIVERSITIES DO IT.

11        BUT THERE'S SOME COMPANIES THAT DO THAT AS WELL.

12        THAT'S NOT THE WAY APPLE OPERATES.  APPLE USES ITS PATENTS

13   IN ITS BUSINESS.

14   Q.   IT'S NOT APPLE'S BUSINESS MODEL TO MONETIZE ITS -- IT'S

15   NOT A DRIVING PART OF ITS BUSINESS MODEL, MONETIZING ITS

16   PATENTS; IS THAT RIGHT?

17   A.   THAT'S RIGHT.

18   Q.   BY LICENSES?

19   A.   THAT'S RIGHT.

20   Q.   CONTRAST THAT WITH COMPANIES LIKE RAMBUS HERE IN THE SOUTH

21   BAY, THAT'S AT THE CORE OF THEIR BUSINESS MODEL?

22   A.   YES, THERE ARE COMPANIES THAT DO THAT.  APPLE'S NOT ONE OF

23   THEM.

24   Q.   OKAY.  LET'S GO TO THE NEXT GRAPHIC, RELATIONSHIP BETWEEN

25   THE PARTIES.
```

1           CAN YOU TELL US WHAT THIS GROUPING OF, OR THESE

2    GEORGIA PACIFIC FACTORS, OR GROUPING OF FACTORS RELATES TO AND

3    WHAT EVIDENCE YOU THOUGHT WAS RELEVANT TO THIS FACTOR IN YOUR

4    ANALYSIS?

5    A.   WELL, THE RELATIONSHIP BETWEEN THE PARTIES HERE RELATES TO

6    HOW, HOW COMPETITIVE THEY ARE WITH ONE ANOTHER, AND WHAT WE'VE

7    SEEN HERE IS THAT THERE'S NOT ONLY SUBSTANTIAL AND DIRECT

8    COMPETITION, BUT IN MANY DIMENSIONS, IT'S BEEN CHARACTERIZED BY

9    SAMSUNG AS A TWO HORSE RACE.

10          SO THERE'S A LOT OF COMPETITION BETWEEN THE PARTIES HERE,

11   AND THAT WOULD PLAY AN IMPORTANT ROLE IN THE NEGOTIATION.

12              MR. BENNETT:  BEFORE WE BRING UP THE NEXT SLIDE, YOUR

13   HONOR, WHILE THIS HAS NOT ACTUALLY BEEN OFFICIALLY SEALED, IT

14   DOES INCLUDE SOME INFORMATION LAST NIGHT THAT WAS SEALED ON A

15   PRIOR EXHIBIT, SO WE'D REQUEST TO PUBLISH THIS JUST TO THE JURY

16   AT THIS POINT.  IT'S -- WELL, IT'S THE NEXT IN THE PROGRESSION

17   OF THE SLIDE WE'RE ON, PDX 92.45.

18          THAT INFORMATION ON THE LOWER RIGHT IS, IS WHAT'S BEEN

19   SEALED BEFORE.

20              THE COURT:  DO YOU WANT TO SEAL PDX 92.45?

21              MR. BENNETT:  YES.

22              THE COURT:  THAT'S FINE.

23              MR. BENNETT:  THANK YOU, YOUR HONOR.

24   Q.   ALL RIGHT.  DR. VELLTURO, WITH THE PAGE THAT'S ON THE

25   SCREEN FOR THE LADIES AND GENTLEMEN OF THE JURY, CAN YOU TELL

1   US WHAT THIS NEXT CATEGORY IS AND HOW, IN YOUR VIEW, IT AFFECTS

2   THE HYPOTHETICAL NEGOTIATION?

3   A.   IT'S COMMERCIAL SUCCESS AND PROFITABILITY, AND IT'S

4   REFERRING TO THE PRODUCTS THAT PRACTICE THE PATENT AND THE

5   INDUSTRY MORE GENERALLY, AND WHAT I'VE IDENTIFIED HERE ARE TWO

6   KEY TAKEAWAYS AND ISSUES THAT I DISCUSSED BACK ON TUESDAY.

7         THE FIRST IS THAT, AGAIN, THE FALL OF 2011 IS AN EXTREMELY

8   IMPORTANT TIME IN THIS MARKETPLACE BECAUSE THE MARKET IS

9   GROWING VERY FAST FOR SMARTPHONES AND A LOT OF PEOPLE ARE

10  BUYING THEIR FIRST SMARTPHONE.

11        THE SECOND, IN TERMS OF THE SUCCESS, IS THE SHEER NUMBER

12  OF UNITS AND THE DOLLAR REVENUE THAT SAMSUNG EARNED WITH THE

13  ACCUSED UNITS.  THOSE TWO NUMBERS ARE ON THE SCREEN IN THE

14  BOTTOM RIGHT-HAND CORNER.

15  Q.   AND WHAT'S SHOWN THERE IS UNITS AND REVENUES.  FOR THE

16  PRODUCTS, WERE THE SALES OF THE ACCUSED UNITS THAT GENERATED

17  THOSE REVENUES, WAS THAT PROFITABLE FOR SAMSUNG?  WERE THOSE

18  UNITS PROFITABLE?

19  A.   YES.

20  Q.   PROCEEDING WITH 92.45, WHAT'S THE NEXT GROUP OF FACTORS

21  THAT WOULD INFLUENCE THE HYPOTHETICAL NEGOTIATION?

22  A.   WELL, THIS IS GETTING TO THE ROLE OF THE TECHNOLOGIES

23  THEMSELVES AND HOW THEY AFFECT DEMAND FOR THE PRODUCTS AND HOW

24  THAT WOULD FACTOR INTO A LICENSE.

25        AND, AGAIN, I'M REFERRING BACK TO WORK WE'VE ALREADY DONE

 1      BACK ON TUESDAY, THAT SAMSUNG HAD A COMPETITIVE DISADVANTAGE

 2      WITH RESPECT TO ITS USER INTERFACE AND ITS USER EXPERIENCE.  IT

 3      RECOGNIZED THAT AND TURNED TO THE IPHONE TO HELP SOLVE THAT

 4      PROBLEM, AND THESE PATENTS AND THE INFRINGEMENT OF THESE

 5      PATENTS WAS THE OUTCOME OF THAT, THAT APPROACH.  SO THESE

 6      TECHNOLOGIES WEREN'T WORKING.

 7      Q.   OKAY.  FINALLY -- NOT FINALLY, BUT IF WE CAN ADVANCE THE

 8      SLIDE IN TERMS OF THE NEXT CATEGORY, EFFECT ON OTHER SALES,

 9      ECOSYSTEM EFFECTS, WHAT DOES THAT REFER TO?

10      A.   SO THE PRODUCT THAT'S BEING LICENSED CAN OFTEN CONTRIBUTE

11      TO MORE SALES THAN JUST THE LICENSED PRODUCT, AND THAT IS

12      DEFINITELY THE CASE HERE.  SO THIS FACTOR LOOKS AT WHAT OTHER

13      SALES THE LICENSED PRODUCTS WOULD LEAD TO AND HOW THAT WOULD

14      FACTOR INTO THE NEGOTIATION.

15      Q.   OKAY.  AND DID YOU IDENTIFY DOCUMENTS THAT CAUSED YOU TO

16      BELIEVE THAT THE PARTIES, INCLUDING SAMSUNG, TO THIS

17      HYPOTHETICAL NEGOTIATION WERE AWARE OF THIS PHENOMENON?

18      A.   YES.

19      Q.   OKAY.  IF WE TURN TO EXHIBIT 214, ALREADY ADMITTED, THIS

20      IS A DOCUMENT YOU DISCUSSED ON TUESDAY.  IS THAT RIGHT,

21      DR. VELLTURO?

22      A.   YES.

23      Q.   OKAY.  AND THE DATE OF THIS DOCUMENT AGAIN IS

24      SEPTEMBER 2011?

25      A.   THAT'S RIGHT.

1    Q.   RIGHT AROUND THE TIME OF THE HYPOTHETICAL NEGOTIATION?

2    A.   YES.

3    Q.   IS THAT RIGHT?

4    A.   YES.

5    Q.   TURN TO PAGE 53, AND THERE ARE TWO PARTS OF THIS GRAPHIC

6    I'D JUST LIKE YOU TO WALK THE JURY THROUGH.

7         STARTING ON THE LEFT, REPEAT PURCHASERS, WHAT'S SHOWN

8    THERE AND HOW DOES THAT RELATE TO THIS ECOSYSTEM EFFECT?

9    A.   SO WHAT THIS IS IDENTIFYING IS REPEAT PURCHASERS, WHICH

10   IS -- WHICH RESULTS FROM A SURVEY -- IF YOU BLOW IT UP A LITTLE

11   BIT MORE AT THE BOTTOM, YOU CAN SEE THE ACTUAL SOURCE, THE

12   SURVEY SOURCE.

13        IT'S ACTUALLY A NIELSEN SURVEY, AND THIS IS THE SAME

14   NIELSEN THAT DOES TELEVISION RATINGS AND STUFF LIKE THAT, THIS

15   IS THEIR CONSUMER SURVEYS, AND IT'S ASKING PEOPLE WHO OWN AN

16   APPLE DEVICE WHETHER THEIR PREVIOUS DEVICE WAS ALSO AN APPLE

17   PHONE.

18        SO IN 78 PERCENT OF THE PEOPLE SURVEYED WHO HAD AN IPHONE,

19   78 PERCENT OF THEM HAD AN IPHONE AS THEIR PREVIOUS PHONE.

20        AND ON THE SAMSUNG SIDE, OF THE PEOPLE THAT HAD A SAMSUNG

21   PHONE, 51 PERCENT OF THEM THEIR PREVIOUS PHONE WAS A SAMSUNG

22   PHONE.

23   Q.   AND THERE'S ANOTHER GRAPHIC ON THE RIGHT-HAND SIDE OF THE

24   PAGE.  IF WE COULD BLOW THAT UP?

25        AND COULD YOU JUST EXPLAIN HOW THIS GRAPHIC RELATES TO

1      THE, QUOTE UNQUOTE, ECOSYSTEM EFFECT?

2      A.   WELL, WHAT THIS IDENTIFIES IS HAVING SOLD ONE OF YOUR

3      PHONES TO A CUSTOMER, HOW MANY MORE PHONES IN THE FUTURE ARE

4      YOU LIKELY TO SELL TO THAT SAME CUSTOMER?

5           AND FOR APPLE, IT'S QUITE A HIGH NUMBER, IT'S 3.3.  THAT

6      IS, WHEN PEOPLE BUY APPLE PHONES, THEY TEND TO STAY WITH THEM

7      FOR QUITE A WHILE.

8      Q.   THAT'S SAMSUNG'S ESTIMATE; IS THAT RIGHT?

9      A.   THAT'S RIGHT.

10          AND THEN THE SAMSUNG NUMBER IS THERE AS WELL.  IT'S

11     CONSIDERABLY LOWER, BUT THIS IS A TIME WHEN SAMSUNG WAS REALLY

12     JUST GETTING STARTED IN 2011, SO THAT'S NOT TOO SURPRISING.

13     Q.   AND HOW WOULD THIS INFORMATION, IN YOUR OPINION, AFFECT

14     THE HYPOTHETICAL NEGOTIATION?

15     A.   I THINK IT WOULD AFFECT IT A LOT BECAUSE WHAT'S GOING TO

16     HAPPEN IS WHEN SAMSUNG MAKES SALES UNDER THE LICENSE, THAT'S

17     GOING TO INCREASE THE LIKELIHOOD THAT THAT CUSTOMER IS GOING TO

18     BUY FROM SAMSUNG IN THE FUTURE.

19          ON THE OTHER SIDE OF THE COIN, WHEN APPLE REALIZES THAT

20     THERE'S GOING TO BE THIS SHIFT IN DEMAND AS A RESULT OF A

21     LICENSE, IT'S NOT JUST GOING TO FACE THE POTENTIAL OF A

22     REDUCED -- OF A REDUCTION IN ITS IPHONE SALES, BUT IT COULD

23     HAPPEN IN THE NEXT GENERATION AND THE NEXT GENERATION AS WELL.

24          SO THAT IS GOING TO FACTOR IN, AND I'VE GOT SOME NUMBERS

25     THAT ARE GOING TO DEAL WITH THAT IN A MINUTE.

1    Q.   AND YOU MENTIONED THAT THE SAMSUNG DOCUMENT WAS BASED ON

2    NIELSEN DATA.  DID YOU OBTAIN AND USE THAT DATA AS WELL IN THE

3    CALCULATION THAT WE'RE GOING TO TURN TO SHORTLY?

4    A.   I DID.

5    Q.   LET ME TURN TO ONE ADDITIONAL EXHIBIT HERE ON THIS

6    SUBJECT.  IF YOU COULD LOOK IN YOUR BINDER AT PLAINTIFF'S

7    EXHIBIT 203, DR. VELLTURO.

8    A.   YES.

9    Q.   IS THIS AN INTERNAL SAMSUNG DOCUMENT THAT YOU REVIEWED AND

10   RELIED UPON IN FORMING YOUR OPINIONS IN THIS CASE?

11   A.   IT IS.

12           MR. BENNETT:  MOVE EXHIBIT 203, YOUR HONOR.

13           MR. QUINN:  NO OBJECTION.

14           THE COURT:  IT'S ADMITTED.

15        (PLAINTIFF'S EXHIBIT 203 WAS ADMITTED IN EVIDENCE.)

16           THE COURT:  GO AHEAD, PLEASE.

17   BY MR. BENNETT:

18   Q.   IF WE COULD BRING UP THE FIRST PAGE, IT SAYS "BEAT APPLE."

19        DO YOU SEE THAT?

20   A.   I DO.

21   Q.   GENERALLY WHAT DOES THIS DOCUMENT ADDRESS?

22   A.   THIS IS A, A COLLECTION AT SAMSUNG OF, AS IT SAYS,

23   CONSUMER INSIGHTS, THAT IS, STUDIES OF CONSUMER'S ATTITUDES AND

24   USAGES BETWEEN APPLE PRODUCTS AND SAMSUNG PRODUCTS.

25   Q.   AND IF YOU TURN TO PAGE 36 OF THE EXHIBIT, AGAIN, IS THERE

1    A CHART HERE THAT BEARS ON THIS ECOSYSTEM ISSUE YOU'VE BEEN

2    DISCUSSING?

3    A.   THERE IS.  ACTUALLY, THIS CHART HAS THE SAME NUMBERS THAT

4    WE JUST SAW ON THE PREVIOUS DOCUMENT.  IT GOES ACROSS TO APPLE

5    AND IDENTIFIES LOYALTY, WHICH IS THE LIKELIHOOD OF

6    REPURCHASING, AND IT'S 78 PERCENT.

7         AND AGAIN, FOR SAMSUNG, THAT LIKELIHOOD OF REPURCHASING IS

8    51 PERCENT.

9         SO THE NUMBERS ARE REPEATED IN THIS DOCUMENT.

10   Q.   ALL RIGHT.  IF WE CAN NOW GO BACK TO 92.45 AND ADVANCE TO

11   THE FINAL SLIDE HERE, THE FINAL, FINAL FACTOR, HYPOTHETICAL

12   NEGOTIATION.

13        WHAT IS THIS FACTOR AND WHAT DOES IT REFER TO AND HOW DOES

14   IT RELATE TO WHAT WE'VE BEEN DISCUSSING?

15   A.   WHAT WE'RE DOING IS A HYPOTHETICAL NEGOTIATION.  WHAT

16   FACTOR 15 DOES IS IT REALLY TAKES ALL OF THE COMPONENTS THAT

17   WE'VE BEEN TALKING ABOUT, AND TO THE EXTENT THAT WE CAN PUT

18   NUMBERS BEHIND THEM, THIS IS WHERE WE DO IT, WHERE I DO IT TO

19   COME UP WITH A REASONABLE ROYALTY.

20   Q.   AND BEFORE WE GET TO THE NUMBERS, CAN YOU JUST IDENTIFY

21   WHAT WERE THE FUNDAMENTAL ISSUES OR FACTORS THAT WOULD DRIVE

22   THIS HYPOTHETICAL NEGOTIATION FROM EACH SIDE?

23   A.   YES.

24   Q.   BEFORE WE BRING THAT UP, COULD YOU JUST EXPLAIN WHAT'S

25   WRITTEN THERE, DR. VELLTURO?

 1    A.   I FORGOT TO MENTION, WE'VE GOT AN IMAGE HERE OF PEOPLE

 2    NEGOTIATING.   THE IDEA IS THERE ARE TWO SIDES TO THE TABLE.

 3    ONE SIDE WOULD BE APPLE IS GOING TO BE TURNING OVER ITS

 4    TECHNOLOGY TO SAMSUNG, A DIRECT RIVAL, SO WHAT WOULD BE A

 5    ROYALTY THAT APPLE WOULD REQUIRE FROM SAMSUNG TO BE WILLING TO

 6    DO THAT?

 7         BUT THERE'S THE OTHER SIDE OF THE TABLE, WHICH IS ON THE

 8    SAMSUNG SIDE, GIVEN THE BENEFITS THAT THEY ANTICIPATED THEY

 9    WOULD GET, WHAT WOULD SAMSUNG BE REASONABLY WILLING TO PAY?

10         SO THOSE ARE THE ULTIMATE QUESTIONS, AND I'M GOING TO GO

11    THROUGH SOME NUMBERS TO GET THERE.

12    Q.   ONCE THIS HYPOTHETICAL LICENSE IS ULTIMATELY STRUCK, WHAT

13    ARE THE IMPLICATIONS FOR EACH SIDE?

14    A.   THEY'RE DIFFERENT FOR BOTH SIDES.

15    Q.   HOW DOES THE HYPOTHETICAL LICENSE AFFECT APPLE GOING

16    FORWARD?

17    A.   FOR APPLE, ONCE THE LICENSE HAS BEEN GRANTED TO SAMSUNG,

18    IN A SENSE THE CAT IS OUT OF THE BAG, WHICH IS SAMSUNG THEN HAS

19    COMPLETE FREE REIGN TO USE THE PATENTS IN WHICHEVER PRODUCTS IT

20    WISHES TO COMPETE AGAINST APPLE.

21         SO REALLY THAT PART -- ONCE THIS LICENSE IS SIGNED, THAT'S

22    KIND OF SET IN STONE AND APPLE HAS TO LIVE WITH THAT NEW

23    REALITY.

24    Q.   ON THE OTHER SIDE, WHAT ARE THE ONGOING IMPLICATIONS FOR

25    SAMSUNG IN TERMS OF ITS FLEXIBILITY?

1    A.   WELL, SO SAMSUNG, COMING OUT OF THE LICENSE, WILL NOW HAVE

2    THE ABILITY TO USE THE PATENTS, BUT THEY'LL BE PAYING MONEY.

3         AND IMPORTANTLY, SAMSUNG CAN RECOGNIZE THAT IT NOW NEEDS

4    TO PAY THAT MONEY AND CAN ALTER ITS APPROACH TO SELLING THE

5    PRODUCTS IN TERMS OF THE PROFITS IT EARNS OR THE PRICES IT

6    CHARGES TO REFLECT THAT.

7         SO SAMSUNG HAS THIS FLEXIBILITY ABOUT HOW TO ADJUST ITS

8    BUSINESS MODEL TO THE ROYALTY IT NOW OWES.

9         APPLE HAS TO FACE THE REALITY THAT IT HAS NOW A PRINCIPAL

10   COMPETITOR HAVING ITS PATENTS.

11   Q.   AND HOW DO THESE CONSIDERATIONS AFFECT, IN YOUR JUDGMENT,

12   THE OUTCOME OF THIS NEGOTIATION?

13   A.   I THINK IT AFFECTS IT A LOT, THAT SAMSUNG HAS THE

14   FLEXIBILITY TO ADJUST ITS BUSINESS STRATEGY TO REFLECT THE

15   OUTCOME OF THE LICENSE AND THAT APPLE DOES NOT INDICATES TO ME

16   THAT MORE WHAT APPLE NEEDS TO BE ABLE TO WALK AWAY FROM THE

17   TABLE IS GOING TO BE MORE IMPORTANT AND MORE CONTROLLING IN THE

18   NEGOTIATION.

19   Q.   SO NOW THAT WE'VE REVIEWED THESE GROUPS OF FACTORS, HOW DO

20   YOU -- HOW DID YOU TURN THAT REVIEW INTO A QUANTITATIVE

21   CALCULATION OF A REASONABLE ROYALTY?

22   A.   WHAT I DO IS I ACTUALLY COLLECT THE INCENTIVES THAT BOTH

23   SIDES WOULD HAVE SITTING AT THE TABLE TO UNDERSTAND WHAT KINDS

24   OF NUMBERS THEY WOULD BE LOOKING AT AND ULTIMATELY AGREE TO.

25   Q.   IS THERE AN ECONOMIC CONSTRUCT OR DOCTRINE THAT IS KNOWN

1    THAT YOU APPLIED IN THIS CASE TO CONSTRUCT THE ACTUAL NUMBERS

2    ON EACH SIDE OF THIS CALCULATION?

3    A.   YES.

4    Q.   OR NEGOTIATION?

5    A.   YES, THERE IS.

6    Q.   WHAT IS THAT?

7    A.   IT'S CALLED THE EDGEWORTH BOX.  IT'S NAMED AFTER AN

8    ECONOMIST IN THE LATE 19TH CENTURY NAMED EDGEWORTH.  HE LAID

9    THIS OUT IN A PAPER, I THINK IT WAS 1889, AND IT'S BEEN USED A

10   LOT EVER SINCE.

11   Q.   HAVE YOU PREPARED A CONFIDENTIAL SLIDE TO HELP THE JURY

12   UNDERSTAND HOW YOU TURN THE FACTORS WE'VE BEEN DISCUSSING INTO

13   A QUANTITATIVE ANALYSIS?

14   A.   YES.

15   Q.   OKAY.  IF WE CAN BRING UP EXHIBIT, PLAINTIFF'S EXHIBIT

16   DEMONSTRATIVE EXHIBIT 92.59.

17        WALKING THROUGH THIS, CAN YOU EXPLAIN, DR. VELLTURO, HOW

18   YOU -- FIRST OF ALL, WHAT ARE YOU GOING TO CALCULATE ON THIS

19   SLIDE?

20   A.   SO WHAT I'M GOING TO DO IS I'M GOING TO CALCULATE THE

21   NUMBER THAT APPLE WOULD REQUIRE SITTING AT THE NEGOTIATION, AND

22   JUST TO DO AN EXAMPLE, I'M GOING TO DO IT FOR THE '647 PATENT,

23   BUT IT APPLIES EQUIVALENTLY TO THE OTHER PATENTS.

24   Q.   SO ARE WE GOING TO POPULATE THIS CHART AND THEN DO A

25   MATHEMATICAL CALCULATION?

1    A.    THAT'S RIGHT.

2    Q.    WHY DON'T WE START POPULATING THE CHART AND EXPLAIN TO THE

3    JURY WHAT WE'RE BRINGING UP AND HOW IT WOULD BE A FACTOR IN THE

4    HYPOTHETICAL NEGOTIATION?

5    A.    SO THE QUESTION IS, WHAT WOULD BE THE IMPACT THAT APPLE

6    WOULD EXPECT IF THE LICENSE IS GRANTED TO SAMSUNG, WHICH,

7    REMEMBER, IT HAS TO BE UNDER THIS HYPOTHETICAL NEGOTIATION.

8         WELL, THE FIRST ONE WOULD BE THAT IT WOULD SHIFT DEMAND

9    TOWARDS SAMSUNG'S PRODUCTS BECAUSE NOW IT'S USING A BETTER, YOU

10   KNOW, A BETTER INVENTION THAN IT COULD USE OTHERWISE, AND THAT

11   NUMBER IS REFLECTED BY, AGAIN, MY ADJUSTED NUMBER FROM

12   PROFESSOR HAUSER ABOUT THE SHIFT IN DEMAND ASSOCIATED WITH

13   USING THIS PATENT.  SO THAT'S THE FIRST ONE.

14   Q.    OKAY.  THAT'S THE NUMBER -- THAT RELATES TO THE '647

15   PATENT IN THIS EXAMPLE?

16   A.    THAT'S RIGHT.

17   Q.    OKAY.  THE NEXT CATEGORY HERE IS SALES IMPACT.  COULD WE

18   POPULATE THAT AND COULD YOU EXPLAIN TO THE LADIES AND GENTLEMEN

19   OF THE JURY WHAT'S SHOWN THERE?  AND WITHOUT ARTICULATING THE

20   NUMBERS, IF YOU CAN DO THAT.

21   A.    SO IN THIS CASE, WHAT'S -- THERE'S GOING TO BE A SHIFT OF

22   DEMAND OVER TO SAMSUNG AS A RESULT OF THE LICENSE.  SOME OF

23   THAT IS GOING TO BE A SHIFT AWAY FROM APPLE AND APPLE WOULD

24   RECOGNIZE THAT AND WOULD ACCOUNT FOR THAT IN TERMS OF ITS

25   RELATIVE PROPORTION OF BUSINESS IN TERMS OF WHAT THAT SHIFT

1     WOULD MEAN TO ITS OWN BUSINESS, AND THIS FIGURE CAPTURES THAT.

2     Q.   DOES THAT RELATE TO APPLE'S MARKET SHARE?

3     A.   IT DOES.

4     Q.   THE NEXT CATEGORY YOU HAVE HERE IS ECOSYSTEM EFFECTS.  YOU

5     TALKED QUITE A BIT ABOUT THAT, BUT CAN YOU EXPLAIN WHAT THE

6     NUMBERS THERE ON THE BOARD, WHAT THE ECOSYSTEM EFFECTS ARE?

7     A.   SO THE ECOSYSTEM EFFECT HERE CAPTURES ONLY ONE ASPECT OF

8     CONSUMER LOYALTY, AND THAT'S THE LIKELIHOOD THAT SOMEONE WHO

9     BUYS A PHONE FROM A GIVEN CARRIER HERE AT APPLE WILL BUY THEIR

10    NEXT PHONE FROM THAT CARRIER.  AND AS YOU SAW BEFORE, THAT

11    NUMBER WAS ABOUT 78 PERCENT, NOT 46 PERCENT.

12         BUT I MADE AN ADJUSTMENT DOWN OF THAT NUMBER TO ACCOUNT

13    FOR THE FACT THAT PEOPLE WILL BE MOVING BACK AND FORTH IN ANY

14    EVENT, AND, THEREFORE, YOU CAN'T COUNT ALL OF THAT AS BEING A

15    SHIFT ASSOCIATED WITH THIS PATENT.  SO I SCALED IT DOWN.

16    Q.   REMEMBER NOT TO VERBALIZE THE NUMBERS ON THE CHART.

17    A.   OKAY.

18    Q.   AND THEN FINALLY, PER UNIT PROFITABILITY, WE SEE A NUMBER

19    THERE.  HOW DOES THAT FACTOR INTO THE QUANTITATIVE ANALYSIS?

20    A.   WELL, APPLE NATURALLY WOULD BE SITTING AT THE TABLE

21    RECOGNIZING THAT THE SHIFT IN DEMAND FROM THE LICENSE WOULD

22    MOVE SALES FROM APPLE TO SAMSUNG AND THOSE SALES WOULD RESULT

23    IN LOSSES AT APPLE.  SO THEY WOULD HAVE FACTORED IN THE VALUE

24    OF THOSE SALES INTO THE NEGOTIATION, AND THIS NUMBER IS THAT

25    PER UNIT EXPECTED PROFIT NUMBER THEY WOULD HAVE HAD IN MIND AT

1      THE TABLE.

2      Q.   AND IF WE SHOW AT THE BOTTOM HERE, HAVE YOU SHOWN HOW

3      THESE NUMBERS WOULD YIELD A CALCULATION?

4      A.   YES.  SO THE LICENSE RESULTS IN A SHIFT OF DEMAND.

5      Q.   REFERRING TO THE FIRST NUMBER?

6      A.   THAT'S RIGHT.

7           AND THEN THE NEXT NUMBER IS THAT PORTION OF THE SHIFT IN

8      DEMAND THAT APPLE WOULD RECOGNIZE WOULD COME FROM ITS BUSINESS.

9           THE NEXT NUMBER REFLECTS THIS ECOSYSTEM EFFECT, AND YOU'LL

10     NOTICE THAT HAS A 1 IN FRONT OF IT BECAUSE IF SOMETHING IS

11     INCREASING BY A PERCENTAGE, YOU MULTIPLY IT BY 1 POINT THAT

12     PERCENTAGE.

13          AND THEN THERE'S THE PER UNIT PROFIT NUMBER, SO I

14     MULTIPLIED THOSE FOUR NUMBERS TOGETHER.

15     Q.   AND THAT YIELDS A NUMBER YOU CAN ARTICULATE.  THAT'S A PER

16     UNIT ROYALTY FOR THE '647 PATENT, THE NUMBER THAT'S SHOWN

17     THERE?

18     A.   THIS WOULD BE THE NUMBER APPLE WOULD REQUIRE PER LICENSE

19     OF SAMSUNG UNITS OF $12.49 OF THE '647 PATENT.

20     Q.   NOW, DID YOU PREPARE A SIMILAR SLIDE THAT PROVIDES YOUR

21     ANALYSIS OF WHAT SAMSUNG VIEWS, IN YOUR OPINION, WOULD HAVE

22     BEEN IN THIS HYPOTHETICAL NEGOTIATION?

23     A.   RIGHT, IT'S THE FLIPSIDE, AND DID I THIS FOR SAMSUNG AS

24     WELL.

25     Q.   LET'S BRING UP 5692.61.  AND, AGAIN, CAN WE POPULATE THIS

1    AND CAN YOU WALK US THROUGH HERE, DOCTOR, WHAT THESE NUMBERS

2    REPRESENT?

3    A.   SURE.   SO THERE'S THE EFFECT OF THE TECHNOLOGY, WHICH IS,

4    AGAIN, THE SAME FIGURE.   THAT IS, THESE ARE THE UNITS THAT ARE

5    SHIFTING TOWARD SAMSUNG BECAUSE THEY NOW HAVE THE LICENSE.

6         NOW, NOT ALL OF THOSE REPRESENT PURELY INCREMENTAL SALES

7    FOR SAMSUNG BECAUSE THEY HAVE SOME OF THEIR OLDER MODELS WHERE

8    THEY COULD CONTINUE TO HAVE MADE SOME OF THE SALES WITH THAT

9    OLDER MODEL.

10        SO THEY WOULD HAVE ONLY EXPECTED ABOUT 86 PERCENT OF THOSE

11   NEWLY LICENSED SALES TO BE TRULY NEW TO SAMSUNG.

12   Q.   AGAIN, DON'T ARTICULATE ANY MORE NUMBERS, OKAY?

13   A.   GOT IT.

14        THEN THERE'S THE ECOSYSTEM EFFECT, WHICH IS JUST LIKE THE

15   ECOSYSTEM EFFECT ON THE APPLE SIDE, BUT HERE WHAT IT REFLECTS

16   IS WHEN SAMSUNG MAKES MORE SALES BECAUSE THEY HAVE A LICENSE,

17   THEY'RE GOING TO MAKE MORE SUBSEQUENT PHONE SALES AS WELL

18   BECAUSE OF LOYALTIES TO THEIR BRAND.

19        THE PERCENTAGE IS LOWER BECAUSE SAMSUNG IS NOT AS FAR DOWN

20   THE ROAD IN 2011 AS APPLE WAS, BUT THERE'S STILL AN EFFECT.

21        AND THEN LAST THERE IS SAMSUNG'S PER UNIT PROFITABILITY ON

22   THE PHONES FROM THAT TIME PERIOD THAT WOULD HAVE FACTORED INTO

23   THE CALCULATION AS WELL.

24   Q.   ALL RIGHT.   AND THEN HAVE YOU DONE THE SAME CALCULATION AT

25   THE BOTTOM OF THE PAGE HERE?

DIRECT VELLTURO (RESUMED)

1    A.   I DID.

2    Q.   SO YOU'VE -- AND THAT YIELDS A NUMBER SHOWN ON THE FAR

3    RIGHT THERE FOR SAMSUNG; IS THAT RIGHT?

4    A.   YES.

5    Q.   OKAY.  YOU'VE CALCULATED NUMBERS FOR WHAT APPLE WOULD

6    REQUIRE AND WHAT SAMSUNG WOULD WANT TO PAY.  THERE'S A SPREAD

7    BETWEEN THOSE NUMBERS.  HOW DID YOU RESOLVE THAT SPREAD?

8    A.   THE APPLE NUMBER IS HIGHER.  WHAT APPLE WOULD REQUIRE IS

9    HIGHER THAN WHAT SAMSUNG WOULD BE LOOKING TO PAY, AND I

10   RESOLVED THAT BY LOOKING AT THE FLEXIBILITY THAT THE PARTIES

11   WOULD HAVE GOING FORWARD UNDER THE LICENSE TO DEAL WITH THE

12   REASONABLE ROYALTY.

13   Q.   AND WHAT DO YOU MEAN BY THAT?

14   A.   WELL, THIS IS BACK TO THE POINT THAT, THAT APPLE IS GIVING

15   A LICENSE TO ITS MAIN COMPETITOR AND GOING FORWARD, THERE'S

16   REALLY NOTHING THEY CAN DO ABOUT THAT.  THAT'S GOING TO HAPPEN

17   THROUGH THIS EXERCISE.

18        SAMSUNG IS GOING TO BE PAYING A ROYALTY RATE, BUT THEY CAN

19   DEAL WITH THAT ROYALTY RATE BY, FOR EXAMPLE, ACCEPTING A LOWER

20   PROFIT IN THE SHORT RUN FOR LONGER RUN BENEFIT, OR BY ADJUSTING

21   THEIR PRICES TO REFLECT THAT THEY'RE NOW PAYING FOR TECHNOLOGY

22   THAT, IN THE ACTUAL WORLD, THEY DIDN'T PAY FOR.  SO THEY COULD

23   DO ONE OF THOSE TWO THINGS.

24   Q.   NOW, DID YOU PERFORM SIMILAR CALCULATIONS FOR THE OTHER

25   FOUR PATENTS IN THE CASE?

1    A.   I DID.

2    Q.   OKAY.  AND IF WE BRING UP 92.62, DOES THIS CHART

3    ACCURATELY REFLECT THE REASONABLE ROYALTY RATES THAT YOU

4    CALCULATED FOR SMARTPHONES AND TABLETS FOR, IN ADDITION TO THE

5    '647, WE WALKED THROUGH THE '414, '959, '172, AND '721 PATENTS?

6    A.   YES.  YOU CAN SEE THE $12.49 NUMBER, WHICH I DERIVED BACK

7    A COUPLE OF SLIDES AGO UNDER '647.

8         I DID EXACTLY THE SAME CALCULATIONS FOR THE OTHER PATENTS,

9    BOTH FOR SMARTPHONES AND TABLETS, AND THOSE ARE THE ROYALTY

10   RATES THAT APPEAR ON THE SCREEN.

11   Q.   AND ARE THE CALCULATIONS INCLUDED ON THESE SLIDES INCLUDED

12   IN YOUR PLAINTIFF'S EXHIBIT 222A?

13   A.   THEY ARE.

14   Q.   OKAY.  IS THAT AT PAGE 36 THROUGH 42?

15   A.   YES.

16   Q.   SO LET'S RETURN TO PDX 92.63.  WHAT IS THE OUTCOME OF

17   APPLYING THE ROYALTIES WE SAW ON THE PREVIOUS CHART TO THE

18   NUMBER OF UNITS SHOWN ON THE SCREEN?

19   A.   SO I APPLIED THOSE REASONABLE ROYALTY RATES TO THE UNITS

20   THAT WERE ACCUSED UNDER EACH OF THE PATENTS.  NOT ALL OF THE

21   UNITS ARE ACCUSED UNDER ALL OF THE PATENTS.

22        AND AS A RESULT OF APPLYING THAT REASONABLE ROYALTY, I

23   FOUND THAT, ON AVERAGE, THE REASONABLE ROYALTY RATE PER UNIT IS

24   ABOUT $33, AND MULTIPLYING THAT NUMBER BY THE NUMBER OF UNITS

25   GENERATES REASONABLE ROYALTY DAMAGES OF $1.12 BILLION.

1    Q.   AND HAVE YOU ALSO IN THIS CASE CALCULATED REASONABLE

2    ROYALTIES ON A -- EXCUSE ME.  YEAH, HAVE YOU ALSO IN THIS CASE

3    CALCULATED DAMAGES ON A PRODUCT-BY-PRODUCT BASIS, OR BROKEN

4    THEM OUT IN THAT MANNER?

5    A.   RIGHT.  IN A LITTLE BIT I'LL SHOW -- I'VE GOT SOME

6    SCHEDULES WHERE IT'S BROKEN OUT PRODUCT BY PRODUCT AND PATENT

7    BY PATENT.

8    Q.   IF YOU LOOK AT PLAINTIFF'S DEMONSTRATIVE EXHIBIT 92.65, IS

9    THIS AN ACCURATE PRODUCT-BY-PRODUCT BREAKOUT OF THE DAMAGES,

10   BOTH LOST PROFITS AND REASONABLE ROYALTIES YOU HAVE CALCULATED

11   FOR EACH OF THE TEN INFRINGING PHONES, ACCUSED PHONES?

12   A.   JUST TO BE CLEAR, THE LOST PROFITS NUMBER OF 1 BILLION 67

13   MILLION, THAT'S THE SUM OF THE OFF THE MARKET LOST PROFITS OF

14   507 MILLION AND THE DIMINISHED DEMAND LOST PROFITS OF 560

15   MILLION, AND HERE YOU CAN SEE HOW THAT BREAKS OUT ACROSS THE

16   ACCUSED PRODUCTS.

17   Q.   AGAIN, IF WE BRING UP PAGE 12 OF CONFIDENTIAL EXHIBIT

18   222A, DOES THAT PAGE INCLUDE THE INFORMATION WE JUST SAW ON THE

19   GRAPHIC, PRODUCT-BY-PRODUCT BREAKOUT OF THE DAMAGES?

20   A.   IT DOES.

21   Q.   AND IF WE BRING UP THE NEXT PAGE, PAGE 13, AGAIN, THIS IS

22   CONFIDENTIAL, DOES THAT INCLUDE A BREAKOUT OF THE PATENT -- OF

23   THE DAMAGES BY PATENT?

24   A.   IT PROVIDES IT BY PATENT.

25   Q.   ONE VERY QUICK QUESTION WITH RESPECT -- IF WE GO BACK TO

1       THE GRAPHIC THAT SHOWED THE DAMAGES BY PRODUCT, I'M JUST GOING

2       TO BE VERY QUICK ABOUT THIS, THERE'S BEEN DISCUSSION IN THIS

3       CASE OF THE GALAXY NEXUS PHONE.

4           WHAT PERCENTAGE OF THE UNITS ACCUSED IN THIS CASE ARE

5       GALAXY NEXUS PHONES?

6       A.   IT'S A VERY SMALL PERCENTAGE.  MY RECOLLECTION IS IT'S

7       ABOUT, ABOUT 3 PERCENT OF THE UNITS THAT ARE AT ISSUE IN THIS

8       CASE.

9       Q.   LET'S JUST VERY BRIEFLY BRING UP 92.20, CONFIDENTIAL.

10          DOES THIS ACCURATELY REFLECT THE RELEVANT PERCENTAGE OF

11      GALAXY NEXUS PHONES VERSUS ALL THE OTHER ACCUSED UNITS IN THIS

12      CASE THAT MAKE UP THE OVER 37 MILLION ACCUSED UNITS?

13      A.   YES.

14      Q.   DR. VELLTURO, VERY -- WRAPPING UP HERE, HAVE YOU PREPARED

15      SOME ALTERNATIVE CALCULATIONS TO THOSE WHICH YOU'VE JUST

16      PRESENTED?

17      A.   YES.

18      Q.   OKAY.  AND WHY DID YOU DO THAT?

19      A.   SO I IDENTIFIED THE NUMBER OF UNITS THAT GO INTO OFF THE

20      MARKET LOST PROFITS, THE NUMBER OF UNITS THAT GO INTO

21      DIMINISHED DEMAND LOST PROFITS, AND THE NUMBER OF UNITS THAT GO

22      INTO THE REASONABLE ROYALTY.

23          IF YOU MOVE THOSE UNITS INTO DIFFERENT BUCKETS OR

24      DIFFERENT PARTS OF THAT, YOU GET DIFFERENT DAMAGES, AND I

25      WANTED TO SHOW WHAT THAT EFFECT IS.

1    Q.   LET'S LOOK AT PLAINTIFF'S DEMONSTRATIVE, CONFIDENTIAL,

2    92.66.

3         AND JUST, WITHOUT DISCUSSING THE NUMBERS ON THE CHART,

4    WITH MR. LEE'S ASSISTANCE, CAN YOU SHOW WHAT THE EFFECT ON YOUR

5    CALCULATIONS WOULD BE IF THERE WERE NO OFF THE MARKET LOST

6    PROFITS?

7    A.   SO IF WE ELIMINATE THE OFF THE MARKET LOST PROFITS

8    CATEGORY, THOSE UNITS THEN FALL, SOME OF THEM, TO DIMINISHED

9    DEMAND, BUT THE MAJORITY OF THEM GO TO REASONABLE

10   ROYALTIES.  SO I'VE DONE THE CALCULATION WHERE THOSE UNITS FALL

11   INTO THOSE BUCKETS.

12   Q.   AND WHAT IS THAT -- CAN WE BRING UP THOSE RESULTS, THOSE

13   NUMBERS?

14   A.   RIGHT.  THE DIMINISHED DEMAND NUMBER FOR LOST PROFITS IS

15   $630.6 MILLION.  REASONABLE ROYALTIES IS $1.151 BILLION.  AND

16   THE TOTAL IS $1.781 BILLION.

17   Q.   HAVE YOU ALSO PREPARED A DEMONSTRATIVE THAT ILLUSTRATES

18   FOR THE JURY HOW YOUR CALCULATIONS WOULD CHANGE IF ONLY

19   REASONABLE -- IF ALL THE UNITS WERE JUST ASSESSED A REASONABLE

20   ROYALTY DAMAGE?

21   A.   YES.

22   Q.   CAN WE -- WITH MR. LEE'S ASSISTANCE, CAN YOU TALK US

23   THROUGH THIS?

24   A.   SO HERE THE OFF THE MARKET LOST PROFITS AND THE DIMINISHED

25   DEMAND LOST PROFIT UNITS, THEY ALL DROP DOWN TO THE REASONABLE

1    ROYALTY AT THE BOTTOM.  SO THERE'S JUST ONE NUMBER TO COMPUTE,

2    AND THAT NUMBER WOULD BE 1 BILLION 233 MILLION.

3    Q.   OKAY.  AND DID YOUR EXHIBIT 222 INCLUDE CALCULATIONS OF

4    THE 2.194 NUMBER YOU'VE PUT FORTH HERE THIS MORNING AND THESE

5    ALTERNATIVES?

6    A.   YES.

7    Q.   IS THE 2.194 SET FORTH AT PAGES 12 AND 13?

8    A.   WHICH EXHIBIT ARE YOU POINTING TO?  I'M SORRY.

9    Q.   222A.  I'M SORRY.

10   A.   THE 2.191 BILLION, YES.

11   Q.   YES.  NOW, WE JUST WALKED THROUGH THESE ALTERNATIVE

12   SCENARIOS, BUT I WANT TO NOW RETURN TO THE 2.194.  AND WITH THE

13   EIGHT OF CONFIDENTIAL PDX 92.70, WHAT IS YOUR OPINION IN THIS

14   CASE THAT APPLE HAS SUFFERED BY VIRTUE OF SAMSUNG'S SALES OF

15   THE ACCUSED UNITS?

16   A.   SO IT'S MY OPINION THAT APPLE HAS SUSTAINED DAMAGES AS A

17   RESULT OF LOST PROFITS OF $1,067,108,409, AND HAS SUSTAINED

18   DAMAGES WITH RESPECT TO A REASONABLE ROYALTY ON THE ACCUSED

19   UNITS ON WHICH LOST PROFITS ARE NOT CLAIMED OF $1,124,025,000,

20   FOR A TOTAL OF $2,191,133,409.

21   Q.   AND THAT DATA UNDER THE UNITS COLUMN, THOSE PERCENTAGES,

22   WITHOUT RECITING THEM, ACCURATELY REFLECT THE RELEVANT NUMBER

23   OF UNITS THAT ARE IN EACH CATEGORY OF DAMAGES?

24   A.   THAT'S CORRECT, LESS THAN 10 PERCENT OF THE ACCUSED UNITS

25   FIND THEIR WAY INTO THE LOST PROFITS CALCULATION.

1          MR. BENNETT:  ALL RIGHT.  THANK YOU, DR. VELLTURO.  I

2     HAVE NO FURTHER QUESTIONS.

3          THE COURT:  ALL RIGHT.  TIME IS NOW 10:08.

4          MR. QUINN:  YOUR HONOR, WHILE WE SET UP, CAN I HAVE

5     PERMISSION TO RUN DOWN THE HALL?

6          THE COURT:  PLEASE.

7        (PAUSE IN PROCEEDINGS.)

8          MR. MCELHINNY:  IN ORDER TO USE OUR TIME EFFICIENTLY,

9     MAY I TAKE CARE OF ONE BOOKKEEPING ITEM?

10       WE'RE IN AGREEMENT WITH THE OTHER SIDE.  PLAINTIFF'S

11    EXHIBIT 122A, THE PARTIES STIPULATE THAT IT IS IN EVIDENCE, BUT

12    YOUR HONOR NEVER ACTUALLY SAID IT IS ADMITTED, AND SO IT

13    DOESN'T SHOW UP ON THE COURT REPORTER'S LIST OF DOCUMENTS IN

14    EVIDENCE.

15         THE COURT:  122A, THE IPHONE BUYER SURVEY, EASE OF

16    USE, I HAVE IT AS ADMITTED ON APRIL 1ST.

17         MR. MCELHINNY:  WE ALL DO, YOUR HONOR.

18         MS. MAROULIS:  THAT'S FINE, YOUR HONOR.

19         THE COURT:  I'M SORRY?

20         MS. MAROULIS:  THAT'S CORRECT, YOUR HONOR.

21         THE COURT:  YEAH.  IS THAT NOT REFLECTED --

22         MR. MCELHINNY:  IT WILL BE REFLECTED NOW.  THANK YOU,

23    YOUR HONOR.

24       (PLAINTIFF'S EXHIBIT 122A WAS ADMITTED ON APRIL 1, 2014.)

25         THE COURT:  OKAY.  I HAVE SOME HOUSEKEEPING ON THE

```
 1     EXHIBIT LIST, BUT WE CAN TAKE THAT UP DURING THE BREAK.

 2          (PAUSE IN PROCEEDINGS.)

 3               THE COURT:  ALL RIGHT.  AND WE'LL GO UNTIL 10:30 AND

 4     THEN TAKE OUR BREAK.

 5               MR. QUINN:  OKAY.  THANK YOU, YOUR HONOR.

 6               THE COURT:  ALL RIGHT.  TIME IS NOW 10:10.

 7          GO AHEAD, PLEASE, MR. QUINN.

 8                          CROSS-EXAMINATION

 9     BY MR. QUINN:

10     Q.   GOOD MORNING, DR. VELLTURO.

11          GOOD MORNING, LADIES AND GENTLEMEN.

12          EXCEPT FOR THE '172 PATENT, FOR YOUR ANALYSIS, YOU ASSUMED

13     INFRINGEMENT; CORRECT?

14     A.   YES.

15     Q.   AND YOU ALSO ASSUMED THAT THE PATENTS ARE VALID; CORRECT?

16     A.   YES.

17     Q.   SO YOU'RE NOT QUALIFIED TO DETERMINE WHETHER OR NOT, IN

18     FACT, THERE WAS INFRINGEMENT.  FAIR TO SAY?

19     A.   THAT'S CORRECT.

20     Q.   AND YOU'RE NOT QUALIFIED, YOURSELF, TO GIVE AN OPINION

21     ABOUT THE SCOPE OF THESE PATENT CLAIMS; IS THAT CORRECT?

22     A.   YES.

23     Q.   AND AS TO APPLE'S PATENT CLAIMS, IF APPLE CLAIMS, FOR

24     EXAMPLE, THAT CLAIM 20 OF THE '414 PATENT COVERS ALL POSSIBLE

25     FORMS OF BACKGROUND SYNCING, YOU'RE NOT QUALIFIED TO OPINE ONE
```

1    WAY OR THE OTHER AS TO WHETHER THAT'S TRUE; RIGHT?

2    A.   THAT'S RIGHT.  RIGHT.

3    Q.   AND SO WHEN YOU SAY THAT SAMSUNG IMPLEMENTED A

4    NON-INFRINGING ALTERNATIVE, YOU ARE SAYING THAT -- YOU'RE

5    SAYING THAT SOMETHING ABOUT A SAMSUNG PHONE CHANGED SO THAT

6    APPLE ITSELF ADMITS THAT THE PHONE DOES NOT INFRINGE A

7    PARTICULAR PATENT CLAIM; CORRECT?

8    A.   I'M SORRY.  WHICH PATENT ARE YOU ASKING ME ABOUT.

9    Q.   WHENEVER YOU SAY THAT SAMSUNG IMPLEMENTED A NON-INFRINGING

10   ALTERNATIVE -- I THINK THAT'S A PHRASE YOU'VE USED A COUPLE OF

11   TIMES; RIGHT?

12   A.   YES.

13   Q.   WHEN YOU SAY THAT, WHAT YOU'RE SAYING IS THAT SOMETHING

14   ABOUT A SAMSUNG PHONE CHANGED SO THAT SAMSUNG IS NOW DOING

15   SOMETHING THAT EVEN APPLE CLAIMS IS NOT INFRINGING ITS CLAIM;

16   CORRECT?

17   A.   THAT'S MY UNDERSTANDING.

18   Q.   YEAH.

19   A.   YOU'RE RIGHT.  I DON'T FIGURE THAT OUT TECHNICALLY.

20   Q.   RIGHT.

21   A.   I DON'T HAVE THAT EXPERTISE, YOU'RE RIGHT.

22   Q.   RIGHT.  SO WHEN YOU SAY THAT, YOU'RE NOT SAYING THAT

23   SAMSUNG SAID "OH, NO, THIS ANDROID FEATURE INFRINGES, SO WE

24   BETTER CHANGE IT."

25        YOU'RE NOT SAYING THAT?

1    A.   I'M NOT SAYING THAT.

2    Q.   LET'S TALK A MOMENT WITH THE OFF THE MARKET LOST PROFITS

3    CALCULATION THAT YOU'VE PRESENTED, DR. VELLTURO.

4         YOU DISCUSSED THIS CONCEPT OF OFF THE MARKET LOST PROFITS

5    WITH THE JURY TODAY; RIGHT?

6    A.   YES.

7    Q.   AND YOU EXPLAINED THAT THESE DAMAGES ARE FOR A TIME PERIOD

8    WHEN SAMSUNG ACCUSED PRODUCTS ARE NOT BEING SOLD BECAUSE, I

9    THINK YOU SAID, SAMSUNG IS DOING THEIR REDESIGN WORK; RIGHT?

10   A.   AND THEY'RE GETTING CARRIER APPROVAL, YES.

11   Q.   RIGHT.  AND THE -- IN OTHER WORDS, THE IDEA IS HOW LONG IT

12   WOULD TAKE SAMSUNG TO DESIGN AND ACTUALLY IMPLEMENT A

13   NON-INFRINGING ALTERNATIVE; CORRECT?

14   A.   YES.

15   Q.   AND YOU CALCULATED THESE DAMAGES FOR THIS OFF THE MARKET

16   LOST PROFITS USING A FOUR-MONTH PERIOD?

17   A.   I DID.

18   Q.   AND UNDER YOUR FOUR-MONTH DESIGN AROUND PERIOD, YOU SAID

19   THIS OFF THE MARKET LOST PROFITS TOTALLED SOME 507 MILLION,

20   PLUS?  IT WAS A NUMBER LIKE THAT?

21   A.   YES.

22   Q.   ALL RIGHT.  AND IF WE COULD LOOK AT PLAINTIFF'S DX 92.30,

23   IF WE COULD PUT THAT UP ON THE SCREEN.  I DON'T BELIEVE THIS IS

24   A CONFIDENTIAL DOCUMENT SO I THINK IT CAN BE PUT UP ON THE

25   SCREEN.  92.30.

```
 1            DO WE HAVE A --

 2                MR. WATSON:  IT'S SEALED.

 3                MR. QUINN:  I'M SORRY, IT'S SEALED.

 4       Q.   SO THE NUMBER FOR THIS OFF THE MARKET LOST PROFITS THAT

 5       THE JURY CAN SEE HERE, THE $507 MILLION NUMBER, THAT IS THE

 6       ONLY NUMBER THAT YOU HAVE GIVEN THE JURY FOR THIS OFF THE

 7       MARKET LOST PROFITS; IS THAT CORRECT?

 8       A.   NO, THAT'S NOT QUITE CORRECT.

 9       Q.   OKAY.

10       A.   FOR OFF THE MARKET, YES, I'M SORRY, THAT'S RIGHT.

11       Q.   YES, THAT'S THE ONE NUMBER; RIGHT?  CORRECT?

12       A.   YES.

13       Q.   BUT, IN FACT, IF IT WOULD TAKE -- IF THERE WAS

14       INFRINGEMENT AND IF THE PATENT WAS VALID AND IT WOULD TAKE

15       SAMSUNG LESS THAN FOUR MONTHS TO IMPLEMENT A DESIGN AROUND,

16       THAT NUMBER WOULD GO DOWN; CORRECT?

17       A.   YES.

18       Q.   BECAUSE YOU ASSUMED THE FOUR MONTHS IN YOUR ANALYSIS?

19       A.   I ASSUMED THE FOUR MONTHS AND IT'S CONSISTENT WITH WHAT

20       I'VE OBSERVED WITH RESPECT TO THE TWO TIMES THAT SAMSUNG DID

21       DESIGN AROUND.

22       Q.   ALL RIGHT.  WE'RE GOING TO TALK ABOUT THAT.  THAT'S

23       EXACTLY WHERE I'M GOING.

24            IF, IN FACT, THE TIME IT TOOK TO DESIGN AROUND AND GET

25       CARRIER APPROVAL AND DO WHATEVER NEEDED TO BE DONE WERE ONLY
```

1    ONE MONTH RATHER THAN FOUR MONTHS, THAT NUMBER WOULD GO FROM

2    $507 MILLION TO ABOUT $17.5 MILLION?

3    A.   I DON'T -- I CAN'T DO THAT MATH SITTING HERE, BUT IT DOES

4    BECOME QUITE SMALL, THAT'S MY RECOLLECTION.

5    Q.   ALL RIGHT.  YOU HAVEN'T DONE THAT CALCULATION, SIR?

6    A.   NO.  I KNOW IT'S A SMALL NUMBER.

7    Q.   YOU KNOW IT'S A SMALL NUMBER.  IN FACT, YOU'VE DONE MORE

8    THAN ONE REPORT IN THIS CASE; CORRECT?

9    A.   YES.

10   Q.   AND IN THE FIRST REPORT THAT YOU DID, YOU ACTUALLY

11   CALCULATED WHAT THIS NUMBER WOULD BE IF IT WAS ONLY ONE MONTH

12   TO DO A DESIGN AROUND; CORRECT?

13   A.   USING DIFFERENT PERIODS, PRODUCTS, AND PATENTS, YES.  THIS

14   CASE HAS CHANGED QUITE A BIT OVER TIME.

15   Q.   SIR, THE ANSWER TO MY QUESTION IS YES?

16   A.   YES, I DID.

17   Q.   YOU CALCULATED ONE -- SO YOU KNOW HOW TO DO THAT?  YOU

18   COULD DO THAT?

19   A.   YES.

20   Q.   ALL RIGHT.  BUT YOU CHOSE TO COME AND PRESENT THE JURY

21   WITH THE LARGER FOUR-MONTH FIGURE RATHER THAN TO PRESENT THEM

22   WITH THE ONE-MONTH FIGURE, WHICH YOU ADMIT YOU COULD CALCULATE;

23   CORRECT?

24   A.   I PROVIDED THE FOUR-MONTH FIGURE.

25   Q.   NOW, YOU TESTIFIED ON TUESDAY ABOUT HOW AFTER APPLE FILED

1     SUIT AND GAVE NOTICE ON THE SLIDE TO UNLOCK PATENT, THE '721,

2     YOU TESTIFIED HOW LONG IT TOOK SAMSUNG TO IMPLEMENT A

3     NON-INFRINGING ALTERNATIVE.

4         DO YOU RECALL SAYING THAT TO THE JURY ON TUESDAY, SIR?

5     A.   YES.

6     Q.   AND LET'S LOOK AT YOUR TESTIMONY ON TUESDAY.

7         AND WITH THE PERMISSION OF THE COURT, MAY WE DISPLAY THE

8     TRIAL TESTIMONY OF DR. VELLTURO ON TUESDAY?

9             THE COURT:  THAT'S FINE.  GO AHEAD, PLEASE.

10            MR. QUINN:  IF WE CAN PUT THAT UP ON THE SCREEN.

11    Q.   AND WHAT YOUR TESTIMONY WAS, YOU SAID THAT "AS TO THE '721

12    PATENT" -- THE QUESTION WAS, "DID SAMSUNG ACTUALLY AT ONE POINT

13    INTRODUCE A NON-INFRINGING VERSION, OR A DESIGN AROUND OF THE

14    PATENT?

15        "ANSWER:  YES.

16        "AND WHEN DID IT DO THAT?

17        "IN JUNE 2012.

18        "AND HOW LONG WAS THAT AFTER APPLE FILED SUIT?

19        "APPLE FILED SUIT ON FEBRUARY 8TH, 2012.  SO FOUR MONTHS."

20        DO YOU SEE THAT, SIR?  THAT WAS YOUR TESTIMONY?

21    A.   YES.

22    Q.   SO YOU GAVE THAT TESTIMONY ON TUESDAY TO THE JURY TO

23    SUPPORT YOUR FOUR-MONTH PERIOD FOR THE OFF THE MARKET DAMAGES;

24    CORRECT?

25    A.   THAT'S ONE PIECE OF IT, YES.

1     Q.   ALL RIGHT.  SO FOUR MONTHS OFF THE MARKET, AND YOU TOLD

2     THE JURY IT TOOK THEM FOUR MONTHS TO COME UP WITH A DESIGN

3     AROUND FOR THIS SLIDE TO UNLOCK PATENT; CORRECT?

4     A.   FOR THIS PATENT.

5     Q.   ALL RIGHT.  LET'S -- IF WE COULD TAKE A LOOK AT A GALAXY

6     NOTE.  AND YOU'RE FAMILIAR WITH THE GALAXY NOTE.  THAT WAS PART

7     OF THE SUBJECT OF YOUR EXPERT STUDY; CORRECT?

8     A.   YES.

9     Q.   AND THIS IS JOINT EXHIBIT 30A.  AND LET ME SHOW YOU THIS

10    GALAXY NOTE, AND LET'S TAKE A LOOK AT HOW IT UNLOCKS.

11         DO YOU SEE THAT?

12    A.   I ACTUALLY DIDN'T.  I'M SORRY.

13    Q.   OKAY.  DID YOU SEE THAT?

14    A.   I DID.

15    Q.   ALL RIGHT.  NOW, THAT'S NOT INFRINGING, IS IT?

16    A.   MY UNDERSTANDING THAT DOES NOT INFRINGE.

17    Q.   OKAY.  THAT'S WHAT YOU WOULD CALL A NON-INFRINGING

18    ALTERNATIVE; CORRECT?

19    A.   THAT'S -- IF SOMETHING DOESN'T INFRINGE, I REFER TO IT AS

20    NON-INFRINGING.

21    Q.   ALL RIGHT.

22    A.   I DON'T DETERMINE THAT, BUT THAT'S HOW I TYPICALLY USE

23    THAT PHRASE.

24    Q.   AND YOU ACTUALLY PREPARED AND THE JURY WAS SHOWN A

25    DEMONSTRATIVE TO SHOW THE PATENTS THAT APPLE ACCUSED ON EACH OF

```
 1    SAMSUNG'S PRODUCTS; CORRECT?

 2    A.   YES.

 3    Q.   IF WE COULD TAKE A LOOK AT THAT, THAT'S PDX 92.12, WHICH

 4    SHOWS ACCUSED BY PRODUCT, AND WE SEE HERE THAT IN SLIDE TO

 5    UNLOCK THE GALAXY NOTE IS NOT ACCUSED.  CORRECT?

 6    A.   YES.

 7    Q.   THAT'S YOUR SLIDE.  THAT'S WHAT YOU PREPARED; CORRECT?

 8    A.   YES, THAT'S MY UNDERSTANDING.

 9    Q.   IT'S ACCURATE?

10    A.   THAT'S MY UNDERSTANDING, YES.

11    Q.   ALL RIGHT.  YOU ALSO PREPARED A SLIDE FOR THE JURY THAT

12    SHOWED WHAT THE RELEASE DATES WERE ON THE VARIOUS SAMSUNG

13    PRODUCTS; CORRECT?

14    A.   YES.

15    Q.   AND IF WE COULD TAKE A LOOK AT THAT, THAT'S PLAINTIFF'S

16    EXHIBIT 92.11, AND WE SEE THE GALAXY NOTE RIGHT HERE; CORRECT?

17    A.   YES.

18    Q.   AND THAT SHOWS THAT IT WAS -- THE GALAXY NOTE WAS RELEASED

19    IN FEBRUARY OF 2012; CORRECT?

20    A.   YES.

21    Q.   NO MISTAKE THERE; RIGHT?

22    A.   I'M SORRY?

23    Q.   THIS IS YOUR CHART?

24    A.   RIGHT.

25    Q.   IT'S ACCURATE?
```

1    A.   YES.

2    Q.   SO IN YOUR TESTIMONY ON TUESDAY, YOU TOLD US THIS SUIT WAS

3    FILED IN FEBRUARY OF 2011; CORRECT?  I THINK YOU SAID

4    FEBRUARY 20TH OF 2011.

5         MR. WATSON:  12.

6    BY MR. QUINN:

7    Q.   I'M SORRY, FEBRUARY 12TH, 2012.

8         SORRY.  FEBRUARY OF 2012, YOU TOLD US --

9    A.   FEBRUARY 8TH, 2012.

10   Q.   2012.  AND ACCORDING TO YOUR SLIDES, SAMSUNG HAD A

11   NON-INFRINGING ALTERNATIVE, SAMSUNG HAD AN UNLOCK MECHANISM FOR

12   THE GALAXY NOTE THAT APPLE DOES NOT ACCUSE OF INFRINGING THE

13   '721 PATENT.  SAMSUNG HAD THAT AS OF FEBRUARY 2012; CORRECT?

14   A.   IT WAS INTRODUCED ON, I BELIEVE, FEBRUARY 17TH, IS WHEN

15   THIS WAS IMPLEMENTED, AND THE DAMAGES I HAVE WITH RESPECT TO

16   OFF THE MARKET ACTUALLY RUN JUST ABOUT EXACTLY THAT PERIOD FOR

17   THIS PATENT.

18   Q.   SIR, MAYBE MY QUESTION WASN'T CLEAR.

19        AS OF FEBRUARY 2012, SAMSUNG HAD AN UNLOCKING DEVICE THAT

20   APPLE CONCEDES WAS NOT INFRINGING.  TRUE?

21   A.   YES.

22   Q.   SO WHEN YOU WERE ASKED ON TUESDAY, "DID SAMSUNG ACTUALLY

23   AT ONE POINT INTRODUCE A NON-INFRINGING VERSION, OR DESIGN

24   AROUND," INSTEAD OF GIVING THE ANSWER, "YES, JUNE 2012, FOUR

25   MONTHS AFTER SUIT WAS FILED," A MORE ACCURATE ANSWER WOULD HAVE

1    BEEN SAMSUNG HAD A NON-INFRINGING ALTERNATIVE IN FEBRUARY, THE

2    VERY MONTH SUIT WAS FILED; CORRECT?

3    A.   NO, THAT'S NOT RIGHT.

4    Q.   SIR, THIS IS NOT ACCUSED, THE UNLOCK MECHANISM?

5    A.   OH, I UNDERSTAND, YES.

6    Q.   ALL RIGHT.  AND THAT WAS RELEASED IN FEBRUARY?

7    A.   YES.

8    Q.   LET'S TAKE A LOOK AT EXHIBIT 196.1.  IF WE CAN PUT THIS UP

9    ON THE SCREEN.

10        THIS IS A DOCUMENT THAT REFERRED TO A USER WAS USING A

11   PHONE THAT THEY SAID THAT WHEN IT SYNCED, IT BECAME A USELESS

12   BRICK.

13        DO YOU RECALL TESTIFYING ABOUT THIS DOCUMENT?

14   A.   YES.

15   Q.   AND, KEN, PERHAPS IF WE COULD BLOW UP THE LANGUAGE THERE.

16        "SO WHEN MY PHONE IS SYNCING, IT'S BASICALLY A USELESS

17   BRICK.  ONCE THE SYNCING ICON TURNS ON, I REALLY CAN'T DO

18   ANYTHING."

19        DO YOU SEE THAT?

20   A.   YES.

21   Q.   AND YOU SHOWED THIS TO THE JURY ON TUESDAY; RIGHT?

22   A.   I DID.

23   Q.   AND YOU USED THIS DOCUMENT TO SHOW THAT ONE, ONE --

24   A.   I THINK I SHOWED IT THIS MORNING, BUT --

25   Q.   ALL RIGHT.  I THOUGHT IT WAS TUESDAY, BUT MAYBE BOTH.

1           BUT YOU USE THIS TO SHOW THAT ONE GOOGLE, ONE USER OF AN

2     ANDROID POWERED PHONE RESPONDED NEGATIVELY TO A PHONE THAT

3     FREEZES WHEN IT'S SYNCING; CORRECT?

4     A.   YES, THAT'S REPORTED IN THIS REVIEW DOCUMENT.

5     Q.   RIGHT.  AND YOU DID THAT BECAUSE YOU WANTED TO CONVINCE

6     THE JURY OF THE IMPORTANCE OF CLAIM 20 OF THE '414 PATENT

7     REGARDING BACKGROUND SYNCING; CORRECT?

8     A.   I -- NO, I WOULDN'T CHARACTERIZE WHAT I DID THAT WAY.  I

9     WAS COLLECTING INFORMATION, WHEN I SAY IT, ABOUT REACTIONS TO

10    INVENTIONS, OR TO FEATURES THAT RELATE TO THE INVENTIONS HERE

11    AND THIS WAS AN EXAMPLE OF THAT THAT WAS PART OF WHAT LED TO MY

12    CONCLUSION THAT THIS WAS A VALUABLE INVENTION.

13    Q.   WELL, YOU WANTED TO SHOW THE DIFFERENCE BETWEEN THE USER

14    EXPERIENCE OF THE SYNCING ARCHITECTURE THAT APPLE CLAIMS TO OWN

15    AND WHAT HAPPENS IF YOU DON'T USE IT; CORRECT?

16    A.   NO, THAT'S NOT WHAT I WAS DOING.

17    Q.   WELL, YOU WANTED TO SHOW HOW A PHONE MIGHT BE LIKE A BRICK

18    IF IT DID NOT USE THE SYNCING ARCHITECTURE THAT APPLE CLAIMS TO

19    OWN; CORRECT?

20    A.   NO, I WOULDN'T CHARACTERIZE WHAT I WAS DOING THAT WAY.

21    Q.   OKAY.  LET'S -- WOULD YOU AGREE WITH ME THAT IF THIS

22    DOCUMENT IS ACTUALLY TALKING ABOUT A VERSION OF ANDROID THAT

23    HAD THE SAME SYNCING ARCHITECTURE THAT APPLE CLAIMS TO OWN, OR

24    THAT -- AND THAT IT'S ACCUSING HERE, THAT IT REALLY CANNOT BE

25    USED AS AN EXAMPLE OF WHAT HAPPENS IF YOU DON'T USE WHAT APPLE

1   SAYS ITS PATENT COVERS?

2   A.   I -- I'M SORRY.  I COULDN'T FOLLOW THAT QUESTION.

3   Q.   ALL RIGHT.  LET ME TRY THAT AGAIN.  IF YOU WANT -- WOULD

4   YOU AGREE WITH ME THAT IF THIS DOCUMENT IS ACTUALLY TALKING

5   ABOUT -- THIS IS AN INTERNAL GOOGLE DOCUMENT.  DO YOU

6   UNDERSTAND THAT?

7   A.   YES.

8   Q.   ALL RIGHT.  WOULD YOU AGREE WITH ME THAT IF WHAT THIS

9   DOCUMENT IS ACTUALLY TALKING ABOUT INVOLVES A VERSION OF

10  ANDROID THAT HAS THE VERY SAME SYNCING ARCHITECTURE THAT APPLE

11  ACCUSES IN THIS CASE -- ARE YOU WITH ME SO FAR?

12  A.   I THINK SO.

13  Q.   ALL RIGHT.  -- THAT IT REALLY CAN'T BE USED AS AN EXAMPLE

14  OF WHAT HAPPENS IF YOU DON'T USE WHAT APPLE CLAIMS ITS PATENT

15  COVERS?

16  A.   I -- I THINK THE ANSWER TO THAT IS, IN TERMS OF THE

17  TECHNICAL ASPECTS, I UNDERSTAND THAT YOUR ANSWER WOULD BE, YES.

18       BUT I'M MORE FOCUSSED ON THE USER RESPONSE TO THE FEATURE.

19  Q.   ALL RIGHT.  WELL, ARE YOU SAYING THAT YOU DID NOT MEAN TO

20  LEAVE A SUGGESTION WITH THIS JURY THAT THE REASON THIS PHONE

21  WAS FREEZING WAS BECAUSE IT DIDN'T USE THIS APPLE PATENTED,

22  CLAIMED -- THIS TECHNOLOGY, SYNCING TECHNOLOGY THAT APPLE

23  CLAIMS TO OWN?  IS THAT THE SUGGESTION THAT YOU WANTED TO LEAVE

24  WITH THIS JURY?

25  A.   NO, THAT'S NOT WHAT I WAS DOING WITH THIS EXAMPLE.

1    Q.   DO YOU KNOW THAT THE VERSION OF ANDROID BEING DISCUSSED IN

2    THIS DOCUMENT, IN THIS GOOGLE DOCUMENT, HAS THE SAME SYNCING

3    ARCHITECTURE THAT APPLE CLAIMS INFRINGES CLAIM 20 OF THE '414

4    PATENT THAT APPLE WANTS TO BE PAID FOR IN THIS CASE?  DO YOU

5    KNOW?

6    A.   I DON'T KNOW.  I'M NOT A TECHNICAL EXPERT.

7    Q.   OKAY.  YOU'RE NOT A TECHNICAL EXPERT.

8         BUT DO YOU THINK THAT -- YOU'RE AN EXPERIENCED EXPERT

9    WITNESS; CORRECT?

10   A.   I'VE TESTIFIED A NUMBER OF TIMES, YES.

11   Q.   RIGHT.  AND I THINK YOU TOLD US IN YOUR DEPOSITION THAT

12   YOU HAD BEEN RETAINED IN LITIGATION RELATED MATTERS FOR

13   SOMETHING LIKE 200 TIMES.

14   A.   SINCE GRADUATE SCHOOL, THAT SOUNDS ABOUT RIGHT.

15   Q.   ALL RIGHT.  SO BEFORE -- BEFORE COMING TO THIS JURY AND

16   SUGGESTING THAT THIS DOCUMENT SHOWS HOW WORTHLESS SMARTPHONES

17   CAN BE IF THEY DON'T USE APPLE'S CLAIMED PATENTED TECHNOLOGY,

18   WOULDN'T YOU WANT TO LOOK INTO WHETHER OR NOT THIS DOCUMENT IS

19   TALKING ABOUT A PHONE THAT HAS THAT TECHNOLOGY THAT APPLE

20   CLAIMS TO OWN?  WOULDN'T YOU WANT TO LOOK INTO THAT?

21   A.   THAT'S NOT WHAT I'M DOING WITH THIS DOCUMENT, SIR.

22        WHAT I'M DOING WITH THIS DOCUMENT IS I'M IDENTIFYING THAT

23   CONSUMERS RECOGNIZE THAT IT IS A MATERIAL SHORTCOMING WHEN

24   THEIR PHONE LOCKS WHILE SYNCING.  THAT'S THE CONSUMER FEATURE,

25   THE CONSUMER FEATURE THAT CONSUMERS CARE ABOUT.

1      NOW, MY UNDERSTANDING FROM THE TECHNICAL EXPERTS IS THAT

2    WITHOUT USING THE ACCUSED -- WITHOUT USING THE ASSERTED CLAIM,

3    THE SAMSUNG PHONES WOULD RUN A GREATER RISK OF DOING THAT MORE

4    OFTEN AND THAT WOULD BE A PROBLEM.

5      I'M NOT NECESSARILY LINKING THIS TO THE INVENTION, BUT

6    THIS IS THE NATURE OF THE USER EXPERIENCE THAT'S AFFECTED BY

7    THE CLAIMED INVENTION.

8      THAT'S MY UNDERSTANDING.

9    Q.   SIR, WHEN YOU TALKED ABOUT THIS -- AND I THINK IT WAS

10   TUESDAY -- YOU DIDN'T SAY THAT TO THE JURY, DID YOU?  WHAT YOU

11   JUST SAID, DID YOU NOT SAY THAT?

12   A.   I DON'T -- I'M SURE I DIDN'T USE THOSE EXACT WORDS.

13   Q.   NO.  YOU DIDN'T SAY, "LADIES AND GENTLEMEN OF THE JURY,

14   I'M USING THIS REALLY AS JUST AS AN ILLUSTRATION TO SHOW THAT

15   IT'S IMPORTANT THAT YOUR PHONE NOT FREEZE WHEN IT'S SYNCING."

16     YOU DIDN'T SAY THAT, DID YOU?

17   A.   I DIDN'T SAY THAT, THAT'S TRUE.

18   Q.   NO.  AND JUST TO BE CLEAR, BECAUSE YOU DIDN'T LOOK INTO

19   THIS AND YOU DON'T KNOW WHETHER OR NOT THAT VERSION OF ANDROID

20   THAT'S BEING DISCUSSED IN THIS GOOGLE DOCUMENT ALREADY HAD THE

21   SYNCING ARCHITECTURE THAT'S ACCUSED HERE, SINCE YOU DON'T KNOW

22   THAT, IT WOULD SIMPLY BE WRONG FOR YOU TO LEAVE THE IMPRESSION

23   WITH THE JURY THAT THE PROBLEM WITH THIS PHONE WAS IT DIDN'T

24   HAVE THAT ARCHITECTURE.  THAT WOULD BE WRONG TO LEAVE THAT

25   IMPRESSION?

1    A.   THAT WOULD BE WRONG BECAUSE YOU NEED THE TECHNICAL EXPERTS

2    TO ADD THAT SECOND PIECE.  I CAN'T ADD THAT SECOND PIECE.

3    Q.   ALL RIGHT.  YOU TOLD US ALSO, SIR, AND I THINK YOU

4    REPEATED IT TODAY, ON TUESDAY AND TODAY, YOU TOLD US ABOUT THE

5    SEQUENCE OF EVENTS RELATING TO UNIVERSAL SEARCH WHERE YOU SAID

6    UNIVERSAL SEARCH WAS ON SAMSUNG PHONES, THERE WERE USER

7    COMPLAINTS, AND THEN UNIVERSAL SEARCH WAS RESTORED AFTER THE

8    USER COMPLAINTS.

9         RIGHT?

10   A.   YES.

11   Q.   AND YOU TOLD THAT TO THE JURY AS AN EXAMPLE TO SHOW THAT

12   THAT'S HOW VALUABLE -- THAT'S SOME MEASURE OF HOW VALUABLE

13   UNIVERSAL SEARCH IS; CORRECT?

14   A.   YES.

15   Q.   ALL RIGHT.  NOW, WHEN YOU TOLD THAT TO THE JURY, DIDN'T

16   YOU LEAVE SOMETHING OUT THAT'S PRETTY IMPORTANT?

17   A.   I DON'T THINK SO.

18   Q.   YOU KNOW FOR A FACT, SIR, THAT THE REASON SAMSUNG TOOK

19   UNIVERSAL SEARCH -- YOU KNOW THAT GOOGLE CREATED A SPECIAL

20   VERSION OF THE QUICK SEARCH BOX AND PROVIDED IT TO SAMSUNG THAT

21   DIDN'T HAVE THE LOCAL SEARCH CAPABILITY BECAUSE AN INJUNCTION

22   HAD BEEN ENTERED BY A COURT; CORRECT?  YOU KNOW THAT?

23   A.   I DO KNOW THAT, YES.

24   Q.   YOU DIDN'T TELL THE JURY THAT?

25   A.   NO.  THE JURY ALREADY HEARD THAT.  BUT THAT WASN'T -- THAT

1    ULTIMATELY DOESN'T AFFECT MY -- WHAT I'VE DETERMINED FROM THIS

2    EVENT.

3    Q.   ALL RIGHT.  LET'S TALK ABOUT THAT.

4    A.   OKAY.

5    Q.   YOU KNOW THAT AN INJUNCTION WAS ENTERED, GOOGLE CREATED A

6    SPECIAL VERSION OF THE QUICK SEARCH BOX THAT DIDN'T HAVE THE

7    LOCAL SEARCH CAPABILITY, THAT THAT INJUNCTION WAS APPEALED, AND

8    THE COURT OF APPEALS REVERSED.  YOU KNOW THAT, RIGHT?

9    A.   YES.

10   Q.   AND YOU KNOW THAT INJUNCTION WAS OBTAINED ON A PATENT, THE

11   '604 PATENT, THAT APPLE THEN ABANDONED.  YOU KNOW THAT;

12   CORRECT?

13   A.   I DIDN'T KNOW THAT.

14   Q.   DIDN'T KNOW THAT?

15   A.   I DIDN'T KNOW THAT.

16   Q.   I DON'T THINK THERE'S ANY DISPUTE ABOUT THAT.  BUT YOU

17   KNOW THAT APPLE HAS CONTINUED TO PURSUE A CLAIM RELATED TO

18   UNIVERSAL SEARCH ON ANOTHER PATENT CLAIM; CORRECT?

19   A.   ARE YOU REFERRING TO THE '959 PATENT?

20   Q.   YES.

21   A.   YES.

22   Q.   AND YOU KNOW WHAT YOU KNOW ABOUT THOSE INJUNCTION

23   PROCEEDINGS BECAUSE YOU PARTICIPATED IN THEM; CORRECT?

24   A.   YES.

25   Q.   YOU GAVE A VERY LENGTHY DECLARATION TO THE COURT IN

1    SUPPORT OF THAT INJUNCTION PROCEEDING; CORRECT?

2    A.   I DID.

3    Q.   AND YOUR DEPOSITION WAS TAKEN?

4    A.   YES.

5    Q.   AND IN THOSE PROCEEDINGS, YOU TALKED ABOUT A LOT OF THE

6    THINGS THAT YOU'VE TALKED ABOUT IN COURT HERE, SUCH AS

7    FIRST-TIME SMARTPHONE BUYERS AND THINGS LIKE THAT; CORRECT?

8    A.   YES.

9         THE COURT:  IT'S 10:31.  I'M SORRY TO INTERRUPT YOUR

10   EXAMINATION, BUT CAN WE GO AHEAD AND TAKE OUR BREAK?

11        MR. QUINN:  SURE.

12        THE COURT:  OKAY.  ALL RIGHT.  THANK YOU FOR YOUR

13   PATIENCE AND YOUR SERVICE.

14        LET'S TAKE A 20 MINUTE BREAK NOW.  PLEASE DON'T RESEARCH

15   OR DISCUSS THE CASE.  THANK YOU.

16        (JURY OUT AT 10:32 A.M.)

17        THE COURT:  YOU MAY STEP DOWN.

18        THE JURORS HAVE LEFT THE COURTROOM.  PLEASE TAKE A SEAT.

19        I HAVE A COUPLE OF ISSUES.  THE FIRST IS COMPARING THE

20   JOINT EXHIBIT LIST THAT WAS FILED YESTERDAY WITH MY LIST, I

21   WANTED TO JUST CONFIRM THAT DX 459A IS A REDACTED VERSION OF

22   DX 459.  WE DID NOT HAVE 459A AT THE TIME OF MR. SCHILLER'S

23   TESTIMONY.  I ASSUME THAT 459A IS JUST MR. COOK'S LETTER AND

24   NOT THE "NEW YORK TIMES" ARTICLE.

25        DOES THAT SOUND CORRECT?

```
1              MR. WATSON:  THAT'S CORRECT.

2              MR. QUINN:  YES, YOUR HONOR.

3              MS. MAROULIS:  YES, YOUR HONOR.

4              THE COURT:  OKAY.  ALL RIGHT.  THEN ON DX 411, I HAD

5      MORE PAGES UNSEALED THAN WHAT YOU HAD IN YOUR JOINT EXHIBIT

6      LIST THAT WAS FILED YESTERDAY, AND THE SEALING ORDER ONLY --

7      WELL, DID NOT GRANT SEALING FOR PAGES 1, 2, 4, 5, 10, 11, 13,

8      14, 25, AND 32.

9          SO IF YOU COULD JUST CHECK THAT AND MAKE SURE YOU'RE IN

10     AGREEMENT WITH THE SEALING ORDER AND JUST MAKE THAT CORRECTION,

11     PLEASE, TO THE JOINT EXHIBIT LIST.

12             MS. MAROULIS:  YES, YOUR HONOR.

13             THE COURT:  OKAY.  ALL RIGHT.  SO THAT WAS FOR

14     DX 411, PLEASE JUST DOUBLE CHECK THE SEALING ON THAT.

15         OKAY.  THIS IS SOUNDING LIKE A BROKEN RECORD, BUT THE

16     TRANSCRIPT DIED AT 9:09.  SO IT WAS ONLY ACTIVE FOR ABOUT THREE

17     MINUTES THIS MORNING.  SO, AGAIN, I'M ASKING YOU IF YOU WOULD

18     PLEASE TURN OFF YOUR CELL PHONES, AND IF YOU DO NOT HAVE TO

19     HAVE A LIVE, ACTIVE LAPTOP IN HERE, IF YOU WOULD PLEASE

20     CONSIDER GOING TO THE OVERFLOW ROOM WHERE YOU WILL BE ABLE TO

21     HEAR EVERYTHING THAT'S SAID, SEE THE EXHIBITS ON THE SCREEN,

22     AND ALSO OBSERVE THE TESTIMONY OF THE WITNESS.  I'M JUST MAKING

23     THAT REQUEST AGAIN.

24         ALL RIGHT.  THANK YOU.  LET'S --

25             MR. LEE:  YOUR HONOR, COULD WE RAISE ONE THING VERY
```

```
 1        QUICKLY?

 2                   THE COURT:  WHAT'S THAT?

 3                   MR. LEE:  JUST TO ALERT YOU TO WHAT'S COMING YOUR

 4        WAY.

 5                   THE COURT:  OKAY.

 6                   MR. LEE:  SAMSUNG DISCLOSED AT 9:00 O'CLOCK THIS

 7        MORNING THE DIRECT WITNESSES FOR MONDAY, PLUS EXHIBITS.  THEY

 8        DISCLOSED 12 WITNESSES AND LITERALLY HUNDREDS OF EXHIBITS.

 9             BRIEFING THOSE OBJECTIONS TO YOUR HONOR IN FIVE PAGES

10        IS -- I MEAN, THE IDEA THAT WE'RE GOING TO GET THROUGH 12

11        WITNESSES AND ONE OF THEM IS AN EXPERT REALLY, I DON'T THINK,

12        IS POSSIBLE.

13             BUT THE TASK OF TRYING, IN FIVE PAGES, TO BRIEF HUNDREDS

14        OF EXHIBITS FOR 12 WITNESSES IS NOT SOMETHING THAT'S --

15                   THE COURT:  I UNDERSTAND.  LET'S TALK ABOUT WHICH

16        WITNESSES YOU HAVE FOR NEXT WEEK.  I DID GET SAMSUNG'S ROLLING

17        EXHIBIT LIST.

18                   MS. MAROULIS:  YOUR HONOR, IF I MAY, THREE OF THE

19        WITNESSES ARE SHORT DEPOSITION CLIPS AND SEVERAL OTHERS ARE

20        VERY SHORT PRIOR ARTISTS.  SO WE'RE CONCERNED ABOUT NOT BEING

21        ABLE TO FILL THE MONDAY TIME ENTIRELY.  WE KNOW THAT THE

22        COURT'S PREFERENCE IS --

23                   THE COURT:  CAN I ASK YOU A QUICK QUESTION?

24                   MS. MAROULIS:  YES, YOUR HONOR.

25                   THE COURT:  YOU DISCLOSED SEVEN PEOPLE YESTERDAY.  DO
```

```
1      YOU STILL INTEND TO PROCEED WITH THOSE SEVEN?

2           MS. MAROULIS:  THREE OF THEM ARE DEPOSITION

3      WITNESSES, SO WE -- WE WILL PLAY THEM WHENEVER --

4           THE COURT:  BUT LOCKHEIMER, SOHN --

5           MS. MAROULIS:  YES, YOUR HONOR, WE EXPECT TO --

6           THE COURT:  -- HACKBORN.

7           MS. MAROULIS:  TODAY WE'RE GOING TO TRY TO PUT ON

8      LOCKHEIMER, SOHN, AND HACKBORN, AND I DON'T THINK WE'LL GET TO

9      CLARK.  WE'LL MONITOR OUR TIME TO SEE HOW MUCH TIME WE HAVE FOR

10     EVERYTHING.

11          AND THE NEXT THREE PEOPLE ARE SHORT DEPOSITION

12     DESIGNATIONS THAT WE DISCLOSED SO THAT WE CAN PLAY THEM IF

13     THERE IS, LIKE, THREE OR FOUR MINUTES LEFT, SO WE PUT A DEPO

14     DESIGNATION INSTEAD OF A WITNESS.  SO THOSE DEPO DESIGNATIONS

15     CAN GO TODAY OR MONDAY.

16          THE COURT:  OKAY.  LET ME ASK, IS APPLE RESTING AFTER

17     DR. VELLTURO?

18          MR. LEE:  YES, YOUR HONOR.

19          THE COURT:  YOU ARE.  OKAY.

20          MR. LEE:  YES, YOUR HONOR.

21          THE COURT:  OKAY.  ALL RIGHT.  HOW LENGTHY ARE THE --

22     I KNOW IT'S DIFFICULT TO PREDICT, FOR MR. LOCKHEIMER, MR. SOHN,

23     AND MS. HACKBORN?  DO YOU EXPECT THAT TO TAKE THE REST OF THE

24     AFTERNOON?

25          MS. MAROULIS:  IT DEPENDS ON APPLE'S CROSS.
```

```
 1              THE COURT:  SURE.

 2              MS. MAROULIS:  BUT WE THINK THAT THEY ALL COULD BE

 3      DONE TODAY.

 4              THE COURT:  TODAY.

 5              MS. MAROULIS:  YEAH.

 6              THE COURT:  OKAY.  SO WHO'S ON THE LIST FOR -- YOU

 7      KNOW, WE WILL BE DOING THIS ON SATURDAY AND SUNDAY.  SO I WOULD

 8      CERTAINLY ASK FOR ANY CONSIDERATION, IF YOU DON'T THINK YOU'RE

 9      GOING ON ALL 12, I WOULD ASK THAT WE NOT HAVE TO DO THIS ON

10      SATURDAY AND SUNDAY, PLEASE.

11              MR. LEE:  YOUR HONOR, ACTUALLY, IT'S SORT OF A DOUBLE

12      WHAMMY, BECAUSE THIS IS 12 PEOPLE TODAY WHO WE'LL HAVE TO BRIEF

13      TO YOUR HONOR TONIGHT.  THERE WILL BE ANOTHER DISCLOSURE AT

14      9:00 O'CLOCK TOMORROW MORNING OF ADDITIONAL WITNESSES BY

15      SAMSUNG, I PRESUME.

16              MS. MAROULIS:  AND TOMORROW'S DISCLOSURE I CAN TELL

17      THE COURT IS PROBABLY ABOUT FOUR OR FIVE PEOPLE BECAUSE THEY'RE

18      LONGER WITNESSES, FOR EXAMPLE, EXPERTS GO LONG.

19          IF PRIOR ART CAN GO FOR FIVE, SEVEN, TEN MINUTES AND THE

20      CONCERN IS IF WE DON'T DISCLOSE THEM, THE COURT WOULD RIGHTLY

21      NOT LET US PRESENT THEM, BECAUSE THE OBJECTIONS WON'T BE

22      BRIEFED.  WE WILL DEFINITELY INFORM THE COURT THIS WEEKEND IF

23      WE'RE NOT CALLING ANYONE FROM THAT LIST, BUT WE CAN'T BE IN A

24      POSITION WHERE TEN MINUTES REMAIN OF THE COURT DAY, AND WE

25      DON'T HAVE ANYONE BECAUSE THE COURT DOESN'T WANT TO WASTE THE
```

1       JURY'S TIME.

2               THE COURT:  SO FOR THE 12 PEOPLE WHO HAVE BEEN

3       IDENTIFIED FOR MONDAY, WHO ARE THEY?

4               MR. LEE:  YOUR HONOR, IT'S BIER -- LET ME GO LIVE AND

5       THEN DEPOSITIONS, IS THAT OKAY?

6               THE COURT:  THAT'S FINE.

7               MR. LEE:  BIER, BRINGERT, DENISON, FRID-NILSON,

8       N-I-L-S-O-N, YOUNGMI KIM, PENDLETON, PFEIFER, AND WESTBROOK,

9       AND JEFFAY, AND JAFFAY IS AN EXPERT ON ONE OF THE PATENTS.

10         THEN THERE WERE THREE DEPOSITIONS DISCLOSED ON DE ICAZA,

11      D-E  I-C-A-Z-A, FUHR F-U-H-R, AND STEDFAST.

12         AND, YOUR HONOR, I HEAR WHAT MS. MAROULIS SAYS ABOUT THE

13      LENGTH, BUT THE PROBLEM IS IF YOU LOOK AT SOME OF THESE

14      DISCLOSURES, THEY CAN'T ALL BE SHORT.  THE NUMBER OF EXHIBITS

15      DISCLOSED ARE IN THE SCORES THAT WE HAVE TO NOW SORT THROUGH,

16      COME UP WITH CROSS-EXAMINATION.  I MEAN, LITERALLY FOR JUSTIN

17      DENISON, IF HE'S GOING TO BE SHORT, THERE'S 50 EXHIBITS.

18         AND THIS IS JUST GOING TO CREATE -- I MEAN, IT'S A PROBLEM

19      FOR US, BUT, YOUR HONOR, IT'S GOING TO CREATE A LOGJAM FOR YOUR

20      HONOR, AND IT'LL BE DOUBLE THE LOGJAM ONCE WE HAVE THE

21      DISCLOSURE TOMORROW.

22              THE COURT:  DO YOU HAVE A PROPOSAL, MS. MAROULIS?

23      I --

24              MS. MAROULIS:  YOUR HONOR, LET ME TALK --

25              THE COURT:  I'M REALLY SKEPTICAL THAT YOU HAVE SEVEN

1    WITNESSES IDENTIFIED, UNDERSTANDING THREE ON THIS LIST ARE

2    DEPOSITIONS, BUT IF YOU'VE ALREADY DISCLOSED ANOTHER 12 FOR

3    MONDAY, DO YOU REALLY THINK YOU'RE GOING TO GET THROUGH 19

4    PEOPLE BY MONDAY?  THAT SEEMS A LITTLE OPTIMISTIC.

5             MS. MAROULIS:  I HEAR YOU.  THERE'S SOME CONFUSION.

6    THE TWO -- TWO OF THE PEOPLE DISCLOSED ON LAST NIGHT'S LIST ARE

7    AMONG THE 12 BECAUSE YOU DISCLOSE THEM ON THE ROLLING LIST

8    BEFORE YOU DISCLOSE THEM, SOMETIMES, ON DISCLOSURE.  SO

9    STEDFAST AND DE ICAZA.

10            THE COURT:  OKAY.  THAT'S 17 PEOPLE STILL.

11            MS. MAROULIS:  YES.

12            THE COURT:  17 PEOPLE, AND I'M JUDGING FROM THE CROSS

13   I'VE SEEN SO FAR OF DR. VELLTURO THAT THAT'S GOING TO TAKE A

14   WHILE.

15            MS. MAROULIS:  WE WILL GO UNTIL THE BREAK PROBABLY.

16            THE COURT:  YOU MEAN UNTIL LUNCH; RIGHT?  SO THEN, I

17   DON'T KNOW, MAYBE 15 MINUTES OF REDIRECT, MAYBE 5 MORE MINUTES

18   OF RECROSS.

19        REALLY WE'RE GOING TO GET THROUGH 17 WITNESSES THIS

20   AFTERNOON AND MONDAY?  I JUST THINK THAT'S NOT REALISTIC.

21            MS. MAROULIS:  YOUR HONOR, IF I MAY TALK TO MY TEAM

22   DURING THE NEXT COURT BREAK OR AFTER WE DISBAND NOW AND WE'LL

23   SEE WHAT WE CAN DO.

24        BUT IF WE REDUCE THE LIST, WE OBVIOUSLY ASK THE COURT'S

25   INDULGENCE IF WE NEED TO SHUFFLE WITNESSES TO FILL THE TIME OR

```
 1        IF WE NEED TO END FIVE MINUTES EARLY, BECAUSE THE CONCERN WAS

 2        TO FILL THE TIME AND NOT TO WASTE A MINUTE OF THE JURY'S TIME.

 3        THAT'S WHY THE DISCLOSURE IS THE WAY IT IS.

 4                THE COURT:  I THINK IF YOU END FIVE MINUTES EARLY,

 5        THEY'LL PROBABLY BE ELATED.

 6            YOU KNOW, I'M JUST GOING TO ASK THAT -- WE WILL BE DOING

 7        THIS OVER THE WEEKEND.  IF WE CAN AVOID HAVING TO DO 19

 8        WITNESSES OVER THE WEEKEND, I'D REALLY, REALLY APPRECIATE THAT.

 9            SO WHY DON'T YOU CONFER AND SEE IF THERE'S SOME NARROWING

10        THAT COULD PERHAPS HAPPEN FOR WHAT HAS TO BE BRIEFED BOTH

11        SATURDAY AND SUNDAY AND RULED ON THIS WEEKEND, I'D REALLY

12        APPRECIATE THAT.

13                MS. MAROULIS:  YES, YOUR HONOR.  WE WILL DO THAT.

14        MAY WE ADDRESS ONE MORE POINT?

15                THE COURT:  YES.

16                MS. MAROULIS:  AND THAT RELATES TO THE PROFFERS THAT

17        WE FILED YESTERDAY.

18                THE COURT:  OKAY, YES.

19                MR. QUINN:  YOUR HONOR, AT SOME POINT WE WOULD LIKE

20        TO DISCUSS THE PROFFER THAT WE COULD -- THAT WE FILED YESTERDAY

21        AND THERE WAS A RESPONSE FROM APPLE RELATING TO -- AND I

22        KNOW --

23                THE COURT:  IT'S BEEN BRIEFED SO MANY TIMES.

24                MR. QUINN:  I KNOW.

25                THE COURT:  I'VE ISSUED SO MANY ORDERS.  I THINK
```

```
 1        YOU'VE LAID A COMPREHENSIVE RECORD FOR APPEAL ON THOSE ISSUES.

 2            I MEAN, I THINK I'VE BRIEFED HTC AT LEAST THREE, MAYBE

 3    FOUR TIMES.

 4            MR. QUINN:  I DON'T -- I'M NOT TALKING ABOUT HTC,

 5    YOUR HONOR.

 6            THE COURT:  UM-HUM.

 7            MR. QUINN:  I'M TALKING ABOUT THE 60 CENTS LICENSE

 8    ISSUE.

 9            THE COURT:  I UNDERSTAND.  I UNDERSTAND.

10            MR. QUINN:  WHICH --

11            THE COURT:  BUT I'VE ALREADY RULED ON THAT MULTIPLE

12    TIMES AS WELL, AND I UNDERSTAND FROM THE FEDERAL CIRCUIT

13    ARGUMENT THAT THE COURT WAS QUITE -- ASKED SOME VERY POINTED

14    QUESTIONS ABOUT THAT WHOLE CASE AND WAS QUITE CRITICAL, NOT TO

15    BE DISRESPECTFUL.  SO I DON'T KNOW WHAT THE CIRCUIT IS GOING TO

16    DO WITH THAT CASE.

17            MR. QUINN:  RIGHT.

18            THE COURT:  I DON'T SEE A NEED, BECAUSE AS I PUT ON

19    THE RECORD, DIFFERENT -- WE WENT BACK AND LOOKED AT THAT CASE.

20    DIFFERENT CLAIM CONSTRUCTIONS, DIFFERENT ASSERTED CLAIMS,

21    DIFFERENT NON-INFRINGING ALTERNATIVES, DIFFERENT PARTIES.

22            I THINK IT WOULD BE A MINI-TRIAL THAT WOULD BE VERY

23    CONFUSING AND MISLEADING TO THE JURY, AND I THINK WE HAVE SUCH

24    LIMITED TIME, I DON'T WANT TO INTRODUCE THAT, ESPECIALLY WHEN I

25    DON'T KNOW WHAT THE FEDERAL CIRCUIT IS GOING TO DO ON THAT
```

1    CASE.

2              MR. QUINN:  RIGHT.

3              THE COURT:  WHY WOULD WE WANT TO BRING ALL THAT IN

4    HERE WHEN, FROM MY UNDERSTANDING OF THE ORAL ARGUMENT, THERE

5    WERE SOME VERY, VERY POINTED QUESTIONS THAT WERE ASKED.

6              MR. QUINN:  I UNDERSTAND, YOUR HONOR.

7              THE COURT:  SO --

8              MR. QUINN:  WHATEVER THE FEDERAL CIRCUIT DOES.

9              THE COURT:  UM-HUM.

10             MR. QUINN:  -- I DON'T THINK THAT WILL AFFECT WHAT WE

11   WOULD SEEK TO OFFER HERE, AND THAT IS WHAT APPLE SAID THIS

12   PATENT CLAIM WAS WORTH IN TERMS OF THE LICENSE.

13             THE COURT:  THERE WERE DIFFERENT KINDS THAT WERE

14   ASSERTED, THERE WERE DIFFERENT CLAIM CONSTRUCTIONS THAT WERE

15   ISSUED, AND I REALLY DON'T WANT TO GET INTO, WELL, THESE CLAIMS

16   WERE ASSERTED AGAINST MOTOROLA, THESE CLAIMS ARE ASSERTED HERE.

17   THIS WAS JUDGE POSNER'S CLAIM CONSTRUCTION OF DIFFERENT TERMS

18   THAN WERE CONSTRUED HERE.  I JUST THINK IT WOULD BE VERY

19   CONFUSING FOR THIS JURY.  THEY ALREADY HAVE A LOT TO ABSORB.

20             MR. QUINN:  I APPRECIATE THAT, YOUR HONOR.  I JUST

21   WANT TO MAKE SURE THE COURT UNDERSTOOD THAT THAT'S -- THAT IS

22   THE INDEPENDENT CLAIM OF THE DEPENDENT CLAIM THAT'S AT ISSUE

23   HERE.  SO THEY ACTUALLY ARE VERY CLOSELY RELATED.

24        AND I DID HEAR -- I MEAN, THE COURT DID READ TO US WHAT

25   THE COURT SAID AT THE FINAL PRETRIAL CONFERENCE.

1          JUST A COUPLE OF PAGES EARLIER IN THE TRANSCRIPT THE COURT

2    MADE REMARKS SAYING, LOOK, I'M GOING TO EXCLUDE -- I'M GOING TO

3    GRANT IT TO EXCLUDE THE POSNER OPINION, AND THAT WAS IT, YOU

4    KNOW, THE SPECIFIC EXHIBIT, THE COURT SAID THE SPECIFIC EXHIBIT

5    THAT WAS THE SUBJECT OF THE MOTION.  AND WE UNDERSTOOD THAT TO

6    MEAN -- YOU KNOW, AND THE COURT SAID YOU WOULD OTHERWISE DENY

7    THE MOTION.

8          WE UNDERSTOOD THAT TO MEAN THAT WE WERE NOT PRECLUDED FROM

9    BRINGING THAT ONE DATA POINT IN, THE 60 CENTS.

10         AND, YOUR HONOR, WE'VE SAID OUR PIECE.  YOU'RE RIGHT,

11   YOU'VE BEEN PATIENT WITH US ON THIS.

12         BUT THE REALITY IS THIS CASE WILL GO TO THE JURY WITHOUT

13   THE JURY HAVING ANY INFORMATION AT ALL ABOUT ANY REAL WORLD

14   LICENSE ON A SMARTPHONE, AND I DON'T THINK THAT IS WHERE WE ALL

15   WANT TO BE.

16         SO THIS IS A -- THIS IS SOMETHING THAT WON'T BE AFFECTED

17   BY THE FED CIRCUIT OPINION.  IT'S WHAT THEY SAID THIS

18   INDEPENDENT CLAIM, WE'RE NOW LITIGATING THE DEPENDENT ONE, WAS

19   WORTH.  LET THEM CROSS.  LET THEM EXPLAIN.

20           THE COURT:  OKAY.  WE WENT THROUGH, IN THE WHOLE

21   PERMANENT INJUNCTION ORDER AND ALL OF THE LICENSES THAT THE

22   FEDERAL CIRCUIT CONSIDERED ON YOUR MOTION, AND YOU HAVE TO LOOK

23   AT THE SPECIFIC CIRCUMSTANCES OF THE PARTIES, WHAT DESIGN

24   AROUNDS WERE AVAILABLE TO THEM.  MOTOROLA AND SAMSUNG ARE NOT

25   THE SAME COMPANY.  THERE ARE UNIQUE CIRCUMSTANCES TO THESE

```
 1        PARTICULAR PARTIES --

 2               MR. QUINN:  YES.

 3               THE COURT:  -- THAT WOULD NEED TO BE EXPLAINED, AND

 4    WE WOULD HAVE TO GET INTO TESTIMONY.  I'M JUST CONCERNED ABOUT

 5    A MINI-TRIAL INVOLVING ANOTHER COMPANY, ANOTHER LITIGATION THAT

 6    MIGHT BE VERY CONFUSING TO THIS JURY.

 7          BUT DID YOU WANT TO SAY SOMETHING?

 8               MR. MCELHINNY:  JUST THAT YOU ARE EXHIBITING THE

 9    PATIENCE OF JOB.

10               THE COURT:  NO, I DON'T THINK THAT WAS A NECESSARY

11    COMMENT.

12          BUT -- OKAY.  I -- YOU KNOW, I WILL GO BACK DURING THE

13    BREAK AND THINK ABOUT THIS FURTHER, BUT THAT IS JUST MY

14    CONCERN.  IT'S REALLY A 403 CONCERN, THAT IT MIGHT BE VERY

15    CONFUSING TO START GETTING INTO A SEPARATE LITIGATION INVOLVING

16    A DIFFERENT DEFENDANT AND IT JUST -- IT MIGHT BE VERY

17    CONFUSING.  THERE'S A LOT TO ABSORB AS IT IS IN THIS CASE, AND

18    THEN IF THEY ALSO HAVE TO TRY TO PARSE OUT WHAT WAS A MOTOROLA

19    LITIGATION MIGHT BE VERY CONFUSING.  THAT'S MY CONCERN.

20               MR. QUINN:  I UNDERSTAND, YOUR HONOR.

21               MR. MCELHINNY:  I WOULD, YOUR HONOR, LIKE TO POINT

22    OUT THAT WE'RE NOW MID-WAY THROUGH THIS WITNESS'S EXAMINATION

23    AND THE DIRECT WAS DONE IN RELIANCE ON YOUR HONOR'S ORDERS, AND

24    TO CHANGE THE RULING MIDWAY WOULD ADD ANOTHER -- EVERYTHING

25    YOU'VE SAID IS CORRECT, YOUR HONOR HAS RULED ON THIS THREE
```

```
 1    TIMES BUT TO CHANGE THE RULING IN THE MIDDLE OF HIS EXAMINATION

 2    WOULD BE PARTICULARLY UNFAIR TO US.

 3            MR. QUINN:  I APPRECIATE, YOUR HONOR, I DON'T

 4    THINK -- I UNDERSTAND WHAT THE COURT SAYS ABOUT MINI-TRIAL AND

 5    CONFUSION AND ALL THE REST OF IT.

 6        BUT IT DOESN'T SEEM THAT THE ALTERNATIVE SHOULD BE THAT

 7    ANOTHER PATENT CLAIM AND THE CIRCUMSTANCES HAS TO BE ON ALL

 8    FOURS, THE EXACT SAME CLAIM, THE EXACT SAME PARTIES, ET CETERA,

 9    IN ORDER FOR IT TO BE RELEVANT FOR CONSIDERATION UNDER THE

10    GEORGIA PACIFIC FACTOR.

11        THAT'S ALL I WOULD SAY.  I APPRECIATE IT.

12            THE COURT:  I'LL THINK ABOUT THIS FURTHER DURING THE

13    BREAK.

14            MR. QUINN:  THANK YOU, YOUR HONOR.

15            THE COURT:  ALL RIGHT.  LET'S GO AHEAD AND TAKE OUR

16    NEW ABBREVIATED BREAK.

17            MR. BENNETT:  CAN WE HAVE TEN MINUTES, YOUR HONOR?

18            THE COURT:  YES, GO AHEAD AND TAKE TEN MINUTES.

19        (RECESS FROM 10:47 A.M. UNTIL 11:09 A.M.)

20        (JURY IN AT 11:09 A.M.)

21            THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

22    SEAT.

23        ALL MY RULINGS REMAIN.  I DID NOT CHANGE MY MIND OVER THE

24    BREAK.

25        ALL RIGHT.  LET'S GO.  THE TIME IS NOW 11:05.  THANK YOU.
```

1          MR. QUINN:  THANK YOU, YOUR HONOR.

2     Q.   ANYWAY, JUST TO FINISH UP ON THE INJUNCTION ISSUE AND

3     UNIVERSAL SEARCH, YOU KNOW THAT UNIVERSAL SEARCH IS INCLUDED IN

4     A NEW RELEASE OF ANDROID THAT SUMMER CALLED JELLY BEAN AND

5     THAT'S HOW IT CAME BACK?

6     A.   I DON'T -- I DON'T KNOW THE SPECIFICS, NO, I DON'T.

7     Q.   YOU DON'T KNOW THAT.

8     A.   NO.

9     Q.   YOU DON'T -- YOU DON'T HAVE ANY FACTS INDICATING THAT ANY

10    CONSUMER COMPLAINT, ANY USER COMPLAINT, HAD ANYTHING TO DO WITH

11    UNIVERSAL SEARCH BEING INCLUDED IN THE JELLY BEAN UPDATE AT

12    ANDROID, DO YOU?

13    A.   I SAW DR. COCKBURN'S DISCUSSION OF THIS.  THAT'S THE

14    EXTENT OF MY KNOWLEDGE.  I DON'T HAVE ANY INDEPENDENT VIEW.

15    Q.   WELL, YOU DON'T -- INCLUDING WHAT DR. COCKBURN SAID, YOU

16    HAVE NO FACTS INDICATING THAT GOOGLE INCLUDED THIS UNIVERSAL

17    SEARCH CAPABILITY IN THE JELLY BEAN UPDATE THAT SUMMER BECAUSE

18    OF COMPLAINTS FROM USERS?  YOU DON'T HAVE ANY FACTS TO INDICATE

19    THAT, DO YOU, SIR?

20    A.   I DON'T HAVE THOSE TECHNICAL SKILLS TO KNOW EXACTLY WHEN

21    GOOGLE DID WHAT IT DID WITH ITS VARIOUS DESSERTS.

22    Q.   ALL RIGHT.  SO, AGAIN, IT WOULD -- IT WOULDN'T BE RIGHT,

23    BASED ON YOUR TESTIMONY AND WHAT YOU KNOW, YOU WOULDN'T WANT TO

24    LEAVE THE JURY WITH THE IMPRESSION THAT YOU HAVE THE TECHNICAL

25    KNOWLEDGE AND EXPERIENCE -- OR KNOWLEDGE OF THE HISTORY HERE TO

1    SAY THAT UNIVERSAL SEARCH WAS INCLUDED IN JELLY BEAN BECAUSE OF

2    SOME CONSUMER COMPLAINTS BECAUSE YOU SIMPLY DON'T KNOW THAT;

3    CORRECT?

4    A.   NO.  I'M NOT A TECHNICAL EXPERT.

5    Q.   AND MY STATEMENT IS CORRECT, SIR?

6    A.   RIGHT.  I'M NOT HERE TO PROVIDE YOU WITH TECHNICAL

7    EXPERTISE BECAUSE I DON'T HAVE IT.

8    Q.   ALL RIGHT.  AND YOU TALK ABOUT REVEALED PREFERENCES.  IN

9    THAT INSTANCE WOULD YOU AGREE THAT SAMSUNG'S REVEALED

10   PREFERENCE WAS NOT TO GIVE IN TO APPLE'S LEGAL DEMANDS?

11   CORRECT?

12   A.   I'M NOT FOLLOWING THAT QUESTION.  I'M NOT SURE WHAT YOU'RE

13   REFERRING TO.

14   Q.   WELL, THEY APPEALED, THEY WON; RIGHT?

15   A.   YES.

16   Q.   AND APPLE CAN BE WRONG?

17   A.   YES.

18   Q.   I DON'T KNOW IF ANYBODY EVER GOT A NOBEL PRIZE FOR THE

19   PRINCIPLE, BUT IS THERE ALSO A PRINCIPLE THAT SAYS SOMETHING

20   LIKE, YOU KNOW, IF YOU THINK YOU'RE RIGHT, DON'T GIVE IN TO

21   DEMANDS THAT ARE MADE BY A BIG COMPETITOR?  IS THAT ANOTHER

22   PRINCIPLE?

23   A.   THAT'S A CONCEPT THAT CAN APPLY IN CERTAIN SITUATIONS.

24   Q.   ALL RIGHT.  AND IF WE COULD TALK FOR A MOMENT ABOUT THAT

25   CONCEPT OF REVEALED PREFERENCE THAT YOU TESTIFIED TO ON

```
 1    TUESDAY.  I THINK YOU'VE INDICATED ALREADY YOU'VE DONE A LOT OF

 2    WORK IN THIS CASE; CORRECT?

 3    A.   YES.

 4    Q.   AND IT'S ACTUALLY THE PRELIMINARY INJUNCTION PROCEEDING.

 5    YOU FILED DECLARATIONS TOTALING 134 PAGES?

 6    A.   THAT SOUNDS ABOUT RIGHT.

 7    Q.   AND YOU DID REPORTS AND SUPPLEMENTAL REPORTS; RIGHT?

 8    A.   YES.

 9    Q.   AND YOU WERE DEPOSED FOR SEVEN HOURS IN THIS CASE?

10    A.   YES, I WAS.

11    Q.   AND YOU GAVE US A REPORT, AND YOU KNOW THE WHOLE PURPOSE

12    OF THAT REPORT IS TO TELL US WHAT YOUR OPINIONS ARE AND WHAT

13    IT'S BASED ON AND WHAT YOU'RE GOING TO TESTIFY TO AT TRIAL;

14    CORRECT?

15    A.   YES.

16    Q.   ALL RIGHT.  IN NOWHERE, NOWHERE IN ALL THOSE PAPERS THAT

17    YOU FILED, NOR IN YOUR REPORT, DID YOU SAY ANYTHING ABOUT THIS

18    LAW OF REVEALED PREFERENCE THAT YOU TESTIFIED TO ON TUESDAY;

19    RIGHT?

20    A.   I'D HAVE TO SEE THE REPORT.  IT'S SUCH A COMMON CONCEPT IN

21    ECONOMICS THAT I'M NOT SURE WHETHER I SPECIFICALLY CALLED IT

22    THAT.

23         BUT ACTIONS -- I, AS AN ECONOMIST, I DERIVE A LOT OF

24    SIGNIFICANCE AND IMPORTANCE FROM ACTIONS, AND WHETHER I CALLED

25    IT THAT OR NOT IN THE REPORT, I JUST DON'T REMEMBER.
```

1    Q.   THAT WAS AFTER GIVING US THE REPORTS, KNOWING THAT THIS

2    WAS THE OPPORTUNITY WE'D HAVE TO LEARN WHAT YOU HAD TO SAY, YOU

3    DIDN'T SAY ANYTHING ABOUT THIS CONCEPT OF REVEALED PREFERENCE,

4    PAUL SAMUELSON AND HIS NOBEL PRIZE THAT YOU TESTIFIED AT LENGTH

5    ABOUT ON TUESDAY, YOU HADN'T SAID ANYTHING TO US ABOUT THAT

6    UNTIL YOU TOOK THE STAND ON TUESDAY; CORRECT?

7    A.   NO, I DIDN'T CALL IT THAT, BUT THAT CONCEPT IS ALL OVER

8    ALL OF THOSE REPORTS.

9    Q.   ALL RIGHT.  SO YOU'LL AGREE AT LEAST YOU DIDN'T USE THE

10   WORDS "REVEAL PREFERENCE"?

11   A.   I DON'T REMEMBER.  I MIGHT HAVE, BUT I'M NOT SURE.

12   Q.   LET'S TALK A LITTLE BIT ABOUT DR. HAUSER AND HIS WORK.

13        IF WE COULD PUT UP PLAINTIFF'S EXHIBIT 92.72.  THIS IS

14   CONFIDENTIAL, SO IT'LL JUST BE FOR THE JURY.

15        AND FOR THIS SECOND CATEGORY HERE OF DIMINISHED DEMAND

16   LOST PROFITS, THAT'S BASICALLY -- THAT'S DERIVED FROM A -- FROM

17   CONCLUSIONS THAT DR. HAUSER REACHES ABOUT WHAT THE PERCENTAGE

18   DECREASE WOULD BE IN SALES OF SAMSUNG PHONES IF THEY DIDN'T

19   HAVE THESE FEATURES; CORRECT?

20   A.   THAT'S PARTLY CORRECT, BUT THAT'S PARTLY NOT CORRECT.

21   Q.   ALL RIGHT.  WELL, FOR THESE DIMINISHED DEMAND LOST

22   PROFITS, YOU USED PERCENTAGES FROM DR. HAUSER'S SURVEY TO

23   DETERMINE PERCENTAGE DECREASE IN THE SALES OF SAMSUNG PHONES;

24   CORRECT?

25   A.   IN THE CALCULATIONS, I DO USE THOSE PERCENTAGES, THAT'S

1    RIGHT.

2    Q.    RIGHT.  AND, IN FACT, IN TERMS OF DATA, THE ONLY

3    QUANTIFIED DATA THAT YOU HAVE ABOUT DECREASES IN CONSUMER

4    DEMAND IF SAMSUNG DID NOT HAVE THESE FEATURES IN ITS PHONES,

5    THAT'S FROM DR. HAUSER; CORRECT?

6    A.    NO, THAT'S NOT CORRECT.

7    Q.    OKAY.  OTHER THAN DR. HAUSER, WHERE DID YOU GET THE --

8    WHAT OTHER DATA DO YOU HAVE ABOUT DECREASES IN DEMAND?  I'M

9    TALKING ABOUT QUANTIFIABLE DATA.

10   A.    THERE ARE DECREASES IN DEMAND THAT ARE ASSOCIATED WITH THE

11   REDESIGN PERIODS, THAT IS, THE OFF THE MARKET PERIODS, AND

12   THOSE CALCULATIONS HAVE -- TAKE NO INPUTS FROM DR. HAUSER'S

13   SURVEY AT ALL.

14   Q.    ALL RIGHT.  I'M TALKING NOW -- MY QUESTIONS RELATE TO

15   DIMINISHED DEMAND.

16   A.    OKAY.

17   Q.    ARE WE TOGETHER NOW?

18   A.    DIMINISHED DEMAND?

19   Q.    THE ONLY NUMBERS, QUANTIFIABLE DATA THAT YOU HAVE

20   SUPPORTING THE IDEA THAT IF SAMSUNG PHONES DID NOT INCLUDE

21   THESE FEATURES, SAMSUNG WOULD SELL FEWER PHONES, THAT COMES

22   FROM DR. HAUSER; CORRECT?

23   A.    NO, THAT'S NOT QUITE RIGHT.

24   Q.    ALL RIGHT.  WHAT OTHER QUANTIFIABLE NUMBERS DO YOU HAVE?

25   A.    I USED PROFESSOR HAUSER'S PERCENTAGES FOR THE

1    CALCULATIONS.

2    Q.    OKAY.

3    A.    COULD I FINISH?

4    Q.    SURE.

5    A.    OKAY.  SO I USED IT FOR THE CALCULATIONS, BUT THERE'S A

6    MUCH BROADER SET OF ANALYSIS I DID LOOKING AT THE VOLUME OF THE

7    SALES, LOOKING AT THE CHANGES IN MARKET SHARES, LOOKING AT ALL

8    OF THAT, THAT INFORMS MY OPINION ABOUT THE IMPORTANCE OF THESE

9    PATENTS AND THAT'S ANOTHER PART OF WHAT I DID.

10        SO IN TERMS OF DETERMINING THAT THESE PATENTS WERE

11   SIGNIFICANT AND WERE IMPORTANT, THERE'S A LOT OF OTHER

12   QUANTITATIVE ANALYSIS I DID.

13   Q.    ALL RIGHT.

14   A.    WHEN IT COMES TIME TO DO THE CALCULATIONS, I DO USE THE

15   PERCENTAGE REDUCTIONS FROM WILLINGNESS TO BUY FROM

16   PROFESSOR HAUSER'S SURVEY.

17   Q.    ALL RIGHT.  LET'S USE YOUR WORDS THEN, THE CALCULATIONS

18   AND THE COMPUTATIONS.

19        IN DOING THE COMPUTATIONS, YOU ARRIVE AT THIS DIMINISHED

20   DEMAND THAT YOU PRESENTED TO THE JURY, IN DOING THOSE

21   CALCULATIONS, YOU RELIED ON DR. HAUSER'S SURVEY; CORRECT?

22   A.    YES, I DO.

23   Q.    AND IN DOING THOSE CALCULATIONS, THAT'S THE ONLY

24   QUANTITATIVE DATA YOU HAVE ABOUT DECREASE IN SALES THAT WOULD

25   BE ATTRIBUTABLE TO SAMSUNG PHONES NOT HAVING THESE FEATURES;

```
 1        CORRECT?

 2        A.   THOSE ARE THE PERCENTAGES I USE, YES.

 3        Q.   ALL RIGHT.

 4        A.   THAT'S WHAT I USE.

 5        Q.   ALL RIGHT.  SO -- AND JUST TO REMIND US, DR. HAUSER'S

 6        SURVEY THAT WE'RE TALKING ABOUT HERE, IF WE COULD PUT UP

 7        EXHIBIT, PLAINTIFF'S EXHIBIT 140, PAGE 51.

 8             THIS IS ONE PAGE FROM THAT SURVEY?  YOU REVIEWED THE

 9        SURVEY; CORRECT?

10        A.   I DID.

11        Q.   OKAY.  AND SO IF THE -- IF WE CAN GO BACK TO THE EXHIBIT

12        WE WERE JUST LOOKING AT, KEN, EXHIBIT 92.72.

13             IF THE JURY CONCLUDES THAT DR. HAUSER'S SURVEY, WHEN HE

14        SURVEYED THESE PEOPLE ABOUT THESE MINOR FEATURES, THAT IT'S NOT

15        RELIABLE, THEN THOSE PERCENTAGE DECREASES THAT HE DERIVED WOULD

16        NOT BE RELIABLE; CORRECT?

17        A.   I THINK THAT NATURALLY FOLLOWS.

18        Q.   THAT NATURALLY FOLLOWS.

19             AND THE COMPUTATIONS THAT YOU THEN DO USING THOSE

20        PERCENTAGE DECREASES WOULD NOT BE RELIABLE; CORRECT?

21        A.   THOSE WOULD NEED TO BE CHANGED.

22        Q.   RIGHT?

23        A.   TO REFLECT WHAT NUMBERS THE JURY FELT WERE APPROPRIATE

24        NUMBERS.

25        Q.   ALL RIGHT.  BUT THE ONLY NUMBER -- DR. HAUSER GAVE US
```

```
1    NUMBERS ABOUT PERCENTAGE DECREASES IN SALES; CORRECT?

2    A.   YES.

3    Q.   YOU TRANSLATED THOSE INTO HOW MANY UNITS, FEWER UNITS

4    SAMSUNG WOULD SELL, CORRECT?

5    A.   YES.

6    Q.   AND THOSE NUMBERS, THE NUMBER OF FEWER UNITS, IF

7    DR. HAUSER'S NUMBERS ON PERCENTAGE DECREASES ARE WRONG, THEN

8    YOUR NUMBERS ON THE NUMBER OF UNITS THAT SAMSUNG WOULDN'T SELL,

9    THOSE WOULD BE WRONG, TOO?  CORRECT?

10   A.   THEY WOULD NEED TO BE CHANGED.

11   Q.   NEED TO BE CHANGED.  I MEAN, DR. HAUSER, HE GAVE YOU A SET

12   OF NUMBERS WHICH YOU USED; RIGHT?

13   A.   YES.

14   Q.   DID YOU ALSO -- IF WE CAN TAKE A LOOK AT EXHIBIT 2367, THE

15   WILLINGNESS TO PAY NUMBERS, THESE ARE ALSO NUMBERS DR. HAUSER

16   CAME UP WITH IN HIS SURVEY?

17   A.   I REMEMBER THESE NUMBERS, YES.

18   Q.   AND THIS IS NOT CONFIDENTIAL.

19        AND ALTHOUGH IT DIDN'T FACTOR INTO THE MATH, YOU TOOK

20   THESE INTO CONSIDERATION AS WELL IN DOING YOUR ANALYSIS, THESE

21   NUMBERS THAT THE JURY IS LOOKING AT HERE?

22   A.   I WAS AWARE OF THESE NUMBERS, YES.

23   Q.   WELL, YOU WEREN'T JUST AWARE OF THEM, YOU TOOK THEM INTO

24   CONSIDERATION IN DOING YOUR ANALYSIS; CORRECT?

25   A.   AT A VERY HIGH LEVEL, YES.
```

1    Q.   AND, AGAIN, TO THE EXTENT THAT YOU CONSIDERED THESE

2    NUMBERS, IF THE JURY DECIDES THESE ARE UNREASONABLE, THEN TO

3    THE EXTENT THAT YOU CONSIDERED THEM, YOUR RELIANCE ON THEM

4    WOULD BE UNREASONABLE; CORRECT?

5    A.   NO, THAT'S NOT CORRECT.

6    Q.   OKAY.  LET'S TAKE A LOOK AT PLAINTIFF'S EXHIBIT 92.37.

7    THIS IS NOT CONFIDENTIAL.

8        THIS EXHIBIT -- THIS IS ONE OF YOUR SLIDES, SIR?

9    A.   YES.

10   Q.   AND THIS EXHIBIT SHOWS AN INDIVIDUAL PERCENTAGE DIMINISHED

11   DEMAND WITH RESPECT TO EACH OF THESE FEATURES WITH RESPECT TO

12   THE GALAXY S III; CORRECT?

13   A.   WELL, IT DOESN'T SPECIFICALLY SAY THE S III, BUT I THINK

14   THAT'S THE EXAMPLE.

15   Q.   ALL RIGHT.  SO YOU'RE CALCULATING THE DIMINISHED DEMAND

16   NUMBERS, THOSE DAMAGES WE LOOKED AT, BASED ON ADDING UP THE

17   TOTAL OF THESE; CORRECT?

18   A.   WELL, I DO IT SEPARATELY FOR EACH PATENT.

19   Q.   I KNOW.  BUT -- AND WHEN YOU ACTUALLY GET DOWN FOR A

20   DIMINISHED DEMAND TOTAL FOR THAT PHONE, YOU ADD UP ALL THREE

21   ALSO, DON'T YOU?

22   A.   IN THE TOTAL.  BUT AS I SAID, I PROVIDE IT PATENT BY

23   PATENT AS WELL.  SO EACH OF THOSE ROWS WOULD BE PROVIDED

24   SEPARATELY.

25   Q.   SO YOUR DAMAGES NUMBER, YOU ASSUME THAT WITHOUT THESE

1      THREE FEATURES, SAMSUNG WOULD LOSE ESSENTIALLY -- I MEAN, THE

2      TOTAL HERE COMES TO ABOUT 19.6 PERCENT?

3      A.   YES.

4      Q.   IF WE ADD THEM UP QUICKLY.

5           SO YOU ASSUME THAT IF SAMSUNG DIDN'T HAVE THESE FEATURES

6      IN ITS BEST SELLING PHONE, THE GALAXY S III, IT WOULD LOSE ONE

7      OF EVERY FIVE SALES.

8      A.   YES.

9      Q.   CORRECT.

10     A.   YES.

11     Q.   AND, AGAIN, THESE PERCENTAGES ARE BASED ON DR. HAUSER'S

12     SURVEY; CORRECT?

13     A.   THESE PERCENTAGES ARE ADJUSTMENTS FROM DR. HAUSER'S

14     SURVEY.

15     Q.   YEAH, YOU --

16     A.   THE NUMBERS ORIGINATE FROM DR. HAUSER'S SURVEY.

17     Q.   YOU TOLD US THAT YOU DID SOME LINEARIZATION?

18     A.   YES.

19     Q.   ALL RIGHT.  AND IT'S TRUE THAT FOR OTHER ACCUSED PRODUCTS,

20     THE NUMBER OF, YOU KNOW, THE PERCENTAGE OF SALES THAT YOU

21     DETERMINED WOULD BE LOST ARE EVEN HIGHER; CORRECT?

22     A.   FOR SOME IT'S HIGHER; FOR SOME ITS LOWER.

23     Q.   AND YOUR DIMINISHED DEMAND LOST PROFITS NUMBER, USING THIS

24     METHOD, BASED UPON DURING HAUSER'S SURVEY, IS -- IF WE CAN GO

25     BACK TO THAT, THE FIRST SLIDE, KEN, 92.72 -- IS $569.6 MILLION,

```
 1    APPROXIMATELY?  CORRECT?

 2    A.   YES.

 3    Q.   THAT'S THE NUMBER YOU COME UP WITH?

 4    A.   YES.

 5    Q.   ANOTHER PART OF YOUR DAMAGES CALCULATION THAT YOU

 6    PRESENTED TO THE JURY RELATES TO REASONABLE ROYALTY; CORRECT?

 7    A.   YES.

 8    Q.   AND IF WE LOOK AT PLAINTIFF'S EXHIBIT 92.59 -- THIS IS

 9    UNDER SEAL, SO THIS WILL JUST BE FOR THE JURY -- AND THESE

10    NUMBERS HERE, THIS IS WHAT YOU CHARACTERIZED AS, IN A

11    NEGOTIATION, THIS HYPOTHETICAL NEGOTIATION, WHAT APPLE WOULD BE

12    WILLING TO ACCEPT; CORRECT?

13    A.   I THINK IT'S WHAT APPLE WOULD BE LOOKING AT AS A

14    REQUIREMENT IN THE PAYMENT TO BE -- TO AGREE TO THIS

15    HYPOTHETICAL NEGOTIATION AND GRANT A LICENSE.

16    Q.   ALL RIGHT.  AND, AGAIN, THIS ANALYSIS HERE, THIS

17    CALCULATION RELATING TO THE REASONABLE ROYALTY, AGAIN, IS BASED

18    ON DR. HAUSER'S SURVEY; CORRECT?

19    A.   ONE OF THE NUMBERS IS DERIVED FROM DR. HAUSER'S WORK.

20    Q.   AND THAT'S -- AND I DON'T THINK THIS IS A CONFIDENTIAL

21    NUMBER, THE 6.14 PERCENT IN THE UPPER RIGHT-HAND CORNER;

22    CORRECT?

23    A.   YES.

24    Q.   AND THAT'S THE NUMBER THAT YOU CALL -- THIS IS WHAT WE'RE

25    LOOKING AT HERE, THIS IS WHAT YOU CALLED THE HAUSER PERCENTAGE
```

```
1     FOR THE REPRESENTATIVE ACCUSED PRODUCT THAT'S THE GALAXY 2

2     EPIC 4G, 4G TOUCH?

3     A.   RIGHT, THAT IS THE PRODUCT THAT WAS ABOUT TO BE INTRODUCED

4     RIGHT AROUND THE TIME OF THE NEGOTIATION.

5     Q.   RIGHT.  AND THEN YOU HAVE A FORMULA HERE AT THE BOTTOM

6     THAT YOU TOLD THE JURY THIS IS HOW YOU CALCULATED THE

7     REASONABLE ROYALTY; CORRECT?

8     A.   THIS IS HOW I CALCULATE WHERE APPLE WOULD BE AT THE

9     NEGOTIATING TABLE.

10    Q.   EXACTLY.  AND THAT'S WHERE YOU ACTUALLY CONCLUDE THAT'S

11    WHAT THE ROYALTY WOULD BE; RIGHT?

12    A.   IT IS.

13    Q.   BECAUSE ALTHOUGH YOU SAY THE PARTIES, YOU KNOW, START FAR

14    APART, AT THE END OF -- AS APPLE'S EXPERT HERE, YOU CONCLUDE

15    THAT THE RESULT OF THE NEGOTIATION WOULD BE SAMSUNG WOULD

16    ACCEPT APPLE'S NUMBER; CORRECT?

17    A.   YES.

18    Q.   AND SAMSUNG WOULD JUST RAISE PRICES?  RIGHT?

19    A.   OR -- NO.

20    Q.   YOU SAID --

21    A.   I SAID TWO THINGS.  ONE, THAT SAMSUNG WOULD RECOGNIZE THAT

22    IT WAS GOING TO RAISE PRICES; OR THAT IT WOULD TAKE A REDUCTION

23    IN ITS PROFITABILITY NOW THAT IT WAS PAYING FOR TECHNOLOGY THAT

24    IT ACTUALLY HADN'T PAID FOR.

25    Q.   OKAY.  BUT YOU HAD THIS FORMULA AT THE BOTTOM, AND I THINK
```

1    YOU'VE TOLD US THAT THIS FIRST NUMBER HERE, THE .0614 PERCENT,

2    THAT COMES FROM DR. HAUSER; RIGHT?

3    A.   YES.  ALTHOUGH, AGAIN, I'VE LINEARIZED IT.

4    Q.   LINEARIZED IT.  THAT'S A SMALL ADJUSTMENT YOU DO, RIGHT?

5    A.   IT'S NOT SMALL.  16 PERCENT OF THE NUMBER.

6    Q.   OKAY.  IF THE JURY CONCLUDES THAT DR. HAUSER IS FROM THE

7    SURVEY THAT HE DID OF THESE FEATURES, THAT THERE'S SO MANY

8    PROBLEMS WITH IT THAT IT'S UNRELIABLE AND THEY ASSIGN A 0 TO

9    THAT NUMBER, EFFECTIVE TECHNOLOGY BECAUSE THEY REJECT

10   DR. HAUSER'S NUMBER ALTOGETHER, THEN THIS FORMULA WORKS OUT TO

11   A 0; CORRECT?

12   A.   SO IF YOU PUT 0 IN THERE, APPLE WOULD BE WILLING TO GRANT

13   THE LICENSE FOR 0?

14   Q.   IT COMES OUT TO 0; CORRECT?

15   A.   YOUR MATHEMATICS WOULD COME OUT TO 0, BUT THAT'S THE

16   PROBLEM IS THAT APPLE WOULD NOT GRANT THIS FOR NOTHING TO A

17   CHIEF COMPETITOR.  THAT'S EXACTLY WHY THIS CALCULATION THAT

18   YOU'RE PROPOSING DOESN'T MAKE SENSE.

19   Q.   WELL, IT'S BASED ON -- THIS IS A HYPOTHETICAL NEGOTIATION,

20   A SITUATION THAT YOU'VE DESCRIBED TO THE JURY; RIGHT?

21   A.   YES.

22   Q.   ALL RIGHT.  LET'S TAKE A LOOK AT THE SAMSUNG NUMBERS, THE

23   WILLINGNESS -- THIS IS PLAINTIFF'S EXHIBIT 92.61, AND THIS IS

24   ALSO CONFIDENTIAL, SAMSUNG'S WILLINGNESS TO PAY.

25       THIS IS WHAT YOU CONCLUDE SAMSUNG WOULD BE WILLING TO PAY

1    AT A NEGOTIATION; RIGHT?

2    A.   SITTING AT THAT TABLE AT THAT TIME, YES.

3    Q.   RIGHT.  AND, AGAIN, THIS NUMBER IN THE UPPER RIGHT-HAND

4    CORNER, THAT'S BASED ON DR. HAUSER; RIGHT?

5    A.   WITH AN ADJUSTMENT, RIGHT.

6    Q.   AND, AGAIN, IF THE JURY REJECTS DR. HAUSER, THEY CERTAINLY

7    CANNOT RELY ON THIS CALCULATION; CORRECT?

8    A.   NO, THAT'S NOT CORRECT.  THEY WOULD JUST NEED TO PUT A

9    DIFFERENT NUMBER IN FOR THAT ONE VARIABLE.

10   Q.   SO IS IT YOUR TESTIMONY THEN THAT DR. HAUSER TESTIFIED TO

11   A NUMBER OF DIFFERENT PERCENTAGES, DECREASES IN DEMAND THAT THE

12   JURY COULD SUBSTITUTE IN?

13   A.   WELL, THERE WERE DIFFERENT NUMBERS DEPENDING ON DIFFERENT

14   COMBINATIONS OF SMARTPHONES, SCREEN SIZES, AND PRICES.

15   Q.   RIGHT.  BUT LET'S FOCUS ON ONE SMARTPHONE, ONE MODEL, ONE

16   SCREEN SIZE, ONE PRICE.

17        DO YOU MEAN TO COMMUNICATE TO THIS JURY THAT DR. HAUSER

18   GAVE THEM A NUMBER OF ALTERNATIVES THAT THEY MIGHT USE FOR ONE

19   PHONE?

20   A.   NO.  HE PROVIDED ONE NUMBER FOR THAT.

21   Q.   YEAH.  HE PROVIDED ONE NUMBER FOR EVERY PHONE; CORRECT?

22   A.   FOR EVERY PATENT FOR EVERY PHONE.

23   Q.   ALL RIGHT.  SO IT JUST SIMPLY ISN'T ACCURATE TO SAY -- ARE

24   YOU SUGGESTING THAT THE JURY SHOULD JUST COME UP WITH A NUMBER

25   OUT OF THE AIR IN TERMS OF AN ALTERNATIVE PERCENTAGE DECREASE?

```
 1      A.   NO, I'M NOT SUGGESTING THAT.

 2      Q.   WELL, YOU AGREE WITH ME THAT DR. HAUSER DID NOT GIVE THEM

 3      ALTERNATIVE NUMBERS FOR EACH PHONE; CORRECT?

 4      A.   THAT'S TRUE.

 5      Q.   ALL RIGHT.  SO IF THEY -- IF THEY REJECT DR. HAUSER'S

 6      ANALYSIS, THEY MUST REJECT HIS NUMBERS FOR EACH PHONE; RIGHT?

 7      A.   THEY WOULD NEED TO DEVELOP OTHER POTENTIAL NUMBERS.  IF

 8      THEY REJECT IT BY DEFINITION, THEY WOULD NEED TO CHANGE THE

 9      CALCULATIONS.

10      Q.   SO THE JURY DO THEIR OWN SURVEY?

11      A.   THERE'S A LOT MORE INFORMATION IN THIS CASE ABOUT THE

12      VALUE OF THE TECHNOLOGIES IN GENERAL.

13      Q.   I UNDERSTAND, SIR.  YOU'VE READ A BUNCH OF DOCUMENTS THAT

14      APPLE PROVIDED TO YOU; CORRECT?

15      A.   YES.

16      Q.   AND YOU'VE COME HERE AND YOU'VE SELECTED SOME DOCUMENTS TO

17      PRESENT TO THE JURY; RIGHT?

18      A.   YES.

19      Q.   AND SOME -- YOU'VE SELECTED PASSAGES OF THOSE DOCUMENTS TO

20      PRESENT TO THE JURY; RIGHT?

21      A.   FROM A VERY LARGE SET, YES.

22      Q.   RIGHT.  SO IN TERMS OF QUANTITATIVE DATA, DECREASES IN

23      SALES, DECREASES IN DEMAND, THE ONLY NUMBERS THEY HAVE COME

24      FROM DR. HAUSER; CORRECT?

25      A.   WELL, NOT WITH RESPECT TO OFF THE MARKET --
```

1    Q.   NO.  I TALKED ABOUT DIMINISHED DEMAND.

2    A.   OKAY.

3    Q.   THE ONLY NUMBERS THEY HAVE COME FROM DR. HAUSER; CORRECT?

4    A.   THE PERCENTAGE NUMBERS THAT ARE CURRENTLY BEFORE THE JURY

5    ARE THE ONES THAT DR. HAUSER PRESENTED.

6    Q.   ALL RIGHT.  DO YOU INTEND TO PRESENT SOME MORE LATER ON?

7    IS THAT WHAT YOU'RE SIGNALLING TO ME?

8    A.   NO.

9    Q.   ALL RIGHT.  THE REASONABLE ROYALTY ALSO IS BASED ON

10   DR. HAUSER SURVEY?

11   A.   TO SOME DEGREE, YES.

12   Q.   HAVE YOU SEEN -- IF WE COULD PUT UP SDX 2375, SDX 2375,

13   THIS IS YOUR EDGEWORTH BOX, WHAT YOU REFER TO AS THE EDGEWORTH

14   BOX ANALYSIS?

15   A.   YES.

16   Q.   AND THIS REFLECTS YOUR CALCULATION OF WHAT YOU SAY SAMSUNG

17   WOULD BE WILLING TO PAY FOR ALL FIVE PATENTS; RIGHT?

18   A.   THAT'S PART OF IT, YES.

19   Q.   AND ALSO THE MINIMUM AMOUNT THAT APPLE WOULD ACCEPT TO

20   LICENSE THE PATENTS?

21   A.   TO SAMSUNG, YES.

22   Q.   AND SO -- AND IT FOOTS TO THIS -- TO APPLE'S WILLINGNESS

23   TO ACCEPT IS THE $40.10 CENTS PER UNIT?

24   A.   IF ALL FIVE PATENTS.

25   Q.   AND THAT'S WHAT YOU ULTIMATELY CONCLUDE THE ROYALTY OUGHT

1    TO BE?

2    A.   WELL --

3    Q.   THAT IT WOULD BE AS A RESULT OF THE NEGOTIATION?

4    A.   IF ALL FIVE PATENTS APPLY.

5    Q.   SO YOU'VE SEEN -- YOU'VE SEEN ESTIMATES THAT THERE ARE AS

6    MANY AS 250,000 PATENTS IN A SMARTPHONE?  YOU'VE SEEN THOSE

7    ESTIMATES, HAVEN'T YOU?

8    A.   I'VE SEEN SOME ESTIMATES LIKE THAT, YES.

9    Q.   AND IF YOU TAKE THE AVERAGE VALUE OF THESE FIVE PATENTS,

10   IT'S ROUGHLY -- UNDER THE SCENARIO THAT YOU'RE PRESENTING TO

11   THE JURY, IT'S ROUGHLY $8 A PATENT; CORRECT?

12   A.   WELL, THEY HAVE THEIR OWN NUMBERS, BUT 40 DIVIDED BY 5 IS

13   80, YES.

14   Q.   SO IF WE -- YOU SAY YOU'VE SEEN THESE NUMBERS THAT THERE

15   ARE AS MANY AS 250,000 PATENTS IN A SMARTPHONE, AT $8 A PATENT,

16   THAT WOULD BE A PRETTY EXPENSIVE SMARTPHONE, CAN YOU AGREE WITH

17   THAT?

18   A.   EIGHT TIMES 250,000 IS A BIG NUMBER.  BUT THAT'S NOT A

19   MEANINGFUL CALCULATION.  I UNDERSTAND THAT'S A BIG NUMBER.

20   Q.   IT'S LIKE $2 MILLION, SOMETHING LIKE THAT?  RIGHT?

21   A.   THAT SOUNDS ABOUT RIGHT.  BUT, AGAIN, THE CALCULATION

22   DOESN'T HAVE TO BE THAT.  BUT THAT'S THE MATH.

23   Q.   WELL, YOU WERE HERE -- WERE YOU HERE WHEN DOCTOR -- OR NOT

24   DOCTOR -- MR. SCHILLER FROM APPLE TESTIFIED THAT JUST THREE

25   UPGRADES TO IOS INCLUDED 500 NEW FEATURES?  WERE YOU HERE WHEN

1    HE TESTIFIED TO THAT?

2    A.   YES.

3    Q.   ALL RIGHT.  AND HE WENT THROUGH THOSE PRESS RELEASES.  DO

4    YOU RECALL THAT?

5    A.   YES.

6    Q.   AT $8, YOU KNOW, WHAT YOU SAY A REASONABLE ROYALTY WOULD

7    BE, THAT WOULD ALSO YIELD A PRETTY BIG NUMBER?

8    A.   THAT WOULD BE A BIG NUMBER, BUT IT WOULDN'T TELL ME

9    ANYTHING.

10   Q.   OKAY.  LET'S TAKE A LOOK AT SOME OF THE DOCUMENTS THAT YOU

11   TALKED TO THE -- THAT YOU SHOWED THE JURY ON TUESDAY AND YOU

12   CAME UP WITH THIS GRAPH.

13       IF WE COULD PUT THAT UP ON THE SCREEN, IT'S PLAINTIFF'S

14   EXHIBIT 92.8.

15       AND YOU RECALL THAT, YOU KNOW, YOU KIND OF TALKED THROUGH

16   THIS GRAPH, AND ALONG THE GRAPH THERE ARE -- THIS IS NOT

17   CONFIDENTIAL -- YOU KNOW, THERE ARE NOTES THAT YOU MADE ABOUT

18   VARIOUS DOCUMENTS THAT YOU SAW THAT YOU SELECTED TO PRESENT TO

19   THE JURY THAT YOU THOUGHT WERE SIGNIFICANT; RIGHT?

20   A.   YES.  IT WAS A SUBSET.  THERE WERE 200 SAMSUNG DOCUMENTS

21   IN MY REPORT.  I DIDN'T WANT TO GO THROUGH ALL OF THEM.

22   Q.   OKAY.  AND THE FIRST ONE HERE IS THE CRISIS OF DESIGN,

23   PLAINTIFF'S EXHIBIT 149.  DO YOU RECALL THAT?

24   A.   THE FIRST DOCUMENT ON THIS IS --

25   Q.   -- ON THIS GRAPH?

1    A.   THAT'S RIGHT.  THAT'S THE ONE THAT THE HEAD OF MOBILE

2    TELECOMMUNICATIONS, THE GLOBAL HEAD, YES.

3    Q.   YES.

4    A.   THAT'S THAT ONE.

5    Q.   ALL RIGHT.  IF WE COULD PUT THAT UP ON THE SCREEN.

6         AND YOU READ TO THE -- YOU READ TO THE JURY, OR CALLED THE

7    JURY'S ATTENTION -- IF WE CAN TURN TO PAGE 3 -- SOME LANGUAGE

8    HERE IN THE MIDDLE OF THE PAGE BEGINNING "ALL THE CARRIERS TELL

9    ME."

10        DO YOU SEE THAT?  "ALL THE CARRIERS TELL ME, HEY, JK, YOUR

11   PHONES HAVE GREAT TECHNOLOGICAL PROWESS AND EVERYTHING'S GREAT.

12   BUT IT'S HARD TO SELL THEM AS HIGH-END PHONES.  THAT'S BECAUSE

13   WE SPENT ALL OF OUR SUBSIDY FUNDS ON THE IPHONE AND CAN'T GIVE

14   A PENNY IN SUBSIDY TO YOUR PHONES, SO OF COURSE YOUR PHONES

15   WILL BE EXPENSIVE AND THEN IT FOLLOWS THAT THEY WON'T SELL.  I

16   HEAR THINGS LIKE THIS:  LET'S TAKE SOMETHING LIKE THE IPHONE."

17        DO YOU RECALL ON TUESDAY CALLING THAT LANGUAGE TO THE

18   JURY'S ATTENTION?

19   A.   YES.

20   Q.   NOW, JUST BEFORE THAT PASSAGE THAT YOU READ, THERE'S SOME

21   OTHER LANGUAGE THAT YOU DID NOT READ TO THE JURY; CORRECT?

22   A.   YEAH, THERE'S MUCH MORE TO THIS E-MAIL.

23   Q.   WELL, LET'S LOOK AT THE -- LET'S LOOK AT THE SENTENCE NOT

24   JUST SOMEWHERE IN THE DOCUMENT BUT JUST IMMEDIATELY BEFORE THAT

25   PASSAGE.

CROSS VELLTURO

1    DO YOU SEE WHERE IT SAYS, "A COMPANY GOES OUT OF BUSINESS

2  BECAUSE OF ITS OWN SUCCESS FACTORS.  SAMSUNG'S SUCCESS FACTORS

3  ARE DILIGENCE, SINCERITY, AND ACTING IN AN EXEMPLARY MANNER.

4  THE KIND THAT SAYS YES TO WHATEVER A CARRIER WANTS," DOT, DOT,

5  DOT, DOT, "THAT'S A SHORTCUT TO GOING OUT OF BUSINESS."

6    DO YOU SEE THAT, SIR?

7  A.  I SEE THAT SENTENCE, YES.

8  Q.  AND THEN IT PICKS UP WITH THE LANGUAGE THAT YOU READ TO

9  THE JURY; RIGHT?

10 A.  YES.

11 Q.  SO WHAT WAS HAPPENING HERE WAS MR. SHIN WAS SAYING, YOU

12 KNOW, I HAVE CARRIERS TELLING ME MAKE SOMETHING LIKE THE

13 IPHONE, BUT JUST DOING WHAT THE CARRIERS WANT YOU TO DO IS A

14 WAY -- A ROUTE TO GO OUT OF BUSINESS.  THAT'S WHAT HE SAYS,

15 ISN'T IT?

16 A.  NO, THAT'S -- THAT'S NOT HOW I READ THIS DOCUMENT.  I'M

17 SORRY.

18    WHEN I PAIR IT UP WITH WHAT SAMSUNG THEN ULTIMATELY DID,

19 WHICH IS GO OUT AND USE THE IPHONE USER INTERFACE TO DEVELOP

20 ITS PRODUCTS, I CAN'T SQUARE THAT WITH YOUR INTERPRETATION OF

21 THIS DOCUMENT.

22 Q.  SO ARE YOU A TECHNOLOGY EXPERT NOW?

23 A.  NO.

24 Q.  IS THAT YOU'RE SAYING?

25 A.  I'M AN INCENTIVE -- I'M AN ECONOMIST.  I STUDY INCENTIVES.

1    Q.   OKAY.

2    A.   AND GIVEN WHAT I OBSERVED THEY DID AFTER THIS, IT PROVIDES

3    ME, AS AN ECONOMIST, WITH AN UNDERSTANDING OF THE ISSUE THAT

4    THEY WERE IDENTIFYING WAS A COMPETITIVE DISADVANTAGE FOR THEM

5    THAT NEEDED TO BE SOLVED.

6    Q.   OKAY.  IN ANY EVENT, DO YOU SEE HERE WHERE HE SAYS, YOU

7    KNOW, JUST DOING WHAT THE CARRIERS SAY -- HE SAYS THAT THE

8    CARRIERS TELL US, MAKE SOMETHING LIKE THE IPHONE, THAT'S WHAT

9    YOU READ TO THE JURY ON TUESDAY.

10        THE SENTENCE BEFORE THAT YOU DIDN'T READ TO THE JURY, HE

11   SAYS, JUST DOING WHAT THE CARRIERS WANT, THAT'S A WAY TO GO OUT

12   OF BUSINESS, RIGHT?  JUST LOOKING AT THIS DOCUMENT?

13   A.   THOSE -- I DON'T WANT TO INTERPRET THE WORDS THAT WAY, BUT

14   THE WORDS ARE WHAT THEY ARE.

15   Q.   WELL, WHAT MR. SHIN TOLD THE PEOPLE IN THE MEETING WAS TO

16   FOCUS ON SCREEN SIZE; CORRECT?

17   A.   THAT'S ONE OTHER -- THAT'S ONE OTHER ASPECT OF THIS MEMO.

18   Q.   LET'S --

19   A.   LET'S GET RID OF OUR DISADVANTAGES AND LET'S USE SCREEN

20   SIZE AS OUR ADVANTAGE, YES.

21   Q.   LET'S TAKE A LOOK AT PAGE 6 IN THE MIDDLE OF THE PAGE.  HE

22   SAYS -- AND BY THE WAY, THIS IS ANOTHER PASSAGE YOU DIDN'T READ

23   TO THE JURY; RIGHT?

24   A.   THAT'S RIGHT.

25   Q.   HE SAYS, "OUR MOST IMPORTANT ASSET IS OUR SCREEN.  IT IS

```
 1      VERY IMPORTANT THAT WE MAKE SCREEN SIZE BIGGER, AND IN THE

 2      FUTURE MOBILE PHONES WILL ABSORB EVEN THE FUNCTION OF E-BOOKS."

 3           DO YOU SEE THAT?

 4      A.   I DO.

 5      Q.   AND THEN UP ABOVE, HIGHER IN THE PAGE, THE PARAGRAPH

 6      BEGINNING "ALL THIS TIME," YOU READ THE LANGUAGE TO THE JURY

 7      THAT SAYS "WHEN SAMSUNG'S UX IS COMPARED TO THE UNEXPECTED

 8      COMPETITOR, APPLE'S IPHONE, THE DIFFERENCE IS TRULY THAT OF

 9      HEAVEN AND EARTH.  IT'S A CRISIS OF DESIGN."

10           DO YOU RECALL READING THAT TO THE JURY?

11      A.   I DO.

12      Q.   AND WHAT HE WAS REFERRING TO THERE, IN CONTRASTING THE

13      IPHONE, WAS ANOTHER SAMSUNG PHONE CALLED THE AMMONIA; CORRECT?

14      A.   THE OMNIA.

15      Q.   THE APPARENTLY AMMONIA, OR THE -- THE OMNIA.

16           (LAUGHTER.)

17           THE WITNESS:  I WAS GOING TO SAY, I THINK THEY MAY

18      NEED SOME MARKING EXECUTIVES SWITCHES IF THEY'RE CALLING THE

19      PHONE AMMONIA.

20      BY MR. QUINN:

21      Q.   WHAT HE'S REFERRING TO, AS YOU KNOW, THANK YOU FOR

22      CORRECTING ME, WAS THE OMNIA; CORRECT?

23      A.   THAT'S ONE OF THE PHONES HE'S REFERRING TO.

24      Q.   RIGHT.  AND LET'S TAKE A LOOK AT WHAT HE SAYS THERE.  IF

25      YOU TURN BACK TO PAGE 3, TWO-THIRDS OF THE WAY DOWN, THERE'S A
```

1     PASSAGE THAT SAYS, "DO YOU KNOW HOW DIFFICULT THE OMNIA IS TO

2     USE?  WHEN YOU COMPARE THE 2007 VERSION OF THE IPHONE WITH OUR

3     CURRENT OMNIA, CAN YOU HONESTLY SAY THE OMNIA IS BETTER?  IF

4     YOU COMPARE THE UX WITH THE IPHONE, IT'S A DIFFERENCE BETWEEN

5     HEAVEN AND EARTH."

6          DO YOU SEE THAT?

7     A.   YES.

8     Q.   AND YOU KNOW THAT THE OMNIA WAS A PHONE THAT RAN ON A

9     WINDOWS OPERATING SYSTEM; CORRECT?

10    A.   THAT'S MY RECOLLECTION.

11    Q.   RIGHT.  NOT AN ANDROID SYSTEM; CORRECT?

12    A.   THAT'S WHAT I RECALL.

13    Q.   SO THIS CRISIS OF DESIGN THAT'S BEING TALKED ABOUT IN THIS

14    DOCUMENT IS -- RELATES TO PHONES THAT SAMSUNG HAD BEEN MAKING

15    THAT RUN ON WINDOWS SOFTWARE BEFORE THEY SWITCHED OVER TO

16    ANDROID; CORRECT?

17    A.   HE'S USING THAT AS AN EXAMPLE, BUT THAT'S ONE EXAMPLE HE

18    USES HERE.

19    Q.   OKAY.  LET'S TURN THEN, IF WE CAN GO BACK TO THE GRAPH,

20    THE FIRST DOCUMENT REFERRED TO THE CRISIS IN DESIGN.

21         IF WE CAN GO BACK TO THE GRAPH, 92.8, KEN.

22         ANOTHER THING YOU CALLED THE JURY'S ATTENTION TO WERE

23    SIDE-BY-SIDE EVALUATIONS, DO YOU RECALL THAT, SHOWING THE JURY

24    SOME SIDE-BY-SIDE EVALUATIONS OF PHONES THAT YOU FOUND TO BE

25    SIGNIFICANT?

1    A.   YES.

2    Q.   CAN WE PUT THE ONE UP WITH THE ACTUAL EXHIBIT, 92.8?

3         AND, IN FACT, YOU -- ANOTHER -- YOU CHOSE TO MAKE THAT THE

4    SECOND THING YOU PLOTTED HERE THAT YOU SHOWED THE JURY WAS

5    SIDE-BY-SIDE COMPARISONS; RIGHT?

6    A.   THE FIRST ONE IS THE IPHONE ANNOUNCEMENT, AND SO THIS

7    WOULD BE THE THIRD.

8    Q.   ALL RIGHT.  AND IF WE COULD TAKE A LOOK AT EXHIBIT 121,

9    PLAINTIFF'S EXHIBIT 121 -- WELL, IF WE CAN START WITH 92.13.

10   I'M SORRY.  92.13.  THIS IS A DEMONSTRATIVE THAT YOU SHOWED THE

11   JURY.

12   A.   NO, I DON'T THINK SO.

13   Q.   92.13?

14   A.   OH, I'M SORRY.  THIS DOCUMENT?  YES.

15   Q.   92.13.

16   A.   THIS IS CAPTURING SOME OF THE INFORMATION THAT CAME FROM

17   PROFESSOR COCKBURN'S SYSTEM.

18   Q.   OKAY.  SO THIS 92.13 IS A DEMONSTRATIVE YOU SHOWED THE

19   JURY; RIGHT?

20   A.   YES, IT IS.

21   Q.   ALL RIGHT.  AND UP AT THE TOP YOU BLEW UP AND HIGHLIGHTED

22   FOR THE JURY, "SAME AS IPHONE, CLARIFY THE UNLOCKING STANDARD

23   BY SLIDING ."

24   A.   DIRECTION OF IMPROVEMENT, YES.

25   Q.   AND YOU BLEW THAT UP, AND THAT CAME FROM A DOCUMENT,

```
 1     RIGHT, THAT YOU -- THAT CAME FROM A LENGTHY DOCUMENT?

 2     A.   YES.  IT'S ONE OF THE SLIDES.

 3     Q.   SO LET'S TURN TO THAT PAGE.  THIS IS PLAINTIFF'S EXHIBIT

 4     121 AT 100.  121 AT 100, AND THIS IS THE FULL PAGE WHERE YOU

 5     PULLED THAT LANGUAGE OUT FROM THE BOTTOM FOR YOUR

 6     DEMONSTRATIVE, RIGHT, "SAME AS IPHONE, CLARIFY THE UNLOCKING

 7     STANDARD BY SLIDING."  RIGHT?

 8     A.   I'M SORRY.

 9     Q.   IS IT ON THE SCREEN IN FRONT OF YOU?  I'M SURE IT'S IN A

10     BOOK UP THERE.  PLAINTIFF'S EXHIBIT 121?

11     A.   SO YOU'RE ASKING ME ABOUT THIS SINGLE SHEET.

12     Q.   YEAH, THIS SHEET?

13     A.   OH, OKAY.

14     Q.   RIGHT.  SO THIS LANGUAGE -- THIS IS THE DOCUMENT WHERE YOU

15     TOOK THAT LANGUAGE THAT WAS AT THE TOP OF YOUR DEMONSTRATIVE

16     THAT WE JUST LOOKED AT; CORRECT?

17     A.   RIGHT.  THIS IS THE -- THIS IS ONE PAGE FROM THAT

18     DOCUMENT.

19     Q.   RIGHT.  AND THIS IS THE LANGUAGE THAT YOU -- THE LANGUAGE

20     DOWN AT THE BOTTOM THAT YOU INCLUDED AT THE TOP OF YOUR

21     DEMONSTRATIVE; CORRECT?

22     A.   YES.

23     Q.   AND WHAT THIS DOCUMENT IS ACTUALLY TALKING ABOUT, IT'S

24     COMPARING A SAMSUNG PHONE CALLED THE VICTORY WITH THE IPHONE.

25     DO YOU SEE THAT?
```

CROSS VELLTURO

1    A.   YES.

2    Q.   AND WHAT IT SAYS HERE IS THAT "AS THERE IS NO STANDARD AS

3    TO WHAT POINT FLICK IS NEEDED TO UNLOCK, IT CAN UNLOCK WITH

4    ONLY A SLIGHT FLICK."

5        DO YOU SEE THAT?

6    A.   I DO.

7    Q.   NOW, ACTUALLY, IF WE CAN GO UP TO THE TOP, KEN.

8        IT SAYS FOR THE VICTORY, "THE SCREEN LOCK GETS UNLOCKED

9    WITH A SLIGHT FLICK MOTION."

10       DO YOU SEE THAT?

11   A.   I DO.

12   Q.   AND THEN BELOW THAT IT SAYS "THE IPHONE IS HANDLED THROUGH

13   SLIDING."

14       DO YOU SEE THAT?

15   A.   YES.

16   Q.   AND BELOW THAT IT SAYS -- THERE'S A PROBLEM HERE WITH JUST

17   HAVING A FLICK.  IT SAYS, "AS THERE IS NO STANDARD AS TO WHAT

18   POINT FLICK IS NEEDED TO UNLOCK, IT CAN UNLOCK WITH ONLY A

19   SLIGHT FLICK."

20       RIGHT?  DO YOU SEE THAT?

21   A.   YES.

22   Q.   ALL RIGHT.  AND SO WHAT IT'S SAYING HERE IS JUST HAVING A

23   FLICK, YOU KNOW, IS A PROBLEM, IT'S BETTER TO SLIDE; CORRECT?

24   THAT'S WHAT IT'S SAYING?

25   A.   IT'S SAYING THAT THERE'S A PROBLEM AND THE PROBLEM IS

1    HANDLED BY THE IPHONE THROUGH SLIDING.

2    Q.   WELL, IF WE CAN GO BACK, KEN, AND PUT THE DOCUMENT UP, "BY

3    SLIDING."

4         IS IT YOUR UNDERSTANDING THAT APPLE OWNS SLIDING?

5    A.   I'M NOT A TECHNICAL EXPERT.

6    Q.   RIGHT.

7    A.   BUT THE ANSWER IS, NO, THEY DON'T OWN SLIDING.

8    Q.   THEY DON'T OWN SLIDING.  THE PROBLEM HERE THAT'S BEING

9    DISCUSSED IS A FLICK, JUST HAVING A FLICK IS A PROBLEM, RIGHT?

10   THAT'S YOUR UNDERSTANDING OF THE DOCUMENT?

11   A.   THAT'S WHAT THEY'RE ADDRESSING IN THIS SPECIFIC SLIDE.

12   Q.   ALL RIGHT.  BETTER TO SLIDE; RIGHT?

13   A.   THAT WOULD BE ONE SOLUTION.

14   Q.   ALL RIGHT.

15   A.   THEY'RE EVALUATING THAT FROM THE IPHONE AS A DIRECTION TO

16   TAKE.

17   Q.   ALL RIGHT.  LET'S TAKE A LOOK AT ANOTHER PAGE SIDE-BY-SIDE

18   COMPARISON YOU SHOWED THE JURY, THIS IS PAGE 19 -- IF WE GO TO

19   EXHIBIT 157, PAGE 19, THIS IS ANOTHER SCREEN UNLOCK.

20        AND WHAT IT SAYS AT THE TOP HERE IS, AGAIN, THIS IS

21   ADDRESSING WHAT'S PERCEIVED TO BE A PROBLEM, IT SAYS "IF THE

22   USER DIDN'T TOUCH THE ICON, HE CAN'T KNOW HOW TO UNLOCK.  WITH

23   THE IPHONE, WHENEVER THE SCREEN IS TURNED ON, IT ALWAYS SHOWED

24   GUIDE TEXT."

25        DO YOU SEE THAT?

1    A.   I DO.

2    Q.   SO WHAT IT'S SAYING IS THAT WITH THIS PHONE, UNTIL YOU

3    TOUCH IT, THERE'S NO INDICATION OF DIRECTIONAL -- OF WHAT

4    DIRECTION TO MOVE.  ISN'T THAT WHAT IT'S SAYING?

5    A.   THAT'S MY INTERPRETATION OF THE LANGUAGE, YES.

6    Q.   ALL RIGHT.  IT'S SAYING YOU NEED TO GIVE SOME INDICATION,

7    LIKE THE IPHONE GIVES SOME INDICATION, THERE'S AN ARROW; RIGHT?

8    A.   IT'S A CUE.

9    Q.   RIGHT?

10   A.   THERE'S A CUE ABOVE YOU WHAT NEEDED TO DO.

11   Q.   AND WHAT THE SAMSUNG PEOPLE ARE SAYING HERE IT IS, IT

12   WOULD BE A GOOD IDEA TO HAVE A CUE, BECAUSE WHEN THE USER SEES

13   THE SCREEN, BECAUSE THEY DON'T GET A CUE WITH THIS PHONE UNTIL

14   THEY PUT THEIR FINGER ON IT; RIGHT?

15   A.   I -- NO.  I THINK IT SAYS MORE THAN THAT.  I THINK IT'S

16   SAYING THAT YOU NEED A CUE, AND THEN YOU NEED TO KNOW WHAT TO

17   DO ONCE YOU HAVE THE CUE.

18   Q.   RIGHT.  IF THE USER DIDN'T TOUCH THE ICON, HE CAN'T KNOW

19   HOW TO UNLOCK.

20   A.   RIGHT.

21   Q.   RIGHT?  SO THIS IS SAYING GIVE THE USER A CUE, AND IT'S

22   BENCHMARKING IT AGAINST THE IPHONE; CORRECT?

23   A.   YES.

24   Q.   SO IF WE GO BACK TO THE GRAPH, WE'LL TALK NOW ABOUT THE

25   NEXT DOCUMENT THAT YOU PUT ON YOUR GRAPH, 92.8.  SO WE'VE

1    TALKED ABOUT THE CRISIS OF DESIGN, SIDE-BY-SIDE EVALUATIONS,

2    AND THEN THERE'S THIS DOCUMENT FROM SEPTEMBER 11, PLAINTIFF'S

3    EXHIBIT 214.  THAT'S THE VISIT OF MR. CHOI.  DO YOU RECALL

4    THAT?

5    A.   I DO.

6    Q.   AND IF WE COULD TURN TO PLAINTIFF'S EXHIBIT 214, THIS IS

7    ANOTHER DOCUMENT THAT YOU SAID THAT YOU RELIED ON IN REACHING

8    YOUR OPINIONS; CORRECT, SIR?

9    A.   YES.

10   Q.   ALL RIGHT.  IF WE CAN LOOK AT PLAINTIFF'S EXHIBIT 214 AT

11   PAGE 8, AND ON TUESDAY YOU LOOKED AT THIS PAGE, PAGE 8, AND

12   TOLD THE JURY THAT CARRIERS WILL COMPETE TO CAPTURE, THIS

13   LANGUAGE AT THE TOP -- AND THIS IS CONFIDENTIAL, YOUR HONOR --

14   IT SAYS "CARRIERS WILL COMPETE TO CAPTURE THE 60 MILLION U.S.

15   CONSUMERS WHO WILL BUY THEIR FIRST SMARTPHONES IN 2012."

16   RIGHT?

17   A.   YES.

18   Q.   SO THIS IS THE ISSUE THAT YOU IDENTIFIED ABOUT NEW

19   SMARTPHONE PURCHASERS COMING INTO THE MARKET; CORRECT?

20   A.   YES.

21   Q.   IF YOU LOOK AT PAGE 8 HERE, LOWER DOWN, THE SAME PAGE THAT

22   YOU SHOWED TO THE JURY, IT SAYS IN THE LOWER RIGHT, AND I THINK

23   I CAN READ THIS, "FIRST-TIME BUYERS HAVE A LOWER WILLINGNESS TO

24   PAY."

25        DO YOU SEE THAT?

```
 1     A.   YES.

 2     Q.   AND BELOW THAT IT SAYS, "$49 AND $99 PRICE POINTS CONTINUE

 3     TO GROW IN IMPORTANCE."

 4          DO YOU SEE THAT?

 5     A.   I DO.

 6     Q.   AND YOU KNOW THAT SAMSUNG SELLS PHONES AT A LOT OF

 7     DIFFERENT PRICE POINTS; CORRECT?

 8     A.   COMPARED WITH APPLE, YES.

 9     Q.   ALL RIGHT.  WELL, YOU KNOW SAMSUNG SELLS PHONES AT MANY

10     MORE DIFFERENT PRICE POINTS THAN APPLE DOES; CORRECT?

11     A.   NO.

12     Q.   YOU DON'T AGREE WITH THAT STATEMENT?

13     A.   NO, I WOULDN'T AGREE WITH THAT.

14     Q.   IN 2011 WHEN THIS DOCUMENT WAS PREPARED, SAMSUNG SOLD MANY

15     MORE PHONES AT DIFFERENT PRICE POINTS THAN APPLE DID; CORRECT?

16     A.   CAN I ASK A CLARIFYING QUESTION?

17     Q.   SURE.

18     A.   WHEN YOU SAY "SOLD PHONES," YOU MEAN WHAT THE CONSUMER

19     PAID TO THE CARRIER?  OR DO YOU MEAN WHAT SAMSUNG CHARGED THE

20     CARRIER?

21     Q.   I MEAN WHAT -- THE PRICE TO THE CONSUMER?

22     A.   THERE WERE DIFFERENT PRICE POINTS.  THERE WERE DIFFERENT

23     PRICE POINTS FOR APPLE'S PHONES THEN, TOO.

24     Q.   BUT THE AVERAGE PRICE OF SAMSUNG PHONES IN 2011 WAS LOWER

25     THAN FOR THE IPHONE; CORRECT?
```

```
1    A.   I DON'T KNOW THAT.

2    Q.   ALL RIGHT.  WELL, I MEAN, YOU TESTIFIED ON TUESDAY THAT

3    THE COMPETITION FOR FIRST-TIME BUYERS IS PARTICULARLY IMPORTANT

4    BECAUSE ONCE THEY BUY THEIR FIRST PHONE, THEY'RE VERY LIKELY,

5    IF NOT GUARANTEED, BUT THEY'RE VERY LIKELY TO MAKE THEIR NEXT

6    PURCHASE FROM A SIMILAR MANUFACTURER.

7         THAT'S WHAT YOU SAID; RIGHT?

8    A.   THAT DOESN'T SOUND RIGHT.

9    Q.   THAT DOESN'T SOUND RIGHT?

10   A.   THE FIRST PART SOUNDS RIGHT, BUT I DON'T THINK I SAID

11   "ALMOST GUARANTEED."

12   Q.   NO.  IT SAYS --

13   A.   IT'S VERY LIKELY, BUT NOT GUARANTEED.

14   Q.   IT SAYS BUY THEIR FIRST PHONE, THEY ARE VERY LIKELY, IT'S

15   NOT GUARANTEED, BUT THEY'RE VERY LIKELY TO MAKE THEIR NEXT

16   PURCHASE FROM A SIMILAR MANUFACTURER.

17        THAT WAS YOUR TESTIMONY?

18   A.   YES, THAT SOUNDS RIGHT.

19   Q.   AND THAT'S A CONCEPT SOMETIMES YOU'VE HEARD OF IT CALLED

20   STICKINESS?

21   A.   YES.

22   Q.   AND THE 60 MILLION CONSUMERS WHO ARE REFERRED TO AT THE

23   TOP WHO ARE COMING INTO THE MARKET WHO ARE BUYING A SMARTPHONE,

24   THESE ARE THE FIRST-TIME SMARTPHONE BUYERS IT'S TALKING ABOUT

25   HERE; RIGHT?
```

1     A.   YES.

2     Q.   AND A LOT OF THOSE SMARTPHONE BUYERS, BY DEFINITION, THE

3     FIRST TIME, ALREADY OWNED A FEATURE PHONE; CORRECT?

4     A.   THAT'S CORRECT, YES.

5     Q.   AND NONE OF THEM, WE KNOW NONE OF THEM OWNED AN APPLE

6     FEATURE PHONE BECAUSE THERE'S NO SUCH THING; RIGHT?

7     A.   TRUE.

8     Q.   OKAY.  AND SO A LOT OF THESE PEOPLE WOULD HAVE FEATURE

9     PHONES, SAMSUNG FEATURE PHONES; CORRECT?

10    A.   OH, I DON'T THINK SO.  SAMSUNG'S SHARE IN FEATURE PHONES

11    WAS QUITE LOW.  AND STICKINESS REALLY DOESN'T TRANSLATE FROM A

12    FEATURE PHONE TO A SMARTPHONE.  IT'S THE FAMILIARITY WITH THE

13    USER INTERFACE THAT CREATES THAT STICKINESS AND THE USER

14    INTERFACE FUNDAMENTALLY CHANGES WHEN YOU GO FROM A FEATURE

15    PHONE TO A SMARTPHONE.

16         SO THAT LINK IS NOT COMPLETELY BROKEN, BUT IT'S

17    SUBSTANTIALLY BROKEN.

18    Q.   I SEE.  THAT'S, AGAIN, NOT SOMETHING YOU TESTIFIED TO ON

19    TUESDAY; CORRECT?

20    A.   NO.

21    Q.   WELL, IF YOU TURN TO PAGE 49, DO YOU SEE HERE, ON THE

22    LEFT-HAND SIDE, WHERE IT SAYS FIRST -- FIRST HERE SAMSUNG

23    IDENTIFIES WHO ITS COMPETITORS ARE?

24    A.   IT DOES.

25    Q.   AND FOR FIRST SMARTPHONE BUYERS, IT IDENTIFIES THESE

1    COMPETITORS OVER AT THE RIGHT-HAND SIDE; CORRECT?

2    A.   IT ADDS THOSE TO THE LIST THAT IT PRESENTED EARLIER IN

3    THIS DOCUMENT.  BUT THOSE ARE KIND OF NEWER COMPETITORS THAT

4    ALSO COMPETE DOWN THAT SPACE.

5    Q.   WELL, I MEAN, THE WAY TO READ THIS DOCUMENT IS FROM LEFT

6    TO RIGHT?  DO YOU AGREE THAT IT'S FOR FLAGSHIP PHONES, WHO ITS

7    KEY COMPETITORS ARE; FOR CARRIERS, WHO ITS KEY COMPETITORS ARE;

8    FOR FIRST SMARTPHONE BUYERS, WHO ITS KEY COMPETITORS ARE?

9        DO YOU SEE THAT LANGUAGE?

10   A.   I SEE THE LANGUAGE.  THE WAY TO READ THE DOCUMENT IS TO

11   READ THE WHOLE DOCUMENT.  AND THIS DOCUMENT IS OVERWHELMINGLY

12   ABOUT APPLE.  AND THERE ARE OCCASIONS WHERE OTHER CARRIERS ARE

13   MENTIONED AS WELL.

14   Q.   I'M TALKING ABOUT THIS PAGE NOW.

15   A.   OKAY.

16   Q.   IF YOU'LL HELP ME OUT HERE FOR A SECOND, DR. VELLTURO, IT

17   IDENTIFIES, IF YOU LOOK AT FIRST SMARTPHONE BUYERS ON THE

18   LEFT-HAND SIDE, AND THEN IN THE UPPER RIGHT IT SAYS KEY

19   COMPETITORS.

20       DO YOU SEE THAT?

21   A.   I DO.

22   Q.   AND THERE ARE SOME COMPANIES THAT IT IDENTIFIES AS BEING

23   KEY COMPETITORS FOR FIRST-TIME SMARTPHONE BUYERS; RIGHT?

24   A.   YES, I SEE THAT LIST.

25   Q.   AND APPLE'S APPARENTLY ABOVE -- IT'S IDENTIFIED AS A KEY

```
 1       COMPETITOR FOR FLAGSHIP PHONES; RIGHT?

 2       A.   ON THIS SLIDE, THAT'S THE EMPHASIS.  BUT APPLE'S PHONES

 3       ARE EVERYWHERE AT THIS POINT.

 4       Q.   RIGHT.  BUT WE'RE TALKING ABOUT THIS -- SIR, DO YOU SEE

 5       YOUR ROLE HERE AS BEING, IN A SENSE, AN ADVOCATE?

 6       A.   NO.

 7       Q.   SO YOU'RE -- YOU'RE JUST HERE BEING COMPLETELY INDEPENDENT

 8       GIVING YOUR OPINIONS; IS THAT CORRECT?

 9       A.   CORRECT.  I'M PROVIDING MY ANALYSIS BASED ON ALL OF THE

10       DATA AND ALL THE DOCUMENTS.

11       Q.   ALL RIGHT.  WELL, LET'S GO -- IF WE CAN SKIP FORWARD TO

12       PAGE, EXHIBIT 214, PAGE 76.  THIS IS ANOTHER PAGE THAT YOU DID

13       NOT SHOW THE JURY.

14            AND UP AT THE TOP HERE, THE TITLE OF THIS IS "OUR PLAN TO

15       WIN," RIGHT?  DO YOU SEE THAT?

16       A.   YES, I SEE THAT.

17       Q.   AND IT SAYS "SAMSUNG IS INVESTING IN SERVICES THAT DRIVE

18       SAMSUNG DIFFERENTIATION AND EXPAND SAMSUNG'S ECOSYSTEM."

19            DO YOU SEE THAT?

20       A.   I DO.

21       Q.   AND IF WE LOOK AT PAGE 85 -- AGAIN, THIS WAS A PAGE YOU

22       DIDN'T SHOW THE JURY TALKING ABOUT SAMSUNG DIFFERENTIATION;

23       CORRECT?

24       A.   I DIDN'T SHOW THIS, THAT'S RIGHT.

25       Q.   OKAY.  AND IF WE CAN TURN TO PAGE -- PAGE 54 OF EXHIBIT
```

```
1      214.  IT TALKS ABOUT SAMSUNG'S STRATEGY ABOUT WINNING, BUILDING

2      LONG-TERM CONSUMER LOYALTY.

3           DO YOU SEE THAT?

4      A.   I DO.

5      Q.   THIS IS ANOTHER PAGE THAT YOU DIDN'T SHOW THE JURY?

6      A.   I DIDN'T.

7      Q.   AND IT TALKS ABOUT CREATIVE MARKETING IDEAS.  DO YOU SEE

8      THAT ON THE RIGHT-HAND SIDE?  CREATIVE MARKETING IDEAS?

9      A.   OH, I SEE IT, YES.

10     Q.   BEST IN CLASS PRODUCT FEATURES.  DO YOU SEE THAT?

11     A.   I DO.

12     Q.   OWNABLE CONSUMER BENEFITS?  PREMIUM RETAIL EXECUTION?  DO

13     YOU SEE THAT?

14     A.   YES.

15     Q.   I MEAN, YOU UNDERSTOOD, AND YOU'RE AWARE, THAT SAMSUNG HAS

16     PUT ENORMOUS EFFORTS INTO BUILDING ITS BRAND?  YOU'RE AWARE OF

17     THAT?

18     A.   YES, THERE'S BEEN A LOT OF WORK RECENTLY DONE ON THAT.

19     Q.   AND THAT -- AND SAMSUNG HAS BEEN VERY SUCCESSFUL AT THAT?

20     A.   THEIR BRAND AWARENESS IS DEFINITELY UP.

21     Q.   OKAY.  SO LET'S TALK A LITTLE BIT ABOUT, YOU KNOW, YOUR

22     ROLE IN THIS CASE.

23          I MEAN, YOU'VE TOLD US THAT YOU'VE BEEN INVOLVED AS DOING

24     THIS TYPE OF WORK IN ABOUT 200 DIFFERENT CASES.

25     A.   DIFFERENT THAN THIS WHEN I STARTED OUT, SO IT WOULDN'T BE
```

1       THIS KIND OF WORK IN ALL OF THOSE CASES.

2       Q.   ALL RIGHT.  WELL, IN TERMS OF ENGAGEMENTS THAT YOU'VE HAD

3       WHERE YOU'RE INVOLVED IN BEING RETAINED BY A COMPANY THAT'S

4       INVOLVED IN LITIGATION, I THINK YOU TOLD US THERE WERE ABOUT

5       200 INSTANCES; IS THAT CORRECT?

6       A.   YES.

7       Q.   ALL RIGHT.  AND, IN FACT, YOU KNOW, YOU'RE KIND OF A

8       PROFESSIONAL AT DOING THIS; RIGHT?

9       A.   WELL, I'M AN ECONOMIST.  I AM A PROFESSIONAL ECONOMIST,

10      AND SOMETIMES THAT LEADS ME TO BE DOING THIS.

11      Q.   WELL, IN FACT, AT LEAST AS OF YOUR DEPOSITION LAST

12      SEPTEMBER, YOU HAD SAID THAT DURING THE PREVIOUS YEAR, 90

13      PERCENT OF YOUR TIME WAS SPENT DOING THIS TYPE OF WORK;

14      CORRECT?

15      A.   OVER THE PREVIOUS YEAR, THAT'S RIGHT.

16      Q.   RIGHT.

17      A.   YES.

18      Q.   AND YOU SAID THAT OVER THE LAST FIVE YEARS, AS OF THE TIME

19      OF YOUR DEPOSITION, THE PROFESSIONAL WORK FOR WHICH YOU ARE

20      PAID, 80 TO 85 PERCENT OF IT WAS THIS TYPE OF WORK; CORRECT?

21      A.   NO.  I'M NOT SURE WHAT YOU'RE DOING WITH TEACHING IN THAT

22      NUMBER.

23      Q.   WELL, YOU --

24      A.   SO I'VE BEEN TEACHING FOR A LOT OF TIME, AND I WAS PAID

25      FOR THAT AND THAT'S PROFESSIONAL WORK, AND THAT TOOK A

```
 1        SIGNIFICANT CHUNK OUT OF THE NUMBER YOU'RE IDENTIFYING.

 2        Q.   SO IN TERMS OF WHEN YOU ARE ACTUALLY, FOR THINGS FOR WHICH

 3        YOU ARE ACTUALLY PAID, OVER THE PREVIOUS FIVE YEARS,

 4        APPROXIMATELY 80 TO 85 PERCENT OF IT WAS LITIGATION CONSULTING

 5        TYPE WORK IN THE PREVIOUS FIVE YEARS BEFORE YOUR DEPOSITION?

 6        A.   YES, THROUGH QES, THROUGH THE COMPANY.

 7             BUT I WAS ALSO TEACHING.

 8        Q.   OKAY.

 9        A.   AND I GOT COMPENSATED, NOT A LOT, BUT I GOT COMPENSATED

10        FOR TEACHING.

11        Q.   ALL RIGHT.  LET'S MAKE SURE WE'RE ON THE SAME PAGE HERE.

12             AS OF THE TIME OF YOUR DEPOSITION, IF WE LOOK BACK OVER

13        THE LAST FIVE YEARS AND LOOK AT THE ACTIVITIES FOR WHICH YOU'VE

14        BEEN PAID, 80 TO 85 PERCENT OF IT WAS FOR DOING THIS TYPE OF

15        WORK THAT YOU'RE DOING NOW?

16        A.   THAT SOUNDS RIGHT.

17        Q.   RIGHT?

18        A.   LEAVING OUT THE TEACHING.

19        Q.   AND JUST SO THERE'S NO CONFUSION, YOU ARE NOT ON ANY

20        FACULTY OF ANY UNIVERSITY OR INSTITUTION, EDUCATIONAL

21        INSTITUTION?

22        A.   THAT'S RIGHT.

23        Q.   AND NEVER HAVE BEEN?

24        A.   I WAS A LECTURER, AND I APPEARED ON THE FACULTY LIST, BUT

25        I'M NOT ON THE FACULTY ON A REGULAR BASIS.
```

1    Q.   RIGHT.  YOU HAVE NEVER BEEN ON THE FACULTY OF ANY

2    EDUCATIONAL INSTITUTION; TRUE?

3    A.   TRUE.

4    Q.   ALL RIGHT.  AND YOU KEEP BRINGING UP YOU LECTURE.  WHAT

5    THAT MEANS IS TWO TIMES IN THE PREVIOUS FIVE YEARS YOU LECTURED

6    AT A CLASS AT BOSTON UNIVERSITY; CORRECT?

7    A.   NO.  I TAUGHT THE WHOLE CLASS.  I DIDN'T COME IN AND

8    PROVIDE A 15 MINUTE LECTURE.

9    Q.   ALL RIGHT.

10   A.   I BUILT THE COURSE CURRICULUM, I WROTE ALL THE LECTURES, I

11   WROTE ALL THE EXAM ATTENTION.

12   Q.   OKAY.

13   A.   I GRADED ALL THE EXAMS.

14   Q.   ALL RIGHT.  SORRY.  YOU TAUGHT TWO COURSES?

15   A.   I TAUGHT TWO COURSES.

16   Q.   IN THE LAST FIVE YEARS?

17   A.   THAT'S RIGHT.

18   Q.   AND AT LEAST AS OF THE TIME OF YOUR DEPOSITION IN THIS

19   CASE -- AND SETTING ASIDE YOUR WORK ON THAT PRELIMINARY

20   INJUNCTION THAT GOT REVERSED AS OF THE TIME OF YOUR DEPOSITION,

21   YOUR BILLINGS TO APPLE WERE $1.15 MILLION; CORRECT?

22   A.   THAT'S WHAT I RECALL, YES.

23   Q.   ALL RIGHT.  AND TELL US, HOW MUCH DID APPLE PAY YOU FOR

24   THE WORK ON THAT WHOLE PRELIMINARY INJUNCTION PROCEEDING WHERE

25   YOU SUBMITTED ANOTHER REPORT AND YOUR DEPOSITION WAS TAKEN?

1    HOW MUCH DID APPLE PAY YOU FOR THAT?

2    A.   I KNOW FOR ALL MY WORK ON THIS CASE, INCLUDING ALL THE

3    WORK INVOLVED IN THIS TRIAL, APPLE'S PAID ME $2.3 MILLION, AND

4    THAT WOULD INCLUDE THAT 1.1 NUMBER.

5    Q.   $2.3 MILLION?

6    A.   2.3.

7    Q.   AND THAT COVERS YOUR WORK UP TO WHAT POINT IN TIME?

8    A.   ESSENTIALLY NOW.

9    Q.   ESSENTIALLY NOW.  SO, I MEAN, YOU'VE BILLED THEM -- YOU'VE

10   BEEN HERE ALL WEEK, THE LAST COUPLE OF WEEKS WATCHING THE

11   TRIAL?

12   A.   I HAVEN'T BILLED THEM -- I'VE PREPARED A BILL FOR MARCH,

13   BUT I HAVEN'T DONE THE FIRST TEN DAYS OF APRIL YET.

14   Q.   ALL RIGHT.  WHAT'S THE BILL FOR MARCH?

15   A.   I DON'T KNOW THAT AS I SIT HERE.

16   Q.   ALL RIGHT.

17   A.   I KNOW THE TOTAL, BUT I DON'T KNOW THE MARCH BILL.

18   Q.   YOU KNEW YOU WERE GOING TO BE ASKED THAT QUESTION?

19   A.   I KNEW I WAS GOING TO BE ASKED THE TOTAL, AND I HAD THAT

20   PREPARED FOR YOU.  BUT LAST MONTH, I DON'T KNOW SITTING HERE.

21   Q.   DOES THE TOTAL INCLUDE THE MARCH INCREMENT?

22   A.   IT DOES.

23   Q.   OKAY.  AND THIS ISN'T THE FIRST TIME YOU'VE WORKED FOR

24   APPLE?  I THINK YOU TOLD US THAT; RIGHT?

25   A.   CORRECT.

1    Q.   APPLE HAS COME BACK AGAIN AND AGAIN AND AGAIN TO HIRE YOU

2    WHEN THEY NEEDED SOMEBODY TO COME AND GIVE OPINIONS IN COURT

3    FOR THEM; RIGHT?

4    A.   YES.

5    Q.   THEY'VE HIRED YOU SOME 20 TIMES?

6    A.   FIFTEEN.

7    Q.   15 TIMES.  THANK YOU.

8         SO YOU'RE A PROFESSIONAL WITNESS FOR APPLE, AREN'T YOU,

9    SIR.

10   A.   NO, I'M NOT.  IF I WERE A PROFESSIONAL WITNESS FOR APPLE,

11   I WOULDN'T BE WORKING WITH MICROSOFT, I WOULDN'T BE WORKING

12   WITH AMAZON.  I WORK WITH VERY DIRECT RIVALS OF APPLE.

13   Q.   WELL, WHAT YOU DO IS APPLE'S LAWYERS SELECT SOME DOCUMENTS

14   TO GIVE TO YOU, YOU DO YOUR ANALYSES, YOU REVIEW THOSE

15   DOCUMENTS, AND YOU MAKE SELECTIONS OF THE DOCUMENTS THAT YOU

16   THINK WILL BE HELPFUL FOR APPLE'S CASE, AND YOU COME TO COURT

17   AND YOU PRESENT PASSAGES OF THOSE DOCUMENTS TO THE JURY?

18   THAT'S WHAT YOU DO, ISN'T IT?

19   A.   NO, THAT'S NOT WHAT I DO AT ALL.

20   Q.   OKAY.

21   A.   THE VERY FIRST STEP OF THAT ISN'T RIGHT.

22   Q.   WELL, LET'S TAKE A LOOK AT SOME OTHER DOCUMENTS, AND WE'LL

23   SEE WHAT OTHER DOCUMENTS YOU CONSIDERED AND WHAT OTHER

24   DOCUMENTS YOU WERE PROVIDED.

25        IF WE COULD PUT UP ON THE SCREEN -- WE'RE GOING TO

```
 1    CONSTRUCT ANOTHER GRAPH, SIR.  I MEAN, WE LOOKED AT THE ONE

 2    GRAPH YOU PREPARED THAT, YOU KNOW, WHERE YOU HAD THE FOUR OR

 3    FIVE DOCUMENTS THAT YOU CALLED OUT.

 4        DO YOU RECALL THAT, THAT WE JUST LOOKED AT?

 5    A.   YES.

 6    Q.   ALL RIGHT.  SO IF WE CAN PUT UP A BLANK -- ACTUALLY, MAYBE

 7    I'LL DO THIS ON THE ELMO.

 8        I THINK YOU'VE BEEN CLEAR THAT THERE ARE THOUSANDS OF

 9    DOCUMENTS IN THIS CASE AND YOU MADE A SELECTION ABOUT WHICH

10    ONES TO PRESENT TO THE JURY AND TO PUT ON THIS GRAPH THAT YOU

11    SHOWED THEM; CORRECT?

12    A.   YES.

13    Q.   OKAY.  ONE DOCUMENT THAT YOU DIDN'T SHOW THE JURY IS

14    EXHIBIT, DEFENDANT'S EXHIBIT 489.245.

15        IF WE COULD PUT THAT UP?

16        AND THIS IS IN EVIDENCE, YOUR HONOR.

17        IT'S AN E-MAIL FROM STEVE JOBS -- IF WE COULD BLOW THAT UP

18    AT THE TOP.  IT'S DATED OCTOBER 24TH, 2010.

19        AND THEN DOWN AT THE BOTTOM, 2011, HOLY WAR WITH GOOGLE.

20        DO YOU SEE THAT?  DO YOU SEE THAT, SIR?

21    A.   I'M SORRY.  YOU'RE ASKING ME?

22    Q.   YEAH.

23    A.   I'M SORRY.

24    Q.   DO YOU SEE THAT?

25    A.   DO I HAVE A COPY OF THIS DOCUMENT UP HERE?
```

CROSS VELLTURO

1    Q.   IT SHOULD BE IN THE BINDER.

2    A.   OKAY.  IF YOU COULD --

3    Q.   EXHIBIT 489?

4    A.   489.

5    Q.   489.

6    A.   OKAY.

7    Q.   AND LET ME JUST ASK YOU, YOU KNOW THAT THIS IS A DOCUMENT

8    THAT WAS PRODUCED BY APPLE; RIGHT?  YOU CAN SEE THAT FROM THE

9    NUMBER AT THE BOTTOM.

10   A.   I DON'T HAVE IT IN FRONT OF ME YET, BUT I'M FAIRLY

11   CONFIDENT IT WAS PRODUCED BY APPLE.

12   Q.   ALL RIGHT.  THIS IS NOT A DOCUMENT THAT YOU CITE IN YOUR

13   REPORT, IS IT?

14   A.   I THINK IT'S IN THE DOCUMENTS I CONSIDERED, BUT I DON'T

15   THINK --

16   Q.   YOU THINK IT'S IN THE DOCUMENTS YOU CONSIDERED?

17   A.   I'M NOT SURE.  I THINK IT IS, BUT I'M NOT SURE.

18   Q.   WOULD YOU CHECK ON THAT OVER LUNCH FOR US AND LET US KNOW

19   AFTER LUNCH?

20   A.   OKAY.

21   Q.   ALL RIGHT.  AND ONE OF THE THINGS THAT THIS DOCUMENT

22   SAYS -- IF WE CAN GO OVER TO .5, KEN -- IS STRATEGY, "CATCH UP

23   TO ANDROID WHERE WE ARE BEHIND.  NOTIFICATIONS, TETHERING,

24   SPEECH, AND LEAP FROG THEM."

25        DO YOU SEE THAT?  IT'S PROBABLY ON THE SCREEN IN FRONT OF

```
 1      YOU IF YOU WANT TO TAKE A LOOK AT IT.

 2      A.   THIS IS EXHIBIT DX --

 3      Q.   YEAH, DEFENDANT'S EXHIBIT 489.245.  I'M SURE IT'S ON THE

 4      SCREEN IN FRONT OF YOU, TOO.

 5      A.   WELL, I'M TRYING TO SEE THE WHOLE DOCUMENT, AND I'M

 6      JUST -- I'M NOT ABLE TO DO IT WITH WHAT YOU'VE GIVEN ME.

 7      Q.   YOU DON'T HAVE IT?

 8      A.   I HAVE IT --

 9              THE COURT:  IT'S A 150 PAGE DOCUMENT.

10              MR. QUINN:  IT'S ACTUALLY, IT'S ONLY, LIKE, FOUR

11      PAGES, YOUR HONOR.

12              THE COURT:  NO, NO, THIS EXHIBIT, THIS IS THE NUMBER

13      IS THIS BIG.  SO JUST GIVE HIM A MINUTE TO TAKE A LOOK AT IT.

14              MR. QUINN:  OKAY.

15              THE COURT:  OKAY.  IT'S JUST AT THE END.  IT'S A

16      LARGE DOCUMENT.

17              MR. QUINN:  IT'S -- MAY I APPROACH THE WITNESS, YOUR

18      HONOR?  I'VE GOT A SEPARATE COPY OF IT.

19              THE COURT:  IT'S JUST AT THE END.  HE JUST NEEDS A

20      SECOND TO FIND IT.

21              MR. QUINN:  OKAY.

22              THE WITNESS:  OKAY.  I SEE IT.

23      BY MR. QUINN:

24      Q.   ALL RIGHT.  AND IT SAYS THERE, NUMBER 5, YOU SEE

25      "STRATEGY:  CATCH UP TO ANDROID WHERE WE ARE BEHIND" IN POINT
```

```
1        NUMBER 5?

2        A.   YES, I SEE THAT.

3        Q.   AND THEN BELOW THAT, NUMBER 6, "CATCH UP TO GOOGLE, CLOUD

4        SERVICES, AND LEAP FROG THEM."

5             DO YOU SEE THAT?

6        A.   I DO.

7        Q.   AND THEN IT SAYS BELOW THAT, "ANDROID DEEPLY INTEGRATES

8        GOOGLE CLOUD SERVICES, WAY AHEAD OF APPLE IN CLOUD SERVICES FOR

9        CONTACTS, CALENDARS, E-MAIL."

10            DO YOU SEE THAT?

11       A.   YES.

12       Q.   AND SO THIS DOCUMENT, OCTOBER 25, 2010 -- LET'S --

13       BUILDING THIS GRAPH HERE, LET'S CALL THIS NUMBER 1.  THAT'S

14       ABOUT THERE ON THE TIMELINE WHERE I'VE INDICATED THERE?

15       A.   CAN WE SQUEEZE IT OUT A BIT SO YOU CAN SEE THE DATES ON

16       THE BOTTOM?

17       Q.   CAN WE -- THANK YOU.

18            THE COURT:  THE TIME IS 12:01.  DO YOU WANT TO ASK A

19       SHORT QUESTION OR SHALL WE GO AHEAD AND TAKE OUR BREAK?

20            MR. QUINN:  GOOD TIME TO BREAK, YOUR HONOR.

21            THE COURT:  OKAY.  IT'S 12:01 NOW.  PLEASE DON'T

22       RESEARCH OR DISCUSS THE CASE, AND WE'LL SEE YOU BACK AT 1:00

23       O'CLOCK.

24            THANK YOU.

25            (JURY OUT AT 12:01 P.M.)
```

```
1              THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK.  THANK

2     YOU.

3              (LUNCH RECESS WAS TAKEN 12:01 P.M. TO 1:04 P.M.)

4              (JURY IN AT 1:04 P.M.)

5              THE CLERK:  ONE IS COMING.

6              (PAUSE IN PROCEEDINGS.)

7              THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

8     THE TIME IS NOW 1:05.

9     PLEASE GO AHEAD.

10             MR. QUINN:  THANK YOU, YOUR HONOR.

11    Q.  DR. VELLTURO, JUST TO REORIENT OURSELVES, WE HAD STARTED

12    WITH -- WE CAN PUT THIS UP -- PLAINTIFF'S EXHIBIT 92.8 HERE,

13    THE GRAPH YOU CREATED OF THE SAMSUNG U.S. SMARTPHONE MARKET

14    SHARE OVER THIS PERIOD OF TIME, 2007 TO 2013, ANNOTATED WITH

15    SOME EVENTS AND DOCUMENTS THAT YOU THOUGHT WERE SIGNIFICANT

16    RELATING TO THAT; CORRECT?

17    A.  YES.

18        SORRY.  YES.

19    Q.  AND WE -- I TOLD YOU WE WERE GOING TO LOOK AT SOME OTHER

20    DOCUMENTS THAT, THINGS THAT HAD HAPPENED IN THAT TIME PERIOD,

21    OTHER DOCUMENTS THAT HAD BEEN CREATED AND SEE IF THEY HAD SOME

22    RELATION TO THE MARKET SHARE ALSO.  OKAY?  JUST TO ORIENT

23    OURSELVES.

24    A.  OKAY.

25    Q.  ALL RIGHT.  AND WE LOOKED AT THIS E-MAIL FROM MR. JOBS
```

```
 1    WHERE HE SAYS, YOU KNOW, LOOKING BACKWARD, HE SAW A NEED TO

 2    CATCH UP WITH ANDROID.

 3         AND YOU WERE GOING TO LOOK OVER THE LUNCH HOUR ABOUT

 4    WHETHER THAT WAS IN YOUR REPORT.

 5         DID YOU HAVE A CHANCE TO DO THAT?

 6    A.   YES.

 7    Q.   AND THE ANSWER IS?

 8    A.   I CAN GIVE YOU A PARTIAL ANSWER, WHICH IS THE, THE ACTUAL

 9    DOCUMENT NUMBER DOESN'T APPEAR IN MY LIST OF DOCUMENTS

10    CONSIDERED.

11         BUT I'VE GOT ABOUT 80 DEPOSITIONS THAT I REVIEWED AND

12    READ, AND THEY HAVE EXHIBITS ASSOCIATED WITH EACH ONE OF THOSE,

13    AND I HAVEN'T HAD TIME TO GET THROUGH THAT WHOLE LIST.

14    Q.   RIGHT.

15    A.   SO IT COULD BE IN THERE, I'M NOT SURE.

16    Q.   YOU JUST DON'T KNOW?

17    A.   I'M NOT SURE AS I SIT HERE.

18    Q.   CAN YOU TELL US AS YOU SIT HERE WHETHER, IN FORMING YOUR

19    OPINIONS IN THIS CASE, YOU CONSIDERED THIS, THIS PARTICULAR

20    E-MAIL?

21    A.   THINKING BACK TO WHEN I WROTE MY REPORT, WHICH WAS, YOU

22    KNOW, A WHILE AGO, I DON'T REMEMBER THIS ONE SPECIFICALLY

23    COMING UP.

24    Q.   ALL RIGHT.  OKAY.

25         SO IF WE COULD ASK YOU -- IF WE CAN TAKE A LOOK AT
```

```
1      EXHIBIT -- DEFENSE EXHIBIT 404.006, 404.006, WHICH IS NOT YET

2      IN EVIDENCE AND IS A CONFIDENTIAL DOCUMENT.

3            HAVE YOU FOUND IT, SIR?

4      A.   YES.  YES.

5      Q.   I MEAN, YOU CAN TELL THAT THIS IS A DOCUMENT THAT WAS

6      PRODUCED BY APPLE?

7      A.   YES.

8      Q.   ALL RIGHT.

9            YOUR HONOR, THIS IS CONFIDENTIAL, BUT I'D OFFER IT IN

10     EVIDENCE.

11              THE COURT:  ALL RIGHT.  ANY OBJECTION.

12              MR. BENNETT:  NO OBJECTION, YOUR HONOR.

13              THE COURT:  IT'S ADMITTED.

14        (DEFENDANTS' EXHIBIT 404.006 WAS ADMITTED IN EVIDENCE.)

15              THE COURT:  GO AHEAD, PLEASE.

16     BY MR. QUINN:

17     Q.   ALL RIGHT.  SO THIS -- THIS DOCUMENT, CAN YOU TELL, IS

18     THIS ONE INCLUDED IN YOUR REPORT?

19     A.   I CERTAINLY RECALL REVIEWING A LOT OF DOCUMENTS LIKE THIS.

20     INTELLECTUAL PROPERTY NOT 100 PERCENT SURE.  THIS ONE'S -- I

21     DON'T HAVE THE NUMBERS MEMORIZED, BUT I'VE SEEN DOCUMENTS LIKE

22     THIS AND I'VE REVIEWED THEM.

23     Q.   YOU JUST DON'T KNOW WHETHER YOU REVIEWED THIS PARTICULAR

24     DOCUMENT?

25     A.   I CAN'T TELL YOU THAT.
```

CROSS VELLTURO

```
 1     Q.   IF I COULD ASK YOU TO TURN TO PAGE 006 OF THAT DOCUMENT,

 2     SO IT'S 404.006, YOU'LL SEE THERE AT THE TOP OF THIS APPLE

 3     DOCUMENT SOME KEY CONCLUSIONS.

 4          DO YOU SEE THAT UP AT THE TOP?

 5     A.   I DO, YES.

 6     Q.   AND I DON'T KNOW IF THERE'S AN OBJECTION TO MY READING OUT

 7     LOUD POINTS 3 AND 4.

 8          MR. BENNETT:  IT'S UNDER SEAL, YOUR HONOR.

 9          SORRY.

10          MR. QUINN:  IT'S OKAY?

11     Q.   SO IT SAYS "KEY CONCLUSIONS, MISSED OPPORTUNITIES."

12          POINT 3, "IPHONE PRESENCE AT POINT-OF-SALE IS NOT

13     EFFECTIVE AND PERHAPS EVEN DAMAGING."

14          DO YOU SEE THAT?

15     A.   I DO, YES.

16     Q.   AND THEN POINT 4, "IPHONE 3GS WOULD BE A GREAT CHOICE FOR

17     MANY, ESPECIALLY FIRST-TIME SMARTPHONE BUYERS, BUT IT IS

18     INVISIBLE AT POINT OF SALES."

19          DO YOU SEE THAT?

20     A.   I SEE THAT LANGUAGE.

21     Q.   ALL RIGHT.  SO DOES THIS INDICATE TO YOU THAT PEOPLE AT

22     APPLE WERE IDENTIFYING SOME PROBLEMS THAT APPLE WAS HAVING AT

23     THE RETAIL LEVEL?

24     A.   ON A WORLDWIDE BASIS.  THIS HAS GOT INTERVIEWS ALL AROUND

25     THE WORLD, SO -- BUT I DO SEE THAT.
```

1   Q.   ALL RIGHT.  AND SO -- AND THIS DOCUMENT IS DATED IN JULY

2   OF 2011?

3   A.   THAT'S RIGHT.

4   Q.   ALL RIGHT.  SO IF WE GO TO JULY OF 2011, WHICH WOULD BE

5   ABOUT HERE (INDICATING), AND WE HAVE APPLE PROBLEMS AT POINT OF

6   SALE.

7           MR. BENNETT:  YOUR HONOR, COULD WE HAVE AN

8   IDENTIFICATION NUMBER ATTACHED TO THIS DEMONSTRATIVE FROM

9   MR. QUINN.

10          MR. QUINN:  WHAT WOULD BE NEXT IN ORDER,

11  DEMONSTRATIVE?

12          MR. GRANT:  DX 507.

13          MR. QUINN:  507?

14          MR. GRANT:  YES.

15          MR. QUINN:  DX 507.

16      (DEFENDANTS' EXHIBIT DX 507 WAS MARKED FOR

17  IDENTIFICATION.)

18  BY MR. QUINN:

19  Q.   AND THEN IN OCTOBER OF 2011, THE GALAXY S II COMES TO

20  MARKET.  DO YOU RECALL THAT?

21  A.   YES.

22  Q.   AND THE GALAXY S II HAD CERTAIN DISTINGUISHING FEATURES

23  THAT THE IPHONE DID NOT HAVE; CORRECT?

24  A.   SOME, YES.

25  Q.   OKAY.  AND ONE OF THOSE IS IT HAD A 4.52 INCH SCREEN

1    COMPARED TO THE IPHONE'S 3.5 INCH SCREEN?

2    A.   WHICH IPHONE?

3    Q.   THE IPHONE THAT WAS THEN OUT IN OCTOBER OF 2011.

4    A.   WELL, THE 4S, THE IPHONE 4S ALSO COMES OUT IN 2011.

5    Q.   ALL RIGHT.

6    A.   AND I THINK THAT'S A 4 INCH SCREEN.  I THINK THE ONE

7    BEFORE THAT IS 3 AND A HALF.  IT'S HARD TO KEEP THEM EXACTLY

8    STRAIGHT.

9    Q.   SO, I MEAN, DO YOU RECALL -- 3 AND A HALF.

10        YOU'RE SAYING THAT THERE WAS, AT THE TIME THAT THE

11   GALAXY S II CAME OUT, THERE WAS AN IPHONE ON THE MARKET THAT

12   HAD A 4 INCH SCREEN?  IS THAT YOUR TESTIMONY, SIR?

13   A.   I'M SPEAKING FROM RECOLLECTION.  THE 4S MAY HAVE BEEN THE

14   ONE THAT HAD THE 4 INCH OR IT MAY HAVE BEEN THE 5.

15   Q.   YOU'RE JUST NOT SURE?

16   A.   AS I SIT HERE, I DON'T REMEMBER EXACTLY.

17   Q.   OKAY.  MAYBE WE'LL COME BACK TO THAT.

18   A.   OKAY.

19   Q.   SO ANOTHER EVENT WE HAVE IS THAT IN OCTOBER OF 2011, THE

20   GALAXY S II COMES OUT.  SO THAT'S APPROXIMATELY HERE

21   (INDICATING).

22        AND THEN IN NOVEMBER OF 2011, SAMSUNG LAUNCHES A

23   COMMERCIAL ADVERTISING CAMPAIGN, THE NEXT BIG THING.

24        DO YOU RECALL THAT?

25   A.   YES.

```
1    Q.   AND THAT'S IN NOVEMBER 2011?

2    A.   YES, AROUND THAT TIME.

3    Q.   SO THAT'S ABOUT HERE (INDICATING).

4         AND THEN IF YOU TURN, PLEASE, TO DEFENSE EXHIBIT -- I'M

5    SORRY.  IN FEBRUARY OF 2012, THE NOTE IS RELEASED.  WE LOOKED

6    AT THAT THIS MORNING.

7         DO YOU RECALL THAT?

8    A.   YES, I DO.

9    Q.   YEAH.  AND THAT HAD AN EVEN LARGER SCREEN; CORRECT?

10   A.   YES, IT DID.

11   Q.   SO THAT'S FEBRUARY OF 2012 (INDICATING).

12        AND AMONG THE FEATURES OF THE GALAXY NOTE WAS IT HAD A 5.3

13   INCH SCREEN?

14   A.   THAT SOUNDS RIGHT, YES, 5.3 INCHES.

15   Q.   ALL RIGHT.  AND IT ALSO RAN ON THE SUPER FAST, OR THE

16   FASTER LTE NETWORK.

17        DO YOU RECALL THAT?

18   A.   THAT'S MY RECOLLECTION, YES.

19   Q.   AND AT THAT POINT, APPLE DIDN'T HAVE A PHONE THAT RAN ON

20   THE LTE NETWORK; RIGHT?

21   A.   I THINK THAT'S RIGHT.

22   Q.   AND THE GALAXY NOTE AT THIS TIME ALSO HAD A STYLUS THAT

23   YOU COULD USE AS AN ALTERNATIVE WAY OF USING THE DEVICE?

24   A.   IT DID.

25   Q.   SO WERE YOU HERE WHEN MR. SCHILLER TESTIFIED?
```

```
1    A.   YES, I WAS.

2    Q.   DO YOU RECALL MR. SCHILLER'S TESTIMONY THAT THE IPHONE

3    SCREEN SIZE WAS 3.5 INCHES UNTIL SEPTEMBER 2012 WHEN IT BECAME

4    4 INCHES WITH THE IPHONE 5?

5         AS YOU THINK ABOUT IT, DOES THAT NOW SEEM RIGHT?

6    A.   THAT COULD BE RIGHT.

7    Q.   ALL RIGHT.  SO THEN IN FEBRUARY OF 2012, THERE'S AN APPLE

8    CARRIER CHANNEL REVIEW.  IF YOU'D LOOK, PLEASE, AT DEFENSE

9    EXHIBIT 500.004?

10        HAVE YOU FOUND THAT, SIR?

11   A.   I'M AT EXHIBIT 500 AND I'M LOOKING FOR 004.

12   Q.   OKAY.  EXHIBIT 500, THIS IS A DOCUMENT -- AN APPLE

13   DOCUMENT?  YOU CAN TELL FROM LOOKING AT IT?

14   A.   YES, IT'S AN APPLE DOCUMENT.

15            MR. QUINN:  WE'D OFFER THIS, YOUR HONOR.

16            THE COURT:  ALL RIGHT.  ANY OBJECTION?

17            MR. BENNETT:  NO OBJECTION, YOUR HONOR.

18            THE COURT:  IT'S ADMITTED.

19        (DEFENDANTS' EXHIBIT 500 WAS ADMITTED IN EVIDENCE.)

20            THE COURT:  GO AHEAD, PLEASE.

21            MR. BENNETT:  ACCEPT, YOUR HONOR, THERE ARE CERTAIN

22   SEALED PAGES.  ONE -- EVERYTHING EXCEPT 1, 2, 13, 16 THROUGH

23   18, AND 20, YOUR HONOR, ARE UNDER SEAL.

24            THE COURT:  OKAY.  GO AHEAD, PLEASE, MR. QUINN.

25            MR. QUINN:  OKAY.
```

```
 1      Q.   SO THIS DOCUMENT, SIR, IF YOU'D TURN TO PAGE 004, AND JUST

 2   FOR THE JURY?

 3           IN THIS DOCUMENT, INTERNAL APPLE DOCUMENT, IT NOTES -- IT

 4   SAYS "KEY HEADWINDS WE ARE FACING."

 5           DO YOU SEE THAT IN 004?

 6      A.   YES.

 7      Q.   AND ONE OF THE HEADWINDS IT IDENTIFIES IS --

 8               MR. BENNETT:  OBJECTION, YOUR HONOR.

 9               MR. QUINN:  OKAY.  IS THERE ANY -- I WOULD PROPOSE TO

10   READ ITEMS 2 AND 4.  IS THERE ANY OBJECTION TO READING THOSE

11   TWO?  I'M SORRY.

12               MR. BENNETT:  A SHORT STATEMENT --

13               MR. MCELHINNY:  NO, NO OBJECTION.  IT'S A SEALED

14   DOCUMENT.

15               MR. BENNETT:  WE OBJECT.

16               THE COURT:  WELL, THE OBJECTION IS OVERRULED.  I'M

17   GOING TO ALLOW MR. QUINN TO READ THOSE TWO.

18           GO AHEAD, PLEASE.

19   BY MR. QUINN:

20      Q.   SO IN THIS -- IN TERMS OF KEY HEADWINDS IN THIS APPLE

21   DOCUMENT, THEY IDENTIFY "OUR SAC PREMIUM IS DRIVING CARRIERS TO

22   CAP OUR VOLUMES."

23           DO YOU SEE THAT?

24      A.   YES, I SEE THAT LANGUAGE.

25      Q.   AND SAC PREMIUM, THAT REFERS TO SUBSCRIBER ACQUISITION
```

```
1    COST; CORRECT?

2    A.   YES.

3    Q.   AND THEN ITEM NUMBER 4, IT SAYS, "WE ARE LOSING CUSTOMERS

4    AT POS."

5         RIGHT?

6    A.   POINT OF SALE.

7    Q.   AT POINT OF SALE.

8         AND IS THIS A DOCUMENT THAT'S IN YOUR REPORT?

9    A.   I -- AGAIN, I CAN'T REMEMBER EVERY DOCUMENT THAT'S IN MY

10   REPORT, BUT I'VE SEEN DOCUMENTS LIKE THIS BEFORE.

11   Q.   DO YOU KNOW WHETHER YOU CONSIDERED THIS DOCUMENT IN

12   ARRIVING AT YOUR OPINIONS?

13   A.   I -- I LOOKED -- I CONSIDERED DOCUMENTS LIKE THIS.  I'M

14   NOT SURE IF THIS EXACT ONE IS THERE, BUT I THINK IT IS.

15   Q.   ALL RIGHT.  SO THIS IS IN FEBRUARY 2012.  SO THAT'S ABOUT

16   HERE (INDICATING).

17        AND YOU UNDERSTAND TO INDICATE -- THIS TO INDICATE THAT,

18   YOU KNOW, APPLE IS HAVING PROBLEMS WITH CARRIERS, TOO, AT THIS

19   TIME, THEY'RE CAPPING --

20   A.   I --

21   Q.   -- OUR VOLUMES?

22   A.   I'M SORRY, MR. QUINN.  I HATE TO DO THIS.  I THINK THOSE

23   FOUR ARE OFF, THOSE FOUR CIRCLES.  I THINK YOU'VE GOT THEM IN

24   THE MIDDLE OF 2011, NOT 2012.

25        SO IF YOU GO ALL THE WAY TO THE LEFT-HAND SIDE OF THE
```

1    CHART, YOU CAN SEE THAT 2007 APPEARS AT THE BEGINNING OF 2007,

2    AND SO IF 2012 BEGINS ON THE CHART YOU'RE CONSTRUCTING EXACTLY

3    JUST PAST THAT.  ONE OF THOSE BAD MANUALS.

4    Q.   THIS IS A DOCUMENT THAT'S DATED IN FEBRUARY OF 2012;

5    RIGHT?

6    A.   RIGHT.

7    Q.   AND SO I'M DOING MY BEST HERE.  I'M DOING IT FREEHAND, BUT

8    I'M NOT PRECISE, I UNDERSTAND.  BUT I'M MARKING IT HERE AS A 6.

9    A.   OKAY.  I THINK -- IT'S YOUR CHART, BUT I THINK --

10   Q.   ALL RIGHT.

11   A.   -- THOSE FOUR, IF YOU'RE TRYING TO GET EARLY 2012, SHOULD

12   BASICALLY BE OVER THE 2, THE SECOND 2 OF 2012.

13   Q.   WELL, OKAY.  I MAY BE OFF.  THIS ISN'T BROKEN DOWN IN

14   MONTHS.  I'M DOING THE BEST I CAN.  I RECOGNIZE IT'S NOT

15   PRECISE.

16        BUT WE HAVE A DOCUMENT HERE THAT INDICATES THAT APPLE

17   REALIZES IT'S HAVING SOME PROBLEMS WITH CARRIERS AS OF FEBRUARY

18   OF 2012; RIGHT?

19   A.   CARRIERS ARE LOOKING AT, AT THE IPHONE AND TRYING TO GET A

20   BETTER DEAL.

21   Q.   WELL, WHAT APPLE SAID INTERNALLY, WHEN THE EXECUTIVES WERE

22   TALKING TO THEMSELVES, WAS THAT CARRIERS WERE CAPPING THEM, THE

23   VOLUMES; CORRECT?

24   A.   I SEE THAT LANGUAGE, YES.

25   Q.   YEAH.  AND ALSO IT AGAIN REFERS TO THAT POINT OF SALE

1        PROBLEM THAT WE'VE SEEN REFERENCE TO BEFORE; RIGHT?

2        A.   BEFORE AS IN THE LAST DOCUMENT?

3        Q.   YEAH.

4        A.   YES, I UNDERSTAND THAT LANGUAGE THERE.

5        Q.   AND THEN IN JUNE OF 2012, SAMSUNG COMES OUT WITH THE

6        GALAXY S III; CORRECT?

7        A.   YES.

8        Q.   FLAGSHIP PHONE?

9        A.   IT IS.

10       Q.   HIGHEST SELLING SAMSUNG PHONE, SMARTPHONE OF ALL TIME?

11       A.   CERTAINLY OF THE ONES WE'RE LOOKING AT IN THIS CASE, IT

12       HAD THE MOST SALES.

13       Q.   WELL, I MEAN, YOU KNOW IT WAS A -- IT WAS A COMMERCIAL

14       SUCCESS?

15       A.   IT HAD A LOT OF SALES.

16       Q.   ALL RIGHT.  AND IT HAD SOME REAL DISTINGUISHING FEATURES

17       THAT THE IPHONE DIDN'T HAVE; CORRECT?

18       A.   YES.

19       Q.   AND THOSE INCLUDED A 4.8 INCH SCREEN; CORRECT?

20       A.   THAT SOUNDS RIGHT, YES.

21       Q.   AND IT HAD THIS NEAR FIELD COMMUNICATIONS ABILITY WHERE

22       YOU COULD TAKE COMPATIBLE PHONES AND TAP THEM TOGETHER AND

23       EXCHANGE DATA JUST BY TAPPING THEM TOGETHER?

24       A.   YES.

25       Q.   AND IT RAN ON THAT FAST LTE NETWORK, WHICH AS OF THIS DATE

1      APPLE STILL DIDN'T HAVE A PHONE THAT RAN LTE, ON LTE; CORRECT?

2      A.   THAT'S CORRECT.

3      Q.   ALL RIGHT.  SO THAT'S THE GALAXY S III, AND THAT COMES OUT

4      IN JUNE OF 2012, APPROXIMATELY HERE (INDICATING).

5           AND THEN IN SEPTEMBER OF 2012, THE IPHONE 5 LAUNCHES WITH

6      THE IOS 6 OPERATING SYSTEM; CORRECT?

7           DO YOU RECALL THAT?

8      A.   YES.

9      Q.   AND THAT'S THE PHONE THAT CAME OUT WITH THIS MAPS PROBLEM,

10     APPLE MAPS, WHICH WAS A, KIND OF A FIASCO?

11     A.   I REMEMBER THE MAPS ISSUE, AND IT WAS ABOUT THAT TIME.

12     Q.   ALL RIGHT.  AND YOU REMEMBER THE CEO OF APPLE WROTE A

13     LETTER TO CUSTOMERS REALLY KIND OF APOLOGIZING FOR THE PROBLEMS

14     WITH THE MAPS APP; CORRECT?

15     A.   YES, I SAW THAT LETTER WHEN MR. SCHILLER WAS HERE, YES.

16     Q.   AND THIS WAS THE -- THIS PHONE WAS THE FIRST TIME APPLE

17     HAD A PHONE THAT RAN ON THE FAST LTE NETWORK; CORRECT?

18     A.   YES.

19     Q.   AND IT WAS ALSO THE FIRST APPLE PHONE THAT WAS LARGER THAN

20     3.5 INCHES?

21     A.   I THINK THAT'S CORRECT.

22     Q.   SO THAT'S -- I'LL PUT THE GALAXY 3 S (INDICATING).

23          AND THE IPHONE --

24     A.   JUST TO BE CLEAR --

25     Q.   IPHONE 5?

1     A.   I THINK IT'S THE S III, NOT THE 3 S.

2     Q.   THANK YOU.

3     A.   BECAUSE IT'S GOING TO BE THE 4S AND THE 5.

4     Q.   THANK YOU.

5     A.   SURE.

6     Q.   AND THE IPHONE 5 LAUNCHES IN SEPTEMBER OF 2012; CORRECT

7     (INDICATING)?

8     A.   YES.

9     Q.   AND THEN I'D ASK YOU TO PLEASE LOOK AT DEFENSE EXHIBIT

10    407.

11         AND THIS IS IN EVIDENCE, YOUR HONOR.

12         AND I'D ASK YOU TO TURN, IF YOU WOULD, PLEASE, TO PAGE

13    005.  407.005.

14         ARE YOU WITH ME?

15    A.   I'M ALMOST THERE.  YES, I'M THERE.

16    Q.   ALL RIGHT.  AND IN THIS INTERNAL APPLE DOCUMENT, THE FOLKS

17    AT APPLE NOTE THAT "SAMSUNG'S BRAND IMPRESSION IS JUST AS

18    STRONG AS APPLE'S IN THE U.S."

19         DO YOU SEE THAT?

20    A.   YES, I SEE THAT LANGUAGE.

21    Q.   SO SAMSUNG'S BRAND MARKETING HAD OBVIOUSLY HAD SOME

22    RESULTS?

23    A.   I THINK THIS NUMBER IS HIGHER FOR SAMSUNG THAN IT HAD BEEN

24    IN PREVIOUS YEARS.  I'M NOT SURE HOW MUCH HIGHER, BUT IT'S

25    HIGHER.

1    Q.   OKAY.  WELL, WOULD YOU AGREE WITH ME THAT THE BRAND

2    MARKETING, SAMSUNG'S EFFORTS IN BUILDING ITS BRAND HAD HAD SOME

3    RESULTS?

4    A.   I THINK THAT'S RIGHT.  YOU NEED TO SEE A PREVIOUS PERIOD'S

5    NUMBER TO MAKE A COMPARISON, AND I DON'T HAVE THAT, BUT I THINK

6    IT INCREASED.

7    Q.   AND THAT IS IN DECEMBER 2012, ABOUT HERE (INDICATING).

8         AND THEN IF YOU TURN, PLEASE, TO DEFENSE EXHIBIT 409, SIR,

9    THIS IS IN EVIDENCE -- AND BY THE WAY.  NO, GO AHEAD.

10        IF YOU WOULD PLEASE TURN TO EXHIBIT 409.  AND IF YOU WOULD

11   TURN TO PAGE 409.002.  YOU WERE HERE DURING THE TESTIMONY OF

12   MR. SCHILLER WHERE HE TESTIFIED ABOUT THIS E-MAIL THAT HE

13   WROTE?

14   A.   YES, I WAS HERE.

15   Q.   WHERE HE SAYS "I WATCHED THE SAMSUNG PRE-SUPER BOWL AD

16   THAT LAUNCHED TODAY.  IT'S PRETTY GOOD AND I CAN'T HELP BUT

17   THING 'THESE GUYS ARE FEELING IT' (LIKE AN ATHLETE WHO CAN'T

18   MISS BECAUSE THEY ARE IN THE ZONE) WHILE WE STRUGGLE TO NAIL A

19   COMPELLING BRIEF ON IPHONE.  THAT'S SAD BECAUSE WE HAVE MUCH

20   BETTER PRODUCTS," HE SAYS.

21        DO YOU SEE THAT?

22   A.   I DO.

23   Q.   AND SO THAT'S FEBRUARY OF 2013 (INDICATING).

24        AND SO THEN HE SAYS, "APPLE ADVERTISING STRUGGLING."

25        DID YOU REVIEW THIS DOCUMENT IN CONNECTION WITH YOUR

1    REPORT?

2    A.   I THINK SO, YES.

3    Q.   OKAY.  NOW, IF YOU'D PLEASE TURN TO DEFENSE EXHIBIT 413.

4         AND THIS IS IN EVIDENCE.  IT'S NOT CONFIDENTIAL.

5         AND IF WE COULD --

6              MR. BENNETT:  PARTS OF THIS DOCUMENT ARE SEALED, YOUR

7    HONOR.

8              THE COURT:  OKAY.  JUST 8, 14, 46, AND 1 ARE NOT

9    SEALED.

10             MR. QUINN:  I WAS GOING TO GO TO 8, 14, AND 46.

11             MR. BENNETT:  I SHOW 8, 14, AND 46 AS SEALED.

12             THE COURT:  NO.  THEY ARE NOT SEALED.

13             MR. BENNETT:  EXCUSE ME, I'M SORRY.  I MISSPOKE, YOUR

14   HONOR.

15             MR. QUINN:  SO 8, 14, AND 46 IS WHAT I PROPOSE TO

16   USE.  OKAY?

17   Q.   SO IF WE CAN LOOK, THIS IS AN INTERNAL APPLE DOCUMENT;

18   RIGHT?

19   A.   I'M SORRY, MR. QUINN.  I'M WAY BEHIND YOU.

20   Q.   OKAY.

21   A.   I'VE GOT A LOT OF VOLUMES UP HERE.

22   Q.   THIS WOULD BE EXHIBIT, DEFENSE EXHIBIT 413.

23   A.   YEAH, OKAY.  YES, I'M SORRY.  WHICH PAGE DO YOU WANT ME

24   ON?

25   Q.   IF WE COULD TURN TO PAGE 8 WHERE IT SAYS, IN THIS INTERNAL

```
1    APPLE DOCUMENT, IT SAYS "GROWTH RATES ARE SLOWING."

2         DO YOU SEE THAT?

3    A.   I SEE THAT LANGUAGE.  I'M JUST TAKING A MOMENT TO

4    FAMILIARIZE MYSELF WITH THE --

5    Q.   ACTUALLY, I WASN'T GOING TO ASK YOU MORE QUESTIONS ABOUT

6    THAT PAGE?

7    A.   I'M SORRY, YOU'RE NOT GOING TO ASK ME?

8    Q.   NOT ABOUT THAT PAGE.

9    A.   I SEE THAT LANGUAGE, YES.

10   Q.   ALL RIGHT.  IF YOU'D TURN, PLEASE, TO PAGE 14.  AND YOU

11   SEE THE QUESTION -- THERE'S A QUESTION THERE AT THE TOP IN THIS

12   APPLE DOCUMENT, "SO WHAT IS GOING ON?"

13        DO YOU SEE THAT, SIR?

14   A.   I DO, YES.

15   Q.   AND IT SAYS, IN THE LOWER -- IN THE LEFT-HAND SIDE HERE,

16   "STRONGEST DEMAND COMING FROM LESS EXPENSIVE AND LARGER SCREEN

17   SMARTPHONES."

18        DO YOU SEE THAT?

19   A.   I DO.

20   Q.   AND THEN IN THE MIDDLE, THE MIDDLE BULLET SAYS "CARRIERS

21   HAVE STRONG INTEREST IN CAPPING IPHONE DUE TO ONE OR MORE

22   FACTORS:  HIGH SHARE, SUBSIDY PREMIUM, UNFRIENDLY POLICIES,

23   LACK OF ALIGNMENT."

24        DO YOU SEE THAT?

25   A.   I DO.  I SEE THAT LANGUAGE.
```

CROSS VELLTURO

```
 1    Q.   AND THEN IF YOU GO TO THE THIRD BULLET AT THE RIGHT-HAND

 2    SIDE, IT SAYS, "COMPETITORS HAVE DRASTICALLY IMPROVED THEIR

 3    HARDWARE AND IN SOME CASES THEIR ECOSYSTEMS.  SPENDING

 4    EXCEEDINGLY AMOUNTS OF MONEY ON ADVERTISING AND/OR

 5    CARRIER/CHANNEL TO GAIN TRACTION."

 6         DO YOU SEE THAT?

 7    A.   I DO.

 8    Q.   AND THEN THE CONCLUSION, LOOKING BACK ON WHAT'S GOING ON

 9    IN THE MARKETPLACE IS ON PAGE 46, ISN'T IT?  IF YOU LOOK ON

10    PAGE 46?  ARE YOU WITH ME, SIR?

11    A.   I AM.  I'M JUST TRYING TO GET CONTEXT.  THIS DOCUMENT

12    COVERS LOTS OF DIFFERENT COUNTRIES, AND I'M JUST NOT SURE WHERE

13    WE ARE HERE.

14    Q.   WELL, SIR, PERHAPS YOUR COUNSEL CAN ASK YOU SOME MORE

15    QUESTIONS IF HE CARES TO.

16    A.   OKAY.

17    Q.   BUT I'D LIKE TO CALL YOUR ATTENTION TO THIS PAGE 46.

18         CONCLUSION IN THIS APPLE DOCUMENT IS CONSUMERS WANT WHAT

19    WE DON'T HAVE.

20         DO YOU SEE THAT?

21    A.   I SEE THAT LANGUAGE, YES.

22    Q.   AND IT SAYS OVER HERE THAT THE GROWTH IS COMING FROM --

23    WHERE DOES THE GROWTH COME FROM, PHONES UNDER $300, PHONES OVER

24    $300 WITH LARGER SCREENS, THE 4 INCH SCREENS; CORRECT?

25    A.   PHONES OVER $300 WITH SCREENS LARGER THAN 4 INCHES, I SEE
```

1    THAT.

2    Q.   ALL RIGHT.  AND, YOU KNOW, WERE YOU HERE WHEN MR. SCHILLER

3    TESTIFIED ABOUT THIS DOCUMENT?

4    A.   YEAH.  WELL, I WAS HERE FOR ALL OF HIS TESTIMONY, YES.

5    Q.   RIGHT.  AND DID YOU HEAR MR. SCHILLER SAY, YOU KNOW, THIS

6    WAS JUST THE OPINION OF ONE SALES PERSON?  DO YOU RECALL HIM

7    SAYING THAT?

8    A.   NO.

9    Q.   YOU DON'T REMEMBER THAT?

10   A.   I DON'T REMEMBER THAT SPECIFICALLY.

11   Q.   DO YOU RECALL HIM SAYING THIS IS NOT AN OFFICIAL APPLE

12   DOCUMENT?  DO YOU RECALL HIM SAYING THAT?

13   A.   I DO RECALL THAT.

14   Q.   ALL RIGHT.

15        IF I -- MAY I HAVE PERMISSION, YOUR HONOR, TO READ FROM

16   THE TRIAL TRANSCRIPT MR. SCHILLER'S TESTIMONY, PAGE 548:9 TO

17   15?

18        (PAUSE IN PROCEEDINGS.)

19        MR. QUINN:  "QUESTION:  THIS IS WHAT I'M LOOKING

20   ABOUT.  THIS IS THE DOCUMENT WE'RE LOOKING AT; CORRECT?

21        "ANSWER:  YES.  BUT THIS IS ONE SALES LEADER WHO PUT

22   TOGETHER A DOCUMENT FROM OTHER SALES LEADERS.  THIS IS NOT AN

23   OFFICIAL APPLE DOCUMENT WITH OUR STANCE IN TERMS OF WHAT WE

24   THINK.

25        "QUESTION:  SO YOU'VE NOW IDENTIFIED THIS AS A ONE-PERSON

```
1    DOCUMENT?

2         "ONE PERSON CREATED THIS, YES."

3    Q.   NOW, THAT'S NOT TRUE, IS IT?

4    A.   I'M SORRY.  WHAT'S NOT TRUE?

5    Q.   THAT'S NOT TRUE, WHAT MR. SCHILLER SAID, THAT THIS IS A

6    ONE-PERSON DOCUMENT, IT'S NOT AN OFFICIAL APPLE DOCUMENT,

7    THAT'S SIMPLY NOT TRUE, IS IT?

8    A.   I DON'T KNOW THAT ONE WAY OR THE OTHER.

9    Q.   WELL, IS --

10   A.   MR. SCHILLER WAS THERE, SO I WOULD DEFER TO HIM ON THE

11   CONTEXT OF THIS DOCUMENT.

12   Q.   WELL, IF YOU TAKE A LOOK, PLEASE, AT DEFENSE EXHIBIT 411,

13   IF YOU'D TURN TO THAT, PLEASE?

14   A.   OKAY.

15   Q.   AND THIS IS AN -- EXHIBIT 411 IS AN APPLE DOCUMENT;

16   CORRECT?

17   A.   NO.  I'VE GOT A COVER E-MAIL.

18   Q.   WELL, YOU CAN SEE THE APPLE BATES NUMBERS DOWN AT THE

19   BOTTOM?

20   A.   YES, I SEE THE BATES NUMBERS.

21        MR. QUINN:  WE OFFER THIS, YOUR HONOR, OFFER EXHIBIT

22   411.

23        MR. BENNETT:  YOUR HONOR, ALL BUT, ALL BUT PAGES 1,

24   2, AND 32 ARE SEALED.

25        THE COURT:  ALL RIGHT.  IT'S ADMITTED.
```

CROSS VELLTURO

```
 1              (DEFENDANTS' EXHIBIT 411 WAS ADMITTED IN EVIDENCE.)

 2              THE COURT:  GO AHEAD.

 3              MR. QUINN:  IF WE COULD PUT UP ON THE SCREEN THE

 4      FIRST PAGE OF THIS, AND BLOW UP THE TOP.

 5      Q.   THIS IS A DOCUMENT, AND IT'S FROM A DENNIS BURKE, WHO HAS

 6      AN E-MAIL ADDRESS AT APPLE; RIGHT?

 7      A.   YES, I SEE THAT.

 8      Q.   AND THEN THERE'S A NUMBER OF OTHER PEOPLE HERE, WHO THE

 9      DOCUMENT IS TO A BUNCH OF THEM, THEY ALL HAVE APPLE E-MAIL

10      ADDRESSES?  DO YOU SEE THAT?

11      A.   I DO.

12      Q.   AND THERE'S A REFERENCE TO A MR. OPPENHEIMER?

13      A.   I SEE OPPENHEIMER.

14      Q.   HE'S THE CHIEF FINANCIAL OFFICER OF APPLE, AT LEAST AT

15      THIS TIME, IS A MAN BY THE NAME OF PETER OPPENHEIMER; CORRECT?

16      A.   I THINK THAT'S RIGHT.

17      Q.   OKAY.  SO ATTACHED TO THIS WE HAVE THE VERY SAME DOCUMENT,

18      AT LEAST HAVING THOSE SAME PAGES THAT MR. SCHILLER TESTIFIED

19      WAS NOT AN OFFICIAL APPLE DOCUMENT AND WAS JUST SIMPLY A

20      ONE-PERSON DOCUMENT; CORRECT?  IF YOU TURN TO PAGE 004?

21      A.   I SEE THAT SLIDE, YES.

22      Q.   GROWTH RATES ARE SLOWING, SAME PAGE?

23      A.   I SEE THAT.

24      Q.   PAGE 06, FACING KEY HEADWINDS?

25      A.   THAT'S NOT THE SAME LIST.
```

1    Q.   ALL RIGHT.

2    A.   SO THIS IS A DIFFERENT DOCUMENT.

3    Q.   WELL, HOW ABOUT --

4    A.   THEY HAD SOME COMMONALITY, BUT IT'S A DIFFERENT DOCUMENT.

5    Q.   WELL, HOW ABOUT THE LAST PAGE, PAGE 10.

6    A.   OKAY.

7    Q.   "CONSUMERS WANT WHAT WE DON'T HAVE."

8    A.   I'M SORRY.  THAT'S THE LAST PAGE OF THIS --

9    Q.   NO, IT'S PAGE 10?

10   A.   OKAY.

11   Q.   PAGE 10.  AGAIN, YOU SEE "CONSUMERS WANT WHAT WE," APPLE,

12   "DON'T HAVE."  CORRECT?

13   A.   I SEE THAT.  BUT THIS IS NOT THE SAME DOCUMENT.  IT'S GOT

14   WHAT APPEARS TO BE A STICKY IN THE TOP RIGHT-HAND CORNER.  SO

15   I'M NOT SURE -- I SEE THE BARS ARE THE SAME.

16   Q.   RIGHT.  THAT PAGE IS THE SAME?

17   A.   WELL, THE NUMBERS ON IT ARE THE SAME, AND THE LANGUAGE IS

18   THE SAME.

19   Q.   THE LANGUAGE, THE SAME?  "CONSUMERS WANT WHAT WE," APPLE,

20   "DON'T HAVE"?

21   A.   THAT'S PART OF WHAT IT'S SAYING, YES.

22   Q.   LESS EXPENSIVE PHONES?

23   A.   THAT'S WHAT IT'S INDICATING, YES.

24   Q.   APPLE HAD COME OUT WITH THE NOTE?

25   A.   I THINK YOU -- CAN I HAVE THAT QUESTION BACK.

1    Q.   I'M SORRY.  SAMSUNG HAD COME OUT WITH THE NOTE?

2    A.   THE NOTE HAD COME OUT MORE THAN A YEAR EARLIER.

3    Q.   RIGHT.

4    A.   YES, IT WAS OUT.

5    Q.   EXACTLY.  AND THE GALAXY S III, SAMSUNG HAD COME OUT WITH

6    THAT?

7    A.   YES.

8         THE COURT:  FOR THE RECORD, LET ME JUST CLARIFY THAT

9    THE FOLLOWING PAGES OF THIS DOCUMENT ARE NOT SEALED, 1, 2, 4,

10   5, 10, 11, 13, 14, 25, AND 32.

11        GO AHEAD, PLEASE.

12   BY MR. QUINN:

13   Q.   SO THIS IS "CONSUMERS WANT WHAT WE DON'T HAVE" IN APRIL

14   2013.  (INDICATING.)

15        NOW, SIR, IF YOU WERE -- IF YOU WERE TRYING TO EDUCATE THE

16   JURY ABOUT WHAT FACTORS HAD CAUSED AN INCREASE IN SAMSUNG'S

17   SMARTPHONE MARKET SHARE, LOOKING AT YOUR EXHIBIT 92.8, DO YOU

18   THINK THAT IT WOULD BE FAIR, IF YOU WERE BEING INDEPENDENT AND

19   IF YOU WERE BEING FAIR, TO ALSO CALL TO THE JURORS' ATTENTION

20   THESE OTHER THINGS THAT WERE GOING ON IN -- AT APPLE, APPLE'S

21   OWN OBSERVATIONS ABOUT HOW IT WAS STRUGGLING, AND NOT HAVING --

22   NOT HAVING WHAT CONSUMERS WANT, WOULD THAT BE FAIR?

23   A.   I WAS TRYING TO IDENTIFY THE DOCUMENTS THAT WERE SPECIFIC

24   TO THE INVENTIONS HERE.  I MEAN, THERE ARE LOTS OF OTHER EVENTS

25   THAT WENT ON, AND I DID TAKE THOSE INTO CONSIDERATION.

1    Q.   OKAY.  WELL, YOU KNOW, HAVING THOUGHT ABOUT IT NOW, DO YOU

2    THINK IT'S FAIR TO TAKE IN -- I MEAN, YOU WERE TRYING TO TELL

3    THE JURY, I GUESS, YOU WERE TRYING TO GIVE THEM SOME

4    INFORMATION ABOUT WHY SAMSUNG'S SMARTPHONE MARKET SHARE WAS

5    GOING UP; RIGHT?  YOU WERE TRYING TO HELP THEM UNDERSTAND THAT?

6    A.   YES.  BUT THERE ARE MULTIPLE REASONS.

7    Q.   RIGHT.  BUT, YOU KNOW, SPECIFICALLY WHAT YOU TRIED TO TELL

8    THIS JURY IS THAT THESE FIVE SMALL SOFTWARE FEATURES, WHICH

9    APPLE CLAIMS TO OWN, ARE THE REASON WHY SAMSUNG'S MARKET SHARE

10   IS GOING UP?  THAT'S WHAT YOU WERE TRYING TO TELL THE JURY;

11   RIGHT?

12   A.   NO, THAT'S NOT WHAT I SAID.

13   Q.   NO?  OKAY.

14   A.   THAT'S NOT IT.

15   Q.   WELL, IF YOU WERE TRYING TO EXPLAIN WHY SAMSUNG'S U.S.

16   SMARTPHONE MARKET SHARE WAS INCREASING, DO YOU THINK IT WOULD

17   BE FAIR TO ALSO TAKE INTO ACCOUNT THESE KINDS OF THINGS THAT

18   WE'VE LISTED HERE, MANY OFF OF APPLE'S OWN DOCUMENTS, ABOUT

19   DEVELOPMENTS IN THE MARKET, DEVELOPMENTS IN SAMSUNG'S

20   TECHNOLOGY AND ITS SCREEN SIZE, HOW APPLE WAS STRUGGLING IN

21   RETAIL AND POINT OF SALE, AND RECOGNIZING THAT IT DIDN'T HAVE

22   WHAT CONSUMERS WANTED, WOULD THAT BE FAIR TO TAKE INTO ACCOUNT?

23   A.   YES, AND I DO.

24   Q.   SO YOU DO TAKE THEM INTO ACCOUNT, BUT WHEN YOU PREPARED

25   THIS CHART HERE, YOU DECIDED ONLY TO PUT REFERENCES TO THESE

```
 1    PARTICULAR DOCUMENTS ON YOUR CHART BECAUSE YOU THOUGHT THEY

 2    WOULD HELP APPLE, WHICH HAS COME BACK TO HIRE YOU NOW FOR THE

 3    15TH TIME; CORRECT?

 4    A.   NO, THAT'S NOT WHY THESE ARE HERE.

 5         (PAUSE IN PROCEEDINGS.)

 6    BY MR. QUINN:

 7    Q.   I'D LIKE TO CHANGE SUBJECTS NOW AND TALK ABOUT HOW YOU

 8    ARRIVED AT ALLOCATIONS OF WHAT SALES WOULD BE MADE, WHAT

 9    ADDITIONAL SALES APPLE WOULD MAKE IN WHAT YOU REFER TO AS THE

10    BUT FOR WORLD, THE WORLD WHERE SAMSUNG IS NOT PRACTICING THESE

11    SOFTWARE FEATURES.  OKAY?  ARE YOU WITH ME?

12    A.   I THINK SO.

13    Q.   YOU'VE SAID THAT THE SALES THAT SAMSUNG MADE WHICH IT

14    WOULDN'T HAVE MADE BUT FOR THE ALLEGED INFRINGEMENT, YOU CALL

15    THOSE CANDIDATES FOR LOST PROFITS?

16    A.   AT THE FIRST STAGE, THAT'S RIGHT.

17    Q.   RIGHT.  CANDIDATES FOR APPLE'S LOST PROFITS; RIGHT?

18    A.   YES, THAT'S WHAT'S AT ISSUE HERE.

19    Q.   RIGHT.  AND YOU HAVE THE OPINION THAT APPLE COULD HAVE

20    CAPTURED A PROPORTION OF THOSE CANDIDATE SALES EQUAL TO ITS

21    MARKET SHARE; CORRECT?

22    A.   ALMOST.

23    Q.   YOU MAKE AN ADJUSTMENT FOR THE CARRIERS, RIGHT, BECAUSE

24    NOT ALL PHONES ARE AVAILABLE ON ALL CARRIERS?

25    A.   I DO MAKE THAT ADJUSTMENT, TOO.
```

1    Q.   ALL RIGHT.  SO BASICALLY YOU IDENTIFIED THE NUMBER OF

2    UNITS BASED ON PROFESSOR HAUSER, OR THE NUMBER OF FEWER UNITS

3    THAT SAMSUNG WOULD HAVE SOLD AND THEN YOU DECIDE HOW MANY OF

4    THOSE APPLE COULD HAVE CAPTURED?

5    A.   IT'S -- IT'S VERY -- IT'S DIFFERENT BETWEEN THE OFF THE

6    MARKET PERIOD AND DIMINISHED DEMAND PERIOD.

7    Q.   I'M TALKING ABOUT DIMINISHED DEMAND.

8    A.   WE'RE ONLY TALKING ABOUT DIMINISHED DEMAND.  THAT'S

9    ESSENTIALLY CORRECT.

10   Q.   ALL RIGHT.  AND IN DECIDING HOW MANY OF THOSE CANDIDATE

11   SALES WOULD HAVE GONE TO APPLE, TO THAT GROUP, THE SALES THAT

12   SAMSUNG LOST, YOU APPLIED TO THAT APPLE'S MARKET SHARE; RIGHT?

13   YOU SAID APPLE WOULD HAVE -- OF THOSE SALES, APPLE WOULD HAVE

14   CAPTURED A NUMBER EQUAL TO ITS MARKET SHARE, ROUGHLY?

15   A.   VERY ROUGHLY.

16   Q.   ALL RIGHT.  AND YOU USE A MARKET SHARE, I THINK IT

17   VARIES -- I MEAN, IT'S SOMETHING LIKE -- IT'S CLOSE TO 40

18   PERCENT?

19   A.   SOMETIMES, YES.

20   Q.   AND YOU GOT THAT FROM THAT IDC DATABASE THAT YOU REFERRED

21   TO?

22   A.   THAT'S RIGHT.

23   Q.   ONE THING WE KNOW ABOUT THESE LOST -- THE SALES THAT

24   SAMSUNG WOULD HAVE LOST, BY DEFINITION, WE'RE TALKING ABOUT

25   SALES THAT OTHERWISE WOULD HAVE GONE TO SAMSUNG; RIGHT?  YOU'RE

```
1     SAYING SAMSUNG LOST THESE SALES BECAUSE THEY DON'T HAVE THE

2     FEATURES, AND THEY WOULD -- THESE ARE, BY DEFINITION, SALES

3     THAT SAMSUNG OTHERWISE WOULD HAVE HAD; CORRECT?

4     A.   I'M SORRY.  I HAVE NO IDEA WHAT THAT QUESTION MEANS.

5     Q.   ALL RIGHT.  YOU APPLY A MARKET SHARE ANALYSIS, APPLE'S

6     MARKET SHARE, TO A NUMBER OF SALES THAT SAMSUNG LOST; RIGHT?

7     A.   I APPLY IT TO SALES THAT SAMSUNG MADE BY INFRINGING --

8     Q.   RIGHT.

9     A.   -- THAT IT WOULDN'T HAVE MADE HAD IT NOT INFRINGED.

10    Q.   ALL RIGHT.  SO THE ONE THING THAT WE KNOW ABOUT THOSE

11    SALES ARE THOSE ARE PEOPLE -- SALES THAT SAMSUNG MADE FROM

12    PEOPLE THAT MADE A DECISION TO BUY AN ANDROID PHONE; CORRECT?

13    A.   THAT WOULD BE TRUE FOR ALL OF THE ACCUSED PHONES, YES.

14    Q.   AND THOSE ARE PEOPLE WHO DECIDED TO BUY A SAMSUNG ANDROID

15    PHONE; CORRECT?

16    A.   YES.

17    Q.   ALL RIGHT.  SO LET'S, LET'S SEE HOW REASONABLE THE

18    ASSUMPTION IS TO ASSUME THAT APPLE WOULD HAVE CAPTURED 40

19    PERCENT OF THOSE SALES.

20         WE HAVE A NOTE 2 PHONE, WHICH IS JX 31.

21         NOW, THIS -- YOU'RE FAMILIAR WITH THE SAMSUNG NOTE 2

22    PHONE; CORRECT?

23    A.   YES.

24    Q.   AND IT IS -- ONE THING WE CAN SAY IS A SAMSUNG NOTE 2 IS

25    VERY DIFFERENT THAN AN IPHONE; CORRECT?
```

1    A.   IN SOME RESPECTS IT IS.

2    Q.   ALL RIGHT.

3    A.   IN OTHERS IT'S VERY SIMILAR.

4    Q.   SOMEONE WHO WAS LOOKING FOR A NOTE 2 WAS LOOKING FOR

5    SOMETHING VERY DIFFERENT THAN AN IPHONE; TRUE?

6    A.   THAT IS NOT TRUE.

7    Q.   WELL, LET'S SEE.  THIS HAS A 5.5 INCH HD SUPER AMOLED

8    DISPLAY; CORRECT?

9    A.   IT DOES.

10   Q.   APPLE -- THE IPHONE DOESN'T HAVE THAT?

11   A.   THE APPLE PHONE DOES NOT HAVE THAT SAME DISPLAY.

12   Q.   IT HAS A STYLUS THAT YOU CAN TAKE OUT AND DO THINGS THAT

13   YOU OTHERWISE CAN'T DO; CORRECT?

14   A.   CORRECT.

15   Q.   APPLE DOESN'T HAVE THAT?

16   A.   THAT'S TRUE, TOO.

17   Q.   IT HAS THE ABILITY TO DO MULTI WINDOW BROWSING?

18   A.   YES.

19   Q.   IPHONE DOESN'T HAVE THAT?

20   A.   THAT'S CORRECT.

21   Q.   IT HAS A 1.6 GIGAHERTZ QUAD CORE SAMSUNG EXYNOS CHIP?

22   APPLE DOESN'T HAVE THAT?

23   A.   I'M PRETTY SURE APPLE DOESN'T HAVE A SAMSUNG CHIP AS TO

24   ITS CPU.  BUT IN TERMS OF ALL THAT OTHER STUFF YOU SAID, I'M

25   NOT SURE.

1    Q.   AND IT HAS THIS ABILITY TO DO NEAR FIELD COMMUNICATIONS BY

2    TAPPING THEM TOGETHER.  IPHONE DOESN'T HAVE THAT EITHER; RIGHT?

3    A.   THAT'S TRUE.

4    Q.   CAN WE AGREE THAT SOMEONE WHO IS LOOKING TO BUY THIS PHONE

5    WAS LOOKING TO BUY A PHONE THAT WAS VERY DIFFERENT THAN THE

6    IPHONE, HAS FEATURES VERY DIFFERENT THAN THE IPHONE?

7    A.   NO, SIR.  IF YOU LOOK AT THE INTERNAL DOCUMENTS AT

8    SAMSUNG, THEY IDENTIFY THE PEOPLE WHO BOUGHT THE NOTE AND ASKED

9    THEM WHAT OTHER PHONES THEY CONSIDERED, THE TOP PHONE WAS THE

10   IPHONE 5.

11   Q.   YOU'RE TALKING ABOUT PEOPLE WHO, BY DEFINITION, BOUGHT THE

12   NOTE; RIGHT?

13   A.   THAT'S RIGHT.  BUT THEIR TOP ALTERNATIVE CONSIDERATION WAS

14   THE IPHONE PRODUCT.

15   Q.   SO YOU THINK IT'S PERFECTLY REASONABLE TO ASSUME THAT

16   PEOPLE WHO DIDN'T BUY THIS PHONE, DECIDED NOT TO BUY THIS PHONE

17   BECAUSE IT DOESN'T HAVE THESE LITTLE SOFTWARE FEATURES, THAT

18   APPLE WOULD CAPTURE A NUMBER OF THOSE SALES FOR THE IPHONE THAT

19   WOULD BE EQUAL TO APPLE'S MARKET SHARE, NOTWITHSTANDING THE

20   FACT THAT THE IPHONE DOESN'T HAVE ANY OF THESE FEATURES?

21   A.   YES, BASED ON THOSE SURVEY DATA THAT I SAW, THE NUMBER

22   PROBABLY WOULD BE EVEN NORTH OF THE MARKET SHARE.  BUT I USED

23   THE MARKET SHARE.

24   Q.   I MEAN, SIR, ISN'T IT FAR MORE PLAUSIBLE THAT A PERSON WHO

25   DIDN'T BUY A NOTE AS AN ALTERNATIVE WOULD BUY ANOTHER LARGE

```
 1        SCREEN ANDROID PHONE?  ISN'T THAT --

 2        A.    ANOTHER NON --

 3        Q.    -- ISN'T THAT PLAUSIBLE?

 4        A.    ANOTHER NON-INFRINGING ANDROID PHONE OR --

 5        Q.    ANOTHER DROID PHONE?  THEY WOULD BE INCLINED TO BUY

 6        ANOTHER ANDROID PHONE?

 7        A.    DEPENDING ON THE CHARACTERISTICS OF THAT PHONE.

 8              BUT, AGAIN, THE IPHONE 5 WAS A TOP CONSIDERATION FOR THE

 9        PHONE YOU HAVE IN YOUR HAND, AND IT WAS ALSO A TOP

10        CONSIDERATION FOR THE S III.

11        Q.    ALL RIGHT.  IN DOING YOUR WORK, YOU'VE SEEN A LOT OF

12        SURVEYS ABOUT WHY PEOPLE BUY SMARTPHONES, HAVEN'T YOU?

13        A.    YES.

14        Q.    I MEAN, YOU KNOW APPLE DOES THOSE SURVEYS?

15        A.    THEY DO.

16        Q.    IF WE COULD TAKE A LOOK AT, FOR EXAMPLE, DEFENSE EXHIBIT

17        377, AND I'D LIKE TO SHOW -- I'LL SHOW PAGE 12 AND PAGE 15.

18              (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

19              MR. QUINN:  SO THIS IS IN EVIDENCE.  I'M TOLD, YOUR

20        HONOR, WE CAN DISPLAY PAGES 12 AND 13.

21              IF YOU CAN PUT UP 12.

22        Q.    THIS IS AN EXAMPLE -- WHEN YOU'RE WITH ME.

23        A.    I'M ALMOST THERE.

24        Q.    THIS IS AN INTERNAL APPLE DOCUMENT SURVEYING REASONS,

25        PRIMARY REASONS FOR PURCHASING AN IPHONE BY COUNTRY?
```

1     A.   THAT'S ONE OF THE THINGS IT STUDIES.  IT STUDIES A LOT OF

2     OTHER THINGS, TOO.

3     Q.   RIGHT.  ALONG THE LEFT-HAND SIDE WE HAVE HERE A LIST OF

4     REASONS FOR -- THAT CONSUMERS GAVE FOR PURCHASING AN IPHONE,

5     CORRECT, ALONG THE LEFT-HAND SIDE?

6     A.   YES, I SEE THAT.

7     Q.   AND YOU SEE DOWN HERE ONLY 16 PERCENT SAID THEY WANTED A

8     SPECIFIC IPHONE MODEL FEATURE OR CAPABILITY?

9          DO YOU SEE THAT?

10    A.   I DO.

11    Q.   AND THEN IF YOU TURN TO PAGE 15 OF THIS DOCUMENT, APPLE

12    ACTUALLY DID A SURVEY TO SEE WHAT FEATURES, YOU KNOW, PEOPLE

13    WHO CARED ABOUT SPECIFIC FEATURES, WHAT FEATURES WERE THEY

14    LOOKING FOR?

15         DO YOU SEE THAT?

16    A.   I DO.

17    Q.   AND YOU SEE A LIST HERE, YOU KNOW, SIRI, MEGAPIXEL CAMERA,

18    THE WEIGHT, RETINA DISPLAY, THINNESS, PHYSICAL APPEARANCE AND

19    DESIGN, LTE, BATTERY LIFE.  IT GOES ON.  DO YOU SEE A LIST

20    THERE --

21    A.   I SEE A LIST.

22    Q.   -- OF THE DIFFERENT FACTORS?

23         AND I WON'T TAKE THE TIME TO GO THROUGH ALL OF THEM, BUT

24    YOU'VE SEEN OTHER SURVEYS LIKE THIS THAT LIST THE FEATURES THAT

25    PEOPLE IDENTIFY AS THE REASONS THEY BUY SMARTPHONES; CORRECT?

1     A.   SOME OF THE FEATURES THAT CONTRIBUTED TO THEIR REASONS,

2     YES.

3     Q.   YEAH.  AND HAVE YOU EVER SEEN, YOU KNOW, A SURVEY THAT

4     SHOWED PEOPLE SAID, YOU KNOW, WHAT I REALLY WANT IN A PHONE IS

5     THREE COMPONENT BACKGROUND SYNCING?  HAVE YOU EVER SEEN THAT?

6     A.   I'VE NEVER SEEN THAT.  THAT WOULDN'T MAKE SENSE --

7     Q.   RIGHT.

8     A.   -- AS SOMETHING TO DO IN A SURVEY.  THAT'S NOT LANGUAGE --

9     CONSUMERS UNDERSTAND THE NATURE OF THE USER EXPERIENCE, BUT

10    THAT KIND OF TECHNICAL BACKGROUND AS TO WHAT'S HAPPENING THAT'S

11    CREATING THE EXPERIENCE, THAT WOULDN'T MAKE SENSE TO SURVEY

12    THAT.

13    Q.   RIGHT.  NOT JUST TECHNICAL BACKGROUND, BUT YOU'VE NEVER

14    SEEN SURVEYS THAT WHERE CONSUMER SAID, WELL, THE REASON I BUY

15    THIS PHONE IS I WANT TO MAKE SURE THAT IT SYNCS IN BACKGROUND.

16    THERE ISN'T A SURVEY THAT YOU'VE GOT THERE IN YOUR BINDERS THAT

17    SEE THAT?

18    A.   NO.  IF I CAN FINISH, THAT'S JUST NOT HOW THESE

19    FEATURES -- I'M SORRY -- THAT'S NOT HOW THESE INVENTIONS FACTOR

20    INTO CONSUMER SATISFACTION WITH THE PHONE.

21    Q.   ALL RIGHT.

22    A.   THAT'S THE GENERAL USER EXPERIENCE THAT IT, THAT IT

23    CONTRIBUTES TO.

24    Q.   OKAY.  AND, YOU KNOW, BY THE WAY, YOU UNDERSTAND THAT IF

25    SOMEBODY WANTED TO COPY APPLE'S CLAIMED, YOU KNOW, THREE

```
 1    COMPONENT BACKGROUND SYNCING TECHNOLOGY, THEY COULDN'T LOOK AT

 2    AN IPHONE TO COPY IT BECAUSE APPLE DOESN'T DO IT?  YOU

 3    UNDERSTAND THAT?

 4    A.   AGAIN, I'M NOT A TECHNICAL EXPERT, BUT MY UNDERSTANDING IS

 5    THAT THE -- WITH RESPECT TO THE '414 PATENT, APPLE DOESN'T

 6    PRACTICE THE ASSERTED CLAIM.

 7    Q.   ALL RIGHT.  AND THAT'S TRUE OF THREE OF THE PATENTS, THAT

 8    APPLE ADMITS THAT THREE OF THE PATENT CLAIMS THAT IT IS SUING

 9    ON HERE, IT DOESN'T PRACTICE?

10    A.   THAT'S MY UNDERSTANDING.

11    Q.   ALL RIGHT.  AND NOBODY COULD COPY THOSE FEATURES BY

12    LOOKING AT AN IPHONE BECAUSE APPLE DOESN'T DO IT, DOESN'T DO

13    THOSE CLAIMS, DOESN'T PRACTICE THOSE CLAIMS; CORRECT?

14    A.   YEAH.  I DON'T KNOW HOW THAT ALL WORKS.  I'M JUST NOT

15    TECHNICALLY ADVANCED IN THAT WAY.

16    Q.   AND IF I ASKED YOU ABOUT THESE OTHER PATENT CLAIMS,

17    WHETHER YOU'VE EVER SEEN, YOU KNOW, A SURVEY WHERE SOMEBODY

18    SAYS, YOU KNOW, WHAT I'M REALLY LOOKING FOR IN A PHONE IS

19    LINKING STRUCTURES TO ACTIONS, YOU'VE NEVER SEEN THAT?

20    A.   NO.  IT WOULDN'T SAY THAT.

21    Q.   OR --

22    A.   I WOULDN'T EXPECT THAT.

23    Q.   OR EVEN, YOU KNOW, WHAT I'M REALLY LOOKING FOR IN A PHONE

24    IS, YOU KNOW, THE ABILITY TO SEARCH WITH ONE BUTTON AND GET

25    SEARCH RETURNS LOCALLY ON THE PHONE AS WELL AS ON THE INTERNET.
```

1        THAT'S REALLY WHY I BUY THIS PHONE.

2            YOU HAVEN'T SEEN THAT, EITHER?

3        A.   I HAVEN'T SEEN SOMETHING WITH THAT LEVEL OF DETAIL.  THAT

4        WOULDN'T MAKE SENSE --

5        Q.   ALL RIGHT.

6        A.   -- TO DO A SURVEY THAT WAY.

7        Q.   LET ME ASK YOU THIS:  BY THE WAY, IS IT IMPORTANT TO YOU

8        AT ALL -- I MEAN, YOU'VE COME HERE, YOU'VE SPENT A LOT OF TIME

9        AND BEEN PAID A LOT OF MONEY AND YOU'RE OBVIOUSLY VERY

10       EXPERIENCED AT WHAT YOU DO AND YOU'VE DONE IT A LOT FOR APPLE,

11       AND YOU'VE COME AND PRESENTED HUGE DAMAGES CLAIM, OVER $2

12       BILLION; CORRECT?

13       A.   THAT'S THE NUMBER, YES.

14       Q.   RIGHT.  WAS IT IMPORTANT TO YOU, IN YOUR DAMAGES ANALYSIS,

15       AS TO WHETHER APPLE EVEN CONSIDERS THESE FEATURES IMPORTANT

16       ENOUGH ITSELF TO USE THEM IN THE IPHONE?  WAS THAT IMPORTANT TO

17       YOU IN YOUR ANALYSIS IN COMING UP WITH THIS $2 BILLION PLUS

18       CLAIM?

19       A.   SURE, I TOOK THAT INTO CONSIDERATION.

20       Q.   AND, YOU KNOW, IN YOUR -- DID THAT INCREASE THE VALUE IN

21       YOUR MIND, THE FACT THAT APPLE DOESN'T DO IT?

22       A.   NO, THAT'S NOT -- THAT'S NOT THE EFFECT.

23       Q.   SO YOU USED THAT AS A FACTOR TO HOLD DOWN THE NUMBER?

24       A.   NO, THAT WOULDN'T BE THE FACTOR EITHER.  I'M REALLY

25       FOCUSSED ON THE BENEFIT SAMSUNG GOT FROM USING THE PATENTED

```
 1        INVENTIONS IN TERMS OF WHERE THAT MEANT THEIR SALES WERE GOING

 2        TO GO.

 3        Q.   I SEE.  NOW, YOU'VE SAID THAT YOU REVIEWED WHAT DR. HAUSER

 4        DID AND YOU THOUGHT IT WAS PERFECTLY FINE.

 5        A.   THERE WAS THE NUMBERS.  I DIDN'T SEE ANYTHING IN THE

 6        NUMBERS THAT SEEMED OUT OF KILTER FOR ME.

 7        Q.   RIGHT.

 8        A.   I DIDN'T GO INTO THE NITTY GRITTY OF THE SURVEY DESIGN AND

 9        ALL OF THAT.  I'M NOT A CONJOINT EXPERT.

10        Q.   WELL, YOU THOUGHT THAT IT WAS APPROPRIATE FOR YOU -- I

11        MEAN, YOU SATISFIED YOURSELF, AS AN EXPERT, YOU THOUGHT IT WAS

12        APPROPRIATE FOR YOU TO RELY ON DR. HAUSER'S SURVEY; CORRECT?

13        A.   YES.

14        Q.   NOW, DOES IT STAND TO REASON TO YOU THAT IF YOU SURVEY

15        PEOPLE ABOUT VERY SMALL FEATURES AND LEAVE OUT THE LARGE ONES,

16        IT WILL MAKE THE SMALL ONES SEEM MORE IMPORTANT?  DOES THAT

17        SEEM RIGHT TO YOU?

18        A.   NO, THAT'S NOT NECESSARILY A PROBLEM AT ALL.

19        Q.   WELL, HOW ABOUT IF YOU TAKE SURVEY PARTICIPANTS, YOU KNOW,

20        YOU READ TO THEM DESCRIPTIONS OF FEATURES, YOU GIVE THEM AN

21        ICON TO REMIND THEM WHAT THE FEATURE IS, YOU HAVE THEM WATCH A

22        VIDEO DESCRIBING THE FEATURE, YOU DO ALL THOSE THINGS TO

23        EDUCATE THEM AND EMPHASIZE THE FEATURES, DO YOU THINK THAT

24        MIGHT MAKE IT SEEM MORE IMPORTANT TO THE PEOPLE, THOSE FEATURES

25        SEEM MORE IMPORTANT TO THE PEOPLE WHO PARTICIPATE IN THE
```

1    SURVEY?

2    A.   WELL, SEE, NOW YOU'RE GETTING MUCH MORE INTO THE NITTY

3    GRITTY OF THE EXECUTION OF THE SURVEY AND YOU'RE STEPPING

4    BEYOND MY FIELD.  SO I DON'T KNOW.  I DON'T.

5    Q.   ISN'T THIS -- YOU ARE RELYING ON THIS SURVEY TO TELL THE

6    JURY THAT SAMSUNG OWES APPLE $2 BILLION; RIGHT?

7    A.   FOR PART OF THAT, YES.

8    Q.   YEAH.  AND YOU ARE NOT WILLING TO OPINE WHETHER OR NOT YOU

9    CAN MAKE SMALL FEATURES SEEM MORE IMPORTANT BY HAVING PEOPLE

10   WATCH VIDEOS ABOUT THEM, YOU KNOW, EDUCATE THEM ABOUT THEM,

11   GIVING THEM DESCRIPTIONS, LEAVING OUT THE LARGE FEATURES, YOU

12   DON'T HAVE AN OPINION ABOUT THAT?

13   A.   DR. HAUSER ADDRESSED ALL OF THOSE ISSUES AND HE'S THE

14   EXPERT ON THIS, AND I UNDERSTAND HIS EXPLANATIONS.  THEY MADE

15   SENSE TO ME.

16        BUT I'M NOT THE EXPERT.

17   Q.   ARE YOU TRYING TO DISTANCE YOURSELF NOW FROM DR. HAUSER?

18   A.   NO.  I DEFINITELY USED HIS NUMBERS.

19   Q.   THERE'S BEEN SOME DISCUSSION OF THE GALAXY NEXUS.  I MEAN,

20   YOU'RE AWARE THAT THE SAMSUNG GALAXY NEXUS, THAT ALL THE

21   OPERATING SYSTEM HARDWARE ON THAT, ALL THE APPLICATIONS -- I'M

22   SORRY -- ALL THE OPERATING SYSTEM SOFTWARE ON THE GALAXY NEXUS,

23   ALL OF THE APPLICATION SOFTWARE ON THE GALAXY NEXUS IS PURE

24   ANDROID?  YOU'RE AWARE OF THAT?

25   A.   I'VE HEARD THAT SAID QUITE A NUMBER OF TIMES, BUT I DON'T

```
 1        INDEPENDENTLY HAVE KNOWLEDGE OF THAT.

 2        Q.   ALL RIGHT.

 3        A.   BUT I'VE HEARD THAT.

 4        Q.   ALL RIGHT.  AND YOU KNOW THAT ALL THAT SOFTWARE IS MADE BY

 5        GOOGLE, NOT SAMSUNG.  TRUE?

 6        A.   AGAIN, THAT'S MY UNDERSTANDING.

 7        Q.   RIGHT.

 8        A.   BUT I DON'T -- I DON'T KNOW THAT PERSONALLY.

 9        Q.   BUT YOU KNOW THAT SAMSUNG IS BEING SUED ON THE GALAXY

10        NEXUS FOR INFRINGING ALL FIVE PATENT CLAIMS IN THIS CASE;

11        RIGHT?

12        A.   YES.

13        Q.   YOU KNOW THAT?

14        A.   YES.  THEY SELL --

15        Q.   ON THE SOFTWARE MADE BY GOOGLE?

16        A.   ON THE PHONES THAT THEY SELL AND COLLECT A REVENUE ON.

17        Q.   ALL RIGHT.  AND IT'S YOUR OPINION THAT, YOU KNOW, THESE

18        PARTICULAR PATENT CLAIMS, YOU KNOW, THEY'RE SO IMPORTANT THAT

19        THEY REALLY -- THEY'RE SIGNIFICANT FEATURES IN DRIVING SALES?

20        THAT'S YOUR OPINION, ISN'T IT, SIR?

21        A.   FOR SOME CONSUMERS, YES.

22        Q.   ALL RIGHT.  SO IF WE CAN TAKE A LOOK AT PLAINTIFF'S

23        EXHIBIT 92.19.  IT'S ONE OF YOUR DEMONSTRATIVES -- WELL, THIS

24        IS CONFIDENTIAL, SO JUST FOR THE JURY.

25             THIS IS A -- YOU PREPARED THIS, SIR?
```

1    A.   YES.

2    Q.   THIS IS A COMPARISON OF GALAXY NEXUS SALES VERSUS THE

3    OTHER ACCUSED PRODUCTS; RIGHT?

4    A.   IT IS.

5    Q.   RIGHT.  THE GALAXY NEXUS IS ALLEGED TO INFRINGE ALL FIVE

6    OF THESE SUPPOSEDLY SUPER VALUABLE PATENT CLAIMS; RIGHT?

7    A.   YES.

8    Q.   DIDN'T DO VERY WELL, DID IT?

9    A.   IT HAD SOME SALES, BUT, NO, IT WASN'T NEARLY AS SUCCESSFUL

10   AS THE OTHERS.

11   Q.   COMPARED TO, SAY, THE S III, WHICH IS ONLY ALLEGED TO

12   PRACTICE -- ONLY ALLEGED TO PRACTICE THREE OF THE CLAIMS;

13   RIGHT?

14   A.   THAT'S RIGHT.

15   Q.   ALL RIGHT.  SO DOES THIS, THIS FACT, DOES THIS CAUSE YOU

16   TO QUESTION AT ALL WHETHER THESE SMALL SOFTWARE FEATURES

17   ACTUALLY DO DRIVE SALES SINCE THE NEXUS HAD ALL FIVE OF THEM

18   AND IT DIDN'T REALLY DO VERY WELL?

19   A.   NO.

20   Q.   DID THAT CAUSE YOU TO QUESTION THAT AT ALL?

21   A.   NO, NOT AT ALL.  THERE ARE OTHER FEATURES THAT DRIVE

22   DEMAND IN ADDITION TO THESE, AND THESE CONTRIBUTED.  BUT OTHER

23   THINGS HELP, TOO, AND SOMETIMES THOSE GENERATED SUBSTANTIAL

24   SALES BECAUSE THOSE WERE GOOD FEATURES, TOO.

25        BUT YOU NEEDED THESE FEATURES TO HAVE A GOOD USER

```
 1    EXPERIENCE AND IF THEY DIDN'T HAVE IT, THE SALES WOULD HAVE

 2    BEEN LOWER, AND THAT'S TRUE FOR ALL OF THESE FEATURES.

 3              MR. QUINN:  NOTHING FURTHER.

 4              THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:58.

 5              MR. BENNETT:  MAY I ASK COUNSEL FOR THE

 6    DEMONSTRATIVES 507.

 7              MR. QUINN:  WHICH ONE IS THAT?

 8              MR. BENNETT:  THE ONE YOU MADE HERE.

 9              MR. QUINN:  ALL RIGHT.  I'VE GOT TO FIND IT.

10         (PAUSE IN PROCEEDINGS.)

11              THE COURT:  ALL RIGHT.  TIME IS 1:59.  GO AHEAD,

12    PLEASE.

13              MR. BENNETT:  THANK YOU, YOUR HONOR.

14                        REDIRECT EXAMINATION

15    BY MR. BENNETT:

16    Q.  VERY BRIEFLY, DR. VELLTURO, IF YOU LOOK AT THIS

17    DEMONSTRATIVES THAT MR. QUINN WAS CREATING UP HERE -- DO YOU

18    HAVE THAT ON YOUR SCREEN?

19    A.  I DO.

20    Q.  I THINK HE CALLED OUT TO YOU THE FACT THAT DURING THIS

21    TIME PERIOD, THE GALAXY S II, THE GALAXY S III, AND THE GALAXY

22    NOTE PRODUCT WERE ALL INTRODUCED INTO THE U.S. MARKET BY

23    SAMSUNG.

24         DO YOU RECALL THAT?

25    A.  I DO.
```

1    Q.   AND THOSE THREE PRODUCTS, ARE THOSE THE THREE LARGEST

2    DRIVERS OF DAMAGES IN THIS CASE?

3    A.   BY FAR.

4    Q.   AND THE GALAXY S II, AND THE GALAXY S III, DID THEY ALL

5    INCLUDE THE -- YOU HAD -- THE JURY SAW EARLIER, I WOULDN'T

6    BRING IT UP NOW -- WELL, WE CAN ACTUALLY, 92.18, IT'S

7    CONFIDENTIAL, YOUR REVEALED PREFERENCE CHART.

8         DID THOSE PRODUCTS ALL INCLUDE THE INVENTIONS OF THE QUICK

9    LINKS INVENTION?

10   A.   THEY ALL DID.

11   Q.   DID THEY ALL INCLUDE THE BACKGROUND SYNC?

12   A.   YES.

13   Q.   AND DID THEY INCLUDE THE UNIVERSAL SEARCH FEATURE?

14   A.   YES.

15   Q.   AND MR. QUINN WAS UP HERE, HE WAS WAVING AT YOU A, A

16   SAMSUNG PRODUCT AND ASKING YOU, WELL, GEE, DIDN'T ALL THESE

17   PEOPLE BUY THIS PRODUCT BECAUSE OF THESE DIFFERENT FEATURES.

18        AND I WANT TO MAKE SURE THE ANSWER YOU WERE TRYING TO GIVE

19   WAS CLEAR TO THAT.  YOU REFERRED TO AN INTERNAL SAMSUNG

20   DOCUMENT THAT SAID WHAT ABOUT WHO SAMSUNG WAS BEATING IN THE

21   MARKETPLACE WHEN THEY WERE GETTING SALES WITH THESE PRODUCTS?

22   A.   THERE'S AN INTERNAL SAMSUNG DOCUMENT WHERE THEY -- IT'S

23   CALLED -- IT'S A REGISTRATION SURVEY, SO IT'S PEOPLE THAT

24   REGISTERED THEIR NEW PHONE WHERE THEY SURVEYED PEOPLE THAT HAD

25   BOUGHT THE NOTE AND ASKED THEM WHAT OTHER PHONES THEY HAD

```
 1        CONSIDERED IN THEIR PURCHASE DECISION.

 2             AND THE TOP PHONE, BY FAR, IN THAT CONSIDERATION WAS THE

 3        IPHONE 5.

 4        Q.   AND MR. QUINN USED THE TERM "MINOR FEATURES" OVER AND OVER

 5        AGAIN IN ASKING YOU QUESTIONS.

 6             DID YOU SEE, IN YOUR ANALYSIS OF THE TECHNOLOGY, INCLUDING

 7        SIDE-BY-SIDE COMPARISONS, NOT JUST THE ONES YOU SHOWED THE JURY

 8        BUT MANY, MANY MORE IN SAMSUNG'S FILES, THAT AS TO THESE MINOR

 9        FEATURES, THEY WERE INCORPORATED INTO THE SAMSUNG PRODUCTS BY

10        DESIGNERS MAKING CHOICES BASED UPON SIDE-BY-SIDE COMPARISONS OF

11        THEIR PRODUCTS AND THE IPHONE?

12        A.   YES, I DID.

13             MR. BENNETT:  NOTHING FURTHER.

14             THE COURT:  ALL RIGHT.  THE TIME IS NOW 2:02.

15        REDIRECT?  I MEAN RECROSS?  EXCUSE ME.

16             MR. QUINN:  NOTHING FURTHER.

17             THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

18        I ASSUME IT'S SUBJECT TO RECALL.

19             MR. BENNETT:  SUBJECT TO RECALL, YES, YOUR HONOR.

20             THE COURT:  ALL RIGHT.  THEN YOU MAY BE EXCUSED.

21             THE WITNESS:  THANK YOU, YOUR HONOR.

22             THE COURT:  SUBJECT TO RECALL.

23             MR. MCELHINNY:  AT THIS TIME, YOUR HONOR, APPLE RESTS

24        ITS CASE-IN-CHIEF.

25             THE COURT:  ALL RIGHT.  I'M ASSUMING WE'LL BE HAVING
```

1        SOME DISCUSSION; CORRECT?

2            ALL RIGHT.  THEN I THINK IT MAKES SENSE TO EXCUSE OUR

3    JURY, AND WE WILL NEED SOME TIME TO HANDLE SOME MATTERS OUTSIDE

4    YOUR PRESENCE.  SO WE'RE GOING TO GO AHEAD AND TAKE WHAT WOULD

5    OTHERWISE BE OUR 2:15 BREAK.  WE'LL GO AHEAD AND TAKE IT NOW.

6            YOU MAY STEP DOWN.

7                THE WITNESS:  THANK YOU.

8                THE COURT:  SO THE TIME IS NOW 2:03.  WHY DON'T WE

9    BREAK UNTIL 2:25.  ALL RIGHT?  THANK YOU.

10           IF WE CAN FINISH SOONER, WE WILL.  BUT I THINK THAT WOULD

11   BE SAFER.  ALL RIGHT?

12           PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

13           (JURY OUT AT 2:03 P.M.)

14               THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

15           AND PLEASE TAKE A SEAT.

16           LET ME ALSO JUST PUT ON THE RECORD SOME OF THE

17   CONVERSATIONS WE'VE HAD WHEN THERE WAS NO TRANSCRIPT, AND THAT

18   WAS EARLIER THIS MORNING.

19           ONE WAS I HAD INFORMED THE PARTIES THAT DURING THE MORNING

20   BREAK I HAD ISSUED THE SEALING ORDER ON PS 229, AND THE PARTIES

21   PLACED ON THE RECORD THAT THEY WOULD TRY TO SEEK A STIPULATION

22   AS TO SOME OF THE PRIOR ART INVENTORS, AND ALSO TRY TO NARROW

23   THE NUMBER -- THERE'S NO WAY WE'RE DOING 14 SAMSUNG WITNESSES

24   ON MONDAY.  SO I THINK IT'S UNNECESSARY TO MAKE CHAMBERS WORK

25   OVER THE WEEKEND ON OBJECTIONS FOR 14 WITNESSES.  THAT'S AN

```
 1        EIGHTH AMENDMENT VIOLATION, OKAY?

 2             (LAUGHTER.)

 3                  THE COURT:  SO LET'S FIGURE OUT HOW WE'RE GOING TO

 4        FIX THAT.

 5                  MS. MAROULIS:  YOUR HONOR, PRIOR TO THE LUNCH BREAK,

 6        I FORWARDED TO COUNSEL FOR APPLE A LIST OF SIX PRIOR ARTISTS

 7        THAT WE WILL WITHDRAW FROM MONDAY'S WITNESS LIST IF THERE IS A

 8        STIPULATION.

 9                  THE COURT:  OKAY.

10                  MS. MAROULIS:  THEIR NAMES ARE FUHR, F-U-H-R;

11        PFEIFER, P-F-E-I-F-E-R; STEDFAST, S-T-E-D-F-A-S-T; DE ICAZA,

12        D-E I-C-A-Z-A; FRID-NILSON; AND BIER.

13             WE'RE WAITING A RESPONSE FROM APPLE, AND I UNDERSTAND

14        THEY'RE CONFERRING INTERNALLY AND WE'RE HOPING TO INFORM THE

15        COURT EITHER BY THE END OF THE COURT DAY OR IMMEDIATELY

16        THEREAFTER ON WHETHER THE COURT NEEDS TO ADDRESS OBJECTIONS OR

17        RESPONSES TO THOSE SIX WITNESSES.

18                  THE COURT:  OKAY.  WELL, WHAT ABOUT -- YOU HAVE 17

19        WITNESSES IDENTIFIED, ONE OF THEM IS A TECHNICAL EXPERT,

20        CORRECT, DR. JEFFAY.  SO I JUST REALLY DON'T THINK MONDAY WE'RE

21        GOING TO HAVE THAT MANY WITNESSES, ESPECIALLY BECAUSE WE MAY

22        NOT GET TO VERY MANY OF THE WITNESSES TODAY.

23                  MS. MAROULIS:  YOUR HONOR, WE WOULD DISCLOSE 12 FOR

24        MONDAY.  I THINK MR. LEE MISCONSTRUED SOME NUMBERS

25        INADVERTENTLY BECAUSE WE HAD -- IF WE TAKE OFF THOSE SIX PEOPLE
```

1    THAT I JUST READ, WE WILL HAVE SIX SETS OF FOLKS ON WHICH

2    OBJECTIONS WILL BE MADE.

3        SO THE COURT WOULD ONLY NEED TO CONSIDER OBJECTIONS ON SIX

4    WITNESSES FOR MONDAY LINEUP.  BECAUSE THE COURT --

5            THE COURT:  WELL, THIS ISN'T A HUGE HELP BECAUSE --

6    WELL, SO HOW MANY WITNESSES ARE THERE THAT, THAT CHAMBERS HAS

7    TO RULE ON OVER THE WEEKEND?

8            MS. MAROULIS:  SIX, YOUR HONOR.  IF APPLE WITHDRAWS,

9    OR IF APPLE AGREES TO WITHDRAW THESE OTHER 6, BECAUSE THERE

10   WERE A TOTAL DISCLOSED FOR MONDAY OF 12 --

11           THE COURT:  I GUESS I'M KIND OF CONFUSED BECAUSE WE

12   ALREADY RULED LAST NIGHT ON OBJECTIONS FOR SEVEN OF SAMSUNG'S

13   WITNESSES.

14           MS. MAROULIS:  YOUR HONOR, IT WAS FIVE.

15           THE COURT:  SO YOU'RE SAYING IN ADDITION, IN

16   ADDITION -- WELL, YOU IDENTIFIED SEVEN WITNESSES ON YOUR

17   WITNESS LIST, AND WHATEVER OBJECTIONS THERE WERE TO THOSE

18   SEVEN, WE RULED ON LAST NIGHT.

19       SO YOU'RE SAYING IN ADDITION, YOU THINK YOU'RE GOING TO

20   GET SIX MORE WITNESSES ON MONDAY IN ADDITION TO THE SEVEN

21   YOU'VE ALREADY DISCLOSED?  SO WE'RE GOING TO HAVE 13 WITNESSES

22   BY MONDAY?

23           MS. MAROULIS:  NO, YOUR HONOR.  WE WILL HAVE SIX

24   WITNESSES ON MONDAY, BECAUSE WHAT HAPPENED IS WE NEED TO

25   DISCLOSE THE ROLLING LIST OF SEVEN, OUT OF THOSE SEVEN, FIVE

```
1        WITNESSES WERE SUBJECT TO HPO DISCLOSURES AND SUBJECT TO RULING

2        BY THE COURT.

3             THE OTHER TWO ARE ACTUALLY SUBJECT TO THIS MORNING'S

4        DISCLOSURES.  SO FOR MONDAY, THE TOTAL NUMBER OF WITNESSES

5        DISCLOSED TO APPLE THIS MORNING WAS 12.  IF WE CAN TAKE OFF THE

6        TABLE SIX, THEN THE COURT ONLY HAS TO RULE ON SIX, ONE EXPERT

7        AND FIVE LIVE.

8                  THE COURT:  WELL, THIS IS WHAT I'M GOING TO DO --

9                  MS. MAROULIS:  OKAY.

10                 THE COURT:  - I THINK YOU'RE HOLDING THE PRIOR ART

11       INVENTORS HOSTAGE IN EXCHANGE FOR DOING ANY FURTHER NARROWING

12       ON SAMSUNG'S PART IS NOT FAIR.

13            SO WHAT WE'RE GOING TO DO IS LET'S SEE HOW FAR WE GET BY

14       4:30 TODAY AND -- BECAUSE YOU'VE ALREADY DISCLOSED SEVEN

15       WITNESSES FOR TODAY, AND LET'S SEE HOW FAR YOU GET AND THEN I'D

16       LIKE YOU TO REASSESS AFTER THAT WHETHER THE COURT HAS TO SPEND

17       THE TIME DOING 13 OR 14 WITNESSES BY MONDAY.

18            I DON'T THINK THAT'S REALISTIC JUST IN TERMS OF THE

19       TIMING.

20            SO WHY DON'T WE REASSESS AFTER YOU SEE HOW FAR YOU GET

21       WITH THE SEVEN WITNESSES YOU'VE DISCLOSED FOR TODAY.

22                 MS. MAROULIS:  YES, YOUR HONOR.

23                 THE COURT:  OKAY.

24                 MS. MAROULIS:  WE WILL REPORT AT 4:30.

25                 THE COURT:  OKAY.
```

1          MS. MAROULIS:  MAY WE NOW PROCEED TO SAMSUNG'S JMOL?

2          THE COURT:  YES, PLEASE.

3          MS. MAROULIS:  YOUR HONOR, SAMSUNG MOVES FOR JMOL ON

4     A NUMBER OF ISSUES ON WHICH APPLE FAILED TO MEET ITS BURDEN.

5          FIRST, THERE IS A SHORT MOTION REGARDING THE PRACTICE OF

6     PATENTS.  THE EVIDENCE CONCLUSIVELY ESTABLISHED THAT APPLE

7     FAILED, AS A MATTER OF LAW, TO PROVE THAT IT PRACTICED --

8     PRACTICES NOW OR EVER PRACTICED THE FIVE ASSERTED CLAIMS AT

9     ISSUE.

10         AS TO THREE OF THEM, THERE'S NO DISPUTE AND, IN FACT,

11    EXPRESS ADMISSIONS FROM APPLE, SPECIFICALLY, THOSE ARE '959,

12    '414, AND 172 ASSERTED CLAIMS.  THERE'S AN ORDER ON THE MOTION

13    IN LIMINE AT DOCKET 1398.

14         THERE IS ALSO A STATEMENT OF UNDISPUTED FACT NUMBER 17 IN

15    JOINT PRETRIAL STATEMENT ON DOCKET 1377.

16         AND IN THE MOST RECENT BRIEF THAT APPLE SUBMITTED AT THE

17    INVITATION OF THE COURT TO SHOW ANY EVIDENCE OF PAST OR CURRENT

18    PRACTICE, APPLE ADMITTED THAT THERE'S GOING TO BE NO EXPERT

19    TESTIMONY AS TO THOSE PATENTS.

20         THAT BRIEF IS AT DOCKET 1567.

21         SO AS TO THREE PATENTS AND ASSERTED CLAIMS, THERE'S NO

22    DISPUTE AT ALL.

23         WITH RESPECT TO THE '647 PATENT, APPLE'S EXPERT,

24    DR. MOWRY, DID NOT PROVIDE ANY OPINION AS TO WHETHER APPLE

25    PRACTICES THE ASSERTED CLAIM.  HE DID NOT PROVIDE ANY TESTIMONY

```
 1          ON THE SUBJECT.

 2               AS THE COURT KNOWS FROM EXCLUDING APPLE'S LAY WITNESS,

 3     MR. DENIAU, FROM PROVIDING ANY PRACTICE TESTIMONY, LAY

 4     WITNESSES CANNOT PROVIDE SUCH COMPARISON AND TESTIFIED ON THE

 5     PRACTICE OF PATENTS IN A NUMBER OF CASES, SUCH AS GART VERSUS

 6     LOGITECH AND LASER DESIGN V. BJ CRYSTAL, AND THE COURT

 7     CONCLUDED THAT LAY WITNESSES CANNOT ESTABLISH PRACTICE.

 8               THERE WAS NO IOS CODE OR DEVICES INTRODUCED DURING

 9     DR. MOWRY'S TESTIMONY OR ANY OTHER APPLE WITNESS TESTIMONY.

10               SO AS TO THE '647 PATENT, THERE WAS ALSO INCONCLUSIVE LACK

11     OF EVIDENCE THAT THEY PRACTICE THE ASSERTED CLAIM.

12               FINALLY, WITH RESPECT TO THE '721 PATENT, THERE WAS VERY

13     MINOR CONCLUSORY TESTIMONY BY DR. COCKBURN.

14               HOWEVER, ALL HE DID WAS TO SHOW A DEMONSTRATIVE VIDEO.  HE

15     DID NOT PROVIDE A LIMITATION-BY-LIMITATION ANALYSIS

16     ESTABLISHING THAT APPLE PRACTICES CLAIM 8 AS TO CURRENT VERSION

17     OR ANY VERSIONS.

18               MOREOVER, APPLE DID NOT EVEN INTRODUCE ANY APPLE DEVICES

19     THROUGH THIS EXPERT OR ANY APPLE SOURCE CODE.

20               SO IN SUMMARY, ALL OF THE ASSERTED CLAIMS, THERE'S --

21     CLEARLY JMOL IS APPROPRIATE AS A MATTER OF LAW.

22               STEMMING FROM THIS ISSUE AND RELATED TO IT IS THE FACT

23     THAT SAMSUNG SHOULD OBTAIN JMOL ON THE SUBJECT OF ALLEGED

24     COPYING.

25               APPLE HAS CLAIMED THAT COPYING IS RELEVANT TO A NUMBER OF
```

 1    DIFFERENT AREAS OF THIS CASE FROM WILLFULNESS TO DAMAGES TO

 2    OBVIOUSNESS, AND APPLE MADE A -- MADE COPYING A BIG PART OF THE

 3    CASE.

 4         HOWEVER, AS THE CASE FROM THE FEDERAL CIRCUIT AND DISTRICT

 5    COURTS EXPLAINS, ANY ALLEGED COPYING HAS TO HAVE SOME

 6    TECHNOLOGICAL NEXUS TO THE PATENTED INVENTIONS.

 7         BECAUSE APPLE DOES NOT PRACTICE AND HAS NOT PRACTICED ANY

 8    OF THE ASSERTED CLAIMS AT ISSUE, AS JUST DISCUSSED, APPLE

 9    CANNOT SHOW ANY COPYING THAT IS RELEVANT TO THIS CASE AND SOME

10    FORM OF SUMMARY -- SOME FORM OF JMOL SHOULD BE ENTERED AND AN

11    APPROPRIATE JURY INSTRUCTION SHOULD BE ISSUED.

12         THE CASES THAT ESTABLISH THE COPYING MUST RELATE TO

13    ASSERTED CLAIM TO SUPPORT A FINDING OF WILLFULNESS ARE, AMONG

14    OTHERS, LEAPFROG ENTERPRISES VERSUS FISHER PRICE, VNUS MEDICAL

15    TECHNOLOGIES VERSUS DIOMED HOLDINGS, AND ICU MEDICAL VERSUS

16    RYMED TECHNOLOGIES.  THEY ARE IN LINE WITH THE FEDERAL CIRCUIT

17    CASES THAT REQUIRE A TECHNOLOGICAL NEXUS BETWEEN COPYING AND

18    THE ASSERTED CLAIMS.  THEY'RE AMAZON VERSUS BARNES & NOBLE, A

19    FEDERAL CIRCUIT DECISION FROM 2001, WRIGLEY V. CADBURY, AND

20    MANY OTHER CASES.

21         SO IN THIS CASE JMOL IS APPROPRIATE AS TO ALLEGED COPYING.

22         BEYOND THAT, APPLE HAS FAILED TO ESTABLISH ITS BURDEN ON

23    WILLFULNESS.  THE COPYING ISSUE HAS ALREADY BEEN ADDRESSED.

24         IN ADDITION, APPLE DID NOT SHOW ANY KNOWLEDGE BY SAMSUNG

25    OF THE ASSERTED PATENTS EXCEPT FOR '647, AND AS TO '647, THEY

```
 1        DID NOT SHOW AN ADEQUATE NOTICE THAT IS PRODUCT AND PATENT

 2        SPECIFIC.

 3             MOVING ON FROM THOSE SUBJECTS TO THE INFRINGEMENT, APPLE

 4        FAILED TO ESTABLISH ITS BURDEN ON THE INFRINGEMENT AS WELL.

 5        WITH RESPECT TO THE '647 PATENT, AT LEAST -- THE REASON APPLE

 6        FAILED IS BECAUSE IT DIDN'T ESTABLISH THAT THE ACCUSED PRODUCTS

 7        HAD ANALYZER SERVERS.

 8             APPLE FAILED TO APPLY THE PROPER CONSTRUCTION IN

 9        PRESENTING ITS CASE, SPECIFICALLY, APPLE WAS BOUND, THROUGH

10        COLLATERAL ESTOPPEL DOCTRINE, BY THE CONSTRUCTION THAT WAS

11        ISSUED IN THE APPLE VERSUS MOTOROLA CASE WITH JUDGE POSNER, AND

12        SAMSUNG INCORPORATES BY REFERENCE IN THIS ARGUMENT THE

13        SUBMISSION THAT SAMSUNG PROVIDED TO THE COURT IN CONNECTION

14        WITH INCLUDING THE PROPOSED CONSTRUCTION FROM JUDGE POSNER INTO

15        THE JURY BOOKS.  THAT MOTION WAS DENIED, BUT THE ARGUMENTS ON

16        THE COLLATERAL ESTOPPEL WERE LAID OUT THERE.

17             APPLE IS BOUND BY THAT CASE AND BY THAT CONSTRUCTION

18        BECAUSE THE JUDGMENT HAS ALREADY BEEN ENTERED, AND EVEN THOUGH

19        IT'S ON APPEAL, THAT DOES NOT -- THAT DOESN'T PREVENT

20        COLLATERAL ESTOPPEL FROM ATTACHING.

21             AND UNDER SAMSUNG'S PROPOSED CONSTRUCTION, OR RATHER,

22        PROPOSED CONSTRUCTION FROM THAT CASE, DR. MOWRY DID NOT

23        ESTABLISH THE PRESENCE OF THE ANALYZER SERVER OR VARIOUS OTHER

24        ELEMENTS.

25             THAT IS ALSO THE CASE WITH OTHER PATENTS THAT APPLE
```

1    PRESENTED.  APPLE'S TESTIMONY BY DR. SNOEREN WITH RESPECT TO

2    '414 AND '959 PATENTS WAS EXTREMELY CONCLUSORY.  THE CLEAREST

3    EXAMPLE OF THAT IS THE '414 PATENT WHERE --

4              THE COURT:  LET ME STOP YOU FOR JUST FOR ONE SECOND.

5              MS. MAROULIS:  YES.

6              THE COURT:  WHAT ELSE DO YOU HAVE, OTHER THAN

7    INFRINGEMENT?  AND I ASSUME YOU'RE GOING TO GO THROUGH ALL FIVE

8    PATENTS?

9              MS. MAROULIS:  YES, YOUR HONOR.  WE'LL GO THROUGH ALL

10   THE INFRINGEMENT OF EACH PATENT WITH SPECIFIC ARGUMENTS, AND

11   THEN I'VE ALREADY COVERED ALLEGED COPYING AND PRACTICE OF

12   PATENTS, SO THEN THERE WOULD BE JMOL'S RELATED TO DAMAGES.

13      SO --

14             THE COURT:  OKAY.  I'M WONDERING -- IT SOUNDS LIKE

15   THIS IS GOING TO TAKE SOME TIME.  I'M WONDERING IF IT'S PERHAPS

16   BETTER NOT TO MAKE OUR JURY WAIT.

17             MS. MAROULIS:  THAT WOULD BE FINE, YOUR HONOR.  WE

18   CAN DO THIS AT WHATEVER TIME IS CONVENIENT TO THE COURT.  WE

19   JUST NEED TO DO IT SOME TIME AFTER APPLE RESTS.  SO IF THE

20   COURT PREFERS, WE CAN DO IT AT 4:30 AFTER THE JURY IS

21   DISMISSED.

22             THE COURT:  DO YOU HAVE INFRINGEMENT AS TO ALL FIVE

23   PATENTS?  AND THEN JUST TELL ME BY -- I MEAN, THIS IS NOT TO

24   SAY THAT WE GET JUDGMENT AS A MATTER OF LAW AS TO EVERY TEENY,

25   TINY FACTUAL FINDING THAT THE JURY SHOULD MAKE IN THE CASE.  I

1       REALLY DON'T THINK THAT'S AN APPROPRIATE USE OF JMOL.

2           SO WHAT ARE YOUR DAMAGES JMOL MOTIONS?

3               MS. MAROULIS:  YOUR HONOR, WE ARE --

4               THE COURT:  AT A HIGH LEVEL.  I DON'T WANT YOU TO

5       READ THE SCRIPT.

6               MS. MAROULIS:  THAT'S FINE, YOUR HONOR.

7           WELL, WITH RESPECT TO THE PANDUIT FACTORS, WE WERE GOING

8       TO GO THROUGH PANDUIT 2, 3, AND 4 AND SHOW THE ABSENCE OF

9       EVIDENCE.  FOR EXAMPLE, PANDUIT 2 IS DEMAND FOR THE PATENT --

10              THE COURT:  SO YOU WANT ME TO MAKE FINDINGS ON

11      INDIVIDUAL PANDUIT FACTORS?  THIS IS NOT A JMOL.  I'M NOT

12      MAKING TEENY, TINY FACTUAL DECISIONS ON EVERYTHING.

13          THIS IS JMOL AS TO JUDGMENT AS A MATTER OF LAW AS TO A

14      QUESTION THAT'S ON THE JURY VERDICT.

15              MS. MAROULIS:  YOUR HONOR, THE --

16              THE COURT:  THIS IS NOT MAKE EVERY TEENY, TINY

17      FINDING AND GIVE US JUDGMENT ON THAT.

18              MS. MAROULIS:  YOUR HONOR, IF APPLE CANNOT SHOW ONE

19      OF THE FOUR PANDUIT FACTORS, IT CANNOT SHOW LOST PROFITS.  SO

20      WE CAN SAY THAT THEY'RE NOT ENTITLED TO LOST PROFITS BECAUSE

21      THEY FAILED TO SHOW IT.

22          BUT WE PROBABLY NEED TO EXPLAIN WHY.  AND SO WE'RE NOT

23      DISPUTING THE PANDUIT 1, BUT WE DID WANT TO EXPLAIN ON PANDUIT

24      2, 3, AND 4.  AND WE'RE COGNIZANT OF THE COURT'S TIME AND NOT

25      WISHING TO WASTE THAT, BUT THERE'S A NEED TO APPROPRIATELY

```
1     PRESERVE THIS FOR APPEAL.

2            THE COURT:  ALL RIGHT.  OTHER THAN PANDUIT 2, 3, AND

3      4, WHAT ELSE?

4            MS. MAROULIS:  OTHER GROUNDS INCLUDE THAT

5      MR. VERHOEVEN'S OPINIONS ARE ENTIRELY BASED ON DR. HAUSER'S

6      IMPROPER CONJOINT SURVEY, AND WE WERE GOING TO MAKE REFERENCE

7      TO SAMSUNG'S ARGUMENTS FOR PURPOSES OF DAUBERT AND THE BRIEFING

8      AND HEARING ARGUMENTS ON THAT.

9            WITH RESPECT TO THE PANDUIT FACTORS, VERY BRIEFLY, IT WAS

10     LACK OF CAPACITY, THE TESTIMONY OF MR. SEXTON; LACK OF

11     ESTABLISHING DEMAND FOR THE PATENTED FEATURES, AS OPPOSED TO

12     PRODUCT AS A WHOLE; AND WITH RESPECT TO THE FOURTH FACTOR, LACK

13     OF SUPPORTING EVIDENCE FOR CALCULATIONS WITH RESPECT TO U.S.

14     VERSUS FOREIGN SALES.  OVERALL WE'VE PREVIOUSLY MOVED ON THIS

15     ISSUE.

16           BUT THERE'S A LACK OF CAUSATION BETWEEN APPLE FAILED TO

17     ESTABLISH CAUSATION FOR PURPOSES OF DAMAGES, AND, THEREFORE,

18     CANNOT RECOVER LOST PROFITS AS WELL.

19           AND WITH RESPECT TO REASONABLE ROYALTY, BECAUSE MOST OF

20     THE REASONABLE ROYALTY IS, IN EFFECT, THE ANALYSIS THAT

21     DR. VELLTURO APPLIES TO LOST PROFITS.  IT'S THE SAME ARGUMENTS

22     THERE.  IT'S ESSENTIALLY THE SAME THING AS REASONABLE ROYALTY

23     AND LOST PROFITS ARE THE SAME.

24           THE COURT:  SO HOW LONG OF A SPEECH DO YOU HAVE?  HOW

25     MANY PAGES?  I SEE YOU KIND OF THUMBING THROUGH.  HOW MANY
```

```
 1        PAGES IS THAT?

 2                    MS. MAROULIS:  I CAN DO THIS IN 15 OR 15 MINUTES.

 3                    THE COURT:  HOW MANY PAGES IS THAT?  THAT'S NOT MY

 4        QUESTION.

 5                    MS. MAROULIS:  THERE ARE 24 PAGES, YOUR HONOR.

 6                    THE COURT:  THERE ARE 24 PAGES?  THERE ARE 24 PAGES?

 7                    MS. MAROULIS:  YOUR HONOR, WE NEED TO PRESERVE THE

 8        ARGUMENTS.  I CAN MAKE IT SHORTER.

 9                    THE COURT:  I MEAN, SOME OF THE ARGUMENTS YOU'RE

10        MAKING ABOUT JUDGE POSNER'S CLAIM CONSTRUCTION IN THE MOTOROLA

11        CASE IN ILLINOIS, THAT SHOULD HAVE BEEN BROUGHT IN AND

12        COLLATERALLY ESTOPPED APPLE IN THIS CASE.  I MEAN, WOW, ARE WE

13        GOING TO ARGUE THIS 25 TIMES?

14            I'M JUST SORT OF --

15                    MS. MAROULIS:  WOULD THE COURT PREFER THAT WE --

16                    THE COURT:  WHY ARE YOU DOING THIS ON THE 26TH AND

17        27TH, AND 28TH AND 29TH TIME?  YOU'VE PRESERVED YOUR RECORD.

18        YOU'VE GOT A RECORD ON JUDGE POSNER.  I KNOW YOU WANT ALL THE

19        MOTOROLA CASE IN.  WE'VE RULED ON THAT A NUMBER OF TIMES.

20            THIS IS WHAT I WOULD LIKE TO DO, BECAUSE I WOULD LIKE TO

21        BE ABLE TO TAKE A BREAK AND HAVE THE JURY COME BACK AND HAVE

22        ADDITIONAL EVIDENCE.  WHAT I WOULD LIKE IS FOR -- I'M NOT GOING

23        TO HAVE YOU READ A 24-PAGE DOCUMENT, OKAY?

24            SO WHAT I WOULD LIKE -- THERE'S NO QUESTION EVERYTHING HAS

25        BEEN PRESERVED.  WE DON'T NEED TO REHASH THINGS THAT I'VE
```

```
 1          ALREADY RULED ON FIVE, SIX, SEVEN TIMES.

 2              SO WHEN WE COME BACK LATER AT THE END OF THE DAY, I WOULD

 3      JUST LIKE SORT OF WHAT YOUR BIGGER PICTURE POINTS ARE.  I'LL

 4      LET APPLE RESPOND, AND THEN I'LL RULE.

 5              BUT I'M NOT GOING TO HAVE, YOU KNOW, JUST A READING OF 24

 6      PAGES.

 7                  MS. MAROULIS:  YOUR HONOR.

 8                  THE COURT:  OKAY.

 9                  MS. MAROULIS:  UNDERSTOOD.  MAY WE HAVE AN AGREEMENT

10      FROM APPLE THAT THEY WILL NOT CLAIM WAIVER IF WHATEVER WE MOVE

11      ON AFTER TRIAL DOESN'T MATCH EXACTLY WHAT I SAID, BECAUSE THEY

12      DID THAT IN THE FIRST CASE, AND THAT'S WHY WE WANTED TO LAY OUT

13      OUR RECORD.

14              SO IF THERE'S AN AGREEMENT THAT WE GENERALLY PRESERVED

15      BROAD ARGUMENTS BY THIS, WE'RE FINE NOT TAKING UP ANY MORE

16      TIME.

17              BUT THERE WERE VERY SPECIFIC COMMENTS THAT THIS WAS WAIVED

18      OR THAT WAS WAIVED, AND WE JUST WANT TO AVOID THAT.

19                  THE COURT:  HOW DO YOU WANT TO PROCEED?

20                  MR. MCELHINNY:  AT THIS --

21                  THE COURT:  HOW LONG IS YOUR PAPER?

22                  MR. MCELHINNY:  MY PAPER --

23                  THE COURT:  YES.

24                  MR. MCELHINNY:  -- IS 71 PAGES, YOUR HONOR.

25              (LAUGHTER.)
```

```
 1          MR. MCELHINNY:  BUT IN FAIRNESS, I HAD -- WE HAD
 2    GUESSED WHAT GROUNDS, SO I'M PREPARED FOR WHATEVER GROUNDS, AND
 3    THEY'VE MISSED HALF OF THEM ALREADY, YOUR HONOR.  SO MINE IS
 4    PROBABLY ONLY ABOUT 35 PAGES.
 5          THE COURT:  OH, SO YOU FOUND MORE WAYS THAT I SHOULD
 6    RULE AGAINST YOU.  I'VE RULED NOW THREE TIMES MORE WAYS.
 7          MS. MAROULIS:  I WOULD LIKE MR. MCELHINNY TO MAKE MY
 8    MOTION.
 9          MR. MCELHINNY:  WE ANTICIPATED MORE ARGUMENTS, YOUR
10    HONOR.
11          THE COURT:  THEY FOUND THREE TIMES AS MANY WAYS THAT
12    HE SHOULD LOSE.
13          MR. MCELHINNY:  OUR VIEW -- WE HAVE A DIFFERENT VIEW
14    OF THE FEDERAL RULES, AS USUAL.  THIS IS NOT THE TIME FOR THIS
15    MOTION.  I MEAN, THE EXTENDED JMOL MOTION USUALLY COMES AT THE
16    END OF THE TRIAL.  THEY CAN MAKE VERY BRIEFLY WHATEVER
17    ARGUMENTS THEY'VE GOT TO MAKE NOW.  THE QUESTION IS WHETHER OR
18    NOT YOU'RE GOING TO STOP THE TRIAL NOW OR WHETHER WE'RE GOING
19    TO PROCEED AND JMOL -- THEY DON'T EVEN HAVE TO MAKE A JMOL
20    MOTION RIGHT NOW, YOUR HONOR.  THIS IS COMPLETELY VOLUNTARY
21    UNDER THE RULES.
22          THE COURT:  WELL, BUT IT'S VOLUNTARY.  IT GIVES
23    SAMSUNG THE OPTION TO MAKE IT.  IF THEY WANT TO MAKE IT, THEY
24    SHOULD BE ALLOWED TO DO SO.
25          MR. MCELHINNY:  I AGREE WITH THAT, YOUR HONOR.
```

```
 1              MS. MAROULIS:  YOUR HONOR, I HAVE NOT HEARD APPLE SAY

 2    THEY WILL NOT WAIVE IF WE DON'T STATE EVERY ARGUMENT WITH

 3    SPECIFICITY.  IF THERE'S AN AGREEMENT, THEN --

 4              THE COURT:  WELL, I'M JUST WONDERING, NOT THAT I WANT

 5    TO DO THIS, BUT WHETHER IT WOULD BE PERHAPS BETTER TO GIVE YOU

 6    THREE OR FOUR PAGES SO THAT WE'RE ALL NOT SITTING HERE HAVING

 7    YOU READ 24 PAGES AND HAVING MR. MCELHINNY READ 71 PAGES.

 8              MS. MAROULIS:  THAT WOULD BE BEST, YOUR HONOR.

 9              THE COURT:  A SHORT, A SHORT STATEMENT.

10         I REALLY WOULD ASK THAT WE NOT REHASH HOLD TERRITORY

11    THAT'S ALREADY BEEN RULED ON A NUMBER OF TIMES.  I THINK THAT'S

12    BEEN COMPLETELY PRESERVED.

13         LET ME THINK ABOUT THIS, AND I'LL LET YOU KNOW HOW I'D

14    LIKE TO PROCEED AFTER THE BREAK.

15              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

16              THE COURT:  LET'S GO AHEAD AND TAKE A BREAK NOW.

17              MS. MAROULIS:  THANK YOU, YOUR HONOR.

18         (RECESS FROM 2:23 P.M. UNTIL 2:39 P.M.)

19         (JURY OUT AT 2:39 P.M.)

20              THE COURT:  OKAY.  WELCOME BACK.  SO THIS IS WHAT I'D

21    LIKE TO DO.  RATHER THAN HAVING -- PLEASE TAKE A SEAT, RATHER

22    THAN HAVING 24 PAGES READ AND 71 PAGES READ, I'M GOING TO GIVE

23    YOU FIVE PAGES EACH TO BRIEF THIS, AND I WOULD LIKE SAMSUNG

24    TO -- BECAUSE WE'RE GOING TO HAVE TO DO THIS OVER THE WEEKEND

25    WITH ALL OF YOUR OBJECTIONS -- I'M GOING TO ASK SAMSUNG TO FILE
```

1    TONIGHT.

2         WHAT TIME DO YOU THINK YOU CAN FILE?  IT SOUNDS LIKE YOU

3    HAVE IT READY, YOU HAVE 24 PAGES READY, SO IT'S JUST A MATTER

4    OF CONDENSING IT TO THE KEY POINTS.

5              MS. MAROULIS:  8:00 O'CLOCK, YOUR HONOR.

6              THE COURT:  OKAY.  THANK YOU.  AND THEN I WOULD LIKE

7    APPLE'S RESPONSE SATURDAY MORNING.  SO TELL ME WHAT TIME YOU

8    CAN DO IT?

9              MS. KREVANS:  YOUR HONOR, WE HAVE TO WRITE AN

10   OVERNIGHT BRIEF ALREADY ON ALL OF THEIR OBJECTIONS FOR THE

11   WITNESSES, SO COULD WE HAVE UNTIL 2:00 P.M. TOMORROW?

12             THE COURT:  THAT'S FINE.

13             MS. KREVANS:  THANK YOU.

14             THE COURT:  NOW, I -- I WAS CONFUSED BY THE JMOL

15   MOTION ON COPYING BECAUSE THERE'S NOT GOING TO BE A LEGAL

16   RULING EITHER BY THE JURY OR BY THE COURT THAT THERE EITHER WAS

17   OR WAS NOT COPYING.

18        NOW, CERTAINLY COPYING EVIDENCE MIGHT BE RELEVANT OR

19   PROBATIVE OF WILLFULNESS OR WHAT THE DAMAGES NUMBER SHOULD BE,

20   BUT THE JURY IS NOT GOING TO BE MAKING A FINDING THAT EITHER,

21   YES, THERE WAS OR WAS NOT COPYING.  SO I'M UNCLEAR ON WHY

22   THAT'S A JMOL MOTION.

23             MR. MCELHINNY:  OUR VIEW --

24             MS. MAROULIS:  YOUR HONOR, RULE 50 -- EXCUSE ME,

25   MR. MCELHINNY -- RULE 50 ALLOWS THE PARTIES TO MOVE ON ISSUES

```
 1      AND NOT SIMPLY A CLAIM OR DEFENSE.  SO YOU CAN MOVE ON

 2      SOMETHING SMALLER THAN A CLAIM OR DEFENSE.  WE ALSO MOVED

 3      SEPARATELY FOR NO WILLFULNESS.  SO THE COURT CAN CONSIDER THAT.

 4           BUT TO THE EXTENT THE COURT IS NOT CONTEMPLATING GRANTING

 5      JMOL AND WILLFULNESS, COPYING IS A SMALLER SUBSET OF THAT.

 6           MR. MCELHINNY:  THE CONTEXT OF RULE 50 IS THAT THE

 7      COURT CAN RULE ON AN ISSUE IF IT IS DISPOSITIVE OF A CLAIM, AND

 8      SO WHAT IT SAYS IS YOU CAN RULE ON AN ISSUE AND IF THAT IS

 9      DISPOSITIVE, YOU CAN GRANT JUDGMENT, AND WE AGREE WITH YOUR

10      HONOR THAT THE PURPOSE OF RULE 50 IS NOT TO GET A THOUSAND

11      LITTLE FACTUAL ISSUES.

12           WE THINK IT APPLIES BOTH TO WHETHER APPLE PRACTICES THE

13      PATENTS, WHICH IS -- WHICH DOESN'T -- IT'S NOT SOMETHING THAT

14      THE JURY WILL FIND, AND I AGREE WITH YOUR HONOR ABOUT COPYING,

15      THAT THESE ARE NOT APPROPRIATE MOTIONS FOR JMOL AT THIS TIME.

16           THE COURT:  ALL RIGHT.  WELL, LET'S BRING OUR JURY

17      IN, PLEASE.

18           MS. KREVANS:  YOUR HONOR --

19           THE COURT:  OH, ONE SECOND.

20           MS. KREVANS:  ONE QUICK PRELIMINARY MATTER ABOUT

21      MR. LOCKHEIMER, WHO I UNDERSTAND IS SAMSUNG'S FIRST WITNESS.

22      DURING THE HPO PROCESS, SAMSUNG WITHDREW A NUMBER OF EXHIBITS

23      THAT THEY SAID HE WOULD TALK ABOUT ABOUT PRIOR ART THAT'S

24      ASSERTED IN THE CASE, REPRESENTED THAT HE WAS GOING TO DISCUSS

25      ONLY, CONSISTENT WITH HIS DISCLOSURE, DEVELOPMENT OF ANDROID
```

1    SOFTWARE AND ANDROID SOFTWARE FEATURES, AND I'M QUOTING FROM

2    WHAT THEY SAID, THIS INCLUDES THE DEVELOPMENT HISTORY OF THE

3    ACCUSED FEATURES.

4        SOME OF THE DOCUMENTS THEY WANT TO USE WITH HIM PRE-DATE

5    THE FILING DATES OF SOME OF OUR PATENTS.  THEIR E-MAIL WENT ON

6    TO SAY WE DO NOT CONTEND THAT ANY OF THIS TESTIMONY CONSTITUTES

7    PRIOR ART, AND WE DO NOT INTEND TO PRESENT IT FOR THAT PURPOSE.

8        GIVEN THAT REPRESENTATION, AND BECAUSE WE THINK THERE IS A

9    RISK THAT THE JURY WOULD BE CONFUSED BY A PRESENTATION THAT

10   TALKED ABOUT DEVELOPMENT OF ANDROID FEATURES THAT ARE PRIOR TO

11   THE DATES OF SOME OF THE PATENTS, WE WOULD LIKE TO REQUEST A

12   LIMITING INSTRUCTION, WHICH I HAVE SHOWN TO COUNSEL FOR

13   SAMSUNG, THAT YOU WOULD GIVE TO THE JURY THAT WOULD SAY YOU ARE

14   NOT TO CONSIDER MR. LOCKHEIMER'S TESTIMONY REGARDING DESIGN AND

15   DEVELOPMENT OF ANDROID SOFTWARE AS EVIDENCE OF PRIOR ART TO THE

16   PATENTS IN SUIT.

17       IN OTHER WORDS, COMPLETELY CONSISTENT WITH THEIR

18   REPRESENTATION THAT THEY ARE NOT PRESENTING IT FOR THAT PURPOSE

19   AND TO AVOID JURY CONFUSION.

20       MS. MAROULIS:  YOUR HONOR, IT WOULD BE EXTREMELY

21   PREJUDICIAL FOR SAMSUNG TO START OFF ITS CASE WITH A LIMITING

22   INSTRUCTION ON A WITNESS.  WE'VE NEVER DONE THIS IN THIS TRIAL

23   OR OTHER TRIALS, EVEN THOUGH VARIOUS WITNESSES HAVE BEEN

24   LIMITED BY HPO ORDERS OR EXPERT REPORTS OR A VARIETY OF THINGS.

25       MR. LOCKHEIMER CAN AND WILL TESTIFY CONSISTENT WITH HIS

```
1         DISCLOSURE, AND SAMSUNG IS GOING TO ABIDE BY THE COURT'S ORDER.

2              BUT TO ACTUALLY HAVE A JURY, THE FIRST THING THEY HEAR

3         ABOUT MR. LOCKHEIMER IS A LIMITING INSTRUCTION WOULD BE NOT

4         PROPER, WOULD BE PREJUDICIAL TO SAMSUNG, AND IT'S NOT WARRANTED

5         BECAUSE IF THERE'S A COURT ORDER, WE'RE GOING TO BE COMPLYING

6         WITH THE COURT ORDER.  THAT'S THAT.

7              WE WITHDREW AN EXHIBIT -- ANY EXHIBITS THAT WOULD BE

8         SUBJECT TO THE ORDER.  WE SENT THEM THE E-MAIL CONFIRMING THAT.

9              THERE'S NOTHING FOR THEM TO SUGGEST THAT WE'RE GOING TO

10        VIOLATE THE ORDER, AND TO START THE CASE OFF, SAMSUNG'S

11        CASE-IN-CHIEF WITH THAT KIND OF INSTRUCTION WOULD BE WRONG.

12              MS. KREVANS:  YOUR HONOR, THIS IS NOT ABOUT WITHDRAWN

13        EXHIBITS.  THIS IS ABOUT WHAT THEY ARE GOING TO HAVE THIS

14        WITNESS TESTIFY ABOUT, WHICH THEY HAVE REPRESENTED IS NOT A

15        PRESENTATION INTENDED TO BE ABOUT PRIOR ART, BUT BECAUSE THEY

16        CLEARLY DO INTEND TO PRESENT A HISTORY OF ANDROID THAT GOES

17        BACK BEFORE THE DATES OF SOME OF THE PATENTS, WE NEED TO MAKE

18        SURE THAT THE JURY IS NOT CONFUSED AND CONSISTENT WITH THEIR

19        REPRESENTATION THAT THEY DO NOT CONTEND THAT THE TESTIMONY

20        CONSTITUTES PRIOR ART AND THAT THEY'RE NOT PRESENTING IT FOR

21        THAT PURPOSE, WE SHOULD EXPLAIN TO THE JURY THAT IT SHOULD NOT

22        BE CONSIDERED AS SUCH.

23              MS. MAROULIS:  YOUR HONOR, THAT IS WHAT

24        CROSS-EXAMINATION IS FOR.  THEY CAN ELICIT THAT HE'S NOT

25        TESTIFYING AS A PRIOR ARTIST OR FOR PRIOR ARTS.
```

```
 1            BUT NOT A SINGLE WITNESS IN THIS CASE, OR IN PRIOR TRIALS

 2   IN THIS SERIES OF LITIGATION, HAD --

 3            THE COURT:  WHY IS HE NOT DISCLOSED AS A PRIOR ART

 4   INVENTOR?  IS THAT BECAUSE THEY DIDN'T CHOOSE THIS AS ONE OF

 5   THEIR PRIOR ART REFERENCES?

 6            MS. KREVANS:  THAT'S RIGHT, YOUR HONOR.  AND, IN

 7   FACT, BECAUSE OF THAT, WE HAVE NOT BROUGHT WITNESSES TO SHOW

 8   THAT WE CAN PRE-DATE THIS WORK, AND WE DON'T INTEND, AND WE

 9   SHOULDN'T HAVE TO, CROSS-EXAMINE HIM TO SHOW THAT THE WORK HE'S

10   GOING TO TALK ABOUT DOESN'T, IN FACT, MEET THE ELEMENTS OF THE

11   CLAIMS.

12        BUT THIS IS CLEARLY AN ISSUE OF POSSIBLE JURY CONFUSION.

13   THEY HAVE AGREED THAT THEY DON'T CONTEND THE TESTIMONY

14   CONSTITUTES PRIOR ART.  I'M NOT QUITE SURE WHY THEY NEED TO

15   PRESENT IT BECAUSE IT'S NOT REALLY RELEVANT TO AN ISSUE IN THE

16   CASE.

17        BUT IF THEY DO WANT TO PRESENT IT AND IF THEY WANT TO LAY

18   OUT THIS HISTORY GOING BACK IN TIME, THEN THE JURY SHOULD GET

19   AN INSTRUCTION THAT SAYS, AS I SAID, THIS IS NOT TO BE

20   CONSIDERED AS EVIDENCE OF PRIOR ART TO THE PATENTS IN SUIT.

21            MS. MAROULIS:  YOUR HONOR, WE HAVE TO PRESENT A CASE

22   TO REBUT APPLE'S ALLEGATIONS OF COPYING OR IMITATING OR

23   WHATEVER IT IS THAT THEY'RE SAYING HAPPENED.  WE NEED TO

24   PRESENT EVIDENCE OF IT INDEPENDENTLY.

25            THE COURT:  WHY DIDN'T YOU LIST THIS AS ONE OF YOUR
```

```
 1          PRIOR ARTISTS?

 2                  MS. MAROULIS:  IT'S NOT PRIOR ARTIST.  THIS IS NOT

 3          PRIOR ART TESTIMONY.  IT'S TESTIMONY OF DEVELOPMENT THAT'S

 4          COMPLETELY UNRELATED AND SEPARATE FROM BEFORE WHAT APPLE IS

 5          DOING.  IT IS NOT PRIOR ART.  HE'S ENTIRELY CONSISTENT WITH HOW

 6          WE DISCLOSED HIM IN OUR WITNESS DISCLOSURE.  THIS IS NOT PRIOR

 7          ART.  WE HAVE OTHER THINGS THAT GO TO PRIOR ART.

 8              BUT THIS GOES TO SOMETHING COMPLETELY DIFFERENT.  THIS IS

 9          HOW GOOGLE AND SAMSUNG DID NOT COPY ANYTHING OF APPLE'S.

10                  THE COURT:  AND HE WAS DEPOSED ON ALL THESE TOPICS?

11                  MS. KREVANS:  HE WAS DEPOSED ON DEVELOPMENT OF

12          ANDROID, YOUR HONOR.  AT THAT TIME THEY HADN'T HAD TO LIMIT

13          THINGS.

14              BUT THE POINT IS THAT IF THEY'RE GOING TO PUT THIS WITNESS

15          ON -- AND BY THE WAY, THE ISSUE IS NOT WHETHER GOOGLE COPIED.

16          THE ISSUE IS WHETHER SAMSUNG COPIED.  SO LONG AS -- THIS IS AN

17          ATTEMPT AT MISDIRECTION.  THE CASE IS NOT ABOUT GOOGLE.  IT'S

18          ABOUT SAMSUNG.

19              BUT WE CAN'T CROSS-EXAMINE A WITNESS WHO WORKS FOR GOOGLE

20          ABOUT WHAT SAMSUNG IS CONTENDING IN THE CASE.  I CAN'T FIX

21          THIS, THIS JURY CONFUSION POINT BY ASKING THIS GOOGLE WITNESS,

22          "WHAT IS SAMSUNG CONTENDING IN THIS CASE?  IS IT CONTENDING

23          THAT YOUR WORK IS PRIOR ART?"  HOW WOULD HE KNOW?

24                  MR. QUINN:  YOUR HONOR, IF I MAY, YOUR HONOR?

25              THE POINT IS THAT THIS IS INDEPENDENT DEVELOPMENT.
```

1    ANDROID WAS DEVELOPED INDEPENDENTLY.  THERE HAVE BEEN

2    SUGGESTIONS, THERE'S THAT MY-PHONE-BECOMES-A-USELESS-BRICK

3    DOCUMENT, WHICH THEY USED WITH DR. VELLTURO, SHOWED THE JURY,

4    RAISING AN ISSUE ABOUT WHETHER GOOGLE HAD A NEED TO ADOPT

5    APPLE'S TECHNOLOGIES SO PHONES COULD SYNC IN BACKGROUND.

6        AND THEY -- THE WHOLE POINT OF THIS IS THAT ANDROID WAS

7    DEVELOPED INDEPENDENTLY, WE SAID THAT IN OPENING STATEMENT, BY

8    GOOGLE.

9        IT'S NOT PRIOR ART.  IT'S INDEPENDENT DEVELOPMENT.

10   THERE'S A SUGGESTION THAT SAMSUNG HAS COPIED AND GOOGLE HAS

11   COPIED.

12        MS. KREVANS:  YOUR HONOR, WE ARE NOT SAYING THEY

13   CAN'T PRESENT THIS EVIDENCE.

14       I AM SIMPLY SAYING, BECAUSE YOU UNDERSTAND -- NOW THEY'RE

15   REAFFIRMING, THIS IS NOT SUPPOSED TO BE FOR PRIOR ART.

16       THE JURY SHOULD BE TOLD, THIS IS NOT EVIDENCE OF PRIOR

17   ART.

18        MR. QUINN:  WELL, BUT --

19        MS. KREVANS:  THEY'RE PRESENTING IT FOR A DIFFERENT

20   REASON, BUT THERE'S GREAT POTENTIAL FOR JURY CONFUSION IF THE

21   JURY IS NOT SO INSTRUCTED.

22       AND BY THE WAY, NO WITNESS TALKED ABOUT THAT DOCUMENT

23   ABOUT MY PHONE IS A BRICK WHEN IT'S SYNCHRONIZING AS EVIDENCE

24   OF GOOGLE COPYING.  IT WAS PRESENTED AS EVIDENCE THAT

25   BACKGROUND SYNC IS A VALID FEATURE.

```
 1            THE COURT:  WHAT ABOUT AN INSTRUCTION THAT JUST SAYS

 2    THIS IS EVIDENCE OF INDEPENDENT DEVELOPMENT AND NOT EVIDENCE OF

 3    PRIOR ART?

 4            MS. KREVANS:  WHAT WE THINK WE NEED IS SOMETHING THAT

 5    TELLS THE JURY IT'S NOT EVIDENCE OF PRIOR ART.  AS LONG AS

 6    THAT'S IN THERE, WE'RE GOING TO BE HAPPY WITH IT.

 7            MR. QUINN:  THE PROBLEM WITH THAT, YOUR HONOR, YOU

 8    KNOW, IT CASTS A SHADOW, I SUBMIT, ON HIS CREDIBILITY.

 9            THIS IS THE FIRST TIME A WITNESS, OUR FIRST WITNESS WE

10    CALL COMES TO THE STAND, THE JURY GETS SOME SPECIAL INSTRUCTION

11    ABOUT HIM, I THINK THE JURY WILL, IF ANYTHING, BE CONFUSED BY

12    THIS COURT INSERTING ITSELF AND TELLING THE JURY SOMETHING

13    ABOUT THIS WITNESS'S TESTIMONY.

14            YOU KNOW, THAT HASN'T HAPPENED FOR ANY OTHER WITNESS.  I

15    THINK THAT INVITES CONFUSION.  IT DEPRECATES HIS TESTIMONY.  IT

16    SUGGESTS THAT THEM THAT, YOU KNOW, HE'S NOT SOMEHOW AS

17    SIGNIFICANT OR THERE ARE CERTAIN THINGS THAT THEY, THEY

18    SHOULDN'T GIVE HIM CREDIT FOR.

19            THE COURT:  SO THEN WHY DON'T YOU ASK THE QUESTION,

20    IS THIS EVIDENCE OF INDEPENDENT DEVELOPMENT OF ANDROID --

21            MR. QUINN:  I'M NOT GOING --

22            THE COURT:  -- AND NOT EVIDENCE OF PRIOR ART?

23            MR. QUINN:  I'M GOING --

24            THE COURT:  THAT'LL TAKE CARE OF IT IF YOU DON'T WANT

25    THE COURT'S INSTRUCTION.
```

```
1              MR. QUINN:  OKAY.  I WILL DO THAT, YOUR HONOR.

2              MS. KREVANS:  YOU ARE GOING TO ELICIT FROM THIS

3     WITNESS, WHO -- YOUR HONOR, THIS WITNESS HAS NO TESTIMONY, NO

4     FOUNDATION TO TESTIFY ABOUT THESE PATENTS.  HOW CAN HE TESTIFY

5     ABOUT WHETHER WHAT HE'S SAYING IS PRIOR ART ABOUT THEM?

6          AND I DON'T THINK THIS CASTS A SHADOW ON ANYTHING, AND IT

7     WAS SAMSUNG'S DECISION TO CALL HIM AS THEIR FIRST WITNESS.

8              THE COURT:  WHY WASN'T THIS IN THE OBJECTIONS?  I

9     RULED ON THE LOCKHEIMER OBJECTIONS YESTERDAY.  WHY IS THIS

10    COMING UP NOW?

11             MS. KREVANS:  YOUR HONOR, BECAUSE THIS IS -- THIS IS

12    NOT ACTUALLY AN OBJECTION.  AND THERE WERE MANY OBJECTIONS

13    ABOUT MR. LOCKHEIMER WHICH HAVE BEEN RESOLVED BY MEETING AND

14    CONFERRING AMONG THE PARTIES, IN ADDITION TO THE ONES THAT WERE

15    MADE.

16         NOW THAT THEY HAVE SAID THIS IS WHAT THEY'RE GOING TO DO,

17    AND WE HAVE THE REPRESENTATION --

18             THE COURT:  WHEN DID THEY SAY THAT?  WHEN DID THEY

19    SAY THAT?

20             MS. KREVANS:  THAT THEY ARE NOT GOING TO CONTEND THAT

21    ANY OF THIS TESTIMONY CONSTITUTES PRIOR ART.  YESTERDAY, I

22    BELIEVE.

23             MS. MAROULIS:  PRIOR TO THE BRIEF, ACTUALLY.

24             THE COURT:  WHEN?

25             MS. MAROULIS:  IT WAS PRIOR TO --
```

1465

```
 1          MS. KREVANS:  I LOSE TRACK.  MAYBE IT WAS THE NIGHT

 2     BEFORE LAST.  WE OBJECTED TO SOME OF THEIR EXHIBITS, THEY

 3     WITHDRAW THEM, AND WE ALSO OBJECTED TO THE SCOPE OF HIS

 4     TESTIMONY AND THEY WITHDRAW SOME THINGS.

 5          THERE WERE SOME ISSUES THAT DIDN'T COME TO THE COURT

 6     BECAUSE THEY WITHDRAW THINGS.

 7          MR. QUINN:  YOUR HONOR, WE HAVE NEVER CLAIMED THAT

 8     HIS TESTIMONY WOULD BE PRIOR ART.

 9          MS. KREVANS:  AND THAT IS WHY --

10          MR. QUINN:  BECAUSE WE NEVER HAVE.

11          MS. MAROULIS:  I HAVE, YOUR HONOR, AN E-MAIL TO

12     APPLE.

13          MS. KREVANS:  MAY I, MS. MAROULIS?

14          MS. MAROULIS:  GO AHEAD.

15          MS. KREVANS:  THEY ARE NOT CLAIMING, AND, THEREFORE

16     IT CAN'T BE PREJUDICIAL TO TELL THE JURY THAT THERE IS NO

17     CONTENTION THAT THIS DEVELOPMENT STORY IS PRIOR ART.

18          IT IS SIMPLY CONFIRMING TO THE JURY WHAT THEY HAVE

19     REPRESENTED TO US AND NOW TO THE COURT.  AND I DON'T THINK IT

20     CASTS A SHADOW ON ANYTHING.

21          THE COURT:  WELL, WE HAVE A COUPLE OF OPTIONS, EITHER

22     WHEN YOU INTRODUCE THE WITNESS, YOU CAN SAY HE'S GOING TO

23     TESTIFY ABOUT THE INDEPENDENT DEVELOPMENT OF ANDROID AND NOT

24     EVIDENCE OF PRIOR ART TO THE PATENTS IN SUIT, OR I CAN RESERVE

25     THIS UNTIL THE TESTIMONY IS OVER AND MAKE A DECISION AT THAT
```

1    TIME BASED ON HOW THE TESTIMONY COMES IN.

2           MR. QUINN:  I WILL SOLICIT THAT, YOUR HONOR.  I WILL

3    GET THAT -- I WILL SOLICIT THAT TESTIMONY.

4           THE COURT:  HOW IS HE GOING TO KNOW THAT IT'S NOT

5    PRIOR ART TO THE PATENTS IN SUIT?

6           MS. KREVANS:  HE HAS NO BASIS TO SAY ANYTHING ABOUT

7    THE PATENTS IN SUIT, YOUR HONOR.

8           MR. QUINN:  YOUR HONOR, MAYBE THE SECOND OPTION MAKES

9    THE MOST SENSE, FOR THE COURT TO RESERVE THE ISSUE, HEAR THE

10   TESTIMONY, AND DECIDE WHETHER THE COURT THINKS IT'S NECESSARY.

11          THE COURT:  ALL RIGHT.  THAT'S WHAT I'M GOING TO DO.

12   YOU KNOW, ISSUES LIKE THIS SHOULD BE IN THE OBJECTIONS.  WE

13   SHOULD NOT BE WASTING EVERYONE'S TIME TO RAISE THIS FOR THE

14   FIRST TIME WHEN YOU'VE HAD THE DEPOSITION OF MR. LOCKHEIMER FOR

15   I DON'T KNOW HOW LONG AND YOU'VE KNOWN THE SCOPE OF WHAT HE HAS

16   TESTIFIED TO PREVIOUSLY.

17          ALL RIGHT.  LET'S GO AHEAD AND BRING --

18          THANK YOU.

19          (PAUSE IN PROCEEDINGS.)

20          (JURY IN AT 2:53 P.M.)

21          THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

22   I'M SORRY FOR OUR DELAY IN HAVING YOU WAIT.

23   OKAY.  SAMSUNG SHOULD CALL ITS FIRST WITNESS.

24          MR. QUINN:  THANK YOU, YOUR HONOR.

25   SAMSUNG CALLS HIROSHI LOCKHEIMER.

```
 1              THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

 2         (DEFENDANTS' WITNESS, HIROSHI LOCKHEIMER, WAS SWORN.)

 3              THE WITNESS:  I DO.

 4              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

 5         PULL THE MICROPHONE TOWARDS YOU AND STATE YOUR NAME AND

 6    SPELL IT.

 7              THE WITNESS:  SURE.  MY NAME IS HIROSHI LOCKHEIMER.

 8    H-I-R-O-S-H-I, L-O-C-K-H-E-I-M-E-R.

 9              THE COURT:  OKAY.  THE TIME IS NOW 2:54.  GO AHEAD,

10    PLEASE.

11                         DIRECT EXAMINATION

12    BY MR. QUINN:

13    Q.   HIROSHI LOCKHEIMER?

14    A.   YES.

15    Q.   I'M THINKING A GERMAN GUY FELL IN LOVE WITH A JAPANESE

16    WOMAN.

17    A.   SOMETHING LIKE THAT.  THAT IS ACTUALLY MY NAME.

18    Q.   WHERE DO YOU WORK, SIR?

19    A.   I WORK AT GOOGLE.

20    Q.   AND WHAT IS IT THAT YOU DO AT GOOGLE?

21    A.   I'M A VICE-PRESIDENT OF ENGINEERING FOR ANDROID.

22    Q.   AND ARE YOU THE ENGINEER, THE PERSON WHO'S IN CHARGE OF

23    ANDROID AT GOOGLE?

24    A.   SURE.

25    Q.   AND CAN YOU TELL THE JURY APPROXIMATELY HOW MANY PEOPLE
```

```
1    YOU HAVE REPORTING TO YOU EITHER DIRECTLY OR INDIRECTLY?

2    A.   ABOUT 600, MAYBE 700 PEOPLE IN THE CONTEXT OF ANDROID.

3    Q.   AND WHO DO YOU REPORT TO?

4    A.   SUNDAR PICHAI.

5    Q.   WHO DOES HE REPORT TO?

6    A.   LARRY PAGE.

7    Q.   THAT'S THE CEO?

8    A.   CORRECT.

9    Q.   SO YOU'RE TWO LEVELS FROM THE CEO OF GOOGLE?

10   A.   THAT'S RIGHT.

11   Q.   HOW LONG HAVE YOU WORKED AT GOOGLE?

12   A.   ALMOST EIGHT YEARS, EIGHT YEARS IN APRIL, ACTUALLY, THIS

13   MONTH.

14   Q.   AND WHILE YOU'VE BEEN AT GOOGLE, HAVE YOU ALWAYS WORKED ON

15   ANDROID?

16   A.   I HAVE.

17   Q.   HOW IS IT THAT YOU CAME -- HOW DID IT COME ABOUT THAT YOU

18   CAME TO JOIN GOOGLE AND WORK ON THE ANDROID PROJECT.

19   A.   WELL, I WORKED WITH A LOT OF PEOPLE PREVIOUSLY WHO WORKED

20   ON THE ANDROID TEAM, SPECIFICALLY ANDY RUBIN CALLED ME UP AND

21   SAID WE'RE DOING SOMETHING YOU MIGHT BE EXCITED ABOUT.  SO HE

22   CALLED ME AND THAT'S HOW I ENDED UP THERE.

23   Q.   WHO WAS ANDY RUBIN?

24   A.   ANDY WAS THE FOUNDER OF ANDROID.  ANDROID WAS AN

25   INDEPENDENT COMPANY THAT GOOGLE PURCHASED MANY YEARS AGO.
```

1    Q.   AND YOU KNEW ANDY FROM A PREVIOUS JOB THAT YOU HAD?

2    A.   I DID.

3    Q.   ALL RIGHT.  AND HOW DID THAT COME ABOUT?  DID HE INTERVIEW

4    YOU OR ASK YOU TO COME OVER OR --

5    A.   YEAH.  HE E-MAILED ME.  I WAS TRAVELLING AT THE TIME.  HE

6    E-MAILED ME AND SAID, HEY, YOU KNOW, WE HAVEN'T TALKED IN A

7    WHILE, BUT COULD YOU COME OVER TO CHECK OUT WHAT WE'RE DOING, I

8    THINK YOU'RE GOING TO LIKE IT.

9    Q.   DID YOU HAVE ANY IDEA WHAT IT WAS HE WAS GOING TO TALK TO

10   YOU ABOUT?

11   A.   NO IDEA.

12   Q.   DID YOU GO SEE HIM?

13   A.   I DID.

14   Q.   AND WHAT WAS SAID BETWEEN THE TWO OF YOU?

15   A.   HE GAVE ME A DEMO OF WHAT THEY WERE WORKING ON, AND I WAS

16   BLOWN AWAY.  I JUST DIDN'T IMAGINE THAT'S WHAT THEY WERE DOING.

17   Q.   THAT GOOGLE WOULD BE WORKING ON A PHONE OPERATING SYSTEM?

18   A.   YEAH, IT JUST DIDN'T OCCUR TO ME, ESPECIALLY -- THIS IS

19   EIGHT YEARS AGO.  YOU KNOW, I THOUGHT OF GOOGLE AS A SEARCH

20   COMPANY.  I GO TO GOOGLE.COM ON MY P.C.  I DIDN'T REALIZE THAT

21   GOOGLE WAS WORKING ON A MOBILE OPERATING SYSTEM.

22   Q.   AND YOU OBVIOUSLY DECIDED TO JOIN THE COMPANY?

23   A.   I DID.

24   Q.   AND THAT WAS ABOUT WHEN IN?

25   A.   WELL, WHEN I FIRST SAW THE DEMO, IT WAS JANUARY OF 2006.

1    I JOINED THE COMPANY IN APRIL OF 2006.

2    Q.   AND YOU INDICATED THERE WAS THIS GROUP THAT DEVELOPED

3    ANDROID THAT ACTUALLY JOINED GOOGLE BEFORE YOU DID?

4    A.   CORRECT.

5    Q.   DO YOU RECALL ROUGHLY HOW LONG THAT WAS -- HOW LONG THEY

6    HAD BEEN AT GOOGLE?

7    A.   I THINK IT WAS ABOUT, I'M GUESSING -- WELL, LET ME PUT IT

8    THIS WAY, I THINK IT WAS IN THE SUMMER OF 2005 WHEN THEY WERE

9    ACQUIRED.

10   Q.   ALL RIGHT.  AND WHEN YOU JOINED, JUST GENERALLY, WHAT WAS

11   THE STATUS OF THE ANDROID PROJECT WHEN YOU JOINED IN THE SPRING

12   OF 2006?

13   A.   IT WAS, IT WAS EARLY DAYS, BUT THEY HAD A DEMO WORKING,

14   OBVIOUSLY I SAW IT.

15   Q.   UM-HUM.

16   A.   IT WAS RUNNING ON A PROTOTYPE DEVICE.  SO IT HAD SOFTWARE.

17   THEY HAD A HARDWARE PHONE OF SOMEONE ELSE AND THE SOFTWARE WAS

18   RUNNING ON THAT HARDWARE.

19   Q.   AND HAD YOU HAD PRIOR EXPERIENCE WITH MOBILE DEVICES?

20   A.   I HAD, YEAH.

21   Q.   AND DID YOU HAVE A PARTICULAR -- DID YOU HAVE A PARTICULAR

22   INTEREST IN THE MOBILE DEVICE AREA?

23   A.   YEAH.  THAT'S MY PASSION.  I LOVE MOBILE DEVICES.  I'VE

24   BEEN DOING MOBILE FOR A VERY LONG TIME.  IT'S SOMETHING I

25   REALLY ENJOY DOING.

1    Q.   CAN YOU GIVE THE JURY SOME IDEA OF THE OTHER CONTEXTS

2    BEFORE JOINING GOOGLE AND WORKING ON ANDROID THAT YOU WORKED ON

3    MOBILE DEVICES?

4    A.   SURE.  I USED TO WORK AT A COMPANY CALLED GOOD TECHNOLOGY

5    THAT PROVIDED A WIRELESS E-MAIL DEVICE.  THIS IS BACK IN, YOU

6    KNOW, 1999, SOMETHING LIKE THAT.  IT WAS REALLY EARLY DAYS OF

7    MOBILE TECHNOLOGIES.

8         TODAY, YOU KNOW, EVERYONE ASSUMES WIRELESS IS ALWAYS

9    THERE.  BACK THEN THAT WAS KIND OF A NEW THING.  SO WE BUILT A

10   WIRELESS E-MAIL DEVICE.  I DID THAT.

11        I WAS ALSO AT PALM, PALM PILOT.  I DON'T KNOW IF YOU'VE

12   HEARD OF THAT, BUT I WAS AT THAT COMPANY.

13        AND I'VE ALSO BEEN DOING OPERATING SYSTEMS IN GENERAL FOR

14   A LONG TIME.  I WAS AT A COMPANY CALLED BE INCORPORATED, B-E,

15   WHICH MADE OPERATING SYSTEMS FOR COMPUTERS.

16   Q.   SO WHAT IS ANDROID?

17   A.   WELL, IT'S AN OPERATING SYSTEM FROM MOBILE PHONES.

18   Q.   ALL RIGHT.  WHAT WAS THE ORIGINAL CONCEPT OF HAVING AN

19   ANDROID OPERATING SYSTEM?

20   A.   WELL, THE ORIGINAL IDEA BEHIND ANDROID WAS TO BUILD AN

21   OPERATING SYSTEM AND ACTUALLY OPEN SOURCE IT, MAKE IT AVAILABLE

22   TO THE WORLD FOR FREE TO MANUFACTURERS COULD ADAPT IT.

23   Q.   BACK IN THIS TIMEFRAME, 2006 WHEN YOU JOINED GOOGLE, WERE

24   THERE ALREADY OTHER MOBILE OPERATING SYSTEMS THAT WERE OUT IN

25   THE MARKETPLACE?

1    A.    SURE.

2    Q.    AND DO YOU RECALL THE NAMES OF ANY OF THOSE?

3    A.    YEAH.  THESE ARE JUST EXAMPLES, BUT SYMBIAN, FOR INSTANCE;

4    PALM OBVIOUSLY WAS OUT THERE, I WORKED THERE BEFORE; WINDOWS

5    MOBILE, THAT WAS FROM MICROSOFT; THERE WAS THIS THING CALLED

6    J2ME.

7    Q.    OKAY.  AND WAS THERE -- WAS THE CONCEPT THAT ANDROID WOULD

8    BE DIFFERENT IN SOME WAY THAN THESE OTHER MOBILE OPERATING

9    SYSTEMS THAT ALREADY EXISTED?

10   A.    YEAH.

11   Q.    AND HOW SO?

12   A.    WELL, THE IDEA WAS THAT THERE WERE A NUMBER OF

13   DIFFERENCES, THE FIRST ONE BEING IT WAS OPEN SOURCE, AND WHAT

14   OPEN SOURCE MEANS IS WE MAKE THE BUILDING BLOCKS OF THE

15   PRODUCT, SOURCE CODE IS WHAT SOFTWARE ENGINEERS CALL IT,

16   COMPLETELY AVAILABLE TO THE WHOLE WORLD TO SEE.  SO IT WAS OPEN

17   SOURCE.

18        AND ALSO IT WAS FREE.  IT DIDN'T COST ANYTHING FOR SOMEONE

19   TO USE ANDROID.

20   Q.    SO WAS THERE A PARTICULAR PROBLEM THAT FOLKS THAT

21   DEVELOPED ANDROID WERE TRYING TO SOLVE THAT EXISTED IN THE

22   INDUSTRY THAT CAUSED YOU TO GO IN THIS DIRECTION?

23   A.    YEAH, THERE WERE A NUMBER OF THINGS THAT WERE GOING ON AT

24   THE TIME IN INDUSTRY.

25        ONE THING WAS BACK THEN PHONES WERE NOT AS SMART AS THEY

1    ARE TODAY, YOU KNOW, SMARTPHONES, WE ALL THINK ABOUT

2    SMARTPHONES TODAY, BUT BACK THEN THAT WAS KIND OF A NEW TERM

3    AND MAJOR COMPANIES, INCLUDING GOOGLE, WAS WORKING ON

4    SMARTPHONE TECHNOLOGIES.

5         AND WHAT SMARTPHONES MEAN IS THAT RATHER THAN PHONES BEING

6    MOSTLY A HARDWARE PRODUCT, THERE WAS A LOT OF SOFTWARE

7    INVOLVED.  SO WE WERE PROVIDING THAT SOFTWARE AND THE EXPERTISE

8    IN THE SOFTWARE.

9         THE OTHER THING THAT WAS GOING ON WAS BECAUSE THERE WERE

10   SO MANY PLATFORMS OUT THERE, AS AN APPLICATION DEVELOPER -- AND

11   WHEN I SAY APPLICATION DEVELOPER, I MEAN GOOGLE BEING IN THE

12   BUSINESS OF PROVIDING PRODUCTS TO MOBILE PHONES -- IT WAS HARD

13   TO MANAGE ALL THESE DIFFERENT PLATFORMS THAT WERE OUT THERE.

14        SO WE WANTED TO MAKE SURE THERE WAS A PLATFORM THAT GOOGLE

15   COULD COUNT ON AND THAT WOULD BE ANDROID.

16   Q.   AND IN THAT LAST ANSWER WHEN YOU REFERRED TO PLATFORMS,

17   WHAT ARE YOU REFERRING TO?

18   A.   AN OPERATING SYSTEM.  ANDROID IS A PLATFORM, IT'S AN OS.

19   THESE ARE SOMEWHAT INTERCHANGEABLE TERMS IN THIS CONTEXT.

20   Q.   SO IT WAS A CHALLENGE FOR GOOGLE AND OTHER APPLICATION

21   DEVELOPERS TO BE ABLE TO MAKE APPLICATIONS FOR ALL THESE

22   DIFFERENT MOBILE PHONE PLATFORMS THAT WERE OUT THERE?

23   A.   YEAH, IT MEANT THAT THEY HAD TO DO THAT WORK MULTIPLE

24   TIMES.  IF YOU'RE WRITING AN APPLICATION FOR ONE OS, OR

25   PLATFORM, YOU HAD TO DO THAT WORK ALL OVER AGAIN FOR ANOTHER

1      OS, OR PLATFORM, AND SO ON AND SO FORTH.

2          IT WAS BECOMING SOMEWHAT ONEROUS, AND WE WANTED TO PROVIDE

3      A COMMON PLATFORM THAT MULTIPLE MANUFACTURERS COULD ADOPT,

4      WHICH IS WHY WE MADE IT PUBLICLY AVAILABLE AND FREE.

5      Q.   WERE THE PHONE MANUFACTURERS BACK THEN FACING CHALLENGES,

6      DEALING WITH CHANGES IN SOFTWARE AND THE LIKE?

7      A.   ABSOLUTELY.  WELL, THIS IS, THIS IS THE POINT THAT I WAS

8      TRYING TO MAKE EARLIER, WHICH IS BACK THEN, YOU KNOW, PHONES

9      WERE BECOMING SMARTER AND SMARTER, WHICH MEANT THERE WAS MORE

10     AND MORE SOFTWARE REQUIRED TO MAKE THE PHONES SMARTER.

11         AND THIS IS NO LONGER THE CASE, BUT BACK THEN, YOU KNOW,

12     LATE 19, YOU KNOW, 1999, THAT ERA, AND GOING UP TO 2006 OR SO,

13     THE PHONE MANUFACTURERS MOSTLY HAD HARDWARE EXPERTISE AND THEY

14     WERE VERY GOOD AT THAT.

15         BUT THEY HADN'T ACTUALLY BUILT OUT THEIR SOFTWARE

16     EXPERTISE YET AND THAT'S WHERE WE CAME IN THE PICTURE.

17     Q.   SO WHEN YOU SAY THE PHONE MANUFACTURERS, YOU MEAN FOLKS

18     LIKE SAMSUNG, LG, MOTOROLA AND THE LIKE?

19     A.   THOSE ARE EXAMPLES, YEAH.

20     Q.   OKAY.  SO FOR THOSE MANUFACTURERS, DID THE IDEA OF HAVING

21     AN ANDROID OPEN SOURCE PLATFORM OFFER SOME ADVANTAGES?

22         MS. KREVANS:  OBJECTION, SCOPE.  SUBJECT TO THE

23     BRIEFING TO THE COURT PRIOR.

24         MR. QUINN:  IT'S PART OF THE DEVELOPMENT, YOUR HONOR.

25         MS. KREVANS:  HE'S NOT TALKING ABOUT ANDROID ANY

```
 1        MORE, YOUR HONOR.  HE'S TALKING ABOUT PHONE MANUFACTURERS AND

 2        WHAT THEY THOUGHT.

 3               MR. QUINN:  THE ADVANTAGES OF ANDROID FOR

 4        MANUFACTURERS IS WHAT I INTENDED TO ASK.

 5               THE COURT:  THAT IS BEYOND THE SCOPE, SO THE

 6        OBJECTION IS SUSTAINED.

 7        BY MR. QUINN:

 8        Q.  WERE THERE ADVANTAGES TO MANUFACTURERS THAT YOU WERE

 9        TRYING TO ACHIEVE IN DEVELOPING THE ANDROID SOFTWARE?

10               MS. KREVANS:  SAME OBJECTION, YOUR HONOR.

11               THE COURT:  SUSTAINED.

12        BY MR. QUINN:

13        Q.  YOU KNOW, FROM THE STANDPOINT OF CHARACTERS, WERE --

14        CARRIERS, WERE THERE ADVANTAGES IN DEVELOPING THE ANDROID

15        PLATFORM, WERE YOU TRYING TO OBTAIN CERTAIN ADVANTAGES FOR

16        CARRIERS?

17               MS. KREVANS:  SAME OBJECTION, YOUR HONOR.

18               THE COURT:  SUSTAINED.

19        BY MR. QUINN:

20        Q.  DO YOU KNOW HOW MANY FEATURES THERE ARE IN THE ANDROID

21        OPERATING SYSTEM?

22        A.  I DON'T KNOW.  I'VE NEVER, I'VE NEVER COUNTED, BUT IT'S

23        THOUSANDS.

24        Q.  AND DO YOU KNOW HOW MANY OF THOSE FEATURES THAT ARE

25        INCLUDED IN THE ANDROID OPERATING SYSTEM CONTRIBUTE TO EASE OF
```

1    USE?

2    A.   WELL, EASE OF USE IS A GENERAL PRINCIPAL THAT WE HOLD VERY

3    DEARLY.  IT'S VERY IMPORTANT.  SO ALL THOSE FEATURES WE TRY TO

4    MAKE EASE OF USE.

5    Q.   AND YOU SAID THAT THE WHOLE IDEA WAS TO GIVE IT AWAY FOR

6    FREE?

7    A.   CORRECT.

8    Q.   IT -- HOW -- IS THAT SOFTWARE AVAILABLE FOR ANYONE?

9    A.   YEAH, IT'S ACTUALLY AVAILABLE ON THE INTERNET.  YOU CAN GO

10   TO SOURCE.ANDROID.COM AND DOWNLOAD THE SOFTWARE AND THE SOURCE

11   CODE FOR THE SOFTWARE.

12   Q.   LET'S GO BACK TO WHAT IT WAS LIKE WHEN YOU JOINED GOOGLE

13   BACK IN THE SPRING OF 2006.

14       WHAT WERE THE NUMBER OF PEOPLE ON THE TEAM, THE ANDROID

15   TEAM WHEN YOU FIRST JOINED IT?

16   A.   I DON'T REMEMBER THE EXACT NUMBER, BUT WE ALL FIT IN A

17   SMALL CONFERENCE ROOM MUCH SMALLER THAN THIS ROOM.  PROBABLY

18   20, 30 PEOPLE, SOMETHING LIKE THAT.

19   Q.   WE HEARD ABOUT FROM APPLE THE DEVELOPMENT OF THE IPHONE

20   AND WHAT THAT WAS LIKE.

21       CAN YOU TELL US WHAT THAT WAS LIKE, THAT TEAM WORKING

22   TOGETHER IN THE EARLY DAYS IN DEVELOPING ANDROID?

23   A.   WELL, IT WAS VERY MUCH A START-UP LIKE ENVIRONMENT.

24   PEOPLE TENDED TO THINK OF GOOGLE AS A VERY BIG COMPANY, BUT WE

25   WERE A SMALL TEAM WITHIN GOOGLE AND WE WERE VERY AUTONOMOUS.

1    THE COMPANY LET US DO OUR THING.

2         AS I SAID, IT WAS A VERY SMALL, LEAN AND MEAN TEAM, WHICH

3    WAS INTENTIONAL ON OUR PART.  WE WERE ALL VERY PASSIONATE ABOUT

4    WHAT WE WERE DOING AND WE WORKED REALLY HARD AND IT WAS VERY

5    START-UP LIKE.  I THINK THAT'S THE BEST WAY TO DESCRIBE IT.

6    Q.   WHEN YOU GOT THERE, YOU SAID EVERYBODY COULD FIT INTO ONE

7    CONFERENCE ROOM.  ARE WE TALKING SIX PEOPLE OR TWO DOZEN

8    PEOPLE?  HOW MANY APPROXIMATELY?

9    A.   WHEN I JOINED, IT WAS 20 OR 30 PEOPLE, SOMETHING LIKE THAT

10   MUCH.

11   Q.   IF WE JUST JUMP FORWARD FOR A MOMENT, WHEN WAS THE FIRST

12   PHONE RELEASED TO MARKET THAT ACTUALLY RAN ON ANDROID SOFTWARE?

13   A.   THE FIRST PHONE -- WHEN DID IT COME OUT?

14   Q.   YES?

15   A.   IT WAS OCTOBER 22ND, 2008.

16   Q.   OKAY.  SO WHEN YOU START OUT, THERE'S A SMALL GROUP OF

17   PEOPLE IN THE SPRING OF 2006, BY THE TIME THE PROJECTS WAS --

18   YOU HAD GOTTEN THE FIRST VERSION OF ANDROID OUT THERE,

19   APPROXIMATELY HOW MANY PEOPLE WERE THERE ON THE ANDROID TEAM AT

20   THAT POINT?

21   A.   UM, YOU KNOW, LESS THAN A HUNDRED STILL.  WE KEPT IT VERY

22   SMALL.  YOU KNOW, MAYBE 70, SOMETHING LIKE THAT.

23   Q.   AND --

24   A.   ENGINEERS.

25   Q.   WAS THERE A REASON WHY YOU KEPT THE DEVELOPMENT TEAM

1        SMALL?

2        A.    YEAH, ABSOLUTELY.

3        Q.    WHAT WAS THAT?

4        A.    WELL, IT'S BEEN OUR BELIEF THAT IT'S GOOD TO HAVE A SMALL

5        TEAM.  THAT WAY YOU CAN KNOW EVERYONE, YOU KNOW WHAT EVERYONE

6        IS WORKING ON AND YOU'RE ALL VERY -- YOU SHARE IN A COMMON GOAL

7        AND IT'S A VERY PERSONAL, SORT OF INTIMATE SETTING AND IT'S

8        EASIER TO COORDINATE WITH EACH OTHER.  THE BIGGER YOU GET, MORE

9        AND MORE TIME IS SPENT COORDINATING WITH EACH OTHER RATHER THAN

10       DOING THE WORK.  SO VERY MUCH INTENTIONAL WE KEPT THE TEAM

11       SMALL.

12       Q.    YOU REFERRED EARLIER TO IT BEING A LOT OF WORK.  CAN YOU

13       GIVE THE JURY SOME IDEA ABOUT WHAT THE HOURS WERE LIKE OR THE

14       LEVEL OF EFFORT INVOLVED IN DEVELOPING THESE PROGRAM?

15       A.    THE HOURS WERE PRETTY GRUELLING.  THEY CONTINUE TO BE

16       GRUELLING, BY THE WAY, BUT WE WORKED REALLY HARD, 60, 70, 80

17       HOURS.  WE WORKED WEEKENDS.  WE WORKED REALLY LATE AT NIGHT.

18       ALL HOURS.

19       Q.    WAS IT A CHALLENGE KEEPING UP MORALE ON THE TEAM?

20       A.    I WOULDN'T SAY SO ACTUALLY BECAUSE WE WERE ALL PASSIONATE

21       ABOUT WHAT WE WERE DOING.  SO WE WERE THERE EXCITED TO BE DOING

22       THIS.  IT FELT KIND OF NATURAL TO WORK HARD.

23       Q.    BEFORE THE FIRST PHONE THAT ACTUALLY RAN THE ANDROID

24       SOFTWARE WAS RELEASED TO THE MARKET, DID THERE COME A POINT

25       WHERE GOOGLE ANNOUNCED THAT IT WAS DEVELOPING THIS ANDROID

1     PLATFORM?

2     A.    SURE.

3     Q.    AND WHEN WAS THAT, APPROXIMATELY?

4     A.    APPROXIMATELY IT WAS THE FALL OF 2007.

5     Q.    AND THAT ANNOUNCEMENT WAS MADE IN CONNECTION WITH WHAT?

6     A.    WE ANNOUNCED WHAT'S KNOWN AS AN SDK.

7     Q.    WHAT'S THAT?

8     A.    IT STANDS FOR SOFTWARE DEVELOPMENT KIT, AND IT'S BASICALLY

9     A SET OF TOOLS, LIKE EMULATORS, DOCUMENTATION AND CORRESPONDING

10    MATERIALS THAT ENABLED APPLICATION DEVELOPERS TO BUILD

11    APPLICATIONS FOR ANDROID.

12    Q.    AND SO AT THAT TIME WAS THAT SOFTWARE DEVELOPMENT KIT

13    RELEASED TO THE WORLD?

14    A.    IT WAS.

15    Q.    AND WHAT WAS THE POINT OF DOING THAT BEFORE YOU EVEN HAD A

16    PHONE THAT RAN AN ANDROID?

17    A.    WELL, WE KNEW FROM DAY ONE THAT THERE NEEDED TO BE

18    APPLICATIONS ON THE ANDROID, THAT ALL THE APPLICATIONS WOULDN'T

19    BE PROVIDED BY GOOGLE.  IN FACT, MOST OF THE APPLICATIONS

20    SHOULD BE PROVIDED BY EXTERNAL COMPANIES.

21         WE KNEW THAT WAS OUR VISION.

22         WHAT WE WANTED TO MAKE SURE WAS WHEN THE FIRST PHONE

23    LAUNCHED, YOU KNOW, WHICH TURNED OUT TO BE IN OCTOBER OF 2008,

24    WE WANTED TO MAKE SURE THAT THERE WERE APPLICATIONS THERE FROM

25    DAY ONE, WHICH MEANT THAT THE APPLICATION DEVELOPERS NEEDED A

1    HEAD START BEFORE CONSUMERS WOULD BUY THE PRODUCT.

2    Q.    AND DID THAT WORK OUT?  BY THE TIME THE FIRST LOAN

3    LAUNCHED, WAS THERE ACTUALLY A PLACE WHERE PEOPLE COULD GO AND

4    DOWNLOAD APPS ON ANDROID?

5    A.    SURE, SURE.

6    Q.    SO HOW LONG DID IT TAKE TO WRITE THE ANDROID SOFTWARE

7    PLATFORM, YOU KNOW, FROM THE BEGINNING WHEN IT FIRST STARTED

8    UNTIL, YOU KNOW, THE FIRST PHONE CAME TO MARKET WITH AN

9    ANDROID, YOU KNOW, SOFTWARE PROGRAM?

10   A.    HOW LONG DID IT TAKE TO GET TO 1.0.

11   Q.    YEAH, TO 1.0?

12   A.    LET'S SEE.  SO WHEN I JOINED IN APRIL OF 2006, THE PROJECT

13   HAD ALREADY BEEN STARTED, SO LET'S SAY SOME TIME IN 2005 THEY

14   STARTED IT.

15        1.0 WAS BASICALLY OCTOBER OF 2008.  SO, YOU KNOW, THREE

16   YEARS, SOMETHING LIKE THAT.

17   Q.    IS THAT A LONG TIME FOR A SOFTWARE DEVELOPMENT PROGRAM?

18   A.    IT IS, YEAH.  IN GENERAL TERMS, IT IS.

19        BUT FOR SOMETHING AS COMPLICATED AS AN OPERATING SYSTEM

20   AND AS INVOLVED AS WHAT WE WERE DOING, IT'S NOT SURPRISING.

21   Q.    OKAY.  AND SINCE 1.0, HAVE THERE BEEN REVISIONS TO THE

22   ANDROID PROGRAM?

23   A.    ABSOLUTELY.

24   Q.    AND HOW OFTEN DO THOSE COME OUT?

25   A.    PRETTY OFTEN.  YOU KNOW, WE'VE DONE MANY, MANY PLATFORM

1    RELEASES, NEW VERSIONS OVER THE YEARS, MULTIPLE VERSIONS PER

2    YEAR.  SO VERY -- A LOT OF RAPID ITERATIONS AND EVOLUTION OF

3    THE PLATFORM.

4    Q.   AND WE'VE HEARD NAMES LIKE JELLY BEAN.  THEY ALL SOUND

5    LIKE DESSERTS?

6    A.   TASTY TREATS.

7    Q.   WHAT ARE SOME OF THE NAMES OF THE DIFFERENT VERSIONS?

8    A.   THE LATEST ONE IS CALLED KIT KAT.  JELLY BEAN WAS THE

9    PREVIOUS ONE.  AND LET'S SEE, I'LL GO -- THE TRICK, BY THE WAY,

10   IS IT'S ALPHABETICAL.

11   Q.   OKAY.

12   A.   THE FIRST ONE WAS CUPCAKE; THE NEXT ONE WAS DONUT, SO C

13   AND D; ECLAIR; FROYO; GINGERBREAD; HONEYCOMB; ICE CREAM

14   SANDWICH; JELLY BEAN; AND THEN KIT KAT.  ALL ALPHABETICAL.

15   Q.   OKAY.  WHY THESE REVISIONS?  WHY IS IT -- WHY DO YOU HAVE

16   THAT?

17   A.   WELL, WE WANT TO CONSTANTLY IMPROVE THE PRODUCT, AND, YOU

18   KNOW, COME OUT WITH NEW INNOVATIONS.  OUR GOAL WAS TO HAVE OUR

19   USERS BE REALLY EXCITED ABOUT THE PRODUCT AND WANT TO USE THE

20   PRODUCT AND BE HAPPY ABOUT USING THE PRODUCT.  SO THAT'S AN

21   ITERATIVE PROCESS AND, YOU KNOW, WE COME UP WITH NEW IDEAS AND

22   THIS IS A WAY TO GET THAT OUT THERE.

23   Q.   OKAY.  IS IT EVER FINISHED?

24   A.   I DON'T THINK SO.  I DON'T THINK AN OPERATING SYSTEM IS

25   EVER FINISHED.  IT'S GOING TO NEED A CONSTANT EVOLUTION.

1    Q.   OKAY.  THERE'S BEEN TESTIMONY THAT THE IPHONE WAS FIRST

2    AVAILABLE IN STORES IN JUNE OF 2007.  CAN YOU TELL US WHAT THE

3    STATUS OF THE ANDROID PROJECT WAS AS OF THAT TIME, JUNE OF

4    2007?

5    A.   LET'S SEE.  IN JUNE OF 2007, I DON'T ACTUALLY REMEMBER

6    WHEN THE IPHONE CAME OUT, BUT I'LL TAKE YOUR WORD FOR IT.

7         IN JUNE OF 2007, WE WERE RUNNING ON PROTOTYPE HARDWARE, WE

8    WERE OBVIOUSLY ALREADY DOING THAT WHEN I GOT THE DEMO IN

9    JANUARY OF 2006.  SO THAT WAS CONTINUING.

10        THERE WAS A LOT OF SOFTWARE BEING BUILT AT THAT POINT.  WE

11   WERE WORKING WITH MANUFACTURERS.  I WAS TRAVELING AROUND THE

12   WORLD WITH MY CO-WORKERS MEETING WITH MANUFACTURERS, TALKING

13   WITH THEM ABOUT ANDROID, EDUCATING THEM ON ANDROID.  SO A LOT

14   OF THINGS WERE GOING ON.

15   Q.   ALL RIGHT.  IN ADDITION TO THE ACTUAL WORK OF CREATING THE

16   CODE, THE SOFTWARE PROGRAM, WERE YOU ALSO INVOLVED IN THINGS,

17   YOU KNOW, EXTERNAL TO THE COMPANY AND ACTIVITIES IN THE

18   INDUSTRY TO TRY TO EDUCATE PEOPLE ABOUT THIS PRODUCT THAT WAS

19   COMING OUT?

20   A.   ABSOLUTELY.

21   Q.   CAN YOU TELL US A LITTLE BIT ABOUT WHAT THAT ENTAILED?

22   A.   SURE.  WELL, A LOT OF TRAVEL BECAUSE A LOT OF

23   MANUFACTURERS ARE NOT IN THE BAY AREA.  I'M BASED IN THE BAY

24   AREA.

25        WE WOULD MEET WITH MANUFACTURERS, LIKE SAMSUNG AND OTHERS,

1    YOU MENTIONED HTC AND LG AS EXAMPLES, TO EDUCATE THEM ON

2    ANDROID.  WE WOULD TELL THEM, HEY, WE'RE DOING THIS THING

3    CALLED ANDROID.  IT'S GOING TO BE OPEN SOURCE.  IT'S GOING TO

4    BE FREE.  WHAT DO YOU THINK?  DO YOU WANT TO USE IT?  THEY

5    WOULD HAVE A LOT OF QUESTIONS.  WE WOULD TALK ABOUT THAT.  THAT

6    SORT OF THING.

7    Q.   SO WHAT WAS THE REACTION WHEN, YOU KNOW, YOU SHOWED UP AS

8    GOOGLE FROM MOUNTAIN VIEW IN WHEREVER AND TO TELL THEM WE'RE

9    GOING TO GO INTO THE PHONE BUSINESS, WHAT WAS THE REACTION THAT

10   YOU GOT?

11   A.   I THINK SURPRISE INITIALLY, JUST LIKE I WAS SURPRISED WHEN

12   I FOUND OUT ANDY WAS WORKING ON ANDROID AT A SEARCH COMPANY.  I

13   THINK THEY HAD A SIMILAR RESPONSE, WHICH WAS, REALLY, GOOGLE IS

14   DOING A MOBILE OPERATING SYSTEM?

15        BUT, YOU KNOW, I THINK THEY QUICKLY REALIZED WE WEREN'T

16   JOKING AROUND.  I MEAN, WE HAD PROTOTYPES.  WE HAD DEMOS.  WE

17   HAD A LOT OF INFORMATION TO SHARE WITH THEM.

18   Q.   ALL RIGHT.  BUT WAS THAT SOMETHING THAT YOU ACTUALLY HAD

19   TO EDUCATE PEOPLE ABOUT AND SELL THEM A LITTLE BIT ON THE

20   CONCEPT?

21   A.   THE CONCEPT ITSELF, YOU KNOW, ONCE PEOPLE -- WHEN I SAY

22   PEOPLE, I MEAN MANUFACTURERS.  THE PEOPLE AT THE MANUFACTURERS

23   SORT OF REALIZED WE WERE SERIOUS ABOUT THIS AND ACTUALLY SAW

24   THE MERITS OF WHAT WE WERE DOING, THEY WERE REALLY INTO IT.

25   Q.   OKAY.  SO YOU TOLD US THAT THE FIRST ANDROID POWERED PHONE

```
 1    CAME TO MARKET IN NOVEMBER 2006.  WHAT WAS THE MANUFACTURER

 2    THAT BROUGHT THAT FIRST PHONE TO MARKET?

 3    A.   WELL, THE FIRST PHONE WAS OCTOBER 2008.

 4    Q.   I'M SORRY?

 5    A.   YEAH.  AND THAT WAS HTC.

 6    Q.   OKAY.

 7    A.   THAT WAS THE NAME OF THE MANUFACTURER?

 8    Q.   AND DO YOU REMEMBER WHEN THAT HAPPENED?  YOU KNOW, WAS

 9    THAT A BIG DAY FOR YOU?

10    A.   YEAH, ABSOLUTELY.

11    Q.   OKAY.

12    A.   IT WAS A HUGE DAY FOR ME.

13    Q.   HOW DOES GOOGLE DISTRIBUTE ANDROID TODAY?  IS IT BY GOING

14    TO THAT WEB PAGE THAT YOU REFERRED TO?

15    A.   THE SOURCE CODE TO ANDROID, YES, IS STILL AVAILABLE ON

16    SOURCE.ANDROID.COM.

17    Q.   DO YOU KNOW HOW MANY HANDSET MANUFACTURERS TODAY, HOW MANY

18    DIFFERENT COMPANIES THAT MAKE, YOU KNOW, MOBILE PHONES CREATE

19    PRODUCTS THAT RUN ON ANDROID SOFTWARE?

20    A.   YOU KNOW, I --

21           MS. KREVANS:  YOUR HONOR, BEYOND THE SCOPE.

22           THE COURT:  SUSTAINED.

23    BY MR. QUINN:

24    Q.   IN TERMS OF THE DEVELOPMENT OF ANDROID, ARE MANUFACTURERS

25    ABLE TO, YOU KNOW, LAYER ON ANDROID THEIR OWN, YOU KNOW, THEIR
```

```
 1        OWN IDENTITIES OR IN SOME WAY BRAND THEM THEMSELVES?

 2              MS. KREVANS:  SAME OBJECTION, YOUR HONOR.

 3              THE COURT:  SUSTAINED.

 4   BY MR. QUINN:

 5   Q.   DOES GOOGLE REQUIRE THAT MANUFACTURERS USE GOOGLE APPS?

 6   THAT IS, VARIOUS GOOGLE APPS?  THAT IF YOU'RE GOING TO USE

 7   ANDROID, THAT YOU MUST ALSO USE GOOGLE APPS?

 8              MS. KREVANS:  SAME OBJECTION, YOUR HONOR.

 9              THE COURT:  OVERRULED.

10              THE WITNESS:  SORRY.  THE QUESTION AGAIN?

11   BY MR. QUINN:

12   Q.   YEAH.  THE QUESTION IS WHETHER GOOGLE REQUIRES THAT

13   SOMEONE WHO'S GOING TO USE ANDROID ALSO USE GOOGLE APPS?

14   A.   YEAH, WE DO NOT.

15   Q.   ALL RIGHT.  SO, FOR EXAMPLE, COULD YAHOO DOWNLOAD ANDROID

16   AND MAKE A YAHOO PHONE?

17   A.   ABSOLUTELY.

18   Q.   HOW ABOUT IN TERMS OF THE THIRD PARTY APP DEVELOPERS THAT

19   MAKE APPS FOR ANDROID, DO THEY NEED APPROVAL OF GOOGLE IN ORDER

20   TO OFFER THEIR APPS IN THE MARKETPLACE?

21   A.   NO.  WE HAVE A, A STORE, IT'S CALLED GOOGLE PLAY, WHERE

22   APPLICATION DEVELOPERS CAN ACCOMPLISH THEIR APPLICATIONS AND

23   PROVIDED THEY'RE NOT DOING ANYTHING ILLEGAL OR ANYTHING LIKE

24   THAT, THEY CAN ABSOLUTELY PUBLISH THEIR APPLICATIONS WITHOUT US

25   AGREEING TO IT OR ANYTHING LIKE THAT.  IT'S SELF-SERVICE.
```

1    Q.   NOW, YOU INDICATED THAT THE ANDROID SYSTEM IS FLEXIBLE.

2    CAN YOU EXPLAIN HOW IT'S FLEXIBLE FROM THE STANDPOINT OF

3    MANUFACTURERS?

4         MS. KREVANS:  YOUR HONOR, ANYTHING ABOUT WHAT

5    MANUFACTURERS THOUGHT OR DID IS BEYOND THE SCOPE.

6         MR. QUINN:  YOUR HONOR, HE'S DESIGNATED DESIGN, OP,

7    DEVELOPMENT AND OPERATION, AS WELL AS POTENTIAL ALTERATIONS TO

8    ANDROID SOFTWARE IS THE DESIGNATION.

9         THE COURT:  OVERRULED.

10        GO AHEAD.  YOU MAY ANSWER.

11   BY MR. QUINN:

12   Q.   SO IN TERMS -- IN TERMS OF THE FLEXIBILITY THAT IS

13   AVAILABLE TO MANUFACTURERS, CAN YOU EXPLAIN WHY ANDROID IS AN

14   ADVANTAGE FOR MANUFACTURERS?

15   A.   SURE.  WELL, THE -- THE OPEN SOURCE NATURE OF ANDROID

16   MEANS THAT A LOT OF CUSTOMIZATION IS POSSIBLE BY THE

17   MANUFACTURERS.  OPEN SOURCE MEANS THE SOURCE CODE, WHICH IS

18   WHAT ENGINEERS WORK ON, WE MAKE THAT AVAILABLE FOR THE WHOLE

19   WORLD TO SEE, WHICH MEANS THAT THE MANUFACTURERS HAVE ACCESS TO

20   THE SOURCE CODE THAT, IN FACT, GOOGLE'S ENGINEERS HAVE BUILT.

21        WHAT THIS DOES IS THE MANUFACTURERS CAN THEN TAKE THAT

22   SOURCE CODE, ADD SOME INTERESTING TWIST TO IT OF THEIR OWN, IT

23   MIGHT BE A BRANDING THING, IT MIGHT BE A NEW FEATURE, IT COULD

24   BE ANYTHING, BUT THAT'S A LEVEL OF FLEXIBILITY THAT IS NOT

25   AVAILABLE ON OTHER PLATFORMS, ESPECIALLY THOSE THAT ARE CLOSED

```
 1        SOURCE.

 2        Q.   HOW ABOUT FOR CARRIERS, DOES IT ENABLE FLEXIBILITY FOR

 3        CARRIERS ALSO TO MAKE CHANGES IN THE OPERATION OF ANDROID?

 4                  MS. KREVANS:  SAME OBJECTION, YOUR HONOR.

 5                  THE COURT:  OVERRULED.

 6        GO AHEAD.  YOU MAY ANSWER.

 7                  THE WITNESS:  FOR CARRIERS, IT'S A SIMILAR TYPE OF

 8        THING.  IF A CARRIER, FOR INSTANCE, WANTS TO OFFER A NEW

 9        SERVICE, AN EXAMPLE MIGHT BE THEY USED TO HAVE 3G, BUT NOW THEY

10        HAVE 4G LTE, THAT'S NEW NETWORK TECHNOLOGY, YOU MIGHT HAVE SEEN

11        ADS ABOUT IT, THAT'S A NEW NETWORK TECHNOLOGY THAT NEEDS

12        SOFTWARE.

13             AND THIS ENABLES CARRIERS TO WORK WITH THEIR MANUFACTURERS

14        TO ADD THESE FUNCTIONALITIES INTO ANDROID WITHOUT GOOGLE HAVING

15        TO DO EVERYTHING.

16        BY MR. QUINN:

17        Q.   ALL RIGHT.  DOES THAT MEAN AT THE END THAT THERE'S MORE

18        OPTIONS AVAILABLE TO USERS, MORE DIFFERENT CHOICES AVAILABLE TO

19        THEM IN TERMS OF PROGRAMS AND TYPES OF PHONES AND FEATURES?

20        A.   ABSOLUTELY.  THAT'S ONE OF THE MAIN DESIGN GOALS OF

21        ANDROID WAS CHOICE AND ABILITY FOR PEOPLE TO BE ABLE TO CHOOSE

22        DIFFERENT TYPES.  ONE SIZE DOES NOT FIT ALL.

23             YOU KNOW, BEING ABLE TO CREATE A BIGGER PHONE, SMALLER

24        PHONES, LTE PHONES, 3G PHONES, IT'S REALLY UP TO THE

25        MANUFACTURER.
```

1      Q.   AND DO YOU -- IS THERE ALWAYS ONE DEVICE THAT -- WE'VE

2      HEARD OF SOMETHING CALLED A GOOGLE EXPERIENCE DEVICE?

3      A.   UM-HUM.

4      Q.   CAN YOU TELL US WHAT THAT IS?

5      A.   YEAH.  IT'S A TERM THAT WE USED TO USE TO REFER TO DEVICES

6      THAT WE WOULD WORK WITH -- "WE" MEANING ANDROID ENGINEERS AT

7      GOOGLE -- WOULD WORK DIRECTLY WITH AN OEM, A MANUFACTURER ON.

8      WE WOULD DO THESE ABOUT ONCE A YEAR.  EVERY TIME THERE'S A NEW

9      PLATFORM RELEASE, A NEW VERSION OF THE OPERATING SYSTEM, WE

10     WOULD PICK A MANUFACTURER, AND WE WOULD WORK WITH THEM ON A

11     SPECIFIC DEVICE.

12          AND THAT DEVICE WOULD COME WITH ANDROID -- WITHOUT ANY OF

13     THE CUSTOMIZATIONS THAT I TALKED ABOUT, JUST THE WAY THAT WE,

14     THE ANDROID TEAM AT GOOGLE ENVISIONED IT, AND THAT'S WHAT

15     DIFFERENTIATED GOOGLE EXPERIENCE DEVICE WAS THERE WAS NO

16     CUSTOMIZATION.

17     Q.   ALL RIGHT.  SO THE GOOGLE EXPERIENCE DEVICES, THAT WOULD

18     HAVE SORT OF PURE ANDROID IN TERMS OF THE OPERATING PLATFORM?

19     A.   YEAH, THAT'S WHAT SOME PEOPLE CALL IT, PURE ANDROID, YES.

20     Q.   ALL RIGHT.  AND THE APPLICATIONS?

21     A.   THE APPLICATIONS, TOO.

22     Q.   ALL RIGHT.  AND IF WE HAVE A NEXUS PHONE HERE.  I'M

23     HOLDING EXHIBIT, JX 29K, WHICH HAS BEEN IDENTIFIED AS A NEXUS

24     PHONE.

25          CAN YOU TELL US WHETHER THIS IS, YOU KNOW, WHAT WOULD HAVE

1       BEEN -- WHAT YOU USED TO CALL A GOOGLE EXPERIENCE DEVICE.

2       A.   YEAH, THEY'RE ROUGHLY SYNONYMOUS.  THAT ONE LOOKS LIKE A

3       GALAXY NEXUS, WHICH, YOU KNOW, WE CALL IT NEXUS.  THAT WAS KIND

4       OF A NEWER NAME FOR GOOGLE EXPERIENCE DEVICE.

5       Q.   ALL RIGHT.  AND WHO WROTE THE OPERATING SYSTEM SOFTWARE ON

6       THIS PHONE?

7       A.   THE ANDROID TEAM AT GOOGLE DID.

8       Q.   AND WHO WROTE THE APPLICATION SOFTWARE ON THIS PHONE?

9       A.   SAME ANSWER, THE ANDROID TEAM AT GOOGLE.

10      Q.   IS THERE ANY SOFTWARE ON THIS GALAXY NEXUS PHONE THAT WAS

11      NOT WRITTEN BY GOOGLE?

12      A.   YEAH.

13      Q.   WHAT WOULD THAT BE?

14      A.   MOSTLY -- AGAIN, THIS IS A GOOGLE EXPERIENCE DEVICE, SO

15      THOSE, THE SOFTWARE THAT DIDN'T COME FROM GOOGLE IS MOSTLY

16      AROUND HARDWARE SPECIFIC FUNCTIONALITY, YOU KNOW, THINGS THAT

17      TALK TO THE CHIP OR THINGS THAT TALK TO THE SCREEN OR NETWORK

18      RELATED STUFF.

19      Q.   ALL RIGHT.  WOULD ANY OF THAT HARDWARE SPECIFIC

20      FUNCTIONALITY, WOULD THAT LEVEL OF SOFTWARE HAVE ANYTHING TO DO

21      WITH GMAIL?

22      A.   NO.

23      Q.   OR GOOGLE -- THE GOOGLE SEARCH APPLIANCE, YOU KNOW, WHAT'S

24      BEEN REFERRED TO ALSO AS UNIVERSAL SEARCH HERE, WOULD THAT HAVE

25      ANYTHING TO DO WITH THAT?

1    A.   THE GOOGLE SEARCH APPLICATION I THINK IS WHAT YOU MEANT.

2    Q.   RIGHT.

3    A.   NO.

4    Q.   OR SYNC ADAPTERS?  WOULD ANY OF THAT SOFTWARE THAT MIGHT

5    BE ADDED BY THE HARDWARE COMPANY HAVE ANYTHING TO DO WITH THE

6    SYNC ADAPTERS?

7    A.   NOT ON THE GALAXY NEXUS, NO.

8    Q.   OR THE GOOGLE KEYBOARD, DID IT HAVE ANYTHING TO DO WITH

9    THAT?

10   A.   NO.

11   Q.   OR THE LOCK SCREEN?

12   A.   NOPE.

13   Q.   OR SOMETHING WE'VE HEARD REFERRED TO AS LINKIFY?

14   A.   NO.

15   Q.   OR THE BROWSER?

16   A.   NO.

17   Q.   WHERE WERE YOU ON JANUARY 9TH, 2007?

18   A.   THAT IS A VERY SPECIFIC DATE.  I DON'T KNOW.  I DON'T

19   REMEMBER.

20   Q.   ALL RIGHT.  IT DOESN'T MATTER.

21        DO YOU REMEMBER WHEN THE IPHONE WAS ANNOUNCED?

22   A.   (SHAKES HEAD FROM SIDE TO SIDE.)

23        MS. KREVANS:  SAME OBJECTION, YOUR HONOR.

24        THE COURT:  SUSTAINED.

25

1        BY MR. QUINN:

2        Q.   WELL, JUST BY WAY OF, YOU KNOW, I'M JUST ASKING, AT ANY

3        POINT -- YOU BECAME AWARE THAT THERE WAS SOMETHING CALLED AN

4        IPHONE THAT CAME INTO THE MARKETPLACE?

5                MS. KREVANS:  SAME OBJECTION, YOUR HONOR.

6                MR. QUINN:  THIS -- WE HAVE TO ADDRESS THE ISSUE,

7        YOUR HONOR.

8                MS. KREVANS:  THIS WAS SPECIFICALLY THE SUBJECT OF

9        THE HPO, YOUR HONOR.

10               MR. QUINN:  I DON'T THINK SO.

11               THE COURT:  WHY DON'T YOU MOVE ON.  I'LL TAKE A LOOK

12       AT IT.

13               MR. QUINN:  OKAY.

14       Q.   DID YOU -- DID YOU EVER COPY ANYTHING FROM THE IPHONE?

15       A.   NO.

16               MS. KREVANS:  SAME OBJECTION, YOUR HONOR.

17               THE COURT:  OVERRULED.

18           HE CAN ANSWER THAT QUESTION.

19               THE WITNESS:  NO.

20       BY MR. QUINN:

21       Q.   ANY MEMBERS OF YOUR TEAM EVER COPY ANYTHING FROM THE

22       IPHONE?

23       A.   NOT THAT I'M AWARE OF.

24       Q.   WOULD IT EVER OCCUR TO YOU TO COPY SOMETHING FROM THE

25       IPHONE?

1    A.   NO.  ACTUALLY, IF ANYTHING, THE OPPOSITE.  WE LIKE TO HAVE

2    OUR OWN IDENTITY.  WE HAVE OUR OWN IDEAS.  WE WERE VERY

3    PASSIONATE, AS I MENTIONED, ABOUT WHAT WE WERE DOING, AND IT

4    WAS IMPORTANT THAT IT WAS OUR IDEAS.

5    Q.   ALL RIGHT.  WERE THERE SOME THINGS THAT, YOU KNOW, ANDROID

6    OFFERED TO THE MARKETPLACE THAT ANDROID WAS THE FIRST TO BRING

7    TO THE MARKETPLACE?

8    A.   SURE.

9    Q.   AND CAN YOU THINK OF SOME OF THOSE THINGS?

10   A.   YEAH.

11   Q.   WHAT WOULD BE EXAMPLES?

12   A.   WELL, AN EXAMPLE IS MULTITASKING.

13   Q.   WHAT IS THAT?

14   A.   YEAH.  THAT'S THE ABILITY TO HAVE MULTIPLE THINGS RUNNING

15   AT THE SAME TIME, MULTIPLE APPLICATIONS AND SO ON AND SO FORTH

16   RUNNING AT THE SAME TIME.

17   Q.   THAT WAS SOMETHING THAT ANDROID, YOU FOLKS AT GOOGLE

18   DEVELOPED FOR ANDROID AND THAT WAS THE FIRST IN A MOBILE

19   OPERATING SYSTEM?

20   A.   WELL, FIRST CERTAINLY IN THAT SORT OF CATEGORY OF

21   SMARTPHONE, YEAH.

22   Q.   ALL RIGHT.  HOW ABOUT -- CAN YOU THINK OF ANY OTHERS,

23   THINGS THAT YOU DEVELOPED WHICH WERE ANDROID FIRSTS?

24   A.   SURE.  NOTIFICATION SHADE.

25        I'M SORRY ABOUT THAT.

1     Q.   AND DID THEY -- THE FLEXIBILITY THAT YOU REFERRED TO THAT

2     WAS BUILT INTO ANDROID, DID THAT ENABLE CARRIERS AND EQUIPMENT

3     MANUFACTURERS TO BRING FEATURES TO MARKET FIRST USING THE

4     FLEXIBILITY IN ANDROID?

5     A.   SURE.

6     Q.   AND CAN YOU GIVE SOME EXAMPLES OF THAT?

7     A.   YEAH.  I THINK A PERFECT EXAMPLE OF THAT IS THE 3G AND 4G

8     LTE TOPIC I WAS DISCUSSING EARLIER.  4G LTE IS THE NEW NETWORK

9     TECHNOLOGY, WAS THE NEW NETWORK TECHNOLOGY.  CARRIERS IN THE

10    U.S., FOR INSTANCE, VERIZON, WAS ABLE TO ROLL THAT OUT VERY

11    EARLY ON THE ANDROID.

12    Q.   AND THAT WAS A FIRST WITH ANDROID?

13    A.   I BELIEVE SO.

14    Q.   AND HOW ABOUT SCREEN SIZE?  DID THE DEVELOPMENT OF ANDROID

15    ENABLE LARGER SIZE SCREENS?

16    A.   SURE.

17    Q.   CAN YOU EXPLAIN HOW SOFTWARE CONTRIBUTES TO A HARDWARE

18    FEATURE LIKE THAT?

19    A.   YEAH.  THE SOFTWARE NEEDS TO KNOW WHAT IS THE ACCEPTABLE

20    RANGE OF SCREEN SIZES.  IS THERE ONE SCREEN SIZE AND THAT'S

21    ONLY ONE?  OR IS THERE -- CAN THERE BE MULTIPLE SCREEN SIZES?

22         THE IDEA BEHIND THE ANDROID, SINCE DAY ONE ACTUALLY, WAS

23    THAT WE WANTED THE OPERATING SYSTEM AND THE APPLICATIONS

24    RUNNING ON TOP OF THE OPERATING SYSTEM TO BE ABLE TO RUN ON

25    VARIOUS SCREEN SIZES.  THAT WAS A DESIGN CONCEPT.

1     Q.   ALL RIGHT.  IS IT -- HOW DO YOU MAKE SURE, IN DEVELOPING

2     ANDROID AND IN SORT OF DESIGNING IT AND PULLING IT TOGETHER,

3     HOW DO YOU MAKE SURE THAT THE APPLICATIONS THAT ARE BUILT FOR

4     ANDROID CAN RUN ON THE PHONES, THE HANDSETS MADE BY A NUMBER OF

5     DIFFERENT MANUFACTURERS?

6     A.   YEAH.  SO THIS GETS INTO THE TOPIC AROUND COMPATIBILITY,

7     COMPATIBILITY.

8     Q.   WHAT DO YOU MEAN BY THAT?

9     A.   YEAH.  SO BASICALLY ANDROID, AS AN OPERATING SYSTEM, OPEN

10    SOURCE OPERATING SYSTEM, CAN BE USED FOR ANY PURPOSE.  YOU

11    COULD BUILD A REFRIGERATOR RUNNING ANDROID.

12    Q.   ARE THERE SUCH THINGS?

13    A.   ACTUALLY, I USED TO MAKE THAT JOKE BACK IN 2008 OR

14    WHATEVER, BUT THERE NOW ARE ACTUALLY REFRIGERATORS RUNNING

15    ANDROID.

16    Q.   CAN YOU MAKE PHONE CALLS?

17    A.   YEAH.

18         (LAUGHTER.)

19         THE WITNESS:  BUT THE IDEA IS THERE'S THIS WHOLE

20    OPERATING SYSTEM, IT'S OPEN SOURCE, YOU COULD PUT IT IN

21    WHATEVER PRODUCT YOU WANT TO.

22         IF YOU WANT TO BUILD A PRODUCT THAT CAN RUN APPLICATIONS

23    THAT PEOPLE DOWNLOAD THROUGH A STORE, LIKE GOOGLE PLAY, THERE

24    IS A COMPATIBILITY REQUIREMENT.

25         AND SO WE HAVE PROCESSES AND TECHNOLOGIES IN PLACE TO MAKE

1    SURE, IF A MANUFACTURER DECIDES THEY WANT TO BUILD A COMPATIBLE

2    DEVICE, HERE'S WHAT YOU NEED TO DO.  AND WE EXPLAIN IT TO THEM,

3    AND THEY MAKE A DECISION WHETHER THAT'S WHAT THEY WANT TO DO OR

4    NOT.

5    BY MR. QUINN:

6    Q.   DOES OPEN SOURCE ANDROID INCLUDE GOOGLE APPLICATIONS LIKE

7    GMAIL, YOUTUBE, GOOGLE MAPS, THE PLAY STORE?  IS THAT PART OF

8    THE ANDROID OPEN SOURCE PROGRAM?

9    A.   NOT PART OF THE OPEN SOURCE, NO.

10   Q.   WHY NOT?

11   A.   THOSE ARE -- YOU MENTIONED GMAIL, FOR INSTANCE, OR

12   YOUTUBE.  THOSE ARE GOOGLE PRODUCTS, JUST LIKE THERE'S GMAIL ON

13   THE WEB FROM YOUR P.C. OR YOU CAN USE YOUR P.C. TO GET TO

14   YOUTUBE, THOSE ARE PRODUCTS FROM GOOGLE.  SO FOR THOSE

15   PRODUCTS, IN OTHER WORDS, THEY'RE NOT TIED TO THE OPERATING

16   SYSTEM, THE SOURCE CODE IS NOT PUBLICLY AVAILABLE.  THOSE ARE

17   PROPRIETARY APPLICATIONS.

18   Q.   ALL RIGHT.  BUT CAN SOMEONE WHO WANTS TO MAKE A PRODUCT

19   THAT RUNS ON ANDROID INCLUDE THOSE GOOGLE PRODUCTS, LIKE GMAIL,

20   YOUTUBE, GOOGLE MAPS, YOU KNOW, ON THEIR PRODUCT ALONG WITH THE

21   OPEN SOURCE CODE?

22   A.   YOU MEAN MANUFACTURERS?

23   Q.   YES, EXACTLY?

24   A.   CAN MANUFACTURERS INCLUDE GMAIL OR YOUTUBE OR SOMETHING

25   LIKE THAT.

1    Q.   YES.

2    A.   YES, IF THEY GET A LICENSE FROM US, THEY CAN DO THAT.

3    Q.   IS THERE SOME TYPE OF A LICENSING AGREEMENT THAT THEY NEED

4    TO ENTER INTO?

5         MS. KREVANS:  BEYOND THE SCOPE, YOUR HONOR.

6         THE COURT:  OVERRULED.

7    GO AHEAD.  YOU MAY ANSWER.

8         THE WITNESS:  YES, THERE IS.

9    BY MR. QUINN:

10   Q.   ALL RIGHT.  SO LET ME TALK A LITTLE BIT NOW ABOUT, YOU

11   KNOW, IN TERMS OF WHAT CAN BE CHANGED, THE WAY ANDROID IS

12   DESIGNED, AT LEAST FOR PROPRIETARY APPLICATIONS, ABOUT, YOU

13   KNOW, WHAT A MANUFACTURER LIKE SAMSUNG OR SOME OTHER HANDSET

14   MANUFACTURER, WHAT THEY CAN CHANGE IN ANDROID AND WHAT THEY

15   CAN'T CHANGE IN ANDROID.

16        THAT'S THE SUBJECT I'M TURNING TO IF YOU FOLLOW ME.

17   A.   I DO.

18   Q.   OKAY.  THE OPEN SOURCE PART THAT YOU CAN DOWNLOAD, CAN

19   THEY MAKE ANY CHANGES THEY WANT IN THAT?

20   A.   YEAH, ABSOLUTELY.  AND THAT -- IT DEPENDS -- SO THE ANSWER

21   IS, YES, BUT IT ALSO DEPENDS.  THERE'S A LITTLE BIT OF A NUANCE

22   THERE.

23   Q.   COULD YOU EXPLAIN, PLEASE?

24   A.   SURE.  SO IF A MANUFACTURER -- REMEMBER I WAS TALKING

25   ABOUT THE REFRIGERATOR.  IF SOMEONE WANTS TO BUILD AN ANDROID

1    DEVICE THAT ISN'T COMPATIBLE, THEY DON'T CARE ABOUT

2    APPLICATIONS, THEY CAN DO WHATEVER THEY WANT.

3    Q.   RIGHT.

4    A.   IF SOMEONE WANTS TO MAKE, A MANUFACTURER WANTS TO MAKE A

5    DEVICE THAT IS COMPATIBLE, IN OTHER WORDS, YOU CAN RUN

6    APPLICATIONS ON IT, THEN THERE ARE THOSE COMPATIBILITY

7    REQUIREMENTS.

8        SO AS PART OF THE COMPATIBILITY REQUIREMENTS, THERE ARE

9    TEST CASES THAT WE RUN TO ENSURE API'S, THESE ARE BUILDING

10   BLOCKS FOR APPLICATIONS, ARE CONSISTENT ACROSS ONE DEVICE TO

11   ANOTHER.

12   Q.   OKAY.  SO DO THESE COMPATIBILITY REQUIREMENTS SORT OF

13   LIMIT THE CHANGES THAT CAN BE MADE IN THE OPEN SOURCE SOFTWARE

14   IF SOMEONE WANTS TO MAKE A PRODUCT THAT'S GOING TO BE ANDROID

15   COMPATIBLE?

16   A.   CORRECT.  THERE'S SOME GUIDELINES AROUND WHAT YOU CAN AND

17   CANNOT DO BECAUSE THE WHOLE PREMISE IS YOU'RE TRYING TO BUILD A

18   COMPATIBLE DEVICE.  THERE ARE CERTAIN THINGS -- YOU KNOW, IN

19   ORDER TO BE COMPATIBLE, THEY HAVE TO BE CONSISTENT FROM ONE

20   DEVICE TO ANOTHER.

21   Q.   ALL RIGHT.  LET ME NOW ASK YOU ABOUT THOSE GOOGLE PRODUCTS

22   THAT YOU IDENTIFIED, LIKE GMAIL, YOUTUBE, GOOGLE MAPS, THE PLAY

23   STORE.  I ASSUME THERE'S OTHERS AS WELL?

24   A.   SURE.

25   Q.   CAN SOMEONE WHO WANTS TO MAKE AN ANDROID -- A PRODUCT THAT

```
1    RUNS ON ANDROID MAKE CHANGES IN THOSE GOOGLE PROPRIETARY

2    PRODUCTS?

3    A.   THEY CANNOT.

4    Q.   WHY NOT?

5    A.   WELL, AS I MENTIONED EARLIER, THESE APPLICATIONS, LIKE

6    GMAIL OR YOUTUBE, ARE PRODUCTS FROM GOOGLE.  WE DON'T SUPPLY

7    THE SOURCE CODE FOR THOSE.  THOSE ARE PROPRIETARY, MEANING IF

8    YOU DON'T HAVE THE SOURCE CODE, YOU CAN'T MODIFY IT.  YOU JUST

9    GET -- YOU, MEANING THE MANUFACTURER, JUST GET THE END RESULT

10   OF WHAT WE'VE BUILT.  WE DON'T GIVE YOU THE SOURCE CODE THAT WE

11   USE TO BUILD IT.  SO THEY CAN'T MODIFY IT.

12   Q.   INSTEAD OF THE END RESULT, THE SOURCE, WHAT IS IT THAT

13   THEY GET?

14   A.   THE END RESULT OF SOURCE CODE, AFTER A BUNCH OF TECHNICAL

15   THINGS THAT HAPPEN, IS BINARIES.

16   Q.   SO THEY GET THE BINARY TODAY FOR THESE SPECIFIC GOOGLE

17   PRODUCTS?

18   A.   CORRECT.

19   Q.   LET ME ASK YOU ABOUT SOME OF THE FEATURES THAT WE'VE HEARD

20   ABOUT IN THIS TRIAL.

21        ARE THERE SYNC ADAPTERS, SYNC ADAPTERS IN GOOGLE GMAIL?

22   A.   SURE.

23   Q.   AND THAT'S A PROPRIETARY GOOGLE PRODUCT?

24   A.   YES.

25   Q.   ARE THERE SYNC ADAPTERS IN GOOGLE CALENDAR?
```

```
 1        A.   YES.

 2        Q.   AND IN GOOGLE CONTACTS?

 3        A.   YES.

 4        Q.   AND CAN THOSE SYNC ADAPTERS IN THOSE PROPRIETARY GOOGLE

 5   PRODUCTS BE CHANGED BY A MANUFACTURER WHO'S MAKING A PRODUCT

 6   THAT'S GOING TO USE THOSE APPS?

 7        A.   NO.

 8        Q.   THAT'S BECAUSE THEY GET THAT IN BINARY FORM AND THEY CAN'T

 9   CHANGE THAT?

10        A.   YEAH, THEY'RE INCLUDED IN THE BINARY, THAT IS, GMAIL OR SO

11   ON, AND SINCE GMAIL IS BINARY, THEY CAN'T MODIFY IT.

12        Q.   ALL RIGHT.  LET ME ASK YOU ABOUT ANOTHER FEATURE WE'VE

13   HEARD ABOUT, AND THAT'S A GOOGLE KEYBOARD.

14             IS THERE -- FIRST OFF, IS THERE SUCH A THING AS A GOOGLE

15   KEYBOARD?

16        A.   THERE IS.

17        Q.   IS THAT SOMETHING THAT IS PROPRIETARY, THAT KEYBOARD

18   THAT'S PROPRIETARY TO GOOGLE?

19        A.   THE GOOGLE KEYBOARD IS PROPRIETARY, YES.

20        Q.   IF A MANUFACTURER IS MAKING A PRODUCT THAT RUNS ON ANDROID

21   AND WANTS TO USE THAT GOOGLE KEYBOARD, CAN THEY MAKE CHANGES TO

22   THAT KEYBOARD?

23        A.   YEAH.  IT'S UP TO THEM WHETHER THEY WANT TO USE IT OR NOT.

24   BUT IF THEY DECIDE THEY WANT TO USE IT, THEY CAN'T MODIFY IT.

25        Q.   CANNOT?
```

1    A.   CANNOT.

2    Q.   AND THEN WE'VE ALSO HEARD TESTIMONY ABOUT LINKING

3    STRUCTURES TO ACTIONS OR ANALYZER SERVERS, YOU KNOW, A FEATURE

4    THAT ACTUALLY RECOGNIZES AND LINKS PHONE NUMBERS AND E-MAIL

5    ADDRESSES IN TEXT.

6         DO YOU UNDERSTAND WHAT I'M REFERRING TO?

7    A.   I HAVEN'T HEARD THE TESTIMONY OBVIOUSLY, BUT, SURE, I

8    UNDERSTAND WHAT YOU'RE SAYING.

9    Q.   ALL RIGHT.  IS THERE SOMETHING CALLED A LINKIFY API?

10   A.   THERE IS.

11   Q.   ALL RIGHT.  IS THAT SOMETHING THAT A MANUFACTURER WHO

12   WANTS TO BUILD A GOOGLE PRODUCT AND HAS ACCESS TO THIS, IS THAT

13   SOMETHING THAT THEY CAN CHANGE?

14   A.   WELL, LINKIFY, AGAIN, IF THEY'RE BUILDING A COMPATIBLE

15   DEVICE, THAT FALLS INTO THE COMPATIBILITY REQUIREMENTS THAT I

16   MENTIONED.

17        SO THE SOURCE CODE IS AVAILABLE TO LINKIFY.  MANUFACTURERS

18   CAN SEE THE SOURCE CODE TO LINKIFY.  THEY CAN MODIFY IT.

19        BUT THEY HAVE TO ABIDE BY THE RULES OF COMPATIBILITY.

20   Q.   AND DOES THAT MEAN COULD THEY CHANGE WHAT'S CALLED THE

21   SIGNATURE?

22   A.   NO, THEY CANNOT CHANGE THE SIGNATURE, NO.

23   Q.   MAYBE YOU COULD EXPLAIN WHAT THE SIGNATURE IS?

24   A.   YEAH, I WAS JUST GOING TO DO THAT.  SIGNATURES BASICALLY

25   MEAN WHAT THE API IS CALLED, THE NAME OF THE API.  YOU KNOW,

1       JUST LIKE MY NAME IS HIROSHI, EVERY API HAS A UNIQUE NAME, AND

2       THAT'S WHAT WE REFER TO AS A SIGNATURE.

3       Q.   CAN THEY CHANGE THE BEHAVIOR OF THE LINKIFY API?

4       A.   THAT'S THE OTHER THING THAT THEY CANNOT CHANGE.   SO

5       BASICALLY THE COMPATIBILITY REQUIREMENTS SAY THAT YOU CAN'T

6       CHANGE THE SIGNATURE AND YOU CAN'T CHANGE WHAT THE API DOES.

7       Q.   OKAY.   WE'VE HEARD ABOUT BACKGROUND SYNCHRONIZATION.   DOES

8       THAT MEAN SOMETHING TO YOU, THE TERM BACKGROUND

9       SYNCHRONIZATION?

10      A.   SURE.

11      Q.   AND WHAT DOES THAT MEAN TO YOU IN THE CONTEXT OF ANDROID?

12      A.   IT MEANS SYNCHRONIZATION THAT'S HAPPENING WITHOUT THE USER

13      BEING AWARE OF IT.

14      Q.   DOES ANDROID INCLUDE BACKGROUND SYNCHRONIZATION?

15      A.   SURE.

16      Q.   AND WHY DID GOOGLE DECIDE TO INCLUDE BACKGROUND

17      SYNCHRONIZATION IN ANDROID?

18      A.   WELL, IT'S AN INCREDIBLY USEFUL FEATURE.   IT'S SOMETHING

19      THAT I ACTUALLY PERSONALLY HAVE A LOT OF EXPERIENCE WITH AT

20      THIS COMPANY CALLED GOOD THAT I WORK AT.   THEY DID WIRELESS

21      E-MAIL, AND YOU CAN IMAGINE SYNCHRONIZING E-MAIL IS A CORE PART

22      OF THAT OFFERING.   IT'S AN IMPORTANT FEATURE.   GOOGLE IS ALSO A

23      CLOUD COMPANY.

24      Q.   WHAT DOES THAT MEAN, CLOUDS COMPANY?

25      A.   IT MEANS GOOGLE PRODUCES CLOUD SERVICES, WEBSITES, THINGS

```
1    THAT YOU INTERACT WITH AT GOOGLE THROUGH THEIR WEBSITE.  GMAIL

2    IS AN EXAMPLE.  GOOGLE RUNS A MAIL SERVICE CALLED GMAIL.  AND

3    SINCE WE HAD A CLOUD MAIL SERVICE CALLED GMAIL, SYNCHRONIZING

4    THAT ON A MOBILE PHONE SEEMED LIKE AN OBVIOUS THING TO DO.

5    Q.   IS THIS AN IDEA THAT GOOGLE HAD A LOT OF EXPERIENCE WITH,

6    BACK WHEN ANDROID WAS BEING DEVELOPED, USING THE CLOUD TO SYNC

7    YOU'RE E-MAILS AND THE LIKE?

8    A.   ABSOLUTELY, I THINK GOOGLE FIRST AND FOREMOST WAS KNOWN AS

9    A CLOUD COMPANY.  THAT'S WHEN I MENTIONED TO OEM'S AND THEY

10   WOULD SAY GOOGLE IS BUILDING ON OPERATING SYSTEM, THEIR INITIAL

11   THOUGHT WAS GOOGLE IS A CLOUD COMPANY.  ABSOLUTELY, THAT'S PART

12   OF OUR DNA.

13   Q.   I HOPE YOU HAVE A BINDER UP THERE WITH YOU.  DO YOU HAVE A

14   BINDER?

15   A.   YES.

16   Q.   IF I COULD ASK YOU TO TURN TO DEFENDANT'S EXHIBIT 327.

17   A.   327.

18   Q.   YES, 327?

19   A.   OKAY.

20   Q.   AND I'LL ASK YOU IF YOU CAN IDENTIFY THAT DOCUMENT FOR US.

21   A.   SURE.  IT'S A, AN F.R.D., WHAT I CALL AN F.R.D.,

22   FUNCTIONAL REQUIREMENTS DOCUMENT.

23   Q.   WHAT IS IT?

24   A.   IT'S A DOCUMENT THAT, THAT DESCRIBES SOME OF WHAT HAD BEEN

25   BUILT, OR WHAT WAS PLANNING TO BE BUILT FOR ANDROID.
```

1    Q.   WERE YOU INVOLVED IN WRITING THIS DOCUMENT?

2    A.   I WAS.  I WAS THE INITIAL AUTHOR OF IT.

3              MR. QUINN:  OFFER EXHIBIT 327, YOUR HONOR.

4              MS. KREVANS:  NO OBJECTION.

5              THE COURT:  IT'S ADMITTED.

6         (DEFENDANTS' EXHIBIT 327 WAS ADMITTED IN EVIDENCE.)

7              THE COURT:  GO AHEAD, PLEASE.

8    BY MR. QUINN:

9    Q.   IF WE COULD PUT THE FIRST PAGE UP ON THE SCREEN, KEN.

10        IT SAYS "ANDROID PROJECT SOFTWARE FUNCTIONAL REQUIREMENTS

11   DOCUMENT, VERSION 0.90, JULY 6TH, 2006."

12        AND, AGAIN, COULD YOU JUST TELL US FOR -- YOU KNOW, WHAT

13   THIS WAS CREATED FOR BACK IN JULY OF 2006.

14   A.   YEAH.  THE MAIN PURPOSE OF THIS DOCUMENT WAS TO

15   COMMUNICATE -- BACK ON JULY 6TH, 2006, THAT'S THE VERY EARLY

16   DAYS OF ANDROID, WE HADN'T LAUNCHED A PRODUCT YET OBVIOUSLY, SO

17   WE WERE TALKING TO MANUFACTURERS, VARIOUS MANUFACTURERS, YOU

18   KNOW, AS I MENTIONED EARLIER, TRAVELLING AROUND THE WORLD.

19        THIS IS ONE OF THE DOCUMENTS THAT WE WOULD SHOW THESE

20   MANUFACTURERS SAYING, HEY, WE HAVE A DEMO, HERE'S THIS DOCUMENT

21   THAT DESCRIBES WHAT WE'RE BUILDING TO GIVE YOU A BETTER IDEA OF

22   WHAT WE'RE BUILDING.  SO THAT WAS ONE OF THE PURPOSES OF THIS

23   DOCUMENT.

24   Q.   ALL RIGHT.  IF YOU'D TURN, PLEASE, TO PAGE 40?

25   A.   40?

1      Q.   YEAH, 4-0?

2      A.   4-0.

3      Q.   YEAH, 327.040.

4           AND, KEN, IF WE COULD BLOW UP 14 THERE, SYNC.  ABOVE THAT,

5      KEN.  WHERE IT SAYS SYNC, 14, SYNC.  THERE YOU GO.

6           AND WHAT DO WE SEE HERE?  WHAT DOES THIS COVER HERE THAT

7      YOU'VE WRITTEN IN THE DOCUMENT?

8      A.   IT'S A SECTION OF THE F.R.D. THAT TALKS ABOUT WHAT OUR

9      PLANS WERE, OR WHAT WE HAD BUILT AROUND SYNCHRONIZATION.

10     Q.   AND IF WE COULD LOOK AT 14.1.5 A LITTLE BIT FURTHER DOWN.

11     THERE'S A REFERENCE THERE TO BACKGROUND SYNC?

12     A.   YES.

13     Q.   SO -- WAS BEING ABLE TO SYNC IN BACKGROUND, WAS THAT

14     SOMETHING THAT WAS ALWAYS CONTEMPLATED FROM THE BEGINNING IN

15     ANDROID AS BEING A FEATURE OF THE ANDROID OPERATING SYSTEM?

16     A.   ABSOLUTELY.  THAT WAS, AS I MENTIONED BEFORE, GOOGLE BEING

17     A CLOUD COMPANY FIRST, EVEN WHEN I JOINED ANDROID BACK IN APRIL

18     OF 2006, THE TEAM HAD ALREADY BEEN THINKING ABOUT THIS.

19          I WAS ALSO VERY PASSIONATE ABOUT THIS GIVEN MY PRIOR

20     EXPERIENCE AT GOOD TECHNOLOGY.

21     Q.   OKAY.  WERE SYNC ADAPTERS PART OF THE ANDROID FRAMEWORK

22     BACK IN THE VERY FIRST VERSION OF ANDROID 1.0?

23     A.   YES.

24     Q.   AND HAS THE SYNC FRAMEWORK REMAINED THE SAME, YOU KNOW,

25     YOU'VE HAD THESE DIFFERENT VERSIONS ALL NAMED AFTER DESSERTS

DIRECT LOCKHEIMER

```
1    AFTER ANDROID?

2    A.   TASTY TREATS.

3    Q.   TASTY TREATS, SORRY.  HAS THE SYNC FRAMEWORK REMAINED THE

4    SAME SINCE ANDROID 1.0?

5    A.   WELL, FUNDAMENTALLY.  ARCHITECTURALLY IT HASN'T CHANGED.

6    OBVIOUSLY IT'S BEEN -- THE FIRST VERSION CAME OUT IN 2008.

7    IT'S NOW 2014.  WE'VE HAD MANY, MANY VERSIONS, MANY

8    OPPORTUNITIES TO BIG -- TO FIX BUGS AND SO ON.

9         SO OBVIOUSLY THERE HAVE BEEN SOME CHANGES.

10        BUT ARCHITECTURALLY IT HASN'T CHANGED.

11   Q.   HAVE THERE ALWAYS BEEN SYNC ADAPTERS IN EVERY VERSION OF

12   ANDROID?

13   A.   YES.

14   Q.   AND YOU SAY THE ARCHITECTURE, FUNDAMENTAL ARCHITECTURE OF

15   THE SYNCING FEATURE HAS REMAINED THE SAME?

16   A.   CORRECT.  CORRECT.

17   Q.   WE HAVE IN EVIDENCE PLAINTIFF'S EXHIBIT 196.  IF WE COULD

18   PUT THIS UP ON THE SCREEN, KEN.

19        IF YOU COULD TURN TO THAT, PLEASE.

20   A.   I HAVE, YEAH.

21   Q.   ALL RIGHT.  SO, YOU KNOW, THIS IS A -- THIS DOCUMENT IS

22   ENTITLED "REPORT:  ANDROID GMAIL - ANDROID LATENCY SURVEY

23   FINDINGS."

24        WHAT'S THIS ABOUT?

25   A.   I HAVEN'T -- I HAVEN'T SEEN THIS DOCUMENT BEFORE.
```

```
 1              BUT BASED ON THE FORMAT AND SO ON, IT LOOKS LIKE IT'S A, A

 2     RESEARCH REPORT OR SUMMARY FROM U.S. RESEARCHERS.

 3              MS. KREVANS:  YOUR HONOR, GIVEN THE WITNESS'S

 4     TESTIMONY HE HASN'T SEEN THE DOCUMENT BEFORE, WE OBJECT TO

 5     FURTHER QUESTIONS ON FOUNDATION GROUNDS.

 6              MR. QUINN:  I CAN LAY SOME FOUNDATION, YOUR HONOR.

 7              THE COURT:  GO AHEAD, PLEASE.

 8     BY MR. QUINN:

 9     Q.   WAS THERE A, A GROUP WHOSE JOB IT WAS TO TRY TO, YOU KNOW,

10     FIND OUT WHAT USER'S REACTIONS WERE WITH ANDROID AND WHAT

11     DIFFICULTIES THEY WERE FACING AND TO STUDY THOSE AND DO SURVEYS

12     AND THE LIKE?

13     A.   YEAH.

14     Q.   AND WHAT -- DID THAT GROUP HAVE A NAME?

15     A.   THE UX RESEARCH TEAM.

16     Q.   OKAY.  AND IS THERE A WOMAN BY THE NAME OF HELENA ROEBER?

17     A.   ROEBER, YES.

18     Q.   AND WHAT WAS HER POSITION?

19     A.   SHE WAS A MEMBER OF THE UX RESEARCH TEAM.  SHE WAS A UX

20     RESEARCHER.

21     Q.   DID THIS RESEARCH TEAM FROM TIME TO TIME PRODUCE FINDINGS

22     OR REPORTS ON WHAT THEY FOUND IN SURVEYING USERS, ANDROID

23     USERS?

24     A.   YES.

25     Q.   YOU SAID THAT THE FORMAT OF THE REPORT SEEMED SIMILAR TO
```

```
 1        YOU.  DOES THIS APPEAR TO BE ONE OF THOSE REPORTS FROM THE USER

 2        EXPERIENCE TEAM?

 3        A.   IT DOES.

 4             MR. QUINN:  SO I WOULD OFFER THAT DOCUMENT, YOUR

 5        HONOR.  I THINK IT'S IN EVIDENCE ALREADY.

 6             THE COURT:  IT'S ADMITTED, BUT IT'S NOT ADMITTED FOR

 7        THE TRUTH OF WHAT'S ASSERTED.

 8          (PLAINTIFF'S EXHIBIT 196 WAS ADMITTED IN EVIDENCE.)

 9        BY MR. QUINN:

10        Q.   BUT THERE'S A -- IF YOU LOOK DOWN AT THE BOTTOM,

11        MR. LOCKHEIMER, THERE'S A QUOTE THAT THE JURY HAS HEARD, "WHEN

12        MY PHONE IS SYNCING, IT'S BASICALLY A USELESS BRICK.  ONCE THE

13        SYNCING ICON TURNS ON, I REALLY CAN'T DO ANYTHING WITH MY PHONE

14        EXCEPT TO WAIT FOR ANR'S.  SAY, FOR EXAMPLE, I'M READING

15        E-MAILS IN A GMAIL APP.  WHEN I REPLY TO AN E-MAIL, GMAIL GOES

16        AND SYNCS SO IT CAN SEND THAT E-MAIL.  I NOW CAN'T READ ANY

17        E-MAIL UNTIL THE SYNC IS COMPLETE WITHOUT HUGE LATENCY AND

18        ANR'S."

19          DO YOU SEE THAT?

20        A.   I DO.

21        Q.   DOES THIS APPEAR TO BE ONE USER'S REPORT OF AN EXPERIENCE

22        THAT THEY HAD THAT THEY WEREN'T HAPPY WITH?

23             MS. KREVANS:  YOUR HONOR, THERE'S STILL NO FOUNDATION

24        FOR THIS WITNESS TO DISCUSS THIS DOCUMENT.  WE OBJECT.

25             MR. QUINN:  I THINK HE IDENTIFIED IT, YOUR HONOR, AS
```

```
 1      A REPORT FROM THE USER, UX EXPERIENCE TEAM.

 2                MS. KREVANS:  YOUR HONOR, HE IDENTIFIED IT AS A TYPE

 3      OF REPORT THAT MIGHT HAVE EXISTED.  IT WAS, IN ADDITION, AN

 4      EXTREMELY LEADING QUESTION.

 5                THE COURT:  WHY DON'T YOU ASK ANOTHER QUESTION, BUT

 6      I'LL ALLOW QUESTIONING INTO THIS DOCUMENT.  GO AHEAD, PLEASE.

 7                MR. QUINN:  I'M SORRY, YOUR HONOR?

 8                THE COURT:  I'M GOING TO OVERRULE THE OBJECTION.

 9           GO AHEAD, PLEASE.

10                MR. QUINN:  THANK YOU, YOUR HONOR.

11      Q.   IN THIS REPORT, IT INDICATES THAT THERE WERE 58 RESPONSES

12      FROM THE SURVEY?  DO YOU SEE THAT?  IT'S IN THE --

13      A.   I DO, YEAH, UNDER WHAT WE DID, I SEE THAT.

14      Q.   RIGHT.  AND THIS APPEARS TO BE ONE RESPONSE THAT THE UX

15      EXPERIENCE GROUP IS ADDRESSING?  IS THAT HOW YOU UNDERSTAND

16      THIS?

17      A.   YEAH, ABSOLUTELY.

18                MS. KREVANS:  OBJECTION.  LEADING, YOUR HONOR.

19                THE COURT:  SUSTAINED.

20                MR. QUINN:  OKAY.

21      Q.   WELL, AS OF THE --

22                THE COURT:  THE QUESTION IS STRICKEN, AND THE ANSWER

23      IS STRICKEN.

24           GO AHEAD, PLEASE.

25
```

BY MR. QUINN:

Q.   WELL, AS OF THE TIME OF THIS REPORT, SEPTEMBER OF 2009,
WERE THERE ALREADY THESE SYNC ADAPTERS IN THE VERSION OF
ANDROID THAT EXISTED THEN?

A.   YES.  SYNC ADAPTERS APPEARED IN 1.0, WHICH WAS 2008.  SO,
YES.

Q.   AND IT HAD THAT SAME ARCHITECTURE THAT ONE -- THAT EXISTED
IN 1.0?  YOU TOLD US THAT REALLY -- THAT HADN'T CHANGED?

A.   THE ARCHITECTURE HADN'T FUNDAMENTALLY CHANGED, NO.

Q.   I MEAN, IT -- CAN YOU TELL US WHETHER OR NOT THIS USER
EXPERIENCE TEAM WOULD GET REPORTS ABOUT PROBLEMS THAT USERS
HAD.

A.   SORRY.  WHAT DO YOU MEAN?

Q.   THEY'D DO SURVEYS ABOUT PROBLEMS THAT USERS WERE HAVING?
IS THAT THE CASE?

A.   YEAH.  WELL, ACTUALLY, IN THIS TIMEFRAME ACTUALLY, YOU CAN
SEE THE REPORT IS TITLED "ANDROID GMAIL - ANDROID LATENCY
SURVEY FINDINGS, THAT'S THE TITLE OF THE REPORT, THE ANDROID
LATENCY SURVEY FINDINGS," AND THAT RINGS A BELL BECAUSE AROUND
THAT TIME, LATENCY -- AND I'LL DEFINE THAT IN A SECOND -- BUT
LATENCY WAS A REALLY IMPORTANT THING THAT WE WERE VERY FOCUSSED
ON.

Q.   WHAT DOES LATENCY MEAN?

A.   WELL, LATENCY MEANS HOW EFFICIENT A PERSON COULD BE WHEN
THEY WERE USING THIS PRODUCT, THE TIME IT TAKES TO USE THE

```
 1        PRODUCT.  THAT WAS A GENERAL THING NOT JUST ABOUT GMAIL -- THIS

 2        REPORT HAPPENS TO BE ABOUT GMAIL, BUT IN GENERAL, WE WERE

 3        TRYING TO IMPROVE THE LATENCY OF ANDROID, MAKE IT FASTER, MAKE

 4        IT FEEL SMOOTHER.

 5             AND SO WE WERE FOCUSSED ON IMPROVING THAT OVERALL, AND

 6        THIS APPEARS TO BE A DOCUMENT THAT TALKS ABOUT THE GMAIL

 7        PORTION OF THAT SPECIFICALLY.

 8        Q.   AND IS THAT -- CAN YOU TELL US WHY THAT WAS KIND OF AN

 9        ONGOING PROJECT, THAT AS ISSUED WERE IDENTIFIED OR USERS HAD

10        ISSUES THAT YOU'D TRY TO IMPROVE THE FUNCTIONING IN THE

11        PROGRAM?

12        A.   YEAH.  IN GENERAL, IT'S GOOD TO IMPROVE YOUR PRODUCTS.

13        WE -- I MEAN, THAT'S KIND OF OBVIOUS.

14             AND SO WE, YOU KNOW, WE HAD FEEDBACK, JUST EVEN OURSELVES

15        USING IT, THINGS WOULD SLOW DOWN FROM TIME TO TIME, NOT JUST

16        GMAIL, BUT JUST IN GENERAL.

17             SO WE WANTED TO FOCUS ON THAT AND REALLY IMPROVE THE

18        PRODUCT OVERALL.

19             IN FACT, IN JELLY BEAN, SO THIS IS 2012 WHEN WE LAUNCHED

20        JELLY BEAN -- SORRY -- 2013 WHEN WE LAUNCHED JELLY BEAN, WE HAD

21        THIS PROJECT CALLED PROJECT BUTTER THAT WAS ALL ABOUT LATENCY

22        AND IMPROVING THINGS.  SO IT'S BEEN AN ONGOING THING EVEN UNTIL

23        RECENT YEARS.

24        Q.   SO LET ME CHANGE GEARS NOW AND TALK ABOUT A DIFFERENT

25        FEATURE.
```

1          WAS THERE A FEATURE IN ANDROID THAT ENABLED A USER TO

2     CONDUCT A SINGLE SEARCH THAT WOULD RETURN RESULTS LOCALLY FROM

3     THE PHONE ITSELF AND ALSO FROM THE INTERNET?

4     A.   WAS THERE A FEATURE LIKE THAT?

5     Q.   WAS THERE A FEATURE LIKE THAT?

6     A.   YES.

7     Q.   AND WHAT WAS THE -- WHAT WAS THE NAME OF THAT FEATURE?

8     A.   I REFERRED TO IT AS PHONETOP SEARCH, LIKE DESKTOP, BUT

9     PHONETOP.  THAT'S WHAT I REFERRED TO IT.  IT WAS IN A PRODUCT

10    CALLED QSB.  THERE'S MANY NAMES FOR IT, BUT THAT'S WHAT I REFER

11    TO IT AS.

12    Q.   WAS THAT A FEATURE THAT WAS CONTEMPLATED TO HAVE IN

13    ANDROID FROM EARLY ON?

14    A.   YES.

15    Q.   AND HAD GOOGLE HAD EXPERIENCE BEFORE WITH THE ABILITY TO

16    DO SEARCHES BOTH LOCALLY ON A DEVICE AND ON THE INTERNET AND TO

17    RETURN RESULTS FROM BOTH AT THE SAME TIME?

18    A.   SURE.

19    Q.   AND WHAT WOULD THAT BE?

20    A.   WELL, I CAN THINK OF A PRODUCT CALLED GOOGLE DESKTOP

21    SEARCH, WHICH IS SOMETHING I USED EVEN BEFORE I WAS A GOOGLE

22    EMPLOYEE.  SO IT SHOULD HAVE BEEN 2005 OR EVEN BEFORE THAT.

23    WHO KNOWS.

24         IT WAS A FEATURE -- IT WAS A PRODUCT THAT GOOGLE HAD THAT

25    LET YOU SEARCH YOUR P.C., FILES ON YOUR P.C. AND THE WEB AT THE

1        SAME TIME.

2        Q.   AND THAT WAS BACK WHEN, WHEN GOOGLE DEVELOPED THAT?

3        A.   WELL --

4              MS. KREVANS:  YOUR HONOR, OUTSIDE THE SCOPE.  THIS IS

5        NOT ANDROID.

6              MR. QUINN:  IT'S --

7              THE COURT:  GO AHEAD.  YOU MAY ANSWER.

8              THE WITNESS:  YOUR QUESTION WAS WHEN WAS THAT

9        DEVELOPED?

10       BY MR. QUINN:

11       Q.   YEAH, WHEN WAS THE GOOGLE DESKTOP?

12       A.   I DON'T KNOW WHEN IT WAS DEVELOPED.  I WASN'T A GOOGLE

13       EMPLOYEE AT THE TIME.  IT PRE-DATED ME.  BUT THAT GIVES YOU A

14       SENSE OF THE TIMING.  IT WAS BEFORE 2006.

15       Q.   OKAY.  DID THERE COME -- AT ANY POINT DID GOOGLE CREATE A

16       SPECIAL VERSION OF THIS GOOGLE SEARCH APP FOR SAMSUNG WHICH DID

17       NOT INCLUDE THE LOCAL SEARCH CAPABILITY?

18       A.   DID THAT HAPPEN?

19       Q.   DID THAT HAPPEN?  DO YOU RECALL WHETHER OR NOT THAT

20       HAPPENED?

21       A.   I DO.

22       Q.   AND DO YOU RECALL APPROXIMATELY WHEN THAT HAPPENED?

23       A.   IT WAS JUNE OR JULY, I THINK IT WAS CLOSER TO JUNE OF --

24       LET'S SEE -- 2012.

25       Q.   AND DO YOU RECALL THE CIRCUMSTANCES UNDER WHICH GOOGLE DID

1     THAT, CREATED THAT SPECIAL CAPABILITY FOR SAMSUNG?

2     A.   WHY DID WE DO THAT?

3     Q.   YEAH.

4     A.   BASICALLY -- I DON'T KNOW ALL THE DETAILS ACTUALLY.  I'M

5     NOT -- I'M NOT FAMILIAR WITH ALL THE DETAILS BECAUSE IT WAS A

6     LEGAL NATURE, SOMETHING OF LEGAL SUBSTANCE.  I'M NOT A LAWYER,

7     SO I DIDN'T QUITE UNDERSTAND ALL THAT.  AND, FRANKLY, PEOPLE

8     DIDN'T EXPLAIN EVERYTHING TO ME.

9          BUT SOMETHING LEGAL HAPPENED, AND THAT WAS WHAT CAUSED

10    THAT TO HAPPEN.

11    Q.   ALL RIGHT.  AND THIS -- I THINK YOU SAID THIS WAS THE

12    SUMMER OF 2012?

13    A.   '12, YES.

14    Q.   DURING THAT SUMMER, DID GOOGLE RELEASE A NEW VERSION,

15    UPDATED VERSION OF ANDROID?

16    A.   WE DID, YES.

17    Q.   AND WHAT ONE WAS THAT NAMED?

18    A.   JELLY BEAN.

19    Q.   AND DID JELLY BEAN, WHEN IT WAS RELEASED, DID THAT

20    INCLUDE, CONTINUE TO INCLUDE THIS ABILITY TO BOTH DO LOCAL

21    PHONETOP SEARCH AS WELL AS INTERNET SEARCH AND RETURN RESULTS

22    FROM BOTH?

23    A.   YEAH.  YES, IT DID.

24    Q.   ALL RIGHT.  AND WAS JELLY BEAN PROVIDED TO SAMSUNG?

25    A.   SURE.

1    Q.   AND DO YOU KNOW WHETHER SAMSUNG INSTALLED JELLY BEAN ON

2    SAMSUNG PHONES?

3    A.   SURE, YEAH.   THERE HAVE BEEN SAMSUNG PHONES WITH JELLY

4    BEAN, SURE.

5    Q.   DID -- DID ANY PHONE USER COMPLAINTS ABOUT THE FACT THAT

6    LOCAL SEARCH WAS NOT AVAILABLE HAVE ANYTHING TO DO WITH THE

7    DECISION TO INCLUDE BOTH LOCAL AND INTERNET SEARCH IN JELLY

8    BEAN?

9    A.   WELL, I ACTUALLY DON'T KNOW IF THERE WERE ANY COMPLAINTS.

10        BUT EITHER WAY, NO, THE JELLY BEAN VERSION OF THIS FEATURE

11   FOR MONTHS BEYOND -- YOU KNOW, BEFORE THE SUMMER WHEN WE WERE

12   TALKING ABOUT THIS OTHER VERSION --

13   Q.   RIGHT.

14   A.   -- HAD THIS PHONETOP SEARCH AND A WEB SEARCH FUNCTIONAL

15   CONTEMPLATED.   SO THAT WAS SOMETHING THAT WAS ALREADY IN THE

16   WORKS FOR A VERY LONG TIME.

17   Q.   OKAY.   THINKING BACK, YOU KNOW, ON THE DEVELOPMENT OF

18   ANDROID AND THE INCLUSION OF THIS -- WHAT DID YOU CALL IT,

19   GOOGLE SEARCH APP?

20   A.   SURE, YEAH.

21   Q.   IS THAT SOMETHING THAT, EARLY ON -- CAN YOU TELL US

22   WHETHER OR NOT THAT'S SOMETHING THAT PEOPLE HAD A LOT OF HOPE

23   FOR, ENTHUSIASM FOR ABOUT THIS ABILITY TO DO BOTH, GET RESULTS

24   LOCALLY ON THE PHONE AND ON THE INTERNET AT THE SAME TIME?

25   A.   YEAH, ESPECIALLY IN THE EARLY DAYS THERE WAS A LOT OF

1    EXCITEMENT AROUND THAT FUNCTIONALITY.

2    Q.   AND AS IT TURNED OUT ULTIMATELY, FROM THE STANDPOINT OF

3    ANDROID, CAN YOU TELL US WHETHER OR NOT THAT HAS, IN FACT, YOU

4    KNOW, ACTUALLY KIND OF PANNED OUT AS A HIGHLY USED FEATURE?

5    A.   YEAH.  I'D HAVE TO SAY IT DIDN'T QUITE PAN OUT THE WAY A

6    LOT OF PEOPLE THOUGHT IT WOULD.

7    Q.   DO YOU ACTUALLY HAVE SOME DATA ABOUT HOW OFTEN PEOPLE

8    ACTUALLY USE THAT LOCAL, THE LOCAL SEARCH RETURNS ON THEIR

9    PHONES WHEN THEY USE THE -- THIS APPLICATION, THIS FEATURE?

10   A.   I DO.

11   Q.   AND WHAT DO YOU KNOW IN THAT REGARD?

12   A.   WELL, THE DATA BASICALLY SAYS THAT ABOUT 98 PERCENT OF THE

13   TIME WHEN PEOPLE ARE PRESENTED WITH BOTH TYPES OF RESULTS, THE

14   LOCAL AND THE WEB-BASED RESULTS, 98 PERCENT OF THE TIME PEOPLE

15   JUST DO WEB.  THEY DON'T TAP ON THE PHONE RESULTS.

16   Q.   ALL RIGHT.  DID YOU ACTUALLY REQUEST THAT SOMEBODY AT

17   GOOGLE RESEARCH THAT AND FIND OUT HOW OFTEN THIS IS ACTUALLY

18   USED?

19   A.   I DID.

20   Q.   AND IF YOU COULD TURN, PLEASE, TO EXHIBIT 308.

21   A.   OKAY.

22   Q.   CAN YOU IDENTIFY THIS DOCUMENT?

23   A.   YEAH.  IT'S AN E-MAIL FROM ME TO MARYAM, SORRY, FROM

24   MARYAM KAMVAR TO ME.

25            MR. QUINN:  WE'D OFFER THIS, YOUR HONOR.

```
 1              THE COURT:  ANY OBJECTION?

 2              MS. KREVANS:  NO OBJECTION, YOUR HONOR.

 3              THE COURT:  IT'S ADMITTED.

 4         (DEFENDANTS' EXHIBIT 308 WAS ADMITTED IN EVIDENCE.)

 5              THE COURT:  GO AHEAD, PLEASE.

 6              MR. QUINN:  IF WE COULD DISPLAY THAT, PLEASE.

 7    Q.   WHO IS MARYAM KAMVAR GARRETT?

 8    A.   MARYAM IS AN ENGINEER FROM GOOGLE.

 9    Q.   OKAY.  AND, YOU KNOW, IS THIS -- WERE YOU INVOLVED IN HER

10    DOING SOME RESEARCH FOR YOU?

11    A.   YEAH.  I ASKED HER TO DO THIS RESEARCH FOR ME.

12    Q.   AND WHAT WAS THE RESEARCH YOU ASKED HER TO DO?

13    A.   I ASKED HER BASICALLY EXACTLY WHAT WE JUST TALKED ABOUT,

14    HOW POPULAR IS THE PHONETOP SEARCH, DO PEOPLE ACTUALLY USE IT.

15    Q.   AND THIS IS THE RESULTS OF WHAT SHE -- OF HER RESEARCH?

16    A.   THESE ARE THE FINDINGS, CORRECT.

17    Q.   NOW, GOING BACK TO THE EARLY DAYS OF ANDROID AND THE

18    DEVELOPMENT OF ANDROID, DID YOU HAVE PEOPLE ON THE ANDROID TEAM

19    WHO WERE WORKING ON THE ABILITY TO DETECT STRUCTURES AND DATA,

20    LIKE E-MAIL ADDRESSES, PHONE NUMBERS AND THE LIKE, AND MAKE

21    LINKS?  IS THAT SOMETHING YOU HAD PEOPLE WORKING ON?

22    A.    IN THE EARLY DAYS, SURE, BEFORE WE LAUNCHED, ABSOLUTELY.

23    Q.   OKAY.  AND DID YOU ALSO HAVE PEOPLE, IN THE EARLY DAYS OF

24    ANDROID, WORKING ON A FEATURE WHERE, ON THE KEYBOARD AS YOU

25    TYPED, THE WORD SUGGESTIONS WOULD APPEAR TO COMPLETE WORDS OR
```

```
 1       TO CORRECT SPELLINGS AND THE LIKE?

 2       A.   YEAH.  I THINK THAT WAS PROBABLY 2008/2009.

 3       Q.   AND WAS IT YOUR EXPECTATION FROM THE BEGINNING THAT

 4       ANDROID WOULD INCLUDE, AS A FEATURE, A WORD SUGGESTION FEATURE?

 5       A.   SORRY.  ASK ME THAT AGAIN.

 6       Q.   WAS IT YOUR EXPECTATION FROM THE BEGINNING THAT ANDROID

 7       WOULD INCLUDE SUCH A WORD SUGGESTION FEATURE AS PART OF THE

 8       KEYBOARD?

 9               MS. KREVANS:  OBJECTION.  LEADING.

10               MR. QUINN:  I CAN REPHRASE IT, YOUR HONOR.

11               THE COURT:  OVERRULED.

12          GO AHEAD, PLEASE.  YOU MAY ANSWER.

13       BY MR. QUINN:

14       Q.   WAS IT YOUR EXPECTATION FROM THE BEGINNING THAT THERE

15       WOULD BE A WORD SUGGESTION FEATURE?

16       A.   YEAH.  MY EXPECTATION FROM THE BEGINNING WAS THAT THERE

17       WOULD BE SOME SORT OF KEYBOARD FOR ANDROID ON THE SCREEN.

18       SUGGESTIONS SEEMED LIKE A NATURAL THING TO DO.

19          I SPEAK JAPANESE AND THAT'S HOW JAPANESE INPUT KEYBOARDS

20       WORK.  SO THAT WAS KIND OF MY MENTAL MODEL OF HOW THINGS

21       WORKED.

22       Q.   IF WE COULD TURN BACK TO EXHIBIT 327?

23       A.   327?

24       Q.   YEAH, DEFENSE EXHIBIT 327, WHICH IS THAT SOFTWARE

25       FUNCTIONAL REQUIREMENTS DOCUMENT THAT WE LOOKED AT.  NOW,
```

1     AGAIN, JUST TO REMIND OURSELVES, THIS IS DATED JULY 6TH, 2006?

2     A.   YES.

3     Q.   IF YOU'D TURN, PLEASE, TO PAGE 21.

4     A.   OKAY.

5     Q.   AND YOU'LL SEE A SECTION THERE, 5.9.2 CALLED TOUCHSCREEN.

6     A.   I SEE IT.

7     Q.   DO YOU SEE THAT?  AND IT SAYS "TOUCHSCREENS WILL NOT BE

8     SUPPORTED.  THE PRODUCT WAS DESIGNED WITH THE PRESENCE OF

9     DISCRETE PHYSICAL BUTTONS AS AN ASSUMPTION.  HOWEVER, THERE IS

10    NOTHING FUNDAMENTAL IN THE PRODUCT'S ARCHITECTURE THAT PREVENTS

11    THE SUPPORT OF TOUCHSCREENS IN THE FUTURE."

12         DO YOU SEE THAT?

13    A.   I DO.

14    Q.   AND COULD YOU TELL US WHY, AT THIS POINT IN TIME, YOU SAID

15    THIS IN THE FUNCTIONAL REQUIREMENTS DOCUMENT.

16    A.   SURE.  AS I MENTIONED EARLIER, THIS DOCUMENT, THE F.R.D.,

17    WAS SOMETHING THAT WE -- OR THAT I AUTHORED SO THAT WE COULD

18    SHARE WITH MANUFACTURERS THAT WE WERE TALKING TO WHEN WE WERE

19    EDUCATING THEM ON ANDROID.

20         AT THIS POINT, YOU KNOW, IN JULY OF 2006, WE WERE WORKING

21    ON PROTOTYPE HARDWARE, WHICH WE HAPPENED TO HAVE RECEIVED FROM

22    HTC.  THAT WAS JUST AN OFF-THE-SHELF PHONE THAT THEY HAD BUILT

23    AND THAT PHONE DIDN'T HAPPEN TO HAVE A TOUCHSCREEN.

24         SO I WAS JUST DOCUMENTING SORT OF WHAT WE HAD BEEN WORKING

25    AT THAT POINT, AND -- BUT THAT'S WHY YOU CAN SEE IN THE SECOND

1      PARAGRAPH I WAS TALKING ABOUT WHERE WE THINK WE MIGHT BE

2      HEADED.  WE WERE KIND OF FORESHADOWING THAT POINT ABOUT

3      TOUCHSCREENS IN THE FUTURE.

4      Q.   WHEN YOU SAY "THERE IS NOTHING IN THE ARCHITECTURE THAT

5      PREVENTS THE TOUCHSCREENS IN THE FUTURE"?

6      A.   YEAH, AT THIS POINT IN TIME WE WERE WORKING ON A PROTOTYPE

7      DEVICE, WHICH WE NEVER SHIPPED, BY THE WAY, THAT WAS JUST A

8      PHONE THAT DIDN'T HAVE A TOUCHSCREEN ON IT.  BUT AT THE SAME

9      TIME, WE WERE THINKING ABOUT TOUCHSCREENS, SO THAT'S WHY I HAD

10     PUT THAT SECOND PARAGRAPH IN THERE.

11     Q.   BACK IN THIS TIMEFRAME IN 2006, THE SECOND HALF OF 2006,

12     WERE YOU ACTUALLY INVESTIGATING TOUCHSCREEN TECHNOLOGY AND

13     WHETHER, YOU KNOW, IT HAD REACHED A POINT WHERE YOU COULD

14     INCLUDE THAT AS A CAPABILITY IN ANDROID?

15              MS. KREVANS:  OBJECTION.  LEADING.

16              THE COURT:  SUSTAINED.

17              MR. QUINN:  OKAY.

18     Q.   WAS THE SUBJECT -- CAN YOU TELL US WHETHER OR NOT THE

19     SUBJECT OF TOUCHSCREEN TECHNOLOGY WAS SOMETHING THAT YOU WERE

20     INVESTIGATING IN THE SECOND HALF OF 2006?

21     A.   ABSOLUTELY WE WERE LOOKING AT TOUCHSCREENS.

22     Q.   AND WHAT WERE YOU DOING IN THAT REGARD?

23     A.   WELL, WE WERE LOOKING AT VARIOUS TECHNOLOGIES THAT WERE

24     OUT THERE.

25              WE WERE ALSO MINDFUL OF THE FACT THAT THERE WERE MANY

```
 1      PRODUCTS THAT HAD ALREADY SHIPPED WITH TOUCHSCREENS.  I

 2      MENTIONED EARLIER THAT I HAD WORKED AT PALM.  THE PALM PILOT

 3      HAD A TOUCHSCREEN ON IT, AND THERE ARE MANY OTHER PRODUCTS THAT

 4      HAD TOUCHSCREENS MUCH EARLIER THAN 2006.

 5           SO TOUCHSCREENS AS A CONCEPT WAS NOT NEW TO US, AND WE

 6      WERE LOOKING AT VARIOUS VENDORS, TECHNOLOGY PROVIDERS AND

 7      SUPPLIERS, TO SEE WHAT PRODUCTS THEY HAD AVAILABLE THAT WE

 8      COULD USE.

 9      Q.   AND CAN YOU RECALL THE NAMES OF ANY OF THOSE PROVIDERS WHO

10      YOU WERE TALKING TO BACK IN THE 2006 TIMEFRAME ON THE SUBJECT

11      OF TOUCHSCREENS?

12      A.   SURE.

13      Q.   WHICH ONES ARE YOU THINKING OF?

14      A.   SYNAPTICS.

15      Q.   OKAY.  WHAT WAS THE -- WHAT WAS THE FIRST MOBILE PHONE

16      THAT CAME OUT, SMARTPHONE THAT CAME OUT THAT HAD A CAPACITY OF

17      TOUCHSCREEN?

18               MS. KREVANS:  BEYOND THE SCOPE, YOUR HONOR.

19               THE COURT:  SUSTAINED.

20      BY MR. QUINN:

21      Q.   IN YOUR CONSIDERATION OF TOUCHSCREENS AS PART OF ANDROID,

22      WAS ONE OF THE CONSIDERATIONS OTHER PRODUCTS THAT CAME OUT INTO

23      THE MARKET?

24               MS. KREVANS:  SAME OBJECTION, AND LEADING.

25               THE COURT:  SUSTAINED.
```

```
 1        BY MR. QUINN:

 2        Q.   WHAT DID YOU CONSIDER IN ADDITION TO, YOU KNOW, YOU

 3        REFERRED TO YOUR EXPERIENCE AT PALM?

 4        A.   YES.

 5        Q.   AND YOU REFERRED TO TOUCHSCREEN MANUFACTURERS, COMPANIES

 6        THAT YOU SPOKE TO.

 7             WAS THERE ANYTHING ELSE THAT YOU CONSIDERED IN 2006 THAT

 8        CONTRIBUTED IN ANY WAY TO YOUR DECISION TO MAKE -- ABOUT THE

 9        INCLUSION OF TOUCHSCREENS.

10        A.   YEAH.  WELL, THAT'S KIND OF THE POINT OF WHAT WE WERE

11        DOING HERE.  WE WERE VISITING THESE MANUFACTURERS IN THE SUMMER

12        OF 2006, AND BEYOND, TALKING TO THEM, SHOWING THEM THIS

13        DOCUMENT, GETTING THEIR FEEDBACK.

14             ON THE TOUCHSCREEN SPECIFICALLY, YOU KNOW, WE WOULD TALK

15        TO CERTAIN MANUFACTURERS, LG SPECIFICALLY COMES TO MIND, WHO

16        WERE WORKING ON A PRODUCT AT THE TIME WITH THE CAPACITY OF

17        TOUCHSCREEN FROM SYNAPTICS.  IN FACT, I THINK THAT'S HOW WE GOT

18        TO KNOW SYNAPTICS, AND THEY WERE SHIPPING THE PRODUCT.

19             SO WE WERE GETTING FEEDBACK FROM MANUFACTURERS SAYING,

20        HEY, WE'RE GOING TO DO THIS.  WE, THE MANUFACTURERS, ARE GOING

21        TO DO THIS.  SO THEY WERE TELLING US THAT THE TOUCHSCREENS WERE

22        IMPORTANT.

23        Q.   WHAT WAS THE NAME OF THAT LG PRODUCT THAT HAD THE

24        TOUCHSCREEN THAT YOU JUST PREFERRED TO?

25        A.   IT WAS WALLED THE LG PRADA.
```

1    Q.   AND WAS THAT A SMARTPHONE?

2    A.   SURE.

3    Q.   DID IT HAVE A TOUCHSCREEN?

4    A.   IT DID.

5    Q.   AND WHEN DID THAT COME TO MARKET?

6    A.   I BELIEVE THAT WAS DECEMBER OF THAT YEAR, DECEMBER OF

7    2006.

8    Q.   IF YOU COULD TURN, PLEASE, TO PLAINTIFF'S EXHIBIT 173.

9    I'LL ASK YOU IF YOU CAN IDENTIFY THIS DOCUMENT.

10   A.   SURE.

11   Q.   WHAT IS IT?

12   A.   IT'S A -- IT'S THE DOCUMENT THAT WE'RE TALKING ABOUT, THE

13   F.R.D., BUT A NEWER VERSION OF IT.

14          MR. QUINN:  WE'D OFFER THIS, YOUR HONOR.

15          MS. KREVANS:  NO OBJECTION, YOUR HONOR.

16          THE COURT:  IT'S ADMITTED.

17      (PLAINTIFF'S EXHIBIT 173 WAS ADMITTED IN EVIDENCE.)

18          THE COURT:  GO AHEAD, PLEASE.

19          MR. QUINN:  IF WE CAN DISPLAY THE FIRST PAGE.

20   Q.   THIS IS NOW ANOTHER -- IS THIS NOW ANOTHER VERSION OF THIS

21   FUNCTIONAL REQUIREMENTS DOCUMENT.

22   A.   IT LOOKS LIKE IT, YEAH.

23   Q.   AND THIS IS DATED NOVEMBER 2007?

24   A.   NOVEMBER 10TH, 2007, YES.

25   Q.   AND IF YOU TURN, PLEASE, TO PAGE 20.

DIRECT LOCKHEIMER

1            AND, KEN, IF WE COULD BLOW UP 3.11.2.

2            DO YOU SEE UP THERE IT SAYS "A TOUCHSCREEN FOR

3    FINGER-BASED NAVIGATION - INCLUDING MULTI-TOUCH CAPABILITIES --

4    IS REQUIRED.  STYLUS-BASED NAVIGATION IS NOT SUPPORTED."

5            DO YOU SEE THAT.

6    A.   I DO.

7    Q.   HAD THERE BEEN A CHANGE IN YOUR THINKING ABOUT

8    TOUCHSCREENS AS A RESULT OF NEW PRODUCTS COMING TO MARKET AND

9    YOUR CONVERSATIONS WITH SYNAPTICS AND OTHERS IN THE INDUSTRY?

10   A.   I WOULDN'T REALLY SAY A CHANGE IN OUR THINKING.  WE WERE

11   ALWAYS THINKING ABOUT TOUCHSCREENS.  CERTAINLY AT THIS POINT,

12   IN THIS DOCUMENT -- I GUESS IT WAS -- LET'S LOOK AT THE DATE

13   AGAIN -- IT WAS 2007, NOVEMBER OF 2007, I THINK WE HAD GAINED

14   CONFIDENCE IN THESE TECHNOLOGIES, GAINED CONFIDENCE IN

15   SYNAPTICS, TO HAVE THE TECHNOLOGY TO DO WHAT WE WANTED IT TO

16   DO.

17           AND AS I MENTIONED EARLIER, THESE DOCUMENTS WERE MEANT FOR

18   MANUFACTURERS, MEANING THEY OFTEN LAGGED WHAT WAS ACTUALLY

19   HAPPENING IN THE LABS IN OUR COMPANY.  WE WANTED TO TELL OUR

20   MANUFACTURES WHEN WE WERE CERTAIN THAT WE COULD DO SOMETHING,

21   THAT IT WAS SOMETHING THAT WE WOULD BE DOING.

22   Q.   AND DID THE IPHONE HAVE ANYTHING TO DO WITH THE DECISION

23   TO INCLUDE A TOUCHSCREEN IN ANDROID, OR SUPPORT A TOUCHSCREEN

24   IN ANDROID?

25           MS. KREVANS:  BEYOND THE SCOPE AND SUBJECT TO YOUR

1    PRIOR RULING, YOUR HONOR.

2          MR. QUINN:  IT'S ABOUT THE DEVELOPMENT OF ANDROID,

3    YOUR HONOR.

4          THE COURT:  OVERRULED.

5      GO AHEAD.  YOU MAY ANSWER.

6          THE WITNESS:  DID THE IPHONE HAVE ANYTHING TO DO WITH

7    IT?  NO.  WE WERE LOOKING AT TOUCHSCREENS IN 2006.

8    BY MR. QUINN:

9    Q.  NOW, IN TERMS OF THE DEVELOPMENT OF ANDROID, WOULD YOU

10   HAVE DISCUSSIONS WITH MANUFACTURERS ABOUT, YOU KNOW, WHAT YOUR

11   RESPECTIVE ROLES WOULD BE?  YOU KNOW, WHAT GOOGLE, YOU KNOW,

12   THE SOFTWARE PLATFORM MAKER AND THE HANDSET MANUFACTURER, WHAT

13   THEIR RESPECTIVE ROLES WOULD BE WHEN YOU WENT AROUND AND

14   VISITED THEM?

15   A.  SURE.  YEAH, ON AN ONGOING BASIS, BUT ESPECIALLY IN THE

16   EARLY DAYS WHEN WE WERE GETTING TO KNOW EACH OTHER, WE WERE

17   TALKING ABOUT WHO WAS GOING TO DO WHAT.

18   Q.  IN THE EARLY DAYS, CAN YOU TELL US WHAT THE TENOR OF THOSE

19   CONVERSATIONS WAS IN THE RESPECTIVE ROLES OF GOOGLE VERSUS THE

20   MANUFACTURERS?

21   A.  YEAH.  IT WAS ACTUALLY REALLY INTERESTING IN THE EARLY

22   DAYS, YOU KNOW, IT BECAME PRETTY EVIDENT TO US RIGHT AWAY THAT

23   THESE MANUFACTURERS WERE USED TO WORKING WITH VENDORS, VENDORS

24   MEANING COMPANIES THAT THEY PAY MONEY TO AND GET THEM TO DO

25   WHAT, YOU KNOW, WHAT THEY WANT TO BE DONE.  SO A

1    CUSTOMER-VENDOR RELATIONSHIP WITH THE MANUFACTURER AS THE

2    CUSTOMER.

3         AND I THINK IT KIND OF CONFUSED THEM WITH GOOGLE COMING

4    IN, THEY WERE TEMPTED TO TREAT US LIKE A VENDOR, EXCEPT WE

5    WEREN'T CHARGING THEM ANY MONEY, WE WERE GIVING THEM ANDROID

6    FOR FREE.

7         AND WE MADE IT CLEAR TO THEM EARLY ON, THAT WE'RE NOT A

8    VENDOR.  WE'RE A PEER OF YOURS.  WE'RE GOING TO WORK TOGETHER.

9    DON'T TREAT US LIKE A VENDOR.

10   Q.   AND WAS THERE DISCUSSIONS ABOUT WHO WOULD MAKE DECISIONS

11   ABOUT WHAT FEATURES ARE GOING TO BE SUPPORTED OR INCLUDED IN

12   ANDROID AND WHAT WOULDN'T?

13   A.   SURE.

14   Q.   AND CAN YOU TELL US WHOSE DECISIONS THOSE WERE?

15   A.   YEAH.  YOU KNOW, WE WOULD GET FEEDBACK FROM EVERYWHERE,

16   RIGHT, MANUFACTURERS WOULD GIVE US FEEDBACK, OPERATOR WOULD

17   GIVE US FEEDBACK, AND, YOU KNOW, WE WOULD TELL THEM, THANKS FOR

18   THE FEEDBACK.

19        WE ALSO HAVE A ROADMAP, BUT IF YOUR ROADMAP AND YOUR

20   FEEDBACK LINES UP, GREAT.  IF WE DISAGREE, WE DON'T WANT TO DO

21   WHAT YOU WANT US TO DO, WELL, THE GOOD NEWS IS IT'S OPEN

22   SOURCE, YOU CAN DO IT YOURSELF.

23        AND THAT'S KIND OF HOW THOSE CONVERSATIONS WENT.

24   Q.   YOU CAN DO IT YOURS, BUT WOULD THAT BE SUBJECT TO WHAT --

25   THE LIMITATIONS YOU DISCUSSED EARLIER IN TERMS OF

1        COMPATIBILITY?

2        A.   OF COURSE, YEAH, WITHIN THE CONFINES OF THE

3        COMPATIBILITY -- ASSUMING AGAIN THAT THEY'RE BUILDING A

4        COMPATIBLE DEVICE, WHICH MANY PEOPLE DO, YOU KNOW, WE SAID YOU

5        CAN BUILD THESE FEATURES USING THE SOURCE CODE FROM ANDROID.

6        IF YOU WANT TO BE COMPATIBLE, MAKE SURE YOU STILL PASS THE

7        COMPATIBILITY TEST.  AND THAT'S WHAT'S ACTUALLY HAPPENING OUT

8        THERE.

9        Q.   AND IN TERMS OF THE PROPRIETARY GOOGLE APPS, LIKE GMAIL

10       AND YOUTUBE AND THE LIKE, WHEN YOU SAY YOU CAN DO WHAT YOU WANT

11       TO DO, DO YOU MEAN TO CONVEY THAT THEY COULD MAKE CHANGES TO

12       THOSE?

13       A.   NO.  SORRY.

14            FOR THINGS LIKE GMAIL OR, YOU KNOW, THESE PRODUCTS FROM

15       GOOGLE DIRECTLY, YOU KNOW, GMAIL, YOUTUBE AND SO ON THAT WE

16       TALKED ABOUT EARLIER, THOSE WERE PROPRIETARY.  THEY DIDN'T HAVE

17       THE ABILITY TO CHANGE THOSE, AND WE WERE A LOT FIRMER WITH

18       THOSE, TOO, SAYING THIS IS OUR PRODUCT.  THIS IS WHAT WE'RE

19       BUILDING FOR THOSE PRODUCTS.

20       Q.   HAVE THERE BEEN OCCASIONS THAT YOU PERSONALLY KNOW OF

21       WHERE, YOU KNOW, SAMSUNG IN PARTICULAR HAS COME TO GOOGLE AND

22       ASKED FOR CHANGES IN ANDROID THAT YOU'VE TOLD THEM, NO, WE'RE

23       NOT GOING TO DO THAT?

24       A.   SURE.

25       Q.   THE FIVE FEATURES THAT THE JURY HAS HEARD ABOUT HERE,

1       YOU'RE GENERALLY FAMILIAR WITH WHAT THOSE ARE?

2       A.   AT A VERY HIGH LEVEL.

3       Q.   ALL RIGHT.  BUT AT ANY POINT DID SAMSUNG HAVE ANY INPUT TO

4       GOOGLE ABOUT THE ARCHITECTURE OR DESIGN OR THE DEVELOPMENT OF

5       THOSE FIVE FEATURES?

6       A.   I DON'T THINK SO.  I MEAN, IF WE BREAK IT DOWN, THE GOOGLE

7       PRODUCTS OF GMAIL, THESE WERE OUR PRODUCTS.  WE WERE BUILDING

8       IT.  WE WERE RUNNING IT.  IT WAS OUR RESPONSIBILITY.  THEY

9       COULDN'T MODIFY IT.

10          FOR THE OTHER TECHNOLOGIES THAT WERE NOT PROPRIETARY,

11      LET'S SAY LINKIFY, YOU KNOW, THOSE WERE BEING BUILT BEFORE WE

12      EVEN MET WITH SAMSUNG.

13          SO I DON'T KNOW HOW THEY COULD HAVE GIVEN US FEEDBACK WHEN

14      WE HAD ALREADY BUILT THOSE THINGS.

15          (PAUSE IN PROCEEDINGS.)

16          MR. QUINN:  THANK YOU.  NOTHING FURTHER.

17          THE COURT:  ALL RIGHT.  THE TIME IS NOW 4:06.

18      CROSS-EXAMINATION?

19          MS. KREVANS:  CAN I JUST HAVE A SECOND, YOUR HONOR,

20      TO HAND OUT BINDERS?

21          THE COURT:  YES.  YES.

22          (PAUSE IN PROCEEDINGS.)

23          THE COURT:  ARE YOU READY?

24          MS. KREVANS:  YES, YOUR HONOR.

25          THE COURT:  THE TIME IS 4:07.  GO AHEAD, PLEASE.

1                          **CROSS-EXAMINATION**

2       BY MS. KREVANS:

3       Q.   GOOD AFTERNOON, MR. LOCKHEIMER.

4       A.   GOOD AFTERNOON.

5       Q.   WE HAVEN'T MET BEFORE.  I'M RACHEL KREVANS, AND I'M ONE OF

6       APPLE'S LAWYERS IN THIS CASE.  YOU WORK FOR GOOGLE?

7       A.   I DO, YEAH.

8       Q.   NOT FOR SAMSUNG?

9       A.   CORRECT.

10      Q.   AND YOU'RE HERE TO TESTIFY TODAY ABOUT THE DEVELOPMENT OF

11      THE ANDROID OPEN SOURCE CODE THAT'S AVAILABLE TO EVERYONE;

12      RIGHT?

13      A.   WELL, I'M HERE TO TESTIFY ON WHATEVER YOU WANT TO ASK ME.

14      I'LL TRY MY BEST TO ANSWER YOU.

15      Q.   OKAY.  AND JUST SO THE JURY ISN'T CONFUSED, GOOGLE IS NOT

16      A DEFENDANT IN THIS CASE; RIGHT?

17      A.   I DON'T BELIEVE SO.

18      Q.   OKAY.  SAMSUNG IS THE DEFENDANT?

19      A.   I GUESS SO.  I'M NOT A LAWYER, SO I DON'T KNOW ALL THE

20      DETAILS BUT --

21      Q.   ALL RIGHT.  CAN WE PUT UP, MR. LEE, APPLE'S OPENING SLIDE

22      29?

23           ON THE SCREEN ARE NINE SMARTPHONES THAT ARE THE SUBJECT OF

24      THIS CASE, MR. LOCKHEIMER.  THIS IS THE SAMSUNG ADMIRE, THE

25      SAMSUNG GALAXY NEXUS, THE SAMSUNG GALAXY NOTE, THE SAMSUNG

```
1      GALAXY NOTE 2, THE SAMSUNG GALAXY S II, THE SAMSUNG S II
2      EPIC 4G TOUCH, THE SAMSUNG GALAXY S II SKYROCKET, THE SAMSUNG
3      GALAXY S III, AND THE SAMSUNG STRATOSPHERE.
4           THOSE ARE ALL PHONES THAT SAMSUNG MAKES AND SELLS; RIGHT?
5      A.   MAKES IN TERMS OF THE HARDWARE, SURE.
6      Q.   AND IT'S SAMSUNG THAT MAKES THE PHONES; RIGHT?
7      A.   DO YOU MEAN PHYSICALLY MAKES THE PHONES?
8      Q.   PHYSICALLY MAKES THE PHONE?
9      A.   YEAH, THAT'S MY UNDERSTANDING.
10     Q.   AND WHATEVER SOFTWARE IS ON THOSE PHONES IS THE SOFTWARE
11     THAT SAMSUNG CHOOSES TO PUT ON THEM, RIGHT?
12     A.   WELL, NOT FOR ALL NINE.  THERE'S AN EXCEPTION IN THERE.
13     Q.   IT'S SAMSUNG -- YOU'RE TALKING ABOUT THE GALAXY NEXUS;
14     RIGHT?
15     A.   SURE.
16     Q.   LET'S PUT THE NEXUS ASIDE FOR A MOMENT.  WOULD YOU AGREE
17     WITH ME THAT FOR THE OTHER EIGHT PHONES, IT'S COMPLETELY
18     SAMSUNG'S CHOICE WHAT SOFTWARE THEY DECIDED TO PUT ON THE
19     PHONES?
20     A.   YEAH.
21     Q.   NOW, THE GALAXY NEXUS, THAT'S THE ONE YOU TALKED ABOUT
22     BEFORE, I THINK YOU CALLED IT THE PURE ANDROID PHONE.
23          AGAIN, IT WAS SAMSUNG'S CHOICE WHETHER TO PUT ANDROID
24     SOFTWARE ON THAT PHONE; RIGHT?
25     A.   WELL, I DON'T KNOW IF I WANT PUT IT THAT WAY.  IT WAS
```

```
 1    SAMSUNG'S CHOICE TO WORK WITH US ON THE GALAXY NEXUS.

 2    Q.   SO IT WAS SAMSUNG'S CHOICE TO HAVE THE CODE THAT WAS ON

 3    THE PHONE THAT RAN ON IT; RIGHT?

 4    A.   THEY DECIDED THEY WANTED TO WORK WITH US ON THE GALAXY

 5    NEXUS.  PART OF THE DEAL WITH THE GALAXY NEXUS WAS THE CODE

 6    WOULD COME FROM US.

 7    Q.   OKAY.  THEY MADE THAT CHOICE?

 8    A.   SURE.

 9    Q.   ALL RIGHT.  THERE'S ONE OTHER PRODUCT INVOLVED IN THIS

10    CASE, THE GALAXY TAB PRODUCT THAT'S ALSO A PRODUCT THAT SAMSUNG

11    MAKES?

12    A.   I'VE HEARD OF IT, YEAH.

13    Q.   OKAY.  AND ALL TEN OF THESE PRODUCTS ARE PRODUCTS THAT

14    SAMSUNG SELLS; RIGHT?

15    A.    IN THE CASE OF THE GALAXY NEXUS, WE ALSO SELL IT DIRECTLY

16    FROM OUR WEBSITE.  BUT -- WE, MEANING GOOGLE.  BUT SAMSUNG ALSO

17    SELLS THEM.

18    Q.   OKAY.  YOU HAD YOUR DEPOSITION TAKEN IN THIS CASE; RIGHT?

19    A.   I DID.

20    Q.   AND BEFORE THAT DEPOSITION, YOU HADN'T EVEN HEARD OF SOME

21    OF THE SMARTPHONES THAT ARE ON THIS SLIDE; RIGHT?

22    A.   SOME OF THEM, YEAH.

23    Q.   OKAY.  LET'S START WITH THE ADMIRE.  ACTUALLY, STRIKE

24    THAT.

25         NOT ONLY HADN'T YOU HEARD OF QUITE A FEW OF THEM, YOU
```

1    DIDN'T HAVE ANY ROLE IN THE DEVELOPMENT OR MANAGEMENT OF THE

2    SOFTWARE FOR MANY OF THEM; RIGHT?

3    A.    I DIDN'T HAVE THE RESPONSIBILITY FOR SOFTWARE?  WELL, IT

4    TURNS OUT THEY ALL USE ANDROID.  THAT'S MY ASSUMPTION HERE.  SO

5    I DON'T KNOW HOW YOU DEFINE WHETHER I WAS RESPONSIBLE FOR SOME

6    OF THE SOFTWARE.

7         ANDROID IS A BIG PART OF THE SOFTWARE THAT THEY PROVIDE IN

8    THESE DEVICES.

9    Q.    WHY DON'T WE TAKE THEM ONE BY ONE AND WE'LL SEE WHAT YOU

10   SAY TODAY.

11   A.    SURE, OKAY.

12   Q.    WE CERTAINLY KNOW WHAT YOU SAID AT YOUR DEPO.

13        AT THE TIME OF YOUR DEPOSITION, YOU HAD NOT HEARD OF THE

14   ADMIRE PHONE; RIGHT?

15   A.    THAT'S MY RECOLLECTION, RIGHT.

16   Q.    AND AT THE TIME OF YOUR DEPOSITION, YOU HADN'T HEARD OF

17   THE STRATOSPHERE PHONE?

18   A.    CORRECT?

19   Q.    AND AT THE TIME OF YOUR DEPOSITION, YOU HAD NOT HEARD OF

20   THE SAMSUNG S II EPIC 4G TOUCH?

21   A.    RIGHT.

22   Q.    AND YOU ALSO HAD NOT HEARD OF THE SAMSUNG GALAXY S II

23   SKYROCKET?

24   A.    UM-HUM, THAT'S CORRECT.

25   Q.    AND WITH RESPECT TO THE SAMSUNG GALAXY NOTE, YOU'D HEARD

1    OF THE DEVICE, BUT YOU HAD NO ROLE IN THE DEVELOPMENT OR

2    MANAGEMENT OF THE ANDROID SOFTWARE RUNNING ON THE PHONE; RIGHT?

3    A.   WELL, IT WAS THEIR DEVICE.  IT USES ANDROID, WHICH I'M

4    RESPONSIBLE FOR.

5        BUT IN TERMS OF THEIR DEVICE SPECIFICALLY, YEAH, THAT

6    WASN'T MY RESPONSIBILITY.

7    Q.   THE DEVELOPMENT OR MANAGEMENT OF THE SOFTWARE THAT

8    ACTUALLY RAN ON THE GALAXY NOTE WAS NOT YOUR RESPONSIBILITY?

9    A.   YEAH, OKAY, SURE.

10   Q.   OKAY.  AND, AGAIN, THE SAMSUNG GALAXY S II, THAT ONE YOU'D

11   ALSO HEARD OF AT YOUR DEPOSITION, BUT, AGAIN, YOU HAD NO ROLE

12   IN THE DEVELOPMENT OF THE SOFTWARE THAT ACTUALLY RUNS ON THE

13   GALAXY S II; RIGHT?

14   A.   I HAD HEARD OF THE S II.  I COULDN'T HEAR WHETHER YOU SAID

15   I HAD OR HADN'T.

16       BUT I HAD HEARD OF THE S II, SIMILAR TO THE NOTE, YEAH.

17   Q.   SO AT YOUR DEPOSITION, YOU DIDN'T EVEN KNOW WHAT VERSION

18   OF ANDROID CODE MIGHT BE RUNNING ON THE S II?

19   A.   YEAH.  THERE ARE MANY, MANY ANDROID DEVICES OUT THERE.  I

20   CAN'T KEEP TRACK OF, YOU KNOW, WHAT VERSIONS EACH ONE IS

21   RUNNING.

22   Q.   OKAY.  AND THE SAME FOR THE GALAXY S III.  YOU'D HEARD OF

23   IT AS OF THE TIME OF YOUR DEPOSITION, BUT YOU DIDN'T KNOW WHAT

24   SPECIFICALLY WAS THE CODE THAT WAS RUNNING ON IT?

25   A.   CORRECT.

1      Q.   AND THE SAME WAS TRUE AT YOUR DEPOSITION OF THE GALAXY TAB

2      10 -- TAB 2 10.1, WHICH IS AT ISSUE IN THIS CASE; RIGHT?

3      A.   SURE, YEAH.

4      Q.   OKAY.  YOU TALKED A LITTLE BIT WITH SAMSUNG'S COUNSEL

5      ABOUT SOME INFORMATION THAT YOU SAID YOU REQUESTED IN 2013

6      ABOUT HOW OFTEN PEOPLE ACTUALLY USE LOCAL SEARCH RESULTS IN

7      CONNECTION WITH THE SEARCH FEATURE THAT IS ON THE PHONES THAT

8      RUN ANDROID; RIGHT?

9      A.   THIS IS WHAT WE WERE TALKING ABOUT EARLIER TODAY?

10     Q.   YES, WITH MR. QUINN?

11     A.   YES.

12     Q.   AND YOU SAID THAT SEARCH FEATURE WAS CALLED QUICK SEARCH

13     BOX, SOMETIMES ALSO CALLED OTHER THINGS?

14     A.   PHONETOP.

15     Q.   AND THIS IS BASICALLY A FEATURE THAT'S BEEN IN THE ANDROID

16     CODE FOR SOME TIME THAT ENABLES A USER TO ENTER A SINGLE SEARCH

17     QUESTION, THEY COULD TYPE IN JUST ONE THING, AND THE CODE

18     RUNNING ON A DEVICE THAT HAS THE QUICK SEARCH BOX IS GOING TO

19     BOTH SEARCH THE INTERNET AND SEE WHAT'S OUT THERE ON THE

20     INTERNET THAT'S RESPONSIVE TO WHATEVER THEY TYPED IN, AND IT'S

21     ALSO GOING TO SEARCH WHATEVER IS STORED ON THEIR PHONE AS WELL;

22     RIGHT?

23     A.   RIGHT.

24     Q.   AND YOU CALLED THE SEARCH RESULTS THAT MIGHT BE ON THE

25     PHONE THE PHONETOP?

1    A.   THAT'S WHAT I CALL IT, YEAH.   IT'S LIKE DESKTOP, PHONETOP.

2    Q.   OKAY.

3    A.   KIND OF MAKES SENSE.

4    Q.   AND THE POINT OF THIS FEATURE WAS THAT THE USER WOULD ONLY

5    HAVE TO SEARCH ONE TIME AND THEY WOULD FIND WHATEVER WAS OUT

6    THERE ON THE WEB THAT THE CODE INSIDE THE DEVICE THOUGHT WAS

7    WORTHY OF BEING SERVED UP TO THEM, AND THEY WOULD ALSO SEE, AS

8    THEIR RESULTS, THINGS THAT WERE ON THE PHONE ITSELF?

9    A.   RIGHT, THE WEB AND THE PHONE, CORRECT.

10   Q.   SO ON THE PHONE, IT MIGHT BE SOMETHING THAT WAS IN THEIR

11   CONTACTS, FOR EXAMPLE?   RIGHT?

12   A.   COULD BE, SURE.

13   Q.   COULD BE CONTACTS, COULD BE CALENDAR, SOMETHING LOCALLY

14   STORED ON THE PHONE?

15   A.   CORRECT.

16   Q.   ALL RIGHT.   YOU DECIDED TO ASK SOMEONE WHO WORKED FOR YOU

17   TO GO AND SEE HOW OFTEN PEOPLE WERE ACTUALLY USING THE QUICK

18   SEARCH BOX IN JULY OF 2013 AND SHE GAVE YOU A REPORT WHICH

19   WE'VE JUST SAW EARLIER AS EXHIBIT 308; RIGHT?

20   A.   I DON'T REMEMBER THE NUMBERS, BUT, YEAH, I'LL TAKE YOUR

21   WORD FOR IT.

22   Q.   WHY DON'T YOU TURN BACK TO IT IN THE BINDER SO WE'RE BOTH

23   ON THE SAME PAGE.

24   A.   308.

25   Q.   308.

1        A.   IN SAMSUNG'S BINDER?

2        Q.   I THINK IT'S IN BOTH BINDERS, SO WHICHEVER IS HANDIER.

3        A.   I'LL LOOK AT YOUR BINDER.  308.  OKAY.  I'M THERE.

4        Q.   OKAY.  SO THIS IS FROM JULY 23RD, 2013.  AND MR. QUINN

5        ASKED YOU A COUPLE QUESTIONS ABOUT THIS DOCUMENT, AND YOU TOLD

6        HIM THAT WHAT THIS INFORMATION SHOWED YOU WAS THAT IN 98

7        PERCENT OF THE SEARCHES THAT WERE DONE IN THE TIME THAT SHE

8        LOOKED AT, THE PERSON ACTUALLY, WHEN THEY GOT THE SEARCH

9        RESULTS BACK, PICKED ONE OF THE RESULTS THAT CAME FROM THE WEB;

10       RIGHT?

11       A.   YEAH, 98 PERCENT, CORRECT.

12       Q.   OKAY.  LET'S LOOK AT A LITTLE BIT MORE DETAIL IN THIS

13       DOCUMENT.

14            SO THEY'RE USING, IN THIS DOCUMENT, IT'S CALLED THE GOOGLE

15       SEARCH APPLICATION, THAT'S ANOTHER NAME FOR WHAT YOU WERE

16       CALLING QUICK SEARCH BOX.

17       A.   IT'S SYNONYMOUS, YES.

18       Q.   OKAY.  NOW, WHAT MS. GARRETT -- IS THAT HER NAME?

19       A.   YES.

20       Q.   WHAT SHE ACTUALLY DID FOR YOU IS SORT OF A SERIES OF

21       INVESTIGATIONS.

22            AND IF YOU LOOK AT THE SECOND PAGE OF THIS DOCUMENT, IN

23       THE MIDDLE OF THE TEXT, YOU SEE WHERE IT SAYS "NOW WE COUNT THE

24       TOTAL NUMBER OF SEARCHES UNDERTAKEN BY PEOPLE WHO HAVE GSA 2.4

25       AND UP ON THEIR DEVICES."

1          NOW, IS THAT JELLY BEAN CODE AS IT EXISTED IN JULY 2013?

2     A.   WELL, GSA 2.0 -- 2.4 IS A VERSION NUMBER OF THE GSA, THE

3     SEARCH APPLICATION.  JELLY BEAN IS THE NAME OF THE OPERATING

4     SYSTEM.  SO WE'RE TALKING ABOUT TWO DIFFERENT THINGS.

5     Q.   RIGHT, BECAUSE THIS SEARCH APPLICATION KIND OF BOLTS ON TO

6     THE ANDROID FRAMEWORK.  SO THERE'S JELLY BEAN AND THEN THERE'S

7     THE SEARCH APPLICATION WHICH IS ALSO PROVIDED; RIGHT?

8     A.   I DON'T KNOW IF I WOULD SAY IT BOLTS ON, BUT I GET YOUR

9     POINT.  THERE -- GSA IS AN APPLICATION THAT RUNS ON TOP OF THE

10    OPERATING SYSTEM.  SO THEY HAVE DIFFERING VERSION NUMBERS.

11    Q.   OKAY.  AND WHAT YOUR COLLEAGUE, MS. GARRETT, TOLD YOU IS

12    SHE WANTS -- IN ORDER TO COUNT THE TOTAL NUMBER OF SEARCHES

13    UNDERTAKEN BY PEOPLE WHO HAVE THIS QUICK SEARCH BOX ON THEIR

14    DEVICES, SHE'S GOING TO CHECK GOOGLE'S LOGS GOING BACK 7.25

15    DAYS.  SO THIS IS A WEEK'S WORTH OF INFORMATION SHE HAS HERE?

16    A.   IT LOOKS LIKE IT, YEAH.

17    Q.   AND WHEN SHE SAYS GOOGLE'S LOGS, THIS IS BECAUSE GOOGLE

18    HAS A WAY TO TRACK WHAT SEARCHES ARE DONE BY THIS GOOGLE SEARCH

19    APPLICATION RUNNING ON THE PHONES?

20    A.   FROM THIS APPLICATION, SPECIFICALLY.

21    Q.   SO GOOGLE HAS A LOG SOME PLACE ON SOME BIG COMPUTER AND

22    SHE CAN GO LOOK FOR SEVEN DAYS AND SAY MANY TIMES WAS THIS

23    QUICK SEARCH BOX USED?

24    A.   SURE.  THERE'S INDICATED THAT SHE CAN DO AN ANALYSIS ON,

25    YEAH.

1    Q.   OKAY.  AND SHE DID THAT ANALYSIS, AND IF YOU LOOK IN THE

2    SMALL TYPE -- IF WE COULD SCROLL UP, MR. LEE, SO WE CAN SEE

3    WHAT'S JUST BELOW THAT PARAGRAPH WE JUST READ.

4         WHAT SHE FINDS IS THAT IN JUST SEVEN DAYS, THERE ARE 800

5    MILLION SEARCHES USING THIS FEATURE THAT SEARCHES BOTH THE

6    INTERNET AND THE LOCAL PHONE SEARCH; RIGHT?

7    A.   817 MILLION SEARCHES THROUGH THE GSA APP.

8    Q.   OKAY.  THERE MIGHT BE MORE SEARCHES BECAUSE SHE WASN'T

9    SEARCHING LOGS FOR EARLIER RELEASES BECAUSE THE DATA WASN'T SO

10   GOOD FOR THAT, RIGHT?

11   A.   I ACTUALLY DON'T KNOW WHY SHE DIDN'T GO EARLIER.  THE

12   REASON I SAID 817 MILLION FROM THE GOOGLE SEARCH APP IS BECAUSE

13   PEOPLE MIGHT HAVE DONE SEARCHES THROUGH OTHER APPLICATIONS.

14   THEY MIGHT HAVE USED A WEB BROWSER, FOR INSTANCE.

15   Q.   OKAY.  BUT RIGHT NOW WE'RE JUST INTERESTED IN THE GOOGLE

16   SEARCH APP BECAUSE THAT'S THIS UNIVERSAL SEARCH THING THAT

17   LOOKS AT BOTH THE WEB AND THE LOCAL INFO ON THE PHONE THAT YOU

18   TALKED ABOUT WITH MR. QUINN?

19   A.   YEP.

20   Q.   AND WHAT SHE SAID WAS 817 MILLION SEARCHES USING THAT

21   QUICK SEARCH BOX APP IN JUST SEVEN DAYS, BUT SHE DIDN'T STOP

22   THERE IN THE INFORMATION THAT SHE GAVE TO YOU, RIGHT?

23   A.   WELL, THE E-MAIL GOES ON.  THERE'S A LOT MORE DATA HERE,

24   YEAH.

25   Q.   OKAY.  AND WE KNOW THERE MUST BE MORE DATA BECAUSE YOU

1    TOLD MR. QUINN THAT ONLY A SMALL NUMBER OF THOSE SEARCHES

2    RESULTED IN PEOPLE ACTUALLY PICKING THE SEARCH RESULT THAT CAME

3    FROM THE PHONE ITSELF; RIGHT?

4    A.   RIGHT.

5    Q.   SO LET'S GO ON.   AND IF WE COULD LOOK AT PAGE 4, SHE

6    MARCHES THROUGH AND SHE SAYS -- I TAKE IT -- STRIKE THAT.

7         ANOTHER THING THAT YOUR DATA THAT GOOGLE COLLECTS ON THESE

8    SEARCHES CAN TELL YOU IS NOT JUST HOW MANY SEARCHES HAPPENED,

9    BUT WHEN THE SEARCH RESULTS ARE PRESENTED TO THE USER ON THE

10   SCREEN OF THEIR PHONE, WHICH ONE DID THEY TAP ON TO GO FURTHER

11   WITH; RIGHT?

12   A.   YEAH.   I DON'T KNOW THE DETAILS OF HOW MUCH INFORMATION

13   SHE HAS.   SHE'S THE EXPERT ON THAT.

14   Q.   OKAY.   BUT YOU KNOW, BECAUSE YOU TOLD MR. QUINN, THAT YOU

15   AT LEAST CAN TELL WHEN THE SCREEN SHOWED THE SEARCH RESULTS TO

16   THE USER, DID THEY TAP ON SOMETHING THAT WAS FROM THE WEB OR

17   DID THEY TAP ON SOMETHING THAT WAS LOCAL FROM THE PHONE; RIGHT?

18   A.   WELL, WHAT I TOLD HIM WAS 98 PERCENT OF THE SEARCHES WERE

19   NOT PHONETOP SEARCHES.

20   Q.   OKAY.   AND YOU GOT THAT FROM EXHIBIT 308?

21   A.   CORRECT.

22   Q.   OKAY.   SO LET'S AT HOW MANY WERE PHONETOP SEARCHES.

23        IF YOU LOOK AT PAGE 4, DO YOU SEE WHERE SHE SAYS "NEXT WE

24   COUNT THE CLICKS ON PHONETOP SEARCH RESULTS."

25        DO YOU SEE THAT?

1     A.   SORRY.  LET ME CATCH UP.  WE'RE ON PAGE 4.

2     Q.   PAGE 4?

3     A.   SORRY.

4     Q.   FIRST REAL TEXT AT THE TOP OF PAGE 4?

5     A.   NEXT WE COUNT --

6     Q.   DO YOU SEE "NEXT WE COUNT THE CLICKS ON PHONETOP SEARCH

7     RESULTS."

8     A.   SOMEHOW -- I'LL JUST LOOK AT THE SCREEN.  THIS BINDER IS

9     NOT HELPING ME RIGHT NOW.  I'LL LOOK AT THE SCREEN.  I DO SEE

10    IT ON THE SCREEN.

11    Q.   SO WHAT SHE'S COUNTING THERE IS FROM GOOGLE'S LOGS ABOUT

12    THESE SEARCHES, HOW MANY PEOPLE WHEN THEY SAW THE SEARCH

13    RESULTS DISPLAYED TAPPED ON AND PICKED WHAT YOU CALLED THE

14    PHONETOP SEARCH RESULTS; RIGHT?

15    A.   I'M SORRY.  I'M CONFUSED.  I'M TRYING TO FIND -- YOU SAID

16    PAGE 4.

17    Q.   YEAH, WHY DON'T YOU -- DO YOU HAVE THE DOCUMENT THERE?

18    A.   OKAY, PAGE 4.  SORRY ABOUT THAT.

19    Q.   THAT'S NOT A PROBLEM.  DO YOU SEE IT NOW?

20    A.   "NEXT WE COUNT THE CLICKS ON PHONETOP SEARCH RESULTS," I

21    DO SEE THAT.

22    Q.   OKAY.  SO IN THE LOGS THAT GOOGLE HAS, SHE'S ABLE TO LOOK

23    AT THESE HOW MANY PEOPLE FROM THESE 800 MILLION SEARCHES, WHEN

24    THEY SAW THE RESULT, DECIDED THE RESULT THEY WANTED TO TAP ON

25    AND SEE MORE ABOUT WAS THE RESULT THAT CAME FROM THE LOCAL

 1       STORAGE ON THE PHONE; RIGHT?

 2       A.   THIS NUMBER SEEMS TO BE THE NUMBER OF PEOPLE WHO CLICKED

 3       ON PHONETOP SEARCH RESULTS, RIGHT.

 4       Q.   OKAY.  AND THE NUMBER THAT WE SEE THERE IS 14,667,000 AND

 5       CHANGE, RIGHT?

 6       A.   YEAH, 14 MILLION, YEAH.

 7       Q.   SO IN THIS ONE WEEK THAT SHE LOOKED AT, 800 MILLION PEOPLE

 8       USED UNIVERSAL SEARCH, AND, IN FACT, 14 MILLION OF THEM WANTED

 9       TO SEE THE RESULT THAT CAME FROM THEIR LOCAL PHONE; RIGHT?

10       A.   RIGHT, 817 MILLION AND CHANGE PEOPLE DID USE THE GOOGLE

11       SEARCH APP TO DO SOME SORT OF SEARCH, AT LEAST THAT'S THE WAY I

12       INTERPRET IT.

13            AND THE WAY I'M INTERPRETING THIS, 14 MILLION AND CHANGE

14       OF THOSE WERE -- RESULTED INTO CLICKS ON PHONETOP SEARCH

15       RESULTS.

16       Q.   AND THAT'S JUST IN ONE WEEK, 14 MILLION SEARCHES RESULTED

17       IN INFORMATION WITH THE THING THAT SOMEBODY WANTED TO LOOK AT

18       THEN WAS FROM THE PHONE?

19       A.   SURE, YEAH.

20       Q.   IN ONE WEEK'S WORTH OF USE?

21       A.   UM-HUM.

22            MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

23            THE COURT:  ALL RIGHT.  THE TIME IS NOW 4 :23.  WE'LL

24       JUST GO UNTIL 4:30.

25            MR. QUINN:  THANK YOU, YOUR HONOR.

```
1           THE COURT:  THANK YOU.

2           MR. QUINN:  IF WE COULD PUT THAT EXHIBIT 308 BACK UP,

3    KEN.  308.002, AND IF WE COULD ENLARGE THAT NUMBER.

4    ///

5    ///

6                      REDIRECT EXAMINATION

7    BY MR. QUINN:

8    Q.   I THINK IN RESPONSE TO MS. KREVANS'S QUESTIONS, SHE ASKED

9    YOU IN TERMS OF PEOPLE DOING THE SEARCHES, 14,667,000 PEOPLE

10   DOING SEARCHES, AND YOU RESPONDED IN TERMS OF THIS IS HOW MANY

11   PEOPLE WERE DOING SEARCHES.

12        AND I JUST, FOR CLARITY, IS THIS THE NUMBER OF PEOPLE,

13   WHAT WE'RE LOOKING AT HERE ON THE ONE PAGE, 817 MILLION PEOPLE

14   DOING SEARCHES AND ON THE OTHER PAGE, PAGE 4, 14 MILLION PEOPLE

15   CLICKING ON THE PHONETOP?  OR IS IT SOMETHING ELSE?

16   A.   NO, THAT'S A GOOD POINT.  IT'S NOT UNIQUE INDIVIDUALS.

17   IT'S NOT LIKE THERE WERE 817 MILLION OR 14 MILLION UNIQUE

18   INDIVIDUALS HERE.  THESE ARE 817 MILLION EVENTS, YOU CAN THINK

19   OF IT AS, THAT'S WHAT THAT'S AN ENGINEERING CENTRIC WAY OF

20   LOOKING AT IT, BUT IT'S 817 MILLION TIMES, IT COULD HAVE BEEN

21   THE SAME PERSON 10 TIMES, IT COULD HAVE BEEN THE SAME PERSON

22   ONCE.

23        BUT YOU ADD IT ALL UP, 817 MILLION TIMES IN 7.2 FIVE DAYS,

24   PEOPLE USED THE GSA TO DO SOME SORT OF SEARCH, AND 14 MILLION

25   AND CHANGE TIMES, IT COULD HAVE BEEN ONE PERSON, IT COULD HAVE
```

1   BEEN 14 MILLION PEOPLE, I DON'T KNOW WHAT THE NUMBER OF PEOPLE

2   WERE, BUT IT'S THE NUMBER OF TIMES THAT IT HAPPENED, NOT THE

3   NUMBER OF PEOPLE.

4   Q.   SO IS THAT BASICALLY EIGHT MILLION OUT OF 1800 -- OR

5   800-PLUS MILLION QUERIES AND ROUGHLY 14 MILLION-PLUS PEOPLE

6   TAPPED ON THE LOCAL SEARCH RESULT?

7   A.   NOT NECESSARILY PEOPLE.  18 MILLION TIMES SOMETHING.

8   Q.   QUERIES?

9   A.   YEAH, SOME SET OF PEOPLE BETWEEN 1 AND THAT NUMBER TAPPED

10  ON IT.

11  Q.   ALL RIGHT.  IF WE COULD LOOK AT SLIDE 29 FROM THE

12  PLAINTIFF'S OPENING THAT COUNSEL SHOWED YOU JUST A MOMENT AGO

13  WITH THE PICTURES OF ALL THE ACCUSED PHONES UP THERE.  I MEAN,

14  YOU KNOW THAT ALL THESE PHONES HERE RUN ON ANDROID, THE ANDROID

15  OPERATING SYSTEM?  YOU KNOW THAT; CORRECT?

16         MS. KREVANS:  OBJECTION.  LEADING.

17         THE COURT:  SUSTAINED.

18         MR. QUINN:  ALL RIGHT.

19  Q.   DO YOU KNOW WHETHER OR NOT THESE PHONES ALL RUN ON

20  ANDROID?

21  A.   WELL, THAT'S MY ASSUMPTION.  I HAVEN'T VERIFIED THAT

22  PERSONALLY MYSELF.

23  Q.   ALL RIGHT.  BUT IT WOULD -- COULD SOMEONE TELL, JUST BY

24  TURNING ON THE PHONE?

25         MS. KREVANS:  OBJECTION, YOUR HONOR.  HE'S NOW

```
 1        ESTABLISHED THE WITNESS HAS NO KNOWLEDGE, AS I THINK I DID ON

 2        CROSS-EXAMINATION AS WELL.

 3                   THE COURT:  OVERRULED.

 4              GO AHEAD.  YOU MAY ANSWER.

 5                   THE WITNESS:  SORRY.  CAN YOU ASK THE QUESTION?

 6        BY MR. QUINN:

 7        Q.   IF YOU TURN ON THE PHONE, WOULD ONE BE ABLE TO TELL

 8        WHETHER THAT PHONE RAN ON ANDROID SOFTWARE?

 9        A.   SURE, WITH A PRETTY HIGH LEVEL OF CONFIDENCE, YEAH, JUST

10        VISUALLY OR BY USING SOME TOOLS, YOU COULD TELL.

11        Q.   AND COUNSEL ASKED YOU SOME QUESTIONS FROM YOUR DEPOSITION

12        WHERE SHE -- YOU KNOW, YOU WERE UNCERTAIN ABOUT WHAT SOFTWARE

13        RAN ON SOME OF THESE PHONES, AND YOU SAID SOMETHING LIKE, I

14        DON'T KNOW WHICH VERSION OF ANDROID.

15              DO YOU RECALL THAT?

16        A.   YEAH.

17        Q.   WHAT -- COULD YOU EXPLAIN WHAT YOU MEANT WHEN YOU WERE

18        SAYING I'M NOT SURE WHAT VERSION OF ANDROID?

19        A.   WELL, THERE'S MULTIPLE VERSIONS OF ANDROID, RIGHT, I

20        TALKED ABOUT ALL THE TASTY TREATS, SO THAT'S, THAT'S ONE WAY.

21              ANOTHER WAY IS, WELL, SINCE THEY'RE RUNNING ANDROID,

22        ASSUMING THEY'RE RUNNING ANDROID, YOU KNOW, WITHOUT ACTUALLY

23        SEEING THAT, I CAN'T KNOW WHICH VERSION IS RUNNING.

24        Q.   AND YOU DO KNOW THAT JOINT EXHIBIT 29K, THE NEXUS PHONE,

25        IS PURE ANDROID?
```

1    A.   YES, IT'S A NEXUS DEVICE, MEANING THE SOFTWARE EXPERIENCE

2    WAS ONE THAT WE PROSCRIBED.

3    Q.   AND IT'S YOUR UNDERSTANDING THAT ALL FIVE PATENTS THAT --

4    THAT APPLE IS ACCUSING THIS PHONE WITH RESPECT TO ALL FIVE

5    PATENT CLAIMS IN THIS CASE.

6    A.   YEAH, THE FIVE --

7         MS. KREVANS:  OBJECTION.  THERE'S NO FOUNDATION FOR

8    THIS WITNESS TO TALK ABOUT ANY PATENT.

9         THE COURT:  SUSTAINED.

10        LAY THE FOUNDATION, PLEASE.

11   BY MR. QUINN:

12   Q.   SIR, DO YOU HAVE SOME GENERAL UNDERSTANDING ABOUT THE

13   NATURE OF THE PATENT CLAIMS ASSERTED IN THIS CASE?

14        MS. KREVANS:  YOUR HONOR, THEY REPRESENTED TO US THEY

15   WOULDN'T ASK THE WITNESS ANY QUESTIONS ABOUT PATENT, PART OF

16   THE DISCUSSION WE HAD BEFORE THIS.

17        MR. QUINN:  IT'S FOUNDATIONAL, YOUR HONOR.

18        THE COURT:  ALL RIGHT.

19        MR. QUINN:  AND I'M AT THE END.

20        THE COURT:  WELL, IT'S CONTRARY TO WHAT WAS

21   REPRESENTED, BUT IF HE KNOWS THE ANSWER, HE CAN ANSWER.

22   BY MR. QUINN:

23   Q.   SIR, DO YOU KNOW, AT A GENERAL LEVEL, WHAT PATENT CLAIMS

24   ARE ASSERTED IN THIS CASE?

25   A.   YEAH, YOU TOLD ME.

1    Q.   ALL RIGHT.

2    A.   A VERY HIGH LEVEL.

3    Q.   AND IS IT YOUR UNDERSTANDING THAT THIS NEXUS PHONE IS

4    ACCUSED ON ALL FIVE OF THOSE?

5    A.   THAT'S WHAT I'VE BEEN TOLD.

6         THE COURT:  HE'S TESTIFYING HERE.  IF YOU'RE TELLING

7    HIM, HE'S JUST GOING TO TESTIFY TO WHAT YOU TOLD HIM?  I'M

8    GOING TO HAVE TO --

9         MR. QUINN:  ALL RIGHT.  NOTHING FURTHER, YOUR HONOR.

10        THE COURT:  ALL RIGHT.  THANK YOU.

11        MS. KREVANS:  AND YOUR HONOR, AT THIS TIME WE WOULD

12   RENEW OUR REQUEST FOR THE INSTRUCTION THAT WE DISCUSSED DURING

13   THE BREAK, PARTICULARLY GIVEN THE CHRONOLOGY THAT WAS

14   ESTABLISHED AND SOME OF THE TESTIMONY THAT WAS ELICITED FROM

15   THE WITNESS.

16        THE COURT:  WE'RE NOT GOING TO TALK ABOUT THAT WITH

17   THE JURY.

18      DO YOU HAVE ANY REDIRECT FOR THIS WITNESS?

19        MS. KREVANS:  I DO NOT, YOUR HONOR.

20        THE COURT:  OKAY.  AND IS HE EXCUSED SUBJECT TO

21   RECALL OR NOT SUBJECT TO RECALL?

22        MS. KREVANS:  NOT SUBJECT TO RECALL.

23      BUT, YOUR HONOR, WE -- GIVEN THAT IT'S FRIDAY, WE THINK

24   THAT WE ARE ENTITLED TO THE INSTRUCTION PROMPTLY.

25        THE COURT:  THAT'S DENIED.  OKAY?

```
1          ALL RIGHT.  LET ME HEAR FROM MR. QUINN.  IS HE SUBJECT TO

2    RECALL OR NOT?

3              MR. QUINN:  NOT SUBJECT TO RECALL.

4              THE COURT:  OKAY.  THEN YOU ARE EXCUSED.

5          ALL RIGHT.  IT'S 4:29, BUT I'M NOT GOING TO HAVE A WITNESS

6    CALLED IN FOR A MINUTE AND A HALF, SO WE'LL GO AHEAD AND

7    ADJOURN FOR THE DAY.

8          OUR SCHEDULE NEXT WEEK WILL BE THE SAME AS THE PREVIOUS

9    TWO WEEKS, MONDAY, TUESDAY, FRIDAY, 9:00 TO 4:30.  NO TRIAL ON

10   WEDNESDAY OR THURSDAY.

11         PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

12         WE'LL SEE YOU MONDAY MORNING AT 9:00 O'CLOCK.

13         THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

14         (JURY OUT AT 4:30 P.M.)

15             THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT THE

16    JURORS HAVE LEFT THE COURTROOM.

17         PLEASE TAKE A SEAT.

18         SO SAMSUNG HAD IDENTIFIED SEVEN WITNESSES FOR TODAY, WE'VE

19    JUST FINISHED ONE.  SO WE HAVE SIX MORE.

20         SO TELL ME, DO WE STILL NEED TO DO SIX OBJECTIONS THIS

21    WEEKEND FOR MONDAY?

22             MS. MAROULIS:  YOUR HONOR, THE ONLY OBJECTIONS THE

23     COURT SHOULD RULE ON ARE WITH RESPECT TO THREE WITNESSES,

24     BRINGERT, WESTBROOK, AND PENDLETON.  BECAUSE WE WENT SLOWER

25     TODAY THAN EXPECTED, WE'RE NOT GOING TO NEED TO GO BEYOND THAT.
```

```
 1              THE COURT:  OKAY.  SO THEN THE -- OTHER THAN WHAT'S

 2      ALREADY BEEN RULED ON, WHAT YOU NEED A RULING ON BY SUNDAY

 3      WOULD BE BRINGERT, PENDLETON, AND WHO IS THE OTHER ONE?

 4              MS. MAROULIS:  WESTBROOK, YOUR HONOR.

 5              THE COURT:  WESTBROOK, OKAY.

 6          SO THEN TOMORROW THEN APPLE IS GOING TO FILE, AND SAMSUNG

 7      WILL FILE, YOUR CROSS OBJECTIONS AND RESPONSES TO HIGH PRIORITY

 8      OBJECTIONS TO THOSE THREE WITNESSES.  THAT WILL BE SATURDAY.

 9              AND THEN WHAT ABOUT ON SUNDAY?  WHAT'S GOING TO BE FILED

10      ON SUNDAY?

11              MS. MAROULIS:  YOUR HONOR, MAY WE RESPOND TO THE

12      COURT A LITTLE BIT LATER?  I DO NEED TO CONFER WITH THE TEAM,

13       BOTH PEOPLE HERE AND BACK AT THE OFFICE.

14          IT WOULD BE VERY HELPFUL IF THE COURT DIRECTED APPLE TO

15      RESPOND TO OUR OFFER ABOUT PRIOR ARTISTS TOMORROW MORNING SO

16      THAT DOESN'T HAVE TO GO INTO SOME DISCLOSURES.

17              THE COURT:  WELL, IF THOSE ARE REALLY SHORT, WHAT IS

18      YOUR PROBLEM WITH DOING HIGH PRIORITY OBJECTIONS TO -- YOU

19      KNOW, ALL THE DEPOSITIONS IN THIS CASE HAVE GENERALLY BEEN LESS

20      THAN FIVE MINUTES.  WHAT'S THE PROBLEM?

21              MR. LEE:  YOUR HONOR, WE'LL BE ABLE TO RESPOND THIS

22      EVENING.

23          THE PROBLEM -- THE CHALLENGE IS THAT IT'S A SUBSET OF THE

24      DEPOSITION, OF THE EXHIBITS THAT ARE BEFORE YOUR HONOR, AND

25      THEY'RE ASKING FOR A STIPULATION NOT ONLY TO AUTHENTICITY, BUT
```

1    PUBLIC AVAILABILITY.  SO WE NEED TO GO BACK AND JUST MAKE SURE.

2    BUT WE'LL RESPOND TO THEM THIS EVENING ON THE PROPOSAL THAT

3    THEY'VE MADE.

4              THE COURT:  OKAY.  WELL, AS FAR AS WHAT YOU FILE ON

5    SUNDAY, I DON'T HAVE TO RULE ON THAT UNTIL MONDAY NIGHT, SO --

6              MS. MAROULIS:  YES, YOUR HONOR.

7              THE COURT:  YOU KNOW, WE MIGHT CONSIDER IT, BUT WE --

8              MS. MAROULIS:  WE'LL BE MINDFUL OF THE COURT'S TIME

9    IN TRYING TO PRIORITIZE AND RESOLVE WHAT WE CAN WITH APPLE.

10             THE COURT:  THAT'S FINE.  I'M NOT PRESSURING ONE SIDE

11   OR THE OTHER TO STIPULATE TO TESTIMONY.  IT'S UP TO THE SIDES

12   TO DECIDE WHAT THEY WANT.

13        BUT I APPRECIATE NOT HAVING TO DO 14 WITNESS OBJECTIONS

14   THIS WEEKEND WHEN WE ONLY GOT THROUGH ONE OF THE SEVEN THAT

15   WERE DESIGNATED FOR TODAY.

16        SO YOU'LL FILE YOUR JMOL MOTIONS TONIGHT AND TOMORROW

17   AFTERNOON, AND WE'LL RULE ON THOSE.

18        YOU'LL CHECK THE SEALING DESIGNATION ON THE EXHIBIT THAT I

19   RAISED THIS MORNING.

20             MS. MAROULIS:  YES, YOUR HONOR, 411.

21             THE COURT:  WHAT ELSE?  ANYTHING ELSE?  I THINK WE

22   ALL HAVE ENOUGH HOMEWORK WEEKEND.  ANYTHING ELSE THAT WE NEED

23   TO --

24             MS. MAROULIS:  YOUR HONOR, MAY WE HAVE THE TIME FOR

25   TODAY?

```
 1            THE COURT:  OH, YES.

 2            MS. MAROULIS:  BOTH SAMSUNG'S AND APPLE'S?

 3            THE COURT:  YES.

 4         (PAUSE IN PROCEEDINGS.)

 5            THE COURT:  OKAY.  TODAY WE, UNFORTUNATELY, DID NOT

 6    DO AS MUCH AS WE NORMALLY DO BECAUSE OF THE VARIOUS OTHER

 7    ISSUES THAT CAME UP, BUT WE HAVE 3 HOURS AND 32 MINUTES FOR

 8    SAMSUNG TODAY.  SO YOUR OVERALL TOTAL IS 10 HOURS AND 1 MINUTE.

 9         ALL RIGHT.  AND TODAY APPLE USED 1 HOUR AND 24 MINUTES.

10    SO APPLE'S TOTAL IS 12 HOURS AND 38 MINUTES.

11         OKAY.  WHAT ELSE?  ANYTHING ELSE THAT WE SHOULD ORGANIZE?

12            MS. MAROULIS:  YOUR HONOR, MAY I HAVE ANOTHER HOUR

13    FOR JMOLS, TO FILE AT 9:00 P.M. AS OPPOSED TO 8:00?  I SPOKE

14    TOO SOON.

15            THE COURT:  THAT'S FINE.

16            MS. MAROULIS:  THANK YOU.

17            THE COURT:  THAT'S FINE.

18         OKAY.  ANYTHING ELSE?

19            MR. LEE:  NOTHING FOR APPLE, YOUR HONOR.

20            THE COURT:  OKAY.

21            MS. MAROULIS:  NOTHING FOR SAMSUNG.

22            THE COURT:  ALL RIGHT.  THANK YOU ALL.  WE'LL SEE YOU

23    MONDAY.

24         (THE EVENING RECESS WAS TAKEN AT 4:34 P.M.)

25
```

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076

17

18

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

20

21         DATED:  APRIL 11, 2014

22

23

24

25