1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3        SAN JOSE DIVISION

4

5

        APPLE INC., A CALIFORNIA          )  C-12-00630 LHK
6        CORPORATION,                      )
                                          )  SAN JOSE, CALIFORNIA
7                    PLAINTIFF,           )
                                          )  APRIL 15, 2014
8              VS.                        )
                                          )  VOLUME 8
9        SAMSUNG ELECTRONICS CO., LTD.,   )
        A KOREAN BUSINESS ENTITY;        )  PAGES 1763-2051
10       SAMSUNG ELECTRONICS AMERICA,     )
        INC., A NEW YORK CORPORATION;    )
11       SAMSUNG TELECOMMUNICATIONS       )
        AMERICA, LLC, A DELAWARE         )
12       LIMITED LIABILITY COMPANY,       )
                                          )
13                    DEFENDANTS.         )
        _____  )

14

15

16            TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LUCY H. KOH
17            UNITED STATES DISTRICT JUDGE

18

19

20            APPEARANCES ON NEXT PAGE

21

22   OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR
                                  CERTIFICATE NUMBER 8074

24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

```
 1

 2      A P P E A R A N C E S:

 3      FOR PLAINTIFF          MORRISON & FOERSTER
        APPLE:                 BY:  HAROLD J. MCELHINNY
 4                                  RACHEL KREVANS
                               425 MARKET STREET
 5                             SAN FRANCISCO, CALIFORNIA  94105

 6

 7                             WILMER, CUTLER, PICKERING,
                               HALE AND DORR
 8                             BY:  WILLIAM F. LEE
                               60 STATE STREET
 9                             BOSTON, MASSACHUSETTS  02109

10                             BY:  MARK D. SELWYN
                               950 PAGE MILL ROAD
11                             PALO ALTO, CALIFORNIA  94304

12

13      FOR SAMSUNG:           QUINN, EMANUEL, URQUHART & SULLIVAN
                               BY:  JOHN B. QUINN
14                                  WILLIAM PRICE
                               865 S. FIGUEROA STREET, FLOOR 10
15                             LOS ANGELES, CALIFORNIA  90017

16                             BY:  VICTORIA F. MAROULIS
                                    KEVIN B. JOHNSON
17                             555 TWIN DOLPHIN DRIVE
                               SUITE 560
18                             REDWOOD SHORES, CALIFORNIA  94065

19

20

21

22

23

24

25
```

1

2                        INDEX OF WITNESSES

3      DEFENDANT'S

4      **KEVIN JEFFAY**
             DIRECT EXAM BY MR. NELSON              P. 1768
5            CROSS-EXAM BY MS. KREVANS              P. 1813
             REDIRECT EXAM BY MR. NELSON           P. 1840
6
       **BREWSTER KAHLE**
7            DIRECT EXAM BY MS. MAROULIS           P. 1844
             CROSS-EXAM BY MR. MUELLER             P. 1855
8
       **ULRICH PFEIFER**
9            DIRECT EXAM BY MS. MAROULIS           P. 1862
             CROSS-EXAM BY MR. MUELLER             P. 1868
10           REDIRECT EXAM BY MS. MAROULIS         P. 1873

11     **MARTIN RINARD**
             DIRECT EXAM BY MR. PAK                P. 1875
12           CROSS-EXAM BY MS. KREVANS             P. 1933
             REDIRECT EXAM BY MR. PAK              P. 1954
13
       **SAUL GREENBERG**
14           DIRECT EXAM BY MR. NELSON             P. 1959
             CROSS-EXAM BY MR. MCELHINNY           P. 1986
15           REDIRECT EXAM BY MR. NELSON           P. 2002

16     **DANIEL WIGDOR**
             DIRECT EXAM BY MR. NELSON             P. 2005
17           CROSS-EXAM BY MR. MCELHINNY           P. 2031

18

19

20

21

22

23

24

25

1

2                          <u>**INDEX OF EXHIBITS**</u>

3                                <u>MARKED</u>        <u>ADMITTED</u>

4      <u>PLAINTIFF'S</u>

5      193                                    1939

6

7

       <u>DEFENDANT'S</u>
8
       338                                    1779
9      339                                    1779
       341                                    1779
10     338                                    1788
       312                                    1848
11     311                                    1851
       301                                    1864
12     305                                    1866
       313                                    1867
13     304                                    1923
       343                                    1970
14     344                                    1970
       492                                    2010
15     346                                    2026

16

17     <u>JOINT</u>

18     50B                                    1791
       35O                                    1801
19     72                                     1905
       35N                                    1906
20     55                                     1929
       56                                     1931
21     60                                     1964
       59                                     2017
22

23

24

25

```
1    SAN JOSE, CALIFORNIA                    APRIL 15, 2014

2                    P R O C E E D I N G S

3         (JURY OUT AT 9:02 A.M.)

4              THE COURT:  GOOD MORNING AND WELCOME.

5              MR. MCELHINNY:  GOOD MORNING, YOUR HONOR.

6              MR. QUINN:  GOOD MORNING, YOUR HONOR.

7         (JURY IN AT 9:02 A.M.)

8              JUROR:  I FORGOT MY GLASSES.

9              THE CLERK:  SHE'S GOING TO GO GET HER GLASSES.

10        (PAUSE IN PROCEEDINGS.)

11             THE COURT:  GOOD MORNING AND WELCOME.  EVERYONE

12   PLEASE TAKE A SEAT.

13        PLEASE CALL YOUR NEXT WITNESS.

14             MR. NELSON:  THANK YOU, YOUR HONOR.

15        SAMSUNG'S FIRST WITNESS THIS MORNING CALLS

16   DR. KEVIN JEFFAY.

17             THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

18        (DEFENDANTS' WITNESS, KEVIN JEFFAY, WAS SWORN.)

19             THE WITNESS:  I DO.

20             THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

21        AND WOULD YOU PULL THE MICROPHONE TOWARDS YOU AND STATE

22   YOUR NAME, PLEASE, AND SPELL IT.

23             THE WITNESS:  HI.  MY NAME IS KEVIN JEFFAY.  IT'S

24   K-E-V-I-N, J-E-F-F-A-Y.

25             THE COURT:  OKAY.  TIME IS 9:04.  GO AHEAD, PLEASE.
```

1          MR. NELSON:  THANK YOU, YOUR HONOR.

2                   **DIRECT EXAMINATION**

3     BY MR. NELSON:

4     Q.   COULD YOU GO AHEAD AND INTRODUCE YOURSELF TO THE JURY?

5     A.   GOOD AFTERNOON.  MY NAME IS KEVIN JEFFAY AS YOU JUST

6     HEARD.  I'M A PROFESSOR OF COMPUTER SCIENCE IN THE DEPARTMENT

7     OF COMPUTER SCIENCE AT THE UNIVERSITY OF NORTH CAROLINA AT

8     CHAPEL HILL.

9     Q.   HOW LONG HAVE YOU BEEN AT THE UNIVERSITY OF NORTH

10    CAROLINA?

11    A.   A LITTLE OVER 25 YEARS.

12    Q.   CAN YOU TELL US WHAT AREA YOU TEACH IN?

13    A.   SURE.  I'VE TAUGHT A VARIETY OF SUBJECTS OVER THE 25

14    YEARS.  CURRENTLY MY TEACHING FOCUSES ON OPERATING SYSTEMS AND

15    NETWORKING COURSES.

16    Q.   NOW, CAN WE PUT UP SDX 2540, PLEASE.  WE'LL WAIT A MINUTE

17    UNTIL IT COMES UP.

18         THERE WE GO.

19         SO CAN YOU TELL US WHAT -- THE HIGHEST DEGREE AT LEAST

20    THAT YOU'VE EARNED, PLEASE.

21    A.   I HAVE A PH.D. IN COMPUTER SCIENCE FROM THE UNIVERSITY OF

22    WASHINGTON.

23    Q.   AND WHEN WAS THAT, THAT YOU GOT THAT?

24    A.   THAT WAS 1989.

25    Q.   DID YOU DO ANY PARTICULAR TYPE OF RESEARCH WITH THAT

1      PH.D.?

2      A.   I DID.  I DID WHAT TODAY WE CALL AN OPERATING SYSTEMS

3      DISSERTATION.  I WAS INTERESTED IN THE SOFTWARE THAT WAS ON

4      EMBEDDED DEVICES AND CONTROL SYSTEMS, WHAT ARE CALLED REAL TIME

5      COMPUTER SYSTEMS.

6      Q.   OKAY.  AND SINCE THAT PH.D., HAVE YOU DONE ANY OTHER TYPES

7      OF RESEARCH?

8      A.   YES, YES.  I'VE DONE A WIDE VARIETY OF TOPICS.  I'VE -- IN

9      THE EARLY '90S, I DID A LOT OF WORK IN WHAT TODAY IS CALLED

10     STREAMING MEDIA.  WE WERE ONE OF THE FIRST GROUPS THAT WAS

11     WORKING ON TRANSMITTING AUDIO AND VIDEO, IN OUR CASE LIVE AUDIO

12     AND VIDEO OVER THE INTERNET FOR THINGS LIKE VIDEO CONFERENCING.

13          FOR THE LAST MANY YEARS I'VE BEEN FOCUSSING ON AN AREA

14     THAT WE CALL NETWORK MEASUREMENT, WHICH IS LOOKING AT TRAFFIC,

15     THAT'S NETWORK TRAFFIC PACKETS WE CALL THEM THAT ARE FLOWING ON

16     A NETWORK AND TRYING TO DISCERN PATTERNS IN THE TRAFFIC, TRYING

17     TO UNDERSTAND, FOR EXAMPLE, IS SOMEONE TRYING TO ATTACK A

18     NETWORK OR BREAK INTO A SERVER.

19     Q.   SO HAVE YOU AUTHORED ANY ARTICLES OR PAPERS IN THE

20     COMPUTER SCIENCE FIELD?

21     A.   YEAH.  AS AN ACADEMIC, THAT'S WHAT WE DO.  SO AT THIS

22     POINT I THINK I'M WELL OVER 100 PAPERS AND WITH SOME OF MY

23     STUDENTS, WE'VE WRITTEN A FEW BOOKS AND WHAT ARE CALLED

24     MONOGRAPHS, WHICH ARE SINGLE TOPIC TEXTS.

25     Q.   SO I'VE HEARD THIS TERM "PEER REVIEWED JOURNALS"?

1    A.   YES.

2    Q.   CAN YOU TELL US WHAT THAT MEANS?

3    A.   PEER REVIEW MEANS THAT YOU DON'T GET TO DECIDE WHETHER

4    YOUR RESEARCH IS GOOD.  YOU DISTRIBUTE IT TO THE COMMUNITY, AND

5    THERE'S A PROCESS BY WHICH OTHER RESEARCHERS REVIEW IT AND IF

6    THEY ALL AGREE THAT IT'S CORRECT AND A SIGNIFICANT

7    DISTRIBUTION, THEN IT GETS PUBLISHED, AND ALL OF MY WORK IS

8    PEER REVIEWED.

9    Q.   NOW, HAVE YOU OBTAINED ANY PATENTS FOR THE RESEARCH THAT

10   YOU'VE DONE, OR SOME OF THE RESEARCH PROJECTS?

11   A.   YES.  NOT ME PERSONALLY.  THE UNIVERSITY HAS SEEN FIT TO

12   PATENT THE TECHNOLOGY IN SEVERAL OF MY PH.D. STUDENTS

13   DISSERTATIONS BECAUSE THEY WOULD GO OFF AND PRODUCTIZE THE

14   STUFF.

15        SO WE HAVE TWO PATENTS ISSUED AND ONE PATENT IS PENDING.

16   Q.   OKAY.  NOW, HAVE YOU EVER TESTIFIED IN COURT BEFORE, COURT

17   PROCEEDINGS LIKE THIS AS AN EXPERT WITNESS?

18   A.   YES.

19   Q.   ABOUT HOW MANY TIMES?

20   A.   I THINK PROBABLY ABOUT 10 OR 12 TIMES.

21   Q.   AND OVER WHAT PERIOD OF TIME IS THAT?

22   A.   MAYBE 15 YEARS.

23   Q.   NOW.

24        MR. NELSON:  AT THIS POINT, YOUR HONOR, WE OFFER

25   DR. JEFFAY JEFF AS AN EXPERT WITNESS IN COMPUTER SCIENCE AND

```
 1          SOFTWARE ARCHITECTURE.

 2                    MS. KREVANS:  NO OBJECTION.

 3                    THE COURT:  ALL RIGHT.  SO CERTIFIED.

 4          GO AHEAD, PLEASE.

 5                    MR. NELSON:  THANK YOU, YOUR HONOR.

 6     Q.   SO ARE YOU BEING COMPENSATED FOR THE WORK THAT YOU'VE DONE

 7     HERE IN THIS CASE?

 8     A.   YES.

 9     Q.   AND HOW MUCH?

10     A.   MY RATE IS $550 AN HOUR.

11     Q.   AND THAT COMPENSATION IS IT ALL DEPENDENT UPON HOW THE

12     CASE TURNS OUT?

13     A.   NO, NOT AT ALL.

14     Q.   ALL RIGHT.  SO WHY DON'T YOU GIVE US AN OVERVIEW OF WHAT

15     YOU WERE ASKED TO DO IN CONNECTION WITH THIS CASE.

16     A.   OKAY.  I BASICALLY HAD TWO TASKS.  THE FIRST WAS TO

17     INITIALLY LOOK AT APPLE'S ALLEGATIONS OF INFRINGEMENT AGAINST

18     SAMSUNG.  SO THAT REQUIRED ME TO STUDY THE PATENT, STUDY --

19     Q.   LET ME STOP YOU THERE.

20     A.   SORRY.

21     Q.   WHICH PATENT?

22     A.   THANK YOU.  FOR ME IT'S JUST ONE.

23          I'M HERE TO TALK ABOUT WHAT WE'VE BEEN CALLING THE '647

24     PATENT, AND, AGAIN, THAT'S JUST THE LAST THREE DIGITS OF THE

25     PATENT.  I FORGET ACTUALLY WHAT THE FIRST DIGITS ARE.  BUT IT'S
```

1    THE '647 PATENT.  SO THANK YOU.

2        SO I STUDIED APPLE'S ALLEGATIONS OF INFRINGEMENT, I

3    STUDIED THE PATENT ITSELF, I STUDIED THE DEVICES, LOOKED AT

4    MANUALS, SOURCE CODE, AND CAME UP WITH MY INDEPENDENT OPINIONS

5    TO WHETHER OR NOT I THOUGHT THE ACCUSED DEVICES INFRINGED CLAIM

6    9 OF THE '647 PATENT.

7    Q.   DID YOU DO ANYTHING ELSE?

8    A.   YES.  THE SECOND TASK WAS TO CONSIDER THE VALIDITY OF

9    CLAIM 9, IN PARTICULAR IN LIGHT OF THE WAY THAT APPLE SEEMED TO

10   BE INTERPRETING THE PATENT.

11       SO FOR THAT I HAD TO LOOK AT THE, WHAT'S CALLED THE

12   PROSECUTION HISTORY, THE BACK-AND-FORTH CORRESPONDENCE BETWEEN

13   THE INVENTORS AND THE PATENT OFFICE.

14       AND THEN I WENT AND PUT MYSELF BACK IN THE MINDSET OF

15   SOMEONE IN 1996, WHICH IS WHEN THE PATENT WAS APPLIED FOR, AND

16   TRIED TO UNDERSTAND THE LAY OF THE LAND, THE STATE OF THE ART,

17   WHAT WERE PEOPLE DOING, WHETHER OTHER SYSTEMS EXISTED.

18       AND I WAS AN ACTIVE RESEARCHER AT THAT TIME, SO THAT WAS

19   FAIRLY EASY TO DO.  BUT I HAD TO GO BACK AND SURVEY WHAT HAD

20   BEEN DONE PRIOR TO 1996.

21   Q.   OKAY.  SO IF YOU LOOK AT JX ONE IN YOUR BINDER, IS THAT

22   THE '647 PATENT THAT YOU'RE REFERRING TO?

23   A.   YES, AND I SEE THE NUMBERS PATENT NUMBER 5,946,647.

24   Q.   THANKS.  SO CAN WE PUT UP SDX 2541, PLEASE.

25       SO CAN YOU JUST GIVE US A BRIEF OVERVIEW AND REMIND US,

```
 1        IT'S BEEN A LITTLE WHILE SINCE WE TALKED ABOUT THE '647 PATENT,

 2   WHAT WE SEE HERE IN CLAIM 9?

 3   A.    SURE.   SO, REMEMBER, FOR THIS PARTICULAR PATENT, THE CLAIM

 4   THAT'S AT ISSUE IS CLAIM 9, AND THE WAY THIS WORKS IS THAT

 5   CLAIM 9 INCLUDES ALL OF THE ELEMENTS OF CLAIM 1.   SO I HAVE THE

 6   TWO OF THEM UP HERE TOGETHER.

 7        AND THE BACKGROUND HERE IS THAT THESE CLAIMS WERE

 8   ORIGINALLY DIRECTED TO A DESKTOP COMPUTER.   SO THIS IS --

 9   AGAIN, THE PATENT WAS APPLIED FOR IN 1996, YOU KNOW, ALL THE

10   DEVICES, THE IPHONE, THE SAMSUNG PHONES, THEY DIDN'T EXIST BACK

11   THEN.

12        AND THE PATENT WAS DIRECTED TO TRYING TO SOLVE THE PROBLEM

13   OF MAKING IT EASY FOR PEOPLE TO FIND STRUCTURES, INSTANCES OF

14   PATTERNS IN A DOCUMENT THAT YOU WOULD SEE ON THE MONITOR ON

15   YOUR COMPUTER.

16        SO BACK THEN, YOU KNOW, WE WERE GETTING BIGGER AND BIGGER

17   MONITORS, YOU COULD SEE MORE DATA ON THE SCREEN, AND SO THAT

18   YOU DIDN'T HAVE TO VISUALLY SCAN THROUGH THE DATA YOURSELF,

19   THIS WAS A SYSTEM THAT WOULD DETECT STRUCTURES AND ALLOW YOU TO

20   PERFORM ACTIONS ON IT.

21        AND WE CAN SEE WHAT'S ACTUALLY CLAIMED HERE IN CLAIM 1,

22   AND THE WAY I WOULD CHARACTERIZE THIS IS THAT CLAIM 1 HAS A

23   NUMBER OF VERY GENERIC ELEMENTS.   THEY HAVE LIKE AN INPUT

24   DEVICE, AN OUTPUT DEVICE, A MEMORY AND PROCESSING UNIT, AND

25   THOSE ARE -- I THINK THIS IS WHAT YOU'RE GOING TO FIND ON JUST
```

1        ABOUT ANY COMPUTER SYSTEM.

2            SO FROM MY PERSPECTIVE, THE INTERESTING PART IS THE, THE

3        INTENDED LIMITATIONS UNDER THE MEMORY, SO IT'S THE MEMORY

4        STORING INFORMATION, INCLUDING PROGRAM ROUTINES INCLUDING, AND

5        THE POINT HERE IS THAT THIS PATENT IS REALLY ABOUT A PARTICULAR

6        SET OF COMPONENTS THAT ARE INSIDE THE COMPUTER THAT WOULD DO

7        THE DETECTING AND LINKING OF ACTIONS.

8            SO --

9                MS. KREVANS:  YOUR HONOR, I'M SORRY TO INTERRUPT, BUT

10       THE WITNESS IS ABOUT TO START TALKING ABOUT THINGS THAT ARE

11       PRECLUDED BY YOUR ORDERS OF LAST NIGHT.

12               MR. NELSON:  I'M NOT SURE WHAT WE'RE REFERRING TO,

13       YOUR HONOR.  HE'S NOT GOING TO OFFER ANY OPINIONS ON CLAIM

14       CONSTRUCTION, CONSISTENT WITH WHAT ANY EXPERT WITNESS WOULD DO.

15       HE'S GOING TO SIMPLY OFFER THE OPINIONS IN HIS REPORT ABOUT THE

16       REASONS WHY THE DEVICES DON'T INFRINGE.

17               MS. KREVANS:  YOUR HONOR, THERE WERE NO OPINIONS IN

18       HIS REPORT WITH RESPECT TO THE ANALYZER SERVER OR THE LINKING

19       ACTIONS THAT ARE NOT BASED ON A CLAIM CONSTRUCTION YOU

20       PRECLUDED HIM FROM TESTIFYING ABOUT.

21           SO HE HAS NO FOUNDATION FOR TALKING ABOUT THOSE TWO

22       ELEMENTS OF THE CLAIM, THE ANALYZER SERVER ELEMENT OR THE

23       ACTION PROCESSOR FOR THE LINKING -- I'M SORRY -- THE LINKING

24       ACTIONS TO STRUCTURES.  HE HAS NO FOUNDATION FOR ANY TESTIMONY

25       ABOUT EITHER OF THOSE THINGS.

1          THE COURT:  WELL, I'M GOING TO OVERRULE THE

2    OBJECTION, BUT IT IS CORRECT THAT HE DID NOT GIVE A PLAIN AND

3    ORDINARY MEANING CONSTRUCTION OF THOSE TERMS.  SO HE SHOULD NOT

4    BE DOING THAT TODAY.  BUT PLEASE HAVE A SEAT.  I'M GOING TO

5    OVERRULE YOUR OBJECTION.

6          GO AHEAD, PLEASE.

7          MR. NELSON:  THANK YOU, YOUR HONOR.

8    Q.   SO LET'S THEN -- WELL, TALK ABOUT THE STRUCTURE THAT YOU

9    WERE TALKING ABOUT AND THE --

10   A.   YES.

11   Q.   -- THE SOFTWARE ARCHITECTURE.

12   A.   YEAH.  THE ONLY POINT I WAS TRYING TO MAKE IS THAT IF YOU

13   LOOK AT THE MEMORY LIMITATION AND YOU LOOK AT THE THREE THINGS

14   THAT ARE INDENTED THERE, THESE ARE PARTICULAR COMPONENTS THAT

15   HAVE TO BE IN A MEMORY.

16        SO THE ONLY POINT I WANTED TO MAKE IS THAT YOU JUST READ

17   THE PLAIN LANGUAGE OF THE CLAIM.  IT'S NOT JUST DETECTING

18   STRUCTURES AND DATA AND LINKING ACTIONS.  IT'S THE DETECTING

19   STRUCTURES AND LINKING ACTIONS IS DONE WITH AN ANALYZER SERVER.

20   AND IT'S NOT JUST ANY USER INTERFACE, IT'S A PARTICULAR TYPE OF

21   USER INTERFACE.

22        AND IN ADDITION, YOU HAVE TO HAVE THIS THING CALLED AN

23   ACTION AND AN ACTION PROCESSOR.

24        SO WE'VE HEARD LOTS OF ABOUT DETECTING STRUCTURES AND

25   LINKING ACTIONS, AND WE HAVEN'T HEARD SO MUCH ABOUT IS THE FACT

1     THAT THAT HAS TO BE DONE IN A PARTICULAR WAY, THAT HAS TO BE

2     DONE WITH A PARTICULAR COMPONENT, FOR EXAMPLE, THE ANALYZER

3     SERVER.

4     Q.   THANK YOU.  SO NOW LET'S -- CAN WE PUT UP FIGURE 4 OF THE

5      PATENT, PLEASE -- OR, NO, 5.  5.

6          I SHOULD OPEN MY PATENT, AND THEN I WOULD KNOW WHICH

7     FIGURE IT IS.  I'M SORRY.

8          YES, FIGURE 5.

9          AND WHEN I SAY THE PATENT, I MEAN JX 1.

10         SO FIGURE 5, CAN YOU JUST TELL US WHAT FIGURE 5 IS, FIRST

11    OF ALL?

12    A.   SURE.  SO THIS IS GOING TO BE, FIRST, A SERIES OF FIGURES

13     THAT ARE IN THE PATENT THAT DESCRIBE THE OPERATION OF WHAT'S

14     CALLED AN EMBODIMENT OF THE INVENTION.

15         SO THE IDEA IS ON YOUR DESKTOP COMPUTER, MAYBE YOU'RE

16    PRESENTED WITH THIS DOCUMENT, MAYBE IT'S A MEMO, MAYBE IT'S AN

17    E-MAIL.  AND THE WAY THEY DESCRIBED THIS PARTICULAR EMBODIMENT

18    IS THE FIRST THING THE USER WOULD DO IS INSTRUCT THE COMPUTER

19    TO GO OFF AND DETECT ANY STRUCTURES THAT MIGHT BE IN THERE.

20         SO YOU CAN SEE THE DETECT STRUCTURES INTERFACE COMPONENT

21    IN THE UPPER RIGHT-HAND CORNER -- THERE WE GO -- AND SO THE

22    IDEA IS THE USER WOULD GO OVER THERE AND CLICK ON THAT.

23         AND ONCE THEY DID THAT, WE WOULD GET THE NEXT FIGURE.

24    Q.   IF WE'D GO TO FIGURE 6 THEN.

25    A.   SO THIS IS THE SAME DOCUMENT.  SO THE IDEA IS YOU WOULD

1    TELL THE SYSTEM TO DETECT THE STRUCTURES, AND WE CAN SEE THAT

2    IT'S GONE OFF AND DETECTED A VARIETY OF STRUCTURES AND

3    INDICATED THE FACT THAT IT'S DETECTED THEM BY DRAWING A BOX

4    AROUND THEM TO, YOU KNOW, CALL THE USER'S ATTENTION TO THEM.

5    Q.   NOW, IF WE GO FORWARD THEN TO FIGURE 7, CAN YOU TELL US

6    WHAT WE'RE SEEING HERE?

7    A.   RIGHT.  SO THEN THIS IS THE THIRD STEP, AND THE IDEA IS

8    THE USER COULD PUT THEIR MOUSE ON ANY ONE OF THESE STRUCTURES

9    AND CLICK ON THE MOUSE, AND THEY WOULD GET THIS POP-UP MENU.

10   AND THE POP-UP MENU WOULD SHOW A SET OF ACTIONS THAT THEY COULD

11   TAKE.

12        AND THE IDEA IS THAT SPECIFIC PROGRAM ROUTINES TO CALL A

13   NUMBER OR PUT THE NUMBER IN AN ELECTRONIC TELEPHONE BOOK, THOSE

14   SPECIFIC ROUTINES WOULD BE LINKED TO THIS SO THAT WHEN A USER

15   SELECTED, FOR EXAMPLE, PUT INTO AN ELECTRONIC TELEPHONE BOOK,

16   THE PUT INTO ELECTRONIC TELEPHONE BOOK ROUTINE WOULD RUN AND

17   THE NUMBER WOULD BE PUT INTO THE TELEPHONE BOOK.

18   Q.   IN CONNECTION WITH THE WORK THAT YOU DID IN THIS CASE, DID

19   YOU LOOK AT THINGS AND DETERMINE WHAT THE STATE OF THE ART WAS

20   AT THE TIME?

21   A.   YES.

22   Q.   MEANING WHEN THE PATENT WAS FILED?

23   A.   YES, YES, I DID.

24   Q.   SO CAN YOU LOOK IN YOUR BINDER AT DX 339 AND THEN 341.

25   A.   OKAY, I HAVE THAT.

1    Q.   ACTUALLY, I THINK 338 IS THE FIRST ONE.

2    A.   OKAY, I HAVE THAT.

3    Q.   SO CAN YOU TELL US WHAT 338 IS, PLEASE, DX 338?

4    A.   SURE.  SO 338 IS A TECHNICAL PAPER THAT APPEARED IN A

5    COMPUTER SCIENCE JOURNAL IN 1992, BUT IT TURNS OUT THIS WAS A

6    FOLLOW-ON PUBLICATION FROM A CONFERENCE PUBLICATION.

7         AND IT'S A PAPER ABOUT A SYSTEM CALLED EMBEDDED BUTTONS,

8    AND THIS IS BASED ON SOME RESEARCH THAT WAS DONE AT XEROX PARK

9    AS WE CALL IT, WHICH IS THE XEROX PALO ALTO RESEARCH CENTER, SO

10   JUST UP THE ROAD HERE.  IT'S A VERY FAMOUS RESEARCH LAB AND

11   PERSONAL COMPUTING AND USER INTERACTION.

12        AND WHAT THEY HAD DONE IN THE VERY EARLY '90S IS BUILT A

13   SYSTEM THAT DETECTED STRUCTURES IN DOCUMENTS AND LINKED ACTIONS

14   TO THEM AND ALLOWED USERS TO PERFORM ACTIONS ON DETECTED

15   STRUCTURES.

16   Q.   SO YOU MENTIONED THAT 338 WAS A FOLLOW-ON TO A CONFERENCE

17   PAPER; IS THAT RIGHT?

18   A.   CORRECT.

19   Q.   OKAY.  SO IF YOU LOOK AT 339 --

20   A.   RIGHT.

21   Q.   -- IS THAT THE PAPER?

22   A.   YES.  SO 339 IS THE COVER PAGE, THE FIRST PAGE IS THE

23   COVER PAGE OF THE CONFERENCE PROCEEDINGS, IT'S CALLED CHI,

24   WHICH STANDS FOR COMPUTER HUMAN INTERACTION, AND THIS WAS IN

25   1991.  SO THEY PUBLISHED A FIRST PAPER IN '91, AND THEN THE

1      JOURNAL PAPER IN '92.

2      Q.   NOW, WAS THERE ALSO A VIDEO THAT ACCOMPANIED THE PAPER AT

3      THE CONFERENCE?

4      A.   YES, IT'S COMMON TO DO DEMONSTRATIONS AT THESE

5      CONFERENCES, AND IN THE EARLY '90S, YOU COULDN'T JUST BRING A

6      COMPUTER IN, WE DIDN'T HAVE LAPTOPS, SO PEOPLE MADE VIDEOS.

7           SO THEY MADE A VIDEO OF THE OPERATION OF THE SYSTEM, AND

8      THEY SHOWED THE VIDEO TO THE CONFERENCE.

9      Q.   AND HAVE YOU SEEN THAT VIDEO?

10     A.   I HAVE.

11          MR. NELSON:  SO AT THIS POINT, YOUR HONOR, I OFFER

12     DX 338, DX 339 AND DX 341 INTO EVIDENCE.

13          MS. KREVANS:  NO OBJECTION TO 338 AND 341.  NO

14     FURTHER OBJECTION TO 339.

15          THE COURT:  ALL RIGHT.  ALL THREE ARE ADMITTED.

16     (DEFENDANTS' EXHIBITS 338, 338, AND 341 WERE ADMITTED IN

17     EVIDENCE.)

18          THE COURT:  GO AHEAD, PLEASE, MR. NELSON.

19          MR. NELSON:  THANK YOU.

20     Q.   SO CAN WE LOOK AT A CLIP FROM THAT VIDEO AND LET US KNOW

21     WHAT IT IS THAT WE'RE SEEING HERE.  THIS IS DX 341.

22     A.   SO --

23          (VIDEO WAS PLAYED IN OPEN COURT OFF THE RECORD.)

24     BY MR. NELSON:

25     Q.   ALL RIGHT.  SO NOW THAT WAS A CLIP FROM THE VIDEO, BUT CAN

1    YOU TELL US WHAT IT WAS THAT YOU WERE SEEING HERE?

2    A.   YEAH.  MAYBE WE CAN PUT THE FIRST FRAME UP SO I CAN TALK

3    ABOUT IT.

4    Q.   SURE.

5         IS THAT POSSIBLE, MR. KOTARSKI?

6         MR. KOTARSKI:  SURE.

7         THE WITNESS:  SO WHAT YOU WERE LOOKING AT IS A SCREEN

8    SHOT OF SOMEBODY'S WORKSTATION AT XEROX PARK, AND YOU'RE SEEING

9    THREE SEPARATE WINDOWS THAT ARE ALL SEPARATED BY THAT DARK

10   BLACK HORIZONTAL BAR.

11        AND THE BOTTOM WHERE, WHERE IT SAYS PHONE NUMBERS, THIS IS

12   A PAGE OUT OF A USER'S PHONEBOOK THAT THEY MIGHT HAVE IN A

13   DOCUMENT, AND WHAT THE SYSTEM DOES IS IT'S GOING TO

14   AUTOMATICALLY DETECT STRUCTURES IN THIS DOCUMENT AND THEN LINK

15   ACTIONS TO THEM.

16        AND THAT WAS WHAT WAS SHOWN WHEN THE USER WENT -- LET ME

17   SEE IF I CAN DO THIS HERE -- THIS BIT HERE WHERE IT SAYS TARGET

18   AND IT SAYS HASH, HASH, HYPHEN, HASH, HASH, HASH, THAT'S A

19   PATTERN, AND YOU MAY HAVE USED AN EDITOR LIKE MICROSOFT WORD

20   WHERE YOU CAN SPECIFY WILD CARDS WHEN YOU DO A SEARCH.  THIS IS

21   BASICALLY SAYING LOOK FOR A PATTERN THAT IS ANY DIGIT, DIGIT,

22   DIGIT, HYPHEN, FOUR MORE DIGITS.

23        AND IF YOU THINK ABOUT IT, THAT WILL RECOGNIZE A LOCAL

24   PHONE NUMBER, A PHONE NUMBER WITHOUT AN AREA CODE.

25        SO THAT'S A PATTERN, AND THEN THE SYSTEM SAYS APPLY THAT

1     PATTERN TO THE DOCUMENT AND FIND ALL THE INSTANCES OF

2     STRUCTURES THAT MATCH THAT PATTERN, AND THAT'S WHAT WAS SHOWN

3     WHEN THEY WE WANT AND CLICKED ON A BUTTON UP HERE (INDICATING).

4          AND THEN WHAT YOU SAW WAS JUST LIKE -- SO THOSE FIGURES

5     THAT I SHOWED YOU IN THE PATENT, THE SYSTEM WENT AND DETECTED

6     AND THROUGH LITTLE BOXES AROUND EACH OF THESE PHONE NUMBERS AND

7     IN THE LANGUAGE OF --

8     Q.   CAN WE ROLL THAT FORWARD, MAYBE WITHOUT THE SOUND?

9     A.   AND IN THE LANGUAGE OF THIS DOCUMENT, WHAT THEY'RE SAYING

10    IS WE'RE TURNING STRUCTURES IN THE DOCUMENT INTO BUTTONS, SO

11    THERE ARE THINGS THAT YOU CAN NOW CLICK ON.

12         SO BEFORE THAT WAS JUST TEXT, AND NOW THESE ARE BUTTONS

13    THAT YOU CAN CLICK ON, AND THE IDEA IS THAT THEY HAVE ACTIONS

14    NOW THAT ARE LINKED TO EACH PARTICULAR STRUCTURE, AND THIS

15    PARTICULAR EXAMPLE WAS JUST ONE ACTION THAT'S LINKED, THAT'S

16    THE DIAL ACTION, BUT LATER ON IN THE VIDEO THEY SHOW MULTIPLE

17    ACTIONS.

18         SO YOU'VE GONE FROM A STATIC DOCUMENT TO NOW SOMETHING

19    WHERE THEY'VE DETECTED STRUCTURES AND YOU CLICK ON A STRUCTURE,

20    YOU ARE GET A POP-UP MENU, AND YOU CAN PERFORM AN ACTION ON

21    THAT STRUCTURE.

22    Q.   NOW, LET'S -- YOU SAID THAT YOU HAD OPINIONS THAT YOU'RE

23    GOING TO OFFER ABOUT WHY THE ACCUSED DEVICES DON'T INFRINGE, SO

24    LET'S MOVE TO THOSE.

25         NOW, HAVE YOU FORMED ANY OPINIONS ABOUT WHETHER THE

 1    ACCUSED BROWSER AND MESSENGER APPLICATIONS ON THE SAMSUNG

 2    PRODUCTS INFRINGE CLAIM 9 OF THE '647 PATENT?

 3    A.   YES.  AND MY OPINION IS THEY DO NOT INFRINGE.

 4    Q.   AND CAN YOU GIVE US AN OVERVIEW BRIEFLY AS TO WHY THAT'S

 5    THE CASE?

 6         AND WE CAN PUT SDX 2541 BACK UP HERE.

 7    A.   YEAH.  I THINK THE EASIEST WAY TO SAY IT IS LET'S GO BACK

 8    TO THE MEMORY LIMITATION AND TO THE LITTLE SUBCOMPONENTS, THE

 9    ANALYZER SERVER, THE USER INTERFACE, AND THE ACTION PROCESSOR.

10         AND I BELIEVE WHEN DR. MOWRY TESTIFIED, HE PRIMARILY

11    FOCUSSED ON WHAT I WOULD CALL THE FUNCTION.  HE FOCUSSED ON THE

12    FACT THAT STRUCTURE ARE DETECTED, THAT ACTIONS ARE LINKED, THAT

13    A USER CAN SELECT AN ACTION AND PERFORM AN ACTION.  SO IN

14    ESSENCE, HE FOCUSSED ON EXACTLY WHAT I JUST SHOWED YOU IN

15    EMBEDDED BUTTONS.

16         WHAT HE DID NOT FOCUS ON IS THIS EMBEDDING AND LINKING HAS

17    TO BE DONE IN A VERY PARTICULAR WAY, WITH AN ANALYZER SERVER.

18    AND IN MY ANALYSIS, THERE IS NO ANALYZER SERVER IN THE ACCUSED

19    DEVICES.

20         IN ADDITION, WE'LL TALK ABOUT THIS, THERE ARE SOME

21    PROBLEMS WITH THE USER INTERFACE.  THEY DON'T HAVE EXACTLY THE

22    CLAIMED USER INTERFACE, AND THEY ALSO DON'T HAVE EXACTLY THE

23    ACTION PROCESSOR.

24         SO THE ISSUE ISN'T THE FUNCTIONS, IT'S THE OVERALL

25    ARCHITECTURE THAT YOU HAVE TO DO THESE FUNCTIONS WITH THE

1      PARTICULAR COMPONENTS AND THE PHONES LACK THE PARTICULAR

2      COMPONENTS.

3      Q.   ALL RIGHT.  LET'S TAKE THE FIRST ONE OF THOSE.  IF WE CAN

4      PUT UP SDX 2568, PLEASE.

5           SO LET'S TALK ABOUT THIS FIRST LIMITATION.

6           SO DO THE ACCUSED BROWSER AND MESSENGER APPLICATIONS HAVE

7      AN ANALYZER SERVER FOR DETECTING STRUCTURES IN THE DATA AND FOR

8      LINKING ACTIONS IN THE DETECTED STRUCTURES?

9      A.   NO, THEY DON'T.

10     Q.   OKAY.  SO WHAT DO THE ACCUSED PRODUCTS DO INSTEAD?

11     A.   SO THE EASIEST WAY TO SAY THIS IS THERE IS NO SERVER HERE,

12     AND DR. MOWRY, WHEN HE TESTIFIED, I LISTENED VERY CAREFULLY, I

13     READ THE TRANSCRIPT, WHEN HE WAS ON EXAMINATION BY APPLE'S

14     LAWYERS ON DIRECT EXAMINATION, HE NEVER EVEN SAID THE WORDS

15     ANALYZER SERVER.

16          HIS WHOLE FOCUS WAS ON DETECTING STRUCTURES AND LINKING

17     AND NEVER SHOWED THAT THERE WAS A SERVER THERE.

18          AND WHEN YOU LOOK AT THE CODE THAT'S ACTUALLY THERE, WHAT

19     YOU SEE IS THAT THERE IS NO SERVER, THAT ALL -- TO THE EXTENT

20     ANY DETECTING AND LINKING OCCURS, IT'S ALL DONE BY THE

21     APPLICATIONS THEMSELVES.

22     Q.   OKAY.  SO LET'S STOP THERE AND BREAK THAT DOWN.

23          SO WHAT CODE WAS IT THAT DR. MOWRY POINTED TO FOR THIS

24     PARTICULAR LIMITATION?

25     A.   WELL, THERE WERE SEVERAL PIECES OF CODE.  THERE WAS THIS

1    THING CALLED LINKIFY FOR THE MESSENGER AND OTHER BODIES OF

2    CODE, SOMETHING CALLED CACHE BUILDER AND CONTENT DETECTORS.  SO

3    HE WAS REFERRING TO WHAT ARE GENERICALLY CALLED LIBRARIES.

4    Q.   OKAY.  NOW, CAN YOU EXPLAIN TO US WHAT YOU MEAN BY

5    LIBRARIES?

6    A.   SURE.  LIBRARIES ARE BITS OF CODE THAT EXIST SO THAT ALL

7    PROGRAMMERS CAN USE THEM.  IT'S -- THINK OF THE PUBLIC LIBRARY,

8    YOU KNOW, THE PUBLIC LIBRARY EXISTS SO ANYBODY CAN READ A BOOK

9    AND YOU DON'T HAVE TO BUY YOUR OWN COPY OF THE BOOK.

10        SO EVEN FRESHMAN COMPUTER SCIENTISTS USE LIBRARIES, AND SO

11   THE IDEA IS SO THAT YOU DON'T HAVE TO REINVENT THE WHEEL EVERY

12   TIME.  YOU GO TO THE LIBRARY, YOU TAKE CODE OUT OF THE LIBRARY,

13   YOU INTEGRATE IT IN YOUR APPLICATION, AND AT THAT POINT THE

14   LIBRARY CODE IS NO DIFFERENT THAN ANY OTHER CODE IN THE

15   APPLICATION.  IT'S ALL, YOU KNOW, JUST AN APPLICATION.

16        AND THE POINT IS THAT THE BROWSER AND MESSENGER USE THE

17   LIBRARIES TO DO -- WHATEVER DETECTING AND LINKING THEY DO, THEY

18   DO IT THEMSELVES WITHOUT THE USE OF A SERVER.

19   Q.   SO YOU SAID THE LIBRARY RUNS AS PART OF THE APPLICATION?

20   A.   IT'S NOT -- IT'S NOT PART OF THE APPLICATION.  IT IS THE

21   APPLICATION.  IT'S -- YOU CAN'T SEPARATE IT.  IT'S -- THE CODE

22   FOR THE LIBRARY IS, IS -- IT'S CERTAINLY IN THE APPLICATION.

23        HOW AM I TRYING TO SAY THIS?  IT'S IN THERE JUST LIKE

24   EVERY OTHER PIECE OF CODE IS IN THERE.  IF YOU WERE TO LOOK AT

25   AN APPLICATION, YOU CAN'T TELL WHAT'S LIBRARY CODE AND WHAT'S

1   CODE THAT A PROGRAMMER WROTE.  IT'S ALL BOUND TOGETHER INTO ONE

2   COHERENT APPLICATION.

3   Q.   SO THEN IN THE CASE OF, LET'S JUST TAKE THE MESSENGER

4   APPLICATION THAT DR. MOWRY POINTED TO, WHAT IS IT THAT'S

5   ACTUALLY DOING THE DETECTING AND LINKING THAT HE POINTED TO?

6   A.   WHAT HE POINTED TO WAS THIS, THIS SET OF ROUTINES THAT

7   ARE -- REMEMBER WE TALKED ABOUT THIS NOTION, OR HE TALKED ABOUT

8   THIS NOTION OF A CLASS WHICH STANDS FOR A CHUNK OF SOFTWARE,

9   AND IT WAS CLASS THAT WAS CALLED LINKIFY.

10  Q.   AND LINKIFY IS PART OF THIS LIBRARY; IS THAT RIGHT?

11  A.   YES.  YOU MAY REMEMBER MS. HACKBORN FROM GOOGLE TESTIFIED

12  ABOUT LINKIFY YESTERDAY AND SHE SAID IT'S PART OF THIS, WHAT'S

13  CALLED THE FRAMEWORK, AND THE FRAMEWORK EXISTS FOR APPLICATIONS

14  TO USE.  THEY GET THEIR OWN COPY OF THE CODE.

15  Q.   AND THEN WITH RESPECT TO THE BROWSER APPLICATION, WHAT DID

16  DR. MOWRY POINT TO?

17  A.   THESE WERE CLASSES THAT WERE RUN BY THE NAME OF CACHE

18  BUILDER AND CONTENT DETECTORS.

19  Q.   AND WHAT ARE THOSE?

20  A.   THOSE ARE -- THOSE ARE ALSO LIBRARIES.  THAT'S ALSO A PART

21  OF THE LIBRARY CODE THAT MS. HACKBORN TALKED ABOUT.

22  Q.   SO DID YOU ACTUALLY LOOK AT THE SOURCE CODE YOURSELF?

23  A.   OH, YEAH.  I LOOKED AT EVERYTHING.  I LOOKED AT ALL OF

24  THEM.

25  Q.   AND DID THAT CONFIRM YOUR ANALYSIS?

```
1    A.   YEAH.  I MEAN, YOU LOOK AT THE CODE, AND IT'S -- IT'S A
2    COMBINATION OF THE CODE AND HOW THE APPLICATION IS BUILT.  YOU
3    HAVE TO LOOK AT THE ROUTINES THAT SAY HOW ARE ALL THE
4    COMPONENTS OF THE APPLICATION PULLED TOGETHER AND INTEGRATED
5    TOGETHER.
6         SO IT'S WHAT'S CALLED THE BUILD CODE.  SO I LOOKED AT THE
7    ACTUAL SOURCE CODE AND THE BUILD PROCESS.
8    Q.   NOW, DID YOU CONSIDER THE TESTIMONY OF ANY OF THE NAMED
9    INVENTORS ON THE '647 PATENT IN FORMING YOUR OPINIONS
10   CONCERNING THIS ELEMENT THAT WE'RE TALKING ABOUT?
11   A.   I DID.
12   Q.   AND HOW DID THAT INFORM YOUR OPINION?
13   A.   WELL, IT CONFIRMED WHAT I REALIZED, AND WHAT I THINK WHAT
14   WE CALL PERSONS OF ORDINARY SKILL IN THE ART WOULD REALIZE, AND
15   THAT IS THAT THERE'S A FUNDAMENTAL DISTINCTION BETWEEN A
16   SEVERER AND A SHARED LIBRARY.
17        MS. KREVANS:  YOUR HONOR, THIS IS PRECISELY THE
18   TESTIMONY THAT YOUR HONOR SAID HE COULD NOT GIVE IN LAST
19   NIGHT'S ORDER --
20        MR. NELSON:  WELL --
21        MS. KREVANS:  -- WITH REFERENCE TO WHAT PERSONS OF
22   ORDINARY SKILL WOULD KNOW, AND I MOVE THAT IT BE STRUCK.
23        MR. NELSON:  I DON'T -- HE'S NOT --
24        THE COURT:  OVERRULED.
25        GO AHEAD.
```

```
 1              MR. NELSON:  THANK YOU, YOUR HONOR.

 2     Q.  SO YESTERDAY IN THE DEPOSITION EXCERPT THAT WE TALKED

 3     ABOUT, THERE WERE SOME E-MAILS REFERENCED.

 4     A.  YES.

 5     Q.  DO YOU RECALL THAT?

 6     A.  THERE WERE SOME E-MAILS BACK AND FORTH BETWEEN VARIOUS

 7     INVENTORS TALKING ABOUT A PROBLEM THEY WERE HAVING.

 8     Q.  SO IF YOU LOOK AT DX 334 IN YOUR BINDER --

 9     A.  OKAY.

10     Q.  LET ME KNOW WHEN YOU GET THERE.

11     A.  I'M THERE.

12     Q.  SO WHAT IS DX 334?

13     A.  DX 334 IS AN E-MAIL THAT WAS SENT FROM TOM BONHURA, WHO

14     WAS ONE OF THE INVENTORS ON THE '647 PATENT, TO JIM MILLER,

15     WHO'S ALSO AN INVENTOR, AND CC'D TO SEVERAL OTHER PEOPLE.

16          AND IT'S AN E-MAIL FROM NOVEMBER 1996 THAT'S TALKING ABOUT

17     A PROBLEM THAT THEY'RE HAVING WITH A SYSTEM THAT APPLE HAS SAID

18     USED THE INVENTION OF THE '647 PATENT.

19     Q.  SO THEN IF YOU LOOK AT THE SECOND PAGE OF EXHIBIT 334 --

20     A.  OKAY.

21     Q.  YOU'LL SEE WHAT'S THERE?

22     A.  YES.

23     Q.  AND WHAT'S THAT?

24     A.  THIS IS A RESPONSE TO THAT E-MAIL FROM A FELLOW NAMED

25     DAVID WRIGHT, WHO'S ALSO ONE OF THE NAMED INVENTORS, AND THIS I
```

```
 1        BELIEVE OCCURRED ON -- LATER THAT SAME DAY, AND HE'S TALKING

 2        ABOUT A SOLUTION TO THIS PERFORMANCE PROBLEM THAT WE WERE

 3        HAVING WITH THEIR SYSTEM.

 4        Q.   SO THEN FINALLY ON THE BOTTOM OF PAGE 2, CONTINUING ON TO

 5        PAGE 3, WHAT DO YOU SEE THERE?

 6        A.   THIS IS A THIRD E-MAIL, AGAIN FROM TOM BONHURA, THE FIRST

 7        PERSON WE SPOKE ABOUT, AND THIS IS A COUPLE WEEKS LATER, BUT

 8        THIS IS NOW IN DECEMBER 1996.

 9             AND IN THIS E-MAIL, I BELIEVE IT'S THE CASE THAT

10        MR. BONHURA IS SHARING HIS IDEAS AS TO WHAT THEY MIGHT DO TO

11        DEAL WITH THIS PERFORMANCE PROBLEM.

12                  MR. NELSON:  YOUR HONOR, AT THIS POINT I'LL OFFER DX,

13        DEFENDANT'S EXHIBIT 334 INTO EVIDENCE.

14                  MS. KREVANS:  NO FURTHER OBJECTION, YOUR HONOR.

15                  THE COURT:  ALL RIGHT.  IT'S ADMITTED.

16        (DEFENDANTS' EXHIBIT 334 WAS ADMITTED IN EVIDENCE.)

17                  THE COURT:  GO AHEAD, PLEASE.

18        BY MR. NELSON:

19        Q.   SO NOW LET'S GO TO THE NEXT POINT, THE NEXT ELEMENT THAT

20        YOU TALKED ABOUT, AND WE'LL PUT UP 2576.

21             THIS IS THE USER INTERFACE LIMITATION.

22        A.   YES.

23        Q.   NOW, DID YOU FORM AN OPINION AS TO WHETHER ANY OF THE

24        ACCUSED APPLICATIONS MEET THIS USER INTERFACE LIMITATION, OR

25        ARE LIKE THIS USER INTERFACE LIMITATION?
```

1     A.   I DID.

2     Q.   AND WHAT'S THAT?

3     A.   THE ANALYSIS I DID SHOWS THAT AT LEAST THE JELLY BEAN

4     BROWSER -- SO, REMEMBER, JELLY BEAN IS ONE OF THE VERSIONS OF

5     ANDROID, IT'S ONE OF THE NEWER VERSIONS -- THAT THE BROWSER

6     THAT'S ACCUSED DOES NOT SATISFY THIS LIMITATION BECAUSE IT

7     DOESN'T ENABLE THE SELECTION OF A DETECTED STRUCTURE.

8     Q.   NOW, DID YOU -- WELL, EXPLAIN WHAT YOU MEAN BY IT DOESN'T

9     ENABLE THE SELECTION OF A DETECTED STRUCTURE.

10    A.   SO THE THING THAT'S CURIOUS ABOUT THE BROWSER IN ALL THE

11    ACCUSED VERSIONS OF ANDROID IS IT DOESN'T SHOW YOU ANY

12    STRUCTURE.  YOU JUST -- WHEN YOU'RE LOOKING AT A WEB PAGE, IT'S

13    JUST A BLANK PAGE, SO IT'S NOT SOLVING THE PROBLEM THAT THE

14    INVENTORS TALKED ABOUT, THE FACT THAT YOU HAVE TO VISUALLY

15    SEARCH AND YOU, THE USER, YOU HAVE TO FIND THE STRUCTURES.

16         AND ON JELLY BEAN, IF I'M LOOKING AT A WEB PAGE, I, THE

17    USER, I HAVE TO FIND A STRUCTURE AND IN ORDER TO DO SOMETHING,

18    I HAVE TO SELECT THAT STRUCTURE.  THE SYSTEM GIVES YOU NO HELP

19    IN DOING IT.

20         AND THE IMPORTANT PART IS THAT AS I'M GETTING READY TO

21    SELECT THAT STRUCTURE, ALL THE WHILE, ABSOLUTELY NOTHING IS

22    DETECTED.

23         AND AT THE POINT IN TIME WHEN I TOUCH THE SCREEN AND I

24    MAKE MY SELECTION, NOTHING HAS BEEN DETECTED INSIDE THE SYSTEM.

25         SO, THEREFORE, IT DOES NOT HAVE A USER INTERFACE THAT

```
 1        ENABLES THE SELECTION OF A DETECTED STRUCTURE.

 2        Q.   NOW, DID YOU LOOK AT THE CODE FOR THE JELLY BEAN BROWSER

 3        TO INFORM YOUR OPINIONS HERE?

 4        A.   I DID.

 5        Q.   OKAY.  SO LET'S NOT PUT THIS UP YET.

 6             NO, NO.  OH, YEAH.

 7             SO JX 50C IS ALREADY IN EVIDENCE, YOUR HONOR.

 8             I WAS TRYING TO GO THROUGH TO SEE IF THIS WAS ONE OF THE

 9        SPECIFIC FILES THAT WAS ALREADY ADMITTED.  I BELIEVE IT WAS

10        DISCUSSED, BUT I COULDN'T FIND IT ON THE LIST.  THE FILE IS

11        WEBVIEWCORE.JAVA.  IT'S ALL ONE WORD.

12             THE COURT:  I DON'T HAVE JX 50C.

13             MR. NELSON:  JX 50C, I THINK, WAS THE SAMSUNG

14        PRODUCED CODE, YOUR HONOR.

15             MS. KREVANS:  YOUR HONOR --

16             MR. NELSON:  OH, 50B.  I GOT ONE LETTER OFF.

17             THE COURT:  I HAVE 50A ADMITTED ON APRIL 8TH, AND 51A

18        ADMITTED ON APRIL 8TH.

19             I DON'T THINK I HAVE A 50C.  IF YOU WANT TO MOVE IT NOW.

20             MR. NELSON:  YEAH.  CAN I MOVE IT THEN, YOUR HONOR?

21             THE COURT:  OKAY.  SO JX 50C?

22             MR. NELSON:  OKAY.  NOW THEY'RE TELLING ME IT'S B,

23        JX 50B.  I'M SORRY.

24             THE COURT:  ALL RIGHT.  JX 50B, AND THAT IS WHOSE

25        CODE?
```

1            MR. NELSON:  THAT'S -- THAT WOULD BE SAMSUNG CODE.

2            THE COURT:  OKAY.  THAT'S SAMSUNG PROPRIETARY CODE?

3            MR. NELSON:  THAT'S WHERE IT WAS PRODUCED.  IT'S

4    ACTUALLY IN THE OPEN SOURCE BUT --

5            THE COURT:  ALL RIGHT.  ANY OBJECTION TO MOVING

6    JX 50B INTO EVIDENCE?

7            MS. KREVANS:  YOUR HONOR, COULD WE HAVE AN

8    IDENTIFICATION, SINCE THIS IS A SUBSET OF THE ORIGINAL JX 50,

9    OF WHAT JX 50B ACTUALLY IS?

10           MR. NELSON:  AT THIS POINT, IT'S A FILE, THE

11   WEBVIEW -- WEBVIEWCORE.JAVA.

12           MS. KREVANS:  SO JX 50 CONSISTS SOLELY OF THE FILE

13   WEBVIEWCORE.JAVA FROM THE SAMSUNG PROJECT CODE?

14           MR. NELSON:  YEAH.

15           MS. KREVANS:  NO OBJECTION THEN, YOUR HONOR.

16           THE COURT:  ALL RIGHT.  IT IS ADMITTED.

17        (JOINT EXHIBIT 50B WAS ADMITTED IN EVIDENCE.)

18           THE COURT:  AND I GRANTED THE SEALING MOTION LAST

19   NIGHT.

20           MR. NELSON:  OKAY.  GREAT.  THANK YOU, YOUR HONOR.

21   BY MR. NELSON:

22   Q.  SO HERE ON SDX 2570, CAN YOU TELL US WHAT'S BEING SHOWN

23   HERE?

24   A.  SURE.  I ASSUME THE JURY CAN SEE THIS.

25           THIS IS A SNIPPET OF CODE, COMPUTER SOURCE CODE, THAT'S

1        USED FOR THE USER INTERFACE AND THE BROWSER, AND THE TWO

2        HIGHLIGHTED LINES THAT YOU SEE THERE, THIS IS THE POINT IN THE

3        CODE WHERE THE SYSTEM READS THE POSITION OF A USER'S TOUCH.

4             SO THINK OF A SCREEN AS BEING AN X/Y GRID, AND IT'S

5        BASICALLY SAYING THE USER HAS TOUCHED THE SCREEN AT THIS X/Y

6        POSITION, AND THIS IS IMPORTANT BECAUSE THIS IS THE LAST PLACE

7        IN THE CODE AT WHICH THE SYSTEM READS WHAT THE USER IS -- WHAT

8        THE USER HAS SELECTED.  THIS IS THE ONLY PLACE WHERE THE USER

9        INDICATES THEIR SELECTION.

10            AND THE VERY NEXT LINE THAT'S NOT HIGHLIGHTED, 2958, IF

11       YOU LOOK AT THE RIGHT-HAND SIDE OF THAT LINE THAT SAYS PERFORM

12       HIT TEST.  THIS IS THE PLACE WHERE DR. MOWRY'S ANALYSIS

13       STARTED, AND THE POINT IS TO THE EXTENT ANY DETECTION IS

14       OCCURRING HERE, IT'S OCCURRING DOWNSTREAM FROM THE PERFORM HIT

15       TEST.

16            AND SO THE POINT IS ANY DETECTION THAT'S OCCURRING IS

17       OCCURRING AFTER THE USER HAS MADE THEIR SELECTION AND THE

18       SYSTEM HAS RECOGNIZED THEIR SELECTION.

19            SO AT THE TIME THE USER MADE THEIR SELECTION AND TOUCHED

20       THE SCREEN, NOTHING HAD BEEN DETECTED.

21       Q.   SO IF WE GO BACK TO THE CLAIM LANGUAGE, AND WE CAN PUT UP

22       SDX 2576, HOW DOES THAT INFORM YOUR OPINION REGARDING THE

23       ELEMENT "A USER INTERFACE ENABLING THE SELECTION OF A DETECTED

24       STRUCTURE IN A LINKED ACTION"?

25       A.   SO THAT ELEMENT IS NOT THERE.

1              AND THIS IS THE ONE THAT'S IN BLUE.  WE CONVENIENTLY PUT

2     LINES ACROSS IT TO MAKE IT HARD TO READ.

3              BUT WE'RE TALKING ABOUT THE BLUE LIMITATION.  THE POINT IS

4     THAT THE BROWSER DOES NOT ENABLE THE SELECTION OF A DETECTED

5     STRUCTURE.  THE USER, IN A SENSE, IS DOING THE DETECTION.

6     Q.   SO NOW LET'S MOVE TO THAT LAST LIMITATION THAT YOU

7     DISCUSSED, THE ACTION PROCESSOR.

8     A.   OKAY.

9     Q.   SO ARE YOU AWARE THAT THE COURT PROVIDED A CONSTRUCTION OF

10    THIS TERM?

11    A.   I AM.

12    Q.   AND LET'S PUT UP 2546.

13             AND DO YOU SEE THAT?

14    A.   I DO.

15    Q.   SO IS THIS THE CONSTRUCTION -- IS THIS THE CONSTRUCTION

16    THAT THE COURT OFFERED AND THAT YOU APPLIED IN CONNECTION WITH

17    YOUR OPINIONS REGARDING THE ACTION PROCESSOR LIMITATION?

18    A.   YES.  THIS IS WHAT I USED.

19    Q.   NOW, DO YOU HAVE AN OPINION AS TO WHETHER THE ACCUSED

20    PRODUCTS HAVE THE CLAIMED ACTION PROCESSOR?

21    A.   I DO.  AND MY OPINION IS THEY DO NOT.

22    Q.   AND WHY IS THAT?

23    A.   I WOULD CALL OUR ATTENTION TO THE WORD "SELECTED ACTION,"

24    AND THE ISSUE HERE IS THAT THE ANDROID PHONES USE A VERY

25    DIFFERENT MECHANISM TO PERFORM FUNCTIONS AND WHAT WAS DESCRIBED

1       AND CLAIMED IN THE PATENT.

2       Q.   AND WHAT MECHANISM IS THAT?

3       A.   SO WE HEARD MS. HACKBORN YESTERDAY TALK ABOUT THIS THING

4       CALLED INTENTS, WHICH IS KIND OF AN ABSTRACT CONCEPT, BUT IT'S

5       ACTUALLY VERY POWERFUL AND IT'S FUNDAMENTALLY DIFFERENT FROM

6       WHAT'S IN THE PATENT.

7            THE IDEA IS WHAT THE PATENT DESCRIBES IS THAT WHEN YOU

8       SELECT AN ENTRY FROM A MENU, THERE IS A SOFTWARE ROUTINE THAT

9       WILL PERFORM THAT PARTICULAR ACTION.

10           SO IF YOU HIT DIAL, YOU HIT THE DIAL ROUTINE.

11           AND WHAT MS. HACKBORN DESCRIBED AS INTENTS, THE IDEA IS

12      YOU DON'T WANT TO BIND SPECIFIC ROUTINES TO MEMORY -- TO MENU

13      ITEMS BECAUSE ON AN ANDROID PHONE, BECAUSE IT'S OPEN, YOU CAN

14      HAVE LOTS OF APPLICATIONS THAT CAN PERFORM THE SAME FUNCTION

15      AND E-MAIL, I DON'T KNOW THAT MAY BE THE SIMPLEST EXAMPLE, THE

16      PHONE COMES WITH SEVERAL E-MAIL PROGRAMS YOU CAN USE, AND IF

17      YOU WANTED TO, FOR EXAMPLE, E-MAIL AN E-MAIL ADDRESS THAT WAS

18      DETECTED, YOU MIGHT WANT YOUR, YOUR FAVORITE E-MAIL PROGRAM TO

19      BE USED.

20           AND THE POINT IS THAT THE ONLY THING THAT'S LINKED IS THIS

21      PROGRAM, THIS ROUTINE THAT'S CALLED START ACTIVITY THAT, AS

22      MS. HACKBORN DESCRIBED, GOES OFF AND FIGURES OUT WHAT SOFTWARE

23      TO ACTUALLY EXECUTE.

24      Q.   SO IF WE PUT UP DR. MOWRY'S SLIDE ON THIS ISSUE, PDX

25      88.35, DO YOU SEE THAT?

1    A.   I DO.

2    Q.   THIS -- THIS IS CONFIDENTIAL, SO -- I BELIEVE.

3         YOU SHOULD HAVE THAT.  THANK YOU.

4         SO CAN YOU EXPLAIN TO US WHAT IT WAS THAT DR. MOWRY WAS

5    POINTING TO HERE.

6    A.   SO, AGAIN, THIS IS FROM DR. MOWRY'S PRESENTATION, AND WHAT

7    HE SHOWED WAS THAT THE ACTION THAT'S LINKED TO THE MENU ITEMS

8    IS THIS THING CALLED START ACTIVITY, AND WHAT HE DIDN'T SHOW

9    YOU IS THAT THIS EXACT SAME CHAIN OF CODE -- CAN I SAY THE

10   NAMES?  IS THAT OKAY?

11        SO THESE THREE BLUE BUBBLES, THE FIRST BUBBLE, SECOND

12   BUBBLE, THIRD BUBBLES, THAT EXACT CHAIN OF BUBBLES IS EXACTLY

13   WHAT WOULD BE LINKED OFF AFTER ADD CONTACT.

14        SO ADD CONTACT IS A SEPARATE ACTION THE USER WOULD WANT TO

15   PERFORM, BUT YET THE EXACT SAME CODE GETS EXECUTED FOR DIAL OR

16   ADD CONTACT OR IF THERE'S ANY OTHER ACTIONS.

17        SO THE POINT IS YOU'RE NOT DOING THE ACTION THAT'S

18   SELECTED.  THE CODE THAT'S LINKED IS NOT THE ACTION THAT THE

19   USER IS SELECTING.  THE USER IS SELECTING DIAL AND THAT RUNS

20   THE START ACTIVITY.  AND IF THE USER SELECTS ADD CONTACT, THE

21   CODE THAT RUNS THE START ACTIVITY.  SO THERE'S ONLY EVER ONE

22   ACTION THAT'S LINKED.

23   Q.   AND WHY DOESN'T THAT MEET THE ACTION PROCESSOR LIMITATION?

24   A.   WELL, CAN WE JUST MAYBE GO BACK TO THE CLAIM CONSTRUCTION

25   SO WE CAN --

1    Q.   SURE.  THAT WOULD BE THE NEXT SLIDE, CLAIM CONSTRUCTION.

2    IT IS SDX 2546, PLEASE.

3    A.   I MEAN, I CAN JUST SAY IT WHILE WE'RE TRYING TO FIND THE

4    SLIDE.

5    Q.   YEAH, PLEASE.

6    A.   THE ISSUE IS THAT YOU HAVE TO DO -- TO PERFORM THE

7    SELECTED -- THE THING THAT'S LINKED IS FOR THE SELECTED ACTION.

8    THE SELECTED ACTION WAS NOT START ACTIVITY.  IT WAS NOT GO OFF

9    AND FIND THE APPLICATION RUN.

10        THE SELECTED ACTIVITY THAT THE USER SELECTED WAS DIAL OR

11   ADD CONTACTS, AND THAT'S NOT WHAT'S LINKED.

12   Q.   SO LET'S MOVE ON TO A DIFFERENT TOPIC.

13        SO YOU'VE JUST TOLD US WHY YOU BELIEVE THE ACCUSED DEVICES

14   DON'T INFRINGE.

15        BUT ARE THERE DIFFERENT WAYS TO DO IT BESIDES WHAT'S

16   ACCUSED?

17   A.   OH, ABSOLUTELY.

18   Q.   OKAY.  AND WHAT WOULD BE SOME OF THOSE WAYS?

19   A.   WELL, AGAIN, I SHOWED YOU THE EMBEDDED BUTTONS SYSTEM AND

20   I'LL TELL YOU THAT DR. MOWRY WILL -- IS OF THE OPINION THAT

21   EMBEDDED BUTTONS IS -- DOESN'T PRACTICE THE INVENTION.

22        BUT EMBEDDED BUTTONS FUNDAMENTALLY DETECTS STRUCTURES,

23   LINKS STRUCTURES, AND ALLOWS YOU TO PERFORM ACTIONS ON THEM.

24   SO LOOKING AT THOSE TWO SYSTEMS, I MEAN, EMBEDDED BUTTONS IS

25   LOOKS JUST LIKE WHAT'S IN THE PATENT.  FIGURES 5, 6, AND 7 IN

1   THE VIDEO WE SHOWED, THEY'RE PRETTY MUCH IDENTICAL STEPS.  YET

2   ONE IS THE INVENTION AND ONE DR. MOWRY SAYS IS NOT THE

3   INVENTION.

4       SO THERE'S CLEARLY LOTS OF WAYS TO DO THIS AND THE PATENT

5   ONLY COVERS ONE WAY.

6   Q.   NOW, IF WE PUT UP SDX 2541, WHICH HAS CLAIM 9 THERE, ALL

7   THE LIMITATIONS OF CLAIM 1 AND THEN CLAIM 9, NOW, WOULD IT BE

8   POSSIBLE TO USE SOMETHING DIFFERENT THAN A POP-UP MENU, WHICH

9   IS IN CLAIM 9?

10  A.   YES.  SO CLAIM 9 IS THE CLAIM THAT'S ASSERTED AND CLAIM 9

11  ADDS A POP-UP MENU OF THE LINKED ACTIONS.

12      SO ALL YOU HAVE TO DO IN A SENSE, TO NOT PRACTICE THE

13  PATENT, IS JUST GET RID OF THE POP-UP MENU.

14  Q.   AND WHAT WOULD SOME ALTERNATIVE MENUS BE?

15  A.   ANY OTHER KIND OF MENU, AND THE PATENT ITSELF

16  DIFFERENTIATES BETWEEN DIFFERENT TYPE OF MENUS, THEY TALK ABOUT

17  PULL-DOWN MENUS VERSUS POP-UP, THERE'S ALL KINDS AND THE PATENT

18  ONLY COVERS ONE, THE POP-UP.  SO IF YOU RELEASE THE POP-UP WITH

19  ANOTHER KIND OF MENU, MY UNDERSTANDING IS LEGALLY YOU CANNOT

20  INFRINGE THE PATENT.

21  Q.   SO WHAT -- HOW DIFFICULT WOULD THAT CHANGE BE IN THE

22  ACCUSED DEVICES?

23  A.   WELL, IN THE ACCUSED DEVICES IT WOULD BE FAIRLY SIMPLE

24  BECAUSE, AGAIN, THE ACCUSED DEVICES, BECAUSE THEY'RE OPEN,

25  THEY'RE MEANT TO BE PROGRAMMABLE, THERE ARE LOTS OF LIBRARIES

1    THAT YOU CAN USE AND THEY HAVE LOTS OF LIBRARIES FOR DIFFERENT

2    TYPES OF MENUS.

3         SO A PROGRAMMER CAN PICK A DIFFERENT TYPE OF MENU.  AND WE

4    HEARD MS. HACKBORN SAY THAT IN HER ESTIMATION IT WOULD TAKE

5    LESS THAN A DAY TO MAKE THE CHANGE.

6         I'VE BEEN INVOLVED IN MODIFYING SYSTEMS LIKE THIS.  I

7    AGREE THAT IT'S NOT A BIG CHANGE.  YOU KNOW, IT'S CERTAINLY ON

8    THE ORDER OF A DAY.  SO IT'S NOT A BIG DEAL.

9    Q.   SO NOW LET'S MOVE ON TO THE SURVEY THAT DR. HAUSER DID

10   CONCERNING THE '647 PATENT.

11        AND WE'LL PUT UP 2650, PLEASE, SDX 2650.

12        SO DID YOU REVIEW THE DESCRIPTION AND THE VIDEO FROM

13   DR. HAUSER'S SURVEY CONCERNING THE '647 PATENT?

14   A.   YES, I SAW THE VIDEO AND STUDIED THE TEXT HERE.

15   Q.   SO -- AND WHAT WAS YOUR OPINION OF THE, OF THAT

16   DESCRIPTION WITH RESPECT TO THE PATENTED FEATURE?

17   A.   WELL, IF THE PURPOSE OF THE SURVEY WAS TO SHED SOME

18   INSIGHT INTO THE VALUE OF THE ALLEGED INVENTION, MY OPINION IS

19   THAT THE SURVEY DOES NOT DO THAT BECAUSE IT DOES NOT DESCRIBE

20   THE INVENTION.

21        WHAT'S DESCRIBED HERE, FOR EXAMPLE, IS -- CAN EASILY BE A

22   PHONE THAT DOES NOT INFRINGE.

23   Q.   AND WHY IS THAT?

24   A.   BECAUSE, AGAIN, AS I SAY, THE ISSUE ISN'T DETECTING

25   STRUCTURES AND LINKING ACTIONS.  WE HAVE TO DO THAT.  BUT YOU

1    HAVE TO DO IT A CERTAIN WAY.  YOU HAVE TO DO IT WITH AN

2    ANALYZER SERVER, AND YOU HAVE TO HAVE A SPECIFIC USER

3    INTERFACE.  YOU HAVE TO HAVE AN ACTION PROCESSOR.  SO IT'S NOT

4    JUST DETECTING, LINKING AND ALLOWING THE USER TO OPERATE.  YOU

5    HAVE TO HAVE THESE STRUCTURES.

6         AND THE SURVEY DOESN'T ADDRESS ANY OF THESE.  SO FOR THAT

7    REASON, AS I SAY, FOR WHAT'S LITERALLY HIGHLIGHTED HERE IN THIS

8    EXAMPLE, DETECTING A PHONE NUMBER AND AN E-MAIL, FIRST OF ALL,

9    ANDROID PHONES HAVE E-MAIL APPLICATION, AND THE E-MAIL

10   APPLICATION DOES ALLOW YOU TO DO THIS AND YET E-MAIL IS NOT

11   ACCUSED OF INFRINGEMENT.

12        SO THIS IS JUST AS EASILY DESCRIBING A SYSTEM THAT DOES

13   NOT INFRINGE AS ANYTHING.

14   Q.  SO LET'S MOVE TO THE LAST SENTENCE THERE, "THIS FEATURE,

15   IF YOU WANTED TO TAKE VARIOUS ACTIONS, LIKE CALLING OR TEXTING

16   A NUMBER, YOU WOULD HAVE TO MANUALLY IDENTIFY AND SELECT THE

17   EXACT TEXT THAT MIGHT BE DATA TO TAKE ACTIONS ON."

18        DO YOU SEE THAT?

19   A.  I DO.

20   Q.  DO YOU AGREE THAT THAT'S AN ACCURATE DESCRIPTION OF AN

21   ALTERNATIVE?

22   A.  I THINK IT'S HIGHLY MISLEADING BECAUSE TO GET RID OF THE

23   FEATURE, AGAIN, ALL YOU HAVE TO DO IS GO TO THE POP-UP MENU.

24   SO THEY HAVE SAID WITHOUT THIS FEATURE, YOU USE A DIFFERENT

25   KIND OF MENU.

1          TO ME THIS IS MAKING IT VERY, VERY HARD TO DO SOMETHING

2     WHEN THE FEATURE IS NOT THERE.  AND IN REALITY, ALL YOU HAVE TO

3     DO IS USE A DIFFERENT MENU.

4     Q.   SO ARE THERE DIFFERENT WAYS TO DIAL A NUMBER, FOR EXAMPLE,

5     IN THE ACCUSED BROWSER APPLICATION?

6     A.   YES.

7     Q.   THAT AREN'T ACTUALLY ACCUSED IN THIS CASE?

8     A.   YES.  SO THE OTHER THING THAT THIS IS MISSING IS IN A

9     SENSE, THERE ARE SIMPLER WAYS TO DIAL PHONE NUMBERS THAT ARE

10    SEEN IN DOCUMENTS, AND THIS ISN'T INDICATING THAT YOU'VE ALWAYS

11    HAD THIS CHOICE, SO THAT IF YOU DIDN'T HAVE THE INVENTION, YOU

12    COULD STILL DIAL PHONE NUMBERS, AND I HAVE A DEMONSTRATION HERE

13    THAT'LL SHOW YOU IT'S ACTUALLY EASIER.

14    Q.   SO IF WE PUT UP SDX 2571, DO YOU SEE THAT?

15    A.   I DO.

16    Q.   CAN YOU TELL US WHAT YOU SEE HERE?

17    A.   THESE ARE TWO SAMSUNG PHONES, OBVIOUSLY, AND THESE ARE

18    GOING TO BE VIDEOS OF USING THE BROWSER APPLICATION TO DIAL A

19    PHONE NUMBER.

20         AND THE PHONE ON THE LEFT, WHAT WE'RE GOING TO SHOW IS A

21    FEATURE THAT I DON'T BELIEVE ANYONE HAS TALKED ABOUT THAT I'LL

22    CALL TAP TO DIAL, AND THIS IS PROBABLY THE FASTEST WAY TO DIAL

23    A PHONE NUMBER THAT'S ON A WEB PAGE.

24         SO MAYBE WE CAN JUST RUN THE VIDEO.

25    Q.   PLEASE.

```
 1      A.   SO IF YOU OPEN THE BROWSER, THERE'S THE FINGER, THERE'S

 2      THE BROWSER, WE SEE THE PHONE NUMBER, WE JUST TAP ON THAT PHONE

 3      NUMBER AND, BOOM, YOU GET THE DIALER.

 4           OKAY.  THIS IS NOT ACCUSED AND THE SURVEY DIDN'T SAY YOU

 5      COULD DO SOMETHING THAT SIMPLE IF YOU DIDN'T HAVE THE

 6      INVENTION.

 7           AND ON THE RIGHT IS, JUST FOR COMPARISON, IS WHAT'S

 8      ACCUSED OF INFRINGING.

 9           SO, AGAIN, YOU OPEN THE BROWSER AND YOU SEE A PHONE

10      NUMBER.  YOU HAVE TO DO A LONG PRESS.

11           NOW, IN THE OTHER EXAMPLE, WE WOULD ALREADY HAVE BEEN

12      DIALING THE PHONE NUMBER BY NOW, BUT NOW WE HAVE THE EXTRA STEP

13      OF HITTING DIAL AND WE GET TO THE EXACT SAME PLACE.  AND THE

14      USER WEREN'T TOLD THIS.

15                MR. NELSON:  THANK YOU.  YOUR HONOR, I'M GOING TO

16      OFFER JX 350, IT IS, WHICH IS A GALAXY 3, THAT WAS THE ONE USED

17      IN THIS VIDEO, INTO EVIDENCE.

18                THE COURT:  JX 350?

19                MR. NELSON:  WELL, I THINK IT'S A PARENTHESES O,

20      REMEMBER WE WERE DOING LIKE 35A, B.

21                THE COURT:  OKAY.  35 -- ALL RIGHT.  ANY OBJECTION?

22                MS. KREVANS:  NO OBJECTION, YOUR HONOR.

23                THE COURT:  IT'S ADMITTED.

24           (JOINT EXHIBIT 35O WAS ADMITTED IN EVIDENCE.)

25                MR. NELSON:  THANK YOU.
```

1    Q.   SO NOW I WANT TO MOVE TO YOUR SPECIFIC OPINIONS ON

2    INVALIDITY.

3    A.   OKAY.

4    Q.   NOW, FIRST OF ALL, DID YOU LOOK AT INVALIDITY FROM THE

5    PERSPECTIVE OF ONE OF ORDINARY SKILL IN THE ART?

6    A.   I DID.

7    Q.   WHAT IS ONE OF ORDINARY SKILL IN THE ART WITH RESPECT TO

8    THIS '647 PATENT?

9    A.   MY UNDERSTANDING IS WHEN YOU ASSESS VALIDITY, YOU HAVE TO

10   SAY WHO'S THE AUDIENCE OF THE PATENT, AND IT'S THIS PERSON OF

11   ORDINARY SKILL IN THE ART, AND MY OPINION IS THAT SUCH A PERSON

12   WOULD HAVE HAD -- SO BACK IN 1996, THEY WOULD HAVE HAD A

13   COMPUTER SCIENCE DEGREE, A COMPUTER ENGINEERING DEGREE,

14   SOMETHING IN A RELATED AREA, AND WOULD HAVE ON THE ORDER OF TWO

15   YEARS OF EXPERIENCE WORKING DEVELOPING SOFTWARE.

16   Q.   DO YOU MEET THAT CRITERIA?

17   A.   YES, YES.  I -- YES.

18   Q.   SO LET'S TALK ABOUT SIDEKICK.  WHAT IS SIDEKICK?

19   A.   SIDEKICK IS A SYSTEM WE HEARD ABOUT YESTERDAY FROM MR. --

20   BY THE NAME OF FRID-NILSON, AND SIDEKICK WAS THIS PERSONAL

21   PRODUCTIVITY APP THAT RAN ON YOUR P.C. BACK IN THE DARK AGES OF

22   PERSONAL COMPUTING IN THE MID-1980S.

23   Q.   NOW, WHEN YOU EVALUATED SIDEKICK, WHAT INFORMATION DID YOU

24   LOOK AT?

25   A.   I HAD AN EXECUTABLE COPY OF THE PROGRAM, SO I WAS ABLE TO

1    EXECUTE THE PROGRAM ITSELF.  THE PROGRAM CAME WITH SOME VERY

2    DETAILED MANUALS, AND I STUDIED THE MANUALS.

3         AND THEN IN ADDITION, I ALSO HAD THE SOURCE CODE FOR THE

4    SYSTEM.

5    Q.   NOW, YOU SAID THAT -- WERE THOSE ALL FOR THE SAME VERSION?

6    A.   YES, MY UNDERSTANDING IS THAT IT WAS ALL FOR VERSION

7    1.56A.

8    Q.   DID YOU ACTUALLY RUN THE EXECUTABLES, THE PROGRAM ITSELF?

9    A.   YES.  WE SET UP A SYSTEM WHERE WE COULD ESSENTIALLY BUILD

10   AN ENVIRONMENT, SUCH AS DOS EXISTED IN 1985, AND RAN THE

11   SIDEKICK SOFTWARE.

12   Q.   AND DID YOU TAKE SCREEN SHOTS?

13   A.   I DID.

14   Q.   FROM THAT?

15        MS. KREVANS:  YOUR HONOR, WE OBJECT.  THIS SYSTEM WAS

16   NEVER MADE AVAILABLE FOR INSPECTION, AND IT'S NOT ON THE

17   EXHIBIT LIST.

18        MR. NELSON:  WELL, THE --

19        MS. KREVANS:  MOVE TO STRIKE THE TESTIMONY ABOUT IT.

20        MR. NELSON:  SO THE SYSTEM, YOUR HONOR, ACTUALLY

21   THAT -- IT'S THE SIDEKICK EXECUTABLES, WHICH ARE IN EVIDENCE

22   YESTERDAY.

23        THE SYSTEM AND THE SCREEN SHOTS WERE DESCRIBED IN DETAIL

24   IN THE EXPERT REPORT, AND THE EXACT SCREEN SHOTS THAT WE'LL GO

25   THROUGH HERE WERE IN THE EXPERT REPORT.

1           THE SYSTEM WAS DESCRIBED, MADE AVAILABLE, THEY COULD HAVE

2    ASKED FOR INSPECTING THE EMULATOR IF THEY WANTED TO, AND THEY

3    NEVER DID.

4           MS. KREVANS:  YOUR HONOR, UNLIKE SOME OF THE OTHER

5    DEMONSTRATION SYSTEMS WE'LL SEE WITH OTHER EXPERTS, THIS SYSTEM

6    IS NOT SOMETHING THAT'S HERE, IT'S NOT AVAILABLE FOR

7    INSPECTION.  IT'S NOT ON THE EXHIBIT LIST.  THE CODE IS WHAT'S

8    ON THE EXHIBIT LIST.  WE HAVE NO OBJECTION TO HIM TALKING ABOUT

9    THE CODE.

10          THE COURT:  WHAT DO YOU HAVE OF THE SYSTEM?  HE'S

11   JUST GOING TO TESTIFY, OR WHAT?

12          MR. NELSON:  THERE'S, THERE'S SCREEN SHOTS OF THE

13   OPERATION.

14          THE COURT:  OKAY.  CAN YOU PASS THIS?  I'D RATHER

15   HANDLE THIS OUTSIDE THE PRESENCE OF THE JURY.

16          MR. NELSON:  SURE.  THIS IS ACTUALLY THE LAST THING I

17   HAVE, YOUR HONOR.

18          THE COURT:  GIVE ME THE RELEVANT PORTIONS, PARAGRAPHS

19   OF THE EXPERT REPORT, PLEASE.

20          MR. NELSON:  SURE.  THE SCREEN SHOTS YOU'LL FIND

21   AT -- THIS WOULD BE IN THE OPENING REPORT -- PAGES 152 AND 153,

22   AND FOR ONE OF THEM IT'LL BE ON PAGE 163, AND THE SYSTEM IS

23   DESCRIBED IMMEDIATELY PRIOR TO THAT.

24      IS THAT CORRECT?

25          THE COURT:  ALL RIGHT.  152, 153, AND WHAT WAS THE

1       OTHER PAGE?

2               MR. NELSON:  '163.

3               THE COURT:  ALL RIGHT.  THE OBJECTION IS OVERRULED.

4       GO AHEAD, PLEASE.

5               MR. NELSON:  THANK YOU, YOUR HONOR.

6       Q.   ALL RIGHT.  SO LET'S PUT UP -- LET'S START WITH THE

7       PREAMBLE OF -- WELL, IT'S GOING TO BE IN CLAIM 1, BUT IT'S

8       CLAIM 9 BECAUSE ALL OF THE ELEMENTS ARE IN THERE?

9       A.   SURE.

10      Q.   SO THIS IS SDX 2581.

11              SO CAN YOU TELL US WHAT YOUR OPINION WAS CONCERNING THE

12      PREAMBLE WITH RESPECT TO THE SIDEKICK SYSTEM?

13      A.   SURE.  SO IT'S ON THE RIGHT HAND, JUST TO REFRESH OUR

14      MEMORIES, THIS IS A SCREEN SHOT OF SIDEKICK IN OPERATION AFTER

15      IT'S BEEN RUN AND DETECTED A PHONE NUMBER IN THE 206 AREA CODE

16      THAT'S HIGHLIGHTED.

17              SO BASED ON MY ANALYSIS, SIDEKICK IS A COMPUTER SYSTEM, A

18      COMPUTER BASED SYSTEM FOR DETECTING STRUCTURES AND DATA AND

19      PERFORMING ACTIONS ON DETECTED STRUCTURES.  WE'RE GOING TO SEE

20      THAT YOU CAN DIAL THIS PHONE NUMBER.

21      Q.   NOW, LET'S MOVE TO THE NEXT LIMITATION, THE INPUT DEVICE

22      AT SDX 2583.

23              AND CAN YOU TELL US WHAT WE'RE LOOKING AT HERE?

24      A.   SURE.  THESE ARE EXCERPTS FROM THE HANDBOOK, BUT WHEN YOU

25      EXECUTE THE PROGRAM, YOU SEE THE SAME THING, THAT SIDEKICK

1      TAKES INPUT FROM A KEYBOARD AND KEYBOARD QUALIFIES AS AN INPUT

2      DEVICE.

3      Q.   NOW LET'S MOVE FORWARD THEN TO THE NEXT LIMITATION, WHICH

4      IS AN OUTPUT DEVICE FOR PRESENTING THE DATA.

5           CAN YOU TELL US WHAT YOUR OPINION WAS AND WHAT YOU RELIED

6      ON WITH RESPECT TO THE ELEMENT FOR THIS PATENT AT ISSUE?

7      A.   SURE.  WE SEE FROM THE SCREEN SHOTS THAT THERE WAS A

8      SCREEN, THERE WAS A MONITOR, AND THE HANDBOOK ALSO SHOWS THAT

9      THE SIDEKICK WAS MEANT TO WORK WITH VARIOUS TYPES OF MONITORS

10     AND MONITORS ARE OUTPUT DEVICES.

11     Q.   NOW, LET'S GO TO THE NEXT ELEMENT, "A MEMORY STORING

12     INFORMATION INCLUDING PROGRAM ROUTINES," DO YOU SEE THAT?  CAN

13     YOU TELL US WHAT YOUR OPINION WAS WITH RESPECT TO THE SIDEKICK

14     SYSTEM AND THE INFORMATION YOU REVIEWED CONCERNING THAT SYSTEM?

15     A.   SURE.  SO SIDEKICK RUNS ON A P.C., P.C.'S OBVIOUSLY HAD

16     MEMORY, IN PARTICULAR MEMORY THAT WOULD STORE A PROGRAM.  SO IT

17     HAS MEMORY STORING PROGRAM ROUTINES.  AND THE MEMORY HERE IS

18     RAM.

19     Q.   RAM, THAT'S THE MEMORY?

20     A.   YEAH.

21     Q.   128K?

22     A.   100 -- ALL 128K, YEAH.

23     Q.   OKAY.  THEN LET'S GO TO THE NEXT LIMITATION, THE ANALYZER

24     SERVER LIMITATION, AN ANALYZER SERVER FOR DETECTING STRUCTURES

25     IN THE DATA, LINKING THE ACTIONS TO THE DETECTED STRUCTURES.

1           DO YOU SEE THAT?

2      A.   I DO.

3      Q.   TELL US WHAT WE'RE LOOKING AT HERE.  THIS IS SDX 2587?

4      A.   AGAIN, THIS IS JUST OUR SCREEN SHOT AGAIN, AND THE WAY

5      SIDEKICK WORKED, AS WE HEARD FROM MR. NIELSEN, AND MY OPERATION

6      CONFIRMS THIS, IS SIDEKICK RAN WHAT WAS CALLED A TSR, AND IF

7      YOU WERE A DOS AFICIONADO IN THE '80S YOU'LL RECOGNIZE THIS,

8      AND IT'S ESSENTIALLY A PROGRAM THAT RUNS IN THE BACKGROUND AND

9      CAN BE USED BY ANY OTHER PROGRAM.

10          SO UNLIKE WHAT WE'VE SEEN WITH THE ACCUSED PRODUCTS, THIS

11     IS ACTUALLY A SEPARATE PROGRAM, AND IT'S BEING USED HERE WITH

12     MS-DOS, WHICH IS THE BLUE SCREEN, THE TOP PART OF THE BLUE

13     SCREEN.  AND SO MS-DOS HASN'T BEEN MODIFIED IN ANY WAY, IT'S

14     NOT DOING DETECTING, IT'S NOT DOING LINKING, IT'S JUST SHOWING

15     YOU DATA.

16          AND THE SIDEKICK TSR THAT'S RUNNING IN THE BACKGROUND,

17     IT'S THE THING THAT'S DOING DETECTING AND DETECTING STRUCTURES,

18     IT CAN DETECT MULTIPLE STRUCTURES, MULTIPLE DIFFERENT PHONE

19     NUMBER STRUCTURES, AND WILL LINK THE DIALLING ACTION TO EACH OF

20     THESE DETECTED STRUCTURES.

21     Q.   NOW, DOES THIS TSR PROGRAM YOU TALKED ABOUT, TERMINATE AND

22     STAY RESIDENT, RUN AS PART OF THE APPLICATION THAT'S USING IT?

23     A.   NO.  AND THAT'S THE KEY THING.  IT'S NOT -- THE

24     APPLICATION -- MS-DOS IS JUST VANILLA MS-DOS.  MS-DOS KNOWS

25     NOTHING ABOUT SIDEKICK, KNOWS NOTHING ABOUT PHONE NUMBERS, AND

```
1     SIDEKICK RUNNING IN THE BACKGROUND IS THE THING THAT'S DOING

2     ALL THE WORK.

3     Q.   NOW, LET'S MOVE ON TO THE NEXT LIMITATION.  THIS IS SDX

4     2597, THE USER INTERFACE LIMITATION THAT YOU DISCUSSED EARLIER.

5          CAN YOU TELL US WHAT YOUR OPINION WAS WITH RESPECT TO THE

6     SIDEKICK SYSTEM AND THE INFORMATION YOU REVIEWED CONCERNING

7     THAT?

8     A.   SURE.  SO SIDEKICK OBVIOUSLY HAD A USER INTERFACE.  THE

9     WAY IT WORKED IS YOU HIT A PARTICULAR KEY ON THE KEYBOARD AND

10    YOU WOULD SEE THE POP-UP MENU ON THE TOP SCREEN, AND ALL OF

11    THESE APPLICATIONS HERE, THESE ARE ALL PART OF THE PERSONAL

12    PRODUCTIVITY SUITE THAT WAS SIDEKICK.

13         AND ONE OF THEM IS THE DIALER, AND IF YOU INVOKE THE

14    DIALER, WHAT THE DIALER THEN DOES IS TAKE THE TEXT FROM THE

15    EDITOR AND PROCESS IT USING A PATTERN TO FIND INSTANCES OF THE

16    PATTERN, AND IT HAS A SET OF PHONE NUMBER PATTERNS SO IT CAN

17    DETECT DIFFERENT TYPES OF PHONE NUMBERS.

18         AND IN THIS EXAMPLE, IT DETECTS THE STRUCTURE THAT IS THE

19    PATTERN, YOU KNOW, PAREN, AREA CODE, PAREN, AND THEN THE SEVEN

20    DIGIT NUMBER.

21         AND IT HIGHLIGHTS THAT FOR THE USER.

22         AND THEN IN ADDITION, THERE IS AN ACTION THAT IS LINKED

23    HERE, WHICH IS THE DIAL ACTION THAT'S SHOWN DOWN, IT'S KIND OF

24    HARD TO SEE, DOWN IN THE LITTLE HORIZONTAL MENU AT THE BOTTOM

25    OF THE SCREEN.
```

1     Q.    WHERE IT SAYS DIAL AND IT HAS THE RETURN?

2     A.    YEAH, IT HAS -- YEAH.  IF YOU REMEMBER, THAT'S THE WAY

3     OLD-FASHIONED WAY OF INDICATING THE ENTER KEY, THE DOWN LEFT

4     POINTING ARROW.

5     Q.    SO LET'S MOVE ON THEN TO THE ACTION PROCESSOR LIMITATION

6     CONCERNING THE SIDEKICK SYSTEM, AND THIS WOULD BE SDX 2600.

7           NOW, CAN YOU TELL US WHAT YOUR ANALYSIS OF THE SIDEKICK

8     SYSTEM SHOWED WITH RESPECT TO THIS PARTICULAR LIMITATION.

9     A.    SURE.  SO IT HAS AN ACTION PROCESSOR THAT PERFORMS THE

10    SELECTED ACTION.  SO UNLIKE THE ACCUSED PRODUCTS WHERE ANDROID

11    HAS TO GO FIGURE OUT WHAT TO DO, HERE DIALLING IS DIRECTLY TIED

12    TO THE PHONE NUMBER.

13          SO WHEN YOU HIT THE DIAL KEY, IT POPS UP THIS LITTLE

14    WINDOW TELLING YOU THAT IT'S DIALLING THIS PHONE NUMBER USING A

15    MODEM THAT'S ATTACHED TO THE COMPUTER.

16    Q.    NOW, LET'S MOVE ON TO THE PROCESSING UNIT LIMITATION, THE

17    LAST LIMITATION THERE.  AND THIS WOULD BE SDX 2604.

18          CAN YOU TELL US WHAT YOUR OPINION WAS WITH REGARD TO THAT

19    LIMITATION.

20    A.    SURE.  AS I INDICATED EARLIER, A PROCESSING UNIT IS A

21    FAIRLY GENERIC LIMITATION, AND BECAUSE THIS RAN ON A P.C., THE

22    P.C. CONTAINED THE PROCESSING UNIT THAT WAS COUPLED TO ALL THE

23    OTHER DEVICES AND THE MEMORY AND CONTROLLED THE EXECUTION OF

24    PROGRAM ROUTINES.

25    Q.    SO NOW I WANT TO MOVE ON TO THE LAST LIMITATION, THE

```
 1        LIMITATION THAT'S ADDED BY CLAIM 9, THE POP-UP MENU LIMITATION.

 2             CAN YOU EXPLAIN TO US YOUR OPINION REGARDING THE

 3        ADDITIONAL LIMITATION OF THE POP-UP MENU FROM CLAIM 9?

 4        A.   SURE.  SO SIDEKICK DID NOT HAVE A POP-UP MENU FOR

 5        DISPLAYING THE LINKED ACTIONS.

 6        Q.   AND WHAT DID IT USE?

 7        A.   IT USED THIS MORE DOS-STYLE MENU THAT WAS SHOWN AT THE

 8        BOTTOM BELOW THAT GRAY BAR BECAUSE THIS WAS NOT A MOUSE-BASED

 9        SYSTEM.  IT WAS KEYBOARD-BASED.  SO IT TOLD YOU THE KEYS TO

10        PRESS.  SO IT USED A DIFFERENT TYPE OF MENU.

11        Q.   NOW, WERE THERE POP-UP MENUS USED IN SIDEKICK?

12        A.   THERE WERE POP-UP MENUS, AND WE SEE POP-UP MENUS USED TO

13        INVOKE THE DIALER, AND WE HEARD FROM MR. FRID-NILSON THAT, YOU

14        KNOW, THEY COULD HAVE USED A POP-UP MENU TO PROVIDE AN ACCESS

15        TO THE LINKED ACTIONS.

16             THEY, IN THEIR CASE, THEY JUST CHOSE NOT TO BECAUSE THE

17        GRAPHICS CAPABILITIES OF THESE OLD P.C.'S HAD VERY LOW

18        RESOLUTION, THE MENU JUST WOULD HAVE BEEN TOO LARGE I THINK IS

19        WHAT HE SAID.

20        Q.   SO DO YOU THINK IT WOULD HAVE BEEN OBVIOUS TO USE A POP-UP

21        MENU IN PLACE OF THE DOS DIAL MENU THAT YOU TALKED ABOUT?

22        A.   I DO, AND THE IMPORTANT THING TO UNDERSTAND IS THAT MY

23        UNDERSTANDING IS THAT WHEN WE'RE ASSESSING THINGS LIKE

24        OBVIOUSNESS, WE'RE DOING IT AS OF THE DATE OF THE PATENT.  SO

25        WE'RE NOT TALKING ABOUT OBVIOUS IN 1985, WE'RE TALKING ABOUT
```

1       OBVIOUS IN 1996.

2            SO IN 1996, WE'VE GOT TONS OF SCREEN REAL ESTATE, HIGH

3       RESOLUTION.  POP-UP MENUS ARE EXTRAORDINARILY COMMON.  THEY'RE

4       EVERYWHERE.

5            SO FOR THAT REASON MY BELIEF IS IT WOULD HAVE BEEN OBVIOUS

6       TO TAKE A SYSTEM LIKE SIDEKICK AND INSTEAD OF USING THIS, YOU

7       WOULD HAVE JUST USED A POP-UP.

8       Q.   HAVE YOU HEARD THE IDEA OF SECONDARY CONSIDERATIONS OF

9       NON-OBVIOUSNESS?

10      A.   I'M AWARE OF THAT, YES.

11      Q.   AND CAN YOU JUST TELL US WHAT THAT IS, WHAT YOUR

12      UNDERSTANDING IS?

13      A.   I CAN TELL YOU MY RECENT UNDERSTANDING IS THAT WHEN YOU

14      CLAIM THIS SOMETHING IS OBVIOUS, YOU LOOK TO SEE WHETHER OR NOT

15      THERE ARE ANY WHAT ARE CALLED SECONDARY CONSIDERATIONS THAT

16      WOULD SUGGEST, IS IT MORE LIKE -- IS IT MORE LIKE THE OBVIOUS

17      OR NOT OBVIOUS, AND THE SECONDARY CONSIDERATIONS ARE CALLED

18      NON-OBVIOUSNESS, ARE THERE INDICATIONS THAT THE INVENTION WAS

19      NOT OBVIOUS.

20      Q.   NOW, DID YOU SEE ANY SECONDARY -- OF THESE SECONDARY

21      CONSIDERATIONS INDICATING THAT THE USE OF A POP-UP MENU WOULD

22      NOT BE OBVIOUS?

23      A.   I BELIEVE I STUDIED ALL OF THEM, AND I SAW NO INDICATION

24      THAT THE USE OF A POP-UP WAS ANYTHING OTHER THAN OBVIOUS.

25      Q.   OKAY.  NOW, WE'VE HEARD SOME TALK ABOUT COPYING IN THIS

1    CASE.  IS COPYING ONE OF THE SECONDARY CONSIDERATIONS?

2    A.   MY UNDERSTANDING IS THAT IT IS.

3    Q.   AND CAN YOU RECALL THE DOCUMENT ABOUT A SMART ORGANIZER?

4    A.   I DO.

5    Q.   AND CAN YOU REMIND US WHAT THAT WAS?

6    A.   MY UNDERSTANDING IS THIS IS A SAMSUNG DOCUMENT THAT'S

7    DATED IN 2010 THAT HAS WHAT I WOULD CALL SOME ASPIRATIONAL TEXT

8    IN IT THAT SAYS WE SHOULD DO THIS, BUT WHERE "THIS" IS ALL

9    DESCRIBED AT A VERY HIGH LEVEL.

10   Q.   NOW, IS THAT SMART ORGANIZER AN ACCUSED FUNCTION OR

11   FEATURE IN THIS CASE?

12   A.   NO.

13   Q.   DO YOU THINK THAT THAT DOCUMENT IS EVIDENCE THAT THERE WAS

14   COPYING OF THE '647 PATENT?

15   A.   NO.  I MEAN, MY UNDERSTANDING IS WHEN YOU'RE TALKING ABOUT

16   COPYING, YOU'RE TALKING ABOUT COPYING THE CLAIMED INVENTION.

17       SO IN THIS CASE IT WOULD BE COPYING LIKE AN ANALYZER

18   SERVER AND COPYING AN ACTION PROCESSOR.

19       SO COPYING THE SPECIFIC SOFTWARE ARCHITECTURE TO DO THIS.

20       AND THAT DOCUMENT DOESN'T SAY ANYTHING ABOUT THE SOFTWARE

21   ARCHITECTURE.

22       AND THE MORE INTERESTING THING IS MY UNDERSTANDING IS THAT

23   DOCUMENT IS DATED 2010, AND THE FEATURES THAT DR. MOWRY ACCUSES

24   OF INFRINGING EXISTED IN ANDROID AND SAMSUNG PHONES IN 2009.

25       SO THE DOCUMENT IS AFTER THE ALLEGED FEATURES WERE ALREADY

1    IN THE PHONES, SO I DON'T SEE HOW IT COULD HAVE EVIDENCE OF

2    COPYING.

3              MR. NELSON:  ALL RIGHT.  THANK YOU, SIR.  I DON'T

4    HAVE ANY FURTHER QUESTIONS FOR YOU.

5              THE WITNESS:  THANK YOU.

6              THE COURT:  THE TIME IS 10:04.  I'LL GIVE YOU A

7    MINUTE TO GET SET UP.

8              MS. KREVANS:  THANK YOU, YOUR HONOR.

9         (PAUSE IN PROCEEDINGS.)

10             THE COURT:  IF ANYONE WANTS TO STAND AND STRETCH

11   WHILE WE'RE GETTING SET UP, YOU'RE WELCOME TO DO SO.

12        (PAUSE IN PROCEEDINGS.)

13             THE COURT:  ALL RIGHT.  TIME IS NOW 10:05.  GO AHEAD,

14   PLEASE.

15                         **CROSS-EXAMINATION**

16   BY MS. KREVANS:

17   Q.   GOOD MORNING, DR. JEFFAY.

18   A.   GOOD MORNING.

19   Q.   WE HAVEN'T MET BEFORE.  I'M RACHEL KREVANS.  I'M ONE OF

20   APPLE'S LAWYERS.

21   A.   HOW DO YOU DO?

22   Q.   I WANT TO START BY MAKING SURE WE'RE ALL ON THE SAME PAGE

23   ABOUT WHAT THIS CASE IS ABOUT.

24        SAMSUNG IS A DEFENDANT IN THIS CASE; RIGHT?

25   A.   CORRECT.

1      Q.   NOT GOOGLE?

2      A.   CORRECT.

3      Q.   IT WAS SAMSUNG'S LAWYERS WHO HIRED YOU TO GIVE OPINIONS ON

4      BEHALF OF SAMSUNG IN THE CASE?

5      A.   CORRECT.

6      Q.   AND THEY'RE THE ONES WHO ARE PAYING YOU?

7      A.   I'M SORRY?

8      Q.   THEY'RE THE ONES WHO ARE PAYING YOU; RIGHT?

9      A.   YES, I THINK THAT'S CORRECT.

10     Q.   AND IT WAS SAMSUNG'S CHOICE WHAT CODE TO PUT ON THE

11     SAMSUNG ACCUSED DEVICES IN THIS CASE; RIGHT?

12     A.   I DON'T KNOW THAT I KNOW THAT FOR A FACT.

13     Q.   YOU DON'T KNOW WHO DECIDED WHAT CODE IS RUNNING ON THE

14     SAMSUNG PHONES?

15     A.   I DON'T KNOW WHO HAS THE FINAL SAY AS TO EXACTLY WHAT CODE

16     RUNS.

17     Q.   AND YOU KNOW THAT THE CODE THAT YOU LOOKED AT ON THE

18     SAMSUNG PHONES THAT RELATES TO THESE STRUCTURES AND PROGRAM

19     ROUTINES THAT DETECT DATA AND CAUSE THINGS LIKE DIAL OR ADD TO

20     CALENDAR OR ADD TO CONTACTS TO HAPPEN WITH THESE STRUCTURES,

21     YOU KNOW THAT CODE WAS BASED ON WHAT WAS ORIGINALLY THE ANDROID

22     FRAMEWORK; RIGHT?

23     A.   IF I UNDERSTAND THE QUESTION RIGHT, I THINK THE ANSWER IS

24     YES.

25     Q.   OKAY.  BUT YOU HAVEN'T INVESTIGATED WHAT CHANGES THE

1    SAMSUNG COMPUTER PROGRAMMERS MADE TO THAT CODE TO CREATE THE

2    VERSION THAT ACTUALLY RUNS ON THE SAMSUNG ACCUSED PRODUCTS;

3    RIGHT?

4    A.   THAT'S CORRECT.

5    Q.   NOW, SAMSUNG DIDN'T HAVE TO USE ANDROID AS THE OPERATING

6    SYSTEM FOR ITS PHONES; RIGHT?

7    A.   I'M SORRY?

8    Q.   SAMSUNG DIDN'T HAVE TO USE ANDROID AS THE OPERATING SYSTEM

9    FOR ITS PHONES; RIGHT?

10   A.   THAT WOULD BE MY ASSUMPTION, BUT --

11   Q.   THEY HAD OTHER CHOICES?

12   A.   I'M SORRY?

13   Q.   THEY HAD OTHER CHOICES?

14   A.   I'M MISSING THE LAST PART.

15   Q.   THEY HAD OTHER CHOICES?

16   A.   OTHER CHOICES.  IT STANDS TO REASON.  I GUESS I DON'T KNOW

17   THAT FOR A FACT.

18   Q.   OKAY.  LET'S GET A COUPLE THINGS OUT OF THE WAY THAT I

19   THINK YOU ACTUALLY AGREE ON WITH DR. MOWRY.

20   A.   OKAY.

21   Q.   LET'S START WITH CODE VERSIONS AND SUBVERSIONS AND THAT

22   SORT OF THING.

23   A.   SURE.

24   Q.   COULD WE PUT UP PDX 188.3.

25   A.   YES.

1     Q.   YOU WERE HERE FOR PROFESSOR MOWRY'S TESTIMONY?

2     A.   YES.

3     Q.   YOU READ HIS REPORT?

4     A.   YES.

5     Q.   AND IN HIS REPORT, HE USED CERTAIN PRODUCTS TO REPRESENT

6     OTHER ACCUSED PRODUCTS WHEN THEY WERE RUNNING THE SAME CODE

7     VERSION; RIGHT?

8     A.   I THINK THAT'S RIGHT.

9     Q.   OKAY.  AND ONE OF THE THINGS THAT HE AND YOU AGREE ON IS

10    THAT WHEN WE TALK ABOUT EACH OF THE VERSIONS OF THE BASIC

11    ANDROID FRAMEWORK, SAY, JELLY BEAN OR GINGERBREAD OR ICE CREAM

12    SANDWICH, THERE'S NO DIFFERENCES ACROSS SUBVERSIONS OF EACH OF

13    THOSE CODE BASES THAT ARE RELEVANT TO THE ANALYSIS OF WHETHER

14    CLAIM 9 IS INFRINGED; RIGHT?

15    A.   YOU'RE TALKING ABOUT LIKE THE, THE FIRST NUMBER DOT LOWER

16    NUMBER?

17    Q.   EXACTLY.

18    A.   THAT'S CORRECT.

19    Q.   NO DIFFERENCES THAT MATTER?

20    A.   WELL, I MEAN, THERE ARE DIFFERENCES, BUT WE AGREE THAT THE

21    DIFFERENCES AREN'T GERMANE.

22    Q.   OKAY.  AND YOU ALSO AGREE WITH PROFESSOR MOWRY THAT

23    THERE'S NO DIFFERENCES THAT MATTER IN THE CODE THAT'S RUNNING

24    ON THESE ACCUSED PRODUCTS DEPENDING ON WHICH CARRIER, AT&T OR

25    SPRINT, ET CETERA, IS THE ONE WHO GAVE THE PHONE TO THE

1    CUSTOMER?

2    A.   THAT'S RIGHT.

3    Q.   OKAY.  AND YOU ALSO AGREE WITH PROFESSOR MOWRY THAT THE

4    PHONES THAT HE CHOSE TO REPRESENT, FOR EXAMPLE, THE SAMSUNG

5    ADMIRE REPRESENTING ALL OF THE ACCUSED PHONES RUNNING

6    GINGERBREAD FOR THE MESSAGING APPLICATION, YOU AGREE THAT HE

7    PICKED REPRESENTATIVE PHONES THAT, IN FACT, WERE TRULY

8    REPRESENTATIVE OF THE REST OF THE ACCUSED PHONES FOR EACH OF

9    THESE APPLICATIONS, RIGHT?

10   A.   WELL, WE HAD SOME ISSUES CERTAINLY IN MY DEPOSITION

11   BECAUSE THERE ARE OTHER PRODUCTS THAT I GUESS ARE NOW NO LONGER

12   HERE.  BUT I THINK GIVEN WHERE WE ARE TODAY, THAT'S CORRECT.

13   Q.   FOR THE PRODUCTS THAT ARE CURRENTLY ACCUSED, HE'S CORRECT

14   ABOUT THE PRODUCTS THAT ARE THE REPRESENTATIVE NATURE OF THE

15   PHONES?

16   A.   YES, I HAVE NO ISSUE WITH THAT.

17   Q.   OKAY.  COULD WE PUT UP SDX 2578, MR. LEE.

18        THIS IS A SLIDE YOU JUST TALKED ABOUT WITH SAMSUNG'S

19   COUNSEL?

20   A.   YES.

21   Q.   ALL RIGHT.  ANOTHER THING YOU ACTUALLY AGREE ON WITH

22   PROFESSOR MOWRY IS ALL OF THE ELEMENTS OF CLAIM 1 AND CLAIM 9

23   THAT ARE NOT STRUCK OUT ON THIS SLIDE ARE, IN FACT, PRESENT IN

24   EACH OF THE ACCUSED DEVICES; CORRECT?

25   A.   CERTAINLY FOR CLAIM 1, THAT'S TRUE.

1          I DON'T BELIEVE THAT'S THE CASE FOR CLAIM 9.

2     Q.   YOU DON'T AGREE THAT EACH OF THE ACCUSED DEVICES THAT --

3     LET'S BREAK THIS DOWN INTO TWO THINGS.

4          YOU'RE SAYING THAT IT'S YOUR OPINION THAT EACH OF THE

5     ACCUSED DEVICES THAT IS ACCUSED OF INFRINGING IN THE MESSAGING

6     APPLICATION HAS A POP-UP MENU THAT SHOWS MULTIPLE ACTIONS.

7     A.   THE ISSUE ISN'T THE POP-UP MENU.  I AGREE THAT IT HAS A

8     POP-UP MENU.  THE ISSUE IS THE LINKED ACTIONS AND THAT GOES

9     BACK TO THE ACTION PROCESSOR LIMITATION, THE IDEA BEING THAT

10    THERE'S JUST ONE ACTION THAT'S LINKED, THE START ACTIVITY.

11    Q.   OKAY.

12    A.   BUT I AGREE IT HAS A POP-UP MENU.

13    Q.   ALL RIGHT.  SO THE ONLY REAL DISPUTES HERE ARE YOUR

14    OPINION THAT YOU THINK THAT THE -- YOU THINK THAT THE ANALYZER

15    SERVER LIMITATION ISN'T MET AND YOU DON'T THINK THAT THERE

16    IS -- THE START ACTIVITY MEETS THE LINKING ACTIONS TO

17    STRUCTURES?

18    A.   START ACTIVITY -- THE LINKING ACTIONS IS THE PROCESS OF

19    DOING THE LINKING.

20         WHAT I'M SAYING IS IT DOESN'T MEET THE CONSTRUCTION OF

21    ACTION AS USED IN ACTION PROCESSOR, WHICH THEN ALSO CARRIES

22    INTO CLAIM 9.

23         I DON'T THINK I'M TALKING ABOUT THE PROCESS OF DOING THE

24    LINKING.

25    Q.   OKAY.  BUT IT'S REALLY -- YOU'RE JUST POINTING OUT YOU

```
 1    THINK THE SAME ISSUE YOU POINTED OUT FOR ACTION PROCESSOR YOU

 2    BELIEVE ALSO IS SOMEHOW PART OF CLAIM 9?

 3    A.   YES.

 4    Q.   OKAY.  NOW, YOU DO AGREE THAT THE ACCUSED PRODUCTS FOR THE

 5    '647 PATENT ALL DETECT STRUCTURES IN DATA; RIGHT?

 6    A.   EVENTUALLY, YES.

 7    Q.   AND YOU AGREE THAT THE BROWSER APPLICATION IN THE JELLY

 8    BEAN VERSIONS OF THE CODE THAT RUN ON THE ACCUSED PRODUCTS USES

 9    THE CONTENT DETECTOR CLASS LIBRARY TO IDENTIFY ITEMS AND TEXT

10    ON THESE PRODUCTS; RIGHT?

11    A.   YES.

12    Q.   AND YOU AGREE THAT THE MESSAGING APPLICATION USES THE

13    LINKIFY CLASS LIBRARY TO DETECT ITEMS AND TEXT, ITEMS SUCH AS

14    PHONE NUMBERS AND E-MAIL ADDRESSES?

15    A.   YES, THAT'S THE LIBRARY IT USES.

16    Q.   OKAY.  AND YOU AGREE THAT THOSE LIBRARIES, CACHE BUILDER,

17    CONTENT DETECTOR, AND LINKIFY CAN BE USED BY APPLICATIONS OTHER

18    THAN BROWSING?

19    A.   I DON'T BELIEVE I USED THAT.

20    Q.   OKAY.  THANK YOU.  LET'S GO BACK AND PICK THAT UP.

21         YOU AGREE THAT IN THE GINGERBREAD AND ICE CREAM VERSIONS

22    OF ANDROID, THE BROWSER APPLICATION USES THE CACHE BUILDER

23    LIBRARY CODE TO IDENTIFY STRUCTURES AND TEXTS; RIGHT?

24    A.   YES.

25    Q.   AND ALL THREE OF THESE LINKS, CACHE BUILDER, CONTENT
```

1    DETECTOR, AND LINKIFY CAN BE USED IN THE CODE RUNNING ON THE

2    SAMSUNG ACCUSED PRODUCTS BY APPLICATIONS OTHER THAN BROWSER AND

3    MESSAGING RIGHT?

4    A.    IN PRINCIPLE THEY CAN.

5    Q.    OKAY.  YOU GAVE SOME TESTIMONY ABOUT WHAT YOU SAID WERE

6    OTHER WAYS THAT "THIS" COULD BE DONE, "THIS" MEANING LETTING A

7    USER GET AN ELECTRONIC DOCUMENT ON A SMARTPHONE AND HAVE THE

8    PHONE IDENTIFY STRUCTURES SUCH AS E-MAIL ADDRESSES, PHONE

9    NUMBERS, ET CETERA, IN THE DOCUMENT AND ENABLE THE USER TO

10   SELECT THEM AND PERFORM AN ACTION; RIGHT?

11   A.    THAT WAS REALLY A LONG QUESTION.

12        I THINK WHAT I SAID WAS YOU CAN DO ALL OF THAT WITHOUT,

13   FOR EXAMPLE, USING AN ANALYZER SERVER OR AN ACTION PROCESSOR.

14   Q.    OKAY.  SO YOU THINK THERE ARE DIFFERENT WAYS TO DO THAT

15   THING?

16   A.    "THAT THING" BEING DETECTING STRUCTURES AND LINKING

17   ACTION, YES.

18   Q.    OKAY.  AND YOU SAID THOSE OTHER WAYS WOULDN'T HAVE BEEN A

19   BIG DEAL TO CHANGE THE CODE TO DO; RIGHT?

20   A.    NO.  I THINK YOU'RE CONFUSING TWO THINGS.  I THINK THE BIG

21   DEAL, ALLEGED BIG DEAL WAS WITH REGARD TO THE POP-UP, JUST

22   GETTING RID OF THE POP-UP.

23   Q.    OKAY.  SO YOUR OPINION THAT IT WOULDN'T HAVE BEEN A BIG

24   DEAL TO CHANGE THESE THINGS IS LIMITED TO THE POP-UP MENU?

25   A.    I'M JUST TELLING YOU WHAT I TESTIFIED TO.  THE OTHER

```
1     THINGS CAN BE CHANGED.  THEY WOULD BE MORE COMPLEX TO CHANGE.

2     Q.   OKAY.  NOW, IF WE COULD PUT THE CLAIM BACK UP, MR. LEE.

3          YOU TESTIFIED WITH RESPECT TO THIS POP-UP MENU ALTERNATIVE

4     THAT ALL YOU'D HAVE TO DO TO NOT PRACTICE THE PATENT WOULD BE

5     TO ELIMINATE THE POP-UP MENU OF CLAIM 9; RIGHT?

6     A.   CORRECT.

7     Q.   IF ALL SOMEONE DID TO CHANGE A DEVICE THAT I THINK FRINGED

8     CLAIM 9 WAS ELIMINATE THE POP-UP MENU OF CLAIM 9, THAT DEVICE

9     WOULD STILL INFRINGE CLAIM 1; RIGHT?

10    A.   I'M SAYING THAT IF CLAIM 9 IS THE FOCUS, I'M JUST SAYING

11    THE EASIEST WAY TO END THE DISCUSSION IS TO GET RID OF POP-UP.

12         IF THEN SOMEONE WANTED TO ALLEGE CLAIM 1 WAS INFRINGED,

13    THERE'S OTHER THINGS YOU WOULD DO.

14    Q.   ALL RIGHT.  LET ME ASK MY QUESTION AGAIN BECAUSE I THINK

15    MAYBE YOU DIDN'T HEAR IT RIGHT.

16         IF YOU HAD A DEVICE THAT INFRINGED CLAIM 9 AND THE ONLY

17    THING YOU CHANGED WAS TO TAKE OUT THE POP-UP MENU, THAT DEVICE

18    WOULD STILL INFRINGE CLAIM 1; RIGHT?

19    A.   IF IT WAS FOUND THAT IT INFRINGED CLAIM 9 AND YOU JUST

20    REPLACED THE POP-UP MENU, THEN IT WOULD STILL -- ARE YOU OKAY?

21         THEN IT WOULD STILL HAVE THE OTHER ELEMENTS OF CLAIM 1.

22    Q.   OKAY.

23         YOUR HONOR, MAY I JUST GET A COUGH DROP?

24         THE COURT:  YES, GO AHEAD.

25         (PAUSE IN PROCEEDINGS.)
```

1    BY MS. KREVANS:

2    Q.   OKAY.  LET'S TURN TO THE TESTIMONY YOU GAVE ON VALIDITY.

3    LET'S GET A COUPLE THINGS OUT OF THE WAY FIRST.

4         YOU TESTIFIED WHEN YOUR LAWYER WAS ASKING YOU ABOUT YOUR

5    BACKGROUND, THAT YOU'RE A NAMED INVENTOR ON A COUPLE OF PATENTS

6    IN THE UNITED STATES; RIGHT?

7    A.   HE'S NOT MY LAWYER, BUT, YES, I DID TESTIFY TO THAT.

8    Q.   YOU'RE RIGHT.  SAMSUNG'S LAWYER ASKED YOU THOSE QUESTIONS?

9    A.   CORRECT.

10   Q.   YOU TOLD HIM YOU'RE A NAMED INVENTOR ON TWO PATENTS;

11   RIGHT?

12   A.   YES.

13   Q.   AND YOU THINK THAT THE PATENT OFFICE DID ITS JOB PROPERLY

14   WHEN IT DECIDED TO ISSUE THOSE PATENTS TO YOU AS AN INVENTOR;

15   RIGHT?

16   A.   I -- THAT'S MY ASSUMPTION.

17   Q.   YOU THINK YOUR PATENTS ARE VALID?

18   A.   AS FAR AS I KNOW, THAT'S RIGHT.

19   Q.   OKAY.  ANOTHER BACKGROUND QUESTION ABOUT VALIDITY.

20        YOU'RE NOT RELYING, FOR THE VALIDITY OPINIONS THAT YOU'RE

21   GIVING TO THIS JURY, ON ANY WORK DONE BY GOOGLE WITH RESPECT TO

22   ANDROID THAT YOU SAY IS PRIOR ART TO THESE PATENTS; RIGHT?

23   A.   I'M SORRY.  I DIDN'T UNDERSTAND -- I'M NOT RELYING ON --

24   Q.   YOU'RE NOT RELYING, FOR YOUR VALIDITY OPINIONS, ON ANY

25   WORK DONE BY GOOGLE IN THE DEVELOPMENT OF ANDROID; RIGHT?

1    A.   THANK YOU.  YES, THAT'S CORRECT.

2    Q.   EMBEDDED BUTTONS.  YOU GAVE A LITTLE BIT OF TESTIMONY

3    ABOUT THAT AT THE BEGINNING OF YOUR PRESENTATION.

4         COULD YOU -- LET'S LOOK AT EXHIBIT 338, WHICH IS THE PAPER

5    ABOUT EMBEDDED BUTTONS.  COULD WE SEE THAT, MR. LEE?

6         IS THIS THE PAPER THAT WAS WRITTEN BY ERIC BIER, THE

7    INVENTOR OF THE EMBEDDED BUTTONS PROTOTYPE SYSTEM?

8    A.   CORRECT, THIS IS THE SECOND PAPER.

9    Q.   OKAY.  IF YOU LOOK ON PAGE 2 OF THIS DOCUMENT, IT SAYS, IF

10   YOU LOOK AT THE TOP PARAGRAPH ON THE PAGE, BLOW IT UP, EMBEDDED

11   BUTTONS WAS A LIBRARY OF ROUTINES AND THE RUNTIME KERNEL WHICH

12   SUPPORTS THE ADDITION OF BUTTON BEHAVIORS TO A POTENTIALLY

13   LARGE VARIETY OF DOCUMENT EDITORS; RIGHT?

14   A.   I SEE THAT.

15   Q.   AND A LITTLE FARTHER DOWN THIS SAME PAGE, MR. BIER'S PAPER

16   SAYS THAT EMBEDDED BUTTONS WAS FOR USE WITH APPLICATION

17   DESIGNERS IN THE CEDAR PROGRAMMING ENVIRONMENT.

18        DO YOU SEE THAT?  IT'S JUST RIGHT BELOW THAT ON THE PAGE?

19   A.   I HAVE IT.

20   Q.   DO YOU SEE THAT?

21   A.   I SEE THAT.

22   Q.   CAN YOU HIGHLIGHT THAT FIRST SENTENCE OF THE NEXT

23   PARAGRAPH FOR US, MR. LEE?

24        SO THIS WAS FOR PEOPLE WHO WERE WORKING IN THE CEDAR

25   PROGRAMMING ENVIRONMENT; RIGHT?

1    A.    YEP.

2    Q.    AND THEN IF YOU TURN TO PAGE 4 OF THIS DOCUMENT IT SAYS

3    EMBEDDED BUTTONS PROVIDES A SCRIPTING LANGUAGE TO REPRESENT THE

4    BEHAVIOR OF A BUTTON.

5          RIGHT?

6    A.    THAT'S TRUE.

7    Q.    OKAY.  A SCRIPTING LANGUAGE IS A PROGRAMMING LANGUAGE;

8    RIGHT?

9    A.    YES.

10   Q.    EMBEDDED BUTTONS -- LET ME BACK UP FOR A SECOND.

11         EMBEDDED BUTTONS WAS A PROTOTYPE; CORRECT?

12   A.    CORRECT.

13   Q.    NOT SOMETHING THAT WAS EVER SOLD AS FAR AS YOU KNOW?

14   A.    IT WAS A RESEARCH PROJECT.

15   Q.    AND IT WAS A RESEARCH PROJECT THAT WAS DIRECTED TOWARDS

16   PROVIDING TOOLS THAT PROGRAMMERS COULD USE TO DO THINGS USING,

17   FOR EXAMPLE, PROGRAMMING LANGUAGE?

18   A.    I THINK IT WAS PROVIDING TOOLS THAT THE PROGRAMMER COULD

19   USE TO DO EXACTLY WHAT THE '647 PATENT DID.

20   Q.    NOW, IN CONNECTION WITH THE DESCRIPTION YOU GAVE THE JURY

21   OF EMBEDDED BUTTONS, YOU SHOWED THEM A VIDEO FROM A

22   DEMONSTRATION THAT MR. BIER DID OF HIS PROTOTYPE; RIGHT?

23   A.    CORRECT.

24   Q.    AND YOU SAID ABOUT THIS VIDEO THAT IT SHOWED THAT THE

25   SYSTEM AUTOMATICALLY DETECTED PHONE NUMBERS AND THEN LINKED

1      ACTIONS TO THEM?

2      A.   CORRECT.

3      Q.   THAT'S THE TESTIMONY YOU GAVE THIS MORNING; RIGHT?

4      A.   YES.

5      Q.   NOW, LET'S LOOK AT THE VIDEO AGAIN.

6           THIS IS DX 341, YOUR HONOR.

7           COULD WE RUN THIS VIDEO AGAIN, PLEASE, MR. LEE.

8           (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

9              MS. KREVANS:  COULD YOU TAKE US BACK TO THE START OF

10     THE VIDEO, MR. LEE, AND JUST SHOW US THE SCREEN WE SEE AT THE

11     START.

12     Q.   NOW, IN THIS VIDEO, IN THIS DEMONSTRATION, AT THE POINT

13     WHERE YOUR EXCERPT IS STARTED, WHERE WE SEE ON THE SCREEN AT

14     THE TOP, DO YOU SEE THE WORD TARGET UP THERE?

15     A.   I DO.

16     Q.   AT THE VERY TOP?

17     A.   YES, I CAN.

18     Q.   AND NEXT TO IT IS WRITTEN XXX-XXXX?

19     A.   THAT'S A HASH.

20     Q.   THOSE ARE HASHES.  ALL RIGHT.

21     A.   RESOLUTION.

22     Q.   IT'S A LITTLE BLURRY.

23     A.   IT'S A LITTLE BLURRY.

24     Q.   IT'S OLD.  SO FOUR HASH MARKS, OR POUND SIGNS, DASH THREE

25     MORE?

1      A.   NO.  THREE THEN FOUR.

2      Q.   ALL RIGHT.  AND AT THIS POINT IN THIS DEMONSTRATION, THE

3      USER WHO'S USING THIS PROTOTYPE WAS MR. BIER ACTUALLY, HE HAS

4      ALREADY DECIDED WHAT TYPE OF INFORMATION THEY WANT TO SEARCH

5      FOR IN THE DATA; RIGHT?

6      A.   CORRECT, THEY'RE BUILDING A PHONE CONTACT BOOK APP.

7      Q.   SO THIS IS A DEMONSTRATION OF SOMEONE BUILDING CODE THAT'S

8      GOING TO DETECT PHONE NUMBERS; RIGHT?

9      A.   RIGHT.  SO THESE ARE FOR THE PROGRAMMERS WHO ARE GOING TO

10     BUILD THINGS LIKE THE '647.

11     Q.   OKAY.  AT THIS POINT THE PROGRAMMER WHO'S BUILDING THIS

12     HAS ALREADY DECIDED, "I WANT TO PROGRAM THIS TO LOOK FOR A

13     PHONE NUMBER," AND TO DO THAT, NEXT TO THE WORD TARGET, SOMEONE

14     HAS ALREADY TYPED IN THREE HASH MARKS DASH FOUR HASH MARKS,

15     RIGHT?

16     A.   RIGHT.  THEY'RE SPECIFYING THE PATTERN THAT THEY'RE GOING

17     TO SEARCH FOR.

18     Q.   OKAY.  THAT'S SOMETHING THE USER HAD TO DO, THEY WANT TO

19     DECIDE, I WANT TO LOOK FOR PHONE NUMBERS AND IN MY HEAD, I KNOW

20     THAT A PHONE NUMBER SHOULD LOOK LIKE THREE HASH MARKS AND FOUR

21     HASH MARKS AND I'M GOING TO TYPE THAT IN; RIGHT?

22     A.   NO, I THINK THAT'S A MISCHARACTERIZATION OF WHAT'S HERE.

23     THIS IS FOR DEVELOPERS TO BUILD APPLICATIONS.  SO THE

24     PROGRAMMER IS ABSOLUTELY SPECIFYING THE PATTERN, JUST LIKE ALL

25     PROGRAMMERS IN GOOGLE SPECIFY PATTERNS FOR KNOWN NUMBERS IN

1      ANDROID.  THIS IS NOT THE END USER.

2      Q.   IN THIS DEMONSTRATION OF WHAT COULD BE USED FOR THIS, WITH

3      THIS SYSTEM, THE PROGRAMMER HAS JUST PUT IN THIS PATTERN OF

4      THREE HARSH MARKS AND A DASH AND FOUR HASH MARKS; RIGHT?

5      A.   YES, ABSOLUTELY, THE PROGRAMMER DID THAT.

6      Q.   IN FACT, THAT'S WHAT MR. BIER SAID IN HIS DEPOSITION WHEN

7      HE TALKED ABOUT WHAT WAS HAPPENING IN THIS VIDEO; RIGHT?

8      A.   I BELIEVE THAT'S CORRECT.

9      Q.   OKAY.  AND, IN FACT, WHAT HE SAID WAS THE USER MANUALLY

10     TYPED IN, AND HE'S ACTUALLY SAID XXX HYPHEN AND THEN FOUR MORE

11     X'S CORRECT?

12     A.   I'M SORRY.

13     Q.   THAT'S WHAT HE SAID IN HIS DEPO; RIGHT?

14     A.   OKAY.

15     Q.   BUT LET'S LOOK AT MR. BIER'S TESTIMONY.

16          COULD WE SEE PAGE 167 OF MR. BIER'S DEPOSITION, PLEASE?

17     AND IF WE COULD GO TO LINE 2.  I'M SORRY, 176, LINE 21.

18          "QUESTION:  AND THE -- TO INITIATE THE PROCESS OF GOING

19     THROUGH THE ADDRESS BOOK FOR -- TO SEARCH FOR THE STRINGS, THAT

20     WAS SOMETHING THAT WAS INITIATED BY A USER REQUESTING THAT

21     ACTIVITY TO OCCUR; CORRECT?"

22          ANSWER BY MR. BIER:  "THAT IS WHAT WE SAW IN ALL THE

23     VIDEOS, YES.

24          "QUESTION:  IN THE VIDEO, IF YOU RECALL, AND WE CAN PULL

25     IT BACK UP IF WE NEED TO, THERE WAS A -- AT THE TOP OF THE

1     TIOGA EDITOR, THERE WAS A PLACE FOR THE USER TO PUT IN A TEXT

2     STRING TO BE SEARCHED.

3          "DO YOU RECALL THAT?"

4          ANSWER BY MR. BIER:  "THERE WAS A SEPARATE TOOL THAT WE

5     SAW CALLED THE EDIT TOOL WHERE ONE COULD SPECIFY THE SEARCH

6     PATTERNS AND REPLACEMENT PATTERNS.

7          "QUESTION:  AND SO TO -- FOR THE EXAMPLE OF FIGURE 2 IN

8     THE ARTICLE, AND THE ON LINE ADDRESS BOOK EXAMPLE AND WHAT WAS

9     SHOWN IN THE VIDEO, THE USER MANUAL TYPED IN XXX DASH AND THEN

10    FOUR MORE X'S; CORRECT?"

11         ANSWER BY MR. BIER, "THAT IS CORRECT."

12         THAT IS WHAT MR. BIER TESTIFIED ABOUT THIS VIDEO; CORRECT?

13    A.   THAT'S ABSOLUTELY CORRECT.

14    Q.   NOW, LET'S PUT UP THE '647 PATENT, THAT'S JX 1, AND LET'S

15    LOOK AT COLUMN 1 OF THE PATENT AND WHAT THE INVENTORS TOLD THE

16    PATENT OFFICE ABOUT THE BACKGROUND OF THE INVENTION AND SYSTEMS

17    THAT EXISTED AT THE TIME OF THEIR APPLICATION.

18         COULD WE SEE LINES 38 TO 42, MR. LEE?

19         AT LINES 38 TO 42 OF THE BACKGROUND OF THE INVENTION PART

20    OF THEIR APPLICATION, THE INVENTORS TOLD THE PATENT OFFICE,

21    THAT "CONVENTIONAL SYSTEMS THAT IDENTIFY STRUCTURES IN COMPUTER

22    DATA DO NOT ENABLE AUTOMATIC PERFORMANCE OF AN ACTION ON AN

23    IDENTIFIED STRUCTURE."

24         DO YOU SEE THAT?

25    A.   I DO.

```
 1        Q.   AND THEN IT SAYS, "FOR EXAMPLE, IF A LONG E-MAIL MESSAGE

 2        IS SENT TO A USER, THE USER MAY IMPLEMENT A PATTERN ANALYSIS

 3        UNIT TO SEARCH FOR PARTICULAR STRUCTURES, SUCH AS TELEPHONE

 4        NUMBERS."

 5             SO THE INVENTORS TOLD THE PATENT OFFICE, WHEN THEY FILED

 6        THEIR APPLICATION, THAT THERE WERE ALREADY SYSTEMS THAT -- IN

 7        WHICH A USER COULD IMPLEMENT A PATTERN ANALYSIS UNIT TO SEARCH

 8        FOR PARTICULAR STRUCTURES, SUCH AS A TELEPHONE NUMBER; RIGHT?

 9        A.   SURE, BUT THIS IS NOT EMBEDDED BUTTONS.

10        Q.   THEY DIDN'T SAY THE NAME "EMBEDDED BUTTONS," BUT, IN FACT,

11        THEY TOLD THE PTO AND THE PTO KNEW WHEN THEY ISSUED THE PATENT

12        THAT THERE ALREADY EXISTED SYSTEMS THAT -- WHERE THE USER COULD

13        IMPLEMENT A PATTERN ANALYSIS TO SEARCH FOR PARTICULAR

14        STRUCTURES, SUCH AS A TELEPHONE NUMBER; RIGHT?

15        A.   THAT'S RIGHT, AND THE IMPORTANT PART IS THE NEXT SENTENCE.

16        Q.   THE NEXT SENTENCE SAYS, "UPON IDENTIFICATION OF A

17        STRUCTURE, THE USER MAY WANT TO PERFORM AN ACTION ON THE

18        STRUCTURE, SUCH AS MOVING THE NUMBER TO AN ELECTRONIC TELEPHONE

19        BOOK."

20             THAT'S ACTUALLY NOT SOMETHING THAT WE SAW IN THE EMBEDDED

21        BUTTONS VIDEO; RIGHT?  WE SAW DIAL IN THE VIDEO, RIGHT.

22        A.   SORRY.  IT'S THE SENTENCE AFTER THAT THAT'S THE IMPORTANT

23        SENTENCE.

24        Q.   OKAY.  WHY DON'T YOU BLOW UP A LITTLE BIT MORE, MR. LEE,

25        SO WE CAN SEE MORE.  KEEP GOING DOWN.
```

```
 1              I THINK WE NEED TO GO ACTUALLY TO THE NEXT PARAGRAPH,

 2       MR. LEE.

 3              JUST IN THE NEXT PARAGRAPH DOWN BELOW HERE, THE INVENTORS

 4       TOLD THE PTO, "ONE TYPE OF SYSTEM THAT HAS ADDRESSED THIS

 5       PROBLEM INVOLVES DETECTING TELEPHONE NUMBERS.  SUCH SYSTEMS

 6       ENABLE A USER TO SELECT A TELEPHONE NUMBER AND REQUEST THAT THE

 7       APPLICATION AUTOMATICALLY DIAL THE NUMBER."

 8              THAT IS ALSO SOMETHING THAT THE INVENTORS TOLD THE PTO

 9       EXISTED AT THE TIME THEY FILED THEIR APPLICATION; RIGHT?

10       A.   YES.

11       Q.   LET'S LOOK AT THE SIDEKICK SYSTEM.  YOU TALKED ABOUT THAT

12       AS WELL.

13              SIDEKICK WAS DIFFERENT FROM EMBEDDED BUTTONS IN A COUPLE

14       OF WAYS; RIGHT?  FIRST OF ALL, IT WAS AN ACTUAL PRODUCT; RIGHT?

15       A.   CORRECT.

16       Q.   AND SECOND, RATHER THAN HAVING A USER HAVE TO PROGRAM IN

17       THE PATTERN THAT THEY WANTED, LIKE WE SAW IN THE VIDEO FOR

18       EMBEDDED BUTTONS, SIDEKICK WAS A PRODUCT THAT WAS ALREADY

19       PRE-CONFIGURED TO FIND PHONE NUMBERS AS IT WAS SOLD, RIGHT?

20       A.   AGAIN, I THINK YOU'RE CONFLATING THE NOTION OF USER.

21       USERS AND EMBEDDED BUTTONS OR OTHER RESEARCHERS WHO ARE GOING

22       TO BE BUILDING COMPUTER SYSTEMS FOR OTHER PEOPLE TO USE.

23       SIDEKICK, ABSOLUTELY CORRECT, COMMERCIAL PRODUCT.  SO THE

24       NOTION OF A USER THERE IS THE END USER, THE PERSON WHO

25       PURCHASES THE PRODUCT.
```

1    Q.   OKAY.  SO SIDEKICK WAS PRE-CONFIGURED TO FIND PHONE

2    NUMBERS FOR USERS?

3    A.   CORRECT.

4    Q.   IN ELECTRONIC DOCUMENTS?

5    A.   CORRECT.

6    Q.   AND THE ACTION THAT IT COULD PERFORM WITH A PHONE NUMBER

7    THAT IT FOUND WAS TO DIAL THE PHONE IF THE COMPUTER WAS HOOKED

8    UP TO THE PHONE WITH THE RIGHT EQUIPMENT TO ACTUALLY MAKE THE

9    PHONE DIAL; RIGHT?

10   A.   CORRECT.

11   Q.   AND WE ALREADY SAW THAT THE PATENT AND TRADEMARK OFFICE

12   KNEW THAT SYSTEMS THAT COULD DO THAT EXISTED AT THE TIME OF THE

13   APPLICATION BECAUSE THE INVENTORS TOLD THEM SO, RIGHT?

14   A.   THAT'S MISLEADING.  IF WE CAN PUT THE TEXT FROM COLUMN 1

15   BACK ON THE SCREEN, I'D BE HAPPY TO TELL YOU WHY THAT'S

16   MISLEADING AND THAT'S NOT CORRECT.

17   Q.   LET'S PUT BACK UP COLUMN 1 AT LINES 51 AND ON, THAT

18   PARAGRAPH.

19        THE INVENTORS TOLD THE PATENT OFFICE, "ONE TYPE OF SYSTEM

20   THAT HAS ADDRESSED THIS PROBLEM INVOLVES DETECTING TELEPHONE

21   NUMBERS.  SUCH SYSTEMS ENABLE A USER TO SELECT A TELEPHONE

22   NUMBER AND REQUEST THAT THE APPLICATION AUTOMATICALLY DIAL THE

23   NUMBER."

24        THAT'S WHAT THE INVENTORS TOLD THE PATENT AND TRADEMARK

25   OFFICE; RIGHT?

1     A.    THAT'S TWO SENTENCES.  THEY ALSO TOLD THEM THE FOLLOWING

2     PARAGRAPH, WHICH I'D LIKE TO INDICATE SAYS "THESE SYSTEMS DO

3     NOT RECOGNIZE THE SELECTED DATA AS A TELEPHONE NUMBER."

4           SIDEKICK -- SO THIS IS TALKING ABOUT, YOU KNOW, SELECTING

5     WHERE THE USER HIGHLIGHTS AND THEN IT DIALS THAT.  IT SAYS

6     THOSE DO NOT RECOGNIZE THE DATA AS A TELEPHONE NUMBER.

7     SIDEKICK RECOGNIZED THE DATA AS A TELEPHONE NUMBER BECAUSE IT

8     HAS PATTERNS.

9           AND THE WAY YOU CAN SEE THIS IS IN FURTHER CHARACTERIZING

10    THE ART, WE GO DOWN A COUPLE MORE SENTENCES -- I CAN'T FIND IT

11    HERE.  OH, IT'S JUST THE VERY NEXT SENTENCE, "HOWEVER, THESE

12    SYSTEMS DO NOT RECOGNIZE THE SELECTED DATA AS A TELEPHONE

13    NUMBER, AND THEY GENERALLY PRODUCE AN ERROR MESSAGE IF THE USER

14    SELECTS INVALID CHARACTERS AS A PHONE NUMBER."

15          SO THE USER IS SELECTING, LIKE, YOU KNOW, CUTTING AND

16    PASTE SELECTING.

17          SIDEKICK DETECTS THE PHONE NUMBERS, HAS PHONE NUMBERS, AND

18    AS SUCH THE USER CANNOT SELECT AN INVALID CHARACTER AND IT WILL

19    NOT GENERATE AN ERROR MESSAGE.  SO SIDEKICK IS THE NOT THE

20    SYSTEM THAT THEY WERE DESCRIBING TO THE PTO.

21          THE COURT:  ALL RIGHT.  I'D LIKE TO TAKE OUR BREAK

22    NOW.  IT'S 10:31.  I'M SORRY TO INTERRUPT THE EXAMINATION.

23          LET'S TAKE A 15 MINUTE BREAK.  PLEASE DON'T RESEARCH OR

24    DISCUSS THE CASE.

25          THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

```
 1              (JURY OUT AT 10:32 A.M.)

 2                  THE COURT:  YOU MAY STEP DOWN.

 3                  THE WITNESS:  THANK YOU.

 4                  THE COURT:  LET'S TAKE OUR BREAK NOW.  THANK YOU.

 5              (RECESS FROM 10:32 A.M. UNTIL 10:46 A.M.)

 6              (JURY IN AT 10:46 A.M.)

 7                  THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

 8          THE TIME IS NOW 10:47.

 9          GO AHEAD, PLEASE.

10      BY MS. KREVANS:

11      Q.  NOW, BEFORE THE BREAK, PROFESSOR JEFFAY, WE WERE TALKING

12      ABOUT THE SIDEKICK SYSTEM.

13      A.  THAT'S CORRECT.

14      Q.  AND YOU'VE REVIEWED THE USER MANUAL FOR THE SIDEKICK

15      SYSTEM, AS WELL AS DOING A, A DEMONSTRATION FOR YOURSELF OF

16      WHAT THE CODE ACTUALLY DID ON THE SCREEN; RIGHT?

17      A.  CORRECT, AND LOOKING AT THE SOURCE CODE ITSELF, YES.

18      Q.  OKAY.  COULD YOU PUT THE MIKE A LITTLE BIT CLOSER TO YOU.

19      A.  I'LL SCOOT UP.

20      Q.  THAT MIKE HAS TO BE VERY CLOSE.

21      A.  I GUESS.

22      Q.  GREAT.

23          NOW, YOU SHOWED THE JURY SOME SLIDES THAT WERE FROM A

24      DEMONSTRATION YOU CREATED FOR YOURSELF OF THE SIDEKICK WHERE

25      YOU RAN THE CODE ON AN EMULATOR TO SEE WHAT THE SCREEN WOULD
```

1    LOOK LIKE WHEN YOU'RE RUNNING SIDEKICK; CORRECT?

2    A.   CORRECT.

3    Q.   AND YOU ACTUALLY MADE THAT DEMONSTRATION LAST YEAR AS PART

4    OF THE WORK THAT YOU WERE RETAINED BY SAMSUNG TO DO IN THIS

5    CASE; CORRECT?

6    A.   CORRECT.

7    Q.   LET'S LOOK WHY THE YOUR SLIDE 98.1.

8         THE THING ON THE RIGHT IS THE SCREEN SHOT FROM YOUR

9    EMULATION OF WHAT SIDEKICK CODE COULD DO?

10   A.   YEAH, THERE'S TWO SCREEN SHOTS.

11   Q.   OKAY.  LET'S -- SO WE CAN SEE IT BETTER, THAT MAKES THAT A

12   LITTLE BIT BETTER.  COULD WE SEE 98.2, PLEASE, MR. LEE.

13        SO WE'RE LOOKING NOW AT ONE OF YOUR SCREEN SHOTS FROM YOUR

14   EMULATION YOU DID LAST YEAR; RIGHT?

15   A.   CORRECT.

16   Q.   AND THIS IS AN E-MAIL THAT YOU TYPED IN WHICH YOU PUT

17   THREE PHONE NUMBERS IN THE SAME E-MAIL; RIGHT?

18   A.   THAT'S CORRECT.

19   Q.   SO YOU COULD DEMONSTRATE WHAT THE SIDEKICK SYSTEM COULD

20   DO?

21   A.   RIGHT, SO I COULD DEMONSTRATE DIFFERENT TYPES -- SO I

22   COULD DEMONSTRATE IT COULD DETECT DIFFERENT TYPES OF

23   STRUCTURES.

24   Q.   SO THE STRUCTURE WE'RE SEEING IT DETECTING HERE IS A PHONE

25   NUMBER; RIGHT?

1     A.   IT'S MORE THAN THAT.  I MEAN, THESE ARE ALL PHONE NUMBERS

2     ON HERE, BUT THE IMPORTANT THING IS THAT WHAT WE SEE AS PHONE

3     NUMBERS, THE SOFTWARE ONLY SEES AS PATTERNS.

4          SO THE INTERNATIONAL PHONE NUMBER THAT'S AT THE BOTTOM

5     WHERE IT SAYS OUR SWEDEN OFFICE IS, I MEAN, THAT'S A PHONE

6     NUMBER, BUT YOU NEED A DIFFERENT PATTERN TO RECOGNIZE THAT

7     PHONE NUMBER, AND THE PATENT DESCRIBES A STRUCTURE THAT IS USED

8     AS A PATTERN.  SO EVEN THOUGH TO HUMANS, THEY'RE PHONE NUMBERS,

9     TO SOFTWARE, THOSE ARE STRUCTURES.

10    Q.   ALL THREE ARE PHONE NUMBERS; RIGHT, DR. JEFFAY?

11    A.   AS HUMANS WE SEE THEM AS PHONE NUMBERS.  THE SOFTWARE SEES

12    THEM AS THREE SEPARATE STRUCTURES.

13    Q.   OKAY.  AND LET'S LOOK AT THE SIDEKICK MANUAL FOR A MOMENT

14    TO SEE HOW THIS PULLEY WORK AND HAD WHAT THEY TOLD THE USERS

15    THEY COULD DO.  IF WE LOOK AT THIS IS EXHIBIT 330, AND IF WE

16    LOOK AT PAGE 165, MR. LEE.  AND THERE'S A SECTION HERE CALLED

17    DIALER; RIGHT?

18    A.   YES.

19    Q.   AND THIS IS THE FEATURE OF SIDEKICK THAT COULD DETECT

20    PHONE NUMBERS AND THEN IF THE PERSON WANTED TO DIAL THAT PHONE

21    NUMBER, DIAL IT FOR THEM; RIGHT?

22    A.   CORRECT.

23    Q.   OKAY.  IF WE LOOK AT THE BOTTOM PARAGRAPH, IT SAYS WITH

24    SIDEKICK'S MAIN SELECTION WINDOW ON THE SCREEN, PRESS ALT D OR

25    D PLUS F5 IF YOU PREFER TO ACTIVATE THE DIALER."

1              THAT WOULD TURN ON THE SIDEKICK FUNCTION OF DIALLING;

2    RIGHT?

3    A.    CORRECT.

4    Q.    THE "THE FIRST PHONE NUMBER ON THE SCREEN IS POINTED OUT,

5    AND YOU CAN MAKE THE CALL BY PRESSING THE ENTER KEY."

6              THAT'S WHAT THE MANUAL SAID; RIGHT?

7    A.    THAT'S WHAT IT SAYS.

8    Q.    LET'S GO BACK TO YOUR SCREEN SHOT, 98.2, AND THIS IS WHAT

9    WOULD HAPPEN IF YOU HAD THIS TEXT AND YOU ACTIVATED THIS

10   FUNCTION OF SIDEKICK, AS THE MANUAL SAYS, THE SYSTEM IS GOING

11   TO POINT OUT THE FIRST PHONE NUMBER ON THE SCREEN; RIGHT?

12   A.    YES.

13   Q.    AND THAT'S WHAT YOU'VE SHOWN ON YOUR SCREEN SHOT?

14   A.    AND THAT'S EXACTLY WHAT IT DID.

15   Q.    OKAY.  NOW, LET'S SEE A LITTLE BIT MORE ABOUT WHAT THE

16   MANUAL SAYS ON PAGE 166.

17             COULD WE SEE THAT, MR. LEE.

18             THIRD PARAGRAPH DOWN, "IF YOU HAVE MORE THAN ONE NUMBER ON

19   THE SCREEN THAT LOOKS LIKE A PHONE NUMBER, THE FIRST ONE WILL

20   BE CHOSEN."

21             THAT'S WHAT WE SAW ON YOUR SCREEN SHOT; RIGHT?  YOU HAD

22   THREE PHONE NUMBERS AND SIDEKICK HAD HIGHLIGHTED THE FIRST ONE;

23   RIGHT?

24   A.    CORRECT.

25   Q.    BECAUSE THAT'S WHAT SIDEKICK WAS PROGRAMMED TO DO, ALWAYS

1    HIGHLIGHT THE FIRST ONE IF THERE'S MULTIPLE NUMBERS ON THE

2    SCREEN?

3    A.   CORRECT.

4    Q.   AND THEN WHAT THE MANUAL TELLS THE USER TO DO IS YOU CAN

5    THEN MOVE TO THE NEXT ONE BY PRESSING THE ARROW KEY; RIGHT?

6    A.   CORRECT.

7    Q.   AND IF YOU DIDN'T WANT TO DIAL THE NUMBER ON THE SCREEN AT

8    ALL, YOU WOULD DO SOMETHING DIFFERENT.  BUT IF YOU WANTED TO DO

9    THE SECOND ONE, YOU WOULD THEN PRESS THE ARROW KEY; RIGHT?

10   A.   CORRECT.

11   Q.   SO IF WE GO BACK TO YOUR SLIDE, THE SYSTEM SAW THAT THERE

12   WERE THREE PHONE NUMBERS IN THIS E-MAIL, IT PICKED THE FIRST

13   ONE BECAUSE IT'S ALWAYS GOING TO PICK THE FIRST ONE?

14   A.   CORRECT.

15   Q.   RIGHT.  IF YOU DON'T WANT THE FIRST ONE, YOU HIT THE ARROW

16   KEY TO GET TO THE SECOND ONE, AND IF WE WENT ON IN THIS DEMO,

17   IF WE HIT THE ARROW KEY AND USED THE THING, THE SECOND PHONE

18   NUMBER, THE ONE THAT STARTS WITH 6 IS GOING TO GET HIGHLIGHTED;

19   RIGHT?

20   A.   YES.

21   Q.   AND IF THE USER WANTED TO DIAL THAT PHONE NUMBER, THEY

22   WOULD HIT THE ENTER KEY?

23   A.   CORRECT.

24   Q.   IF THE USER WANTED THE THIRD ONE, THEY'D HAVE TO HIT THE

25   ARROW AGAIN, AND THEN THE SYSTEM WOULD SAY, OKAY, THEY REJECTED

1    THE FIRST ONE THAT I PICKED, I, THE SOFTWARE, THEY REJECTED THE

2    SECOND ONE THAT I, THE SOFTWARE, PICKED.  THEY WANT THE THIRD

3    ONE, AND THE SYSTEM WOULD HIGHLIGHT THE THIRD ONE?

4    A.    CORRECT.

5    Q.    AND IF THE PERSON WANTED TO DIAL THE THIRD ONE, THEY WOULD

6    THEN HIT THE ENTER KEY?

7    A.    YES.

8    Q.    AND IF INSTEAD OF AN E-MAIL THIS HAD BEEN, AS DISCUSSED IN

9    THE SIDEKICK MANUAL A PHONE LIST THAT HAD 20 NUMBERS ON IT,

10   SIDEKICK WOULD HAVE DONE THE SAME THING WE SAW HERE, RIGHT, IT

11   WOULD HAVE PICKED THE FIRST ONE FIRST?

12   A.    YES.

13   Q.    AND THE USER, IF THEY WANTED NUMBER 19, THEY WOULD HAVE TO

14   HIT THE SPACE BAR OR THE ENTER KEY 18 TIMES; RIGHT?

15   A.    YES.

16   Q.    BECAUSE THE USER IN SIDEKICK COULDN'T JUST SAY I WANT TO

17   SELECT THE 19TH NUMBER AND GO RIGHT THERE?

18   A.    YEAH.  THIS IS BEFORE WE USED MICE.  IT JUST DIDN'T HAVE A

19   MOUSE.  IT HAD A KEYBOARD.

20   Q.    SIDEKICK DIDN'T DO THAT, RIGHT?

21   A.    IT DIDN'T DO.

22   Q.    SIDEKICK DID NOT LET THE USER JUST SELECTIVELY PICK WHICH

23   NUMBER THEY WANTED; RIGHT?

24   A.    I DON'T KNOW WHAT YOU MEAN BY CORRECTING.  THEY CAN PICK

25   ANY NUMBER THAT THEY WANT.

1    Q.   BY REJECTING EACH NUMBER IN TURN AS THE SYSTEM --

2    A.   REJECTING IS YOUR TERM.  YOU JUST SIMPLY HIT THE NEXT KEY,

3    THE ARROW KEY UNTIL YOU GET THE NUMBER YOU WANT.

4    Q.   TWENTY NUMBERS YOU WANT, THE USER CAN'T JUST SAY I WANT

5    NUMBER 19 AND PICK IT, RIGHT, IN SIDEKICK?

6    A.   SURE THEY CAN.  THEY JUST -- I MEAN, YOU'RE SAYING YOU

7    CAN'T DO IT WITH ONE KEY PRESS.  THAT'S TRUE.

8    Q.   IT CAN'T --

9    A.   THEY CAN PICK THE NUMBER THEY WANT AND DIAL IT.

10   Q.   THEY CAN REJECT THE FIRST 19 ONES THE SYSTEM OFFERS THEM

11   TO GET TO THE ONE THEY WANT?

12   A.   SO REJECT IS YOUR WORD.  I THINK THE WAY PEOPLE WOULD VIEW

13   THIS IS I WANT THIS THING HERE, IT'S JUST, YOU'RE, LIKE,

14   USING -- YOU'RE LITERALLY USING THE ARROW KEYS ON THE KEYBOARD

15   AND YOU JUST GO TO THAT PHONE NUMBER.  YOU'RE NOT REJECTING

16   THEM.

17   Q.   NINETEEN TIMES?

18   A.   YES, 19 TIMES.

19          MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

20          THE COURT:  ALL RIGHT.  THE TIME IS NOW 10:54.

21      YOU READY?

22          MR. NELSON:  YES, YOUR HONOR.

23          THE COURT:  ALL RIGHT.  TIME IS 1054.  GO AHEAD,

24   PLEASE.

25          MR. NELSON:  THANK YOU, YOUR HONOR.

```
 1          SO CAN WE PUT CLAIM 1 CLAIM 9 UP THERE.  WE CAN USE THAT

 2   SLIDE THAT I WAS USING, MR. KOTARSKI.  I BELIEVE IT'S -- LET ME

 3   FIND IT IN THE OUTLINE, SDX 2541.

 4                        REDIRECT EXAMINATION

 5   BY MR. NELSON:

 6   Q.   SO YOU RECALL SOME QUESTIONS ABOUT CLAIM 1 AND CLAIM 9?

 7   A.   YES.

 8   Q.   SO --

 9   A.   YES.

10   Q.   LET'S JUST BE CLEAR HERE.  IS CLAIM 1 ASSERTED IN THIS

11   CASE?

12   A.   NO.

13   Q.   OKAY.  -- SO CLAIM 1 IS NOT ASSERTED, APPLE CHOSE TO

14   ASSERT CLAIM 9 IN THIS CASE; RIGHT?

15   A.   THAT'S MY UNDERSTANDING.

16   Q.   AND WITH RESPECT TO SIDEKICK, YOU -- WE LOOKED AT THAT

17   LAST LIMITATION THAT WAS ADDED BY CLAIM 9, DO YOU RECALL THAT?

18   A.   CORRECT.

19   Q.   RIGHT.  AND THAT'S -- YOU SAID THAT THAT WASN'T DIRECTLY

20   PRESENT IN SIDEKICK; IS THAT RIGHT?

21   A.   RIGHT, THE POP-UP MENU IS MISSING FOR THE LINKED ACTIONS.

22   Q.   OKAY.  BUT YOU THINK THAT WOULD BE OBVIOUS TO INCLUDE THAT

23   IN SIDEKICK?

24   A.   SURE.  AND, AGAIN, THE IMPORTANT THING TO UNDERSTAND IS

25   WHEN YOU'RE DOING THIS TYPE OF ANALYSIS, THE NOTION OF
```

1    OBVIOUSNESS IS IN 1996, NOT 1985, AND PERSONAL COMPUTING WAS

2    WELL ALONG BY '96 AND POP-UP MENUS WERE EVERYWHERE.

3    Q.   SO THEN WITH RESPECT TO ALL OF THE ELEMENTS OF CLAIM 1, IS

4    IT YOUR OPINION THAT ALL OF THOSE ARE FOUND EXPLICITLY IN THE

5    SIDEKICK SYSTEM?

6    A.   YES.

7    Q.   OKAY.  SO YOU'RE FAMILIAR WITH THE CONCEPT UNDER THE LAW

8    CALLED ANTICIPATION?

9    A.   I AM.

10   Q.   AND CAN YOU EXPLAIN TO US WHAT THAT MEANS?

11   A.   I -- I'LL TELL YOU MY UNDERSTANDING.

12        THERE'S TWO WAYS TO INVALIDATE A CLAIM.  ONE OF THEM IS

13   ANTICIPATION, WHICH IS IF A PRIOR ART PUBLICATION OR SYSTEM

14   DISCLOSES OR TEACHES ALL OF THE ELEMENTS OF A CLAIM, THEN

15   THAT'S SAID TO ANTICIPATE AND THAT WOULD MEAN IT WOULD BE

16   INVALID.

17   Q.   SO THEN IF CLAIM 1 HAD BEEN ASSERTED HERE, WHAT'S YOUR

18   OPINION?

19   A.   IT WOULDN'T INFRINGE AND IT WOULD BE INVALID.

20   Q.   SO, NOW, LET ME JUST TALK ABOUT EMBEDDED BUTTONS FOR A

21   SECOND.  YOU HAD A NUMBER OF QUESTIONS ON EMBEDDED BUTTONS?

22   A.   YES.

23   Q.   NOW, DID YOU OFFER THE OPINION HERE TODAY THAT EMBEDDED

24   BUTTONS DISCLOSED THE SPECIFIC SOFTWARE ARCHITECTURE OF THE

25   ANALYZER SERVER, THE USER INTERFACE, AND THE ACTION PROCESSOR

```
 1       THAT ARE IN THE CLAIM?

 2       A.   NO.  THAT WASN'T MY POINT.

 3            MY POINT OF SHOWING EMBEDDED BUTTONS IS JUST TO CALL

 4       ATTENTION TO THE FACT THAT WE'RE NOT TALKING ABOUT DETECTING

 5       AND LINKING.  IF WE'RE JUST TALKING ABOUT DETECTING AND

 6       LINKING, ALL OF THAT IS EMBEDDED BUTTONS.  I WAS USING THAT AS

 7       AN EXAMPLE TO SAY YOU GOT TO GO WAY UNDER THE COVERS AND

 8       THERE'S A PARTICULAR TYPE OF SERVER THAT'S PRESENT AND THE USER

 9       INTERFACE AND ACTION PROCESSOR ALL OCCUR.

10            MR. NELSON:  ALL RIGHT.  THANK YOU, SIR.  I HAVE NO

11       FURTHER QUESTIONS.

12            THE WITNESS:  THANK YOU.

13            THE COURT:  ALL RIGHT.  THE TIME IS NOW 10:57.  IS

14       THERE ANY RECROSS?

15            MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

16            THE COURT:  ALL RIGHT.  IS THIS WITNESS EXCUSED

17       SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

18            MS. KREVANS:  NOT SUBJECT TO RECALL.

19            MR. NELSON:  SUBJECT TO RECALL FOR POTENTIAL

20       REBUTTAL, YOUR HONOR.

21            THE COURT:  ALL RIGHT.  YOU ARE SUBJECT TO RECALL.

22            MS. KREVANS:  YOUR HONOR, THEY HAVE NO REBUTTAL

23       WITNESS.

24            THE COURT:  I'M SORRY.

25            MS. KREVANS:  WHAT REBUTTAL CASE COULD THEY HAVE WITH
```

```
 1    THIS WITNESS?

 2              MR. NELSON:  REMEMBER THAT DISCUSSION WE HAD, YOUR

 3    HONOR?

 4              THE COURT:  WELL, YOUR REBUTTAL CASE WOULD BE ON YOUR

 5    AFFIRMATIVE PATENTS.

 6              MR. NELSON:  RIGHT.  BUT REMEMBER WE WERE TALKING

 7    ABOUT THE ISSUE OF THE EXPERTS TO COME BACK TO ADDRESS THINGS

 8    THAT COULDN'T HAVE BEEN BECAUSE OF THE STRUCTURE IN THE

 9    REPORTS.

10              MS. KREVANS:  YOUR HONOR, THE ISSUE THAT WAS RAISED

11    WAS WHETHER OUR EXPERTS WILL COME BACK AT THEIR INSISTENCE TO

12    ADDRESS CERTAIN ISSUES, NOT WHETHER THEIR EXPERTS COULD COME

13    BACK.

14              MR. NELSON:  BUT --

15              THE COURT:  WELL, SAMSUNG'S REBUTTAL CASE WILL BE ON

16    SAMSUNG'S AFFIRMATIVE TWO PATENTS AND NOT ON ANY FURTHER

17    DEFENSE AS TO APPLE'S PATENTS.

18              MR. NELSON:  RIGHT.  I UNDERSTAND, YOUR HONOR, BUT

19    THEN WE WERE TALKING ABOUT THEIR EXPERTS -- THEY HAVE THE

20    BURDEN OF PROOF ON INFRINGEMENT, AND THEIR EXPERTS COULD

21    POTENTIALLY COME IN DURING THEIR REBUTTAL CASE WHERE THEY'RE

22    RESPONDING TO THE INVALIDITY AND DOING FURTHER REBUTTAL ON

23    INFRINGEMENT.

24         IT -- WHERE WE WOULD BE NOT SAME POSITION, IT'S JUST THE

25    STRUCTURE OF THE CASE.
```

```
 1              THE COURT:  WELL, WHY DON'T WE DEAL WITH THIS

 2      LATER --

 3              MR. NELSON:  YES, YES.

 4              THE COURT:  -- OUTSIDE THE PRESENCE OF THE JURY?

 5          FOR NOW I'M GOING TO SAY IT'S SUBJECT TO RECALL.  OKAY.

 6              MR. NELSON:  THANK YOU, YOUR HONOR.

 7              THE COURT:  OKAY.  WE'LL DEAL WITH IT LATER.

 8          YOU MAY STEP DOWN.

 9              THE WITNESS:  THANK YOU.

10              MS. MAROULIS:  YOUR HONOR, SAMSUNG CALLED

11      BREWSTER KAHLE AS ITS NEXT WITNESS.

12              THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

13          OOPS, STAND UP, PLEASE.

14          (DEFENDANTS' WITNESS, BREWSTER KAHLE, SWORN.)

15              THE WITNESS:  I DO.

16              THE CLERK:  THANK YOU.  COULD YOU PULL THE MICROPHONE

17      TOWARDS YOU AND TELL US YOUR NAME AND SPELL IT, PLEASE.

18              THE WITNESS:  BREWSTER KAHLE.  B-R-E-W-S-T-E-R,

19      K-A-H-L-E.

20              THE COURT:  ALL RIGHT.  TIME IS NOW 11:00 O'CLOCK.

21          GO AHEAD, PLEASE.

22                         DIRECT EXAMINATION

23      BY MS. MAROULIS:

24      Q.   GOOD MORNING, MR. KAHLE.  HOW ARE YOU?

25      A.   FINE, THANK YOU.
```

1       Q.   WHERE DO YOU LIVE, SIR?

2       A.   SAN FRANCISCO, CALIFORNIA.

3       Q.   AND WHAT DO YOU DO FOR A LIVING?

4       A.   I'M THE FOUNDER AND DIGITAL LIBRARIAN OF THE INTERNET

5       ARCHIVE.

6       Q.   WHAT IS INTERNET ARCHIVE?

7       A.   IT'S A NONPROFIT LIBRARY THAT COLLECTS BOOK, MUSIC, VIDEO,

8       WEB PAGES, GIVES THEM ALL AWAY FOR FREE.

9       Q.   CAN YOU GIVE A COUPLE EXAMPLES FOR THE JURY OF THE MOST

10      FAMOUS THINGS THAT THEY KNOW ABOUT THE INTERNET ARCHIVE?

11      A.   THE ARCHIVE IS BEST KNOWN FOR HAVING ALL THE GRATEFUL DEAD

12      CONCERTS AND ALSO HAVE THE WAYBACK MACHINE, WHICH IS AN ARCHIVE

13      OF WEB PAGES THAT'S USED BY LOTS OF PEOPLE.

14      Q.   PRIOR TO WORKING -- OR FOUNDING INTERNET ARCHIVE, WHERE

15      DID YOU WORK?

16      A.   I HELPED START THINKING MACHINES CORPORATION; I STARTED

17      WAIS, INCORPORATED; AND THEN ALEXA INTERNET.

18      Q.   YOU MENTIONED WAIS, THAT'S W-A-I-S.  CAN YOU PLEASE TELL

19      THE JURY WHAT THAT IS?

20      A.   YES.  WAIS STANDS FOR THE WIDE AREA INFORMATION SERVER

21      PROJECT, AND -- YEAH.

22      Q.   WHOSE IDEA WAS WAIS?

23      A.   MINE.

24      Q.   HOW DID YOU GO ABOUT IT?

25      A.   THE IDEA WAS TO TAKE TECHNOLOGIES THAT WE WERE DEVELOPING

1    ON SUPERCOMPUTERS FOR SEARCHING AND FINDING INFORMATION IN

2    LARGE COLLECTIONS AND THEN BRING IT DOWN TO PERSONAL COMPUTERS

3    AND ALSO TO MAKE IT AVAILABLE OVER THE INTERNET.

4    Q.    LET'S BREAK IT DOWN A LITTLE BIT.  DID YOU SAY THAT YOU

5    COULD SEARCH PERSONAL INFORMATION, WHAT DO YOU MEAN BY THAT?

6    A.    WITH THIS SYSTEM, YOU COULD BASICALLY SEARCH YOUR OWN HARD

7    DRIVE, YOUR OWN PERSONAL COMPUTER OF E-MAIL AND MEMOS OR, OR

8    PRESENTATIONS AND THE LIKE.

9    Q.    WHAT ABOUT CORPORATE INFORMATION?

10   A.    YES, IN THE SAME SYSTEM, YOU COULD BASICALLY CONNECT TO

11   AND SEARCH DATABASES OF CORPORATE INFORMATION.

12   Q.    AND WHAT ABOUT WIDE AREA INFORMATION?

13   A.    YES.  SAME THING.  YOU COULD CONNECT TO DATABASES OF, OR

14   WHOLE SERVERS AND SYSTEMS OF NEWSPAPERS, MAGAZINES, WEATHER,

15   DNA SEQUENCES, ALL SORTS OF DIFFERENT THINGS, OF THINGS THAT

16   WERE AVAILABLE ON THE INTERNET.

17   Q.    HOW DID YOUR WORK ON WAIS BEGIN?

18   A.    BY WORKING ON THE SUPERCOMPUTER AND TRYING TO MAKE IT SO

19   THAT WE COULD INTERACT WITH COMPUTERS JUST WITH HUMAN LANGUAGE,

20   YOU COULD JUST BASICALLY ASK QUESTIONS IN ENGLISH AND BE ABLE

21   TO GET THINGS THAT WOULD BE USEFUL TO PEOPLE.

22         INTERESTINGLY, THIS WAS NOT COMMON THEN.  THIS IS -- WELL,

23   THIS WAS THE EARLY DAYS.

24   Q.    WHEN YOU SAY "THEN," WHEN WAS THAT?

25   A.    THE EARLY DAYS OF THE INTERNET.

 1      Q.   I'M SORRY, SIR.  WHEN YOU SAID "THEN," WHEN WAS IT?  WHAT

 2      YEAR?

 3      A.   LATE '80S AND EARLY '90S.

 4      Q.   DID THINKING MACHINE COME OUT WITH A PRODUCT?

 5      A.   YES, THINKING MACHINES CAME OUT WITH A SOFTWARE PRODUCT ON

 6      TOP OF THE SUPERCOMPUTER TO BE ABLE TO HELP PEOPLE SEARCH

 7      INFORMATION ON THEM.

 8      Q.   OKAY.  DURING THAT TIME, DID YOU EDUCATE PEOPLE ABOUT WAIS

 9      AND WHAT IT DOES?

10      A.   YES, YES.  WE WENT AND -- I WOULD GIVE TALKS AND HOLD

11      WORKSHOPS, BUT I TELL YOU ACTUALLY THE MAJOR WAY PEOPLE KNEW

12      ABOUT IT IS BY GIVING AWAY FREE SOFTWARE.  SO WE GAVE AWAY FREE

13      SOFTWARE AND THOUSANDS AND THOUSANDS OF PEOPLE USED IT THAT

14      WAY.

15      Q.   WHEN DID YOU MAKE THE SOFTWARE AVAILABLE FOR FREE?

16      A.   APRIL 1991.

17      Q.   DID YOU GIVE ANY LECTURES TO PROMOTE WAIS?

18      A.   OH YES, YEAH.

19      Q.   BEFORE YOU IS A BINDER.  PLEASE TURN TO THE TAB CALLED

20      DX 312 IN YOUR BINDER.

21           DO YOU RECOGNIZE THE EXHIBIT DX 312?

22      A.   YES.

23      Q.   WHAT IS IT?

24      A.   IT'S A CD, OR A DVD VERSION OF A, OF A LECTURE THAT I GAVE

25      AT XEROX PARK IN 1991.

1    Q.   AND DID YOU GIVE THIS LECTURE YOURSELF?

2    A.   OH, YES.  I -- I REQUESTED IT FROM THE ARCHIVIST AT XEROX

3    PARK AND THEN DIGITIZED IT AND THEN MADE IT AVAILABLE FOR THE

4    FREE ON THE INTERNET ARCHIVE SEVERAL YEARS AGO.

5    Q.   AND IT WAS IN 1991?

6    A.   DID I DO THAT IN 1991?

7    Q.   NO, NO.  WAS THE LECTURE IN 1991?

8    A.   YES, THE LECTURE WAS IN 1991.

9         MS. MAROULIS:  YOUR HONOR, I MOVE DX 312 INTO

10   EVIDENCE.

11        MR. MUELLER:  YOUR HONOR, NO FURTHER OBJECTION.

12        THE COURT:  ALL RIGHT.  IT IS ADMITTED.

13        (DEFENDANTS' EXHIBIT 312 WAS ADMITTED IN EVIDENCE.)

14        THE COURT:  GO AHEAD, PLEASE.

15   BY MS. MAROULIS:

16   Q.   SIR, YOU MENTIONED PREVIOUSLY THAT WAIS COULD SEARCH

17   PERSONAL AND WIDE CORPORATE AREA INFORMATION.  AM I RECALLING

18   THIS CORRECTLY?

19   A.   YES.

20   Q.   IN 1991, WHEN YOU GAVE THIS TALK, DID WAIS HAVE ALL THOSE

21   CAPABILITIES?

22   A.   YES.

23   Q.   LET'S START WITH THE PERSONAL INFORMATION.  I'M GOING TO

24   ASK MR. KOTARSKI TO DISPLAY FOR US DX 312 AT 54:16.

25        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

```
1    BY MS. MAROULIS:

2    Q.   SIR, WHAT IS GOING ON THERE?  WHAT ARE YOU EXPLAINING?

3    A.   I'M EXPLAINING THAT YOU CAN USE THE WAIS SYSTEM TO SEARCH

4    YOUR PERSONAL E-MAIL AND DOCUMENTS IN A SMOOTH, EASY WAY ON

5    YOUR OWN LOCAL COMPUTER.

6    Q.   OKAY.  LET'S LOOK AGAIN AT DX 312, MR. KOTARSKI, AT TIME

7    49:14.

8         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

9    BY MS. MAROULIS:

10   Q.   SIR, WHAT'S GOING ON IN THIS PORTION OF THE VIDEO?

11   A.   THAT'S WHERE A WAIS CLIENT WILL GO AND ASK REMOTE SERVERS

12   THAT ARE VERY DIFFERENT KINDS OF SERVERS IN LOTS OF DIFFERENT

13   PLACES, AND THOSE SERVERS WILL ANSWER BASED ON DIFFERENT

14   ALGORITHMS, HEURISTICS, APPROACHES THAT THEY WOULD TRY TO

15   ANSWER QUESTIONS AS WELL AS THEY CAN TO BRING THOSE BACK TO THE

16   USERS.

17   Q.   SO YOU TALKED ABOUT SEARCHING YOUR GIRLFRIEND'S E-MAILS

18   AND YOU TALKED ABOUT SEARCHING IN OSLO, NORWAY SERVICE.  CAN

19   YOU DO BOTH AT THE SAME TIME?

20   A.   YES.  BASED -- AND THAT WAS COMMONLY DONE.  YOU BASICALLY

21   DRAG SEVERAL SOURCES THAT MIGHT BE YOUR PERSONAL, YOUR

22   CORPORATE, AND WIDE AREA AND YOU'D ASK THE SAME QUESTION,

23   FREE-FORM QUESTION, OF ALL OF THESE REMOTE SERVERS, OR LOCAL

24   SERVERS.

25   Q.   LET'S LOOK AT AN ILLUSTRATION OF THAT AT 26:13,
```

 1      MR. KOTARSKI.

 2          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

 3      BY MS. MAROULIS:

 4      Q.   SIR, YOU REFERRED HERE TO A MASSIVELY PARALLEL MACHINE OR

 5      SYSTEM.  WHAT DID YOU MEAN BY THAT?

 6      A.   THE CONNECTION MACHINE WAS A PARALLEL SUPERCOMPUTER THAT

 7      HAD SORT OF DIFFERENT ALGORITHMS AND A DIFFERENT APPROACH THAN

 8      THE FREE VERSION HAD, DIFFERENT WAYS OF TRYING TO EVALUATE THE

 9      QUESTION THAT WAS TRYING TO BE ASKED BY THE PERSON BRINGING IT

10      UP.

11      Q.   AND HOW WAS A WAIS CLIENT CONNECTING TO ALL THESE SERVES?

12      A.   IT WOULD OPEN AN INDEPENDENT CONNECTION OVER THE INTERNET,

13      USUALLY TCPI, SOMETIMES THE LOCAL ONE COULD BE DONE THAT SAME

14      WAY, OR SOMETIMES IT WOULD BE A DIRECT CONNECT TO THE FILES.

15      Q.   DID ANYONE ELSE USE WAIS SOFTWARE?

16      A.   OH, YEAH.  THOUSANDS AND THOUSANDS OF PEOPLE.  AL GORE

17      DID.

18      Q.   SIR, WOULD YOU PLEASE TURN TO TAB DX 311 IN YOUR BINDER.

19          DO YOU RECOGNIZE THE DOCUMENT IN YOUR BINDER?

20      A.   YES.

21      Q.   WHAT IS IT?

22      A.   IT'S A PROCEEDINGS FROM A WAIS WORKSHOP THAT WAS HELD IN

23      1992.

24      Q.   AND HOW DO YOU KNOW THAT THIS IS THE CONFERENCE MATERIALS

25      OF THE PROCEEDINGS?

DIRECT KAHLE

```
1    A.   OH, IT SAYS SO.  YES, IT'S THE PAPERS THAT WERE PUT OUT

2    DURING THAT CONFERENCE.  I WAS THE CO-CHAIR OF IT.

3    Q.   AND YOU ATTENDED THE CONFERENCE?

4    A.   YES.

5    Q.   IN 1991?

6    A.   1992.

7    Q.   1992.  THANK YOU.

8         YOUR HONOR, I MOVE THIS EXHIBIT, DX 311 INTO EVIDENCE.

9              MR. MUELLER:  NO FURTHER OBJECTION, YOUR HONOR.

10             THE COURT:  IT'S ADMITTED.

11        (DEFENDANTS' EXHIBIT 311 WAS ADMITTED IN EVIDENCE.)

12             THE COURT:  GO AHEAD, PLEASE.

13   BY MS. MAROULIS:

14   Q.   HOW MANY PEOPLE ATTENDED THE CONFERENCE?

15   A.   IT WAS A FEW DOZEN, MAYBE A HUNDRED.

16   Q.   OKAY.  IT SAYS HERE THAT THE CONFERENCE WAS SPONSORED BY

17   NATIONAL SCIENCE ASSOCIATION.  WHAT IS THAT -- NATIONAL SCIENCE

18   FOUNDATION?

19   A.   NATIONAL SCIENCE FOUNDATION IS A FUNDING AGENCY OF THE

20   UNITED STATES GOVERNMENT FOR FUNDING RESEARCH.

21   Q.   WHY WAS THIS ORGANIZATION SPONSORING THE WAIS CONFERENCE?

22   A.   WELL, WAIS WAS KIND OF A BIG DEAL AT THE TIME.  SO IT WAS

23   ONE OF THE MAJOR APPLICATIONS ON TOP OF THIS NEW THING CALLED

24   THE INTERNET.

25   Q.   CAN YOU PLEASE TURN TO PAGE 11 OF THIS EXHIBIT AND LOOK AT
```

1        THE FIRST PARAGRAPH.  PAGE 13.

2        A.   PAGE 13?

3        Q.   YES.

4        A.   UM-HUM.

5        Q.   IT SAYS "HOW DOES WAIS WORK?"

6             AND IT GOES ON TO SAY, "THE SERVERS, AT THIS POINT, DO NOT

7   'UNDERSTAND' THE USERS ENGLISH LANGUAGE QUESTION, RATHER THEY

8   TRY TO FIND DOCUMENTS THAT CONTAIN THOSE WORDS AND PHRASES AND

9   RANKS THEN BASED ON THE HEURISTICS."

10            IS A THIS AN ACCURATE DESCRIPTION OF THE WAIS SYSTEM.

11       A.   YES.

12       Q.   PLEASE TURN TO PAGE 23 OF THIS DOCUMENT.

13       A.   YES.

14       Q.   DO YOU RECOGNIZE THIS ARTICLE?

15       A.   YEP.

16       Q.   IS THAT YOU ON THE FRONT PAGE OF THE BUSINESS SECTION OF

17   THE "NEW YORK TIMES"?

18       A.   YEAH.  YES, THAT IS.

19       Q.   HOW DID IT MAKE YOU FEEL TO BE PROFILED IN THE

20   "NEW YORK TIMES" FOR YOUR WORK ON WAIS?

21       A.   OH, IT WAS PRETTY GREAT.  YEAH, I WAS ON THE FRONT PAGE OF

22   THE BUSINESS SECTION OF THE "NEW YORK TIMES."

23       Q.   LET'S TURN TO THE NEXT PAGE OF THIS DOCUMENT.  UNDER THE

24   SECOND COLUMN IT STATES, "AT THINKING MACHINES, THE WAIS SYSTEM

25   SERVES AS 'A CORPORATE MEMORY,' ALLOWING EMPLOYEES TO RETRIEVE

1      MEMOS, DOCUMENTS AND OTHER INTERNAL INFORMATION."

2           WAS THAT ACCURATE AT THE TIME THIS ARTICLE WAS WRITTEN?

3      A.   YES.

4      Q.   AND THE NEXT PARAGRAPH, AND THE NEXT COLUMN STATES, "WAIS

5      DELIVERS INFORMATION OVER THE INTERNET."

6           IS THAT ACCURATE?

7      A.   YES.

8      Q.   TWO PARAGRAPHS DOWN, YOU'RE QUOTED AS STATES "INFORMATION

9      RETRIEVAL TECHNOLOGY IS STARTING TO SPREAD FROM SUPERCOMPUTERS

10     ALL THE WAY DOWN TO THE PERSONAL COMPUTER."

11          IS THAT AN ACCURATE QUOTE OF WHAT YOU SAID?

12     A.   YES.

13     Q.   WHAT DID YOU MEAN BY THAT?

14     A.   WELL, IT USED TO NEED A SUPERCOMPUTER TO BE ABLE TO GO AND

15     DO THIS KIND OF ARTIFICIAL INTELLIGENCE KIND OF SEARCHING

16     THROUGH AND MAKING MEANING OUT OF THESE THINGS.

17          BUT WE WERE STARTING TO BE ABLE TO IMPLEMENT IT ON

18     THESE -- IT'S HARD TO REMEMBER THE PERSONAL COMPUTERS WERE KIND

19     OF WIMPY, BUT THEY CAN START TO ACTUALLY DO QUITE A BIT BY

20     AROUND THEN.

21     Q.   SIR, WE TALKED ABOUT CAPABILITIES OF WAIS.  NOW LET'S TALK

22     ABOUT WAIS FROM THE USER'S POINT OF USE, USER EXPERIENCE.

23          COULD A USER OF WAIS, IN 1991, SEARCH PERSONAL, CORPORATE,

24     AND WIDE AREA INFORMATION AT THE SAME TIME?

25     A.   YES.

1    Q.   HOW WOULD ONE EXPERIENCE A WAIS QUERY?

2    A.   MOST USERS WOULD OPEN A WAIS CLIENT, SELECT A SET OF

3    SOURCES, WHICH ARE LOCATED ON SERVERS THAT MIGHT BE ON THEIR

4    PERSONAL COMPUTER OR REMOTE, AND BE ABLE TO THEN TYPE IN A

5    NATURAL LANGUAGE QUESTION, WHICH WOULD THEN CONNECT TO THOSE

6    DIFFERENT SERVERS, BRING BACK THE INFORMATION, AND THEN TRY TO

7    ORDER THOSE IN A GOOD WAY AND WEAVE THOSE ANSWERS TOGETHER INTO

8    ONE RESPONSE.

9    Q.   YOU REFERRED TO WEAVING.

10       WOULD THE WEAVING RESULTS OCCUR ON THE CLIENTS?

11   A.   YES, THE CLIENT WOULD PULL THESE DIFFERENT RESPONSES BACK

12   FROM DIFFERENT SERVES, AND BASED ON THE PARAMETERS, THE CLIENT

13   WOULD TRY TO PUT IT TOGETHER IN A WAY THAT WOULD MAKE SENSE FOR

14   THAT PARTICULAR USER.  SO THE USER COULD ACTUALLY USE SMARTS TO

15   GO AND PULL -- TO WEIGH ONE OVER ANOTHER.

16   Q.   HAVE YOU RECEIVED ANY RECOGNITION FOR YOUR WORK ON WAIS?

17   A.   YES.  I THINK IT WAS THE MAJOR REASON WHY I WAS INDUCTED

18   INTO THE INTERNET HALL OF FAME.

19   Q.   WHAT IS THE INTERNET HALL OF FAME?

20   A.   IT'S A PROGRAM BY THE INTERNET SOCIETY, IT'S THE -- THE

21   GUYS THAT RUN THE INTERNET, AND THEY WERE PULLING TOGETHER A

22   HALL OF FAME, AND I WAS HONORED TO BE IN THE FIRST YEAR OF

23   INDUCTEES IN THE INTERNET HALL OF FAME.

24       MS. MAROULIS:  THANK YOU, SIR.  I DON'T HAVE FURTHER

25   QUESTIONS.

```
 1              THE WITNESS:  THANK YOU.

 2              THE COURT:  ALL RIGHT.  THE TIME IS NOW 11:15.

 3              MR. MUELLER:  MAY I PROCEED, YOUR HONOR?

 4              THE COURT:  YES.  TIME IS NOW 11:15.  GO AHEAD.

 5                        CROSS-EXAMINATION

 6     BY MR. MUELLER:

 7     Q.   GOOD MORNING, MR. KAHLE.  MY NAME IS JOE MUELLER.  I'M

 8     GOING TO ASK YOU A FEW QUESTIONS.

 9          IN YOUR DIRECT EXAMINATION, SIR, YOU DID NOT SAY A WORD

10     ABOUT APPLE'S '959 UNIVERSAL SEARCH PATENT; CORRECT?

11     A.   CORRECT.

12     Q.   YOU DID NOT TESTIFY ABOUT WHETHER SAMSUNG IS INFRINGING

13     THE '959 UNIVERSAL SEARCH PATENT; CORRECT?

14     A.   CORRECT.

15     Q.   YOU DID NOT SAY A WORD ABOUT WHETHER THE PATENT OFFICE

16     MADE A MISTAKE IN ISSUING THAT PATENT; CORRECT, SIR?

17     A.   CORRECT.

18     Q.   NOW, IN FACT, YOU ARE A NAMED INVENTOR ON OVER 15 U.S.

19     PATENTS; RIGHT?

20     A.   THAT MAY BE RIGHT.

21     Q.   AND YOU TESTIFIED THAT YOU'RE A MEMBER OF THE INTERNET

22     HALL OF FAME.  YOU BELIEVE IN INNOVATION?

23     A.   YES.

24     Q.   YOU BELIEVE IN INVENTIONS; RIGHT?

25     A.   YES.
```

1      Q.   YOU BELIEVE IN THE VALUE OF PATENTS; CORRECT?

2      A.   MOST.

3      Q.   AND, IN FACT, YOU HAVE 15 OF YOUR OWN?  OR MORE?  IS THAT

4      RIGHT?

5      A.   I DON'T KNOW MY NUMBER.

6      Q.   THE PATENT OFFICE DID THE RIGHT THING WHEN IT ISSUED YOUR

7      PATENTS; CORRECT, SIR?

8      A.   I HOPE SO.

9      Q.   DO YOU KNOW A DR. MARTIN RINARD?

10     A.   NO.

11     Q.   NEVER MET HIM?  NEVER HEARD OF HIM?

12     A.   NOT THAT I RECALL.

13     Q.   NOW, YOU'RE HERE TO TESTIFY ABOUT SOMETHING CALLED THE

14     WAIS SYSTEM; IS THAT RIGHT?

15     A.   YES.

16     Q.   AND THE WAIS SYSTEM WAS COMPRISED OF CLIENTS, SERVERS, AND

17     THE PROTOCOL BY WHICH THOSE CLIENTS AND SERVERS COMMUNICATED;

18     CORRECT?

19     A.   YES.

20     Q.   AND, IN FACT, IF WE GO TO DX 311, WHICH IS IN THE BINDER

21     THAT YOU WERE JUST HANDED AND IT WAS ADMITTED A MOMENT AGO,

22     COULD WE PLEASE TURN, SIR, TO PAGE 28?  DO YOU SEE, SIR, WHERE

23     IT SAYS THE WAIS ARCHITECTURE?

24     A.   CAN I JUST LOOK UP HERE?

25     Q.   WHATEVER IS EASIER.

1    A.    OKAY.   WHAT DOCUMENT IS THIS PART OF?

2    Q.    THIS IS THE ONE THAT YOU JUST TESTIFIED ABOUT JUST A

3    MOMENT AGO, DX 311.

4    A.    SHOULD I GO BACK TO THIS ONE?

5    Q.    WHICHEVER IS EASIER.   IT'S DX 311.

6    A.    AND PAGE?

7    Q.    THIS IS PAGE 28.

8    A.    YES.

9    Q.    AND DO YOU SEE THAT, SIR, THE WAIS ARCHITECTURE?

10   A.    YES.

11   Q.    "CLIENT SERVERS AND THE PROTOCOL THAT CONNECTS THEM";

12   RIGHT?

13   A.    YES.

14   Q.    NOW, AS A GENERAL MATTER, A SERVER COULD BE SOFTWARE

15   RUNNING ON A COMPUTER; CORRECT?

16   A.    YES.

17   Q.    BUT IN THE PARTICULAR CASE OF THE WAIS SYSTEM, THE CLIENT

18   AND THE SERVER WERE INTENDED TO BE PHYSICALLY ISOLATED; RIGHT?

19   A.    NO.   THEY COULD BE ISOLATED, BUT THEY OFTEN WERE ON THE

20   SAME MACHINE.

21   Q.    BUT, IN FACT, IF WE LOOK AT THE NEXT PAGE, SIR, PAGE 29,

22   LET ME DIRECT YOUR ATTENTION TO WHERE IT SAYS, "IN A CLIENT

23   SERVER SYSTEM" -- IT'S A LITTLE BIT HIGHER IN THE PAGE, OR A

24   LITTLE BIT LOWER IN THE PAGE, "IN A CLIENT-SERVER SYSTEM, THE

25   CLIENT PROGRAM IS THE USER INTERFACE, THE SERVER DOES THE

1    SEARCHING AND RETRIEVAL OF DOCUMENTS BASED ON INDICES AND THE

2    PROTOCOL IS USED TO TRANSMIT THE QUERIES AND RESPONSES."

3         RIGHT.

4    A.   YES.

5    Q.   AGAIN, THIS IS THE DOCUMENT YOU JUST ADMITTED THROUGH

6    SAMSUNG'S ATTORNEY; CORRECT?

7    A.   YES.

8    Q.   NEXT SENTENCE:  "THE CLIENT AND THE SERVER ARE ISOLATED

9    FROM EACH OTHER THROUGH THE PROTOCOL SO THAT THEY COULD BE

10   PHYSICALLY DISTINCT AND INTERCHANGEABLE."

11        CORRECT?

12   A.   YES, THEY CAN BE PHYSICALLY DISTINCT, BUT THEY DON'T HAVE

13   TO BE.

14   Q.   BUT, IN FACT, THIS DOCUMENT IS DESCRIBING ISOLATION,

15   PHYSICALLY DISTINCT, CORRECT?

16   A.   NO.  THEY CAN BE.  IT SAYS THAT THEY CAN BE PHYSICALLY

17   DISTINCT.  BUT THEY DON'T HAVE TO BE, BECAUSE A LOT OF THE

18   SYSTEMS WERE LOCAL AT THAT TIME, AND THEN THE IDEA WITH THE

19   WAIS SYSTEM IS YOU COULD DO NOT ONLY LOCAL, BUT REMOTE AT THE

20   SAME TIME.

21   Q.   SIR, ARE YOU FINISHED?

22   A.   YES.

23   Q.   SIR, YOUR DOCUMENT SAYS THE CLIENT AND SERVER ARE ISOLATED

24   FROM EACH OTHER; CORRECT?

25   A.   IT SAYS THEY CAN BE PHYSICALLY DISTANT.

1    Q.   SIR, RIGHT BEFORE THAT IT SAYS THE CLIENT AND SERVER ARE

2    ISOLATED FROM EACH OTHER?

3    A.   AND SO THEY CAN BE PHYSICALLY DISTANT.

4    Q.   NOW, THERE'S DIFFERENT VERSIONS OF THE WAIS SYSTEM; RIGHT?

5    A.   UH-HUH.

6    Q.   MANY DIFFERENT VERSIONS; RIGHT?

7    A.   UH-HUH.

8    Q.   MANY VERSIONS THAT YOU WERE NOT INVOLVED WITH?

9    A.   CORRECT, IT WAS AN OPEN SYSTEM THAT WAS MEANT TO BE BUILT

10   ON BY MANY, AND IT WAS.

11   Q.   NOW, BEFORE THIS CASE, YOU HAD NEVER HEARD OF A PARTICULAR

12   VARIATION CALLED FREEWAIS SF; CORRECT?

13   A.   CORRECT.

14   Q.   YOU DID NOT KNOW WHETHER FREEWAIS SF HAD BEEN USED IN THE

15   UNITED STATES; CORRECT?

16   A.   YEAH, I DONE -- I DON'T REMEMBER IT.

17   Q.   YOU DIDN'T KNOW WHETHER ANY PARTICULAR, OR HOW ANY

18   PARTICULAR FREEWAIS SF SYSTEM WAS SET UP; RIGHT?

19   A.   CORRECT.

20   Q.   YOU DIDN'T KNOW WHERE ANY PARTICULAR FREEWAIS SF SERVER

21   WAS LOCATED; CORRECT?

22   A.   CORRECT.

23   Q.   DIDN'T KNOW WHERE ANY PARTICULAR FREEWAIS SF CLIENT WAS

24   LOCATED; CORRECT?

25   A.   CORRECT.

1    Q.   DIDN'T KNOW HOW ANY PARTICULAR FREEWAIS SF CLIENT DID

2    SEARCHING; CORRECT?

3    A.   IF IT WAS A WAIS SYSTEM, THEN IT WOULD HAVE USED THE WAIS

4    PROTOCOLS.  SO PRESUMABLY IT WOULD HAVE USED THE SAME CLIENTS

5    AND SERVERS THAT ALL OF THE WAIS SYSTEMS DID.

6    Q.   SIR, YOU DIDN'T KNOW FOR SURE BECAUSE YOU'D NEVER HEARD OF

7    IT; RIGHT?

8    A.   I GUESS IT COULD HAVE BEEN NON-WAIS.

9    Q.   FREEWAIS SF YOU HAD NEVER HEARD OF BEFORE THIS CASE?

10   A.   CORRECT, I DIDN'T KNOW THAT PARTICULAR IMPLEMENTATION.

11   Q.   NOW, A FEW MOMENTS AGO I ASKED YOU ABOUT DR. RINARD AND

12   YOU SAID YOU'D NEVER HEARD OF HIM; CORRECT?

13   A.   CORRECT.

14   Q.   AND YOU CERTAINLY DID NOT HELP DR. RINARD SET UP HIS OWN

15   FREEWAIS SYSTEM LAST YEAR, IN 2013; CORRECT?

16   A.   NOT THAT I'M AWARE OF.

17   Q.   AND YOU DID NOT ASSIST DR. RINARD IN TRYING TO DETERMINE

18   WHETHER THAT SYSTEM THAT HE BUILT LAST YEAR WAS LIKE ANYTHING

19   AVAILABLE BEFORE JANUARY 5TH, 2000; CORRECT?

20   A.   SINCE I DON'T -- IF HE CALLED IT WAIS, THEN IT'S PROBABLY

21   A WAIS SYSTEM.

22   Q.   SIR, YOU DID NOT HELP DR. RINARD, DID YOU?

23   A.   I DID NOT.

24   Q.   AND YOU'RE NOT HERE TO OFFER ANY OPINION ON ANY VALIDITY

25   OF THE '959 PATENT; CORRECT, SIR?

```
1        A.   CORRECT.

2                  MR. MUELLER:  NO FURTHER QUESTIONS.

3                  THE COURT:  OKAY.  TIME IS NOW 11:22.

4                  MS. MAROULIS:  NO REDIRECT, YOUR HONOR.

5                  THE COURT:  NO REDIRECT, OKAY.  IS THIS WITNESS

6        EXCUSED SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

7                  MR. MUELLER:  NO RECALL, YOUR HONOR.

8                  MS. MAROULIS:  NOT SUBJECT TO RECALL.

9                  THE COURT:  OKAY.  THEN YOU ARE EXCUSED.

10                 THE WITNESS:  THANK YOU.

11                 MS. MAROULIS:  YOUR HONOR, SAMSUNG CALLS ULRICH

12       PFEIFER TO THE STAND.

13            YOUR HONOR, THIS WITNESS WILL HAVE A STANDBY INTERPRETER.

14       HE WILL TESTIFY IN ENGLISH, BUT WE SHOULD SWEAR IN THE

15       INTERPRETER.

16                 THE CLERK:  IN WHAT LANGUAGE?

17                 MS. MAROULIS:  GERMAN.

18            (PAUSE IN PROCEEDINGS.)

19                 THE CLERK:  IF I CAN HAVE THE INTERPRETER RAISE YOUR

20       RIGHT HAND, PLEASE.

21            (GERMAN INTERPRETER, MATTHIAS STEIRT, WAS SWORN.)

22                 THE INTERPRETER:  I DO.

23                 THE CLERK:  CAN I HAVE YOUR NAME, PLEASE?

24                 THE INTERPRETER:  MATTHIAS STEIERT.

25                 THE CLERK:  COULD YOU PLEASE SPELL IT?
```

```
 1              THE INTERPRETER:  FIRST NAME M-A-T-T-H-I-A-S.  LAST

 2    NAME S-T-E-I-E-R-T.

 3              THE CLERK:  THANK YOU.

 4         NOW FOR THE WITNESS TO RAISE YOUR RIGHT HAND, PLEASE.

 5         (DEFENDANTS' WITNESS, ULRICH PFEIFER, WAS SWORN.)

 6              THE WITNESS:  YES, I DO.

 7              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

 8         AND WOULD YOU PULL THE MICROPHONE TOWARDS YOU, IT'S KIND

 9    OF FAR OFF THERE, AND GIVE US YOUR NAME, PLEASE, AND SPELL IT.

10              THE WITNESS:  MY NAME IS ULRICH PFEIFER.  AND IT'S

11    U-L-R-I-C-H.  LAST NAME IS P-F-E-I-F-E-R.

12              THE CLERK:  THANK YOU.

13              THE COURT:  ALL RIGHT.  TIME IS NOW 11:25.  GO AHEAD,

14    PLEASE.

15                         DIRECT EXAMINATION

16    BY MS. MAROULIS:

17    Q.   GOOD MORNING, MR. FIRE.  HOW ARE YOU TODAY?

18    A.   GOOD MORNING.  I'M FINE.

19    Q.   WHERE DO YOU LIVE, SIR?

20    A.   I LIVE IN DORTMUND, D-O-R-T-M-U-N-D, GERMANY.

21    Q.   AND, SIR, WHAT DO YOU DO FOR A LIVING?

22    A.   I'M LEADING A GROUP OF SOFTWARE DEVELOPERS AT VERIZON

23    GERMANY.

24    Q.   SIR, IF YOU WOULD SPEAK UP A LITTLE BIT IN THE MICROPHONE

25    AND SPEAK SLOWER.
```

```
1              WHY DID YOU COME HERE TODAY?

2      A.   I CAME TO TESTIFY ABOUT THE WAIS SYSTEMS, SPECIFICALLY

3      FREEWAIS SF.

4      Q.   WHAT IS WAIS AGAIN?

5      A.   WAIS IS A SYSTEM, A PROGRAM TO SEARCH DOCUMENTS AND YOUR

6      LOCAL COMPUTER OR BY THE WEB.

7      Q.   WHAT IS FREEWAIS SF?

8      A.   SORRY.  FREEWAIS SF IS THE NAME WE GAVE THE VERSION WE

9      DEVELOPED AT THE UNIVERSITY IN DORTMUND IN THE MID-'90S.

10     Q.   AND WHAT DOES THE FREE PART OF IT MEAN?

11     A.   FREE WAS INHERENT FROM THE PREVIOUS VERSION, BUT IT MEANS

12     FREELY AVAILABLE IN SOURCE CODE WITH NO CHARGE.

13     Q.   WHAT WAS YOUR ROLE IN DEVELOPING FREEWAIS SF?

14     A.   I DID ALL OF THE DEVELOPMENT, DEVELOPED IT IN PART MYSELF,

15     AND IN PART WAS DONE BY A DIPLOMA STUDENT OF MINE, TUNG,

16     T-U-N-G, AND THE LAST NAME IS H-Y --

17     Q.   H-Y-U-N-H, T-U-N-G.

18          SIR WHO HAD -- I'M SORRY.  HOW DID YOU RELEASE WAIS

19     SOFTWARE TO THE PUBLIC?

20     A.   I PUT IT OR HAD IT PUT ON OUR DEPARTMENTAL SERVER WHERE IT

21     COULD BE ACCESSED BY THE OUTSIDE COMMUNITY, AND WE ALSO

22     ANNOUNCED IT ON THE COMPUTER SYSTEMS WAIS NEWS GROUP, WHICH IS

23     SORT OF A PUBLIC E-MAIL SYSTEM.

24     Q.   SO WHO HAD ACCESS TO THE SOFTWARE ONCE YOU POSTED IT?

25     A.   ANYBODY WITH CONNECTIVITY TO THE INTERNET COULD ACCESS
```

```
 1      THAT FILE DISTRIBUTIONS.

 2      Q.   DID THAT INCLUDE PEOPLE IN THE UNITED STATES?

 3      A.   YEAH, THAT WOULD INCLUDE PEOPLE IN THE UNITED STATES.

 4      Q.   MR. PFEIFER, THERE'S A BINDER IN FRONT OF YOU.  CAN YOU

 5      PLEASE OPEN IT TO EXHIBIT DX 301.

 6           DO YOU RECOGNIZE IT?

 7      A.   ONE SECOND.  YES, I RECOGNIZE IT.

 8      Q.   WHAT IS IT?

 9      A.   IT'S A CD ROM CONTAINING THE DISTRIBUTION OF FREEWAIS SF

10      TO 065.

11      Q.   HOW DO YOU KNOW THAT THIS IS FREEWAIS SF 2.0.65.

12      A.   I DID LOOK AT THE FILES AND RECOGNIZED THEM AS WHAT I HAD

13      WORKED ON IN THE MID-'90S, AND I ALSO DID LOOK UP ALL THE FILES

14      ON THIS CD ROM IN MY ARCHIVE THAT I RETAINED FROM THE

15      UNIVERSITY.

16      Q.   AND DID YOU UPLOAD THIS FILE TO THE DORTMUND FTP SITE?

17      A.   YES, I DID UPLOAD IT.

18           MS. MAROULIS:  YOUR HONOR, I MOVE DX 301 INTO

19      EVIDENCE.

20           MR. MUELLER:  NO FURTHER OBJECTION, YOUR HONOR.

21           THE COURT:  IT'S ADMITTED.

22      (DEFENDANTS' EXHIBIT 301 WAS ADMITTED IN EVIDENCE.)

23           THE COURT:  GO AHEAD, PLEASE.

24      BY MS. MAROULIS:

25      Q.   WHEN DID YOU UPLOAD THIS FILE ON THE FTP SITE?
```

```
 1     A.   THE DISTRIBUTION WAS CREATED ON JANUARY 31ST, 1996.  AND

 2     IT WAS UPLOADED SHORTLY AFTER THAT, SAY WITHIN A MINUTE --

 3     WITHIN A WEEK.

 4     Q.   MR. PFEIFER, I'M GOING TO OPEN UP THE FILE CALLED IR

 5     SEARCH C IN EXHIBIT 301.

 6          DID YOU WRITE THIS CODE?

 7     A.   I DIDN'T WRITE IT.  IT WAS ORIGINALLY WRITTEN BY, WRITTEN

 8     BY BREWSTER KAHLE FROM THINKING MACHINES.

 9     Q.   DID YOU MODIFY THIS CODE?

10     A.   WE DID MODIFY IT TO EXTEND THE FUNCTIONALITY AND FIX

11     PROBLEMS WE FOUND.

12     Q.   HOW DO YOU KNOW IT WAS WRITTEN BY BREWSTER KAHLE?

13     A.   THE FILE WE ORIGINALLY TOOK BEFORE WE CHANGED IT CONTAINED

14     HIS E-MAIL ADDRESS ON THE TOP.

15     Q.   AND YOUR NAME APPEARS HERE.  WHAT DOES THAT MEAN?

16     A.   THAT MEANS I DID THE LAST CHANGE ON THAT FILE.

17     Q.   OKAY.  DO YOU KNOW WHETHER ANYONE IN THE UNITED STATES

18     KNEW ABOUT YOUR WAIS SOFTWARE?

19     A.   YES.  MANY PEOPLE KNEW.  I RECEIVED E-MAILS FROM PEOPLE IN

20     THE -- FROM THE UNITED STATES, ALSO SAW A NEWS GROUP POSTINGS

21     ON THAT NEWS GROUP FROM THE UNITED STATES.

22     Q.   LET'S TURN TO EXHIBIT DX 305 IN YOUR BINDER.

23          DO YOU RECOGNIZE IT?

24     A.   DX -- WHAT.

25     Q.   WHAT IS IT?
```

1       A.   IT'S A SUMMARY OF E-MAILS I SELECTED.  SO IT'S JUST A

2    SELECTION OF THE E-MAILS THAT SHOW THAT FREEWAIS SF WAS USED IN

3    THE UNITED STATES.

4       Q.   WHERE DID YOU OBTAIN THOSE E-MAILS?

5       A.   THESE E-MAILS AND THE NEWS GROUP POSTINGS WERE IN THE

6    ARCHIVE I RETAINED FROM THE UNIVERSITY.

7            MS. MAROULIS:  YOUR HONOR, I MOVE DX 305 INTO

8    EVIDENCE.

9            MR. MUELLER:  YOUR HONOR, I DO OBJECT INSOFAR AS THIS

10   IS FOR THE TRUTH OF THE MATTER ASSERTED?  I BELIEVE YOUR HONOR

11   HAS INDICATED YOU WOULD GIVE A LIMITING INSTRUCTION THAT IT IS

12   NOT FOR THAT PURPOSE.

13           THE COURT:  YES, I AM GOING TO GIVE THAT INSTRUCTION.

14       DX 305 IS ADMITTED, BUT IT'S NOT ADMITTED FOR THE TRUTH OF

15   THE MATTER OF WHAT'S ASSERTED THEREIN.

16       (DEFENDANTS' EXHIBIT 305 WAS ADMITTED IN EVIDENCE.)

17           THE COURT:  GO AHEAD, PLEASE.

18   BY MS. MAROULIS:

19       Q.   SIR, YOU MENTIONED ALSO THAT YOU -- ACTUALLY, LET ME GO

20   BACK TO THE EXHIBIT.

21       CAN YOU POINT ME TO ANY E-MAIL THAT SHOWS THAT THE E-MAIL

22   WAS SENT FROM THE UNITED STATES?

23       A.   SORRY.  MOST OF THEM HAVE INDICATIONS.  IF WE GO TO THE

24   LAST PAGE, FOR EXAMPLE -- I'M SORRY.  PAGE NUMBER 3, IN THE

25   LAST ROW THERE'S MAIL FROM TED OKADA.  IT LISTS FOOD FOR THE

DIRECT PFEIFER

1    HUNGRY IN THE SECOND COLUMN.  IT ALSO HAS DOMESTIC PHONE

2    NUMBERS WITH THE RIGHT AREA CODE FOR THAT.

3    Q.   THANK YOU.  YOU ALSO FOUND, OR MENTIONED THAT YOU FOUND

4    SOME LOG DATA.

5         CAN YOU PLEASE TURN TO EXHIBIT 313 IN YOUR BINDER.

6    A.   YES.

7    Q.   DO YOU RECOGNIZE DX 313?

8    A.   YEAH.  THAT'S AN E-MAIL I WROTE IN '97 TO MY PROFESSOR AND

9    TO A COLLEAGUE OF MINE, GOEVERT.  GOEVERT IS G-O-E-V-E-R-T.

10            MS. MAROULIS:  YOUR HONOR, I MOVE EXHIBIT DX 313 INTO

11   EVIDENCE.

12            MR. MUELLER:  NO FURTHER OBJECTION, YOUR HONOR.

13            THE COURT:  IT'S ADMITTED.

14   (DEFENDANTS' EXHIBIT 313 WAS ADMITTED IN EVIDENCE.)

15            THE COURT:  GO AHEAD, PLEASE.

16   BY MS. MAROULIS:

17   Q.   HOW IS IT THAT YOU HAVE THIS LOG SHOWING THAT THEY WERE

18   RUNNING WAIS SOFTWARE?

19   A.   WE ADDED CODE TO OUR DISTRIBUTION THAT WOULD SEND

20   INFORMATION ABOUT THE INSTALLATION TO OUR SERVERS SO THEY COULD

21   KEEP TRACK OF WHICH ENVIRONMENTS IT WORKED, AND THIS

22   INFORMATION CONTAINED THE SOURCE, OR THE INTERNET ADDRESS WHERE

23   THE DATA CAME FROM.

24        AND THIS INTERNET ADDRESS COULD BE LINKED BACK TO THE

25   COUNTRY AS SHOWN HERE.

1    Q.   OKAY.  SIR, ARE YOU BEING COMPENSATED FOR YOUR TIME AWAY

2    FROM YOUR JOB?

3    A.   I'M COMPENSATED FOR THE TIME I SPEND ON THIS TRIAL AND

4    ALSO MY EXPENSES ARE REIMBURSED.

5    Q.   OKAY.  AND WHAT DO YOU PLAN TO DO WITH THE MONEY YOU'RE

6    GETTING?

7    A.   FOR COMING TO THIS TRIAL, FOR THE TIME I'M COMPENSATED, I

8    WANT TO DONATE THAT MONEY TO A CHARITY THAT WORKS IN INDIA AND

9    NEPAL.

10           MS. MAROULIS:  THANK YOU VERY MUCH, SIR.  NO FURTHER

11   QUESTIONS AT THIS POINT.

12           THE COURT:  OKAY.  TIME IS 11:33.

13           MR. MUELLER:  JUST A MOMENT, YOUR HONOR.

14        (PAUSE IN PROCEEDINGS.)

15           MR. MUELLER:  MAY I PROCEED?

16           THE COURT:  YES.  TIME IS NOW 11:33.  GO AHEAD,

17   PLEASE.

18                        **CROSS-EXAMINATION**

19   BY MR. MUELLER:

20   Q.   GOOD AFTERNOON, SIR.  MY NAME IS JOE MUELLER.  I'M GOING

21   TO ASK YOU A FEW QUESTIONS.

22        NOW, IN YOUR DIRECT EXAMINATION JUST NOW YOU DID NOT SAY A

23   WORD ABOUT APPLE'S '959 UNIVERSAL SEARCH PATENT; CORRECT.

24   A.   THAT IS CORRECT, YES.

25   Q.   NOT A WORD ABOUT WHETHER SAMSUNG INFRINGES IT; CORRECT?

1    A.   THAT IS CORRECT.

2    Q.   NOT A WORD ABOUT WHETHER THE PATENT OFFICE MADE A MISTAKE

3    IN ISSUING IT; CORRECT?

4    A.   THAT'S CORRECT.

5    Q.   IN FACT, YOU'RE NOT HERE TO TESTIFY ON THAT AT ALL; RIGHT,

6    SIR?

7    A.   THAT IS CORRECT.

8    Q.   DO YOU KNOW A DR. MARTIN RINARD?

9    A.   MARTIN BERNARD.

10   Q.   RINARD, R-I-N-A-R-D?

11   A.   I DON'T RECALL, NO.

12   Q.   NEVER HEARD OF HIM?

13   A.   (SHAKES HEAD FROM SIDE TO SIDE.)

14   Q.   IS THAT RIGHT?

15   A.   (NODS HEAD UP AND DOWN.)

16   Q.   YOU DID TESTIFY ABOUT SOMETHING CALLED FREEWAIS SF; RIGHT?

17   A.   UM-HUM.

18   Q.   BUT, IN FACT, DID YOU NOT TELL THE LADIES AND GENTLEMEN OF

19   THE JURY ANYTHING AT ALL ABOUT HOW SEARCHING WAS DONE LOCALLY

20   AND REMOTELY USING FREEWAIS SF; CORRECT?

21   A.   NOT JUST NOW, YES, THAT'S CORRECT.

22   Q.   SO I WON'T ASK YOU EITHER.

23        YOU DID TESTIFY AS TO CERTAIN SOURCE CODE AND YOU

24   AUTHENTICATED IT; RIGHT?

25   A.   UM-HUM.

1    Q.    NOW, THAT SOURCE CODE YOU SAID YOU BELIEVED TO BE USED IN

2    THE U.S. BASED ON SOME INTERNET POSTINGS; IS THAT RIGHT, SIR?

3    A.    SOME E-MAILS, THE NEWS GROUP POSTINGS, PLUS THE LOCK DATA

4    WE RECEIVED.

5    Q.    YOU KNOW, IN FACT, SIR, WHEN YOU IDENTIFIED THAT CODE FOR

6    THIS CASE, YOU FOUND IT ON SERVERS IN POLAND, THE

7    CZECH REPUBLIC, FINLAND, AND GERMANY; CORRECT?

8    A.    THAT'S THE COPY I -- COPIES I RETRIEVED, YES, CORRECT.

9    Q.    YOU DID NOT FIND IT ON A SERVER IN THE UNITED STATES;

10   CORRECT, SIR?

11   A.    NO, I THINK THAT'S NOT QUITE TRUE.  I THINK I FOUND ONE AT

12   CORNELL.

13   Q.    IN YOUR DEPOSITION YOU TESTIFIED TO JUST THOSE FOUR

14   COUNTRIES; RIGHT?  POLAND, THE CZECH REPUBLIC, FINLAND AND

15   GERMANY?

16   A.    YEAH, THAT WAS WHAT CAME TO MIND.  I WOULD NOT WANT TO

17   RULE OUT THAT I PUT ONE COPY OF, OR FETCHED ONE COPY FROM THE

18   UNITED STATES.

19   Q.    BUT THE FOUR COUNTRIES YOU IDENTIFIED WERE ABROAD;

20   CORRECT, SIR?

21   A.    YES, THAT'S CORRECT.

22   Q.    NOW, THERE ARE MULTIPLE WAYS TO CONFIGURE FREEWAIS SF;

23   RIGHT?

24   A.    THAT IS TRUE.

25   Q.    THERE'S DIFFERENT OPTIONS A USER COULD USE OR NOT USE;

1    CORRECT?

2    A.   THAT IS CORRECT.

3    Q.   IF YOU COULD TURN TO DX 305, PLEASE, SIR, WHICH IS THE

4    INTERNET POSTINGS YOU REFERRED TO WITH MS. MAROULIS, AND LET ME

5    KNOW WHEN YOU HAVE THAT IN FRONT OF YOU.

6    A.   YES, I HAVE IT.

7    Q.   DX 305 DOES NOT PROVIDE US WITH THE DETAILS AS TO HOW ANY

8    PARTICULAR SYSTEM WAS CONFIGURED; CORRECT, SIR?

9    A.   THAT'S NOT 100 PERCENT TRUE.  I THINK THE BOB WOOD E-MAIL,

10   FOR EXAMPLE, ON PAGE 3, THE MIDDLE ENTRY --

11   Q.   SIR, THESE ARE EXERTS FROM E-MAILS AND INTERNET POSTINGS;

12   CORRECT?

13   A.   YES.

14   Q.   NOT A FULL DESCRIPTION OF ANY SYSTEM CONFIGURATION;

15   CORRECT?

16   A.   THAT IS CORRECT.  BUT IT SHOWS THAT IMPLEMENTATION USED

17   LOCAL SEARCH AND REMOTE SEARCH.

18   Q.   SIR, IT DOES NOT PROVIDE A FULL DESCRIPTION, RIGHT?  THESE

19   ARE EXERTS FROM E-MAILS AND INTERNET POSTINGS?

20   A.   THAT'S TRUE.  THERE IS ANOTHER E-MAIL FROM A MR. GOLDSHEIM

21   WHICH HAS CONFIGURATIONS IN IT WHICH SHOWS THAT HE HAS IT

22   CONFIGURED FOR SOUNDEX.  THAT'S S-O-U-N-D-E-X.

23   Q.   SIR, AGAIN, THE ANSWER TO MY QUESTION IS THIS DOES NOT

24   PROVIDE A COMPLETE DESCRIPTION OF ANY SYSTEM CONFIGURATION;

25   RIGHT?

1       A.   LET ME CHECK THE OTHER ONES.

2            I RECEIVED E-MAILS WHICH CONTAINED THE COMPANY DESCRIPTION

3       BUT ON THAT --

4       Q.   NOT IN THIS EXHIBIT?

5       A.   YES.

6       Q.   DX 313, PLEASE TURN TO THAT, SIR.  THAT'S THE OTHER

7       EXHIBIT YOU ADMITTED.

8            AND THIS REFERS TO CERTAIN DATA PURPORTEDLY FROM VARIOUS

9       COUNTRIES; CORRECT?

10      A.   YEAH, THAT IS CORRECT.

11      Q.   THIS DOES NOT GIVE US ANY INFORMATION AS TO ANY PARTICULAR

12      SYSTEM CONFIGURATION; CORRECT, SIR?

13      A.   NO, IT -- IT IS NOT A LOT OF STUFF.  IT'S JUST A SUMMARY

14      OF HOW MANY DIFFERENT INTERNET ADDRESSES WE RECEIVED DATA FROM.

15      Q.   LAST COUPLE QUESTIONS, SIR.

16           YOU TESTIFIED YOU'VE NEVER HEARD OF DR. RINARD; CORRECT.

17      A.   YES.

18      Q.   SO YOU DID NOT HELP DR. RINARD SET UP HIS FREEWAIS SF

19      SYSTEM IN 2013; CORRECT?

20      A.   MAYBE I DID, BUT I DON'T REMEMBER.

21      Q.   YOU DON'T REMEMBER; RIGHT, SIR?

22      A.   RIGHT.

23      Q.   NOW, YOU'VE BEEN PAID BY SAMSUNG.  YOU WERE PART OF THEIR

24      TEAM FOR THIS CASE.

25           BUT YOU WERE NEVER PUT IN TOUCH WITH DR. RINARD TO HELP

1    HIM WITH FREEWAIS SF; CORRECT?

2    A.   PAID BY SAMSUNG -- PAID BY SAMSUNG IS NOT CORRECT.  I GET

3    COMPENSATED BY QUINN, EMANUEL.

4         AND -- SORRY.  CAN YOU REPEAT THE REST OF IT?

5    Q.   SURE.  MY FINAL QUESTION, SIR, IS SAMSUNG NEVER ASKED YOU

6    TO SPEAK TO DR. RINARD TO HELP SET UP A FREEWAIS SF SYSTEM LAST

7    YEAR; CORRECT?

8    A.   I HAD NO CONTACT WITH SAMSUNG AT ALL.

9    Q.   SAMSUNG DIDN'T ASK YOU TO HELP DR. RINARD DETERMINE

10   WHETHER SUCH A SYSTEM WAS AVAILABLE BEFORE JANUARY 5TH, 2000;

11   RIGHT?

12   A.   I HAD NO CONTACT WITH SAMSUNG, SO THEY COULDN'T ASK ME.

13   Q.   OR SAMSUNG'S ATTORNEYS?  THEY NEVER ASKED YOU TO DO THAT?

14   A.   TO -- NO.

15   Q.   THANK YOU, SIR.

16        I HAVE NO FURTHER QUESTIONS?

17             THE COURT:  ALL RIGHT.  THE TIME IS 11:39.

18                   **REDIRECT EXAMINATION**

19   BY MS. MAROULIS:

20   Q.   MR. PFEIFER, TO CLARIFY, COULD FREEWAIS SF SEARCH BOTH

21   LOCALLY AND REMOTE AT THE SAME TIME?

22             MR. MUELLER:  I OBJECT AS OUTSIDE THE SCOPE OF

23   DIRECT, YOUR HONOR.  I EXPLICITLY --

24             MS. MAROULIS:  COUNSEL OPENED THE DOOR.

25             MR. MUELLER:  I DON'T THINK I DID.  I WOULDN'T ASK

```
1    HIM ABOUT THAT.  I DIDN'T ASK HIM ABOUT IT BECAUSE HE HADN'T

2    BEEN ASKED ABOUT IT ON DIRECT.  THE ONLY POINT I WAS MAKING IS

3    THAT HIS DIRECT DID NOT REACH THAT ISSUE.

4            THE COURT:  I'LL ALLOW IT.

5        GO AHEAD.

6    BY MS. MAROULIS:

7    Q.   SIR, COULD FREEWAIS SF SEARCH LOCALLY AND REMOTE AT THE

8    SAME TIME?

9    A.   YES, IT COULD.

10           MS. MAROULIS:  THANK YOU.  NO FURTHER QUESTIONS.

11           THE COURT:  ALL RIGHT.  THE TIME IS NOW --

12           MR. MUELLER:  NOTHING FURTHER, YOUR HONOR.

13           THE COURT:  -- 11:40.  MAY THIS WITNESS BE EXCUSED

14   AND IS IT SUBJECT TO RECALL OR NOT?

15           MS. MAROULIS:  NOT SUBJECT TO RECALL.

16           MR. MUELLER:  NOT SUBJECT, YOUR HONOR.

17           THE COURT:  OKAY.  YOU ARE EXCUSED.

18           THE WITNESS:  THANK YOU.

19       (PAUSE IN PROCEEDINGS.)

20           MR. PAK:  YOUR HONOR, SEAN PAK ON BEHALF OF SAMSUNG.

21       WE CALL DR. MARTIN RINARD, R-I-N-A-R-D.

22       (PAUSE IN PROCEEDINGS.)

23           THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

24       (DEFENDANTS' WITNESS, MARTIN RINARD, WAS SWORN.)

25           THE WITNESS:  I DO.
```

```
 1              THE CLERK:  WOULD YOU PULL THE MICROPHONE TOWARDS YOU

 2    AND PLEASE STATE YOUR NAME AND SPELL IT.

 3              THE WITNESS:  MY NAME IS MARTIN RINARD.  M-A-R-T-I-N,

 4    R-I-N-A-R-D.

 5              THE COURT:  ALL RIGHT.

 6         OH, I GUESS YOU'RE NOT READY.

 7         (PAUSE IN PROCEEDINGS.)

 8              THE COURT:  OKAY.  TIME IS NOW 11:43.  WE'LL GO UNTIL

 9    NOON.  GO AHEAD, PLEASE.
```

<div align="center">**DIRECT EXAMINATION**</div>

```
11    BY MR. PAK:

12    Q.   GOOD MORNING, DR. RINARD.

13    A.   GOOD MORNING.

14    Q.   WOULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY.

15    A.   MY NAME IS MARTIN RINARD.  I'M A PROFESSOR AT THE

16    MASSACHUSETTS INSTITUTE OF TECHNOLOGY, OTHERWISE KNOWN AS

17    M.I.T.

18         AT M.I.T. I TEACH COMPUTER SCIENCE IN THE ELECTRICAL

19    ENGINEERING AND COMPUTER SCIENCE DEPARTMENT.  AND I DO RESEARCH

20    IN THE COMPUTER SCIENCE AND ARTIFICIAL INTELLIGENCE LABORATORY

21    ALSO AT M.I.T.

22    Q.   DR. RINARD, JUST TO HELP WITH THE COURT REPORTER, IF YOU

23    COULD SPEAK A LITTLE BIT SLOWER, THAT WOULD HELP US A LOT?

24    A.   I'LL DO MY BEST.

25    Q.   OKAY.  THANK YOU.
```

1          NOW, DR. RINARD, HAVE YOU PREPARED SOME SLIDES TO HELP

2    WITH YOUR PRESENTATION HERE TODAY?

3    A.   I HAVE.

4    Q.   AND, DR. RINARD, LET'S PUT UP THE FIRST SLIDE, SDX 2883.

5    IS THAT YOU IN THE PICTURE?

6    A.   THAT IS INDEED ME.

7    Q.   SO LET'S BEGIN WITH HAVING YOU DESCRIBE BRIEFLY FOR US

8    YOUR EDUCATIONAL AND WORK EXPERIENCE WITH RESPECT TO THE '959

9    PATENT.

10   A.   SO I GOT A BACHELOR'S DEGREE IN COMPUTER SCIENCE FROM

11   BROWN UNIVERSITY IN PROVIDENCE, RHODE ISLAND.  I THEN WORKED

12   FOR TWO START-UP COMPANIES AS A SOFTWARE ENGINEER.

13        AFTER THAT I WENT BACK TO GRADUATE SCHOOL AT STANFORD

14   UNIVERSITY IN PALO ALTO UP HERE.  MY FIRST ACADEMIC JOB WAS IN

15   THE UNIVERSITY OF CALIFORNIA AT SANTA BARBARA, DOWN THE COAST

16   OF SANTA BARBARA.

17        AFTER SEVERAL YEARS THERE, I MOVED TO M.I.T. AND I'VE BEEN

18   AT M.I.T. EVER SINCE.

19   Q.   IF YOU COULD MOVE THE MIKE BACK A LITTLE BIT, THAT WOULD

20   HELP.  GREAT.

21        DR. RINARD, WHEN WE SEE M.I.T. COMPUTER SCIENCE AND

22   ARTIFICIAL INTELLIGENCE LABORATORY ON THE SCREEN, WHAT'S YOUR

23   ROLE WITH RESPECT TO THAT LAB.

24   A.   THAT'S THE MAIN LAB AT M.I.T. THAT DOES COMPUTER SCIENCE

25   AND ARTIFICIAL INTELLIGENCE RESEARCH.  I'M A MEMBER OF THAT

```
 1        LAB, AND I DO RESEARCH AT THAT LAB.

 2        Q.   IN ADDITION TO YOUR TEACHING RESPONSIBILITIES, DOCTOR, DO

 3        YOU ALSO PROVIDE RESEARCH AND CONDUCT RESEARCH?

 4        A.   YES, I DO.

 5        Q.   WHAT KIND OF RESEARCH DO YOU DO?

 6        A.   COMPUTER SECURITY, DISTRIBUTED SYSTEMS, ALL KINDS OF

 7        RESEARCH IN COMPUTER SCIENCE.

 8        Q.   HOW LONG HAVE YOU BEEN DOING THAT KIND OF RESEARCH?

 9        A.   I'VE BEEN PUBLISHED -- MY FIRST PAPER WAS PUBLISHED IN

10        1984.  SO THAT MEANS GOING ON 30 YEARS NOW I'VE BEEN A

11        PUBLISHED RESEARCHER.

12        Q.   DR. RINARD, DO YOU ALSO RECEIVE FUNDS FROM GOVERNMENTAL

13        ORGANIZATIONS FOR THE RESEARCH THAT YOU DID?

14        A.   YES, I DO.

15        Q.   LET'S SEE THE NEXT SLIDE.  WHAT ARE SOME OF THOSE

16        EARRINGS?

17        A.   SO DARPA, THIS IS THE DEFENSE ADVANCED RESEARCH PROJECTS

18        AGENCY.  IT IS THE ADVANCED GOVERNMENT RESEARCH ARM OF THE

19        DEPARTMENT OF DEFENSE.

20             SO MANY OF MY DARPA GRANTS ARE ADMINISTERED THROUGH THE

21        AIR FORCE RESEARCH LAB.

22        Q.   WHAT ELSE HAS DARPA INVESTED IN TO YOUR KNOWLEDGE?

23        A.   HELPED INVENT THE INTERNET AND STEALTH WARFARE TECHNOLOGY.

24        Q.   HOW ABOUT PRIVATE COMPANIES?  HAVE YOU RECEIVED FUNDS FROM

25        PRIVATE COMPANIES?
```

 1    A.   YES, I HAVE.

 2    Q.   AND --

 3    A.   THAT WOULD BE IBM, MICROSOFT, SAMSUNG, AND SUN

 4    MICROSYSTEMS.

 5    Q.   NOW, YOU MENTIONED SAMSUNG.  DOES THE FACT THAT SAMSUNG

 6    HAD, IN THE PAST, PROVIDED SOME RESEARCH FUNDING, DOES THAT

 7    AFFECT YOUR TESTIMONY HERE TODAY?

 8    A.   NO, IT DOES NOT.

 9    Q.   HOW LONG AGO AND WHAT WAS THE RELATIVE AMOUNT OF THE

10    FUNDING THAT YOU RECEIVED FROM SAMSUNG FOR YOUR RESEARCH?

11    A.   IT WAS, I BELIEVE, IN 2009, 2010 FOR ONE YEAR, AND IT WAS

12    SMALL COMPARED TO MY OTHER RESEARCH FUNDING.

13    Q.   NOW, TO QUALIFY YOU AS AN EXPERT FOR THE COURT, I HAVE TO

14    ASK YOU ABOUT ANY AWARDS OR HONORS THAT YOU HAVE RECEIVED.

15         CAN YOU TELL ME ABOUT A SIGNIFICANT AWARD THAT YOU HAVE

16    RECEIVED FROM YOUR COLLEAGUES IN A FIELD THAT'S RELATED TO THE

17    '959 PATENT.

18    A.   SURE.  SEVERAL YEARS AGO I WAS ELECTED AN ACM FELLOW.  ACM

19    IS THE ASSOCIATION FOR COMPUTING MACHINERY.  IT'S THE OLDEST

20    PROFESSIONAL SOCIETY RELATED TO COMPUTING AND ACM FELLOWS ARE

21    THE TOP 1 PERCENT OF THE MEMBERSHIP OF THE ACM.

22         MR. PAK:  YOUR HONOR, AT THIS POINT I'D LIKE TO

23    TENDER DR. RINARD AS AN EXPERT IN THE FIELD OF COMPUTER

24    SCIENCE, DISTRIBUTING SYSTEMS, AND DATA PROCESSING.

25         MS. KREVANS:  NO OBJECTION.

```
 1              THE COURT:  ALL RIGHT.  SO CERTIFIED.  OKAY.  GO

 2     AHEAD, PLEASE.

 3     BY MR. PAK:

 4     Q.   WHAT IS YOUR HOURLY RATE?

 5     A.   I CHARGE $850 AN HOUR.

 6     Q.   HOW DOES THAT RATE COMPARE?

 7     A.   THAT IS MY STANDARD CONSULTING RATE.

 8     Q.   APPROXIMATELY HOW MANY HOURS HAVE YOU SPENT WORKING ON

 9     THIS CASE?

10     A.   MORE THAN 900.

11     Q.   AND WHAT DID YOU SPEND ALL OF THAT TIME WORKING WITH

12     RESPECT TO THIS CASE?

13     A.   I WAS GIVEN TWO PATENTS TO ANALYZE, ONE OF WHICH IS NO

14     LONGER IN THE CASE; I WAS ASKED TO ANALYZE A LARGE AMOUNT OF

15     PRIOR ART; I WAS ASKED TO ANALYZE A LARGE AMOUNT OF SOFTWARE; I

16     ALSO REVIEWED A LOT OF TESTIMONY AND A LOT OF OTHER MATERIALS.

17     Q.   AND HAVING DONE ALL OF THAT WORK, HAVE YOU FORMED SOME

18     OPINIONS ABOUT THE '959 PATENT?

19     A.   YES, I HAVE.

20     Q.   AND ARE THOSE OPINIONS YOUR INDEPENDENT ASSESSMENT AND

21     CONCLUSIONS?

22     A.   YES, THEY ARE.

23     Q.   DR. RINARD, LET'S GO TO THE NEXT SLIDE IN YOUR

24     DEMONSTRATIVES.  CAN YOU SUMMARIZE FOR US BRIEFLY THE

25     ASSIGNMENT THAT WAS GIVEN TO YOU WITH RESPECT TO THE '959
```

1    PATENT?

2    A.   SURE.  MY FIRST ASSIGNMENT WAS TO ANALYZE THE PATENT; THE

3    SECOND WAS TO EVALUATE THE INFRINGEMENT ALLEGATIONS; AND THE

4    THIRD WAS TO EVALUATE THE VALIDITY OR THE INVALIDITY OF THE

5    PATENT.

6    Q.   REMIND US AGAIN, THE '959 PATENT, WHAT APPLICATION IN

7    PARTICULAR IS ACCUSED OF INFRINGEMENT BY APPLE AND ITS EXPERT,

8    DR. SNOEREN?

9    A.   THAT WOULD BE THE GOOGLE SEARCH APPLICATION.

10   Q.   DID YOU SAY THE GOOGLE SEARCH APPLICATION?

11   A.   THE GOOGLE SEARCH APPLICATION.

12   Q.   HAVE YOU -- HAVE WE HEARD A DIFFERENT NAME FOR THAT

13   APPLICATION?

14   A.   IT'S ALSO CALLED THE QUICK SEARCH BOX, AND SOMETIMES

15   REFERRED TO AS GOOGLE NOW.

16   Q.   GOOGLE SEARCH APPLICATION, WHICH COMPANY CREATED THAT

17   SOFTWARE?

18   A.   GOOGLE.

19   Q.   BASED ON THE EVIDENCE THAT YOU'VE SEEN, INCLUDING THE

20   SOURCE CODE, WAS THE GOOGLE SEARCH APPLICATION CODE MODIFIED BY

21   SAMSUNG IN ANY WAY?

22   A.   NO.

23   Q.   IS THE GALAXY NEXUS ONE OF THE ACCUSED DEVICES IN THIS

24   CASE?

25   A.   YES, IT IS.

```
1    Q.   AND BASED ON YOUR REVIEW OF THE EVIDENCE, INCLUDING THE

2    SOURCE CODE, DID SAMSUNG DESIGN OR MODIFY ANY OF THE SOFTWARE

3    CODE FOR THE GALAXY NEXUS?

4    A.   IT'S MY UNDERSTANDING THAT THE GALAXY NEXUS IS A GOOGLE

5    EXPERIENCE PHONE WHERE NONE OF THE THINGS CONTROLLED BY

6    SAMSUNG, IT'S ALL CONTROLLED BY GOOGLE.

7    Q.   AND DOES THAT INCLUDE THE ACCUSED GOOGLE SEARCH

8    APPLICATION?

9    A.   YES.

10   Q.   AND FOR ANY OF THE OTHER DEVICES FROM SAMSUNG THAT ARE AT

11   ISSUE WITH RESPECT TO THE '959 PATENT, HAS GOOGLE ACCUSED

12   ANYTHING IN THIS TRIAL OTHER THAN THE GOOGLE SEARCH

13   APPLICATION?

14   A.   DO YOU MEAN SAMSUNG -- YES.  HAS GOOGLE ACCUSED ANYTHING?

15   Q.   I'M SORRY.  HAS APPLE ACCUSED ANYTHING BESIDES THE GOOGLE

16   SEARCH APPLICATION?

17   A.   NO.  IT'S ONLY THE GOOGLE SEARCH APPLICATION FOR THIS

18   PATENT.

19   Q.   SOMETHING CALLED TOUCHWIZ FROM SAMSUNG.  DO YOU KNOW

20   WHETHER THAT'S BEEN ACCUSED BY APPLE WITH RESPECT TO THE '959

21   PATENT?

22   A.   MY UNDERSTANDING IS IT HASN'T.

23   Q.   DR. RINARD, WERE YOU HERE IN COURT WHEN DR. SNOEREN, ON

24   BEHALF OF APPLE, TESTIFIED ABOUT THE INFRINGEMENT ALLEGATIONS

25   AGAINST GOOGLE SEARCH APPLICATION?
```

1     A.   YES, I WAS.

2          MR. PAK:  YOUR HONOR, I'D LIKE TO PUT UP A

3     DEMONSTRATIVE FROM DR. SNOEREN'S PRESENTATION.  THAT'S PDX

4     91-24.

5     Q.   DR. RINARD, DO YOU RECALL THIS DEMONSTRATIVE AND ALSO THE

6     TESTIMONY THAT DR. SNOEREN GAVE ABOUT THAT?

7          AND CAN WE GO TO PDX 91-24.  THANK YOU.

8     A.   YES, I WAS PRESENT IN COURT FOR DR. SNOEREN'S TESTIMONY,

9     AND I RECALL THAT TESTIMONY, AND I RECALL HIM TESTIFYING ABOUT

10    THIS DIAGRAM.

11    Q.   AND SO WHAT ARE WE LOOKING AT HERE ON PDX 91-24?

12    A.   SO THIS IS A REPRESENTATION OF THE GOOGLE SEARCH

13    APPLICATION SOFTWARE ARCHITECTURE.

14    Q.   AND WHAT WAS DR. SNOEREN AT TRIAL TRYING TO DEMONSTRATE

15    THROUGH THIS PARTICULAR DEMONSTRATIVE?

16    A.   HE WAS TRYING TO DEMONSTRATE INFRINGEMENT OF THE '959

17    PATENT.

18    Q.   NOW, LET'S FOCUS ON THE BOXES OR THE LABELS TO THE LEFT,

19    BROWSER MODULE, CONTACTS MODULE, AND THE GOOGLE PLAY MODULE.

20         WHAT PARTICULAR ELEMENT WAS DR. SNOEREN TRYING TO

21    ILLUSTRATE THROUGH THE -- THROUGH THOSE PARTICULAR MODULES?

22    A.   LOCAL SEARCH.

23    Q.   NOW, THE GOOGLE MODULE TO THE RIGHT, WHICH ELEMENT WAS

24    DR. SNOEREN TRYING TO DEMONSTRATE THROUGH THAT PARTICULAR

25    MODULE?

1     A.   THE INTERNET HEURISTIC.

2     Q.   AND WHEN YOU SAY THE INTERNET HEURISTIC, DR. SNOEREN --

3     DR. RINARD, YOU MAY HAVE YOUR LASER POINTER THERE IN FRONT OF

4     YOU.

5          CAN YOU POINT OUT TO THE MEMBERS OF THE JURY WHICH ELEMENT

6     IN CLAIM 25 AND CLAIM 24 YOU'RE REFERRING TO?

7     A.   I'M GOING TO HAVE TO MOVE TO GET AROUND PEOPLE.  SO YOU

8     SEE THE ELEMENT SAYS "PROVIDE SAID INFORMATION IDENTIFIER TO A

9     PLURALITY OF HEURISTICS TO LOCATE INFORMATION IN THE PLURALITY

10    OF LOCATIONS WHICH INCLUDE THE INTERNET AND LOCAL STORAGE

11    MEDIA."

12    Q.   SO YOU'RE TALKING ABOUT THE HEURISTIC TO LOCATE

13    INFORMATION ON THE INTERNET?

14    A.   THAT'S CORRECT.

15    Q.   AND JUST TO SUMMARIZE, TO SHOW INFRINGEMENT, DOES APPLE

16    NEED TO SHOW EACH AND EVERY ELEMENT OF CLAIM 25?

17    A.   ALL OF THE ELEMENTS HAVE TO BE PRESENT FOR INFRINGEMENT TO

18    OCCUR.  IF EVEN ONE ELEMENT IS MISSING, THERE'S NO INFRINGEMENT

19    WHATSOEVER.

20    Q.   NOW, LOOKING AT THIS GOOGLE MODULE TO THE RIGHT,

21    DR. SNOEREN INCLUDED THE WORD "MODULE" IN DESCRIBING THAT PIECE

22    OF CODE.

23          DO YOU SEE THAT?

24    A.   YES, I DO.

25    Q.   DOES THE WORD "MODULE" ACTUALLY APPEAR ANYWHERE IN THE

1      CLAIM LANGUAGE OF CLAIM 24 OR 25?

2      A.   NO, IT DOES NOT.

3      Q.   AND IS THAT SIGNIFICANT?

4      A.   IT'S VERY SIGNIFICANT.

5      Q.   AND WHY IS THAT?

6      A.   WELL, BECAUSE IT MEANS THAT THE WORD "MODULE" IS

7      IRRELEVANT IN THIS CASE.  IT'S NOT PRESENT IN THE CLAIM

8      LANGUAGE, IT'S NOT PRESENT IN THE MEANING OF THE TERMS AS

9      DEFINED BY THE COURT.  IT'S JUST NOT RELEVANT.

10     Q.   DO YOU BELIEVE THAT IT WOULD BE PROPER TO INCLUDE THE WORD

11     "MODULE" IN ANALYZING THE CLAIMS OF CLAIM 24 AND 25?

12     A.   IT WOULD BE IMPROPER.

13     Q.   NOW, LOOKING AT THE GOOGLE MODULE FROM DR. SNOEREN'S

14     DIAGRAM, IF WE COULD ZOOM THAT UP IN THE NEXT POWERPOINT SLIDE

15     HERE, THERE ARE TWO ARROWS YOU SEE THAT ARE PRESENTED ON THE

16     SCREEN COMING OFF OF GOOGLE MODULE.

17     A.   I SEE THOSE TWO ARROWS.

18     Q.   ONE IS GOING TO THE INTERNET AND THE OTHER IS GOING TO THE

19     LOCAL DATABASE.

20          DO YOU SEE THAT?

21     A.   I DO SEE THAT.

22     Q.   IF WE FOCUS ON WHAT'S BEEN IDENTIFIED AS THE INTERNET IN

23     THE GOOGLE MODULE, WHAT IS THAT REFERRING TO, ACCORDING TO

24     DR. SNOEREN?

25     A.   THE GOOGLE SERVERS.

```
 1    Q.   AND WHEN YOU SAY GOOGLE SERVERS, WHAT ARE YOU REFERRING

 2    TO?

 3    A.   GOOGLE SUGGESTION SERVERS SITTING ON THE INTERNET IN DATA

 4    CENTERS THROUGHOUT THE WORLD.

 5    Q.   WHEN YOU TALK ABOUT GOOGLE SERVERS, IS THAT ON A PHONE

 6    DEVICE ANYWHERE?

 7    A.   NO, NO, NO.  IT'S IN A BIG AIR CONDITIONED BUILDING.

 8    Q.   SOMEWHERE ON THE INTERNET?

 9    A.   SOMEWHERE ON THE INTERNET.

10    Q.   AND JUST TO REMIND US, IS SIMPLY SEARCHING INFORMATION ON

11    THE INTERNET ENOUGH TO SATISFY THE LIMITATION OF CLAIM 25?

12    A.   NO, BECAUSE THE PLURALITY OF LOCATIONS HAVE TO INCLUDE

13    BOTH THE INTERNET AND LOCAL STORAGE MEDIA.

14    Q.   AND WERE YOU HERE WHEN DR. SNOEREN TESTIFIED ABOUT THE

15    GOOGLE MODULE AND THE CONNECTION TO THE INTERNET IN HIS

16    DIAGRAM?

17    A.   YES.

18              MR. PAK:  AND, YOUR HONOR, I'D LIKE TO PRESENT SOME

19    TESTIMONY FROM TRIAL FROM DR. SNOEREN, AND THIS IS TRIAL

20    TESTIMONY AT PAGE 1005, LINE 12 THROUGH 14.

21              THE COURT:  GO AHEAD, PLEASE.

22              MR. PAK:  THANK YOU.

23    Q.   SO DR. SNOEREN WAS ASKED:

24         "QUESTION, YOU'RE NOT ACCUSING THE FUNCTIONALITY OF THE

25    GOOGLE SEARCH SERVER; RIGHT?
```

1        "ANSWER:  I THINK THAT'S FAIR."

2        DO YOU SEE THAT?

3    A.   I DO SEE THAT.

4    Q.   WHAT IS THE SIGNIFICANCE OF THAT TESTIMONY FROM

5    DR. SNOEREN?

6    A.   THE SIGNIFICANCE OF THIS TESTIMONY IS THAT THE GOOGLE

7    SERVERS CANNOT POSSIBLY BE THE REQUIRED HEURISTIC TO LOCATE

8    INFORMATION ON THE INTERNET.

9    Q.   IS THE GOOGLE SERVER TECHNOLOGY THAT LIVES ON THE INTERNET

10   AT ALL AT ISSUE IN THIS CASE WITH RESPECT TO THE '959 PATENT?

11   A.   NO, DR. SNOEREN STATED EXPLICITLY THAT HE'S NOT ACCUSING

12   THAT PARTICULAR SET OF SERVERS.

13   Q.   NOW, THE GOOGLE SEARCH ENGINE TECHNOLOGY THAT EXISTED ON

14   THE INTERNET, DO YOU KNOW THE TIMEFRAME THAT WAS CREATED FOR

15   THE FIRST TIME?

16   A.   1997.

17   Q.   AND HOW DO YOU KNOW THAT DATE?

18   A.   BECAUSE AT THAT TIME, AS SOON AS IT CAME OUT, I, AND

19   ESSENTIALLY EVERYONE I KNEW, SWITCHED FROM WHATEVER SEARCH

20   ENGINE WE WERE USING TO USE GOOGLE BECAUSE GOOGLE GAVE SO MUCH

21   BETTER RESULTS.

22   Q.   AND THE TIMEFRAME AGAIN?

23   A.   1997.

24   Q.   MR. KOTARSKI, IF WE CAN GO BACK TO PDX 91.24.

25        NOW, IF WE FOCUS ON THE LEFT ARROW THAT IS COMING OUT OF

```
 1    THE GOOGLE MODULE, THE LOCAL DATABASE, DO YOU HAVE AN

 2    UNDERSTANDING OF WHAT DR. SNOEREN IS REPRESENTING BY THAT ARROW

 3    AND BOX?

 4    A.    YES.   THAT IS A CONNECTION TO STORED SEARCH HISTORY, LOCAL

 5    STORED SEARCH HISTORY.

 6    Q.    AND CAN YOU EXPLAIN A LITTLE BIT TO THE JURY WHAT IS MEANT

 7    BY LOCAL SEARCH HISTORY DATABASE?

 8    A.    SURE.   SO ON YOUR PHONE, ON A PHONE, THERE'S LOCAL STORAGE

 9    THAT YOU CAN, THAT THE PHONE CAN ACCESS DIRECTLY.   INSIDE THAT

10    STORAGE, THERE'S A DATABASE OF INFORMATION.   ONE OF THE THINGS

11    IN THIS PARTICULAR DATABASE IS YOUR SEARCH HISTORY.

12    Q.    AND WERE YOU HERE FOR THE TESTIMONY OF DR. BJORN BRINGERT

13    FROM GOOGLE WHO WORKED ON THIS CODE ON BEHALF OF GOOGLE?

14    A.    YES, I WAS.

15    Q.    AND DID YOU HEAR TESTIMONY FROM DR. BRINGERT ABOUT HOW

16    WIDELY OR NOT WIDELY THIS LOCAL HISTORY DATABASE IS USED?

17    A.    YES, I DID HEAR THAT TESTIMONY.

18    Q.    AND WHAT DID HE SAY ABOUT THAT?

19    A.    HE SAID THE LOCAL DATABASE WAS VERY INFREQUENTLY USED.

20    AND THE REASON WAS THAT IF YOU HAVE A GOOGLE APP ON YOUR PHONE,

21    AND THE VAST MAJORITY OF USERS DO, THIS DATABASE IS NOT USED.

22    Q.    AND DO YOU REMEMBER APPROXIMATELY WHAT PERCENTAGE?

23    A.    DR. BRINGERT SAID THAT 92 PERCENT OF PHONES WORLDWIDE HAD

24    A GOOGLE ACCOUNT ON THEM, AND THERE'S A LARGE PROPORTION IN THE

25    UNITED STATES.
```

1    Q.   NOW, JUST TO REMIND US, THIS LOCAL DATABASE, WHERE IS THAT

2    STORED?  IS THAT ON THE INTERNET OR IS THAT ON THE PHONE?

3    A.   THAT'S ON THE PHONE.

4    Q.   LET'S LOOK AT WHAT DR. SNOEREN HAD TO SAY ABOUT THIS LOCAL

5    DATABASE ELEMENT FROM THE GOOGLE MODULE.

6         AND, YOUR HONOR, I'D LIKE TO SHOW TRIAL TESTIMONY PAGE

7    1004, LINES 7 THROUGH 20.

8              THE COURT:  GO AHEAD, PLEASE.

9              MR. PAK:  THANK YOU.  THIS IS DR. SNOEREN'S TESTIMONY

10   FROM TRIAL.

11   Q.   DO YOU SEE THAT?

12   A.   I DO SEE THAT.

13   Q.   YOU WERE ASKED, "YOU'RE NOT SAYING THAT A HEURISTIC TO

14   LOOK AT INFORMATION THAT'S PREVIOUSLY BEEN RETRIEVED AND STORED

15   FROM THE INTERNET IS SEARCHING, LOCATING INFORMATION ON THE

16   INTERNET."

17        AND DO YOU SEE THAT QUESTION?

18   A.   YES.

19        WHEN HE WAS ASKED THAT QUESTION, HE GIVES THE ANSWER AND

20   HE SAYS "I THINK IT DEPENDS ON WHAT THE HEURISTIC IS ACTUALLY

21   DOING AND WHERE IT'S DOING THAT."

22        DO YOU SEE THAT?

23   A.   I DO SEE THAT.

24   Q.   DR. RINARD, WHAT IS YOUR UNDERSTANDING OF WHAT DR. SNOEREN

25   WAS SAYING ABOUT WHETHER THE ISSUE OF SEARCHING SOMETHING

```
 1    THAT'S LOCAL IS ACTUALLY SEARCHING SOMETHING THAT'S ON THE

 2    INTERNET?

 3    A.   HE APPEARS TO BE SAYING THAT SEARCHING SOMETHING LOCAL IS

 4    SEARCHING SOMETHING ON THE INTERNET.

 5    Q.   DOES THAT MAKE ANY SENSE TO YOU FROM A TECHNOLOGICAL

 6    STANDPOINT?

 7    A.   THAT MAKES NO SENSE WHATSOEVER.  IF YOU'RE GOING TO SEARCH

 8    ON THE INTERNET, YOU'VE GOT TO SEARCH ON THE INTERNET.  YOU

 9    CAN'T SEARCH ON YOUR LOCAL DEVICE.

10    Q.   SO LOOKING AT THIS LOCAL DATABASE, IS THAT ON THE INTERNET

11    OR IS THAT ON THE PHONE?

12    A.   THE LOCAL DATABASE IS ON THE TELEPHONE.  IT'S ON THE

13    PHONE.

14    Q.   AND IF WE GO BACK TO THE GOOGLE MODULE PICTURE AGAIN, PDX

15    91.24, DO YOU RECALL DR. SNOEREN TALKING ABOUT SOMETHING CALLED

16    BLENDING?

17    A.   YES, I DO RECALL THAT.

18    Q.   AND WHAT WAS DR. SNOEREN DISCUSSING AS A BLENDING FUNCTION

19    IN THE GOOGLE MODULE?

20    A.   SO HE POINTED TO SOME CODE THAT TOOK RESULTS FROM THE

21    LOCAL DATABASE AND RESULTS FROM THE GOOGLE SERVERS AND BLENDED

22    THEM TOGETHER INTO A SINGLE LIST OF RESULTS TO SHOW TO THE USER

23    ON THE PHONE.

24    Q.   SO IT'S -- AND, AGAIN, WHAT IS IT BLENDING?

25    A.   IT'S BLENDING ALL OF THE LOCATED RESULTS.
```

1      Q.   IS BLENDING INFORMATION THAT'S ALREADY BEEN FOUND EITHER

2      FROM THE LOCAL DATABASE OR THE INTERNET A HEURISTIC FOR

3      LOCATING ANY TYPE OF INFORMATION?

4               MS. KREVANS:  OBJECTION.

5               THE WITNESS:  NO, IT'S NOT.

6               MS. KREVANS:  LEADING, YOUR HONOR.

7               MR. PAK:  LET ME REPHRASE IT, YOUR HONOR.

8               THE COURT:  OKAY.  PLEASE DO SO.  THE OBJECTION'S

9      SUSTAINED.

10     BY MR. PAK:

11     Q.   WITH RESPECT TO THE BLENDING FUNCTIONALITY THAT WE JUST

12     TALKED ABOUT, WHAT IS YOUR OPINION ON WHETHER THAT BLENDING

13     SATISFIES ANY OF THE CLAIM ELEMENTS IN CLAIM 25?

14     A.   THE BLENDING CAN'T POSSIBLY BE IN ANY OF THE HEURISTICS IN

15     CLAIM 25, BECAUSE ALL OF THE HEURISTICS IN CLAIM 25 HAVE TO

16     LOCATE INFORMATION AND THE BLENDING OPERATION IS NOT LOCATING

17     INFORMATION.

18          WHAT IT'S DOING IS TAKING INFORMATION THAT HAS ALREADY

19     BEEN LOCATED, EITHER IN THE LOCAL DATABASE OR BY THE GOOGLE

20     SERVERS, AND PUTTING IT TOGETHER.  SO IT CAN'T POSSIBLY BE ANY

21     OF THE HEURISTICS IN CLAIM 25.

22     Q.   AND HAVE YOU HAD A CHANCE TO ANALYZE THE ACTUAL SOURCE

23     CODE THAT CORRESPONDS TO THE BLENDING FUNCTIONALITY ACCUSED?

24     A.   YES, I HAVE.

25     Q.   AND DOES YOUR REVIEW OF THE SOURCE CODE INFORM YOUR

1    OPINION IN THAT REGARD?

2    A.   IT INDEED DOES.

3    Q.   AND DOES IT SUPPORT YOUR OPINION?

4    A.   IT SUPPORTS MY OPINION.

5    Q.   AND AGAIN, DR. RINARD, THE LANGUAGE, CAN YOU READ INTO THE

6    RECORD THE LANGUAGE THAT TALKS ABOUT LOCATING INFORMATION THAT

7    YOU JUST DISCUSSED?

8    A.   IF I CAN -- YEAH.  OKAY.  YEAH.  TO PROVIDE "SAID

9    INFORMATION IDENTIFIER TO A PLURALITY OF HEURISTICS TO LOCATION

10   INFORMATION IN THE PLURALITY OF LOCATIONS WHICH INCLUDE THE

11   INTERNET AND LOCAL STORAGE MEDIA."

12        THE COURT:  I'M SORRY TO INTERRUPT YOU, BUT THE TIME

13   IS NOW NOON.  LET'S GO AHEAD AND TAKE OUR ONE HOUR LUNCH BREAK

14   UNTIL 1:00 O'CLOCK.

15        PLEASE DON'T RESEARCH OR DISCUSS THE CASE.  WE'LL SEE YOU

16   BACK IN AN HOUR.  THANK YOU.

17        (JURY OUT AT 12:01 P.M.)

18        THE COURT:  YOU MAY STEP DOWN.

19        ALL RIGHT.  LET'S GO AHEAD AND TAKE OUR BREAK.  THANK YOU.

20        MR. PAK:  THANK YOU, YOUR HONOR.

21        (LUNCH RECESS WAS TAKEN FROM 12:01 P.M. TO 1:02 P.M.)

22

23

24

25

DIRECT RINARD

1        **AFTERNOON SESSION**

2        (JURY OUT AT 1:02 P.M.)

3            THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

4        LET ME ASK ONE QUICK QUESTION WITH REGARD TO DR. WIGDOR.

5        WHAT KIND OF IMPEACHMENT WOULD APPLE ENVISION

6   NECESSITATING USE OF THE SUMMARY JUDGMENT ORDER?  BECAUSE I

7   THINK I MIGHT REVERSE MY RULING ON THAT.  I DON'T REALLY SEE

8   WHY IT WOULD BE NECESSARY.

9            MR. MCELHINNY:  IT GOES TO THE QUESTION OF -- WELL,

10   YOU DON'T WANT TO HEAR THAT.

11        BUT HE'S TESTIFYING ON NON-INFRINGING ALTERNATIVES, YOUR

12   HONOR.

13            THE COURT:  YES.

14            MR. MCELHINNY:  SO THE QUESTION IS WHAT DEFINITION OF

15   THE INFRINGEMENT HE'S USING FOR THAT.

16            THE COURT:  WELL, I ASSUME HE WOULD TESTIFY

17   CONSISTENT WITH THE INFRINGEMENT SUMMARY JUDGMENT ORDER.

18            MR. MCELHINNY:  THAT'S WHY -- THIS IS JUST -- I AGREE

19   WITH THAT.  I ABSOLUTELY AGREE THAT HE WILL, AND THEN WE'LL

20   NEVER SEE THAT ORDER, AND IT'LL NEVER COME UP.

21            THE COURT:  WELL, I DON'T WANT ANY LONG SPEAKING

22   PREEMPTIVE OBJECTIONS DURING ANY OF THESE EXPERT WITNESS'

23   TESTIMONY, LIKE WHAT HAPPENED WITH THE PREVIOUS EXPERT,

24   DR. JEFFAY, I JUST DON'T WANT TO SEE THOSE OBJECTIONS AGAIN.

25   OKAY?

```
 1            I WILL -- I DON'T THINK THAT THE SUMMARY JUDGMENT ORDER

 2     SHOULD COME UP AT ALL, AND DR. WIGDOR IS NOT GOING TO TESTIFY

 3     ABOUT THE ISSUE OF INFRINGEMENT.  I DOUBT IT WILL COME UP WITH

 4     REGARD TO NON-INFRINGING ALTERNATIVES, BECAUSE I'M ASSUMING

 5     HE'S GOING TO TESTIFY CONSISTENT WITH THE SUMMARY JUDGMENT

 6     ORDER, SO I REALLY SEE NO CIRCUMSTANCE IN WHICH THAT WOULD

 7     BE --

 8            MR. MCELHINNY:  UNLESS HE TESTIFIES INCONSISTENTLY

 9     WITH THE NON-INFRINGEMENT ORDER.  THAT'S ALL I WANT TO

10     ESTABLISH, YOUR HONOR.

11            THE COURT:  WELL, BEFORE THAT HAPPENS, YOU'LL HAVE TO

12     GET APPROVAL FROM ME.

13            MR. MCELHINNY:  I UNDERSTAND.

14            THE COURT:  BEFORE YOU ASK ANY QUESTION WITH REGARD

15     TO THAT.  OKAY.  WE'LL HAVE TO TAKE A BREAK AND I'D HAVE TO

16     HAVE AN OPPORTUNITY TO THINK ABOUT IT.

17            MR. MCELHINNY:  WITH REGARD TO WHAT, YOUR HONOR?

18     YOU'RE TALKING ABOUT THE ORDER?

19            THE COURT:  I DON'T THINK THAT THE SUMMARY JUDGMENT

20     ORDER SHOULD BE USED WITH DR. WIGDOR.

21            MR. MCELHINNY:  THANK YOU, YOUR HONOR.

22            THE COURT:  SO ANYWAY --

23            MR. MCELHINNY:  OKAY.  I UNDERSTAND.

24            THE COURT:  I THINK I'VE MADE MYSELF CLEAR.  SO NO

25     MORE LONG, SPEAKING OBJECTIONS, PLEASE.
```

```
 1              ALL RIGHT.  LET'S BRING OUR JURY IN.

 2              (JURY IN AT 1:04 P.M.)

 3              THE COURT:  OKAY.  GOOD AFTERNOON.  WELCOME BACK.

 4     PLEASE TAKE A SEAT.  TIME IS NOW 1:05.  GO AHEAD, PLEASE.

 5              MR. PAK:  THANK YOU, YOUR HONOR.

 6     Q.   WELCOME BACK, DR. RINARD.

 7     A.   THANK YOU.

 8     Q.   BEFORE THE LUNCH BREAK, WE WERE TALKING ABOUT THE ACCUSED

 9     BLENDING FUNCTIONALITY IN THE GOOGLE SEARCH APPLICATION.  DO

10     YOU RECALL THAT?

11     A.   YES, I DO.

12     Q.   WERE YOU HERE WHEN DR. BJORN BRINGERT FROM GOOGLE

13     TESTIFIED ABOUT THAT FUNCTIONALITY IN THE GOOGLE SEARCH

14     APPLICATION?

15     A.   I WAS.

16              MR. PAK:  YOUR HONOR, I'D LIKE TO PRESENT SOME TRIAL

17     TESTIMONY FROM DR. BRINGERT.

18              THE COURT:  GO AHEAD, PLEASE.

19              MR. PAK:  PAGE 1567, LINE 8 THROUGH 23.

20     Q.   DR. RINARD, DO YOU SEE THE TESTIMONY THAT WE PRESENTED ON

21     THE SCREEN FROM DR. BRINGERT?

22     A.   YES, I DO.

23     Q.   AND DO YOU SEE THAT SPECIFICALLY HE TESTIFIED THAT THE

24     BLENDING RESULTS DOES NOT SEARCH THE INTERNET, DOES NOT SEARCH

25     ANYTHING AT ALL, AND DOES NOT LOCATE ANYTHING?
```

```
 1          DO YOU SEE THAT?

 2    A.   YES.

 3    Q.   AND DO YOU REMEMBER HIM GIVING THE EXAMPLE OF THE BLENDER

 4    WITH THE MILK AND THE BANANAS?

 5    A.   THE ICE CREAM, YES, I REMEMBER THAT.

 6    Q.   NOW, DR. RINARD, HAVING DONE YOUR OWN INDEPENDENT

 7    INVESTIGATION INTO THE SOURCE CODE AND ALL OF THE EVIDENCE IN

 8    THIS CASE, DO YOU AGREE WITH DR. BRINGERT'S TESTIMONY ABOUT THE

 9    BLENDING FUNCTIONALITY.

10    A.   I ABSOLUTELY --

11          MS. KREVANS:  OBJECTION.  LEADING, YOUR HONOR.

12          THE COURT:  SUSTAINED.

13    BY MR. PAK:

14    Q.   DO YOU AGREE -- HOW DOES DR. BRINGERT TESTIMONY AT TRIAL

15    COMPORT OR RELATE TO YOUR TESTIMONY?

16    A.   SO I ANALYZED THE SOURCE CODE AND WHAT I FOUND IS EXACTLY

17    CONSISTENT WITH WHAT DR. BRINGERT SAID.

18          MR. PAK:  YOUR HONOR, I WOULD ALSO LIKE TO PRESENT

19    THE SDX 3009 DEMONSTRATIVE THAT DR. BRINGERT DREW FOR US, WHICH

20    IS NOW PART OF THE TRIAL RECORD.

21          THE COURT:  OKAY.  IT'S NOT BEEN ADMITTED, BUT THAT'S

22    FINE.

23          MR. PAK:  THAT'S RIGHT, YOUR HONOR.  WE'LL ONLY BE

24    USING IT AS A DEMONSTRATIVE.

25          THE COURT:  GO AHEAD, PLEASE.
```

```
 1       BY MR. PAK:

 2       Q.   OKAY.  DR. RINARD, LOOKING AT THIS PICTURE, DO YOU RECALL

 3       THAT THIS IS THE HIGH-LEVEL ARCHITECTURE DIAGRAM THAT

 4       DR. BRINGERT DREW.

 5       A.   YES.

 6              MS. KREVANS:  YOUR HONOR, THIS IS NOT IN HIS EXPERT

 7       REPORT.  I HAVE NO OBJECTION SO LONG AS WE'RE ALSO ABLE TO USE

 8       IT.

 9              THE COURT:  THAT'S FINE.

10       BY MR. PAK:

11       Q.   DR. RINARD, LOOKING AT THIS HIGH-LEVEL DIAGRAM, WHAT DID

12       DR. BRINGERT CONVEY WITH THIS DIAGRAM WITH RESPECT TO YOUR

13       TESTIMONY HERE TODAY?

14       A.   SO IF YOU WILL LOOK AT THE RED BOX, THAT IS WHAT'S ON THE

15       PHONE.  OKAY?

16              AND IF YOU LOOK AT THE CLOUD OVER HERE, THOSE ARE THE

17       GOOGLE SERVERS.  OKAY?  THAT'S WHAT BJORN BRINGERT SAID LOCATES

18       INFORMATION ON THE INTERNET.  OKAY?

19              AND HE SAID THAT IS NOT ACCUSED BY DR. SNOEREN.

20       Q.   WITH RESPECT TO THE LOCAL DATABASE, IS THAT DEPICTED HERE

21       ON THIS DIAGRAM (INDICATING)?

22       A.   YES.  THERE'S A LOCAL DATABASE RIGHT THERE.

23              MS. KREVANS:  I'M SORRY, YOUR HONOR.  THE WITNESS

24       JUST TESTIFIED ABOUT SOMETHING THAT MR. BRINGERT DID NOT

25       ACTUALLY SAY.  HE SAID THAT MR. BRINGERT GAVE OPINIONS ABOUT
```

```
 1        WHAT DR. SNOEREN SAID.

 2        BY MR. PAK:

 3        Q.   DO YOU WANT TO CLARIFY?

 4        A.   SURE.

 5             MS. KREVANS:  I MOVE TO STRIKE THAT.

 6             THE COURT:  ALL RIGHT.  THAT MOTION IS GRANTED.

 7        THAT'S STRICKEN.  GO AHEAD, PLEASE.

 8        BY MR. PAK:

 9        Q.   DR. RINARD, CAN YOU RESTATE YOUR OPINION AGAIN?

10        A.   SO WHAT DR. BRINGERT SAID WAS WHEN YOU TYPE IN SOMETHING,

11        AND HERE IT WAS THE GOOGLE QUICK SEARCH BOX, IT GOES OUT TO

12        GOOGLE SERVERS AND YOU GET THE RESULTS BACK HERE AND IN A

13        MINORITY OF THE CASE, YOU SEARCH THE LOCAL DATABASE RIGHT

14        THERE, AND THE RESULTS COME BACK HERE (INDICATING).

15        Q.   AND, DR. RINARD, HAVING EVALUATED DR. SNOEREN'S

16        INFRINGEMENT ALLEGATIONS, IS HE ACCUSING THE SEARCH OF THE

17        GOOGLE SERVER TO THE RIGHT OF THE CLOUD?

18        A.   HE IS NOT ACCUSING THE GOOGLE SERVERS ON THE RIGHT.

19        Q.   MR. KOTARSKI, WE CAN TAKE THAT DOWN.

20             NOW, DR. RINARD, HAVE YOU SEEN ANY EVIDENCE IN THIS CASE

21        INDICATING WHETHER DR. SNOEREN'S INFRINGEMENT THEORY DEPENDS ON

22        THIS SEARCH OF THE LOCAL DATABASE IN ORDER TO SATISFY THE

23        HEURISTIC TO LOCATE INFORMATION ON THE INTERNET?

24        A.   YES.

25        Q.   AND WHAT EVIDENCE DO YOU HAVE IN MIND?
```

1    A.   SO THERE IS AN ALTERNATE IMPLEMENTATION OF THE GOOGLE

2    SEARCH APPLICATION THAT HAS THAT LOCAL DATABASE REMOVED.

3    Q.   AND DO YOU KNOW WHAT VERSION?

4    A.   THAT IS VERSION 2.7.

5    Q.   DID YOU, SIR, HAVE A CHANCE TO ANALYZE THAT SOURCE CODE

6    AND PROVIDE TESTIMONY AND ANALYSIS IN YOUR EXPERT REPORT?

7    A.   NO.

8    Q.   DID YOU LOOK AT VERSION 2.7?

9    A.   NOT FOR MY EXPERT REPORT.

10   Q.   DID YOU HAVE A CHANCE TO OPINE ABOUT IT.

11   A.   YES -- NO.

12   Q.   OKAY.  DID YOU GIVE -- DID YOU ACCUSE -- DO YOU HAVE AN

13   OPINION, SITTING HERE TODAY, DR. RINARD, ON WHETHER THE GOOGLE

14   SEARCH APPLICATION, VERSION 2.7, INFRINGES THE PATENT OR NOT?

15   A.   YES, I DO.

16   Q.   WHAT IS THAT OPINION?

17   A.   IT DOES NOT INFRINGE.

18   Q.   AND HAVING MADE THAT POSITION ON THE RECORD, DO YOU KNOW

19   WHETHER DR. SNOEREN HAS ANY INFRINGEMENT ALLEGATIONS AGAINST

20   VERSION 2.7 OF THE GOOGLE SEARCH APPLICATION?

21   A.   DR. SNOEREN HAS NO INFRINGEMENT ALLEGATIONS WHATSOEVER.

22   Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHETHER DR. SNOEREN

23   WAS GIVEN THE OPPORTUNITY TO ANALYZE THAT SOURCE CODE?

24   A.   MY UNDERSTANDING IS THAT HE WAS, THAT HE WAS GIVEN THE

25   OPPORTUNITY TO ANALYZE THAT SOURCE CODE.

1    Q.   AND SITTING HERE TODAY, DO YOU KNOW WHETHER DR. SNOEREN

2    HAS EVER OFFERED ANY INFRINGEMENT ALLEGATION AGAINST VERSION

3    2.7 OF THE GOOGLE SEARCH APPLICATION.

4    A.   DR. SNOEREN --

5              MS. KREVANS:  OBJECTION, YOUR HONOR.

6              THE COURT:  OKAY, WAIT.  THERE'S AN OBJECTION.

7    PLEASE DON'T ANSWER UNTIL I HAVE A CHANCE TO RULE.

8              THE WITNESS:  I APOLOGIZE.

9              MS. KREVANS:  HE'S LEADING HIM, YOUR HONOR.

10             THE COURT:  SUSTAINED.

11   BY MR. PAK:

12   Q.   DO YOU KNOW WHETHER THERE IS ANY INFRINGEMENT ALLEGATION

13   AGAINST GOOGLE SEARCH, VERSION 2.7?

14   A.   THERE IS NO ALLEGATION OF INFRINGEMENT AGAINST THIS

15   VERSION.

16   Q.   NOW, DR. RINARD, HAVE YOU PREPARED SOME SLIDES

17   DEMONSTRATING THE ARCHITECTURAL ASPECTS OF THE GOOGLE SEARCH

18   APPLICATION, VERSION 2.7?

19   A.   YES, I HAVE.

20             MR. PAK:  AND, YOUR HONOR, I'D LIKE TO PRESENT A

21   DEMONSTRATIVE SDX 2914.

22             MS. KREVANS:  YOUR HONOR, THIS IS NOT IN THE REPORT

23   THAT MR. -- THAT DR. RINARD GAVE US.

24             MR. PAK:  HE -- MAY I RESPOND, YOUR HONOR?

25             THE COURT:  YES.

1           MR. PAK:  IT'S DESCRIBED IN TEXT ON PAGE 3, PARAGRAPH

2    335 OF DR. RINARD'S REBUTTAL REPORT, YOUR HONOR.

3           THE COURT:  AND WHAT'S THE -- DO I HAVE THE

4    DEMONSTRATIVE?

5           MR. PAK:  THE DEMONSTRATIVE IS SDX 2914.

6           THE COURT:  PARAGRAPH 334 IS ABOUT WAIS.  IS THERE

7    ANOTHER --

8           MR. PAK:  IT'S ACTUALLY IN THE REBUTTAL REPORT, YOUR

9    HONOR, IN THE OPENING -- RINARD'S REBUTTAL REPORT, PARAGRAPH

10   335.

11          MS. KREVANS:  AND, YOUR HONOR, THIS PARAGRAPH IS

12   ABOUT FUNCTIONALITY.  THERE'S -- HE'S ASKING HIM ABOUT

13   ARCHITECTURE.

14          THE COURT:  OVERRULED.

15       GO AHEAD, PLEASE.

16   BY MR. PAK:

17   Q.   DR. RINARD, LOOKING AT SDX 2914, WHAT HAVE YOU DEPICTED ON

18   THIS SLIDE AS TO THE ARCHITECTURE OF THE GOOGLE SEARCH

19   APPLICATION, VERSION 2.7?

20   A.   IT HAS NO LOCAL SEARCH ENTRY DATABASE.

21   Q.   AND HOW HAVE YOU INDICATED THAT IN THIS DEMONSTRATIVE?

22   A.   WITH A RED BOX MISSING THE DATABASE.

23   Q.   AND, DR. RINARD, IF WE COMPARE THIS TO THE ACTUAL

24   PRESENTATION OF THE ACCUSED ARCHITECTURE FROM DR. SNOEREN TO

25   THE LEFT, WHAT IS YOUR TESTIMONY REGARDING THE COMPARISON OF

1       THESE TWO ARCHITECTURES?

2       A.   SO IF YOU LOOK AT THE ARCHITECTURE ON THE RIGHT, YOU'LL

3       SEE THAT IT'S MISSING THE LOCAL DATABASE.

4            THIS ARCHITECTURE IS NOT ACCUSED, HAS NO INTERNET

5       HEURISTIC, THERE IS NO HEURISTIC FOR LOCATING INFORMATION ON

6       THE INTERNET.

7            NOW, IF YOU LOOK ON THE -- ON THE ARCHITECTURE DIAGRAM ON

8       THE LEFT, YOU'LL SEE THAT IT HAS THIS LOCAL DATABASE.

9            NOW, THE ONE ON THE LEFT IS ACCUSED, THE ONE ON THE RIGHT

10      IS NOT.

11           THERE'S NO WAY TO GET A HEURISTIC THAT LOCATES INFORMATION

12      ON THE INTERNET JUST BY ADDING THE LOCAL DATABASE BECAUSE THE

13      ONLY THING THAT YOU CAN ADD THERE IS SOMETHING THAT SEARCHES

14      LOCALLY BUT NOT IN THE INTERNET.

15      Q.   SO, DR. RINARD, CAN YOU SUMMARIZE FOR THE JURY WHAT YOUR

16      ULTIMATE OPINION IS ON THE QUESTION OF NON-INFRINGEMENT WITH

17      RESPECT TO THE ACCUSED GOOGLE SEARCH APPLICATION ON THE LEFT?

18      A.   SO CLEARLY THE ACCUSED GOOGLE SEARCH APPLICATION IS

19      MISSING A LIMITATION, IT'S MISSING AN ELEMENT THAT THE CLAIM

20      REQUIRES, THAT ELEMENT IS A HEURISTIC THAT LOCATES INFORMATION

21      ON THE INTERNET; THEREFORE, IT DOES NOT INFRINGE.

22      Q.   THANK YOU, DR. RINARD.

23           NOW, LET'S GO BACK TO THE GOOGLE SEARCH APPLICATION,

24      VERSION 2.7 ON THE RIGHT.

25           FUNCTIONALLY, HOW DOES THIS GOOGLE SEARCH APPLICATION,

```
 1      VERSION 2.7, WHICH IS NOT ACCUSED, LOOK TO THE USER?  WHAT DOES

 2      THE USER EXPERIENCE LOOK LIKE?

 3      A.   IT PROVIDES THE SAME FUNCTIONALITY AS THE ACCUSED VERSION.

 4      Q.   HOW DO YOU KNOW THAT, SIR?

 5      A.   BECAUSE I DOWNLOADED IT AND USED IT.

 6      Q.   AND WHAT'S YOUR UNDERSTANDING OF THE COMPANY THAT CREATED

 7      THE GOOGLE SEARCH APPLICATION, VERSION 2.7?

 8      A.   THIS WOULD BE GOOGLE.

 9      Q.   AND BASED ON YOUR REVIEW OF THE SOURCE CODE AND THE

10      EVIDENCE IN THIS CASE, WHAT IS YOUR UNDERSTANDING OF HOW LONG

11      IT TOOK FOR THIS LOCAL SEARCH HISTORY FUNCTIONALITY TO HAVE

12      BEEN REMOVED?

13      A.   ABOUT EIGHT HOURS.

14      Q.   EIGHT HOURS?  EIGHT HOURS OF TIME?

15      A.   YES.

16      Q.   AND HOW DO YOU KNOW THAT, SIR?

17      A.   I SPOKE TO THE ENGINEER, MR. BRINGERT.

18      Q.   DID YOU PREPARE A DEMONSTRATION OF THE ACTUAL USER

19      SPECIFICATION OF THE GOOGLE SEARCH APPLICATION, VERSION 2.7

20      THAT WE SEE IN THE ARCHITECTURE DIAGRAM?

21      A.   YES.

22               MR. PAK:  YOUR HONOR, I'D LIKE TO PLAY SDX 3008,

23      WHICH IS A VIDEO DEMONSTRATION OF THIS PARTICULAR ONE.

24               THE COURT:  GO AHEAD, PLEASE.

25               THE WITNESS:  SO HERE I'M DOING A GOOGLE SEARCH USING
```

```
 1      THE GOOGLE SEARCH APPLICATION.  I'M TYPING IN O-R AND YOU CAN

 2      SEE THAT I GET BACK RESULTS FROM THE INTERNET AND FROM THE

 3      LOCAL DEVICE.

 4      BY MR. PAK:

 5      Q.   YEAH.  LET'S PAUSE IT THERE, MR. KOTARSKI.

 6           CAN YOU, DR. RINARD, CAN YOU EXPLAIN TO US AGAIN WHAT

 7      WE'RE SEEING ON THE SCREEN.

 8      A.   SURE.  IF YOU LOOK AT THE TOP THREE LINES THERE, THOSE ARE

 9      SEARCH RESULTS COMING BACK FROM THE INTERNET.

10           THE ONE ON THE BOTTOM, WHICH IS -- OKAY.  THERE'S A RESULT

11      ON THE BOTTOM OF CONTACTS THAT WE'LL SEE AS THE VIDEO GOES

12      FORWARD.

13      Q.   OKAY.  LET'S PLAY THAT AGAIN, MR. KOTARSKI.  AND THEN I'LL

14      TELL YOU WHEN TO PAUSE.

15           DR. RINARD, IF YOU COULD TELL MR. KOTARSKI WHEN TO PAUSE.

16      A.   OKAY.  SO SEARCH GOOGLE, TYPED IN O-R -- LET'S PAUSE

17      THAT -- YOU SEE A CONTACT AT THE BOTTOM AND YOU SEE THREE

18      RESULTS FROM THE GOOGLE SERVERS ON THE TOP.

19      Q.   SO WHAT ARE THESE RESULTS HERE AT THE TOP?

20      A.   THOSE ARE THE RESULTS COMING BACK FROM THE GOOGLE SERVERS.

21      Q.   AND WHAT'S THE RESULT HERE ON THE BOTTOM?

22      A.   THAT'S COMING FROM THE LOCAL DEVICE.  IT'S COMING FROM THE

23      CONTACTS.

24      Q.   AND THE RESULT OF WHAT THE USER TYPED IN HERE AT THE TOP?

25      A.   YES.
```

1    Q.   SO THE USER TYPED IN O-R AND GOT RESULTS FROM THE

2    INTERNET, AS WELL AS THE LOCAL DEVICE?

3    A.   THAT'S CORRECT.

4    Q.   OKAY.  LET'S GO AHEAD AND FINISH THE VIDEO.

5         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

6         THE WITNESS:  OKAY.  NOW I TYPE O-G AND GET OREGON

7    TRIAL.  AND YOU SEE I SELECT OREGON TRIAL, AND OREGON TRAIL

8    DATABASES SHOW UP.

9         I THEN GO BACK AND DO AT GOOGLE SEARCH, I USE THE GOOGLE

10   SEARCH APPLICATION, AND YOU SEE OREGON TRAIL NOW.  I TYPE IN

11   O-R AND AGAIN I GET SOME MORE INTERNET SEARCH RESULTS.

12        AND NOW I'VE SELECTED CONTACTS.

13   BY MR. PAK:

14   Q.   SO TO BE CLEAR, WHAT WE JUST SAW ON THE SCREEN, IS THAT

15   ACCUSED OF INFRINGING ANY CLAIMS OF THE '959 PATENT?

16   A.   IT IS NOT.

17   Q.   AND WHAT IS YOUR OPINION WITH RESPECT TO WHETHER WHAT WE

18   JUST SAW FROM THE GSA, OR GOOGLE SEARCH APPLICATION, VERSION

19   2.7, PROVIDES THE BENEFITS OF UNIVERSAL SEARCH?

20   A.   IT PROVIDES THE BENEFITS.

21   Q.   SO IF -- WITH RESPECT TO THAT EVIDENCE, WHAT DOES THAT

22   TELL YOU ABOUT WHETHER CLAIM 25 FROM THE '959 PATENT IS A

23   REQUIREMENT FOR PROVIDING UNIVERSAL SEARCH ON MOBILE DEVICES?

24   A.   IT'S NOT A REQUIREMENT AT ALL.

25   Q.   AND WHY NOT?

1      A.   WELL, BECAUSE CLEARLY YOU HAVE THIS ALTERNATIVE THAT

2      PROVIDES OTHER BENEFITS BUT DOESN'T DO CLAIM 25.

3      Q.   AND, AGAIN, WHY IS IT NOT PERFORMING CLAIM 25?

4      A.   BECAUSE IT'S MISSING THIS KEY ELEMENT, THE ELEMENT OF A

5      HEURISTIC, WHICH LOCATES INFORMATION IN THE INTERNET.

6           MR. PAK:  YOUR HONOR, I'D LIKE TO ADMIT JX 72, WHICH

7      IS THE ACTUAL PHONE RUNNING THAT PARTICULAR VERSION OF THE

8      GOOGLE SEARCH APPLICATION, VERSION 2.7.

9           THE COURT:  ANY OBJECTION?

10          MS. KREVANS:  NO FURTHER OBJECTION, YOUR HONOR.

11          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

12     (JOINT EXHIBIT 72 WAS ADMITTED IN EVIDENCE.)

13          THE COURT:  GO AHEAD, PLEASE.

14     BY MR. PAK:

15     Q.   DR. RINARD, ARE THERE OTHER DESIGN ALTERNATIVES TO WHAT'S

16     BEING CLAIMED HERE IN CLAIM 25 BESIDES THE ONE THAT WE JUST

17     SAW?

18     A.   THERE ARE OTHER DESIGN ALTERNATIVES.

19     Q.   AND DO YOU HAVE ONE IN MIND THAT YOU'D LIKE TO PRESENT TO

20     THE JURY?

21     A.   THERE IS THE SO-CALLED INTERNET ONLY DESIGN ALTERNATIVE.

22     Q.   CAN WE TURN TO SDX 2919.

23          DR. RINARD, CAN YOU EXPLAIN WHAT THIS DESIGN ALTERNATIVE

24     IS USING THE DEMONSTRATIVE AT SDX 2919?

25     A.   YES.  SO WHAT THIS IS, IS YOU HIT THE GOOGLE SEARCH BOX,

 1    YOU SEARCH THE INTERNET, YOU SEARCH IT AND ALL IT DOES IS IT

 2    GETS ONLY INTERNET RESULTS.  IT GETS NO RESULTS FROM THE PHONE

 3    AT ALL.  IT ONLY GETS RESULTS FROM THE GOOGLE SERVERS.

 4    Q.   AND DO YOU KNOW WHETHER DR. SNOEREN ACCUSES THIS VERSION

 5    OF INFRINGING ANY CLAIM THE '959 PATENT?

 6    A.   IN THIS EXPERT -- FROM HIS REPORT, YOU'LL SEE THAT -- I'M

 7    SORRY -- YOU'LL SEE THAT HE DOES NOT ACCUSE THESE VERSIONS AT

 8    ALL.  THIS IS A DEMONSTRATIVE IN THE TRIAL.

 9    Q.   DR. SNOEREN, WHAT DID HE SAY WAS THE INTRODUCTION DATE OF

10    THIS VERSION, INTERNET ONLY GOOGLE SEARCH APPLICATION?

11    A.   JULY 6TH, 2012.

12    Q.   AND DO YOU HAVE AN UNDERSTANDING, BASED ON THE EVIDENCE

13    THAT YOU REVIEWED, HOW LONG IT TOOK TO CREATE THIS VERSION OF

14    THE GOOGLE SEARCH APPLICATION THAT ONLY SEARCHES THE INTERNET?

15    A.   APPROXIMATELY TWO DAYS.

16    Q.   AND IS THERE ANY EVIDENCE THAT THIS DESIGN WOULD HAVE BEEN

17    ACCEPTABLE TO USERS?

18    A.   YES, THERE IS.

19    Q.   WHAT IS THAT EVIDENCE?

20    A.   THERE'S LOG DATA FROM GOOGLE THAT SAYS 98 PERCENT OF THE

21    TIME PEOPLE ONLY USE THE RESULTS FROM THE GOOGLE SERVICE WHEN

22    THEY DO A SEARCH.

23    Q.   AND WERE YOU HERE WHEN DR. BRINGERT TESTIFIED TO THAT

24    EFFECT?

25    A.   YES.

```
 1              MR. PAK:  NOW, YOUR HONOR, I'D LIKE TO MOVE IN JX 35,

 2    IN PARENTHESES, N, WHICH IS THE PHONE THAT CORRESPONDS TO THIS

 3    VERSION.

 4              MS. KREVANS:  NO OBJECTION, YOUR HONOR.

 5              THE COURT:  IT'S ADMITTED.

 6         (JOINT EXHIBIT 35N WAS ADMITTED IN EVIDENCE.)

 7              THE COURT:  GO AHEAD, PLEASE.

 8    BY MR. PAK:

 9    Q.   DR. RINARD, IF WE TURN TO ANOTHER TOPIC, WERE YOU ASKED TO

10    ANALYZE THE SURVEY RESULTS OF ONE OF APPLE'S EXPERTS,

11    DR. HAUSER?

12    A.   YES, I WAS.

13    Q.   DID YOU FORM SOME OPINIONS REGARDING THAT SURVEY?

14    A.   I DID.

15    Q.   IF WE TURN TO SDX 2927, DR. RINARD, CAN YOU EXPLAIN TO US

16    WHAT YOU'VE ILLUSTRATED ON THE UPPER LEFT-HAND CORNER OF THIS

17    DEMONSTRATIVE?

18    A.   SO THIS IS THE TEXT THAT DR. HAUSER GAVE TO HIS SURVEY

19    PARTICIPANTS DESCRIBING THE UNIVERSAL SEARCH.

20    Q.   AND DO YOU HAVE AN UNDERSTANDING OF WHETHER HE WAS TRYING,

21    DR. HAUSER WAS DESCRIBING UNIVERSAL SEARCH IN THE CONTEXT OF

22    THE '959 PATENT?

23    A.   IT'S MY UNDERSTANDING THAT HE WAS ATTEMPTING TO DO SO.

24    Q.   AND NOW YOU'VE REPRODUCED THE LANGUAGE OF CLAIM 25

25    LIMITATION ON THE BOTTOM OF THIS SLIDE.  CAN YOU PROVIDE YOUR
```

1    ASSESSMENT OF WHETHER DR. HAUSER'S DESCRIPTION OF UNIVERSAL

2    SEARCH CORRELATES IN ANY WAY TO WHAT'S BEING ACTUALLY CLAIMED

3    IN CLAIM 25?

4    A.   SO IF YOU LOOK AT CLAIM 25, WHAT CLAIM 25 REQUIRES IS THAT

5    THE INFORMATION IDENTIFIER BE APPLIED SEPARATELY TO EACH

6    HEURISTIC.

7         NOW, YOU'LL SEE THAT THE TERM "APPLIED SEPARATELY" APPEARS

8    NOWHERE.  NONE OF THIS APPEARS IN THIS SURVEY LITERATURE.

9    OKAY?

10        SO -- IN FACT, IT APPEARS ONLY WHEN YOU TALK ABOUT

11   SOMETHING THAT UNIVERSAL SEARCH DOESN'T PROVIDE.

12        SO WHAT THIS MEANS IS THAT THIS IS TECHNICALLY INACCURATE.

13   Q.   NOW, IF WE TURN TO THE NEXT SLIDE, WHICH IS SDX 2928, HAVE

14   YOU HAD A CHANCE TO ANALYZE THE COURT'S CONSTRUCTION OF

15   HEURISTIC IN VIEW OF WHAT DR. HAUSER PROVIDED AS A DESCRIPTION

16   OF UNIVERSAL SEARCH?

17   A.   YES, I HAVE.

18   Q.   AND WHAT IS YOUR FINDING?

19   A.   MY FINDING IS THAT, AGAIN, THE DESCRIPTION IS TECHNICALLY

20   INACCURATE BECAUSE IT DOESN'T INCLUDE SOME OF THE WORDS THAT

21   THE COURT HAS USED TO DEFINE THE TERM "HEURISTIC."

22   Q.   AND WHAT ARE THOSE WORDS?

23   A.   THAT DOES NOT CONSIST SOLELY OF CONSTRAINT SATISFACTION

24   PARAMETERS.

25   Q.   IS THAT AN IMPORTANT PART OF THE CORE DEFINITION OF

1        HEURISTIC AS PROVIDED BY THE COURT?

2                  MS. KREVANS:  OBJECTION.  LEADING.

3                  THE COURT:  SUSTAINED.

4        BY MR. PAK:

5        Q.   HAVING CONSIDERED THIS EVIDENCE, DR. RINARD, WHAT IS YOUR

6        ULTIMATE CONCLUSION ON WHETHER, AS A TECHNOLOGY MATTER,

7        DR. HAUSER'S DESCRIPTION OF UNIVERSAL IS ACCURATE IN CAPTURING

8        THE SCOPE OF CLAIM 25?

9        A.   IT'S NOT ACCURATE AT ALL.

10       Q.   HAVE YOU ALSO HAD A CHANCE TO CONSIDER DR. HAUSER'S SURVEY

11       WITH RESPECT TO WHAT HE DESCRIBES AS POSSIBLE ALTERNATIVES TO

12       UNIVERSAL SEARCH?

13       A.   YES, I HAVE.

14       Q.   LET'S TURN TO THE NEXT SLIDE, SDX 2929.

15            DR. RINARD, WHAT HAVE YOU EXCERPTED ON THE BOTTOM OF THIS

16       SLIDE?

17       A.   SO THIS IS DR. HAUSER'S SUMMARY OF WHAT THE AVAILABLE

18       ALTERNATIVES WOULD BE TO THE UNIVERSAL SEARCH.

19       Q.   AND WHAT DOES HE SAY?

20       A.   HE SAYS WITHOUT UNIVERSAL SEARCH, YOU WOULD HAVE TO

21       SEPARATELY SEARCH EACH INFORMATION SOURCE, FOR EXAMPLE,

22       SEARCHING THE INTERNET IN A BROWSER OR FOR YOUR CONTACTS WITHIN

23       YOUR CONTACTS APPLICATION.

24       Q.   TO THE EXTENT THAT UNIVERSAL SEARCH IN DR. HAUSER'S SURVEY

25       IS INTENDED TO DESCRIBE CLAIM 25 OF THE '959 PATENT, OR EVEN

1   CLAIM 1 OF THE '959 PATENT, DO YOU AGREE WITH THAT STATEMENT?

2   A.   NO, I DO NOT BECAUSE THERE IS AN AVAILABLE ALTERNATIVE

3   THAT SEARCHES THE LOCAL DEVICE AND THE INTERNET WITHOUT

4   INFRINGING THE CLAIM.

5   Q.   AND WHICH ALTERNATIVE DO YOU HAVE IN MIND?

6   A.   THAT'S THE 2.7 ALTERNATIVE THAT WE JUST DISCUSSED.

7   Q.   IS THAT THE VIDEO THAT YOU DEMONSTRATED?

8   A.   YES.

9   Q.   IS THAT WHAT YOU REPRODUCED HERE ON THE RIGHT-HAND SIDE?

10  A.   YES.

11  Q.   JUST TO SUMMARIZE, WHAT IS YOUR OPINION ON WHETHER A

12  MOBILE DEVICE CAN PERFORM UNIVERSAL SEARCH WITHOUT HAVING TO

13  PRACTICE CLAIM 25?

14  A.   CLEARLY IT CAN.

15  Q.   AND IN LIGHT OF THIS EVIDENCE, DOES DR. HAUSER'S SURVEY

16  ACCURATELY DESCRIBE THE USER EXPERIENCE OF THE INVENTION

17  CLAIMED IN CLAIM 25?

18  A.   NOT AT ALL.

19          MS. KREVANS:  OBJECTION.  LEADING.

20          THE COURT:  OVERRULED.

21  BY MR. PAK:

22  Q.   DR. RINARD, I WANT TO MOVE TO THE NEXT TOPIC OF YOUR

23  ANALYSIS, WHICH IS THE VALIDITY OF CLAIM 25 OF THE '959 PATENT.

24      HAVE YOU HAD A CHANCE TO ANALYZE THAT ISSUE?

25  A.   YES, I HAVE.

1     Q.   AND WHAT TYPES OF EVIDENCE DID YOU ANALYZE?

2     A.   SO WHEN I ANALYZED THE VALIDITY, I ANALYZED THE SOURCE

3     CODE, I ANALYZED DOCUMENTATION, I ANALYZED TESTIMONY.

4     Q.   AND IS THERE A -- AND WHAT STANDARD DID YOU USE IN

5     ASSESSING WHETHER CLAIM 25 IS VALID OR INVALID?

6     A.   CLEAR AND CONVINCING.

7     Q.   AND SPECIFICALLY IN TERMS OF THE PRIOR ART, WHICH PRIOR

8     ART ARE YOU HERE TO TESTIFY ABOUT?

9     A.   I'M HERE TO TESTIFY ABOUT THE WAIS SOFTWARE THAT YOU HAVE

10    HEARD ABOUT PREVIOUSLY FROM THE LAST TWO WITNESSES.

11    Q.   WERE YOU HERE IN THE COURTROOM FOR THE TESTIMONY OF

12    MR. PFEIFER AND MR. KAHLE?

13    A.   YES, I WAS PRESENT FOR BOTH.

14    Q.   SO LET'S TURN TO SDX 2933.  AND JUST REMIND US AGAIN, WHAT

15    IS THE WAIS SYSTEM?

16    A.   OKAY.  SO WAIS STANDS FOR WIDE AREA INFORMATION SERVERS.

17    IT'S A SYSTEM THAT WAS INITIALLY DEVELOPED AT THINKING

18    MACHINES, THEN SPUN OFF TO WAIS, INC. AND A FREE SOFTWARE

19    VERSION WAS EXTENDED ON IN DORTMUND UNIVERSITY TECHNOLOGY.  IT

20    WAS A SYSTEM FOR SEARCHING LOCAL AND INTERNET INFORMATION WITH

21    A SINGLE SEARCH USING HEURISTIC.

22    Q.   AND WHEN YOU HEARD THE TESTIMONY OF MR. KAHLE AND

23    MR. PFEIFER, DID THAT TESTIMONY AFFECT YOUR ANALYSIS?

24    A.   NOT AT ALL.  IT MERELY REINFORCED MY ANALYSIS.

25    Q.   DID THE PATENT OFFICE KNOW ABOUT THE WAIS TECHNOLOGY WHEN

```
 1        IT WAS BEING ASKED TO EVALUATE THE VALIDITY OF THE '959 PATENT?

 2   A.   IT WAS NOT CONSIDERED WHEN THEY WERE EVALUATING THE

 3   VALIDITY OF THE '959 PATENT.

 4   Q.   LET'S TURN TO SDX 2935.

 5        YOUR HONOR, THIS IS AN EXCERPT FROM 311, DX 311 WHICH IS

 6   ALREADY IN EVIDENCE.

 7             THE COURT:  GO AHEAD, PLEASE.

 8   BY MR. PAK:

 9   Q.   DR. RINARD, THIS IS THE WAIS CONFERENCE MATERIAL THAT I

10   BELIEVE MR. KAHLE TALKED ABOUT DURING HIS TESTIMONY.

11        WHAT IS THE SIGNIFICANCE OF THIS EXCERPT SPECIFICALLY THE

12   PART THAT'S UNDERLINED?

13   A.   SO THIS IS THE -- THIS IS A HISTORICAL DOCUMENT THAT

14   ATTEMPTS TO ANSWER THE QUESTION, WHAT DOES WAIS DO?

15        WHAT IT SAYS IS THAT IT'S A SYSTEM THAT ALLOW USERS ON

16   DIFFERENT PLATFORMS CAN ACCESS PERSONAL, COMPANY, AND PUBLISHED

17   INFORMATION FROM ONE INTERFACE.

18   Q.   HOW DOES THAT RELATE TO THE IDEA OF UNIVERSAL SEARCH THAT

19   WE'VE BEEN HEARING ABOUT IN THIS CASE?

20   A.   IT'S BASICALLY THIS IDEA THAT YOU CAN SEARCH A WHOLE BUNCH

21   OF PLACES WITH A SINGLE QUERY.

22   Q.   WHAT'S THE DATE OF THIS CONFERENCE PROCEEDING?

23   A.   THIS IS 1992.

24   Q.   NOW, IF WE GO BACK TO CLAIM 24 AND 25, WHAT TYPE OF CLAIM

25   ARE THESE CLAIMS?
```

1    A.    OKAY.   THESE ARE A SO-CALLED COMPUTER READABLE MEDIUM

2    CLAIM.  LET ME SHOW YOU THAT RIGHT THERE.  SEE WHERE IT SAYS

3    COMPUTER READABLE MEDIUM, THAT'S SOMETHING LIKE A DISTRICT OR A

4    MEMORY ON YOUR COMPUTER THAT THE COMPUTER CAN READ.  AND THE

5    IDEA THERE IS THAT CAN CONTAIN PROGRAMMING INSTRUCTIONS TO DO

6    SEVERAL STEPS.

7         THE FIRST IS RECEIVE AN INFORMATION IDENTIFIER.  SO YOU

8    HAVE TO HAVE PROGRAM INSTRUCTIONS IN THAT MEMORY TO RECEIVE.

9         YOU THEN HAVE TO PROVIDE THAT INFORMATION IDENTIFIER TO A

10   PLURALITY OF HEURISTICS.  SO YOU HAVE TO HAVE INSTRUCTIONS IN

11   THE COMPUTER READABLE MEDIUM THAT PROVIDE THAT INFORMATION

12   IDENTIFIER TO THE HEURISTICS THAT LOCATE INFORMATION IN THE

13   INTERNET AND LOCAL STORAGE MEDIUM.

14        YOU ALSO HAVE TO HAVE INSTRUCTIONS THAT DETERMINE AT LEAST

15   ONE CANDIDATE ITEM OF INFORMATION AND DISPLAY IT.

16   Q.    NOW, IS THIS A CLAIM THAT IS DIRECTED TO A METHOD OF USING

17   A PARTICULAR SYSTEM?

18   A.    NO, IT'S NOT.  IT'S JUST DIRECTED TO INSTRUCTIONS PRESENT

19   IN A DISK OR ANY OTHER KIND OF COMPUTER READABLE MEDIUM.

20   Q.    AND IS CLAIM 25 DIRECTED TO A SYSTEM THAT IS CONFIGURED IN

21   A PARTICULAR WAY.

22             MS. KREVANS:  OBJECTION.  LEADING, YOUR HONOR.

23             THE WITNESS:  NO.

24             THE COURT:  SUSTAINED.

25   BY MR. PAK:

1    Q.   DR. RINARD, IS THERE A REQUIREMENT AT ALL IN CLAIM 25

2    ABOUT A SYSTEM?

3    A.   NO, NO REQUIREMENT AT ALL.

4    Q.   HOW ABOUT A CONFIGURATION OF THE SYSTEM?

5    A.   NO, NONE OF THAT.

6    Q.   AND, DR. RINARD, IN ANALYZING THE WAIS PRIOR ART, WHAT

7    SPECIFICALLY ARE YOU RELYING ON AS THE PRIOR ART?

8    A.   I'M RELYING ON THE SOFTWARE DISTRIBUTION THAT CONTAINS THE

9    SOURCE CODE FOR WAIS.

10   Q.   AND HAVE YOU HAD A CHANCE TO ANALYZE THAT SOURCE CODE?

11   A.   I HAVE INDEED.

12   Q.   AND WHY IS THE SOURCE CODE IMPORTANT?

13   A.   THE SOURCE CODE IS IMPORTANT BECAUSE THE SOURCE CODE IS

14   WHAT CONTAINS THE INSTRUCTIONS THAT YOU NEED IN YOUR COMPUTER

15   READABLE MEDIUM TO INVALIDATE THE CLAIM, TO DO EVERYTHING THE

16   CLAIM SAYS TO DO.

17        MR. PAK:  YOUR HONOR, I'M GOING TO BE PRESENTING SOME

18   CODE.  THIS IS PUBLICLY AVAILABLE CODE, SO I DON'T THINK WE

19   NEED TO HAVE ANY CONFIDENTIALITY DESIGNATION FOR THIS.

20   Q.   SO THIS IS FROM DX 301, WHICH IS ALREADY ADMITTED INTO

21   EVIDENCE FROM MR. PFEIFER.

22        AND MR. KOTARSKI, IF WE CAN PULL UP DX 301/X/QCOMMANDS.C,

23   LINES 1340 TO 1341.

24   A.   OKAY.

25   Q.   AND, DR. RINARD, CAN YOU WALK US THROUGH, AT A HIGH LEVEL,

1    WHAT THIS PIECE OF CODE MEANS IN WAIS AND HOW THAT RELATES TO

2    THE CLAIM LANGUAGE?

3    A.   SURE.  SO THIS IS THE CODE THAT'S GRABBING THE WAIS QUERY

4    OUT OF THE WINDOWS SYSTEM, PUTTING IT INTO AN INTERNAL DATA

5    STRUCTURE INSIDE THE COMPUTER, AND THAT IS HOW WAIS RECEIVES

6    THE INFORMATION IDENTIFIER.  THOSE ARE THE INSTRUCTIONS THAT

7    PERFORM, THAT RECEIVE THE INFORMATION IDENTIFIER.

8    Q.   LET'S PULL UP DX 301/X/QCOMMANDS.0, LINES 682 TO 702?

9    A.   OKAY.  SO THESE ARE THE INSTRUCTIONS THAT PRESENT THE

10   INFORMATION IDENTIFIER THAT'S THE REQUEST MESSAGE HERE AND THE

11   REQUEST MESSAGE HERE TO THE PLURALITY OF HEURISTICS.

12   Q.   AND HOW DOES THAT RELATE TO THE ACTUAL CLAIM LANGUAGE OF

13   CLAIM 24 AND 25?

14   A.   THOSE ARE THE INSTRUCTIONS THAT SATISFY THE PROVIDE

15   LIMITATION.

16   Q.   LET'S PULL UP DX 301/IR/SERSRSEARCH.C, LINES 1572 TO 1573.

17        AND, DR. RINARD, WHAT IS THIS SOURCE CODE AND HOW DOES IT

18   RELATE TO THE CLAIM LANGUAGE?

19   A.   OKAY.  SO THIS SOURCE CODE IS PART OF THE SOURCE CODE THAT

20   IMPLEMENTS WAIS'S HEURISTIC'S RANKING ALGORITHM.

21   Q.   WHEN YOU SAY WAIS'S HEURISTIC RANKING ALGORITHM, WHAT ARE

22   YOU TALKING ABOUT?

23   A.   SO THAT HAS THE INFORMATION AND LOCAL STORAGE MEDIA AND

24   THE INTERNET, AND ONE OF THE WAYS THAT IT USES, THAT IT

25   PERFORMS THOSE HEURISTICS IS TO USE THIS HEURISTIC RANKING

1    METHOD THAT RANKS DOCUMENTS ACCORDING TO HOW RELEVANT WAIS

2    THINKS THEY'RE GOING TO BE TO THE USER'S QUERY.

3    Q.   WHAT IS YOUR OPINION ON WHETHER THIS SATISFIES HER HONOR'S

4    CLAIM CONSTRUCTION OF HEURISTIC?

5    A.   THEY DO.

6    Q.   AND WHY?

7    A.   WELL, BECAUSE WHAT THEY DO IS THEY IMPLEMENT A RULE OF

8    THUMB THAT SAYS, YOU KNOW, THAT CONSIDERS THE DOCUMENT TO BE

9    COMPOSED OF WORDS AND IT SAYS HOW SIMILAR IS THE DOCUMENT TO

10   THE WORDS IN THE QUERY, HOW SIMILAR ARE THE WORDS IN THE

11   DOCUMENT TO THE WORDS IN THE QUERY, DOCUMENTS THAT HAVE

12   COLLECTIONS OF WORDS THAT ARE MORE SIMILAR AND HIGHER

13   FREQUENCIES OF THOSE WORDS ARE RANKED HIGHER.

14        SO IN THIS WAY, WAIS ATTEMPTS TO ESTIMATE HOW RELEVANT

15   EACH DOCUMENT IS THAT IT CAN SEARCH TO THE QUERY THAT'S GOING

16   ON.

17   Q.   IS THIS USE OF THIS HEURISTIC LIMITED TO A PARTICULAR

18   SOURCE OF INFORMATION OR DOES IT COVER BOTH TYPES?

19   A.   IT COVERS ALL --

20        MS. KREVANS:  OBJECTION.  LEADING.

21        THE COURT:  SUSTAINED.

22   BY MR. PAK:

23   Q.   WHAT TYPES OF SOURCES ARE USED FOR THE HEURISTIC RANKING

24   ALGORITHM?

25   A.   OKAY.  THIS IS A KEY PART OF THE WAIS SEARCH ALGORITHMS

1        FOR ALL KINDS OF SOURCES.

2        Q.   WHEN YOU SAY ALL KINDS OF SOURCES, WHAT ARE YOU TALKING

3        ABOUT?

4        A.   LOCAL, INTERNET.

5        Q.   LET'S LOOK AT ANOTHER PIECE OF EVIDENCE FROM THE SOURCE

6        CODE, DX 301/IR/SYNONYM.C, LINES 66 THROUGH 70.

7             AND, DR. RINARD, WHAT IS THIS SOURCE CODE AND HOW DOES IT

8        RELATE TO THE CLAIM ANALYSIS?

9        A.   OKAY.  SO THIS SOURCE CODE IS PART OF THE SOURCE CODE THAT

10        IMPLEMENTS SO-CALLED SYNONYM MATCHING IN WAIS.  SYNONYM

11        MATCHING IS FUNCTIONALITY THAT, WHEN YOU TYPE IN A WORD LIKE

12        PHONE, LETS WAIS RETRIEVE DOCUMENTS THAT CONTAIN WORDS LIKE

13        TELEPHONE, SYNONYMS OF PHONE.

14        Q.   AND HOW DOES THAT RELATE TO YOUR OPINION ABOUT THE CLAIM

15        LANGUAGE RELATED TO HEURISTICS?

16        A.   THIS IS PART OF THE REASON THAT WAIS HAS -- THAT WAIS

17        SEARCHES THE HEURISTIC, BECAUSE IT'S APPLYING THIS HEURISTIC

18        THAT IF YOU GIVE SOMETHING LIKE PHONE, YOU MIGHT WANT TO HEAR,

19        YOU MIGHT WANT TO RETRIEVE DOCUMENTS THAT CONTAIN TELEPHONES.

20        Q.   LET'S LOOK AT MORE SOURCE CODE.  DX 301/IRSERSC.C, LINES

21        909 TO 917.

22        A.   OKAY.  SO --

23        Q.   AND, DR. RINARD, WHAT IS THIS SOURCE CODE AND HOW DOES IT

24        RELATE TO THE CLAIM LANGUAGE?

25        A.   SO THIS IS PART OF THE SOURCE CODE THAT IMPLEMENTS THE

1    SO-CALLED STEMMING FUNCTIONALITY.  WHAT STEMMING DOES IS WHEN

2    YOU TYPE IN A WORD LIKE ANALYSIS, IT'LL CHOP OFF THE END AND

3    THAT LETS YOU FIND DOCUMENTS THAT ALSO CONTAIN WORDS LIKE

4    ANALYZING THAT HAVE THE SAME STEM, BUT ARE SPELLED DIFFERENTLY.

5    Q.   AND WHAT IS YOUR OPINION ON WHETHER THIS TYPE OF ALGORITHM

6    SATISFIES HER HONOR'S CONSTRUCTION OF HEURISTICS?

7    A.   THIS ABSOLUTELY SATISFIES HER HONOR'S CONSTRUCTION OF

8    HEURISTICS.

9    Q.   LET'S LOOK AT A COUPLE MORE PIECES OF SOURCE CODE STARTING

10   WITH DX 301 -- WELL, BEFORE WE DO THAT, HAVING SEEN ALL THIS

11   EVIDENCE AND THE CODE, WHAT IS YOUR ULTIMATE OPINION ON WHETHER

12   THE LIMITATION STARTING WITH PROVIDE AND INCLUDING THE

13   HEURISTICS LANGUAGE IS SATISFIED IN THE WAIS SOURCE CODE?

14   A.   IT IS INDEED SATISFIED.

15   Q.   LET'S LOOK AT DX 301/X/QCOMMANDS.C, LINES 378 THROUGH 79.

16       DR. RINARD, WHAT IS THIS SOURCE CODE AND HOW DOES IT

17   RELATE TO THE CLAIM LANGUAGE.

18   A.   OKAY.  SO THIS IS THE SOURCE CODE THAT DETERMINES AT LEAST

19   ONE CANDIDATE ITEM OF INFORMATION BASED UPON THE PLURALITY OF

20   HEURISTICS AND DISPLAYS THAT REPRESENTATION OF THE CANDIDATE

21   ITEM OF INFORMATION.

22   Q.   SO HAVING SEEN THIS CODE, WHAT'S YOUR ASSESSMENT ON THE

23   FINAL ELEMENT OF CLAIM 24?

24   A.   WAIS SATISFIES THIS LIMITATION AS WELL, THIS PART AS WELL.

25   Q.   WE TALKED ABOUT HOW CLAIM 25 IS A DEPENDENT CLAIM FROM

Case 5:12-cv-00630-LHK   Document 1717   Filed 04/16/14   Page 157 of 290

```
 1      CLAIM 24; CORRECT?

 2      A.   YES.

 3      Q.   SO LOOKING AT THE LAST LIMITATION OF CLAIM 25, DO YOU HAVE

 4      AN OPINION ON WHETHER THAT IS SATISFIED BY WAIS?

 5      A.   YES, IT IS.

 6      Q.   AND LET'S LOOK AT SOMETHING THAT WE'VE ALREADY SEEN, IT'S

 7      DX 301/X/QCOMMANDS.C, LINES 682 TO 702.

 8           DR. RINARD, HOW DOES THIS SOURCE CODE RELATE TO THE FINAL

 9      ELEMENT IN CLAIM 25?

10      A.   SO WHAT YOU'LL SEE HERE IS THE CODE THAT PROVIDES THE

11      INFORMATION IDENTIFIER TO THE HEURISTIC RIGHT HERE, THE

12      INTERNET HEURISTIC.  IT IS SEPARATE FROM THE CODE THAT PROVIDES

13      IT TO THE LOCAL HEURISTIC IN THIS IMPLEMENTATION, AND YOU CAN

14      SEE THE INFORMATION IDENTIFIER HERE IS PROVIDED SEPARATELY.

15      Q.   NOW, DR. RINARD, LOOKING AT SDX 3003 --

16      A.   UM-HUM.

17      Q.   -- WE WALKED THROUGH THE SOURCE CODE.  WHAT IS YOUR

18      OPINION ON WHETHER THE WAIS SOURCE CODE ITSELF CONTAINS

19      INSTRUCTIONS THAT SATISFY EACH AND EVERY LIMITATION OF CLAIM 24

20      AND CLAIM 25?

21      A.   THE WAIS SOURCE CODE DOES CONTAIN INSTRUCTIONS THAT

22      SATISFY ALL OF THE LIMITATIONS, ALL OF THE ELEMENTS OF CLAIM

23      25.

24      Q.   SO IN YOUR OPINION, SHOULD WE CHECK OFF ALL OF THESE

25      LIMITATIONS?
```

1      A.   ALL -- CHECK THEM ALL OFF.

2      Q.   NOW, DR. RINARD, HAVE YOU ANALYZED ANY EVIDENCE ON THE

3      QUESTION OF WHETHER THE WAIS SOURCE CODE ITSELF WAS PUBLICLY

4      AVAILABLE AND DISTRIBUTED IN THE UNITED STATES BEFORE THE '959

5      PATENT WAS FILED?

6      A.   YES, I HAVE.

7      Q.   AND WHAT EVIDENCE DO YOU HAVE IN MIND?

8      A.   I HAVE EVIDENCE THAT IT IS DISTRIBUTED WITH THE WAIS

9      SOURCE CODE DISTRIBUTION.

10     Q.   AND LET'S LOOK AT THAT.  IF YOU -- MR. KOTARSKI, PULL UP

11     DX 301/DOC/SFFWSF.PS AT PAGE 5.

12     A.   OKAY.  SO WHAT WE'RE SEEING HERE ARE MIRROR SITES.  HERE'S

13     THE IDEA.  YOU MAY RECALL THAT WAIS WAS INTENDED TO BE, AND IN

14     FACT WAS, DISTRIBUTED PUBLICLY BY THE INTERNET.

15          SO WHAT HAPPENS IS YOU SET UP A SITE THAT PEOPLE CAN GO TO

16     AND DOWNLOAD WAIS.

17          NOW, IF YOU HAVE ONLY ONE SITE, IT'S DIFFICULT FOR

18     EVERYBODY TO GO TO THAT ONE SITE BECAUSE THEY MAY BE VERY, VERY

19     FAR AWAY OR THAT SITE MAY GET OVERLOADED WITH MANY PEOPLE

20     TRYING TO DOWNLOAD THE SOFTWARE.

21          SO WHAT YOU DO IS ESTABLISH MIRROR SITES, SITES THAT HAVE

22     THE SAME CONTENT BUT ARE DISTRIBUTED THROUGHOUT THE WORLD.

23     THAT WAY IF SOMEBODY WANTS TO DOWNLOAD SOMETHING, THEY CAN GO

24     TO A SITE THAT IS CLOSER TO THEM AND LESS LOADED AND GET IT

25     MORE QUICKLY.

1      Q.   DR. RINARD, LOOKING AT THIS PARTICULAR ENTRY FROM THE USER

2      MANUAL FOR WAIS, WHAT EVIDENCE HERE RELATES TO THE QUESTION OF

3      WHETHER THE WAIS SOFTWARE WAS DISTRIBUTED IN THE UNITED STATES

4      PRIOR TO THE CRITICAL DATE?

5      A.   OKAY.  SO YOU SEE THAT ENTRY RIGHT THERE, THAT IS A MIRROR

6      SITE AT SYRACUSE UNIVERSITY.

7      Q.   HOW DO YOU KNOW THAT?

8      A.   IT SAYS SYR.EDU.

9      Q.   THAT'S THE WEBSITE FOR SYRACUSE?

10     A.   YES.

11     Q.   WHAT DOES THAT TELL YOU?

12     A.   THAT TELLS YOU THAT THE MIRROR SITE CONTAINS THE WAIS

13     SOURCE CODE DISTRIBUTION IN THE UNITED STATES.

14     Q.   NOW, HAVE YOU CONSIDERED OTHER EVIDENCE ON THE QUESTION OF

15     WHETHER THE WAIS SOURCE CODE ITSELF WAS MADE AVAILABLE IN THE

16     UNITED STATES PRIOR TO THE CRITICAL DATE OF THE '959 PATENT?

17     A.   YES.

18     Q.   AND WHAT ARE SOME OTHER PIECES OF EVIDENCE?

19     A.   THE INTERNET POSTINGS, E-MAILS, AND THE EVIDENCE THAT

20     DR. PFEIFER PRESENTED THIS MORNING.

21     Q.   AND WERE YOU HERE FOR THAT TESTIMONY AS WELL?

22     A.   I WAS HERE FOR THAT TESTIMONY.

23     Q.   SO WHAT'S YOUR ULTIMATE CONCLUSION OR WHETHER THE WAIS

24     SOURCE CODE WAS MADE AVAILABLE IN THE UNITED STATES BEFORE THE

25     CRITICAL DATE OF THE '959 PATENT?

1     A.   MY CONCLUSION IS THAT IT INDEED WAS AVAILABLE IN THE

2     UNITED STATES BEFORE THAT DATE.

3     Q.   NOW, YOU TALKED ABOUT THE SOURCE CODE.  IN ADDITION TO

4     ANALYZING THE SOURCE CODE, DID YOU CONSIDER ANY OTHER EVIDENCE

5     TO CORROBORATE YOUR OPINION ON INVALIDITY OF THE '959 PATENT?

6     A.   YES, I DID.

7     Q.   WHAT DID YOU LOOK AT?

8     A.   SO WHAT I DID WAS I INSTALLED THE SOURCE CODE ON A

9     MACHINE, OR TWO MACHINES ACTUALLY, AND THEN RAN THE SOURCE

10    CODE.  THE GOAL OF THIS EXERCISE WAS, FIRST, TO CORROBORATE MY

11    OPINIONS ABOUT THE PRESENCE OF THE REQUIRED INSTRUCTIONS IN THE

12    WAIS SOURCE CODE BY EXECUTING THOSE INSTRUCTIONS.

13         AND SECOND, TO PREPARE A DEMONSTRATIVE THAT I COULD USE TO

14    HELP THE MEMBERS OF THE JURY TO SEE WHAT THE INSTRUCTIONS DO IN

15    ACTION.

16    Q.   BEFORE -- AND HAVE YOU BROUGHT THAT DEMONSTRATIVE WITH

17    YOU?

18    A.   YES.

19    Q.   BEFORE WE DO THAT, LET'S LOOK AT TWO ADDITIONAL PIECES OF

20    EVIDENCE.  LOOKING AT SDX 2934.

21         AND, YOUR HONOR, THIS IS TAKEN FROM DX 304, WHICH IS

22    ALREADY -- ACTUALLY, LET'S TAKE THIS DOWN.

23         DR. RINARD, IF YOU LOOK IN YOUR BINDER, YOU WILL SEE A

24    DOCUMENT, DX 304.

25    A.   OKAY.  IS THAT --

```
 1        Q.    IT MIGHT BE IN VOLUME 2.

 2        A.    OKAY.  I'M SORRY.  WHAT WAS THE NUMBER AGAIN?

 3        Q.    304.

 4        A.    OKAY, YES.

 5        Q.    DO YOU RECOGNIZE THIS DOCUMENT?

 6        A.    I RECOGNIZE THIS DOCUMENT.

 7        Q.    WHAT IS THE DOCUMENT?

 8        A.    THIS IS THE GERMAN VERSION OF MR. TUNG'S THESIS, AND IT'S

 9        THEN FOLLOWED BY THE ENGLISH TRANSLATION.

10        Q.    AND DID YOU RELY ON THIS DOCUMENT IN FORMING YOUR OPINIONS

11        IN THIS CASE?

12        A.    YES, I DID.

13              MR. PAK:  YOUR HONOR, I'D LIKE TO MOVE DX 304 INTO

14        EVIDENCE.

15              MS. KREVANS:  YOUR HONOR, NO FURTHER OBJECTION, SO

16        LONG AS THE AGREED UPON LIMITING INSTRUCTION IS GIVEN WITH

17        RESPECT TO THIS DOCUMENT, WHICH IS -- HAS BEEN SUBMITTED TO THE

18        COURT BY THE PARTIES.  I HAVE A COPY HERE.

19              THE COURT:  YOU HAVE WHAT?  I DIDN'T HEAR THAT.

20              MS. KREVANS:  THE PARTIES HAD STIPULATED THAT IF THIS

21        EVIDENCE WAS OFFERED, THERE WOULD BE A LIMITING INSTRUCTION

22        THAT IT NOT BE CONSIDERED AS PRIOR ART BUT SOLELY TO

23        CORROBORATE OTHER EVIDENCE.

24              THE COURT:  OKAY.  SO THIS IS ADMITTED.

25              (DEFENDANTS' EXHIBIT 304 WAS ADMITTED IN EVIDENCE.)
```

```
1              THE COURT:  AND THIS IS NOT PRIOR ART TO THE '959

2    PATENT.  CORRECT?

3              MR. PAK:  THAT'S RIGHT, YOUR HONOR.  WE'RE USING IT

4    FOR CORROBORATION PURPOSES.

5              THE COURT:  OKAY.  GO AHEAD, PLEASE.

6    BY MR. PAK:

7    Q.   DR. RINARD, IF YOU COULD PRESENT SDX 2934, WHAT IS THIS

8    DOCUMENT AND WHAT DOES IT DO IN TERMS OF CORROBORATING YOUR

9    TESTIMONY?

10   A.   SO THIS DOCUMENT IS A DOCUMENT WRITTEN BY MR. TUNG, WHO

11   WAS A MASTER'S STUDENT AT THE TECHNICAL UNIVERSITY OF DORTMUND,

12   AND THIS DOCUMENT IS A DOCUMENT THAT DESCRIBES THE FREEWAIS

13   SOFTWARE THAT I ANALYZED.

14   Q.   AND WHAT IS IT SPECIFICALLY IN THE HIGHLIGHTED TEXT THAT

15   CORROBORATES YOUR TESTIMONY ABOUT THE SOURCE CODE AND THE

16   SOURCE CODE ANALYSIS?

17   A.   SO IT SAYS THAT YOU CAN -- THAT WAIS IS DESIGNED TO HELP

18   USERS FIND INFORMATION LOCALLY ON THE INTERNET AND THOSE

19   INFORMATION SOURCES CAN BE LOCAL OR ON LINE.

20             MR. PAK:  IF WE TURN TO THE NEXT DEMONSTRATIVE, YOUR

21   HONOR, THIS ONE IS IN EVIDENCE FROM DX 311, AND THAT'S SDX

22   2936.

23             MS. KREVANS:  I'M SORRY, YOUR HONOR.  THE

24   DEMONSTRATIVE IS NOT IN EVIDENCE.  I BELIEVE EXHIBIT 311 IS.

25             MR. PAK:  YES.
```

```
 1                    THE COURT:  I UNDERSTOOD WHAT YOU MEANT.  GO AHEAD,

 2      PLEASE.

 3      BY MR. PAK:

 4      Q.   DR. RINARD, LOOKING ON THE SCREEN, THIS DOCUMENT IS

 5      ALREADY IN EVIDENCE, WHAT IS THE RELEVANCE OF THIS EXCERPT FROM

 6      DX 311 WITH RESPECT TO YOUR TESTIMONY ON THE WAIS SYSTEM?

 7      A.   IT CONFIRMS MY UNDERSTANDING THAT, IN FACT, MY ANALYSIS

 8      GENERATED THAT THE WAIS SYSTEM DOES, IN FACT, USE HEURISTICS

 9      FOR SEARCH.

10      Q.   AND THE WORD HEURISTIC, WHERE -- IS THAT IN THE DOCUMENT

11      ITSELF?

12      A.   YES.  THIS IS A HISTORICAL DOCUMENT FROM THE WAIS

13      CONFERENCE.

14      Q.   NOW, I WANT TO PLAY THE VIDEO, DR. RINARD, AND HAVE YOU

15      WALK US THROUGH THE WAIS VIDEO DEMONSTRATION SYSTEM AND TELL US

16      HOW THAT RELATES TO YOUR TESTIMONY ABOUT THE WAIS SYSTEM.

17      A.   SURE.

18                    MR. PAK:  AND, YOUR HONOR, THIS IS THE WAIS VIDEO

19      THAT WE HAVE PROVIDED BEFORE, SDX 2939.

20                    THE COURT:  WOULD YOU LIKE THE LIGHTS LOWERED?

21                    MR. PAK:  YES, YOUR HONOR.

22                    THE COURT:  OKAY.  PLEASE.

23          THANK YOU.

24      BY MR. PAK:

25      Q.   AND DR. RINARD, FEEL FREE TO ASK FOR THE VIDEO TO BE
```

1    STOPPED AT THE RIGHT PLACES TO PROVIDE YOUR COMMENTARY.

2    A.    SURE, OKAY.  LET'S START IT UP.

3    (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

4         THE WITNESS:  STOP IT.

5         OKAY.  SO WHAT WE'RE LOOKING AT HERE IS A GRAPHICAL USER

6    INTERFACE FOR WAIS.  BLOW THAT UP.

7         AND YOU CAN SEE THAT WE'VE GOT SEVERAL DATABASES IN THE

8    MIDDLE OF THE SCREEN THERE.  ONE OF THEM IS A PHONE BOOK, AND

9    ONE OF THEM IS PRESIDENTIAL INAUGURAL ADDRESS.

10        CONTINUE.  WHAT WE'RE GOING TO DO IS CONTINUE THE VIDEO.

11        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

12        THE WITNESS:  OKAY.  NOW WE'RE POPPING UP

13   INFORMATION -- LET'S STOP THE VIDEO -- STOP IT JUST BEFORE

14   THAT.

15        OKAY.  LET'S LOOK AT PHONE BOOK.

16        OKAY.  STOP.  OKAY.  SO NOW WE'VE POPPED UP A WINDOW, AND

17   WHAT YOU CAN SEE IS, I'D LIKE TO DIRECT YOUR ATTENTION TO THE

18   SECOND LINE DOWN WHERE IT SAYS LOCAL HOST.

19        THIS IS THE NAME OF THE MACHINE ON WHICH THE PHONE BOOK,

20   THIS IS THE MACHINE THAT'S RUNNING THE WAIS INTERFACE.  OKAY.

21   LET'S CONTINUE.

22        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

23        THE WITNESS:  I'M GOING TO BRING UP A WINDOW --

24   STOP -- ABOUT THE PRESIDENTIAL INAUGURAL ADDRESS DATABASE.

25   LET'S TAKE A LOOK AT THE SECOND LINE THERE.

1          NOW, YOU'LL SEE FOUR NUMBERS SEPARATED BY PERIODS.  THIS

2     IS SOMETHING CALLED AN I.P. ADDRESS, OR INTERNET PROTOCOL

3     ADDRESS, 12.144.180.200.  OKAY?

4          THIS IS THE ADDRESS ON THE INTERNET OF THE MACHINE THAT'S

5     STORING THE PRESIDENTIAL INAUGURAL ADDRESS'S DATABASE.  SO ANY

6     SEARCH OF THIS DATABASE WILL BE A SEARCH ON THE INTERNET.

7          LET'S CONTINUE.

8          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

9          THE WITNESS:  STOP.  NOW WHAT WE'RE GOING TO DO IS DO

10     A WAIS SEARCH.  FIRST THING WE'VE GOT TO DO IS SPECIFY THE

11     DATABASES THAT WE'RE GOING TO SEARCH.  SO LET'S CONTINUE AGAIN.

12          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

13          THE WITNESS:  OKAY.  STOP.  WHAT WE DID WAS WE ADD

14     THE PHONE BOOK.  LET'S GO AGAIN.  CONTINUE.

15          NOW WE HAVE THE PRESIDENTIAL INAUGURAL ADDRESSES.  NOW

16     WE'RE TYPING IN THE TERM WE WANT TO SEARCH FOR, GEORGE.

17          OKAY.  NOW WE'RE GOING TO GO OFF AND HIT THE SEARCH

18     BUTTON.

19          LET'S STOP THE VIDEO RIGHT THERE.

20          OKAY.  SO NOW WE GOT BACK TWO RESULTS.  ONE OF THEM IS

21     GEORGE ADAMS.TXT, THAT'S FROM THE PHONEBOOK.  THAT'S FROM THE

22     LOCAL DATABASE.  THE OTHER IS GEORGE WASHINGTON.TXT, THAT'S

23     FROM THE PRESIDENTIAL INAUGURAL ADDRESSES, THAT'S THE DATABASE

24     FROM THE INTERNET.

25          NOW, IF WE GO DOWN TO THE VERY BOTTOM, WE CAN SEE THAT

1    WAIS IS SEARCHING THE PHONEBOOK AND SEARCHING THE PRESIDENTIAL

2    INAUGURAL ADDRESSES.

3    BY MR. PAK:

4    Q.   THANK YOU, DR. RINARD.  SO LOOKING AT THIS SLIDE, OR THE

5    DEMONSTRATION, WE HAVE TWO NUMBERS, 510 AND 67, 510 FOR THE

6    GEORGE ADAMS.TXT AND 67 FOR GEORGE WASHINGTON.TXT.

7    A.   YES.

8    Q.   WHAT'S THE SIGNIFICANCE OF THOSE TWO NUMBERS?

9    A.   THOSE TWO NUMBERS ARE THE WAIS RELEVANCE RANKING HEURISTIC

10   AT WORK.  OKAY?

11       SO 510 IS HOW RELEVANT WAIS THINKS THE GEORGE ADAMS

12   PHONEBOOK ENTRY IS TO THE QUERY GEORGE.  OKAY.  SO IT'S GOT A

13   HIGH NUMBER BECAUSE GEORGE IS A SMALL FILE, A SMALL DATABASE,

14   IT THINKS IT'S VERY RELEVANT.

15       GEORGE WASHINGTON IS A BIGGER FILE, AND EVEN THOUGH IT'S

16   GOT GEORGE, IT THINKS IT'S LESS RELEVANT BECAUSE THERE'S OTHER

17   THINGS GOING ON.

18       SO WHAT IT DOES IS SORTS THESE TWO ENTRIES, ONCE IT GETS

19   THEM BACK FROM THE TWO SOURCES, ACCORDING TO THE RELEVANCE

20   RANKING AND THEM PRESENTS THEM TO THE USER.

21           MR. PAK:  YOUR HONOR, WE CAN TURN THE LIGHTS BACK ON.

22   Q.   DR. RINARD, DID YOU CHANGE ANY SOURCE CODE INSTRUCTIONS

23   WHATSOEVER IN PREPARING THIS DEMONSTRATION?

24   A.   NO, I DID NOT.  IT'S THE SAME SOURCE CODE THAT WE GOT OFF

25   THE DISK.

1    Q.   AND JUST TO BE CLEAR ON THE RECORD, ARE YOU PRESENTING THE

2    DEMONSTRATION AS PRIOR ART OR ARE YOU PRESENTING SOMETHING ELSE

3    AS PRIOR ART?

4    A.   NO.  THIS IS A CRITICAL THING.  I AM NOT PRESENTING THE

5    DEMONSTRATION AS PRIOR ART.  THIS DEMONSTRATION WAS BUILT IN

6    2013, LONG AFTER 2000.  IT'S NOT PRIOR ART.

7         THE PRIOR ART HERE IS THE SOFTWARE, THE SOURCE CODE, FROM

8    WHICH THIS DEMONSTRATE VIDEO WAS INSTALLED.

9    Q.   THANK YOU, DR. RINARD.  I WANT TO JUST JUMP TO ONE MORE

10   PIECE OF PRIOR ART.  THIS IS SDX 2981.

11        ACTUALLY, WHY DON'T WE BRING THAT DOWN, MR. KOTARSKI.

12        BEFORE WE DO THAT, DR. RINARD, IF YOU CAN LOOK AT JX 55 IN

13   YOUR BINDER AND LET ME KNOW WHAT THAT IS.

14   A.   THIS IS A PATENT THAT'S TO KIM SMITH.

15   Q.   AND WHAT'S THE DATE OF THE PATENT?

16   A.   THE DATE OF THE PATENT IS FILED JULY 15, 1999.

17   Q.   AND IS THIS SOMETHING THAT YOU RELIED UPON IN FORMING YOUR

18   OPINIONS?

19   A.   YES.

20        MR. PAK:  YOUR HONOR, I'D LIKE TO MOVE JX 55 INTO

21   EVIDENCE.

22        MS. KREVANS:  NO OBJECTION, YOUR HONOR.

23        THE COURT:  IT'S ADMITTED.

24   (JOINT EXHIBIT 55 WAS ADMITTED IN EVIDENCE.)

25        THE COURT:  GO AHEAD, PLEASE.

1      BY MR. PAK:

2      Q.   IF WE TURN TO SLIDE SDX 2982, IF WE GO TO THE NEXT SLIDE,

3      WHAT IS THE RELEVANCE OF THE SMITH PATENT IN TERMS OF YOUR

4      OPINION ABOUT VALIDITY?

5      A.   SO THE SMITH PATENT IS ABOUT STORING LOCAL -- IT'S ABOUT

6      ACCESSING LOCAL AND REMOTE INFORMATION IN RESPONSE TO A SINGLE

7      QUERY USING HEURISTIC.

8      Q.   HOW IS THIS RELATED TO THE CONCEPT OF UNIVERSAL SEARCH

9      THAT WE'VE BEEN HEARING ABOUT?

10     A.   IT'S ANOTHER EXAMPLE OF UNIVERSAL SEARCH.

11     Q.   THIS IS A UNITED STATES PATENT THAT WAS FILED WHEN?

12     A.   JULY 15, 1999.

13     Q.   IF WE TURN TO THE NEXT SLIDE, SDX 2988, WHAT'S THE

14     SIGNIFICANCE OF THIS FIGURE FROM THE SMITH PATENT?

15     A.   SO THIS SHOWS WHAT THE SMITH PATENT IS DOING.  YOU CAN SEE

16     801.  THIS IS THE INFORMATION IDENTIFIER THAT THE SMITH SYSTEM

17     RECEIVES.  IT GIVES THAT TO THE LOCAL SEARCH AND THE REMOTE

18     SEARCH, AND BOTH SEARCHES HAPPEN.  YOU SEE THE LOCAL AND REMOTE

19     SEARCH CALLED OUT HERE.

20          YOU GET THE RESULTS BACK AND YOU DISPLAY THEM, LIST SEARCH

21     RESULTS.

22     Q.   LET'S LOOK AT ONE MORE PIECE OF EVIDENCE, JX 56 IN YOUR

23     BINDER.

24     A.   UM-HUM.

25     Q.   DO YOU RECOGNIZE THAT DOCUMENT?

1    A.    YES.

2    Q.    WHAT IS IT?

3    A.    IT IS A PATENT TO YAOV SHOHAM, WHO'S A PROFESSOR AT

4    STANFORD UNIVERSITY.

5    Q.    AND WHAT'S THE DATE?

6    A.    THE DATE ON THIS ONE IS MAY 12, 1995.

7    Q.    IS SHOHAM S-H-O-H-A-M?

8    A.    YES.

9    Q.    NOW, DR. RINARD, DID YOU CONSIDER THIS DOCUMENT IN FORMING

10   YOUR OPINIONS ABOUT THE VALIDITY OF THE '959 PATENT?

11   A.    YES, I DID.

12         MR. PAK:  YOUR HONOR, I'D LIKE TO MOVE THIS INTO

13   EVIDENCE.  THIS IS JX 56.

14         MS. KREVANS:  NO OBJECTION.

15         THE COURT:  IT'S ADMITTED.

16         (JOINT EXHIBIT 56 WAS ADMITTED IN EVIDENCE.)

17         THE COURT:  GO AHEAD, PLEASE.

18   BY MR. PAK:

19   Q.    IF WE TURN TO 2996, WHAT IS THIS REFERENCE TO COLUMN 68 OF

20   THE SHOWN REFERENCE?

21   A.    THIS TELLS US THAT HEURISTIC SEARCH TECHNIQUES ARE WELL

22   ESTABLISHED BY 1995, AND, IN FACT, THE SHOHAM PATENT IS USING

23   CONVENTIONAL HEURISTIC SEARCH.

24   Q.    WHAT IS YOUR OPINION ON WHETHER IT WOULD HAVE BEEN,

25   WHETHER THOSE SKILLED IN THE ART WOULD HAVE BEEN MOTIVATED TO

1    COMBINE THE TEACHINGS OF THE SHOHAM PATENT WITH THE TEACHINGS

2    OF THE SMITH PATENT THAT WE JUST SAW?

3    A.   THEY WOULD HAVE BEEN.  THEY'RE IN THE SAME FIELD.  THEY'RE

4    ATTEMPTING TO SOLVE SIMILAR PROBLEMS.  THEY WOULD HAVE BEEN

5    MOTIVATED TO COMBINE.

6    Q.   SO TO SUMMARIZE YOUR OPINIONS, HAVING LOOKED AT SMITH AND

7    SHOHAM, AS WELL AS THE FREEWAIS SYSTEMS SOURCE CODE, WHAT IS

8    YOUR ULTIMATE OPINION ON THE VALIDITY OF THE '959, CLAIM 25?

9    A.   THIS CLAIM IS INVALID.

10   Q.   FINALLY, DID YOU HAVE A CHANCE TO CONSIDER WHAT ARE CALLED

11   SECONDARY CONSIDERATIONS?

12   A.   YES.

13   Q.   WHAT ARE SECONDARY CONSIDERATIONS?

14   A.   SECONDARY CONSIDERATIONS ARE THINGS THAT YOU CONSIDER

15   BEFORE YOU COME TO A FINDING OF OBVIOUSNESS.

16   Q.   LET'S LOOK AT SDX 2999.

17        CAN YOU BRIEFLY SUMMARIZE FOR THE JURY THE ANALYSIS YOU

18   DID AND YOUR FINDINGS ON THE SECONDARY CONSIDERATIONS ON

19   WHETHER THE CLAIM 24 AND 25 OF THE '959 PATENT ARE INVALID.

20   A.   SO HERE'S SOME SECONDARY CONSIDERATIONS THAT I CONSIDERED.

21   THERE'S NO COMMERCIAL SUCCESS OF THE '959 PATENT.  NO APPLE

22   PRODUCT EVER PRACTICED THE CLAIMED INVENTION OR EVER USED THE

23   CLAIMED INVENTION, AND, IN FACT, SAMSUNG DOESN'T USE THE

24   CLAIMED INVENTION.

25        I'M AWARE OF NO PRAISE FOR THE '959 PATENT, AND OTHER

1    CONSIDERATIONS.

2         BUT OBVIOUSNESS, AND ALSO THERE'S NO COPYING.

3    Q.   WERE YOU HERE FOR THE TESTIMONY OF DR. BRINGERT ABOUT THE

4    GENESIS OF THE ACCUSED GOOGLE SEARCH APPLICATION?

5    A.   YES.

6    Q.   AND HOW DOES THAT RELATE TO YOUR OPINIONS ON COPYING?

7    A.   WELL, DR. BRINGERT SAID THERE WAS NO COPYING.

8    Q.   WHERE DID THIS TECHNOLOGY COME FROM?

9    A.   IT CAME FROM GOOGLE.

10        MR. PAK:  THANK YOU.  I PASS THE WITNESS, YOUR HONOR.

11        THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:52.  WE'LL

12   GO TO 2:15, PLEASE.

13        (PAUSE IN PROCEEDINGS.)

14        THE COURT:  OKAY.  ARE YOU READY?

15        MS. KREVANS:  LET ME JUST GET -- I AM READY, YOUR

16   HONOR.

17        THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:53.  GO

18   AHEAD, PLEASE.

19                      **CROSS-EXAMINATION**

20   BY MS. KREVANS:

21   Q.   GOOD AFTERNOON, DR. RINARD.  I'M RACHEL KREVANS.  I'M ONE

22   OF THE ATTORNEYS FOR APPLE.  WE HAVEN'T MET BEFORE?

23   A.   GOOD AFTERNOON.  I'VE SEEN YOU IN COURT BEFORE.

24   Q.   LET'S START WITH WHAT THIS CASE IS ABOUT.

25   A.   UM-HUM.

CROSS RINARD

1    Q.   THE DEFENDANT HERE IS SAMSUNG; RIGHT?

2    A.   THAT'S MY UNDERSTANDING.

3    Q.   THE ACCUSED PRODUCTS ARE PRODUCTS MADE AND SOLD BY SAMSUNG

4    IN THE UNITED STATES?

5    A.   THAT'S MY UNDERSTANDING.

6    Q.   SAMSUNG GETS THE MONEY WHEN THEY SELL THEM?

7    A.   THAT'S MY UNDERSTANDING.

8    Q.   GOOGLE IS NOT A DEFENDANT?

9    A.   THAT'S MY UNDERSTANDING.

10   Q.   IT WAS SAMSUNG'S LAWYERS WHO HIRED YOU TO COME GIVE

11   OPINIONS THAT SAMSUNG'S PRODUCTS DON'T INFRINGE AND THAT THIS

12   PATENT IS INVALID?

13   A.   I WOULDN'T AGREE WITH THAT.

14   Q.   IT WASN'T SAMSUNG'S LAWYERS WHO HIRED YOU?

15   A.   I WAS RETAINED BY SAMSUNG, YES.

16   Q.   AND THEY'RE PAYING YOU?

17   A.   OH, YEAH.

18   Q.   OKAY.  AND YOU SAID YOU WORKED ABOUT 900 HOURS ON THIS

19   CASE?

20   A.   YES, THAT'S RIGHT.

21   Q.   AND YOUR RATE IS $850 ON HOUR?

22   A.   YES, THAT'S CORRECT.

23   Q.   I'M NOT GREAT WITH ZEROS, BUT THAT MEANS YOU'VE BEEN PAID

24   ABOUT $750,000 FOR YOUR WORK ON?

25   A.   ALTOGETHER, I THINK THAT'S PRETTY ACCURATE.  A LOT OF

1    WORK.

2    Q.   YOU SPENT A LOT OF HOURS?

3    A.   OH, YEAH.

4    Q.   OKAY.  IT WAS SAMSUNG WHO CHOSE TO INCLUDE THE GOOGLE

5    QUICK SEARCH BOX, ALSO KNOWN SOMETIMES AS SEARCH APPLICATION,

6    ON THE PHONES THAT THEY'RE SELLING IN THE UNITED STATES; RIGHT?

7    A.   THAT'S NOT MY UNDERSTANDING.

8    Q.   IT'S NOT YOUR UNDERSTANDING THAT SAMSUNG MADE THE CHOICE

9    TO INCLUDE THE GOOGLE QUICK SEARCH BOX ON THEIR PHONES?

10   A.   WELL, THE GALAXY NEXUS IS ONE OF THE ACCUSED DEVICES IN

11   THIS CASE, AND IT'S MY UNDERSTANDING THAT GOOGLE CONTROLS WHO'S

12   ON THAT PHONE, NOT SAMSUNG.

13   Q.   YOU THINK -- WAIT, I'M SORRY.  IS IT YOUR TESTIMONY THAT

14   GOOGLE FORCED SAMSUNG TO MAKE A PHONE CALLED THE GALAXY NEXUS

15   AND PUT GOOGLE SOFTWARE ON IT?

16   A.   NO, IT'S MY UNDERSTANDING THAT GOOGLE CONTROLS THE

17   SOFTWARE ON THAT PHONE.

18   Q.   THAT WASN'T MY QUESTION.

19        IS IT YOUR TESTIMONY THAT GOOGLE WAS ABLE TO FORCE -- TO

20   COMPEL SAMSUNG TO MANUFACTURE A PHONE CALLED THE GALAXY NEXUS

21   AND PUT GOOGLE SOFTWARE ON IT?

22   A.   THAT'S NOT EXACTLY WHAT I THINK HAPPENED, BUT IT'S MY

23   UNDERSTANDING THAT GOOGLE CONTROLS THE SOFTWARE ON THAT PHONE.

24   Q.   THAT SAMSUNG AGREED WITH GOOGLE, MAYBE, THAT GOOGLE WOULD

25   WRITE ALL THE CODE FOR THE PHONE.

1          BUT GOOGLE HAD NO POWER TO FORCE SAMSUNG TO MAKE THAT

2     PHONE; RIGHT?

3     A.   I THINK THAT'S RELATIVE -- YES, THAT'S ACCURATE.

4     Q.   OKAY.  YOU GAVE SOME TESTIMONY ABOUT ALTERNATIVES THAT YOU

5     SAY, I TAKE IT, WOULD HAVE BEEN AVAILABLE TO SAMSUNG TO USE

6     INSTEAD OF THE QUICK SEARCH BOX THAT'S BEEN ACCUSED OF

7     INFRINGEMENT; RIGHT?

8     A.   I GAVE ALTERNATIVES TO THE -- THAT WOULD HAVE BEEN

9     AVAILABLE FOR THE QUICK SEARCH BOX.

10    Q.   ALL RIGHT.  YOU TALKED ABOUT TWO DIFFERENT ALTERNATIVES;

11    RIGHT?

12    A.   YES.

13    Q.   LET'S MAKE SURE THAT WE ALL HAVE THEM STRAIGHT IN OUR

14    HEADS.

15         ONE OF THEM IS ONE THAT YOU SAID SAMSUNG ACTUALLY DID, AND

16    YOU CALLED THAT ONE THE INTERNET-ONLY ALTERNATIVE?

17    A.   THAT'S NOT WHAT I SAID.

18    Q.   YOU -- DO YOU REMEMBER TALKING ABOUT SOMETHING YOU CALLED

19    THE INTERNET-ONLY SEARCH ALTERNATIVE?

20    A.   YES.

21    Q.   AND THAT'S AN ALTERNATIVE YOU SAID, AT LEAST AT ONE POINT

22    IN TIME, SAMSUNG ACTUALLY PUT ON ITS PHONES.  IN FACT, YOU SAID

23    IT WAS INTRODUCED ON JULY 6TH, 2012, ON SOME PHONES BY SAMSUNG?

24    A.   THERE -- YEAH, THERE IS A VERSION OF THE QUICK SEARCH BOX,

25    THE INTERNET-ONLY VERSION, AND THAT WAS BUILT AND MY

```
1     UNDERSTANDING WAS DEPLOYED.

2     Q.   IT WAS ACTUALLY DEPLOYED STARTING IN JULY 2012?

3     A.   THAT'S MY UNDERSTANDING, YES.

4     Q.   ON SOME --

5     A.   AVAILABLE.

6     Q.   AND ON -- AND IT WAS USED ON SOME VERSIONS OF PHONES THAT

7     WERE SOLD BY SAMSUNG FOR A FEW MONTHS IN 2012 AND THEN THEY

8     SWITCHED BACK TO THE PRIOR VERSION OF THE CODE IN THE FALL OF

9     2012.  SO THAT STARTING IN THE FALL OF 2012, THE QUICK SEARCH

10    BOX ON THE SAMSUNG ACCUSED PHONES WAS INTERNET AND LOCAL

11    SEARCH; RIGHT?

12    A.   SO THAT'S A LONG SEQUENCE, AND I THINK IT IS RELATIVELY

13    ACCURATE TO MY UNDERSTANDING.

14         SO, YES.

15    Q.   SO THERE WERE A FEW MONTHS IN 2012 WHEN SAMSUNG WAS

16    SELLING PHONES THAT HAD THE INTERNET-ONLY ALTERNATIVE; RIGHT?

17    A.   IT'S MY UNDERSTANDING THAT IN THE SUMMER THERE WERE

18    SAMSUNG PHONES WITH THAT INTERNET-ONLY ALTERNATIVE AVAILABLE ON

19    THEM.

20    Q.   IN THE SUMMER AND EARLY FALL OF 2012?

21    A.   THAT'S MY UNDERSTANDING, YES.

22    Q.   AND THEN THEY STARTED SELLING PHONES AGAIN WITH THE

23    PREVIOUS VERSION THAT HAD INTERNET AND LOCAL SEARCH IN THE

24    QUICK SEARCH APPLICATION; RIGHT?

25    A.   IT'S MY UNDERSTANDING THAT EVENTUALLY, YES, SAMSUNG TOOK
```

CROSS RINARD

```
 1      OUT THE INTERNET-ONLY ALTERNATIVE.

 2      Q.   OKAY.  AND THE OTHER THING YOU TALKED ABOUT, THE 2.7

 3      ALTERNATIVE, THAT'S ONE YOU SAID -- YOU DOWNLOADED THAT

 4      PERSONALLY AND PUT IT ON A PHONE TO DEMONSTRATE TO THE JURY;

 5      RIGHT?

 6      A.   YES.

 7      Q.   OKAY.  NOW, IN THE COURSE OF FORMING YOUR OPINION ABOUT

 8      THESE NON-INFRINGING ALTERNATIVES, YOU REVIEWED OPINIONS FROM

 9      APPLE'S EXPERTS IN THE CASE; RIGHT?

10      A.   YES, I DID.

11      Q.   YOU LOOKED AT DR. SNOEREN'S REPORT?

12      A.   SO I LOOKED AT DR. SNOEREN'S REPORT WHERE HE DISCUSSED THE

13      INTERNET-ONLY SEARCH OPTION.

14      Q.   AND YOU ALSO LOOKED AT DR. HAUSER'S REPORT?

15      A.   YES, I READ DR. HAUSER'S REPORT.

16      Q.   IN FACT, YOU READ QUITE A FEW REPORTS OFFERED BY APPLE IN

17      THE CASE; RIGHT?

18      A.   DR. HAUSER'S, DR. SNOEREN, AND OTHERS AS WELL, YES.

19      Q.   DR. VELLTURO?

20      A.   YES.

21      Q.   AND DR. VELLTURO ALSO HAD A REPORT WHERE HE TALKED ABOUT

22      THE VALUE OF INVENTIONS AND WHETHER THEY WERE IMPORTANT IN THE

23      MARKETPLACE; RIGHT?

24      A.   I DON'T RECALL THAT SPECIFICALLY.  IF YOU COULD PROVIDE ME

25      WITH THE REPORT, I'LL TAKE A LOOK.
```

1    Q.    OKAY.  WHY DON'T I -- I'D LIKE TO SHOW YOU A DOCUMENT THAT

2    WAS ONE OF THE DOCUMENTS THAT DR. VELLTURO CITED IN HIS REPORT

3    ON THAT QUESTION.  IT'S PX 193, AND IT'S IN THE BINDER IN FRONT

4    OF YOU.

5             MR. PAK:  YOUR HONOR, I THINK THAT GOES BEYOND THE

6    SCOPE OF HIS DIRECT EXAMINATION.  WE DID NOT PRESENT ANY

7    TESTIMONY FROM DR. VELLTURO.

8             MS. KREVANS:  HE PRESENTED TESTIMONY ON WHETHER

9    CONSUMERS WOULD CARE.

10            THE COURT:  UNDERSTOOD.

11            OVERRULED.  GO AHEAD, PLEASE.

12   BY MS. KREVANS:

13   Q.    YOU SHOULD HAVE A RELATIVELY SMALL BINDER FOR ME,

14   DR. RINARD.  193 SHOULD BE EASY TO FIND.

15   A.    UM-HUM.

16   Q.    ARE YOU WITH ME?

17   A.    I BELIEVE I AM AT THE -- YES.

18   Q.    OKAY.  NOW, 193 IS AN ARTICLE FROM "IB TIMES," WHICH IS AN

19   ONLINE PUBLICATION; RIGHT?

20   A.    LET ME SEE THIS.  OKAY.  I SEE THE ARTICLE.

21            MS. KREVANS:  YOUR HONOR, WE MOVE 193.

22            THE COURT:  ANY OBJECTION?

23            MR. PAK:  YOUR HONOR, I THINK THIS LACKS FOUNDATION

24   WITH RESPECT TO THIS WITNESS.

25            THE COURT:  OVERRULED.

```
 1           GO AHEAD, PLEASE.  IT'S ADMITTED.

 2           (PLAINTIFF'S EXHIBIT 193 WAS ADMITTED IN EVIDENCE.)

 3               THE COURT:  OKAY.

 4      BY MS. KREVANS:

 5      Q.   THE TITLE OF -- SORRY.  I'VE GOT THAT THROAT THING BACK.

 6           THE TITLE OF EXHIBIT 193 IS "SAMSUNG GALAXY S III:  SPRINT

 7      CONFIRMS OTA UPDATE DISABLING UNIVERSAL SEARCH, AT&T FOLLOWS

 8      SUIT."

 9           NOW, SPRINT AND AT&T WERE TWO OF THE CARRIERS THAT OFFERED

10      SAMSUNG SMARTPHONES TO THEIR CUSTOMERS; RIGHT?

11      A.   I'LL ACCEPT THAT IF YOU PRESENT IT, YES.

12      Q.   YOU DON'T KNOW?

13      A.   I DON'T HAVE AN OPINION ON THAT.

14      Q.   OKAY.  ALL RIGHT.  LET'S LOOK AT THE FIRST PARAGRAPH OF

15      THIS REPORT.  IT SAYS, "RECENT REPORTS SAY THAT THE SPRINT

16      VARIANT OF THE SAMSUNG GALAXY S III WAS ABOUT TO RECEIVE AN OTA

17      (OVER-THE-AIR) UPDATE THAT WOULD DISABLE UNIVERSAL SEARCH

18      FUNCTIONALITY ON THE HANDSET.  THE UPDATE MEANT THAT THE USERS

19      OF SPRINT GALAXY S III WON'T HAVE BEEN ABLE TO USE THE GOOGLE

20      SEARCH BAR ON THE HOME SCREEN TO FIND THEIR APPS, CONTACTS, AND

21      OTHER DATA.  ONLY WEB-BASED RESULTS WOULD COME BACK WHEN THEY

22      SEARCHED WITH THAT METHOD."

23           AND THE DATE OF THIS IS JULY 12TH, 2012.

24           SO THIS FITS THE TIMEFRAME WHEN YOU TESTIFIED THAT THE

25      INTERNET-ONLY ALTERNATIVE WAS ACTUALLY PUT ON PHONES THAT
```

CROSS RINARD

1    SAMSUNG WAS SELLING; RIGHT?

2    A.   IT LOOKS LIKE IT'S AFTER JULY 6TH, YES.  AND YOU SEE THAT

3    IN THE MIDDLE OF THIS PAGE, THERE'S A PARAGRAPH THAT STARTS

4    WITH "THE VERGE," COULD WE BLOW THAT UP, PLEASE, MR. LEE.

5         "'THE VERGE' REPORTED THAT WHILE AT&T GALAXY S III OWNERS

6    WILL HAVE A LESS-FUNCTIONAL SEARCH BAR TO DEAL WITH AFTER THE

7    UPDATE, THEY CAN SET THINGS RIGHT BY DOWNLOADING THE OLD APP

8    FILE FOR THE GOOGLE QUICK SEARCH BOX AND INSTALLING IT AFTER

9    THE UPDATE."

10        DO YOU SEE THAT?

11   A.   I SEE THAT IN THE DOCUMENT, YES.

12   Q.   DID YOU EVER INVESTIGATE WHETHER PEOPLE, AS THIS ARTICLE

13   TOLD THEM THEY COULD DO, WHEN THIS DISABLING UPDATE WAS PUT OUT

14   TAKING LOCAL SEARCH AWAY FROM USERS WENT OUT AND DOWNLOADED THE

15   OLD APP FILE SO THAT THEY COULD RESTORE LOCAL SEARCH AS THIS

16   ARTICLE SUGGESTS?

17   A.   OH, I DID A TECHNICAL INVESTIGATION.  I DIDN'T LOOK INTO

18   THIS PARTICULAR ASPECT OF IT.

19   Q.   YOU DIDN'T LOOK INTO THIS?

20   A.   THAT'S RIGHT.

21   Q.   OKAY.  COULD YOU LOOK AT EXHIBIT 308, WHICH IS IN YOUR

22   BINDER.

23   A.   OKAY.

24   Q.   YOU GAVE SOME TESTIMONY THAT YOU HAD INFORMATION THAT

25   SUGGESTED THAT NOT MANY PEOPLE USED OR CARED ABOUT THE LOCAL

```
 1      SEARCH FEATURE OF THE QUICK SEARCH BOX APPLICATION; RIGHT?

 2      A.   I BELIEVE I TESTIFIED ABOUT HOW OFTEN PEOPLE USE GOOGLE

 3      SEARCH RESULTS FROM THE INTERNET, FROM GOOGLE SEARCH SERVERS

 4      WITH GOOGLE SEARCH.

 5      Q.   HAVE YOU LOOKED AT EXHIBIT 308 BEFORE?

 6      A.   YES.

 7      Q.   THIS IS A DOCUMENT YOU TALKED ABOUT IN YOUR EXPERT REPORT;

 8      RIGHT?

 9      A.   I BELIEVE THAT'S TRUE.

10      Q.   AND YOU RELIED ON THIS DOCUMENT FOR THE FACT THAT MOST OF

11      THE TIME, WHEN PEOPLE USED THE QUICK SEARCH APPLICATION THAT

12      SEARCHED BOTH ON THE WEB AND LOCALLY, THE SEARCH RESULT THEY

13      ACTUALLY WERE INTERESTED IN WAS FROM THE WEB, RIGHT?

14      A.   YES, THE RESULT THAT THEY USED WAS FROM THE WEB.

15      Q.   AND, IN FACT, EXHIBIT 308 IS A DOCUMENT FROM GOOGLE THAT A

16      GOOGLE EMPLOYEE ASKED ANOTHER GOOGLE EMPLOYEE TO PUT TOGETHER

17      TO LOOK AT A WEEK'S WORTH OF INFORMATION AND SEE HOW OFTEN

18      PEOPLE WERE USING THE APP, SEE HOW MANY USES THE APP HAD, AND

19      OFTEN THE LOCAL RESULT WAS PICKED VERSUS THE WEB RESULT.

20      RIGHT?

21      A.   ROUGHLY, YES.

22      Q.   OKAY.  A WEEK AND -- IT'S SEVEN AND ONE QUARTER DAYS,

23      RIGHT?

24      A.   I BELIEVE SO.

25      Q.   WE'LL CALL IT A WEEK.
```

1          AND THIS WASN'T EVEN LOG DATA THAT GOOGLE HAD FOR EVERY

2     USER OF THE QUICK SEARCH BOX BECAUSE IT WAS ONLY PHONES RUNNING

3     JELLY BEAN AT THE TIME; RIGHT?

4     A.    RESTRICTED VERSION 2.4 PLUS, YES.

5     Q.    THAT'S JELLY BEAN?

6     A.    I BELIEVE SO, YES.

7     Q.    OKAY.  AND WHAT GOOGLE'S LOGS TRACKED --

8     A.    UM-HUM.

9     Q.    -- FOR THIS WEEK-LONG PERIOD WAS THAT THERE WERE 800

10    MILLION SOME SEARCHES AND WHEN THEY THEN ALSO TRACKED WHICH

11    SEARCH RESULT THE USER PICKED, 14 MILLION TIMES, IN JUST A

12    WEEK, THE USER WANTED THE LOCAL SEARCH RESULT; RIGHT?

13    A.    I THINK THEY USED THE LOCAL SEARCH RESULT, YES.

14    Q.    FOURTEEN MILLION TIMES?

15    A.    FOURTEEN MILLION SOME.

16    Q.    IN A WEEK?

17    A.    YES.

18    Q.    OKAY.  LET'S TALK ABOUT INVALIDITY FOR A MOMENT.

19          YOU, YOURSELF, HAVE A PATENT; RIGHT?

20    A.    YES, THERE'S -- YES, I DO.

21    Q.    OKAY.  ARE YOU PROUD OF YOUR INVENTION?

22    A.    ABSOLUTELY.

23    Q.    DO YOU THINK THE PATENT OFFICE DID THE RIGHT THING BY

24    GRANTING YOUR PATENT?

25    A.    I SURE HOPE THEY DID.

1    Q.   OKAY.  AND YOUR PATENT, LIKE THE '959 PATENT, IS PRESUMED

2    TO BE VALID BECAUSE THE U.S. GOVERNMENT DECIDED THAT IT WAS

3    RIGHT TO ISSUE THE CLAIMS; RIGHT?

4    A.   IT IS PRESUMED TO BE VALID, YES.

5    Q.   NOW, JUST, AGAIN, SO WE'RE NOT CONFUSED, YOU'RE NOT, AND

6    YOU HAVEN'T TODAY TOLD THE JURY THAT ANYTHING THAT HAPPENED IN

7    THE DEVELOPMENT OF ANDROID CODE AT GOOGLE IS PRIOR ART TO THE

8    '959 PATENT; RIGHT?

9    A.   THAT IS CORRECT, I'M NOT SAYING THAT GOOGLE ITSELF -- THAT

10   ANDROID DEVELOPMENT WAS PRIOR ART TO THE '959 PATENT.

11   Q.   OKAY.  LET'S LOOK AT A COUPLE OF THE THINGS THAT YOU

12   IDENTIFIED AS PRIOR ART THAT YOU THINK MEANS THE U.S. PATENT

13   OFFICE MADE A MISTAKE.

14        LET'S START WITH THE SMITH PATENT.

15   A.   SO I DON'T AGREE WITH THAT CHARACTERIZATION BY THE WAY.

16   Q.   YOU'RE NOT SAYING THAT THE PATENT OFFICE MADE A MISTAKE IN

17   GRANTING THE '959 PATENT?

18   A.   WHAT I'M SAYING IS THE PATENT OFFICE DIDN'T HAVE THE

19   INFORMATION IN FRONT OF IT THAT THEY NEEDED TO MAKE THE RIGHT

20   DECISION.

21   Q.   YOU THINK THEIR DECISION WAS WRONG?

22   A.   IN THIS CASE, YES.

23   Q.   OKAY.  LET'S LOOK AT ONE OF THE THINGS YOU TALKED ABOUT,

24   THE SMITH PATENT.  THIS IS JX 55.

25   A.   UM-HUM.

1    Q.   NOW, YOU SHOWED THE JURY FIGURE 5 OF THE SMITH PATENT.

2         COULD WE TURN TO FIGURE 7 OF THE SMITH PATENT, MR. LEE.

3         THIS IS A FIGURE FROM THE SMITH PATENT THAT YOU'RE RELYING

4    ON FOR YOUR INVALIDITY OPINIONS; RIGHT?

5    A.   BUT I WANT TO CORRECT THE RECORD, I BELIEVE I SHOWED THE

6    JURY FIGURE 8.

7    Q.   OKAY.  THIS IS FIGURE 7.  YOU DIDN'T SHOW THIS TO THE

8    JURY; RIGHT?

9    A.   THAT'S CORRECT.

10   Q.   OKAY.  THIS IS A SYSTEM IN THE SMITH PATENT FOR A CABLE

11   BOX; RIGHT?

12   A.   I BELIEVE SMITH CALLS IT A CONVERSION SYSTEM WHERE YOU'VE

13   GOT TV AND COMPUTERS COMING TOGETHER FOR A SINGLE SYSTEM AND

14   THE BOX IS A COMBINED BOX.

15   Q.   OKAY.  SO THIS IS A FANCY CABLE BOX THAT BOTH CONTROLS TV

16   CONTENT ON YOUR TV AND ALSO CAN BE USED TO BRING YOU GAMES THAT

17   YOU OTHERWISE MIGHT PLAY ON A COMPUTER?

18   A.   OR DVD'S AND OTHER KINDS OF THINGS LIKE THAT.

19   Q.   OKAY.  MAKE SURE YOU KEEP THE MIKE CLOSE TO YOUR PHONE

20   DR. RINARD, I'M SORRY, CLOSE TO YOUR MOUTH SO THE JURY CAN HEAR

21   YOU?

22   A.   OKAY.

23   Q.   OKAY.  NOW, IN FIGURE 7 --

24   A.   UM-HUM.

25   Q.   -- YOU SEE WHERE THERE'S THAT POINTER THAT'S LABELED 300?

1       A.   YES.

2       Q.   AND IT'S POINTING TO A BOX THERE ON A MENU THAT'S LABELED

3       GAMES.  RIGHT?

4       A.   YES.  300 IS POINTING TO THE BOX LABELED GAMES IN FIGURE

5       7.

6       Q.   AND IN YOUR ANALYSIS OF HOW YOU SAY THAT THIS SMITH PATENT

7       RENDERS THE '959 PATENT INVALID, YOU'RE USING THE USER CLICKING

8       ON THAT BOX THAT SAYS GAMES AS THE INFORMATION IDENTIFIER

9       THAT'S PROVIDED UNDER THE CLAIM; RIGHT?

10      A.   THAT'S FOR ONE OF THE WAYS IN WHICH SMITH MAKES THIS

11      PATENT INVALID, AND IT'S A SCENARIO, BUT IT'S CERTAINLY NOT THE

12      ONLY SCENARIO.

13      Q.   WE SEE A MENU OVER THERE ON THE LEFT-HAND SIDE OF FIGURE

14      7, RIGHT?

15      A.   UM-HUM.

16      Q.   TV, HOME THEATER, GAMES, WEB, MUSIC, ET CETERA, THAT'S A

17      MENU THAT IS SELECTED TO THIS USER AND THEY COULD PICK

18      SOMETHING BY CLICKING ON IT, RIGHT?

19      A.   YES, THAT'S WHAT IS DEPICTED HERE IN FIGURE 7.

20      Q.   AND FIGURE 7 DOESN'T SHOW ANY ABILITY FOR THE USER TO TYPE

21      IN THEIR OWN SEARCH QUERY, RIGHT?

22      A.    IN THIS PARTICULAR THING, YES.  BUT THERE ARE OTHER WAYS

23      OF ENTERING THE SEARCH QUERY.

24      Q.   FIGURE 7, THEY CAN PICK GAMES; RIGHT?

25      A.   THAT'S ONE WAY.  THEY CAN ALSO -- THERE'S OTHER THINGS

```
1    THEY CAN CLICK ON FIGURE 7 TO PROVIDE AN INFORMATION

2    IDENTIFIER.

3    Q.   BUT THEY'RE PICKING FROM THE MENU THAT'S PROVIDED IN

4    FIGURE 7; RIGHT?

5    A.   FIGURE 7 PROVIDES OTHER WAYS OF PROVIDING AN INFORMATION

6    IDENTIFIER.

7    Q.   WE'RE LOOKING AT FIGURE 7 WITH YOU, DR. RINARD.

8    A.   UM-HUM.

9    Q.   NOBODY IS TYPING ANYTHING INTO FIGURE 7, RIGHT?  THEY'RE

10   PICKING FROM THIS MENU?

11   A.   THEY ARE -- THAT'S RIGHT.  IN FIGURE 7.

12        AND IT ALSO SHOWS OTHER WAYS OF PROVIDING THE INFORMATION

13   IDENTIFIER.

14        FOR EXAMPLE, IF YOU LOOK WHERE IT SAYS CLICK MORE LIKE

15   THIS, GAMES, WHAT THE PATENT SAYS IS THAT CAN PROVIDE, FOR

16   EXAMPLE, SOMETHING LIKE THE NAME OF THE GAME THAT YOU CAN GO

17   OFF AND SEARCH FOR OTHER GAMES THAT ARE LIKE THAT.

18   Q.   THAT WOULD BE AFTER THEY'D CLICKED GAMES ON THE LEFT;

19   CORRECT?

20   A.   YES.

21   Q.   SO IF THEY CLICK -- WHEN THEY CLICK GAMES ON THE LEFT --

22   WHAT THIS FIGURE IS SHOWING US IS THAT IF THEY CLICK GAMES ON

23   THE LEFT WHAT WE SEE ON THE RIGHT IS GOING TO COME UP AND IT

24   WILL THEN OFFER THEM GAME TITLES FOR THE GAME MOST RECENTLY

25   PLAYED, GAME TITLE FOR THE GAME MOST OFTEN PLAYED, AND GAME
```

```
 1      TITLE FOR THE GAME NEXT MOST OFTEN PLAYED.

 2          THEY COULD THEN CLICK ANOTHER BUTTON TO GET MORE GAMES

 3      LIKE ONE OF THOSE CATEGORIES; RIGHT?

 4      A.   YEAH, THAT'S EXACTLY THE WAY THIS PATENT OPERATES.

 5      THERE'S MULTIPLE WAYS IN WHICH THIS PATENT WILL INVALIDATE THE

 6      '959 PATENT.

 7      Q.   NONE OF THOSE THINGS THAT WE JUST DESCRIBED AS WE'RE

 8      DISCUSSING THIS ARE USER TYPING IN A SEARCH QUERY; RIGHT?

 9      A.   WELL, THAT'S CORRECT.

10      Q.   PICKING FROM A PREDETERMINED MENU; RIGHT?

11      A.   AND PROVIDING INFORMATION IDENTIFIER USING THAT MECHANISM

12      AS DESCRIBED IN THE PATENT.

13      Q.   ALL RIGHT.  LET'S TURN TO THE WAIS PRIOR ART THAT YOU

14      TALKED ABOUT.

15      A.   UM-HUM.

16      Q.   I WANT TO CLEAR UP A COUPLE THINGS BECAUSE WE'VE HAD A

17      COUPLE WITNESSES WHO CAME IN HERE AND TESTIFIED BEFORE YOU AND

18      ONE OF THEM WAS A GENTLEMAN FROM RIGHT HERE IN THE BAY AREA,

19      MR. KAHLE, AND ANOTHER ONE WAS A GENTLEMAN WHO WAS A FORMER

20      ACADEMIC FROM GERMANY, MR. PFEIFER.  RIGHT?

21      A.   I REMEMBER THOSE TWO WITNESSES, YES.

22      Q.   OKAY.  NOW, THEY TALKED ABOUT TWO THINGS.  THEY TALKED

23      ABOUT WAIS, THAT'S WHAT MR. KAHLE TALKED ABOUT, AND MR. ULRICH

24      -- MR. PFEIFER, ULRICH PFEIFER FROM GERMANY, HE TALKED ABOUT

25      SOMETHING THAT HE HAD WRITTEN, WHICH WAS HE TOOK THE BASIC WAIS
```

CROSS RINARD

1   CODE AND THEN HE WROTE THE CODE AND THAT WAS FREEWAIS SF;

2   RIGHT?

3   A.   I DON'T BELIEVE THAT'S AN ACCURATE CHARACTERIZATION OF

4   WHAT HAPPENED.

5   Q.   MR. PFEIFER TALKED ABOUT FREEWAIS SF; RIGHT?

6   A.   YES.

7   Q.   THE SOURCE CODE THAT YOU JUST SHOWED THE JURY WHEN MR. PAK

8   WAS ASKING YOU QUESTIONS WAS FREEWAIS SF SOURCE CODE; RIGHT?

9   A.   THAT IS CORRECT.  IT WAS FREEWAIS SF SOURCE CODE.

10   Q.   THAT CAME FROM SOMETHING, SOURCE CODE THAT MR. PFEIFER

11   FOUND STORED IN GERMANY; RIGHT?

12   A.   AND IN THE UNITED STATES, AS WELL AS AT CORNELL.  HE

13   TESTIFIED TO THAT.

14   Q.   THE COPY THAT WAS USED IN THIS CASE CAME FROM GERMANY;

15   RIGHT?

16   A.   AND I BELIEVE THE COPY HE TESTIFIED WAS IDENTICAL TO THE

17   ONE AT CORNELL.

18   Q.   THE COPY THAT YOU USED TO MAKE THE DEMONSTRATION YOU GAVE

19   TO THE JURY CAME FROM HIM IN GERMANY; RIGHT?

20   A.   IT CAME FROM HIM, AND I BELIEVE HE TESTIFIED TODAY IT WAS

21   THE SAME AS THE ONE AT CORNELL.

22   Q.   LET'S BE STRAIGHT HERE, DR. RINARD.  THE COPY THAT YOU

23   USED TO MAKE YOUR DEMONSTRATION CAME FROM DR. ULRICH; RIGHT?

24   A.   THAT'S MY UNDERSTANDING, YES.

25   Q.   AND, IN FACT, WHAT HE ACTUALLY SAID IS WHEN HE WAS ASKED

CROSS RINARD

```
 1    WHERE DID YOU FIND THIS, WHERE IS THIS CODE STORED, HE NAMED

 2    FOUR PLACES IN GERMANY AND THEN HE SAID HE DIDN'T WANT TO RULE

 3    OUT THAT IT ALSO WAS IN THE UNITED STATES, PERHAPS AT CORNELL?

 4    A.   I HEARD HIM STATE MORE DEFINITIVELY THAT IT WAS AT CORNELL

 5    EARLIER.

 6    Q.   OKAY.  WELL, WE'LL HAVE THE TRANSCRIPT, SO WE CAN LOOK AT

 7    THAT.  BUT YOUR VERSION THAT YOU USED FOR YOUR DEMO CAME FROM

 8    GERMANY, RIGHT?

 9    A.   IT CAME FROM ULRICH PFEIFER.

10    Q.   IN GERMANY?

11    A.   YES, VIA HIS RECORDS.

12    Q.   VIA HIS RECORDS?

13    A.   VIA THE CHARD WEBSITE DATABASE THAT HE HAD.

14    Q.   THAT HE HAD IN GERMANY?

15    A.   YES.

16    Q.   OKAY.  AND THAT'S FREEWAIS SF SOURCE CODE?

17    A.   YES, THAT'S RIGHT.

18    Q.   OKAY.  COULD WE LOOK AT THE CLAIM FOR A MOMENT.

19         NOW, WHEN YOU WERE TALKING TO MR. PAK, YOU SAID THIS

20    PATENT WAS ABOUT A COMPUTER READABLE MEDIUM FOR LOCATING

21    INFORMATION; RIGHT?

22    A.   FROM A PLURALITY OF LOCATIONS, AND, AGAIN, THE REST OF IT.

23    Q.   OKAY.

24    A.   AND CONTAINING INSTRUCTION FOR THE COMPUTER READABLE

25    MEDIUM HERE ASKING TO OBTAIN PROGRAM INSTRUCTIONS, AND THAT'S
```

```
1      THE KEY THING.

2      Q.   OKAY.

3      A.   AND THOSE INSTRUCTIONS HAVE TO BE, YOU KNOW, ABLE TO DO

4      THE THINGS THAT THE ELEMENTS IN THE CLAIM SAY YOU NEED TO DO.

5      THEY NEED TO BE ABLE TO DO THAT.

6      Q.   OKAY.  THE DEMONSTRATION THAT YOU SHOWED THE JURY IS A

7      DEMONSTRATION THAT YOU, YOURSELF, CREATED LAST YEAR IN 2013;

8      RIGHT?

9      A.   FOR THE PURPOSES OF CORROBORATING MY OPINION ON THE SOURCE

10     CODE AND FOR BEING ABLE TO SHOW THE JURY THE SOURCE CODE

11     INSTRUCTIONS WHICH INVALIDATE THE CLAIM IN ACTION.

12          MS. KREVANS:  MOVE TO STRIKE AS NONRESPONSIVE, YOUR

13     HONOR.

14          THE COURT:  OVERRULED.

15     BY MS. KREVANS:

16     Q.   DR. RINARD, YOU UNDERSTAND THAT THIS IS A TRIAL IN WHICH

17     WE ALL HAVE TIME LIMITS?

18     A.   I UNDERSTAND THAT, YES.

19     Q.   OKAY.  I WOULD APPRECIATE IT IF YOU WOULD ANSWER THE

20     QUESTIONS THAT I ASK.  YOUR COUNSEL, SAMSUNG'S COUNSEL, WILL

21     HAVE A CHANCE TO GET BACK UP AND ASK YOU MORE QUESTIONS.  ALL

22     RIGHT?

23     A.   UM-HUM.

24     Q.   THE DEMONSTRATION THAT YOU SHOWED THE JURY, THAT'S A

25     DEMONSTRATION THAT YOU PUT TOGETHER LAST YEAR IN 2013; RIGHT?
```

1    A.   YES, BUT THAT'S NOT THE POINT OF -- THE POINT OF THAT IS

2    NOT TO SHOW THE JURY PRIOR ART.  THE POINT OF THAT IS TO SHOW

3    THE JURY THE INSTRUCTIONS THAT ARE THE PRIOR ART EXECUTED.

4    Q.   SO THE ANSWER TO MY QUESTION WAS, YES, YOU MADE A

5    DEMONSTRATION IN 2013; RIGHT?

6    A.   YES.

7    Q.   AFTER YOU WERE HIRED BY SAMSUNG IN THIS CASE?

8    A.   YES.

9    Q.   AND YOU MADE IT BY TAKING THE SOURCE CODE THAT CAME FROM

10   MR. PFEIFER IN GERMANY AND COMPILING IT SO THAT IT WAS

11   EXECUTABLE CODE THAT COULD ACTUALLY BE PUT ON A COMPUTER

12   READABLE MEDIUM AND HAVE A PROCESSOR ACTUALLY DO THINGS WITH

13   THE INSTRUCTIONS; RIGHT?

14   A.   I WOULDN'T CHARACTERIZE IT THAT WAY.

15   Q.   SOURCE CODE IS NOT SOMETHING THAT A PROCESSOR CAN USE TO

16   EXECUTE INSTRUCTIONS; RIGHT?

17   A.   SOURCE CODE CAN BE ON COMPUTER READABLE MEDIUM.  IN FACT,

18   IN MOST CASES IT IS.

19   Q.   BUT NOTHING CAN HAPPEN ON THE PROCESSOR SERVER OF A

20   COMPUTER FROM SOURCE CODE.  IT HAS TO BE COMPILED INTO

21   INSTRUCTIONS FOR THE PROCESSOR TO RUN; RIGHT?

22   A.   THE SOURCE CODE CONTAINS INSTRUCTIONS, AND ONE OF THE WAYS

23   OF MAKING THOSE INSTRUCTIONS EXECUTE IS COMPILING THEM.

24   Q.   AND THE ONLY REASON THAT THERE WAS ANY DEMO TO SHOW THE

25   JURY, AS YOU SHOWED IT, WAS BECAUSE YOU, IN FACT, TOOK THE

1    SOURCE CODE AND COMPILED IT AND MADE A SYSTEM THAT YOU BUILT

2    LAST YEAR SO THAT YOU COULD SHOW THE JURY HOW YOU SAY THAT IT

3    WORKED; RIGHT?

4    A.   SO WHAT I DID WAS I COMPILED THE CODE SO THAT I COULD SHOW

5    THE JURY THE SOURCE CODE INSTRUCTIONS IN ACTION FROM THIS 1995

6    SOURCE CODE.  I DIDN'T CHANGE ANY OF THE INSTRUCTIONS, JUST

7    INSTALLED THEM ON THE MACHINE.

8    Q.   AND THIS 900 SOME HOURS THAT YOU SPENT ON THIS CASE, DID

9    YOU SPEND ANY OF THOSE HOURS TRYING TO FIND A SYSTEM, A

10   COMPUTER SOMEWHERE IN THE UNITED STATES THAT ACTUALLY HAD THE

11   FREEWAIS SF SOURCE CODE INSTALLED, EXECUTABLE, AND RUNNING THE

12   WAY YOU DEMO'D IT?

13   A.   NO, THAT'S NOT THE POINT HERE.  THE POINT HERE IS THE

14   INSTRUCTIONS IN THE SOURCE CODE ARE WHAT INVALIDATES THE CLAIM,

15   NOT THE COMPILED SOURCE CODE.

16   Q.   LET ME TRY AGAIN, DR. RINARD, BECAUSE I'M NOT SURE YOU

17   HEARD MY QUESTION.

18        THOSE 900 HOURS THAT YOU SPENT WORKING FOR SAMSUNG IN THIS

19   CASE, DID YOU SPEND ANY OF THOSE 900 HOURS TRYING TO FIND

20   SOMEONE IN THE UNITED STATES WHO ACTUALLY HAD A SYSTEM THAT

21   EXISTED BEFORE JANUARY 2000 THAT HAD FREEWAIS SF CODE INSTALLED

22   ON IT AND RUNNING BEFORE THAT DATE?

23   A.   I DID NOT, AND IT'S NOT RELEVANT TO THIS CASE.

24   Q.   YOU DIDN'T EVEN LOOK?

25   A.   THAT'S CORRECT.  IT'S NOT RELEVANT TO THIS CASE.

1    Q.   ONE FINAL QUESTION.  THE TUNG THESIS THAT YOU SHOWED THE

2    JURY THAT YOU SAID CORROBORATED SOME OF THE OTHER OPINIONS

3    YOU'VE GIVEN --

4    A.   YES.

5    Q.   -- THAT WAS A DOCUMENT THAT WASN'T WRITTEN IN ENGLISH,

6    BUT, IN FACT, IT WAS A TRANSLATION OF A GERMAN THESIS WRITTEN

7    BY A GERMAN STANDARD DEPARTMENT, RIGHT?

8    A.   IT'S MY UNDERSTANDING THAT IT WAS A CERTIFIED TRANSLATION

9    THAT WAS CERTIFIED FOR THE PURPOSES OF THIS LITIGATION.

10              MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

11              THE COURT:  OKAY.  THE TIME IS 2:18.

12              MR. PAK:  YOUR HONOR, MAY I PROCEED?

13              THE COURT:  OKAY.  2:19.  GO AHEAD, PLEASE.

14                       **REDIRECT EXAMINATION**

15   BY MR. PAK:

16   Q.   CAN WE BRING UP PLAINTIFF'S EXHIBIT 193.  AND CAN WE BRING

17   UP THE -- DO YOU RECALL, DR. RINARD, THAT YOU WERE ASKED ABOUT

18   THIS DOCUMENT DURING YOUR CROSS-EXAMINATION?

19   A.   YES, I WAS.

20   Q.   IF WE COULD BRING UP THE MIDSECTION THERE.

21   A.   UM-HUM.

22   Q.   DO YOU SEE THAT ONE OF THE STATEMENTS IN THIS ARTICLE

23   STATES THAT "THE UNIVERSAL SEARCH FUNCTIONALITY CAME UNDER

24   SCRUTINY RECENTLY AFTER APPLE APPROACHED THE U.S. COURTS

25   SEEKING A BAN ON GALAXY NEXUS FOR INFRINGING ITS SOFTWARE

```
 1        PATENT ON THE UNIVERSAL SEARCH.  WHILE A FEDERAL APPEALS COURT

 2        TEMPORARILY OVERTURNED THE PRELIMINARY INJUNCTION, APPLE HAS

 3        TIME UNTIL THURSDAY TO CHALLENGE THE DECISION."

 4            DO YOU SEE THAT?

 5        A.   I DO SEE THAT.

 6        Q.   DO YOU KNOW WHAT HAPPENED AFTERWARDS WITH THE FEDERAL

 7        CIRCUIT IN TERMS AFTER THAT PRELIMINARY INJUNCTION?

 8        A.   YES, I DO.

 9        Q.   WHAT IS THAT?

10            MS. KREVANS:  YOUR HONOR, THIS IS BEYOND THE SCOPE OF

11        THE EXPERT REPORT.

12                THE COURT:  OVERRULED.

13            GO AHEAD.  YOU MAY ANSWER.

14                THE WITNESS:  THE FEDERAL CIRCUIT SAID APPLE'S

15        INTERPRETATION OF THE PATENT IS WRONG AND IT'S HIGHLY LIKELY

16        THAT SAMSUNG DOES NOT INFRINGE THE PATENT.

17                MS. KREVANS:  YOUR HONOR, WE MOVE TO STRIKE.  THAT

18        OPINION WAS NOT ABOUT THE PATENT THAT'S AT ISSUE IN THIS CASE.

19                MR. PAK:  LET ME ASK IT THIS WAY, YOUR HONOR.

20                THE COURT:  SUSTAINED.

21        BY MR. PAK:

22        Q.   DR. RINARD, DO YOU KNOW WHETHER THE PRELIMINARY INJUNCTION

23        THAT IS CITED IN THIS CASE WAS OVERTURNED BY THE FEDERAL

24        CIRCUIT?

25        A.   YES, I DO, AND IT WAS OVERTURNED.
```

1    Q.   AND WHEN THE FEDERAL CIRCUIT OVERTURNED THE PRELIMINARY

2    INJUNCTION, DO YOU KNOW WHAT HAPPENED WITH RESPECT TO THE

3    GOOGLE SEARCH APPLICATION AND ITS INTRODUCTION BACK INTO THE

4    SAMSUNG DEVICES?

5    A.   YES, THE GOOGLE SEARCH APPLICATION WAS REINTRODUCED.

6    Q.   NOW, WITH RESPECT TO GOOGLE SEARCH APPLICATION, VERSION

7    2.7 THAT YOU TALKED ABOUT IN YOUR TESTIMONY -- DO YOU RECALL

8    THAT?

9    A.   YES, I DO.

10   Q.   -- IS THAT ALSO AN ALTERNATIVE TO WHAT IS DESCRIBED AS

11   UNIVERSAL SEARCH BY APPLE IN THIS INVESTIGATION -- IN THIS CASE

12   WITH RESPECT TO CLAIM 25?

13            MS. KREVANS:  OBJECTION.  LEADING.

14            THE COURT:  SUSTAINED.

15   BY MR. PAK:

16   Q.   WHAT IS YOUR OPINION ON WHETHER THE GOOGLE SEARCH, VERSION

17   2.7, IS AN ALTERNATIVE TO THE CLAIMED INVENTION OF THE '959

18   PATENT?

19   A.   GOOGLE SEARCH 2.7 IS, IN FACT, AN ALTERNATIVE TO THE

20   CLAIMED INVENTION.

21   Q.   IS IT AVAILABLE FOR DOWNLOAD FOR ANYONE?

22   A.   IT'S AVAILABLE FOR DOWNLOAD ON THE GOOGLE PLAY STORE

23   TODAY.

24   Q.   ANOTHER QUESTION.  YOU WERE ASKED ABOUT THIS DOCUMENT FROM

25   GOOGLE TALKING ABOUT THE RELATIVE USAGE OF INTERNET SEARCHES

1    VERSUS LOCAL SEARCHES USING THE GOOGLE SEARCH APPLICATION?

2    A.   I REMEMBER THAT.

3    Q.   AND COUNSEL POINTED OUT IT WAS 14 MILLION TIMES IN THAT

4    PARTICULAR DATA?

5    A.   I REMEMBER THAT.

6    Q.   DO YOU KNOW WHAT THE RELATIVE PERCENTAGE IS OF THAT $14

7    MILLION -- 14 MILLION NUMBER COMPARED TO THE OVERALL SEARCH?

8    A.   IT'S LESS THAN 2 PERCENT.

9    Q.   DO YOU CONSIDER THAT TO BE SIGNIFICANT?

10   A.   ABSOLUTELY.  WHAT IT SHOWS IS THAT PEOPLE AREN'T USING

11   THIS LOCAL FUNCTIONALITY HARDLY AT ALL.

12   Q.   FINALLY, DR. RINARD, WHEN YOU SAID, IN RESPONSE TO

13   QUESTIONS ABOUT LOOKING FOR SYSTEMS, THAT IT'S NOT RELEVANT TO

14   CLAIM 25 OF THE '959 PATENT, CAN YOU EXPLAIN WHY IT'S NOT

15   RELEVANT?

16   A.   ABSOLUTELY.  SO IF YOU TAKE A LOOK AT THIS CLAIM, IT SAYS

17   "A COMPUTER READABLE MEDIUM," SO, FOR EXAMPLE, THE WAIS SOURCE

18   CODE SITTING ON A SERVER IN SYRACUSE IS A -- IT IS SITTING ON A

19   COMPUTER READABLE MEDIUM, AND THE -- WAIT.  THE -- OKAY.  IT

20   SAYS IT HAS TO CONTAIN PROGRAM INSTRUCTIONS THAT DO EVERYTHING,

21   THAT CAN DO EVERYTHING IN THE CLAIM.

22        WHEN THAT SOURCE CODE DISTRIBUTION IS SITTING ON THAT

23   SERVER THAT CONTAINS ALL THE PROGRAM INSTRUCTIONS REQUIRED TO

24   INVALIDATE THE CLAIM, AND THE COMPUTER READABLE MEDIUM THAT'S

25   THE DISK OF THAT SERVER INVALIDATES THE CLAIM.

1       Q.   DOES THIS CLAIM HAVE ANYTHING TO DO WITH SYSTEMS OR

2       SYSTEMS CONFIGURATIONS?

3       A.   IT HAS NOTHING.

4                MR. PAK:  YOUR HONOR, I PASS THE WITNESS.

5                THE COURT:  ALL RIGHT.  THE TIME IS NOW 2:22.  IS

6       THERE ANY REDIRECT.

7                MS. KREVANS:  THERE IS NOT, YOUR HONOR.

8            YOU MEAN RECROSS?  NO.

9                THE COURT:  I'M SORRY, RECROSS.

10           ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

11               MS. KREVANS:  YES, AND NOT SUBJECT TO RECALL, YOUR

12      HONOR.

13               THE COURT:  ALL RIGHT.

14               MR. PAK:  WELL, I THINK WE HAVE THAT SAME ISSUE

15      PENDING, YOUR HONOR.

16               THE COURT:  OKAY.  WELL, IT'LL BE SUBJECT TO RECALL

17      ON ISSUE OF INVALIDITY ONLY.  OKAY?

18           YOU MAY BE EXCUSED.

19               THE COURT:  GO AHEAD AND CALL YOUR NEXT WITNESS.

20           OH, I'M SO SORRY.  I'M SORRY.  I FORGOT.  LET'S TAKE OUR

21      BREAK NOW.  SORRY.  SORRY ABOUT THAT.

22               MR. NELSON:  I WAS GETTING EXCITED.

23               THE COURT:  2:23.  LET'S GO AHEAD AND TAKE A BREAK TO

24      2:35 AND THEN WE'LL TAKE ANOTHER BREAK AT 3:30.

25               MR. NELSON:  ALL RIGHT.  THANK YOU, YOUR HONOR.

```
 1          THE COURT:  ALL RIGHT.  THANK YOU.

 2          (RECESS FROM 2:24 P.M. UNTIL 2:34 P.M.)

 3          (JURY IN AT 2:35 P.M.)

 4          THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

 5     SEAT.

 6          PLEASE CALL YOUR NEXT WITNESS.

 7          MR. NELSON:  THANK YOU, YOUR HONOR.  SAMSUNG CALLS

 8     PROFESSOR SAUL GREENBERG AS ITS NEXT WITNESS.

 9          (PAUSE IN PROCEEDINGS.)

10          THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

11          (DEFENDANTS' WITNESS, SAUL GREENBERG, WAS SWORN.)

12          THE WITNESS:  I DO.

13          THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

14          AND PULL THE MICROPHONE TOWARDS YOU.  WOULD YOU STATE YOUR

15     NAME, PLEASE, AND SPELL IT.

16          THE WITNESS:  YES, IT'S SAUL GREENBERG.  S-A-U-L,

17     G-R-E-E-N-B-E-R-G.

18          THE COURT:  ALL RIGHT.  THE TIME IS NOW 2:37.  GO

19     AHEAD, PLEASE.

20          MR. NELSON:  THANK YOU, YOUR HONOR.

21                        DIRECT EXAMINATION

22     BY MR. NELSON:

23     Q.   PROFESSOR GREENBERG, CAN YOU PLEASE INTRODUCE YOURSELF?

24     A.   SURE.  I AM SAUL GREENBERG.

25     Q.   THERE YOU GO.  WHERE DO YOU WORK?
```

1      A.    I WORK AT THE UNIVERSITY OF CALGARY IN CANADA.

2      Q.    ANYTHING IN PARTICULAR THAT YOU TEACH THERE AT THE

3      UNIVERSITY OF CALGARY?

4      A.    YES.   I TEACH HUMAN COMPUTER INTERACTION.

5      Q.    WHAT'S HUMAN COMPUTER INTERACTION?

6      A.    SO HUMAN COMPUTER INTERACTION IS A DISCIPLINE CONCERNED

7      WITH THE DESIGN, IMPLEMENTATION, AND EVALUATION OF INTERFACES

8      FOR HUMAN USE.   IT'S THE DESIGN OF THINGS THAT PEOPLE SEE ON

9      THE COMPUTERS.

10     Q.    LIKE USER INTERFACES AND SUCH?

11     A.    EXACTLY.

12     Q.    SO DID YOU PREPARE SOME DEMONSTRATIVES, SOME SLIDES TO

13     HELP FOLLOW THE TESTIMONY HERE TODAY?

14     A.    YES, I DID.

15     Q.    OKAY.   SO CAN WE PUT UP SDX 2666.

16           ALL RIGHT.   SO NOW CAN YOU DESCRIBE FOR US YOUR

17     EDUCATIONAL BACKGROUND, PLEASE.

18     A.    SURE.   I HAVE A BACHELOR OF SCIENCE IN 1976 FROM THE YALE

19     UNIVERSITY; A MASTER'S OF COMPUTER SCIENCE FROM THE UNIVERSITY

20     OF CALGARY IN 1984; AND A PH.D. IN COMPUTER SCIENCE IN 1989.

21     Q.    SO YOU MENTIONED YOU WERE A PROFESSOR AT THE UNIVERSITY OF

22     CALGARY.   HOW LONG HAS THAT BEEN THE CASE?

23     A.    TWENTY-FIVE YEARS, AND A FULL PROFESSOR SINCE 1997.

24     Q.    AND WHAT DO YOU MEAN WHEN YOU SAY "FULL PROFESSOR"?

25     A.    THERE ARE SEVERAL RANKS OF PROFESSOR FROM ASSISTANT TO

1    ASSOCIATE AND FULL, AND FULL IS THE HIGHEST RANK.

2    Q.   NOW, YOU SAID A MINUTE AGO YOU TEACH CLASSES IN HUMAN

3    COMPUTER INTERACTION.  IS THAT RIGHT?

4    A.   YES, I TEACH CLASSES AT ALL LEVELS.

5    Q.   HAVE YOU RECEIVED ANY AWARDS OR HONORS, THINGS LIKE THAT

6    IN HUMAN COMPUTER INTERACTION?

7    A.   I RECEIVED A VARIETY OF AWARDS OVER THE YEARS.  MY MOST

8    RECENT AND PERHAPS THE ONE I'M PROUDEST OF IS CALLED THE ACM

9    FELLOW.

10   Q.   WHAT'S AN ACM FELLOW?

11   A.   THE ACM IS ASSOCIATION OF COMPUTING MACHINERY.  IT'S A

12   VERY BIG ORGANIZATION OF COMPUTING PROFESSIONALS, AND THE AWARD

13   IS FOR SIGNIFICANT CONTRIBUTIONS TO THE FIELD.

14   Q.   NOW, HAVE YOU AUTHORED ANY ARTICLES, PAPERS, THINGS LIKE

15   THAT IN THIS HUMAN COMPUTER INTERACTION FIELD?

16   A.   OH, YEAH.  I HAVE OVER 250 PEER REVIEWED PUBLICATIONS;

17   FIVE BOOKS; AND NUMEROUS OTHER PUBLICATIONS.

18   Q.   ARE THERE EDITORIAL BOARDS FOR -- IN HUMAN COMPUTER

19   INTERACTION?

20   A.   OH, YEAH.  THERE'S A VARIETY OF JOURNALS AND I'M ON THE

21   BOARD OF THREE OF WHAT I CONSIDER TO BE THE MAJOR JOURNALS IN

22   OUR FIELD.

23           MR. NELSON:  AT THIS POINT, YOUR HONOR, I OFFER

24   DR. GREENBERG, PROFESSOR GREENBERG AS AN EXPERT IN COMPUTER

25   SCIENCE AND HUMAN COMPUTER INTERACTION.

```
 1              MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

 2              THE COURT:  ALL RIGHT.  HE'S SO CERTIFIED.  GO AHEAD,

 3      PLEASE.

 4              MR. NELSON:  THANK YOU, YOUR HONOR.  I APPRECIATE IT.

 5      Q.   SO ARE YOU BEING COMPENSATED FOR YOUR WORK?

 6      A.   YES, I -- SORRY.

 7      Q.   THAT'S OKAY.

 8      A.   YES, I AM.  I'M, AGAIN, $550 AN HOUR, PLUS EXPENSES.

 9      Q.   SO IS YOUR COMPENSATION IN ANY WAY DEPENDENT ON HOW THE

10      CASE TURNS OUT?

11      A.   NO.  IT'S COMPLETELY INDEPENDENT.

12      Q.   ALL RIGHT.  SO CAN YOU TELL US, AT A HIGH LEVEL, JUST

13      SUMMARIZE FOR US WHAT YOU WERE ASKED TO DO FOR THIS CASE?

14      A.   SO AT A HIGH LEVEL I WAS ASKED TO LOOK AT THE '721 PATENT,

15      AND LOOK AT A VARIETY OF DOCUMENTS, PLUS A VARIETY OF DEVICES

16      AND DESIGNS ON THOSE DEVICES AND FORM AN OPINION ON WHETHER,

17      FIRST, THE '721 PATENT IS VALID OR NOT; WHETHER PARTICULAR

18      DEADLINES OR DEVICES INFRINGE OR DON'T INFRINGE; AND ALSO TO

19      FORM AN OPINION ON ACCEPTABILITY OF ALTERNATIVE DESIGNS.

20      Q.   SO LET'S GO TO JX 10 IN YOUR BINDER.

21      A.   OKAY.  JUST A -- LET ME MAKE SURE I HAVE THE RIGHT BINDER

22      HERE.

23           OKAY.  I SEE IT.

24      Q.   IT SHOULD BE THE '721 PATENT.

25      A.   YES.
```

1    Q.   IS THAT RIGHT?

2    A.   YES, THIS IS THE '721 PATENT.

3    Q.   SO CAN YOU TELL US WHAT THE, WHAT THE FILING DATE ON THIS

4    PATENT IS?

5    A.   SO THE EFFECTIVE FILING DATE IS DECEMBER 23RD, 2005.

6    Q.   AND YOU SAID EFFECTIVE FILING DATE.  WHAT DO YOU MEAN BY

7    THAT?

8    A.   WELL, THIS IS A CONTINUATION OF AN APPLICATION, SO THE

9    INITIAL APPLICATION WAS DONE ON DECEMBER 23RD, 2005.

10   Q.   SO LET'S TALK ABOUT YOUR INVALIDITY OPINIONS FIRST.

11        DID YOU USE ANY PARTICULAR INTERPRETATION OR CONSTRUCTION

12   OF THE CLAIM TERMS IN CONNECTION WITH YOUR OPINIONS IN THIS

13   CASE?

14   A.   WELL, MY UNDERSTANDING IS THAT THE COURT DID NOT GIVE ITS

15   OWN DEFINITION OF ANY CLAIM TERMS, SO I USED THE TERMS AS WOULD

16   HAVE BEEN UNDERSTOOD BY A PERSON OF ORDINARY SKILL IN THE ART

17   AROUND THAT DATE 2005.

18   Q.   SO WITH RESPECT TO THE '721 PATENT, DO YOU HAVE AN OPINION

19   ON WHAT SOMEBODY WOULD HAVE TO BE TO BE A PERSON OF ORDINARY

20   SKILL IN THE ART?

21   A.   SURE.  WELL, DEPENDING UPON THEIR DEGREE PROGRAM, IT WOULD

22   BE SOMEONE WITH A FIRST DEGREE IN INTERACTION DESIGN, OR A

23   GRADUATE DEGREE SPECIALIZING IN HUMAN COMPUTER INTERACTION,

24   PLUS ABOUT TWO TO THREE YEARS OF EXPERIENCE, INDUSTRIAL

25   EXPERIENCE IN HUMAN COMPUTER INTERACTION TECHNIQUES, WITH A

1      FOCUS ON HIGHLY INTERACTIVE TOUCHSCREENS, THAT IS, TOUCHSCREENS

2      THAT GO BEYOND JUST SIMPLE BUTTON PRESSES.

3      Q.   SO IT'S BEEN A LITTLE WHILE SINCE WE'VE TALKED ABOUT THE

4      '721, AND WE'RE TALKING ABOUT A LOT OF PATENTS IN THIS CASE.

5           CAN YOU JUST REMIND US, AT A HIGH LEVEL, WHAT THE '721

6      PATENT IS ABOUT.

7      A.   SURE.  AT A HIGH LEVEL, IT CONCERNS USER INTERFACES FOR

8      TOUCHSCREENS ON PORTABLE -- ON DEVICES.  IN PARTICULAR, IT'S --

9      IT DESCRIBED A VERY SPECIFIC METHOD FOR UNLOCKING A DEVICE ON A

10     TOUCHSCREEN DISPLAY BY MOVING AN IMAGE FROM ONE LOCATION TO

11     ANOTHER.

12     Q.   SO CAN YOU GO TO JX 60 IN YOUR BINDER.

13     A.   OKAY.

14     Q.   AND CAN YOU TELL US WHAT JX 60 IS?

15     A.   JX 60 IS A PATENT APPLICATION, AN INTERNATIONAL PATENT

16     PUBLICATION, OR APPLICATION, FROM MAY 8TH, 2003 BY AN INVENTOR

17     NAMED HYPPONEN.

18     Q.   OKAY.  WHAT'S THE DATE ON THAT?

19     A.   MAY 8TH, 2003.

20     Q.   OH, YEAH.  I THINK YOU SAID THAT.  I'M SORRY?

21     A.   YEAH.

22          MR. NELSON:  YOUR HONOR, AT THIS POINT, I'D MOVE TO

23     ADMIT JX 60, THE HYPPONEN PATENT INTO EVIDENCE.

24          MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

25          THE COURT:  IT'S ADMITTED.

```
 1              (JOINT EXHIBIT 60 WAS ADMITTED IN EVIDENCE.)

 2              THE COURT:  GO AHEAD, PLEASE.

 3      BY MR. NELSON:

 4      Q.  YOU SAID THE PATENT, THE EFFECTIVE FILING DATE OF

 5      DECEMBER 23, 2005, AND YOU DESCRIBED WHAT THAT WAS.

 6              WAS THAT -- WERE THERE OTHER PATENTS OUT THERE THAT USED

 7      IMAGES, THINGS LIKE THAT, SLIDERS ON TOUCHSCREEN PHONES?

 8              MR. MCELHINNY:  THAT WAS LEADING, YOUR HONOR.

 9              THE COURT:  SUSTAINED.

10      BY MR. NELSON:

11      Q.  SO WHAT WAS THE STATE OF THE ART?

12      A.  WELL, AS THIS PARTICULAR PATENT USES --

13              MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  THIS WAS

14      RULED ON LAST NIGHT, THIS LINE OF QUESTIONING ABOUT THE GENERAL

15      STATE OF THE ART.

16              MR. NELSON:  YOU KNOW WHAT?  IT'S NOT A BIG DEAL.

17      FOR TIME, I CAN JUST MOVE STRAIGHT TO THE OPINIONS, YOUR HONOR.

18              THE COURT:  OKAY.  GO AHEAD, PLEASE.  THANK YOU.

19              MR. NELSON:  OKAY.

20      Q.  SO LET'S GO RIGHT TO IT THEN.  HAVE YOU FORMED OPINIONS

21      REGARDING THE VALIDITY OF CLAIM 8 OF THE '721 PATENT?

22      A.  YES, I HAVE.

23      Q.  OKAY.  SO CAN YOU TELL US WHAT, WHAT THE OPINIONS THAT

24      YOU'RE GOING TO PRESENT HERE TODAY?

25      A.  SURE.  WHAT I'M GOING TO PRESENT HERE TODAY IS THAT THE
```

DIRECT GREENBERG

1      '721 PATENT, AND IN PARTICULAR CLAIM 8 OF THE PATENT, IS

2      INVALID IN TERMS OF TWO PIECES OF PRIOR ART THAT I'LL CALL

3      NEONODE AND PLAISANT, AND IT'S INVALID FOR OBVIOUSNESS.

4      Q.   SO LET'S START WITH THE NEONODE QUICK START GUIDE.  THIS

5      WAS ADMITTED YESTERDAY, DX 342.

6           AND CAN YOU PULL UP, MR. KOTARSKI, PAGES -- PAGE 1 OF

7      THAT.  YEAH.  SO PAGE -- YEAH, PAGE 1.  IS THAT PAGE 1?

8                MR. KOTARSKI:  YES.

9                MR. NELSON:  OH, OKAY.

10     Q.   SO WHAT IS THIS?

11     A.   WELL, THERE'S TWO THINGS HERE.  THIS IS A WEB PAGE FROM

12     NEONODE.COM, AND A DOCUMENT CALLED THE N1 QUICK START GUIDE.

13          AND THE WEB PAGE WAS AVAILABLE AS OF JULY 2004, AS WAS THE

14     DOCUMENT AT LEAST BY THOSE DATES ON THE INTERNET.

15     Q.   SO HOW DO YOU KNOW ABOUT THAT?

16     A.   WELL, THESE -- THESE PAGES -- THERE'S A, WELL, THERE WAS A

17     DECLARATION BY MR. BUTLER AND MR. BUTLER WAS SPEAKING FOR THE

18     INTERNET ARCHIVE AND HE DESCRIBED HOW THE WAYBACK MACHINE

19     PERIODICALLY ARCHIVES MATERIALS FROM THE INTERNET, AND WHEN IT

20     DOES SO, IT TIMESTAMPS THE TIME THAT IT RETRIEVED THAT

21     MATERIAL.

22          IN THIS PARTICULAR CASE, THE TIMESTAMP SAYS THAT

23     SPECIFICALLY THAT THIS MATERIAL WAS RETRIEVED JULY 21ST, 2004,

24     AND IT ACTUALLY GIVES THE TIME TO THE SECOND.

25     Q.   ALL RIGHT.  THANK YOU.

```
 1              SO LET'S PULL UP SDX 2690.  AND CAN YOU TELL US HERE WHAT

 2      WE SEE ON SDX 2690?

 3      A.   SURE.  SO THIS IS THE N1 QUICK START GUIDE, WHICH

 4      DESCRIBES THE FUNCTION OF A PHONE, A SMARTPHONE CALLED A

 5      NEONODE WHICH HAS THE TOUCH DISPLAY.

 6              SO CAN I DO THIS IN REFERENCE TO THE CLAIMS?

 7      Q.   SURE, ABSOLUTELY.

 8      A.   SO WHAT WE SEE ON THE BOTTOM LEFT THERE IS THE ACTUAL

 9      PHONE ITSELF, IT'S THE IMAGE OF A PHONE, AND THIS IS A

10      SMARTPHONE WITH A TOUCH DISPLAY.  THAT LITTLE CIRCLE IS JUST AN

11      INSET SHOWING THE ON/OFF BUTTON, OR THE POWER BUTTON

12      (INDICATING).

13              SO AT THE TOP WE SEE THAT THE PHONE, THAT THE MANUAL

14      DESCRIBES THAT THIS UNIT CAN BE LOCKED, AND IN PARTICULAR IT

15      SAYS THE PURPOSE OF LOCKING IS, IN PART -- IS THERE A LASER

16      POINTER HERE?

17      Q.   HERE'S ONE.

18              MAY I APPROACH, YOUR HONOR?

19              THE COURT:  YES, PLEASE.  GO AHEAD.

20              THE WITNESS:  THANK YOU.

21      BY MR. NELSON:

22      Q.   HERE YOU GO.

23      A.   LET'S SEE IF I CAN ACTUALLY POINT.

24      Q.   YEAH, POINT IT AWAY FROM YOU.

25      A.   THERE WE GO.  WE SEE THAT IT SAYS THAT THE PURPOSES OF THE
```

1       LOCKING UNIT IS, IN PART, TO MAKE SURE THAT NO UNINTENTIONAL

2       CALLS ARE MADE, THAT IS THAT THE LOCKING UNIT WOULD THEN

3       PREVENT ACCIDENTAL ACTIVATION.

4       Q.   HOW IS THAT RELEVANT TO YOUR OPINIONS?

5       A.   WELL, THIS IS THE MATTER OF THE '721 PATENT WHERE IT

6       HAD -- IT DESCRIBES A LOCK SCREEN WHICH IS, IN PART, TO PREVENT

7       ACCIDENTAL ACTIVATION.

8       Q.   OKAY.

9       A.   THEN IT DESCRIBES HOW TO UNLOCK THE UNIT.  AND SO FIRST IT

10      SAYS THAT YOU "PRESS A POWER BUTTON ONCE," AND THEN "THE TEXT

11      'RIGHT SWEEP TO UNLOCK'" APPEARS.

12           SO THIS IS, IN TERMS OF THE '721, CLAIM 8, THIS IS A

13      VISUAL CUE THAT INDICATES THE DIRECTION OF MOVEMENT.

14           SO THAT'S QUITE IMPORTANT.

15           SO THIS APPEARS ON THE SCREEN.  AND THEN IT SAYS WHAT TO

16      DO, THE ACTION THE USER HAS TO TAKE, AND IT SAYS "SWEEP RIGHT

17      TO UNLOCK YOUR UNIT."

18           THAT IS, A USER SHOULD TOUCH ON THE LEFT SIDE OF THE

19      DISPLAY, MOVE THEIR FINGER ACROSS SO THERE'S A TOUCH IN

20      ACCORDANCE WITH THE CONTACT, WHEN THEY GET TO THE RIGHT SIDE OF

21      THE DISPLAY, THE DEVICE WILL UNLOCK.

22      Q.   SO THEN WHAT, IF ANYTHING, DO YOU BELIEVE IS MISSING FROM

23      THE NEONODE QUICK START GUIDE WITH RESPECT TO CLAIM 8 OF THE

24      '721 PATENT?

25      A.   WELL, CLAIM 8 REQUIRES THAT THERE BE AN IMAGE THAT IS

1     MOVED, WHAT THEY CALL AN UNLOCK IMAGE, AND THERE IS NO IMAGE ON

2     THE NEONODE PHONE.  SO IT'S MISSING THAT.

3     Q.   SO --

4     A.   BUT EVERYTHING ELSE IN TERMS OF THE GESTURE THAT'S MADE

5     AND THE VISUAL CUES, IT'S ALL THERE.

6     Q.   SO ARE YOU AWARE OF ANY OTHER REFERENCES, PRIOR TO

7     DECEMBER 23RD, 2005, THAT SHOW THIS KIND OF IMAGE?

8     A.   I'M NOT SURE WHAT YOU MEAN BY --

9     Q.   WHEN YOU SAID THE IMAGE WAS MISSING?

10    A.   OH, THE IMAGE, YES.  SO THERE WAS THE NEO -- SORRY.  THE

11    HYPPONEN PATENT ALSO HAD A SET OF SLIDERS WHERE YOU COULD MOVE

12    THE KNOB, WHICH IS AN IMAGE OF THE SLIDERS.

13         NOW, WHEN YOU MOVED THE KNOB OF THE LAST SLIDER FROM ONE

14    FIXED POSITION TO ANOTHER POSITION, THE DEVICE WOULD UNLOCK.

15    Q.   OKAY.  NOW, CAN YOU TURN TO DX 344 IN YOUR BINDER.

16    A.   OKAY.

17    Q.   AND WHEN YOU GET THERE, CAN YOU TELL ME WHAT DX 344 IS.

18    A.   YES.  THIS IS A PAPER TITLED "TOUCHSCREEN TOGGLE DESIGN,"

19    AND IT WAS WRITTEN BY CATHERINE PLAISANT FROM THE HUMAN

20    COMPUTER INTERACTION LABORATORY AT THE UNIVERSITY OF MARYLAND,

21    ALONG WITH DANIEL WALLACE.

22         THIS PAPER AND AN ACCOMPANYING VIDEO WAS PRESENTED AT THE

23    ACM CHI CONFERENCE ON HUMAN FACTORS AND COMPUTING SYSTEMS IN

24    MONTEREY, CALIFORNIA IN 1992.

25         THIS IS THE BIGGEST CONFERENCE IN OUR FIELD.  IT'S A VERY

1    IMPORTANT CONFERENCE.

2    Q.   NOW, PRIOR TO YOUR INVOLVEMENT IN THIS CASE, HAD YOU SEEN

3    THAT VIDEO BEFORE THAT YOU JUST TALKED ABOUT?

4    A.   YES.  WELL, I SAW BOTH THE VIDEO AND THE PAPER, THEY'RE

5    ONE REFERENCE, AND I ATTENDED THAT CONFERENCE AND I SAW THE

6    VIDEO THERE.

7            MR. NELSON:  SO, YOUR HONOR, AT THIS POINT I MOVE TO

8    ADMIT INTO EVIDENCE DEFENDANTS' EXHIBIT 343 AND 344.

9            MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

10            THE COURT:  THEY'RE ADMITTED.

11        (DEFENDANTS' EXHIBITS  343 AND 343 WERE ADMITTED IN

12    EVIDENCE.)

13            THE COURT:  GO AHEAD, PLEASE.

14    BY MR. NELSON:

15    Q.   SO CAN YOU TELL US WHAT THE GENERAL SUBJECT MATTER IS OF

16    THE PLAISANT -- I'M GIVING IT A SHOT -- PAPER AND THE VIDEO?

17    A.   YES.  THE PAPER JUST -- PLAISANT DESCRIBES A DESIGN OF A

18    VARIETY OF TOUCHSCREENS CALLED TOGGLES THAT SWITCH STATE FROM

19    ONE STATE TO ANOTHER, THINGS LIKE ON OR OFF, AND THAT COULD

20    INCLUDE THINGS LIKE LOCK TO UNLOCK.

21    Q.   SO LET'S DO A CLIP FROM DX 343.  WE HAVE THIS IN SAMSUNG

22    SDX 2683.  CAN WE GO AHEAD AND RUN THE CLIP, PLEASE.

23        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

24    BY MR. NELSON:

25    Q.   SO THEN WHAT IS THIS SEGMENT OF THE VIDEO SHOWING YOU?

DIRECT GREENBERG

1    A.   SO THIS SEGMENT SHOWS TWO OF THE TOGGLES THAT THEY

2    DESIGNED THAT WERE OPERATING BY SLIDING ACTIONS, AND WE SEE

3    HERE THAT THERE ARE TWO VERSIONS OF IT, ONE THAT WAS OPERATED

4    BY MOVING THIS KNOB FROM SIDE TO SIDE, AND THE OTHER OPERATED

5    BY MOVING A LEVER HANDLE SIDE TO SIDE.  BUT THE MECHANISM

6    PLAISANT SAYS IS IDENTICAL.

7         SO IN TERMS OF CLAIM 8 OF THE PATENT, WHAT YOU SEE IS THE

8    COMPUTER, WHICH IS AN ELECTRONIC DEVICE, THAT HAS A

9    TOUCHSCREEN, WHICH ALSO IN TERMS OF THE PATENT INCLUDES THINGS

10   LIKE MEMORY, PROCESSORS, MODULES CONTAINING INSTRUCTIONS.  SO

11   THIS IS ALL DISCLOSED IN THIS LITTLE CLIP.

12        GOING ON TO THE CLAIM, IT ALSO DESCRIBES HOW YOU MAKE

13   CONTACT AT A PREDEFINED LOCATION, THAT IS, ONE SLIDE OF THE --

14   ONE SIDE OF THE SLIDER ON TOP OF AN IMAGE, WHICH IS A KNOB.

15   ONE MOVES THE IMAGE IN CONTINUAL CONTACT WITH ONE'S FINGER AND

16   IT MOVES CONTINUOUSLY UNTIL THE OTHER SIDE OF THE SLIDER WAS IN

17   AT A PREDEFINED LOCATION, AND AT THAT POINT IT CHANGES STATE.

18        IN OTHER WORDS, WHAT WE'RE TALKING ABOUT SIMPLY IS WE'RE

19   DRAGGING AN IMAGE, IN THIS CASE A KNOB, FROM ONE LOCATION TO

20   ANOTHER AND THEN IT CHANGES STATE.

21   Q.   SO ARE THERE -- OH, SORRY.  ARE YOU DONE?

22   A.   WELL, IT ALSO DISCLOSES VISUAL CUES AS REQUIRED BY

23   CLAIM 8.

24   Q.   SO WHAT VISUAL CUES ARE YOU TALKING ABOUT?

25   A.   SO THE VISUAL CUES INDICATE A DIRECTION OF MOVEMENT, AND

 1      IN THIS CASE WE SEE THE KNOB ON ONE SIDE OF THE SLIDER AND THE

 2      CHANNEL OF THE SLIDER SAYS IT CAN ONLY BE MOVED IN THE OPPOSITE

 3      DIRECTION.

 4          SO THAT'S A DIRECTION OF MOVEMENT.  WHEN ONE ACTUALLY

 5      MOVES THE KNOB, IT'S CONSTRAINED TO THAT CHANNEL.

 6          AND, OF COURSE, THE LABELS, IN THIS CASE THEY'RE ON AND

 7      OFF, BUT IT COULD INDICATE THAT WE GO FROM ONE LABEL TO THE

 8      OTHER LABEL IN THAT DIRECTION AND IT WILL CHANGE TO THAT STATE.

 9      Q.   SO YOU MENTIONED THAT THERE WAS ALSO A PAPER ACCOMPANYING

10      THIS VIDEO.  IS THAT RIGHT?

11      A.   THAT'S CORRECT.

12      Q.   SO DID ANYTHING IN THAT PAPER PLAY A ROLE IN THE OPINIONS

13      THAT YOU'RE PRESENTING HERE?

14      A.   SURE.  YOU MAY HAVE HEARD AT THE END OF THIS CLIP SHE SAID

15      HOW IF YOU, USING A SLIDING MOTION GREATLY REDUCES THE CHANCES

16      OF -- I CAN'T REMEMBER HER EXACT WORD, BUT IT SAYS IT GREATLY

17      REDUCES THE CHANCES OF TOGGLING THAT SWITCH ACCIDENTALLY, THAT

18      IS, IT'S ABOVE ACCIDENTAL ACTIVATION.

19          NOW, THE PAPER ENFORCES THIS.

20      Q.   IF WE GO TO SDX 2686.  SO IS THIS AN EXCERPT FROM THAT

21      PAPER THAT YOU'RE REFERRING TO?

22      A.   YES, IT IS, AND THIS ACTUALLY SPEAKS DIRECTLY TO THAT.

23      SHE SAYS THAT EVEN THOUGH SLIDERS WERE NOT PREFERRED -- AND

24      THERE'S A RANK ORDER THAT USES THIS, SO SOME WERE PREFERRED

25      MORE THAN OTHERS -- BUT SHE SAYS THE FACT THAT USER USE THEM

```
 1        CORRECTLY IS ENCOURAGING.  SO SHE TEACHES THAT THE SLIDING

 2        TOGGLES WORKED.

 3            BUT THEN SPECIFICALLY SHE SAID SHE TEACHES THAT ANOTHER

 4        ADVANTAGE OF THE SLIDING MOVEMENT IS THAT IT IS LESS LIKELY TO

 5        BE DONE INADVERTENTLY, AND, THEREFORE, MAKING THE TOGGLE VERY

 6        SECURE.

 7            THAT IS, SHE'S TEACHING THAT A SPECIFIC ADVANTAGE OF THE

 8        USING THE SLIDING ACTION ON A TOGGLE FROM ONE PREDEFINED

 9        LOCATION TO ANOTHER PREVENTS ACCIDENTAL ACTIVATION.

10        Q.   SO DO YOU THINK AS OF EARLY 1995 --

11        A.   '92.

12        Q.   2005?

13        A.   AH, 2005.

14        Q.   THE PAPER IS '92, RIGHT?

15        A.   YOU SAID 1995.

16        Q.   I'M SORRY.  I WAS MOVING ON TO ANOTHER THING.

17            DO YOU THINK AS OF 2005 -- THE PATENT IS DECEMBER 23RD,

18        2005; RIGHT.

19        A.   YES.

20        Q.   DO YOU THINK THAT THERE WOULD HAVE BEEN CHALLENGES IN

21        IMPLEMENTING SLIDERS LIKE WE SEE HERE ON A TOUCHSCREEN PHONE?

22        A.   ABSOLUTELY NONE.  THIS IS A VERY SIMPLE USER INTERFACE

23        USING ENTIRELY KNOWN COMPONENTS FOR ENTIRELY KNOWN REASONS ON

24        A -- THIS IS -- IT'S ENTIRELY PREDICTABLE ABOUT WHAT WILL

25        HAPPEN.  THERE WOULD BE NO CHALLENGE WHATSOEVER.
```

1    Q.   WHY DO YOU SAY THAT?

2    A.   WELL, SLIDERS ARE, ARE VERY WELL KNOWN.  THEY COME WITH

3    ANY -- WITH ALMOST EVERY GRAPHICAL USER INTERFACE.  BUILDER, IT

4    JUST -- IT WOULD LITERALLY TAKE MOMENTS TO DO.

5    Q.   SO DO YOU THINK, AS OF 2005, THAT A PERSON OF ORDINARY

6    SKILL IN THE ART THAT YOU DEFINED BEFORE WOULD COMBINE THE

7    NEONODE TEACHING WITH PLAISANT?

8              MR. MCELHINNY:  THAT'S LEADING, YOUR HONOR.

9              THE COURT:  SUSTAINED.

10   BY MR. NELSON:

11   Q.   SO WHAT'S YOUR OPINION ON WHETHER THESE TWO WOULD BE

12   COMBINED?

13   A.   WELL, IF ONE LOOKS AT, AT NEONODE AND PLAISANT -- WELL,

14   FIRST, A PERSON WOULD BE HIGHLY INTERESTED IN BOTH OF THEM.

15   Q.   WHY IS THAT?

16   A.   WELL, FIRST, THEY BOTH DEAL WITH TOUCH BASE SYSTEMS, THEY

17    BOTH DEAL WITH USER INTERFACES.

18        THEY BOTH TALK ABOUT CHANGING STATE, BUT PLAISANT IS GOING

19   FROM ANY STATE TO ANOTHER STATE, AND NEONODE IS SPECIFIC TO GO

20   FROM LOCKING TO UNLOCKING.

21        THEY BOTH SPECIFICALLY DESCRIBE HOW A SLIDING ACTION IS

22   USED TO PREVENT ACCIDENTAL ACTIVATION.

23        SO THIS IS -- YOU KNOW, A PERSON LOOKING AT THIS WOULD

24   JUST THINK IT NATURAL TO COMBINE THESE TWO, AS WELL TAKING THE

25   IDEAS IN PLAISANT, THE SLIDER, AND PUTTING THEM ON THE NEONODE

1    IS, IS JUST A VERY ROUTINE THING TO THINK ABOUT IN TERMS OF

2    INTERACTION DESIGN.

3    Q.   SO CAN WE PULL UP SDX 2692.

4        SO WHAT'S YOUR OPINION ON THESE REFERENCES VIS-À-VIS THE

5    ELEMENTS OF CLAIM 8 OF THE '721 PATENT?

6    A.   SURE.  IF WE LOOK AT -- IF WE START WITH THE NEONODE 15,

7    THE NEONODE PHONE GIVES US THE SLIDING GESTURE AND THAT MEANS

8    WE CAN UNLOCK, SLIDING FROM SIDE TO SIDE.

9        PLAISANT GIVES US -- AND IT ALSO SAYS THAT WE HAVE A, A

10   PROCESSORS, MODULES AND ALL THE OTHER THINGS REQUIRED, AND --

11   SORRY, LET ME REPEAT.  THE NEONODE PHONE, AS I SAID, IS A

12   SMARTPHONE, IT HAS A TOUCH SENSITIVE DISPLAY, HAS PROCESSES,

13   MODULES CONTAINING INSTRUCTIONS.

14       SO THE ONLY THING THE NEONODE PHONE IS MISSING IS THE

15   UNLOCK IMAGE.  THAT'S PROVIDED BY PLAISANT.

16       AND PLAISANT ALSO IS QUITE DEFINITIVE THAT THE TOUCH

17   STARTS AT A FIRST PREDEFINED LOCATION, ONE SIDE OF THE TOGGLE,

18   AND THAT IT ENDS ON THE OTHER PREDEFINED REGION, WHICH IS THE

19   OTHER SIDE OF THE TOGGLE.  SO NEONODE PLUS PLAISANT GIVES YOU

20   EVERYTHING.

21       CONVERSELY, IF YOU LOOK AT PLAISANT, THE ONLY THING THAT

22   PLAISANT DID NOT EXPLICITLY DISCLOSE IS THAT IT CAN RUN ON A

23   PORTABLE DEVICE AND THAT ONE OF THE STATES THAT IT TALKS ABOUT

24   CAN BE UNLOCKING.

25       NEONODE GIVES YOU ALL OF THAT.  SO IF YOU COMBINE IT THAT

```
 1        WAY, YOU GET ALL OF THE CLAIM LIMITATIONS.

 2        Q.   NOW, WERE EITHER OF THE TWO REFERENCES THAT YOU JUST

 3        TALKED ABOUT, THE NEONODE GUIDE OR THE PLAISANT REFERENCE,

 4        BEFORE THE PATENT OFFICE WHEN THEY CONSIDERED THE '721 PATENT?

 5        A.   THE PATENT OFFICE DID NOT HAVE THE NEONODE -- THE PLAISANT

 6        VIDEO.  THEY ONLY HAD THE TWO-PAGE PAPER, AND THE VIDEO

 7        ACTUALLY SHOWS THE SLIDERS IN OPERATION, SO YOU CAN SEE THE

 8        NUANCES OF THAT.

 9             THEY ALSO DID NOT HAVE THE NEONODE QUICK START GUIDE.

10        HOWEVER, THEY DID HAVE ANOTHER VERSION OF THE NEONODE USER

11        MANUAL THAT DISCLOSES PRETTY MUCH THE SAME INFORMATION.

12        Q.   NOW, ARE YOU FAMILIAR WITH THE CONCEPT OF SECONDARY

13        INDICIA OF NON-OBVIOUSNESS?

14        A.   YES, I AM.

15        Q.   CAN WE PULL UP SDX 2695.

16             SO BEFORE YOU REACHED YOUR OPINION THAT YOU PRESENTED HERE

17        TODAY ON INVALIDITY, DID YOU CONSIDER THESE SECONDARY

18        CONDITIONS?

19        A.   YES, I DID.

20        Q.   AND WHAT'S YOUR OPINION REGARDING THEM?

21        A.   MY OPINION IS THAT NONE OF THESE WOULD STOP FROM RENDERING

22        AN OPINION OF OBVIOUSNESS.

23             FOR EXAMPLE, IF YOU LOOK AT COMMERCIAL SUCCESS, THERE'S

24        NOTHING -- THERE'S NO QUESTION THAT THE APPLE IPHONE WAS A

25        COMMERCIAL SUCCESS.
```

1          BUT I'VE SEEN NO EVIDENCE THAT SAYS THAT THAT COMMERCIAL

2     SUCCESS WAS DUE TO THE LOCK SCREEN.

3     Q.   SO WE'VE HEARD A FAIR AMOUNT ABOUT COPYING IN THIS CASE

4      AND YOU'VE BEEN HERE FOR SOME OF THE TESTIMONY.

5          CAN WE PUT UP SDX 2700.  NOW, WHAT'S YOUR OPINION

6     CONCERNING THIS ALLEGED EVIDENCE OF COPYING?

7     A.   WELL, MY OPINION IS THAT THERE'S NO COPYING, AND IF I CAN

8      EXPLAIN THAT BY REFERRING TO THESE, THESE DESIGNS HERE?

9     Q.   PLEASE DO.

10    A.   SO ALL OF THE DISCUSSION ABOUT COPYING REFERS TO THE

11     INITIAL LOCK SCREEN, AND APPLE AND DR. COCKBURN TALK ABOUT THIS

12     IN REFERENCE TO COPYING THE IPHONE.  AND I BELIEVE DR. COCKBURN

13     HIMSELF SAYS THAT THERE'S NO COPYING OF THE ACTUAL PATENT.

14         SO AT THE TOP HERE WE SEE ALL THE DEVICES THAT WE

15    DISCUSSED IN TERMS OF UNLOCK SCREENS, SOME OF THEM ACCUSED,

16    SOME OF THEM UNACCUSED.

17         AT THE VERY TOP ARE ALL OF THE DESIGNS BY SAMSUNG.

18         AT THE BOTTOM ARE DESIGNS BY GOOGLE.

19         SO IF WE START ON THE LEFT-MOST ONE, THIS IS THE PUZZLE

20    UNLOCK.  AND AS YOU CAN SEE, THAT'S JUST A BUNCH OF PUZZLE

21    PIECES.  IT LOOKS NOTHING LIKE THE IPHONE.  THERE'S NO SLIDER.

22    THERE'S NO CHANNEL.  THERE'S NO BUTTON THAT ONE MOVES AROUND IN

23    THE CHANNEL.

24         AS WELL WE'VE HEARD FROM MS. KIM, WHO WAS SAMSUNG'S

25    DESIGNER, THAT THIS WAS DONE BEFORE, BEFORE ANY OF THESE

1     COPYING DOCUMENTS WERE -- OR ANY OF THESE DOCUMENTS ALLEGED TO

2     DESCRIBE COPYING WERE PRODUCED.

3          SO THIS PRE-DATES IT.  SO THERE COULD NOT HAVE BEEN ANY

4     COPYING OF THIS DESIGN.

5     Q.    WHAT ABOUT THE OTHER THREE DESIGNS ON THE TOP?

6     A.    THESE THREE DESIGNS ARE, ARE UNACCUSED DESIGNS, AND THEY

7     ARE ALSO DESIGNS THAT EVEN DR. COCKBURN SAYS DO NOT INFRINGE.

8          SO THEY CAN'T -- THEY CAN'T BE ACCUSED OF COPYING EITHER.

9     Q.    AND HOW ABOUT THE THREE ON THE BOTTOM?  WHAT'S THERE?

10    A.    WELL, THE THREE ON THE BOTTOM HERE, THE REMAINING DESIGNS

11    ARE ALL PRODUCED BY GOOGLE AND NOT BY SAMSUNG.  AND WE'VE HEARD

12    FROM MS. KIM AS WELL THAT SHE HAD ABSOLUTELY NO DISCUSSION OR

13    INFLUENCE OVER THESE DESIGNS WITH, WITH GOOGLE.

14         SO, AGAIN, THERE'S NO EVIDENCE OF COPYING.

15    Q.    SO I WANT TO TURN TO ANOTHER TOPIC, THE SURVEY BY

16    DR. HAUSER CONCERNING THE '721 PATENT.

17    A.    SURE.

18    Q.    SO DID YOU REVIEW THAT SURVEY, THE DESCRIPTION AND THE

19    VIDEO?

20    A.    I REVIEWED THE PORTION THAT CONCERNS WHAT HE CALLS THE

21    SLIDE TO UNLOCK PORTION, AS WELL AS I SAW THE ACCOMPANYING

22    VIDEO.

23    Q.    SO IF WE CAN PULL UP SDX 2711.

24         SO CAN YOU TELL ME WHAT THIS IS HERE?

25    A.    WELL, YES.  THIS IS THE TEXT PORTION OF THE SURVEY BY

1       DR. HAUSER ON SLIDE TO UNLOCK.

2       Q.   SO DO YOU THINK THE SURVEY THAT WAS DONE WAS ACCURATE

3       CONCERNING THE '721 PATENT?

4       A.   NO, I DO NOT.

5       Q.   AND WHY IS THAT?

6       A.   WELL, FOR SEVERAL REASONS.  FIRST, IF WE LOOK AT WHAT HE

7       SAYS, HE SAYS THAT THIS IS ALL ABOUT UNLOCKING THE TABLET.

8       IT'S MY UNDERSTANDING HE HAD A COMPLETELY DIFFERENT SURVEY

9       DEALING WITH THE PHONES THAT NEVER INCLUDED THIS.

10           SO A PERSON READING THE SURVEY, AT THE BEGINNING OF THE

11      SURVEY, WOULD BE THINKING ABOUT TABLETS, NOT ABOUT PHONES, AND

12      EVEN DR. COCKBURN HAD SAID THAT.

13      Q.   SO ANYTHING ELSE?

14      A.   YES.  IF YOU ACTUALLY LOOK AT WHAT HE SAYS HERE, I BELIEVE

15      HE -- YOU KNOW, I JUST THINK IT'S WRONG.  SO FIRST HE DESCRIBES

16      THE SLIDE TO UNLOCK FEATURE, AND THEN HE SAYS, "WITHOUT THIS

17      FEATURE" -- I CAN'T KEEP THIS RED DOT STEADY -- "WITHOUT THIS

18      FEATURE, YOU WOULD HAVE TO UNLOCK YOUR DEVICE USING OTHER

19      TECHNIQUES WHICH MAY MAKE UNINTENTIONAL UNLOCKS MORE LIKELY."

20           THIS JUST ISN'T TRUE.

21      Q.   WHY DO YOU SAY THAT?

22      A.   WELL, THERE'S MANY UNLOCK TECHNIQUES THAT ARE POSSIBLE.

23      THAT WOULD BE EQUALLY LIKELY, IF NOT EVEN BETTER THAN THIS.

24           FOR EXAMPLE, ONE COULD HAVE A LONG SWIPE THAT -- TO

25      PREVENT ACCIDENTAL UNLOCKS.

1       Q.   SO NOW I WANT TO TURN TO SOME OF YOUR OTHER OPINIONS, YOUR

2       NON-INFRINGEMENT OPINIONS.   OKAY?

3       A.   OKAY.

4       Q.   SO DID YOU LOOK -- FOR EXAMPLE, LET'S GO TO SDX 2713

5       FIRST.

6            AND WHAT DO WE HAVE HERE?

7       A.   SO THIS IS THE GALAXY NEXUS, AND I SHOW THESE IMAGES

8       PORTRAY THE UNLOCK SCREEN OF TWO VERSIONS OF THE ANDROID

9       OPERATING SYSTEM, ICE CREAM SANDWICH AND THE JELLY BEAN.

10      Q.   AND WHY DO YOU HAVE THEM SEPARATELY?

11      A.   WELL, APPLE, APPLE LUMPS THIS ALL TOGETHER, BUT AS YOU CAN

12      SEE JUST EVEN LOOKING AT THE IMAGES, THE TWO OPERATE

13      DIFFERENTLY.

14           AT THE TOP OF THE ICE CREAM SANDWICHES -- WELL, THE

15      VISUALS ARE DIFFERENT ON THEM, SO THEY HAVE TO BE CONSIDERED

16      DIFFERENTLY.

17      Q.   SO HAVE YOU REACHED ANY OPINIONS AS TO WHETHER EITHER OF

18      THESE DESIGNS INFRINGE CLAIM 8?

19      A.   YES.   NEITHER OF THEM INFRINGE, AND IF I COULD EXPLAIN BY

20      LOOKING AT THE CLAIM LANGUAGE?

21      Q.   SURE.   WE CAN PUT THAT UP.   I THINK WE HAVE SDX 2714.

22      A.   SO THIS IS A PORTION OF THE CLAIM LANGUAGE, AND THE -- TO

23      INFRINGE, THE DESIGN MUST MEET EACH AND EVERY LIMITATION THAT'S

24      STATED HERE.

25           SO LET'S JUST LOOK AT WHAT IT SAYS.   IT SAYS THAT WE HAVE

1      TO DETECT A CONTACT WITH THE TOUCH-SENSITIVE DISPLAY AT A FIRST

2      PREDEFINED LOCATION CORRESPONDING TO AN UNLOCK IMAGE.

3           SO THERE HAS TO BE -- WHEN YOU TOUCH, THERE HAS TO BE AN

4      IMAGE THERE.

5           SECOND, IT SAYS "TO CONTINUOUSLY MOVE THE UNLOCK IMAGE ON

6      THE TOUCH-SENSITIVE DISPLAY."

7           SO THIS IMAGE THAT WE'RE MOVING HAS TO BE THE SAME AS THE

8      IMAGE WE'RE TOUCHING.  IT CAN'T BE DIFFERENT.

9           NOW, IF WE GO BACK TO THE FIGURE I'VE SHOWN BEFORE --

10     Q.   SDX 2713, PLEASE.

11     A.   -- SO IF YOU LOOK ON THE LEFT HERE IN BOTH VERSIONS, WE

12     SEE THAT THE IMAGE APPEARS AS A SMALL PADLOCK SURROUNDED BY A

13     SMALL CIRCLE, AND WE SEE THAT IN ICE CREAM SANDWICH AND JELLY

14     BEAN.  BUT AS SOON AS A PERSON TOUCHES THAT SCREEN, THOSE

15     IMAGES DISAPPEAR AND IT'S REPLACED BY ANOTHER IMAGE.  WE SEE A

16     DIFFERENT IMAGE APPEAR.  IN ICE CREAM SANDWICH, WE SEE THAT'S A

17     LARGE CIRCLE, AND I'M NOT SURE IF YOU CAN SEE IT BECAUSE OF THE

18     LIGHTS IN THIS ROOM.

19     Q.   WE CAN TURN THEM DOWN A LITTLE BIT, PLEASE.

20     A.   WE SEE HERE THAT THERE'S AN ARRAY OF SMALL DOTS.  SO THE

21     IMAGES ARE DIFFERENT.

22          FURTHERMORE, ON THE ICE CREAM -- THE JELLY BEAN VERSION

23     DOWN HERE, THE DOTS ACTUALLY DON'T MOVE AT ALL.  THE ONLY THING

24     THAT HAPPENS IS THAT INDIVIDUAL DOTS GET BRIGHTER OR DIMMER.

25     THERE'S NO MOVEMENT WHATSOEVER.

```
 1            SO IT DOESN'T MEET THE LIMITATIONS OF THE CLAIMS.

 2     Q.   SO A MINUTE AGO -- WE CAN BRING THE LIGHTS BACK UP.  THANK

 3     YOU VERY MUCH.  I'M SORRY.  I'M NOT -- I SHOULD ASK YOU THAT.

 4            THE COURT:  NO, PLEASE.  GO AHEAD.

 5     BY MR. NELSON:

 6     Q.   ALL RIGHT.  THE -- YOU WERE TALKING ABOUT SOME SAMSUNG

 7     DESIGNS THAT WEREN'T ACCUSED.  DO YOU RECALL THAT?

 8     A.   YES, I WAS.

 9     Q.   SO IF WE CAN PUT UP SDX 2724.  SO WHAT'S SHOWN HERE?

10     A.   WHAT WE SEE ARE THREE OTHER DESIGNS, NONE OF THESE ARE

11     ACCUSED, AND MAYBE I SHOULD JUST BRIEFLY EXPLAIN HOW THEY WORK.

12            IN ALL OF THESE DESIGNS, THEY WORK THE SAME WAY, ALTHOUGH

13     THE VISUALS ARE DIFFERENT.  IN ALL OF THEM, YOU CAN TOUCH

14     ANYWHERE ON THE SCREEN AND YOU CAN MOVE IN ANY DIRECTION, AND

15     AS LONG AS YOUR MOVEMENT IS LONGER THAN A GIVEN DISTANCE, THE

16     DEVICE WILL UNLOCK.

17            THE ONLY THING THAT'S DIFFERENT HERE IS THE VISUALS.  IN

18     THIS CASE, IT LOOKS LOOK A GLASS -- THIS IS CALLED GLASS

19     UNLOCK, THE WHOLE SCREEN MOVES WITH YOU.

20            THIS ONE IS A CIRCLE UNLOCK WHERE IT SHOWS A VARIETY OF

21     VISUAL CUES AND THE OTHER DISTANCE IT HAS TO BE MOVED, YOU SEE

22     THE OTHER RAYS THERE.

23            AND RIPPLE UNLOCK GIVES YOU THE RIPPLE EFFECT ON YOUR

24     FINGER.

25     Q.   NOW, WERE YOU HERE FOR DR. COCKBURN'S TESTIMONY?
```

1     A.   YES, I WAS.

2     Q.   DID YOU HEAR WHEN HE SAID THAT HE DIDN'T THINK THAT THESE

3     DESIGNS HAD ALL OF THE ADVANTAGES OF THE '721, CLAIM 8 OF THE

4     '721 PATENT?

5     A.   YES.  HE -- WELL, THERE'S SEVERAL THINGS.

6          WELL, FIRST I SHOULD ALSO SAY THAT DR. COCKBURN BELIEVES

7     THAT THESE DESIGNS DO NOT INFRINGE AS WELL.

8          AND HE ALSO LISTED A WHOLE VARIETY OF BENEFITS THAT HE

9     FEELS CLAIM 8 OF THE '721 PATENT HAS.

10         NOW, I DON'T ACTUALLY NECESSARILY AGREE WITH ALL THOSE

11    BENEFITS, BUT I BELIEVE THESE THREE DESIGNS HAVE EXACTLY THE

12    SAME BENEFITS, IF NOT MORE SO IN SOME CASES.

13    Q.   AND WHY DO YOU SEE THAT?

14    A.   WELL, SOME OF THE BENEFITS THAT HE LISTS ARE, FOR EXAMPLE,

15    EFFICIENCY.  THIS DESIGN IS, IN MY OPINION --

16    Q.   BLESS YOU.

17              THE COURT:  THANK YOU.

18              THE WITNESS:  SORRY?

19         THIS DESIGN IS, IN MY OPINION, BETTER THAN THE SLIDE TO

20    UNLOCK BECAUSE YOU CAN TOUCH ANYWHERE AND MOVE A CERTAIN

21    DISTANCE AND THEN IT'LL UNLOCK, WHICH MEANS YOU CAN DO IT EYES

22    FREE.

23         NOW, WE'VE HEARD FROM MR. CHRISTIE, THE INVENTOR OF THE

24    SLIDE TO UNLOCK MECHANISM, THAT YOU'RE USING THESE THINGS,

25    LIKE, UP TO A HUNDRED TIMES A DAY OR MORE, AND THINK ABOUT HOW

1    MANY TIMES WE DO THAT IN CROWDED SITUATIONS WHEN SAFETY IS

2    CRITICAL.  IF YOU HAVE TO LOOK DOWN AT THE SCREEN -- IT'S MUCH

3    EASIER TO NOT LOOK AT THE SCREEN AND NOT TRIP AND SO ON.  THAT

4    DOESN'T HAPPEN WITH THESE UNLOCK METHODS.

5    BY MR. NELSON:

6    Q.   NOW I WANT TO GO TO SDX 2699.  AND CAN YOU TELL US WHAT'S

7    SHOWN HERE?

8    A.   YES.  THIS IS A CHRONOLOGY OF ONE OF THESE UNLOCK SCREENS

9    WHERE DESIGNS WERE INTRODUCED ON PRODUCTS.

10   Q.   SO IF WE GO TO THE GLASS UNLOCK, FOR EXAMPLE?

11   A.   OKAY.

12   Q.   I THINK THAT'S THE FIRST ONE THAT YOU DESCRIBED JUST A

13   MOMENT AGO?

14   A.   RIGHT THERE.

15   Q.   DO YOU KNOW WHEN THAT WAS AVAILABLE?

16   A.   YES.  THAT WAS AVAILABLE ON SEPTEMBER 2011.  THAT WAS

17   BEFORE THE '721 PATENT WAS ISSUED.

18   Q.   SO DO YOU HAVE AN OPINION ON HOW LONG IT WOULD HAVE TAKEN

19   SAMSUNG TO CHANGE FROM ONE OF THE OTHER ACCUSED SCREENS TO THE

20   GLASS UNLOCK SCREEN?

21   A.   WELL, AT THE TIME OF THE FILING OF THIS CASE, WHICH WAS

22   FEBRUARY 8, 2012, THERE WERE -- THE GLASS UNLOCK, THE UNACCUSED

23   GLASS UNLOCK SCREEN WAS AVAILABLE, AS WAS -- LET'S SEE, WHERE

24   IS IT? -- AS WAS THE NOTE HERE, WHICH IS THE CIRCLE UNLOCK.  SO

25   IT WOULD HAVE TAKEN THEM NO TIME AT ALL.  THEY COULD HAVE JUST

1       SWAPPED OUT THE INTERFACE AND USED THAT INSTEAD.

2       Q.   NOW, I WANT TO TURN TO ONE MORE TOPIC, THE IPHONE AND IOS

3       7 IN PARTICULAR.

4            SO DO YOU -- DO YOU HAVE AN OPINION AS TO WHETHER THE IOS

5       7, OR IPHONE RUNNING ON IOS 7, PRACTICES CLAIM 8 OF THE '721

6       PATENT?

7       A.   YES.   IOS 7 IS THE LATEST VERSION OF THE APPLE OPERATING

8       SYSTEM THAT WAS JUST RELEASED NOT THAT LONG AGO, AND IN MY

9       OPINION IT DOES NOT PRACTICE CLAIM 8 OF THE '721 PATENT.

10      Q.   SO IF WE PULL UP SDX 2726, CAN YOU DEMONSTRATE FOR US WHY

11      THAT'S THE CASE?

12      A.   SURE.   BEFORE YOU PLAY THE VIDEO, SO THIS IS -- THIS IS A

13      VIDEO OF, OF UNLOCKING THE SCREEN.

14           AND NOW IF WE PLAY IT --

15              THE COURT:   WOULD YOU LIKE THE LIGHTS LOWERS.

16       (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

17              THE WITNESS:   YOU CAN SEE THE PERSON CAN TOUCH

18      ANYWHERE MORE OR LESS ON THE LEFT HALF OF THE SCREEN AND THEY

19      DON'T HAVE TO TOUCH ON THE IMAGE, AND THEY CAN MOVE IN A

20      ROUGHLY LEFT TO RIGHT DIRECTION, AS WELL AS 45 -- PLUS OR MINUS

21      45 DEGREES ON THE OTHER SIDE AND IT WILL UNLOCK.

22           NOW, IN THIS CASE, THE PERSON DOESN'T HAVE TO PRESS ON AN

23      IMAGE.   THEY CAN PRESS ANYWHERE ON THE LEFT HALF.

24           SO THERE'S NO UNLOCK IMAGE.   THEY DON'T HAVE TO PRESS AT A

25      PREDEFINED LOCATION CORRESPONDING TO AN UNLOCKED IMAGE.

```
 1            IT DOESN'T MEET THE CLAIM LIMITATIONS.

 2    BY MR. NELSON:

 3    Q.   SO WHAT ELEMENTS OF CLAIM 8 DO YOU THINK AREN'T PRACTICED?

 4    A.   THERE'S NO UNLOCK IMAGE, AND THERE'S NO PREDEFINED

 5    LOCATION OF CONTACT ON THAT UNLOCK IMAGE.  THE PERSON CAN

 6    TOUCH ANYWHERE ON THAT SIDE OF THE SCREEN.

 7            MR. NELSON:  ALL RIGHT.  THANK YOU, SIR.  I

 8    APPRECIATE IT.

 9        I HAVE NO FURTHER QUESTIONS.

10            THE WITNESS:  PLEASURE.

11            THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:13.  WE'LL

12    GO UNTIL 3:30 AND TAKE OUR BREAK AT THAT TIME.

13            MR. MCELHINNY:  SO THE BREAK AT --

14            THE COURT:  WE'LL GO TO 3:30 AND THEN TAKE OUR BREAK

15    AT FOR TEN MINUTES.

16            MR. MCELHINNY:  THANK YOU, YOUR HONOR.

17        (PAUSE IN PROCEEDINGS.)

18            THE COURT:  ALL RIGHT.  TIME IS 3:14.  GO AHEAD,

19    PLEASE.

20                        CROSS-EXAMINATION

21    BY MR. MCELHINNY:

22    Q.   GOOD AFTERNOON, PROFESSOR.  MY NAME IS HAROLD MCELHINNY.

23    WE HAVEN'T MET, RIGHT?

24    A.   NO, WE HAVEN'T.  GOOD AFTERNOON.

25    Q.   AS I UNDERSTAND, YOU'VE BEEN HERE FOR MOST OF THE TIME
```

CROSS GREENBERG

1    DURING THE TRIAL; IS THAT RIGHT?

2    A.   I'VE BEEN HERE FOR CERTAIN TESTIMONY, BUT NOT, CERTAINLY

3    NOT ALL OF THE TRIAL.

4    Q.   OKAY.  PROFESSOR, YOU WOULD DESCRIBE YOURSELF AS AN

5    ACADEMIC; ISN'T THAT CORRECT?

6    A.   I'M AN ACADEMIC MAINLY.  I HAVE WORKED WITH INDUSTRY IN

7    MY, IN PART OF MY ACADEMIC CAREER.

8    Q.   WHEN WE ASKED YOU THIS QUESTION AT YOUR DEPOSITION, YOU

9    SAID "I'M PRIMARILY AN ACADEMIC, AND I PRIMARILY DESIGN AND

10   WORK ON RESEARCH PROJECTS"?

11   A.   YES, I THINK THAT'S A FAIR CHARACTERIZATION OF WHAT I JUST

12   SAID.

13   Q.   OKAY.  YOU'VE NEVER DESIGNED A TELEPHONE, HAVE YOU?

14   A.   NO, I HAVE NOT.

15   Q.   OKAY.  AND YOU ARE NOT AN INVENTOR; ISN'T THAT RIGHT?

16   A.   AND BY INVENTOR, DO YOU MEAN IN TERMS OF A PATENT?

17   Q.   I DO.  WOULD YOU CONSIDER YOURSELF AN INVENTOR?

18   A.   I INVENT A LOT OF THINGS, YES.

19   Q.   OKAY.  YOU HAVE NEVER BEEN AWARDED A PATENT?

20   A.   I'VE NEVER APPLIED FOR A PATENT.

21   Q.   AND, IN FACT, YOU'VE NEVER EVEN SUBMITTED A PATENT

22   APPLICATION; ISN'T THAT RIGHT?

23   A.   THAT'S CORRECT.

24   Q.   YOU'VE NEVER MET WITH A PATENT EXAMINER; CORRECT?

25   A.   I HAVE NOT -- I'VE MET PATENT EXAMINERS BUT NOT IN TERMS

1     OF APPLYING FOR A PATENT.

2     Q.   NOT IN TERMS OF THE PATENT PROCESS?

3     A.   NO.

4     Q.   OKAY.  I THINK TODAY ACTUALLY WAS THE FIRST TIME THAT OUR

5     JURY HAD A CHANCE TO START HEARING WHAT WE CALL INVALIDITY

6     TESTIMONY.  YOU'VE BEEN HERE MOST OF THE DAY; RIGHT?

7     A.   YES.

8     Q.   WE'RE 0 FOR 3 SO FAR IN OUR PATENTS.  ARE YOU KEEPING

9     COUNT?

10    A.   WELL, I'VE -- I WASN'T REALLY KEEPING COUNT.

11    Q.   ALL RIGHT.  BUT -- WHO WAS THE PATENT EXAMINER ON THE '721

12    PATENT, SIR?

13    A.   I WOULD HAVE TO LOOK UP THE NAME.

14    Q.   PLEASE DO.  PLEASE DO.  IT'S JX 10.

15         AND CAN WE HAVE IT ON THE SCREEN, PLEASE.

16    A.   SO THE PRIMARY EXAMINER IT SAYS IS BORIS PESIN, AND THE

17    ASSISTANT EXAMINER IS ANDRES, I CAN'T PRONOUNCE THE NAME,

18    GUTIERREZ.

19    Q.   GUTIERREZ.

20    A.   GUTIERREZ.

21    Q.   AS PART OF THE WORK YOU'VE DONE IN THIS CASE, YOU STUDIED

22    THE '721 PATENT; CORRECT?

23    A.   YES, I DID.

24    Q.   YOU LOOKED AT THE PROSECUTION HISTORY OF THE PATENT?

25    A.   YES, I DID.

1    Q.    APPROXIMATELY HOW LARGE ARE THE PROSECUTION HISTORIES?

2    A.    FAIRLY LARGE.

3    Q.    FAIRLY LARGE.  AND YOU WENT THROUGH EVERY PAGE OF IT,

4    RIGHT?

5    A.    I WENT THROUGH -- IT'S BEEN QUITE A WHILE SINCE I'VE GONE

6    THROUGH IT, BUT YES.

7    Q.    WE'RE BASICALLY HERE SECOND-GUESSING THE DECISION THAT WAS

8    MADE BY THESE EXAMINERS; RIGHT?  THAT'S WHAT YOU'RE DOING?

9    A.    WELL, JUST IN PART.  REMEMBER THAT THE PLAISANT VIDEO WAS

10   NOT IN FRONT OF THE PATENT EXAMINER, SO WE'RE, WE'RE BUILDING

11   ON THAT, TOO.

12   Q.    BUT YOU ARE SECOND-GUESSING THE ULTIMATE DECISION THAT

13   THEY MADE TO ISSUE THIS PATENT; ISN'T THAT TRUE?

14   A.    WELL, I DON'T KNOW IF I WOULD CALL IT SECOND-GUESSING.

15   WHAT I WOULD SAY IS I'M FORMING OPINIONS OVER THE VALIDITY OF

16   THE PATENT, AND I THINK IN THIS CASE THEY GOT IT WRONG.

17   Q.    FAIR ENOUGH.

18         AND IN ORDER TO DO THAT, DID YOU RECONSTRUCT WHAT THEY

19   ACTUALLY DID WHEN THEY WENT THROUGH THE PROCESS TO STUDY THIS

20   PATENT AND DECIDE, AS GOVERNMENT OFFICIALS, WHETHER OR NOT IT

21   SHOULD BE ALLOWED?

22   A.    I'VE GONE THROUGH THE FILE HISTORY.

23   Q.    OKAY.  HOW DOES THE PTO -- PTO IS PATENT AND TRADEMARK

24   OFFICE.  YOU KNOW THAT?

25   A.    YES.

1    Q.   OKAY.  HOW DOES THE PTO DIVIDE THE RESPONSIBILITIES

2    BETWEEN THE PRIMARY AND ASSISTANT EXAMINERS?

3    A.   THAT I'M NOT AWARE OF HOW THEY DO THAT.

4    Q.   ARE YOU FAMILIAR WITH THE REPUTATIONS OF THESE TWO

5    EXAMINERS?

6    A.   NO, I'M NOT.

7    Q.   YOU WOULD AGREE THAT THESE EXAMINERS HAVE EXPERTISE IN

8    THIS FIELD, WOULDN'T YOU?

9    A.   I'M NOT AWARE ONE WAY OR ANOTHER.  I BELIEVE THAT

10   EXAMINERS ARE -- SHOULD BE EXPERT IN A PARTICULAR DOMAIN.  I

11   DON'T KNOW IN THIS PARTICULAR CASE IF THEY'RE EXPERTS IN

12   UNLOCKING PER SE.  I JUST DON'T KNOW ONE WAY OR ANOTHER.

13   Q.   YOU DON'T KNOW ONE WAY OR ANOTHER WHETHER OR NOT THE

14   PATENT AND TRADEMARK OFFICE ASSIGNS PATENT APPLICATIONS TO

15   EXAMINERS WHO HAVE A PARTICULAR EXPERTISE IN THE FIELD?

16   A.   OH.  I KNOW THAT THEY HAVE PARTICULAR EXPERTISE.  I JUST

17   DON'T KNOW THE PRECISE EXPERTISE.

18   Q.   WOULD YOU AGREE, BASED ON YOUR REVIEW OF WHAT HAPPENED

19   HERE, THAT THE EXAMINERS IN THIS CASE WENT ABOUT THEIR JOB

20   QUITE CAREFULLY?

21   A.   IT LOOKED LIKE THEY WENT ABOUT THEIR JOB QUITE CAREFULLY.

22        BUT IN TERMS OF THE REFERENCES THAT I DISCUSSED, NEONODE

23   AND PLAISANT, THEY DON'T DISCUSS THAT AT ALL.

24   Q.   THEY HAD THE PATENT UNDER EXAMINATION FOR TWO YEARS; IS

25   THAT RIGHT?

```
 1     A.   I'D HAVE TO LOOK AT THE DATES, BUT I WILL -- IF -- I WILL

 2     TAKE THAT, THAT THAT'S WHAT IT IS.

 3     Q.   WOULD YOU AGREE WITH ME THAT THEY LOOKED AT ACTUALLY QUITE

 4     A BIT OF PRIOR ART BEFORE THEY ISSUED THIS PATENT?

 5     A.   YES.

 6     Q.   AND DID YOU REVIEW ALL OF THE PRIOR ART THAT THEY

 7     REVIEWED?

 8     A.   I DID NOT READ EVERY PAPER THAT THEY REVIEWED, BUT I READ

 9     THE FILE HISTORY.

10     Q.   THEY CONDUCTED BROAD SEARCHES OF THE PRIOR ART TO SEE

11     WHETHER OR NOT THERE WAS PRIOR ART THAT WAS RELEVANT TO THIS

12     PATENT; CORRECT?

13     A.   IT APPEARS THAT THEY DID.

14     Q.   CAN YOU TELL US IN WHAT ART AREAS THEY SEARCHED?

15     A.   I'D HAVE TO LOOK BACK AT THE PATENT.

16     Q.   SIR, IT'S JX 10.  PLEASE, PUT IT RIGHT IN FRONT OF YOU.

17     A.   SORRY.  JX 10 IS JUST TO --

18     Q.   IT SHOULD BE IN YOUR BINDER.  IT SHOULD HAVE A TAB ON IT.

19     IT SHOULD SAY JX 10.

20     A.   HERE IT IS.

21     Q.   THE JURY ALSO HAS THIS IN THEIR BINDERS.  SO LET ME HELP

22     YOU OUT HERE.

23          IF YOU LOOK IN THE LEFT-HAND CORNER --

24     A.   IN THE FIELD OF CLASSIFICATION SEARCH?

25     Q.   YES.  WHERE IT SAYS THERE IN U.S. THEY CLERKED IN CLASS
```

1       715/863.

2           DO YOU SEE THAT?

3       A.   I DO.

4       Q.   CAN YOU TELL US WHAT FIELD THAT IS THAT THEY SEARCHED IN?

5       A.   NO, I CAN'T.  I DON'T KNOW.

6       Q.   YOU DIDN'T NEED TO KNOW THAT IN ORDER TO SECOND-GUESS

7       THEIR OPINION?

8       A.   I LOOKED AT WHAT THEY REVIEWED AND LOOKED AT THE FILE

9       HISTORY.

10      Q.   YOU LOOKED AT WHAT THEY REVIEWED.  DO YOU MEAN BY THAT YOU

11      LOOKED AT THE SPECIFIC STUFF THEY CITED IN THE PATENT?  OR DO

12      YOU MEAN YOU LOOKED IN THIS FIELD IN ORDER TO SEE ALL THE ART

13      THEY REVIEWED BEFORE THEY CHOSE WHAT THEY PUT IN THE PATENT?

14      A.   I LOOKED AT THE FILE HISTORY AND I LOOKED AT -- AND I

15      LOOKED AT THE PATENT, AND I LOOKED AT THE PRIOR ART THAT I

16      EXAMINED.

17      Q.   YOU UNDERSTAND THAT WHAT IS QUOTED IN THE FILE HISTORY IS

18      SOMETHING THAT THE EXAMINERS HAVE SELECTED AS A SUBSET OF WHAT

19      THEY REVIEW WHEN THEY DO AN ART CLASS SEARCH; CORRECT?

20      A.   I'LL -- AS I SAID, I'M NOT A PATENT EXAMINER, SO I'M NOT

21      QUITE SURE HOW THEY GO ABOUT THIS PROCESS.

22      Q.   YOU DON'T KNOW HOW THE PROCESS WORKS?

23      A.   I KNOW ROUGHLY HOW THE PROCESS WORKS.

24      Q.   WERE YOU HERE WHEN THE MOVIE WAS SHOWN TO THIS JURY?

25      A.   NO, I WAS NOT.

1    Q.    OKAY.   SO YOU'RE NOT PREPARED TO TELL US WHAT THEY SAW

2    WHEN THEY SEARCHED THROUGH THE ART CLASSES IN GENERAL, OTHER

3    THAN WHAT WAS SPECIFICALLY CITED IN THE PATENT; CORRECT?

4    A.    WELL, WHAT I AM PREPARED TO SAY IS THAT THEY LIST ON THE

5    SECOND PAGE A VARIETY OF U.S. PATENT DOCUMENTS, FOREIGN PATENT

6    DOCUMENTS AND OTHER PUBLICATIONS, AND THAT'S EVERYTHING THAT

7    WAS LOOKED AT.

8    Q.    THEY ALSO SEARCHED INTERNATIONAL PATENT DOCUMENTS;

9    CORRECT?

10   A.    IT SAYS FOREIGN PATENT DOCUMENTS, YES.

11   Q.    AND IF YOU LOOK ABOVE IN THE SEARCH FIELD FOR

12   INTERNATIONAL PATENTS, YOU CAN SEE THAT THEY SEARCHED IN CLASS

13   G06F.

14        DO YOU SEE THAT?

15   A.    YES, I DO.

16   Q.    THAT'S INTERNATIONAL.   YOU'RE CANADIAN.   CAN YOU TELL US

17   WHAT THAT SEARCH AREA IS?

18   A.    I DON'T KNOW WHAT THOSE NUMBERS REPRESENT, NO.

19   Q.    YOU MENTIONED THE HYPPONEN PATENT.   IS THAT RIGHT?

20   A.    THAT'S CORRECT.

21   Q.    AND THAT IS -- YOU MARKED IT, YOU PUT IT IN EVIDENCE AS

22   SDX 60, RIGHT?

23   A.    I'LL HAVE TO CHECK.   HOLD ON.   YES, THAT'S CORRECT.

24   Q.    I PUT IT ON THE SCREEN IN FRONT OF YOU.

25   A.    YES, THAT'S CORRECT.

1    Q.   CAN YOU SEE THERE, SIR, SECTION 51, THAT THE HYPPONEN

2    PATENT FALLS INTO INTER CLASS G 06 F.

3    A.   YES, I DO.

4    Q.   SO THAT WAS THE CLASS THAT OUR EXAMINERS SEARCHED WHEN

5    THEY WERE TRYING TO DECIDE WHETHER THE APPLE PATENT WAS VALID;

6    CORRECT?

7    A.   YES.

8    Q.   ARE YOU PREPARED TO TELL THESE JURORS THAT THE EXAMINERS

9    DIDN'T SEE THE HYPPONEN PATENT?

10   A.   I DON'T KNOW WHAT THE EXAMINERS SAW OR DIDN'T SEE.  I

11   ASSUME THAT THERE WOULD BE A GREAT MANY PUBLICATIONS IN THIS

12   AREA, AND I DON'T KNOW WHETHER THEY DID A DETAILED SEARCH,

13   WHETHER THEY READ EVERYTHING OR NOT.

14        BUT IF IT'S NOT ON THE FACE OF THE PATENT, IT WOULD NOT

15   HAVE BEEN CONSIDERED, AND HYPPONEN IS NOT LISTED ON THE FACE OF

16   THIS PATENT.

17   Q.   WELL, NOT CONSIDERED, WHAT YOU MEAN BY THAT IS IT WAS NOT

18   CHOSEN FROM THEIR SEARCH AS SOMETHING THAT THEY FOUND

19   PARTICULARLY RELEVANT THAT REQUIRED CONSIDERATION?

20   A.   WELL, THERE'S NOTHING IN THE FILE HISTORY OR THE PATENT

21   ITSELF THAT SAYS THAT THEY ACTUALLY READ THE HYPPONEN PATENT.

22   WHAT'S LISTED HERE IS WHAT MATERIALS THAT THEY -- WE DO KNOW

23   THE MATERIALS LISTED HERE, THAT'S WHAT THEY HAD ON HAND.

24   Q.   BUT WE DO KNOW, AND THAT'S WHY THEY PUT IT IN THE PATENT,

25   WHAT BROAD AREAS THEY SEARCHED; CORRECT?

1    A.   WE KNOW THE BROAD AREAS, YES.

2    Q.   ALL RIGHT.  LET'S LOOK AT WHAT IS SPECIFICALLY MARKED ON

3    THE PATENT.  WOULD YOU AGREE WITH ME THAT THE PATENT EXAMINERS

4    CITED OVER 60 U.S. PATENTS THAT THEY READ AND CONSIDERED BEFORE

5    THEY ISSUED THIS PATENT?

6    A.   I HAVEN'T COUNTED THEM ALL, BUT THERE'S A BIG LIST, YES.

7    Q.   WOULD YOU AGREE WITH ME THAT THEY CONSIDERED 13 PATENTS

8    FROM OTHER COUNTRIES?

9    A.   THAT LOOKS ABOUT CORRECT.

10   Q.   WOULD YOU CONSIDER -- WOULD YOU AGREE WITH ME THAT THEY

11   CONSIDERED 39 OTHER PUBLICATIONS?

12   A.   I HAVEN'T COUNTED, BUT IT'S A BIG LIST.

13   Q.   ALL RIGHT.  THEY REVIEWED PUBLICATIONS FROM SUCH COMPANIES

14   SUCH AS IBM; CORRECT?

15   A.   LET ME LOOK.  JUST -- YES, THEY HAVE.

16   Q.   OKAY.  DID YOU REVIEW THOSE PUBLICATIONS TO SEE WHAT THEY

17   TAUGHT?

18   A.   WELL, THERE'S SEVERAL -- THERE'S A VARIETY IN HERE THAT I

19   DID REVIEW, BUT I HAVEN'T REVIEWED ALL OF THEM.

20   Q.   SO YOU DON'T KNOW WHETHER THE EXAMINERS THOUGHT THAT THESE

21   WERE MORE RELEVANT THAN SOME OF THE ART THAT YOU'RE TALKING

22   ABOUT?

23   A.   I CAN'T FORM THAT OPINION.

24   Q.   DID YOU RELY ON SAMSUNG'S LAWYERS TO TELL YOU WHAT WAS

25   RELEVANT AND WHAT WASN'T?

CROSS GREENBERG

1    A.   YOU KNOW, I ACTUALLY KNEW ABOUT THE PLAISANT, BOTH

2    PLAISANT WELL BEFORE THIS CASE, AND I WAS ALSO AWARE OF THE

3    NEONODE BEFORE THIS PARTICULAR CASE.

4    Q.   AND YOU MENTIONED THIS, SO LET'S BE CLEAR.  THE EXAMINERS

5    HAD IN FRONT OF THEM A DOCUMENT THAT SPECIFICALLY, A USER'S

6    MANUAL FOR NEONODE PHONE; CORRECT?

7    A.   YES, THAT'S CORRECT.

8    Q.   AND, AGAIN, SO THERE'S NO CONFUSION, YOU HAVE NO EVIDENCE,

9    YOU HAVE NOT RELIED IN ANY WAY ON WHETHER OR NOT THE NEONODE

10   PHONE WAS EVER AVAILABLE IN THE UNITED STATES; RIGHT?

11   A.   I HAVE NOT PROVIDED ANY EVIDENCE AS FAR AS THE NEONODE

12   PHONE ITSELF.

13   Q.   SO THEY HAD A NEONODE, AND I THINK YOU SAID ON YOUR DIRECT

14   THAT IT WAS JUST AS DETAILED AS THE DOCUMENT YOU'RE NOW RELYING

15   UPON AS PART OF YOUR COMBINATION TO SAY OUR PATENT IS VALID --

16   OBVIOUS, RIGHT?

17   A.   I BELIEVE I SAID THEY COVERED PRETTY MUCH THE SAME

18   MATERIALS.

19   Q.   AND THEY GOT THIS DOCUMENT, THIS NEONODE DOCUMENT, BECAUSE

20   THE APPLE PATENT LAWYERS PROVIDED IT TO THE EXAMINER; ISN'T

21   THAT RIGHT?

22   A.   I UNDERSTAND THAT'S CORRECT.

23   Q.   OKAY.  AND THEY ALSO HAD, I THINK YOU SAID, THE ARTICLE

24   THAT YOU'RE RELYING ON FROM DR. PLAISANT; CORRECT?

25   A.   YES.  BUT THEY DID NOT HAVE THE VIDEO AND THE VIDEO AND

1    PAPER ARE ONE SINGLE REFERENCE.  THAT'S HOW IT'S TREATED AT THE

2    ACM CHI CONFERENCE.  ONE WITHOUT THE OTHER IS NOT COMPLETE.

3    Q.   THEY HAD THE ARTICLE; CORRECT?

4    A.   THEY HAD THE TWO-PAGE ARTICLE, YES.

5    Q.   AND, AGAIN, THEY HAD THE ARTICLE BECAUSE APPLE'S PATENT

6    LAWYERS GAVE IT TO THE EXAMINER; RIGHT?

7    A.   I'M NOT SURE WHO GAVE IT TO THEM, BUT THEY DID HAVE IT.

8    Q.   DO YOU KNOW HOW TO FIND THAT OUT FROM THE PATENT?

9    A.   IT SAYS OTHER PUBLICATIONS, AND I THINK THAT BECAUSE THEY

10   RECEIVED IT FROM SOME OTHER SOURCE, BUT I DON'T KNOW.

11   Q.   IF YOU LOOK AT THE VERY -- LET ME SHOW YOU HOW TO READ

12   PATENTS, SIR.  IF YOU LOOK AT THE VERY END OF THE COLUMN, THE

13   VERY LAST COLUMN --

14   A.   I SEE THE STARRED --

15   Q.   YES, IF IT'S CITED BY THE EXAMINER, IT WOULD HAVE AN

16   ASTERISK NEXT TO IT?

17   A.   THANKS FOR REMINDING ME.

18   Q.   YOU'RE WELCOME.

19   A.   I FORGOT ABOUT THAT.

20   Q.   IN FACT, THEY HAD THE PLAISANT ARTICLE BECAUSE THE APPLE

21   LAWYERS GAVE IT TO THEM?

22   A.   YES.

23   Q.   AND THE TWO EXAMINERS THAT WE'RE TALKING ABOUT HERE

24   CONCLUDED THAT THE; 721 PATENT WAS A VALID INVENTION; THAT WAS

25   THEIR CONCLUSION; CORRECT?

1    A.   YES, THAT WAS THEIR CONCLUSION, BUT AS I MENTIONED, I

2    THINK THEY GOT IT WRONG AND THAT'S WHY WE'RE HERE TODAY.

3    Q.   THEY WEREN'T BEING PAID BY APPLE, WERE THEY?

4    A.   I -- I UNDERSTAND IN FILING PATENTS, APPLE DOES PAY FEES.

5    BUT I BELIEVE THEY'RE PAID BY THE U.S. GOVERNMENT.

6    Q.   IS THERE ANY QUESTION IN YOUR MIND ABOUT WHETHER THE

7    EXAMINERS ARE GOVERNMENT EMPLOYEES OF THE UNITED STATES

8    GOVERNMENT, PAID FOR BY THE UNITED STATES GOVERNMENT?

9    A.   THEY'RE GOVERNMENT EMPLOYEES, YES.

10   Q.   AND THEY WEREN'T PAID BY SAMSUNG?

11   A.   NO.

12   Q.   LIKE YOU ARE?

13   A.   I'M BEING PAID BY SAMSUNG FOR MY TIME, YES.

14   Q.   HOW MUCH HAVE YOU BEEN PAID TO WORK ON THIS CASE?

15   A.   SO I -- AS I MENTIONED, I'M BEING PAID $550 AN HOUR.  I

16   PUT IN ROUGHLY 400 HOURS IN THIS CASE.

17   Q.   THE EXAMINER --

18   A.   THIS ACTUALLY INCLUDES NOT JUST THIS PATENT BUT ANOTHER

19   ONE THAT'S NO LONGER AT ISSUE.

20   Q.   WOULD YOU AGREE WITH ME THAT THE EXAMINERS WHO ISSUED THIS

21   PATENT WERE SIMPLY HARD WORKING GOVERNMENT OFFICIALS DOING

22   THEIR JOB AS WELL AS THEY KNEW BEST.

23   A.   I DON'T KNOW THE EXAMINERS, SO I CAN'T SAY WHETHER THEY

24   KNEW ONE WAY OR ANOTHER.  I ASSUME THEY'RE GOVERNMENT EMPLOYEES

25   AND DOING A GOOD JOB.

CROSS GREENBERG

1    Q.   AND EXPERTS IN THE FIELD?

2    A.   EXPERTS IN WHAT THEY DO, YES.  BUT I STILL BELIEVE THAT

3    THEY GOT IT WRONG IN THIS CASE, AND THAT'S WHY WE'RE HERE.

4    Q.   YOU TESTIFIED, I BELIEVE, THAT IT WOULD TAKE NO -- IT

5    WOULD HAVE TAKEN SAMSUNG NO TIME AT ALL TO INSTALL A

6    NON-INFRINGING ALTERNATIVE?

7    A.   THAT'S CORRECT.

8    Q.   DID YOU EVER DISCUSS THAT OPINION THAT YOU JUST GAVE US

9    WITH ANY SAMSUNG ENGINEER?

10   A.   NO, I DID NOT.  BUT --

11   Q.   HAVE YOU DISCUSSED IT WITH ANY ENGINEER WHO'S EVER

12   ACTUALLY WORKED IN REAL LIFE IN INSTALLING A FEATURE ON A

13   PHONE?

14   A.   I HAVE NOT DISCUSSED THAT WITH AN ENGINEER BUT AS I

15   SAID --

16   Q.   YOU TESTIFIED --

17   A.   EXCUSE ME.  CAN I?

18   Q.   NO.  I'M ON THE TIME.  IF WE WANT AN EXPLANATION, YOU CAN

19   GIVE IT, I'M SURE.

20        YOU TESTIFIED -- IF I UNDERSTOOD IT CORRECTLY, YOU

21   TESTIFIED TO THIS JURY AGAIN THAT SAMSUNG DIDN'T NEED TO COPY

22   BECAUSE THEY HAD CREATED THE INVENTION MORE THAN A YEAR BEFORE.

23   ISN'T THAT WHAT YOU SAID?

24   A.   WHAT I SAID WAS THOSE DESIGNS WERE ALREADY AVAILABLE, SO,

25   YES, I AGREE WITH THAT.

```
 1              AND IT'S JUST A MATTER OF SWAPPING OUT ONE DESIGN OVER

 2    ANOTHER.

 3    Q.   AND YOU GAVE US YOUR OPINION THAT SAMSUNG DIDN'T COPY

 4    APPLE'S INVENTIONS; CORRECT?

 5    A.   THAT'S CORRECT.

 6    Q.   NOW, WHEN DR. COCKBURN FILED HIS REPORT, IN THAT REPORT HE

 7    CITED A NUMBER OF SAMSUNG DOCUMENTS, SOME OF WHICH THE JURY HAS

 8    SEEN, AND SAID IN HIS VIEW THAT THOSE DOCUMENTS WERE EVIDENCE

 9    OF COPYING.  CORRECT?

10    A.   THAT'S WHAT DR. COCKBURN SAYS, AND I DISAGREE WITH HIM.

11    Q.   AND YOU LOOKED AT THOSE DOCUMENTS AND YOU SAID YOU

12    DISAGREE WITH HIM; CORRECT?

13    A.   THAT'S CORRECT.

14    Q.   IN ANY OF THESE HOURS THAT YOU'VE SPENT WORKING FOR THE

15    SAMSUNG LAWYERS, DID YOU EVER ASK THEM TO PROVIDE YOU WITH

16    EVERY DOCUMENT THAT SHOWED A COMPARISON BETWEEN THE SLIDE TO

17    UNLOCK FEATURE AND THE DESIGN OF THEIR PHONES?

18    A.   WHAT I DID --

19    Q.   CAN YOU ANSWER MY QUESTION FIRST?

20    A.   NO.

21    Q.   YOU DID NOT?

22              HAVE YOU -- LET ME ASK YOU THE SAME QUESTION WE ASKED

23    MS. KIM.  YOU WERE HERE FOR MS. KIM'S TESTIMONY.

24    A.   YES, I WAS.

25    Q.   YOU HEARD HER TESTIFY THAT THE EVIDENCE OF HER DESIGN
```

1    CHANGED A YEAR BEFORE WOULD HAVE BEEN IN SOME PRM SYSTEM, OR

2    SOME SYSTEM IN WHICH THEY KEPT A RECORD.  DID YOU HEAR HER SAY

3    THAT?

4    A.   YES, I HEARD HER SAY THAT.

5    Q.   DID YOU EVER SEE ANY DOCUMENTS FROM THAT SYSTEM?

6    A.   NO, I DID NOT.

7    Q.   HAVE YOU EVER SEEN ANY WRITTEN EVIDENCE WHATSOEVER FROM

8    SAMSUNG'S FILES SHOWING THAT THEY HAD SOLVED THAT SLIDE TO

9    UNLOCK PROBLEM A YEAR BEFORE THE VICTORY DOCUMENT?

10   A.   WHAT I HEARD WAS MS. KIM'S TESTIMONY ONLY.

11   Q.   HAVE YOU EVER SEEN A WRITTEN SAMSUNG DOCUMENT THAT

12   CORROBORATES THAT TESTIMONY?

13   A.   NO.

14           MR. MCELHINNY:  NOTHING FURTHER, YOUR HONOR.

15           THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:30.  WHY

16   DON'T WE TAKE OUR TEN MINUTE BREAK NOW.

17       PLEASE DON'T RESEARCH OR DISCUSS THE CASE, AND WE'LL BE

18   BACK AT 3:40 TO CONCLUDE FOR THE DAY AT 4:30.

19       ALL RIGHT.  THANK YOU VERY MUCH.

20       (JURY OUT AT 3:31 P.M.)

21           THE COURT:  ALL RIGHT.  WE'LL TAKE OUR BREAK NOW.

22   THANK YOU.

23       (RECESS FROM 3:31 P.M. UNTIL 3:41 P.M.)

24       (JURY IN AT 3:41 P.M.)

25           THE COURT:  ALL RIGHT.  WELCOME BACK.

EVERYONE PLEASE TAKE A SEAT.
THE TIME IS NOW 3:42.
GO AHEAD, PLEASE.
MR. NELSON: THANK YOU, YOUR HONOR.

**REDIRECT EXAMINATION**

BY MR. NELSON:
Q. SO CAN WE PUT UP SDX 2700 AGAIN, 2700.
SO THE THREE ON THE BOTTOM THAT -- THE THREE DESIGNS ON THE BOTTOM THERE, ARE THOSE ACCUSED OF INFRINGEMENT IN THE CASE?
A. YES, THEY ARE.
SORRY. THE -- I CAN'T SEE THE TEXT THERE.
Q. IT SHOULD BE ON YOUR SCREEN, TOO.
A. OH, RIGHT. THANK YOU.
Q. YOU'RE WELCOME.
A. YES, THEY ARE.
Q. SO WHERE DO THOSE DESIGNS COME FROM?
A. THEY COME FROM GOOGLE, NOT SAMSUNG.
Q. HAVE YOU SEEN ANY EVIDENCE OR ALLEGATION IN THIS CASE THAT GOOGLE COPIED THE IPHONE?
A. NO -- NONE AT ALL.
Q. SO --
A. EXCUSE ME.
Q. ALL RIGHT? THERE'S WATER RIGHT THERE.
A. I'M GOOD. THANKS.

1    Q.   SO THEN A FEW QUESTIONS ON THE PATENT.

2         SO IF WE GO TO THE '721 PATENT, JX 10.

3    A.   OKAY.

4    Q.   SO YOU WERE ASKED SOME QUESTIONS ABOUT THE EXAMINERS IN

5    THE CASE.

6    A.   YES.

7    Q.   DO YOU KNOW HOW MANY OTHER APPLICATIONS THE EXAMINERS WERE

8    LOOKING AT THE TIME THEY WERE LOOKING AT THE '721 APPLICATION?

9    A.   NO, I DON'T.

10   Q.   DO YOU KNOW HOW MANY OTHER REFERENCES THERE WERE IN THOSE

11   APPLICATIONS?

12   A.   NO, I DON'T.

13   Q.   DO YOU KNOW HOW MANY REFERENCES WERE CITED HERE WITH

14   RESPECT TO THE '721?

15   A.   WE SEE THE NUMBER OF REFERENCES HERE, AND THERE'S A

16   CONSIDERABLE NUMBER OF THEM.

17   Q.   SO -- DO YOU KNOW HOW MUCH TIME THE EXAMINERS HAD TO SPEND

18   ON THE APPLICATION FOR THE '721 PATENT?

19   A.   NO, I DON'T.

20   Q.   OKAY.  SO LET'S JUST GO BACK.

21        NOW, YOU WERE ASKED A NUMBER OF QUESTIONS.  IS THERE

22   ANYTHING ABOUT THE QUESTIONS YOU WERE ASKED THAT CHANGES YOUR

23   OPINIONS HERE IN THE CASE.

24   A.   NO, THERE'S NOTHING ABOUT THE QUESTIONS THAT I WAS ASKED.

25   AS I HAD MENTIONED, I HAD LOOKED AT PLAISANT, AND INCLUDING THE

1    VIDEO, WHICH THE PATENT EXAMINER DID NOT HAVE, AND IN

2    COMBINATION WITH NEONODE, AND I CAME TO AN OPINION ABOUT THAT.

3         AND FROM THOSE TWO REFERENCES, I BELIEVE THE PATENT

4    EXAMINERS GOT IT WRONG.

5    Q.   SO ARE YOU OFFERING AN OPINION THAT THE PATENT OFFICE, OR

6    THE PATENT EXAMINERS DIDN'T DO THEIR JOB IN THIS CASE?

7    A.   NO, NOT AT ALL.  I THINK THEY PROBABLY DO THEIR BEST

8    EFFORTS, BUT I GUESS, LIKE ALL OF US, SOMETIMES THINGS SLIP

9    THROUGH THE CRACKS.

10        MR. NELSON:  ALL RIGHT.  THANK YOU, SIR.  I HAVE NO

11   FURTHER QUESTIONS.

12        THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:44.

13      IS THERE ANY RECROSS?

14        MR. MCELHINNY:  THERE IS NOT, YOUR HONOR.

15        THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

16   AND IT'S JUST SUBJECT TO RECALL AN INVALIDITY; CORRECT?

17        MR. NELSON:  YES, YOUR HONOR.

18        THE COURT:  ALL RIGHT.  THEN YOU MAY BE EXCUSED.

19      (PAUSE IN PROCEEDINGS.)

20        MR. NELSON:  YOUR HONOR?

21        THE COURT:  YES.

22        MR. NELSON:  I THINK THOSE BINDERS FOR THE CROSS THAT

23   YOU'VE GOT ARE PROBABLY FOR -- I THINK THEY WERE FOR BOTH

24   WITNESSES, THE NEXT WITNESS AS WELL.

25        THE COURT:  OH, OKAY.

```
1               MR. NELSON:  AT LEAST MINE WERE.

2               THE COURT:  AH, OKAY.  THANK YOU.

3               MR. NELSON:  YOU'RE WELCOME.

4               THE COURT:  I'LL KEEP THESE HERE THEN.

5               MR. NELSON:  I FIGURED THAT MIGHT SAVE YOU A LITTLE

6       TIME.

7           (PAUSE IN PROCEEDINGS.)

8               THE COURT:  OKAY.  ARE YOU READY, MR. NELSON.

9               MR. NELSON:  YES, I AM, YOUR HONOR.  THANK YOU.

10              THE COURT:  PLEASE CALL YOUR NEXT WITNESS.

11              MR. NELSON:  SO SAMSUNG CALLS AS ITS NEXT WITNESS

12      PROFESSOR DANIEL WIGDOR.

13          (DEFENDANTS' WITNESS, DANIEL WIGDOR, WAS SWORN.)

14              THE WITNESS:  I DO.

15              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

16          AND WOULD YOU PULL THE MICROPHONE TOWARDS YOU AND STATE

17      YOUR NAME, PLEASE, AND SPELL IT.

18              THE WITNESS:  DANIEL WIGDOR.  D-A-N-I-E-L,

19      W-I-G-D-O-R.

20              THE CLERK:  THANK YOU.

21                          DIRECT EXAMINATION

22      BY MR. NELSON:

23      Q.   GOOD AFTERNOON, PROFESSOR.

24      A.   GOOD AFTERNOON.

25      Q.   SO CAN YOU TELL US --
```

```
1              THE COURT:  WAIT, I'M SORRY.

2              MR. NELSON:  I'M SORRY.

3              THE COURT:  TIME IS NOW 3:47.  GO AHEAD.

4              MR. NELSON:  THANK YOU.

5                       DIRECT EXAMINATION

6     BY MR. NELSON:

7     Q.   CAN YOU TELL US WHERE YOU'RE FROM?

8     A.   I'M FROM A SMALL TOWN OUTSIDE OF TORONTO, ONTARIO.

9     Q.   TELL US WHAT YOU DO FOR A LIVING, PROFESSOR?

10    A.   I'M A COMPUTER SCIENCE PROFESSOR AT THE UNIVERSITY OF

11    TORONTO.

12    Q.   SO WE'LL SLOW DOWN A LITTLE BIT, OKAY?

13         SO WHAT SUBJECT MATTER DO YOU TEACH, WHAT COURSES?

14    A.   GENERALLY COMPUTER SCIENCE, SPECIFICALLY, THE AREA OF

15    HUMAN COMPUTER INTERACTION.

16    Q.   AND WHAT DO YOU MEAN BY HUMAN COMPUTER INTERACTION AGAIN?

17    A.   I THINK IT'S BEEN DEFINED A FEW TIMES.  I THINK I WOULD

18    ADD THAT GENERALLY THE STUDY OF THE HUMAN BORROWING KNOWLEDGE

19    AND TECHNIQUES FROM ANTHROPOLOGY, PSYCHOLOGY, AND SOCIOLOGY

20    UNDERSTANDING THE PERSON, AND THEN THE DESIGN OF TECHNOLOGIES

21    TO SUIT THE PERSON, AND GENERALLY THE CREATION OF USER

22    INTERFACES AND RELATED TECHNOLOGIES.

23    Q.   SO CAN WE PUT UP SDX 2735, PLEASE.

24         SO CAN YOU TELL US YOUR EDUCATIONAL BACKGROUND, PLEASE.

25    A.   I RECEIVED AN HONORS BACHELOR OF SCIENCE IN COMPUTER
```

```
1    SCIENCE FROM THE UNIVERSITY OF TORONTO IN 2002; I THEN DID A

2    MASTER'S DEGREE OF COMPUTER SCIENCE, ALSO AT UNIVERSITY OF

3    TORONTO.

4    Q.   WAS THERE A THESIS WITH THAT MASTER'S PROGRAM?

5    A.   THERE WAS, YES.  MY THESIS WAS PUBLISHED AS TWO PAPERS AND

6    IT WAS TECHNIQUES FOR ENTERING TEXT INTO CELL PHONES.

7    Q.   AND THEN DID YOU GET ANOTHER DEGREE AFTER THAT MASTER'S

8    DEGREE?

9    A.   I DID, YES.  I THEN BEGAN MY PH.D. AT THE UNIVERSITY OF

10   TORONTO AND DID MOST OF MY WORK UNDER THE SUPERVISION OF

11   RESEARCHES AT ITS MITSUBISHI ELECTRIC RESEARCH LABS AND AT

12   HARVARD UNIVERSITY.

13   Q.   WHAT YEAR DID YOU GET YOUR PH.D. THEN?  WHEN WAS IT

14   AWARDED IN?

15   A.   2008.

16   Q.   DO YOU HAVE ANY PATENTS WHERE YOU'RE A NAMED INVENTOR ON

17   THE PATENT?

18   A.   I DO, YES, EIGHT PATENTS ON USER INTERFACE TECHNOLOGY.

19   Q.   HAVE YOU TESTIFIED IN COURT BEFORE AS AN EXPERT WITNESS?

20   A.   I HAVE, YES, TWICE BEFORE.

21        MR. NELSON:  NOW, AT THIS POINT, YOUR HONOR, I OFFER

22   PROFESSOR WIGDOR AS AN EXPERT IN COMPUTER SCIENCE AND HUMAN

23   COMPUTER INTERACTION.

24        MR. MCELHINNY:  I'M SORRY.  NO OBJECTION, YOUR HONOR.

25        THE COURT:  ALL RIGHT.  SO CERTIFIED.
```

```
 1            GO AHEAD, PLEASE, MR. NELSON.

 2            MR. NELSON:  THANK YOU, YOUR HONOR.

 3   Q.   SO ARE YOU BEING COMPENSATED FOR YOUR WORK HERE?

 4   A.   I AM, YES.  I'M BEING PAID $450 AN HOUR.

 5   Q.   AND IS THAT AT ALL DEPENDENT ON HOW THE CASE TURNS OUT?

 6   A.   CERTAINLY NOT, NO.

 7   Q.   SO CAN YOU TELL US WHAT OPINIONS YOU'RE HERE TO PRESENT

 8   TODAY, JUST GIVE US A SUMMARY OF THEM?

 9   A.   SURE.  I'M HERE TO PRESENT OPINIONS ABOUT THE VALIDITY OF

10   THE '172 PATENT.  I'VE ALSO BEEN ASKED TO GIVE MY OPINION ON

11   THE SUITABILITY AND APPLICABILITY OF NON-INFRINGING

12   ALTERNATIVES TO THAT PATENT.

13   Q.   OKAY.  SO CAN YOU TURN TO JX 13 IN YOUR BINDER, IT'S THE

14   '172 PATENT, I BELIEVE.

15   A.   YES.

16   Q.   AND SO WHICH CLAIM OF THAT PATENT WAS IT THAT YOU

17   ANALYZED?

18   A.   CLAIM 18.

19   Q.   CAN WE PUT UP SDX 2738.

20            AND JUST REMIND US GENERALLY WHAT THE SUBJECT MATTER IS

21   HERE OF CLAIM 18 OF THE '172 PATENT.

22   A.   YES.  CLAIM 18 DESCRIBES A USER INTERFACE THAT A USER SEES

23   WHEN THEY ARE TYPING TEXT INTO A MOBILE DEVICE, AND THAT USER

24   INTERFACE PRESENTS TO THEM WHAT THEY'VE ACTUALLY TYPED, BUT

25   THEN ALSO POSSIBLE ALTERNATIVES THAT THEY MIGHT HAVE INTENDED
```

1    TO TYPE AND DESCRIBES MECHANISMS BY WHICH THEY CAN SELECT THOSE

2    ALTERNATIVES OR TO KEEP WHAT THEY'VE ACTUALLY TYPED.

3    Q.   SO IN CONNECTION WITH YOUR OPINION THAT YOU'RE GOING TO

4    PRESENT HERE TODAY, DID YOU CONSIDER WHAT THE LEVEL OF ORDINARY

5    SKILL OF SOMEBODY IN THE ART IS?

6    A.   I DID, YES.

7    Q.   AND WHAT'S YOUR OPINION REGARDING THAT?

8    A.   SO SOMEONE WHO WOULD HAVE BEEN A READER OF THIS PATENT

9    WOULD BE SOMEONE WHO HAS A BACHELOR'S DEGREE IN COMPUTER

10   SCIENCE OR COMPUTER ENGINEERING AND HAS TWO YEARS EXPERIENCE OF

11   BUILDING THESE SORTS OF TECHNOLOGIES, THESE INTERFACE

12   TECHNOLOGIES, OR EQUIVALENT EXPERIENCE BY HAVING DONE A

13   MASTER'S DEGREE.

14   Q.   SO LET'S TALK ABOUT YOUR, YOUR OPINION HERE THAT YOU'RE

15   PRESENTING TODAY REGARDING CLAIM 18.

16       IF YOU'D TURN TO DX 492 IN YOUR BINDER.

17           THE COURT:  EXCUSE ME.  I'M SORRY TO INTERRUPT YOU.

18   THE TIME IS 3:52.

19       GO AHEAD, PLEASE, WOULD YOU LIKE A COUGH DROP OR SOME

20   WATER?

21           JUROR:  EXCUSE ME.

22       (PAUSE IN PROCEEDINGS.)

23           JUROR:  CAN I GO CHECK?

24           THE COURT:  YES.  IF YOU WANT TO JUST TAKE A FIVE

25   MINUTE BREAK -- LET'S JUST TAKE A FIVE MINUTE BREAK.  OKAY.

1          MR. NELSON:  OKAY.  THANK YOU, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  THANK YOU.

3      (RECESS FROM 3:53 P.M. UNTIL 3:57 P.M.)

4      (JURY IN AT 3:57 P.M.)

5          THE COURT:  IS EVERYONE OKAY TO PROCEED?

6          JUROR:  YES.

7          THE COURT:  BECAUSE WE COULD POTENTIALLY END EARLY

8   TODAY IF YOU -- WE'VE BEEN MAKING VERY GOOD TIME SO FAR.

9      ARE YOU OKAY?

10         JUROR:  I'M FINE.

11         THE COURT:  OKAY.  ALL RIGHT.  LET'S GO AHEAD THEN.

12     TIME IS 3:58.  WELCOME BACK.  EVERYONE PLEASE TAKE A SEAT.

13     GO AHEAD, PLEASE, MR. NELSON.

14         MR. NELSON:  THANK YOU, YOUR HONOR.

15   Q.   SO LET'S TURN TO DX 492 IN YOUR BINDER.

16   A.   OKAY.

17   Q.   DO YOU HAVE THAT?

18   A.   I DO.

19   Q.   CAN YOU TELL US WHAT DX 492 IS?

20   A.   THIS IS A U.S. PATENT, COMMONLY CALLED THE ROBINSON

21   PATENT.

22   Q.   IS THIS SOMETHING THAT YOU CONSIDERED IN FORMING YOUR

23   OPINIONS?

24   A.   IT IS, YES.

25         MR. NELSON:  YOUR HONOR, AT THIS POINT I MOVE FOR

```
 1      ADMISSION OF DX 492 INTO EVIDENCE.

 2              MR. MCELHINNY:  NO OBJECTION.

 3              THE COURT:  IT'S ADMITTED.

 4          (DEFENDANTS' EXHIBIT 492 WAS ADMITTED IN EVIDENCE.)

 5              THE COURT:  GO AHEAD, PLEASE.

 6      BY MR. NELSON:

 7      Q.   SO CAN WE PUT UP SDX 2749, PLEASE?

 8          SO AT A HIGH LEVEL, CAN YOU DESCRIBE FOR US THE SYSTEM IN

 9      THE ROBINSON PATENT?

10      A.   CERTAINLY.  ROBINSON DESCRIBES A USER INTERFACE THAT,

11      WHILE THE USER IS TYPING ON A TOUCHSCREEN, SHOWS THEM WHAT

12      THEY'VE ACTUALLY TYPED, AS WELL AS SEVERAL SUGGESTED

13      ALTERNATIVES THAT THEY CAN CHOOSE FROM AMONG AND DESCRIBES THE

14      USER INTERFACE FOR DOING THAT.

15      Q.   SO ARE THERE FIGURES THAT DESCRIBE THAT SYSTEM IN THE

16      ROBINSON PATENT?

17      A.   THERE ARE, YES.

18      Q.   SO CAN WE GO TO 2750?  SDX 2750.

19          NOW, WHAT'S SHOWN HERE?

20      A.   THIS IS FIGURE 1A FROM THE ROBINSON PATENT.  IT SHOWS THE

21      TEXT THAT THE USER OF THE SYSTEM IS IN THE MIDST OF ENTERING

22      AND WHERE THE CURSOR POSITION ENDS UP, AND WE SEE THAT IT'S ON

23      A TOUCHSCREEN WITH A KEYBOARD RENDERED ON THAT TOUCHSCREEN.

24      Q.   SO IF -- IF --

25          (PHONE RINGING)
```

```
 1              THE COURT:  WOULD YOU TURN -- IS THAT A PHONE?  CAN
 2    YOU TURN THE PHONE OFF?  WHOSE PHONE IS RINGING?
 3              AUDIENCE MEMBER:  IT'S OFF, YOUR HONOR.
 4              THE COURT:  OKAY.  WHO WAS THAT?  OH, OKAY.  PLEASE
 5    TURN THAT OFF.
 6         GO AHEAD, PLEASE.
 7              MR. NELSON:  THANK YOU, YOUR HONOR.
 8    Q.   SO IF WE GO TO 2751, PLEASE.
 9         NOW, TELL US WHAT'S SHOWN HERE.
10    A.   YES.  SO THIS IS ANOTHER FIGURE FROM THE ROBINSON PATENT,
11     BUT IT'S SHOWING THE USER HAS BEGUN TO ENTER TEXT USING THE
12     INTERFACE THAT IT DESCRIBES.
13         SO HERE THE USER HAS PUSHED THE R KEY ON THE KEYBOARD,
14    WHICH I'VE HIGHLIGHTED IN THE YELLOW OUTLINE.  THAT'S SOMETHING
15    THAT I'VE ADDED TO THE FIGURE.
16         AND WE CAN SEE THAT THE ACTUAL TEXT THAT THEY'VE TYPED,
17    THE LETTER R IS SHOWN IN THIS WINDOW THAT HAS POPPED UP IN
18    FRONT OF WHAT THEY'RE TYPING, AND THE ACTUAL TEXT, R, IS
19    LABELED 515 UP AT THE TOP.
20         WE ALSO SEE SEVERAL SUGGESTED ALTERNATIVES HAVE BEEN
21    DISPLAYED.  THE WORD A, THE WORD R, CAPITAL LETTER R, ET
22    CETERA.
23    Q.   AND IF WE MOVE FORWARD TO 2752.
24    A.   ALL RIGHT.  THIS IS THE NEXT FIGURE FROM THE PATENT.
25    Q.   ALL RIGHT.  CAN YOU TELL US WHAT'S SHOWN HERE?
```

```
 1     A.   CERTAINLY.  SO THIS IS CONTINUING THROUGH THE SAME

 2     SEQUENCE.  THE USER NOW HAS ENTERED THE LETTER W, SO YOU CAN

 3     SEE THEY'VE TYPED R-W, AND WHAT THEY'VE ACTUALLY TYPED IS IN

 4     THIS WINDOW THAT'S SITTING ON TOP HERE LABELED 525.

 5               MR. MCELHINNY:  I'M SORRY.  ARE WE SEEING THE SAME

 6     THING THAT THE JURY IS SEEING?

 7               JUROR:  YES.

 8               MR. NELSON:  I THINK SO.

 9               MR. MCELHINNY:  THIS IS 2752?

10               MR. NELSON:  YEAH, 2752.  IT'S FIGURE 5B FROM THE

11     494.

12               THE WITNESS:  I'M SORRY.

13     BY MR. NELSON:

14     Q.   PLEASE GO AHEAD.

15     A.   SO THEY'VE TYPED THE LETTER W, WE SEE R-W, AND WE ALSO SEE

16     THAT THE SUGGESTIONS BEING PRESENTED TO THE USER HAVE BEEN

17     REFINED.  NOW THERE ARE OTHER OPTIONS BEING SHOWN.

18     Q.   AND NOW IF WE MOVE FORWARD TO 2753.

19     A.   SURE.

20     Q.   AND CAN YOU TELL US WHAT THIS IS?

21     A.   YES.  SO THE USER HAS NOW TYPED THE LETTER Z, SO THEY'VE

22     NOW TYPED R-W-Z, WE SEE THAT ACTUAL SEQUENCE LABELED 535 IN

23     THIS POP-UP WINDOW, AND WE ALSO SEE SEVERAL SUGGESTED

24     ALTERNATIVES THAT THEY MIGHT WANT TO CHOOSE FROM AMONG, WAS,

25     FAX, REX, TAX.
```

DIRECT WIGDOR                                                    2014

1    Q.   NOW, IF WE MOVE FORWARD THEN TO 2754, CAN YOU TELL US WHAT

2    THIS IS?

3    A.   YES.  SO THIS IS THE LAST LETTER IN THIS SEQUENCE, SO THE

4    USER HAS NOW TYPED R-W-Z-T AND WE SEE THAT LABELED 545 THERE,

5    AND WE SEE A SERIES STILL OF SUGGESTED ALTERNATIVES, FACT,

6    REST, YEAR, AND TEXT.

7         AND NOW WHAT'S GOING TO HAPPEN IS THE USER NOW FACES A

8    CHOICE.  THEY CAN TOUCH R-W-Z-T IF, FOR EXAMPLE, THAT'S AN

9    ACRONYM THAT THEY'RE MEANING TO ENTER.  I DON'T KNOW WHAT

10   R-W-Z-T MIGHT BE, BUT LET'S SAY IT'S AN ACRONYM AND THAT'S WHAT

11   THEY ACTUALLY WANT.  IF THEY TOUCH IT, THAT WILL BE THE TEXT

12   THAT IS ACTUALLY RETAINED.

13        OR THEY CAN TOUCH ANY OF THE SUGGESTED ALTERNATIVES, SO IF

14   THEY WANTED TO ENTER THE WORD FACT OR YEAR, FOR EXAMPLE.

15        OR FINALLY, THEY CAN CHOOSE WHAT IS CALLED THE DEFAULT,

16   AND THAT'S THE ONE THAT'S SHOWN IN BOLD, SO THE WORD TEXT

17   LABELED 541.  AND IF THEY WANT THAT ONE, THEY CAN JUST PUSH THE

18   SPACE BAR SAYING THAT IT'S, IT'S FINISHED, AND NOW THAT WORD

19   GETS PLACED INTO THE TEXT AREA.

20   Q.   SO HERE WE'RE ON 2755 THEN.  WHAT FIGURE IS THIS?

21   A.   THIS IS FIGURE 5, I THINK IT'S D FROM MEMORY.  MY SCREEN

22   HAS CUT OFF, UNFORTUNATELY.  OR E.

23   Q.   5E.

24   A.   THANK YOU.

25   Q.   SO THEN WHAT'S SHOWN HERE?  I THINK YOU MENTIONED IT, BUT

1      LET'S JUST --

2      A.    SURE.  SO THE USER HAS PUSHED THE SPACE BAR AND THE SYSTEM

3      HAS AUTO CORRECTED TO NOT ENTER WHAT THEY ACTUALLY TYPED, BUT

4      INSTEAD TO ENTER THIS DEFAULT WORD, TEXT.

5      Q.    SO NOW LET'S WALK THROUGH YOUR OPINIONS ELEMENT BY ELEMENT

6      WITH CLAIM 18.  OKAY?

7      A.    OKAY.

8      Q.    SO IF WE PUT UP 2758 FIRST?  NOW, 2758 WE HAVE HIGHLIGHTED

9      HERE WHAT WE CALL THE PREAMBLE, "A GRAPHICAL USER INTERFACE ON

10     A PORTABLE ELECTRONIC DEVICE WITH A KEYBOARD AND A TOUCHSCREEN

11     DISPLAY, COMPRISING."

12          DO YOU SEE THAT?

13     A.    I DO, YES.

14     Q.    WHAT YOU'RE YOUR OPINIONS CONCERNING THE PREAMBLE AND THE

15     DISCLOSURE?

16     A.    SURE.  AND JUST TO CLARIFY IT, I PREPARED THIS SLIDE SO

17     THAT THE ACTUAL TEXT OF THE CLAIM 18 OF THE '172 IS SHOWN ON

18     THE LEFT, AND WE'LL BE HIGHLIGHTING ONE AT A TIME.

19          AND ON THE RIGHT I'M SHOWING EXCERPTS FROM, MOSTLY FROM

20     ROBINSON, AND I'LL SHOW HOW THEY COMPARE.

21          SORRY.  SO NOW TO ANSWER YOUR QUESTION.

22     Q.    OKAY.  SO WHAT ARE YOU SHOWING HERE WITH RESPECT TO THE

23     PREAMBLE?

24     A.    SURE.  SO HERE WE SEE FIGURE 1A FROM ROBINSON AND IT SHOWS

25     THE PORTABLE ELECTRONIC DEVICE, IT SHOWS THE KEYBOARD, AND IT

1        SHOWS THAT IT HAS A TOUCHSCREEN DISPLAY.

2             SO IT MEETS ALL OF THE REQUIREMENTS OF THE PREAMBLE.

3        Q.   NOW LET'S GO FORWARD TO THE NEXT ELEMENT, AND THIS WOULD

4        BE 2760, I BELIEVE.

5             SO THIS IS "A FIRST AREA OF THE TOUCHSCREEN DISPLAY," AND

6        IT GOES ON.

7             SO WHAT ARE YOUR OPINIONS CONCERNING THIS ELEMENT?

8        A.   YES.  SO THE REQUIREMENT HERE IS THAT THERE IS AN AREA

9        WHERE THE USER IS ACTUALLY ENTERING TEXT, SO THIS MIGHT, FOR

10       EXAMPLE, BE THE BODY OF AN E MAIL OR THE BODY OF A MESSAGE THAT

11       THEY'RE TYPING.

12            AND AS WE SEE IN ROBINSON, THERE IS A FIRST AREA HERE THAT

13       I'VE HIGHLIGHTED THAT SHOWS, IN FIGURE 1B, THAT AREA WHERE THE

14       BODY OF THE MESSAGE WOULD APPEAR.

15       Q.   SO YOU SAID IN YOUR EARLIER EXAMPLE R-W-Z-T WAS THE TEXT

16       THAT WAS ACTUALLY BEING TYPED.  IS THAT RIGHT?

17       A.   THAT'S CORRECT, YES.

18       Q.   NOW, IN THIS FIGURE, DOES THAT SHOW UP IN THE BLUE AREA

19       THAT YOU MARKED AS THE FIRST AREA?

20       A.   IT'S NOT SHOWN IN THIS FIGURE.

21       Q.   OKAY.  SO IS THAT A DIFFERENCE, THEN, BETWEEN ROBINSON AND

22       CLAIM 18?

23       A.   IT'S CERTAINLY A DIFFERENCE BETWEEN THESE FIGURES AND

24       CLAIM 18, YES.

25       Q.   OKAY.  WELL -- SO THEN WHAT DO YOU DO?

1      A.   WELL, A COUPLE OF THINGS.

2           I OBSERVED THAT WHAT THIS REQUIRES, ESSENTIALLY, IS THAT

3      AS THE USER IS TYPING, WHAT THEY TYPE SHOWS UP AT THEIR CURSOR.

4           NOW, THAT ISN'T SHOWN IN THE FIGURES, BUT ANYONE WHO'S

5      USED A COMPUTER SINCE THE LATE 1970S WOULD BE FAMILIAR WITH

6      THIS IDEA THAT WHERE YOU TYPE -- EXCUSE ME -- AS YOU TYPE, THE

7      TEXT SHOWS UP AT YOUR CURSOR.

8           BUT I'VE ALSO BROUGHT AN EXAMPLE THAT I'M USING TO COMBINE

9      WITH ROBINSON THAT SHOWS THAT.

10     Q.   SO WHAT'S THAT EXAMPLE?

11     A.   IT'S A PATENT THAT I PRONOUNCE XRGOMICS.

12     Q.   OKAY.  I'LL PRONOUNCE IT THAT WAY, TOO, OR I'LL AT LEAST

13     TRY.  XRGOMICS.

14          SO CAN YOU TURN TO JX 59 IN YOUR BINDER?

15     A.   YES.

16     Q.   SO CAN YOU TELL US WHAT JX 59 IS?

17     A.   THIS IS THE PATENT THAT I'VE CALLED XRGOMICS.

18          MR. NELSON:  SO, YOUR HONOR, AT THIS POINT I MOVE

19     JX 59 INTO EVIDENCE.

20          MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

21          THE COURT:  IT'S ADMITTED.

22     (JOINT EXHIBIT 59 WAS ADMITTED IN EVIDENCE.)

23          THE COURT:  GO AHEAD, PLEASE.

24     BY MR. NELSON:

25     Q.   NOW, LET'S LOOK AT SLIDE 2763, AND CAN YOU TELL US AT A

1    HIGH LEVEL WHAT THIS XRGOMICS PATENT DESCRIBES, WHAT IS THE

2    SYSTEM IN THE XRGOMICS PATENT?

3    A.   YES.  SO THE FIGURE YOU SEE ON THE RIGHT SIDE OF THE

4    SCREEN NOW IS A FIGURE FROM XRGOMICS, THIS IS FIGURE 5, AND

5    IT -- JUST LIKE ROBINSON AND JUST LIKE CLAIM 18, IT IS A USER

6    INTERFACE FOR A TOUCHSCREEN THAT, AS THE USER TYPES, SHOWS

7    SUGGESTIONS FOR WHAT THEY ACTUALLY MIGHT BE INTENDING TO TYPE.

8        SO WE SEE THE KEYBOARD DOWN AT THE BOTTOM OF THE SCREEN.

9    ABOVE THAT, I HAVE DEVA HIGHLIGHTED, I'LL TALK ABOUT THAT IN

10   JUST A SECOND, AND ABOVE THAT WE SEE A SERIES OF SUGGESTIONS.

11   Q.   SO THEN WHAT IS IT ABOUT THE XRGOMICS PATENT THAT INFORMS

12   YOUR OPINION WITH RESPECT TO THIS FIRST LIMITATION THAT WE'RE

13   LOOKING AT IN CLAIM 18?

14   A.   SO XRGOMICS HAS THE BEHAVIOR YOU WOULD EXPECT FROM ONE OF

15   THESE SYSTEMS WHERE, AS THE USER IS TYPING, WHAT THEY TYPE DOES

16   SHOW UP IN THE SUGGESTIONS BAR, IT'S SHOWN IN 262, THE USER HAS

17   ACTUALLY TYPED DEVA, BUT IT ALSO SHOWS IT IN THE MAIN BODY OF

18   WHAT IT IS THAT THEY'RE TYPING AS WELL, AND YOU SEE THAT IN

19   258.  SORRY.

20   Q.   SO ARE THE ROBINSON PATENT AND THE XRGOMICS PATENT BOTH

21   PRIOR ART TO THE '172 PATENT?

22   A.   THEY ARE, YES.

23   Q.   OKAY.  WHY IS THAT?

24   A.   WELL, BECAUSE THEY WERE PUBLICLY AVAILABLE BEFORE THE '172

25   PATENT WAS FILED.

 1     Q.   ALL RIGHT.  SO NOW DO YOU HAVE AN OPINION ABOUT WHETHER

 2     SOMEONE OF ORDINARY SKILL IN THE ART WOULD COMBINE THESE

 3     REFERENCES?

 4     A.   I DO, YES.

 5     Q.   AND WHAT'S THAT OPINION?

 6     A.   SO AS I'VE SAID, THE PERSON OF ORDINARY SKILL IN THE ART,

 7     SEEING ALL OF THE BEHAVIORS IN ROBINSON AND UNDERSTANDING HOW

 8     THEY WORK, AND THEN SEEING HOW XRGOMICS WORKS, WOULD CERTAINLY

 9     RECOGNIZE THIS ONE MISSING ELEMENT THAT WHAT THEY TYPE SHOWS UP

10     WHERE THEIR CURSOR IS.  I BELIEVE THEY WOULD COMBINE IT.

11     Q.   AND WHY DO YOU SAY THAT?

12     A.   WELL, IT'S NORMAL IN USER INTERFACE -- WHAT I TEACH MY

13     STUDENTS IN HCI 101 IS TO FOLLOW A PROCESS CALLED ITERATIVE

14     DESIGN, AND WHAT THAT MEANS IS YOU LOOK TO THE CURRENT STATE OF

15     THE ART, EITHER ON A SYSTEM THAT YOU'RE LOOKING TO IMPROVE, OR

16     IF YOU'RE TRYING TO CREATE SOMETHING NEW, YOU SURVEY THE FIELD

17     AND YOU EXAMINE WHAT ARE THE BEST PRACTICES.

18          AND WHAT WE TEACH THEM IS TO UNDERSTAND, GIVEN THE

19     CONTEXT, WHAT ARE THE BEST PRACTICES AND TO INCLUDE THOSE IN

20     THEIR NEW INTERFACE.

21          SO IT IS STANDARD PRACTICE FOR SOMEONE IN THIS FIELD.

22     Q.   SO NOW LET'S MOVE FORWARD TO THE NEXT ELEMENT, SDX 2765.

23     THIS IS "A SECOND AREA OF THE TOUCHSCREEN" AND IT CONTINUES.

24          SO CAN YOU TELL US WHAT YOUR OPINION IS WITH RESPECT TO

25     THIS ELEMENT?

1    A.   SURE.  SO THE REQUIREMENT HERE IS THAT -- REMEMBER IN

2    ADDITION TO THIS FIRST AREA WHERE THE PERSON IS ACTUALLY

3    TYPING, THERE HAS TO BE A SECOND AREA, AND THAT SECOND AREA HAS

4    TO CONTAIN A COUPLE OF THINGS.

5         THE FIRST THING IT HAS TO CONTAIN IS WHAT THE PERSON

6    ACTUALLY TYPED, WHAT'S CALLED THE CURRENT CHARACTER STRING, AND

7    IN ROBINSON, IN THE FIGURE I'VE HIGHLIGHTED, THAT R-W-Z-T IS

8    WHAT THEY'VE ACTUALLY TYPED AND IT'S SHOWN IN THIS SECOND AREA,

9    THIS POP-UP MENU THAT HAS COME UP.

10        THE OTHER REQUIREMENT OF THE LIMITATION IS THAT THERE IS A

11   SUGGESTED REPLACEMENT CHARACTER STRING THAT'S ALSO SHOWN IN THE

12   SECOND AREA, AND WE CAN SEE HERE ROBINSON SHOWS, IN FACT, MORE

13   THAN ONE SUGGESTED REPLACEMENT, BUT I'VE HIGHLIGHTED ONE OF

14   THEM, TEXT.

15   Q.   NOW, LET'S MOVE TO THE NEXT LIMITATION THEN AFTER THE

16   WHEREIN CLAUSE -- THIS WOULD BE 2767 -- THAT BEGINS WITH "THE

17   CURRENT CHARACTER STRING IN THE FIRST AREA."

18   A.   YEAH.

19   Q.   CAN YOU TELL US WHAT YOUR OPINION IS WITH RESPECT TO THIS

20   LIMITATION?

21   A.   SURE.  THIS LIMITATION, IN A NUTSHELL, DESCRIBES AUTO

22   CORRECT BEHAVIOR.  SO THIS IS THE SORT OF BEHAVIOR THAT WE'VE

23   SEEN IN WORD PROCESSORS FOR A LONG TIME WHERE IF YOU FINISH A

24   WORD AND YOU HIT THE SPACE KEY AND IT SEES THAT YOU'VE

25   MISSPELLED THE WORD A LITTLE BIT, IT'LL AUTOMATICALLY CORRECT

 1        THAT WORD FOR YOU.  THIS LIMITATION DESCRIBES THAT AUTO

 2        CORRECTING BEHAVIOR.

 3             IN ROBINSON, IT ALSO DESCRIBES THE SAME THING.

 4        Q.   AND SO THE, THE FIGURE THAT YOU HAVE HERE, THAT'S FROM

 5        WHICH PATENT?

 6        A.   I'M SORRY.  THE FIGURE HERE IS FROM ROBINSON.

 7        Q.   OKAY.  IS THERE ANYTHING IN THE TEXT OF THE ROBINSON

 8        PATENT?

 9        A.   YES.  THE FIGURE HERE, I'VE JUST SORT OF HIGHLIGHTED THE

10        SPACE BAR.  BUT YES, IF WE LOOK TO THE TEXT, I CAN SHOW YOU

11        WHERE IT EXPLAINS THAT.

12        Q.   LET'S GO TO 2768.

13             AND CAN YOU EXPLAIN YOUR OPINION WITH RESPECT TO THIS?

14        A.   SURE.

15        Q.   THIS PART OF THE PATENT?

16        A.   SURE.  SO THIS IS TEXT FROM THE ACTUAL BODY OF THE

17        ROBINSON PATENT.  IT DESCRIBES THE BEHAVIOR OF THE SPACE KEY,

18        AND THERE ARE TWO SECTIONS.

19             AT THE TOP, AND I'VE HIGHLIGHTED SOME, THE SPACE KEY OR

20        RETURN KEY, WHEN THAT IS PRESSED, THE DEFAULT WORD IS FLUSHED

21        TO THE OUTPUT TEXT REGION.

22        Q.   AND WHAT DOES THAT MEAN?

23        A.   "FLUSHED" IS A TERM THAT WE USE IN COMPUTER SCIENCE AND IT

24        MEANS MOVING SOMETHING FROM ONE PART OF MEMORY TO ANOTHER.

25             SO THIS IS SAYING THAT WHEN THEY PUSH SPACE, THE CONTENT

1       GETS PUT TO THE OUTPUT TEXT REGION IN THAT FIRST AREA.

2       Q.   AND THEN HOW ABOUT FROM THE SECOND EXCERPT?  THAT'S

3       COLUMN 33, I BELIEVE, OF THE ROBINSON PATENT.

4       A.   YES, THAT'S RIGHT.

5            SO, AGAIN, I'VE HIGHLIGHTED A SECTION HERE, AND IT SAYS

6       THAT THE SPACE KEY ACTS TO ACCEPT THE DEFAULT WORD TEXT AND

7       ENTERS THE WORD TEXT IN THE TEXT OUTPUT REGION AS THE INSERTION

8       POINT.

9            SO IN OTHER WORDS, WHEN YOU HIT SPACE, IT ACCEPTS THE

10      DEFAULT AND IT AUTO CORRECTS.

11      Q.   NOW, LET'S MOVE ON TO THE NEXT LIMITATION, AND IF WE GO TO

12      2769, PLEASE.

13           SO HERE "THE CURRENT CHARACTER STRING IN THE FIRST AREA

14      THAT BEGINS" AND IT CONTINUES.  CAN YOU TELL US YOUR OPINION

15      WITH RESPECT TO THIS ELEMENT, PLEASE?

16      A.   CERTAINLY.  SO THIS LIMITATION -- AND AGAIN, IT'S A LOT OF

17      TEXT TO DESCRIBE SOMETHING PRETTY SIMPLE.  WHAT IT SAYS IS THAT

18      THE TEXT IN THE FIRST AREA IS REPLACED IF THE USER PERFORMS A

19      GESTURE ON THE SUGGESTED REPLACEMENT.

20           SO PUT ANOTHER WAY, IF THEY TAP OR GESTURE ON THE

21      SUGGESTED REPLACEMENT, IT CHOOSES THAT INSTEAD.

22           AND ROBINSON DOES THAT.  SO HERE I'VE HIGHLIGHTED THE

23      SUGGESTED REPLACEMENT TEXT, AND THE CONTENT OF ROBINSON

24      EXPLAINS THAT IF THE USER TOUCHES TEXT, THAT IT GETS PUT INTO

25      THAT FIRST REGION.

1      Q.   NOW, LET'S GO TO THE LAST ELEMENT THEN, THIS IS SDX 2771,

2      PLEASE.

3           SO -- AND THE ELEMENT BEGINS "THE CURRENT CHARACTER STRING

4      IN THE FIRST AREA IS KEPT," AND IT CONTINUES.

5           CAN YOU TELL US WHAT YOUR OPINION IS WITH RESPECT TO THIS

6      LAST ELEMENT OF CLAIM 18, PLEASE?

7      A.   YES.  SO, AGAIN, A LOT OF TEXT TO DESCRIBE SOMETHING

8      SIMPLE.  IT'S JUST THAT IF THE USER PERFORMS A GESTURE ON THE

9      ACTUAL THING THAT THEY TYPED SHOWN IN THAT SECOND AREA, THEN IT

10     WILL KEEP IT, SO THEY CAN CHOOSE IT FROM THAT MENU.

11          AND ROBINSON SHOWS THAT AS WELL.  IT DESCRIBES THAT IF

12     THEY TOUCH THAT R-W-Z-T, WHICH IS -- OH, THANK YOU FOR THE RED

13     ARROW -- IF THEY TOUCH THAT, THAT TEXT WILL BE PUT INTO THE

14     TEXT OUTPUT REGION.

15     Q.   OKAY.  SO THEN WHAT DID ROBINSON AND XRGOMICS, THAT

16     COMBINATION, WHAT DOES THAT TELL YOU ABOUT THE ELEMENTS OF

17     CLAIM 18?

18     A.   IT'S CLEAR TO ME THAT ALL OF THE LIMITATIONS, THE ELEMENTS

19     OF CLAIM 18 ARE PRESENT IN THESE TWO THINGS, AND IT'S CLEAR TO

20     ME THAT CLAIM 18 IS OBVIOUS.

21     Q.   AND WHY DO YOU SAY THAT?

22     A.   WELL, BECAUSE A PERSON OF ORDINARY SKILL WOULD SEE THESE

23     TWO REFERENCES, WOULD RECOGNIZE THIS VERY SIMPLE, ONE THING

24     MISSING FROM ROBINSON, FROM ITS FIGURES ANYWAY.

25     Q.   AND WHICH ONE THING IS THAT AGAIN?

1   A.   THAT IS THAT IN THE FIGURES, IT DOESN'T SHOW THAT WHEN

2   YOU'RE TYPING YOUR TEXT, THAT THAT SHOWS UP WHERE YOUR CURSOR

3   IS.  THAT'S THE ONE THING THAT ISN'T SHOWN IN THE FIGURES.

4   Q.   OKAY.  AND PLEASE CONTINUE.

5   A.   BUT IT IS -- THAT IS CLEARLY PRESENT IN XRGOMICS, AND

6   THAT'S A BEST PRACTICE AND IT WOULD RECOGNIZE THAT.

7   Q.   NOW, ARE YOU FAMILIAR WITH THE IDEA OF A SECONDARY

8   CONSIDERATIONS OF NON-OBVIOUSNESS?

9   A.   I AM, YES.

10   Q.   DID YOU CONSIDER THOSE BEFORE YOU FORMED YOUR OPINION THAT

11   YOU'VE JUST PRESENTED IN THIS CASE?

12   A.   OF COURSE, YES.

13   Q.   AND HOW DID THOSE INFORM YOUR OPINION HERE?

14   A.   WELL, IT'S CLEAR TO ME THAT NONE OF THOSE SECONDARY

15   CONSIDERATIONS WERE MET, AND SO --

16   Q.   WHAT ABOUT COMMERCIAL SUCCESS?

17   A.   WELL, SO COMMERCIAL SUCCESS, AS YOU POINT OUT, IS ONE OF

18   THE EXAMPLES OF THE THINGS THAT WE SHOULD CONSIDER.

19        BUT I'VE SEEN NO EVIDENCE OF ANY COMMERCIAL SUCCESS THAT

20   IS ATTRIBUTABLE TO SOMETHING THAT PRACTICES CLAIM 18.

21   Q.   AND DOES THE IPHONE PRACTICE CLAIM 18?

22   A.   NO.  THE IPHONE CERTAINLY IS COMMERCIALLY SUCCESSFUL, BUT

23   IT DOESN'T HAVE THIS SPECIFIC USER INTERFACE DESCRIBED IN

24   CLAIM 18.

25   Q.   NOW, I WANT TO MOVE FORWARD TO SOMETHING THAT WE'VE TALKED

1    ABOUT.

2         ARE YOU FAMILIAR WITH SOMETHING CALLED THE DART KEYBOARD?

3    A.   I AM, YES.

4    Q.   AND WHAT'S YOUR UNDERSTANDING OF WHAT THE DART KEYBOARD

5    IS?

6    A.   SO THE DART KEYBOARD IS, WELL, A KEYBOARD THAT WAS PRESENT

7    ON A SAMSUNG PHONE CALLED THE DART, AND SO WE CALL IT THE DART

8    ALTERNATIVE.

9    Q.   SO CAN WE PUT UP SDX 2836.

10        NOW, CAN YOU REMIND US HOW THE DART KEYBOARD WORKS,

11   PLEASE.

12   A.   CERTAINLY.  SO WHAT I HAVE HERE ARE TWO PICTURES OF THE

13   DART, AND WHAT THE USER IS INTENDING TO DO IS TO ENTER THE WORD

14   QUESTION.

15        NOW, ON THE LEFT WE CAN SEE THE USER HAS TYPED THE LETTER

16   Q, AND THAT SHOWS UP IN THE BODY OF THIS TEXT MESSAGE.

17        WE ALSO SEE Q SHOWN IN BLUE IMMEDIATELY ABOVE THEIR

18   FINGER.  THAT SHOWS THE ACTUAL TEXT THAT THEY'VE TYPED.

19        BUT THERE ARE NO SUGGESTIONS YET.

20   Q.   NOW, IS THE DART KEYBOARD ACCUSED OF INFRINGING CLAIM 18

21   OF THE '172 PATENT IN THIS CASE?

22   A.   IT'S NOT, NO.

23   Q.   HAVE YOU EVER USED THE SAMSUNG DART?

24   A.   I HAVE.  I -- I SHOULD JUST FINISH DESCRIBING THE REST OF

25   THE BEHAVIOR, THOUGH.

```
 1    Q.   OH, YEAH.  PLEASE DO.  I WAS GOING TO ENTER IT INTO

 2    EVIDENCE.

 3    A.   OKAY.  I'M SORRY TO INTERRUPT.

 4              MR. NELSON:  WELL, I INTERRUPTED YOU.

 5              MR. MCELHINNY:  I'D JUST RATHER SEE US GO QUESTION

 6    AND ANSWER, BUT ANY WAY YOU WANT TO DO IT.

 7              MR. NELSON:  I'M SORRY.

 8         YOUR HONOR, AT THIS POINT CAN I ENTER THE DART, DX 346,

 9    INTO EVIDENCE?

10              MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

11              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

12         (DEFENDANTS' EXHIBIT 346 WAS ADMITTED IN EVIDENCE.)

13              THE COURT:  GO AHEAD, PLEASE.

14    BY MR. NELSON:

15    Q.   SO LET'S GO BACK TO SDX 2836, PLEASE.

16         AND CAN YOU FINISH TELLING US HOW THE DART KEYBOARD WORKS?

17    A.   I CAN, YES.  SO NOW THE PERSON HAS TYPED THE LETTER Q, AND

18    NOW YOU'RE GOING TO SEE THEY'VE PUSHED THE LETTER U ON THE

19    RIGHT SIDE, AND WHAT HAPPENS IS THEY STILL SEE WHAT THEY'VE

20    ACTUALLY TYPED, Q-U, ON THE LEFT SIDE OF THE SUGGESTIONS BAR.

21         THEY ALSO SEE OTHER SUGGESTED ALTERNATIVES, QUESTION AND

22    QUITE.

23         BUT WHAT THE DART KEYBOARD DOES THAT'S A LITTLE BIT

24    DIFFERENT IS THAT AS THE USER IS TYPING, EVERY TIME THEY PUSH A

25    KEY, IT AUTO CORRECTS THE CONTENT IN THE BODY OF THE THING THAT
```

```
 1      THEY'RE TYPING.

 2            SO THE WORD QUESTION IS AUTO CORRECTED HERE WITHOUT HAVING

 3      TO PUSH SPACE OR WITHOUT HAVING TO FINISH THE WORD.

 4      Q.    NOW, LET'S GO TO SDX 2866A.

 5            SO TELL US WHAT IS SHOWN HERE.

 6      A.    THIS IS A TIMELINE THAT I PREPARED OF SEVERAL EVENTS THAT

 7      ARE RELATED TO THE CASE.

 8      Q.    NOW, WHEN WAS THE DART RELEASED, OR THE DART PHONE WITH

 9      THIS DART KEYBOARD YOU JUST DESCRIBED?

10      A.    AS I SHOW IT HERE ON THE LEFT SIDE, IT WAS RELEASED IN

11      JUNE OF 2011.

12      Q.    AND WHEN WAS IT THAT THE PATENT ISSUED?

13      A.    THE PATENT WAS ISSUED IN DECEMBER OF 2011.

14      Q.    SO DO YOU KNOW WHETHER THE DART KEYBOARD WAS RELEASED ON

15      ANY OF THE PRODUCTS, YOU KNOW, THE SAMSUNG PHONES THAT ARE

16      ACCUSED OF OTHER PATENTS IN THIS CASE?

17      A.    I DO KNOW THAT, YES.

18      Q.    AND WHAT'S THE ANSWER?

19      A.    THE -- IT WAS ALSO RELEASED ON THE GALAXY S III.

20      Q.    OKAY.  DO YOU KNOW WHEN THAT WAS?

21      A.    YES.  IT WAS IN MAY OF 2012 AS I SHOW IT THERE ON THE

22      RIGHT SIDE.

23      Q.    SO WERE YOU HERE FOR PROFESSOR COCKBURN'S TESTIMONY?

24      A.    I WAS, YES.

25      Q.    AND YOU RECALL SOME TESTIMONY ABOUT THE DART KEYBOARD?
```

```
1    A.   I DO.

2    Q.   AND DO YOU RECALL WHAT THAT TESTIMONY WAS?

3    A.   HE DESCRIBED THE DART KEYBOARD AS JARRING.

4    Q.   NOW, DID YOU SEE ANY DOCUMENTS OR E-MAIL OR SOMETHING THAT

5    SAID THAT?

6    A.   I DID, YES.  THERE WAS AN E-MAIL SENT WITHIN SAMSUNG THAT

7    WAS TALKING ABOUT ONE OF THE CARRIERS, AND SOMEONE AT ONE OF

8    THE CARRIERS HAD DESCRIBED THE DART ALTERNATIVE AS JARRING AS

9    WELL.

10   Q.   SO DO YOU AGREE WITH THAT?

11   A.   NOT PARTICULARLY, NO, I DON'T AGREE WITH THAT.

12   Q.   WHY IS THAT?

13   A.   WELL, FUNDAMENTALLY WHAT WE'RE TALKING ABOUT IS AUTO

14   CORRECT BEHAVIOR, AND AUTO CORRECT, WELL, LOVE IT OR HATE IT I

15   SUPPOSE, BUT THE -- THE EXPERIENCE THAT THE USER HAS AS THEY'RE

16   TYPING IS THEY -- EVERY TIME THEY ENTER A LETTER, THE SYSTEM

17   AUTO CORRECTS TO BE WHAT IT THINKS IS THE MOST PROBABLE WORD,

18   AND IT'S A VERY USEFUL FEATURE.  IT CAN SAVE A LOT OF TIME.

19   Q.   HAVE YOU HAD EXPERIENCE WITH U/I DESIGN?

20   A.   I HAVE, YES.

21   Q.   HAVE YOU EVER HEARD ANY COMPLAINTS?

22   A.   YES.

23   Q.   CAN YOU EXPLAIN WHAT YOU MEAN?

24   A.   SURE.  THERE'S AN OLD EXPRESSION IN THE USER INTERFACE

25   BUSINESS THAT EVERYTHING IS BEST FOR SOMEONE AND WORST FOR
```

1        SOMEONE ELSE.

2            I DON'T IMAGINE THERE'S AN INTERFACE THAT HAS EVER BEEN

3    MADE THAT DOESN'T HAVE SOMEONE COMPLAINING THAT IT ISN'T WHAT

4    THEY WOULD LIKE.

5            BUT INDIVIDUAL COMPLAINTS ARE CERTAINLY WEIGHED, BUT

6    THERE'S A LOT MORE THAT GOES INTO PRODUCING THESE TEXT ENTRY

7    SYSTEMS.

8    Q.   NOW, I WANT TO TURN TO THE SURVEY BY DR. HAUSER.

9            DID YOU REVIEW THE -- THAT SURVEY WITH RESPECT TO CLAIM 18

10   OF THE '172 PATENT?

11   A.   I DID.  I REVIEWED THE PORTION THAT RELATES TO THAT.

12   Q.   OKAY.  AND CAN WE PUT UP SDX 2867?

13           NOW, BASED UPON YOUR REVIEW, DID YOU FORM ANY OPINION

14   ABOUT THE ACCURACY OF THAT SURVEY?

15   A.   I DID, YES.

16   Q.   AND WHAT'S THAT OPINION?

17   A.   SURE.  SO WHAT WE'RE SHOWING HERE IS THE ACTUAL TEXT THAT

18   WAS PRESENTED TO THE PARTICIPANTS IN THE SURVEY, AND IT

19   DESCRIBES BASICALLY THE INTERFACE DESCRIBED IN CLAIM 18.  IT

20   LEAVES OUT A COUPLE OF DETAILS, BUT THEY ARE IN THE VIDEO THAT

21   ACCOMPANIES IT.

22           BUT MOST CRITICALLY, AT THE END, THE LAST SENTENCE BEFORE

23   MY RED HIGHLIGHTS, THE LAST SENTENCE BEFORE SAYS, "FOR EXAMPLE,

24   IF YOU TYPE 'BIRFDAY' AND THEN PRESS SPACE OR PERIOD, YOU WILL

25   AUTOMATICALLY REPLACE IT WITH 'BIRTHDAY.'"

1          NOW, THIS IS DESCRIBING AUTO CORRECT BEHAVIOR OF THE TYPE

2     THAT WE'VE SEEN FOR DECADES BEFORE THIS PATENT.

3          BUT WHAT IT SAYS IS, NOW IN THE RED UNDERLINED PORTION,

4     "WITHOUT THIS FEATURE," WITHOUT CLAIM 18, "PRESSING SPACE OR

5     PERIOD WOULD RETAIN YOUR ORIGINAL TEXT, 'BIRFDAY.'  IF YOU WANT

6     TO REPLACE YOUR ORIGINAL TEXT, YOU WOULD NEED TO SELECT THE

7     SUGGESTED 'BIRTHDAY' YOURSELF."

8     Q.   AND DO YOU AGREE WITH THAT?

9     A.   I DON'T.

10    Q.   WHAT'S WRONG WITH THAT?

11    A.   SURE.  THIS IS ATTRIBUTING ALL OF AUTO CORRECT BEHAVIOR TO

12    CLAIM 18, AND THIS RED UNDERLINED PORTION DOES NOT ACCURATELY

13    DESCRIBE ALL NON-INFRINGING ALTERNATIVES.

14    Q.   AND WHAT ARE SOME?

15    A.   WELL, FOR EXAMPLE, WITH THE DART KEYBOARD, IF I TYPE

16    "BIRFDAY" ON A DART, IT DOES AUTO CORRECT IT TO "BIRTHDAY."

17    Q.   ANYTHING ELSE?

18    A.   WELL, THE IPHONE ALSO IS AN EXAMPLE OF ONE THAT ISN'T

19    COVERED BY THE CLAIM AND ALSO IS NOT DESCRIBED HERE.

20    Q.   AND TO YOUR UNDERSTANDING, WHAT WAS THE PURPOSE OF THE

21    SURVEY?

22    A.   MY UNDERSTANDING WAS THAT DR. HAUSER WAS ATTEMPTING TO

23    UNDERSTAND THE VALUE OF THESE PATENTS, OF THESE CLAIMS TO

24    SOMEONE'S PURCHASING DECISION.

25    Q.   AND DO YOU THINK THAT THIS SURVEY DOES THAT?

1      A.   WELL, GIVEN THAT IT MISCHARACTERIZES THE NON-INFRINGING

2      ALTERNATIVES, I WOULD POSIT THAT IT DOESN'T.

3                MR. NELSON:   THANK YOU, SIR.   I HAVE NO FURTHER

4      QUESTIONS.

5                THE WITNESS:   THANK YOU.

6                THE COURT:   ALL RIGHT.   THE TIME IS 4:24.   WE'LL JUST

7      GO TO 4:30.   OKAY?

8                MR. NELSON:   WHAT SHOULD I DO WITH THIS?   MY GUYS

9      KEEP THIS?

10               THE COURT:   THAT'S BEEN ADMITTED?

11               MR. NELSON:   YES.

12               THE COURT:   IT CAN GO INTO THE -- WITH ALL THE OTHER

13     PHONES.

14               THE CLERK:   THERE WOULD BE A RED WELL.

15               THE COURT:   WE CAN TAKE CARE OF THAT AT 4:30.

16               MR. NELSON:   OKAY.   THANK YOU, YOUR HONOR.

17               MR. MCELHINNY:   MAY WE HAVE A MINUTE TO SET UP, YOUR

18     HONOR?

19               THE COURT:   YES.

20          (PAUSE IN PROCEEDINGS.)

21               THE COURT:   4:25.   GO AHEAD.

22                              **CROSS-EXAMINATION**

23     BY MR. MCELHINNY:

24     Q.   GOOD AFTERNOON, PROFESSOR.   WERE YOU SITTING HERE WHEN I

25     JUST CROSS-EXAMINED YOUR COLLEAGUE?

```
1    A.   I WAS, YES.

2    Q.   YOU KNOW MY NAME IS HAROLD MCELHINNY?

3    A.   I DO.  NICE TO MEET YOU.

4    Q.   DO YOU KNOW THE NAMES OF THE EXAMINERS ON YOUR PATENTS?

5    A.   I DO.

6    Q.   OKAY, GOOD.

7         HAVE YOU EVER DESIGNED A CONJOINT SURVEY?

8    A.   NO.

9    Q.   ARE YOU HOLDING YOURSELF OUT HERE AS AN EXPERT IN HOW TO

10   DESIGN AND TAKE A SURVEY?

11   A.   I'M NOT, NO.

12   Q.   HAVE YOU EVER DESIGNED ANY SURVEY IN YOUR ENTIRE LIFE?

13   A.   OH, CERTAINLY, YES.

14   Q.   AND YOU'VE GIVEN SURVEYS TO PEOPLE IN THE PUBLIC?

15   A.   YES.

16   Q.   AND YOU WROTE THE QUESTIONS YOURSELF?

17   A.   I HAVE DONE THAT, AND I'VE HAD MY STUDENTS THAT HAVE DONE

18   IT.

19   Q.   AND YOU ARE -- YOU -- YOU HAVE A CERTAIN EXPERTISE, THEN,

20   IN THE ART OF DRAFTING SURVEY QUESTIONS?

21   A.   YES.  I UNDERSTAND THAT I WAS SHOWN A SURVEY OF THAT

22   PARTICULAR TYPE.  I'M NOT AN EXPERT IN THAT TYPE.

23   Q.   DO YOU HAVE EXPERTISE IN OTHER FIELDS RELEVANT TO THIS

24   CASE THAT YOU HAVEN'T TOLD US ABOUT?

25   A.   MAYBE.  I'M SORRY.  YOU'LL HAVE TO TELL ME WHAT'S
```

```
 1      RELEVANT.

 2      Q.   YOU HAVE EIGHT PATENTS?

 3      A.   I DO, YES.

 4      Q.   ARE THEY VALID?

 5      A.   I BELIEVE THAT THEY ARE.  I GUESS WE'LL FIND OUT AS TIME

 6      GOES ON.

 7      Q.   YOU SIGNED A NOTE SAYING THAT THEY WERE VALID AT THE TIME

 8      YOU APPLIED FOR THEM, DIDN'T YOU?

 9      A.   I CERTAINLY BELIEVED THEM TO BE VALID, YES.

10           BUT AS CAN HAPPEN, NEW ART IS DISCOVERED.

11      Q.   THESE ARE U.S. PATENTS?

12      A.   YES, YEAH.

13      Q.   OKAY.  YOU TESTIFIED THAT YOU SAW NO EVIDENCE OF

14      COMMERCIAL SUCCESS.  IS THAT RIGHT?

15      A.   I TESTIFIED THAT I SAW NO EVIDENCE OF COMMERCIAL SUCCESS

16      ATTRIBUTABLE TO CLAIM 18, YES.

17      Q.   AND YOU SPECIFICALLY SAID THE IPHONE ISN'T BECAUSE THE

18      IPHONE DOESN'T PRACTICE THIS CLAIM LANGUAGE?

19      A.   THAT IS WHAT I SAID, YES.

20      Q.   OKAY.  COULD I -- COULD YOU DO ME THE FAVOR OF PUTTING UP

21      YOUR SLIDE 2866A, PLEASE?

22           DID YOU SAY YOU PREPARED THIS SLIDE?

23      A.   I DID, YES.

24      Q.   AND DID YOU CHOOSE THE TERMINOLOGY THAT WAS ON THIS SLIDE?

25      A.   YES.
```

1    Q.   DID YOU CHOOSE THE PHRASE "LAST ACCUSED DEVICE"?

2    A.   I DID.

3    Q.   THAT DEVICE ISN'T ACCUSED ANY LONGER, IS IT, PROFESSOR?

4    A.   I SEE.  NO.  I DIDN'T KNOW THAT TO BE TRUE.  I'M SORRY.

5    Q.   YOU DON'T KNOW THAT THAT INFRINGES THIS PATENT?

6    A.   OH, I SEE.

7         I DO NOW.  YES, I DO KNOW THAT TO BE TRUE.

8    Q.   BECAUSE YOU'RE NOT TESTIFYING ANY LONGER ABOUT

9    NON-INFRINGEMENT; RIGHT?

10   A.   I'M NOT TESTIFYING ABOUT INFRINGEMENT AT ALL, NO.

11   Q.   BECAUSE IN THIS CASE, WHAT USED TO BE THE ACCUSED DEVICES

12   HAVE ALL BEEN FOUND TO INFRINGE; CORRECT?

13   A.   YES, THAT'S MY UNDERSTANDING.

14   Q.   AND THAT INCLUDES THE GALAXY NEXUS PHONE; CORRECT?

15   A.   YES, THAT'S MY UNDERSTANDING.

16   Q.   AND SAMSUNG TELECOMMUNICATIONS AMERICA WAS HELD TO

17   INFRINGE THIS PATENT FOR THE GALAXY NEXUS PHONE; CORRECT?

18   A.   YOU'VE SAID A VERY SPECIFIC NAME OF A COMPANY.  I'VE JUST

19   BEEN REFERRING TO IT AS SAMSUNG.

20        BUT THAT SOUNDS RIGHT, YES.

21   Q.   GOOD ENOUGH.  ONE OF THE SAMSUNG ENTITIES INFRINGED THIS

22   PATENT BY SELLING THE GALAXY NEXUS PHONE; CORRECT?

23   A.   THAT IS MY UNDERSTANDING.

24   Q.   AND HAVE YOU BEEN HERE WHEN THE JURY WAS TOLD THAT THAT

25   WAS A GOOGLE PHONE?

1    A.   I WASN'T HERE WHEN THAT WAS SAID, BUT I UNDERSTAND WHY IT

2    WOULD HAVE BEEN SAID.

3    Q.   AND WERE YOU HERE WHEN THEY SAID THAT GOOGLE CONTROLS THE

4    SOFTWARE OVER THAT PARTICULAR PHONE?

5    A.   I WASN'T HERE WHEN IT WAS SAID, BUT I CAN UNDERSTAND WHY

6    IT WOULD HAVE BEEN.

7    Q.   BUT IT IS SAMSUNG THAT INFRINGES THE '172 PATENT; CORRECT?

8    A.   I -- IT FEELS LIKE YOU'RE ASKING ME TO MAKE A LEGAL

9    CONCLUSION.  I'M NOT -- I DON'T FEEL I HAVE THE EXPERTISE TO DO

10   THAT.

11   Q.   NO.  I'M ASKING YOU IF YOU KNOW WHAT THE RECORD IN THIS

12   CASE IS.

13   A.   I SEE.

14   Q.   IT WAS SAMSUNG THAT WAS HELD TO INFRINGE; CORRECT?

15   A.   THAT'S MY UNDERSTANDING, THAT THEY SELL THE DEVICE, YES.

16   Q.   OKAY.  AND, IN FACT, YOU ISSUED A WRITTEN OPINION IN WHICH

17   YOU SAID THEY DID NOT INFRINGE; CORRECT?

18   A.   UM --

19              MR. NELSON:  OBJECTION, YOUR HONOR.  IT'S RELEVANCE

20   AND 403.

21              MR. MCELHINNY:  GOES TO CREDIBILITY OF THIS WITNESS

22   AND HIS REPORT, YOUR HONOR, AND HIS USE OF MISLEADING CHARTS

23   AND HIS TESTIMONY.

24              THE COURT:  THIS SAYS LAST ACCUSED.

25              I'M GOING TO ALLOW IT.

```
 1            GO AHEAD.  OVERRULED.

 2               THE WITNESS:  I'M SORRY.  COULD YOU REPEAT THE

 3      QUESTION?

 4      BY MR. MCELHINNY:

 5      Q.  YOU GAVE US A WRITTEN REPORT IN WHICH YOU SAID THAT WHAT

 6      USED TO BE THE ACCUSED DEVICES DID NOT INFRINGE THIS PATENT.

 7      THAT WAS YOUR PROFESSIONAL OPINION; CORRECT?

 8      A.  WELL --

 9      Q.  YES OR NO, SIR?

10      A.  YES.  THERE'S CERTAINLY A LOT OF SUBTLETY THAT I THINK

11      NEEDS TO BE EXPLAINED.

12      Q.  I'M -- MR. NELSON IS AN EXPERT IN SUBTLETY.

13            NOW, ISN'T IT A FACT THAT THE PHONES THAT WERE FOUND TO

14      ACCUSE IN THIS CASE, THE SAMSUNG PHONES, HAVE SOLD OVER 7.5

15      MILLION PHONES IN THE UNITED STATES?

16      A.  THAT SOUNDS LIKE ROUGHLY THE RIGHT AMOUNT.

17      Q.  DID YOU CONSIDER THAT AS EVIDENCE OF COMMERCIAL SUCCESS?

18      YES OR NO?

19      A.  I CONSIDERED THAT, YES.

20               MR. MCELHINNY:  OKAY.  YOUR HONOR, IS THIS -- COULD I

21      BREAK AT THIS POINT, PLEASE?

22               THE COURT:  IT'S --

23               MR. MCELHINNY:  I'M -- AS OPPOSED TO STARTING A NEW

24      LINE OF CROSS-EXAMINATION?

25               THE COURT:  ALL RIGHT.  IT'S 4:29 AND 58 SECONDS,
```

```
1          SO --

2               (LAUGHTER.)

3               MR. MCELHINNY:  THANK YOU, YOUR HONOR.

4               THE COURT:  ALL RIGHT.  IT'S 4:30.  I'M GOING TO GO

5     AHEAD AND EXCUSE OUR JURY FOR THE DAY, AND WE WILL NOT HAVE

6     COURT WEDNESDAY OR THURSDAY, BUT WE DO COME BACK ON FRIDAY.

7               AND I DON'T WANT TO GUARANTEE ANYTHING, BUT WE HAVE MADE

8     GOOD PROGRESS.  WE MAY BE ABLE TO HAVE CLOSING ARGUMENTS A DAY

9     EARLIER THAN WHAT WE HAD ORIGINALLY TOLD YOU.

10              I WILL KEEP YOU UPDATED AS THE CASE PROGRESSES.  I MAY

11    HAVE MORE OF AN UPDATE AT THE END OF THE DAY ON FRIDAY AND NEXT

12    WEEK.

13              AGAIN, PLEASE DO NOT RESEARCH OR DISCUSS THE CASE.  WE'LL

14    SEE YOU ON FRIDAY AT 9:00 O'CLOCK.

15              THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

16              (JURY OUT AT 4:30 P.M.)

17              THE COURT:  YOU MAY STEP DOWN.

18              THE WITNESS:  THANK YOU, YOUR HONOR.

19              THE COURT:  ALL RIGHT.  PLEASE TAKE A SEAT.

20              I JUST WANTED TO DO SOME HOUSEKEEPING.

21              JUST TO DO SOME PLANNING, WOULD YOU PLEASE SUBMIT ANOTHER

22    JOINT EXHIBIT LIST UPDATING ALL OF THE EXHIBITS THAT HAVE BEEN

23    ADMITTED SINCE THE LAST LIST?  I THINK THAT WAS FILED, WHAT,

24    THURSDAY AT 11:00?  IS THAT RIGHT?

25              MS. MAROULIS:  SOUNDS ABOUT RIGHT, YOUR HONOR.  WE'LL
```

2038

```
 1        DO THE UPDATED ONE.  WHEN DOES THE COURT NEED IT?

 2               THE COURT:  WELL, I JUST NEED TIME TO CHECK IT

 3     AGAINST MY OWN LIST, SO WHEN CAN YOU -- WHEN IS REALISTIC FOR

 4     YOU TO DO THAT?

 5               MS. KREVANS:  TOMORROW, YOUR HONOR.  WE CAN DO IT

 6     TOMORROW.

 7               MS. MAROULIS:  MAY WE HAVE THURSDAY JUST IN CASE WE

 8     NEED TO CHECK RECORDS AND SEALING?

 9               THE COURT:  THAT'S FINE.  CAN WE SAY THURSDAY AT

10     10:00?

11               MS. MAROULIS:  YES.

12               THE COURT:  SO JOINT EXHIBIT LIST THURSDAY AT

13     10:00 A.M.

14          AND THEN DO YOU ANTICIPATE THAT YOU WILL FINISH WITH YOUR

15     WITNESSES ON FRIDAY?  OR DO YOU THINK YOU'LL GO INTO MONDAY?

16               MS. MAROULIS:  YOUR HONOR, FOR THIS PART OF THE CASE,

17     WE WILL LIKELY GO INTO MONDAY.

18               THE COURT:  YOU WILL LIKELY GO INTO MONDAY?

19               MS. MAROULIS:  YES.

20               THE COURT:  OKAY.  IS APPLE GOING TO MOVE FOR

21     JUDGMENT AS A MATTER OF LAW?

22               MR. MCELHINNY:  WE WILL, YOUR HONOR.

23               THE COURT:  YOU WILL.  ALL RIGHT.  MAYBE WE CAN TALK

24     AT THE END OF DAY -- IT SOUNDS LIKE THAT'S NOT GOING TO HAPPEN

25     ON FRIDAY.
```

```
 1              DO YOU AGREE WITH THAT.

 2              MS. MAROULIS:  YES, YOUR HONOR.

 3              MR. MCELHINNY:  MAY I RAISE, ON THIS TOPIC, A

 4    SLIGHTLY LARGER QUESTION?

 5              WE'RE IN THIS POSITION AGAIN WHERE WE'RE A LITTLE BIT

 6    PERPLEXED BY HOW SAMSUNG IS USING ITS TIME, AND IF THEY DON'T

 7    FINISH THEIR CASE ON FRIDAY, WE'RE -- WE'RE CONCERNED ABOUT

 8    BEING -- WE WOULD LIKE YOUR HONOR TO FIND OUT WHETHER OR NOT

 9    THEY STILL INTEND TO GO FORWARD WITH THEIR COUNTERCLAIMS.

10              MS. MAROULIS:  YOUR HONOR, OUR TIME IS OUR OWN.  WE

11    APPORTION IT THE WAY WE NEED TO AND WE PROVIDE ONLY DISCLOSURE

12    OF WITNESSES.

13              AND YES, WE'RE GOING FORWARD WITH OUR CLAIM.  BUT I DON'T

14    UNDERSTAND THE QUESTION.

15              MR. MCELHINNY:  THAT'S THE -- THAT'S WHAT I NEEDED.

16    THANK YOU, YOUR HONOR.

17              THE COURT:  OKAY.  ALL RIGHT.  SO YOU DO PLAN TO FILE

18    JMOL MOTIONS, BUT IT WILL NOT BE HAPPENING ON FRIDAY.  THAT'S

19    WHAT IT SOUNDS LIKE.

20              MR. MCELHINNY:  YES.

21              THE COURT:  OKAY.  SO THEN WE CAN TALK ABOUT THE

22    TIMING OF THAT BRIEFING ON FRIDAY.  I WOULD SUSPECT THAT WE

23    PROBABLY -- WELL, LET'S TALK ABOUT THAT ON FRIDAY.

24              I WILL -- I ASSUME I NEED TO GIVE YOU A RULING ON THOSE

25    MOTIONS BEFORE THEN APPLE HAS ITS REBUTTAL CASE BEGIN.  IS THAT
```

1    RIGHT?

2           MR. MCELHINNY:  YOU'RE NOT REQUIRED, BUT OBVIOUSLY

3    THAT WOULD BE MOST HELPFUL.

4           THE COURT:  ALL RIGHT.

5           MR. LEE:  YOUR HONOR, THERE ACTUALLY MAY BE SOME

6    TIME, BECAUSE THERE ARE AT LEAST, AT LEAST ONE OR TWO WITNESSES

7    BEFORE THEY FINISH THEIR CASE, INCLUDING THEIR PRIMARY DAMAGES

8    WITNESS WILL BE ON MONDAY, AND THEN THEY START THEIR

9    AFFIRMATIVE CASE AGAINST APPLE.

10          THE COURT:  UM-HUM.

11          MR. LEE:  SO THERE'S SOME TIME TO BUILD IN THE

12   DAMAGES -- WELL, LIKE YOUR HONOR DID BEFORE, BEFORE APPLE WOULD

13   BE REBUTTING THEIR -- REBUTTING THEIR DEFENSIVE CASE.

14       BECAUSE THEY HAVE AT LEAST ONE OR TWO WITNESSES, BY MY

15   COUNT, THAT HAVE NOT BEEN DISCLOSED YET, SO THEY, BY

16   DEFINITION, HAVE TO GO ON MONDAY, INCLUDING DR. CHEVALIER,

17   WHO'S THE PRIMARY DAMAGES PERSON.

18          THE COURT:  WHY COULDN'T SHE GO ON FRIDAY?

19          MR. LEE:  THEY HAVEN'T DISCLOSED.

20          THE COURT:  OH, OKAY.

21          MR. LEE:  THEY HAVEN'T DISCLOSED.

22          THE COURT:  IS THAT REQUIRED TO HAVE BEEN DONE

23   ALREADY?

24          MR. LEE:  YES.

25          THE COURT:  I THINK YOU DON'T FILE UNTIL TOMORROW

```
 1        MORNING.
 2              OH, YOU FILE TOMORROW MORNING OBJECTIONS FOR FRIDAY'S
 3        WITNESSES.
 4                   MR. LEE:  YES.
 5                   THE COURT:  I SEE.
 6                   MS. MAROULIS:  YOUR HONOR, WE DISCLOSED ABOUT FIVE OR
 7        SIX LIVE WITNESSES FOR FRIDAY, AND IT'S A BUNCH OF DEPOSITION
 8        CLIPS.  WE THINK THAT'S GOING TO FILL THE DAY.
 9              AND THEN THERE'S GOING TO BE ONE OR TWO WITNESSES ON
10        MONDAY.
11                   THE COURT:  ONE OR TWO WITNESSES ON MONDAY, SO THEN
12        YOU'LL PROBABLY BE FILING JMOL MOTIONS ON MONDAY THEN.
13                   MS. MAROULIS:  RIGHT.
14                   MR. LEE:  AND WHAT I MEANT TO SAY, YOUR HONOR, IS IF
15        FILING JMOL MOTIONS ON OUR CASE AND THEIR DEFENSES, THEY STILL
16        HAVE -- ON MONDAY THEY STILL HAVE TO START THEIR AFFIRMATIVE
17        CASE AGAINST US.
18                   THE COURT:  RIGHT.
19                   MR. LEE:  THAT'S GOING TO START ON MONDAY, SO THAT
20        GIVES US A LITTLE BIT MORE TIME.
21                   THE COURT:  WELL, MAYBE NOT DEPENDING ON HOW THE TIME
22        IS ALLOCATED.
23              ALL RIGHT.  WELL, WE'LL HAVE TO DEAL WITH THAT ON FRIDAY.
24        I'LL NEED TO BUILD IN SOME TIME TO RULE ON THAT AND -- ALL
25        RIGHT.
```

```
1          I'M ALSO -- LET ME GIVE YOU YOUR TIME TOTALS, BECAUSE WE

2     HAVE MADE GOOD PROGRESS.  I THINK WE'RE GOING TO END EARLIER

3     THAN WE EXPECTED.

4          (PAUSE IN PROCEEDINGS.)

5          THE COURT:  OKAY.  SO TODAY APPLE USED 1 HOUR AND 39

6      MINUTES, AND DESPITE APPEARANCES, I'M NOT COUNTING SECONDS.

7          SO 13, 14 -- SO YOU'VE USED 15 HOURS AND 38 MINUTES TOTAL.

8     THAT'S RIGHT.

9          OKAY.  SO 15 HOURS -- SO YOU HAVE LESS THAN 10 HOURS LEFT.

10         OKAY.  TODAY SAMSUNG USED 3 HOURS AND 55 MINUTES.  THE NEW

11    TOTAL IS 17 HOURS AND 39 MINUTES.

12         SO YOU HAVE, WHAT, 8 HOURS AND 21 MINUTES, SOMETHING LIKE

13    THAT, LEFT.

14         SO BASED ON WHERE WE ARE, THAT MEANS WE'LL ONLY HAVE LESS

15    THAN 17 HOURS OF TRIAL TIME LEFT, AND WE USUALLY DO 5 TO 5 AND

16     A HALF HOURS A DAY.

17         SO I THINK WE WILL BE FINISHED -- WE HAVE FRIDAY, MONDAY,

18    TUESDAY, SO WE'LL BE FINISHING ON FRIDAY MORNING, APRIL THE --

19         MS. KREVANS:  25TH.

20         THE COURT:  APRIL THE 25TH, WHICH IS, I THINK, A

21     LITTLE BIT EARLIER THAN WE HAD ANTICIPATED.

22         WE CAN EITHER USE THAT TIME -- IF THE JURY INSTRUCTIONS

23    ARE READY, I COULD INSTRUCT THE JURY ON THE 25TH.

24         I ASSUME YOU WANT TO DO ALL OF THE CLOSINGS ALL IN ONE

25    DAY.  IS THAT RIGHT?
```

```
 1              MR. MCELHINNY:  YES, YOUR HONOR.

 2              THE COURT:  AND NOT BREAK IT UP --

 3              MS. MAROULIS:  YES, YOUR HONOR.

 4              THE COURT:  -- BETWEEN FRIDAY AND MONDAY?

 5         OKAY.  SO THEN MOST LIKELY WE'D BE CLOSING THEN ON MONDAY

 6    THE 28TH AND DO ALL FOUR HOURS THAT DAY.

 7         SO I WOULD LIKE YOU ALL TO GIVE ME A DATE BY WHICH YOU'RE

 8    GOING TO MEET AND CONFER ON FINAL JURY INSTRUCTIONS,

 9    INCORPORATING ANY CHANGES YOU WANT BASED ON HOW THE EVIDENCE

10    HAS COME IN.

11         WHEN CAN YOU DO THAT?  SO MEET -- UNDERSTANDING THAT I

12    NEED TO FINALIZE THESE INSTRUCTIONS NEXT WEEK, PREFERABLY

13    MIDDLE OF NEXT WEEK POTENTIALLY, FRIDAY AT THE LATEST.

14         WHEN CAN YOU DO THAT?

15              MR. LEE:  HOW WOULD MONDAY BE, YOUR HONOR?

16              THE COURT:  MONDAY?  OKAY.  WILL YOU NEED TO

17    INCORPORATE -- DO YOU THINK YOU'LL NEED TO INCORPORATE ANYTHING

18    THAT HAPPENS DURING THE TRIAL ON TUESDAY, THE 22ND, OR FRIDAY,

19    THE 25TH IN YOUR JURY INSTRUCTIONS?

20              MS. MAROULIS:  YOUR HONOR, WE MAY NEED TO, BUT THERE

21    WILL BE A ONE OFF INSTRUCTION, SO WE CAN ALWAYS ADD THAT

22    SEPARATELY.

23              MR. LEE:  I AGREE WITH THAT.

24              THE COURT:  OKAY.  THEN ON MONDAY -- SO YOU'RE GOING

25    TO FILE YOUR JOINT EXHIBIT LIST THURSDAY, WHICH IS APRIL THE
```

2044

```
1       17TH, AND YOU'LL FILE YOUR JOINT FINAL JURY INSTRUCTIONS ON --

2       CAN WE GET A TIME ON MONDAY?  WHEN CAN YOU DO THAT?

3              MR. LEE:  IS THE END OF THE DAY OKAY, 5:00 O'CLOCK?

4              THE COURT:  THAT'S FINE.

5          NOW, WHAT -- I ASSUME YOU DON'T WANT ANY MORE CHANGES TO

6       YOUR VERDICT FORM, IS THAT RIGHT, THAN WHAT YOU'VE ALREADY

7       SUBMITTED?

8              MS. MAROULIS:  YES, YOUR HONOR.  THE PARTIES HAVE

9       DIFFERENT VERDICT FORMS, SO WE WOULD APPRECIATE AN OPPORTUNITY

10      TO ARGUE IT AT SOME POINT.

11             THE COURT:  OKAY.  LET ME HEAR FROM -- ARGUE IT OR

12      JUST FILE A BRIEF ON IT WITH PAGE LIMITS?

13             MS. MAROULIS:  WHATEVER THE COURT PREFERS.  WE CAN DO

14      EITHER.

15         IT HAS TO DO WITH THE SPECIFICITY AND HOW DETAILED THE

16      VERDICT FORM IS, AND THE AREA OF BIGGEST DISPUTE IS DAMAGES

17      BECAUSE WE HAVE A MUCH MORE DETAILED SUMMARY, OR BASICALLY

18      EXPLANATION OF THE DAMAGES FOR THE JURY TO AVOID ANY ISSUES

19      POST-TRIAL.

20         IF THE COURT PREFERS A WRITTEN PRODUCT, WE'D BE HAPPY TO

21      SUBMIT IT.

22             MR. MCELHINNY:  IF YOU'D GIVE US A COUPLE OF PAGES,

23      YOUR HONOR, I THINK THAT WOULD BE MORE -- EASIER FOR YOUR HONOR

24      TO USE.

25             THE COURT:  OKAY.  AND I DEFINITELY DON'T WANT TO DO
```

1          IT WHILE THE JURY IS WAITING FOR US TO HANDLE THIS.

2              IF I DO NEED ADDITIONAL ARGUMENT AND HAVE QUESTIONS, THEN

3     I CAN ALWAYS SET A HEARING, PERHAPS EVEN ON FRIDAY, THE 25TH,

4     AFTER WE'VE EXCUSED THE JURY FOR THE DAY.  WE'LL FINISH WITH

5     EVIDENCE AND WE CAN TAKE CARE OF THAT.

6              BUT I WOULD LIKE A BRIEF FILED -- WHEN CAN YOU DO THAT?

7              MS. MAROULIS:  WOULD YOU LIKE IT THE SAME DAY AS JURY

8     INSTRUCTIONS ON MONDAY AT 5:00 P.M.?

9              THE COURT:  THAT'S FINE.  MONDAY AT 5:00 P.M.  CAN WE

10    SAY THREE PAGES EACH OR DO YOU NEED MORE THAN THAT?

11             MS. MAROULIS:  THAT SHOULD BE SUFFICIENT.

12             THE COURT:  DO YOU AGREE WITH THAT, OR DO YOU NEED

13    MORE?

14             MR. MCELHINNY:  THAT'S FINE, YOUR HONOR.

15             THE COURT:  OKAY.  SO OTHER THAN THE VERDICT FORM AND

16    THE JURY INSTRUCTIONS AND THE FINAL EXHIBIT LIST AND THE FINAL

17    EXHIBITS, WHICH YOU ALL HAVE THE SAME PROCESS AS YOU DID THE

18    LAST TWO TRIALS OF JUST -- I WANT TO MAKE SURE THAT BOTH SIDES

19    STIPULATE TO EVERYTHING THAT GOES IN THE JURY ROOM.

20             WHAT ELSE DO WE NEED TO START PREPARING?  BECAUSE NEXT

21    WEEK -- YOU KNOW, WE'LL HAVE TO GET EVERYTHING FINALIZED NEXT

22    WEEK SO WE CAN CLOSE ON MONDAY, THE 28TH.

23             MS. KREVANS:  YOUR HONOR, THE PARTIES HAVE BEEN

24    EXCHANGING WHAT WE THINK IS EVIDENCE THAT HAS COME IN, WHETHER

25    THERE HAVE BEEN LIMITING INSTRUCTIONS.

```
 1          WHAT WE HAVE DONE FOR THE PREVIOUS TWO TRIALS IS, AT THE

 2     END OF THE TRIAL WHEN WE HAVE THE ADMITTED EXHIBIT LIST, THE

 3     PARTIES HAVE GOTTEN TOGETHER IN A CONFERENCE ROOM AT SOMEBODY'S

 4     HOTEL WITH PHYSICAL COPIES OF EVERY EXHIBIT AND GONE THROUGH

 5     AND PHYSICALLY CHECKED THEM TO MAKE THE JOINT SET THAT'S GIVEN

 6     TO THE JURY, AND I'M SURE WE CAN DO THAT AGAIN.

 7          THE COURT:  OKAY.  SO I GUESS YOU'LL PROBABLY BE

 8     DOING THAT EITHER THE 23RD AND THE 24TH, THE WEDNESDAY AND

 9     THURSDAY WHEN WE DON'T HAVE TRIAL NEXT WEEK, OR OVER THE

10     WEEKEND.

11          MS. KREVANS:  I THINK IT WILL BE A FUN WEEKEND TASK,

12     YOUR HONOR.

13          THE COURT:  OKAY.  ALL RIGHT.  SO YOU ALL WILL PLAN

14     ON DOING THAT.

15          WHAT ELSE DO WE NEED TO PREPARE FOR THE END OF THE TRIAL?

16     ANYTHING ELSE OTHER THAN THOSE ITEMS?

17          MS. MAROULIS:  THAT SOUNDS ABOUT IT, YOUR HONOR.  IF

18     THERE'S ANYTHING ELSE, WE'LL INFORM THE COURT ON FRIDAY.

19          THE COURT:  OKAY.  I'M ASSUMING, ON THE JMOL'S AS

20     WELL, RATHER THAN HAVING IT BE ORALLY ARGUED, I'LL JUST TAKE

21     BRIEFS OF THE SAME PAGE LIMITS AS THE LAST JMOL'S, AND I GUESS

22     WE CAN TALK ON FRIDAY WHEN WE HAVE A BETTER SENSE OF TIMING AS

23     TO WHEN THOSE SHOULD BE FILED.  OKAY?

24          MR. MCELHINNY:  I THINK AS A TECHNICAL MATTER, YOU'RE

25     GOING TO GET A SERIES OF JMOL'S, YOUR HONOR.  WE HAVE A JMOL AT
```

```
 1       THE CLOSE OF THEIR CLOSE; THERE'S GOING TO BE A JMOL AT THE

 2       CLOSE OF THEIR CROSS CASE; AND THEN THERE'S JMOL'S AT THE CLOSE

 3       OF ALL THE EVIDENCE.

 4            SO I -- I WOULD -- I JUST WANT TO MAKE SURE YOUR HONOR IS

 5       RECEIVING THAT.

 6                 THE COURT:  OH, I KNOW THIS IS GOING TO BE A SERIES.

 7                 MR. MCELHINNY:  THANK YOU.

 8                 THE COURT:  I MEAN, YOU ALL COULD STIPULATE TO MAKING

 9       IT A ONE-SHOT DEAL, BUT I ASSUME THAT'S NOT HAPPENING.

10            SO, NO, I UNDERSTAND THERE'S GOING TO BE A SERIES.

11            I WOULD ASSUME THAT YOU WOULD JUST -- APPLE WOULD JUST

12       FILE ONE SET ON BOTH SAMSUNG'S AFFIRMATIVE CASE AND ON YOUR

13       AFFIRMATIVE CASE.  YOU'RE PLANNING TO SEPARATE IT IN TIME?

14       WHAT IF THERE'S NOT THAT MUCH TIME BETWEEN --

15                 MR. MCELHINNY:  THAT COMES BACK TO MY POINT, WHICH WE

16       DON'T HAVE FULL -- WE DON'T KNOW WHEN THIS CLOSE OF SAMSUNG'S

17       CASE-IN-CHIEF ON ITS CROSS-COMPLAINT IS GOING TO BE.

18            WHAT WE KNOW SO FAR IS THAT THEY HAVE TO CALL THEIR

19       DAMAGES EXPERT IN OUR CASE ON MONDAY BECAUSE THEY HAVEN'T

20       DISCLOSED HER.

21            WHAT ELSE THEY PLAN TO DO ON MONDAY AND HOW THEY PLAN TO

22       USE THEIR TIME, WE DON'T HAVE VISIBILITY TO THAT, SO WE DON'T

23       KNOW WHETHER THEY FINISH -- WE KNOW THAT THEY WOULD FINISH

24       THEIR DEFENSE TO OUR CASE ON MONDAY.

25            WE DON'T KNOW --
```

```
 1              MS. MAROULIS:  IT'LL BE MONDAY MORNING, YOUR HONOR.

 2              MR. MCELHINNY:  WE DON'T KNOW WHEN THEY WILL FINISH

 3     THEIR CASE-IN-CHIEF ON THEIR CROSS-COMPLAINT.

 4              THE COURT:  WELL, I DON'T WANT TWO SEPARATE MOTIONS,

 5     ONE ON YOUR AFFIRMATIVE CASE AND ONE ON SAMSUNG'S AFFIRMATIVE

 6     CASE.  IF THAT'S -- YOU KNOW, THEY -- SAMSUNG HAS NO OBLIGATION

 7     TO SOMEHOW BIFURCATE ITS TIME.  THEY HAVE COMBINED TIME FOR

 8     THEIR AFFIRMATIVE CASE AND THEIR DEFENSIVE CASE TO APPLE'S

 9     AFFIRMATIVE CASE.

10         SO I THINK TRYING TO DRAW SOME DEMARCATION LINE BETWEEN

11     WHAT -- THOSE TWO PRESENTATIONS IS ARTIFICIAL.

12              MR. MCELHINNY:  PERFECT.

13              THE COURT:  AND SO I WOULD JUST WANT ONE SET OF JMOL

14     BRIEFS.

15         I WOULD LIKE IT TO BE THE SAME PAGE LIMITS -- YOU CAN TRY

16     TO CONVINCE ME OTHERWISE -- BUT I WOULD LIKE TO KEEP IT THE

17     SAME PAGE LIMITS AND JUST HAVE ONE SET AFTER SAMSUNG RESTS IN

18     THIS PORTION OF ITS CASE.

19         I UNDERSTAND THAT AFTER THEY REST AND AFTER YOU REST,

20     SAMSUNG WILL PROBABLY WANT TO RENEW ITS JMOL MOTIONS; AND THEN

21     AFTER THEY REST AFTER YOU REST, THEN YOU WILL PROBABLY FILE

22     ANOTHER SET OF JMOL MOTIONS.

23         BUT I DON'T WANT TO HAVE A BIFURCATED ONE AFTER SAMSUNG

24     RESTS THIS NEXT TIME.

25              MR. MCELHINNY:  PERFECT.  I UNDERSTAND THAT.
```

```
1              THE COURT:  OKAY?

2              MR. MCELHINNY:  BUT NOW I JUST DON'T KNOW -- NOW I

3     JUST DON'T KNOW WHEN THAT WILL BE.

4              THE COURT:  IT SOUNDS LIKE IT'S GOING TO BE SOMETIME

5     ON MONDAY POTENTIALLY.

6          CORRECT?

7              MS. MAROULIS:  WE WILL FINISH WITH OUR DEFENSES TO

8     APPLE'S CASE MONDAY MORNING.

9              THE COURT:  OKAY.

10             MS. MAROULIS:  AND WE WILL COMMENCE OUR OFFENSIVE

11    CASE AGAINST THEM.

12             MR. MCELHINNY:  THAT'S WHY WE'RE TRYING TO FIGURE

13    THIS OUT.  GIVEN THE NUMBER OF WITNESSES, IT JUST DOESN'T SEEM

14    POSSIBLE TO US THAT THEY COULD DO ALL OF THAT ON MONDAY.  IT

15    SEEMS LIKE THEY'RE GOING TO GO OVER INTO TUESDAY.

16             MS. MAROULIS:  YES, YOUR HONOR, WE WILL GO INTO

17    TUESDAY.  I JUST CAN'T GIVE A VERY DETAILED BREAKDOWN.  BUT IT

18    WILL START ON MONDAY AND GO INTO TUESDAY, AND DEPENDING ON

19    LENGTH OF THEIR CROSSES, IT MAY OR MAY NOT GO TO FRIDAY.  IT

20    JUST DEPENDS WHAT THEY DO.

21             THE COURT:  OKAY.  THAT'S -- ALL RIGHT.  THAT'S FINE.

22             MS. MAROULIS:  WE WILL UPDATE THE COURT ON FRIDAY,

23    BECAUSE BY THE END OF THE DAY WE CAN TALK MORE ABOUT THE TIMING

24    WHEN WE SEE HOW FAR WE GET ON FRIDAY.

25             THE COURT:  SURE.  AND AT SOME POINT BOTH SIDES WILL
```

```
1      JUST BE HITTING YOUR 25 HOUR TIME LIMITS.  SO SAMSUNG HAS LESS

2      THAN 8 HOURS LEFT AND, AND AS I SAID, APPLE HAS, WHAT, 9 HOURS

3      AND 22 MINUTES LEFT.

4          SO AT SOME POINT WE'RE JUST GOING TO START HITTING THOSE

5      TIME LIMITS NEXT WEEK.

6          WHAT ELSE DO WE NEED TO COORDINATE -- BLESS YOU -- FOR

7      TODAY AND FOR NEXT WEEK?  ANYTHING ELSE?

8              MS. KREVANS:  YOUR HONOR, I JUST WANT TO MAKE SURE I

9      DIDN'T -- BECAUSE I DON'T WANT ANYBODY TO GO AWAY WITH THE

10     MISIMPRESSION -- THAT I DIDN'T MISHEAR THE TIMES.  YOU SAID

11     SAMSUNG HAS NOW USED 17 HOURS AND 39 MINUTES.

12             THE COURT:  YES.

13             MS. KREVANS:  AND I THINK YOU SAID THAT MEANS THEY

14     HAVE ABOUT 8 HOURS AND 21 MINUTES LEFT, BUT I THINK THAT'S

15     ACTUALLY 7 HOURS AND 21 MINUTES LEFT.

16             THE COURT:  THEY HAVE ROUGHLY ABOUT 7 AND A HALF

17     HOURS LEFT.

18             MS. KREVANS:  THANK YOU, YOUR HONOR.

19             THE COURT:  I THINK I MAY HAVE BEEN -- ANYWAY, IF I

20     MISSPOKE, THAT'S MY MISTAKE.

21         YOU HAVE ROUGHLY 9 AND A HALF HOURS LEFT.

22             MS. KREVANS:  THANK YOU, YOUR HONOR.

23             THE COURT:  OKAY.  WHAT ELSE?  ANYTHING ELSE?

24             MS. MAROULIS:  NOTHING ELSE FOR TODAY, YOUR HONOR.

25             THE COURT:  OKAY.  THANK YOU.  I'LL SEE YOU ON FRIDAY
```

1    MORNING.

2              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

3              (WHEREUPON, THE EVENING RECESS WAS TAKEN.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7         WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        _____
          IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076
17

18        _____

19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20

21        DATED:  APRIL 15, 2014

22

23

24

25