Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

APPLE INC., a California Corporation,

Plaintiff,

v.

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

Defendants.

CASE NO. 12-cv-00630-LHK (PSG)

**REBUTTAL EXPERT REPORT OF DR. TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation, and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

Counterclaim-Plaintiffs,

v.

APPLE INC., a California corporation,
Counterclaim-Defendant.

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn & Crutcher LLP

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................... 1

II.     BACKGROUND AND QUALIFICATIONS ............................................................ 1

III.    MATERIALS REVIEWED ....................................................................................... 1

IV.     SUMMARY OF OPINIONS ..................................................................................... 2

V.      LEGAL PRINCIPLES .............................................................................................. 2

        A.      Presumption of Validity ................................................................................. 2

        B.      Priority Date .................................................................................................... 3

        C.      Prior Art .......................................................................................................... 3

        D.      Anticipation .................................................................................................... 4

        E.      Obviousness .................................................................................................... 4

        F.      Indefiniteness .................................................................................................. 5

        G.      Conception and Reduction to Practice ........................................................... 5

VI.     PERSON OF ORDINARY SKILL IN THE ART .................................................... 6

VII.    FURTHER BACKGROUND OF THE '647 PATENT AND RELATED
        TECHNOLOGY ........................................................................................................ 8

        A.      The '647 patent ............................................................................................... 8

        B.      '647 Patent Prosecution History ..................................................................... 9

        C.      Technology Background ................................................................................ 11

VIII.   CLAIM ANALYSIS ............................................................................................... 26

        A.      Disputed '647 Patent Terms and Constructions ........................................... 27

        B.      Claim 6 Is Not Indefinite .............................................................................. 33

IX.     CONCEPTION AND REDUCTION TO PRACTICE OF THE '647 PATENT .................. 33

X.      THE '647 PATENT CLAIMS ARE NOT ANTICIPATED BY THE PRIOR ART ............ 44

        A.      Introduction ................................................................................................... 44

        B.      Case Narrowing ............................................................................................. 45

Gibson, Dunn &

Crutcher LLP

C.   Sidekick & Sidekick Owner's Manual ................................................................ 46

    1.   Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures:" ................................................ 48

    2.   "an input device for receiving data; an output device for presenting the data; a memory storing information including program routines including;" ................................................ 52

    3.   "an analyzer server for detecting structures in the data, and for linking actions to the detected structures;" ................................................ 52

    4.   "a user interface enabling the selection of a detected structure and a linked action; and;" ................................................ 55

    5.   "an action processor for performing the selected action linked to the selected structure; and;" ................................................ 57

    6.   "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines." ............. 58

    7.   Claim 4: "The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in data." ................. 58

    8.   Claim 6: "The system recited in claim 1, wherein the analyzer server includes a string library and a fast string search function for detecting string structures in the data." ................................................ 59

    9.   Claim 8: "The system recited in claim 1, wherein the user interface highlights detected structures." ................................................ 60

    10.  Claim 9: "The system recited in claim 1, wherein the user interface enables selection of an action by causing the output device to display a pop-up menu of the linked actions." ................................................ 60

D.   Mosaic Web Browser/MHonArc System ................................................................ 60

    1.   Overview of Mosaic ................................................................ 60

    2.   Overview of Hypertext Markup Language Applications such as the Mosaic Web browser ................................................................ 62

    3.   The MHonArc/Mosaic system Does Not Anticipate Claim 1 of the '647 patent ................................................................ 65

    4.   Claim 4: "The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in data." ................. 75

    5.   Claim 6: "The system recited in claim 1, wherein the analyzer server includes a string library and a fast string search function for detecting string structures in the data." ................................................ 75

    6.   Claim 8: The system recited in Claim 1, wherein the user interface

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647

ii

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

highlights detected structures................................................................. 75

    7.    Claim 9: "The system recited in claim 1, wherein the user interface enables selection of an action by causing the output device to display a pop-up menu of the linked actions." ...................................................... 76

E.    Perspective Software ......................................................................................... 76

    1.    Overview of Perspective .......................................................................... 76

    2.    Claim 1 .................................................................................................... 78

    3.    Claim 4: "The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in data.".................. 97

    4.    Claim 6: "The system recited in claim 1, wherein the analyzer server includes a string library and a fast string search function for detecting string structures in the data.".......................................................................... 97

    5.    Claim 8: The system recited in Claim 1, wherein the user interface highlights detected structures.................................................................. 97

    6.    Claim 9: "The system recited in claim 1, wherein the user interface enables selection of an action by causing the output device to display a pop-up menu of the linked actions." ...................................................... 97

F.    Embedded Buttons .......................................................................................... 97

    1.    Overview of Embedded Buttons .................................................................... 97

    2.    Claim 1: "A computer-based system for detecting structures in data and performing actions on detected structures:"................................................. 105

    3.    "a user interface enabling the selection of a detected structure and a linked action; and;" .................................................................................. 108

    4.    "an action processor for performing the selected action linked to the selected structure; and;" ........................................................................ 108

    5.    "a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines." .......... 109

    6.    Claim 4: "The system recited in claim 1, wherein the analyzer server includes grammars and a parser for detecting structures in data.".................. 109

    7.    Claim 6: "The system recited in claim 1, wherein the analyzer server includes a string library and a fast string search function for detecting string structures in the data.".......................................................................... 109

    8.    Claim 8: "The system recited in claim 1, wherein the user interface highlights detected structures." ................................................................. 110

    9.    Claim 9: "The system recited in claim 1, wherein the user interface

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647

iii

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

enables selection of an action by causing the output device to display a pop-up menu of the linked actions." ............................................................ 110

XI.     THE SUBJECT MATTER OF THE '647 PATENT CLAIMS WOULD NOT HAVE BEEN OBVIOUS. ......................................................................................... 110

        A.     Introduction ........................................................................................ 110

        B.     The Scope and Content of the Prior Art ............................................. 111

        C.     Differences Between the Prior Art and the Claims at Issue ................. 117

               1.     Sidekick combined with "the knowledge of a person of ordinary skill in the art ......................................................................................... 117

               2.     Embedded Buttons System combined with "the knowledge of a person of ordinary skill in the art .......................................................... 119

               3.     MHonArc System/Mosaic System combined with "the knowledge of a person of ordinary skill in the art ............................................... 120

               4.     Perspective System combined with "the knowledge of a person of ordinary skill in the art ............................................................... 121

               5.     Sidekick combined with  Grune, Salton, and HIG ........................ 123

               6.     U.S. Patent No. 5,437,036 ("Stamps") combined with Larry Koved & Ben Shneiderman, Embedded Menus: Selecting Items in Context ("Koved") ...................................................................................... 125

        D.     Level of Ordinary Skill in the Art ..................................................... 134

        E.     Objective Indicia of Non-Obviousness ............................................. 135

               1.     Commercial Success ..................................................................... 135

               2.     Copying ........................................................................................ 137

               3.     Praise and Recognition of Others .................................................. 140

               4.     Long-Felt but Unresolved Need .................................................... 143

               5.     No Acceptable Non-Infringing Alternatives ................................. 144

               6.     No Simultaneous Invention ........................................................... 144

XII.    REEXAMINATION OF THE '647 PATENT ................................................... 145

        A.     December 10, 2010 Non-Final Office Action ..................................... 146

        B.     February 10, 2011 Response to Non-Final Office Action .................... 146

        C.     June 27, 2011 Non-Final Office Action ............................................. 149

REBUTTAL EXPERT REPORT OF TODD C.                                    HIGHLY CONFIDENTIAL
MOWRY REGARDING VALIDITY OF U.S.                                     ATTORNEYS' EYES ONLY
PATENT NO. 5,946,647                        iv

Gibson, Dunn &
Crutcher LLP

D.     August 11, 2011 Examiner Interview ........................................................ 149

E.     August 29, 2011 Response to Office Action ............................................. 149

F.     December 16, 2011 Final Office Action .................................................... 151

G.     February 16, 2012 Response to Office Action .......................................... 153

H.     June 20, 2013 Board of Patent Appeals Decision .................................... 154

REBUTTAL EXPERT REPORT OF TODD C.                          HIGHLY CONFIDENTIAL
MOWRY REGARDING VALIDITY OF U.S.                          ATTORNEYS' EYES ONLY
PATENT NO. 5,946,647                          v

Gibson, Dunn &
Crutcher LLP

perform on those structures).  *See* '647 Patent at 2:49-53 ("Upon selection of a detected structure, the user interface presents and enables selection of candidate actions.").  Dr. Jeffay fails to address the fact that, unlike the system disclosed in the '647 patent, the computer-based system of Sidekick does not itself perform detection as required by the '647 patent.   In fact, the user invokes the "Dialer" before any structures are allegedly detected.

135.       Sidekick's Dialer feature requires a user to enter various prompts to enable a single telephone number to be highlighted at any given time.  Specifically, after installing the Sidekick application on a computer and opening a document, a user must enter a series of keystrokes – specifically, "Ctrl" and "Alt" – in order to activate Sidekick.  *See* Sidekick 1.5 Owner's Handbook, 1985, Borland International ("Sidekick Handbook"), at 13.  Then, the user must activate the Dialer feature in particular by pressing, e.g., "Alt" and "D".  Sidekick Handbook, at 29.  Only then does the Sidekick Dialer highlight a single item – the first telephone number appearing in a document.  Sidekick Handbook, at 30 ("If you have more than one number on the screen that looks like a phone number, the first one will be chosen.").

136.       Thus, unlike the '647 Patent, the Sidekick system requires user prompts to detect and highlight only the next piece of relevant data, as shown in the Sidekick screenshots below:



**Figure 2-7: Dialer Window**

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                    49

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

**Sidekick Handbook, at 29.**



137.     This is contrary to both the '647 Patent's teaching of a system that itself detects structures in data.  ('647 Patent at Claim 1 ("A computer-based system for detecting structures in data and performing actions on detected structures"), 5:29-31 ("As illustrated in Fig. 6, analyzer server 220 identifies the phone number, post-office address, e-mail address and name.").  This functionality is shown in Figure 6 of the '647 Patent, in which multiple data structures have been detected and presented to the user automatically:

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                    50

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

149.        Sidekick also fails to disclose this limitation because Sidekick does not "creat[e] a specified connection" to or association with any "action", i.e., "computer subroutine that causes the CPU to perform a sequence of operations *on the particular structure to which it is linked*." '647 Patent at 2:31-34 (emphasis added).  Indeed, Dr. Jeffay has not pointed out any statement in the Sidekick Handbook that discloses that software is actually operating on a telephone number structure. Rather, systems such as Sidekick that enable the dialing of a telephone number would simply send the string of numbers it had identified to a hardware modem.  *See*, *e.g.*, Sidekick Handbook at 29 ("The Dialer turns your computer into an automatic dialer provided you have a modem connected to your computer.").  In my opinion, sending a string of digits to a piece of hardware, such as a modem, does not constitute an "action" as understood in light of Judge Posner's construction or the disclosure of the '647 Patent.

150.        Ultimately, Dr. Jeffay's assessment of the Sidekick system, and specifically its Dialer functionality, ignores the fact that the '647 Patent inventors specifically informed the PTO about prior art references similar to Sidekick by including in the body of the patent a discussion of the limited functionality of these systems.  '647 Patent at 1:52-65.  Indeed, the patentees gave the specific example of systems only able to detect telephone numbers, and only able to allow dialing of those numbers, as prior art systems over which they were inventing.  '647 Patent at 1:52-65.  The patent was therefore granted over background art that was functionally identical to Sidekick.[5]

### 4.        "a user interface enabling the selection of a detected structure and a linked action; and;"

151.        The Sidekick Dialer does not disclose a "user interface enabling the selection of a detected structure and a linked action."  First, the "selection of a detected structure," as written in the claim limitation, requires that a particular detected structure can be chosen from a set of structures. Sidekick, however, not the user, dictates which phone number will be highlighted.  Sidekick will only "detect" one structure at a time, and the user has no control over which number will be selected.

_____

[5]  Notably, claims 1, 4, 6, 8, and 9, among others, were recently reaffirmed in reexamination as well.

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                    55

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

Jeffay Validity Report, ¶ 333 ("If you have more than one number on the screen that looks like a phone number, the first one will be chosen. You can then move to the next one by pressing [RIGHT ARROW]....") (citing SAMNDCA0963825, Sidekick Handbook, at 30).  At no point does Sidekick allow a user to select from a multitude of structures.  This can be seen from the screenshot that Dr. Jeffay relies upon in paragraph 331 of his declaration, wherein only one phone number has been identified by Sidekick and highlighted for the user, with no indication that Sidetrack has recognized, or will recognize, a second phone number appearing further down on the screen :



**Sidekick Screenshot**

152.        This is contrary to the teachings of the '647 Patent, in which a user can select one structure from among multiple structures and can choose any one on which to perform an operation via the user interface.  '647 Patent at 3:5-14 ("In a display-type environment, application program interface 230 retrieves the locations in document 210 of the presentation regions for the detected structures from application 167.  Application program interface 230 then transmits this location information to user interface 240, which highlights the detected structures, although other presentation mechanisms can be used.  User interface 240 enables selection of an identified structure

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                                  56

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

by making the presentation regions mouse-sensitive, i.e. aware when a mouse event such as mouse-down operation is performed while the cursor is over the region.").

153.        Similarly, Sidekick does not perform the claim limitation of a "user interface enabling the selection of . . . a linked action."  As with the selection of a detected structure, the selection of an action requires that there be a set of multiple actions from which to select.  When the Sidekick Dialer recognizes a telephone number, however, only a single operation – using the computer's modem to make a telephone call to the number – is available.[6]  In addition, the '647 Patent teaches that when a user selects a portion of detected data, the system presents to the user a context menu of actions to perform on the data selected.  '647 Patent at 4:23-31 ("Upon selection of this structure, user interface 240 presents and enables selection of the linked candidate actions using any selection mechanism, such as a conventional pull-down or pop-up menu.")).  It is from that menu that a user will then be able to "select" a particular action.  Sidekick does not perform this functionality, but instead has a single menu that is persistently present to the user at the bottom of the screen when the Sidekick software is running, both before and after a particular phone number is highlighted.  Indeed, as described above, the user invokes the "Dial" feature before any phone numbers are "detected."

### 5.   "an action processor for performing the selected action linked to the selected structure; and;"

154.        It is my opinion that the Sidekick system does not disclose "an action processor for performing the selected action linked to the selected structure" for at least the reason that the Sidekick system does not allow the performance of a "selected" linked action.  Instead, as discussed above, Sidekick allows only a single operation – calling a telephone number – to be performed relative to any information that has been highlighted in a document.  This is contrary to the teachings of the '647 Patent of presenting a menu of candidate actions to be performed on a specific type of data detected.  '647 Patent at 4:23-31 ("Upon selection of this structure, user interface 240 presents

---

[6]   As shown in the screenshot above, the user may also hit an arrow key to move to another number, if one can be identified by Sidekick, as well as hit other keys to bring up a "Help" menu, visit a general telephone directory, or exit the program.  However, none of these are actions that can be said to be "linked" to a particular detected "structure", or phone number.

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                          57

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

379.     Specifically, Dr. Jeffay alleges that "the inventors themselves were exposed to the types of teachings and systems described" in Dr. Jeffay's "state of the art" section.  Jeffay Validity Report, ¶ 661.  Dr. Jeffay argues that the inventors were aware of the Embedded Buttons system, hyptertext, "centralized assistants like Newton Intelligent Assistant," and that the inventors had "heard of the work of Pandit."  *Id.*  I have already explained why each of these systems and references fail to disclose key elements of the '647 patent claims.  I have also explained that Dr. Jeffay's assertion that the inventors were aware of the Embedded Buttons system is erroneous.

380.     Also, Dr. Jeffay's mention of the inventor's awareness of Pandit is based on an email from Bonnie Nardi regarding a discussion with Mr. Pandit at a CHI conference.  *See id.*  The existence of this email, however, indicates that the inventors had conceived of their invention long before any alleged "awareness" of Mr. Pandit's work, to the extent any such awareness existed. There is no evidence that the statements made by Pandit at the CHI conference were similar to what became the '636 patent; in fact, Dr. Nardi clearly states that Pandit was "a long way from productization."  APLNDC6630-0000118136.

### E.     Objective Indicia of Non-Obviousness

381.     I understand that certain objective factors can evidence the non-obviousness of a claimed invention, including commercial success of the claimed subject matter, copying of the claimed invention by others in the industry, and praise of the invention.  While I do not believe that Dr. Jeffay has demonstrated obviousness as to the asserted claims, my opinion as to non-obviousness is further supported by various of the so-called "secondary considerations."  While I address specific factors and evidence below, I have also reviewed Apple's Supplemental Response to Samsung's Interrogatory No. 5 and the documents cited therein as they relate to the '647 patent, and I agree that the evidence there, which I incorporate here by reference, supports the non-obviousness of the '647 patent.

#### 1.     Commercial Success

382.     As I explained in Section VI. of my Opening Report, which I incorporate here by reference, at least the Apple devices running iOS 3.0 through 6.0 practice the asserted claims of the

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                    135

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

'647 patent.  Apple's sales information, for example that provided in Apple's Supplemental Response to Interrogatory No. 5, shows commercial success of these products.   The "data detector" functionality is one of the functionalities that makes Apple's smartphones "smart," and while it is not the only such feature, it is the combination of such "smart" features that makes Apple's products so unique and successful in the marketplace.  This is evidenced by the materials I cite in section V.E. of my Opening Report, which I incorporate here by reference.

383.      In addition, as I explained in my Opening Report, Samsung's Accused Products incorporate the patented features of the '647 patent.  I understand that these products have achieved substantial commercial success. Indeed, I understand that revenues for the Samsung Accused Products that the '647 patent total several billion dollars.  I have also seen evidence that the benefits conferred by the asserted '647 patent claims are valuable to consumers and drive at least part of the demand for Samsung's Accused Products.  These benefits are described at least in section V.E. of my Opening Report.

384.      In addition, regarding the commercial success of Samsung's products and the relationship to the '647 patent functionality, I have reviewed the expert report of Professor John Hauser.  I understand that Professor Hauser "designed and conducted two separate surveys—one for smartphones and one for tablets—to determine the effect that removing the features related to the patents at issue."  Hauser Report, ¶ 12.  He "also used these surveys to determine what price premium, if any, Samsung consumers are willing to pay for these patent-related features."  Id.  Professor Hauser summarized the results of his analysis as follows:

> The choice simulation results that I have obtained and the robustness checks that I have performed demonstrate that, for both smartphones and tablets, the patent-related features at issue in this case, whether individually or collectively, have substantial effects on Samsung consumers' willingness to buy the relevant Samsung products. My analysis of the data also finds that, on average, Samsung consumers place substantial positive value on the patent-related features at issue in this case.

Hauser Report, ¶ 14.

385.      Specifically, with respect to the ability to detect structures and provide a menu of linked actions for the user to choose from, Professor Hauser found that Samsung smartphone consumers were between 5 and 16 percent less likely to buy a smartphone without this feature.

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                          136

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

Hauser Report, ¶ 118, Exhibit N1.  Professor Hauser further found that "the percentage decline in willingness-to-buy upon removal of" this feature ranged from 4 to 23 percent for tablets.  Id., ¶ 119, Exhibit N2.  Professor Hauser also conducted a market simulation that predicted a "price premium" customers would pay for this feature.  Id., ¶ 129 and Table 9.  This evidence demonstrates that the commercial success of the Apple and Samsung products that practice the '647 patent is driven in a non-trivial amount by the patented features.

386.     I also understand that Samsung has removed other accused features from its products based on Apple's infringement claims, for example, I understand that Samsung removed the Google keyboard from its products because Apple accused that keyboard of infringing U.S. Patent No. 8,074,172.  But Samsung has not removed the accused '647 patent functionality from its devices.  In fact, as I explained in section V.E. of my Opening Report, Samsung has modified the publicly available Android messaging application so that it provides individualized context menus[9] with multiple actions for each detected structure.  In other words, Samsung has designed away from a purported non-infringing alternative to more closely mimic the accused functionality because it recognizes that consumers prefer the system claimed by the '647 patent and, consequently, that this technology plays a role in the commercial success of its products.

387.     Dr. Jeffay does not appear to refute that the Apple products are commercially successful, however, he states there is not sufficient evidence to link this commercial success to the claimed functionality.  Jeffay Validity Report, ¶ 808.  For the reasons discussed above, I disagree with Dr. Jeffay's assertion.  The evidence cited above shows that the '647 patent's technology does drive consumer demand for and the commercial success of Apple's and Samsung's products.

## 2.     Copying

388.     Samsung's copying of the invention is shown by its inclusion of the functionality in the accused products here, as I explained in my Opening Report.  Also, as I identified in section V.E. of my Opening Report, which I incorporate here by reference, I have reviewed several Samsung and

---

[9]  Samsung contends (erroneously) that a single context menu does not infringe the '647 patent.

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                      137

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

Google documents in which they discuss the desirability of incorporating the patented functionality into their products.[10]  In discussing one of these examples, Dr. Jeffay makes the strange argument that it does not show evidence of copying because there is purportedly no indication regarding whether the accused functionality existed in "other applications" such as Browser and Messaging or whether the accused functionality was every actually implemented.  Jeffay Validity Report, ¶ 813.  The documents speak for themselves.  The explicitly discuss the desirability of incorporating the data detectors functionality as found in the iPhone into Samsung's products, including into the Browser and Messaging applications.  Thus, such functionality clearly did not exist at that time.  Moreover, I am familiar with numerous Samsung devices, including the Accused Devices, that now incorporate the patented technology.

389.     There are other examples of copying as well.  For instance, after Apple announced the pending release of Data Detectors, a company named MacSpigot released a software package called "Data Ratchet." MILLER00000897-900; MILLER00001070-75.  Data Ratchet "automatically and instantaneously extracts critical information from web pages, email, or any other text document" and claimed to be "an implementation of the 'Apple Data Detectors' information extraction design currently in development at Apple."

390.     I disagree with Dr. Jeffay's assertion that this evidence is not sufficiently linked to the asserted '647 patent claims, especially given the details provided regarding detection of structures

---

[10] *See, e.g.* SAMNDCA10267763-898 ("Comparative Evaluation Result" containing a "Usability Evaluation" comparing the iPhone with a Samsung device codenamed "Lismore" providing a side-by-side comparison with the iPhone browser, and stating that while the iPhone allows a user to tap the phone number and dial it is "inconvenient to make a call after finding the number through [a] web search" on Samsung devices because the user must "memorize the phone number" and "launch the Dialer to make the call."); SAMNDCA11568028-49, at *47 (discussing implementation of ability to recognize addresses and dates in multiple apps, including the Browser and Messaging, and to have a "popup" when a user selects a detected address or date); S-ITC-001764757 (email exchange regarding implementation of address detection); S-ITC-001742947-3080 (comparison between Samsung S1 and iPhone finding that an improvement to the S1 browser would be to provide links to dial phone numbers like the iPhone does); S-ITC-001750005-196 (comparison with iPhone stating that it is desirable to be able to call phone numbers detected in web pages); S-ITC-0017355469-553, at *519 (discussing desirability of recognizing structures in emails); GOOGNDCAL630-00004854 (email exchange among Google engineers stating "we should be able to do the same thing that was just shown at wwdc.").

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                    138

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

and the explicit reference in some cases to Apple devices or to Apple Data Detectors, which was described in numerous public documents available to Samsung and others. *See, e.g.*, APLNDC630-0000077465-98; APLNDC630-0000098808-16; APLNDC630-0000109800-810; APLNDC630-0000109811-20; APLNDC630-0000133394-404; APLNDC630-0000145737-780; APLNDC630-0000145781-91; APLNDC630-0000145932-65; APLNDC630-0000146424-29; APLNDC630-0000146614-22.

391. Dr. Jeffay misstates the record when he says that he "understands that Apple contends that the first product it released that incorporated this technology was iOS 3 (a/k/a "iPhone OS 3")." Jeffay Validity Report, ¶ 814. Dr. Jeffay's understanding is incorrect. Apple's Interrogatory Responses never state that products using iOS 3 were the "first" Apple products to incorporate the '647 patent technology. In fact, based on my discussions with Apple engineers, as well as my own experience with several Mac computers I have owned, I understand that Mac computers (including MacBook Air, MacBook Pro, Mac mini, iMac, and Mac Pro) running either the OS X 10.5 Leopard operating system or a later version of OS practice the '647 patent, and that a form of the "data detector" functionality was first implemented in Mac OS 8 in 1997, and that it was also used in Mac OS 9. From my discussions with Apple engineers, I also understand that the data detector functionality in iOS 3.0 originated from an existing functionality in Mac OS X. Mac OS X 10.5 was released in 2007, well before any implementation of the accused technology by Samsung, Google, or others. *See* https://www.apple.com/pr/library/2007/10/16Apple-to-Ship-Mac-OS-X-Leopard-on-October-26.html (Apple press release noting release of Mac OS X 10.5 in October 2007); April 23, 2012 Declaration of Cary Clark, ¶ 26 (noting that certain of the accused functionality was introduced to Android version 1.5 in April 2009); April 23, 2012 Declaration of Dianne Hackborn, ¶ 14 (noting that certain of the accused functionality was introduced to Android version 1.0 in 2008).

392. I also disagree with Dr. Jeffay's assertion that Samsung could not have copied the patented technology because Samsung did not have access to Apple's source code. Jeffay Validity Report, ¶¶ 815-816. Dr. Jeffay appears to assert that it is the particular software implementation that constitutes the novel feature of the '647 patent. But the '647 patent itself does not contain source

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                    139

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

code.  And, as discussed above, one of ordinary skill could implement the patented technology in a number of ways.  Dr. Jeffay is simply engaging in hindsight analysis.

### 3.    Praise and Recognition of Others

393.    In addition, the Data Detectors functionality has received praise and recognition from the industry.  Before Apple's full release of the original Apple Data Detectors, Apple sought testers for prototype versions.  The public response was highly positive, with many requesting to be testers and many of those discussing the novelty and utility of the software.  See e.g. WRIGHT0000812-1299.  For example, individuals including a researcher from NASA Ames Research Center requested to be a beta tester, explaining that the "DataDetector technology is just the type of thing that has always made the Mac a popular platform for our scientific community."  WRIGHT00001055.

394.    The new technology received praise from many users who tested it. WRIGHT00001243 ("[I] have been thinking there was something along these lines that was missing, something that made the OS act somewhat like an Internet Browser does at times – everything is linked to the right places (Files and applications) . . . This is it! This is brilliant. It works so simply, and yet it is so smart and sophisticated."); WRIGHT00001299 ("I've been playing with the pre-release version of Apple Data Detectors, and I think this is probably the coolest thing since AppleScript."); WRIGHT00001066 ("Excellent!!! This is truly a major breakthrough idea!!! . . . I hope many people will recognize the huge value in what you're doing. You're helping the computer fit the way humans work, instead of making the human fit exact character sequences into rigid fields, records and forms. Its EXACTLY the kind of value-add I look for in 'Insanely Great' Macintosh software."); WRIGHT00001121 ("WOW! Another brilliant Apple technology!"); WRIGHT00001232 ("I stumbled onto your site and would love to see this technology delivered . . . Thank you for your excellent work.").

395.    Such recognition has taken many other forms, including cellular service providers requiring that phones on their networks practice the '647 patent, Samsung's and other companies' encouragement of its customers to practice the patent, and praise from other programmers.

REBUTTAL EXPERT REPORT OF TODD C.                                    HIGHLY CONFIDENTIAL
MOWRY REGARDING VALIDITY OF U.S.                                    ATTORNEYS' EYES ONLY
PATENT NO. 5,946,647                          140

Gibson, Dunn &
Crutcher LLP

If a message contains a link to a Web page, tap the message and then tap the link to open it in the Web browser.

If a message contains a phone number, tap the message and then tap the phone number to dial the number or add it to your contacts.

APLNDC630-0001902119-277, *183.  Samsung provides similar guidance in other User Guides for the Accused Products.  *See, e.g.*, APLNDC630-0000160976-1176, *986 (Galaxy SII Epic 4G Touch); APLNDC630-Y0000058371-527, *437-38 (Transform Ultra); APLNDC630-0001900018-255, *119 (Galaxy Note II).  Other companies have similarly highlighted the patented functionality to their consumers.  *See e.g.*, APLNDC630-Y0000318688-884, *802 (HTC EVO 4G User Guide); SAMNDCA11040680-834, *766 (HTC Hero); Kyocera000144-321,*237 (Kyocera Milano).  As I explained in my Opening Report, the ITC determined that HTC's Android-based smartphones infringed claims 1 and 8 of the '647 patent.  Also, I served as an expert in *Apple Inc. v. Motorola*, Case No. 1:11-cv-08540 (N.D. Ill.), in which I determined that Motorola's Android-based smartphones also infringed claims 1 and 8.

398.        Apple's Data Detectors functionality also received praise from the public.  For example, one technology blogger explained why the Data Detector functionality in the iPhone obviated the need for having a copy and paste feature.  "Why Apple iPhone Copy and Paste is mostly unnecessary," http://www.myallo.com/blog/2008/08/why-apple-iphone-copy-and-paste-is-mostly-unnecessary/.  This is exactly what the '647 patent describes as the problem it was trying to avoid—automatically detecting structures and providing a set of linked actions so that the user does not have to tediously select, copy, and paste a piece of information into a new application.  *See, e.g.*, '647 patent, 1:13-2:2.

399.        Other technology journalists and bloggers have praised the '647 patent functionality:

The next bit is really clever. Apple has included something it calls Data Detectors in Mail that automatically identify addresses, phone numbers and diary dates so you can add them to the Address Book or iCal.

To add a phone number for example you simply hover over it and a Data Detector menu appears. It gives you the option to create a new contact or add information to an existing one. You can then edit how and where the information will appear in Address Book right in the Mail app.

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                        142

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

Date data detectors enable you to add the event to iCal or check your schedule for the day on which the event is to take place. Data detectors can even tell relative dates apart - say you received an email on Friday 26th in which someone writes, "See you at 10am next Wednesday", the data detectors will know to place the event in your calendar at the correct time, on the correct day and on the correct date.

"7 things you'll love about Leopard: From Quick Look to Data Detectors, this cat positively purrs," http://www.techradar.com/us/news/software/operating-systems/computing/apple/7-things-you-ll-love-about-leopard-132999;

Data Detectors is the best feature from upgrading to Leopard 10.5.2 this week.

Hover over an event, phone number, or address and you'll have an option to add to Address Book or iCal.

Data Detectors- Beau Smith, http://beausmith.com/blog/data-detectors.php;

In my opinion, the best addition to Mail app in Leopard are data detectors. This feature means that Mail will automatically pick out dates, times and addresses so you can add events to iCal or view a map with just a couple of clicks.

Data Detectors in Mail (01/22/09); http://www.macosxtips.co.uk/index_files/data-detectors-in-mail.php;

I wouldn't normally devote a whole blog post to one feature of Mac OS X Leopard, but this one really deserves it.

Data detectors is a huge innovation and something I would love to see in all kind of systems.

Leopard: Data Detectors – Awesome!; http://www.tedeytan.com/2007/11/15/81;

*See also*, *e.g.*, Langberg, Mike, "Show of Potential Apple breaks new ground by displaying what's on its Drawing Board 'Innovation is at the heart of what we do'," San Jose Mercury News (Aug. 7, 1996); The Macintosh Biblioblog: Apple Data Detectors Are So Useful; http://macbiblioblog.blogspot.com/2008/02/apple-data-detectors-are-so-useful.html.

### 4.      Long-Felt but Unresolved Need

400.      While I disagree with Dr. Jeffay's conclusion that the '647 patent was an obvious combination of prior art elements that were well-known, Dr. Jeffay's statements regarding the state of the art actually support the non-obviousness of the '647 patent.

401.      For example, parsers for identifying structures in data were present in the art well before the invention of the '647 patent.  So too were user interface menus.  And since the advent of

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                    143

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

1    I declare under penalty of perjury that the foregoing is true and correct.

2  Dated:  9/13/13

3                                                    Todd C. Mowry

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF TODD C.                    HIGHLY CONFIDENTIAL
MOWRY REGARDING VALIDITY OF U.S.                     ATTORNEYS' EYES ONLY

Gibson, Dunn &