1   JOSH A. KREVITT (CA SBN 208552)
    jkrevitt@gibsondunn.com
2   H. MARK LYON (CA SBN 162061)
    mlyon@gibsondunn.com
3   GIBSON, DUNN & CRUTCHER LLP
    1881 Page Mill Road
4   Palo Alto, CA 94304-1211
    Telephone: (650) 849-5300
5   Facsimile: (650) 849-5333

6   HAROLD J. McELHINNY (CA SBN 66781)
    hmcelhinny@mofo.com
7   JAMES P. BENNETT (CA SBN 65179)
    jbennett@mofo.com
8   JACK W. LONDEN (CA SBN 85776)
    jlonden@mofo.com
9   RACHEL KREVANS (CA SBN 116421)
    rkrevans@mofo.com
10  RUTH N. BORENSTEIN (CA SBN 133797)
    rborenstein@mofo.com
11  ERIK J. OLSON (CA SBN 175815)
    ejolson@mofo.com
12  MORRISON & FOERSTER LLP
    425 Market Street
13  San Francisco, California  94105-2482
    Telephone:  (415) 268-7000
14  Facsimile:  (415) 268-7522

    WILLIAM F. LEE
    william.lee@wilmerhale.com
    WILMER CUTLER PICKERING
    HALE AND DORR LLP
    60 State Street
    Boston, MA 02109
    Telephone: (617) 526-6000
    Facsimile: (617) 526-5000

    MARK D. SELWYN (SBN 244180)
    mark.selwyn@wilmerhale.com
    WILMER CUTLER PICKERING
    HALE AND DORR LLP
    950 Page Mill Road
    Palo Alto, California 94304
    Telephone: (650) 858-6000
    Facsimile: (650) 858-6100

15  Attorneys for Plaintiff and
    Counterclaim-Defendant APPLE INC.

16

17                  UNITED STATES DISTRICT COURT

18              NORTHERN DISTRICT OF CALIFORNIA

19                       SAN JOSE DIVISION

20

21  APPLE INC., a California corporation,

22              Plaintiff,

23       v.

24  SAMSUNG ELECTRONICS CO., LTD., a
    Korean corporation; SAMSUNG
25  ELECTRONICS AMERICA, INC., a New
    York corporation; and SAMSUNG
26  TELECOMMUNICATIONS AMERICA,
    LLC, a Delaware limited liability company,

27              Defendants.

28

Case No.    12-cv-00630-LHK

**APPLE INC.'S MOTION FOR A
PERMANENT INJUNCTION**

Date:  July 10, 2014
Time:  1:30 p.m.
Place:  Courtroom 8, 4th Floor
Judge:  Hon. Lucy H. Koh

REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED

1

**NOTICE OF MOTION AND MOTION**

2   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3       PLEASE TAKE NOTICE that on July 10, 2014, at 1:30 p.m., before the Honorable Lucy

4   Koh in Courtroom 8 of the above-entitled Court, located at 280 South 1st Street, San Jose,

5   California, Plaintiff Apple Inc. will move, and hereby does move, for a permanent injunction

6   against Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung

7   Telecommunications America, Inc.

8       This motion is based on this notice of motion and supporting memorandum of points and

9   authorities and such other written or oral argument as may be presented at or before the time that

10  the Court takes this motion under submission.

11

12  Dated: May 23, 2014                    WILMER CUTLER PICKERING
                                            HALE AND DORR LLP

13                                      By:  /s/ William F. Lee
                                            WILLIAM F. LEE
14

15                                          Attorneys for Plaintiff
                                            APPLE INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................................................. iii

**I.**     **INTRODUCTION** ....................................................................................................... 1

**II.**    **ARGUMENT** .............................................................................................................. 3

    A.    Samsung's Infringement Has Irreparably Harmed Apple........................................ 5

          1.    Apple Has Shown Irreparable Harm to Its Reputation and Brand
                Under *Douglas Dynamics*. ........................................................................... 5

          2.    Apple Has Shown Irreparable Harm Resulting From Its Sales-
                Based Losses Under *Apple III*................................................................... 11

    B.    Money Damages Are Inadequate to Compensate Apple for Samsung's
          Infringement........................................................................................................ 15

    C.    The Balance of Hardships Strongly Favors Entry of an Injunction. ...................... 17

    D.    The Public Interest Favors Injunctive Relief. ...................................................... 19

**III.**   **CONCLUSION** ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Laboratories v. Sandoz, Inc.*,
 544 F.3d 1341 (Fed. Cir. 2008) ........................................................................ 19

*Acumed L.L.C. v. Stryker Corp.*,
 551 F.3d 1323 (Fed. Cir. 2008) ........................................................................ 17

*Apple, Inc. v. Samsung Electronics Co.*,
 678 F.3d 1314 (Fed. Cir. 2012) ........................................................................ 15

*Apple Inc. v. Samsung Electronics Co.*,
 735 F.3d 1352 (Fed. Cir. 2013) ................................................................... passim

*Broadcom Corp. v. Emulex Corp.*,
 732 F.3d 1325 (Fed. Cir. 2013) .................................................................... 4, 19

*Broadcom Corp. v. Qualcomm Inc.*,
 543 F.3d 683 (Fed. Cir. 2008) .................................................................... passim

*Douglas Dynamics, L.L.C. v. Buyers Products Co.*,
 717 F.3d 1337 (Fed. Cir. 2013) ................................................................... passim

*eBay Inc. v. MercExchange, L.L.C.*,
 547 U.S. 388 (2006) .................................................................................... 4, 15

*Edwards Lifesciences AG v. CoreValve, Inc.*,
 699 F.3d 1305 (Fed. Cir. 2012) ............................................................... 3, 4, 16

*i4i Ltd. P'ship v. Microsoft Corp.*,
 598 F.3d 831 (Fed. Cir. 2010) .......................................................................... 15

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
 694 F.3d 51 (Fed. Cir. 2012) ........................................................................... 17

*Presidio Components, Inc. v. American Technical Ceramics Corp.*,
 702 F.3d 1351 (Fed. Cir. 2012) .................................................................... passim

*Trebro Manufacturing, Inc. v. Firefly Equipment, LLC*,
 No. 2013-1437, 2014 WL 137790 (Fed. Cir. Apr. 9, 2014) ................................. 6

*Verizon Services Corp. v. Vonage Holdings Corp.*,
 503 F.3d 1295 (Fed. Cir. 2007) ................................................................. 12, 19

STATUTES

35 U.S.C. § 154 ................................................................................................. 3

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Article I, § 8 ............................................................................................................. 3

## I.    INTRODUCTION

On summary judgment, this Court held as a matter of law that Samsung had repeatedly infringed Apple's '172 patent with respect to multiple Samsung products.  And after a thirteen-day trial, the jury in this case found that Samsung had infringed Apple's '647 and '721 patents tens of millions of times, and had done so willfully for the '721 patent.  Because each prong of the four-factor test for injunctive relief weighs heavily in Apple's favor, the Court should bring Samsung's pervasive and harmful infringement to an end—by entering an injunction (like the one attached at Exhibit A) that narrowly enjoins Samsung from further use of the specific *features* found to infringe the '647, '721, and '172 patents, after expiration of a "sunset period" during which Samsung can swap-in the non-infringing alternatives that it claims are already available and easy to implement.

***Irreparable Harm***:  In *Apple Inc. v. Samsung Electronics Co.*, 735 F.3d 1352 (Fed. Cir. 2013) ("*Apple III*"), the Federal Circuit made clear that patentees can establish irreparable harm in a "variety of ways," including based on the type of harm to "reputation and brand" at issue in *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336 (Fed. Cir. 2013)—where the patentee and infringer were direct competitors, the patentee had a longstanding reputation in the industry as an "innovator" while the infringer did not, and the patentee tried to protect its strong reputation and the uniqueness of its patented technologies by declining to license its patents. The same facts are present here, where even Samsung admits that:  (1) Apple and Samsung are "fierce" direct competitors; (2) Apple has an established reputation as "an amazingly innovative company," while Samsung is viewed as a "fast follower" and "not an innovator"; and (3) much of Apple's success stems from its ability to develop inventive product features, and to preserve the uniqueness of those features by patenting them and refusing to license their use, except in rare circumstances.  Therefore, just like the patentee in *Douglas Dynamics*, Apple will continue to suffer irreparable harm to its reputation as an innovator absent an injunction that precludes Samsung from further infringing use of Apple's patented technologies.

Apple also can independently show irreparable harm arising from the sales and market share that it lost as a result of Samsung's infringement.  For those harms, Apple has proven a

sufficient "causal nexus"—i.e., it has shown "the importance of the claimed invention in the context of the accused products," and "some connection between the patented feature and demand for Samsung's products."  The trial record proves that Apple suffered sales-based losses for each of its infringed patents, and that consumers, Samsung, and Apple all view the three patented technologies as enabling key smartphone features.

*Inadequacy of Money Damages*:  Money cannot adequately compensate Apple for the irreparable harm that it has suffered as a result of Samsung's unlawful infringement.  It would be impossible to quantify the amount of money needed to make Apple whole in light of its damaged reputation as an innovator, for the market share that Apple has unfairly lost to a direct competitor like Samsung, or for the harm that would result if Apple is stripped of its right to exclude a "fierce" direct competitor from using Apple's patented and unique technologies to compete against Apple itself.

*Balance of Hardships*:  Although Samsung's infringement has been widespread, and the resulting irreparable injury to Apple enormous, the relief that Apple seeks is narrow.  Rather than barring entire product lines from the marketplace, Apple merely proposes to stop Samsung from further use of the specific features that the jury found to infringe Apple's three patents (and those features not more than "colorably different").  That form of injunction is no broader than necessary to protect Apple's valuable patent rights, and also allows Samsung to compete on fair terms.  Apple's proposed injunction also provides Samsung with a one-month "sunset period"—a delay in enforcement that should avoid *any* harm to Samsung given its repeated representations at trial that acceptable design-arounds are available *now* and can be implemented quickly and easily within that time period.

*Public Interest*:  Apple has spent many billions of dollars—and undertaken significant risks—to develop its patented technologies, including the three patents at issue here.  The public interest strongly favors protecting that substantial investment.  Nor is there any countervailing risk that the public would be harmed by an injunction.  Having represented that it can design-around Apple's patents completely and quickly, Samsung cannot complain that Apple's narrowly-tailored injunction will deprive the public of a single Samsung product.

In sum, because injunctive relief is necessary to protect Apple's reputation, products, and patented technologies from further abuse, and because Samsung and the public would not suffer any resulting prejudice, the Court should enter Apple's proposed permanent injunction. Otherwise, Samsung will continue to exploit its strategy of using Apple's patented inventions to compete directly against Apple, knowing that it can avoid any meaningful consequences of its infringement. Indeed, immediately after the jury verdict in this case, Samsung's lead counsel publicly declared victory *for Samsung*—even though juries and the ITC have now found that Samsung has infringed ***eleven different Apple patents***—because it is now "years into the holy war" and "they have not collected a nickel" "or succeeded in taking any products off the market." This strategy to delay, and ultimately prevent, any meaningful relief is, and has been, a conscious choice by Samsung. (Decl. of Mark D. Selwyn in Support of Apple Inc.'s Mot. for a Permanent Injunction ("Selwyn Decl."), Ex. 1 [Vanity Fair Article].) Only an injunction can finally end Samsung's unfair and illegal practice of trying to compete with Apple through infringement.

## II.    ARGUMENT

"A patentee's right to exclude is a fundamental tenet of patent law." *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012). That right stems directly from the Constitution, and is protected by Congressional statute. U.S. Const., art. I, sec. 8 ("The Congress shall have power . . . [t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."); 35 U.S.C. § 154(a)(1) ("Every patent shall contain . . . a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States . . . .").

But the right to exclude is not automatic. Rather, to obtain injunctive relief following a finding of patent infringement, a patentee must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The Supreme Court and Federal Circuit have confirmed, however, that courts applying this four-prong test "normally" should impose injunctive relief in the "vast majority" of cases finding patent infringement—especially those involving direct competitors and patentees who generally do not license their patents.  *See eBay*, 547 U.S. at 395 (Roberts, C.J., concurring) (explaining that *eBay* should be applied consistently with the "long tradition of equity practice" to "grant[] injunctive relief upon a finding of infringement in the vast majority of patent cases"); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013) ("The courts have a long history of remedying trespass on property rights—including patent rights—by removing the trespasser."); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012) (holding that a proper *eBay* analysis "proceeds with an eye to the 'long tradition of equity practice' granting 'injunctive relief upon a finding of infringement in the vast majority of patent cases,'" and noting that "the axiomatic remedy for trespass on property rights is removal of the trespasser"); *Edwards*, 699 F.3d at 1314 ("Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement.").

That "normal" result should apply here.  As detailed below, the trial record confirms that each prong of the *eBay* test strongly favors an award of injunctive relief to Apple—particularly given the narrow form of Apple's proposed injunction, which merely enjoins Samsung from further use of the specific infringing ***features***, and which includes a "sunset period" that grants Samsung the full amount of time that it said it needs to implement design-arounds.  At bottom, the Constitutional and statutory right to exclude would largely be meaningless if Apple—one of the most innovative companies in the world, and which carefully guards its right to exclude—cannot bar a "fierce" direct competitor from using Apple's patented inventions to compete directly against Apple itself.

### A.      Samsung's Infringement Has Irreparably Harmed Apple.

Consistent with principles of equity, the Federal Circuit has explained that a patentee may satisfy the irreparable harm requirement in "a variety of ways."  *Apple III*, 735 F.3d at 1361-62 (discussing Federal Circuit's post-*eBay* injunction decisions); *see Douglas Dynamics*, 717 F.3d at 1344 ("Irreparable injury encompasses different types of losses . . . .").  For example, in *Apple III*, the Federal Circuit explained that patentees can establish irreparable harm based on lost sales, lost market share, and harm to "ecosystem," if those sales-based losses have a sufficient "causal nexus" to the claimed invention.  *See Apple III*, 735 F.3d at 1361-62.

*Apple III* further recognized, however, that other "distinguishable" types of harm can satisfy the irreparable harm prong as well—including the type of harm to "reputation and brand distinction" at issue in *Douglas Dynamics,* for which the Federal Circuit did not require proof of a "causal nexus" (presumably because that type of reputational harm flows directly from the mere fact of infringement).  *Id.* at 1362 (finding *Douglas Dynamics* "distinguishable" from cases involving a "causal nexus" because "the evidence showed the patentee had suffered irreparable 'erosion in reputation and brand distinction' as a result of the defendant's infringement – a type of harm not asserted by Apple").

As detailed below, the record confirms that, absent an injunction, Apple will continue to suffer at least two types of irreparable harm due to Samsung's ongoing, massive infringement: (1) the same type of harm to "reputation and brand" that warranted an injunction in *Douglas Dynamics*; and (2) the same type of sales-based harm that was at issue in *Apple III*.

### 1.      Apple Has Shown Irreparable Harm to Its Reputation and Brand Under *Douglas Dynamics*.

In *Douglas Dynamics*, the Federal Circuit reversed the district court's finding of no irreparable harm based on five factors, all of which are present here.

***First***, the Federal Circuit relied on the direct competition between the patentee and infringer:  "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and

1  infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d at 1345.  Similarly, in this

2  case, witnesses from both parties confirmed the "fierce" and "extreme[]" direct competition

3  between Apple and Samsung in the smartphone and tablet markets.  (Tr. [Schiller] at 471:10-

4  472:20 (describing the "extremely competitive environment with Samsung"); Tr. [Chevalier] at

5  2433:9-17 ("Apple and Samsung are fierce competitors in this market . . . ."); Tr. [Sohn] at

6  1635:20-25 & PX 216.003 ("Beating Apple is no longer merely an objective.  It is our survival

7  strategy."); PX 3002 [DiCarlo Dep.] (identifying Apple as Samsung's "largest smartphone

8  competitor in the – in the US market").)

9      The Federal Circuit has recently and repeatedly confirmed that the mere existence of

10  this undisputed direct competition alone weighs "strongly" in favor of finding that Apple has

11  suffered (and will continue to suffer) irreparable injury as a result of Samsung's infringement.

12  *See Presidio*, 702 F.3d at 1363 ("Direct competition in the same market is certainly one factor

13  ***suggesting strongly*** the potential for irreparable harm . . . ." (emphasis added)); *Trebro Mfg., Inc.*

14  *v. Firefly Equip., L.L.C.*, No. 2013-1437, 2014 WL 1377790, at *9 (Fed. Cir. Apr. 9, 2014)

15  ("Trebro and Firefly are direct competitors selling competing products in this market.  Thus, the

16  record ***strongly shows*** a probability for irreparable harm." (emphasis added)).

17      ***Second***, in *Douglas Dynamics*, the Federal Circuit found that the patentee had "earned

18  itself a reputation in the marketplace as an innovator and trusted supplier of quality

19  snowplows," and that its "reputation as an innovator will certainly be damaged if customers

20  found the same 'innovations' appearing in competitors' snowplows." *Douglas Dynamics*, 717

21  F.3d at 1344-45 (explaining irreparable harm to the patentee's reputation would exist "[e]ven

22  absent consumer confusion" resulting from the infringement).  Likewise, in this case, Apple's

23  reputation as an "innovator" was one of the few agreed-upon facts at trial.

24      For example, at the outset of the trial, Samsung's counsel proclaimed in his opening

25  statement that "Apple is an amazingly innovative company."  (Tr. [Quinn] at 360:1-2.)  And

26  Phil Schiller, who leads Apple's Marketing Group, testified (without rebuttal) that Apple seeks

27  patents to build and protect its reputation as an innovator, and to preserve the uniqueness of its

28  patented features:

> We're a product company, a technology product company. We make products that are hopefully unique and special . . . . And those inventions, if they're unique and special, we want to use them in our products for ourselves, to differentiate ourselves from the rest of the market. And patents hopefully help to protect us so that we can do that and have our unique advantages. They also help identify those things that we've created in our products that are unique to Apple that people will recognize and see as Apple inventing them, being the creative inventor company that we like to be seen as. I think it's really important to the very DNA of Apple that we're an innovator who creates unique differentiations in our products that customers value.

(Tr. [Schiller] at 451:8-452:9.)  Mr. Schiller further explained (also without rebuttal) that by destroying Apple's ability to maintain exclusive control over the uniqueness of its patented features, Samsung had irreparably tarnished Apple's reputation as an innovator:

> [I]t confuses customers about the source of those things, whether Apple is being [an] innovator and doing these things or whether Samsung or someone else is innovating, and that confuses customers and to the extent that this happens a lot and it's happening on a very large scale, more and more it diminishes whether people even see Apple as the innovator we are in the things we're creating.

(*Id.* at 469:15-470:18; *id.* at 473:25-474:21 ("[Samsung's infringement] has caused people to question some of the innovations that we've created and Apple's role as the innovator.").)[1]

This damage to Apple's reputation as an innovator is particularly acute for the '647 and '721 patents, which Apple itself practices. At trial, Apple software engineer, Thomas Deniau, testified that most of Apple's products (including iPhones and iPads) use "data detectors"—software that, just as claimed in the '647 patent, scans text to identify certain types of structures (e.g., phone numbers, dates, email addresses) and provides options to users based on the specific types of detected structures (e.g., save a detected email address in an address book, or compose a new email using the address). (Tr. [Deniau] at 789:23-790:13, 791:15-18 ("Most of Apple's products use data detectors. Macs use it. iPhones use it. iPads use it. iPod Touches also."); *see also* Tr. [Mowry] at 830:3-831:23 (explaining benefits of the '647 invention).)

Likewise, Apple inventor Greg Christie testified regarding the "slide-to-unlock" feature of the '721 patent—which he invented during development of the original iPhone to provide a

---

[1]   As Mr. Schiller explained, this is an important problem for Apple because its marketing strategy showcases Apple's products as the "hero," and that strategy is less effective when Apple cannot maintain the exclusivity of its patented features. (*Id.* at 469:15-470:18.)

1  reliable and easy solution for the problem of accidental dialing when using a touchscreen

2  smartphone.  (Tr. [Christie] at 598:17-599:17, 599:25-601:12.)  Mr. Christie, Mr. Schiller, and

3  Apple's technical expert, Dr. Andrew Cockburn, also collectively explained that Apple still

4  uses the invention of the '721 patent today, and that Apple's long-standing promotion and use

5  of the "slide-to-unlock" feature has made it a unique element of an iPhone user's experience.

6  (Tr. [Christie] at 600:23-602:5 ("It was also the first thing they'd see when they bought it, they

7  took it home and they'd plug it in, the battery charges, it comes on and it's going to sit there

8  saying slide to unlock.  So this was – this was the customer's first experience."); *id.* at 610:18-

9  20 (all iPhones use "slide-to-unlock"); Tr. [Schiller] at 432:18-433:18 & PX 180 (explaining

10  how Apple's first iPhone ad purposefully "started with the slide to unlock feature" because

11  Apple wanted to "start[] the ad with something you're going to be doing every day, many,

12  many times a day, which is to unlock the screen, and to do that, you use a simple gesture, slide

13  to unlock . . . [a]nd that one starting point was a great beginning to your understanding of what

14  an iPhone is and what this kind of device can do"); Tr. [Cockburn] at 635:23-636:3 (noting

15  benefits of the '721 invention and discussing Apple's practice of it).)[2]

16      The harm to Apple's reputation is not diminished simply because Samsung's infringing

17  smartphones include other features not covered by the '647, '721, and '172 patents.  In *Douglas*

18  *Dynamics*, the Federal Circuit expressly rejected the defendant's argument that an injunction

19  was inappropriate merely because the infringed patent "cover[ed] only some components of the

20  accused snowplow assemblies."  717 F.3d at 1343-44.

21      Nor can Samsung deny the importance of proprietary technologies that help differentiate

22

23  [2]   Although Apple did not prove at trial that it practices the sole asserted claim of the '172 patent
(directed to autocorrect technology), the Federal Circuit has repeatedly held that a non-practicing,

24  but product-supplying patentee may be irreparably harmed if forced to compete with products
embodying the patentee's own claimed invention.  *See Trebro*, 2014 WL 1377790, at *9 ("[T]he

25  fact that Trebro does not presently practice the patent does not detract from its likely irreparable
harm."); *Presidio*, 702 F.3d at 1363 (holding that "the district court placed too much weight on

26  Presidio's failure to practice the '356 patent" where Presidio's products "embod[ied] similar
technology" and the parties were "close competitors"); *Broadcom Corp. v. Qualcomm Inc.*, 543

27  F.3d 683, 703 (Fed. Cir. 2008) ("Broadcom provided evidence of irreparable harm, despite the
fact that it does not currently practice the claimed inventions.").  Those facts exist here given that

28  Apple's products include an autocorrect feature.  (Tr. [Cockburn] at 695:18-23, 749:2-750:8.)

a company's products from those of its competitors.  At trial, Samsung's own Chief Marketing Officer, Todd Pendleton, admitted that "innovation leadership" is critically important, and that Samsung "tout[s] in [its] advertising . . . where [Samsung] come[s] to market first with those leading edge innovations."  (Tr. [Pendleton] at 1704:4-22; *id.* at 1708:17-1709:13 (testifying Samsung would not allow a competitor to use innovative features that distinguish Samsung's own products).)   And Samsung's expert, Dr. Tülin Erdem, testified that companies cannot effectively differentiate products that contain the same features.  (Tr. [Erdem] at 2340:5-22.)

*Third*, in *Douglas Dynamics*, the Federal Circuit explained that a patentee regarded as an innovator can suffer particularly severe harm to its reputation when its inventions appear in "products considered less prestigious and innovative."  717 F.3d at 1345.  In this case, Mr. Pendleton acknowledged that Samsung is perceived as a company that is "not an innovator," and that is a "fast follower."  (Tr. [Pendleton] at 1696:2-1698:11 (defining a "fast follower" as "someone who lets someone else introduce the innovative product and then quickly follows with their own products"); DX 431.005 (identifying Samsung's objective to "Overcome Fast Follower Status & Establish Samsung as Challenger Brand to Apple").)   This too irreparably harms Apple—by leading consumers to associate Apple's patented features with a company viewed by many as "not an innovator."

*Fourth*, in *Douglas Dynamics*, the Federal Circuit held that the patentee's reputation as an innovator also would be irreparably harmed if the patentee's customers and business partners "believed [the patentee] did not enforce its intellectual property rights."  717 F.3d at 1345. Again, that same harm exists here.   Throughout this litigation, Samsung has relentlessly criticized Apple for attempting to enforce its patent rights.  For example, despite findings that Samsung has infringed ***eleven*** Apple patents (six in the 1846 litigation, two in the parties' ITC investigation, and three in this case), Samsung's counsel recently went on a press tour in which he cast Apple as a patent "jihadist," labeled Apple's efforts to enforce its patents against Samsung as "Apple's Vietnam" and an "embarrassment to Apple," and declared a complete victory for Samsung because "Apple hasn't collected a penny — or succeeded in taking any products off the market."  (Selwyn Decl., Exs. 2 [CNET Article], 3 [San Jose Mercury News

1   Article] and 4 [Law360 Article].)   Beyond the reputational harm already inflicted by these

2   inflammatory public statements, Apple will suffer even further if the Court fails to enter an

3   injunction because others might "believe[] [Apple] did not enforce its intellectual property

4   rights."   *Douglas Dynamics*, 717 F.3d at 1345.

5          ***Finally***, in *Douglas Dynamics*, the Federal Circuit rested its finding of irreparable harm,

6   in, part, on evidence that the patentee had suffered reputational damage from the defendant's

7   infringement because the patentee generally refused to license its patents:

8              Exclusivity is closely related to the fundamental nature of patents as
               property rights. It is an intangible asset that is part of a company's
9              reputation, and here, [the patentee's] exclusive right to make, use, and
               sell the patented inventions is under attack by Buyers's infringement.
10

11   *Id.*; *see Presidio*, 702 F.3d at 1363 ("The district court correctly found Presidio's unwillingness

12   to license favored finding irreparable injury.").   The same is true here.

13          In the 1846 litigation, the Federal Circuit and this Court found that Apple aggressively

14   seeks to maintain exclusivity over its patented inventions by refusing to license them, except in

15   rare circumstances.   (1846 Dkt. 3016 at 35 (finding that Apple has "exceptionally restrictive

16   licensing practices").)   *See Apple III*, 735 F.3d at 1370 (discussing Apple's limited licensing).

17   And in this case, Samsung's witnesses agreed that Apple's strong reluctance to license its

18   patents has continued.   (Tr. [Chevalier] at 2433:9-17 ("[W]e know that Apple is, in general,

19   very reluctant to license their intellectual property."); *id.* at 2496:18-21 ("Q. You know that

20   Apple doesn't license its intellectual property, you told us that earlier today, or is reluctant to

21   license its intellectual property?  A. It doesn't as a matter of course.").)   Just like in *Douglas*

22   *Dynamics*, Apple's general refusal to license weighs strongly in favor of finding that Apple will

23   suffer irreparable harm to its reputation without an injunction that restores Apple's exclusivity

24   by barring Samsung from further infringing use of Apple's patented features.[3]

25          In sum, in this infringement case between two "fierce" direct competitors, Samsung has

26

27   [3]   As discussed below, the few instances in which Apple has licensed its asserted patents have
     involved broad cross-licenses and litigation settlements, most of which impose significant
28   restrictions on the use of Apple's distinctive feature patents.

substantially damaged Apple's reputation in multiple respects—including by tainting Apple's reputation as an innovator, by leading customers and competitors to believe that Apple is not entitled to enforce its patent rights (even when it prevails on its infringement claims), and by disrupting Apple's attempts to maintain exclusivity over its patented inventions.  A permanent injunction is needed to stem further irreparable harm to Apple's reputation, and to restore the exclusivity lost through Samsung's unauthorized use of Apple's patented inventions.  In fact, in *Douglas Dynamics*, the Federal Circuit viewed these types of harm to reputation as sufficient to reverse—***as an abuse of discretion***—the denial of a permanent injunction.  717 F.3d 1344-45.

### 2.   Apple Has Shown Irreparable Harm Resulting From Its Sales-Based Losses Under *Apple III*.

As discussed above, irreparable injuries to Apple's reputation alone warrant injunctive relief.  But Apple also has suffered sales-based losses that independently confirm Apple will suffer irreparable harm without an injunction.

Specifically, the record shows that, due to Samsung's more than 35 million infringing sales, Apple has suffered lost market share and downstream sales, and harm to its ecosystem—i.e., the same sales-based harms found to exist in the 1846 litigation.  *See Apple III*, 735 F.3d at 1360 (affirming findings that "Apple has continued to lose market share to Samsung," that "Apple has suffered some irreparable harm in the form of loss of downstream sales," and that there was "harm to Apple's ecosystem," all of which were "not disputed on appeal").  (Tr. [Schiller] at 557:22-558:9 (explaining that, in the "head to head competition" between Apple and Samsung, "[i]f [Samsung] gets sales, [Apple] lose[s] sales"); *id.* at 448:8-449:4 (describing Apple's "ecosystem," in which smartphone sales lost to Samsung lead to losses in future downstream sales); *id.* at 564:17-565:5 (explaining significance of when Apple loses a first-time smartphone buyer to Samsung); *id*. at 1214:11-14 [Vellturo] ("Apple and Samsung have been head-to-head direct competitors during this period, and, in fact, most of the other competitors have taken a very secondary role.  So they're very direct competitors."); PX 3002 [DiCarlo Dep.] (admitting Samsung's ongoing strategy is "to convert Apple [] customers to Samsung customers"); PX 208.004 ("███████████████████████████████████

1  ▮▮▮▮▮▮▮▮▮"); PX 216.003 ("Beating Apple is no longer merely an objective, it is our

2  survival strategy.  We must take consumers back from them . . . .").)

3  These sales-based losses "squarely support[] a finding of irreparable harm."  *Presidio*,

4  702 F.3d at 1363; *see Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310

5  (Fed. Cir. 2007) (recognizing "lost opportunities to sell other services to lost customers" as a

6  form of irreparable harm).

7  *Apple III* required a sufficient "causal nexus" between Apple's sales-based injuries and

8  Samsung's infringement—i.e., "some connection between the patented feature and demand for

9  [Samsung's infringing] products," such as proof "that the inclusion of a patented feature makes

10  a product significantly more desirable."  *Apple III*, 735 F.3d at 1364.  That type of proof exists

11  here given trial evidence showing that consumers, Samsung, and Apple all view the patented

12  features of the '647, '721, and '172 patents as sufficiently important to show a "causal nexus."

13  *First*, the record contains direct evidence confirming the importance of Apple's patented

14  features to consumers.  For example, Dr. John Hauser, one of the most well-respected survey

15  experts in the world, conducted a conjoint study from which he concluded that "[t]he features

16  that were enabled by the patents at issue in this case have a measurable impact on consumer

17  demand for Samsung telephones, smartphones, and tablets."   (Tr. [Hauser] at 1126:1-6,

18  1075:16-20; PX 141; Tr. [Reibstein] at 2116:17-2117:10 (Samsung's expert admitting that he

19  has "a considerable amount of respect" for Dr. Hauser, that Dr. Hauser has "integrity," and that

20  Dr. Hauser is "very well known in the field of conjoint studies").)

21  At trial, Samsung quibbled with the method that Dr. Hauser used to calculate how many

22  people purchase smartphones and tablets based on the patented features, and the price premium

23  for those features.  But Samsung did not offer a single relevant survey of its own (Dr. Erdem's

24  novel claim to have measured consumer demand based solely on user eye movements across a

25  computer screen did not test *any* patented feature).  Samsung did not have its experts conduct a

26  meaningful survey of consumer demand for Apple's patented features—even though it did just

27  that in the 1846 case for its own patents—because it knows that consumers value the features

28

claimed by the '647, '721, and '172 patents, just as Dr. Hauser concluded.[4]

**Second**, the evidence confirms that Samsung views the patented features as important to consumers. For example, Samsung's pre-litigation documents repeatedly discuss and promote the specific features found to infringe the '647, '721, and '172 patents, and show that Samsung intentionally copied from Apple:

- For the '647 patent, Samsung performed a side-by-side comparison with the iPhone, and expressed a desire for its products to include a "link function"—like Apple's data detectors feature. (Tr. [Mowry] at 875:12-15, 878:17-881:7; PX 146.037.) Similarly, a pre-litigation Samsung product "roadmap" highlighted a demand for Samsung's products to create a calendar entry automatically from the content of a user's email—using a description that copied a figure directly from a paper written by '647 inventor James Miller about Apple's data detectors software. (Tr. [Mowry] at 883:13-884:11, 888:12-890:21; PX 106.003; PX 107.052.) Samsung's own product manuals further confirm the importance of the infringing linking feature to customers by expressly describing the feature and instructing them how to use it. (Tr. [Mowry] at 836:14-838:7; PX 233.362; PX 237.823.) And even Google engineers identified the "linking" function as a "powerful feature[]." (PX 116.002; Tr. [Mowry] at 881:14-883:10.)

- For the '721 patent, Samsung's documents catalog its widespread copying of the "slide-to-unlock" feature—including through side-by-side comparisons with Apple's products. (Tr. [Cockburn] at 638:22-650:3 ("I saw these documents and a great many in addition to this and my conclusion is that they copied."); PX 119.011; PX 121.027; PX 121.100; PX 157.019-.020; PX 219.014.) Samsung also emphasizes its infringing "slide-to-unlock" feature to users in product manuals (Tr. [Cockburn] at 656:14-18; *e.g.*, PX 239.21), and Samsung designer, Ms. Kim, confirmed that Samsung views its "first page screen" as a way for Samsung's products to

---

[4]   Dr. Judith Chevalier's "sentence counting" analysis of product reviews (a task she has not performed in any other case), though flawed, shows repeated mentions of the patented features, which also confirms their importance to consumers. (SDX 3778 (identifying multiple mentions of the patented features in 66 reviews).) Dr. Chevalier conceded on cross-examination that she had "not seen a document describing [Apple's patented features] as minor or trivial." (Tr. [Chevalier] at 2448:1-6.)

"be differentiated in the market" because "this is actually a method to communicate with our customers."  (Tr. [Kim] at 1729:3-1731:10, 1747:5-8.)  Other documents show that Samsung's carrier customers such as Verizon view the "slide-to-unlock" feature as an important part of the user experience.  (Tr. [Cockburn] at 683:20-684:13, 686:16-20; PX 181.005 ("VZW showed negative response towards our company's circle lock playing the role of the visual cue.").)

- For the '172 patent, Samsung's own documents show repeated complaints from carriers and consumers directed to alternative word correction features that Samsung included in smartphones.  (Tr. [Cockburn] at 698:21-700:10, 701:25-702:21, 704:4-21; PX 168.004; PX 169.004; PX 219.104.)  Those complaints simply reinforce that Samsung's two customer bases (carriers and end-users) view reliable word correction as an important smartphone feature, and prefer the accurate and easy-to-use interface claimed in the '172 patent and included in Samsung's infringing products.  (Tr. [Cockburn] at 694:16-695:17.)

Collectively, these Samsung documents—which reflect the importance of, and demand for, Apple's patented features, including as copied and implemented in Samsung's products— are precisely the type of evidence that the Federal Circuit has explained may help show a sufficient "causal nexus."  *See Apple III*, 735 F.3d at 1367 (holding that "Apple's evidence of copying by Samsung may be relevant" to the "causal nexus" analysis).

Beyond these documents, Samsung's own **conduct** confirms that the patented features are important to consumers.  Despite having notice of the '647, '721, and '172 patents for years, and despite claiming that the patented features are insignificant and easy to design around with already-available alternatives, Samsung **never** implemented a design-around for the '647 patent, and sold an **additional 7 million products** that infringed the '721 and '172 patents after Apple filed this lawsuit.  (Tr. [Velturo] at 1249:7-1253:14; Tr. [Wigdor] at 2036:13-16.)  Samsung's unwillingness to remove the infringing features from its products only further reinforces the value of, and consumer demand for, Apple's patented inventions.

**Third**, as detailed above, the trial record confirms that Apple views its patented features claimed in the '647 and '721 patents as critical elements of an Apple user's unique experience.  As Mr. Deniau testified, the usefulness of data detectors has caused Apple to include that

feature in "[m]ost of Apple's products," including iPhones and iPads.  (Tr. [Deniau] at 789:23-790:13, 791:15-18.)   Likewise, Mr. Christie testified that Apple has depicted the "slide-to-unlock" feature of the '721 patent prominently in its advertising, and has included that feature in its products since the initial release of the iPhone—a feature that many Apple customers use multiple times each day.  (Tr. [Christie] at 600:23-602:5, 610:18-20; Tr. [Schiller] at 432:16-433:18 & PX 180; Tr. [Cockburn] at 635:23-638:21 ("slide-to-unlock" is "a critical feature" because it involves a user's "initial interaction with the device").)[5]

Apple has suffered significant harm due to Samsung's infringing sales, and the record shows "some connection between the patented feature[s] and demand for Samsung's products," thereby showing a "causal nexus" for Apple's sales-based irreparable harms.

### B.    Money Damages Are Inadequate to Compensate Apple for Samsung's Infringement.

No amount of money can make Apple whole in light of Samsung's infringement.  For example, money damages cannot fully restore the harm caused to Apple's reputation as an innovator, especially if Apple must continue competing against Samsung products that use Apple's own patented inventions.  *See eBay*, 547 U.S. at 395 (Roberts, C.J., concurring) (noting the "long tradition" of enjoining patent infringement "is not surprising given the difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to use an invention against the patentee's wishes—a difficulty that often implicates the first two factors of the traditional four-factor test"); *Douglas Dynamics*, 717 F.3d at 1345 ("This court finds remedies at law inadequate to compensate Douglas for at least the reputation loss Douglas has suffered from Buyers's infringement.").

The market share and downstream sales that Apple has lost as a result of Samsung's infringement are also classic injuries that money damages cannot adequately substitute.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010) (holding money damages could not remedy "loss of market share, brand recognition, and customer goodwill" because

---

[5]   Although Apple does not currently practice claim 18 of the '172 patent, Mr. Schiller explained that Apple still seeks to exclude others from using inventions that Apple does not currently practice because Apple may wish to use them in the future.  (Tr. [Schiller] at 444:18-445:2.)

1    "[s]uch losses may frequently defy attempts at valuation"); *Apple, Inc. v. Samsung Elecs. Co.*,

2    678 F.3d 1314, 1337 (Fed. Cir. 2012) (O'Malley, J., concurring) ("Because the loss of future

3    downstream purchases are difficult to quantify, these considerations support a finding that

4    monetary damages would be insufficient to compensate Apple."). Damages are also impossible

5    to quantify here because, as discussed above, a consumer's initial choice of a smartphone often

6    dictates their future purchases, making it difficult to measure the harm caused by an initial

7    infringing Samsung sale. *See Qualcomm*, 543 F.3d at 703 ("[D]ifficulty in estimating monetary

8    damages reinforces the inadequacy of a remedy at law."). (Tr. [Vellturo] at 1308:7-1310:23 &

9    PX214.121 (identifying effect of repeat purchases on the smartphone market).)

10       Nor could money adequately compensate Apple if it is forced to let Samsung continue

11   infringing Apple's patents—despite Apple's consistent efforts to maintain exclusive use over its

12   patented inventions by generally refusing to license them. *See Douglas Dynamics*, 717 F.3d at

13   1345 (casting "exclusivity" as "an intangible asset that is part of a company's reputation," and

14   holding that "remedies at law [were] inadequate to compensate [the patentee] for at least the

15   reputation loss [it] has suffered from Buyers's infringement"); *Presidio*, 702 F.3d at 1362

16   ("This historical practice of protecting the right to exclude through injunctive relief is not

17   surprising given the difficulties of protecting this right solely with monetary relief."); *Edwards*,

18   699 F.3d at 1314 ("The innovation incentive of the patent is grounded on the market exclusivity

19   whereby the inventor profits from his invention.").

20       A different result does not apply merely because Apple has licensed the '647 patent to

21   ███████████████████ Microsoft, ████████████████████████

22   ████████████████████████████████████████

23   ███████████████████████████████████. In addition, at the

24   time of their licenses, ███████ Microsoft did not compete with Apple in the smartphone or

25   tablet markets (unlike Samsung), both licenses were executed years before Apple launched the

26   iPhone and iPad, and the Microsoft license has highly restrictive terms that would not parallel

27   the unfettered rights of use Samsung would receive here without an injunction. Finally,

28   Apple's licenses with ████████████ were only executed in the context of litigation

1    settlements, ███████████████████████████████████████████

2    ████████████████████████████████████████████████████████

3    ████████████████    (Selwyn Decl., Exs. 5 and 6; Dkt. 443-21; Dkt. 443-19.)

4         This Court previously found that Apple's "exceptionally restrictive licensing practices"

5    cannot be used to monetize the value of Samsung's continuing infringement, and it should

6    reach the same conclusion here.  (1846 Dkt. 3016 at 35; *id*. at 36-37 ("Apple's past licensing

7    behavior demonstrates a reluctance to license the utility patents-in-suit to Samsung," and

8    Apple's licenses "provide little insight into whether Apple would be willing to provide

9    Samsung unencumbered access to the patented features for money."); Dkt. 1326 at 9-14, 21

10   (excluding evidence concerning HTC license.)  *See Apple III*, 735 F.3d at 1370 (holding "the

11   identity of the past licensees, the experience in the market since the licenses were granted, and

12   the identity of the new infringer" are all relevant when determining if a license can be used to

13   show the adequacy of money damages); *Qualcomm*, 543 F.3d at 703 (patentee's license to a

14   non-competitor "has little bearing on the effect of a compulsory license to a direct competitor,"

15   including because it involved non-monetary benefits); *Acumed L.L.C. v. Stryker Corp.*, 551

16   F.3d 1323, 1328-29 (Fed. Cir. 2008) (affirming that money damages were inadequate despite a

17   prior license made as part of a litigation settlement); *cf. LaserDynamics, Inc. v. Quanta

18   Computer, Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012) (discussing unique litigation pressures that

19   distort licensing agreements made for settlement purposes).

20        **C.**    **The Balance of Hardships Strongly Favors Entry of an Injunction.**

21        A balancing of the hardships strongly favors Apple.  For years, Apple has been forced to

22   compete against products that contain its own patented technologies—including ***more than 35***

23   ***million*** sales of Samsung smartphones found to infringe the '647 patent alone.  As noted in the

24   harm section above, this massive unauthorized use has irreparably harmed Apple.  By contrast,

25   Apple's narrowly-tailored injunction should impose no significant burden on Samsung for two

26   primary reasons.

27        ***First***, the conduct that the injunction prohibits is narrow in scope.  Rather than seeking

28   to bar entire product lines from the marketplace, Apple instead seeks an injunction that merely

precludes Samsung from using the specific features that the jury found to infringe Apple's '647, '721, and '172 patents, and those features "not more than colorably different." That injunction is no broader in scope than necessary to protect Apple's valuable patent rights, and also allows Samsung to compete in the marketplace on fair terms.

In fact, Samsung represented at trial that it now has non-infringing alternatives ready to go for the '647 patent, which would require "less than a day" to implement. (Tr. [Jeffay] at 1797:21-1798:8; Tr. [Hackborn] at 1587:25-1588:11 (testifying "[c]hanges like these shouldn't take more than a day for an engineer").) Samsung also represented that it has existing non-infringing alternatives to the '172 and '721 patents—including in its "best selling" Galaxy S III phone. (Tr. [Quinn] at 383:7-22 ("Samsung has a keyboard which Apple admits does not infringe."); *id.* at 384:8-14 ("In June 2011, before Apple's patented claim issued, Samsung put its own non-infringing keyboard on the Samsung Dart phone, and it's since been installed on many Samsung phones . . . ."); *id.* at 399:17-19 ("We're selling lots of these phones without using any Apple slide to unlock feature.").

Given these representations, Samsung cannot legitimately contend that it would suffer ***any*** harm from Apple's narrow proposed injunction, which merely prohibits Samsung from using infringing features that it claims to have already designed around—and that, according to Samsung, would be quick and easy to implement. *See Douglas Dynamics*, 717 F.3d at 1345 ("If indeed Buyers had a non-infringing alternative which it could easily deliver to the market, then the balance of hardships would suggest that Buyers should halt infringement and pursue a lawful course of market conduct."); *Qualcomm*, 543 F.3d at 704 (affirming injunction, in part, because "Qualcomm could have—and in fact may have—begun design-around efforts upon receipt of the complaint, which Broadcom filed more than two years prior to the jury verdict").[6]

***Second***, despite the lack of any potential harm to Samsung, out of an abundance of

---

[6]   Samsung has told its investors that it "believes the outcome of these matters will not have a material impact on the financial condition of the Company." (Selwyn Decl., Ex. 7.) Samsung cannot suddenly reverse course by arguing that it would be materially harmed by an injunction awarded in this case.

1    caution, Apple's proposed injunction also includes a "sunset period" of one month—i.e., the

2    longest period of time that Samsung said it needs to design-around Apple's patents—to allow

3    Samsung to remove the infringing features before the injunction is enforceable.  (Tr. [Quinn] at

4    3336:2-3337:6 ("And we wouldn't need four months.  You know, we're talking about Samsung,

5    one of the, you know, greatest, largest, most important technology companies in the world.

6    They could do these changes, if they had to do it, in one month.").)

7          The Federal Circuit has repeatedly recognized that this type of delayed enforcement

8    provision "may make an injunction more equitable and, thus, more justifiable in any given

9    case."  *Apple III*, 735 F.3d at 1363; *see Emulex*, 732 F.3d at 1339 (praising as "an exemplary

10   exercise of discretion" a tailored "permanent injunction to meet unique market concerns with a

11   well-crafted sunset period"); *Qualcomm*, 543 F.3d at 704 (approving injunction with a sunset

12   period, in part, because it gave the infringer time to implement design-arounds); *Verizon*, 503

13   F.3d at 1311 n.12 (noting defendant could have requested a "workaround period" to ameliorate

14   any hardship from a permanent injunction).

15         In the end, because Apple only narrowly seeks to enjoin infringing features for which

16   Samsung already claims to have design-arounds, and because the proposed injunction provides

17   Samsung with sufficient time to remove the patented features from its products, Samsung

18   should not have to remove a single product from marketplace.  Therefore, because Samsung

19   would suffer no harm from entry of Apple's proposed injunction, while Apple will continue to

20   suffer irreparable harm without an injunction, a balancing of hardships strongly favors Apple.

21         **D.    The Public Interest Favors Injunctive Relief.**

22         Apple's narrowly-tailored injunction also will serve the public interest by encouraging

23   investment in innovation, such as the significant investment—and huge risks—involved in

24   Apple's development of its patented technologies, including the three patents at issue here.  (Tr.

25   [Schiller] at 423:3-21, 424:15-425:13, 443:12-444:3 (explaining Apple's development of the

26   iPhone took years, involved "hundreds of people," and was "[i]ncredibly risky"); Tr. [Deniau]

27   at 790:14-791:1, 801:23-802:9 (describing Apple's work on data detectors); Tr. [Christie] at

28   600:2-22, 602:6-15 (describing development of "slide-to-unlock" feature).)  The public interest

1  is served by rewarding this type of investment-based risk with meaningful patent protection.

2  *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1363 (Fed. Cir. 2008) ("The patent laws

3  promote . . . progress by offering a right of exclusion for a limited period as an incentive to

4  inventors to risk the often enormous costs in terms of time, research, and development.");

5  *Douglas Dynamics*, 717 F.3d at 1346 (observing "the public's general interest in the judicial

6  protection of property rights in inventive technology" as favoring injunctive relief).

7       The public interest also disfavors "competing in the marketplace using a competitor's

8  patented technology," as Samsung has done here ***tens of millions of times***.  *Id.*  In fact, the

9  public's interest in the enforcement of patent rights is particularly strong in this case given that

10  the technology at issue does not implicate public safety concerns, and the limited scope of

11  Apple's proposed injunction will prevent any disruptions in product availability.  Indeed, if

12  anything, the public will benefit from the diversity of additional product offerings if Samsung

13  implements design-arounds to Apple's patented technologies.

14  **III.**    **CONCLUSION**

15       For the foregoing reasons, Apple respectfully requests that the Court enter the injunction

16  attached as Exhibit A, which precludes Samsung from continuing use of the features found to

17  infringe the '647, '721, and '172 patents, beginning one month after the injunction enters.

18

19  Dated: May 23, 2014          WILMER CUTLER PICKERING HALE

20                          AND DORR LLP

21                       By:  */s/ William F. Lee*

22                          William F. Lee

23                       Attorneys for Plaintiff

24                       APPLE INC.

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on May 23, 2014, to all counsel of record who are deemed to have consented to electronic service via the Court's ECF system per Civil Local Rule 5-1.

/s/ William F. Lee
William F. Lee