QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Cal. Bar. No. 108542)
williamprice@quinnemanuel.com
Michael L. Fazio (Cal. Bar No. 228601)
michaelfazio@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>        Defendants. | CASE NO. 12-cv-00630-LHK<br><br>**SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT**<br><br>**Date:    July 10, 2014**<br>**Time:   1:30 p.m.**<br>**Place:  Courtroom 8, 4th Floor**<br>**Judge:  Hon. Lucy H. Koh** |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 10, at 1:30 p.m., before the Honorable Lucy H. Koh, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung") shall and hereby do move the Court for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), renewing Samsung's prior request pursuant to Fed. R. Civ. P. 50(a), and alternatively for amendment of the judgment pursuant to Fed. R. Civ. P. 59(e).  This motion is based on the memorandum of points and authorities below, the declaration of Judith A. Chevalier, the trial record, all pleadings and papers on file in this action, such matters as are subject to judicial notice, and all other matters or arguments that may be presented in connection with this motion.

DATED: May 23, 2014                   Respectfully submitted,

                                      QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP

                                      By /s/ Victoria F. Maroulis
                                         Kevin P.B. Johnson
                                         Victoria F. Maroulis
                                         William C. Price
                                         Michael L. Fazio

                                         Attorneys for SAMSUNG ELECTRONICS CO.,
                                         LTD., SAMSUNG ELECTRONICS AMERICA,
                                         INC. and SAMSUNG
                                         TELECOMMUNICATIONS AMERICA, LLC

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 1

I.    SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON APPLE'S CLAIM AS TO THE '647 PATENT .................................................................. 1

    A.    No Reasonable Jury Could Find Infringement Of Claim 9 Of The '647 Patent. ............................................................................................................. 1

        1.    The '647 Patent Requires A Separate Server And A Specified Connection. ........................................................................................ 3

        2.    Apple Presented Its Case Only Under Its Improper Constructions. .............. 4

            (a)    Apple lost broad claim constructions in a parallel proceeding ......... 4

            (b)    Apple's pretrial strategy relied upon now-rejected constructions ........................................................................................ 5

            (c)    Apple's trial presentation relied upon the rejected claim constructions ......................................................................................... 6

            (d)    Apple's trial presentation represents a failure of proof .................... 6

            (e)    Apple's risk failed when the Federal Circuit rejected its constructions ......................................................................................... 8

        3.    The Accused Samsung Devices Do Not Infringe Claim 9. .......................... 8

            (a)    The accused devices lack a "specified connection" ......................... 9

            (b)    The accused devices lack an analyzer server ................................. 11

            (c)    The accused devices lack an action processor................................ 13

            (d)    The Jelly Bean Galaxy Nexus Does Not Infringe ........................... 13

    B.    No Reasonable Jury Could Find Claim 9 Of The '647 Patent Valid. ..................... 14

II.    SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON APPLE'S CLAIM AS TO THE '721 PATENT .................................................................. 16

    A.    No Reasonable Jury Could Find Claim 8 Of The '721 Patent Valid. ..................... 16

    B.    The '721 Patent Is Indefinite As A Matter Of Law.............................................. 19

    C.    No Reasonable Jury Could Find The Galaxy Nexus Infringed The '721 Patent. .......................................................................................................... 19

-i-    Case No. 12-cv-00630-LHK

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

D.    No Reasonable Jury Could Find Clear And Convincing Evidence Of Willful Infringement Of The '721 Patent. ....................................................... 21

1.    Samsung's Objectively Reasonable Defenses Preclude Willfulness As A Matter Of Law ...................................................................... 22

2.    There Is No Evidence That Samsung Acted With Knowledge Or Reckless Disregard. .......................................................................... 23

III.   SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT THE '172 PATENT IS INVALID ..................................................................... 25

IV.    SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT CLAIM 25 OF THE '959 PATENT IS INVALID ................................................ 28

A.    WAIS Anticipates Claim 25 Of The '959 Patent. ................................. 28

B.    Claim 25 Is Obvious In Light Of Smith And Shoham. ........................... 31

C.    Claim 25 Of The '959 Patent Is Indefinite. .......................................... 32

V.    SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT THE '414 PATENT IS INVALID ..................................................................... 34

A.    Windows Mobile 5 Meets All Limitations Of Claim 20. ........................ 35

B.    Claim 20 Requires Only One Synchronization Processing Thread. ........ 36

C.    The Exchange Components All Provide A Synchronization Processing Thread ............................................................................................. 37

VI.    THE RECORD LACKS SUFFICIENT EVIDENCE THAT SEC IS LIABLE FOR INDUCEMENT OR CONTRIBUTORY INFRINGEMENT .................................. 38

VII.   THE COURT SHOULD DEDUCT THE FULL AMOUNT OF THE GALAXY S II AWARDS AS IMPERMISSIBLE DOUBLE RECOVERY .................................. 39

A.    The Judgment Here Includes Impermissible Double Recovery. ............. 39

B.    Damages Of $21,108,660 For Sales Through June 30, 2012 Should Be Deducted. ....................................................................................... 42

C.    Damages Of $2,012,273 For Sales From July 1, 2012 Through August 24, 2012 Should Be Deducted. ............................................................... 42

D.    Damages Of $9,184,992 For Sales From August 25, 2012 To The Date Of The Verdict Should Be Deducted. ...................................................... 42

E.    Damages Deductions Are Also Clear If This Court Rejects Liability On Any Of The Patents. ......................................................................... 43

VIII.   NO REASONABLE JURY COULD HAVE CONCLUDED THAT CLAIM 15 OF THE '239 PATENT IS NOT INFRINGED ...................................................... 44

A.    Substantial Evidence Was Presented To Conclude Claim 15 Was Infringed. ........ 44

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

B.     Apple Improperly Compared The Products To An Embodiment Of The
       Invention.......................................................................................... 44

C.     Each Of Apple's Non-Infringement Arguments Relied On Claim
       Constructions That Are Contrary To The Plain And Ordinary Meaning................ 45

CONCLUSION ....................................................................................................... 45

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

# TABLE OF AUTHORITIES

**Page**

## Cases

*Accentra Inc. v. Staples, Inc.*,
   851 F. Supp. 2d 1205 (C.D. Cal. 2011), *aff'd in part,*
      *rev'd in part on other grounds*, 500 F. App'x 922 (Fed. Cir. 2013) ........................................41

*Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*,
   No. 02-C- 2590, 2004 WL 5129997 (N.D. Ill. Dec. 15, 2004) ................................................40

*Aero Products International, Inc. v. Intex Recreation Corp.*,
   466 F.3d 1000 (Fed. Cir. 2006) ............................................................................................40

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ............................................................................................44

*Apple, Inc. v. Motorola, Inc.*,
   869 F. Supp. 2d 901 (N.D. Ill. 2012) ....................................................................................5

*Apple Inc. v. Motorola, Inc.*,
   No. 12-1548 (Fed. Cir. Apr. 25, 2014) ........................................................................ passim

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
   920 F. Supp. 2d 1079 (N.D. Cal. 2013) ................................................................................22

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
   No. 3:01-CV-0485, 2010 WL 815466 (M.D. Penn. Mar. 3, 2010),
      *aff'd per curiam*, 477 Fed. App'x 740 (Fed. Cir. 2012) ........................................41

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*,
   216 F.3d 1042 (Fed. Cir. 2000) ..............................................................................................8

*Bard Peripheral Vascular, Inc. v. Gore & Assoc., Inc.*,
   682 F.3d 1003 (Fed. Cir. 2012) ............................................................................................22

*Catalina Lighting, Inc. v. Lamps Plus, Inc.*,
   295 F.3d 1277 (Fed. Cir. 2002) ......................................................................................39, 40

*Commil USA, LLC v. Cisco Sys., Inc.*,
   720 F.3d 1361 (Fed. Cir. 2013) ............................................................................................38

*Conopco, Inc. v. May Dep't Stores Co.*,
   46 F.3d 1556 (Fed. Cir. 1994) ..............................................................................................25

*Cornell Univ. v. Hewlett-Packard Co.*,
   609 F. Supp. 2d 279 (N.D.N.Y. 2009), *amended*,
   2009 WL 1405208 (N.D.N.Y. May 15, 2009) ......................................................................43

*DSU Med. Corp. v. JMS Co.*,
   471 F.3d 1293 (Fed. Cir. 2006) ............................................................................................38

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
   567 F.3d 1314 (Fed. Cir. 2009) ............................................................................................22

*Duran v. Town of Cicero, Ill.*,
   653 F.3d 632 (7th Cir. 2011) ................................................................................................41

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
   363 F.3d 1263 (Fed. Cir. 2004) ............................................................................................38

*In re GPAC Inc.*,
   57 F.3d 1573 (Fed. Cir. 1995) ..............................................................................................15

*Galderma Laboratories, LP v. Tolmar, Inc.*,
   737 F.3d 731 (Fed. Cir. 2013) ..............................................................................................17

*Geo M. Martin Co. v. Alliance Machine Systems Int'l LLC*,
   618 F.3d 1294 (Fed. Cir. 2010) ............................................................................................16

*In re Gurley*,
   27 F.3d 551 (Fed. Cir. 1994) ................................................................................................18

*Halliburton Energy Services, Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) ............................................................................................32

*Halliburton Oil Well Cementing Co. v. Walker*,
   329 U.S. 1 (1946) ..................................................................................................................7

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010), *aff'd on other grounds*, 131 S. Ct. 2238 (2011) .....................39

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
   No. 96 CV 1307-B(AJB), 2004 WL 2284001 (S.D. Cal. Sept. 7, 2004) .................................41

*IpVenture, Inc. v. Cellco P'ship*,
   2011 WL 207978 (N.D. Cal. Jan. 21, 2011) ..........................................................................23

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
   392 F.3d 1317 (Fed. Cir. 2004) ............................................................................................32

*KSR Int'l, Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ............................................................................14, 16, 18, 19, 26, 27

*In re Kubin*,
   561 F.3d 1351 (Fed. Cir. 2009) ............................................................................................18

*Lakeside-Scott v. Multnomah Cty.*,
   556 F.3d 797 (9th Cir. 2009) ..................................................................................................1

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
   2012 WL 3222237 (N.D. Cal. 2012)........................................................................................9

*Minks v. Polaris Indus., Inc.*,
   546 F.3d 1364 (Fed. Cir. 2008) ............................................................................................41

*Mirror Worlds, LLC v. Apple Inc.*,
    692 F.3d 1351 (Fed. Cir. 2012), *affirming*, 784 F. Supp. 2d 703 (E.D. Tex. 2011) ...................9

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    No. 13-369 (argued Apr. 28, 2014) .............................................................................33, 34

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*,
    157 F.3d 866 (Fed. Cir. 1998) ....................................................................................................8

*Princeton Biochemicals, Inc. v. Beckman Ins., Inc.*,
    180 F.R.D. 254 (D.N.J. 1997) .................................................................................................24

*Process Control Corp. v. Hydreclaim Corp.*,
    190 F.3d 1350 (Fed. Cir. 1999) ..............................................................................................19

*Raytheon Co. v. Roper Corp.*,
    724 F.2d 951 (Fed. Cir. 1983) ................................................................................................20

*In re Seagate Techs., Inc. v. Gateway, Inc.*,
    497 F.3d 1360 (Fed. Cir. 2007) .........................................................................................21, 23

*Shockley v. Arcan, Inc.*,
    248 F.3d 1349 (Fed. Cir. 2001) ..............................................................................................41

*Solannex, Inc. v. Miasole*,
    2011 WL 4021558 (N.D. Cal. Jan. 4, 2012) .........................................................................23

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
    620 F.3d 1305 (Fed. Cir. 2010) ..............................................................................................22

*State Indus., Inc. v. A.O. Smith Corp.*,
    751 F.2d 1226 (Fed. Cir. 1985) .........................................................................................24, 25

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    709 F.3d 1365 (Fed. Cir. 2013) ..............................................................................................39

*TrafFix Devices, Inc. v. Mkt'g Displays, Inc.*,
    532 U.S. 23 (2001) ..................................................................................................................25

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
    617 F.3d 1296 (Fed. Cir. 2010) ..............................................................................................32

*Turner v. Burlington N. Santa Fe RR*,
    338 F.3d 1058 (9th Cir. 2003) ..................................................................................................1

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ..............................................................................................22

*Wyers v. Master Lock Co.*,
    616 F.3d 1231 (Fed. Cir. 2010) .........................................................................................25, 27

## **Statutes**

35 U.S.C. § 102(b) ............................................................................................................................34

35 U.S.C. §112, ¶ 6 ...................................................................................................................7

35 U.S.C. § 112(b) ...................................................................................................................19

35 U.S.C. § 271(b) ...................................................................................................................38

35 U.S.C. § 271(c) ...................................................................................................................38

35 U.S.C. § 284 ........................................................................................................................42

35 U.S.C. § 289 ...........................................................................................................1, 39, 43

Fed. R. Civ. P. 50(b)..................................................................................................................1

Fed. R. Civ. P. 59(e)..................................................................................................................1

**Other Authorities**

Mark A. Lemley, *Software Patents and the Return of Functional Claiming,*
   2013 Wis. L. Rev. 905 (2013).............................................................................................7

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Judgment as a matter of law under Fed. R. Civ. P. 50(b) is required where a plaintiff fails to present a legally sufficient basis for a reasonable jury to rule in its favor. *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802 (9th Cir. 2009). Thus, JMOL "is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Id.* (quotation marks omitted). With respect to double counting of damages, amendment of the judgment under Fed. R. Civ. P. 59(e) is required where "the motion is necessary to correct manifest errors of law or fact upon which the judgment is based" or "the motion is necessary to prevent manifest injustice." *Turner v. Burlington N. Santa Fe RR*, 338 F.3d 1058, 1063 (9th Cir. 2003). Samsung is entitled to judgment as a matter of law or, in the alternative, amendment of the judgment for the reasons below.

## I. SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON APPLE'S CLAIM AS TO THE '647 PATENT

### A. No Reasonable Jury Could Find Infringement Of Claim 9 Of The '647 Patent.

U.S. Patent No. 5,946,647 is directed to a computer system in which an "analyzer server" detects patterns in data from other applications and automatically identifies them as email addresses or phone numbers or the like. JX1. In the words of the patent, the patterns are "structures." The "analyzer server" is programmed to link the detected structure to a specified computer subroutine to perform an action on the identified structure, such as making a phone call. As an example, the patent describes a word processing program on a computer (the client program) submitting a document to the "analyzer server" for pattern analysis. *See, e.g.*, Dkt. 1151 at pp. 14-15. Apple filed this patent in 1996 when it was selling desktop Macintosh computers, well before any work on a mobile phone and over a decade before Apple would release the iPhone. Apple's attempts to force this old client-server patent onto mobile phone applications by avoiding the properly limiting claim construction has come to naught: on the last day of trial, in a case between Apple and Motorola involving the same patent, the Federal Circuit confirmed the constructions that Samsung believed correct—that a "server" entails a client-server relationship and that the separate "server" must make a "specified connection" between detected structures and

1  linked actions—and the Federal Circuit rejected the constructions upon which Apple pinned its

2  hopes throughout trial.  The result of the claim construction is two-fold.

3      *First*, as a matter of infringement, the accused Samsung devices lack at least two required

4  elements of the claims.  For "analyzer server," Apple presented evidence of a single application,

5  including a shared library that Apple's expert admitted is incorporated into the application and

6  runs as part of it.  There is no separate server on the Samsung devices.  The accused devices are

7  not desktop computers that include a server program dedicated to serving client applications.

8  Without that separateness, there can be no infringement because "the plain meaning of 'server,'

9  when viewed from the perspective of a person of ordinary skill in the art, entails a client-server

10  relationship" and "the specification discloses an analyzer server that is separate from the

11  application it serves."  *Apple Inc. v. Motorola, Inc.*, No. 12-1548, Slip Op. at 22-23 (Fed. Cir. Apr.

12  25, 2014).  Nor do the Samsung devices meet the requirement that the application software, which

13  Apple says performs the function of an analyzer server, performs "linking actions" to the detected

14  patterns.  The required link created by the analyzer server is not just an association between a

15  detected structure and an action, as Apple unsuccessfully argued in *Motorola*, but a "specified

16  connection," implying a joining.  *Id*. at 24-25.  A specified connection is entirely lacking on the

17  open-source Android platform.  There is no pre-programmed connection.  Rather, the system goes

18  through an entire decision process each time after the user selects an action she may wish to

19  perform.  Android is specifically designed *not* to have preset connections.  There is no "specified

20  connection" like there might be on a desktop where the software is static.  Thus, even if there is an

21  "analyzer server" on Samsung's phones, there is no linking, joining, or specified connection

22  between the software Apple says is the server and the software that executes the commands.

23      *Second*, the burden of proving infringement lies squarely with Apple.  At trial, Apple "shot

24  for the moon" by relying on overly broad claim constructions that were rejected on the last day of

25  trial by the Federal Circuit.  For instance, on Day 4 of the trial, Dr. Mowry presented evidence of

26  software "associations" to satisfy the "linking actions" limitation.  Tr. 828:16-20.  But mere

27  association was specifically rejected by the Federal Circuit; there must be a specified connection, a

28  joining between the programs.  Relying upon the broader constructions at trial was Apple's choice

and it must live by it.  The evidence presented to the jury shows there are no material facts in dispute and Apple's evidence of infringement does not and cannot meet its burden.  Now that the constructions are confirmed and Apple has had its chance to present its evidence, there can be only one outcome: Samsung is entitled to judgment of non-infringement as a matter of law.

### 1.     The '647 Patent Requires A Separate Server And A Specified Connection.

At trial, Apple asserted a single claim, claim 9 (dependent upon claim 1):

1.  A computer-based system for detecting structures in data and performing actions on detected structures, comprising:

an input device for receiving data;
an output device for presenting the data;
a memory storing information including program routines including
an *analyzer server* for detecting structures in the data, and for *linking actions to the detected structures*;
a user interface enabling the selection of a detected structure and a linked action; and
an action processor for performing the selected action linked to the selected structure; and
a processing unit coupled to the input device, the output device, and the memory for controlling the execution of the program routines.

9.  The system recited in claim 1, wherein the user interface enables selection of an action by causing the output device to display a pop-up menu of the linked actions.

JX1 (highlighting terms subject to claim construction dispute).

On April 25, 2014, the Federal Circuit provided definitive, limiting constructions of the highlighted terms, affirming the following:

- "analyzer server" is "a server routine separate from a client that receives data having structures from the client"; and

- "linking actions to the detected structures" is "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."

*Motorola*, Slip Op. at 21.  The Federal Circuit's constructions expressly rejected Apple's broader constructions and lead to a finding of non-infringement as a matter of law.  Indeed, as set forth more fully below and in the next section, contrary to Apple's assertions at trial that its proposed constructions of "analyzer server" and "linking actions" are consistent with the Federal Circuit's recent constructions, the Federal Circuit has now expressly rejected both of Apple's constructions.

With respect to "analyzer server," the plain meaning "entails a client-server relationship." *Id.* at 23.  Indeed, "the specification describes the analyzer server and the application, which it serves, as separate structures."  *Id.*  The Federal Circuit rejected Apple's attempt to read out the separateness of the server: "Apple's proposed construction contradicts the claim language because it reads 'analyzer server' out of the claim."  *Id.*

With respect to "linking actions," the Federal Circuit *rejected* Apple's contention that the correct construction is "*associating* detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structure to which they are associated." *Id.* at 24 (emphasis added).  The Federal Circuit explained:

> From a general sense, the plain meaning of associating relates to a mere commonality, while linking infers a joining. Additionally, the specification here demonstrates that linking is more than just associating.  The patent consistently differentiates between associating and linking and implies that linking is a more specific connection than merely associating.

*Id.*  The Federal Circuit's decision leads to a finding of non-infringement because the undisputed evidence is that the accused Android software in Samsung's devices does not have a separate server and does not have any specified connections to applications.

### 2.   Apple Presented Its Case Only Under Its Improper Constructions.

As a threshold matter, this case is unusual because of Apple's litigation strategy.  Apple took the risk that it would prevail in the parallel *Motorola* action and obtain broad claim constructions for the '647 patent.  That gambit failed, and Apple's proof to the jury was lacking as a matter of law.  Rule 50 exists precisely to correct situations like this.

### (a)   Apple lost broad claim constructions in a parallel proceeding

Prior to this action, Apple sued Motorola for infringement of the '647 patent in a case pending before Judge Posner sitting by designation in the Northern District of Illinois.  On March 19, 2012, Judge Posner rejected Apple's constructions of the '647 patent claims with respect to "analyzer server" and "linking actions."  Dkt. 118-11.  The *Motorola* district court also rejected the opinions of Apple's expert, Dr. Mowry.  *See, e.g.*, *id.* at 10.

On April 23, 2012, Samsung told this Court that these terms of the '647 patent required construction.  Dkt. 115 at 5-6.  On June 22, 2012, Judge Posner dismissed the *Motorola* case with

1  prejudice.  *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 924 (N.D. Ill. 2012).  On appeal,

2  Apple asserted that Judge Posner's "constructions reduced a valuable invention to a trivial one."

3  Opening Brief of Apple in *Motorola*, Nos. 2012-1548, 2012-1549, at 33 (Nov. 12, 2012).  In part

4  Apple was correct.  The invention was "trivial," and that was confirmed by the Federal Circuit.

5       Samsung has always maintained that collateral estoppel precluded Apple from asserting

6  any constructions other than those established by the *Motorola* district court.  *See* Dkt. 1521-3.[1]  In

7  any event, Apple had a choice: it could proceed under the narrow (now confirmed proper)

8  *Motorola* constructions; it could proceed under both alternatives; or it could proceed under the

9  broad, plain meaning constructions it advocated, lost, and appealed in the *Motorola* case.  Apple

10  chose the last—the high risk option that the Federal Circuit would reverse Judge Posner and

11  impose a broad construction for "analyzer server" and "linking actions."

12       **(b)       Apple's strategy relied upon now-rejected constructions**

13       Apple's "shoot for the moon" strategy is apparent from Apple's expert reports of Dr.

14  Mowry.  It describes the now-affirmed *Motorola* constructions as "erroneous."  Dkt. 1673-7

15  (Mowry Rebuttal) ¶ 81.  And Apple urged the Court to construe the terms.  Dkt. 803-4 at 5 n. 6

16  (summary judgment papers).  Samsung took the prudent course:  its expert Dr. Jeffay applied both

17  constructions in his expert report.  Dkt. 1673-8 ¶¶ 284-296 (Jeffay Opening); Dkt. 1673-8 ¶¶ 121-

18  133 (Jeffay Rebuttal).  To compound the problem, at the summary judgment hearing Apple

19  wrongly asserted that this Court had construed the patent in Apple's favor, arguing that the issue

20  of disputed constructions had "already been decided by the Court, and that is consistent with the

21  position we've been advocating in front of the Federal Circuit now in the Posner case."  Dec. 12,

22  2013 Hr'g Tr. 25:20-26:23.  This Court, of course, had not construed the terms consistent with

23  what Apple was then advocating to the Federal Circuit.  And the Federal Circuit would roundly

24  reject Apple's plain meaning constructions.  On March 28, 2014, on the eve of trial, this Court

25  denied Samsung's motion to include the *Motorola* constructions in the jury books.  Dkt. 1536.

26  ────────────────────

27       [1]  For instance, at the Technology Tutorial, Samsung informed the court: "We believe that
[analyzer server]'s been construed and it's collateral estoppel."  Dkt. 481 at 59:25-60:4.

28

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

(c)     **Apple's trial presentation relied upon the rejected claim constructions**

At trial, Apple and its expert Dr. Mowry proceeded to allege infringement under Apple's proposed constructions only.  Dkt. 1521-3 at 2-3.  As the table below establishes, Dr. Mowry testified using Apple's proposed constructions for those terms:

| Term | Apple's Rejected Construction | Dr. Mowry's Day 4 Testimony |
|------|------|------|
| **analyzer server** | **a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure (Dkt. 1673-7 (Opening) ¶ 68)** | A. [The analyzer server] is program routines, *meaning that it's software, and the software detects structures in the data and links actions to the detected structures.* (Tr. 2789:22-24) (emphasis added) |
| **linking actions to the detected structures** | **associating detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are associated (Dkt. 1673-7 (Opening) ¶ 68** | A. [The inventors] said what was needed was a new invention where if you had a system that could automatically find these things, like phone numbers, e-mail addresses and so on, and also *automatically associate different choices and things you could do with them, which they call actions.* (Tr. 828:16-20) (emphasis added) |

Dr. Mowry's testimony about the meaning of the analyzer server term uses the same language as Apple's proposed construction for that term in *Motorola*, which Dr. Mowry himself termed "Apple's proposed construction" in his expert reports.  Dkt. 1673-7 ¶ 68; Dkt. 118-11 at 10.  This is the exact construction that Judge Posner and the Federal Circuit rejected.  *Motorola*, Slip Op. at 22 ("We agree with the district court's construction of 'analyzer server.'").

(d)     **Apple's trial presentation represents a failure of proof**

At trial, Apple made no effort to present evidence that would meet the narrower constructions mandated by the Federal Circuit.

Apple presented its evidence of infringement via the testimony of its expert Dr. Mowry. He told that jury that the Court had defined the term "action processor," but for all other terms he relied upon the "plain and ordinary meaning" of the terms to one of skill in the art.  Tr. 840:6-22. Dr. Mowry showed the jury videos of screenshots of the accused phones being used.  PDX88.14, 88.15, 88.16.  He told the jury that "it's easy to tell whether a particular claim element is met just by looking at what the phone does," and that when you operate the phone "you can actually see the behavior of that software" on the phone.  Tr. 843:12-844:1.  Dr. Mowry told the jury he looked at the software to confirm the behavior.  Tr. 844:2-5.  The evidence, however, is a failure of proof.

1    For the "analyzer server," Dr. Mowry told the jury that the accused software, including Linkify,

2    meets the limitation.  Tr. 850:11-852:3; PDX88.18A.  There was no attempt to show the jury that

3    Linkify or the other accused software was separate from the application as a server needs to be.

4        Worse still was how Apple presented its evidence with respect to "linking actions."  As

5    shown above, Dr. Mowry presented evidence that the invention was about "associating" different

6    choices.  This "associating" position was specifically considered and rejected by the Federal

7    Circuit.  *Motorola*, Slip Op. at 24-25.  Again, there is a failure of proof here.  Apple cannot present

8    its case to the jury as if association is all that is required, as if the invention was about associating

9    or merely being able to be linked, when the claims require a very different standard of a "specified

10   connection" between the software.  This is a separate failure of proof by Apple.

11       As further proof that Apple did not meet its burden of providing evidence that Samsung's

12   devices contained an "analyzer server," Dr. Mowry relied upon a functional definition of

13   "analyzer server," improperly defining it by what it *does* as opposed to what it *is*.  This is the

14   wrong standard as a matter of law.  Claim 9 is system claim—not means plus function under 35

15   U.S.C. § 112, ¶ 6.  It must be defined in terms of structure.

16       For instance, when asked about the definition he used, Dr. Mowry testified:  "The

17   definition of analyzer server is it's – it's given right here in the claim language.  It's a piece of

18   software that performs these functions."  Tr. 893:7-16.  When asked on cross-examination whether

19   any device that has the functions of detecting and linking is necessarily an "analyzer server," Dr.

20   Mowry confirmed his testimony that any software with that functionality is an "analyzer server."

21   Tr. 917:10-19.

22       It is black letter patent law that unless a claim is written in means plus function format, it

23   must be written as a structure.  Functional claiming is not permitted.  *Halliburton Oil Well*

24   *Cementing Co. v. Walker*, 329 U.S. 1, 12-13 (1946) ("broad functional claims" create "ambiguity"

25   and disserve the patent laws); Mark A. Lemley, *Software Patents and the Return of Functional*

26   *Claiming*, 2013 Wis. L. Rev. 905 (2013).  Dr. Mowry presented the claim limitation and evidence

27   in purely functional terms.  But he failed to present any evidence of the structure such as the

28

1    separateness required by the Federal Circuit, to provide proof that the software that he claimed

2    performed those functions is, in fact, a server.

3              **(e)      Apple's risk failed when the Federal Circuit rejected its constructions**

4              After Apple's case on the '647 patent was complete, the Federal Circuit issued its decision

5    on April 25, 2014.  On Monday, April 28 (Day 13 of trial), Apple recalled Dr. Mowry to try to

6    resuscitate its case.  The effort failed as a matter of law.  Dr. Mowry merely repeated his prior

7    analysis, substituting the words he previously used for the language of the *Motorola* constructions.

8    *See* Tr. 3016:4-3032:5.  He pointed to no new code—despite, for example, the new requirement of

9    a "specified connection"—and he did not use any new demonstratives or exhibits to demonstrate

10   infringement under the narrower *Motorola* constructions.  *See id.*  When pressed on cross-

11   examination regarding his inconsistent prior testimony, Dr. Mowry admitted he was previously

12   "describing what the claim language required" but incredibly claimed his earlier testimony did not

13   presume a different definition of the terms.  Tr. 3033:11-18, 3035:19-22.  This despite Dr. Mowry

14   admitting he did not use the words "server routine," "client," "separate from the client," or

15   "receive data from the client," required by the analyzer server construction.  Tr. 3036:6-3037:9.  In

16   sum, Dr. Mowry offered infringement opinions under inaccurate, incomplete, and legally incorrect

17   constructions, then baldly claimed his "new" testimony was consistent with his prior testimony

18   and with the *Motorola* constructions.  Tr. 3033:11-18.  Such testimony fails to meet the burden of

19   proof.  *See, e.g.*, *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000)

20   ("[I]t is well settled that an expert's unsupported conclusion on the ultimate issue of infringement

21   is insufficient to raise a genuine issue of material fact."); *Phillips Petroleum Co. v. Huntsman*

22   *Polymers Corp.,* 157 F.3d 866, 876 (Fed. Cir. 1998) (rejecting expert declarations that accused

23   product and process met the claim limitation where they were "wholly conclusory").

24             As explained below, under the proper constructions of the terms "analyzer server" and

25   "linking actions to the detected structures," there is no infringement as a matter of law.

26             **3.      The Accused Samsung Devices Do Not Infringe Claim 9.**

27             No reasonable jury could find that the accused Samsung devices infringe claim 9 of the

28   '647 patent.  In particular, based on the constructions from the Federal Circuit, Apple did not

1  prove that the accused devices "link[] actions to the detected structures," nor is there proof of the

2  type of client-server relationship required by the Federal Circuit's "analyzer server" construction.

3  As such, Samsung is entitled to judgment of no infringement as a matter of law.  *Mirror Worlds,*

4  *LLC v. Apple Inc*., 692 F.3d 1351, 1357 (Fed. Cir. 2012), *affirming*, 784 F. Supp. 2d 703 (E.D.

5  Tex. 2011) (granting Apple's motion for judgment as a matter of law of non-infringement, setting

6  aside jury verdict for lack of evidence of infringement).  Apple has the burden of coming forward

7  with more evidence than just an expert saying there is infringement: "Where a party's expert

8  offers legal conclusions on an ultimate issue, judgment as a matter of law may be appropriate

9  when the expert's opinion cannot be reconciled with either the language of the claims at issue or

10  the evidence presented at trial."  *Mformation Techs., Inc. v. Research in Motion Ltd*., 2012 WL

11  3222237, at *2 (N.D. Cal. 2012) (Ware, C.J.) (granting post-verdict JMOL).

(a)    The accused devices lack a "specified connection"

13      Claim 9 requires that the "analyzer server" "link[] actions to the detected structures."  The

14  Federal Circuit's construction of "linking actions" is "creating a specified connection between

15  each detected structure and at least one computer subroutine that causes the CPU to perform a

16  sequence of operations on that detected structure."  Accordingly, any code Apple identifies as the

17  "analyzer server" must perform "linking," as expressed in the Federal Circuit's construction.  No

18  reasonable juror could find such "linking," however, as the only evidence and testimony presented

19  was that the user—not an analyzer server—specifies the action to be performed, but the accused

20  devices do not create the claimed "specified connection."

21      Apple accuses the "Intents" system in Android of satisfying the "linking" elements.  Tr.

22  3026:21-3028:25.  Dianne Hackborn is the Google engineer who designed the accused Intents

23  system; she testified at trial, and her testimony went unrebutted.

24      Ms. Hackborn explained that desktops have "a big screen" where a user can see lots of

25  applications.  A mobile system with a small screen, however, needs to be more flexible and that

26  was what Intents were designed to do.  Tr. 1576:22-1577:11.  Ms. Hackborn explained that Intents

27  allows a user to choose, for instance, to compose an email message and then "give it to Android

28  and then Android will find an application that will actually do that."  Tr. 1580:7-13.  It is

1  undisputed that there is no pre-programmed connection to a specific application for a specific

2  action because Android was intended to "have an open platform, and we wanted to allow third

3  party applications to work the same as built-in applications on Android, and Intents allowed us to

4  work with both third party and built-in applications the same way."  Tr. 1580:20-1581:6.  The

5  flexible Android system is the opposite of the server system claimed in the patent, which requires

6  a specified connection to an application for executing the ultimate action.

7        Samsung's expert Dr. Jeffay explained to the jury that a consequence of Ms. Hackborn's

8  flexible system is that there is no "specified connection" between any detected structure and the

9  routines that will operate on it.  Tr. 1794:3-1796:11, 1818:2-24.  Simply put, in the accused

10 devices, no application is ever "specified" by an "analyzer server" to "cause the CPU to perform a

11 sequence of operations on [a] detected structure."

12       Dr. Mowry's testimony, to the extent it is entitled to any weight, does not provide grounds

13 for a reasonable juror to disagree.  Dr. Mowry did not point to any evidence that the routines that

14 will "cause[] the CPU to perform a sequence of operations on the detected structure" form a

15 "specified connection" to a detected structure.  Rather, Dr. Mowry offered a different explanation

16 that conflicts with the "user interface" limitation of claim 9.  He identified the StartActivity

17 program routine as the "action" and relied on the process of an Intent being sent to StartActivity

18 **after** the user selects the name of an action from the context menu.  Tr. 854:14-56:22, 857:22-

19 58:10, 860:8-61:1, 2795:13-2796:16, 3020:1-21, 3021:12-19.  Indeed, he agreed that the user must

20 make a particular choice of a generic set of actions (*e.g.*, "Send email") **before** StartActivity is

21 called and **before** the system ultimately determines the application to perform the requested action.

22 Tr. 3027:15-17 ("such that if the user picks that particular option, it will necessarily call start

23 activity"); Tr. 3028:13-15 ("so that if the user chooses that particular linked action, it will

24 necessarily call start activity").  This conflicts with the "user interface" limitation of claim 9,

25 which requires "a user interface enabling the selection of a detected structure and a **linked** action."

26 Based on Dr. Mowry's testimony, no reasonable juror could find that a user can make a "selection

27 of a . . . **linked** action," as required by the claim language, because as Dr. Mowry admits, his

28 alleged "specified connection" (*i.e.*, the call to StartActivity) does not occur until **after** the user

1    makes a selection from the menu.  In other words, to the extent there is any "specified connection"

2    at all, it does not occur until **after** the user's selection of a generic name from a menu.  Tr. 3088:5-

3    89:1.  Therefore, the user selects an action **to be linked** rather than the claimed **linked action**.

4                    **(b)        The accused devices lack an analyzer server**

5            Similarly, there is no proof that the accused products have an analyzer server that is

6    "separate from" client applications, nor that the code Dr. Mowry accuses of being the "analyzer

7    server" "receives data" from the alleged client applications.  The Federal Circuit construed

8    "analyzer server" as "a server routine separate from a client that receives data having structures

9    from the client."  *Motorola*, Slip Op. at 22.

10           Apple accused certain Android software libraries, including ones containing "Linkify," of

11   being the "analyzer server" for purposes of infringing the '647 patent.  PDX88.18A; Tr. 850:11-

12   18.  Dianne Hackborn, the Google engineer with knowledge of Linkify, testified:  "Linkify does

13   not run on its own.  It runs as part of the application that's using it."  Tr. 1585:14-16.  She further

14   testified that Linkify "is not a server."  Tr. 1585:17-18.  In fact, she explained it is not a server

15   because there is "no sharing of data it does between applications" and "it would be a waste to have

16   the overhead of putting it as a separate server."  Tr. 1585:19-1586:2.  *This testimony is undisputed.*

17           Ms. Hackborn further testified that although Android uses servers, such as the clipboard,

18   the accused libraries are different from servers.  Tr. 1583:3-1584:13, 1586:3-10.  And one of the

19   '647 inventors, Dr. Thomas Bonura, also testified at deposition that "constructurally [a shared

20   library] shares some similarities with client server, *but in truth it's a different kind of*

21   *implementation*…."  DX506 at 168:20-25.

22           Apple's Dr. Mowry, however, omitted the client-server relationship entirely, testifying as

23   if there was no requirement that the server be separate.  Tr. 850:11-861:7.  When brought back on

24   Day 13, and given the opportunity to address the correct construction, Dr. Mowry did not offer

25   any new evidence or testimony showing a client-server relationship or that the alleged analyzer

26   server receives data from a client.  *See* Tr. 3017:1-3025:25.  For instance, Dr. Mowry failed to

27   show that the routines he identifies ever "receive data" from the Messenger or Browser

28   application.  *Id.*  That is because he cannot make such a showing—the routines run as part of the

1  accused applications, and thus there is no need for a client-server relationship, or for the sending

2  or receiving of data.  Tr. 1784:4-1785:2, 3081:13-3083:5.

3       Despite not introducing new evidence, Dr. Mowry did broadly claim that the requirement

4  of "separateness" is met based on his say-so that (1) the code he accuses is "designed to be reused

5  across different applications"; (2) there is one copy of the accused code in memory; and (3)

6  multiple applications can use the code.  Tr. 3022:4-3024:19.  But there is no evidentiary support in

7  the record for any of those statements.  In fact, despite his claims, Apple never identified a single

8  non-accused application that uses the code Dr. Mowry accuses, nor did Apple identify any record

9  support for its claim that the code is "designed" to be reused across applications or that there is

10  only one copy of the code in memory.  This is in stark contrast to what is in the record:  testimony

11  from a Google engineer that the code in question is not in fact a server.  Tr. 1585:9-18.

12       Similarly, Dr. Mowry identified what he claimed was "glue code" in the accused devices

13  and stated this supported his conclusion that there was an "analyzer server."  Tr. 3020:8-11,

14  3020:19-21, 3021:16-19.  Dr. Mowry referred to three routines as glue code:

15  addCallandContactMenuItems, onCreateContextMenu, and showLinksContextMenu.  *Id.*  These

16  routines are unequivocally part of the "client" applications:  as Dr. Mowry admitted, this is "code

17  in the client"/"code from the client."  *Id*.  This means these routines are not "separate from a

18  client," as required by the Federal Circuit's construction.  Importantly, *prior* to the Federal

19  Circuit's construction, Dr. Mowry stated unequivocally that the code he later called glue code was

20  the very code he said performs the claimed "linking."  Tr. 854:20-24

21  (addCallandContactMenuItems is the linking code because it is the "routine that can construct the

22  set of choices that the user gets in the pop-up menu"); Tr. 856:1-6 (same for

23  showLinksContextMenu for Messenger); Tr. 860:10-16 (onCreateContextMenu is the linking

24  code because it "constructs the set of choices for what the user can do").  Dr. Mowry's about-face

25  was because there is no separate server.  Rather, Dr. Mowry resorted to calling anything "glue

26  code" that performed the claimed functions but was in the application and not separate.

27       As Dr. Mowry admitted in the portion of deposition used to impeach him, "glue code" is

28  not a term of art taught in computer science.  Tr. 3047:9-3050:7.  Instead, it is a term Dr. Mowry

1    used to cover for the fact that the code he says performs "linking" is "code in the client." Thus,

2    the evidence supports only one conclusion:  that the accused products lack an "analyzer server"

3    that is "separate from a client" or that "receives data having structures from a client."

4              **(c)       The accused devices lack an action processor**

5              Apple has also failed to introduce evidence sufficient for a reasonable juror to conclude the

6    accused devices have the claimed "action processor."  The Court construed "action processor" as

7    "program routine(s) that perform the selected action on the detected structure."  Dkt. 447 at 20.

8    No such routines exist within Samsung's accused devices. Tr. 2794:1-2796:21.  Not surprisingly,

9    Dr. Mowry did not identify any program routines that perform the selected action on the detected

10   structure.  For instance, he pointed to the startActivity and ResolveActivity routines in Samsung's

11   accused devices. Tr. 873:8-74:4; PDX88.35; Tr. 2794:1-96:21.  But he failed to identify how

12   these routines—which he identifies as the action processor—perform the "selected action" (*e.g.*,

13   "Send email") "on a detected structure."  He conceded that when a user chooses the "selected

14   action," startActivity merely "makes use of these other routines" that will ultimately cause an

15   application to launch. Tr. 873:17-874:2.  This is not "perform[ing] the selected action on the

16   detected structure" because the action the user has selected—*i.e.*, "Send email"—is not performed

17   on a detected structure by startActivity and ResolveActivity.  Rather, the action is performed by

18   the *application*, such as the email application chosen to send the message (*e.g.*, Gmail).

19             **(d)       The Jelly Bean Galaxy Nexus Does Not Infringe**

20             Additionally, no reasonable juror could find that the Jelly Bean Browser infringes claim 9

21   because it lacks a "user interface enabling the selection of a *detected* structure."  Dr. Mowry

22   acknowledged that the Jelly Bean Browser only detects a structure *after* the user selects that

23   structure on the screen. Tr. 909:8-16.  In other words, any "detection" performed by the system is

24   only *after* the user has made his or her selection of the structure, in contrast with the plain

25   language of the claim. Tr. 2791:24-2793:23.

26             Accordingly, no reasonable juror could find that the Jelly Bean Galaxy Nexus infringes

27   claim 9 of the '647 patent.  Dr. Mowry and Apple acknowledged that the Messenger application

28   on the Galaxy Nexus does not infringe claim 9. Tr. 2792:21-2793:1 (Dr. Mowry), 3144:8-12

1   (Apple JMOL), 3225:3-5 (Apple Closing).  Because the only other accused application on that

2   device is the Jelly Bean Browser, Tr. 841:23-843:3, which does not infringe, no reasonable juror

3   could find that the Jelly Bean Galaxy Nexus infringes claim 9.

4        **B.        No Reasonable Jury Could Find Claim 9 Of The '647 Patent Valid.**

5        The Court should grant judgment as a matter of law that claim 9 of the '647 patent is

6   obvious over Sidekick.  *KSR Int'l, Co. v. Teleflex Inc.*, 550 U.S. 398, 426 (2007) ("The ultimate

7   judgment of obviousness is a legal determination") (citation omitted).  "If a person of ordinary

8   skill can implement a predictable variation, § 103 likely bars its patentability."  *Id.* at 417.

9        There is no dispute that Sidekick is prior art to the '647 patent.  DX330; DX331; DX332;

10  Tr. 1711:20-1723:10.  The Sidekick system disclosed nearly all of the limitations of claim 9,

11  including detecting various types of phone numbers and enabling a user to select a detected phone

12  number and perform an action on that number—dialing the number.  DX330 at 29-30, 75-76.

13  Sidekick detected any type of phone number.  DX330 at 75-76; Tr. 1718:23-1719:6, 1803:8-13,

14  1805:10-1809:24, 1834:7-1835:12.  And the Sidekick Handbook specifically instructed users on

15  how to change the detection code to detect other types of phone numbers.  DX330 at 99, 75; Tr.

16  1718:23-1719:6, 1802:18-1809:24.  Apple's expert even admitted Sidekick could find and dial

17  multiple types of phone numbers.  Tr. 2808:22-2809:2.

18       Samsung acknowledged that Sidekick did not explicitly disclose two limitations of claim

19  9:  (1) "linking actions to the detected structures" and (2) a "pop-up menu" of linked actions.  But

20  Samsung presented substantial evidence that these limitations would have been obvious based on

21  Sidekick.  Indeed, there is no dispute that a user can perform an action on a detected structure in

22  Sidekick (DX330 at 29-30, 75-76), nor is there any dispute that Sidekick disclosed a pop-up menu.

23       The construction of "linking actions" is "creating a specified connection between each

24  detected structure and at least one computer subroutine that causes the CPU to perform a sequence

25  of operations on that detected structure."  *Motorola*, Slip Op. at 21.  Samsung's expert, Dr. Jeffay,

26  explained that Sidekick did not explicitly disclose the required "specified connection" between

27  detected structures and actions.  Tr. 3092:9-3094:8.  By the time of the '647 patent, however,

28  performing linking using a "specified connection" would have been obvious.  *Id.*  Indeed, the '647

1    patent itself refers to the particular embodiment of "linking" as "using *conventional* pointers."

2    JX1 at 3:65-67 (emphasis added).  Similarly, the '647 patent describes "pop-up menus" as

3    "conventional."  JX1 at 4:27-31.  Sidekick disclosed a pop-up menu.  Tr. 1722:23-1723:4.

4    Sidekick also disclosed a menu at the bottom of the screen that presented the action—"dial"—to

5    the user, in the conventional DOS format, and implementing the disclosed menu as a pop-up

6    would have been an obvious variation by 1996.  Tr. 1810:2-1811:7.

7           Furthermore, Apple failed to offer any testimony whatsoever on the objective indicia of

8    non-obviousness, while Samsung provided testimony and evidence showing that these indicia are

9    absent.  *Compare* Tr. 1811:8-1813:2, *with* Tr. 2787:24-2811:3, 1777:18-1781:21, 1823:2-1830:10,

10   1841:20-1842:9.  To the extent Apple tries to rely on any other evidence it submitted in this case,

11   Apple has failed to draw the required nexus between that evidence and the alleged invention itself.

12   *In re GPAC Inc.,* 57 F.3d 1573, 1580 (Fed. Cir. 1995).  The Court properly excluded Apple from

13   drawing a nexus between any alleged evidence and Apple's alleged practice.  Dkt. 1760 at 2.

14          Apple attempted to distinguish claim 9 from Sidekick by arguing that claim 9 requires the

15   detection of multiple *types* of structures and linking of *multiple* actions to each detected structure.

16   Tr. 3101:17-3104:14.  As an initial matter, claim 9 does not require the detection of multiple *types*

17   of structures; it only requires the detection of multiple structures ("an analyzer server for *detecting*

18   *structures in the data*, and for linking actions to the *detected structures*").  Apple's improper claim

19   construction position adds words not found in the claim:  "an analyzer server for detecting

20   **multiple types of** structures in the data, and for linking actions to the detected structures."  Even

21   assuming Apple was right, there should be no dispute that Sidekick could detect multiple *types* of

22   structures, as Sidekick could detect and dial multiple types of phone numbers.  DX330 at 75-76;

23   Tr. 1718:23-1719:6, 1803:8-13; 1805:10-1809:24, 1834:7-1835:12, 2808:22-2809:2.

24          Similarly, Apple's attempt to end-run around the Federal Circuit's construction of "linking

25   actions" by alleging the necessity of multiple linked actions is wholly inappropriate.  The Federal

26   Circuit's construction expressly allows one or more linked actions for each detected structure

27   ("creating a specified connection between *each detected structure and at least one computer*

28   *subroutine* that causes the CPU to perform a sequence of operations on that detected structure").

1   All that is required is that any given structure be linked to at least one action.  Sidekick plainly

2   satisfies this requirement, as the "Dial" action is linked to each detected phone number.[2]

3          Finally, "[s]econdary considerations of non-obviousness must be considered when

4   present."  *Geo M. Martin Co. v. Alliance Machine Systems Int'l LLC*, 618 F.3d 1294, 1304 (Fed.

5   Cir. 2010).  Here, the secondary considerations—including Apple's failure to show *any* secondary

6   considerations in favor of nonobviousness—weigh in favor of obviousness.

7   **II.     SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON**
        **APPLE'S CLAIM AS TO THE '721 PATENT**

8

9          **A.      No Reasonable Jury Could Find Claim 8 Of The '721 Patent Valid.**

10          The Court should grant judgment as a matter of law that Claim 8 of the '721 patent is

11   obvious.  *KSR* held that "the combination of familiar elements according to known methods is

12   likely to be obvious when it does no more than yield predictable results," and "[i]f a person of

13   ordinary skill can implement a predictable variation, § 103 likely bars its patentability."  550 U.S.

14   at 416-17.  Claim 8 of the '721 patent is a classic example of an obvious combination under *KSR*.

15   The elements of Claim 8 are nothing more than known elements used for their known purpose,

16   and the record is devoid of any evidence to the contrary.  Indeed, the only basis for this Court's

17   statement in its preliminary injunction decision that Apple had a likelihood of success on this issue

18   was that one of the two pieces of prior art (a Neonode device) might not have been a proper prior

19   art reference, *see* Dkt. 221 at 50, but at trial it was firmly established that the Neonode Guide is

20   properly considered prior art, Tr. 1966, a point that Apple no longer disputes.

21          Samsung presented evidence concerning two pieces of prior art, the Neonode N1

22   Quickstart Guide (DX342) and a video and paper by Plaisant that were presented at the ACM CHI

23   conference in 1992 (DX343, DX344).  Tr. 1965:23-1976:1.  Together, the prior art disclosed all of

24   the limitations in claim 8 of the '721 patent.  Claim 8 (dependent upon claim 7) covers:

25          A portable electronic device, comprising . . . one or more modules including instructions:
        to *detect a contact* with the touch-sensitive display at a first predefined location
        corresponding to an unlock image; *to continuously move the unlock image* on the touch-

26   _____

27   [2]   Moreover, adding additional actions, to the extent necessary, would have been obvious, and
      Apple did not offer evidence to the contrary.  Tr. 1805:11-20, 1806:23-1807:20, 1810:2-1811:7.

28

sensitive display in accordance with the movement of the detected contact . . . ; and *to unlock the hand-held electronic device* if the unlock image is moved from the first predefined location on the touch screen to a predefined unlock region on the touch-sensitive display [and also] further comprising instructions to display *visual cues to communicate a direction* of movement of the unlock image required to unlock the device.

JX10 at 19:50-20:12 (emphasis added).

The Neonode guide disclosed unlocking a portable, touch-screen phone with a left to right sweep gesture. Tr. 1968:8-21; DX342. In fact, Neonode even has "Right sweep to unlock" appear on the screen of the device, and teaches that the user must "[s]weep right to unlock" the phone. DX342.013. Thus, Neonode describes at least "[a] portable electronic device" with a "touch-sensitive display" and "visual cues to communicate a direction of movement . . . required to unlock the device." JX10 at 19:50-20:12. Indeed, this Court recognized that "NeoNode discloses several of the claimed limitations of the '721 Patent." Dkt. 221 at 50. The only element of Claim 8 missing from Neonode is the moving image accompanying the sweep. Tr. 1968:22-1969:2. While Apple characterized the lack of an "unlock image and its movement" as missing elements, rather than one element, Tr. 2865:2-11, they conceded the basic point: the single design choice of adding the image or not is the only element not explicitly disclosed.

The Plaisant reference plainly disclosed this sliding image that could be moved from one predefined location to another to change the state of the device. Tr. 1970:15-1971:20. At trial, Apple did not dispute that Plaisant discloses an image that moves from one predefined location to another. Tr. 2865:12-2866:16. Apple also did not contend that Claim 8 of the '721 patent combines the elements of Neonode and Plaisant in any unexpected or unpredictable way. Tr. 2864:2-2866:16. Moreover, Apple did not dispute that the combination of the two references presented by Samsung disclosed each and every element of Claim 8.

Instead, Apple's **sole** argument against the Neonode/Plaisant combination is that Plaisant "teaches away" from using the sliding mechanism. Tr. 2863:21-2866:16. The law and the facts do not support this argument. Tr. 2864:2-2866:16; DX343; DX344. "A reference does not teach away if it does not criticize, discredit, or otherwise discourage investigation into the invention claimed." *Galderma Laboratories, LP v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013) (internal quotation marks and alterations omitted). The record is clear that Plaisant did not

"discourage," and in fact encouraged, the use of sliders.  Plaisant taught that sliders should be used to solve *the precise problem* identified by both named inventor Gregory Christie and Apple's expert as the "accidental unlocking" problem allegedly solved by Claim 8 of the '721 patent.  Tr. 600:2-5; Tr. 636:4-13.  Specifically, Plaisant taught that an "advantage of the sliding movement is that it is *less likely to be done inadvertently* therefore making the toggle very secure (the finger has to land on and lift off the right locations)."  DX 344.002 (emphasis added); Tr. 1972:12-1973:9.  Neonode likewise identified the same accidental unlocking problem, and used a sliding unlock gesture as the solution.  *See* DX342.013 ("Keylock is automatic on the N1, to save battery and *to make sure no unintentional calls are made*. . . . Sweep right to unlock your unit") (emphasis added).  The fact that the same need and the same solution – a sliding gesture – were identified by both references provides the reason to combine their undisputed teachings.  *See KSR*, 550 U.S. at 420 ("[A]ny need or problem known in the field … at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.").

        As a matter of law, any ambivalence in Plaisant about sliders does not constitute "teaching away" because Plaisant plainly did not attempt to dissuade others from using sliders.  *See, e.g.*, *In re Kubin*, 561 F.3d 1351, 1357 (Fed. Cir. 2009) ("Mathew's quasi-agnostic stance toward the existence of a human homologue of the 2B4 gene cannot fairly be seen as dissuading one of ordinary skill in the art from combining Mathew's teachings with those of Valiante.").  While Apple's expert testified that Plaisant "tells you not to use the sliding mechanism," Tr. 2866:4, there is no such statement in the prior art.  Plaisant does state that "[t]he toggles that are pushed seemed to be preferred over the toggles that slide," but it made clear "[e]ven if sliders were not preferred, the fact that users used them correctly is *encouraging*."  DX344.002 (emphasis added).  As the Federal Circuit has recognized, "[a] known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use."  *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).  That is especially true here given that Plaisant pointed out the important "*advantage*" of sliders directly relevant to the combination at issue.  DX344.002 (emphasis added).  In short, the point of the "teaching away" analysis is that "when the prior art teaches away from combining certain known elements, discovery of a

1    successful means of combining them is more likely to be nonobvious," *see KSR*, 550 U.S. at 416,

2    and there is no plausible reading of Plaisant that renders the use of sliders nonobvious.

3         Finally, no secondary indicia weigh against the determination that Claim 8 is obvious.

4    Apple made no effort to establish a nexus between purported secondary indicia such as

5    commercial success and the subject matter of claim 8.  Tr. 2867:20-2869:25.  Indeed, the notion

6    that commercial success is tied to practicing the particular elements of claim 8 is belied by the fact

7    that Samsung's best selling phone, the Galaxy S III, was not accused of infringing the '721 patent.

8         **B.    The '721 Patent Is Indefinite As A Matter Of Law.**

9         Claim 8 is also invalid because the claim term "unlock" is indefinite.  *See* JX10.  To be

10   valid, claims must "particularly point[] out and distinctly claim[] the subject matter which the

11   inventor … regards as the invention."  35 U.S.C. § 112(b).  Apple's own expert pointed out that

12   "unlocking can be used in alternative circumstances," but the limits of those circumstances are

13   undefined.  Tr. 633:12-16.  The '721 patent suggests a range of what may be considered locked, or

14   unlocked, without sufficient clarity for a person of ordinary skill in the art to understand when

15   using a sliding image to change state would run afoul of the claim 8.  Tr. 633:5-11 ("when the

16   device is locked, a predefined set of actions is unavailable the device will ignore ***most, if not all***,

17   input") (emphasis added); JX10 at 7:64-67 ("In the user-interface lock state … the device …

18   ignores ***most, if not all,*** user input.") (emphasis added); *id.* at 8:8-10 ("In some embodiments, the

19   device 100 in the lock state may respond to ***a limited set*** of user inputs ….") (emphasis added).

20        **C.    No Reasonable Jury Could Find The Galaxy Nexus Infringed The '721 Patent.**

21        The record does not support infringement of the '721 patent by the Galaxy Nexus devices.

22   Claim 8 of the '721 patent requires, *inter alia*, detecting "a contact with the touch-sensitive display

23   at a first predefined location corresponding to ***an unlock image***" and continuously moving "***the***

24   ***unlock image*** on the touch sensitive display in accordance with movement of the detected

25   contact."  JX10 at 19:58-20:1 (emphasis added).  The plain language thus requires that the image

26   with which the user makes contact be the same image that then moves with user contact.  *See*

27   *Process Control Corp. v. Hydreclaim Corp.,* 190 F.3d 1350, 1355-1357 (Fed. Cir. 1999) (as an

28   antecedent basis, "a discharge rate" is the same as a later occurrence of "the discharge rate").  Yet,

the image with which the user makes contact on the Galaxy Nexus devices – a padlock in a circle – *disappears* upon user contact and is replaced by another, different image.[3]  Tr. 1980:4-1981:21.  Apple even admits that the image changes upon user contact.  Tr. 740:23-741:1, 742:9-14.

Apple's argument that the unlock image can disappear yet still somehow be "the unlock image" is based on an unsupported interpretation of the claim, and should be rejected as a matter of law.  Apple first relies on the idea that "the unlock image" is a "graphical interactive user-interface object with which the user interacts."  Tr. 678:9-18.  But however characterized, Apple cannot supplant the claim's explicit statement that there must be an unlock image with which the user makes contact, and it is "the" unlock image that must then move.  JX10 at 19:58-61.

Nor is there anything in the specification that supports Apple's broad interpretation that any new image can move across the screen, even if it is not the same unlock image.  The specification states only that "***the arrow*** on the unlock image 402 may appear and disappear," JX10 at 12:41-42 (emphasis added), not that the unlock image itself can disappear.  In any case, the language of the claim, not the specification, controls.  *See, e.g.*, *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983).  Having claimed a device in which the selected unlock image moves continuously across the screen, Apple cannot now rewrite or broaden the claim.

In addition to misapplying the plain meaning of the claim, the evidentiary record cannot support a finding that Galaxy Nexus infringes.  Apple's expert admits that the original image he identifies as the unlock image "changes form to something else" when the user makes contact.  Tr. 740:23-741:14; *see also* Tr. 742:9-14.  And although Dr. Cockburn contends that the image is a graphical interactive user interface object that may change form, *see, e.g.*, Tr. 678:6-679:5, he failed to offer any evidence that "the unlock image" in the Galaxy Nexus was, in fact, a graphical interactive user interface object that actually changed form.  *See* Tr. 620:12-707:7.  He also failed to analyze any source code with respect to the graphical user interface object(s), which would show whether the image changed form, or was instead a different object.  Tr. 626:5-11.

---

[3]  In the Ice Cream Sandwich version of the Galaxy Nexus, the new image is a larger circle.  Tr. 1981:11-18.  In the Jelly Bean Version, the new image is a series of dots.  Tr. 1981:11-21.

1    Accordingly, there is no evidence in the record to support a finding that the Galaxy Nexus

2    infringes because it is an image that changes form, even under Dr. Cockburn's theory.

3          An additional, separate basis for judgment of non-infringement exists for the Jelly Bean

4    version of the Galaxy Nexus, which uses a different design than the Ice Cream Sandwich version.

5    Tr. 676:17-677:12.  In the Jelly Bean version, when the padlock in a circle image disappears, a

6    series of dots appears.  Tr. 676:17-677:5, 1980:4-1981:25.  Apple does not contend that the second

7    image – the series of dots – moves.  Tr. 677:2-5; *see also* Tr. 2860:10-2861:7.  Instead, Dr.

8    Cockburn described "a spotlight effect on the dots" as "the image changing from one visual

9    representation to another."  Tr. 677:2-5; *see also* Tr. 2861:6-7.  Thus, the Jelly Bean version of the

10   Galaxy Nexus cannot infringe claim 8 because there is no evidence of any "unlock image" that

11   continuously moves in accordance with movement of the detected contact, as required by claim 8.

12         Finally, judgment of non-infringement should be granted as to all three devices that the

13   jury found infringe the '721 patent because Apple offered no evidence of any of the required

14   "instructions."  JX10 at 19:55-20:12.  Indeed, the asserted claim requires various instructions,

15   including instructions "to detect a contact," "to continuously move the unlock image," and "to

16   display visual cues."  Yet Apple's expert admits he did not look at source code in forming his

17   opinions concerning infringement.  Tr. 626:5-11.

18   **D.     No Reasonable Jury Could Find Clear And Convincing Evidence Of Willful
             Infringement Of The '721 Patent.**

19

20         The Federal Circuit has held that "to establish willful infringement, a patentee must show

     by clear and convincing evidence that the infringer acted despite an objectively high likelihood

21   that its actions constituted infringement of a valid patent . . . .  If this threshold objective standard

22   is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by

23   the record developed in the infringement proceeding) was either known or so obvious that it

24   should have been known to the accused infringer."  *In re Seagate Techs., Inc. v. Gateway, Inc.*,

25   497 F.3d 1360, 1371 (Fed. Cir. 2007) (*en banc*).  Thus, willfulness here requires clear and

26   convincing proof (1) to the Court of an objectively high likelihood that the patents were valid and

27   infringed; and (2) to the jury that Samsung subjectively knew or recklessly disregarded that the

28

patents were valid and infringed.  *Bard Peripheral Vascular, Inc. v. Gore & Assoc., Inc.,* 682 F.3d 1003, 1007 (Fed. Cir. 2012).  Apple fails to satisfy either prong of the willfulness test.

### 1. Samsung's Objectively Reasonable Defenses Preclude Willfulness As A Matter Of Law.

"To establish objective willfulness, Apple must prove by clear and convincing evidence that there was an objectively high likelihood that its actions constituted infringement of a valid patent."  *Apple, Inc. v. Samsung Elecs. Co., Ltd.,*  920 F. Supp. 2d 1079, 1107-1109 (N.D. Cal. 2013) (internal quotation marks omitted).  Where there is an "objectively reasonable defense," then objective willfulness fails as matter of law.  *Id.* (granting JMOL that infringement was not willful where Samsung presented reasonable invalidity defenses); *see also, e.g.*, *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1337 (Fed. Cir. 2009) (plaintiff could not show willfulness as a matter of law where "the record developed in the infringement proceeding . . . , viewed objectively, indisputably shows that the question of equivalence was a close one").

Even if Samsung's defenses as to validity and infringement do not prevail, they are at least "reasonable," which forecloses a finding of willfulness.  Samsung presented a strong invalidity case with respect to the combination of Neonode and Plaisant, where Apple's only objection to the combination is that Plaisant "teaches away" from sliders despite explicitly stating that sliders had advantages that were encouraging.  Samsung's argument is, at a minimum, reasonably debatable, and this alone defeats the objective prong of the willfulness inquiry.  Indeed, the Federal Circuit rejected a finding of willfulness in a situation where, as here, "[t]he combination" of prior art "plainly discloses all of the claimed limitations," even where the jury seemingly decided that "one of skill in the art would not have found the combination obvious," because the defense of obviousness was not unreasonable.  *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010).  Moreover, Samsung presented a strong noninfringement defense based on the language requiring an unlock image.  At the very least, infringement and validity are not so clear that it was unreasonable for Samsung to argue otherwise.  *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310-11 (Fed. Cir. 2011) ("Uniloc has failed to meet the threshold objective prong of *Seagate*" where "infringement . . . is a complicated issue.").

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

2.     **There Is No Evidence That Samsung Acted With Knowledge Or Reckless Disregard.**

There is no evidence in the record to support a finding of subjective willfulness.  "To willfully infringe *a patent*, the patent must exist and one must have knowledge of it . . . ." *IpVenture, Inc. v. Cellco P'ship*, 2011 WL 207978, at *2 (N.D. Cal. Jan. 21, 2011) (emphasis in original).  "Hence a party cannot be found to have 'willfully' infringed a patent of which the party had no knowledge."  *Solannex, Inc. v. Miasole*, 2011 WL 4021558, at *3 (N.D. Cal. Jan. 4, 2012).  Knowledge of Apple products does not equate to knowledge of Apple patents—and Samsung plainly had no pre-suit notice of the '721 patent.  Tr. 1043:19-20.  Indeed, the '721 patent did not even issue until October, 25, 2011, mere months before this litigation commenced.  *See* JX10.

Because there is no evidence that Samsung knew of the '721 patent before this suit commenced, Apple must rely entirely on post-suit conduct to support subjective willfulness.  However, in "ordinary circumstances" the inquiry should focus on the defendant's pre-suit knowledge because patentees "should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct."  *Seagate*, 497 F.3d at 1374.  To be sure, *Seagate* recognized that it was possible, "depend[ing] on the facts of each case," to have subjective willfulness for post-suit conduct where a preliminary injunction is denied for non-merits reasons.  *Id.*  Here, however, the facts show that even though this Court found a likelihood of success for Apple on the '721 patent, it recognized significant defenses of obviousness and noninfringement, *see* Dkt. 221 at 43-52; the basis for the decision on obviousness was inapplicable at trial, *see supra* at p.16; and all of these defenses ultimately went to the jury.  Thus, the Court's preliminary injunction decision provided no basis for Samsung to believe that it could not ultimately prevail, and, accordingly, it does not displace the usual rule that post-suit conduct is insufficient to show willfulness.

Furthermore, even if the preliminary injunction decision had put Samsung on notice that Apple had a high likelihood of success on the '721 patent, there still would be no basis for a finding of subjective willfulness.  No new model released by Samsung since this suit was filed in February of 2012 has even been accused of infringing the '721 patent.  Tr. 710:11-711:14, 714:19-715:6; DX508.007; PX300.  Moreover, for the three devices that the jury found to be infringing,

1   there is no evidence that Samsung continued to sell infringing versions of these devices for a

2   significant amount of time after the preliminary injunction decision.  For two of the devices

3   (Admire and Stratosphere), Apple does not dispute that updates rendered the devices non-

4   infringing by July and August 2012, respectively.  PX222A.  For the third (Galaxy Nexus),

5   Samsung also updated it in the summer of 2012, from the Ice Cream Sandwich version to the Jelly

6   Bean version.  Tr. 909:1-7, 1513:11-18.  While Apple contends that the Jelly Bean version is also

7   infringing, there is a strong – and certainly a reasonable – argument that the unique features of the

8   Jelly Bean version render it non-infringing.  *See supra* at p.21.  In short, there is no evidence that

9   Samsung created or continued to sell devices it knew to be infringing.

10      Apple relies on the specter of "copying," but Apple conceded that it was not claiming that

11   Samsung copied the patent, but that it copied the iPhone itself.  *See* Tr. 728:12-16, 730:25-731:3.

12   As to Samsung allegedly copying the iPhone, there are several critical flaws in this argument.

13      *First*, Samsung did not design the lock screen for two of the three models that the jury

14   found infringe the '721 patent.  Both the Admire and Galaxy Nexus lock screens were solely

15   designed by Google.  Tr. 733:4-23, 1727:19-1728:6, 1978:9-14.  There is absolutely no evidence

16   that Google copied Apple's iPhone.  Tr. 734:17-19.  There is also no evidence that Samsung had

17   any role in Google's lock screen designs, or that Google and Samsung ever discussed lock designs

18   or made suggestions to each other.  Tr. 733:12-734:16.  Thus, the record has no evidence that can

19   support a finding that these Google designs are copies of the iPhone by Samsung.  While Apple

20   claims that it is irrelevant whether Google or Samsung designed the lock screen, it does matter for

21   purposes of subjective willfulness because the issue is Samsung's *mens rea*, and there can be no

22   evidence of Samsung's bad intent for a design that it played no role in creating.

23      *Second*, the so-called "copying" evidence introduced by Apple, all from 2010, predates the

24   issuance of the '721 patent.  *See* Tr. 2900:11-2902:3; PX120 (May 5, 2010); PX121 (May 31,

25   2010); PX157 (March 24, 2010).  And before the issuance of the patent, there was no obligation to

26   refrain from copying at all.  *See, e.g.*, *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236

27   (Fed. Cir. 1985).  It is error to suppose "that copying is synonymous with willful infringement."

28   *Princeton Biochemicals, Inc. v. Beckman Ins., Inc.,* 180 F.R.D. 254, 258 n.3 (D.N.J. 1997).

Copying publicly-known information not protected by a valid patent is fair competition. *See TrafFix Devices, Inc. v. Mkt'g Displays, Inc.*, 532 U.S. 23, 29 (2001).  Thus, the alleged copying has no role in establishing any bad intent on the part of Samsung.  *See Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562-63 (Fed. Cir. 1994) ("In resolving the willfulness, . . . the court is cautioned not to place undue weight on defendants' activities prior to the issuance of the patent.").

*Third*, the only evidence of supposed copying are Samsung documents recommending that future designs behave more like the iPhone, and there is no evidence that Samsung ever acted on any of these recommendations. Tr. 2900:11-2902:3.  Rather, the only testimony is that of Ms. Kim, who testified that, while she would look at problems identified in documents of this nature, she did not rely on the proposed solutions for her design work.  Tr. 1736:7-1738:2.  Moreover, while Samsung unequivocally established that no copying occurred, even if it had, it would not support willfulness because "copying requires evidence of efforts to replicate a specific product," *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010), and there is no such specificity in the alleged desire to have Samsung products behave more like the iPhone.  Rather, the evidence shows only that Samsung analyzed its competitor's products in looking to improve its own; that does not constitute willful infringement.  *See State Indus.*, 751 F.2d at 1235-36 ("Conduct such as Smith's, involving keeping track of a competitor's products and designing new and possibly better or cheaper functional equivalents is the stuff of which competition is made and is supposed to benefit the consumer.  …  It should not be discouraged by punitive damage awards except in cases where conduct is so obnoxious as clearly to call for them.").

*Finally*, the undisputed facts belie willfulness for the one lock screen at issue that was designed by Samsung.  It is undisputed that the Stratosphere uses the puzzle design that Samsung designed in 2008 or 2009, over a year *before* every one of the 2010 comparison analyses upon which Apple bases its copying claim.  Tr. 1731:23-25, 2900:4-2902:3; PX120; PX121; PX157.

## III.   SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT THE '172 PATENT IS INVALID

The Court should grant judgment as a matter of law that claim 18 of the '172 patent is obvious.  Samsung presented substantial evidence that a combination of two prior art references,

1  U.S. Patent No. 7,880,730 ("Robinson") (DX492) and International Publication No. WO

2  2005/008899 A1 ("Xrgomics") (JX59), render claim 18 obvious as understood by a person of

3  ordinary skill in the art in 2007.  *See KSR Int'l*, 550 U.S. at 416-17.  Apple responded that these

4  references cover different subject matters and lack at least one limitation of claim 18.  Tr.

5  2905:21-2906:2.  But Apple's response is inapposite.

6       Claim 18 of the '172 patent covers a particular form of text correction, in which a "current

7  character string" is displayed in a first and second area of a touch screen display.  JX13.  The user

8  can replace a mistyped word (*i.e.*, the "current character string") by selecting a delimiter or

9  selecting a replacement word in the second area.  *Id*.  The user can also keep the "current character

10  string" by selecting it in the second area.  *Id*.

11       Robinson similarly discloses a first and second area of a touch screen display with

12  suggested replacements in the second area.  Tr. 2016:8-14, 2020:1-14.  The user can replace a

13  mistyped word by selecting a delimiter or selecting a replacement character string in the second

14  area.  Tr. 2020:15-2022:25.  The user can also keep the "current character string" by selecting it in

15  the second area.  Tr. 2023:1-14.

16       Xrgomics discloses another text correction system in which the touch screen display

17  includes a first and second area.  Tr. 2017:25-2018:19.  The first area includes the "current

18  character string" and the second area includes suggestions that a user can select to replace the

19  "current character string."  *Id*.  The combination of Robinson and Xrgomics plainly discloses all

20  the limitations of claim 18.  Tr. 2023:15-20.

21       Claim 18 of the '172 patent, like claim 8 of the '721 patent, is a classic example of an

22  obvious combination under *KSR*.  Based on the disclosures in Robinson and Xrgomics, claim 18 is

23  nothing more than a combination of familiar elements according to known methods that provides

24  predictable results.  *See* Tr. 2017:1-9, 2018:14-19, 2019:6-10.

25       Apple alleged that Robinson and Xrgomics lacked several limitations of claim 18.  Tr.

26  2903:24-2904:21, 2905:18-2906:2.  But the Robinson patent discloses every limitation of claim 18

27  except arguably the "current character string" in the "first area."  Tr. 2023:15-2024:3.  Apple's

28  expert, Dr. Cockburn, tried to broaden this distinction by repeatedly highlighting the missing

"current character string in the first area" for other limitations.  Tr. 2903:24-2904:21.  But there is no dispute this "current character string in the first area" is the only thing allegedly missing from Robinson.  *Id.*  And the Xrgomics reference plainly discloses this current character string displayed in a first area.  Tr. 2018:11-19, 2024:5-6.  Apple does not dispute this.  Instead, Apple's only argument for something supposedly missing from both Robinson and Xrogmics is that "[b]oth of the disclosures are missing at least this element, 'the current character string in the first area is replaced with the suggested replacement string when the user presses a delimiter.'"  Tr. 2905:21-24.  But this argument simply ignores that the *combination* does cover every aspect of this element:  Robinson for the suggested replacement string when the user presses a delimiter, and Xrgomics for the current character string in the first area.

Combining Robinson and Xrgomics would have been obvious to a person of ordinary skill in the art that the time of the invention.  Tr. 2023:18-2024:6.  Indeed, Apple never contended that claim 18 combines the disclosures of Robinson and Xrgomics in any unexpected or unpredictable way.  *See* Tr. 2905:18-2906:2.  Instead, Dr. Cockburn attempted to distinguish Xrgomics as not being a "spelling correction patent" but rather a "word completion patent."  Tr. 2904:22-2905:17.  This is legally and factually irrelevant.  Both Robinson and Xrgomics disclose user interfaces for a touch screen that provide suggestions for user input, exactly like claim 18 of the '172 patent.  Tr. 2018:3-10; *see also Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 (Fed. Cir. 2010) ("[T]he ultimate inference as to the existence of a motivation to combine references may boil down to a question of 'common sense,' appropriate for resolution on summary judgment or JMOL.").

"When there is a design need or market pressure to solve a problem"—here, user interfaces for efficient text entry on a touch screen—"and there are a finite number of identified, predictable solutions"—here, whether to display what the user typed in the first area or not—"a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp."  *KSR Int'l*, 550 U.S. at 402.  Indeed, combining Robinson and Xrgomics to arrive at claim 18 was well within the technical grasp of a person of ordinary skill in the art, and the combination would be "standard practice for someone in this field."  Tr. 2019:1-21.

Apple also failed to present any credible evidence of secondary indicia of non-obviousness, particularly because Apple does not practice claim 18.  Tr. 695:18-20.  As such, Apple could not demonstrate any nexus between purported secondary indicia such as commercial success and the subject matter of claim 18.  Tr. 2906:3-13.  Also, the idea that commercial success is tied to practicing the elements of claim 18 is belied by the fact that Samsung's best-selling phone, the Galaxy S III, was not accused of infringing the '172 patent.  Tr. 776:14-20, 778:6-15.

## IV.   SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT CLAIM 25 OF THE '959 PATENT IS INVALID

No reasonable jury could find claim 25 of the '959 patent valid because the WAIS prior art anticipated each and every limitation of claim 25; claim 25 of the '959 patent is obvious in light of Smith and Shoham; and the term "heuristic" in claim 25 renders the claim invalid as indefinite.

### A.   WAIS Anticipates Claim 25 Of The '959 Patent.

Samsung presented expert testimony, fact testimony, and documents showing that the WAIS prior art, as found in DX301, was publicly available, known, and in use in the United States, prior to the priority date of the '959 patent.  DX301; Tr. 1863:18-1865:3, 1865:17-1867:25, 1870:1-4, 1920:2-1922:2; DX301 at freeWAIS-sf 2.0.65\docs\SF\fwsf.ps at p.14; DX305; DX313.

WAIS anticipates each limitation of claim 25.  Fact witnesses testified that the WAIS prior art, long before the priority date of the '959 patent, searched local and Internet sources with a single search using heuristics.  Tr. 1846:4-16, 1848:16-22, 1853:21-25; Tr. 1874:7-9.  Their testimony was corroborated by contemporaneous documentary evidence.  DX301; DX304.400, 536-63; DX305; DX311; DX313.  Apple declined to cross-examine Samsung's witnesses on these points, and presented no contrary fact witnesses or documentary evidence.  Samsung's expert, Dr. Rinard, further explained that the WAIS prior art met every limitation of claim 25.  First, he showed how the WAIS prior art provided software on a "computer readable medium for locating information from a plurality of locations containing program instructions" because DX301 includes instructions that locate information locally and on the Internet.  Tr. 1911:14-21, 1912:9-21, 1914:6-16, 1926:5-21 (explaining source code and documentation and demonstrating capabilities of compiled WAIS software).  Dr. Rinard also testified that WAIS "receives an

1   information identifier" when it receives a user's query.  Tr. 1914:20-1915:7 (explaining source

2   code); Tr. 1927:15-18 (demonstrating capabilities of compiled WAIS software).  Source code and

3   documents, as well as the testimony of Brewster Kahle, the original author of WAIS, corroborated

4   Dr. Rinard's testimony.  Tr. 1852:5-11, 1854:1-8; DX301 at 2.0.65\x\qcommands.c,

5   2.0.65\docs\SF\fwsf.ps; DX 304.532-33; DX 311.013; DX312.

6        Dr. Rinard further demonstrated that WAIS "provided said information identifier to a

7   plurality of heuristics to locate information in the plurality of locations which include the Internet

8   and local storage media."  Tr. 1915:8-1918:14 & Tr. 2916:20-2917:19 (explaining source code

9   and documentation); Tr. 1925:14-1928:20 (demonstrating capabilities of WAIS compiled

10  software).  Mr. Kahle again corroborated Dr. Rinard's testimony, Tr. 1849:10-16, 1851:25-

11  1852:11, 1854:1-8; as did Mr. Pfeifer, Tr. 1874:7-9, and the WAIS source code and

12  contemporaneous documentation in evidence, DX301 at 2.0.65\x\qcommands.c,

13  2.0.65\docs\SF\fwsf.ps; DX304.400, 449-52, 461, 482-83, 520, 553-55, 560-61; DX311.013, 018,

14  023-024, 034-35, 046, 053; DX312 at 26:13-50, 49:14-50:36, 54:16-54:49.

15       Dr. Rinard testified that WAIS has instructions to "determine at least one candidate item of

16  information based on the plurality of heuristics" and to "display a representation of said candidate

17  item of information."  Tr. 1918:15-24 (explaining source code); Tr. 1927:9-28:20 (demonstrating

18  capabilities of WAIS compiled software).  Once again, Mr. Kahle corroborated Dr. Rinard's

19  testimony, Tr. 1854:1-8, as did WAIS documentation, *see, e.g.*, DX301 at 2.0.65\x\qcommands.c,

20  2.0.65\docs\SF\fwsf.ps; DX304.461, 454-458, 532; DX311.013, 067-068.  Finally, Dr. Rinard

21  testified that WAIS has instructions "wherein the information identifier is applied separately to

22  each heuristic."  Tr. 1918:15-24 (explaining source code); Tr. 1919:6-14 (explaining source code).

23       Apple presented no fact witnesses on WAIS, and its expert Dr. Snoeren made only a few

24  arguments against WAIS' anticipation of claim 25.  These arguments fail, lacking support in the

25  record as well as legal sufficiency, entitling Samsung to judgment of anticipation as a matter of

26  law.  First, Apple rehashed its failed summary judgment argument (Dkt. 1150 at 27-29) that Dr.

27  Rinard was required to show that someone in the United States configured WAIS in exactly the

28  way he demonstrated it.  Tr. 1953:8-12.  Dr. Snoeren then opined that "source code" cannot be the

"program instructions" recited in claim 25 because source code must be compiled to qualify as these "program instructions." Tr. 2824:7-21.  As Dr. Rinard explained, however, "the instructions in the source code are what invalidate[] the claims, not the compiled source code."  Tr. 1953:13-15.  Claim 25 requires only "program instructions," that is, *source code*.  Tr. 1913:16-19, 1914:1-16, 1952:15-23, 1957:12-1958:3, 2915:2-15; *see also* Dkt. 854 at n.16 & n.17.  Apple itself agreed as much, jointly providing to the jury a glossary including a definition of "source code" that equated "source code" to "instructions."  Tr. 3293:18-94:2.  Further, Dr. Snoeren presented source code to the jury when seeking to show "program instructions" for purposes of infringement.  Tr. 950:12-956:23.  Thus, no reasonable jury could find Dr. Snoeren's argument credible or give it any weight.  Regardless, even on Apple's reading that source code must be compiled to be "program instructions," Samsung presented overwhelming evidence at trial that the WAIS source code (DX301) was compiled, installed, and executed in the United States before the priority date of the '959 patent.  Tr. 1865:4-67:25, 1870:1-71:22; DX305; DX313.

Other than claiming source code is not "program instructions," Apple's opposition to WAIS focused on a single element of the claim:  Apple alleged WAIS lacked the claimed "plurality of heuristics."  That argument must fail, as a matter of law.  Dr. Snoeren first opined that all the "heuristics" in the claim must be located on a single device, as opposed to elsewhere, such as on servers on the Internet.  Tr. 2820:4-2823:6.  But claim 25 says no such thing.  It requires instructions on a computer-readable medium that "*provide* said information identifier to a plurality of heuristics to locate information in the plurality of locations which include the Internet and local storage media."  JX4 at 9:20-22 (emphasis added).  As Dr. Rinard explained, the "heuristics" in claim 25 can be located anywhere, so long as the instructions on the computer readable medium *provide* the information identifier to those heuristics – wherever the heuristics are located.  Tr. 1915:8-15, 2815:7-16:25, 2917:20-18:19.  By contrast, Apple's view of claim 25 is unsupported.  Under Apple's view, the "Internet"—also recited in claim 25—would have to be located on one computer-readable medium on a single computer.  Claim 25 requires no such thing, JX4 at 9:16-30, and thus cannot contain the additional "heuristic location" limitation suggested by Apple.

Dr. Snoeren also asserted that Samsung did not show that WAIS had a "plurality of heuristics" because (in his view) WAIS had a plurality (more than one) heuristic, but had the same plurality – the same *set* – of heuristics on the local computer and on the Internet.  Tr. 2823:7-2824:6.  Apple's attempt to impose a requirement of a *different* set of heuristics, *unique* to each location, has no support in the claim language.  As Dr. Rinard showed, WAIS had instructions to provide the user's query to three different heuristics—the "plurality of heuristics" required by the claim—including identifying the separate source code that implements each of these heuristics. Tr. 2916:20-1917:19 (discussing source code in WAIS for stemming, synonym matching, and relevance ranking heuristics).  Accordingly, applying the proper standard for the claim language, no reasonable jury could find that WAIS does not anticipate claim 25 of the '959 patent.

**B.      Claim 25 Is Obvious In Light Of Smith And Shoham.**

At trial, Dr. Rinard testified that claim 25 is invalid as obvious in light of the Smith and Shoham patents.  JX55; JX56; Tr. 1929:12-1932:9.  According to Dr. Rinard, the Smith patent, filed July 15, 1999, is "about accessing local and remote information in response to a single query using heuristic."  Tr. 1929:16; 1930:5-7; SDX2982.  It is thus an example of universal search.  Tr. 1930:10.  Dr. Rinard explained that Smith receives an information identifier, "gives that to the local search and the remote search, and both searches happen. . . . You get the results back and you display them, list search results."  Tr. 1930:16-21; SDX2988.  The Shoham patent was filed on May 12, 1995.  Tr. 1931:6; JX56.  As Dr. Rinard explained, column 8 of Shoham "tells us that heuristic search techniques are well established by 1995, and, in fact, the Shoham patent is using conventional heuristic search."  Tr. 1931:19-23; SDX2996.  Dr. Rinard further explained that those skilled in the art would have been motivated to combine Shoham with Smith, references that are in the same field and that seek to solve similar problems.  Tr. 1931:24-1932:5.

Dr. Rinard also presented overwhelming – and undisputed – evidence that secondary considerations support a finding of obviousness.  Tr. 1932:21-1933:2 ("There's no commercial success of the '959 patent.  No Apple product ever practiced the claimed invention or ever used the claimed invention, and, in fact, Samsung doesn't use the claimed invention.  I'm aware of no praise for the '959 patent, and . . . . there's no copying.")  Apple failed to rebut Dr. Rinard's

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

testimony concerning obviousness based on Smith and Shoham.  Dr. Snoeren declined to give a

point-by-point response to Dr. Rinard's testimony.  Tr. 2826:11-21.  Instead, he claimed a person

of ordinary skill would not have combined the teachings of Smith and Shoham because "they're

patents about entirely different things," Tr. 2826:24-2827:3, opining that "it's not clear at all why

you would use this mathematical formulation from Shoham, which doesn't know what it's looking

for, with the device from Smith, which has a very particular domain."  Tr. 2827:17-20.

Finally, Dr. Snoeren did not dispute Dr. Rinard's opinions or the evidence concerning

secondary considerations of non-obviousness.  Tr. 1932:20-1933:2.  In fact, Dr. Snoeren did not

even mention secondary considerations.  *See* Tr. 2826:11-2828:20.  This failure renders his

opinions concerning obviousness flawed as a matter of law, and they thus cannot be considered in

evaluating obviousness.  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors

USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010) ("Our case law is clear that this type of evidence

'must be considered in evaluating the obviousness of a claimed invention.'") (quoting *Iron Grip

Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1323 (Fed. Cir. 2004)).  Based on these facts, no

reasonable jury could find that Smith and Shoham do not render claim 25 obvious.

### C.      Claim 25 Of The '959 Patent Is Indefinite.

As Samsung previously explained in its summary judgment briefing, the term "heuristic"

renders claim 25 of the '959 patent invalid as indefinite.  Dkt. 805-4 at 16-22, 946-4 at 9-13.

Because persons of skill in the art cannot agree on the meaning or scope of the term "heuristic,"

claim 25 does not "particularly point[] out and distinctly claim[]," 35 U.S.C. § 112(b), a single

invention.  Dkt. 805-4 at 16-22; Dkt. 946-4 at 9-13.  In denying Samsung's summary judgment

motion, the Court distinguished *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244,

1253 (Fed. Cir. 2008), because "in *Halliburton*, the term at issue ('fragile gel') was the only

element distinguishing the claimed invention from the prior art."  Dkt. 1150 at 32.  The Court

deemed this point "crucial" to its analysis.  *Id.*  But at trial, in distinguishing the prior art Smith

patent from claim 25, the ***only*** limitation Apple's expert, Dr. Snoeren, identified as missing was

"the plurality of heuristics."  Tr. 2828:1-8.  Similarly, aside from its spurious claim that source

code is not "program instructions" and therefore could not qualify as prior art, Apple's ***only***

1   validity rebuttal for WAIS was that it lacked the "plurality of heuristics" identified in claim 25.

2   Tr. 2820:4-2824:6.  Apple thus presented the exact scenario the Court identified in its summary

3   judgment order as "crucial" for determining claim 25's definiteness.  The record at trial shows that

4   "the precise boundary of the term 'heuristic'" is not "less important" for the validity of claim 25 of

5   the '959 patent, but instead, based on Apple's own proffered evidence, critical.  Dkt. 1150 at 33.

6          The Court foresaw this possibility.  It provided in its summary judgment order that

7   "Samsung remains free to raise the issue of indefiniteness again should the term 'heuristic'

8   become central to Apple's attempts to distinguish the '959 patent from any prior art."  Dkt. 1150

9   at 33 n.11.  Despite the Court's warning, Apple put the term "heuristic" front-and-center while

10  defending claim 25's validity.  Apple's knowing conduct in the face of the Court's summary

11  judgment order confirms the indefiniteness of the asserted claim.  Dkt. 1150 at 33.

12         Moreover, even guided by this Court's claim construction from its summary judgment

13  order, expert testimony at trial left the jury with definitions of "heuristic" even more vague and

14  contradictory than those considered on summary judgment.  *See, e.g.*, Tr. 938:13-20 (Dr. Snoeren:

15  "The word they used in the patent is called heuristic. . . . The Court has helpfully defined for us

16  what that means, but it's a rule of thumb, ***or just basically, you know, a good idea***.  It's not

17  necessarily perfect.  . . .  You may not be able to map out and prove it's the right thing to do.  But

18  ***somebody who's familiar with the task, this is what they would try to do***.") (emphasis added); *id.*

19  2856:13-20 ("Q: Is a heuristic for locating information the same or different than a heuristic for

20  blending search results?  A. Again, it could be both.  Q. You don't have a yes or no answer on that

21  today?  A. No.  I think we discussed this.  It can, in certain instances, locate information, and there

22  are certain instances of blending that don't locate information."); *see also id.* 2856:7-2857:16.

23         Claim 25 is therefore indefinite under the "insolubly ambiguous" standard this Court

24  applied on summary judgment.  Dkt. 1051 at 30-34.  But this "insolubly ambiguous" standard is

25  itself not the appropriate benchmark for measuring indefiniteness.  The Supreme Court, in

26  *Nautilus, Inc. v. Biosig Instruments, Inc.*, No. 13-369 (argued Apr. 28, 2014), has already

27  explained as much.  In *Nautilus*, petitioner contends that the "insolubly ambiguous" standard runs

28  contrary to Section 112's prohibition on ambiguous claims; that it undermines the policy that

1   "[p]atent claims define the patentee's rights against the public at large, and accordingly must

2   provide clear notice to all of what they encompass"; and that it produced the wrong result on the

3   facts.  Br. of Petitioner at 2-5.  In oral argument, petitioner, respondent, and the Solicitor General

4   *all agree* that "insolubly ambiguous" is the wrong test.  Tr. of Oral Arg. at 24-25:

5       JUSTICE KENNEDY: "You would agree, I take it, that if, was, it, 'insolubly ambiguous'
        were the standard that the court used, that we should reverse?"

6       RESPONDENT: "If there were no other context and only those words alone would be
        used, it seems that some district courts might misinterpret those words, as the Solicitor

7       General has mentioned, but –"

8       CHIEF JUSTICE ROBERTS:  "So it was fair, as I suggested earlier, nobody agrees with
        that formulation; right?"

9       RESPONDENT:  "Yes, I guess so, Your Honor."

10  Claim 25 is indefinite under any of the proposed standards at issue in *Nautilus*, just as it is

11  indefinite under the "insolubly ambiguous" standard,[4] because, as Samsung explained on summary

12  judgment, persons of skill in the art cannot agree on the meaning of the term "heuristic," because

13  its meaning is not reasonably clear and the term does not allow persons of skill to ascertain what,

14  exactly, is claimed.  *See, e.g.*, Dkt. 805-4 at 16-22; Tr. 938:13-20, 951-59, 1886:6-8.

15  **V.   SAMSUNG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT THE
        '414 PATENT IS INVALID**

16

17          Claim 20 of the '414 patent is invalid as a matter of law because it is anticipated by the

18  Windows Mobile 5 prior art.[5]  At trial, Samsung presented clear and convincing evidence that

19  Windows Mobile 5 meets every limitation of claim 20.  Apple *did not dispute* Samsung's factual

20  evidence, but instead rested its opposition to anticipation on two assertions that fail as a matter of

21  _____

22      [4]  The parties in *Nautilus* propose the following standards:  Petitioner contends a claim is
    indefinite where its "scope, read in light of the specification by one skilled in the art, is susceptible

23  of more than one reasonable interpretation."  Br. of Petitioner at 2.  Respondent contends "a claim
    satisfies the definiteness requirement when its meaning is reasonably clear to a person skilled in

24  the art."  Br. of Respondent at 20.  The Solicitor General contends "a patent claim is 'particular[]'
    and 'distinct[]' under section 112 if a person skilled in the relevant art would reasonably

25  understand what is claimed."  Br. of the U.S. as Amicus Curiae Supporting Respondent at 12.

26      [5]  Apple does not dispute that Windows Mobile 5 was released to the public in 2005.  Tr.
    2189:1-25, 2191:4-12, 2220:8-21; DX514 at 15:7-9; DX316.  The '414 patent was filed on

27  January 7, 2007, more than one year after Windows Mobile 5 was publicly available.  JX7.001.
    Accordingly, Windows Mobile 5 is prior art to the '414 patent under 35 U.S.C. § 102(b).

28

1   law:  first, that claim 11's disclosure of "at least *one* synchronization processing thread" requires

2   *three* synchronization processing threads in claim 20, even though claim 20 includes no such

3   requirement; and, second, that only one of the synchronization software components Samsung

4   identified actually "provides" a thread.  Because Apple's sole defenses depend on a misreading of

5   the plain language of the claims, the Court should find claim 20 invalid as a matter of law.

**A.      Windows Mobile 5 Meets All Limitations Of Claim 20.**

Claim 20, which depends on claim 11, reads in full:

> 11.  A computer readable storage medium containing executable program instructions which when executed cause a data processing system to perform a method comprising: executing at least one user-level non-synchronization processing thread,
>
> wherein the at least one user-level non-synchronization processing thread is provided by a user application which provides a user interface to allow a user to access and edit structured data in a first store associated with a first database; and
>
> executing at least one synchronization processing thread concurrently with the executing of the at least one user-level non-synchronization processing thread, wherein the at least one synchronization processing thread is provided by a synchronization software component which is configured to synchronize the structured data from the first database with the structured data from a second database.
>
> 20.  The storage medium as in claim 11 wherein the synchronization software component is configured to synchronize structured data of a first data class and other synchronization software components are configured to synchronize structured data of other corresponding data classes.

Apple does not dispute any of the following evidence that Samsung presented at trial in the

form of testimony from Samsung's expert Dr. Chase and Windows Mobile engineer Gary Hall, as

well as Windows Mobile 5 documentation and source code:

• The Windows Mobile 5 system was sold on handheld computing devices, including the HP

   iPAQ, which stores executable program instructions corresponding to Windows Mobile 5

   source code produced by Microsoft in this litigation.  Tr. 2184:17-21, 2191:3-12.

• Windows Mobile 5 contains instructions to cause a data processing system (*i.e.*, the

   Windows Mobile 5 software) to execute a user-level non-synchronization processing

   thread provided by a Contacts, Calendar and/or E-mail application.  Tr. 2191:16-2192:3;

   DX514 at 30:4-10.  These applications provide a user interface to allow a user to access

   and edit structured data (*e.g.*, mail data, contacts data, or calendar data) in a first store

   associated with a first database.  Tr. 2191:16-2192-13.

1     •     Windows Mobile 5 also contains instructions to cause the software to execute a number of

2          synchronization processing threads concurrently with the aforementioned user-level non-

3          synchronization processing thread.  Tr. 2192:15-2193:8; DX317.005.

4     •     At least one synchronization processing thread is created by a synchronization software

5          component called the IMAP Mail component.  Tr. 2192:10-13.  The IMAP Mail

6          component further is configured to synchronize structured data between the local database

7          and a second database on an IMAP mail server.  Tr. 2193:25-2194:16.  As required by

8          claim 20, the IMAP Mail component is configured to synchronize structured data of a mail

9          data class.  *Id.*

10    •     Windows Mobile 5 also contains other synchronization software components, including

11         Calendar and Contacts Exchange Providers, which are configured to synchronize

12         structured data of calendar and contacts data classes, respectively.  JX7 at 47; Tr. 2193:25-

13         2194:16, 2848:10-18; DX317.002; DX514 at 40:22-41:11.

14 Based on this undisputed evidence, Windows Mobile 5 anticipates each and every limitation of

15 claim 20.  On that basis alone, the Court should grant JMOL that claim 20 is invalid.

16        **B.**     **Claim 20 Requires Only One Synchronization Processing Thread.**

17        According to Apple, claim 20 requires not only three "synchronization software

18 components" that are "configured to synchronize structured data," but also requires each of these

19 three synchronization software components to "provide" its own thread.  This was Apple's sole

20 basis for alleging that claim 20 is valid over Windows Mobile 5.  There is no dispute that one

21 synchronization software component in Windows Mobile 5, the IMAP Mail component, provides

22 a synchronization processing thread.  Tr. 2254:10-13.  Apple does not dispute that this IMAP Mail

23 Component met claim 11's requirement that "at least *one* synchronization processing thread is

24 provided by *a* synchronization software component."  JX7 at 47 (emphasis added).  Apple also

25 does not dispute that the IMAP Mail Component met claim 20's requirement that "***the***

26 synchronization software component [of claim 11] is configured to synchronize structured data of

27 a first data class."  JX7 at 47 (emphasis added).  Yet Apple claimed Windows Mobile 5 did not

28 invalidate, based on a phantom limitation of claim 20: three synchronization processing

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

1  components that each provide a synchronization processing thread.  Dkt. 1818 at 6:7-8 ("Samsung

2  identified only one 'Provider' that creates a thread – falling two short of what claim 20 requires.");

3  *see also* Tr. 2847:5-10.

4      Apple's argument is wrong as a matter of law.  The word "provide" appears only in claim

5  11, in reference to *one* synchronization software component; "provide" does not appear in claim

6  20.  Claim 20 requires three synchronization software components "configured to synchronize

7  structured data" of a "data class."  One of these three components is the same component as in

8  claim 11 (and referred to as "the" component that synchronizes a "first" data class).  This one

9  component must "provide" a thread, as claim 11 describes.  JX7 at 47.  But the two "other"

10  software components that synchronize data of "other" classes are *not* mentioned in claim 11, and

11  are *not* described in claim 20 as "provid[ing]" threads.  *Id.*  Apple simply adds a new limitation –

12  "three synchronization processing threads provided by three synchronization software

13  components" – into the asserted claim.  Apple has never identified what language it believes gives

14  rise to this purported requirement.  Nor could it; no reasonable interpretation supports such a

15  requirement.  Because Apple cannot rewrite the claims, and Apple does not dispute that Windows

16  Mobile 5 anticipates all *actual* limitations of claim 20, that claim is invalid.

17      **C.      The Exchange Components All Provide A Synchronization Processing Thread.**

18      Even if Apple were correct (it is not) that claim 20 requires each of the three sync software

19  components to "provide" their own sync processing thread, Samsung demonstrated at trial that

20  Windows Mobile 5's three Exchange Provider components do exactly this, by providing

21  synchronization processing threads for each sync request.  Tr. 2192:15-20.  The inventor of the

22  patent, Gordon Freedman, agrees that a synchronization software component would "provide" a

23  thread as long as that component "would have executing code and that executing code must

24  execute in a thread"—which Apple does not dispute the Exchange components *all do*.  Tr. 2854:9-

25  23.  Apple explicitly *agreed* that the Exchange Provider components synchronize e-mail, contacts

26  and calendar data, and therefore are "synchronization software components" that are "configured

27  to synchronize those particular data classes."  Tr. 2848:10-23.  It argued only that the Exchange

28  Provider components do not provide synchronization processing threads, with no explanation

other than its ipse dixit interpretation that the word "provide" must mean only "create."  Tr. 2848:13-2849:2, 2855:7-9.  But the claim language says nothing about "creating" threads, JX7 at 47, and Apple presented no evidence why "creating" a thread would be required.  Because Apple does not dispute that Windows Mobile 5's Exchange Provider components execute in threads, as required by claim 20, the Exchange Provider components anticipate claim 20 as a matter of law.

## VI.   THE RECORD LACKS SUFFICIENT EVIDENCE THAT SEC IS LIABLE FOR INDUCEMENT OR CONTRIBUTORY INFRINGEMENT

There can be a valid finding of inducement and contributory infringement only if there is a predicate offense of direct infringement.  *See, e.g.*, *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004).  Because there is no liability for direct infringement for the reasons stated above, there can be no liability for indirect infringement.

Furthermore, even if there were direct infringement, there is no evidence to support the claims for indirect infringement.  First, the record lacks sufficient evidence that SEC actively induced infringement under 35 U.S.C. § 271(b).  "To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they actively and knowingly aided and abetted another's direct infringement."  *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (*en banc*).  "[M]ere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven."  *DSU*, 471 F.3d at 1305.  While Apple argues that Samsung was notified of the existence of the '647 patent by Apple's August 2010 presentation, knowledge of the patent is not enough, and the record is devoid of any evidence that Samsung knew that the "induced acts constitute patent infringement," as required by law.  *See id.*  To the contrary, the record reflects Samsung's belief that it did not infringe the '647 patent, and the '647 patent is not valid.  Tr. 1767-1842, 3054-3099.  Accordingly, the record does not establish the specific intent required for infringement under section 271(b).  *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1368 (Fed. Cir. 2013).

Second, the record also lacks sufficient evidence that SEC contributed to infringement under 35 U.S.C. § 271(c).  "Liability for induced or contributory infringement under § 271(b) or (c) requires knowledge that the induced acts constitute patent infringement."  *SynQor, Inc. v.*

*Artesyn Techs., Inc.*, 709 F.3d 1365, 1379 (Fed. Cir. 2013) (quotation marks omitted).  There is no evidence of the required knowledge here.  Moreover, infringement under section 271(c) requires that the "material or apparatus" used in practicing the patented process "have no substantial noninfringing uses."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851-52 (Fed. Cir. 2010), *aff'd on other grounds*, 131 S. Ct. 2238 (2011).  Apple presented no evidence that the Browser and Messenger applications in Samsung products have no substantial noninfringing uses.  The record evidence establishes the opposite:  Samsung's products were capable of substantial non-infringing uses, such as the Tap to Dial functionality.  Tr. 1800:14-1801:14, 2798:9-21.

## VII.    THE COURT SHOULD DEDUCT THE FULL AMOUNT OF THE GALAXY S II AWARDS AS IMPERMISSIBLE DOUBLE RECOVERY

### A.    The Judgment Here Includes Impermissible Double Recovery.

Under well established law, a patentee that receives profits under 35 U.S.C. § 289 is not entitled to a further recovery for utility patent infringement from the same sale.  *See Catalina Lighting, Inc. v. Lamps Plus, Inc.,* 295 F.3d 1277, 1291 (Fed. Cir. 2002); *see also* 35 U.S.C. § 289 (a patentee "shall not twice recover the profit made from the infringement").  This Court has accordingly recognized that federal law prohibits double recovery.  *See* 1846 case Dkt. 2271 at 19 n.2; 3/5/2014 H'rg Tr. 24:17-18 ("I agree with you that there will have to be only one recovery.").

The jury's verdict here creates impermissible double recovery with respect to the Galaxy S II, Galaxy S II Epic 4G Touch, and Galaxy S II Skyrocket (the "Galaxy S II Products").  In the 1846 case, there is a final judgment awarding damages, pursuant to 35 U.S.C. § 289, for infringement by the Galaxy S II Products; the award for these products represented Samsung's profits and did not include any amount of utility patent royalty.  1846 case Dkt. 2271 at 10.[6]  Here, the jury's verdict awards damages for infringement of utility patents by the Galaxy S II Products.

---

[6] At the time of the March 5, 2014 hearing on Samsung's motion to exclude evidence of damages on sales for which Apple obtained infringer's profits, the Court had not yet entered final judgment in the 1846 case.  Later, the Court entered final judgment, and Samsung filed a notice of appeal and secured a *supersedeas* bond, which the Court approved.  1846 case Dkt. 3033.

Apple has conceded that sales of Galaxy S II Products in this case overlap with the award of Samsung's profits in the 1846 case. Dkt. 1334-03 at 19-20. And in both cases Apple has conceded it cannot seek double recovery for the same sales. *See, e.g.*, 1846 Dkt. 1856 at 11 ("Apple is entitled to one and only one remedy for each individual sale of an infringing smartphone or tablet"); Dkt. 1334-03 at 20 ("Apple understands and intends to comply with the law preventing double recovery"). Indeed, Apple defended its inclusion of a question on the jury form separating out the awards for the Galaxy S II Products on the basis that the answers would allow the Court to prevent impermissible double recovery. Dkt. 1334-03 at 21.

Apple's only objection seems to be that the 1846 judgment will likely be appealed, but Apple has not identified any authority for its contention that a court should enter a judgment allowing double recovery simply because the other, final judgment is subject to appeal. Contrary to Apple's contention, *see* Dkt. 1334-03 at 20, neither *Catalina Lighting* nor *Aero Products International, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000 (Fed. Cir. 2006), is limited to the situation where a judgment has already been satisfied. In *Catalina Lighting*, the Federal Circuit heard an appeal from a single judgment, 295 F.3d at 1281, and reversed the award of both a reasonable royalty and infringer's profits as impermissible double recovery, *id.* at 1292. Likewise, *Aero Products International* deals with a judgment entering a jury award of damages for both patent and trademark infringement. 466 F.3d at 1019. There, the Federal Circuit reversed the district court's denial of defendants' post-trial motion, *id.*, which sought relief from the impermissible double recovery. *Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, No. 02-C-2590, 2004 WL 5129997, at*1 (N.D. Ill. Dec. 15, 2004).[7] Neither case is limited to "collection" on a double recovery, and both make clear that a court must vacate a judgment including a double

---

[7]   Apple's representation that *Aero Products International* relied on the fact the defendants had "already paid" the patent damages, Dkt. 1334-03 at 20, is unsupported and nonsensical. Because *the very same opinion* ruled on the defendants' appeal of patent infringement and validity, the defendants could hardly have "already paid" the damages.

recovery.[8]  Indeed, a court recently rejected as baseless a patentee's request to delay deduction of double recovery until after appeal.  *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:01-CV-0485, 2010 WL 815466, at *4 (M.D. Penn. Mar. 3, 2010), *aff'd per curiam*, 477 Fed. App'x 740 (Fed. Cir. 2012).

The Court should grant JMOL and deduct the amount of the Galaxy S II Product awards as impermissible double recovery.  "[W]here a portion of a verdict is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount."  *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1371 (Fed. Cir. 2008) (internal quotation omitted); *see also Accentra Inc. v. Staples, Inc.*, 851 F. Supp. 2d 1205, 1232 (C.D. Cal. 2011), *aff'd in part, rev'd in part on other grounds*, 500 F. App'x 922 (Fed. Cir. 2013) (highest permissible royalty is a matter of law and does not require a new trial); *Integra Lifesciences I, Ltd. v. Merck KGaA*, No. 96 CV 1307-B(AJB), 2004 WL 2284001, at *12 (S.D. Cal. Sept. 7, 2004) (similar).  In the alternative, this Court can accomplish the same thing by amending the judgment.  *See, e.g.*, *Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 642 (7th Cir. 2011); *Arlington Indus.*, 2010 WL 815466, at *4.

There is no justification for entering judgment here that includes a legally impermissible double recovery, and the Court should deduct these awards from any judgment.  All of these amounts are identified in Question 10b of the verdict form, and we address each column in turn.

| Accused Samsung Product | August 1, 2011 – June 30, 2012 | July 1, 2012 – August 24, 2012 | August 25, 2012 – Present |
|---|---|---|---|
| ~~Galaxy S II (JX32)~~ | ~~6,203,049~~ | ~~298,099~~ | ~~2,123,612~~ |
| Galaxy S II Epic 4G Touch (JX33) | 9,041,506 ~~8,008,191~~ | 1,221,256 ~~1,081,684~~ | 5,752,034 ~~5,094,659~~ |
| Galaxy S II Skyrocket (JX34) | 2,972,393 ~~6,780,043~~ | 354,007 ~~809,490~~ | 319,749 ~~729,394~~ |
| Galaxy SII (JX32) | 9,094,761 | 437,010 | 3,113,189 |

---

[8]  *Shockley v. Arcan, Inc.*, 248 F.3d 1349 (Fed. Cir. 2001), is not to the contrary; it deals with joint and several liability, not at issue here, and confirms the rule against double recovery, noting a party is liable for "damages (up to a full single recovery) suffered by the patentee."  *Id.* at 1364.

### B. Damages Of $21,108,660 For Sales Through June 30, 2012 Should Be Deducted.

Apple concedes that the awards in the 1846 case reflect sales though June 30, 2012. *See* 1846 case Dkt. 1989 at 27. The Court allowed the damages awarded for the Galaxy S II Products in that case to stand based on Section 289. 1846 case Dkt. 2271 at 10. Accordingly, the damages awarded by the jury here for sales through June 30, 2012 represent an impermissible double recovery. The jury verdict states this amount to be $21,108,660 ($9,094,761 + $9,041,506 + $2,972,393), Dkt. 1884 at 10b, which should be deducted from Apple's damages.

### C. Damages Of $2,012,273 For Sales From July 1, 2012 Through August 24, 2012 Should Be Deducted.

In the 1846 case, the jury's awards included the period between June 30, 2012 (the end date for the evidence presented to the jury) and August 24, 2012 (the date of the verdict). Specifically, the Court held that "[w]hile it is true that the jury did not hear evidence of sales between June 30 and August 24, it is also possible that the jury considered this fact in arriving at its ultimate award." 1846 case Dkt. 2271 at 3. Accordingly, the Court denied Apple's request for supplemental damages during that period: "awarding additional amounts of damages incurred before trial would be an improper invasion of the jury's province to determine actual damages and an inappropriate use of 35 U.S.C. § 284 to enhance inadequate compensatory damages." *Id.* (quotation marks omitted). Given that supplemental damages were improper for the period because the jury award covered that period, the extra damages here for that period are likewise improper as double recovery. The jury verdict states this amount to be $2,012,273 ($437,010 + $1,221,256 + $354,007), Dkt. 1884 at 10b, which should be deducted from the total damages.

### D. Damages of $9,184,992 For Sales From August 25, 2012 To The Date Of The Verdict Should Be Deducted.

The Court stated its intention in the 1846 case to award supplemental damages for the period beginning August 25, 2012. 1846 case Dkt. 2271 at 3. Specifically, the Court indicated it would "determine the per-sale amount on a product-by-product basis, and use that per-sale amount to determine the supplemental damages amount for each product that has remained on the market for any post-verdict period." *Id.* at 5. Because the awards for the Galaxy S II Products were based

on Section 289, *id.* at 10, these supplemental damages necessarily reflect disgorgement of Samsung's profits on any post-verdict sales.  Accordingly, any damages awarded here for sales after August 24, 2012 constitute an impermissible double recovery.  The jury verdict states this amount to be $9,184,992 ($3,113,189 + $5,752,034 + $319,769), Dkt. 1884 at 10b, which should be deducted from the total damages.[9]

### E.    Damages Deductions Are Also Clear If This Court Rejects Liability On Any Of The Patents.

If the Court determines that as a matter of law Samsung is not liable for violation of the '647 or '172 patent, *see supra*, the Court can easily deduct the awards for one patent for each time period of Galaxy S II sales, using information already contained in the  jury's verdict.  *See, e.g.*, *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 292 (N.D.N.Y. 2009), *amended*, 2009 WL 1405208 (N.D.N.Y. May 15, 2009) (Rader, J., by designation) (correcting royalty base as a matter of law and re-calculating the resulting damages).

The jury determined the share of damages for the three time periods in Question 10b by applying three specific percentages to the per-product totals in Question 10a.  Chevalier Decl. ¶ 5-6.  As a consequence, the exact amount of damages that the jury attributed to each patent for each time period can be easily determined.  *Id.* ¶ 7.  For the Galaxy S II Products, the combined damages the jury attributed to the '172 patent in Question 10b are $11,047,966:  $7,154,523 for Aug. 1, 2011 to Jun. 30, 2012; $699,454 for Jul. 1, 2012 to Aug. 24, 2012; and $3,193,989 for Aug. 25, 2012 to Verdict.  *Id.* ¶ 8.  The combined damages the jury attributed to the '647 patent in Question 10b are $21,257,959:  $13,954,137 for Aug. 1, 2011 to Jun. 30, 2012; $1,312,819 for Jul. 1, 2012 to Aug. 24, 2012; and $5,991,003 for Aug. 25, 2012 to Verdict.  *Id.*  If the Court determines that Samsung is not liable under the '647 or '172 patent, the Court may use these amounts to deduct the impermissible double recovery on the Galaxy S II Products.

---

[9]   If the Court declines to deduct any portion of the damages for the Galaxy S II Products in this case, Samsung reserves the right to seek deduction of appropriate amounts in the 1846 case.

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

## VIII.   NO REASONABLE JURY COULD HAVE CONCLUDED THAT CLAIM 15 OF THE '239 PATENT IS NOT INFRINGED

The Court should grant JMOL that claim 15 of the '239 patent is infringed.

### A.   Substantial Evidence Was Presented To Conclude Claim 15 Was Infringed.

No reasonable jury can conclude that claim 15 was not infringed.  Samsung demonstrated that each accused iPhone is an apparatus for transmission of data.  Tr. 2540:5-17.  Substantial evidence, including confidential documents and source code, showed how each iPhone meets the "computer limitation," and how each iPhone's applications processor is a "video capture module" that captures and compresses video in real time.  Tr. 2540:18-47:3, 2693:22-24, 2696:2-5, 2709:9-10:8, 2781:1-14; DX351A, JX52A.  Substantial evidence showed that the iPhones met the Court's construction for "means for transmission of said captured video."  Tr. 2547:14-57:4, 2709:9-10:8, 2781:1-14; DX353A, DX371, JX52A.  The evidence showed that all of the iPhones included a modem (baseband processor) that was connected to the cell phone (the iPhones).  Tr. 2548:10-51:6, 2520:9-21:3; DX353A, DX371.  Substantial evidence, including source code, showed that the iPhones performed the Court's software sequence: initializing both a hardware and software port, Tr. 2551:11-53:15; DX351A; JX52A; Tr. 2752:14-53:2; obtaining a cellular connection, Tr. 2553:17-54:5, JX52A; obtaining said captured video, Tr. 2554:6-55:17, JX52A; and transmitting said captured video, Tr. 2555:18-57:4.  Dr. Schonfeld established that both FaceTime and transmitting videos over email/text messages infringe.  Tr. 2529:17-23, 2537:16-39:9.

### B.   Apple Improperly Compared The Products To An Embodiment Of The Invention.

Apple's expert, Dr. Storer, improperly compared the accused products to commercial embodiments of the '239 patent, as opposed to claim 15, to conclude that the iPhones did not infringe.  *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1347 (Fed. Cir. 2003); Tr. 2779:15-80:14.  For example, Dr. Storer opined that the iPhones do not have a "video capture module" because they lack "plug-in slots" for video cards that receive analog inputs, like the early commercial embodiments.  Tr. 2725:18-43:23.  But claim 15 is not limited to a video card, much less one that must receive analog signals and plug into a device.  Indeed, the inventors expressly removed the "video card" limitation from claim 15.  Tr. 2589:8-90:13; JX26.137.  Dr. Storer also

argued that the iPhones did not "initialize a port" and did not have a cell phone "connected to" a modem through comparisons to the early commercial embodiment. Tr. 2745:3-53:19. Similarly, Dr. Storer improperly argued that FaceTime does not infringe because it streams video where the commercial embodiment transmits the entirety of the video. Tr. 2753:20-57:25.[10] A reasonable jury would compare the accused iPhones to claim 15, as opposed to commercial embodiments as Dr. Storer did. Thus, no reasonable jury could conclude that claim 15 is not infringed.

### C.   Each Of Apple's Non-Infringement Arguments Relied On Claim Constructions That Are Contrary To The Plain And Ordinary Meaning.

Apple's non-infringement arguments were based on interpretations of claim terms completely divorced from the plain and ordinary meaning of those terms. First, Apple argued that a "video capture module" must receive analog signals and must be something that is plugged into another component. Tr. 2724:21-26:7, 2727:2-23, 2728:16-23, 2730:7-14, 2733:1-7, 2734:4-38:3, 2743:1-5; *see also* Tr. 2589:8-90:13; JX26.137. Second, Apple argued that a "port" is limited to a very specific type of hardware port.[11] Tr. 2744:16-46:18, 2751:14-53:19. Third, Apple argued that a cell phone is not "connected to" a modem unless it is "connected by cables." Tr. 2744:7-46:18. Finally, Apple construed "video" as something other than streaming video and video frames. Tr. 2753:23-55:13.[12] There is no basis in the intrinsic or extrinsic record to inject these narrowing limitations into claim 15, and a reasonable jury applying proper, plain meaning constructions would have found that the accused iPhones infringe.

### CONCLUSION

For the foregoing reasons, the Court should enter an order granting Samsung judgment as a matter of law on Apple's claims for relief or, in the alternative, amendment of the judgment to reduce damages by $32,305,925. This Court should also enter an order granting Samsung judgment as a matter of law on its claim that Apple infringed the '239 patent.

---

[10] In fact, the FirstLook Video Product streamed video. Tr. 2512:2-19.

[11] Dr. Schonfeld still identified a hardware port that was initialized. Tr. 2551:11-53:15; JX52A.

[12] Regardless, Apple's expert *admitted* that FaceTime transmits video. Tr. 2781:1-17.

Case No. 12-cv-00630-LHK

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT

1    DATED: May 23, 2014                  Respectfully submitted,

2                                         QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP
3

4                                         By */s/ Victoria F. Maroulis*_____
                                             Kevin P.B. Johnson
5                                            Victoria F. Maroulis
                                             William C. Price
6                                            Michael L. Fazio

7                                            Attorneys for SAMSUNG ELECTRONICS CO.,
8                                            LTD., SAMSUNG ELECTRONICS AMERICA,
                                             INC. and SAMSUNG
9                                            TELECOMMUNICATIONS AMERICA, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAMSUNG'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 50(b) AND MOTION TO AMEND THE JUDGMENT