1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

6   APPLE INC., A CALIFORNIA          )  C-12-00630 LHK
    CORPORATION,                      )
                                      )  SAN JOSE, CALIFORNIA
7              PLAINTIFF,             )
                                      )  APRIL 18, 2014
8        VS.                          )
                                      )  VOLUME 9
9   SAMSUNG ELECTRONICS CO., LTD.,    )
    A KOREAN BUSINESS ENTITY;         )  PAGES 2052-2334
10  SAMSUNG ELECTRONICS AMERICA,      )
    INC., A NEW YORK CORPORATION;     )
11  SAMSUNG TELECOMMUNICATIONS        )
    AMERICA, LLC, A DELAWARE          )
12  LIMITED LIABILITY COMPANY,        )
                                      )
13             DEFENDANTS.            )
    _____  )

14

15

16          TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE LUCY H. KOH
17         UNITED STATES DISTRICT JUDGE

18

19

20        APPEARANCES ON NEXT PAGE

21

22  OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, CRR
                                 CERTIFICATE NUMBER 8074

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

2053

```
 1

 2      A P P E A R A N C E S:

 3      FOR PLAINTIFF          MORRISON & FOERSTER
        APPLE:                 BY:  HAROLD J. MCELHINNY
 4                                  RACHEL KREVANS
                               425 MARKET STREET
 5                             SAN FRANCISCO, CALIFORNIA  94105

 6

 7                             WILMER, CUTLER, PICKERING,
                               HALE AND DORR
 8                             BY:  WILLIAM F. LEE
                               60 STATE STREET
 9                             BOSTON, MASSACHUSETTS  02109

10                             BY:  MARK D. SELWYN
                               950 PAGE MILL ROAD
11                             PALO ALTO, CALIFORNIA  94304

12

13      FOR SAMSUNG:           QUINN, EMANUEL, URQUHART & SULLIVAN
                               BY:  JOHN B. QUINN
14                                  WILLIAM PRICE
                               865 S. FIGUEROA STREET, FLOOR 10
15                             LOS ANGELES, CALIFORNIA  90017

16                             BY:  VICTORIA F. MAROULIS
                                    KEVIN B. JOHNSON
17                             555 TWIN DOLPHIN DRIVE
                               SUITE 560
18                             REDWOOD SHORES, CALIFORNIA  94065

19

20

21

22

23

24

25
```

1                            INDEX OF WITNESSES

2     DEFENDANTS'
      **DANIEL WIGDOR**
3          CROSS-EXAM BY MR. MCELHINNY (RES.)      P. 2056

4     **DAVID REIBSTEIN**
           DIRECT EXAM BY MR. PRICE                P. 2060
5          CROSS-EXAM BY MR. BENNETT               P. 2104
           REDIRECT EXAM BY MR. PRICE              P. 2143
6          RECROSS-EXAM BY MR. BENNETT             P. 2152
           FURTHER REDIRECT EXAM BY MR. PRICE      P. 2156
7
      **GARY HALL**
8          VIDEOTAPED DEPOSITION PLAYED            P. 2159

9     **JEFFREY CHASE**
           DIRECT EXAM BY MR. PAK                  P. 2160
10         CROSS-EXAM BY MS. KREVANS               P. 2232

11    **NICK DICARLO**
           DIRECT EXAM BY MS. MAROULIS             P. 2255
12         CROSS-EXAM BY MR. LEE                   P. 2259

13    **SARAH CHANDLER**
           DEPOSITION READ                         P. 2268
14         VIDEOTAPED DEPOSITION PLAYED            P. 2272

15    **GREG JOSWIAK**
           DEPOSITION READ                         P. 2273
16         VIDEOTAPED DEPOSITION PLAYED            P. 2275

17    **ART RANGEL**
           DEPOSITION READ                         P. 2276
18         VIDEOTAPED DEPOSITION PLAYED            P. 2278

19    **PHILIP SCHILLER**
           DEPOSITION READ                         P. 2278
20         VIDEOTAPED DEPOSITION PLAYED            P. 2280

21    **STEVEN SINCLAIR**
           DEPOSITION READ                         P. 2280
22

23    **TULIN ERDEM**
           DIRECT EXAM BY MR. QUINN                P. 2283
24         CROSS-EXAM BY MR. BENNETT               P. 2308

25

2055

```
 1                        INDEX OF EXHIBITS

 2                                    MARKED      ADMITTED

 3        DEFENDANTS'

 4        454A                                     2084
          315                                      2187
 5        316                                      2187
          317                                      2188
 6        314                                      2189
          321                                      2197
 7        314A                                     2220
          316                                      2220
 8        326                                      2221
          321                                      2223
 9        320A                                     2224
          319                                      2224
10        314A & 320A (WITHDRAWN)                  2225

11


12        JOINT

13        8                                        2179

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    SAN JOSE, CALIFORNIA                    APRIL 18, 2014

2                    P R O C E E D I N G S

3        (JURY OUT AT 9:03 A.M.)

4            THE COURT:  GOOD MORNING AND WELCOME.

5        (JURY IN AT 9:04 A.M.)

6            THE COURT:  OKAY.  IF THE WITNESS WILL PLEASE COME

7    FORWARD.  YOU'RE STILL UNDER OATH.  PLEASE TAKE A SEAT.

8            THE WITNESS:  THANK YOU.

9        (DEFENDANTS' WITNESS, DANIEL WIGDOR, PREVIOUSLY SWORN.)

10           THE COURT:  IT'S 9:05.  GO HEAD, PLEASE.

11           MR. MCELHINNY:  THANK YOU.

12                   CROSS-EXAMINATION (RESUMED)

13   BY MR. MCELHINNY:

14   Q.   PROFESSOR, MY NAME IS HAROLD MCELHINNY.  I WAS TALKING TO

15   YOU LAST TUESDAY WHEN WE BROKE.  DO YOU REMEMBER THAT?

16   A.   I DO.  GOOD MORNING.

17   Q.   LAST TUESDAY YOU TESTIFIED THAT IN YOUR OPINION, THE '172

18   AUTOMATIC WORD CORRECTION WAS INVALID BECAUSE THE INVENTION

19   WOULD HAVE BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE

20   ART; CORRECT?

21   A.   THAT'S TRUE, YES.

22   Q.   AND SORT OF THE CENTRAL PIECE OF ART THAT YOU RELIED UPON

23   WAS SOMETHING CALLED THE ROBINSON PATENT, DX 492; CORRECT?

24   A.   MY OPINION WAS A COMBINATION OF ROBINSON AND SOMEWHERE.

25   Q.   BUT WHEN YOU ACTUALLY READ THE TERMS OF THE COMPLAINT, OR
```

1     THE CLAIMS OF THE PATENT, YOU WERE USING FIGURES FROM THE

2     ROBINSON PATENT; CORRECT?

3     A.   I BELIEVE I USED FIGURES FROM BOTH PATENTS, BUT, YES, I

4     DID USE FIGURES FROM ROBINSON.

5     Q.   AND, IN FACT, YOU SHOWED THE JURY SEVEN FIGURES FROM THE

6     ROBINSON PATENT; CORRECT?

7     A.   I HONESTLY HAVEN'T COUNTED, BUT THAT SOUNDS ROUGHLY RIGHT.

8     Q.   DID YOU SHOW THEM FIGURE 1A?

9     A.   I SHOULD DOUBLE-CHECK TO MAKE SURE I GET THE NUMBERS

10    RIGHT.

11    Q.   SURE.  GO AHEAD.  IT'S DX 479 -- 492.  IT SHOULD BE IN

12    YOUR BINDER.

13    A.   I SEE IT HERE ON THE SCREEN.  YES, I DO REMEMBER SHOWING

14    THAT FIGURE.

15    Q.   FIGURE 1B?

16    A.   YES, I REMEMBER SHOWING THAT FIGURE.

17    Q.   FIGURE 5A?

18    A.   I'M JUST NOW RELYING ON THE SCREEN CHANGING THEM.

19    Q.   OKAY.

20    A.   YES, I REMEMBER SHOWING THEM THAT FIGURE.

21    Q.   5B?

22    A.   YES.

23    Q.   5C?

24    A.   YES.

25    Q.   5D?

1    A.   YES, THAT'S RIGHT.

2    Q.   AND 5E; CORRECT?

3    A.   YES.

4    Q.   SIR, ISN'T IT TRUE THAT THE PATENT EXAMINER WHO EXAMINED

5    THE '172 PATENT HAD THOSE IDENTICAL FIGURES IN FRONT OF HIM?

6    A.   I BELIEVE THAT HE DID, YES.

7    Q.   IT WAS IN A DIFFERENT PATENT CALLED THE LONGE PATENT;

8    CORRECT?

9    A.   I'VE BEEN PRONOUNCING IT DIFFERENTLY, BUT, YES.

10   Q.   HOW WOULD YOU PRONOUNCE IT?

11   A.   I'VE BEEN SAYING LONGE, BUT I DON'T KNOW WHERE THE NAME

12   COMES FROM.

13   Q.   AND LONGE WAS A CO-INVENTOR ON THE ROBINSON PATENT;

14   CORRECT?

15   A.   I BELIEVE THAT'S RIGHT, YES.

16   Q.   SO WOULD YOU AGREE WITH ME THAT THE DISCLOSURE THAT YOU

17   HAVE CITED TO THIS JURY IN ROBINSON IS THE SAME DISCLOSURE IN

18   LONGE AND THAT IT WAS BEFORE THE EXAMINER WHO MADE THE DECISION

19   TO ISSUE THE '172 PATENT?

20   A.   RIGHT.  WELL, AS I SAID, WHAT I SHOWED THE JURY WAS THE

21   COMBINATION OF ROBINSON AND XRGOMICS, BUT, YES.

22   Q.   THE FIGURES YOU'VE TALKED ABOUT, THE DISCLOSURE, YES, WERE

23   PART OF THE LONGE THAT THE EXAMINER HAD.

24        MR. MCELHINNY:  THANK YOU.  I HAVE NOTHING FURTHER

25   WITH THIS WITNESS, YOUR HONOR.

1          THE COURT:  ALL RIGHT.  THE TIME IS 9:07.

2          MR. NELSON:  NOTHING FROM ME, YOUR HONOR.

3          THE COURT:  ALL RIGHT.  SO NO REDIRECT.

4      ALL RIGHT.  MAY THIS WITNESS BE EXCUSED SUBJECT TO RECALL

5  ON INVALIDITY?

6          MR. NELSON:  YES, YOUR HONOR.  THANK YOU.

7          THE COURT:  ALL RIGHT.  YOU MAY BE EXCUSED.

8          THE WITNESS:  THANK YOU, YOUR HONOR.

9          MR. PRICE:  YOUR HONOR, CAN WE TAKE A SECOND TO SET

10  UP THE EASELS AND --

11         THE COURT:  PLEASE.  PLEASE, GO AHEAD AND GET SET UP.

12         MR. PRICE:  ALSO, I CHECKED WITH YOUR COURT

13  REPORTERS, IS IT OKAY IF I HAVE A STOP WATCH, USE MY PHONE AS A

14  STOPWATCH?

15         THE COURT:  THAT SHOULD BE FINE, AS LONG AS THERE

16  AREN'T ANY OTHER PHONES GOING.

17      GO AHEAD, PLEASE.

18         MR. PRICE:  WE CALL, YOUR HONOR, PROFESSOR REIBSTEIN.

19      (PAUSE IN PROCEEDINGS.)

20         THE CLERK:  WOULD YOU STAND AND RAISE YOUR RIGHT

21  HAND, PLEASE.

22      **(DEFENDANTS' WITNESS, DAVID REIBSTEIN, SWORN.)**

23         THE WITNESS:  I DO.

24         THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

25      WOULD YOU STATE YOUR NAME, PLEASE, AND SPELL IT FOR US?

```
 1              THE WITNESS:  DAVID REIBSTEIN.  IT'S D-A-V-I-D,

 2     R-E-I-B-S-T-E-I-N.

 3              THE CLERK:  THANK YOU.

 4              THE COURT:  ALL RIGHT.  TIME IS NOW 9:10.  GO AHEAD,

 5     PLEASE.

 6                         DIRECT EXAMINATION

 7     BY MR. PRICE:

 8     Q.   GOOD MORNING, PROFESSOR REIBSTEIN.

 9     A.   GOOD MORNING.

10     Q.   GOOD MORNING, LADIES AND GENTLEMEN.

11          PROFESSOR, YOU'VE BEEN HIRED TO ACT AS AN EXPERT IN THIS

12     CASE BY SAMSUNG?

13     A.   THAT IS CORRECT.

14     Q.   AND COULD YOU TELL US WHAT YOUR ASSIGNMENT WAS?

15     A.   I WAS ASKED TO REVIEW AND OFFER AN OPINION OF

16     PROFESSOR HAUSER'S REPORT IN THIS CASE.

17     Q.   AND THAT'S THAT CONJOINT STUDY REPORT?

18     A.   THAT IS.

19     Q.   OKAY.  DID YOU -- HAVE YOU PREPARED A SLIDE THAT KIND OF

20     SUMMARIZES SOME OF YOUR BACKGROUND?

21     A.   I HAVE.

22     Q.   OR SEVERAL SLIDES?

23     A.   SEVERAL SLIDES.

24     Q.   OKAY.  SO LET'S PUT UP, IF WE COULD, SDX 130.  AND

25     STARTING AT THE TOP, COULD YOU TELL US WHERE YOU'RE CURRENTLY
```

1    WORKING?

2    A.   I'M CURRENTLY A CHAIRED PROFESSOR AT THE WHARTON SCHOOL AT

3    THE UNIVERSITY OF PENNSYLVANIA.

4    Q.   AND COULD YOU TELL US THE WHARTON SCHOOL, HOW DOES THAT

5    RANK, LIKE, AMONG BUSINESS SCHOOLS?

6    A.   IT'S GENERALLY CONSIDERED ONE OF THE BEST, IF NOT THE BEST

7    BUSINESS SCHOOL IN THE WORLD.

8    Q.   LIKE IN THE RECENT RANKINGS, IS IT -- WHERE DOES IT STAND?

9    A.   WELL, THE MOST RECENT RANKING THAT CAME OUT, SO THEY VARY

10   FROM RANKING TO RANKING, BUT THE MOST RECENT RANKING THEY CAME

11   OUT WAS THE "U.S. NEWS AND WORLD REPORT," WHICH HAD WHARTON

12   TIED WITH HARVARD AND STANFORD AS THE BEST BUSINESS SCHOOL IN

13   THE WORLD.

14   Q.   OKAY.  AND YOU GOT HERE, IT SAYS CHAIRED PROFESSOR, AND

15   WE'VE HEARD, YOU KNOW, LECTURER AND PROFESSOR.

16       COULD YOU TELL US REALLY BRIEFLY, BECAUSE I'M ON THE

17   CLOCK, WHAT A CHAIRED PROFESSOR IS?

18   A.   SO THERE'S VARIOUS DIFFERENT RANKS THAT YOU HAVE AS A

19   PROFESSOR, AND YOU START OFF AS AN ASSISTANT PROFESSOR AND THEN

20   YOU GET PROMOTED UP THE RANKS.

21       BUT A CHAIRED PROFESSOR IS THE HIGHEST POSITION YOU COULD

22   HAVE ON THE FACULTY.

23   Q.   AND THIS MARKETING, VERY BRIEFLY, WHAT'S A PROFESSOR OF

24   MARKETING?

25   A.   SO MARKETING IS ONE OF THE DISCIPLINES WITHIN BUSINESS.

DIRECT REIBSTEIN

1     WE, WITHIN MARKETING, ONE OF THE MAJOR RESPONSIBILITIES OF

2     MARKETING IS DOING WHAT WE CALL MARKET RESEARCH, UNDERSTANDING

3     WHAT IT IS THAT IS IMPORTANT TO CUSTOMERS, AND WHAT PRODUCTS

4     AND CHARACTERISTICS THEY MIGHT BE INTERESTED IN.

5          AND WE ALSO THEN WORK ON HOW WE DELIVER THAT TO CUSTOMERS

6     THROUGH THE PRODUCT, THROUGH OUR BRAND, WHAT PRICES WE CHARGE,

7     HOW YOU DISTRIBUTE THE PRODUCT, HOW YOU ADVERTISE AND

8     COMMUNICATE THE PRODUCT, AND THE PRICING.

9     Q.   NOW, AS A PROFESSOR OF MARKETING, DO YOU DEAL OR TEACH

10    CONJOINT STUDIES?

11    A.   I DO.

12    Q.   HOW ABOUT CONSUMER SURVEYS?

13    A.   CONSUMERS SURVEYS, TOO.

14    Q.   MARKET RESEARCH AND ANALYSIS?

15    A.   ABSOLUTELY, YES.

16    Q.   NOW, LET'S JUST GO TOWARD THE BOTTOM AND VERY QUICKLY, I'M

17    GOING TO SKIP TO YOUR DOCTORATE.  YOU HAVE A DOCTORATE OF

18    INDUSTRIAL ADMINISTRATION AT PURDUE UNIVERSITY.  WHAT'S

19    INDUSTRIAL ADMINISTRATION?

20    A.   ANYBODY GETTING A PH.D. FROM THE BUSINESS SCHOOL AT PURDUE

21    UNIVERSITY IS CONSIDERED A DOCTORATE IN INDUSTRIAL

22    ADMINISTRATION.  IT REALLY IS ANOTHER WAY OF SAYING BUSINESS.

23         I SPECIFICALLY CONCENTRATED ON MARKETING WITHIN THAT.

24    Q.   AND WITHIN THAT CONCENTRATION, DID YOU HAVE ANY PARTICULAR

25    FOCUS?

```
 1    A.    SO MOST OF MY FOCUS WAS ON THE QUANTITATIVE ASPECTS OF

 2    MARKETING, AND SO IT WOULD BE VARIOUS STATISTICS AND ECONOMICS

 3    AS THEY WOULD APPLY TO MARKETING, AND I ALSO HAD A MINOR IN

 4    CONSUMER BEHAVIOR.

 5    Q.    THE MULTIPLE VARIOUS STATISTICS, DOES THAT ASSIST YOU IN

 6    EVALUATING OR CREATING CONJOINT STUDIES?

 7    A.    SO CONJOINT STUDIES ARE A VERY STATISTICALLY BASED METHOD,

 8    AND IT'S EXTREMELY HELPFUL TO BE ABLE TO HAVE THAT BACKGROUND.

 9    Q.    CAN YOU THEN VERY QUICKLY TELL US THEN ABOUT PREVIOUS

10    PLACES WHERE YOU HAVE TAUGHT, OTHER THAN WHARTON?

11    A.    SO THE FIRST JOB THAT I HAD AFTER I GOT MY PH.D. IS I WAS

12    HIRED BY THE HARVARD BUSINESS SCHOOL, AND I WAS AN ASSISTANT

13    PROFESSOR THERE.  AND I WAS THERE FOR FIVE YEARS.

14         I LEFT THERE, AND I WENT TO WHARTON IN 1980 WHERE I WAS AN

15    ASSOCIATE PROFESSOR.  AND I DID END UP LEAVING WHARTON AND

16    GOING AS A VISITING PROFESSOR TO STANFORD BUSINESS SCHOOL.

17    Q.    UM-HUM.

18    A.    I WAS THERE FOR JUST A VERY BRIEF PERIOD OF TIME BEFORE I

19    GOT ENTICED TO COME BACK TO WHARTON.

20    Q.    WHAT ENTICED YOU TO GO BACK TO WHARTON?

21    A.    WELL, STANFORD WAS A VERY EFFECTIVE PLACE TO BE FOR SURE,

22    BUT I WAS ASKED TO BECOME THE DEAN OF THE GRADUATE DIVISION AND

23    THE VICE DEAN OF THE SCHOOL.

24         AND I WAS WILLING TO DO SO ONLY IF I COULD ALSO HAVE A, A

25    MAJOR SORT OF RESTRUCTURING OF OUR OVERALL CURRICULUM.
```

1    Q.   AND WHY WAS THAT SOMETHING THAT WAS IMPORTANT TO YOU, TO

2    GET THE CHANCE TO RESTRUCTURE THE CURRICULUM?

3    A.   WELL, IT TURNS OUT WHEN I WAS, AS A PROFESSOR, I HAVE

4    INFLUENCE OVER THE STUDENTS THAT I HAVE IN MY CLASS AND CLASSES

5    TEND TO BE 60, 70, 80 STUDENTS IN CLASS.

6         IN THE ROLE OF BEING THE DEAN, I SUDDENLY HAD 1600

7    STUDENTS THAT I COULD HAVE AN INFLUENCE AND TRY AND SHAPE THEIR

8    CAREERS.

9    Q.   SO HOW LONG WERE YOU DEAN?

10   A.   SO I WAS IN THAT ROLE FOR FIVE YEARS AND AFTER WHICH I

11   DECIDED I WANTED TO MOVE BACK AND BE A FULL-TIME AS A

12   PROFESSOR.

13   Q.   DURING THAT FIVE YEARS, WERE YOU ABLE TO ACCOMPLISH WHAT

14   YOU WANTED, WHICH WAS TO REDO THE CURRICULUM?

15   A.   SO I -- I ABSOLUTELY WANTED TO GO THROUGH AND REDO THE

16   CURRICULUM, GOT THAT ACCOMPLISHED, GOT IT IN PLACE, AND SO I

17   FELT THAT I HAD ACCOMPLISHED WHAT MY OBJECTIVE WAS THERE.

18   Q.   AND HOW DID THAT WORK OUT, THAT RESTRUCTURING?

19   A.   WELL, IT TURNS OUT THAT RIGHT AFTER WE HAD DONE THAT

20   RESTRUCTURING, WE SUDDENLY -- WHARTON, FOR THE FIRST TIME WAS

21   CATAPULT UP TO THE NUMBER ONE POSITION IN THE "BUSINESS WEEK"

22   RATINGS AND IN THE "BUSINESS WEEK" ARTICLE, IT GAVE ATTRIBUTION

23   TO THE NEW CURRICULUM.

24   Q.   HAVE OTHERS FOLLOWED THAT, OTHER SCHOOLS FOLLOWED THAT?

25   A.   SO THERE WERE MANY OTHER SCHOOLS THAT NOTED WHAT IT IS

1    THAT WHARTON DID AND TRIED MODELING THEIR CHANGES IN THEIR

2    CURRICULUM TO MIMIC SOME OF THE THINGS THAT WE HAD DONE.

3    Q.   AND SO HAVE YOU BEEN AT WHARTON, OR AT SOME CAMPUS OF

4    WHARTON EVER SINCE?

5    A.   SO I'VE BEEN AT WHARTON FOR -- I RETURNED TO WHARTON IN

6    1988, AND I'VE BEEN AT WHARTON SINCE THAT TIME.

7    Q.   SO LET'S FOCUS THEN ON SOME OF YOUR OTHER PROFESSIONAL

8    ACTIVITIES, AND IF WE COULD PUT UP SDX 130 -- 3133.

9         AND HERE I WANT YOU TO TALK FIRST ABOUT, THERE'S A SECTION

10   THAT SAID EDITOR AND REVIEWER, AND YOU SEE THERE SOME MAGAZINES

11   THERE, LIKE "MARKETING SCIENCE," "MARKETING LETTERS," AND THE

12   "JOURNAL OF MARKETING RESEARCH."

13        COULD YOU TELL US WHAT KIND OF MAGAZINES THEY ARE IN YOUR

14   PROFESSION?

15   A.   THOSE ARE ACADEMIC JOURNALS, AND THIS IS WHERE ACADEMICS

16   SUBMIT TO THOSE AND THOSE THAT ARE LISTED UP THERE ARE

17   CONSIDERED THE TOP JOURNALS IN MY FIELD.

18   Q.   AND COULD YOU TELL US VERY QUICKLY WHAT IT MEANS TO BE A

19   REVIEWER OF, SAY, MARKETING SCIENCE?

20   A.   SO EVERY JOURNAL AS A PANEL OF REVIEWERS WHERE YOUR

21   RESPONSIBILITY IS AS PEOPLE SUBMIT ARTICLES TO THESE PARTICULAR

22   JOURNALS, YOU'RE SUPPOSED TO BE REVIEWING THOSE AND OFFERING

23   COMMENTS AND A SUGGESTION TO THE EDITOR AS TO WHETHER OR NOT

24   THE ARTICLES SHOULD BE ACCEPTED OR REJECTED AND TO PROVIDE

25   FEEDBACK TO THE AUTHORS ABOUT WHAT IT IS THEY SHOULD BE DOING

1      IF THEY WERE GOING TO HAVE TO REDO THAT ARTICLE.

2      Q.   AS A REVIEWER, HAVE YOU REVIEWED ARTICLES THAT DEALT WITH

3      CONJOINT STUDIES?

4      A.   OH, YES, SEVERAL TIMES.

5      Q.   IT ALSO MENTIONS WITH RESPECT TO "MARKETING SCIENCE" AND

6      "MARKETING LETTERS," EDITOR.  SO WHAT WAS THAT?

7      A.   SO THERE WERE SPECIAL ISSUES THAT WERE DEVELOPED FOR

8      "MARKETING SCIENCE" AND "MARKETING LETTERS," AND I WAS THE

9      EDITOR THAT MADE THE ULTIMATE DECISION ABOUT WHAT ARTICLES

10     WOULD BE ACCEPTED IN THOSE PARTICULAR JOURNALS.

11     Q.   AND IF WE LOOK DOWN HERE AT PUBLICATIONS, IT SAYS 40

12     ARTICLES, YOU'VE PUBLISHED ABOUT 40 ARTICLES?

13     A.   YES, THAT'S CORRECT.

14     Q.   IN PROFESSIONAL MAGAZINES OR?

15     A.   IT CAN BE ANY ACADEMIC JOURNALS.

16     Q.   HAVE ANY OF THOSE INVOLVED CONJOINT STUDIES?

17     A.   YES, THERE HAVE BEEN SEVERAL.

18     Q.   AND IT SAYS SEVEN MARKETING BOOKS.  WHAT'S YOUR LATEST?

19     A.   I'M ALWAYS GLAD TO PROMOTE MY BOOK, SO THIS IS GREAT.  THE

20     LATEST ONE THAT I'VE DONE IS A BOOK ON MARKETING METRICS.

21     Q.   WHAT'S A MARKETING METRIC?

22     A.   SO MARKETING METRICS REALLY COVERS WHAT MEASURES THERE ARE

23     IN MARKETING, WHAT MEASURES COMPANIES SHOULD BE USING AND IN

24     THAT BOOK WE TALK ABOUT THOSE MEASURES, CLEARLY DEFINE THOSE

25     MEASURES AND DESCRIBE HOW IT IS THAT DATA SHOULD BE COLLECTED

1     AND HOW IT'S TO BE USED.

2     Q.   AND IF WE -- BY THE WAY, YOU TALKED ABOUT CONJOINT STUDIES

3     IN YOUR BOOKS?

4     A.   CONJOINT IS COVERED IN MY METRICS BOOKS.

5     Q.   IS IT ONE OF MANY TOOLS?

6     A.   IT'S ONE OF SEVERAL TOOLS THAT ARE AVAILABLE TO MARKETERS.

7     Q.   AT THE END THERE'S SOMETHING ABOUT "FORTUNE MAGAZINE"

8     NAMING YOU ON ONE OF THE NATION'S EIGHT "FAVOR BUSINESS SCHOOL

9     PROFESSORS" AND WINNING AWARDS.  HOW IMPORTANT IS TEACHING TO

10    YOU?

11    A.   I VIEW TEACHING AS A MAJOR PART OF MY RESPONSIBILITY AND

12    IT'S VERY IMPORTANT TO DO A GOOD JOB IN THE CLASSROOM.

13    Q.   ARE YOU TEACHING A CLASS CURRENTLY?

14    A.   YES, I AM.

15    Q.   WHERE?

16    A.   SO WHEN YOU SAY "CURRENTLY," NOT AT THIS SPECIFIC MOMENT.

17    Q.   NO.

18    A.   BUT I AM TEACHING A CLASS AT -- WE HAVE A CAMPUS ALSO IN

19    SAN FRANCISCO, SO I'M TEACHING IN OUR SAN FRANCISCO CAMPUS

20    RIGHT NOW.

21    Q.   AND WHAT KIND OF COURSE?

22    A.   SO THERE'S A SOURCE ON, IT'S CALLED DYNAMIC COMPETITIVE

23    MARKETING STRATEGY, AND IT'S A COURSE THAT'S OFFERED TO OUR

24    EXECUTIVE M.B.A. STUDENTS.  THESE ARE FULL-TIME EXECUTIVES THAT

25    COME TO TAKE THE PROGRAM EVERY OTHER WEEKEND FOR 24 MONTHS.

1    Q.   AND WHAT KIND OF THESE EXECUTIVES, WHERE DO THEY COME

2    FROM?

3    A.   SO THEY'RE FULL-TIME EMPLOYEES.  THEY'RE WORKING FOR

4    COMPANIES, PRIMARILY FROM THE WEST COAST, BUT I'VE GOT STUDENTS

5    RIGHT NOW THAT COME FROM MICROSOFT, THEY COME FROM AMAZON,

6    APPLE, GOOGLE, INTEL, SOME STUDENTS COME FROM COLORADO.

7    SOME -- I EVEN HAVE A STUDENT THAT COMES EVERY OTHER WEEKEND

8    FROM CHINA.

9    Q.   AND IN THAT COURSE HAVE YOU TAUGHT CONJOINT?

10   A.   YES, I HAVE.

11   Q.   AND SO LET'S -- CAN WE FIND OF FOCUSSED ON THE ACADEMIC

12   STUFF.

13        HAVE YOU ACTUALLY BEEN INVOLVED IN A FOUNDING, FOUNDING,

14   CREATING COMPANIES?

15   A.   I HAVE HELPED CREATE SOME COMPANIES THAT HAVE BEEN

16   FOUNDED.

17   Q.   AND IF WE COULD LOOK AT SDX 3134.

18        DOES THIS SHOW SOME OF THE COMPANIES THAT YOU HAVE EITHER

19   FOUNDED OR BEEN A DIRECTOR OF OR BOTH?

20   A.   YES.  SO DIRECTLY, I'VE BEEN A DIRECTOR MEANING ON THE

21   BOARD OF DIRECTORS, AND SOME OF THOSE I'VE ALSO BEEN A FOUNDER

22   FOR.

23   Q.   AND THAT INCLUDES SHOPZILLA, BIZRATE, AND AND1 WERE A

24   COUPLE OF COMPANIES THAT YOU WERE ACTUALLY ONE OF THE FOUNDERS?

25   A.   THAT'S CORRECT.

1    Q.   WITH STUDENTS?

2    A.   SO BOTH OF THOSE WERE WITH, I DID THEM WITH FORMER

3    STUDENTS.

4    Q.   SHOPZILLA AND BIZRATE, WAS THAT EVENTUALLY SOLD IN A

5    BIDDING WAR?

6    A.   SO WE ENDED UP SELLING THAT.  THERE WAS A BIDDING WAR FOR

7    THAT.  WE EVENTUALLY SOLD IT.

8    Q.   BIDDING WARS AMONG WHOM?

9    A.   SO THERE WERE SEVERAL COMPANIES THAT HAD EXPRESSED AN

10   INTEREST IN US.  GOOGLE HAD BEEN EXPRESSING AN INTEREST, BUT IT

11   WENT DOWN TO A BIDDING WAR BETWEEN A COMPANY CALLED SCRIPTS AND

12   EBAY.

13   Q.   AND TELL US REALLY QUICKLY, WHAT IS SHOPZILLA?

14   A.   SHOPZILLA, I DON'T WANT TO SOUND TOO MUCH LIKE AL GORE,

15   BUT SHOPZILLA WAS THE FIRST PRODUCT SEARCH ENGINE.  SO THERE

16   WERE OTHER SEARCH ENGINES, BUT THIS WAS THE FIRST THAT DID

17   COMPARISON SHOPPING AND ALLOWED YOU TO SORT OF EXPLORE, IF I'M

18   INTERESTED IN BUYING A PRODUCT, WHERE I WOULD GO?

19   Q.   AND I FORGOT HOW MANY OF OUR PEOPLE HERE HAVE YOUNG BOYS

20   OR PLAYED BASKETBALL.  CAN YOU TELL US WHAT AND1 IS?

21   A.   AND1 IS A VERY, VERY DIFFERENT TYPE OF COMPANY.  IT'S A

22   BASKETBALL APPAREL COMPANY AIMED AT INNER CITY YOUTH.

23   Q.   IN ADDITION TO FORMING YOUR OWN COMPANIES OR BEING ON

24   BOARDS OF DIRECTORS, HAVE YOU CONSULTED WITH BUSINESSES?

25   A.   I HAVE.

```
1    Q.   IF WE COULD PUT UP SDX 3132, DOES THIS SLIDE SHOW SOME OF

2    THE BUSINESSES THAT YOU'VE CONSULTED WITH?

3    A.   IT'S A SAMPLE OF THE COMPANIES THAT I'VE WORKED WITH OVER

4    MY CAREER.

5    Q.   AND SINCE THIS IS NOT GOING TO ACTUALLY BE IN EVIDENCE

6    BECAUSE IT'S A DEMONSTRATIVE, CAN YOU SAY FOR THE RECORD THE

7    TYPES OF COMPANIES YOU'VE CONSULTED WITH?

8    A.   SO YOU SHOULD BE ABLE TO RECOGNIZE FROM THE LOGOS MANY OF

9    THOSE COMPANIES, BUT I'VE WORKED WITH AT&T, INTEL,

10   HEWLETT-PACKARD, GENERAL ELECTRIC, SOUTH WEST BELL, YOU CAN

11   SORT OF SEE FROM THE LOGOS, IBM ARE THE TYPES OF COMPANIES THAT

12   I'VE WORKED WITH.

13   Q.   IN CONSULTING WITH SOME OF THESE COMPANIES, HAVE YOU USED

14   CONJOINT STUDIES?

15   A.   NOT IN ALL OF THEM, BUT I HAVE DONE CONJOINTS FOR SOME OF

16   THOSE COMPANIES.

17   Q.   WHY NOT IN ALL?

18   A.   PRIMARILY BECAUSE CONJOINT IS APPROPRIATE FOR SOME

19   PROBLEMS AND NOT APPROPRIATE FOR ALL PROBLEMS.

20        MR. PRICE:  YOUR HONOR, WE WOULD OFFER

21   PROFESSOR REIBSTEIN AS AN EXPERT IN THE FIELD OF CONJOINT

22   STUDIES, CONSUMER SURVEYS, AND MARKETING RESEARCH AND ANALYSIS.

23        MR. BENNETT:  NO OBJECTION, YOUR HONOR.

24        THE COURT:  ALL RIGHT.  HE'S SO CERTIFIED.  GO AHEAD,

25   PLEASE.
```

1    BY MR. PRICE:

2    Q.   SO, PROFESSOR REIBSTEIN, YOU HEARD THAT DR. VELLTURO USED

3    THE RESULTS OF A CONJOINT STUDY BY DR. HAUSER TO MEASURE

4    REDUCTION IN SALES OF SAMSUNG PRODUCTS ASSUMING THAT CERTAIN

5    FEATURES WERE REMOVED.  YOU HEARD THAT?

6    A.   I HAVE.

7    Q.   AND WHAT MEASUREMENT FROM DR. HAUSER WAS IT THAT WAS USED

8    IN THOSE CALCULATIONS?

9    A.   SO DR. HAUSER PRODUCES A WILLINGNESS TO BUY IN A BUT FOR

10   WORLD OF WILLINGNESS TO BUY, AND THAT WAS INTEGRAL TO THE

11   ESTIMATES THAT WERE USED BY DR. VELLTURO.

12   Q.   AND THAT'S DIFFERENT FROM WILLINGNESS TO PAY NUMBER;

13   RIGHT?

14   A.   THAT IS DIFFERENT THAN A WILLINGNESS TO PAY NUMBER.

15   Q.   OKAY.  NOW, CAN DR. HAUSER'S SURVEY BE USED TO MEASURE

16   WILLINGNESS TO BUY AND REDUCTION IN SALES OF SAMSUNG PRODUCTS,

17   ASSUMING THAT CERTAIN FEATURES WERE TAKEN OUT?

18   A.   ABSOLUTELY NOT.

19   Q.   AND HAVE YOU PREPARED A SLIDE THAT KIND OF SUMMARIZES YOUR

20   OPINIONS ON THAT?

21   A.   I HAVE.

22        MR. PRICE:  AND, YOUR HONOR, IF WE COULD -- FIRST WE

23   CAN MAYBE PUT THIS UP ON THE BOARD.

24   Q.   SO INITIALLY WE'LL PUT IT UP HERE.  AND PERHAPS -- BECAUSE

25   WE'LL KEEP COMING BACK TO THIS, I'M GOING TO PUT IT ON A BOARD,

1        TOO.

2             PERHAPS YOU CAN GIVE THE JURY AN OVERALL VIEW ABOUT YOUR

3        OPINIONS ON WHY DR. HAUSER'S WILLINGNESS TO BUY CONCLUSIONS

4        CANNOT BE USED TO PREDICT REDUCTION IN SALES OF ANY SAMSUNG

5        PRODUCTS?

6        A.   THE FIRST MAJOR FLAW THAT I HAVE LISTED UP THERE IS THAT

7        CONJOINT, A CONJOINT STUDY SUCH AS THE ONE USED BY DR. HAUSER

8        CANNOT BE USED TO TRY AND PREDICT WHAT DEMAND WOULD BE IN THE

9        ACTUAL MARKETPLACE WHEN YOU HAVE OMITTED THE MAJOR FACTORS AND

10       MAJOR DRIVERS OF SALES.

11       Q.   AND WHY IS THAT?  WHY DO YOU -- WHY CAN IT NOT BE USED IF

12       YOU OMIT THE MAJOR DRIVERS?

13       A.   BECAUSE YOU'RE TRYING TO PREDICT WHAT IT IS THAT PEOPLE

14       WOULD BUY AND IF YOU JUST CONCENTRATE ON SMALLER ASPECTS AND A

15       COUPLE OF THE MAJOR FACTORS, YOU'RE GOING TO MISS THE MAJOR

16       DETERMINANTS OF WHAT WOULD DRIVE YOUR SALES AND WHY PEOPLE

17       WOULD BUY THE PRODUCTS.

18       Q.   COULD YOU GIVE ME AN EXAMPLE OF, LIKE, A CONJOINT STUDY

19       WHERE IT MIGHT BE USEFUL BUT YOU CAN'T USE IT TO PREDICT

20       REDUCTION IN SALES?

21       A.   SO, FOR EXAMPLE, WE COULD USE CONJOINT TO TRY AND FIGURE

22       OUT WHAT TYPE OF CUP HOLDER YOU MIGHT WANT TO HAVE IN AN

23       AUTOMOBILE AND YOU MIGHT BE ABLE TO DISCOVER PEOPLE PREFER THIS

24       TYPE OF CUP HOLDER VERSUS ANOTHER CUP HOLDER.

25             BUT YOU WOULD NEVER TRY TO FORECAST WHICH CAR THEY WOULD

1    BUY BASED ON THE CUP HOLDER THAT THEY HAVE WHEN YOU'VE LEFT OUT

2    WHAT BRAND OF CAR IT IS, WHAT THE MILES PER GALLON IS, WHAT THE

3    STYLING IS OF THE CAR.  THOSE WOULD BE MAJOR DETERMINANTS.

4    Q.   AND IN THIS CASE DID YOU DO ANY WORK TO TRY TO SEE, IN

5    THIS PARTICULAR MARKETPLACE, WHAT THE TYPES OF MAJOR DRIVERS

6    WERE IN PURCHASING DECISIONS?

7    A.   I DID CONSIDERABLE RESEARCH ON TRYING TO DETERMINE WHAT

8    WERE SOME OF THE MAJOR FACTORS.  I DIDN'T TRY TO QUANTIFY

9    THOSE, BUT I TRIED TO SEE WHAT ARE THE MAJOR DRIVERS OF SALES

10   THAT PEOPLE WERE TRYING TO LOOK AT IN DETERMINING WHICH BRAND

11   OF SMARTPHONE THEY WOULD BUY.

12   Q.   AND HOW DID YOU DO THAT?

13   A.   SO I DID THIS IN A VARIETY OF WAYS.  ONE OF THE THINGS

14   THAT I ENDED UP DOING IS I LOOKED AT THE WEBSITES OF THE

15   COMPANIES, AND I TRIED TO SEE WHAT FEATURES IT IS THAT WERE

16   BEING MENTIONED ON THOSE WEBSITES.

17        I LOOKED AT THEIR ADVERTISING, NOT ALL OF THEIR

18   ADVERTISING; I LOOKED AT SOME INTERNAL DOCUMENTS FROM BOTH

19   APPLE AND SAMSUNG TO SEE WHAT DIMENSIONS IT IS THAT THEY WERE

20   TALKING ABOUT IN THEIR MARKETING MATERIALS AND MARKET RESEARCH

21   THEY WERE DOING; AND I WENT TO SOME COMPARISON SHOPPING SITES.

22   AND I TRIED TO SEE WHAT WERE THE DIMENSIONS THAT WERE BEING

23   LISTED, WHAT WERE THE FEATURES THAT WERE BEING LISTED TO AID

24   CONSUMERS IN DECIDING WHICH BRAND OF SMARTPHONE IT IS THAT THEY

25   MIGHT WANT.

1    Q.   AND AFTER REVIEWING THIS MATERIAL, DID YOU COME TO ANY

2    CONCLUSIONS ABOUT THE TYPE OF MAJOR DRIVERS IN THIS SMARTPHONE

3    INDUSTRY?

4    A.   I DID.  AND WHAT IT IS THAT -- AND SOME OF THIS IS BASED

5    ON LOOKING AT CROSS SITES AND LOOKING THROUGH THE MATERIAL THAT

6    BRAND WAS A FACTOR THAT CONSUMERS USED, CERTAINLY ONE THAT'S

7    FEATURED ON THOSE SITES; BATTERY; OPERATING SYSTEM; WHETHER OR

8    NOT YOU HAVE A REPLACEABLE BATTERY OR NOT; SPEED OF SYSTEM.

9    THERE WERE SEVERAL.

10        NONE OF THEM INCLUDED THE MINOR FEATURES THAT ARE BEING

11   STUDIED IN THIS PARTICULAR CASE.

12   Q.   AND BY THAT YOU'RE TALKING ABOUT THE PATENTED FEATURES --

13   A.   THE PATENTED FEATURES THAT ARE AT THE FOCAL POINT OF THIS

14   CASE.

15   Q.   SO WHAT WAS WRONG THEN WITH, WITH PROFESSOR HAUSER'S

16   SURVEY AND WHAT HE INCLUDED TO BE MEASURED?

17   A.   SO WHAT IT IS THAT HE INCLUDED IS HE HAD SOME MAJOR

18   FACTORS, BUT HE'S OMITTED MOST OF THE MAJOR FACTORS THAT END UP

19   DETERMINING WHAT BRAND OF SMARTPHONE THAT PEOPLE WOULD BUY, OR

20   WHAT MODELS OF PHONE THEY WOULD END UP BUYING.

21   Q.   NOW, IN THE MARKET THAT YOU REVIEWED OF SMARTPHONES, OKAY,

22   CAN A CONJOINT STUDY, IN YOUR OPINION, BE USED TO MEASURE

23   WILLINGNESS TO BUY, THAT IS, YOU KNOW, WHETHER OR NOT YOU WOULD

24   BUY A PHONE THAT DIDN'T HAVE A FEATURE, WITHOUT THE ACCUSED

25   FEATURES IN THIS CASE; THAT IS, THE DIFFERENT VERSIONS OF THE

1    SLIDE TO UNLOCK OR THE DIFFERENT WAY OF DOING SYNCING, THINGS

2    LIKE THAT?

3    A.   WHEN YOU'RE MEASURING WILLINGNESS TO BUY, YOU WANT TO KNOW

4    WHAT ARE THOSE FACTORS AND HOW MUCH OF THOSE FACTORS DETERMINE

5    WHAT IT IS YOU WILL BUY.

6        A CONJOINT THAT OMITS THOSE FACTORS WILL NOT BE ABLE TO

7    PREDICT WHAT IT IS THAT PEOPLE WOULD BE WILLING TO BUY.

8    Q.   OMITS WHAT FACTORS?

9    A.   OMITS THE MAJOR DRIVERS OF SALES, THAT LIST THAT I GAVE

10   YOU.

11   Q.   OKAY.  SO LET'S -- YOU TALKED ABOUT KIND OF THE FIRST

12   POINT AND I -- IN MORE DETAIL THAN I -- I THOUGHT WE'D GO

13   THROUGH ALL OF THEM FIRST.  SO WE DISCUSSED THAT IN SOME

14   DETAIL.

15       LET'S TALK NOW ABOUT NUMBER 2 WHERE YOU SAID DR. HAUSER'S

16   IMPLEMENTATION GENERATES DATA THAT CAN'T BE RELIED UPON.

17   A.   OKAY.  WOULD YOU PREFER ME TO BE RELATIVELY BRIEF AS WE

18   DESCRIBE THESE TWO?

19   Q.   LET'S GO THROUGH THEM ONE BY ONE SINCE WE'VE KIND OF

20   STARTED DOWN THAT PATH?

21   A.   OKAY.

22   Q.   LET ME ASK YOU FIRST ABOUT THE STUDY ITSELF, DR. HAUSER'S

23   STUDY JUST TO KIND OF REMIND THE JURY.

24       AND THERE'S AN EXHIBIT 140 BEFORE YOU WHICH HAS BEEN

25   IDENTIFIED AS THE SURVEY, AND THIS WAS THE SURVEY WHICH WAS

 1     TAKEN OVER THE INTERNET.  CORRECT.

 2     A.   THAT'S CORRECT.

 3     Q.   AND THE 50, OH, 50 -- LET'S SEE, 52 PAGES DEAL WITH

 4     SMARTPHONES; CORRECT?

 5     A.   THAT IS CORRECT.

 6     Q.   OKAY.  AND IF WE LOOK THROUGH THIS, ON PAGE 51 WE SEE A --

 7     TURN TO 140, PAGE 51, WE SEE -- YOU CAN TELL US WHAT THIS IS.

 8     I KNOW THERE'S A NAME FOR IT, AND I WANT TO MAKE SURE WE USE

 9     THE RIGHT NAME.

10          YOU SEE THIS PAGE.  WHAT'S THIS REFERRED TO?

11     A.   SO AFTER ONE HAD GONE THROUGH ALL THE PRELIMINARIES IN

12     THIS, THE PAGE THAT WE'RE LOOKING AT RIGHT HERE IS THE CHOICE

13     SCREEN THAT THE CONSUMERS HAD.  THEY RECEIVED 16 OF THESE.

14          I HAVE A POINT -- MAY I USE THIS POINTER HERE?

15     Q.   YES.

16     A.   SO WHAT IT IS THAT WE'RE LOOKING AT UP HERE IS EACH ONE OF

17     THESE COLUMNS IS A PARTICULAR PHONE.  THESE ARE -- SO YOU CAN

18     SEE HE'S HIGHLIGHTED PHONE NUMBER 1 AND WHAT IT IS, IT

19     DESCRIBES THE PARTICULAR FEATURES ON THAT PHONE, AND EACH OF

20     THE COLUMNS ARE, ARE VARIOUS COMBINATIONS OF THOSE FEATURES.

21     Q.   AND BEFORE THE RESPONDENT GETS TO THIS PAGE 51, THEN THEY,

22     THEY READ TEXT AND WATCH SOME VIDEOS?

23     A.   THEY, THEY READ TEXT AND THEY WATCH 18 VIDEOS ON THESE

24     FEATURES AND THEY WATCH A 19TH VIDEO, OR ANIMATION, ON

25     INSTRUCTIONS OF HOW TO DO THE QUESTIONNAIRE.

```
 1     Q.   OKAY.  AND NOW LET'S TAKE A STEP BACK.

 2          WHAT IS THE PURPORTED PURPOSE OF, OF THAT INSTRUCTION AND

 3     THEN HAVING THE RESPONDENT GO THROUGH -- THEY GO THROUGH 16

 4     PAGES OF THESE CHOICES; CORRECT.

 5     A.   SIXTEEN TIMES THEY DO THIS CHOICE EXERCISE.

 6     Q.   AND HAVE YOU CREATED A DEMONSTRATIVE THAT KIND OF

 7     DEMONSTRATES WHAT THE PURPORTED PURPOSE OF THAT IS?

 8     A.   I HAVE.

 9     Q.   AND IF WE COULD PUT UP 3161.

10          COULD YOU EXPLAIN TO US, USING THIS, WHAT THE PURPOSE OF

11     THAT IS SUPPOSED TO BE?

12     A.   SO ON THE FAR LEFT OVER THERE, IT INDICATES VALUE OR

13     UTILITY, AND WHAT PROFESSOR HAUSER IS TRYING TO DO IS TO

14     DEMONSTRATE THE VALUE OF A PARTICULAR FEATURE.

15          AND SO HE WANTS TO MEASURE SORT OF THE HEIGHT OF THIS BAR,

16     AND THAT'S WHAT HE'S TRYING TO DO IN THAT CHOICE EXERCISE.

17          BUT WHEN HE ALSO WANTS TO DO IS MEASURE THE VALUE OF THE

18     NON-INFRINGING ALTERNATIVE, THE ALTERNATIVE WAY THAT SAMSUNG

19     COULD HAVE IMPLEMENTED THAT PARTICULAR FEATURE, AND ULTIMATELY

20     WHAT WE WANTED TO DO IS COME UP WITH A MEASURE OF INCREMENTAL

21     VALUE; THAT IS, THE PATENTED FEATURE VERSUS THE ALTERNATIVE WAY

22     THAT IT COULD HAVE BEEN IMPLEMENTED BY SAMSUNG, WHAT I WILL

23     CONTINUE TO REFER TO AS THE NON-INFRINGING ALTERNATIVE.

24     Q.   OKAY.  SO IS PRE-TESTING IMPORTANT BEFORE GIVING SUCH A

25     TEST?
```

1        A.    OH, ABSOLUTELY.

2        Q.    AND WHY IS PRE-TESTING IMPORTANT BEFORE YOU GIVE A TEST

3        WHEN YOU'RE TRYING TO MAKE THESE SORTS OF CALCULATIONS?

4        A.    SO YOU'RE GOING TO WANT TO COME UP WITH A MEASURE OF THE

5        VALUE OF THE PARTICULAR FEATURE AND THE NON-INFRINGING

6        ALTERNATIVE.    YOU'RE GOING TO BE ASKING QUESTIONS OF

7        RESPONDENTS.    YOU WANT TO MAKE SURE THAT THEY FULLY UNDERSTAND

8        THE CHOICES THAT THEY GOT SO THAT WE CAN COME UP WITH THESE

9        PARTICULAR MEASURES.

10       Q.    AND, KEN, YOU CAN TAKE THAT DOWN NOW.

11             NOW, WOULD PRE-TESTING BE OF ANY PARTICULAR IMPORTANCE IN

12       A STUDY IN THIS CASE MEASURING THE DIFFERENCES BETWEEN THE

13       ACCUSED PATENTS AND THE NON-INFRINGING ALTERNATIVES?

14       A.    YES, IT WOULD BE.

15       Q.    WHY WOULD IT BE OF PARTICULAR IMPORTANCE IN A CASE LIKE

16       THIS?

17       A.    IF WE WERE GOING TO BE TALKING ABOUT SOMETHING, SUCH AS

18       SCREEN SIZE, WHICH IS ONE OF THE DIMENSIONS THAT IS IN THIS

19       CASE, YOU COULD SORT OF ASSUME THAT PEOPLE KNOW WHAT WE MEAN BY

20       SCREEN SIZE OR WHAT WE MEAN BY PRICE.

21             BUT HERE WHAT WE'RE TALKING ABOUT ARE FEATURES THAT ARE

22       NOT NECESSARILY GOING TO BE -- WELL, THEY'RE NOT THE PRIMARY

23       DRIVERS, AND THE ALTERNATIVE WAY -- AND WE NEED TO MAKE SURE

24       THAT THE RESPONDENTS UNDERSTAND WHAT WE'RE TALKING ABOUT WHEN

25       WE PRESENT THE FEATURES AND THE ALTERNATIVE WAYS IT COULD BE

1     DELIVERED.

2     Q.   NOW, DID YOU LOOK AT THE, AT PROFESSOR HAUSER'S PRE-TEST?

3     A.   I DID.

4          MR. PRICE:  AND IF WE COULD PUT UP, YOUR HONOR, FROM

5     THE TRIAL TRANSCRIPT OF PROFESSOR HAUSER, IT'S 1152, LINES 7

6     THROUGH 11.

7     Q.   AND HE WAS ASKED, "IN THIS CASE WITH THESE PRE-TESTS,

8     THESE FOLKS WERE ASKED YES OR NO QUESTIONS, DID YOU UNDERSTAND?

9     THEY WERE NOT ASKED TO EXPLAIN TO ME YOUR UNDERSTANDING;

10    CORRECT?

11         "ANSWER:  NO, THEY WERE NOT ASKED TO EXPLAIN TO ME THEIR

12    UNDERSTANDING."

13         DO YOU AGREE THAT THAT WAS AN APPROPRIATE PRE-TEST IN THIS

14    SITUATION, THAT IS, WHERE THE RESPONDENTS WEREN'T ASKED TO

15    EXPLAIN WHAT THEY UNDERSTOOD?

16    A.   I DO NOT.

17    Q.   AND WHY?

18    A.   BECAUSE, AGAIN, WE'RE LOOKING AT NUANCED DIFFERENCES AND

19    HOW IT IS THAT THESE PARTICULAR FEATURES ARE BEING DELIVERED

20    AND IT IS ESSENTIAL THAT WE UNDER -- THAT WE ENSURE THAT THE

21    RESPONDENTS UNDERSTAND WHAT THOSE DIFFERENCES ARE THAT WE'RE

22    TRYING TO DESCRIBE.

23    Q.   SO DID YOU HAVE AN OPPORTUNITY TO EVALUATE HOW THE PEOPLE

24    IN DR. HAUSER'S SURVEY UNDERSTOOD THE DESCRIPTION OF THE

25    ACCUSED PATENTED FEATURES VERSUS THE NON-INFRINGING

1    ALTERNATIVES IN THIS CASE?

2    A.   YES, I DID.

3    Q.   AND COULD YOU TELL US HOW YOU WENT ABOUT DOING THAT?

4    A.   I DID A PARALLEL PRE-TEST TO WHAT IT IS THAT WAS DONE BY

5    PROFESSOR HAUSER, WITH ONE OF THE MAJOR DIFFERENCES BEING THAT

6    I ASKED PEOPLE TO EXPLAIN WHAT THEIR UNDERSTANDING WAS OF THE

7    FEATURES BEING DESCRIBED.

8    Q.   SO DESCRIBE TO US THEN EXACTLY, KIND OF LIKE THE STEPS

9    THAT WERE TAKEN IN DOING THAT?

10   A.   OKAY.  WHAT IT IS THAT I DID IS I SCREENED THE RESPONDENTS

11   IN THE SAME WAY THAT PROFESSOR HAUSER DID.  SO PROFESSOR HAUSER

12   WAS DEALING A PANEL OF RESPONDENTS, I WAS DEALING WITH A PANEL

13   OF RESPONDENTS, I SCREENED, MAKING SURE THAT THEY HAD A SAMSUNG

14   PHONE AND THESE WERE ALL BUYERS OF SAMSUNG PHONES.

15       ONE THING I DID DIFFERENTLY.  HE HAD HIS ONLINE.  I HAD MY

16   RESPONDENTS COME TO A RESEARCH CENTER AND THEN GO THROUGH THE

17   SAME EXERCISES THAT THEY DID WITH PROFESSOR HAUSER.

18       SO THEY HAD TO GO THROUGH THE 18 ANIMATIONS AND THE VIDEO

19   THAT SHOWS HOW TO ANSWER THE QUESTIONS, JUST IN THE SAME

20   FASHION THAT PROFESSOR HAUSER DID.

21   Q.   SO BASICALLY, IF YOU LOOKED AT PROFESSOR HAUSER'S SURVEY,

22   EXHIBIT 140, UP THROUGH PAGE 50, IT WAS THE SAME?

23   A.   IT WAS THE SAME.  IT WAS IDENTICAL.

24   Q.   SAME VIDEOS?

25   A.   SAME VIDEOS.

1    Q.   NOW, SO WHAT HAPPENED THEN AT THAT POINT AFTER ALL THE

2    EDUCATION, HOW DID YOU CONDUCT YOUR PRE-TEST?

3    A.   SO THEN WHAT IT IS THAT I DID IS I ASKED A QUESTION, "DO

4    YOU HAVE ANY DIFFICULTY UNDERSTANDING THE QUESTIONS AND

5    INSTRUCTIONS?"

6    Q.   SO AT THAT POINT --

7    A.   AT THAT POINT, BECAUSE THAT'S SIMILAR TO THE QUESTION THAT

8    PROFESSOR HAUSER ASKED.  HE ASKED HIS QUESTION AFTER THEY HAD

9    GONE THROUGH ALL OF THE INSTRUCTIONS AND THE VIDEOS AND AFTER

10   THEY ANSWERED 16 CHOICE SCREENS, AT THE END OF ALL THAT, HE

11   ASKED, DO THE -- "DO YOU HAVE ANY DIFFICULTY UNDERSTANDING

12   THESE QUESTIONS?"

13   Q.   AND BY CHOICE SCREENS, WE'RE TALKING ABOUT THAT SCREEN YOU

14   SHOWED US ON PAGE 51?

15   A.   WITH THE FOUR -- WITH THE FOUR PHONES THAT WERE UP THERE,

16   THIS ONE RIGHT THERE.

17   Q.   OKAY.  SO WHEN YOU ASKED AFTER ALL THAT INSTRUCTION,

18   BEFORE THEY STARTED DOING THE CHOICE SCREENS, WHETHER THE

19   PARTICIPANTS UNDERSTOOD, WHAT DID THEY SAY?

20   A.   THERE WAS NO ONE THAT SAID THEY DID NOT UNDERSTAND.

21   Q.   SO THEY WERE, THEY WERE READY TO GO TO TAKE THAT TEST?

22   A.   ABSOLUTELY.

23   Q.   OKAY.  SO AT THAT POINT, HOW DID YOU AND PROFESSOR HAUSER

24   DIFFER THEN?

25   A.   SO THEN I PROCEEDED IN THE SAME FASHION THAT

1    PROFESSOR HAUSER DID.  EACH OF THE RESPONDENTS HAD TO SIT IN

2    FRONT OF A COMPUTER SCREEN AND THEY GAVE -- THEY WERE GIVEN A

3    CHOICE SET LIKE THIS ONE WE HAVE UP HERE, FINISHED THIS; THEY'D

4    THEN GO TO THE NEXT CHOICE SET; THEY'D THEN GO TO THE THIRD

5    CHOICE SET.

6         BUT INSTEAD OF CONTINUING, WHAT IT IS I HAD THEM DO IS WE

7    STOPPED.  AND I HAD MODERATORS THAT ASKED THEM QUESTIONS ABOUT

8    HOW WELL THEY UNDERSTOOD AND NOT HOW WELL THEY UNDERSTOOD, BUT

9    TO DESCRIBE THEIR UNDERSTANDING OF EACH OF THE FEATURES IN

10   WHICH THESE, THESE PHONES HAVE BEEN DESCRIBED.

11   Q.   SO AT THIS POINT THESE RESPONDENTS HAVE ALREADY MADE THREE

12   SETS OF CHOICES, THREE DIFFERENT SCREENS?

13   A.   THAT'S CORRECT.

14   Q.   AND THEN YOU STOPPED THEM AND THE MODERATOR SAID, "NOW,

15   LET ME ASK YOU KIND OF ABOUT YOUR UNDERSTANDING AS TO WHAT

16   YOU'VE BEEN DOING"?

17   A.   THAT IS CORRECT.

18   Q.   NOW, THESE MODERATORS, WHO WERE THEY?

19   A.   SO THEY WORKED FOR A PROFESSIONAL FIRM CALLED SCHLESINGER

20   & ASSOCIATES, AND THEY WERE HIRED, SCHLESINGER & ASSOCIATES

21   WERE HIRED TO DO ALL THIS INTERVIEWING.

22   Q.   NOW, THESE MODERATORS, DID THEY KNOW WHETHER THEY WERE

23   WORKING FOR APPLE OR SAMSUNG OR WHAT KIND OF ANSWERS THEY WERE

24   TRYING TO GET?

25   A.   SO THIS STUDY WAS A DOUBLE BLIND STUDY, MEANING THE

1        RESPONDENTS IN THIS PRE-TEST DID NOT KNOW WHAT THE PURPOSE OF

2        IT WAS, AND THE MODERATORS DID NOT KNOW, EITHER.

3            SO THE MODERATORS WERE BLIND AS TO THE SOURCE AND WHAT THE

4        ULTIMATE PURPOSE WAS.  THEY BELIEVED THAT WHAT WE WERE TRYING

5        TO DO IS TO CONSTRUCT, TO MAKE SURE THAT THE RESPONDENTS

6        UNDERSTOOD, AND TRULY UNDERSTOOD, THE FEATURES AS THEY WERE

7        DESCRIBED IN THIS EXERCISE.

8        Q.   NOW, IN FRONT OF YOU THERE SHOULD BE A DEFENDANTS' EXHIBIT

9        454A.

10           IS THIS A TRANSCRIPT OF THE CONVERSATIONS BETWEEN THE

11       MODERATORS AND THE RESPONDENTS THAT TOOK PLACE AT THIS TIME

12       CONCERNING THE ACCUSED PATENT FEATURES AND NON-INFRINGING

13       ALTERNATIVE ALTERNATIVES?

14       A.   DO YOU WANT TO PUT THAT UP SO I CAN SEE WHAT YOU'RE

15       REFERRING TO?

16       Q.   GO TO PAGE 454A.  YOU HAVE A BINDER IN FRONT OF YOU.  IT

17       SHOULD BE IN THERE AS WELL.

18           MR. BENNETT:  THIS IS NOT IN EVIDENCE.

19           MR. PRICE:  OH, IT'S NOT IN EVIDENCE.

20           THE WITNESS:  OKAY.  SO I -- OH, I SEE IT.

21           SO THIS IS A TRANSCRIPT OF THE INTERVIEW THAT HAPPENED

22       BETWEEN THE RESPONDENTS AND THE MODERATOR.

23           MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 454A INTO

24       EVIDENCE.

25           MR. BENNETT:  YOUR HONOR, THE OBJECTION HERE IS THIS

```
 1        IS NOT THE ENTIRE TRANSCRIPTS.  IT'S EXCERPTS.

 2             THE COURT:  UNDERSTOOD.  IT'S ADMITTED.

 3        (DEFENDANTS' EXHIBIT 454A WAS ADMITTED IN EVIDENCE.)

 4             THE COURT:  GO AHEAD, PLEASE.

 5   BY MR. PRICE:

 6   Q.   AND ALL OF THESE INTERACTIONS BETWEEN THE MODERATORS AND

 7   THE RESPONDENTS, WERE THEY ALSO VIDEOTAPED?

 8   A.   THEY WERE ALL VIDEOTAPES, YESTERDAY.

 9             MR. BENNETT:  YOUR HONOR, MAY I SUPPLEMENT THAT

10   OBJECTION AND GET AN INSTRUCTION THIS IS NOT OFFERED FOR THE

11   TRUTH.  IT'S OUT-OF-COURT STATEMENTS.

12             THE COURT:  ANY OBJECTION TO THAT?

13             MR. PRICE:  IT'S NOT OFFERED FOR THE TRUTH.  IT'S

14   OFFERED FOR THE UNDERSTANDING OF THE RESPONDENTS.  IT'S THEIR

15   STATE OF MIND.

16             THE COURT:  ALL RIGHT.  IT'S NOT OFFERED FOR THE --

17   YOU ARE NOT TO CONSIDER THIS FOR THE TRUTH OF THE MATTER STATED

18   HERE IN.  GO AHEAD, PLEASE.

19   BY MR. PRICE:

20   Q.   IN OTHER WORDS, WHAT THE RESPONDENTS SAID THEIR

21   UNDERSTANDING WAS AND WHAT DR. HAUSER SAID, WE'RE NOT SAYING

22   THAT'S ACTUALLY WHAT HE SAID.  CORRECT?

23   A.   SAY THAT AGAIN.

24   Q.   I WAS TRYING TO EXPLAIN IT NOT FOR THE TRUTH, SO LET ME

25   TRY IT AGAIN.
```

```
 1              LET'S JUST JUMP AHEAD.

 2              DID YOU COME TO CONCLUSIONS AFTER LOOKING AT ALL THESE

 3    VIDEOS AS TO WHETHER OR NOT THE VIDEOS AND THE DESCRIPTIONS

 4    THAT DR. HAUSER USED ACTUALLY RESULTED IN RESPONDENT'S

 5    UNDERSTANDING WHAT THEY WERE DOING AND CHOOSING AMONG

 6    NON-INFRINGING ALTERNATIVES AND THE ACCUSED --

 7    A.   WHAT I DISCOVERED IS THAT THE RESPONDENTS HAD

 8    MISUNDERSTANDING OR LACKED AN UNDERSTANDING OF THE FEATURES OR

 9    THE NON-INFRINGING ALTERNATIVE ALTERNATIVES.

10    Q.   AND IF WE COULD PUT UP EXHIBIT 3146B, IS THIS A CHART THAT

11    SUMMARIZES THAT?

12    A.   THIS IS A CHART, IT LOOKS LIKE IT'S HARD TO SEE.  OH, YOU

13    HAVE IT IN FRONT OF YOU, OKAY.  SO THIS IS A CHART THAT DOES DO

14    THAT SUMMARIZATION.

15    Q.   AND IF WE LOOK, WE HAVE -- THERE WERE 26 RESPONDENTS;

16    CORRECT?

17    A.   THERE WERE 26 RESPONDENTS, AND THIS IS A PRE-TEST.  YOU

18    DON'T NEED A LARGE SAMPLE.  THIS IS TO MAKE SURE THAT THEY

19    UNDERSTAND THE SURVEY.  THERE WERE 26 RESPONDENTS.  THIS WAS

20    DONE IN THREE CITIES, AND IN CHICAGO IT WAS DONE OVER TWO DAYS.

21    Q.   SO FOR AUTOMATIC WORD CORRECTION, YOU LOOKED AT THE

22    VIDEOS, AND DOES THIS REFLECT THAT 18 OF THE 26 YOU CONCLUDED

23    THERE WAS A -- EITHER CONFUSION OR SOME LACK OF UNDERSTANDING?

24    A.   WELL, LET'S BE REAL CLEAR.  AT THE TOP OF EACH OF THESE

25    COLUMNS ARE EACH OF THE FEATURES --
```

1    Q.   YES.

2    A.   -- THAT ARE AT THE CENTER OF THIS CASE.  AND WHAT WE SEE

3    AS INDICATED, YES, I JUDGE RESPONDENT NUMBER 1 TO BE -- TO HAVE

4    A MISUNDERSTANDING, OR A LACK OF UNDERSTANDING WITH RESPECT TO

5    EITHER THAT FEATURE OR ITS NON-INFRINGING ALTERNATIVE.

6         AND AS YOU NOTED, 18 OF THE 26 DID NOT HAVE A COMPLETE

7    UNDERSTANDING OF THAT FEATURE OR ITS NON-INFRINGING

8    ALTERNATIVE.

9    Q.   WE HAVE A PROBLEM HERE WITH AT LEAST ONE FEATURE.  OF

10   THESE 26 RESPONDENTS, HOW MANY HAD A LACK OF UNDERSTANDING OF

11   AT LEAST ONE OF THESE CLAIMED PATENT FEATURES OR NON-INFRINGING

12   ALTERNATIVE.

13   A.   EVERY RESPONDENT IN THIS PRE-TEST HAD A LACK OF

14   UNDERSTANDING OF AT LEAST ONE OF THE FEATURES.

15   Q.   NOW, WHAT DOES THAT MEAN WITH RESPECT TO WHETHER OR NOT

16   YOU CAN USE THESE RESULTS FROM THE STUDY?

17   A.   I DON'T SEE HOW WE COULD POSSIBLY USE THIS CONJOINT STUDY

18   WHEN THEY'RE MAKING JUDGMENTS ACROSS PHONES WHEN THEY DON'T

19   UNDERSTAND THE DIMENSIONS THAT ARE BEING DESCRIBED.

20   Q.   LET'S PUT UP 3147 AS A DEMONSTRATIVE.

21        IS -- THESE ARE THE LITTLE THUMBNAILS, PICTURES OF VIDEOS

22   OF THESE 26?

23   A.   NOW, THERE'S 26 THUMBNAILS UP THERE, AND EACH ONE IS AN

24   EXCERPT OF THE VIDEO OF THE RESPONDENT AND THE MODERATOR.

25   Q.   OKAY.  AND IF WE CAN GO TO 3148 -- BY THE WAY, WHEN YOU

```
 1        SAY LACK OF UNDERSTANDING, ARE YOU -- WHAT YOU'RE SAYING IS

 2        THERE WAS A LACK OF UNDERSTANDING OF WHAT DR. HAUSER'S

 3        PRESENTATION WAS; CORRECT?

 4        A.   I'M NOT EVEN SAYING THAT DR. HAUSER'S PRESENTATION WAS

 5        CORRECT.  I'M SAYING GIVEN WHAT IT IS THAT HE DESCRIBED, DO

 6        PEOPLE UNDERSTAND THE FEATURE AND THE NON-INFRINGING

 7        ALTERNATIVE AS DESCRIBED BY PROFESSOR HAUSER.

 8        Q.   OKAY.  AND HERE WE HAVE 3148 AND THIS SAYS UNDERSTANDING

 9        ON UNIVERSAL SEARCH, AND YOU FOUND -- YOU CONCLUDED FOUR OF THE

10        26 LACKED UNDERSTANDING ON THAT.

11        A.   THAT IS CORRECT.

12        Q.   AND I'D LIKE TO PLAY, AS AN EXAMPLE, SAY, NUMBER 3.  AND

13        BEFORE I DO SO, LET ME SET UP SOMETHING HERE.

14             THESE MODERATORS, WE'RE GOING TO SEE THEY'RE GOING TO BE

15        POINTING AT A SCREEN; CORRECT?

16        A.   CORRECT.

17        Q.   AND WHAT ARE THEY POINTING AT?

18        A.   SO THEY'RE POINTING AT THE CHOICE SCREEN THAT WE HAD UP

19        EARLIER, THE ONE THAT YOU HAVE ON THE POSTER BOARD THERE, AND

20        THEY'RE GOING TO BE POINTING -- HERE WE HAVE IT -- THEY'RE

21        GOING TO POINT AT A PARTICULAR ICON AND THEY'RE GOING TO SAY,

22        "WHAT DOES THIS REPRESENT?  WHAT IS --" LET ME SEE.

23             OKAY.  SO ACTUALLY, WE CAN GO TO ANOTHER SECTION OF THAT

24        BOARD.

25        Q.   THESE TWO -- I'M SORRY, KEN.
```

1     A.   SO HERE -- DO THAT ONE, THE ONE WE JUST HAD, OR THE ONE

2     YOU'RE POINTING TO WOULD BE GOOD.

3          SO HERE IS QUICK LINKS.  THEY ARE GOING TO POINT TO THIS.

4     THIS IS -- IT'S ACTUALLY THE ICON THAT PROFESSOR HAUSER USES IN

5     HIS SURVEY AND IT'S WHAT HE USES IN HIS CHOICE SET.  SHE'S

6     GOING TO POINT TO THIS AND SAY QUICK LINKS, WHAT DO YOU

7     UNDERSTAND THAT TO MEAN?

8     Q.   AND WHAT IF SHE'S POINTING TO, LIKE, HERE WHERE THERE'S NO

9     QUICK LINKS ICON?

10    A.   IF SHE POINTS TO A SPACE WHERE THERE'S NOTHING, WHAT DO

11    YOU HAVE IF THERE'S NOTHING IN THAT SPACE?

12         SO THIS IS THE NON-INFRINGING ALTERNATIVE, AND THE

13    NON-INFRINGING ALTERNATIVE HERE IS REPRESENTED BY, BY AN EMPTY

14    SPACE.

15    Q.   OKAY.  AND SO THE WAY THIS WAS SET UP BY DR. HAUSER WAS

16    THAT IF IT WAS BLANK, IT WAS MEANT TO CONVEY THE NON-INFRINGING

17    ALTERNATIVE THAT WAS EXPLAINED?

18    A.   SO JUST GOING -- I'LL POINT OVER HERE, HERE'S QUICK LINKS.

19    THIS IS THE PATENTED FEATURE, QUICK LINKS.  AND IF WE GO BACK

20    TO WHERE WE JUST WERE, WHEN YOU GO TO THIS CHOICE, THIS IS THE

21    ALTERNATIVE WAY THAT SAMSUNG COULD HAVE BEEN PROVIDING A QUICK

22    LINKS FEATURE.

23    Q.   IT SUGGESTS NOTHING AT ALL.

24    A.   IT DOES SUGGEST THAT.  I MEAN, IT COULD SUGGEST NOTHING.

25    I -- I'M GOING TO LATER SHOW THAT IT DOES SUGGEST NOTHING.

1    Q.   BUT THESE RESPONDENTS WEREN'T TOLD THE NON-INFRINGING

2    ALTERNATIVE?

3    A.   THEY WERE TOLD HERE'S A PHONE WITH THIS IMAGE, WHAT DOES

4    THAT MEAN, AND IF YOU DON'T HAVE THAT, WHAT DO YOU HAVE ON YOUR

5    PHONE?

6    Q.   OKAY.  SO LET'S GO, IF WE CAN, BACK TO 3148 AND IF WE CAN

7    LOOK AT NUMBER 3 VERY QUICKLY.

8         AND --

9         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

10   BY MR. PRICE:

11   Q.   SO WHY DID YOU JUDGE THIS AS SHOWING THE LACK OF

12   UNDERSTANDING OF HOW DR. HAUSER EXPLAINED UNIVERSAL SEARCH AND

13   THE ALTERNATIVE?

14   A.   THE WAY PROFESSOR HAUSER DESCRIBES UNIVERSAL SEARCH IS YOU

15   HAVE THE FEATURE PROVIDES YOU THE ABILITY TO ENTER INTO A

16   SEARCH BOX AND BE ABLE TO SEARCH THE INTERNET AS WELL AS WHAT'S

17   ON YOUR PHONE WITH ONE SEARCH.

18        IF YOU DIDN'T HAVE THAT FEATURE, THAT IS, THE

19   NON-INFRINGING ALTERNATIVE, YOU COULD DO A SEARCH ON THE

20   INTERNET, OR YOU COULD DO A SEARCH ON YOUR PHONE.

21        WHAT THIS RESPONDENT IS SAYING SAYS NOTHING ABOUT THAT.

22   WHAT THIS RESPONDENT IS SAYING IS THAT UNIVERSAL SEARCH, YOU

23   CAN SEARCH WHEREVER YOU ARE IN THE UNIVERSE.  HE'S USING THAT

24   WORD AND SAYING YOU CAN GET WI-FI WHEREVER YOU ARE, EVEN IF

25   YOU'RE IN A NON WI-FI ZONE IF YOU HAVE THAT FEATURE OF

1       UNIVERSAL SEARCH.

2             I JUDGED THAT PERSON TO HAVE A LACK OF UNDERSTANDING OF

3       WHAT IT IS THAT IS MEANT BY UNIVERSAL SEARCH.

4       Q.   AND, AGAIN, THE JURY WILL HAVE THE TRANSCRIPTS OF EVERY

5       ONE OF THESE THAT YOU JUDGED TO BE -- TO HAVE A LACK OF

6       UNDERSTANDING AND CONFUSION?

7       A.   EVERY ONE THAT IT CIRCLED IN HERE IS AN EXHIBIT THAT'S

8       AVAILABLE TO THE JURY.  I SAY CIRCLED.  IT'S HIGHLIGHTED.

9       Q.   LET'S GO TO SDX 3149.  THIS IS ON QUICK LINKS, AND WE SEE

10      THERE'S SOME THUMBNAILS THAT ARE IN PURPLE; RIGHT?

11      A.   THAT'S RIGHT.

12      Q.   AND IT SAYS 25 OF 26 RESPONDENTS EXHIBITED CONFUSION OR

13      LACK OF UNDERSTANDING AS TO QUICK LINKS.

14            NOW, FIRST, COULD YOU TELL US, YOU KNOW, WHAT WAS

15      DR. HAUSER'S EXPLANATION IN THE VIDEO AS TO WHAT QUICK LINKS

16      WAS?

17      A.   SO QUICK LINKS IS IF YOU HAVE A -- IF YOU, FOR EXAMPLE,

18      RECEIVE AN E-MAIL AND IN THAT E-MAIL IS A PHONE NUMBER, YOU'D

19      BE ABLE TO -- IT WOULD BE RECOGNIZED, WE OFTEN SEE IT AS BLUE

20      OR UNDERLINED.  YOU'D BE ABLE TO PUT YOUR FINGER ON IT AND WHAT

21      IT WOULD DO IS GIVE YOU OPTIONS TO CALL OR PUT IT INTO YOUR

22      CONTACTS OR OTHER OPTIONS, AND IT WOULD LET YOU GO AHEAD AND

23      MAKE THAT CALL.

24            THAT'S WHAT THAT FEATURE IS.

25            THE ALTERNATIVE IS, IF YOU DIDN'T HAVE THAT REPRESENTED BY

1    THAT BLANK BOX, IS THAT YOU WOULD HAVE TO HIGHLIGHT IT MANUALLY

2    AND THEN YOU COULD PRESS ON IT AND IT WILL GIVE YOU THAT SAME

3    SET OF OPTIONS.

4    Q.   SAME SET OF A MENU WITH --

5    A.   A MENU THAT WOULD SAY YOU COULD CALL, PUT IN YOUR

6    CONTACTS, SEND A TEXT, THINGS LIKE THAT.

7    Q.   AND THAT WAS WHAT DR. HAUSER'S PRESENTATION OF IT WAS?

8    A.   THAT WAS DR. HAUSER PRESENTATION THAT HE DID IN HIS

9    ANIMATIONS.

10   Q.   LET'S TAKE SOME EXAMPLES.  LET'S LOOK AT NUMBER 8 HERE.

11        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

12   BY MR. PRICE:

13   Q.   AND WHY DID YOU JUDGE THIS TO SHOW A LACK OF UNDERSTANDING

14   AS TO DR. HAUSER'S DESCRIPTION?

15   A.   THIS IS -- SHE'S POINTING TO THE BLANK BOX FOR QUICK LINKS

16   AND IF YOU DON'T HAVE THAT, SHE'S SAYING I DON'T HAVE AN OPTION

17   OF HIGHLIGHTING IT, PRESSING AND GETTING THAT SET OF OPTIONS.

18   I'VE GOT TO WRITE IT DOWN OR MEMORIZE IT.

19        AND IT SHOWS NO UNDERSTANDING OF THE NON-INFRINGING

20   ALTERNATIVE THAT WAS AVAILABLE.

21   Q.   SO LET ME JUST, IN VIEW OF THE TIME, SHOW ONE OTHER

22   EXAMPLE THEN ON THIS.

23        LET'S GO TO 10.

24        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

25   BY MR. PRICE:

1       Q.   SO WHY DID YOU MAKE A JUDGMENT, FOR EXAMPLE, THAT THIS

2       PERSON DOESN'T HAVE AN UNDERSTANDING OF DR. HAUSER'S

3       DESCRIPTION OF THE NON-INFRINGING ALTERNATIVE?

4       A.   IT WAS VERY SIMILAR TO WHAT WE SAW ON THE PREVIOUS ONE.

5       YOU'RE GOING TO HAVE TO WRITE IT DOWN AND TRY IT AND GET TO IT

6       THAT WAY.  BUT YOU DON'T HAVE THE NON-INFRINGING ALTERNATIVE AS

7       DESCRIBED BY PROFESSOR HAUSER.

8       Q.   OKAY.  LET'S GO TO SDX 3150, AND THIS IS BACKGROUND

9       SYNCING.

10           AND HERE YOU SAY THAT 22 OF 26 EXHIBITED CONFUSION OR LACK

11      OF UNDERSTANDING ON BACKGROUND SYNCING.

12      A.   YES.

13      Q.   AND FIRST, AGAIN, COULD YOU JUST QUICKLY REMIND US WHAT

14      WERE THE DR. HAUSER VIDEO AND DESCRIPTION WAS ABOUT BACKGROUND

15      SYNCING?

16      A.   SO BACKGROUND SYNCING, AS HE DESCRIBES IT, IS THAT WHEN

17      YOU MAKE AN EDIT, FOR EXAMPLE, IN YOUR CONTACTS, YOU CONTINUE

18      TO -- YOU ARE ABLE TO CONTINUE TO USE THE APP AND IT WILL SYNC

19      WITH YOUR OTHER DEVICES THAT HAPPEN TO BE CONNECTED.

20           AND IF YOU -- AND THE NON-INFRINGING ALTERNATIVE IS YOU

21      MAY HAVE TO WAIT OR IF YOU GO TO AN ALTERNATIVE APP, IT WILL DO

22      THE SYNCING, BUT IT WILL DO THE SYNCING IN A NON-INFRINGING

23      ALTERNATIVE.

24      Q.   SO YOU CAN DO THE SYNCING, BUT YOU MIGHT NOT BE ABLE TO

25      USE THE APP WHILE YOU'RE SYNCING?

1     A.   YOU MAY HAVE TO WAIT A SHORT OR LONG PERIOD.

2     Q.   AND IF WE COULD LOOK AT NUMBER 9.

3          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

4     BY MR. PRICE:

5     Q.   WHY DID YOU JUDGE THAT, AGAIN, AS SHOWING A LACK OF

6     UNDERSTANDING OF WHAT DR. HAUSER'S DESCRIPTION IS?

7     A.   MY TAKE ON THIS ONE IS THIS INDIVIDUAL DID NOT UNDERSTAND

8     THAT YOU WOULD BE ABLE TO DO ANY OF THAT SYNCING.  YOU'RE GOING

9     TO HAVE TO, YOU KNOW, SEND IT IN AN E-MAIL OR WRITE IT DOWN AND

10    ENTER IT SEPARATELY INTO ANOTHER DEVICE.

11    Q.   IF WE CAN GO TO NUMBER 12.

12         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

13    BY MR. PRICE:

14    Q.   WHY DID YOU JUDGE THAT BEING -- AS SHOWING CONFUSION?

15    A.   IT TURNS OUT THAT WHAT IT IS THAT HE'S SAYING IS YOU'VE

16    GOT TO USE A USB CORD.  THERE'S NOT GOING TO BE AN ACTUAL

17    SYNCING THAT ENDS UP HAPPENING.

18    Q.   AND, AGAIN, BECAUSE WE DON'T HAVE TIME, EVERY ONE OF THESE

19    IS IN THE TRANSCRIPT IN 454A; CORRECT?

20    A.   SO NOT EVERY ONE EXHIBITED CONFUSION OR LACK OF

21    UNDERSTANDING AS LISTED HERE AT THE TOP?

22    Q.   RIGHT.

23    A.   BUT 22 OF THE 26, AND YOU DO HAVE A TRANSCRIPT OF ALL OF

24    THAT.

25    Q.   AND IN THE EXHIBIT IT WOULD SHOW WHETHER YOU SAID IT WAS

1    CONFUSED AND THEN HAVE THE QUESTION AND ANSWER; CORRECT?

2    A.    THAT'S CORRECT.

3    Q.    OKAY.  SO LET'S GO TO 3151, THE LAST ONE.  JUST A COUPLE.

4          THIS IS AUTOMATIC WORD CORRECTION, 18 OF 26, YOU SAY,

5    EXHIBITED LACK OF CONFUSION -- OR CONFUSION OR LACK OF

6    UNDERSTANDING.

7          QUICKLY REMIND US WHAT DR. HAUSER'S DESCRIPTION WAS AS

8    TO --

9    A.    PROFESSOR HAUSER DESCRIBED IT, AS YOU'RE TYPING, IT WOULD

10   END UP PUTTING IN -- WHEN YOU HIT A SPACE BAR OR A PERIOD, IT

11   WILL PUT IN THE VERSION THAT IT THINKS IS THE CORRECT WORD.

12         THE NON-INFRINGING ALTERNATIVE IS IT WILL HAVE IT IN A

13   SEPARATE BOX.  YOU COULD CLICK ON THAT SEPARATE BOX, AND IT

14   WILL DO THE AUTOMATIC WORD CORRECTION FOR YOU.

15         SO THERE IS AUTOMATIC WORD CORRECTION IN THE

16   NON-INFRINGING ALTERNATIVE.  IT JUST APPEARS IN A SEPARATE BOX

17   AND YOU HAVE TO IDENTIFY IT IN THAT BOX.

18   Q.    OKAY.  AND IF WE COULD LOOK AT NUMBER 2 HERE.

19         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

20   BY MR. PRICE:

21   Q.    LACK OF UNDERSTANDING AS TO THE ALTERNATIVE?

22   A.    ABSOLUTELY.

23   Q.    BY THE WAY, THE QUESTIONER THERE REPEATED THE ANSWER BACK?

24   A.    RIGHT.

25   Q.    IS THAT AN APPROPRIATE METHOD?

```
 1    A.   SO WHAT IT IS THAT SHE'S TRYING TO DO -- AGAIN, WHAT --

 2    SHE DOESN'T KNOW WHAT THE PURPOSE OF THIS IS.  WHAT SHE'S

 3    TRYING TO DO IS SEE IF SHE HAS AN ACCURATE SUMMARIZATION OF

 4    WHAT IT IS THAT THE RESPONDENT SAID.

 5         SO SHE WILL REPEAT, YOU KNOW, IS THIS MY UNDERSTANDING OF

 6    WHAT IT IS THAT YOU'RE SAYING?

 7    Q.   AND WE'LL DO ONE MORE HERE.  WE'RE CUTTING THESE DOWN TO

 8    TWO PER.  SDX 3851.  IF WE COULD SHOW NUMBERS 6.

 9         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

10    BY MR. PRICE:

11    Q.   YOU THOUGHT THAT WAS A MISUNDERSTANDING OF THE

12    ALTERNATIVE?

13    A.   IT DOESN'T DO AUTO CORRECT IN ANY PARTICULAR FASHION.

14    YOU'VE GOT TO GO TO GOOGLE TO LOOK EVERYTHING UP.  I DID THINK

15    THIS RESPONDENT WAS CONFUSED.

16    Q.   DID YOU DO A CHART THAT SHOWED HOW MANY RESPONDENTS AT

17    SOME POINT THOUGHT THE NON-INFRINGING ALTERNATIVE WAS NOTHING

18    AT ALL?

19    A.   SO, AGAIN, IN THAT CHOICE SCREEN THAT WE HAVE ON THE

20    POSTER BOARD THERE, THERE'S THE ICONS AND THEN THERE IS THE

21    NON-INFRINGING ALTERNATIVE WITH THE LACK OF THAT ICON.

22         I WANTED TO KNOW WHO THOUGHT THAT IF YOU DIDN'T HAVE ANY

23    ICON THERE, IT MEANT YOU HAD NO FUNCTIONALITY, AND I DO HAVE A

24    SLIDE ON THAT.

25    Q.   LET'S LOOK AT SLIDE 3160, AND IS IT YOUR CONCLUSION THAT
```

1      21 OF 26 RESPONDENTS ASSUMED THAT THE NON-INFRINGING

2      ALTERNATIVE MEANT NO CAPABILITY AT ALL WITH RESPECT TO --

3      A.   YES.

4      Q.   -- ONE OF THESE PATENTS?

5      A.   THAT'S CORRECT.

6      Q.   OKAY.  AND DO YOU HAVE A REASON -- ANY IDEA AS TO WHY IT

7      COULD BE, AFTER SEEING THIS PRESENTATION AND SEEING THESE

8      VIDEOS, THESE FOLKS WOULD STILL THINK THE NON-INFRINGING

9      ALTERNATIVE IS NOTHING?

10     A.   I MEAN, I SORT OF UNDERSTAND WHY IT IS THEY MIGHT THINK

11     THAT BECAUSE IT'S REPRESENTED ON THAT CHOICE SET THAT WE HAVE

12     WITH A BLANK.

13     Q.   AND IF WE COULD LOOK AT, I BELIEVE IT'S -- AH, GOOD.

14     3159.

15         AND, AGAIN, EXPLAIN TO US WHAT YOU MEAN BY, BY THAT.

16     A.   SO WHAT IT IS THAT WE HAVE HERE, HERE'S A PHONE THAT

17     HAPPENS TO HAVE UNIVERSAL SEARCH AND THAT'S WHAT IT IS WE SEE

18     WITH THAT ICON.

19         BUT WHEN WE LOOK AT THE OTHER THREE PHONES, THERE ARE

20     BLANKS THERE, AND THAT'S WHEN THEY HAVE THE NON-INFRINGING

21     ALTERNATIVE.

22     Q.   NOW, HOW WOULD THAT AFFECT THE RESULTS OF THE CONJOINT

23     STUDY?

24     A.   SO PEOPLE HAVE A MISUNDERSTANDING OF THIS, OR IF THEY --

25     IF THEY THINK THERE'S NOTHING, THAT VALUE THAT IS ASSOCIATED

1    WITH THAT ALTERNATIVE VERSION IS GOING TO BE PERCEIVED TO BE --

2    IT IS GOING TO BE ZERO.

3    Q.   SO IF WE LOOK AT -- YOU PREPARED A SLIDE ON THIS, TOO?

4    A.   I DID.

5    Q.   3161, I BELIEVE IT IS, KEN, THE FULL VERSION.

6         AND YOU PREVIOUSLY TALKED COMPARING HAUSER'S DESCRIPTION

7    OF THE FEATURE WITH THE NON-INFRINGING ALTERNATIVE AND TRYING

8    TO COME UP WITH -- SEE IF THERE'S A DIFFERENCE.

9         AND WHAT IF THE RESPONDENT THINKS THAT THE NON-INFRINGING

10   ALTERNATIVE IS -- INSTEAD OF WHAT PROFESSOR HAUSER DESCRIBED

11   IT, WAS NOTHING?

12   A.   SO, AGAIN, WHAT HE'S TRYING TO MEASURE IS THIS INCREMENTAL

13   VALUE, BUT IF PEOPLE PERCEIVE THERE'S NO FEATURE THERE AT ALL,

14   WHAT HE IS MEASURING IS THE UTILITY OF ZERO.

15        AND SO INSTEAD WHAT IT DOES IS IT DRAMATICALLY INFLATES,

16   OR POTENTIALLY DRAMATICALLY INFLATES -- AND I SAY DRAMATICALLY

17   INFLATES -- THE VALUE THAT'S ASSOCIATED WITH THE FEATURE VERSUS

18   THE ALTERNATIVE.

19   Q.   SO SINCE I'M WAY OVER TIME, I WANT TO FOCUS THEN ON YOUR

20   OTHER OPINIONS.

21   A.   OKAY.

22   Q.   THIS VIDEO TOOK SOME TIME.

23        IF WE LOOK AT WHAT WE HAVE HERE, YOU TALKED ABOUT

24   PRE-TESTING, AND YOU HAVE STUDY CREATES ARTIFICIAL AWARENESS.

25   WILL YOU EXPLAIN TO THE JURY WHAT YOU MEAN BY THAT?

```
1     A.   WELL, WHAT HE DOES IN THE STUDY IS HE HAS ALL THIS

2     EXPLANATION OF THE PARTICULAR FEATURES AND THE NON-INFRINGING

3     ALTERNATIVES, AND HE DOES THAT SO THAT PEOPLE CAN MAKE CHOICES

4     ACROSS THESE -- IN THESE CHOICE SETS.

5          BUT IN THE MARKETPLACE, THAT AWARENESS DID NOT EXIST.  SO

6     IF WHAT WE'RE TRYING TO REPRESENT IS WHAT HAPPENED IN THE

7     ACTUAL MARKETPLACE BEFORE THEY BOUGHT THE PHONE, SO WERE PEOPLE

8     AWARE OF WHAT THESE FEATURES WERE AND THE DIFFERENT WAYS TO

9     IMPLEMENT THEM BEFORE THEY BOUGHT THE PHONE, THEY DIDN'T HAVE

10    THAT AWARENESS.

11         AND WE DID NOT REPRESENT WHAT WOULD HAVE HAPPENED IN THE

12    REAL WORLD BY, BY CREATING A SUPER SET OF CONSUMERS THAT ARE

13    AWARE.

14         VERY DIFFERENT THAN WHAT IT IS THAT'S EXPERIENCED IN THE

15    REAL WORLD.

16    Q.   BECAUSE -- SO IN THIS CASE, YOU KNOW, APPLE'S CONTENDING

17    THAT THERE WERE CONSUMERS WHO BOUGHT THE PHONE WHO WOULD NOT

18    HAVE BOUGHT THE PHONE IF SOME FEATURES WERE MISSING; CORRECT?

19    A.   THAT IS CORRECT.

20    Q.   AND DOES THAT ASSUME THAT THEY KNEW THAT THE FEATURES WERE

21    IN THE PHONE WHEN THEY BOUGHT IT IN THE FIRST PLACE?

22    A.   THAT IS CORRECT.  THE SAMPLE IS GOING TO BE REPRESENTING

23    WHAT THEY WOULD HAVE DONE, THAT'S THE ASSUMPTION THAT HE'S

24    MAKING.

25    Q.   NOW, IF YOU'RE DOING A STUDY THAT WAS JUST, LIKE,
```

```
 1        COMPARING RELATIVE PREFERENCES ON DIFFERENT FEATURES AND NOT

 2        INCLUDING WILLINGNESS TO BUY, I MEAN, WOULD THAT BE AN

 3        APPROPRIATE CONJOINT?

 4        A.   SO HE COULD -- YOU COULD DO A CONJOINT WHERE YOU LOOK AT

 5        RELATIVE PREFERENCES.

 6             BUT WHEN YOU GO TO WILLINGNESS TO BUY, YOU'VE GOT TO BE

 7        REPRESENTING WHAT THEY'RE BUYING -- YOU HAVE TO BE -- YOU HAVE

 8        TO BE REPRESENTING WHAT THEY'RE BUYING CONDITIONS WERE.

 9        Q.   AND I'M GOING TO, RIGHT NOW, KIND OF SKIP THIS ONE HERE

10        EXCEPT FOR THE BIASED PART.

11        A.   OKAY.

12        Q.   TELL ME IN 30 SECONDS OR LESS WHY YOU THINK THAT THE

13        QUESTIONS THEMSELVES THAT WERE ASKED WERE BIASED FROM THE POINT

14        OF VIEW OF SOMEONE WHO'S AN EXPERT AS A MARKET SURVEYOR?

15        A.   SO I SPEND A LOT OF MY TIME DESIGNING SURVEYS.  WHAT I

16        WANT TO DO IS MAKE SURE -- I'M TALKING FAST -- MAKE SURE THAT

17        WE DO NOT HAVE A QUESTION THAT SLANTS AND LEADS THE RESPONDENT

18        IN A PARTICULAR DIRECTION, AND I THOUGHT HAUSER'S -- THAT

19        PROFESSOR HAUSER'S SURVEY WAS BIASED.

20        Q.   NOW, LET'S GO TO THIS LEADS TO INVALID RESULTS.

21             DID YOU TAKE PROFESSOR HAUSER'S DATA AND DO REALITY CHECKS

22        TO SEE IF THEY MADE ANY SENSE?

23        A.   CAN I HAVE FIVE SECONDS ON THE LAST POINT?

24        Q.   SURE.

25        A.   OKAY.  AND IT WAS BIASED BECAUSE IN EACH CASE WHEN HE SAID
```

```
1     IT'S WITHOUT THIS FEATURE, LIKE YOU'RE MISSING SOMETHING, YOU

2     WOULD HAVE TO, AND IN THAT WAY I THOUGHT IT WAS BIASED.

3     Q.   OKAY.  NOW, LET'S GO BACK TO THE REALITY CHECKS.

4          DID YOU LOOK AT DR. HAUSER, PROFESSOR HAUSER'S DATA THAT

5     HE HAD TO SEE IF IT MADE SENSE IN REALITY?

6     A.   I TRIED TO LOOK AT THAT, YES.

7     Q.   FIRST, WE HAVE RESULTS IN WILLINGNESS TO PAY.  IF WE CAN

8     PUT UP 3162.

9          AND, NOW, THE TOP ONES HERE, THESE ARE CALCULATIONS THAT

10    ARE IN PROFESSOR HAUSER'S REPORT; CORRECT?

11    A.   THAT IS CORRECT.

12    Q.   AND THE BOTTOM ARE CALCULATIONS THAT YOU MADE FROM THAT

13    SAME DATA ON THE OTHER FEATURES HE HAD IN HIS REPORT; CORRECT?

14    A.   CORRECT.

15    Q.   ALL HIS DATA?

16    A.   ALL HIS DATA.

17    Q.   AND WHAT MAKES YOU SAY THIS IS -- THESE ARE INFLATED

18    RESULTS?

19    A.   JUST ON THEIR FACE VALUE ALONE, FOR EXAMPLE, IF WE LOOK AT

20    AUTOMATIC WORD CORRECTION, THIS SAYS HOW MUCH ONE WOULD BE

21    WILLING TO PAY FOR A VERSION OF AUTOMATIC WORD CORRECTION

22    VERSUS AN ALTERNATIVE VERSION OF AUTOMATIC WORD CORRECTION, AND

23    WE'RE TALKING ABOUT $102 ON A $149 PHONE.

24    Q.   THAT SEEMS LIKE A LOT TO YOU?

25    A.   THAT SEEMS LIKE A LOT TO ME.
```

1     Q.   AND A SECOND THING YOU DID IS YOU SAID THE STUDY SUGGESTS

2     RESPONDENTS PREFER HIGHER PRICES.  WHAT DID YOU DO WITH THIS

3     DATA TO CHECK THAT OUT?

4     A.   SO I LOOKED AT ALL THE PART WORDS, THE VALUES THAT WERE

5     ASSOCIATED WITH EACH OF THE DIFFERENT PRICE POINTS FOR EACH OF

6     THE INDIVIDUALS, I RAN THE ANALYSIS WITHOUT CONSTRAINING IT,

7     WHICH IS WHAT PROFESSOR HAUSER IMPOSED IN THERE, AND WHAT I

8     FOUND IS, FOR EXAMPLE, 52 PERCENT OF THE RESPONDENTS HAD A

9     HIGHER PART WORTH VALUE, THAT IS, THEY WOULD PREFER $99 OVER

10    $49 WITH EVERYTHING ELSE EQUAL.

11    Q.   AND WE PUT UP -- BEFORE THAT WAS BLOWN UP, I HAD THE

12    NUMBER UP THERE, SDX 3164.

13         SO USING PROFESSOR HAUSER'S DATA, IF YOU HOLD ALL THE

14    PHONE FEATURES CONSTANT, WHAT DOES THIS SHOW?

15    A.   THIS SHOWS THAT 52 PERCENT OF THE PEOPLE WOULD PREFER A

16    PHONE AT $99 VERSUS $49, ALL OTHER THINGS EQUAL.

17    Q.   AND YOU'VE GOT VARIOUS ONES HERE.  OVERALL, IN YOUR

18    OPINION, WHAT IS THAT ONE?

19    A.   FOR THE ENTIRE SAMPLE OF 507 RESPONDENTS, 68 PERCENT OF

20    THEM AT ONE OF THOSE POINTS, AT LEAST ONE OF THOSE POINTS,

21    EXHIBITS I'D RATHER PAY A HIGHER PRICE THAN A LOWER PRICE.

22    Q.   AS A REALITY CHECK?

23    A.   AS A REALITY CHECK TO THE SENSIBILITY OF THE DATA AND THE,

24    THE CONSTRAINT THAT PROFESSOR HAUSER IMPOSED IN THE ANALYSIS

25    THAT HE DID.

1    Q.   DOES THAT RESULT MAKE SENSE IF THE DATA IS ACCURATE?

2    A.   IF THE DATA WERE ACCURATE, I WOULD NOT ANTICIPATE SEEING

3    THIS.

4    Q.   AND, FINALLY, YOU'VE GOT THE STUDY LEADS TO INCORRECT

5    MARKETPLACE PREDICTIONS, AND YOU DID A SLIDE TO ILLUSTRATE

6    THAT; CORRECT?

7    A.   CORRECT.

8    Q.   AND LET'S PUT UP SDX 3165.

9         AND COULD YOU TELL US WHAT YOU DID HERE WITH

10   PROFESSOR HAUSER'S DATA?

11   A.   PROFESSOR HAUSER HAS EVERYBODY GO THROUGH A CHOICE SET AND

12   A CHOICE EXERCISE.  HE'S GOT FOUR PHONES THAT THEY HAVE TO

13   CHOOSE FROM, AND HE ENDS UP TRYING TO PREDICT WHICH PHONES IT

14   IS THAT THEY WOULD DO.

15        AND HE HAS HYPOTHETICAL PHONES.

16        WELL, I TOOK HIS DATA AND USED THOSE SAME VALUES THAT WERE

17   ATTRIBUTED TO EACH OF THE FEATURES, AND WHAT IT IS THAT I DID

18   WAS TRIED TO SEE WHAT WOULD HIS MODEL THAT HIS VALUES PREDICT,

19   THE CHOICES BEING ACROSS THIS POPULATION FOR EACH OF THESE FOUR

20   PHONES?

21   Q.   SO THESE FOUR PHONES ARE ALL ON SALE?

22   A.   ALL ON SALE AT THE SAME TIME.

23   Q.   OKAY.

24   A.   AND THESE WERE -- THESE WERE ALL ON SALE, BUT WHAT IT IS

25   THAT WE SEE IS HIS MODEL WOULD PREDICT THAT THE GALAXY NOTE 2,

1      USING HIS DATA, WOULD BE THE MOST POPULAR OF ALL OF THE PHONES.

2          WHAT IT IS THAT I HAVE ON THE FAR RIGHT-HAND COLUMN IS THE

3      ACTUAL DISTRIBUTION OF SALES ACROSS THOSE PHONES IN THE

4      MARKETPLACE.

5      Q.    AND THEN FOR GALAXY S III, YOU HAVE 29 PERCENT?

6      A.    GALAXY S III, FROM HIS DATA, WOULD PREDICT 29 PERCENT.

7      WHAT WE SEE IN THE MARKETPLACE IS 71 PERCENT.

8          AND SO THE TWO -- HIS MODEL DOES NOT DO A GOOD JOB, NOT

9      EVEN CLOSE TO A GOOD JOB, OF WHAT THE ACTUAL SALES WERE.

10     Q.    OKAY.  WHY -- WHAT IS YOUR OPINION AS TO WHY WE HAVE THESE

11     ANOMALOUS, COUNTERINTUITIVE RESULTS FROM HIS STUDY?

12     A.    SO I DON'T KNOW ALL THE REASONS WHY.

13         WHAT I DO KNOW IS THIS IS THE RESULT OF DOING A CONJOINT

14     AND TRYING TO PREDICT WILLINGNESS TO BUY WHEN WE'RE MISSING

15     MAJOR FEATURES, WHEN PEOPLE DON'T UNDERSTAND WHAT THE

16     PARTICULAR FEATURES ARE, NOR THE NON-INFRINGING ALTERNATIVES,

17     AND WHEN WE CREATE THIS ARTIFICIAL AWARENESS IN THE

18     MARKETPLACE.

19     Q.    AS A REVIEWER FOR ANY OF THOSE MAGAZINES, WOULD YOU HAVE

20     ACCEPTED PROFESSOR HAUSER'S REPORT?

21     A.    I WOULD HAVE REJECTED HIS REPORT.

22         MR. PRICE:  NOTHING FURTHER, YOUR HONOR.

23         THE COURT:  ALL RIGHT.  THE TIME IS NOW 10:12.  WE'LL

24     GO TO 10:30.

25         (PAUSE IN PROCEEDINGS.)

```
 1              THE COURT:  ALL RIGHT.  TIME IS NOW 10:12.  GO AHEAD,

 2      PLEASE.

 3              MR. BENNETT:  THANK YOU, YOUR HONOR.

 4                        CROSS-EXAMINATION

 5      BY MR. BENNETT:

 6      Q.   GOOD MORNING, DR. REIBSTEIN.  WE'VE NEVER MET.  MY NAME IS

 7      JIM BENNETT.  I HAVE A FEW QUESTIONS HERE FOR YOU THIS MORNING.

 8              SIR, JUST TO BE CLEAR, YOU'RE NOT HERE TO TESTIFY TODAY

 9      ABOUT WHETHER APPLE'S PATENTS ARE INFRINGES; IS THAT RIGHT?

10      A.   I AM NOT.

11      Q.   YOU'RE NOT QUALIFIED TO RENDER ANY OPINION ON THAT; IS

12      THAT RIGHT?

13      A.   I AM NOT.

14      Q.   YOUR VERY SPECIFIC FOCUS TODAY IS TO RESPOND TO

15      DR. HAUSER'S STUDY IN THIS CASE; IS THAT RIGHT?

16      A.   THAT IS CORRECT.

17      Q.   IN WHICH DR. HAUSER HAS TESTIFIED ESTABLISHES THAT THERE

18      IS A DEMAND FOR THE PATENTED FEATURES IN THIS CASE.  YOU

19      UNDERSTAND THAT IS ONE OF HIS CONCLUSIONS; IS THAT RIGHT?

20      A.   THAT IS MY UNDERSTANDING.

21      Q.   AND YOU HAVE A SERIES OF CRITIQUES OF THE STUDY THAT LED

22      TO THAT CONCLUSION, SOME OF WHICH YOU'VE SHARED WITH US HERE

23      THIS MORNING; ISN'T THAT RIGHT?

24      A.   THAT IS CORRECT.

25      Q.   OKAY.  WE'LL TURN TO YOUR CRITIQUES MOMENTARILY, BUT LET
```

1        ME BE CLEAR ABOUT SOMETHING AT THE OUTSET.

2            YOU'RE NOT AFFIRMATIVELY PRESENTING TO THE JURY ANY STUDY

3        OF YOUR OWN, BE IT A CONJOINT STUDY OR ANY OTHER ANALYTICAL

4        METHOD THAT PRESENTS YOUR ESTIMATE OR SAMSUNG'S ESTIMATE OF

5        WHAT THE DEMAND FOR THE PATENTED FEATURES IS IN THIS CASE;

6        ISN'T THAT RIGHT?

7        A.   THAT IS CORRECT.

8        Q.   YOU'VE NOT DONE ANY WORK OF THAT KIND; ISN'T THAT RIGHT?

9        A.   I WAS NOT ASKED TO DO SO.

10       Q.   THAT WAS MY NEXT QUESTION.  SAMSUNG, THE PARTY THAT'S

11       RETAINED YOU HERE AND THE LAWYERS THAT RETAINED YOU, DID NOT

12       ASK YOU TO CONDUCT YOUR OWN CONJOINT STUDY, OR ANY OTHER STUDY,

13       TO FIGURE OUT HOW THE PATENTED FEATURES IN THIS CASE AFFECT

14       DEMAND; ISN'T THAT RIGHT?

15       A.   HOW THE PATENTED FEATURE -- TO CONDUCT MY OWN STUDY TO DO

16       THAT?  IS THAT WHAT YOU SAID?

17       Q.   YES.  YOU WEREN'T ASKED TO DO THAT?

18       A.   MY UNDERSTANDING IS THEY DID HAVE OTHER EXPERTS TO TRY AND

19       ADDRESS THAT.

20       Q.   THEY HAVE OTHER EXPERTS TO TRY TO ADDRESS THAT.  WHO DID

21       YOU UNDERSTAND THOSE OTHER EXPERTS WERE?

22       A.   THERE ARE -- THERE IS PROFESSOR ERDEM WHO'S HERE.

23       Q.   ANYBODY ELSE?

24       A.   THERE MAY BE OTHER EXPERTS.  I DON'T KNOW.

25       Q.   HAVE YOU EVER HEARD ABOUT MR. WAGNER, WHO WAS AN EXPERT IN

```
 1       THIS CASE AT THIS TIME.

 2               MR. PRICE:  OBJECTION, YOUR HONOR.  IRRELEVANT TO

 3       THIS CASE.

 4               THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

 5               MR. PRICE:  THERE WAS AN HPO SUSTAINED AS TO THIS.

 6       MY UNDERSTANDING.

 7               THE COURT:  NO, THERE WAS NOT.  GO AHEAD.  OVERRULED.

 8               THE WITNESS:  HAVE I HEARD ABOUT PROFESSOR WAGNER?

 9       BY MR. BENNETT:

10       Q.   YES.

11       A.   WHO WAS AN EXPERT ON TESTING THE -- WHAT THE VALUE OF

12       THESE FEATURES ARE?

13       Q.   YEAH.  HAVE YOU HEARD THAT NAME, PROFESSOR WAGNER?

14       A.   I'VE HEARD OF WAGNER'S BEFORE.

15       Q.   HAVE YOU HEARD OF PROFESSOR -- HAVE YOU HEARD OF A

16       PROFESSOR WAGNER RETAINED BY SAMSUNG IN THIS CASE BEFORE?

17       A.   I HAVE NOT.

18       Q.   HAVE YOU HEARD THAT A PROFESSOR WAGNER, RETAINED BY

19       SAMSUNG IN THIS CASE, ADVOCATED THAT -- ADVOCATED THAT IN THIS

20       CASE APPLE COULD CALCULATE DAMAGES ON THE BASIS OF A CONJOINT

21       STUDY OF THE PATENTED FEATURES?  DID ANYONE EVER TELL YOU THAT?

22               MR. PRICE:  OBJECTION, ASSUMES FACTS NOT IN EVIDENCE

23       ABOUT THE PROFESSOR, AND I'VE BEEN TOLD THAT THERE'S AN HPO ON

24       THIS.

25               THE COURT:  OVERRULED.  GO AHEAD, PLEASE.
```

1       BY MR. BENNETT:

2       Q.   HAS ANYBODY EVER TOLD YOU THAT, SIR?

3       A.   THEY HAVE NOT.

4       Q.   THIS IS THE FIRST TIME YOU'VE HEARD THAT?

5       A.   THAT IS CORRECT.

6       Q.   OKAY.  ALSO BEFORE FORMING YOUR OPINIONS IN THIS CASE, YOU

7       DID NOT SPEAK TO ANYONE AT SAMSUNG, DID YOU?

8       A.   NO, I DID NOT.

9       Q.   YOU DIDN'T TALK TO ANYBODY FROM SAMSUNG?

10      A.   I DID NOT.

11      Q.   OKAY.  ISN'T THIS TRUE THAT ON THE SUBJECT THAT YOU'RE NOT

12      ADDRESSING IN THIS CASE, WHAT THE DEMAND FOR THE PATENTED

13      FEATURES IS, AS AN EXPERT IN MARKETING, AS AN EXPERT IN

14      INDUSTRIAL ORGANIZATION, IF SOMEONE HOLDS A PH.D. IN THE FIELDS

15      OF ECONOMICS AND ITS PRACTICAL APPLICATION IN BUSINESS, ISN'T

16      IT TRUE THAT APPARENTLY SOMEBODY AT SAMSUNG BELIEVES THERE'S

17      SOME DEMAND OUT THERE IN THE MARKETPLACE FOR THESE PATENTED

18      FEATURES?

19            MR. PRICE:  OBJECTION.  SPECULATION.

20            THE COURT:  OVERRULED.

21      IF YOU KNOW.

22            THE WITNESS:  SO I HAVE NO WAY OF TRYING TO JUDGE

23      THAT.

24      BY MR. BENNETT:

25      Q.   YOU'VE NOT THOUGHT OF THAT BEFORE THIS MOMENT?

1    A.   I HAVE THOUGHT ABOUT THAT.

2    Q.   OKAY.  BUT YOU'VE NOT ASKED ANYBODY AT SAMSUNG THAT

3    QUESTION:  DO YOU FOLKS THINK THERE'S SOME VALUE TO OR DEMAND

4    FOR THE PATENTED FEATURES IN THIS CASE?

5         YOU'VE NEVER ASKED ANYBODY THAT QUESTION, HAVE YOU, SIR?

6    A.   I HAVE NOT.

7    Q.   OKAY.  NOW, YOU'RE AWARE -- OR ARE YOU AWARE, I SHOULD

8    ASK, THAT SAMSUNG HAS INCORPORATED ONE OR MORE OF THE PATENTED

9    FEATURES IN THIS CASE INTO OVER 37 MILLION ACCUSED SMARTPHONES

10   AND TABLETS?

11   A.   I KNOW THAT'S WHAT THEY'RE ACCUSED OF.  ACTUALLY, I DON'T

12   KNOW THE NUMBER.

13   Q.   OKAY.  AND YOU HAVEN'T -- YOU -- YOU DID NOT AT ANY TIME

14   SEEK TO ASK ANYONE AT SAMSUNG, OR THE LAWYERS WHO REPRESENT

15   THEM WITH WHOM YOU WERE WORKING WITH, ABOUT THE DESIGN DECISION

16   TO INCLUDE THOSE FEATURES IN THE ACCUSED PHONES; IS THAT RIGHT?

17   A.   WHAT I HAVE TESTIFIED TO IS WHAT I WAS ASKED TO DO IN THIS

18   CASE, WHICH IS TO PROVIDE AN OPINION OF THE STUDY THAT WAS DONE

19   BY PROFESSOR HAUSER.

20   Q.   SO THE SHORT ANSWER IS IT NEVER OCCURRED TO YOU TO ASK

21   ANYBODY AT SAMSUNG, WHY HAVE YOU DESIGNED THESE FEATURES INTO

22   THESE PHONES?

23   A.   IS THAT A QUESTION?

24   Q.   IT IS A QUESTION.  THERE'S A QUESTION MARK AT THE END.

25   A.   OKAY.  SO THE ANSWER TO THAT IS DID IT EVER OCCUR TO ME TO

```
 1     ASK THAT?

 2     Q.   YEAH.

 3     A.   OKAY.

 4     Q.   YES.  SORRY?

 5     A.   IT DID OCCUR TO ME.  I DIDN'T HAVE ACCESS, NOR DID I ASK

 6     ANYBODY AT SAMSUNG THAT QUESTION.

 7     Q.   SO HOW MANY HOURS HAVE YOU SPENT WORKING ON THIS CASE?

 8     A.   I'VE SPENT 400 HOURS, MORE THAN 400 HOURS.

 9     Q.   AND I THINK WE'VE BEEN ADVISED THAT YOUR BILLINGS ALONE ON

10     THIS CASE ARE $422,000; IS THAT RIGHT?

11     A.   THAT IS CORRECT.

12     Q.   AND FOR THAT TIME AND THOSE HOURS, IN ALL THAT TIME, YOU

13     DID NOT HAVE ACCESS TO ANYBODY AT SAMSUNG, THE CLIENT THAT'S

14     RETAINING YOU, TO ASK THEM WHY HAVE YOU PUT THESE FEATURES INTO

15     37 MILLION PHONES?  IS THAT YOUR TESTIMONY, SIR?

16     A.   THAT IS MY TESTIMONY, SIR.

17     Q.   OKAY.  WITHOUT EVEN ASKING THEM, YOU WOULD KNOW, WOULDN'T

18     YOU, AS A MATTER OF ECONOMICS, ONE REASON ANY MANUFACTURER

19     WOULD INCLUDE FEATURES IN A PHONE IS THE BELIEF THAT THOSE

20     FEATURES MAY HELP TO PROMOTE OR MAINTAIN SALES?

21     A.   YOU WOULD THINK THAT THEY MIGHT DO IT BECAUSE IT'S EASY TO

22     MANUFACTURE, IT'S EASY TO DO, IT MAY BE BECAUSE THEY THINK THAT

23     IT DOES HELP PROVIDE INCREASE IN SALES, YES.

24     Q.   THAT'S ONE REASON --

25     A.   THAT'S ONE REASON.
```

CROSS REIBSTEIN

1    Q.    -- A RATIONAL FIRM WOULD DO SOMETHING LIKE THAT; RIGHT?

2    A.    THAT'S ONE REASON.

3    Q.    OKAY.  SO HAS IT OCCURRED TO YOU THAT SOMEONE AT SAMSUNG

4    HAS MADE THE JUDGMENT THAT THESE PATENTED FEATURES ARE

5    PROMOTING SALES?

6    A.    THEY -- THEY MAY HAVE MADE THAT JUDGMENT, CORRECT.

7    Q.    AND WHEN WE TALK ABOUT SAMSUNG'S SALES, THEIR LARGEST

8    SINGLE CUSTOMERS YOU KNOW ARE CARRIERS, DON'T YOU?

9    A.    I PRESUME SO.

10   Q.    OKAY.  I THINK WE SAW IN YOUR BACKGROUND SLIDES ONE OF THE

11   COMPANIES YOU REPRESENT IS AT&T; IS THAT RIGHT?

12   A.    THAT I'VE DONE CONSULTING FOR.

13   Q.    OKAY.  YOU KNOW, DON'T YOU, THAT THE CARRIERS ARE A LARGE

14   BUYER OF SMARTPHONES FROM AMONG OTHERS AT SAMSUNG?

15   A.    THEY'RE LARGE DISTRIBUTORS OF PHONES.

16   Q.    OKAY.  AND THEY BUY THOSE PHONES IN THE FIRST INSTANCE,

17   DON'T THEY?

18   A.    THEY BUY THEM AND RESELL THEM.

19   Q.    AND THE CARRIERS ARE SOPHISTICATED CUSTOMERS, AREN'T THEY?

20   A.    I BELIEVE SO.

21   Q.    CARRIERS WANT CERTAIN FEATURES INCLUDED IN THE PHONES THEY

22   PURCHASE FROM MANUFACTURERS, DON'T THEY?

23   A.    I DON'T KNOW IF THEY GO DOWN TO PARTICULAR FEATURES IN

24   SOME OF THEIR DECISION MAKING.

25   Q.    YOU'RE AWARE OF THIS, AREN'T YOU, THAT ALL OF THE PATENTED

1    FEATURES, THAT THE FEATURES ASSOCIATED WITH THE PATENTS IN THIS

2    CASE, SLIDE TO UNLOCK, AUTO CORRECT, UNIVERSAL SEARCH, QUICK

3    LINKS AND BACKGROUND SYNC, THEY ALL RELATE TO USER INTERFACE,

4    DON'T THEY?

5    A.   THEY DO.

6    Q.   OKAY.  THEY ALL CONTRIBUTE IN SOME WAY, DON'T THEY, TO

7    WHAT'S KNOWN AS EASE OF USE?

8    A.   RELATIVE TO THEIR NON-INFRINGING ALTERNATIVES?  OR ARE YOU

9    JUST ASKING THE FUNCTIONALITY OVERALL?

10   Q.   WE'LL GET TO NON-INFRINGING ALTERNATIVES.

11   A.   OKAY.  SO YOU'RE ASKING ABOUT THE FUNCTIONALITY.

12   Q.   AND BY THE WAY, LET ME -- WE'LL GET TO -- YEAH, JUST THE

13   FUNCTIONALITY.

14   A.   OKAY.

15   Q.   THEY ALL CONTRIBUTE TO EASE OF USE, DON'T THEY?

16   A.   I WOULD ASSUME THAT THEY DO.

17   Q.   AND ARE YOU AWARE THAT AS EARLY AS FEBRUARY 2010, CARRIERS

18   WERE COMMUNICATING TO SAMSUNG'S MOBILE PHONE DIVISION, TO THE

19   HEAD OF THAT DIVISION, THAT SAMSUNG NEEDED TO IMPROVE ITS USER

20   INTERFACE?

21   A.   I'M NOT AWARE OF THAT COMMUNICATION.

22   Q.   NOBODY EVER TOLD YOU ABOUT THAT HISTORY?

23   A.   NO, THEY DID NOT.

24   Q.   SPECIFICALLY, THAT IT NEEDED TO IMPROVE THE EASE OF USE OF

25   ITS PHONES.  HAVE YOU EVER HEARD THAT BEFORE?

1   A.   NO, I HAVE NOT.

2   Q.   OKAY.  HAVE YOU SEEN ANY OF THE DOCUMENTS THAT REFLECT

3   THAT HISTORY?

4   A.   NO, I HAVE NOT.

5   Q.   OKAY.  HAVE YOU SEEN ANY OF THE DOCUMENTS FOLLOWING THAT

6   FEBRUARY 10TH COMMUNICATION FROM THE CARRIERS THAT REFLECT HOW,

7   WHEN AND HOW IT WAS THAT THE PATENTED FEATURES IN THIS CASE

8   WORKED THEIR WAY INTO SAMSUNG'S FLAGSHIP LINE OF PHONES, THEIR

9   GALAXY PHONES?

10       MR. PRICE:  I'M GOING TO OBJECT.  THAT ASSUMES FACTS

11   NOT IN EVIDENCE.  ASSUMES INFRINGEMENT.

12       MR. BENNETT:  I DON'T THINK I USED THE WORD

13   "INFRINGEMENT."  I SAID PATENTED FEATURES.

14       THE COURT:  OVERRULED.

15     GO AHEAD.  YOU MAY ANSWER.

16       THE WITNESS:  NO, I HAVE NOT.

17   BY MR. BENNETT:

18   Q.   OKAY.  AND YOU DON'T KNOW -- SO, AGAIN, YOU DON'T KNOW AND

19   YOU HAVEN'T STUDIED HOW AND WHY IT WAS SAMSUNG CHOSE, IN 2010,

20   TO START INCORPORATING THESE PATENTED FEATURES INTO THEIR

21   PHONES; IS THAT TRUE, SIR?

22   A.   I DO NOT.

23   Q.   OKAY.  BUT YOU DID, ON DIRECT EXAMINATION, YOU SAID

24   REFERENCING THESE PATENTED FEATURES, YOU CALLED THEM MINOR

25   FEATURES; IS THAT RIGHT?

1   A.   I BELIEVE THAT I -- THAT'S THE TERM THAT I USED.  WE

2   PROBABLY COULD FIND THAT SOMEWHERE.  BUT I DO BELIEVE THEY'RE

3   MINOR FEATURES.

4   Q.   YOU'RE NOT RUNNING FROM THAT TERM, MINOR FEATURES, ARE

5   YOU?

6   A.   I'M NOT RUNNING FROM THAT TERM.

7   Q.   AND, AGAIN, WHEN YOU CALL A FEATURE MINOR, THAT'S NOT A

8   JUDGMENT YOU'RE QUALIFIED TO MAKE BASED ON TECHNICAL

9   ENGINEERING SKILL; IS THAT RIGHT?

10   A.   I AM NOT A TECHNICAL EXPERT IN THIS CASE.

11   Q.   OKAY.  DO YOU KNOW WHETHER ANYONE AT SAMSUNG INTERNALLY

12   PUT THESE FEATURES INTO THE PHONE, ANY ONE OF THEM, LET ALONE

13   ALL FIVE OF THEM, EVER DESCRIBED ANY ONE OF THEM AS MINOR?

14   A.   I HAVE NOT TALKED TO ANYONE AT SAMSUNG.

15   Q.   OKAY.  HAVE YOU MADE ANY RESEARCH ABOUT WHETHER OR NOT

16   SAMSUNG CONSIDERS THESE FEATURES IMPORTANT?

17   A.   I HAVE NOT TALKED TO SAMSUNG ABOUT THAT.

18   Q.   ONE OF THE FEATURES THAT YOU'RE DESCRIBING HERE AS MINOR

19   IS BACKGROUND SYNC; IS THAT RIGHT?

20   A.   THAT IS -- AND WHEN I REFER TO MINOR, I'M ALSO REFERRING

21   TO THE AREA THAT YOU DON'T WANT TO GO INTO YET, OR WE WILL GO

22   TO.

23   Q.   I'M GOING TO GET THERE, DON'T WORRY.

24   A.   AND IS RELATIVE TO THE NON-INFRINGING ALTERNATIVE.

25   Q.   AND IS BACKGROUND SYNC -- I DON'T THINK YOU ANSWERED THE

1     QUESTION.

2     A.   OKAY.

3     Q.   I DON'T THINK THAT WAS INTENTIONAL.  SO LET ME REASK IT,

4     OR RESTATE IT.

5     A.   OKAY.

6     Q.   WAS ONE OF THE FEATURES THAT YOU MEANT TO LABEL AS MINOR

7     BACKGROUND SYNC?

8     A.   ONE OF THE FEATURES THAT I LABELED AS MINOR WAS THE

9     DIFFERENCE BETWEEN THE BACKGROUND SYNC IN THE PATENTED FEATURE

10    AND THE NON-INFRINGING ALTERNATIVE.

11    Q.   WE'RE GOING TO GET THERE.  BUT JUST TO BE CLEAR, WE

12    ESTABLISHED AT THE OUTSET YOU'RE NOT AN EXPERT ON PATENTS; IS

13    THAT RIGHT?

14    A.   I HAVE SAID THAT.

15    Q.   YOU'RE NOT A TECHNOLOGY EXPERT; IS THAT RIGHT?

16    A.   I'M NOT A TECHNOLOGY EXPERT.

17    Q.   AND LET'S JUST BE CLEAR ABOUT THIS RIGHT AT THE OUTSET,

18    YOU'RE NOT AN EXPERT, ARE YOU, SIR, ON THE EXISTENCE, THE

19    AVAILABILITY OR THE SCOPE OF A NON-INFRINGING ALTERNATIVE

20    EITHER, ARE YOU?

21    A.   I'M NOT AN EXPERT ON IT.  I HAVE BEEN INFORMED ABOUT THE

22    EXISTENCE OF NON-INFRINGING ALTERNATIVES.

23    Q.   BUT WHETHER THOSE INFRINGE -- NON-INFRINGING ALTERNATIVES

24    EXIST IN THE REAL WORLD, WHETHER THEY'RE VIABLE, YOU DON'T KNOW

25    ANYTHING -- YOU'RE NOT QUALIFIED TO OPINE ON THOSE SUBJECTS;

CROSS REIBSTEIN

1    ARE YOU?

2    A.   I HAVE BEEN TOLD THAT THEY EXIST.  BUT DO I HAVE THE

3    TECHNICAL EXPERTISE ON THAT?  THE ANSWER IS NO.

4    Q.   SO WHEN YOU TALK ABOUT NON-INFRINGING ALTERNATIVES AND

5    EVERYTHING YOU HAVE TO SAY ABOUT THAT, YOU'RE GOING TO BE

6    REPEATING SOMETHING YOU'VE BEEN TOLD; ISN'T THAT RIGHT?

7    A.   SOMETHING I'VE BEEN TOLD OR HAVE READ.

8    Q.   SO YOU'RE GOING TO BE REPEATING SOMETHING YOU READ OR WERE

9    TOLD; IS THAT RIGHT?

10    A.   I'LL REPEAT MY ANSWER, THAT'S CORRECT.

11    Q.   OKAY.  GOING BACK TO BACKGROUND SYNC, I THREW MYSELF OFF

12    SYNC HERE.

13    A.   OKAY.

14    Q.   WERE YOU HERE IN THE COURTROOM ON, I THINK IT WAS LAST

15    FRIDAY, THE 11TH, WHEN HIROSHI LOCKHEIMER TESTIFIED?

16    A.   NO, I WAS TEACHING AT THAT TIME.

17    Q.   OKAY.  HAS ANYBODY PROVIDED YOU WITH THE TRANSCRIPT OF HIS

18    TESTIMONY?

19    A.   THEY HAVE NOT.

20    Q.   OKAY.  IF WE COULD BRING UP THE TRIAL TESTIMONY OF

21    MR. LOCKHEIMER AT 1501, LINES 16 TO 23.

22         HAVE YOU BEEN ADVISED, PRIOR TO THIS MOMENT, THAT WHEN

23    MR. LOCKHEIMER, WHO'S FROM GOOGLE, WAS ASKED ABOUT THE

24    BACKGROUND SYNCING FUNCTION, HE DESCRIBED IT AS A, QUOTE,

25    "IMPORTANT AND INCREDIBLY USEFUL FEATURE"?

1     A.   HAVE I BEEN INFORMED OF THAT?  THE ANSWER IS, NO.

2     Q.   OKAY.  LET ME ASK YOU THIS AND THEN WE'LL MOVE ON.

3          YOU HAVEN'T INVESTIGATED, HAVE YOU, WHAT VALUE, IF ANY,

4     SAMSUNG PLACES ON THE FEATURES AT ISSUE IN THIS CASE?

5     A.   I HAVE NOT.

6     Q.   SO, AGAIN, TO ROUND THIS OUT, YOU'RE NOT HERE TO EXPRESS

7     ANY OPINION WHATSOEVER ABOUT THE VALUE OF THE PATENTED FEATURES

8     IN THIS CASE?

9     A.   I AM NOT.

10    Q.   WHETHER THEY, IN FACT, IN THE REAL WORLD, GENERATE DEMAND

11    FOR THE ACCUSED PRODUCTS?  YOU'RE NOT HERE TO TALK ABOUT THAT

12    EITHER; IS THAT RIGHT?

13    A.   I AM HERE TO TALK ABOUT WHETHER OR NOT PROFESSOR HAUSER'S

14    SURVEY PROVIDES EVIDENCE ON THAT.  SO THE ANSWER IS NO.

15    Q.   YOU'RE JUST HERE TO CRITIQUE DR. HAUSER; CORRECT?

16    A.   THAT IS CORRECT.

17    Q.   OKAY.  SO BEFORE WE TURN TO THOSE CRITIQUES, A FEW

18    QUESTIONS ABOUT DR. HAUSER.  YOU'RE FAMILIAR WITH HIM BY

19    REPUTATION; IS THAT RIGHT?

20    A.   I AM FAMILIAR WITH HIM BY REPUTATION AND PERSONALLY.

21    Q.   YOU KNOW HIM PERSONALLY?

22    A.   THAT IS CORRECT.

23    Q.   TO CUT TO THE CHASE, YOU HAVE A LEVEL OF RESPECT FOR HIM?

24    A.   I HAVE A CONSIDERABLE AMOUNT OF RESPECT.

25    Q.   AND I THINK HE WOULD APPRECIATE THAT.

1           IN TERMS OF HIS PROFESSIONAL REPUTATION, HE'S VERY WELL

2      KNOWN IN THE FIELD OF CONJOINT STUDIES; ISN'T THAT RIGHT?

3      A.    THAT IS CORRECT.

4      Q.    HE'S PUBLISHED MANY, MANY ARTICLES ON THAT SUBJECT; ISN'T

5      THAT RIGHT?

6      A.    THAT IS CORRECT.

7      Q.    AND HE'S ACTUALLY PUBLISHED MORE, AND MORE RECOGNIZED ON

8      THAT SUBJECT OF CONJOINT STUDIES THAN YOU ARE, ISN'T HE?

9      A.    HE'S BEEN VERY FOCUSSED ON THE TOPIC OF CONJOINT, AND HE'S

10     CONCENTRATED HIS RESEARCH THERE.  I'VE BEEN BROADER.

11     Q.    OKAY.  SO, AGAIN, HE IS RECOGNIZED, IN YOUR FIELD, AS MORE

12     OF AN EXPERT ON THE SUBJECT OF CONJOINT STUDIES THAN YOU ARE;

13     ISN'T THAT RIGHT?

14     A.    I THINK THEY WOULD BOTH BE RECOGNIZED AS EXPERTS IN THE

15     FIELD ON CONJOINT.

16     Q.    OKAY.  WELL, YOU'VE -- YOU SAID YOU'VE PUBLISHED SEVERAL

17     ARTICLES ON CONJOINT STUDIES?

18     A.    I -- I DON'T KNOW IF I USED THE WORLD "SEVERAL."  I MAY

19     HAVE.

20     Q.    THAT'S WHAT I THOUGHT YOU SAID.

21     A.    THERE'S A SMALL NUMBER THAT I'VE PUBLISHED ON CONJOINT.

22     Q.    DR. HAUSER HAS PUBLISHED DOZENS, HASN'T HE?

23     A.    I THINK HE TESTIFIED THAT HE'S PUBLISHED 25 ARTICLES ON

24     CONJOINT.

25     Q.    OKAY.  AND IS IT TRUE YOU'VE PUBLISHED -- OF THE HANDFUL

1        YOU HAVE PUBLISHED, THE LAST ONE WAS WRITTEN ALMOST 25 YEARS

2        AGO IN 1990; ISN'T THAT TRUE?

3        A.    I DON'T KNOW THE DATE OF THAT.  I'D HAVE TO LOOK AT MY

4        RESUME.

5        Q.    DOES THAT SOUND APPROXIMATELY RIGHT?

6        A.    SO WHAT I CAN SAY IS LAST YEAR I PUBLISHED A BOOK WHEREIN

7        I TALK ABOUT CONJOINT.

8        Q.    AND GOING BACK TO DR. HAUSER, NONE OF YOUR CRITIQUES OF

9        DR. HAUSER IN THIS CASE HAVE BEEN INTENDED TO SUGGEST ANY

10       CHALLENGE TO HIS INTEGRITY, HAVE THEY?

11       A.    I AM NOT CHALLENGING HIS INTEGRITY.

12       Q.    YOU BELIEVE IN HIS INTEGRITY, DON'T YOU?

13       A.    I BELIEVE IN HIS INTEGRITY.

14       Q.    OKAY.  AND NONE OF YOUR CRITIQUES HERE TODAY HAVE BEEN

15       INTENDED TO SUGGEST THAT IN CONDUCTING HIS CONJOINT STUDY,

16       DR. HAUSER WAS IN ANY WAY IMPROPERLY TRYING TO INFLUENCE THE

17       RESULTS OF THE STUDY; ISN'T THAT TRUE, SIR?

18       A.    NOT CONSCIOUSLY, NO.

19       Q.    OKAY.  AND I THINK THE -- ALL RIGHT.

20            SO ONE OF YOUR CRITIQUES, AND IT'S BEEN ON THIS BOARD

21       MR. PRICE SORT OF GLIDED OVER IT, WAS INACCURATE PRESENTATION

22       OF THE CLAIMED FUNCTIONALITIES.

23            DO YOU RECALL THAT?

24       A.    I DO.

25       Q.    THAT WAS A PRINCIPAL CRITIQUE YOU HAD IN YOUR REPORT IN

1      THIS CASE IN SEPTEMBER OF 2013; ISN'T THAT RIGHT?

2      A.   I DON'T THINK I'D SAY IT'S THE PRINCIPAL OR A PRINCIPAL

3      ONE.  IT'S ONE OF THE SEVERAL THAT I HAVE IN THIS CASE.

4      Q.   IT TOOK UP A NUMBER OF PAGES IN YOUR REPORT; ISN'T THAT

5      TRUE?

6      A.   I DON'T KNOW HOW MANY PAGES, BUT I KNOW I DID TALK ABOUT

7      IT.

8      Q.   OKAY.  AND AS YOU'VE SAID BEFORE, YOU'RE -- PART OF THE

9      REASON YOU PUT UP THAT CHART THAT SHOWED DR. HAUSER MEASURING

10     THE WRONG THING, YOU'RE CRITIQUING HERE HIS DESCRIPTION OF THE

11     FEATURES AND THE NON-INFRINGING ALTERNATIVES ON THE DIFFERENCE

12     BETWEEN THE TWO; IS THAT RIGHT?

13     A.   SO IN THAT SECTION I'M CRITIQUING HOW IT IS THAT HE

14     DESCRIBED THE FEATURE AND THE NON-INFRINGING ALTERNATIVES, BUT

15     MY CRITIQUE HERE IN THE COURTROOM TODAY, I DID NOT HAVE TIME TO

16     ADDRESS THE -- MY ASSESSMENT OF THE INACCURATE PRESENTATIONS.

17     Q.   OKAY.

18          THE COURT:  THE TIME IS -- I'M SORRY TO INTERRUPT

19     YOU.  THE TIME IS NOW 10:30.  I'D LIKE TO GO AHEAD AND TAKE OUR

20     MORNING BREAK.  SORRY TO INTERRUPT YOU.

21          MR. BENNETT:  THAT'S OKAY.

22          THE COURT:  LET'S GO AHEAD AND TAKE A 15 MINUTE

23     BREAK.  PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

24          THANK YOU.

25          AND YOU MAY STEP DOWN AS SOON AS THE JURORS GO TO THE

1    ROOM.  THANK YOU.

2         (JURY OUT AT 10:31 A.M.)

3              THE COURT:  GO AHEAD, PLEASE.  YOU CAN STEP DOWN.

4              THE WITNESS:  THANK YOU.

5              THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK NOW.

6              MS. MAROULIS:  YOUR HONOR, CAN WE RAISE A VERY BRIEF

7    QUESTION REGARDING AUTHENTICATION DECLARATIONS.

8              THE COURT:  YES.

9              MS. MAROULIS:  WE WANTED TO MOVE THEM INTO EVIDENCE

10   VERY QUICKLY WITHOUT READING THE WHOLE THING BECAUSE IT'S GOING

11   TO BE PAGES AND PAGES, AND IT WOULD BE VERY TEDIOUS FOR THE

12   JURY AND DIFFICULT FOR THE COURT REPORTER.

13        I UNDERSTAND FROM APPLE THAT THEY ARE DEMANDING THAT WE

14   READ THEM AND THAT'S GOING TO TAKE A LONG TIME.  SO I'M JUST

15   ASKING THE COURT FOR DISPENSATION TO MOVE THEM IN WITH THE

16   APPROPRIATE EXHIBITS WITHOUT HAVING TO READ THE ENTIRETY OF

17   ATTACHED HERETO IS THE SOURCE CODE, ET CETERA.

18             MR. MCELHINNY:  THIS IS A CHANGE IN THE GROUND RULES.

19   I MEAN, WE HAVE BEEN -- THIS IS SWORN TESTIMONY.  WE, IN ORDER

20   TO HELP THEM, AGREED THAT IT COULD BE READ IN.  IT'S HEARSAY.

21   BUT INSTEAD OF BRINGING WITNESSES, WE ALL AGREED THAT THEY

22   COULD READ IN THE DECLARATIONS.  THEY'VE DONE IT TWICE BEFORE.

23        THERE IS NO -- THERE IS NO WRITTEN TESTIMONY IN EVIDENCE.

24   NO DEPOSITIONS ARE IN EVIDENCE.  WE LODGED THE CLIPS.  TO

25   PUT -- TO START PUTTING NOW WRITTEN TESTIMONY IN EVIDENCE GIVES

1    IT ADDED WEIGHT AND CHANGES THE WAY THAT WE'VE BEEN DOING THE

2    CASE.

3              THE COURT:  THOSE WILL BE READ.

4              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

5              THE COURT:  OKAY?  THANK YOU.

6         (RECESS FROM 10:32 A.M. UNTIL 10:46 A.M.)

7         (JURY IN AT 10:47 A.M.)

8              THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

9         THE TIME IS NOW 10:47.  GO AHEAD, PLEASE.

10             MR. BENNETT:  THANK YOU, YOUR HONOR.

11   Q.   HELLO AGAIN, DR. REIBSTEIN.

12   A.   HELLO.

13   Q.   SIR, LET'S TALK ABOUT THE PRE-TEST YOU DID, THE SIMULATED

14   PRE-TEST?

15   A.   SURE.

16   Q.   OKAY.  AND LET'S AGAIN MAKE IT CLEAR THAT YOU DID NOT AND

17   HAVE NOT DONE -- YOU HAVE VARIOUS CRITIQUES OF DR. HAUSER'S

18   STUDY, SOME OF THEM INFORMED MY THAT PRE-TEST.

19        AGAIN, YOU DIDN'T TAKE ANY OF THESE CRITIQUES, BUILD THEM

20   INTO A STUDY OF YOUR OWN AND THEN RERUN THAT STUDY TO SEE WHAT

21   IT SHOWED ABOUT DEMAND FOR THE PATENTED FEATURES; CORRECT?

22   A.   I DID NOT.

23   Q.   WHAT YOU DID INSTEAD WAS TO --

24   A.   MAY I ADD TO THAT ANSWER FOR A SECOND?

25   Q.   AS YOUR COUNSEL SAID, WE'RE ALL ON THE CLOCK, AND --

```
1    A.   OKAY.

2    Q.   WHAT DO YOU WANT TO ADD?

3    A.   SO I DIDN'T GO AND ESTIMATE DEMAND, BUT I DID DO A STUDY

4    THAT INFORMED THE PRE-TEST.

5    Q.   AND THAT'S WHAT I'M GOING TO TURN TO.

6    A.   YEAH, OKAY.

7    Q.   AND WHAT YOU DID INSTEAD WAS RUN YOUR OWN PRE-TEST.

8         AND LET'S BE CLEAR.  IN THE PRE-TEST, 26 PEOPLE WERE

9    CHOSEN.  WE'VE SEEN FIVE OR SIX OF THEM; IS THAT RIGHT?

10   A.   I DON'T KNOW WHAT THE NUMBER WAS, BUT, YES, THAT'S

11   CORRECT.

12   Q.   YOU DON'T KNOW WHAT THE NUMBERS WERE?

13   A.   I KNOW THERE WERE 26 PEOPLE.  I DON'T KNOW HOW MANY WE

14   SHOWED.

15   Q.   OKAY.  LET ME BE CLEAR, NONE OF THOSE PEOPLE WERE PEOPLE

16   WHO PARTICIPATED IN DR. HAUSER'S SURVEY?

17   A.   THEY WERE DRAWN FROM THE SAME CRITERIA THAT WAS DRAWN FOR

18   PROFESSOR HAUSER SURVEY, BUT NONE OF THEM ANSWERED PROFESSOR

19   HAUSER'S SURVEY.

20   Q.   PROFESSOR HAUSER'S SMARTPHONE SURVEY HAD 507 PARTICIPANTS.

21   THESE 26 PEOPLE WHO PARTICIPATED IN THIS EXERCISE WE'VE SEEN

22   VIDEO CLIPS FROM, NONE OF THEM ARE AMONG THE 507 PEOPLE?

23   A.   THEY'RE TO BE REPRESENTATIVE OF THE SAME POOL THAT

24   PROFESSOR HAUSER WAS SAMPLING FROM.

25   Q.   OKAY.  DR. HAUSER, WHEN HE WAS HERE, AND YOU WERE HERE,
```

1    YOU HEARD HIM, HE EXPLAINED HOW IN HIS DESIGN OF HIS TEST, HE

2    HAD SOMETHING CALLED INCENTIVE ALIGNMENT, WHICH ENCOURAGED

3    PEOPLE TO MAKE CHOICES AND SO FORTH.  DID YOU HAVE INCENTIVE

4    ALIGNMENT IN YOUR PRE-TEST?

5    A.   AS WAS SIMILARLY DONE WITH PROFESSOR HAUSER, IN THE

6    PRE-TEST, I DID NOT HAVE AN INCENTIVE ALIGNMENT.

7    Q.   SO NONE OF THOSE INDIVIDUALS WHO WE SAW IN THE -- ON THE

8    VIDEO WHO YOU LABELED AS CONFUSED OR NOT UNDERSTANDING, NONE OF

9    THEM HAD THE SAME INCENTIVE AS THEY LOOKED AT THEIR SCREENS AND

10   WENT THROUGH THAT PROCESS THAT THE 507 PARTICIPANTS IN

11   DR. HAUSER'S SURVEY HAD TO PAY ATTENTION AND MAKE SMART

12   CHOICES; RIGHT?

13   A.   SO AS I JUST SAID, NONE OF THEM HAD THE INCENTIVE

14   ALIGNMENT THAT HE USED IN HIS PARTICULAR STUDY.

15   Q.   OKAY.  NOW, IN TERMS OF THE INTERVIEWS OF THESE

16   INDIVIDUALS, IT WAS A LITTLE UNCLEAR, EARLY ON YOU WERE TALKED

17   ABOUT HOW YOU SCREEN AND HAD DID VARIOUS THINGS.  BUT THIS IS

18   TRUE, ISN'T IT, YOU DIDN'T PERSONALLY CONDUCT THE INTERVIEWS

19   WITH ANY OF THESE PARTICIPANTS, DID YOU?

20   A.   NO.  I HIRED PEOPLE TO DO THAT.

21   Q.   DID YOU NOT MEET THEM?

22   A.   I DID NOT MEET THEM.

23   Q.   YOU HIRED WHO INTERVIEWS FROM THE SCHLESINGER GROUP; IS

24   THAT RIGHT?

25   A.   THERE WERE A TOTAL OF THREE INTERVIEWERS.

1    Q.   YOU DID NOT SPEAK TO ANY PARTICIPANTS?

2    A.   THEY WERE GIVEN INSTRUCTIONS.

3    Q.   BUT YOU DID NOT SPEAK TO THEM?

4    A.   DID I NOT SPEAK TO THEM.

5    Q.   AND YOU'VE NEVER WORKED WITH ANY OF THOSE INDIVIDUALS

6    BEFORE; IS THAT RIGHT?

7    A.   I DON'T BELIEVE SO.

8    Q.   AND YOU DON'T KNOW WHO SPOKE TO THEM, IF SIGNIFICANT, TO

9    INSTRUCT THEM AS TO HOW TO CONDUCT THE INTERVIEWS; IS THAT

10   RIGHT?

11   A.   THERE WAS AN INTERVIEW GUIDE THAT WAS PUT TOGETHER.  I

12   DESIGNED THAT GUIDE AND THAT'S WHAT WAS PROVIDED TO THEM.

13   Q.   OKAY.  AND AS A RESULT OF THESE INTERVIEWS DONE BY THESE

14   FOLKS, YOU PUT UP A CHART THAT SHOWED A LOT OF PEOPLE WERE

15   CONFUSED, LIKE ONLY 1 OUT OF 26 PEOPLE GOT THE VIDEO

16   DESCRIPTION OF QUICK LINKS IS WHAT YOUR PRE-TEST REPORTS TO

17   SHOW; IS THAT RIGHT?

18   A.   THAT IS CORRECT.

19   Q.   OKAY.  AND SIMILAR WITH RESPECT TO OTHER FEATURES; IS THAT

20   RIGHT?

21   A.   NOT AS, NOT AS OVERWHELMING, BUT STILL IT WAS AN ALARMING

22   NUMBER.

23   Q.   NOW, AND YOU HAVE AN EXHIBIT, I FORGET THE NUMBER, BUT

24   MR. PRICE REFERRED TO IT, THAT INCLUDES EXCERPTS OF TRANSCRIPTS

25   FROM WHICH YOU'VE GLEANED THESE CONCLUSIONS; IS THAT RIGHT?

1     A.    THE -- ARE YOU TALKING ABOUT THE WRITTEN TRANSCRIPTS?

2     Q.    YES.

3     A.    YES.

4     Q.    OKAY.  AND AS YOU SAY, THOSE ARE GOING TO BE IN EVIDENCE;

5     IS THAT RIGHT?

6     A.    THAT IS MY UNDERSTANDING.

7     Q.    NOW, LOOK UP IN YOUR BINDER, WE HAVE MARKED AS EXHIBIT

8     2002 --

9     A.    SO THERE'S MULTIPLE BINDERS UP HERE.  DO YOU KNOW WHICH

10    ONE YOU'RE REFERRING TO?

11    Q.    PROBABLY ONE THAT SAYS CROSS-EXAMINATION EXHIBITS.

12          MAY I APPROACH, YOUR HONOR, TO HELP?

13              THE COURT:  GO AHEAD, PLEASE.

14              THE WITNESS:  I HAVE EIGHT BINDERS UP HERE.

15    BY MR. BENNETT:

16    Q.    IT'S THIS ONE (INDICATING).

17    A.    THANK YOU.

18    Q.    WHAT IS IT YOU WANT ME TO LOOK UP HERE?

19    A.    LOOK AT EXHIBIT 2002.

20    Q.    I'LL REPRESENT TO YOU THAT THESE ARE ADDITIONAL EXCERPTS

21    OF THE TRANSCRIPTS OF THE INTERVIEWS CONDUCTED IN YOUR PRE-TEST

22    THAT ARE NOT INCLUDED IN THE EXHIBIT YOU SPONSORED, AND I'D ASK

23    YOU TO LOOK AT THE EXHIBIT --

24    A.    SO BEFORE YOU GO ON, I'M TRYING TO FIND WHAT IT IS YOU'RE

25    REFERRING TO.  OH, I SEE, PX 2002.

1    Q.   CORRECT.  AND I'LL REPRESENT TO YOU THESE ARE ADDITIONAL

2    EXCERPTS FROM THE TRANSCRIPTS, THE TRANSCRIPTIONS OF THE

3    PRE-TEST INTERVIEWS THAT YOU'VE BEEN DESCRIBING.  THESE ARE IN

4    ADDITION TO WHAT YOU INCLUDED IN YOUR EXHIBIT, 456A.

5            MR. WATSON:  454.

6            MR. BENNETT:  454A.

7    Q.   DO YOU RECOGNIZE THOSE AS ADDITIONAL EXCERPTS OF THE

8    TRANSCRIPTS?

9    A.   FRANKLY, I DON'T KNOW WHAT EXACTLY WAS SUBMITTED, LIKE IN

10   TERMS OF WHAT THE JURY SAW, SO I DON'T KNOW THE ANSWER TO THAT

11   QUESTION.

12   Q.   NO.  I'M JUST ASKING YOU WHETHER YOU RECOGNIZE WHAT'S IN

13   THE BINDER THERE MARKED AS EXHIBIT 2002 AS THE FORM OF

14   TRANSCRIPTS THAT WERE GENERATED BY YOUR PRE -- BY YOUR

15   EXERCISE.

16   A.   THEY -- I'M NOT LOOKING THROUGH ALL OF THEM, BUT IT

17   APPEARS TO ME THAT'S CORRECT.

18           MR. BENNETT:  I WOULD MOVE EXHIBIT 2002A, YOUR HONOR.

19           THE COURT:  ANY OBJECTION?

20           MR. PRICE:  A?

21           MR. BENNETT:  IS IT JUST 2002?  I'M SORRY.

22           MR. PRICE:  THIS IS A DEMONSTRATIVE, I THINK, YOUR

23   HONOR.

24           THE COURT:  NO, PX 2002 IS ALL OF THE TRANSCRIPTS.

25           MR. PRICE:  I THINK HE SAID A.

```
1              MR. BENNETT:  IT'S 2002, JUST 2002.

2              THE COURT:  IT'S ADMITTED.

3              MR. PRICE:  OBJECTION.  IT'S NOT ON THE EXHIBIT LIST.

4    JIM.

5              THE COURT:  WAIT.  PUT IT DOWN.  IT'S NOT ON THE

6    EXHIBIT LIST?

7              MR. BENNETT:  YOUR HONOR, IT IS THE -- IT'S FROM THE

8    UNIVERSE OF WHICH DR. REIBSTEIN SELECTED HIS 454A.  IT'S THE

9    DOCUMENT THAT IS 454A AND ALL OF THE EXHIBITS PURPORT TO

10   SUMMARIZE.  THESE ARE ADDITIONAL EXCERPTS FROM THAT.

11             MR. PRICE:  I'M AFRAID, YOUR HONOR, THAT HE'S SAYING

12   IT'S A SUBSET OF 454A?

13             MR. BENNETT:  IT'S A SUBSET OF THE UNIVERSE OF

14   TRANSCRIPTS THAT WERE PROVIDED.

15             MR. PRICE:  WELL, THEN WE OBJECT.  IT WASN'T ON THE

16   OBJECT LIST.

17             MR. BENNETT:  YOUR HONOR, IT'S -- THEY'RE PRESENTING

18   A SUMMARY OF THIS THROUGH DR. REIBSTEIN, AND WE'RE PRODUCING

19   INFORMATION FROM THE DOCUMENT THAT HE PURPORTS TO BE, AND

20   COUNSEL PURPORTS TO BE FAIRLY AND ACCURATELY SUMMARIZING.

21             THE COURT:  WELL, IF IT WASN'T ON THE EXHIBIT LIST,

22   IT'S NOT GOING TO BE ADMITTED.

23             MR. BENNETT:  OKAY.

24   Q.  LET ME ASK YOU THIS, DR. REIBSTEIN, HAVE YOU REVIEWED THE

25   TRANSCRIPTS IN THEIR ENTIRETY OF YOUR PRE-TEST INTERVIEW?
```

1    A.   YES, I HAVE.

2    Q.   OKAY.  NOW, LET ME ASK YOU A FEW QUESTIONS.  ISN'T THE

3    FOLLOWING TRUE:  THAT ONE THING THAT YOU WANTED TO BE CAREFUL

4    ABOUT WAS PREVENTING THE INTRODUCTION OF ANY BIAS INTO THAT

5    PROCESS?

6    A.   THAT IS CORRECT.

7    Q.   OKAY.  IT WAS -- AND TO THAT END, IT WAS IMPORTANT THAT

8    THE INTERVIEWER'S INTERACTION WITH THE RESPONDENTS NOT TAINT

9    THE RESULTS; ISN'T THAT CORRECT?

10   A.   THAT IS CORRECT.

11   Q.   FOR EXAMPLE, BY SUGGESTING TO PARTICIPANTS THAT THEY WERE

12   OR SHOULD BE CONFUSED; IS THAT RIGHT?

13   A.   THAT IS CORRECT.

14   Q.   OKAY.  THAT'S SOMETIMES CALLED INTERVIEWER BIAS; IS THAT

15   RIGHT?

16   A.   SO THEY MAY USE THE TERM "CONFUSED" IN THERE WHEN THEY

17   SAY -- WHEN SOMEBODY SAYS, I JUST DON'T GET THIS, THEY MAY SAY,

18   YOU KNOW, THEY MAY SAY, ARE YOU CONFUSED?  SO THEY MAY ASK IT

19   IN AN INQUIRY.

20   Q.   SO TO PREVENT -- ISN'T THIS TRUE, THAT TO PREVENT IMPROPER

21   SUGGESTION FROM CREEPING INTO THIS PROCESS, YOU DRAFTED A

22   SCRIPT FOR THE INTERVIEWERS?

23   A.   THAT IS CORRECT.

24   Q.   AND WASN'T THE NUMBER ONE INSTRUCTION YOU GAVE YOUR

25   INTERVIEWS WAS THIS:  TO KEEP TO THAT SCRIPT?

1    A.   TO KEEP TO THAT SCRIPT.  OBVIOUSLY WHEN YOU'RE DOING AN

2    OPEN INTERVIEW, YOU HAVE TO ELABORATE BEYOND THAT, AND THAT IS

3    FULLY WHAT'S EXPECTED.

4    Q.   BUT YOU SCRIPTED THE INTRODUCTORY REMARKS THEY WOULD MAKE;

5    ISN'T THAT RIGHT?

6    A.   SCRIPTED THE INTRODUCTORY REMARKS THEY WOULD MAKE.

7    Q.   AND YOU REVIEWED ALL THE TRANSCRIPTS THAT YOU PURPORT TO

8    HAVE ACCURATELY SUMMARIZED; ISN'T THAT RIGHT?

9    A.   DID I REVIEW ALL OF THE TRANSCRIPTS.

10   Q.   ISN'T IT TRUE THAT IN THE INTRODUCTORY COMMENTS TO THE

11   TEST PARTICIPANTS, YOUR INTERVIEWERS DID NOT STICK TO THE

12   SCRIPTS THAT YOU GAVE THEM?

13   A.   I'D HAVE TO GO BACK AND LOOK AT ALL OF THESE.  I HAVEN'T

14   LOOKED AT THESE FOR SEVERAL MONTHS, BUT I THINK THE

15   INTERVIEWERS DID AN OUTSTANDING JOB OF STICKING TO THE SCRIPT.

16   Q.   DIDN'T YOU SEE IN PLACES WHERE THEY WERE PUSHING, QUOTE,

17   "THIS IS WHAT YOU SAID IN YOUR DEPOSITION, WHERE THEY WERE

18   PUSHING MORE THAN YOU WOULD HAVE LIKED"?

19   A.   I DID SAY THAT, AND I DO BELIEVE THAT THERE WERE A COUPLE

20   TIMES THAT THEY WENT BEYOND WHAT IT IS I WOULD HAVE PREFERRED

21   THEY HAD DONE BECAUSE I THOUGHT IT WAS ALREADY REALLY CLEAR.

22   Q.   OKAY.  AND AT THE VERY OUTSET THESE INTERVIEWERS, AGAIN,

23   NOT SOMETHING YOU'D SCRIPTED, THEY TOLD EVERY PARTICIPANT WHO

24   PARTICIPATED IN THIS THAT THEY WERE LOOKING FOR GLITCHES; IS

25   THAT RIGHT?

```
 1      A.   THEY WERE LOOKING FOR GLITCHES?  NO.

 2      Q.   THEY TOLD THEM NOT TO HOLD BACK IN ANY EXPRESSION OF

 3      CONFUSION; ISN'T THAT RIGHT?

 4      A.   THEY WERE SUPPOSED TO BE EXPRESSING WHATEVER IT IS THAT

 5      THEY UNDERSTOOD.

 6      Q.   THEY TOLD THEM, DIDN'T THEY, THAT BECAUSE SOME PEOPLE ARE

 7      SOMETIMES EMBARRASSED TO ADMIT THAT SOMETHING IS NOT CLEAR, WE

 8      REALLY WANT YOU TO TELL US THAT.  THEY SAID STUFF LIKE THAT

 9      OVER AND OVER AGAIN, DIDN'T THEY?

10      A.   WHAT THEY ENDED UP SAYING IS DON'T BE EMBARRASSED, GO

11      AHEAD AND EXPRESS WHAT IT IS, AND PEOPLE HAVE DIFFICULTY WITH

12      THESE.  IT IS REALLY TO ELICIT WHAT IT IS THAT PEOPLE

13      UNDERSTOOD.

14      Q.   AND WHAT THE INTERVIEWERS SAID OVER AND OVER AGAIN WAS

15      WE'RE HERE TO FIND OUT WHETHER YOU'RE CONFUSED.  THAT'S WHAT WE

16      REALLY NEED AND WANT TO KNOW.  DIDN'T THEY SAY THAT IN THAT

17      SCRIPT THAT YOU'VE REVIEWED IN ITS ENTIRETY BUT ONLY PRESENTED

18      IN PART?

19      A.   SO I'D HAVE TO GO BACK AND LOOK AT THAT.

20      Q.   ISN'T IT TRUE THAT EVEN AFTER THOSE SORTS OF INTRODUCTORY

21      COMMENTS, AGAIN, IN PORTIONS AFTER THAT TRANSCRIPT THAT YOU'VE

22      NOT PRESENTED HERE TODAY, RESPONDENTS SAID OVER AND OVER AGAIN

23      THEY FOUND THE VIDEO AND ANIMATIONS AND DESCRIPTIONS TO BE

24      CLEAR, VERY, VERY CLEAR, ABSOLUTELY CLEAR, PERFECT, AND I THINK

25      THIS IS LIKE THAT?
```

1    A.   AND SIMILAR TO WHAT IT IS THAT WE HAD FROM

2    PROFESSOR HAUSER, THEY SAID THEY WERE NOT CONFUSED UNTIL THEY

3    WERE ASKED TO DESCRIBE WHAT IT IS THEY UNDERSTOOD.

4    Q.   BUT NONE OF THOSE RESPONSES WHERE PEOPLE SAID I FIND IT

5    CLEAR, I FIND IT VERY CLEAR, WHICH ARE SPRINKLED ALL OVER THAT

6    ENTIRE TRANSCRIPT THAT YOU'RE NOT PRESENTING HERE, YOU HAVEN'T

7    PRESENTED ANY OF THOSE IN YOUR DEMONSTRATIVE?

8    A.   THAT THEY SAID IT WAS CLEAR?

9    Q.   YES.

10   A.   SO WHAT IT IS THAT I HAVE IN THE TRANSCRIPTS THAT WERE

11   PROVIDED WERE FOR THOSE PEOPLE, AND IT'S THE OVERWHELMING

12   NUMBER OF PEOPLE, THAT DID EXPRESS THAT THEY WERE CONFUSED.

13   Q.   OKAY.

14   A.   IF YOU'RE ASKING IF THERE WERE SOME PEOPLE WHO GOT IT

15   CLEARLY, MY TESTIMONY IS ABSOLUTELY.

16   Q.   AND PEOPLE YOU CATEGORIZED AS CONFUSED, SOME OF THOSE

17   PEOPLE YOU CATEGORIZED AS CONFUSED SIMPLY BECAUSE THEY DIDN'T

18   REMEMBER THE EXACT DESCRIPTIONS IN THE HAUSER SURVEY WHEN YOU

19   ASKED THEM THAT; ISN'T THAT TRUE?

20   A.   WELL, WHAT'S INTERESTING TO ME IS THESE INDIVIDUALS ARE

21   GOING --

22   Q.   BEFORE I -- COULD YOU ANSWER THE QUESTION AND THEN TELL ME

23   WHAT'S INTERESTING TO YOU?

24   A.   I DON'T KNOW IF --

25          MR. PRICE:  YOUR HONOR, I OBJECT TO INTERRUPTING THE

```
1    WITNESS'S ANSWER.

2              THE COURT:  OVERRULED.  GO AHEAD.

3              THE WITNESS:  DO YOU WANT TO REPEAT YOUR QUESTION,

4    PLEASE.

5    BY MR. BENNETT:

6    Q.   SURE.  COULD I HAVE IT READ BACK, PLEASE.  I APOLOGIZE.

7         (RECORD READ.)

8              THE WITNESS:  SO I REMEMBER ONE INDIVIDUAL WHO

9    SPECIFICALLY SAID I CAN'T REMEMBER WHAT THAT IS.  SO I DID

10   CLASSIFY THAT AS SOMEBODY INCAPABLE OF GIVING AN ACCURATE

11   RESPONSE ON THIS.

12   BY MR. BENNETT:

13   Q.   AND SOME --

14   A.   AND I CLASSIFIED THEM AS CONFUSED OR LACKING AN

15   UNDERSTANDING.  LACKING OF UNDERSTANDING.

16   Q.   AND DOES THAT PERSON AND OTHERS LIKE HIM OR HER ASK IN THE

17   PART -- IN THE COURSE OF YOUR PRE-TEST SIMULATION, OR PARALLEL

18   PRE-TEST, TO BE ABLE TO GO BACK AND LOOK AT THE DESCRIPTION AND

19   ANIMATION DESCRIBING THE PATENTED FEATURES BEFORE THEY ANSWERED

20   YOUR QUESTION?  ISN'T THAT RIGHT?

21   A.   SO WHEN THEY WERE ASKED -- SO I'M TRYING TO GET TO THE

22   SPECIFIC ONE, BECAUSE I RECALL ONE INDIVIDUAL WHO SAID, I DON'T

23   REMEMBER.  CAN I GO BACK AND LOOK?

24   Q.   YES.

25   A.   THAT'S RIGHT.
```

1    Q.   AND THAT PERSON, PER YOUR INSTRUCTIONS TO THE

2    INTERVIEWERS, WAS TOLD, NO, YOU CAN'T.  YOU'VE GOT TO ANSWER IT

3    WITHOUT LOOKING BACK AT THE ANIMATION; IS THAT RIGHT?

4    A.   AND THE REASON BEHIND THAT IS WE WANT TO KNOW, GIVEN THAT

5    THEY'RE GOING THROUGH THIS CHOICE EXERCISE, COULD THEY ANSWER

6    THESE QUESTIONS OF WHAT THEIR UNDERSTANDING WAS.

7    Q.   BUT WHEN YOU DESIGNED YOUR PARALLEL PRE-TEST TO HAVE THAT

8    FEATURE TO IT, YOU WERE AWARE, WEREN'T YOU, THAT PARTICIPANTS

9    IN DR. HAUSER'S SURVEY, AS THEY WERE ON THAT CHOICE PAGE MAKING

10   THE OPTION, HAD THE OPTION, IF THEY CHOSE, TO GO BACK AND LOOK

11   AT THE DESCRIPTION OF ANY FEATURE THAT THEY WERE CHOOSING

12   BETWEEN?

13   A.   AND WHEN I DISCOVERED THAT PEOPLE HAD THE OPTION IN MY

14   PRE-TEST AS WELL, BECAUSE THEY WENT ON AND DID ALL THE REST OF

15   THE CHOICE EXERCISE, THEY HAD THE OPTION TO GO BACK AND ONLY

16   TWO INDIVIDUALS AT ANY TIME EVER WENT BACK AND LOOKED AT THAT.

17   Q.   WELL, ISN'T IT TRUE THAT YOUR, YOUR INTERVIEWERS, AGAIN,

18   THIS WOULD BE REFLECTED IN THE TRANSCRIPT THAT YOU'VE REVIEWED

19   IN ITS ENTIRETY BUT PRESENTED HERE ONLY IN PART, YOUR

20   INTERVIEWERS TOLD PEOPLE --

21        MR. PRICE:  OBJECTION, YOUR HONOR.  HE'S TESTIFYING

22   ABOUT SOMETHING NOT IN EVIDENCE.

23        THE COURT:  OVERRULED.  GO AHEAD.  ASK THE QUESTION.

24   BY MR. BENNETT:

25   Q.   YOUR INTERVIEWERS TOLD PEOPLE WHO ASKED TO BE ABLE TO GO

1     BACK AND LOOK AT THE ANIMATION THAT, NO, WE DON'T WANT YOU TO

2     DO?

3     A.   NO, WE DON'T WANT YOU TO DO THAT WHEN WE'RE ASKING YOU

4     WHAT IS IT YOU CURRENTLY UNDERSTAND, SINCE YOU'VE ALREADY

5     ANSWERED THREE CHOICE EXERCISES, WHAT IS YOUR CURRENT

6     UNDERSTANDING OF THESE FROM WHICH YOU'VE BEEN ANSWERING THE

7     CHOICE.

8          THEY DID HAVE THE OPPORTUNITY SUBSEQUENTLY AT ANY POINT TO

9     GO BACK AND GET IT EXPLAINED TO THEM AGAIN AND SEE THE

10    ANIMATION ONCE AGAIN.

11    Q.   AND, DOCTOR, LET ME ASK YOU THIS:  WOULD YOU AGREE WITH ME

12    THAT THIS IS A DIFFERENCE BETWEEN UNDERSTANDING SOMETHING AND

13    BEING ABLE TO ARTICULATE IT IN A WAY THAT SATISFIES YOU OR ONE

14    OF YOUR INTERVIEWERS?

15    A.   SO I GAVE EACH OF THE RESPONDENTS AN OPPORTUNITY TO FULLY

16    ELABORATE WHAT THEIR PARTICULAR UNDERSTANDING IS.

17    Q.   IN FACT, THERE ARE PEOPLE WHO ACCURATELY DESCRIBED THE

18    PATENTED FEATURES IN DR. HAUSER'S DESCRIPTION OF THEM WHO YOU

19    LABELED AS CONFUSED; ISN'T THAT RIGHT?

20    A.   THEY ACCURATELY DESCRIBED THE FEATURES BUT NOT THE

21    NON-INFRINGING ALTERNATIVE.

22    Q.   WELL, LET'S LOOK AT, BY WAY OF EXAMPLE, AT SDX 3230.  THIS

23    IS ONE OF YOUR DEMONSTRATIVES.  I DON'T KNOW IF YOU SHOWED IT.

24         BUT THIS IS A PARTICIPANT WHO YOU LABELED AS CONFUSED

25    ABOUT BACKGROUND SYNC; IS THAT RIGHT?

```
 1    A.   I'D HAVE TO GO BACK AND LOOK AT THE LABELING ON THAT.

 2    Q.   I'LL REPRESENT TO YOU --

 3    A.   MY GUESS IS, YES.

 4    Q.   I'LL REPRESENT TO YOU THAT'S THE CASE.

 5    A.   OKAY.

 6    Q.   THIS PERSON ACCURATELY DESCRIBED THE BENEFIT OF THE

 7    PATENT, DIDN'T HE OR SHE?

 8    A.   NOW, IS THIS THE ENTIRE PART THAT I HAVE IN THIS EXCERPT

 9    HERE FROM THEM.

10    Q.   THIS IS FROM A DEMONSTRATIVE THAT YOUR COUNSEL PREPARED?

11    A.   BUT IS THIS ALL OF WHAT WE HAVE FOR SUBJECT NUMBER TWO.

12    Q.   I DIDN'T PREPARE IT, SO I CAN'T TELL YOU.  ALL I CAN DO IS

13    LOOK AT WHAT YOUR COUNSEL GAVE US AND ASK YOU, LOOKING AT THAT,

14    ISN'T IT TRUE THAT THIS PARTICIPANT ACCURATELY DESCRIBED THE

15    BENEFIT OF THE -- THE BENEFIT OF THE PATENT AS DESCRIBED BY

16    DR. HAUSER?

17    A.   SO LET ME READ IT NOW.

18         (PAUSE IN PROCEEDINGS.)

19         (RINGING PHONE.)

20         THE COURT:  IS THAT SOMEBODY'S PHONE?  WHOSE PHONE IS

21    THAT?  I THINK THAT'S SOMEBODY'S PHONE.  CAN YOU PLEASE TURN IT

22    OFF.

23         MR. BENNETT:  THIS -- I'M SORRY, YOUR HONOR.

24         THE COURT:  I THINK WE'RE WAITING FOR HIM TO READ.

25         THE WITNESS:  OH, NO.  I'VE GONE AHEAD.  I DIDN'T
```

```
 1        KNOW.  I WAS WAITING FOR YOU.

 2             THE COURT:  GO AHEAD, PLEASE.

 3             MR. BENNETT:  THANK YOU, YOUR HONOR.

 4             THE WITNESS:  SO I DON'T KNOW IF THIS IS THE

 5   TRANSCRIPT IN ITS ENTIRETY WITH RESPECT TO THIS, WHAT HAS BEEN

 6   SUBMITTED ON SUBJECT NUMBER 20.

 7        BUT I'LL TAKE IT THAT I HAVE LABELED THIS AS SOMEBODY WHO

 8   WAS CONFUSED.

 9   BY MR. BENNETT:

10   Q.   OKAY.  AND THIS PERSON YOU LABELED CONFUSED UNDERSTOOD THE

11   BENEFIT OF THE PATENT, DIDN'T HE OR SHE?

12   A.   AS I READ THE TOP PART OF THAT, I WOULD SAY THAT IS

13   CORRECT.

14   Q.   OKAY.  AND --

15   A.   AND JUST, YOU KNOW, TO BE CLEAR, I LABELED THEM THAT THEY

16   WERE CONFUSED ABOUT THE PATENT OR THE NON-INFRINGING

17   ALTERNATIVE.

18   Q.   WHY EXACTLY DID YOU LABEL THIS PERSON CONFUSED?

19   A.   SO BEING ABLE TO DO THINGS -- SO IN LOOKING AT THIS RIGHT

20   NOW, THAT'S NOT -- THAT'S NOT AS CLEAR TO ME.

21   Q.   DID YOU ACTUALLY MAKE THESE DETERMINATIONS AS TO WHO WAS

22   CONFUSED OR NOT OR DID SOMEBODY ELSE DO IT WITH YOU?

23   A.   SO I ULTIMATELY WAS THE DECISION MAKER ON THIS.  I DID

24   HAVE OTHER, OTHER PEOPLE WHO HELPED EVALUATE THESE AS WELL.

25   Q.   WHO WERE THE OTHER --
```

1    A.   BUT THIS IS SOLELY MY RESPONSIBILITY.

2    Q.   THE BUCK STOPS THERE.  I GET IT.

3         BUT WHO HELPED YOU BEFORE THE BUCK STOPPED THERE?

4    A.   SO I HAD A COUPLE PEOPLE THAT, THAT WORKED ON IT WITH ME.

5    Q.   WHO?

6    A.   SO ONE OF THEM IS THE NAME JUSTIN WORKS, AND THE OTHER ONE

7    IS NAMED ANGELIE, AND I APOLOGIZE, I DON'T HAVE HER LAST NAME

8    DOWN.

9    Q.   AND WHO DO THEY WORK WITH?

10   A.   THEY BOTH WORK FOR THE ANALYSIS GROUP.

11   Q.   AND THE ANALYSIS GROUP HELPED YOU A LOT IN THIS CASE;

12   DIDN'T THEY?

13   A.   THEY ASSISTED ME IN THE CASE.

14   Q.   I THINK I ASKED YOU EARLIER, YOU BILLED $422,000 ON THIS

15   CASE YOURSELF.  THAT DOESN'T INCLUDE WHAT THE ANALYSIS GROUP

16   THAT WORKED WITH YOU BILLED, DID THEY?

17   A.   IT DOES NOT.

18   Q.   THEY SPENT MORE TIME ON THIS THAN YOU DID, DIDN'T THEY?

19   A.   I DON'T KNOW HOW MUCH TIME THEY SPENT.

20   Q.   THEY'VE GOT MORE PEOPLE WORKING ON IT THAN YOU, DON'T

21   THEY?

22   A.   MORE PEOPLE THAN ME?

23   Q.   YES.

24   A.   YES.

25   Q.   HOW MANY PEOPLE FROM ANALYSIS GROUP WORKED ON THIS?

1    A.   I HAVE NO IDEA.

2    Q.   UNNAMED PEOPLE FROM THE ANALYSIS GROUP THAT THIS JURY IS

3    NEVER GOING TO SEE WERE INVOLVED IN THE PROCESS OF DECIDING WHO

4    WAS CONFUSED; IS THAT RIGHT?

5    A.   THERE WERE TWO PEOPLE THAT WERE WORKING UNDER MY

6    DIRECTION.

7    Q.   LET ME ASK YOU SOME QUESTIONS ABOUT ANALYSIS GROUP.

8         I THINK WE'RE GOING TO BE HEARING MORE ABOUT THEM AS OTHER

9    DAMAGES EXPERTS COME FORWARD FOR SAMSUNG.

10        THEY ARE -- YOU ACTUALLY -- YOU'RE HELD OUT BY ANALYSIS

11   GROUP ON THEIR WEBSITE AS ONE OF THEIR EXPERTS; IS THAT RIGHT?

12   A.   I BELIEVE THEY HAVE LISTED ME AS SUCH.

13   Q.   AND YOUR RESUME IS UP THERE IF YOU GO AND LOOK; IS THAT

14   RIGHT?

15   A.   I HAVEN'T GONE AND LOOKED.

16   Q.   YOU'VE NEVER LOOKED AT YOUR RESUME THEY POSTED THERE?

17   A.   I HAVE NOT.

18   Q.   OKAY.  AND YOU'RE IDENTIFIED AS SOMEBODY WHOSE EXPERTISE

19   INCLUDES SURVEYS AND EXPERIMENTAL STUDIES; IS THAT RIGHT?

20   A.   I DON'T KNOW WHAT IT IS THEY HAVE LISTED UP THERE.

21   Q.   OKAY.  NOW, WE'VE -- I'VE SAID SEVERAL TIMES YOU DIDN'T

22   CHOOSE TO DO A CONJOINT STUDY OF YOUR OWN IN THIS CASE; IS THAT

23   RIGHT?

24   A.   THAT IS CORRECT.

25   Q.   AND I THINK IN YOUR DEPOSITION YOU SAID ONE OF THE REASONS

1    FOR THAT WAS THAT THE FEATURES HERE WERE TOO SMALL TO BE

2    SUBJECT TO A CONJOINT STUDY, THEY'RE SECONDARY FEATURES; IS

3    THAT RIGHT?

4    A.   I DON'T KNOW IF I USED THE WORD SECONDARY, BUT I'M

5    COMFORTABLE WITH THAT.  I THINK I SAID SECONDARY OR TERTIARY.

6    Q.   SECONDARY OR TERTIARY?

7         IN FACT, IF YOU GO TO THE ANALYSIS GROUP WEBSITE THAT

8    HOLDS YOU OUT AS ONE OF THEIR EXPERTS IN THE FIELD OF SURVEYS

9    AND EXPERIMENTAL STUDIES, IT TOUTS THEIR EXPERTISE IN CONJOINT

10   ANALYSIS, DOESN'T IT?

11   A.   I HAVE NOT GONE TO THEIR SITE, SO I CANNOT ANSWER THAT.

12   Q.   YOU'VE NEVER LOOKED THERE; IS THAT RIGHT?

13   A.   THAT IS CORRECT, SIR.

14   Q.   OKAY.  WOULD IT SURPRISE YOU TO LEARN THAT THAT WEBSITE

15   DESCRIBES THE ANALYSIS GROUP'S EXPERTISE IN CONJOINT STUDIES AS

16   INCLUDING THE ABILITY TO CONDUCT CONJOINT STUDIES DETERMINING

17   THE VALUES ASSOCIATED WITH OR DEMAND ASSOCIATED WITH SECONDARY

18   AND TERTIARY FEATURES?

19        MR. PRICE:  OBJECTION.  IT'S ASKING FOR HEARSAY AND

20   IRRELEVANT.

21        THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

22        THE WITNESS:  SO AS I'VE SAID, I'VE NEVER GONE TO

23   THEIR SITE, SO I DON'T KNOW WHAT SORT OF THINGS THEY LIST ON

24   THERE.

25   BY MR. BENNETT:

1      Q.   WOULD IT SURPRISE YOU TO LEARN THAT THAT'S WHAT IT SAYS?

2      A.   I DON'T KNOW THE NATURE OF WHAT THEY PUT UP THERE, BUT

3      I -- IT WOULD NOT SURPRISE ME THAT IT SAYS THEY HAVE CONJOINT

4      EXPERTISE.

5           I DON'T KNOW ABOUT THE SECONDARY OR TERTIARY COMMENT THAT

6      YOU ADDED.

7      Q.   ONE FINAL AREA.  YOU TALKED ABOUT, IN YOUR BOARD, YOU

8      TALKED ABOUT IRRATIONAL RESULTS FROM DR. HAUSER'S SURVEY.  DO

9      YOU RECALL THAT?

10     A.   WHAT KIND OF RESULTS?

11     Q.   INVALID RESULTS.

12     A.   INVALID RESULTS?

13     Q.   DO YOU RECALL THAT?  DO YOU RECALL MR. PRICE PUT UP A

14     GRAPHIC THAT TALKED ABOUT 68 PERCENT OF THE PEOPLE PREFERRING

15     HIGHER PRICES?

16     A.   I DO RECALL THAT.

17     Q.   YOU DIDN'T MEAN TO SUGGEST IN THAT TESTIMONY, DID YOU,

18     THAT ANY ONE OF THE 507 PEOPLE WHO PARTICIPATED IN DR. HAUSER'S

19     SURVEY, WHEN YOU LOOKED AT THE RAW DATA, HAD ACTUALLY MADE A

20     CHOICE THAT REFLECTED A PREFERENCE FOR A HIGHER PRICE?  YOU

21     DIDN'T MEAN TO SUGGEST THAT, DID YOU?

22     A.   WHAT I DID MEAN TO SUGGEST IS THAT --

23     Q.   CAN I ASK YOU TO ANSWER MY QUESTION AND THEN YOU CAN TELL

24     US AGAIN WHAT YOU MEANT?

25     A.   OKAY.

1    Q.   DID YOU MEAN TO SUGGEST THAT ANY ONE OF THE 507

2    PARTICIPANTS IN DR. HAUSER'S SMARTPHONE SURVEY WHO MADE CHOICES

3    HAD, HAD IN ANY SINGLE CHOICE, ANY ONE OF THE SINGLE CHOICES

4    THEY MADE IN THE RAW DATA REFLECTED A PREFERENCE FOR A HIGHER

5    PRICED PRODUCT, EVERYTHING ELSE BEING EQUAL?

6    A.   THEY -- THAT WAS NEVER A CHOICE THAT WAS GIVEN TO THEM.

7    Q.   OKAY.  THEY NEVER MADE SUCH A CHOICE, DID THEY?

8    A.   THEY NEVER MADE SUCH A CHOICE.

9         NOW CAN I GO AHEAD AND DESCRIBE WHAT I FOUND?

10   Q.   I'LL ASK YOU.  I THINK I'LL BRING IT.  WHAT YOU DID WAS

11   YOU DID AN ANALYSIS, OR MADE SOME PREDICTIONS OR ESTIMATIONS OF

12   THE DATA YOURSELF; IS THAT RIGHT?

13   A.   SO WHAT IT IS THAT I DID IS THE SAME TYPE OF ANALYSIS THAT

14   PROFESSOR HAUSER DID, AND I CREATED PART WORTHS, AND THAT IS A

15   VALUE FOR EACH LEVEL OF PRICE, AND FOR 68 PERCENT OF THE

16   RESPONDENTS, THERE WAS SOME TIME WHEN THE RESPONDENT HAD A

17   HIGHER VALUE FOR A HIGHER PRICE THAN FOR A LOWER PRICE.

18   Q.   OKAY.  BUT IN DOING THAT ESTIMATION, YOU REFERRED TO IT --

19   YOU TALKED ABOUT DR. HAUSER IN HIS STUDY IMPOSING A CONSTRAINT

20   AND THAT YOU RELIEVED THE -- IN YOUR RE-SIMULATION, YOU

21   BELIEVED THAT CONSTRAINT, OR SOMETHING TO THAT EFFECT.  DO YOU

22   REMEMBER THAT?

23   A.   I RAN IT EXACTLY THE WAY THAT DR. HAUSER DID, AND I ALSO

24   RAN IT, THERE'S AN OPTION WITHIN THE SAWTOOTH SOFTWARE TO RUN

25   IT WITHOUT THAT CONSTRAINT, AND I RAN IT WITHOUT THAT

1    CONSTRAINT TO CHECK TO SEE WHETHER OR NOT THAT CONSTRAINT WAS

2    VIOLATED IN REALITY.

3    Q.   AND DR. HAUSER HAD USED THE CONSTRAINT, WHICH IS A

4    CUSTOMARY WAY OF CONDUCTING A CONJOINT SURVEY; ISN'T THAT

5    RIGHT?

6    A.   THERE ARE MANY TIMES WHEN THAT CONSTRAINT IS USED AND IT

7    IS DONE BECAUSE YOU BELIEVE THAT IT IS SORT OF REMOVING SOME OF

8    THE NOISE AND YOU DO THAT WHEN YOU BELIEVE IT'S JUST A SMALL

9    PORTION OF THE INDIVIDUALS.

10   Q.   AND IF YOU'RE GOING TO REMOVE THAT CONSTRAINT, AS YOU DID,

11   BEFORE YOU PRESENT DATA RESULTING FROM THE OPERATIONS OF THE

12   MODEL WITHOUT THAT CONSTRAINT IMPOSED, YOU NEED TO DO A CHECK

13   FOR THE STATISTICAL VALIDITY OF YOUR RESULTS, DON'T YOU?

14   A.   IT WOULD BE A GOOD IDEA.

15   Q.   AND YOU HAVEN'T PRESENTED ANY SUCH RESULTS, HAVE YOU,

16   HERE?

17   A.   I DIDN'T PRESENT IT, BUT I WILL TELL YOU THAT THAT PERIOD

18   OF TIME IS A STATISTICALLY DIFFERENT SIGNIFICANTLY DIFFERENT

19   THAN ZERO; THAT IS, THERE'S A SIGNIFICANT NUMBER, STATISTICALLY

20   SIGNIFICANT NUMBER THAT DO EXHIBIT A PREFERENCE FOR A HIGHER

21   PRICE.

22   Q.   YOU HAVE NOT, IN YOUR REPORT OR IN YOUR DIRECT TESTIMONY

23   TODAY, DISCLOSED OR SHARED ANY STATISTICAL VALIDITY TESTS YOU

24   DID ON THE RESULTS THAT SUPPORT YOUR CONCLUSION THAT

25   DR. HAUSER'S STUDY LEADS TO INVALID TESTS; ISN'T THAT TRUE?

```
 1      A.   IN MY TESTIMONY --

 2      Q.   ISN'T THAT TRUE?

 3      A.   THAT IS TRUE.  IN MY TESTIMONY TODAY, I DID NOT DO THAT.

 4      IN MY CROSS, I JUST DID.

 5      Q.   IN YOUR REPORT, YOU DIDN'T DISCLOSE ANY OF THAT, DID YOU?

 6      A.   I DON'T BELIEVE I DID.

 7      Q.   SO WHAT YOU JUST SHARED ON CROSS WAS SOMETHING WE'VE HEARD

 8      FOR THE FIRST TIME, SIX MONTHS AFTER YOU FILED A HUNDRED -- 200

 9      PAGE REPORT IN WHICH THAT INFORMATION WAS NOT DISCLOSED.  FAIR

10      STATEMENT?

11      A.   FAIR STATEMENT.

12              MR. BENNETT:  NOTHING FURTHER.

13              THE WITNESS:  OKAY.

14              THE COURT:  TIME IS 11:14.  ALL RIGHT.  11:14.  GO

15      AHEAD, PLEASE.
```

**REDIRECT EXAMINATION**

```
17      BY MR. PRICE:

18      Q.   PROFESSOR REIBSTEIN, LET ME FIRST GO TO YOUR OWN PRE-TEST.

19      YOU WERE ASKED WHETHER OR NOT THERE WAS AN INCENTIVE ALIGNMENT

20      IN YOUR PRE-TEST.  DO YOU RECALL THAT?

21      A.   THAT'S CORRECT.

22      Q.   WERE YOU TRYING TO DUPLICATE, AS WELL AS YOU COULD,

23      PROFESSOR HAUSER'S PRE-TEST?

24      A.   I WAS TRYING TO DUPLICATE HIS PRE-TEST, THAT'S CORRECT.

25      Q.   AND WHAT'S THE PURPOSE OF THE PRE-TEST?
```

1    A.   THE PURPOSE OF THE PRE-TEST IS TO MAKE SURE THAT PEOPLE

2    UNDERSTAND THE QUESTIONS THAT ARE INCLUDED IN THE SURVEY SO

3    THAT YOU COULD DESIGN A SURVEY THAT YOU WOULD ADMINISTER TO A

4    LARGER SAMPLE AND IN A COMPREHENSIBLE WAY.

5    Q.   OKAY.  PROFESSOR HAUSER, IN HIS PRE-TEST TO SEE WHETHER OR

6    NOT THESE WERE UNDERSTANDABLE QUESTIONS, THESE NUANCES, DID HE

7    HAVE AN INCENTIVE ALIGNMENT IN THE PRE-TEST TO DETERMINE

8    WHETHER OR NOT THESE QUESTIONS ACTUALLY WERE UNDERSTANDABLE AS

9    UNDERSTOOD?

10   A.   I WOULD HAVE TO GO BACK AND LOOK, BUT I'M PRETTY SURE HE

11   DID NOT.

12   Q.   AND YOU WERE ASKED QUESTIONS ABOUT WHETHER OR NOT WE --

13   YOU KNOW, THERE WAS A DEMONSTRATIVE SHOWING THAT, THAT ACT OF

14   GOING THROUGH ALL OF THE INSTRUCTIONS AND VIDEOS, WHETHER OR

15   NOT THE RESPONDENTS, IN YOUR PRE-TEST, SAID THEY ALL UNDERSTOOD

16   WHAT THEY WERE SHOWN.  DO YOU RECALL THAT?

17   A.   I DO.

18   Q.   OKAY.  AND, IN FACT, DIDN'T YOU TESTIFY THAT THAT WAS, IN

19   FACT, WHAT THEY ALL SAID AFTER THEY SAW ALL OF THE VIDEOS?

20   A.   THERE WAS NO ONE WHO INDICATED THEY DID NOT UNDERSTAND IN

21   A YES/NO QUESTION.

22   Q.   SO IN A YES/NO QUESTION, NO ONE SHOWED A LACK OF

23   UNDERSTANDING; RIGHT?

24   A.   THAT'S CORRECT.

25   Q.   AND THAT'S WHAT PROFESSOR HAUSER FOUND?

1    A.    THAT'S EXACTLY WHAT PROFESSOR HAUSER DID.

2    Q.    AND THEN AFTER ACTUALLY MAKING THREE DECISIONS, GOING

3    THROUGH THREE SCREENS, THAT'S WHEN YOU EXPLORED, OR YOUR

4    MODERATORS EXPLORED WHAT THEIR UNDERSTANDING WAS?

5    A.    THAT'S CORRECT.

6    Q.    SO, FOR EXAMPLE, YOU SAID YOU RECALLED ONE GENTLEMAN WHO

7    SAID HE COULDN'T RECALL WHAT THE ICON WAS.  DO YOU REMEMBER

8    THAT?

9    A.    I DO.

10   Q.    OKAY.  NOW, DID HE SAY THAT AFTER HE HAD ALREADY MADE

11   THREE CHOICES?

12   A.    EXACTLY.  HE HAD GONE THROUGH, HE MADE THREE CHOICES, AND

13   THEN HE SAID THAT I DON'T RECALL WHAT THAT MEANS.

14   Q.    AND THERE WAS SOME MENTION ABOUT 454A, AND THIS IS THE

15   TRANSCRIPT OF ALL OF THE QUESTIONS AND ANSWERS CONCERNING THESE

16   PATENTS FEATURED; CORRECT?  I DON'T KNOW THAT I -- 454A?

17   A.    YES, THAT IS CORRECT.

18   Q.    IN FACT, IF WE PUT UP 454A, PAGE 2, LET'S BLOW UP THE LAST

19   ONE.

20         SO YOU INCLUDED IN THESE TRANSCRIPTS ARE QUESTIONS AND

21   ANSWERS WHERE THE CONCLUSION WAS THAT THERE WAS NO CONFUSION?

22   A.    THAT IS CORRECT.  SO YOU SEE HERE AN INDIVIDUAL I PUT AS

23   NOT BEING CONFUSED.

24   Q.    SO 454A CONTAINS THE QUESTIONS AND ANSWERS CONCERNING

25   THESE, THESE PATENTED FEATURES AND NON-INFRINGING ALTERNATIVES,

```
 1    BOTH THE ONES YOU SAID WERE CONFUSED OR JUDGED CONFUSED OR LACK

 2    OF UNDERSTANDING AND THOSE YOU DID NOT; RIGHT?

 3    A.   THAT'S CORRECT.

 4    Q.   SO THEY'RE ALL IN THERE; CORRECT?

 5    A.   ALL OF IT IS IN THERE.

 6    Q.   AND WITH RESPECT TO SDX 3230, THE ONLY ONE YOU WERE SHOWN

 7    BY OPPOSING COUNSEL IN HERE -- DO YOU RECALL THAT?

 8    A.   I DO.

 9    Q.   AND IN THE FIRST ANSWER HERE IT SAYS BACKGROUND SYNCING,

10    IT'S A BIG HELP BECAUSE YOU CAN SYNC EVERYTHING.

11         DO YOU SEE THAT?

12    A.   I DO.

13    Q.   AND YOU KNOW THAT DR. HAUSER'S DESCRIPTION OF THE PATENTED

14    FEATURE MEANT YOU COULD SYNC EVERYTHING AT ONCE?

15    A.   I -- NO, I DON'T BELIEVE IT WAS THAT YOU COULD SYNC

16    EVERYTHING AT ONCE.

17    Q.   AND IN ANY EVENT, IF THERE'S ANY DOUBT AS TO WHETHER OR

18    NOT SOMEONE APPEARED CONFUSED OR EXPLORATORY QUESTIONS WHERE

19    THEY DID SEEM TO HAVE A LACK OF UNDERSTANDING, CAN THE JURY

20    MAKE THEIR OWN DECISION BY LOOKING AT THE TRANSCRIPT HERE AND

21    DETERMINING WHETHER OR NOT THE PERSON SEEMED CONFUSED OR NOT?

22    A.   WHAT I HAVE DONE IS I'VE PROVIDED ALL THE TRANSCRIPTS SO

23    ONE COULD LOOK AT THAT, AND THAT IS AVAILABLE TO THE JURY.

24    Q.   OKAY.  AND YOU WERE ASKED ABOUT THE NON-INFRINGING

25    ALTERNATIVES, AND I THINK YOU SAID YOUR ONLY UNDERSTANDING CAME
```

1    FROM A LAWYER OR SOMETHING; RIGHT?

2    A.   CORRECT.  WELL, GO AHEAD.

3    Q.   NOW, WITH RESPECT TO YOUR PRE-TEST, OKAY, WHAT WAS YOUR

4    UNDERSTANDING -- WHAT DID YOU USE AS YOUR UNDERSTANDING OF THE

5    NON-INFRINGING ALTERNATIVE THAT WAS BEING TESTED?

6    A.   SO NOW IN THE PRE-TEST, THE ONLY THING I WAS LOOKING AT

7    WAS WHETHER OR NOT THEY UNDERSTOOD WHAT PROFESSOR HAUSER

8    PROVIDED AS THE DESCRIPTION.  SO IT WASN'T ANY OTHER

9    ALTERNATIVE, TECHNICAL OR POSSIBLE ALTERNATIVE.  IT WAS SIMPLY

10   WHAT IT IS THAT PROFESSOR HAUSER PROVIDED IN HIS INSTRUCTION

11   AND WHETHER OR NOT THEY COULD UNDERSTAND THOSE -- THAT

12   DESCRIPTION.

13   Q.   AND WHAT DID YOU MEAN WHEN YOU SAID THAT THESE 26

14   RESPONDENTS WERE SCREENED THE SAME WAY AS PROFESSOR HAUSER

15   SCREENED HIS PRE-TEST?

16   A.   SO THERE WAS -- PROFESSOR HAUSER HAS A SAMPLE THAT HE'S

17   DRAWN AND HE HAS CRITERIA FOR THAT, AND I USED THE SAME

18   CRITERIA THAT HE USED.

19   Q.   YOU WERE ASKED A NUMBER OF TIMES ABOUT YOU NOT DOING YOUR

20   OWN CONJOINT?

21   A.   CORRECT.

22   Q.   AFTER YOUR RESEARCH INTO THIS MARKETPLACE, YOU KNOW, DO

23   YOU BELIEVE IT WOULD HAVE BEEN APPROPRIATE TO DO A CONJOINT TO

24   FIND OUT A, A WILLINGNESS TO BUY COMPARING THE ALLEGED PATENTED

25   FEATURE VERSUS THE ALLEGED NON-INFRINGING ALTERNATIVE?

1    A.   SO MAYBE I DIDN'T MAKE IT CLEAR IN MY FIRST POINT THAT WE

2    HAD UP THERE.  I DO NOT BELIEVE CONJOINT IS THE RIGHT TOOL AND

3    COULD NOT BE USED TO ESTIMATE WILLINGNESS TO BUY WHEN WE'RE

4    DEALING WITH VERY OBSCURE, SECONDARY OR TERTIARY DIMENSIONS AND

5    THE DISTINCTION BETWEEN THE FEATURE AND THE NON-INFRINGING

6    FEATURE IN THE ABSENCE OF THE DRIVERS.

7    Q.   AND YOU SAY OBSCURE.  YOU'RE TALKING ABOUT THE DIFFERENCES

8    BETWEEN THEM?

9    A.   I'M TALKING ABOUT THE DIFFERENCES.

10   Q.   AND WITH RESPECT TO CONJOINT, YOU WERE ASKED QUESTIONS

11   ABOUT YOUR EXPERTISE, AND I'D LIKE TO PUT UP SDX 3132 AND JUST

12   ASK YOU, HOW MANY OF THESE COMPANIES DID YOU DO CONJOINT

13   STUDIES FOR?

14   A.   SO I DON'T RECALL THE SPECIFIC NUMBER, BUT I DID A

15   CONJOINT FOR AT&T AND FOR HEWLETT-PACKARD, FOR INTEL, FOR

16   JOHNSON & JOHNSON AND MAYBE SEVERAL OTHERS.

17   Q.   AND THESE FOLKS, THESE COMPANIES YOU FIGURE PROBABLY COULD

18   HAVE HIRED ANYBODY IN THE WORLD TO DO THEIR CONJOINT STUDIES?

19   A.   THEY HAD A CHOICE OF MANY PEOPLE TO DO THAT.

20   Q.   AND WE'VE TALKED ABOUT YOUR RATE FOR TESTIFYING.  WHAT'S

21   YOUR RATE FOR CONSULTING?

22   A.   SO FOR CONSULTING, IT'S BETWEEN $2,000 AND $3,000 PER

23   HOUR.

24   Q.   YOU WERE ASKED A QUESTION ABOUT MR. WAGNER.  IS YOUR -- DO

25   YOU KNOW THAT MR. WAGNER IS AN ACCOUNTANT?

```
1    A.   HE'S A WHAT?

2    Q.   AN ACCOUNTANT?

3    A.   I DO NOT KNOW THAT.

4    Q.   OKAY.  WITH RESPECT TO -- YOU WERE ASKED A QUESTION ABOUT

5    WHETHER OR NOT IT WAS RATIONAL TO LISTEN TO THE CARRIERS AND

6    WHAT THEY WANTED IN A USER INTERFACE.  DO YOU RECALL THAT?

7    A.   I DO.

8    Q.   SO LET ME ASK YOU THIS:  IF A COMPANY WAS GETTING INTO A

9    MARKET LATE AND WANTED A GOOD USER INTERFACE FOR A SMARTPHONE,

10   WOULD IT BE RATIONAL TO TURN TO GOOGLE AND TO USE THE ANDROID

11   UNIVERSAL INTERFACE DEVELOPED BY THE ENGINEERS IN MOUNTAIN VIEW

12   AT GOOGLE?  WOULD THAT BE A RATIONAL CHOICE?

13             MR. BENNETT:  OBJECTION.  SCOPE AND QUALIFICATION TO

14   BE ADDRESS THESE INDUSTRY --

15             MR. PRICE:  FOLLOWS UP WITH WHAT HE ASKED HIM.

16             THE COURT:  OVERRULED.

17        GO AHEAD, PLEASE.

18   BY MR. PRICE:

19   Q.   WOULD THAT BE A RATIONAL DECISION, IF YOU THINK YOU'RE

20   GETTING INTO THE MARKET, TO TURN TO THE FOLKS IN MOUNTAIN VIEW

21   WHO ARE SPECIALIZED IN DEVELOPING USER INTERFACE, THE FOLKS AT

22   GOOGLE, AND USE ANDROID?

23   A.    THAT WOULD SEEM TO BE A LOGICAL OPTION FOR THEM, YES.

24   Q.   OH, YOU WERE ASKED ABOUT MAJOR FEATURES VERSUS NON-MAJOR

25   FEATURES AND YOU WERE SHOWN A CLIP, A LITTLE CLIP FROM
```

1          MR. LOCKHEIMER FROM GOOGLE ABOUT SYNCING.

2               DO YOU KNOW WHETHER OR NOT HE WAS TESTIFYING ABOUT WHAT

3     APPLE CLAIMED TO OWN AS BACKGROUND SYNCING OR WHETHER OR NOT HE

4     WAS TESTIFYING ABOUT GOOGLE'S VIEW OF ITS BACKGROUND SYNCING IN

5     GENERAL?

6     A.   SO I JUST SAW THAT EXCERPT.  I DON'T KNOW THE CONTEXT IN

7     WHICH HE WAS TESTIFYING TO THAT.

8     Q.   AND WHEN YOU WERE LOOKING AT MAJOR DRIVERS, YOU ACTUALLY

9     DEVELOPED A SLIDE WHICH, WHICH DEPICTED FEATURES THAT WERE

10    MENTIONED IN THE REVIEW SITES THAT YOU LOOKED AT THAT COMPARED

11    PHONES; CORRECT?

12    A.   THAT IS CORRECT.

13    Q.   IF WE CAN PUT UP SDX 3169, THIS IS -- MAYBE WE CAN BLOW IT

14    UP -- THIS IS A DEMONSTRATIVE THAT YOU DEVELOPED TO SHOW THE

15    FEATURES THAT WERE MENTIONED IN THESE COMPARISONS OF PHONES;

16    CORRECT?

17    A.   THIS IS A, A LIST WITH ALL THE FEATURES THAT WERE IN THESE

18    11 DIFFERENT COMPARISON SHOPPING SITES.

19    Q.   AND THE ONES IN BOLD, WHAT'S THE -- WHAT ARE THOSE?

20    A.   THOSE ARE THE ONES THAT APPEARED IN THREE OR MORE OF THE

21    COMPARISON SITES.

22    Q.   OKAY.

23    A.   AND SO THOSE SITES OBVIOUSLY THOUGHT THOSE WERE MORE

24    IMPORTANT FOR CUSTOMERS IN THEIR DECISION PROCESS.

25    Q.   LET'S GO BACK.  AND YOU'VE GOT A COUPLE THAT ARE IN RED.

1      WHAT DOES THIS INDICATE?

2      A.   THE ONES THAT ARE HIGHLIGHTED IN RED THERE, OR ENCASED IN

3      RED, ARE THE ONES THAT PROFESSOR HAUSER DID USE IN HIS CONJOINT

4      AS DISTRACTION FEATURES.

5      Q.   AND THE OTHER BOLD ONES, THESE DRIVING FEATURES WERE NOT

6      IN THE CONJOINT STUDY; CORRECT?

7      A.   AND NONE OF THE OTHER BOLD ONES ARE IN HIS PARTICULAR

8      CONJOINT.

9      Q.   AND HOW ABOUT THE FEATURES THAT APPLE'S PARTICULAR, YOU

10     KNOW, ALLEGED PATENTED WAY OF DOING SOMETHING?  I MEAN, APPLE'S

11     PARTICULAR CLAIM, IS THAT FUNCTIONALITY PART OF THIS?

12     A.   SO NONE OF THE ACCUSED FEATURES, NOR THEIR ALTERNATIVE WAY

13     OF DELIVERING, IS LISTED ON ANY OF THESE SITES.

14     Q.   OKAY.  DID YOU NEED TO TALK TO PEOPLE AT SAMSUNG TO STUDY

15     PROFESSOR HAUSER'S SURVEY?

16     A.   NEVER -- THAT WOULD NOT BE NECESSARY AT ALL.

17     Q.   DID YOU NEED TO TALK TO PEOPLE AT SAMSUNG TO COME TO THE

18     CONCLUSION THAT A CONJOINT ANALYSIS IN THIS MARKET ON THESE

19     TYPES OF FEATURES WOULD BE AN INAPPROPRIATE WAY TO ANALYZE THE

20     SITUATION?

21     A.   ABSOLUTELY NOT.

22     Q.   AND SO WHY ISN'T IT THAT EVEN THOUGH YOU'VE DONE CONJOINT

23     STUDIES FOR MAJOR COMPANIES AND YOU'VE REVIEWED ARTICLES ABOUT

24     THEM AND WRITTEN ARTICLES, WHY ISN'T IT YOU HAVEN'T FOCUSSED

25     YOUR ENTIRE CAREER ON CONJOINT STUDIES?

1   A.   BECAUSE I THINK CONJOINT IS A USEFUL TOOL FOR SOME

2   PURPOSES.

3        BUT I DO NOT BELIEVE IT IS A USEFUL TOOL FOR EVERY

4   PROBLEM, AND I DO NOT BELIEVE THAT IT IS A USEFUL TOOL TO

5   ADDRESS THE MARKET OUTCOME QUESTION, THE WILLINGNESS TO BUY

6   QUESTION THAT IS BEING UTILIZED IN THIS CASE AND ADDRESSED IN

7   THIS CASE.

8        MR. PRICE:  ONE SECOND, YOUR HONOR.

9        (PAUSE IN PROCEEDINGS.)

10       MR. PRICE:  NOTHING FURTHER, YOUR HONOR.

11       THE COURT:  ALL RIGHT.  THE TIME IS NOW 11:27.  IS

12   THERE ANY REDIRECT.

13       MR. BENNETT:  VERY BRIEFLY.

14       THE COURT:  OR RECROSS.  EXCUSE ME.

15                      **RECROSS-EXAMINATION**

16   BY MR. BENNETT:

17   Q.   MR. REIBSTEIN, VERY BRIEFLY.  DON'T PUT YOUR CONSULTANT

18   RATE ON YET.

19   A.   OKAY.

20   Q.   STICK WITH THE TESTIMONY RATE.

21       SIR, YOU -- MR. PRICE JUST SHOWED YOU A LIST OF ALL THE

22   FEATURES AND PHONES AND SO FORTH.

23       YOU RECALL THAT DR. HAUSER, ON HIS -- THE CHOICE PAGE OF

24   HIS STUDY, AT THE BOTTOM OF THE LISTS OF ALL THE PHONES, HE

25   TELLS THE PARTICIPANTS TO ASSUME THAT THE PHONE YOU'RE CHOOSING

1    FROM INCLUDES ALL OF THE OTHER FEATURES OF YOUR CURRENT PHONE;

2    ISN'T THAT RIGHT.

3    A.   THAT IS CORRECT.

4    Q.   IT WOULD INCLUDE ALL THE OTHER FEATURES THAT YOU'RE

5    TALKING ABOUT, MAJOR, MINOR, WHATEVER THE SAMSUNG PHONE OWNER

6    WHO PARTICIPATED IN THAT SURVEY HAD ON THEIR PHONE; RIGHT?

7    A.   THAT IS CORRECT.  THAT IS WHAT HE DID.

8    Q.   AND YOU WERE ASKED A SERIES OF QUESTIONS ABOUT, AGAIN, WHY

9    YOU DIDN'T DO A CONJOINT STUDY HERE AND WHY YOU THINK IT'S

10   INAPPROPRIATE.

11        LET ME ASK YOU, HAVE YOU EVER HEARD OF A FEATURE CALLED

12   PHOTO GALLERY BOOKMARK.

13   A.   YES, I HAVE.

14   Q.   IS THAT A MAJOR FEATURE IN A SMARTPHONE?

15   A.   IT IS -- IT'S NOT ONE THAT I WOULD THINK IS A MAJOR

16   FEATURE, NO.

17   Q.   EVER HEARD OF E-MAIL PHOTO?

18   A.   IS THAT E-MAILING A PHOTO?

19   Q.   I DON'T KNOW.  HAVE YOU EVER HEARD THAT TERM, E-MAIL

20   PHOTO?  LET'S ASSUME THAT'S WHAT IT IS?

21   A.   I HAVE HEARD OF THAT TERM, BUT I DON'T KNOW EXACTLY WHAT

22   THAT MEANS.

23   Q.   DO YOU CONSIDER THAT TO BE A MAJOR FEATURE IN A

24   SMARTPHONE?

25   A.   IF IT WAS E-MAILING A PHOTO, I THINK PEOPLE DO FIND THAT

1    IMPORTANT, BUT I HAVEN'T GONE OUT AND MEASURED THAT.

2    Q.   HOW ABOUT WINDOW DIVIDING, DO YOU KNOW WHAT THAT IS?  HAVE

3    YOU EVER HEARD OF IT?

4    A.   I HAVE HEARD OF IT.

5    Q.   DO YOU THINK THAT'S A MAJOR FEATURE IN A SMARTPHONE?

6    A.   I DO NOT KNOW IF IT'S A MAJOR FEATURE.

7    Q.   HAVE YOU EVER HEARD OF MUSIC IN BACKGROUND?

8    A.   I HAVE HEARD OF MUSIC IN BACKGROUND.

9    Q.   IS THAT A MAJOR FEATURE IN A SMARTPHONE?

10   A.   AGAIN, I DON'T KNOW IF IT'S A MAJOR FEATURE.

11   Q.   DO YOU KNOW WHO DR. SUKUMAR IS?

12   A.   I DO NOT.

13   Q.   YOU NEVER HEARD HIS NAME BEFORE?

14   A.   I HAVE NOT.

15   Q.   DID ANYBODY EVER TELL YOU THAT SAMSUNG, IN RELATED

16   LITIGATION IN WHICH THEY WERE SUING APPLE BY WAY OF

17   COUNTERCLAIM, AS HERE, ACCUSING THESE FEATURES IN THE IPHONE

18   THAT I JUST ENUMERATED OF VIOLATING THEIR PATENTS, COMMISSIONED

19   DR. SUKUMAR TO DO A CONJOINT STUDY ON THOSE FEATURES?

20        MR. PRICE:  I'M GOING TO OBJECT.  THAT'S WAY BEYOND

21   THE SCOPE.

22        MR. BENNETT:  HE GOT INTO THIS ON REDIRECT, YOUR

23   HONOR, SPECIFICALLY.

24        THE COURT:  OVERRULED.

25      GO AHEAD.

```
 1                    THE WITNESS:  SO I -- I BRIEFLY WAS TOLD SOMETHING

 2    ABOUT THIS.

 3    BY MR. BENNETT:

 4    Q.   WHO TOLD YOU THAT?

 5    A.   SO IT WAS SOMEONE -- SO THAT WAS SHOWN TO ME VERY BRIEFLY

 6    BY SAMSUNG COUNSEL.

 7    Q.   LOOK AT EXHIBIT 213 IN YOUR BINDER.

 8    A.   THAT'S PTX 213.

 9    Q.   PTX 213.

10    A.   OKAY.

11    Q.   IS THAT THE CONJOINT REPORT BY DR. SUKUMAR THAT WAS SHOWN

12    TO YOU BRIEFLY BY SAMSUNG COUNSEL?

13    A.   I CAN'T -- I CAN'T TELL BECAUSE I -- I WAS VERY BRIEFLY

14    TOLD ABOUT THIS.  I DON'T KNOW.

15    Q.   YOU CAN'T EXCLUDE THAT THIS IS WHAT YOU WERE SHOWN?

16    A.   I CAN'T EXCLUDE THAT THIS WAS WHAT I WAS SHOWN.

17                    MR. BENNETT:  I WOULD MOVE EXHIBIT 213, YOUR HONOR.

18                    MR. PRICE:  OBJECTION, 403.

19         (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

20                    THE COURT:  WHAT'S THE OBJECTION?

21                    MR. PRICE:  403.  IT'S AN ENTIRE EXPERT REPORT

22    THEY'RE PUTTING IN FROM ANOTHER CASE, THE ENTIRE THING, WHICH

23    WASN'T EVEN USED TO CALCULATE DAMAGES.

24                    THE COURT:  ALL RIGHT.  IT'S NOT GOING TO BE ADMITTED

25    UNDER 403, BUT YOU CAN CROSS ON IT.
```

1          MR. BENNETT:  OKAY.  I THINK THE CROSS WILL BE SHORT.

2    Q.   YOU HAVEN'T STUDIED THIS ENOUGH TO ANALYZE WHAT IT TELLS

3    YOU OR THE LADIES AND GENTLEMEN OF THIS JURY ABOUT SAMSUNG'S

4    ENDORSEMENT OF THE USE OF CONJOINT STUDIES IN PATENT LITIGATION

5    LIKE THIS ON MINOR FEATURES; ISN'T THAT TRUE?

6    A.   I -- THE ANSWER IS I HAVE NOT -- I DON'T KNOW IF THEY EVEN

7    USED THIS TO TRY AND ESTIMATE WILLINGNESS TO BUY, AND THAT'S

8    WHAT THE CRUX OF IT IS.

9         I DO BELIEVE IT'S POSSIBLE TO USE CONJOINT TO MEASURE

10   IMPORTANCE, BUT I DON'T BELIEVE IT'S -- WHEN YOU'RE DOING MINOR

11   FEATURES, THAT YOU CAN USE IT TO ESTIMATE WILLINGNESS TO BUY.

12   Q.   IMPORTANCES ARE MEASURES OF DEMAND AT SOME LEVEL, AREN'T

13   THEY?

14   A.   THAT THEY DO NOT DETERMINE WHETHER OR NOT YOU'RE WILLING

15   TO BUY RELATIVE TO THE OTHER DIMENSIONS THAT MIGHT BE OMITTED.

16          MR. BENNETT:  NOTHING FURTHER, YOUR HONOR.

17          MR. PRICE:  I HAVE FOLLOW UP.

18          THE COURT:  ALL RIGHT.  GO AHEAD.  LET ME GET THE

19   TIME.  IT'S 11:31.  GO AHEAD, PLEASE.

20                    **FURTHER REDIRECT EXAMINATION**

21   BY MR. PRICE:

22   Q.   EXACTLY.  CONJOINTS CAN BE USED IN SOME CIRCUMSTANCES,

23   CAN'T THEY?

24   A.   YOU'VE HEARD ME TESTIFY THAT I HAVE USED THEM, YES.

25   Q.   CAN THEY BE USED IN CIRCUMSTANCES LIKE THIS WHERE YOU'RE

1    TRYING TO CALCULATE WILLINGNESS TO BUY?

2    A.   I THINK IN THIS CASE THEY WOULD NOT BE THE APPROPRIATE

3    TOOL, SO NO.

4    Q.   AND WITH RESPECT TO THE REPORT YOU WERE JUST ASKED ABOUT,

5    DO YOU KNOW WHETHER OR NOT THAT REPORT AT ALL EVEN ATTEMPTED TO

6    CALCULATE WILLINGNESS TO BUY TO ESTIMATE HOW FEW, YOU KNOW,

7    WHETHER PURCHASERS WOULD NOT BUY SOMETHING IF SOMETHING WASN'T

8    IN THE PHONE?

9    A.   I HAVE NOT REVIEWED THE REPORT FULLY, BUT I BELIEVE NO.

10   Q.   DO YOU KNOW IF ANYONE EVER EVEN ATTEMPTED TO CALCULATE

11   DAMAGES BASED UPON THAT REPORT?

12   A.   I DON'T BELIEVE THAT THEY DID, BUT I HAVEN'T REVIEWED IT

13   IN ITS ENTIRETY.

14   Q.   AND FOR SDX 3169, WHICH WE SHOWED YOU, YOU WERE JUST

15   ASKED, DIDN'T PROFESSOR HAUSER SAY, YOU KNOW, ASSUME -- MAKE AN

16   ASSUMPTION ABOUT EVERYTHING BEING EQUAL, OR EVERYTHING IN YOUR

17   PHONE -- WHAT WAS THE EXACT QUESTION?

18   A.   ASSUME ALL OTHER FEATURES NOT LISTED HERE ARE -- I MEAN,

19   THIS ISN'T THE EXACT WORDING, BUT ASSUME ALL THE OTHER FEATURES

20   ARE IDENTICAL.

21   Q.   OKAY.  DOES THAT HAVE ANYTHING AT ALL TO DO WITH YOUR

22   CRITICISM THAT CONJOINT STUDIES FOR ESTIMATING MARKETING

23   OUTCOMES HAS TO INCLUDE MAJOR FEATURES IN THE STUDY?

24   A.   NO.  NO, IT DOES NOT.

25   Q.   OKAY.  IN FACT, DID YOU HEAR -- DOES PROFESSOR HAUSER

1    AGREE WITH THAT, THAT SAYING HOLDING EVERYTHING CONSTANT IS NOT

2    THE SAME AS INCLUDING THE FEATURE IN YOUR STUDY?

3    A.   BECAUSE IN THE REAL WORLD, THINGS AREN'T HELD CONSTANT.

4    WE DO HAVE VARIANCES ACROSS ALL THOSE OTHER DIMENSIONS, AND

5    THAT'S WHY THEY'RE LISTED IN THE COMPARISON SHOPPING SITES.

6    Q.   I MEAN, FOR EXAMPLE, IN THIS STUDY, PROFESSOR HAUSER DID

7    INCLUDE SCREEN SIZE; RIGHT?

8    A.   HE DID INCLUDE SCREEN SIZE.

9    Q.   THAT'S A MAJOR FEATURE; RIGHT?

10   A.   YES.

11   Q.   SO MY QUESTION THEN IS, IF YOU'RE GOING TO HAVE A CONJOINT

12   STUDY THAT'S USABLE FOR ESTIMATING MARKET OUTCOMES AND

13   WILLINGNESS TO BUY, DO YOU HAVE TO INCLUDE THOSE FEATURES IN

14   THE STUDY ITSELF SO THAT IT'S PART OF A CHOICE SET THAT THE

15   CONSUMERS ARE USING IN DECIDING WHETHER OR NOT TO BUY A PHONE?

16   A.   IT TAKES ME BACK TO THE AUTOMOBILE EXAMPLE.  I CAN'T

17   PREDICT WHAT KIND OF CARS PEOPLE ARE GOING TO BUY WITHOUT

18   HAVING THE MAJOR FEATURES INCLUDED.

19         MR. PRICE:  NOTHING FURTHER.

20         THE COURT:  ALL RIGHT.  THE TIME IS NOW 11:34.  IS

21   THERE GOING TO BE ANY FURTHER --

22         MR. BENNETT:  NO.  IT'S GOT TO STOP SOME TIME, YOUR

23   HONOR.

24         THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED

25   AND IS IT SUBJECT TO RECALL OR NOT?

1      MR. PRICE:  NOT -- UNFORTUNATELY, NOT.

2      THE COURT:  OKAY.  NOT SUBJECT TO RECALL; CORRECT?

3      MR. BENNETT:  CORRECT.

4      THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED AND YOU

5  MAY STEP DOWN.

6      (PAUSE IN PROCEEDINGS.)

7      MS. MAROULIS:  YOUR HONOR, SHOULD WE PROCEED THE NEXT

8  WITNESS IS BY DEPOSITION.

9      THE COURT:  YES, PLEASE.  GO AHEAD.  THE TIME IS NOW

10  11:35.

11      MS. MAROULIS:  SAMSUNG CALLS BY DEPOSITION GARY HALL,

12  WHO'S A FORMER EMPLOYEE AT MICROSOFT.

13      THE COURT:  ALL RIGHT.  WOULD YOU LOWER THE LIGHTS,

14  PLEASE.  THANK YOU.

15      **(THE VIDEOTAPED DEPOSITION OF GARY HALL WAS PLAYED IN OPEN**

16  **COURT OFF THE RECORD.)**

17      THE COURT:  ALL RIGHT.  THE TIME IS 11:42.  DO YOU

18  WANT TO LODGE THE TRANSCRIPT?

19      MS. MAROULIS:  WE'RE LODGING THIS AS DX 514.  THANK

20  YOU.

21      THE COURT:  DX 514 IS JUST LODGED.

22      ALL RIGHT.

23      MR. PAK:  YOUR HONOR, THIS MORNING WE CALL JEFFREY

24  CHASE TO THE STAND ON BEHALF OF SAMSUNG.

25      (PAUSE IN PROCEEDINGS.)

```
 1                    MR. MCELHINNY:  YOUR HONOR?

 2                    THE COURT:  YES.

 3                    MR. MCELHINNY:  THAT'S NOT THE ROLLING SEVEN WE WERE

 4        GIVEN, SO THEY HAD ANOTHER WITNESS IN BETWEEN.  ARE THEY NOT

 5        CALLING MR. WINSHIP?

 6                    MR. PAK:  WE'RE NOT CALLING MR. WINSHIP.

 7                    THE COURT:  ALL RIGHT.

 8                    MR. PAK:  THANK YOU.

 9                    THE CLERK:  WOULD YOU STAND AND RAISE YOUR RIGHT

10        HAND, PLEASE.

11             (DEFENDANTS' WITNESS, JEFFREY CHASE, WAS SWORN.)

12                    THE WITNESS:  I DO.

13                    THE CLERK:  HAVE A SEAT, PLEASE.

14             PULL THE MICROPHONE TOWARDS YOU AND STATE YOUR NAME AND

15        SPELL IT.

16                    THE WITNESS:  MY NAME IS JEFFREY CHASE.

17        J-E-F-F-R-E-Y, C-H-A-S-E.

18                    THE COURT:  ALL RIGHT.  THE TIME IS NOW 11:44.  GO

19        AHEAD, PLEASE.

20                          DIRECT EXAMINATION

21        BY MR. PAK:

22        Q.   GOOD MORNING, DR. CHASE.

23        A.   GOOD MORNING.

24        Q.   CAN YOU TELL US WHERE YOU'RE FROM?

25        A.   I'M FROM DURHAM, NORTH CAROLINA.
```

```
1      Q.   AND WHAT DO YOU DO FOR A LIVING, DR. CHASE?

2      A.   I'M A PROFESSOR OF COMPUTER SCIENCE AT DUKE UNIVERSITY.

3      Q.   AND HOW LONG HAVE YOU BEEN DOING THAT?

4      A.   THIS IS MY 20TH YEAR.

5      Q.   AND HAVE YOU PREPARED SOME SLIDES TO HELP US WITH YOUR

6      PRESENTATION?

7      A.   YES, I HAVE.

8      Q.   PUT UP THE FIRST SLIDE, MR. KOTARSKI.

9           WHILE WE'RE PUTTING UP, DR. CHASE, CAN YOU TELL US BRIEFLY

10     WHAT YOU DO AS A PROFESSOR OF COMPUTER SCIENCE AT DUKE?

11     A.   WELL, I TEACH GRADUATE AND UNDERGRADUATE COURSES IN

12     COMPUTER SCIENCE, PRIMARILY IN OPERATING SYSTEMS, DISTRIBUTED

13     SYSTEMS, NETWORKS, AND I DO RESEARCH IN THOSE AREAS AS WELL,

14     FOCUSSING PRIMARILY ON CLOUD COMPUTING.

15     Q.   THE NEXT SLIDE.  AND, DR. CHASE, WHAT DEGREES DO YOU HAVE?

16     A.   WELL, I HAVE A PH.D. IN COMPUTER SCIENCE FROM THE

17     UNIVERSITY OF WASHINGTON UP IN SEATTLE.

18     Q.   AND DO YOU HAVE ANY EXPERIENCE IN THE COMPUTER SOFTWARE

19     INDUSTRY?

20     A.   YES.  AFTER UNDERGRADUATE, I WORKED FOR A FEW YEARS FOR A

21     COMPANY CALLED DIGITAL EQUIPMENT CORPORATION, CONTINUED TO WORK

22     FOR THEM IN GRADUATE SCHOOL, AND I ALSO SPENT A YEAR AT H-P

23     LABS UP THE ROAD IN PALO ALTO.

24     Q.   AND, DR. CHASE, HAVE YOU PUBLISHED ANY PAPERS ON YOUR

25     RESEARCH?
```

```
 1     A.   YES.  I HAVE OVER 100 PUBLICATIONS AND PEER REVIEWED

 2     CONFERENCES AND JOURNALS IN VARIOUS AREAS.

 3     Q.   AND, DR. CHASE, TO QUALIFY YOU AS AN EXPERT, I'D LIKE TO

 4     ASK IF YOU'VE WON ANY SIGNIFICANT AWARDS FROM YOUR COLLEAGUES?

 5     A.   A NUMBER OF MY PAPERS HAVE WON VARIOUS HONORS OR AWARDS

 6     FROM THE FORUMS THAT THEY WERE PRESENTED IN.

 7          ONE THAT I'M PROUD OF IS ONE OF MY PAPERS WAS MOST

 8     RECENTLY SELECTED AS ONE OF THE BEST 20 PAPERS IN 20 YEARS FOR

 9     HIGH PERFORMANCE DISTRIBUTING COMPUTING, AND SOME OF OUR

10     RESEARCH RECENTLY WON AN INNOVATION IN NETWORKING AWARD FROM

11     CENIC, C-E-N-I-C, WHICH IS THE CONSORTIUM, CALIFORNIA

12     CONSORTIUM FOR ADVANCED NETWORKING.

13     Q.   AND ALL TOLD, DOCTOR, HOW MANY YEARS OF EXPERIENCE DO YOU

14     HAVE IN THE FIELD OF '414 PATENT?

15     A.   I'VE BEEN BUILDING SOFTWARE AND RESEARCHING SOFTWARE IN

16     ACADEMIA AND INDUSTRY FOR 32 YEARS.

17          MR. PAK:  YOUR HONOR, WE'D LIKE TO MOVE TO QUALIFY

18     DR. CHASE AS AN EXPERT IN THE FIELD OF COMPUTER SCIENCE,

19     NETWORK COMPUTING, AND DATA SYSTEMS.

20          MS. KREVANS:  NO OBJECTION, YOUR HONOR.

21          THE COURT:  ALL RIGHT.  SO CERTIFIED.  GO AHEAD,

22     PLEASE.

23     BY MR. PAK:

24     Q.   DR. CHASE, ARE YOU BEING COMPENSATED FOR YOUR TIME TODAY

25     AND ALSO WORK ON THIS CASE?
```

1    A.    YES.

2    Q.    AND WHAT IS YOUR RATE?

3    A.    MY STANDARD CONSULTING RATE IS $650 AN HOUR.

4    Q.    DOES YOUR COMPENSATION DEPEND AT ALL ON THE OUTCOME OF

5    THIS LITIGATION?

6    A.    NO, IT DOES NOT.

7    Q.    DR. CHASE, LET'S JUMP TO THE ISSUE OF NON-INFRINGEMENT FOR

8    THE '414 PATENT.

9          CAN YOU PUT UP SDX 3617?

10         CAN YOU REMIND US AGAIN WHAT THE '414 PATENT IS DIRECTED

11   TOWARD?

12   A.    WELL, THIS IS THE -- THE '414 PATENT IS THE PATENT THAT

13   APPLE REFERS TO AS BACKGROUND SYNC.

14   Q.    AND WAS BACKGROUND SYNCHRONIZATION SOMETHING THAT WAS

15   FAMILIAR TO THOSE OF SKILL IN THE ART IN 2007 WHEN THE '414

16   PATENT APPLICATION WAS FIRST FILED?

17   A.    YES, VERY MUCH SO.  THERE WERE A NUMBER OF SYSTEMS THAT

18   DID BACKGROUND SYNC.  WE JUST HEARD MR. HALL TESTIFY ABOUT

19   THAT.

20         IN GENERAL, EVERYBODY IS FAMILIAR WITH THE IDEA THAT

21   YOU'RE USING AN E-MAIL APPLICATION, OR ANOTHER APPLICATION, AND

22   DING, YOU'VE GOT MAIL.  MAIL COMES IN.

23         SO THAT'S A COMMON EXAMPLE OF BACKGROUND SYNC, AND THERE

24   ARE OTHER EXAMPLES THAT HAVE BEEN AROUND FOR MANY YEARS.

25   Q.    DR. CHASE, WE'VE HANDED YOU A BINDER AND IT'S GOT SOME OF

1     THE DOCUMENTS THAT WE'LL WALK THROUGH TODAY.  THERE'S A COPY OF

2     THE PATENT, JX 7.  I'M GOING TO REFER TO THAT FROM TIME TO

3     TIME.

4          THERE'S ALSO A COPY OF THE FILE HISTORY FOR THE '414

5     PATENT AT JX 8.  DO YOU -- THAT'S THE THICK BINDER.

6     A.   AH.

7               MR. PAK:  YOUR HONOR, MAY I --

8               THE WITNESS:  I DON'T THINK I HAVE JX 8.

9               MR. PAK:  YOUR HONOR, MAY I APPROACH THE WITNESS?

10              THE COURT:  PLEASE, GO AHEAD AND HELP HIM OUT.

11    BY MR. PAK:

12    Q.   WE'LL REFER TO THAT AFTER THE BREAK AFTER LUNCH,

13    DR. CHASE.

14    A.   THANK YOU.

15    Q.   TURN TO SDX 3631.  WHAT IS IT YOUR UNDERSTANDING OF WHICH

16    CLAIM HAS BEEN ASSERTED AGAINST THE SAMSUNG PRODUCTS IN THIS

17    CASE?

18    A.   APPLE HAS ASSERTED CLAIM 20, WHICH DEPENDS FROM CLAIM 11.

19    SO IT INCLUDES THE LIMITATIONS OF CLAIM 11.

20    Q.   SO WE HAVE CLAIM 20 HERE, BUT WE ALSO HAVE ON THE BOARD

21    THE LANGUAGE OF CLAIM 11, AS WELL AS CLAIM 20.

22    A.   YES.

23    Q.   AND JUST TO REMIND THE JURY, DOES CLAIM 20 DEPEND FROM

24    CLAIM 11?

25    A.   YES, IT DOES.

1    Q.   SO IN ORDER TO SATISFY CLAIM 20, YOU MUST MEET ALL OF THE

2    LIMITATIONS OF CLAIM 11, AS WELL AS CLAIM 20?

3    A.   CORRECT.

4    Q.   AND DOES CLAIM 20 COVER ALL FORMS OR TYPES OF BACKGROUND

5    SYNCHRONIZATION?

6         MS. KREVANS:  OBJECTION.  LEADING.

7         THE COURT:  SUSTAINED.

8    BY MR. PAK:

9    Q.   WHAT TYPES OF BACKGROUND SYNCHRONIZATION IS COVERED BY

10   CLAIM 20 OF THE '414 PATENT?

11   A.   WELL, CLAIM 20 COVERS A VERY SPECIFIC STRUCTURE FOR

12   BACKGROUND SYNCHRONIZATION, AND YOU CAN SEE THAT FROM THE

13   LANGUAGE OF THE CLAIM THAT IT HAS THREE KEY REQUIREMENTS.

14   THERE HAVE TO BE THREE DATA CLASSES THAT ARE SYNCHRONIZED, SO

15   YOU CAN SEE ON THE LEFT, IN FIGURE 4 FROM THE PATENT, YOU HAVE

16   CALENDAR, CONTACTS, AND OTHER, WHICH COULD BE E-MAIL.

17        AND THERE HAVE TO BE THREE SYNCHRONIZATION SOFTWARE

18   COMPONENT, WHICH ARE THESE YELLOW BOXES HERE IN FIGURE 4 FROM

19   THE PATENT, AND EACH OF THOSE SYNCHRONIZATION SOFTWARE

20   COMPONENTS MUST BE, QUOTE, "CONFIGURED TO SYNCHRONIZE

21   STRUCTURED DATA," UNQUOTE, FROM THE CORRESPONDING DATA CLASS.

22   Q.   NOW, WERE YOU HERE IN COURT, DR. CHASE, LAST WEEK WHEN

23   DR. SNOEREN ON BEHALF OF APPLE PRESENTED HIS TESTIMONY ON THIS

24   PATENT?

25   A.   YES, I WAS.

1    Q.   NOW, DOES DR. SNOEREN AGREE WITH YOU THAT CLAIM 20

2    REQUIRES THREE SYNCHRONIZATION COMPONENTS, EACH CONFIGURED TO

3    SYNCHRONIZE STRUCTURED DATA FOR A DIFFERENT DATA CLASS?

4    A.   YES, HE DOES.

5    Q.   SO IS HAVING TWO SYNCHRONIZATION COMPONENTS THAT SATISFY

6    THE LANGUAGE OF THE CLAIMS, IS THAT SUFFICIENT TO SHOW

7    INFRINGEMENT OF CLAIM 20?

8    A.   NO, IT IS NOT.

9    Q.   DO YOU KNOW WHETHER DR. SNOEREN AGREES WITH YOU THAT TWO

10   IS NOT SUFFICIENT TO SHOW THAT?

11   A.   HE DOES AGREE.

12   Q.   LET'S TURN TO DR. SNOEREN'S INFRINGEMENT ANALYSIS,

13   DX 3634.

14        DR. CHASE, WHAT ARE YOU DEPICTING ON THIS SLIDE WITH

15   RESPECT TO DR. SNOEREN'S INFRINGEMENT ALLEGATIONS?

16   A.   WELL, DR. SNOEREN HAS ACCUSED ANDROID COMPONENTS CALLED

17   SYNC ADAPTERS, AND HE'S ACCUSED SIX SYNC ADAPTERS.  SO THE

18   SLIDE SHOWS THE SIX SYNC ADAPTERS.  THERE ARE THREE DIFFERENT

19   DATA CLASSES, CALENDAR, CONTACTS, AND E-MAIL, AND THERE ARE TWO

20   SYNC ADAPTERS FOR EACH DATA CLASS, ONE FOR DATA THAT'S ON

21   GOOGLE SERVERS AND ONE FOR DATA THAT'S ON EXCHANGE SERVES,

22   MICROSOFT EXCHANGE SERVERS.

23        AND SO THERE ARE SIX SYNC ADAPTERS ONLY.

24   Q.   YOU SAID SYNC ADAPTERS?

25   A.   SYNC, S-Y-N-C, ADAPTERS.

1    Q.   OKAY.  AND DOES DR. SNOEREN ACCUSE ANY OTHER PART OF THE

2    ANDROID SOFTWARE BESIDES THESE SIX SYNC ADAPTERS FOR CLAIM 20?

3    A.   NO, HE DOES NOT.

4    Q.   WHAT MUST DR. SNOEREN PROVE TO SHOW THAT THE ANDROID SYNC

5    ADAPTERS ACTUALLY INFRINGE CLAIM 20 OF THE '414 PATENT?

6    A.   WELL, HE MUST SHOW THAT ONE SYNC ADAPTER, AT LEAST ONE

7    SYNC ADAPTER FROM EACH OF THE THREE DATA CLASSES MEETS ALL OF

8    THE PARTICULAR REQUIREMENTS OF THE CLAIM, IN PARTICULAR, THAT

9    THAT SYNC ADAPTER IS CONFIGURED TO SYNCHRONIZE STRUCTURE DATA

10   FROM THAT DATA CLASS.

11   Q.   DR. CHASE, HAVING CONSIDERED ALL OF THE EVIDENCE,

12   INCLUDING THE ANDROID SOURCE CODE IN THIS CASE AND THE

13   TESTIMONY, HAS DR. SNOEREN, IN YOUR EXPERT OPINION, SATISFIED

14   HIS BURDEN OF PROOF?

15   A.   NO.

16   Q.   AND WHY IS THAT?

17   A.   WELL, IN TERMS -- FOUR OF THESE SIX SYNC ADAPTERS ACTUALLY

18   DO NOT MEET THIS KEY LIMITATION THAT THEY'RE CONFIGURED TO

19   SYNCHRONIZE STRUCTURED DATA FROM THEIR CLASS.

20   Q.   LET'S TURN TO THE NEXT SLIDE, MR. KOTARSKI.

21        CAN YOU IDENTIFY FOR THE JURY WHICH FOUR OUT OF THE SIX DO

22   NOT SATISFY THE LANGUAGE OF CLAIM 20?

23   A.   WELL, THE FOUR X'D OUT ON THE SLIDE, AND NONE OF THE SYNC

24   ADAPTERS FOR DATA ON MICROSOFT EXCHANGE SERVERS IS CONFIGURED

25   TO SYNCHRONIZE STRUCTURED DATA OF THAT CLASS, AND NEITHER OF

```
 1        THE E-MAIL SYNC ADAPTERS.

 2             SO AS YOU CAN SEE, THERE ARE NO SYNC ADAPTERS OF THE

 3        E-MAIL DATA CLASS AND SO THAT MEANS THAT ONLY TWO OF THESE

 4        CLASSES HAVE A SYNC ADAPTER THAT MEETS THE LIMITATIONS AND SO

 5        YOU REALLY NEED THREE FOR CLAIM 20, AND SO THERE'S NO

 6        INFRINGEMENT.

 7        Q.   LET'S START WITH THE GMAIL SYNC ADAPTER, WHICH IS THE ONE

 8         IN THE UPPER RIGHT-HAND CORNER.

 9             YOUR HONOR, MAY I PRESENT TRIAL TESTIMONY FROM

10        DR. SNOEREN.

11                  THE COURT:  PLEASE, GO AHEAD.

12                  MR. PAK:  PAGE 1012 OF THE TRIAL TRANSCRIPT AT LINES

13        8 THROUGH 18, MR. KOTARSKI.

14        Q.   DO YOU SEE THAT DR. SNOEREN WAS ASKED:

15             "QUESTION:  SO YOU SEE 'THE SYNC ADAPTER ASSOCIATED WITH

16        EACH APPLICATION PERFORM SYNCHRONIZATION FUNCTIONS FOR THE DATA

17        ASSOCIATED WITH THOSE APPLICATIONS, INCLUDING DETERMINING WHAT

18        LOCAL DATA IS NEW, SENDING NEW OR MODIFIED DATA TO THE REMOTE

19        SERVICE, AND RECEIVING NEW OR MODULE DATE DATA FROM THE REMOTE

20        SERVICE;' RIGHT?

21             "ANSWER:  YES, I DO SAY THAT AND THAT'S ABSOLUTELY TRUE."

22             DO YOU SEE THAT TESTIMONY FROM DR. SNOEREN?

23        A.   YES.  HE SAID THAT ALL OF THE SYNC ADAPTERS PERFORM THOSE

24        OPERATIONS.

25        Q.   AND THEN COUNSEL THEN FOLLOWED UP AND ASKED, "IT'S YOUR
```

```
 1        OPINION -- AND WE'LL TAKE THE GMAIL SYNC ADAPTER.  IT'S YOUR

 2        OPINION FROM YOUR ANALYSIS THAT THE GMAIL SYNC ADAPTER DOES ALL

 3        THREE OF THOSE THINGS; CORRECT?"

 4             AND DR. SNOEREN TESTIFIED UNDER OATH, "YES."

 5             DO YOU SEE THAT TESTIMONY?

 6        A.   YES.

 7        Q.   NOW, YOU ACTUALLY HAD A CHANCE TO ANALYZE THE SOURCE CODE?

 8        A.   YES.

 9        Q.   DO YOU AGREE WITH DR. SNOEREN THAT THE GMAIL SYNC ADAPTER

10        DOES ALL OF THESE THINGS THAT HE IDENTIFIED ON THE RECORD?

11        A.   NO, I DO NOT.  THE GMAIL SYNC ADAPTER IS MISSING A KEY

12        LIMITATION.  IT IS NOT CONFIGURED TO SYNCHRONIZE STRUCTURED

13        DATA OF THE MAIL CLASS.  IN FACT, IT HAS NO OPERATIONS ON

14        STRUCTURED DATA OF THE MAIL CLASS AT ALL.

15        Q.   AS A FACTUAL MATTER, IS DR. SNOEREN RIGHT OR WRONG WHEN HE

16        SAYS, IN THIS TRIAL TESTIMONY, THAT THE GMAIL SYNC ADAPTER DOES

17        THESE THINGS?

18        A.   THE GMAIL SYNC ADAPTER DOES NONE OF THESE THINGS.

19             MR. PAK:  LET'S LOOK AT PDX 91.18, YOUR HONOR.  THIS

20        IS A TRIAL DEMONSTRATIVE USED BY THE PLAINTIFF'S EXPERT.

21             THE COURT:  GO AHEAD, PLEASE.

22        BY MR. PAK:

23        Q.   AND IT'S ON YOUR SCREEN.  OF THIS IS, I BELIEVE,

24        CONFIDENTIAL CODE.  SO THIS IS GOOGLE CONFIDENTIAL CODE ON YOUR

25        SCREEN.
```

```
1              DR. CHASE, THIS WAS THE SNIPPET OF CODE THAT DR. SNOEREN

2      PRESENTED ON BEHALF OF APPLE.  DID YOU HAVE A CHANCE TO ANALYZE

3      THIS CODE.

4      A.   YES, I DID.

5      Q.   AND LOOKING AT THIS CODE, DO YOU SEE ANYTHING IN THIS CODE

6      THAT SHOWS THAT THE GMAIL SYNC ADAPTER DOES ANY OF THE THINGS

7      THAT DR. SNOEREN CLAIMS IT DOES?

8              MS. KREVANS:  OBJECTION.  LEADING, YOUR HONOR.

9              MR. PAK:  LET ME REPHRASE, YOUR HONOR.

10             THE COURT:  SUSTAINED.  GO AHEAD, PLEASE.

11     BY MR. PAK:

12     Q.   DR. CHASE, WHAT IS YOUR ASSESSMENT OF THIS CODE WITH

13     RESPECT TO THE CLAIM LANGUAGE?

14     A.   WE CAN SEE WHAT THIS CODE DOES, IT'S VERY SIMPLE, JUST A

15     FEW LINES.  AND WHAT IT DOES IS IT OBTAINS A REFERENCE TO

16     ANOTHER ELEMENT OF THE GMAIL APPLICATION CALLED A MAIL ENGINE

17     FOR A PARTICULAR E-MAIL ACCOUNT, AND THEN IT PASSES THE REQUEST

18     TO PERFORM A SYNC ALONG TO THE MAIL ENGINE BY CALLING THE MAIL

19     ENGINE.  IT DOES NOT DO ANY OF THE OTHER THINGS THAT WE TALKED

20     ABOUT.

21     Q.   AND DOES DR. SNOEREN ACTUALLY DISPUTE THAT?  DOES HE

22     DISPUTE THE FACT THAT THE GMAIL SYNC ADAPTER ACTUALLY DON'T

23     PERFORM ANY OF THESE THINGS ITSELF?

24     A.   WELL, THIS IS THE CODE FOR THE GMAIL SYNC ADAPTER AND WE

25     CAN -- WE'RE LOOKING AT THE SAME CODE, AND WE CAN SEE FROM THE
```

```
 1        CODE IT DOES NOT DO THESE THINGS, AND I BELIEVE THAT

 2        DR. SNOEREN DOES NOT DISPUTE THAT.

 3        Q.   NOW, WERE YOU ALSO IN THE COURTROOM, SIR, WHEN MR. PAUL

 4        WESTBROOK FROM GOOGLE CAME HERE TO TESTIFY UNDER OATH?

 5        A.   YES, I WAS.

 6        Q.   AND DO YOU RECALL THAT MR. WESTBROOK WAS TESTIFYING ABOUT

 7        THE GMAIL SYNC ADAPTER AND SOME OF THE OTHER ANDROID

 8        COMPONENTS?

 9        A.   YES, I DO.

10             MR. PAK:  SO I'D LIKE TO, YOUR HONOR, SHOW SDX 3010.

11             THE COURT:  GO AHEAD, PLEASE.

12   BY MR. PAK:

13        Q.   DR. CHASE, DO YOU REMEMBER THIS DIAGRAM?

14        A.   YES, I DO.  THIS IS THE DIAGRAM THAT MR. WESTBROOK DREW.

15        Q.   AND, DR. CHASE, CAN YOU IDENTIFY BY YOUR LASER POINTER THE

16        COMPONENT THAT CORRESPONDS TO THE SYNC ADAPTER FOR GMAIL?

17        A.   THE SYNC ADAPTER IS THIS LITTLE RECTANGLE ABOVE THE DOTTED

18        LINE.

19        Q.   AND DOES THIS DIAGRAM AND THE SYNC ADAPTER COMPONENT MATCH

20        UP TO YOUR ANALYSIS OF HOW THE GMAIL ARCHITECTURE WORKS?

21        A.   YES.  WE CAN SEE BELOW THE DOTTED LINE IS AN ELEMENT OF

22        THE ANDROID FRAMEWORK CALLED THE SYNC MANAGER, AND THE SYNC

23        MANAGER SENDS A REQUEST TO PERFORM A SYNCHRONIZATION OPERATION

24        TO THE SYNC ADAPTER, AND THE SYNC ADAPTER MERELY PASSES THAT

25        REQUEST ALONG TO THE MAIL ENGINE AS INDICATED BY THE ARROWS.
```

```
 1              SO THIS CONFIRMS THAT MY ANALYSIS IS CORRECT.

 2     Q.   NOW, DR. CHASE, DO YOU SEE A REPRESENTATIVE OF A DATABASE

 3     IN DR. -- OR MR. WESTBROOK'S DIAGRAM?

 4              MS. KREVANS:  OBJECTION.  LEADING.

 5              MR. PAK:  IS THERE A DATABASE IN THIS DIAGRAM?

 6              THE COURT:  SUSTAINED.

 7              THE WITNESS:  THE DATABASE -- THE DATABASE IS

 8     REPRESENTED BY THIS SMALL CYLINDER HERE.  IT'S VERY COMMON TO

 9     REPRESENT A DATABASE WITH A CYLINDER.  WE SAW IT IN FIGURE 4

10     THAT I TALKED ABOUT A MOMENT AGO, AND THAT'S THE MAIL ENGINE

11     ABOVE IT.

12     BY MR. PAK:

13     Q.   IS THE SYNC ADAPTER CONNECTED TO THE LOCAL DATABASE?

14     A.   THE GMAIL SYNC ADAPTER HAS NO CONNECTION TO THAT DATABASE.

15     Q.   IS THE SYNC ADAPTER CONNECTED TO THE GMAIL SERVER IN THE

16     INTERNET?

17     A.   SO WHEN A SYNC OCCURS, IT'S SYNCING DATA WITH THE GMAIL

18     SERVER, WHICH IS THIS CLOUD UP HERE IN THE UPPER LEFT, AND THE

19     SYNC ADAPTER HAS NO CONNECTION TO THE GMAIL SERVER.

20     Q.   DOES THE SYNC ADAPTER ITSELF PERFORM ANY SYNCHRONIZATION?

21     A.   THE SYNC ADAPTER ITSELF PERFORMS NO SYNCHRONIZATION OF

22     MAIL DATA.

23     Q.   SO WHAT IN THIS DIAGRAM ACTUALLY COORDINATES THE

24     SYNCHRONIZATION FUNCTION IN GMAIL?

25     A.   IT'S ACTUALLY THE MAIL ENGINE THAT COORDINATES THE
```

1       SYNCHRONIZATION, AND MR. WESTBROOK TESTIFIED THAT THAT WAS FOR

2       VERY GOOD REASONS HAVING TO DO WITH PERFORMANCE FOR MAIL IN

3       GMAIL.

4       Q.   HAVING TALKED ABOUT THE GMAIL SYNC ADAPTER, I WANT TO

5       FOCUS YOUR ATTENTION ON THE EXCHANGE SYNC ADAPTERS THAT

6       DR. SNOEREN ACCUSES.

7       A.   YES.

8       Q.   AND IF WE COULD HAVE SDX 3638, THESE ARE THE SYNC ADAPTERS

9       ON THE BOTTOM ROW.  DO YOU RECALL THAT?

10      A.   YES, THAT'S CORRECT.  ONE FOR EACH OF CALENDAR, CONTACTS,

11      AND E-MAIL.

12      Q.   AND CAN YOU REMIND THE JURY WHAT IS MEANT BY EXCHANGE IN

13      THIS CONTEXT?

14      A.   WELL, EXCHANGE -- EXCHANGE IS THE MICROSOFT SERVICE THAT

15      HANDLES PERSONAL INFORMATION, CALENDAR, CONTACTS, AND E-MAIL ON

16      MICROSOFT SERVERS, AND IT HAS A SYNC PROTOCOL, THE ACTIVE SYNC

17      PROTOCOL THAT WE JUST HEARD MR. HALL MENTION THAT HAS BEEN A

18      STANDARD FOR SYNCHRONIZATION IN THE INDUSTRY SINCE THE LATE

19      1990S.

20      Q.   AND DO YOU -- WERE YOU HERE WHEN MR. WESTBROOK ALSO TALKED

21      ABOUT THE E-MAIL EXCHANGE SYNC ADAPTERS DURING HIS TESTIMONY?

22      A.   YES, I WAS.

23      Q.   AND LOOKING AT THIS ARCHITECTURE, HOW DOES THIS

24      ARCHITECTURE COMPARE TO THE ARCHITECTURE THAT WE JUST WENT

25      THROUGH FOR THE GMAIL SYNC ADAPTER ARCHITECTURE?

1    A.  WELL, THE SYNC ADAPTERS FOR EXCHANGE IS VERY SIMILAR.

2    THERE ARE SOME DIFFERENCES.  BUT PRIMARILY THE CODE PASSES A

3    SYNCHRONIZATION REQUEST ALONG TO ANOTHER COMPONENT OF EXCHANGE

4    CALLED THE EXCHANGE SERVICE.  THERE'S NO SYNCHRONIZATION OF

5    STRUCTURED DATA OF THESE CLASSES IN THE EXCHANGE SYNC ADAPTERS.

6    IN THAT RESPECT, VERY SIMILAR TO THE GMAIL SYNC ADAPTER.

7    Q.  AND DOES DR. SNOEREN DISPUTE THAT THE EXCHANGE SYNC

8    ADAPTERS SIMPLY CALL INTO THIS OTHER EXCHANGE SERVICE.

9         MS. KREVANS:  OBJECTION.  LEADING.

10        THE COURT:  SUSTAINED.

11    GO AHEAD AND REPHRASE, PLEASE.

12   BY MR. PAK:

13   Q.  SURE.

14    DO YOU RECALL DR. SNOEREN'S TESTIMONY ABOUT HOW THE

15   EXCHANGE SYNC ADAPTERS RELATE TO THE EXCHANGE SERVICE?

16   A.  DR. SNOEREN HAS TESTIFIED THAT ALL OF THE SYNC ADAPTERS

17   PERFORM THE STEPS THAT WE SAW IN HIS TESTIMONY EARLIER, AND

18   HE'S TESTIFIED THAT THE WAY THAT THEY DO THAT IS BY CALLING IT

19   THE EXCHANGE SERVICE.  WE'RE LOOKING AT THE SAME CODE, AND WE

20   AGREE THAT IT CALLS INTO THE EXCHANGE SERVICE.

21        THE COURT:  I'M SORRY TO INTERRUPT YOUR EXAMINATION,

22   BUT IT'S NOON.  I'D LIKE US TO GO AHEAD, PLEASE, AND TAKE OUR

23   ONE HOUR LUNCH BREAK.

24        MR. PAK:  SURE.

25        THE COURT:  WE'LL SEE EVERYONE BACK AT 1:00 O'CLOCK.

```
 1        PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

 2            THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

 3            (JURY OUT AT 12:01 P.M.)

 4                THE COURT:  YOU MAY STEP DOWN.

 5                THE WITNESS:  THANK YOU.

 6                THE COURT:  ALL RIGHT.  THANK YOU -- OH.

 7                MR. QUINN:  YOUR HONOR, BEFORE WE BREAK, CAN I RAISE

 8        ONE ISSUE?

 9                THE COURT:  YES.

10                MR. QUINN:  JUST DOING THE ARITHMETIC, IT APPEARS

11        WE'RE GOING TO CLOSE THE EVIDENCE NEXT FRIDAY.

12                THE COURT:  YES, IT DOES.

13                MR. QUINN:  IT DOES.

14                THE COURT:  WOULD EVERYONE LIKE TO TAKE A SEAT SO YOU

15        DON'T HAVE TO STAND.

16                MR. QUINN:  THE EVIDENCE WILL BE CLOSED NEXT FRIDAY,

17        AND I ACTUALLY THINK THAT THE WAY IT WORKS OUT, WE ONLY HAVE

18        SOMETHING LIKE 80 MINUTES OF EVIDENCE NEXT FRIDAY IS OUR

19        PROJECTION AND WHAT IT LOOKS LIKE.

20                THE COURT:  OKAY.

21                MR. QUINN:  AND SO, YOUR HONOR, WE -- WE REALLY WOULD

22        APPRECIATE A LITTLE MORE TIME.  WE HAVE THE -- WE HAVE THAT

23        WHOLE DAY.  WE'D APPRECIATE THE COURT MAY WANT TO DO OTHER

24        THINGS THAT DAY, BUT THE WAY THIS HAS WORKED OUT, MOST OF THAT

25        DAY, WE'LL HAVE THE -- THE JURORS WILL COME IN FOR 80 MINUTES
```

1    OF TESTIMONY AND THEN WE'LL BE DONE.

2           AND, FRANKLY, YOUR HONOR, IT'S GOING TO BE VERY, VERY HARD

3    TO DO JUSTICE TO OUR CASE WITHOUT SOME SMALL ADDITIONAL AMOUNT

4    OF TIME.

5           THE COURT HAS OBVIOUSLY SEEN FIRST-HAND THE CHOICES WE'VE

6    MADE AND HOW WE'VE PRESENTED OUR EVIDENCE.

7           I HOPE THE COURT'S ASSESSMENT OF THAT IS LIKE OURS, THAT

8    WE HAVEN'T WASTED TIME.  WE'VE TRIED TO GO THROUGH THIS

9    EXPEDITIOUSLY.  WE'VE CUT WITNESSES.

10          BUT I THINK THERE IS A REAL PROBLEM DOING JUSTICE TO THE

11   CASE, AND WE HAVE MOST OF THAT DAY NEXT FRIDAY.  I MEAN, EVEN

12   AN ADDITIONAL HOUR AND A HALF A SIDE, YOUR HONOR, WOULD MAKE A

13   HUGE DIFFERENCE FOR US, AND WE'D ASK THE COURT TO CONSIDER

14   THAT.

15          THE COURT:  I WAS PLANNING ON USING THAT DAY TO

16   FINALIZE JURY INSTRUCTIONS AND THE VERDICT FORM TO HAVE

17   EVERYTHING READY SO THAT ON MONDAY MORNING WE COULD START RIGHT

18   AWAY WITH THE READING OF JURY INSTRUCTIONS AND GO INTO THE FOUR

19   HOURS OF CLOSING.  THAT'S HOW I WAS PLANNING TO USE THAT DAY.

20          DO YOU WANT TO RESPOND TO THE REQUEST FOR ADDITIONAL TIME?

21          MR. MCELHINNY:  WE, WE -- I CAN'T EMPHASIZE HOW

22   STRONG LY WE WOULD OPPOSE THIS.  WE'VE DONE A HUGE AMOUNT OF

23   PRETRIAL WORK WHERE YOUR HONOR GAVE EVERYBODY OPPORTUNITIES TO

24   COMMENT ON THE AMOUNT OF TIME, MADE ADJUSTMENTS.

25          BUT MORE IMPORTANTLY, WE ARE WHERE WE ARE.  WE'VE LIVED

1    WITH OUR LIMITATION.  OUR CASE-IN-CHIEF IS IN.  WE CHOSE TIME

2    LIMITS FOR THE WITNESSES THAT WE HAVE HAD WHO WE COULD HAVE

3    GIVEN ADDITIONAL TIME TO AND WE ARE BOXED.  GIVING US AN EXTRA

4    HOUR AND A HALF IN THE MIDDLE OF THEIR CASE IS NOT EQUAL.

5         WE HAD TO DETERMINE WHAT WITNESSES TO PUT IN, HOW MUCH

6    TIME TO GIVE THEM, AND WHAT ASSESSMENTS, SAVING TIME TO OPPOSE

7    THEIR CASE AND DO ALL THE REST OF THIS.

8         THIS IS THE SAME AS WHAT HAPPENED IN THE FIRST CASE.  WE

9    HAVE BEEN LIVING WITHIN YOUR HONOR'S RULES.  WE HAVE BEEN

10   MAKING STRATEGIC DECISIONS TO COMPLY WITH THAT TIME LIMITATION,

11   AND TO CHANGE THAT RULE TWO-THIRDS OF THE WAY THROUGH THE TRIAL

12   ONLY BENEFITS THEM AND WOULD HURT -- WOULD BE TREMENDOUSLY

13   HURTFUL TO US.

14        MR. QUINN:  I UNDERSTAND THE FORCE OF MR. MCELHINNY'S

15   ARGUMENT, YOUR HONOR, BUT WE DO HAVE A SEPARATE CASE THAT

16   HASN'T EVEN BEGUN YET.  THEY OBVIOUSLY HAVE INTENTIONS TO GO TO

17   TOWN ON THE REBUTTAL CASE AS WELL.

18        I -- YOU KNOW, I HEAR WHAT MR. MCELHINNY SAYS.

19        I ALSO THINK, OKAY, THAT'S A LAWYER'S -- THAT'S A

20   PREDICTABLE LAWYER'S ARGUMENT.

21        AN ADDITIONAL HOUR AND A HALF TO THEM, TO US, THEY WOULD

22   FIND VERY GOOD USES FOR THAT.  WE HAVE ONE CASE, OUR

23   COUNTERCLAIM CASE, THAT HASN'T EVEN BEGUN YET.

24        AND I DON'T KNOW WHETHER THE COURT NEEDS -- IF WE ONLY

25   HAVE AN HOUR AND A HALF, OR LESS THAN AN HOUR AND A HALF WITH

1      THE COURT ON TESTIMONY, I DON'T KNOW WHETHER THE COURT NEEDS

2      ALL OF NEXT FRIDAY IN ORDER TO DEAL WITH JURY INSTRUCTIONS.

3          I WOULD HOPE THAT THERE WOULD BE SOME WAY THAT SOME AMOUNT

4      OF THAT DAY COULD BE ALLOCATED FOR SOME ADDITIONAL TESTIMONY.

5              MR. MCELHINNY:  I HATE TO BE A PREDICTABLE LAWYER,

6      BUT WHEN DID THEY REALIZE THEY HAD THIS PROBLEM?  I RAISED THIS

7      TWO DAYS AGO.  THEY HAVE GONE THROUGH -- WE DID -- WE HAD A

8      TIME LIMIT ON OUR CROSS-EXAMINATION FOR MR. REIBSTEIN.  WE HAD

9      TIME LIMITS ON THE THREE EXPERTS THAT THEY'VE ALL PUT ON.

10         WE HAVE BEEN MAKING DECISIONS, STRATEGIC DECISIONS ABOUT

11     HOW MUCH TIME TO ADJUST TO EACH WITNESS, AND THAT'S ALL HISTORY

12     NOW.

13             THE COURT:  ALL RIGHT.  WELL, WE'VE HAD ROUGHLY

14     ALMOST 35, 36 HOURS OF TESTIMONY SO FAR.  SO WE HAVE ROUGHLY

15     14, 14 HOURS LEFT.  SO I THINK TO CHANGE THE TIME LIMITS NOW,

16     WHEN EVERYONE HAS BEEN ASSUMING THESE ARE THE LIMITS, WOULD BE

17     PREJUDICIAL.  SO THE REQUEST IS DENIED.

18         ALL RIGHT.  LET'S TAKE OUR BREAK.  THANK YOU.

19         (LUNCH RECESS WAS TAKEN FROM 12:06 P.M. TO 1:01 P.M.)

20

21

22

23

24

25

```
 1
 2                          AFTERNOON SESSION
 3          (JURY IN AT 1:02 P.M.)
 4              THE COURT:  ALL RIGHT.  PLEASE TAKE A SEAT.  WELCOME
 5     BACK.
 6          (PAUSE IN PROCEEDINGS.)
 7              THE COURT:  OKAY.  WELCOME BACK TO EVERYONE.
 8          TIME IS NOW 1:02.  GO AHEAD, PLEASE.
 9              MR. PAK:  THANK YOU.
10     Q.  WELCOME BACK, DR. CHASE.
11     A.  THANK YOU.
12     Q.  I THINK WE FOUND JX 8.  IT SHOULD BE THE BINDER IN FRONT
13     OF YOU.
14     A.  YES, JX 8.
15     Q.  CAN YOU CONFIRM FOR ME THIS IS A COPY OF THE FILE HISTORY
16     FOR THE '414 PATENT?
17     A.  THIS IS THE FILE HISTORY FOR THE '414 PATENT.
18     Q.  DID YOU CONSIDER THIS FILE HISTORY IN FORMING YOUR
19     OPINIONS?
20     A.  YES, I DID.
21              MR. PAK:  I'D LIKE TO MOVE IT INTO EVIDENCE.
22              MS. KREVANS:  NO OBJECTION.
23              THE COURT:  IT'S ADMITTED.
24          (JOINT EXHIBIT 8 WAS ADMITTED IN EVIDENCE.)
25              THE COURT:  GO AHEAD, PLEASE.
```

1        BY MR. PAK:

2        Q.   DR. CHASE, I WANT TO TURN TO ANOTHER THING DR. SNOEREN

3        TESTIFIED TO DURING HIS TRIAL TESTIMONY, AND MR. KOTARSKI, IF

4        WE CAN PUT UP PAGES 1034 AND 1035 FROM THE TRANSCRIPT.

5             AND DO YOU SEE HERE, DR. CHASE, THAT WHEN DR. SNOEREN WAS

6        ASKED THE QUESTION ABOUT SYNCHRONIZATION, HE ANSWERED, "I WANT

7        TO BE CLEAR, IT'S MY POSITION THAT I'VE IDENTIFIED

8        SYNCHRONIZATION COMPONENTS THAT CAUSE THE SYNCHRONIZATION TO

9        OCCUR, ABSOLUTELY."

10            DO YOU SEE THAT TESTIMONY?

11       A.   YES, I DO SEE THAT.  PREVIOUS TESTIMONY THAT WE SAW WAS

12       THAT THE SYNCHRONIZATION SOFTWARE COMPONENTS PERFORMED THESE

13       VARIOUS ACTIONS, AND I JUST WANT TO EMPHASIZE THAT THAT'S

14       WRONG.

15            AND WHAT HE'S SAYING HERE IS THAT THEY CAUSE

16       SYNCHRONIZATION TO OCCUR, WHICH IS A LITTLE DIFFERENT.

17       Q.   DR. CHASE, GOING BACK TO THE CLAIM LANGUAGE OF CLAIM 11

18       AND 20, IS THERE ANY LANGUAGE IN THESE TWO CLAIMS THAT TALK

19       ABOUT CAUSING SYNCHRONIZATION TO OCCUR?

20       A.   NO, THE WORD "CAUSE" DOES NOT APPEAR IN THE CLAIM

21       LANGUAGE.

22       Q.   AND YOU SEE THE LANGUAGE "CONFIGURED TO SYNCHRONIZE"

23       INSTEAD FOR THE SOFTWARE COMPONENTS?

24       A.   CONFIGURED TO SYNCHRONIZE STRUCTURED DATA, YES.

25       Q.   NOW, IS CAUSING THE SOMETHING TO OCCUR THE SAME THING AS

```
 1    ACTUALLY DOING IT WHEN IT COMES TO SOFTWARE COMPONENTS?

 2    A.   CAUSING IS NOT THE SAME THING AS DOING, AND I CAN USE A

 3    SIMPLE EXAMPLE.

 4         I DON'T KNOW HOW TO FIX A CAR, BUT IF MY CAR IS BROKEN, I

 5    CAN CALL THE MECHANIC TO FIX MY CAR, AND IF THAT CALL CAUSES

 6    THE MECHANIC TO FIX MY CAR, I REALLY CAN'T SAY THAT I DID IT

 7    MYSELF OR I COULD DO IT MYSELF.

 8         CAUSING IS VERY DIFFERENT FROM DOING.  THAT APPLIES TO

 9    SOFTWARE SYSTEMS AS WELL.  CONFIGURING A COMPONENT TO ACTUALLY

10    DO SOMETHING IS VERY DIFFERENT FROM CONFIGURING A COMPONENT TO

11    CAUSE SOMETHING ELSE TO DO IT.

12    Q.   IF YOU CAN PULL UP THE FILE HISTORY, SIR, I'D LIKE TO

13    DIRECT YOUR ATTENTION TO JX 8, PAGE 195, MR. KOTARSKI.

14         AND THIS IS AN EXCERPT FROM THE MARCH 5TH, 2009 AMENDMENT.

15         DR. CHASE, WHAT IS THE SIGNIFICANCE OF THIS EVIDENCE?

16    A.   WELL, THE FILE HISTORY -- THE FILE HISTORY IS A RECORD OF

17    THE INTERACTIONS BACK AND FORTH BETWEEN APPLE AND THE PATENT

18    OFFICE IN OBTAINING THE -- IN GETTING THE '414 PATENT ISSUED,

19    AND WHAT WE SEE HERE IS AN EARLIER VERSION OF THE CLAIM

20    LANGUAGE, AND WHAT THE EARLIER VERSION OF THE CLAIM LANGUAGE

21    SAYS IS "CONFIGURED TO CAUSE RETRIEVAL AND STORAGE OF

22    STRUCTURED DATA."

23         MS. KREVANS:  OBJECTION, YOUR HONOR.  THIS IS BEYOND

24    THE SCOPE OF HIS EXPERT REPORT.

25         MR. PAK:  YOUR HONOR, IT'S DISCUSSED IN HIS OPENING
```

```
 1       REPORT AT PAGE 205 AND 206.

 2                 THE COURT:  ALL RIGHT.  IT'S OVERRULED.

 3            GO AHEAD.

 4       BY MR. PAK:

 5       Q.   NOW, TURNING TO JX 8 AT 718, WHICH IS AN EXCERPT FROM THE

 6       JUNE 18TH, 2009 FINAL REJECTION BY THE UNITED STATES PATENT

 7       OFFICE, WHAT IS THE SIGNIFICANCE OF THIS EVIDENCE?

 8       A.   THIS IS A PORTION OF AN OFFICE ACTION FROM THE PATENT

 9       EXAMINER AT THE U.S. PATENT AND TRADEMARK OFFICE, AND WHAT THE

10       PATENT EXAMINER IS SAYING IS REJECTING -- THE PATENT EXAMINER

11       IS REJECTING THIS CLAIM LANGUAGE THAT SAYS "CAUSE" AS

12       UNPATENTABLE IN VIEW OF THE PRIOR ART, AND THE PATENT EXAMINER

13       SAYS "THE SYNCHRONIZATION SOFTWARE COMPONENT IS MERELY

14       CONFIGURED TO CAUSE RETRIEVAL AND STORAGE," AND THAT THAT'S NOT

15       EQUIVALENT TO ACTUALLY STORING DATA.  IT'S NOT EQUIVALENT TO

16       MODIFYING ANY STRUCTURED DATA FROM THE STORE.

17            SO CAUSING IS NOT DOING.

18       Q.   IF WE TURN TO CURRENT CHARACTER STRING 8 AT 751, WHICH IS

19       TAKEN FROM THE NOVEMBER 11TH, 2009 AMENDMENT BY APPLE,

20       DR. CASE, WHAT IS THE SIGNIFICANCE OF THIS EVIDENCE?

21       A.   WHAT WE SEE HERE IS AN AMENDED VERSION OF THE CLAIM

22       LANGUAGE.  AFTER THE PATENT EXAMINER REJECTED THE CLAIMS AS

23       BEING -- BASED ON THIS LANGUAGE, APPLE REVISED THE CLAIMS AND

24       RESUBMITTED IT FOR RECONSIDERATION BY THE PATENT OFFICE.

25            AND IN THE NEW VERSION OF THE CLAIM, YOU CAN SEE THAT
```

1    "CONFIGURED TO CAUSE RETRIEVAL AND STORAGE," "CAUSE RETRIEVAL

2    AND STORAGE" IS REMOVED AND IT'S REPLACED WITH "SYNCHRONIZE."

3         SO THE NEW LANGUAGE READS "CONFIGURED TO SYNCHRONIZE."  SO

4    IN RESPONSE TO THIS REJECTION, THEY'VE STRUCK THE WORD "CAUSE"

5    AND REPLACED IT WITH "CONFIGURED TO SYNCHRONIZE."

6    Q.   AND IF WE LOOK AT THE ACTUAL CLAIM LANGUAGE OF CLAIM 11

7    AND 20 FROM THE '414 PATENT, WHAT IS THE ACTUAL CLAIM LANGUAGE

8    FOR THE SYNCHRONIZATION COMPONENT?

9    A.   THE CLAIM LANGUAGE THAT WE SEE HERE IS EQUIVALENT TO THE

10   LANGUAGE WE JUST SAW.  THAT LANGUAGE APPEARED IN THE FINAL

11   CLAIMS OF THE PATENT THAT ARE THE ONES THAT ARE ASSERTED IN

12   THIS LITIGATION.

13   Q.   TO SUMMARIZE THEN, DR. CHASE, DO THE ACCUSED ANDROID SYNC

14   ADAPTERS MEET THE REQUIREMENTS OF CLAIM 20?

15   A.   THEY DO NOT.  FOUR OF THOSE SYNC ADAPTERS ARE NOT

16   CONFIGURED TO SYNCHRONIZE STRUCTURED DATA.

17   Q.   AND, DR. CHASE, WHO CREATED THE SOURCE CODE THAT WE'VE

18   BEEN DISCUSSING FOR BOTH GMAIL AND ANDROID E-MAIL?

19   A.   GOOGLE.

20   Q.   AND BASED ON YOUR REVIEW OF THE SOURCE CODE, DID SAMSUNG

21   MODIFY ANY OF THE GOOGLE CODE ON ANY OF THE ACCUSED DEVICES?

22   A.   NOT IN A SUBSTANTIAL WAY.  DR. SNOEREN HIMSELF TESTIFIED

23   THAT ANY CHANGES BY SAMSUNG WERE INCONSEQUENTIAL FROM THE

24   PERSPECTIVE OF HIS INFRINGEMENT ANALYSIS, AND I REVIEWED THE

25   CODE AND I AGREE WITH HIM IN THAT REGARD.

1    Q.   I WANT TO TRANSITION NOW, DR. CHASE, TO TALKING ABOUT

2    VALIDITY OF CLAIM 20 OF THE '414 PATENT.

3         WERE YOU GIVEN AN OPPORTUNITY TO ANALYZE PRIOR ART SYSTEMS

4    THAT EXISTED BEFORE THE '414 PATENT APPLICATION WAS FILED?

5    A.   YES.  I EXAMINED A NUMBER OF PRIOR ART SYSTEMS, AND TWO

6    THAT I THINK WE'LL TALK ABOUT ARE WINDOWS MOBILE FROM

7    MICROSOFT, AND EVOLUTION FROM NOVELL.

8    Q.   AND WERE YOU HERE FOR THE VIDEO TESTIMONY OF MR. HALL FROM

9    MICROSOFT?

10   A.   YES, AND HE WAS SPEAKING ABOUT WINDOWS MOBILE WITH ACTIVE

11   SYNC.

12   Q.   AND DID THE PATENT AND TRADEMARK OFFICE KNOW ABOUT THESE

13   TWO SYSTEMS WHEN IT WAS EVALUATING THE VALIDITY OF THE '414

14   PATENT?

15   A.   NO, THEY DID NOT.

16   Q.   LET'S TURN TO SDX 3641.

17        DR. CHASE, CAN YOU TELL US BRIEFLY WHAT WINDOWS MOBILE 5

18   IS AS A PRIOR ART SYSTEM?

19   A.   WINDOWS MOBILE 5 IS A SYSTEM FROM MICROSOFT THAT RUNS ON

20   WIRELESS DEVICES, MOBILE DEVICES, INCLUDING H-P IPAQ, I-P-A-Q,

21   DEVICES, WHICH IS HIGHLIGHTED HERE.

22   Q.   SO WHAT IS THIS DEVICE HERE ON THE LEFT-HAND SIDE?

23        MS. KREVANS:  YOUR HONOR, OBJECTION.  THIS IS A SLIDE

24   THAT HAS OTHER DOCUMENTS THAT ARE NOT IN EVIDENCE AND AS TO

25   WHICH THIS WITNESS CANNOT ESTABLISH A FOUNDATION TO HAVE THEM

1    ADMITTED INTO EVIDENCE.

2         THE COURT:  SUSTAINED.

3         MR. PAK:  YOUR HONOR, AT THIS TIME I'D LIKE TO WALK

4    THROUGH THAT EVIDENCE AND THEN WE CAN GO BACK TO THE

5    DEMONSTRATIVE.

6    Q.   DX 315, SIR, CAN YOU LOOK AT THAT DOCUMENT IN THE BINDER?

7    A.   YES.  DX 315 IS A PRESS RELEASE FROM H-P ABOUT THE RELEASE

8    OF THE IPAQ, AND IT SAYS THAT THE IPAQ WAS RELEASED AND RUNNING

9    WINDOWS MOBILE 5 IN SEPTEMBER OF 2005, AND I RELIED ON THIS FOR

10   MY OPINIONS.

11   Q.   AND YOU RELIED ON THIS AND CITED THIS IN YOUR EXPERT

12   REPORT?

13   A.   YES, THAT'S CORRECT.

14        MR. PAK:  YOUR HONOR, I'D LIKE TO MOVE DX 315 INTO

15   EVIDENCE.

16        MS. KREVANS:  NO OBJECTION YOUR HONOR.

17        THE COURT:  IT'S ADMITTED.

18   (DEFENDANTS' EXHIBIT 315 WAS ADMITTED IN EVIDENCE.)

19        THE COURT:  GO AHEAD, PLEASE.

20   BY MR. PAK:

21   Q.   DX 316, DO YOU RECOGNIZE THAT?

22   A.   YES.

23        MS. KREVANS:  YOUR HONOR, THIS IS A DOCUMENT TO WHICH

24   WE DO OBJECT.  THIS WITNESS CANNOT ESTABLISH A FOUNDATION FOR

25   IT AND THEY HAVE NOT CALLED THE WITNESS WHO COULD.

```
1              MR. PAK:  YOUR HONOR, MAY I ASK THE QUESTION?  AND

2     IT'S CITED IN HIS REPORT.

3              THE COURT:  ALL RIGHT.  GO AHEAD AND SEE IF YOU CAN

4     LAY THE FOUNDATION AND TELL ME WHAT PARAGRAPH IT'S CITED IN.

5              MR. PAK:  IT'S 531, CITING THE DECLARATION AT

6     PARAGRAPH 29, YOUR HONOR, OF HIS OPENING REPORT.

7     Q.   DR. CHASE, WHAT IS THIS DOCUMENT, DX 316?

8     A.   THIS IS A PORTION OF A SALES RECORD THAT WAS PROVIDED BY

9     MICROSOFT.  IT WAS ATTACHED TO A DECLARATION FROM MICROSOFT

10    STATING THAT WINDOWS MOBILE 5 WAS AVAILABLE IN SEPTEMBER OF

11    2005, AND THIS --

12             MS. KREVANS:  YOUR HONOR --

13             THE WITNESS:  -- DOCUMENT HERE STATES THAT THEY --

14             MS. KREVANS:  YOUR HONOR, WE OBJECT TO THE WITNESS

15    PUBLISHING THE CONTENTS OF THE DOCUMENT WHICH IS NOT IN

16    EVIDENCE, AND WHICH HE HAS NO FOUNDATION TO ADMIT.

17             MR. PAK:  YOUR HONOR, HE RELIED SPECIFICALLY ON THIS

18    DECLARATION IN FORMING HIS EXPERT OPINIONS.  THERE'S NO

19    CHALLENGE TO THE AUTHENTICITY OF THE DOCUMENT THERE, AND WE'D

20    LIKE TO MOVE THAT INTO EVIDENCE.

21             THE COURT:  OVERRULED.

22        GO AHEAD, PLEASE.

23    BY MR. PAK:

24    Q.   NOW, DR. CHASE --

25        AT THIS TIME, YOUR HONOR, WE'D LIKE TO MOVE DX 316 INTO
```

```
1        EVIDENCE.

2               MS. KREVANS:  NO FURTHER OBJECTION, YOUR HONOR.

3               THE COURT:  WELL, ONE THING IS RELYING ON WHAT'S IN

4        HIS EXPERT REPORT.

5            THERE'S ANOTHER IN GETTING A MICROSOFT DOCUMENT IN

6        EVIDENCE.

7            HE CAN CERTAINLY TESTIFY TO WHAT'S IN HIS REPORT,

8        PARAGRAPH 531.

9            I'LL GO AHEAD AND ADMIT IT.

10           (DEFENDANTS' EXHIBIT 316 WAS ADMITTED IN EVIDENCE.)

11              THE COURT:  GO AHEAD, PLEASE.

12              MR. PAK:  THANK YOU, YOUR HONOR.

13       Q.   NOW, CAN YOU TAKE A LOOK AT DX 317, SIR?

14       A.   YES.

15       Q.   WHAT IS DX 317?

16       A.   DX 317 IS A COLLECTION OF ARTICLES FROM MICROSOFT

17       "TECHNET."  IT'S A MICROSOFT PUBLICATION, AND THEY DESCRIBE

18       EXCHANGE, EXCHANGE ACTIVE SYNC PROTOCOL, AND SOME DETAILS ON

19       WINDOWS MOBILE 5.

20       Q.   DID YOU RELY ON THIS EVIDENCE IN FORMING YOUR EXPERT

21       OPINIONS?

22       A.   YES, I DID.

23              MR. PAK:  YOUR HONOR, I'D LIKE TO MOVE DX 317 INTO

24       EVIDENCE.

25              MS. KREVANS:  YOUR HONOR, THESE ARE PRESS RELEASES.
```

```
 1        IF THEY'RE ADMITTED, IT SHOULD BE WITH A LIMITING INSTRUCTION

 2        THAT THEY'RE NOT TO BE ADMITTED FOR THE TRUTH BECAUSE THEY'RE

 3        HEARSAY.

 4              THE WITNESS:  THIS IS TECHNICAL DOCUMENTATION FROM

 5        MICROSOFT.

 6              THE COURT:  ALL RIGHT.  THIS IS ADMITTED.

 7        (DEFENDANTS' EXHIBIT 317 WAS ADMITTED IN EVIDENCE.)

 8              MR. PAK:  THANK YOU, YOUR HONOR.

 9              THE COURT:  WITHOUT A LIMITING INSTRUCTION.

10              MR. PAK:  THANK YOU, YOUR HONOR.

11   Q.   DX 314, PLEASE TAKE A LOOK AT THAT IN YOUR BINDER.

12   A.   DX 314 ARE REFERENCED SELECTIONS FROM WINDOWS MOBILE 5

13   SOURCE CODE WHICH I ALSO RELIED ON FOR ANY EXPERT OPINIONS.

14              MR. PAK:  YOUR HONOR, I'D LIKE TO MOVE DX 314 INTO

15        EVIDENCE.

16              MS. KREVANS:  YOUR HONOR, AGAIN, THIS WITNESS CANNOT

17        AUTHENTICATE THE SOURCE CODE.

18         AND IN ADDITION, SAMSUNG DID NOT IDENTIFY ANY SPECIFIC

19        PAGES OR FILES FROM IT PURSUANT TO YOUR COURT'S PRIOR ORDER,

20        EVEN THOUGH WE REQUESTED THAT THEY DO SO.

21              MR. PAK:  YOUR HONOR, THIS IS ON OUR EXHIBIT LIST.

22        WE DID DISCLOSE ALL OF THIS.  THIS IS CITED IN DR. CHASE'S

23        EXPERT REPORT AS THE FOUNDATION FOR HIS EXPERT ANALYSIS.

24         AND IN FACT, APPLE HAS STIPULATED TO THE AUTHENTICITY OF

25        BOTH DX 314 AND 316, WHICH IS THE WINDOWS MOBILE 5 SOURCE CODE.
```

```
 1          THERE'S NO QUESTION ABOUT FOUNDATION, YOUR HONOR.

 2               THE COURT:  IT'S ADMITTED.

 3          (DEFENDANTS' EXHIBIT 314 WAS ADMITTED IN EVIDENCE.)

 4               THE COURT:  GO AHEAD, PLEASE.

 5               MR. PAK:  THANK YOU, YOUR HONOR.

 6     Q.   NOW, I WANT TO GO BACK TO THE PRESENTATION DEMONSTRATIVE,

 7     SDX 3641.  JUST REMIND US AGAIN, WHAT IS THIS DEVICE ON THE

 8     LEFT-HAND SIDE?

 9     A.   WELL, IT'S A, A DEVICE, A HANDHELD WIRELESS DEVICE RUNNING

10     WINDOWS MOBILE, AND IT LOOKS VERY MUCH LIKE THE IPAQ DEVICES.

11     Q.   IS THAT A HANDHELD DEVICE?

12     A.   IPAQ IS A HANDHELD DEVICE, YES, WITH A STYLUS AND

13     TOUCHSCREEN SCREEN.

14     Q.   AND WINDOWS MOBILE 5, IS THAT SOFTWARE THAT'S RUNNING ON

15     THAT DEVICE?

16     A.   YES, WINDOWS MOBILE 5 ARE SOFTWARE INSTRUCTIONS THAT ARE

17     STORED IN THE MEMORY OF THAT DEVICE.

18     Q.   AND COMPARE FOR US THE TIMING OF THE RELEASE OF WINDOWS

19     MOBILE 5 TO WHEN APPLE FILED ITS PATENT APPLICATION FOR THE

20     '414 PATENT.

21     A.   WELL, WINDOWS MOBILE WAS AVAILABLE AS EARLY AS 2003, AND I

22     BELIEVE MR. HALL, WE JUST HEARD MR. HALL SAY THAT.

23          WINDOWS MOBILE 5 BECAME AVAILABLE IN SEPTEMBER OF 2005.

24          THE APPLE '414 PATENT APPLICATION WAS FILED IN JANUARY OF

25     2007.
```

```
1     Q.   AND DR. CHASE, DID YOU PREPARE A VIDEO DEMONSTRATION OF

2     THE IPAQ DEVICE RUNNING WINDOWS MOBILE 5?

3     A.   YES.

4          MR. PAK:  AND YOUR HONOR, WE'D LIKE TO PLAY THAT

5     VIDEO AS A DEMONSTRATIVE.  IT'S SDX 3600.

6          THE COURT:  GO AHEAD, PLEASE.

7          MR. PAK:  MR. KOTARSKI, IF WE CAN HAVE THAT.

8     AND I'LL ASK DR. CHASE TO HELP US UNDERSTAND WHAT'S GOING

9     ON.

10         (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

11         THE WITNESS:  SO WHAT'S IMPORTANT HERE IS THAT

12    WINDOWS MOBILE 5 PERFORMED BACKGROUND SYNC, AND WHAT WE SEE IS

13    A USER USING ONE WINDOWS MOBILE 5 IPAQ DEVICE AND HE'S ADDING

14    AN ENTRY TO A CONTACT RECORD IN THE ADDRESS BOOK FOR THIS

15    DEVICE, AND IT'S GOING TO SYNC THE NEW ENTRIES FOR

16    AKIN ANDERSON.

17         AND YOU CAN SEE THAT IT'S MISSING FROM THE SECOND DEVICE,

18    WHICH IS NOW GOING TO SYNC AND OBTAIN THAT RECORD.

19         MEANWHILE, A USER IS USING THE INTERFACE OF THE SECOND

20    DEVICE AND JUST LOOKING AT DIFFERENT CONTACTS, AND WE CAN SEE

21    NOW THAT IT'S SYNCING, WE CAN SEE A LITTLE THING GOING AROUND

22    HERE, AND NOW THE ENTRY FOR AKIN ANDERSON HAS APPEARED.

23         SO WHILE THE USER WAS USING THIS DEVICE, THE DEVICE

24    CONTACTED THE SERVER AND FETCHED THIS ENTRY WHICH HAD BEEN

25    ENTERED ON THE OTHER DEVICE ON THE LEFT-HAND SIDE.
```

```
 1            SO THIS IS BACKGROUND SYNC.

 2     BY MR. PAK:

 3     Q.   AND WHEN WAS THIS DEVICE AVAILABLE?

 4     A.   THIS IS -- THIS DEVICE WAS AVAILABLE WELL BEFORE 2005, BUT

 5     THIS PARTICULAR ONE RUNNING WINDOWS MOBILE 5 WAS AVAILABLE IN

 6     SEPTEMBER OF 2005.

 7     Q.   NOW, JUST TO BE CLEAR, ARE YOU RELYING ON THE

 8     DEMONSTRATION AS PRIOR ART OR ARE YOU RELYING ON THE SOURCE

 9     CODE?

10     A.   THE PRIOR ART IS THE INSTRUCTIONS IN THE DEVICE STORED IN

11     THE MEMORY OF THE DEVICE WHICH CORRESPOND TO THE SOURCE CODE

12     WHICH I EXAMINED.

13     Q.   DR. CHASE, I'D LIKE -- AT THIS TIME I'D LIKE TO WALK

14     THROUGH THE CLAIM LIMITATIONS AND HAVE YOU OPINE ON THE SOURCE

15     CODE.  DX 3644.

16            DR. CHASE, WHAT ARE WE LOOKING AT HERE IN TERMS OF YOUR

17     COMPARISON OF THE CLAIM LANGUAGE TO THE INSTRUCTIONS THAT ARE

18     ON WINDOWS MOBILE 5?

19     A.   WELL, THE PICTURES SHOW THE USER INTERFACE FOR THREE

20     DIFFERENT APPLICATIONS, FOR CONTACTS, CALENDAR, AND E-MAIL, AND

21     SO THEY'RE APPLICATIONS THAT PRESENT A USER INTERFACE, AND THE

22     USER INTERFACE IS CONTROLLED BY WHAT'S CALLED A THREAD WHICH

23     CORRESPONDS TO THE USER LEVEL NON-SYNCHRONIZATION PROCESSING

24     THREAD OF THE CLAIMS.

25            SO HERE WE HAVE A USER -- THREE USER APPLICATIONS
```

```
 1     PRESENTING USER INTERFACES TO THE USER THAT ALLOW THE USER TO

 2     ACCESS AND EDIT STRUCTURED DATA FOR MAIL, CALENDAR, AND

 3     CONTACTS.

 4     Q.   IS THERE A DATABASE ON THE SYSTEM IN THE SOURCE CODE?

 5     A.   YES.   THE DATA FROM THESE THREE DATA CLASSES IS STORED IN

 6     DATABASES ON THE DEVICE THAT ARE KNOWN AS CEDB, OR EDB, THAT

 7     ARE ON THE DEVICE, AND IN THE CASE OF E-MAIL, THERE'S ANOTHER

 8     DATABASE CALLED MAPI, M-A-P-I.

 9     Q.   ARE THESE DATABASES USED FOR SYNCHRONIZATION?

10     A.   WELL, WHEN SYNCHRONIZATION OCCURS BETWEEN A DEVICE AND THE

11     SERVER, THE E-MAIL -- EXCUSE ME -- THE STRUCTURED DATA IS

12     OBTAINED FROM THIS DATABASE AND SENT TO THE SERVER, OR OBTAINED

13     FROM THE SERVER AND STORED IN THIS DATABASE.

14     Q.   THANK YOU.   LET'S TURN TO SDX 3646.

15          CAN YOU PLEASE COMPARE THE SOURCE CODE THAT YOU HAD FOUND

16     TO THE "EXECUTING A SYNCHRONIZATION PROCESSING THREAD

17     CONCURRENTLY" UNDER HER HONOR'S CONSTRUCTION OF THAT TERM

18     "CONCURRENTLY"?

19     A.   WELL, I DID SEE -- I DID REVIEW THE SOURCE CODE AND I SAW

20     WHERE SYNCHRONIZATION THREADS ARE CREATED.

21          ALL OF THESE SYNCHRONIZATION OPERATIONS OCCUR ON THREADS.

22     WINDOWS MOBILE CREATES A THREAD FOR EACH SYNCHRONIZATION

23     REQUEST AND FOR EACH SERVER, AT LEAST ONE THREAD, AND THESE ARE

24     THE SYNCHRONIZATION PROCESSING THREADS OF THE CLAIM, AND THEY

25     DO EXECUTE CONCURRENTLY WITH THE THREAD THAT CONTROLS THE USER
```

```
 1     INTERFACE, THE U/I THREAD.

 2     Q.   HOW DO YOU KNOW THAT THEY OCCUR CONCURRENTLY?

 3     A.   WELL, I EXAMINED THE SOURCE CODE, AND THE COURT HAS A

 4     CONSTRUCTION FOR "CONCURRENTLY," THAT TWO THREADS ARE

 5     CONCURRENT IF THEY ARE ACTIVE DURING AN OVERLAPPING TIME

 6     INTERVAL.

 7          I CONSIDERED THAT CONSTRUCTION AND, IN MY REVIEW OF THE

 8     SOURCE CODE, THOSE THREADS ARE CONCURRENT.

 9     Q.   THANK YOU.  LET'S TURN TO SDX 3648.

10          AND LOOKING AT THIS LIMITATION ON SDX 3648 --

11     MR. KOTARSKI, IT'S THE NEXT SLIDE -- CAN YOU COMPARE THE CLAIM

12     LIMITATION IN RED TO THE LEFT, TO THE WINDOWS MOBILE 5 SOURCE

13     CODE AND ARCHITECTURE?

14     A.   THIS IS A PICTURE FROM ONE OF THE "TECHNET" ARTICLES AND

15     IT DEPICTS A WINDOWS MOBILE 5 CLIENT, A HANDHELD DEVICE ON THE

16     LEFT HERE, AND EXCHANGE ON THE RIGHT.

17          AND WINDOWS MOBILE 5 HAS COMPONENTS CALLED PROVIDERS FOR

18     E-MAIL, CONTACTS, AND CALENDAR.  THEY'RE ILLUSTRATED THERE.

19          AND THESE ARE SYNCHRONIZATION SOFTWARE COMPONENTS AND THEY

20     PROVIDE THE SYNCHRONIZATION PROCESSES THREADS I SPOKE ABOUT.

21     Q.   THANK YOU.

22          AND THEN, YOUR HONOR, THE NEXT ONE IS A CONFIDENTIAL

23     DOCUMENT, SDX 3650.  IT'S A DEMONSTRATIVE.

24          IT'LL BE ON YOUR SMALL SCREENS.

25          AND DR. CHASE, WITHOUT IDENTIFYING THE SPECIFIC SOFTWARE
```

1    COMPONENT NAMES, WHICH ARE MICROSOFT CONFIDENTIAL, CAN YOU

2    DESCRIBE TO US WHAT YOU FOUND IN THE SOURCE CODE CORRESPONDING

3    TO SYNCHRONIZATION SOFTWARE COMPONENT THAT IS CONFIGURED TO

4    SYNCHRONIZE STRUCTURED DATA?

5    A.   WELL, THESE ARE, ON THE TOP THREE, ARE PROVIDER

6    COMPONENTS.  MR. HALL SPOKE ABOUT THOSE AS WELL IN THE

7    DEPOSITION TESTIMONY THAT WE SAW.

8        THERE'S ONE EACH FOR THE THREE DATA CLASSES, MAIL,

9    CALENDAR, AND CONTACTS, EXCHANGE INBOX PROVIDER AND EXCHANGE

10   CALENDAR PROVIDER AND EXCHANGE CONTACTS PROVIDER.

11       NOW, THERE'S A FOURTH COMPONENT HERE.  IF YOU WANT TO USE

12   YOUR DEVICE WITH A DIFFERENT KIND OF MAIL SERVER, YOU NEED

13   ANOTHER COMPONENT FOR THAT, AND THERE IS IN PARTICULAR A

14   COMPONENT CALLED IMAP MAIL COMPONENT THAT CAN SYNCHRONIZE DATA

15   WITH IMAP MAIL SERVERS.  THAT'S A STANDARD MAIL PROTOCOL IN THE

16   INTERNET.

17   Q.   THANK YOU, DR. CHASE.

18       TURN TO DX 3651, AND CAN YOU TELL US WHERE YOU -- WHETHER

19   YOU WERE ABLE TO FIND A SECOND DATABASE IN THE WINDOWS MOBILE 5

20   CODE CORRESPONDING TO THE CLAIM LANGUAGE?

21   A.   WELL, YES.  THESE HANDHELD DEVICES SYNCHRONIZE WIRELESSLY

22   ON THE GO WITH EXCHANGE SERVERS, AND THE EXCHANGE SERVER WE CAN

23   SEE THERE ON THE RIGHT ON THIS PICTURE DOES HAVE A DATABASE

24   WHERE IT STORES A SECOND COPY OF ALL THAT DATA.

25   Q.   TURN TO SDX 3653.  LOOKING AT THE LAST REMAINING ELEMENT

1    FOR CLAIM 20 IN RED, CAN YOU COMPARE WHAT YOU FOUND IN THE

2    SOURCE CODE IN THE ARCHITECTURE TO THAT CLAIM ELEMENT?

3    A.   WELL, THOSE THREE PROVIDER COMPONENTS THAT I SPOKE ABOUT

4    ARE SYNCHRONIZATION SOFTWARE COMPONENTS, EACH FOR A DIFFERENT

5    DATA CLASS, AND THEY MEET THE LIMITATIONS FOR THE CLAIM.

6         THEY ARE, IN PARTICULAR, CONFIGURED TO SYNCHRONIZE

7    STRUCTURED DATA OF THOSE DATA CLASSES.  THEY HAVE INSTRUCTIONS

8    TO DO THAT.

9    Q.   ARE WERE YOU ABLE TO FIND THREE OF THEM FOR THREE

10   DIFFERENT CLASSES?

11   A.   YES.

12   Q.   WHAT ARE THEY?

13   A.   THREE, ONE FOR EACH OF THREE DIFFERENT CLASSES, E-MAIL,

14   CONTACTS AND CALENDAR.

15   Q.   SO IF WE TURN TO SDX 3643, LOOKING AT THE CLAIM

16   LIMITATIONS ON THE SCREEN -- FIRST OF ALL, IS THERE ANYTHING IN

17   THE CLAIM LANGUAGE OF CLAIM 20 THAT REQUIRES A PLUG-IN

18   ARCHITECTURE OSTENSIBLY BY A THIRD PARTY?

19   A.   THERE'S NOTHING.

20   Q.   IS THERE ANYTHING IN HER HONOR'S CLAIM CONSTRUCTION THAT

21   REQUIRES SUCH A LIMITATION?

22   A.   NO.

23   Q.   SO LOOKING AT THE CLAIM LANGUAGE AS WRITTEN, DO YOU -- CAN

24   WE CHECK OFF EACH OF THESE LIMITATIONS HERE?

25   A.   YES.

1    Q.   AND, SIR, IN YOUR OPINION, DOES THE WINDOWS MOBILE 5 THAT

2    EXISTED IN 2005 ANTICIPATE EVERY SINGLE ELEMENT OF CLAIM 20?

3    A.   YES.  IT -- IT MEETS ALL OF THE LIMITATIONS FOR CLAIM 20,

4    INCLUDING THE LIMITATIONS FOR CLAIM 11.

5         DR. SNOEREN DOES NOT CONTEST THAT IT MEETS THE LIMITATIONS

6    FOR CLAIM 11 AT LEAST.

7         BECAUSE IT MEETS ALL OF THESE LIMITATIONS, WINDOWS MOBILE

8    5 ANTICIPATES THE CLAIM.  THAT RENDERS THE CLAIM INVALID

9    BECAUSE MICROSOFT DID IT FIRST.

10   Q.   AND WAS -- THAT IMAP MAIL THAT YOU TALKED ABOUT, WAS THAT

11   STORED IN A DATABASE SOMEWHERE?

12   A.   SO AN EXAMPLE OF AN IMAP SERVER WOULD BE SOMETHING CALLED

13   CYRUS, AND CYRUS ALSO STORES MAIL DATA IN THE DATABASE.

14   Q.   DR. CASE, IN ADDITION TO WINDOWS MOBILE 5, DID YOU

15   CONSIDER ANOTHER PIECE OF PRIOR ART?

16   A.   YES, THE OTHER PIECE THAT'S IMPORTANT HERE IS EVOLUTION.

17   Q.   CAN WE TURN TO SDX 3655.

18        DR. CHASE, WHAT IS NOVELL EVOLUTION?

19   A.   WELL, EVOLUTION IS AN APPLICATION FOR MANAGING PERSONAL

20   DATA, E-MAILS, CONTACTS AND CALENDAR.  IT RUNS ON LINUX

21   SYSTEMS, AND IN PARTICULAR, IT'S SHIPPED WITH THE LINUX SYSTEM

22   THAT WAS SOLD BY NOVELL CORPORATION.

23   Q.   IF YOU WOULD TURN TO DX 321 IN YOUR BINDER?

24   A.   YES.

25   Q.   DO YOU RECOGNIZE THAT SET OF DOCUMENTS?

1    A.   THIS IS A -- THIS IS A 321 -- PARDON ME.  321, I DO

2    RECOGNIZE THIS.  THIS IS A PRESS RELEASE REGARDING THE RELEASE

3    OF SUSE LINUX 10.0 FROM NOVELL WHICH WAS AVAILABLE IN

4    SEPTEMBER 2005.

5         MS. KREVANS:  YOUR HONOR, WE OBJECT AND MOVE TO

6    STRIKE.  THAT WAS NOT AN EXHIBIT THAT WAS DISCUSSED IN HIS

7    REPORT.

8         MR. PAK:  YOUR HONOR, IT WAS DISCUSSED SPECIFICALLY

9    IN PARAGRAPH 229 TO 241, WHICH CITES TO THE NOVELL DECLARATION

10   THAT HAS ALL OF THESE PRESS RELEASES, AND THIS IS THE EXACT

11   SAME INFORMATION THAT HE RELIED UPON IN HIS EXPERT REPORT.

12        THE COURT:  IT JUST SAYS "SEE DECLARATION OF NOVELL."

13        MR. PAK:  YES, AND THESE PRESS RELEASES ARE ATTACHED

14   AND THE DECLARATION WAS CITED AS MATERIALS CONSIDERED IN HIS

15   EXPERT REPORT.

16      THESE ARE PRESS RELEASES THAT ARE PUBLICLY AVAILABLE

17   DOCUMENTS THAT SHOWCASE, OR THEY DOCUMENT THE AVAILABILITY OF

18   THE SOFTWARE.

19        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

20      (DEFENDANTS' EXHIBIT 321 WAS ADMITTED IN EVIDENCE.)

21        THE COURT:  GO AHEAD, PLEASE.

22        MR. PAK:  THANK YOU.

23   Q.   CAN YOU TAKE A LOOK AT 319, DX 319?

24   A.   YES.  319 IS THE CD WHICH I RECOGNIZE.

25        MR. PAK:  AND, YOUR HONOR, I'D LIKE TO --

1     Q.   DID YOU RELY ON THAT CD FOR THE WINDOWS -- OR THE NOVELL

2     EVOLUTION SOFTWARE?

3     A.   NOVELL PROVIDED BOTH AN INSTALLABLE IMAGE AND SOURCE CODE

4     FOR NOVELL SUSE LINUX 10.0 AND EVOLUTION AND THIS CD IS ONE OF

5     THOSE.

6           MR. PAK:  YOUR HONOR, WE'D LIKE TO MOVE --

7           THE COURT:  LET'S TAKE A BREAK.  I'D LIKE THE JURY TO

8     STEP OUT.  THE TIME IS NOW 1:26.

9           (JURY OUT AT 1:26 P.M.)

10          THE COURT:  OKAY.  THE RECORD SHOULD REFLECT THAT THE

11    JURORS HAVE LEFT THE COURTROOM.

12          AND YOU MAY STEP DOWN.

13          THIS IS PRETTY UNORTHODOX OF TRYING TO GET ALL THE PRIOR

14    ART IN THROUGH YOUR EXPERT.

15          MS. KREVANS:  THIS IS OUR --

16          THE COURT:  THIS IS HAPPENING WITH EVERY SINGLE PIECE

17    OF PRIOR ART.  I'M NOT CLEAR.  THIS DECLARATION OF NOVELL, IS

18    THAT WHAT YOU ALL DIDN'T WANT TO READ IN THE RECORD BECAUSE IT

19    WAS GOING TO TAKE TOO MUCH TIME?

20          MS. KREVANS:  THERE WAS SUPPOSED TO BE A LIVE WITNESS

21    WHO WAS SUPPOSED TO TESTIFY BEFORE THIS WITNESS AND THEY

22    DROPPED HIM, AND NOW THEY ARE JUST USING A WITNESS THAT HAS NO

23    FOUNDATION TO SAY THAT ANY OF THESE THINGS ARE THE RIGHT THING

24    TO PUT THEM IN.

25          MR. PAK:  YOUR HONOR, WE HAVE A NOVELL DECLARATION

```
 1        THAT WE WILL READ INTO THE RECORD.

 2            YOUR HONOR, WE'RE TRYING TO --

 3                THE COURT:  I'M NOT GOING TO LET IT IN UNLESS YOU

 4        READ IT INTO THE RECORD.  THIS IS NOT PROPER.  YOU'RE DOING

 5        THIS ON EVERY PIECE OF PRIOR ART.

 6            THIS IS NOT THE WITNESS FOR MICROSOFT.  THIS IS NOT THE

 7        WITNESS FOR NOVELL.  THIS IS IMPROPER.

 8            I KIND OF LET IT SLIDE ONCE, BUT NOW I SEE THAT YOU'RE

 9        GOING TO JUST DO THIS -- YOU NEED TO HAVE THE APPROPRIATE

10        WITNESSES GET THIS EVIDENCE IN.

11                MR. PAK:  SHOULD WE TAKE A BREAK NOW, YOUR HONOR, AND

12        READ IN THE DECLARATION?  WOULD THAT --

13                THE COURT:  I THINK THAT WOULD BE APPROPRIATE.  DO

14        YOU HAVE A DECLARATION FOR MICROSOFT AS WELL?

15                MR. PAK:  ACTUALLY, THAT ALREADY CAME IN, YOUR HONOR,

16        I THINK FROM THE TESTIMONY OF MR. GARY HALL.

17            BUT, YES, WE HAVE A DECLARATION THAT WE CAN READ IN AS

18        WELL.

19                MS. KREVANS:  HE DID NOT AUTHENTICATE ALL OF THESE

20        EXHIBITS, YOUR HONOR.

21            AND IN ADDITION, THERE WERE THINGS THAT THEY NEEDED

22        MR. WINSHIP TO DO AND NOW THEY'VE DROPPED MR. WINSHIP.  THAT'S

23        THE WITNESS THEY SKIPPED.

24                THE COURT:  WHAT WOULD MR. WINSHIP AUTHENTICATE, THE

25        SALES NUMBERS?
```

 1              MR. PAK:  NO, YOUR HONOR.  HE WAS ONLY THERE TO TALK

 2     ABOUT THE FUNCTIONALITY OF THE CODE GENERALLY.

 3         THESE ARE DECLARATIONS.  THEY'RE NOT CONTESTING THE

 4     AUTHENTICITY OF THE SOURCE CODE.  THESE ARE DECLARATIONS THAT

 5     WE WILL READ INTO THE RECORD IN THE RELEVANT PORTIONS, YOUR

 6     HONOR, TO GET THIS EVIDENCE IN.

 7              MS. KREVANS:  YOUR HONOR, WE HAVE NOT STIPULATED TO

 8     THE AUTHENTICITY OF 319 AND 320, WHICH ARE SOURCE CODE.

 9              MR. PAK:  YES -- WELL --

10              MS. KREVANS:  AND THIS IS COMPLETELY IMPROPER.

11         AND IN ADDITION, I DID NOT WANT TO MAKE A LONG SPEECH IN

12     FRONT OF THE YOUR, BUT YOUR HONOR, AT THEIR REQUEST,

13     ESTABLISHED A PRECEDENT THAT THE PARTIES COULD NOT SIMPLY

14     DISCLOSE AN EXHIBIT, A MASS OF SOURCE CODE, WITHOUT IDENTIFYING

15     BATES NUMBERS OR FILE PATHS OR FILE NAMES, AND THAT'S WHAT

16     THEY'VE DONE WITH EVERY SOURCE CODE THAT THEY'RE READING IN

17     TODAY.

18              MR. PAK:  FIRST OF ALL, APPLE DID STIPULATE TO THE

19     AUTHENTICITY OF 314, 316, 319 --

20              THE COURT:  WELL, LET ME SEE THE STIPULATION, PLEASE.

21              MR. PAK:  YES.

22              THE COURT:  I'D LIKE TO SEE THE STIPULATION.

23         I DON'T RECALL MR. HALL TESTIFYING ABOUT MOBILE 5.0 PRESS

24     RELEASES, WHICH IS DX 315.

25              MR. PAK:  THESE ARE COVERED IN THE EVOLUTION PRESS

DIRECT CHASE

1    RELEASES, YOUR HONOR.

2         ARE YOU TAKING ABOUT THE WINDOWS MOBILE PRESS RELEASES?

3              THE COURT:  I'M TALKING ABOUT THE WINDOWS MOBILE.  I

4    DON'T RECALL ANY EXHIBITS GOING IN THROUGH MR. HALL'S

5    DEPOSITION.

6              MR. MCELHINNY:  I COVERED THAT DEPOSITION.  HE DID

7    NOT IDENTIFY A SPECIFIC DOCUMENT.  THERE WAS NOT AN EXHIBIT.

8    THERE WAS NOT AN EXHIBIT OFFERED.

9              THE COURT:  SO HOW ARE YOU GETTING THE MOBILE 5.0,

10   DX 315, IN?  I DON'T THINK IT WAS COMING IN THROUGH THE EXCERPT

11   I SAW FROM MR. HALL'S DEPOSITION.

12             MR. PAK:  YOUR HONOR, WHAT WE HAVE IS DECLARATIONS OF

13   MR. GOGERTY, THAT'S WINDOWS MOBILE 5.

14             THE COURT:  OKAY.

15             MR. PAK:  WE HAVE THE DECLARATION OF MR. LUNDBERG FOR

16   THE MOBILE -- FOR THE NOVELL EVOLUTION SOFTWARE.

17             THE COURT:  OKAY.  WELL, I'M GOING TO REQUIRE THAT

18   THOSE BE READ, BECAUSE OTHERWISE I DON'T THINK THIS IS PROPER.

19   THIS IS NOT A MICROSOFT/NOVELL WITNESS TO GET THESE DOCUMENTS

20   IN.

21             MS. KREVANS:  AND YOUR HONOR, THEY WOULD ALSO NEED TO

22   READ THE DECLARATION OF MR. GOGERTY, WHO IS A MICROSOFT

23   ARCHIVIST.

24             THE COURT:  I'M SORRY.  LET'S GO PIECE BY PIECE.

25        WHO WOULD AUTHENTICATE DX 315, WHICH IS THE MOBILE 5.0

```
 1        PRESS RELEASES?  WHO WOULD DO THAT?  IT'S NOT MR. HALL.

 2               MR. PAK:  WE'RE CHECKING THAT, YOUR HONOR.

 3               THE COURT:  OKAY.

 4               MR. PAK:  CAN I READ -- I AM -- I'M PREPARED TO READ

 5        IN THE RELEVANT SECTIONS --

 6               THE COURT:  NO.  WE'RE BRINGING THE JURY IN.  THIS IS

 7        THE INTRODUCTION OF EVIDENCE.  IT'S GOING TO BE WITH THE JURY

 8        IN.

 9            BUT LET ME UNDERSTAND.  I DON'T WANT TO HAVE ANY

10        OBJECTIONS IN FRONT OF THE JURY, SO LET'S WORK THIS OUT NOW.

11               MR. PAK:  YES.

12               THE COURT:  DX 316, WHO IS THE WITNESS --

13               MR. PAK:  THAT'S MR. GOGERTY, G-O-G-E-R-T-Y.

14               THE COURT:  OKAY.  SO HE'S DX 316.  OKAY.

15            THEN YOU'RE GOING TO TELL ME WHO IS DX 315, RIGHT, THE

16        PRESS RELEASES?

17               MR. PAK:  YES.  THE SALES RECORD, WINDOWS MOBILE 5,

18        DX 316, YOUR HONOR, WOULD ALSO BE MR. GOGERTY.

19               THE COURT:  NO. YOU ALREADY TOLD ME DX 316 IS

20        GOGERTY.  WHO IS THE PRESS RELEASES, DX 315?

21               MR. PAK:  WE'RE STILL LOOKING INTO THAT, YOUR HONOR.

22               THE COURT:  OKAY.  THAT'S FINE.

23            NOW, DX 317, THE "TECHNET," WHO IS GETTING THAT IN?  IS

24        THAT GOGERTY?

25               MR. PAK:  APPLE STIPULATED TO AUTHENTICITY ON THAT,
```

1        SO WE'RE GOING TO GET THE STIPULATION ON THAT.

2                THE COURT:  OKAY.

3                MS. KREVANS:  AUTHENTICITY, BUT NOT ADMISSIBILITY,

4        YOUR HONOR.

5                THE COURT:  WHAT'S YOUR OBJECTION ON ADMISSIBILITY?

6                MR. PAK:  THIS IS A PUBLIC DOCUMENT, YOUR HONOR.

7                THE COURT:  WHAT'S YOUR OBJECTION?

8                MS. KREVANS:  AS LONG AS THEY'RE TOLD THAT IT IS NOT

9        FOR THE TRUTH OF THE MATTER STATED, WE'D BE FINE WITH IT.  IT'S

10       A PRESS RELEASE.  BUT THEY DON'T WANT THAT INSTRUCTION.

11               THE COURT:  WELL, DX 317, IT DIDN'T LOOK LIKE A PRESS

12       RELEASE TO ME.  I THINK YOU MIGHT BE -- 315 IS A PRESS RELEASE,

13       BUT 317, IT LOOKS LIKE A TECHNICAL DOCUMENT.

14               MR. PAK:  IT'S A MICROSOFT TECHNICAL DOCUMENT, YOUR

15       HONOR, THAT WAS PRODUCED IN THIS CASE.  IT'S AUTHENTIC.

16               THE COURT:  ARE YOU REFERRING TO 315?

17               MS. KREVANS:  I'M REFERRING TO 315, YOUR HONOR.

18               THE COURT:  OKAY.  SO HAVE YOU STIPULATED THEN TO

19       31 -- WHAT IS IT?

20           I WANT TO SEE THE STIPULATION, PLEASE.  WHAT IS IT THAT

21       HAS BEEN STIPULATED TO?

22               MS. KREVANS:  HERE'S ANOTHER COPY OF THE STIPULATION,

23       YOUR HONOR.

24               THE COURT:  OKAY.  THANK YOU.

25               (PAUSE IN PROCEEDINGS.)

1              MS. KREVANS:  AND, YOUR HONOR, UNFORTUNATELY, THE

2    STIPULATION DOES NOT ALWAYS GO BY NUMERICAL ORDER OF EXHIBIT.

3              THE COURT:  THAT'S FINE.  LET'S GO TO DX 317.  YOU

4    HAVE STIPULATED TO ITS AUTHENTICITY?

5              MS. KREVANS:  WE HAVE STIPULATED TO ITS AUTHENTICITY.

6              THE COURT:  WHAT IS YOUR OBJECTION?  THIS IS A

7    TECHNICAL DOCUMENT.  THIS WAS NOT A PRESS RELEASE.

8              MS. KREVANS:  I WAS THINKING OF 315, YOUR HONOR --

9              THE COURT:  OKAY.  WELL --

10             MS. KREVANS:  -- WHICH WE DON'T THINK SHOULD COME IN

11   FOR THE TRUTH.

12             THE COURT:  ALL RIGHT.  WELL, LET'S GO TO -- LET'S GO

13   TO DX 314.

14             MR. PAK:  YES.  THAT WILL BE COVERED IN MR. GOGERTY'S

15   DECLARATION, YOUR HONOR.

16             THE COURT:  OKAY.  ALL RIGHT.

17          AND LET'S GO TO 321.

18             MR. PAK:  YOUR HONOR, THAT WILL BE COVERED IN

19   MR. LUNDBERG'S DECLARATION.

20             THE COURT:  OKAY.  THAT'S DX 321.

21          OKAY.  WHAT OTHER -- I'D LIKE TO JUST WORK THIS OUT NOW

22   OUTSIDE THE PRESENCE OF THE JURY --

23             MR. PAK:  SURE.

24             THE COURT:  -- SO WE DON'T HAVE ANY OBJECTIONS AND

25   DON'T HAVE TO DO ANY OF THIS IN FRONT OF THE JURY.

```
 1            SO WHAT ELSE IS GOING TO BE ADMITTED WITH REGARD TO THE

 2     NOVELL EVOLUTION?

 3            MR. PAK:  I THINK WE TALKED ABOUT 319, THAT'S THE

 4     SOFTWARE, YOUR HONOR, THAT WILL -- THAT APPLE HAS STIPULATED TO

 5     THE AUTHENTICITY OF THAT CODE.  THEY HAVE --

 6            MS. KREVANS:  I DON'T THINK SO.

 7            MR. BUROKER:  DO YOU HAVE A STIPULATION?

 8            MR. PAK:  310.  WE'RE MAKING EXTRA COPIES, YOUR

 9     HONOR, BUT 319 HAS BEEN STIPULATED TO.

10            THE COURT:  DO YOU HAVE A PARAGRAPH IN THE

11     STIPULATION?

12            MS. KREVANS:  I HAVE 317, 323, 325, 3 --

13            THE COURT:  I DON'T SEE DX 319 IN THE STIPULATION.

14            MR. PAK:  OKAY, YOUR HONOR.  WE DON'T NEED 319.  WE

15     JUST NEED THE ACTUAL SOURCE CODE -- ACTUALLY, 319 IS THE SOURCE

16     CODE AND THAT HAS BEEN -- THAT'S THE SOFTWARE, 319 WILL BE

17     COVERED BY MR. LUNDBERG.

18            THE COURT:  OKAY.

19            MS. KREVANS:  AND 32 --

20            MR. PAK:  320 IS THE -- YOU GUYS ARE NOT OBJECTING TO

21     THIS, RIGHT?

22            MS. KREVANS:  WE DO.

23            MR. PAK:  OKAY.  SO 320 IS STIPULATED, WHICH IS THE

24     SOFTWARE.

25            MS. KREVANS:  NO.
```

```
 1              MR. PAK:  319 IS THE SOURCE CODE.  THERE'S A CD ROM.

 2              MS. KREVANS:  I'M SORRY.  WHERE IS 320?

 3              MR. PAK:  DOCKET 1677, PARAGRAPH 2.

 4              THE COURT:  DO YOU -- I DON'T HAVE THAT.  CAN I SEE,

 5       WHERE'S THE STIPULATION ON 320?

 6              MR. PAK:  YOUR HONOR, CAN I HAND THIS UP TO YOU?

 7              THE COURT:  YES, PLEASE.

 8              MS. KREVANS:  MAY I SEE IT?

 9          (PAUSE IN PROCEEDINGS.)

10              MR. PAK:  YOUR HONOR, MAY I APPROACH?

11              THE COURT:  YES, PLEASE.  THIS IS WITH REGARD TO

12       DX 320?

13              MR. PAK:  320, YOUR HONOR, PARAGRAPH 2.

14              THE COURT:  IS THAT SOURCE CODE?

15              MR. PAK:  IT'S A CD ROM OF THE ACTUAL BINARY CODE,

16       YOUR HONOR.

17          AND THEN 319, YOUR HONOR, WHICH IS THE SOURCE CODE, WILL

18       BE ADMITTED THROUGH THE DECLARATION OF LUNDBERG.

19              MR. BUROKER:  320 IS THE SOFTWARE.  320 IS THE SOURCE

20       CODE.

21          (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

22              THE COURT:  ALL RIGHT.  NOW, ARE THOSE ALL OF THE

23       EXHIBITS THAT YOU --

24              MR. PAK:  THAT'S ALL WE NEED, YOUR HONOR.

25              THE COURT:  OKAY.  NOW, 315, WHO IS GETTING THAT IN?
```

```
 1              MR. PAK:  315, WHICH IS THE PRESS RELEASE --

 2              THE COURT:  THE PRESS RELEASE.

 3              MR. PAK:  -- YOUR HONOR, WE BELIEVE THAT'S

 4    NON-HEARSAY, A PUBLIC DOCUMENT.  IT'S BEEN AUTHENTICATED TO --

 5    OR ACTUALLY, YOUR HONOR, WE WILL HAVE DR. CHASE BEING THE

 6    SPONSORING WITNESS FOR THIS PRESS RELEASE.

 7         IF THEY WANT TO HAVE A LIMITING INSTRUCTION, WE'RE FINE

 8    WITH THAT.

 9         BUT WE THINK THIS IS A DOCUMENT THAT'S BEEN PRODUCED IN

10    THIS INVESTIGATION AND RELIED UPON.

11              MS. KREVANS:  YOUR HONOR, THEY ARE OFFERING THIS

12    DOCUMENT FOR THE TRUTH OF THE MATTER STATED AND IT'S HEARSAY,

13    AND DR. CHASE CANNOT FIX THAT PROBLEM.

14              THE COURT:  WELL, WE CAN JUST GIVE A LIMITING

15    INSTRUCTION THAT IT'S NOT FOR THE TRUTH OF THE MATTER ASSERTED.

16    I THINK THAT'S THE WAY WE'VE BEEN DEALING WITH PRESS RELEASES

17    AND PUBLICATIONS.

18              MS. KREVANS:  YOUR HONOR, WE'VE BEEN DEALING WITH

19    THAT WHERE THINGS ARE NOT BEING OFFERED FOR THE TRUTH.

20         THIS IS BEING OFFERED FOR THE TRUTH.

21              MR. PAK:  YOUR HONOR, WE'RE MERELY POINTING OUT, WITH

22    RESPECT TO THAT, THAT THIS PRESS RELEASE WAS DATED

23    SEPTEMBER 26TH, 2005.

24         WE'RE NOT OFFERING IT FOR THE TRUTH OF THE DESCRIPTIONS

25    AND THE CONTENT OF THIS ARTICLE.
```

```
 1          THIS IS A, A PUBLIC ARTICLE THAT I THINK IS A NON-HEARSAY

 2     DOCUMENT AND I THINK IT CAN BE CONSIDERED AS A NON-HEARSAY

 3     DOCUMENT FOR THE FACT THAT H-P MADE THIS ANNOUNCEMENT WITH THE

 4     WINDOWS MOBILE 5 ON SEPTEMBER 26TH, 2005.

 5          MS. KREVANS:  YOUR HONOR, THEY ARE USING THIS PRESS

 6     RELEASE TO TRY TO PROVE CONTENT OF THE PRIOR ART.  THAT IS TO

 7     PROVE THE TRUTH.

 8          MR. PAK:  IT'S A NON-HEARSAY DOCUMENT, YOUR HONOR.

 9          MS. KREVANS:  IT'S CLEARLY HEARSAY.

10          THE COURT:  WELL, I THINK IT WOULD BE OVERLY

11     PREJUDICIAL TO SAMSUNG TO EXCLUDE IT.

12          MR. PAK:  THANK YOU, YOUR HONOR.

13          THE COURT:  BUT YOU'RE GOING TO HAVE TO LAY SOME

14     FOUNDATION FOR IT WITH DR. CHASE.

15          NOW, WHAT IS YOUR OBJECTION, MS. KREVANS, ABOUT THE SOURCE

16     CODE?

17          MS. KREVANS:  AT SAMSUNG'S REQUEST, QUITE EARLY IN

18     THIS CASE, WHEN WE WERE TRYING TO OFFER SOURCE CODE, YOU

19     ESTABLISHED A RULE THAT SPECIFIC BATES RANGES WITHIN THESE

20     MASSIVE AMOUNTS OF SOURCE CODE, OR SPECIFIC FILE NAMES OR PATH

21     NAMES, NEEDED TO BE IDENTIFIED WITH THE DISCLOSURES SO THE

22     OTHER PARTY WOULD KNOW WHAT PORTION OF THE SOURCE CODE WAS

23     ACTUALLY INTENDED TO BE DISCUSSED.

24          THE SOURCE CODE THAT WAS DISCLOSED FOR TODAY, WHICH

25     INCLUDES BOTH WINDOWS MOBILE SOURCE CODE AND EVOLUTION SOURCE
```

1    CODE, WAS DISCLOSED EN MASS.

2              MR. PAK:  THAT'S NOT TRUE, YOUR HONOR.  DX 314 WAS

3    NOT PRODUCED EN MASS.

4              MS. KREVANS:  WE ASKED FOR IDENTIFICATION AND THEY

5    REFUSED.

6              MR. PAK:  WE DID PROVIDE THE IDENTIFICATION IN OUR

7    EXPERT REPORTS.  DX 314 IS PART OF THE EXCERPTS OF THE

8    MICROSOFT WINDOWS SOURCE CODE THAT WE RELIED ON SPECIFICALLY.

9         YOUR HONOR, WE'RE NOT -- IT'S CLEAR THAT DR. CHASE HAS

10   ANALYZED THIS CODE AND HE'S PRESENTING ANALYSIS ON THIS CODE,

11   JUST LIKE DR. SNOEREN DID IN HIS INFRINGEMENT ANALYSIS, AND

12   THEY MOVED THE ENTIRE SOURCE CODE FOR ANDROID INTO EVIDENCE.

13        WE THINK THAT IT'S CLEAR TO HAVE -- IT WOULD BE BENEFICIAL

14   FOR THE COURT TO HAVE THE SOURCE CODE IN EVIDENCE.  THERE'S

15   NOTHING -- THERE ARE NOT REALLY ANY CHALLENGES TO THE

16   AUTHENTICITY OF THE SOURCE CODE.

17             MS. KREVANS:  THIS IS EXACTLY THE ISSUE WE HAD TWO

18   WEEKS AGO AND YOUR HONOR SAID, FROM HERE ON, SPECIFIC FILE

19   NAMES, SPECIFIC BATES RANGES, NOT 3,000 PAGES.

20             THE COURT:  WHY ISN'T THIS THE SPECIFIC BATES RANGE,

21   MSFT CODE 170 TO 3225?

22             MR. PAK:  IT IS, YOUR HONOR.  AND DX --

23             MS. KREVANS:  IT'S THE WHOLE THING.

24             MR. PAK:  IF YOU LOOK AT DX 314, YOUR HONOR, WHICH IS

25   THE PORTIONS OF THE MICROSOFT WINDOWS MOBILE 5 SOURCE CODE THAT

1       WE PROVIDED IN ADVANCE TO COUNSEL, IT HAS A BATES RANGE.

2           AND IT'S THE EXCERPTS THAT WE'RE RELYING ON, YOUR HONOR.

3       IT'S NOT THE ENTIRE THING.  IT'S SELECTIONS FROM THE WINDOWS

4       MOBILE 5 SOURCE CODE.

5           MS. KREVANS:  IT IS EVERYTHING FROM PAGE 170 TO 3,000

6       SOMETHING, YOUR HONOR.  IT'S THIS ENTIRE BOX FULL OF STUFF.

7           MR. PAK:  YOUR HONOR, THERE'S THOUSANDS OF PAGES OF

8       MICROSOFT CODE.  WE'VE IDENTIFIED, APPROPRIATELY, PAGE 170 TO

9       3225 IN ADVANCE, YOUR HONOR, AND FOLLOWED THE PROTOCOL.

10          THE COURT:  WHAT ABOUT 319?  THERE'S NO LIMITATION

11      THERE.

12          MR. PAK:  319, YOUR HONOR, IS SOFTWARE -- 319 IS

13      ACTUALLY THE SOFTWARE, NOT THE SOURCE CODE.

14          I MISSPOKE, YOUR HONOR.  320 IS THE SOURCE CODE THAT WE'RE

15      RELYING ON.

16          AND WE GAVE THEM SPECIFIC FILE NAMES IN AN E-MAIL THAT WE

17      JUST SENT TO THEM ON APRIL 15TH, 2014.

18          THE COURT:  WELL, I MEAN, THAT'S NOT GOOD ENOUGH.

19      THIS WAS YOUR RULE THAT MS. MAROULIS REQUESTED THAT ENTIRE

20      SOURCE CODE COULD NOT BE ADMITTED BECAUSE ON APPEAL, WE DIDN'T

21      WANT THE ISSUE OF SOMEBODY CITING TO A DIFFERENT PORTION THAN

22      WHAT WAS TESTIFIED TO DURING THE TRIAL.  SO THIS IS NOT NARROW

23      ENOUGH.  320 IS NOT NARROW ENOUGH.

24          MR. PAK:  YOUR HONOR, COULD WE -- SINCE WE'VE ALREADY

25      PROVIDED NOTICE TO APPLE'S COUNSEL OF THE SPECIFIC FILES, COULD

```
 1      WE PROVIDE AN AMENDED EXHIBIT THAT HAS JUST THE FILE NAMES THAT

 2      WE HAVE PREVIOUSLY IDENTIFIED TO APPLE?

 3              MS. KREVANS:  THE ONLY -- I DON'T THINK THEY'VE

 4      IDENTIFIED ANY FILE NAMES FOR 320.

 5          FOR 314, I DON'T BELIEVE THEY'VE IDENTIFIED ANYTHING.

 6              MR. PAK:  314 IS --

 7              THE COURT:  AND WHERE IS IT IN DR. CHASE'S REPORT --

 8              MR. PAK:  DR. CHASE, YOUR HONOR --

 9              THE COURT:  -- THE IDENTIFICATION OF SPECIFIC FILE

10      NAMES?

11              MS. KREVANS:  ALL THE EXPERTS, IN THEIR REPORTS,

12      LISTED MANY, MANY SETS OF FILES.

13          THE ISSUE NOW IS, CAN THEY SHOW THE JURY CODE THEY DIDN'T

14      TELL US THEY WERE GOING TO SHOW SO WE COULDN'T BE PREPARED AND

15      DO THEY GET TO PUT IT INTO EVIDENCE?

16              MR. PAK:  YOUR HONOR, THE --

17              THE COURT:  WELL, I'M GOING TO ENFORCE THE RULE THAT

18      SAMSUNG REQUESTED THAT SPECIFIC CODE BE IDENTIFIED AND ONLY

19      THAT BE ADMITTED.

20          SO I NEED THAT IDENTIFICATION FOR DX 314 AND DX 320.  WHAT

21      IS THE -- WHAT IS THAT?

22              MR. PAK:  I HAVE A LISTING HERE, YOUR HONOR.  WOULD

23      YOU -- THIS IS FOR --

24              MS. KREVANS:  FOR 320?

25              MR. PAK:  THIS IS FOR 320.
```

```
1                THE COURT:  OKAY.

2                MR. PAK:  AND WE HAVE 72 FILES, YOUR HONOR, THAT WE

3     INCLUDED FOR EVOLUTION SOURCE CODE, WHICH WE CAN PROVIDE INTO

4     EVIDENCE.

5                THE COURT:  ALL RIGHT.  SO FOR 314, IT'S 72 FILES?

6     IS THAT WHAT YOU SAID?

7                MR. PAK:  FOR 314, IT'S THE BATES RANGES 170,

8     MICROSOFT CODE 170 TO MICROSOFT CODE 3225.

9                MS. KREVANS:  THAT IS 3,000-PLUS PAGES.

10               MR. PAK:  OUT OF HUNDREDS OF THOUSANDS OF LINES OF

11    SOURCE CODE.

12               THE COURT:  WHAT IS IT FOR DX 320?

13               MR. PAK:  DX 320, YOUR HONOR, WE HAVE A LISTING OF

14    SPECIFIC CODE FILES THAT WE PROVIDED IN ADVANCE.

15          WE CAN LABEL THIS AS A DX 320A, YOUR HONOR, WHICH WILL

16    JUST BE THE FILES THAT WE SUBMITTED AS PART OF HIS EXPERT

17    REPORT THAT HE RELIED UPON.

18               THE COURT:  AND HOW MANY FILES ARE THOSE?

19               MR. PAK:  I THINK THERE'S APPROXIMATELY --

20               MR. CURRAN:  72.

21               MR. PAK:  -- 72 FILES, YOUR HONOR.

22               MS. KREVANS:  I'M SORRY, MR. PAK.

23          SINCE THIS WAS NOT IN OUR ORIGINAL DISCLOSURE, CAN YOU

24    SHOW ME WHAT YOU'RE RELYING ON TO SAY THAT YOU GAVE US NOTICE

25    OF THIS?
```

1            MR. PAK:  YES.  THIS WAS THE E-MAIL THAT WAS SENT

2    WITH MR. BORNSTEIN -- TO RUTH BORNSTEIN ON APRIL 15TH, 2014,

3    EVOLUTION EXCHANGE.

4            HERE'S THE LIST OF ALL THE FILES.

5            SO WE SENT YOU AN E-MAIL WITH THE LISTING OF ALL THE FILE

6    NAMES.  HERE IS THE PRINTOUTS.

7            YOUR HONOR, WE UNDERSTAND THAT THERE ARE SOURCE CODE FILES

8    HERE.  WE DID PROVIDE THEM WITH ADVANCED NOTICE.  THEY HAVE

9    THEM.

10           WE WOULD ASK THAT THESE BE ADMITTED, YOUR HONOR.

11           THE COURT:  ALL RIGHT.  DO YOU AGREE THAT IT WAS

12   DISCLOSED ON APRIL 15TH E-MAIL TO MS. BORNSTEIN?

13           (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

14           MS. KREVANS:  FOR 320, THEY DID DISCLOSE.  SUBSEQUENT

15   TO THEIR ACTUAL DISCLOSURE, THEY DISCLOSED 72 FILES.

16           FOR 314, THEY DID NOT.

17           MR. PAK:  FOR 314, WE PROVIDED THE LIST, THE BATES

18   RANGE, YOUR HONOR.

19           MS. KREVANS:  THERE'S NOTHING SPECIFIC FOR 314.  IT'S

20   THE WHOLE BATES RANGE.

21           MR. PAK:  NO, IT'S NOT, YOUR HONOR.

22           MS. KREVANS:  IT'S 3,000 PAGES.  THEY GAVE US A 3,000

23   PAGE --

24           THE COURT:  SO NO FILES WERE IDENTIFIED.

25           MS. KREVANS:  FOR 314.

```
 1            MR. PAK:  YOUR HONOR, HE DID IDENTIFY THOSE FILES BY

 2    BATES RANGE.  THAT'S WHY IF YOU LOOK INTO THE EXHIBIT FOR 314,

 3    IT SPECIFICALLY SAYS SELECTIONS FROM WINDOWS MOBILE 5 SOURCE

 4    CODE.

 5            THE COURT:  RIGHT.  BUT THE RULE THAT WAS CREATED AT

 6    SAMSUNG'S REQUEST WAS THAT YOU HAVE TO IDENTIFY THE FILES AND

 7    THE BATES RANGE.

 8            MR. PAK:  THOSE BATES RANGES ACTUALLY IDENTIFY THE

 9    FILES, YOUR HONOR.  IF YOU LOOK AT THE BATES RANGES, YOU WILL

10    SEE THE FILE NAMES.

11         THIS IS HOW WE DID IT, YOUR HONOR.  WE'RE NOT TRYING TO

12    MOVE IN ENTIRE SOURCE CODE.

13         YOUR HONOR, WE THINK THERE'S NO CHALLENGE TO THE

14    AUTHENTICITY OF THE CODE.

15         I UNDERSTAND, YOUR HONOR, THAT WE SHOULD HAVE --

16            THE COURT:  IF YOU DIDN'T WANT THIS RULE APPLIED TO

17    YOU, YOU SHOULD NEVER HAVE ASKED FOR IT TO BE APPLIED TO APPLE.

18            MR. PAK:  WE UNDERSTAND, YOUR HONOR.  WE'RE SAYING WE

19    COMPLIED WITH IT, WE JUST COMPLIED WITH IT BY PROVIDING THE

20    BATES RANGE INSTEAD OF THE FILE NAMES.

21            THE COURT:  YOU ASKED FOR FILE NAMES.  THAT'S WHAT

22    MS. MAROULIS ASKED FOR.  THAT'S WHAT I AGREED WITH HER AND

23    ORDERED APPLE TO DO, SO YOU SHOULD DO THE SAME.

24            MR. PAK:  YOUR HONOR, WHAT I BELIEVE WAS ASKED FOR

25    WAS A WAY TO RECOGNIZE, IN THE RECORD, A SUBPORTION OF THE CODE
```

```
 1        SO THAT WE DON'T END UP WITH A SITUATION WHERE YOU HAVE ENTIRE

 2        SOURCE CODE FILES FOR ALL PRODUCTS, INCLUDING THE ACCUSED

 3        PRODUCTS AND THE PRIOR ART INTO THE RECORD.

 4            WE DID OUR VERY BEST GOOD FAITH ATTEMPT TO COMPLY WITH

 5        THAT BY IDENTIFYING EITHER BY BATES RANGE OR SOURCE CODE FILE

 6        NAMES.

 7                THE COURT:  YOU'VE IDENTIFIED 3,055 PAGES.

 8                MR. PAK:  YOUR HONOR, OUT OF HUNDREDS OF THOUSANDS OF

 9        LINES OF SOURCE CODE.  IF WE BROUGHT IN THE ENTIRE WINDOWS

10        WINDOWS MOBILE SOURCE CODE, YOUR HONOR, THAT WOULD BE --

11                THE COURT:  NO.  SAME RULE.  THE SAME RULE SHOULD

12        APPLY.  YOU ALL SHOULD HAVE IDENTIFIED THE FILE.

13            THIS IS WHAT YOU ASKED FOR.  I WOULD NOT HAVE REQUIRED IT

14        HAD SAMSUNG NOT REQUESTED IT.  YOU ASKED FOR THE FILE NAMES AND

15        THE BATES RANGES.

16                MR. PAK:  YOUR HONOR, WE'RE NOT -- IT'S NOT 3,000

17        RANGES EITHER, YOUR HONOR.  WE ACTUALLY IDENTIFIED SELECTIONS,

18        WHICH IS A SMALL SUBSET, AND I CAN READ THEM INTO THE RECORD.

19                THE COURT:  WELL, I'M LOOKING AT EXHIBIT 314.  IT

20        SAYS BATES RANGE MSFT CODE 000170 TO MSFT CODE 003225.  SO

21        THAT'S WHERE I'M GETTING MY 3,055 NUMBER.

22                MS. KREVANS:  THAT'S WHERE WE'RE GETTING IT, TOO,

23        YOUR HONOR.

24                MR. PAK:  AND, YOUR HONOR --

25                THE COURT:  DO YOU COME OUT WITH A DIFFERENT
```

```
 1      CALCULATION?

 2              MR. PAK:  WELL, WE -- YES, YOUR HONOR, WE DO.

 3              THE COURT:  OKAY.

 4              MR. PAK:  BECAUSE THESE ARE THE EXCERPTS THAT WE ARE

 5      RELYING UPON AND THAT WE IDENTIFIED TO THEM.

 6          THIS IS MICROSOFT CODE -- AND THIS IS IN THE EXHIBIT LIST,

 7      YOUR HONOR.  LET ME READ THAT INTO THE RECORD.

 8          MICROSOFT CODE 170 TO 416; MICROSOFT CODE 1127 TO 1666;

 9      MICROSOFT CODE 2023 TO 2025; MICROSOFT CODE 2089 TO 2803;

10      MICROSOFT CODE 2956 TO 2957; MICROSOFT CODE 2996 TO 03225.

11      THOSE ARE THE BEGINNING BATES RANGES.

12          AND THE ENDING BATES RANGES FOR THOSE SIX SEGMENTS OF

13      MICROSOFT CODE 170 TO 416 --

14              THE COURT:  OKAY.  I CAN'T -- THE TRANSCRIPT IS NOT

15      READY FOR ME TO COPY THAT DOWN.

16              MR. PAK:  BUT, YOUR HONOR, THIS IS IN OUR EXHIBIT

17      LIST.

18              THE COURT:  OKAY.  I HAVE YOUR EXHIBIT LIST.  JUST

19      GIVE ME ONE MINUTE AND TELL ME WHAT PAGE IT'S ON.

20              MR. PAK:  SURE.  IT'S ON PAGE 2, YOUR HONOR, OF OUR

21      EXHIBIT LIST AT EXHIBIT NUMBER 314.  AND WE IDENTIFIED

22      JEFFREY CHASE, GARY HALL, AND PATRICK GOGERTY AS THE SPONSORING

23      WITNESSES WITH THESE SPECIFIC RANGES.

24              THE COURT:  ALL RIGHT.  THEN I THINK WHAT YOU SHOULD

25      DO IS HAVE AN EXHIBIT 314A --
```

```
 1              MR. PAK:  YES.

 2              THE COURT:  -- WHICH IS ONLY THESE BATES RANGES.

 3              MR. PAK:  THANK YOU, YOUR HONOR.  WE'LL DO THAT.

 4         WE'LL DO THE SAME FOR 319 AS WELL.

 5              THE COURT:  I THINK IT'S 320.

 6              MR. PAK:  320A.

 7              THE COURT:  320A, WHICH IS THE 72 FILES IDENTIFIED IN

 8    THE APRIL 15TH E-MAIL.

 9         OKAY.  SO WE'LL GO AHEAD.

10              MR. PAK:  OKAY.

11              THE COURT:  AND THERE'S A PLACE -- WELL, WHY DON'T WE

12    DO THIS:  I WOULD RATHER THAT YOU PRODUCE THE NEW 314A AND 320A

13    TO APPLE, AND THEN IF APPLE HAS ANY FURTHER OBJECTION, YOU CAN

14    LET ME KNOW, BUT THEN AT THAT POINT I'LL RULE ON ITS

15    ADMISSIBILITY.

16         BUT I'M GOING TO ALLOW THE TESTIMONY NOW.

17         BUT I DO THINK WE NEED TO HAVE THE DECLARATIONS OF

18    MR. GOGERTY AND MR. LUNDBERG READ IN.  OKAY?

19              MR. PAK:  OKAY, YOUR HONOR.

20              THE COURT:  ALL RIGHT.  LET'S DO THAT.  THAT'LL JUST

21    CLEAN THIS UP.

22         OKAY.  I'M GOING TO RETURN THESE TO YOU.  I THINK THIS ONE

23    CAME FROM MR. PAK AND THIS ONE CAME FROM MS. KREVANS.  I DO

24    HAVE COPIES OF THOSE UP HERE.

25              MR. PAK:  THANK YOU.
```

1          SO, YOUR HONOR, WE'LL BE READING IN TWO DECLARATIONS INTO

2      THE RECORD FROM MR. GOGERTY.

3              THE COURT:  RIGHT.  LET ME BRING OUR JURY IN.  THEY

4      SHOULD HEAR THIS.  THIS IS EVIDENCE.

5              MR. PAK:  OH, SURE.

6          (JURY IN AT 1:49 P.M.)

7              THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

8      SEAT.

9          THE TIME IS NOW 1:50.

10         GO AHEAD, PLEASE.

11             MR. PAK:  YOUR HONOR, MAY I PROCEED?

12             THE COURT:  YES, PLEASE.  I SAID GO AHEAD, PLEASE.

13             MR. PAK:  THANK YOU.

14         LADIES AND GENTLEMEN OF THE JURY, I'M GOING TO BE READING

15     IN THE DECLARATIONS OF MR. PAUL -- MR. PATRICK GOGERTY --

16     G-O-G-E-R-T-Y -- AND THIS IS A DECLARATION OF MICROSOFT

17     CORPORATION.

18         "PARAGRAPH 1.  THIS DECLARATION IS MADE PURSUANT TO

19     FEDERAL RULES OF EVIDENCE (8036) AND 902(11) FOR THE PURPOSE OF

20     AUTHENTICATING AND CERTIFYING AS A BUSINESS RECORD SOURCE CODE

21     DEVELOPED BY AND LOCATED IN THE ARCHIVES OF MICROSOFT

22     CORPORATION.

23         "PARAGRAPH 2.  I'M CURRENTLY, AND HAVE BEEN SINCE APRIL,

24     2000, A PARALEGAL IN THE LEGAL AND CORPORATE AFFAIRS DEPARTMENT

25     AT MICROSOFT.  MY CURRENT POSITION IS SENIOR PARALEGAL.  IN MY

1    ROLE AS SENIOR PARALEGAL, I HAVE ACCESS, DIRECTLY OR INDIRECTLY

2    THROUGH OTHER MICROSOFT EMPLOYEES, TO MICROSOFT'S ARCHIVES AND

3    REPOSITORIES OF SOURCE CODE OF ITS OPERATING SYSTEMS AND

4    PROGRAMS.  THE OTHER MICROSOFT EMPLOYEES THROUGH WHOM I HAVE

5    INDIRECT ACCESS TO THESE ARCHIVES AND THEIR REPOSITORIES AND

6    SOURCE CODE ACT AS CUSTODIANS OF THE SOURCE CODE IN THE NORMAL

7    COURSE OF THEIR BUSINESS.

8         "MICROSOFT IS NOT A PARTY TO THE ABOVE-CAPTIONED

9    LITIGATION.

10        "PARAGRAPH 10.  I RESPONSE TO A SUBPOENA SERVED ON

11   MICROSOFT BY SAMSUNG IN THIS MATTER, I LOCATED THE SOURCE CODE

12   FOR THE WINDOWS MOBILE 5.0 SYSTEM IN MICROSOFT'S SOURCE CODE

13   REPOSITORY.  THE CODE I LOCATED INCLUDED BOTH THE SOURCE CODE

14   FILES FOR THE OFFICIALLY-RELEASED VERSION OF WINDOWS MOBILE 5.

15        "11.  I CERTIFY, AS THE INDIVIDUAL WHO LOCATED THESE

16   RECORDS, THAT THE SOURCE CODE IS A TRUE AND CORRECT COPY OF THE

17   CODE THAT WAS STORED AT OR NEAR THE TIME OF THE RELEASE OF THE

18   WINDOWS MOBILE 5.0 SOFTWARE IN THE SOURCE CODE REPOSITORY.

19        "THE SOURCE CODE REPOSITORY IS KEPT IN THE REGULARLY

20   CONDUCTED ACTIVITIES OF MICROSOFT BUSINESS, I.E., DEVELOPING

21   AND SELLING SOFTWARE, AND STORING THE SOURCE CODE WAS A REGULAR

22   PRACTICE OF THAT ACTIVITY.

23        "THE SOURCE CODE REPOSITORY IS MAINTAINED AND RELIED ON IN

24   THE REGULAR COURSE OF BUSINESS AS AN ACCURATE COPY OF THE

25   WINDOWS MOBILE 5.0 SOURCE CODE, AND OF AN ACCURATE HISTORY OF

1        CHANGES MADE THERETO."

2              AND YOUR HONOR, AT THIS POINT I'D LIKE TO MOVE INTO

3        EVIDENCE EXHIBIT 314A, WHICH WILL BE A REVISED VERSION OF THAT

4        EXHIBIT.

5              THE COURT:  THAT'S ADMITTED.

6        (DEFENDANTS' EXHIBIT 314A WAS ADMITTED IN EVIDENCE.)

7              MR. PAK:  THANK YOU, YOUR HONOR.

8        I'D ALSO LIKE TO READ INTO THE RECORD PARAGRAPH 29.

9              "ON APRIL 17TH, 2013, I CAUSED TO BE GENERATED A U.S.

10       ADJUSTED REVENUE AND UNIT SUMMARY FROM MICROSOFT'S MS SALES

11       DATABASE.  THE DOCUMENT MARKED MICROSOFT 630-001175 ATTACHED

12       HERETO AS EXHIBIT 9, IS A TRUE AND CORRECT COPY OF THIS SUMMARY

13       WHICH SHOWS THE ADJUSTED SUM OF SALES, IN U.S. DOLLARS, FOR THE

14       WINDOWS MOBILE 5.0 PRODUCT GROUPING, BETWEEN THE PERIOD OF

15       OCTOBER 2005 AND JUNE OF 2006.

16             "AS THE INDIVIDUAL WHO CAUSED THIS SUMMARY TO BE

17       GENERATED, I CERTIFY THAT IT WAS GENERATED FROM A DATABASE OF

18       SALES INFORMATION THAT WAS UPDATED, MAINTAINED, AND RELIED UPON

19       IN THE REGULAR COURSE OF MICROSOFT BUSINESS, AND ON INFORMATION

20       AND BELIEF, THAT THE SUMMARY IS AN ACCURATE RECORD OF SALES FOR

21       WINDOWS MOBILE 5.0."

22             YOUR HONOR, I'D LIKE TO MOVE DX 316, WHICH IS THE WINDOWS

23       MOBILE 5 INTO EVIDENCE.

24             THE COURT:  YOU MEAN DX 316.  OKAY.  THAT'S ADMITTED.

25       (DEFENDANTS' EXHIBIT 316 WAS ADMITTED IN EVIDENCE.)

```
 1              MR. PAK:  AND THEN PARAGRAPH 31, "MICROSOFT'S WEBSITE

 2      HOSTS A MICROSOFT PUBLICATION ENTITLED 'SMART CLIENT

 3      ARCHITECTURE AND DESIGN GUIDE.'  I HAVE REVIEWED" -- AND

 4      DOCUMENTED, "REVIEWED THE DOCUMENTS ATTACHED HERETO AS

 5      EXHIBIT 10, AND CERTIFY THAT IT IS A TRUE AND CORRECT COPY OF"

 6      THAT DOCUMENT, WHICH WAS PUBLISHED ON OCTOBER 26TH, 2004.

 7          YOUR HONOR, I'D LIKE TO MOVE DX 326 INTO EVIDENCE.

 8              THE COURT:  OKAY.  THAT IS ADMITTED.

 9          (DEFENDANTS' EXHIBIT 326 WAS ADMITTED IN EVIDENCE.)

10              MR. PAK:  THANK YOU, YOUR HONOR.

11          AND THIS DECLARATION WAS SIGNED UNDER OATH ON JULY 16TH,

12      2013.

13          YOUR HONOR, I'D LIKE TO PROCEED AND READ INTO THE

14      DECLARATION EXCERPTS FROM MR. JIM LUNDBERG'S DECLARATION.

15              MS. KREVANS:  YOUR HONOR, BEFORE WE MOVE ON TO

16      MR. LUNDBERG, COULD WE HAVE THE LIMITING INSTRUCTION WITH

17      RESPECT TO THE MICROSOFT PRESS RELEASE?

18              THE COURT:  YES.  WITH REGARD TO DX 315, THE WINDOWS

19      MOBILE 5.0 PRESS RELEASES, THOSE ARE ADMITTED, BUT NOT FOR THE

20      TRUTH OF WHAT'S STATED THEREIN.

21              MR. PAK:  YOUR HONOR, MAY I PROCEED?

22              THE COURT:  PLEASE, GO AHEAD.

23              MR. PAK:  OKAY.  NOW I'M READING TO YOU, LADIES AND

24      GENTLEMEN OF THE JURY, THE DECLARATION OF JIM F. LUNDBERG, WHO

25      IS AFFILIATED WITH NOVELL CORPORATION.
```

1        "THIS DECLARATION IS MADE PURSUANT TO FEDERAL RULE OF

2     EVIDENCE 803(6), 901(11), AND 902(12) FOR THE PURPOSE OF

3     AUTHENTICATING AND CERTIFYING AS BUSINESS RECORDS SOURCE CODE

4     AND SOFTWARE DEVELOPED AND GENERATED FROM THE ARCHIVES OF

5     NOVELL AND/OR SUSE LINUX.

6        "CURRENTLY, I AM A VICE-PRESIDENT, LEGAL FOR ATTACHMATE

7     GROUP.  I HAVE HELD THIS TITLE SINCE 2011.  SINCE 2005, I HAVE

8     HELD THE TITLE OF VICE-PRESIDENT, LEGAL AT NOVELL.  AS PART OF

9     MY DUTIES SINCE 2011, I HAVE ACTED AS A CUSTODIAN OF RECORDS

10    FOR ATTACHMATE.  SINCE 2011, NOVELL AND SUSE HAVE OPERATED

11    SEPARATE BUSINESS UNITS OF ATTACHMATE.  PRIOR TO 2011, I ACTED

12    AS A CUSTODIAN OF RECORDS FOR NOVELL.

13       "NOVELL IS A SOFTWARE COMPANY BASED IN PROVO, UTAH.  IN

14    2004, NOVELL ACQUIRED SUSE," S-U-S-E, "A SOFTWARE COMPANY AND

15    DEVELOPER OF THE SUSE LINUX OPERATING SYSTEM.  UPON THAT

16    ACQUISITION, NOVELL TOOK OVER DEVELOPMENT AND COMMERCIAL

17    RELEASE OF THE SUSE LINUX OPERATING SYSTEM, INCLUDING SUSE

18    LINUX PROFESSIONAL.

19       "NOVELL AND SUSE ARE NOT PARTIES TO THE ABOVE-CAPTIONED

20    LITIGATION.

21       "NOVELL OFFICIALLY RELEASED THE SUSE LINUX 10.0 OPERATING

22    SYSTEM FOR COMMERCIAL SALE IN THE FIRST WEEK OF OCTOBER 2005.

23    EXHIBITS 2 AND 3 TO THIS DECLARATION ACCURATELY REFLECT THE

24    RELEASE DATE.  NOVELL GENERATES THESE PRESS RELEASES IN THE

25    NORMAL COURSE OF BUSINESS WHEN IT RELEASES SOFTWARE FOR

```
1        DISTRIBUTION."

2             YOUR HONOR, I'D LIKE TO MOVE DX 321, WHICH IS THE SUMMARY

3        OF PRESS RELEASES, INTO EVIDENCE.

4             THE COURT:  IT'S ADMITTED.

5             (DEFENDANTS' EXHIBIT 321 WAS ADMITTED IN EVIDENCE.)

6             MS. KREVANS:  YOUR HONOR, MAY WE HAVE THE SAME

7        LIMITING INSTRUCTION, PLEASE?

8             THE COURT:  THIS IS A BUSINESS RECORD, ISN'T IT?

9             MR. PAK:  YES, YOUR HONOR.

10            MS. KREVANS:  IT'S A PRESS RELEASE, YOUR HONOR.

11            THE COURT:  THE DECLARATION SAYS THAT HE CREATES

12       THESE IN HIS NORMAL COURSE OF BUSINESS.

13            GO AHEAD, PLEASE.

14            MR. PAK:  THANK YOU.

15            "PARAGRAPH 10.  ON MAY 16TH, 2013, IN CONNECTION WITH A

16       SUBPOENA SERVED UPON NOVELL IN THIS CASE, I DIRECTED

17       CRAIG GARDNER, A SENIOR SOFTWARE ENGINEER FAMILIAR WITH THE

18       SUSE LINUX SOFTWARE CODE, TO LOCATE THE SUSE LINUX PROFESSIONAL

19       10.0 SOURCE CODE WITHIN THE SUSE SERVER ARCHIVES.  THE SOURCE

20       CODE HE LOCATED INCLUDED FILES THAT WERE COMPILED TO BUILD THE

21       OFFICIALLY RELEASED VERSION OF SUSE LINUX PROFESSIONAL 10.0.

22            "ON MAY 20TH, 2013, I PRODUCED AN ISO IMAGE OF THE SOURCE

23       CODE I LOCATED AT THE FOLLOWING FTP ADDRESS," AND THAT'S

24       FTP.NOVELL.COM/OUTGOING/SUSE-10.0-DVD-SRC-RC4.ISO."

25            YOUR HONOR, I OFFER DX 320 INTO EVIDENCE.
```

1           THE COURT:  AND IT'S GOING TO BE THE A.

2           MR. PAK:  THAT'S RIGHT, YOUR HONOR.

3           THE COURT:  ALL RIGHT.  THAT IS ADMITTED.

4       (DEFENDANTS' EXHIBIT 320A WAS ADMITTED IN EVIDENCE.)

5           MR. PAK:  NOW, IN PARAGRAPH 11 --

6           THE COURT:  WHY DON'T -- WHEN YOU HAVE A, I'LL ADMIT

7    IT AT THAT TIME.

8           MR. PAK:  THANK YOU, YOUR HONOR.

9         "ON MAY 16TH, 2013, I ALSO DIRECTED MR. GARDNER TO LOCATE

10   SUSE LINUX PROFESSIONAL 10.0 SOFTWARE WITHIN THE SUSE SERVER

11   ARCHIVES.

12        "ON MAY 20TH, 2013, I PRODUCED AN ISO IMAGE OF THIS

13   SOFTWARE AT THE FOLLOW FTP ADDRESS:

14   FTP.NOVELL.COM/OUTGOING/SUSE-10.0-DVD-RC4.ISO."

15        YOUR HONOR, I OFFER DX 319 INTO EVIDENCE.

16          THE COURT:  OKAY.  THAT IS ADMITTED TODAY.  THAT'S

17   THE BINARY --

18          MR. PAK:  THAT'S RIGHT, YOUR HONOR.

19          THE COURT:  BINARY CODE FOR SUSE LINUX.

20      (DEFENDANTS' EXHIBIT 319 WAS ADMITTED IN EVIDENCE.)

21          MR. PAK:  YOUR HONOR, THIS DECLARATION WAS SIGNED

22   UNDER OATH ON JUNE 25TH, 2013.

23          MS. KREVANS:  YOUR HONOR, HE HAS NOT READ THE PORTION

24   OF THE DECLARATION WHICH AUTHENTICATES THAT CODE.  IT'S

25   PARAGRAPH 12 OF THE DECLARATION.

```
 1              MR. PAK:  OKAY.  I WILL READ THAT INTO THE RECORD AS

 2    WELL, YOUR HONOR.

 3              "IN ACCORDANCE WITH MY RESPONSIBILITIES AS A CUSTODIAN OF

 4    RECORDS FOR ATTACHMATE, I CERTIFY THAT THE RECORDS REFERENCED

 5    IN PARAGRAPHS 10 AND 11 HEREIN ARE TRUE COPIES OF THE SUSE

 6    LINUX PROFESSIONAL 10.0 SOURCE CODE AND SOFTWARE AS IT EXISTED

 7    AT THE TIME OF THE SUSE LINUX PROFESSIONAL 10.0 OFFICIAL

 8    RELEASE.  THE ARCHIVES FROM WHICH I OBTAINED THESE RECORDS WERE

 9    MAINTAINED ON SUSE SERVERS AND RELIED ON IN THE REGULAR COURSE

10    OF NOVELL'S AND SUBSEQUENTLY SUSE'S BUSINESS AS A DEVELOPER AND

11    SELLER OF THE SOFTWARE."

12              THE COURT:  SO FOR 314 AS WELL, UNTIL WE HAVE A, I'M

13    NOT GOING TO ADMIT THAT.  WE CAN ADMIT THAT ON MONDAY.

14         (EXHIBITS 314A AND 320A WERE WITHDRAWN FROM EVIDENCE.)

15              THE COURT:  SO 314A AND 320A WE'LL RESERVE, BUT WE'LL

16    HAVE TESTIMONY TODAY.

17         326, WHAT WAS THAT?  THAT'S NOT IN THE BINDER.  THAT WAS A

18    MANUAL FOR --

19              MR. PAK:  I BELIEVE THAT WAS A MANUAL FOR THE

20    NOVELL --

21              THE COURT:  WINDOWS MOBILE.

22              MR. PAK:  OR ACTUALLY --

23              MS. KREVANS:  I DON'T THINK IT IS.

24              THE COURT:  I THINK IT'S WINDOWS; CORRECT?

25              MR. PAK:  YES, YOUR HONOR, THAT'S CORRECT.  326 IS
```

```
 1    THE MICROSOFT SMART CLIENT ARCHITECTURE DOCUMENT AND DESIGN

 2    GUIDE FOR WINDOWS MOBILE.

 3              THE COURT:  ALL RIGHT.  NOW, I THINK WITH REGARD TO

 4    THE PRESS RELEASE ON THE SUSE LINUX, BASED ON A PRIOR ART

 5    DISCUSSION, I'M GOING TO SAY THAT'S ALSO NOT FOR THE TRUTH OF

 6    THE MATTER ASSERTED.

 7              MS. KREVANS:  YOUR HONOR, IS THAT EXHIBIT 321?

 8              THE COURT:  THAT'S 321.

 9        SO THE LIMITING INSTRUCTION IS FOR 315 AND 321, BUT

10    EVERYTHING ELSE IS ADMITTED.

11              MR. PAK:  THANK YOU, YOUR HONOR.

12              THE COURT:  OKAY.  THANK YOU.

13        LET'S GO AHEAD AND BRING --

14              MR. PAK:  DR. CHASE BACK?

15              THE COURT:  -- DR. CHASE BACK.

16        IF YOU WOULD PLEASE COME BACK.

17              MR. PAK:  YOUR HONOR, MAY I PROCEED?

18              THE COURT:  PLEASE, GO AHEAD.

19    BY MR. PAK:

20    Q.  OKAY.  AND DR. CHASE, BEFORE THE BREAK WE WERE TALKING

21    ABOUT THE SUSE SOFTWARE CODE, AND I BELIEVE YOU'VE ALSO

22    PREPARED A DEMONSTRATION OF THAT SYSTEM.

23    A.  YES, THAT'S -- YES, THAT'S CORRECT.

24    Q.  SO I'D LIKE TO NOW HAVE MR. KOTARSKI PLAY THAT VIDEO AT

25    SDX 3606.
```

```
1            YOUR HONOR?

2                 THE COURT:  PLEASE, GO AHEAD.

3            (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

4                 THE WITNESS:  LIKE WINDOWS MOBILE, SUSE ALSO SUPPORTS

5       BACKGROUND SYNCING OF MULTIPLE DATA CLASSES, AND HERE WE SEE

6       TWO IBM THINKPAD LAPTOPS WHICH WE INSTALLED SUSE LINUX AND

7       EVOLUTION ON, AND ON THE LEFT WE HAVE A USER WHO'S COMPOSING AN

8       E-MAIL TO THE USER ON THE RIGHT, AND HE'S JUST SENT THAT

9       E-MAIL.

10           AND THAT E-MAIL IS GOING TO BE UPLOADED TO THE SERVER VIA

11      SYNC, AND THEN IT'S GOING TO BE DOWNLOADED ON THE OTHER SIDE AS

12      PART OF A BACKGROUND SYNC WHILE THE USER ON THE OTHER SIDE IS

13      USING THE USER INTERFACE FOR THE E-MAIL APPLICATION.

14           SO THE USER THERE HAS MADE A DRAFT, AND WHILE THAT WAS

15      HAPPENING, THE E-MAIL THAT WAS UPLOADED WAS RECEIVED.

16           SO THAT'S AN EXAMPLE OF BACKGROUND SYNC FOR THE E-MAIL

17      DATA CLASS.

18      BY MR. PAK:

19      Q.   SO JUST TO SUMMARIZE WHAT WE SAW, DR. CHASE, WE SAW AN

20      E-MAIL BEING SENT FROM THE LEFT-HAND SIDE COMPUTER TO THE

21      RIGHT-HAND SIDE COMPUTER AND BEING RECEIVED WHILE THE USER WAS

22      TYPING ON THE RIGHT SIDE; IS THAT CORRECT?

23      A.   YES.

24                 MS. KREVANS:  OBJECTION, YOUR HONOR.  LEADING.

25                 THE COURT:  SUSTAINED.
```

1              THE WITNESS:  AS I SAID, THE USER WAS USING THE

2    BACKGROUND SYNC.  THE USER WAS USING THE INTERFACE AND THE

3    E-MAIL ARRIVED WHILE THE USER WAS USING THE INTERFACE.  THE

4    SYNC OCCURRED WHILE THE APPLICATION WAS ACTIVE AS STATED IN THE

5    CLAIMS.

6    BY MR. PAK:

7    Q.   DR. CHASE, I'D LIKE TO NOW TURN YOUR ATTENTION TO THE

8    CLAIM LANGUAGE.

9              AND WE CAN HAVE THE LIGHTS BACK UP.

10             SDX 3658.  DID YOU HAVE A CHANCE TO ANALYZE ALL OF THE

11   LINUX SOURCE CODE THAT WAS PRODUCED, THE EVOLUTION SOURCE CODE

12   THAT WAS PRODUCED BY NOVELL IN THIS CASE?

13   A.   YES, I DID.

14   Q.   AND WERE YOU ABLE TO COMPARE WHAT WAS -- WHAT YOU FOUND IN

15   THE SOURCE CODE TO THE CLAIM LANGUAGE OF CLAIMS 11 AND 20?

16   A.   YES.  SHALL I WALK THROUGH IT?

17   Q.   YES, PLEASE.

18   A.   ALL -- WELL, OKAY.  SO WE SAW AN EXAMPLE OF BACKGROUND

19   SYNC AND THAT WAS A USER USING A, AN APPLICATION THAT PROVIDES

20   A USER INTERFACE TO ACCESS AND EDIT STRUCTURED DATA, IN THIS

21   CASE E-MAIL.

22             AND OF COURSE ALL OF THIS IS ON A COMPUTER READABLE

23   STORAGE MEDIUM, WHICH IS THE CD, FOR EXAMPLE, THAT THE CODE

24   CAME ON.

25             AND THE -- THE USER APPLICATION HAS A THREAD THAT CONTROLS

1      ITS USER INTERFACE, SO THAT'S THE USER LEVEL

2      NON-SYNCHRONIZATION PROCESSING THREAD PROVIDED BY A USER

3      APPLICATION AS REQUIRED BY THE CLAIMS.

4          THE USER IS USING THAT USER INTERFACE TO ACCESS AND EDIT

5      STRUCTURED DATA OF A MAIL CLASS THAT IS STORED IN A FIRST

6      STORAGE LOCATED WITH THE FIRST DATABASE, AND THAT IS A LOCAL

7      MAIL STORER, A MAIL STORER AND A MAIL SUMMARY DATABASE.

8          AND WHEN THE SYNC OCCURRED, THE SYNC OCCURS ON A SEPARATE

9      THREAD FROM THE THREAD THAT CONTROLS THE U/I, AND THAT IS THE

10     AT LEAST ONE SYNCHRONIZATION PROCESSING THREAD.

11         AND AS WE CAN SEE FROM THE BACKGROUND SYNC, THEY RUN

12     CONCURRENTLY.  THEY APPEAR TO HAPPEN TO THE USER AT THE SAME

13     TIME.  IT RUNS CONCURRENTLY WITH THE USER LEVEL

14     NON-SYNCHRONIZATION PROCESSING THREAD WHICH CONTROLS THE U/I.

15         NOW, I LOOKED AT THE SOURCE CODE AND I IDENTIFIED

16     SYNCHRONIZATION SOFTWARE COMPONENTS THAT PROVIDE THESE, THE

17     SYNCHRONIZATION PROCESSING THREAD WHICH ARE CONFIGURED TO

18     SYNCHRONIZE STRUCTURED DATA FROM THE FIRST DATABASE WITH THE

19     STRUCTURED DATA FROM THE SECOND DATABASE.

20         IN THIS CASE, THE FIRST DATABASE IS THE MAIL SUMMARY

21     CACHE, AND THE SECOND DATABASE IS THE DATABASE MAINTAINED BY

22     THE E-MAIL SERVER FOR THE E-MAIL WAS STORED.

23         AND IN ADDITION, I'VE IDENTIFIED SIMILAR SYNCHRONIZATION

24     SOFTWARE COMPONENTS FOR THE CALENDAR AND CONTACTS DATA CLASSES,

25     WHICH ALSO ALLOW BACKGROUND SYNCHRONIZATION TO OCCUR, AND THEY

1       ARE CONFIGURED TO SYNCHRONIZE STRUCTURED DATA OF THEIR CLASSES

2       AS REQUIRED BY THE CLAIMS.

3            SO ALL OF THE LIMITATIONS OF CLAIM 20, INCLUDING THE

4       LIMITATIONS OF CLAIM 11, ARE MET.

5       Q.   CAN YOU CHECK THESE OFF THEN, THESE LIMITATIONS?

6       A.   YES, PLEASE.

7       Q.   THANK YOU.

8            NOW, WERE YOU ASKED TO LOOK AT A SURVEY DESCRIPTION FROM

9       DR. HAUSER ON THE '414 PATENT?

10      A.   YES, I WAS.

11      Q.   CAN I TURN TO SDX 3673.

12           DR. CHASE, HAVING LOOKED AT DR. HAUSER'S SURVEY

13      DESCRIPTION OF THE '414 PATENT, WHAT IS YOUR EXPERT OPINION ON

14      WHETHER THAT SURVEY DESCRIPTION ACCURATELY DESCRIBES CLAIM 20

15      OF THE '414 PATENT?

16      A.   IT IS NOT AN ACCURATE DESCRIPTION OF CLAIM 20.  IT REFERS

17       TO A SINGLE DATA CLASS, WHICH IS CONTACTS.

18           CLAIM 20 REQUIRES THREE DATA CLASSES.

19           AND IN ADDITION, THE HAUSER SURVEY SUMMARY DOES NOT SAY

20      ANYTHING ABOUT COMPONENTS OR HOW SYNCING IS IMPLEMENTED BY

21      THOSE COMPONENTS.

22           AND IN FACT, THE HAUSER SUMMARY ACTUALLY DESCRIBES

23      BACKGROUND SYNCING FUNCTIONALITY IN GENERAL, SUCH AS THE

24      EXAMPLES THAT WE JUST SAW IN EVOLUTION AND WINDOWS MOBILE 5.

25      Q.   AND LASTLY, SIR, I WANT TO GO TO SDX 3680.

1        DID YOU HAVE A CHANCE TO CONSIDER THE SECONDARY

2   CONSIDERATIONS OF NON-OBVIOUSNESS BEFORE FORMING YOUR OPINIONS

3   ON VALIDITY IN THIS CASE?

4   A.   YES, I DID.

5   Q.   AND CAN YOU WALK US THROUGH YOUR ANALYSIS OF THE SECONDARY

6   CONSIDERATIONS THAT ARE LISTED ON THIS SLIDE?

7   A.   WELL, WITH REGARD TO COMMERCIAL SUCCESS, I WOULD NOTE THAT

8   APPLE HAS STIPULATED THAT THEY DO NOT PRACTICE CLAIM 20 IN THE

9   IPHONE, SO ANY COMMERCIAL SUCCESS OF THE IPHONE COULD NOT BE

10  DUE TO THE INVENTION OF CLAIM 20.

11       WITH RESPECT TO AWARDS OR PRAISE, THE NAMED INVENTOR OF

12  THE '414 PATENT, MR. GORDON FRIEDMAN, WHO'S AN APPLE EMPLOYEE,

13  IN HIS DEPOSITION SAID THAT HE WAS NOT AWARE OF ANY AWARDS OR

14  PRAISE FOR THE INVENTION OF THE '414 PATENT.  I'M NOT, EITHER.

15       AND CLEARLY THERE'S NO EVIDENCE OF LONG-FELT NEED BECAUSE

16  BACKGROUND SYNCING FUNCTIONALITY WAS A NORMAL AND EXPECTED PART

17  OF SOFTWARE SYSTEMS FOR YEARS BEFORE THE '414 PATENT, AND I'M

18  NOT AWARE OF ANY EVIDENCE OF FAILURE OF OTHERS TO IMPLEMENT

19  THAT TECHNOLOGY.

20       AND WITH RESPECT TO COPYING, MR. FRIEDMAN SAID IN HIS

21  DEPOSITION THAT HE WAS NOT AWARE OF ANY COPYING OF THE '414

22  PATENT.

23  Q.   IF WE GO TO THE LAST SLIDE, SDX 3677, ON THE ISSUE OF

24  COPYING, DR. CHASE, REMIND US AGAIN WHAT THIS IS ON THE

25  LEFT-HAND SIDE AND HOW IT COMPARES TO THE FILING OF THE '414

1    PATENT APPLICATION.

2    A.   WELL, THIS IS A TIMELINE, AND ON THE LEFT-HAND SIDE WHAT

3    WE SEE ACTUALLY IS A SNIPPET FROM A DESIGN FUNCTIONAL

4    REQUIREMENTS DOCUMENT AT THE EARLY STAGES OF CONCEPTION OF THE

5    ANDROID SOFTWARE, AND IT SAYS THAT BACKGROUND SYNCING IS A

6    DESIGN REQUIREMENT, A FUNCTIONAL REQUIREMENT FOR ANDROID.

7         NOW, THIS WAS IN 2006, SO THIS WAS BEFORE THE '414 PATENT

8    WAS FILED.

9         NOW, THE FIRST VERSION OF ANDROID THAT CONTAINED THAT

10   FUNCTIONALITY WAS RELEASED TO THE PUBLIC IN 2008, WHICH IS WELL

11   BEFORE THE '414 PATENT ISSUED IN 2010.

12        SO IN MY OPINION, IT IS NOT THE CASE THAT THIS

13   FUNCTIONALITY WAS COPIED FROM THE '414 PATENT IN THAT IT WAS

14   RELEASED BEFORE THE '414 PATENT ISSUED AND IT WAS CONCEIVED AND

15   IMPLEMENTATION BEGUN WELL BEFORE THE '414 PATENT WAS FILED.

16        MR. PAK:  THANK YOU, YOUR HONOR.  I PASS THE WITNESS.

17        THE COURT:  ALL RIGHT.  THE TIME IS NOW 2:09.

18   WE'LL JUST GO TO 2:15 AND THEN WE'LL TAKE OUR BREAK.

19   (PAUSE IN PROCEEDINGS.)

20        THE COURT:  READY?  OKAY.  TIME IS 2:09.  GO AHEAD,

21   PLEASE.

22                        **CROSS-EXAMINATION**

23   BY MS. KREVANS:

24   Q.   GOOD AFTERNOON, DR. CHASE.

25   A.   GOOD AFTERNOON.

CROSS CHASE

1    Q.   WE HAVEN'T MET.  I'M RACHEL KREVANS.  I'M ONE OF APPLE'S

2    LAWYERS IN THIS CASE.

3    A.   PLEASED TO MEET YOU.

4    Q.   LET'S TALK ABOUT A COUPLE THINGS FIRST TO GET ON THE SAME

5    PAGE.

6        YOU WERE HIRED BY SAMSUNG'S LAWYERS TO GIVE OPINIONS IN

7    THIS CASE?

8    A.   THAT'S CORRECT.

9    Q.   IT'S SAMSUNG THAT'S PAYING YOU?

10   A.   I RECEIVE CHECKS FROM QUINN, EMANUEL, THE LAW FIRM.

11   Q.   SAMSUNG'S COUNSEL?

12   A.   SAMSUNG'S COUNSEL, YES.

13   Q.   OKAY.  AND IT'S SAMSUNG THAT MAKES AND SELLS THE PRODUCTS

14   THAT ARE AT ISSUE IN THE CASE?

15   A.   THAT'S CORRECT.

16   Q.   SAMSUNG IS THE ONE WHO DECIDES WHAT SOFTWARE TO PUT ON

17   THOSE PRODUCTS?

18   A.   WELL, SOME PORTIONS OF THAT SOFTWARE, OF COURSE, COME FROM

19   GOOGLE AND ARE NOT AVAILABLE TO SAMSUNG.  SAMSUNG WILL CHOOSE

20   WHETHER OR NOT TO PUT THEM ON THE DEVICE, CERTAINLY.  BUT THEY

21   CAN'T MODIFY THE SOFTWARE, GMAIL, FOR EXAMPLE.

22   Q.   LET'S BE REALLY CLEAR.  I THINK YOU AND I AGREE ABOUT

23   THIS, BUT I WANT TO MAKE SURE EVERYBODY UNDERSTANDS WHAT WE'RE

24   SAYING?

25   A.   SURE.

1    Q.   SAMSUNG MADE THE CHOICE WHAT SOFTWARE TO PUT ON THESE

2    PHONES; RIGHT?

3    A.   YES, THAT'S CORRECT.   THEY CHOOSE WHETHER OR NOT TO PUT

4    THAT SOFTWARE ON THE PHONES.

5         BUT IN SOME OF THAT SOFTWARE THEY CANNOT CHANGE WHAT THE

6    SOFTWARE DOES IF THEY DO CHOOSE TO PUT IT ON THE PHONES.

7    THAT'S WHAT I INTENDED TO SAY.

8    Q.   SO SOME OF THE SOFTWARE THAT SAMSUNG PUTS ON THEIR PHONES

9    IS PROPRIETARY GOOGLE SOFTWARE THAT GOOGLE WRITES, AND IF

10   SAMSUNG CHOOSES THAT SOFTWARE, ONCE THEY CHOOSE TO PUT IT ON

11   THE PHONES, THEY CAN'T ALTER THAT PARTICULAR PART OF THE CODE

12   ON THE PHONES?

13   A.   RIGHT.   THE CODE IS PROPRIETARY SOFTWARE OF GOOGLE AND

14   SAMSUNG DOES NOT HAVE ACCESS TO THE SOURCE CODE, AND,

15   THEREFORE, THEY CAN'T MODIFY THE SOURCE CODE TO CHANGE THE

16   FUNCTIONALITY OF THAT CODE.

17   Q.   OKAY.

18   A.   IN THE CASE OF THAT SOFTWARE THAT'S PROPRIETARY GOOGLE

19   CODE.

20   Q.   AND YOU'RE NOT SAYING THAT THAT'S TRUE OF ALL THE SOFTWARE

21   ON SAMSUNG'S PHONES?

22   A.   NO, I'M NOT.

23   Q.   JUST ONE CHUNK OF IT.   YOU'RE TALKING ABOUT A

24   PARTICULAR -- THE COMPONENTS THAT DO SYNCHRONIZATION FOR GOGGLE

25   GMAIL, GOOGLE CALENDAR, GOOGLE CONTACTS; RIGHT?

1      A.   WELL, YES.  BUT WE ALSO ESTABLISHED THAT ON SOME OF THE

2      ACCUSED TABLETS, THE NEXUS, THAT ALL OF THAT CODE COMES FROM

3      GOOGLE AND NONE OF THAT IS MODIFIED BY SAMSUNG.

4      Q.   AND, AGAIN, YOU'RE TALKING ABOUT SYNC ADAPTER, SYNC

5      MANAGER, THAT CODE?

6      A.   ALL OF THE ACCUSED -- ALL OF THE SOFTWARE THAT RUNS ON

7      THAT DEVICE.

8      Q.   WELL --

9      A.   INCLUDING THOSE SYNC ADAPTERS THAT YOU MENTIONED, YES.

10     Q.   LET'S MAKE SURE WE'RE REALLY PRECISE HERE, DR. CHASE.

11     YOU'RE NOT HERE TO TESTIFY ABOUT ALL OF THE SOFTWARE THAT RUNS

12     ON ANY ACCUSED DEVICES, RIGHT?  YOU ONLY LOOKED AND YOU'RE ONLY

13     HERE TO OPINE ABOUT THE SOFTWARE THAT DOES WHAT'S BEEN ACCUSED

14     OF INFRINGING THE '414 PATENT; RIGHT?

15     A.   YES, THAT'S CORRECT.

16     Q.   OKAY.  SO YOU ARE TALKING ABOUT THE SOFTWARE THAT RELATES

17     TO THE SYNCHRONIZATION FUNCTIONS; RIGHT?

18     A.   I -- YES, THAT'S CORRECT.

19     Q.   OKAY.  AND, AGAIN, JUST TO MAKE SURE WE'RE CLEAR, THIS

20     GOOGLE PROPRIETARY CODE THAT'S SOME CODE THAT SAMSUNG PUTS ON

21     ACCUSED DEVICES, ONCE IT CHOOSES IT, IT CAN'T MODIFY IT, THAT'S

22     NOT CODE THAT'S AVAILABLE TO THE PUBLIC; RIGHT?

23     A.   THE SOURCE CODE IS NOT AVAILABLE TO THE PUBLIC.  THE

24     APPLICATIONS ARE AVAILABLE TO THE PUBLIC VIA THOSE DEVICES,

25     YES.

CROSS CHASE

1    Q.   ALL RIGHT.  SO YOU'RE NOT TALKING HERE ABOUT ANDROID OPEN

2    SOURCE CODE THAT ANYBODY CAN USE?

3    A.   THAT'S CORRECT.  THAT'S CORRECT.

4    Q.   ALL RIGHT.  NOW, YOU MENTIONED SOME THINGS WHEN SAMSUNG'S

5    COUNSEL WAS ASKING YOU QUESTIONS THAT YOU SAY YOU AND

6    DR. SNOEREN ACTUALLY AGREE WITH.  RIGHT?

7    A.   THERE ARE SOME THINGS THAT DR. SNOEREN AND I AGREE ON,

8    YES.

9    Q.   OKAY.  LET'S TALK ABOUT -- THERE'S A FEW MORE THAT YOU

10   AGREE ON THAT YOU HAVEN'T MENTIONED YET; RIGHT?

11   A.   YES, CERTAINLY.

12   Q.   OKAY.  AND WHY DON'T WE PUT UP YOUR SLIDE 3632.  I THINK

13   IT WAS A HANDY SLIDE THAT HAD THE CLAIM ON IT, 11 AND 20

14   TOGETHER.

15        WITH RESPECT TO THE ANALYSIS OF WHETHER THE SAMSUNG

16   PRODUCTS INFRINGE CLAIM 20, THERE ARE QUITE A FEW THINGS THAT

17   YOU AND DR. SNOEREN BOTH AGREE ARE IN THE CLAIM AND ALSO IN

18   THESE PRODUCTS; RIGHT?

19   A.   THAT'S CORRECT.

20   Q.   SO, FOR EXAMPLE, STARTING AT THE TOP OF THE CLAIM, YOU AND

21   PROFESSOR SNOEREN AGREE THAT EACH OF THESE PRODUCTS HAS A

22   COMPUTER READABLE STORAGE MEDIUM; RIGHT?

23   A.   YES, CERTAINLY.

24   Q.   AND YOU AGREE THAT THAT COMPUTER READABLE STORAGE MEDIUM

25   IN EACH PRODUCT INCLUDES EXECUTABLE PROGRAM INSTRUCTIONS;

1    RIGHT?

2    A.   CERTAINLY.

3    Q.   AND SOME OF THE INSTRUCTIONS ON THAT MEDIUM CAN CAUSE A

4    DATA PROCESSING SYSTEM TO PERFORM APPLICATIONS FOR THE USER,

5    SUCH AS CALENDAR, CONTACTS, GOOGLE E-MAIL, WHICH IS GMAIL,

6    EXCHANGE E-MAIL, ET CETERA; RIGHT?

7    A.   YES.  THAT LANGUAGE, OF COURSE, IS NOT FROM THE CLAIM, BUT

8    YES.

9    Q.   WELL, THE CLAIM TALKS ABOUT --

10   A.   THEY CERTAINLY CAUSE A DATA PROCESSING SYSTEM, SUCH AS ONE

11   OF THE ACCUSED DEVICES, TO PERFORM A METHOD.

12   Q.   AND THE -- SOME OF THOSE METHODS INCLUDE USER APPLICATIONS

13   LIKE APPLICATIONS THE USER CAN USE FOR THEIR CALENDAR, FOR

14   THEIR CONTACTS AND FOR E-MAIL; RIGHT?

15   A.   YES, THAT'S CORRECT.

16   Q.   OKAY.

17   A.   OF COURSE, THAT'S NOT IN THE CLAIM LANGUAGE.

18   Q.   RIGHT.  THE CLAIM JUST REQUIRES A USER INTERFACE, WHICH

19   EACH OF THOSE APPLICATIONS HAS; RIGHT?

20   A.   EACH OF THOSE APPLICATIONS HAS A USER INTERFACE, YES.

21   Q.   AND THE CLAIM REQUIRES THAT THE USER BE ABLE TO ACCESS AND

22   EDIT DATA, WHICH EACH OF THE ACCUSED DEVICES DOES THROUGH THE

23   USER INTERFACE; RIGHT?

24   A.   THAT'S CORRECT.

25   Q.   AND, IN FACT, WHEN WE GO ALL THE WAY DOWN TO CLAIM 20, WE

1    SEE WE NEED THREE CLASSES OF DATA FOR WHICH THERE ARE USER

2    APPLICATIONS WHERE THE USER CAN ACCESS AND EDIT DATA AND EACH

3    OF THESE DEVICES HAS THOSE; RIGHT?

4    A.   YES.  BUT WHAT'S IMPORTANT IS THAT THEY DON'T, THEY DON'T

5    DO IT IN -- CLAIM 20 DESCRIBES A PARTICULAR WAY.

6    Q.   WE'RE GOING TO -- DON'T WORRY, DR. CHASE, WE'RE GOING TO

7    GO THROUGH THE WHOLE THING.  SO YOU DON'T HAVE TO JUMP AHEAD.

8    A.   OKAY.

9    Q.   YOU AGREE WITH ME, EACH OF THEM HAS USER APPLICATIONS AND,

10   IN FACT, EACH OF THREE CLASSES OF USER APPLICATIONS, CALENDAR,

11   CONTACTS, E-MAIL, RIGHT?

12   A.   YES, AND IT PERFORMS BACKGROUND SYNC OF ALL THREE CLASSES.

13   BUT NOT IN THE MATTER REQUIRED BY THE CLAIMS.

14   Q.   LET'S STICK WITH ME.  WE WANT TO BE ORDERLY.  YOU AND I

15   KNOW THIS CLAIM REALLY WELL, BUT WE HAVE TO WALK THROUGH IT

16   BECAUSE NOT EVERYBODY ELSE IN THE COURTROOM DOES.

17        SO WE HAVE USER APPLICATIONS, WE HAVE THREE SETS OF DATA,

18   THE USER CAN ACCESS AND EDIT EACH OF THE THREE ON EACH OF THE

19   ACCUSED DEVICES; RIGHT?

20   A.   YES.

21   Q.   AND, IN FACT, IN EACH OF THE ACCUSED DEVICES, THERE'S A

22   USER LEVEL APPLICATION THAT PROVIDES A NON-SYNCHRONIZATION

23   PROCESSING THREAD; RIGHT?

24   A.   YES, I THINK THAT DR. SNOEREN AND I AGREE ON THAT.

25   Q.   OKAY.  IN FACT, EACH OF THE CALENDAR, CONTACTS, AND E-MAIL

```
1    APPLICATIONS ON THESE ACCUSED DEVICES PROVIDES A USER LEVEL

2    NON-SYNCHRONIZATION PROCESSING THREAD LIKE WE SEE IN THIS

3    CLAIM; RIGHT?

4    A.   YES.

5    Q.   OKAY.  AND EACH OF THEM ALLOWS A USER TO ACCESS AND EDIT

6    STRUCTURED DATA; RIGHT?

7    A.   YES.  THE USER INTERFACE ALLOWS THEM TO ACCESS AND EDIT

8    STRUCTURED DATA.

9    Q.   OKAY.  AND THEY EACH INCLUDE LOCAL DATABASES IN WHICH

10   STRUCTURED DATA IS STORED; RIGHT?

11   A.   THAT'S CORRECT.

12   Q.   AND THAT STRUCTURED DATA INCLUDES DATA FOR CALENDAR AND

13   FOR CONTACTS AND FOR E-MAIL ON EACH OF THE ACCUSED DEVICES;

14   RIGHT?

15   A.   THAT'S CORRECT.

16   Q.   AND MAIL AND CALENDAR AND CONTACTS ARE THREE DIFFERENT

17   DATA CLASSES AS THE TERM DATA CLASS IS USED IN CLAIM 20; RIGHT?

18   A.   INDEED THEY ARE.

19   Q.   OKAY.  AND IN EACH OF THE ACCUSED PRODUCTS, THAT DATA FOR

20   EACH OF THOSE DATA CLASSES, WHICH IS STORED IN THE LOCAL

21   DATABASE, CAN BE SYNCHRONIZED WITH DATA STORED IN A REMOTE

22   LOCATION?

23   A.   IT CAN BE SYNCHRONIZED WITH DATA STORED IN A REMOTE

24   LOCATION, NOT IN A MANNER DESCRIBED BY THE CLAIMS.

25   Q.   OKAY.  LET'S JUST -- IT CAN BE STORED ON THE LOCAL
```

1    DATABASE, ON THE PHONE OR THE TABLET, AND THAT DATA CAN BE

2    SYNCHRONIZED BY EACH OF THE ACCUSED DEVICES WITH DATA STORED

3    SOMEWHERE ELSE.  RIGHT?

4    A.   THAT'S CORRECT.

5    Q.   OKAY.  AND EXAMINE THAT SYNCHRONIZATION CAN HAPPEN IN THE

6    BACKGROUND WITHOUT INTERFERING WITH THE USER LEVEL APPLICATION

7    IF THE PERSON HAPPENS TO BE USING IT WHILE THE SYNCHRONIZATION

8    IS GOING ON; RIGHT?

9    A.   THAT'S CORRECT.

10   Q.   AND, IN FACT, THE THREAD ON WHICH THE SYNCHRONIZATION IS

11   HAPPENING IS A DIFFERENT THREAD FOR EACH OF THESE APPLICATIONS

12   THAN THE THREAD THAT IS DOING THE APPLICATION ITSELF; RIGHT?

13   A.   THAT'S CORRECT.

14   Q.   OKAY.  NOW, YOU WERE HERE WHEN PROFESSOR SNOEREN TESTIFIED

15   AND HE HAD A SLIDE THAT SHOWED SIX THINGS CALLED SYNC ADAPTERS

16   THAT'S IN EACH OF THESE ACCUSED DEVICES, AND YOU PUT UP A SLIDE

17   SOMETHING VERY SIMILAR; RIGHT?

18   A.   YES.

19   Q.   YOU AGREE THAT THERE ARE SIX SOFTWARE COMPONENTS ON EACH

20   OF THE ACCUSED DEVICES, EACH OF WHICH IS CALLED A SYNC ADAPTER;

21   RIGHT?

22   A.   I AGREE THAT SYNC ADAPTERS ARE SOFTWARE COMPONENTS, YES.

23   Q.   OKAY.  SO WE'RE WORKING OUR WAY THROUGH THE CLAIM.

24        SO THE CLAIM SAYS WE HAVE TO HAVE THESE SYNCHRONIZATION

25   SOFTWARE COMPONENTS, AND YOU AGREE THAT THERE ARE SIX OF THEM,

1    THREE FOR THE GOOGLE APPLICATIONS, GMAIL, CALENDAR, CONTACTS,

2    AND THREE FOR THE ONES THAT WORK WITH MICROSOFT EXCHANGE,

3    E-MAIL, CALENDAR, AND CONTACTS; RIGHT?

4    A.   YES.  AND I AGREE THAT THEY ARE SYNCHRONIZATION SOFTWARE

5    COMPONENTS.

6    Q.   OKAY.

7    A.   BUT THEY ARE NOT CONFIGURED TO SYNCHRONIZE STRUCTURED

8    DATA, FOUR OF THE SIX ARE NOT CONFIGURED TO SYNCHRONIZE

9    STRUCTURED DATA OF THE CLASSES.

10         THE COURT:  I'M SORRY TO INTERRUPT YOU.  LET'S GO

11   AHEAD AND TAKE A TEN MINUTE BREAK NOW.  IT'S 2:19.  WE'LL TAKE

12   A BREAK UNTIL 2:30.

13        THANK YOU.  PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

14        (JURY OUT AT 2:19 P.M.)

15         THE COURT:  ALL RIGHT.  THE JURORS HAVE LEFT THE

16   COURTROOM.  LET'S TAKE OUR BREAK NOW.  THANK YOU.

17        (RECESS FROM 2:20 P.M. UNTIL 2:30 P.M.)

18        (JURY IN AT 2:30 P.M.)

19         THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

20   SEAT.

21        THE TIME IS NOW 2:31.  GO AHEAD, PLEASE.

22   BY MS. KREVANS:

23   Q.   SO I THINK BEFORE THE BREAK WE WERE WALKING THROUGH

24   VARIOUS PIECES OF THE CLAIM AND WE TALKED ABOUT THE FACT THAT

25   EACH OF THOSE SIX SYNC ADAPTERS THAT YOU AND DR. SNOEREN BOTH

```
1      IDENTIFIED INVOKES A THREAD.  CORRECT?

2      A.   I WOULDN'T AGREE TO THAT.

3      Q.   YOU DON'T -- YOU DON'T THINK THAT EACH OF THE SIX SYNC

4      ADAPTERS, THOSE SOFTWARE COMPONENTS THAT YOU AND DR. SNOEREN

5      BOTH IDENTIFIED, INVOKES A THREAD IN THE ACCUSED PRODUCTS?

6      A.   WELL, I THINK WE HAVE TO BE A LITTLE BIT CAREFUL.

7      DR. SNOEREN ACCUSED VERY SPECIFIC CODE AS THE SYNC ADAPTERS,

8      AND THERE'S SOME OTHER CODE ASSOCIATED WITH THAT.

9           THERE ARE THREADS CREATED AS PART OF THE SYNCHRONIZATION

10     PROCESS CERTAINLY, AS I'VE TESTIFIED.

11          I DON'T THINK IT'S QUITE RIGHT TO SAY THAT THE SYNC

12     ADAPTERS INVOKE THEM.

13     Q.   YOU RECALL THAT YOUR DEPOSITION WAS TAKEN IN THIS CASE,

14     PROFESSOR CHASE?

15     A.   YES, I DO.

16     Q.   OKAY.  COULD YOU LOOK AT YOUR DEPOSITION, WHICH SHOULD BE

17     IN THE BINDER THAT WE GAVE YOU, AT PAGE 60.

18          ARE YOU THERE?

19     A.   PAGE?

20     Q.   60.

21     A.   60 OF THE BINDER OR PAGE 60 --

22     Q.   60 OF THE DEPOSITION?

23     A.   OKAY.  BECAUSE I HAVE FOUR PAGES PER PAGE.

24     Q.   EXACTLY.  WE'RE SAVING PAPER.

25     A.   YES, THANK YOU.
```

```
 1        Q.   ARE YOU THERE?

 2        A.   PAGE 60, YES, I AM.

 3        Q.   AND YOU WERE UNDER OATH AT YOUR DEPOSITION AND YOU WERE

 4    TRYING TO ANSWER THE QUESTIONS AS TRUTHFULLY AND CORRECTLY AS

 5    YOU CAN; RIGHT?

 6        A.   YES.  YES.

 7        Q.   OKAY.

 8        A.   YES.

 9        Q.   PAGE 60, LINE 13.

10             "QUESTION:  DO YOU DISAGREE WITH THE OPINION OF APPLE'S

11    EXPERT THAT EACH THOSE SIX SYNC ADAPTERS INVOKE A THREAD?"

12             YOUR ANSWER WAS, "EACH OF THOSE SIX SYNC ADAPTERS DOES

13    CREATE A THREAD IN AT LEAST THE JELLY BEAN VERSION OF ANDROID."

14             THAT WAS YOUR TESTIMONY; RIGHT?

15        A.   YES.  THAT'S NOT THE WHOLE STORY.  THAT'S PART OF A LONGER

16    DISCUSSION.

17        Q.   OKAY.  THAT WAS YOUR TESTIMONY, THAT EACH OF THOSE SIX

18    SYNC ADAPTERS CREATES A THREAD IN AT LEAST THE JELLY BEAN

19    VERSION OF ANDROID; RIGHT?

20        A.   WELL, YES.  BUT --

21        Q.   PROFESSOR CHASE, THAT WAS THE TESTIMONY YOU GAVE AT YOUR

22    DEPOSITION; RIGHT?

23        A.   YES, THAT'S THE TESTIMONY I GAVE IN MY DEPOSITION.  BUT

24    THERE'S ONE PART THAT YOU'RE LEAVING OUT AND I WOULD BE HAPPY

25    TO DIRECT YOU TO IT IF YOU WILL ALLOW ME.
```

```
 1         Q.   YOUR COUNSEL IS FREE TO GET BACK UP AND ASK YOU ANY

 2    QUESTION HE LIKES, PROFESSOR CHASE.

 3         AT YOUR DEPOSITION THIS WAS THE TESTIMONY YOU GAVE.  DO

 4    YOU WANT TO DISAVOW IT NOW?

 5         A.   WELL, WHAT DR. SNOEREN --

 6         Q.   YES OR NO, PROFESSOR CHASE?

 7         A.   THE CODE THAT DR. SNOEREN ACCUSED AS SYNC ADAPTERS, THE

 8    CLASS SPECIFIC CODE THAT HE SHOWED YOU ON PERFORM SYNC DOES NOT

 9    INVOKE A THREAD.  AND I CAN -- I'D BE HAPPY TO CLARIFY FOR YOU

10    IF YOU WILL ALLOW ME.

11         Q.   IN FACT, IN YOUR DEPOSITION, YOU ALSO TESTIFIED THAT THE

12    SIX SYNC ADAPTERS THAT PROFESSOR SNOEREN IDENTIFIED WERE

13    SUBSTANCES FROM THE ABSTRACT THREAD AND SYNC ADAPTER CLASS;

14    CORRECT?

15         A.   THAT'S CORRECT.

16         Q.   AND IN -- YOU ALSO TESTIFIED THAT THE SYNC ADAPTERS -- YOU

17    HAD NO REASON TO DISPUTE THAT THE SYNC ADAPTERS IN THE OTHER

18    VERSIONS OF ANDROID AT ISSUE, GINGERBREAD AND ICE CREAM

19    SANDWICH, ALSO CREATE THREADS ON THE ACCUSED PRODUCTS.  THAT

20    WAS ALSO YOUR TESTIMONY AT YOUR DEPOSITION; RIGHT?

21         A.   THERE ARE CERTAINLY -- CERTAINLY SYNCHRONIZATION

22    OPERATIONS RUN ON SEPARATE SYNC THREADS IN THOSE PRODUCTS AS

23    WELL.

24         Q.   COULD YOU LOOK BACK AT YOUR DEPOSITION AT PAGE -- LINE 25

25    OF PAGE 60.
```

```
1              "DO YOU HAVE ANY REASON TO DOUBT THAT THE OTHER VERSIONS

2     OF ANDROID THAT RUN ON THE ACCUSED PRODUCTS, THOSE SIX SYNC

3     ADAPTERS WILL ALSO CREATE A THREAD?"

4              YOUR ANSWER WAS, "SYNC ADAPTERS ARE COMMONLY SUBCLASS FROM

5     ABSTRACT THREADED SYNC ADAPTER AND ABSTRACT THREADED SYNC

6     ADAPTER DOES CREATE A THREAD IN ALL VERSIONS OF ANDROID THAT

7     I'M FAMILIAR WITH.  SO I HAVE NO REASON TO DISPUTE THAT THOSE

8     SYNC ADAPTERS DO CREATE A THREAD IN OTHER VERSIONS OF ANDROID

9     ON THE ACCUSED PRODUCTS."

10             THAT WAS YOUR TESTIMONY; RIGHT?

11    A.   NO.  ABSTRACT THREADED SYNC ADAPTER --

12    Q.   MR. CHASE, I'M SORRY.  THAT WAS THE TESTIMONY YOU GAVE AT

13    YOUR DEPOSITION; CORRECT?

14    A.   ABSTRACT THREADED SYNC ADAPTER IS NOT PART OF A SYNC

15    ADAPTER CODE THAT DR. SNOEREN ACCUSED.  SO THAT'S WHAT I WAS

16    REFERRING TO.  THAT'S WHAT I UNDERSTOOD YOU TO BE REFERRING TO.

17    A DISTRIBUTED -- THAT WAS MY TESTIMONY, AN ABSTRACT THREADED

18    SYNC ADAPTER DOES CREATE A THREAD.

19             ABSTRACT THREADED SYNC ADAPTER IS ANOTHER PIECE OF CODE

20    THAT IS USED BY ALL OF THE ANDROID SYNC ADAPTERS THAT

21    DR. SNOEREN ACCUSED AND DOES CREATE A THREAD IN EACH OF THESE

22    VERSIONS.

23    Q.   SO THE SYNC ADAPTERS THAT DR. SNOEREN IDENTIFIED ALL USE

24    ABSTRACT THREADED SYNC ADAPTER?

25    A.   I THINK THAT WOULD BE FAIR, YES.
```

```
1    Q.   OKAY.  NOW, IN THE ACCUSED PRODUCTS, THERE IS ALSO

2    SOMETHING KNOWN AS THE SYNC MANAGER; RIGHT?

3    A.   THE SYNC MANAGER, YES.

4    Q.   AND THE SYNC MANAGER IN EACH OF THE ACCUSED PRODUCTS IS

5    RESPONSIBLE FOR SCHEDULING SYNCHRONIZATION OPERATIONS; RIGHT?

6    A.   MR. WESTBROOK REFERRED TO IT AS THE TRAFFIC COP FOR

7    SYNCHRONIZATION OPERATIONS IN ANDROID, YES.

8    Q.   OKAY.  AND THAT'S BECAUSE ACTUALLY, ALTHOUGH IN THIS CASE

9    WE'RE FOCUSSED ON THESE SIX SYNC ADAPTERS, THERE ARE MANY OTHER

10   SYNC ADAPTERS ALSO PRESENT IN EACH OF THE ACCUSED DEVICES;

11   RIGHT?

12   A.   WELL, THERE CAN BE.  AN APPLICATION CAN, YES, CREATE ITS

13   OWN SYNC ADAPTER.  APPLICATIONS MAY HAVE SYNC ADAPTERS.  THERE

14   CAN BE OTHER SYNC ADAPTERS, YES.

15   Q.   OKAY.  SO YOU HAVE TO HAVE SOMETHING LIKE THE SYNC MANAGER

16   TO BE THE TRAFFIC COP TO MAKE SURE THAT THE SYNC ADAPTERS

17   AREN'T INTERFERING WITH ONE ANOTHER; RIGHT?

18   A.   ONE OF ITS FUNCTIONS SO TO ASSURE THAT IT DOES NOT ITSELF

19   REQUEST MORE THAN TWO SYNCHRONIZATION OPERATIONS AT A TIME AS

20   MR. WESTBROOK TESTIFIED.

21   Q.   TRAFFIC COP?

22   A.   TRAFFIC COP, YES.

23   Q.   OKAY.  NOW, YOU LOOKED AT DR. SNOEREN'S ANALYSIS OF THE

24   SOURCE CODE IN THE ACCUSED PRODUCTS, RIGHT?

25   A.   YES, I DID.
```

```
 1    Q.   AND YOU DIDN'T FIND ANY SUBSTANTIVE ERRORS IN HIS

 2    ANALYSIS?

 3    A.   I -- WELL, HIS REPORT -- I HAVE -- I HAVE A NUMBER OF

 4    DISAGREEMENTS WITH DR. SNOEREN'S ANALYSIS.

 5    Q.   LET ME MAKE MY QUESTION MORE PRECISE.  YOU DIDN'T FIND ANY

 6    SUBSTANTIVE ERRORS OF DR. SNOEREN'S ANALYSIS OF WHAT THE

 7    SOFTWARE ACTUALLY DOES, RIGHT?

 8    A.   WELL, DR. SNOEREN SAID THAT THE SOFTWARE, THESE SIX SYNC

 9    ADAPTERS EACH PERFORMS ALL OF THESE VARIOUS OPERATIONS THAT WE

10    TALKED ABOUT IN MY DIRECT, AND THAT'S JUST WRONG.  I MEAN,

11    THAT'S FACTUALLY WRONG.

12    Q.   SO LET ME ASK YOU AGAIN.

13    A.   AND THAT'S ONE OF THE NUMBER OF -- I'M SORRY.

14    Q.   COULD YOU LOOK AT YOUR DEPOSITION, PAGE 133, LINE 16.

15         "QUESTION:  DID YOU IDENTIFY ANY ERRORS IN DR. SNOEREN'S

16    SOURCE CODE ANALYSIS?"

17         YOUR ANSWER WAS:  "I DID NOT IDENTIFY ANY SUBSTANTIVE

18    ERRORS IN WHAT DR. SNOEREN SAID THE SOFTWARE DOES."

19         RIGHT?

20    A.   AND IT'S VERY CLEAR THAT THAT WAS IN THE CONTEXT OF A

21    DISCUSSION OF EXHIBIT 6 OF HIS REPORT, AND NOT OF THE BODY OF

22    HIS REPORT.

23         NOW, EXHIBIT 6 -- MAY I -- MAY I?

24    Q.   WELL, I THINK, AS YOU WENT ON TO SAY IN YOUR ANSWER, YOUR

25    ISSUE IS WHAT DOES THE CLAIM MEAN, NOT WHETHER DR. SNOEREN HAS
```

```
 1         INCORRECTLY SAID WHAT STEP EACH PIECE OF SOFTWARE DOES; RIGHT?

 2    A.    WELL, IT'S A LITTLE BIT MORE THAN THAT, BECAUSE EXHIBIT 6

 3    IS ESSENTIALLY TRACE, IT'S A TRACE OF SOURCE CODE.  IT'S THIS

 4    FILE, THIS LINE CALLS THIS, AND THEN THAT CALLS THAT.  AND

 5    WE'RE LOOKING AT THE SAME SOURCE CODE, THOSE KINDS OF THINGS

 6    ARE FAIRLY STRAIGHTFORWARD, AND I DID NOT FIND SUBSTANTIVE

 7    ERRORS IN HIS ANALYSIS IN EXHIBIT 6.

 8         BUT IN THE BODY OF HIS REPORT, HE CHARACTERIZED VERY

 9    BROADLY BASED ON THAT ANALYSIS, AND I DID -- I DO HAVE -- I

10    HAVE, YES, I FOUND ERRORS IN THAT.

11    Q.    OKAY.  LET'S JUST STICK WITH MY QUESTION TO YOU, WHICH WAS

12    YOU DID NOT FIND ANY ERRORS IN DR. SNOEREN'S ANALYSIS OF STEP

13    BY STEP WHAT HAPPENS IN THE SOFTWARE?  THAT'S WHAT YOU'RE

14    CALLING EXHIBIT 6, AND YOU FOUND NO ERRORS IN THAT; RIGHT?

15    A.    I PREVIOUSLY TESTIFIED THAT I FOUND NO SUBSTANTIVE ERRORS

16    IN EXHIBIT 6 OF HIS INFRINGEMENT REPORT.

17    Q.    AND, IN FACT, IT'S YOUR VIEW THAT PROFESSOR SNOEREN IS A

18    PERSON NOT JUST OF ORDINARY SKILL IN THE ART IN THIS CASE BUT

19    OF EXTRAORDINARY SKILL; RIGHT?

20    A.    YES.  I KNOW DR. SNOEREN.  I'VE ENCOUNTERED HIM IN

21    PROFESSIONAL CONTEXTS.  HE'S A REPUTABLE COMPUTER SCIENTIST.

22         THERE ARE SUBSTANTIAL ERRORS IN HIS REPORT AS I'VE

23    TESTIFIED.  I DON'T KNOW WHY THOSE ERRORS WOULD BE THERE.

24    BUT --

25    Q.    PROFESSOR CHASE, BEAR WITH ME.  YOU KNOW FROM YOUR COUNSEL
```

```
1        WE'RE ALL BEING TIMED HERE.

2        A.   YES.

3        Q.   I'D LIKE YOU TO ANSWER MY QUESTIONS, AND IF YOU HAVE

4        SOMETHING MORE TO SAY, I KNOW YOUR COUNSEL WILL GET UP AND ASK

5        YOU MORE QUESTIONS.  OKAY?

6        A.   YES.

7        Q.   ALL RIGHT.  LET'S TURN TO YOUR OPINIONS ON VALIDITY.

8             FIRST OF ALL, YOU -- YOU'RE ARE A NAMED INVENTOR ON 11

9        ISSUED U.S. PATENTS; RIGHT?

10       A.   YES.

11       Q.   AND YOU THINK THAT THE PATENT OFFICE DID ITS JOB PROPERLY

12       WHEN IT FOUND THAT THE CLAIMS IN YOUR PATENTS WERE VALID OVER

13       THE PRIOR ART?

14       A.   IT'S MY PRESUMPTION THAT THEY DID THEIR JOB PROPERLY TO

15       THE BEST OF THEIR ABILITY.  AND, OF COURSE, FOR THOSE PATENTS,

16       WE PROVIDE THEM WITH VARIOUS PRIOR ART THAT THEY SHOULD LOOK

17       AT.

18            AND IN THIS CASE, PART OF THE ISSUE IS THAT APPLE DID NOT

19       PROVIDE THEM WITH KNOWLEDGE OF EVOLUTION AND WINDOWS MOBILE

20       FIVE.

21       Q.   PROFESSOR CHASE, YOU THINK THE PATENT OFFICE DID ITS JOB

22       RIGHT WHEN IT ISSUED YOUR PATENTS; RIGHT?

23       A.   YES, I BELIEVE SO.

24       Q.   OKAY.  NOW, IN YOUR TESTIMONY REGARDING VALIDITY, YOU

25       DISCUSSED TWO PIECES OF PRIOR ART, EVOLUTION AND WINDOWS
```

```
1     MOBILE; RIGHT?

2     A.   YES.

3     Q.   YOU'RE NOT HERE TO TELL THE JURY THAT THE CLAIM 20 OF THE

4     '414 PATENT IS INVALID BASED ON ANYTHING THAT SOFTWARE

5     DEVELOPERS FOR ANDROID DID; RIGHT?

6     A.   NO.

7     Q.   OKAY.  JUST SO WE'RE CLEAR ON THAT.  THE ISSUE HERE IS

8     JUST EVOLUTION AND WINDOWS MOBILE; RIGHT?

9     A.   YES.

10    Q.   ALL RIGHT.  YOU SHOWED THE JURY A VIDEO OF A DEMONSTRATION

11    OF THE -- WHAT YOU CALLED THE EVOLUTION SYSTEM.

12         DO YOU RECALL THAT?

13    A.   IT'S THE EVOLUTION APPLICATION RUNNING ON SUSE LINUX 10.0,

14    YES.

15    Q.   ALL RIGHT.  FOUR, THE RELEVANT DATE HERE FOR PRIOR ART IS

16    JANUARY 7TH, 2007; RIGHT?

17    A.   I UNDERSTAND --

18    Q.   JUNE.  JUNE 2007; RIGHT?

19    A.   IF I COULD HAVE A COPY OF THE PATENT HERE -- BUT, YEAH, I

20    UNDERSTAND THAT THE FILING DATE IS IN EARLY 2007, YES.

21    Q.   JANUARY 2007?

22    A.   YES.

23    Q.   THE VIDEO DEMONSTRATION THAT YOU SHOWED US, THAT WASN'T A

24    VIDEO FROM BACK BEFORE JANUARY OF 2007; RIGHT?

25    A.   THAT WAS A VIDEO OF SYSTEMS THAT WERE RUNNING SOFTWARE
```

```
 1        FROM WELL BEFORE JANUARY 2007 ON LAPTOP COMPUTERS FROM WELL

 2        BEFORE 2007.

 3             I INSTALLED THE AUTHENTICATED VERSION OF THE CODE FROM

 4        NOVELL ON THOSE LAPTOPS AND TESTED IT AND THAT'S WHAT WE SHOWED

 5        YOU IN THE VIDEO.

 6        Q.   OKAY.  SO LET'S BE CLEAR.  THE VIDEO THAT YOU SHOWED THE

 7        JURY WAS SOMETHING THAT YOU MADE LAST YEAR IN 2013 AFTER YOU

 8        WERE HIRED BY SAMSUNG'S COUNSEL TO BE THEIR EXPERT IN THIS

 9        CASE; RIGHT?

10        A.   THAT'S CORRECT.

11        Q.   SO YOU'RE NOT TRYING TO LEAVE ANYBODY WITH THE IMPRESSION

12        THAT THIS VIDEOTAPE WAS CREATED BEFORE THE PATENT APPLICATION

13        WAS FILED?

14        A.   ALL OF THE TECHNOLOGY SHOWN IN THAT VIDEO WAS CREATED AND

15        BEHAVED IN EXACTLY THE SAME WAY BEFORE THE PATENT WAS FILED.

16        WE EVEN USED THE NETWORK SWITCH THAT WAS FROM THAT TIME PERIOD.

17        Q.   YOU MADE THE VIDEO LAST YEAR AFTER YOU WERE HIRED BY

18        QUINN, EMANUEL FOR THIS CASE?

19        A.   THAT'S CORRECT.

20        Q.   OKAY.  AND YOU -- YOU WENT THROUGH EVOLUTION KIND OF FAST

21        IN RESPONSE TO QUESTIONS FROM SAMSUNG'S COUNSEL.

22             LET ME ASK YOU ABOUT A PART OF THE CLAIM THAT I'M NOT SURE

23        GOT COVERED IN DETAIL.

24             THERE'S A FIRST DATABASE REQUIRED BY THE CLAIM IN WHICH

25        DATA HAS TO BE STORED; RIGHT?
```

1    A.    THAT'S CORRECT.

2    Q.    ONE OF THE REQUIREMENTS OF THE CLAIM; RIGHT?

3    A.    YES.

4    Q.    AND IN YOUR EXPERT REPORT, YOU POINTED, FOR EVOLUTION, FOR

5    MEETING THAT FIRST DATABASE REQUIREMENT, TO SOMETHING YOU

6    CALLED THE FOLDER SUMMARY DATABASE; RIGHT?

7    A.    IN THE CASE OF E-MAIL, YES, IT IS THE FOLDER SUMMARY

8    DATABASE.

9          AND THERE ARE SEPARATE DATABASES FOR CONTACTS AND CALENDAR

10   DATA CLASSES IN EVOLUTION.

11   Q.    OKAY.  AND THE FOLDER SUMMARY DATABASE, AS ITS NAME

12   SUGGESTS, FOR E-MAIL DOESN'T ACTUALLY STORE THE E-MAIL MESSAGES

13   THEMSELVES, IT STORES SUMMARY DATA PERTAINING TO THE E-MAIL,

14   RIGHT?

15   A.    IT STORES STRUCTURED DATA FROM MAIL MESSAGES, THE HEADER

16   DATA, LIKE SUBJECT LINES, FROM, TO, THE DATE IT WAS SENT, THOSE

17   KINDS OF THINGS, THAT'S STRUCTURED DATA OF THE MAIL CLASS IN MY

18   OPINION, YES.  IT DOES NOT STORE THE BODIES OF THE E-MAILS.

19   Q.    OKAY.  LET'S TALK FOR A MOMENT ABOUT WINDOWS MOBILE.  YOU

20   ALSO SHOWED THE JURY A VIDEO OF A DEMONSTRATION OF A SYSTEM, I

21   THINK YOU CALLED IT WINDOWS MOBILE WITH ACTIVE SYNC; RIGHT?

22   A.    YES.

23   Q.    OKAY.  THAT VIDEO WAS ALSO MADE LAST YEAR IN 2013 IN

24   CONNECTION WITH YOUR WORK FOR SAMSUNG'S LAWYERS IN THIS CASE?

25   A.    THAT VIDEO WAS MADE USING H-P IPAQ RUNNING A TRUE AND

```
 1     CORRECT COPY OF WINDOWS MOBILE 5 THAT WE OBTAINED FROM THAT ERA

 2     AND THAT WE OBTAINED VIA EBAY, ACTUALLY.

 3     Q.   THE VIDEO WAS MADE IN 2013 AFTER YOU WERE HIRED TO HELP

 4     SAMSUNG'S LAWYERS IN THIS CASE; RIGHT?

 5     A.   THE VIDEO WAS MADE IN 2013, AND ALL OF THE TECHNOLOGY AND

 6     BEHAVIORS SHOWN IN THE VIDEO PRE-DATES THE FILING DATE OF THE

 7     PATENT.

 8     Q.   NOW, I'D LIKE TO CALL UP JUST FOR THE JURY, SINCE THAT'S

 9     THE WAY MR. PAK DID IT, SAMSUNG'S DEMONSTRATIVE SDX 3650.

10          NOW, THIS IS A -- THIS IS A DEMONSTRATIVE THAT HAS ON IT

11     SOME OF THE THOSE THINGS YOU SAID WERE SYNCHRONIZATION SOFTWARE

12     COMPONENTS THAT YOU FOUND IN WINDOWS MOBILE; RIGHT?

13     A.   YES.

14     Q.   AND THE REASON THIS ONE WAS SHOWN ONLY TO THE JURY IS

15     BECAUSE UNDER THE, THE SAME BOXES YOU SHOWED BEFORE FOR MAIL,

16     CALENDAR, AND CONTACTS WITH THESE BOXES THAT ARE EACH OF THE

17     PROVIDERS YOU TESTIFIED ABOUT ON DIRECT, YOU'VE ACTUALLY GOT

18     THE NAME OF A FILE, AND I WON'T SAY THEM OUT LOUD.

19     A.   YES.

20     Q.   OKAY.  NOW, THOSE ARE -- THOSE NAMES DOWN BELOW, THOSE ARE

21     THE NAMES IN THE ACTUAL CODE THAT RUNS ON WINDOWS MOBILE

22     THAT -- FOR FOUR THINGS THAT YOU IDENTIFIED AS SYNCHRONIZATION

23     PROCESSING COMPONENTS; RIGHT?

24     A.   NO.

25     Q.   THOSE ARE NOT SYNCHRONIZATION PROCESSING COMPONENTS?
```

1      A.   I DIDN'T CHARACTERIZE THEM THAT WAY.

2      Q.   SYNCHRONIZATION SOFTWARE COMPONENTS?

3      A.   SYNCHRONIZATION SOFTWARE COMPONENTS, YES.

4      Q.   OKAY.  THANK YOU.

5           AND, AGAIN, WITHOUT SAYING THOSE NAMES OUT LOUD, NONE OF

6      THOSE -- NONE OF THOSE PIECES OF CODE ITSELF CREATES A

7      SYNCHRONIZATION THREAD; CORRECT?

8      A.   IN THE CASE OF THE PIN PROVIDERS ON THE TOP ROW, THAT IS

9      CORRECT.

10     Q.   ARE YOU SAYING THAT THE ONE ON THE BOTTOM ROW, ON THE

11     BOTTOM LEFT OF THE SLIDE, DOES CREATE A THREAD?

12     A.   THE IMAP MAIL COMPONENT DOES CREATE A THREAD, YES.  IT'S A

13     SYNCHRONIZATION PROCESSING THREAD.

14     Q.   BUT NONE OF THE ONES IN THE TOP ROW CREATES A THREAD?

15     A.   THAT IS CORRECT.

16     Q.   AND JUST BECAUSE WE TALKED ABOUT THREADS THAT DID TWO

17     DIFFERENT THINGS, JUST SO WE'RE REALLY CLEAR, NONE OF THOSE

18     CREATES A SYNCHRONIZATION THREAD; RIGHT?

19     A.   YEAH.  AS I TESTIFIED, NONE OF THOSE PIN PROVIDERS CREATES

20     A SYNCHRONIZATION PROCESSING THREAD AS I UNDERSTAND THE MEANING

21     OF IT IN THE CLAIMS.

22           MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

23           THE COURT:  ALL RIGHT.  THE TIME IS 2:48.

24           MR. PAK:  NO QUESTIONS FOR THIS WITNESS, YOUR HONOR.

25           THE COURT:  ALL RIGHT.  IS THIS WITNESS EXCUSED?

```
 1              MR. PAK:  SUBJECT TO RECALL.

 2              THE COURT:  SUBJECT TO RECALL FOR VALIDITY; RIGHT?

 3              MR. PAK:  THAT'S CORRECT.

 4              THE COURT:  ALL RIGHT.  YOU MAY BE EXCUSED.

 5              THE WITNESS:  THANK YOU, YOUR HONOR.

 6              THE COURT:  THE TIME IS 2:48.

 7          (PAUSE IN PROCEEDINGS.)

 8          MS. MAROULIS:  YOUR HONOR, SAMSUNG CALLS NICK DICARLO

 9      AS ITS NEXT WITNESS.

10              THE COURT:  DO WE HAVE THE PHOTOS?

11              THE CLERK:  NOT YET.

12          (PAUSE IN PROCEEDINGS.)

13              THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

14          (DEFENDANTS' WITNESS, NICHOLAS DICARLO, WAS SWORN.)

15              THE WITNESS:  YES.

16              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

17          AND PULL THE MICROPHONE TOWARDS YOU AND STATE YOUR NAME

18      AND SPELL IT, PLEASE.

19              THE WITNESS:  NICHOLAS DICARLO.  N-I-C-H-O-L-A-S, D-I

20      CAPITAL C-A-R-L-O.

21              THE COURT:  ALL RIGHT.  THE TIME IS NOW 2:50.  GO

22      AHEAD, PLEASE.

23                          DIRECT EXAMINATION

24      BY MS. MAROULIS:

25      Q.   GOOD AFTERNOON, MR. DICARLO.  CAN YOU PLEASE TELL US WHAT
```

1    IS YOUR CURRENT POSITION?

2    A.   I'M THE VICE-PRESIDENT OF PRODUCT PLANNING AND PRODUCT

3    MARKETING FOR SAMSUNG TELECOMMUNICATIONS AMERICA.

4    Q.   HOW LONG HAVE YOU WORKED FOR SAMSUNG?

5    A.   MORE THAN SIX YEARS.

6    Q.   WHAT ARE YOUR CURRENT JOB RESPONSIBILITIES AS THE

7    VICE-PRESIDENT OF PRODUCT MARKETING AND PRODUCT PLANNING?

8    A.   I WORK WITH OUR COLLEAGUES IN KOREA AND WITH CARRIER

9    CUSTOMERS LIKE AT&T AND VERIZON TO IDENTIFY OPPORTUNITIES TO

10   IMPROVE OUR SMARTPHONES, TABLETS, AND WEARABLES.

11   Q.   SIR, YOU MENTIONED YOUR WORK INVOLVES WORKING WITH

12   CARRIERS SUCH AS AT&T AND VERIZON.  WHAT ARE YOUR TYPICAL

13   INTERACTIONS WITH CARRIERS LIKE?

14   A.   SURE.  SO I WOULD PRIMARILY BE COMING TO THEM WITH WHAT

15   OUR FEATURE PRODUCTS ARE GOING TO BE, WHATEVER THE NEXT GALAXY

16   SMARTPHONE IS GOING TO BE, AND TALK WITH THEM ABOUT THE COOL

17   NEW FEATURES AND CAPABILITIES THAT WE'RE GOING TO PUT INTO THE

18   DEVICE, WHY WE THINK IT FITS THEIR NETWORK AND WHAT

19   ADVANCEMENTS WE'LL BE MAKING.

20   Q.   ARE YOU INVOLVED IN CARRIER APPROVALS?

21   A.   YEAH, TO A CERTAIN EXTENT.

22   Q.   HOW WOULD YOU DESCRIBE SAMSUNG'S RELATIONSHIP WITH ITS

23   CARRIERS?

24   A.   SURE.  SINCE WE ENTERED THIS INDUSTRY IN THE LATE 90S,

25   WE'VE ALWAYS HAD A VERY CARRIER CENTRIC STRATEGY.  WE TRY TO

```
1    SUPPORT THE LATEST NETWORK TECHNOLOGY AND LIKE LTE AND WIMAX,

2    W-I-M-A-X, AND SO I THINK THAT WE'VE BUILT A REALLY GOOD

3    RELATIONSHIP WITH THEM OVER THE YEARS.

4    Q.   MR. DICARLO, DOES SAMSUNG EVER MAKE CHANGES TO THE DEVICES

5    BEFORE THE PRODUCT IS RELEASED?

6    A.   OF COURSE, YES.

7    Q.   WHAT ABOUT AFTER, DOES SAMSUNG MAKE CHANGES AFTER THE

8    PRODUCT IS RELEASED?

9    A.   YEAH, WE UPDATE THE OS, WE ADD FEATURES, DELETE FEATURES,

10   FIX BUGS, YEAH, QUITE COMMON.

11   Q.   BASED ON YOUR EXPERIENCE, IF SAMSUNG NEEDED A CARRIER

12   APPROVAL FOR SOFTWARE FEATURES ON AN URGENT BASIS, HOW LONG

13   WOULD IT TAKE?

14   A.   SURE.  WE DO THAT VERY, VERY FREQUENTLY, AND IT CAN BE

15   JUST IN A MATTER OF DAYS.

16   Q.   DOES THE CARRIER ALWAYS REQUIRE SAMSUNG TO GET ITS

17   APPROVAL TO MAKE A CHANGE TO A FEATURE?

18   A.   YEAH, THEY ALMOST ALWAYS DO, BUT THERE'S CERTAINLY THINGS

19   THAT THEY SAY DOESN'T IMPACT IT AND THEY DON'T NEED TO TEST.

20   BUT MOSTLY THEY DO.

21   Q.   YOU MENTIONED THAT CHANGES CAN BE APPROVED AND ROLLED OUT

22   IN A MATTER OF DAYS.  CAN YOU GIVE US AN EXAMPLE, PLEASE?

23   A.   SURE, YEAH.  A SPECIFIC EXAMPLE RELATED TO THE QUICK

24   SEARCH FEATURE IN THE GALAXY S III, WE IN SOME CASES ENTER THE

25   LAB AND EXITED THE LAB ON THE SAME DAY.
```

```
 1      Q.   WHEN DID THIS CHANGE HAPPEN?

 2      A.   LET'S SEE.  WE GOT THE SOFTWARE FROM GOOGLE ON JULY 5TH

 3      AND ENTERED THE LAB ON JULY 5TH WITH T-MOBILE AND EXITED ON

 4      JULY 5TH.  VERIZON WAS -- EXITED JULY 6TH.  SPRINT TOOK A

 5      LITTLE BIT LONGER, TOOK ABOUT SIX DAYS.

 6      Q.   WHY DID THIS REMOVAL OF THIS FEATURE TAKE PLACE?

 7      A.   I THINK IT WAS RELATED TO AN INJUNCTION.

 8      Q.   OKAY.  SO YOU JUST TESTIFIED THAT AS BETWEEN SEVERAL

 9      CARRIERS IT TOOK BETWEEN ONE DAY AND SIX DAYS TOTAL.  IS THAT

10      CORRECT?

11      A.   YEP.

12      Q.   WHAT WAS THE IMPACT OF REMOVING THIS FEATURE ON SAMSUNG'S

13      SALES?

14      A.   I DON'T THINK IT HAD ANY IMPACT ON THE GALAXY S III'S.

15      IT'S PROBABLY OUR BEST SELLING SMARTPHONE THAT WE'VE EVER HAD

16      IN THE U.S., AND I DON'T THINK IT HAD ANY IMPACT AT ALL.

17      Q.   HOW MANY GALAXY S III'S DID SAMSUNG SELL FROM JULY THROUGH

18      OCTOBER 2012?

19      A.   I THINK WE WERE SELLING BETWEEN 1.3 AND 1.5 MILLION PER

20      MONTH.  THAT'S JUST MY RECOLLECTION.

21              MS. MAROULIS:  THANK YOU.  I PASS THE WITNESS.

22              THE COURT:  OKAY.  THE TIME IS NOW 2:54.

23              MR. LEE:  CAN WE HAVE JUST A MINUTE, YOUR HONOR, TO

24      GIVE HIM THE NOTEBOOK?

25              THE COURT:  THAT'S FINE.  ARE YOU READY?
```

```
 1                THE WITNESS:  YES.

 2                MR. LEE:  YES.

 3                THE COURT:  OKAY.  TIME IS NOW 2:54.  GO AHEAD,

 4      PLEASE.

 5                          CROSS-EXAMINATION

 6      BY MR. LEE:

 7      Q.   MR. DICARLO, MY NAME IS BILL LEE AND I REPRESENT APPLE.

 8      WE'VE NOT MET BEFORE; CORRECT?

 9      A.   CORRECT.

10      Q.   SO THE JURY IS CLEAR, YOU'RE NOT HERE TO TESTIFY ABOUT

11      WHETHER SAMSUNG INFRINGES THE APPLE PATENTS; CORRECT?

12                MS. MAROULIS:  OBJECTION.  BEYOND THE SCOPE OF THE

13      DIRECT.

14                MR. LEE:  I'M ACTUALLY TRYING TO DETERMINE WHAT THE

15      SCOPE IS, YOUR HONOR.

16                THE COURT:  OVERRULED.  GO AHEAD.  YOU MAY ANSWER.

17      BY MR. LEE:

18      Q.   IS THAT CORRECT, SIR?

19      A.   I'M NOT HERE TO SPECIFY OR DISCUSS WHETHER WE INFRINGED OR

20      NOT.

21      Q.   AND YOU'RE NOT HERE TO TESTIFY ABOUT VALIDITY; CORRECT?

22      A.   NO.

23      Q.   YOU'RE NOT HERE TO TESTIFY ABOUT THE AMOUNT OF DAMAGES;

24      CORRECT?

25      A.    TO THE EXTENT THAT ANY INDIVIDUAL FEATURE IS VALUABLE, I
```

1    DON'T THINK THAT THAT'S REALLY A VALID METHOD, BUT THE AMOUNT

2    OF THE DAMAGES ISN'T PART OF MY TESTIMONY.

3    Q.   SO YOU TOLD US ABOUT YOUR DUTIES IN MARKETING AND

4    ADVERTISING AT SAMSUNG; CORRECT?

5    A.   PRIMARILY PRODUCT MARKETING.

6    Q.   RIGHT.  AND YOU'VE DONE IT YOU'VE SAID FOR ALMOST SIX

7    YEARS; CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   AND YOU WERE INVOLVED IN PRODUCT MARKETING AT THE TIME

10   THAT THE IPHONE 3G WAS LAUNCHED, WERE YOU NOT?

11   A.   YES, I WAS.

12   Q.   TURN, IF YOU WOULD, TO PX 147, WHICH IS ALREADY ADMITTED,

13   AND I'D LIKE TO TALK ABOUT WHAT SAMSUNG'S MARKETING AND

14   ADVERTISING RESPONSE WAS TO THE IPHONE 3G.

15        YOU WERE IN YOUR PRESENT POSITION AT THAT TIME; CORRECT?

16   A.   I BELIEVE I WAS DIRECTOR LEVEL AT THAT TIME, BUT

17   ESSENTIALLY THE SAME.

18            MS. MAROULIS:  OBJECTION.  BEYOND THE SCOPE.

19            MR. LEE:  YOUR HONOR, HE TESTIFIED ABOUT HIS DUTIES

20   AND RESPONSIBILITIES INVOLVEMENT IN MARKETING FOR ALL OF THE

21   SAMSUNG PRODUCTS.

22            THE COURT:  ALL RIGHT.  OVERRULED.

23   BY MR. LEE:

24   Q.   NOW, THIS IS A SAMSUNG DOCUMENT, IS IT NOT?

25   A.   IT DOES SAY SAMSUNG ON IT.  IT COULD BE A CONSULTANT THAT

CROSS DICARLO

1      PREPARED IT FOR US, BUT IT DOES SAY SAMSUNG.

2      Q.   IT SAYS SAMSUNG AND IT SAYS JULY 2008; CORRECT?

3      A.   YES.

4      Q.   AND THAT WAS A MONTH AFTER THE IPHONE 3G WAS LAUNCHED;

5      CORRECT?

6      A.   YOU'RE REFRESHING MY MEMORY ABOUT THE SPECIFIC DATE OF

7      THAT PRODUCT LAUNCH.

8      Q.   THAT SEEMS RIGHT TO YOU?  DOES THAT SEEM RIGHT TO YOU?

9      A.   IT SEEMS RIGHT.

10     Q.   TURN, IF YOU WOULD, TO PAGE 13.  DO YOU SEE THE SAMSUNG

11     LOGO AT THE TOP RIGHT-HAND CORNER?  PAGE 13.  IT'S ON THE

12     SCREEN, TOO, MR. DICARLO IF THAT WILL HELP YOU.

13     A.   OKAY, YES, I'M ON THE RIGHT PAGE.

14     Q.   AND YOU SEE THE CAPTION AT THE COP, "CONCLUSION:  SOFTWARE

15     IS THE NEW VALUE DRIVER."

16          DO YOU SEE THAT?

17     A.   YES, I DO SEE THAT.

18     Q.   AND DO YOU SEE THE SECOND SENTENCE OF THE SAMSUNG

19     DOCUMENT, "FOCUSSING ON HARDWARE IS A LOOSING PROPOSITION FOR

20     DIRECT IPHONE COMPETITION."

21          CORRECT?

22     A.   I DO SEE THAT.  THERE'S QUITE A BIT OF OTHER THINGS IN

23     THIS DOCUMENT, BUT I DO SEE THAT.

24     Q.   OKAY.  NOW LET'S SEE WHAT SAMSUNG'S RESPONSE -- WE'VE

25     LOOKED AT THE IPHONE 3G.

```
1              NOW LET'S SEE WHAT THE MARKETING RESPONSE WAS WHEN THE

2      IPHONE 4 WAS INTRODUCED.  OKAY?

3      A.   OKAY.

4      Q.   YOU WERE IN YOUR PRESENT POSITION AND HAD SIMILAR DUTIES

5      WHEN THE IPHONE 4S WAS INTRODUCED; CORRECT?

6      A.   YES.

7      Q.   TURN, IF YOU WOULD, TO PX 215, WHICH IS ALREADY IN

8      EVIDENCE.

9              MS. MAROULIS:  YOUR HONOR, OBJECTION.  THIS IS BEYOND

10     THE SCOPE.  THE WITNESS TESTIFIED ONLY AS TO CARRIER APPROVALS,

11     AND THIS IS A VERY FAR RANKING CROSS.  WE'RE ALL ON THE TIME

12     CLOCK, AND I'M GOING TO NEED TO REDIRECT.

13             MR. LEE:  WELL, YOUR HONOR, TWO THINGS.  ONE IS HE

14     TESTIFIED BROADLY TO HIS RESPONSIBILITIES FOR MARKING, PRODUCT

15     MARKETING FOR ALL OF THESE PRODUCTS, AND THE SECOND THING IS

16     THIS IS ON MY TIME.

17             MS. MAROULIS:  YOUR HONOR, HE TESTIFIED THAT HIS JOB

18     IS VICE-PRESIDENT OF PRODUCT PLANNING.  IT'S MERELY IDENTIFYING

19     HIM AS AN INDIVIDUAL, BUT WE DID NOT GO INTO ANY SUBJECTS OTHER

20     THAN CARRIER APPROVALS FOR VERY SPECIFIC REASONS.

21             THE COURT:  WELL, PRODUCT PLANNING AND MARKET

22     MARKETING.  I MEAN, YOU WANT HIM TO JUST CALL HIM BACK LATER

23     DURING HIS CASE?  YOU'LL STILL HAVE TO USE TIME.

24             MS. MAROULIS:  YES, YOUR HONOR.  WE CALLED HIM FOR A

25     SPECIFIC PURPOSE ONLY.
```

1          THE COURT:  I'LL ALLOW ONE QUESTION ON 215.

2          MR. LEE:  SURE.  LET ME ACTUALLY SEE IF I CAN LAY A

3     FOUNDATION.

4     Q.   AS -- WHAT'S YOUR TITLE AGAIN?  VICE-PRESIDENT OF?

5     A.   PRODUCT PLANNING AND PRODUCT MARKETING.

6     Q.   RIGHT.  AND --

7          MS. MAROULIS:  CAN WE PLEASE TURN DOWN -- PUT DOWN

8     THE DOCUMENT.

9     BY MR. LEE:

10    Q.   AND AS PART OF THOSE RESPONSIBILITIES, MR. DICARLO, DO YOU

11    HAVE RESPONSIBILITY FOR DETERMINING WHAT THE RESPONSE IS TO THE

12    LAUNCH OF COMPETING PRODUCTS BY COMPETITORS, SUCH AS APPLE?

13    A.   YEAH.  PRIMARILY I WOULD BE DESCRIBING WHERE I THINK OUR

14    PRODUCT HAS ADVANTAGES, SUCH AS IN THIS DOCUMENT, THE ARTICLE

15    IS REFERRING TO FIERCE WIRELESS'S ASSESSMENT ABOUT THE

16    ADVANTAGES, SUCH AS THE BIG SCREEN ON THE GALAXY S II VERSUS

17    THE 4S.

18    Q.   AND YOU WOULD BE INVOLVED IN FORMULATING THE RESPONSE TO

19    LAUNCH BY APPLE OF, FOR INSTANCE, THE IPHONE 4S; CORRECT?

20    A.   SURE.

21    Q.   SURE.  AND YOU HAVE THIS E-MAIL IN FRONT OF YOU; CORRECT?

22    A.   YES, I DO.

23    Q.   YOU REMEMBER THIS, DO YOU NOT?

24         MS. MAROULIS:  YOUR HONOR, THIS IS STILL BEYOND THE

25    SCOPE OF DIRECT, AND THE WITNESS IS NOT EVEN COPIED ON ANY PART

```
1        OF THIS DOCUMENT.

2                MR. LEE:  YOUR HONOR, HE JUST SAID HE REMEMBERED IT.

3        HE REMEMBERED THE EVENTS.  IF WHAT THEY'D LIKE ME TO DO IS

4        RECALL HIM AS PART OF OUR CASE, I'LL RECALL HIM AS PART OF OUR

5        CASE.  IT SEEMS LIKE A WASTE OF TIME.

6                THE COURT:  WHY DON'T YOU RECALL HIM.  YOU'LL HAVE TO

7        BRING HIM BACK ON ANOTHER DAY.

8                MS. MAROULIS:  THANK YOU.

9        BY MR. LEE:

10       Q.  SO, MR. DICARLO, JUST A COUPLE MORE QUESTIONS.  I'M GOING

11       TO RECALL YOU AS PART OF OUR CASE TO ASK YOU ABOUT PX 215.

12       OKAY.

13       A.  OKAY.

14       Q.  NOW, APART FROM WHAT YOU'VE TALKED ABOUT WITH MS. MAROULIS

15       AND ME, YOU HAVE NO OTHER TESTIMONY OR OPINIONS TO OFFER ON THE

16       QUESTION OF PATENT INFRINGEMENT BY SAMSUNG; CORRECT?

17                MS. MAROULIS:  OBJECTION.  THIS IS NOT AN EXPERT

18       WITNESS.

19       BY MR. LEE:

20       Q.  IS THAT CORRECT?

21                THE COURT:  OVERRULED.

22                THE WITNESS:  YEAH, IT'S A BROAD STATEMENT.  I DON'T

23       THINK THAT IT'S PART OF OUR STRATEGY TO INFRINGE.

24       BY MR. LEE:

25       Q.  RIGHT.  AND IT'S -- YOU HAVE NOTHING TO OFFER THE JURY ON
```

```
1     SAMSUNG'S CLAIMS AGAINST APPLE FOR PATENT INFRINGEMENT;

2     CORRECT?

3     A.   NOT THAT I CAN THINK OF.

4            MR. LEE:  YOUR HONOR, NOTHING FURTHER SUBJECT TO

5     RECALL.

6            THE COURT:  OKAY.  TIME IS NOW 3:01.

7            MS. MAROULIS:  THANK YOU, YOUR HONOR.  NOTHING

8     FURTHER FOR US.

9            THE COURT:  ALL RIGHT.  I ASSUME THIS WITNESS IS

10    SUBJECT TO RECALL, BUT YOU'RE EXCUSED FOR THE DAY.

11           MR. LEE:  YOUR HONOR, WE'LL -- IF WE COULD, WE'LL

12    RECALL HIM ON TUESDAY.

13           MS. MAROULIS:  YOUR HONOR, IF WE COULD, I'D LIKE TO

14    DISCUSS OUTSIDE THE PRESENCE OF THE JURY THIS EXHIBIT WITH

15    RELATION TO THIS WITNESS.  BUT NOT RIGHT NOW.

16           MR. LEE:  OKAY.

17           THE COURT:  WE CAN DO A HIGH PRIORITY OBJECTION LIKE

18    WE NORMALLY DO.  THAT WOULD BE THE APPROPRIATE TIME FOR THAT.

19           MS. MAROULIS:  YES, YOUR HONOR.

20        (PAUSE IN PROCEEDINGS.)

21           MR. QUINN:  YOUR HONOR.

22           THE COURT:  YES.  ARE WE HAVING EXHIBITS NOW OR A

23    LIVE WITNESS?

24           MR. QUINN:  WE'RE HAVING DEPOSITIONS.

25           THE COURT:  I MEAN DEPOSITIONS.
```

```
 1              MR. QUINN:  DEPOSITION TESTIMONY, YOUR HONOR.

 2              THE COURT:  OKAY.

 3              MR. QUINN:  AND IN ORDER TO SAVE TIME, I PROPOSE TO

 4    READ THE DEPOSITION TESTIMONY VERY QUICKLY.

 5              THE COURT:  OKAY.  THAT'S YOUR --

 6              MR. QUINN:  BUT NOT SO QUICKLY THAT IT'LL TAX THE

 7    COURT REPORTER.

 8              THE COURT:  OKAY.  THAT'S FINE.  TIME IS 3:03.

 9         GO AHEAD, PLEASE.

10              MR. QUINN:  THE FIRST IS THE DEPOSITION OF

11    SARAH CHANDLER, WHO IS DIRECTOR OF OPERATIONS FOR PRODUCT

12    DEVELOPMENT AND PROCUREMENT OF APPLE WHO IS DESIGNATED BY APPLE

13    TO BE A 30(B)(6) WITNESS, THAT IS, A PERSON TO TESTIFY ON

14    CERTAIN SUBJECTS.

15         THOSE SUBJECTS ARE IDENTIFICATION AND EXPLANATION OF EACH

16    APPLE PURCHASE OR REIMBURSABLE PURCHASE OF ANY SAMSUNG,

17    ANDROID, OR THIRD PARTY'S SMARTPHONE OR TABLET COMPUTER FOR ANY

18    PURPOSE, INCLUDING FOR PURPOSES OF TESTING, ANALYSIS, REVIEW,

19    CONSIDERATION, EVALUATION, INSPECTION, TEARDOWN -- AM I DOING

20    OKAY? -- REVERSE ENGINEERING OR COPYING.

21              MR. MCELHINNY:  EXCUSE ME, YOUR HONOR.  I DON'T KNOW

22    WHAT HE'S READING FROM.

23              THE COURT:  THAT'S NOT THE TRANSCRIPT.

24              MR. MCELHINNY:  THEY GAVE US A DEPOSITION CLIP THAT

25    THEY SAID THEY WERE GOING TO PUT IN.  AND THAT'S NOT THE
```

```
1     DEPOSITION CLIP.
2              MR. QUINN:  THIS IS THE 30(B)(6) DEPOSITION
3     DESIGNATION, YOUR HONOR.
4              MR. MCELHINNY:  YOUR HONOR, YOU DON'T READ DEPOSITION
5     NOTICES.  I'M SORRY.  WE EXCHANGED DEPOSITION CLIPS.  WE HAVE
6     VIDEOS THAT WE THOUGHT WE WERE GOING TO SEE.  THIS IS NOT IN
7     THE CLIP WHICH THEY GAVE US AND THE LINES THEY TOLD US THEY
8     WERE GOING TO LEAVE.
9              MR. QUINN:  YOUR HONOR, I'D ASK THE COURT TO TAKE
10    JUDICIAL NOTICE OF WHAT THE 36 DESIGNATION WAS.  THERE'S THREE
11    PARAGRAPHS THAT SHE WAS DESIGNATED TO TESTIFY ON.  I DON'T
12    THINK IT'S DISPUTED AT ALL.
13             MR. MCELHINNY:  THE TESTIMONY THAT'S COMING IN IS THE
14    TESTIMONY THAT WAS DESIGNATED, YOUR HONOR.
15             THE COURT:  I DON'T THINK IT'S APPROPRIATE TO READ
16    THE DEPOSITION NOTICE.  I THINK IT'S APPROPRIATE TO SHOW THE
17    CLIPS.
18             MR. MCELHINNY:  THANK YOU, YOUR HONOR.
19             MR. QUINN:  ALL RIGHT.
20             THE COURT:  BUT IF YOU WANT TO READ IT, THEN READ IT
21    AND DON'T READ THE DEPOSITION NOTICE.
22             MR. QUINN:  ALL RIGHT.
23             THE COURT:  OTHERWISE --
24             MR. QUINN:  OKAY.  I WILL READ IT.
25             THE COURT:  YOU KNOW, IF THERE WAS A
```

```
1          CROSS-EXAMINATION QUESTION ABOUT WHAT TOPIC SHE WAS DESIGNATED

2     FOR, WHY DON'T YOU READ THAT.  THAT'S HOW IT WOULD COME IN.

3               MR. QUINN:  ALL RIGHT.  I WILL READ THE DESIGNATED

4     PASSAGES, YOUR HONOR.

5               THE COURT:  OKAY.  THANK YOU.

6               MR. QUINN:  "QUESTION:  SO IN YOUR UNDERSTANDING OF

7     THE WORD, DOES IT SURPRISE YOU THAT SENIOR APPLE EXECUTIVES

8     WERE STUDYING A COMPETITOR'S PRODUCT WITH RESPECT TO CALL

9     FUNCTIONS AND SYNCING?

10         "ANSWER:  I THINK IT'S CUSTOMARY FOR EXECUTIVES IN AN

11    INDUSTRY TO LOOK AT WHAT ELSE IS HAPPENING IN THE INDUSTRY.

12         "LET'S TAKE A LOOK AT -- AND WE'LL MARK THIS AS EXHIBIT 3.

13    IT'S -- APPEARS TO BE A SPREADSHEET OR A CATALOG WITH SEVERAL

14    COLUMNS.  IT'S GOT BATES NUMBERS 1927 THROUGH 1935.

15         "AND THIS IS THE WAY IT WAS PRODUCED TO US.  IT'S KIND OF

16    DIFFICULT TO READ, BUT THIS IS THE WAY THAT WE GOT IT FROM

17    APPLE.

18         I THINK AS LONG AS WE STICK WITH THE SAME NUMBERS -- LINE

19    NUMBERS ON THE LEFT-HAND SIDE, YOU CAN TRACE THROUGH THE

20    DOCUMENT.

21         "LET ME JUST ASK WHETHER YOU RECOGNIZE THIS DOCUMENT.

22         "ANSWER:  I'VE SEEN PART OF IT.

23         "QUESTION:  IN -- IN WHAT CONTEXT DID YOU SEE IT?

24         "ANSWER:  IN MY PREPARATION.

25         "QUESTION:  AND WHAT IS YOUR UNDERSTANDING OF WHAT THIS
```

```
1    DOCUMENT IS?

2            "ANSWER:  IT APPEARS TO BE A LIST OF PRODUCTS PURCHASED.

3               MR. LEE:  EXCUSE ME, YOUR HONOR.  THIS DOCUMENT IS

4       NOT IN EVIDENCE.  IT SHOULDN'T BE ON THE SCREEN.

5               MR. QUINN:  "QUESTION:  AND WHAT IS YOUR

6       UNDERSTANDING OF WHAT THIS DOCUMENT IS?

7            "ANSWER:  IT APPEARS TO BE A LIST OF PRODUCTS PURCHASED.

8            "QUESTION:  PRODUCTS PURCHASED BY APPLE EMPLOYEES?

9            "ANSWER:  FROM THE ONES THAT I HAVE LOOKED UP ON THAT --

10      OR THAT I KNOW, YES.

11           "QUESTION:  IF WE LOOK AT -- IF WE JUST FOCUS ON COLUMN F,

12      YOU'LL SEE UNDERLINE 13 IT SAYS, 'A SAMSUNG ETERNITY PHONE

13      ORDERED FOR EBAY FOR COMPETITIVE TESTING.'  DO YOU SEE THAT?

14           "ANSWER:  YES.

15           "QUESTION:  DO YOU KNOW WHAT COMPETITIVE TESTING REFERRED

16      TO THERE?

17           "ANSWER:  I DON'T KNOW SPECIFICALLY WHAT THE PURCHASER WAS

18      REFERRING TO, NO.

19           "EXHIBIT 4 IS -- IT'S BATES NUMBERS 1984 THROUGH 2005.

20           "QUESTION:  OKAY.  IF YOU TRACK THROUGH LINE 4, YOU'LL SEE

21      YOUR -- WHAT I ASSUME IS YOUR NAME UNDER -- WELL, IT SAYS --

22      IT'S THE PAGE THAT HAS IJKLMNO AT THE TOP.  THERE'S A LINE THAT

23      SAYS 'CHANDLER, ACTION BY IAPPROVE.'

24           "ANSWER:  MM-HMM.

25           "QUESTION:  DO YOU SEE THAT?
```

1          "ANSWER:  YEAH.

2          "QUESTION:  WHAT -- WHAT IS 'IAPPROVE'?

3          "ANSWER:  SO THIS IS THE SAME LINE ITEM WE WERE TALKING

4     ABOUT BEFORE.  THE PERSON REFERENCED IN COLUMN D WORKS FOR

5     SOMEONE WHO WORKS FOR ME.

6          "SO I ASSUME WHAT YOU'RE SEEING HERE IS AN OUTPUT OF OUR

7     APPROVAL SYSTEM.

8          "SO THIS IS EXHIBIT 6.

9          "IT'S A SET OF SLIDES, BATES NUMBERS 12351 THROUGH 12374.

10    LET ME ASK YOU IF YOU CAN IDENTIFY THIS DOCUMENT.

11         "ANSWER:  YES, THIS DOCUMENT LOOKS FAMILIAR.  I HAVE NOT

12    STUDIED THE SPECIFICS OF THIS PARTICULAR ONE, BUT THIS IS A

13    FAMILIAR FORMAT.

14         "THIS IS EXHIBIT 8, WHICH IS BATES NUMBER 2304 THROUGH

15    2327, SAMSUNG GALAXY'S S III TAKE-APART SLIDES.

16         "QUESTION:  SAME QUESTION.  THIS IS ANOTHER REPORT OF A

17    TAKE-DOWN ANALYSIS DONE FOR COST ESTIMATING PURPOSES?

18         "ANSWER:  LOOKS LIKE.  YES, THAT'S WHAT IT LOOKS LIKE.

19         "QUESTION:  ARE THERE REASONS UNRELATED TO COPYING THAT A

20    COMPANY WOULD WANT TO UNDERSTAND HOW ITS COMPETITORS' PRODUCTS

21    OPERATE?

22         "ANSWER:  ARE THERE CONCEIVABLY REASONS?  SURE.

23         AND, YOUR HONOR, WE WOULD OFFER IN EVIDENCE THE REFERENCED

24    EXHIBITS, WHICH ARE DX 489, PAGES 1 THROUGH 9.

25              THE COURT:  WHAT IS DX 489, 1 THROUGH 9.  WHAT DOES

1       THAT MEAN, DX 491, 92, 93, 94?

2               MR. QUINN:  THESE ARE THE PAGES THAT ARE REFERENCED,

3       THAT WERE IDENTIFIED BY EXHIBIT NUMBER IN THE DEPOSITION.

4               THE COURT:  SO IT'S PAGE 1 THROUGH 9 OF DX 489.

5               MR. QUINN:  YES.

6               THE COURT:  AND YOU'RE ONLY SEEKING TO APPARENTLY

7       ADMIT THOSE PAGES?

8               MR. QUINN:  1 TO 9.

9               THE COURT:  OKAY.  WHAT IS THIS DOCUMENT?

10              MR. QUINN:  IT'S A LOG OF COMPETITOR PRODUCT

11      PURCHASED.

12              THE COURT:  ALL RIGHT.  ANY OBJECTION?

13              MR. MCELHINNY:  NO OBJECTION, YOUR HONOR.

14              THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

15              MR. QUINN:  AND THEN ALSO THE SAME EXHIBIT, YOUR

16      HONOR, THERE'S A COUPLE OF OTHER PAGES.  THERE'S A FEW OTHER

17      BATCHES OF PAGES.  ALSO FROM 489, 10 TO 28.

18              THE COURT:  10 TO 28, OKAY.

19              MR. QUINN:  32 TO 55.

20              THE COURT:  32 TO 55.

21              MR. QUINN:  AND 68 TO 91.

22              THE COURT:  68 TO 91, THAT'S ALL ADMITTED.

23              MR. MCELHINNY:  THIS IS ALL ADMITTED UNDER SEAL, YOUR

24      HONOR.  SOME OF THEM ARE.  WHICH ARE THE ONES THAT ARE UNDER

25      SEAL?

```
 1              (DEFENDANTS' EXHIBIT 489, PAGES 1 - 9, 10 - 28, 32 - 35,

 2     68 - 91, WAS ADMITTED IN EVIDENCE.)

 3              MR. QUINN:  AND THAT CONCLUDES SAMSUNG'S PORTION OF

 4     THE DEPOSITION OF SARAH CHANDLER.

 5              THE COURT:  ALL RIGHT.

 6              MR. QUINN:  CAN WE STOP THE CLOCK.

 7              THE COURT:  YES.  HOW DID YOU DECIDE TO DO IT?  DID

 8     YOU WANT TO DO COUNTERS OR --

 9              MR. MCELHINNY:  I HAVE A COUNTER.  I THINK EVERYBODY

10     IS DYING TO SEE WHAT SARAH CHANDLER LOOKS LIKE, SO I --

11              THE COURT:  ALL RIGHT.  OKAY, FINE.  GO AHEAD.  IT'S

12     3:09.

13              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

14              (THE VIDEOTAPED DEPOSITION OF SARAH CHANDLER WAS PLAYED IN

15     OPEN COURT OFF THE RECORD.)

16              MR. MCELHINNY:  AT THIS TIME, YOUR HONOR, I WOULD

17     LIKE TO LODGE PLAINTIFF'S EXHIBIT 3009 AS A DEPOSITION CLIP.

18              THE COURT:  OKAY.  TIME IS 3:11.  OKAY.

19              MR. QUINN:  YOUR HONOR, THE NEXT DEPOSITION --

20              THE COURT:  YES.

21              MR. QUINN:  -- IS MR. GREG JOSWIAK, J-O-S-W-I-A-K,

22     APPLE VICE-PRESIDENT FOR IOS, IPOD, AND IPHONE PRODUCT

23     MARKETING.

24              THE COURT:  ALL RIGHT.  TIME IS 3:11.

25          GO AHEAD, PLEASE.
```

```
1              MR. QUINN:  "QUESTION:  GOOD MORNING, MR. JOSWIAK.

2         "ANSWER:  GOOD MORNING.

3         "QUESTION:  I UNDERSTAND THAT YOU'VE BEEN DESIGNATED TO

4    TESTIFY ON CERTAIN SUBJECTS RELATING TO THIS CASE.

5         "ANSWER:  IT'S MY UNDERSTANDING AS WELL.

6         "QUESTION:  BUT YOU UNDERSTAND THAT ONE OF THE SUBJECTS

7    YOU'VE BEEN DESIGNATED TO TESTIFY ON IS FACTORS RELATING TO --

8    THAT DRIVE CONSUMER DEMAND FOR MOBILE DEVICES; RIGHT?

9         "ANSWER:  I DO.

10        "QUESTION:  IS IT TRUE THAT IT WOULD BE DIFFICULT TO LIST

11   ALL THE FEATURES THAT CONTRIBUTE TO EASE OF USE OF A MOBILE

12   DEVICE?

13        "ANSWER:  IT WOULD BE DIFFICULT TO LIST ALL OF THEM.

14        "QUESTION:  SO EVEN THOUGH IT'S DIFFICULT, CAN YOU DO

15   THAT, SITTING HERE TODAY?

16        "ANSWER:  WE PROBABLY DON'T HAVE ENOUGH TIME.  AND, AGAIN,

17   IT WOULD BE VERY DIFFICULT TO DO.  THERE ARE LOTS AND LOTS OF

18   FEATURES OF A PRODUCT.  AND AS I SAID, WE CERTAINLY BUILD EASE

19   OF USE INTO EVERYTHING WE TRY TO DO.  AGAIN, NOT EVERYTHING IS

20   OF EQUAL WEIGHT, AS I SAID.  BUT CERTAINLY IT'S IMPORTANT, IT'S

21   IMPORTANT THING FOR US WHEN WE ARE DESIGNING OUR PRODUCTS.

22        "QUESTION:  WELL, LET'S -- I WOULD ASK YOU PLEASE TO DO

23   THE BEST YOU CAN FOR ME, AND LIST FOR ME ALL THE FEATURES THAT

24   YOU'RE AWARE OF THAT CONTRIBUTE TO EASE OF USE OF APPLE MOBILE

25   DEVICES.
```

1          "ANSWER:  AS I SAID, TO REALLY APPROACH THAT, I WOULD LIKE

2     TO HAVE MULTIPLE INDIVIDUALS AND MORE TIME TO SPEND.  THERE ARE

3     LOTS AND LOTS OF FEATURES, IF NOT THOUSANDS OF FEATURES IN OUR

4     PRODUCTS.

5          "QUESTION:  WOULD IT BE TRUE TO SAY, THEN, IT'S NOT

6     SOMETHING REALLY THAT YOU CAN DO RIGHT NOW TO LIST THE FACTORS

7     THAT CONTRIBUTE TO EASE OF USE OF APPLE MOBILE DEVICES?

8          "ANSWER:  AS I SAID, IT WOULD BE A DIFFICULT ASSIGNMENT.

9     THERE ARE SO MANY FEATURES IN A PRODUCT.  SO MANY FEATURES

10    THAT, AGAIN, FOR US CONTRIBUTE TO EASE OF USE, AND THAT WE

11    DESIGN EASE OF USE INTO THOSE FEATURES.  THEY ARE KIND OF

12    SYMBIOTIC.  AND IT WOULD BE A VERY DIFFICULT ASSIGNMENT TO SIT

13    HERE AND TRY TO LIST ALL OF THOSE FOR YOU.

14         "QUESTION:  COULD YOU GIVE ME AN ESTIMATE OF THE NUMBER OF

15    FEATURES IN ANY APPLE MOBILE DEVICE WHICH, IN YOUR VIEW,

16    CONTRIBUTE TO EASE OF USE?

17         "ANSWER:  I WOULDN'T KNOW HOW TO ESTIMATE THAT, JOHN.

18         "QUESTION:  AND COULD YOU TELL ME WHAT YOU REGARD AS THE

19    MOST IMPORTANT FEATURES IN TERMS OF CONTRIBUTING TO EASE OF

20    USE?

21         "ANSWER:  AGAIN, IT WOULD BE A DIFFICULT ASSIGNMENT TO

22    COME UP WITH SUCH A LIST.

23         "QUESTION:  IS IT TRUE, THEN, THAT YOU HAVE NOT

24    ACTUALLY -- YOU'RE NOT AWARE OF ANY SURVEYS OR DATA THAT'S BEEN

25    COLLECTED CONCERNING WHAT PARTICULAR INGREDIENTS OF EASE OF USE

```
 1        CAUSE CONSUMERS TO BUY MOBILE DEVICES; IS THAT TRUE?

 2             "ANSWER:  I THINK I HAVE TRIED TO ANSWER THAT, JOHN.  SO

 3        AGAIN, WE LOOK AT EASE OF USE IS SOMETHING WE SURVEY.  WE DONE

 4        TRY TO SURVEY THE INGREDIENTS THAT MAKE THAT UP."

 5             THAT CONCLUDES THE READING OF MR. JOSWIAK'S TESTIMONY,

 6        YOUR HONOR.

 7             THE COURT:  ALL RIGHT.  IT'S 3:14.  WHAT WAS

 8        MS. CHANDLER'S TITLE?

 9             MR. QUINN:  SHE IS DIRECTOR OF OPERATIONS, PRODUCT

10        DEVELOPMENT/PROCUREMENT.

11             THE COURT:  THANK YOU.  THANK YOU.

12        ALL RIGHT.  MR. MCELHINNY, DO YOU HAVE A --

13             MR. MCELHINNY:  WE DO, YOUR HONOR.

14             THE COURT:  ALL RIGHT.

15             MR. MCELHINNY:  GREG JOSWIAK.

16             THE COURT:  ALL RIGHT.  TIME IS 3:14.  GO AHEAD,

17        PLEASE.

18             (THE VIDEOTAPED DEPOSITION OF GREG JOSWIAK WAS PLAYED IN

19        OPEN COURT OFF THE RECORD.)

20             MR. MCELHINNY:  YOUR HONOR, I WOULD LIKE TO LODGE

21        PLAINTIFF'S EXHIBIT 3007.

22             THE COURT:  ALL RIGHT.  TIME IS 3:16.

23        OKAY.  TIME IS 3:17.  DO YOU WANT TO GO AHEAD AND

24        INTRODUCE THE WITNESS FIRST.  I WON'T COUNT IT ON YOUR TIME.

25             MR. QUINN:  THANK YOU.  ARTHUR RANGEL, APPLE DIRECTOR
```

```
 1        OF PRODUCT MARKETING, RESEARCH AND ANALYSIS.

 2                THE COURT:  ALL RIGHT.  TIME IS 3:17.  GO AHEAD,

 3        PLEASE.

 4                MR. QUINN:  "QUESTION:  OTHER THAN ASKING QUESTIONS

 5        ABOUT EASE OF USE, HAVE YOU DONE ANYTHING TO SPECIFICALLY TEST

 6        OR SURVEY THE FEATURE OF LINKING STRUCTURES TO ACTIONS AS IT

 7        RELATES TO THE '647 PATENT?

 8            "ANSWER:  AS I UNDERSTAND HOW IT RELATES TO THE PATENT,

 9        NO, I DON'T THINK WE HAVE DONE ANYTHING SPECIFICALLY TO THAT

10        FEATURE -- ON THAT FEATURE.

11            "QUESTION:  AND SO IS IT FAIR TO SAY THAT YOU HAVEN'T DONE

12        ANY KIND OF SEPARATE CONSUMER RESEARCH RELATING TO -- THIS

13        FEATURE OF LINKING STRUCTURES TO ACTIONS?

14            "ANSWER:  I DON'T THINK SO, NO.

15            "QUESTION:  AND HAVE YOU DONE ANY KIND OF RESEARCH TO

16        SPECIFICALLY TEST CONSUMER REACTION TO THE AUTO CORRECT

17        FEATURE?

18            "ANSWER:  AGAIN, NOT THAT I CAN RECALL.

19            "QUESTION:  AND HAVE YOU DONE ANYTHING TO -- OR HAS APPLE,

20        TO YOUR KNOWLEDGE, DONE ANYTHING TO TEST CONSUMER REACTION TO

21        THE SLIDE TO UNLOCK FEATURE?

22            MR. STONE:  SPECIFICALLY FOR THAT FEATURE?

23            MR. KIDMAN:  SPECIFICALLY FOR THAT FEATURE.

24            THE WITNESS:

25            "ANSWER:  AGAIN, NO.  WE -- NOT THAT I'M AWARE OF.  WE --
```

1    AGAIN, I MENTIONED IN THE PREVIOUS TESTIMONY THAT THAT WOULD

2    PROBABLY BE EASE OF USE.  SO ONLY EASE OF USE, BUT NOTHING

3    SPECIFIC TO THAT FEATURE THAT I'M AWARE OF.

4         "QUESTION:  SO IN -- SO SURVEY RESPONDENTS WHO IDENTIFY

5    EASE OF USE AS BEING AN IMPORTANT PURCHASE DECISION, YOU HAVE

6    NO IDEA WHETHER THEY MIGHT BE REFERRING TO THE FORM FACTOR OR

7    THE SCREEN SIZE, FOR EXAMPLE?

8         "ANSWER:  THERE'S A WHOLE LOT THAT GOES INTO EASE OF USE,

9    AND IT'S FROM CONVERSATIONS WITH PROBABLY HUNDREDS OF CONSUMERS

10   OVER THE YEARS.  EASE OF USE ON OUR PHONES IS EVERYTHING ABOUT

11   IT, RIGHT?  IT'S HOW YOU HOLD IT.  IT'S HOW YOU OPERATE IT.

12   IT'S THE FLUIDITY OF MOVING FROM ONE SCREEN TO ANOTHER.  IT'S

13   THE INTEGRATION OF THE APPLICATIONS.  IT'S EVERYTHING.  WE

14   DON'T BREAK IT OUT IN OUR SURVEYS BY EACH AND EVERY

15   SUBCOMPONENT OF WHAT THAT MAY BE.

16        AGAIN, MY ANALOGY IS SIMILAR TO THE OS X BROWSER OR

17   OPERATING SYSTEM WHERE THERE ARE 200 PLUS FEATURES.  SO TEST

18   200 AND PLUS FEATURES TO UNDERSTAND EASE OF USE OF OS X IS

19   IMPRACTICAL.  I WOULD SAY THE SAME THING IS TRUE FOR THE

20   IPHONE.  AND OUR EASE OF USE RATINGS HAVE BEEN CONSISTENTLY

21   HIGH SINCE WE STARTED TRACKING THIS ON IPHONE."

22        THAT CONCLUDES THE READING OF MR. RANGEL.

23             THE COURT:  3:19.

24             MR. MCELHINNY:  MAY I INTRODUCE MR. RANGEL, YOUR

25   HONOR?

```
1            (THE VIDEOTAPED DEPOSITION OF ARTHUR RANGEL WAS PLAYED IN

2      OPEN COURT OFF THE RECORD.)

3              THE COURT:  OKAY.  TIME IS 3:19.

4              MR. MCELHINNY:  YOUR HONOR, MOVE AND LODGE

5      PLAINTIFF'S EXHIBIT 3008.

6              THE COURT:  OKAY.  TIME IS NOW 3:20.

7        OKAY.  GO AHEAD AND INTRODUCE THE WITNESS, PLEASE.

8              MR. QUINN:  THE NEXT DEPOSITION PASSAGE IS FROM THE

9      DEPOSITION OF PHILIP SCHILLER, APPLE'S SENIOR VICE-PRESIDENT OF

10     WORLDWIDE MARKETING.

11             THE CLERK:  THAT'S NOT THE PICTURE I WAS GIVEN.

12             THE COURT:  THAT'S OKAY.  THEY ALREADY HAVE A PICTURE

13     OF MR. SCHILLER.

14        OKAY.  TIME IS 3:21.  GO AHEAD, PLEASE.

15             MR. QUINN:  "QUESTION:  WHAT'S YOUR POSITION AT

16     APPLE?

17        "ANSWER:  I'M SENIOR VICE-PRESIDENT OF WORLDWIDE

18     MARKETING.

19        "QUESTION:  SO YOU'RE IN CHARGE OF MARKETING AT APPLE?

20        "ANSWER:  YES, I'M IN CHARGE OF MARKETING AT APPLE.

21        "QUESTION:  SO IN THE END, IN THE -- IN THE GRAND SCHEME

22     OF HOW PEOPLE FEEL ABOUT APPLE TODAY, YES, I THINK THE -- THE

23     -- THE -- THE LONG-TERM EFFECT OF ATENNAGATE WAS NEGLIGIBLE,

24     AND -- AND I DON'T SEE IT HAVING A BIG NEGATIVE EFFECT IN THE

25     LONG TERM.
```

1     "QUESTION:  ATENNAGATE, THAT'S -- WHAT WAS THAT?

2     "ANSWER:  IT'S A TERM THAT WAS GIVEN BY SOMEONE IN THE

3     PRESS TO THE FACT THAT WHEN YOU HOLD A CELL PHONE IN A CERTAIN

4     WAY, YOU CAN ATTENUATE THE SIGNAL AND DROP THE -- THE BARS OF

5     RANGE YOU GET A BIT.  AND -- AND WHEN THAT WAS OBSERVED, PEOPLE

6     WROTE STORIES ABOUT IT AND CALLED IT ATENNAGATE.

7     "QUESTION:  HOW MANY FEATURES OF THE -- ARE THERE ON THE

8     IPHONE THAT CONTRIBUTE TO EASE OF USE?

9     "ANSWER:  VERY MUCH.  I DON'T HAVE A COUNT OFF THE TOP OF

10    MY HEAD.

11    "QUESTION:  CAN YOU GIVE ME AN APPROXIMATE NUMBER?

12    "ANSWER:  I WOULD EXPECT THERE ARE HUNDREDS.  I DON'T KNOW

13    ANY APPROXIMATE NUMBER.

14    "QUESTION:  ARE SOME OF THESE FEATURES MORE IMPORTANT THAN

15    OTHERS IN TERMS OF THEIR CONTRIBUTION TO EASE OF USE.

16    "ANSWER:  AGAIN, I'M NOT SURE.  I DON'T THINK IN TERMS OF

17    ONE THING BEING MORE IMPORTANT THAN OTHERS.  I THINK SOME --

18    YOU SEE AND USE MORE FREQUENTLY THAN OTHERS.  I THINK SOME MAY

19    MATTER TO CERTAIN CUSTOMERS MORE THAN SOME OTHER CUSTOMER.  I'M

20    NOT SURE HOW TO USE THE WORD IMPORTANT IN THAT QUESTION.

21    "QUESTION:  I MEAN, DO YOU HAVE THE ABILITY TO RANK IN

22    TERMS OF THE EXTENT TO WHICH A FEATURE CONTRIBUTES TO USE OF

23    EASE?  DO -- CAN -- CAN YOU RANK THEM IN TERMS OF WHAT FEATURES

24    CONTRIBUTE THE MOST AND WHAT FEATURES CONTRIBUTE LESS TO EASE

25    OF USE?  CAN YOU DO THAT?

```
 1              "ANSWER:  I -- I'VE NEVER THOUGHT OF DOING THAT.  I'M NOT

 2      SURE HOW I WOULD GO ABOUT DOING THAT.

 3              "QUESTION:  ARE YOU AWARE OF ANY SURVEY DATA OR MARKET

 4      DATA OR DATA OF ANY NATURE THAT RANKS WHAT FEATURES ARE MORE

 5      IMPORTANT IN TERMS OF THEIR CONTRIBUTION TO EASE OF USE?

 6              "ANSWER:  I CAN'T THINK OF ANY MYSELF OFF THE TOP OF MY

 7      HEAD RIGHT NOW, NO.

 8          THAT CONCLUDES THE READING OF MR. SCHILLER'S DEPOSITION.

 9              THE COURT:  ALL RIGHT.  3:23.

10              MR. MCELHINNY:  WE HAVE I DEPOSITION CLIP, YOUR

11      HONOR.

12              THE COURT:  OKAY.  3:23.  GO AHEAD.  PLEASE.

13          (THE VIDEOTAPED DEPOSITION OF PHILIP SCHILLER WAS PLAYED

14      IN OPEN COURT OFF THE RECORD.)

15              MR. MCELHINNY:  YOUR HONOR, I MOVE TO LODGE

16      PLAINTIFF'S EXHIBIT 3006.

17              THE COURT:  ALL RIGHT.  TIME IS 3:25.  GO AHEAD AND

18      INTRODUCE YOUR NEXT WITNESS, PLEASE.

19              MR. QUINN:  ALL RIGHT.  YOUR HONOR, THE FINAL

20      DEPOSITION READING IS STEVEN SINCLAIR, WHO'S APPLE'S IPHONE

21      PRODUCT MARKETING MANAGER.

22              THE COURT:  ALL RIGHT.  THE TIME IS 3:25.

23              MR. QUINN:  "QUESTION:  ALL RIGHT.  HAVE YOU SEEN

24      SURVEYS OR ANY TYPE OF STUDIES WHICH INDICATE WHAT FEATURES OF

25      APPLE PRODUCTS CONTRIBUTE TO EASE OF USE?
```

```
 1              "ANSWER:  I DON'T BELIEVE WE'VE BROKEN DOWN FEATURES IN A

 2      WAY THAT TIE DIRECTLY TO EASE OF USE.  WE TRY AND -- EASE OF

 3      USE IS A -- IS AN ATTRIBUTE OF EVERY FEATURES.  SO EVERY

 4      FEATURE WE WORK ON, WE ASK OURSELVES:  IS THIS EASY TO USE?

 5      DOES THIS CONTRIBUTE TO THE OVERALL EASE OF USE OF THIS

 6      PRODUCT.

 7              "QUESTION:  DO YOU HAVE ANY INFORMATION AT ALL ABOUT WHAT

 8      FEATURES CONSUMERS ASSOCIATE WITH EASE OF USE.

 9              "ANSWER:  IT'S ALL OF THE FEATURES.  ALL OF THE FEATURES

10      CONTRIBUTE TO EASE OF EASE, EITHER IN THE MOST -- FOR THE MOST

11      PART, FOR OUR PRODUCTS, POSITIVELY; IN A FEW CASES, LIKE THE

12      EXAMPLES I GAVE YOU, NEGATIVELY.

13              "QUESTION:  WHEN YOU SAY THERE ARE MANY, MANY FEATURES

14      THAT ARE INCLUDED UNDER THE CATEGORY OF EASE OF USE, CAN YOU

15      GIVE ME AN APPROXIMATION OF HOW MANY FEATURES THERE ARE?

16              "ANSWER:  NO, I CAN'T."

17              THAT CONCLUDES THE DEPOSITION READING, YOUR HONOR.

18              THE COURT:  ALL RIGHT.  3:26.

19              MR. QUINN:  WE WOULD OFFER -- WE WOULD LIKE TO LODGE

20      WITH THE COURT, YOUR HONOR, OUR TRANSCRIPTS, OUR PASSAGES OF

21      THOSE TRANSCRIPTS WHICH I JUST READ.  I HAVE NUMBERS THAT I CAN

22      READ INTO THE RECORD.

23              THE COURT:  I THINK THEY'RE GOING TO -- THEY'RE

24      ACTUALLY TRANSCRIBED IN HERE.

25              MR. MCELHINNY:  WHEN YOU READ THEM, THEY'RE IN THE
```

```
1    RECORD.

2              MR. QUINN:  OKAY.

3              THE COURT:  THEY'RE PART OF THE RECORD ALREADY.

4              MR. QUINN:  ALL RIGHT.

5              THE COURT:  ALL RIGHT.  DO YOU HAVE A --

6              MR. MCELHINNY:  I DON'T.  MR. SINCLAIR, WE'RE NEVER

7    GOING TO KNOW WHAT HE LOOKS LIKE, YOUR HONOR.  WE HAVE NO

8    COUNTER FOR HIM.

9              THE COURT:  ALL RIGHT.  WELL, IT'S 3:26 NOW.  WE CAN

10   EITHER GO AHEAD AND CALL THE NEXT WITNESS FOR A COUPLE MINUTES

11   OR WE CAN JUST TAKE OUR BREAK NOW.  I THINK THAT MAKES MORE

12   SENSE AND THEN CALL THE WITNESS AFTER.

13        ALL RIGHT.  LET'S TAKE A TEN MINUTE BREAK NOW.  THANK YOU

14   FOR YOUR PATIENCE AND YOUR SERVICE.

15        PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

16        (JURY OUT AT 3:27 P.M.)

17             THE COURT:  ALL RIGHT.  THANK YOU.  LET'S TAKE OUR

18   BREAK.

19        (RECESS FROM 3:27 P.M. UNTIL 3:37 P.M.)

20        (JURY IN AT 3:37 P.M.)

21             THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

22   SEAT.

23        CALLING YOUR NEXT WITNESS, PLEASE.

24             MR. QUINN:  YOUR HONOR, SAMSUNG CALLS PROFESSOR

25   TULIN ERDEM.
```

```
 1            YOUR HONOR, PROFESSOR ERDEM HAS AN EYE ISSUE, AND WE'D

 2    LIKE TO, WITH THE COURT'S PERMISSION, HAVE MS. KHAN SIT UP

 3    THERE WITH HER AND HELP HER FIND DOCUMENTS.  IT'LL SAVE TIME.

 4    I THINK IT'S ACTUALLY MORE BENEFICIAL FOR THE CROSS THAN THE

 5    DIRECT.

 6            THE COURT:  ALL RIGHT.  PLEASE GO AHEAD.

 7            THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

 8       (DEFENDANTS' WITNESS, TULIN ERDEM, WAS SWORN.)

 9            THE WITNESS:  I DO.

10            THE CLERK:  WOULD YOU PULL THE MICROPHONE FORWARDS

11    YOU AND STATE YOUR NAME, PLEASE, AND SPELL IT.

12            THE WITNESS:  SURE.  TULIN ERDEM.  T-U-L-I-N,

13    E-R-D-E-M.

14            THE COURT:  OKAY.  THE TIME IS NOW 3:38.  GO AHEAD,

15    PLEASE.

16                       DIRECT EXAMINATION

17    BY MR. QUINN:

18    Q.   GOOD AFTERNOON, PROFESSOR ERDEM.

19    A.   GOOD AFTERNOON.

20    Q.   WHAT IS YOUR PRESENT POSITION?

21    A.   I'M A PROFESSOR OF BUSINESS AND MARKETING AT STERN SCHOOL

22    OF BUSINESS AT NYU, NEW YORK UNIVERSITY.

23    Q.   IF WE COULD PLEASE PUT UP ON THE SCREEN SDX 3500, A

24    DEMONSTRATIVE.

25            HOW LONG HAVE YOU BEEN A PROFESSOR AT NYU?
```

1     A.   THIS IS MY EIGHTH YEAR.

2     Q.   AND HAVE YOU BEEN TENURED THERE FOR THE ENTIRE TIME THAT

3     YOU'VE BEEN THERE?

4     A.   YES.

5     Q.   AND BEFORE BEING AT THE PROFESSOR -- BEING A PROFESSOR AT

6     NYU, THE LEONARD STERN SCHOOL OF BUSINESS, WHERE WERE YOU?

7     A.   I WAS AT THE HAAS SCHOOL OF BUSINESS AT THE UNIVERSITY OF

8     CALIFORNIA AT BERKELEY.

9     Q.   AND HOW LONG WERE YOU THERE?

10    A.   THIRTEEN YEARS.

11    Q.   CAN YOU TELL THE JURY, PLEASE, WHAT THE SUBJECTS HAVE BEEN

12    THAT YOU'VE TAUGHT IN AT BOTH NYU AND AT BERKELEY?

13    A.   I HAVE TAUGHT MANY COURSES IN MARKETING, BRANDING,

14    MARKETING RESEARCH, CONSUMER DECISION MAKING AND CHOICE.

15    Q.   AND DO WE HAVE HERE A LIST OF YOUR EDUCATIONAL BACKGROUND,

16    YOUR PH.D., M.A., AND B.A.?

17    A.   CORRECT.

18    Q.   AND HAVE YOU ALSO PUBLISHED ACADEMIC ARTICLES?

19    A.   YES.  I HAVE MORE THAN 40 PUBLICATIONS.

20    Q.   COULD YOU TELL THE JURY JUST GENERALLY, WHAT THE NATURE,

21    THE SUBJECT MATTERS OF THOSE ARTICLES ARE?

22    A.   MOST OF THE PAPERS WERE IN THE AREA OF CONSUMER DECISION

23    MAKING AND CHOICE.

24    Q.   IF WE COULD TURN, PLEASE, TO SDX 3501.  HAVE YOU RECEIVED

25    ANY -- OTHER THAN YOUR PROFESSORIAL APPOINTMENT AT THE SCHOOLS,

1    HAVE YOU RECEIVED ANY APPOINTMENTS?

2    A.   SURE.  I WAS THE EDITOR-IN-CHIEF OF "JOURNAL OF MARKETING

3    RESEARCH," WHICH IS ONE OF THE TOP JOURNALS IN THE MARKETING

4    FIELD.

5         THE EDITORS MAKE THE ACCEPTANCE AND REJECTION DECISIONS OF

6    PAPERS AT AN IVY LEAGUE JOURNAL.  SO I MUST HAVE ACCEPTED AND

7    REJECTED ABOUT 2,400 PAPERS IN MY TERM AS THE EDITOR.

8         I WAS THE PRESIDENT OF INFORMS SOCIETY, THE SOCIETY FOR

9    PROFESSIONAL -- INFORMS, FOR INSTITUTE FOR OPERATIONS RESEARCH

10   AND MANAGEMENT SCIENCES.

11   Q.   AND WHAT IS THAT?  WHAT IS INFORMS?

12   A.   IT IS A PROFESSIONAL SOCIETY OF ACADEMIC PRACTITIONERS.

13        AND THEN I HAVE BEEN SERVING ON EDITORIAL BOARDS OF ALMOST

14   ALL MAJOR MARKETING JOURNALS.

15        ALSO, WHEN I WAS AT U.C. BERKELEY, I WAS AN THE ASSOCIATE

16   DEAN FOR FACULTY AND RESEARCH FOR THREE YEARS.

17   Q.   AND HAVE YOU ALSO RECEIVED RECOGNITION WITHIN THE AWARDS

18   OR ANYTHING OF THAT NATURE?

19   A.   I HAVE BEST PAPER AWARDS; I HAVE ALSO TWO MAJOR NATIONAL

20   SCIENCE FOUNDATION GRANTS FOR RESEARCH.

21   Q.   AND HAVE YOU TAUGHT IN THE AREA OF CONSUMER DECISION

22   MAKING THE ENTIRE TIME THAT YOU WERE AT BERKELEY AND AT NYU?

23   A.   YES.

24   Q.   AND MARKETING RESEARCH AS WELL?

25   A.   YES.  THESE ARE DIFFERENT MODULES.  THE COURT MAY NOT BE

1    CALLED AS SUCH, BUT I HAVE BEEN ALWAYS TEACHING CONSUMER

2    CHOICE, CONSUMER DECISION MAKING, MARKETING RESEARCH METHODS.

3    Q.   DO YOU ALSO STUDY CONJOINT SURVEYS AND THE CONJOINT SURVEY

4    METHODOLOGY?

5    A.   YES.  AND I TEACH MANY DIFFERENT METHODOLOGIES, INCLUDING

6    CONJOINT.

7         MR. QUINN:  YOUR HONOR, WE'D OFFER PROFESSOR ERDEM AS

8    AN EXPERT IN THE MARKETING RESEARCH AND CONSUMER DECISION

9    MAKING FIELD.

10         MR. BENNETT:  NO OBJECTION, YOUR HONOR.

11         THE COURT:  SO CERTIFIED.  GO AHEAD, PLEASE.

12    BY MR. QUINN:

13    Q.   WHAT IS THE STUDY OF CONSUMER DECISION MAKING?  WHAT IS

14    THAT?

15    A.   CONSUMER DECISION MAKING STUDIES CONSUMERS WANTS,

16    INFORMATION SEARCH REVIEW, ALTERNATIVES, EVALUATION OF

17    ALTERNATIVES, CONSIDERATION OF ALTERNATIVES, AND PURCHASES.

18    Q.   IS THIS AN ACADEMIC FIELD OF STUDY WITH ITS OWN BODY OF

19    KNOWLEDGE?

20    A.   DEFINITELY.

21    Q.   AND WHAT WAS YOUR ASSIGNMENT IN THIS CASE,

22    PROFESSOR ERDEM?

23    A.   MY ASSIGNMENT WAS TO EXAMINE KEY DECISION FACTORS AND KEY

24    DEMAND DRIVERS IN SMARTPHONE AND TABLET MARKETS.

25    Q.   OKAY.  BUT WE'LL GO INTO THE DETAIL OF WHAT YOU DID, BUT,

```
 1        FIRST, COULD YOU PLEASE TELL THE JURY WHAT THE CONCLUSIONS WERE

 2     OF YOUR RESEARCH IN CONNECTION WITH FULFILLING THAT ASSIGNMENT?

 3     A.   SURE.   SMARTPHONE AND TABLET MARKETS ARE COMPLEX MARKETS.

 4     COMPLEX MARKETS ARE CHARACTERIZED BY THE EXISTENCE OF MANY

 5     PRODUCTS, MODELS, OPTIONS.

 6        ALSO, THESE PRODUCTS HAVE MANY FEATURES, MANY ATTRIBUTES.

 7     THEY ARE ALSO MANY DECISION FACTORS FOR CONSUMERS.

 8        SO THESE ARE THE COMPLEXITY OF THE ENVIRONMENT, WHICH

 9     MAKES THE DECISION MAKING VERY COMPLEX FOR CONSUMERS.

10        SO COGNITIVE LOAD IS HIGH, IT'S HARD FOR THEM TO MAKE

11     DECISIONS SO THEY HAVE TO SAVE ON EFFORT AND TIME.   AND,

12     THEREFORE, THEY USE WHAT WE CALL HEURISTICS.   THESE ARE

13     DECISION SHORTCUTS A CONSUMER MAY SAY, FOR EXAMPLE, I WILL ONLY

14     BUY SOMETHING THAT'S BELOW $150 IN SMARTPHONE MARKET.   SOMEBODY

15     ELSE MIGHT SAY I WANT THE NEWEST.   THESE ARE JUST EXAMPLES.   SO

16     THAT'S ONE FINDING, THESE ARE COMPLEX MARKETS, COMPLEX DECISION

17     MAKING ENVIRONMENTS, THEY ARE CONSUMER USE SHORTCUTS.   THAT'S

18     ONE FINDING.

19        I ALSO FOUND THAT CONSUMERS REVIEW VERY LIMITED

20     INFORMATION GIVEN THE ABUNDANCE OF DIFFERENT FACTORS, THEY

21     REVIEW LIMITED INFORMATION.

22        THEY ONLY CONSIDER ALSO FEW THINGS IN MAKING A DECISION.

23     AND BASICALLY A HANDFUL OF MAJOR ATTRIBUTES MATTER, MAJOR

24     DECISION FACTORS MATTER IN THEIR DECISION MAKING.   THESE MAY BE

25     DIFFERENT FROM CONSUMER TO CONSUMER, BUT THEY ONLY CONSIDER A
```

```
 1        FEW THINGS.

 2             AND MAJOR ATTRIBUTES OF PRODUCTS DRIVE THEIR DECISIONS,

 3        NOT MINOR ATTRIBUTES.

 4        Q.   SO I'M GOING TO ASK YOU NOW WHAT YOU DID TO REACH YOUR

 5        CONCLUSIONS.  MR. PRICE TOOK UP MOST OF MY TIME THIS MORNING,

 6        SO I'M GOING TO HAVE TO ASK YOU TO GO THROUGH IT KIND OF

 7        QUICKLY.

 8             COULD YOU SUMMARIZE FOR THE JURY WHAT YOU DID AS PART OF

 9        YOUR RESEARCH TO REACH THESE CONCLUSIONS.

10        A.   SURE.  I HAVE UTILIZED MULTIPLE SOURCES OF INFORMATION.

11        SO THESE ARE COMPLEX MARKETS.  I ALREADY KNOW THE ACADEMIC

12        LITERATURE.  I WENT BACK TO THE ACADEMIC LITERATURE, ESPECIALLY

13        THE LITERATURE ON DECISION MAKING IN COMPLEX MARKETS.

14        INCIDENTALLY, OF COURSE, WE HAVE EVEN PAPERS IN CELL PHONE

15        MARKETS, SMARTPHONE MARKETS.

16             SO I SURVEYED VERY SYSTEMATICALLY THE WHOLE LITERATURE.

17        THAT'S ONE PIECE I RELIED ON.

18        Q.   THAT'S THE ACADEMIC LITERATURE?

19        A.   THE ACADEMIC LITERATURE.

20        Q.   OKAY.  THEN WHAT?

21        A.   THE SECOND SOURCE WAS APPLE'S AND SAMSUNG'S INTERNAL

22        MARKETING COUNTS.  THESE ARE VERY MARKETING SAVVY COMPANIES.  I

23        MUST HAVE READ APPROXIMATELY MORE THAN 1,000 PAGES OF DOCUMENTS

24        FROM APPLE AND SAMSUNG ON PURCHASE DRIVERS, MOTIVATORS TO BUY,

25        IMPORTANCE OF ATTRIBUTES, MANY DIFFERENT STUDIES.  SO THAT WAS
```

```
 1        THE SECOND SOURCE.

 2   Q.   THIRD?

 3   A.   AS A THIRD SOURCE, I LOOKED AT THIRD PARTY RESEARCH.

 4   THESE ARE INDUSTRY TREND REPORTS FOR COMP STORE, GOOGLE,

 5   NIELSEN RESEARCH.  THEY ALSO TALK ABOUT CONSUMER DECISION

 6   MAKING AND CHOICE IN THESE MARKETS.

 7        I ALSO DID A VERY SYSTEMATIC REVIEW OF ONLINE COMPARISON

 8   WEBSITES, SHOPPING WEBSITES, REVIEW WEB SITES.

 9        AND THEN FINALLY, THE FINAL PIECE WAS THAT I DID MY OWN

10   CORROBORATIVE STUDIES.

11   Q.   ALL RIGHT.  SO LET'S LOOK AT SOME OF THE -- WE DON'T HAVE

12   TIME TO LOOK AT VERY MANY OF THESE DOCUMENTS, BUT IF YOU'D

13   LOOK, PLEASE, AT EXHIBIT 457.  THIS IS NOT YET IN EVIDENCE.

14        AND MY QUESTION TO YOU IS IF YOU CAN IDENTIFY THIS

15   DOCUMENT.

16   A.   SURE.  THIS IS A COMPILATION FROM APPLE'S IPHONE BUYER'S

17   SURVEYS.  THIS IS FROM YEAR 2013.  APPLE CONDUCTS THESE TYPE OF

18   SURVEYS QUARTERLY.

19        MR. QUINN:  IF YOU COULD -- YOUR HONOR, WE'D OFFER

20   THIS DOCUMENT NOW, THE COMPILATION EXHIBIT 457.

21        MR. BENNETT:  TO WHICH WE OBJECT, YOUR HONOR.  THIS

22   WAS NOT DISCLOSED IN THE WITNESS'S REPORT.

23        (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

24        THE COURT:  IT WAS NOT DISCLOSED WHERE?

25        MR. BENNETT:  NOT IN ERDEM'S REPORT.
```

1          MR. QUINN:  YOUR HONOR, I'M INFORMED THAT IPHONE

2     BUYER SURVEYS ARE CITED THROUGHOUT THE REPORT, THROUGHOUT HER

3     REPORT.  THIS IS A COMPILATION OF THE IPHONE BUYER SURVEYS.

4          THE COURT:  WHAT I HAVE AS 457 IS A DOCUMENT THAT'S

5     NUMBER -- HAS PAGES 1 THROUGH 49.  IT DOESN'T SEEM TO BE A

6     COMPILATION.  OR -- OH, I SEE.

7          MR. QUINN:  ACTUALLY, THIS WAS THE SUBJECT OF AN IN

8     LIMINE MOTION, AND THE COURT OVERRULED THAT.

9          THE COURT:  WHERE IS IT IN HER REPORT?

10          MR. QUINN:  WELL, SHE REFERRED TO IPHONE BUYER

11     SURVEYS, YOU KNOW, JUST FOR EXAMPLE, YOUR HONOR, PAGE 58.

12          THE COURT:  I ONLY HAVE HER REBUTTAL EXPERT REPORT

13     HERE.  DO --

14          MR. WATSON:  THAT IS HER REPORT.

15          MR. QUINN:  THAT IS HER REPORT, YOUR HONOR.

16          THE COURT:  IS THAT HER REPORT?  WHAT PARAGRAPH IS

17     IT?

18          MR. QUINN:  BY WAY OF EXAMPLE, PAGE 58, FOOTNOTE 211,

19     THERE'S A REFERENCE TO IPHONE BUYER SURVEY.  AND I THINK IF WE

20     GO THROUGH THE REPORT, THE COURT WILL -- THERE ARE MANY

21     REFERENCES TO THESE IPHONE BUYER SURVEYS.

22          MR. BENNETT:  NOT IN THIS ONE, YOUR HONOR.

23          MR. QUINN:  BUT IN ANY EVENT, YOUR HONOR, THIS IS AN

24     APPLE DOCUMENT.

25          THE COURT:  ALL RIGHT.  OVERRULED.

```
 1                 MR. QUINN:  ALL RIGHT.  SO WE'D OFFER THAT, YOUR

 2     HONOR.

 3                 MR. BENNETT:  YOUR HONOR, NO FURTHER OBJECTION,

 4     EXCEPT IT IS A SEALED DOCUMENT.

 5                 THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

 6          (DEFENDANTS' EXHIBIT 457 WAS ADMITTED IN EVIDENCE.)

 7     BY MR. QUINN:

 8     Q.   WELL, IF WE COULD TURN TO PAGE 11.

 9          (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

10                 THE WITNESS:  YES.

11     BY MR. QUINN:

12     Q.   ALL RIGHT.  SO IF WE COULD DISPLAY PAGE 11 JUST BY WAY OF

13     EXAMPLE.  THIS IS A COMPENDIUM OF WHAT, IF YOU COULD TELL THE

14     JURY?

15     A.   APPLE IPHONE SURVEYS.  APPLE DOES THIS EVERY QUARTER.

16     Q.   AND THIS COVERS A NUMBER OF QUARTERS, THIS COMPENDIUM?

17     A.   CORRECT.  I THINK THIS PARTICULAR ONE COVERS ABOUT 10 TO

18     12 QUARTERS.

19     Q.   OKAY.  AND I THINK THE JURY IS FAMILIAR WITH THIS FORMAT

20     OF DOCUMENT THAT APPLE DOES EVERY QUARTER IS WHAT YOU'RE

21     SAYING?

22     A.   CORRECT.

23     Q.   IF WE COULD TURN NOW TO EXHIBIT 452, IS THIS ANOTHER APPLE

24     DOCUMENT?

25     A.   YES.
```

```
 1                MR. QUINN:  WE'D OFFER THAT, YOUR HONOR.

 2                THE COURT:  ALL RIGHT.  ANY OBJECTION?  MR. BENNETT?

 3                MR. BENNETT:  YOUR HONOR, IT'S UNDER SEAL, AND I'M

 4     TOLD THAT EVERYTHING THAT'S SHOWN TO THE PUBLIC IS FINE, BUT

 5     THEN -- PAGE 21 IS FINE.

 6          (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

 7                MR. QUINN:  PAGE 21 IS FINE.  SO I THINK THERE'S NO

 8     OBJECTION, YOUR HONOR.  WE'D REQUEST PERMISSION --

 9                THE COURT:  ALL RIGHT.  IT'S ADMITTED.

10          (DEFENDANTS' EXHIBIT 452 WAS ADMITTED IN EVIDENCE.)

11                THE COURT:  WHAT IS 452?

12                MR. QUINN:  IT'S A -- THE TITLE OF THE DOCUMENT IS,

13     IT SAYS U.S. PRELIMINARY RESULTS ON THE FIRST PAGE.

14                THE COURT:  OKAY.  IT'S ADMITTED.

15     BY MR. QUINN:

16     Q.   IF WE COULD TURN TO PAGE 21, AND IS THIS ANOTHER EXAMPLE

17     OF AN INTERNAL APPLE DOCUMENT, IT'S A SMARTPHONE SURVEY?

18     A.   CORRECT.

19     Q.   AND IS -- DOES THIS JUST COVER APPLE PHONES, APPLE MOBILE

20     DEVICES, OR IS IT OTHER, YOU KNOW, APPLE -- OR SMARTPHONES

21     GENERALLY?

22     A.   THIS PARTICULAR ONE IS ABOUT SMARTPHONES IN GENERAL.  AS

23     YOU SEE, THE FIRST COLUMN IS ABOUT TOTAL RESPONSES; THE SECOND

24     ONE IS ABOUT IPHONE; THE THIRD ONE ANDROID; THE FOURTH ONE

25     ABOUT OTHERS.
```

1           AND IT LISTS THE DIFFERENT FEATURES THAT CONSUMERS FIND

2     IMPORTANT IN THIS MARKET.

3     Q.   OKAY.  AND THEN EXHIBIT 433, IF WE COULD LOOK AT THAT

4     QUICKLY.  THIS WILL BE THE LAST ONE OF THESE?

5     A.   YEAH, THIS IS A SAMSUNG DOCUMENT.  IT'S AN INITIAL LAUNCH

6     REPORT.

7              MR. QUINN:  I'D OFFER THAT, YOUR HONOR.

8              THE COURT:  ANY OBJECTION?

9              MR. BENNETT:  NO OBJECTION, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  IT'S ADMITTED.

11       (DEFENDANTS' EXHIBIT 433 WAS ADMITTED IN EVIDENCE.)

12             THE COURT:  LET ME JUST STATE FOR THE RECORD, FOR

13    DX 457, THE FOLLOWING PAGES ARE NOT SEALED:  1, 9, 11, 17, 21,

14    25, 29, 34, 36, 38, 40, 42, 44, 46, AND 48.  THE OTHER PAGES

15    ARE SEALED.

16        GO AHEAD, PLEASE.

17    BY MR. QUINN:

18    Q.   NOW, THE SAMSUNG DOCUMENT, EXHIBIT 433, IF WE COULD TURN,

19    PLEASE, TO PAGE 7 AND SHOW THAT TO THE JURY.

20        AND WHAT DO WE SEE HERE?

21    A.   SO THIS IS A CHART ABOUT REASONS FOR CHOOSING GALAXY 3,

22    AND AS YOU SEE, THEY LISTED THEM IN THE ORDER OF IMPORTANCE AS

23    SEEN FROM THE EYE OF THE CONSUMERS.  SO THESE ARE THE CONSUMERS

24    WHO ARE TALKING ABOUT WHAT'S IMPORTANT TO THEM IN BUYING THIS

25    PHONE.

1          AND SOME OF THE TOP FACTORS ARE THINGS LIKE SIZE AND

2     QUALITY OF THE SCREEN, THE OPERATING SYSTEM, THE BRAND, SPEED.

3     Q.    THANK YOU, PROFESSOR.

4          BUT YOU SAID YOU REVIEWED OVER A THOUSAND PAGES LIKE THIS?

5     A.    CORRECT.

6     Q.    OF SURVEYS OF SMARTPHONE BUYERS AND WHAT FEATURES

7     MOTIVATED THEM TO PURCHASE PHONES?

8     A.    CORRECT.

9     Q.    AND THEN YOU ALSO TOLD US THAT YOU DID A SYSTEMATIC REVIEW

10    OF COMPARISON WEBSITES AND THE LIKE.

11         AND IF WE COULD LOOK UP -- IF WE CAN PUT UP SDX,

12    DEMONSTRATIVE 3502, WHAT IS IT THAT WE'RE LOOKING AT HERE?

13    A.    THIS IS -- THIS PARTICULAR SCREEN SHOT IS FROM THE AT&T

14    WEBSITE ON FEBRUARY 27TH, 2014 SHOWING THE UNIQUE MODELS THEY

15    ARE FEATURING.

16         BUT I, OF COURSE, LOOKED AT MANY DIFFERENT WEBSITES AND

17    YOU CAN EASILY SAY THAT AT ANY GIVEN TIME IN THE MARKET THESE

18    DAYS, THERE ARE MORE THAN 100 UNIQUE MODELS, AND THAT'S WHAT I

19    WAS REFERRING TO AS ONE OF THE CHARACTERISTICS OF THE

20    COMPLEXITY OF THE MARKET, THERE ARE SO MANY OPTIONS.

21    Q.    SO IS THIS AN EXAMPLE OF THOSE SHOPPING SITES AND WEBSITES

22    THAT YOU LOOKED AT?

23    A.    WE WILL, I THINK, SEE MORE EXAMPLES.  I JUST -- YES, AT&T

24    IS ONE OF THOSE WEBSITES.

25    Q.    OKAY.  THEN YOU TOLD US THAT YOU DID YOUR OWN

1    CORROBORATIVE RESEARCH?

2    A.   YES.

3    Q.   AND WHAT WAS THE -- TELL US HOW YOU WENT ABOUT DOING THAT

4    RESEARCH?

5    A.   SURE.  I RETRIEVED CONSUMER STUDIES.

6    Q.   AND I THINK WE HAVE A DEMONSTRATIVE 3510, IF WE COULD PUT

7    THAT UP ON THE SCREEN.  YOU WERE TELLING US YOU DID THREE

8    STUDIES.

9    A.   YES.  THE FIRST STUDY WAS ABOUT CONSUMERS BEING ON A

10   SMARTPHONE SHOPPING WEBSITE.  IT WAS A VERY REALISTIC

11   ENVIRONMENT.  I MIMICKED A SHOPPING WEBSITE.  AND CONSUMERS

12   WERE -- THE CONSUMERS WERE CHOOSING UP TO 12 PHONES TO

13   CONSIDER.

14        AND I ANALYZED DATA FROM 141 CONSUMERS FOR THAT STUDY.

15        THE SECOND AND THIRD STUDY, THOSE WERE CHOICE STUDIES,

16   MEANING CONSUMERS WERE ON AN ONLINE SMARTPHONE COMPARISON

17   WEBSITE, AND THEY WERE GIVEN FIVE BRANDS AND THEY WERE GOING TO

18   CHOOSE ONE OF THE FIVE.

19        STUDY 2 WAS IN THE SMARTPHONE MARKET.  STUDY 3 WAS IN THE

20   TABLET MARKET.

21        IN STUDY 2, I ANALYZED THE RESPONSES FOR 342 CONSUMERS;

22   AND, IN THE OTHER STUDY, THIS NUMBER WAS 223.

23   Q.   ALL RIGHT.  WHAT TOOL DID YOU USE TO CONDUCT THE STUDY AND

24   COLLECT DATA?

25   A.   I DID THE METHODOLOGY, SO I TRACKED THE MOVEMENTS OF THE

1    EYES OF CONSUMERS.

2    Q.   AND COULD YOU EXPLAIN TO THE JURY, PLEASE, HOW THAT WORKS?

3    AND IF WE CAN LOOK AT -- PUT UP EXHIBIT 3507, DX 3507.  HOW

4    DOES THIS EYE TRACKING METHODOLOGY WORK?

5    A.   SO IT WOULD THE RESPONDENT, THE CONSUMER, SITTING IN FRONT

6    OF A COMPUTER, LIKE WE ALL DO, IT'S VERY REALISTIC, AND THEY

7    ARE DOING THEIR TASK, WE WILL SEE THE TASK, SO THEY ARE

8    REVIEWING SOME INFORMATION.  THEY ARE MAKING THEIR CHOICES.

9         WHILE THEY COMPLETE THAT TASK --

10   Q.   IF WE COULD LOOK AT 3508, PERHAPS, AND YOU CAN EXPLAIN IT.

11   A.   ALL RIGHT.  CAN YOU --

12   Q.   3508, KEN.  THANKS.

13   A.   SO THEIR EYE IS BEING TRACKING AND HOW THAT HAPPENS IS

14   THAT THE BOTTOM PANEL OF THE COMPUTER SCREEN HAS INFRARED LIGHT

15   EMITTERS AND A CAMERA.

16        THE INFRARED LIGHT EMITTERS EMIT THESE INFRARED LIGHT AND

17   THESE LIGHTS ARE REFLECTED FROM THE SURFACE OF THE EYE OF THE

18   RESPONDENT, AND THE CAMERA RECORDS THESE EYE MOVEMENTS.

19        SO YOU CAN SEE WHERE THE CONSUMER IS LOOKING AT DURING THE

20   TASK.

21   Q.   IN THE FIELD OF CONSUMER DECISION MAKING, IS EYE TRACKING

22   A RECOGNIZED RESEARCH TOOL?

23   A.   DEFINITELY.

24   Q.   IF WE COULD LOOK AT EXHIBIT 3509.  AND LET ME JUST ASK

25   YOU, IS THIS USED IN PRIVATE INDUSTRY BY COMPANIES THAT ARE

```
 1        ACTUALLY TRYING TO MAKE DECISIONS ABOUT PRODUCTS?

 2        A.   DEFINITELY.  SOME ARE --

 3                  MR. BENNETT:  OBJECTION, YOUR HONOR.  LEADING AND

 4        VAGUE.

 5                  THE COURT:  SUSTAINED.

 6        BY MR. QUINN:

 7        Q.   CAN YOU TELL US WHETHER OR NOT ASSUMER EYE TRACKING IS

 8        USED BY COMPANIES IN PRIVATE INDUSTRY?

 9        A.   YES, IT IS USED.  ON THE SLIDE THERE ARE EXAMPLES OF SOME

10        OF THESE COMPANIES.  THESE VARY FROM BIG FREQUENTLY PURCHASED

11        PRODUCT CATEGORY COMPANIES LIKE P & G, KRAFT, TO OTHER

12        COMPANIES LIKE FACEBOOK, YAHOO, GOOGLE.

13        Q.   IS IT ALSO USED IN THE ACADEMIC WORLD BY PROFESSORS, SUCH

14        AS YOURSELF, WHO STUDY CONSUMER CHOICE AND DECISION MAKING?

15        A.   THAT'S TRUE.

16        Q.   AND HOW LONG HAS THIS TECHNOLOGY BEEN AROUND AND USED FOR

17        THESE PURPOSES?

18        A.   SINCE THE 70S, ALTHOUGH SOME VERY EARLY FORMS OF EYE

19        TRACKING METHODOLOGY WAS AROUND EVEN ALMOST LIKE A HUNDRED

20        YEARS AGO BUT SINCE 70S IN TERMS OF THE MORE MODERN TECHNOLOGY.

21        Q.   AND WHY DID YOU CHOOSE TO USE THIS EYE TRACKING TECHNOLOGY

22        FOR THE SURVEY THAT YOU DID?

23        A.   THIS IS A VERY APPROPRIATE TOOL FOR THE QUESTIONS I WAS

24        LOOKING AT BECAUSE EYE TRACKING, GIVEN THAT IT TRACKS THE EYE

25        MOVEMENTS OF THE CONSUMERS, YOU HAVE INFORMATION ABOUT WHAT
```

1        THEY VIEWED, WHETHER THEY ARE LOOKING AT SOMETHING, WHETHER

2        THEY ARE PAYING ANY ATTENTION.

3            THE ORDER OF WHICH THEY ARE COLLECTING THE INFORMATION.

4            AND THEN, LIKE I DID, IF YOU COLLECT ALSO THEIR CHOICE

5        DATA, AND YOU WILL SEE THAT IN MY STUDIES, I COLLECTED THEIR

6        CHOICE DATA, THEY CLICKED AND DECIDED WHAT TO BUY, USING

7        STATISTICAL MODELS, YOU CAN LINK THEIR ATTENTION OR WHAT THEY

8        LOOK AT TO THEIR CHOICES.

9            IF THEY DON'T LOOK AT IT ALL, OBVIOUSLY IT CANNOT AFFECT

10       CHOICE.

11           BUT IF THEY LOOK AT IT, YOU CAN USE STATISTICAL MODELS TO

12       SEE WHICH PIECES OF INFORMATION THEY LOOKED AT MATTERS IN THEIR

13       DECISION MAKING.

14       Q.   WHAT WAS YOUR ROLE IN CONNECTION WITH THIS PARTICULAR EYE

15       TRACKING STUDY OR THAT IS TO SAY THESE THREE STUDIES?

16       A.   I DESIGNED THE STUDIES, I ANALYZED THE DATA.  THE DATA WAS

17       COLLECTED BY TOBII, T-O-B-I-I.

18       Q.   WHO IS -- WHO OR WHAT IS TOBII?

19       A.   TOBII IS THE INDUSTRY LEADER IN EYE TRACKING TECHNOLOGY

20       AND DATA COLLECTION.  THEY ARE SOFTWARE AND HARDWARE IN THIS

21       INDUSTRY, IS THE INDUSTRY STANDARD.

22       Q.   ALL RIGHT.  LET'S JUST LOOK AT -- WE ONLY HAVE TIME TO

23       TAKE A BRIEF LOOK AT ONE OF YOUR SURVEYS.  IF WE COULD PUT UP

24       SDX 3514, YOU TOLD US THAT THIS, THIS SECOND STUDY RELATED TO

25       SMARTPHONE PURCHASES.

```
 1     A.   CORRECT.

 2     Q.   AND DOES THIS SLIDE HERE SUMMARIZE WHAT THE -- WHAT THE

 3     SURVEY WAS, THIS SECOND STUDY?

 4     A.   SURE.   JUST BRIEFLY, IT WAS BASED ON ACTUAL ONLINE

 5     COMPARISON WEBSITE DESIGN, E.G., GDGT.COM, CONSUMERS WERE GIVEN

 6     FIVE OPTIONS, FIVE GRANTS OF SMARTPHONES AND THEY WERE ASKED TO

 7     CHOOSE ONE.

 8          WE HAD THREE DIFFERENT GROUPS OF CONSUMERS.   I SAY THAT

 9     THESE ARE COMPLEX MARKETS AND ONE OF THE CHARACTERISTICS OF

10     THAT IS THAT THERE ARE SO MANY FEATURES IN THE MARKET, SO WE

11     MANIPULATED ALSO THE COMPLEXITY BY SHOWING TO ONE GROUP OF

12     CONSUMERS SEVEN FEATURES, THE SECOND GROUP SAW 28, THE THIRD

13     GROUP SAW 38.

14     Q.   SO IF WE CAN -- I'M SORRY.

15     A.   THERE WERE THREE GROUPS OF CONSUMERS WHO COMPLETED THE

16     STUDY.

17     Q.   ALL RIGHT.   SO IF WE COULD LOOK AT DEMONSTRATIVE 3515, AND

18     COULD YOU TELL US WHAT WE'RE LOOKING AT HERE?

19     A.   SO THIS IS A REAL -- I MEAN, THIS IS THE WEBSITE FROM

20     GDGT.COM, SO THAT'S WHAT I MEAN BY COMPARISON WEBSITES.

21     PROBABLY MOST OF US ARE FAMILIAR WITH THESE KIND OF WEBSITES.

22     THESE WEBSITES SHOW SOME PRODUCT OPTIONS, FIVE, SIX, WHATEVER,

23     FOUR.

24          SO THE COLUMNS ARE THE PRODUCTS, AND THE ROWS ARE

25     INFORMATION PIECES ABOUT THE ATTRIBUTES OF THESE PRODUCTS.
```

1    Q.    AND WHAT USE DID YOU MAKE OF THIS KIND OF DATA FROM

2    WEBSITES IN DOING YOUR EYE TRACKING SURVEY?

3    A.    SO I WANTED TO CREATE A REALISTIC SETTING.  THIS GUIDED MY

4    DESIGN OF MY WEB SCREEN, SO TO SPEAK, THAT THE PARTICIPANTS

5    WERE GOING TO LOOK AT, AND I THINK MY -- WE CAN SHOW THAT TOO

6    IN TERMS OF HOW MY SCREEN SHOT LOOKED LIKE.

7    Q.    DEMONSTRATIVE 3517, IF WE COULD PUT THAT UP, PLEASE.  WHAT

8    ARE WE LOOKING AT HERE?

9    A.    SO THIS IS FOR THE THIRD GROUP.  SO THE THIRD GROUP SAW

10   THE MOST FEATURES, SO THERE'S THE HIGHEST COMPLEXITY SCENARIO.

11         THERE ARE FIVE PHONES:  SAMSUNG IS THERE, APPLE IS THERE,

12   NOKIA, ET CETERA.  SO FIVE PHONES.

13         AND THEN THESE FIVE PHONES ARE DESCRIBED BY MANY DIFFERENT

14   FEATURES, BRAND, PRICE, AND MANY OTHERS.  THE GROUPS OF

15   CATEGORIES WERE, OF COURSE, RANDOMIZED FOR THOSE RESPONDENTS.

16         SO THE CONSUMER WENT TO THIS WEBSITE, IF THE PERSON WAS IN

17   THE HIGH COMPLEXITY GROUP, SAW THIS PAGE, AND THEN REVIEWED THE

18   INFORMATION AND MADE A CHOICE.

19   Q.    NOW, IN THESE -- IN THIS LIST OF FEATURES THAT WE SEE

20   HERE, WILL WE SEE ANY OF THE FIVE CLAIMED PATENTED FEATURES

21   THAT THIS CASE INVOLVES?

22   A.    NO.

23   Q.    WHY NOT?

24   A.    BECAUSE IT WOULDN'T BE REALISTIC.  WHEN I WAS DESIGNING

25   THE STUDY, I VERY SYSTEMATICALLY, ACROSS MANY REPRESENTATIVE

1    WEBSITES, SUCH WEBSITES, AND THE CLAIMED FUNCTIONALITIES DON'T

2    SHOW UP IN ANY OF THEM.

3         AND I WANTED TO MIMIC THE REAL WORLD, SO TO SPEAK, FOR

4    CONSUMERS WHERE THEY SEE WHAT THEY WOULD SEE ON A TYPICAL

5    WEBSITE.

6         AND I WANTED TO FIND OUT HOW DO THEY MAKE DECISIONS.

7    Q.   ALL RIGHT.  WELL, CAN THIS PROVIDE YOU, AS A PROFESSIONAL

8    IN THE SCIENCE OF CONSUMER DECISION MAKING, WITH USEFUL

9    INFORMATION EVEN THOUGH IT DOESN'T INCLUDE THE APPLE PATENTED

10   FEATURES?

11   A.   YES.

12   Q.   WHY IS THAT?

13   A.   FIRST OF ALL, IT GIVES YOU LOTS OF INFORMATION IN TERMS OF

14   SOME OF THE THINGS I SAID.  I MENTIONED THAT I WANTED TO

15   CORROBORATE VERY INDEED CONSUMERS USE SHORTCUTS IN THIS

16   PARTICULAR MARKET.  THERE'S LOTS OF INFORMATION.  THERE'S LOTS

17   OF EVIDENCE.  BUT I WANTED TO CONFIRM THAT WITH MY OWN STUDIES

18   IF THAT'S THE CASE OR MAYBE NOT.

19        SO THIS GIVES YOU LOTS OF INFORMATION ABOUT HOW DO THEY

20   MAKE THEIR CHOICES.

21        SECOND, I PUT SOME MAJOR ATTRIBUTES THAT MOST WEBSITES

22   CITE, AND SOME OTHER MINOR ATTRIBUTES THAT ARE CITED FEWER

23   TIMES BY FEWER WEBSITES.

24        AND THEN USING STATISTICAL MODELS, I LINKED CONSUMER'S

25   CHOICES TO WHETHER THEY LOOKED AT MAJOR ATTRIBUTES, WHETHER

1      THEY LOOKED AT MINOR ATTRIBUTES, AND THAT TELLS ME SOMETHING IN

2      TERMS OF WHAT DRIVES THEIR CHOICES.

3      Q.   ALL RIGHT.  ARE THERE VIDEO RECORDS OF EACH OF THESE

4      DECISIONS BEING MADE BY THESE CONSUMERS, OR PEOPLE WHO

5      PARTICIPATED IN YOUR SURVEY?

6      A.   UM-HUM, THAT'S CORRECT.

7      Q.   AND WE HAVE ONE OF THOSE, EXHIBIT 3526.

8           AND I'D REQUEST PERMISSION TO PLAY THIS NOW, YOUR HONOR,

9      IT'S A DEMONSTRATIVE.

10          THE COURT:  GO AHEAD, PLEASE.

11     BY MR. QUINN:

12     Q.   AND WHILE IT'S BEING PLAYED, WOULD YOU PLEASE TELL THE

13     JURY WHAT IT IS THEY ARE SEEING.

14     A.   SURE.  I'LL TRY TO LOOK AT IT MYSELF, TOO.

15          (VIDEO PLAYED.)

16          THE WITNESS:  SO THIS IS ONE RESPONDENT, IT'S A

17     SAMSUNG OWNER, AND AS YOU SEE, THE CIRCLES SHOW THAT HE'S

18     LOOKING AT THESE AND THE LONGER HE LOOKS, THE BIGGER THE

19     CIRCLE.

20          HE COMES BACK TO THE SAME INFORMATION SOMETIMES, SO YOU

21     MAY SEE MULTIPLE CIRCLES IN THAT INFORMATION BOX.

22          AND AS YOU SEE, THIS PERSON CHECKED THE BRAND NAMES, OF

23     COURSE, AND CHECKED MOST OF THE PRICES AT THIS POINT.

24          IT'S NOT SYSTEMATIC.  HE IS JUMPING ALL OVER THE PLACE.

25          HE'S CHECKING A LOT OF SAMSUNG PHONES, NOT SURPRISING,

```
 1      HE'S A SAMSUNG OWNER.

 2           CHECK SOME OF THE NOKIA, SO HE SEEMS TO BE INTERESTED AT

 3      LEAST IN SOME OF THE FEATURES OF THE NOKIA.

 4           AND HE'S STILL KIND OF LOOKING AROUND, CHECKING SOME

 5      INFORMATION, SKIPPING A LOT OF INFORMATION AS YOU SEE, BEING

 6      VERY NOT SYSTEMATIC AND PAYING MORE ATTENTION TO SAMSUNG PHONE

 7      AND TAKING MORE INFORMATION ON SOMETHING THAT IS SORT OF MORE

 8      FAMILIAR WITH.

 9      BY MR. QUINN:

10      Q.   OKAY.  AND IS THAT THE END OF THE VIDEO?

11      A.   IT SHOULD SHOW -- WHY DID THE CHOICE DIDN'T COME UP?

12      Q.   IT DIDN'T COME UP?

13      A.   OR MAYBE IT WAS TELLING ME I MISSED IT.

14      Q.   I DON'T THINK SO.  MAYBE WE CAN RUN IT AGAIN, KEN, IF WE

15      CAN.

16           AT THE END OF THAT, DOES THE CONSUMER ACTUALLY MAKE A

17      CHOICE.

18      A.   YES.  AT THE END OF THAT, THEY CAN CLICK THEIR CHOICE, AND

19      INSTEAD YOU SEE THEIR EYE, WHICH IS CHECKING ON THE CLICK

20      BUTTON.  YOU HAVE ALSO THE CLICK DATA.  SO THEY CLICK ON ONE OF

21      THE PHONES, AND THIS PARTICULAR RESPONDENT CHOSE SAMSUNG.

22      Q.   ALL RIGHT.  SO DID THIS ACTUAL SURVEY THAT YOU DID, DID

23      THIS CONFIRM OR CORROBORATE THE OTHER RESEARCH THAT YOU DID

24      ABOUT HOW CONSUMERS MAKE DECISIONS WITH RESPECT TO SMARTPHONES

25      AND TABLETS?
```

1      A.   DEFINITELY.

2              MR. BENNETT:  OBJECTION, LEADING.

3              THE COURT:  SUSTAINED.

4      BY MR. QUINN:

5      Q.   CAN YOU TELL US WHETHER OR NOT THE RESULTS THAT YOU GOT AS

6      A RESULT OF DOING THIS SURVEY WERE CONSISTENT WITH WHAT YOUR

7      RESEARCH HAD LED YOU TO BELIEVE.

8      A.   YES.  FIRST OF ALL, AS YOU SAW, THEY SKIPPED A LOT OF --

9      MANY OF THEM, NOT JUST THIS PERSON, THERE WAS A LOT OF

10     INFORMATION SKIPPING, ALTHOUGH THERE WAS, OF COURSE, REVEALED

11     THAT SOME PEOPLE LOOKED AT MUCH MORE, CHECKED MORE ATTRIBUTES

12     THAT ARE OTHERS.  BUT OVERALL, THEY SKIPPED A LOT OF

13     INFORMATION, SO LIMITED REVIEW OF INFORMATION.

14         THEN THEY WERE USING A LOT OF SHORTCUTS.  I HAVE THE OTHER

15     STUDIES THAT WE DIDN'T DISCUSS, BUT THEY USED A LOT OF

16     SHORTCUTS, LIKE USING FILTERS, ET CETERA.

17         AND, FINALLY, WHEN I DID THE STATISTICAL ANALYSIS,

18     ATTENTION TO MAJOR ATTRIBUTES AFFECTED THE CHOICES, BUT NOT

19     ATTENTION TO MINOR ATTRIBUTES.

20     Q.   WHAT DO YOU MEAN BY THAT?  YOU SAID STATISTICAL ANALYSIS

21     THAT SHOWED THAT ATTENTION TO MAJOR ATTRIBUTES CORRELATED WITH

22     PURCHASE DECISIONS BUT MINOR ATTRIBUTES DIDN'T?

23     A.   CORRECT.  SO WHETHER THEY LOOKED AT MAJOR ATTRIBUTES OR

24     NOT, THAT AFFECTED CHOICES.

25         BUT NOT WHETHER THEY LOOKED AT MINOR ATTRIBUTES OR NOT.

1    SO EVEN IF THEY LOOKED AT MINOR ATTRIBUTES, LET'S SAY, AND THEY

2    DID ACROSS RESPONDENTS, THEY LOOKED AT THE MINOR ATTRIBUTES

3    DIDN'T AFFECT THEIR CHOICES.

4        SO SINCE THIS IS STATISTICAL ANALYSIS AND IT PARSES OUT

5    THE EFFECTS, IT SHOWS THAT CHOICE IS STATISTICALLY

6    SIGNIFICANTLY RELATED TO MAJOR ATTRIBUTES BUT NOT TO MINOR

7    ATTRIBUTES.

8        SO THE BOTTOM LINE IS THAT IN MY STUDY, MAJOR ATTRIBUTES

9    DID DRIVE THE CHOICE, BUT NOT THE MINOR ATTRIBUTES.

10   Q.   ALL RIGHT.  YOU'RE FAMILIAR WITH DR. HAUSER'S STUDY?  YOU

11   READ THAT, HIS REPORT?

12   A.   CORRECT.

13   Q.   AND HIS TESTIMONY?

14       IF WE COULD LOOK AT PLAINTIFF'S EXHIBIT 140 AT PAGE 51.

15       HOW WOULD YOU COMPARE THE WAY CONSUMERS MAKE DECISIONS

16   ABOUT SMARTPHONES AND TABLETS IN THE REAL WORLD TO THE WAY THAT

17   THE DECISION MAKING THAT DR. HAUSER EMPLOYED IN HIS SURVEY?

18   A.   SO DR. HAUSER HERE IN THIS SCREEN SHOT SHOWS FOUR PRODUCTS

19   AND THESE FOUR PRODUCTS ARE DESCRIBED BY MANY, MANY ATTRIBUTES,

20   BUT THE CONSUMERS HAVE TO DO THIS 16 TIMES IN HIS CASE BECAUSE

21   HE'S MANIPULATING THE DIFFERENT LEVELS OF ATTRIBUTES.

22       HIS CONJOINT STUDY ASSUMES THAT CONSUMERS REVIEWED ALL OF

23   THIS INFORMATION, TOOK INTO ACCOUNT EVERYTHING, THEY CHECK ALL

24   PRODUCTS, ALL ATTRIBUTES, MAKE SPECIFIC TRADEOFFS, LIKE THIS IS

25   LOW PRICE, THIS IS HIGH PRICE, THIS IS GOOD ON SCREEN SIZE,

1        THIS IS NOT, SO CONSIDERING EVERYTHING, THEY ARE MAKING A

2        CHOICE.

3            SO FULL INFORMATION REVIEW, FULL CONSIDERATION, FULL

4        CONSIDERATION OF ALL THE ATTRIBUTES.

5        Q.   AND IS THAT, THE WAY YOU JUST DESCRIBED THE RESPONDENTS TO

6        DR. HAUSER'S SURVEY MAKING DECISIONS ON THE SURVEY, IS THAT

7        CONSISTENT WITH WHAT YOU LEARNED ABOUT HOW CONSUMERS IN THE

8        REAL WORLD MAKE DECISIONS?

9        A.   IT IS NOT CONSISTENT.  IT'S NOT CONSISTENT WITH MY STUDY,

10       WITH MY OWN STUDIES.  BUT IT'S NOT CONSISTENT, EITHER, WITH THE

11       INDUSTRY REPORTS I READ, THE ACADEMIC LITERATURE I SUMMARIZED.

12       IT IS NOT CONSISTENT WITH ANY OF THE SOURCES OF INFORMATION I

13       RELIED ON TO DRAW MY CONCLUSIONS.

14       Q.   ALL RIGHT.  AND YOU EVALUATED DR. HAUSER'S REPORT AND HIS

15       CONCLUSIONS?

16       A.   YES.

17       Q.   AND DO YOU AGREE WITH THEM?

18       A.   NO.

19       Q.   WHY NOT?

20       A.   BECAUSE HIS RESULTS ARE INVALID FOR A NUMBER OF REASONS,

21       BUT I THINK THE MOST IMPORTANT ONES, THAT RELATES TO MY

22       ASSIGNMENT ABOUT KEY DEMAND DRIVERS.

23            ONE, HE HAS MANY, MANY MAKE ATTRIBUTES.  WE KNOW IN THIS

24       MARKET, BRAND MATTERS, PRICE MATTERS, WIRELESS CAPABILITIES

25       MATTER.

1      Q.    CAMERA QUALITY?

2      A.    CAMERA MATTERS, MANY DIFFERENT THINGS.

3            AND HE ONLY HAS A FEW OF THESE THINGS.  HE HAS CAMERA, BUT

4      EVEN IN THE CAMERA, HE DOESN'T HAVE THE THING THAT REALLY

5      MATTERS, WHICH IS CAMERA QUALITY, MEGA PIXEL, ET CETERA.

6            AND THEN I THINK HE HAS SCREEN SIZE.  BUT AS YOU SAW ON

7      THOSE SLIDES, THERE ARE A BUNCH OF OTHER MAJOR ATTRIBUTES IN

8      THIS MARKETPLACE, BATTERY LIFE, ET CETERA, HE MENTIONED SOME OF

9      THEM.  SO THAT'S ONE THING, LEAVING OUT ALL THESE MAJOR

10     ATTRIBUTES.

11           THE SECOND THING IS, HE INTRODUCES THESE VERY MINOR

12     FEATURES THAT CONSUMERS ARE USUALLY, OR TYPICALLY CONSUMERS ARE

13     AWARE OF, MOST CONSUMERS APPARENTLY NOT AWARE OF THESE VERY

14     GRANULAR, MINOR FEATURES.

15           AND THEN HE ADVOCATES THEM.  HE TRAINS THEM ABOUT THESE

16     FEATURES.  THE MOMENT YOU DO THAT, WE CALL IT DEMAND ARTIFACTS.

17     Q.    DEMAND -- SORRY?

18     A.    DEMAND ARTIFACTS.  YOU ARE ELEVATING ARTIFICIALLY THE

19     IMPORTANCE, THE VALUE OF THESE THINGS BECAUSE YOU ARE BEING

20     TOLD, HERE ARE SOME THINGS YOU LOOK 16 TIMES, THEY MUST BE

21     IMPORTANT.

22           AND THE THIRD POINT I ALREADY MADE, WE KNOW THAT IN THESE

23     MARKETS, IN THESE COMPLEX MARKETS, PEOPLE USE SHORTCUTS.

24     PEOPLE DON'T REVIEW ALL THE INFORMATION.  PEOPLE DON'T MAKE THE

25     FULL TRADEOFFS ACROSS ATTRIBUTES AND IT DOESN'T REALLY AFFECT

```
 1        THE REAL WORLD.

 2                 MR. QUINN:  NOTHING FURTHER.  THANK YOU VERY MUCH.

 3                 THE COURT:  ALL RIGHT.  THE TIME IS 4:12, AND WE'LL

 4        JUST GO TO 4:30.

 5                 MR. BENNETT:  ALL RIGHT.  THANK YOU VERY MUCH.

 6            (PAUSE IN PROCEEDINGS.)

 7                 THE COURT:  ARE YOU READY?

 8                 MR. BENNETT:  I'M READY.

 9                 THE COURT:  ALL RIGHT.  THE TIME IS 4:12.

10            GO AHEAD, PLEASE.

11                        CROSS-EXAMINATION

12        BY MR. BENNETT:

13        Q.   GOOD AFTERNOON, DR. ERDEM.  NICE TO MEET YOU.  MY NAME IS

14        JIM BENNETT.

15        A.   GOOD AFTERNOON.  NICE TO MEET YOU.

16        Q.   I HAVE A FEW QUESTIONS ABOUT YOUR STUDY.

17            FIRST, JUST TO BE CLEAR, I THINK EVERYBODY IS BY NOW,

18        YOU'RE NOT HERE TO TALK ABOUT THE VALIDITY OR INFRINGEMENT OF

19        ANY APPLE PATENTS; CORRECT?

20        A.   THAT'S CORRECT.

21        Q.   YOU'VE PRESENTED CERTAIN OPINIONS IN THIS CASE BASED ON

22        YOUR EYE TRACKING STUDY; CORRECT?

23        A.   CORRECT.

24        Q.   AND TO PERFORM THAT, WE SAW SOME OF THE SCREENS AND WE SAW

25        THE INFORMATION YOU WENT BACK, WENT THROUGH TO CREATE YOUR
```

1    ONLINE SHOPPING SITE THAT YOU TRACK THE EYE MOVEMENTS ON?

2    A.   YES.

3    Q.   TO PERFORM THAT STUDY, YOU WENT THROUGH AND LOOKED AT --

4    TO CONSTRUCT YOUR ONLINE STORE, YOU STUDIED, DIDN'T YOU,

5    FEATURES OF PHONES THAT WERE ADVERTISED ON THE SOURCES YOU

6    IDENTIFIED?  OR LISTED AT LEAST?

7    A.   I WOULDN'T CALL THEM ADVERTISED.  THESE WERE LISTED ON

8    COMPARISON WEBSITES AND SHOPPING WEBSITES.

9    Q.   OKAY.  LET ME BACK UP A SECOND.  ON YOUR EYE TRACKING

10   STUDY -- YOU'VE NEVER PUBLISHED A PAPER ON EYE TRACKING;

11   CORRECT?

12   A.   I DIDN'T PUBLISH A PAPER WITH EYE TRACKING DATA.

13   Q.   OKAY.  AND YOU ARE NOT AWARE, ARE YOU, OF ANY SMARTPHONE

14   MANUFACTURER OR CARRIER WHO HAS EVER USED AN EYE TRACKING STUDY

15   SUCH AS YOU HAVE PRESENTED HERE TO MEASURE THE DEMAND FOR

16   SPECIFIC FEATURES IN THEIR PRODUCTS?

17   A.   I DON'T -- I DON'T KNOW.  I JUST KNOW THAT ACTUALLY AMONG

18   THE DOCUMENTS I WENT THROUGH, THERE WAS A THIRD PARTY EYE

19   TRACKING PIECE, RESEARCH PIECE THAT LOOKED AT HOW CONSUMERS

20   MAKE CHOICES IN THE SMARTPHONE MARKETS.

21        INTERESTINGLY, IT WAS A THIRD PARTY RESEARCH, BY THE WAY,

22   NOT COMMISSIONED BY APPLE OR SAMSUNG.  IT WAS COMPARING APPLE

23   TO SAMSUNG.

24   Q.   BUT YOU'RE NOT AWARE OF ANY SMARTPHONE MANUFACTURER WHO'S

25   EVER USED EYE TRACKING TO DETERMINE DEMAND OR VALUE OF SPECIFIC

1     FEATURES IN THEIR PHONES, ARE YOU?

2     A.    I DON'T KNOW WHETHER SMARTPHONE MANUFACTURERS USED IT.

3     Q.    AND YOU'RE NOT AWARE OF ANY CARRIER THAT'S EVER DONE THAT,

4     ARE YOU?

5     A.    I DON'T KNOW WHETHER CARRIERS USED IT.

6     Q.    OKAY.  LET ME ASK YOU THIS:  I THINK MR. PRICE EARLIER

7     TODAY TALKED ABOUT REALITY TEST.  HAVE YOU APPLIED A REALITY

8     TEST TO THE RESULTS OF YOUR WORK HERE?

9     A.    YES.

10    Q.    OKAY.  HAVE YOU STEPPED BACK FROM YOUR RESULTS, THE

11    RESULTS YOU'VE COMPILED AND ASK YOURSELF WHETHER THEY MAKE

12    SENSE IS WHAT I'M ASKING YOU?

13    A.    YES.  I THINK SO.

14    Q.    OKAY.  WELL, LET'S -- LET ME GO BACK TO WHERE I WAS.  ALL

15    THE FEATURES THAT YOU INCLUDED IN YOUR EYE TRACKING STUDY WERE

16    ON A WEBSITE PUT OUT BY A SMARTPHONE MANUFACTURER OR A CARRIER;

17    IS THAT RIGHT?

18    A.    THAT'S NOT CORRECT.  WE LOOKED AT ALL THESE DIFFERENT,

19    LIKE GDGT.COM IS A REVIEW SITE.

20    Q.    OKAY.  LET ME ASK IT THIS WAY:  EVERY FEATURE YOU INCLUDED

21    IN YOUR EYE TRACKING STUDY IS A REAL WORLD FEATURE THAT'S BEEN

22    DESIGNED INTO A PHONE BY A MANUFACTURER, SUCH AS SAMSUNG; ISN'T

23    THAT RIGHT?

24    A.    SURE.  THESE ARE FEATURES THAT ARE ALREADY IN THE PHONES.

25    Q.    OKAY.  AND THESE ARE -- THE GREAT BULK OF THESE FEATURES

1    ARE ALL FEATURES THAT ARE NOT ONLY IN THE PHONES, BUT THEY'VE

2    BEEN CALLED OUT AT ONE TIME OR ANOTHER OR ONE WAY OR ANOTHER BY

3    THE MANUFACTURER OF THE PHONE OR THE CARRIERS, THE CARRIERS

4    THAT PEOPLE USE TO USE THOSE PHONES?

5    A.   WHAT DO YOU MEAN BY "CALLED"?  THESE WITH PHONES THAT ARE

6    BEING SOLD.

7    Q.   AND YOU HAVE FOUND, IN THE PUBLIC INFORMATION, LISTING OF

8    THESE VARIOUS FEATURES, IDENTIFICATION OF THESE FEATURES THAT

9    YOU INCLUDED IN YOUR ONLINE STORE; RIGHT?

10   A.   THESE ARE PHONES THAT ARE OFFERED AT VARIOUS TIMES, NOW,

11   SOME OF THEM ARE OLD, BUT THESE ARE REAL PHONES OFFERED ON REAL

12   WEBSITES.

13   Q.   OKAY.  AND YOU AGREE THAT CARRIERS ARE IMPORTANT PLAYERS

14   IN THE SMARTPHONE MARKET; RIGHT?

15   A.   SURE.

16   Q.   AND YOU'RE AWARE THAT CARRIERS ARE SAMSUNG'S MOST

17   IMPORTANT BUYERS, AREN'T YOU?

18   A.   BY -- YOU MEAN AS A DISTRIBUTOR AND THEY BUY PHONES FROM

19   THEM?  SURE.

20   Q.   FOR INSTANCE, IN YOUR REPORT, YOU REPORTED CITING A

21   SAMSUNG OFFICIAL ABOUT HOW SAMSUNG HAS 100 DIFFERENT

22   SMARTPHONES AVAILABLE ON THE MARKET BECAUSE THE CARRIERS HAVE

23   DEMANDED THAT.

24       DO YOU RECALL THAT?

25   A.   I DON'T RECALL THAT, BUT IF YOU'RE SAYING IT, I'M SURE I

1        DID SAY IT.

2        Q.    UM-HUM.  NOW, YOU'VE CONCLUDED THAT MANY, MANY, MANY OF

3        THESE FEATURES THAT THE CARRIERS HAVE INCLUDED IN THEIR PHONES

4        AND THAT HAVE BEEN LISTED BY THE CARRIERS AND THE -- EXCUSE

5        ME -- THAT THE MANUFACTURERS HAVE INCLUDED IN THEIR PHONES AND

6        THAT THE CARRIERS HAVE INCLUDED IN THEIR WEBSITES, YOU'VE

7        CONCLUDED THAT THEY HAVE NO EFFECT ON DEMAND, RIGHT?  NONE?

8        A.    NOT JUST BASED ON THAT PARTICULAR PIECE, LIKE WEBSITE

9        PIECE.

10           IF YOU LOOK AT ALL THE SOURCES OF INFORMATION I UTILIZED,

11       WHAT I CONCLUDED IS KEY DEMAND DRIVERS DON'T INCLUDE NON-MAJOR

12       ATTRIBUTES.

13       Q.    SO LET'S -- LET ME GET SPECIFIC HERE AND LET'S USE ONE OF

14       YOUR DEMONSTRATIVES THAT COUNSEL PREPARED.  I DON'T THINK HE

15       SHOWED IT, BUT LET'S BRING UP FIRST SDX 3540.  DO YOU SEE IT

16       HERE?  IT SAYS STUDY TO -- FIRST OF ALL, IS THIS A

17       DEMONSTRATIVE THAT YOU PREPARED?

18       A.    YEAH.  THIS WAS TO CONVEY TO THE JURY THE STATISTICAL

19       ANALYSIS.  BUT THEN WE CUT IT SHORT.

20       Q.    BUT WHAT YOUR CONCLUSION UP TOP HERE IS MINOR FEATURES DO

21       NOT IMPACT CHOICES, AND IF YOU LOOK DOWN IN THE LOWER RIGHT

22       THERE, THERE'S A LISTING THAT SAYS MINOR FEATURES AND YOU LIST

23       SECONDARY CAMERA, SCREEN PIXEL DENSITY, TV OUT.

24           DO YOU SEE ALL THAT?

25       A.    CORRECT.

1    Q.   AND THESE ARE EXAMPLES AND THEN YOU HAVE AN ELLIPSES

2    BECAUSE THERE ARE MORE OF THOSE MINOR FEATURES RIGHT?

3    A.   CORRECT.

4    Q.   BUT THOSE ARE THREE OF A LONGER LIST OF MINOR FEATURES

5    THAT YOU'VE CONCLUDED HAVE NO EFFECT ON CONSUMER DEMAND; IS

6    THAT RIGHT, DOCTOR?

7    A.   CORRECT.  AS A GROUP, MINOR FEATURES DON'T MATTER.

8    Q.   AND LET'S BRING UP, IF WE COULD, EXHIBIT 59 TO ERDEM'S

9    REPORT.

10        IN THIS REPORT, WE HAVE A FULL LIST, DON'T WE, OF -- THAT

11   INCLUDES THE MINOR FEATURES THAT YOU SAY DON'T AFFECT CONSUMER

12   DEMAND?

13   A.   THESE ARE THE FULL SET OF FEATURES IN -- YES, THESE ARE

14   THE FULL SET OF FEATURES.

15   Q.   AND 21 OF THOSE FEATURES ON THE FAR RIGHT-HAND COLUMN

16   UNDER HIGH COMPLEXITY, 21 OF THOSE FEATURES YOU'VE CONCLUDED

17   HAVE NO EFFECT ON CONSUMER DEMAND; IS THAT RIGHT?

18   A.   AS A -- AS A COMBINED GROUP, THEY DON'T DRIVE CONSUMER

19   CHOICES.

20   Q.   OKAY.  AND THOSE FEATURES THAT YOU'VE CONCLUDED DO NOT

21   DRIVE CONSUMER CHOICES INCLUDE VIDEO CAMERA; IS THAT RIGHT?

22   A.   WHATEVER IS LISTED THERE.  IF IT IS LISTED THERE, IT IS

23   THERE.

24   Q.   OKAY.  VIDEO CAMERA, YOUR CONCLUSION IS THAT HAS NO EFFECT

25   ON THE PURCHASING OF SMARTPHONES?

1    A.   IN MY STUDIES, THIS DIDN'T HAVE A PARTICULAR SIGNIFICANT

2    EFFECT ON CONSUMER'S CHOICES.

3    Q.   SAME THING WITH SCREEN RESOLUTION.  IN YOUR STUDY, IT HAD

4    NO EFFECT?  BASED UPON YOUR STUDY, YOU'RE SUGGESTING THAT

5    SCREEN RESOLUTION HAS NO EFFECT ON THE DEMAND FOR SMARTPHONES?

6    A.   DIDN'T AFFECT CONSUMER CHOICES.

7    Q.   OKAY.

8    A.   CONSUMER CHOICES WERE AFFECTED BY THOSE MAKE ATTRIBUTES

9    LIKE BRAND, PRICE, THE OTHER GROUP ATTRIBUTES, AS WELL AS PRIOR

10   OWNERSHIP OF BRAND, LIKE IF YOU WERE AN APPLE OWNER, YOU WERE

11   MORE -- WE FOUND THAT YOU ARE MORE LIKELY TO BUY APPLE AGAIN.

12   THE SAME THING IS TRUE FOR SAMSUNG.

13   Q.   OKAY.  SAME WITH RESPECT TO GPS.  YOUR FINDING IS THAT THE

14   INCLUSION OF A GPS FUNCTION IN A SMARTPHONE HAS NO EFFECT ON

15   CONSUMER DEMAND?

16   A.   AS A GROUP, YES.  WE DIDN'T EVALUATE EACH OF THEM

17   SEPARATELY.

18   Q.   OKAY.  SAME WITH RESPECT TO THE CENTRAL PROCESSING UNIT?

19   YOU FOUND THAT IN YOUR STUDY THAT DIFFERENCES IN THE CPU IN

20   THESE PHONES HAD NO EFFECT ON CONSUMER DEMAND?

21   A.   IT WAS IN THE MORE COMPLEX GROUP, BUT YES.

22   Q.   OKAY.  AND SAME WITH RESPECT TO, FOR INSTANCE, SOMETHING

23   CALLED A QWERTY KEYBOARD, WHICH IS A KEYBOARD ON A SMARTPHONE

24   THAT YOU CAN USE TO TEXT, AS OPPOSED TO THE OLD NINE DIGIT CELL

25   PHONE KEYBOARD, YOU CONCLUDED THAT HAVING AN ACTUAL KEYBOARD

1     THAT YOU COULD USE TO E-MAIL AND TEXT MESSAGE, THAT THAT HAD NO

2     EFFECT AND WAS NOT A DRIVER OF CONSUMER DEMAND FOR CELL PHONES;

3     CORRECT?

4     A.   YES.  BUT FOR CONSUMERS, THESE KIND OF THINGS, LIKE IF YOU

5     TELL THEM YOU CANNOT TYPE AT ALL ON YOUR PHONE, THAT WOULD BE A

6     DIFFERENT THING.

7          BUT THEY KNOW THAT THAT'S NOT THE CASE.  THEY DON'T NEED

8     TO LOOK AT Q-W-E-R-T-Y FOR THAT ONE, RIGHT, BECAUSE

9     TOUCHSCREEN, WE KNOW WE ARE TALKING ABOUT SMARTPHONES, THEY

10    HAVE IMAGES.

11         SO I WOULD INTERPRET THAT PARTICULAR EXAMPLE A BIT

12    DIFFERENTLY.  SO I WOULDN'T SAY NOT BEING ABLE TO TYPE AT ALL

13    WOULDN'T MATTER, BUT THAT FEATURE, MINOR FEATURE DOESN'T

14    CAPTURE THAT.

15    Q.   OKAY.  YOU CAN'T TYPE AT ALL WITHOUT A KEYBOARD, CAN YOU?

16    A.   YES, BUT QWERTY DOESN'T CAPTURE NOT HAVING -- THAT FEATURE

17    IS NOT STANDING FOR NOT HAVING A KEYBOARD.

18    Q.   QWERTY REFERS TO THE TYPEWRITER TYPE KEYBOARD AS OPPOSED

19    TO THE NINE DIGIT, ISN'T THAT WHAT QWERTY STANDS FOR?  IT'S THE

20    FIRST SIX LETTERS YOU SEE ACROSS THE TOP OF THE TYPEWRITER

21    KEYBOARD?

22    A.   I THINK IT'S A SPECIFIC KEYBOARD.  THAT'S HOW THE

23    CONSUMERS INTERPRET THESE THINGS.

24    Q.   LET'S BRING UP SDX 3169.  THIS IS A GRAPHIC THAT

25    DR. REIBSTEIN SHOWED THE LADIES AND GENTLEMEN OF THE JURY THIS

1    MORNING.

2         AND HE, IN HIS TESTIMONY, CRITIQUED DR. HAUSER FOR NOT

3    INCLUDING IN HIS STUDY THE QWERTY KEYBOARD, THE CPU, AND THE

4    GPS SAYING THAT THOSE WERE ALL MAJOR FEATURES THAT SHOULD HAVE

5    BEEN INCLUDED AND YOUR TESTIMONY IS THEY'RE MINOR FEATURES THAT

6    CONSUMERS DON'T CARE ABOUT.

7         MR. QUINN:  YOUR HONOR, THIS MISLEADS THE TESTIMONY.

8    IT'S ARGUMENTATIVE.

9         THE COURT:  OVERRULED.  GO AHEAD.  YOU MAY ANSWER.

10         THE WITNESS:  CAN YOU REPEAT THE QUESTION.

11   BY MR. BENNETT:

12   Q.   IT'S YOUR TESTIMONY THAT QWERTY, CPU, AND GPS DON'T DRIVE

13   CONSUMER DEMAND; IS THAT RIGHT?

14   A.   WHAT I SAID IS AS A GROUP, LIKE I SAID, I DIDN'T

15   DIFFERENTIATE BETWEEN THE DIFFERENT ATTRIBUTES ONE VERSUS THE

16   OTHER.

17   Q.   IF WE --

18   A.   SO I JUST PUT AS A GROUP, I HAVE BRAND SEPARATELY, PRICE

19   SEPARATELY, SOME OTHER THINGS LIKE BATTERY LIFE, CAMERA, ET

20   CETERA, SEPARATELY AS A GROUP OF MAJOR FEATURES.

21         AND THEN ALL MINOR THINGS ARE LUMPED AS ONE MINOR GROUP.

22         AS A GROUP, THE MINOR THINGS DIDN'T DRIVE DEMAND.  IT WAS

23   THE MAJOR THINGS THAT DRIVE DEMAND.

24   Q.   AND IF WE LOOK AT -- IF WE GO BACK TO YOUR EXHIBIT 59, I

25   TAKE IT IF THESE THINGS AS A GROUP AREN'T DRIVING DEMAND, THEY

CROSS ERDEM

```
 1    AREN'T GOING TO DRIVE DEMAND INDIVIDUALLY; WOULD THAT BE TRUE,

 2    DOCTOR?

 3    A.   PROBABLY IN THE MARKET WHERE THERE ARE EXAMPLES OF

 4    DIFFERENT FACTORS, AND I THINK ACTUALLY THESE ARE CONSISTENT

 5    WITH THE APPLE AND SAMSUNG DOCUMENTS.  WHEN YOU LOOK AT THOSE,

 6    CONSUMERS MAY DIFFER.  SOME OF THEM MAY PLACE A DIFFERENT

 7    IMPORTANCE ON BATTERY, THE OTHER ONE ON BRAND.

 8         BUT THERE ARE VERY FEW THINGS THERE ARE -- THAT ARE

 9    IMPORTANT TO THEM.

10    Q.   I'D HOPED, DOCTOR, TO LET YOU GO BACK TO NEW YORK FOR THE

11    WEEKEND.

12    A.   I HOPE SO.

13    Q.   BUT I CANNOT DO THAT UNLESS WE GET SHORTER ANSWERS.

14         DOCTOR, ONE OF THE THINGS YOU IDENTIFIED ON YOUR EXHIBIT

15    59 HERE AS A MINOR FEATURE, NOT DRIVING DEMAND, WAS SOMETHING

16    CALLED NFC.

17         DO YOU SEE THAT?

18    A.   YES.

19    Q.   THAT'S NEAR FIELD COMMUNICATION; RIGHT?

20    A.   YES.

21    Q.   THAT'S S BEAM; RIGHT?

22    A.   THAT'S -- CAN YOU REPEAT THAT?

23    Q.   HAVE YOU ALSO HEARD THAT REFERRED TO AS S BEAM?

24    A.   I KNOW IT'S NEAR FIELD COMMUNICATION.

25    Q.   YOU WERE NOT HERE ON MONDAY WHEN MR. PENDLETON TESTIFIED
```

1    ON BEHALF OF SAMSUNG, WERE YOU?

2    A.   NO.

3    Q.   ARE YOU AWARE -- IF WE CAN BRING UP EXHIBIT -- GRAPHIC 4.

4         ARE YOU AWARE THAT MR. PENDLETON TESTIFIED THAT NFC, OR

5    S BEAM, IS ONE OF THE FEATURES OF THE SAMSUNG GALAXY PHONES

6    THAT SAMSUNG VIEWS AS VALUABLE, AS A DRIVER OF DEMAND, AND AS

7    SOMETHING THAT IT PROMOTES?

8    A.   SAMSUNG CAN PROMOTE AND THEY CAN THINK IT'S VALUABLE.  IT

9    MIGHT BE USEFUL TO CONSUMERS, TOO.

10        BUT THOSE THINGS ARE NOT EQUAL TO DRIVING DEMAND FOR A

11   CONSUMER.

12        IN A MARKET WITH PRODUCTS, WITH THOUSANDS OF FEATURES,

13   EACH ONE OF THEM COULD BE USEFUL.

14        BUT THEY DON'T NECESSARILY DRIVE DEMAND BECAUSE CONSUMERS

15   ARE USING ONLY A HANDFUL OF FACTORS.

16   Q.   SO -- JUST TO BE CLEAR ON THIS, WHEN MR. PENDLETON --

17   FIRST OF ALL, SINCE YOU DID YOUR EYE STUDY, IT WAS DONE SIX

18   MONTH AS GO, DID YOU SHARE IT WITH ANY BUSINESS PEOPLE AT

19   SAMSUNG?

20   A.   I DON'T THINK SO.

21   Q.   ARE YOU AWARE OF ANY DECISIONS OR EFFORTS BEING MADE AT

22   SAMSUNG TO TRIM DOWN ON THEIR PRODUCT OFFERINGS AND TRIM DOWN

23   IN THEIR FEATURES THAT THEY OFFER IN THEIR PRODUCTS ON THE VIEW

24   THAT NONE OF THESE THINGS MATTER TO CONSUMERS?

25   A.   I DON'T KNOW WHETHER ANYBODY AT SAMSUNG SAW THE RESULTS.

 1    Q.   BUT YOU JUST TAKE A DIFFERENT VIEW OF THIS THAN

 2    MR. PENDLETON IN TERMS OF THE IMPORTANCE OF THAT FEATURE?

 3    A.   AGAIN, YOU HAVE TO DEFINE IMPORTANCE.  COMPANIES OBVIOUSLY

 4    TRY TO IMPROVE THEIR PRODUCTS CONSTANTLY, AND THERE ARE

 5    THOUSANDS OF FEATURES.  THEY HAVE TO ATTEND TO ALL THOSE

 6    FEATURES OTHERWISE THE PRODUCT WON'T IMPROVE.

 7         BUT WHETHER IT BECOMES A KEY DEMAND DRIVER IS A DIFFERENT

 8    QUESTION.

 9    Q.   DR. ERDEM, YOUR IRREPARABLE HARM STUDY CONFIRMED A VIEW

10    THAT YOU CAME TO THAT CONSUMERS MAKE HEURISTICS DECISIONS; IS

11    THAT RIGHT?

12    A.   YES.  I HAD LOOKED AT ALL OF THESE OTHER SOURCES I

13    MENTIONED, LITERATURE, THIRD PARTY RESEARCH, ET CETERA, AND

14    THERE WAS OVERWHELMING EVIDENCE THAT PEOPLE USE SHORTCUTS.

15    Q.   BRING UP YOUR EXHIBIT, DEMONSTRATIVE 3538.  IT SAYS WHAT

16    YOU JUST SAID.  CONSUMERS USE SHORTCUTS, THEY SKIP INFORMATION,

17    THEY TRY TO SIMPLIFY THE DECISION MAKING PROCESS.  IS THAT

18    RIGHT?

19    A.   CORRECT.

20    Q.   AND IN YOUR REPORT, YOU ELABORATE ON THIS.  YOU DESCRIBE

21    CONSUMERS AS CONFUSED ABOUT THE MOST BASIC ATTRIBUTES OF

22    SMARTPHONES, ISN'T THAT WHAT YOU SAY IN YOUR REPORT?

23    A.   THAT'S NOT BASED ON MY OWN COOPERATIVE STUDIES, BUT ON

24    THIRD PARTY RESEARCH, APPLE/SAMSUNG RESEARCH.

25    Q.   THAT'S A VIEW YOU BROUGHT TO YOUR RESEARCH BEFORE YOU EVEN

```
 1      DID YOUR EYE TRACKING STUDY?  YOU SAY IN YOUR REPORT THAT

 2      CONSUMERS OVERWHELMED WITH INFORMATION; IS THAT RIGHT?

 3              MR. QUINN:  EXCUSE ME, YOUR HONOR.  THERE WERE TWO

 4      QUESTIONS THERE.

 5              MR. BENNETT:  LET ME RESTATE IT.

 6              THE COURT:  SUSTAINED.

 7      BY MR. BENNETT:

 8      Q.   YOU SAY IN YOUR REPORT, DR. ERDEM, THAT CONSUMERS ARE

 9      OVERWHELMED WITH INFORMATION REGARDING SMARTPHONES AND THEIR

10      FEATURES; CORRECT?

11      A.   AND THE REPORTS MENTION HOW MUCH INFORMATION THERE IS

12      AVAILABLE IN THE MARKETPLACE, AND CONSUMERS ARE OVERWHELMED

13      WITH THE AMOUNT OF INFORMATION.

14      Q.   AND YOU SAID IN YOUR REPORT THAT THEY ARE -- THAT'S ONE

15      REASON THEY ARE OVERWHELMED IS THAT THEY ARE PLAGUED WITH

16      PRODUCT OFFERINGS THAT PEOPLE LIKE MR. PENDLETON ARE PUTTING

17      OUT IN THE MARKET PLACE, PLAGUED, RIGHT?

18      A.   THERE ARE MANY DIFFERENT --

19              MR. QUINN:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

20              THE COURT:  OVERRULED.  GO AHEAD, PLEASE.

21              THE WITNESS:  THERE ARE MANY DIFFERENT PRODUCTS, MANY

22      DIFFERENT FEATURES, NOT JUST IN SMARTPHONE MARKETS.  I THINK

23      CONSUMERS ARE INDEED -- WE HAVE SO MANY CHOICES AND THE

24      DECISION PROCESS BECOMES COMPLEX, AND, THEREFORE, IT'S VERY

25      RATIONAL FOR CONSUMERS TO USE SHORTCUTS.
```

1    BY MR. BENNETT:

2    Q.   OKAY.  SUCH THAT IN YOUR DEPOSITION, REFERRING TO THE

3    PATENTED FEATURES HERE -- AND TO BE CLEAR AGAIN, YOU DIDN'T

4    STUDY THE PATENTED FEATURES; IS THAT RIGHT?

5    A.   I LOOKED AT THE TOTAL SOURCES OF INFORMATION, ALL THE

6    INFORMATION THAT'S AVAILABLE TO ME, AND IN CONSUMER STUDIES,

7    THESE PATENTED FUNCTIONALITIES DIDN'T COME UP.

8    Q.   YOUR EYE TRACKING STUDY DOES NOT INCLUDE A SINGLE ONE OF

9    THE PATENTED FEATURES?

10   A.   NO, THAT WOULDN'T HAVE BEEN REALISTIC.  MY STUDY DOESN'T

11   HAVE THOSE FEATURES THEMSELVES.

12   Q.   BECAUSE YOUR VIEW IS THAT THEY ARE MINOR OR SECONDARY SUCH

13   THAT ONLY -- AND THIS IS LANGUAGE YOU'VE USED IN YOUR

14   DEPOSITION -- "ONLY A WEIRD PERSON, A TECHNO WHATEVER, OR A

15   CRAZY PERSON WOULD CARE ABOUT THESE FEATURES IN BUYING A

16   PHONE"?  WAS THAT YOUR TESTIMONY?

17   A.   MY VIEW WAS THAT THESE KIND OF -- IT'S NOT JUST MY VIEW,

18   WHEN YOU LOOK AT ALL THESE SOURCES AGAIN, NOBODY -- THEY

19   DON'T -- THEY ARE NOT EVEN APPARENTLY ON THE RADAR SCREEN OF

20   CONSUMERS.  THESE ARE VERY GRANULAR, AND THEY WOULDN'T DRIVE

21   DEMAND BASED ON ALL OF THE INFORMATION SOURCES I UTILIZED.

22        I THINK THAT IN THE DEPOSITION I WAS ASKED, WELL, THERE

23   WOULD BE SOME CONSUMERS WHO WOULD CARE A LOT, AND I WAS JUST

24   JOKING ABOUT THE FACT THAT YOU CAN ALWAYS FIND ONE CONSUMER OR

25   A FEW CONSUMERS WHO WILL DO ANYTHING.  OBVIOUSLY I WOULD NEVER

```
 1      SAY NONE OF THE CONSUMERS WOULD DO THIS OR ALL CONSUMERS WILL

 2      BEHAVE THAT WAY.

 3      Q.   OKAY.

 4      A.   THERE'S ALWAYS AN EXCEPTION TO THE RULE.  SO I WAS JOKING

 5      ABOUT THAT ONE.

 6      Q.   ALL RIGHT.

 7              THE COURT:  THE TIME IS 4:30.  I THINK WE SHOULD

 8      BREAK FOR THE DAY AND YOU CAN CONTINUE ON MONDAY.

 9              MR. BENNETT:  OKAY.

10              THE COURT:  ALL RIGHT.

11              MR. BENNETT:  THANK YOU, YOUR HONOR.

12              THE COURT:  ALL RIGHT.  THE TIME IS 4:30.  AND YOU

13      MAY STEP DOWN.  I DID WANT TO GIVE THE JURY -- I TOLD YOU ON

14      TUESDAY, WE NOW HAVE LESS THAN 12 HOURS OF TRIAL TESTIMONY

15      LEFT, AND AS YOU HAVE SEEN THE LAST THREE WEEKS, WE GET ABOUT 5

16      HOURS TO 5 AND A HALF HOURS OF TESTIMONY IN A SINGLE DAY.

17          SO I SUSPECT THAT BY FRIDAY MORNING WE WILL HAVE CONCLUDED

18      ALL OF THE EVIDENCE PORTION OF THIS TRIAL, AND THE PARTIES HAVE

19      BEEN GIVEN -- YOU MAY STEP DOWN.

20              THE WITNESS:  THANK YOU.

21              THE COURT:  THE PARTIES HAVE BEEN GIVEN TWO HOURS PER

22      SIDE FOR CLOSING ARGUMENT, AND THEY WOULD LIKE TO DO ALL OF THE

23      CLOSING ARGUMENTS ON ONE DAY VERSUS SPLITTING IT UP BETWEEN TWO

24      DAYS, WHICH I THINK MAKES A LOT OF SENSE.

25          SO WE WILL NOT BE HAVING CLOSING ARGUMENTS NEXT FRIDAY
```

```
 1        BECAUSE I ALSO HAVE TO READ TO YOU THE FINAL JURY INSTRUCTIONS,

 2        WHICH WILL BE LONGER THAN THE PRELIMINARY INSTRUCTIONS, THE

 3        READING OF THE FINAL JURY INSTRUCTIONS THEMSELVES, THEY HAVEN'T

 4        BEEN DECIDED YET, BUT IT COULD TAKE AT LEAST AN HOUR.

 5            SO I DID WANT TO GIVE YOU THAT ADVANCED NOTICE THAT WE

 6        HAVE PROCEEDED MUCH MORE QUICKLY.  WE ORIGINALLY THOUGHT WE

 7        WOULD CLOSE ON TUESDAY, AND THAT YOU WOULD BEGIN DELIBERATING

 8        ON WEDNESDAY, APRIL 30TH, BUT I THINK WE'VE NOW PROGRESSED A

 9        DAY OR TWO FASTER.

10            SO I WILL HAVE MORE GUIDANCE FOR YOU AS TO THE TIMING SO

11        THAT YOU CAN MAKE YOUR OWN SCHEDULE FOR YOUR OWN WORK AND

12        FAMILY AND OTHER OBLIGATIONS.

13            I MAY HAVE MORE INFORMATION AT THE END OF THE DAY ON

14        MONDAY, AND CERTAINLY BY THE END OF THE DAY ON TUESDAY WHAT OUR

15        SCHEDULE IS.

16            NOW, IT COULD BE THAT ON FRIDAY, WE FINISH WITH THE

17        EVIDENCE IN THE MORNING AND THAT I GO AHEAD AND EXCUSE YOU IN

18        THE MORNING BECAUSE IT WILL TAKE US SOME TIME TO FINALIZE THE

19        EXHIBIT LIST, WHICH WILL GO TO THE JURY ROOM, FINALIZE THE

20        FINAL JURY INSTRUCTIONS, THE VERDICT FORM, MAKE SURE EVERYONE

21        IS FINE WITH ALL THE EXHIBITS AS WELL WHICH WILL GO INTO THE

22        JURY ROOM.

23            SO THAT MAY TAKE US TIME, AND WE MAY NEED TO EXCUSE YOU

24        FRIDAY MORNING AND NOT HAVE TRIAL ANY MORE THAT DAY SO THAT WE

25        CAN TAKE CARE OF EVERYTHING WE NEED TO TAKE CARE OF BEFORE WE
```

```
1        CAN CLOSE.

2             OKAY?  SO NEXT WEEK WE WILL SEE YOU MONDAY, 9:00 TO 4:30;

3        TUESDAY, 9:00 TO 4:30; NOT WEDNESDAY; NOT THURSDAY, AND THEN

4        FRIDAY.

5             I WILL HAVE MORE INFORMATION BY THE END OF THE DAY TUESDAY

6        AS TO WHAT OUR SCHEDULE FOR FRIDAY LOOKS LIKE.  OKAY?

7             ALL RIGHT.  AGAIN, PLEASE DON'T RESEARCH OR DISCUSS THE

8        CASE.  THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.  WE'LL SEE

9        YOU MONDAY AT 9:00.

10            (JURY OUT AT 4:33 P.M.)

11                 THE COURT:  OKAY.  THE RECORD SHOULD REFLECT THE

12        JURORS HAVE LEFT THE COURTROOM.

13            I WOULD LIKE TO RAISE JUST SOME SEALING ISSUES ON SOME OF

14        THE EXHIBITS.

15                 PLEASE TAKE A SEAT.

16            SOME SEALING ORDERS I JUST WANT TO PUT ON THE RECORD.

17        OTHERS I HAVE SOME QUESTIONS.

18            LET ME ASK, WITH REGARD TO DX 433, THAT CAME IN WITH

19        DR. ERDEM, DOES SAMSUNG WANT THAT DOCUMENT SEALED?  I DON'T

20        THINK THERE WAS AN ORDER OR A REQUEST TO SEAL ON THAT DOCUMENT.

21        I DON'T BELIEVE I'VE RULED ON THAT PARTICULAR DOCUMENT.  BUT

22        WHAT'S YOUR REQUEST?  THAT IS THE S III EARLY CUSTOMER PROFILE

23        HIGHLIGHT -- INSIGHTS.

24                 MR. QUINN:  YES, WE WOULD LIKE IT SEALED.

25                 THE COURT:  OKAY.  NO OBJECTION TO THAT; CORRECT,
```

1          MR. BENNETT?

2                    MR. BENNETT:  NO OBJECTION, YOUR HONOR.

3                    THE COURT:  ALL RIGHT.

4                    MR. MCELHINNY:  YOUR HONOR, I ASK IF DOCUMENT 1628,

5          YOU MAY HAVE RULED ON THIS ALREADY.

6                    THE COURT:  ON 16 --

7                    MR. LEE:  THAT'S WHAT OUR CHART SHOWS, 1628.

8                    THE COURT:  OKAY.  OKAY.  THAT SAYS -- THANK YOU.

9          PAGES 3 THROUGH 13 AND 16, TO THE EXTENT NOT USED DURING AN

10         EXAMINATION, AND PAGE 17.

11              SO IT'S NOT THE ENTIRE DOCUMENT, IT'LL JUST BE THOSE

12         PAGES.

13              SO AS FOR DX, DX 433, THAT IS SEALED AS TO PAGES 3 THROUGH

14         13, 16 AND 17.

15                    ALL RIGHT.  THANK YOU.

16              NOW, 452, I THINK ARGUABLY THERE ARE COVER PAGES THAT

17         COULD BE UNSEALED, BUT I HAD PREVIOUSLY RULED TO SEAL THAT

18         DOCUMENT, SO I'M JUST PLACING ON THE RECORD THAT THAT ONE IS

19         SEALED IN ITS ENTIRETY.

20              NOW, LET'S GO TO -- SOME OF THE EXHIBITS ON THE EXHIBIT

21         LIST, I DID WANT TO PLACE ON THE RECORD, SINCE IT WASN'T

22         INDICATED IN THE TRANSCRIPT, THAT FOR PX 203, THE FOLLOWING

23         PAGES WERE SEALED:  3, 4, 7, 9 THROUGH 16, 19 THROUGH 21, 23

24         THROUGH 25, 28 THROUGH 33, AND 36 THROUGH 38.

25                    THE ORDERS WHICH SEALED THOSE PAGES WERE IN ECF NUMBER

```
 1      1680 AND 1656, BUT I DIDN'T PLACE THEM INTO THE RECORD AT THE

 2      TIME THE DOCUMENT WAS ADMITTED.

 3             NOW, WITH REGARD TO DX 404, WAS PAGE 6 UNSEALED WHEN IT

 4      WAS SHOWN TO THE JURY?  OTHERWISE I BELIEVE THE REST OF THAT

 5      DOCUMENT IS SEALED.  THAT'S THE APPLE POINT OF SALE INFLUENCE

 6      ON SMARTPHONE BUYERS.

 7             MR. LEE:  YOUR HONOR, PAGE 6 WAS SHOWN TO THE JURY AT

 8      TRANSCRIPT 1402-3, AND THAT'S THE ONLY PAGE THAT WAS SHOWN.

 9             THE COURT:  OKAY.  SO THAT PAGE IS UNSEALED THEN.

10      SO -- SO .06 IS UNSEALED.

11             ALL RIGHT.  THEN WITH DX 500, THIS WAS AGREED TO ON THE

12      RECORD, I JUST WANTED TO CLARIFY THAT THE ENTIRE DOCUMENT IS

13      SEALED, EXCEPT FOR PAGES 1, 12, 13, 16 THROUGH 18, AND 20.

14             MR. LEE:  THAT'S CORRECT.

15             THE COURT:  ALL RIGHT.  NOW, DX 411, ALL PAGES ARE

16      SEALED EXCEPT 1, 2, 4, 5, 10, 11, 13, 14, 25, AND 32.

17             SO IT'S A LITTLE BIT MORE THAN WHAT YOU ALL SAY.

18             MR. LEE:  YOUR HONOR, THAT WAS THE UNIVERSE OF PAGES

19      THAT WOULD BE UNSEALED IF USED, BUT I THINK THAT ONLY 1 THROUGH

20      4, 5, 10, AND 32 HAVE BEEN ACTUALLY USED AND SHOWN.

21             THE COURT:  RIGHT.  BUT THESE PARTICULAR PAGES ARE

22      USUALLY JUST COVER PAGES.  THEY HAVE THE APPLE LOGO AND NOT

23      MUCH ELSE.  I REALLY DON'T SEE THERE BEING ANY SEALABLE

24      INFORMATION IN THOSE, SO I'M GOING TO UNSEAL THOSE PAGES.

25             OKAY.  WITH REGARD TO DX 336, IT WAS ADMITTED ON
```

```
 1        APRIL 14TH, AT PAGE 1578 WITH NO SEALING, BUT IN YOUR EXHIBIT,

 2    YOU HAVE IT SEALED.

 3            DO YOU JUST WANT TO CLARIFY THAT ONE?

 4            MS. MAROULIS:  ONE MINUTE, YOUR HONOR.

 5            THE COURT:  OKAY.  THERE WAS NO SEALING ORDER ON

 6    THIS.  THERE WAS TESTIMONY FROM MS. HACKBORN.  I'M NOT SURE IF

 7    THIS IS THE OPEN SOURCE PART OF ANDROID.

 8            MR. PAK:  YES, YOUR HONOR, WE DON'T NEED SEALING ON

 9    THAT.

10            THE COURT:  OH, NO SEALING ON THAT.  OKAY.  I THINK

11    THAT NEEDS TO BE CORRECTED BECAUSE IN THE EXHIBIT LIST, IT SAYS

12    IT'S SEALED IN ITS ENTIRETY.

13            MR. PAK:  YES, YOUR HONOR.

14            THE COURT:  OKAY.  SO THAT ONE IS NO SEALING.  IF YOU

15    WOULD MAKE THAT CHANGE TO YOUR EXHIBIT LIST, PLEASE.

16        AND THEN I DID JUST WANT TO PUT ON THE RECORD, I DIDN'T

17    NOTE THE SEALING WHEN THE EXHIBIT WAS ADMITTED ON APRIL 14TH AT

18    PAGE 1635, BUT THERE WAS PREVIOUSLY A SEALING ORDER GRANTED.

19        AND SO I DID WANT TO PLACE ON THE RECORD FOR PX 216, PAGES

20    5, 6, AND 8 WERE SEALED.

21        OKAY?  SO I THINK THAT SORT OF CLARIFIES ANY DISCREPANCIES

22    I HAD IN MY SEALING NOTATIONS ON MY EXHIBIT LIST AND WHAT YOU

23    HAVE IN YOUR JOINT EXHIBIT LIST WHICH YOU FILED YESTERDAY.

24        OKAY.  LET ME ASK ABOUT THE SCHEDULE FOR NEXT WEEK AND

25    WHEN TO EXPECT THE JMOL MOTIONS.  WHEN DO YOU ANTICIPATE
```

1    COMPLETING THIS PHASE OF YOUR CASE?

2              MS. MAROULIS:  YOUR HONOR, WE REVIEWED THE TRANSCRIPT

3    FROM LAST TIME THE COURT RAISED IT, AND IT SEEMED LIKE THE

4    COURT WANTED ONE SET OF MOTIONS FOR THE WHOLE CASE.

5              THE COURT:  YES.

6              MS. MAROULIS:  SO WE SUGGESTED TO APPLE THAT BOTH

7    PARTIES FILE ONE SET OF MOTIONS AND ONE SET OF OPPOSITIONS ON

8    FRIDAY AFTERNOON, AND THE SCHEDULE WE PROPOSE WOULD BE FRIDAY

9    NIGHT BY 8:00 AND OPPOSITION SATURDAY NIGHT BY 8:00.

10        WE HAVEN'T HEARD BACK YET, BUT WE'RE FLEXIBLE SOMEWHAT ON

11   THE TIMING.

12             THE COURT:  I WASN'T SAYING THAT IT HAD TO BE AT THE

13   END OF THE CASE.

14        WHEN SAMSUNG RESTS FOR THIS PORTION OF ITS CASE, IF APPLE

15   WANTS TO FILE A JMOL, I WILL ENTERTAIN IT.  AND THEN WHEN APPLE

16   RESTS, IF SAMSUNG WANTS TO FILE A JMOL, I WAS GOING TO ALLOW

17   THAT AS WELL.

18             MS. MAROULIS:  THAT WOULD BE FINE, YOUR HONOR,

19   WHATEVER THE COURT PREFERS.  WE UNDERSTOOD IT TO BE THAT YOU

20   WANTED ONE SET OF PAPERS AT THE END OF THE CASE TOGETHER, BUT

21   WHATEVER --

22             THE COURT:  WELL, WE COULD DO IT THAT WAY AS WELL.

23   I'M JUST CONCERNED ABOUT CONCENTRATING TOO MUCH OF THE WORK

24   THAT THE COURT HAS TO DO ON SUNDAY, BECAUSE I HAVE TO RULE ON

25   YOUR EVIDENTIARY OBJECTIONS FOR CLOSING ARGUMENTS, WHICH I

```
1    SUSPECT WILL BE EXTENSIVE, FINALIZE THE JURY INSTRUCTIONS, THE

2    VERDICT FORM, RULE ON JMOL'S.

3         WHAT WOULD YOU LIKE TO DO?  DO YOU WANT TO JUST DO ONE --

4    IF YOU JUST WANT TO DO ONE SET ON FRIDAY, THAT'S FINE.  BUT I'M

5    NOT REQUIRING IT, AND I CERTAINLY AM GIVING YOU THE OPTION, IF

6    YOU WANT TO, OF DOING JMOL MOTIONS EARLIER AND AFTER EACH SIDE

7    CONCLUDES THEIR PHASE.

8         MR. LEE:  YOUR HONOR, I THINK WE THINK THAT ONE SET

9    IS FINE, AND IF WE COULD DO IT ON THAT BASIS, IT MOVES IT UP SO

10   THAT YOU DON'T HAVE THE TRAFFIC JAM OVER THE WEEKEND, WE CAN

11   TRY TO DO THAT.

12        THE COURT:  SO HOW ARE YOU GOING TO DO THAT, AFTER

13   EACH SIDE RESTS, YOU WANT TO JUST PLACE ON THE RECORD THAT YOUR

14   JMOL MOTION WILL BE WHAT YOU FILE AT THE END OF THE WEEK?

15        MR. LEE:  YEAH.

16        MS. MAROULIS:  YES, YOUR HONOR.

17        MR. LEE:  IF THAT'S ALL RIGHT WITH SAMSUNG, THAT

18   WOULD BE FINE WITH US.

19        THE COURT:  OKAY.

20        MS. MAROULIS:  YES, YOUR HONOR, THIS IS TO AVOID

21   LENGTHY ARGUMENTS OR FILING SERIATIM.

22        THE COURT:  OKAY.  THAT'S FINE.  IF THAT'S WHAT YOU

23   ALL WANT, I JUST WANT TO PLACE ON THE RECORD AGAIN I HAVE GIVEN

24   YOU THE OPTION TO FILE SERIAL JMOL MOTIONS, BUT YOU HAVE

25   REQUESTED TO DO IT AT THE END, THAT'S FINE.
```

1              OKAY.  CAN WE JUST GO AHEAD AND PLACE ON THE RECORD NOW

2       THAT APPLE IS RESERVING ITS JMOL MOTIONS THAT IT WOULD ASSERT

3       WHEN SAMSUNG CLOSES THIS PORTION OF ITS CASE?  AND THAT SAMSUNG

4       IS RESERVING THE JMOL MOTIONS THAT IT WOULD ASSERT AFTER APPLE

5       FINISHES ITS REBUTTAL AND DEFENSIVE CASE, AND THAT APPLE IS

6       RESERVING ITS JMOL MOTIONS THAT IT WOULD SERVE AFTER SAMSUNG

7       CLOSES ITS REBUTTAL -- OR DEFENSIVE REBUTTAL CASE AND

8       INVALIDITY CASE?

9              MR. LEE:  YES, YOUR HONOR.  AND I THINK IT WOULD ALSO

10       INCLUDE OUR RESERVING ON OUR JMOL AT THE END OF THEIR -- THE

11       CLOSE OF THE EVIDENCE ON THEIR OFFENSIVE CASE.  I THINK YOU'VE

12       GOT EVERYTHING IN THERE EXCEPT FOR THAT ONE COMPONENT, AND THAT

13       WOULD COVER EVERYTHING.

14              THE COURT:  OKAY.  CAN I JUST GET AN AGREEMENT?  I

15       MEAN, IF WE NEED TO DO IT AND ASK THE JURY TO STEP OUT AFTER WE

16       CONCLUDE WITH THE LAST SAMSUNG WITNESS, WE CAN DO THAT.

17              BUT I WAS HOPING THAT WE COULD GET SOME AGREEMENT THAT

18       YOU'VE APPROPRIATELY AND PROPERLY RESERVED YOUR JMOL MOTIONS AT

19       THE APPROPRIATE TIME SO I DON'T HAVE TO EXCUSE THE JURY JUST

20       FOR TWO MINUTES FOR YOU TO STATE YOUR RESERVATIONS ON YOUR JMOL

21       MOTION.

22              MR. LEE:  I'M SURE WE CAN DO THAT.

23              MS. MAROULIS:  YES.

24              THE COURT:  ALL RIGHT.  THAT'S FINE THEN.  SO YOU

25       WILL NOT BE FILING THEM ON TUESDAY.  YOU'LL JUST FILE ON

1      FRIDAY.  THAT'S FINE.

2           WHAT WAS THE SCHEDULE -- IF YOU FILE SATURDAY NIGHT, THEN

3      THAT MAKES IT A LITTLE BIT MORE DIFFICULT FOR US TO TRY TO

4      REVIEW ALL THE TRANSCRIPT CITES AND ALL THE EXHIBITS BY SUNDAY.

5           MS. MAROULIS:  WHAT WOULD BE THE SCHEDULE THAT WOULD

6      WORK FOR THE COURT?  IT WOULD BE SOMETHING WHERE WE FILE ON

7      FRIDAY AND RESPONSES WOULD YOU DUE ON SATURDAY, SO IF THE COURT

8      PREFERS THAT, WE WOULD MAKE IT WORK.

9           THE COURT:  OKAY.  LET ME GIVE YOU YOUR TIME TOTALS

10     AND THAT MAY ALSO HELP US WITH TIMING AS WELL.

11          (PAUSE IN PROCEEDINGS.)

12          THE COURT:  ALL RIGHT.  TODAY APPLE USED 2 HOURS AND

13     2 MINUTES.  SO IN TOTAL APPLE HAS USED 17 HOURS AND 40 MINUTES.

14     BY MY CALCULATION, YOU HAVE 7 HOURS AND 20 MINUTES LEFT.  OKAY?

15          TODAY SAMSUNG USED 3 HOURS AND 30 MINUTES.  YOUR TOTAL IS

16     21 HOURS AND 9 MINUTES.  SO BY MY CALCULATION, SAMSUNG HAS 3

17     HOURS AND 51 MINUTES LEFT.

18          IT IS POSSIBLE THAT WE COULD EVEN FINISH ON TUESDAY WITH

19     EVIDENCE POTENTIALLY.  SOMETIMES WE GET 5 AND A HALF HOURS OF

20     TESTIMONY IN, BUT THAT WOULD BE DIFFICULT.  I THINK THERE WILL

21     BE SOME PORTION GOING ON FRIDAY, BUT IT'S PRETTY MINIMAL.

22          WHAT IS THE EARLIEST ON SATURDAY?  IT'S GOING TO BE MUTUAL

23     MOTIONS, SO IT'S A DEADLINE THAT APPLIES TO BOTH.  WHAT IS THE

24     EARLIEST ON FRIDAY THAT YOU COULD FILE THE JMOL MOTIONS AND THE

25     EARLIEST ON SATURDAY YOU COULD RESPOND SO WE CAN GO BACK AND

```
 1    CHECK ALL THE TRANSCRIPT CITES AND EXHIBIT CITES FOR OUR

 2    RULING?

 3              MR. LEE:  HOW ABOUT 3:00 P.M. ON FRIDAY, 3:00 P.M. ON

 4     SATURDAY?

 5              THE COURT:  WOULD THAT WORK FOR YOU?

 6              MS. MAROULIS:  THAT'S FINE, YOUR HONOR.

 7              THE COURT:  ALL RIGHT.  THANK YOU.

 8              MS. MAROULIS:  AND CAN WE HAVE EIGHT PAGES PER SIDE?

 9     THE COURT PREVIOUSLY SAID FIVE PER SIDE.

10              THE COURT:  THAT'S FINE.  IF YOU'RE ONLY GOING TO DO

11     ONE, THAT'S FINE.

12              MS. MAROULIS:  THANK YOU.

13              THE COURT:  OKAY.  SO FRIDAY AT 3:00 P.M. AND

14     SATURDAY AT 3:00 P.M.

15          ALL RIGHT.  IS THERE ANY OTHER PLANNING THAT WE NEED TO DO

16     FOR NEXT WEEK?  ANYTHING ELSE?

17              MS. MAROULIS:  YOUR HONOR, WILL THERE BE A CHARGING

18     CONFERENCE FOR THE JURY INSTRUCTIONS, OR IS IT GOING TO BE

19     HANDLED BY PAPER?

20              THE COURT:  I AM INCLINED TO HANDLE IT BY PAPER, BUT

21     I HAVEN'T MADE A FINAL DECISION, AND I WAS ANTICIPATING DOING

22     SOMETHING SIMILAR TO WHAT WE DID FOR THE DAMAGES RETRIAL OF

23     SAYING YOUR OBJECTIONS HAVE BEEN RESERVED, ONLY STATE NEW OR

24     DIFFERENT OBJECTIONS TO THE PROPOSED FINAL JURY INSTRUCTIONS.

25          DO YOU HAVE A PREFERENCE OF MAKING IT AN ORAL CONFERENCE
```

```
 1    VERSUS IN WRITING?

 2              MS. MAROULIS:  LET THE PARTIES CONFER AND LET THE

 3    COURT KNOW?  WE NEED TO PRESERVE OBJECTIONS, BUT WE'LL TRY TO

 4    DO IT IN THE MOST TIME EFFICIENT MANNER.

 5              THE COURT:  SO I'M ENVISIONING SOMETHING SIMILAR TO

 6    THE PRELIMINARY JURY INSTRUCTIONS WHERE I WILL FILE PROPOSED

 7    FINAL AND GIVE YOU AN OPPORTUNITY TO RESPOND TO THAT.  I HOPE

 8    THAT YOU'LL NOT REPEAT WHAT YOU'VE ALREADY SAID.

 9         YOU CAN RESERVE YOUR OBJECTIONS THAT HAVE ALREADY BEEN

10    FILED FOR PURPOSES OF APPEAL AND JUST INCLUDE ANY, YOU KNOW,

11    NEW ISSUES.  IF WE MADE A MISTAKE, IF WE HAVE A TYPO, SOMETHING

12    LIKE THAT.

13         AND THEN I'LL FILE ANOTHER SET AFTER I GET YOUR COMMENTS,

14    AND THEN GIVE YOU ONE MORE CHANCE IN CASE THERE'S AN ERROR IN

15    THERE, TO COMMENT, AND THEN FILE A FINAL SET.

16         SO I'M ENVISIONING WE'LL GO THROUGH TWO ROUNDS BEFORE I

17    FILE A FINAL.  THAT'S WHY I THINK WE'RE JUST GOING TO NEED SOME

18    TIME FOR US TO PREPARE THAT, FOR YOU TO RESPOND, AND THEN FOR

19    US TO REVIEW AND INCORPORATE YOUR RESPONSES.

20         SO I THINK WE CAN DO IT ALL ON PAPER, BUT IF YOU HAVE A

21    STRONG PREFERENCE, I'M WILLING TO CONSIDER DOING IT ORALLY.

22         WITH PAPER, IT'S JUST A LITTLE BIT EASIER TO GO BACK AND

23    LOOK UP THE FEDERAL CIRCUIT CASE, WHATEVER IS BEING CITED.

24              MR. LEE:  PAPER IS FINE WITH APPLE, YOUR HONOR.

25              THE COURT:  OKAY.  WELL, IF YOU WANT TIME TO THINK
```

1      ABOUT IT, THAT'S FINE.

2               MS. MAROULIS:  CAN WE THINK ABOUT THAT?

3               THE COURT:  THAT'S FINE.  WE HAVE A COUPLE MORE DAYS

4      OF TRIAL TESTIMONY.

5               MS. MAROULIS:  THANK YOU.

6               THE COURT:  OKAY.  ANYTHING ELSE THAT WE SHOULD PLAN

7      FOR TODAY?  NO?  ALL RIGHT.  THANK YOU.  WE'LL SEE YOU MONDAY

8      MORNING AT 9:00.

9               (THE EVENING RECESS WAS TAKEN AT 4:49 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15
      _____
16    IRENE RODRIGUEZ, CSR, CRR
      CERTIFICATE NUMBER 8076
17

18
      _____
19    LEE-ANNE SHORTRIDGE, CSR, CRR
      CERTIFICATE NUMBER 9595
20

21         DATED:  APRIL 18, 2014

22

23

24

25