1               UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5

6  APPLE INC., A CALIFORNIA     )  C-12-00630 LHK
    CORPORATION,                 )
                           )  SAN JOSE, CALIFORNIA
7             PLAINTIFF,     )
                           )  APRIL 22, 2014
8         VS.                )
                           )  VOLUME 11
9  SAMSUNG ELECTRONICS CO., LTD.,  )
    A KOREAN BUSINESS ENTITY;    )  PAGES 2620-2873
10  SAMSUNG ELECTRONICS AMERICA,   )
    INC., A NEW YORK CORPORATION;   )
11  SAMSUNG TELECOMMUNICATIONS     )
    AMERICA, LLC, A DELAWARE       )
12  LIMITED LIABILITY COMPANY,     )
                           )
13           DEFENDANTS.     )
    _____ )

14

15

16             TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20            APPEARANCES ON NEXT PAGE

21

22  OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595

23

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
         TRANSCRIPT PRODUCED WITH COMPUTER

```
 1

 2      A P P E A R A N C E S:

 3      FOR PLAINTIFF          MORRISON & FOERSTER
        APPLE:                 BY:   HAROLD J. MCELHINNY
 4                                   RACHEL KREVANS
                               425 MARKET STREET
 5                             SAN FRANCISCO, CALIFORNIA  94105

 6

 7                             WILMER, CUTLER, PICKERING,
                               HALE AND DORR
 8                             BY:   WILLIAM F. LEE
                               60 STATE STREET
 9                             BOSTON, MASSACHUSETTS  02109

10                             BY:   MARK D. SELWYN
                               950 PAGE MILL ROAD
11                             PALO ALTO, CALIFORNIA  94304

12

13      FOR SAMSUNG:           QUINN, EMANUEL, URQUHART & SULLIVAN
                               BY:   JOHN B. QUINN
14                                   WILLIAM PRICE
                               865 S. FIGUEROA STREET, FLOOR 10
15                             LOS ANGELES, CALIFORNIA  90017

16                             BY:   VICTORIA F. MAROULIS
                                     KEVIN B. JOHNSON
17                             555 TWIN DOLPHIN DRIVE
                               SUITE 560
18                             REDWOOD SHORES, CALIFORNIA  94065

19

20

21

22

23

24

25
```

```
 1                        INDEX OF WITNESSES

 2      DEFENDANTS'

 3      KENNETH PARULSKI
              DIRECT EXAM BY MR. JOHNSON (RES.)       P. 2624
 4            CROSS-EXAM BY MR. LEE                    P. 2627

 5      SANJAY RAO
              DIRECT EXAM BY MR. CEDERBERG            P. 2645
 6            CROSS-EXAM BY MR. LEE                    P. 2553

 7      JAMES KEARL
              DIRECT EXAM BY MR. CEDERBERG            P. 2656
 8            CROSS-EXAM BY MR. LEE                    P. 2669
              REDIRECT EXAM BY MR. CEDERBERG          P. 2677
 9

10      PLAINTIFFS'

11      TIM MILLET
              DIRECT EXAM BY MS. TALLON               P. 2687
12            CROSS-EXAM BY MR. JOHNSON               P. 2701

13      ROBERTO GARCIA
              DIRECT EXAM BY MR. SELWYN               P. 2703
14

15      TRACEY MAZUR
              BY DECLARATION                          P. 2716
16

17      JAMES STORER
              DIRECT EXAM BY MR. SELWYN               P. 2718
              CROSS-EXAM BY MR. JOHNSON               P. 2779
18

19      JAMES MACCOUN
              BY VIDEOTAPED DEPOSITION                P. 2785

20      TODD MOWRY
              FURTHER DIRECT EXAM BY MS. KREVANS      P. 2787
21

22      MARK ALEXANDER SNOEREN
              FURTHER DIRECT EXAM BY MS. KREVANS      P. 2812
              FURTHER CROSS-EXAM BY MR. PAK           P. 2850
23

24      ANDREW COCKBURN
              FURTHER REDIRECT EXAM BY MR. MCELHINNY  P. 2859
25
```

2623

INDEX OF EXHIBITS

                                    MARKED        ADMITTED

PLAINTIFF'S

253                                               2732
248                                               2733
254                                               2735
249                                               2736
257                                               2739
294                                               2770
227, 228 & 229                                    2785
102                                               2832


DEFENDANTS'

391A                                              2667


JOINT

22                                                2624
24                                                2675
23                                                2722
40B                                               2771

```
 1    SAN JOSE, CALIFORNIA                    APRIL 22, 2014

 2                     P R O C E E D I N G S

 3         (JURY OUT AT 9:04 A.M.)

 4             THE COURT:  GOOD MORNING AND WELCOME.

 5             MR. JOHNSON:  YOUR HONOR, MAY THE WITNESS GO AHEAD

 6    AND TAKE THE STAND?

 7             THE COURT:  YES, PLEASE.

 8         (JURY IN AT 9:04 A.M.)

 9             THE COURT:  GOOD MORNING.  WELCOME.  PLEASE TAKE A

10    SEAT.

11         IT'S 9:05.  PLEASE GO AHEAD.

12         YOU'RE STILL UNDER OATH, SIR.

13         (DEFENDANTS' WITNESS, KENNETH PARULSKI, WAS PREVIOUSLY

14    SWORN.)

15                  DIRECT EXAMINATION (RESUMED)

16    BY MR. JOHNSON:

17    Q.   MR. PARULSKI, WHEN WE STOPPED YESTERDAY WE WERE TALKING

18    ABOUT THE '449 PATENT, SAMSUNG'S '449 PATENT, AND WE WERE

19    MAKING OUR WAY THROUGH THE CLAIM LIMITATIONS AND WE MADE OUR

20    WAY FROM LIMITATION A DOWN TO I AND WE WERE ON LIMITATION J OF

21    THE '449 PATENT.

22         AT THIS POINT, YOUR HONOR, I WANT TO GO AHEAD AND ADMIT

23    JX 22, WHICH IS THE '449 PATENT.

24             THE COURT:  IT'S ADMITTED.

25         (JOINT EXHIBIT 22 WAS ADMITTED IN EVIDENCE.)
```

DIRECT PARULSKI (RES.)

1           THE COURT:  GO AHEAD, PLEASE.

2           MR. JOHNSON:  THANK YOU.

3    Q.   WITH RESPECT TO LIMITATION J, MR. PARULSKI, CAN YOU

4    EXPLAIN, IS THAT LIMITATION MET IN THE ACCUSED PRODUCTS?

5    A.   YES, IT'S MET IN THE IPHONE 5 AND OTHER PRODUCTS.

6           THE LIMITATION J IS THAT THE DISPLAY LISTS

7    CLASSIFICATIONS, SO THIS IS AN ALBUM HERE, AND WE SEE THE

8    CLASSIFICATIONS, SUCH AS GOLDEN GATE IS ONE OF THE ALBUMS, AND

9    IT ALSO LISTS THE NUMBER OF IMAGES IN EACH CLASSIFICATION.  YOU

10   SEE IN PARENTHESES THE NUMBER 20.  THAT'S THE NUMBER OF PHOTOS

11   AND VIDEOS THAT ARE CLASSIFIED AS GOLDEN GATE.

12   Q.   SO IF WE GO BACK TO YOUR CHECK LIST, CAN WE CHECK OFF

13   LIMITATION J?

14   A.   YES, WE CAN.

15   Q.   AND WE'RE ON THE LAST LIMITATION, CLAIM 27'S LIMITATION.

16           CAN YOU EXPLAIN TO US, WHAT IS CLAIM 27'S LIMITATION AND

17   WHERE IS THAT FOUND IN THE ACCUSED PRODUCTS?

18   A.   YES.  CLAIM 27, OF COURSE, REQUIRES ALL OF THE LIMITATIONS

19   OF CLAIM 25 THAT WE CHECKED OFF YESTERDAY AND A MOMENT AGO, AND

20   THEN ALSO REQUIRES THAT THE USER BE ABLE TO CHANGE THE

21   CLASSIFICATION.

22           AND I'LL SHOW A SHORT VIDEO CLIP NOW -- IF YOU WOULD,

23   PLEASE -- WHERE THE USER WILL GO IN AND ACTUALLY PRESS ON

24   GOLDEN GATE TO OPEN THE ALBUM, THEY'LL SELECT A PARTICULAR

25   VIDEO CLIP AND PRESS "REMOVE FROM ALBUM," AND NOW THEY'VE

1    CHANGED THE CLASSIFICATION SO THAT THAT VIDEO CLIP IS NO LONGER

2    CLASSIFIED UNDER THE GOLDEN GATE ALBUM, AND YOU'LL SEE THE

3    NUMBER, IT'S A LITTLE SMALLER, BUT THE NUMBER IS NOW 19.

4         SO ONE IMAGE HAS BEEN REMOVED FROM THAT ALBUM.  ONE VIDEO

5    HAS BEEN REMOVED FROM THAT ALBUM.

6    Q.   AND THAT'S A CHANGE IN THE CLASSIFICATION?

7    A.   YES, IT IS.

8    Q.   DID YOU REVIEW APPLE'S SOURCE CODE AS PART OF YOUR

9    ANALYSIS IN THIS CASE?

10   A.   YES, I DID.

11   Q.   SO IF WE GO BACK TO YOUR CHECKLIST, CAN WE CHECK THE LAST

12   LIMITATION?

13   A.   YES, WE CAN.

14   Q.   AND, SIR, FINALLY, WHAT'S YOUR FINAL CONCLUSION ABOUT

15   WHETHER ALL OF THE ACCUSED PRODUCTS MEET EACH LIMITATION?

16   A.   I HAVE CONCLUDED THAT ALL FIVE OF THE APPLE PRODUCTS MEET

17   EACH LIMITATION OF CLAIM 27 OF THE '449 PATENT.

18        MR. JOHNSON:  YOUR HONOR, I PASS THE WITNESS.

19        THE COURT:  ALL RIGHT.  TIME IS 9:08.

20   (PAUSE IN PROCEEDINGS.)

21        MR. LEE:  IF WE CAN JUST HAVE A MINUTE TO GET SET UP,

22   YOUR HONOR?

23        THE COURT:  YES, THAT'S FINE.

24   (PAUSE IN PROCEEDINGS.)

25        THE COURT:  OKAY.  READY?

```
 1              MR. LEE:  YES, YOUR HONOR.

 2              THE COURT:  ALL RIGHT.  TIME IS 9:08.

 3         GO AHEAD, PLEASE.

 4                      CROSS-EXAMINATION

 5    BY MR. LEE:

 6    Q.   GOOD MORNING, MR. PARULSKI.

 7    A.   GOOD MORNING.

 8              MR. LEE:  GOOD MORNING, LADIES AND GENTLEMEN.

 9    Q.   MR. PARULSKI, YOU'RE HERE TO TALK ABOUT THE '449 PATENT;

10    CORRECT?

11    A.   YES.

12    Q.   THE '449 PATENT IS NOT THE WORK OF ANY SAMSUNG ENGINEER,

13    IS IT?

14    A.   AS I DISCUSSED, THE '449 PATENT WAS INVENTED BY ENGINEERS

15    AT HITACHI.

16    Q.   SO THE ANSWER IS NO, IT'S NOT THE WORK OF ANY SAMSUNG

17    ENGINEERS; CORRECT?

18    A.   IT IS NOT THE WORK OF ANY SAMSUNG ENGINEERS.

19    Q.   AND, IN FACT, YOU CALLED IT THE SAMSUNG PATENT.  IT WAS

20    THE HITACHI PATENT UNTIL JULY OF 2011; CORRECT?

21    A.   THE PATENT WAS ACQUIRED BY SAMSUNG FROM HITACHI IN THAT

22    TIMEFRAME.

23    Q.   RIGHT.  AND DURING THE TIME PERIOD THAT HITACHI OWNED THE

24    PATENT, DID IT EVER SUGGEST THAT APPLE'S PRODUCTS INFRINGED THE

25    PATENT?
```

1    A.   I'M NOT AWARE OF, OF IT HAVING DONE SO.

2    Q.   RIGHT.  SO DURING THAT ENTIRE -- THE PATENT ISSUED IN WHAT

3    YEAR, SIR?

4    A.   THE PATENT ISSUED ON MAY 1ST, 2001.

5    Q.   RIGHT.  AND THE PRODUCTS THAT YOU'VE NOW ACCUSED OF

6    INFRINGING, THEY CAME TO MARKET BEFORE 2011 WHEN SAMSUNG

7    ACQUIRED THESE PATENTS; CORRECT?

8    A.   THE ORIGINAL IPHONE PRODUCTS CAME TO MARKET BEFORE SAMSUNG

9    ACQUIRED THE PATENT.

10   Q.   AND DURING THAT ENTIRE PERIOD, DID HITACHI EVER SAY,

11   "APPLE, YOU'RE INFRINGING OUR PATENTS"?

12   A.   I HAVE NOT SEEN ANY EVIDENCE OF HITACHI HAVING BROUGHT THE

13   PATENT TO APPLE'S ATTENTION.

14   Q.   HAVE YOU TALKED TO ANY OF THE NAMED INVENTORS ON THE

15   PATENT?

16   A.   SAMSUNG ATTEMPTED TO CONTACT THEM AND WAS NOT ABLE TO.

17   Q.   DR. PARULSKI, HAVE YOU TALKED TO ANY OF THE NAMED

18   INVENTORS ON THE PATENT?

19   A.   SO I WAS TRYING TO CLARIFY.  I HAVE NOT HAD THE

20   OPPORTUNITY TO TALK TO ANY OF THE INVENTORS ON THE PATENT.

21   Q.   NOW, YOU HAVE THE PATENT IN FRONT OF YOU NOW; CORRECT?

22   A.   YES, I DO.

23   Q.   AND IT'S TRUE, IS IT NOT, THAT THE FIRST TIME THAT YOU

24   EVER SAW THIS PATENT WAS WHEN SAMSUNG'S LAWYERS CONTACTED YOU

25   IN 2012 AND SENT A COPY TO YOU?  IS THAT CORRECT?

1      A.   I WAS VERY FAMILIAR WITH THIS PRODUCT IN 1997 --

2      Q.   DR. PARULSKI, I'M ASKING YOU ABOUT THE PATENT.  IS THE

3      FIRST TIME THAT YOU SAW THE PATENT IN 2012 WHEN A LAWYER SENT

4      IT TO YOU?

5      A.   FIRST OF ALL, I DON'T HAVE A PH.D., SO "MISTER" OR "DAN"

6      IS FINE.

7      Q.   FAIR ENOUGH.

8      A.   AND I WAS NOT AWARE OF THE PATENT UNTIL I WAS CONTACTED.

9      Q.   OKAY.  SO LET'S LOOK AT THE PATENT AND LOOK AT WHAT THE

10     ACTUAL PATENT SAYS.  WE'RE GOING TO BRING UP THE '449 PATENT.

11          IT WAS FILED IN APRIL 1997; CORRECT?

12     A.   YES.  IT WAS ORIGINALLY FILED IN JAPAN AND IT WAS FILED IN

13     THE U.S. ON APRIL 17TH, 1997.

14     Q.   ALL RIGHT.  NOW, THE '449 PATENT DESCRIBES A DIGITAL

15     CAMERA, DOES IT NOT?

16     A.   IT DESCRIBES A DIGITAL CAMERA THAT CAPTURES BOTH VIDEOS

17     AND PHOTOS.

18     Q.   AND LET'S BRING UP FIGURE 2 FROM THE PATENT IF WE COULD.

19          NOW, YOU AGREE WITH ME THAT THE WORDS OF THE PATENT ARE

20     IMPORTANT; CORRECT?

21     A.   THE CLAIMS OF THE PATENT ARE PARTICULARLY IMPORTANT.  BUT

22     THE WORDS ARE IMPORTANT AS WELL.

23     Q.   AND YOU UNDERSTAND THAT THE WORDS BEFORE THE CLAIMS ARE

24     ACTUALLY THE WORDS THAT THE INVENTORS PUT IN THEIR APPLICATION

25     TO THE PATENT OFFICE.  YOU KNOW THAT, DON'T YOU?

1    A.   THE WORDS IN THE SPECIFICATION DESCRIBE EMBODIMENTS OF THE

2    INVENTION.

3    Q.   SO THE ANSWER IS YES; CORRECT?

4    A.   UM --

5    Q.   THOSE ARE THE WORDS THAT THE INVENTORS PUT DOWN ON PAPER

6    WHEN THEY SOUGHT A PATENT FROM THE PATENT OFFICE; CORRECT?

7    A.   THE SPECIFICATION DESCRIBES THE EMBODIMENTS OF THE

8    INVENTION, AND THE INVENTOR NEEDS TO REVIEW THOSE WORDS AND

9    AGREE THAT THEY ARE CORRECT IN DESCRIBING THE INVENTION.

10   Q.   AND THE INVENTORS PROVIDE THE FIGURES TO THE PATENT

11   OFFICE; CORRECT?

12   A.   MY EXPERIENCE IS THAT THE FIGURES ARE USUALLY DRAWN BY THE

13   STAFF THAT ARE PART OF THE COMPANY OR THE LAW FIRM, BUT THE

14   INVENTORS ARE INVOLVED IN THE PROCESS.

15   Q.   AND THEY HAVE TO APPROVE THEM?

16   A.   THE INVENTORS NEED TO REVIEW THE PATENT APPLICATION AND

17   SIGN THE APPLICATION BEFORE IT'S FILED.

18   Q.   SO THE ANSWER, AGAIN, IS YES; CORRECT?

19   A.   THE INVENTORS DO NEED TO REVIEW THE PATENT APPLICATION.

20   Q.   OKAY.  NOW, LET'S LOOK AT ONE OF THE FIGURES, FIGURE 2

21   WHICH YOU SHOWED THE LADIES AND GENTLEMEN OF THE JURY.

22        DO YOU RECALL SHOWING THIS TO THE JURY?

23   A.   YES, I DO.

24   Q.   NOW, THE PATENT DESCRIBES THIS FIGURE AS A, QUOTE,

25   "PORTABLE DIGITAL CAMCORDER."

1          CORRECT?

2               AND IF IT WILL HELP YOU, WE'LL BRING UP THE PATENT,

3     COLUMN 3, LINE 3 TO 5.

4     A.   YES, THAT WOULD BE HELPFUL.

5     Q.   OKAY.  AND I'LL BRING UP THE SENTENCE, AND LET'S JUST BE

6     SURE WE'RE ON THE SAME PAGE.  IT SAYS "FIGURE 2 SHOWS AN

7     EXAMPLE OF AN OUTER APPEARANCE OF A PORTABLE DIGITAL CAMCORDER

8     IN WHICH THE SOFTWARE PROGRAM SHOWN IN FIGURE 1 IS EXECUTED."

9               THAT'S WHAT THE PATENT SAYS; CORRECT?

10    A.   YES.  IT ACTUALLY SAYS "COMCORDER," WHICH I THINK IS A

11    MISSPELLING, BUT I THINK THAT'S CORRECT.

12    Q.   AND IF WE GO TO THE NEXT SENTENCE, IT SAYS, "THIS

13    CAMCORDER PROVIDES A CAPABILITY OF RECORDING AND REPRODUCING AN

14    NTSC OR PAL TV SYSTEM SIGNAL."

15              CORRECT?

16    A.   THIS IS PART OF THE SPECIFICATION, THAT'S CORRECT.

17    Q.   AND NTSC OR PAL TV SYSTEM SIGNALS ARE ANALOG SIGNALS;

18    CORRECT?

19    A.   I BELIEVE NTSC AND PAL, WHEN THEY ARE TRANSMITTED, ARE

20    TRANSMITTED AS ANALOG SIGNALS.

21              BUT IT'S POSSIBLE TO ACTUALLY HAVE AN NTSC OR A PAL SIGNAL

22    IN DIGITAL FORM.

23    Q.   IN 1996?

24    A.   YES, IN 1996.

25    Q.   AND DOES THE PATENT SAY THAT?

1    A.   I THINK, AND I DON'T KNOW THAT I'M GOING TO BE ABLE TO

2    LOCATE THE EXACT SECTION, BUT I DO BELIEVE IT TALKS ABOUT

3    HAVING A CHIP THAT HAS AN NTSC OR PAL SIGNAL, AND THEN FOLLOWED

4    BY A D/A CONVERTER, AND THE FACT THAT IT'S FOLLOWED BY A D/A

5    CONVERTER WOULD SUGGEST THAT IT'S ACTUALLY IN DIGITAL FORM.  SO

6    IT IS POSSIBLE TO HAVE AN NTSC OR PAL IN DIGITAL FORM.

7    TYPICALLY --

8    Q.   MR. PARULSKI, I KNOW THAT THERE ARE THINGS THAT YOU WANT

9    TO TELL THE JURY IS POSSIBLE.  I'M TRYING TO DETERMINE WHAT THE

10   WORDS SAY.

11        DO THE WORDS EVER SAY, DOES THE PATENT EVER SAY THAT THE

12   NTSC OR PAL TV SYSTEMS SIGNAL ARE DIGITAL?

13   A.   IT DOESN'T SAY THAT THEY ARE ANALOG --

14   Q.   OKAY.

15   A.   -- OR DIGITAL.

16   Q.   NOW, YOU USED THE WORD "ALBUM" WITH THE LADIES AND

17   GENTLEMEN OF THE JURY DURING YOUR DIRECT TESTIMONY; CORRECT?

18   A.   YES, I DID.

19   Q.   DOES THE WORD "ALBUM" EVER APPEAR IN THE PATENT ONE TIME?

20   A.   THE PATENT USES THE WORD "FOLDER" IN ONE OF THE FIGURES,

21   AND IT DISCUSSES "CLASSIFICATION."

22        BUT IT NEVER USES THE WORD "ALBUM."

23   Q.   SO THE ANSWER IS NO, IT DOESN'T USE THE WORD "ALBUM";

24   CORRECT?

25   A.   THE PATENT DOES NOT USE THE WORD "ALBUM."

1    Q.   NEVER MENTIONS A TOUCHSCREEN; CORRECT?

2    A.   THE PATENT DESCRIBES A DISPLAY AND IT DESCRIBES SOME, SOME

3    USER BUTTONS.  BUT THE DISPLAY IS NOT A TOUCHSCREEN.

4    Q.   NEVER MENTIONS A SMARTPHONE; CORRECT?

5    A.   THE PATENT DESCRIBES A DEVICE THAT RECORDS PHOTOS AND

6    VIDEOS AND PHOTOS WITH SOUND, BUT IT DOES NOT DESCRIBE

7    TELEPHONE FUNCTIONALITY.  IT DOES NOT DESCRIBE A SMARTPHONE.

8    Q.   SO THE ANSWER IS IT DOES NOT; CORRECT?

9    A.   IT DOES NOT DESCRIBE A SMARTPHONE.

10   Q.   AND IT DOES NOT DESCRIBE A TABLET COMPUTER; CORRECT?

11   A.   IT DOES NOT DESCRIBE A TABLET COMPUTER.

12   Q.   ALL RIGHT.  NOW, LET'S LOOK AT THE '449 PATENT CLAIM IF WE

13   COULD, AND I'M GOING TO PUT ON THE SCREEN CLAIMS 25 AND 27.

14        AND I'M GOING TO HIGHLIGHT THE PORTION -- NOW, THIS IS THE

15   CLAIM, AND AS YOU TOLD THE JURY JUST A FEW MINUTES AGO, THE

16   CLAIM IS VERY IMPORTANT; CORRECT?

17   A.   YES, I DID SAY THAT.

18   Q.   AND I'M GOING TO HIGHLIGHT THE PORTION THAT SAYS "A LIST

19   OF SAID MOVING IMAGE SIGNALS AND STILL IMAGE SIGNALS AS SEARCH

20   MODE."

21        DO YOU REMEMBER TALKING TO MR. JOHNSON ABOUT THOSE?

22   A.   YES, I DO.

23   Q.   AND YOU DESCRIBED TO MR. JOHNSON WHY YOU THOUGHT THAT THAT

24   WAS INFRINGED; CORRECT?

25   A.   I SHOWED THE INFRINGEMENT ANALYSIS OF THAT CLAIM ELEMENT.

1    Q.   ALL RIGHT.  NOW, MR. PARULSKI, THE PATENT TELLS US WHY

2    THEY HAVE THIS REQUIREMENT, DOESN'T IT?

3    A.   I GUESS I'M NOT CERTAIN WHAT YOU'RE ALLUDING TO.

4    Q.   OKAY.  LET ME ASK YOU IF YOU AGREE OR DISAGREE WITH THIS

5    STATEMENT:  BROWSING THROUGH 3,000 JPEG IMAGES TO FIND A

6    PARTICULAR IMAGE STORED IN A DIGITAL CAMERA WAS IMPRACTICAL

7    BECAUSE THE PROCESS OF RETRIEVING, DECOMPRESSING, AND

8    DISPLAYING EACH IMAGE COULD TAKE ABOUT AN HOUR.

9         DO YOU AGREE OR DISAGREE?

10   A.   SO THIS STATEMENT --

11   Q.   DR. PARULSKI -- MR. PARULSKI, DO YOU AGREE OR DISAGREE?

12   A.   THIS IS ONE OF THE LINES, I BELIEVE, OF THE PATENT

13   SPECIFICATION.

14   Q.   WELL, IT'S EVEN MORE THAN THAT.  IT'S ACTUALLY A LINE FROM

15   YOUR EXPERT REPORT, ISN'T IT?

16   A.   I BELIEVE THAT'S ALSO INCLUDED IN MY EXPERT REPORT, YES.

17   Q.   IT'S INCLUDED MULTIPLE TIMES, IS IT NOT?

18   A.   I'M NOT CERTAIN OF HOW MANY TIMES, BUT I COULD BELIEVE

19   THAT IT'S INCLUDED MULTIPLE TIMES.

20   Q.   SO LET'S LOOK AT WHERE IT SAYS IT IN THE PATENT.

21        COULD I HAVE COLUMN 1, LINE 36 TO 42.

22        AND DO YOU SEE THE SENTENCE THAT SAYS, "IN ORDER TO

23   RETRIEVE" -- LET ME GET THE RIGHT SENTENCE -- "IT MEANS THAT

24   THE EXPANSION OF 3000 IMAGES NEEDS ABOUT ONE HOUR.  THIS METHOD

25   LACKS IN" PRACTICALITY, "PRACTICABILITY."

1          DO YOU SEE THAT?

2     A.    YES.  I BELIEVE RIGHT ABOVE IT, IT'S TALKING ABOUT THE

3     PROCESS OF LOOKING AT ONE IMAGE AT A TIME AND ADVANCING THROUGH

4     EACH IMAGE, AND I THINK IT'S EXPLAINED THAT IF IT TOOK ONE

5     SECOND TO ADVANCE ONE AT A TIME THROUGH EACH IMAGE AND YOU HAD

6     3,000 STILL IMAGES, THEN WHEN YOU DO THE MATH, IT WOULD TAKE

7     ABOUT AN HOUR JUST TO GO THROUGH EVERY IMAGE THAT WAS RECORDED.

8     Q.    THE PATENT SAYS WHAT I JUST READ; CORRECT?

9     A.    YOU READ ONE LINE AND I WAS TRYING TO EXPLAIN JUST THE

10    LINE ABOVE IT.

11    Q.    ALL RIGHT.  TELL ME IF YOU AGREE OR DISAGREE WITH THIS

12    STATEMENT:  RATHER THAN BROWSE THROUGH THE ENTIRE COLLECTION OF

13    IMAGES TO FIND A PARTICULAR IMAGE, A USER CAN ORGANIZE AND

14    RETRIEVE IMAGES FROM ALBUMS OR CLASSIFICATION.

15          AGREE OR DISAGREE?

16    A.    YES, I AGREE WITH THAT STATEMENT.

17    Q.    RIGHT.  AND, IN FACT, THAT'S EXACTLY THE STATEMENT THAT

18    YOU MADE IN YOUR REBUTTAL REPORT, "RATHER THAN BROWSE THROUGH

19    AN ENTIRE SELECTION OF IMAGES"; CORRECT?

20    A.    I DON'T HAVE THE WORDS IN FRONT OF ME, BUT I WOULD BELIEVE

21    THAT THAT'S CORRECT.

22    Q.    SO NOW LET'S LOOK AT CAMERA ROLL.

23          COULD WE HAVE UP APPLE'S OPENING SLIDE 57 ON THE SCREEN.

24          DO YOU SEE ON THE LEFT CAMERA ROLL?  I'M ONLY GOING TO

25    ADDRESS THE LEFT.  YOU TOLD US THE SEARCH FUNCTION IN THE APPLE

1    PRODUCTS SEARCHES TEXT, IT DOESN'T SEARCH PHOTOS; CORRECT?

2    A.   WHAT I BELIEVE I SAID WAS THAT WHAT YOU HAD ON THE RIGHT

3    SIDE WAS WHAT I WOULD CALL A WORD SEARCH, AND THAT WAS USED --

4    THAT'S USED, FOR EXAMPLE, TO LOOK FOR A DOCUMENT THAT CONTAINS

5    A WORD, AND THAT I THINK WE AGREE THAT THE APPLE IPHONE DOESN'T

6    USE THAT TO LOCATE A PARTICULAR IMAGE.

7    Q.   SO THE ANSWER TO MY QUESTION IS THAT SEARCH FUNCTION DOES

8    NOT SEARCH PHOTOS; CORRECT?

9    A.   I -- AS FAR AS I KNOW, IT DOES NOT.  I DON'T KNOW WHETHER

10   THERE'S ANY POSSIBILITY OF SEARCHING USING THAT FUNCTION, FOR

11   EXAMPLE, TO FIND IMAGE NAMES.

12   Q.   ALL RIGHT.

13   A.   SO I -- I'M NOT AWARE OF IT, BUT I DON'T WANT TO

14   ABSOLUTELY SAY THAT IT CAN'T FIND IMAGES.

15   Q.   BUT YOU KNOW THIS IS THE TRIAL AND YOU HAVE TO GIVE US

16   YOUR BEST JUDGMENT.  YOU CAN'T SAY THAT; CORRECT?

17   A.   MY INFRINGEMENT ANALYSIS DID NOT INVOLVE THAT TEXT SEARCH.

18   IT INVOLVED THE CAMERA ROLL THAT YOU SEE HERE.

19   Q.   NOW, LET'S TALK -- LET'S MAKE SURE THE LADIES AND

20   GENTLEMEN OF THE JURY UNDERSTAND HOW CAMERA ROLL WORKS.

21        CAMERA ROLL, WHEN YOU BRING UP CAMERA ROLL, ACTUALLY

22   DISPLAYS EVERY IMAGE, EVERY SINGLE IMAGE THAT HAS BEEN TAKEN

23   WITH THE CAMERA ON THE APPLE DEVICE; CORRECT?

24   A.   THE CAMERA ROLL --

25   Q.   IS THAT TRUE OR NOT, DR. -- MR. PARULSKI?  DOES IT BRING

1    UP EVERY SINGLE IMAGE THAT HAS BEEN TAKEN WITH THE CAMERA ON

2    THAT DEVICE?  JUST YES OR NO?

3    A.   I -- IF I CAN PLEASE JUST CLARIFY THAT IT, IT SHOWS THE

4    IMAGES CAPTURED WITH THAT DEVICE.

5        BUT THERE'S, FOR EXAMPLE, A PHOTO LIBRARY ALBUM THAT IF

6    YOU CAPTURED AN IMAGE ON A DIFFERENT PHONE AND SYNCHRONIZED IT

7    TO THAT DEVICE, THAT WOULD NOT BE PART OF THE CAMERA ROLL.

8    THAT WOULD BE IN A SEPARATE ALBUM.

9    Q.   I ASKED YOU ABOUT CAMERA ROLL BECAUSE THAT IS THE FOCUS OF

10   YOUR INFRINGEMENT ANALYSIS.  WHEN YOU BRING UP CAMERA ROLL, YOU

11   BRING UP EVERY -- THE ENTIRE COLLECTION OF IMAGES THAT HAVE

12   BEEN TAKEN WITH THAT PICTURE; CORRECT?  WITH THAT CAMERA;

13   CORRECT?

14   A.   SO EVERY VIDEO OR PHOTO THAT YOU'VE TAKEN WITH THAT ACTUAL

15   CAMERA, THAT ACTUAL IPHONE, DIGITAL CAMERA, WILL BE IN THE

16   CAMERA ROLL.

17   Q.   OKAY.  AND LET'S COMPARE THAT TO WHAT YOU SAY THE

18   INVENTION COVERS AT PARAGRAPH 293 OF YOUR EXPERT REPORT.

19       CAN WE HAVE PAGE 108 TO THE REBUTTAL EXPERT REPORT.

20       AND I'LL BRING IT UP ON THE SCREEN, MR. PARULSKI.

21           MR. JOHNSON:  SORRY, COUNSEL.  IS THIS THE REBUTTAL

22   REPORT?

23           MR. LEE:  YES.  MR. JOHNSON, PAGE 108, PARAGRAPH 293.

24   Q.   AND TO BE CLEAR, YOU'RE TALKING ABOUT THE PROBLEM THAT THE

25   '449 PATENT SOLVES.

1          DO YOU SEE THAT IN YOUR REPORT?

2          "THE '449 PATENT SOLVES THIS AND OTHER PROBLEMS BY

3     ALLOWING IMAGES TO BE ORGANIZED INTO DIFFERENT CLASSIFICATIONS

4     OR ALBUMS WITHIN THE DIGITAL CAMERA.  RATHER THAN BROWSE

5     THROUGH THE ENTIRE COLLECTION OF IMAGES TO FIND A PARTICULAR

6     IMAGE, A USER CAN ORGANIZE AND RETRIEVE IMAGES FROM ALBUMS OR

7     CLASSIFICATIONS."

8          THOSE WERE YOUR WORDS; CORRECT?

9     A.   YES, THAT'S WHAT I WROTE IN MY EXPERT REPORT.

10    Q.   AND YOU STAND BY THEM; CORRECT?

11    A.   YES, I DO.

12    Q.   ALL RIGHT.  NOW, LET'S LOOK AT A DIFFERENT PART OF THE

13    CLAIM.

14         COULD WE HAVE THE CLAIM BACK UP, AND I WANT TO FOCUS YOU

15    ON THE PORTION THAT TALKS ABOUT THE COMPRESSOR.

16         DO YOU RECALL TALKING WITH THE LADIES AND GENTLEMEN OF THE

17    JURY ABOUT THAT PORTION OF THE CLAIM?

18    A.   YES, I DO.

19    Q.   AND THE CLAIM SAYS, "A COMPRESSOR WHICH COMPRESSES SAID

20    DIGITAL SIGNAL OUTPUTTED FROM SAID A/D CONVERTER, AND GENERATES

21    COMPRESSED DATA BY USING A DIFFERENT COMPRESSING METHOD FOR

22    MOVING IMAGE SIGNALS AND FOR STILL IMAGE SIGNALS."

23         DO YOU SEE THAT?

24    A.   YES, I DO.

25    Q.   THE REFERENCE, MR. PARULSKI, IS TO A COMPRESSOR; CORRECT?

1   A.   YES.  I'VE IDENTIFIED A SINGLE APPLE DESIGN CHIP WITH THE

2   CIRCUITRY THAT PERFORMS BOTH COMPRESSING METHODS.

3   Q.   WELL, LET'S BE CLEAR FOR THE JURY.  WHAT YOU CALLED THE

4   COMPRESSOR INVOLVES TWO CHIPS MADE BY TWO DIFFERENT COMPANIES

5   IN TWO DIFFERENT LOCATIONS IN THE PRODUCT; ISN'T THAT TRUE?

6   A.   NO, THAT'S COMPLETELY WRONG.

7   Q.   WELL, LET'S TAKE A LOOK AT YOUR EXHIBIT.

8        COULD I HAVE UP MR. PARULSKI'S -- I THINK THIS HAS TO GO

9   ONLY --

10       THIS IS UNDER SEAL, YOUR HONOR, SO IT'S ONLY FOR YOU AND

11  THE JURY.

12            THE COURT:  THAT'S FINE.

13            MR. LEE:  PDX -- SDX 3729.

14  Q.   NOW, MR. PARULSKI, THIS IS ONE OF THE DEMONSTRATIVES THAT

15  YOU SHOWED THE JURY ON YOUR DIRECT; CORRECT?

16  A.   YES, THAT'S CORRECT.

17  Q.   IT REFERS TO A COMPRESSOR; CORRECT?

18  A.   THE CLAIM LIMITATION ON THE LEFT IS A COMPRESSOR IN RED,

19  AND I'VE IDENTIFIED THE UNIT FROM THE CHIP USED IN THE IPHONE 5

20  IN RED.  I'VE JUST CIRCLED THE UNIT THAT'S IN APPLE'S BLOCK

21  DIAGRAM OF THE APPLE -- OF THE CHIP THAT APPLE HAS DESIGNED.

22  Q.   RIGHT.  NOW LET'S TALK ABOUT WHAT YOU SAID ACTUALLY DO THE

23  COMPRESSING.

24       THE BLUE, TO USE YOURS, IS THE COMPRESSOR FOR STILL IMAGE

25  SIGNALS; CORRECT?

1    A.   NO.  I SAID THE BLUE IMAGE IS THE COMPRESSING METHOD, THE

2    JPEG COMPRESSION IS USED FOR STILL IMAGES.

3    Q.   ALL RIGHT.

4    A.   THAT'S THE EVIDENCE OF WHICH COMPRESSING METHOD IS USED

5    FOR STILL IMAGES.

6    Q.   AND WHO MAKES THAT CHIP?

7    A.   WELL, THE --

8    Q.   MR. PARULSKI, WHO MAKES THAT CHIP AND SELLS IT TO APPLE?

9    A.   COULD YOU CLARIFY WHAT YOU MEAN BY "THAT CHIP"?

10   Q.   THE CHIP THAT YOU HAVE CIRCLED IN BLUE, THE JPEG

11   COMPRESSION CHIP.

12   A.   THAT IS NOT THE CHIP.  THAT IS THE SMALL PORTION -- THIS

13   IS AN APPLE DRAWN BLOCK DIAGRAM.  YOU SEE BEHIND IT IS A LARGE

14   DIAGRAM, 1.2 BLOCK DIAGRAM.  THAT LARGE BLOCK DIAGRAM, THAT IS

15   A SINGLE CHIP.

16        SO WHAT I SHOW IN BLUE AND WHAT I SHOW IN GREEN, ALL OF

17   THIS CIRCUITRY IN THIS UNIT, AND A WHOLE LOT OF OTHER

18   CIRCUITRY, IS ALL ON A SINGLE CHIP.  IT'S ALL ONE INTEGRATED

19   CIRCUIT.

20   Q.   MR. PARULSKI, LET'S SEE WHAT YOU SAID ABOUT WHO MADE THESE

21   CHIPS IN YOUR EXPERT REPORT, SIR.

22        TURN, IF YOU WOULD, TO VOLUME 1, TAB 3.  AND I'M GOING TO

23   NOW TALK ABOUT VIDEO -- THERE'S VIDEO ENCODING AND STILL

24   IMAGING ENCODING; CORRECT?  ARE YOU WITH ME?

25   A.   YOU SAID YOU'RE GOING TO TALK ABOUT IT, AND I'M ASSUMING

1      YOU WILL.

2      Q.   OKAY.  I JUST WANT YOU TO HAVE IT IN MIND.

3           NOW, TURN, IF YOU WOULD, IN YOUR INITIAL REPORT TO

4      PARAGRAPH 174, PAGE 71.

5           OKAY.  NOW, YOU SAY IN YOUR REPORT -- YOU LIST WHO MAKES

6      THE DIFFERENT PARTS; CORRECT?

7      A.   WELL, FIRST OF ALL, WHAT IT SAYS --

8      Q.   MR. PARULSKI, DO YOU LIST WHO MAKES THE DIFFERENT PARTS ON

9      THE CHART THAT YOU SHOWED THE JURY?

10     A.   SO THE CHART THAT'S SHOWN RIGHT NOW THAT YOU'RE LOOKING

11     AT, THIS IS ACTUALLY AN EXCERPT FROM THE APPLE DESIGN DOCUMENT.

12     SO THIS IS -- THIS IS PART OF THAT REALLY DETAILED DESIGN

13     DOCUMENT THAT I REVIEWED DURING MY INFRINGEMENT ANALYSIS.

14          AND WHAT YOU'RE SEEING HERE, THIS LIST, THIS LIST WITH TWO

15     COLUMNS IS ACTUALLY RIGHT FROM THE APPLE DOCUMENT.

16          SO I DID NOT MAKE -- I DID NOT MAKE THIS LIST.  THIS IS

17     ACTUALLY RIGHT OUT OF THE APPLE DOCUMENT.

18     Q.   RIGHT.  AND THE APPLE DOCUMENT SAYS THAT FOR THE VIDEO

19     ENCODER, IT'S MADE BY IMAGINATION; CORRECT?

20     A.    IT DOES NOT SAY IT'S MADE BY IMAGINATION.  WHAT IT SAYS IS

21     THAT THE LARGE CHIP USES WHAT'S CALLED THE I.P. CORE THAT'S THE

22     DESIGN, OR THE BLUEPRINT, AND IMAGINATION SUPPLIES THAT

23     BLUEPRINT.

24          BUT THAT'S -- THAT -- APPLE HAS CHOSEN TO INTEGRATE THAT

25     IMAGINATION VIDEO ENCODER, ALONG WITH A BUNCH OF OTHER

1    CIRCUITRY, ON A SINGLE INTEGRATED CIRCUIT.

2    Q.   GOOD.  THE FACT THAT APPLE HAS CHOSEN TO GET SOMETHING

3    FROM IMAGINATION, A THIRD PARTY, AND PUT IT INTO THEIR CHIP,

4    THAT'S NOT A DEFENSE TO INFRINGEMENT, IS IT?

5    A.   I BELIEVE THAT IF APPLE IS PROVIDING THE INFRINGING

6    PRODUCT, THEN THE INFRINGEMENT IS APPLE.

7    Q.   IT DOESN'T MATTER WHO SUPPLIED THE SOFTWARE, WHO DESIGNED

8    THE SOFTWARE, WHO SUPPLIED THE COMPONENT; CORRECT?

9    A.   IT -- IT -- FOR THE PURPOSES OF MY ANALYSIS, IT DIDN'T

10   MATTER THAT IMAGINATION, FOR EXAMPLE, SUPPLIED THE BLUEPRINT

11   FOR THE CIRCUITRY USED IN THIS CHIP.

12   Q.   ALL RIGHT.  SO THE VIDEO ENCODER WAS -- HAS SOME

13   COMPONENTS SUPPLIED BY IMAGINATION; CORRECT?  IS THAT RIGHT?

14   A.   THE DESIGN OF THE VIDEO ENCODER, THE I.P. CORE, THE

15   BLUEPRINT, IF YOU WILL, FOR THAT PART OF THE CHIP IS SUPPLIED

16   BY IMAGINATION.

17   Q.   RIGHT.  AND THE H.264 COMPRESSION IS SUPPLIED BY A

18   DIFFERENT SUPPLIER.  IT'S SUPPLIED BY SAMSUNG; CORRECT?

19   A.   NO.  I THINK THAT'S WRONG.

20   Q.   WHO DO YOU THINK SUPPLIES IT?

21   A.   IF -- IF -- YOU CAN LOOK AT THE DIAGRAM --

22   Q.   MR. PARULSKI, WHO DO YOU THINK SUPPLIES IT?

23   A.   YOU SAID H.264.  THAT'S LISTED IN THE DIAGRAM YOU'RE NOW

24   DISPLAYING AS IMAGINATION.

25   Q.   ALL RIGHT.  I SEE WHERE THE CONFUSION IS.

1          SO FOR IMAGINATION, WE'RE AT H.264.

2          AND WHO SUPPLIES THE JPEG COMPRESSION?

3     A.   THE JPEG I.P. CORE, THE DESIGN -- THE BLUEPRINT FOR THE

4     JPEG METHOD IS SUPPLIED BY SAMSUNG.

5     Q.   SO WE HAVE TWO DIFFERENT SUPPLIERS SUPPLYING TWO DIFFERENT

6     CHIPS TO PERFORM TWO DIFFERENT PROTOCOLS, AND IT'S YOUR BEST

7     JUDGMENT THAT THEY ARE A SINGLE COMPRESSOR?  THAT'S YOUR

8     TESTIMONY; CORRECT?

9     A.   AGAIN, YOU KEEP SAYING YOU HAVE TWO DIFFERENT CHIPS.  WE

10    SHOWED THE EVIDENCE YESTERDAY, THERE'S A SINGLE CHIP --

11    REMEMBER THE CHIP THAT SAID A6 AND HAD AN APPLE LOGO.  THAT'S

12    ONE INTEGRATED CIRCUIT.  THERE'S NOT A SEPARATE INTEGRATED

13    CIRCUIT THAT CORRESPONDS TO THE BLUE AND THE GREEN BOXES ON THE

14    DRAWING.  THAT'S ONE INTEGRATED CIRCUIT.

15    Q.   WITH COMPONENTS SUPPLIED BY DIFFERENT SUPPLIERS; CORRECT?

16    A.   WHAT THE DIFFERENT --

17    Q.   MR. PARULSKI, IS THAT RIGHT?  WITH COMPONENTS SUPPLIED BY

18    DIFFERENT SUPPLIERS?

19    A.   IF I CAN PLEASE CLARIFY WHAT YOU -- WHAT A COMPONENT IS.

20    Q.   WELL, LET'S USE YOURS.

21         CAN I HAVE PDX 3729 BACK UP ON THE SCREEN.

22         FOR WHATEVER YOU'VE CIRCLED IN RED, THERE ARE COMPONENTS

23    SUPPLIED BY SAMSUNG, THERE ARE COMPONENTS SUPPLIED BY

24    IMAGINATION; CORRECT?

25    A.   AGAIN, TO CLARIFY --

1    Q.   CAN YOU ANSWER -- JUST TELL ME IF YOU CAN ANSWER THAT

2    QUESTION YES OR NO?

3    A.   IT DEPENDS ON WHAT YOU MEAN BY THE WORD "COMPONENT."

4    Q.   OKAY.  THAT'S FAIR ENOUGH.  AND THAT WOULD APPLY TO YOUR

5    ANALYSIS OF WHETHER THERE'S A SINGLE COMPRESSOR IN A CHIP WITH

6    PARTS SUPPLIED BY TWO DIFFERENT SUPPLIERS AT TWO DIFFERENT

7    POINTS IN TIME; CORRECT?

8    A.   THERE'S -- THERE IS A SINGLE CHIP WITH LOTS OF CIRCUITRY.

9    I'VE IDENTIFIED IN APPLE'S DOCUMENTATION A PORTION OF THE

10   CIRCUITRY OF THAT SINGLE CHIP.  WITHIN -- WITHIN THE PORTION OF

11   THAT CIRCUITRY, THERE'S A DESIGN FOR A JPEG CODING THAT'S

12   SUPPLIED BY SAMSUNG AND THERE'S A DESIGN FOR AN H.264 ENCODER

13   THAT'S SUPPLIED BY IMAGINATION.

14   Q.   AND YOU KNOW IMAGINATION AND SAMSUNG ARE TWO DIFFERENT

15   COMPANIES; CORRECT?

16   A.   YES.

17            MR. LEE:  NOTHING FURTHER, YOUR HONOR.

18            THE COURT:  ALL RIGHT.  THE TIME IS 9:32.

19            MR. JOHNSON:  NO QUESTIONS, YOUR HONOR.

20            THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

21   AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

22            MR. JOHNSON:  NOT SUBJECT TO RECALL.

23            THE COURT:  DO YOU AGREE WITH THAT, MR. LEE?

24            MR. LEE:  I AGREE, YOUR HONOR.

25            THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED.

```
 1              (PAUSE IN PROCEEDINGS.)

 2                   THE COURT:  ARE YOU READY?

 3                   MR. CEDERBERG:  YES, I AM.

 4                   THE COURT:  ALL RIGHT.  WOULD YOU PLEASE CALL YOUR

 5     NEXT WITNESS?

 6                   MR. CEDERBERG:  YES.  SAMSUNG CALLS DR. SANJAY RAO.

 7              AND I'D LIKE TO INTRODUCE MYSELF TO THE COURT.  MY NAME IS

 8     JON CEDERBERG FOR SAMSUNG.

 9              FOR THE JURY, I'M JON CEDERBERG FOR SAMSUNG.

10                   THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

11              (DEFENDANTS' WITNESS, SANJAY RAO, WAS SWORN.)

12                   THE WITNESS:  YES, I DO.

13                   THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

14              PULL THE MICROPHONE TOWARDS YOU, AND WOULD YOU STATE YOUR

15     NAME, PLEASE, AND SPELL IT?

16                   THE WITNESS:  DR. SANJAY AUMAR RAO.  THAT'S SPELLED

17     S-A-N-J-A-Y, MIDDLE CAME IS A-U-M-A-R, LAST NAME IS R-A-O.

18                        DIRECT EXAMINATION

19     BY MR. CEDERBERG:

20     Q.   CAN YOU PULL THE MICROPHONE A LITTLE CLOSER TO YOU?

21     A.   ALL RIGHT.

22                   THE COURT:  TIME IS 9:35.

23              GO AHEAD, PLEASE.

24     BY MR. CEDERBERG:

25     Q.   DR. RAO, COULD YOU TELL US WHAT YOU DO FOR A LIVING?
```

1       A.   I'M A MARKETING CONSULTANT.

2       Q.   WHERE DO YOU WORK?

3       A.   CHARLES RIVER ASSOCIATES.

4       Q.   AT WHAT LOCATION OF CHARLES RIVER?

5       A.   WASHINGTON, D.C.

6       Q.   CAN YOU TELL THE JURY WHAT CHARLES RIVER DOES?

7       A.   IT'S A GLOBAL MANAGEMENT CONSULTING COMPANY, SPECIALIZING

8       IN ECONOMICS, FINANCE, AND MANAGEMENT CONSULTING.

9       Q.   AND WHAT'S YOUR POSITION AT CHARLES RIVER?

10      A.   I'M A VICE-PRESIDENT IN THE LIFE SCIENCES PRACTICE.  I

11      OVERSEE MARKETING RESEARCH, CONSUMER SURVEYS, AND SIMILAR KINDS

12      OF THINGS.

13      Q.   WERE YOU RETAINED BY SAMSUNG AS AN EXPERT IN THIS CASE?

14      A.   YES, I WAS.

15      Q.   BEFORE WE GET INTO YOUR EXPERT TESTIMONY, CAN YOU TELL THE

16      JURY BRIEFLY YOUR EDUCATIONAL BACKGROUND?

17      A.   SURE.  I HAVE A PH.D. IN MARKETING WITH A MINOR IN

18      STATISTICS AND ECONOMETRICS FROM THE WHARTON SCHOOL AT THE

19      UNIVERSITY OF PENNSYLVANIA.

20           I ALSO HAVE A BACHELOR'S DEGREE IN AERONAUTICAL

21      ENGINEERING FROM THE INDIAN INSTITUTE OF TECHNOLOGY.

22      Q.   CAN YOU GIVE THE JURY A QUICK SUMMARY OF YOUR EMPLOYMENT

23      BACKGROUND?

24      A.   SURE.  I HAVE 27 YEARS OF EXPERIENCE DESIGNING, MANAGING,

25      EXECUTING, AND BUILDING STRATEGIES AND SURVEYS.  I'VE DONE THAT

```
 1        FOR A NUMBER OF COMPANIES, A NUMBER OF INDUSTRIES.

 2    Q.   MAY SDX 3901 BE DISPLAYED.

 3        DR. RAO, WHAT WAS YOUR ASSIGNMENT IN THIS CASE?  WHAT DID

 4    WE ASK YOU TO DO?

 5    A.   WELL, I WAS ASKED TO CONDUCT AN INDEPENDENT EVALUATION TO

 6    DETERMINE THE RELATIVE VALUE TO THE USER THAT CERTAIN APPLE

 7    PRODUCTS BASED ON PARTICULAR FEATURES.

 8        I ALSO LOOKED AT USAGE RATES OF THOSE FEATURES.

 9    Q.   AND TO PERFORM THIS TASK, DID YOU HAVE TO DO A SURVEY?

10    A.   YES.

11    Q.   OKAY.  AND WHO DID YOU UNDERSTAND WANTED TO USE THE

12    RESULTS OF YOUR SURVEY?

13    A.   A DAMAGES EXPERT BY THE NAME OF DR. JAMES KEARL WHO

14    SPECIALIZES IN DAMAGES.

15    Q.   NOW, ON YOUR ASSIGNMENT HERE, YOU SAY YOU WERE ASSIGNED TO

16    DO THE RELATIVE VALUE THAT USERS OF CERTAIN APPLE PRODUCTS

17    PLACE ON FEATURES.  CAN YOU TELL THE JURY WHAT YOU MEAN BY

18    "RELATIVE VALUE"?

19    A.   SURE.  SO IF YOU ARE A USER OF A PARTICULAR DEVICE AND

20    THERE ARE FEATURES ON THOSE DEVICES, YOU DERIVE BENEFITS FROM

21    THE USE OF THOSE FEATURES, OR YOU EXPECT TO DERIVE CERTAIN

22    BENEFITS FROM THE USE OF THOSE FEATURES.  SO THAT'S VALUE TO

23    ME.

24        WHAT I'M INTERESTED IN, HOWEVER, IS HOW THAT VALUE

25    MEASURES UP AGAINST THE VALUE OF OTHER FEATURES ON THE SAME
```

```
 1    DEVICE.  SO IF YOU'VE GOT 15 FEATURES AT PLAY, WHAT'S THE VALUE

 2    DERIVED FROM A FEATURE COMPARED TO THE VALUE DERIVED FROM ANY

 3    OTHER FEATURE?  THAT'S RELATIVE VALUE TO ME.

 4    Q.   DR. RAO, WHEN YOU USE THE TERMS "FEATURES" AND "DEVICES,"

 5    WHAT PARTICULAR TYPES OF FEATURES AND DEVICES ARE YOU TALKING

 6    ABOUT THAT YOU LOOKED AT IN YOUR SURVEY?

 7    A.   THERE WERE SEVERAL, 14 FEATURES THAT WERE GIVEN TO ME BY

 8    DR. KEARL --

 9          MR. LEE:  YOUR HONOR, BEFORE WE GO INTO THIS, I DON'T

10    THINK HE'S BEEN QUALIFIED OR OFFERED AS AN EXPERT.  WE HAVE NO

11    OBJECTION, BUT JUST GOING THROUGH THE PROTOCOL, I THINK HE

12    SHOULD BE OFFERED.

13          MR. CEDERBERG:  YOUR HONOR, THEN I'LL TENDER DR. RAO

14    AS AN EXPERT.

15          MR. LEE:  NO OBJECTION.

16          THE COURT:  IN THE FIELD OF MARKETING, OR WHAT

17    PARTICULAR FIELD?

18          MR. CEDERBERG:  MARKETING AND SURVEYING.

19          THE COURT:  ALL RIGHT.  SO CERTIFIED.

20      GO AHEAD, PLEASE.

21    BY MR. CEDERBERG:

22    Q.   IF YOU CAN FINISH YOUR ANSWER, WHAT FEATURES AND DEVICES

23    WERE YOU TALKING ABOUT?

24    A.   THERE WERE A SET OF 14 FEATURES THAT WERE GIVEN TO ME BY

25    DR. KEARL, AND THE TASK WAS OBVIOUSLY TO DETERMINE THE RELATIVE
```

```
1    VALUE.

2    Q.   AND HOW DID YOU GO ABOUT DOING THAT?

3    A.   I USED THE SURVEY BASED METHODOLOGY CALLED THE METHOD OF

4    MAXIMUM DIFFERENCE, OR MAX DIFF.  M-A-X, D-I-F-F.

5    Q.   CAN YOU TELL THE JURY WHAT MAX DIFFERENT CHIPS IS?

6    A.   SURE.  MAX DIFF IS A MEASUREMENT AND SCALING SYSTEM

7    DEVISED BY MARKETING SCIENTISTS TO ASSESS THE RELATIVE VALUE

8    PLACED ON A SET OF FEATURES WITHIN A GIVEN SET.

9         SO IF YOU USE MAX DIFF IN SURVEY DATA, YOU WILL BE ABLE TO

10   UNDERSTAND THE RELATIVITY AMONG THE FEATURES THAT YOU'RE

11   LOOKING AT, WHETHER FEATURE A IS THREE TIMES MORE VALUABLE THAN

12   FEATURE B, OR FEATURE B IS SIX TIMES MORE VALUABLE THAN FEATURE

13   C.

14   Q.   CAN WE PUT UP SDX 3903, PLEASE.

15        CAN YOU TELL THE JURY WHAT THIS IS?

16   A.   THESE ARE THE FOUR FEATURES THAT I UNDERSTAND ARE IN TRIAL

17   RIGHT NOW.

18   Q.   AND THEY WERE FOUR OF THE 14 IN YOUR SURVEY?

19   A.   THAT'S CORRECT.

20   Q.   AND CAN YOU TELL THE JURY WHO YOU DID THIS SURVEY, WHO

21   PARTICIPATED?

22   A.   THERE WERE THREE TYPES OF USERS THAT I SURVEYED:  THE

23   USERS OF THE IPHONE 4, 4S, AND 5; THE USERS OF THE IPAD 2 AND 3

24   MINI; AND THE USERS OF THE IPOD TOUCH, FOURTH AND FIFTH

25   GENERATION.
```

1     Q.   OKAY.  HOW WAS THAT DATA COLLECTED FROM THOSE USERS?

2     A.   WE USED AN ONLINE SURVEY METHODOLOGY WHERE SURVEYS WENT

3     OUT OVER THE INTERNET.  WE FOLLOWED ALL MODERN PRINCIPALS OF

4     COLLECTING DATA IN ONLINE SURVEYS.

5     Q.   CAN SDX 3905 BE PLACED UP, PLEASE.

6          CAN YOU TELL THE JURY WHAT THEY'RE SEEING HERE?

7     A.   WELL, THAT'S A SAMPLE SCREEN SEEN BY AN IPHONE USER AS

8     PART OF OUR SURVEY.  THE GRID AT THE BOTTOM OF THE CHART

9     PRESENTS FOUR OF THE 14 FEATURES.  THESE FOUR FEATURES ARE

10    DRAWN RANDOMLY FROM THAT SET OF 14, AND WHAT OUR RESPONDENT IS

11    SUPPOSED TO DO IS PICK THE ONE OF THE FOUR FEATURES THAT HE OR

12    SHE BELIEVES OFFERS HIM OR HER THE MOST VALUE, AND ONE OF THE

13    FOUR FEATURES THAT HE OR SHE BELIEVES OFFERS HIM OR HER THE

14    LEAST VALUE, AND THAT'S ABOUT IT.  IT'S PRETTY STRAIGHTFORWARD

15    TASK.

16    Q.   SO THEY FILL IN ONE OF THE DOTS ON THE LEFT-HAND SIDE AND

17    ONE OF THE DOTS ON THE RIGHT-HAND SIDE?

18    A.   THAT'S CORRECT.

19    Q.   HOW MANY SLIDES ARE THEY SHOWN OF THIS?

20    A.   THEY'RE SHOWN A TOTAL OF 13 SCREENS, AND BECAUSE YOU'VE

21    GOT HUNDREDS OF RESPONDENTS, 13 TIMES HUNDREDS OF RESPONDENTS

22    GIVES YOU THOUSANDS OF DATA BITES.

23    Q.   AND WITH REGARD TO THE SURVEY, HOW MANY PEOPLE

24    PARTICIPATED IN YOUR SURVEY?

25    A.   WE HAD A LITTLE UNDER 1500 PEOPLE IN TOTAL PARTICIPATE:

1    626 IPHONE 4, 4S, 5 USERS; 594 IPAD 2, 3, AND MINI USERS; AND

2    264 IPOD TOUCH FOURTH AND FIFTH GENERATION USERS.

3    Q.   CAN SDX 3906 BE PLACED UP ON THE SCREEN, PLEASE.

4         WHAT IS THIS DESIGNED TO SHOW, DR. RAO?

5    A.   SURE.  IF YOU SAW THAT GRID OF FOUR FEATURES FROM WHICH A

6    RESPONDENT PICKED THE MOST AND LEAST VALUABLE FEATURE, THOSE

7    CHOICES PROVIDED BY A SINGLE RESPONDENT GIVES US FIVE DATA

8    POINTS.

9         SO, FOR EXAMPLE, IF YOU HAD FOUR FEATURES, A, B, C, AND D,

10   AND A USER PICKED A AS BEING THE MOST VALUABLE AND D AS BEING

11   LEAST VALUABLE, JUST THOSE TWO CHOICES TELLS YOU THAT A IS MORE

12   VALUABLE THAN B; A IS MORE VALUABLE THAN D; A IS MORE VALUABLE

13   THAN C; AND THAT B IS MORE VALUABLE THAN D; AND C IS MORE

14   VALUABLE THAN D.

15        SO TWO CHOICES, FIVE DATA POINTS.  AND IF YOU DO THIS OVER

16   HUNDREDS OF RESPONDENTS, YOU GET PLENTY OF GOOD DATA TO DO YOUR

17   STUDY.

18   Q.   CAN WE PUT UP SDX 3910, PLEASE.

19        WHAT IS THIS?

20   A.   SO THESE ARE THE RELATIVE VALUE SCORES THAT ARE GENERATED

21   AS A RESULT OF OUR ANALYSIS AND MODELING.

22        IF YOU LOOK AT THE RIGHT COLUMN, THOSE ARE THE ACTUAL

23   SCORES.  YOU CAN, FOR EXAMPLE, PICK THE SCORE ON THE SECOND ROW

24   AND SAY THAT SCORE OF 224 IS TWICE AS MORE VALUABLE AS ANOTHER

25   SCORE, LET'S SAY FEATURE NUMBER 6, WHICH IS ABOUT 109.

1           SO JUST BY LOOKING AT THESE SCORES, WE CAN ASSESS THE

2     RELATIVITY AMONG THE FEATURES THAT ARE AT PLAY HERE.

3           SO THIS COMES OUT OF THE SOFTWARE PROGRAM THAT WE'VE USED

4     TO ANALYZE THE DATA.

5     Q.   AND DR. RAO, THE NUMBERS ON THE RIGHT, HOW ARE THOSE

6     GENERATED?

7     A.   THEY ARE GENERATED USING A SOFTWARE PROGRAM DESIGNED

8     SPECIFICALLY FOR MAX DIFF, OR THE TYPE OF APPLICATION THAT

9     WE'VE USED HERE.

10          WHAT THE MODEL DOES, WHAT THE SOFTWARE PROGRAM DOES IS

11    TAKE ALL THE DATA THAT YOU HAVE AND BUILDS A MODEL AND FITS THE

12    MODEL TO THE DATA, AND AS A RESULT OF THAT, IT IS ABLE TO

13    PREDICT THE RELATIVE VALUE OF EACH OF THE 14 FEATURES IN TERMS

14    OF THE NUMBERS THAT YOU SEE ON THE RIGHT SIDE.

15          AND USING THOSE NUMBERS, YOU CAN CLEARLY SEE HOW

16    RELATIVELY MORE VALUABLE ONE FEATURE IS FROM ANOTHER FEATURE.

17    Q.   I BELIEVE YOU TESTIFIED YOU WERE NOT ONLY COLLECTING DATA

18    ON RELATIVE VALUE, BUT ALSO USAGE DATA.

19    A.   THAT'S CORRECT.

20    Q.   HOW DID YOU GO ABOUT DOING THAT?

21    A.   SO WE USED A PRETTY STANDARD METHODOLOGY THAT ALL SURVEYS

22    USE, WHICH IS ASK A SIMPLE QUESTION, CLEARLY FRAMED, THAT SAYS,

23    "DID YOU USE A FEATURE, YES OR NO."

24          IF THE ANSWER IS YES, YOU MAKE SURE THAT THAT PERSON IS

25    COUNTED AS A USER OF THE FEATURE.

```
1              AND THAT'S IT.

2    Q.   OKAY.  WHEN YOU GOT THE DATA ON THE FOUR FEATURES AND YOU

3    GOT THE DATA ON THE USAGE, WHAT DID YOU DO WITH THAT DATA?

4    A.   WELL, I HANDED THAT DATA ON USAGE, AS WELL AS RELATIVE

5    VALUES, FOR DR. JAMES KEARL, WHO I BELIEVE IS A DAMAGES EXPERT

6    AND WHO DEVELOPED THE DAMAGES MODEL FROM THAT.

7              MR. CEDERBERG:  MAY I HAVE A MOMENT, YOUR HONOR?

8              THE COURT:  YES.

9         (PAUSE IN PROCEEDINGS.)

10             MR. CEDERBERG:  NOTHING ELSE.

11             THE COURT:  ALL RIGHT.  TIME IS NOW 9:45.

12        (PAUSE IN PROCEEDINGS.)

13             THE COURT:  9:46.  GO AHEAD, PLEASE.

14                      CROSS-EXAMINATION

15   BY MR. LEE:

16   Q.   GOOD MORNING, DR. RAO.

17   A.   GOOD MORNING.

18   Q.   YOU WORK AT CHARLES RIVER ASSOCIATES, A CONSULTING FIRM;

19   IS THAT CORRECT?

20   A.   THAT'S CORRECT.

21   Q.   DR. RAO WORKS AT THE SAME FIRM?

22   A.   WELL, I'M DR. RAO.

23   Q.   DR. KEARL, I'M SORRY.

24   A.   YES.

25   Q.   YOU TOLD US YOUR EXPERTISE OR FOCUS IS IN LIFE SCIENCES;
```

1       CORRECT?

2       A.   I'M PART OF THE LIFE SCIENCES PRACTICE, YES.  MY

3       EXPERTISE, TECHNICAL EXPERTISE IS MARKETING SURVEYS.

4       Q.   YOU WOULD AGREE THAT YOU'RE NOT AN EXPERT IN THE MARKETING

5       OF SMARTPHONES, TABLETS, OR MP3 PLAYERS; CORRECT?

6       A.   YES, I'M NOT AN EXPERT.

7       Q.   AND YOU'VE NEVER BEEN HIRED, BEFORE YOU WERE HIRED IN THIS

8       CASE, TO WORK ON A PROJECT CONCERNING SMARTPHONES, TABLETS

9       COMPUTERS, OR MP3 PLAYERS; CORRECT?

10      A.   THAT'S CORRECT.

11      Q.   ALL RIGHT.  NOW, LET ME ASK YOU A FEW QUESTIONS ABOUT

12      YOUR -- LET ME ASK YOU THIS FIRST:  YOUR SURVEY ONLY CONCERNED

13      THE FEATURES THAT SAMSUNG ACCUSES APPLE OF INFRINGING IN THE

14      SAMSUNG PATENTS; CORRECT?

15      A.   THAT'S RIGHT.

16      Q.   YOU WEREN'T ASKED TO DO THE SAME SURVEY FOR THE APPLE

17      PATENTS; CORRECT?

18      A.   YES.

19      Q.   NO ONE ASKED YOU TO DO ANY SURVEY FOR THE FIVE FEATURES ON

20      THE APPLE PATENTS; CORRECT?

21      A.   THAT'S CORRECT.

22      Q.   ALL RIGHT.  LET ME ASK YOU A FEW QUESTIONS ABOUT YOUR

23      MIC DIFF SURVEY.  IT'S TRUE, IS IT NOT, DR. RAO, THAT A

24      MIC DIFF SURVEY CANNOT BE USED TO DETERMINE THE DOLLAR VALUE OF

25      ANY FEATURE; CORRECT?

1    A.   IT'S MAX DIFF, AND WHAT MAX DIFF DOES IS JUST LOOK AT THE

2    RELATIVE VALUE.   THERE IS NO MONETIZATION THERE.

3    Q.   SO THE ANSWER, CORRECTING MY, MY -- THE NAME I GAVE IT,

4    MAX DIFF, THE MAX DIFF SURVEY CANNOT BE USED TO DETERMINE THE

5    DOLLAR VALUE OF ANY FEATURE; CORRECT?

6    A.   YES.   WHAT -- WHAT IT DOES IS IT GIVES YOU RELATIVE VALUE,

7    AND THEN SOMEBODY ELSE CAN TAKE THE RELATIVE VALUE AND MONETIZE

8    IT DEPENDING ON WHAT THE VALUE STRUCTURE IS.

9    Q.   AND DO YOU KNOW OF ANY PATENT CASE IN THE UNITED STATES

10   WHERE A MIC DIFF STUDY HAS BEEN USED TO CALCULATE DAMAGES FOR

11   PATENT INFRINGEMENT?   ANY CASE, ANYWHERE?

12   A.   I'M NOT A PATENT EXPERT, SO -- I'M NOT A PATENT EXPERT.   I

13   DON'T KNOW TOO MUCH ABOUT PATENTS.

14        MR. LEE:   ALL RIGHT.   NOTHING FURTHER, YOUR HONOR.

15        THE COURT:   OKAY.   THE TIME IS NOW 9:48.

16   IS THERE ANY REDIRECT?

17        MR. CEDERBERG:   NONE, YOUR HONOR.

18        THE COURT:   ALL RIGHT.   MAY MR. -- DR. RAO BE

19   EXCUSED, AND IS IT SUBJECT TO RECALL OR NO RECALL?

20        MR. CEDERBERG:   EXCUSED, NO RECALL.

21        MR. LEE:   NO RECALL, YOUR HONOR.

22        THE COURT:   ALL RIGHT.   YOU ARE EXCUSED.

23        MR. CEDERBERG:   AND SAMSUNG CALLS AS THEIR NEXT

24   WITNESS DR. JAMES KEARL.

25        AND WITH APPLE'S PERMISSION, WE HAVE A ONE SENTENCE

1    STIPULATION TO READ IN.

2              THE COURT:  OKAY.  GIVE US ONE MINUTE TO GET SET UP,

3    PLEASE.

4         (PAUSE IN PROCEEDINGS.)

5              THE COURT:  OKAY.  THE JURORS ALL HAVE A PHOTO?

6              THE CLERK:  UM-HUM.

7         RAISE YOUR RIGHT HAND, PLEASE.

8         **(DEFENDANTS' WITNESS, JAMES KEARL, WAS SWORN.)**

9              THE WITNESS:  I DO.

10             THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

11        PULL THE MICROPHONE TOWARDS YOU AND STATE YOUR NAME,

12   PLEASE, AND SPELL IT.

13             THE WITNESS:  JAMES RUSSELL KEARL, K-E-A-R-L.

14             THE COURT:  ALL RIGHT.  TIME IS 9:49.

15        GO AHEAD, PLEASE.

16             MR. CEDERBERG:  YES, I'D LIKE TO READ A STATEMENT,

17   STIPULATION FROM THE JOINT AMENDED PRETRIAL STATEMENT AND

18   PROPOSED ORDER.  ON PAGE 6, ITEM 14, SAMSUNG'S LAWSUIT INFORMED

19   APPLE OF ALL OF SAMSUNG'S ASSERTED PATENTS ON APRIL 18TH, 2012.

20             THE COURT:  GO AHEAD, PLEASE.

21                       **DIRECT EXAMINATION**

22   BY MR. CEDERBERG:

23   Q.   DR. KEARL, WHAT DO YOU DO FOR A LIVING?

24   A.   I'M A PROFESSOR OF ECONOMICS AT BRIGHAM YOUNG UNIVERSITY,

25   AND A SENIOR CONSULTANT WITH CHARLES RIVER ASSOCIATES.

1    Q.   CAN WE PUT UP SDX 3920.

2         AND WHAT IS THIS?

3    A.   THIS IS A BRIEF BIO.

4    Q.   OKAY.  I NOTICE ON THE -- ON YOUR BRIEF BIO AT THE BOTTOM,

5    IS THAT YOUR EDUCATIONAL BACKGROUND?

6    A.   YES.  I HAVE A PH.D. IN ECONOMICS FROM M.I.T., AND I DID A

7    POSTDOC IN LAW AND ECONOMICS AT THE HARVARD LAW SCHOOL.

8    Q.   AND THE THIRD BULLET POINT DOWN SAYS AUTHOR.  HAVE YOU

9    WRITTEN ANYTHING?

10   A.   I HAVE PUBLISHED TWO BOOKS IN ECONOMICS AND A NUMBER OF

11   ARTICLES IN THE LEADING ECONOMICS JOURNALS.

12   Q.   AND THE SECOND BULLET POINT FROM THE BOTTOM SAYS EXPERT

13   WITNESS, AND IT SAYS RULE 702, COURT, ORACLE V. GOOGLE

14   LITIGATION.

15        CAN YOU TELL THE JURY WHAT THAT ROLE WAS?

16   A.   I'VE BEEN AN EXPERT WITNESS IN A LOT OF CASES, BOTH FOR

17   PLAINTIFFS AND DEFENDANTS.  BUT A FEW YEARS AGO, I WAS HIRED BY

18   JUDGE WILLIAM ALSUP OF THE NORTHERN DISTRICT OF CALIFORNIA TO

19   BE A COURT EXPERT, TO BE HIS EXPERT.

20        THE -- ORACLE HAD ITS OWN DAMAGES EXPERT, AND GOOGLE HAD

21   ITS DAMAGES EXPERT, AND JUDGE ALSUP WANTED AN INDEPENDENT

22   EXPERT REPRESENTING THE COURT.

23   Q.   OKAY.  HAVE YOU -- AND WHAT IS YOUR AREA OF EXPERTISE?

24   A.   APPLIED MICROECONOMICS AND THE ESTIMATION OF LEGAL

25   DAMAGES.

1           MR. CEDERBERG:  YOUR HONOR, WE TENDER DR. KEARL AS AN

2    EXPERT ON ECONOMICS FOR PURPOSES OF CALCULATING DAMAGES.

3           MR. LEE:  NO OBJECTION, YOUR HONOR.

4           THE COURT:  ALL RIGHT.  HE'S SO CERTIFIED.

5       GO AHEAD, PLEASE.

6    BY MR. CEDERBERG:

7    Q.   OKAY.  WHAT WERE YOU ASKED TO DO IN THIS MATTER?

8    A.   I WAS ASKED TO ESTIMATE THE REASONABLE ROYALTY DAMAGES

9    THAT SHOULD BE PAID TO SAMSUNG FOR APPLE'S INFRINGEMENT OF TWO

10   PATENTS, THE '239 PATENT AND THE '449 PATENT.

11   Q.   WHEN YOU DID THIS ANALYSIS, DID YOU MAKE ANY ASSUMPTIONS?

12   A.   I ASSUMED THAT THE PATENTS WERE BOTH VALID AND BOTH

13   INFRINGED.

14   Q.   OKAY.  LET'S START WITH THE '239 PATENT.

15       CAN YOU PUT UP SDX 3922.

16       OKAY.  AND CAN YOU DESCRIBE TO THE JURY WHAT YOU

17   UNDERSTOOD THE ACCUSED FEATURES TO BE IN THE ACCUSED PRODUCTS?

18   A.   SURE.  YOU'VE HEARD THIS FROM THE TECHNICAL EXPERTS, BUT

19   THE ACCUSED FEATURES ON THE '239 PATENT ARE THE USE OF FACETIME

20   TO TRANSMIT VIDEO CALLS OVER A CELLULAR CONNECTION; AND THEN

21   THERE ARE TWO OTHER, ONE TO TAKE VIDEO AND TRANSMIT IT TO

22   ANOTHER DEVICE VIA E-MAIL; AND THE THIRD ONE IS TO TAKE VIDEO

23   AND TRANSFER IT TO ANOTHER DEVICE VIA TEXT MESSAGE.

24       THE IPHONE 4 IS ACCUSED UNDER THE SECOND AND THIRD.  THE

25   IPHONE 4S AND 5 ARE ACCUSED UNDER THE FIRST -- ALL THREE

1    FEATURES.

2    Q.   AND WHO ORIGINALLY OWNED THE '239 PATENT?

3    A.   IT WAS OWNED ORIGINALLY BY VOCI, WHICH IS --

4    Q.   OKAY.  IS THAT VIDEO OVER CELL?  IS THAT THE NAME OF THE

5    COMPANY?

6    A.   IT IS.

7    Q.   AND HOW DID SAMSUNG ACQUIRE IT?

8    A.   SAMSUNG PURCHASED THE PATENT -- I'M SORRY -- PURCHASED THE

9    PATENT IN SEPTEMBER OF 2010.

10   Q.   AND FOR HOW MUCH?

11   A.   $2.3 MILLION.

12   Q.   NOW LET'S GO TO THE '449 PATENT.

13        CAN SDX 3923 BE PLACED UP.

14        AND WHAT DID YOU UNDERSTAND THE FEATURES AND THE ACCUSED

15   PRODUCTS TO BE THERE?

16   A.   THE ACCUSED FEATURE IN THIS CASE IS THE DISPLAY OF THE

17   NUMBER OF PHOTOS OR VIDEOS IN, NEAR THE TITLE IN THE ALBUM, AND

18   THE ACCUSED PRODUCTS ARE THE IPHONES 4, 4S, AND 5, AND THE IPOD

19   TOUCH, FOURTH AND FIFTH GENERATION.

20   Q.   CAN YOU TELL THE JURY WHAT APPROACH YOU DEVELOPED IN ORDER

21   TO ESTIMATE WHAT THE REAL REASONABLE ROYALTY DAMAGES WOULD BE?

22   A.   SURE.  YOU'VE HEARD THE GEORGIA-PACIFIC FACTORS FROM OTHER

23   WITNESSES.  I APPLIED THE GEORGIA-PACIFIC APPROACH.  THERE ARE

24   15 FACTORS.

25        FACTOR 15 SUGGESTS A HYPOTHETICAL NEGOTIATION BEFORE

1      INFRINGEMENT, AND FACTORS 1 THROUGH 14 THEN FRAME AND INFORM

2      HOW YOU THINK ABOUT THAT HYPOTHETICAL NEGOTIATION.  AND THAT'S

3      THE APPROACH THAT I TOOK.

4      Q.    WITH REGARD TO THE HYPOTHETICAL NEGOTIATION THAT YOU

5      DEVELOPED AS YOUR MODEL, WHO WERE THE PARTICIPANTS IN THAT

6      NEGOTIATION?

7      A.    INFRINGEMENT OCCURS BEFORE THESE PATENTS ARE SOLD, SO IN

8      THE '239 PATENT, THE PARTIES WOULD BE APPLE AND THE OWNER OF

9      THE PATENT AT THE TIME, VOCI; AND FOR THE '449 PATENT, IT WOULD

10     BE APPLE AND THE OWNER OF THE PATENT AT THE TIME, HITACHI.

11     Q.    WHY DID YOU CONCLUDE THAT THE REASONABLE ROYALTY DAMAGES

12     THAT YOU CALCULATED THAT SAMSUNG'S ENTITLED TO?

13     A.    SAMSUNG PURCHASED BOTH OF THOSE PATENTS AND IT OWNED THEM

14     DURING THE RELEVANT DAMAGES PERIOD.

15     Q.    OKAY.  HAVE YOU DEVELOPED AN OPINION BASED UPON YOUR

16     ANALYSIS OF THE REASONABLE ROYALTY DAMAGES RESULTING FROM THE

17     INFRINGEMENT OF THOSE TWO PATENTS?

18     A.    I HAVE.

19     Q.    MAY SDX 3942 BE PLACED IN FRONT OF THE WITNESS.

20          OKAY.  AND WHAT DOES THIS SHOW?

21     A.    I ESTIMATE THAT THE REASONABLE ROYALTY DAMAGES FOR THE

22     '239 PATENT FOR THE THREE FEATURES TOGETHER, THAT IS, PUT

23     TOGETHER, IS $6,067,788; AND THAT THE REASONABLE ROYALTY FOR

24     THE '449 PATENT FOR THE SINGLE FEATURE IS $158,400.

25     Q.    OKAY.  CAN WE PUT UP SDX 3925.

1          IN ARRIVING AT YOUR DAMAGES OPINION, WHAT MATERIALS DID

2     YOU REVIEW AND ANALYZE AND RELY ON?

3     A.   THERE WAS AN ENORMOUS AMOUNT OF INFORMATION FROM APPLE,

4     FROM THIRD PARTY SOURCES, PUBLICLY AVAILABLE INFORMATION.

5          IN THE CATEGORIES THAT I SUGGESTED IN THIS DEMONSTRATIVE,

6     I REVIEWED ALL OF THAT INFORMATION, OR HAD MY STAFF REVIEW IT,

7     AND CONCLUDED FROM THAT THAT PARTICULARLY THE FACETIME USE WAS

8     VERY IMPORTANT TO APPLE, THAT APPLE ADVERTISED IT, IT TALKED

9     ABOUT IT A LOT.

10         THE OTHER TWO FEATURES WERE TALKED ABOUT LESS, BUT WERE

11    TALKED ABOUT BY APPLE.

12         THE '449 FEATURE, THE NUMBER OF THE ALBUMS, WAS NOT REALLY

13    NOTED IN THESE DOCUMENTS, SO IT WAS A USEFUL FEATURE, BUT NOT

14    AS IMPORTANT AS THE FACETIME AND THE FEATURES IN THE '239

15    PATENT.

16    Q.   UNDER ALL THOSE MATERIALS THAT YOU REVIEWED, DID YOU

17    REVIEW APPLE'S -- A VIDEO OF APPLE'S JUNE 7TH, 2010 LAUNCH

18    EVENT OF THE IPHONE 4?

19    A.   I DID.

20    Q.   MAY SDX 3928 BE PLACED ON THE SCREEN.

21         CAN YOU TELL US WHAT THAT IS?

22    A.   SURE.  THIS IS A SCREEN SHOT FROM THAT VIDEO.  AT THIS

23    CONFERENCE, STEVE JOBS ANNOUNCES THE IPHONE 4, AND -- WITH A

24    LOT OF FANFARE, HE ANNOUNCES FACETIME, A FEATURE OF THAT PHONE.

25         HE THEN DEMONSTRATES THE FEATURE BY MAKING A CALL TO

1    TONY IVES USING FACETIME, AND AFTER THAT, HE'S COMMENTING ON

2    SORT OF WHAT THE FEATURE WILL BE, OR WHAT THEY HOPE THE FEATURE

3    BECOMES.

4         SO HE SAYS THAT THE FEATURE IN 2010 WILL BE WI-FI ONLY,

5    BUT THAT APPLE ANTICIPATES OR HOPES THAT IT CAN BECOME FACETIME

6    OVER CELLULAR AS WELL.

7    Q.   DID APPLE EVENTUALLY MAKE FACETIME AVAILABLE OVER

8    CELLULAR?

9    A.   IT DID.  TWO YEARS LATER AT A JUNE CONFERENCE, IT

10   ANNOUNCED IOS 6, AN OPERATING SYSTEM THAT MADE FACETIME OVER

11   CELLULAR POSSIBLE.

12   Q.   CAN WE PUT UP SDX 3930, PLEASE.

13   A.   THIS IS A SCREEN SHOT FROM THAT VIDEO THAT I REVIEWED.

14   AGAIN, IN JUNE OF 2012, SCOTT FORSTALL, WHO WAS THEN THE

15   VICE-PRESIDENT FOR TECHNOLOGY FOR APPLE, INDICATES -- YOU CAN

16   READ THE QUOTE, BUT HE SAYS THAT FACETIME IS A TERRIFIC WAY TO

17   HAVE VIDEO CALLS, BUT IT HAS THIS ONE LIMITATION, IT'S ONLY

18   AVAILABLE OVER WI-FI, AND THAT HE'S HERE TO ANNOUNCE THAT

19   THERE'S A NEW FEATURE -- OTHER FEATURES WERE ANNOUNCED AS

20   WELL -- BUT IT WAS THIS FEATURE IN WHICH IOS 6 WOULD ENABLE

21   FACETIME OVER CELLULAR.

22   Q.   OKAY.  CAN WE PUT UP SLIDE SDX 3938.

23        AND I WANT TO WALK THE JURY THROUGH THE METHODOLOGY YOU

24   USED TO GET THOSE DAMAGE NUMBERS.  CAN YOU JUST GIVE US AN

25   OVERVIEW OF WHAT THAT IS?

1        A.   SURE.  IN ORDER TO DERIVE A REASONABLE ROYALTY, I -- THERE

2    WERE FIVE STEPS.

3            THE FIRST OF THE STEPS IS THAT APPLE, IN THE NEGOTIATION,

4    WOULD BE WILLING TO PAY MORE IF IT SOLD LOTS OF UNITS THAT

5    INCORPORATED THE INFRINGING, AND LESS IF IT SOLD FEWER.  SO I

6    USED THE NUMBER OF INFRINGING UNITS DERIVED FROM APPLE

7    FINANCIAL DOCUMENTS.

8            BUT APPLE, IN THE HYPOTHETICAL NEGOTIATION, WOULDN'T BE

9    WILL TO PAY FOR ALL OF THOSE UNITS IF IT THOUGHT ONLY PART OF

10   THE PEOPLE WHO HAD THE INFRINGING FUNCTIONALITY WOULD BE USING

11   IT, SO I ADJUSTED THAT DOWNWARD BY THE USAGE RATE.

12       Q.   WHERE DID YOU GET THE USAGE RATE?

13       A.   I GOT THE USAGE RATE FROM DR. RAO'S SURVEY.

14       Q.   NOW WE'RE DOWN TO THE THIRD CIRCLE THERE THAT SAYS $.99

15   MAC FACETIME APP.  WHAT'S THAT?

16       A.   I HAVE A QUANTITY, AND NOW I HAVE TO GIVE A DOLLAR VALUE

17   TO THAT QUANTITY.  APPLE ACTUALLY SOLD FACETIME AS AN APP FOR

18   THE MAC FOR $.99, SO I USED THAT MARKET PRICE FOR FACETIME AS A

19   WAY OF MONETIZING THE QUANTITY.

20       Q.   AS A TRAINED ECONOMIST, DID YOU REVIEW THIS EVIDENCE OF

21   DEMAND FOR THAT FACETIME APP AT THE PRICE OF $.99?

22       A.   SURE.  APPLE PUT THIS UP.  MR. JOBS INDICATED THAT, WHEN

23   HE ROLLED OUT THE IPHONE 4, THAT THE NUMBER ONE DEMAND FOR MAC

24   USERS WAS FACETIME ON THE MAC.  WHEN THEY FINALLY MADE IT

25   AVAILABLE, ABOUT 900,000 PAID APPS WERE DOWNLOADED FOR THE MAC.

1          FOR THE FIRST FOUR WEEKS AFTER IT WAS ANNOUNCED, IT WAS

2     THE NUMBER ONE DOWNLOAD, PAID DOWNLOAD, FOR MACS.

3          AND FOR 31 WEEKS IN THE NEXT 18 MONTHS OR SO, IT WAS IN

4     THE TOP 10 OF PAID DOWNLOADS FOR THE MAC.

5     Q.   OKAY.  NOW, USING YOUR METHODOLOGY, YOU'VE BEEN WALKING US

6      THROUGH THE FACETIME PART OF THE PATENT.

7          NOW WE'RE AT THE RELATIVE VALUE.  WHAT DID YOU HAVE TO DO

8     SPECIAL FOR THE FACETIME PORTION?

9     A.   WELL, IT TURNS OUT THAT ON THE IPHONE, YOU CAN MAKE

10     FACETIME CALLS EITHER BY WI-FI OR YOU CAN MAKE THEM BY

11     CELLULAR.

12          WI-FI IS NOT ACCUSED OF INFRINGING THE PATENT, CELLULAR

13     IS.  SO I NEEDED TO APPORTION THE $.99 BETWEEN THE VALUE THAT

14     CONSUMERS PUT ON WI-FI, THE CELLULAR -- FACETIME OVER WI-FI

15     VERSUS FACETIME OVER CELLULAR.

16          AND TO DO THAT, I USED THE RELATIVE VALUE SCORES DERIVED

17     FROM DR. RAO'S SURVEY.

18          IT TURNS OUT THAT WHEN YOU CALCULATE THIS, THAT THE

19     RELATIVE VALUE IS ABOUT HALF, THAT IS, PEOPLE PUT ABOUT HALF

20     THE VALUE ON FACETIME OVER WI-FI AND ABOUT HALF THE VALUE ON

21     FACETIME OVER CELLULAR.

22          SO THE FOURTH CIRCLE, TIMES THE THIRD CIRCLE, IS ABOUT

23     $.50.

24     Q.   OKAY.  AND WITH THE OTHER TWO FEATURES THAT WE SAW ON THE

25      '239 PATENT, HOW DID YOU MONETIZE THEM?

1    A.   AGAIN, DR. RAO'S SURVEY GIVES YOU RELATIVE VALUES, BUT IN

2    THIS CASE, RELATIVE TO THE VALUE OF FACETIME.  SO I USED THOSE

3    RELATIVE VALUE SCORES RELATIVE TO THE TOTAL VALUE OF FACETIME

4    TO DERIVE WHAT GOES INTO THE RELATIVE VALUE CIRCLE.

5    Q.   NOW, THE LAST CIRCLE SAYS 30/70 BARGAINING SPLIT.  I TAKE

6    IT THAT HAS TO DO WITH THE HYPOTHETICAL NEGOTIATION.

7    A.   SURE.  YOU CAN THINK ABOUT THE FIRST FOUR AS GIVING YOU

8    THE MONETARY VALUE OF THE FEATURE.  APPLE WOULDN'T BE WILLING

9    TO PAY ALL OF THIS TO THE PATENT HOLDER, AND THE HYPOTHETICAL

10   NEGOTIATION WOULD BE ABOUT HOW THAT WOULD BE DIVIDED.

11        IN THIS CASE, APPLE HAS TO TAKE THE TECHNOLOGY IN THE

12   PATENT -- IT'S NOT VOCI THAT CREATES FACETIME, IT'S APPLE --

13   APPLE HAS TO TAKE THAT, IT HAS TO INCORPORATE IT INTO A

14   COMMERCIAL PRODUCT, IT HAS TO SELL THAT COMMERCIAL PRODUCT.

15        SO YOU FIGURE APPLE AS THE DEVELOPER OF THE FACETIME

16   FUNCTIONALITY.

17        APPLE HAS A BUSINESS MODEL IN WHICH IT SHARES WITH THE

18   DEVELOPERS OF THINGS ON THE APP STORE, AND ELSEWHERE, ON A

19   30/70 BASIS WHERE THE DEVELOPERS GET 70 PERCENT, APPLE GETS 30.

20        SO I'M THINKING OF APPLE HERE IN THE ROLE OF THE DEVELOPER

21   RETAINING 70 PERCENT AND THEREBY WILLING TO PAY TO THE PATENT

22   HOLDER 30 PERCENT OF THE TOTAL VALUE OF THE FACETIME.

23   Q.   AND DID YOU USE THAT RATIO TO DO YOUR CALCULATIONS?

24   A.   I DID.

25   Q.   AND WITH REGARD TO THE '449 PATENT, DID YOU DO THOSE IN A

1    SIMILAR WAY?

2    A.   I DID.  IT TURNS OUT THAT WITH THE '449 -- IN DOING THIS

3    KIND OF THING, YOU HAVE TO THINK ABOUT THE NON-INFRINGING

4    ALTERNATIVES.  IN THE -- FOR THE '239 PATENT, THERE ARE NO

5    NON-INFRINGING ALTERNATIVES, BUT FOR THE '449, THERE WAS A

6    NON-INFRINGING ALTERNATIVE.

7        SO WHAT I NEEDED TO THINK ABOUT FOR THE VALUE OF THE

8    FEATURE WAS THE INCREMENTAL VALUE ENABLED BY THE PATENT

9    RELATIVE TO A NON-INFRINGING ALTERNATIVE.

10       SO I HAVE TO TAKE A SIXTH STEP AND ADJUST THIS DOWN

11   FURTHER TO GET TO THE INCREMENTAL VALUE, AND I DID THAT FOR THE

12   '449 PATENT.

13            MR. CEDERBERG:  YOUR HONOR, NEXT I'D LIKE TO SHOW

14   WHAT'S BEEN ORDERED SEALED, AND THAT IS SHOWN TO THE COURT AND

15   THE JURY, DX 391A.  AND IF THE WITNESS HAS THAT UP ON THE

16   SCREEN?

17   Q.   DO YOU HAVE THAT, DR. KEARL?

18   A.   I DO.

19   Q.   CAN YOU TELL US WHAT THAT IS?

20   A.   SURE.  THIS IS THE SUMMARY OF THE EXACT CALCULATIONS THAT

21   I MADE USING THE METHODOLOGY I'VE DESCRIBED.  IN THE TABLE THAT

22   THE JURY CAN SEE AT THE TOP, YOU CAN SEE THE FEATURES IN THE

23   THREE COLUMNS, AND YOU CAN SEE THE ACCUSED PRODUCTS IN THE

24   THREE ROWS.

25           AND THE TOTAL AMOUNT, YOU CAN SEE IT FOR EACH FEATURE AND

1      EACH ACCUSED PRODUCT, AND THE TOTAL AMOUNT OF A LITTLE OVER

2      6 MILLION IS THE AMOUNT THAT I TESTIFIED TO EARLIER.

3            IN THE BOTTOM TABLE, YOU SEE, FOR THE SINGLE FEATURE, THE

4      VALUE FOR THE REASONABLE ROYALTY FOR EACH OF THE INFRINGING

5      PRODUCTS, AND YOU CAN SEE THE TOTAL THERE IS THE NEARLY 160,000

6      THAT I TESTIFIED TO EARLIER.

7            THE OTHER PAGES IN THIS SUMMARY THAT I PUT TOGETHER DETAIL

8      THE CALCULATIONS FOR THE FOLLOWING METHODOLOGY THAT I DESCRIBED

9      IN A GENERAL WAY A MINUTE AGO.

10           MR. CEDERBERG:  OKAY.  YOUR HONOR, WE OFFER DX 391A,

11     SEALED.

12           THE COURT:  ANY OBJECTION?

13           MR. LEE:  NO OBJECTION, YOUR HONOR.

14           THE COURT:  AND THE ENTIRE DOCUMENT IS SEALED.  IT'S

15     ADMITTED.

16         (DEFENDANTS' EXHIBIT 391A WAS ADMITTED IN EVIDENCE.)

17           THE COURT:  GO AHEAD, PLEASE.

18           MR. CEDERBERG:  CAN WE PUT 3942 BACK UP?

19     Q.   BEFORE I ASK YOU ANOTHER QUESTION, AT THE '449 PATENT

20     THERE, OR THE '239 PATENT, YOU MENTIONED VOCI.  ARE YOU

21     FAMILIAR WITH A PERSON NAMED DR., OR MR. FREEMAN?

22     A.   YES.  I WAS HERE DURING HIS TESTIMONY.

23     Q.   AND JUST REMIND THE JURY WHO HE WAS.

24     A.   HE WAS THE INVENTOR, AND HE FORMED THIS FIRM CALLED VOCI

25     WHICH CAME TO HOLD THE PATENT.

1    Q.   OKAY.  NOW, IF I LOOK AT THIS, THE '449 RESULTS THAT YOU

2    GOT ARE A LOT LOWER THAN THE '239 RESULTS.  CAN YOU EXPLAIN

3    THAT TO THE JURY?

4    A.   SURE.  THERE ARE TWO REASONS.  ONE IS, AS I INDICATED AT

5    THE BEGINNING OF MY TESTIMONY, THERE'S LOTS OF EVIDENCE THAT

6    THE '239 PATENTED FEATURES WERE IMPORTANT TO APPLE, THEY WERE

7    VALUABLE TO APPLE, THEY WERE ADVERTISED BY APPLE, THEY WERE

8    PART OF ITS MATERIALS.

9         THE '449 WAS LESS IMPORTANT.

10        AND SECOND, THE '449 ROYALTY REPRESENTS THE INCREMENTAL

11   VALUE RELATIVE TO A NON-INFRINGING ALTERNATIVE, WHILE THE '239

12   DOES NOT.

13   Q.   AND JUST SO WE'RE CLEAR, FOR THE '449, WHAT WAS THE

14   NON-INFRINGING ALTERNATIVE AS YOU UNDERSTAND IT?

15   A.   THE NON-INFRINGING ALTERNATIVE WAS ACTUALLY THE IPAD,

16   WHICH DIDN'T HAVE THE NUMBER ALBUM FEATURE ON IT.

17   Q.   NOW, WE HEARD EARLIER THAT THAT '239 PATENT SOLD FOR ABOUT

18   $2.3 MILLION.  WAS THAT AN IMPORTANT FACTOR IN YOUR ANALYSIS?

19   A.   SURE.  I'M AN ECONOMIST.  MARKET PRICES MATTER WHERE

20   PEOPLE MAKE EXCHANGES, AND IT WAS BOUGHT FOR 2.39 MILLION.

21        AND IN SOME SENSE, THIS IS SORT OF A REALITY CHECK.  THAT

22   IS, I HAVE A ROYALTY HERE OF A LITTLE OVER $6 MILLION FOR AN

23   IMPORTANT FEATURE TO APPLE, BUT IT'S A FEATURE THAT ALSO SOLD

24   IN THE MARKET, AT LEAST THE PATENT SOLD IN THE MARKET.

25        SO THE 2.3 MILLION IS -- SINCE THESE ARE KIND OF IN THE

```
 1    SAME BALLPARK, IT SUGGESTS THAT I'VE DONE THIS CORRECTLY.

 2    Q.   JUST GOING BACK TO YOUR HYPOTHETICAL NEGOTIATION, BESIDES

 3    COMING UP WITH A PRICE, WERE THERE FEATURES OF THE PATENT THAT

 4    YOU THOUGHT WOULD RESULT FROM THAT HYPOTHETICAL NEGOTIATION?

 5    A.   SURE.  I ASSUMED THAT, FOLLOWING THE GEORGIA-PACIFIC

 6    FACTORS, THAT THE LICENSE WOULD BE NONEXCLUSIVE, THAT IT WOULD

 7    BE FOR SALES IN THE UNITED STATES, AND I REVIEWED A LARGE

 8    NUMBER OF APPLE LICENSES AND CAME TO LEARN THAT APPLE GENERALLY

 9    HAD LUMP SUMP LICENSES.  SO I ASSUMED, BASED ON THAT REVIEW,

10    UNDER THE GEORGIA-PACIFIC FACTORS, THAT IT WOULD BE A LUMP SUM

11    LICENSE, LUMP SUM FEE FOR THE LICENSE.

12              MR. CEDERBERG:  NO FURTHER QUESTIONS, YOUR HONOR.

13              THE COURT:  ALL RIGHT.  TIME IS 10:08.

14         (PAUSE IN PROCEEDINGS.)

15              THE COURT:  ARE YOU READY?

16              MR. LEE:  YES.

17              THE COURT:  OKAY.  TIME IS 10:08.

18         GO AHEAD, PLEASE.

19                        CROSS-EXAMINATION

20    BY MR. LEE:

21    Q.   GOOD MORNING, DR. KEARL.

22    A.   GOOD MORNING, MR. LEE.

23    Q.   DR. KEARL, LET ME PUT BACK UP SDX 3942.  THIS IS THE SLIDE

24    YOU WERE JUST TALKING ABOUT, TOTAL DAMAGES OF ABOUT

25    $6.2 MILLION; CORRECT?
```

```
 1    A.   CORRECT.

 2    Q.   ALL RIGHT.  NOW, YOU'RE BEING COMPENSATED AT THE RATE OF

 3    $700 AN HOUR; CORRECT?

 4    A.   THAT'S CORRECT.

 5    Q.   AND YOU AND DR. RAO WORK AT CHARLES RIVER ASSOCIATES;

 6    CORRECT?

 7    A.   NOT QUITE CORRECT.  HE IS AN EMPLOYEE OF CHARLES RIVER.

 8    I'M AFFILIATED WITH CHARLES RIVER.

 9    Q.   FAIR ENOUGH.

10    A.   I WORK WITH CHARLES RIVER, SURE.

11    Q.   NOW, THE AMOUNT OF THAT CHARLES RIVER HAD BILLED FOR YOUR

12    SERVICES AND DR. RAO'S, AS OF SEPTEMBER OF LAST YEAR, EIGHT OR

13    NINE MONTHS AGO, WAS $2.2 MILLION; WASN'T IT?

14    A.   I DON'T KNOW WHAT IT WAS THEN.  BUT I CAN TELL YOU WHAT IT

15    IS NOW.

16    Q.   YEAH.  I'D LIKE TO KNOW THE TOTAL AMOUNT THAT

17    CHARLES RIVER ASSOCIATES HAS BILLED FOR THE $6 MILLION DAMAGE

18    CLAIM.  JUST GIVE ME THE DOLLAR AMOUNT IF YOU COULD.

19    A.   I'LL GIVE YOU THE NUMBER, BUT I NEED TO FRAME IT IN A

20    CERTAIN WAY.

21         MR. CEDERBERG:  EXCUSE ME, YOUR HONOR.

22         THE COURT:  EXCUSE ME.  THERE'S AN OBJECTION.

23         MR. CEDERBERG:  THE FIRST QUESTION WAS ABOUT WHAT

24    DR. KEARL AND DR. RAO HAD BILLED.

25         NOW I CAN'T TELL IF HE'S ASKING ABOUT THE WITNESSES WHO
```

```
 1        TESTIFIED OR THE WHOLE COMPANY FOR A WHOLE LOT OF --

 2                 THE COURT:  ALL RIGHT.  VAGUENESS.

 3                 MR. LEE:  I'LL RESTATE IT, YOUR HONOR.

 4                 THE COURT:  ALL RIGHT.  IT'S SUSTAINED.

 5        BY MR. LEE:

 6        Q.   HOW MUCH HAS CHARLES RIVER ASSOCIATES BEEN PAID FOR THE

 7        WORK THAT YOU'VE DONE AND DR. RAO HAS DONE AND THAT THEY HAVE

 8        SUPPORTED?

 9        A.   WELL, I DON'T THINK CHARLES RIVER BREAKS IT OUT FOR JUST

10        DR. RAO'S WORK AND MY WORK.

11             CHARLES RIVER HAS BEEN PAID ABOUT $3.1 MILLION FOR THE

12        WORK BY DR. RAO, BY ME, BY THE SURVEY COMPANY ON THIS MATTER,

13        ON A LOT OF MATTERS THAT ARE NOT IN THIS LITIGATION.

14        Q.   AND YOU WERE HERE WHEN DR. SCHONFELD TESTIFIED; CORRECT?

15        A.   I WAS.

16        Q.   AND YOU WERE HERE WHEN MR. PARULSKI TESTIFIED; CORRECT?

17        A.   I WAS.

18        Q.   AND YOU HEARD THEM TESTIFY ABOUT THE AMOUNTS THAT THEY'VE

19        BEEN PAID; CORRECT?

20        A.   YES.

21        Q.   SO SAMSUNG HAS PAID, IN TOTAL, ABOUT -- MORE THAN

22        $4 MILLION FOR THESE TWO PATENTS, THE '239 AND '449, TO THEIR

23        EXPERT WITNESSES; CORRECT?

24                 MR. CEDERBERG:  OBJECTION.  MISSTATES THE TESTIMONY,

25        YOUR HONOR.
```

```
1              THE COURT:  OVERRULED.

2         GO AHEAD, PLEASE.

3    BY MR. LEE:

4    Q.   IS THAT RIGHT?

5    A.   YES.  BUT, YOU KNOW, YOU DON'T KNOW THE END WHEN YOU

6    START.

7    Q.   OKAY.

8    A.   WHEN SAMSUNG RETAINED ME, IT DIDN'T KNOW WHAT THE END

9    VALUE WOULD BE.  IT ASKED ME TO GIVE MY BEST OPINION, TO DERIVE

10   A VALUE HERE, AND IT COMES OUT WHERE IT COMES OUT.

11   Q.   RIGHT.

12   A.   BUT THEY DIDN'T KNOW THAT GOING IN.

13   Q.   RIGHT.  BUT WE KNOW IT NOW, DON'T WE?

14   A.   WE DO.

15   Q.   NOW, LET ME SEE IF I CAN CORRECT ONE THING.  YOU SAID THAT

16   SAMSUNG BOUGHT THE '239 PATENT IN SEPTEMBER 2010.  IT'S

17   ACTUALLY SEPTEMBER 2011; CORRECT?

18   A.   CORRECT, YEAH.

19   Q.   YOU ALSO SAID THAT SAMSUNG BOUGHT THE PATENT FOR

20   $2.3 MILLION.  THEY ACTUALLY BOUGHT TWO PATENTS, DIDN'T THEY?

21   A.   THEY DID.

22   Q.   ALL RIGHT.  SO THE RIGHT DATE IS SEPTEMBER 2011; CORRECT?

23   A.   CORRECT.

24   Q.   AND THE TOTAL AMOUNT FOR TWO PATENTS WAS 2.3 -- WAS

25   $2.3 MILLION; CORRECT?
```

1    A.    CORRECT.

2    Q.    AND THAT PURCHASE, IN 2011, WAS AFTER APPLE HAD MET WITH

3    SAMSUNG AND ASKED THEM TO STOP COPYING THEIR PATENTS; CORRECT?

4    A.    THAT'S MY UNDERSTANDING.

5    Q.    IT'S AFTER APPLE HAD SUED THEM FOR INFRINGEMENT; CORRECT?

6    A.    THAT'S MY UNDERSTANDING AS WELL.

7    Q.    AND YOU KNOW, DURING THE PERIOD OF TIME AFTER ACQUISITION

8    THROUGH THE DATE THAT THE CLAIM WAS ASSERTED, SAMSUNG WAS

9    SELLING COMPONENTS TO APPLE; CORRECT?

10   A.    THAT'S MY UNDERSTANDING.

11   Q.    AND YOU ALSO KNOW, DR. KEARL, THAT DURING THAT ENTIRE TIME

12   THEY WERE SELLING COMPONENTS, THEY NEVER ONCE SUGGESTED THAT

13   THE '239 PATENT WAS INFRINGED; CORRECT?

14   A.    THAT I HAVE NO WAY OF KNOWING.

15   Q.    AND THE '239 PATENT HAS EXPIRED; CORRECT?

16   A.    YES.  IT EXPIRED IN FEBRUARY.

17   Q.    AND IT'S NOT THE WORK OF ANYONE AT SAMSUNG; CORRECT?

18   A.    THAT'S CORRECT.

19   Q.    NOW LET'S TALK ABOUT THE '449 PATENT.

20        LET ME ASK YOU ONE QUESTION.  YOU HAD TALKED ABOUT APPS.

21        DO YOU REMEMBER THAT?

22   A.    YES.

23   Q.    DO YOU AGREE OR DISAGREE WITH THIS STATEMENT:  THE VALUE

24   THAT THESE USERS PLACED ON FACETIME IS LIKELY HIGHER, AND

25   LIKELY MANY TIMES HIGHER, THAN THE $.99 AMOUNT I USED IN MY

CROSS KEARL

1    CALCULATIONS.

2    A.   THAT'S FROM MY REPORT.  I AGREE WITH IT.

3    Q.   OKAY.  AND IT'S TRUE, IS IT NOT?

4    A.   YES, SIR.

5    Q.   OKAY.  NOW, SAMSUNG ALSO PURCHASED THE '449 PATENT;

6    CORRECT?

7    A.   IT DID.

8    Q.   FROM HITACHI; CORRECT?

9    A.   YES, ALONG WITH 33 OTHER PATENTS, I THINK SEVEN PATENT

10   APPLICATIONS, AND SOMETHING LIKE 66 FOREIGN PATENTS, PLUS A

11   CROSS-LICENSE.  SO IT WAS A BUNDLE OF THINGS THAT IT HAD

12   BOUGHT.

13   Q.   RIGHT.  NOW, LET ME ASK YOU TO LOOK AT TAB 4 IN YOUR

14   NOTEBOOK, WHICH IS JX 24.

15        YOUR HONOR, THIS IS SEALED, SO I'M NOT -- LET ME OFFER IT,

16   FIRST.

17        DO YOU HAVE IT?

18   A.   I DO.

19   Q.   TAB 4?

20   A.   THIS IS SAMSUNG'S USE OF APPLE'S PATENTS AND SMARTPHONES?

21   Q.   NO.  IT SHOULD BE AT TAB 4.  IT SHOULD BE THE ASSIGNMENT

22   AND PURCHASE AGREEMENT.

23   A.   THAT'S NOT THE TAB 4.

24   Q.   DO YOU HAVE THE RIGHT --

25        CAN I APPROACH, YOUR HONOR, AND ASSIST HIM?

```
 1                  THE COURT:  GO AHEAD, PLEASE.

 2            (PAUSE IN PROCEEDINGS.)

 3       BY MR. LEE:

 4       Q.   OKAY?

 5       A.   TAB 2.

 6       Q.   TAB 2.  MY FAULT.  MY PROBLEM.  MY BAD.

 7            SO YOU HAVE TAB 2 BEFORE YOU?

 8       A.   I DO.

 9       Q.   YOU RECOGNIZE THAT AS THE ACQUISITION AGREEMENT; CORRECT?

10       A.   YES.

11                  MR. LEE:  AND, YOUR HONOR, WE OFFER JX 24, WHICH IS

12       UNDER SEAL AS I UNDERSTAND IT.

13                  THE COURT:  ANY OBJECTION?

14                  MR. CEDERBERG:  NO OBJECTION.

15                  THE COURT:  IT'S ADMITTED.

16            (JOINT EXHIBIT 24 WAS ADMITTED IN EVIDENCE.)

17                  THE COURT:  GO AHEAD, PLEASE.

18       BY MR. LEE:

19       Q.   DR. KEARL, THAT PURCHASE OCCURRED IN JULY 2011; CORRECT?

20       A.   YES.

21       Q.   AND --

22       A.   I DON'T SEE THE DATE ON HERE, BUT -- IT'S EITHER JUNE OR

23       JULY 2011.

24       Q.   AND BEFORE THE DATE OF THE ACQUISITION, NO ONE AT HITACHI

25       EVER SUGGESTED THAT APPLE WAS INFRINGING THIS PATENT, THE '449
```

1    PATENT; CORRECT?

2    A.   I DON'T KNOW THAT.

3    Q.   BUT YOU DO KNOW THAT AFTER THE DATE OF ACQUISITION,

4    SAMSUNG WAS SUPPLYING COMPONENTS TO APPLE; CORRECT?

5    A.   YES.

6    Q.   AND YOU KNOW THAT SAMSUNG NEVER ONCE SUGGESTED, BEFORE IT

7    FILED THIS LAWSUIT, THAT APPLE'S USE OF THOSE COMPONENTS WAS

8    INFRINGING THE PATENT?

9    A.   I DON'T KNOW THAT.

10   Q.   NOW, DR. KEARL, ONE LAST QUESTION OR TWO.

11        YOU AGREE WITH ME THAT -- YOU'RE AN EXPERIENCED DAMAGES

12   EXPERT; CORRECT?

13   A.   I'VE DONE THIS A FAIR NUMBER OF TIMES, YES.

14   Q.   AND YOU UNDERSTAND THAT YOU HAVE TO LOOK PATENT-BY-PATENT

15   IN DETERMINING THE APPROPRIATE LEVEL OF DAMAGES FOR A

16   PARTICULAR PATENT; CORRECT?

17   A.   THAT'S CORRECT.  THAT'S WHAT I'VE DONE.

18   Q.   AND WHEN YOU LOOK AT THE HYPOTHETICAL NEGOTIATION, YOU

19   HAVE TO LOOK AT THE PARTICULAR CIRCUMSTANCES THAT ARE INVOLVED

20   WITH THE PATENT HOLDER AND THE ALLEGED INFRINGER AT THE TIME OF

21   THE HYPOTHETICAL NEGOTIATION, PATENT-BY-PATENT; CORRECT?

22   A.   AGREED.

23             MR. LEE:  NOTHING FURTHER, YOUR HONOR.

24             THE COURT:  ALL RIGHT.  THE TIME IS 10:16.

25             MR. CEDERBERG:  ONE QUICK QUESTION, YOUR HONOR.

```
 1                 THE COURT:  GO AHEAD, PLEASE.

 2                      REDIRECT EXAMINATION

 3      BY MR. CEDERBERG:

 4      Q.   DR. KEARL, YOU WERE ASKED BY MR. LEE ABOUT HOW MUCH

 5      CHARLES RIVER RECEIVED IN TOTAL FOR THIS CASE.

 6           DO YOU REMEMBER THAT?

 7      A.   I DO.

 8      Q.   YOU SAID IT WAS WHAT YOU DID, WHAT DR. RAO DID, AND THE

 9      THINGS NOT RELATED AT ALL TO THIS CASE?

10      A.   CORRECT.

11      Q.   MY QUESTION IS, CAN YOU TELL THE JURY HOW MUCH YOU HAVE

12      RECEIVED FOR YOUR DAMAGES ANALYSIS?

13      A.   ABOUT 340,000, BUT THAT'S FOR THE DAMAGES ANALYSIS, PLUS A

14      LOT OF OTHER THINGS I'VE DONE FOR SAMSUNG.

15                 MR. CEDERBERG:  NOTHING FURTHER.

16                 THE COURT:  ALL RIGHT.  THE TIME IS 10:17.

17                 MR. LEE:  NOTHING FURTHER.

18                 THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

19      AND IT IS SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

20                 MR. LEE:  NOT SUBJECT TO RECALL FOR APPLE, YOUR

21      HONOR.

22                 THE COURT:  DO YOU AGREE WITH THAT, MR. CEDERBERG?

23                 MR. CEDERBERG:  I DO.

24                 THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED.

25           (PAUSE IN PROCEEDINGS.)
```

1            MR. JOHNSON:  YOUR HONOR, AND LADIES AND GENTLEMEN,

2      AT THIS POINT SAMSUNG RESTS ITS AFFIRMATIVE CASE AGAINST APPLE.

3            MR. LEE:  AND, YOUR HONOR, WE RESERVE OUR MOTIONS IN

4      ACCORDANCE WITH THE PRIOR AGREEMENT.

5            THE COURT:  UNDERSTOOD.  IT'LL BE BRIEFED ON FRIDAY.

6      OKAY.  THEN WE'LL TAKE A MINUTE JUST TO GET SET UP AND --

7            MR. LEE:  WE'RE GOING TO RETRIEVE THE BINDERS FROM

8      THE FLOOR.

9            THE COURT:  YES, PLEASE.  IF YOU COULD PLEASE REMOVE

10     THE EXTRA BINDERS FROM THE WITNESS STAND SO IT'LL BE A LITTLE

11     LESS CUMBERSOME FOR THE NEXT WITNESS.

12       (PAUSE IN PROCEEDINGS.)

13           MR. LEE:  YOUR HONOR, APPLE'S FIRST WITNESS ON THIS

14     PORTION OF THE CASE IS TIMOTHY MILLET, AND MY PARTNER,

15     NINA TALLON, IS GOING TO DO THE EXAMINATION.

16           THE COURT:  OKAY.  I'M SORRY TO INTERRUPT YOU, JUST

17     ONE SECOND.

18       I DON'T FIND HERE ANY SEALING ORDER ON JX 24.  I GENERALLY

19     WILL NOT SEAL THE WHOLE THING.  IT HAS TO BE JUST THE PORTION

20     PURSUANT TO THE NINTH CIRCUIT'S DECISION IN ELECTRONIC ARTS.

21           MR. LEE:  IT'S A SAMSUNG DOCUMENT, YOUR HONOR.  WE

22     HAVE --

23           MS. MAROULIS:  YOUR HONOR, MAY I CHECK DURING THE

24     NEXT BREAK?

25           THE COURT:  SURE.  WE CAN TAKE CARE OF THIS LATER.

```
1            MS. MAROULIS:  THANK YOU, YOUR HONOR.

2            THE COURT:  I'M NOT GOING TO SEAL IT AT THIS TIME.

3        (PAUSE IN PROCEEDINGS.)

4            THE COURT:  WHY DON'T WE -- WHY DON'T WE TAKE OUR

5    BREAK EARLY?  THERE'S A REQUEST FOR BIO BREAK.  OKAY?

6            MR. LEE:  I'LL SECOND THAT.

7            THE COURT:  DO YOU WANT TO GO AHEAD AND TAKE OUR 15

8    MINUTE BREAK NOW?  SHOULD WE TAKE OUR 15 MINUTE BREAK NOW?

9    LET'S GO AHEAD AND DO THAT.  SORRY.

10           MS. TALLON:  THAT'S QUITE ALL RIGHT.

11           THE COURT:  COME BACK AT 10:30.  THANK YOU.

12       (JURY OUT AT 10:19 A.M.)

13           THE CLERK:  THEY HAVE AN ISSUE.

14           THE COURT:  ALL RIGHT.  DO WE NEED TO GO ON -- WE

15   SHOULD GO ON THE RECORD FOR THIS.

16           MS. MAROULIS:  VERY BRIEFLY.

17           MR. MCELHINNY:  VERY BRIEFLY, YOUR HONOR.

18           THE COURT:  OKAY.

19           MR. MCELHINNY:  WE HAVE A JOINT SCHEDULING PROCESS

20   THING TO SUGGEST TO THE COURT --

21           THE COURT:  OKAY.

22           MR. MCELHINNY:  -- FOR THE CLOSING DEMONSTRATIVES.

23           THE COURT:  YES.

24           MR. MCELHINNY:  WE HAVE AGREED ON A PROCESS, SUBJECT

25   TO YOUR HONOR'S PERMISSION.  THE PROCESS THAT WE HAVE AGREED
```

```
 1        UPON IS THAT WE WOULD EXCHANGE THEM -- EXCHANGE THE PROPOSED

 2        DEMONSTRATIVES AMONGST EACH OTHER ON SATURDAY MORNING.

 3                   THE COURT:  OKAY.

 4                   MR. MCELHINNY:  AND THAT WE WOULD FILE -- IF THERE

 5        ARE OBJECTIONS, WE WOULD FILE THE BRIEFS SIMULTANEOUSLY AT 9:00

 6        O'CLOCK A.M. ON SUNDAY MORNING, WITH A LIMITATION OF SIX PAGES.

 7                   MS. MAROULIS:  PER SIDE.

 8                   MR. MCELHINNY:  PER SIDE.  SIX PAGES IS WHAT YOU GAVE

 9        US AT THE LAST TRIAL, AND WE HAVE A LIMIT ON THE NUMBER OF

10        DEMONSTRATIVES ALREADY IN YOUR COURT -- IN YOUR HONOR'S ORDER.

11                   THE COURT:  OKAY.  DO YOU NEED THE EXTRA TIME?

12                   MR. MCELHINNY:  WE HAVE TO GO THROUGH THEM AND

13        DECIDE.

14                   THE COURT:  ALL RIGHT.  THAT'S FINE.

15                   MR. MCELHINNY:  AND WE HAVE TO MEET AND CONFER AND --

16                   THE COURT:  ALL RIGHT.

17                   MR. MCELHINNY:  -- REVISE THEM.

18                   THE COURT:  OKAY.  CAN I BARGAIN WITH YOU HERE?

19                   MS. MAROULIS:  OKAY.

20                   MR. MCELHINNY:  YOU HAVE A LOT OF LEVERAGE IN THIS

21        HYPOTHETICAL NEGOTIATION.

22                   THE COURT:  CAN I GET THE JMOL'S A LITTLE BIT EARLIER

23        THEN, BECAUSE OTHERWISE WE'LL BE DOING THE JMOL RESEARCH ON

24        SATURDAY NIGHT AND THE OBJECTIONS ON SUNDAY.

25                   SO I THINK RIGHT NOW THE JMOL SCHEDULE WAS --
```

```
 1                MS. MAROULIS:  IT'S 3:00 O'CLOCK ON FRIDAY.  WHEN
 2      WOULD YOU LIKE THEM?
 3                MR. MCELHINNY:  NOON?  CAN WE GET IT TO YOU --
 4                THE COURT:  COULD WE DO -- IS IT POSSIBLE TO DO THAT
 5      AT NOON AND NOON?
 6                MS. MAROULIS:  YES, YOUR HONOR.
 7                THE COURT:  SO THEN WE CAN FOCUS ON JMOL'S ON
 8      SATURDAY AND OBJECTIONS ON SUNDAY.
 9                MS. MAROULIS:  YES, YOUR HONOR.
10                MR. MCELHINNY:  OKAY.
11                THE COURT:  LET'S DO THAT.  FRIDAY NOON, SATURDAY
12      NOON, EIGHT PAGES PER SIDE ON JMOL.
13                MR. MCELHINNY:  AND IF YOU WANT TO PUT A STAR,
14      MS. MAROULIS AND I AGREED ON THIS.
15                THE COURT:  OKAY.  YOU CAN STILL SETTLE,
16      MR. MCELHINNY.
17                MR. MCELHINNY:  YES, YOUR HONOR.
18           (RECESS FROM 10:21 A.M. UNTIL 10:36 A.M.)
19           (JURY OUT AT 10:36 A.M.)
20                THE COURT:  IS THERE AN ISSUE?
21                MR. PRICE:  YOUR HONOR, YES.  WE MAY GET TO THIS
22      BEFORE LUNCH.
23           MY UNDERSTANDING, OF COURSE, IS APPLE STILL PLANS TO PLAY
24      THE DEPOSITION OF MR. MACCOUN.
25                THE COURT:  OKAY.
```

```
 1              MR. PRICE:  AND I WOULD REQUEST THAT WHEN THAT IS

 2      PLAYED, THAT A LIMITING INSTRUCTION BE GIVEN THAT -- THE

 3      INSTRUCTION BEING THAT THIS EVIDENCE CANNOT BE CONSIDERED BY

 4      YOU AS EVIDENCE THAT APPLE'S ASSERTED PATENTS ARE VALID OR

 5      INFRINGED OR THAT EITHER GOOGLE OR SAMSUNG BELIEVE THAT AN

 6      APPLE PATENT IS VALID OR INFRINGED.

 7              AND THE REASON BEING, OF COURSE, IS SOMEONE MIGHT THINK

 8      THAT THOSE SORTS OF DISCUSSIONS ARE SOME SORT OF ADMISSION

 9      ABOUT VALIDITY OR INFRINGEMENT, AND THAT IS NOT WHY IT'S BEING

10      OFFERED AND NOT HOW IT SHOULD BE CONSIDERED.

11              THE COURT:  DO YOU AGREE WITH THAT?

12              MR. MCELHINNY:  NOT IN THE SLIGHTEST.

13          I MEAN, I DON'T AGREE -- ONE, WE HAVEN'T GIVEN ANY

14      LIMITING INSTRUCTION ABOUT WHAT ANY WITNESS'S TESTIMONY CAN BE

15      CONSIDERED FOR, AND THE OVERALL VERSION THAT SOME WITNESS'S

16      INSTRUCTION IS NOT RELEVANT, I DISAGREE WITH THAT ENTIRELY.

17              BUT, TWO, WHAT THIS EVIDENCE WILL SHOW IS THAT THERE IS A

18      WRITTEN AGREEMENT BETWEEN GOOGLE AND SAMSUNG THAT COVERS SOME,

19      BUT NOT ALL, OF THE PATENTS, AN INDEMNITY AGREEMENT.

20              IT GOES TO THE TESTIMONY THAT THEY PUT ON FROM GOOGLE

21      WITNESSES THAT WENT DIRECTLY TO VALIDITY AND INFRINGEMENT.  IT

22      PUTS THAT TESTIMONY IN DOUBT.

23              IT GOES TO THE FACT THAT ONLY SOME OF THE PATENTS ARE

24      INDEMNIFIED, NOT ALL OF THEM.  THEY'VE BEEN ARGUING GOOGLE

25      DEFENSES TO ALL OF THEM.
```

```
1          TO SCREEN THIS OUT WHEN THE TESTIMONY THAT THIS IS -- THE
2     TESTIMONY THAT THIS IS CHALLENGING GOES DIRECTLY TO THOSE
3     ISSUES.
4          THE COURT:  WELL, THIS IS WHAT I WOULD LIKE TO DO:
5     BECAUSE I HAVEN'T SEEN THE TRANSCRIPT, I DON'T KNOW WHAT THE
6     TESTIMONY IS.
7          DO YOU EXPECT THAT TO HAPPEN BEFORE LUNCH?
8          MR. MCELHINNY:  I DON'T -- THAT -- THE TIMING I DON'T
9     KNOW.  HE -- THAT WILL BE THE FIRST THING WE DO ON OUR
10    REBUTTAL.  I HAVE THE DEPOSITION CLIP THAT I COULD GIVE TO YOUR
11    HONOR.
12         THE COURT:  YES, CAN I HAVE A COPY OF THAT SO I CAN
13    LOOK AT THAT?
14         SO IF YOU NEED TO PLAY IT BEFORE LUNCH, THEN I'D LIKE TO,
15    DURING THE BREAK, MAKE A DECISION ABOUT WHETHER A LIMITING
16    INSTRUCTION WOULD BE APPROPRIATE AND GIVE IT IF IT'S NECESSARY
17    AFTER THE CLIP.
18         MR. PRICE:  CERTAINLY.
19         THE COURT:  OKAY.  WHAT WAS THE LANGUAGE THAT YOU
20    WANTED ME TO GIVE?  GIVE THAT TO ME ONE MORE TIME.  I THINK I
21    GOT SOME OF IT, BUT THIS EVIDENCE --
22         MR. PRICE:  -- CANNOT BE CONSIDERED BY YOU AS
23    EVIDENCE THAT APPLE'S ASSERTED PATENTS ARE VALID OR INFRINGED,
24    OR THAT EITHER GOOGLE OR SAMSUNG BELIEVES THAT AN APPLE PATENT
25    IS VALID OR INFRINGED.
```

1          AND CERTAINLY I'D LIKE FURTHER ARGUMENT, WHEN APPROPRIATE,

2     TO RESPOND TO MR. MCELHINNY'S COMMENTS.

3               THE COURT:  LET ME MAKE SURE THAT I GOT THAT LANGUAGE

4     CORRECTLY.  THIS EVIDENCE CANNOT BE CONSIDERED BY YOU THAT --

5     AS EVIDENCE THAT APPLE'S PATENTS ARE VALID OR INFRINGED, OR

6     THAT GOOGLE OR SAMSUNG BELIEVE THAT APPLE'S PATENTS ARE VALID

7     AND INFRINGED?

8               MR. PRICE:  YES.

9               THE COURT:  IS THAT THE LANGUAGE?  OKAY.

10          AND APPLE'S POSITION IS NO INSTRUCTION IS APPROPRIATE?

11              MR. MCELHINNY:  MY -- THAT'S MY VIEW.

12              THE COURT:  OKAY.

13              MR. MCELHINNY:  IF YOUR HONOR WERE TO CONSIDER AN

14     INSTRUCTION, WHICH WE DON'T THINK YOU SHOULD --

15              THE COURT:  YES.

16              MR. MCELHINNY:  -- WE THINK YOU SHOULD GO ON AND SAY

17     THIS EVIDENCE IS BEING ADMITTED TO SHOW THE POTENTIAL BIAS OF

18     THE GOOGLE WITNESSES WHO TESTIFIED BEFORE YOU.

19              MR. PRICE:  AND --

20              THE COURT:  THE POTENTIAL BIAS OF THE GOOGLE

21     WITNESSES WHO HAVE TESTIFIED IN THIS TRIAL?

22              MR. MCELHINNY:  YES, YOUR HONOR.

23              MR. PRICE:  AND, YOUR HONOR, THE -- I'LL LET YOU

24     WRITE THAT DOWN FIRST.

25              THE COURT:  ALL RIGHT.  CAN WE GET SOME KIND OF

```
 1          AGREEMENT HERE?

 2               MR. PRICE:  THERE IS -- I'M SORRY.  THERE IS AN

 3          INSTRUCTION, IN THE FINAL INSTRUCTIONS, AS TO THE MANY FACTORS

 4          ONE MAY CONSIDER, AND THIS WOULD BE HIGHLIGHTING THAT FACTOR,

 5          AND I THINK THAT WOULD BE INAPPROPRIATE.

 6               IT'S SORT OF LIKE WHENEVER WE PUT IN EVIDENCE THAT'S

 7          HEARSAY, YOU TELL THE JURY IT CANNOT BE USED FOR THE TRUTH.

 8          BUT YOU THEN DON'T TELL THEM THE WAYS IT WHICH IT CAN BE USED

 9          BECAUSE THAT'S GOING TO BE DEALT WITH IN YOUR FINAL

10          INSTRUCTIONS.

11               THE PROBLEM -- THE REASON FOR A LIMITING INSTRUCTION IS TO

12          PREVENT PREJUDICE, AND HERE IT'S CLEARLY NECESSARY TO PREVENT

13          PREJUDICE FOR THE JURY TO KNOW THAT THE EVIDENCE IS NOT AN

14          ADMISSION OF ANY GUILT AND THAT IT CAN'T BE USED TO SHOW

15          VALIDITY OR INFRINGEMENT.

16               HOWEVER, IT WOULD BE PREJUDICIAL THEN TO POINT OUT THIS

17          ONE PART OF THE MANY THINGS THEY MAY USE TO EVALUATE WITNESS

18          CREDIBILITY AT THIS STAGE.

19               THE COURT:  OKAY.  I HEAR BOTH OF YOU.

20               MR. MCELHINNY:  SAMSUNG IS ASKING FOR AN

21          EXTRAORDINARY INSTRUCTION, AND AN UNBALANCED ONE AS WELL, YOUR

22          HONOR.

23               THE COURT:  WELL, THAT'S WHY I MIGHT REQUIRE THE TWO

24          OF YOU TO HAVE LUNCH AND SEE IF YOU CAN WORK IT OUT.

25               MR. MCELHINNY:  THAT'S A PRETTY HIGH PRICE TO
```

```
 1          PRONOUNCE, YOUR HONOR, AT THIS POINT.

 2              (LAUGHTER.)

 3                  THE COURT:  ALL RIGHT.  WELL, LET'S GO FORWARD, AND

 4          I -- WE HAVE A JURY WAITING.  HOPEFULLY I CAN TAKE A LOOK AT

 5          THIS TRANSCRIPT AND WE CAN HAVE A FURTHER DISCUSSION LATER IF

 6          NECESSARY.

 7                  MR. MCELHINNY:  THANK YOU, YOUR HONOR.

 8                  MS. MAROULIS:  AND YOUR HONOR, TO UPDATE YOU ON YOUR

 9          QUESTION, WE'RE FILING PRESENTLY A MOTION TO SEAL ON JX 24.

10                  THE COURT:  THANK YOU.

11                  MS. MAROULIS:  THANK YOU VERY MUCH FOR BRINGING IT

12          UP.  SO IT'S GOING TO BE UNDER SEAL PENDING THE MOTION.

13                  THE COURT:  THAT'S FINE.  AND I WILL RULE ON IT AS

14          QUICKLY AS POSSIBLE SO THAT THE APPROPRIATE PORTIONS WILL BE

15          SEALED.

16              AND IT NEEDS TO BE CONSISTENT WITH HOW WE'RE SEALING THE

17          OTHER AGREEMENTS IN THE CASE.

18                  MS. MAROULIS:  YES, YOUR HONOR.

19                  THE COURT:  OKAY.  ALL RIGHT.  ANYTHING ELSE?

20              THEN LET'S BRING IN OUR JURY, PLEASE.  WE'LL GO UNTIL

21          NOON.

22              (JURY IN AT 10:42 A.M.)

23                  THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

24          SEAT.

25                  MS. PARKER BROWN, IF YOU WOULD PLEASE SWEAR IN THE
```

1      WITNESS?

2              THE CLERK:  PLEASE STAND AND RAISE YOUR RIGHT HAND,

3      PLEASE.

4          **(PLAINTIFF'S WITNESS, TIM MILLET, WAS SWORN.)**

5              THE WITNESS:  I DO.

6              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

7          AND PULL THE MICROPHONE TOWARD YOU AND STATE YOUR NAME,

8      PLEASE, AND SPELL IT.

9              THE WITNESS:  MY NAME IS TIM MILLET, THAT'S T-I-M,

10     M-I-L-L-E-T.

11             THE CLERK:  THANK YOU.

12             THE COURT:  ALL RIGHT.  THE TIME IS NOW 10:43.

13         GO AHEAD, PLEASE.

14             MS. TALLON:  GOOD MORNING, LADIES AND GENTLEMEN.  MY

15     NAME IS NINA TALLON.  I'M AN ATTORNEY REPRESENTING APPLE.

16                         **DIRECT EXAMINATION**

17     BY MS. TALLON:

18     Q.   GOOD MORNING, MR. MILLET.

19     A.   GOOD MORNING.

20     Q.   WOULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY AND TELL

21     US WHERE YOU WORK?

22     A.   AGAIN, MY NAME IS TIM MILLET AND I'M AN EMPLOYEE AT APPLE

23     IN CUPERTINO.

24     Q.   HOW LONG HAVE YOU WORKED AT APPLE?

25     A.   I JOINED APPLE IN SEPTEMBER OF 2005.

1    Q.   COULD YOU TELL US A LITTLE BIT ABOUT YOUR JOB AT APPLE

2    TODAY?

3    A.   SO I'M A SENIOR DIRECTOR IN THE PLATFORM ARCHITECTURE

4    GROUP AT APPLE.

5    Q.   AND WHAT DOES THAT MEAN?  WHAT IS PLATFORM ARCHITECTURE?

6    A.   PLATFORM ARCHITECTURE IS A GROUP AT APPLE IN THE HARDWARE

7    ENGINEERING DIVISION THAT IS RESPONSIBLE FOR CONSULTING ACROSS

8    VARIOUS HARDWARE PROJECTS AT APPLE.

9    Q.   WHAT TYPES OF HARDWARE DO YOU WORK ON?

10   A.   SO I HAVE A GROUP, A COUPLE GROUPS OF TEAMS WHAT DEVELOP

11   TECHNOLOGY THAT WE INTEGRATE INTO THE SOC'S THAT WE BUILD AT

12   APPLE.

13   Q.   WHAT IS AN SOC?

14   A.   SO AN SOC IS A SYSTEM ON A CHIP.

15   Q.   WHAT DOES THAT MEAN?

16   A.   SO A SYSTEM ON A CHIP IS ESSENTIALLY A SINGLE INTEGRATED

17   CIRCUIT THAT INTEGRATES A LARGE NUMBER OF DIFFERENT COMPONENTS

18   THAT HISTORICALLY HAVE BEEN SEPARATE COMPONENTS IN A COMPUTER,

19   FOR EXAMPLE.

20        SO WE'LL PUT MANY THINGS INSIDE ONE PIECE OF SILICON.

21   Q.   WHAT COMPONENTS DOES THE SOC IN APPLE'S PRODUCTS INCLUDE?

22   A.   SO IT VARIES FROM CHIP TO CHIP, BUT TYPICALLY THEY WILL

23   HAVE A CPU, CENTRAL PROCESSING UNIT; A GPU, A GRAPHICAL

24   PROCESSING UNIT; USUALLY THERE'S A CAMERA PROCESSING UNIT; AND

25   THERE ARE INTERFACES, PROCESSORS THAT INTERFACE TO EXTERNAL

1        MEMORIES, THINGS LIKE THAT.

2        Q.    WHICH APPLE PRODUCTS INCLUDE AN SOC?

3        A.    SO THE SOC'S I WORKED ON ARE ALL THE IOS DEVICES, THAT

4        INCLUDES IPHONES, IPADS, IPOD TOUCHES.

5        Q.    AND WHICH OF THOSE PRODUCTS HAVE YOU PERSONALLY WORKED ON?

6        A.    WITH REGARD TO THE SOC WORK, I'VE WORKED ON ALL OF THE

7        PROJECTS AT APPLE THAT INTEGRATE OUR SOC'S.

8        Q.    NOW, AT THE TIME THAT YOU WERE WORKING ON APPLE'S IOS

9        PRODUCTS, HAD YOU EVER HEARD OF THE '239 OR '449 PATENTS?

10       A.    NO.

11       Q.    WHAT COMPANY DESIGNS THE SOC IN APPLE'S PRODUCTS?

12       A.    SO APPLE DESIGNS THE TOP LEVEL CHIP.  WE DECIDE ALL THE

13       DIFFERENT COMPONENT DESIGNS THAT GO INTO THE SOC.

14       Q.    AND WHAT COMPANY DESIGNS COMPONENTS FOR THE APPLE SOC'S?

15       A.    SOMETIMES SOME OF THE COMPONENT DESIGNS IN THE SOC ARE

16       DESIGNED AT APPLE, AND SOMETIMES WE WORK WITH PARTNERS TO

17       LICENSE TECHNOLOGY THAT WE INTEGRATE.

18       Q.    WHO ARE SOME OF THOSE PARTNERS?

19       A.    WE HAVE A FEW TIER 1 PARTNERS.  ARM TECHNOLOGIES IS ONE,

20       THEY PROVIDE OUR CPU'S; WE WORK WITH A COMPANY CALLED

21       IMAGINATION TECHNOLOGIES AND THEY DEVELOP GRAPHICS AND VIDEO

22       PROCESSING COMPONENT DESIGNS; AND OCCASIONALLY WE'LL WORK WITH

23       OUR MANUFACTURING PARTNERS TO LICENSE SOME TECHNOLOGY, SO

24       SAMSUNG IS A BIG TECHNOLOGY PROVIDER FOR OUR SOC'S.

25       Q.    NOW, ONCE APPLE HAS THE DESIGN FOR THE SOC, WHAT COMPANY

1    MANUFACTURERS IT?

2    A.   HISTORICALLY THE PARTNER WE'VE WORKED WITH EXCLUSIVELY HAS

3    BEEN SAMSUNG.

4    Q.   NOW, IF WE TAKE THE IPHONE 5, FOR EXAMPLE, CAN AN IPHONE 5

5    USER ADD TO THE COMPONENTS INSIDE HIS OR HER IPHONE?

6    A.   NO.

7    Q.   IS THE SAME THING TRUE FOR ALL IPHONES?

8    A.   YES.

9    Q.   IF YOU COULD TURN, MR. MILLET, IN THE BINDER THAT YOU HAVE

10   IN FRONT OF YOU TO TAB 6, WHICH IS DX 351A -- AND THIS DOCUMENT

11   HAS ALREADY BEEN ADMITTED, BUT BECAUSE IT IS CONFIDENTIAL,

12   WE'LL JUST SHOW IT TO THE JURY AND THE COURT -- AND IF YOU

13   COULD TURN TO PAGE 3392, WHICH IS IN THE UPPER RIGHT-HAND

14   CORNER OF THE DOCUMENT.

15   A.   OKAY.

16   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

17   A.   YES.

18   Q.   WHAT IS IT?

19   A.   SO THIS IS THE H -- THE 3392?

20   Q.   YES.  IT'S JUST COME UP NOW.  PAGE 3392?

21   A.   THERE IT IS.

22   Q.   WHAT IS THIS DOCUMENT?

23   A.   SO H5P USER'S MANUAL.  IT'S AN EXCERPT.

24   Q.   WHAT IS H5P?

25   A.   SO H5P IS JUST THE INTERNAL CODE NAME WE USE TO DESCRIBE

```
1    THE SOC THAT IS INSIDE THE IPHONE 5.

2    Q.   NOW, STAYING WITH TAB 6, IF YOU COULD TURN TO PAGE 3412 --

3    A.   OKAY.

4    Q.   -- WHO CREATED THE BLOCK DIAGRAM SHOWN ON THIS PAGE?

5    A.   I DID.

6    Q.   AND WHAT DOES THIS PICTURE SHOW?

7    A.   SO THIS PICTURE SHOWS A VERY HIGH LEVEL DESCRIPTION OF HOW

8    WE PUT TOGETHER THE SOC, THE H5P SOC.

9    Q.   AND STICKING WITH THIS DIAGRAM, DO YOU SEE A PINK BOX NEAR

10   THE UPPER LEFT CORNER OF THE BLOCK DIAGRAM?

11   A.   YES.

12   Q.   WHAT IS THAT?

13   A.   SO THIS IS ONE OF THE SUBDESIGNS INSIDE THE SOC.  IT'S

14   REALLY A GROUPING OF DIFFERENT COMPONENTS THAT WE GROUP

15   TOGETHER AND CALL THE HPERF-NRT.

16        THE COURT:  I'M SORRY TO INTERRUPT YOU.  TIME IS NOW

17   10:49.

18      DX 351A, WHICH WAS ADMITTED WITH DR. SCHONFELD AND

19   MR. PARULSKI, WAS THE H3P USER'S MANUAL.

20        MS. TALLON:  YOUR HONOR, H3P I THINK IS THE FIRST OF

21   MANY MANUALS IN THAT COMPILATION.  H5P IS PART OF THAT AS WELL.

22        THE COURT:  OKAY.  BUT ARE YOU USING DX 351?  WE

23   SHOULD PROBABLY THEN ADMIT THAT, BECAUSE I ONLY HAVE 351A AS

24   BEING ADMITTED AND THAT'S THE H3P USER MANUAL.

25        MR. JOHNSON:  YOUR HONOR, MS. TALLON IS CORRECT.
```

```
1     IT'S A BIG EXHIBIT AND IT CONTAINS THE USER MANUALS FOR

2     SEVERAL --

3              THE COURT:  OH, THEY'RE BOTH IN A?

4              MS. TALLON:  THAT'S CORRECT.

5              THE COURT:  OKAY.

6              MR. JOHNSON:  SO RATHER THAN BRING BOXES OF THE

7     DOCUMENT, WE'VE PUT EXCERPTS.

8              THE COURT:  OKAY.  I SEE.  I JUST WANT TO MAKE SURE

9     THAT THE PARTIES, YOU AGREE --

10             MR. JOHNSON:  WE DO.

11             THE COURT:  -- WHAT'S IN 3 -- DO YOU WANT TO CALL

12    THIS ONE 351?

13             MR. JOHNSON:  I THINK IT'S 351A.  THAT'S THE WAY THE

14    PARTIES --

15             THE COURT:  ALL RIGHT.  THAT'S FINE.

16         SORRY TO INTERRUPT YOU.  GO AHEAD.  IT'S 10:50.

17             MS. TALLON:  THANK YOU, YOUR HONOR.

18    Q.   MR. MILLET, WHAT -- YOU JUST MENTIONED THAT THE BLOCK

19    WE'RE LOOKING IS CALLED THE HPERF-NRT BLOCK.  WHAT DOES THAT

20    LANGUAGE OR LABEL MEAN?

21    A.   SO IT'S REALLY JUST A SHORTHAND.  THE HPERF IS MEANT TO

22    DESCRIBE A SET OF COMPONENT DESIGNS THAT ARE RELATIVELY HIGH

23    PERFORMANCE.  SO THAT'S WHAT THE HPERF MEANS.

24         THE NRT IS JUST AN ACRONYM USED TO DESCRIBE COMPONENT

25    DESIGNS THAT HAVE THE PROPERTY THAT THEY ARE NON REAL TIME.
```

1       THEY HAVE NO REAL TIME REQUIREMENTS AROUND HOW THEY ACCESS

2       MEMORY.

3       Q.   NOW, IF WE COULD STAY WITH TAB 6 AND DX 351A AND

4       PAGE 3431, WE'LL TAKE A CLOSER LOOK AT THIS HPERF-NRT BLOCK.

5            WHAT IS THE PICTURE ON THIS PAGE?

6       A.   THIS IS A CLOSE-UP OF THE SAME BLOCK WE WERE JUST LOOKING

7       AT.  IT'S THE HPERF-NRT BLOCK.

8       Q.   DO YOU SEE THE BLOCKS LABELED 2X JPEG CODEC?

9       A.   YES.

10      Q.   WHAT IS A JPEG CODEC?

11      A.   SO A JPEG CODEC IS A COMPONENT DESIGNED THAT CAN BE USED

12      TO COMPRESS AND DECOMPRESS STILL IMAGES, PICTURES.

13      Q.   WHAT COMPANY SUPPLIES THE JPEG CODECS TO APPLE?

14      A.   SAMSUNG.

15      Q.   WHERE DOES SAMSUNG GET THE DESIGN FOR THE JPEG CODECS?

16      A.   SAMSUNG WORKS WITH A COMPANY CALLED SHIKINO.

17      Q.   IS THAT TRUE FOR ALL THE IOS DEVICES?

18      A.   YES.

19      Q.   STAYING WITH THIS BLOCK DIAGRAM, DO YOU ALSO SEE THE BLOCK

20      LABELED IMG VXE 380 H.264 ENCODE?

21      A.   YES.

22      Q.   WHAT IS AN H.264 ENCODER?

23      A.   SO THE H.264 VIDEO ENCODER IS A COMPONENT DESIGN YOU CAN

24      USE TO COMPRESS MOVIES, VIDEO.

25      Q.   WHAT COMPANY SUPPLIES THE VIDEO ENCODER IN THE IPHONE 5'S

1    SOC TO APPLE?

2    A.    IMAGINATION TECHNOLOGIES.

3    Q.    WHAT COMPANY SUPPLIES THE VIDEO ENCODER IN THE OTHER APPLE

4    SOC'S?

5    A.    IN PREVIOUS SOC'S, WE HAVE USED EARLIER VERSIONS OF

6    IMAGINATION'S ENCODER, AND ALSO SAMSUNG PROVIDED US VIDEO

7    ENCODERS IN THE PAST.

8    Q.    DO YOU SEE THE DOTTED LINE SURROUNDING SEVERAL OF THE

9    COMPONENTS IN THIS DIAGRAM?

10   A.    YES.

11   Q.    WHAT ARE THE REASONS THAT YOU DREW THOSE DOTTED LINES?

12   A.    SO THOSE DOTTED LINES ARE MEANT TO REPRESENT WHAT WE CALL

13   POWER DOMAINS.  BASICALLY A BOX THAT HAS A DOTTED LINE DRAWN

14   AROUND IT IS A BOX, IS A COMPONENT DESIGN THAT WE CAN

15   INDEPENDENTLY POWER ON AND OFF.  WE CAN SWITCH THOSE BLOCKS OFF

16   TO SAVE POWER.

17   Q.    WHAT ARE SOME OF THE OTHER COMPONENTS THAT WE SEE HERE IN

18   THE HPERF-NRT BLOCK DIAGRAM?

19   A.    SO IN ADDITION TO THE BLOCK WE'VE LOOKED AT, THERE IS, IN

20   THE UPPER RIGHT SIDE OF THIS, A BLOCK CALLED A PL080DMA.  THIS

21   IS A BLOCK WE USE TO PROVIDE THE CPU DEBUGGING CAPABILITIES.

22        ON THE BOTTOM OF THE DOCUMENT YOU SEE A LABEL CDIO BYPASS,

23   THAT'S ESSENTIALLY AN EXTERNAL INTERFACE THAT WE USE TO ALLOW

24   MISCELLANEOUS I/O BLOCKS TO PASS THROUGH THIS BLOCK TO GET TO

25   MEMORY.  SO IT'S REALLY JUST AN INTERFACE FOR THAT.

1          AND THERE'S A SCALER ROTATOR IN THERE, THERE'S TWO COPIES

2     ACTUALLY OF THE SCALER ROTATOR IN THERE THAT WE USE FOR IMAGE

3     PROCESSING.

4     Q.   NOW, WHAT, IF ANYTHING, DO THE OTHER COMPONENTS HAVE TO DO

5     WITH IMAGE OR VIDEO COMPRESSION?

6     A.   NOTHING.

7     Q.   THEN WHAT ARE THE REASON THAT THOSE COMPONENTS ARE SHOWN

8     IN THE SAME BLOCK AS THE COMPONENTS THAT ARE USED FOR IMAGE AND

9     VIDEO COMPRESSION?

10    A.   SO THE REASON WE PUT THESE BLOCKS TOGETHER IS, AGAIN,

11    THEY'RE HIGH PERFORMANCE BLOCKS AND THEY ALL HAVE THE PROPERTY

12    THAT THEY DON'T HAVE ANY REAL TIME REQUIREMENTS, AND THAT'S THE

13    REASON THE BLOCKS ARE TOGETHER AND THAT'S WHY WE LABELED IT

14    HPERF-NRT.

15    Q.   WHAT ARE THE REASONS THAT APPLE USES ONE COMPRESSOR FOR

16    STILL IMAGES AND A DIFFERENT COMPRESSOR FOR VIDEO?

17    A.   SO VIDEO COMPRESSION AND STILL IMAGE COMPRESSION ARE VERY

18    DIFFERENT THINGS.  VIDEO COMPRESSION IS MUCH MORE COMPLICATED.

19    IT REQUIRES A BIGGER INVESTMENT IN SILICON, BIGGER, MORE

20    COMPLICATED, MORE POWER HUNGRY DESIGN; WHEREAS STILL IMAGE

21    COMPRESSION IS A MUCH SIMPLER PROCESS AND CAN BE IMPLEMENTED

22    WITH A MUCH SMALLER, MORE EFFICIENT BLOCK, SO THE JPEG CODECS

23    ARE MUCH SMALLER.

24         SO WE LIKE TO TURN THE VIDEO CODECS OFF, THE VIDEO ENCODER

25    WE WANT TO LEAVE OFF WHILE WE'RE TAKING STILL IMAGES TO SAVE

1    POWER.

2         THE OTHER BENEFIT OF HAVING THE TWO BLOCKS BE SEPARATE IS

3    THAT OUR SOFTWARE TEAM WILL OCCASIONALLY WANT TO HAVE

4    FLEXIBILITY WITH REGARD TO FEATURES.  THEY MAY WANT TO TAKE A

5    STILL IMAGE AT THE SAME TIME THEY'RE CAPTURING VIDEO.

6         NOW, IF IT WAS THE SAME DESIGN, THAT WOULD BE A MUCH MORE

7    COMPLICATED PROCESS.  SO KEEPING THEM SEPARATE GIVES THEM THAT

8    FLEXIBILITY.

9    Q.   NOW, STAYING WITH TAB 6 IN YOUR BINDER, MR. MILLET, CAN

10   YOU TURN TO PAGE 3472?  WHAT DOES THIS PICTURE SHOW?

11   A.   SO THIS PICTURE IS THE FLOOR PLAN FOR THE H5P SOC.

12   Q.   HOW DOES THIS FLOOR PLAN COMPARE WITH THE BLOCK DIAGRAM WE

13   SAW EARLIER?

14   A.   SO THIS DIAGRAM, THE FLOOR PLAN IS A MUCH MORE DETAILED

15   REPRESENTATION OF THE SOC.  THE BLOCK DIAGRAM IS MUCH HIGHER

16   LEVEL.  IT'S MORE LIKE A CARTOON DRAWING.

17        THIS IS ACTUALLY CLOSER TO THE PHYSICAL IMPLEMENTATION OF

18   THE SOC.  IF YOU ACTUALLY LOOKED AT IT UNDER A MICROSCOPE, YOU

19   WOULD SEE A BLOCK ARRANGEMENT SOMEWHAT LIKE THIS.

20   Q.   WHERE ARE THE BLOCKS THAT ARE USED FOR IMAGE AND VIDEO

21   COMPRESSION SHOWN IN THIS PHYSICAL LAYOUT?

22   A.   SO IN THE UPPER LEFT-HAND CORNER YOU'LL SEE TWO KIND OF

23   ORANGE/BROWN COLORED BLOCKS.  THESE TWO BLOCKS ARE THE

24   PARTITIONS, THE PHYSICAL PARTITIONS WHERE THE VIDEO ENCODER

25   LIVES.

1          JUST BELOW THE RIGHT-MOST OF THOSE TWO BLOCKS IS A BLOCK

2     LABELED PD_NRT.  THIS IS THE PARTITION THAT INCLUDES THE JPEG

3     CODE DECK.

4     Q.   DO THE JPEG ENCODER OR VIDEO ENCODER HAVE CIRCUITRY THAT

5     OVERLAPS?

6     A.   NO.

7     Q.   DO THE JPEG AND VIDEO ENCODERS IN THE SOC'S OF THE OTHER

8     ACCUSED PRODUCTS HAVE CIRCUITRY THAT OVERLAPS?

9     A.   NO.

10    Q.   NOW, WE'VE JUST TALKED A LITTLE BIT ABOUT COMPONENTS THAT

11    PERFORM COMPRESSION.

12         DO THE APPLE SOC'S ALSO INCLUDE COMPONENTS THAT PERFORM

13    STILL IMAGE AND VIDEO DECOMPRESSION?

14    A.   YES.

15    Q.   OKAY.  STAYING WITH THIS FLOOR PLAN THAT WE'RE LOOKING AT

16    HERE, COULD YOU PLEASE IDENTIFY FOR US THE COMPONENTS THAT

17    PERFORM THE STILL IMAGE AND VIDEO DECOMPRESSION?

18    A.   SO THE, THE VIDEO DECOMPRESSION, IF WE LOOK TO THE RIGHT

19    OF -- JUST IMMEDIATELY TO THE RIGHT OF THE VIDEO ENCODER, THE

20    TWO ORANGE BLOCKS, THERE'S A GRAY-ISH/BROWN-ISH BLOCK LABELED

21    PD_DEC.  THIS IS THE VIDEO DECODER.

22         THE STILL IMAGE DECODER IS BACK IN THE PD_NRT BLOCK.  IT'S

23    DONE IN THE JPEG CODECS.

24    Q.   WHAT, IF ANY, CIRCUITRY DO THESE COMPONENTS HAVE THAT

25    OVERLAPS?

```
 1      A.   NONE.

 2      Q.   WHAT COMPANIES SUPPLY THESE COMPONENT DESIGNS TO APPLE?

 3      A.   THE VIDEO DECODER IS COMPONENT DESIGN WE GET FROM

 4      IMAGINATION TECHNOLOGIES, AND AGAIN, THE JPEG CODECS ARE

 5      PROVIDED BY SAMSUNG.

 6      Q.   AND WHAT COMPANY SUPPLIES THAT JPEG DESIGN TO SAMSUNG?

 7      A.   SHIKINO.

 8      Q.   IS THE SAME TRUE FOR THE DECODERS ON THE SOC'S IN THE

 9      OTHER IOS PRODUCTS?

10      A.   YES.

11      Q.   NOW, STAYING WITH TAB 6, DX 351A, IF YOU COULD TURN NOW TO

12      PAGE 1 -- IT'S ALSO ON THE SCREEN IN FRONT OF YOU, MR. MILLET,

13      IF THAT HELPS.

14      A.   OKAY.

15      Q.   DO YOU RECOGNIZE THIS DOCUMENT?

16      A.   YES.

17      Q.   WHAT IS IT?

18      A.   SO THIS IS THE H3P USER'S MANUAL, OR AN EXCERPT FROM IT.

19      Q.   WHAT IS H3P?

20      A.   H3P IS THE CODE NAME THAT WE USED TO DESCRIBE THE SOC IN

21      THE IPHONE 4.

22      Q.   IS THIS SOC ALSO USED IN THE IPOD TOUCH FOURTH GENERATION?

23      A.   I BELIEVE SO, YES.

24      Q.   NOW, IF WE COULD TURN IN THIS MANUAL TO PAGE 26 -- IT'S

25      ALSO ON THE SCREEN IN FRONT OF YOU IF YOU NEED IT -- WHAT DOES
```

1     THE PICTURE ON THIS PAGE SHOW?

2     A.   SO THIS IS THE BLOCK DIAGRAM FOR THE H3P TOP LEVEL SOC.

3     Q.   COULD YOU PLEASE POINT OUT FOR US WHERE THE COMPONENTS FOR

4     PERFORMING STILL IMAGE AND VIDEO COMPRESSION ARE SHOWN IN THIS

5     BLOCK DIAGRAM?

6     A.   SO FOR STILL IMAGE, THERE'S A PINK BLOCK, SORT OF IN THE

7     MIDDLE ROW OF THE DIFFERENT COMPONENT DESIGNS, AND IT'S

8     LABELLED HPERF1, AND THE JPEG CODEC SITTING IN THE MIDDLE THERE

9     IS THE BLOCK RESPONSIBLE FOR STILL IMAGE COMPRESSION.

10    Q.   AND COULD YOU POINT OUT THE COMPONENTS FOR STILL IMAGE AND

11    VIDEO DECOMPRESSION, MR. MILLET?

12    A.   SO FOR VIDEO DECOMPRESSION, IF WE MOVE OVER TO THE RIGHT

13    THERE A COUPLE OF BLOCKS, THERE'S A BLUE BLOCK THAT HAS TWO

14    COMPONENT DESIGNS INTEGRATED IN IT.  THE IMAGINATION VXD 374 IS

15    OUR VIDEO DECODER.

16    Q.   STAYING WITH DX 351A, IF WE COULD GO NOW TO PAGE 3455.

17    A.   OKAY.

18    Q.   DO YOU RECOGNIZE THIS PAGE?

19    A.   YES.

20    Q.   WHAT IS SHOWN IN THE DIAGRAM HERE?

21    A.   SO THIS IS THE, THE AUDIO SUBSYSTEM INSIDE THE H5P SOC.

22    Q.   AND WHAT AUDIO PROCESSING, IF ANY, DOES THIS AUDIO

23    SUBSYSTEM PERFORM IN THE IPHONE 5?

24    A.   NONE.

25    Q.   WHAT ARE THE REASONS WHY IT DOES NOT?

1    A.   WE DESIGNED THIS, THIS BLOCK WITH THE HOPE THAT SOFTWARE

2    WOULD USE IT TO DO LOW POWER AUDIO PROCESSING.

3         BUT IN THE END, WHEN THE PRODUCT CAME OUT, THE SOFTWARE

4    TEAM DECIDED TO NOT USE IT BECAUSE THEY FOUND THAT IT WAS LESS

5    EFFICIENT, LESS FLEXIBLE, AND DIDN'T REALLY SAVE THEM ANY

6    POWER.

7    Q.   HOW DO THE SOC'S IN THE IPHONE 4S AND IPOD TOUCH FIFTH

8    GENERATION COMPARE WITH THE IPHONE 5 IN TERMS OF THE AUDIO

9    SUBSYSTEM?

10   A.   SO THOSE SOC'S ALSO INCLUDED A BLOCK VERY SIMILAR TO THIS

11   ONE, AND, AGAIN, THE SOFTWARE TEAM ALSO IN THAT CASE CHOSE NOT

12   TO USE THE BLOCK FOR THE REASON THAT WE INTENDED, WHY WE BUILT

13   IT.

14        MS. TALLON:  THANK YOU, MR. MILLET.

15      NO FURTHER QUESTIONS.

16        THE COURT:  ALL RIGHT.  TIME IS NOW 11:00 O'CLOCK.

17        MR. JOHNSON:  MAY WE HAVE A MINUTE, PLEASE?

18        THE COURT:  OF COURSE.

19      (PAUSE IN PROCEEDINGS.)

20        THE COURT:  ARE YOU READY, MR. JOHNSON?

21        MR. JOHNSON:  YES, I AM.  THANK YOU.

22        THE COURT:  OKAY.  IT'S 11:01.

23      GO AHEAD, PLEASE.

24   ///

25   ///

1                          **CROSS-EXAMINATION**

2      BY MR. JOHNSON:

3      Q.   GOOD MORNING, MR. MILLET.   MY NAME IS KEVIN JOHNSON.   YOU

4      AND I HAVE NOT MET.

5           YOU'RE NOT HERE TO PROVIDE AN OPINION ABOUT WHETHER APPLE

6      INFRINGES THE '239 OR '449 PATENTS; RIGHT?

7      A.   I DON'T THINK SO, NO.

8      Q.   YOU HAVEN'T READ THE PATENTS, HAVE YOU?

9      A.   I ACTUALLY HAVE READ THE PATENTS.

10     Q.   YOU'VE READ THE PATENTS NOW SINCE YOUR DEPOSITION?

11     REMEMBER YOU WERE ASKED AT YOUR DEPOSITION AND YOU SAID YOU

12     DIDN'T KNOW WHAT ANY OF THE PATENTS WERE ABOUT; RIGHT?

13     A.   THAT'S CORRECT.

14     Q.   OKAY.   YOU ARE NOT HERE TO TESTIFY ABOUT APPLE'S IOS

15     SOFTWARE, RIGHT?   YOU'RE NOT AN EXPERT ON THAT?

16     A.   NO.

17     Q.   YOU'RE A HARDWARE ARCHITECT?

18     A.   AN SOC ARCHITECT, YES.

19     Q.   AN SOC ARCHITECT INVOLVED IN THE CHIP; RIGHT?

20     A.   YES.

21     Q.   OKAY.   THE APPLE A6 CHIP CONTAINS THE CIRCUITRY FOR BOTH

22     THE PHOTO AND VIDEO COMPRESSORS AND DECOMPRESSORS, DOESN'T IT?

23     A.   I'M SORRY.   WHICH CHIP ARE YOU TALKING ABOUT?

24     Q.   THE A6.   THE APPLE A6 CHIP CONTAINS THE CIRCUITRY FOR BOTH

25     THE PHOTO AND VIDEO COMPRESSORS AND DECOMPRESSORS; RIGHT?

```
 1      A.   SORRY.  I'M -- THE A6?

 2      Q.   YES.

 3      A.   A, NUMBER 6?

 4           I APOLOGIZE.  I WAS THROWN OFF.  SO THE, THE -- CAN YOU

 5      JUST REPEAT IT ONE MORE TIME?

 6      Q.   THE APPLE A6 CHIP CONTAINS THE CIRCUITRY FOR BOTH THE

 7      PHOTO AND VIDEO COMPRESSORS AND DECOMPRESSORS; RIGHT?

 8      A.   YES.  SORRY.

 9                MR. JOHNSON:  NO FURTHER QUESTIONS.

10                THE COURT:  ALL RIGHT.  THE TIME IS 11:02.

11           IS THERE ANY REDIRECT?

12                MS. TALLON:  NO, YOUR HONOR.

13                THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED?

14                MS. TALLON:  YES, YOUR HONOR.

15                THE COURT:  AND IT'S NOT SUBJECT TO RECALL; CORRECT?

16                MS. TALLON:  CORRECT.

17                THE COURT:  DO YOU AGREE WITH THAT, MR. JOHNSON?

18                MR. JOHNSON:  YES, I DO.

19                THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

20                MR. LEE:  AND YOUR HONOR, LADIES AND GENTLEMEN, OUR

21      NEXT WITNESS WILL BE ROBERTO GARCIA FROM APPLE.

22           WE'LL JUST MOVE THE BOOKS AROUND, YOUR HONOR.

23           MR. SELWYN IS GOING TO PRESENT MR. GARCIA.

24                THE COURT:  OKAY.  THAT'S FINE.  GO AHEAD AND GET SET

25      UP.
```

```
 1              (PAUSE IN PROCEEDINGS.)

 2                  THE CLERK:  WOULD YOU STAND AND RAISE YOUR RIGHT

 3         HAND, PLEASE?  SORRY.

 4              (PLAINTIFF'S WITNESS, ROBERTO GARCIA, WAS SWORN.)

 5                  THE WITNESS:  YES.

 6                  THE CLERK:  WOULD YOU HAVE A SEAT NOW, PLEASE.

 7              AND PULL THE MICROPHONE TOWARDS YOU AND STATE YOUR NAME

 8         AND SPELL IT.

 9                  THE WITNESS:  MY NAME IS ROBERTO GARCIA,

10         R-O-B-E-R-T-O, G-A-R-C-I-A.

11                  THE COURT:  ALL RIGHT.  TIME IS 11:04.

12              GO AHEAD, PLEASE.

13                          DIRECT EXAMINATION

14         BY MR. SELWYN:

15         Q.   GOOD MORNING.  WOULD YOU PLEASE INTRODUCE YOURSELF TO THE

16         JURY AND TELL US WHERE YOU WORK.

17         A.   MY NAME IS ROBERTO GARCIA.  I WORK AT APPLE.

18         Q.   WHAT IS YOUR CURRENT POSITION AT APPLE?

19         A.   I MANAGE THE MESSAGES APPLICATION, WHICH IS IMESSAGE AND

20         SMS FOR IOS AND MAC OS.

21         Q.   AND MR. GARCIA, IF YOU COULD JUST MOVE A LITTLE BIT CLOSER

22         TO THE MIKE AND SPEAK A LITTLE BIT SLOWER?

23         A.   SURE.

24         Q.   WHEN DID YOU FIRST JOIN APPLE?

25         A.   I STARTED WORKING AT APPLE IN, SOON AFTER COLLEGE IN 2003.
```

1      Q.   WHAT WAS YOUR POSITION AT APPLE WHEN YOU JOINED IN 2003?

2      A.   I WORKED AS A Q/A ENGINEER FOR THE PRODUCT THAT EVENTUALLY

3      BECAME KNOWN AS IWORK.

4      Q.   FOR HOW LONG DID YOU WORK AT APPLE IN THAT POSITION?

5      A.   I WORKED THERE FOR ABOUT TWO YEARS BEFORE GOING BACK TO

6      GRADUATE SCHOOL.

7      Q.   AND TELL US WHAT YOU DID NEXT.

8      A.   SO IN 2005, I GOT A FELLOWSHIP FROM APPLE TO GO TO

9      GRADUATE SCHOOL.

10     Q.   WHAT WAS THAT APPLE FELLOWSHIP?

11     A.   SO APPLE IS PART OF A CONSORTIUM OF COMPANIES AND RESEARCH

12     UNIVERSITIES THAT SPONSOR FELLOWSHIPS FOR UNDERREPRESENTED

13     MINORITIES TO GO TO -- TO ATTEND GRADUATE SCHOOL AND GET A

14     MASTER'S, PH.D.

15     Q.   TELL US MORE ABOUT YOUR EDUCATIONAL BACKGROUND, PLEASE.

16     A.   I WENT TO HIGH SCHOOL IN SAN ANTONIO, TEXAS, WHICH IS

17     WHERE I'M FROM, AND I CAME TO THE BAY AREA IN 1998 TO ATTEND

18     STANFORD UNIVERSITY WHERE I GOT MY BACHELOR'S OF SCIENCE IN

19     COMPUTER SCIENCE.  AFTERWARDS I STARTED WORKING AT APPLE, AND

20     EVENTUALLY I GOT MY MASTER'S IN COMPUTER SCIENCE FROM

21     JOHNS HOPKINS UNIVERSITY.

22     Q.   WHEN DID YOU RETURN TO WORK AT APPLE?

23     A.   I -- WHILE I WAS IN GRADUATE SCHOOL, I GOT AN INTERNSHIP

24     AT APPLE WHERE I, I -- WHICH IS THE JOB THAT EVENTUALLY LED TO

25     THE FULL TIME JOB THAT I GOT THERE.

```
1    Q.   AND WHEN DID YOU RETURN FULL TIME TO APPLE?

2    A.   2007.

3    Q.   WHAT MADE YOU DECIDE TO RETURN FULL TIME?

4    A.   I THINK IT WAS -- SO I WAS -- WHEN I WENT TO GRADUATE

5    SCHOOL, I WAS VERY INTERESTED IN RESEARCH AND, YOU KNOW, SORT

6    OF THE DRAW OF LEARNING COMPUTER SCIENCE, EXPLORING THAT AND

7    POTENTIALLY DOING A PH.D.

8         AND I THINK I -- WHEN STEVE JOBS GOT ON THE STAGE AND

9    ANNOUNCED THE IPHONE AND HE SHOWED, YOU KNOW, THE GLASS

10   CYLINDER ON ALL THE TV'S, THERE WAS THIS BEAUTIFUL, GLEAMING

11   IPHONE SPINNING IN THIS CYLINDER, I WAS ENAMORED LIKE EVERYBODY

12   ELSE AND I WANTED TO BE A PART OF THAT.

13   Q.   WHAT HAS BEEN YOUR MAIN PROJECT AT APPLE SINCE YOU

14   RETURNED TO THE COMPANY IN 2007?

15   A.   FACETIME.

16   Q.   COULD YOU BRIEFLY EXPLAIN TO THE JURY WHAT FACETIME IS?

17   A.   FACETIME IS THIS -- YOU'VE PROBABLY SEEN PEOPLE WALKING

18   AROUND WITH THEIR IPHONES TALKING TO SOMEBODY, OR MAYBE YOU MAY

19   HAVE SEEN COMMERCIALS WITH PEOPLE TALKING TO THEIR

20   GRANDPARENTS.

21        IT'S VIDEO CALLING ON YOUR, ON YOUR IPHONE THAT -- YOU

22   KNOW, IT'S THIS VERY INTIMATE EXPERIENCE.  IT CONNECTS PEOPLE.

23   THAT'S KIND OF WHAT THE PRODUCT IS.

24   Q.   WHAT PROJECT WERE YOU FIRST ASSIGNED TO AT APPLE WHEN YOU

25   RETURNED IN 2007?
```

1    A.   I STARTED WORKING ON ICHAT.

2    Q.   WHAT WAS ICHAT?

3    A.   ICHAT IS APPLE'S INSTANT MESSAGING APPLICATION THAT ALSO

4    HAD A VIDEO CONFERENCING PIECE TO IT THAT I WORKED ON.

5    Q.   DID YOU WORK ON ANYTHING ELSE IN 2007 IN ADDITION TO

6    ICHAT?

7    A.   SORRY.  YEAH.  AT THE END OF 2007, I STARTED WORKING -- I

8    WAS -- BASICALLY SINCE I STARTED AT APPLE, I WAS, YOU KNOW,

9    KIND OF PESTERING MY BOSS, LIKE I WANT TO BE PART OF THE

10   IPHONE, I WANT TO DO SOMETHING.

11        AND I HAD -- I HAD LEARNED ALL THESE REALLY GREAT THINGS

12   IN GRADUATE SCHOOL AND WORKING FOR MY BOSS, THESE GREAT

13   NETWORKING TECHNOLOGIES AND AUDIO, AUDIO PROCESSING AND ALL

14   THESE OTHER THINGS, AND I REALLY WANTED TO PUT TOGETHER

15   SOMETHING ON THE IPHONE.

16        AND SO KIND OF IN MY SPARE TIME, I FINALLY GOT ACCESS TO

17   SOME OF THE TECHNOLOGY THAT WOULD ENABLE ME TO WORK ON THE

18   IPHONE AND PUT TOGETHER SOME OF THE PIECES THAT I HAD LEARNED

19   IN BUILDING ICHAT AND IN MY INTERNSHIP.

20        SO THAT ALL STARTED AT THE END OF 2007.

21   Q.   WAS THAT A PROTOTYPE?

22   A.   YEAH.  SO MY IDEA WAS I REALLY WANTED -- LIKE I SAID, IN

23   MY INTERNSHIP, I HAD BUILT THIS GREAT KIND OF AUDIO OVER I.P.

24   SO YOU COULD HAVE KIND OF LIKE A PHONE CALL KIND OF THING ON A

25   MAC, AND I WANTED TO BRING THAT TO THE IPHONE.  I WANTED TO PUT

1    THE TECHNOLOGY THAT I BUILT THERE, AND SO I STARTED WORKING ON

2    THIS PROTOTYPE.

3    Q.   AND FOR HOW LONG DID YOU WORK ON THE PROTOTYPE?

4    A.   I MADE MY FIRST -- SO I STARTED WORKING ON THIS PROTOTYPE

5    IN 2000 -- IN LATE 2007, SO WHEN MY SON WAS BORN IN JULY OF

6    2008.

7         SO SOMETIME AFTER THAT I HAD BROUGHT THE PROTOTYPE UP

8    ENOUGH SO THAT I COULD CONNECT USING ICHAT, THE ICHAT PROTOCOL,

9    I COULD CONNECT MY PHONE TO MY MAC SO I COULD HAVE A, YOU KNOW,

10   A REAL VOICE CALL BETWEEN THOSE TWO DEVICES AROUND AUGUST OF

11   2008.

12        AND AFTER THAT WE WERE ABLE TO DECODE A VIDEO FRAME FROM

13   THE MAC ON THE PHONE ALSO IN 2008, AND THAT'S AS FAR AS WE

14   COULD TAKE THE PROTOTYPE.

15   Q.   AND WHAT DID YOU DO WITH THAT PROTOTYPE WHEN YOU ACHIEVED

16   THAT LEVEL OF FUNCTIONALITY?

17   A.   I SHOWED IT TO MY BOSS AND I WAS VERY HAPPY WITH IT.

18   Q.   WHO WAS YOUR BOSS?

19   A.   JOE AVALON.

20   Q.   WHAT WAS MR. AVALON'S REACTION TO WHAT YOU SHOWED HIM?

21   A.   I THINK HE STARTED DEMOING -- OR I REMEMBER DEMOING TO

22   MANAGEMENT AND SHOWING WHAT GREAT PROGRESS WE HAD MADE DESPITE

23   NOT REALLY -- DESPITE SORT OF THE LIMITATIONS OF THE TECHNOLOGY

24   AT THE TIME.

25   Q.   WERE YOU THEN ASSIGNED TO AN IPHONE PROJECT?

1    A.   SO EVENTUALLY, YEAH, I STARTED WORKING ON A PROJECT CALLED

2    GAME KIT.

3    Q.   WHAT WAS GAME KIT?

4    A.   SO IN 2008, IT BECAME CLEAR THAT -- AND BEFORE THAT --

5    THAT THE APP STORE HAD TAKEN OFF AND THE IPHONE WAS A GREAT

6    GAMING PLATFORM.

7         AND SO, YOU KNOW, THE COMPANY HAD DECIDED -- OR MY

8    MANAGEMENT HAD DECIDED THAT IT WOULD BE A GREAT THING FOR

9    DEVELOPERS TO HAVE A WAY TO PLAY -- TO WRITE APPLICATIONS THAT

10   COULD PLAY GAMES WITH EACH OTHER, AND THEY COULD ALSO DO VOICE

11   CHAT, WHICH WAS SORT OF MY AREA OF EXPERTISE.

12   Q.   AND THEN WHAT WAS YOUR NEXT PROJECT AFTER GAME KIT?

13   A.   YOU KNOW, EVERYONE LOVED WHAT WE HAD DONE WITH GAME KIT,

14   AND THE NEXT PART OF THAT WAS THEY WERE EXPANDING THE VISION OF

15   WHAT GAME KIT WAS AND THERE WAS SOMETHING CALLED GAME CENTER

16   THAT I STARTED ON.

17   Q.   BRIEFLY, WHAT WAS GAME CENTER?

18   A.   GAME CENTER IS A, A SOCIAL NETWORKING FOR GAMES.  YOU

19   COULD SEE -- IT'S A -- IT'S APPLE'S SOCIAL NETWORK FOR GAMES.

20   SO YOU COULD SEE, LIKE, YOUR FRIENDS' HIGH SCORES AND STUFF

21   LIKE THAT WHEN YOU PLAY GAMES OR APPS OR WHATEVER IT IS.

22   Q.   AND WHAT YEAR WERE YOU WORKING ON GAME CENTER?

23   A.   THAT WAS IN 2009.

24   Q.   DID YOU WORK ON OTHER PROJECTS WHILE YOU WERE WORKING ON

25   GAME CENTER?

1      A.   SO PART OF THE GAME CENTER WORK I DID, I WAS EXPANDING THE

2      VOICE CHAT INTO, TO HAVE MULTIPLE PEOPLE.  SO YOU COULD IMAGINE

3      YOU AND ALL OF YOUR FRIENDS WERE DOING, YOU KNOW, ALL OVER THE

4      COUNTRY AND YOU COULD, WHILE YOU WERE PLAYING A GAME, ALL TALK

5      TO EACH OTHER AT THE SAME TIME.

6           SO I WAS WORKING ON THAT PIECE FOR GAME CENTER, AND A LOT

7      OF THE CODE I WAS WRITING THERE BECAME PART OF THE FACETIME

8      PRODUCT.

9      Q.   AND WHEN DID YOU START TO WORK ON THAT ASPECT OF THE

10     FACETIME PRODUCT?

11     A.   YOU KNOW, THE CODE WAS REALLY -- THE CODE WAS REALLY THE

12     SAME IT TURNED OUT.  THE CODE THAT I WAS WRITING FOR GAME

13     CENTER TURNED OUT TO BE VERY USEFUL FOR FACETIME AS WELL.  SO I

14     WOULD SAY, LIKE, LATE 2009.

15     Q.   AND WAS IT CALLED FACETIME AT THAT POINT?

16     A.   NO.  IT WAS CALLED VENICE.

17     Q.   WAS THAT AN INTERNAL NAME WITHIN THE COMPANY?

18     A.   THAT WAS THE CODE NAME.  WE USE A LOT OF CODE NAMES.

19     Q.   HOW DID THE WORK THAT YOU HAD DONE THE PRIOR TWO YEARS ON

20     THE PROTOTYPE AND ON GAME KIT AND ON GAME CENTER RELATE TO THE

21     WORK THAT YOU WERE DOING ON FACETIME?

22     A.   YOU CAN THINK OF IT AS AN EVOLUTION.  SO IT STARTED OUT AS

23     A VERY, VERY SIMPLE APPLICATION, THE PROTOTYPE, AND AS WE -- AS

24     WE WENT FURTHER ALONG, WE BUILT LAYERS AND LAYERS.

25          SO THERE WERE -- THERE WAS A NETWORKING PIECE WHICH

1    ALLOWED TWO DEVICES TO SEND PACKETS BACK AND FORTH TO EACH

2    OTHER.

3         AND THEN WE BUILT THE AUDIO PIECE, WHICH ALLOWED YOU TO

4    HAVE, YOU KNOW, THIS REALTIME COMMUNICATION, SEAMLESS

5    INTERACTION.

6         AND THEN WE ADDED VIDEO ON TOP OF THAT, AND ALL OF THAT,

7    YOU KNOW, OVER TIME THE CODE GOT BETTER AND MORE REFINED AND

8    MORE ADVANCED AND ALL OF THAT BECAME KNOWN AS FACETIME.

9    Q.   BEGINNING IN THE FALL OF 2009, HOW MUCH OF YOUR TIME WERE

10   YOU DEVOTING TO DEVELOPING FACETIME?

11   A.   I SPENT ALL OF -- LIKE I SAID, I -- GETTING TO BE PART OF

12   THE IPHONE WAS THE REASON WHY I WENT BACK TO APPLE, SO I SPENT

13   ALL OF MY TIME THERE.

14   Q.   AND HOW MANY APPLE ENGINEERS WORKED ON YOUR TEAM

15   DEVELOPING FACETIME?

16   A.   FOUR.

17   Q.   WERE THERE OTHER TEAMS WHO WERE ALSO INVOLVED IN

18   DEVELOPING FACETIME?

19   A.   YEAH.  THERE WAS THE CORE AUDIO TEAM WHO DID THE KIND OF

20   AUDIO BACK END, THE, YOU KNOW, DEALING WITH THE MICROPHONE AND

21   THE SPEAKER.

22        THERE WAS THE VIDEO CODEC TEAM, THE APPLICATION TEAM

23   WHICH, YOU KNOW, DRAWS THE PRETTY BUTTONS AND THINGS LIKE THAT.

24        I'M DIMINISHING IT.

25        BUT, YEAH, THERE WERE ALL THESE DIFFERENT TEAMS, TOO, THAT

1      CAME TOGETHER.

2      Q.   HOW MUCH CODE DID YOU AND OTHERS WRITE FOR FACETIME?

3      A.   AT LEAST TENS OF THOUSANDS OF LINES OF CODE.

4      Q.   AND WHEN DID APPLE INTRODUCE FACETIME TO THE MARKET?

5      A.   JUNE OF 2010.

6      Q.   WAS THAT THE WI-FI VERSION?

7      A.   THAT'S CORRECT.

8      Q.   AND WHEN WAS THE CELLULAR VERSION RELEASED?

9      A.   I BELIEVE IN JUNE -- IT WAS ANNOUNCED IN JUNE OF 2012, AND

10     I THINK IT SHIPPED TO CUSTOMERS IN THE FALL OF 2012.

11     Q.   NOW, CAN YOU BRIEFLY DESCRIBE SOME OF THE ENGINEERING

12     CHALLENGES YOU FACED IN DEVELOPING FACETIME?

13     A.   YOU KNOW, ONE OF THEM WAS REALLY SURPRISING, WHICH IS I

14     TALKED ABOUT ICHAT AND THE EXPERIENCE THERE IS YOU LOG -- YOU

15     HAVE A LOG-IN NAME AND PASSWORD AND THERE'S A BUDDY LIST, AND

16     WHEN WE FIRST STARTED DEMOING FACETIME, STEVE JOBS JUST HATED

17     THAT EXPERIENCE.

18          WHAT HE WANTED WAS ON DAY 1 WHEN PEOPLE BOUGHT THE

19     IPHONE 4, THAT YOU PULL IT OUT OF THE BOX, AND IF ANYBODY IN

20     YOUR FAMILY OR YOUR FRIENDS HAD PURCHASED AN IPHONE 4, YOU

21     WOULD CALL THEM UP AND PRESS A BUTTON AND YOU WOULD UPGRADE TO

22     THIS NEW VIDEO CALLING EXPERIENCE.

23          SO THAT WAS A HUGE CHALLENGE TO BUILD THE BACK END FOR

24     THAT, TO KNOW THAT THIS PHONE WAS ASSOCIATED WITH YOU, THE

25     SECURITY AROUND THAT, AND THAT WAS HUGE.

1    Q.   ARE YOU PROUD OF THE WORK THAT YOU DID ON FACETIME?

2    A.   I'M EXTREMELY PROUD OF THE WORK I DID ON FACETIME.

3         ONE OF THE PROUDEST MOMENTS OF MY LIFE, IN FACT, WAS WHEN

4    MY DAUGHTER WAS BORN IN 2011, THE -- MY IN-LAWS COULDN'T BE

5    THERE WITH US FOR THE BIRTH, OR VISIT.  THEY WERE STUCK IN

6    TEXAS.

7         AND SHORTLY AFTER WE HAD SWADDLED HER AND PUT HER IN MY

8    WIFE'S ARMS, I MADE A FACETIME CALL TO MY MOTHER-IN-LAW.  AND,

9    YOU KNOW, WE COULD HEAR HER BAWLING IN CRYSTAL CLEAR AUDIO IN

10   THE, IN THE MOMENTS AFTER.

11        AND LATER ON, YOU KNOW, SHE HUGGED ME AND SHE SAID, LIKE,

12   SHE FELT LIKE SHE WAS RIGHT THERE.

13        AND I THINK THAT'S THE -- THAT'S TOTALLY THE THING THAT WE

14   AIMED FOR WHEN WE MADE FACETIME.

15   Q.   DID YOU GET ANY PATENTS FOR YOUR WORK ON FACETIME?

16   A.   I BELIEVE WE -- I'VE BEEN GRANTED FIVE PATENTS IN RELATION

17   TO THE WORK THAT I DID WITH FACETIME.

18   Q.   WHAT ARE THE PRIMARY HARDWARE COMPONENTS THAT FACETIME

19   USES?

20   A.   I THINK I MENTIONED SOME OF THEM ALREADY.  THERE'S THE

21   MICROPHONE, THE SPEAKER, THE DISPLAY, THE PROCESSOR, THE CPU,

22   THE WI-FI CHIP, CELLULAR CHIP.  IT'S PRETTY MUCH THE WHOLE

23   DEVICE REALLY.

24   Q.   DO YOU HAVE ANY EXPERIENCE WITH VIDEO CAPTURE MODULES?

25   A.   I THINK SO.  MY -- YES.  MY ROOMMATE IN COLLEGE HAD ONE.

DIRECT GARCIA

1       Q.   AND WHAT DID HE DO WITH IT?

2       A.   SO HE -- HE USED TO HAVE A -- HE USED TO HAVE THIS OLD

3       P.C., IT WAS A BIG BEIGE BOX, AND HE PUT A VIDEO CAPTURE CARD

4       INTO THE BOX AND HE USED TO CONNECT HIS VCR TO IT SO THAT HE

5       COULD DIGITIZE SOME OF HIS HOME MOVIES.

6            HE HAD -- HE WAS A REAL BIG FAN OF BLACKADDER.  HE WANTED

7       TO WATCH HIS SHOW ON THE COMPUTER.

8       Q.   HAVE YOU EVER USED A VIDEO CAPTURE MODULE WHILE AT APPLE?

9       A.   NO.

10      Q.   NOW, LET ME ASK YOU SOME QUESTIONS ABOUT HOW FACETIME

11      ACTUALLY WORKS.

12           DOES FACETIME EVER RECORD A VIDEO?

13      A.   NO.

14      Q.   DOES FACETIME EVER SEND A RECORDED VIDEO?

15      A.   NO.

16      Q.   WHAT THEN DOES FACETIME SEND BETWEEN TWO USERS?

17      A.   SO AS VIDEO FRAMES ARE CAPTURED FROM THE CAMERA, OR WE

18      PROCESS THEM ONE AT A TIME, WE ENCRYPT THEM, WE ENCODE THEM,

19      AND THEN WE SEND THE PACKET.

20      Q.   NOW, YOU MENTIONED A VIDEO FRAME.  WHAT IS THE DIFFERENCE

21      BETWEEN A VIDEO AND A VIDEO FRAME?

22      A.   SO I THINK OF IT -- SO A VIDEO FRAME TO ME IS A STILL

23      IMAGE.  IT'S ONE, ONE, ONE MOMENT IN TIME.

24           A VIDEO IS VASTLY DIFFERENT.  IT'S -- IT'S MORE LIKE

25      SOMETHING I THINK OF LIKE ON YOUR BLUERAY OR SOMETHING.  IT'S A

1        BIG COLLECTION OF ALL THESE IMAGES, THERE'S A FILE, THERE'S A

2        HEADER FOR IT.

3            AND WE DON'T SEND ANYTHING LIKE THAT IN FACETIME.

4        Q.   NOW, YOU'RE FAMILIAR WITH FACETIME'S SOURCE CODE; RIGHT?

5        A.   YES.

6        Q.   ARE THERE ANY FILES THAT REFER TO CAPTURING VIDEO IN THEIR

7        NAMES?

8        A.   YES.

9        Q.   WHY ARE THEY CALLED THAT?

10       A.   I MEAN, I THINK IT'S JUST A -- IT'S JUST A LAYMAN'S

11       PARLANCE.  WHEN WE WRITE THE CODE, WE TRY TO WRITE IT IN A WAY

12       THAT COMMUNICATES SOMETHING THAT IS, IN ENGLISH,

13       UNDERSTANDABLE, AND SO -- BUT IT REALLY HAS NOTHING TO DO WITH

14       CAPTURING VIDEO AT ALL.  EACH FRAME IS PROCESSED ONE AT A TIME,

15       AND AT THAT LAYER, THERE WAS REALLY NO RELATIONSHIP TO THE

16       PRIOR FRAME.

17       Q.   WELL, CAN A USER EVER REPLAY A VIDEO FROM A FACETIME CALL?

18       A.   NO.

19       Q.   WHY NOT?

20       A.   THERE'S NO VIDEO TO PLAY BACK.

21       Q.   WERE THERE ANY REASONS THAT YOU DESIGNED FACETIME SO THAT

22       IT DID NOT CREATE OR RECORD A VIDEO?

23       A.   YEAH.  SO, I MEAN, WE DIDN'T TALK ABOUT IT EARLIER, BUT

24       THE -- WHEN WE WERE TALKING ABOUT TECHNICAL CHALLENGES, THERE

25       ARE A BUNCH OF TECHNICAL CHALLENGES.  THERE'S THE -- THERMALS

1     IS A BIG ONE.  SO YOU DON'T WANT TO DO -- ANYTHING YOU DO ON

2     THE IPHONE, YOU KNOW, IT'S THIS REALLY SMALL, COMPACT AREA, AND

3     LIKE I SAID, VIDEO CALLING USES ALL THESE DIFFERENT SUBSYSTEMS.

4     ANYTHING YOU DO HAS A POWER AND A THERMAL COST.

5         AND SO BECAUSE RECORDING A VIDEO DOESN'T HAVE ANYTHING TO

6     DO WITH THE EXPERIENCE OF MAKING A FACETIME CALL, WE WOULD

7     NEVER DO THAT.  WE WOULD NEVER DO THAT EXTRA WORK.

8         IN ADDITION, YOU KNOW, I KNOW I'M VERY SERIOUS ABOUT IT, I

9     DON'T WANT MY VIDEO CALLS RECORDED BY ANYBODY OR SEEN BY

10    ANYBODY, SO WE TAKE -- ME AND EVERYBODY ON OUR TEAM TOOK THE

11    SECURITY AND THE PRIVACY OF THE PRODUCT VERY SERIOUSLY.

12    Q.   BEFORE THIS CASE, HAD YOU EVER HEARD OF THE '239 PATENT?

13    A.   NO.

14    Q.   HAD YOU EVER HEARD OF A COMPANY CALLED VOICE OVER

15    CELLULAR, OR VOCI?

16    A.   NO.

17    Q.   NOW, WE'VE TALKED A LOT ABOUT FACETIME.  LET ME ASK YOU

18    VERY BRIEFLY ABOUT A DIFFERENT FUNCTIONALITY.

19        WHEN DID APPLE FIRST INTRODUCE THE CAPABILITY IN THE

20    IPHONE OF SENDING VIDEO OVER CELLULAR IN AN E-MAIL MESSAGE?

21    A.   SO MY RECOLLECTION OF THAT IS WHEN THE IPHONE 3GS CAME

22    OUT, WHICH I BELIEVE WAS IN 2009, WE STARTED THAT.

23         MR. SELWYN:  THANK YOU, MR. GARCIA.

24    NO FURTHER QUESTIONS.

25         THE COURT:  ALL RIGHT.  THE TIME IS NOW 11:22.

1          MR. JOHNSON:  YOUR HONOR, NO QUESTIONS.

2          THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

3     AND IS IT SUBJECT TO RECALL OR NO RECALL?

4          MR. SELWYN:  NOT SUBJECT TO RECALL.

5          THE COURT:  DO YOU AGREE WITH THAT, MR. JOHNSON?

6          MR. JOHNSON:  YES.

7          THE COURT:  OKAY.  THEN YOU ARE EXCUSED.

8          MR. LEE:  YOUR HONOR, AND LADIES AND GENTLEMEN, OUR

9     NEXT WITNESS WILL BE PROFESSOR JAMES STORER.  MR. SELWYN WILL

10    DO THE EXAMINATION.

11         THE COURT:  ALL RIGHT.

12         MR. LEE:  AND THERE'S ACTUALLY A DECLARATION TO READ

13    IN.

14         THE COURT:  OKAY.  11:22.

15       GO AHEAD, PLEASE.

16         MR. SELWYN:  WE HAVE A DECLARATION OF TRACEY MAZUR TO

17    READ INTO THE RECORD, IF I MAY?

18         THE COURT:  GO AHEAD, PLEASE.

19         MR. SELWYN:  IF WE COULD PUT THAT ON THE SCREEN.

20    THIS IS TITLED DECLARATION OF TRACEY MAZUR.

21       "I, TRACEY MAZUR, DECLARE AS FOLLOWS:

22       "THIS DECLARATION IS MADE FOR THE PURPOSE OF

23    AUTHENTICATING VARIOUS DOCUMENTS PRODUCED BY INTEL CORPORATION.

24       "I AM EMPLOYED AS CURATOR AT INTEL.  I HAVE BEEN EMPLOYED

25    AT INTEL SINCE 1998, AND HAVE BEEN WORKING IN INTEL'S CORPORATE

 1    ARCHIVES SINCE 2006.  I MAKE THIS DECLARATION BASED ON PERSONAL

 2    KNOWLEDGE.

 3         "AS PART OF ITS CORPORATE RECORD KEEPING PRACTICES, INTEL

 4    MAINTAINS AN ARCHIVE OF HISTORICAL MATERIAL.  THE ARCHIVE

 5    INCLUDES TECHNICAL LITERATURE, PROMOTIONAL DOCUMENTS AND OTHER

 6    MEDIA PERTAINING TO PAST INTEL PRODUCTS.  THIS PRODUCT RELATED

 7    MATERIAL IS COLLECTED FROM INTEL BUSINESS UNITS AND INDIVIDUALS

 8    INVOLVED IN PRODUCT DEVELOPMENT AND MARKETING.  THE ARCHIVES

 9    ARE MAINTAINED OFFSITE AT A SECURE DOCUMENT ARCHIVING FACILITY.

10         "IN RESPONSE TO A DISCOVERY REQUEST FROM APPLE, WE

11    RETRIEVED SEVERAL BOXES OF ARCHIVE MATERIAL FROM OFFSITE

12    STORAGE.  SPECIFIC DOCUMENTS PERTAINING TO SEVERAL INTEL VIDEO

13    PRODUCTS IDENTIFIED IN APPLE'S REQUESTS WERE IDENTIFIED.  I AM

14    INFORMED THAT THOSE HAVE BEEN PROVIDED TO APPLE IN DOCUMENT

15    BEARING BATES NUMBERS 161DOC1 THROUGH 5945.  THESE DOCUMENTS

16    ARE AUTHENTIC COPIES OF THE TECHNICAL LITERATURE ORIGINALLY

17    PLACED IN INTEL'S ARCHIVES.

18         "PURSUANT TO 28 U.S.C. 1746, I DECLARE UNDER PENALTY OF

19    PERJURY THAT THE FOREGOING IS TRUE AND CORRECT."

20         SIGNED, TRACEY MAZUR.

21         THE COURT:  ALL RIGHT.  THE TIME IS 11:24.

22         MR. SELWYN:  YOUR HONOR, APPLE CALLS PROFESSOR

23    JAMES STORER.

24         **(PLAINTIFF'S WITNESS, JAMES STORER, WAS SWORN.)**

25         THE WITNESS:  I DO.

```
 1              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

 2          WOULD YOU PULL THE MICROPHONE TOWARDS YOU AND STATE YOUR

 3      NAME AND SPELL IT, PLEASE.

 4              THE WITNESS:  YES.  MY NAME IS JAMES STORER,

 5      S-T-O-R-E-R.

 6              THE CLERK:  THANK YOU.

 7              THE COURT:  ALL RIGHT.  TIME IS 11:24.

 8          GO AHEAD, PLEASE.

 9                       DIRECT EXAMINATION

10      BY MR. SELWYN:

11      Q.   GOOD MORNING.  WOULD YOU PLEASE INTRODUCE YOURSELF TO THE

12      JURY BY TELLING US YOUR NAME AND WHERE YOU LIVE?

13      A.   SURE.  I'M JIM STORER AND I LIVE IN LINCOLN,

14      MASSACHUSETTS.

15      Q.   MAY WE HAVE PDX 90.1 ON THE SCREEN.

16          DR. STORER, WHAT DO YOU DO FOR A LIVING?

17      A.   I'M A PROFESSOR OF COMPUTER SCIENCE AT BRANDEIS

18      UNIVERSITY.

19      Q.   HOW LONG HAVE YOU TAUGHT AT BRANDEIS AND WHAT POSITIONS

20      HAVE YOU HELD?

21      A.   I'VE BEEN THERE A LONG TIME.  I CAME IN 1980, AND I

22      STARTED OUT AS AN ASSISTANT PROFESSOR AND EVENTUALLY BECAME

23      FULL PROFESSOR AND WAS CHAIR OF THE DEPARTMENT FOR ABOUT TEN

24      YEARS.

25      Q.   IF YOU COULD JUST SCOOTCH A LITTLE BIT CLOSER TO THE
```

```
 1        MICROPHONE?

 2        A.   HOW ABOUT THIS?

 3        Q.   VERY GOOD.

 4        A.   HOW ABOUT THAT?

 5        Q.   THAT'S GREAT.

 6             PLEASE TELL THE JURY ABOUT YOUR EDUCATIONAL BACKGROUND.

 7        A.   YES.  SO I WAS AN UNDERGRADUATE AT CORNELL UNIVERSITY, AND

 8        THEN I GOT MY MASTER'S AND PH.D. AT PRINCETON UNIVERSITY IN THE

 9        DEPARTMENT OF ELECTRICAL ENGINEERING AND COMPUTER SCIENCE.

10        Q.   WHAT HAS BEEN THE FOCUS OF YOUR WORK WITHIN THE FIELD OF

11        COMPUTER SCIENCE?

12        A.   SO THROUGHOUT MY CAREER, MY RESEARCH HAS BEEN FOCUSSED ON

13        DATA COMPRESSION AND IMAGE PROCESSING, CONTENT-BASED IMAGE

14        RETRIEVAL, EACH OF THESE RELATING TO MULTIMEDIA ALGORITHMS AND

15        SOFTWARE AND HARDWARE.

16        Q.   WHAT IS DATA COMPRESSION?

17        A.   SO DATA COMPRESSION IS KIND OF, AS THE NAME SUGGESTS, IT'S

18        THE WAY IN WHICH YOU CAN TAKE DATA AND MAKE IT SMALLER AND MAKE

19        IT USE LESS STORAGE OR BE LESS TO TRANSMIT OVER A COMMUNICATION

20        LINK.

21        Q.   WHAT COURSES DO YOU TEACH AT BRANDEIS?

22        A.   SO THE TEACHING GOES A LITTLE BROADER THAN MY RESEARCH.  I

23        TEACH BOTH AT THE UNDERGRADUATE LEVEL, INTRODUCTORY COURSES,

24        AND ALSO AT THE GRADUATE LEVEL, WHICH WOULD BE COURSES TENDING

25        TO BE MORE RELATED TO MY RESEARCH, ALGORITHMS AND SOFTWARE AND
```

1      HARDWARE FOR THINGS RELATED TO DATA COMPRESSION AND IMAGE

2      PROCESSING, THINGS LIKE THAT.

3      Q.   HAVE YOU PUBLISHED ANY BOOKS OR ARTICLES?

4      A.   YES.  SO BOTH.  A HALF DOZEN OR SO BOOKS, AND OF COURSE

5      OVER THE YEARS ARTICLES IN BOTH PROFESSIONAL CONFERENCES AND

6      JOURNALS.

7      Q.   HAVE YOU EVER WORKED OUTSIDE THE UNIVERSITY?

8      A.   YES.

9      Q.   WHERE?

10     A.   WELL, FIRST OF ALL, WHEN I GRADUATED FROM PRINCETON, I

11     ALSO WORKED AT ATT BELL LABORATORIES FOR A WHILE.

12          AND THEN OVER THE YEARS, I DO CONSULTING ON THE SIDE; AND

13     I'VE ALSO HAD SEVERAL SMALL COMPANIES OF MY OWN.  ONE OF THEM,

14     THE MORE RECENT ONE, WAS A COMPANY THAT WAS FUNDED BY NASA

15     UNDER A FEDERAL PROGRAM CALLED SMALL BUSINESS -- SBIR, SMALL

16     BUSINESS INNOVATION RESEARCH PROGRAM, AND IT COMES IN SEVERAL

17     PHASES OF FUNDING.

18          AND IN THAT, WITH THAT COMPANY, WE DEALT WITH VERY HIGH

19     SPEED COMPRESSION HARDWARE, INCLUDING 4,000 PROCESSING ELEMENTS

20     TO DO VERY HIGH SPEED COMPRESSION OF NASA IMAGERY AND DATA.

21     Q.   HAVE YOU HAD A LEADERSHIP ROLE IN ANY ACADEMIC

22     CONFERENCES?

23     A.   YES.  SO IN -- IN 1991 I FOUNDED THE IEEE DATA COMPRESSION

24     CONFERENCE, THAT'S I-E-E-E FOR INSTITUTE OF ELECTRICAL AND

25     ELECTRONIC ENGINEERS, AND THAT CONFERENCE NOW HAS BEEN THE

```
 1        PREMIER CONFERENCE FOR DATA COMPRESSION AND RELATED THINGS FOR

 2        THE LAST -- ACTUALLY NEXT YEAR WILL BE THE 25TH ANNIVERSARY OF

 3        THE CONFERENCE, AND I'VE BEEN CHAIR OF IT EACH YEAR.

 4        Q.   ARE YOU A NAMED INVENTOR ON ANY PATENTS?

 5        A.   YES.  SO FIVE PATENTS, ALTHOUGH THREE WHICH WOULD BE MOST

 6        RELATED TO ISSUES IN THIS CASE.

 7              MR. SELWYN:  YOUR HONOR, APPLE OFFERS DR. STORER AS

 8        AN EXPERT IN THE FIELD OF COMPUTER SCIENCE, INCLUDING IMAGE AND

 9        VIDEO PROCESSING, COMPRESSION, DATA COMMUNICATIONS, AND DIGITAL

10        CAMERA HARDWARE AND SOFTWARE.

11              THE COURT:  ANY OBJECTION?

12              MR. JOHNSON:  NO OBJECTION.

13              THE COURT:  OKAY.  SO CERTIFIED.

14        GO AHEAD, PLEASE.

15   BY MR. SELWYN:

16        Q.   DR. STORER, WHAT PATENTS WERE YOU ASKED TO STUDY IN

17        CONNECTION WITH THIS LITIGATION?

18        A.   SO THE PATENTS ARE REFERRED TO AS THE '239 PATENT AND THE

19        '449 PATENT.

20        Q.   CAN WE PLEASE HAVE PDX 90.2 ON THE SCREEN.

21              AND, DR. STORER, CAN YOU DESCRIBE FOR THE JURY THE TYPES

22   OF MATERIALS THAT YOU REVIEWED AS PART OF YOUR STUDY?

23        A.   SURE.  YOU CAN SEE THEM LISTED UP HERE.  OF COURSE I

24   LOOKED AT THE PATENT AND THE FILE HISTORIES; LOOKING AT THE

25   DEVICES THEMSELVES; LOOKING AT ALL OF THIS TECHNICAL
```

1    LITERATURE, MANUALS, DOCUMENTATION, SOURCE CODE, OF THE

2    UNDERLYING PRODUCTS.

3         I ALSO HAVE TALKED TO THE ENGINEERS ON THE TELEPHONE,

4    VISITED APPLE, SEEN THE ENGINEERS, OBSERVED, QUOTE, TEAR-DOWN

5    OF THE PRODUCTS, DISASSEMBLIES OF THE PRODUCTS.

6         AND I'VE ALSO LOOKED AT DOCUMENTS FROM SAMSUNG.

7    Q.   YOU MENTIONED THE FILE HISTORY.  WHAT IS THAT?

8    A.   SO THE FILE HISTORY IS MERELY A RECORD OF ALL WRITTEN

9    CORRESPONDENCE BETWEEN THE APPLICANT AND -- IT'S A WRITTEN

10   RECORD OF ALL CORRESPONDENCE BETWEEN THE APPLICANT AND THE

11   EXAMINER IN THE PROCESS OF OBTAINING THE PATENT.

12   Q.   LET ME ASK YOU TO TURN, PLEASE, IN YOUR BINDER TO TABS 6

13   AND 7, WHICH ARE JX 23 AND 26.

14        DO YOU RECOGNIZE THOSE DOCUMENTS?

15   A.   YES.

16   Q.   WHAT ARE THEY?

17   A.   THESE ARE THE FILE HISTORIES FOR THE TWO PATENTS, THE '239

18   AND '449.

19        MR. SELWYN:  YOUR HONOR, I MOVE THE ADMISSION OF

20   JX 23, AND JX 26 IS ALREADY IN EVIDENCE.

21        THE COURT:  26 IS IN EVIDENCE.  I DON'T THINK 23 IS.

22   ALL RIGHT.  ANY OBJECTION?

23        MR. JOHNSON:  NO OBJECTION.

24        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

25        (JOINT EXHIBIT 23 WAS ADMITTED IN EVIDENCE.)

DIRECT STORER

```
 1              THE COURT:  GO AHEAD, PLEASE.

 2    BY MR. SELWYN:

 3    Q.   ARE YOU BEING COMPENSATED FOR THE TIME YOU SPEND WORKING

 4    ON THIS MATTER?

 5    A.   YES.

 6    Q.   AT WHAT RATE?

 7    A.   $675 AN HOUR.

 8    Q.   NOW, BASED ON YOUR STUDY OF ALL THE MATERIALS THAT YOU

 9    CONSIDERED, WHAT CONCLUSION DID YOU REACH REGARDING WHETHER

10    APPLE INFRINGES THE '239 OR '449 PATENTS?

11    A.   THEY DO NOT.

12    Q.   WE'LL START WITH THE '239 PATENT, AND WHEN WE FINISH WITH

13    THAT, WE'LL TURN TO THE '449 PATENT.

14         CAN WE HAVE THE COVER PAGE OF THE '239 PATENT -- IT SHOULD

15    BE AT TAB 8 IN YOUR BINDER -- PUT UP ON THE SCREEN.

16         WHEN WAS THE '239 PATENT FILED?

17    A.   SO IT WAS FILED OVER 20 YEARS AGO.

18    Q.   IS THE '239 PATENT STILL IN FORCE?

19    A.   NO.  IT EXPIRED A COUPLE MONTHS AGO.

20    Q.   DID SAMSUNG HAVE ANY INVOLVEMENT IN THE RESEARCH AND

21    DEVELOPMENT UNDERLYING THE '239 PATENT?

22    A.   NO.

23    Q.   HOW DID SAMSUNG COME TO OWN THE '239 PATENT?

24    A.   IT WAS PURCHASED.

25    Q.   CAN YOU REMIND US WHICH APPLE PRODUCTS ARE TODAY ACCUSED
```

1    OF INFRINGING THE ASSERTED CLAIM OF THE '239 PATENT, WHICH IS

2    CLAIM 15?

3    A.    YES.   YES.   IT'S THE IPHONE 4, 4S, AND 5.

4    Q.    AND WHAT SPECIFIC FEATURES OF THESE PRODUCTS HAS SAMSUNG

5    IDENTIFIED AS INFRINGING?

6    A.    FACETIME, AND ALSO THE ABILITY TO ATTACH VIDEOS TO

7    MESSAGING AND E-MAIL, WITH THE EXCEPTION OF FACETIME FOR THE

8    IPHONE 4.

9    Q.    FOR PURPOSES OF YOUR ANALYSIS, DID YOU IDENTIFY ANY

10   RELEVANT DIFFERENCES AMONG THE THREE ACCUSED APPLE PRODUCTS?

11   A.    NO.

12   Q.    AND FOR PURPOSES OF YOUR ANALYSIS, DID YOU TREAT ANY OF

13   THE ACCUSED APPLE PRODUCTS AS BEING REPRESENTATIVE?

14   A.    YES.   THE IPHONE 5 IS A GOOD REPRESENTATIVE.

15   Q.    CAN WE PLEASE PUT CLAIM 15 OF THE '239 PATENT ON THE

16   SCREEN.

17        DR. STORER, AT A HIGH LEVEL, WOULD YOU EXPLAIN TO US YOUR

18   UNDERSTANDING OF WHAT THIS CLAIM COVERS?

19   A.    SURE.   GENERALLY IT DESCRIBES VIDEO CAPTURE HARDWARE TO

20   RECEIVE VIDEO AND TRANSMIT IT OVER CELLULAR FREQUENCY.

21   Q.    LET ME FOCUS YOUR ATTENTION ON THE FIRST LIMITATION OF

22   CLAIM 5, 15, WHICH READS, QUOTE "A COMPUTER INCLUDING A VIDEO

23   CAPTURE MODULE TO CAPTURE AND COMPRESS VIDEO IN REAL TIME."

24        DR. STORER, WHAT IS A VIDEO CAPTURE MODULE?

25   A.    YES.   SO A VIDEO CAPTURE MODULE WAS TECHNOLOGY AT THAT

```
 1    TIME PERIOD, IN FACT, WE EVEN HEARD IT DISCUSSED A LITTLE BIT

 2    EARLIER ON WHEN MR. GARCIA TALKED ABOUT HAVING TO SCRATCH HIS

 3    HEAD BACK TO HIS ROOMMATE, AND IT WAS USED BACK IN THAT TIME

 4    PERIOD WHERE TYPICAL VIDEOS WERE THINGS LIKE YOU PLAY ON YOUR

 5    TV, MAYBE A VIDEO COMING FROM A VCR OR A VIDEO COMING FROM A

 6    CAMERA, AND THE VIDEO CAPTURE MODULE WAS A COMPONENT OF A VIDEO

 7    CARD THAT YOU PLUG INTO A COMPUTER AND YOU USE THAT NOW AS A

 8    WAY TO CONNECT A CABLE AND RECEIVE THAT VIDEO, TURN IT INTO THE

 9    1'S AND 0'S A COMPUTER CAN UNDERSTAND, AND STORE IT ON THE HARD

10    DRIVE.

11    Q.   WERE YOU IN THE COURTROOM YESTERDAY WHEN DR. SCHONFELD WAS

12    SHOWN THE SENTENCE IN HIS EXPERT REPORT THAT READ, QUOTE, "IN

13    FACT, THE VIDEO CAPTURE MODULE IS A COMPONENT OF THE VIDEO

14    CARD"?

15    A.   YES.

16    Q.   DO YOU AGREE WITH DR. SCHONFELD IN THAT RESPECT?

17    A.   YES.

18    Q.   LET ME ASK YOU TO HELP US ROLL BACK THE CLOCK BY TWO

19    DECADES.

20         FOR WHAT PURPOSE WAS A VIDEO CAPTURE MODULE USED BACK WHEN

21    THE INVENTORS DID THEIR WORK?

22    A.   YES.  THIS IS IMPORTANT TO UNDERSTAND.  BACK THEN VIDEO,

23    ANALOG VIDEO, WAS EXACTLY THE STUFF YOU PLAYED IN YOUR OLD TV

24    SET.  IT CAME OUT OF A VCR, IT CAME FROM A CAMERA, THAT SORT OF

25    THING.
```

DIRECT STORER

1         AND YOU NEEDED -- IF YOU WANTED TO GET INTO THE COMPUTER,

2    YOU NEEDED A VIDEO CAPTURE MODULE.

3         AND SO YOU LITERALLY WOULD TAKE A CABLE THAT CAME FROM,

4    LET'S SAY, THE VCR, AND NOW INSTEAD OF CONNECTING IT TO OUR OLD

5    TV SET, YOU WOULD CONNECT IT TO A CONNECTOR ON THE VIDEO

6    CAPTURE MODULE, WHICH IS A COMPONENT OF THE VIDEO CARD THAT'S

7    INSERTED INTO A COMPUTER AT THAT TIME.

8    Q.   WERE YOU IN THE COURTROOM YESTERDAY WHEN THE INVENTOR,

9    MR. FREEMAN, DESCRIBED WHAT HE CALLED HIS AH-HA MOMENT?

10   A.   YES, I WAS.

11   Q.   AND HOW DID HIS AH-HA MOMENT RELATE TO THE PURPOSE OF A

12   VIDEO CAPTURE MODULE?

13   A.   SO HE REALLY WAS SAYING THIS IS SORT OF THE HEART OF HIS

14   INVENTION, THE FACT THAT AT THAT TIME PERIOD, HE COULD BUY

15   VIDEO CAPTURE MODULES.

16        YOU COULD BUY THESE DEVICES, WHICH ALLOWED YOU TO TAKE THE

17   ANALOG VIDEO AT THAT TIME, WHICH WAS VERY HARD TO WORK WITH,

18   AND TURN IT INTO THE BITS THAT THE COMPUTER CAN UNDERSTAND.

19        SO IT REALLY WAS THE ESSENCE OF THE INVENTION.  IT RELIED

20   ON THIS NEW TECHNOLOGY, THE AH-HA MOMENT OF A VIDEO CAPTURE

21   MODULE, THE NEW TECHNOLOGY OF 20 YEARS AGO.

22   Q.   WHEN WERE VIDEO CAPTURE MODULES FIRST SOLD?

23   A.   SO BY THE TIME THE FILING OF THE INVENTION CAME AROUND,

24   THEY WERE WIDELY AVAILABLE.  IN FACT, WE EVEN HEARD SAMSUNG'S

25   EXPERT TALK ABOUT THE FACT THAT YOU COULD EASILY OBTAIN THEM AT

1       THAT TIME.  THEY HAD BECOME COMMERCIALLY AVAILABLE.

2       Q.   HAVE YOU PERSONALLY EVER USED A VIDEO CARD WITH A VIDEO

3       CAPTURE MODULE?

4       A.   YES.

5       Q.   WHEN?

6       A.   SO I'M ACTUALLY OLD ENOUGH TO HAVE BEEN DOING RESEARCH

7       BACK THEN, AND WE WOULD USE THEM IN THE LABORATORY.

8            WHEN I WAS DOING EXPERIMENTS WHERE I WAS TRYING TO DEAL

9       COMPRESSION ALGORITHMS, I WOULD STILL NEED TO HAVE DIGITAL

10      VIDEO TO WORK WITH, AND SO FIRST I'D HAVE TO TAKE THE ANALOG

11      VIDEO, THE STUFF FROM THE VCR THAT SAID -- AND CONVERT IT BY

12      HAVING A VIDEO CAPTURE CARD IN ONE OF THESE OLD COMPUTERS WHERE

13      I COULD NOW CAPTURE THE VIDEO WITH THE VIDEO CAPTURE MODULE ON

14      THE CARD, AND NOW HAVE THESE DIGITAL BITS THAT I COULD WORK

15      WITH IN MY EXPERIMENTS.

16      Q.   AND HOW DID YOU, OR ANY OTHER USER, INSTALL A VIDEO

17      CAPTURE MODULE INTO A COMPUTER IN THE 1990S?

18      A.   SO IT'S IMPORTANT TO REMEMBER THAT BACK IN THAT TIMEFRAME,

19      THIS WAS A STANDARD THING.  COMPUTERS WERE DESKTOP MACHINES --

20      I OFTEN THINK OF THEM AS STANDING STRAIGHT UP AND DOWN, BUT

21      THEY OFTEN SAT ON THEIR SIDE -- AND IT WAS EXPECTED THAT YOU

22      WOULD BE PLUGGING CARDS INTO THEM.  USUALLY WHEN YOU BOUGHT IT,

23      YOU HAD TO PLUG IN AT LEAST ONE CARD.

24      Q.   DOES THE '239 PATENT SPECIFICATION DISCUSS VIDEO CAPTURE

25      MODULES?

```
 1        A.    YES.

 2        Q.    COULD WE PLEASE HAVE ON THE SCREEN, FROM THE '239 PATENT,

 3        COLUMN 4, LINES 28 THROUGH 48.

 4              DR. STORER, WHAT DOES THIS PASSAGE TELL US ABOUT THE VIDEO

 5        CAPTURE MODULE COMPONENT REQUIRED BY CLAIM 15?

 6        A.    SO IT'S INTERESTING.  AGAIN, TO START AT THE BEGINNING

 7        WHERE IT'S TALKING ABOUT WHAT IS THE SOURCE OF THE VIDEO, VIDEO

 8        CAMERA, VIDEO CASSETTE RECORDER?  IT'S TALKING SPECIFICALLY

 9        ABOUT THE KIND OF VIDEO THAT PEOPLE WERE FAMILIAR WITH IN THOSE

10        DAYS, THE KIND OF VIDEO THAT YOU NORMALLY MIGHT PLAY FROM THE

11        VCR TO YOUR TV SET.

12              BUT THEN IT'S GOING DOWN FURTHER ON AND ACTUALLY TALKING

13        ABOUT PARTICULAR HARDWARE.  IT'S NOTING YOU CAN NOW BUY IT FROM

14        INTEL AND IBM, AND THERE'S ACTUALLY STANDARD SOFTWARE TO

15        CONTROL THE HARDWARE, THE VIDEO FOR WINDOWS IN THIS CASE.

16        Q.    AND HOW WOULD THE USER USE THE VIDEO CAPTURE MODULE TO

17        CAPTURE VIDEO FROM ANOTHER DEVICE?

18        A.    SO YOU WOULD PURCHASE YOUR COMPUTER, YOU WOULD PURCHASE

19        YOUR VIDEO CAPTURE MODULE, YOU WOULD PLUG THE CARD INTO THE

20        MACHINE, INTO THE COMPUTER, AND THEN YOU WOULD NOW TAKE A CABLE

21        AND CONNECT YOUR SOURCE OF VIDEO, CAMERA, VCR, WHATEVER,

22        INSTEAD OF CONNECTING TO THE TV SET, YOU WOULD ACTUALLY CONNECT

23        IT TO THE CONNECTOR ON THE VIDEO CAPTURE MODULE.

24        Q.    DID THE '239 PATENT HAVE ANY FIGURES THAT GENERALLY

25        ILLUSTRATE WHAT YOU JUST DESCRIBED TO US?
```

1      A.    YES.

2      Q.    WHAT FIGURE IS THAT?

3      A.    SO FIGURE 1, IF YOU TURN TO THAT, THAT'S A GOOD ONE.

4      Q.    IF WE CAN HAVE, PLEASE, FIGURE 1 ON THE SCREEN, AND I

5      WOULD LIKE TO ALSO PUT UP COLUMN 4, LINES 6 THROUGH 16.  THANK

6      YOU.

7            WHAT DOES THIS SECTION OF THE '239 PATENT TELL US ABOUT

8      FIGURE 1?

9      A.    SO THIS IS AN IMPORTANT SECTION, RIGHT?  IT'S BEGINNING BY

10     SAYING THE DRAWINGS REPRESENT THE PRESENT INVENTION, RIGHT?

11     IT'S TELLING YOU THIS IS A PICTURE OF WHAT IT IS THAT'S BEING

12     INVENTED, AND NOW IT ACTUALLY GOES THROUGH ONE ITEM AT A TIME

13     IN THIS PARAGRAPH DESCRIBING THAT FIGURE.

14     Q.    SO LET'S BRIEFLY DISCUSS FIGURE 1 SO WE CAN UNDERSTAND

15     WHERE THE VIDEO CAPTURE MODULE FITS IN AND WHAT IT DOES.  WHAT

16     IS BOX 1 IN FIGURE 1?

17     A.    SO BOX 1 IS A PICTURE OF A VIDEO CAMERA.  OF COURSE THE

18     PATENT SAYS IT COULD JUST AS WELL BE A VCR OR WHATEVER, AND

19     IT'S THE SOURCE OF THE VIDEO.  IT'S WHERE THE VIDEO IS COMING

20     FROM.  IT'S THE ANALOG VIDEO AT THAT TIME.  IT'S THE SOURCE

21     WHERE INSTEAD OF PLUGGING INTO YOUR TV SET, IT'S NOW A CABLE

22     COMING FROM THAT SOURCE THAT'S GOING TO GO TO THE NEXT ITEM

23     DESCRIBED, NUMBER 2.

24     Q.    COULD WE PULL UP COLUMN 4, LINES 27 THROUGH 31.

25           HOW DOES THE PATENT EXPLAIN WHAT THE VIDEO CAMERA DOES?

1    A.   SO HERE AGAIN, IT'S SAYING THE VIDEO CAMERA -- WHICH COULD

2    JUST AS WELL BE VIDEO CASSETTE RECORDER, OKAY? -- IT IS WHERE

3    THE VIDEO IS BEING RECEIVED FROM, OKAY?  IT'S THE REMOTE

4    DEVICE, THE PLACE WHERE WE'RE GOING TO CONNECT A CABLE AND TAKE

5    THE VIDEO FROM THERE, INSTEAD OF THROUGH A TV SET, INTO THE

6    CONNECTOR ON THE VIDEO CAPTURE MODULE.

7    Q.   LET'S PUT BACK UP FIGURE 1, AND CAN YOU TELL US WHAT BOX 2

8    IS?

9    A.   YES.  SO BOX 2 IS CALLED THE REMOTE UNIT, AND THIS IS A

10   COMPUTER.  IT'S A COMPUTER WITH THE ABILITY TO PLUG CARDS INTO

11   IT, AND THIS IS WHERE A VIDEO CAPTURE MODULE, ON A VIDEO CARD,

12   IS PLUGGED INTO THE COMPUTER AND NOW A CABLE CAN BE RUN FROM

13   NUMBER 1, THE CAMERA OR THE VCR, INTO THE CONNECTOR ON THE

14   VIDEO CAPTURE MODULE.

15   Q.   AND WHAT IS BOX 3?

16   A.   SO BOX 3 IS NOW AT THE OTHER END.  YOU KNOW, 1 AND 2 ARE

17   IN ONE LOCATION, AND BOX 3 IS CALLED THE HOST UNIT.  IT

18   RECEIVES COMPRESSED BITS FROM A TRANSMISSION MEDIA,

19   COMMUNICATION LINE.

20   Q.   WOULD YOU PLEASE EXPLAIN BOX 4?

21   A.   SO BOX 4 IS ANOTHER COMPUTER, OKAY, AND BOX 4'S JOB IS NOW

22   TO DECOMPRESS THOSE 1'S AND 0'S THAT REPRESENT THE COMPRESSED

23   DIGITAL FORM AND TURN IT BACK INTO THE FORM THAT YOU CAN --

24   THAT PEOPLE COULD USE, THE ANALOG VIDEO THAT THEY NOW COULD

25   PLAY ON THE TV SET OR THAT SORT OF THING.

1    Q.   NOW I'D LIKE YOU TO FOCUS ON THE REMOTE UNIT, WHICH IS BOX

2    2 IN FIGURE 1.

3         WHAT TYPE OF VIDEO SIGNAL DID THE VIDEO CAPTURE MODULE

4    CAPTURE?

5    A.   SO THE PATENT AGAIN TALKS ABOUT THIS VERY CLEARLY.

6    NUMBER 1 IS, THE SOURCE OF VIDEO IS A CAMERA, A VCR, AND WHEN

7    YOU CONNECT A CABLE FROM 1 TO 2, THE VIDEO CAPTURE MODULE IS

8    CAPTURING ANALOG VIDEO COMING IN, MAKING IT DIGITAL, AND

9    STORING THE COMPRESSED BITS ON TO THE HARD DRIVE OF THAT

10   COMPUTER, WHICH IS THE REMOTE UNIT, NUMBER 2.

11   Q.   HAVE YOU EVER HEARD OF THAT VIDEO DESCRIBED AS PLAYABLE

12   VIDEO?

13   A.   YEAH, EXACTLY.  VIDEO THAT COMES OUT OF THE DEVICES AS

14   PEOPLE NORMALLY USE THEM, A CAMERA, A VCR, INSTEAD OF PLUGGING

15   IT INTO THE SYSTEM, YOU COULD JUST AS WELL PLUG IT RIGHT INTO

16   YOUR TV AND PLAY IT.

17   Q.   CAN YOU TAKE A PHOTO OR A VIDEO WITH A VIDEO CAPTURE

18   MODULE?

19   A.   NO.

20   Q.   WHY NOT?

21   A.   THE VIDEO CAPTURE MODULE, ITS JOB IS TO, AS THE NAME

22   SUGGESTS, CAPTURE THE VIDEO, THE VIDEO THAT'S COMING FROM

23   SOMEWHERE ELSE, THE ANALOG SIGNAL, AND TURN IT INTO 1'S AND 0'S

24   AND STORE THOSE COMPRESSES 1'S AND 0'S ON TO THE HARD DRIVE.

25   SO NO.

```
 1     Q.   WOULD YOU PLEASE TURN IN YOUR BINDER TO TAB 9, WHICH IS

 2     PX 253.

 3          DO YOU RECOGNIZE THAT DOCUMENT?

 4     A.   YES, I DO.

 5     Q.   WHAT IS IT?

 6     A.   SO THIS IS A COVER OF A FAX PAGE.  IT'S A PRICE QUOTATION

 7     THAT WAS SENT TO ONE OF THE INVENTORS.

 8              MR. SELWYN:  YOUR HONOR, I MOVE THE ADMISSION OF

 9     PX 253.

10              THE COURT:  ANY OBJECTION?

11              MR. JOHNSON:  JUST ONE SECOND.  TAB 9?  SORRY.

12              MR. SELWYN:  TAB 9.

13              MR. JOHNSON:  NO OBJECTION.

14              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

15          (PLAINTIFF'S EXHIBIT 253 WAS ADMITTED IN EVIDENCE.)

16              THE COURT:  GO AHEAD, PLEASE.

17     BY MR. SELWYN:

18     Q.   LET'S LOOK AT THE FIRST PAGE OF PDX 253.  WHAT IS SHOWN

19     HERE?

20     A.   SO THIS IS A PRICE QUOTE FOR PURCHASING A VIDEO CAPTURE

21     MODULE, AND IT'S FOR PURCHASING HARDWARE THAT'S MADE BY IBM AND

22     INTEL CALLED THE ACTION MEDIA HARDWARE.

23     Q.   WHAT WAS ATTACHED TO THE FAX COVER SHEET WITH THE PRICE

24     QUOTES?

25     A.   SO ATTACHED TO THIS SHEET WAS A BROCHURE FOR THE PRODUCT.
```

1    Q.   AND WHAT WAS THE ACTION MEDIA II PRODUCT?

2    A.   ACTION MEDIA II WAS A VIDEO CAPTURE MODULE THAT ALLOWED

3    YOU -- IT WAS A COMPONENT OF A VIDEO BOARD THAT YOU COULD PLUG

4    INTO YOUR COMPUTER AND DO EXACTLY WHAT WE'VE BEEN TALKING

5    ABOUT, RECEIVE AN ANALOG VIDEO FROM A VIDEO SOURCE, LIKE A VCR

6    OR CAMERA, TURN IT INTO 1'S AND 0'S, AND STORE THE COMPRESSED

7    BITS ON THE HARD DRIVE.

8    Q.   COULD WE HAVE ON THE SCREEN PAGE 2 OF PX 253.  THE PHOTO

9    IS A LITTLE GRAINY, BUT DO YOU RECOGNIZE IT?

10   A.   YES.  THIS IS A PICTURE FROM THE BROCHURE THAT'S ATTACHED.

11   AGAIN, THE QUALITY IS KIND OF BAD BECAUSE IT WAS A FAX AT THE

12   TIME.

13   Q.   DO YOU HAVE A BETTER PHOTO OF THIS ACTION MEDIA II?

14   A.   YES.

15   Q.   COULD WE HAVE YOU TURN IN YOUR BINDER TO TAB 10, PX 248?

16   A.   YES.

17   Q.   DO YOU RECOGNIZE THAT DOCUMENT?

18   A.   YES.

19   Q.   WHAT IS IT?

20   A.   SO IT'S A BROCHURE FOR THIS PRODUCT.

21        MR. SELWYN:  YOUR HONOR, I MOVE THE ADMISSION OF

22   PX 248.

23        MR. JOHNSON:  NO OBJECTION.

24        THE COURT:  IT'S ADMITTED.

25        (PLAINTIFF'S EXHIBIT 248 WAS ADMITTED IN EVIDENCE.)

```
 1              THE COURT:  GO AHEAD, PLEASE.

 2              MR. SELWYN:  COULD WE PLEASE TURN TO PAGE 3, AND I'D

 3      ASK THAT THE PHOTO BE PUT ON THE SCREEN.

 4      Q.   DR. STORER, WHAT IS SHOWN IN THIS PHOTOGRAPH?

 5      A.   THIS IS THE SAME PHOTO THAT WAS IN THE FAX FOR THE

 6      BROCHURE FOR THE ACTION MEDIA PRODUCT, AND THE BIG BOARD THAT'S

 7      SHOWN IS -- IT PLUGS INTO THE COMPUTER, AND THE LITTLE BOARD,

 8      THE VIDEO CAPTURE MODULE -- THE WHITE ARROWS SHADED GOING DOWN

 9      SHOW THAT THAT LITTLE BOARD SNAPS ON TO THE BIG BOARD TO CREATE

10      ONE THING THAT YOU ACTUALLY PLUG INTO THE COMPUTER.

11      Q.   AND WHEN YOU SAY "THE LITTLE BOARD," YOU'RE REFERRING TO

12      THE ONE AT THE TOP OF THE SCREEN?

13      A.   YES, THE ONE AT THE TOP, THE VIDEO CAPTURE MODULE SNAPS ON

14      TO -- IT'S CALLED THE DAUGHTER BOARD, THE DAUGHTER BOARD -- THE

15      DAUGHTER, THAT'S THE TERM THAT THE SOFTWARE DEVELOPERS USED --

16      AND IT SNAPS DIRECTLY ON TO THE BIGGER BOARD SO THAT YOU CAN

17      NOW PLUG IT INTO THE MACHINE.

18      Q.   WOULD YOU PLEASE TURN IN YOUR BINDER TO TAB 11, PX 254.

19           DO YOU RECOGNIZE THAT DOCUMENT?

20      A.   YES.

21      Q.   WHAT IS IT?

22      A.   SO THIS IS ANOTHER BROCHURE BY THE SAME COMPANY, INTEL,

23      FOR SOMETHING CALLED THE INTEL SMART VIDEO RECORDER.  AGAIN,

24      IT'S ANOTHER VIDEO CAPTURE MODULE HARDWARE, AND IT'S ENTITLED

25      "INSTALLATION GUIDE AND VIDEO TIPS."
```

```
 1              MR. SELWYN:  YOUR HONOR, I MOVE THE ADMISSION OF

 2    PX 254.

 3              MR. JOHNSON:  NO OBJECTION.

 4              THE COURT:  IT'S ADMITTED.

 5         (PLAINTIFF'S EXHIBIT 254 WAS ADMITTED IN EVIDENCE.)

 6              THE COURT:  GO AHEAD, PLEASE.

 7              MR. SELWYN:  CAN WE PLEASE HAVE ON THE SCREEN PAGES

 8    8, 9, AND 10 ON THE BOARD, AND IF WE COULD TRY TO PUT JUST THE

 9    DIAGRAMS FROM THOSE PAGES UP ONE AFTER ANOTHER.

10    Q.   CAN YOU EXPLAIN FOR THE JURY, PLEASE, WHAT THE FIGURES ON

11    THESE PAGES SHOW?

12    A.   SURE.  SO THIS IS GIVING INSTRUCTIONS, TYPICAL

13    INSTRUCTIONS AT THAT TIME FOR INSTALLING THE CARD.  PEOPLE ARE

14    VERY FAMILIAR WITH THIS.

15         ON THE LEFT-HAND SIDE IS A PICTURE OF THE COMPUTER AT THE

16    TOP, TYPICAL COMPUTER AT THE TIME -- THIS ONE IS POSITIONED ON

17    ITS SIDE -- AND IT SHOWS YOU REMOVING THE COVER, THE METAL

18    U-SHAPED COVER THAT COVERS THE COMPUTER.

19         AND IN THE MIDDLE, YOU'RE LOOKING DOWN INTO THE COMPUTER

20    NOW, AND THIS IS COMPLETELY TYPICAL OF THE TIME.  IT HAS SOME

21    NUMBER OF EXPANSION SLOTS, IN THIS CASE EIGHT SLOTS, AND THAT

22    DOWN ARROW ON THE BOTTOM PORTION IN THE MIDDLE IS SAYING TAKE

23    THE CARD AND PUSH IT DOWN INTO THE SLOT, INTO ONE OF THE SLOTS.

24         AND THEN THE RIGHT-HAND SIDE, AT THE TOP IT SHOWS THE

25    COVER BACK ON.
```

1          AND THEN IN THE LOWER RIGHT, NOW WITH THE COVER BACK ON,

2     IT'S SHOWING A CLOSE-UP OF THE BACK OF THE MACHINE, AND NOW ONE

3     OF THE THOSE SLOTS IS NO LONGER EMPTY.  ONE OF THOSE SLOTS HAS

4     THE EDGE OF THE CARD STICKING OUT OF IT, AND THE EDGE OF CARD

5     HAS THE CONNECTOR WHERE YOU WOULD NOW ATTACH THE CABLE COMING

6     FROM THE VIDEO SOURCE, THE CAMERA, THE VCR, THAT ANALOG VIDEO

7     SOURCE THAT YOU COULD HAVE PLUGGED INTO YOUR TV, BUT NOW YOU'RE

8     GOING TO PLUG THE CABLE INTO THE CONNECTOR ON THE EDGE OF THAT

9     CARD STICKING OUT OF THE BACK OF THE MACHINE.

10    Q.   TURN, IF YOU COULD IN YOUR BINDER, TO TAB 12, PX 249.

11         DO YOU RECOGNIZE THAT DOCUMENT?

12    A.   YES.

13    Q.   WHAT IS IT?

14    A.   SO THIS IS ANOTHER DOCUMENT OF THE SAME TIME PERIOD BY

15    INTEL CORPORATION, WHICH IS AGAIN DESCRIBING -- IT'S ENTITLED

16    "UNDERSTANDING P.C. VIDEO."

17         MR. SELWYN:  YOUR HONOR, I MOVE THE ADMISSION OF

18    PX 249.

19         THE COURT:  ANY OBJECTION?

20         MR. JOHNSON:  NO OBJECTION.

21         THE COURT:  IT'S ADMITTED.

22    (PLAINTIFF'S EXHIBIT 249 WAS ADMITTED IN EVIDENCE.)

23         THE COURT:  GO AHEAD, PLEASE.

24         MR. SELWYN:  COULD WE PLEASE HAVE PAGE 4 ON THE

25    SCREEN?

```
 1       Q.   DR. STORER, WHAT DOES THE DIAGRAM ON PAGE 4 SHOW US?

 2       A.   SO AGAIN, THIS IS DEPICTING SOMETHING VERY TYPICAL AT THE

 3   TIME.  IT'S SHOWING THE TYPICAL SETUP YOU WOULD HAVE.  IN THE

 4   CENTER OF THE DIAGRAM IS A COMPUTER, AND IT'S SHOWING IT WITH

 5   THE COVER UP.

 6       IN THE UPPER LEFT, IT'S SHOWING THE TYPICAL KINDS OF VIDEO

 7   SOURCES YOU WOULD HAVE AT THAT TIME, A CAMERA, A VCR.

 8       AND IT'S SHOWING THAT FROM THOSE SOURCES, YOU RUN A CABLE

 9   TO THE CARDS IN THE COMPUTER, THERE'S ALSO AN AUDIO CARD AS

10   WELL, AND THE VIDEO -- THE CABLE GOES TO THE BACK OF THAT VIDEO

11   CAPTURE MODULE.

12       AND SO THIS IS THE TYPICAL SCENARIO WHERE THERE'S AN

13   ANALOG INPUT, YOU PUT IT ON TO A TV, BUT IT'S CONNECTED TO THE

14   BACK OF THIS COMPUTER, TO THE CONNECTOR ON THE VIDEO CAPTURE

15   MODULE.

16       AND YOU CAN SEE IT DEPICTED THERE WITH THOSE CARDS WITH

17   THE TOP OFF.  THEY HAVEN'T BEEN PUSHED INTO THE MACHINE.

18       Q.   ARE VIDEO CAPTURE MODULES STILL AVAILABLE TODAY?

19       A.   IT IS POSSIBLE TO GET ONE TODAY.

20       Q.   AND WHY WOULD SOMEONE WANT A VIDEO CAPTURE MODULE TODAY?

21       A.   WELL, SUPPOSE YOU HAVE OLD, REALLY OLD VCR TAPES WITH

22   FAMILY VIDEOS OR SOMETHING AND YOU WANT TO SOMEHOW GET THEM IN

23   A WAY YOU CAN USE THEM ON A COMPUTER OR SEND THEM SOMEWHERE.

24       IF YOU CAN FIND SOMEONE THAT HAS A DESKTOP MACHINE, YOU

25   CAN STILL BUY CARDS TODAY THAT'LL PLUG INTO THE MACHINE AND LET
```

1    YOU -- YOU'D ALSO HAVE TO HAVE AN OLD VCR -- AND LET YOU PUT

2    YOUR TAPE IN THE VCR, CONNECT THE CABLE AND DIGITIZE IT, AND

3    THEN BE ABLE TO USE IT IN THE MODERN WORLD.

4    Q.   NOW THAT YOU'VE EXPLAINED WHAT A VIDEO CAPTURE MODULE IS,

5    LET'S HAVE YOU COMPARE THE FIRST LIMITATION OF CLAIM 15 TO THE

6    THREE ACCUSED PRODUCTS.

7         AND IF WE COULD HAVE CLAIM 15 PUT BACK ON THE SCREEN, AND

8    LET'S HIGHLIGHT THE FIRST LIMITATION.

9         DR. STORER, LET ME ASK YOU FIRST, CAN YOU CREATE A VIDEO

10   WITH THE ACCUSED PRODUCTS?

11   A.   CAN YOU CREATE A VIDEO WITH THE ACCUSED PRODUCTS?

12   CERTAINLY.

13   Q.   AND CAN THE ACCUSED PRODUCTS CAPTURE VIDEO?

14   A.   NO.  SO THE ACCUSED PRODUCTS DO NOT RECEIVE VIDEO.  THEY

15   DON'T CAPTURE -- THEY DON'T HAVE A VIDEO CAPTURING MODEL.  THEY

16   CAN CREATE VIDEO, AND THE TERMINOLOGY -- WE HEARD THIS WHEN WE

17   HEARD MR. GARCIA'S TESTIMONY -- THE TERM "CAPTURING" CERTAINLY

18   IS USED IN A MODERN SENSE IN THE APPLE PRODUCTS AND THEY CAN

19   CREATE VIDEOS.

20        BUT THEY CANNOT -- THEY CAN CREATE BITS THAT REPRESENT

21   INDIVIDUAL FRAMES OF VIDEOS, BUT THEY CANNOT CAPTURE VIDEO FROM

22   AN EXTERNAL SOURCE.  THEY DON'T HAVE VIDEO CAPTURE MODULES TO

23   RECEIVE ANALOG VIDEO FROM AN EXTERNAL SOURCE.

24   Q.   SO LET ME FOCUS YOUR ATTENTION ON THE COMPONENT THAT'S

25   LISTED IN THE FIRST LIMITATION.  DO THE ACCUSED APPLE PRODUCTS

```
 1      HAVE A COMPONENT CALLED A VIDEO CAPTURE MODULE?

 2      A.   NO.

 3      Q.   CAN YOU EXPLAIN TO THE JURY WHAT YOU DID TO DETERMINE THAT

 4      THE ACCUSED APPLE PRODUCTS DO NOT HAVE A VIDEO CAPTURE MODULE?

 5      A.   SURE.  SO BESIDES, YOU KNOW, LOOKING AT THE DOCUMENTATION

 6      FOR THE PRODUCT, LOOKING AT SOFTWARE, LOOKING AT MANUALS, I'VE

 7      ACTUALLY LOOKED AT THE BILL OF MATERIALS FOR THE PRODUCT THAT

 8      LISTED EVERYTHING, FOR EXAMPLE, THAT'S LISTED IN THE IPHONE 5.

 9      Q.   PLEASE TURN IN YOUR BINDER TO TAB 13, WHICH IS PX 257.

10           WHAT IS THAT DOCUMENT?

11      A.   SO THIS IS -- THIS IS THE BILL OF MATERIALS FOR THE

12      IPHONE 5.

13           MR. SELWYN:  YOUR HONOR, I MOVE THE ADMISSION OF

14      PX 257.

15           MR. JOHNSON:  NO OBJECTION.

16           THE COURT:  IT'S ADMITTED.

17      (PLAINTIFF'S EXHIBIT 257 WAS ADMITTED IN EVIDENCE.)

18           THE COURT:  IS THIS SUBJECT TO SEALING OR NOT?

19           MR. SELWYN:  IT IS SUBJECT TO SEALING.

20           THE COURT:  GO AHEAD, PLEASE.

21      BY MR. SELWYN:

22      Q.   DR. STORER, APPROXIMATELY HOW MANY COMPONENTS DOES THE

23      BILL OF MATERIALS LIST?

24      A.   SO ACTUALLY THERE'S OVER A THOUSAND COMPONENTS IN AN

25      IPHONE 5.  IT'S A VERY COMPLICATED DEVICE.  AND THIS BILL OF
```

```
 1      MATERIALS LISTS EVERY SINGLE ONE OF THEM, INCLUDING THE SCREWS.

 2      Q.   SO WHY DID YOU REVIEW THE BILL OF MATERIALS?

 3      A.   WELL, I LOOKED AT IT TO SEE WHETHER -- TO CHECK WHETHER IT

 4      LISTED A VIDEO CAPTURE MODULE, AND OF COURSE IT DOES NOT.

 5      Q.   DID YOU REVIEW BILLS OF MATERIALS FOR OTHER ACCUSED

 6      PRODUCTS?

 7      A.   YES.  YES.

 8           I LOST THE MIKE.  SORRY.  YES.

 9      Q.   AND WHAT DID YOU FIND?

10      A.   SAME THING.  SIMPLY NOT PRESENT, NOT LISTED IN THE BILL OF

11      MATERIALS, NOT SOMETHING YOU WOULD EVER EXPECT TO OR EVER WOULD

12      FIND IN THESE PRODUCTS.

13      Q.   WOULD IT BE POSSIBLE TO INSTALL A VIDEO CARD OR A VIDEO

14      CAPTURE MODULE OR A VIDEO CARD HAVING A VIDEO CAPTURE MODULE

15      INTO THE ACCUSED APPLE PRODUCTS?

16      A.   NO, OF COURSE NOT.

17      Q.   WHY NOT?

18      A.   SO THE ACCUSED PRODUCTS DON'T HAVE PLUG-IN SLOTS.  THEY'RE

19      NOT COMPUTERS OF THE OLD DAYS LIKE THAT.  IT SIMPLY PHYSICALLY

20      DOESN'T MATCH UP IN ANY WAY TO THE TECHNOLOGY WE'RE TALKING

21      ABOUT.

22      Q.   AND I THINK YOU MAY HAVE IN FRONT OF YOU A PHYSICAL

23      EXHIBIT MARKED PX 255.  IS THAT -- OH, I HAVE IT.

24      A.   YOU'VE GOT IT.  OKAY.

25           MR. SELWYN:  YOUR HONOR, MAY I APPROACH?
```

```
 1              THE COURT:  YES.  AND FOR THE SECOND, PX 257 WAS

 2   SEALED IN ITS ENTIRETY.

 3   BY MR. SELWYN:

 4   Q.   DR. STORER, I'VE HANDED YOU PX 255, WHICH IS ALREADY IN

 5   EVIDENCE.

 6        DO YOU RECOGNIZE THAT?

 7   A.   YES, I DO.

 8   Q.   WHAT IS IT?

 9   A.   SO THERE WAS A DAY WHERE -- WELL, ONE OF THE DAYS THAT I

10   WENT AND VISITED APPLE, A BRAND NEW IPHONE 5 WAS PURCHASED, AND

11   UNFORTUNATELY, IT WAS PURCHASED FOR THE REASON OF TAKING IT

12   APART.

13        SO A QUALIFIED ENGINEER TOOK IT APART IN A WAY WHERE THE

14   COMPONENTS WOULDN'T BE DESTROYED SO WE CAN LOOK AT ALL THE

15   COMPONENTS, AND HERE -- THIS IS THE -- THIS IS WHAT'S LEFT OF

16   THE CASE, THE SCREEN AND SORT OF THE EMPTY CASE WITH JUST THE

17   BATTERY -- THE BATTERY IS A BIG PART -- WITH THE BATTERY LEFT

18   AND HERE'S THE MAIN CARD THAT CAME OUT OF IT (INDICATING).

19        SO I WAS ABLE TO OBSERVE THE, THE DISASSEMBLY OF IT WITH

20   QUALIFIED ENGINEERS TAKING IT APART IN A WAY WHERE IT WOULDN'T

21   BE DESTROYED.

22        AND ALSO I TOOK PICTURES OF IT AT THE TIME.

23   Q.   DID YOU IDENTIFY A VIDEO CAPTURE MODULE WHEN THE PRODUCT

24   WAS DISASSEMBLED?

25   A.   NO.
```

1    Q.   NOW, DO YOU RECALL DR. SCHONFELD'S TESTIMONY YESTERDAY

2    ABOUT HOW THE INVENTORS REMOVED VIDEO CARD FROM CLAIM 15 WHEN

3    THEY PROSECUTED THEIR PATENT APPLICATION AND, THEREFORE, THEY

4    INTENDED TO CLAIM ONLY A VIDEO CAPTURE MODULE?

5    A.   YES.

6    Q.   DO YOU AGREE WITH DR. SCHONFELD THAT CLAIM 15 REQUIRES A

7    VIDEO CAPTURE MODULE AND NOT A VIDEO CARD?

8    A.   CLAIM 15 ONLY REQUIRES A VIDEO CAPTURE MODULE.

9    Q.   DOES THAT CHANGE YOUR NON-INFRINGEMENT OPINION IN ANY WAY?

10   A.   NO.   IT -- IT REQUIRES THE VIDEO CAPTURE MODULE.

11   Q.   WHAT DOES DR. SCHONFELD CALL THE VIDEO CAPTURE MODULE IN

12   THE ACCUSED PRODUCTS?

13   A.   SO HE CALLS IT THE APPLICATION PROCESSOR, AND THAT'S

14   ANOTHER NAME FOR WHAT YOU'VE HEARD TODAY OF THE SYSTEM ON A

15   CHIP, THE SOC.

16   Q.   AND TELL US AGAIN WHAT THE SOC DOES.

17   A.   SO THE SOC IS THIS, IS THIS -- IT'S A VERY LARGE

18   COLLECTION OF COMPONENTS, A VERY, VERY COMPLEX CHIP WHICH HAS

19   ON IT MANY DIFFERENT COMPONENTS DESIGNED BY DIFFERENT

20   MANUFACTURERS, POWERED IN DIFFERENT WAYS, A VERY COMPLEX

21   SYSTEM.

22   Q.   DO YOU AGREE WITH DR. SCHONFELD THAT THE SYSTEM ON THE

23   CHIP IS THE SAME AS THE VIDEO CAPTURE MODULE COMPONENT IN

24   CLAIM 15?

25   A.   NO.

1    Q.   WHAT ARE THE REASONS THAT YOU BELIEVE THE SOC IS NOT THE

2    SAME AS THE REQUIRED VIDEO CAPTURE MODULE COMPONENT?

3    A.   WELL, THERE ARE A NUMBER OF REASONS.  FIRST OF ALL, IT'S

4    PHYSICALLY, OF COURSE, VERY DIFFERENT.  IT HAS NONE OF THE

5    ASPECTS OF A COMPONENT OF A VIDEO CARD.

6         BUT ALSO, THE SOC -- AND THIS IS AN IMPORTANT POINT --

7    WHAT COMES INTO IT ARE DIGITAL BITS REPRESENTING FRAMES OF

8    VIDEO.  WE HEARD SOME OF THE APPLE ENGINEERS TALK ABOUT THIS

9    TODAY, OKAY?

10        SO IT'S NOT RECEIVING ANALOG VIDEO.  THERE'S NOT A CABLE

11   BEING PLUGGED IN COMING FROM A REMOTE SOURCE.  IT'S A HIGH TECH

12   NOTION, THIS IDEA OF THE ENTIRE SYSTEM ON A CHIP, AND WE'VE

13   HEARD TESTIMONY HOW IN THE OLD DAYS THEY WOULD HAVE BEEN ON

14   MANY, MANY PLACES IN AN OLDER COMPUTER.

15        SO IT'S PHYSICALLY VERY DIFFERENT, FUNCTIONALLY VERY

16   DIFFERENT, DIGITAL BITS COMING IN, NO RECEPTION OF ANALOG

17   AUDIO, ET CETERA.

18   Q.   DOES THE '239 PATENT EVER MENTION SYSTEMS ON A CHIP OR

19   SOC'S OR IMAGE SENSORS?

20   A.   NO.

21   Q.   DO THE ACCUSED PRODUCTS HAVE ANY COMPONENT THAT PERFORMS

22   THE SAME FUNCTION AS A VIDEO CAPTURE MODULE?

23   A.   NO.

24   Q.   LET'S TURN NOW, IF WE COULD, TO THE SECOND LIMITATION OF

25   CLAIM 15 -- IF WE COULD HAVE THAT BACK UP ON THE SCREEN --

1    WHICH READS, "MEANS FOR TRANSMISSION OF SAID CAPTURED VIDEO

2    OVER A CELLULAR FREQUENCY."

3         NOW, HAS THE COURT ALREADY INTERPRETED WHAT THIS

4    LIMITATION REQUIRES?

5    A.   YES.

6    Q.   AND CAN WE PLEASE HAVE PDX 90.3 ON THE SCREEN.

7         DR. STORER, WHAT STRUCTURE DID THE COURT RULE WAS REQUIRED

8    TO PERFORM THE FUNCTION OF CAPTURED VIDEO OVER A CELLULAR

9    FREQUENCY?

10   A.   YOU CAN READ HERE, I THINK THERE'S TWO PARTS, THERE'S THE

11   ONE OR MORE MODEMS CONNECTED TO ONE OR MORE CELLULAR

12   TELEPHONES, AND IN ADDITION, THERE'S SOFTWARE THAT'S REQUIRED

13   FOR CONTROLLING THIS HARDWARE.

14   Q.   CAN WE HAVE COLUMN 4, LINES 17 THROUGH 27, AND COLUMN 8,

15   LINES 46 THROUGH 49 OF THE PATENT ON THE SCREEN, PLEASE.

16        WHAT DOES THE PATENT TELL US HERE ABOUT HOW MODEMS WERE

17   USED WITH CELLULAR TELEPHONES TO TRANSMIT VIDEO?

18   A.   YES.  SO HERE YOU SEE A SECTION OF THE PATENT, AGAIN,

19   DISCUSSING THIS TECHNOLOGY.  IT'S DISCUSSING THE VIDEO CAPTURE

20   MODULE.

21        AND THEN IT ALSO GOES ON TO TALK ABOUT THIS MOTION OF

22   COM1, AND BACK AT THAT TIME, COM1 WAS A STANDARD -- BASICALLY

23   WHEN YOU WANTED TO TALK TO ONE OF THESE OLD-FASHIONED

24   COMPUTERS, PEOPLE KNEW THAT COM1 WAS A STANDARD PLACE YOU COULD

25   PLUG IN A CABLE, AND THIS IS EXACTLY TALKING ABOUT THE NOTION

```
 1    OF HAVING CABLES THAT CONNECT CABLE TO A MODEM, A MODEM TO A

 2    CELLULAR TELEPHONE.

 3    Q.   DO THE ACCUSED PRODUCTS HAVE ONE OR MORE MODEMS CONNECTED

 4    TO CELLULAR TELEPHONES?

 5    A.   NO.

 6    Q.   WHY NOT?

 7    A.   SO THE ACCUSED PRODUCTS, THIS IS SOMETHING COMPLETELY

 8    DIFFERENT, RIGHT?  WE'RE TALKING ABOUT THIS, THIS HIGH TECH

 9    DEVICE.  THERE'S NO TWO THINGS CONNECTED BY CABLES.  THERE'S NO

10    STANDARD COM1.  THERE'S NO PORTS, OKAY?

11         IT'S SIMPLY -- IT DOESN'T EVEN MAP TO THE KIND OF SCENARIO

12    WE HAD 20 YEARS AGO WHEN WE WERE TALKING ABOUT THE COMPUTER,

13    THE MODEM, THE TELEPHONE, THE CABLES, THE STANDARD SUCH AS COM1

14    WHERE YOU PLUGGED IN THE CABLES.

15    Q.   WHAT DOES DR. SCHONFELD SAY SATISFIES THE REQUIREMENT OF

16    ONE OR MORE MODEMS CONNECTED TO CELLULAR TELEPHONES?

17    A.   HE POINTS TO THE, TO THE BASEBAND PROCESSOR IN THE, IN THE

18    DEVICE.

19    Q.   AND WHAT DOES HE SAY THAT'S CONNECTED TO?

20    A.   AND SO HE -- HE SAYS THAT THE BASEBAND PROCESSOR, BY

21    VIRTUE OF BEING IN THE DEVICE, IS CONNECTED TO THE PHONE AS A

22    WHOLE.

23    Q.   WHAT IS THE BASEBAND PROCESSOR?

24    A.   SO THE BASEBAND PROCESSOR IS A, IS A LITTLE INTEGRATED

25    CHIP THAT HAS MODEM FUNCTIONALITY IN THIS SORT OF MODERN
```

1    SCENARIO.

2    Q.   WOULD THE CELLULAR PHONE OPERATE AS A CELLULAR PHONE IF

3    YOU REMOVE THAT BASEBAND CHIP?

4    A.   NO.  ONCE YOU TAKE THE BASEBAND CHIP OUT, THE PHONE

5    WOULDN'T WORK, SO YOU'D HAVE THIS THING THAT WASN'T A PHONE

6    ANYMORE.

7    Q.   DO YOU AGREE WITH DR. SCHONFELD THAT THE BASEBAND CHIP

8    CONNECTED TO THE DEVICE SATISFIES THE REQUIREMENT OF ONE OR

9    MORE MODEMS CONNECTED TO CELLULAR TELEPHONES?

10   A.   NO.  I MEAN, IF YOU -- IF YOU -- HAVING THE CHIP INSIDE

11   THE PHONE IS NOT TWO THINGS CONNECTED TOGETHER.

12        TAKING THE CHIP OUT, YOU DON'T EVEN HAVE A PHONE ANYMORE.

13        IT'S SORT OF CIRCULAR, TRYING TO HAVE SOMETHING CONNECTED

14   TO ITSELF.  IT SIMPLY DOES NOT MAP WITH THE SCENARIO AND WHAT'S

15   BEING DESCRIBED AND WHAT'S BEING CLAIMED BACK 20 YEARS AGO OF

16   STANDARDIZATION OF A COM1 PORT ON A COMPUTER CONNECTED WITH A

17   CABLE TO A MODEM, CONNECTED WITH A CABLE TO A CELLULAR

18   TELEPHONE.

19        MR. SELWYN:  YOUR HONOR, I'M AT A GOOD BREAKING POINT

20   IF YOU WISH TO TAKE LUNCH NOW.

21        THE COURT:  TIME IS NOW NOON.  LET'S GO AHEAD AND

22   TAKE OUR LUNCH BREAK.

23        I'M GOING TO ASK THE JURY TO COME BACK AT 1:05.  THERE IS

24   ONE QUICK ISSUE I'D LIKE TO HANDLE WITH THE ATTORNEYS OUTSIDE

25   YOUR PRESENCE.

```
 1        SO THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.  WE'LL

 2   SEE YOU BACK AT 1:05.  PLEASE DON'T RESEARCH OR DISCUSS THE

 3   CASE.

 4        (JURY OUT AT 12:01 P.M.)

 5            THE COURT:  YOU CAN STEP DOWN NOW.

 6   YOU LOOK LIKE YOU HAVE AN ISSUE.

 7            MR. MCELHINNY:  I ALWAYS LOOK LIKE I HAVE AN ISSUE,

 8    YOUR HONOR.

 9        JUST FURTHER TO WHAT YOU'RE GOING TO BE LOOKING AT, I

10   WOULD LIKE TO REFER THE COURT TO THE TRANSCRIPT AT 1463, LINES

11    7 TO 18.

12        I WAS REMINDED, AND YOUR HONOR WILL REMEMBER, THAT WHEN

13   MR. LOCKHEIMER TESTIFIED, WE ASKED FOR A LIMITING INSTRUCTION,

14   AND I'M REFERRING YOU TO THE ARGUMENTS THAT THE ATTORNEYS FROM

15   SAMSUNG MADE ABOUT WHY IT WOULD BE INAPPROPRIATE IN THAT CASE

16   TO GIVE A LIMITING INSTRUCTION TO AN OVERALL WITNESS'S

17   TESTIMONY.

18            THE COURT:  RIGHT, AND I'M NOT GOING TO GIVE THAT

19   LIMITING INSTRUCTION.  I THINK THAT ISSUE HAS BEEN RESOLVED BY

20   THE FOLLOW-UP QUESTIONS THAT MS. KREVANS HAS ASKED THOSE

21   WITNESSES OF, YOU KNOW, CONFIRMING THAT THEY'RE NOT ASSERTING

22   THAT ANY GOOGLE OR ANDROID DEVELOPMENT IS PRIOR ART.

23            MR. MCELHINNY:  THIS ARGUMENT IS BROADER ABOUT WHY A

24   LIMITING INSTRUCTION TO A WITNESS'S TESTIMONY WOULD BE

25   INAPPROPRIATE.  THAT'S THE ONLY REASON I'M CITING IT.
```

DIRECT STORER

1              THE COURT:  ALL RIGHT.  THANK YOU.

2         I'LL SEE YOU BACK AT 1:00 SO WE CAN DISCUSS THIS BEFORE WE

3    BRING THE JURY OUT.  OKAY?

4         THANK YOU.

5         (THE LUNCH RECESS WAS TAKEN.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DIRECT STORER

```
 1              **AFTERNOON SESSION**

 2        (JURY OUT AT 1:09 P.M.)

 3              THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

 4        I WOULD LIKE TO READ A LIMITING INSTRUCTION THAT IS

 5   MODELED AFTER FEDERAL RULE OF EVIDENCE 411, AND SO THIS IS HOW

 6   IT WOULD READ.  IT'S PRETTY MUCH MODELED AFTER THE FEDERAL RULE

 7   OF EVIDENCE.

 8        SO EVIDENCE THAT A PARTY IS INDEMNIFIED IS NOT ADMISSIBLE

 9   TO PROVE THAT THE PARTY IS LIABLE, BUT IS ADMISSIBLE FOR

10   ANOTHER PURPOSE, SUCH AS PROVING A WITNESS'S BIAS.

11        DO YOU WANT TO COMMENT ON THAT?  I JUST THINK IT'S SAFEST

12   TO LOOK AT THE FEDERAL RULE OF EVIDENCE.

13        DOES THAT MEAN -- DOES THE SILENCE MEAN EVERYONE IS OKAY,

14   OR --

15              MR. PRICE:  YOUR HONOR --

16        (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

17              THE COURT:  I MEAN, IF IT WAS A LIVE PERSON, THEN

18   THERE COULD BE EXAMINATION SAYING, YOU KNOW, THIS IS NO

19   ADMISSION THAT EITHER GOOGLE OR SAMSUNG BELIEVED THE APPLE

20   PATENTS WERE VALID OR INFRINGED.

21        BUT THE SORT OF CURE THAT HAS OCCURRED IS WITH ANY

22   CONFUSION ABOUT WHETHER THE ANDROID DEVELOPMENT IS PRIOR ART.

23        BUT WE DON'T HAVE THE OPPORTUNITY TO DO THAT BECAUSE THIS

24   WITNESS IS ONLY APPEARING BY DEPOSITION, SO I THINK A LIMITING

25   INSTRUCTION WOULD BE APPROPRIATE SO THIS JURY DOES NOT CONSIDER
```

```
 1        THAT TESTIMONY AS EVIDENCE OF LIABILITY.

 2             DO YOU WANT TO BE HEARD?

 3                  MR. PRICE:  YOUR HONOR, AT THIS POINT I THINK THAT

 4        WOULD BE FINE WITH US.

 5                  THE COURT:  OKAY.

 6                  MR. PRICE:  I THINK FOR CLOSING INSTRUCTIONS --

 7        BECAUSE THAT INSTRUCTION WAS CREATED FOR, LIKE, AN INSURANCE

 8        LIABILITY CONTEXT -- I THINK WE MIGHT NEED TO HAVE TO FURTHER

 9        DEFINE, QUOTE, "LIABILITY" AS APPLYING TO THIS TRIAL; THAT IS,

10        INFRINGEMENT OR PATENT INFRINGEMENT.

11             BUT AT THIS TIME I THINK IT'S -- I THINK IT'S SUFFICIENT

12        SO THE JURY KNOWS AT THIS TIME THAT IT HAS THAT LIMITED

13        PURPOSE.

14                  MR. MCELHINNY:  OUR POSITION IS, OBVIOUSLY, THIS IS

15        LIVE TESTIMONY, THAT QUESTIONS COULD HAVE BEEN ASKED AT THE

16        DEPOSITION AND COUNTER-DESIGNATIONS WOULD HAVE BEEN MADE.

17             BUT I WILL SAY THAT THE INSTRUCTION -- SO WE WOULD PREFER

18        NO INSTRUCTION.

19                  THE COURT:  I UNDERSTAND THAT.

20                  MR. MCELHINNY:  BUT THE INSTRUCTION THAT YOU ARE

21        GIVING SOLVES MY BALANCE ISSUE.

22                  THE COURT:  OKAY, GOOD.  THEN THAT'S THE ONE THAT I

23        WILL GIVE BEFORE THAT DEPOSITION CLIP IS PLAYED.

24                  MR. MCELHINNY:  THANK YOU, YOUR HONOR.

25                  MR. PRICE:  THANK YOU.
```

1          THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU BOTH.

2      OKAY.  LET'S BRING OUR JURY IN AND FINISH UP WITH

3  DR. STORER'S DIRECT.

4          (JURY IN AT 1:12 P.M.)

5          THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

6      THE TIME IS NOW 1:13.

7      GO AHEAD, PLEASE.

8  BY MR. SELWYN:

9  Q.   DR. STORER, WHEN WE TOOK THE BREAK BEFORE LUNCH, WE WERE

10  COMPARING THE ACCUSED PRODUCTS AND THE COURT'S CONSTRUCTION OF

11  THE SECOND LIMITATION OF CLAIM 15 OF THE '239 PATENT.

12      DO YOU RECALL THAT?

13  A.   YES.

14  Q.   SO COULD WE HAVE BACK UP ON THE SCREEN THE COURT'S

15  CONSTRUCTION OF THE SECOND LIMITATION, AND I WANT TO FOCUS YOUR

16  ATTENTION NOW ON THE REQUIREMENT THAT THERE BE ONE OR MORE

17  COMMUNICATION PORTS ON SAID APPARATUS.

18      DO YOU SEE THAT LANGUAGE?

19  A.   YES.

20  Q.   DO THE ACCUSED APPLE PRODUCTS HAVE ONE OR MORE

21  COMMUNICATION PORTS ON SAID APPARATUS?

22  A.   NO.

23  Q.   WHAT DID DR. SCHONFELD IDENTIFY AS COMMUNICATION PORTS?

24  A.   YES.  SO HE IDENTIFIED SOME ELECTRICAL CONNECTIONS BETWEEN

25  CHIPS.

1    Q.   DO YOU AGREE WITH THAT?

2    A.   NO.

3    Q.   WHY NOT?

4    A.   SO THESE ELECTRICAL CONNECTIONS ARE NOT PORTS.  THE

5    PRODUCT DOESN'T HAVE PORTS.  WE'VE SEEN HOW THE PATENT VERY

6    CLEARLY DESCRIBES THE TECHNOLOGY AT THE TIME, HOW SOMEONE

7    READING THE CLAIMS, READING THE PATENT UNDERSTANDS THE

8    TECHNOLOGY AT THAT TIME.

9         THERE AREN'T PORTS IN THESE PRODUCTS.

10   Q.   THE COURT'S CONSTRUCTION ALSO REQUIRES A SOFTWARE SEQUENCE

11   OF INITIALIZING ONE OR MORE COMMUNICATION PORTS IN SAID

12   APPARATUS; RIGHT?

13   A.   YES.

14   Q.   WHAT DOES DR. SCHONFELD IDENTIFY AS THE REQUIRED SOFTWARE

15   FOR INITIALIZING ONE OR MORE COMMUNICATION PORTS?

16   A.   SO HE DESCRIBES CERTAIN LEVELS OF SOFTWARE AND, I THINK,

17   THINGS THAT ARE, LIKE, SOFTWARE PORTS.

18   Q.   WHAT IS A SOFTWARE PORT?

19   A.   SO A SOFTWARE PORT IS A MODERN CONCEPT.  IT'S A WAY

20   ACTUALLY TO AVOID HARDWARE PORTS, OR A WAY NOT TO HAVE TO USE

21   HARDWARE PORTS.

22        IT'S NOT A WAY TO NOT HAVE TO USE THE KIND OF PORTS THAT

23   IN THE OLD DAYS YOU DID USE, YOU PLUGGED THE CABLES IN, AND YOU

24   HAD THAT STANDARD COM1 THAT THE PATENT TALKS ABOUT.

25   Q.   DOES THE PATENT DISCLOSE SOFTWARE PORTS OR ANYTHING LIKE

1    SOFTWARE PORTS?

2    A.   NO.

3    Q.   DO YOU AGREE WITH DR. SCHONFELD THAT THE ACCUSED PRODUCTS

4    HAVE SOFTWARE FOR INITIALIZING ONE OR MORE COMMUNICATION PORTS?

5    A.   SO I WOULD -- SORRY.  SAY THAT AGAIN.

6    Q.   DO YOU AGREE WITH DR. SCHONFELD THAT THE ACCUSED PRODUCTS

7    CONTAIN SOFTWARE FOR INITIALIZING ONE OR MORE COMMUNICATION

8    PORTS?

9    A.   NO.

10   Q.   WHY NOT?

11   A.   SO -- SO SOFTWARE -- SOFTWARE -- FIRST OF ALL, THE

12   PRODUCTS DON'T -- THEY DON'T HAVE PORTS, SO IT'S KIND OF -- THE

13   TERMINOLOGY DOESN'T EVEN REALLY FIT.

14       AND ALSO, AGAIN, WHEN YOU READ THE TERMS OF THIS CLAIM, IT

15   TALKS ABOUT INITIALIZATION SEQUENCES.  THESE ARE -- THIS IS

16   SORT OF STANDARD TERMINOLOGY AT THE TIME WHEN -- I REMEMBER

17   WORKING WITH THESE THINGS WAY BACK WHEN.  IT ALSO EVEN INVOKES

18   A DIFFERENT KIND OF CONCEPT.

19       BUT IN ANY CASE, THERE ARE NO PORTS TO INITIALIZE.

20   Q.   THE REQUIRED STRUCTURE ALSO INVOLVED, QUOTE, "OBTAINING

21   SAID CAPTURED VIDEO," AND PERHAPS WE CAN HIGHLIGHT THAT

22   REQUIREMENT.

23       NOW, I WANT TO FOCUS YOUR ATTENTION ON FACETIME IN

24   PARTICULAR.  DOES FACETIME EVER OBTAIN CAPTURED VIDEO?

25   A.   NO.

1    Q.   WHY NOT?

2    A.   SO THIS IS AN IMPORTANT POINT.  BEFORE I TALKED ABOUT, YOU

3    KNOW, THE TERMINOLOGY OF CAPTURING AND THESE MODERN PRODUCTS

4    BEING ONE OF CREATION, THIS MODERN PRODUCT CREATES VIDEO DATA

5    FOR VIDEO FRAMES.  IT DOESN'T RECEIVE VIDEO.  IT DOESN'T --

6    THERE'S NO CONNECTION TO A SOURCE.

7         BUT WITH FACETIME, WE CAN SAY A LOT MORE, AND MR. GARCIA

8    SAID A LOT ABOUT THIS TODAY, BUT I THINK IT'S OKAY TO TALK

9    ABOUT IT AGAIN.

10        THERE IS NO VIDEO AT ALL ON FACETIME.  FACETIME IS A

11   PROCESS WHERE THERE'S -- DATA FOR AN INDIVIDUAL FRAME IS

12   CREATED AND THEN IT'S IMMEDIATELY TRANSMITTED, AND THEN DATA

13   FOR ANOTHER INDIVIDUAL FRAME IS CREATED AND IT'S IMMEDIATELY

14   TRANSMITTED.

15        THERE IS NO SAVED DATA.  THERE IS NO VIDEO TO PLAY BACK.

16   HE TALKED ABOUT THIS FOR A LOT OF TECHNICAL REASONS, BUT ALSO

17   PRIVACY REASONS.

18        BUT THERE SIMPLY IS NO VIDEO LAYING AROUND ANYWHERE, LET

19   ALONE IN A RECEIVER OR SOMETHING.

20   Q.   WHAT DOES DR. SCHONFELD SAY IS CAPTURED VIDEO WITH

21   FACETIME?

22   A.   SO HE -- HE ACTUALLY SAYS IT'S THE CONCEPT OF A SINGLE

23   FRAME.

24   Q.   AND DO YOU AGREE OR DISAGREE WITH HIM?

25   A.   NO.  A SINGLE FRAME IS NOT VIDEO.

1    Q.   THAT BRINGS US NOW TO THE FINAL STRUCTURAL REQUIREMENT,

2    SOFTWARE FOR, QUOTE, "TRANSMITTING THE CAPTURED VIDEO."

3         AGAIN FOCUSSING YOUR ATTENTION ON FACETIME, DOES FACETIME

4    TRANSMIT CAPTURED VIDEO?

5    A.   NO.

6    Q.   WHY NOT?

7    A.   SO, AGAIN, THEY DON'T HAVE THIS CAPTURED VIDEO EXISTING,

8    RIGHT?  FACETIME SIMPLY LITERALLY IMMEDIATELY, THE MOMENT THAT

9    DIGITAL DATA REPRESENTING ONE FRAME -- AND WE HEARD A LOT OF

10   DISCUSSION ABOUT THIS, BUT IT'S AN IMPORTANT POINT -- THE

11   MINUTE THE DATA FOR THAT ONE FRAME IS CREATED, IT IS

12   IMMEDIATELY TRANSMITTED, AND AT THE POINT IT'S TRANSMITTED,

13   THEN IT'S GONE.  THERE'S NO VIDEO LAYING THERE.

14   Q.   DID THE INVENTORS EVER BUILD A PRODUCT BASED ON THE '239

15   PATENT?

16   A.   YES.

17   Q.   WHAT WAS IT CALLED?

18   A.   SO IT WAS CALLED THE FIRSTLOOK VIDEO SYSTEM.

19   Q.   CAN WE PUT UP ON THE SCREEN PAGE 2 OF PX 251, WHICH IS

20   ALREADY IN EVIDENCE.

21        AND, DR. STORER, WOULD YOU DESCRIBE FOR US WHAT THE

22   FIRSTLOOK VIDEO PRODUCT WAS?

23   A.   SO IT WAS A, A PRODUCT -- THIS IS A PICTURE OF IT.  THERE

24   WAS A COMPUTER, THERE WERE MODEMS, CELL PHONES, CABLES

25   CONNECTING THE COMPUTER TO THE MODEM, THE MODEM TO THE CELL

```
 1      PHONES, IN THE COMPUTER WAS INSTALLED THE VIDEO CAPTURING

 2      MODULE.  AND THAT'S AN ACTUAL PICTURE OF THE PRODUCT THAT WAS

 3      SOLD.

 4      Q.   AND IS THIS THE REMOTE UNIT PART?

 5      A.   THIS IS CALLED -- YEAH, THIS IS THE REMOTE UNIT PART.

 6      Q.   HOW MUCH DID THE FIRSTLOOK VIDEO REMOTE UNIT WEIGH?

 7      A.   YOU CAN SEE IT RIGHT DOWN AT THE BOTTOM, 28 POUNDS.

 8      Q.   LET'S TURN BACK TO THE FIRST PAGE OF THIS BROCHURE, AND IF

 9      WE COULD BLOW UP THE PARAGRAPH BELOW THE GRAY BOX IN THE FIRST

10      COLUMN.

11          WHAT DOES THE BROCHURE TELL US WAS NEEDED TO OPERATE WITH

12      THE FIRSTLOOK PRODUCT?

13      A.   WELL IT TALKS ABOUT A LOT OF STUFF LIKE POWER AND SO ON,

14      BUT THE FIRST ITEM IS A REMOTE VIDEO SOURCE.

15      Q.   CAN WE ENLARGE THE TEXT IN THE SECOND COLUMN OF PAGE 2?

16          HOW DOES THE BROCHURE DESCRIBE THE VIDEO SIGNAL?

17      A.   OKAY.  SO -- SO THIS REMOTE VIDEO SOURCE, AGAIN, IT SAYS

18      IT'S THE TYPICAL KINDS OF VIDEO WE'VE TALKED ABOUT AT THAT

19      TIME, VHS TAPE, IT COULD BE THE OLD BETA TAPES OF SONY, 8

20      MILLIMETERS, A CAMERA.

21          THESE ARE STANDARD ANALOG VIDEO SOURCES, THE KIND, THE

22      SAME KIND OF VIDEO YOU PLUG INTO THE OLD TV SET.  THIS IS WHAT

23      VIDEO CAPTURE MODULES DO.  THIS IS WHAT THIS PRODUCT IS

24      DESIGNED TO DO.  IT'S GOT A VIDEO CAPTURE MODULE INSTALLED, AND

25      IT'S DESIGNED TO HAVE A CABLE CONNECTING THE EXTERNAL VIDEO
```

1     SOURCE TO THE CONNECTOR ON THE VIDEO CAPTURE MODULE ON THAT

2     COMPUTER, AND THAT COMPUTER IS CONNECTED THROUGH THE CABLES TO

3     A TELEPHONE AND WHATNOT.

4     Q.   NOW IF WE CAN ENLARGE THE PORTION ON PAGE 1 BELOW "FIELD

5     TEST SAMPLE RESULTS."

6          WHAT DOES THE BROCHURE TELL US ABOUT HOW LONG IT TOOK THE

7     FIRSTLOOK PRODUCTS TO TRANSMIT VIDEOS?

8     A.   SO IT GIVES TWO EXAMPLES.  THE FIRST EXAMPLE IS WHEN YOU

9     HAVE, LET'S SAY, A LOW QUALITY VIDEO, ONLY SEVEN FRAMES A

10    SECOND, AND IT TAKES IT -- FOR A 15 SECOND CLIP, IT TAKES IT

11    FIVE MINUTES, MINUTES TO SEND SECONDS.

12         THE SECOND EXAMPLE IS WHERE IT TALKS ABOUT MORE NORMAL

13    QUALITY VIDEO, AND IT SAYS IT TAKES IT 16 MINUTES TO SEND 15

14    SECONDS.

15         SO IT'S TALKING ABOUT LITTLE, TEENY SECONDS CLIPS AND IT

16    TAKES MINUTES TO ACTUALLY SEND THEM.

17    Q.   SO COULD THE FIRSTLOOK BE USED FOR VIDEO CALLS?

18    A.   I MEAN, NO.  I MEAN -- SO -- OKAY.  SO, YOU KNOW, I'M AT

19    MY OFFICE, IT'S AFTER CLASS, I CALL MY DAUGHTER TO SAY "TELL

20    MOM I'LL BE HOME IN 15 MINUTES."

21         IF YOU'RE USING THIS PRODUCT, I COULD DRIVE HOME QUICKER

22    THAN THE MESSAGE GOT THERE.  IT'S A MESSAGE GOING IN ONE

23    DIRECTION THAT'S TAKING MINUTES FOR JUST A FEW SECONDS.

24    Q.   WHAT DOES THE '239 PATENT SAY ABOUT VIDEO CALLS?

25    A.   SO THE '239 PATENT SAID NOTHING ABOUT VIDEO CALLS.

1    Q.   WHAT DOES THE '239 PATENT SAY ABOUT TWO-WAY COMMUNICATION?

2    A.   SO -- ABSOLUTELY NOTHING, RIGHT?  EVEN THESE TEST RESULTS

3    ARE TALKING ABOUT A VERY SLOW ONE-WAY TRANSMISSION.

4    Q.   DR. SCHONFELD TESTIFIED THAT THE ONLY THING NEEDED WOULD

5    HAVE BEEN TWO REMOTE UNITS TO HAVE TWO-WAY COMMUNICATIONS.

6         DO YOU AGREE WITH HIM?

7    A.   NO.

8    Q.   WHY NOT?

9    A.   WELL, WE'VE ALREADY HEARD A LOT ABOUT THIS TODAY AND WE

10   HEARD MR. GARCIA TALK ABOUT THE TREMENDOUS AMOUNT OF WORK THAT

11   WENT INTO GETTING A WORKING SYSTEM, AND IT'S EASY TO TALK ABOUT

12   TWO ONE-WAY THINGS THAT YOU CAN EASILY SEND WITHIN A TWO-WAY

13   THING, FORGET THE FACT THAT ONE-WAY THING MIGHT TAKE MINUTES TO

14   SEND.

15        IT'S A VERY COMPLEX PROCESS TO COORDINATE COMMUNICATIONS.

16   I KNOW THAT FROM MY OWN EXPERIENCE.

17        AND CERTAINLY WHEN I HEARD HIM TALK ABOUT IT, VERY

18   UNDERSTANDABLE, IT'S A MAJOR PROJECT TO TRY TO ACTUALLY GET

19   TWO-WAY COMMUNICATIONS COORDINATED IN A SINGLE DEVICE.

20   Q.   LET'S SWITCH GEARS NOW AND TURN TO THE OTHER PATENT, THE

21   '449 PATENT.  YOU'LL FIND THAT AT TAB 17 IN YOUR BINDER.

22        AND WHILE YOU'RE LOOKING FOR THAT, IF WE COULD HAVE THE

23   COVER PAGE OF THE '449 PATENT PUT ON THE SCREEN, PLEASE.

24        DR. STORER, AT A HIGH LEVEL, WHAT IS THE CLAIMED INVENTION

25   OF THE '449 PATENT?

DIRECT STORER

1    A.   SO THIS PATENT IS TALKING ABOUT A DIGITAL CAMERA AT THAT

2    TIME, AND IT HAS VARIOUS SPECIFICATIONS ON HOW THE HARDWARE

3    COMPRESSION MUST WORK, AND IT HAS VARIOUS SPECIFICATIONS ABOUT

4    THE USER INTERFACE.

5    Q.   DID SAMSUNG INVENT ANY OF THE TECHNOLOGY IN THE '449

6    PATENT?

7    A.   NO.   THEY BOUGHT THIS FROM HITACHI IN 2011, I BELIEVE.

8    Q.   WHEN WAS THE '449 PATENT FILED?

9    A.   IT WAS FILED IN 1996 IN JAPAN, AND 1997 IN THE U.S.

10   Q.   WOULD YOU EXPLAIN TO US THE PROBLEM THAT THE '449 PATENT

11   WAS TRYING TO SOLVE?

12   A.   YES.   SO IT -- IT ADDRESSES THE PROBLEM OF IF I HAVE MANY,

13   MANY PHOTOS ON MY CAMERA, HOW CAN I ACCESS THEM AND FIND

14   SOMETHING?

15   Q.   LET'S LOOK AT COLUMN 1, LINES 24 THROUGH 35 OF THE '449

16   PATENT.

17        WHAT DOES THIS PASSAGE DESCRIBE?

18   A.   SURE.   SO HERE YOU SEE IT BEGINNING -- THE PARAGRAPH

19   BEGINS BY TALKING ABOUT SUPPOSE I HAD 3,000 PHOTOS ON MY

20   CAMERA, AND IT CONCLUDES BY SAYING IT WOULD BE IMPRACTICAL TO

21   CHECK THROUGH THEM ALL.   IF YOU'RE LOOKING FOR SOMETHING -- IT

22   USES THE WORD CHECKING, RIGHT? -- THIS IS THE PROBLEM.   3,000

23   PHOTOS, I DON'T WANT TO HAVE TO CHECK THROUGH THEM ALL TO LOOK

24   FOR SOMETHING.

25   Q.   IS FINDING A PARTICULAR IMAGE AMONG MANY IMAGES ON A

```
 1        DEVICE STILL A PROBLEM TODAY?

 2        A.   NO.

 3        Q.   WHY NOT?

 4        A.   SO TODAY THERE ARE OTHER THINGS THAT WEREN'T AVAILABLE AT

 5        THAT TIME.  THERE'S MODERN SWIPING TECHNOLOGY WHERE YOU CAN DO

 6        THE THING THAT THE PATENT COULDN'T DO, THAT IT WAS TRYING TO

 7        FIND SOME OTHER SOLUTION FOR.

 8        Q.   AND WHAT SOLUTION DID THE HITACHI INVENTORS CLAIM IN THE

 9        '449 PATENT TO ADDRESS THE PROBLEM THAT THEY IDENTIFIED?

10        A.   SO THEY PROPOSED USING A SEARCH MODE.

11        Q.   WHICH APPLE PRODUCTS DO YOU UNDERSTAND SAMSUNG TO BE

12        ACCUSING OF INFRINGING THE '449 PATENTS?

13        A.   SO IT'S THE APPLE 4 -- THE IPHONE 4, 4S, 5, AND ALSO THE

14        IPAD TOUCH FOURTH AND FIFTH GENERATION.

15        Q.   FOR PURPOSES OF YOUR ANALYSIS, DID YOU IDENTIFY ANY

16        RELEVANT DIFFERENCES AMONG THOSE PRODUCTS?

17        A.   NO.  SORRY.  NO.

18        Q.   AND WERE YOU HERE WHEN MR. PARULSKI TESTIFIED THAT APPLE

19        INFRINGES CLAIM 27 OF THE '449 PATENT?

20        A.   YES.

21        Q.   SO LET'S PULL UP CLAIMS 25 AND 27 AND SEE IF WE CAN

22        UNDERSTAND WHERE THE DISPUTE IS BETWEEN YOU AND SAMSUNG'S

23        EXPERT, MR. PARULSKI.

24             WOULD YOU PLEASE IDENTIFY FOR US THE REASONS THE ACCUSED

25        APPLE PRODUCTS, IN YOUR VIEW, DO NOT INFRINGE CLAIM 27?
```

1    A.   SURE.  SO IT'S SORT OF A LONG CLAIM, BUT IF YOU GO TO THE

2    FOURTH ITEM THAT STARTS "A COMPRESSOR," OKAY, IT DOESN'T --

3    THIS CLAIM ELEMENT DOESN'T JUST SAY ANY OLD COMPRESSOR.  IT

4    GIVES CERTAIN CONDITIONS THAT THAT COMPRESSOR MUST MEET IF YOU

5    WANT TO BE SATISFYING THIS CLAIM.

6         AND THIS IS ONE OF FIVE THINGS THAT ARE THINGS THAT THE

7    CLAIM SAYS HAS TO BE THERE THAT AREN'T IN THE APPLE PRODUCTS.

8         THE SECOND ONE IS, THE ONE STARTING "A DECOMPRESSOR," AND

9    THIS -- THE LANGUAGE HERE KIND OF NARROWS THE COMPRESSOR CLAIM.

10   IT AGAIN IS -- THE SPECIFICATIONS ARE WHAT KIND OF HARDWARE

11   DECOMPRESSOR YOU CAN HAVE TO BE SATISFYING THIS CLAIM ELEMENT.

12        AND AGAIN, THAT IS SOMETHING NOT PRESENT IN THE APPLE

13   PRODUCTS.

14        AND THEN IF YOU GO A LITTLE FURTHER DOWN TO THE ONE THAT

15   STARTS "A DISPLAY" -- YEAH, RIGHT THERE -- THERE ARE TWO THINGS

16   THERE.  IT TALKS ABOUT LIST AND A SEARCH MODE.

17        NEITHER OF THOSE THINGS ARE IN THE APPLE PRODUCTS.

18        AND FINALLY, THE FIFTH REASON IS THE SECOND TO LAST THING,

19   AND IT TALKS ABOUT THIS -- SORRY, STARTING "WHEREIN" -- YEAH --

20   IT TALKS ABOUT THE NOTION OF CLASSIFYING WHILE YOU'RE

21   RECORDING.

22        AND AGAIN, THAT'S SOMETHING THAT'S NOT IN THE APPLE

23   PRODUCTS.

24   Q.   NOW THAT YOU'VE GIVEN US AN OVERVIEW, LET'S WALK THROUGH

25   EACH OF THOSE FIVE REASONS, BEGINNING WITH THE CLAIM'S

1        REQUIREMENT OF A LIST.

2              WHAT IS A LIST IN THE CONTEXT OF THE '449 PATENT?

3        A.   SO THE '449 PATENT TALKS ABOUT THE NOTION OF A LIST IN THE

4        NATURAL WAY YOU DID IT AT THAT TIME.  IT TALKS ABOUT IT BEING

5        SOMETHING THAT GOES FROM THE TOP TO DOWN IN A LINEAR FASHION.

6        Q.   WHAT DOES SAMSUNG'S EXPERT, MR. PARULSKI, SAY MEETS THE

7        LIST REQUIREMENT?

8        A.   HE SEEMS TO BE SORT OF ALLOWING IT TO BE PRETTY MUCH

9        ANYTHING, INCLUDING JUST BROWSING.

10       Q.   AND HOW DOES THE CAMERA ROLL RELATE TO WHAT IS ACCUSED OF

11       INFRINGING AND MEETING THE LIST REQUIREMENT?

12       A.   HE -- HE ACCUSES THE CAMERA ROLL.

13       Q.   WHAT IS THE CAMERA ROLL?

14       A.   SO THE CAMERA ROLL IS THE PLACE IN THE DEVICE, LET'S SAY

15       IN THE IPHONE 5, WHERE ALL THE PICTURES YOU'VE TAKEN ARE

16       LOCATED.

17       Q.   HAVE YOU PREPARED A DEMONSTRATIVE SHOWING THE CAMERA ROLL?

18       A.   YES.

19       Q.   CAN WE PLEASE HAVE PDX 90.6 PUT ON THE SCREEN.

20             WHAT DOES THIS SLIDE SHOW?

21       A.   SO THIS IS -- THIS IS A SCREEN SHOT OF WHAT YOU WOULD SEE

22       WHEN YOU'RE LOOKING AT THE CAMERA ROLL.  YOU CAN SEE THAT AT

23       THE TOP IT SAYS CAMERA ROLL, AND WHAT YOU SEE IS A

24       TWO-DIMENSIONAL ARRAY OF COLORED THUMBNAILS.

25       Q.   DID YOU HEAR MR. PARULSKI TESTIFY THAT THE LIST OF THE

```
 1        '449 PATENT IS A, QUOTE, "SET OF ITEMS"?

 2    A.    YES.  YES.

 3    Q.    DO YOU AGREE WITH HIM?

 4    A.    WELL, NO.  I MEAN, IN TECHNICAL LITERATURE, BUT ALSO JUST

 5    IN EVERY DAY SPEECH, A SET IS A COLLECTION OF THINGS, RIGHT?

 6    IT'S A COLLECTION OF THINGS, AN ADDING OF THINGS.

 7           A LIST ARE THINGS IN AN ORDER, A FIRST ONE, A SECOND ONE,

 8    A THIRD ONE, AND SO ON.

 9    Q.    LET'S PUT UP NOW FIGURE 7 OF THE '449 PATENT.

10           WHAT DOES FIGURE 7 TELL US ABOUT THE REQUIRED LIST?

11    A.    SO FIGURE 7 IS NOW FROM THE PATENT, IT'S LIKE A SCREEN

12    SHOT OF THE PROPOSED CAMERA, AND IT'S SHOWING YOU THIS, THIS

13    LIST, RIGHT?  IT'S SHOWING YOU FIRST ITEM, SECOND ITEM, THIRD

14    ITEM, FOURTH ITEM, AND SO ON.  AND FOR EACH ITEM IT HAS SOME

15    INFORMATION, SUCH AS THE DATE IT WAS TAKEN.

16    Q.    LET'S TURN NOW TO FIGURE 8 OF THE '449 PATENT.

17           WOULD YOU DESCRIBE THE LIST SHOWN IN FIGURE 8?

18    A.    SO SAME THING.  IN THIS CASE, IT'S A SECOND WAY YOU CAN

19    VIEW THE SCREENS.  IT'S ANOTHER, IF YOU WILL, SCREEN SHOT FROM

20    THE PROPOSED INVENTION.

21           HERE AGAIN, FIRST ITEM, SECOND ITEM.

22           HERE, TO THE RIGHT OF EACH ITEM, IS AN ICON OR A THUMBNAIL

23    OF WHAT'S THERE.

24           BUT, AGAIN, IT'S IN THIS VERY ONE-AT-A-TIME DOWNWARD

25    FASHION, ONE AFTER THE OTHER.
```

1    Q.   HOW MANY IMAGES ARE IN THE FOLDER IN FIGURE 8?

2    A.   WELL, IF YOU LOOK UP AT THE TOP JUST ABOVE THE FIGURE OF

3    THE LITTLE MAN THERE, THERE'S SOMETHING THAT SAYS 1 OUT OF 6,

4    SO THIS IS 1 OUT OF 6 SCREENS.  THE SCREENS CAN ONLY SHOW THREE

5    AT A TIME, SO YOU HAVE TO GO THROUGH SIX MORE SCREENS, OR 18

6    TOTAL PHOTOS IN THIS CASE, OR PHOTOS AND VIDEOS.

7    Q.   NOW LET'S PULL UP AGAIN THE DEMONSTRATIVE 90.6, AND IF WE

8    COULD PUT THAT NEXT TO FIGURES 7 AND 8.

9         DR. STORER, WHAT ARE THE REASONS THAT YOU CONCLUDED THAT

10   CAMERA ROLL IS NOT A LIST?

11   A.   WELL, WHEN YOU LOOK AT THIS ON THE LEFT, YOU HAVE THIS

12   OLD-FASHIONED NOTION OF ONE AT A TIME, YOU HAVE TO TAP THROUGH

13   IT ONE AT A TIME TO LOOK AT IT.

14        ON THE RIGHT YOU HAVE THIS IDEA OF A TWO-DIMENSIONAL ARRAY

15   OF COLOR ICONS THAT CAN BE ACCESSED WITH MODERN TECHNOLOGY.

16        BUT IT JUST DOESN'T LOOK -- IT'S JUST NOT THE SAME THING,

17   THIS TWO-DIMENSIONAL ARRAY OF COLORED THUMBNAILS AND THIS

18   ONE-DIMENSIONAL TOP TO DOWN ARRANGEMENT THAT THE PATENT

19   DESCRIBES.

20   Q.   LET'S TURN BACK TO THE CLAIM LANGUAGE NOW, AND I WANT TO

21   ASK YOU ABOUT THE SECOND REASON FOR YOUR NON-INFRINGEMENT

22   CONCLUSION REGARDING CAMERA ROLL WHICH RELATES TO THE TERM

23   SEARCH MODE.

24        WHAT IS A SEARCH MODE IN THE CONTEXT OF THE '449 PATENT?

25   A.   SURE.  SO THE SEARCH MODE IS A TERM THAT'S USED IN THE

1    CLAIMS, AND IT'S USED AND IT'S MEANT TO BE JUST READ WITH ITS

2    PLAIN MEANING AT THAT TIME, A SEARCH MODE.  IT'S SOMETHING

3    YOU -- THAT PEOPLE ARE FAMILIAR WITH, SUCH AS GOING TO A BOX IN

4    A TEXT SENDER OR GOING TO THE WEB PAGE AND ENTERING A SEARCH

5    QUERY, JUST THE PLAIN MEANING THAT IT WOULD HAVE AT THAT TIME.

6    Q.   WHAT UNDERSTANDING OF SEARCH MODE DID MR. PARULSKI APPLY?

7    A.   SO, AGAIN, HE SEEMS TO BE -- I MENTIONED THIS EARLIER.  HE

8    SEEMS TO BE ALLOWING IT TO INCLUDE PRETTY MUCH ANYTHING,

9    INCLUDING BROWSING.

10    Q.   DO YOU AGREE WITH MR. PARULSKI'S UNDERSTANDING THAT SEARCH

11    MODE CAN INCLUDE BROWSING?

12    A.   NO.

13    Q.   WHY NOT?

14    A.   SO -- THIS IS ACTUALLY AN IMPORTANT POINT.  REMEMBER

15    BEFORE WE TALKED ABOUT HOW THE WHOLE PREMISE OF THE PATENT,

16    WHAT IT WAS TRYING TO AVOID, WHAT IT WAS TRYING NOT TO DO, WHAT

17    IT WAS TRYING TO MAKE A NEW INVENTION FOR WAS TO AVOID HAVING

18    TO -- WE USE THE TERMINOLOGY CHECKING THROUGH EVERYTHING,

19    RIGHT?  SO CHECKING THROUGH EVERYTHING IS A THING THAT IS NOT

20    SEARCH MODE.

21        SEARCH MODE IS THE THING THAT THE PATENT IS PROPOSING TO

22    BE AN ALTERNATIVE TO.

23    Q.   IF YOU LOOK IN FRONT OF YOU, THERE SHOULD BE A PHYSICAL

24    EXHIBIT, JX 40B.

25        DO YOU SEE THAT?

```
 1      A.   I DO.

 2      Q.   WHAT IS THAT?

 3      A.   THIS IS AN IPHONE 5, ONE THAT HAN BEEN DISASSEMBLED.

 4           MR. SELWYN:  YOUR HONOR, MAY DR. STORER COME TO THE

 5      ELMO TO DEMONSTRATE HOW CAMERA ROLL WORKS?

 6           THE COURT:  YES.

 7      BY MR. SELWYN:

 8      Q.   DR. STORER, WOULD YOU PLEASE?

 9      A.   OKAY.  SO I HAVEN'T USED THIS BEFORE.  I JUST HOLD IT DOWN

10      HERE?

11      Q.   JUST PLACE IT DOWN THERE.

12      A.   THERE WE GO.  OKAY, GOOD.  OKAY.  LIKE THAT.

13           SO LET'S GO AHEAD AND WE'LL TURN IT ON.  NOW, HOPEFULLY

14      PEOPLE CAN SEE THAT.

15           WE HAVE THE FIRST SCREEN, AND I'M GOING TO TAP ON THE ICON

16      THAT SAYS PHOTOS, OKAY?  AND IF YOU LOOK AT THIS, WE SEE

17      THAT -- LET ME HOLD IT IN MY HAND NOW.

18           WE SEE, SIMILAR TO THE SCREEN SHOT WE SAW BEFORE OF AN

19      IPHONE, AND WHAT'S REALLY NICE ABOUT THIS TECHNOLOGY NOW IS

20      WITH THIS MODERN TECHNOLOGY, BROWSING IS SUDDENLY EASY, RIGHT?

21           THIS IS AN ENTIRELY DIFFERENT APPROACH THAN THE APPROACH

22      TAKEN BY THE PATENT.  THIS IS DOING WHAT THE PATENT SAYS IT

23      CAN'T DO.  IT'S USING TECHNOLOGY THAT WASN'T AVAILABLE AT THAT

24      TIME.

25      Q.   YOU CAN RETURN TO YOUR SEAT.  THANK YOU.
```

DIRECT STORER

```
 1            WHAT DOES THE --

 2     A.    THAT'S OKAY.

 3            (LAUGHTER.)

 4            THE WITNESS:  THAT COULD HAVE BEEN BAD.  SORRY.

 5            MR. SELWYN:  WE HAVEN'T LOST A WITNESS YET.

 6            THE WITNESS:  WHEN I WAS RUNNING MY CONFERENCE, ONCE

 7     SOMEONE STEPPED OFF THE BACK OF THE PODIUM.  OKAY.

 8     BY MR. SELWYN:

 9     Q.    OKAY.  ALL SET?

10     A.    YES.

11     Q.    WHAT DOES THE '449 PATENT SAY ABOUT WHETHER THE CAMERA

12     ROLL APPROACH ADDRESSES THE PROBLEM THAT THE HITACHI INVENTORS

13     TRIED TO SOLVE.

14     A.    SO AS I WAS JUST DESCRIBING, IT'S SORT OF EXACTLY THE

15     OPPOSITE.  THE '449 PATENT IS TALKING ABOUT THAT NOT WANTING TO

16     CHECK THROUGH EVERYTHING.  IT'S SAYING THE LAST THING YOU WANT

17     TO DO IS TRY TO BROWSE THROUGH EVERYTHING.

18            IT'S TRYING TO PROPOSE A SOLUTION FOR NOT DOING THAT, AND

19     THE SOLUTION IT PROPOSES IS MUCH DIFFERENT CONSISTENTLY.  IT'S

20     NOT TECHNOLOGY THAT EXISTED.

21     Q.    COULD WE HAVE FIGURE 8 BACK ON THE SCREEN, PLEASE.

22            NOW, MR. PARULSKI SUGGESTED YESTERDAY THAT A USER COULD

23     SEARCH FOR A PICTURE USING THE DISPLAY OF FIGURE 8 BY USING THE

24     ARROWS CORRESPONDING TO THE BUTTONS AT THE BOTTOM OF THE

25     SCREEN.
```

1          DO YOU RECALL THAT?

2     A.    I DO.

3     Q.    HOW LONG WOULD IT TAKE A USER TO SCROLL THROUGH, FOR

4     EXAMPLE, 3,000 IMAGES USING THE TECHNOLOGY AT THE TIME OF THE

5     PATENT?

6     A.    WELL, YOU KNOW, LET'S -- YOU CAN PUT ASIDE HOW LONG THE,

7     HOW FAST THE CAMERA OPERATES.  JUST IMAGINE YOURSELF WITH 3,000

8     IMAGES ON YOUR DEVICE AND HAVING TO TAP THE BUTTON ONCE FOR

9     EACH ONE TO LOOK THROUGH THEM, AND THEN HEAVEN FORBID I MISSED

10    IT.  NOW GO BACK AND TAP 3,000 TIMES AGAIN.

11          I MEAN, THIS WOULD JUST BE -- THIS IS WHAT THEY WERE

12    SAYING WAS NOT POSSIBLE.  THIS IS THE THING THEY WERE TRYING TO

13    SOLVE.  THEY HAD A LIST, THEY WANTED TO CHECK THROUGH IT, AND

14    THEY COULDN'T PERHAPS.  IT WAS JUST IMPRACTICAL.

15    Q.    LET'S TURN BACK TO THE CLAIM LANGUAGE AND NOW I WANT TO

16    FOCUS ON THE THIRD REASON YOU IDENTIFIED, THE COMPRESSOR

17    REQUIREMENT.

18          WHAT DOES THE CLAIMED COMPRESSOR REQUIRE?

19    A.    SO, AGAIN, AS I MENTIONED EARLIER, IT TALKS ABOUT THIS

20    COMPRESSOR, BUT IT DOESN'T SAY JUST ANY OLD COMPRESSOR.  IT

21    SAYS IT HAS TO BE A SINGLE COMPRESSOR THAT HAS THESE TWO

22    DIFFERENT METHODS BUILT INTO IT, ONE FOR IMAGES, ONE FOR

23    VIDEOS.

24    Q.    NOW CAN WE PULL UP FIGURE 4 ON THE SCREEN, AND I'D ASK

25    THAT WE ZOOM IN ON BOX 409, AND LET'S ALSO PULL UP COLUMN 4,

```
 1         LINES 10 THROUGH 20, WHICH DESCRIBES BOX 409.  PERFECT.

 2              WHAT DID THE HITACHI INVENTORS DESCRIBE IN THIS PASSAGE?

 3    A.   SO MAYBE WE CAN EVEN -- CAN WE BLOW UP THAT BOX?  OKAY.

 4    SO ON THE LEFT, UPPER LEFT THERE IS THE BLOCK DIAGRAM OF THE

 5    WHOLE CAMERA, AND WHAT WE'VE BLOWN UP IS THE BLOCK THAT'S

 6    LABELED MPEG/JPEG.  AND THIS IS ACTUALLY AN IMPORTANT POINT,

 7    OKAY?

 8              SO MPEG -- JPEG IS THE STANDARD FOR IMAGE COMPRESSION,

 9    WHICH IS STILL AROUND, AND MPEG WAS THE STANDARD FOR VIDEO

10    COMPRESSING.  AND THEY WERE THE STANDARDS AT THAT TIME.  OKAY?

11    THIS IS WHAT EVERYONE KNEW ABOUT WHO WOULD READ THIS PATENT.

12    THIS IS WHAT PEOPLE WERE USING.  THE TWO STANDARDS HAD BEEN

13    DESIGNED BY THE SAME COMMITTEES AND THEY'D BEEN DESIGNED TO

14    WORK TOGETHER.

15              AND THE REASON WAS THAT BACK THEN, DOING SOMETHING LIKE

16    JPEG COMPRESSION -- WE HEARD MR. GARCIA SAY HOW EASY IT IS

17    NOWADAYS WITH THIS HIGH TECH CARD, BUT BACK THEN, IT WAS

18    EXPENSIVE.  YOU HAD TO BUY AND HAVE CUSTOM HARDWARE TO DO IT.

19    IT WAS AN EXPENSIVE THING.

20              MPEG, SAME THING.

21              AND SO THE STANDARDS COMMITTEE DESIGNED THEM TO GO

22    TOGETHER SO THEY COULD SHARE THE SAME EXPENSIVE HARDWARE.  THE

23    SAME EXPENSIVE HARDWARE COULD BE USED FOR BOTH STANDARDS.

24              AND THAT'S WHAT YOU SEE THE PATENT TALKING ABOUT WHEN IT

25    GETS TO THE END THERE AND IT SAYS -- THE THIRD TO LAST LINE
```

1    SAYS "SAME COMMON POINTS," AND IT ENDS BY SAYING "SAVING THE

2    CIRCUITRY."  THIS PARAGRAPH IS REMINDING THE USER WHAT YOU

3    REALLY WANT TO DO IS HAVE THIS SINGLE METHOD, AND THEY'RE

4    MOTIVATED BY THE FACT THAT EVERYONE IS FAMILIAR WITH THE FACT

5    OF THE STANDARDS GOING TOGETHER AND THE NEED TO SHARE THE

6    EXPENSIVE PARTS.

7    Q.   WHAT DOES SAMSUNG'S EXPERT SAY MEETS THIS LIMITATION, THE

8    COMPRESSOR REQUIREMENT, IN THE APPLE PRODUCTS?

9    A.   SO SAMSUNG POINTS TO A COLLECTION OF COMPONENTS.

10   Q.   IN WHAT?

11   A.   IN THE SOC.  SOMETIMES IT'S BEEN REFERRED TO AS THE

12   APPLICATION PROCESSOR.  THIS IS THE SYSTEM ON A CHIP, SOC.

13   Q.   WOULD YOU PLEASE TURN TO TAB 18 IN YOUR BINDER, AND CAN

14   YOU TELL US WHAT THAT IS?

15   A.   YES.  THIS IS ENTITLED THE H5P USER'S MANUAL.

16        MR. SELWYN:  YOUR HONOR, I MOVE THE ADMISSION OF

17   PX 294.

18        THE COURT:  ANY OBJECTION?

19        MR. JOHNSON:  NO, YOUR HONOR.

20        THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

21     (PLAINTIFF'S EXHIBIT 294 WAS ADMITTED IN EVIDENCE.)

22        THE COURT:  LET ME ASK, JX 40B HAS NOT BEEN ADMITTED.

23   JX 40 HAS.  WHAT'S THE DIFFERENCE BETWEEN THOSE TWO?  THEY'RE

24   BOTH IPHONE 5'S.

25        MR. SELWYN:  I BELIEVE WE MAY HAVE TWO PHYSICAL

```
 1          EXHIBITS THAT ARE THE IPHONE 5.

 2                  THE COURT:  OKAY.  JX 40 AND 40B?

 3                  MR. SELWYN:  YES.

 4                  THE COURT:  OKAY.  ARE YOU MOVING TO ADMIT 40B?

 5                  MR. SELWYN:  I AM.

 6                  THE COURT:  OKAY.  ANY OBJECTION?

 7                  MR. JOHNSON:  NO, YOUR HONOR.

 8                  THE COURT:  ALL RIGHT.  THAT'S ADMITTED AS WELL THEN.

 9              (JOINT EXHIBIT 40B WAS ADMITTED IN EVIDENCE.)

10                  THE COURT:  GO AHEAD, PLEASE.

11                  MR. SELWYN:  LET'S PUT ON THE SCREEN, PLEASE -- AND

12      THIS IS CONFIDENTIAL, SO JUST FOR THE COURT, THE WITNESS, AND

13      THE JURY -- PAGE 21 OF PX 294.

14      Q.   WHAT DOES THIS PAGE SHOW?

15      A.   SO THIS IS A HIGH LEVEL BLOCK DIAGRAM OF THE SOC, AND THIS

16      WAS DISCUSSED EARLIER BY MR. MILLET.

17      Q.   WHERE IS THE GROUP OF COMPONENTS THAT MR. PARULSKI SAYS IS

18      THE COMPRESSOR?

19      A.   SO IF YOU LOOK AT THE PINK BOX THAT'S IN THE UPPER LEFT TO

20      THE RIGHT OF BLUE AND THE LEFT OF THE RED.

21      Q.   NOW, IF YOU COULD TURN, PLEASE, TO PAGE 40 OF THE SAME

22      EXHIBIT -- AND WE'LL PUT IT UP ON THE SAME SCREENS -- WHAT DOES

23      THIS PAGE SHOW?

24      A.   SO THIS IS THAT PINK, THE PINK AREA WE SAW BLOWN UP.  AND

25      YOU MAY RECALL THAT WE'VE ALREADY HEARD HOW THIS IS REFERRED TO
```

1      AS THE HPERF-NRT BLOCK.  MR. MILLET TALKED ABOUT IT.

2      Q.   DO YOU AGREE THAT THE HPERF-NRT BLOCK IS A COMPRESSOR?

3      A.   NO.  NO.

4      Q.   WHY NOT?

5      A.   SO IF YOU TAKE A LOOK AT THIS, IT'S SORT OF A DEPICTION OF

6      A COLLECTION OF COMPONENTS.  IN FACT, SOME OF THEM ARE JUST ON

7      TOP OF EACH OTHER WHEN IT SAYS TWO TIMES SOMETHING.  THEY'RE

8      COMPONENTS THAT ARE MADE -- DESIGNED BY DIFFERENT

9      MANUFACTURERS, DIFFERENT POWERING.

10          THERE ARE SOME COMPONENTS ON HERE THAT DON'T EVEN HAVE

11     ANYTHING TO DO WITH COMPRESSION OR DECOMPRESSION.

12     Q.   WHAT COMPANY SUPPLIES TO APPLE THE COMPONENT THAT PERFORMS

13     VIDEO COMPRESSION?

14     A.   SO VIDEO COMPRESSION, H.264, IS DESIGNED BY IMAGINATION

15     TECHNOLOGIES, AND IT'S FABRICATED ONTO THE CHIP BY SAMSUNG.

16     Q.   WHAT COMPANY SUPPLIES THE COMPONENT THAT PERFORMS THE

17     STILL IMAGE COMPRESSION?

18     A.   SO -- SO A COMPANY CALLED SHIKINO DESIGNS IT, AND AGAIN

19     IT'S FABRICATED ONTO THE CHIP BY SAMSUNG.

20     Q.   IS IT THE CASE THAT MR. PARULSKI SAYS COMPONENTS THAT

21     SAMSUNG SELLS TO APPLE MEETS THIS LIMITATION?

22     A.   YEAH.

23     Q.   CAN YOU PLEASE TURN TO PAGE 81 OF THE SAME EXHIBIT,

24     PX 294, AND AGAIN LET'S DISPLAY THIS ON THE SAME SCREENS.

25          CAN YOU EXPLAIN WHAT THIS PAGE SHOWS?

1       A.   YES.  SO, AGAIN, THIS IS SOMETHING THAT THE APPLE

2   ENGINEER, MR. MILLET, TALKED ABOUT.  IT'S CALLED A FLOOR PLAN.

3       I LIKE TO THINK OF IT AS LIKE AN AERIAL VIEW, RIGHT?  YOU

4   TAKE THE MICROSCOPE AND BLOW IT UP AND YOU LOOK DOWN AND WHAT

5   DO YOU SEE?  YOU SEE THIS WHOLE CITY FULL OF COMPONENTS.

6       AND THIS IS HOW THEY ACTUALLY EXIST AS HE EXPLAINED.  THIS

7   IS HOW THEY REALLY EXIST ON THE MATERIAL.

8       Q.   WHY ARE THERE DIFFERENT COLORS ON THIS DIAGRAM?

9       A.   SO IN -- THERE'S A LEGEND AT THE BOTTOM.  I GUESS I CAN'T

10  POINT TO IT.  YOU'RE LOOKING AT YOUR SCREENS.  AND IN ADDITION

11  TO THESE COMPONENTS BEING DESIGNED BY DIFFERENT VENDORS, AS YOU

12  MENTIONED, THE COLORS IN THE LEGEND ARE INDICATING HOW THEY'RE

13  POWERED, AND DIFFERENT COLORS MEAN A DIFFERENT POWER GRID.

14      Q.   ARE THE COMPONENTS THAT PERFORM STILL IMAGE COMPRESSION ON

15  SEPARATE POWER DOMAINS FROM THE VIDEO COMPRESSION COMPONENTS?

16      A.   YES.

17      Q.   DID MR. PARULSKI ADDRESS THE ACTUAL PHYSICAL LAYOUT IN HIS

18  TESTIMONY?

19      A.   NO.

20      Q.   WE TALKED A FEW MINUTES AGO ABOUT THE REASONS COMMON

21  CIRCUITRY FOR STILL IMAGE AND VIDEO COMPRESSION WAS USED AT THE

22  TIME OF THE '449 PATENT.

23      DOES APPLE USE COMMON CIRCUITRY TO IMPLEMENT STILL IMAGE

24  AND VIDEO COMPRESSION TODAY?

25      A.   NO.

1    Q.   CAN YOU EXPLAIN TO US WHY IT DOES NOT?

2    A.   SURE.  SO THIS IS ACTUALLY ANOTHER IMPORTANT POINT, AND

3         MR. MILLET TALKED ABOUT SOME OF THEM.

4              SO THERE ARE A NUMBER OF REASONS.  FIRST OF ALL, WHEN YOU

5         TALK ABOUT THE POWER -- LET'S GO TO THAT LEGEND WE JUST HAD --

6         NOW YOU CAN TURN OFF THINGS WHEN YOU'RE NOT USING THEM, AND

7         BATTERY POWER IS A HUGE ISSUE IN THESE MODERN DEVICES.

8              ANOTHER THING THAT'S IMPORTANT HERE IS THAT THE H.264 THAT

9         HE TALKED ABOUT, IT TAKES SO MUCH POWER.  IT'S ALSO A MUCH MORE

10        POWERFUL COMPRESSION STANDARD.  IN THIS PRODUCT, IT'S SOMETHING

11        MUCH BETTER THAN MPEG IN THE SENSE THAT IT COMPRESSES THE DATA

12        MORE.

13             SO YOU KNOW HAVE -- BUT ON THE OTHER HAND, IT DOESN'T

14        SHARE ANY COMPONENTS WITH JPEG, SO THERE NO LONGER WOULD BE A

15        REASON TO PUT THEM TOGETHER.

16             ONE THING NOW YOU CAN DO THAT YOU COULDN'T DO BEFORE IS

17        YOU ALSO, IN ADDITION TO TURNING ONE OR THE OTHER OFF, YOU CAN

18        RUN THEM BOTH, AND HE MENTIONED THIS AS WELL.  YOU CAN BE DOING

19        THE VIDEO COMPRESSION AND IMAGE COMPRESSION AT THE SAME TIME.

20        YOU COULD NEVER DO THAT BEFORE WHEN THEY WERE SHARING.

21             SO IN THE END, YOU GET BASICALLY A HIGHER PERFORMANCE,

22        THAT IS, THE BETTER COMPRESSION, YOU GET LOWER POWER USAGE,

23        BETTER POWER USAGE, LOWER COSTS.  IT'S LIKE THIS BIG WIN-WIN,

24        BUT IT'S IN THE CONTEXT OF THIS VERY MODERN TECHNOLOGY THAT

25        WASN'T AVAILABLE BACK THEN.

1    Q.   NOW LET'S GO BACK TO THE CLAIM LANGUAGE, IF WE CAN HAVE

2    THAT ON THE SCREEN, AND I WANT TO ASK YOU NOW ABOUT THE

3    DECOMPRESSOR REQUIREMENT YOU IDENTIFIED.

4         WHAT DOES CLAIM 25 SAY THE DECOMPRESSOR REQUIRES?

5    A.   SO THE DECOMPRESSOR, THE WAY THE CLAIM IS READ, IT PRETTY

6    MUCH MIRRORS THE COMPRESSOR.  DECOMPRESSION IS THE REVERSE OF

7    COMPRESSION, AND IT BASICALLY SAYS THE SAME THING, THAT IT'S

8    NOT JUST ANY DECOMPRESSOR, IT HAS TO BE A SINGLE DECOMPRESSOR

9    WHICH HAS BOTH A METHOD FOR VIDEO AND DIFFERENT METHOD FOR

10   IMAGES.

11   Q.   COULD YOU SUMMARIZE HAVE WHY THE ACCUSED PRODUCTS DON'T

12   MEET THE DECOMPRESSOR REQUIREMENT?

13   A.   PRETTY MUCH ALL THE REASONS I JUST SAID FOR THE

14   COMPRESSOR.  HIGHER PERFORMANCE, THE POWER CONSIDERATIONS, ALL

15   OF THE THINGS THAT I SAID FOR THE COMPRESSOR APPLY IN THE SAME

16   WAY TO THE DECOMPRESSOR.

17   Q.   LET'S TURN BACK TO THE CLAIM LANGUAGE ONE LAST TIME AND I

18   WANT TO ASK YOU ABOUT THE FINAL REQUIREMENT YOU IDENTIFIED AS A

19   REASON THAT THE APPLE PRODUCTS DO NOT INFRINGE.

20        AND IF WE COULD HIGHLIGHT, AS YOU HAVE, THE LANGUAGE,

21   "WHEREIN SAID RECORDING CIRCUIT RECORDS EACH ONE OF SAID

22   PLURALITY OF IMAGE SIGNALS WITH CLASSIFICATION DATA."

23        DO YOU SEE THAT?

24   A.   YES.

25   Q.   CAN YOU EXPLAIN TO US WHAT THAT REQUIREMENT MEANS?

1    A.   YES.  SO IT'S IMPORTANT TO REALLY READ THIS ONE, SO LET ME

2    SAY THAT ONE MORE TIME.  "WHEREIN SAID RECORDING CIRCUIT

3    RECORDS," RECORDS, "EACH ONE OF SAID PLURALITY OF IMAGE SIGNALS

4    WITH CLASSIFICATION DATA."

5        IT'S NOT MERELY SAYING NOW YOU'VE GOT TO HAVE

6    CLASSIFICATIONS AROUND WHERE YOU CAN CLASSIFY THINGS.  IT'S

7    SAYING THAT THE RECORDING HAS TO WORK IN A WAY THAT YOU'RE

8    CLASSIFYING IT WHILE YOU'RE RECORDING IT.

9    Q.   AND WHAT DID MR. PARULSKI, SAMSUNG'S EXPERT, SAY MEETS THE

10   "RECORDS WITH CLASSIFICATION DATA" REQUIREMENT?

11   A.   SO, AGAIN, THE CAMERA ROLL.

12   Q.   DO YOU AGREE THAT CAMERA ROLL IS A CLASSIFICATION?

13   A.   NO.

14   Q.   WHY NOT?

15   A.   SO WE KIND OF TALKED ABOUT THIS ALREADY.  CAMERA ROLL IS

16   EVERYTHING THAT YOU'VE TAKEN.  IT'S NOT -- IT'S NOT SOMETHING

17   LIKE, "WELL, I'VE GOT SOME PICTURES IN A FOLDER CALLED

18   SAN FRANCISCO AND I'VE GOT SOME PICTURES IN THE FOLDER CALLED

19   SAN DIEGO."

20       CAMERA ROLL IS ABSOLUTELY EVERYTHING.  IT DOESN'T

21   DISTINGUISH ANYTHING.  IT'S EVERYTHING YOU'VE TAKEN.  IT'S NOT

22   A CLASSIFICATION.

23   Q.   COULD WE HAVE FIGURE 6, PLEASE, ON THE SCREEN.

24       EXPLAIN TO US WHAT FIGURE 6 SHOWS.

25   A.   THIS IS ANOTHER FIGURE FROM THE PATENT, AND THE ITEMS 1,

1    2, AND 3 ARE WHAT THE PATENT CALLS CLASSIFICATIONS.  YOU CAN

2    PUT CERTAIN PICTURES IN EACH ONE OF THEM, AND IF YOU PUT IT IN

3    FOLDER NUMBER 1, IT'S CLASSIFICATION 1.  IF YOU PUT IT IN

4    FOLDER NUMBER 3, IT'S CLASSIFICATION NUMBER 3.

5    Q.   SO JUST SO WE'RE CLEAR, WHAT DOES THE PATENT SAY ITEM 605,

6    606, AND 607 ARE?

7    A.   RIGHT.  SO I'M SORRY.  I SHOULD HAVE -- 605, 606, AND 607

8    ARE INDICATING THE FOLDERS 1, 2, AND 3 I WAS JUST DESCRIBING.

9         SO THOSE THREE LINES ARE EACH SHOWING A FOLDER WHICH THE

10   PATENT CALLS A CLASSIFICATION.  IF YOU PUT IT IN FOLDER 1, IT'S

11   CLASSIFIED AS 1.  IF YOU PUT IT IN FOLDER 3, IT'S CLASSIFIED AS

12   TYPE 3.

13   Q.   WHAT DOES THE PATENT SAY ITEM 608 IS?

14   A.   SO THIS IS IMPORTANT.  608, THE PATENT SAYS THIS IS NOT A

15   CLASSIFICATION.  THIS FOLDER IS CALLED "ALL," AND IT'S ALL OF

16   THE IMAGES IN THE CAMERA.  EVERYTHING THAT'S IN 1, 2, AND 3

17   WOULD BE IN "ALL."  EVERYTHING IN THE CAMERA WOULD BE IN "ALL."

18   Q.   WHAT DOES MR. PARULSKI SAY REGARDING WHETHER ITEM 608 IS A

19   CLASSIFICATION?

20   A.   ACTUALLY, HE AGREES.  HE SAYS THAT IT'S NOT A

21   CLASSIFICATION.

22   Q.   SO YOU AND MR. PARULSKI AGREE ON THAT POINT?

23   A.   YES.

24   Q.   HOW DOES THE "ALL" FOLDER, 608, COMPARE TO THE CAMERA ROLL

25   IN APPLE'S PRODUCTS?

1    A.   SO THERE'S NOT MUCH COMPARISON BETWEEN THESE, THE PATENT

2    AND THE PRODUCTS, BUT IN THIS ONE REGARD, THERE'S A CLEAR

3    ANALOGY.  HERE, IN THE FIGURE AND IN THE DESCRIPTION OF THE

4    PATENT, ALL, WHICH IS EVERYTHING IN THE CAMERA, IS NOT A

5    CLASSIFICATION, AND IN JUST IN THE SAME WAY, THE CAMERA ROLL,

6    WHICH IS EVERYTHING YOU'VE TAKEN ON THE IPHONE, IS NOT A

7    CLASSIFICATION.

8    Q.   SO WOULD YOU SUMMARIZE FOR US, PLEASE, THE REASONS THAT

9    YOU BELIEVE CAMERA ROLL DOES NOT MEET THE LIMITATION "WHEREIN

10   SAID RECORDING CIRCUIT RECORDS EACH ONE OF SAID PLURALITY OF

11   IMAGE SIGNALS WITH CLASSIFICATION DATA"?

12   A.   SO -- SO HERE'S -- SO THIS IS REALLY WHERE IT WAS

13   IMPORTANT TO REMEMBER THE LANGUAGE OF THAT -- THAT YOU JUST

14   READ.  IT'S SAYING YOU HAVE TO CLASSIFY AS YOU TAKE PICTURES.

15        WELL, WHEN A PICTURE -- WHEN YOU TAKE A PICTURE, IT

16   AUTOMATICALLY GOES IN THE CAMERA ROLL, BECAUSE THAT'S

17   EVERYTHING IN THE DEVICE.  YOU'RE NOT CLASSIFYING IT.  YOU'RE

18   NOT SAYING, "WAIT A MINUTE, THIS IS A PICTURE OF SAN FRANCISCO,

19   I SHOULD PUT IT IN FOLDER NUMBER 1," AND WHEN YOU WANT TO TAKE

20   THE NEXT PICTURE, "THIS IS A PICTURE FROM SAN DIEGO, I SHOULD

21   PUT IN THIS FOLDER NUMBER 3."

22        CAMERA ROLL IS SIMPLY THE PLACE WHERE EVERYTHING GOES THAT

23   YOU'VE TAKEN.  NOTHING IS CLASSIFIED AND THERE'S NO

24   CLASSIFICATION AS YOU'RE RECORDING.

25        MR. SELWYN:  THANK YOU, DR. STORER.

```
1          I HAVE NO FURTHER QUESTIONS.

2              THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:49.

3              MR. JOHNSON:  YOUR HONOR, IF WE COULD HAVE A MINUTE

4      JUST TO HAND UP SOME BINDERS PLEASE?

5              THE COURT:  OF COURSE.

6          LET ME JUST STATE FOR THE RECORD THAT PX 294 WAS SEALED IN

7      ITS ENTIRETY.

8          (PAUSE IN PROCEEDINGS.)

9              THE COURT:  YOU READY, MR. JOHNSON?

10             MR. JOHNSON:  YES, I AM.  THANK YOU.

11             THE COURT:  OKAY.  TIME IS 1:50.

12         GO AHEAD, PLEASE.

13                      CROSS-EXAMINATION

14     BY MR. JOHNSON:

15     Q.   GOOD AFTERNOON, DR. PARULSKI.  NOT DR. PARULSKI.

16          DR. STORER.

17     A.   THAT'S OKAY.  GOOD AFTERNOON.

18     Q.   I DON'T HAVE A LOT OF TIME, BUT I HAVE SOME QUESTIONS, SO

19     LET ME START BY ASKING YOU, DURING THE COURSE OF YOUR DIRECT

20     EXAMINATION, YOU PUT UP PRODUCT BROCHURES, PRICE QUOTATIONS ALL

21     DESCRIBING THE FIRSTLOOK SORT OF PRODUCT BACK FROM THE EARLY

22     1990S; RIGHT?

23          DO YOU REMEMBER THAT?

24     A.   YES.

25     Q.   OKAY.  SO YOU WERE ASKED TO LOOK AT WHETHER THE PRODUCTS
```

1    THAT ARE ACCUSED INFRINGE CLAIM 15 AND 27; RIGHT?

2    A.   YES.

3    Q.   OKAY.  AND THE CLAIMS OF BOTH OF THOSE PATENTS ARE WHAT

4    DESCRIBE THE SCOPE OF THE INVENTION; RIGHT?

5    A.   YES.  YOU HAVE CLAIM -- JUST TO BE CLEAR, CLAIM 15 IN

6    THE --

7    Q.   '239?

8    A.   RIGHT.  AND CLAIM 27 IN THE '449.

9    Q.   BUT MY POINT IS BOTH OF THOSE CLAIMS ARE WHAT DEFINE THE

10   SCOPE OF THE INVENTION?

11   A.   SURE.

12   Q.   SO YOU'RE SUPPOSED TO COMPARE THE LANGUAGE IN THE CLAIMS

13   TO WHAT'S IN THE ACCUSED PRODUCTS; RIGHT?

14   A.   YES.

15   Q.   OKAY.  AND DURING THE COURSE OF YOUR DIRECT TESTIMONY, I

16   DIDN'T SEE YOU PUT UP OR REFER TO ANY OF APPLE'S INTERNAL

17   SOURCE CODE.  RIGHT?

18   A.   IN THE DIRECT TESTIMONY, THAT'S CORRECT.

19   Q.   OKAY.  AND IF WE GO AND WE LOOK AT SDX 3985, PLEASE -- AND

20   THIS IS JUST FOR THE COURT AND THE WITNESS AND ALSO FOR THE

21   JURY -- YOU WOULD AGREE WITH ME THAT AS IT RELATES TO THE '239

22   PATENT, THIS IS THE SOURCE CODE FOR FACETIME, MAIL AND

23   MESSAGES, MAIL MESSAGES.  RIGHT?  THOSE ARE AT LEAST PORTIONS

24   OF THE SOURCE CODE?

25   A.   REALLY, REALLY SMALL PORTIONS, YES.

CROSS STORER

```
 1        Q.   OKAY.  NOW, I HEARD YOU ALSO SAY, DURING THE COURSE OF

 2   YOUR DIRECT, THAT -- AND THIS AGAIN IS WITH RESPECT TO THE '239

 3   PATENT -- THAT THERE'S NO VIDEO ON FACETIME.

 4        DO YOU REMEMBER THAT?

 5   A.   YES.

 6   Q.   OKAY.  COULD WE PUT UP HIS REBUTTAL REPORT, PARAGRAPH

 7   '516, PLEASE.

 8        YOU SUBMITTED A COUPLE REPORTS IN THIS CASE?

 9   A.   YES.

10   Q.   DO YOU REMEMBER STATING IN YOUR EXPERT REPORT, WITH

11   RESPECT TO FACETIME, QUOTE, "AT THE TIME THE CAMERA IS TURNED

12   ON AND THE FACETIME APPLICATION PREPARES TO TRANSMIT VIDEO"?

13        DO YOU REMEMBER SAYING THAT IN YOUR EXPERT REPORT?

14   A.   YES.

15   Q.   AND YET TODAY YOU SAID THERE'S NO VIDEO ON FACETIME;

16   RIGHT?  THAT'S WHAT YOU SAID?

17   A.   CERTAINLY, YES.

18   Q.   OKAY.  NOW, I WANT TO ASK YOU ABOUT THE '449 PATENT.  YOU

19   WERE IN THE COURTROOM AND YOU HEARD ABOUT MR. PARULSKI, SAMSUNG

20   EXPERT, WITH HIS 32 YEARS IN DIGITAL CAMERA PHOTOGRAPHY AT

21   KODAK; RIGHT?

22   A.   YES.

23   Q.   AND, AGAIN, THE CLAIMS DEFINE THE SCOPE OF THE INVENTION,

24   AND CLAIM 27 AND 25 OF THE '449 PATENT TALK ABOUT A DIGITAL

25   CAMERA; RIGHT?
```

```
1    A.   YES.

2    Q.   RIGHT AT THE VERY TOP, IT SAYS "A DIGITAL CAMERA"?

3    A.   YES.

4    Q.   NOW, YOU DON'T HAVE ANY EXPERIENCE DESIGNING A DIGITAL

5    CAMERA, DO YOU?

6    A.   WELL, I WOULDN'T SAY THAT.

7    Q.   LET ME ASK YOU ONE MORE TIME.  YOU'VE NEVER DESIGNED A

8    CAMERA, HAVE YOU?

9    A.   I THINK IF YOU SAY IT THAT WAY, I'VE NEVER BEEN PART OF AN

10   INDUSTRIAL DESIGN GROUP TO DESIGN A CAMERA, THAT'S FAIR.

11   Q.   SO YOU'VE NEVER DESIGNED A CAMERA; RIGHT?

12   A.   THAT'S FAIR IF YOU WANT TO SAY THAT.

13   Q.   AND YOU'VE NEVER DESIGNED A LENS FOR A CAMERA, HAVE YOU?

14   A.   I THINK THAT'S FAIR, YES.

15   Q.   AND YOU'VE NEVER DESIGNED AN IMAGE SENSOR USED IN A

16   CAMERA; RIGHT?

17   A.   I HAVE BEEN INVOLVED IN DESIGNS OF SENSORS, YES.

18   Q.   SIR, YOU'VE NEVER DESIGNED AN IMAGE SENSOR FOR A CAMERA,

19   HAVE YOU?

20   A.   I THINK IF YOU SAY IT THAT WAY, IT'S FAIR.

21   Q.   AND YOU'VE NEVER DESIGNED AN A/D CONVERTER CHIP, HAVE YOU?

22   A.   I THINK THAT'S FAIR.

23        MR. JOHNSON:  NO FURTHER QUESTIONS.

24        THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:54.  IS

25   THERE ANY REDIRECT?
```

```
1              MR. SELWYN:  NO REDIRECT.

2              THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

3     AND IS IT SUBJECT TO RECALL OR NOT?

4              MR. LEE:  EXCUSED, NOT SUBJECT TO RECALL, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  DO YOU AGREE WITH THAT,

6     MR. JOHNSON.

7              MR. JOHNSON:  WE AGREE, YES.

8              THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED.

9              MR. LEE:  YOUR HONOR?

10             THE COURT:  YES.

11             MR. LEE:  APPLE RESTS ITS DEFENSE TO SAMSUNG'S

12    DEFENSIVE CASE.

13             THE COURT:  OKAY.

14             MS. MAROULIS:  YOUR HONOR, SAMSUNG RESERVES ITS JMOL

15    MOTIONS PER PRIOR DISCUSSIONS.

16             THE COURT:  ALL RIGHT.

17             MR. LEE:  AS DO WE.

18             THE COURT:  UNDERSTOOD.  THAT WILL ALL BE BRIEFED ON

19    FRIDAY.

20         (PAUSE IN PROCEEDINGS.)

21             THE COURT:  OKAY.

22             MR. MCELHINNY:  YOUR HONOR, APPLE IS PREPARED TO

23    BEGIN ITS REBUTTAL CASE.

24         AS THE FIRST THING WE'RE GOING TO DO, WE'RE GOING TO READ

25    IN A SWORN INTERROGATORY ANSWER FROM SAMSUNG.
```

1         THE PARTIES HAVE AGREED, WE UNDERSTAND THAT YOUR HONOR HAS

2    AN INSTRUCTION, AND THIS COVERS THE SAME MATERIAL AND WE'RE

3    AGREED THAT YOU -- THAT THE INSTRUCTION MAY BE APPROPRIATE EVEN

4    BEFORE THE INTERROGATORY.

5         THE COURT:  AT THIS TIME?

6         MR. MCELHINNY:  YES, YOUR HONOR.

7         THE COURT:  OKAY.  EVIDENCE THAT A PARTY IS

8    INDEMNIFIED IS NOT ADMISSIBLE TO PROVE THAT THE PARTY IS

9    LIABLE, BUT IS ADMISSIBLE FOR ANOTHER PURPOSE, SUCH AS PROVING

10   A WITNESS'S BIAS.

11        OKAY.  TIME IS 1:58.

12        GO AHEAD, PLEASE.

13        MR. MCELHINNY:  AT THIS POINT, I'M GOING TO READ

14   SAMSUNG'S SWORN ANSWER TO APPLE'S INTERROGATORY -- APPLE'S

15   INTERROGATORY, THIRD SET OF INTERROGATORIES, ANSWER NUMBER 32.

16        THE DATE OF THIS ANSWER WAS SEPTEMBER 24, 2012.

17        QUESTION:  "TO THE EXTENT SAMSUNG CLAIMS TO BE INDEMNIFIED

18   OR OTHERWISE COMPENSATED IN CONNECTION WITH THIS LAWSUIT BY ANY

19   THIRD PARTY, IDENTIFY THAT THIRD PARTY, STATE THE FULL BASIS

20   FOR THE ALLEGED INDEMNIFICATION, AND DESCRIBE THE SCOPE OF THE

21   ALLEGED INDEMNIFICATION."

22        AFTER AN OBJECTION, THE ANSWER IS:  "SUBJECT TO AND

23   WITHOUT WAIVING THE FOREGOING GENERAL AND SPECIFIC OBJECTIONS,

24   SAMSUNG RESPONDS AS FOLLOWS:  SAMSUNG IS NOT CURRENTLY SEEKING

25   INDEMNIFICATION FROM ANY THIRD PARTY."

1              AGAIN, DATED SEPTEMBER 24TH, 2012.

2              THE COURT:  ALL RIGHT.

3              MR. MCELHINNY:  AT THIS POINT, YOUR HONOR, WE WOULD

4    LIKE TO PLAY THE DEPOSITION CLIP OF A MR. JAMES MACCOUN.

5              MR. MACCOUN, AT THE TIME OF HIS DEPOSITION, WAS A PATENT

6    COUNSEL AT GOOGLE.

7              **(THE VIDEOTAPED DEPOSITION OF JAMES MACCOUN WAS PLAYED IN**

8    **OPEN COURT OFF THE RECORD.)**

9              MR. MCELHINNY:  AT THIS POINT, YOUR HONOR, I WOULD

10   LIKE TO LODGE PLAINTIFF'S EXHIBIT 3010 AS A DEPOSITION CLIP.

11             THE COURT:  ALL RIGHT.  THAT'S LODGED.

12             MR. MCELHINNY:  AND I WOULD LIKE TO MOVE THE

13   ADMISSION OF PX 227, PX 228, AND PX 229, ALL OF WHICH ARE

14   SEALED EITHER IN THEIR ENTIRETY OR IN PART AT SAMSUNG'S

15   REQUEST.

16             MS. MAROULIS:  NO FURTHER OBJECTION, YOUR HONOR.

17             THE COURT:  OKAY.  THOSE WILL BE ADMITTED.

18        (PLAINTIFF'S EXHIBITS 227, 228, AND 229 WERE ADMITTED IN

19   EVIDENCE.)

20             THE COURT:  AND I'LL CLARIFY THE SEALING LATER.

21             MR. MCELHINNY:  THANK YOU, YOUR HONOR.

22             THE COURT:  ALL RIGHT.  THE TIME IS 2:16.

23        DO YOU NEED A MINUTE TO GET YOUR NEXT WITNESS READY?

24             MS. KREVANS:  WE DO, YOUR HONOR.

25             THE COURT:  OKAY.  ACTUALLY, IT'S 2:16.  PERHAPS WE

```
1        SHOULD TAKE OUR TEN MINUTE BREAK.

2              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  LET'S TAKE OUR TEN MINUTE

4     BREAK FOR THE AFTERNOON.

5          PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

6          (JURY OUT AT 2:16 P.M.)

7              THE COURT:  THE JURORS ARE LEFT THE COURTROOM.

8     PLEASE GO AHEAD AND TAKE YOUR BREAK.

9          (RECESS FROM 2:17 P.M. UNTIL 2:26 P.M.)

10             THE COURT:  LET ME TAKE CARE OF ONE SEALING ISSUE.

11    SO I DID GRANT SAMSUNG'S REQUEST TO SEAL JX 24 OVER LUNCH, SO

12    THAT'S BEEN SEALED.

13             MS. MAROULIS:  THANK YOU, YOUR HONOR.

14             THE COURT:  AS FAR AS PX 228, I DON'T SEE ANY SEALING

15    ORDER.  IF YOU CAN POINT ME TO AN ECF DOCKET NUMBER --

16             MS. MAROULIS:  YOUR HONOR, THERE'S NO SEALING ORDER

17    FOR 228.  THERE IS A SEALING ORDER FOR 227 AND FOR 229.

18             THE COURT:  YES.  FOR 227, IT WAS SEALED IN ITS

19    ENTIRETY.

20             MS. MAROULIS:  CORRECT.

21             THE COURT:  FOR 229, ONLY THE HIGHLIGHTED PORTIONS OF

22    PARAGRAPHS 5, 6, 8, AND 24 WERE SEALED, AND I HAD DENIED

23    SEALING AS TO THE OTHER PARAGRAPHS.

24             MS. MAROULIS:  THAT'S CORRECT, YOUR HONOR.

25             THE COURT:  OKAY.  SO THERE IS NO SEALING FOR 228.
```

```
1        ALL RIGHT.  THANK YOU.

2             THANK YOU FOR CLARIFYING.

3             SHALL WE BRING IN OUR JURY?  ALL RIGHT.  LET'S DO THAT,

4    PLEASE.

5             (JURY IN AT 2:27 P.M.)

6             THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

7    SEAT.

8             PLEASE CALL YOUR NEXT WITNESS.

9             AND DO YOU ALL WANT ME TO HAVE HIM SWORN IN AGAIN, OR THEY

10   HAVE A CONTINUING OBLIGATION?  IS THAT ALL RIGHT?

11            MR. NELSON:  THAT'S OKAY, YOUR HONOR, YES.

12            THE COURT:  ALL RIGHT.  THAT'S OKAY FOR APPLE?

13            MS. KREVANS:  YES, YOUR HONOR.

14            THE COURT:  ALL RIGHT.

15            MS. KREVANS:  YOUR HONOR, APPLE CALLS PROFESSOR

16   TODD MOWRY.

17            THE COURT:  ALL RIGHT.  SIR, YOU ARE STILL UNDER

18   OATH.

19            THE WITNESS:  OKAY.

20            THE COURT:  OKAY.  TIME IS NOW 2:30.  GO AHEAD,

21   PLEASE.
```

**FURTHER REDIRECT EXAMINATION**

```
23   BY MS. KREVANS:

24   Q.  WELCOME BACK, PROFESSOR MOWRY.

25            I WANT TO CONTINUE A DISCUSSION WE HAD ABOUT THE '647
```

1    PATENT, AND I'D LIKE TO START WITH THE TOPIC OF INFRINGEMENT.

2          WERE YOU PRESENT WHEN SAMSUNG'S EXPERT, DR. JEFFAY,

3    TESTIFIED ABOUT THE '647 PATENT?

4    A.   YES, I WAS.

5    Q.   AND YOU HEARD THE OPINIONS THAT HE GAVE ABOUT WHY HE

6    THOUGHT THAT THE SAMSUNG ACCUSED SMARTPHONES DO NOT INFRINGE

7    THE '647 PATENT?

8    A.   YES, I HEARD THAT.

9    Q.   COULD WE PUT UP SLIDE PDX 88.8, MR. LEE, PLEASE, AND THE

10   CLAIM LANGUAGE.

11         WHICH ELEMENTS OF CLAIM 9 DID DR. JEFFAY SAY HE THOUGHT

12   WERE NOT MET?

13   A.   C1, C2, C3, AND E.

14   Q.   AND WHAT WAS THE NATURE OF THE DISPUTE THAT HE RAISED WITH

15   REGARD -- REGARDING ELEMENT E?

16   A.   DR. JEFFAY SAID THAT ALTHOUGH THE ACCUSED DEVICES DO HAVE

17   POP-UP MENU, HE SAID THAT THEY DO NOT DISPLAY LINKED ACTIONS.

18   Q.   IS THAT THE SAME ISSUE THAT HE RAISED WITH RESPECT TO

19   ELEMENT C3?

20   A.   YES, THAT'S CORRECT.

21   Q.   LET'S GO THROUGH C1, 2, AND 3 THEN.

22         FIRST ELEMENT, C1, AN ANALYZER SERVER FOR DETECTING

23   STRUCTURES IN THE DATA AND FOR LINKING ACTIONS TO THE DETECTED

24   STRUCTURES."

25         WHAT REASON DID DR. JEFFAY GIVE FOR BELIEVING THAT ELEMENT

1    C1 WAS NOT MET?

2    A.   DR. JEFFAY ARGUES THAT THAT ANALYZER SERVER CANNOT BE

3    IMPLEMENTED USING A SHARED LIBRARY.

4    Q.   DO YOU AGREE OR DISAGREE WITH THAT OPINION?

5    A.   I DISAGREE.

6    Q.   DO THE ACCUSED SAMSUNG SMARTPHONES, IN FACT, USED SHARED

7    LIBRARIES TO DETECT STRUCTURES AND LINK ACTIONS?

8    A.   YES, THEY DO.

9    Q.   IS THERE ANYTHING IN THE CLAIM LANGUAGE THAT WE'RE LOOKING

10   AT ON THE SCREEN HERE, THAT IS, CLAIM 9 OF THE '647, THAT

11   EXCLUDES USING A SHARED LIBRARY AS THE ANALYZER SERVER OF THE

12   CLAIM?

13   A.   NO, THERE IS NOT.

14   Q.   IS THERE ANYTHING IN THE SPECIFICATION OF THE '647 PATENT

15   THAT EXCLUDES USING A SHARED LIBRARY AS THE ANALYZER SERVER OF

16   THE CLAIM?

17   A.   NO, THERE IS NOT.

18   Q.   WHAT DOES THE CLAIM REQUIRE, AS IT WOULD HAVE BEEN

19   UNDERSTOOD BY A PERSON OF ORDINARY SKILL WHEN THIS PATENT WAS

20   FILED, OF SOMETHING IN ORDER FOR IT TO BE THE ANALYZER SERVER

21   OF THE CLAIM?

22   A.    IT IS PROGRAM ROUTINES, MEANING THAT IT'S SOFTWARE, AND

23   THE SOFTWARE DETECTS STRUCTURES IN THE DATA AND LINKS ACTIONS

24   TO THE DETECTED STRUCTURES.

25   Q.   HAVE YOU SEEN ANY DOCUMENTS CREATED BY THE INVENTORS OF

1    THE '647 PATENT ABOUT WHETHER A SHARED LIBRARY CAN BE AN

2    ANALYZER SERVER OF THEIR INVENTION?

3    A.   YES, I HAVE.

4    Q.   COULD WE SEE DX 334, MR. LEE?

5         AND THIS IS IN EVIDENCE, YOUR HONOR.

6         AND COULD WE SEE PAGE 3 OF THIS DOCUMENT.

7         WHAT IS DX 334?

8    A.   THIS IS AN E-MAIL EXCHANGE AMONGST INVENTORS OF THE '647

9    PATENT.

10   Q.   OKAY.  AND IT'S FROM 1996?

11   A.   YES.

12   Q.   COULD WE LOOK AT THE PARAGRAPH WHERE IT SAYS "I KNOW.

13   IT'S EARLY," AND THE PARAGRAPH RIGHT UNDERNEATH THAT, MR. LEE.

14        WHAT WERE THE INVENTORS SAYING TO ONE ANOTHER IN THIS

15   E-MAIL IN 1996 THAT'S PERTINENT TO THE ISSUE OF WHETHER THE

16   ANALYZER SERVER OF THE INVENTION CAN BE IMPLEMENTED AS A SHARED

17   LIBRARY?

18   A.   THOMAS BONHURA, WHO WROTE THIS PARTICULAR MESSAGE, IS

19   DISCUSSING MULTIPLE DIFFERENT IMPLEMENTATIONS OF AN ANALYZER

20   SERVER, AND HE SAYS, "I AM LOOKING INTO IMPLEMENTING THE

21   SERVER," MEANING THE ANALYZER SERVER, "AS A SHARED LIBRARY

22   RATHER THAT IS A FIRST CLASS APPLICATION."

23   Q.   AND WERE YOU HERE WHEN SOME DEPOSITION TESTIMONY WAS

24   PLAYED FROM DR. BONHURA?

25   A.   YES, I WAS.

1    Q.   AND IF WE COULD SEE THE TRANSCRIPT OF MR. BONURA'S

2    DEPOSITION AT 157:19 TO 158:3, MR. LEE.

3         WHAT DID MR. -- WHAT DID DR. BONHURA SAY IN THIS

4    DEPOSITION TESTIMONY?

5    A.   HE CONFIRMED THAT A SHARED LIBRARY IS ONE WAY TO IMPLEMENT

6    AN ANALYZER SERVER.

7    Q.   OKAY.  ONE OTHER THING ABOUT THE ANALYZER SERVER ELEMENT.

8         COULD WE SEE PROFESSOR JEFFAY'S TRIAL TESTIMONY AT PAGE

9    1783, LINES 10 TO 15, MR. LEE.

10        WERE YOU -- YOU RECALL THAT PROFESSOR JEFFAY SAID, ABOUT

11   YOU, "THAT DR. MOWRY, WHEN HE TESTIFIED, I LISTENED VERY

12   CAREFULLY, I READ THE TRANSCRIPT, WHEN HE WAS ON EXAMINATION BY

13   APPLE'S LAWYERS ON DIRECT EXAMINATION, HE NEVER EVEN SAID THE

14   WORDS ANALYZER SERVER."

15   A.   YES, I WAS HERE AND I HEARD THAT.

16   Q.   IS THAT RIGHT?

17   A.   NO, THAT'S NOT CORRECT.  I USED THE WORDS "ANALYZER

18   SERVER" MULTIPLE TIMES AND I, IN FACT, SPENT A WHILE GOING

19   THROUGH THE CODE FOR THE ANALYZER SERVER.

20   Q.   OKAY.  IS THERE ANYTHING THAT DR. JEFFAY SAID ABOUT

21   WHETHER THE ANALYZER SERVER ELEMENT WAS MET BY THE NON-ACCUSED

22   SMARTPHONES THAT CHANGES YOUR ANALYSIS IN ANY WAY?

23   A.   NO, THERE IS NOT.

24   Q.   OKAY.  LET'S GO ON -- IF WE COULD HAVE THE CLAIM SLIDE

25   BACK UP, MR. LEE -- TO ELEMENT C2, "A USER INTERFACE ENABLING

1      THE SELECTION OF A DETECTED STRUCTURE AND A LINKED ACTION."

2           WHAT WAS DR. JEFFAY'S REASON FOR SAYING THAT HE DISPUTED

3      WHETHER THE NINE ACCUSED SMARTPHONES MET ELEMENT C2?

4      A.   DR. JEFFAY ARGUED THAT, SPECIFICALLY FOR THE BROWSER

5      APPLICATION ON THE JELLY BEAN VERSION OF ANDROID, THAT THE USER

6      INTERFACE DID NOT ENABLE THE SELECTION OF A DETECTED STRUCTURE.

7      Q.   WAS THAT AN ARGUMENT THAT APPLIED TO EVERY SMARTPHONE

8      ACCUSED IN THIS CASE?

9      A.   NO, ONLY THE ONES THAT RUN ON JELLY BEAN AND HAVE THE

10     BROWSER.

11          AND IN FACT, WITH THE EXCEPTION OF THE GALAXY NEXUS, ALL

12     OF THE ACCUSED PRODUCTS THAT RUN JELLY BEAN ALSO RUN AN

13     INFRINGING APPLICATION, WHICH IS MESSAGING.

14     Q.   SO JUST SO WE'RE CLEAR HERE, IF YOU ASSUMED FOR A MOMENT

15     THAT DR. JEFFAY WERE CORRECT ABOUT THIS ARGUMENT ABOUT HOW THE

16     BROWSER APPLICATION WORKS WITH THE PHONE RUNNING THE JELLY BEAN

17     CODE, WOULD THAT MEAN THAT PHONES RUNNING JELLY BEAN DON'T

18     INFRINGE?

19     A.   NO, IT WOULD NOT.

20     Q.   AND WHY NOT?

21     A.   AS I SAID, THEY STILL -- WITH THE EXCEPTION OF THE GALAXY

22     NEXUS, WHICH RUNS THE OPEN SOURCE VERSION OF MESSAGING -- THE

23     OTHER ACCUSED DEVICES THAT RUN JELLY BEAN ALL HAVE A MESSAGING

24     APPLICATION, WHICH DR. JEFFAY DID NOT ARGUE.  I MEAN,

25     DR. JEFFAY DID NOT ARGUE THAT THAT DID NOT MEET THIS CLAIM

1    ELEMENT.

2    Q.   OKAY.  SO THEN, WITH RESPECT TO DR. JEFFAY'S ARGUMENT THAT

3    ELEMENT C2 IS NOT MET IN THE BROWSER APPLICATION AND FOR PHONES

4    RUNNING JELLY BEAN, WHAT WAS THE SPECIFIC ARGUMENT THAT HE

5    MADE?

6    A.   HIS ARGUMENT RELATES TO THE TIMING OF WHEN THINGS

7    OCCURRED.

8    Q.   OKAY.  COULD YOU EXPLAIN TO US WHAT IT IS?  AND WHY DON'T

9    WE USE YOUR SLIDE 88.40?  WHAT WAS HIS ARGUMENT?

10   A.   YES.  THIS SLIDE IS SHOWING A TIMELINE GOING FROM LEFT TO

11   RIGHT, AND ON THE LEFT WHEN THE USER FIRST TOUCHES THE SCREEN,

12   AT THAT POINT THE SYSTEM HAS NOT BEGUN DETECTING THE STRUCTURE.

13        BUT ONCE THE SYSTEM NOTICES THAT THE USER HAS TOUCHED THE

14   SCREEN, IT BEGINS LOOKING UNDER THE USER'S FINGER TO SEE IF

15   THERE'S A STRUCTURE THERE.

16        NOW, IN ORDER TO SELECT THE STRUCTURE, THE USER NEEDS --

17   FOR THIS PURPOSE, THE USER NEEDS TO DO A PRESS AND HOLD

18   GESTURE, SO THEY NEED TO KEEP THEIR FINGER DOWN ON THE SCREEN

19   LONG ENOUGH FOR A TIMER TO GO OFF.

20        BY THE TIME THAT TIMER GOES OFF, STRUCTURE DETECTION IS

21   COMPLETED, SO AT THE TIME THAT THEY'RE MAKING THE SELECTION

22   THROUGH PRESS AND HOLD, THE STRUCTURE HAS BEEN DETECTED.

23        SO THE USER IS SELECTING A DETECTED STRUCTURE.

24   Q.   SO YOU DISAGREE WITH DR. JEFFAY?

25   A.   YES.

1        Q.   OKAY.  LET'S TURN TO THE THIRD ELEMENT YOU IDENTIFIED.

2             IF WE COULD SEE THE CLAIM AGAIN, MR. LEE, ELEMENT C3, "AN

3        ACTION PROCESSOR FOR PERFORMING THE SELECTED ACTION LINKED TO

4        THE SELECTED STRUCTURE."

5             IS THIS THE, THE LAST THING THAT DR. JEFFAY RAISED A

6        DISPUTE ABOUT?

7        A.   YES.

8        Q.   ALL RIGHT.  LET'S LOOK AT DR. JEFFAY'S TESTIMONY FROM THIS

9        TRIAL AT PAGE 1795, LINES 17 TO 22.

10            AND YOU RECALL HE SAID, "SO THE POINT IS YOU'RE NOT DOING

11       THE ACTION THAT'S SELECTED.  THE CODE THAT'S LINKED IS NOT THE

12       ACTION THAT THE USER IS SELECTING.  THE USER IS SELECTING DIAL

13       AND THAT RUNS THE START ACTIVITY.  AND IF THE USER SELECTS ADD

14       CONTACT, THE CODE THAT RUNS THE START ACTIVITY.  SO THERE'S

15       ONLY EVER ONE ACTION THAT'S LINKED."

16            WHAT IS HE TRYING TO SAY HERE, PROFESSOR MOWRY?

17       A.   HE'S TRYING TO SAY THAT SINCE EACH ACTION INVOLVES RUNNING

18       START ACTIVITY, THAT THERE'S ONLY ONE ACTION AND NOT MULTIPLE

19       ACTIONS.

20       Q.   DO YOU AGREE WITH DR. JEFFAY ON THIS?

21       A.   NO.  I DISAGREE.

22       Q.   LET'S START WITH COULD YOU JUST EXPLAIN TO THE JURY WHAT

23       START ACTIVITY IS?

24       A.   START ACTIVITY IS THE UTILITY IN ANDROID THAT ALLOWS ONE

25       PROGRAM TO LAUNCH ANOTHER PROGRAM AND PASS DATA TO IT, AND THE

1      PATENT DESCRIBES ACTIONS AS BEING THINGS LIKE LAUNCHING ANOTHER

2      PROGRAM AND GIVING IT DATA, WHICH WOULD BE THE CHARACTERS FROM

3      THE DETECTED STRUCTURE.

4      Q.   OKAY.  AND WHEN YOU SAY "ROUTINE," YOU'RE TALKING ABOUT A

5      PIECE OF SOFTWARE?

6      A.   YES, IT'S A PIECE OF SOFTWARE, THAT'S RIGHT.

7      Q.   OKAY.  COULD WE SEE YOUR SLIDE 88.22.

8           COULD YOU EXPLAIN TO THE JURY WHY YOU THINK THAT

9      DR. JEFFAY IS WRONG ABOUT THIS?

10     A.   YES.  SO -- THIS ONE IS -- THIS IS JUST BEFORE THE JURY.

11     Q.   YES, SO YOU SHOULD EXPLAIN TO THEM BY REFERENCE TO TOP,

12     BOTTOM, WHAT YOU WANT TO DO.

13     A.   OKAY.  I WON'T USE MY LASER POINTER.  THAT'S FINE.

14          OKAY.  SO ON THE LEFT WE SEE AN EXAMPLE WHERE THE USER HAS

15     SELECTED A DETECTED PHONE NUMBER, AND THERE'S A POP-UP MENU

16     WITH TWO DIFFERENT LINKED ACTIONS, CALL AND ADD TO CONTACTS.

17          AND WHAT CALL MEANS IS LAUNCH THE DIALER, THE PREFERRED

18     DIALER WITH THE DETECTED PHONE NUMBER DIGITS FILLED IN, AND YOU

19     CAN SEE THAT IN THE TOP RIGHT, AND THE ADD TO CONTACTS OPTION

20     MEANS LAUNCH THE CONTACTS PROGRAM WITH THE DETECTED PHONE

21     NUMBER DIGITS FILLED IN, AND YOU SEE THAT ON THE BOTTOM RIGHT.

22          AND THE WAY THAT THAT OCCURS IS THAT THE ANALYZER SERVER

23     HAS BUILT AN INTENT OBJECT, IT'S A SELECTION OF DATA, THAT

24     DESCRIBES TO START ACTIVITY WHAT IT'S SUPPOSED TO DO.

25          SO, FOR EXAMPLE, IN THE MIDDLE, FOR THE CALL OPTION, THERE

1     ARE TWO IMPORTANT FIELDS IN AN INTENT OBJECT.  THE ONE THAT'S

2     CALLED THE DATA FIELD FOR THE CALLING OPTION, WHICH I LABELED

3     INTENT OBJECT 1, THE DATA FIELD CONTAINS THE DIGITS OF THE

4     PHONE NUMBER, THE T-E-L: PREFIX, AND THE ACTION FIELD CONTAINS

5     ACTION VIEW, AND THAT COMBINATION OF ACTION VIEW AND T-E-L:

6     TELLS ANDROID THAT IT SHOULD LAUNCH THE PREFERRED DIALER AND

7     FILL IN THOSE DIGITS YOU SEE IN THE DATA FIELD.

8          SO THAT'S WHAT HAPPENS WITH START ACTIVITY IN THAT CASE.

9          IN THE BOTTOM, WE SEE WHAT THE ANALYZER SERVER BUILDS FOR

10    THE ADD TO CONTACTS OPTION WHERE YOU SEE THE SAME DATA FIELD,

11    BUT THE ACTION FIELD IS NOW ACTION INSERT OR EDIT, AND ANDROID

12    UNDERSTANDS THAT WHEN YOU PASS IT THAT INTENT OBJECT, IT SHOULD

13    INSTEAD LAUNCH YOUR CONTACTS PROGRAM WITH THE PHONE NUMBER

14    FILLED IN.

15         SO START ACTIVITY IS CALLED IN EACH CASE, BUT IT'S PASSED

16    DIFFERING INPUTS WHICH RESULTS IN VERY DIFFERENT BEHAVIORS.

17    Q.   SO DOES START ACTIVITY DO THE SAME THING IF IT'S LAUNCHED

18    BECAUSE THE USER PICKS CALL VERSUS IF IT'S LAUNCHED BECAUSE THE

19    USER PICKS ADD TO CONTACTS?

20    A.   NO, IT DOES NOT.  IT LAUNCHES ENTIRELY DIFFERENT THINGS AS

21    YOU -- AS ILLUSTRATED ON THE RIGHT SIDE OF THAT SCREEN.

22    Q.   OKAY.  BOTTOM LINE, PROFESSOR MOWRY, WHAT IS YOUR OPINION

23    REGARDING WHETHER EACH OF THE NINE SAMSUNG SMARTPHONES THAT'S

24    ACCUSED OF INFRINGING CLAIM 9 OF THE '647 PATENT, IN FACT,

25    INFRINGES?

1    A.   IT'S MY OPINION THAT EACH OF THE ACCUSED DEVICES DOES

2    INFRINGE CLAIM 9 OF THE '647 PATENT.

3    Q.   OKAY.  LET'S TALK FOR A MOMENT ABOUT ANOTHER ISSUE THAT'S

4    COME UP IN THIS TRIAL, AND THAT IS WHETHER THERE WERE CHANGES

5    THAT SAMSUNG COULD HAVE MADE TO THE CODE RUNNING ON THESE NINE

6    PHONES TO AVOID INFRINGING THE '647 PATENT.

7         DOES DR. JEFFAY TALK ABOUT AN ALTERNATIVE THAT SAMSUNG

8    WOULD HAVE IMPLEMENTED THAT WOULD HAVE AVOIDED INFRINGEMENT OF

9    CLAIM 9?

10   A.   YES, HE DISCUSSED ONE ALTERNATIVE.

11   Q.   AND WHAT WAS THAT?

12   A.   IT WAS TO REMOVE THE POP-UP MENU AND REPLACE IT WITH AN

13   ALTERNATIVE MENU, SUCH AS A PULL-DOWN MENU.

14   Q.   WOULD REPLACING THE POP-UP MENU WITH A PULL-DOWN MENU IN

15   THE ACCUSED PHONES AVOID INFRINGEMENT OF THE '647 PATENT?

16   A.   NO, IT WOULD NOT, BECAUSE IF A SYSTEM INFRINGED CLAIM 9,

17   THAT WOULD MEAN THAT IT WOULD SATISFY EVERY ELEMENT OF CLAIM 1,

18   AND IF THE ONLY CHANGE THAT YOU MADE WAS TO REPLACE THE POP-UP

19   MENU, THEN BY DEFINITION, THE DEVICE WOULD STILL INFRINGE

20   CLAIM 1.

21        SO IT WOULD STILL INFRINGE THE PATENT.

22   Q.   OKAY.  ANOTHER QUESTION ABOUT THIS ALTERNATIVE HE TALKED

23   ABOUT.  WOULD REPLACING THE POP-UP MENU WITH A PULL-DOWN MENU

24   PROVIDE THE USER OF THE SMARTPHONE WITH THE SAME BENEFIT THAT

25   CLAIM 9 OF THE '647 PATENT PROVIDES?

1     A.   NO, IT WOULD NOT, BECAUSE THE POINT OF THE POP-UP MENU IS

2     THAT THE USER IMMEDIATELY SEES THE OPTIONS FOR THE LINKED

3     ACTIONS IN FRONT OF THEM ON THE SCREEN.

4          WITH A PULL-DOWN MENU, THOSE OPTIONS ARE NOT IMMEDIATELY

5     VISIBLE AND THE USER HAS TO GO TAKE SOME OTHER ACTION ON THE

6     SCREEN IN ORDER TO MAKE THEM VISIBLE.

7          SO THAT'S LESS CONVENIENT FOR THE USER AND INVOLVES AN

8     EXTRA STEP.

9     Q.   NOW, DO YOU RECALL DR. JEFFAY ALSO GAVE SOME TESTIMONY

10    ABOUT SOMETHING HE CALLED TAP TO DIAL?

11    A.   YES.

12    Q.   IS TAP TO DIAL A FEATURE OF THE PHONES THAT YOU HAVE

13    OPINED INFRINGES THE '647 PATENT?

14    A.   NO, TAP TO DIAL DOES NOT INFRINGE THE '647 PATENT.

15    Q.   OKAY.  CAN YOU REMIND THE JURY WHAT TAP TO DIAL IS?

16    A.   INSTEAD OF USING A PRESS AND HOLD TO SELECT A DETECTED

17    PHONE NUMBER, FOR EXAMPLE, IN THE BROWSER, IF YOU INSTEAD

18    QUICKLY TAP YOUR FINGER ON A PHONE NUMBER, WHAT IT'LL DO

19    INSTEAD IS TO LAUNCH THE DIALER, WHICH IS THE DEFAULT ACTION.

20         SO THERE ARE TWO DIFFERENT GESTURES, AND ONE OF THEM JUST

21    DOES A DEFAULT ACTION.

22    Q.   AND DOES TAP TO DIAL PROVIDE A USER WITH THE BENEFITS OF

23    CLAIM 9 OF THE '647 PATENT?

24    A.   NO, BECAUSE IT ONLY PROVIDES ONE ACTION.  SO FOR A PHONE

25    NUMBER, THE ONLY THING YOU CAN DO IS DIAL.

FURTHER REDIRECT MOWRY

```
1              BUT SOMETIMES YOU WANT TO ADD A PHONE NUMBER TO YOUR

2      CONTACT LIST, OR YOU MIGHT WANT TO SEND A TEXT MESSAGE TO THE

3      PHONE NUMBER.

4              SO THE IMPORTANT POINT OF THE '647 PATENT WAS THAT YOU'D

5      HAVE MULTIPLE ACTIONS FOR THE DETECTED STRUCTURES.

6      Q.   OKAY.  LET'S TURN TO VALIDITY.

7              YOU RECALL THAT AT THE START OF THE TESTIMONY THAT

8      DR. JEFFAY GAVE -- I THINK IT WAS LAST WEEK NOW -- HE SHOWED A

9      VIDEO AND HE TALKED A LITTLE BIT ABOUT SOMETHING CALLED

10     EMBEDDED BUTTONS WHERE THERE WAS A VIDEO DEMONSTRATION AND AN

11     ARTICLE.

12     A.   YES.

13     Q.   COULD WE PUT UP DR. JEFFAY'S TESTIMONY FROM PAGE 1841,

14     LINE 23, TO 1842, LINE 2.

15             DID DR. JEFFAY ACTUALLY OFFER -- WELL, LET ME START THAT

16     OVER.  THAT WAS NOT GOING TO BE A GOOD QUESTION.

17             DID DR. JEFFAY WALK THE JURY THROUGH EACH ELEMENT OF THE

18     CLAIM 9 AND GIVE AN OPINION THAT EVERY ELEMENT OF CLAIM 9 WAS

19     MET BY THE EMBEDDED BUTTONS DEMONSTRATION AND ARTICLE?

20     A.   NO, HE DID NOT.

21     Q.   AND, IN FACT, HE -- HE TOLD HIS OWN COUNSEL, WHEN HE WAS

22     ASKED BY HIM, THAT HE WASN'T OFFERING OPINIONS THAT ANY OF

23     ELEMENTS C1, 2, OR 3 WERE MET; RIGHT?

24     A.   THAT'S CORRECT, YES.

25     Q.   OKAY.  LET ME ASK YOU, DID THE EMBEDDED BUTTONS VIDEO
```

1    DEMONSTRATION OR ARTICLE DISCLOSE A SYSTEM THAT WAS

2    PRE-CONFIGURED TO DETECT STRUCTURES IN DATA AND LINK ACTIONS TO

3    THOSE STRUCTURES?

4    A.   NO, IT DID NOT.

5    Q.   WHY DIDN'T IT?

6    A.   FOR SEVERAL REASONS.  ONE REASON IS THAT IT DOESN'T DO --

7    IT DOESN'T AUTOMATICALLY DETECT STRUCTURES OR LINK ACTIONS TO

8    THE STRUCTURES.

9         INSTEAD, THE USER IS MANUALLY ENTERING A SEARCH AND

10   REPLACE QUERY USING A TEXT EDITOR.  SO THE USER HAS TO DO ALL

11   OF THE WORK, AND THE SYSTEM ISN'T DETECTING ANY PATTERNS THAT

12   IT KNOWS ABOUT AHEAD OF TIME.

13        INDEED, THE EMBEDDED BUTTONS SOURCE CODE, WHICH I

14   REVIEWED, DOESN'T CONTAIN ANY CODE FOR LOOKING FOR A PHONE

15   NUMBER OR LINKING ACTIONS TO IT.

16        AND ALSO, AT MOST, ALL THAT WAS DEMONSTRATED IN THE VIDEO

17   WAS DETECTING ONE THING, WHICH IS A PHONE NUMBER, WHICH THE

18   USER HAD TO DO, AND LINKING ONE THING TO IT, WHICH IS DIALLING

19   A PHONE NUMBER.

20   Q.   SO I KNOW DR. JEFFAY DIDN'T GIVE THE OPINION, BUT I JUST

21   WANT TO MAKE SURE THE JURY UNDERSTANDINGS YOUR VIEWS.

22        IN YOUR VIEW, DOES THE EMBEDDED BUTTONS INFORMATION THAT

23   WAS PRESENTED TO THE JURY, THE CLIP OF THE VIDEO AND THE

24   ARTICLE, ANTICIPATE CLAIM 9 OF THE 647 PATENT?

25   A.   NO, IT CLEARLY DOES NOT.

1    Q.   AND IN YOUR OPINION, DOES THE EMBEDDED BUTTONS VIDEO AND

2    ARTICLE THAT WAS PRESENTED TO THE JURY, IN COMBINATION WITH

3    ANYTHING ELSE THAT WAS IDENTIFIED TO THE JURY BY DR. JEFFAY,

4    RENDER CLAIM 9 OBVIOUS?

5    A.   NO, IT DOES NOT.

6    Q.   OKAY.  LET'S SET EMBEDDED BUTTONS ASIDE AND LET'S TURN TO

7    THE SECOND THING THAT DR. JEFFAY TALKED ABOUT, AND THIS ONE HE

8    ACTUALLY SAID INVALIDATED CLAIM 9, THE SIDEKICK.

9         DO YOU RECALL THE SIDEKICK SYSTEM?

10   A.   YES.

11   Q.   THIS WAS AN ACTUAL PRODUCT?

12   A.   YES, THAT'S RIGHT.

13   Q.   ALL RIGHT.  DID DR. JEFFAY OFFER AN OPINION ABOUT WHETHER

14   SIDEKICK ANTICIPATES CLAIM 9 OF THE '647 PATENT?

15   A.   YES.  DR. JEFFAY SAID THAT THE SIDEKICK DOES NOT

16   ANTICIPATE CLAIM 9 OF THE '647 PATENT.

17   Q.   HE SAID IT DOES NOT ANTICIPATE?

18   A.   THAT'S CORRECT.

19   Q.   WHAT IS THE DEFINITION OF ANTICIPATION?

20   A.   ANTICIPATION MEANS THAT A SINGLE PIECE OF PRIOR ART MUST

21   SATISFY EVERY ELEMENT OF THE CLAIM.

22   Q.   OKAY.  IS THERE A SECOND DOCTRINE CALLED OBVIOUSNESS?

23   A.   YES.

24   Q.   WHAT DOES OBVIOUSNESS MEAN?

25   A.   OBVIOUSNESS MEANS THAT IF THERE'S A PIECE OF PRIOR ART

1    THAT DOESN'T SATISFY EVERY ELEMENT OF THE CLAIM, BUT THE PARTS

2    THAT ARE MISSING WOULD HAVE BEEN OBVIOUS THINGS FOR A PERSON OF

3    ORDINARY SKILL TO DO.

4    Q.   OKAY.  WHAT ELEMENT OF THE CLAIM DID DR. JEFFAY ADMIT THAT

5    SIDEKICK DOES NOT DISCLOSE?

6    A.   THE PART THAT'S IN, SPECIFICALLY IN THE CLAIM 9 LANGUAGE

7    FOR A POP-UP MENU DISPLAYING LINKED ACTIONS.

8    Q.   DO YOU AGREE WITH DR. JEFFAY THAT THE ONLY THING THAT

9    CLAIM 9 REQUIRES -- IF WE COULD PUT THE CLAIM BACK UP FOR A

10   MOMENT, MR. LEE -- DO YOU AGREE WITH DR. JEFFAY THAT THE ONLY

11   THING THAT CLAIM 9 REQUIRES THAT IS MISSING FROM SIDEKICK IS

12   THE POP-UP MENU?

13   A.   NO, I DON'T AGREE WITH THAT.

14   Q.   WHAT ELSE IS MISSING FROM SIDEKICK?

15   A.   SIDEKICK IS ALSO MISSING AN ANALYZER SERVER FOR DETECTING

16   STRUCTURES IN THE DATA, AND FOR LINKING ACTIONS TO THE DETECTED

17   STRUCTURES, AS WELL AS A USER INTERFACE ENABLING A SELECTION OF

18   DETECTED STRUCTURE AND A LINKED ACTION.

19   Q.   AND WHAT IS YOUR BASIS FOR CONCLUDING THAT SIDEKICK IS

20   MISSING ALL OF THOSE ELEMENTS?

21   A.   I STUDIED THE SOURCE CODE IN GREAT DETAIL.

22   Q.   OKAY.  ELEMENT C1, THE ANALYZER SERVER, "AN ANALYZER

23   SERVER FOR DETECTING STRUCTURES IN THE DATA," WAS SIDEKICK

24   CAPABLE OF DETECTING MULTIPLE STRUCTURES?

25   A.   NO, IT WAS NOT.  THE ONLY STRUCTURE THAT IT COULD DETECT

```
 1        WAS A PHONE NUMBER.

 2        Q.   AND WAS THE -- THE ANALYZER SERVER ELEMENT GOES ON AND

 3        TALKS ABOUT LINKING ACTIONS, PLURAL, TO THE DETECTED

 4        STRUCTURES.

 5             WAS SIDEKICK CAPABLE OF LINKING MULTIPLE ACTIONS TO A

 6        STRUCTURE THAT COULD DETECT?

 7        A.   NO.  THE ONLY ACTION THAT IT COULD LINK IS DIALLING.

 8        Q.   OKAY.  DID DR. JEFFAY GIVE ANY TESTIMONY ABOUT HOW THE

 9        CODE FOR SIDEKICK WORKED?

10        A.   NO, HE DID NOT.

11        Q.   BUT YOU'VE LOOKED AT THE CODE; RIGHT?

12        A.   YES, THAT'S CORRECT.

13        Q.   OKAY.  COULD WE SEE PDX 88.7 -- I'M SORRY.  I HAVE TO ASK

14        ABOUT CONFIDENTIALITY.

15             IS THE SIDEKICK CODE SEALED?  NO?

16                  MR. NELSON:  I DON'T THINK SO.

17                  MS. KREVANS:  OKAY.  88.75 THEN.

18        Q.   WHAT ARE WE LOOKING AT HERE, PROFESSOR MOWRY?

19        A.   THIS IS A PORTION OF THE SIDEKICK SOURCE CODE THAT SHOWS

20        THE PARAMETERS THAT DESCRIBES THE ONE PATTERN INSIDE SIDEKICK

21        FOR A PHONE NUMBER.

22        Q.   WHAT DO YOU MEAN WHEN YOU SAY "ONE PATTERN FOR A PHONE

23        NUMBER"?

24        A.   SIDEKICK ONLY DESCRIBES A SINGLE PATTERN THAT DESCRIBES

25        WHAT IT'S LOOKING FOR WHEN IT'S TRYING TO FIND A PHONE NUMBER,
```

1      AND I CAN DESCRIBE IT IF MORE DETAIL IF YOU'D LIKE.

2      Q.   ALL RIGHT.  DID IT USE THE SAME PATTERN TO DETECT EVERY

3      PHONE NUMBER IT COULD DETECT?

4      A.   YES, THAT'S RIGHT.

5      Q.   ALL RIGHT.  COULD YOU PLEASE, UNDERSTANDING THAT NONE OF

6      THE REST OF US ARE SOFTWARE ENGINEERS, TELL US WHAT THIS CODE

7      DOES TO DEFINE THE PATTERN THAT IT USED TO DETECT PHONE

8      NUMBERS?

9      A.   YES.  WHAT SIDEKICK DOES IS IT WALKS THROUGH EVERY ROW ON

10     THE SCREEN AND IT'S LOOKING FOR A SEQUENCE OF CHARACTERS THAT

11     MIGHT CONTAIN A PHONE NUMBER, AND THE BEGINNING OF THAT

12     SEQUENCE IS THAT IT'S LOOKING FOR A CHARACTER IN WHAT IT HAS

13     LABELED SET 1 -- I DON'T KNOW IF YOU CAN BLOW THAT UP A LITTLE

14     BIT, MAYBE -- BUT THERE'S A SET OF CHARACTERS, RIGHT THERE, SO

15     THE PHONE NUMBER --

16     Q.   I'M SORRY.  SO SET 1 IS ACTUALLY NOT THE FIRST SET?  SET 1

17     IS UNDER SET 2, JUST SO EVERYBODY IS ORIENTED IN THE RIGHT

18     PLACE?

19     A.   YES.  THE CODE IS NOT WELL DOCUMENTED OR VERY DESCRIPTIVE.

20     IT'S A LITTLE HARD TO FOLLOW IT.

21          BUT FOR SOME REASON, SET 1 IS THE NAME FOR THE LEGAL SET

22     OF CHARACTERS FOR THE BEGINNING OF A CHARACTER SEQUENCE THAT

23     MIGHT BE A PHONE NUMBER.

24          AND YOU SEE THIS CONTAINS DIGITS AND A LEFT PARENTHESES.

25     NOTICE IT DOES NOT CONTAIN A PLUS.  I'LL GET BACK TO THAT LATER

1     PERHAPS.

2          AFTER IT FINDS A FIRST CHARACTER, IT CONTINUES ON LOOKING

3     FOR MORE CHARACTERS THAT MIGHT BE A PHONE NUMBER, AND THIS

4     INCLUDES -- THIS IS -- THIS NEXT SET OF CHARACTERS IS SET 3, IT

5     JUMPS SEVERAL TO SET 3.

6          SO YOU SEE THESE CHARACTERS HERE, THESE INCLUDES THINGS

7     LIKE DASHES AND BOTH RIGHT AND LEFT PARENTHESES AND DIGITS AND

8     SOME OTHER THINGS.

9          SO AS LONG AS IT'S CONTINUING TO FIND THESE CHARACTERS,

10    ANY NUMBER OF THEM IN ANY ORDER, IT THINKS THIS MIGHT BE A

11    PHONE NUMBER.

12         AND AFTER IT'S FOUND THAT CHARACTER SEQUENCE, IT GOES

13    THROUGH AND PULLS ALL THE DIGITS OUT OF IT AND IT LOOKS FOR --

14    IT HAS TWO SANITY CHECKS.  IT MAKES SURE YOU HAVE A MINIMUM

15    NUMBER OF DIGITS, WHICH BY DEFAULT IS 6 UP IN THE TOP THERE,

16    AND IT ALSO MAKES SURE YOU HAVE AT LEAST ONE OF A SET OF

17    REQUIRED CHARACTERS, WHICH IS EITHER A DASH OR A LEFT OR RIGHT

18    PAREN.

19         SO THAT IS THE -- IT'S A VERY PRIMITIVE WAY TO LOOK FOR

20    PHONE NUMBERS, BUT THAT'S WHAT IT DOES.

21    Q.   AND WAS THIS SINGLE DEFINITION OF A STRUCTURE THE ONLY

22    DEFINITION THAT SIDEKICK USED TO LOOK FOR ANY KIND OF PHONE

23    NUMBER IN AN ELECTRONIC DOCUMENT SUCH AS AN E-MAIL?

24    A.   YES, THAT'S CORRECT.

25    Q.   WOULD IT USE THIS SAME DEFINITION, THE SAME PATTERN, TO

1    LOOK FOR DOMESTIC AND INTERNATIONAL PHONE NUMBERS?

2    A.   YES.  IT ONLY RECOGNIZES ONE PATTERN.

3    Q.   AND THAT PATTERN WOULD ALLOW IT TO RECOGNIZE A PROPERLY

4    TYPED INTERNATIONAL PHONE NUMBER?

5    A.   ACTUALLY, NO, IT WOULD NOT BECAUSE AN INTERNATIONAL PHONE

6    NUMBER, AS DR. JEFFAY ILLUSTRATED I THINK IN HIS TESTIMONY, HAS

7    A PLUS IN FRONT OF IT, WHICH HAS A SPECIAL MEANING, AND SO IT

8    MEANS YOU NEED TO DIAL, FROM THE UNITED STATES, 011 IN ORDER TO

9    DIAL INTERNATIONALLY.

10        AND SIDEKICK IS NOT CAPABLE OF RECOGNIZING THAT.  IT

11   DOESN'T LOOK FOR THAT CHARACTER.  THERE'S NO PLUS IN SET 3.

12        AND EVEN IF IT FOUND IT, IT DOESN'T KNOW WHAT TO DO WITH

13   IT.

14   Q.   ALL RIGHT.  SO LET'S -- JUST SO WE'RE CLEAR ABOUT THAT,

15   COULD WE SEE PDX 98.2 PLEASE, MR. LEE.

16        IS THIS THE -- AN E-MAIL THAT MR. JEFFAY -- I'M SORRY --

17   THAT DR. JEFFAY TYPED FOR THE DEMONSTRATION HE MADE LAST YEAR

18   OF HOW SIDEKICK WORKED FOR PURPOSES OF HIS OPINION IN THIS

19   CASE?

20   A.   YES, THAT'S CORRECT.

21   Q.   OKAY.  SO HE WAS RUNNING SIDEKICK CODE ON A COMPUTER HE

22   SET UP LAST YEAR AND THEN HE TYPED THIS E-MAIL TO SHOW HOW

23   SIDEKICK WORKED?

24   A.   YES.

25   Q.   ALL RIGHT.  I TAKE IT AT THE POINT IN THIS DEMONSTRATION

1    WHERE HIS SCREEN SHOT IS ON, HE'S ALREADY TURNED ON THE DIALER

2    FUNCTION OF SIDEKICK?

3    A.   THAT'S RIGHT.

4    Q.   OKAY.  WHAT DO WE SEE ON THIS SCREEN RIGHT NOW?

5    A.   WELL, RIGHT NOW IT'S HIGHLIGHTING THE FIRST PHONE NUMBER

6    THAT IT SEES AT THE TOP OF THE SCREEN.

7    Q.   AND THAT'S BECAUSE, AS WE DISCUSSED LAST TIME, SIDEKICK

8    ALWAYS HIGHLIGHTED THE FIRST PHONE NUMBER IT SAW FIRST?

9    A.   THAT'S RIGHT.

10   Q.   OKAY.  THAT'S A DOMESTIC PHONE NUMBER?

11   A.   YES.

12   Q.   AND SIDEKICK HAS DETECTED IT?

13   A.   YES.

14   Q.   ALL RIGHT.  IN THIS LAST LINE OF THE E-MAIL, IT SAYS "OUR

15   SWEDEN OFFICE" IS, AND THEN THERE IS A PHONE NUMBER INDICATED

16   WITH A PLUS AND 46 -- THAT'S A COUNTRY CODE?

17   A.   THAT'S CORRECT.

18   Q.   AND THEN A WHOLE BUNCH MORE DIGITS THERE WITH A PHONE

19   NUMBER, MAYBE A CITY AND A NUMBER SOMEWHERE IN SWEDEN?

20   A.   YES, PROBABLY, YES.

21   Q.   OKAY.  COULD WE SEE ANOTHER SCREEN SHOT FROM THE SAME

22   DEMONSTRATION THAT WAS IN PROFESSOR JEFFAY'S EXPERT REPORT ON

23   INVALIDITY AT PAGE 175?

24   A.   YES.

25   Q.   WHAT'S SHOWN ON THIS SCREEN, PROFESSOR MOWRY?

1    A.   THIS IS WHAT HAPPENS WHEN SIDEKICK STEPS FORWARD TO THE

2    POINT OF HIGHLIGHTING SOME OF THE DIGITS IN THAT SWEDISH PHONE

3    NUMBER.  AND THE IMPORTANT THING -- IF IT'S POSSIBLE TO ZOOM IN

4    ON THE TELEPHONE NUMBER CHARACTERS THERE -- WHAT YOU'LL NOTICE

5    IS -- THIS IS VERY IMPORTANT -- THAT THE PLUS IS NOT

6    HIGHLIGHTED.

7    Q.   WHAT DOES IT MEAN THAT THE PLUS IS NOT HIGHLIGHTED?

8    A.   IT MEANS THAT SIDEKICK HAS NOT DETECTED THE INTERNATIONAL

9    DIALLING PREFIX.

10   Q.   SO SIDEKICK WASN'T LOOKING FOR THAT PLUS?

11   A.   NO, IT WASN'T LOOKING FOR THE PLUS.

12   Q.   OKAY.  IF SOMEONE WAS ACTUALLY USING SIDEKICK WITH THIS

13   E-MAIL AND THEY HIT THE NO BUTTON TWICE FOR THE FIRST TWO PHONE

14   NUMBERS IN THE E-MAIL AND THEY GOT DOWN TO THIS THIRD ONE AND

15   THEY PRESSED THE ENTER KEY THAT MADE SIDEKICK DIAL IT, WOULD

16   THEY GET SWEDEN?

17   A.   THEY WOULD NOT GET SWEDEN.

18   Q.   AND WHY IS THAT?

19   A.   BECAUSE IT WOULD NOT DIAL 011 BEFORE STARTING TO DIAL

20   46(0)10.  SO YOU MIGHT GET A RANDOM PHONE NUMBER IN THE

21   UNITED STATES OR CANADA, BUT YOU WON'T GET SWEDEN.

22   Q.   OKAY.  IF THE PERSON HAD WRITTEN THIS E-MAIL HAD KNOWN HOW

23   THE SIDEKICK CODE WORKED AND HAD TYPED OUT 011 INSTEAD OF THE

24   PLUS, WOULD SIDEKICK HAVE DETECTED 011 46(0)10-6933082 AS A

25   PHONE NUMBER?

```
1     A.   YES, BECAUSE THAT WOULD MATCH ITS SINGLE PATTERN FOR WHAT

2     A PHONE NUMBER LOOKS LIKE.

3     Q.   OKAY.  WAS DR. JEFFAY, BOTTOM LINE, WAS HE RIGHT THAT

4     SIDEKICK COULD DETECT MULTIPLE STRUCTURES AS REQUIRED BY

5     ELEMENT C1?

6     A.   NO, HE WAS NOT CORRECT ABOUT THAT.

7     Q.   NOW, JUST -- THIS SHOULD BE QUICK -- WAS SIDEKICK CAPABLE

8     OF LINKING MULTIPLE ACTIONS TO THE PHONE NUMBER THAT IT COULD

9     DETECT?

10    A.   NO.  SIDEKICK CAN ONLY DIAL.

11    Q.   OKAY.  AND IF WE COULD JUST LOOK AT THE TESTIMONY FROM

12    MR. FRID-NIELSEN, THE TRANSCRIPT THE PAGE 1723, PLEASE,

13    MR. LEE.  1723, LINES 7 TO 10.

14        WHO WAS MR. FRID-NIELSEN?  CAN YOU JUST REMIND THE JURY?

15    A.   HE WAS AN ENGINEER FROM BORLAND WHO WAS ONE OF THE

16    DEVELOPERS OF SIDEKICK.

17    Q.   AND HOW MANY OPTIONS DID HE SAY SIDEKICK OFFERED A USER

18    FOR A DETECTED PHONE NUMBER?

19    A.   AS YOU SEE RIGHT HERE, ONE OPTION, WHICH IS DIALING.

20    Q.   OKAY.  COULD WE SEE THE PATENT, COLUMN 1, LINES 58 TO 65,

21    PLEASE, MR. LEE.

22        WHAT DID THE INVENTORS SAY IN THEIR PATENT APPLICATION

23    ABOUT THE IMPORTANCE OF HAVING MULTIPLE ACTIONS THAT COULD BE

24    LINKED TO A DETECTED STRUCTURE?

25    A.   IT IS VERY IMPORTANT.  IT IS THE THING THAT THEY HIGHLIGHT
```

1    AT THE END OF THE BACKGROUND SECTION AND THAT THEY HIGHLIGHT AT

2    THE BEGINNING OF THE SUMMARY OF THE INVENTION.

3        AND IN PARTICULAR, HERE WE'RE LOOKING AT THE END OF THE

4    BACKGROUND SECTION THAT'S DESCRIBING THE STATE OF THE ART, AND

5    IT SAYS THAT ALTHOUGH THERE WERE SYSTEMS THAT COULD DETECT AND

6    DIAL PHONE NUMBERS, IT SAYS "THEY DO NOT ENABLE THE PERFORMANCE

7    OF OTHER CANDIDATE ACTIONS, SUCH AS MOVING THE NUMBER TO AN

8    ELECTRONIC TELEPHONE BOOK."

9        AND IT GOES ON TO SAY, "IF A USER WISHES TO PERFORM A

10   DIFFERENT ACTION ON AN IDENTIFIED CELL PHONE NUMBER, SUCH AS

11   STORING THE NUMBER IN AN ADDRESS BOOK," THAT THE USER CAN'T DO

12   THAT AUTOMATICALLY.

13   Q.   WHAT IS YOUR ULTIMATE CONCLUSION, PROFESSOR MOWRY, ABOUT

14   WHETHER SIDEKICK, ALONE OR IN COMBINATION WITH ANY OTHER

15   REFERENCE, COULD RENDER CLAIM 9 OF THE '647 PATENT OBVIOUS?

16   A.   IT'S MY OPINION THAT IT COULD NOT.

17   Q.   AND COULD YOU TELL THE JURY WHAT YOUR OVERALL CONCLUSION

18   IS REGARDING INFRINGEMENT AND VALIDITY ISSUES IN THIS CASE

19   ABOUT CLAIM 9 OF THE '647 PATENT?

20   A.   IT'S MY OPINION THAT THE ACCUSED DEVICES INFRINGE CLAIM 9

21   AND THAT CLAIM 9 IS VALID.

22   Q.   AS AN EXPERT IN COMPUTER SCIENCE, WHAT IS YOUR OVERALL

23   OPINION ABOUT WHETHER CLAIM 9 OF THE '647 WAS A VALUABLE

24   INVENTION?

25   A.   AS I MENTIONED EARLIER, I THINK IT WAS AN INVENTION -- IT

1    WAS AN INVENTION THAT WAS AHEAD OF ITS TIME.  WHILE IT WAS

2    USEFUL WHEN IT WAS INVENTED, IT'S EVEN MORE USEFUL TODAY ON A

3    SMARTPHONE.

4             MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

5             THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:01.

6             MR. NELSON:  I COVERED EVERYTHING LAST TIME, YOUR

7    HONOR, SO I DON'T HAVE ANY QUESTIONS.

8             THE COURT:  ALL RIGHT.  THEN MAY THIS WITNESS BE

9    EXCUSED, AND IS IT SUBJECT TO RECALL OR NOT?

10             MR. NELSON:  NOT --

11             MS. KREVANS:  EXCUSED, NOT SUBJECT TO RECALL.

12             THE COURT:  ALL RIGHT.  DO YOU AGREE WITH THAT,

13    MR. NELSON?

14             MR. NELSON:  I DO, YOUR HONOR.

15             THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED.

16        (PAUSE IN PROCEEDINGS.)

17             THE COURT:  OKAY.  GO AHEAD, PLEASE.

18             MS. KREVANS:  YOUR HONOR, APPLE CALLS PROFESSOR ALEX

19    SNOEREN.

20             **(PLAINTIFF'S WITNESS, MARK ALEXANDER SNOEREN, WAS**

21    **PREVIOUSLY SWORN.)**

22             THE COURT:  OKAY.  SIR, YOU'RE STILL UNDER OATH.

23             THE WITNESS:  YES, MA'AM.

24             THE COURT:  READY?

25             MS. KREVANS:  YES, YOUR HONOR.

FURTHER REDIRECT SNOEREN

```
1              THE COURT:  ALL RIGHT.  TIME IS 3:03.

2         GO AHEAD, PLEASE.

3                  FURTHER REDIRECT EXAMINATION

4    BY MS. KREVANS:

5    Q.  WELCOME BACK TO YOU AS WELL, PROFESSOR SNOEREN.

6    A.  THANK YOU.

7    Q.  COULD YOU REMIND THE JURY FIRST, WHICH PATENTS ARE YOU

8    HERE TO ADDRESS?

9    A.  I'M HERE TO DISCUSS THE '414 BACKGROUND SYNC PATENT, AND

10   THE '959 UNIVERSAL SEARCH PATENT.

11   Q.  OKAY.  AND WHAT WAS THE -- WHAT WERE THE TOPICS OF THE

12   OPINIONS YOU PREVIOUSLY EXPLAINED TO THE JURY ABOUT THOSE

13   PATENTS?

14   A.  I DISCUSSED INFRINGEMENT OF ASSERTED CLAIMS OF THOSE

15   PATENTS WITH RESPECT TO TEN ACCUSED SAMSUNG PRODUCTS.

16   Q.  OKAY.  SO YOU HAD THE NINE SMARTPHONES, AS WELL AS THE

17   TABLET?

18   A.  YES, MA'AM.

19   Q.  ALL RIGHT.

20   A.  YES, MA'AM.

21   Q.  ALL RIGHT.  YOU GOT -- YOU'VE GOT TO KEEP THAT MIKE REALLY

22   CLOSE TO YOU.  OKAY?

23        ALL RIGHT.  LET'S START WITH THE '959 PATENT.  AND THE

24   CLAIM AT ISSUE HERE IS CLAIM 25; RIGHT?

25   A.  YES, MA'AM.
```

1    Q.   COULD WE SEE PDX 91.5, WHICH I HOPE IS CLAIM 25.

2         OKAY.  NOW, SAMSUNG HAD AN EXPERT, PROFESSOR RINARD, WHO

3    CAME AND TESTIFIED ABOUT THIS PATENT.  WERE YOU ABLE TO BE HERE

4    DURING HIS TESTIMONY?

5    A.   NO, MA'AM.  I WAS BACK ON CAMPUS TEACHING.  BUT I HAVE

6    READ HIS TESTIMONY.

7    Q.   OKAY.  NOW, HE PUT SOME ARGUMENTS FORWARD ABOUT HIS VIEWS

8    ABOUT WHY SAMSUNG DOES NOT INFRINGE CLAIM 25 OF THE '959

9    PATENT.

10        DO YOU RECALL THE OPINIONS HE PUT FORWARD?

11   A.   YES, MA'AM, I DO.

12   Q.   DO YOU AGREE WITH HIM?

13   A.   I DO NOT.

14   Q.   OKAY.  COULD YOU EXPLAIN WHAT THE ARGUMENT WAS THAT HE PUT

15   FORWARD?

16   A.   WELL, HIS ARGUMENT, I THINK, WAS THAT THE MODULE THAT I

17   IDENTIFIED ON THE ACCUSED DEVICES, WHAT I REFERRED TO AS THE

18   GOOGLE MODULE, OR THE WEB MODULE IN OLDER GINGERBREAD VERSION,

19   DID NOT LOCATE INFORMATION ON THE INTERNET AND DID NOT PROVIDE

20   A HEURISTIC FOR DOING SO.

21   Q.   OKAY.  COULD YOU POINT US TO THE CLAIM ELEMENT THAT'S AT

22   ISSUE FOR DOING THAT?

23   A.   SURE.  SO THAT'S CLAIM ELEMENT C, AND IT HAS TO EMPLOY A

24   PLURALITY OF HEURISTICS TO LOCATE INFORMATION IN A PLURALITY OF

25   LOCATIONS, WHICH INCLUDES THE INTERNET.

1    Q.   OKAY.  AND HEURISTIC IS A TERM THAT THE COURT HAS DEFINED

2    FOR US IN THIS CASE?

3    A.   YES, MA'AM.  THE COURT'S DEFINED IT AS A RULE OF THUMB

4    THAT DOES NOT CONSIST ENTIRELY OF CONSTRAINT SATISFACTION

5    PARAMETERS.

6    Q.   OKAY.  HOW MANY HEURISTICS -- WHAT'S THE MINIMUM NUMBER OF

7    HEURISTICS THAT A DEVICE HAS TO HAVE TO INFRINGE CLAIM 25?

8    A.   A PLURALITY, SO TWO.

9    Q.   AT LEAST TWO?

10   A.   YES, AT LEAST TWO.

11   Q.   OKAY.  AND C2 GOES ON AND IT SAYS THAT "HEURISTICS HAVE TO

12   LOCATE INFORMATION IN THE PLURALITY OF LOCATIONS."

13        HOW MANY LOCATIONS AT LEAST MUST THERE BE RULES OF THUMB

14   TO SEARCH IN?

15   A.   ONE LOCATION FOR EACH HEURISTIC, SO AT LEAST TWO.

16   Q.   OKAY.  CAN YOU EXPLAIN WHY YOU DISAGREE WITH THE ARGUMENT

17   THAT PROFESSOR RINARD PUT FORWARD ABOUT WHETHER THERE WERE THE

18   REQUIRED HEURISTICS IN THESE PHONES AND THE TABLET?

19   A.   ABSOLUTELY.  SO I POINTED TO FUNCTIONALITY ON THE DEVICES

20   WHICH CORRESPONDS TO A RULE OF THUMB THAT MEETS THE COURT'S

21   CONSTRUCTION THAT DOES LOCATE INFORMATION ON THE INTERNET, AND

22   I EVEN SHOWED THE JURY THE CODE THAT I WAS REFERRING TO THAT

23   DOES THAT.

24   Q.   OKAY.  LET'S BRING UP YOUR SLIDE -- AND THIS IS

25   CONFIDENTIAL, MR. LEE, SO SHOW ONLY THE JURY AND THE COURT --

1        91.24.

2              WHERE IS THE HEURISTIC THAT PROFESSOR RINARD SAYS IS

3        MISSING?

4        A.   SO THE HEURISTIC FOR LOCATING INFORMATION ON THE INTERNET

5        IS INSIDE OF THE RIGHT-HAND BLUE CIRCLE, WHICH IN THIS CHART IS

6        LABELED THE GOOGLE MODULE.

7        Q.   OKAY.  AND CAN YOU EXPLAIN THE NATURE OF THE DISAGREEMENT

8        BETWEEN YOU AND PROFESSOR RINARD ABOUT WHETHER THAT HEURISTIC

9        MEETS THE REQUIREMENTS OF CLAIM 25?

10       A.   WELL, THE DISAGREEMENT APPEARS TO REVOLVE AROUND THE FACT

11       THAT THE HEURISTIC, WHICH IS IMPLEMENTED ON THE PHONE, USES

12       INFORMATION THAT'S ON THE PHONE TO DO ITS WORK, IN PARTICULAR,

13       IT USES INFORMATION THAT IT JUST OBTAINED FROM A LOCATION ON

14       THE INTERNET, THE GOOGLE SEARCH SUGGESTION SERVER, WITH

15       INFORMATION THAT IT OBTAINED PREVIOUSLY FROM THE INTERNET AND

16       BLENDED THOSE TWO THINGS TOGETHER.

17             AND MY UNDERSTANDING OF DR. RINARD'S ARGUMENT IS THAT

18       SOMEHOW BECAUSE IT'S OPERATING ON INFORMATION THAT'S STORED ON

19       THE PHONE, THAT IT'S NOT LOCATING INFORMATION ON THE INTERNET.

20       Q.   SO I WANT TO MAKE SURE WE'RE CLEAR ABOUT THIS.  THIS IS A

21       PIECE OF CODE, I THINK YOU CALLED IT A BLENDING CODE LAST TIME,

22       IT TAKES RESULTS THAT HAVE COME FROM THE INTERNET FROM A SEARCH

23       THAT HAS JUST HAPPENED, FROM GOOGLE SUGGESTION SERVER --

24       A.   THAT'S CORRECT, YES, MA'AM.

25       Q.   -- AND IT BLENDS THOSE RESULTS WITH RESULTS THAT ARE

1    ALREADY STORED ON THE PHONE FROM A PREVIOUS SEARCH OF THE

2    INTERNET?

3    A.   YES, MA'AM.

4    Q.   OKAY.  WHY DOES DR. RINARD THINK THAT THAT IS NOT A

5    HEURISTIC LOCATED ON THE PHONE FOR SEARCHING INFORMATION FROM

6    THE INTERNET?

7    A.   WELL, AS BEST AS I CAN TELL, HE SOMEHOW THINKS THAT

8    BECAUSE THE INFORMATION HAS BEEN RETRIEVED FROM THE INTERNET

9    AND IS AT THAT MOMENT STORED ON THE PHONE -- BECAUSE, AGAIN,

10   THAT'S WHERE THE HEURISTIC IS IMPLEMENTED -- THAT IT

11   DISQUALIFIES IT FROM BEING INFORMATION THAT WAS LOCATED ON THE

12   INTERNET.

13   Q.   AND WHAT'S YOUR VIEW ABOUT THAT ARGUMENT?

14   A.   I DON'T THINK IT MAKES ANY SENSE BECAUSE I DON'T KNOW HOW

15   ELSE YOU IMPLEMENT A HEURISTIC ON THE PHONE IF IT DOESN'T WORK

16   WITH INFORMATION THAT'S ON THE PHONE.

17   Q.   NOW, THE --

18   A.   SO --

19   Q.   THE CLAIM REQUIRES THAT THIS BE A HEURISTIC FOR LOCATING

20   INFORMATION ON THE INTERNET.

21        DOES THIS HEURISTIC, WHICH OPERATES ON THE PHONE, LOCATE

22   INFORMATION ON THE INTERNET?

23   A.   ABSOLUTELY.  I THINK WE'VE SEEN A NUMBER OF VIDEOS THAT

24   DEMONSTRATE THAT, AND I THINK THE JURORS WILL HAVE THE PHONES

25   THEMSELVES AND CAN CONFIRM THAT WHEN THEY USE THEM.

1      Q.    OKAY.  COULD WE SEE SDX 3009.  WHAT IS -- THIS IS A

2      DEMONSTRATIVE.  WHAT ARE WE LOOKING AT RIGHT HERE,

3      PROFESSOR SNOEREN?

4      A.    WELL, I'VE BEEN TOLD THAT THIS IS A DRAWING THAT A GOOGLE

5      WITNESS DREW, I ASSUME RIGHT HERE, WHEN HE WAS IN COURT.

6      Q.    AND HAVE YOU READ HIS TESTIMONY?

7      A.    I HAVE READ HIS TESTIMONY.

8      Q.    THAT WAS MR. BRINGERT?

9      A.    YES, MA'AM.

10     Q.    SO YOU'VE READ THE TESTIMONY THAT MR. BRINGERT GAVE ABOUT

11     THIS DRAWING?

12     A.    I HAVE.

13     Q.    ALL RIGHT.  CAN YOU EXPLAIN HOW THIS DRAWING RELATES TO

14     YOUR OPINIONS?

15     A.    WELL, I THINK THAT DRAWING CONFIRMS MY OPINIONS AND IT'S

16     JUST ANOTHER RENDITION OF EXACTLY THE SOURCE CODE THAT I SHOWED

17     AND THE FUNCTIONALITY WE'VE ALL BEEN DESCRIBING ABOUT HOW THE

18     RESULTS THAT ARE OBTAINED AT THAT MOMENT FROM THE INTERNET,

19     WHICH IS ON THE RIGHT-HAND SIDE THERE, THAT CLOUD, THAT

20     CORRESPONDS TO THE INTERNET WITH RESULTS FROM PREVIOUS SEARCHES

21     OF THE INTERNET, WHICH CORRESPONDS TO THAT CYLINDER ON THE

22     LEFT-HAND SIDE, HOW THEY'RE BEING COMBINED AND BLENDED

23     TOGETHER.

24          SO THE CODE THAT I SHOWED THE JURY AND THE HEURISTIC, IN

25     THIS DRAWING, LIVES IN THE LITTLE BOX IN THE CENTER, RIGHT

1    THERE, AND AS YOU CAN SEE, THAT'S ON THE PHONE.

2         AND MY UNDERSTANDING IS IN THIS DRAWING, THAT RED BOX

3    CORRESPONDS TO STUFF THAT'S ON THE PHONE, AND SO THE HEURISTIC

4    IS ON THE PHONE AND IT'S BLENDING THE TWO RESULTS, ONE FROM THE

5    IMMEDIATE SEARCH AND ONE FROM PREVIOUS SEARCHES.

6    Q.   OKAY.  THE ONE FROM THE IMMEDIATE SEARCH IS WHAT'S COMING

7    IN FROM THE CLOUD ON THE RIGHT?

8    A.   YES, MA'AM.

9    Q.   OKAY.  WHAT IS YOUR ULTIMATE OPINION ABOUT WHETHER EACH OF

10   THE NINE ACCUSED SMARTPHONES AND THE ACCUSED TABLETS IN THIS

11   CASE INFRINGE CLAIM 25 OF THE '959 PATENT?

12   A.   AS I SAID BEFORE, THEY DO INFRINGE THE ASSERTED CLAIM.

13   Q.   OKAY.  LET'S SWITCH TO ANOTHER TOPIC RELATED TO

14   INFRINGEMENT, AND THAT IS ALTERNATIVES, ALTERNATIVE SEARCH

15   APPLICATIONS.

16        HAVE YOU REVIEWED PROFESSOR RINARD'S TESTIMONY ABOUT A

17   VERSION OF THE QUICK SEARCH BOX, OR GOOGLE SEARCH APPLICATION,

18   THAT SAMSUNG USED FOR A FEW MONTHS IN 2012?

19   A.   YES, MA'AM, I HAVE.

20   Q.   OKAY.  AND YOU, IN FACT, TESTIFIED YOURSELF ABOUT THAT

21   TEMPORARY CHANGE THAT SAMSUNG MADE TO THE CODE?

22   A.   THAT'S CORRECT.

23   Q.   OKAY.  WHAT WAS THE NATURE OF THE CHANGE THAT WAS MADE TO

24   THE SEARCH FUNCTION CODE FOR THOSE FEW MONTHS IN 2012?

25   A.   SO THAT CHANGE DISABLED THE ABILITY OF THE QUICK SEARCH

1    BOX TO SEARCH LOCATIONS ON THE PHONE, SO IT TURNED IT INTO A

2    SEARCH FUNCTIONALITY THAT ONLY SEARCHED THE LOCATION ON THE

3    INTERNET.  SO IT WAS NO LONGER A UNIVERSAL SEARCH.

4    Q.   OKAY.  IN YOUR OPINION, WHILE THAT TEMPORARY REDESIGN WAS

5    IN PLACE, DID IT PROVIDE USERS OF THE PHONES WITH THE FULL

6    BENEFIT OF CLAIM 25 OF THE '959 PATENT?

7    A.   NO, ABSOLUTELY NOT.  AS I SAID, IT WAS NO LONGER A

8    UNIVERSAL SEARCH.

9    Q.   ALL RIGHT.  LET'S TURN TO THE TOPIC OF VALIDITY OF THE

10   '959 PATENT.  HAVE YOU REVIEWED PROFESSOR RINARD'S TESTIMONY ON

11   THAT TOPIC AS WELL?

12   A.   YES, MA'AM, I HAVE.

13   Q.   OKAY.  AND I WANT TO JUST REMIND YOU, BEFORE WE START THIS

14   DISCUSSION -- REMIND ALL OF US, REALLY -- THE FILING DATE OF

15   THE '959 PATENT WAS JANUARY 2000; RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   SO WE'RE ASSESSING THIS INVENTION AT THAT TIME?

18   A.   YES, MA'AM.

19   Q.   ALL RIGHT.  NOW, DR. RINARD GAVE SOME TESTIMONY THAT CLAIM

20   25 WAS INVALID BASED ON SOMETHING THAT HE CALLED THE WAIS OR

21   FREEWAIS SF SYSTEM; IS THAT RIGHT?

22   A.   YES, MA'AM.  I READ THAT TESTIMONY.

23   Q.   DO YOU AGREE WITH PROFESSOR RINARD THAT THE FREEWAIS SF

24   SOURCE CODE THAT HE IDENTIFIED RENDERS CLAIM 25 INVALID?

25   A.   NO, MA'AM, I DO NOT AGREE.

1    Q.   OKAY.  LET'S PUT THE CLAIM BACK UP FOR A MOMENT, MR. LEE,

2    88.8.

3         I'M SORRY.  YOU'RE RIGHT.  THAT WAS THE WRONG SLIDE.

4         COULD YOU IDENTIFY FOR THE JURY WHAT PARTS OF THIS, THE

5    REQUIREMENTS OF THIS CLAIM ARE NOT DISCLOSED BY THE WAIS OR

6    FREEWAIS SF SYSTEM THAT PROFESSOR RINARD DESCRIBED?

7    A.   WELL, THERE ARE MULTIPLE PARTS, BUT ONE OF THEM THAT WE

8    WERE JUST DISCUSSING IS THE REQUIREMENT THAT THE HEURISTIC FOR

9    SEARCH OR LOCATING INFORMATION ACTUALLY HAS TO BE IMPLEMENTED

10   ON THE DEVICE, AND IN THE WAIS SYSTEM, THAT'S NOT THE CASE.

11   Q.   NOW, WHERE IN THE CLAIM DO YOU SEE THE REQUIREMENT THAT

12   THE HEURISTIC FOR LOCATING INFORMATION ON THE INTERNET BE

13   LOCATED ON THE PHONE ITSELF, THE DEVICE ITSELF?

14   A.   SO IN THE PREAMBLE, YOU'LL SEE IT SAYS "A COMPUTER

15   READABLE MEDIUM," AND SO REMEMBER THAT'S THE MEMORY ON THE

16   PHONE, THAT'S THE STORAGE, "FOR LOCATING THE INFORMATION FROM A

17   PLURALITY OF LOCATIONS CONTAINING PROGRAMMING INSTRUCTIONS."

18        AND SO AGAIN, THESE ARE THE INSTRUCTIONS THAT ARE ON THAT

19   MEDIUM, AND SO THOSE ARE OBVIOUSLY LOCATED ON THAT DEVICE.

20        AND ALSO IN PART C WHEN IT TALKS ABOUT A PLURALITY OF

21   LOCATIONS AND IT REFERS TO LOCAL STORAGE MEDIA, OBVIOUSLY THAT

22   ONLY HAS MEANING IF YOU KNOW WHERE IS LOCAL, AND SO OBVIOUSLY

23   IT HAS TO BE TALKING ABOUT THAT DEVICE.

24        AND SO THOSE LOCATIONS ARE LOCAL TO THE DEVICE, AND SO ALL

25   OF THIS HAS TO BE HAPPENING ON THE SAME DEVICE.

1          AND, YOU KNOW, THERE ARE FIGURES IN THE PATENT, AND I

2    THINK IF YOU LOOK AT FIGURE 1, THERE'S A REALLY GREAT MAP THAT

3    SHOWS ALL THE THINGS THAT ARE LOCAL, AND THE ONLY THING THAT

4    ISN'T LOCAL IS THE INTERNET AND THE NETWORK.

5    Q.   OKAY.  COULD WE SEE SLIDE 91.68, PLEASE.

6          WHAT ARE YOU DEPICTING ON THIS SLIDE, PROFESSOR SNOEREN?

7    A.   SO THIS IS JUST A DRAWING TO TRY AND DEPICT THE SYSTEM

8    THAT DR. RINARD PUT TOGETHER IN 2013, WHICH HE HAS TESTIFIED HE

9    BELIEVES INVALIDATES THE CLAIM THAT WE'VE BEEN DISCUSSING.

10   Q.   OKAY.  USING THIS DEPICTION OF THE SYSTEM THAT DR. RINARD

11   CONSTRUCTED IN 2013 FOR THIS CASE, CAN YOU EXPLAIN TO THE JURY

12   WHAT, WHAT ELEMENTS OF CLAIM 25 ARE NOT MET BY THE SYSTEM THAT

13   DR. RINARD CONSTRUCTED?

14   A.   SURE.  SO I'VE ILLUSTRATED TWO, SO I'M GOING TO START WITH

15   THE FIRST ONE, WHICH IS THE ONE WE'RE TALKING ABOUT, WHICH IS

16   WHERE THE HEURISTIC IS.

17         SO IN THE UPPER LEFT, I'VE DEPICTED THE LOCAL P.C., SO

18   THIS IS THE COMPUTER THAT THE USER ACTUALLY USES TO ISSUE THE

19   QUERY.

20         AS YOU CAN SEE, WHAT DR. RINARD HAS DONE IS HE HAS

21   INSTALLED A COPY OF THAT FREEWAIS SF SERVER ON THAT MACHINE,

22   AND HE POINTS TO THAT AS PROVIDING THE RULE OF THUMB FOR

23   SEARCHING LOCAL INFORMATION.

24         NOW, DR. RINARD HAS INSTALLED ANOTHER COPY OF THAT SAME

25   SOFTWARE ON A REMOTE MACHINE, WHICH HE TESTIFIED THAT HE PUT ON

1        THE INTERNET.

2             AND SO HE'S USING THAT CLIENT, WHICH IS THAT BLUE BOX,

3        THAT X WAIS BOX, TO ISSUE A QUERY WHICH THEN USES THE GREEN

4        SERVER TO SEARCH LOCALLY ON THE LEFT-HAND SIDE, AND IT USES THE

5        GREEN SERVER ON THE COMPUTER ON THE RIGHT-HAND SIDE TO SEARCH

6        REMOTELY.

7             BUT THE HEURISTICS ARE LOCATED INSIDE OF THOSE GREEN

8        BOXES, AND SO IN DR. RINARD'S SYSTEM, THE HEURISTIC TO SEARCH

9        THE LOCATION ON THE INTERNET IS ACTUALLY IMPLEMENTED AND

10       LOCATED ON A MACHINE ON THE INTERNET, NOT THE SAME MACHINE AS

11       THE CLIENT WHERE THE USER WAS ISSUING THE REQUEST AND MEETING

12       ALL THE OTHER LIMITATIONS OF THE CLAIM.

13       Q.   SO JUST SO THAT'S CLEAR -- COULD WE PUT THE CLAIM BACK UP

14       FOR A MOMENT, MR. LEE -- THE PREAMBLE OF THE CLAIM SAYS "A

15       COMPUTER READABLE MEDIUM."  DOES EVERYTHING IN B THROUGH E HAVE

16       TO BE ON THE COMPUTER READABLE MEDIUM?

17       A.   WELL, THE INSTRUCTIONS THAT DO EVERYTHING IN B THROUGH E

18       HAVE TO BE ON THE MEDIUM, AND SO ALL THE DEVICES THAT

19       FACILITATE THOSE THINGS ARE ALL ON THAT SAME DEVICE --

20       Q.   OKAY.

21       A.   -- WHICH CONTAINS THE MEDIUM, YES.

22       Q.   ALL RIGHT.  INCLUDING C, THE PLURALITY OF HEURISTICS?

23       A.   YES, EXACTLY.

24       Q.   ALL RIGHT.  COULD WE GO BACK TO 91.6 -- YES, THANK YOU,

25       MR. LEE.  YOU'RE WAY AHEAD OF ME.

1          ARE THERE TWO DIFFERENT COMPUTER READABLE MEDIUMS THAT

2     MUST BE OPERATING IN THE SLIDE THAT YOU'VE SHOWN, THAT THEY'RE

3     SHOWING US RIGHT NOW?

4     A.    WELL, YES.   THERE'S MEMORY ON THE LOCAL P.C. ON THE LEFT,

5     AND THEN THERE'S GOING TO BE MEMORY ON THE REMOTE P.C. ON THE

6     RIGHT WHICH ARE STORING THOSE PROGRAMS.

7     Q.    OKAY.   IS THERE A SECOND REASON WHY YOU BELIEVE THAT THE

8     FREEWAIS SF SOURCE CODE AND DEMONSTRATION OF THE SOURCE CODE

9     THAT DR. RINARD GAVE THE JURY DOES NOT ANTICIPATE CLAIM 25?

10    A.    WELL, THERE ARE ACTUALLY THREE, AND I APOLOGIZE, I WAS

11    GOING TO EXPLAIN TWO OF THEM WITH THIS SLIDE.

12         THE SECOND ONE I WANTED TO EXPLAIN WITH THIS SLIDE IS THE

13    LITTLE YELLOW BOX INSIDE OF THOSE GREEN BOXES IS MY DEPICTION

14    OF THE HEURISTIC, SO THERE'S ONE IN EACH BOX.

15         BUT MY UNDERSTANDING OF DR. RINARD'S TESTIMONY WAS THAT HE

16    COMPILED A SOURCE CODE TO MAKE THE FREEWAIS SF PROGRAM, AND IF

17    HE DID THAT, HE COULD COMPILE IT TWICE OR THREE TIMES OR 17

18    TIMES AND HE'S GOING TO GET THE SAME PROGRAM EVERY TIME.

19         AND SO THAT MEANS THAT WHATEVER HEURISTIC IS CONTAINED IN

20    THAT YELLOW BOX IS ACTUALLY THE SAME HEURISTIC.

21         AND SO WHAT WE HAVE HERE IS TWO COPIES OF THE SAME

22    HEURISTIC.   WE DON'T HAVE A PLURALITY OF HEURISTICS.   WE DON'T

23    HAVE DIFFERENT HEURISTICS, ONE FOR LOCAL AND ONE FOR REMOTE.

24         SO THAT WAS THE SECOND REASON I WANTED TO POINT OUT ON

25    THIS SLIDE.

1    Q.    OKAY.  IF WE COULD PUT THE CLAIM BACK UP AGAIN, MR. LEE.

2          CAN YOU POINT THE JURY TO WHERE THE CLAIM REQUIRES THAT

3    THERE BE MORE THAN ONE HEURISTIC?

4    A.    ABSOLUTELY.  SO THAT'S AGAIN THE SAME TEXT IN CLAIM C

5    THERE.  IT HAS TO PROVIDE AN INFORMATION IDENTIFIER TO A

6    PLURALITY OF HEURISTICS TO LOCATE INFORMATION.

7    Q.    OKAY.  NOW, YOU SAID THERE WAS A THIRD REASON WHY YOU DO

8    NOT BELIEVE THAT THE SOURCE CODE, THE WAIS SOURCE CODE THAT

9    DR. RINARD TESTIFIED ABOUT, OR HIS DEMONSTRATION THAT HE MADE

10   LAST YEAR, WOULD INVALIDATE CLAIM 25.  WHAT WAS THAT THIRD

11   REASON?

12   A.    WELL, MY READING OF DR. RINARD'S TESTIMONY IS THAT HE SAID

13   THAT THE SOURCE CODE MEETS THESE LIMITATIONS.

14         BUT, AGAIN, THE PREAMBLE, THAT'S THE PART A, THIS NEEDS TO

15   HAVE PROGRAM INSTRUCTIONS, AND AS I THINK WE'VE TALKED A COUPLE

16   TIMES IN THIS CASE, THE WAY SOURCE CODE WORKS IS THAT'S FOR

17   HUMANS TO READ AND WRITE.  COMPUTERS DON'T ACTUALLY EXECUTE

18   SOURCE CODE.

19         SO IN ORDER TO GET PROGRAM INSTRUCTIONS, YOU HAVE TO

20   COMPILE THAT CODE.  SO THE SOURCE CODE ITSELF WOULDN'T ACTUALLY

21   EVEN MEET THE PREAMBLE OF THE CLAIM.

22   Q.    OKAY.  AND MR. LEE -- I'M SORRY TO MAKE YOU SWITCH BACK

23   AND FORTH SO MANY TIMES -- BUT CAN YOU SHOW US THAT SLIDE ONE

24   MORE TIME WITH THE TWO COMPUTERS, ONE LOCAL AND ONE INTERNET.

25         OKAY.  HAVE YOU, YOURSELF, LOOKED AT THE SOURCE CODE THAT

1    DR. RINARD USED?

2    A.   YES, I HAVE.

3    Q.   THIS IS JUST -- AGAIN, SO WE'RE CLEAR -- IS THIS THE

4    SOURCE CODE THAT CAME FROM DR. PFEIFER IN GERMANY?

5    A.   I DID -- I DON'T RECALL EXACTLY WHO IT CAME FROM, BUT YES,

6    THE TESTIMONY IS IT DID COME FROM GERMANY, THAT'S CORRECT.

7    Q.   OKAY.  IN THE SOURCE CODE ITSELF, IS THERE ANYTHING THAT

8    SAYS THAT THE QUERY THAT'S PUT IN -- WHERE YOU'VE GOT THE BLUE

9    BOX ON THE COMPUTER ON THE LEFT -- HAS TO BE SENT TO SOMEPLACE

10   THAT'S ON THE INTERNET?

11   A.   NO, ABSOLUTELY NOT.

12   Q.   WHERE ELSE WOULD THE SOURCE CODE PERMIT THE QUERY TO BE

13   SENT?

14   A.   SO THE SOURCE CODE JUST ALLOWS IT TO BE SENT TO A LOCAL

15   SERVER AND A SERVER ON ANOTHER MACHINE.  YOU COULD HAVE IT

16   CONNECTED TO ANOTHER MACHINE IN THE SAME ROOM IN A LOCAL AREA

17   NETWORK, OR EVEN IN A WIDE AREA NETWORK, AND BOTH OF THOSE ARE

18   CONTEMPLATED IN THE PATENT ITSELF AND ARE CALLED OUT AS

19   DIFFERENT THAN THE INTERNET.

20   Q.   OKAY.  IS THERE ANY EVIDENCE THAT HAS BEEN PUT FORWARD IN

21   THIS TRIAL THAT ANYONE SET UP A SYSTEM AND INSTALLED THIS

22   FREEWAIS SF CODE THAT PROFESSOR RINARD TALKED ABOUT BEFORE

23   JANUARY OF 2000 ON A MACHINE THAT WAS IN ONE LOCATION TALKING

24   TO A MACHINE IN ANOTHER LOCATION WHERE THAT SECOND LOCATION WAS

25   ON THE INTERNET?

```
1    A.   NOT IN THE WAY THAT DR. RINARD DESCRIBED IT, NO, MA'AM.

2    Q.   OKAY.  IS THERE ANY -- WELL, WHAT IS YOUR ULTIMATE OPINION

3    ABOUT WHETHER, EVEN IF THE WAIS SYSTEM, AS DR. RINARD DESCRIBED

4    IT, THAT IS SET UP ON THESE TWO COMPUTERS, HAD ACTUALLY EXISTED

5    BEFORE JANUARY 7TH, 2000, IT WOULD HAVE ANTICIPATED CLAIM 25?

6    A.   IT WOULD NOT.

7    Q.   AND WHAT IT YOUR OVERALL CONCLUSION ABOUT WHETHER THE WAIS

8    SYSTEM, AS DR. RINARD DESCRIBED IT, WOULD RENDER CLAIM 25

9    OBVIOUS?

10   A.   IT WOULD NOT.

11   Q.   NOW, DURING DR. RINARD'S TESTIMONY, HE ALSO MENTIONED TWO

12   PATENTS CALLED SMITH AND SHOHAM.

13        DO YOU RECALL THAT?

14   A.   YES, MA'AM, I DO.

15   Q.   DID DR. RINARD WALK THROUGH THE CLAIM LIMITATIONS, EACH

16   LIMITATION OF CLAIM 25 AND SHOW HOW, IN COMBINATION, SMITH AND

17   SHOHAM WOULD MEET EVERY LIMITATION?

18   A.   NOT IN HIS TESTIMONY, NO, MA'AM.

19   Q.   OKAY.  GIVEN HOW LITTLE INFORMATION HE PROVIDED, ARE YOU

20   ABLE TO RESPOND POINT-BY-POINT TO HIS OPINION?

21   A.   NO, MA'AM.

22   Q.   LET ME ASK YOU A COUPLE OF QUESTIONS NONETHELESS ABOUT

23   SMITH AND SHOHAM.

24        FIRST, WOULD A PERSON OF ORDINARY SKILL, IN JANUARY OF

25   2000, HAVE HAD A REASON TO COMBINE THE TEACHINGS OF THE SMITH
```

1    PATENT WITH THE TEACHINGS OF THE SHOHAM PATENT?

2    A.   NO, MA'AM.  THEY'RE PATENTS ABOUT TWO ENTIRELY DIFFERENT

3    THINGS.

4    Q.   CAN YOU JUST BRIEFLY EXPLAIN TO THE JURY WHAT EACH OF THEM

5    WAS ABOUT?

6    A.   SURE.  SO THE SMITH PATENT WAS A PATENT FOR A FANCY SET

7    TOP BOX OR TABLE BOX, SO IN 2000 WE WERE JUST STARTING TO GET

8    THE FANCY BOXES THAT WOULD CONNECT YOUR DVD PLAYER TO YOUR TV,

9    OR MAYBE YOUR XBOX OR SOMETHING LIKE THAT.  THAT'S WHAT THE

10   SMITH PATENT WAS ABOUT.

11       THE SHOHAM PATENT WAS ACTUALLY A VERY THEORETICAL

12   MATHEMATICAL PATENT ABOUT HOW TO DO SEARCHES IN WHAT IT CALLED

13   A HYPERLINKED NETWORK DATABASE.  IN FACT, IT EVEN TALKED ABOUT

14   HOW TO DO SEARCHES WHEN YOU DON'T KNOW WHAT YOU'RE LOOKING FOR,

15   WHICH IS NOT AT ALL THE SITUATION IN SMITH OR THE WAY THAT

16   DR. RINARD DESCRIBED HOW THAT DEVICE WORKED.

17       SO IT'S NOT CLEAR AT ALL WHY YOU WOULD USE THIS

18   MATHEMATICAL FORMULATION FROM SHOHAM, WHICH DOESN'T KNOW WHAT

19   IT'S LOOKING FOR, WITH THE DEVICE FROM SMITH, WHICH HAS A VERY

20   PARTICULAR DOMAIN.

21   Q.   IF, DESPITE THE ABSENCE OF A REASON TO COMBINE THESE TWO

22   THINGS, A PERSON OF ORDINARY SKILL HAD COMBINED THEM IN JANUARY

23   OF 2000, WOULD THAT COMBINATION HAVE HAD ALL OF THE ELEMENTS OF

24   CLAIM 25, SUCH AS TO INVALIDATE THE CLAIM?

25   A.   NO, IT WOULDN'T HAVE.

1    Q.   AND WHY WOULD IT NOT, JUST BRIEFLY?

2    A.   A NUMBER OF REASONS.  ONE OF THEM IS THAT, JUST LIKE THE

3    WAIS SYSTEM THAT DR. RINARD CREATED, THE SMITH SYSTEM, WHEN IT

4    TALKS ABOUT SEARCHING IN MULTIPLE LOCATIONS, IT USES THE SAME

5    SET OF RULES, AND SO IF SOMEONE HAD TAKEN SHOHAM AND DECIDED TO

6    TURN THOSE RULES INTO HEURISTICS, IT STILL WOULD HAVE RUN THE

7    SAME HEURISTIC IN THOSE DIFFERENT LOCATIONS.  SO IT DOESN'T

8    WOULDN'T HAVE HAD A PLURALITY OF HEURISTICS.

9    Q.   OKAY.  WHAT IS YOUR OVERALL OPINION ABOUT WHETHER THE '959

10   PATENT IS VALID AND INFRINGED?

11   A.   IT'S MY OPINION THAT THE '959 ASSERTED CLAIM IS VALID AND

12   IS INFRINGED BY THE TEN ACCUSED DEVICES.

13   Q.   AND AS AN EXPERT IN COMPUTER SCIENCE, CAN YOU GIVE US YOUR

14   OPINION OF THE VALUE OF THE INVENTION OF CLAIM 25 OF THE '959

15   PATENT?

16   A.   WELL, I THINK THAT UNIVERSAL SEARCH AS DESCRIBED IN THIS

17   PATENT IS QUITE VALUABLE ON TODAY'S DEVICES, AND SMARTPHONES IN

18   PARTICULAR, AND I'VE SEEN EVIDENCE THAT USERS, WHEN DENIED THAT

19   FUNCTIONALITY IN THESE DEVICES, ARE UPSET ABOUT IT.

20        SO I THINK IT HAS OBVIOUS VALUE.

21   Q.   OKAY.  LET'S TURN TO THE '414 PATENT.

22        COULD WE SEE SLIDE 91.36, PLEASE, MR. LEE.

23        THIS IS CLAIM 20 OF THE '414 PATENT WHICH INCORPORATES

24   CLAIM 11.

25        COULD YOU REMIND THE JURY -- I KNOW YOU WALKED THROUGH

1     THIS DETAIL BEFORE -- COULD YOU REMIND THE JURY OF THE KEY

2     REQUIREMENTS OF CLAIM 20?

3     A.   WELL, THERE ARE A NUMBER OF REQUIREMENTS, BUT I THINK THE

4     ONES THAT ARE IN DISPUTE REVOLVE AROUND THE SYNCHRONIZATION

5     SOFTWARE COMPONENT, AND IN PARTICULAR CLAIM 20 REQUIRES THAT

6     THERE BE THREE OF THEM, AND THAT IT REQUIRES THAT EACH ONE OF

7     THEM BE CONFIGURED TO SYNCHRONIZE STRUCTURED DATA OF A

8     PARTICULAR CLASS.  SO THIS WAS THE MAIL, CONTACTS, CALENDAR.

9          AND SO IT REQUIRES THAT THOSE SOFTWARE SYNCHRONIZATION

10    COMPONENTS PROVIDE A THREAD.

11         I THINK THOSE ARE THE MAIN POINTS OF CONTENTION HERE.

12    Q.   OKAY.  SO YOU -- WERE YOU HERE WHEN DR. CHASE TESTIFIED?

13    A.   YES, I WAS ABLE TO WATCH HIM.

14    Q.   ALL RIGHT.  LET'S SEE IF WE CAN FOCUS IN ON WHAT HE SAID

15    THAT DISAGREED WITH YOUR CONCLUSIONS AND YOUR RESPONSE.

16         COULD WE SEE DX 3634.

17         WE'VE SEEN SLIDES LIKE THIS A NUMBER OF TIMES NOW WITH THE

18    SIX SYNC ADAPTERS.  THIS HAPPENS TO BE THEIRS.  WHAT DO WE SEE

19    ON THE TOP ROW AND BOTTOM ROW OF THE SLIDE?

20    A.   SO THIS IS DR. CHASE'S DESCRIPTION OF THE SIX SYNC

21    ADAPTERS THAT ARE IDENTIFIED.  THE TOP ROW CORRESPOND WITH THE

22    ONES THAT CORRESPOND WITH THE GOOGLE SERVERS, AND THE BOTTOM

23    ROW CORRESPOND TO ONES THAT WORK WITH MICROSOFT EXCHANGE

24    SERVERS.

25    Q.   OKAY.  AND YOU DR. CHASE BOTH AGREE THESE SIX SYNC

```
1    ADAPTERS ARE PRESENT ON EACH OF THE ACCUSED DEVICES; RIGHT?

2    A.   YES, MA'AM.

3    Q.   AND THE TWO OF YOU ALSO AGREE THAT THE GOOGLE CALENDAR

4    SYNC ADAPTER AND THE GOOGLE CONTACTS SYNC ADAPTER QUALIFY AS

5    SYNCHRONIZATION SOFTWARE COMPONENTS THAT ARE CONFIGURED TO

6    SYNCHRONIZE STRUCTURED DATA FROM A PARTICULAR DATA CLASS, ET

7    CETERA, AS REQUIRED BY THE CLAIM; RIGHT?

8    A.   YES, MA'AM, WE DO.

9    Q.   OKAY.  SO THE DISPUTE REALLY FOCUSES ON WHETHER THERE'S A

10   THIRD ONE, AND IN THIS CASE EITHER THE GMAIL SYNC ADAPTER OR

11   THE EXCHANGE MAIL SYNC ADAPTER; RIGHT?

12   A.   YES, THAT SEEMS TO BE THE CASE.

13   Q.   OKAY.  WHAT IS YOUR UNDERSTANDING AS TO WHY DR. CHASE HAS

14   PUT FORWARD THE OPINION THAT THE GMAIL SYNC ADAPTER AND THE

15   EXCHANGE MAIL SYNC ADAPTER ARE NOT CONFIGURED TO SYNCHRONIZE

16   STRUCTURED DATA?

17   A.   WELL, THAT'S PRECISELY IT.  HE THINKS THAT THEY SOMEHOW

18   DON'T MEET THE REQUIREMENT THAT THEY'RE CONFIGURED TO

19   SYNCHRONIZE.

20   Q.   DO YOU AGREE WITH HIM?

21   A.   NO, I DO NOT.

22   Q.   WHAT'S THE BASIS FOR HIS, HIS VIEW THAT THESE SYNC

23   ADAPTERS ARE NOT CONFIGURED TO SYNCHRONIZE STRUCTURED DATA?

24   A.   WELL, HE'S -- HE'S LOOKED AT THE SAME CODE THAT I HAVE AND

25   HE UNDERSTANDS WHAT THEY DO.
```

1          BUT HE SEEMS TO THINK THAT THE CLAIM SAYS SOMETHING IT

2     DOESN'T, AND HE SEEMS TO THINK THAT SOMEHOW THE CLAIM REQUIRES

3     THAT THE SYNC ADAPTERS ACTUALLY PERFORM EVERY SINGLE STEP OF

4     THE SYNCHRONIZATION THEMSELVES.

5     Q.    OKAY.  AS YOU UNDERSTAND THE CLAIM LANGUAGE, WHAT DOES

6     CLAIM 20 REQUIRE OF EACH OF THESE SYNC ADAPTERS FOR THEM TO

7     MEET THE CLAIM?

8     A.    WELL, IT JUST REQUIRES THAT THEY'RE CONFIGURED TO

9     SYNCHRONIZE A DATA CLASS, AND TO ME, "CONFIGURED" IS JUST A

10    PLAIN LANGUAGE TERM, AND SO ONE SKILLED IN THE ART AT THE TIME

11    OF THE INVENTION WOULD HAVE UNDERSTOOD THAT CONFIGURED JUST

12    MEANS THAT IT'S SPECIALIZED TO DO A PARTICULAR DATA CLASS AND

13    NOT ANOTHER ONE.  SO IT KNOWS HOW TO SYNCHRONIZE MAIL, BUT NOT

14    CALENDAR OR CONTACTS.

15    Q.    AND DOES THE GMAIL SYNC ADAPTER ON EACH OF THE ACCUSED

16    DEVICES HAVE WITHIN IT CODE THAT IS SPECIFICALLY WRITTEN TO

17    SYNCHRONIZE MAIL, IN THIS CASE GOOGLE MAIL, AND NOT OTHER DATA

18    CLASSES?

19    A.    YES, MA'AM, ABSOLUTELY.  I SHOWED IT TO THE JURY LAST

20    TIME.

21    Q.    OKAY.  COULD YOU REMIND US HOW THESE SIX SYNC ADAPTERS FIT

22    INTO THE OVERALL ANDROID ARCHITECTURE?

23    A.    SURE.  SO AS WE'VE HEARD TESTIMONY, THE ANDROID FRAMEWORK

24    HAS A SYNC MANAGER THAT WORKS WITH A PARTICULAR PIECE OF

25    SOFTWARE WHICH IS CALLED THE ABSTRACT THREADED SYNC ADAPTER,

```
1     AND EACH ONE OF THESE SIX ARE A SPECIAL TYPE OF ABSTRACT

2     THREADED SYNC ADAPTER.

3     Q.   OKAY.  COULD WE LOOK AT PX 102, WHICH SHOULD BE IN A

4     BLISSFULLY SMALL BINDER IN FRONT OF YOU?

5     A.   I HAVE IT HERE.

6     Q.   WHAT IS PX 102?

7     A.   THIS IS A PRINTOUT DATED JUNE 6TH OF 2013 OF A PORTION OF

8     THE ANDROID DEVELOPER'S DOCUMENTATION AND WEBSITE.

9               MS. KREVANS:  OKAY.  YOUR HONOR, WE MOVE THE

10    ADMISSION OF PX 102.

11              THE COURT:  ANY OBJECTION?

12              MR. PAK:  NO, YOUR HONOR.

13              THE COURT:  IT'S ADMITTED.

14         (PLAINTIFF'S EXHIBIT 102 WAS ADMITTED IN EVIDENCE.)

15              THE COURT:  GO AHEAD, PLEASE.

16         ACTUALLY, IT'S ACTUALLY 3:30.  SHOULD WE GO AHEAD AND TAKE

17    OUR BREAK NOW?

18              MS. KREVANS:  THAT WOULD BE PERFECT, YOUR HONOR.

19              THE COURT:  OKAY.  THAT'S ADMITTED.

20         IT'S 3:30.  WE'LL GO AHEAD AND TAKE OUR TEN MINUTE BREAK.

21    PLEASE DON'T RESEARCH OR DISCUSS THE CASE.  THANK YOU.

22         (JURY OUT AT 3:31 P.M.)

23              THE COURT:  YOU MAY STEP DOWN.

24              THE WITNESS:  THANK YOU.

25              THE COURT:  LET'S GO AHEAD AND TAKE OUR BREAK NOW.
```

1       THANK YOU.

2               MR. PAK:  THANK YOU, YOUR HONOR.

3           (RECESS FROM 3:31 P.M. UNTIL 3:42 P.M.)

4               THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

5           THE TIME IS NOW 3:43.

6           GO AHEAD, PLEASE.

7               MS. KREVANS:  YOUR HONOR, CAN I JUST CHECK, RIGHT

8       BEFORE THE BREAK, DID THE COURT ADMIT PX 102?

9               THE COURT:  I DID.

10              MS. KREVANS:  OKAY.  COULD WE SEE PX 102 ON THE

11      SCREEN, MR. LEE.

12      Q.  WHAT DOES THIS DOCUMENT TELL US ABOUT SYNC ADAPTER THAT'S

13      RELEVANT TO YOUR OPINIONS IN THE CASE AND TO YOUR RESPONSE TO

14      PROFESSOR CHASE'S OPINIONS?

15      A.   SO AS I WAS SAYING BEFORE THE BREAK, THE ABSTRACT THREADED

16      SYNC ADAPTER IS WHAT'S CALLED THE BASE CLASS, OR THE TYPE OF

17      SOFTWARE OBJECT THAT ALL SIX OF THE SYNC ADAPTERS THAT I POINT

18      TO ARE.  SO ANYTHING THAT THIS DOCUMENT DESCRIBES APPLIES

19      EQUALLY TO ALL SIX OF THEM.

20          THIS DOCUMENT SAYS A COUPLE OF THINGS THAT I THINK ARE

21      REALLY SALIENT TO THE POINTS THAT WERE RAISED.  SO IF YOU LOOK

22      AT THE FIRST PARAGRAPH UNDER THE CLASS OVERVIEW WHERE IT JUST

23      DESCRIBES WHAT AN ABSTRACT THREADED SYNC ADAPTER DOES, IT SAYS

24      "AN ABSTRACT IMPLEMENTATION OF A SYNC ADAPTER THAT SPAWNS A

25      THREAD TO INVOKE A SYNC OPERATION."

1          SO YOU SEE RIGHT THERE IT'S SAYING THAT IT CREATES A

2     THREAD AND IT INVOKES A SYNC OPERATION, AND IT GOES ON TO

3     DESCRIBE HOW IT INVOKES THAT SYNC OPERATION.

4     Q.   BEFORE WE GO ON, LET ME ASK YOU, DOES EVERY ONE OF THE SIX

5        SYNC ADAPTERS THAT YOU SHOWED ON YOUR PREVIOUS SLIDE, THE

6        SAMSUNG SLIDE, DOES EVERY ONE OF THEM SPAWN A THREAD AS THIS

7        DOCUMENT SAYS?

8     A.   YES, MA'AM.

9     Q.   AND "SPAWN" MEANS?

10    A.   SPAWN MEANS PROVIDE OR CREATE.

11    Q.   OKAY.  AND THEN SKIPPING DOWN A SENTENCE, IT SAYS "WHEN A

12       START SYNC IS RECEIVED AND THERE IS NO SYNC OPERATION IN

13       PROGRESS, THEN A THREAD WILL BE STARTED" THAT'S THAT THREAD "TO

14       RUN THE OPERATION AND ON PERFORM SYNC WILL BE INVOKED ON THAT

15       THREAD."

16          AND AGAIN, ON PERFORM SYNC IS THE CODE THAT I SHOWED THE

17    JURY LAST TIME.

18          AND JUST TO MAKE SURE ALL WE ALL UNDERSTAND ALL THAT STUFF

19    THAT WE SKIPPED THERE, THOSE ARE A SET OF PARAMETERS.  SO THESE

20    ARE VALUES THAT ARE PASSED INTO ON PERFORM SYNC TO TELL IT

21    SPECIFICALLY WHAT IT SHOULD DO, AND ONE OF THEM WHICH PERTAINS

22    TO THE CODE THAT I SHOWED THE JURY LAST TIME IS ACCOUNT, WHICH

23    TALKS ABOUT THE PARTICULAR USER ACCOUNT.

24    Q.   SO IN THE CASE OF THE GMAIL SYNC ADAPTER, WHAT WOULD BE

25       SPECIFIED THERE IN THE GMAIL SYNC ADAPTER WOULD BE THE

1       PARTICULAR GMAIL MAIL SYNC -- PARTICULAR GMAIL MAIL ACCOUNT

2       THAT WAS GOING TO BE SYNCHRONIZED?

3                MR. PAK:  OBJECTION.  LEADING, YOUR HONOR.

4                MS. KREVANS:  I'LL REPHRASE, YOUR HONOR.

5                THE COURT:  SUSTAINED.

6          GO AHEAD, PLEASE, BUT IT'S SUSTAINED.

7       BY MS. KREVANS:

8       Q.  IN THE CODE THAT YOU SHOWED THE JURY LAST TIME, WHAT WAS

9       SPECIFIED IN THE AREA THAT'S JUST INDICATED HERE BY ACCOUNT?

10      A.  SO AGAIN, AS I SHOWED THE JURY, THAT CODE TAKES THE USER'S

11      ACCOUNT FOR THEIR GMAIL.

12         SO THEN ACTUALLY ON PAGE 3 OF THE DOCUMENT, IT PROVIDES

13      EVEN MORE DESCRIPTION OF HOW ON PERFORM SYNC WORKS, SO IF WE GO

14      DOWN UNDER THE PUBLIC METHODS SECTION, IT LISTS ON PERFORM SYNC

15      AS ONE OF THE METHODS THAT THE -- SORRY, I GUESS THE JURY HAS

16      THIS.

17         SO IT SAYS ON PERFORM SYNC, AND THEN UNDER THAT IT

18      DESCRIBES WHAT ON PERFORM SYNC DOES, AND IT SAYS "PERFORM A

19      SYNC FOR THIS ACCOUNT.  SYNC ADAPTER-SPECIFIC PARAMETERS MAY BE

20      SPECIFIED," AND THEN UNDER PARAMETER, ONE OF THEM IS THE

21      ACCOUNT THAT SHOULD BE SYNCED.

22               THE COURT:  THERE'S NEVER BEEN A REQUEST TO SEAL THIS

23      DOCUMENT, I DON'T BELIEVE.  IS THERE A REASON WHY THIS PAGE IS

24      ONLY ON --

25               MS. KREVANS:  DOES THIS DOCUMENT NEED TO BE SEALED,

1        MR. PAK?

2              THE COURT:  THERE'S NEVER BEEN A MOTION TO SEAL IT.

3              MR. PAK:  I DON'T THINK SO, YOUR HONOR.

4              THE COURT:  OKAY.

5              MS. KREVANS:  SO MR. LEE, YOU CAN SHOW THIS TO

6        EVERYBODY.

7        Q.    LET ME ASK YOU ABOUT SOMETHING ELSE THAT DR. CHASE SAID IN

8        HIS TESTIMONY.  DO YOU RECALL THAT HE SAID SOME THINGS ABOUT

9        THE FILE HISTORY OF THE '414 PATENT THAT RELATED TO THIS

10       CONFIGURED TO SYNCHRONIZE ISSUE?

11       A.    YES, MA'AM, I DO.

12       Q.    COULD YOU FIRST JUST EXPLAIN TO THE JURY WHAT THE FILE

13       HISTORY OF A PATENT IS?

14       A.    SURE.  SO I THINK I HAVE THE FILE HISTORY RIGHT HERE, AND

15       SO THIS IS JUST A WRITTEN RECORDING OF THE CONVERSATION THAT

16       GOES ON BETWEEN THE PATENT OFFICE AND THE APPLICANT FOR THE

17       PATENT OVER THESE INTERVENING YEARS BETWEEN WHEN THE PATENT IS

18       SUBMITTED AND IT'S GRANTED THAT THEY DISCUSS AND REFINE THE

19       EXACT WORDS THAT GO INTO THE PATENT CLAIMS.  SO THE PATENT IS

20       VERY PRECISE ABOUT WHAT THEY INVENTED AND WHAT THEY DIDN'T

21       INVENT.

22       Q.    OKAY.  NOW, DR. CHASE SHOWED THE JURY A LITTLE PIECE OF

23       THAT BIG FILE HISTORY, AND IF WE COULD SEE THE TRIAL TRANSCRIPT

24       OF HIS TESTIMONY AT PAGE 2183, LINES 3 TO 5, HE SAID "SO THE

25       NEW LANGUAGE READS 'CONFIGURED TO SYNCHRONIZE.'  SO IN RESPONSE

1      TO THIS REJECTION," HE WAS TALKING ABOUT REJECTION FROM THE

2      PATENT OFFICE, "THEY'VE STRUCK THE WORD 'CAUSE' AND REPLACED IT

3      WITH 'CONFIGURED TO SYNCHRONIZE.'"

4           NOW, IS THAT WHAT HAPPENED IN THE FILE HISTORY?

5      A.   THAT'S WHAT DR. CHASE SAID, BUT THAT'S NOT ACTUALLY WHAT

6      HAPPENED IN THE FILE HISTORY.

7      Q.   OKAY.  LET'S LOOK AT PAGE 751 OF JX 8, WHICH IS THE FILE

8      HISTORY.  AND COULD WE SEE, AT THE BOTTOM OF THE PAGE IN

9      PARAGRAPH 12 -- THAT'S FINE, MR. LEE.

10          SO WHAT ARE WE LOOKING AT HERE, PROFESSOR SNOEREN?

11     A.   SO THIS IS THE TEXT THAT DR. CHASE SHOWED THE JURY LAST

12     TIME, WHICH IS PART OF THE FILE HISTORY, AND IT'S SHOWING THE

13     DIFFERENCES BETWEEN THE TEXT THAT APPLE HAD SUBMITTED

14     PREVIOUSLY TO THE PATENT OFFICE AND THE CHANGES THAT THEY'RE

15     MAKING IN THIS RESUBMISSION TO TRY AND ADDRESS SOME OF THE

16     ISSUES THE PATENT OFFICE HAD.

17     Q.   WHAT WAS THE SPECIFIC ISSUE THAT THE PATENT OFFICE HAD

18     RAISED ABOUT THE PREVIOUS LANGUAGE OF THIS CLAIM?

19     A.   WELL, THE PREVIOUS LANGUAGE OF THIS CLAIM, THE PATENT

20     OFFICE HAD FOUND ANOTHER PATENT, WHICH IS ACTUALLY NONE OF THE

21     ONES THAT WE'VE BEEN DISCUSSING SO FAR, WHICH HAS TO DO WITH

22     RETRIEVING AND STORING DATA FROM A THING CALLED A LOG.  IT'S

23     NOT IMPORTANT WHAT A LOG IS, BUT IT'S NOT A DATABASE.

24          SO THE PATENT OFFICE SAID "THE LANGUAGE THAT'S IN THE TEXT

25     THAT YOU'VE GIVEN US NOW SEEMS TO BE GENERIC ENOUGH TO TALK

1     ABOUT RETRIEVAL AND STORAGE IN A LOG," AND SO APPLE RESPONDED

2     TO THAT BY CHANGING THE LANGUAGE TO MAKE IT SPECIFIC.

3     Q.   OKAY.   COULD YOU JUST EXPLAIN TO THE JURY WHAT THE MEANING

4     OF THE LANGUAGE THAT IS STRUCK OUT AND THE LANGUAGE THAT'S

5     UNDERLINED IS IN THIS AMENDMENT THAT WAS SUBMITTED BY APPLE.

6     A.   SURE.   SO WHEN YOU SEE TEXT THAT'S STRUCK OUT, AND SO HERE

7     THAT'S "CAUSE RETRIEVAL AND STORAGE" AND "THE FIRST STORE,"

8     THAT'S THE TEXT THAT WAS THERE WHEN THE PATENT OFFICE

9     COMPLAINED.

10          AND THEN WHEN YOU SEE THE UNDERLINED TEXT, THAT'S TEXT

11    THAT APPLE REPLACED THE STRUCK OUT TEXT WITH, AND ANYTHING

12    THAT'S NOT STRUCK OUT OR UNDERLINED HAS JUST REMAINED THE SAME

13    THROUGH THIS REVISION.

14    Q.   SO BEFORE THIS CHANGE WAS MADE, DID THIS DRAFT CLAIM

15    LANGUAGE SAY "A SYNCHRONIZATION SOFTWARE COMPONENT WHICH IS

16    CONFIGURED TO CAUSE RETRIEVAL AND STORAGE OF STRUCTURED DATA

17    FROM THE FIRST STORE"?

18    A.   YES, PRECISELY.

19    Q.   AND WHAT DOES THE LANGUAGE SAY AFTER THE AMENDMENT?

20    A.   AFTER THE AMENDMENT, THEY REALIZED THAT THAT WAS A VERY

21    BROAD STATEMENT, SO THEY CHANGED IT TO SAY "CONFIGURED TO

22    SYNCHRONIZE THE STRUCTURED DATA FROM THE FIRST DATABASE WITH

23    THE STRUCTURED DATA FROM THE SECOND DATABASE," BECAUSE THAT'S

24    WHAT THE INVENTION DOES, IT SYNCHRONIZES THE FIRST DATABASE

25    WITH THE SECOND DATABASE.

1    Q.   DOES ANYTHING ABOUT THIS LANGUAGE IN THE FILE HISTORY

2    AFFECT YOUR OPINION THAT EACH OF THE SYNC ADAPTERS, INCLUDING

3    THE GMAIL SYNC ADAPTER AND THE EXCHANGE MAIL SYNC ADAPTER, ARE

4    CONFIGURED TO SYNCHRONIZE STRUCTURED DATA WITHIN THE MEANING OF

5    CLAIM 20 OF THE '414 PATENT?

6    A.   NO.  I READ THIS FILE HISTORY AS I FILED MY REPORTS AND I

7    DID MY ANALYSIS, AND IT JUST REINFORCED MY OPINION THAT THEY

8    ARE, IN FACT, CONFIGURED TO SYNCHRONIZE.

9    Q.   OKAY.  LET'S TURN TO A SLIGHTLY DIFFERENT TOPIC RELATING

10   TO INFRINGEMENT.

11       DID YOU SEE THE TRIAL TESTIMONY FROM AN ENGINEER WHO WORKS

12   FOR GOOGLE NAMED PAUL WESTBROOK?

13   A.   YES, MA'AM, I DID.

14   Q.   OKAY.  LET'S LOOK AT A COUPLE OF THINGS HE SAID ABOUT

15   MODIFICATIONS THAT SAMSUNG COULD HAVE MADE TO THE CODE ON THEIR

16   PHONES AND TABLETS.

17       COULD WE SEE TRIAL TRANSCRIPT 1655, LINES 17 TO 24.

18       MR. WESTBROOK, THE QUESTION WAS, "NOW, SPECIFICALLY, IS IT

19   POSSIBLE TO MODIFY THESE APPLICATIONS, THE GMAIL AND ANDROID

20   E-MAIL APPLICATIONS SO THEY SYNCHRONIZE ONLY WHEN THE USER IS

21   NOT USING THEM?"

22       AND HE ANSWERED, "YES, IT WOULD.

23       "QUESTION:  HOW WOULD YOU DO THAT?

24       "ANSWER:  WHEN THE U/I IS SHOWN TO THE USER, YOU WOULD

25   STOP SYNCHRONIZATION FROM HAPPENING AND YOU CAN START IT AGAIN

1        WHEN THE U/I IS NOT BEING SHOWN TO THE USER."

2            WHAT IS THE NATURE OF THIS CHANGE THAT MR. WESTBROOK WAS

3        SUGGESTED COULD HAVE BEEN MADE?

4        A.   WELL, WHAT HE'S SUGGESTING IS THAT GMAIL WOULDN'T INVOKE

5        THE SYNC ADAPTER WHILE IT WAS SHOWING THE USER A DISPLAY AND

6        SAYING THAT GMAIL WOULDN'T ACTUALLY SYNCHRONIZE MAIL WHILE THE

7        USER WAS USING GMAIL.

8        Q.   WHAT DOES THAT MEAN IN REAL LIFE IF I'VE GOT A SAMSUNG

9        SMARTPHONE AND I'M USING MY E-MAIL APP?

10       A.   WELL, AS HE EXPLAINED IN HIS TESTIMONY, THAT SYNC ADAPTER

11       IS THE THING THAT SYNCHRONIZES E-MAIL, IT'S THE THING THAT

12       SENDS AND RECEIVES E-MAIL.  SO WHAT THAT MEANS IS WHILE YOU

13       WERE USING THE GMAIL APPLICATION ITSELF, YOU COULDN'T SEND OR

14       RECEIVE E-MAIL.  YOU HAVE TO CLOSE IT TO ACTUALLY GET MAIL TO

15       SEND OR TO GET NEW MAIL TO COME IN.

16       Q.   SO NO SYNCHRONIZATION WHILE YOU'RE USING E-MAIL?

17       A.   THAT SEEMS TO BE WHAT HE'S SUGGESTING, YES.

18       Q.   OKAY.  SO IF SAMSUNG ACTUALLY MADE THIS CHANGE, WOULD THE

19       PHONES WITH THE CHANGED CODE PROVIDE THE USER ALL THE BENEFITS

20       OF THE '414 PATENT?

21       A.   WELL, NO, IT WOULDN'T PROVIDE BACKGROUND SYNCHRONIZATION.

22       Q.   OKAY.  COULD WE LOOK AT ANOTHER SUGGESTION HE MADE, TRIAL

23       TRANSCRIPT 1657, LINES 6 TO 9.

24            "QUESTION:  NOW, WOULD IT BE POSSIBLE TO MODIFY THE GMAIL

25       ANDROID APPLICATION SO IT DOES NOT UPDATE THE DATABASE TO

1        REFLECT CHANGES FROM THE USER?"

2               HE SAYS "YES, IT WOULD BE."

3               WHAT KIND OF CHANGE WAS HE SUGGESTING WOULD BE POSSIBLE

4        HERE?

5        A.   SO HERE I BELIEVE HE'S REFERRING TO THE LOCAL DATABASE,

6        THE ONE ON THE PHONE, AND SO WHAT HE'S SAYING IS AS YOU'RE

7        USING YOUR GMAIL APPLICATION ON THE PHONE, PRESUMABLY TYPING A

8        MESSAGE OR SOMETHING LIKE THAT, IT WOULDN'T SAVE THE CHANGES ON

9        THE PHONE.

10              AND SO IF YOU DIDN'T HAVE NETWORK CONNECTIVITY SO THAT IT

11       COULD PUSH THOSE CHANGES TO THE SERVER AND SYNC THEM BACK, YOU

12       WOULDN'T ACTUALLY BE ABLE TO SEE THEM ON THE PHONE, WHICH SEEMS

13       SORT OF ODD BECAUSE THEN YOU'D BE TRYING TO MAKE CHANGES ON THE

14       PHONE AND YOU WOULDN'T BE ABLE TO SEE WHAT YOU'D DONE.

15       Q.   WOULD A USER OF A PHONE THAT HAD CODE MODIFIED THE WAY

16       THAT MR. WESTBROOK SUGGESTED IN THE SECOND SUGGESTION HAVE THE

17       FULL BENEFITS OF THE INVENTION OF CLAIM 20 OF THE '414 PATENT?

18       A.   NO, THEY WOULDN'T.

19       Q.   OKAY.  LET'S TURN TO THE TOPIC OF VALIDITY OF THE '414

20       PATENT.

21              YOU HEARD AND UNDERSTOOD THE TESTIMONY THAT

22       PROFESSOR CHASE GAVE ABOUT VALIDITY OF THE '414 PATENT?

23       A.   YES, MA'AM, I DID.

24       Q.   OKAY.  AND I WANT TO REMIND YOU, FOR THE '414 PATENT, THE

25       DATE OF FILING OF THE APPLICATION AND SO THE RELEVANT DATE HERE

```
1      IS JANUARY 2007.  OKAY?

2      A.   YES, MA'AM.

3      Q.   ALL RIGHT.  HE TESTIFIED ABOUT TWO PIECES OF PRIOR ART.

4      LET'S TALK THE FIRST ONE, WHICH WAS SOMETHING CALLED EVOLUTION.

5           WHAT WAS EVOLUTION?

6      A.   SO EVOLUTION WAS A FANCY E-MAIL PROGRAM THAT RAN ON A

7      PARTICULAR VERSION OF LINUX SUSE, SO THAT'S JUST AN OPERATING

8      SYSTEM FOR A DESKTOP P.C.

9      Q.   WHAT IS YOUR OPINION REGARDING WHETHER THE EVOLUTION

10     SYSTEM INVALIDATES CLAIM 20 OF THE '414 PATENT?

11     A.   MY OPINION IS THAT IT DOES NOT.

12     Q.   AND WHAT IS THE BASIS FOR YOUR OPINION?

13     A.   WELL, IN DR. CHASE'S TESTIMONY, HE -- WHEN HE'S TALKING

14     ABOUT THE MAIL CLASS AS ONE OF THE CLASSES OF DATA THAT

15     SYNCHRONIZE, HE POINTS TO THIS THING CALLED THE MAIL SUMMARY

16     FILE AND HE SAYS THAT THAT MEETS THE CLAIM LIMITATION THAT

17     THERE'S A FIRST DATABASE, AND IT DOES NOT.

18     Q.   WHY DOES -- WELL, ACTUALLY, FIRST, CAN WE PUT CLAIM 20

19     BACK UP, MR. LEE.

20          CAN YOU SHOW US WHERE IN THE CLAIM THIS REQUIREMENT OF A

21     FIRST DATABASE IS?

22     A.   SURE.  SO IT'S -- IT'S MARKED AS D HERE, IT'S THE END OF

23     CLAIM 11, AND IT'S -- IN FACT, THIS IS THE AMENDMENT THAT APPLE

24     MADE IN THE FILE HISTORY PART WE WERE TALKING ABOUT.

25          SO IT'S VERY SPECIFIC THAT IT SAID YOU HAD TO SYNCHRONIZE
```

1      DATA FROM A FIRST DATABASE, WHICH IS ON THE DEVICE, WITH

2      STRUCTURED DATA FROM A SECOND DATABASE, WHICH IN THIS CASE IS

3      THE GMAIL SERVERS.

4      Q.   CAN YOU REMIND US WHAT STRUCTURED DATA IS?

5      A.   SURE.  SO IT'S JUST DATA THAT HAS A PARTICULAR FORMAT THAT

6      MAKES IT EASILY ACCESSIBLE.  I THINK I ACTUALLY HAVE A SLIDE ON

7      THAT IF YOU'D LIKE TO LOOK AT IT.

8      Q.   COULD WE LOOK AT -- WELL, I WOULD HAVE TO KNOW THE NUMBER

9      OF THAT SLIDE.

10          WHY DON'T WE LOOK AT THE PATENT AND LOOK AT FIGURE --

11              MR. BUROKER:  IT'S PDX 91.30.

12              MS. KREVANS:  91.30, MR. LEE.

13          THANK YOU, MR. BUROKER.

14     Q.   WHAT ARE YOU SHOWING US HERE?

15     A.   SURE.  SO THIS IS TWO FIGURES FROM THE PATENT ON THE

16     BOTTOM THERE WHICH THE PATENT IS USING TO DESCRIBE STRUCTURED

17     DATA, AND THOSE YOU MAY RECOGNIZE AS CARDS IN A ROLODEX FILE,

18     AND THEY'RE JUST STRUCTURED BECAUSE EACH FIELD IS VERY

19     DESCRIPTIVE.

20          AND YOU CAN SEE, FOR INSTANCE, ON THE RIGHT-HAND SIDE,

21     THERE ARE TWO PHONE NUMBERS, AND BECAUSE THE DATA STRUCTURED,

22     IT'S CLEAR WHICH ONE OF THOSE IS A HOME PHONE AND WHICH ONE IS

23     A CELL PHONE.

24     Q.   AND YOUR SLIDE IS HEADED "DIFFERENCE BETWEEN FLAT FILE AND

25     STRUCTURED DATA IN A DATABASE."

1           WHAT'S A FLAT FILE AND WHAT IS THE DIFFERENCE BETWEEN A

2    FLAT FILE AND STRUCTURED DATA IN A DATABASE?

3    A.    SURE.  SO A FLAT FILE IS RELEVANT BECAUSE THE MAIL SUMMARY

4    FILE THAT DR. CHASE POINTS TO IS VERY SIMILAR TO A FLAT FILE,

5    SO I'VE JUST SHOWN YOU ONE, AN EXAMPLE OF ONE -- THIS ISN'T THE

6    MAIL SUMMARY ONE, BUT IT'S AN EXAMPLE OF A FLAT FILE -- AND

7    WHAT YOU CAN SEE IS IT'S JUST ALL OF THE DATA JUST APPENDED ONE

8    AFTER ANOTHER JUST IN A BIG ROW.

9           AND SO YOU'LL SEE THAT THE DATA FOR MR. CARL BILODEAU AND

10   FOR MS. ROBIN ARTURO IS CONTAINED WITHIN THAT FILE.

11          BUT YOU CAN SEE, BECAUSE IT'S A FLAT FILE AND IT DOESN'T

12   HAVE ANY EASY INDEXING OR WAY TO GET THROUGH IT TO ACCESS A

13   PARTICULAR ENTRY IN IT, IT'S SORT OF A CLUMSY THING TO WORK

14   WITH AND NOT VERY EASY TO ACCESS.

15          AND COMPARE THAT TO THE VISUALIZATION THERE OF THOSE

16   ROLODEX CARDS, AND THAT'S A LOGICAL DEPICTION OF HOW A DATABASE

17   WORKS.  IT'S VERY NEATLY INDEXED AND QUICK TO ACCESS AND YOU

18   CAN JUMP TO ROBIN ARTURO'S ENTRY BECAUSE IT'S ALPHABETIZED OR

19   SOMETHING LIKE THAT.

20   Q.    OKAY.  AND JUST, AGAIN, SO WE UNDERSTAND THIS EXAMPLE, UP

21   THERE AT THE TOP WHEN YOU SHOW THE FLAT FILE, WHERE WE SEE

22   ROBIN ARTURO'S INFORMATION -- I GUESS ROBIN COULD BE A HE OR A

23   SHE, LET'S ASSUME SHE'S A SHE -- WHERE YOU SEE HER, SHE'S GOT

24   TWO PHONE NUMBERS.

25          CAN YOU TELL FROM THE FLAT FILE WHETHER THOSE PHONE

1    NUMBERS ARE A HOME NUMBER OR WORK NUMBER OR A CELL PHONE NUMBER

2    OR A FAX NUMBER?

3    A.   AS YOU CAN SEE, IT'S NOT EVIDENT FROM THE FILE ITSELF.

4    YOU'D HAVE TO READ THE APPLICATION TO FIGURE THAT OUT.

5    Q.   COULD YOU TELL THAT INFORMATION IF THIS INFORMATION WAS

6    STORED AS STRUCTURED DATA IN A DATABASE?

7    A.   YES, THE DATA HAS WHAT'S CALLED SCHEMA, WHICH IS THE

8    DEFINITION OF THAT PARTICULAR STRUCTURE, AND HOW TO READ AND

9    ACCESS IT.

10   Q.   OKAY.  DOES EVOLUTION, OR DID EVOLUTION, BEFORE

11   JANUARY 2007, STORE STRUCTURED DATA IN A DATABASE FOR EACH OF

12   THE REQUIRED DATA CLASSES THAT DR. CHASE RELIES ON?

13   A.   NO, IT DOES NOT.

14   Q.   WHICH ONE DID IT NOT STORE STRUCTURED DATA IN A DATABASE?

15   A.   WELL, I LOOKED AT ALL THE SOURCE CODE FOR EVOLUTION AND I

16   LOOKED AT THIS MAIL SUMMARY FILE, AND THAT MAIL SUMMARY FILE IS

17   NOT A DATABASE.  IT'S MUCH MORE SIMILAR TO A FLAT FILE.

18        IN FACT, ALL OF THE PROGRAMMER'S COMMENTS ABOUT THE MAIL

19   SUMMARY FILE CALL IT A MAIL SUMMARY FILE.  THEY DON'T CALL IT A

20   DATABASE, WHICH IS IMPORTANT BECAUSE THERE ARE DATABASES IN

21   EVOLUTION AND WHEN THE PROGRAMMERS WRITE COMMENTS ABOUT THOSE,

22   THEY CALL IT A DATABASE.  SO THEY'RE MAKING A CLEAR DISTINCTION

23   EVEN IN THE CODE ABOUT WHAT'S A DATABASE AND WHAT'S NOT, AND

24   THE MAIL SUMMARY FILE IS NOT.

25   Q.   IN SUM, PROFESSOR SNOEREN, WHAT IS YOUR OPINION AS TO

1    WHETHER EVOLUTION DISCLOSES ALL OF THE LIMITATIONS OF CLAIM 20

2    OF THE '414 PATENT?

3    A.   MY OPINION IS IT DOES NOT.

4    Q.   WHAT IS YOUR OPINION AS TO WHETHER CLAIM 20 OF THE '414

5    PATENT IS INVALID, EITHER AS ANTICIPATED OR OBVIOUS OVER

6    EVOLUTION?

7    A.   MY OPINION IS THAT IT IS NOT INVALID.  IT IS VALID.

8    Q.   OKAY.  NOW, DR. CHASE TESTIFIED ABOUT A SECOND PIECE OF

9    PRIOR ART.  HE CALLED IT WINDOWS MOBILE.

10   A.   YES, MA'AM.

11   Q.   OKAY.  AND WHAT WAS WINDOWS MOBILE?

12   A.   SO WINDOWS MOBILE WAS AN OPERATING SYSTEM, OR I THINK THEY

13   DESCRIBED IT AS AN ENVIRONMENT, THAT RAN ON HANDHELD DEVICES,

14   AND I THINK DR. CHASE SHOWED IT RUNNING ON A COMPAQ IPAQ, WHICH

15   WAS A LITTLE HANDHELD PDA.

16   Q.   OKAY.  NOW, DR. CHASE EXPRESSED AN OPINION THAT WINDOWS

17   MOBILE ANTICIPATES CLAIM 20.  IS THAT RIGHT?

18   A.   I BELIEVE THAT IS, YES.

19   Q.   DID HE EXPRESS ANY OPINION THAT WINDOWS MOBILE RENDERS

20   CLAIM 20 OBVIOUS?

21   A.   NO, MA'AM.

22   Q.   ALL RIGHT.  LET'S TALK ABOUT ANTICIPATION THEN.

23        WHAT IS YOUR OPINION AS TO WHETHER WINDOWS MOBILE

24   ANTICIPATES CLAIM 20?

25   A.   IT DOES NOT.

FURTHER REDIRECT SNOEREN

1    Q.   COULD WE SEE PDX 91 -- ACTUALLY, FIRST, COULD WE SEE

2    CLAIM 20.

3         WOULD YOU POINT OUT TO THE JURY WHICH PORTIONS OF CLAIM 20

4    WINDOWS MOBILE DID NOT DISCLOSE?

5    A.   SURE.  SO, AGAIN, IN CLAIM 20 WE NEED THOSE THREE

6    DIFFERENT SOFTWARE SYNCHRONIZATION COMPONENTS, AND EACH ONE OF

7    THEM HAS TO MEET ALL OF THE LIMITATIONS FROM 11.

8         AND IN PARTICULAR, THE ONES THAT ARE IMPORTANT WITH THE

9    WINDOWS MOBILE IS THEY HAVE TO BE CONFIGURED TO SYNCHRONIZE,

10   AND THEY HAVE TO PROVIDE A THREAD.

11   Q.   OKAY.  AND WE -- WE SEE THOSE LIMITATIONS.  THE PROVIDING

12   A THREAD IS IN 11D; IS THAT RIGHT?

13   A.   YES, MA'AM.

14   Q.   OKAY.  AND ALSO CONFIGURED TO SYNCHRONIZE?

15   A.   YES, MA'AM.

16   Q.   AND THE REQUIREMENT THAT THERE BE THREE OF THEM IS IN WHAT

17   YOU'VE GOT UP THERE LABELED AS E?

18   A.   YES, MA'AM.

19   Q.   OKAY.  COULD WE SEE YOUR SLIDE 91.69.

20        WHAT ARE YOU SHOWING US ON 91.69, PROFESSOR SNOEREN?

21   A.   WELL, IN THE BACKGROUND WHAT I'VE DONE IS REPRODUCED A

22   DIAGRAM THAT DR. CHASE SHOWED AS PART OF HIS TESTIMONY, WHICH I

23   BELIEVE CAME FROM ONE OF THE MICROSOFT DOCUMENTS DESCRIBING

24   WINDOWS MOBILE.

25        AND WHAT I'VE DONE IS I'VE JUST SORT OF HIGHLIGHTED THE

1    IMPORTANT PARTS IN YELLOW, THE IMPORTANT PARTS FOR THE CLAIM

2    ANYWAY, AND I'VE BLOWN THEM UP HERE ON THE RIGHT-HAND SIDE JUST

3    SO WE CAN ALL READ THEM AND TALK ABOUT THEM.

4    Q.   SO THIS IS ACTUALLY A SLIDE THAT DR. CHASE USED?

5    A.   THE BACKGROUND IS, YES.  THE FRONT PART IS SOMETHING THAT

6    I'VE JUST BLOWN UP SO WE CAN ALL SEE IT EASILY.

7    Q.   OKAY.  JUST SO WE'RE CLEAR, WHAT'S HERE BLOWN UP IS WHAT'S

8    IN YELLOW FROM C CHASE'S SLIDE?

9    A.   PRECISELY.

10   Q.   OKAY.  USING THIS SLIDE, CAN YOU EXPLAIN TO US WHAT YOU

11   FOUND MISSING FROM THE WINDOWS MOBILE SYSTEM THAT IS REQUIRED

12   BY CLAIM 20?

13   A.   SURE.  SO WHEN DR. CHASE TESTIFIED ABOUT SOFTWARE

14   SYNCHRONIZATION COMPONENTS THAT WERE CONFIGURED TO SYNCHRONIZE

15   A PARTICULAR DATA CLASS, HE POINTED TO THOSE TOP THREE BOXES,

16   HE USED THE WORD "PROVIDER," AND EACH ONE OF THOSE ARE, INDEED,

17   SOFTWARE SYNCHRONIZATION COMPONENTS AND THEY ARE, INDEED,

18   CONFIGURED TO SYNCHRONIZE THOSE PARTICULAR DATA CLASSES.

19        BUT I'VE LOOKED AT THE SOURCE CODE AND, IN FACT, DR. CHASE

20   EVEN TESTIFIED IN HIS TESTIMONY THAT NONE OF THOSE PROVIDE A

21   THREAD.

22        SO NONE OF THOSE THREE THINGS MEET THE LIMITATIONS OF THE

23   CLAIM.

24   Q.   NONE OF WHICH THREE THINGS?

25   A.   NONE OF THE TOP THREE THINGS, THE PROVIDERS FOR EITHER

1        E-MAIL, CONTACTS, OR CALENDAR.

2        Q.   OKAY.

3        A.   NOW, DR. CHASE DID TESTIFY THAT THERE IS A SOFTWARE

4    SYNCHRONIZATION COMPONENT THAT PROVIDES A THREAD, AND THERE IS,

5    HE'S RIGHT.  THE SYNC CLIENT COMPONENT DOWN IN THE BOTTOM DOES

6    PROVIDE A THREAD AND, IN FACT, IT PROVIDES A THREAD THAT EACH

7    ONE OF THOSE OTHER CLASSES USE.

8           BUT, AGAIN, I'VE LOOKED AT THE SOURCE CODE AND THAT SYNC

9    CLIENT IS NOT CONFIGURED -- YEAH, THE SYNC CLIENT IS NOT

10   CONFIGURED TO SYNCHRONIZE ANY PARTICULAR CLASS OF DATA AND, IN

11   FACT, THAT SYNC CLIENT SYNCHRONIZES ALL THREE OF THOSE CLASSES

12   OF DATA.  IT JUST GOES ONE BY ONE IN A GIANT LOOP.

13       Q.   SO IS THERE ANYWHERE IN WINDOWS MOBILE A SOFTWARE

14   COMPONENT THAT IS SPECIFIC TO A DATA CLASS, SUCH AS E-MAIL,

15   CONTACTS, OR CALENDAR, AND ALSO PROVIDES A THREAD TO

16   SYNCHRONIZE THAT DATA CLASS?

17       A.   NO, MA'AM, THERE'S NOT.

18       Q.   OKAY.  WHAT IS THE SIGNIFICANCE OF THAT WITH RESPECT TO

19   CLAIM 20?

20       A.   WELL, AGAIN, AS WE'VE DISCUSSED, CLAIM 20 REQUIRES THAT

21   YOU HAVE THREE SOFTWARE SYNCHRONIZATION COMPONENTS, AND EACH

22   ONE OF THEM IS BOTH CONFIGURED TO SYNCHRONIZE A PARTICULAR DATA

23   CLASS AND PROVIDE A THREAD.

24       Q.   WHAT IS YOUR OVERALL OPINION AS TO WHETHER THE WINDOWS

25   MOBILE SYSTEM ANTICIPATES CLAIM 20?

1     A.   MY OPINION IS IT DOES NOT.

2     Q.   WHAT IS YOUR OVERALL CONCLUSION IN THIS CASE,

3     PROFESSOR SNOEREN, ABOUT WHETHER CLAIM 20 OF THE '414 PATENT IS

4     VALID AND WHETHER IT IS INFRINGED BY EACH OF THE TEN ACCUSED

5     PRODUCTS?

6     A.   MY OPINION IS THAT IT IS, AS IT WAS PRESUMED, VALID AND

7     THAT EACH OF THE TEN ACCUSED SAMSUNG PRODUCTS DO, IN FACT,

8     INFRINGE THE ASSERTED CLAIM.

9     Q.   AND AS AN EXPERT IN COMPUTER SCIENCE, WHAT IS YOUR VIEW

10    ABOUT THE VALUE OF CLAIM 20 OF THE '414 PATENT?

11    A.   I THINK THAT BACKGROUND SYNC PROVIDES A VERY VALUABLE

12    FUNCTIONALITY THAT WE ALL FIND GREAT USE OF IN DEVICES LIKE THE

13    ACCUSED DEVICES.

14         MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

15         THE COURT:  ALL RIGHT.  THE TIME IS NOW 4:06.

16         MR. PAK:  YOUR HONOR, COULD I HAVE JUST A FEW SECONDS

17    TO SET UP?

18         THE COURT:  YES, PLEASE.  SURE.

19       (PAUSE IN PROCEEDINGS.)

20         MR. PAK:  I'M READY TO GO.

21         THE COURT:  ALL RIGHT.  IT'S NOW 4:06.

22       GO AHEAD, PLEASE.

23                  **FURTHER RECROSS-EXAMINATION**

24    BY MR. PAK:

25    Q.   GOOD AFTERNOON, DR. SNOEREN.

1      A.   GOOD AFTERNOON.

2      Q.   NOW, DR. SNOEREN, YOU WOULD AGREE WITH ME THAT THE ACTUAL

3      LANGUAGE OF A CLAIM MATTERS; CORRECT?

4      A.   ABSOLUTELY.

5      Q.   YOU CAN'T ADD WORDS AND YOU CAN'T SUBTRACT WORDS FROM THE

6      CLAIM LANGUAGE; CORRECT?

7      A.   NO.  YOU'D HAVE TO INTERPRET THE LANGUAGE AS ONE SKILLED

8      IN THE ART AT THE TIME THE CLAIM WOULD HAVE DONE SO.

9      Q.   SIR, YOU WOULD AGREE WITH ME THAT WHEN YOU DO YOUR

10     INFRINGEMENT ANALYSIS, DETAILS MATTER?

11     A.   YES.

12     Q.   DETAILS MATTER WHEN YOU DO YOUR PRIOR ART ANALYSIS AS

13     WELL; CORRECT?

14     A.   YES.

15     Q.   AND YOU UNDERSTAND THAT THE SAME CLAIM SHOULD BE

16     INTERPRETED IN THE SAME WAY WHETHER YOU'RE LOOKING AT IT FOR

17     INFRINGEMENT PURPOSES OR YOU'RE LOOKING AT IT FOR PRIOR ART

18     PURPOSES; RIGHT?

19     A.   YES, THAT'S ABSOLUTELY TRUE.

20     Q.   YOU'RE SUPPOSED TO HAVE ONE STANDARD; RIGHT?

21     A.   I'M SORRY?

22     Q.   ONE STANDARD FOR THE CLAIM?

23     A.   YES.

24     Q.   OKAY.  NOW, DR. SNOEREN, I WANT TO SHOW YOU THE CLAIM

25     LANGUAGE OF THE '414 PATENT.

1          AND LET'S PUT UP SDX 3632.

2          DR. SNOEREN, YOU WOULD AGREE WITH ME THAT THE LANGUAGE OF

3     THE CLAIM AS ISSUED DOES NOT CONTAIN THE WORD "CAUSE"; CORRECT?

4     A.   NO.  IT IS IN THE PREAMBLE OF CLAIM 11.

5     Q.   THANK YOU.  BUT LOOKING AT THE SYNCHRONIZATION COMPONENT,

6     IT SAYS -- SYNCHRONIZATION SOFTWARE COMPONENT IS NOT DESCRIBED

7     IN THE ACTUAL CLAIM LANGUAGE AS CAUSING SOMETHING TO OCCUR;

8     CORRECT?

9     A.   SO IT DOES SAY SYNCHRONIZATION COMPONENT WHICH IS

10    CONFIGURED TO SYNCHRONIZE, THAT'S ABSOLUTELY TRUE.

11    Q.   THE WORD "CAUSE" WAS REMOVED DURING PROSECUTION; CORRECT?

12    A.   MULTIPLE WORDS WERE REMOVED, "CAUSE," "RETRIEVE,"

13    "STORAGE" WAS REMOVED.

14    Q.   "CAUSE" WAS ONE OF THE WORDS THAT WAS REMOVED DURING

15    PROSECUTION BY APPLE; CORRECT?

16    A.   YES, SIR.

17    Q.   AND AS STATED IN THE CLAIM LANGUAGE, IT SAYS THE SOFTWARE,

18    "SYNCHRONIZATION SOFTWARE COMPONENT WHICH IS CONFIGURED TO

19    SYNCHRONIZE," IT DOES NOT SAY "WHICH IS CAUSING CONFIGURATION

20    OF SYNCHRONIZATION"; CORRECT?

21    A.   IT ONLY SAYS WHAT IT SAYS, SIR.

22    Q.   AND THAT'S A STANDARD THAT YOU'RE SUPPOSED TO APPLY IN

23    ANALYZING BOTH PRIOR ART AND INFRINGEMENT ISSUES; CORRECT?

24    A.   YES, SIR.

25    Q.   NOW, DR. SNOEREN, YOU WOULD ALSO AGREE WITH ME THAT IN

```
 1        THIS CLAIM, THE LANGUAGE SAYS "PROVIDE A THREAD"; TRUE?  A

 2        PROCESSING THREAD IS PROVIDED BY A USER APPLICATION?

 3        A.   YES, IT'S PASSIVE, EXACTLY.  IT SAYS "PROVIDED BY."

 4        Q.   IT DOESN'T SAY "CREATED," DOES IT, SIR?

 5        A.   NO.

 6        Q.   IT DOESN'T SAY "INVOKED," DOES IT, SIR?

 7        A.   NO.

 8        Q.   IT DOESN'T SAY "SPAWNED"?

 9        A.   NO.  THEY CHOSE THE WORD "PROVIDED."

10        Q.   LET ME SHOW YOU -- AND YOU HAD A CHANCE TO CONSIDER THE

11        DEPOSITION TESTIMONY OF ONE OF THE INVENTORS OF THIS PATENT,

12        MR. FREEMAN; CORRECT?

13        A.   YES, SIR, I DID.

14             MR. PAK:  YOUR HONOR, I'D LIKE TO PRESENT SOME

15        DEPOSITION TESTIMONY FROM MR. FREEMAN'S DEPOSITION, PAGE 115,

16        LINES 6 THROUGH 15.

17             THE COURT:  GO AHEAD, PLEASE.

18             MS. KREVANS:  YOUR HONOR, UNLESS THIS TESTIMONY IS

19        ALREADY IN THE RECORD, IT'S NOT PROPER TO USE IT WITH THIS

20        WITNESS.

21             MR. PAK:  YOUR HONOR, THIS IS SOMETHING THAT HE

22        CONSIDERED DURING HIS EXPERT REPORT ON THIS VERY ISSUE OF

23        PROVIDING A THREAD.

24             MS. KREVANS:  YOUR HONOR, IF THEY WANTED TO READ

25        DEPOSITION TESTIMONY TO THE JURY, THEY SHOULD HAVE DESIGNATED
```

1        IT IN A DESIGNATION.

2               MR. PAK:  IT'S 30(B)(6) TESTIMONY.

3               THE COURT:  IT'S OF FREEMAN, MITCHELL FREEMAN OR THE

4        INVENTOR?

5               MR. PAK:  THE INVENTOR FREEMAN.

6               THE COURT:  OVERRULED.

7           GO AHEAD, PLEASE.

8        BY MR. PAK:

9        Q.   DR. SNOEREN, THIS IS THE TESTIMONY OF THE INVENTOR FROM

10       APPLE ON THIS PATENT.

11           "QUESTION:  AND WHAT DOES IT MEAN FOR A SYNCHRONIZATION

12       PROCESSING THREAD TO BE PROVIDED BY A SYNCHRONIZATION SOFTWARE

13       COMPONENT?

14           THE WITNESS TESTIFIED "A COMPONENT, WHICH IS SOME SOFTWARE

15       APPLICATION, WOULD HAVE EXECUTING CODE AND THAT EXECUTING CODE

16       MUST EXECUTE IN A THREAD.  THUS, THAT THREAD WOULD BE PROVIDED

17       BY THE SYNCHRONIZATION COMPONENT."

18           DO YOU SEE THAT?

19       A.   I SEE THAT.

20       Q.   YOU UNDERSTAND, SIR, THAT IN THAT TESTIMONY FROM THE

21       INVENTOR FROM APPLE, HE DID NOT USE THE WORD "SPAWN," "INVOKE,"

22       OR "CREATE"; CORRECT?

23       A.   THAT'S CORRECT.

24       Q.   AND WHAT HE'S SAYING HERE IN THIS TESTIMONY, YOUR HONOR --

25       DR. SNOEREN, IS DIFFERENT THAN YOUR INTERPRETATION OF PROVIDING

```
 1      A THREAD; ISN'T THAT TRUE?

 2      A.   NO, THAT'S NOT.  YOU'RE SHOWING JUST ONE QUESTION AND

 3      ANSWER, AND IF YOU'D LIKE TO SHOW THE WHOLE PAGE, I'D BE HAPPY

 4      TO EXPLAIN TO YOU THE PRECEDING QUESTION AND ANSWER THAT GIVES

 5      YOU THE CONTEXT FOR THIS ANSWER WHERE HE MAKES IT VERY CLEAR

 6      HE'S SAYING THE EXACT SAME THING THAT I AM.

 7      Q.   ARE YOU SAYING THAT PROVIDING A THREAD IS THE SAME THING

 8      AS CREATING A THREAD, SIR?  YES OR NO?

 9      A.   YES, SIR.  I'VE SAID THAT, AND I'LL SAY IT AGAIN.

10           MR. PAK:  YOUR HONOR, I'D LIKE TO SHOW THE DEPOSITION

11      TESTIMONY OF DR. SNOEREN, AND I BELIEVE THIS ONE IS FROM

12      PAGE 299 TO PAGE 300 FROM HIS DEPOSITION TRANSCRIPT.

13           THE COURT:  GO AHEAD, PLEASE.

14           MR. PAK:  "QUESTION" -- AND THIS IS AT THE BOTTOM,

15      MR. KOTARSKI -- "I UNDERSTAND THERE'S A DISPUTE AMONG THE

16      EXPERTS, AND I DON'T MEAN TO NECESSARILY HAVE YOU ADOPT

17      DR. CHASE'S CONSTRUCTION.  SO MY UNDERSTANDING OF CLAIM -- OF

18      THE DISPUTE IS THAT YOU SAY THAT THE WORD PROVIDING IN CLAIM 11

19      REQUIRES CREATING A THREAD; IS THAT FAIR?

20           "ANSWER:  I SAY IT REQUIRES PROVIDING THE THREAD, WHICH IS

21      THE PLAIN LANGUAGE INTERPRETATION.  I'M NOT QUITE SURE WHAT YOU

22      MEAN BY 'CREATE.'  I MEAN, TECHNICALLY THERE IS NO CREATE."

23           THAT'S THE SWORN TESTIMONY YOU GAVE UNDER OATH, SIR,

24      RIGHT?

25      A.   YES, I BELIEVE THAT --
```

1    Q.   DR. SNOEREN?

2    A.   I BELIEVE IN THE NEXT QUESTION, I SAID "CLARIFY" OR

3    "SUBSTANTIATE" --

4    Q.   I'M ON THE CLOCK HERE, DR. SNOEREN.  IS THAT THE SWORN

5    TESTIMONY YOU GAVE UNDER OATH?

6    A.   ABSOLUTELY.

7    Q.   ONE LAST QUESTION ON THE '959 PATENT.  DR. SNOEREN, ISN'T

8    IT TRUE THAT A HEURISTIC FOR LOCATING INFORMATION, WHICH IS THE

9    LANGUAGE IN THE PATENT CLAIM, IS DIFFERENT THAN A HEURISTIC FOR

10   BLENDING OR FUSING SEARCH RESULTS?  ISN'T THAT TRUE?

11   A.   WELL, IT DEPENDS WHAT THE BLENDING IS DOING OR WHY IT'S

12   DOING IT.

13   Q.   YES OR NO, SIR?  IS A HEURISTIC FOR LOCATING INFORMATION

14   THE SAME OR DIFFERENT THAN A HEURISTIC FOR BLENDING SEARCH

15   RESULTS?

16   A.   AGAIN, IT COULD BE BOTH.

17   Q.   YOU DON'T HAVE A YES OR NO ANSWER ON THAT TODAY?

18   A.   NO.  I THINK WE DISCUSSED THIS.  IT CAN, IN CERTAIN

19   INSTANCES, LOCATE INFORMATION, AND THERE ARE CERTAIN INSTANCES

20   OF BLENDING THAT DON'T LOCATE INFORMATION.

21         MR. PAK:  YOUR HONOR, I'D LIKE TO SHOW THE DEPOSITION

22   TRANSCRIPT OF DR. SNOEREN ON PAGE 232, LINE 18 TO 233, LINE 10.

23         THE COURT:  GO AHEAD, PLEASE.

24         MR. PAK:  "QUESTION:  IF I TAKE THE SAME

25   FUNCTIONALITY OR CODE, BUT NOW IT'S INSIDE OF A HEURISTIC

1        MODULE, DO YOU BELIEVE THAT SUCH CODE OR FUNCTIONALITY FOR

2        BLENDING SEARCH RESULTS CAN SATISFY CLAIM 24?

3              ANSWER FROM DR. SNOEREN:  "AGAIN, I DON'T KNOW WHAT CODE

4        YOU'RE TALKING ABOUT.  THE GLOBAL HEURISTICS, AS WE'VE

5        DESCRIBED, DO A DIFFERENT THING THAN THE PLURALITY OF HEURISTIC

6        MODULES.  THE PLURALITY OF HEURISTIC MODULES LOCATE

7        INFORMATION, PLURALITY OF LOCATIONS.

8              "THE GLOBAL HEURISTICS MAY, AS WE'VE DISCUSSED, FUSE,

9        ORDER, THAT SORT OF THING TO THOSE RESULTS:

10             "SO IF YOU TOOK CODE THAT EXISTED TO DO ONE OF THOSE

11        THINGS, JUST BECAUSE YOU PUT IN A MODULE, DIDN'T PUT IT IN A

12        MODULE, DOESN'T CHANGE THE FUNCTIONALITY, SO IT MAY NOT

13        ACTUALLY DO WHAT THE OTHER THING NEEDED TO DO."

14             THAT WAS YOUR SWORN TESTIMONY, RIGHT, SIR?

15        A.   YES, SIR.

16             MR. PAK:  YOUR HONOR, I PASS THE WITNESS.

17             THE COURT:  ALL RIGHT.  TIME IS NOW 4:13.

18        IS THERE ANY REDIRECT?

19             MS. KREVANS:  JUST ONE QUESTION, YOUR HONOR, I THINK.

20             THE COURT:  GO AHEAD.  TIME IS STILL 4:13.

21                       **FURTHER REDIRECT EXAMINATION**

22        BY MS. KREVANS:

23        Q.   PROFESSOR SNOEREN, MR. PAK SHOWED YOU SOME LANGUAGE OUT OF

24        YOUR DEPOSITION AND ASKED YOU A QUESTION, AND YOU WERE TRYING

25        TO TELL HIM THERE WAS SOMETHING MORE YOU SAID IN THE DEPOSITION

1     THAT YOU THOUGHT EXPLAINED THE POINT.

2          COULD YOU JUST TELL US WHAT THAT WAS?

3     A.   SURE.  DR. PAK ASKED ME A QUESTION ABOUT A PARTICULAR

4     WORD, WHICH IS "CREATE," WHICH MAY HAVE A PLAIN LANGUAGE

5     MEANING THAT HE HAD IN HIS MIND.

6          BUT I WANTED TO MAKE SURE WE WERE BEING VERY PRECISE ABOUT

7     WHAT HE ACTUALLY MEANT, SO I WENT ON TO EXPLAIN TO HIM THAT

8     THERE ARE OTHER TERMS WE USE TECHNICALLY, INCLUDING THE WORD

9     "SUBSTANTIATE," THAT MEAN THE SAME THING AS "PROVIDING."

10              MS. KREVANS:  NOTHING FURTHER, YOUR HONOR.

11              THE COURT:  ALL RIGHT.  TIME IS NOW 4:14.

12          MAY THIS WITNESS BE EXCUSED, AND IS IT -- I ASSUME IT'S

13     NOT SUBJECT TO RECALL.

14              MR. PAK:  I DON'T THINK WE HAVE ANY MORE RECALLS

15     LEFT, YOUR HONOR.

16          (LAUGHTER.)

17              THE COURT:  ALL RIGHT.  AND YOU AGREE, RIGHT,

18     MS. KREVANS?

19              MS. KREVANS:  ABSOLUTELY, YOUR HONOR.

20              THE COURT:  ALL RIGHT.  YOU ARE EXCUSED.

21              THE WITNESS:  THANK YOU.

22          (PAUSE IN PROCEEDINGS.)

23              THE COURT:  ARE YOU READY?

24              MR. MCELHINNY:  I AM READY, YOUR HONOR.

25              THE COURT:  ALL RIGHT.  PLEASE CALL YOUR NEXT

1    WITNESS.

2              MR. MCELHINNY:  WE WOULD CALL, RECALL

3    PROFESSOR ANDREW COCKBURN.

4              **(PLAINTIFF'S WITNESS, ANDREW COCKBURN, WAS PREVIOUSLY**

5    **SWORN.)**

6              THE COURT:  SIR, YOU ARE STILL UNDER OATH.

7         OKAY.  TIME IS 4:16.  GO AHEAD, PLEASE.

8                    **FURTHER REDIRECT EXAMINATION**

9    BY MR. MCELHINNY:

10   Q.   SO IT'S JUST YOU AND ME, WE'VE GOT ALL DAY THURSDAY, MOST

11   OF FRIDAY, WE'RE NOT ON THE CLOCK, TALK SLOWLY.  OKAY?

12        WERE YOU IN THE COURTROOM DURING THE TESTIMONY OF

13   PROFESSOR GREENBERG?

14   A.   YES, I WAS.

15   Q.   DR. GREENBERG TALKED ABOUT THE SLIDE TO UNLOCK PATENT, THE

16   '721.

17        DO YOU RECALL THAT?

18   A.   YES, I DO.

19   Q.   SO THAT WE'RE CLEAR, WHEN YOU TESTIFIED ABOUT THE '721,

20   HOW MANY DIFFERENT SAMSUNG MODELS DID YOU ACCUSE?

21   A.   THERE WERE SIX DIFFERENT MODELS.

22   Q.   AND WHEN DR. GREENBERG GOT A CHANCE, HOW MANY OF THOSE SIX

23   MODELS DID HE SAY DID NOT INFRINGE?

24   A.   ONE, THE GALAXY NEXUS.

25   Q.   WHAT DID HE SAY DID INFRINGEMENT FOR THE OTHER FIVE MODELS

1      THAT WE -- WHAT, IF ANYTHING, DID HE SAY ABOUT THE OTHER FIVE

2      MODELS THAT WE ACCUSE?

3      A.   NOTHING.  HE DIDN'T ADDRESS INFRINGEMENT FOR THE OTHER

4      FIVE.

5      Q.   OKAY.  SO LET'S TALK THEN ABOUT WHAT HE DID SAY ABOUT THE

6      GALAXY NEXUS.  WHY DID HE SAY THAT THE GALAXY NEXUS PHONE DID

7      NOT INFRINGE THE '721 PATENT?

8      A.   HE SAID THAT THE IMAGE CHANGES ON CONTACT AND THAT,

9      THEREFORE, THE DEVICE DID NOT INFRINGE.

10     Q.   LET'S LOOK AT 7 -- SDX 2713, PLEASE.

11          CAN YOU ILLUSTRATE THAT FOR US, PLEASE, PROFESSOR?

12     A.   SURE.  ON THE TOP ROW WE SEE THE ICE CREAM SANDWICH

13     VERSION OF THE GALAXY NEXUS, AND ON THE BOTTOM ROW, THE JELLY

14     BEAN VERSION.  IT'S THE LEFT-HAND FOUR IMAGES THAT ARE RELEVANT

15     HERE.

16          DR. GREENBERG SAID -- I'M SORRY.  WHAT THESE IMAGES ARE

17     SHOWING, THE LEFT-HAND ROW -- SORRY -- THE LEFT-HAND COLUMN

18     SHOWS THE STATE OF THE DEVICE BEFORE THE FINGER TOUCH IS DOWN,

19     AND THE RIGHT-HAND COLUMN SHOWS THE STATE OF THE DEVICE

20     IMMEDIATELY AFTER THE FINGER MAKES CONTACT WITH THE IMAGE.

21          SO YOU SEE ON THE ICE CREAM SANDWICH VERSION, THE TOP ROW,

22     THE IMAGE CHANGES FROM A SMALL CIRCLE WITH A PADLOCK INSIDE IT

23     TO A SLIGHTLY LARGER CIRCLE ON CONTACT.

24          AND IN THE JELLY BEAN VERSION IN THE BOTTOM ROW, IT

25     CHANGES FROM THE SMALL CIRCLE WITH A PADLOCK TO AN IMAGE THAT

1    IS COMPOSED OF A SERIES OF DOTS, CONCENTRIC CIRCLES OF DOTS IN

2    THE BACKGROUND, AND A SPOTLIGHT THAT MOVES WITH THE FINGER THAT

3    ILLUMINATES THOSE DOTS.

4    Q.   AND SO THAT IT'S CLEAR, AFTER THAT CHANGE, DOES THAT IMAGE

5    CONTINUE TO SLIDE OVER TO THE LOCK THAT'S SHOWN?

6    A.   BOTH OF THE IMAGES, THE CIRCLE ON THE TOP AND THE

7    SPOTLIGHT ON THE BOTTOM, MOVE WITH THE FINGER CONTINUOUSLY.

8    Q.   BUT PROFESSOR GREENBERG SAID THAT BECAUSE THE ORIGINAL

9    IMAGE CHANGED, SOMEHOW THAT RELEASED IT FROM INFRINGE.  WAS

10   THAT HIS ARGUMENT?

11   A.   THAT'S CORRECT, THAT'S HIS ARGUMENT.

12   Q.   LET ME GUESS.  DO YOU AGREE WITH THAT ARGUMENT?

13   A.   I DISAGREE.

14   Q.   AND WHY?

15   A.   PROFESSOR GREENBERG IS IGNORING THE SPECIFICATION FOR THE

16   PATENT, WHICH IS VERY CLEAR THAT THE IMAGE CAN CHANGE.  HE'S

17   ALSO --

18   Q.   LET'S PUT THAT UP SO THAT'S CLEAR.  LET'S PUT UP JX 10,

19   WHICH IS THE PATENT, AT PAGE 24, COLUMN 12, LINES 40 TO 47,

20   PLEASE.

21        IS THIS THE SPECIFICATION THAT YOU'RE TALKING ABOUT?

22   A.   THIS IS THE PIECE THAT'S RELEVANT HERE.

23   Q.   ALL RIGHT.  I INTERRUPTED YOU.  PLEASE GO AHEAD.

24   A.   IT DIRECTLY STATES THAT "THE UNLOCK IMAGE MAY BY ANIMATED,

25   FOR EXAMPLE, THE ARROW IN ON THE UNLOCK IMAGE MAY APPEAR AND

1     DISAPPEAR IN A PULSE-LIKE MANNER," AND THAT THINGS MAY EMANATE

2     FROM ONE END OF THE CHANNEL.

3          SO IT'S DESCRIBING VERY CLEARLY THAT THIS UNLOCK IMAGE CAN

4     CHANGE IN ITS VISUAL PORTRAYAL.

5          THE CLAIM ALSO MAKES THAT CLEAR.

6     Q.   LET'S LOOK AT PDX 97.90 PLEASE.

7          WHAT HAVE WE GOT HERE?

8     A.   SO IT'S ELEMENT G THAT'S RELEVANT HERE.

9     PROFESSOR GREENBERG DIRECTED YOU TO THE FIRST HALF OF THAT

10    ELEMENT TO CONTINUOUSLY MOVE THE UNLOCK IMAGE IN ACCORDANCE

11    WITH THE CONTACT, BUT HE IGNORED THE LATTER HALF OF THAT SAME

12    ELEMENT, WHICH SPECIFICALLY TEACHES THAT THE UNLOCK IMAGE IS A

13    GRAPHICAL, INTERACTIVE USER INTERFACE OBJECT WITH WHICH A USER

14    INTERACTS.

15    Q.   ALL RIGHT.  I WANT TO TALK ABOUT ANOTHER SUBJECT, WHICH IS

16    A SUBJECT THAT'S COME UP A COUPLE OF TIMES, THIS PUZZLE PIECE,

17    PUZZLE TO UNLOCK.

18         DO YOU KNOW WHAT I'M TALKING ABOUT?

19    A.   YES, I DO.

20    Q.   I THINK, WHEN YOU AND I WERE LAST HERE, WE TALKED ABOUT

21    HOW, IN OPENING, SAMSUNG'S COUNSEL USED THAT AS A DEMONSTRATION

22    AND MOVED IT AROUND AND SAID THIS DOESN'T INFRINGE THE '721

23    PATENT.

24    A.   THAT'S RIGHT.

25    Q.   DID PROFESSOR GREENBERG SAY THAT PUZZLE UNLOCK DID NOT

1        INFRINGE THE '721 PATENT?

2        A.   NO, HE DID NOT.

3        Q.   DID ANY SAMSUNG WITNESS, TESTIFYING UNDER OATH, TAKE THE

4        POSITION THAT PUZZLE UNLOCK DOES NOT INFRINGE THIS PATENT?

5        A.   NONE THAT I SAW.

6        Q.   WHAT IS YOUR CONCLUSION, AGAIN SO THAT WE HAVE IT, AS TO

7        INFRINGEMENT OF THE '721 PATENT?

8        A.   IT'S VERY CLEAR THAT ALL OF THE DEVICES INFRINGE THE '721.

9        THEIR EXPERT MADE NO ARGUMENT AGAINST INFRINGEMENT FOR ALL OF

10       THE DEVICES EXCEPT THE NEXUS, AND THE CLAIM OF NON-INFRINGEMENT

11       IN THE NEXUS CONTRADICTS THE TEACHINGS OF THE SPECIFICATION.

12       Q.   LET'S THEN TALK ABOUT WHAT PROFESSOR GREENBERG TOLD US

13       ABOUT THE VALIDITY OF THE '721 PATENT.

14            FIRST, IN YOUR PRESENCE, YOU HEARD HIM TESTIFY.  DID

15       PROFESSOR GREENBERG SAY ANYTHING ABOUT GOOGLE HAVING INVENTED

16       THE '721 INVENTION BEFORE APPLE DID?

17       A.   NO, NOTHING.

18       Q.   DID HE SAY THAT ANYONE HAD INVENTED SLIDE TO UNLOCK BEFORE

19       APPLE DID?

20       A.   NO.

21       Q.   CAN YOU TELL US, CAN YOU SUMMARIZE TO GIVE US THE PLACE,

22       WHAT IT WAS THAT PROFESSOR GREENBERG BASED HIS OPINION THAT THE

23       CLAIM WAS INVALID ON?

24       A.   YES.  HE -- WELL, HE SAID THE PATENT EXAMINERS SIMPLY GOT

25       IT WRONG, AND HIS BASIS FOR THAT IS TWO PRIOR PUBLICATIONS, ONE

1      A NEONODE GUIDE, AND ANOTHER ONE A PUBLICATION BY PLAISANT.

2      Q.   ALL RIGHT.  LET'S LOOK AT PDX 97.93.

3           WHAT DO WE HAVE HERE?

4      A.   THIS IS ONE OF THE PAGES, OR AN EXTRACT OF ONE OF THE

5      PAGES IN THE NEONODE QUICK START GUIDE, AND IT TELLS US HOW THE

6      USER WERE SUPPOSED TO UNLOCK, AND THE WAY THEY DID IT WAS TO

7      FIRST PRESS A POWER BUTTON ONCE, AND THAT'S THE PHYSICAL BUTTON

8      YOU SEE HIGHLIGHTED ON THE LEFT.

9           THEN THE TEXT "RIGHT SWEEP TO UNLOCK" APPEARS ON THE

10     SCREEN, AND THE USER WAS SUPPOSED TO MAKE A SWEEP, A RIGHT-WARD

11     SWEEP SOMEWHERE ON THE DEVICE TO UNLOCK IT.

12     Q.   AGAIN, TO MAKE SURE WE'VE GOT THE DETAILS RIGHT, YOU'RE

13     TALKING ABOUT A NEONODE GUIDE.  YOU MEAN A WRITTEN DOCUMENT?

14     A.   THAT'S CORRECT, THIS IS A DOCUMENT.

15     Q.   DID PROFESSOR GREENBERG BASE ANY OF HIS OPINIONS BASED ON

16     THE ACTUAL NEONODE PHONE?

17     A.   NO, HE DID NOT.

18     Q.   WAS THERE ANY EVIDENCE PRESENTED THAT YOU'RE AWARE OF THAT

19     A NEONODE PHONE WAS EVER IN THE UNITED STATES PRIOR TO THE TIME

20     THAT THIS PATENT APPLICATION WAS FILED?

21     A.   NO, THERE'S BEEN NO SUCH EVIDENCE.

22     Q.   CAN YOU COMPARE THE CLAIMS -- DO YOU AGREE WITH

23     PROFESSOR GREENBERG THAT THE NEONODE GUIDE LAYS OUT MOST OF THE

24     ELEMENTS OF THE CLAIM 8 OF THE '721 PATENT?

25     A.   NO.  IT -- IT'S CLEARLY LACKING MANY ELEMENTS OF THE

1     CLAIM.

2     Q.   AND DO YOU HAVE A GRAPHIC -- YOU DO HAVE A GRAPHIC.

3     97.94, PLEASE.

4     A.   SURE, THE NEONODE GUIDE IS CLEARLY LACKING ALL THE

5     ELEMENTS CONCERNING THE UNLOCK IMAGE AND ITS MOVEMENT.  SO

6     THERE'S NO PREDEFINED LOCATION CORRESPONDING TO AN UNLOCK

7     IMAGE.  THERE'S NO CONTINUOUS MOVEMENT OF AN UNLOCK IMAGE.

8     THERE'S NO UNLOCKING THE DEVICE IF THE IMAGE IS MOVED FROM ONE

9     LOCATION TO ANOTHER.  AND THERE ARE NO VISUAL CUES

10    COMMUNICATING THE DIRECTION OF MOVEMENT.  THERE'S NO IMAGE TO

11    MOVE.

12    Q.   DID PROFESSOR GREENBERG TRY TO COMBINE THE NEONODE GUIDE

13    WITH ANOTHER PUBLICATION?

14    A.   YES, HE DID, THE PLAISANT APPLICATION.

15    Q.   AND CAN YOU SHOW US, PLEASE, USING SOME GRAPHICS, REMIND

16    US WHAT THE PLAISANT APPLICATION IS.

17    A.   SURE.  QUICKLY I'VE GOT A FEW SLIDES ON PLAISANT, THIS IS

18    THE PAPER, THE TWO-PAGE PAPER, IT DESCRIBES TOUCH SCREEN TOGGLE

19    DESIGNS, SO THESE ARE ON/OFF SWITCHES.

20         AND THE WAY THEY WERE INTENDED TO BE USED WAS THE TOUCH

21    SCREEN WOULD BE MOUNTED INTO A WALL OR INTO CABINETRY AND IT

22    WOULD BE USED TO CONTROL, FOR REMOTE CONTROL, OFFICE OR HOME

23    APPLIANCES, LIKE AIR CONDITIONING UNITS OR HEATERS.

24         THE PUBLICATION ITSELF AND THE VIDEO THAT ACCOMPANIES IT

25    BOTH TEACH AWAY FROM THE USE OF SLIDING.

1    Q.   LET ME INTERRUPT YOU.  WHEN YOU SAY IT "TEACHES AWAY" FROM

2    THE USE OF SLIDING, WHAT DOES THAT MEAN THAT IT TEACHES AWAY?

3    A.   SO THEY CONSIDERED A VARIETY OF DIFFERENT MECHANISMS FOR

4    TOGGLING, AND IT TELLS YOU NOT TO USE THE SLIDING MECHANISM.

5    Q.   CAN YOU SHOW US THAT IN THE PLAISANT?

6    A.   SURE.

7    Q.   PDX 97.99, PLEASE.

8    A.   SO THE TOP FIGURE IS EXTRACTED FROM THE VIDEO, AND THE

9    BOTTOM TEXT IS FROM THE PAPER, AND IT TELLS US THAT TOGGLES

10   THAT ARE PUSHED SEEM TO BE PREFERRED OVER TOGGLES THAT SLIDE;

11   AND THE SLIDING IS MORE COMPLEX THAN SIMPLY TOUCHING; AND ALSO

12   THAT SLIDERS ARE HARDER TO IMPLEMENT.

13        AND THE FIGURE AT THE TOP SHOWS THOSE RESULTS FOR USER

14   PREFERENCE INDICATING THAT BOTH OF THE TWO DESIGNS THAT THEY

15   CONSIDERED, LEVERS AND SLIDERS, WAS THE LEAST PREFERRED, THAT'S

16   THE SLIDER HIGHLIGHTED IN RED AND THE LEVER.

17   Q.   PROFESSOR GREENBERG TOLD THIS JURY THAT A PERSON OF

18   ORDINARY SKILL IN THE ART WOULD HAVE BEEN NATURALLY MOTIVATED

19   TO COMBINE THE NEONODE GUIDE WITH THE PLAISANT ARTICLE.

20        DID YOU AGREE WITH THAT OPINION?

21   A.   NO, I DO NOT.

22   Q.   AND WHY DO YOU SAY THAT?

23   A.   THE PATENT OFFICE, THE PATENT EXAMINER, HAD ALL OF THE

24   NEONODE GUIDE AVAILABLE TO THEM.

25        THEY ALSO HAD PLAISANT, IN ITS COMPLETE FORM, AVAILABLE TO

1    THEM, AND THEY COMMENTED EXTENSIVELY ON PLAISANT.  THERE WAS AN

2    EXTENSIVE DISCUSSION OF PLAISANT, AND AT THE END OF THAT

3    DISCUSSION, THEY CONCLUDE THAT PLAISANT DOES NOT, OR NONE OF

4    THE PRIOR ART DISCLOSES CONTINUOUS MOVEMENT OF THE UNLOCK IMAGE

5    TO ORDER TO UNLOCK THE DEVICE.

6    Q.   WHEN I ASKED PROFESSOR GREENBERG ABOUT THAT, WHEN I SAID

7    "DIDN'T THE EXAMINER ACTUALLY HAVE BOTH OF THESE THINGS IN

8    FRONT OF HIM?" PROFESSOR GREENBERG SAID, "HOLD IT A MINUTE.

9    THEY DIDN'T HAVE THE PLAISANT VIDEO."

10        DO YOU REMEMBER HIM SAYING THAT?

11   A.   I REMEMBER HIM SAYING THAT.

12   Q.   WHAT, IF ANY, SIGNIFICANCE DO YOU FIND IN THAT?

13   A.   WELL, THE FIRST THREE WORDS OF THE PAPER THAT IS CONTAINED

14   IN THE PATENT HISTORY --

15   Q.   CAN WE SEE 97.100, PLEASE?

16   A.   SO THE FIRST THREE WORDS ARE "THIS VIDEO DESCRIBES."  SO

17   IT'S IMPLAUSIBLE THAT THE PATENT EXAMINERS WERE UNAWARE OF THE

18   VIDEO.

19        AND FURTHERMORE, THE VIDEO ADDS NO TEACHING TO THE PAPER.

20   Q.   ANOTHER SUBJECT.  PROFESSOR GREENBERG TALKED ABOUT

21   SOMETHING THAT HE CALLED SECONDARY CONSIDERATIONS, AND I'M NOT

22   SURE ANYONE HAS -- ARE YOU FAMILIAR WITH THAT TERM, SECONDARY

23   CONSIDERATIONS?

24   A.   YES, I AM.

25   Q.   I'M NOT SURE ANYBODY HAS EXPLAINED WHAT, IF ANYTHING, THE

1      USE OF SECONDARY CONSIDERATIONS IS IN AN INVALIDITY DISCUSSION.

2          CAN YOU TELL US WHAT YOUR UNDERSTANDING IS OF WHY -- WHAT

3      SECONDARY CONSIDERATIONS ARE -- HERE'S A COMPOUND QUESTION:

4      WHAT ARE SECONDARY CONSIDERATIONS AND WHY DO YOU LOOK TO THEM?

5      A.   SURE.   SECONDARY CONSIDERATIONS ARE THOSE THINGS THAT YOU

6      MIGHT SEE, THEY GIVE ELEMENTS THAT INDICATE WHETHER SOMETHING

7      IS NEW, NOVEL, AND INTERESTING.   SO YOU SEE THESE THINGS IN AN

8      INVENTION IF IT'S NEW.

9      Q.   CAN WE HAVE 97.104, PLEASE?

10     A.   SO THE SORTS OF THINGS THAT YOU MIGHT SEE WOULD BE

11     COMMERCIAL SUCCESS; PRAISE, PEOPLE SAYING THIS IS A GREAT

12     INVENTION; SKEPTICISM, SOME PEOPLE SAYING THIS INVENTION WON'T

13     WORK; UNEXPECTED RESULTS; LONG FELT BUT UNMET NEED; AND THE

14     DESIRE OF OTHERS TO COPY IT IN ORDER TO OBTAIN ITS BENEFITS.

15     Q.   DID YOU CONSIDER THE SECONDARY CONSIDERATIONS?

16     A.   YES, I DID.

17     Q.   AND WHAT, IF ANYTHING, DID THEY TELL YOU -- HOW, IF IN ANY

18     WAY, DID THEY INFORM YOUR OPINION ABOUT THE VALIDITY OF THIS

19     PATENT?

20     A.   YES.   WELL, CLEARLY THERE'S BEEN COMMERCIAL SUCCESS BOTH

21     OF THE IPHONES THAT USE THIS INVENTION, AND FOR THE DEVICES

22     THAT HAVE COPIED THE TECHNIQUE.

23          AND PRAISE, THAT WAS WONDERFULLY EVIDENT IN THE VIDEO WE

24     SAW WITH STEVE JOBS DURING THE OPENING WHERE HE DEMONSTRATED

25     THAT LAUNCH OF THE IPHONE.   HE SWIPED TO UNLOCK AND THE

1     AUDIENCE BURST INTO CHEERS, AND OF COURSE THAT'S PRAISE FOR A

2     DEVICE.

3          AND LONG FELT, BUT UNMET NEED, YOU MIGHT REMEMBER MY NOKIA

4     N800 THAT I INTRODUCED.

5     Q.   IN AMERICA WE WOULD SAY NOKIA.

6          SORRY.  GO AHEAD.

7     A.   AND I BOUGHT THIS IN 2007.  IT HAS A TOUCHSCREEN, AND IT

8     HAD AN INFURIATING MECHANISM FOR UNLOCKING, AND THIS WAS NOT A

9     NEW -- UNLOCKING WAS NOT A NEW THING.  THIS HAD BEEN AROUND FOR

10    A LONG TIME.

11         AND ALSO WE'VE SEEN -- I INTRODUCED A LOT OF EVIDENCE OF

12    COPYING BY SAMSUNG.

13    Q.   WHEN MY FRIEND MR. LEE WAS ASKING DR. CHEVALIER ABOUT

14    CERTAIN FEATURES IN THE PHONES, SHE MENTIONED -- HE WAS TALKING

15    TO HER ABOUT NEAR FIELD COMMUNICATIONS AND SHE SAID THIS WAS

16    IMPORTANT, THAT SAMSUNG ACTUALLY ADVERTISED THAT.

17         DO YOU RECALL WHETHER OR NOT APPLE ADVERTISED SLIDE TO

18    UNLOCK AS A FEATURE?

19    A.   YES, SIR.  SLIDE TO UNLOCK WAS ONE OF THE FIRST, FIRST

20    USED COMPONENTS TO ADVERTISE THE IPHONE.

21    Q.   PROFESSOR GREENBERG TESTIFIED THAT, IN HIS OPINION, THE

22    CURRENT VERSION OF THE IPHONE DOES NOT PRACTICE CLAIM 8 OF THE

23    '721 PATENT.

24         DID YOU HEAR HIM SAY THAT?

25    A.   I DID.

1       Q.    DO YOU AGREE WITH THAT OPINION?

2       A.    NO.   THAT'S CLEARLY WRONG.

3       Q.    AND WHAT IS YOUR OPINION?

4       A.    I PREPARED SOME SLIDES THAT SHOW HOW IOS 7 WORKS AND IT

5       CONFORMING ENTIRELY TO THE PATENT.

6             THE COURT:  YOU KNOW, IT'S 4:30.

7             MR. MCELHINNY:  PERFECT.

8             THE COURT:  I'M GOING TO ASK THAT WE GO AHEAD AND END

9       FOR TODAY AND RESUME ON FRIDAY AT 9:00 O'CLOCK.

10            MR. MCELHINNY:  THANK YOU, YOUR HONOR.

11            THE COURT:  OKAY.

12      ALL RIGHT.  SO I SAID I WOULD GIVE YOU AN UPDATE.  THE

13      PARTIES HAVE LESS THAN AN HOUR LEFT FOR TRIAL TESTIMONY AND

14      EXHIBITS, SO WE ANTICIPATE THAT SOMETIME EARLY ON FRIDAY WE

15      SHOULD CONCLUDE, AND WE'LL GO AHEAD AND EXCUSE YOU SO WE CAN

16      TAKE CARE OF SOME MATTERS OUTSIDE YOUR PRESENCE AND, AS I SAID

17      BEFORE, WE NEED TO FINALIZE THE VERDICT FORM AND THE JURY

18      INSTRUCTIONS.

19      SO MONDAY WE'LL BE GOING A FULL DAY OF READING THE FINAL

20      JURY INSTRUCTIONS AND FOUR HOURS OF CLOSING.

21      YOU MAY HAVE A SMALL AMOUNT OF TIME TO DELIBERATE ON

22      MONDAY, BUT YOU'LL BEGIN IN EARNEST ON TUESDAY, AND YOUR

23      DELIBERATIONS WILL BE FROM 9:00 TO 4:30, AND THEY'LL BE

24      CONSECUTIVE DAYS.  YOU CAN DELIBERATE ON WEDNESDAY AND THURSDAY

25      NEXT WEEK AS WELL AS THE OTHER DAYS, MONDAY, TUESDAY, FRIDAY.

1      OKAY?

2          ALL RIGHT.  THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

3      PLEASE DO NOT RESEARCH OR DISCUSS THE CASE.

4          WE'LL SEE YOU FRIDAY AT 9:00 A.M.

5          (JURY OUT AT 4:32 P.M.)

6              THE COURT:  YOU MAY STEP DOWN.

7          GO AHEAD AND PLEASE TAKE A SEAT.

8          LET ME GIVE YOU YOUR TIME TOTALS FOR TODAY.

9          (PAUSE IN PROCEEDINGS.)

10             THE COURT:  ALL RIGHT.  TODAY APPLE USED 4 HOURS AND

11     29 MINUTES, SO YOUR TOTAL TRIAL TIME IS 24 HOURS AND 23

12     MINUTES.  YOU HAVE 37 MINUTES LEFT FOR FRIDAY MORNING.

13         DO YOU WANT A BREAKDOWN OF THE DIFFERENT AFFIRMATIVE

14     CASES.

15             MR. MCELHINNY:  NO.

16         (LAUGHTER.)

17             THE COURT:  NO?  OKAY.

18             MR. MCELHINNY:  I'M SORRY.  I SHOULD HAVE SAID, NO

19     THANK YOU, YOUR HONOR.

20             THE COURT:  OKAY.  SAMSUNG TODAY USED 51 MINUTES, SO

21     SAMSUNG'S TRIAL TIME TOTAL IS 24 HOURS AND 49 MINUTES, AND

22     SAMSUNG HAS 11 MINUTES LEFT.

23         SO WE'RE CLEARLY GOING TO FINISH WITHIN THE FIRST HOUR ON

24     FRIDAY.

25             NOW, I'VE RULED ON, I BELIEVE, ALL OF THE OBJECTIONS FOR

1    ANY REMAINING WITNESSES, BUT DO YOU ANTICIPATE FILING ANY MORE

2    TOMORROW?

3              MS. MAROULIS:  NO, YOUR HONOR.  APPLE DID NOT

4    DISCLOSE ANY FURTHER WITNESSES THIS MORNING, SO WE'RE OUT OF

5    NEW WITNESSES, OR NEW OBJECTIONS.

6              THE COURT:  OKAY.  DO YOU AGREE WITH THAT?

7              MR. MCELHINNY:  DEPENDS WHETHER OR NOT THEY INTEND TO

8    CALL A WITNESS IN THEIR REMAINING 11 AND WHETHER THEY'RE GOING

9    TO MAKE A DISCLOSURE, AND I DON'T KNOW --

10             MS. MAROULIS:  WE'VE ALREADY MADE DISCLOSURES AND

11   THEY WERE RULED ON.

12             MR. MCELHINNY:  OKAY.  I'M SORRY.

13             THE COURT:  OKAY.  SO THEN THERE WILL BE NO

14   OBJECTIONS THAT THE COURT NEEDS TO RULE ON BETWEEN NOW AND

15   THURSDAY NIGHT?

16             MS. MAROULIS:  THE CLOSING OBJECTIONS, YEAH.

17             THE COURT:  CLOSING OBJECTIONS, WHICH YOU'RE FILING

18   ON SUNDAY MORNING AT 9:00.

19             MS. MAROULIS:  YEAH.

20             THE COURT:  OKAY.  GREAT.  WHAT ELSE?  IS THERE

21   ANYTHING ELSE THAT WE NEED TO ORGANIZE TO PREPARE THIS CASE FOR

22   CLOSING, OTHER THAN WHAT WE'VE ALREADY DONE?

23             MS. MAROULIS:  NOT FOR SAMSUNG, YOUR HONOR.

24             THE COURT:  NO?

25             MR. MCELHINNY:  WE'RE GOOD, YOUR HONOR.

2873

1              THE COURT:  ALL RIGHT.  THANK YOU.  I'LL SEE YOU

2       FRIDAY MORNING AT 9:00.

3              (WHEREUPON, THE EVENING RECESS WAS TAKEN.)

1

2

3                       CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____

      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18         DATED:  APRIL 22, 2014

19

20

21

22

23

24

25