1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

5

   APPLE INC., A CALIFORNIA        )  C-12-00630 LHK
6  CORPORATION,                    )
                                   )  SAN JOSE, CALIFORNIA
7                PLAINTIFF,        )
                                   )  APRIL 29, 2014
8            VS.                   )
                                   )  VOLUME 14
9  SAMSUNG ELECTRONICS CO., LTD.,  )
   A KOREAN BUSINESS ENTITY;       )  PAGES 3194-3369
10 SAMSUNG ELECTRONICS AMERICA,    )
   INC., A NEW YORK CORPORATION;   )
11 SAMSUNG TELECOMMUNICATIONS      )
   AMERICA, LLC, A DELAWARE        )
12 LIMITED LIABILITY COMPANY,      )
                                   )
13               DEFENDANTS.       )
   _____  )

14

15

16              TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE LUCY H. KOH
17            UNITED STATES DISTRICT JUDGE

18

19

20            APPEARANCES ON NEXT PAGE

21

22 OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
23                              IRENE RODRIGUEZ, CSR, CRR
                                CERTIFICATE NUMBER 8074

24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1

 2      A P P E A R A N C E S:

 3      FOR PLAINTIFF          MORRISON & FOERSTER
        APPLE:                 BY:  HAROLD J. MCELHINNY
 4                                  RACHEL KREVANS
                               425 MARKET STREET
 5                             SAN FRANCISCO, CALIFORNIA  94105

 6

 7                             WILMER, CUTLER, PICKERING,
                               HALE AND DORR
 8                             BY:  WILLIAM F. LEE
                               60 STATE STREET
 9                             BOSTON, MASSACHUSETTS  02109

10                             BY:  MARK D. SELWYN
                               950 PAGE MILL ROAD
11                             PALO ALTO, CALIFORNIA  94304

12

13      FOR SAMSUNG:           QUINN, EMANUEL, URQUHART & SULLIVAN
                               BY:  JOHN B. QUINN
14                                  WILLIAM PRICE
                               865 S. FIGUEROA STREET, FLOOR 10
15                             LOS ANGELES, CALIFORNIA  90017

16                             BY:  VICTORIA F. MAROULIS
                                    KEVIN B. JOHNSON
17                             555 TWIN DOLPHIN DRIVE
                               SUITE 560
18                             REDWOOD SHORES, CALIFORNIA  94065

19

20

21

22

23

24

25
```

1

2                         INDEX OF PROCEEDINGS

3

4    CLOSING ARGUMENT BY MR. MCELHINNY          P. 3198

5    CLOSING ARGUMENT BY MR. PRICE              P. 3255

6    CLOSING ARGUMENT BY MR. NELSON             P. 3273

7    CLOSING ARGUMENT BY MR. JOHNSON            P. 3313

8    CLOSING ARGUMENT BY MR. QUINN              P. 3322

9    REBUTTAL CLOSING ARGUMENT BY MR. LEE       P. 3344

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        SAN JOSE, CALIFORNIA                    APRIL 29, 2014

 2                        P R O C E E D I N G S

 3            (JURY OUT AT 9:08 A.M.)

 4                THE COURT:  GOOD MORNING AND WELCOME.

 5                MR. MCELHINNY:  GOOD MORNING, YOUR HONOR.

 6                MR. PRICE:  GOOD MORNING.

 7            (JURY IN AT 9:08 A.M.)

 8                THE COURT:  GOOD MORNING, WELCOME.  PLEASE TAKE A

 9        SEAT.

10            YOU HAVE NOW HEARD ALL THE EVIDENCE AND YESTERDAY YOU

11        HEARD THE LAW.  IT'S NOW TIME TO HEAR THE CLOSING ARGUMENTS OF

12        COUNSEL.  EACH COUNSEL WILL HAVE AN OPPORTUNITY TO REVIEW THE

13        EVIDENCE AND ARGUE TO YOU WHAT HE OR SHE BELIEVES THAT EVIDENCE

14        HAS SHOWN.

15            I AGAIN REMIND YOU THAT WHAT THE ATTORNEYS SAY DURING

16        THEIR ARGUMENTS IS NOT EVIDENCE.  IF ANY ATTORNEY MISSTATES THE

17        EVIDENCE OR THE LAW, YOU ARE TO RELY ON YOUR OWN RECOLLECTION

18        OF THE EVIDENCE AND ON THE JURY INSTRUCTIONS THAT I HAVE

19        PROVIDED TO YOU.

20            THE SEQUENCE OF THE CLOSING ARGUMENTS WILL BE AS FOLLOWS:

21        APPLE WILL GIVE THE FIRST CLOSING ARGUMENT ON ITS AFFIRMATIVE

22        CASE AGAINST SAMSUNG; SAMSUNG WILL THEN GIVE ITS CLOSING

23        ARGUMENT ON ITS DEFENSIVE CASE AGAINST APPLE'S AFFIRMATIVE

24        CASE, AS WELL AS ON SAMSUNG'S AFFIRMATIVE CASE AGAINST APPLE;

25        APPLE WILL THEN GIVE A CLOSING ARGUMENT ON ITS DEFENSIVE CASE
```

```
 1        AGAINST SAMSUNG'S AFFIRMATIVE CASE.

 2             SO UPON THE CONCLUSION OF THESE ARGUMENTS, YOU WILL BEGIN

 3        DELIBERATIONS IN THE JURY ROOM.  PLEASE REMEMBER THAT YOU ARE

 4        NOT TO DISCUSS THE CASE UNTIL ALL EIGHT JURORS ARE PRESENT IN

 5        THE JURY ROOM.

 6             SO WITH THAT, I'M GOING TO INVITE APPLE'S COUNSEL TO COME

 7        UP.

 8             TIME IS NOW 9:10.  GO AHEAD, PLEASE.

 9               MR. MCELHINNY:  THANK YOU.  MAY IT PLEASE THE COURT.

10               (MR. MCELHINNY GAVE HIS CLOSING ARGUMENT ON BEHALF OF THE

11          PLAINTIFF.)

12               MR. MCELHINNY:  LADIES AND GENTLEMEN OF THE JURY,

13        GOOD MORNING.

14               JURORS:  GOOD MORNING.

15               MR. MCELHINNY:  LET'S REMEMBER HOW WE GOT HERE.  IN

16        JANUARY OF 2007, APPLE INTRODUCED THE IPHONE, A MULTITOUCH,

17        TOUCHSCREEN DEVICE THAT COMBINED A MUSIC PLAYER AND AN INTERNET

18        BROWSER AND A TELEPHONE.

19             THAT PRODUCT, AND THE NEW FEATURES THAT MADE IT

20        ACCESSIBLE, FUN, AND EASY TO USE, WERE REVOLUTIONARY.

21             I'M GOING TO TAKE A MINUTE HERE AND EXPLAIN A LITTLE BIT

22        ABOUT THE PROCESS.  UP UNTIL NOW, YOU'VE SAT THERE PATIENTLY

23        AND THE LAWYERS HAVE BROUGHT YOU PAGES AND THEY PUT SLIDES ON

24        THE SCREEN.

25             THAT WONDERFUL WORLD IS GOING TO CHANGE THIS AFTERNOON AND
```

1     YOU'RE GOING TO GET LOCKED IN THIS LITTLE ROOM AND THEY'RE

2     GOING TO BRING IN ALL OF THESE TRAYS OF EXHIBITS AND THEY'RE IN

3     WHITE BINDERS.  AND THE EXHIBITS ALL HAVE EXHIBIT NUMBERS ON

4     THEM, BUT THE PAGES AREN'T MARKED, THEY'RE NOT HIGHLIGHTED.

5     YOU'RE GOING TO HAVE TO FIND THOSE EXHIBITS YOURSELF.

6         SO WHAT I'M GOING TO DO -- MANY OF THE SLIDES THAT YOU'VE

7     SEEN ARE NOT GOING TO BE IN EVIDENCE, SO YOU WON'T FIND THOSE.

8     YOU WILL JUST FIND THE EXHIBITS.

9         SO WHAT I'M GOING TO DO AS I WALK THROUGH THIS THIS

10    MORNING IS I'M GOING TO CALL OUT EXHIBIT NUMBERS, AND IF THAT'S

11    HELPFUL TO YOU, YOU CAN TAKE THOSE EXHIBIT NUMBERS DOWN AND

12    YOU'LL BE ABLE TO FIND -- IF YOU'RE INTERESTED IN THESE

13    DOCUMENTS, YOU'LL BE ABLE TO FIND THAT DOCUMENT WHEN YOU LOOK

14    IN THE BINDERS LATER THIS AFTERNOON.

15        THIS DOCUMENT IS EXHIBIT 145.  WE CALL IT THE GRAVITY TANK

16    DOCUMENT.  THIS WAS A DOCUMENT THAT WAS PREPARED, YOU'LL

17    REMEMBER, BY SAMSUNG'S CONSULTANTS ANALYZING THE EFFECT OF THE

18    IPHONE, AND THEY CALLED IT REVOLUTIONARY.

19        THE IPHONE LITERALLY CREATED A NEW SMARTPHONE MARKET.  IT

20    TOOK THE WORLD BY STORM.  APPLE CREATED ONE OF THE MOST

21    SUCCESSFUL PRODUCTS EVER IN THE FIELD OF ELECTRONICS, AND IT

22    WAS THE MOST SUCCESSFUL UNTIL THE INTRODUCTION OF THE IPAD

23    THREE YEARS LATER IN 2010, AN ENTIRELY NEW AND REVOLUTIONARY

24    PRODUCT.

25        THESE PRODUCTS WERE CREATED BY TRUE GENIUSES, LIKE

1      STEVE JOBS, AND LIKE THE APPLE INVENTORS WHO CAME HERE TO

2      TESTIFY BEFORE YOU.  PEOPLE, IF YOU CAN REMEMBER BACK NOW -- IT

3      SEEMS SO LONG AGO -- LIKE GREG CHRISTIE WHO CAME HERE AND

4      TESTIFIED ON BEHALF OF THE IPHONE, ORIGINAL IPHONE TEAM.

5          TIM MILLET, THOMAS DENIAU WHO CAME FROM PARIS WITH HIS

6      FRENCH ACCENT, AND ROBERTO GARCIA.  THEY WERE, AND ARE, REAL

7      PEOPLE WHO, THROUGH GENIUS AND HARD WORK, HAVE MADE REAL

8      CONTRIBUTIONS TO THE WAY PEOPLE COMMUNICATE WITH EACH OTHER AND

9      SHARE INFORMATION.

10         THEY CAME HERE TO THIS COURTROOM.  THEY FACED

11     CROSS-EXAMINATION AND THEY TESTIFIED BEFORE YOU.

12         AND AS YOU ALSO KNOW, THEIR INVENTIONS ARE PROTECTED BY

13     PATENTS THAT WERE ISSUED BY THE U.S. PATENT AND TRADEMARK

14     OFFICE.

15         WE SAW THAT MR. JOBS EXPRESSLY WARNED WOULD-BE COMPETITORS

16     THAT APPLE WAS SEEKING PATENT PROTECTION FOR ITS INVENTIONS, TO

17     PUT THOSE COMPETITORS ON NOTICE THAT THEY COULD NOT SIMPLY COPY

18     APPLE'S NOVEL FEATURES AND DESIGNS.

19         THAT PART IS HISTORY.  IT IS UNCONTROVERTED.  NOT A WORD

20     OF IT HAS BEEN CHALLENGED IN THIS TRIAL.

21         WE ARE HERE BECAUSE OF A SERIES OF DECISIONS BY SAMSUNG

22     ELECTRONICS.  WE KNOW THAT IN JUNE 2007, SAMSUNG DID NOT EVEN

23     HAVE A TOUCHSCREEN SMARTPHONE.  IT WASN'T EVEN WORKING ON THAT.

24         INSTEAD, IT SPECIALIZED IN LESS COMPLICATED FEATURE

25     PHONES.

1            WE ALSO KNOW THAT AT THAT TIME SAMSUNG WAS NOT

2      PARTICULARLY SUCCESSFUL.  IT WAS ONLY SELLING ABOUT 5 PERCENT

3      OF THE PHONES IN THE UNITED STATES MARKETPLACE.  IT WAS NOT A

4      LEADER, AND IT WAS NOT MAKING PROGRESS.

5            AND THEN WE SHOWED YOU EXHIBIT 149.  WE KNOW THAT SAMSUNG

6      BROUGHT ALL OF ITS EXECUTIVES TOGETHER FOR A CRITICAL MEETING

7      IN FEBRUARY 2010 WHEN ITS TOP EXECUTIVE MADE CLEAR THAT SAMSUNG

8      WAS SUFFERING WHAT THEY CALLED A CRISIS OF DESIGN AND THAT ITS

9      MOST SOPHISTICATED CUSTOMERS, THE AMERICAN PHONE COMPANIES,

10     WERE TELLING SAMSUNG THAT THE ONLY WAY FORWARD FOR IT WAS TO,

11     QUOTE -- THIS IS THEIR WORDS -- TO "MAKE SOMETHING LIKE THE

12     IPHONE."

13           AND WE KNOW THAT THIS WAS FOLLOWED BY MONTH AFTER MONTH OF

14     FRENZIED ACTIVITY AT SAMSUNG WHEN SAMSUNG DESIGNERS CHANGED

15     PHONE AFTER PHONE THAT WAS UNDER DEVELOPMENT TO COPY FEATURE

16     AFTER FEATURE AFTER FEATURE FROM THE IPHONE, AND THAT SAMSUNG

17     BEGAN TO SELL THESE INFRINGING PRODUCTS IN THE UNITED STATES.

18           WE KNOW THAT THAT LED TO A SECOND CRISIS, AND IN

19     AUGUST 2010, THERE WAS A MEETING BETWEEN SAMSUNG AND APPLE AND

20     AT THAT TIME, AS YOU HEARD, APPLE WAS ACTUALLY SAMSUNG'S

21     LARGEST COMPETITOR -- CUSTOMER BECAUSE SAMSUNG -- APPLE BOUGHT

22     ITS COMPONENTS, ITS PARTS FROM SAMSUNG.

23           AND THEY HAD THIS MEETING, AND AT THE MEETING, APPLE

24     ACCUSED SAMSUNG OF COPYING AND ACCUSED SAMSUNG OF INFRINGING

25     APPLE PATENTS AND DID EVERYTHING IT COULD DO TO CONVINCE

1       SAMSUNG TO COMPETE FAIRLY INSTEAD OF UNFAIRLY.

2           BUT WE KNOW THAT SAMSUNG REJECTED THAT REQUEST AND

3       CONTINUED TO RELEASE VERSION AFTER VERSION OF INFRINGING PHONES

4       AND TABLETS, INCLUDING THE MORE THAN 37 MILLION DEVICES THAT

5       ARE AT ISSUE IN THIS CASE.

6           AND UNLIKE IN FAIRY TALES, WE KNOW THAT SAMSUNG'S ILLEGAL

7       STRATEGY HAS BEEN WILDLY SUCCESSFUL.  YOU HEARD THAT THEY HAVE

8       DRIVEN EVERY OTHER COMPETITOR, INCLUDING ALMOST EVERY OTHER

9       ANDROID COMPETITOR, ALMOST ENTIRELY OUT OF THE MARKET.

10          THE ONLY PRODUCTS THAT ARE SELLING TODAY ARE APPLE

11      PRODUCTS AND SAMSUNG PRODUCTS THAT INFRINGE APPLE PATENTS.  IT

12      IS LITERALLY A TWO HORSE RACE.

13          AND, FINALLY, WE KNOW THAT SAMSUNG'S STRATEGY HAS UNFAIRLY

14      INJURED APPLE, THE COMPANY AND THE EMPLOYEES WHO WERE THE

15      SOURCE OF ALL THIS CREATIVITY.

16          THAT IS HOW WE CAME TO THIS PLACE.

17          AND SO NOW IT IS TIME FOR YOU, A JURY CHOSEN BY LOT TO

18      REPRESENT THIS COMMUNITY, TO DO JUSTICE, TO ASSEMBLE THE FACTS,

19      TO APPLY THE LAW TO THOSE FACTS, AND TO AWARD WHATEVER DAMAGES

20      THAT YOU FIND ARE APPROPRIATE.  THAT'S WHY WE'RE HERE.

21          FOUR SHORT WEEKS AGO I STOOD BEFORE YOU AND I TOLD YOU TWO

22      THINGS THAT I WOULD LIKE TO REPEAT THIS MORNING.  FIRST, I TOLD

23      YOU THAT THERE WERE PROBLEMS WITH LAWSUITS.  IT'S NOT EASY TO

24      BE A JUROR IN A CASE AS COMPLICATED AS THIS.  THE TESTIMONY

25      COMES IN ONE WITNESS AT A TIME, YOU SEE ONLY BITS AND PIECES OF

1    DOCUMENTS ON THE SCREEN, AND YOU DON'T EVEN FIND OUT THE LEGAL

2    PRINCIPLES UNTIL THE LAST DAY OF THE TRIAL.  IT IS DIFFICULT

3    AND WE GREATLY APPRECIATE YOUR WILLINGNESS TO UNDERTAKE THAT

4    TASK.

5         I ALSO TOLD YOU THAT ON THE APPLE SIDE, WE FELT IT WAS OUR

6    JOB TO DO WHAT WE COULD DO TO HELP YOU WITH YOUR JOB.  IT WAS

7    OUR JOB TO PRESENT THE EVIDENCE IN A CLEAR AND HELPFUL WAY, AND

8    IT IS BILL LEE'S AND MY JOB THIS MORNING TO TRY TO BRING THAT

9    EVIDENCE TOGETHER IN A WAY THAT WE HOPE WILL BE USEFUL TO YOU

10   WHEN YOU BEGIN YOUR DELIBERATIONS.

11        TO DO THAT, I'M GOING TO USE THE VERDICT FORM AND THE

12   INSTRUCTIONS THAT JUDGE KOH READ TO YOU YESTERDAY.  THE VERDICT

13   FORM CONTAINS ALL THE QUESTIONS YOU WILL BE ASKED TO ANSWER.

14   THE JURY INSTRUCTIONS TELL YOU HOW TO GO ABOUT ANSWERING THOSE

15   QUESTIONS.

16        CRITICALLY, THE INSTRUCTIONS HELP YOU DECIDE WHICH OF THE

17   EVIDENCE YOU HAVE SEEN IS RELEVANT TO THE QUESTIONS YOU HAVE TO

18   DECIDE AND WHICH OF THE EVIDENCE YOU HAVE SEEN HAS BEEN AN

19   ATTEMPT TO CONFUSE, TO MAKE YOUR JOB MORE DIFFICULT AND YOUR

20   ANSWERS LESS ACCURATE.

21        THE FIRST THING I WANT TO MAKE CLEAR IS WHO THE PARTIES

22   ARE TO THIS CASE.  OBVIOUSLY APPLE IS THE PLAINTIFF IN THE

23   FIRST PART OF THE CASE.  APPLE INVENTED THE FIVE PATENTS THAT

24   WE BROUGHT IN FRONT OF YOU, AND IT OWNS THOSE FIVE PATENTS.

25        THE FIRST DEFENDANT IN OUR CASE IS SAMSUNG ELECTRONICS

```
 1     CORPORATION, OR SEC.  AND AS YOU HEARD, SEC IS LOCATED IN

 2     SUWON, SOUTH KOREA.  SEC OWNS THE OTHER TWO DEFENDANTS, SAMSUNG

 3     ELECTRONICS AMERICA AND SAMSUNG TELECOMMUNICATIONS AMERICA.

 4          SEC MANUFACTURES PHONES AND TABLETS AND SELLS THEM

 5     DIRECTLY TO ITS SUBSIDIARIES IN THE UNITED STATES.

 6          SEC DECIDES WHAT SOFTWARE IS GOING TO BE INSTALLED IN THE

 7     PHONES IT SELLS IN THE UNITED STATES.  IT WAS SEC THAT CHOSE TO

 8     USE THE ANDROID OPERATING SYSTEM.  SEC SETS THE PRICES AT WHICH

 9     THE SUBSIDIARIES SELL THE ACCUSED PRODUCTS IN THE

10     UNITED STATES.

11          AND AS YOU MAY REMEMBER WHEN JUSTIN DENISON TESTIFIED, HE

12     TESTIFIED THAT ALL OF THE EMPLOYEES OF ALL THE SAMSUNG

13     COMPANIES SEE THEMSELVES AS PART OF SEC.

14          SOMEWHAT STRANGELY, NO EXECUTIVE FROM SEC TESTIFIED AT

15     THIS TRIAL.  NO ONE CAME TO EXPLAIN TO YOU THE DECISIONS THAT

16     SEC MADE, TO TELL YOU WHY THOSE DECISIONS WERE MADE, OR TO

17     DEFEND THEMSELVES IN ANY WAY AGAINST THE SERIOUS ACCUSATIONS

18     THAT YOU HAVE BEFORE YOU.  NONE OF THEM WERE BRAVE ENOUGH TO

19     COME HERE AND FACE CROSS-EXAMINATION.

20          SAMSUNG ELECTRONICS OF AMERICA, WHO WE CALL SEA, IS A U.S.

21     CORPORATION HEADQUARTERED IN NEW JERSEY.  SEA SELLS THE TABLETS

22     ACCUSED IN THIS CASE DIRECTLY TO CARRIERS, STORES, AND

23     CONSUMERS IN THE UNITED STATES.

24          NO SEA EMPLOYEE TESTIFIED AT THIS TRIAL.

25          FINALLY, SAMSUNG TELECOMMUNICATIONS OF AMERICA, STA, SELLS
```

1    SAMSUNG SMARTPHONES TO CARRIERS, STORES, AND CONSUMERS IN THE

2    UNITED STATES.  STA IS HEADQUARTERED IN TEXAS.

3         WITH THE EXCEPTION OF ONE DESIGNER, EVERY SAMSUNG WITNESS

4    IN THIS CASE, MR. SOHN, THE FORMER CEO, MR. PENDLETON,

5    MR. DENISON, MR. SHEPPARD, AND MR. DICARLO WORKS OR WORKED FOR

6    STA DURING THE RELEVANT TIME PERIODS, AND ALL OF THESE GUYS

7    WERE MARKETING PEOPLE.  NOT ONE SOFTWARE ENGINEER.  NOT ONE

8    PERSON WHO COULD TALK ABOUT HOW THE INFRINGING PHONES CAME TO

9    BE.

10        NOW I WANT TO TALK ABOUT THE PATENTS.  FOR EACH OF THE

11   FIVE PATENTS IN THIS CASE, YOU WILL BE ASKED THREE QUESTIONS.

12        THE FIRST QUESTION IS, DID ANY OF THE THREE SAMSUNG

13   COMPANIES INFRINGE THE PATENT?

14        THE SECOND QUESTION IS, IF THERE WAS INFRINGEMENT, WAS

15   THAT INFRINGEMENT WILLFUL?

16        AND, THIRD, DID SAMSUNG PROVE, BY CLEAR AND CONVINCING

17   EVIDENCE, THAT THE PATENT IS INVALID?

18        IF YOU FIND THAT THE PATENT WAS INFRINGED, YOU WILL BE

19   ASKED -- THAT A VALID PATENT WAS INFRINGED, YOU WILL THEN BE

20   ASKED TO AWARD DAMAGES, BUT I'M GOING TO DEAL WITH DAMAGES

21   SEPARATELY.

22        LET'S START WITH THE '721 PATENT.  WE ARE ASSERTING, AS

23   YOU RECALL, CLAIM 8 OF THAT PATENT.

24        YOU WILL REMEMBER THAT PROFESSOR COCKBURN CAREFULLY WALKED

25   US THROUGH THE ELEMENTS OF CLAIM 8 AND TESTIFIED THAT SIX

1    SAMSUNG PHONES, WHICH HE DIVIDED INTO FOUR FAMILIES, INFRINGED

2    THE '721 PATENT.

3         YOU CAN SEE THE FOUR FAMILIES ON THIS SLIDE.

4         LET'S BE CLEAR.  YOU HEARD NO DEFENSE FROM SAMSUNG TO FIVE

5    OF THESE SIX PHONES.

6         SAMSUNG'S EXPERT ON THE SLIDE TO UNLOCK WAS

7    PROFESSOR GREENBERG AND HE ONLY DEFENDED ONE PHONE, THE GALAXY

8    NEXUS.

9         FOR THE OTHER FIVE, HE PRESENTED NO DEFENSE.

10        I WANT TO POINT OUT ONE THING VERY SPECIFICALLY.  FOUR

11   WEEKS AGO IN HIS OPENING, SAMSUNG'S COUNSEL TOLD YOU THAT

12   SAMSUNG'S PUZZLE PIECE DESIGN, WHICH YOU SEE HERE ON THE

13   STRATOSPHERE PHONE, DID NOT INFRINGE.  HE EVEN SHOWED YOU A

14   VIDEO CLIP.

15        BUT NO SAMSUNG WITNESS BACKED THAT UP.

16   PROFESSOR GREENBERG DID NOT DEFEND THE PUZZLE PIECE.  HE

17   COULDN'T, BECAUSE THE CLAIM LANGUAGE OF THE '721 PATENT READS

18   ON IT DIRECTLY.

19        THERE IS NOTHING IN THE CLAIM LANGUAGE ABOUT MOVING ALONG

20   A TRACK.  THE PATENT CLAIMS REQUIRE CONTACT WITH AN UNLOCK

21   IMAGE.

22        LET'S GO BACK AND LOOK AT THE PHONE.  THE PUZZLE PIECE IS

23   THE UNLOCK IMAGE.  THE CLAIMS REQUIRE CONTINUOUSLY MOVING THAT

24   UNLOCK IMAGE AND UNLOCKING THE DEVICE WHEN THE UNLOCK IMAGE IS

25   MOVED TO A PREDEFINED UNLOCK REGION.

1           THE PREDEFINED REGION IS OBVIOUSLY THE MISSING PIECE OF

2      THE PUZZLE.

3           AND THE CLAIMS REQUIRE VISUAL CUES TO INDICATE THE

4      DIRECTION OF MOVEMENT OF THE UNLOCK IMAGE REQUIRED TO UNLOCK

5      THE DEVICE.

6           THE PUZZLE PIECE DOES ALL OF THAT.

7           SO YOU MAY ASK YOURSELF, WHY WOULD SAMSUNG'S LAWYER MAKE

8      AN ARGUMENT TO YOU THAT HE KNEW, THAT HE KNOWS THAT SAMSUNG HAD

9      NO EVIDENCE TO SUPPORT?  WAS HE TRYING TO HELP YOU TO GET TO A

10     CORRECT DECISION?

11          PROFESSOR GREENBERG DID DEFEND ONE PHONE, THE GALAXY

12     NEXUS.  HE SAID IT DIDN'T INFRINGE BECAUSE WHEN YOU TOUCH THE

13     UNLOCK IMAGE, THE GRAPHICS CHANGE.

14          BUT AS PROFESSOR COCKBURN EXPLAINED, THE PATENT CLAIM

15     LANGUAGE IS NOT LIMITED TO ANY PARTICULAR GRAPHIC DEPICTION.

16     HE SHOWED YOU THE SPECIFICATION WHICH EXPRESSLY ANTICIPATES

17     THAT ANIMATED GRAPHICS MIGHT BE USED.

18          SO REALLY, SAMSUNG HAS NO DEFENSE TO INFRINGEMENT ON ANY

19     OF THE SIX ACCUSED PHONES.

20          LET ME HELP YOU WITH SOMETHING ELSE.  YOU ARE GOING TO

21     HAVE A TON OF PHONES WITH YOU IN THE JURY ROOM.  YOU'VE BEEN

22     TOLD YOU CAN'T PLAY GAMES WITH THEM, BUT YOU'RE GOING TO HAVE

23     THE PHONES IN THERE.

24          EACH ONE WILL HAVE AN EXHIBIT NUMBER ON IT.  IF YOU WANT

25     TO FIND THE PHONE THAT DEMONSTRATES THE INFRINGING ACTIVITY FOR

1    ANY OF A PARTICULAR -- FOR A PARTICULAR PATENT, YOU CAN FIND

2    THE RIGHT EXHIBIT NUMBER BY LOOKING AT THE CORRECT COLUMN IN

3    THE VERDICT FORM.  SO AFTER THE PHONES THAT ARE ACCUSED, FOR

4    EXAMPLE, THE ADMIRE, YOU'LL SEE THE EXHIBIT NUMBER JX 28B, SO

5    IF YOU WANT TO TEST THE ADMIRE FOR THIS PATENT, YOU CAN LOOK AT

6    THAT EXHIBIT.

7        TWO THINGS TO REMEMBER:  NOT ALL OF YOUR EXHIBITS INFRINGE

8    EVERY PATENT, SO YOU HAVE TO BE SURE THAT YOU HAVE THE RIGHT

9    EXAMPLE FOR THE PARTICULAR PATENT THAT YOU ARE LOOKING AT.

10       SECOND, PLEASE REMEMBER THE JUDGE'S INSTRUCTION NOT TO

11   ACCEPT SOFTWARE UPDATES SO THAT THE EXHIBITS WILL CONTINUE TO

12   BE ACCURATE.

13       THE QUESTION THEN IS, WHICH OF THE SAMSUNG COMPANIES IS

14   GUILTY FOR INFRINGING THIS PATENT?

15       AS YOU WILL SEE FROM THE INSTRUCTIONS, THERE ARE THREE

16   SEPARATE WAYS A COMPANY CAN COMMIT PATENT INFRINGEMENT.

17       THE FIRST IS CALLED DIRECT INFRINGEMENT AND IT IS DEFINED

18   IN YOUR INSTRUCTION NUMBER 24.  WHOEVER MAKES, USES, OR SELLS

19   THE ACCUSED DEVICE IN THE UNITED STATES, THAT'S PATENT

20   INFRINGEMENT.

21       INSTRUCTION NUMBER 25 PRESENTS GUIDELINES FOR DETERMINING

22   WHEN SALES OCCURRED IN THE UNITED STATES.

23       APPLYING THESE INSTRUCTIONS, WE BELIEVE THAT SEC IS LIABLE

24   FOR DIRECT INFRINGEMENT OF THE '721 PATENT BECAUSE IT SELLS ALL

25   OF THE ACCUSED PHONES TO STA AND SHIPS THEM TO STA IN THE

1        UNITED STATES FOR RESALE TO CUSTOMERS.

2            WE BELIEVE THAT STA IS LIABLE FOR DIRECT INFRINGEMENT

3        BECAUSE IT SELLS THE ACCUSED SMARTPHONES IN THE UNITED STATES.

4            WE BELIEVE THAT WHEN YOU ADDRESS QUESTION NUMBER 4 IN THE

5        VERDICT FORM, YOU SHOULD FIND INFRINGEMENT BY BOTH SEC AND STA.

6            LET ME STOP HERE TO POINT OUT THAT DESPITE ALL THE TIMES

7        THAT SAMSUNG MENTIONED IT, YOU WILL NOT FIND A SINGLE QUESTION

8        ABOUT GOOGLE IN YOUR VERDICT FORM OR IN YOUR JURY INSTRUCTIONS.

9        GOOGLE IS NOT A DEFENDANT IN THIS CASE.

10            IF YOU FIND DIRECT INFRINGEMENT BY STA, YOU WILL BE ASKED

11        IN THE VERDICT FORM WHETHER OR NOT SEC -- THIS IS A LEGAL

12        TERM -- INDUCED THAT INFRINGEMENT.  INDUCEMENT IS A SEPARATE

13        WAY OF COMMITTING PATENT INFRINGEMENT.

14            INSTRUCTION 28 SETS OUT THREE ELEMENTS OF INDUCING

15        INFRINGEMENT.

16            FIRST, SEC MUST HAVE INTENTIONALLY TAKEN ACTION THAT

17        ACTUALLY INDUCED DIRECT INFRINGEMENT.

18            THIS IS WHY WE BROUGHT YOU THE EVIDENCE THAT SEC MAKES ALL

19        THE DEVICES.  IT DESIGNS THE PHONES, IT SETS THE PRICES, AND

20        THE AMERICAN SUBSIDIARIES REPORT BACK THEIR SALES AND

21        STRATEGIES TO HEADQUARTERS, AS YOU SAW ON THE EXHIBITS.

22            SECOND, SEC MUST HAVE BEEN AWARE OF THE ASSERTED PATENTS.

23        THIS IS WHY WE READ YOU UNDISPUTED FACT NUMBER 13 IN WHICH SEC

24        ADMITS THAT IT HAS KNOWN OF THESE PATENTS SINCE AT LEAST THE

25        LAWSUIT WAS FILED.

1          AND, THIRD, SEC MUST HAVE KNOWN THAT THE ACTS IT WAS

2     CAUSING WOULD INFRINGE.  THE INSTRUCTION GOES ON TO SAY THAT

3     THIS KNOWLEDGE ELEMENT CAN BE SATISFIED BY WHAT THE LAW CALLS

4     WILLFUL BLINDNESS.

5          HERE WE ASK YOU TO REMEMBER THE SAMSUNG DOCUMENTS SHOWING

6     THAT SAMSUNG'S ADOPTION OF THE SLIDE TO UNLOCK WAS INTENTIONAL,

7     THAT WE ASKED THEM TO STOP THE INFRINGEMENT, THAT THEY SHOWED

8     UP HERE IN COURT WITH LITERALLY NO DEFENSE, AND THAT DESPITE

9     OUR EFFORTS, SAMSUNG CONTINUED TO SELL INFRINGING PHONES.

10         SAMSUNG CLEARLY KNEW THAT IT WAS CAUSING INFRINGEMENT.

11         WE ASK THAT AFTER YOU CONSIDER ALL THIS EVIDENCE, YOU FIND

12    THAT SEC INDUCED ITS SUBSIDIARY, STA, TO COMMIT INFRINGEMENT OF

13    THE '721 PATENT AND THAT YOU ANSWER YES TO QUESTION 5 ON YOUR

14    VERDICT FORM.

15         FINALLY, YOU WILL GET ASKED WHETHER OR NOT SEC COMMITTED

16    WHAT THE LAW CALLS CONTRIBUTORY INFRINGEMENT.  THIS IS A THIRD

17    WAY IN WHICH A PARTY CAN INFRINGE.

18         CONTRIBUTORY INFRINGEMENT IS DEFINED IN INSTRUCTION

19    NUMBER 29 OF THE JURY INSTRUCTIONS.  AGAIN, IT HAS THREE

20    ELEMENTS.

21         ONE, THAT SEC SUPPLIED AN IMPORTANT COMPONENT OF THE

22    INFRINGING PART OF THE PRODUCT.  HERE YOU KNOW THAT IT WAS SEC

23    THAT MADE ALL OF THE KEY DECISIONS ABOUT WHAT SOFTWARE WAS

24    PLACED ON THE INFRINGING PHONES.

25         TWO, THAT THE COMPONENT IS NOT A COMMON COMPONENT SUITABLE

1        FOR NON-INFRINGING USE.  OBVIOUSLY ALL THIS SOFTWARE IS

2        SPECIFICALLY DESIGNED FOR PHONES.  IT HAS NO OTHER USE.

3              AND, THREE, THAT SAMSUNG SUPPLIED THE COMPONENT WITH

4        KNOWLEDGE OF THE PATENT AND KNOWLEDGE THAT THE COMPONENT WAS

5        ESPECIALLY MADE OR ADAPTED FOR USE IN AN INFRINGING MANNER.

6              THIS IS SIMILAR TO WHAT WE LOOKED AT BEFORE.  GIVEN

7        SAMSUNG'S ADMITTED KNOWLEDGE OF THE PATENT AND INTENTIONAL

8        COPYING OF THE PATENTED FEATURES, IT CLEARLY KNEW THAT ITS

9        SOFTWARE WAS DESIGNED TO INFRINGE.

10             AFTER YOU CONSIDER THESE FACTORS, WE ASK THAT YOU ANSWER

11       YES TO QUESTION NUMBER 6 ON THE VERDICT FORM.

12             AFTER YOU ANSWER THE INFRINGEMENT QUESTIONS, YOU WILL BE

13       ASKED WHETHER OR NOT SAMSUNG PROVED THAT THE '721 PATENT WAS

14       INVALID.  THE INSTRUCTIONS YOU WILL NEED ARE INSTRUCTION

15       NUMBER 31, WHICH DESCRIBES THE BURDEN OF PROOF, AND INSTRUCTION

16       NUMBER 34, WHICH DESCRIBES THE TEST FOR OBVIOUSNESS.

17             INSTRUCTION 31, SAMSUNG -- TELLS US THAT SAMSUNG HAS TO

18       PROVE INVALIDITY BY WHAT THE LAW CALLS CLEAR AND CONVINCING

19       EVIDENCE, WHICH IS A HIGHER THAN NORMAL STANDARD IN A CIVIL

20       CASE.

21             THE KEY QUESTION FOR OBVIOUSNESS IN INSTRUCTION 34 IS

22       WHETHER OR NOT THE INVENTION WOULD HAVE BEEN OBVIOUS TO A

23       PERSON OF ORDINARY SKILL IN THE FIELD AT THE TIME OF THE

24       INVENTION.

25             BUT THE INSTRUCTION SETS OUT SEVERAL IMPORTANT RULES.

1          FIRST, YOU ARE REQUIRED TO CONSIDER WHAT WAS THE CONTENT

2     OF THE PRIOR ART?  WHAT WAS KNOWN BEFORE THE INVENTION?

3          SECOND, YOU ARE SUPPOSED TO CONSIDER WHAT THE LAW CALLS

4     ADDITIONAL FACTORS THAT MAY BE RELEVANT TO OBVIOUSNESS.  I

5     THINK OF THESE AS REALITY TESTS TO SEE HOW THE WORLD ACTUALLY

6     REACTED TO THE INVENTION AT THE TIME.

7          BUT MOST IMPORTANT, YOU CANNOT PROVE THAT SOMETHING IS

8     OBVIOUS JUST BY GOING AND FINDING BITS AND PIECES IN THE PRIOR

9     ART AND TRYING TO PUT THEM TOGETHER.

10         AS JUDGE KOH HAS TOLD YOU, YOU CANNOT USE HINDSIGHT.

11         IN OTHER WORDS, YOU CAN'T DO EXACTLY WHAT SAMSUNG HAS DONE

12    HERE.  YOU CANNOT USE THE PATENT ITSELF AS A ROADMAP TO TRY TO

13    FIND THE VARIOUS ELEMENTS IN THE PRIOR ART.

14         YOU KNOW FROM YOUR OWN EXPERIENCE THAT MANY TIMES WHEN YOU

15    POINT OUT SOMETHING NEW TO SOMEONE, YOU SAY, "LOOK AT THIS,

16    THIS IS A NEW IDEA," THE PERSON WILL GO, "OH, YEAH.  WELL,

17    THAT'S OBVIOUS."

18         BUT WHERE WERE THEY BEFORE YOU POINTED IT OUT TO THEM?

19    IT'S ONCE YOU SEE THE IDEA THAT, ALL OF A SUDDEN, IN

20    RETROSPECT, USING HINDSIGHT, IT APPEARS OBVIOUS.

21         WHERE WAS SAMSUNG BEFORE IT SAW THE IPHONE?  YOU KNOW THE

22    ANSWER TO THAT QUESTION.  THEY DIDN'T EVEN HAVE A SMARTPHONE.

23         PROFESSOR GREENBERG TESTIFIED THAT THE '721 PATENT WOULD

24    HAVE BEEN OBVIOUS IN LIGHT OF A PHONE MANUAL FOR A EUROPEAN

25    PHONE CALLED THE NEONODE AND AN ARTICLE BY A PERSON NAMED

1    PLAISANT.

2         AS YOU SAW, THERE WERE HUGE PROBLEMS WITH THIS POSITION.

3    BOTH OF THESE REFERENCES THAT HE WAS TALKING ABOUT WERE

4    ACTUALLY BEFORE THE PTO EXAMINERS WHO ISSUED THE PATENT, AND

5    YOU CAN SEE THAT ON THE FACE OF THE PATENT WHERE THEY ARE

6    LISTED.

7         LET ME PAUSE HERE FOR A MOMENT.  YOU'RE GOING TO SEE,

8    THROUGHOUT ALL OF THESE PATENTS, THAT THE EXAMINERS WHO LOOKED

9    AT THEM WERE EXTREMELY THOROUGH.  THE PROSECUTION HISTORY,

10   WHICH IS IN EVIDENCE, IS HUNDREDS OF PAGES LONG.  THAT'S JX 8

11   FOR ONE OF OUR PATENTS.  MANY PATENTS AND PUBLICATIONS ARE

12   CITED.

13        EVEN IN A COUPLE OF CASES WHERE SAMSUNG HAS FOUND SOME

14   REFERENCE THAT MAY NOT HAVE BEEN CITED, NO SAMSUNG EXPERT HAS

15   EVER TESTIFIED TO YOU UNDER OATH THAT THIS NEW REFERENCE WAS

16   MORE RELEVANT THAN THE ART THAT THE EXAMINER ACTUALLY LOOKED

17   AT.

18        THAT'S AN IMPORTANT THING, BECAUSE IF THE EXAMINER HAS

19   LOOKED AT MORE RELEVANT ART, OTHER ART IS NOT IMPORTANT

20   ANYMORE.  IT'S AN IMPORTANT GAP IN THE EVIDENCE THAT WAS NOT

21   FILLED IN HERE.  NO ONE HAS EVER SAID THESE NEW THINGS ARE SO

22   IMPORTANT AND THE EXAMINER NEVER SAW ANYTHING LIKE IT.

23        SPECIFICALLY WITH RESPECT TO NEONODE AND PLAISANT,

24   PROFESSOR COCKBURN POINTED OUT THAT NEONODE HAS NO VISUAL CUES

25   AND NO CONTINUOUS MOVEMENT.

1          THESE X'S ON THE SCREEN SHOW THAT ELEMENTS ARE MISSING.

2          HE POINTED OUT THAT NOT ONLY DID PLAISANT NOT FILL OUT THE

3     GAPS, PLAISANT ACTUALLY TAUGHT AWAY FROM USING A SLIDE IMAGE.

4     YOU MAY REMEMBER, HE PUT THE ARTICLE UP AND IT SAID THAT PEOPLE

5     WHO LOOKED AT THIS HAD MORE PROBLEMS WITH SLIDERS.  THEY WERE

6     HARDER TO IMPLEMENT.  IT WAS NOT AS GOOD.

7          THERE WAS NO CLEAR AND CONVINCING EVIDENCE THE '721 PATENT

8     IS INVALID.

9          SO THEN WE MOVE TO THE ADDITIONAL FACTORS TO BE CONSIDERED

10    UNDER INSTRUCTION -- UNDER THE INSTRUCTION.

11         PROFESSOR GREENBERG SAID THAT NO FACTOR, NONE OF THESE,

12    WEIGHED IN FAVOR OF VALIDITY.

13         BUT HE SIMPLY IGNORED THE EVIDENCE OF PUBLIC ACCLAIM.  HE

14    IGNORED THE APPLE AD THAT WE SHOWED YOU THAT ACTUALLY FEATURED

15    THE SLIDE TO UNLOCK FEATURE.

16         HE IGNORED DOCUMENT AFTER DOCUMENT SHOWING THAT SAMSUNG

17    INTENTIONALLY COPIED THIS FEATURE FROM THE IPHONE.

18         PLAINTIFF'S EXHIBIT 121, WHICH IS THE VICTORY PHONE,

19    PLAINTIFF'S EXHIBIT 120, WHICH IS THE BEHOLD PHONE, PLAINTIFF'S

20    EXHIBIT 219, WHICH WAS THE KEPLER PHONE, AND PLAINTIFF'S

21    EXHIBIT 157, WHICH WAS THE AMETHYST PHONE, DR. GREENBERG DIDN'T

22    MENTION THEM.

23         EVERY ONE OF THOSE SAMSUNG INTERNAL DOCUMENTS COPIES SLIDE

24    TO UNLOCK FROM THE IPHONE.  NOT ONE OF THEM SUGGESTS THAT THE

25    IDEA WAS OBVIOUS OR THAT SAMSUNG HAD IT FIRST, THAT IT'S IN THE

1    GOOGLE SOFTWARE.  NONE OF THE THINGS YOU HAVE HEARD FROM

2    SAMSUNG IN THIS TRIAL ARE SUPPORTED BY A SINGLE PAGE OF

3    SAMSUNG'S OWN INTERNAL DOCUMENTS.  THEY ARE TRYING TO SELL YOU

4    A VERSION OF THE STORY THAT NEVER, EVER HAPPENED.

5         LET'S TALK ABOUT THAT FOR A MINUTE.

6         THIS IS A TRIAL.  I MEAN, OBVIOUSLY THE PARTIES DISAGREE.

7    IT'S NOT UNUSUAL FOR PARTIES TO SEE THE WORLD DIFFERENTLY AND

8    YOU HAVE TO DECIDE WHERE THE TRUTH IS.

9         BUT IN THAT REGARD, WE HAVE TRIED TO PROVE EVERY IMPORTANT

10   FACT FROM SAMSUNG'S OWN DOCUMENTS.  THOSE DOCUMENTS WERE

11   CREATED BEFORE THIS LAWSUIT EXISTED.  THEY SHOW WHAT THE PEOPLE

12   AT SAMSUNG WERE ACTUALLY THINKING AT THE TIME.  THEY NEVER

13   THOUGHT THOSE DOCUMENTS WOULD SEE THE LIGHT OF DAY.

14        ON THE OTHER HAND, EVERY POINT SAMSUNG HAS TRIED TO MAKE

15   IN THIS TRIAL IS CONTRADICTED BY ITS OWN DOCUMENTS.  THEIR

16   WITNESSES SAY A; THEIR OWN DOCUMENTS SAY B.  YOU HAVE SEEN THAT

17   IN CASE AFTER CASE.

18        BUT SOMEHOW THAT DOESN'T SEEM TO EMBARRASS THEM.

19        SO BACK TO THE FACTORS THAT ARE RELEVANT TO OBVIOUSNESS.

20        ANOTHER FACTOR IS PRAISE FROM OTHERS IN THE FIELD.  AND

21   YOU MAY REMEMBER, IT'S BEEN A WHILE NOW, BUT WHEN WE SAW WHAT

22   SAMSUNG'S EUROPEAN DESIGNERS ACTUALLY SAID -- THIS IS SAMSUNG'S

23   DESIGNERS -- WHEN THEY SAW THE SLIDE TO UNLOCK, WHICH IS

24   EXHIBIT 119, THEY DIDN'T SAY IT WAS OBVIOUS.  THEY SAID IT WAS

25   A "CREATIVE WAY TO SOLVE USER INTERFACE COMPLEXITY."

1          IF YOU WEIGH THESE FACTORS, YOU WILL FIND THAT THEY

2     SUPPORT THE CONCLUSION THAT SLIDE TO UNLOCK WAS AN IMPORTANT

3     AND NOVEL INVENTION.

4          IF YOU AGREE, YOU WILL ANSWER QUESTION 8 IN THE VERDICT

5     FORM NO, SAMSUNG HAS NOT PROVEN THAT THIS CLAIM IS INVALID.

6          THAT WILL BRING YOU TO THE QUESTION OF WHETHER OR NOT

7     SAMSUNG'S INFRINGEMENT WAS WILLFUL.

8          INSTRUCTION NUMBER 30 WILL TELL YOU THAT THE TEST FOR

9     WILLFULNESS IS ONE OF RECKLESS DISREGARD, WHICH MEANS THAT

10    SAMSUNG ACTUALLY KNEW OR IT WAS SO OBVIOUS THAT IT SHOULD HAVE

11    KNOWN THAT ITS ACTIONS CONSTITUTED INFRINGEMENT OF A VALID AND

12    ENFORCEABLE PATENT.

13         HERE AGAIN, COPYING PLAYS A BIG PART AND YOU CAN FIND

14    WILLFULNESS IF YOU FIND THAT SAMSUNG COPIED OUR PATENTED

15    FEATURES.

16         I'M NOT GOING TO GO BACK THROUGH THE DOCUMENTS, BUT THINK

17    ABOUT THE BIG PICTURE FOR A MOMENT.  SAMSUNG KNEW ABOUT THE

18    PATENTS, IT KNEW IT WAS FACING ITS OWN CRISIS OF DESIGN, AND IT

19    INTENTIONALLY COPIED THE IPHONE.

20         WHEN IT GOT HERE TO TRIAL, IT PRESENTED NO INFRINGEMENT

21    DEFENSE FOR FIVE OF THE PRODUCTS THAT WERE ACCUSED, AND AN

22    INVALIDITY DEFENSE THAT HAD ALREADY BEEN REJECTED BY THE PTO.

23         THE FACT THAT IT ACTED WILLFULLY IS BEYOND DISPUTE.

24         IF YOU AGREE, YOU SHOULD ANSWER YES TO QUESTION NUMBER 7

25    ON THE VERDICT FORM FOR BOTH SEC AND STA, AND THAT WILL BE IT

1    FOR THE '721 PATENT.

2         THE NEXT PATENT, THE '172 AUTOMATIC WORD CORRECTION PATENT

3    WILL BE A LOT QUICKER BECAUSE YOU DON'T GET ASKED ANY QUESTIONS

4    ABOUT INFRINGEMENT.  JUDGE KOH HAS ALREADY FOUND INFRINGEMENT

5    AS A MATTER OF LAW.  SEVEN SAMSUNG PHONES INFRINGE THE '172

6    PATENT.  YOU WILL FIND THEM LISTED IN PLAINTIFF'S EXHIBIT 222A

7    AT PAGE 7.

8         HERE'S AN AD FOR EXHIBIT 222A.  THERE'S A LOT OF DATA IN

9    THIS CASE.  THERE'S A LOT OF DAMAGES NUMBERS.  THERE'S A LOT OF

10   LISTS OF PHONES.  WE HAVE LISTED ALL OF OUR -- ALL THE DATA

11   THAT WE THINK YOU WILL NEED, AND I'LL MENTION IT SEVERAL TIMES

12   TODAY, IN THIS ONE EXHIBIT, 222A, AND THAT'S WHERE YOU WILL

13   FIND ALL OF THE NUMBERS AND THE LISTS OF ACCUSED DEVICES AND

14   EVERYTHING IN ONE PLACE IF THAT'S HELPFUL TO YOU.

15        I'M GOING TO BE SHOWING YOU SOME SLIDES, YOU WON'T HAVE

16   THE SLIDES, BUT YOU WILL HAVE THIS EXHIBIT 222A.

17        SO FOR THIS PATENT, WE CAN MOVE DIRECTLY TO VALIDITY.

18   THIS TIME IT WAS PROFESSOR WIGDOR WHO TESTIFIED THAT, IN HIS

19   VIEW, THE PTO WAS WRONG.  PROFESSOR WIGDOR ARGUED THAT THE '172

20   INVENTION WAS INVALID DUE TO A COMBINATION OF THE ROBINSON AND

21   XRGOMICS PATENTS.

22        BUT AS IT TURNED OUT, THE PTO HAD ALL THE FIGURES -- HE

23   DIDN'T MENTION THIS ON DIRECT, BUT ON CROSS-EXAMINATION, HE

24   ADMITTED THAT THE PTO HAD ALL THE FIGURES FROM THE ROBINSON

25   PATENT BEFORE IT IN ANOTHER PATENT TO AN INVENTOR CALLED LONGE.

1          PROFESSOR COCKBURN POINTED OUT THAT BECAUSE ROBINSON DID

2     NOT SHOW THE CURRENT CHARACTER STRING IN THE TEXT BOX, IT WAS

3     MISSING MANY OF THE ELEMENTS IN CLAIM 18 OF THE '172 PATENT.

4          AND THE GAPS COULD NOT BE FILLED BY XRGOMICS BECAUSE

5     XRGOMICS WASN'T EVEN A SPELLING CORRECTION PATENT.  IT WAS A

6     PATENT FOR WORD EXTENSION.  IT DOES NO CORRECTION.

7          ABSOLUTELY NO REASON WHY PERSONS OF ORDINARY SKILL WOULD

8     TRY TO COMBINE THOSE TWO PATENTS.

9          PROFESSOR WIGDOR ALSO COMPLETELY IGNORED THE ADDITIONAL

10    FACTORS THAT ARE RELEVANT TO OBVIOUSNESS.  HE IGNORED THE FACT

11    THAT SAMSUNG HAD SOLD OVER 7.5 MILLION INFRINGING PHONES AS

12    EVIDENCE OF COMMERCIAL SUCCESS.

13         AND HE IGNORED THE INTERNAL SAMSUNG DOCUMENTS, SUCH AS

14    PLAINTIFF'S EXHIBIT 168, WHERE T-MOBILE REPORTED THAT THE

15    ALTERNATIVE THAT SAMSUNG WAS USING ON ITS DART PHONE HAD BEEN

16    TOO JARRING.

17         NOWHERE DID ANYONE EVER SUGGEST THAT THE APPLE PATENT AND

18    THE APPLE PATENTED FEATURE WAS OBVIOUS.

19         SO WHEN YOU GET TO QUESTION 8 ON THE VERDICT FORM, WE ASK

20    YOU TO CONCLUDE THAT THE PTO GOT IT RIGHT AND ANSWER NO AS TO

21    WHETHER SAMSUNG HAS PROVEN INVALIDITY OF THE '172 PATENT.

22         FINALLY, ON WILLFULNESS, WE KNOW, ONCE AGAIN, THAT SAMSUNG

23    CONTINUED TO USE THE FEATURE EVEN AFTER IT WAS AWARE OF THE

24    PATENT AND EVEN THOUGH IT HAD NO INFRINGEMENT DEFENSE.  THAT IS

25    THE CLASSIC DEFINITION OF WILLFULNESS.  SO YOU SHOULD ANSWER

1      QUESTION NUMBER 7 YES.

2           THE THIRD PATENT IS APPLE'S '647 PATENT, WHICH YOU HEARD

3      REFERRED TO AS QUICK LINKS OR ALSO DATA DETECTORS.

4           APPLE IS ASSERTING CLAIM 9 AGAINST NINE ACCUSED SAMSUNG

5      PHONES.  AGAIN, YOU CAN SEE THEM HERE, BUT YOU WILL ALSO FIND

6      THEM IN EXHIBIT 222A AT PAGE 7.

7           WE CALLED DR. TODD MOWRY TO TESTIFY CONCERNING THIS

8      PATENT.  DR. MOWRY LOOKED AT THE SOFTWARE CODE IN EVERY ACCUSED

9      PHONE AND HE WALKED YOU THROUGH EACH OF THE CLAIM LIMITATIONS

10     AGAINST REPRESENTATIVE SAMSUNG PHONES.

11          DR. MOWRY CAREFULLY TOOK YOU THROUGH THE SAMSUNG SOFTWARE

12     THAT CARRIES OUT EACH OF THE CLAIMED FUNCTIONS.

13          SAMSUNG CALLED DR. JEFFAY AND DR. JEFFAY CONCEDED THAT THE

14     PHONES THAT DR. MOWRY LOOKED AT WERE REPRESENTATIVE OF THE

15     ACCUSED PHONES, AND THAT MOST OF THE CLAIM ELEMENTS ARE PRESENT

16     IN THE ACCUSED PHONES.

17          DR. JEFFAY, AS YOU'LL REMEMBER BECAUSE WE HEARD IT AGAIN

18     YESTERDAY, ARGUED THAT THERE WAS NO INFRINGEMENT BECAUSE IN HIS

19     OPINION, AN ANALYZER SERVER, AS THE TERM IS USED IN THE CLAIM,

20     COULD NOT BE PROGRAMMED AS A SHARED LIBRARY.

21          BASICALLY DR. JEFFAY SAYS A SHARED -- A SERVER AND A

22     LIBRARY ARE DIFFERENT.

23          WE BROUGHT DR. MOWRY BACK IN REBUTTAL TO SHOW YOU THAT

24     THAT WAS WRONG.

25          WE SHOWED YOU THE TESTIMONY OF THE INVENTOR, DR. BONHURA.

1          WE SHOWED YOU THIS TESTIMONY.

2               BUT WE ALSO SHOWED YOU A 1996 APPLE -- 1996 APPLE INTERNAL

3     E-MAIL, WHICH IS DEFENDANT'S EXHIBIT DX 334, SHOWING THAT THE

4     APPLE INVENTORS HAD ACTUALLY BEEN CONSIDERING IMPLEMENTING THE

5     ANALYZER SERVER AS A SHARED LIBRARY, EXACTLY THE SAME

6     IMPLEMENTATION THAT SAMSUNG ENDED UP USING YEARS LATER IN ITS

7     INFRINGING PHONES.

8               AND THIS IS THE CRITICAL POINT:  THERE WAS MORE THAN ONE

9     WAY THAT A SOFTWARE DESIGNER COULD IMPLEMENT AN ANALYZER

10    SERVER, MORE THAN ONE WAY TO DESIGN THE SOFTWARE.

11              APPLE CONSIDERED A SHARED LIBRARY.  YOU CAN SEE THAT HERE.

12              SAMSUNG USES A SHARED LIBRARY.

13              THEY BOTH IMPLEMENT ANALYZER SERVERS.

14              BUT HERE YOU'LL SEE THAT APPLE'S INTERNAL DOCUMENTS ARE

15    COMPLETELY CONSISTENT WITH THE POSITION THAT WE'RE TAKING IN

16    THIS CASE.

17              YESTERDAY YOU'LL RECALL WE HAD TO COME BACK BECAUSE THE

18    JUDGE GAVE US ADDITIONAL DETAIL ABOUT THIS PATENT, TWO NEW

19    INSTRUCTIONS, AND SO THE EXPERTS CAME BACK TO TESTIFY ABOUT

20    THAT.

21              AND DR. JEFFAY CAME BACK AND HE CAME BACK TO RAISE TWO NEW

22    ISSUES.  FIRST, HE CLAIMED THAT THE SHARED LIBRARY WAS NOT

23    SEPARATE FROM THE CLIENT APPLICATIONS, WHICH IS REQUIRED, A

24    SERVER ROUTINE SEPARATE FROM A CLIENT.

25              FRANKLY, THAT ARGUMENT IS A SHELL GAME.  EVERYONE AGREES

1       THAT THIS CODE THAT WE'RE TALKING ABOUT IS CALLED A SHARED

2       LIBRARY.  THAT'S WHY IT'S CALLED THAT.  IT ISN'T PART OF ONE

3       APPLICATION.  IT'S SHARED BY EVERY APPLICATION THAT NEEDS TO

4       USE IT.

5             AND AS DR. JEFFAY WAS FORCED TO CONCEDE ON

6       CROSS-EXAMINATION, THE SAME LIBRARY IS USED BY THE BROWSER

7       APPLICATION.  IT IS ALSO USED BY THE MESSAGING APPLICATION.  IT

8       IS USED BY OTHER APPLICATIONS.

9             IT IS NOT PART OF ANY ONE APPLICATION OR PART OF ANY ONE

10      CLIENT.  IT IS SEPARATE AND AVAILABLE TO ALL OF THEM.

11            AS DR. MOWRY EXPLAINED WHEN HE ACTUALLY SHOWED YOU THE

12      CODE, IT IS STANDALONE CODE THAT SITS IN A SEPARATE PLACE IN

13      MEMORY.

14            DR. JEFFAY KEPT SAYING, WELL, IT CAN'T RUN BY ITSELF.

15            BUT, FIRST, YOU'RE NOT GOING TO FIND "RUN BY ITSELF" ANY

16      PLACE IN THIS CLAIM INSTRUCTION.  THAT'S NOT PART OF THE ISSUE

17      HERE.

18            BUT SECOND, AS DR. MOWRY SAID, ALL SOFTWARE PROGRAMS WORK

19      TOGETHER.  EVERYTHING WORKS WITH AN OPERATING SYSTEM.  THESE

20      PROGRAMS DON'T RUN BY THEMSELVES.  THAT'S NOT THE TEST.

21            THE TEST IS WHETHER OR NOT THIS CODE IS SEPARATE FROM THE

22      APPLICATION, AND BECAUSE IT IS A LIBRARY, A SHARED LIBRARY, IT

23      IS SEPARATE.  IT IS USED BY ALL.  IT IS PART OF NONE.

24            SECOND, ON LINKING ACTIONS TO THE DETECTED STRUCTURES,

25      ALTHOUGH DR. JEFFAY ADMITTED THAT THE CODE IN THE PHONES

1    CREATES THE REQUIRED SPECIFIED CONNECTION TO THE START

2    ACTIVITY, COMPUTER SUBROUTINE UNDER THE COURT'S LINKING ACTIONS

3    CONSTRUCTION, HE SAID THAT IT DIDN'T MEET THE CLAIM BECAUSE

4    START ACTIVITY DOESN'T DO ALL OF THE STEPS THAT ARE REQUIRED TO

5    MAKE A PHONE CALL OR SEND AN E-MAIL, WHATEVER ACTION THE USER

6    SELECTED.

7         BUT, AGAIN, LOOK AT THE CONSTRUCTION THAT THE COURT GAVE

8    YOU YESTERDAY FOR LINKING ACTIONS.  IT DOESN'T REQUIRE THAT THE

9    LINKED COMPUTER SUBROUTINE DO EVERY STEP, JUST THAT IT PERFORM

10   A SEQUENCE OF OPERATIONS ON THE DETECTED STRUCTURE.

11        AND DR. -- PROFESSOR MOWRY WALKED YOU THROUGH THE CODE AND

12   SHOWED YOU THAT THE SHARED LIBRARY CODE PERFORMED THE

13   OPERATIONS FOR BOTH THE BROWSER AND THE MESSENGER APPLICATIONS.

14        WHEN YOU GET TO QUESTION 1, WHICH COVERS DIRECT

15   INFRINGEMENT OF THE '647 PATENT, WE ASK YOU TO SAY YES AS TO

16   BOTH SEA AND STA AND TO FIND SEA LIABLE FOR INDUCED AND

17   CONTRIBUTORY INFRINGEMENT FOR THE REASONS THAT WE HAVE

18   DISCUSSED.

19        AS TO VALIDITY ON THIS PATENT, WE HAD ANOTHER ONE OF THOSE

20   WEIRD MOMENTS.  IN THE OPENING, IF YOU TOOK NOTES, YOU'LL

21   REMEMBER THAT SAMSUNG'S LAWYER SAID THAT A PRODUCT -- HE TALKED

22   ABOUT THIS PRODUCT AT GREAT LENGTH -- CALLED EMBEDDED BUTTONS

23   AND HE TALKED ABOUT HOW EMBEDDED BUTTONS HAD BEEN INVENTED AT

24   XEROX PARK AND HE PROMISED YOU THAT THEY WOULD SHOW YOU THAT

25   EMBEDDED BUTTONS INVALIDATED THE '647 PATENT.

1          BUT ONCE AGAIN, THERE TURNED OUT TO BE NO EVIDENCE TO

2     SUPPORT WHAT HE TOLD YOU.  DR. JEFFAY MENTIONED EMBEDDED

3     BUTTONS, BUT HE DID NOT RELY ON IT TO ARGUE INVALIDITY.

4     YESTERDAY HE DIDN'T EVEN MENTION IT AT ALL WHEN HE WENT BACK TO

5     THE ISSUE OF VALIDITY.

6          INSTEAD, DR. JEFFAY RELIES ON A DIALLING SYSTEM CALLED

7     SIDEKICK, AND YOU WILL REMEMBER THAT.

8          BUT THERE WAS NO EVIDENCE AT ALL TO SUPPORT THE ARGUMENT

9     THAT SAMSUNG'S LAWYER TOLD YOU THAT THEY WERE GOING TO MAKE.

10         SO LET'S TALK ABOUT SIDEKICK.  AS YOU HAVE SEEN, SIDEKICK

11    WAS A VERY PRIMITIVE DIALING SYSTEM.  IT DETECTED ONLY A SINGLE

12    STRUCTURE, A SIMPLE PHONE NUMBER FORMAT, AND IT DID NOT OFFER A

13    MENU OF OPTIONS ONCE IT IDENTIFIED THAT STRUCTURE.

14         THOSE ARE THE VERY THINGS THAT MADE THE '647 INVENTION SO

15    HELPFUL.  IT IDENTIFIED MULTIPLE STRUCTURES AND IT PROVIDED A

16    MENU OF OPTIONS.

17         SIDEKICK DOES NOT PRACTICE THE INVENTION AND IT CANNOT

18    PROVE THAT THIS PATENT IS INVALID.

19         YESTERDAY DR. JEFFAY WAS FORCED TO ADMIT THAT SIDEKICK --

20    THE FIRST TIME HE WAS HERE, DR. JEFFAY ADMITTED THAT SIDEKICK

21    DIDN'T HAVE THE POP-UP MENU, IT DIDN'T PROVIDE THE, THE

22    OPTIONS.

23         YESTERDAY HE WAS ALSO REQUIRED TO ADMIT THAT IT DIDN'T

24    HAVE THE LINKING ACTION THAT WAS REQUIRED BY THE COURT'S

25    ADDITIONAL CONSTRUCTION.  YOU'D HAVE TO PUT ANOTHER X ON THIS

1    SLIDE FOR THE LINKING ACTION.

2         WHAT YOU HAVE HERE IS AN EXPERT TELLING YOU SIMPLY THAT

3    ALMOST ALL OF THE CLAIM REQUIREMENTS WOULD HAVE BEEN OBVIOUS,

4    EVEN THOUGH THERE IS NO EVIDENCE THAT ANYONE EVER CREATED THIS

5    INVENTION, THAT ANYONE EVER FILLED IN THE GAPS, THAT ANYONE

6    EVER CREATED WHAT IT WAS THAT MAKES THIS INVENTION VALUABLE.

7         HE SIMPLY WAVED HIS HANDS OVER IT AND HE SAID THIS WOULD

8    HAVE BEEN OBVIOUS.

9         THAT CANNOT BE CLEAR AND CONVINCING EVIDENCE.  HOW CAN IT

10   BE OBVIOUS IF THE THOUSANDS OF PEOPLE WORKING IN THIS FIELD

11   NEVER THOUGHT OF IT UNTIL THE APPLE INVENTORS DID IT?

12        AND IN THIS CASE, THE ADDITIONAL FACTORS RELEVANT TO

13   OBVIOUSNESS ARE AGAIN HELPFUL.  YOU SAW THAT SAMSUNG

14   INTENTIONALLY COPIED THIS FEATURE, WITH THE USEFUL POP-UP MENU,

15   DIRECTLY FROM THE IPHONE -- THAT'S IN PLAINTIFF'S EXHIBIT

16   146 -- AND THEY COPIED IT IN 2010.

17        WHY DO YOU HAVE TO COPY IT IN 2010 IF THE IDEA WAS OBVIOUS

18   ALL THOSE YEARS FROM THE SIDEKICK?

19        SO IN QUESTION NUMBER 8, WHEN YOU ARE ASKED IF SAMSUNG

20   PROVED THE PATENT INVALID, YOU SHOULD ANSWER NO.

21        ON THE ISSUE OF WILLFULNESS, WE KNOW THAT THE '647 PATENT

22   IS ONE OF THE PATENTS THAT WAS EXPRESSLY LISTED WHEN APPLE MET

23   WITH SAMSUNG IN AUGUST 2010 AND ASKED THEM TO STOP COPYING.

24        BUT WE KNOW THAT INSTEAD OF STOPPING, SAMSUNG SIMPLY -- WE

25   SAW THIS -- CUT AND PASTE THE APPLE INVENTOR'S ORIGINAL PAPER

1     INTO ITS 2011/2012 USER EXPERIENCE PLANNING DOCUMENT.  THESE

2     ARE EXHIBITS 106 AND 107.

3            AND, FINALLY, WE KNOW THAT FROM THE TESTIMONY, AFTER APPLE

4     FILED THIS SUIT, GOOGLE CHANGED ITS OWN ANDROID CODE TO

5     ELIMINATE THE POP-UP MENU.

6            BUT WHEN THAT HAPPENED, SAMSUNG STOPPED USING THE GOOGLE

7     CODE AND IT WROTE ITS OWN CODE SO THAT ITS PHONES WOULD

8     CONTINUE TO COPY THE APPLE PRODUCTS DOWN TO THE SMALLEST

9     DETAIL.  THAT IS WILLFUL INFRINGEMENT.

10           THE FOURTH PATENT IS THE '959 UNIVERSAL SEARCH PATENT.

11    APPLE IS ASSERTING CLAIM 25.

12           DR. SNOEREN SHOWED HOW EACH OF THE CLAIM ELEMENTS IS FOUND

13    ON THE ACCUSED SAMSUNG DEVICES.

14           AGAIN, SAMSUNG'S NON-INFRINGEMENT DEFENSE IS RELATIVELY

15    NARROW.  SAMSUNG DOES NOT DENY THAT IT HAS UNIVERSAL SEARCH.

16    IT DOES NOT DENY THAT ITS PHONES SEARCH BOTH LOCALLY AND ON THE

17    INTERNET.

18           INSTEAD, DR. RINARD RAISED A VERY TECHNICAL ARGUMENT TO

19    TRY TO DEFEAT INFRINGEMENT.  DR. RINARD ARGUED THAT THE GOOGLE

20    HEURISTIC ON THE SAMSUNG DEVICES DOES NOT SEARCH INFORMATION ON

21    THE INTERNET BECAUSE THERE IS ALSO A SEPARATE HEURISTIC ON

22    GOOGLE SERVERS THAT ALSO OPERATES ON GOOGLE INTERNET SEARCHES.

23    THAT WAS HIS ARGUMENT.

24           BUT AS DR. SNOEREN SHOWED YOU ON REBUTTAL, THAT'S NOT

25    REALLY A DEFENSE BECAUSE THE SAMSUNG PHONES LOCATE BOTH CURRENT

 1   AND HISTORICAL INTERNET RESULTS.  THE PHONE ITSELF STORES THE

 2   USER'S INTERNET HISTORY, AND THAT IS SEARCHED AS PART OF THE

 3   UNIVERSAL SEARCH FEATURE.

 4        IRONICALLY, DR. SNOEREN WAS ABLE TO USE THIS DRAWING FROM

 5   THE GOOGLE ENGINEER, BJORN BRINGERT, TO PROVE THIS POINT.  THE

 6   DRAWING SHOWS CLEARLY THAT THE PHONE ITSELF SEARCHES FOR

 7   INFORMATION ON THE INTERNET.

 8        BECAUSE THE SAMSUNG DEVICES ARE COVERED BY THE CLAIM

 9   LANGUAGE, WE ASK THAT YOU ANSWER YES TO QUESTION NUMBER 2

10   CONCERNING THE '959 PATENT.

11        BUT THERE'S ONE ADDITIONAL POINT HERE.  UNDER THE '959

12   PATENT, THE ACCUSED DEVICES INCLUDE BOTH PHONES AND TABLETS.

13        SO IN THIS CASE, ALL THREE COMPANIES ARE DIRECT

14   INFRINGERS.  SEC SELLS PHONES AND TABLETS; SEA SELLS TABLETS;

15   AND STA SELLS PHONES.

16        QUESTIONS 5 AND 6 ON THE VERDICT FORM ABOUT CONTRIBUTORY

17   INDUCEMENT CONTINUE TO BE THE SAME ANALYSIS BECAUSE IT IS SEC

18   THAT INDUCES BOTH SEA AND STA TO INFRINGE AND IT IS SEC THAT

19   CONTRIBUTES TO THEIR INFRINGEMENT.

20        WITH REGARD TO VALIDITY, SAMSUNG PRESENTED TWO ARGUMENTS.

21   THE FIRST WAS BASED ON THE SOFTWARE PROGRAM CALLED FREEWAIS SF.

22        THE SECOND WAS BASED ON A COMBINATION OF TWO PATENTS

23   CALLED SMITH AND SHOHAM.

24        LET ME DEAL WITH FREEWAIS SF FIRST.  I'M SURE THAT THIS

25   WAS PRETTY COMPLICATED WHEN THE EVIDENCE WAS GOING IN.

1          IN ORDER TO UNDERSTAND WHAT SAMSUNG WAS TRYING TO DO, YOU

2     HAVE TO LOOK AT THE INSTRUCTIONS.  AS YOU WILL SEE FROM

3     INSTRUCTION NUMBER 32, WHICH DEALS WITH ANTICIPATION, YOU ARE

4     SUPPOSED TO CONSIDER ONLY EVIDENCE THAT MEETS THE LEGAL

5     DEFINITION OF PRIOR ART.

6          AND IN THIS CASE, IN ORDER TO BE PRIOR ART, THE ART HAD TO

7     BE PUBLICLY KNOWN OR PUBLICLY USED BY OTHERS IN THE

8     UNITED STATES BEFORE THE APPLE INVENTORS CONCEIVED OF THE

9     INVENTION.

10         SO THE '959 PATENT WAS FILED, YOU'LL SEE ON THE FACE, IN

11    JANUARY OF 2000.  SO IN ORDER FOR FREEWAIS SF TO BE PRIOR ART,

12    IT HAD TO HAVE BEEN KNOWN OR USED IN THE U.S. AT LEAST BEFORE

13    2000.

14         SAMSUNG -- ONE OF SAMSUNG'S PROBLEMS IS THAT THERE IS NO

15    EVIDENCE THAT ANYONE HAD EVER USED THE FREEWAIS SF PROGRAM TO

16    SEARCH LOCALLY AND ON THE INTERNET IN THE UNITED STATES BEFORE

17    THE YEAR 2000.

18         I USE THREE CARD MONTE, I USE THE SHELL GAME.

19         SAMSUNG PUT IN A BUNCH OF EVIDENCE ABOUT A U.S. COMPANY

20    CALLED WAIS, W-A-I-S, THEY EVEN BROUGHT A WITNESS TO TALK ABOUT

21    THE WAIS COMPANY, AND THE WAIS COMPANY, AN AMERICAN COMPANY,

22    MADE SOFTWARE.

23         THAT IS NOT THE SOFTWARE THAT DR. RINARD RELIED UPON.  THE

24    AMERICAN WAIS SOFTWARE IS NOT PART OF THEIR INVALIDITY.  IT'S

25    SIMPLY IN THIS CASE TO CONFUSE THIS ISSUE OF WHAT WAS IN

1        AMERICA AND WHAT WASN'T IN AMERICA.

2             THE SOFTWARE THEY'RE RELYING ON IS CALLED FREEWAIS SF, AND

3        AS YOU WILL RECALL, SAMSUNG BROUGHT THE SOURCE CODE OVER FOR

4        FREEWAIS SF OVER FROM GERMANY LAST YEAR AND PAID DR. RINARD TO

5        SET UP HIS OWN COMPUTER SYSTEM USING OUR PATENT AS A ROADMAP.

6             WHAT THEY WANTED TO ARGUE TO YOU WAS THAT YOU COULD ASSUME

7        THAT BECAUSE DR. RINARD WAS ABLE TO DO IT LAST YEAR, SOMEONE

8        ELSE MUST HAVE DONE THIS MORE THAN 15 YEARS AGO.

9             BUT THERE IS NO EVIDENCE THAT ANYONE HAD DONE IT BEFORE

10       DR. RINARD USED OUR PATENT AS A ROADMAP.  THERE'S CERTAINLY NOT

11       CLEAR AND CONVINCING EVIDENCE.

12            SO SAMSUNG HAS LOTS OF PROBLEMS HERE.  FIRST OF ALL, THE

13       PATENT CLAIMS A COMPUTER READABLE MEDIUM.

14            SOURCE CODE, WHICH THEY BROUGHT OVER FROM GERMANY -- THIS

15       IS WHY YOU HEARD THIS TESTIMONY -- SOURCE CODE IS NOT COMPUTER

16       READABLE.  PEOPLE READ IT.  MACHINES DON'T.  SO SOURCE CODE

17       CANNOT BE PRIOR ART TO THIS PATENT.

18            YOU MAY REMEMBER THAT DR. RINARD TESTIFIED THAT ONE OF THE

19       THINGS HE HAD TO DO, HE USED THE WORD "COMPILE," HE HAD TO

20       COMPILE THE SOURCE CODE HE GOT FROM GERMANY.  COMPILING IS THE

21       STEP THAT TURNS SOURCE CODE, WHICH PEOPLE CAN READ, INTO

22       COMPUTER -- INTO A COMPUTER READABLE MEDIUM.

23            SAMSUNG KNEW THIS WAS A PROBLEM, SO IT BROUGHT DR. RINARD

24       BACK, HE WAS THEIR LAST WITNESS BEFORE YESTERDAY, SO LAST

25       FRIDAY, THEY BROUGHT HIM BACK TO TRY A LITTLE BIT MORE OF THIS

 1        THREE CARD MONTE.

 2            THIS TIME, DR. RINARD TESTIFIED THAT WHAT HE -- HE WASN'T

 3    RELYING ON THE SOFTWARE, THE SOURCE CODE, HE WAS RELYING ON THE

 4    DISK, BECAUSE THE DISK IS A COMPUTER READABLE MEDIUM, AND SO HE

 5    SAID "NOW I'M RELYING ON THE DISK AND NOT THE SOURCE CODE."

 6            BUT THAT PUTS SAMSUNG BACK WHERE IT STARTED, BECAUSE THE

 7    DISK THAT'S IN EVIDENCE GOT HERE ONLY LAST YEAR FROM GERMANY.

 8    IT WAS NOT IN THE UNITED STATES BEFORE THE YEAR 2000.  THE DISK

 9    CANNOT BE PRIOR ART.

10            SO TO PUT IT SIMPLY, WE DON'T THINK YOU CAN FIND CLEAR AND

11    CONVINCING EVIDENCE THAT FREEWAIS SF, THE GERMAN PROGRAM, WAS

12    EVER USED IN THE UNITED STATES FOR AN INTERNET SEARCH BEFORE

13    JANUARY OF 2000.

14            BUT THEN SAMSUNG HAS AN EVEN BIGGER PROBLEM.  WHEN IT GOT

15    THE SOURCE CODE LAST YEAR, EVEN THOUGH IT WAS USING OUR PATENT

16    AS A ROADMAP, IT FOUND OUT THAT INSTALLING FREEWAIS SF ON A

17    SINGLE COMPUTER DOES NOT MEET CLAIM 25.  THERE IS ONLY ONE SET

18    OF HEURISTICS, YOU'LL REMEMBER YOU NEED TWO, AND THERE IS NO

19    INTERNET SEARCH -- YOU NEED THREE.

20            SO DR. RINARD HAD TO SET IT UP ON TWO SEPARATE COMPUTERS,

21    ONE TO SEARCH LOCALLY AND THE OTHER TO SEARCH THE INTERNET.

22            BUT THEN THE CODE HE POINTED TO ON THE INTERNET HEURISTIC

23    WAS ON THE WRONG PLACE.  IT'S ON THE SECOND COMPUTER.

24            SO AFTER ALL THAT WORK THAT HE DID, WHAT DR. RINARD ENDED

25    UP PROVING WAS EXACTLY HOW COOL APPLE'S INVENTION IS.  IT

1    PERMITS UNIVERSAL SEARCH, LOCAL AND INTERNET, USING THE SAME

2    DEVICE.  NO ONE HAD EVER DONE THAT BEFORE APPLE CREATED ITS

3    PATENT.

4         DR. RINARD ALSO MENTIONED THOSE OTHER TWO PATENTS, SMITH

5    AND SHOHAM.  HE LITERALLY JUST MENTIONED THEM.  HE NEVER TRIED

6    TO MATCH THE CLAIMS OF THE APPLE PATENT TO THE TECHNOLOGY OF

7    THOSE TWO PATENTS.

8         WITH RESPECT TO UNIVERSAL SEARCH, THE OTHER FACTORS ARE

9    ALSO SIGNIFICANT.  YOU HEARD ABOUT THIS IN THE TESTIMONY.  THIS

10   IS THE PATENT THAT SAMSUNG SAYS IT TEMPORARILY TOOK OUT OF ITS

11   PHONES BECAUSE OF THIS CASE.

12        BUT WHAT IT -- BUT WHICH IT RUSHED TO PUT BACK IN AT THE

13   FIRST POSSIBLE MOMENT BECAUSE ITS CUSTOMERS DEMANDED IT.

14        THIS IS SIGNIFICANT EVIDENCE OF PUBLIC ACCLAIM, AND ALSO

15   OF SAMSUNG'S WILLFUL INFRINGEMENT.

16        AT THE END OF THE DAY, THIS IS ANOTHER CASE WHERE THE

17   PATENT AND TRADEMARK OFFICE PERFORMED A THOROUGH EXAMINATION

18   AND CONCLUDED THAT THIS PATENT WAS VALID.  DR. RINARD NEVER

19   TOLD YOU THAT THE ART HE TESTIFIED ABOUT WAS MORE RELEVANT THAN

20   WHAT THE EXAMINER CONSIDERED.  THERE IS NO COMPELLING OR CLEAR

21   AND CONVINCING EVIDENCE THAT WOULD JUSTIFY OVERTURNING THE PTO

22   DECISION.

23        ARE WE HAVING FUN?

24        (LAUGHTER.)

25             MR. MCELHINNY:  FINALLY, THERE IS THE '414 -- I'M

1     SORRY TO MARCH YOU THROUGH ALL THIS, BUT IT'S THE ONLY WAY I

2     CAN THINK OF TO ACTUALLY HELP YOU DO IT, SO THIS IS THE WAY

3     WE'VE GOT TO DO IT.  I DON'T WANT YOU TO BE IN THERE AND SAY,

4     WHAT?

5         SO HERE WE GO.

6         FINALLY, THERE'S THE '414 BACKGROUND SYNC PATENT.  WE HAVE

7     ACCUSED TEN SAMSUNG DEVICES.

8         ONCE AGAIN, DR. SNOEREN, USING SAMSUNG SOURCE CODE,

9     DEMONSTRATED THAT EVERY ELEMENT OF THE CLAIM IS FOUND IN EVERY

10    ACCUSED DEVICE.

11        SAMSUNG BROUGHT IN DR. CHASE TO RAISE A TECHNICAL DEFENSE.

12    YOU MAY REMEMBER THAT DR. CHASE TESTIFIED THAT EVEN THOUGH THE

13    SAMSUNG PHONES HAVE SIX SYNC ADAPTERS, IN HIS OPINION, FOUR OF

14    THOSE SIX SYNC ADAPTERS WERE NOT KEY -- THE CLAIM LANGUAGE IS

15    CONFIGURED TO SYNCHRONIZE BECAUSE THEY DID NOT CARRY OUT EVERY

16    STEP OF THE SYNCHRONIZATION THEMSELVES, BUT SIMPLY STARTED THE

17    PROCESS.

18        SAME ARGUMENT WE HEARD BEFORE.  IT DOESN'T DO THE WHOLE

19    THING, IT ONLY STARTS THE PROCESS, THEREFORE, IT DOESN'T COUNT.

20        ON REBUTTAL, DR. SNOEREN CAME BACK AND SHOWED YOU THE

21    SOURCE CODE WHERE THE SYNC ADAPTERS PERFORMED A ROUTINE WHICH

22    WAS CALLED ON PERFORM SYNC.

23        AND THEN HE SHOWED YOU TWO GOOGLE DOCUMENTS THAT PROVED

24    THAT IT IS DR. SNOEREN WHO WAS CORRECT ON THIS ISSUE.  WE

25    SHOWED YOU PLAINTIFF'S EXHIBIT 172, WHICH SAYS THAT THE SYNC

1      ADAPTER HANDLES ALL OF THE SYNC PROTOCOL LOGIC.

2           AND WE SHOWED YOU PLAINTIFF'S EXHIBIT 102 -- THE FIRST ONE

3      WAS 172, THIS ONE IS 102 -- AND THIS DOCUMENT DESCRIBES HOW THE

4      SYNC ADAPTER IS A FEATURE THAT PROVIDES THE NECESSARY THREAD.

5      BASED ON THIS EVIDENCE AND DR. SNOEREN'S TESTIMONY, WE BELIEVE

6      WE HAVE PROVEN INFRINGEMENT.

7           AGAIN, IN THIS CASE, BECAUSE THE ACCUSED DEVICES ARE BOTH

8      TABLETS AND PHONES, IT IS ALL THREE SAMSUNG ENTITIES THAT

9      INFRINGE.

10          TO TRY TO PROVE THAT THIS PATENT IS INVALID, SAMSUNG

11     PRESENTED TWO PIECES OF PRIOR ART.  THE FIRST WAS A PROGRAM

12     CALLED WINDOWS MOBILE.  BUT AS DR. SNOEREN EXPLAINED, WINDOWS

13     MOBILE DOESN'T HAVE THE SYNC COMPONENTS THAT ARE SPECIFIC TO

14     THREE DIFFERENT DATA CLASSES AND THAT CREATE THEIR OWN THREADS.

15          INSTEAD, E-MAIL, CALENDAR, AND CONTACTS WERE ALL SYNCED ON

16     THE SAME THREAD, SLOWING THINGS DOWN FOR THE USER.

17          WINDOWS MOBILE IS JUST ANOTHER EXAMPLE OF WHAT THE WORLD

18     WAS LIKE BEFORE THE '414 PATENT WAS INVENTED.

19          THE SECOND PIECE OF ART WAS A COMPUTER PROGRAM CALLED

20     EVOLUTION.  BUT AS DR. SNOEREN EXPLAINED, FOR E-MAIL, EVOLUTION

21     WORKED ON SOMETHING CALLED A SUMMARY TABLE.  IT DID NOT HAVE

22     THE DATABASE THAT WAS REQUIRED BY THE CLAIM.

23          SO, AGAIN, WE THINK THAT SAMSUNG HAS FAILED TO PROVE

24     INVALIDITY.

25          TO CONFIRM THAT, AGAIN, YOU LOOK AT THE OTHER FACTORS.

```
 1        AND THEN HERE I THOUGHT THE -- SAMSUNG PUT THIS EVIDENCE IN,

 2     AND I WONDERED, WHY WERE THEY DOING IT?  IT'S SO CLEAR TO ME.

 3        YOU MAY REMEMBER THAT SAMSUNG SHOWED YOU THIS SLIDE.  THIS

 4     WAS SLIDE 83.  IT WAS A SAMSUNG EXHIBIT 327.  IT SHOWED HERE

 5     THE 2006 GOOGLE DOCUMENT THAT DESCRIBED BACKGROUND SYNC AS A

 6     FEATURE, IN 2006, THAT GOOGLE HOPED TO HAVE IN THE SOFTWARE

 7     THAT THEY WERE PLANNING TO WRITE.

 8        THIS IS EXACTLY WHAT YOUR JURY INSTRUCTIONS CALLED

 9     LONG-FELT NEED.  GOOGLE WANTED THE FEATURE IN 2006, BUT THEY

10     DIDN'T KNOW HOW TO DO IT.

11        IN FACT, THE EVIDENCE IS THAT THEY WEREN'T ABLE TO GET IT

12     INTO THEIR OWN SOFTWARE UNTIL TWO YEARS LATER IN 2008.

13        HOW COULD IT TAKE THE PEOPLE AT GOOGLE TWO YEARS IF THE

14     INVENTION WAS OBVIOUS?

15        SAMSUNG'S INFRINGEMENT WAS WILLFUL BECAUSE IT HAD KNOWN OF

16     THE PATENT, BUT IT MADE NO EFFORT WHATSOEVER TO REMOVE THE

17     FEATURES FROM THE PHONES.

18        SO THAT CONCLUDES WHAT THE LAW REFERS TO AS THE LIABILITY

19     ISSUES.  BY THIS TIME, YOU WILL HAVE FINISHED QUESTIONS 1

20     THROUGH 8 IN THE VERDICT FORM.  YOU WILL HAVE DECIDED WHETHER

21     OR NOT ANY OF THE SAMSUNG COMPANIES IS LIABLE FOR PATENT

22     INFRINGEMENT.

23        AND IF YOU FIND ANY OF THEM LIABLE, IF YOU FIND THAT AN

24     APPLE PATENT IS VALID AND INFRINGED, YOU WILL MOVE ON TO THE

25     ISSUE OF DAMAGES.
```

1          BUT BEFORE I GO THERE, I WANT TO MENTION TWO THINGS THAT

2     YOU WILL NOT FIND IN THE JURY INSTRUCTIONS.  THEY ARE NOT IN

3     THE INSTRUCTIONS BECAUSE THEY ARE SIMPLY EFFORTS TO MISDIRECT.

4          THE FIRST IS THE QUESTION OF WHETHER OR NOT APPLE USES ANY

5     OF THE PARTICULAR CLAIMS OF THE PATENT, OR THE PATENTS, IN ITS

6     PRODUCTS.  YOU WON'T FIND THAT ANYWHERE IN THE VERDICT FORM.

7     IT'S NOT RELEVANT TO INFRINGEMENT OR VALIDITY.

8          THE ISSUE IN THIS CASE IS SAMSUNG'S CONDUCT, AND IT IS

9     SAMSUNG THAT NEEDS TO CONVINCE YOU THAT THE INVENTIONS IT HAS

10    TAKEN, THE INVENTIONS IT HAS COPIED, THE INVENTIONS IT HAS PUT

11    IN TENS OF MILLIONS OF INFRINGING PRODUCTS, THE INVENTIONS IT

12    HAS REFUSED TO STOP USING, HAVE NO VALUE.

13         THE SECOND ISSUE IS THE GOOGLE ISSUE.  AGAIN, IN HIS

14    OPENING, LAWYER -- SAMSUNG'S LAWYER SAID THIS CASE WOULD BE

15    ABOUT APPLE -- REMEMBER, HE USED THE PHRASE, EVERYONE WENT,

16    (GASP) APPLE'S WAR ON GOOGLE.

17         BUT AS YOU HAVE NOW SEEN, THERE IS NO SUCH WAR ON APPLE'S

18    PART.  YOU SAW AN E-MAIL THAT USED THOSE WORDS, JUST A SNIPPET.

19    I BET A DOLLAR THAT YOU'LL SEE IT AGAIN THIS MORNING.

20         BUT THE EXHIBIT IS DX 489.  WHEN YOU LOOK AT THE EXHIBIT,

21    YOU WILL SEE THAT IT TALKS ABOUT A COMPETITIVE WAR, MAKING

22    BETTER PRODUCTS, MAKING THE RETAIL EXPERIENCE BETTER, GETTING

23    MORE SALES.

24         SO MUCH FOR THE CONCEPT OF A HOLY WAR.

25         BUT WHAT WE DO NOW KNOW IS THAT SAMSUNG AND GOOGLE HAVE

1    WORKED OUT THEIR ISSUES CONCERNING PATENT INFRINGEMENT AMONGST

2    THEMSELVES.  SAMSUNG'S LAWYERS ARE PAID BY BOTH SAMSUNG AND

3    GOOGLE.  GOOGLE IS HELPING TO DEFEND THE '959 AND '414 PATENTS,

4    BUT ONLY THOSE TWO.  NOT ALL FIVE AS SAMSUNG'S COUNSEL MAY HAVE

5    SUGGESTED.

6              MR. PRICE:  I OBJECT.  THAT'S IMPROPER ARGUMENT BASED

7    ON --

8              THE COURT:  OVERRULED.  PLEASE SIT DOWN.

9              MR. MCELHINNY:  AT THE END OF THE DAY, GOOGLE SHOULD

10   NOT BE AN ISSUE FOR YOU.  YOU WILL NOT FIND IT ANY PLACE IN

11   YOUR INSTRUCTIONS.

12        SAMSUNG MAKES, USES, AND SELLS.  THERE WAS NO CLAIM THAT

13   GOOGLE INVENTED ANY OF THESE FEATURES BEFORE APPLE DID.  NO

14   SAMSUNG EXPERT CAME IN HERE AND SAID "I'M RELYING ON GOOGLE'S

15   WORK AS PRIOR ART."  SO GOOGLE IS IRRELEVANT TO VALIDITY.

16        YOU SHOULD REACH YOUR JUDGMENT BASED ON THE EVIDENCE.

17   GOOGLE'S AND SAMSUNG'S SECRET INDEMNITY AGREEMENTS WILL TAKE

18   CARE OF THEMSELVES.

19        IF THIS GOOGLE ISSUE HAS ANY RELEVANCE AT ALL, IT IS

20   RELEVANT TO CREDIBILITY.  SAMSUNG'S LAWYER GOT UP AT THE

21   BEGINNING AND POINTED THE FINGER AT GOOGLE.  HE DIDN'T MENTION

22   THAT GOOGLE IS HELPING TO PAY HIS FEES.

23        WHEN SAMSUNG PRESENTED GOOGLE WITNESSES AS DISINTERESTED

24   THIRD PARTIES, THEY DID NOT MENTION THAT GOOGLE HAD AGREED IN A

25   CONTRACT TO HELP DEFEND THIS CASE.

1          WE HAD TO BRING THAT AGREEMENT TO YOUR ATTENTION.

2          BUT THEN, AS YOU SAW, WHEN WE ASKED SAMSUNG, IN

3    SEPTEMBER 2012, IF THEY HAD SOUGHT INDEMNITY, THEY LIED TO US,

4    AND THEY LIED TO US UNDER OATH.

5          IF IT STRIKES YOU THAT PARTIES THAT LIE UNDER OATH CANNOT

6    BE TRUSTED, YOU WILL FIND THAT COMMON SENSE THOUGHT EXPRESSLY

7    SPELLED OUT FOR YOU IN JURY INSTRUCTION NUMBER 12.

8          SO NOW I'D LIKE TO TURN TO DAMAGES.  THIS IS THE HEART OF

9    THIS CASE.

10          MAKE NO MISTAKE ABOUT IT.  THERE ARE TWO WAYS THAT SAMSUNG

11   CAN WIN THIS CASE.  OBVIOUSLY THEY WIN THE CASE IF YOU DECIDE

12   THAT THEY DO NOT INFRINGE OR IF YOU DECIDE THAT OUR PATENTS ARE

13   NOT VALID.  IF THAT'S WHAT YOU DECIDE, SAMSUNG WILL WIN, AND IN

14   THAT CASE THEY DESERVE TO WIN.

15          BUT SAMSUNG WINS EVEN IF YOU DO FIND INFRINGEMENT IF YOU

16   AWARD DAMAGES AT A LEVEL THAT ENDS UP REWARDING SAMSUNG'S

17   BUSINESS STRATEGY.

18          IF SAMSUNG CAN COPY APPLE'S PRODUCTS, SELL INFRINGING

19   PRODUCTS, AND INCREASE ITS MARKET SHARE AND END UP PAYING ONLY

20   A SMALL FINE, ITS STRATEGY WILL HAVE BEEN SUCCESSFUL AND,

21   WHATEVER YOU INTENDED, SAMSUNG WILL END UP AS A BIG WINNER.

22          THIS IS EXACTLY SAMSUNG'S STRATEGY.  THAT IS WHY ITS

23   WITNESSES CALL SOFTWARE FEATURES TRIVIAL, EVEN THOUGH ITS

24   INTERNAL DOCUMENTS CALL THEM CRITICAL.

25          IT'S WHY SAMSUNG'S WITNESSES HAVE TESTIFIED THAT THE

1    PATENTS ARE EASY TO DESIGN AROUND, EVEN THOUGH SAMSUNG'S

2    BEHAVIOR SHOWS THAT THEY RESISTED, AND IN MANY CASES, HAVE

3    REFUSED TO CHANGE TO SO-CALLED NON-INFRINGING ALTERNATIVES.

4         AND THAT IS WHY SAMSUNG'S POSITION IS THAT APPLE HAS LOST

5    NO LOST PROFITS AND THAT, IN A NEGOTIATION, APPLE WOULD LICENSE

6    ITS PATENTS FOR PENNIES ON THE DOLLAR.

7         EVERY ONE OF THOSE ARGUMENTS IS AN ARGUMENT AIMED AT

8    CONVINCING YOU TO LOWER THEIR DAMAGES.

9         SO LET'S SEE WHAT THE COURT'S INSTRUCTIONS SAY ABOUT

10   DAMAGES.  YOU WILL FIND THAT THERE ARE TWO POSSIBLE MEASURES OF

11   DAMAGES, I TOLD YOU THIS AT THE BEGINNING, LOST PROFITS AND A

12   REASONABLE ROYALTY.

13        AT A MINIMUM, IF YOU FIND INFRINGEMENT, WE ARE ENTITLED TO

14   A REASONABLE ROYALTY.  WE RECOVER LOST PROFITS ONLY IF WE HAVE

15   PROVED THEM.

16        SO LET'S LOOK FIRST AT LOST PROFITS.  THE TEST IS EASILY

17   STATED:  APPLE IS ENTITLED TO LOST PROFITS IF WE PROVE THAT

18   THERE WAS A REASONABLE PROBABILITY THAT APPLE WOULD HAVE MADE

19   MORE SALES IF THE INFRINGING PRODUCTS HAD NOT BEEN ON THE

20   MARKET.

21        LET ME STATE THAT AGAIN.  IF YOU FIND THAT ANY SAMSUNG

22   PHONE INFRINGES, YOU ASK, WHAT WOULD HAVE HAPPENED IN THE

23   MARKETPLACE IF SAMSUNG HAD TO TAKE THAT PHONE OFF THE

24   MARKETPLACE ENTIRELY SO THAT THE FEATURES COULD BE REDESIGNED?

25   IN THAT TIME THAT IT WAS OFF THE MARKET, WOULD APPLE HAVE MADE

```
 1        SOME OF THOSE SALES?

 2             IN INSTRUCTION NUMBER 37, THE COURT WILL GIVE YOU FOUR

 3        FACTORS THAT APPLE MUST PROVE.

 4             FIRST, THAT THERE WAS DEMAND FOR THE PATENTED PRODUCT.

 5             TWO, THAT THERE WERE NO ACCEPTABLE NON-INFRINGING

 6        ALTERNATIVES AVAILABLE, OR EVEN IF THERE WERE, THE NUMBER OF

 7        SALES THAT WOULD BE MADE DESPITE THE NON-INFRINGING

 8        ALTERNATIVES.

 9             THREE, THAT APPLE HAD THE CAPACITY TO MANUFACTURE AND

10        MARKET THE ADDITIONAL PHONES.

11             AND NOW YOU'RE SEEING WHY SOME OF THESE WITNESSES CAME TO

12        TESTIFY.

13             AND, FOUR, THE AMOUNT OF PROFIT THAT APPLE WOULD HAVE MADE

14        IN ITS LOST SALES.

15             LET'S LOOK AT THESE FACTORS A LITTLE MORE.

16             WAS THERE DEMAND IN THE MARKETPLACE?  WE KNOW THERE WAS.

17        WE KNOW THERE WAS DEMAND FOR THE APPLE PRODUCTS THAT PRACTICED

18        THE SLIDE TO UNLOCK AND DATA DETECTOR PATENTS BECAUSE YOU HAVE

19        SEEN THE SALES NUMBERS.

20             YOU ALSO SAW, I'M NOT GOING TO WASTE YOUR TIME WITH IT

21        RIGHT NOW, BUT THEY'RE IN EVIDENCE, THE DOZENS AND DOZENS OF

22        ARTICLES PRAISING APPLE'S PRODUCTS.

23             WE ALSO KNOW THAT THERE WAS DEMAND FOR THE SAMSUNG

24        PRODUCTS THAT INFRINGED THE PATENTS BECAUSE WE ALSO SAW THE

25        SAMSUNG SALES FIGURES AND HOW THEY SKYROCKETED WHEN SAMSUNG
```

1    STARTED TO SELL PHONES THAT INCORPORATED APPLE'S INFRINGING --

2    APPLE'S PATENTED FEATURES.

3         FINALLY, WE SAW FROM SAMSUNG'S INTERNAL DOCUMENT, WHICH IS

4    EXHIBIT 156, THE AMERICAN PHONE MARKET WAS A TWO HORSE RACE.

5    IF A SALE DIDN'T GO TO SAMSUNG, IT WAS MOST LIKELY GOING TO GO

6    TO APPLE.

7         THERE WAS CLEARLY DEMAND FOR THE PRODUCTS.

8         THE SECOND FACTOR INVOLVES WHAT THE LAW CALLS ACCEPTABLE

9    NON-INFRINGING ALTERNATIVES.  WERE THERE OTHER WAYS TO

10   ACCOMPLISH THE SAME RESULTS THAT WOULD HAVE BEEN ACCEPTABLE TO

11   A CONSUMER, BUT THAT DID NOT INFRINGE APPLE'S PATENTS?

12        THE INSTRUCTION, NUMBER 37, SAYS WE CAN GET LOST PROFITS

13   EITHER IF WE PROVE THERE WERE NO ACCEPTABLE NON-INFRINGING

14   ALTERNATIVES, OR EVEN IF THERE WERE ALTERNATIVES AVAILABLE,

15   THEN WE COULD HAVE MADE ADDITIONAL SALES IN THE CASE.

16        DR. VELLTURO ADDRESSED BOTH SITUATIONS.  HE FOUND LOST

17   PROFITS WHERE THERE WERE NO NON-INFRINGING ALTERNATIVES

18   AVAILABLE.  THIS IS WHAT HE CALLED THE OFF THE MARKET LOST

19   PROFITS.  THE PRODUCT ITSELF WOULD HAVE BEEN OFF THE MARKET

20   DURING THE TIME SAMSUNG WAS SEARCHING FOR A NON-INFRINGING

21   ALTERNATIVE THAT WAS ACCEPTABLE TO USERS AND CARRIERS.

22        AND THEN DR. VELLTURO FOUND A SMALLER NUMBER OF LOST

23   PROFITS AFTER SOME HYPOTHETICAL REDESIGN PRODUCT CAME BACK ON

24   THE MARKET BECAUSE THE HYPOTHETICAL ALTERNATIVES WOULD NOT HAVE

25   BEEN EQUALLY ATTRACTIVE TO USERS AND CARRIERS.

1          THE FIRST QUESTION IS, HOW LONG WOULD THE SAMSUNG PHONES

2     BE OFF THE MARKET WHILE THEY WERE BEING REDESIGNED?

3          WE ARE ONLY SEEKING OFF THE MARKET LOST PROFITS FOR THREE

4     PATENTS, THE '647, THE '721, AND THE '172 AND, BASED ON THE

5     TESTIMONY OF OUR EXPERT, DR. VELLTURO, ONLY FOR A FOUR MONTH

6     PERIOD.  WE THINK THAT'S PRETTY CONSERVATIVE.

7          FOR THE QUICK LINKS PATENT, WE KNOW THAT SAMSUNG HAS NEVER

8     BEEN ABLE TO DESIGN AROUND IT.  THEY STILL USE IT TO THIS DAY.

9          USING A HYPOTHETICAL FOUR MONTH PERIOD IS EXTREMELY

10    FAVORABLE TO THEM.

11         FOR THE SLIDE TO UNLOCK AND WORD CORRECTION PATENTS, BASED

12    ON DR. COCKBURN'S TESTIMONY, IT WOULD TAKE MONTHS TO DESIGN A

13    NEW INTERFACE, TO TEST IT, AND TO GET CARRIER APPROVAL.

14         SAMSUNG HAS TOLD YOU THAT IT WOULD ONLY TAKE TWO HOURS,

15    BUT THEY PRODUCED NO DOCUMENTS THAT SHOW THE NORMAL DESIGN --

16    HOW LONG THE NORMAL DESIGN PROCESS TAKES.

17         THERE REALLY IS NO EVIDENCE IN THE RECORD THAT SUPPORTS

18    ANY PERIOD SHORTER THAN FOUR MONTHS.  IT'S ALL WHAT I CALLED AT

19    THE BEGINNING WOULDA, SHOULDA, COULDA.

20         DURING THE OFF THE MARKET PERIOD, SAMSUNG SOLD MILLIONS OF

21    INFRINGING PHONES.

22         DR. VELLTURO CALCULATED THAT ONLY A FRACTION OF THOSE

23    SALES WOULD HAVE GONE TO APPLE IF THE SAMSUNG PHONES HAD BEEN

24    OFF THE MARKET -- I CAN'T SAY THE NUMBER OUT LOUD, BUT YOU CAN

25    SEE THE NUMBER OF UNITS ON THE SCREEN IN RED -- AND THAT APPLE

1     LOST THOSE PROFITS.  THAT RESULTS IN OFF THE MARKET LOST

2     PROFITS OF ABOUT $507 MILLION.

3          THE SECOND ELEMENT OF THE NON-INFRINGING ALTERNATIVE

4     FACTOR IS WHETHER OR NOT CONSUMERS WOULD HAVE BEEN DISAPPOINTED

5     WITH THE HYPOTHETICAL NON-INFRINGING DESIGN THAT WOULD HAVE

6     REPLACED THE PATENTED FEATURES.

7          AGAIN, ALL THE EVIDENCE TELLS US THAT THEY WOULD BE.

8          FIRST, WE HAD THE REAL WORLD EVIDENCE.  WE KNOW THAT

9     EVENTUALLY SAMSUNG REMOVED THE SLIDE TO UNLOCK AND AUTO CORRECT

10    FEATURES, SO WE GAVE THEM FULL CREDIT FOR THAT AND WE ARE NOT

11    SEEKING DIMINISHED DEMAND LOST PROFITS FOR THOSE TWO PATENTS.

12         BUT FOR THE REMAINING THREE, WE KNOW THAT IN THE REAL

13    WORLD, SAMSUNG HAS NEVER BEEN ABLE TO DESIGN AROUND QUICK LINKS

14    OR BACKGROUND SYNC.  THEY HAVE NEVER FOUND AN ALTERNATIVE THAT

15    WORKED FOR THEM IN THE REAL WORLD.

16         AND WE KNOW THAT WITH UNIVERSAL SEARCH, WHEN THEY TOOK IT

17    OUT AS PART OF THIS CASE, THEY PUT IT BACK IN AT THEIR FIRST

18    OPPORTUNITY BECAUSE THEIR USERS DEMANDED IT.

19         SO IN THE REAL WORLD -- THE DAMAGES WORLD IS MUCH EASIER

20    FOR THEM BECAUSE IT TALKS ABOUT THIS HYPOTHETICAL WORLD.  BUT

21    IN THE REAL WORLD, THE WORLD IN WHICH SAMSUNG ACTUALLY MADE

22    DECISIONS THAT WE CAN SEE, SAMSUNG HAS NEVER FOUND A

23    SATISFACTORY ALTERNATIVE.  IT JUST KEEPS ON INFRINGING.

24         GIVING THEM CREDIT FOR SOME HYPOTHETICAL DESIGN AROUND

25    THAT NEVER HAPPENED IS EXTREMELY CONSERVATIVE.

1           AND THEN WE CONFIRMED THAT CONSUMERS VALUE THESE FEATURES

2    OVER THE ALTERNATIVES BY CALLING ON PROFESSOR JOHN HAUSER TO DO

3    A CONJOINT SURVEY TO MEASURE EXACTLY HOW REAL CONSUMERS VALUE

4    THESE FEATURES.  AND THAT SURVEY, DESIGNED AND CARRIED OUT BY

5    ONE OF THIS COUNTRY'S ABSOLUTE EXPERTS IN THE FIELD, CONFIRMED

6    THAT REAL LIFE CONSUMERS FIND THESE FEATURES VALUABLE AND

7    PREFER THEM TO ALTERNATIVES THAT DO NOT INFRINGE.

8           USING THE SAME METHODS THAT HE HAS PERSONALLY USED DOZENS

9    OF TIMES AND THAT AMERICAN INDUSTRY HAS USED THOUSANDS OF TIMES

10   A YEAR FOR THE LAST FOUR DECADES, DR. HAUSER CONFIRMED WHAT IS

11   OBVIOUS, THAT THERE IS DEMAND FOR THE PATENTED FEATURES, THAT

12   CARRIERS AND CONSUMERS WANT THESE FEATURES IN THE PHONE, THAT

13   THEY HAVE AN IMPACT ON PURCHASING DECISIONS.

14          WHAT DID DR. HAUSER DO?  HE CONDUCTED A SMARTPHONE SURVEY

15   OF 507 PARTICIPANTS AND A TABLET SURVEY WITH 459 PARTICIPANTS.

16   EACH OF THESE PARTICIPANTS HAD A STRONG INCENTIVE TO

17   PARTICIPATE CONSCIENTIOUSLY IN THE SURVEY, BECAUSE YOU'LL

18   REMEMBER THEY GOT THIS POTENTIAL PRIZE SMARTPHONE OR TABLET

19   THAT INCLUDED THE FEATURES AND PRICE PREFERENCES THAT THEY HAD

20   INDICATED WITH THEIR SURVEY CHOICES.

21          THE SURVEY PARTICIPANTS WERE THEN WALKED THROUGH A SERIES

22   OF WRITTEN AND ANIMATED DESCRIPTIONS OF THE PATENTED FEATURES

23   AND ANOTHER 21 DISTRACTION FEATURES, WHICH DESCRIPTIONS THEY

24   COULD REPLAY AT ANY TIME IN THE SURVEY PROCESS, INCLUDING WHEN

25   THEY MADE THEIR SURVEY CHOICES.

```
 1              FROM THE 500 PARTICIPANTS IN THE SMARTPHONE SURVEY -- AND

 2      LET'S BE CLEAR, THESE ARE THE PEOPLE WHO ACTUALLY DID THE

 3      SURVEY, THEY'RE NOT THE PEOPLE IN DR. REIBSTEIN'S VIDEOS, THESE

 4      ARE THE PEOPLE DR. HAUSER SURVEYED -- DR. HAUSER WAS ABLE TO

 5      GATHER A RICH DATA SET REFLECTING OVER 16,000 CHOICES OR DATA

 6      POINTS WHICH HE ANALYZED USING THE INDUSTRY GOLD STANDARD, THE

 7      SAWTOOTH SOFTWARE, AND WHICH ESTABLISHED DEMAND FOR THE

 8      PATENTED FEATURES IN THIS CASE.

 9              DR. HAUSER VALIDATED THE RESULTS OF THIS ANALYSIS WITH

10      STANDARD TESTS THAT ESTABLISHED THEIR STATISTICAL RELIABILITY.

11              LET'S BE CLEAR.  SAMSUNG ABSOLUTELY HATES THE RESULTS OF

12      PROFESSOR HAUSER'S SURVEY BECAUSE IT SHOWS SO DRAMATICALLY THE

13      PATENTED FEATURES ARE VALUABLE.

14              THE SURVEY UNDERMINES EVERY ARGUMENT SAMSUNG NEEDS TO MAKE

15      IN THIS COURTROOM, SO SAMSUNG HAS DECLARED WAR ON IT.

16              EARLIER IN THIS CASE, AS YOU SAW, A SAMSUNG EXPERT NAMED

17      WAGNER TOLD THIS COURT THAT A CONJOINT SURVEY WAS EXACTLY THE

18      WAY TO MEASURE THE VALUE OF FEATURES AT ISSUE IN THIS CASE.

19              YOU DIDN'T SEE WAGNER IN THIS COURTROOM.  HE'S HISTORY.

20              AND YOU CERTAINLY NEVER SAW A SURVEY DONE BY SAMSUNG.

21              WHY WOULD THEY RUN A SURVEY?  THEY KNOW THAT THE FEATURES

22      ARE VALUABLE, AND THEY KNOW THAT ANY WELL DESIGNED SURVEY WOULD

23      SHOW THAT RESULT.

24              INSTEAD, YOU SAW A WHOLE FLOCK OF NEW EXPERTS TO NITPICK

25      HAUSER'S QUESTIONNAIRE, TO NITPICK THE DESIGN OF THE CHOICE
```

1     SCREENS, AND TO OFFER THINGS LIKE EYE TRACKING TESTS AND

2     SENTENCE COUNTING TESTS WHICH THEY ADMITTED HAVE NEVER, EVER

3     PREVIOUSLY BEEN USED IN ANY SERIOUS DISCUSSION OF THE VALUE OF

4     PATENTS.

5          AND AS THEY ADMITTED, NOT ONE OF THESE PEOPLE HAS THE

6     EXPERTISE IN CONJOINT STUDIES TO MATCH DR. HAUSER.  FRANKLY,

7     THEY COULDN'T.  HE IS THE BEST.

8          AND HIS STUDY CONFIRMED WHAT SAMSUNG'S ACTIONS AND YOUR

9     COMMON SENSE TELL US IS TRUE.  THESE FEATURES HAVE VALUE.  THEY

10    HELP TO SELL PHONES.

11         IF THEY DIDN'T, SAMSUNG WOULD NEVER HAVE COPIED THEM AND

12    IT WOULD HAVE DROPPED THEM YEARS AGO.  BUT THAT NEVER HAPPENED.

13         THE SAMSUNG DECISION MAKERS, THE PEOPLE WHO DID NOT SHOW

14    UP HERE TO ANSWER OUR QUESTIONS, HAVE DECIDED THAT SAMSUNG

15    NEEDS THESE FEATURES TO CONTINUE TO BE SUCCESSFUL IN THE

16    MARKETPLACE.  THEIR ACTIONS SPEAK LOUDER THAN ANY SURVEY EVER

17    COULD, AND THEIR ACTIONS CONFIRM PROFESSOR HAUSER'S RESULTS.

18    THAT IS THE REVEALED PREFERENCES THAT DR. VELLTURO TOLD US

19    ABOUT.

20         SO FOR THE SECOND FACTOR, SAMSUNG PRODUCTS WOULD HAVE BEEN

21    OFF THE MARKET FOR AT LEAST FOUR MONTHS.

22         AND THEN IN THE HYPOTHETICAL WORLD WHERE THEY STOPPED

23    USING APPLE'S PATENTED FEATURES, THAT CHANGE WOULD HAVE

24    CONTINUED TO RESULT IN ADDITIONAL SALES OF APPLE PRODUCTS.

25         AND AS YOU SAW, DR. VELLTURO VALUED THOSE DIMINISHED

1    DEMAND LOST PROFITS AT JUST UNDER $560 MILLION.

2         FORTUNATELY, THE NEXT TWO FACTORS ARE EASY.  RORY SEXTON,

3    APPLE'S VICE-PRESIDENT OF SUPPLY AND DEMAND MANAGEMENT,

4    TESTIFIED THAT APPLE HAD THE CAPACITY TO MAKE THE ADDITIONAL

5    PHONES AND TABLETS.  NO SAMSUNG WITNESS DISPUTED THAT

6    TESTIMONY.

7         AND SAMSUNG DID NOT DISPUTE THE PROFIT THAT APPLE MADE

8    FROM THE IPHONE SALES DURING THE DAMAGE PERIOD.

9         THE PROOF OF EACH OF THESE FOUR FACTORS IS STRONG AND IT

10    IS DOCUMENTED.

11         SAMSUNG, ON THE OTHER HAND, HAS STAKED OUT THE POSITION

12    THAT IT COULD SIMPLY HAVE DROPPED ALL THESE PATENTED FEATURES,

13    EVEN THOUGH IT NEVER HAS IN THE REAL WORLD, THAT IT COULD HAVE

14    REDESIGNED ITS PHONES IN LESS THAN A DAY, EVEN THOUGH IT NEVER

15    HAS IN THE REAL WORLD, AND THAT THE FEATURES MAKE NO DIFFERENCE

16    TO CONSUMERS.  WOULDA, SHOULDA, COULDA, EXACTLY AS I PREDICTED

17    IN MY OPENING.

18         AND EXACTLY AS I TOLD YOU SHE WOULD, SAMSUNG'S EXPERT TOLD

19    YOU THAT OUT OF THESE 37 MILLION INFRINGING SALES, APPLE DID

20    NOT LOSE ONE SALE.  NOT ONE.  ZERO.

21         IRONICALLY, AFTER ALL OF THIS DETAIL, YOU'LL FIND

22    INSTRUCTION NUMBER 39, WHICH IS ENTITLED MARKET SHARE.  THIS

23    INSTRUCTION SAYS SIMPLY THAT YOU CAN CHOOSE TO AWARD APPLE ITS

24    LOST PROFITS BY AWARDING IT ITS MARKET SHARE OF THE INFRINGING

25    DEVICES.

1          IN SOME WAYS, MARKET SHARE IS THE EASIEST BECAUSE IT TELLS

2     US EXACTLY WHAT HAPPENED IN THE REAL WORLD.  IT ACCOUNTS FOR

3     BRAND, IT ACCOUNTS FOR ADVERTISING, IT ACCOUNTS FOR SCREEN

4     SIZE, ALL OF THOSE FACTORS SAMSUNG WANTED TO TALK ABOUT.

5          AS YOU MAY RECALL, APPLE'S MARKET SHARE DURING THIS TIME

6     PERIOD WAS 40 PERCENT.

7          BUT YOU WILL RECALL THAT DR. VELLTURO HAS BEEN

8     CONSERVATIVE HERE AS WELL.  HE MADE A NUMBER OF DOWNWARD

9     ADJUSTMENTS BECAUSE OF CARRIERS WHO WERE CARRYING THE PHONES,

10    AND INSTEAD OF 40 PERCENT, APPLE IS SEEKING JUST UNDER 10

11    PERCENT OF SAMSUNG'S INFRINGING SALES.

12         EITHER WAY YOU MEASURE IT, APPLE'S LOST PROFITS DAMAGES

13    ARE JUST OVER $1 MILLION FOR 9.5 PERCENT OF SAMSUNG'S

14    INFRINGING SALES.

15         AGAIN, THIS SLIDE COMES DIRECTLY FROM EXHIBIT 222A.

16         THE SECOND TYPE OF DAMAGES IS WHAT THE LAW CALLS A

17    REASONABLE ROYALTY.  OBVIOUSLY WE DO NOT GET A ROYALTY FOR ANY

18    SALE FOR WHICH YOU AWARD US LOST PROFITS, AND DR. VELLTURO WAS

19    CAREFUL NOT TO DOUBLE COUNT.

20         BUT AS THE JUDGE HAS TOLD YOU IN INSTRUCTION NUMBER 40, A

21    REASONABLE ROYALTY PAYMENT IS THE MINIMUM AMOUNT OF DAMAGES

22    APPLE SHOULD BE AWARDED FOR EVERY ACT OF INFRINGEMENT.

23         IN INSTRUCTION NUMBER 41, JUDGE KOH LISTS 15 FACTORS THAT

24    YOU SHOULD CONSIDER IN DETERMINING A REASONABLE ROYALTY.  I

25    SUBMIT TO YOU THAT EVERY ONE OF THESE FACTORS ARGUES IN FAVOR

1          OF A SUBSTANTIAL ROYALTY.

2               LET'S LOOK AT FACTOR 8, THE PROFITABILITY OF THE PRODUCT

3          MADE UNDER THE PATENTS, AND ITS COMMERCIAL SUCCESS AND CURRENT

4          POPULARITY.

5               THINK BACK TO THE CHARTS WE HAVE SHOWN YOU CONCERNING THE

6          COMMERCIAL SUCCESS OF THE IPHONE AND THEN THE SUCCESS OF THE

7          INFRINGING SAMSUNG PHONES.  THE IPHONE WAS A REVOLUTION.  IT

8          HAS BEEN PHENOMENALLY SUCCESSFUL.

9               AND THE INFRINGING SAMSUNG PHONES HAVE DRIVEN VIRTUALLY

10         EVERY OTHER ANDROID PHONE MAKER OUT OF THE MARKETPLACE, MAKING

11         THE U.S. MARKET A TWO HORSE RACE.

12              IN SHORT, THE IPHONE WAS A REVOLUTIONARY PRODUCT IN A HOT

13         MARKETPLACE AND BOTH COMPANIES ARE MAKING MONEY.  SAMSUNG'S

14         INFRINGING PRODUCTS HAVE BEEN SO SUCCESSFUL THAT SAMSUNG HAS

15         BEEN ABLE TO SUBSTANTIALLY RAISE ITS PRICES.  YOU CAN SEE HOW

16         MUCH, ON YOUR SCREEN, WHICH COMPARES SAMSUNG'S AVERAGE PRICE IN

17         2011 TO ITS AVERAGE PRICE IN 2012.  FACTOR 8 CALLS FOR A

18         SUBSTANTIAL ROYALTY.

19              SO LET'S LOOK AT FACTOR 9, THE ADVANTAGE OF THE PATENTED

20         PROPERTY OVER THE OLDER DEVICES.

21              THIS IS, OF COURSE, ANOTHER PLACE WHERE SAMSUNG'S

22         DOCUMENTS AND ITS CONDUCT TELL A STORY THAT IS ENTIRELY

23         DIFFERENT THAN WHAT SAMSUNG HAS SAID IN THIS COURTROOM.

24              NOTHING SPEAKS MORE CLEARLY TO THIS FACTOR THAN THE CRISIS

25         OF DESIGN E-MAIL.  IN 2010, SAMSUNG WAS STUCK WITH OLD

 1    TECHNOLOGY.  THE DIFFERENCE BETWEEN THAT TECHNOLOGY AND THE

 2    IPHONE WAS THE DIFFERENCE BETWEEN HEAVEN AND EARTH.

 3         THE HIGHEST EXECUTIVES AT SAMSUNG HAVE SPELLED OUT FOR US

 4    IN BLACK AND WHITE EXACTLY WHAT SAMSUNG WOULD HAVE BEEN

 5    THINKING AT THE TIME OF THIS HYPOTHETICAL NEGOTIATION.

 6         IN HIS OPENING, SAMSUNG'S LAWYER TOLD YOU THAT PEOPLE BUY

 7    SAMSUNG PHONES FOR THEIR HARDWARE, NOT FOR THEIR SOFTWARE.  HE

 8    STOOD RIGHT HERE AND HE TOLD YOU THAT.

 9         BUT THEN YOU SAW WHAT SAMSUNG SAID IN ITS INTERNAL

10    DOCUMENTS -- EXHIBIT 147 -- WHAT THE SAMSUNG DECISION MAKERS

11    WHO DIDN'T COME HERE TO TESTIFY UNDER OATH WERE ACTUALLY

12    THINKING, AND THE TRUTH IS ENTIRELY DIFFERENT.  THEY SAID

13    SOFTWARE IS THE NEW VALUE DRIVER.

14         EVEN MR. SOHN EVENTUALLY ADMITTED ON CROSS-EXAMINATION

15    THAT SOFTWARE VALUE HAS BECOME MORE IMPORTANT IN SMARTPHONES.

16         FINALLY, THE FIRST GOOGLE WITNESS, MR. LOCKHEIMER,

17    TESTIFIED THAT BACKGROUND SYNC WAS INCREDIBLY USEFUL, THAT WAS

18    HIS WORDS, INCREDIBLY USEFUL.

19         AFTER THAT TESTIMONY, SAMSUNG STOPPED ASKING THE GOOGLE

20    WITNESSES ABOUT THE VALUE OF SOFTWARE FEATURES.

21         FACTOR 9 ARGUES IN FAVOR OF A SUBSTANTIAL ROYALTY.

22         LET'S LOOK AT FACTOR 11, THE EXTENT TO WHICH THE INFRINGER

23    HAS MADE USE OF THE INVENTION AND ANY EVIDENCE PROBATIVE OF

24    THAT VALUE.

25         YOU KNOW THIS NUMBER NOW BY HEART.  OVER 37 MILLION

```
 1     INFRINGING SALES.  THE POPULATION OF SAN JOSE IS 1 MILLION

 2     PEOPLE.  YOU COULD GIVE EVERY PERSON IN SAN JOSE 37 INFRINGING

 3     PHONES.  THE SIZE OF THIS ILLEGAL ACTIVITY IS BEYOND

 4     COMPREHENSION.

 5              THE COURT:  I'M SORRY TO INTERRUPT YOU, BUT IT'S

 6     10:30 NOW.  LET'S GO AHEAD AND TAKE OUR BREAK.

 7              MR. MCELHINNY:  THANK YOU, YOUR HONOR.

 8              THE COURT:  WE'LL TAKE A 15 MINUTE BREAK.

 9          PLEASE DON'T RESEARCH OR DISCUSS THE CASE.  WE'LL SEE YOU

10     IN 15 MINUTES.

11          (JURY OUT AT 10:31 A.M.)

12              THE COURT:  OKAY.  THE JURORS HAVE LEFT THE

13     COURTROOM.  LET'S TAKE OUR BREAK NOW.  THANK YOU.

14          (RECESS FROM 10:31 A.M. UNTIL 10:45 A.M.)

15          (JURY IN AT 10:45 A.M.)

16              THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

17          THE TIME IS NOW 10:46.

18          GO AHEAD, PLEASE.

19              MR. MCELHINNY:  IT'S STILL ME, BUT I WON'T BE MUCH

20     LONGER, SO IF YOU CAN JUST HOLD ON.

21          WE WERE TALKING ABOUT FACTOR 11 ON THE LIST.  WE TALKED

22     ABOUT 37 MILLION, OVER 37 MILLION INFRINGING SALES.

23          AND SO THE QUESTION IS, IS THIS USE PROBATIVE OF VALUE?

24     HERE YOU CAN RELY ON YOUR COMMON SENSE FOR WHAT DR. VELLTURO

25     CALLED REVEALED PREFERENCES.
```

 1          SAMSUNG COPIED THE INVENTIONS BECAUSE IT THOUGHT THEY WERE

 2     CRITICAL.  IT CONTINUES TO USE THREE OF THEM BECAUSE IT HAS NOT

 3     BEEN ABLE TO THINK OF ANY BETTER WAY, AND IT IS FIGHTING THIS

 4     CASE BECAUSE IT KNOWS IT NEEDS THOSE FEATURES TO CONTINUE TO

 5     SUCCEED IN THE MARKETPLACE.

 6          JUST LIKE YOUR PARENTS TOLD YOU WHEN YOU WERE CHILDREN,

 7     WATCH WHAT THEY DO, NOT WHAT THEY SAY IN A COURTROOM WHEN THEY

 8     ARE WORRIED ABOUT THE CONSEQUENCES.

 9          MAYBE IT WAS MY PARENTS WHO SAID THAT, BUT THAT'S SLIGHTLY

10     DIFFERENT.  OKAY.

11          FACTOR 11 CALLS FOR A SUBSTANTIAL ROYALTY.

12          AND THEN WE CAN GO BACK TO FACTOR 5.  YOU WILL SEE WHY A

13     ROYALTY AGREED UPON IN AUGUST OF 2011 WOULD HAVE BEEN

14     SIGNIFICANT.

15          WHAT WAS THE COMMERCIAL RELATIONSHIP BETWEEN APPLE AND

16     SAMSUNG IN AUGUST OF 2011?  YOU KNOW THAT A YEAR PREVIOUSLY,

17     APPLE HAD ASKED SAMSUNG NOT TO COPY ITS PATENTS, AND THEN BY

18     AUGUST 2011, APPLE KNEW THAT SAMSUNG HAD SIMPLY BLOWN THAT

19     REQUEST OFF.

20          APPLE HAD SEEN THE NEW GALAXY PHONES AND IT KNEW THAT

21     SAMSUNG WAS RIPPING OFF KEY FEATURES.  APPLE KNEW THAT

22     SAMSUNG'S COPYING WAS HELPING SAMSUNG STEAL SALES FROM APPLE.

23          SO IN AUGUST OF 2011, IF SAMSUNG HAD ASKED TO LICENSE FIVE

24     KEY SOFTWARE FEATURES, WHAT WOULD APPLE HAVE SAID?  WOULD APPLE

25     HAVE SAID WHAT SAMSUNG'S WITNESSES TOLD YOU, SURE, GO AHEAD,

1    TAKE ALL FIVE FOR 1.75 A PHONE?

2         YOU KNOW THAT WOULD NOT HAVE HAPPENED.  YOU KNOW THAT

3    WOULD NOT HAVE HAPPENED.

4         REMEMBER THAT -- THE HIGHLIGHT FOR ME OF THE TRIAL,

5    REMEMBER WHEN MR. PENDLETON, THE ADVERTISING GUY FROM STA, WAS

6    SITTING UP THERE AND MR. LEE SURPRISED HIM BECAUSE HE'D BEEN

7    TALKING ABOUT S BEAM, THIS NEAR FIELD COMMUNICATION, AND

8    MR. LEE SAID TO HIM, WOULD SAMSUNG HAVE LICENSED S BEAM TO A

9    COMPETITOR FOR PENNIES ON THE DOLLAR?

10        MR. PENDLETON ALMOST FELL OUT OF HIS CHAIR.  HE ALMOST

11   SWALLOWED HIS TONGUE BECAUSE THE CONCEPT OF GIVING AWAY AN

12   IMPORTANT FEATURE WAS SO FAR FROM ANYTHING HE EVER WOULD HAVE

13   CONSIDERED IN THE REAL WORLD.

14        BY THE WAY, THAT SAME FEATURE WAS ONE THAT THE EYE

15   TRACKING EXPERT SAID HAD NO VALUE.  COMPARE HER TESTIMONY TO

16   THE TESTIMONY OF THE SAMSUNG EXECUTIVE THAT YOU SAW.

17        AUGUST 2011 WAS ALSO A CRITICAL POINT IN THE U.S. MARKET.

18   60 MILLION CONSUMERS WERE GOING TO BUY THEIR FIRST IPHONES

19   WITHIN THE NEXT 18 MONTHS.  AND, AGAIN, YOUR COMMON SENSE TELLS

20   YOU WHAT APPLE WOULD HAVE DONE.

21        TO BE HONEST, I DON'T UNDERSTAND SAMSUNG'S EVIDENCE ON

22   THIS POINT.  SAMSUNG TOLD YOU THAT APPLE HAD DECLARED WAR ON

23   GOOGLE.  THEY TOLD YOU THAT APPLE WAS BEATEN DOWN BY SAMSUNG'S

24   FABULOUS ADVERTISING CAMPAIGN AND THAT APPLE WAS WORRIED THAT

25   NO ONE WANTED ITS PRODUCTS.

1          OBVIOUSLY NONE OF THAT IS TRUE.

2          BUT THINK FOR A MINUTE.  SUPPOSE IT WERE TRUE.  SUPPOSE

3     THAT THEY WERE RIGHT ABOUT THAT.  WOULD THAT HAVE MADE APPLE'S

4     DEMAND IN AUGUST 2011 HIGHER OR LOWER?  DO YOU CHARGE LESS TO A

5     COMPETITOR THAT YOU ARE WORRIED ABOUT?  I DON'T THINK SO.  I

6     DON'T THINK YOU DO.  IF YOU ARE WORRIED ABOUT A COMPETITOR, YOU

7     CHARGE THEM MORE.

8          THE SIMPLE TRUTH IS THAT WHEN YOU REACH THIS POINT IN THE

9     INSTRUCTIONS AND WHEN YOU CONSIDER THE FACTS THAT ARE SET OUT

10    IN YOUR INSTRUCTIONS AND ASK THE QUESTIONS THAT THE LAW ASKS

11    YOU TO -- TELLS YOU TO ASK, WHAT WOULD HAVE HAPPENED IN THIS

12    HYPOTHETICAL WORLD?  WHAT POSITION WOULD THE PARTIES HAVE

13    TAKEN?  YOU WILL SEE THAT DR. VELLTURO'S OPINION ON REASONABLE

14    ROYALTY IS ACCURATE, FAIR, AND BALANCED.

15         THE ROYALTIES HE SET FOR EACH PATENT ARE NOT HIGHER THAN

16    APPLE WOULD HAVE ASKED, AND SAMSUNG, FACING A CRISIS OF DESIGN,

17    WOULD HAVE PAID THEM TO BE ABLE TO STAY IN THIS MARKET.

18         AFTER CONSIDERING ALL 15 FACTORS, DR. VELLTURO CALCULATED

19    A ROYALTY RATE FOR EACH OF THE FIVE PATENTS TO BE APPLIED

20    SEPARATELY TO PHONES AND TABLETS.  YOU CAN SEE THOSE ROYALTY

21    RATES ON SLIDE 96, BUT YOU WILL HAVE THEM IN EVIDENCE AT MY

22    FAMOUS PX 222A, AND THEY'RE AT PAGE 37 OF THAT EXHIBIT.

23         SO HOW WILL YOU FILL OUT THE VERDICT FORM ON THIS ISSUE?

24    QUESTION 9 ASKS YOU FOR A TOTAL OF DAMAGES, COMBINED LOST

25    PROFITS AND REASONABLE ROYALTY.

```
1        AND THEN QUESTION 10A ASKS YOU FOR A DETAILED BREAKDOWN BY

2   PHONE, BY PATENT, AND BY TIME PERIODS.

3        WE HAVE PROVIDED YOU WITH A CHART THAT SHOWS YOU WHAT THE

4   VERDICT FORM WOULD LOOK LIKE IF YOU ACCEPTED DR. VELLTURO'S

5   OPINION.  IT'S ON THE SCREEN HERE.  YOU HAVE FOUR SECONDS TO

6   MEMORIZE IT, BUT YOU COULD ALSO FIND IT AT PAGE 13A OF

7   EXHIBIT 222A.

8        FINALLY, YOU WILL BE ASKED QUESTION 10B, WHICH ASKS YOU TO

9   BREAK OUT DAMAGES FOR THREE ACCUSED PHONES FOR THREE PARTICULAR

10  TIME PERIODS.  DR. VELLTURO'S OPINION AS TO THE CORRECT ANSWER

11  HERE IS HERE ON SLIDE 97, BUT YOU WILL ALSO FIND IT AT 222A AT

12  PAGE 12.

13       WHEN YOU LOOK AT EXHIBIT 222A, AND IF YOU LOOK AT PAGES 19

14  AND 24, YOU WILL FIND THAT WE HAVE GIVEN YOU ALTERNATIVE CHARTS

15  WITH LOWER DAMAGES AMOUNTS THAT YOU CAN USE TO FILL OUT THIS

16  VERDICT FORM.

17       WE DIDN'T DO THAT BECAUSE WE THINK IT'S RIGHT, BUT THEY

18  ARE ALTERNATIVES THAT WILL BE HELPFUL TO YOU IF YOU REACH

19  CONCLUSIONS ABOUT LIABILITY OR DAMAGES THAT ARE NOT THE ONES

20  FOR WHICH I'VE BEEN ADVOCATING.

21       WE PROMISED YOU THAT WE WOULD GIVE YOU THE INFORMATION YOU

22  NEED TO MAKE YOUR DECISION IN A FORM THAT WOULD BE EASY FOR YOU

23  TO USE AND WE HAVE KEPT OUR WORD.

24       IN CLOSING, I WOULD LIKE TO SAY THIS:  BRINGING THIS

25  LAWSUIT WAS APPLE'S LAST CHOICE, ITS LAST OPTION.  YOU KNOW
```

 1      THAT WE MET WITH SAMSUNG A YEAR BEFORE WE SUED AND TRIED TO

 2      PERSUADE THEM TO COMPETE FAIRLY.

 3           YOU KNOW, HOWEVER, FROM SAMSUNG'S INTERNAL DOCUMENTS THAT

 4      SAMSUNG NEVER, EVER CONSIDERED THAT OPTION.  THEY WERE TOO

 5      FOCUSSED ON THEIR OWN CRISIS OF DESIGN, AND THEIR REALIZATION

 6      THAT THE ONLY WAY THEY COULD SUCCEED WAS, QUOTE, "TO MAKE

 7      SOMETHING LIKE THE IPHONE."

 8           SAMSUNG WAS COMMITTED TO TRYING TO GET AWAY WITH PATENT

 9      INFRINGEMENT.

10           APPLE CANNOT SIMPLY WALK AWAY FROM ITS INVENTIONS.  APPLE

11      CANNOT DO THAT TO THE PEOPLE THAT YOU SAW AND THE OTHER PEOPLE

12      LIKE THEM WHO WORKED SO HARD TO COME UP WITH SUCH FABULOUS

13      IDEAS.

14           AND SO WE ARE HERE, 37 MILLION ACTS OF INFRINGEMENT LATER,

15      AND WE ARE COUNTING ON YOU FOR JUSTICE.

16           THE COURT:  OKAY.  TIME IS 10:54.

17           MR. PRICE:  YOUR HONOR, MAY I JUST HAVE A SECOND TO

18      SET UP?

19           THE COURT:  OF COURSE.

20        (PAUSE IN PROCEEDINGS.)

21           MR. QUINN:  YOUR HONOR, I'M READY.

22           THE COURT:  OKAY.  TIME IS NOW 10:56.  GO AHEAD,

23      PLEASE.

24      ///

25      ///

1          **(MR. PRICE GAVE HIS CLOSING ARGUMENT ON BEHALF OF**

2     **DEFENDANTS.)**

3                   MR. PRICE:  GOOD MORNING, LADIES AND GENTLEMEN OF THE

4     JURY.  YOU'RE GOING TO SEE SOMETHING THAT'S NEVER BEEN

5     WITNESSED IN A COURTROOM BEFORE, I THINK.  YOU'RE GOING TO HEAR

6     FROM FOUR LAWYERS IN CLOSING ARGUMENT, BECAUSE WE WANTED YOU TO

7     HEAR FROM THE LAWYERS WHO HAD PRESENTED WITNESSES ON RELEVANT

8     TOPICS.  THAT MIGHT HELP YOU REMEMBER THE TESTIMONY THAT CAME

9     IN.

10         PLUS NONE OF US IS AS DYNAMIC AS MR. MCELHINNY, SO WE

11    WANTED TO MAKE SURE YOU SAW A FEW DIFFERENT PERSONALITIES AT

12    THE SAME TIME.

13         I'M GOING TO TALK TO YOU ABOUT THE REAL WORLD EVIDENCE

14    ABOUT COPYING AND WHY SAMSUNG IS ABLE TO SELL ITS PHONES.

15              AND THEN YOU'RE GOING TO HEAR FROM MR. NELSON, WHO'S GOING

16    TO TALK TO YOU ABOUT SAMSUNG'S -- I MEAN APPLE'S PATENTS,

17    VALIDITY AND INFRINGEMENT.

18         YOU'RE GOING TO HEAR FROM MR. JOHNSON, WHO WILL TALK TO

19    YOU ABOUT SAMSUNG'S PATENTS.

20              AND THEN YOU'RE GOING TO HEAR FROM MR. QUINN, WHO'S GOING

21    TO TALK TO YOU ABOUT THE DAMAGES IN THIS CASE AND WHAT APPLE IS

22    ASKING FOR.

23         NOW, DURING THIS PRESENTATION, HIS PRESENTATION, I DON'T

24    KNOW HOW MANY TIMES MR. MCELHINNY SAID THAT BASICALLY SAMSUNG'S

25    SALES OF THESE ACCUSED PRODUCTS WERE CAUSED BECAUSE THEY HAD

1        TECHNOLOGY RELATING TO THESE FIVE, THE FIVE PATENTS.

2             AND THEY'RE ASKING FOR A BIG NUMBER HERE, AND THE REASON

3        THAT YOU HEARD THE WORD "COPY" SO MUCH, I'M GOING TO SUBMIT TO

4        YOU, IS BECAUSE THEY HAVE TO TRY TO GET YOU A LITTLE ANGRY TO

5        JUSTIFY THIS KIND OF NUMBER.  COPY.  COPY.  STEAL.

6             I THINK IN THE OPENING MR. MCELHINNY SAID SOMETHING ABOUT

7        THE IPHONE BEING A HERO AND SAMSUNG TURNING TO THE DARK SIDE.

8        I DON'T KNOW IF YOU RECALL THAT.

9             WELL, FIRST LET ME ADDRESS COPYING, AND LET ME ADDRESS IT

10       VERY SQUARELY, AND I PUT THIS SLIDE UP HERE TO TALK ABOUT THESE

11       PARTICULAR PATENTS, AND IT'S TRUE THAT IF YOU DON'T PRACTICE A

12       PATENT, THAT DOESN'T MEAN THAT YOU CAN'T COLLECT DAMAGES FOR

13       IT.  YOU STILL GET DAMAGES IF YOU HAVE A PATENT THAT YOU DON'T

14       PRACTICE AND SOMEONE ELSE IS.

15            BUT YOU CAN'T COPY SOMETHING FROM THE IPHONE IF IT'S NOT

16       IN THE IPHONE.

17            AND THE UNDISPUTED EVIDENCE IS THAT APPLE, IN ITS IPHONE,

18       HAS NEVER PRACTICED THE '959, CLAIM 25 OF THE '959, WHICH IS

19       THE UNIVERSAL SEARCH; APPLE HAS NEVER PRACTICED, IN THE IPHONE,

20       CLAIM 20 OF PATENT '414, BACKGROUND SYNCHRONIZATION, IT DOESN'T

21       DO WHAT ITS PATENT SAYS; CLAIM 18 OF THE '172, THE WORD

22       SUGGESTION, APPLE HAS NEVER USED THAT CLAIM IN ITS IPHONE.

23       IT'S NOT PART OF THAT HEROIC IPHONE WHICH CAME OUT IN 2007.

24            SO SAMSUNG DIDN'T COPY IT.  GOOGLE DIDN'T COPY IT.  YOU

25       CAN'T COPY IT IF IT'S NOT THERE, IF APPLE DOESN'T PRACTICE IT.

1          YOU'VE HEARD NO EVIDENCE IN THIS TRIAL AT ALL, BY THE WAY,

2     THAT PRACTICED -- THAT APPLE EVER PRACTICED CLAIM 9 OF THE '647

3     PATENT, WHICH IS THAT QUICK LINKS PATENT.

4          AND THE REASON, BY THE WAY, IS BECAUSE THESE PATENTS ARE

5     SPECIFIC WAYS, USING SPECIFIC ARCHITECTURES, TO ACCOMPLISH

6     SOMETHING.  THEY'RE NOT PATENTS COVERING UNIVERSAL SEARCH OR

7     WORD SUGGESTION.  THEY ARE PARTICULAR WAYS OF DOING IT.

8          SO YOU CAN'T COPY IF IT'S NOT IN THERE.

9          AND I THINK THE EVIDENCE SHOWS THAT, BY THE WAY THEY SLIDE

10    TO UNLOCK, APPLE'S PARTICULAR CLAIM ISN'T BEING PRACTICED BY

11    APPLE NOW WHEN THEY CHANGED IT IN IOS 7.

12         THE SECOND THING, OBVIOUSLY, IS THAT IN A DAMAGES CLAIM,

13    APPLE IS SAYING THAT, LOOK, SAMSUNG IS PRACTICING PARTICULAR

14    CLAIMS USING PARTICULAR ARCHITECTURE THAT'S CAUSING SALES, AND

15    IF IT COULDN'T DO THAT, IF IT WASN'T DOING THAT, THEN A LOT OF

16    PEOPLE WOULD COME TO APPLE, WHICH ALSO IS NOT PRACTICING THOSE

17    CLAIMS OF THOSE PATENTS.

18         AND THAT MAKES NO SENSE WHATSOEVER.  WHY WOULD YOU GO FROM

19    ONE PHONE THAT YOU BOUGHT TO ANOTHER WHICH LACKS THE SAME, YOU

20    KNOW, PRACTICE THAT THE PHONE YOU WERE WITH HAD?  IT SIMPLY

21    MAKES NO SENSE.

22         SO I WANTED TO TALK ABOUT THAT FIRST JUST TO SHOW WHY THIS

23    IS IMPORTANT, NOT BECAUSE YOU CAN'T COLLECT DAMAGES IF YOU HAVE

24    A PATENT THAT YOU'RE NOT PRACTICING.  IT'S BECAUSE YOU CAN'T

25    COPY IT -- IF IT'S NOT IN YOUR PRODUCT, SOMEONE CAN'T COPY IT.

1        AND WHY WOULD SOMEONE COME TO YOUR PRODUCT IF YOU'RE NOT

2    PRACTICING THOSE SAME PATENTS?

3        SO LET ME GET A LITTLE BIT MORE DETAILED, THEN, INTO WHAT

4    WE SHOWED YOU.  THE TRUTH IS THAT THE PARTICULAR PATENTED

5    CLAIMS THAT WERE IN THIS CASE WERE CREATED INDEPENDENTLY, NOT

6    COPIED, BY ANOTHER COMPANY WITH BRILLIANT ENGINEERS, GOOGLE,

7    RIGHT UP THE STREET.

8        AND THE TRUTH IS THAT SAMSUNG SOLD MORE THAN ANY OTHER

9    ANDROID PHONE MAKER BECAUSE IT MADE THE BEST HARDWARE FOR THAT

10   ANDROID PLATFORM WHICH GOOGLE INDEPENDENTLY CREATED.

11       AND APPLE IS TRYING TO DISTRACT YOU FROM THAT BY SAYING

12   COPYING AND BY, BY INTENTIONALLY MISINTERPRETING THE DOCUMENTS.

13       AND LET ME START WITH THE CRISIS OF DESIGN, AND THAT'S

14   EXHIBIT 149.  THAT WAS IN FEBRUARY OF 2010.  IT WAS A

15   PRESENTATION GIVEN BY THE HEAD OF THE MOBILE DIVISION.  I

16   REALLY ASK YOU TO LOOK AT THAT.  YOU HEARD MR. MCELHINNY SAY,

17   IN SAMSUNG'S OWN WORDS, THEY WERE TO COPY THE IPHONE.

18       THAT'S NOT WHAT THAT SPEECH WAS ALL ABOUT.  WHEN YOU READ

19   ABOUT IT, YOU SEE THAT, YES, THEY ARE PRAISING THE IPHONE.  IT

20   REALLY DID COME OUT AND SURPRISE THE INDUSTRY.

21       AND THEY ARE ALSO SAYING THE OMNIA, A SAMSUNG PHONE WHICH

22   USED THE MICROSOFT PLATFORM, THAT'S THE ONE MADE UP IN

23   WASHINGTON BY ANOTHER COMPANY, YOU KNOW, IT WASN'T VERY GOOD

24   COMPARED TO THE APPLE OPERATING PLATFORM.  AND THAT'S PART OF

25   THE DOCUMENT.

1           BUT THE LANGUAGE ABOUT COPYING THE IPHONE, THAT'S WHAT

2    CARRIERS WERE SAYING.

3           AND IF WE CAN SHOW THAT, KEN?

4           AND WHAT WAS BEING SAID HERE IS THAT, YOU KNOW, SAMSUNG IN

5    THE PAST HAD ALWAYS LISTENED TO CARRIERS, THE KIND THAT SAYS

6    YES TO WHATEVER A CARRIER WANTS, THAT'S A SHORTCUT TO GOING OUT

7    OF BUSINESS.

8           AND YOU HEARD MR. SOHN COME HERE AND TELL YOU THAT, YOU

9    KNOW, BEFORE, BEFORE ACTUALLY THE IPHONE AND FOR A FEW YEARS

10   AFTERWARDS, THAT THE MANUFACTURERS LISTENED TO CARRIERS AS TO

11   WHAT TO DO AND WHAT PHONES TO MAKE INSTEAD OF GOING DIRECTLY TO

12   THE CONSUMER.

13          AND HE SAYS, "I HEAR THINGS LIKE LET'S MAKE SOMETHING LIKE

14   THE IPHONE," AND THAT'S COMING FROM THE CARRIERS.  NOWHERE IN

15   THAT DOCUMENT DOES HE SAY "LET'S COPY THE IPHONE."  AND THEY

16   DON'T COPY THE IPHONE.

17          WHAT HE'S SAYING IS THAT WE ARE BEHIND.  WE NEED TO FIND

18   AN OPERATING SYSTEM PLATFORM.  AND THERE ARE DOCUMENTS THAT YOU

19   WILL SEE IN THAT TIMEFRAME THAT SHOW JUST THAT, AND THAT IS

20   EXHIBIT, FOR EXAMPLE, EXHIBIT 201.  MR. MCELHINNY SHOWED YOU

21   THIS DURING THE TRIAL.

22          AND IF YOU GO TO PAGE -- KEN, PAGE 17 -- DO YOU REMEMBER,

23   THIS WAS IN 2009 AND IT'S AN INTERNAL SAMSUNG DOCUMENT, AND DO

24   YOU REMEMBER MR. MCELHINNY SAID THAT HARDWARE USED TO BE THE

25   PRIMARY BUYING FACTOR AND NOW IT'S SOFTWARE, AND YOU HEARD HIM

1       SAY AGAIN IN CLOSING THAT SOFTWARE IS WHAT SELLS PHONES, NOT

2       HARDWARE.

3           WELL, THAT'S MISLEADING BECAUSE WHAT THIS IS TALKING

4       ABOUT, YOU SEE HARDWARE IS THE PRIMARY BUYING FACTOR.  REMEMBER

5       YOU USED TO GO INTO A STORE AND YOU WOULD BUY A PHONE BECAUSE

6       IT WAS A FLIP PHONE OR IT WAS A CAMERA PHONE OR WHATEVER?

7           OKAY.  WELL, THOSE DAYS ARE OVER.  PEOPLE BUY PHONES NOW

8       FOR CONTENT, FOR SERVICES.

9           AND WHAT MR. MCELHINNY DIDN'T SHOW YOU WAS THE SECOND PART

10      HERE.  APPLE USES APPLICATIONS, NOT HARDWARE, FOR SEGMENTATION.

11      AND THIS IS HARD TO SEE.  IT'S EXPERIENCE DRIVEN BY AFTERMARKET

12      CUSTOMIZATION.

13          AND IF YOU LOOK THROUGH THIS DOCUMENT -- AND I ASK YOU TO

14      LOOK ALSO AT PAGES 13 AND 81 -- SAMSUNG WAS IN A PLACE WHERE IT

15      HAD TO FIND AN OPERATING SYSTEM IT COULD USE THAT PEOPLE COULD

16      THEN DOWNLOAD THESE WONDERFUL APPLICATIONS THAT CONSUMERS NOW

17      WANTED FROM THIRD PARTIES, SO IT COULD DOWNLOAD MAPS OR NETFLIX

18      OR PLANTS VERSUS ZOMBIES OR CUT THE ROPE OR MARVEL COMICS.

19      THAT WAS AN IMPORTANT PART.

20          AND WHEN YOU SEE THESE DOCUMENTS THAT SAY SOFTWARE IS A

21      DRIVING FACTOR, READ THE DOCUMENT CAREFULLY, BECAUSE WHAT IT

22      SAYS IS THEY'RE TALKING ABOUT THE SOFTWARE THAT ALLOWS THE

23      CONSUMER EXPERIENCE OF GETTING THESE APPLICATIONS ON THE PHONE

24      SO THE CUSTOMER CAN CUSTOMIZE HIS OWN PHONE.

25          SAMSUNG RECOGNIZED THAT'S WHAT IT NEEDED BACK IN 2009, AND

1    THE WAY IT RESOLVED THAT PROBLEM IS UNDISPUTED.  IT'S IN THE

2    DOCUMENTS THEMSELVES.  IT CHOSE TO GO WITH GOOGLE'S ANDROID

3    PLATFORM AS, BY THE WAY, HAVE ALMOST EVERY OTHER MANUFACTURER.

4    I MEAN, THE ANDROID PLATFORM IS THE WORLD'S ALTERNATIVE TO

5    APPLE'S IOS.

6         AND WE'VE BROUGHT IN HERE AND YOU HEARD MR. LOCKHEIMER

7    TESTIFY, HIROSHI LOCKHEIMER.  AND GOOGLE RECOGNIZED THIS NEED

8    WAY BACK IN 2006.  MR. LOCKHEIMER JOINED THEM IN 2006, GOOGLE

9    IN 2006, AND THAT IS THAT MANUFACTURERS WEREN'T CONCENTRATING

10   ON SOFTWARE AND THAT GOOGLE DECIDED TO BUILD A PLATFORM, WHICH

11   BECAME ANDROID, THAT WOULD BE FLEXIBLE AND OPEN SOURCED.  IT

12   WOULD BE AN OPEN PLATFORM THAT WOULD GIVE YOU THE GUTS ON

13   OPERATING SYSTEM THAT ANY MANUFACTURER COULD USE AND THEN

14   APPLICATION DEVELOPERS, THE PEOPLE WHO WRITE ALL THOSE COOL

15   APPS, YOU KNOW, COULD MAKE FOR IT AND IT WOULD WORK WITH THAT

16   PLATFORM.

17        AND, OF COURSE, GOOGLE MAKES ITS OWN, YOU KNOW, ITS OWN

18   APPLICATIONS.

19        AND THEY BEGAN DOING THAT, AGAIN, BACK IN 2006.  THEY HAD

20   A VERSION 1 OUT IN 2008.

21        AND HERE'S THE KEY UNDISPUTED FACT IN THIS CASE:  THAT

22   EVERY PATENT WHICH APPLE CLAIMS IS INFRINGED IN THIS CASE IS

23   INFRINGED WITH THE BASIC GOOGLE ANDROID SOFTWARE BECAUSE THEY

24   INCLUDE -- THEY ACCUSE THE GALAXY NEXUS OF INFRINGING EVERY ONE

25   OF THEIR FIVE PATENTS, AND YOU HEARD MR. LOCKHEIMER TELL YOU

 1     THAT THE SOURCE CODE, THE CODE FOR EVERY ONE OF THOSE FEATURES

 2     WAS DEVELOPED BY ENGINEERS AT GOOGLE.

 3          AND THIS IS NOT -- THIS IS DIFFERENT, KEN.

 4          THIS IS NOT SAYING, POINTING A FINGER AT GOOGLE OR ANDROID

 5     WHATSOEVER.  THIS IS SAYING THAT APPLE HAS FIVE PATENTS WITH

 6     PARTICULAR METHODOLOGIES AND ARCHITECTURES THAT THEY CLAIM ARE

 7     INFRINGED.

 8          NO.  WE BROUGHT IN THE GOOGLE FOLKS, THE GOOGLE ENGINEERS

 9     WHO INDEPENDENTLY DEVELOPED WHAT ANDROID DOES AND TOLD YOU IT

10     WAS DIFFERENT, DIFFERENT ARCHITECTURE, AND THAT'S SLIDE 20.

11          PUT THAT UP.

12          AND YOU'RE GOING TO HEAR MORE ABOUT THEM WHEN MR. NELSON

13     TALKS.  WE'RE NOT POINTING THE FINGER AT GOOGLE.  WE'RE SAYING

14     THEY INDEPENDENTLY DEVELOPED THESE FEATURES AND THAT THEY DON'T

15     INFRINGE.  WE BROUGHT YOU THE INVENTORS, SHALL WE SAY.

16          AND A QUICK DISTRACTION ON THE INVENTORS.  THE JUDGE

17     INSTRUCTED YOU AT THE TIME THE EVIDENCE CAME IN AS TO WHAT THAT

18     WAS RELEVANT TO -- THAT'S T-284, KEN -- AND THAT'S RELEVANT TO

19     POSSIBLE BIAS.  IF A WITNESS TAKES THE STAND, IF THEY HAVE A

20     POTENTIAL BIAS, A FINANCIAL RESULT PUT IN THE CASE, OR THEY

21     COULD SOMEHOW LOSE MONEY, THAT'S SOMETHING YOU CAN CONSIDER IN

22     SEEING WHETHER THEY'RE TRUTHFUL.

23          BUT WHEN THOSE WITNESSES TOOK THE STAND, APPLE KNEW ABOUT

24     THE ABILITY TO DO THAT.  APPLE KNEW -- THEY DIDN'T ASK THOSE

25     WITNESSES IF THEY KNEW, THEY DIDN'T ASK THE WITNESSES IF THEY

1        WERE BIASED, AND YOU COULD SEE THAT THEY WEREN'T BIASED.

2             WHO IN THIS TRIAL HAS TRIED TO HIDE FROM YOU THE RELEVANCE

3        OF GOOGLE IN THIS CASE?  IT'S NOT -- IT'S NOT SAMSUNG.  IT'S

4        APPLE.

5             EVERY WITNESS WAS ASKED, GOOGLE IS NOT A PARTY TO THIS

6        CASE, YOU KNOW?  YOU UNDERSTAND THAT GOOGLE IS NOT A PARTY TO

7        THIS CASE?  EVERY ONE OF THOSE WITNESSES WAS ASKED THAT BY

8        APPLE TO GIVE YOU THE IMPRESSION THAT GOOGLE WAS IRRELEVANT.

9             GOOGLE IS CRITICAL ON THE QUESTION OF COPYING BECAUSE WE

10       DIDN'T COPY.  SAMSUNG DIDN'T COPY.  THEY WEREN'T TOLD TO COPY.

11       THE ENGINEERS WHO CAME UP WITH THESE FEATURES CAME IN HERE AND

12       TOLD YOU THEY DIDN'T COPY.

13            NOW, THERE'S ONE AREA, WHEN YOU USE THE GOOGLE OPERATING

14       SYSTEM, THERE ARE SOME DIFFERENCES YOU CAN MAKE, LITTLE CHANGES

15       YOU CAN MAKE TO IT SO THAT YOU CAN DIFFERENTIATE YOURSELF FROM

16       ANOTHER COMPANY, LIKE HTC OR MOTOROLA, AND ONE OF THOSE WAS THE

17       COVER, THE SLIDE TO UNLOCK.  YOU CAN CUSTOMIZE THAT.

18            NOW, APPLE ACCUSES GOOGLE'S WAY OF DOING THAT AS

19       INFRINGING.  THE BASIC ANDROID CODE WHICH GOOGLE INDEPENDENTLY

20       CAME UP WITH THEY CLAIM INFRINGES.

21            WELL, WE BROUGHT IN BEFORE YOU SAMSUNG'S SOFTWARE DESIGNER

22       ON, YOU KNOW, THE FACE OF THE PHONE, AND YOU HEARD FROM

23       YOUNGMI KIM, AND SHE TESTIFIED ABOUT WHETHER OR NOT SHE COPIED

24       APPLE'S SLIDE TO UNLOCK AND SHE SAID ABSOLUTELY NOT, AND SHE

25       POINTED OUT THAT THEY TRY TO DIFFERENTIATE THEIR PRODUCTS.

1          AND WHEN YOU SAW HER TESTIFY, YOU COULD EVALUATE HER

2     DEMEANOR.

3          AND IF YOU LOOK AT HER WORK -- AGAIN, LOOK AT WHAT YOU DO,

4     NOT WHAT YOU SAY -- IF WE CAN PUT UP CHART 47 -- IF YOU LOOK AT

5     HER WORK -- BOY, THIS IS HARD TO SEE -- SHE CAME UP, FOR

6     EXAMPLE, WITH THE PUZZLE DESIGN BACK IN 2008/2009.

7          NOW, YOU'VE SEEN SOME DOCUMENTS THAT ARE FROM THE SOFTWARE

8     VERIFICATION GROUP WHICH COMPARE APPLE AND IPHONE ON MANY

9     LEVELS AND SOME TALK ABOUT ELEMENTS OF SLIDE TO UNLOCK.

10          AND WHAT SHE TOLD YOU WAS THESE ARE KIND OF LIKE BOOK

11    REPORTS THAT SHE LOOKS AT AND, FRANKLY, SHE PAYS NO ATTENTION

12    TO THEM.  AND THE WAY YOU KNOW SHE PAYS NO ATTENTION TO THEM IS

13    BY THE RESULTS OF HER WORK.  SHE DID NOT COPY THE IPHONE.

14          LOOK AT WHAT SHE CAME OUT WITH.  WELL, THERE WAS THE SLIDE

15    TO UNLOCK WHICH LOOKS ABSOLUTELY NOTHING LIKE THE IPHONE.

16          SHE CAME OUT WITH THE GALAXY S II.  THE GALAXY S II IS --

17    IN FACT, KEN, MAYBE WE CAN PUT UP SLIDE 44 BECAUSE I'M NOT

18    GOING TO HAVE TIME TO SHOW YOU THE PHONE ITSELF -- THAT'S ONE

19    OF THOSE WHERE THE WHOLE SCREEN SLIDES TO UNLOCK.

20          APPLE DOES NOT ACCUSE THAT OF INFRINGING.

21          ANOTHER DESIGN SHE CAME UP WITH WAS IN THE GALAXY NOTE

22    WHERE YOU SEE THIS CIRCLE HERE AND YOU MOVE YOUR FINGER OUTSIDE

23    THE CIRCLE AND IT UNLOCKS.

24          APPLE DOES NOT ACCUSE THAT OF INFRINGING.

25          SHE CAME UP WITH THE RIPPLE, THE GALAXY S III, WHERE YOU

1    SLIDE -- YOU SWIPE TO UNLOCK.  APPLE DOES NOT ACCUSE THAT OF

2    INFRINGING.

3         IN FACT, THEIR EXPERT TOOK THE STAND -- IF WE CAN GO BACK

4    TO THAT CHART, 47, KEN -- LOOK, THESE ARE COMING OUT BEFORE

5    APPLE'S PATENT IS EVEN ISSUED.

6         AND MR. MCELHINNY CAME UP HERE AND TOLD YOU THAT SAMSUNG

7    COPIED, YOU KNOW, APPLE'S SLIDE TO UNLOCK PATENT.  IT DOESN'T

8    MAKE SENSE.

9         AND THEIR OWN EXPERT, MR. COCKBURN, CAME UP HERE AND TOLD

10   YOU THERE IS NO EVIDENCE.  AND THIS IS, I BELIEVE, T-281, 2 --

11   KEN, THE COCKBURN TESTIMONY.

12        YOU'RE NOT TALKING ABOUT ANYBODY COPYING THE PATENT;

13   CORRECT?

14        RIGHT.

15        THERE'S NO COPYING IN THIS CASE.  THERE WAS A DISCUSSION

16   AND COMPARISON OF THE PHONES.  THE CODE WAS CREATED BY THESE

17   INDEPENDENT GENIUSES AT GOOGLE, THE BASIC ANDROID.

18        YOU KNOW, ANY CHANGE THAT SAMSUNG MADE HAD THE EFFECT OF

19   NOT CHANGING THAT, NOT CHANGING THAT BASIC GOOGLE CODE.  THERE

20   IS NO COPYING.  BUT THEY HAVE TO MAKE YOU THINK THAT SO THAT

21   YOU CAN GET ENRAGED AND THINK THAT THERE SHOULD BE, YOU KNOW,

22   BIG MONEY DAMAGES AWARDED.

23        SO LET ME THEN GO INTO -- AND I ALMOST FORGOT ON THIS --

24   SO WE HAVE, YOU KNOW, GOOGLE, GOOGLE ENGINEERS DEVELOPING THIS

25   CODE.  YOU ARE ASKED, WHERE WERE YOU IN 2007, YOU KNOW, WHEN

1     APPLE CAME OUT?  AND DIDN'T HAVE -- BY THE WAY, IT WASN'T

2     PRACTICING MOST OF THESE PATENTS, AT THIS POINT ALL OF THEM.

3          THE QUESTION WAS, WHERE WERE THEY, LIKE, IN 2010, 2011?

4     WE KNOW WHAT STEVE JOBS THOUGHT.  STEVE JOBS THOUGHT THEY WERE

5     BEHIND ANDROID AT THAT TIME AND HE THOUGHT THAT THEY HAD TO

6     DECLARE A HOLY WAR ON ANDROID, AND THAT'S EXHIBIT 489, AND IF I

7     HAD A BUCK IN MY POCKET, I WOULD GIVE IT TO MR. MCELHINNY,

8     BECAUSE IT'S CRITICAL AS TO WHAT THIS CASE IS REALLY ABOUT.

9          I MEAN, SAMSUNG, MOTOROLA, HTC AND OTHERS CHOSE ANDROID AS

10    A PLATFORM.

11         AND WE KNOW, IN OCTOBER 2010, STEVE JOBS RECOGNIZED WE

12    HAVE TO START A HOLY WAR ON GOOGLE.  THAT'S WHAT 2011 WAS GOING

13    TO BE ALL ABOUT.  IT WAS THE PRIMARY REASON FOR THESE

14    EXECUTIVES GETTING TOGETHER AND MEETING WAS THIS HOLY WAR.

15         AND IF YOU LOOK THROUGH THIS DOCUMENT -- AND DO FLIP

16    THROUGH IT -- EVERYONE WAS SUPPOSED TO TALK ABOUT GOOGLE AND

17    ANDROID AND IT WAS ALL ABOUT APPLE BEING IN DANGER OF HANGING

18    ON TO AN OLD PARADIGM TOO LONG, AN INNOVATOR'S DILEMMA.

19         GOOGLE AND MICROSOFT WERE FURTHER AHEAD IN TECHNOLOGY.  IF

20    YOU GO THROUGH THIS, THEY'RE GOING TO SEE THAT GOOGLE WAS AHEAD

21    IN THE CLOUD, WHICH IS WHERE THE FUTURE WAS GOING, YOU KNOW,

22    WHERE YOU SYNC THROUGH THE CLOUD; THAT GOOGLE WAS AHEAD IN

23    CALENDAR.

24         AND IF YOU KIND OF FLIP THROUGH SOME OF THESE, YES,

25    SAMSUNG IS MENTIONED ALONG WITH GOOGLE, HTC, MOTOROLA, AND RIM.

1    SAMSUNG IS JUST ONE OF THOSE MANUFACTURERS.  AT THIS TIME

2    SAMSUNG WAS NOT THE LEADING ANDROID MANUFACTURER.

3         THE FOCUS IS ON WE HAVE A HOLY WAR WITH GOOGLE.

4         AND THEY WERE GOING TO TARGET WHOEVER BECAME THE LARGEST

5    GOOGLE ANDROID SELLER, THE LARGEST COMPANY THAT SOLD THIS

6    INDEPENDENTLY DEVELOPED PLATFORM THAT YOU COULD THEN USE TO

7    DOWNLOAD YOUR APPLICATIONS AND WATCH TV AND DO ALL THAT FUN

8    STUFF.

9         SO HOW DID WE START, HOW DID SAMSUNG START INCREASING ITS

10   SALES?  IT WASN'T BECAUSE IT COPIED.  IT WASN'T BECAUSE OF FIVE

11   PARTICULAR WAYS OF DOING SOMETHING THAT GOOGLE INDEPENDENTLY

12   DEVELOPED AND WAS DIFFERENT.

13        THE WAY THEY DID IT WAS THEY HAD A PARADIGM SHIFT, AND YOU

14   HEARD FROM MR. SOHN, WHO CAME IN.

15        AND BY THE WAY, THERE'S CRITICISM THAT WE DIDN'T BRING IN

16   EXECUTIVES.  WE BROUGHT IN TO YOU THE INVENTORS OF THE ACCUSED

17   FEATURES, WHICH ARE THE GOOGLE ENGINEERS.

18        WE BROUGHT IN TO YOU, IN FOR YOU TO LOOK AT AND LISTEN TO

19   MS. YOUNGMI KIM, WHO WAS IN CHARGE OF THAT SLIDE TO UNLOCK.

20        AND WE BROUGHT TO YOU DALE SOHN, WHO WAS PRESIDENT OF

21   SAMSUNG AMERICA, AND AS YOU SAW ON THE OTHER SLIDES, WAS KEY

22   ADVISER, YOU KNOW, IN KOREA.

23        AND HE EXPLAINED TO YOU THAT THERE WAS A PARADIGM SHIFT

24   FROM WHAT WE REALIZED -- IF WE CAN PUT UP 156.21 -- WE REALIZED

25   THAT WE HAD TO BRAND SAMSUNG, WE HAD TO GET CONSUMERS TO KNOW

1        WHO WE WERE AND TO GO INTO STORES TO ASK FOR THEM.

2            SAMSUNG WAS WELL KNOWN IN TV'S, YOU KNOW, BUT NOT IN

3        PHONES.

4            SO LET'S FOCUS ON BRANDING.  LET'S IMPROVE OUR RETAIL

5        PRESENCE.  LET'S GO AND CREATE SPECIAL AREAS IN THE RETAILERS.

6        LET'S BE FRIENDLY TO THE RETAILERS IN THIS REGARD.  LET'S SHIFT

7        OUR INVESTMENT STRATEGY IN MARKETING SO THAT WE'RE PROMOTING

8        OUR BRAND.

9            AND BY THE WAY, THAT DIDN'T INCREASE OUR ADVERTISING

10       DOLLARS.  YOU HEARD MR. PENDLETON, WHO'S HEAD OF MARKETING, SAY

11       IT JUST SWITCHED IT SO THAT SAMSUNG WAS CONTROLLING THE BRAND.

12           AND THEN LET'S MAKE SURE THAT OUR PRODUCTS ARE FLAWLESS.

13           AND MR. PENDLETON CAME UP HERE AND TOLD YOU WHAT THE FOCUS

14       WAS ON, HOW ARE WE SELLING THESE PHONES?  WE'RE USING A COMMON

15       PLATFORM, A PLATFORM THAT'S USED BY THE REST OF THE WORLD

16       EXCEPT FOR IOS, SO HOW DO WE SELL SAMSUNG PHONES?

17           BECAUSE AT THAT TIME, HTC WAS SELLING, WHAT, TWICE AS MUCH

18       AS WE WERE OF THE ANDROID PLATFORM.

19           AND HE EXPLAINED TO YOU THAT WE CREATED THESE ADS AND WE,

20       WE FOCUSSED ON OUR LEADERSHIP IN BIG SCREEN, 4G TECHNOLOGY.  HE

21       LATER TALKED ABOUT, YOU KNOW, THE QUALITY OF THE SCREEN.

22           IT'S THE HARDWARE THAT DISTINGUISHED US FROM THE REST OF

23       THE WORLD THAT WAS USING THE BASIC GOOGLE ANDROID SOFTWARE.

24           AND IT WORKED.  AND THE WAY YOU KNOW IT WORKED IS THAT

25       APPLE LATER STARTED PANICKING.  THEY WERE -- FIRST, THE

1    BRANDING WAS WORKING.  YOU REMEMBER THAT MR. SCHILLER, WHEN HE

2    WAS ON THE STAND, WE SHOWED HIM AN E-MAIL WHICH HAD THE

3    "WALL STREET JOURNAL" ARTICLE THAT, THAT IS APPLE LOSING ITS

4    COOL TO SAMSUNG AND HE SAID WE'VE GOT TO DO SOMETHING ABOUT

5    THIS.

6        AND THE RESPONSE FROM, FROM THE LEAD ADVERTISING AGENCY,

7    THE ONLY ADVERTISING AGENCY THAT THEY HAD USED FOR, WHAT, EVER,

8    A FELLOW NAMED JAMES VINCENT WAS, AND THIS IS 408A-3, WAS WE'VE

9    GOT TO DO SOMETHING HERE.  WHAT CAN WE DO?

10       HE'S TALKING ABOUT THINGS THAT APPLE CAN DO, BIGGER

11   SCREENS, THE APPLE BRAND IS SLIPPING.

12       AND THAT WAS EXACTLY WHAT MR. SOHN WAS TRYING TO DO,

13   CONCENTRATE ON THE HARDWARE AND ON THE BRAND, AND APPLE, AS A

14   RESULT OF THAT, WAS LOSING SALES TO SAMSUNG BECAUSE OF APPLE'S

15   HARDWARE, BECAUSE OF THAT.

16       AND BY THE WAY, JUST BECAUSE I DON'T HAVE TIME TO SHOW

17   THEM TO YOU, IF YOU LOOK AT EXHIBITS 409, 410, AND 498, THERE'S

18   THE STRING OF E-MAILS, YOU KNOW, BETWEEN MR. SCHILLER AND

19   OTHERS TALKING ABOUT WHAT ARE WE GOING TO DO?  WE'VE GOT TO DO

20   SOMETHING FAST.  WE HAVE TO MAKE DRASTIC CHANGES.

21       BY THE WAY, THEIR DRASTIC CHANGE WAS THAT, IN THAT SUMMER,

22   FOR THE FIRST TIME IN 14 YEARS, I BELIEVE, 15 YEARS, THEY

23   DECIDED TO DO A BRAND CAMPAIGN THEMSELVES, AND THEIR BRAND

24   CAMPAIGN IS PROBABLY ONE OF THE MOST SIMPLE YOU'VE EVER HEARD

25   OF.  IT WAS, DESIGNED BY APPLE IN CALIFORNIA, AS OPPOSED TO

1    OURS.

2         SO APPLE, IN THE REAL WORLD, RECOGNIZED WHY SAMSUNG PHONES

3    WERE SELLING, NOT BECAUSE OF APPLE'S ACCUSED PATENTS.

4         ANOTHER WAY YOU KNOW THEY RECOGNIZED WHY WE WERE SELLING

5    IS THEY TOOK APART, THEY DIVISECTED -- THEY DISSECTED THE

6    SAMSUNG PHONES, AND IF YOU LOOK AT 489 AND JUST LOOK THROUGH

7    THAT, THAT'S A NUMBER OF DOCUMENTS THAT SHOWED HOW APPLE WOULD,

8    YOU KNOW, TAKE THINGS APART AND LOOK AT THE WIRES AND GUESS

9    WHERE THE WIRES CAME FROM.  EMPLOYEES WOULD GO OUT AND BUY

10   THESE PHONES SO THAT THEY COULD TAKE THEM APART, YOU KNOW, LIKE

11   A FROG.

12        AND THEIR CONCLUSIONS -- IF YOU GO TO PAGE 37 -- WAS --

13   THIS WAS APPLE'S MARKET RESEARCH.  THE GOOD, WHY ARE THESE

14   SAMSUNG PHONES GOOD?  BEAUTIFUL SCREEN, INSANELY SLIM AND

15   LIGHT, VERY FAST, GREAT CAMERA, ATTRACTIVE DESIGN, ENDLESS

16   FEATURES AND CUSTOMIZATION OPTIONS.

17        BY THE WAY, THE BASIC OPERATING SOFTWARE, THEY DIDN'T

18   THINK SAMSUNG WAS VERY GOOD.  THEY SAID WE WEREN'T AS USER

19   FRIENDLY AS HTC AND PHONE RIVALS.

20        SO LET'S TALK ABOUT, BEFORE WE COME TO COURT AND SEEK LOTS

21   OF MONEY FOR THINGS THAT APPLE ITSELF DOES NOT EVEN USE, YOU

22   KNOW, BEFORE WE COME TO COURT, WHAT'S APPLE SAID ITSELF AS TO

23   WHY SAMSUNG IS DOING WELL?

24        NOT BECAUSE OF THESE PARTICULAR WAYS OF DOING PARTICULAR

25   FEATURES, BUT BECAUSE OF WHAT MR. SOHN TOLD YOU, MR. PENDLETON,

1        BECAUSE OF THE BRANDING, BECAUSE OF THE HARDWARE.

2             AND THE FINAL DOCUMENT I'M GOING TO TALK TO YOU ABOUT IS

3        THE OFF SITE THAT TOOK PLACE SHORTLY AFTER THESE E-MAILS OF

4        MR. SCHILLER IN THE SUMMER OF 2012.  THIS IS EXHIBIT 413.

5             AND BY THE WAY, THERE WAS A SUGGESTION THAT THIS EXHIBIT

6        WAS DONE BY SOME LONE MADMAN, I THINK MR. SCHILLER WAS

7        BASICALLY TRYING TO GET YOU TO THINK.

8             ACTUALLY, IF YOU LOOK AT EXHIBIT 411, YOU'LL SEE ANOTHER

9        DRAFT OF THIS, WHICH IS DISTRIBUTED WIDELY, AND IT'S CALLED THE

10       OPPENHEIMER IPHONE REVIEW.  MR. OPPENHEIMER WAS THEN THE CFO OF

11       APPLE.

12            AND IF WE LOOK AND SEE WHAT THEY RECOGNIZED WAS GOING ON,

13       FIRST THEY RECOGNIZE THAT THEIR IPHONE SALES WERE, THE GROWTH

14       WAS SLOWING.  THEY'RE STILL SELLING MORE PHONES THAN ANYBODY.

15       I MEAN, THEY'RE STILL SELLING PHONES AND SELLING OUT EVERY

16       PHONE THEY COME OUT WITH.  PEOPLE LIKE APPLE, AND PEOPLE WHO

17       LIKE APPLE LOVE APPLE.  RAISE YOUR HAND IF YOU LOVE APPLE.  I

18       KNOW THERE ARE A LOT OF YOU ON THE JURY WHO LOVE APPLE.

19            WHY WERE THEY SLOWING?  WELL, THEY VIEWED INTERNALLY WHY,

20       HERE'S THEIR INTERNAL VIEW AS TO WHY.  LET'S GO TO PAGE 814,

21       HERE WE GO, 814.  WHAT'S GOING ON?

22            IT'S BECAUSE THE STRONGEST DEMAND IS COMING FROM LESS

23       EXPENSIVE -- NOT APPLE -- AND LARGE SCREEN SMARTPHONES.

24       EXACTLY WHAT, EVEN BACK THEN IN THAT, QUOTE, "DESIGN OF CRISIS"

25       E-MAIL, EXACTLY WHAT SAMSUNG'S STRATEGY WAS.  LET'S TAKE

1        ADVANTAGE OF OUR ADVANTAGE IN THE HARDWARE.

2             AND THEN THE CARRIERS, THE PEOPLE WHO SELL THE PHONES,

3        WERE GETTING SICK OF APPLE.  DO YOU KNOW WHY?  BECAUSE THOSE

4        PHONES COST APPLE -- I MEAN THE CARRIERS, LIKE, $700, $600.

5        WHEN YOU BUY THEM FOR CHEAPER, THE CARRIER IS PAYING A SUBSIDY.

6        IT'S LOSING MONEY.

7             AND THE CARRIERS ARE CAPPING THE SALES BECAUSE OF SUBSIDY

8        PREMIUMS, UNFRIENDLY POLICIES.

9             APPLE IS THOUGHT OF AS BEING ARROGANT.

10            AND THEN WE LOOK AT THE LAST ONE.  THE COMPETITORS -- AND

11       BY THE WAY, YOU SEE THIS ISN'T SAMSUNG HERE, IT'S ANDROID,

12       BECAUSE THAT'S WHO THE HOLY WAR IS AGAINST BY THE WAY.

13            AND COMPETITORS HAVE DRASTICALLY IMPROVED THEIR HARDWARE

14       AND IN SOME CASES THEIR ECOSYSTEMS, WHICH IS, YOU KNOW, AGAIN,

15       THOSE GREAT APPLICATIONS YOU HAVE AND THE GOOGLE APPS AND LIKE

16       THE SAMSUNG HUB AND THINGS LIKE THAT, YOU KNOW?

17            IT SAYS SPENDING OBSCENE AMOUNTS, BUT ACTUALLY WE WERE

18       SPENDING THE SAME AMOUNT, JUST DOING IT BETTER.

19            AND SO THEIR FINAL CONCLUSION, APPLE'S INTERNAL VERDICT AS

20       TO WHY WE WERE SELLING PHONES, THEY COME IN HERE AND THEY SAY

21       THAT CONSUMERS WANTED SAMSUNG PHONES BECAUSE SAMSUNG COPIED

22       APPLE.

23            THAT WAS NOT THEIR INTERNAL VERDICT.  THEIR INTERNAL

24       VERDICT -- AND THIS IS PAGE -- BRING ME BACK -- 46?

25                 MR. KOTARSKI:  46.

```
 1              MR. PRICE:  46, THEIR CONCLUSION, "CONSUMERS WANT

 2     WHAT WE DON'T HAVE."

 3              WHERE DID THE GROWTH COME FROM?  IT'S COMING FROM WHAT

 4     APPLE DOES NOT HAVE, NOT FROM WHAT APPLE DOES HAVE AND SOMEONE

 5     ELSE COPIED.  THAT'S THE REAL WORLD, NOT THE MADE-UP WORLD.

 6              AND BY THE WAY, ANOTHER REAL WORLD, JUST ONE QUICK REAL

 7     WORLD, THE GALAXY NOTE 2 AND GALAXY S III, APPLE ADMITS, YOU

 8     KNOW, DIDN'T INFRINGE TWO OF THE PATENTS, THE KEYBOARD AND

 9     SLIDE TO UNLOCK.

10              THOSE TWO PHONES -- AND KEN, CAN I HAVE SLIDE 21 -- THOSE

11     TWO PHONES SOLD MORE THAN ALL OTHER PHONES COMBINED THAT ARE

12     ACCUSED IN THIS CASE.  THE FEWER THE NUMBER OF PATENTS THAT

13     THEY CLAIM ARE INFRINGING, THE LARGER SAMSUNG'S SALES.  THAT

14     DOESN'T MAKE SENSE.  SAMSUNG'S SUCCESS IS BECAUSE OF ITS

15     HARDWARE AND INNOVATION AND HARD WORK.  THIS IS A MADE UP CASE.

16              AND NOW I'LL LET MR. NELSON TALK TO YOU ABOUT THAT.

17              **(MR. NELSON GAVE HIS CLOSING ARGUMENT ON BEHALF OF THE**

18     **DEFENDANTS.)**

19              MR. NELSON:  GOOD MORNING, EVERYBODY.

20              JURORS:  GOOD MORNING.

21              MR. NELSON:  SO YOU MIGHT HAVE GUESSED THAT I'D BE

22     TALKING TO YOU ABOUT THE PATENTS.  I'VE HAD THE OPPORTUNITY,

23     OVER THE LAST MONTH, TO TALK TO A LOT OF THE WITNESSES ABOUT

24     THE PATENTS, BUT I HAVEN'T HAD A CHANCE TO TALK TO YOU YET

25     ABOUT THE PATENTS AND THAT'S WHAT I'M GOING TO DO HERE.
```

1          THESE FIVE PATENTS -- IF WE COULD PUT BACK UP SLIDE 18,

2     MR. KOTARSKI -- I WANT TO TALK ABOUT THESE PATENTS.

3          AND BEFORE I GET INTO THIS, I WANT TO CLEAR UP ONE THING

4     THAT APPLE COUNSEL SAID.  HE TOLD YOU THAT THEY BROUGHT IN A

5     NUMBER OF INVENTORS ON THESE PATENTS TO TESTIFY.

6          THAT NUMBER IS ONE.  THAT'S WHO CAME IN.  HE TOLD YOU THEY

7     BROUGHT IN MR. MILLET AND MR. DENIAU AND ONE OTHER GENTLEMAN,

8     MR. GARCIA.  NONE OF THOSE PEOPLE -- YOU'LL HAVE THE PATENTS

9     BACK THERE.  LOOK.  NONE OF THOSE PEOPLE ARE NAMED INVENTORS ON

10    THOSE PATENTS.  THEY BROUGHT TO YOU ONE, THAT WAS THEIR SECOND

11    WITNESS, MR. CHRISTIE.  THAT WAS IT.  AND HE'S A NAMED INVENTOR

12    ON THE '721 PATENT.  THAT'S ALL.

13         SO THE -- THAT MEANS THERE'S 14 -- THERE WERE 14 TOTAL.

14    THAT'S 13 APPLE PEOPLE THAT DIDN'T COME AND TESTIFY TO YOU.  SO

15    OTHER THAN THE '721 PATENT, YOU HAVEN'T HEARD FROM ANY OF THEIR

16    FOLKS.

17         SO LET ME TELL YOU FIRST, BECAUSE YOU'VE HEARD A LOT ABOUT

18    WHAT APPLE DOESN'T WANT YOU TO DO, BUT LET ME TELL YOU WHAT YOU

19    ARE HERE TO DO.

20         AND IF WE COULD PUT UP JURY INSTRUCTION 18.

21         NOW, YOU'VE HEARD, AND WE'VE HEARD THROUGHOUT THIS CASE,

22    THAT THE COURT DETERMINED THAT ONE OF THE PATENTS, THE '172

23    PATENT, WITH CERTAIN MODELS WAS INFRINGED.  WE KNOW THAT.  THAT

24    HASN'T BEEN A SECRET.  APPLE HAS SAID THAT OVER AND OVER AGAIN.

25         BUT YOU KNOW WHAT THAT MEANS?  THE OTHER FOUR PATENTS, THE

1    COURT DECIDED THAT'S UP TO YOU.  THAT'S UP TO YOU TO DECIDE,

2    AND THAT'S RIGHT HERE IN THE INSTRUCTION.

3         AND YOU KNOW WHAT ELSE THE COURT SAID IS ALL FIVE OF THE

4    PATENT CLAIMS ON THE VALIDITY, THAT'S UP FOR YOU -- UP TO YOU

5    TO DECIDE.

6         SO, LOOK, APPLE KEEPS TELLING YOU, THEY'VE DONE IT WITH A

7    NUMBER OF WITNESSES, THE PATENT OFFICE ALREADY LOOKED AT THESE

8    THINGS.  RIGHT?  YOU CAN'T SECOND GUESS THE PATENT EXAMINER.

9         BUT THAT'S JUST NOT THE WAY THE SYSTEM WORKS.  IN FACT,

10   YOU KNOW HOW OUR GOVERNMENT -- WE HAVE CHECKS AND BALANCES.

11   WHEN ONE BRANCH DOES SOMETHING, WE HAVE SOMEBODY ELSE THAT

12   CHECKS IT.

13        THAT'S EXACTLY WHAT THE JURY SYSTEM IS WITH RESPECT TO

14   PATENTS, RIGHT?  THAT'S WHAT YOU'RE SUPPOSED TO DO.  YOU'VE GOT

15   TO HELP OUT THE PATENT OFFICE.

16        THE PATENT OFFICE DOESN'T HAVE THE OPPORTUNITY TO HEAR

17   FROM US THE OTHER SIDE OF THE STORY.  THEY DON'T HAVE THE

18   OPPORTUNITY TO SEE ALL THE ART.  THERE'S THREE OF THESE PATENTS

19   I'M GOING TO TALK TO YOU ABOUT THAT THE PATENT OFFICE NEVER SAW

20   ANY OF THESE THINGS.

21        AND THEN THE OTHER TWO PATENTS WHERE COUNSEL KIND OF BEAT

22   ME UP WHERE COUNSEL SAID THE PATENT OFFICE SAW THIS, THEY NEVER

23   SAW THE COMBINATION THAT WE PRESENTED.

24        AND FURTHERMORE, THERE WAS NOBODY THERE TO PRESENT THE

25   OTHER SIDE OF THE STORY.

1       SO YOU WON'T GET A JURY INSTRUCTION -- YOU CAN GO BACK AND

2       LOOK IN THERE.  GO LOOK THROUGH THOSE JURY INSTRUCTIONS.  NONE

3       OF THEM WILL SAY, OH, DEFER TO THE PATENT OFFICE.  IF THERE WAS

4       SOMETHING THAT WAS IN FRONT OF THE PATENT OFFICE, DON'T GIVE IT

5       CONSIDERATION.  DON'T LOOK AT IT.  THERE'S NO SUCH INSTRUCTION

6       BECAUSE THAT'S NOT THE LAW.

7       AND, IN FACT, IT'S NOT JUST HER HONOR THAT HAS SAID THAT.

8       WE SAW -- REMEMBER THIS PATENT VIDEO AT THE VERY BEGINNING OF

9       THE CASE WHERE THERE WAS, LIKE, AN INTRODUCTION INTO THE PATENT

10      SYSTEM?  WELL, JUDGE FOGEL WAS THE GENTLEMAN THERE AND HE SAID

11      THAT OF COURSE WE NEED THIS SYSTEM BECAUSE THE PATENT OFFICE

12      MAKES MISTAKE.  THINGS ARE OVERLOOKED.

13      SO IT'S VERY IMPORTANT, LADIES AND GENTLEMEN, THAT YOU

14      CONSIDER THE EVIDENCE THAT I'M GOING TO WALK THROUGH AND

15      PRESENT TO YOU, NOT SIMPLY LISTEN TO WHAT APPLE IS TELLING YOU

16      AND DON'T GIVE IT ANY CREDENCE.  THAT'S WHAT I'M ASKING YOU TO

17      DO.

18      THAT'S WHAT THIS CASE IS ABOUT.  WE'RE ENTITLED TO COME

19      HERE AND DEFEND OURSELVES WHEN WE'RE ACCUSED.  WE DON'T HAVE TO

20      JUST SAY, WHATEVER YOU SAY, APPLE.  WE'RE ENTITLED TO COME IN

21      AND PRESENT OUR CASE, AND THAT'S EXACTLY WHAT WE'VE DONE, AND

22      WHEN YOU GO BACK INTO THAT ROOM WHEN I WALK YOU THROUGH THIS

23      EVIDENCE, THAT'S ALL I CAN ASK YOU TO DO IS CONSIDER WHAT I'VE

24      PRESENTED TO YOU.

25      SO LET'S ALSO LOOK AT JURY INSTRUCTION NUMBER 24, AND THIS

1    I WANT TO CLEAR UP A LITTLE BIT BECAUSE IT MIGHT BE A LITTLE

2    BIT CONFUSING.

3         YOU KNOW, YOU'VE HEARD A LOT OF TALK ABOUT THE IPHONE AND

4    PEOPLE LOOKING AT THE IPHONE.

5         NOW, MR. PRICE HAS ALREADY ADDRESSED THAT, THAT THESE

6    PATENTS AREN'T IN, I MEAN, THE IPHONE FOR THE MOST PART.

7         BUT -- OH, I HAVE A LASER POINTER NOW.

8         SO -- BUT THAT'S NOT INFRINGEMENT -- THAT'S NOT HOW YOU

9    DEAL WITH INFRINGEMENT AND INVALIDITY.  YOU DON'T COMPARE THE

10   PRODUCT TO THE PRODUCT.

11        AND, IN FACT, WE KNOW WE COULDN'T BECAUSE THE IPHONE

12   DOESN'T PRACTICE MOST OF THESE PATENTS.

13        IT'S THE CLAIMS OF THE PATENTS THAT MATTER, AND IT'S EVERY

14   WORD HERE THAT MATTERS.  WHEN WE'RE LOOKING AT INFRINGEMENT, WE

15   DON'T GET TO READ THINGS OUT.  RIGHT?  WE DON'T SAY, AH, THAT'S

16   KIND OF CLOSE.  RIGHT?  THAT'S NOT THE WAY IT WORKS.

17        AND THE OTHER THING THAT'S IMPORTANT IS WHEN WE TURN

18   AROUND AND WE LOOK AT THE PRIOR ART AND WE'RE COMPARING THE

19   PRIOR ART TO THE PATENT CLAIMS, WE DON'T PUT NEW WORDS IN.

20   RIGHT?  IT'S GOT TO BE THE SAME BOTH WAYS, AND THAT'S VERY

21   IMPORTANT.  THAT'S A THEME THAT YOU'RE GOING TO SEE AS I WALK

22   THROUGH THIS EVIDENCE, BECAUSE I THINK APPLE IS TRYING TO PLAY

23   IT BOTH WAYS.

24        SO LET ME FIRST TALK ABOUT THIS ANALYZER SERVER PATENT.

25   THAT'S THE '647 PATENT.  THAT'S WHERE WE LEFT OFF YESTERDAY, SO

1    I FIGURED THAT WOULD BE FRESHEST IN EVERYBODY'S MIND AND LET'S

2    PICK UP THERE.

3         NOW, THERE ARE TWO INDEPENDENT REASONS THAT I'M GOING TO

4    GIVE YOU WHY THESE DEVICES DON'T INFRINGE, AND I'M GOING TO

5    WALK YOU THROUGH THAT EVIDENCE.  WE PRESENTED ADDITIONAL

6    THINGS, BUT I WANT TO OUTLINE TWO FOR YOU HERE TODAY, AND I'M

7    GOING TO TALK ABOUT ONE PRIOR ART REFERENCE ABOUT WHY THAT'S

8    INVENTIVE.

9         I WON'T WALK YOU THROUGH THE JURY VERDICT FORM.

10   MR. MCELHINNY ALREADY DID THAT.  HE -- I MEAN, IT'S PROBABLY

11   APPARENT THAT WHERE HE SAYS TO SAY YES, I SAY NO.  RIGHT?

12   WHERE HE SAYS NO, I SAY YES.

13        (LAUGHTER.)

14        MR. NELSON:  NOW, LET'S TALK ABOUT THIS ANALYZER

15   SERVER, OKAY?  THAT'S A LIMITATION OF THE CLAIM.  IT'S

16   REQUIRED, AN ANALYZER SERVER FOR DETECTING STRUCTURES IN THE

17   DATA.

18        NOW, YOU REMEMBER, THROUGH THIS CASE, IT REALLY SEEMED

19   LIKE APPLE WAS TRYING TO READ THAT LIMITATION OUT OF THE CLAIM.

20   THEY WERE TRYING TO GIVE IT NO MEANING, ANALYZER SERVER, IT'S

21   JUST A PIECE OF SOFTWARE.

22        BUT THE COURT GAVE US A CONSTRUCTION YESTERDAY MORNING

23   YOU'LL RECALL.  AND ANALYZER SERVER MEANS SOMETHING, AND IT

24   MEANS SOMETHING VERY IMPORTANT.  IT'S "A SERVER ROUTINE

25   SEPARATE FROM THE CLIENT THAT RECEIVES DATA HAVING STRUCTURES

1      FROM THE CLIENT."

2          SO WE KNOW THAT TO HAVE AN ANALYZER SERVER, YOU'VE GOT TO

3      HAVE AT LEAST TWO THINGS.  RIGHT?  BECAUSE YOU'VE GOT TO HAVE A

4      SERVER, AND YOU'VE GOT TO HAVE A CLIENT, AND THE TWO OF THEM

5      HAVE TO BE SEPARATE.  RIGHT?  THAT'S WHAT THE COURT SAYS THAT'S

6      WHAT SERVER MEANS, ANALYZER SERVER MEANS.

7          SO LET'S TALK ABOUT WHAT WE HEARD ABOUT THAT.  WE BROUGHT

8      IN THE FOLKS THAT ACTUALLY WROTE THAT CODE.  YOU RECALL SOME

9      DISCUSSION ABOUT THE FRAMEWORK CODE AND THE SHARED LIBRARIES.

10         MS. HACKBORN FROM GOOGLE, SHE CAME RELATIVELY EARLY ON OUR

11     SIDE OF THE CASE, SHE ACTUALLY WROTE THAT LINKIFY CODE, AND WE

12     ASKED HER, DID YOU IMPLEMENT IT AS A SERVER?

13         NO, I DIDN'T.

14         IT WASN'T IMPLEMENTED AS A SERVER, AND SHE TOLD YOU WHY

15     THAT WAS.  IT'S BECAUSE IT DIDN'T NEED TO SHARE DATA ACROSS

16     APPLICATIONS.

17         NOW, WHO ELSE DID WE HEAR FROM ABOUT THIS SHARED LIBRARY

18     ISSUE?  WELL, HERE IS ONE OF THE INVENTORS.  APPLE DIDN'T BRING

19     HIM INTO COURT TO TESTIFY.  WE SHOWED YOU HIS DEPOSITION.

20     RIGHT?  WE SHOWED YOU THAT DEPOSITION TESTIMONY.

21         AND COUNSEL REFERENCED THIS DX EXHIBIT 334.  THAT'S THAT

22     SERIES OF E-MAILS WE TALKED ABOUT A FEW TIMES.  I WANT YOU TO

23     GO BACK AND LOOK AT THAT AND I WANT YOU TO READ THAT VERY

24     CAREFULLY.  I'M NOT AFRAID OF THOSE DOCUMENTS, BECAUSE WHEN YOU

25     READ THAT DOCUMENT, WHICH IS WHY I PUT THAT DOCUMENT INTO

1    EVIDENCE, YOU'LL SEE SOMETHING VERY, VERY IMPORTANT, WHICH IS

2    THAT AT THE TIME APPLE FILED THIS PATENT, OKAY -- THIS IS

3    FEBRUARY OF 1996 -- THE ONLY THING THAT THEY HAD EVER

4    COMPLIMENTED -- OR IMPLE -- CONTEMPLATED, THAT'S THE WORD I WAS

5    LOOKING FOR, IS IMPLEMENTING THIS AS A SERVER.  THEY CALL IT A

6    FIRST CLASS APPLICATION, AND THAT MEANS SOMETHING THAT CAN

7    STAND ALONE, RIGHT, BE BY ITSELF.

8         AND, SURE, LATER THERE WAS TALK, BECAUSE IF YOU LOOK

9    THROUGH THOSE E-MAILS, THERE WAS SOME TALK ABOUT SOME PROBLEMS

10   WITH PERFORMANCE BECAUSE OF OVERHEAD AND ISSUES LIKE THAT.

11        SO NOW THERE WAS, MUCH LATER, A DIFFERENT PROPOSAL THAT

12   WAS MADE, MAYBE WE SHOULD ELIMINATE AND WE SHOULD BUILD THAT

13   FUNCTIONALITY INTO THE APPLICATION ITSELF.  RIGHT?  THAT WOULD

14   BE THE SHARED LIBRARY.

15        BUT IF YOU LOOK AT WHEN THAT'S SUGGESTED, THAT IS EIGHT

16   MONTHS AFTER THE PATENT IS FILED.  RIGHT?  EIGHT MONTHS AFTER.

17        THIS PATENT CLAIMS AN ANALYZER SERVER.  IT DOESN'T TALK

18   ABOUT SHARED LIBRARIES.  IT DOESN'T TALK ABOUT IMPLEMENTING THE

19   FUNCTIONS THAT ARE REQUIRED HERE OF THE ANALYZER SERVER IN THE

20   APPLICATION ITSELF.

21        THE FACT THAT THE INVENTORS MAY LATER HAVE DECIDED, WELL,

22   THERE'S SOME PROBLEMS WITH THAT, SO MAYBE I'M GOING TO TRY TO

23   CHANGE IT, THAT'S VERY IMPORTANT BECAUSE THAT -- ONE, WE KNOW

24   IT CAN'T MAKE ITS WAY INTO THE PATENT BECAUSE THE PATENT WAS

25   FILED EIGHT MONTHS BEFORE.  RIGHT?

```
 1         THE SECOND THING WE KNOW IS IT ISN'T IN THE PATENT.
 2    RIGHT?  THIS IS WHERE THE WORDS BECOME VERY IMPORTANT.  IT SAYS
 3    AN ANALYZER SERVER.  IT DOESN'T SAY PUT THAT FUNCTIONALITY IN
 4    THE APPLICATION ITSELF.  RIGHT?
 5         IT'S VERY, VERY IMPORTANT, LADIES AND GENTLEMEN, SO GO
 6    BACK AND LOOK AT THAT AND CONSIDER THAT TESTIMONY THAT WE
 7    PRESENTED TO YOU FROM DR. BONHURA.
 8         APPLE DIDN'T BRING TO YOU ONE SINGLE INVENTOR FOR THE '647
 9    PATENT.  NOBODY CAME IN HERE AND SAT IN THAT STAND AND TOLD YOU
10    WHAT THIS INVENTION WAS ABOUT AND HOW THEY CAME UP WITH IT,
11    WHAT IT WASN'T AND WHAT IT WASN'T.
12         SO WHO ELSE DID WE HEAR FROM ABOUT THIS?  CERTAINLY WE
13    HEARD FROM SAMSUNG'S EXPERT, RIGHT, AND HE EXPLAINED EXACTLY
14    WHAT I JUST DESCRIBED TO YOU, THAT THIS LIBRARY CODE THAT
15    THEY'RE ACCUSING OF INFRINGEMENT, IT'S NOT JUST PART OF THE
16    APPLICATION.  IT IS THE APPLICATION.  RIGHT?
17         WHO ELSE DID WE HEAR FROM?  WE -- THIS IS YESTERDAY.
18    YOU'LL RECALL ME ASKING APPLE'S EXPERT ABOUT THIS LINKIFY,
19    THAT'S THE SHARED LIBRARY THAT THEY'RE ACCUSING IN THE
20    MESSENGER APPLICATION, AND HE ADMITS THAT IT CAN'T RUN AS A
21    STANDALONE APPLICATION, RIGHT?  IT CAN'T RUN BY ITSELF.
22         SO THERE'S NOTHING SEPARATE -- REMEMBER WHAT HE SAID?  AND
23    I ASKED HIM VERY -- WHAT IS THE CLIENT?
24         WELL, THAT'S THE MESSENGER APPLICATION.
25         WHAT IS THE -- THE MESSENGER APPLICATION WITH THE BROWSER,
```

```
 1        YOU KNOW, WE HAD THE BROWSER APPLICATION.  RIGHT?  THAT'S WHAT

 2    HE SAID.  AND HE FREELY ADMITTED, THOSE ARE ONE SINGLE

 3    APPLICATION.

 4        SO WE KNOW FROM THE COURT'S CONSTRUCTION, WE NEED TWO

 5    SEPARATE THINGS.  RIGHT?  TWO SEPARATE THINGS.

 6        WE HAVE ONE.  THEIR EXPERT SAYS THERE'S JUST ONE THING,

 7    THE ONE APPLICATION.

 8        AND WHAT GOOGLE DID HERE, AND WHAT'S BEEN DONE WITH THESE,

 9    IS TO PUT THE FUNCTIONALITY IN THE APPLICATION, ELIMINATE THE

10    OVERHEAD, DON'T USE AN ANALYZER SERVER.

11        SO -- AND THINK ABOUT IT, LADIES AND GENTLEMEN.  DOES IT

12    REALLY MAKE SENSE?  WE HAVE A CONSTRUCTION NOW -- THROUGHOUT

13    THE TRIAL, THEY'RE TRYING TO READ NO MEANING INTO THE ANALYZER

14    SERVER, BUT WE HAVE A CONSTRUCTION THAT SAYS WE NEED TWO

15    SEPARATE THINGS.

16        SO WHAT'S YOUR ANSWER TO THAT?  WELL, I POINTED TO THE ONE

17    THING, THE APPLICATION.

18        BUT REALLY, IF YOU LOOK IN THERE, I COULD KIND OF PULL IT

19    APART AND THAT WOULD BE TWO SEPARATE THINGS.

20        IT DOESN'T MAKE ANY SENSE.

21        NOW, THE OTHER REASON I WANT TO TALK TO YOU ABOUT -- THIS

22    IS TIED TO THE COURT'S CONSTRUCTION AS WELL -- THIS LINKING

23    ACTIONS TO DETECTED STRUCTURES, AND YOU HEARD, IN HIS FIRST

24    TIME AROUND FROM SAMSUNG'S EXPERT, ABOUT WHY THE ACTION

25    PROCESSOR LIMITATION WASN'T MET BECAUSE THERE WERE NO LINKED
```

1     ACTIONS TO DETECTED STRUCTURES.

2          I MEAN, WE SEE HERE THE ACTION PROCESSOR FOR PERFORMING

3     THE SELECTED ACTION LINKED TO THE SELECTED STRUCTURE, MEANING

4     IT'S GOT TO BE WHAT THE ANALYZER SERVER LINKS TO THAT DETECTED

5     STRUCTURE.  RIGHT?

6          AND IN ANDROID -- REMEMBER, WE HEARD FROM MS. HACKBORN,

7     ONCE AGAIN, THAT ANDROID WAS DESIGNED VERY DIFFERENTLY, WITH

8     THIS INTENTS SYSTEM.  THIS IS AN IDEA SHE HAD FROM THE

9     BEGINNING, AND THAT WAS TO MAKE IT FLEXIBLE, RIGHT, SO THAT YOU

10    COULD BRING WHATEVER APPLICATION YOU WANTED.  YOU WOULDN'T HAVE

11    THESE SPECIFIED CONNECTIONS MADE.  RIGHT?

12         THAT WAS A DESIGN CHOICE.  IT WAS WHAT THEY WANTED.

13    BECAUSE, REMEMBER, IT'S AN OPEN PLATFORM.  RIGHT?

14         SO FOR THAT REASON -- AND DR. JEFFAY CAME IN AND EXPLAINED

15    TO YOU WHY THAT WAS DIFFERENT.  YOU CAN SELECT, YOU KNOW, AN

16    ACTION -- OR EXCUSE ME -- YOU PUT, SAY, AN E-MAIL IS A GOOD

17    EXAMPLE BECAUSE YOU MIGHT HAVE A CORPORATE E-MAIL AND YOU MIGHT

18    HAVE A PERSONAL E-MAIL, SO YOU TOUCH ON AN E-MAIL ADDRESS, AND

19    ONE OF THE THINGS YOU MIGHT WANT TO DO IS SEND.

20         WELL, YOU KNOW, YOU HAVE THOSE THINGS AND IT'S GOING TO

21    ASK YOU, WHICH ONE DO YOU WANT?  AND PART OF THAT REASON IS

22    BECAUSE IT'S FLEXIBLE.  YOU CAN RUN THE APPLICATIONS YOU WANT.

23    SO THERE IS NO SPECIFIED CONNECTION.

24         WHAT'S APPLE'S RESPONSE TO THAT?  I DON'T KNOW BECAUSE I

25    DIDN'T UNDERSTAND ANYTHING THAT THEIR EXPERT WAS SAYING

```
 1       YESTERDAY.  I DIDN'T UNDERSTAND IT.  HE TALKED ABOUT A BUNCH OF
 2       CODE AND SAID THIS DOES THIS AND THIS CALLS THIS.  HE NEVER
 3       EXPLAINED TO US IN ENGLISH WHY THAT WAS THE CASE, WHY IS THERE
 4       A SPECIFIED CONNECTION.
 5            SO ONCE AGAIN, THIS IS APPLE'S BURDEN OF PROOF, LADIES AND
 6       GENTLEMEN, AND THEY DIDN'T EXPLAIN IT TO YOU.
 7            WE DID.  WE EXPLAINED TO YOU WHY IT'S NOT THERE.  IT'S NOT
 8       THERE.
 9            SO IF YOU FIND EITHER OF THOSE REASONS, THEN YOU FIND IN
10       OUR FAVOR.  RIGHT?  I DON'T HAVE TO PROVE BOTH.  IT'S JUST ONE
11       OR THE OTHER, BECAUSE EVERYTHING MATTERS.
12            SO NOW I WANT TO TALK ABOUT THE PRIOR ART THAT WE BROUGHT
13       WITH RESPECT TO THIS PATENT, AND YOU'LL RECALL THAT WE BROUGHT
14       MR. LARS FRID-NIELSEN, THE GENTLEMAN FROM DENMARK WHO DESIGNED
15       THIS SYSTEM.  AND THIS SYSTEM, REMEMBER, WAS 1985.  THAT'S 11
16       YEARS BEFORE THE PATENT CAME OUT.
17            AND APPLE, YOU KNOW, THEY SAY, WELL, WAIT A MINUTE, THIS
18       DOESN'T DO A FEW THINGS, ONE OF THE THINGS BEING THE POP-UP
19       MENU WHICH I'LL ADDRESS IN A MOMENT.
20            ANOTHER THING IS, WELL, IT DOESN'T DETECT MULTIPLE
21       STRUCTURES.  REMEMBER THEY SAID THAT?
22            WELL, WE KNOW FROM THIS THAT WE'RE LOOKING AT HERE,
23       DX 332, THE -- THERE ARE DIFFERENT STRUCTURES HERE, DIFFERENT
24       TYPES OF PHONE NUMBERS BECAUSE ONE HAS A PARENTHESES AROUND IT
25       AND ANOTHER ONE JUST HAS THE DASHES.
```

1          AND YOU'LL RECALL, WHEN YOU LOOKED AT THE CODE, HOW

2     APPLE'S EXPERT -- REMEMBER, THEY PUT THAT CODE UP FROM THE

3     SIDEKICK CODE AND IT HAD SET 1 AND ONE PATTERN AND IT HAD SET 2

4     IN ANOTHER PATTERN AND SET 3, AND HE SAID, OH, THOSE ARE ALL

5     ONE PATTERN.

6          WELL, THEY'RE NOT.  THEY'RE DIFFERENT PATTERNS.  RIGHT?

7          AND THAT'S THE POINT, BECAUSE AS THAT TESTIMONY THAT I

8     POINTED OUT TO YOU YESTERDAY FROM THEIR EXPERT, HE ACTUALLY

9     DEFINED, THE FIRST TIME HE CAME UP ON THE STAND, AND SAID EVERY

10    TIME WE HAVE A DIFFERENT PATTERN, YOU'VE GOT A DIFFERENT

11    STRUCTURE.  RIGHT?  SO THERE ARE MULTIPLE STRUCTURES.

12         WHAT'S THE OTHER THING THEY SAID?  WELL, THE OTHER THING

13    THEY SAID IS, WELL, IT DOESN'T DO MULTIPLE ACTIONS.

14         BUT WE KNOW FROM THE CONSTRUCTION THAT THE COURT GAVE US,

15    THAT'S NOT REQUIRED.  IT'S AT LEAST ONE.  RIGHT?  AND I CAN PUT

16    THAT CONSTRUCTION UP.  THIS IS THE LINKING ACTIONS

17    CONSTRUCTION.

18         WE'LL PUT THAT BACK ON THE SCREEN, PLEASE.

19         SEE, CREATING A SPECIFIED CONNECTION BETWEEN EACH DETECTED

20    STRUCTURE -- EXCUSE ME -- AND AT LEAST ONE COMPUTER SUBROUTINE.

21    RIGHT?  IT DOESN'T SAY MULTIPLE ONES BECAUSE YOU CAN HAVE

22    ACTIONS, YOU HAVE MULTIPLE STRUCTURES, YOU HAVE AN ACTION

23    LINKED TO ONE STRUCTURE, YOU HAVE AN ACTION LINKED TO ANOTHER

24    STRUCTURE, YOU HAVE ACTIONS.  RIGHT?  THERE'S NOTHING IN HERE

25    ABOUT THEY HAVE TO BE DIFFERENT TYPES OF ACTIONS.  THERE'S NONE

1        OF THAT.

2              NOW, THE LAST THING THAT APPLE TALKS ABOUT IS THIS POP-UP

3        MENU.  RIGHT?  AND THEY SAID, WELL, THERE'S NOTHING IN THE

4        POP-UP MENU.

5              BUT, REMEMBER, THIS WAS 1985.  RIGHT?  1985.  AND SIDEKICK

6        ITSELF, AS WE DEMONSTRATED TO YOU, HAD POP-UP MENU IN IT.  IT

7        JUST DIDN'T USE IT FOR THIS DIALER FUNCTIONALITY.

8              SO THINK ABOUT THIS, LADIES AND GENTLEMEN:  APPLE'S

9        BASICALLY SAYING, WELL, SIDEKICK HAD ONE, RIGHT, STRUCTURED

10       ACTION.  IT DIDN'T HAVE TWO.  SIDEKICK DID POP-UP MENUS OTHER

11       PLACES, BUT IT DIDN'T DO THEM WITH RESPECT TO THE MENU THAT

12       SHOWS YOU THE ACTION.

13             THEY NEVER BROUGHT TO YOU AN INVENTOR TO SAY, HEY, WAIT A

14       MINUTE, THIS IS WHY IT WAS HARD TO DO TWO AND NOT ONE.  RIGHT?

15       SOMEBODY ELSE ALREADY DID ONE.  THIS WAS WHY IT WAS HARDER TO

16       DO TWO.

17             THEY DIDN'T BRING YOU SOMEBODY TO SAY, EUREKA, THAT'S WHAT

18       I WAS WORKING ON.

19             THEY DIDN'T BRING TO YOU SOMEBODY, ONE OF THE INVENTORS

20       THAT SAID, HEY, WAIT A MINUTE, THIS IS WHY IT WAS HARD TO

21       IMPLEMENT THIS AS A POP-UP MENU.  THEY NEVER DID THAT.

22             SO LADIES AND GENTLEMEN, THAT'S THE PATENT OFFICE.

23             NOW I WANT TO MOVE TO THE '959 PATENT, AND SOMEBODY IS

24       GOING TO -- THE CLAIMS ARE ALWAYS GOING TO BE UP HERE BECAUSE,

25       ONE, I WANT TO REFERENCE THEM AND, TWO, THEY'RE VERY IMPORTANT

1    BECAUSE THAT'S WHAT WE'RE HERE FOR.

2          SO HERE, ON THE '959 PATENT, THIS IS THE HEURISTICS TO

3    LOCATE INFORMATION.  YOU'LL RECALL, RIGHT, THAT'S WHAT THIS

4    PATENT IS.

5          AND HERE'S WHAT I WANT TO FOCUS ON.  THERE'S TWO THINGS

6    THAT I'M GOING TO WALK THROUGH HERE TODAY AND GIVE YOU THE MAP.

7    I'M GOING TO WALK THROUGH WHY THERE'S NO INFRINGEMENT, BECAUSE

8    THERE IS NO HEURISTIC, THAT THERE'S NO HEURISTIC TO LOCATE

9    INFORMATION ON THE INTERNET.  RIGHT?  THAT'S NOT THERE IN THE

10   ACCUSED GOOGLE SEARCH APPLICATION.

11         AND I'M ALSO GOING TO WALK YOU THROUGH THE WAIS PRIOR ART,

12   THE FREEWAIS SF PRIOR ART.  OKAY?

13         AND SO FIRST, BEFORE I DO THAT, I SHOULD REMIND YOU,

14   SIDEKICK, PATENT OFFICE DIDN'T HAVE IT.

15         FREEWAIS PRIOR ART?  THE PATENT OFFICE DIDN'T HAVE IT.  NO

16   DISPUTE ABOUT THAT.

17         NOW, LET'S GO TO THE NEXT SLIDE, MR. KOTARSKI.

18         NOW, HERE I JUST WANT TO REMIND YOU A LITTLE BIT, THIS WAS

19   TRUE WITH THE LAST PATENT I TALKED ABOUT, THE '647, AND IT'S

20   TRUE WITH THE '959 PATENT.  YOU'VE HEARD A LOT FROM APPLE'S

21   COUNSEL ABOUT THE IPHONE, 2007, THIS WAS WHERE EVERYTHING CAME

22   FROM.

23         WELL, WE'VE ALREADY SEEN THAT MOST OF THESE PATENTS AREN'T

24   USED IN THE IPHONE.

25         BUT WE ALSO KNOW THE '647, 1996, THERE'S NO IPHONE AROUND.

1       THIS HAS NOTHING TO DO WITH THE IPHONE.

2           WE ALSO KNOW -- AS MR. PRICE SAID, YOU DIDN'T HEAR ONE

3       SHRED OF EXPERT TESTIMONY.  WE HEARD ALL ABOUT THE CODE AND THE

4       STRUCTURE OF THE CODE FROM THE '647.  DO YOU RECALL THAT?  YOU

5       DIDN'T HEAR ONE WORD FROM THEIR EXPERT ABOUT HOW APPLE DOES IT.

6       RIGHT?  YOU DON'T HAVE ANY BASIS TO CONCLUDE THAT THAT'S THE

7       CASE.  I'M NOT SURE WHY.  I DON'T KNOW WHY THEY DIDN'T WANT TO

8       TELL US.

9           NOW LET'S TALK ABOUT THIS '959 PATENT.  AGAIN, IF YOU LOOK

10      AT THAT PATENT, IT DOESN'T TALK ABOUT MOBILE PHONES, MOBILE

11      DEVICES.  IT TALKS ABOUT DESKTOP COMPUTERS.  RIGHT?  THAT'S

12      WHAT THIS IS FOR.

13          AND LET ME -- IF YOU GO TO THE NEXT SLIDE -- MAKE ONE

14      THING VERY CLEAR, BECAUSE THIS IS IMPORTANT BECAUSE I THINK

15      COUNSEL FOR APPLE REALLY CONFUSED THIS SEVERAL TIMES DURING HIS

16      CASE, PARTICULARLY DURING THE OPENING STATEMENT.

17          YOU'LL RECALL WHERE THEY SHOWED ONE OF THE PHONES AND

18      SAID, WAIT, SOMEBODY IS TYPING IN AND THERE'S INFORMATION

19      COMING FROM THE INTERNET AND LOCALLY, THE CONTACTS.  YOU'LL

20      RECALL THAT VIDEO.

21          WELL, IT'S VERY IMPORTANT WHAT THEY'RE NOT ACCUSING.  THIS

22      IS APPLE'S EXPERT, AND I ASKED HIM FLAT OUT, "YOU'RE NOT

23      ACCUSING THE FUNCTIONALITY OF THE GOOGLE SEARCH SERVER; RIGHT?

24          "I THINK THAT'S FAIR."

25          HE AGREES.  SO THE GOOGLE SEARCH SERVER, THAT'S NOT

```
 1        APPLE'S INFRINGEMENT CLAIM.  THAT DOESN'T HAVE ANYTHING TO DO

 2    WITH IT.

 3            THAT'S VERY IMPORTANT, BECAUSE WHAT IS IT THAT LOCATES THE

 4    INFORMATION ON THE INTERNET?  IT SHOULD COME AS NO SURPRISE.

 5    IT'S THE GOOGLE SEARCH SERVER.

 6            WHAT'S GOOGLE?  WHAT HAS GOOGLE BEEN DOING FOR THE LAST --

 7    SINCE 1997 WHEN THEY WERE FOUNDED?  THAT'S WHAT GOOGLE DOES.

 8            BUT THAT'S NOT ACCUSED.

 9            SO WHAT IS ACCUSED?  LET'S GO TO THE NEXT SLIDE.

10            MR. BRINGERT CAME, THIS IS THE GENTLEMAN FROM GOOGLE WHO

11    WROTE THIS GOOGLE SEARCH APPLICATION, OR HEADED THE TEAM TO

12    WRITE THIS GOOGLE SEARCH APPLICATION, AND HE EXPLAINED -- HE

13    DID THIS DRAWING.  WHAT'S ACCUSED IS RIGHT HERE IN THE MIDDLE.

14    WE'VE HIGHLIGHTED IT AS THIS YELLOW BOX.  HERE IS THE GOOGLE

15    SEARCH SERVER.  REMEMBER, NOT ACCUSED.  RIGHT?

16            WHAT DOES THIS YELLOW BOX DO?  WELL, IT DOESN'T LOCATE

17    INFORMATION ON THE INTERNET.  THAT'S FOR SURE.  THAT'S THE

18    GOOGLE SEARCH SERVER THAT DOES THAT.

19            MR. BRINGERT TOLD US WHAT IT DOES.  HE SAID THIS BLENDS

20    RESULTS.  REMEMBER?  BLENDS RESULTS.  IN OTHER WORDS, I HAVE

21    SOME RESULTS, SOMEBODY FOUND SOMETHING, SOMEBODY LOCATED

22    SOMETHING FOR ME, AND THIS BLENDS RESULTS.

23            WELL, THAT'S NOT LOCATING.  THAT'S NOT WHAT THE CLAIM

24    SAYS.  IT SAYS "HEURISTICS TO LOCATE INFORMATION IN A PLURALITY

25    OF LOCATIONS," ONE OF THEM BEING THE INTERNET.  RIGHT?  IT
```

1    DOESN'T SAY, OH, TO BLEND INFORMATION TOGETHER THAT SOMEBODY

2    ELSE FOUND FOR ME.  THAT'S NOT WHAT THE CLAIM IS, AND YOU CAN'T

3    LET HIM READ THAT LIMITATION OUT OF THE CLAIM.

4         BUT HOW DOES APPLE'S EXPERT ACTUALLY DO THAT?  WELL, THIS

5    WAS INTERESTING.  THIS WAS SOME QUESTIONING FROM MR. PAK.

6         IF YOU GO BACK AND YOU'RE GOING TO LOOK -- AND I NEED TO

7    EXPLAIN A LITTLE BIT ABOUT THIS.  AT THE '959 PATENT, YOU'LL

8    SEE THERE'S SOMETHING DESCRIBED IN THAT '959 PATENT THAT'S

9    CALLED GLOBAL HEURISTICS, OKAY?  THAT'S SOMETHING DIFFERENT

10   THAN A PLURALITY OF HEURISTICS THAT'S IN THE CLAIM.  THESE

11   GLOBAL HEURISTICS, THEY DO SOME OTHER THINGS, BUT THAT'S NOT

12   PART OF THE CLAIM IN THE PATENT.

13        AND WE SEE HERE FROM APPLE'S EXPERT, HE SAYS EXACTLY THAT.

14   THE GLOBAL HEURISTICS, AS WE'VE DESCRIBED, DO A DIFFERENT THING

15   THAN THE PLURALITY OF HEURISTIC MODULES, RIGHT?

16        AND IF WE LOOK FURTHER HERE, WHAT DID HE SAY?  THAT GLOBAL

17   HEURISTICS MAY, AS WE DISCUSSED, FUSE, ORDER, THAT SORT OF

18   THING, THE RESULTS.

19        WELL, WHAT'S FUSE?  THAT'S BLEND, RIGHT?

20        SO HE SAID, APPLE'S EXPERT, HE SAID FLAT OUT IN HIS

21   DEPOSITION THAT THIS -- THAT BLENDING THAT THEY ACCUSED ISN'T

22   ONE OF THESE PLURALITY OF HEURISTICS IN THE CLAIM.

23        BUT HE CAME IN HERE TO COURT AND HE TOLD YOU SOMETHING

24   ELSE.  RIGHT?  HE TOLD YOU SOMETHING ELSE.

25        SO YOU'VE GOT TO CONSIDER THAT WHEN YOU GO BACK THERE.

1       NOW, SO APPLE DOESN'T PRACTICE THIS CLAIM.  THE ACCUSED

2  ANDROID PHONES, SAMSUNG PHONES, DON'T PRACTICE THIS CLAIM.

3       BUT WE SHOWED YOU SOMETHING THAT DID, AND THAT'S THE WAIS

4  SYSTEM, SO LET ME JUST REMIND YOU A LITTLE BIT ABOUT THIS WAIS

5  SYSTEM.

6       THIS WAIS SYSTEM WAS THE UNIVERSAL SEARCH SYSTEM THAT WAS

7  DEVELOPED BY A COUPLE GENTLEMEN WHO WE BROUGHT IN TO TESTIFY --

8  I'LL TALK ABOUT THAT IN A MINUTE -- BUT YOU'LL SEE HERE THIS IS

9  THE UNIVERSAL SEARCH BOX.  THIS IS A DEMONSTRATION OF WHAT THIS

10  CODE WAS.  RIGHT?  THIS IS THE UNIVERSAL SEARCH BOX.  YOU TYPE

11  IN GEORGE, AND WHAT CAME BACK FROM THE LOCAL MACHINE IS, YOU

12  KNOW, GEORGE ADAMS.  HE MIGHT BE A CONTACT THAT YOU HAVE IN

13  YOUR LOCAL MACHINE.

14       AND HERE WHAT CAME BACK IS GEORGE WASHINGTON.  OKAY?

15  THOSE WERE PAPERS ABOUT GEORGE WASHINGTON THAT ARE OUT ON THE

16  INTERNET.

17       AND THEN THERE'S A RANKING THAT'S OVER THERE, THAT

18  HEURISTIC RANKING THAT WAS DESCRIBED FOR YOU.

19       SO WHAT DOES APPLE -- FIRST OF ALL, APPLE SAYS THAT WE'RE

20  PLANNING TO SHOW THAT BECAUSE WE BROUGHT TO YOU SOME GENTLEMEN

21  THAT ARE NOT FROM THE UNITED STATES.

22       WELL, BREWSTER KAHLE, RIGHT -- AND LET ME PUT UP SLIDE

23  22 -- HIS NAME IS RIGHT HERE ON THE CODE.  THAT'S WHY WE

24  BROUGHT HIM FOR YOU.  REMEMBER, THIS WAS OPEN SOURCE CODE,

25  RIGHT?  SO HE DEVELOPED THE FIRST VERSION AND HE DESCRIBED FOR

1    YOU WHAT THAT IS.

2         NOW, OTHER PEOPLE BUILT ON THAT.  MR. PFEIFER IS THE ONE

3    WHO DID THE VERSION THAT WE TALKED ABOUT.  RIGHT?  AND HE SAID,

4    YES, THAT DOES SEARCH LOCALLY AND REMOTE AT THE SAME TIME.

5         WE TALKED -- GO FORWARD TO MR. KAHLE.  HE SAID IT USES

6    HEURISTICS, RIGHT, TO DO THAT.

7         SO THOSE GENTLEMEN CAME IN AND THEY TESTIFIED TO YOU ABOUT

8    WHAT THEIR PRODUCTS DID.

9         NOW, WHAT'S APPLE'S RESPONSE TO THAT?  WELL, APPLE SAYS A

10   FEW THINGS.  THEIR FIRST RESPONSE IS, WAIT A MINUTE, YOU CAN'T

11   EVEN CONSIDER THIS AS PRIOR ART BECAUSE IT WASN'T IN THE

12   UNITED STATES.  REMEMBER THAT?  WE JUST HEARD THAT.

13        WELL, THAT'S NOT RIGHT.  THAT'S NOT RIGHT AT ALL.  THEY

14   SAID THERE WAS NO EVIDENCE, THAT WE HAD NO EVIDENCE THAT IT WAS

15   INSTALLED HERE IN THE UNITED STATES.

16        IF YOU GO BACK AND YOU LOOK HERE -- THIS IS DX 313, THAT'S

17   AN EXHIBIT YOU HAVE -- THIS WAS AN E-MAIL THAT MR. PFEIFER

18   PRODUCED THAT SHOWS ALL THE INSTALLATIONS IN THE UNITED STATES.

19   I'VE HIGHLIGHTED THAT THERE.  YOU GO AHEAD AND GO BACK AND LOOK

20   AT THAT.

21        NOW, WHAT ELSE DID APPLE SAY?  WELL, THEIR SECOND THING IS

22   APPLE SAID, WAIT A MINUTE, SOURCE CODE, THAT'S NOT

23   INSTRUCTIONS.

24        SEE, THE CLAIM SAYS CONTAINING PROGRAM INSTRUCTIONS.  AND

25   LET ME JUST EXPLAIN THIS TO YOU.  IT'S A COMPUTER READABLE

1    MEDIUM, MEANING, YOU KNOW, SOMETHING THE COMPUTER CAN READ,

2    HARD DISK, WHATEVER, RIGHT, THAT CONTAINS THESE PROGRAM

3    INSTRUCTIONS.

4        SO THE PROGRAM INSTRUCTIONS ARE THE SOURCE CODE THAT

5    DR. RINARD TALKED TO YOU ABOUT AND SAID THIS IS THE 1996

6    VERSION, I DIDN'T CHANGE ONE LINE OF CODE.  DO YOU REMEMBER

7    THAT?

8        APPLE NEVER CHALLENGED THAT.  THEY NEVER SAID, WELL, WAIT

9    A MINUTE, HE CHANGED THIS CODE.

10       BUT APPLE NOW SAYS, THEIR EXPERT SAYS, WELL, WAIT A

11   MINUTE, SOURCE CODE CAN'T BE PROGRAM INSTRUCTIONS.

12       INTERESTING.  WHAT THEY'RE SAYING IS, WAIT A MINUTE, IF

13   IT'S INSTRUCTIONS THAT PEOPLE CAN ACTUALLY READ AND GET

14   SOMETHING FROM IT, IT'S NOT PRIOR ART.

15       BUT IF YOU ACTUALLY COMPILE IT, IT IS, EVEN THOUGH PEOPLE

16   CAN'T READ IT.

17       THAT DOESN'T MAKE ANY SENSE.

18       YOU KNOW WHAT ELSE DOESN'T MAKE ANY SENSE?  BEFORE THIS

19   CASE, APPLE AGREED -- YOU'RE GOING TO HAVE THIS IN YOUR

20   GLOSSARIES.  YOU HAVE A LITTLE GLOSSARY IN YOUR JURY BINDERS

21   ABOUT SOME TERMS THAT MIGHT COME UP IN THE CASE AND WHAT THE

22   PARTIES AGREED TO.

23       WELL, LOOK AT THIS ONE.  HERE'S A DEFINITION THAT APPLE

24   AGREED TO.  SOURCE CODE, WRITTEN INSTRUCTIONS FOR A COMPUTER.

25       SO I DON'T KNOW WHAT APPLE'S EXPERT IS TALKING ABOUT.

1        RIGHT?  APPLE'S ALREADY AGREED THOSE ARE WRITTEN INSTRUCTIONS

2        FOR A COMPUTER.

3            WHAT'S THE THIRD THING THEY SAY?  WELL, THE THIRD THING

4        THEY SAY IS, WAIT A MINUTE, ALL OF THE THINGS THAT ARE IN HERE

5        HAVE TO BE LOCATED ON THE LOCAL DEVICE.  REMEMBER THEY SAID

6        THAT?

7            AND THEY SAID, WHAT YOU POINT TO, DR. RINARD, IS A

8        HEURISTIC FOR FINDING INFORMATION ON THE INTERNET THAT'S NOT ON

9        THE LOCAL MACHINE.

10           WELL, FIRST OF ALL, THIS IS JUST THE INSTRUCTIONS.

11       REMEMBER, THIS ISN'T A METHOD CLAIM.  YOU DON'T ACTUALLY HAVE

12       TO DO ANYTHING.  YOU JUST HAVE TO HAVE THE INSTRUCTIONS FOR

13       DOING THAT.  RIGHT?  THAT'S WHAT'S IMPORTANT.

14           THE SECOND THING IS THERE'S NOTHING IN THIS CLAIM -- THIS

15       IS ANOTHER SITUATION WHERE APPLE'S ADDING THINGS TO THE CLAIM.

16       THERE'S NOTHING IN HERE THAT SAYS, OH, WAIT A MINUTE, I NEED TO

17       HAVE ALL OF THAT INFORMATION ON ONE DEVICE AND, LOOK, ONE OF

18       THE THINGS IS THE INTERNET.

19           SO UNDER APPLE'S LOGIC, THE INTERNET HAS TO BE ON THE

20       LOCAL DEVICE.  IT DOESN'T MAKE ANY SENSE.

21           NOW, WHAT'S THE THIRD THING HE SAID?  WELL, THE THIRD

22       THING HE SAID IS SAMSUNG'S EXPERT, DR. RINARD ON THIS, DIDN'T

23       IDENTIFY A PLURALITY OF HEURISTICS.  "PLURALITY" IS JUST A

24       LAWYER WORD THAT MEANS TWO OR MORE, RIGHT?

25           SO -- BUT HE CAME BACK ON REBUTTAL AND HE POINTED OUT

```
 1     THAT, YES, ABSOLUTELY I DID.  THE SOURCE CODE FOR THE THREE

 2     HEURISTICS, THE HEURISTIC RELEVANCE RANKING, STEMMING, AND

 3     SYNONYMS, HE POINTED THOSE OUT.  RIGHT?

 4          NOW, REMEMBER, THAT WAS TOWARDS THE END BEFORE WE HAD THE

 5     OVERTIME, THE ADDITIONAL DAY OF TESTIMONY, AND APPLE'S COUNSEL

 6     NEVER CHALLENGED THAT.  THEY STILL HAD -- THEY MADE A BIG DEAL

 7     OUT OF, WE HAVE 15 MINUTES LEFT, YOUR HONOR, WE'RE JUST GOING

 8     TO GIVE THEM TO THE COURT.  THEY NEVER ASKED HIM A SINGLE

 9     QUESTION.  THEY NEVER CHALLENGED THIS.  THEY NEVER SAID, WELL,

10     WAIT A MINUTE, YOU'RE NOT RIGHT.

11          SO YOU'VE GOT TO THINK ABOUT THAT WHEN YOU'RE GOING BACK

12     THERE AND WEIGHING THE EVIDENCE.

13          NOW I WANT TO MOVE TO THE '414 PATENT.

14          THE '414 PATENT -- SOMEBODY IS GOING TO GET THE CLAIM AND

15     PUT IT UP HERE.

16          AGAIN, THE '414 PATENT, THAT'S WHAT APPLE KEEPS CALLING

17     THE BACKGROUND SYNC PATENT.

18          AND I'M GOING TO TALK ABOUT TWO THINGS, AND I'M GOING TO

19     TALK ABOUT THEM IN THE REVERSE ORDER HERE BECAUSE I DO THINK

20     IT'S IMPORTANT.

21          SO THIS WASN'T THE FIRST BACKGROUND SYNCING DEVICE.  WE

22     SHOWED YOU THAT.  WE SHOWED YOU THE WINDOWS MOBILE M.E.,

23     REMEMBER THAT, THAT MICROSOFT HAD DONE BEFORE.

24          SO THIS ISN'T JUST ABOUT BACKGROUND SYNCING.  IT'S ABOUT A

25     VERY SPECIFIC ARCHITECTURE, AS YOU HEARD DURING THIS CASE, FOR
```

1    BACKGROUND SYNCING, AND WHEN I WALK THROUGH WHAT APPLE SAYS TO

2    TRY TO GET AROUND THE PRIOR ART, YOU'RE GOING TO SEE HOW VERY

3    SPECIFIC IT IS, AND THAT SPECIFIC ARCHITECTURE IS SOMETHING

4    THAT SAMSUNG DOES NOT USE.

5        SO LET'S GO FIRST TO WHAT APPLE TOLD YOU IN OPENING

6    STATEMENT ABOUT WHAT THIS INVENTION IS.  THEY SAID, IT ALLOWS

7    THE PHONE TO DO IT AT THE SAME TIME, MEANING SYNCING, SO THAT

8    THE USER IS NEVER DISRUPTED AND NEVER UNDERSTANDS ACTUALLY THAT

9    THE SYNCING IS HAPPENING IN THE BACKGROUND.

10       WELL, WHAT WERE THEY IMPLYING TO YOU?  THEY WERE IMPLYING

11   TO YOU THAT WITHOUT THIS PATENT, THIS INVENTION, THIS IS

12   BACKGROUND SYNCING.

13       IT'S THE SAME THING WHEN THEY SHOWED YOU MR. LOCKHEIMER'S

14   TESTIMONY.  YOU RECALL THAT TESTIMONY?  THEY SAID, OH, LOOK, HE

15   SAID IT WAS IMPORTANT.

16       WELL, BACKGROUND SYNCING MAY BE.  BUT NOBODY EVER SAID,

17   AND APPLE DIDN'T TELL YOU, OURS IS A REALLY SPECIFIC WAY OF

18   DOING IT.  RIGHT?

19       MR. LOCKHEIMER TALKED -- WHEN HE WAS TALKING ABOUT THAT,

20   HE SAID, YEAH, THIS IS -- YOU KNOW, I WORKED AT THIS COMPANY,

21   GOOD, BACK IN THE 2000S AND IT WAS AN E-MAIL COMPANY AND THAT

22   WAS IMPORTANT TO US, THOSE KINDS OF THINGS.

23       SO DON'T BE DISTRACTED, LADIES AND GENTLEMEN.  THIS CLAIM

24   IS VERY SPECIFIC.

25       AND LET'S WALK THROUGH THAT.  SO WHAT DID APPLE'S EXPERT

1      SAY WHEN I ASKED HIM THESE QUESTIONS?  DID IT COVER ALL WAYS OF

2      DOING BACKGROUND SYNCING?  HE VERY QUICKLY SAID, NO, NO, NO,

3      THIS IS A PARTICULAR WAY.  RIGHT?

4           AND THEN SHORTLY THEREAFTER, HE TOLD US WHAT IT WAS.

5      YOU'VE GOT TO HAVE THREE.  REMEMBER THAT?  WE TALKED ABOUT THAT

6      A FEW TIMES.

7           WITH CLAIM 25, THE WAY THIS IS, AND ALL THE PARTIES AGREE,

8      YOU'VE GOT -- ONE OF MY FINGERS HAS BEEN BROKEN A FEW TIMES,

9      WHEN I HOLD IT UP, IT DOESN'T WORK VERY WELL, SORRY -- I'LL USE

10     THIS HAND -- YOU HAVE GOT TO HAVE THREE OF THESE

11     SYNCHRONIZATION SOFTWARE COMPONENTS, RIGHT, NOT TWO.  AND EACH

12     OF THOSE THREE HAS TO BE FOR A DIFFERENT CLASS OF DATA.  THE

13     EXAMPLES WE'VE BEEN USING WERE E-MAIL, CONTACTS, CALENDAR.

14     RIGHT?  IT'S JUST A DIFFERENT DATABASE IS WHAT WE'RE REALLY

15     TALKING ABOUT WHEN WE SAY A CLASS.

16          SO WE KNOW THAT THAT'S VERY PARTICULAR.

17          WE DON'T DO IT.

18          BUT WINDOWS MOBILE M.E. DOES, AND LET ME SHOW YOU THAT

19     VIDEO THAT WE PLAYED JUST TO REMIND YOU OF WHAT'S GOING ON, AND

20     I'M GOING TO TALK ABOUT THIS, WHAT'S GOING ON.

21          (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

22          MR. NELSON:  WE'VE GOT TWO DEVICES HERE THAT ARE

23     TALKING TO EACH OTHER, AND HERE SOMEBODY IS MAKING A CONTACT,

24     PUTTING IN -- AKIN ANDERSON I THINK IS WHAT IT'S GOING TO TURN

25     OUT TO BE.  YOU SEE HE'S WORKING ON THAT, TYPES IN A PHONE

1      NUMBER, AND SAYS OKAY.

2           SO HE SENT THAT, RIGHT?  BASICALLY, YOU KNOW, OKAY, I WANT

3      TO SYNC.

4           AND NOW OVER HERE WHAT'S GOING ON ON THIS OTHER DEVICE,

5      HE'S GOING THROUGH THE INTERFACE, GOING THROUGH HIS CONTACTS

6      AND SAYING, WELL, YEAH, LOOK, I'M LOOKING AT THIS, I'M LOOKING

7      AT THAT.

8           AND WE SEE UP HERE THAT LITTLE TOWER STARTS BECOMING

9      ACTIVE, SO THAT MEANS IT'S SYNCING, AND THERE YOU GO,

10     AKIN ANDERSON.

11          SO THE WINDOWS M.E., WE KNOW IT CAN DO EXACTLY WHAT APPLE

12     SHOWED YOU WITH THE ACCUSED DEVICES IN THEIR OPENING STATEMENT.

13          SO THIS RIGHT HERE, AS WE WALKED THROUGH, IT HAS THE

14     ARCHITECTURE, THIS VERY SPECIFIC ARCHITECTURE OF CLAIM 20.

15          SO WHAT DOES APPLE SAY IN RESPONSE?  AND THIS IS

16     IMPORTANT.  IN FACT, IN THIS DOCUMENT YOU WANT TO LOOK AT --

17     IT'S DX 317 WHEN YOU GO BACK THERE -- THIS DESCRIBES THE

18     WINDOWS MOBILE M.E. ARCHITECTURE, AND YOU SEE THESE THREE BOXES

19     UP THERE, E-MAIL, CONTACTS, AND CALENDAR.  THAT WAS DR. CHASE,

20     YOU RECALL HE CAME AND TESTIFIED.  THIS IS WHAT HE SAID WERE

21     THE PROVIDERS THAT CORRESPONDED TO THE THREE SYNCHRONIZATION

22     SOFTWARE COMPONENTS.

23          WELL, WHAT DID APPLE'S EXPERT SAY?  HE ACTUALLY SAID IN

24     EACH ONE OF THOSE ARE, INDEED, THE SYNCHRONIZATION, SOFTWARE

25     SYNCHRONIZATION COMPONENTS AND THEY ARE, INDEED, CONFIGURED TO

1          SYNCHRONIZE THOSE PARTICULAR DATA CLASSES.

2              SO HE AGREES, WINDOWS MOBILE M.E., IT HAS THAT SPECIFIC

3      ARCHITECTURE.  THERE'S NO DISPUTE THERE.

4              BUT WHAT DOES HE SAY?  WELL, I'VE LOOKED AT THE SOURCE

5      CODE.

6              AND, IN FACT, DR. CHASE EVEN TESTIFIED IN HIS TESTIMONY

7      THAT NONE OF THOSE PROVIDE A THREAD.

8              SO WE HEARD SOMETHING WE NEVER HEARD IN THE INFRINGEMENT

9      CASE, WELL, WAIT A MINUTE, THOSE DON'T PROVIDE A THREAD.

10             SO NOW THAT BECOMES THE ONLY DISTINCTION HE'S MAKING FOR

11     THIS PRIOR ART REFERENCE, IT DOESN'T PROVIDE A THREAD.  AND HE

12     SAID, WELL, DR. CHASE AGREED.

13             INTERESTING, BECAUSE I LISTENED TO DR. CHASE AND I DIDN'T

14     HEAR THAT.

15             SO WHAT DID DR. CHASE ACTUALLY SAY?  HE'S TALKING ABOUT

16     THESE PROVIDERS, THEY'RE ILLUSTRATED THERE, AND THESE

17     SYNCHRONIZATION SOFTWARE COMPONENTS, AND THEY PROVIDE THE

18     SYNCHRONIZATION SOFTWARE PROCESSING THREADS I SPOKE ABOUT.

19             I DON'T KNOW WHAT HE'S TALKING ABOUT.  WHAT IS APPLE'S

20     EXPERT TALKING ABOUT?  HE TRIED TO TELL YOU THAT DR. CHASE

21     AGREED AND SAID, OH, THESE DON'T PROVIDE A THREAD.

22             BUT YOU CAN SEE THE TESTIMONY RIGHT HERE.  HE EXPLICITLY

23     SAID THEY DO PROVIDE A THREAD.

24             NOW --

25                 THE COURT:  I'M SORRY TO INTERRUPT YOU, BUT IT'S

1        12:02.  CAN WE GO AHEAD AND TAKE OUR LUNCH BREAK?

2                MR. NELSON:  YES, YOUR HONOR.

3                THE COURT:  OKAY.  THANK YOU.  WHY DON'T WE COME BACK

4        AT -- WE HAVE A LOT OF PEOPLE TODAY, SO IT MAY GET CONGESTED.

5        WHY DON'T WE COME BACK AT 1:10?  OKAY?

6            PLEASE DON'T RESEARCH OR DISCUSS THE CASE.  WE'LL SEE YOU

7        BACK AT 1:10.  THANK YOU.

8            (JURY OUT AT 12:03 P.M.)

9                THE COURT:  OKAY.  THE JURORS HAVE LEFT THE

10       COURTROOM.  WHY DON'T I JUST GIVE YOU YOUR TIME TOTALS?

11           APPLE AS USED 1 HOUR AND 31 MINUTES, SO YOU HAVE 29

12       MINUTES LEFT.

13           SAMSUNG HAS USED 1 HOUR AND 7 MINUTES, SO YOU HAVE 53

14       MINUTES LEFT.

15           ALL RIGHT.  THANK YOU.  LET'S TAKE OUR LUNCH BREAK.

16               MR. NELSON:  THANK YOU, YOUR HONOR.

17           (LUNCH RECESS WAS TAKEN FROM 12:03 P.M. TO 1:07 P.M.)

18

19

20

21

22

23

24

25

1                         **AFTERNOON SESSION**

2          (JURY OUT AT 1:09 P.M.)

3              THE COURT:  HAVE THE PARTIES STIPULATED TO THE

4     EXHIBITS?

5              MS. MAROULIS:  YES, YOUR HONOR.

6              MS. KREVANS:  YES, YOUR HONOR.

7              THE COURT:  OKAY.  THANK YOU.

8          (JURY IN AT 1:09 P.M.)

9              THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

10         ALL RIGHT.  ARE YOU READY, MR. NELSON?

11             MR. NELSON:  I AM, YOUR HONOR.

12             THE COURT:  ALL RIGHT.  TIME IS 1:09.  PLEASE GO

13    AHEAD.

14             MR. NELSON:  GREAT, THANK YOU.

15         OKAY.  SO LET'S PICK UP RIGHT WHERE WE LEFT OFF.  WE WERE

16    TALKING ABOUT THE ONLY DISTINCTION THAT APPLE RAISED WITH THE

17    WINDOWS M.E. PRIOR ART, AND THAT WAS THIS IDEA OF PROVIDING A

18    THREAD.  WE LOOKED AT THE TESTIMONY, BUT LET'S SEE IF WE CAN

19    FIGURE OUT WHAT APPLE'S EXPERT WAS TALKING ABOUT.

20         NOW, IF WE GO TO THE NEXT SLIDE, I THINK WE HAVE A LITTLE

21    BIT OF INSIGHT HERE.  WHAT APPLE'S EXPERT HAS DONE IS TO CHANGE

22    THE DEFINITION OF WHAT IT MEANS TO PROVIDE A THREAD, AND HE DID

23    IT IN A WAY THAT WAS INCONSISTENT WITH WHAT HE SAID AT HIS

24    DEPOSITION.  THAT'S THE ONLY WAY THAT HE RAISES THIS

25    DISTINCTION.

1          MR. PAK ASKED HIM A QUESTION, "ARE YOU SAYING THAT

2    PROVIDING A THREAD IS THE SAME THING WAS CREATING A THREAD,

3    SIR?  YES OR NO?"

4          "YES, SIR, I'VE SAID THAT, AND I'LL SAY IT AGAIN."

5          BUT THEN WE SHOWED HIM HIS DEPOSITION TESTIMONY, AND YOU

6    SEE HERE -- I'LL PICK UP TOWARDS THE BOTTOM -- THAT "YOU SAY

7    THAT THE WORD 'PROVIDING' IN CLAIM 11 REQUIRES CREATING A

8    THREAD; IS THAT FAIR?

9          "ANSWER:  I SAY IT REQUIRES PROVIDING THE THREAD, WHICH IS

10   THE PLAIN LANGUAGE INTERPRETATION.  I'M NOT QUITE SURE WHAT YOU

11   MEAN BY 'CREATE.'  I MEAN, TECHNICALLY THERE IS NO CREATE."

12         SO WHEN WE GET TO TRIAL, THE ONLY DISTINCTION THAT HE

13   RAISES -- HE FIRST TELLS YOU THAT DR. CHASE DIDN'T SAY IT, AND

14   WE JUST SAW THAT HE DID, AND THE NEXT THING HE SAID IS HE

15   PROVIDES A DEFINITION OF WHAT IT MEANS TO PROVIDE A THREAD

16   THAT'S DIRECTLY CONTRADICTORY TO WHAT HE SAID AT HIS

17   DEPOSITION, AND THAT'S THE ONLY DISTINCTION THAT APPLE RAISED

18   AT THIS TRIAL WITH RESPECT TO THAT WINDOWS MOBILE M.E. PRIOR

19   ART.

20         SO LET ME TALK ABOUT WHY THIS PATENT IS NOT INFRINGED, BUT

21   I FIRST WANT TO ADDRESS SOMETHING THAT APPLE'S COUNSEL

22   ADDRESSED IN OPENING JUST TO CLEAR -- EXCUSE ME -- IN CLOSING,

23   WE'RE AT THE END NOW, BECAUSE HE LEFT SOMETHING OUT HERE.

24         YOU RECALL THAT HE SHOWED YOU THIS AND SAID, LOOK, IT TOOK

25   TWO YEARS FOR GOOGLE TO DEVELOP THIS BACKGROUND SYNCING.

1          WELL, WHAT WAS GOING ON BETWEEN THIS -- REMEMBER, THIS,

2     YOU HEARD TESTIMONY ABOUT THIS, THIS 2008 ANDROID 1.0 RELEASE,

3     THAT'S A FULL RELEASE.  THAT WAS ON A PHONE, EVERYTHING

4     WORKING.

5          SO FROM 2006 TO 2008, THEY WEREN'T JUST WORKING ON

6     BACKGROUND SYNCING.  RIGHT?  THEY WERE WORKING ON DEVELOPING

7     THE ENTIRE OPERATING SYSTEM, THE PLATFORM, THE FRAMEWORK, ALL

8     THE THINGS YOU HEARD ABOUT THAT ARE GOING ON IN THERE.

9          THE OTHER THING THAT WAS LEFT OFF WAS HERE'S WHERE THE

10    '414 PATENT COMES IN, 2010.  SO THIS IS WAY AFTER THE FACT.

11         NOW, LET'S TALK ABOUT THIS NON-INFRINGEMENT.  SO YOU'LL

12    RECALL THAT -- IF WE GO TO THE NEXT SLIDE, MR. KOTARSKI --

13    YOU'LL RECALL THIS IS -- THESE ARE THE SYNC ADAPTERS THAT WE'RE

14    ACCUSED OF, AND WHAT'S GOING ON HERE IS THEY'RE TRYING TO DO A

15    LITTLE MISDIRECTION.

16         BECAUSE THEY'RE CALLED SYNC ADAPTERS, THEY SAY, OH, OKAY,

17    SYNC ADAPTERS, THEREFORE, THEY MUST DO THE SYNCHRONIZATION.

18    BECAUSE, REMEMBER, THAT'S WHAT THE CLAIM REQUIRES.  RIGHT?

19    SYNCHRONIZATION SOFTWARE COMPONENT IS CONFIGURED TO SYNCHRONIZE

20    STRUCTURED DATA.  RIGHT?

21         WELL, AS WE SHOWED YOU FOR FOUR OF THESE, AND FOR ALL OF

22    THEM IN THE MAIL DATA CLASS, THERE ARE NO SUCH THINGS.  RIGHT?

23    THAT'S NOT WHAT THEY DO.

24         AND WE BROUGHT YOU MR. WESTBROOK.  HE'S THE GENTLEMAN THAT

25    HEADED UP THE GROUP THAT ACTUALLY DID THIS WORK.  RIGHT?  AND

1    HE MADE THIS DRAWING AND HE SHOWED YOU, AND IT'S THIS LITTLE

2    YELLOW BOX AGAIN THAT THEY'RE ACCUSING.  WE HIGHLIGHTED IT.

3    THAT'S THE SYNC ADAPTER.

4         BUT LOOK WHAT IT'S NOT CONNECTED TO.  IT'S NOT CONNECTED

5    TO THE DATABASE AND IT'S NOT CONNECTED TO THE GMAIL SERVER.  IT

6    DOESN'T SYNCHRONIZE ANYTHING.  IT CAN'T.  IT DOESN'T HAVE

7    ACCESS TO THOSE THINGS.

8         AND MR. WESTBROOK EXPLAINED TO YOU WHY THAT WAS.  RIGHT?

9    WE USED A DIFFERENT ARCHITECTURE BECAUSE WE WANTED TO DO IT

10   FASTER.  WE WANTED THE APPLICATION TO BE FASTER.

11        SO IT WASN'T JUST THAT IT WASN'T THERE.  IT WAS THAT THERE

12   WAS A SPECIFIC TECHNICAL REASON FOR IT.

13        AND WITH RESPECT TO THOSE EXCHANGE SYNC ADAPTERS, HE SAID

14   THE SAME THING.  NO, IT'S NOT THAT.  WE WANT TO PUSH E-MAIL.

15   WE WANT TO BE FASTER.  WE USE THE EXCHANGE SERVICE.

16        WE DON'T USE THESE EXCHANGE SYNC ADAPTERS IN ORDER TO DO

17   THE SYNCHRONIZATION OF THE STRUCTURED DATA, WHICH IS WHAT THE

18   CLAIM REQUIRES.

19        SO WHAT DOES APPLE'S EXPERT SAY IN RESPONSE?  WELL, YOU'LL

20   RECALL THIS.  WHAT HE SAYS IS, "WELL, I THINK THERE WAS SOME

21   DISCUSSION ABOUT THAT.  I WANT TO BE CLEAR, IT'S MY POSITION

22   THAT I'VE IDENTIFIED SYNCHRONIZATION COMPONENTS THAT CAUSE THE

23   SYNCHRONIZATION TO OCCUR, ABSOLUTELY."

24        REMEMBER THAT?  HE SAID THAT CAUSE THE SYNCHRONIZATION TO

25   OCCUR.

1          WELL, YOU'LL SEE BOTH PLACES, WHICH IS CONFIGURED TO

2     SYNCHRONIZE HERE IN CLAIM 11, WHEREIN THE SYNCHRONIZATION

3     SOFTWARE COMPONENT IS CONFIGURED TO SYNCHRONIZE, RIGHT, IS

4     CONFIGURED TO SYNCHRONIZE.  IT DOESN'T SAY "CAUSE."

5          IF MY SON CAME TO ME AND SAID, I SAID, SON, DID YOU DO

6     YOUR HOMEWORK, AND HE SAID, WELL, DAD, I CAUSED IT TO BE DONE,

7     THAT ANSWER WOULD SOUND STRANGE TO ME, AND IT SHOULD SOUND

8     STRANGE TO YOU HERE BECAUSE THAT'S NOT WHAT THIS CLAIM

9     REQUIRED.

10         SO HOW DO WE KNOW THAT'S NOT WHAT IT REQUIRED?  AND YOU'LL

11    HAVE THIS.  THIS IS JX 8 THAT WE PUT INTO EVIDENCE.  THIS IS

12    FROM THE FILE WRAPPER AT PAGE 751.

13         YOU'LL SEE THAT AT ONE TIME, APPLE DID HAVE A CLAIM THAT

14    SAID "CONFIGURED TO CAUSE RETRIEVAL AND STORAGE OF THE

15    STRUCTURED DATA," RETRIEVAL AND STORAGE, SYNCHRONIZING.  RIGHT?

16    THAT'S WHAT YOU'RE DOING.  IT SAID THAT.

17         BUT THERE WAS PRIOR ART OUT THERE.  THEY COULDN'T HAVE

18    THAT CLAIM.

19         AND SO THEY TOOK IT OUT, AND NOW IT SAYS "CONFIGURED TO

20    SYNCHRONIZE."

21         SO IN ORDER TO TRY TO GET AROUND THE PRIOR ART IN THE

22    PATENT OFFICE, THEY TOLD THE PATENT OFFICE, NOT CAUSING.

23    RIGHT?  THIS IS A DIRECT RELATIONSHIP.  TAKE IT OUT.  THAT'S

24    THE BARGAIN THEY STRUCK WITH THE PATENT OFFICE.

25         NOW THEY'RE COMING IN HERE AND THEY WANT TO SAY SAMSUNG'S

1    PHONES, ANDROID CODE INFRINGES.  RIGHT?  THEY WANT TO SAY THAT.

2         WHAT DO THEY DO?  THEY TAKE IT -- THEY PUT IT BACK IN.

3    THEY CHANGED THE BARGAIN, RIGHT, BECAUSE THEY CAN'T GET

4    INFRINGEMENT WITHOUT REWRITING THE CLAIM.

5         BUT YOU CAN'T LET THEM DO IT.  YOU CAN'T LET THEM DO IT

6    BECAUSE THAT'S NOT WHAT THE PROCESS IS.  THEY STRUCK THIS DEAL.

7    NOW THEY'VE GOT TO STICK WITH IT.

8         SO NOW LET ME TURN TO THE '172 PATENT.  NOW, IN THE '172

9    PATENT, THIS IS THE ONE THAT THE COURT ALREADY FOUND INFRINGES.

10   YOU DON'T HAVE TO DEAL WITH THAT.

11        ONE THING THAT MIGHT NOT BE CLEAR FROM THIS WITH THE '172

12   PATENT IS FOR THE PHONES THAT ARE IN THIS CASE THAT HAVE BEEN

13   RELEASED SINCE SAMSUNG GOT NOTICE OF THAT PATENT -- THE NOTICE

14   WAS THE LAWSUIT, THAT'S FEBRUARY 8TH, 2012 -- THEY'RE NOT

15   ACCUSING THEM.  NOBODY SAYS -- APPLE DOESN'T SAY THAT THOSE

16   PHONES HAVE THE INFRINGING KEYBOARDS OR THE TABLET.

17        SO I JUST WANT TO MAKE THAT POINT CLEAR BECAUSE IT MAY NOT

18   HAVE BEEN CLEAR TO YOU WHEN WE WENT THROUGH THE CASE.

19        BUT LET ME TELL YOU WHY THAT CLAIM IS INVALID, AND LET ME

20   SHOW YOU HERE.  I WANT TO SHOW YOU THE ROBINSON PRIOR ART.

21        YOU'LL RECALL DR. WIGDOR, SAMSUNG'S EXPERT, CAME IN AND

22   WALKED THROUGH THIS ROBINSON REFERENCE AND TOOK YOU THROUGH

23   STEP BY STEP WITH RESPECT TO THE CLAIMS.

24        AND THE ONLY THING THAT WAS MISSING WAS THE IDEA, IF YOU

25   LOOK BEHIND FROM THIS FIGURE, WAS THAT WHEN YOU'RE TYPING, YOU

1        PUT THE WORDS IN AT THE CURSOR.  RIGHT?  YOU PUT WHAT YOU'RE

2        TYPING IN AT THE CURSOR.

3            AND SO THAT WOULD BE THIS FIRST AREA, THE TOUCHSCREEN

4        DISPLAY THAT, THAT DISPLAYS A CURRENT CHARACTER STRING BEING

5        INPUT BY THE USER.  OKAY?  HE EXPLAINED THAT.

6            NOW -- BUT THAT WAS IT.  THAT WAS THE ONLY THING.

7            AND IF WE LOOK TO 96A, HE BROUGHT THE XRGOMICS PATENT UP,

8        RIGHT, AND SHOWED YOU, HERE'S A MOBILE DEVICE, HERE'S A MOBILE

9        DEVICE AND THIS IS ONE WHERE, AS IS COMMONLY KNOWN, YOU HAVE

10       THE CHARACTERS BEING INPUT.

11           SO WHAT'S APPLE'S RESPONSE TO THAT?  IT'S TWO-FOLD.

12           WELL, THE FIRST THING IS, WELL, THE PATENT OFFICE ALREADY

13       LOOKED AT THIS.

14           WELL, THEY DIDN'T LOOK AT THIS COMBINATION.  ALL THEY

15       TALKED ABOUT IS ROBINSON.  THERE'S NO EVIDENCE THAT THE PATENT

16       OFFICE LOOKED AT THIS COMBINATION OR THAT ANYBODY TOLD THEM,

17       HEY, YOU CAN COMBINE THESE THINGS TOGETHER.

18           WHAT'S THE OTHER THING THEY SAY?  WELL, WAIT A MINUTE,

19       NOBODY WOULD BECAUSE XRGOMICS IS A WORD SUGGESTION PATENT, NOT

20       A WORD CORRECTION PATENT.  THAT'S WHAT THEY SAID.

21           WHERE DOES IT SAY THAT?  IT DOESN'T SAY IT IN THE CLAIM.

22       THAT'S JUST SOMETHING THAT APPLE'S ADDED.  WELL, THIS IS, YOU

23       KNOW, WORD CORRECTION.  THIS IS MISSPELLING.  IT DOESN'T SAY

24       THAT.

25           AND YOU'LL SEE, IN THOSE JURY INSTRUCTIONS, COMBINING

1      THINGS, IF THEY'RE IN THE SAME FIELD, RIGHT, IF THEY'RE

2      RELATED, THEN THOSE ARE KINDS OF THINGS THAT CAN BE COMBINED.

3      SO YOU'VE GOT TO CONSIDER THAT WHEN YOU GO BACK THERE.

4          AND THERE'S ANOTHER THING THAT'S IMPORTANT HERE.  APPLE

5      KEEPS SAYING DEFER TO THE PATENT OFFICE, DEFER TO THEM.  AND

6      I'VE ALREADY TALKED ABOUT THAT.  THAT'S NOT YOUR ROLE HERE.

7          BUT I'M GOING TO ILLUSTRATE HERE WHY IT'S REALLY

8      IMPORTANT, BECAUSE YOU'LL RECALL WHEN APPLE'S EXPERT WENT

9      THROUGH, RIGHT, HE UNDERLINED A WHOLE BUNCH OF THINGS.  EVERY

10     TIME THE FIRST AREA WORD APPEARED, HE UNDERLINED IT.  RIGHT?

11     DO YOU REMEMBER THAT?

12         BUT EACH TIME, I WAS VERY CAREFUL -- AND APPLE'S COUNSEL

13     ACTUALLY SAID THE SAME THING IN CLOSING -- THE REASON WHY HE

14     WAS UNDERLINING IT IS HE SAID, WELL, BECAUSE THE CHARACTERS

15     DON'T APPEAR IN THE FIRST AREA, THIS NEXT THING WON'T HAPPEN.

16         IT'S JUST CONFIRMING THAT THE ONLY THING MISSING IS THE

17     FACT THAT THE FIRST CHARACTERS.

18         SO APPLE -- THEY'RE LOOKING TO MAKE A LOT OF MONEY ON THIS

19     PATENT.  THEY'RE SAYING BECAUSE, WAIT A MINUTE, ROBINSON HAS

20     EVERYTHING ELSE, BUT WE DON'T PUT THE WORDS IN IT IN ROBINSON,

21     YOU KNOW, WHAT YOU'RE TYPING AT THE CURSOR, THAT SHOULD BE FOR

22     A PATENT.  THEY NEVER BROUGHT THE INVENTORS TO YOU AND SAID WHY

23     IS THAT SO DIFFICULT?  RIGHT?

24         AND IT IS PARTICULARLY IMPORTANT HERE BECAUSE REMEMBER AT

25     THE PATENT OFFICE, IT WAS JUST APPLE.  THEY COULD COME IN AND

1    TELL THEM THE SAME THING, WELL, WAIT A MINUTE, THIS IS MISSING

2    AND THIS IS MISSING AND THIS IS MISSING, ALL BECAUSE THERE'S NO

3    CHARACTERS BEING TYPED AT THE FIRST AREA.  THERE WASN'T

4    ANYBODY, LIKE US, TO RESPOND.  RIGHT?

5         SO THAT'S VERY IMPORTANT THAT YOU CONSIDER THAT AND GO

6    BACK.

7         NOW I WANT TO MOVE TO THE LAST PATENT.  THIS IS THE '721

8    PATENT, SLIDE TO UNLOCK.

9         SO HERE -- FIRST I WANT TO SHOW YOU THE GALAXY NEXUS, AND

10   WE TALKED ABOUT THIS AND WHY THAT GALAXY NEXUS DOESN'T INFRINGE

11   THIS CLAIM.  THE WORDS OF THE CLAIM BECOME VERY IMPORTANT HERE.

12        SO YOU'LL SEE HERE THAT YOU HAVE TO MAKE CONTACT WITH AN

13   UNLOCK IMAGE, AND THEN YOU -- TO CONTINUOUSLY MOVE THE UNLOCK

14   IMAGE ON THE TOUCH SENSITIVE DISPLAY.  IN OTHER WORDS, THAT

15   SAME WHEN YOU TOUCH, YOU MOVE IT.

16        BUT IF WE PLAY THE VIDEO OF THE GALAXY NEXUS, YOU'LL

17   RECALL THIS, THAT DOESN'T HAPPEN.  RIGHT?

18            (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

19            MR. NELSON:  YOU'LL SEE, THIS IS WHAT APPLE IS

20   CALLING THE UNLOCK IMAGE.

21        BUT WHEN THE GENTLEMAN TOUCHES IT, IT DISAPPEARS.  IT GOES

22   AWAY.

23        AND APPLE'S RESPONSE TO THAT IS, WELL, I HAVE SOMETHING IN

24   THE SPECIFICATION OF THE PATENT WHERE IT SAYS SOMETHING ON THE

25   UNLOCK IMAGE CAN APPEAR AND DISAPPEAR.

1          WELL, TWO THINGS WITH THAT.  ONE, AS WE WENT THROUGH, IT

2     DOESN'T SAY THE UNLOCK IMAGE CAN DISAPPEAR IN THE

3     SPECIFICATION.  IT'S SOMETHING ON IT.

4          AND THE OTHER THING IS WHAT'S IMPORTANT IS THE CLAIM.  THE

5     CLAIM DOESN'T -- YOU DON'T COMPARE IT TO THE SPECIFICATION.

6     YOU COMPARE IT TO THE CLAIM, AND THE CLAIM SAYS THAT YOU NEED

7     TO CONTINUOUSLY MOVE THAT UNLOCK IMAGE.

8          SO IT DOESN'T INFRINGE FOR THAT REASON.

9          NOW LET ME TALK ABOUT INVALIDITY WITH RESPECT TO THIS

10    PATENT.  I'M GOING TO FINISH UP HERE.

11         SO HERE WAS THE ONLY INVENTOR THAT WAS BROUGHT TO YOU, THE

12    ONLY INVENTOR THAT APPLE HAD, AND THAT WAS MR. CHRISTIE.

13         WELL, HE GAVE SOME INTERESTING TESTIMONY HERE.  HE SAID

14    WHY IT WAS THAT THEY DEVELOPED THEIR UNLOCK SCREEN, "WE WANTED

15    IT TO BE SOMETHING THAT WOULD BE REALLY UNLIKELY TO HAPPEN

16    ACCIDENTALLY."  THAT'S WHAT HE SAID.  RIGHT?  OKAY.

17         WELL, WE SHOWED YOU THE NEONODE PRIOR ART, THIS IS THE

18    PHONE, AND IT IS -- THE REASON FOR THE UNLOCKING, IT SAYS RIGHT

19    THERE IN THE REFERENCE -- AND YOU'LL HAVE THIS DX 342 THAT YOU

20    CAN LOOK AT BACK IN THE JURY ROOM -- IT SAYS TO MAKE SURE NO

21    UNINTENTIONAL CALLS ARE MADE, IN OTHER WORDS, EXACTLY THE SAME

22    REASON.

23         AND FURTHER, WHAT DOES IT SAY IN HERE?  WHAT HAPPENS WITH

24    IT?  YOU PRESS THE POWER BUTTON, JUST LIKE YOU WOULD ON ANY OF

25    THESE PHONES IN ORDER TO GET THE SCREEN TO COME ON, AND THEN

1        THE TEXT "RIGHT SWEEP TO UNLOCK" APPEARS ON THE SCREEN.  SWEEP

2    RIGHT.  THAT'S WHAT THEY SAY.

3        THAT'S WHAT THIS IS.  SO THE ONLY THING THAT WOULD BE

4    MISSING FROM THIS WOULD BE AN UNLOCK IMAGE.  THAT'S ALL.

5        WELL, WE SHOWED YOU PRIOR ART THAT HAS THAT UNLOCK IMAGE.

6    SPECIFICALLY, THE SLIDERS -- IF WE GO TO THE NEXT SLIDE -- THIS

7    IS FROM THE PLAISANT VIDEO THAT WE SHOWED YOU.  RIGHT?  THERE'S

8    SLIDERS IN THE PRIOR ART.

9        AND NOW LET'S GO TO THE THING THAT APPLE SHOWED YOU -- AND

10   THIS IS GOING TO ILLUSTRATE TO YOU WHY IT'S VERY IMPORTANT FOR

11   YOU TO BE A CHECK ON THIS AND NOT SIMPLY DEFER TO THE PATENT

12   OFFICE -- APPLE SHOWED YOU, DURING THEIR EXPERT'S TESTIMONY,

13   THIS FIRST PART FROM THE PLAISANT PAPER WHERE IT SAYS, OH, WE

14   WANT TOGGLES, THOSE ARE PREFERRED OVER SLIDES.  SO HE SAYS THAT

15   TEACHES AWAY FROM USING SLIDERS.  YOU'LL RECALL THAT TESTIMONY.

16       BUT RIGHT BELOW, WHAT THEY DIDN'T SHOW YOU, WHAT DOES IT

17   SAY?  "EVEN IF SLIDERS WERE NOT PREFERRED, THE FACT THAT USERS

18   USED THEM CORRECTLY IS ENCOURAGING SINCE MANY OTHER CONTROLS

19   CAN BE DESIGNED USING A SLIDING MOTION.  ANOTHER ADVANTAGE OF

20   THE SLIDING MOTION IS THAT IT IS LESS LIKELY TO BE DONE

21   INADVERTENTLY."

22       IN OTHER WORDS, EXACTLY THE SAME REASON FOR USING SLIDERS

23   THAT MR. CHRISTIE TESTIFIED TO OF WHY THEY CAME UP WITH THEIR

24   UNLOCK.

25       NOW, THE PATENT OFFICE DIDN'T, THEY DIDN'T -- NOBODY

1    POINTED THIS OUT TO THEM.

2         WE KNOW WHAT APPLE POINTED OUT TO YOU WHEN THEY CAME.  SO

3    TO THE EXTENT THAT THERE WAS A DISCUSSION WITH THE PATENT

4    OFFICE, WE CAN ONLY ASSUME THEY POINTED THEM TO THE SAME THING.

5         THAT'S VERY MISLEADING AND THAT'S WHY IT'S IMPORTANT FOR

6    YOU TO BE A CHECK, BECAUSE WE'RE HERE TO RESPOND.  WE'RE HERE

7    TO BRING OUT THE INFORMATION ON THE OTHER SIDE OF THE STORY.

8         SO WITH THAT, I REALLY APPRECIATE YOUR ATTENTION.  I KNOW

9    IT'S -- IT'S BEEN, YOU KNOW, A LONG, LONG CASE.

10        BUT THINK ABOUT IT WHEN YOU GO BACK IN THERE.  YOUR JOB IS

11   TO WEIGH THE EVIDENCE, RIGHT, TO WEIGH THE EVIDENCE YOU'VE

12   HEARD.

13        AND I'VE GIVEN YOU A ROADMAP FROM MY SIDE OF THE CASE.

14   AND THINK ABOUT WHO WE BROUGHT.  WE BROUGHT THE PEOPLE THAT

15   ACTUALLY WROTE THE SOFTWARE, THE GOOGLE ENGINEERS, MS. KIM.

16   THEY CAME IN.  WE SHOWED THAT.

17        WE BROUGHT IN THE PRIOR ARTISTS, TO THE EXTENT THAT WE

18   WERE RELYING ON PRIOR ART, WHO WROTE THAT SOFTWARE.

19        WHAT DID APPLE DO IN RESPONSE?  APPLE BROUGHT IN ONE

20   INVENTOR.  THE OTHER 13, YOU DIDN'T HEAR THEM.  THEY WEREN'T

21   HERE.

22        WHAT ELSE DID THEY DO?  THEY BROUGHT IN EXPERTS.  THAT'S

23   BASICALLY THEIR CASE.  YOU DON'T HEAR FROM THE PEOPLE WHO DO

24   IT, WHO DEVELOPED IT.  THEY BROUGHT IN EXPERTS, AND AS WE SAW

25   WALKING THROUGH HERE, THEY BROUGHT IN EXPERTS WHO CONTRADICTED

1    THEMSELVES, AND THAT'S SOMETHING FOR YOU TO JUDGE WHEN YOU GO

2    BACK THERE IN THE JURY ROOM.

3         AND WITH THAT, I APPRECIATE YOUR ATTENTION AND I'M GOING

4    TO TURN IT OVER TO MY COLLEAGUE, MR. JOHNSON, WHO'S GOING TO

5    TALK TO YOU ABOUT THE SAMSUNG CASE, SAMSUNG PATENTS.

6         THANK YOU VERY MUCH.

7         **(MR. JOHNSON GAVE HIS CLOSING ARGUMENT ON BEHALF OF THE**

8    **DEFENDANTS.)**

9              MR. JOHNSON:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

10        LET'S SWITCH GEARS.  I'M HERE TO TALK ABOUT THE TWO

11   SAMSUNG PATENTS, THE '239 PATENT AND THE '449 PATENT.

12        NOW, THE AFFIRMATIVE CASE, SAMSUNG'S AFFIRMATIVE CASE WENT

13   BY AND HAPPENED VERY QUICKLY.  WE DIDN'T HAVE MUCH TIME,

14   ESPECIALLY WHEN YOU'RE DEFENDING AGAINST APPLE'S GROSSLY

15   INFLATED DAMAGES CLAIM ON THE APPLE PATENTS.

16        BUT THE QUICK PACE OF THE AFFIRMATIVE CASE SHOULDN'T

17   DETRACT FROM THE IMPORTANCE OF SAMSUNG'S PATENTS, AND I'LL

18   ADDRESS THE EVIDENCE SHORTLY, BUT LET ME SLOW DOWN HERE BECAUSE

19   I WANT YOU TO REMEMBER THE CASE FOR WHAT APPLE DID NOT DO.

20        APPLE DID NOT CHALLENGE THE VALIDITY OF THE SAMSUNG

21   PATENTS.  APPLE DID NOT CHALLENGE THE MOUNTAIN OF EVIDENCE AND

22   THE APPLE SOURCE CODE THAT WE SHOWED YOU THAT SHOWS THAT APPLE

23   INFRINGES THESE TWO PATENTS.

24        AND APPLE DID NOT CHALLENGE THE DAMAGES CALCULATIONS ON

25   THE SAMSUNG PATENTS AT ALL.  THEY DID NOT CHALLENGE -- THEY

1          DIDN'T BRING A SINGLE WITNESS OR HAVE ANY TESTIMONY TO

2     CHALLENGE THE TESTIMONY OF DR. KEARL AND DR. RAO ON DAMAGES.

3          NOW, DR. KEARL CALCULATED DAMAGES TO BE ABOUT $6 MILLION

4     ON THE '239 PATENT AND ABOUT $158,000 FOR THE '449 PATENT.

5          NOBODY CAME TO SAY THESE DAMAGES NUMBERS WERE WRONG, AND

6     NOBODY CAME TO SAY DR. RAO'S STRAIGHTFORWARD SURVEY WAS FLAWED.

7          APPLE NEVER CALLED DR. VELLTURO, THEIR EXPERT, AND NOBODY

8     ELSE CAME TO TESTIFY ON DAMAGES.

9          SO YOU WILL HEAR, LIKELY WHEN APPLE'S COUNSEL STANDS UP TO

10    DO HIS PART OF THE CLOSING, THAT THEY DON'T INFRINGE EITHER ONE

11    OF THESE PATENTS AND THAT THE TECHNOLOGY IS OLD AND NOT USED.

12         BUT EVEN AS THEIR EXPERT ADMITTED AND AS INSTRUCTION

13    NUMBER 18 SAYS IN THE JURY INSTRUCTIONS, YOU ARE TO COMPARE THE

14    ASSERTED CLAIMS TO THE ACCUSED PRODUCTS.  YOU DON'T COMPARE THE

15    1993 FIRSTLOOK PRODUCT, THE OLD PRODUCT BROCHURES AND THE PRICE

16    QUOTATIONS TO THE ACCUSED PRODUCTS.  YOU COMPARE THE CLAIMS TO

17    THE ACCUSED PRODUCTS.

18         AND IF WE LOOK AT THE '239 PATENT, CLAIM 15, THIS PATENT

19    WAS AHEAD OF ITS TIME.  AND THE CLAIM IS SHORT AND

20    STRAIGHTFORWARD.  IT TALKS ABOUT CAPTURING AND COMPRESSING

21    VIDEO AND THEN TRANSMITTING THAT VIDEO OVER A CELLULAR NETWORK.

22         WE BROUGHT YOU MICHAEL FREEMAN FROM TULSA, OKLAHOMA, WHO

23    WAS THE LEAD INVENTOR ON THE PATENT, AND HE CAME AND TOLD YOU

24    ABOUT THE VIDEO TRANSMISSION TECHNOLOGY THAT HE INVENTED WITH

25    HIS FAMILY, AND IT WAS VERY SUCCESSFUL AND IT WAS USED BY THE

1    MILITARY, IT WAS USED BY TELEVISION STATIONS AROUND THE

2    COUNTRY, AND IT WAS USED IN THE OKLAHOMA CITY BOMBINGS TO

3    STREAM VIDEO TO RESCUERS.  HE TOLD YOU HOW THIS TECHNOLOGY WAS

4    SUCCESSFUL AND HOW IT WON TWO EMMY AWARDS.

5         AND THEN WE BROUGHT YOU DR. DAN SCHONFELD, A PROFESSOR

6    FROM THE UNIVERSITY OF ILLINOIS AT CHICAGO, A PROFESSOR OF

7    ELECTRICAL ENGINEERING AND COMPUTER ENGINEERING.

8         AND HE EXPLAINED HOW THE FACETIME OVER CELLULAR FEATURE

9    AND THE ABILITY TO TRANSMIT VIDEOS BY E-MAIL AND TEXT MESSAGES

10   ALL INFRINGE CLAIM 15, AND HE WALKED THROUGH A LOT OF DETAIL,

11   THROUGH DOCUMENTS THAT WERE CONFIDENTIAL APPLE DOCUMENTS,

12   CONFIDENTIAL APPLE SOURCE CODE, AND OTHER THIRD PARTY

13   DOCUMENTS.

14        NOW, THE CLAIMS REQUIRE -- CLAIM 15 REQUIRES A VIDEO

15   CAPTURE MODULE.

16        APPLE SAYS THEY DON'T CAPTURE VIDEO.  WELL, WE KNOW WHEN

17   YOU USE AN IPHONE, YOU CAN RECORD AND CAPTURE VIDEO AND IT

18   STORES IT.

19        DR. SCHONFELD SHOWED YOU -- AND THIS IS ONLY FOR THE JURY

20   AT THIS POINT -- HE SHOWED YOU THE APPLE SOURCE CODE THAT SAYS

21   APPLE CAPTURES VIDEO.  THESE ARE SEGMENTS FROM JX 52A, WHICH

22   YOU'LL HAVE IN THE JURY ROOM, AND THESE ARE FUNCTIONS THAT ARE

23   APPLE'S FUNCTIONS THAT ALL DESCRIBE THE FACT THAT THE IPHONES

24   CAPTURE VIDEO.

25        AND YOU'LL RECALL WHEN I CROSS-EXAMINED APPLE'S EXPERT ON

1        THE STAND AND I ASKED HIM, DID YOU LOOK AT SOURCE CODE AND RELY

2    UPON IT AS PART OF YOUR DIRECT TESTIMONY, HE HAD TO ADMIT THAT

3    HE DID NOT.  HE DID NOT RELY UPON SOURCE CODE IN HIS DIRECT

4    TESTIMONY.

5        SO DR. SCHONFELD, SAMSUNG'S EXPERT, ALSO SHOWED YOU THE

6    SOURCE CODE FOR THE NEXT PART OF THE LIMITATION THAT TALKS

7    ABOUT MEANS FOR TRANSMISSION.

8        AND HE WALKED THROUGH HOW THE SOURCE CODE -- AND AGAIN

9    CONFIDENTIAL DOCUMENTS, PLAINTIFF'S EXHIBIT 255 -- ALSO

10   ESTABLISHED THAT THIS PART OF THE LIMITATION IS MET.

11       SO APPLE'S EXPERT WAS IN A BOX.  WHAT DID THEY DO?

12   APPLE'S EXPERT CAME AND TRIED TO ARGUE THAT APPLE DOESN'T

13   INITIALIZE A PORT AS PART OF THIS MEANS FOR TRANSMISSION.

14       WELL, YOU WILL HAVE DX 351 IN THE JURY ROOM, AND I

15   ENCOURAGE YOU TO LOOK AT PAGE 1818.  AND ON THAT PAGE, YOU WILL

16   SEE APPLE REFERS TO THE FACT THAT IT HAS THREE PORTS.

17       AND HE ALSO SHOWED YOU THE PARTS OF THE SOURCE CODE THAT

18   ALSO ESTABLISH IT HAS PORTS.

19       SO THEN APPLE'S EXPERT WENT SO FAR AS TO SAY, WELL,

20   FACETIME DOESN'T TRANSMIT VIDEO.

21       WELL, WE KNOW FROM COMMON SENSE THAT FACETIME, THE WHOLE

22   PURPOSE BEHIND FACETIME IS TO TRANSMIT VIDEO AND TO HAVE A

23   VIDEO CONVERSATION, AND THAT'S EXACTLY WHAT DR. SCHONFELD

24   EXPLAINED AS HE WALKED THROUGH THE VIDEO THAT SHOWED YOU HOW

25   FACETIME WORKS.

1          AND, IN FACT, ULTIMATELY WHEN I CROSS-EXAMINED DR. STORER

2     AGAIN AND I POINTED OUT TO HIM THAT HE HAD PROVIDED A REPORT

3     EARLIER IN THE CASE AND THAT IN HIS REPORT, IT REFERRED TO THE

4     FACT THAT, QUOTE, "THE FACETIME APPLICATION PREPARES TO

5     TRANSMIT VIDEO," HE HAD NO CHOICE BUT TO AGREE WITH ME.

6          AND THAT STATEMENT THAT HE GAVE IN HIS EXPERT REPORT IN

7     THIS CASE DIRECTLY CONTRADICTS HIS TESTIMONY IN THIS COURT

8     WHERE HE SAID THAT FACETIME DOESN'T TRANSMIT VIDEO.  OF COURSE

9     IT TRANSMITS VIDEO.

10          SO APPLE TOLD YOU DURING THEIR OPENING STATEMENT THAT

11     SAMSUNG SELLS TO APPLE SOME COMPONENTS THAT IT NOW ACCUSES OF

12     INFRINGEMENT.  WELL, THIS IS MISLEADING AND WRONG.

13          FIRST, THE FACT THAT APPLE BUYS SOME COMPONENTS FROM

14     SAMSUNG IS NOT A DEFENSE TO INFRINGEMENT.  APPLE KNOWS IT'S NOT

15     A DEFENSE.  THEY DON'T ALLEGE IT'S A DEFENSE.

16          AND YOU WON'T FIND A JURY INSTRUCTION IN THE JURY

17     INSTRUCTIONS THAT SAYS IT'S A DEFENSE, BECAUSE IT ISN'T A

18     DEFENSE.

19          AS DR. SCHONFELD WENT ON AND EXPLAINED, APPLE ACTUALLY

20     DESIGNS AND IMPLEMENTS THE A6 PROCESSOR, WE SAW THAT PROCESSOR

21     THAT HAD THE APPLE LOGO ON IT, AND WE ALSO SAW -- IF WE PUT UP

22     DX 466, AND AGAIN YOU'LL HAVE THIS IN THE JURY ROOM -- APPLE

23     ITSELF REFERS TO THE FACT THAT IT DESIGNS ITS OWN A6 PROCESSOR

24     CHIP.

25          IN ADDITION, APPLE WRITES ITS SOURCE CODE, AND THE SOURCE

```
 1    CODE IS CONFIDENTIAL -- THEY WON'T LET US SHOW IT TO ANYBODY

 2    ELSE EXCEPT YOU AND THE COURT AT THIS POINT -- AND THEY COMBINE

 3    THE ACCUSED COMPONENTS AND THE SOURCE CODE IN AN INFRINGING

 4    WAY, AND IT'S THIS COMBINATION OF COMPONENTS WITH THE SOURCE

 5    CODE THAT INFRINGES THE CLAIMS.

 6        LET'S TURN TO THE '449 PATENT, THE PHOTO AND VIDEO ALBUM

 7    ORGANIZATION PATENT.

 8        SO CLAIM 27 STARTS WITH A DIGITAL CAMERA.  SAMSUNG BROUGHT

 9    YOU MR. PARULSKI TO TESTIFY.  HE WAS THE DIGITAL CAMERA EXPERT

10    THAT WORKED AT KODAK FOR 32 YEARS.  HE WAS A DIGITAL CAMERA

11    ARCHITECT.  HE DEVELOPED THE WORLD'S FIRST COLOR DIGITAL

12    CAMERA.  HE HAS 200, MORE THAN 200 DIGITAL CAMERA PATENTS AND

13    MORE THAN 60 DIGITAL CAMERA PUBLICATIONS.

14        APPLE BROUGHT YOU DR. STORER AGAIN, THE SAME EXPERT THAT

15    THEY USED ON THE VIDEO TRANSMISSION PATENT, DIFFERENT

16    TECHNOLOGY, AND DR. STORER ADMITTED ON CROSS-EXAMINATION THAT

17    HE DOESN'T HAVE EXPERIENCE DESIGNING DIGITAL CAMERAS.

18        THE ONLY REAL DIGITAL CAMERA EXPERT THAT YOU HEARD IN THIS

19    CASE WAS SAMSUNG'S MR. PARULSKI.

20        AND MR. PARULSKI WALKED THROUGH, AGAIN, THE EVIDENCE,

21    APPLE INTERNAL DOCUMENTS THAT CONFIRMED EACH PART OF THE CLAIM

22    IS IN THE ACCUSED PRODUCTS.  YOU'LL HAVE PLAINTIFF'S EXHIBIT

23    255 AND 351 TO LOOK AT IN THE JURY ROOM, AND HE WALKED THROUGH

24    EACH LIMITATION THAT WE SEE HERE, AND ALSO ON THE NEXT SLIDE,

25    PLEASE, KEN.
```

1           AND HE SHOWED YOU THAT THIS PATENT IS ALL ABOUT SEARCHING

2      FOR PHOTOGRAPHS AND VIDEOS, AND HE SHOWED YOU THAT WHEN YOU

3      HAVE A PHONE, THE APPLE CAMERA ROLL, AND YOU LOOK AT THE CAMERA

4      ROLL, YOU CAN SEARCH THROUGH A LIST OF PHOTOGRAPHS TO FIND THE

5      PHOTO OR THE VIDEO THAT YOU'RE LOOKING FOR.

6           AND HE THEN EXPLAINED HOW THE SOURCE CODE IN THE APPLE

7      CONFIDENTIAL DOCUMENTS CONFIRM HIS UNDERSTANDING, AND HE WALKED

8      THROUGH A LOT OF LIMITATIONS AND FOUND THAT EACH OF THEM WERE

9      PRESENT IN THE IPHONE AND THE IPOD.

10          NOW, LET'S TALK A LITTLE BIT ABOUT DAMAGES.

11          AGAIN, IN THIS CASE WHERE THE PARTIES DISAGREED ON ALMOST

12     EVERYTHING, APPLE DIDN'T BRING A SINGLE WITNESS TO CHALLENGE

13     SAMSUNG'S DAMAGES CASE.  YOU HEARD FROM DR. KEARL, A PROFESSOR

14     OF ECONOMICS WHO HAS WRITTEN BOOKS, TEXTBOOKS ON ECONOMICS,

15     HE'S CALCULATED PATENT DAMAGES IN A LOT OF CASES, AND HE EVEN

16     WAS RETAINED BY THE COURT TO SERVE AS A NEUTRAL EXPERT FOR THE

17     COURT IN ANOTHER CASE.

18          AND YOU HEARD FROM DR. RAO, A SURVEY EXPERT WHO HAS

19     EXTENSIVE EXPERIENCE DESIGNING AND CONDUCTING SURVEYS.

20          NOW, DR. KEARL DID A SIMPLE, STRAIGHTFORWARD ANALYSIS, AND

21     HE USED THE STRAIGHTFORWARD SURVEY THAT DR. RAO HAD DONE TO

22     MEASURE THE RELATIVE VALUE OF THE PATENTED FEATURES IN THE '239

23     AND THE '449 PATENT, AND HE USED REAL WORLD EVIDENCE.

24          HE USED A REAL WORLD PRICE OF $.99 FOR FACETIME, WHICH IS

25     THE PRICE THAT APPLE USERS PAID TO DOWNLOAD THE FACETIME APP

1    ONTO ITS DESKTOP.

2         AND THAT'S WHAT ECONOMISTS DO, THEY USE REAL WORLD

3    EVIDENCE AND REAL WORLD MARKET PRICES.  THAT'S EXACTLY WHAT

4    DR. KEARL DID HERE.

5         AND FOR THE '239 PATENT, HE CALCULATED THAT THE DAMAGES

6    ARE A LITTLE OVER 6 MILLION FOR ALL THREE OF THE IMPORTANT

7    FEATURES OF FACETIME, BEING ABLE TO SEND E-MAIL, AN E-MAIL WITH

8    A VIDEO OR BEING ABLE TO TEXT MESSAGE A VIDEO.

9         AND HIS DAMAGES CALCULATIONS ON BOTH PATENTS CAN BE FOUND

10   IN DEFENDANT'S EXHIBIT 391A, AND YOU'LL HAVE THAT IN THE JURY

11   ROOM ALSO TO REFER TO.  THAT EXHIBIT IS IN EVIDENCE.

12        NOW, AGAIN, YOU DIDN'T HEAR FROM DR. VELLTURO OR ANYBODY

13   ELSE THAT DR. KEARL'S NUMBERS WERE WRONG.  NOT A SINGLE WITNESS

14   CHALLENGED HIS CALCULATIONS OR HIS METHODOLOGY, AND NOT A

15   SINGLE WITNESS CHALLENGED DR. RAO'S SURVEY, EITHER.

16        NOW, FOR THE '449 PATENT, THE NUMBER IS CONSIDERABLY

17   LOWER.  IT'S $158,000, AND DR. KEARL TESTIFIED THAT'S BECAUSE

18   OF TWO REASONS.  THE FIRST IS THE VIDEO ALBUM PATENT IS NOT AS

19   VALUABLE AS THE FACETIME AND E-MAILING VIDEOS FEATURE THAT'S

20   COVERED BY THE '239.

21        AND SECOND, FOR THE '449 PATENT, THERE'S A NON-INFRINGING

22   ALTERNATIVE, A WAY TO DESIGN AROUND THE PATENT, AND IF A PATENT

23   IS EASY TO DESIGN AROUND, IT LOWERS THE VALUE OF THE PATENT.

24   THAT MAKES SENSE.

25        SO DR. KEARL USED REAL WORLD EVIDENCE, AND HE ALSO USED

1    THE FACT THAT -- REMEMBER, THE INVENTOR CAME AND TESTIFIED THAT

2    HE HAD SEVERAL PATENT TECHNOLOGY COMPANIES THAT WERE INTERESTED

3    IN BUYING HIS VIDEO TRANSMISSION PATENT.  SAMSUNG PAID

4    $2.3 MILLION FOR TWO PATENTS, AND HE USED THAT AS A CHECK, AS A

5    REALITY CHECK TO CHECK HIS NUMBER AND HIS METHODOLOGY.

6         AND HE ALSO USED THE FACT THAT HITACHI AND SAMSUNG HAD

7    ENTERED INTO AN AGREEMENT WHERE SAMSUNG PURCHASED THE '449

8    PATENT AS PART OF A BUNDLE OF PATENT RIGHTS.  THEY PURCHASED

9    ABOUT 106 PATENTS AND PATENT APPLICATIONS FOR $35 MILLION, AND

10   HE USED THAT AS ANOTHER REALITY CHECK.

11        I'LL EXPECT THAT APPLE'S COUNSEL, IN CLOSING, WILL SAY --

12   TRY AND MAKE AN ISSUE OUT OF THE FACT THAT SAMSUNG PURCHASED

13   BOTH OF THESE PATENTS.  THERE'S NOTHING WRONG WITH PURCHASING

14   PATENTS.  COMPANIES BUY AND SELL PATENTS ALL THE TIME.

15        AND YOU WON'T HEAR APPLE SAY THAT PURCHASING A PATENT IS A

16   DEFENSE TO INFRINGEMENT.  IT ISN'T.

17        AND THE SAME IS TRUE WITH THE '239 PATENT BEING EXPIRED.

18   THE FACT THAT IT'S NOW EXPIRED DOESN'T RELIEVE APPLE OF THE

19   FACT THAT IT'S STILL LIABLE FOR INFRINGEMENT WHILE THAT PATENT

20   WAS ACTIVE.

21        SO WITH THAT, I GO BACK TO THE FACT THAT THE REAL WORLD

22   PURCHASE PRICES THAT DR. KEARL RELIES ON SERVE AS A REALITY

23   CHECK, AND THEY CONFIRM WHAT YOUR COMMON SENSE ALREADY TELLS

24   YOU, THE $6 MILLION NUMBER FOR THE '239 PATENT AND THE $158,000

25   NUMBER FOR THE '449 PATENT MAKES SENSE.  THEY'RE REAL WORLD

```
1       NUMBERS THAT APPLE DOES NOT DISPUTE.

2            THANK YOU.

3            I'LL TURN IT OVER TO MR. QUINN.

4                MR. QUINN:  THANK YOU.

5            LADIES AND GENTLEMEN, I HAVE VERY LITTLE TIME TO TALK

6        ABOUT DAMAGES, SO I'M GOING TO HAVE TO RELY ON YOU FOLKS TO

7        REMEMBER A LOT OF THE DETAILS BECAUSE THIS IS GOING TO BE

8        PAINFULLY QUICK.  I APOLOGIZE FOR THAT.

9            BUT I WILL BE TALKING ABOUT APPLE'S DAMAGES CLAIM, AND NOT

10       BECAUSE -- JUST TO BE CLEAR, I THINK IT IS CLEAR, WE DON'T

11       THINK WE OWE APPLE A NICKEL.  BUT WE'RE REQUIRED TO ADDRESS ALL

12       THE ISSUES, INCLUDING DAMAGES, AND IN THIS CASE IN PARTICULAR,

13       I THINK IT'S KIND OF REVEALING TO LOOK AT APPLE'S DAMAGES CASE

14       FOR THE LIGHT IT SHEDS ON ALL OF ITS CASE AND THE CREDIBILITY

15       OF ITS CASE.

16           YOU'LL RECALL THERE ARE THREE BUCKETS OF DAMAGES THAT THEY

17       SEEK, THE DIMINISHED DEMAND LOST PROFITS, THE OFF THE MARKET

18       LOST PROFITS, AND THEN THE REASONABLE ROYALTY.

19           I'M GOING TO DISCUSS THOSE IN ORDER, AND I'M GOING TO

20       BEGIN WITH THE DIMINISHED DEMAND LOST PROFITS.

21           YOU'LL RECALL THESE ARE -- THE THEORY OF THIS IS THAT IF

22       WE DIDN'T HAVE THESE FIVE FEATURES IN OUR PHONES, WE WOULD SELL

23       FEWER PHONES AND APPLE WOULD CAPTURE A NUMBER OF THOSE PHONES

24       EQUAL TO ITS MARKET SHARE.  THAT'S THE THEORY, ABOUT 40

25       PERCENT.
```

1          AND LADIES AND GENTLEMEN, THAT IS ALL HAUSER.  THAT IS

2     HAUSER.  THAT IS -- HE'S CENTRAL TO THAT THEORY.  THEY DON'T

3     RELY ON HIM JUST TO SAY, AS MR. MCELHINNY SUGGESTED, THAT THIS

4     SHOWS, THIS SURVEY SHOWS THERE IS DEMAND FOR THESE FEATURES.

5          THE ONLY QUANTITATIVE BASIS THAT DR. VELLTURO HAD FOR HIS

6     DIMINISHED DEMAND NUMBERS WAS HAUSER.  THAT'S ALL HE'S GOT.

7          HE'S ALSO THE BASIS FOR THE WILLINGNESS TO PAY AND THE,

8     YOU KNOW, WILLINGNESS TO BUY NUMBERS AND REASONABLE ROYALTY,

9     AND I'LL GET TO THAT, THAT'S ALSO BASED ON HAUSER.

10         BUT IF VELLTURO DOESN'T HAVE HAUSER, HE DOESN'T HAVE ANY

11    BASIS FOR THESE DIMINISHED DEMAND NUMBERS, SO IT'S IMPORTANT TO

12    BEGIN WITH HIM.

13         AND I JUST WANT TO SAY AT THE BEGINNING, WE DON'T HATE

14    PROFESSOR HAUSER.  WE DON'T HATE HIM.

15         HIS SURVEY, THOUGH, WAS USELESS TO ACCOMPLISH THE PURPOSE

16    THAT HE OFFERED IT FOR.  IT HAS A NUMBER OF FLAWS.  I ONLY HAVE

17    TIME TO DISCUSS A FEW.

18         IN THAT SURVEY, HE PRETENDS LIKE HE'S MEASURING THE

19    DIFFERENCE BETWEEN THE PATENT AND THE ALTERNATIVE, AND YOU SAW

20    THAT.  YOU SAW HOW HE OVERSTATES THE BREADTH OF THE PATENT AND

21    UNDERSTATES WHAT THE ALTERNATIVES ARE.

22         AND REMEMBER, THOSE DESCRIPTIONS IN THE SURVEY CAME FROM

23    THE LAWYERS.

24         IF WE CAN LOOK AT SLIDE 45, I SHOWED YOU THIS IN THE

25    OPENING STATEMENT.  AUTOMATIC WORD CORRECTION, THIS IS THE ONLY

 1    WAY YOU CAN GET AUTOMATIC WORD CORRECTION.  IF YOU DON'T HAVE

 2    OUR FEATURE, YOU KNOW, YOU'VE GOT TO GO DOWN TO THE SECOND AREA

 3    AND SELECT A DIFFERENT SPELLING OR A DIFFERENT WORD.

 4         YOU KNOW THAT'S SIMPLY NOT TRUE.

 5         SLIDE 47.  THE DART PHONE, WE'VE HAD IT SINCE JUNE 15TH,

 6    2011.  FROM, YOU KNOW, WELL BEFORE THEIR PATENT ISSUED.  WE HAD

 7    THAT.  THAT WAS AUTOMATIC WORD CORRECTION.  I SHOWED IT TO YOU

 8    IN OPENING STATEMENT.

 9         THAT WAS NEVER DISPUTED.

10         WHAT IS APPLE'S RESPONSE TO THAT?  SLIDE 48.  THEY SAY,

11    WELL, THEY FOUND THIS DOCUMENT WHERE SOME UNNAMED PERSON SAYS

12    SOMEONE ELSE SAID THE DART KEYBOARD WAS, QUOTE-UNQUOTE, A

13    SOMEWHAT JARRING EXPERIENCE, SO SOMEHOW THAT'S NOT A SUITABLE

14    ALTERNATIVE.

15         TAKE A LOOK AT THE DATE OF THAT DOCUMENT.  IT'S PX 168,

16    SLIDE 49.  THAT'S DATED APRIL 2012.  THAT IS TWO MONTHS BEFORE

17    THE S III PHONE LAUNCHES, OUR ALL TIME BEST SELLER.

18         NOTWITHSTANDING THAT DOCUMENT, WE LAUNCHED THAT PHONE WITH

19    THE DART KEYBOARD, AUTOMATIC WORD CORRECTION, AND WE SOLD

20    3 MILLION PHONES WITH THAT KEYBOARD WITH NO COMPLAINTS.  NOBODY

21    BROUGHT IN ANY EVIDENCE THAT THERE WERE ANY COMPLAINTS.

22         IT WAS REPLACED WITH ANOTHER NON-INFRINGING KEYBOARD A FEW

23    MONTHS LATER, BUT THE POINT IS THIS WAS A CONTRIVED -- THIS WAS

24    A -- THIS SURVEY IS JUST AN EFFORT TO MISLEAD YOU.

25         SYNCING, IF WE LOOK AT SLIDE 44, YOU SAW WHAT PEOPLE WERE

```
 1         TOLD.  IF YOU DON'T HAVE THIS FEATURE, YOU HAVE TO WAIT.  YOU

 2         HAVE TO WAIT.

 3              NO -- NO INFORMATION HERE ABOUT THIS IS THREE COMPONENT

 4         BACKGROUND SYNCING, THIS IS OUR PARTICULAR PATENT.  NO.  THEY

 5         JUST SAY, IF YOU DON'T HAVE THIS, YOU'RE GOING TO HAVE TO WAIT

 6         AND THE WAIT MAY BE LONG OR SHORT.

 7              YOU KNOW, APPLE DOESN'T OWN EVERYTHING.  APPLE DOESN'T OWN

 8         ALL WAYS OF SYNCING IN BACKGROUND.  THEY'VE GOT THIS CLAIM FOR

 9         THREE COMPONENT SYNCING.  THEY DON'T OWN ALL WAYS OF SYNCING.

10              THIS WAS NOT A DESCRIPTION OF THE WORLD AS IT REALLY IS TO

11         SAY, YOU KNOW, IF YOU DON'T DO WHAT WE DO, WHICH THEY DON'T

12         EVEN DESCRIBE, YOU KNOW, YOU'RE GOING TO HAVE TO WAIT.

13              WE SHOWED YOU OTHER, THE WINDOWS MOBILE, MR. NELSON SHOWED

14         YOU SLIDE 43, IT WAS ALREADY OUT THERE.

15              SO, YOU KNOW, THE DESCRIPTIONS WERE FLAWED.

16              SECOND, THE DESIGN OF THE SURVEY MADE IT ABSOLUTELY

17         WORTHLESS FOR WHAT APPLE TRIED TO DO.  YOU KNOW, YOU CAN'T --

18         CONJOINT SURVEYS HAVE THEIR USES.  YOU HEARD THAT.  IF YOU

19         WANTED TO COMPARE CUP HOLDERS AND SEE WHAT CUP HOLDERS PEOPLE

20         PREFER, OR SMALL FEATURES COMPARING THEM AGAINST EACH OTHER,

21         CONJOINT SURVEYS ARE FINE.

22              BUT YOU CAN'T ASK PEOPLE ABOUT CUP HOLDERS AND MAKE

23         CONCLUSIONS ABOUT WHAT AUTOMOBILES THEY WOULD BUY OR WHAT

24         SHIFTS IN MARKET SHARE WOULD BE.

25              DR. HAUSER'S SURVEY IS LIKE SAYING, TELL ME WHAT CUP
```

1    HOLDER YOU LIKE, WHAT GLOVE BOX LATCH YOU PREFER, WHICH AIR

2    CONDITIONING KNOBS YOU PREFER, TELL ME WHETHER YOU WANT TWO

3    DOORS OR FOUR DOORS, AND TELL ME THE COLOR OF THE CAR YOU WANT

4    AND I WILL TELL YOU WHAT CAR YOU'LL BUY.  THAT'S REALLY WHAT IT

5    COMES DOWN TO.

6        YOU CAN'T DO THAT.  FOR COMPLEX PRODUCTS, YOU HAVE TO

7    INCLUDE THE MAJOR FEATURES.

8        AND THIS MAY HAVE GONE PAST A LOT OF US BECAUSE IT

9    HAPPENED SO FAST.  ON THE STAND, DR. HAUSER ACTUALLY AGREED

10   WITH THIS.  SLIDE 42.  HE WAS ASKED THE QUESTION, "YOU DO AGREE

11   THAT FOR THE PURPOSE OF ESTIMATING DEMAND FOR A PATENTED

12   FEATURE, MAJOR PRODUCT FEATURES MUST BE INCLUDED?

13       "ANSWER:  YES."

14       BUT THAT'S EXACTLY WHAT HE DIDN'T DO.  HE LEFT OUT THE

15   MAJOR FEATURES, THE TRUE DRIVERS, BRAND, BATTERY LIFE, LG --

16   YOU KNOW, 4G LTE.  IT'S NOT A PROPER USE OF A SURVEY.

17       INSTEAD -- AND THEN THE OTHER THING HE, YOU KNOW, HE

18   EDUCATED PEOPLE.  INSTEAD OF FINDING OUT, YOU KNOW, ASKING

19   THESE SAMSUNG PHONE OWNERS, WHY DID YOU BUY YOUR PHONES AND

20   FINDING OUT WHAT THEY KNEW ABOUT THESE FEATURES, DO YOU KNOW

21   YOU'VE GOT THIS THREE COMPONENT BACKGROUND SYNC OR NOT, DO YOU

22   KNOW YOU HAVE THIS PHONETOP SEARCH WITH TWO HEURISTICS, INSTEAD

23   HE EDUCATED THEM, MADE THEM WATCH 18 VIDEOS BEFORE THEY TAKE

24   THE SURVEY.

25       THAT CREATES WHAT DR. ERDEM SAYS ARE DEMAND ARTIFACTS.  IT

```
 1      ARTIFICIALLY INFLATES THE VALUE OF THE FEATURES.  YOU'RE NOT

 2      GOING TO GET ANY USEFUL INFORMATION THAT WAY.

 3           AND HOW DOES HE KNOW?  YOU KNOW, THE WHOLE POINT OF THIS

 4      IS IT HAS NO INTEGRITY.  IT HAS NO RELIABILITY IF PEOPLE DON'T

 5      UNDERSTAND IT.

 6           WELL, DR. HAUSER SAID, I CHECKED WHETHER THEY UNDERSTOOD

 7      IT.  I ASKED THEM, DID YOU UNDERSTAND?  YES.  END OF IT.

 8           HE WAS ASKED -- MR. PRICE ASKED HIM ON THE STAND, DIDN'T

 9      YOU ASK THEM WHAT YOU UNDERSTOOD?  HE SAYS, DON'T YOU DO THAT

10      IN YOUR CLASSES AT SCHOOL?

11           HE SAID, NO, I'M A SOCRATIC TEACHER.  I DON'T GIVE TESTS

12      LIKE THAT TO ASK WHAT PEOPLE ACTUALLY LEARN.

13           DOES THIS MAKE ANY SENSE TO YOU FOLKS?  WE'RE RELYING ON

14      YOU TO COME TO THIS COURTROOM AS JURORS AND USE YOUR COMMON

15      SENSE, AND IT WAS CLEAR THAT THESE PEOPLE DID NOT UNDERSTAND

16      THESE QUESTIONS.

17           DR. REIBSTEIN, YOU'LL RECALL, DID AN EXACT PRE-TEST USING

18      THE EXACT SAME WORDS THAT DR. HAUSER USED.  SLIDE 50.  HE FOUND

19      OVERWHELMING CONFUSION, THE YESES UP THERE ARE, YEAH, IT TURNED

20      OUT PEOPLE WERE CONFUSED.

21           SLIDE 51, 25 OUT OF 26 DIDN'T UNDERSTAND QUICK LINKS.

22           22 OUT OF 26 DIDN'T UNDERSTAND BACKGROUND SYNCING.

23           18 OUT OF 26 WERE CONFUSED ABOUT AUTOMATIC WORD

24      CORRECTION.

25           REMEMBER THE VIDEOS.  UNIVERSAL SEARCH MEANT YOU COULD
```

1       HAVE WI-FI WHEREVER YOU WERE.  YOU WOULD ALWAYS BE CONNECTED.

2            TO SYNC, YOU HAVE TO HOOK UP.  WHAT IT MEANT IS, YOU KNOW,

3       IF YOU DIDN'T HAVE THEIR BACKGROUND SYNCING, YOU WOULD HAVE TO

4       HOOK UP, USE A USB CABLE TO HOOK UP TO YOUR COMPUTER.

5            YOU KNOW, IF YOU DON'T HAVE THEIR ANALYZER SERVER, YOU

6       HAVE TO WRITE DOWN AND MEMORIZE PHONE NUMBERS AND ADDRESSES.

7            YOU DON'T HAVE TO TAKE DR. REIBSTEIN'S WORD FOR IT.

8       PLEASE LOOK AT DEFENSE EXHIBIT 454A.  THERE YOU'LL HAVE THE

9       TRANSCRIPTS OF ALL THOSE INTERVIEWS AND YOU CAN DECIDE FOR

10      YOURSELVES.  DID THESE PEOPLE HAVE THE FOGGIEST IDEA OF WHAT

11      THEY WERE BEING ASKED?

12           ONE OF MY FAVORITES, SLIDE 54, HOW WAS THE ALTERNATIVE?

13      YOU KNOW, IF YOU'RE NOT GOING TO USE THE CLAIMED PATENTED

14      FEATURE, HOW WAS THAT PRESENTED TO PEOPLE IN THESE SURVEYS?  AN

15      EMPTY BOX.  AN EMPTY SQUARE.

16           HOW CAN YOU MINIMIZE IT MORE THAN BY JUST PUTTING UP AN

17      EMPTY BOX AND AN EMPTY SQUARE?

18           THIS WAS COMPLETELY CONTRIVED.  THIS WAS A SHAM SURVEY

19      DONE BY A MAN WHO MAY HAVE -- HE'S AT M.I.T., HAS A PH.D., HE

20      DID THIS FOR MONEY, APPLE PAID HIM, AND HE CAME IN AND

21      PRESENTED YOU WITH A SHAM.  I'M JUST -- THAT'S THE WAY IT IS,

22      FOLKS.

23           HOW DO WE KNOW THAT?  TAKE A LOOK AT THIS SLIDE 55.  LOOK

24      AT HIS CONCLUSIONS.  FOR A PHONE THAT COSTS $149, HE CONCLUDED

25      PEOPLE WOULD PAY, JUST FOR EXAMPLE, $102 MORE TO HAVE THEIR

1      PARTICULAR VERSION OF AUTOMATIC WORD CORRECTION OR SUGGESTION

2      WHICH THEY DON'T EVEN USE.  OKAY?

3           IT'S ABSURD.  YOU KNOW THIS IS RIDICULOUS.

4           REMEMBER WHEN MR. PRICE ASKED HIM, YOU KNOW, ISN'T THIS

5      KIND OF ABSURD TO THINK THAT PEOPLE WOULD SPEND THAT MUCH MORE?

6           AND THEN DR. HAUSER WENT KIND OF THE USED CAR SALESMAN'S

7      TRICK, WELL, IT'S ONLY FOUR BUCKS MORE A MONTH.  BUT THE PHONE

8      ITSELF IS SIX BUCKS MORE A MONTH.

9           I MEAN, WHAT KIND OF CREDIBILITY -- THIS HAS ABSOLUTELY NO

10     CREDIBILITY.

11          OTHER IRRATIONAL RESULTS, YOU KNOW, UNCONTRADICTED

12     TESTIMONY, 68 PERCENT OF THE RESPONDENTS, IF YOU LOOK AT THE

13     DATA, ACTUALLY PREFERRED HIGHER PRICES FOR PHONES WITH THE SAME

14     FEATURES.

15          IT DID A TERRIBLE JOB -- SLIDE 56 -- IF YOU USED HIS DATA

16     OF ACTUALLY PREDICTING WHAT WOULD HAPPEN IN THE REAL

17     MARKETPLACE.  HE PREDICTS WITH HIS DATA, GOING THROUGH ALL THE

18     CHOICE SETS, RUNNING IT THROUGH THE SAWTOOTH SOFTWARE PROGRAM,

19     THAT THE NOTE 2 WOULD OUTSELL THE GS III.  IN REAL LIFE, THE

20     GS III OUTSOLD THE NOTE 2 MANY, MANY TIMES MORE.

21          APPLE WANTS YOU TO RELY ON THIS SURVEY.  IT IS CENTRAL

22     THAT THEIR DAMAGES CASE, BOTH REASONABLE ROYALTY AND DIMINISHED

23     DEMAND.  IT'S CENTRAL TO THEIR CASE.  THEY SAY, YOU KNOW,

24     SAMSUNG DIDN'T HAVE -- HAUSER SHOWS THAT IF SAMSUNG DIDN'T HAVE

25     THESE THINGS, YOU'D HAVE 20 TO 45 PERCENT DECLINE IN SALES.

 1          TRUST YOUR INSTINCTS.  TRUST YOUR COMMON SENSE.  THIS

 2    SURVEY IS WORTHLESS.

 3          NOW WE TURN TO DR. VELLTURO.  WHAT DOES HE DO?  HE TAKES

 4    THOSE RESULTS -- HAUSER'S OUTPUT IS EXPRESSED AS A PERCENTAGE

 5    DECLINE IN SALES.  HAUSER TAKES THAT, LOOKS AT APPLE'S -- AT

 6    SAMSUNG'S SALES NUMBERS, YOU KNOW, FIGURES OUT HOW MANY UNITS

 7    THERE ARE, YOU KNOW, DECREASED NUMBER OF UNITS, APPLIES APPLE'S

 8    MARKET SHARE AND CONVERTS THAT TO A LOST PROFITS NUMBER.

 9          IT'S ALL BASED ON HAUSER.  SLIDE 1.  DR. VELLTURO

10    ACKNOWLEDGED THAT.

11          FOLKS, IN THE REAL WORLD, IF THESE FEATURES DRIVE 20 TO 45

12    PERCENT OF THE SALES, WHICH IS WHAT HAUSER CONCLUDES, WHY DON'T

13    THEY SHOW UP ANYWHERE IN THE REAL WORLD?  YOU SAW A LOT OF

14    EVIDENCE -- SLIDE 2 -- PRODUCED BY THESE COMPANIES, BOTH OF

15    THEM, BEFORE THERE EVER WAS A LAWSUIT, THEY LOOKED AT WHY DO

16    PEOPLE BUY PHONES?  WHAT DO THEY RELY ON?  WHAT MATTERS TO

17    THEM?

18          UP ON THE CHART WE'VE GOT SOME OF THOSE.  YOU'VE SEEN THE

19    BUYER SURVEYS.  YOU CAN JOT DOWN THE NUMBERS IF YOU WANT TO GO

20    BACK AND LOOK AT THEM.

21          THESE THINGS NEVER SHOWED UP.  APPLE CLAIMED FEATURES JUST

22    AREN'T FACTORS AT ALL.

23          LET ME TURN TO HIS LOST PROFITS CALCULATION.  YOU GOT SOME

24    INSTRUCTION FROM THE COURT ON THIS -- THIS IS SLIDE 63 -- AND

25    THIS IS ANOTHER REASON THE DIMINISHED DEMAND THEORY MAKES NO

1    SENSE AT ALL.

2        IT'S -- FOR LOST PROFITS, UNDER THE LAW, YOU MUST FIND

3    THAT BUT FOR, BUT FOR THE INFRINGEMENT, APPLE WOULD HAVE MADE

4    SALES THAT IT OTHERWISE DID NOT HAVE.  THAT'S WHAT THE LAW

5    REQUIRES, BUT FOR ACTUAL CAUSATION.

6        AS DR. CHEVALIER'S ANALYSIS SHOWED -- THIS IS SLIDE 4 --

7    THERE'S ABSOLUTELY NO CORRELATION BETWEEN SAMSUNG -- THE

8    PROFITABILITY OF SAMSUNG PHONES AND THE USE OF THEIR CLAIMED

9    TECHNOLOGY.  OUR MOST PROFITABLE PHONES ARE THE ONES THAT ARE

10   CHARGED AS BEING LEAST INFRINGING, THE NOTE 2 AND THE

11   GALAXY S III.

12       IF YOU THINK ABOUT IT FOR A MOMENT, THE IDEA THAT APPLE

13   LOST SALES BECAUSE SAMSUNG ALLEGEDLY HAD THESE FEATURES IS,

14   FRANKLY, NONSENSICAL.  IMAGINE, FOR EXAMPLE, A CUSTOMER GOING

15   INTO A STORE, GEE, WHAT DO I WANT TO BUY?  I WANT TO BUY A

16   PHONE THAT HAS A, YOU KNOW, THREE COMPONENT BACKGROUND SYNCING,

17   I WANT TO MAKE SURE I'VE GOT THAT, AND I WANT AN ANALYZER

18   SERVER, I DON'T WANT SHARED LIBRARIES, I WANT TO MAKE SURE I

19   CAN SEARCH ON THE INTERNET AND ON THE PHONE, I WANT THE TWO

20   HEURISTICS.  THESE ARE MORE IMPORTANT TO ME THAN BIG SCREEN OR

21   BATTERY LIFE OR THE REST OF IT.

22       AND BY THE WAY, I THINK DR. ERDEM IS RIGHT.  ONLY A TECHNO

23   GEEK WOULD BE GOING AND LOOKING FOR, YOU KNOW, THESE KINDS OF

24   DETAILED IMPLEMENTATIONS.

25       LET'S GET REAL.  NOBODY EVER BOUGHT A PHONE TO GET THESE

1    THINGS.  EVEN, YOU KNOW, SLIDE TO UNLOCK.  I DARE SAY, NOBODY

2    EVER BOUGHT A PHONE BECAUSE THEY WANTED TO GET SLIDE TO UNLOCK.

3         SAMSUNG WOULDN'T BE LOSING SALES IF IT USED CIRCLE UNLOCK,

4    IF IT USED RIPPLE WHICH, YOU KNOW, ITS BEST SELLING GS III

5    PHONE USES.

6         AND BY THE WAY, THEY TRIED TO SUGGEST, WELL, YOU HAVE TO

7    HAVE OUR FORM OF SLIDE TO UNLOCK, IT'S BETTER THAN ALL THE

8    ALTERNATIVES BECAUSE OTHERWISE, YOU KNOW, ACCIDENTAL UNLOCKING

9    IS, YOU KNOW, IT'S, IT'S MORE PROBABLE THAT IT MIGHT HAPPEN.

10        THEY COULDN'T IDENTIFY A SINGLE, NOT ONE, IN THIS WHOLE

11   TRIAL, YOU WERE HERE FOUR WEEKS, CUSTOMER COMPLAINT ABOUT ANY

12   OF SAMSUNG'S OTHER FEATURES, WAYS OF UNLOCKING OF BEING MORE

13   PRONE TO UNLOCK.  THERE'S SIMPLY NO EVIDENCE OF THAT.

14        THE IDEA THAT SOME HYPOTHETICAL, YOU KNOW, TECHNO GEEK

15   WOULD BUY AN APPLE PHONE IF SAMSUNG DIDN'T HAVE THESE FEATURES,

16   NOW, I'M GOING TO SWITCH TO APPLE BECAUSE SAMSUNG NO LONGER HAS

17   THESE FEATURES, MAKES NO SENSE.

18        WHY?  BECAUSE APPLE DOESN'T HAVE THEM EITHER.  YOU NOW

19   KNOW THAT.  THAT'S THE THEORY THEY'RE TRYING TO SELL.  WE LOST

20   PROFITS BECAUSE SAMSUNG HAS THESE FEATURES, YOU TAKE AWAY THE

21   FEATURES FROM SAMSUNG, THEY'LL BUY OUR PHONES WHEN WE DON'T

22   HAVE THEM EITHER.

23        AT THE TIME OF OPENING STATEMENT, I SAID THREE OUT OF

24   FIVE.  THAT WAS AGREED.

25        THE ANALYZER SERVER, AS MR. NELSON SAID, THEY PUT ON NO

```
 1    EVIDENCE, NONE, THAT THEY PRACTICED THAT ANALYZER SERVER

 2    PATENT.

 3         YOU KNOW THIS WAS AN IMPORTANT ISSUE.  YOU KNOW IF THEY

 4    PRACTICED IT, THEY WOULD HAVE PUT THAT EVIDENCE IN.

 5         AND I'LL LEAVE IT TO YOU TO LOOK AT THE IOS 7, YOU KNOW,

 6    THE NEW UNLOCK SCREEN WHICH, BY THE WAY, LOOKS A LOT LIKE THE

 7    SAMSUNG GLASS UNLOCK, WHICH HAD COME OUT BEFORE.  I'LL LEAVE IT

 8    TO YOU TO TAKE A LOOK AT THAT -- THAT'S DEFENSE EXHIBIT 345 --

 9    AND YOU DECIDE FOR YOURSELF IF APPLE IS STILL PRACTICING SLIDE

10    TO UNLOCK.

11         NO LOST PROFITS, NO LOST SALES, NO EVIDENCE THAT ANYONE

12    EVER FAILED TO BUY AN IPHONE BECAUSE SAMSUNG HAD THESE

13    FEATURES.

14         SECOND BUCKET OF DAMAGES, OFF THE MARKET.

15         THE THEORY HERE IS, YOU KNOW, BASED ON HOW LONG SAMSUNG --

16    IF SAMSUNG HAD TO DO A DESIGN AROUND, IF WE ACTUALLY DID

17    INFRINGE, WE'RE USING THEIR TECHNOLOGY, WE INFRINGE, WE HAVE TO

18    DO A DESIGN AROUND, WE HAVE TO TAKE OUR PRODUCTS OFF THE MARKET

19    WHILE WE COME UP WITH AN ALTERNATIVE.

20         THEIR THEORY, THEIR THEORY IS, WHILE WE'RE OFF THE MARKET

21    FOR THAT TIME WHILE WE'RE COMING UP WITH AN ALTERNATIVE, APPLE

22    IS GOING TO SELL A LOT MORE PHONES.  THAT'S THE OFF THE MARKET

23    LOST, YOU KNOW, LOST PROFITS THEORY.

24         THIS AGAIN APPLIES ONLY TO THE THREE PATENTS.  SLIDE 5.

25    DR. VELLTURO ACKNOWLEDGED THIS.
```

1        NOW, THIS PRESENTS A REALLY IMPORTANT CREDIBILITY ISSUE

2   BECAUSE DR. VELLTURO CAME IN HERE AND HE CHOSE TO GIVE YOU

3   CALCULATIONS FOR ONLY ONE OFF THE MARKET PERIOD, FOUR MONTHS.

4   HE SAID IT'S GOING TO BE FOUR MONTHS.

5        BY THE WAY, HE'S A FINANCIAL GUY.  HOW DOES HE GET OFF

6   BEING A TECHNOLOGY GUY?  YOU KNOW, A SMARTPHONE EXPERT WHO CAN

7   SAY IT WOULD TAKE FOUR MONTHS?  THAT WAS -- THAT'S NOT WITHIN

8   THE SCOPE OF HIS EXPERTISE.

9        BUT HE CAME IN AND SAID, I'M GOING TO GIVE YOU THE NUMBERS

10  ABOUT WHAT OUR LOST PROFITS WOULD BE IF SAMSUNG WERE OFF THE

11  MARKET FOR FOUR MONTHS, NOT ONE MONTH, NOT TWO MONTHS, NOT

12  THREE MONTHS.  AND THIS IS SLIDE 6.

13       INTERESTINGLY, HE HAD DONE A REPORT BEFORE WHEN THERE WERE

14  A DIFFERENT MIX OF PRODUCTS AT ISSUE AND HE ACKNOWLEDGED IN HIS

15  REPORT BEFORE, HE HAD DONE CALCULATIONS BOTH AT FOUR MONTHS AND

16  AT ONE MONTH.

17       AND WHEN HE WAS ON THE STAND, HE ACKNOWLEDGED TO ME THAT

18  HE HAD DONE THE ONE MONTH CALCULATION BEFORE, HE KNEW HOW TO DO

19  IT, BUT HE DIDN'T COME HERE THIS TIME AND PRESENT YOU WITH THAT

20  NUMBER.  HE ONLY PRESENTED YOU WITH THE FOUR MONTH FIGURE.

21       THAT'S, YOU KNOW, CONSISTENT WITH APPLE'S APPROACH IN THIS

22  WHOLE CASE, LADIES AND GENTLEMEN, GOING FOR THE GRAND SLAM HOME

23  RUN.  HE COULD DO THE ONE MONTH, HAD DONE IT BEFORE, BUT CHOSE

24  ONLY TO PRESENT THE LONGER PERIOD WHICH TRANSLATES TO A LOT

25  MORE MONEY.

QUINN CLOSING

1        AS DR. CHEVALIER TESTIFIED -- THIS IS SLIDE 7 -- IN HIS

2   FIRST SET OF CALCULATIONS, THE DIFFERENCE BETWEEN ONE MONTH OFF

3   THE MARKET AND FOUR MONTHS OFF THE MARKET WAS HUNDREDS OF

4   MILLIONS OF DOLLARS.

5        ON CROSS-EXAMINATION, HE TOLD US -- SLIDE 8 -- HE SAID HE

6   HAD NOT DONE THE ONE MONTH CALCULATION, BUT ACKNOWLEDGED THAT

7   IT WOULD BE A VERY SMALL NUMBER.

8        I CONFRONTED HIM WITH IT.  I SAID, "IF YOU RAN THAT NUMBER

9   FOR ONLY ONE MONTH, IT'S ONLY $17.5 MILLION, ISN'T IT, SIR?"

10       AND HE SAID, "I DON'T KNOW, I CAN'T DO THE MATH SITTING

11  HERE.  IT DOES BECOME QUITE SMALL.

12       "YOU HAVEN'T DONE THAT CALCULATION, SIR?

13       "NO.  I KNOW IT'S A SMALL NUMBER."

14       HE WASN'T TELLING THE TRUTH.  HE WASN'T TELLING THE TRUTH.

15  HE HAD DONE THAT CALCULATION.

16       REMEMBER, THIS IS A GUY THEY'VE HIRED 15 TIMES NOW.  THIS

17  CASE ALONE THEY PAID HIM $2.3 MILLION.  HE WASN'T GOING TO COME

18  IN HERE AND PRESENT A $17.5 MILLION NUMBER.  HE WASN'T GOING TO

19  DO THAT ARITHMETIC THAT HE HAD DONE BEFORE, COULD DO AGAIN TO

20  SHOW WHAT ONE MONTH OFF THE MARKET DAMAGES WOULD BE.

21       WE KNOW THAT FOR TWO OF THE PATENTS, THAT NUMBER IS ZERO.

22  THIS WAS UNCONTRADICTED TESTIMONY OF DR. CHEVALIER.

23       AND I THINK THIS IS PART OF THE REASON WHY DR. VELLTURO

24  DIDN'T COME BACK AND TAKE THE STAND.  I'LL TALK ABOUT IT MORE.

25  HE WAS HERE.  HE DIDN'T COME BACK AND EXPLAIN BECAUSE HE DIDN'T

1        WANT TO BE ASKED THAT QUESTION, WHAT IS THE ONE MONTH?

2            AND WE WOULDN'T NEED FOUR MONTHS.  YOU KNOW, WE'RE TALKING

3        ABOUT SAMSUNG, ONE OF THE, YOU KNOW, GREATEST, LARGEST, MOST

4        IMPORTANT TECHNOLOGY COMPANIES IN THE WORLD.  THEY COULD DO

5        THESE CHANGES, IF THEY HAD TO DO IT, IN ONE MONTH.  HERE'S THE

6        EVIDENCE ON THAT -- SLIDE 10 -- THE TESTIMONY OF DR. GREENBERG.

7        HE SAID THAT, YOU KNOW, THE CIRCLE UNLOCK, WE ALREADY HAD IT,

8        WE COULD SIMPLY SWAP THAT OUT.

9            SLIDE 11, THE TESTIMONY OF YOUNGMI KIM, WE ASKED HER, HOW

10       LONG DID IT TAKE YOU TO COME UP WITH THE RIPPLE DESIGN?  SHE

11       SAID ABOUT 280 HOURS.

12           SLIDE 12, HOW ABOUT THE CIRCLE UNLOCK, HOW LONG DID IT

13       TAKE YOU TO COME UP WITH THAT?  SHE SAID, WELL, IT TOOK ABOUT A

14       MONTH TO DO THAT.

15           YOU KNOW, WORD SUGGESTION -- THIS IS PROFESSOR WIGDOR --

16       WE ALREADY HAD THE DART KEYBOARD.  IT WAS ALSO RELEASED WITH

17       THE GALAXY S III.  WE HAD ORIGINALLY RELEASED IT ON -- WITH THE

18       DART PHONE IN JUNE OF 2011.  HUGELY SUCCESSFUL.

19           WE HAD THOSE ALTERNATIVES.  THEY'RE IN THE CAN.  IT WOULD

20       HAVE BEEN NO CHALLENGE JUST TO SIMPLY SWAP THOSE OUT.

21           FOUR MONTHS TO DO THAT?  GIVE ME A BREAK.  NO EVIDENCE WAS

22       PRESENTED TO YOU.

23           SLIDE 14.  THE OTHER -- YOU KNOW, THE ANALYZER SERVER

24       PATENT, SOMETIMES CALLED LINKS TO STRUCTURES, YOU HEARD THE

25       TESTIMONY FROM DIANNE HACKBORN.  YOU KNOW, YOU ONLY HAVE TO

```
 1    CHANGE ONE THING AND YOU NO LONGER INFRINGE.  YOU REMEMBER

 2    THAT.  IT HAS TO PRACTICE EVERY SINGLE LIMITATION OF THE

 3    PATENT.

 4          SHE SAID MAKING THE CHANGE, SHE'S TALKING ABOUT THE CHANGE

 5    IN THE MENU, IT COULD HAVE BEEN DONE IN A DAY.

 6          ONE MONTH WAS PLENTY OF TIME.

 7          SO WHAT IT APPLE'S FALLBACK POSITION ON THIS?  APPLE'S

 8    FALLBACK POSITION IS, WELL, YOU MIGHT HAVE BEEN ABLE TO DO IT,

 9    BUT THE CARRIERS WOULD OBJECT TO IT, OR THEY WOULD PUT YOU

10    THROUGH A BUREAUCRATIC PROCESS.  YOU WOULDN'T BE ABLE TO GET

11    THE CARRIER APPROVAL IN TIME.

12          THAT MAKE NO SENSE AT ALL.  YOU'VE SEEN THE TESTIMONY

13    ABOUT HOW THE CARRIERS ARE FRUSTRATED WITH APPLE.  THEY'RE

14    CAPPING THEM.  THEY'RE MORE EXPENSIVE BECAUSE THEY -- YOU KNOW,

15    THEY HAVE THE SUBSIDIES THAT THEY HAVE TO PAY.

16          WHY ON EARTH WOULD THE CARRIERS GET IN THE WAY AND BE AN

17    OBSTACLE TO OUR, YOU KNOW, IMPLEMENTING THESE CHANGES?

18          YOU HEARD THE TESTIMONY FROM MR. DICARLO -- SLIDE 15 -- HE

19    SAID WE CAN GET APPROVAL FROM CARRIERS LIKE, IN A MATTER OF

20    DAYS.

21          I DON'T HAVE TIME TO TALK ABOUT THE CAPACITY ISSUE.  THEY

22    HAVE TO PROVE THAT THEY WOULD HAVE THE CAPACITY -- THIS IS

23    SLIDE 57 -- THAT THEY WOULD HAVE THE MARKETING AND

24    MANUFACTURING CAPACITY.

25          YOU HEARD THE TESTIMONY OF MR. SEXTON -- SLIDE 16 AND
```

```
1    17 -- HOW APPLE WAS CONSISTENTLY CAPACITY LIMITED IN BEING ABLE

2    TO MAKE THE IPHONE.

3         THE IDEA THAT IN ONE MONTH, OR EVEN FOUR MONTHS, THEY

4    COULD HAVE CRANKED UP THE LINE AND BEEN ABLE TO MAKE MILLIONS

5    MORE PHONES MAKES NO SENSE AT ALL.

6         THIRD, THE REASONABLE ROYALTY, THIS IS THE HYPOTHETICAL

7    NEGOTIATION.  YOU KNOW, THIS IS, YOU KNOW -- SLIDE 18 -- THE

8    EDGE -- DR. VELLTURO'S SO-CALLED EDGEWORTH BOX.

9         AND I JUST LOVE THIS LITTLE STORY.  HE COMES -- BASED ON

10   HAUSER, HE COMES UP WITH THESE NUMBERS HERE AND HE SAYS THE

11   PARTIES ARE GOING TO BE FAR APART IN THIS NEGOTIATION.  THERE'S

12   NOT GOING TO BE A WAY -- YOU KNOW, THEY'RE GOING TO BE AT AN

13   IMPASSE.  THE NUMBERS ARE FAR APART.

14        SO WHAT WOULD HAPPEN?  WHAT WOULD HAPPEN DID HE SAY?

15   TOTAL CAPITULATION BY SAMSUNG.  SAMSUNG WOULD SAY, OKAY, APPLE,

16   WE'LL PAY YOUR NUMBER.  YOU KNOW, FORGET IT.  WE'LL PAY WHAT

17   YOU ASKED.

18        YOU KNOW, I THINK IF THERE'S ONE THING YOU KNOW ABOUT

19   SAMSUNG, IT'S THAT THEY'RE NOT JUST SIMPLY GOING TO CAVE AND

20   CAPITULATE.

21        BUT DR. VELLTURO HAS AN ANSWER TO THAT.  WELL, YOU KNOW,

22   SAMSUNG WOULD DO IT.  WHY?  BECAUSE THEY'D JUST RAISE THEIR

23   PRICES AND IT WOULDN'T AFFECT THEIR SALES AT ALL.

24        IF ANY COMPANY COULD SIMPLY RAISE ITS PRICES WITH NO

25   IMPACT ON ITS SALES, ANY COMPANY WOULD DO THAT AND THEY
```

1    WOULDN'T WAIT UNTIL SOME HYPOTHETICAL NEGOTIATION.  THEY'D DO

2    IT TOMORROW.  I MEAN, THIS IS JUST A FANTASY.

3         REMEMBER HOW PROFESSOR CHEVALIER CAME UP WITH A REASONABLE

4    ROYALTY USING FIVE DIFFERENT METHODS?  THIS IS SLIDE 20.  SHE

5    WENT THROUGH THEM ONE AT A TIME.

6         REMEMBER, THIS IS AN EXPERT THAT BOTH SETS OF LAWYERS AT

7    DIFFERENT TIMES HAVE RETAINED.  YOU CAN'T GET ANYBODY MORE

8    CREDIBLE THAN SOMEBODY THAT BOTH SIDES HAVE USED.

9         SHE WENT THROUGH THE BENCHMARKS, REAL WORLD BENCHMARKS.

10   THE ANALYTICAL APPROACH, YOU KNOW, TRYING TO SEE IF THERE'S

11   SOME CORRELATION BETWEEN PROFITABILITY AND THE USE OF THE

12   PATENTS, LOOKING AT THEIR OPERATING SYSTEM UPDATES, WHAT THEY

13   FILE WITH THE SEC, WHAT APPLE TELLS THE FEDERAL GOVERNMENT.

14        ITS UPDATES INCLUDING THINGS LIKE TURN-BY-TURN NAVIGATION,

15   FACETIME, FIND MY IPHONE.

16        WHAT THEY'RE WORTH, POSITIONS THAT THEY HAVE TAKEN, YOU

17   KNOW, IN OTHER CASES, LOOKING AT PRODUCT REVIEWS, THE REAL

18   WORLD PRICES FOR APPS, LOOKING AT ALL THESE THINGS.

19        AND THEN SHE LOOKED AT THE GEORGIA-PACIFIC FACTORS AND

20   SAID THAT SHOULD BE AN UPWARD ADJUSTMENT BECAUSE THEY ARE

21   COMPETITORS AND APPLE HAS A CERTAIN POLICY WITH RESPECT TO IT,

22   SO SHE ADJUSTED IT UPWARDS TO $.35, A ROYALTY OF $.35 A PHONE.

23        WHAT'S SIGNIFICANT ABOUT THIS?  SHE GAVE YOU REAL WORLD

24   DATA.  APPLE DID NOT COME IN HERE -- AND SHE ALSO SAID SHE

25   LOOKED AT 200 DIFFERENT SMARTPHONE LICENSES FOR THE PURPOSE OF

QUINN CLOSING

```
 1        DETERMINING THAT A LUMP SUM ROYALTY WOULD BE APPROPRIATE.

 2             THEY DIDN'T PRESENT YOU WITH ANY REAL WORLD DATA AT ALL.

 3        IT WAS ALL HAUSER.

 4             IF WE LOOK AT SLIDE 21 -- THIS IS CONFIDENTIAL -- YOU CAN

 5        GO BACK AND LOOK AT THIS.  THIS IS HER BREAKDOWN ASSUMING A

 6        REASONABLE ROYALTY OF -- REMEMBER, WE'RE NOT SAYING ANYTHING IS

 7        OWED TO THEM -- BUT ASSUMING A REASONABLE ROYALTY WAS OWED,

 8        THIS IS THE NUMBERS.  YOU KNOW, YOU HAVE TO LOOK AT IT BY

 9        PATENT, BY PHONE, AND SHE GIVES A GROSS NUMBER DOWN THERE ON

10        THE BOTTOM.

11             WHEW.

12             (LAUGHTER.)

13                  MR. QUINN:  WHERE IS DR. VELLTURO?  WHERE WAS

14        DR. VELLTURO?  YOU KNOW, WHEN DR. CHEVALIER TESTIFIED -- YOU

15        KNOW, HE WAS HERE MOST OF THE TRIAL, DISAPPEARED FOR A FEW

16        DAYS.  LAST MONDAY, DID YOU SEE HIM HERE?  HE WAS SITTING HERE.

17        THEY BROUGHT HIM BACK.

18             THEY COULD HAVE CALLED HIM.  HE WAS HERE TO LISTEN TO WHAT

19        SHE HAD TO SAY.  IF HE HAD ANYTHING TO SAY IN RESPONSE TO REBUT

20        IT, HE COULD HAVE GOTTEN UP AND TAKEN THE STAND.

21             HE DIDN'T TAKE THE STAND.  HE LEFT SO MANY QUESTIONS

22        UNANSWERED.

23             AND I'M ABOUT TO GET THE HOOK HERE, SO I'M JUST GOING TO

24        JUMP FORWARD.

25             THAT NUMBER, YOU KNOW, $2 BILLION, YOU KNOW, IT'S THE
```

```
 1        POWER OF SUGGESTION, YOU KNOW?

 2             HOW BIG IS A REDWOOD TREE?  IF I TELL YOU A REDWOOD TREE

 3        IS 2,000 FEET HIGH, YOU'D SAY, NO, NO, IT'S NOT 2,000 FEET

 4        HIGH.

 5             IF I ASK YOU, WELL, HOW BIG DO YOU REALLY THINK IT IS?

 6        AND YOU SAY -- WELL, IT'LL INFLUENCE YOU.  YOU'LL SAY, WELL,

 7        1500 FEET.

 8             OTHER PEOPLE, YOU DON'T GIVE THEM THAT NUMBER, YOU SAY,

 9        HOW BIG IS A REDWOOD TREE?  THEY'LL SAY, OH, MAYBE 200, 300

10        FEET.

11             IT'S THE POWER OF SUGGESTION.  THAT'S WHY THEY PUT THAT

12        NUMBER OUT THERE.  IT'S THE ONLY REASON.

13             THEY'LL BE DANCING IN THE STREETS OF CUPERTINO IF YOU GIVE

14        THEM $100 MILLION.  THEY DON'T EXPECT IT.

15             AN UNSUPPORTED NUMBER -- DON'T COMPROMISE FOLKS.

16        DR. VELLTURO, REMEMBER, WHEN HE WAS ON THE STAND, I SAID, HOW

17        IS THE JURY GOING TO COME UP WITH THIS?  HAUSER GAVE THEM ONLY

18        ONE NUMBER.  WHAT ARE THEY GOING TO DO, DO THEIR OWN SURVEY?

19             HE SAYS, WELL, THE NUMBERS WOULD HAVE BEEN TO BE ADJUSTED.

20             WELL, THAT'S AN INVITATION TO YOU TO VIOLATE YOUR OATH AS

21        JURORS AND GO OUTSIDE THE EVIDENCE, BECAUSE HE ONLY PRESENTED

22        THE ONE NUMBER FROM HAUSER ON THOSE TWO BASES.  IT'S COMPLETELY

23        UNSUPPORTED.

24             AN UNSUPPORTED BIG NUMBER DOESN'T GET SUPPORTED BY

25        DIVIDING IT IN HALF OR DIVIDING IT BY 100.  YOU STILL MUST MAKE
```

1    YOUR DECISION BASED ON THE EVIDENCE.

2        DON'T BE INFLUENCED -- THE WAY TO DEAL WITH AN OVERSTATED

3    BIG NUMBER IS NOT TO CREDIT IT, NOT TO ADJUST IT, NOT TO GIVE

4    IT ANY CREDENCE AT ALL BECAUSE IT'S NOT ENTITLED TO ANY

5    CREDENCE.

6        AND I JUST WANT TO CONCLUDE BY SAYING WHAT THIS CASE IS

7    REALLY ABOUT.  IT REALLY IS ABOUT COMPETITION.  IT'S ABOUT

8    COMPETITION WITH APPLE AND IT'S REALLY -- AND ITS ONLY

9    COMPETITOR, AND THAT'S ANDROID.

10       FOR THOSE PEOPLE WHO BELIEVE THAT APPLE HAS BEEN A GREAT

11   AMERICAN COMPANY AND ADMIRE APPLE FOR THE WONDERFUL THINGS THAT

12   IT'S DONE IN THE PAST, I THINK WHAT APPLE NEEDS TO UNDERSTAND

13   IS THAT THE ANSWER TO THAT INNOVATOR'S DILEMMA THAT STEVE JOBS

14   TALKED ABOUT IS NOT HERE IN COURTROOMS SUING PEOPLE.

15       THE ANSWER IS TO GO BACK AND COME OUT WITH SOME MORE GREAT

16   PRODUCTS, LIKE THAT WATCH WE'VE BEEN HEARING ABOUT, OR THE

17   PHONES, YOU KNOW, THE LARGE SCREEN PHONES THAT WE'VE BEEN

18   HEARING ABOUT, OR THE SET TOP BOX, THOSE KINDS OF THINGS.

19       THAT'S WHAT APPLE SHOULD GET BACK TO DOING.  THAT'S WHERE

20   THEY'LL FIND THE SOLUTIONS TO INNOVATION DILEMMA.

21       THEY WANT TO MONOPOLIZE THIS MARKET.  THEY WANT TO ATTACK

22   GOOGLE AND ANDROID BY ATTACKING THE MOST SUCCESSFUL ANDROID

23   MAKER.

24       IF THEY CAN CRIPPLE THE MOST SUCCESSFUL ANDROID MAKER,

25   THEY'LL GO A LONG WAYS TOWARD ACCOMPLISHING THEIR GOAL.

```
 1          THIS SUIT WAS A LONG SHOT.  THEY CYNICALLY THOUGHT IT WAS
 2   WORTH A CHANCE.  IT'S IN OUR BACKYARD.  AFTER ALL, THEY'RE
 3   SAMSUNG.
 4          THEY CERTAINLY WEREN'T GOING TO TAKE ON THE LOCAL COMPANY,
 5   GOOGLE, IN MOUNTAIN VIEW, AND THEY DIDN'T.
 6          THEY KNOW THEY'RE NOT ENTITLED TO A NICKEL.  DON'T FALL
 7   FOR IT.
 8          WE KNOW YOU WON'T FALL FOR IT.  WE'RE COUNTING ON YOU TO
 9   USE YOUR SENSE OF FAIRNESS AND YOUR COMMON SENSE.
10          THE PEOPLE OF SAMSUNG, MANY OF WHOM ARE HERE AND MANY OF
11   WHOM ARE IN THE OVERFLOW COURTROOM NEARBY, BELIEVE THAT SAMSUNG
12   CAN GET JUSTICE, YES, THAT SAMSUNG CAN GET JUSTICE HERE IN
13   APPLE'S BACKGROUND.
14          BASED ON THE EVIDENCE PRODUCED IN THIS TRIAL, YOU HAVE THE
15   TOOLS AND THE POWER TO MAKE SURE THAT JUSTICE IS DONE.
16          THANK YOU FOR YOUR SERVICE.  THANK YOU FOR YOUR ATTENTION.
17               THE COURT:  THE TIME IS 2:05.
18               MR. LEE:  YOUR HONOR, I THINK I HAVE 29 MINUTES.
19               THE COURT:  YOU HAVE 29 MINUTES, THAT'S CORRECT.
20               MR. LEE:  AND DO YOU WANT TO TAKE A BREAK AT THE
21   NORMAL TIME OR SHOULD WE JUST GO STRAIGHT THROUGH?  IT'S UP TO
22   YOU AND THE JURY.
23               THE COURT:  OH, WOULD YOU LIKE TO TAKE JUST A QUICK
24   BATHROOM BREAK NOW?
25               MR. LEE:  AND THEN GO STRAIGHT THROUGH?
```

1          THE COURT:  I THINK SOMEONE HAS REQUESTED THAT.

2       OKAY.  LET'S JUST TAKE A TEN MINUTE BREAK.  OKAY.  THANK

3  YOU.

4          (JURY OUT AT 2:06 P.M.)

5          THE COURT:  ALL RIGHT.  THE JURORS HAVE LEFT THE

6  COURTROOM.  LET'S TAKE OUR TEN MINUTE BREAK.  THANK YOU.

7          (RECESS FROM 2:06 P.M. UNTIL 2:16 P.M.)

8          (JURY IN AT 2:16 P.M.)

9          THE COURT:  OKAY.  WELCOME BACK.  PLEASE TAKE A SEAT.

10      ARE YOU READY, MR. LEE?

11          MR. LEE:  READY, YOUR HONOR.

12          THE COURT:  ALL RIGHT.  2:17.  GO AHEAD, PLEASE.

13          **(MR. LEE GAVE HIS REBUTTAL CLOSING ARGUMENT ON BEHALF OF**

14  **THE PLAINTIFF.)**

15          MR. LEE:  GOOD AFTERNOON, LADIES AND GENTLEMEN.  I'M

16  THE LAST PERSON THAT YOU HAVE TO LISTEN TO, THE LAST ARGUMENT

17  YOU'RE GOING TO HEAR, AND I'M GOING TO ASK YOU ONE THING AT THE

18  BEGINNING AND ONE THING AT THE END.

19          AND THE THING AT THE BEGINNING IS THIS:  YOU'VE HEARD FIVE

20  LAWYERS TALK TO YOU ABOUT SOME COMPLICATED MATERIAL, AND I HAVE

21  29 MINUTES, SO MY FIRST REQUEST IS, HANG IN THERE WITH ME.

22  I'LL GET IT DONE IN 29 MINUTES, OR LESS NOW.  BUT HANG IN THERE

23  WITH ME BECAUSE WE HAVE SOME IMPORTANT, IMPORTANT THINGS TO

24  SAY.

25          LADIES AND GENTLEMEN, THERE'S AN OLD SAYING AMONG TRIAL

```
 1    LAWYERS, AND IT GOES LIKE THIS:  IF THE FACTS ARE GOOD FOR YOU,

 2    FOCUS ON THE FACTS.  IF THE LAW IS GOOD FOR YOU, FOCUS ON THE

 3    LAW.  IF THE LAW AND THE FACTS ARE BAD FOR YOU, ATTACK.

 4    ATTACK.  ATTACK.

 5         AND THAT HAS -- THAT IS WHAT SAMSUNG HAS DONE.  IT HAS

 6    ATTACKED APPLE.  IT HAS ATTACKED ITS SCIENTISTS.  IT HAS

 7    ATTACKED ITS EXECUTIVES.  IT HAS ATTACKED ITS EXPERTS.  AND IT

 8    HAS ATTACKED ITS LAWYERS.

 9              MR. PRICE:  YOUR HONOR, I OBJECT.  THIS IS BEYOND THE

10    SCOPE.  THIS IS SUPPOSED TO BE REBUTTAL TO THE OFFENSIVE CASE.

11              THE COURT:  OVERRULED.

12              MR. LEE:  YOU'VE HEARD THE WORDS IN OPENING,

13    DISHONEST, MISLEADING.  YOU'VE HEARD THEM AGAIN TODAY.

14    MISLEADING.  DISHONEST.  SHAM.

15         WHY DOES SAMSUNG RESORT TO THOSE CHARACTERIZATIONS?

16         BECAUSE, AS MR. MCELHINNY SHOWED, AND I WILL SHOW YOU ON

17    SAMSUNG'S CLAIMS, THE FACTS AND THE LAW ARE WITH APPLE.

18         NOW, YOU'VE BEEN WITH MR. KREVANS, MR. MCELHINNY, OUR

19    COLLEAGUES AND ME FOR A MONTH NOW.  I'LL LET YOU JUDGE, I'LL

20    LET YOU JUDGE WHETHER THE ATTACKING WERE FAIR.

21         I INSTEAD WILL CONCENTRATE ON THE EVIDENCE AND THE LAW.

22         AND I'LL ADDRESS SAMSUNG'S CLAIMS, AND I'D LIKE YOU TO DO

23    ONE THING AS WE DO IT.  FOCUS ON WHAT SAMSUNG SAYS WHEN IT'S

24    THE DEFENDANT, AND COMPARE THAT TO WHAT SAMSUNG SAYS WHEN IT'S

25    THE PLAINTIFF.  BECAUSE, LADIES AND GENTLEMEN, YOU WILL FIND
```

1      THAT THEIR POSITIONS ARE IRRECONCILABLY INCONSISTENT, EXCEPT

2      FOR ONE THING, AND I'LL SHOW YOU THAT THEY'RE INCONSISTENT

3      ACROSS THE BOARD.

4           THE ONE EXCEPTION IS THIS:  IT'S SAMSUNG'S CONSTANT EFFORT

5      TO CHEAPEN THE VALUE OF THE PATENTS.

6           MR. JOHNSON GOT UP TO START HIS CLOSING ON SAMSUNG'S

7      PATENTS AND HE STARTED, HE STARTED TALKING ABOUT APPLE'S DAMAGE

8      CLAIM.

9           WELL, LADIES AND GENTLEMEN, WE DO HAVE THAT CLAIM.  IT'S

10     NOT SOMETHING WE'VE MADE UP AS MR. QUINN SUGGESTS.  WE BELIEVE

11     IN IT.  WE THINK IT'S ACCURATE.  WE STAND BY IT.

12          NOW, I BEGAN MY OPENING ON SAMSUNG'S PATENTS IN 2010,

13     AUGUST 2010, AND I'M GOING TO TAKE YOU BACK THERE NOW BECAUSE

14     YOU'VE HEARD A LITTLE BIT MORE ABOUT THAT MEETING.

15          AS YOU'VE NOW HEARD DIRECTLY, DIRECTLY FROM SAMSUNG'S

16     DIRECTOR OF LICENSING, JON WON LEE, HERE IS WHAT HAPPENED AT

17     THAT MEETING.  APPLE TOLD SAMSUNG THAT IT COPIED APPLE'S

18     PATENTS.  APPLE TOLD SAMSUNG THAT IT HAD INFRINGED APPLE'S

19     PATENTS.

20               MR. PRICE:  OBJECTION.  BEYOND THE SCOPE OF REBUTTAL.

21               MR. LEE:  IT IS NOT, YOUR HONOR.  THIS WAS THE

22      STARTING POINT FOR THE PURCHASE OF SAMSUNG'S PATENTS.

23               THE COURT:  OVERRULED.

24          GO AHEAD, PLEASE.

25               MR. LEE:  APPLE ASKED SAMSUNG TO STOP.

1          AS I SAID TO YOU IN MY OPENING, THIS WAS A CRITICAL MOMENT

2     IN TIME.  SAMSUNG COULD HAVE STOPPED.  THEY COULD HAVE

3     INVENTED, INNOVATED ON ITS OWN.  THEY COULD HAVE STOPPED

4     INFRINGING.

5          OR IT COULD HAVE CHOSEN THE ALTERNATIVE.

6          AND THIS IS WHAT THE ALTERNATIVE WAS:  AFTER APPLE ASKED

7     THEM TO STOP COPYING, AFTER APPLE ASKED THEM TO STOP

8     INFRINGING, AFTER APPLE HAD SUED, SAMSUNG DECIDED TO PURCHASE

9     SOME PATENTS AND THEN SELECTED TWO OLD PATENTS TO SUE APPLE ON.

10         AND SAMSUNG CHOSE THOSE PATENTS, AND THEY CHOSE THOSE

11    PATENTS FOR A REASON, AND I THINK THE EVIDENCE WILL MAKE CLEAR

12    TO YOU JUST WHY.

13         NOW, MR. QUINN TOLD YOU IN HIS OPENING THAT SAMSUNG HAS

14    THE SECOND MOST PATENTS RECEIVED IN THE UNITED STATES FOR A

15    GIVEN YEAR.

16         AS WE TOLD YOU IN OUR OPENING, YOU WILL NOT SEE, AND YOU

17    HAVE NOT SEEN, ONE OF THOSE PATENTS.  YOU HAVE NOT SEEN A

18    SINGLE SAMSUNG PATENT THAT WAS INVENTED BY A SAMSUNG ENGINEER.

19    YOU HAVE NOT SEEN A SINGLE SAMSUNG PATENT THAT RESULTS FROM THE

20    WORK OF SAMSUNG.

21         AND AS I TOLD YOU, THERE IS A REASON FOR THAT.  AS WE SAID

22    IN OUR OPENING, THE REASON IS APPLE HAS BEEN THE INNOVATOR, AND

23    IN THIS FIELD, THE REASON YOU'RE NOT SEEING SAMSUNG PATENTS IS

24    SAMSUNG HAS BEEN THE FAST FOLLOWER.

25         YOU DON'T HAVE TO TAKE MY WORD FOR IT.  THIS IS DX 431,

1    PAGE 5.  THIS IS WHAT SAMSUNG SAID ABOUT ITSELF, A FAST

2    FOLLOWER.

3         AND THIS IS WHAT MR. PENDLETON SAID UNDER

4    CROSS-EXAMINATION, AND IT'S IMPORTANT BECAUSE IT EXPLAINS WHY

5    YOU SEE THE TWO PATENTS THAT I'M GOING TO TALK TO YOU ABOUT

6    THIS AFTERNOON.

7         MR. PENDLETON ADMITTED JUST THIS.

8         "QUESTION:  A FAST FOLLOWER IS SOMEONE WHO LETS SOMEONE

9    ELSE INTRODUCE THE INNOVATIVE PRODUCT AND THEN QUICKLY FOLLOWS

10   WITH THEIR OWN PRODUCT; CORRECT?

11        "THAT IS CORRECT.

12        "QUESTION:  SAMSUNG HAS BEEN CALLED A FAST FOLLOWER;

13   CORRECT?

14        "ANSWER:  YES.

15        "QUESTION:  IT HAS BEEN SPECIFICALLY CALLED A FAST

16   FOLLOWER IN THE SMARTPHONE WORLD; CORRECT?

17        "CORRECT."

18        NOW, THERE'S A SECOND REASON YOU HAVEN'T SEEN A SAMSUNG

19   PATENT ASSERTED AGAINST US, AND MR. PENDLETON GAVE YOU THAT

20   ANSWER AS WELL.  HE TOLD YOU THAT SAMSUNG WOULD NOT LICENSE ONE

21   OF ITS PATENTS FOR PENNIES A UNIT.

22        SAMSUNG WAS NOT GOING TO COME BEFORE YOU WITH A PATENT

23   THAT RESULTED FROM SAMSUNG WORK, LIKE NEAR FIELD COMMUNICATION,

24   AND TELL YOU THAT IT WAS INFRINGED, BUT THAT IT WOULD LICENSE

25   IT FOR $.35 A UNIT.  IT WASN'T GOING TO SAY THAT.  IT COULDN'T

1        SAY THAT.  MR. PENDLETON TOLD YOU THAT.

2            SO WHAT DID SAMSUNG DO?  SAMSUNG WENT OUT AND PURCHASED A

3        GROUP OF PATENTS AND IT SELECTED TWO OLDER PATENTS TO PUT

4        BEFORE YOU TO CLAIM THAT THE PATENTS WERE NOT WORTH MUCH.

5            NOW, THE EVIDENCE ESTABLISHES BOTH PATENTS, BOTH PATENTS

6        PURCHASED BY SAMSUNG AND PUT BEFORE YOU WERE OLD TECHNOLOGIES.

7            THE EVIDENCE ESTABLISHED, AND I'LL GO THROUGH IT IN A

8        LITTLE BIT MORE DETAIL, THAT THE IPHONE AND THE IPOD TOUCH USE

9        DIFFERENT TECHNOLOGIES.

10           MR. GARCIA AND MR. MILLET CAME AND APPEARED BEFORE YOU.

11       THEY DESCRIBED THE ENORMOUS INVESTMENT OF TIME AND EFFORT IN

12       DEVELOPING THESE NEW TECHNOLOGIES, THE TECHNOLOGIES THAT

13       SAMSUNG NOW SAYS INFRINGES.

14           THERE IS NOT A SHRED OF EVIDENCE THAT THE PATENTS WERE

15       COPIED, THAT THE TECHNOLOGY WAS COPIED, THAT THE PRODUCTS WERE

16       COPIED.

17           AND I SHOULD SAY PARENTHETICALLY, THERE'S BEEN SOME TALK

18       ABOUT COPYING A PATENT.  AS YOU KNOW FROM THE VIDEO, A PATENT

19       APPLICATION GETS FILED, BUT IT DOESN'T ISSUE FOR SEVERAL YEARS,

20       BUT IN THE MEANTIME, THERE'S A LOT OF --

21           MR. PRICE:  OBJECTION, YOUR HONOR.  THIS IS NOT

22        OFFENSIVE CASE.

23           THE COURT:  OVERRULED.

24           MR. LEE:  THE EVIDENCE HAS REVEALED TO YOU JUST WHY

25        SAMSUNG SELECTED THESE TWO OLD PATENTS.  SAMSUNG'S TOTAL

1    DAMAGES, AS MR. JOHNSON TOLD YOU, FOR THESE TWO PATENTS IS JUST

2    OVER $6 MILLION.  6,158,000.

3         LET'S START WITH THE '449.

4         DO YOU REMEMBER MR. PARULSKI, WHO TESTIFIED AS SAMSUNG'S

5    EXPERT?  HE TOLD YOU THAT HE HAS BEEN PAID 250,000 ALONE.

6         DOES IT MAKE SENSE TO YOU THAT SOMEONE WOULD PAY $250,000

7    TO AN EXPERT, SETTING ASIDE WHAT THE LAWYERS ARE GETTING PAID,

8    TO PURSUE A $168,000 CLAIM?

9         IT MAKES SENSE ONLY IF YOU HAVE ONE PURPOSE, TO TRY TO

10   CONVINCE FOLKS, FOLKS LIKE YOU, THAT THE PATENTS AREN'T WORTH

11   MUCH.

12        YOU ALSO NOW KNOW THAT THEY HIRED FOUR EXPERTS,

13   DR. SCHONFELD, DR. RAO, MR. PARULSKI, AND DR. KEARL, WHO IN

14   TOTAL WERE PAID OVER $5 MILLION -- AGAIN, WITHOUT WHAT THE

15   LAWYERS HAVE BEEN PAID -- TO PURSUE A $6 MILLION CLAIM.

16        DOES THAT MAKE SENSE?  ONLY IN ONE CIRCUMSTANCE, IF YOU'RE

17   TRYING TO DEVALUE PATENTS, ALL PATENTS.

18        AND THIS WAS AN INTENTIONAL STRATEGY.  AS DR. KEARL

19   TESTIFIED DURING HIS QUICK TESTIMONY ON DAMAGES, HE USED A $.99

20   UPGRADE FOR FACETIME IN HIS ANALYSIS.

21        BUT ON CROSS-EXAMINATION, HE AGREED THAT THE ACTUAL VALUE

22   OF FACETIME WAS MANY, MANY TIMES HIGHER.

23        WHY WOULD YOU USE -- WHY WOULD YOU USE AN ARTIFICIALLY LOW

24   NUMBER?  ONLY ONE REASON.  THEY'RE THE PLAINTIFF.  ONLY ONE

25   REASON.  TO DEVALUE, TO CHEAPEN, TO CONVINCE YOU THAT THE

 1          PATENTS ARE NOT WORTH MUCH.

 2              BUT THIS STRATEGY OF DEVALUING PATENTS WAS NOT IN

 3      ISOLATION.  MR. PRICE TOLD YOU IN HIS OPENING TODAY THAT IT'S

 4      IMPORTANT TO LOOK AT WHAT WAS GOING ON WHEN THESE EVENTS WERE

 5      OCCURRING.  THIS IS 2011, JUNE TO SEPTEMBER, 2011, WHEN THESE

 6      PATENTS WERE PURCHASED.

 7              SO WHAT ELSE WAS SAMSUNG DOING?  LET ME SHOW YOU.

 8              YOU HAVE SEEN AND HAD IT DESCRIBED BY MR. SOHN IN PART,

 9      AND ONE OF THE EXHIBITS THAT CAME IN FROM MR. SOHN IS PX 215,

10      AND THIS IS EXACTLY IN THIS PERIOD OF TIME WHEN THESE PATENTS

11      ARE BEING PURCHASED.

12              ON OCTOBER 4, 2001 -- I'M JUST GOING TO TELL YOU WHAT'S IN

13      THE E-MAIL.  ON OCTOBER 4, 2001, MR. PENDLETON WRITES --

14              MR. PRICE:  YOUR HONOR, I OBJECT.  THIS IS WAY BEYOND

15       THE SCOPE OF REBUTTAL.

16              MR. LEE:  YOUR HONOR --

17              MR. PRICE:  AND WE KNOW WHAT ARGUMENT --

18              THE COURT:  OKAY.  EXCUSE ME.  MR. LEE IS COVERING

19      THE DEFENSIVE CASE TO SAMSUNG'S AFFIRMATIVE CASE.  THIS WAS AT

20      SAMSUNG'S REQUEST THAT WE ORDER THE CLOSINGS THIS WAY.  I WOULD

21      LIKE HIM TO CONTINUE.

22              THE OBJECTION'S OVERRULED.  2:27 IS THE TIME.

23              AND SAMSUNG'S CLOSING WAS FOUR MINUTES OVER, SO IF YOU'RE

24      GOING TO KEEP OBJECTING, I MAY GIVE THOSE FOUR MINUTES TO

25       APPLE.

```
 1            IT'S 2:27.  GO AHEAD, PLEASE.

 2            MR. LEE:  ON OCTOBER 4, 2001, MR. PENDLETON WRITES,

 3      "IT CONTINUES TO BE SAMSUNG'S POSITION TO AVOID ATTACKING APPLE

 4      DUE TO THEIR STATUS AS A LARGE CUSTOMER."  THAT'S OCTOBER 4TH,

 5      2011, RIGHT IN THE MIDDLE OF THESE PURCHASE OF PATENTS.

 6            THREE DAYS LATER, THEY CHANGE THEIR MIND.  THREE DAYS

 7      LATER, THEY SAY, "THIS IS OUR BEST OPPORTUNITY TO ATTACK."

 8            "ATTACK" IS NOT MY WORD.  IT'S THEIR WORD.

 9            SO WHAT HAS CHANGED DURING THAT TIME?  THE E-MAIL TELLS

10      YOU.  FIRST IT TELLS YOU THAT ON OCTOBER 4TH, THE IPHONE 4S WAS

11      LAUNCHED.  IT WAS ENORMOUSLY SUCCESSFUL.

12            SECOND, IT TELLS YOU EXPLICITLY THAT MR. JOBS DIED.

13            AND WHAT IS THE PLAN?  HERE IS WHAT THE E-MAIL SAYS, THREE

14      DAYS LATER, "WE'RE GOING TO ATTACK AS A VERY AGGRESSIVE

15      STRATEGY," AND THIS PURCHASE OF PATENTS, AND THE ASSERTION OF A

16      PATENT, SPENDING MILLIONS OF DOLLARS TO TRY TO CONVINCE YOU

17      THAT PATENTS DON'T HAVE MUCH VALUE ARE PART, PART OF THIS PLAN

18      TO ATTACK.

19            NOW, LET ME TURN QUICKLY TO THE PATENTS BECAUSE I THINK

20      WHEN YOU LOOK AT THE PATENTS, YOU'LL ACTUALLY BE ABLE TO SEE

21      THE INCONSISTENCY WITH THE POSITIONS.

22            IF YOU REMEMBER MR. PARULSKI AND MR. SCHONFELD, THEY

23      TESTIFIED THAT THESE TWO PATENTS ARE -- AND I HAVE IT ON THE

24      SCREEN NOW -- FUNDAMENTAL AND REVOLUTIONARY.  THAT'S WHAT THEY

25      SAID.  THESE PATENTS ARE FUNDAMENTAL AND REVOLUTIONARY.
```

1          SAMSUNG CHARACTERIZED THESE PATENTS AS FUNDAMENTAL AND

2     REVOLUTIONARY TO YOU, EVEN THOUGH ITS OWN EXPERTS HAD NEVER

3     HEARD OF THE PATENTS BEFORE THE LAWYERS HANDED THEM TO THEM,

4     EVEN THOUGH ITS OWN LAWYER -- EVEN THOUGH ITS OWN EXPERTS HAD

5     NEVER HEARD OF THE INVENTORS BEFORE THE LAWYERS HANDED THE

6     PATENTS TO THEM.

7          SAMSUNG CHARACTERIZED THESE PATENTS AS FUNDAMENTAL AND

8     REVOLUTIONARY EVEN THOUGH IT COULD NOT SHOW YOU A SINGLE MODERN

9     DAY PRODUCT, NOT A SINGLE MODERN DAY PRODUCT THAT USED THESE

10    INVENTIONS.

11         AND THEY CHARACTERIZED THEM AS FUNDAMENTAL AND

12    REVOLUTIONARY EVEN THOUGH THERE WAS ABSOLUTELY NO EVIDENCE THAT

13    ANYBODY COPIED THE PATENTS, COPIED THE PRODUCTS THAT THEY

14    INTRODUCED EARLIER, OR COPIED THE TECHNOLOGY.

15         BUT THEN THEY SAY THAT APPLE'S PATENTS ARE TRIVIAL AND

16    NARROW.

17         I'LL ASK YOU THE SAME QUESTION THAT THEY HAVE ASKED YOU.

18    DOES THAT MAKE SENSE?

19         NOW, THE '239 PATENT IS THE FIRST OF THE TWO PATENTS.  IT

20    IS, AS YOU NOW KNOW, ABOUT 20 YEARS OLD AND IT HAS EXPIRED.

21         I DON'T DISAGREE WITH MR. JOHNSON.  THAT DOESN'T MEAN THAT

22    THEY CAN'T GET DAMAGES DURING THE PERIOD THAT THE PATENT WAS IN

23    EFFECT.

24         BUT THIS IS WHERE WHAT MR. MCELHINNY SAID IS IMPORTANT.

25    IT IS SO IMPORTANT TO WATCH WHAT PEOPLE DID RATHER THAN WHAT

1        THEY SAY TODAY THEY COULD HAVE DONE.

2            WHAT HAPPENED IN THE 15 YEARS BEFORE THIS PATENT WAS

3        ACQUIRED BY SAMSUNG?  APPLE'S PRODUCTS WERE ON THE MARKET, THE

4        PRODUCTS ACCUSED OF INFRINGING.

5            DID VOCI, WHO OWNED THE PATENT, EVER ONCE SUGGEST, EVEN

6        THOUGH IT HAD A PATENT BROKER UP THERE TRYING TO SELL THE

7        PATENT, DID THEY ONCE SUGGEST THAT APPLE WAS INFRINGING?  NO.

8        AND THERE'S A REASON.

9            AND THE REASON IS THAT THE PATENT COVERS A VERY SPECIFIC

10       IMPLEMENTATION OF AN OLDER TECHNOLOGY THAT YOU DON'T NEED

11       TODAY.

12           YOU MAY RECALL, WHEN I WAS CROSS-EXAMINING DR. SCHONFELD,

13       I TRIED TO GET HIM TO SAY YES OR NO, WHAT WAS IN THE PATENT,

14       AND WE HAD A LITTLE BIT OF TROUBLING GETTING THERE.

15           THERE'S A REASON HE DIDN'T WANT TO ACKNOWLEDGE WHAT WAS IN

16       THE PATENT, BECAUSE THE PATENT GIVES YOU THE ANSWER.

17           THE PATENT TALKS IN TERMS OF ANALOG VIDEO, LIKE OUR OLD

18       ANALOG PHONES, OUR OLD ANALOG TV'S.  IT TALKS ABOUT VIDEO

19       CAMERAS AND VCR'S.

20           IT HAS A FIGURE 1 IN THE PATENT WHICH TELLS YOU EVERYTHING

21       YOU NEED TO KNOW AS YOU TRY TO UNDERSTAND WHAT THE PATENT

22       CLAIMS.  THAT FIGURE 1 DESCRIBES A REMOTE UNIT.

23           THE REMOTE UNIT DOESN'T RECORD, THOUGH.  THE REMOTE UNIT

24       CAPTURES VIDEO THAT HAS BEEN RECORDED ELSEWHERE, THE VIDEO

25       CAMERA HERE, AND THEN, AND ONLY THEN, DOES IT DO SOMETHING WITH

1      IT.

2          YOU SAW THE INVENTOR'S FIRSTLOOK PRODUCT FROM THE EARLY

3      1990S.

4          NOW, I'M NOT SUGGESTING THAT YOU SHOULD COMPARE THIS TO

5      APPLE'S IPHONE TO MAKE YOUR INFRINGEMENT DETERMINATION.  YOU

6      DON'T NEED TO.

7          BUT IT TELLS YOU A LOT ABOUT WHAT THE TERMS IN THE PATENT

8      MEAN.  IT WAS DESIGNED IN THE EARLY 1990S, IT WAS WEIGHED 28

9      POUNDS, AND IT WAS DESIGNED TO BE USED WITH ANALOG VIDEO

10     CAMERAS.  AND IT SAYS RIGHT IN THE BROCHURE, AT PX 251, VHS,

11     BETA, 8 MILLIMETER.

12         LADIES AND GENTLEMEN, THIS IS THE ONLY PRODUCT THAT YOU

13     HAVE SEEN THAT PRACTICES THIS INVENTION.  OTHER THAN ACCUSING

14     APPLE'S PRODUCTS, SAMSUNG HAS NOT IDENTIFIED FOR YOU A SINGLE

15     OTHER PRODUCT -- AND THIS HAS BEEN OFF THE MARKET FOR 15

16     YEARS -- THAT USES THIS INVENTION.

17         DID THEY SHOW YOU A SINGLE SAMSUNG PRODUCT THAT USES THIS

18     INVENTION?  THEY CALL THIS INVENTION FUNDAMENTAL.

19         BUT THEY DIDN'T TELL YOU THAT THERE'S EVEN A SAMSUNG

20     PRODUCT THAT USES IT.  WHY?  BECAUSE TECHNOLOGY HAS MOVED

21     FORWARD.

22         AND DR. STORER EXPLAINED JUST THAT TO YOU.

23         IF WE PUT ON THE SCREEN CLAIM 15, THIS IS WHAT MR. JOHNSON

24     PUT UP THERE, BUT HE NEVER USED THE WORDS IN HIS CLOSING "VIDEO

25     CAPTURE MODULE."  THAT'S A TERM IN THE PATENT, VIDEO CAPTURE

1      MODULE.

2            AND AS HER HONOR HAS EXPLAINED TO YOU, YOU ARE TO USE THE

3      PLAIN AND ORDINARY MEANING OF THAT BACK IN 1994.

4            SO WHAT WAS THE PLAIN AND ORDINARY MEANING?  WHAT WAS A

5      VIDEO CAPTURE MODULE IN 1994?

6            THE PATENT AND THE EVIDENCE TELLS US.  IT WAS A COMPONENT

7      THAT YOU COULD GO OUT AND BUY, THAT YOU COULD SNAP ON A VIDEO

8      CARD AND INSTALL IN YOUR COMPUTER.  IT LOOKS LIKE THE ONE ON

9      THE SCREEN NOW FROM PX 248.  MR. FREEMAN USED IT.  DR. STORER

10     USED IT.  EVEN MR. GARCIA'S COLLEGE ROOMMATE USED IT.

11           REMEMBER, LADIES AND GENTLEMEN, THE WORDS IN THE

12     SPECIFICATION, THESE AREN'T RANDOM WORDS.  THESE ARE THE WORDS

13     THAT THE INVENTORS PUT DOWN IN THEIR ORIGINAL APPLICATION.

14     THIS IS WHAT THEY WROTE IN 1994.

15           AND THE PATENT DESCRIBES A VIDEO CAPTURE MODULE, JUST AS

16     DR. STORER DESCRIBED IT AND EXACTLY AS THE TYPE OF PRIOR ART

17     THAT COULD BE BOUGHT WITH A VIDEO CARD AND INSTALLED IN YOUR

18     COMPUTER.  THE PATENT TELLS YOU THAT.

19           DR. STORER TOLD YOU THAT AS WELL.

20           APPLE'S IPHONE PRODUCTS DON'T HAVE ONE.  THEY DON'T NEED

21     ONE.  WE TAKE DIGITAL VIDEO.  THE WORLD HAS MOVED FROM ANALOG

22     VIDEO TO DIGITAL VIDEO.  WE TAKE DIGITAL VIDEO AND THERE'S NO

23     NEED TO CAPTURE IT ANYWHERE ELSE.

24           THAT'S WHY, WHEN SAMSUNG CLOSED TODAY, THEY REFERRED YOU

25     TO PHRASES LIKE "CAPTURE VIDEO" DESCRIBING THE RECORDING OF IT

1          AND THEY NEVER USED THE WORDS "VIDEO CAPTURE MODULE."

2              AND THERE'S A SIMPLE REASON.  WE DON'T HAVE THAT.

3              DR. SCHONFELD AND DR. STORER BOTH LOOKED AT THE BILL OF

4      MATERIALS.  THE BILL OF MATERIALS HAS EVERY SINGLE COMPONENT OF

5      THE ACCUSED PRODUCTS RIGHT DOWN TO THE LAST SCREW -- YOU WILL

6      HAVE THEM BEFORE YOU -- LITERALLY TO THE LAST SCREW.  THERE'S

7      NO -- THERE IS NO VIDEO CAPTURE MODULE.

8              WHY?  BECAUSE WE RECORD DIGITAL VIDEO.  WE DON'T NEED TO

9      CAPTURE IT FROM SOMEWHERE ELSE.

10             IN THE SAME WAY, THERE'S MEANS FOR TRANSMISSION, AND I'LL

11     JUST SAY THIS TO GUIDE YOU IN YOUR DELIBERATIONS.  CLAIM 15 IN

12     THE SECOND PART HAS THAT MEANS OF TRANSMISSION.

13             WHEN YOU LOOK AT HER HONOR'S FINAL INSTRUCTION NUMBER 27,

14     YOU WILL SEE SHE SAYS THIS TYPE OF CLAIM, AMONG ALL THE CLAIMS

15     YOU HAVE TO CONSIDER, HAS A SPECIAL MEANING, AND THAT SPECIAL

16     MEANING IS THEY HAVE TO SHOW THAT THE SPECIFIC STRUCTURE, THE

17     SPECIFIC STRUCTURE THEY DESCRIBED 20 YEARS AGO, IS IN OUR

18     PRODUCT.  THAT'S WHAT HER HONOR'S CLAIM INTERPRETATION SAYS,

19     AND THAT'S WHAT'S REQUIRED.

20             THEY CAN'T DO IT.  THEY CAN'T DO IT BECAUSE THERE ARE NO

21     PORTS TO PLUG CABLES IN BECAUSE WE DON'T NEED THEM.  THERE ARE

22     NO MODEMS OUTSIDE OF THE TELEPHONE BECAUSE WE DON'T NEED THEM.

23             THE SPECIFIC THINGS THAT HER HONOR HAS IDENTIFIED SIMPLY

24     AREN'T IN THE APPLE PHONE BECAUSE WE DON'T NEED THEM.

25             NOW LET'S LOOK AT THE '449 PATENT, AND LET ME ADDRESS ONE

 1     THING FIRST, WHICH IS THIS ATTACK ON DR. STORER'S

 2     QUALIFICATIONS.

 3          THIS PATENT IS ABOUT DATA COMPRESSION AND DATA

 4     DECOMPRESSION.  MR. PARULSKI TOLD YOU THAT.  DR. STORER TOLD

 5     YOU THAT.

 6          AS BETWEEN THE TWO OF THEM, THE PERSON WHO HAS THE REAL

 7     EXPERIENCE IN DATA COMPRESSION AND DECOMPRESSION IS ACTUALLY

 8     DR. STORER.

 9          BUT YOU DON'T HAVE TO TAKE MY WORD FOR IT.  WHEN NASA,

10     RIGHT, THE NATIONAL AERONAUTICS SPACE AGENCY, NEEDED SOMEONE TO

11     COME IN AND CONSULT ON DATA DECOMPRESSION AND DATA COMPRESSION,

12     WHO DID THEY GO TO?  THEY WENT TO DR. STORER.

13          NOW, WHAT DR. STORER TOLD YOU IS THERE ARE FIVE SEPARATE

14     REASONS, FIVE SEPARATE REASONS THAT THE MODERN DAY FACETIME IN

15     IPHONE DOESN'T USE THE CLAIMED INVENTION.  I'M NOT GOING TO GO

16     THROUGH ALL FIVE.  INSTEAD I'M GOING TO IDENTIFY TWO FOR YOU.

17          THE FIRST IS THIS.  THERE IS A REQUIREMENT OF A LIST IN A

18     SEARCH MODE.  WHAT THE PATENT TELLS US AND WHAT MR. PARULSKI

19     ACKNOWLEDGED IS THIS:  THE INVENTION EXISTED BECAUSE IT WAS NOT

20     POSSIBLE TO DISPLAY ALL THE PHOTOS IN THE CAMERA AND SIMPLY

21     SCROLL THROUGH THEM.  THE PATENT SAYS THAT.

22          BUT MR. PARULSKI SAID IT IN HIS TRIAL TESTIMONY

23     EXPLICITLY, AND IF I CAN PUT THAT ON THE SCREEN.  THE WHOLE

24     PURPOSE OF THIS WAS YOU CAN'T PUT ALL OF THE PICTURES UP AT

25     ONCE.  THE TECHNOLOGY WON'T ALLOW IT.

1        SO WHAT ARE WE GOING TO DO?  WE'RE GOING TO HAVE A LIST.

2   WE'RE GOING TO HAVE A SEARCH MODE.  AND THAT'S WHAT'S SHOWN AT

3   FIGURES 4 AND 7.

4        DR. STORER ALSO EXPLAINED TO YOU THAT IN THE OLD

5   TECHNOLOGY, THERE WAS A REASON TO HAVE WHAT THE PATENT CLAIMS

6   AS A SINGLE COMPRESSOR BECAUSE THE COMPRESSION TECHNIQUES FOR

7   VIDEO AND STILL IMAGES OVERLAPPED AT THE TIME.

8        BUT TODAY, THEY'RE DIFFERENT, VERY DIFFERENT, AND

9   COMPLETELY DIFFERENT.

10        AND AS A CONSEQUENCE, IF YOU LOOK AT SDX 3729, WHICH I'M

11   GOING TO PUT ON JUST YOUR SCREENS RIGHT NOW, YOU WILL SEE THAT

12   THERE ARE TWO DIFFERENT COMPONENTS EMPLOYING TWO DIFFERENT

13   METHODOLOGIES MADE BY TWO DIFFERENT SUPPLIERS.  THEY DON'T GET

14   CLOSE TO SATISFYING THE LIMITATIONS.

15        AND THEY'RE DIFFERENT FOR A REASON.  THE MODERN DAY

16   TECHNOLOGY NEEDS TO BE DIFFERENT.  THEY CAN'T BE 20 YEAR OLD

17   TECHNOLOGY.

18        NOW, MR. JOHNSON MENTIONED, AND I AGREE WITH HIM, SOME OF

19   THE COMPONENTS THAT ARE ACCUSED OF INFRINGING CAME FROM

20   SAMSUNG.

21        THIS IS IMPORTANT FOR TWO REASONS.  HERE IS THE FIRST.

22   SAMSUNG BOUGHT THESE PATENTS IN 2011.  THEY DIDN'T SUE US UNTIL

23   APRIL OF 2012.  FOR SEVEN MONTHS THEY WERE SELLING US BILLIONS

24   OF DOLLARS OF COMPONENTS, BILLIONS OF DOLLARS OF COMPONENTS,

25   AND THEN THEY SUED US AND THEY NOW CLAIM THAT WE'RE INFRINGING

1    THIS PATENT, THE PATENT THEY PURCHASED, BY USING THE COMPONENTS

2    THEY SOLD TO US.  THEY WANT $6 MILLION FOR USING COMPONENTS

3    THAT THEY SOLD TO US WHILE THEY HELD THE PATENTS AND WE BOUGHT

4    THEM.

5         NOW, IT'S IMPORTANT FOR A SECOND REASON, AND HERE'S WHAT

6    IT IS.  MR. JOHNSON SAID IT'S NO DEFENSE TO PATENT INFRINGEMENT

7    THAT WE BOUGHT THE COMPONENTS FROM SAMSUNG.

8         HE'S RIGHT.  I AGREE.  IT'S NOT A DEFENSE IF YOU'RE THE

9    MAKER OR USER OR SELLER OF A COMPONENT TO A CLAIM OF PATENT

10   INFRINGEMENT.

11        IT APPLIES TO OUR PURCHASE OF COMPONENTS FROM SAMSUNG.

12        IT APPLIES TO SAMSUNG'S USE OF GOOGLE SOFTWARE.

13        IT DOESN'T MATTER WHERE IT COMES FROM IF YOU'RE THE

14   PERSON, IF YOU ARE THE PERSON WHO USES IT.

15        NOW, DAMAGES QUICKLY, AND HERE IS THE MOST IMPORTANT THING

16   ABOUT THE DAMAGES CLAIM.  YOU'VE HEARD MR. QUINN ATTACK

17   DR. HAUSER FOR THE LAST HALF HOUR OR SO, ATTACK HIS STUDY AS

18   DISHONEST AND A SHAM.

19        WHAT DID SAMSUNG DO WHEN IT WAS ITS TURN TO PROVE DAMAGES?

20   REMEMBER, THE SHOE IS NOW ON THE OTHER FOOT.  ASK YOURSELF,

21   WHAT DID THEY DO?

22        DID THEY HAVE DR. ERDEM DO AN EYE TRACKING STUDY TO PROVE

23   THEIR DAMAGES?  NO.

24        DID THEY HAVE DR. CHEVALIER DO A LINE COUNTING STUDY TO

25   PROVE THEIR DAMAGES?  NO.

1          DID THEY DO WHAT MR. WAGNER SAID, A CONJOINT STUDY?  NO.

2          INSTEAD, THEY BROUGHT DR. RAO IN, WHO TESTIFIED FOR EIGHT

3     MINUTES, AND HE PRESENTED YOU WITH A SURVEY, A MAX DIFF SURVEY

4     THAT, LIKE DR. ERDEM'S STUDY, LIKE DR. CHEVALIER'S STUDY, HAS

5     NEVER BEEN USED IN A COURT IN AMERICA TO DETERMINE DAMAGES.

6          HE SHOWED YOU HIS SURVEY SHEET, HE DESCRIBED THE DATA

7     POINTS, AND HE SAID THAT'S ENOUGH.

8          NOW, LADIES AND GENTLEMEN, WHEN YOU RETIRE TO THE JURY

9     ROOM AND YOU CONSIDER THE ATTACKS ON DR. HAUSER, ASK YOURSELF

10    THIS:  IF WHAT DR. RAO DID IS ENOUGH TO DETERMINE DAMAGES, YOU

11    KNOW, THE AMOUNT DOESN'T MATTER, IT'S THE ANALYTICAL FRAMEWORK

12    YOU USE, IF WHAT DR. RAO DID IS ENOUGH, HOW CAN IT POSSIBLY BE

13    THAT WHAT DR. HAUSER DID NOT BE?

14         AND YOU'LL REMEMBER MY LAST CROSS-EXAMINATION OF DR. RAO.

15    DID ANYBODY ASK YOU, DID ANYBODY ASK YOU TO PERFORM A MAX DIFF

16    SURVEY, A CONJOINT SURVEY, ANY OTHER SURVEY THAT WOULD HAVE

17    SHOWN YOU WHAT THE APPLE FEATURES WERE WORTH?

18         AND THE ANSWER WAS NO.  HE DIDN'T DO IT.  NO ONE ELSE DID

19    IT.  AND THERE'S ONLY ONE REASON.  THEY DIDN'T WANT TO KNOW THE

20    ANSWER.

21         NOW, LADIES AND GENTLEMEN, WE'RE AT THE END OF OUR

22    CLOSING, AND BEFORE I SIT DOWN, I'D LIKE TO THANK YOU ON BEHALF

23    OF ALL OF US FOR YOUR CAREFUL TIME AND ATTENTION.  WE KNOW IT'S

24    BEEN A BURDEN, A BURDEN UPON YOU, A BURDEN UPON YOUR FAMILIES.

25         ON BEHALF OF MR. MCELHINNY AND MS. KREVANS AND ALL OF OUR

1    COLLEAGUES, BUT MOSTLY ON BEHALF OF THE FOLKS AT APPLE, WE

2    THANK YOU.

3         NOW I'M GOING TO ASK YOU THAT LAST THING THAT I SAID I WAS

4    GOING TO ASK YOU TO DO, AND THAT'S THIS:  BEFORE YOU RETIRE AND

5    BEGIN YOUR DELIBERATIONS, PUT YOURSELF IN THE POSITION OF THE

6    APPLE ENGINEERS, SCIENTISTS, AND LEADERS.  PUT YOURSELF IN THE

7    POSITION OF SOME OF THE PEOPLE LIKE MR. CHRISTIE, MR. DENIAU,

8    MR. GARCIA, MR. MILLET, AND MR. SCHILLER.

9         LADIES AND GENTLEMEN, THESE ARE THE PEOPLE WHO CAME TO

10   WORK BEFORE THE SUN CAME UP AND LEFT AFTER THE SUN WENT DOWN.

11             MR. PRICE:  YOUR HONOR, I OBJECT.  THIS ISN'T

12   REBUTTAL TO THE OFFENSIVE CASE.

13             MR. LEE:  YOUR HONOR, THIS GOES DIRECTLY TO

14   CHALLENGING THEIR PATENTS.

15             THE COURT:  OVERRULED.

16             MR. LEE:  THESE ARE THE FOLKS WHO WORKED TIRELESSLY,

17   AS MR. GARCIA DESCRIBED TO YOU, TO INVENT FACETIME, AND AS

18   OTHER DESCRIBED TO YOU, TO INVENT THE IPHONE AND THE IPOD

19   TOUCH.

20        THESE ARE PEOPLE WHO INVENTED AND INNOVATED AND

21   FUNDAMENTALLY CHANGED, FUNDAMENTALLY CHANGED THE WAY WE

22   COMMUNICATE.

23        AND FOR THESE FIVE PEOPLE, THEY CAME AND GOT ON THE STAND

24   AND UNDERWENT MUCH CROSS-EXAMINATION.

25        NOW, YOU'RE ONE OF THOSE PEOPLE, AND YOU'VE HEARD THAT THE

1    SAMSUNG PATENTS ARE REVOLUTIONARY AND FUNDAMENTAL, PATENTS THAT

2    NO ONE HAS USED, THAT NO ONE HAD HEARD OF BEFORE THE LAWYER

3    GAVE IT TO THE EXPERT, AND THAT NO ONE HAS COPIED.

4            BUT YOUR WORK IS TRIVIAL AND UNIMPORTANT.

5            DOES THAT MAKE SENSE TO YOU?

6            AND YOU SAY TO YOURSELF, IF YOU'RE MR. GARCIA OR

7    MR. MILLET, HOW CAN THAT BE?  HOW CAN IT BE THAT OUR WORK IS

8    TRIVIAL AND UNIMPORTANT, BUT THESE PATENTS THAT NO ONE IS USING

9    ARE FUNDAMENTAL AND REVOLUTIONARY?

10           YOUR COMMON SENSE WILL TELL YOU WHAT THE ANSWER TO THAT

11   IS.

12           WE ALL WOULD AGREE THAT THE WORLD AND THE GLOBAL ECONOMY

13   DEPENDS UPON INNOVATION AND INVENTION.  WE DEPEND ON PATENTS,

14   PATENTS ISSUED BY THE UNITED STATES PATENT OFFICE UNDER OUR

15   CONSTITUTION.  WE DEPEND UPON FAIR AND SQUARE COMPETITION.  WE

16   DEPEND ON OTHERS TO RESPECT PATENTS, AND AS MR. DENISON SAID,

17   WE DEPEND UPON PEOPLE NOT TO ENGAGE IN THE UNFAIR COMPETITION

18   OF PATENT INFRINGEMENT.

19           AND MOST OF ALL, LADIES AND GENTLEMEN, WE DEPEND UPON

20   PEOPLE LIKE YOU WHO WILL RECOGNIZE THE DIFFERENCE BETWEEN FAIR

21   COMPETITION, FAIR AND SQUARE COMPETITION, AND UNFAIR

22   COMPETITION, THE UNFAIR COMPETITION OF PATENT INFRINGEMENT, AND

23   TO NOT ALLOW IT TO HAPPEN.

24           AND THAT'S WHAT WE ASK YOU TO DO NOW, HERE, TODAY.

25           THANK YOU.

```
1              THE COURT:  THE TIME IS 2:46.

2         PLEASE COME FORWARD.  I'M GOING TO ASK MS. PARKER BROWN TO

3    SWEAR IN OUR BAILIFF, PLEASE.

4         (COURT SECURITY OFFICER SWORN.)

5              THE MARSHAL:  I DO.

6              THE COURT:  OKAY.  SO WHAT IS GOING TO HAPPEN IS THAT

7    YOU ARE GOING TO GET A COPY OF -- NO.  YOU'RE GOING TO GET THE

8    ACTUAL VERDICT FORM.

9         YOU'RE ALSO GOING TO RECEIVE 15 BLANK NOTES.  IF YOU

10   HAVE -- IF ANYONE ON THE JURY HAS ANY QUESTION, YOU CAN PLEASE

11   FILL OUT THE NOTE NUMBER, DATE, TIME, YOUR SIGNATURE.

12        AND WE WILL TRY TO RESPOND TO YOU AS QUICKLY AS WE CAN,

13   BUT PLEASE CONTINUE TO DELIBERATE.  IT MAY TAKE US SOME TIME TO

14   ASSEMBLE EVERYONE AND JOINTLY AGREE UPON A RESPONSE TO YOU.

15        SO WHENEVER YOU HAVE A NOTE, IF YOU WOULD JUST KNOCK ON

16   THE DOOR, YOUR BAILIFF WILL BE OUTSIDE.

17        ALL COMMUNICATIONS SHOULD BE IN WRITING BECAUSE THE

18   PARTIES ARE ENTITLED TO KNOW WHAT INFORMATION YOU ARE GETTING

19   WHILE YOU'RE DELIBERATING.

20        IN ADDITION, YOU WILL HAVE THE JOINT EXHIBIT LIST.  IF YOU

21   WANT TO FIND ANY OF THE EXHIBITS THAT HAVE BEEN REFERENCED

22   THROUGHOUT THE TRIAL, YOU'LL HAVE THIS INFORMATION IN THIS RED

23   WELL WHICH WE ARE GOING TO GIVE TO YOU.

24        IN ADDITION, YOU'RE GOING TO HAVE ALL OF THESE CARTS THAT

25   HAVE ALL OF THE EXHIBITS THAT HAVE BEEN ADMITTED INTO EVIDENCE,
```

1     SO YOU CAN LOOK AT ANYTHING IF YOU WISH.

2          SO TODAY WE'LL BE DELIBERATING UNTIL 4:30 AND YOU WILL

3     STAY IN THIS JURY ROOM.

4          BUT AS OF TOMORROW, I WOULD LIKE YOU TO DELIBERATE IN MY

5     JURY ROOM, WHICH IS ON THE FOURTH FLOOR.  IF WE NEED TO DO

6     ANYTHING IN OPEN COURT, WE'LL COME BACK TO THIS COURTROOM

7     BECAUSE I WILL HAVE OTHER CRIMINAL AND CIVIL CASES IN THE NEXT

8     TWO DAYS HAPPENING IN MY COURTROOM, BUT YOU'LL BE DELIBERATING

9     ON THE FOURTH FLOOR.

10         WHEN YOU GET OFF THE ELEVATORS AND GO BACK TO THE BACK

11    HALL, PLEASE TURN TO THE LEFT TO GO TO THE FIRST STREET SIDE OF

12    THE BUILDING INSTEAD OF GOING TO THE RIGHT TO THE SECOND STREET

13    SIDE OF THE BUILDING, WHICH IS WHERE WE ARE NOW.

14         SO YOU'LL BE DELIBERATING ON THE FOURTH FLOOR FOR THE REST

15    OF THE TIME, BUT THEN WE'LL ALWAYS COME UP HERE TO THIS

16    COURTROOM, SINCE THIS IS THE ONLY ONE LARGE ENOUGH, IF WE NEED

17    TO DO ANYTHING IN OPEN COURT.  OKAY?

18         ALL RIGHT.  SO WITH THAT, YOU CAN PLEASE TAKE YOUR BINDERS

19    AND GO TO THE JURY ROOM UNTIL 4:30 TODAY.

20              THE CLERK:  I'M JUST GOING TO GO BACK AND REMIND THEM

21     THAT I NEED THEIR LUNCH ORDER.

22              THE COURT:  OH, THAT'S FINE.

23         ALL RIGHT.  THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

24         (JURY OUT AT 2:49 P.M.)

25              THE COURT:  OKAY.  THE RECORD SHOULD REFLECT THAT THE

```
 1        JURORS HAVE LEFT THE COURTROOM.

 2            PLEASE TAKE A SEAT.

 3            I WOULD LIKE EACH -- COUNSEL FOR EACH SIDE TO REVIEW THE

 4     MATERIALS THAT ARE ACTUALLY GOING BACK TO THE JURY ROOM.  I

 5     WANT TO HAVE EVERYONE ON THE RECORD SAY THAT THEY ARE OKAY WITH

 6     THESE PARTICULAR MATERIALS.

 7            SO ONE IS THE JOINT EXHIBIT, JOINT LIST OF EXHIBITS

 8     ADMITTED THROUGH APRIL 28TH, 2014.  THE ECF DOCKET NUMBER IS

 9     1857, AND I WILL GIVE YOU AN OPPORTUNITY TO REVIEW THE ACTUAL

10     COPY.

11            ANOTHER ONE ARE THE BLANK JURY NOTES.

12            THE THIRD IS THE VERDICT FORM, WHICH IS ECF DOCKET NUMBER

13     1836.

14            LET ME ASK MS. PARKER BROWN IF YOU CAN LET THEM SEE THOSE

15     MATERIALS.

16            AND WE DO HAVE AGREEMENT AS TO THE EXHIBITS, CORRECT?  CAN

17     YOU PLEASE IDENTIFY WHICH ARE THE CARTS THAT WILL BE GOING TO

18     THE JURY ROOM?

19                THE CLERK:  SO THEY'RE GOING TO INSPECT THIS?

20                THE COURT:  YES, IF YOU WOULD, PLEASE.

21            WHICH ONES ARE THE CARTS THAT ARE GOING TO THE JURY ROOM?

22                THE CLERK:  THESE TWO AND THE DEVICES, I BELIEVE.

23                MR. SABRI:  THAT'S RIGHT.

24                THE COURT:  ALL RIGHT.  SO LET'S JUST PUT ON THE

25     RECORD, I WANT SOMEONE TO IDENTIFY THEMSELVES FOR APPLE AS
```

1    APPROVING THE TWO BEIGE CARTS FULL OF BINDERS AND THE TWO BLACK

2    CARTS FULL OF DEVICES THAT ARE IN RED WELLS.  CAN I HAVE

3    SOMEONE --

4              MR. SABRI:  NATHAN SABRI FOR APPLE, YOUR HONOR.

5              THE COURT:  AND YOU APPROVE OF THOSE FOUR CARTS?

6              MR. SABRI:  YES, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  MS. MAROULIS, DO YOU APPROVE

8    OF THOSE FOUR CARTS?

9              MS. MAROULIS:  YES, YOUR HONOR.

10             THE COURT:  OKAY.  THANK YOU.

11        THEN I'M GOING TO HAVE MS. PARKER BROWN -- MS. PALANJIAN,

12   MR. HUANG, MAYBE YOU CAN HELP -- WHEEL THOSE INTO THE JURY

13   ROOM, PLEASE.

14        OKAY.  MR. SABRI, HAVE YOU REVIEWED THE VERDICT FORM, THE

15   EXHIBIT LIST, AND THE JURY NOTES?

16             MR. SABRI:  I HAVE, YOUR HONOR.

17             THE COURT:  OKAY.  ARE THOSE SATISFACTORILY TO APPLE?

18             MR. SABRI:  YES, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  MS. MAROULIS, HAVE YOU

20   REVIEWED THE VERDICT FORM, THE JURY NOTES, AND EXHIBIT LIST?

21             MS. MAROULIS:  YES, YOUR HONOR.  THEY'RE SATISFACTORY

22   FOR SAMSUNG.

23             THE COURT:  OKAY.  THANK YOU.  SO THOSE WILL GO BACK

24   TO THE JURY ROOM.

25        I DID JUST WANT TO PLACE ON THE RECORD AS WELL THAT THE

1    FINAL JURY INSTRUCTIONS THAT WERE READ TO THE JURY YESTERDAY

2    WERE ECF DOCKET NUMBER 1847.

3         HAVE YOU PROVIDED YOUR BEST MEANS OF CONTACT AND CONTACT

4    INFORMATION TO MS. PARKER BROWN?

5              MR. MCELHINNY:  WE HAVE, YOUR HONOR.

6              MS. MAROULIS:  YES, YOUR HONOR.

7              THE COURT:  OKAY, GREAT.  SO WE KNOW HOW TO CONTACT

8    YOU.

9         WE WILL DO IT, AS WE'VE DONE THE PREVIOUS TWO TRIALS, WHEN

10   THE JURORS LEAVE FOR THE END OF THE DAY, WE'LL JUST HAVE A

11   MESSAGE FILED ON ECF SAYING THE JURORS HAVE ADJOURNED FOR THE

12   DAY.

13        WE'LL ALSO DO, AS WE'VE DONE IN THE PREVIOUS TWO TRIALS,

14   WE WILL FILE THE JURY NOTES SO IF YOUR TEAMS ARE DISPARATE,

15   EVERYONE CAN GO ONLINE AND SEE WHAT THE QUESTION WE HAVE.

16        WE HAVE MR. MINTZ HERE, HE'LL BE OUR LIAISON TREE FOR THE

17   MEDIA, AS IN THE PREVIOUS TWO TRIALS.

18        WHAT ELSE?  ANYTHING ELSE THAT WE NEED TO COORDINATE?

19   ORGANIZE?

20             MR. MCELHINNY:  NOTHING FURTHER FOR APPLE, YOUR

21   HONOR.

22             THE COURT:  OKAY.  ANYTHING -- ANYTHING MORE THAT WE

23   SHOULD COORDINATE?

24             MS. MAROULIS:  NOTHING FURTHER, YOUR HONOR.

25             THE COURT:  OKAY.  THEN THANK YOU VERY MUCH.  WE'LL

LEE REBUTTAL CLOSING

1    GO AHEAD AND LET YOU KNOW WHEN THEY ADJOURN FOR TODAY AND IF WE

2    HAVE ANY NOTES.

3         (A RECESS WAS TAKEN PENDING THE JURY'S DELIBERATIONS.)

1

2

3                            CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____

     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18        DATED:  APRIL 29, 2014

19

20

21

22

23

24

25