QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br>Plaintiff,<br>vs.<br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br>Defendants. | CASE NO. 12-CV-00630-LHK (PSG)<br><br>**DECLARATION OF JUDITH A. CHEVALIER, PH.D. IN OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION**<br><br>Date:   July 10, 2014<br>Time: 2:00 p.m.<br>Place:   Courtroom 8, 4th Floor<br>Judge: Honorable Lucy H. Koh<br><br>REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED |

# TABLE OF CONTENTS

I. Introduction ........................................................................................................ 1

   A.   Background ............................................................................................... 1

   B.   Assignment .............................................................................................. 1

   C.   Overview of Apple's Assertions of Irreparable Harm ............................ 2

   D.   Summary of Conclusions ........................................................................ 3

II. Assessment of Irreparable Harm ........................................................................ 5

   A.   Apple Has Presented No Meaningful Evidence Establishing That
       Incorporation of the '647, '721 and '172 Patented Features Significantly
       Impacts Demand for Smartphones ......................................................... 5

   B.   Evidence from the Marketplace Implies That the Functionalities Associated
       With the '647, '721 and '172 Patents Do Not Have a Discernible Impact on
       the Demand for Smartphones ................................................................. 6

       1.   Demand for Samsung Smartphones Is Driven By Factors Distinct
           from the Functionalities Associated with the '647, '721 and '172
           Patents .......................................................................................... 6

           (a)   Demand for Samsung Smartphones is Driven by Several
                 Factors Including Characteristics and Behavior of Carriers,
                 the OS Platform, Marketing Effort, Device Specific
                 Hardware Characteristics and Retail Price ........................ 6

           (b)   The Functionalities Enabled by the '647, '721, and '172
                 Patents Are Only a Small Part of the Accused Smartphone
                 Operating System ........................................................... 8

              (i)   Smartphones Are Extraordinarily Complex Products
                    With Hundreds If Not Thousands of OS Software
                    Features and Distinct Functionalities ..................... 9

              (ii)   Individual Operating System Software Features Do
                    Not Motivate Customers to Purchase Smartphones ........... 10

       2.   Marketplace Evidence Indicates That the '647, '721 and '172
           Patented Features Are Not Discernible Drivers of Demand for
           Smartphones ................................................................................ 12

           (a)   Samsung's Online Materials Do Not Emphasize the
                 Functionalities Protected by the '647, '721 and '172 Patents ........ 12

           (b)   Samsung's Television/Video Advertising Does Not
                 Highlight the Functionalities Associated With Any of the
                 Apple Patents ................................................................. 14

i

(c) The '647, '721 and '172 Patented Functionalities Account for Negligible Attention in Product Reviews ..................................... 15

(d) The '647, '721, and '172 Patented Functionalities Account for Negligible Attention in Consumer Reviews ............................. 18

(e) Apple's Claimed Use of the '647 and '721 Patented Functionalities Has Received Limited Attention .......................... 18

(f) The Incorporation of the Patented Elements Plays No Measurable Role in Marketplace Outcomes .................................. 21

3. There is No Evidence That Incorporation of the '647, '721, and '172 Patented Features Significantly Increases the Price of Smartphones.......... 21

4. Conclusions ..................................................................................... 23

C. There Is No Evidence That Apple's Brand or Reputation Will Suffer in the Absence of an Injunction on the '647, '721, and '172 Patents ............................. 24

1. Apple Has Presented No Proof That Harm to its Brand or Reputation Is Likely....................................................................................... 24

2. Evidence from Apple Product Reviews Suggest the Patents-at-Issue Are Not Influential to Apple's Reputation ..................................... 25

3. Apple's Assertion That Samsung Is Not an Innovative Firm Is Unfounded ....................................................................................... 26

III. The Jury's Verdict Reflects a Lump Sum Reasonable Royalty ......................................... 27

IV. Apple's Claimed Harms Are Monetarily Compensable ..................................................... 29

I, Judith A. Chevalier, declare as follows:

# I.    INTRODUCTION

### A.    Background

1.    I am the William S. Beinecke Professor of Economics and Finance at the Yale University School of Management.   I also hold a joint courtesy appointment at the Yale Department of Economics.   I received my undergraduate degree in Economics from Yale University in 1989 and my Ph.D. in Economics from the Massachusetts Institute of Technology in 1993.   My curriculum vitae, a true and correct copy of which is attached as Exhibit 1, gives more biographical details and lists my writings.   I previously submitted an expert report in this case (the "Chevalier Report")[1] and testified at trial in April 2014.   A true and correct copy of the Chevalier Report, with selected exhibits thereto, is attached as Exhibit 2.

### B.    Assignment

2.    Apple Inc. ("Apple") has moved to permanently enjoin Samsung Electronics Company, Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Telecommunications America, LLC ("STA") (collectively, "Samsung") from selling products in the U.S. that practice U.S. Patent Number 5,946,647 (the "'647 Patent"), U.S. Patent Number 8,046,721 (the "'721 Patent"), and U.S. Patent Number 8,074,172 (the "'172 Patent").[2]   I have reviewed Apple's motion papers and the evidence cited therein.   I submit this declaration in support of Samsung's Opposition to Apple's Motion for a Permanent Injunction.   In particular, I have been asked to assess whether Apple would suffer irreparable harm absent the Court's granting of a permanent injunction on these patents, and whether Apple's claimed harms are adequately compensable through monetary remedies.

---

[1] Expert Report of Judith A. Chevalier, September 13, 2013, attached hereto as Exhibit 2, with selected exhibits thereto.   I also submitted two declarations dated March 7, 2014 and May 23, 2014.

[2] Apple Inc.'s Motion for a Permanent Injunction, May 23, 2014; U.S. Patent No. 8,046,721: "Unlocking a device by performing gestures on an unlock image"; U.S. Patent No. 8,074,172: "Method, system, and graphical user interface for providing word recommendations"; U.S. Patent No. 5,946,647: "System and method for performing an action on a structure in computer-generated data".

**C.** **Overview of Apple's Assertions of Irreparable Harm**

3.      In its motion, Apple claims that but-for granting Apple a permanent injunction preventing Samsung from using functionalities associated with the '721, '172 and '647 patents, Apple will suffer irreparable harm arising from two sources: (1) sales and market share that will be lost as a result of Samsung's sales of infringing devices; and (2) harm to Apple's reputation as an innovator and its brand.[3]

4.      I understand that to obtain the requested injunctive relief Apple must demonstrate "that it has suffered an irreparable injury" such that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury."[4]   I further understand that Apple must also establish a "causal nexus between Samsung's infringing conduct and Apple's alleged harm."[5] To establish a causal nexus, "[i]t is not enough for the patentee to establish some insubstantial connection between the alleged harm and the infringement."[6]   Apple must "show that the infringing feature drives consumer demand for the accused product."[7]   I understand that the required showing can be accomplished:

> with evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions.  It might also be shown with evidence that the inclusion of a patented feature makes a product significantly more desirable. Conversely, it might be shown with evidence that the absence of a patented feature would make a product significantly less desirable.[8]

The Federal Circuit also stated:

> However, these principles do not mean Apple must show that a patented feature is the one and only reason for consumer demand. Consumer preferences are too complex – and the principles of equity are too flexible – for that to be the correct standard….Thus, rather than show that a patented feature is the exclusive reason for consumer demand, Apple must show some connection between the patented feature

---

[3] Apple Inc.'s Motion for a Permanent Injunction, May 23, 2014, at p. 5.
[4] *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1358 (Fed. Cir. 2013).
[5] *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013).
[6] Order Denying Apple's Renewed Motion for Permanent Injunction, *Apple, Inc. v. Samsung Electronics Co., Ltd.*, Case No. 11-CV-01846-LHK (N.D. Cal., Mar. 6, 2014), at 29, citing *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012).
[7] *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013), citing *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012).
[8] *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1364 (Fed. Cir. 2013).

1   and demand for Samsung's products. [9]

2 And:

> 3   there may be a variety of ways to show that a feature drives demand, including with
> 4   evidence that a feature significantly increases the desirability of a product
> incorporating that feature. Moreover, we see no reason why, as a general matter of
> 5   economics, evidence that a patented feature significantly increases the price of a
> product cannot be used to show that the feature drives demand for the product.[10]

6   **D.      Summary of Conclusions**

7   5.      Apple will not suffer irreparable harm absent the Court's granting of a permanent

8 injunction on the '647, '721 and '172 patents.   There is no evidence that incorporation of the

9 patented technology at issue, separately or together, increases sales, significantly increases

10 desirability, or significantly increases market prices of Samsung's accused products.   To the

11 contrary, these patented functionalities do not discernibly drive demand for the Samsung accused

12 products.   In addition, there is no evidence that Apple's brand or reputation has suffered, let alone

13 any support that it is likely to continue to suffer as a result of Samsung's use of these three patents.

14 Moreover, even if these patents were found to be meaningful in these ways, adequate monetary

15 compensation is available to Apple.

16   6.      Evidence that use of these patents does not drive demand for Samsung's

17 smartphones includes:

> 18   • Specific software features are typically insignificant in driving demand for
> 19   smartphones.   This is, in part, because other device characteristics (such as
> 20   size, screen size, battery life, display definition, storage capacity, camera type,
> 21   price, and connectivity) matter more, but also, in part, because the operating
> 22   systems ("OSs") underlying these products are continually upgraded with
> 23   additional features.   As such, the '647, '721, and '172 patented functionalities
> 24   are only a small part of the smartphone OS, which has hundreds, if not
> 25   thousands, of features.   The total number of features and capabilities in current

27   [9]   *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1363-64 (Fed. Cir. 2013) (emphasis omitted).

28   [10]   *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1367 (Fed. Cir. 2013).

3

popular smartphones is ever expanding, and individual customers regularly fail to observe numerous features.

- A careful review of Samsung and Apple promotional material, third-party product reviews, and consumer reviews, shows that the functionalities related to these patents reflect only a very small portion of the features and benefits of smartphones and that the patented features were not a driver of consumer purchase decisions for the accused products.   Notably, product reviews typically failed to refer to functionality associated with these patents.

- There is no marketplace evidence that incorporation of these patented features increases the price of smartphones.   In contrast, marketplace evidence suggests that only a few individual features – most notably memory size – have a significant impact on market price.

- Apple has pointed to no evidence that incorporation of these patented features increases the sales or measurably increases desirability of smartphones or that the absence of these patented features measurably decreases desirability of smartphones.   Apple cites to the wholly unreliable predictions provided by Dr. Hauser as support for this premise, but these results do not provide any reliable evidence to determine if sales of the accused devices depend in any way on the '647, '721, and '172 patented functionalities.

7.   Evidence that Apple's brand or reputation neither has suffered nor is at risk of suffering from Samsung's use of these patented functionalities includes:

- Apple product reviews, press releases and third-party sources suggest that the patents-at-issue were not influential to building Apple's brand or reputation, including its reputation as an innovator.   Samsung's use of the patented functionalities, therefore, could not harm Apple's brand or reputation.

4

## II.   ASSESSMENT OF IRREPARABLE HARM

### A.   Apple Has Presented No Meaningful Evidence Establishing That Incorporation of the '647, '721 and '172 Patented Features Significantly Impacts Demand for Smartphones

8.   In its motion, Apple presents no direct evidence that incorporation of features associated with the '647, '721, and '172 patents increases demand for smartphones.   Instead, Apple's conclusion that these patents play a significant role in demand for smartphones largely is based on Apple's reliance on an unsound conjoint analysis performed by Dr. Hauser.   As I discussed in my expert report, Dr. Hauser's analysis suffers from several crucial flaws.[11] Importantly, his conjoint survey was not designed in a way that allows one to accurately determine when, if ever, consumers that purchased the accused phones might have altered their purchase decision had the phone not incorporated the patented functionality, making it wholly unsuitable for marketplace predictions.   These observations are consistent with those of Dr. Reibstein.[12]

9.   Among other flaws, the design of Dr. Hauser's conjoint study's "outside option" alternatives taints the output used to determine the portion of customers that would switch phones if a feature was absent.   Rather than reflecting the choice that consumers would make in the "but for" world in which the patented features were removed from all accused Samsung products, the "outside option" construct used by Dr. Hauser essentially allows the respondent to choose between a Samsung product without the patented features and the identical Samsung product with the patented features.   This experiment tells us nothing about whether the same consumer would have bought a different brand of phone rather than a Samsung phone with a few features removed.   My expert report contains a more complete discussion.[13]

10.   Additionally, the study generates predictions that differ significantly from marketplace observations.   For example, Dr. Hauser's predicted demand for the functionalities associated with the patents-at-issue is not credible when compared to the actual demand for the most popular Android apps.   Exhibit 57A to 57C to my expert report, attached hereto at Exhibit 2

---

[11] Chevalier Report, at pp. 121-136.
[12] Trial testimony of David Reibstein, April 18, 2014, Transcript Vol. 9, at 2071-75, 2097-99, and 2157-58.
[13] Chevalier Report, at pp. 128-131.

at pages 240-242, illustrates the demand for the patented features, as implied by Dr. Hauser's analysis, relative to estimates of the actual lifetime sales of the 20 most popular paid Android apps.[14]   As these exhibits show, Dr. Hauser's analysis suggests that demand for each of the individual patented features dramatically exceeds the demand for even the most popular apps. My expert report contains a more complete discussion.[15]

11.     As a result of these flaws and others identified by Dr. Reibstein,[16] the results of Dr. Hauser's conjoint analysis are not meaningful to evaluating, and vastly overstate, the importance of the '647, '721 and '172 patents in consumers' smartphone purchase decisions.

**B.     Evidence from the Marketplace Implies That the Functionalities Associated With the '647, '721 and '172 Patents Do Not Have a Discernible Impact on the Demand for Smartphones**

12.     Apple will not suffer irreparable harm absent the Court's granting of a permanent injunction on the '647, '721 and '172 patents from lost sales and profits deriving from Samsung's continued use of the functionalities associated with these Apple patents.   That is because these patented functionalities do not discernibly drive demand for the Samsung accused products.   In particular, there is no evidence that incorporation of these patented technologies, separately or together, in smartphones increases sales, significantly increases desirability, or significantly increases market prices of those devices.

**1.     Demand for Samsung Smartphones Is Driven By Factors Distinct from the Functionalities Associated with the '647, '721 and '172 Patents**

**(a)     Demand for Samsung Smartphones is Driven by Several Factors Including Characteristics and Behavior of Carriers, the OS Platform, Marketing Effort, Device Specific Hardware Characteristics and Retail Price**

13.     In preparing my expert report and in preparing for trial, I reviewed internal company documents including marketing studies, third-party analysis of the market, including studies commissioned by the parties, data measuring the actual success and failure of marketplace

---

[14]  Chevalier Report, at Exhibits 57A to 57C, attached hereto at Exhibit 2 at pages 240-242, show demand curves for the '647, '721 and '172 patents as well as three other patents that were either dropped from the case or for which Samsung was found not to infringe.

[15]  Chevalier Report, at pp. 131-136.

[16]  Trial testimony of David Reibstein, April 18, 2014, Transcript Vol. 9, at 2060-2159.

6

products and marketplace participants, promotional and instructional materials generated by the manufacturers, and professionally-authored and consumer-authored product reviews.   My evaluation of those sources indicates that demand for smartphones is driven by factors other than the patents-at-issue and that the patents-at-issue do not contribute measurably to demand for smartphones.   My expert report contains a more complete discussion.[17]

14.    Among the elements that impact consumer choice in the smartphone marketplace are:

(1) ***characteristics and behavior of the carrier***, as end users have preferences over carriers because carriers differ in aspects such as network reliability, service cost and ability to roam internationally.   Carriers also play a role in the marketplace through their influence on device pricing (and subsidies), marketing, and the sales processes.   The evidence also shows that ███████████████████████████████████████████[18]

(2) ***operating system characteristics***, including the integration with the device and the availability of applications and other ecosystem characteristics enabled by the operating system.   This often devolves to the consumer decision of whether to buy an Android or iOS product;[19]

(3) ***marketing efforts***, which both Apple and Samsung have engaged in significantly;[20]

(4) ***device-specific characteristics***,[21] such as capabilities, hardware characteristics, and physical characteristics such as battery life,[22] touchscreen capability,[23] screen size/quality,[24] speed of connectivity,[25] and high-quality camera and video;[26]   and

---

[17] Chevalier Report, at pp. 39-68.
[18] DX 413.014, 043-045. *See also*, Chevalier Report, at pp. 42-47.
[19] Chevalier Report, at pp. 47-52.
[20] Chevalier Report, at pp. 52-58.
[21] Chevalier Report, at pp. 58-64.
[22] Chevalier Report, at p. 59.
[23] Chevalier Report, at p. 59.
[24] Chevalier Report, at p. 60. Launch Predictor, U.S., Google, November 2012, at 8. ████████
█████████████████████████████████████████████████████
██████████████████████████████████   A January 2011 U.S. smartphone market study undertaken by

1    (5) **retail price**.[27]

2    15.    The OS is only one factor in the purchase of a smartphone and, as discussed below,

3    the patented elements represent only small components of the smartphone OS.   Instead of

4    identifying the patented elements as important drivers of demand for smartphones, participants in

5    the marketplace have focused on the other elements listed above in their analyses of purchase

6    drivers.   For example, the extent to which more prominent features override the importance of

7    more granular software features is reflected in an Apple April 2013 presentation assessing the

8    evolution of the marketplace during the last year.   Specifically, the presentation pointed to the

9    recent expansion in the smartphone marketplace having been driven by the fact that "consumers

10   want what we [Apple] don't have": phones with screens larger than 4 inches and phones priced

11   below $300.[28]   Furthermore, the presentation evaluated demand for the phones as driven by

12   consumers, carriers, and competitors.   In particular, price, screen size, carrier desires to "cap"

13   iPhone sales, improved hardware and ecosystems, and advertising are illustrated influencers of

14   smartphone demand.[29]   Neither individual OS features nor specifically the '647, '721 and '172

15   patents were identified as purchase motivators.

16                    **(b)    The Functionalities Enabled by the '647, '721, and '172 Patents**
                              **Are Only a Small Part of the Accused Smartphone Operating**
17                            **System**

18   16.    While the OS is one of the five elements identified above, specific OS software

19   features are typically insignificant in driving smartphone demand.   This is, in part, because the

20   OS underlying these products contain a large number of features which are continually upgraded

21   with additional features.   The functionality protected by the patents-at-issue constitutes only a

22   small part of the overall software functionality in the products at issue, and software functionality

23   _____

24   Apple concluded that ████████████████████████████████████████████

25   APLNDC0001765739-834, at 43, 63.   *See also*, SAMNDCA630-07416541-601, at 556, 582
     (Benner Exhibit 9); SAMNDCA630-07416667-692, at 680.

26   [25] Chevalier Report, at p. 60

     [26] Chevalier Report, at p. 60.

27   [27] Chevalier Report, at pp. 64-68.

     [28] *See e.g.*, DX 413.046.   *See also*, DX 411.010.

28   [29] *See e.g.*, DX 413.014.

1   itself represents just a portion of the features of those products.

2        17.    A careful review of third-party product reviews, consumer reviews, and Samsung's

3   advertising shows that the functionality related to the '647, '721 and '172 patents is a small subset

4   of the total features of the products at issue.   As demonstrated below, few customers indicate that

5   specific software features motivated their purchase.   Notably, most reviews and advertisements

6   are silent on the patented elements.

7                        (i)    **Smartphones Are Extraordinarily Complex Products**
                                **With Hundreds If Not Thousands of OS Software**
8                               **Features and Distinct Functionalities**

9        18.    Smartphones are extraordinarily complex and sophisticated devices.

10  Manufacturers compete in part by incorporating a myriad of new features in new generations of

11  both hardware and operating systems.   The abundance of software features is reflected in Apple

12  press releases announcing the release of new versions of iOS (its smartphone operating system)

13  where they regularly highlight the inclusion of more than 100 or 200 new features.   For example:

14       •   "iPhone 3GS includes the new iPhone OS 3.0, the world's most advanced

15           mobile operating system with over 100 new features..."[30]

16       •   "iPhone 4 comes with iOS 4, the newest version of the world's most advanced

17           mobile operating system, which includes over 100 new features and 1500 new

18           APIs for developers." [31]

19       •   "With the launch of iPhone 4S also comes the launch of iOS 5, the world's

20           most advanced mobile operating system with over 200 new features…"[32]

21       •   "iPhone 5 comes with iOS 6, the world's most advanced mobile operating

22

23  _____

24       [30] https://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-
     Fastest-Most-Powerful-iPhone-Yet.html (viewed 7/08/2013).   Apple first claims to use the
25   asserted claims of the '647 patent with the launch of iOS 3. Apple's use of the patented
     functionality was not promoted in the press release. Apple Inc.'s Supplemental Objections and
26   Responses to Samsung's Second Set of Interrogatories, May 28, 2013, at Interrogatory No. 25;
     Apple's List of Accused Products and Asserted Patent Claims Pursuant to July 31, 2013, and
27   January 16, 2014, Court Orders, February 4, 2014.
         [31] DX 444.
28       [32] DX 445.

system with over 200 new features…"[33]

- "iOS 7 is completely redesigned with an entirely new user interface and over 200 new features…"[34]

19.     The Android OS also includes many features.   Google's Vice President of Engineering for Android, Hiroshi Lockheimer, testified at trial that the Android OS includes "thousands" of features and that Google's goal is "to constantly improve the product, and…come out with new innovations."[35]

20.     Moreover, it is often the case that one "feature" will rely on the technology taught by many patents.   For example, as of early 2011, there were an estimated 356,000 patents related to 3G technology held by various entities.[36]   One analyst commenting on the Apple and Samsung litigations estimated that smartphones can embody as many as 250,000 patents due to the wide range of communications and computing technologies that they utilize.[37]

(ii)     **Individual Operating System Software Features Do Not Motivate Customers to Purchase Smartphones**

21.     Individual software features alone do not typically motivate the purchase of smartphones.[38]   The lack of demand driven by individual software features is reflected in many

---

[33] DX 446.

[34] http://www.apple.com/pr/library/2013/09/10iOS-7-With-Completely-Redesigned-User-Interface-Great-New-Features-Available-September-18.html (viewed 9/17/2013).

[35] Trial testimony of Hiroshi Lockheimer, April 11, 2014, Transcript Vol. 6, at 1475-76, 81.

[36] Sascha Segan, "Infographic: Smartphone Patent Wars Explained," *PC Mag*, January 19, 2012, available at http://www.pcmag.com/article2/0,2817,2399098,00.asp (viewed 3/12/2013). Although less than 1 percent of these were declared essential to 3G standards, that would still imply many thousands of patents were require to practice 3G connectivity.

[37] Steve Lohr, "Apple-Samsung Patent Battle Shifts to Trial," *The New York Times*, July 29, 2012; Steve Lohr, "A Bull Market in Tech Patents," *The New York Times*, August 16, 2011.

APLNDC630-0000127433-38.


Apple customer surveys, which show broader explanations for the purchase of an iPhone.[39]

Summarized in Exhibit 40 of my expert report, attached hereto at Exhibit 2 at page 220, examples

of these surveys reveal that



22.

23.

24.

[39] *See e.g.*, Chevalier Report, Exhibit 40, attached hereto at Exhibit 2 at page 220.
[40] Chevalier Report, Exhibit 40, attached hereto at Exhibit 2 at page 220.
[41] Chevalier Report, Exhibit 40, row [9] and [16], attached hereto at Exhibit 2 at page 220.
[42] Chevalier Report, Exhibit 41, attached hereto at Exhibit 2 at page 221.
[43] (115*.07)+(452*.05)+(440*.06)=57.05
[44] DX 433.007.
[45] DX 432.010.

1 ████████████████████████████████████████████████

2 ████ █ ████████████████████████████████████ Again, the lack of

3 attention given to minor aspects of specific software functionality suggests that any individual

4 software elements are unlikely to drive demand.

5       25.     In sum, many surveys assessing the reasons for smartphone purchases have been

6 produced by the parties in this matter.   These contemporaneous business documents collectively

7 provide no evidence that individual granular software elements play any meaningful role in

8 consumer decision-making.   In the infrequent instance where an individual feature matters to a

9 customer, it is usually identified as a larger element than the patented features at issue.   My expert

10 report contains a more complete discussion.[47]

               **2.**        **Marketplace Evidence Indicates That the '647, '721 and '172 Patented**
                         **Features Are Not Discernible Drivers of Demand for Smartphones**

11

12

13       26.     In order to determine the role the patented features play in demand for the accused

14 products, I reviewed a variety of materials in addition to the manufacturer market research

15 discussed above.   Specifically, I examined: manufacturer promotional material, professional

16 reviews, and consumer reviews and discussion.[48]   I also examined the marketplace outcomes of

17 Samsung accused products.   As discussed in more detail below, based on these materials, the

18 patented features do not appear to be measurable drivers of demand.

           **(a)**        **Samsung's Online Materials Do Not Emphasize the**
19                      **Functionalities Protected by the '647, '721 and '172 Patents**

20       27.     Samsung provides detailed information about the accused smartphones on its

21 website.   This material is typically organized into a distinct webpage that, for a given model of

22 phone, provides a product overview, a list of features, specifications, a photo gallery, reviews,

23 accessories, and support.   Given the thousands of features within each phone, a consumer can

24 only be fully cognizant of a smaller set of them when they make their purchase.   This material

25 provides insight into features consumers more likely would be aware of when making their

26

27      [46] DX 437.020.

     [47] Chevalier Report, at pp. 68-90.

28      [48] My expert report contains a more complete discussion.   *See* Chevalier Report, at pp. 75-90.

purchase decision.

28.     Many features for the Samsung Galaxy S III, for example, are highlighted:[49]

- **Jelly Bean and TouchWiz Enhancements**
- **Share Back-to-Back:**   If sharing is your thing, the Samsung Galaxy S® III is your phone. With S Beam, you can share large HD files in seconds – just touch compatible devices back-to-back.
- **Share Big:**   …with AllShare Play… you can play your music, videos and slide shows on any compatible HDTV or computer for all to see.
- **Share Photos Instantly:**   Share Shot lets you share your photos with up to five friends – as you take them.
- **Gesture Smarter:** …Special motion gestures let you do things easier and more intuitively than ever before.
- **Speak, and the Galaxy S III will Listen:**   S Voice™ responds to your every voice command, acting as your on-board personal assistant to give you helpful, accurate information, dial phone numbers, send messages, open apps and more.
- **Simplify any Task:**   Samsung TecTiles™ is the short-hand way to operate your Galaxy S III.
- **Memories in a Moment:**…the camera has 8.0 megapixels and absolutely zero shutter lag… [t]ake up to 20 continuous shots in seconds with Burst Shot. The front-facing camera even has a full 1.9 megapixels, so you can get yourself into the HD action.
- **Picture-in-Everything:**   [Pop Up Play is] a picture-in-picture feature that lets you continue to watch your HD videos while you surf the web or check your email.
- **Powerful Hardware and Software**

29.     None of these feature descriptions, however, delve into the granular level of detail associated with the functionality covered by the patents-at-issue.

30.     The specifications pages provide an even more comprehensive list of distinct attributes of the Samsung Galaxy S III.[50]   They fall into 20 categories (carrier, form factor, size, color, battery, network, platform, CPU/processor, display, user interface, features (GPS navigation), camera, audio, video, fun and entertainment, business and office, messaging options, connectivity, memory, and calling functions) and list more than 50 phone capabilities.   As was the case with the features page, none of the "spec" descriptions delve into the granular level of detail associated with the functionality related to the patents-at-issue.

31.     Although these web sites do not comprehensively list all product features, they provide insight into whether the patents-at-issue would be expected to drive demand for the

---

[49] http://www.samsung.com/us/mobile/cell-phones/SGH-I747MBBATT (viewed 4/24/2013).
[50] http://www.samsung.com/us/mobile/cell-phones/SGH-I747MBBATT (viewed 4/24/2013).

products-at-issue.   As described above, the specific functionalities claimed by Apple are not among the main features emphasized (or even referred to) for any of the accused products.

**(b)      Samsung's Television/Video Advertising Does Not Highlight the Functionalities Associated With Any of the Apple Patents**

32.      I supervised the review of a large collection of Samsung television advertisements to further determine how the accused devices were promoted as well as to determine the extent to which functionalities related to the patents-at-issue were highlighted.   Promotions such as these can demonstrate the features that Samsung believed would help drive demand for its products.[51] Specifically, commercials for the Samsung Galaxy S II, Galaxy S III, and Note II, posted on the Samsung Mobile YouTube Channels were reviewed.[52]

33.      These commercials typically focus on just a few of the product's features, which are usually also described in the video description associated with the YouTube video.   The earliest of the Galaxy S II commercials, uploaded to YouTube on April 15, 2011, focuses exclusively on the new Super AMOLED Plus display.[53]   The other six advertisements highlight one or two features each, including the hardware, thinness, Voice Talk, processor speed, and image quality.[54]   None of these advertisements depicted or made any specific reference to the functionalities protected by Apple's patents.

34.      Consistent with the Galaxy S II commercials, the 18 advertisements for the Galaxy

---

[51]  In addition, according to a July 2012 internal STA document analyzing early customers of the Galaxy SIII, 23 percent of Galaxy SIII respondents encountered TV ads and 9 percent were positively influenced to purchase the Galaxy SIII by those ads.   DX 433.008.

[52]  There were 18 Galaxy S III and 8 Note II commercials on the Samsung Mobile USA YouTube channel that were reviewed.   See http://www.youtube.com/playlist?list=PLD069379E13CF8DE1 (viewed 9/12/2013); http://www.youtube.com/playlist?list=PLmpYZzpDQEhmuznYX54-6PNE5deHQzAab (viewed 9/12/2013).   Galaxy S II advertisements did not appear to be posted on the Samsung Mobile USA YouTube channel; instead, 7 television ads for the Galaxy S II posted on the Samsung Mobile YouTube channel were reviewed.   See http://www.youtube.com/playlist?list=PL3F63929F54D9A90A (viewed 9/12/2013).   How-to videos, promotional demos, and launch event previews were not considered to be television advertisements and were excluded from this review.

[53]  http://www.youtube.com/watch?v=bwEVV7PMn10&list=PL3F63929F54D9A90A (viewed 9/12/ 2013).

[54]  http://www.youtube.com/watch?v=UIj3dFZb8HQ&list=PL3F63929F54D9A90A (viewed 9/12/ 2013).

S III from the Samsung Mobile USA YouTube Channel each focus on a small number of features or functionalities.[55]   The first commercial, uploaded to YouTube on June 19, 2012, introduces the new Galaxy S III product by demonstrating the multitasking capabilities of the phone (*i.e.* the ability to text while watching a video).[56]   Other advertisements focus on media sharing (via AllShare Play, Buddy Photo Share, Share Shot), S Beam, S Voice, gestures, video recording capabilities, screen size, camera features, and the speed of the 4G network.   None of these advertisements depicted or made any specific reference to the functionalities protected by Apple's patents.

35.     The results from my analysis of the Note II are consistent with the above.   The product's advertisements highlight various features not at issue for this injunction.

### (c)     The '647, '721 and '172 Patented Functionalities Account for Negligible Attention in Product Reviews

36.     I also supervised an extensive examination of product reviews conducted by professional reviewers in leading media outlets in order to evaluate the importance of the functionalities protected by the '647, '721 and '172 patents.   Because many purchasers consult reviews in making a purchase decision,[57] these reviews provide insight into factors that influence demand for the products-at-issue.   These reviews are typically quite thorough, commenting on a wide range of product attributes—the selection of which is indicative of the features the reviewer likely believed might be of interest to potential customers.   Additionally, unlike marketing materials (which often focus on larger differentiations between products or brands), product

---

[55] http://www.youtube.com/playlist?list=PLD069379E13CF8DE1 (viewed 9/12/ 2013).
[56] Video titled "Samsung Galaxy S III – Pop Up Play," available at http://www.youtube.com/watch?v=Y-awUtf-p1U&list=PLD069379E13CF8DE1 (viewed 9/12/2013).



reviews address many elements that are common across products in addition to highlighting notable differences.

37.     In particular, I examined numerous professional reviews for several of the accused Samsung devices – Galaxy S II, Galaxy S III, and the Galaxy Note II.   For each of these products, I examined reviews from popular online sources as well as from leading print and online technology publications identified in a survey of public relations professionals.[58]

38.     Using these reviews, the functionalities commented on by the reviewers were identified, and the frequency with which each sentence in the reviews made reference to the functionality associated with Apple's patents was determined.   Specifically, for each sentence in each review, I identified the type of product feature mentioned and classified the feature "mentions" among the following categories: screen quality or screen size; processing capabilities; memory; the camera or photo capabilities; the battery; physical characteristics; the associated network or carriers; the specific operating system and the price.   Furthermore, I tracked sentences that mentioned features other than those captured among the explicitly tracked feature categories (*e.g.*, texting) as well as sentences that did not identify any features at all (*e.g.*, "In fact, Samsung is going to have trouble getting this one back.").   Finally, I identified sentences that referenced the functionalities allegedly protected by Apple's patents.   My methodology is designed to be over-inclusive.   The results are summarized in Exhibits 44 to 47 to my expert report, attached hereto at Exhibit 2 at pages 222-232.

39.     Even with a methodology designed to be over-inclusive, the examination of the Galaxy S III reviews reveals very few sentences that reference functionality associated with Apple's asserted patents.[59]   Of the 3,767 sentences included in the 22 reviews, there were numerous references to screen size or quality (319, or 8 percent of all sentences), camera-related features (518, or 14 percent) and physical characteristics (380, or 10 percent).   This is in stark contrast to the functionalities associated with Apple's '647 patent, which had no mentions.

---

[58] *See,* http://www.prsourcecode.com/pdfs/news/2011_Top_Tech_Pubs_Release.pdf (viewed 9/12/2013) for leading technology publications.

[59] Chevalier Report, Exhibits 44 and 45B, attached hereto at Exhibit 2 at pages 222-223 and 225.

1   Although not accused of infringing the asserted claims of the '721 or '172 patents, the features

2   associated with the '721 patent had 22 mentions (or 0.6 percent of all sentences) and the features

3   associated with the '172 patent had 1 mention (or 0.0 percent).   Altogether, the features

4   associated with the three patents at issue had a total of 23 mentions, representing 0.6 percent of

5   sentences.

6        40.     More generally, examination of the Galaxy S III reviews reveals extensive

7   discussion of numerous Galaxy S III features that are unrelated to the functionality protected by

8   Apple's patents.   These features are ones that are more likely to factor into consumer purchase

9   decisions.[60]   My examination of Galaxy S III reviews suggests the functionalities protected by the

10  Apple patents are of limited, if any, interest to consumers.   This contradicts the proposition that

11  the functionalities protected by the Apple patents had any discernible impact on consumer

12  purchase decisions and sales of the accused products.

13       41.     The results of my Galaxy S II analysis, summarized in Exhibits 44 and 45A to my

14  expert report, attached hereto at Exhibit 2 at pages 222-224, are similar.   Of the 2,149 sentences

15  included in the 16 reviews, there were numerous references to screen size or quality (213, or 10

16  percent), camera-related features (278, or 13 percent) and physical characteristics (190, or 9

17  percent).   There were no references to functionalities associated with Apple's '647 patent, 9

18  mentions (0.4 percent of sentences) associated with the '721 patent (which the SII was found not

19  to infringe), and 6 mentions (0.3 percent) for the '172 patent.   Altogether, features associated with

20  the three patents had 15 mentions representing 0.7 percent of sentences.

21       42.     A comparable analysis of the Galaxy Note II revealed qualitatively similar

22  results.   These products also did not receive much attention for functionalities associated with

23  Apple's patents.   In fact, of the 2,582 sentences included in the 17 reviews of the Note II

24  summarized in Exhibits 44 and 45D to my expert report, attached hereto at Exhibit 2 at pages 222-

25  223 and 227, references to functionalities even potentially associated with Apple's '647 patent

26  totaled 2 mentions (or 0.1 percent).   Although not accused of infringing the asserted claims of the

27  '721 or '172 patents, the features associated with the '721 patent had 2 mentions (0.1 percent), and

28       [60]  *See e.g.,* DX 433.007-008.

1  the features associated with the '172 patent had 4 mentions (0.2 percent).   Altogether, features

2  associated with the three patents had 8 mentions representing 0.3 percent of sentences.

3        43.    In summary, my analysis of product reviews shows they focus on features distinct

4  from those covered by Apple's patents-at-issue.   This suggests that, from the point of view of

5  reviewers or prospective consumers who rely upon the reviews to make purchasing decisions, the

6  patents-at-issue do not significantly increase the desirability of products that incorporate them or

7  significantly decrease the desirability of products that do not incorporate them.

8              **(d)    The '647, '721, and '172 Patented Functionalities Account for
                        Negligible Attention in Consumer Reviews**

9

10       44.    I also conducted an examination of product reviews written by Samsung customers.

11  Because many reviewers comment on product elements which contributed to their purchase

     decision, these also can help determine factors that influence demand for the products-at-issue.[61]
12
     In particular, I conducted an analysis of user comments posted on Amazon.com based on the same
13
     methodology employed in my analysis of reviews conducted by professional media sources.   This
14
     consumer review analysis also covered the Samsung Galaxy S II, S III, and Note II.   The results
15
     are summarized in Exhibit 46 to my expert report, attached hereto at Exhibit 2 at page 228.
16

17       45.    Like the professional reviews, consumer-generated reviews mention features

18  largely distinct from those covered by the patents-at-issue.   References to functionalities

     associated with the three Apple patents were reflected in roughly 0.1 percent of the sentences
19
     reviewed.[62]   This further demonstrates that the functionalities protected by the Apple patents-at-
20
     issue are of limited interest to consumers, and further supports the conclusion that the
21
     functionalities protected by the Apple patents do not have any meaningful impact on consumer
22
     purchase decisions and sales of the accused products.
23

24              **(e)    Apple's Claimed Use of the '647 and '721 Patented
                        Functionalities Has Received Limited Attention**

25       46.    In order to further examine consumer interest in the functionalities protected by

26

27       [61] *See e*.g., Weber Shandwick and KRC Research, "Buy It, Try It, Rate It," September 2012, at
     2, 3, 7.
28       [62] Chevalier Report, Exhibit 46, attached hereto at Exhibit 2 at page 228.

Apple's patents, I conducted an examination of professional and consumer reviews related to specific iPhone models.   This was done in order to capture the extent to which consumer interest might be reflected in reviews prior to the introductions of the accused products.   Interpreting such an analysis requires careful consideration.   Smartphone purchasers have heterogeneous preferences, so what is (or at one time was) important to an Apple customer may not be as important to a Samsung customer, and vice versa.[63]

47.     It is my understanding that Apple first incorporated functionalities associated with the '721 patent in the original iPhone.   I understand that Apple claims the '647 patent was first included in iOS 3 with the iPhone 3GS.   I understand that Apple does not claim to have ever practiced the relevant claim of the '172 patent.   I analyzed the reviews associated with the introductions of the iPhone and iPhone 3GS to see if these accused features were among those mentioned in the reviews of Apple products upon their first introduction.   In doing so, I applied the same methodology that I used for my examination of the Samsung reviews described above.

48.     My examination of professional reviews related to specific iPhone models is summarized in Exhibits 48 and 49 of my expert report, attached hereto at Exhibit 2 at pages 233-238.   Reviews for the original iPhone are potentially informative of the relative importance of the '721 patent.   As the exhibits show, 1 professional review mentioned the '721 patent functionality in 2 sentences.   That represented 0.1 percent of sentences.   The extent to which reviewers emphasized functionalities associated with the '647 patent would be captured by reviews surrounding the introduction of iPhone 3GS/iOS3.   Looking at these reviews shows that this feature was mentioned in two sentences by one review, accounting for 0.1 percent of the review sentences.   Across all Apple product reviews, the asserted functionalities of the '647 and '721 patents collectively had 11 mentions, representing roughly 0.1 percent of the sentences mentioning features (even with the general over-inclusive methodology described previously).

49.     I also have summarized my analysis of consumer reviews for Apple products from Amazon in Exhibit 50 to my expert report, attached hereto at Exhibit 2 at page 239.   Consistent

---

[63]     ███████████████████████████████████████████████████████████
████████████ *See, e.g,* DX 437.020; DX 418.012-013; SAMNDCA630-07590626-41, at 38.

1   with the results of the professional reviews, these show limited mentions of the asserted

2   functionalities.   The '647 patent functionality received no mentions.   The '721 patent

3   functionality was mentioned 2 times (or in 0.0 percent of the sentences).   In contrast, important

4   product characteristics such as battery life and screen size received substantial mentions in these

5   consumer reviews.

6          50.   Given that the '647 functionality is asserted by Apple to have first been included in

7   the iPhone 3GS, if it was viewed as important to consumers, one would expect it would play a role

8   in consumer and reviewer opinions about the benefits of the iPhone 3GS relative to the iPhone 3G.

9   The evidence shows it did not.   Of note, some iPhone 3GS reviewers characterized the changes to

10  the iPhone 3GS as "more evolutionary than revolutionary"[64] and noted that "[t]he iPhone 3GS

11  doesn't make the same grand leap that the iPhone 3G made from the first-generation model."[65]

12  Reviewers of the iPhone 3GS highlighted improvements including multimedia messaging, video

13  recording, voice control, improved battery life, improved camera resolution, spotlight search, turn-

14  by-turn navigation, digital compass, copy & paste, and landscape keyboard.[66]   Apple also did not

15  highlight the '647 functionality in its iPhone 3GS press release, suggesting Apple also did not

16  consider the '647 functionality a significant development.[67]

17         51.   Like Samsung's advertisements, Apple's commercials for the iPhone usually focus

18  on a small number of features.   Although some early advertisements showed the slide-to-unlock

19  functionality, the focus of the ads was not on the slide-to-unlock feature itself.[68]

20

21

22  _____

23  [64] http://online.wsj.com/article/NA_WSJ_PUB:SB124525573550923759.html (viewed
    6/10/2013).

24  [65] reviews.cnet.com/smartphones/apple-iphone-3gs-16gb/4505-6452_7-33674172.html
    (viewed 6/11/2013).

25  [66] *See, e.g.,* reviews.cnet.com/smartphones/apple-iphone-3gs-16gb/4505-6452_7-
    33674172.html (viewed 6/11/2013); and

26  http://www.nytimes.com/2009/06/18/technology/personaltech/18pogue.html?pagewanted=all&_r=
    0 (viewed 6/10/2013).

27  [67] https://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-
    Fastest-Most-Powerful-iPhone-Yet.html (viewed 7/08/2013).

28  [68] *See, e.g.,* Deposition of Steven Sinclair, April 4, 2012, at p. 102.

**(f)     The Incorporation of the Patented Elements Plays No Measurable Role in Marketplace Outcomes**

52.     In addition to the examination of documents, advertising, and product reviews outlined above, I examined the extent to which the profitability and performance of products in the marketplace reflected inclusion or exclusion of the patented elements.   This analysis is particularly relevant to the '172 and '721 patents, as recent Samsung products-at-issue were not accused of practicing the asserted claims of those patents.   My analysis suggests that the '172 and '721 patents are not important drivers of product success.   This conclusion is supported, in part, by the observation that the Galaxy S III, which was never accused of incorporating the asserted claims of either the '172 or '721 patents, is more profitable and more popular than previous phones that were alleged to embody one or both of those patents.[69]   This analysis suggests that the '172 and '721 patents are not important drivers of product performance, as non-infringing products are more profitable than, and as equally salable as, the earlier infringing ones.

**3.     There is No Evidence That Incorporation of the '647, '721, and '172 Patented Features Significantly Increases the Price of Smartphones**

53.     Apple has presented no evidence that smartphone prices are at all impacted by incorporation of the '647, '721, and '172 patented functionalities.   Indeed, marketplace evidence generally shows that very few features have independent impacts on smartphone price and that individual software features have, if anything, negligible impacts on prices.

54.     This is confirmed by looking at Apple's historical pricing, which reveals that very few features impact product price.   One such feature is memory size, as historically, each generation of the iPhone has been offered at three different price levels corresponding to different memory capacities (for example, the iPhone 5S is currently offered for $199 for 16GB capacity, $299 for 32GB capacity, and $399 for 64GB capacity).[70]

55.     In addition, price differences between Apple's new and older models are dictated in large part by a few important hardware features, such as screen size, processor speed and camera

---

[69]  Trial testimony of Judith Chevalier, April 21, 2014, Transcript Vol. 10, at 2423-25; Trial Testimony of Christopher Vellturo, April 11, 2014, Transcript Vol. 6, at 1411.

[70]  Prices are consumer prices with a two-year contract.   http://store.apple.com/us/buy-iphone/iphone5s (viewed 6/5/2014).

quality.   Consistent with this, Apple's Vice President of Finance and Worldwide Business

Management for Product Marketing, Mark Donnelly, testified that the factors considered when

setting prices for new and existing iPhone models, upon the launch of a new generation, include:

████████████████████████████████████████████████████████

███████████████████[71]

56.    The lack of a significant impact of individual software features on price also is

supported by Apple's own estimates of the Estimated Selling Price ("ESP") of software upgrades.

Apple, has (1) in the past, charged for operating system upgrades for certain products;[72] and (2)

estimated, for GAAP accounting purposes, the market price of operating system upgrades related

to its iPhone and iPad products.[73]   Those prices have ranged from $10 to $25 for rights to *entire*

---

[71]  Deposition of Mark Donnelly, August 14, 2013, at 104 (emphasis added).

[72]  Prior to 2010, Apple charged iPod Touch users $10 to upgrade to the next version of the operating system, including updates to the iPod Touch versions of the iOS 2.0 and iOS 3.0 operating systems that are used by some of Apple's practicing products in this matter. *See, e.g.,* http://appleinsider.com/articles/09/06/25/upgrade_fee_sees_few _ipod_touch_users_updating_to_3_0_software (viewed 7/01/2013); http://www.macworld.com/article/1134502/ipodtouch.html (viewed 9/12/2013).   Of note, it was reported that only a small fraction of iPod Touch users actually purchased upgrades for $10 per unit, indicating that many iPod Touch buyers did not value the incremental functionality provided by the OS upgrade. http://appleinsider.com/articles/09/06/25/upgrade_fee_sees_few_ipod_touch_users_updating_to_3 _0_ software (viewed 9/12/2013).

[73]  According to Apple's SEC filings, software upgrade rights sold with each iPhone and iPad have varied from $10 to $25 over time. *See e.g.,* DX 451.52.   As part of its process of creating its periodic financial filings, Apple has accounted for a portion of the revenue generated on sales of certain of its products, including iPhones and iPads, as deferred revenue to account for the fact that as part of the sales of these products, customers purchase "unspecified and specified software upgrade rights and non-software services that are attached to hardware and software products." DX 451.051. To determine the appropriate amount of revenue to be deferred and allocated on a straight line basis "over the estimated lives of each of these devices, which range from 24 to 48 months," Apple determines "the best estimate selling price ('ESP')" of the unspecified and specified software upgrade rights and non-software services, which, according to Apple, "reflect[s] the Company's best estimates of what the selling prices of elements would be if they were sold regularly on a stand-alone basis."   DX 451.029.   Apple's 2011 Form 10-K also noted:
…the Company has concluded that if it were to sell upgrade rights or access to the non-software services on a standalone basis, including those rights and services attached to iOS devices, Mac and Apple TV, the selling prices would be relatively low. Key factors considered by the Company in developing the ESPs for software upgrade rights include prices charged by the Company for similar offerings, market trends for pricing of

1   iOS upgrades.[74]   As discussed above, according to Apple, each iOS upgrade provides users with

2   over 100 or 200 new features.   Assuming the $10 to $25 reflects the price of a single upgrade

3   with 100 new features, the average price per feature would amount to $0.10 to $0.25.   Of note, the

4   functionality of the '647 patent was allegedly included in the iOS 3 upgrade.   Although Apple

5   press releases highlighted some new features in this upgrade, the '647 functionality was not

6   highlighted.   The lack of discussion in reviews and press releases of the '647 patented

7   functionality (and other accused features), as compared to other features, suggests it may be

8   relatively less valuable than average iOS upgrade features.

9                    **4.        Conclusions**

10        57.        In summary, there are a considerable number of features in the products-at-issue.

11   Individual software features generally do not rise to the same importance as brand, carrier, price,

12   and manufacturer marketing in driving sales.   Even if software were to matter to consumers

13   generally, there is a general lack of interest in granular software feature details and distinctions

14   across phones, as elements like the allegedly patented functionalities are not promoted by

15   Samsung or emphasized in product reviews.   Thus, there are limited means by which consumers

16   could explore and compare granular feature distinctions prior to purchase, and there is limited

17   evidence, if any, that consumers actually do so.

18

---

19        Mac and iOS compatible software, the Company's historical pricing practices, the nature
20   of the upgrade rights (e.g., unspecified and when-and-if-available), and the relative ESP
     of the upgrade rights as compared to the total selling price of the product. The Company
21   may also consider, when appropriate, the impact of other products and services, including
     advertising services, on selling price assumptions when developing and reviewing its
22   ESPs for software upgrade rights and related deliverables. The Company may also
     consider additional factors as appropriate, including the pricing of competitive
23   alternatives if they exist and product-specific business objectives. When relevant, the
     same factors are considered by the Company in developing ESPs for offerings such as the
24   non-software services; however, the primary consideration in developing ESPs for the
     non-software services is the estimated cost to provide such services over the estimated
25   life of the related devices, including consideration for a reasonable profit margin. DX
     451.052.
26   [74] *See* Apple Inc. Form 10-KA for the fiscal year ended September 26, 2009, at 6; Apple Inc.
27   Form 10-K for the fiscal year ended September 25, 2010, at 52-53; Apple Inc. Form 10-K for the
     fiscal year ended September 24 2011, at 49; Apple Inc. Form 10-K for the fiscal year ended
28   September 29, 2012, at 49.

58.     My analysis of product reviews, internal documents, promotional materials, and marketplace outcomes, among other evidence, indicates that the features accused of infringing the '647, '721 and '172 patents are not among the features that cause people to buy Samsung products, their incorporation (separately or together) into smartphones does not significantly increase the desirability of the devices, their absence from smartphones does not significantly decrease the desirability of the devices, and their incorporation does not significantly increase the price of smartphones.

**C.     There Is No Evidence That Apple's Brand or Reputation Will Suffer in the Absence of an Injunction on the '647, '721, and '172 Patents**

59.     There is no evidence that Apple's reputation will suffer in the absence of an injunction.   Apple has not demonstrated its brand or reputation has actually been harmed since infringement began or that such harm will occur in the future, or that any brand or reputational harm Apple has suffered, or would suffer, is tied to Samsung's use of the '647, '721 and '172 patents.   In addition, Apple's assertion that it will suffer harm to its reputation as an innovator because "Samsung is viewed as a 'fast follower' and 'not an innovator'" is contrary to a substantial amount of evidence that Samsung is an innovator and is viewed as such in the marketplace.

**1.     Apple Has Presented No Proof That Harm to its Brand or Reputation Is Likely**

60.     Despite claiming it will sustain harm to its "reputation as an innovator" due to Samsung's infringement, Apple neither conducted, nor cited to, any analysis of the harm suffered from Samsung's use of these three patents since 2011.   Instead, the evidence presented in Apple's motion is limited to unsupported statements made at trial by Apple executive, Phil Schiller, that "[Samsung's infringement] has caused people to question some of the innovations that [Apple has] created and Apple's role as the innovator,"[75] and assertions that Apple's "reputation as an innovator" would be harmed because its inventions were being used Samsung, a company that is perceived as "not an innovator" and as a "fast follower."[76]

---

[75] Apple Inc's Motion for a Permanent Injunction, May 23, 2014, at p. 7.
[76] Apple Inc's Motion for a Permanent Injunction, May 23, 2014, at p. 7-9.

### 2. Evidence from Apple Product Reviews Suggest the Patents-at-Issue Are Not Influential to Apple's Reputation

61. Infringement of the three patents-at-issue cannot be harmful to Apple's brand because, among other things, there is no evidence that Apple's reputation as an innovator was meaningfully connected to these patents prior to infringement. Publicly available information suggests Apple's reputation as an innovator has come, largely, from its history of recurrently launching new products and services, like the iPod, iPhone, iPad, iTunes store, and App store, that either create, redefine, or disrupt entire product or service categories.[77] To some degree, Apple's reputation for innovation may be enhanced by also periodically adding certain services or broader features to existing products, such as, perhaps, iCloud, Siri and/or FaceTime, that significantly improve its existing products.[78]

62. As discussed above, individual software features rarely impact consumer purchases, and some of the same evidence suggests that individual software features would not drive Apple's reputation as an innovator. Furthermore, any product features that would be associated (by the public) with Apple innovativeness would be expected to be mentioned in product reviews when the features were first introduced. Broader features such as iCloud, Siri and/or FaceTime were mentioned in professional reviews of Apple products.[79] However, as

---

[77] *See, e.g.,* http://www.forbes.com/sites/darcytravlos/2013/03/24/apple-cash-margins-and-innovation-the-obvious-strategy/ (viewed 6/05/2014) ("Apple is the innovator for consumer technology. Apple is the company that made consumers have to have iPods, iPhones, and iPads. Apple was not the very first to introduce a music player, smartphone or tablet, but it has been the first to mass-popularize each."); http://www.usatoday.com/story/tech/2013/12/23/apple-crunch-year-2014/4143685/ (viewed 6/05/ 2014) ("Apple introduced the iPod in October 2001, revolutionizing music consumption. The iPhone came out in January 2007 and quickly dominated the lucrative high end of the mobile phone industry. The iPad came three years later, creating a new category that is still eating into the huge PC sector."); http://money.cnn.com/2013/06/09/technology/new-apple-products/ (viewed 6/05/2014) ("The problem with [Apple's] business model is that it forces Apple to constantly come up with a groundbreaking new product. Apple has done a remarkable job at that: The iPod, iPhone and iPad have all defined their product category.")

[78] *See, e.g.,* http://venturebeat.com/2010/06/07/how-apple-is-setting-itself-apart-from-the-pack-of-iphone-clones/; http://www.newscientist.com/article/mg21228365.300-how-innovative-is-apples-new-voice-assistant-siri.html#.U4pdevldWz5. (both viewed 6/05/2014).

[79] *See, e.g.,* http://online.wsj.com/news/articles/SB10001424052970203633104576625072852930788 (viewed

discussed above, reviews of Apple products make very little mention of the features associated

with the '647 and '721 patents, even at the time these functionalities were first introduced and

supposedly novel, indicating that these features were not important to building Apple's reputation

as an innovator.   In addition, Apple product press releases, while mentioning a few headline

features and the *number* of new features, did not mention the patented features when first

launched, suggesting these patents were never among the features that Apple believed would drive

its sales or its brand and reputation.[80]   It is even harder to fathom that Apple's reputation as an

innovator could be connected in any way to the relevant claim of the '172 patent, which Apple has

never even claimed to practice.[81]

### 3.   Apple's Assertion That Samsung Is Not an Innovative Firm Is Unfounded

63.   As support for the likelihood that Samsung's continued use of the '647, '721 and

'172 patents would cause irreparable harm to Apple's reputation, Apple asserted that Samsung is

perceived as a company that is "not an innovator," and that is a "fast follower."[82]   That is a

mischaracterization of the evidence Apple cited and is contradicted by other evidence.   Apple's

assertions were drawn from testimony of Samsung's Todd Pendleton, who said that there was in

---

6/10/2013), http://www.nytimes.com/2011/10/12/technology/personaltech/iphone-4s-conceals-sheer-magic-pogue.html?pagewanted=all (viewed 6/10/2013), and http://pogue.blogs.nytimes.com/2011/10/13/a-look-at-icloud/ (viewed 6/4/2014) for discussions of Siri and iCloud.  *See, e.g.,* http://www.brighthand.com/printArticle.asp?newsID=16719 (viewed 6/4/2014) and http://www.engadget.com/2010/06/22/iphone-4-review/ (viewed 6/05/2014) for discussions of FaceTime.

[80]  *See, e.g.,* https://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html (viewed 9/6/2013); http://www.apple.com/pr/library/2008/06/09Apple-Introduces-the-New-iPhone-3G.html (viewed 6/10/2013); https://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html (viewed 9/12/2013); http://www.apple.com/pr/library/2010/06/07Apple-Presents-iPhone-4.html (viewed 9/12/2013) ; http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html (viewed 9/12/2013); http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5.html (viewed 9/12/2013).

[81]  Apple Inc.'s Supplemental Objections and Responses to Samsung's Second Set of Interrogatories, May 28, 2013, at Interrogatory No. 25; Apple's List of Accused Products and Asserted Patent Claims Pursuant to July 31, 2013, and January 16, 2014, Court Orders, February 4, 2014.

[82]  Apple Inc's Motion for a Permanent Injunction, May 23, 2014, at p. 9.

1  the past a perception that Samsung was a fast follower and not an innovator.[83]   Mr. Pendleton,

2  however, also testified that Samsung was not just a fast follower and has innovated in introducing

3  its large-screened products, its Note product line, products using a stylus, and with respect to near

4  field communication.[84]

5       64.   Both industry analysts and technology reviewers have noted Samsung's reputation

6  as an innovator based on these kinds of hardware innovations.   A 2013 ranking by Boston

7  Consulting Group of the most innovative companies across all industries and regions listed

8  Samsung as the second most innovative company (behind only Apple).[85]   A 2013 Credit Suisse

9  mobile handset industry report noted the innovations specifically in Samsung's smartphone

10  portfolio, highlighting the company's "success in its experiment with launching bigger screen size

11  smartphones."[86]

12       65.   Samsung also ranks as an innovative firm with a solid brand on several objective

13  measures.   Samsung was granted 4,676 U.S. patents in 2013, the second highest number behind

14  IBM.[87]   For the 12 months ended December 31, 2013, Samsung spent approximately $13.6

15  billion on research and development.[88]   Overall, Samsung was ranked as the 8th most valuable

16  global brand in 2013 by Interbrand, the 29th most valuable global brand for 2014 by Millward

17  Brown, and the 9th most valuable brand in 2013 by Forbes.[89]   Mr. Pendleton also testified that

18  based on Samsung's recent marketing campaigns such as "the next big thing," Samsung had

19  become the number one "viral brand" in the world.[90]

20  **III.   THE JURY'S VERDICT REFLECTS A LUMP SUM REASONABLE ROYALTY**

21       66.   As I testified at trial, the appropriate form of damages is a lump sum royalty

---

[83] Trial testimony of Todd Pendleton, April 14, 2014, Transcript Vol. 7, at 1697-1698.
[84] Trial testimony of Todd Pendleton, April 14, 2014, Transcript Vol. 7, at 1703-1704.
[85]https://www.bcgperspectives.com/content/articles/innovation_growth_most_innovative_companies_2013_lessons_from_leaders/print (viewed 5/29/2014).
[86] Credit Suisse, "Handset Industry 2013 Outlook," January 7, 2013, at 72.
[87] https://www.ificlaims.com/index.php?page=misc_top_50_2013 (viewed 5/29/2014).
[88] Capital IQ.
[89] Interbrand, "Best Global Brands 2013," at 10; , Millward Brown Optimor, "BrandZ Top 100 Most Valuable Global Brands 2014," at 27; http://www.forbes.com/powerful-brands/list/ (viewed 5/27/2014).
[90] Trial testimony of Todd Pendleton, April 14, 2014, Transcript Vol. 7, at 1676-1681.

1  payment.[91]   My conclusion that the appropriate form of a reasonable royalty award would be a

2  lump sum, which was never rebutted by Dr. Vellturo at trial, ███████████████████

3  ████████████████████████████████████████████

4  ████████████████████[92]   In addition, various economic

5  considerations such as commercialization efforts, apportionment of product success and audit

6  costs support a lump sum arrangement.[93]

7         67.   The jury's damages award is consistent with a lump sum royalty award.   The jury

8  chose an overall award of $119,625,000 and allocated 82.50% of that amount to the '647 patent,

9  2.50% to the '721 patent and 15.00% to the '172 patent.[94]   █████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████   Consistent with a "top

12 down" approach, the jury's damages award does not provide for a uniform per-unit royalty rate for

13 any of the three patents.   ████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████

16 ████████████████

17        68.   The jury's correction of their damages figure to account for the non-award of

18 damages for the Galaxy S II (JX32) for the '172 patent provides further evidence that the award

19 was a lump sum payment.   Having been informed that it failed to calculate damages for one

20 product for one patent (i.e., the Galaxy SII / JX32 for the '172 patent), the jury simply reallocated

21     [91] Trial testimony of Judith Chevalier, April 21, 2014, Transcript Vol. 10, at 2422-23.

22     [92] Chevalier Report, at p. 169.
    [93] Chevalier Report, at pp. 168-170.

23     [94] Amended Verdict Form, pp. 8-9.   In dollar terms, the jury allocated $98,690,625 for the
'647 patent, $2,990,625 for the '721 patent, and $17,943,750 for the '172 patent. *See also* Exhibit

24 3.

25     [95] Exhibit 4; and DX 453A.012. Exhibit 4 shows that for each of the first eight products on the
verdict form, the percent allocations are within a tenth of a percent of the allocations in what I

26 presented at trial. For the Stratosphere (JX37), the jury appears to have awarded damages amounts
that equal the difference between the per patent total and the sum of the damages amounts

27 accounted for by the first 8 products.
    [96] This is true using either my calculation of total units or Dr. Vellturo's calculation of total

28 units.   *See* Exhibit 5.



1  damages across products to keep its original total damages award the same.[97]   In other words,

2  consistent with a lump sum award, the jury did not change either the total damage award or the

3  damages allocated to the '172 patent to reflect the changed number of units.[98]

4  **IV.   APPLE'S CLAIMED HARMS ARE MONETARILY COMPENSABLE**

5        69.      Apple's reasoning for the non-compensable nature of the infringement appears to

6  be largely based on an assertion that Samsung's continued infringement will cause losses to Apple

7  downstream sales in the form of lost future iPhone sales and/or lost sales of related products.[99]

8  Apple's reasoning requires that the patents-at-issue drive the initial purchase.   However, as

9  discussed above, I have seen no evidence that the '647, '721 and '172 patents, separately or

10 together, drive any demand.   And I have seen no evidence in this matter that shows the patents

11 themselves will promote any additional purchases.   Thus, as discussed above, Samsung's practice

12 of the patents-at-issue does not lead to lost sales for Apple.   Given that Samsung's practice of the

13 patents does not lead to current lost sales for Apple, the practice of the patents cannot lead to

14 *future* lost downstream sales for Apple.

15       70.      Furthermore, Dr. Vellturo's reasonable royalty presentation at trial included a

16 calculation of ecosystem effects.   As I pointed out in my expert report, Dr. Vellturo's calculations

17 contain conceptual flaws that result in overstatement of the magnitude of ecosystem effects.[100]

18 This is due in part to Dr. Vellturo's faulty assumption that the repeat purchase propensity (or

19 stickiness) of the average Apple consumer is a reasonable proxy for the product loyalty of the

20 marginal Apple consumer.   Thus, albeit overstated, the jury was presented a quantification of the

21 magnitude of ecosystem effects at trial and the jury was able to place whatever weight on that

22 quantification that they deemed appropriate in arriving at a damages award.[101]

23       71.      Apple's other argument against possible compensation is the continued negative

24 reputational effects from Samsung's future use of the patents.   However, as discussed above,

25 ───────────────
   [97]  Compare original Verdict Form, pp. 8-9 and Amended Verdict Form, pp. 8-9.
26 [98]  *See* Exhibit 3.
   [99]  Apple Inc's Motion for a Permanent Injunction, May 23, 2014, at p. 16.
27 [100]  Chevalier Report, at p. 163.
   [101]  Trial testimony of Christopher Vellturo, April 11, 2014, Transcript Vol. 6, at 1308-10, 17-
28 18.

1  these patents are not meaningful enough to drive product demand, let alone impact the reputation

2  of a large technology company.

3      72.    That Apple can be made whole by monetary compensation is also supported by the

4  fact that Apple has in the past licensed out the patents-at-issue and offered to license at least one of

5  the patents to Samsung. ████████████████████████████████████████████

6  ████████████████████████████████████████████████ ▉  In

7  addition, the '647 patent was specifically called out in the licensing discussions that Apple and

8  Samsung engaged in prior to the filing of this complaint.   This is reflected in an August 2010

9  presentation prepared by Apple for a meeting with Samsung that called out the '647 patent and

10 specifically stated that "Samsung needs a license to continue to use Apple patents in infringing

11 smartphones."[103]

12

13      I declare under penalty of perjury under the laws of the United States of America that the

14 foregoing is true and correct.

15

16      Executed on June 6, 2014, at New Haven. CT.

17

18      *Judith A Chevalier*

19                                          JUDITH A. CHEVALIER

20

21

22

23

24

25

26

---

27  [102] *See*, APLNDC-Y0000408242-383; APL-ITC796-0000010041-79; APLNDC-X0000007220-355.

28  [103] APLNDC00001103-1125, at 117, 125.

# EXHIBIT 1

# EXHIBIT 1

**Curriculum Vitae**
Judith A. Chevalier

**Home:**                                                    **Office:**
236 Edwards St.                                              School of Management
New Haven, CT 06511                                          Yale University
(203) 787-6518                                               135 Prospect Street
                                                            New Haven, CT 06520
**Email:** judith.chevalier@yale.edu                         (203) 432-3122

**Primary Positions:**

February 2005-present, William S. Beinecke Professor of Economics and Finance, Yale School of Management.

September 2007-June 2009, Deputy Provost for Faculty Development, Yale University.

June 2001- February 2005, Yale University School of Management, Professor of Finance and Economics.

July 1999-May 2001, University of Chicago, Graduate School of Business, Professor of Economics.

July 1997-June 1999, University of Chicago, Graduate School of Business, Associate Professor of Economics.

July 1994-June 1997, University of Chicago, Graduate School of Business, Assistant Professor of Economics.

July 1993 - June 1994, Harvard University, Department of Economics, Assistant Professor of Economics.

**Other Positions:**

Organizing Committee, Econometric Society Winter Meetings,  2014-2015.

Provost's Review Committee, Columbia Business School, 2013.

Honors and Awards Committee, American Economic Association, 2012-.

Presidential Search Committee, Yale University, 2012.

Honors and Awards Committee, American Economic Association, 2012- .

Co-editor, *Rand Journal of Economics*, May 2009-March 2013.

Prize committee, Fisher Black Prize, American Finance Association, 2008.

National Science Foundation, Economics Review Panel, 2007-2009.

Editorial Board, *Journal of Industrial Economics*, 2006-2011.

Nominating Committee, American Economic Association, 2007-2008.

Nominating Committee, American Academy of Arts and Sciences, 2006, 2009, 2010.

## EXHIBIT 1

Co-Editor, *American Economic Review*, November 2004-June 2007.

Yale University Budget Committee, Co-chair, 2012-

Steering Committee, Committee on Yale College Education, 2010- .

Advisory Board, Journal of Economic Perspectives, 2009-2012.

Chair, Faculty Section and Steering Committee, Committee on Yale Reaccreditation, 2008-2010.

Search Committee, American Economics Association committee for the editor of the AEA Journal of Microeconomics, Fall 2006.

Executive Committee, American Economic Association, January 2005- January 2008. Member of the finance committee, audit committee, and ad hoc committee on journals.

Visiting Committee, MIT Economics Department, February 2005, February 2007, March 2011.

Member, Dean Search Committee, Yale School of Management, 2004- 2005, 2009-2010.

Chair, Yale University Committee on Cooperative Research, 2003-2006.  Member, 2002-2003.

Member, Provost's Committee on Sexual Misconduct, 2009-2010

Member, Council of the Women's Faculty Forum, Yale University, 2003-2009.

Member, Board of the Chief Executive Leadership Institute, 2005-present.

January 2002-December 2004. Board member, Committee on the Status of Women in the Economics Profession (CSWEP), American Economic Association.

January 2002-present.  Fellow, Davenport College, Yale University.   Member, Summer 2005, search committee for Davenport College Dean.

February 2003- October 2004.  Editor, The B.E. Journals in Economic Analysis and Policy.

AEA Search Committee for Editor of the Journal of Economic Literature, 2003.

January 2002-2009.  Advisory Board, *Quantitative Marketing and Economics*.

January 2001-July 2002.  Associate Editor, *American Economic Review*.

March 2000-September 2004. Associate Editor, The *Journal of Finance*.

American Finance Association nominating committee, 1999.

July 1999 – July 2002, Associate Editor, *Review of Financial Studies*.

January 1999 – December 2003, Associate Editor, *Quarterly Journal of Economics*.

January 1999 – December 2003, Associate Editor, *Journal of Economic Perspectives*.

**EXHIBIT 1**

July 1997-October 2004, Associate Editor, *Journal of Industrial Economics*.

January 1996-October 2004, Associate Editor, *Rand Journal of Economics*.

September 1999-present, Research Associate, National Bureau of Economic Research.

September 1993-September 1999, Faculty Research Fellow, National Bureau of Economic Research.

Consortium Faculty, Cardean University, Unext.com, 1999-2001.  Consulted on design of web-based strategy course.

**Research Interests:**

Time use.  Competition in high technology industries and telecommunications. Competition and regulation in retail industries; implications of retail pricing behavior for macroeconomics.  Competition on the Internet and for information goods.  The problems facing durable goods manufacturers.  The interaction between firm capital structure and product market competition.  The impact of liquidity constraints on markup, inventory, and capital expenditure cyclicality.   Testing models of agency and career concerns.  The impact of "noise traders" on financial markets.  Cross-subsidization of activities within conglomerate firms.

**Education:**

May, 1993, Ph.D., Economics, Massachusetts Institute of Technology.

May, 1989, B.A., *summa cum laude*, Yale University, Distinction in the Major, Economics.

**Honors and Awards:**

Elected Fellow, Econometric Society, 2013.

National Science Foundation research grant for 2011-2014, SBR 1128322, "Strategic Shoppers."

William F. O'Dell Award, *Journal of Marketing Research*, 2011.  For paper published in the *Journal of Marketing Research*, August 2006.

Elected member, American Academy of Arts and Sciences, 2006-present.

nominated paper, Smith Breeden prize, Journal of Finance, 1999.  For paper published in the Journal of Finance, June 1999.

recipient, first annual Elaine Bennett Research Prize.  This prize is intended to recognize research by a young woman in any area of economics.  The prize is administered by the American Economic Association Committee on the Status of Women in the Economics Profession.  Presented January 1999.

Alfred P. Sloan Foundation, Sloan Research Fellow, Awarded for 1997-1998, and 1998-1999 academic years.

Smith Breeden "Distinguished Paper" prize, *Journal of Finance*, 1995.  Prize awarded for paper published in the *Journal of Finance*, September 1995.

**EXHIBIT 1**

National Science Foundation research grant SBR 94-14141 for 1994-1996.

Review of Economic Studies tour (one of seven doctoral students presenting work at conferences in Europe and Israel), Summer, 1993.

National Science Foundation Graduate Fellowship, 1989-1992.

Dickerman Prize, Yale University, for Best Senior Thesis in Economics, 1989.


**Publications:**

With Dina Mayzlin and Yaniv Dover, "Promotional Reviews: An Empirical Investigation of Online Review Manipulation", *American Economic Review,* 2014.

With Jonathan Baker, "The Competitive Consequences of Most Favored Nations Provisions", *Antitrust Magazine*, Spring 2013.

With Keith Chen, "Are Women Overinvesting in Education? Evidence from the medical profession," *Journal of Human Capital,* Summer 2012.

With Austan Goolsbee, "Are Durable Goods Consumers Forward Looking?  Evidence from  the College Textbook Market", *Quarterly Journal of Economics* vol 124, November 2009.

With Keith Chen, "The Taste for Leisure, Career Choice, and the Returns to Education", *Economics Letters*  Vol. 99, May 2008, 353-356.

With Fiona Scott Morton, "State Casket Seller Restrictions:  A Pointless Undertaking?", *Journal of Law and Economics*, August 2008.

With Dina Mayzlin, "The Effect of Word of Mouth on Sales:  Online Book Reviews", *Journal of Marketing Research*, August 2006.

"What Do We Know About Cross-subsidization? Evidence from Merging Firms.", *Advances in Economic Analysis & Policy* 2004: Vol. 4: No. 1, Article 3.
http://www.bepress.com/bejeap/advances/vol4/iss1/art3

with Austan Goolsbee,  "Valuing Internet Retailers:  Amazon and Barnes and Noble", *Advances in Applied Microeconomics* 12:  Organizing the New Industrial Economy, 2003.

with Austan Goolsbee, "Measuring prices and price competition online:  Amazon vs. Barnes and Noble," *Quantitative Marketing and Economics* I (2), June 2003.

with Anil Kashyap and Peter Rossi, "Why don't price rise during periods of peak demand? Evidence from scanner data," *American Economic Review,* March 2003.

with Dennis Carlton, "Free riding and sales strategies on the internet," *Journal of Industrial Economics*, December 2001.

with Chris Avery, "Identifying Investor Sentiment from Price Paths:
The Case of Football Betting," *Journal of Business*, October 1999.

with Glenn Ellison, "Are Some Mutual Fund Managers Better than Others?  Cross-sectional Patterns in Behavior and Performance", *Journal of Finance*, June 1999.

**EXHIBIT 1**

with Chris Avery, "Herding over the Career," *Economics Letters*, June 1999.

with Glenn Ellison, "Career Concerns of Mutual Fund Managers," *Quarterly Journal of Economics*, May 1999.

with Chris Avery and Scott Schaefer, "Why Do Managers Undertake Acquisitions?: an Analysis of Internal and External Rewards to Acquisitiveness", *Journal of Law, Economics, and Organization*, April 1998.

with Glenn Ellison, "Risk Taking by Mutual Funds as a Response to Incentives," *Journal of Political Economy*, December 1997. Reprinted in P.L. Joskow and M. Waterson, eds., *Empirical Industrial Organization*, Edward Elgar, 2004.

with David S. Scharfstein, "Capital Market Imperfections and Countercyclical Markups: Theory and Evidence," *American Economic Review*, September 1996.

"Do LBO Supermarkets Charge More? An Empirical Analysis of the Effects of LBOs on Supermarket Pricing," *Journal of Finance*, September 1995.

"Capital Structure and Product Market Competition: Empirical Evidence from the Supermarket Industry," *American Economic Review*, June 1995. Reprinted in P.L. Joskow and M. Waterson, eds., *Empirical Industrial Organization*, Edward Elgar, 2004.

with David S. Scharfstein, "Liquidity Constraints and the Cyclical Behavior of Markups," *American Economic Review Papers and Proceedings*, May 1995.


**Working Papers/Work in Progress:**

With Veronica Guerrieri and Anil Kashyap, "Consumer Search and Monetary Policy Non-Neutrality", work in progress.

With Chris Avery and Richard Zeckhauser, "The CAPS Prediction System and Stock Market Returns", NBER Working Paper 17298, May 2013. In revision.

With Anil Kashyap, "Best Prices: Implications for Price Measurement", February 2014, Prior version: NBER Working Paper 16680.

With Fiona Scott Morton and David Harrington, "Regulating Direct Cremations: The Cost of Seemingly Small Regulatory Changes", January 2011.

With Fiona Scott Morton and David Harrington, "Differentiated to Death? Examining the Roles of Proximity and Preference in the Patronage of Co-Ethnic Businesses", Yale School of Management  working paper, February 2013.

with Austan Goolsbee, "Entry and Market Size: The College Textbook Market."


**Popular Publications/ Teaching Cases:**
With Dina Mayzlin and Yaniv Dover, "Who Gave that Hotel Five Stars? The Concierge", *Harvard Business Review*, September 2012.

**EXHIBIT 1**

With Keith Chen, "Is Medical School a Worthwhile Investment for Women?", the Atlantic Online Edition, July 23 2012.

With Jaan Elias, "Potash Corporation of Saskatchewan", Yale Case 11-031, October 2011.

*New York Times*, "A Carbon Cap that Starts in Washington", 12/16/07.

*New York Times*, "In Search of Wireless Wiggle Room", 10/21/07.

*New York Times*, "Welcome Stranger, Here's a Speeding Ticket", 9/2/07.

*Slate*, "Oversell" 12/12/06.

*Financial Times*, ."The Pros and Cons of Entering a Market," *Financial Times Mastering Strategy Series*, November 1, 1999. Reprinted in Mastering Strategy, Prentice Hall, 2000

*Financial Times*, "When it Can be Good to Burn your Boats," *Financial Times Mastering Strategy Series*, October 25, 1999. Reprinted in Mastering Strategy, Prentice Hall, 2000


**Teaching:**      "Competitor", Core class, Yale School of Management, Fall 2011, Fall 2012, Fall 2013.

"Technology Strategy", Yale School of Management, Fall 2009.

"Business, Public Policy, and the Information Economy", Yale School of Management, Spring 2012, Fall 2010, Spring  2007, Spring 2006, Spring 2005.

Undergraduate "Business, Public Policy, and the Information Economy", Yale University, Spring 2013, Spring 2012, Spring 2010, Spring 2008,  Spring 2007, Spring 2006, Spring 2005, Spring 2004.

PhD. level Industrial Organization, Yale Economics Department, Spring 2003.

Competitive Strategy, Yale School of Management.  2002-2011.

Competitive Strategy, Graduate School of Business, University of Chicago.  Two sections, Winter 2001.  Three sections, Winter 2000.  Two sections, Autumn 1996; three sections, Autumn 1997; three sections, Autumn 1998.

Competitive Strategy, Executive MBA Program (XP), University of Chicago.  One section, Winter 2001.

PhD. Industrial Organization, Graduate School of Business, University of Chicago.  Co-taught with Dennis Carlton and Josef Perktold, Autumn 1996 and Winter 1997.

Economics of the Firm, Graduate School of Business, University of Chicago, Executive MBA course.  Taught in domestic executive program in Autumn 1995, taught in international executive program in Barcelona, July-August 1996.

Microeconomics, Graduate School of Business, University of Chicago, MBA course.  Seven sections, 1994-1995.  One section, Autumn 1999.

**EXHIBIT 1**

Industrial Organization, Department of Economics, Harvard University, Ph.D. course, Spring, 1994.  Co-taught with Glenn Ellison.

Corporate Finance, Department of Economics, Harvard University, Ph.D. course, Spring, 1994.  Co-taught with Andrei Shleifer.

Corporate Control and Governance, Department of Economics, Harvard University, Undergraduate Course, Spring, 1994.

Strategy teaching for the Business Advisor program for RSM McGladrey, Inc., Graduate School of Business, University of Chicago.  Autumn 1999, Spring 2001, Spring 2002.

**Non-academic positions:**

Board member, the Foote School, 2005-present.  Co-Treasurer and Chair of Audit Committee, 2006- 2008.  Treasurer and Chair of Finance Committee, 2009-present.

# EXHIBIT 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | |
| Plaintiff, | |
| vs. | |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | CASE No. 12-cv-00630-LHK |
| Defendants. | |

## EXPERT REPORT OF JUDITH A. CHEVALIER, PH.D.

## SEPTEMBER 13, 2013

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

I.    Assignment and Introduction ............................................................................ 1

    A.    Qualifications .......................................................................................... 1

    B.    Assignment ............................................................................................. 2

    C.    Executive Summary ............................................................................... 3

    D.    Detailed Summary of Conclusions ........................................................ 5

    E.    Materials Relied Upon ......................................................................... 13

    F.    Compensation ....................................................................................... 14

II.   Background ...................................................................................................... 14

    A.    Parties at Issue ..................................................................................... 14

        1.    Apple ........................................................................................ 14

        2.    Samsung ................................................................................... 15

    B.    Accused Products ................................................................................. 16

        1.    Smartphones ............................................................................ 16

        2.    Tablets ...................................................................................... 18

    C.    Patents-at-Issue .................................................................................... 19

        1.    The '647 Patent [Links for Structures] .................................... 20

        2.    The '959 Patent [Unified Local & Internet Search]................. 20

        3.    The '414 Patent [Asynchronous Data Synchronization] .......... 21

        4.    The '760 Patent [Missed Call Management] ............................ 21

        5.    The '721 Patent [Image Unlock]............................................... 22

        6.    The '172 Patent [Word Recommendations] ............................. 23

    D.    Marketplace at Issue ............................................................................ 23

        1.    The Smartphone and its Evolution........................................... 24

        2.    Overview of iOS and Android .................................................. 28

        3.    Smartphone Manufacturer Leadership Has Shifted Over Time .............. 30

        4.    The Tablet Marketplace Shares Similarities with the Smartphone
             Marketplace.............................................................................. 37

III.  Many Factors Contribute to Smartphone and Tablet Purchase Decisions....................... 39

    A.    Purchases are Linked to Carrier Preferences ...................................... 42

i

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

B.    Operating System Preference is a Factor in Consumer Purchase Decisions ........ 47

C.    Brand Image and its Promotion Matter to Many Customers ............................... 52

D.    Device-Specific Differentiation Impacts Consumer Choice................................ 58

IV.   The Features Enabled by the Patents-at-Issue are a Small Part of the Accused Products and their Operating Systems ................................................................................... 68

A.    Smartphones and Tablets Are Extraordinarily Complex Products with Hundreds If Not Thousands of Features and Distinct Functionalities ..................................... 69

B.    Individual Operating Software Features do not appear to Motivate Customers to Purchase Smartphones and Tablets..................................................................... 72

C.    Marketplace Evidence Indicates that the Patented Features Are Not a Discernible Driver of Demand for the Accused Products ...................................................... 75

1.    Samsung's Online Materials Do Not Emphasize the Functionalities Protected by Any of the Apple Patents ...................................................... 75

2.    Samsung's Television/Video Advertising Does Not Highlight the Functionalities Associated with any of the Apple Patents........................ 77

3.    Patented Functionalities Account for Negligible Attention in Product Reviews................................................................................................... 79

4.    Patented Functionalities Account for Negligible Attention in Consumer Reviews................................................................................................... 85

5.    The Functionalities Associated with Apple Patents-In-Suit Received Limited Attention When First Introduced by Apple................................. 85

D.    Conclusions......................................................................................................... 90

V.   The Velltro Report Overstates the Importance of the Patents-at-Issue, Relying on Qualitative Evidence that Pertains to Features Significantly Broader than the Patents and Includes Elements that are Non-infringing ................................................................ 91

A.    Ease of Use is More Than the Patents-In-Suit ................................................... 92

B.    Velltro Expands the Footprint of the Patents by using Qualitative Evidence that Largely Describes Non-Patented Features ........................................................ 103

C.    Dr. Velltro Improperly Discounts Many of Samsung's Available Design-Around Alternatives ...................................................................................................... 110

1.    The '647 Patent .................................................................................... 112

2.    The '959 Patent .................................................................................... 113

3.    The '414 Patent .................................................................................... 115

4.    The '760 Patent .................................................................................... 116

5.    The '721 Patent .................................................................................... 118

6.    The '172 Patent .................................................................................... 120

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

VI.    The Vellturo Report Lost Profits Conclusion Relies Entirely on a Flawed Conjoint Analysis Performed by Another Expert ............................................................................ 121

    A.    Professor Hauser's Analysis is Based on Inaccurate Descriptions That Overstate The Patented Functionality (Relative To Non-Infringing Alternatives) ............. 122

    B.    Professor Hauser Relies on an Erroneous Assumption to Estimate the Number of People who Purchased the Accused Devices Because of Apple's Patented Technology ................................................................................................................ 128

    C.    Professor Hauser's Analysis Generates Predictions That Differ Substantially From Actual Marketplace Outcomes ............................................................................ 131

        1.    Predictions Differ Substantially from Actual Marketplace Outcomes ... 131

        2.    Predictions Differ Substantially from Survey Respondent Ownership .. 132

        3.    Professor Hauser's Survey Generates Implausible Results ................... 132

        4.    Professor Hauser's Analysis Suggests that Demand for Each of the Individual Patented Features Dramatically Exceeds the Demand for Even the Most Popular Apps ............................................................................ 135

VII.   Lost Profits are not Warranted Because there is No Discernible Link between the Patented Functionality and Sales ............................................................................................. 136

VIII.  Critical Flaws Further Inflate the Vellturo Report Lost Profit Figures ......................... 139

    A.    Blackout Period ............................................................................................. 139

    B.    Conjoint Flaws .............................................................................................. 141

    C.    Vellturo's Mor-Flo Approach Overstates Apple Lost Sales .............................. 142

    D.    Dr. Vellturo's Incremental Profit Rates for Apple Are Overstated ................... 148

    E.    Dr. Vellturo's Capacity Analysis Fails to Account for Apple Supply Shortages 151

IX.    Vellturo Report Royalty Analysis "Double Counts" Lost Profits and Contains Other Errors that Lead to An Overstated Reasonable Royalty Starting Point ..................................... 156

    A.    Overview of Vellturo's Reasonable Royalty Analysis ....................................... 157

    B.    Vellturo Reasonable Royalty Assessment Involves Either a Double Counting or a Back Door Collection of Apple's Lost Profits .................................................... 158

    C.    Vellturo's Assessment of Apple Willingness to Accept and Samsung Willingness to Pay Includes Many Errors .......................................................................... 160

    D.    Failure to Consider Units for Which Apple has Previously Sought Damages ... 164

    E.    Vellturo Consideration of Other *Georgia Pacific* Factors ................................ 164

X.     Reasonable Royalty Analysis ................................................................................. 165

    A.    Overview of Reasonable Royalty Calculations ................................................ 165

        1.    Date of Hypothetical Negotiation ......................................................... 166

        2.    Parties to the Negotiation .................................................................... 167

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

B.    Reasonable Royalty Analysis ................................................................ 167

1.    Form of the Royalty ................................................................ 168

2.    Royalty ................................................................ 170

a)    Overview ................................................................ 170

b)    Market Approach ................................................................ 170

(1)    Licensing Practices in the Telecommunications Industry ................................................................ 171

(2)    Quantitative Analysis ................................................................ 173

(a)    Agreements Involving the Patents-in-Suit    173

(b)    Offers to License the Patents-in-Suit    177

(c)    Other Apple and Samsung License Agreements    179

(d)    Summary of Market Approaches    184

c)    Income Approach ................................................................ 185

(1)    Overview of the Analytical Approach ................................ 185

(2)    Profitability as a Measure of Value ................................ 186

(3)    Apple's Inconsistency Across Lawsuits ........................ 190

(4)    Alternative Measures Using Features ............................ 192

(5)    Reasonableness Check with Apps ................................ 193

(6)    Summary of Income Approaches................................ 195

d)    Cost Approach ................................................................ 196

e)    Qualitative Factors ................................................................ 199

XI.    Conclusions................................................................ 213

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## I.      Assignment and Introduction

### A.      Qualifications

1.      I am the William S. Beinecke Professor of Economics and Finance at the Yale University School of Management.  I also hold a joint courtesy appointment at the Yale Department of Economics.  I received my undergraduate degree in Economics from Yale University in 1989 and my Ph.D. in Economics from the Massachusetts Institute of Technology in 1993.  I was an assistant professor in the Department of Economics at Harvard University from 1993 to 1994.  I was a faculty member at the University of Chicago Graduate School of Business from 1994 to 2001, reaching the rank of full professor in 1999.  I have been a faculty member at the Yale University School of Management since 2001.  I am a Research Associate at the National Bureau of Economic Research.  From 2007 to 2009, I was the Deputy Provost for Faculty Development at Yale University.

2.      At Yale University, I teach courses in competitive strategy at the MBA level including a course entitled "Technology Strategy."  This course helps students understand strategic issues that arise in high-technology industries.  I also teach a course entitled "Business, Public Policy and the Information Economy" at the undergraduate level, although I have previously taught a version of this course at the MBA level.  This course examines copyright, antitrust, and regulatory issues in telecommunications and broadcasting.  At Yale University, I am also a former member and Chair of the University's Committee on Cooperative Research, a committee that oversees the University's patenting and licensing policies.

3.      My research interests include corporate finance and applied industrial organization, and I have published numerous articles in these areas in the American Economic Review; Journal of Political Economy; The Journal of Industrial Economics; The Journal of Law

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and Economics; The Journal of Law, Economics, & Organization; Quarterly Journal of Economics; Journal of Marketing Research; and The Journal of Finance, among others.  In 1999, I received the Elaine Bennett Research Prize, a prize for excellence in research by a woman economist given every two years by the Committee on the Status of Women in the Economics Profession of the American Economic Association.

4.      I am a former co-editor of the American Economic Review, The Rand Journal of Economics, and The B.E. Journal of Economic Analysis and Policy.  I have previously served as an associate editor of The Journal of Finance, The Quarterly Journal of Economics, the Journal of Economic Perspectives, and the RAND Journal of Economics, among others.  I was a member of the Advisory Board of Quantitative Marketing and Economics and a former member of the Editorial Board of The Journal of Industrial Economics.  I was an elected member of the Executive Committee of the American Economic Association and have served on the Nominating Committee and the Honors and Awards Committee of the American Economic Association.  In 2006, I was elected to the American Academy of Arts and Sciences.

5.      My curriculum vitae, which is attached as Exhibit 1, gives more biographical details and lists my writings.  Exhibit 2 specifies the testimony that I have given in the past four years as an expert witness.

**B.      Assignment**

6.      I have been retained on behalf of Samsung Electronics Company, Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Telecommunications America, LLC ("STA") (collectively, "Samsung").  Apple Inc. ("Apple") has alleged that Samsung has infringed five U.S. patents.  The patents-at-issue, listed on the table below are, U.S. Patent

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

numbers 5,946,647 (the "'647 Patent"), 6,847,959 (the "'959 Patent"), 7,761,414 (the "'414

Patent"), 8,046,721 (the "'721 Patent"), and 8,074,172 (the "'172 Patent").[1]

| U.S. Patent Number | Issue Date | Title |
|---|---|---|
| 5,946,647 (the "'647 Patent") | 8/31/1999 | System and method for performing an action on a structure in computer-generated data |
| 6,847,959 (the "'959 Patent") | 1/25/2005 | Universal interface for retrieval of information in a computer system |
| 7,761,414 (the "'414 Patent") | 7/20/2010 | Asynchronous data synchronization amongst devices |
| 8,046,721 (the "'721 Patent") | 10/25/2011 | Unlocking a device by performing gestures on an unlock image |
| 8,074,172 (the "'172 Patent") | 12/6/2011 | Method, system, and graphical user interface for providing word recommendations |

7.      I have been asked to calculate the appropriate damages remedy in this matter

assuming validity and infringement of the asserted patents.  I have also been asked to comment

on the Opening Expert Report of Christopher A. Vellturo, Ph.D., dated August 12, 2013 (the

"Vellturo Report").[2]

**C.    Executive Summary**

8.      I have concluded the following:

• Many factors other than operating system software contribute to smartphone and tablet

purchase decisions.  The features enabled by the patents-at-issue are a small part of the

accused products and their operating systems, which have hundreds if not thousands of

features.  The Vellturo Report overstates the importance of the patents-at-issue, relying

---

[1] Amended Complaint for Patent Infringement, August 31, 2012 ("Complaint"), at ¶ 12.  The patent number 8,014,760 (the "'760 patent") was dropped from the case a few days prior to the filing of my report.  Stipulation and Order Regarding Dismissal of Claims, September 9, 2013.  Although I no longer include a damages calculation for that patent, references to and discussion of '760 patent and the "six" asserted patents still remain in the text and certain exhibits.
[2] As the Vellturo Report relies on the Expert Report of John R. Hauser, dated August 11, 2013 (the "Hauser Report"), I also comment on the Hauser Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

on qualitative evidence that discusses features significantly broader than the patents and includes elements that are not protected by the patents.  Its lost profits and reasonable royalty conclusions hinge entirely on a flawed conjoint analysis performed by another expert, Dr. John Hauser.

- Lost profits are not warranted because there is no demonstrated link between the patented functionality and sales.  These functionalities do not themselves discernibly drive any demand for the Samsung accused products or meaningfully influence the ease of use of the Samsung accused products.

- The Vellturo Report contains numerous errors and significantly overstates the appropriate quantum of damages here.  Critical flaws, including an over-reliance on the flawed conjoint results, the use of an unsupported "blackout period," an improper assessment of Apple's share of displaced units, and an overstatement of Apple profitability, inflate the Vellturo Report lost profits figures.   Additionally, the Vellturo Report royalty analysis "double counts" lost profits and contains numerous errors.

- The appropriate measure of damages in this case is a reasonable royalty.  Use of a number of accepted valuation methods, including the market, income and cost approaches, and a *Georgia Pacific* analysis, indicates a reasonable royalty for Samsung to compensate Apple is approximately $5.9 million if all patents asserted by Apple in this matter are found to be valid, enforceable, and infringed.[3]  The market, income, and cost approaches further demonstrate the unreasonableness of the conclusions presented in the Vellturo Report.

---

[3] *See* Exhibit 4.  This damages amount assumes that Samsung would have been able to offer acceptable non-infringing alternatives by the end of March 2012 for all of the patents-at-issue.  My conclusions can be adjusted to account for the removal of certain products, fewer patents, or a different design-around period.  As I discuss later in this report, this amount can be adjusted downward or upward to take into account different assumptions regarding Samsung design-around options, depending on the Court's finding regarding their availability and acceptability.

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### D.   Detailed Summary of Conclusions

9.     My detailed conclusions are as follows:

- ***Many factors other than operating system software contribute to smartphone and tablet purchase decisions.*** Demand for complex products such as smartphones and tablets is multi-faceted.  The device software is only one factor in the smartphone or tablet purchase decision.  Carrier sales effort, marketing effort by manufacturers, hardware features of the device, price, and the operating system ecosystem all impact consumer choice.   In the current marketplace, the many differentiated products made available from hardware manufacturers cater to diverse consumer preferences.  Samsung has succeeded in this market by offering differentiated products, with a wide variety of devices including large-screen smartphones and low-priced smartphones, marketing them aggressively, and effectively engaging carriers in the promotion process.   Despite the fact that Samsung's devices have software features that are similar to the devices of other Android manufacturers, Samsung has been substantially more successful due to hardware differentiation, marketing, and pricing.

- ***The features enabled by the patents-at-issue are a small part of the accused products and their operating systems.*** The patents-at-issue constitute only a small part of the software of the accused products, and the software is itself only one attribute of the accused devices.  Specific software features themselves are typically insignificant in driving demand for the accused products.  This is, in part, because other phone characteristics (such as size, screen size, battery life, display definition, storage

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

capacity, camera type, price, and connectivity) matter more, but also, in part, because the operating systems ("OSs") underlying these products are continually upgraded with additional features.  The total number of features and capabilities in current popular smartphones is ever expanding, and individual customers regularly fail to observe numerous features.  A careful review of Samsung promotional material, third-party product reviews, and consumer reviews, shows that the functionalities related to the patents-at-issue reflect only a very small portion of the features and benefits of the accused devices (on the order of a fraction of a percent) and that they were not a point of emphasis in consumer purchase decisions.  Notably, promotional material and reviews typically failed to refer to the patented elements.  Instead, features such as screen size, battery life, and connectivity are more important drivers of demand.

- ***The Vellturo Report overstates the importance of the patents-at-issue, relying on qualitative evidence that pertains to features significantly broader than the patents and includes elements that are not protected by the patents***.  Despite the above-described marketplace realities, the Vellturo Report contends that demand for Samsung's accused products "is significantly influenced by the [software] features afforded by the Asserted Patents,"[4] and claims that demand for accused products would decrease by as much as 55% without the accused elements[5] "even if customers may not be aware of the specific technology that enabled that [accused] functionality."[6]  To him, the success of Samsung's products is and was largely dependent on access to just six patents, as they are assumed to be indispensable to offering a product that many

---

[4] Vellturo Report, at 59.
[5] Vellturo Report, at Exhibit 13 (Galaxy S II AT&T).  *See also*, Vellturo Report, at Exhibit 13-A.
[6] Vellturo Report, at 60.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

customers would consider "easy to use." Yet nowhere does Dr. Vellturo independently examine all of the factors that contribute to "ease of use." Dr. Vellturo's conclusion that the asserted patents play an important role in demand is based on an unsound analysis of qualitative document evidence, in which he equates broader references to functionality as evidence of demand for the specific patented functionality. He does not examine whether a product without the patented elements (and with alternative configurations) would be viewed as easy to use. Moreover, Dr. Vellturo proffers no evidence that customers are even aware of (or value) the existence of many of the product features related to the patented elements at the time of purchase other than through his flawed qualitative summary of the evidence. Dr. Vellturo, himself, provides no clear link between the patents-at-issue and customer demand for Samsung's accused products.

- ***The Vellturo Report damages calculations hinge entirely on a flawed analysis performed by another expert.*** The only quantitative basis for demand from the patents-at-issue is taken from a conjoint analysis performed by Professor John Hauser.[7] But Professor Hauser's analysis suffers from several important flaws. The Hauser analysis includes overly broad and inaccurate descriptions of the accused functionalities which enhance the respondent's awareness of, and consequently valuation of, the features-at-issue. Further it uses a misleading statement regarding the "outside option" alternatives from which it derives its results. As a result, it generates predictions that differ

---

[7] Vellturo Report, at 91-2. *See also*, Hauser Report, at Exhibit P and Q.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

significantly from marketplace realities.[8]  Examination of the Hauser conjoint analysis results demonstrates truly incredible implications. The Hauser model inaccurately predicts actual marketplace purchasing, suggests willingness to pay prices many times the price of an entire product, and suggests the features-at-issue are many times more valuable than the most successful apps.  As a result, by using the output from this analysis, Dr. Vellturo vastly overstates the importance of the patents-at-issue and exaggerates damages.

- ***Lost profits are not warranted because there is no discernible link between the patented functionality and sales of the accused devices***. As described above, the patented functionalities reflect only a very small share of functionalities and benefits provided by the accused devices.  The patented functionalities are rarely, if at all, addressed by Samsung third-party media sources and customers in describing the benefits of the accused devices.  Dr. Vellturo describes the benefits of the patented features, but does not disentangle those benefits from features not protected by the patents-at-issue.  Further, Dr. Vellturo fails to provide any independent assessment of the weight consumers place on the patented functionalities relative to all the rest of the benefits provided by the accused devices.  He relies only on wholly unreliable predictions provided by another expert, but these results do not provide any meaningful basis to determine if sales of the accused devices depend in any way on the patented functionalities.  Based on my review, there is no discernible link between the patented

---

[8] I understand that these flaws in the Hauser conjoint analysis, and others, are detailed by Professors Erdem and Reibstein.  *See* Expert Report of Tulin Erdem, September 13, 2013 and Expert Report of David Reibstein, September 13, 2013.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

functionalities and sales of the accused products.  Accordingly, lost profit damages are not appropriate.

- ***Fundamentally flawed assumptions further inflate the Vellturo Report lost profits figures.*** Setting aside the concern that Samsung's use of the technologies at issue did not have a discernible effect on Apple's sales, there are critical errors in Dr. Vellturo's lost profit calculation methodology.

  - First, a large portion of Dr. Vellturo's lost profits stem from a time period when he assumes Samsung would have been out of the market in order to develop non-infringing alternatives to the patented functionalities.  Dr. Vellturo considers all accused units produced during this "blackout" period to be available for a lost profits calculation.  This "blackout" period is, however, "hold-up" damages related to marketplace exclusion, not Apple lost profits from Samsung's use of the patented-invention.  Furthermore, Dr. Vellturo appears to overstate the length of the period, especially in light of Samsung's apparent ability to remove and update certain software features at issue quickly.  Moreover, Dr. Vellturo compounds the "hold-up" amount by having Samsung commence its "blackout" many months after the first infringement of the asserted patents—in effect rewarding Apple for its failure to notify Samsung of its alleged infringement.

  - Second,  for the period subsequent to the "blackout" period, Dr. Vellturo uses the estimates from Professor Hauser's conjoint study to estimate the Samsung units that were sold but would not have been sold in the "but for" world in which

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Samsung had implemented design-arounds.  As mentioned, above, these figures are implausible and result from numerous study design flaws.

- Third, Dr. Vellturo then uses a "Mor-Flo" analysis to convert the number of Samsung units that would have instead been captured by Apple in the "but for" world.  Dr. Vellturo's calculation, however, ignores the fact that, having expressed a preference for an Android device with various features (by choosing the accused Samsung product), a disproportionate share of these consumers in the "but-for" world likely would have instead purchased an alternative Android device with similar features rather than an Apple device.

- Fourth, Dr. Vellturo calculates the profits that Apple would have achieved on lost sales using an estimate of Apple's average incremental profits.  This overstates the relevant profits, as, for example, he uses worldwide profits rather than the relevant U.S. profits and he includes the higher profit rates from various Apple products (such as $399, 64GB iPhones) that likely would not have increased in sales in the absence of Samsung's smartphones, which are all priced below $299 to consumers.

- ***The Vellturo Report royalty analysis "double counts" lost profits and contains numerous additional errors.*** Dr. Vellturo relies on what he refers to as an "Edgeworth Box" royalty analysis.  In doing so, he essentially conducts a second lost profits analysis in disguise.  Despite acknowledging that reasonable royalty damages "are due on sales of Samsung's Accused Products where Apple does not claim [or prove] lost

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

profits due to lost sales,"[9] Dr. Vellturo's construct is premised on the presumption that "royalties under such a license must account for the losses of sales…that Apple would have anticipated from granting such a license."[10]   Double-counting lost profits through the royalty construct represents a clear error.   Moreover, the "losses of sales" used to calculate the royalty are again driven by the inflated results from the Hauser conjoint analysis.   Further compounding these errors are other mistakes, including the use of inflated incremental profits (from the accused and allegedly displaced products) and a speculative gross-up using flawed repurchase estimates to account for possible future sales.

- ***Using of a number of accepted valuation methods, including the market, income and cost approaches, indicates a reasonable royalty should be approximately $5.9 million through February 2013***.  In contrast to Dr. Vellturo, whose quantitative damages conclusions rest on Professor Hauser's conjoint analysis, I have employed several approaches for measuring royalty damages for this case—the "Market" approach, the "Income" approach, and the "Cost" approach as well as an assessment of the *Georgia Pacific* factors.   Specifically, these include: (1) an analysis of the market evidence produced in this matter such as actual license agreements agreed to by Apple in licensing the patents-in-suit, and offers for license agreements made by Apple to Samsung; (2) an analysis of the incremental benefits provided by the patents and of the value ascribed to bundles of features that include the patented features such as in operating system upgrades, (3) an analysis of the design-around costs of the patented

---

[9] Vellturo Report, at 123.
[10] Vellturo Report, at 123.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

elements, and (4) consideration of qualitative factors, including the assumption that the

patents-in-suit are valid, enforceable, and infringed, the nature of competition between

Apple and Samsung, and the contribution to the accused products of many patents not

at issue in this matter.  Together, the appropriate measure of damages is a lump sum

royalty of approximately $5.9 million.  This figure is based on the assumption that in

the context of a royalty negotiation, Samsung would have been in a position to design-

around each of these patents-in-suit by the end of March 2012.[11]  The royalty payments

for each patent are listed below:

| Patent-at-Issue | Total Royalty Amount | Number of Accused Units (Through February 2013) |
|---|---|---|
| '647 Patent | ███████ | ███████ |
| '959 Patent | ███████ | ███ ██████ |
| '414 Patent | ███████ | ███████ |
| '721 Patent | ███████ | ███████ |
| '172 Patent | ███████ | ███████ |

- ***The market, income and cost approaches further demonstrate the unreasonableness
  of the Velluro Report conclusions.*** For example, the ██████ per unit royalty[13]

---

[11] This damages amount assumes that Samsung would have been able to offer acceptable non-infringing alternatives by the end of March 2012 for all of the patents-at-issue.  My conclusions can be adjusted to account for the removal of certain products, fewer patents, or a different design-around period.  As I discuss later in this report, this amount can be adjusted downward or upward to take into account different assumptions regarding Samsung design-around options, depending on the Court's findings regarding their availability and acceptability.  I illustrate possible alternatives to this amount using different design-around assumptions in Exhibit 98.

[12] This figure excludes units from versions of accused products which were identified as non-infringing in the Expert Report of Dr. Alex Snoeren Concerning U.S. Patent Nos. 6,847,959 and 7,761,414, August 12, 2013 (the "Snoeren Report"), at Exhibit 5.  I include a tabulation of those units in Exhibit 4C, and I can adjust my calculations to include them, should it be necessary.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

proffered by Dr. Vellturo is significantly higher than any market approach evidence, and in particular is:



The Vellturo conclusion is also inconsistent with the income approach evidence, as it is:

- o 
- o Inconsistent with any notion that Samsung may need to pay for other technology (including other Apple technology),
- o Wholly inconsistent with the approach advanced by Apple experts Mr. Musika and Ms. Davis, which split all of the product profitability across seven other patents.[19]

## E.    Materials Relied Upon

10.    In undertaking my analyses, I have relied on information from a variety of sources including: the Complaint; interrogatory responses filed by the parties-in-suit; information produced by the parties in this litigation; deposition testimony; information from publicly-available sources such as company SEC filings, third-party product reviews, industry trade press,

---

[13] This royalty is for smartphones, and includes the sum of the per unit rates for six patents. The royalty amount excluding the '760 patent is $40.10 per smartphone. Vellturo Report, at Exhibit 30. Dr. Vellturo's rate for tablets is $31.99 per unit. Vellturo Report, at Exhibit 30-A.
[14] *See, e.g.*, Exhibit 76.
[15] *See, e.g.*, Exhibit 75.
[16] *See, e.g.*, Exhibit 79
[17] *See, e.g.*, Exhibit 86.
[18] *See, e.g.*, Exhibit 26A. ███████████
[19] Supplemental Expert Report of Terry L. Musika, CPA, May 8, 2012; Expert Report of Julie L. Davis, CPA, June 24, 2013.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

company websites and press releases, and other expert reports.  These materials are listed in Exhibit 3.

11.    Should additional information be made available to me, I reserve the right to update my opinions accordingly.

**F.    Compensation**

12.    I am compensated at the rate of $850 per hour for time I incur on this matter.  In addition, I receive compensation based on the professional fees of Analysis Group, Inc., a financial and economic consulting firm, which has provided research support, created exhibits, and assisted in preparation of this report under my direction and supervision.  My compensation is not contingent on my findings or on the outcome of this case.

**II.    Background**

**A.    Parties at Issue**

**1.    Apple**

13.    Apple was incorporated in California in 1977 as a manufacturer of personal computers.[20]  In October 2001, Apple expanded its product portfolio to include iPod-branded portable digital media players.[21]  It launched its first phone product, the iPhone, in June 2007.[22] In its 10-K, Apple describes its current product and services offerings as including "iPhone, iPad, Mac, iPod, Apple TV, a portfolio of consumer and professional software applications, the iOS and OS X operating systems, iCloud, and a variety of accessory, service, and support offerings."[23]

---

[20] Apple Inc. Form 10-K for the fiscal year ended September 29, 2012 ("Apple 2012 10-K"), at 1.
[21] http://www.apple.com/pr/products/ipodhistory/.
[22] http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html;
http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html (all viewed 9/12/2013).
[23] Apple 2012 10-K, at 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

14.     Apple's earnings and market capitalization have been generally increasing in recent years.[24]  For the fiscal year ended September 29, 2012, Apple reported net sales of $156.5 billion and net income of $41.7 billion.[25]   U.S. net sales accounted for $60.9 billion, or 38.9 percent, of the worldwide total.[26]   Apple's income statement for the fiscal years of 2007 to 2012 is summarized in Exhibit 5. As shown in Exhibit 6, Apple's market capitalization has increased from roughly $160 billion at the end of 2007 to roughly $400 billion at the end of the July 2013.

### 2.      Samsung

15.     Samsung Electronics America, Inc. ("SEA"), a New York corporation, and Samsung Telecommunications America, LLC ("STA"), a Delaware limited liability corporation, are subsidiaries of South Korea-based Samsung Electronics Co., Ltd. ("SEC").[27]   SEC is South Korea's largest company and one of Asia's largest electronics companies.[28] SEA was formed in 1978, and it markets a variety of consumer electronics.[29] STA was founded in 1996 and researches, develops, markets, sells and offers for sale a variety of personal and business communication devices in the United States such as mobile phones.[30]

16.     SEA, STA, and SEC (collectively, "Samsung") are part of the Samsung Group, which includes a variety of different companies operating in several business areas, including electronics, chemicals, and financial services.[31] Samsung's earnings and market capitalization have been generally increasing in recent years as well.[32]  In 2012, the Samsung Group reported

---

[24] *See* Exhibit 6.
[25] Apple 2012 10-K, at 43.
[26] Apple 2012 10-K, at 72.
[27] Samsung Defendants' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s Complaint, April 18, 2012 ("Counterclaim"), at ¶¶ 7-8.
[28] Counterclaim, at ¶ 6.
[29] Counterclaim, at ¶ 7.
[30] Counterclaim, at ¶ 8.
[31] https://www.samsung.com/us/aboutsamsung/samsung_group/affiliated_companies/ (viewed 9/12/2013).
[32] *See* Exhibits 7 through 10.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

$247.5 billion in net sales and generated $18.3 billion in net income,[33] while SEC reported

███████████████████████████████████████████[34]  SEA and STA reported net sales of

$11.0 billion and $13.6 billion, respectively, in 2012.[35]  In Exhibit 10, I illustrate Samsung's

market capitalization (based on Korean trading) which has increased from roughly $90 billion at

the end of 2007 to roughly $170 billion at the end of the July 2013.

### B.    Accused Products

17.    Apple has accused Samsung smartphones and tablet computers of infringing all or

a subset of its asserted patents this matter.  I discuss each of these separately in the sections that

follow.

### 1.    Smartphones

18.    Smartphones are converged voice and data mobile wireless communications

devices that offer users a range of features and functionalities, including voice calling, email

support, the ability to access the internet, and multimedia functions (such as gaming and playing

music and video).[36]  Along with generally incorporating a broader range of features and

functionalities, smartphones can be distinguished from other mobile handset types – such as

basic handsets or feature phones – in their use of advanced, multitasking operating systems that

are able to run third-party applications.[37]

---

[33] https://www.samsung.com/us/aboutsamsung/samsung_group/our_performance/ (viewed 9/12/2013).
[34] Exhibit 7.
[35] Exhibits 8 and 9.
[36] Oppenheimer 2012 Handset Guidebook, at 93.
[37] Oppenheimer 2012 Handset Guidebook, at 93. ████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████ The relative share of smartphones as a percent
of total handsets shipments in the U.S. has been growing. *See* Exhibits 11 and 12.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

19.     In recent years, leading smartphone manufacturers for the U.S. marketplace have included Samsung, Apple, Blackberry, HTC, Motorola and LG.[38]  The most popular operating systems used in smartphones have included versions of the Blackberry, Android, iOS, Windows Mobile, Symbian and Palm operating systems.[39] ███████████████

████████████████████████████████████████████████

██ ■  The Android operating system first surpassed Apple's iOS in popularity in late 2009, and exceeded the Blackberry operating system's popularity in mid-2010.[41]  As Exhibit 17 shows, the timing of Android's rise generally corresponded with Blackberry's decline.

20.     Samsung entered the U.S. mobile handset business in 1997[42] and has been selling smartphones in the U.S. since at least 2001.[43]  Having previously marketed smartphones incorporating a variety of operating systems, including versions of the Palm OS and Windows Mobile operating system,[44] Samsung launched its first smartphone incorporating an Android operating system in mid-2009.[45]  Samsung's relative share of the Android operating system marketplace has grown rapidly, reaching more than 50 percent of Android handsets in the fourth quarter of 2012.[46]

---

[38] *See, e.g.,* Exhibits 13, 14, and 15.

[39] *See, e.g.,* Exhibits 16 - 18.  *See also*, SAMNDCA00250503-57, at 510.

[40] Exhibit 19.

[41] Exhibit 16.

[42] *See, e.g.,* http://www.time.com/time/magazine/article/0,9171,218319,00.html (viewed 9/12/2013).

[43] http://reviews.cnet.com/smartphones/samsung-sph-i300-sprint/4505-6452_7-7703904.html (viewed 9/12/2013); http://money.cnn.com/magazines/fortune/fortune_archive/2002/04/01/320613/index.htm (viewed 9/12/2013); http://www.time.com/time/magazine/article/0,9171,218319,00.html (viewed 9/12/2013).

[44] http://reviews.cnet.com/smartphones/samsung-sph-i300-sprint/4505-6452_7-7703904.html; http://reviews.cnet.com/smartphones/samsung-blackjack-sgh-i607/4505-6452_7-32143267.html (both viewed 9/12/2013).

[45] http://gizmodo.com/5229244/meet-the-i7500-samsungs-first-android-phone; http://www.brighthand.com/default.asp?newsID=15161&news=Samsung+I7500+Google+Android  (all viewed 9/12/2013).

[46] *See* Exhibits 20 - 22.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

21.     Apple has accused 17 Samsung smartphone models of infringing all or a subset of

the patents-in-suit, the first of which launched in the U.S. in June 2011.[47]  The accused devices

incorporated different versions of the Android operation system at release, including version 2.2

(a.k.a. "Froyo"), version 2.3 (a.k.a. "Gingerbread"), version 4.0 (aka "Ice-Cream Sandwich") and

version 4.1 (aka "Jelly Bean").  In Exhibit 26A, I show the U.S. units, revenue, gross profit, and

operating profit for each of Samsung's accused products from June 2011 through February 2013.

Over that period, the ███████████████████████████████████████████.[48]

## 2.     Tablets

22.     A tablet computer (or "Tablet") is a hybrid of a personal computer and a

smartphone that is contained in a flat touch screen that typically measures roughly 7 to 10 inches

along the diagonal.[49]  Tablets typically offer Wi-Fi connectivity,[50] and while a subset of tablets

offer cellular communications capability, they are not generally used for voice communications.

Instead, they are primarily used for reading e-books, gaming, email, and web browsing.[51]

23.     Leading tablet vendors for the U.S. marketplace have included Samsung, Apple,

Amazon, and Barnes & Noble.[52]  Samsung launched its first Tablet, the Samsung Galaxy Tab,

---

[47] *See* Exhibit 23.  In this exhibit, I list the accused Samsung smartphone products, their launch dates, their operating system at launch, and the patents asserted against them.

[48] Exhibit 26A.

[49] *See, e.g.,* Eric Franklin, "Tablets Buying Guide," CNET, October 30, 2012, available at http://reviews.cnet.com/tablet-buying-guide/?tag=auxPromo (viewed 9/12/2013). "Tablet Buying Guide," Consumer Reports, January 2011, available at http://www.consumerreports.org/cro/tablets/buying-guide.htm (viewed 9/12/2013).

[50] "Tablet Buying Guide," Consumer Reports, January 2011, available at http://www.consumerreports.org/cro/tablets/buying-guide.htm (viewed 9/12/2013).

[51] *See, e.g.,* iPad Tracking Study FY 12-Q2 Report (APLNDC630-0000177773 – 78021, at APLNDC630-0000177904; "Admob by Google Tablet Survey," available at http://services.google.com/fh/files/blogs/AdMob%20-%20Tablet%20Survey.pdf (viewed 9/12/2013); J. Gove, et. al, "Understanding Tablet Use: A Multi-Method Exploration," September 2012, available at http://static.googleusercontent.com/external_content/untrusted_dlcp/research.google.com/en/us/pubs/archive/38135.pdf (viewed 9/12/2013).

[52] *See e.g.,* Exhibits 27 - 29.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

which incorporated an Android 2.2 (a.k.a. "Froyo") operating system in November 2010.[53]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████.[54]

24.     I understand that Apple has accused two Samsung tablet models of infringing a subset of the patents-in-suit.  These are the Galaxy Tab II 10.1 (launched in February 2012) and Galaxy Note 10.1 (launched in August 2012), which both included version 4.0 of the Android operating system (a.k.a. "Ice Cream Sandwich").[55]  From February 2012 through February 2013, Samsung ████████████████████████████ of the accused tablet devices in the U.S.[56]

## C.     Patents-at-Issue

25.     Apple has accused various Samsung devices of infringing several U.S. patents.[57] For each accused device, it is asserted that the patents-in-suit are directed to enabling or improving certain features or functionalities of the accused products.  I refer to these features and functionalities as the "accused features" or the "accused functionalities."[58]  I understand, however, that non-infringing alternatives exist for each patent-at-issue.  For example, Apple has not accused certain Samsung products-in-suit of infringing a subset of the patents,[59] and Samsung claims to have other alternatives available which would not infringe.[60]

---

[53] Exhibit 30.
[54] Exhibits 31 and 32.
[55] Exhibit 23.
[56] Exhibit 26A.
[57] Exhibit 23 shows which devices are accused of infringing each of the patents.
[58] Both Apple and Samsung refer to "Accused Features" and "Accused Functionalities" in their interrogatories and responses. *See e.g.,* Samsung's Third Supplemental Responses to Apple's First Set of Preliminary Injunction Interrogatories, May 28, 2012, at 2; Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, May 2, 2013, at 25.
[59] Exhibit 23.
[60] Apple also identified certain of its own devices that do not practice certain asserted patents.  Apple Inc.'s Supplemental Objections and Responses to Samsung's Second Set of Interrogatories, May 28, 2013, at 3-8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## 1.    The '647 Patent [Links for Structures]

26.    Issued on August 31, 1999, the '647 patent is entitled "System and Method for Performing an Action on a Structure in Computer-Generated Data."[61]   In particular, claims 1, 4, 6, 8 and 9 are asserted.[62]   I understand that Apple has alleged that the '647 patent describes a feature that allows a user to select multiple recognized structures within text (*e.g.,* a written phone number) and perform multiple actions related to the information (*e.g.,* dial the phone number or send a text message).[63]   Apple has accused each of the 18 products in suit of infringing the '647 patent.

## 2.    The '959 Patent [Unified Local & Internet Search]

27.    Issued on January 25, 2005, the '959 patent is entitled, "Universal Interface for Retrieval of Information in a Computer System."[64]   In particular, claims 24 and 25 are asserted.[65] I understand that Apple has averred that the '959 patent relates to using heuristics to search for information simultaneously in multiple locations, including local storage media and the Internet.[66]   I understand the accused feature  is embodied by the Google Search Application (also called the "Quick Search Box" and/or "Google Now") when programmed to perform both Local Search and Web Search in response to a user query.  Apple has accused all products-in-suit except the Galaxy Note 10.1, Galaxy Tab II 10.1, and Galaxy Rugby Pro of infringing the '959

---

[61] U.S. Patent No. 5,946,647.
[62] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, June 28, 2013, at 1.
[63] Initial Expert Report of Dr. Todd C. Mowry Regarding Infringement of U.S. Patent No. 5,946,647, August 12, 2013, (the "Mowry Report") at 1 and 18-19.  *See also,* Exhibit 25.
[64] U.S. Patent No. 6,847,959.
[65] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, at 1.
[66] Expert Report of Dr. Alex Snoeren Concerning U.S. Patent Nos. 6,847,959 and 7,761,414, August 12, 2013 (the "Snoeren Report"), at 2 and 22-24.  *See also,* Exhibit 25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

patent.[67]  Also, certain models of the Galaxy S III and other accused products have not been specifically identified as using the patent.[68]

### 3.  The '414 Patent [Asynchronous Data Synchronization]

28.  Issued on July 20, 2010, the '414 patent is entitled "Asynchronous Data Synchronization Amongst Devices."[69]  In particular, claims 11 and 20 are asserted.[70]  I understand that Apple has averred that the '414 patent allows for synchronization among devices, where the synchronization is processed such that the user can continue to use the application at issue while synching is occurring.[71]  In particular, I understand that according to Apple's technical expert, claim 11 of the '414 patent describes a specific implementation that *requires* a computer system to execute concurrently (i) a first thread for a user interface that allows users to access and edit data in a database, and (ii) a second thread for synchronization provided by a software component that causes retrieval and storage of the data in that database, with the two threads both active during some overlapping time interval.[72]  Apple has accused each of the 18 products in suit of infringing the '414 patent.[73]

### 4.  The '760 Patent [Missed Call Management]

29.  Issued on September 6, 2011, the '760 patent is entitled "Missed Telephone Call Management for a Portable Multifunction Device."[74]  In particular, claim 10 is asserted.[75]  I

---

[67] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, at Exhibit A.  I note that Dr. Vellturo overstates damages by including units from the Galaxy Note 10.1, Galaxy Tab II 10.1, and Galaxy Rugby Pro in his calculations.  Vellturo Report, at Exhibit 7.
[68] Snoeren Report, Exhibit 5.
[69] U.S. Patent No. 7,761,414.
[70] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, June 28, 2013, at 1.
[71] Snoeren Report, at 8 and 135.  *See also,* Exhibit 25.
[72] Snoeren Report, at 138-149, ¶¶ 382-408.  I understand that claim 20, requires multiple synchronization software components for synchronizing multiple classes of data. Snoeren Report, at 148.  *See also,* Exhibit 25.
[73] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, at Exhibit A.
[74] U.S. Patent No. 8,014,760.
[75] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, June 28, 2013, at 1; Expert Report of Professor Andrew Cockburn, August 12, 2013, (the "Cockburn Report"), at ¶ 490.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

understand that Apple asserts that the '760 patent allows for a particular combination of features available on a phone's missed calls list in response to gestures in specific areas.[76]  In particular, I understand that claim 10 of the '760 patent requires two distinct interactive displayed portions of the screen included in each missed call item in the list. Performing a finger gesture on one area immediately calls the caller back.  Performing a gesture on the other area completely replaces the list of missed calls with a new screen displaying information that allows you to contact the caller in at least two ways, for example by calling or texting the caller. Apple has accused all smartphone products-in-suit of infringing the '760 patent.  None of Samsung's tablets are accused of infringing the '760 patent.   I understand that Apple is no longer asserting this patent in this litigation.

### 5.        The '721 Patent [Image Unlock]

30.        Issued on October 25, 2011, the '721 patent is entitled, "Unlocking a Device by Performing Gestures on an Unlock Image."[77]  In particular, claim 8 is asserted.[78] I understand that Apple has averred that the '721 patent claims a user interface that requires users to unlock a device by moving an image on a screen from one predefined location to another predefined location.[79]  Further, I understand that claim 8 requires visual cues that communicate the direction the image must be moved in order to unlock the device.  Apple has not accused the Galaxy Note, Galaxy Note II, Galaxy Rugby Pro, and Galaxy S III of infringing the '721 patent.  Apple has also not accused the tablet products-in-suit.

---

[76] *See* Exhibit 25.  *See also*, Cockburn Report, at ¶¶ 24-25.
[77] U.S. Patent No. 8,046,721.
[78] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, at 1.
[79] Cockburn Report, at 2 and 30. *See also*, Exhibit 25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### 6.    The '172 Patent [Word Recommendations]

31.    Issued on December 6, 2011, the '172 patent is entitled, "Method, System, and Graphical User Interface for Providing Word Recommendations."[80]  In particular, claim 18 is asserted.[81]  I understand that the '172 patent claims a user interface for displaying word recommendations during text entry and a combination of features that allow the user to select word recommendations to replace typed text or select the typed text to keep it.[82]  Apple has not accused the Dart, Illusion, Galaxy Note II, Galaxy Rugby Pro, or Galaxy S III of infringing the '172 patent.[83]  Apple also has not accused either of the tablet products-in-suit.[84]

### D.    Marketplace at Issue

32.    The wireless communications industry is one that is currently characterized by multi-function products and rapidly evolving technology.  The mobile handset marketplace has progressed over the past decade from one in which mobiles phones primarily were used for voice-based communication to one in which "smartphones" offer a range of capabilities such as internet, email, cameras, games, and music in addition to voice-based communication.

33.    Marketplace participants have been jockeying for leadership through the rapid introduction of new phones with enhanced or novel features and more robust capabilities. Competition has occurred through improvements to the phone hardware, including enhancements to phone screens and cameras, increases in the product data speeds with new connectivity protocols, enrichments to the device software, including the operating systems and associated ecosystems, the introduction of a range of varied products to meet the heterogeneous

---

[80] U.S. Patent No. 8,074,172.
[81] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, at 1.
[82] Cockburn Report, at 5-6 and 110-112. *See also,* Exhibit 25.
[83] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, at Exhibit A. *See also* Exhibit 23.
[84] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, at Exhibit A. *See also* Exhibit 23.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

demands in the marketplace, and prevalent marketing campaigns.  Each new product launch brings with it the possibility of altering the competitive landscape and the result has been frequent and sometimes dramatic changes in share distribution among the players.

34.     In the sections that follow, I discuss the evolution of the smartphone, highlighting that many of the product changes have required improved speed and data capabilities and have altered the underlying concept of a mobile communications device to become more akin to a multifunctional handheld computer.  After that, I provide an overview of the marketplace for tablets, a product category that offers much overlap in functionalities to smartphones, but with the absence of traditional voice-based communication capabilities and the presence of generally larger sizes and screens.

35.     The discussions below will provide an overview of the marketplace participants, with particular focus on the changes within smartphone and tablet unit shares, which have been brought about by different product and launch strategies.   Product differentiation has occurred along a number of dimensions including hardware, software, and brand image, which I discuss in more detail in the next section to this report.  Although there is some consensus on the importance of certain product attributes, customer preferences are generally wide-ranging, with the relative importance of specific product attributes varying significantly from one smartphone/tablet user to the next.

### 1.     The Smartphone and its Evolution

36.     As discussed above, smartphones are converged mobile wireless communication devices that incorporate advanced operating systems and offer a range of capabilities and features to users.  Early smartphones, such as the Handspring (Palm) Treo 180, which was launched in 2002, combined the voice and text communication capabilities of a mobile phone

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

with the ability to send and receive emails, browse the Internet, use a personal digital assistant, and access third party applications.[85]

37.    Later smartphones subsequently improved on the capabilities of the earlier models.  For example, each new generation of smartphones has offered hardware improvements that offer users the ability to utilize the growing list of capabilities of smartphones with bigger and/or higher resolution screens, improved user interfaces, better battery life, and faster, more efficient processors operating on improved data networks.[86]  In addition, over time these products began to include functionalities that had been typically found on other devices, such as quality photo and video recording capabilities, the ability to watch streaming video and listen to streaming audio, GPS capabilities, advanced gaming, and web browsing capabilities.

38.    The pace of innovation in the marketplace for smartphones has been rapid, with frequent introduction of devices with new and/or improved capabilities and features since the early 2000s.  From the early PDA-type phones to the Blackberry, improvements in device functionalities were frequent, with multiple new products introduced each year.   This innovation has continued through the present with manufacturers such as Samsung, HTC, and Motorola, for example, launching several new devices per year for various carriers.[87]  Apple, also a later entrant into the smartphone market space, has generally introduced a new smartphone once a year.

---

[85] http://www.mobiletechreview.com/handspring_treo.htm (viewed 9/12/2013).
[86] For example, compared to the iPhone 4S, the iPhone 5 offered a larger display with higher resolution (4-inch diagonal with 1136 x 640 resolution versus 3.5-inch diagonal with 960 x 640 resolution), an improved processor (A6 chip versus A5 chip), a better battery (8 hour 3G browsing time versus 6 hour 3G browsing time), and LTE coverage. http://store.apple.com/us/iphone/family/iphone/compare (viewed 9/12/2013).
[87] One Apple presentation noted that, in 2011 alone, Samsung introduced 17 different smartphones, HTC introduced 21 different smartphones, and Motorola launched 15 different smartphones, all with different characteristics and different price points. APLNDC630-0000128950-9006, at 8965.  As a result, the life cycle for products, according to one estimate, currently is one year to eighteen months. http://www.usatoday.com/story/tech/2013/03/21/blackberry-ceo-apple-google-samsung-iphone-android-microsoft/2004941/ (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

39.     As smartphones have become more prevalent and as their capabilities have expanded, users have increasingly used the various non-voice communications capabilities of their devices.   Features that were once considered novel, such as cameras, have become commonplace, reflecting the changing patterns of use in the smartphone marketplace. ███ ████████████████████████████████████████████████████ ███████████████████████████ Many of these features such as web browsing, streaming video, sharing photos, downloading apps, playing online games, and using navigation systems involve large amounts of data and require access to a reliable, high-speed data network.[89]

40.     Widespread adoption of these features has created huge demand for data services, causing mobile wireless carriers (or service providers), including the main U.S. carriers, Verizon, AT&T, Sprint and T-Mobile, to spend billions of dollars to continually upgrade their networks.[90] The technologies currently in use reflect a multi-generational evolution of the relevant

---

[88] For example, a June 2012 Apple survey of iPhone users in the U.S. indicated that, ████████████████████████████████████████████
████████████████████████████████ APLNDC630-0000177067-302, at 264-5. ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

See e.g., http://www.nbcnews.com/id/52079518/ns/technology_and_science-tech_and_gadgets/t/ericsson-sees-smartphone-use-video-surging/#.UcXmYvmceVY (viewed 9/12/2013).
[90] http://www.bloomberg.com/article/2012-07-27/aU5oF_UlSky0.html (viewed 9/12/2013);
http://news.cnet.com/8301-1035_3-57546244-94/at-t-will-spend-$14b-to-pump-up-wireless-wireline-networks/ (viewed 9/12/2013); http://online.wsj.com/article/SB10001424052970203918304577241042653586170.html (viewed 9/12/2013); http://www.nbcnews.com/id/52079518/ns/technology_and_science-tech_and_gadgets/t/ericsson-sees-smartphone-use-video-surging/#.UcXmYvmceVY (viewed 9/12/2013). See also, SAMNDCA00256391-502, at 394 and 397.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

standards,[91] with third generation ("3G") communications technologies[92] and fourth generation

("4G") technologies such as Long Term Evolution ("LTE") as the most prevalent.[93]  The

combination of standards compliance and numerous product features and capabilities has caused

device manufactures to seek access to a growing number of patent rights in order to sell their

products.[94]

   41. Furthermore, these enhanced capabilities have helped spur new smartphone

adoption.  Early smartphones such as the Treo 180 exhibited modest success; whereas, with the

launch of the Blackberry line of smartphones and, later, the Apple iPhone and Android phones,

the U.S. smartphone market began to expand significantly. ███████████████████

████████████████████████████████████████████████████████████████████████████████████████████████

██████████████ ██████ ██ to almost 137 million users by March 2013.[97]  ████████████████

---

[91] These are based on the historical Global System for Mobile Communications ("GSM") system and networks based on the historical Code Division Multiple Access ("CDMA") system.  In the U.S., GSM technology is used by AT&T, and T-Mobile, and CDMA technology is used by Verizon and Sprint.

[92] The 3G evolution of the GSM platform is referred to as either Wideband-CDMA ("WCDMA") or Universal Mobile Telephone Service ("UMTS") and incorporated improved data upload and download speeds.

[93] http://www.eweek.com/c/a/Mobile-and-Wireless/Verizon-Wireless-to-Launch-4G-LTE-Service-in-30-US-Cities-417341/ (viewed 9/12/2013); http://www.brighthand.com/special_section/?ss_id=101&page_id=17 (viewed 9/12/2013).  4G technology offers higher transmission speeds and more bandwidth relative to previous generations.

[94] A related issue to the sheer number of patents that may have to be licensed to manufacture and sell a product is the "patent thicket," which occurs when there is "a dense web of overlapping intellectual property rights that a company must hack its way through in order to actually commercialize new technology." *See, e.g.* Shapiro, C., 2000. "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting," *Innovation Policy and the Economy* 119–150, at 120; B. H. Hall, C. Helmers, G. von Graevenitz, C. Rosazza-Bondibene "A Study of Patent Thickets," Intellectual Property Office, 2013 ("Hall et al., 2013"), available at http://www.ipo.gov.uk/ipresearch-thickets.pdf (viewed 9/12/2013).  As Hall et al., 2013 discuss:

> The main problem that patent thickets create for firms are the costs of adequate patent search, the ability to identify all relevant technology, and the consequent threat of hold-up ex post, even if adequate due diligence has been done. This problem is most likely to arise for firms producing and selling products that use a complex technology, for instance the producer of a mobile phone. Such a firm cannot effectively ensure that its products do not infringe on patents granted to another firm, because there are usually very many relevant patents, because the claims in these patents are not always precise and because it is increasingly in the strategic interest of some applicants to hide their applications within the system for as long as the rules allow, leading to uncertainty over exactly which patents and claims will be granted in the end.

Hall et al 2013, at 37 (Citations omitted).

[95] comScore 2008 Digital Year in Review, January 2009, at 12.

[96] comScore, 2010 Mobile Year in Review, February 2011, at 7.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████

████████████████████████████████████████    ██████

### 2.    Overview of iOS and Android

42.    A smartphone's operating system is the software that manages the hardware and interacts with the software resources of the device.  In addition to enabling various features and functionalities of the device and impacting usability, the choice of the operating system impacts the benefits of the associated "ecosystem." This includes availability, number, and variety of third-party apps and media content, and the capability and ease of sharing content across other mobile and non-mobile devices.

43.    Smartphone sales in the U.S. currently are dominated by phones running one of two operating systems: Apple iOS and Google Android.  ███████████████████

████████████████████████████████████████████████

███████████████████████████    █████████████████████

████████████████████████████████████████████████

██████████████████████████████  ██ However, as discussed below, these two operating systems have not always been the marketplace leaders.

44.    Apple iOS was initially released in June 2007 with the launch of the first iPhone, and has been incorporated into Apple devices only.[101]  New iterations of iOS, typically containing what Apple claims is over one hundred or two hundred new features,[102]  have been

---

[97]www.comscore.com/Insights/Press_Releases/2013/5/comScore_Reports_March_2013_U.S.
_Smartphone_Subscriber_Market_Share (viewed 9/12/2013).
[98] *See* Exhibits 11 and 12.
[99] Exhibit 16 (U.S. Smartphone Market Share, by Operating System).  According to IDC, ████████████████████
████████████████████████████████
[100] Exhibit 16.
[101] Exhibit 19.
[102] *See* Exhibit 38.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

released on an approximately annual basis, coinciding with the release of new iPhones.[103]

Exhibit 38 describes the release dates of these iOS versions and some of the key features added

with each update.[104]

45.    Google Android was initially released in February 2008 and first appeared

commercially in October 2008 on the HTC G1 smartphone offered by T Mobile.[105] ████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████

46.    Android currently operates on a number of different smartphones manufactured

by several different firms.  Subsequent to the original launch, Google has released a number of

updates to its Android operating system each containing improved and additional features

relative to prior generation of the operating system.  Exhibit 39 shows the initial release dates for

Android operating system[107] and describes some of the key features that were added with each

version.[108]

47.    Several manufacturers, including HTC, LG, Motorola, and Samsung offer

smartphones that run the Android OS.  They take advantage of Android's customizability to

offer their own, brand-specific user interfaces ("UIs"), which are also commonly referred to as

"skins."  These UIs, which include the Samsung TouchWiz UI, HTC Sense, LG Optimus UI, and

Motorola MotoBLUR, can change the appearance and functionality of the device (including the

homescreen, lockscreen, keyboard, app drawers, cameras, notifications, and widgets),[109]  giving

---

[103] Exhibit 19.
[104] Exhibit 38.
[105] http://reviews.cnet.com/8301-19736_7-20012566-251/the-android-era-from-g1-to-jelly-bean/ (viewed 9/12/13).
[106] Exhibit 16.
[107] Release dates for Android updates vary across manufacturers.
[108] Exhibit 39.
[109] http://android.stackexchange.com/questions/13582/what-are-the-features-that-touchwiz-has-that-vanilla-android-does-not-have (viewed June 18, 2013); http://www.androidcentral.com/touchwiz (viewed 9/12/ 2013);
http://www.theverge.com/2012/5/3/2996509/samsung-features-android-galaxy-s-iii (viewed 9/12/2013);

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

manufacturers a way to differentiate their smartphones.  Other differences between Android

manufacturers include the timeliness and support of their operating system updates, how "open"

of an Android experience their devices provide, and differences across ecosystems (which I

discuss in more detail below).[110]

48.     Various manufacturers also offer "stock Android" devices that include no

manufacturer specific changes to the Android OS; the operating system on stock Android

devices looks and operates the same across manufacturers.[111]  Stock Android phones that are

created by Google in cooperation with third-party manufacturers are referred to as Nexus phones.

To date, four Nexus phones have been released.[112]

### 3.     Smartphone Manufacturer Leadership Has Shifted Over Time

49.     A number of companies have sold and currently sell smartphones in the U.S., and

relative marketplace success has shifted dramatically over the past decade.  Palm and Nokia were

early market leaders in smartphones, but by the mid to late 2000s, Research in Motion ("RIM")

(now named Blackberry) had gained the top position in North America accounting ██████████

███████████.[113]  Blackberry's U.S. marketplace leadership, too, was transitory. ██████████

---

http://www.phonebuff.com/2012/07/touchwiz-ui-review-samsung-galaxy-s3/ (viewed 9/12/2013);
http://gizmodo.com/5921220/every-major-android-skin-compared (viewed 9/12/2013);
http://reviews.cnet.com/smartphones/lg-optimus-l9-t/4505-6452_7-35430049.html (viewed 9/12/2013).
[110] ████████████████████████ SAMNDCA11086713-917, at 748.  *See also,* SAMNDCA11086713-917, at 879.
    http://reviews.cnet.com/8301-19736_7-20089740-251/a-closer-look-at-stock-android-phones/ (viewed 9/12/2013).
[112] The Nexus One, produced by HTC, was released in January 2010.  Samsung produced two Nexus phones, the Nexus S, released in December 2010, and the Galaxy Nexus released in November 2011.  The LG produced Nexus 4 was released in November 2012.  See, http://www.gsmarena.com/htc_google_nexus_one-3069.php (viewed 9/12/2013); http://www.gsmarena.com/samsung_google_nexus_s-3620.php (viewed 9/12/ 2013);
http://www.gsmarena.com/samsung_galaxy_nexus_i9250-4219.php (viewed 9/12/ 2013);
http://www.gsmarena.com/lg_nexus_4_e960-5048.php (viewed 9/12/ 2013);
http://arstechnica.com/gadgets/2013/05/from-the-nexus-one-to-the-nexus-10-a-brief-history-of-nexus-devices/ (viewed 9/12/ 2013).
[113] http://www.canalys.com/newsroom/64-million-smart-phones-shipped-worldwide-2006 (viewed 9/12/2013).  *See also* Exhibit 13.  (Showing North American market shares from 2010 onward.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████

█████████████████████████████

50.     Exhibits 13 through 18 show smartphone market shares over time.  In 2007, Apple entered the smartphone marketplace with the launch of the iPhone.[115]  In late October 2008, the first smartphone incorporating the Google Android system, the HTC-manufactured "T-Mobile G1" was introduced,[116] and over the next year additional Android smartphones were launched in the U.S. by HTC, Samsung, Motorola, and others.[117]

51.     ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

███ ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███ ███

---

[114] *See e.g.*, Exhibit 13.

[115] http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html (viewed 9/12/2013); http://www.apple.com/pr/library/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores.html (viewed 9/12/2013).

[116] http://reviews.cnet.com/t-mobile-g1/ (viewed 9/12/2013).  *See also*, Deposition of Hiroshi Lockheimer, July 26, 2013, at 148.

[117] http://reviews.cnet.com/8301-19736_7-20016542-251/a-brief-history-of-android-phones/ (viewed 9/12/2013)

[118] Exhibit 13.

[119] Exhibit 13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

52.     These changes in marketplace leadership are drawn, in part, from consumer acceptance of new innovations in smartphones introduced over the period.  At first, RIM was the dominant provider, with its Blackberry products catering to business users with well-regarded phones that offered secure email functionality.[120]  However, Blackberry failed to deliver smartphones embodying touchscreens with virtual keyboards, state-of-the-art cameras and music capabilities—instead preferring to enhance its core strength of communications security.[121]  By not reacting sufficiently to non-business users' enthusiasm for touchscreen smartphones that provided access to apps, music, and other features, Blackberry created an opening which Apple and Android devices exploited.[122]  As consumers generally became comfortable with the new devices, so too did the business community, and beginning in mid-2009 RIM's stronghold in that segment began to erode.[123]

53.     Apple's iPhone introduction in 2007 first captured the consumer-centric smartphone buyer.  And despite the fact that early iPhones were missing several "standard cellphone features" such as "voice dialing, picture messaging (MMS), video recording, copy-and-paste, stereo Bluetooth support, memory card slot, and 3G capability (in the original

---

[120] *See, e.g.,* http://www.forbes.com/sites/panosmourdoukoutas/2012/04/01/the-entrepreneurial-failure-of-research-in-motion/ (viewed 9/12/2013); http://www.forbes.com/sites/haydnshaughnessy/2012/04/02/why-rims-failure-could-be-your-failure-too/ (viewed 9/12/2013).  *See also,* SAMNDCA00256391-502, at 446.

[121] *See, e.g.,* http://bgr.com/2011/07/13/rims-inside-story-an-exclusive-look-at-the-rise-and-fall-of-the-company-that-made-smartphones-smart, Jonathan Geller, July 13, 2011 (viewed 9/12/2013);
http://www.theverge.com/2012/2/21/2789676/rim-blackberry-mike-lazaridis-jim-balsillie-lost-empire#section-link-title5 (viewed 9/12/2013).

[122] *See, e.g.,* http://www.forbes.com/sites/panosmourdoukoutas/2012/04/01/the-entrepreneurial-failure-of-research-in-motion/ (viewed 9/12/2013); http://www.forbes.com/sites/haydnshaughnessy/2012/04/02/why-rims-failure-could-be-your-failure-too/ (viewed 9/12/2013); http://www.theverge.com/2012/2/21/2789676/rim-blackberry-mike-lazaridis-jim-balsillie-lost-empire#section-link-title5 (viewed 9/12/2013).

[123] Exhibits 13, 14, and 15.  http://www.digitaltrends.com/mobile/blackberry-once-king-of-corporate-it-now-in-decline/ (viewed 9/12/2013); "New InformationWeek Reports Research Finds Just 7% of IT Pros Plan Increased Use of RIM Products in the Future", PR Newswire, February 23, 2012. ("as smartphone use has gained prevalence in this country, a fundamental change has begun to affect RIM's bottom-line: consumers, as opposed to corporate IT departments, now dictate which devices drive business use, and not the other way around. By shutting RIM out of the consumer game, Apple and Android have forced IT departments to adapt to their platforms.")

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

iPhone),"[124] Apple's market share quickly rose. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Reviewers of the original iPhone (launched in

June 2007) noted characteristics such as its speed, multi-touch touchscreen user interface, display

quality, music player, Wi-Fi compatibility and browser.[126]  With the release of the iPhone 3G

(launched in July 2008), reviewers noted increased browsing speeds and audio quality and the

availability of third-party apps through the Apple App store.[127] ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ iPhones employed Apple's proprietary

iOS operating system and came in only one model – equipped exclusively with a touchscreen

keyboard – introduced annually with some (but limited) variation in color and memory

choices.[129]  Most importantly, through February 2011, the potential market for the iPhone was

limited by Apple's decision to enter into an exclusive relationship with one carrier, AT&T.

Because Verizon, Sprint, and other carriers did not initially enter into agreements with Apple,

---

[124] *See, e.g.,* http://www.nytimes.com/2007/06/27/technology/circuits/27pogue.html?pagewanted=all&_r=0 (viewed 9/12/2013); http://www.nytimes.com/2008/07/09/technology/personaltech/09pogue.html?pagewanted=all (viewed 9/12/2013) http://reviews.cnet.com/smartphones/apple-iphone-8gb-at/4505-6452_7-32309245.html (viewed 9/12/2013); http://reviews.cnet.com/smartphones/apple-iphone-3g-16gb/4505-6452_7-33054209-2.html (viewed 9/12/2013).  The original iPhone and the iPhone 3G also were viewed as having "terrible" cameras. http://www.nytimes.com/2009/06/18/technology/personaltech/18pogue.html?pagewanted=all (viewed 9/12/2013)
[125] Exhibit 13 and Exhibit 65C.  SAMNDCA00256391-502, at 398.  *See also*, SAMNDCA00256391-502, at 437.
[126] *See, e.g.,* http://reviews.cnet.com/smartphones/apple-iphone-8gb-at/4505-6452_7-32309245.html (viewed 9/12/2013); http://www.nytimes.com/2007/06/27/technology/circuits/27pogue.html?pagewanted=all&_r=0 (viewed 9/12/2013).
[127] *See, e.g.,* http://www.nytimes.com/2008/07/09/technology/personaltech/09pogue.html?pagewanted=all (viewed 9/12/2013); http://reviews.cnet.com/smartphones/apple-iphone-3g-16gb/4505-6452_7-33054209-2.html (viewed 9/12/2013).
[128] *See, e.g.,* http://www.apple.com/iphone/compare-iphones/ (viewed 9/12/2013); www.engadget.com/2009/06/17/iphone-3g-s-review/; reviews.cnet.com/smartphones/apple-iphone-3gs-16gb/4505-6452_7-33674172.html (viewed 9/12/2013); http://www.businessinsider.com/things-that-still-annoy-me-about-the-iphone-2012-8?op=1 (viewed 9/12/2013); APLNDC630-0001697453-537, at 458.
[129] http://www.nytimes.com/2011/02/10/technology/10phone.html?_r=0 (viewed 9/12/2013). http://www.apple.com/iphone/compare-iphones/ (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

their subscribers (many still under contract) were not able to take advantage of this new device immediately.

54.     Starting in October 2008 with the launch of the T-Mobile G1 smartphone offered by HTC (and also known as the "HTC Dream"),[130] Google's Android OS along with its partner manufacturing firms also entered the marketplace.  This first Android device offered users a touchscreen device with a camera and 3G and Wi-Fi compatibility that had several features missing from Apple products at the time, such as a physical keyboard, voice commands, a pull-down notification window that consolidated messages and alerts across apps, widgets displaying information on the home screen, and the ability to copy and paste text.[131]  It also featured deeper Gmail integration than iPhone products, with closer replication of the style and functions found in the online application.[132]  The G1 also had a removable battery, expandable SD memory, and an integrated compass that could provide a Google Maps Street View image of the buildings around the user.[133]

55.     By the end of 2009, a variety of Android phones had been launched spanning multiple manufacturers (HTC, Samsung, and Motorola) and multiple carriers (T-Mobile, Sprint, and Verizon).[134]  The release of the Android 1.5 (Cupcake) operating system on the T-Mobile MyTouch 3G featured an on-screen keyboard with support for third party keyboard applications, a differentiator from Apple and Windows Phone products.[135]  It also included a native messaging

---

[130] http://reviews.cnet.com/8301-19736_7-20012566-251/the-android-era-from-g1-to-jelly-bean/ (viewed 9/12/13).
[131] http://www.theverge.com/2011/12/7/2585779/android-history (viewed 9/12/2013);
http://www.popularmechanics.com/technology/gadgets/reviews/4284532 (viewed 9/12/2013);
http://tech.fortune.cnn.com/2009/06/11/infographic-new-iphone-vs-palm-pre-vs-android-g1/ (viewed 9/12/2013).
[132] http://www.theverge.com/2011/12/7/2585779/android-history (viewed 9/12/2013);
http://www.popularmechanics.com/technology/gadgets/reviews/4284532 (viewed 9/12/2013).
[133] http://www.popularmechanics.com/technology/gadgets/reviews/4284532 (viewed 9/12/2013).
[134] http://reviews.cnet.com/8301-19736_7-20016542-251/a-brief-history-of-android-phones/ (viewed 9/12/2013).
[135] http://reviews.cnet.com/8301-19736_7-20016542-251/a-brief-history-of-android-phones/ (viewed 9/12/2013);
http://www.theverge.com/2011/12/7/2585779/android-history (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

application (Google Talk), another feature missing from iPhone products.[136] Android 2.0 (Eclair), initially offered on the Motorola Droid in October 2009, included several additions and improvements, such as support for multiple Google accounts, speech to text capability, and an improved browser and virtual keyboard.[137]  It also featured integrated turn-by-turn Google Maps navigation, something that would be missing from iPhone products for years to come.[138]

56.     HTC was the most successful Android manufacturer at first.  HTC offered early and enthusiastic backing for the Android operating system, along with an emphasis on touchscreen devices and implementation of its highly customizable HTC Sense user interface, and effective ad campaigns and brand building.[139] ████████████████████████████████ ██████████████████████████████████████████████████████████████████

57.     Innovation within the marketplace continued over the following years.   While Apple had (and has) a broad and enthusiastic following, the iPhone is not attractive to all smartphone consumers.  In particular, surveys cite iPhone's expense and perceived inflexibility regarding certain consumer ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████[1]  This has created a further opportunity for Android manufacturers to innovate through flexible and more readily available product features ████████████████████████████████████████████████

---

[136] http://www.theverge.com/2011/12/7/2585779/android-history (viewed 9/12/2013); http://gizmodo.com/5398942/the-iphone+to+android-switch-10-things-you-need-to-know (viewed 9/12/2013).
[137] http://reviews.cnet.com/8301-19736_7-20016542-251/a-brief-history-of-android-phones/ (viewed 9/12/2013); http://www.theverge.com/2011/12/7/2585779/android-history (viewed 9/12/2013).
[138] http://www.theverge.com/2011/12/7/2585779/android-history (viewed 9/12/2013); http://www.pcworld.com/article/185350/droid_iphone_gps_shootout.html (viewed 9/12/2013).
[139] *See, e.g.,* http://gigaom.com/2009/12/23/how-htc-became-a-smartphone-hero/ (viewed 9/12/2013).  See also, http://gigaom.com/2010/04/06/htc-earnings/ which attributes HTC's success also to its "carrier friendly stance."
[140] Exhibits 13, 14, and 15.
[141] *See, e.g.,*  http://www.ibtimes.com/12-features-android-handsets-have-iphone-5-will-not-299795; http://www.forbes.com/sites/adriankingsleyhughes/2012/09/12/five-iphone-5-features-tim-cook-will-not-announce-today/; http://www.insidermonkey.com/blog/apple-inc-aapl-consumer-demand-for-mega-screens-increasing-study-says-141978/; http://reviews.cnet.com/2300-6454_7-10002721.html; http://www.cnet.com/smartphones/apple-iphone-5/4852-6452_7-35022502.html; http://www.businessinsider.com/things-that-still-annoy-me-about-the-iphone-2012-8?op=1 (all viewed 9/12/2013); APLNDC630-0001697453-537, at 458 and 462.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████████.[142] Thus, new

Android phones were able to attract different and newer segments of customers than Apple had

with just its products.[143]

58.     ████████████████████████████████████████████████████████

████████████████████████████████████ ██ ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ ██ However, it was

also due to Samsung's introduction and marketing of its own appealing products.

59.     In just a few years, Samsung had grown from one of the smaller Android

participants to the largest. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[142] *See, e.g.,* SAMNDCA630-06635592-667, at 596, 599, ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████ *See also*, ████████,
http://www.samsungmobilepress.com/2011/02/13/Samsung-announces-the-GALAXY-S-II,-World10281979s-
thinnest-Smartphone-that-Will-Let-You-Experience-More-with-Less (viewed 9/12/ 2013);
http://news.verizonwireless.com/news/2011/04/pr2011-04-20.html (viewed 9/12/2013);
http://www.businesswire.com/news/home/20100323005594/en/Samsung-Welcomes-%E2%80%9CSmart-
Life%E2%80%9D-Global-Launch-Galaxy (viewed 9/12/ 2013); http://www.samsung.com/us/article/tips--tricks-
galaxy-nexus (viewed September 5, 2013); http://www.samsungmobilepress.com/2011/10/19/Samsung-and-Google-
introduce-GALAXY-Nexus (viewed September 5, 2013); http://www.samsung.com/us/news/19704 (viewed 9/12/
2013); http://www.att.com/gen/press-room?pid=19793&cdvn=news&newsarticleid=31893;
http://www.samsung.com/us/article/galaxy-s-a-new-era-in-amoled-technology (viewed 9/12/ 2013);
http://www.apple.com/iphone/design/ (viewed 9/12/ 2013); and http://www.apple.com/pr/library/2011/10/04Apple-
Launches-iPhone-4S-iOS-5-iCloud.html (viewed 9/12/ 2013); and
http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5.html (viewed 9/12/ 2013); and
http://www.apple.com/iphone/features/ (viewed 9/12/ 2013).
[143] *See, e.g.,* http://reviews.cnet.com/8301-19512_7-57599084-233/the-one-thing-apple-must-do-to-keep-me-as-an-
iphone-customer/ (viewed 9/12/ 2013); http://news.cnet.com/8301-1035_3-57599244-94/samsungs-android-
dominance-makes-it-an-apple-contender-study-says/ (viewed 9/12/ 2013).
[144] Exhibits 13, 14, 20, and 21.
[145] *See, e.g.,* http://dottech.org/97795/htc-one-is-perfect-example-of-why-htc-will-not-succeed-they-fail-at-
marketing-opinion/ (viewed 9/12/2013);  "Smartphones 2012, Growth Robust…Time to Think Compute," Credit
Suisse, April 12, 2012, at 70, 76.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███████████████████ ████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████ ██

### 4.    The Tablet Marketplace Shares Similarities with the Smartphone Marketplace

60.    While tablet computers trace their history back to computer technology that was introduced in the late 1950s or early 1960s,[148] the first mass-market tablet, the Apple iPad, was introduced in the U.S. in April 2010.[149]  Since that time, ███████████████████████

███████████████████████████████████████████████████████

███████████ ████████ █████████████████████████████████████

████████████████████████████████████████████████ ██

---

[146] ██ ███████████

██████████████████████████████████████████████████ ██

████████████  http://online.wsj.com/article/SB10001424127887323854904578264090074879024.html (viewed 9/12/2013) (noting that Samsung's aggressive marketing campaigns, along with its engineering skill and large-scale manufacturing ability, have swayed consumers); http://online.wsj.com/article/SB10001424127887324096404578356651577771618.html (viewed 9/12/ 2013) (stating that Samsung's advertising has helped it "open a huge lead in the global smartphone race"); http://www.forbes.com/sites/adamhartung/2013/04/04/how-samsung-changed-the-game-on-apple/ (viewed 9/12/ 2013) (noting that Samsung "changed the game" by focusing on distribution and advertising); Oppenheimer, "2012 Handset Guidebook," November 13, 2011, at 53 ████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████ ██

[148] Catharine Smith, "History Of Tablet PCs (PHOTOS): A Pictorial Timeline Of Tablets, From RAND To The iPad," Huffington Post, June 15, 2010, available at http://www.huffingtonpost.com/2010/04/15/history-tablet-pc-photos_n_538806.html#s777827&title=RAND_Tablet_1964 (viewed 9/12/2013).  In 2007 Amazon first introduced Kindle e-readers to the U.S.  "Turning the Page: The future of books." (2010) PwC, at 5.
[149] http://reviews.cnet.com/tablets/apple-ipad-64gb-at/4505-3126_7-33960299.html (viewed 9/12/2013).
[150] Exhibits 27 - 29.
[151] See Exhibits 27 - 29.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

61.     Competition in the U.S. tablet market shares many similarities to competition in

the smartphone market. ████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████ ██ ██

████████████████████████████████████████████████████████

██████████████████████████ ██ ██████████████████████████

████████████████████████████████████████████████████████

██████████████████████ ██ ████████████████████████████████

████████████

62.     Perhaps the most important distinction between the smartphone market and the

tablet market is the more limited role played by carriers and mobile wireless (*e.g.*, 3G or 4G)

connectivity. ██████████████████████████████████████████████████

███████████████████████████ ██ █████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ ██

---

152 *See* Exhibits 31 and 32.
153 Exhibits 31and 32.
154 Regarding the overall similarity of the purchase considerations, *see, for example*, APL-ITC796-0000508285-457
at 389, 412, 427 (Rangel Deposition Volume 1, Exhibit 7, at pp. 105, 128, 143); SAMNDCA11086713-917 at 882.
155 *See, e.g*, iPad Competitive Tracker, Week of December 12, 2011 (APLNDC630-0001898632); iPad Competitive
Tracker, Week of December 10, 2012 (APLNDC630-0001898633); iPad Competitive Tracker, Week of May 6,
2013 (APLNDC630-0001898634).  *See also*, Deposition of Monica Karo, March 7, 2012, at 82-96.
156 Exhibit 65C.  According to an iPad tracking study conducted by Apple in November 2011, ████████████
████████████████████████████████ APL-ITC796-0000508285-457 at 328 (Rangel
Deposition Vol. 1, Exhibit 7, at 43-44).  *See also*, SAMNDC00503153-204, at 155-56.
████████████████████████████████████████████████ Strategy Analytics U.S. Tablet Survey 2012,
August 28, 2012, at p. 7. ████████████████████████████████████████. *See, e.g.,*
APLNDC630-0000177303-552, at 433 (Tchao Exhibit 4).
157 APL-ITC796-0000508285-457 at 457 (Rangel Deposition Vol. 1, Exhibit 7, at p. 173). ███████████████
█████████████████████████████ APL-ITC796-000050588-6002 at 5983 (Rangel Deposition Vo1. 1, Exhibit
9, at 96.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## III.   Many Factors Contribute to Smartphone and Tablet Purchase Decisions

63.      As the changes in market leadership above suggest, there are many components to the competition within this marketplace, and there are many elements that affect product demand.  The economics literature has recognized the important role that consumer heterogeneity plays in driving demand for differentiated consumer products.  Models of demand for differentiated products date back at least to Lancaster (1972) and McFadden (1974).[158]  In this literature, products are generally modeled as bundles of characteristics.  Individual consumers, each with different demands for different product characteristics, choose their preferred product in the marketplace given the product prices.  Firms succeed in the marketplace if they can provide products that have a bundle of characteristics that are attractive to a substantial group of consumers at a production cost lower than consumers' willingness to pay for those features.

64.      The economics literature also recognizes two types of product differentiation that will be useful to consider in the case of smartphones.  "Horizontal product differentiation" is used to describe a situation in which different consumers prefer different product attributes; at identical prices, some consumers would choose one product and other consumers would choose a different product.[159]  For example, some consumers might greatly prefer a smartphone product with a bigger screen, while other consumers would prefer a smaller screen (because it implies a smaller and more portable product).  At equivalent prices (and for equivalent other features), some consumers would choose the bigger screen and some consumers would choose the smaller screen.

---

[158] Lancaster, Kelvin J., "A New Approach to Consumer Theory." *Journal of Political Economy*, 74, 1966, 132-157. McFadden, Daniel. "Conditional Logit Analysis of Qualitative Choice Behavior," in Zarembka, Paul, ed., Frontiers in Econometrics," Academic Press: New York, 1974, 105-142.

[159] *See, e.g.,* Pepall, Lynne, Daniel J. Richards, and George Norman, Industrial Organization: Contemporary Theory & Practice, 3rd ed. Thomson South-Western, 2005, at 133.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

65.    "Vertical product differentiation" is used to describe a situation in which all consumers would prefer a product with a given attribute.[160]  For example, for smartphones, everything else equal, all consumers (likely) would prefer a product with longer battery life.   If two products were available at equivalent prices and all other features were equivalent, we would expect consumers to choose the product with the longer battery life.[161]   However, consumer heterogeneity generally still plays a role in determining the market position of products that differ in vertical quality dimensions.  For example, different consumers will differ in their willingness to pay for better battery life.  When comparing smartphones with a different mix of features, some consumers will put more weight on the battery life of the phone and some consumers will put less weight on the battery life; consumers who put little weight on the battery life will be willing to buy a phone with shorter battery life if the phone has other features that the consumer views as more desirable.

66.    For smartphones, there are myriad vertical and horizontal product characteristics that affect consumer demand for the products.  As detailed below, the availability and relative importance of smartphone characteristics have changed over time.  And, as in many technologically evolving industries, some product features are desired by so many consumers and offered by so many providers that they eventually become expected or standard features of the products.[162]   Firms compete to introduce new product varieties that contain new features that

[160] See, e.g., Pepall, Lynne, Daniel J. Richards, and George Norman, Industrial Organization: Contemporary Theory & Practice, 3rd ed. Thomson South-Western, 2005, at 133.

[161] This is consistent with a 2008 Yankee Group presentation which identifies longer battery life as among the top two "must have" features and ranked last among the "unimportant features" of smartphone buyers.

[162] See, e.g., Giachetti, Claudio and Gianluca Marchi, (2010) "Evolution of firms' product strategy over the life cycle of technology-based industries: A case study of the global mobile phone industry, 1980–2009," Business History, 52(7) 1123–1150. ("Because some of the most requested features by consumers, such as SMS, no longer distinguished mobile vendors, consumers purchased phones that suited their different lifestyles.")  Theo Downes-LeGuin of consulting firm Market Strategies reported in a June 2010 email to Apple that "[c]ertain features that even a year ago were considered advanced have become commonplace requirements."  APLNDC630-0000124145-46, at 45.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

some consumers will value highly.  As the overall market expands, introducing products that contain features that will only be desired by a subset of consumers becomes more attractive.[163] In effect, as the market expands, the number of varieties expands so that consumers can buy products that are more tailored to each consumer's particular demand.  The literature in competitive strategy, marketing, and economics refers to this process as the "product lifecycle" or "industry lifecycle."[164]  While this is a descriptive term that may not characterize all markets, it provides a useful description of market evolution in the smartphone marketplace.[165]

67.     Among the elements that impact consumer choice in the smartphone marketplace are: (1) characteristics and behavior of the carrier; (2) operating system characteristics, including the integration with the device and the availability of applications and other ecosystem characteristics enabled by the operating system; (3) marketing efforts to enhance brand reputation; (4) device-specific characteristics, such as capabilities, hardware characteristics, and physical characteristics; and (5) retail price.  The importance these factors on consumer choice is highlighted in research studies conducted by and for both Apple and Samsung, third-party generated research on smartphone purchase drivers and on the extent of use of smartphone features and on product satisfaction, analyses of securities analysts, promotional and instructional materials created by the manufacturers, and product reviews authored by consumers and professional reviewers.

---

[163] *See, e.g.,* Klepper, S. (1996). "Entry, Exit, Growth, and Innovation Over the Product Life Cycle," *American Economic Review*, 86(3), 562–583; and Abernathy, W.J., & Utterback, J.M. (1978) "Patterns of Innovation in Technology," *Technology Review*, 80(7), 40-47.

[164] *See, e.g.,* Klepper, S. (1996) "Entry, Exit, Growth, and Innovation Over the Product Life Cycle," *American Economic Review*, 86(3), 562–583; and Abernathy, W.J., & Utterback, J.M. (1978) "Patterns of Innovation in Technology," *Technology Review*, 80(7), 40-47.

[165] For a discussion of the relevance of product/industry lifecycle models to the mobile phone industry from 1980 to 2009, *see* Giachetti, Claudio and Gianluca Marchi, (2010) "Evolution of firms' product strategy over the life cycle of technology-based industries: A case study of the global mobile phone industry, 1980–2009,"  *Business History*, 52(7) 1123–1150.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### A.    Purchases are Linked to Carrier Preferences

68.    Because in the U.S. most handsets typically are bought as part of a bundle that includes wireless service, carriers (also known as service providers) play an important role in U.S. smartphone marketplace competition.  End users have preferences over carriers because carriers differ in aspects such as network reliability, service cost and ability to roam internationally.[166]  Their role is accentuated by two factors: (1) carriers have different attributes that end users care about; and (2) historically, not all handsets have been offered through all carriers (or are compatible with all carrier networks).[167]  ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

69.    Carriers also play a role in the marketplace through their influence on device pricing (and subsidies), marketing, and the sales processes.  ████████████████████

---

[166] According to a 2008 third-party survey conducted for Samsung, the wireless carrier and service plan were rated as "very important" smartphone attributes to approximately three-fourths of those surveyed. SAMNDCA00252685-775, at 707. █████████████████████████████████████████████████
███████████████████████████████████  A 2011 Samsung study found that consumers prefer certain carriers over others based upon factors such as phone selection, contract costs, network speed and customer service. SAMNDCA11086713-917, at 747, 908. *See also*, "Cell phone & service buying guide," Consumer Reports, January 2012, available at http://www.consumerreports.org/cro /cell-phones-services/buying-guide.html (viewed 9/12/2013).

[167] The Motorola Droid, for example, was launched exclusively with Verizon, while slightly different configurations of the Samsung Galaxy SII became available on all the major U.S. carrier networks except for Verizon.  The iPhone was offered exclusively for AT&T Wireless from launch in June 2007 through January 2011.  The combination of AT&T exclusivity and well-documented AT&T service problems in various locations were thought as being important in limiting the sales of the Apple iPhone prior to when Apple brought the iPhone to Verizon. Frost & Sullivan, "North American Smartphones Market," December 2010, p. 50. Helft, Miguel, "Apple Plans to Offer iPhone on Verizon," The New York Times, October 8, 2010, available at http://www.nytimes.com/2010/10/09/technology/09phone.html?_r=0&pagewanted=print (viewed 9/12/2013). *See also*, Exhibit 33.

[168] *See, e.g,* Apple's "Smartphone Market Study – U.S. January 2011", APLNDC0001765739-8340, at ████ ████ and Google's

*See also*, Chintagunta, *et al.*, "Wireless Carriers' Exclusive Handset Arrangements: An Empirical Look at the iPhone," Net Institute Working Paper No. 11-35, October 2011 ("Chintagunta, *et al.*(2011)"), at 14, 22.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

 As part of that bundle purchase, end-users typically pay only a fraction of the amount that is received by the manufacturer for the purchased smartphone, with the wireless carriers providing to the manufacturer a subsidy as the balance of the payment.[170]

70.     Economists have long observed that the incentives of upstream manufacturers and downstream sellers (such as retailers, or in the case of smartphones, carriers) are not fully aligned.  In particular, the course of action that is profit-maximizing for the seller may not be profit-maximizing for the manufacturer.[174]  This "channel conflict" issue arises in the sale of smartphones.  Carrier profits vary based on the smartphone a consumer chooses.  Among the reasons for this is that selling different smartphones entails the carrier incurring different costs,

---

[169] *See, e.g.,* ██████████████████████████
[170] http://www.brighthand.com/default.asp?newsID=18743&news=ATT+Verizon+Sprint+T-Mobile (viewed 9/12/2013).  Carriers provide a subsidy to manufacturers regardless of whether the device is purchased at the carrier store. *See, e.g.,* http://bestbuymobile.com/2012/08/09/what-does-my-phone-really-cost/ (viewed 9/12/2013).
[171] *See, e.g.,* APLNDC630-Y00008911-16, at 15.
[172] *See, e.g.,* http://www.forbes.com/sites/greatspeculations/2013/05/15/t-mobiles-success-with-no-contract-plans-could-shake-up-industry/ (viewed 9/12/2013), http://www.phonearena.com/news/Are-Verizons-Android-customers-paying-through-the-nose-to-subsidize-iPhone-prices_id24839 (viewed 9/12/2013).
[173] *See, e.g.,* APLNDC630-0001848815-62, at 30, 37.  *See also,* http://www.forbes.com/sites/larrymagid/2013/03/26/how-t-mobiles-new-prices-compare-to-competition/ (viewed 9/12/2013).
[174] Economists refer to these misaligned incentives as "vertical externalities."  *See, e.g.,* Tirole, Jean, *The Theory of Industrial Organization*, The MIT Press, Cambridge, MA, 1988, at 174-181.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

including paying differing carrier subsidies, incurring differing marketing expenses and generating sales commissions that vary by brand and model. ██████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ ████████████████████████████

████████████████ █

71.   ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ ██ ███

██████████████████████████ ██████████████████████████

█████████████████████████████████████████████████████

████████ █

72.   Manufacturer incentives (or Sales Promotion Incentive Funds, commonly referred to as "spiffs") also provide carriers (and other retailers, such as Best Buy and Walmart), incentives to promote certain brands and models over others.  According to a January 2012 internal Apple email, Apple's iPhone product marketing manager Steve Sinclair indicated that

███████████████████████████████████████████████████████

---

[175] *See, e.g.,* APLNDC630-0001848815-862, at 22-24, 28-30; APLNDC630-0001849558-678, at 571, 599-602, 606. 625, 634.
[176] *See e.g.*, APLNDC630-0001848021-138, at 028. ██████████████████████████████
██████████████████████████████████████████████████  Google gives a majority of their 30% to their carrier partners, ██████████████████ *See* APLNDC630-0000256653, https://support.google.com/googleplay/android-developer/answer/112622?hl=en (viewed 9/12/2013), and http://www.businessinsider.com/google-play-store-revenue-2013-6 (viewed 9/12/2013).  APLNDC630-0000256653.
[177] APLNDC630-0001849558-678, at 600.
[178] APLNDC630-0001849558-678, at 601.
[179] APLNDC630-0001849558-678, at 602, 638.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



[REDACTED].[180]  A January 2013 email from James Vincent, president of advertising agency TBWA Media Arts Lab, to Apple's senior vice president of worldwide marketing, Philip Schiller, [REDACTED] [REDACTED] [REDACTED] Of note, Samsung is reported to have spent more relative to other manufacturers for "in-store advertising, promotions and training for carrier sales representatives that help close the sale."[182] [REDACTED] [REDACTED].[183]

73.     Further, given that in the U.S., [REDACTED] [REDACTED] [REDACTED] [REDACTED]

---

[180] APLNDC630-0000062640-42.

[181] APLNDC630-0000845537-43, at 538-539.

[182] http://online.wsj.com/article/SB10001424127887324096404578356651577771618.html (viewed 9/12/ 2013). *See also*, APLNDC630-0001849558-678, at 571, 601, 602; Deposition of Greg Joswiak, July 9, 2013, at 64-65; Deposition of Stanley Ng, July 2, 2012, at 97-98.

[183] APLNDC630-0001849558-678, at 571, 601, 602; Deposition of Greg Joswiak, July 9, 2013, at 64-65; Deposition of Stanley Ng, July 7, 2012, at 97-98.

[184] APLNDC630-0000127836-41, at 38.  *See also*, www.theatlanticwire.com/technology/2012/10/why-apple-stores-arent-best-place-buy-iphone/57566/ (viewed 9/12/2013).  allthingsd.com/20130717/apple-wants-to-sell-more-iphones-through-its-own-stores-but-can-it/ (viewed 9/12/2013).  The remainder of Apple products are sold online or through an Apple retail store.  One source describes: "Mobile carrier stores account for most smartphone sales for both Apple and Samsung, with around half of sales for both brands (Chart 7). For Apple, Apple Stores account for almost one-quarter of total sales, while Samsung gets another 18% of its sales from mass merchants and warehouse clubs, like Walmart, Target, and Costco. Both get a similar level of sales from Best Buy. Samsung has more buyers from online outlets, like Amazon and eBay, than Apple does."  *See* Consumer Intelligence Research Partners, "From Basic to Samsung to Apple," August 12 2013, at 4.

[185] [REDACTED] Compare, *e.g.*, "iPad Tracking Study FY12 - Q2" (APLNDC630-0000177773 - 8021, at 7807) to "iPhone Buyer Survey FY12 - Q2." (APLNDC630-0000182457 – 2593, at 2538).  Carriers tend to be less important relative to tablet sales as sales of 3G/4G enabled tablets are significantly outnumbered by Wi-fi only sales. *See, e.g.*, http://www.businessinsider.com/tablets-2011-2?op=1 (viewed 9/12/2013); http://gigaom.com/2012/03/20/sorry-carriers-9-out-of-10-tablets-sold-are-wi-fi/ (viewed 9/12/2013).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



---

186 APLNDC0001347632-34, at 32.
187 SAMNDCA630-07344160-212, at 176 (DiCarlo Exhibit 10).
188 APLNDC630-0000127826-28, at 27.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

76.

**B.      Operating System Preference is a Factor in Consumer Purchase Decisions**

77.      One of the decisions made by consumers in selecting a smartphone or tablet is the

choice of whether to buy an Android or iOS product.

---

[189] APLNDC630-0000127433-38.

Compare, *e.g.,* "iPad Tracking Study FY12 - Q2" (APLNDC630-0000177773 - 8021, at 7807) to "iPhone Buyer Survey FY12 - Q2." (APLNDC630-0000182457 – 2593, at 2538).
[191] SAMNDC00503153-204, at 158.
[192] SAMNDCA11086713-917, at 744.

Deposition of Timothy Benner, June 28, 2013, at 65-66.

http://www.brighthand.com/default.asp?newsID=18803&news=Smartphone+Purchasing+Advice+Gifts+Apple+An
droid+BlackBerry+Windows+Phone (viewed 9/12/2013).
[193] SAMNDCA11086713-917, at 744.

SAMNDCA630-00069861-882, at 866 (Park Exhibit 15).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

78.     This thinking is consistent with the conclusions of Mr. Downes-LeGuin, of

Market Strategies (a consultant to Apple), who observed that "[m]ost consumers think in terms

of iPhone vs. Android (or Droid) vs. other stuff."[194] ███████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████ ██ Other surveys, such as one by Business Insider, reported that

"Among Android users, most [55%] say they will never buy an iPhone because they hate Apple.

Most of the rest say they would buy an iPhone if it worked better with non-Apple products. (And

there's the risk of the "closed" system that Apple is selling)".[196]

79.     This highlights that the operating system is a significant differentiating factor

between phones and tablets, and that consumers likely consider two Android phones as closer

substitutes for one another than an iPhone and an Android phone.   One way in which the

operating systems differ is in the combination of access to third party content and the capability

and ease of sharing content across devices that they provide.   Collectively called a device's

"ecosystem" or "digital ecosystem," it includes mobile applications and media content, access to

mobile data storage and file sharing services (e.g. "the cloud"), and the ability to interact with

other electronic devices, such as televisions, personal computers and streaming media players

such as AppleTV, Roku and Sonos.[197]   In the current market environment, the ecosystem

available to a device is determined, for the most part, by the mobile operating system it uses.[198]

---

[194] APLNDC630-0000124145-46, at 45.
[195] APLNDC630-0000127666-91, at 83.
[196] THE TRUTH ABOUT SMARTPHONES: Our Exclusive Survey On iPhone vs Android;
http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1#ixzz2X3XU24Qn . Some observers have
questioned the results of this survey, as potentially being biased due to its selection of respondents. See, e.g.,
http://news.cnet.com/8301-17852_3-20055181-71.html (viewed 9/12/2013).   Nevertheless, it does indicate that
within certain Android groups, an Apple phone would not have been an option.
[197] http://techpinions.com/why-its-all-about-the-ecosystem/4567 (viewed 9/12/2013).
[198] An Apple FY 2014 Offsite Planning document observed that ███████████████████████████████████
████████ APLNDC630-0001849558-678, at 575.  See also, APLNDC630-0001849558-678, at 577.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

80.     Both iOS and Android have strong and broad ecosystems,[199] with access to numerous apps,[200] the ability to access specific media content,[201] and more recently access to cloud based features.[202] Devices within the same ecosystem are designed to work well with each other and integrate more seamlessly, and a single application purchased on one device may be used on other devices operating within the same ecosystem.[203] Samsung has introduced some ecosystem elements in addition to those provided by Android, with the Samsung Hub content store, and numerous services like Samsung Cloud, Samsung ChatOn, Samsung Share Shot, AllShare Play, and S-Voice.[204]

81.     In part because iOS is offered exclusively on Apple hardware products, the benefits and drawbacks of iOS often are identified closely with the benefits and drawbacks of Apple's devices. ████████████████████████████████████████████

---

[199] *See, e.g.*, APLNDC630-0001849558-678, at 573-7, which also suggests that iOS, Android and the Microsoft ecosystems all have advantages in areas of the ecosystem.

[200] A mobile application, or app, is a type of application software designed to run on a mobile device such as a smartphone or a tablet. http://www.techopedia.com/definition/2953/mobile-application-mobile-app (viewed 9/12/2013). Apps are sold through app stores that are run by the OS developers, such as Apple, Google, Microsoft, RIM, and Amazon and by third parties, such as GetJar and Appitalism, as well as manufacturers and carriers. http://www.mobyaffiliates.com/blog/mobile-app-stores-list/ (viewed 9/12/2013). According to a 2012 Apple survey of iPhone purchasers, ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████. Rangel Deposition Volume 1, Exhibit 5, at p. 18.
████████████████████████████████████████████████████████████████████████████
████ APLNDC630-0000127252-93, at 76-78.
   For example, iPhones have the ability to synch with the iTunes library on a personal computer and play audio and video content that is purchased through the Apple iTunes store. http://www.imore.com/glossary#i (viewed 9/12/2013). Similarly, Android smartphones can access and purchase content (*e.g.*, music, movies, and books) through the Google Play store. http://play.google.com/about/overview/index.html (viewed 9/12/ 2013).

[202] Cloud based programs access content that is stored remotely, rather than on a local hard drive, and many mobile devices and personal computers use cloud based services such as Google Drive, Apple iCloud, Amazon Cloud Drive, and Microsoft SkyDrive to store and backup content, and synchronize mail, contacts, calendars, and other documents across different devices. http://www.pcmag.com/article2/0,2817,2372163,00.asp (viewed 9/12/2013).

[203] http://www.digitaltrends.com/mobile/choosing-an-electronic-ecosystem/ (viewed 9/12/2013).

[204] *See, e.g.*, APLNDC630-0001849558-678, at 575; http://content.samsung.com/ca/main.do;
http://content.samsung.com/us/contents/aboutn/hubIntro.do; http://www.sisa.samsung.com/research-development-sisa/cloud-solutions.html; http://content.samsung.com/us/contents/aboutn/chatOnIntro.do;
http://www.samsung.com/us/article/tips--tricks-galaxy-s-iii;
http://content.samsung.com/us/contents/aboutn/allShareIntro.do (all viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████ ████████████████████████████████████

████████████████████████████████████████████ However,

consumers can differ in their preference for simplicity versus flexibility. ██████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████

82.   ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

█████ █ ██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ ██ ████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████ Nevertheless, the user-

---

[205] An Apple iPhone buyer survey from early 2012 found that ████████████████████████████████
APLNDC630-0000149470, at 491.
[206] A Q1 FY 2010 survey of iPhone buyers found that ██████████████████████████████
████████████ APLNDC0001624594-706, at 608.  Similarly, in a Q1 FY 2012 iPhone buyer survey,
████████████████ APLNDC630-
0000149480-605, at 481.
[207] See, e.g., SAMDCA11086713-6917, at 6746.
[208] ███████████████████████████ █ ████████████████████████████
█████████████████ See also Deposition of Timothy Benner, PhD, June 28, 2013, at 71-75.
[209] SAMNDCA11086713-917, at 743.
[210] http://www.10news.com/money/business/apples-ios-ease-and-elegance-vs-androids-flexibility-and-openness-
071513 (viewed 9/12/2013).  █████████████████████████████████████████████
████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

interface is an important element across all smartphones, and individual Android manufacturers
have taken advantage of Android's customizability to offer their own, brand-specific user
interfaces ("UIs"). This has provided manufacturers a way to differentiate their smartphones,
despite the use of the same operating system.[211]

83.    The operating system and associated ecosystem also are key areas of tablet
competition. ███████████████████████████████████ for
gaming, and for viewing video content.[213]  In fact, according to Strategy Analytics, "Tablets are
all about the experience and the ecosystem."[214] ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ implication of the importance of e-book and video

---

APLNDC630-0000127666-91, at 83. ████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

[211] For example, HTC's Sense UI was considered by some observers to have been a factor in HTC's early success.
*See, e.g.,* http://gigaom.com/2009/12/23/how-htc-became-a-smartphone-hero/ (viewed 9/12//2013).  See also,
http://gigaom.com/2010/04/06/htc-earnings/ which attributes HTC's success also to its "carrier friendly stance."
*See also,* http://android.stackexchange.com/questions/13582/what-are-the-features-that-touchwiz-has-that-vanilla-
android-does-not-have (viewed 9/12/ 2013); http://www.androidcentral.com/touchwiz (viewed 9/12/ 2013);
http://www.theverge.com/2012/5/3/2996509/samsung-features-android-galaxy-s-iii (viewed 9/12/ 2013);
http://www.phonebuff.com/2012/07/touchwiz-ui-review-samsung-galaxy-s3/ (viewed 9/12/ 2013);
http://gizmodo.com/5921220/every-major-android-skin-compared (viewed 9/12/ 2013);
http://reviews.cnet.com/smartphones/lg-optimus-l9-t/4505-6452_7-35430049.html (viewed 9/12/ 2013).
[212] According to an Apple survey conducted in November 2011, ████████████████████████ APL-
ITC796-0000508285-457 at 427 (Rangel Deposition Vol. 1, Exhibit 7, at p. 143).  A Strategy Analytics survey
found that ████████████████████████████████████████████████ Strategy
Analytics U.S. Tablet Survey 2012, August 28, 2012, at 5.
[213] "Admob by Google Tablet Survey," available at http://services.google.com/fh/files/blogs/AdMob%20-
%20Tablet%20Survey.pdf (viewed 9/12/2013); J. Gove, et. al, "Understanding Tablet Use: A Multi-Method
Exploration," September 2012, available at
http://static.googleusercontent.com/external_content/untrusted_dlcp/research.google.com/en/us/pubs/archive/38135.
pdf (viewed 9/12/2013). ████████████████████████████ S-ITC-010538265-320 at 271.
[214] Strategy Analytics "Amazon's Fire Reignites Entry Level Tablet Market," September 29, 2011, at 1.
[215] Deposition of Timothy Benner, June 28, 2013, at 75-76; SAMNDCA630-07416541-601, at 556, 582 (Benner
Exhibit 9).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

content to the tablet marketplace is that while being completely absent from the smartphone

market, Amazon, a leading e-book vendor, is a competitor in the tablet market. Along with its

low price point,[216] according to Strategy Analytics, "Amazon's Fire launched with strong sales

largely due to the library of content Amazon is known for along with a large number of available

apps."[217]



### C.     Brand Image and its Promotion Matter to Many Customers

84.     Economists generally view advertising and other brand promotion activities as

investments.[219]



This is, in part, inter-related with the associations with their different

---

[216] *See, e.g.*, Strategy Analytics "Amazon's Fire Reignites Entry Level Tablet Market," September 29, 2011, and Forrester, "Amazon Will Be Apple's Top Competitor In Tablets," August 29, 2011.
[217] Strategy Analytics Insight, "Will Apple Hit Amazon Where it Hurts with An iPad Nano?" June 18, 2012, at 2.
[218] Exhibit 27.
[219] *See, e.g.*, Bagwell, Kyle, "The Economic Analysis of Advertising," Handbook of Industrial Organization, Vol. 3, eds. M. Armstrong and R. Porter, Elsevier, 2007, 1703-1844, at 1739; Pepall, Lynne, Daniel J. Richards, and George Norman, "Industrial Organization: Contemporary Theory and Practice, 3rd ed." Thomson South-Western, 2005, at 506-512.
[220] ████████████████████████████████████████████. A November 2012 Google Study emphasized the importance of family branding in smartphones. Google "Smartphone Launch Predictor, U.S., November 2012," available at http://www.google.com/think/research-studies/smartphone-launch-predictor.html (viewed 9/12/2013). In addition, academic studies have consistently found that brands with higher brand equity and stronger brand names generate higher purchase intentions, greater purchase loyalty, and can command higher market prices (*See, for instance*, Cobb-Walgren, Ruble, and Donthu, "Brand Equity, Brand Preference, and Purchase Intent," *Journal of Advertising*, Autumn 1995; A. Chaudhuri and Morris Holbrook, "The Chain of Effects from Brand Trust and Brand Affect to Brand Performance: The Role of Brand Loyalty," *Journal of Marketing*, April 2001). These studies have also repeatedly shown that advertising is one of the most effective ways to build brand equity (Yoo, Donthu, and Lee, "An Examination of Selected Marketing Mix Elements and Brand Equity," *Journal of the Academy of Marketing Science*, 2000; Sriram, Balachander & Kalwani, "Monitoring the Dynamics of Brand Equity Using Store-Level Data," *Journal of Marketing*, April 2007; Tolba, "The Impact of Distribution Intensity on Brand Preference and Brand Loyalty," *International Journal of Marketing Studies*, August 2011).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

operating systems, as described above, but also with the marketing of the brands by the various

companies.

85.     As a general matter, survey data shows that ███████████████

███████████████████████████████████████████. According to a 2011

ComTech Report, ██████████████████████████████████████████

███████████████████████████████████████ [221]

Apple's brand strength is consistent with the results of Forbes' listing, which in 2012 ranked

Apple as the most powerful global brand. [222] ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ [223]

86.     Brands, in certain cases, however, also can drive some consumers away from a

product.  Evidence suggests the presence of an anti-Apple bias in a subset of smartphone users.

████████████████████████████████████████████

████████████████████████████████

██████████████████████████ [224]  Theo Downes-LeGuin of Market

Strategies came to a similar conclusion in an email to Apple personnel: ██████████████

████████████████████████████████████

---

[221] "ComTech USA Report Q411," February 10, 2012, at 22 (APLNDC-Y0000148505-555, at 526). ████████████

████████████████████████████████████████████

████████████████████████████████████ APLNDC630-0000127252, at 276.

     In 2012, Forbes named Apple the world's most powerful brand.  K. Badenhausen, "Apple Tops List of the
World's Most Powerful Brands," Forbes, October 2, 2012.
[223] "ComTech USA Report Q411," February 10, 2012, at 22 (APLNDC-Y0000148505-555, at 526).
[224] SAMNDCA11086713-917, at 731.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████[225]   The result is
that some consumers self-select to either purchasing or not purchasing the iPhone based on their
view of the brand.[226]

87.     Brand value and consumer awareness of products can be enhanced through
promotion.   Impactful promotion can be a big point of differentiation among products, and
important aspects of a successful campaign include product and brand advertisements, point-of-
sale merchandising with carrier involvement, and floor staff training.[227]

88.     

---

[225] APLNDC630-0000124145-46, at 45.
[226] According to Phil Schiller, Apple' senior vice president of worldwide marketing at Apple Inc., some people think
that Samsung is cool, while other people do not.  Deposition of Phil Schiller, July 23, 2013, at 78.
[227] See, e.g., APLNDC630-0001849558-678, at 589.
[228] Deposition of Todd Pendleton, July 19, 2013, at 22.
[229] Deposition of Todd Pendleton, March 21, 2012, at 13.
[230] Deposition of Todd Pendleton, March 21, 2012, at 9, 13.
[231] SAMNDCA-07681516-659, at 566-68.  Deposition of Todd Pendleton, July 19, 2013, at 25-28.  *See also*,
http://online.wsj.com/article/SB10001424052702303383020457744504168 0282310.html and
http://allthingsd.com/20120606/with-galaxy-s-iii-samsung-makes-the-case-that-one-size-does-fit-all/  (both viewed
9/12/13).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

89.    Samsung undertook a significant increase in advertising expenditures and celebrity endorsements aimed at developing its Galaxy line of products.[232]  Whereas in 2011 Samsung's marketing spending for the Galaxy S II was only $58.7 million,[233] in 2012, its marketing spending for the Samsung Galaxy S III increased to $275.6 million.[234]  This 2012 level of spending was significantly higher than what Samsung's Android and Windows Phone competitors were spending on their flagship smartphones over the same time period.[235]



[236]  By one estimate, Samsung outspent Apple $401 million to $333 million on smartphone advertising spending in 2012.[237]

large advertising spending "has helped Samsung open a huge lead in the global smartphone race."[240]  Another analyst suggested that "Samsung changed the game by focusing on distribution and advertising."[241]  The

---

[232] *See, e.g.,* Oppenheimer 2012 Handset Guidebook, at 53; and
http://online.wsj.com/article/SB10001424127887324096404578356651577771618.html (viewed 9/12/2013).
[233] iPhone Competitive Tracker, Week of December 12, 2011 (APLNDC630-0001898640), at 1.
[234] iPhone Competitive Tracker, Week of December 10, 2012 (APLNDC630-0001898641), at 1.
[235] iPhone Competitive Tracker, Week of December 10, 2012 (APLNDC630-0001898641).
[236] Exhibits 34 to 36.  Nielsen Q1 2013 Telecom Industry Insights, May 30, 2013, at 38-44 (SAMNDCA630-07395533-77, at 70-7.
[237] http://online.wsj.com/article/SB10001424127887324096404578356651577771618.html (viewed 9/12/ 2013).
[238] Deposition of Todd Pendleton, July 29, 2013 at 20-21.
[239] Deposition of Phil Schiller, July 23, 2013, at 16-19.  Schiller Deposition Exhibit 7 is a presentation that shows historical numbers for Apple media spend in 2012 as [redacted] Deposition of Phil Schiller, July 23, 2013, at 185-188.  Schiller Exhibit 7 (APLNDC630-0001599759-808, at 795).
[240] http://online.wsj.com/article/SB10001424127887324096404578356651577771618.html (viewed 9/12/ 2013).
[241] http://www.forbes.com/sites/adamhartung/2013/04/04/how-samsung-changed-the-game-on-apple/ (viewed 9/12/ 2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



91.     Apple also acknowledged the impact of Samsung's marketing, commenting that competitors are "spending 'obscene' amounts of money on advertising and/or carrier/channel to gain traction,"[247] and in a December 2012 presentation, commented that U.S. Samsung Galaxy smartphone ads were "driving strong brand recognition."[248]  In addition, Apple's senior vice president of worldwide marketing testified that, "on balance, [the] tremendous amount of money [Samsung is] spending on marketing and advertising has helped their brand."[249]  Apple's Stan Ng confirmed that "…[Samsung] spent a lot of money on marketing. They create a lot of

---

[242] Oppenheimer 2012 Handset Guidebook, at 53.
[243] Oppenheimer 2012 Handset Guidebook, at 53.  HTC recently has changed its approach to marketing, and plans to heavily promote its new HTC One phone.  http://blogs.wsj.com/digits/2013/03/25/htcs-marketing-chief-taking-bolder-approach/ (viewed 9/12/2013), http://www.bloomberg.com/news/print/2012-09-05/htc-mimics-apple-marketing-strategy-to-regain-customers.html (viewed 9/12/2013).
[244] Deposition of Todd Pendleton, July 19, 2013, at 9-10; Deposition of Nick DiCarlo, June 25, 2013, at 105-106.
[245] SAMNDCA630-07381890-894, at 891 (Pendleton Exhibit 12).
[246] SAMNDCA11547471-505, at 499 (Cheong Exhibit 2653).
[247] APLNDC630-0001849558-678, at 571.
[248] APLNDC630-0001351415 – 428, at 420.
[249] Deposition of Phil Schiller, July 23, 2013, at 157.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

products."[250]  One of the documents reviewed in the Schiller deposition states, "It is estimated that Samsung spent $4B globally on advertising in 2012, which dwarfs the spend of some major brands around the world.  This increase in spend over 2011 has raised its brand recognition globally and has allowed them to be in the consideration set of consumers in our key markets of music players, PCs, tablets, and mobile phones."[251]  This level of spending was viewed by Apple to have "changed the rules for investment levels out in the market."[252]

92.     Many of Samsung's advertisements consisted of direct attacks on the coolness of Apple brand and were well received by the marketplace.  For example, in both fall of 2011 and fall of 2012, Samsung ran ads featuring customers who wait in line in front of Apple's stores prior to new iPhone releases.[253]  One of these ads featured a young man who preferred a Galaxy S III phone and was merely saving a spot in line for his parents.[254]  At the end of 2012, Ad Age placed Samsung first in its ranking of the top viral brands, a measure of which brands dominated video viewing for the year.[255]  Ad Age specifically noted that Samsung's "biggest hit was its excellent parodies of the Apple faithful in its Galaxy S III campaign."[256]  As a result, some industry observers questioned if "Apple lost its cool."[257]  In response, in early 2013, Apple's

---

[250] Deposition of Stan Ng, July 2, 2013, at 136.

[251] Deposition of Phil Schiller, July 23, 2013, at Exhibit 5 (APLNDC630-0001351415-428, at 418).

[252] MAL 000014320-1, at 20.

[253] http://news.cnet.com/8301-17852_3-57330006-71/apple-cult-mocked-by-samsung-in-galaxy-s-ii-ad/ (viewed 9/12/2013); http://news.cnet.com/8301-13579_3-57516072-37/samsung-slams-iphone-5-linegoers-in-new-attack-ad/ (viewed 9/12/2013).

[254] http://news.cnet.com/8301-13579_3-57516072-37/samsung-slams-iphone-5-linegoers-in-new-attack-ad/ (viewed 9/12/2013).

[255] http://adage.com/article/the-viral-video-chart/samsung-tops-red-bull-google-apple-nike-viral-brand-2012/238847/ (viewed 9/12/2013).

[256] http://adage.com/article/the-viral-video-chart/samsung-tops-red-bull-google-apple-nike-viral-brand-2012/238847/ (viewed 9/12/2013).  Other Samsung's advertising campaigns also were considered effective. For example, Ace Metrix, a company that scores ad effectiveness, ranked a Galaxy Note advertisement as its most effective TV ad of Q1 2012.  http://www.acemetrix.com/news/press-releases/samsung-debuts-most-effective-ad-of-q1/ (viewed 9/12/2013).

[257] APLNDC630-0000845540-42.  Apple's Phil Schiller testified that he believed that Samsung's ads "are better than they used to be" and that they have had "some effectiveness," particularly in convincing people that Samsung is innovating more than Apple.  Deposition of Phil Schiller, July 23, 2013, at 119-120, 155.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

own advertising firm observed that drastic changes might be needed to address the change in the

market perception of Apple.[258]

93.     Brand image and marketing spending also have played a role in the tablet market.

As with smartphones, new tablets are heavily marketed,[259] with Amazon, in particular,

outspending all Android tablet rivals in 2011 and 2012.[260]   In addition, the current number 2 and

3 players in the U.S. market, Amazon and ████████ have leveraged brand names ("Kindle" and

████████ ) from other product spaces.[261]   Apple, too, used the success of its iPhone to help

launch the iPad, leveraging, among other things, its brand identity.[262]  ████████



[263]

### D.    Device-Specific Differentiation Impacts Consumer Choice

94.     While promotional activity plays an important role in creating interest in a

product, consumers will ultimately attempt to choose the product whose features represent the

best match for the consumer's preferences given the price.   Accordingly, the various hardware

and software configurations of smartphones have changed over time to meet consumer

---

[258] APLNDC630-0000845537-43, at 38-40.
[259] *See, e.g,* iPad Competitive Tracker, Week of December 12, 2011 (APLNDC630-0001898632); iPad Competitive Tracker, Week of December 10, 2012 (APLNDC630-0001898633); iPad Competitive Tracker, Week of May 6, 2013 (APLNDC630-0001898634).  *See also,* Deposition of Monica Karo, March 7, 2012, at 24.
[260] iPad Competitive Tracker, Week of December 12, 2011 (APLNDC630-0001898632), at 1-2 and iPad Competitive Tracker, Week of December 10, 2012 (APLNDC630-0001898633), at 1-2.  In 2012, Samsung appears to have fallen behind rivals in tablet ad spending.  iPad Competitive Tracker, Week of December 10, 2012 (APLNDC630-0001898633), at 1.
[261] *See* Exhibits 27 - 29. Samsung's "Galaxy" brand name traces back to June 2009 with the release of its first Android smartphone and has been associated with several successful smartphone products including the Galaxy S II, Galaxy S III, and Galaxy Note lines. http://crave.cnet.co.uk/mobiles/samsung-galaxy-s4-history-traced-in-galaxy-s-evolution-video-50010728/ (viewed 9/12/2013). http://www.digitaltrends.com/mobile/history-of-samsungs-galaxy-phones-and-tablets/ (viewed 9/12/2013). Amazon's Kindle Fire tablet series builds off of the "Kindle" brand name associated with its successful line of e-readers introduced in 2007. http://www.businessweek.com/articles/2012-11-19/five-years-after-the-first-kindle-amazon-girds-for-the-digital-fight#p1 (viewed 9/12/2013).
[262] *See, e.g.,* Deposition of Michael Tchao, June 28, 2013 at 161. ("I think…certainly, Apple's reputation is -- is a driver of -- of sales of the iPad, yes."); http://betanews.com/2011/01/25/why-is-ipad-successful/ (viewed 9/12/2013).
[263] SAMNDCA630-07416541-601, at 556 (Benner Exhibit 9).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

objectives.  As described above, while consumers had fewer choices early in the product

lifecycle, manufacturers compete to improve product features over time, and the marketplace has

now evolved to offer many varieties of smartphones and tablets to cater to customer demands.

     95.    Many surveys have been undertaken, in part, to assess consumer preferences for

different product capabilities.[264]  Documents reporting the results of surveys and focus groups

have been provided in discovery, including various periodically generated iPhone Buyer

Surveys, iPhone User Surveys and Smartphone Market Studies created by or for Apple and



     96.

---

[264] Deposition of Timothy Benner, June 28, 2013, at 61-64; Deposition of James Imahiro, July 2, 2013, at 12-19.

[265] For example, as early as 2007, Samsung was working with mobile industry consulting firm, Yankee Group, to, among other things, research consumers' attitudes towards smartphone features.  *See, e.g.,* SAMNDCA00250503-58, at 03-05, and SAMNDCA00242437-506.

[266] The relative importance of the features that I highlight below is consistent with Samsung deposition testimony. For example, STA's Chief Strategy Officer, Justin Denison, testified:



Deposition of Justin Denison, July 18, 2013, at 32-33.  Also, Samsung's Todd Pendleton testified:

Deposition of Todd Pendleton, July 19, 2013, at 11.

[267] A 2008 Yankee Group presentation created for Samsung ▮▮▮▮▮▮ SAMNDCA00250503-58, at 25.
APLNDC630-0001233246-405, at 261.
APLNDC630-0001233246-405, at 263,267.

- Screen Size/Quality;[269]
- Speed of Connectivity;[270] and
- High-quality camera and video.[271]

97. Despite the consensus regarding the importance of some core features, heterogeneity of consumer preferences is an important element of competition in this marketplace. [redacted]

---

[268] For example, a [redacted] Q1 2013 Telecom Industry Insights, at 20. (SAMNDCA630-07395533-77, at 52.)

[269] [redacted] A January 2011 U.S. smartphone market study undertaken by Apple concluded that [redacted] APLNDC0001765739-834, at 43, 63. *See also*, SAMNDCA630-07416541-601, at 556, 582 (Benner Exhibit 9); SAMNDCA630-07416667-692, at 680.

[270] [redacted] APLNDC630-0000127252, at 278. [redacted] Q1 2013 Telecom Industry Insights, at 20. (SAMNDCA630-07395533-77, at 52.) According to Apple's FY Q2 2013 iPhone Buyer Survey, [redacted] APLNDC630-0001233246-05, at 261. [redacted] A 2008 survey [redacted] SAMNDCA00252685-775, at 707. *See also*, SAMNDCA630-07416667-692, at 681 (Benner Exhibit 11).

[271] [redacted] An Apple iPhone buyer survey, conducted in early 2012, found that the [redacted] APLNDC630-0000182457-593, at 482. According to the equivalent survey done one year later, [redacted] APLNDC630-0001233246-405, at 269.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

needs.[272]   According to Stanley Ng, Senior Director of iPhone Product Marketing for Apple,

Apple iPhone contains "hundreds" of features and different consumers might have different

views over which features matter most.[273]   This is confirmed by Phil Schiller, who explained that

there are many factors that go into a person's decision to purchase a particular product, and that

each person goes through their own decision to determine which features and benefits matter.[274]

Also, ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ [275]

98.   One result of this heterogeneity is that manufacturers have developed products

and brands that emphasize different characteristics that appeal to different consumer types.

Devices differ from one another in various dimensions, including, among other things, screen

size, keyboard type, color, memory size, and connectivity.   Consumers then choose devices

based, in part, on which features they care about most.[276]

---

[272] For example, the ███████████████████████████████████████████████████
████████████████████████████████████████████████████ S-ITC-800037863-8091,
at 7922-7928.  *See also*, SAMNDCA630-06701998-2014, at 2006-2013, which shows that Samsung thinks about
age, family plan vs. non-family plan, and consumer vs. enterprise segments.
[273] Ng Deposition, at 53-54, 56-59, 63, 66, 70-72, 77.
[274] Schiller Deposition, at 323-330.
[275] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████ Nielsen Q1 2013 Telecom Industry Insights, at 20 (SAMNDCA630-07395533-77, at 52).  *See
also*, Deposition of Nick DiCarlo, June 26, 2013, at 103-104.
[276] Different firms are recognized as having innovated through the well-executed inclusion of capabilities at various
times, and along with it, have gained market share.  RIM/Blackberry was widely recognized as having good, secure,
email capability and used that advantage to gain market share leadership in the mid-2000s.
http://www.forbes.com/sites/adamthierer/2012/04/01/bye-bye-blackberry-how-long-will-apple-last/ (viewed
9/12/2013), http://www.theverge.com/2012/2/21/2789676/rim-blackberry-mike-lazaridis-jim-balsillie-lost-empire
(viewed 9/12/2013).  The Apple iPhone was among the first devices to incorporate good touchscreens with virtual
keyboards, features that RIM/Blackberry was slow to incorporate in its devices.
http://online.wsj.com/article/SB10001424052970204191304574139431506299204.html (viewed 9/12/2013),
http://www.cnn.com/2012/06/28/tech/mobile/iphone-5-years-anniversary (viewed 9/12/2013).  An Apple survey of
smartphone buyers in September 2011 found that ████████████████████████████████ Rangel
Deposition Exhibit 4, at p. 17.  Apple also noted that the ████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

99.     Examples of this include:



- ████████████████████████████████████████████

  ████████████████████████████████████

  ██████████████████ ██ ██████████████████████

  ████████████████████████████████████

  ████████████████████████ ██

- ████████████████████████████ ██ ██████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

  ██████████████████████ ██ Apple, on the other hand,

  does not offer a model with a physical keyboard.

- ████████████████████████████████████████

  ████████████████████ ██ However, prior to the launch of

---

████████  Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, May 2, 2013, First Supplemental Response to Interrogatory 20, at 26. Similarly, HTC and Samsung have been on the forefront of marketing smartphones with larger touch screens. http://www.engadget.com/2013/03/01/the-ever-expanding-smartphone-screen/ (viewed 9/12/2013), http://www.ibtimes.com/top-10-smartphones-large-screen-size-374664# (viewed 9/12/2013).

[277]
████████████████████████████████████████████████████ ██
████████████████████████████████████████████████████
████████████████████████████████████████████████ ██
█████.  Deposition of Timothy Benner, June 28, 2013, at 154-155.  *See also*, Deposition of Nick DiCarlo, June 26, 2013, at 191-194.

[278] http://www.samsung.com/global/microsite/galaxynote/note2/benefits.html?type=find (viewed 9/12/2013).

[279] ████████████████████████████████████████████████  See SAMNDCA630-07556681-711, at 696.

[280] http://www.samsung.com/us/mobile/cell-phones/SPH-M930ZKASPR (viewed 9/12/2013).

[281]
████████████████████████████████████████████████
██████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

the iPhone 5 in September 2012, Apple did not offer an LTE device.[282]  That limitation
was justified by some analysts by the perceived technological tradeoffs between better
4G connectivity speed, on one hand, and higher product cost and worse battery life, on
the other.[283]  Regardless, the lack of an LTE offering made it more difficult for Apple
to serve certain segments of the smartphone marketplace that highly valued data speed,

- Memory is an example of a "vertical" product attribute.  All else equal, more memory
  is better.  However, some consumers value additional memory more than others.  This
  leads manufacturers to offer phones with a variety of memory options.  Apple offers
  three different versions of its current flagship, the iPhone 5, with varying memory sizes.
  These different versions also differ greatly in price.  The 16 GB iPhone 5 is offered
  starting at $199, the 32 GB at $299, and the 64 GB at $399.[285]  Certain Android
  smartphones, such as the Galaxy SIII, offer expandable memory that can be purchased
  to supplement the built-in capacity of the phone.[286]

- Some smartphones are designed to appeal to very specific customer segments.  The
  Samsung Galaxy Rugby Pro, for example, is specifically for "rugged outdoor use."
  While it is bulkier than other phones, it is designed to survive water immersion, shocks

---

[282] *See, e.g.,* SAMN DCA630-06635592-667, at 599; http://reviews.cnet.com/8301-19736_7-20127835-251/samsung-galaxy-s-ii-skyrocket-htc-vivid-to-be-at-ts-first-lte-phones (viewed 9/12/2013).
[283] Charles S. Golvin and Thomas Husson "iPhone 4S Cements Apple's Product Strategy Leadership Position," Forrester, Nov. 22, 2011.
[284] APLNDC630-0000062640-42.
[285] http://store.apple.com/us/browse/home/shop_iphone/family/iphone/compare (viewed 9/12/2013).
[286] http://www.samsung.com/global/galaxys3/specifications.html (viewed 9/12/2013).

and falls.  Thus, it is unlikely to appeal to all consumers, because it is designed to appeal to consumers who frequently use their phones outside.[287]

100.     In addition to specific features, price (as faced by the end-user) is well-recognized to impact the smartphone purchase decision, but its relative importance varies across customers. For example, a November 2011 ComTech USA report █████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████ ██ ████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████[289] And the availability to consumers of free or highly subsidized devices can often trigger device upgrades.[290]

101.     As a result, pricing and product tiers have emerged to accommodate these different buyers, with cheaper entry-level models and more expensive premium models with more features.[291]  Firms have taken different strategies in light of this segmented market.  Apple has specialized in selling their flagship high priced devices.[292]  In contrast, Android phone

---

[287] http://www.samsung.com/us/mobile/cell-phones/SGH-I547ZKAATT (viewed 9/12/2013).
[288] APLNDC0002641020-69, at 41.  A 2013 iPhone Buyer Survey conducted by Apple found that █████████████████████████████████████████████████████
████████ APLNDC630-0001233246-405, at 399.
[289] S-ITC-800037863-979, at 923-924. ███████████████████████████████████████
███████████████████ S-ITC-800037863-979, at 889.
[290] Apple's January 2011 Smartphone Market Study - U.S. presentation found that ████████████
██████████████████████████████████████████ APLNDC000127665, at 71.
[291] http://www.digitaltrends.com/mobile/sony-wants-to-skip-budget-friendly-devices-focus-on-premium-hardware/ (viewed, 9/12/2013),
[292] http://appleinsider.com/articles/13/05/29/apples-cook-explains-one-a-year-iphone-strategy-hints-at-future-models-at-variable-price-points (viewed 9/12/2013). Apple's current flagship, the iPhone 5, is offered at three prices based on storage size. The 16 GB iPhone 5 is offered at $199, the 32 GB at $299, and the 64 GB at $399. http://store.apple.com/us/browse/home/shop_iphone/family/iphone/compare (viewed 9/12/2013).  Starting in 2011, Apple began offering a $0 option but only in older models.  http://www.businessinsider.com/free-iphone-3gs-2011-10 (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

manufacturers, including Samsung, have offered a wider range of phone features and prices.[293]

For instance, the Samsung Dart, one of the products-in-suit, was launched for free (with contract) on T-Mobile.[294]

102.



103.    Despite the wide range of consumer preferences, to date Apple has offered a limited variety of smartphones. Apple generally releases one flagship iPhone device per year, and offers a limited number of storage and device color options.[298]  Apple also initially limited network carrier choice for the iPhone, restricting it to the AT&T network up until January

---

[293] Deposition of Arthur Rangel, March 2, 2012, at 112-113.
[294] http://www.androidcentral.com/samsung-dart-now-available-free-contract-t-mobile (viewed 9/12/2013).
[295] Exhibit 26A.

Exhibit 65E.
[297] *See, e.g.*, APLNDC630-0001517084-090, at 087; APLNDC630-0001515479-486, at 484; http://www.businessinsider.com/free-iphone-3gs-2011-10 (viewed 9/12/2013).
[298] http://appleinsider.com/articles/13/05/29/apples-cook-explains-one-a-year-iphone-strategy-hints-at-future-models-at-variable-price-points (viewed 9/12/2013). The latest iPhone, the iPhone 5 is offered in two color schemes ("Black & Slate" and "White & Silver") and with three storage options (16 GB, 32 GB, and 64 GB).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

2011.[299]  Starting in 2009 with the release of the iPhone 3GS, Apple started to offer older models

as a down-market alternative.[300]  The release of the iPhone 4S marked the first time an iPhone

(the iPhone 3GS) was offered for free (with a carrier contract).[301]  Even since then, the variety

offered by Apple has been limited, as these older models vary from the flagship products only in

limited ways.  For instance, all models except the iPhone 5 feature a 3.5 inch screen (the iPhone

5 has a 4 inch screen),[302] and none of the iPhone models offer physical keyboards.  Furthermore,

both Apple's flagship and down-market models can be updated to the same version of iOS, with

only limited capabilities disabled for the down-market models.[303]

104.    In contrast, Android manufacturers offer a wide variety of phones.  A Frost &

Sullivan analysis for Apple on the shelf presence of Android devices showed that in the U.S. in

Q2 2012, Android had over 173 smartphones available, with Samsung, HTC, LG and Motorola

accounting for the largest shares of these units.[304]  Samsung alone currently offers 95 different

phone models on its U.S. mobile website and lists 16 different available carriers.[305]  These

various phones offer a variety of characteristics that appeal to different customers.  For example,

Samsung offers the Galaxy Note II with a large screen and stylus for customers looking for a

---

[299] http://online.wsj.com/article/SB10001424052748704739504576068170230339348.html (viewed 9/12/2013). *See also*, Exhibit 33.
[300] https://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html (viewed 9/12/2013).
[301] http://gizmodo.com/5846568/the-first-free-iphone-is-a-fcking-rip-off (viewed 9/12/2013).
[302] http://www.businessinsider.com/why-iphone-5-has-4-inch-screen-2012-9 (viewed 9/12/2013).
[303] iOS 6, the iOS version running on the current flagship iPhone 5 is also available on the iPhone 4S, iPhone 4, and iPhone 3GS, and introduces over 200 new features to these products. http://www.apple.com/pr/library/2012/06/11Apple-Previews-iOS-6-With-All-New-Maps-Siri-Features-Facebook-Integration-Shared-Photo-Streams-New-Passbook-App.html (viewed 9/12/2013). The same broad number of new operating system features is stated in the release announcement specific to the iPhone 5.
[304] APLNDC630-0000274536-74, at 46-47.
[305] http://www.samsung.com/us/mobile/cell-phones/all-products (viewed 9/12/2013).  According to Justin Denison, Chief Strategy Officer at STA, "part of Samsung's strategy was to try to make our products as broadly available as possible."  Deposition of Justin Denison, July 18, 2013, at 120.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

combination phone and tablet, the Rugby Pro for customers who are often outdoors, and several

phones with physical keyboards for customers who prefer them.[306]

    105.    Device specific differentiation plays a comparable role in tablet competition.



    106.    Product variation with respect to screen size is notable in tablets.  For instance,

the first three generations of the Apple iPad – the iPad, iPad 2 and New iPad – had 9.7 inch

screens.  Several of the more successful competitive products have had smaller screens ranging

from 7 to 8 inches.[308]  In November 2012, Apple launched the Apple iPad mini-- its first Tablet

---

[306] http://www.samsung.com/us/mobile/cell-phones/all-products (viewed 9/12/2013),
http://www.samsung.com/global/microsite/galaxynote/note2/benefits.html?type=find (viewed 9/12/2013),
http://www.samsung.com/us/mobile/cell-phones/SGH-I547ZKAATT (viewed 9/12/2013).  In addition, Kevin
Geklinsky, Director of Business Planning at STA, testified that he believed the Galaxy Nexus was targeted
specifically at "tech savvy Android experienced customers that are looking for a more Google experience."
Deposition of Kevin Geklinsky, July 5, 2012, at 60-61.
[307] SAMNDC00503153-204, at 161.
[308] An article from IDC states that "One in every two tablets shipped this quarter was below 8 inches in screen size.
And in terms of shipments, we expect smaller tablets to continue growing in 2013 and beyond."
http://www.idc.com/getdoc.jsp?containerId=prUS24002213#.UWSDTVs6Wqw (viewed 9/12/2013); Animoca, a
cross-platform app publisher of entertainment products for Android devices, shared its internal data showing that "4
of the top 5 [Android] tablets, and 6 out of the top 10, are of the smaller variety, featuring 7-inch screens."
http://www.animoca.com/en/2013/04/animoca-data-most-popular-android-tablets-worldwide-feb-18-mar-20-2013/
(viewed 9/12/2013); Another article, dated before the release of the iPad Mini shows that some consumers are
unhappy with the large size of the iPad stating, "But I didn't sell my iPad because a new iPad is coming soon.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

with a 7.9-inch screen, emulating the competition which had previously introduced smaller

tablets earlier.[309]  Pricing also has been an important component of tablet competition, with the

more successful Apple competitors undercutting the iPad's price.[310]

## IV.     The Features Enabled by the Patents-at-Issue are a Small Part of the Accused Products and their Operating Systems

107.    The functionality protected by patents-at-issue constitute only a small part of the

overall software functionality in the accused products, and software functionality itself represents

just a portion of the features of the accused devices.  Indeed, the evidence indicates that specific

software features are typically insignificant in driving demand for the accused products.  This is,

in part, because other phone characteristics (such as size, screen size, battery life, display

definition, storage capacity, camera type, price, and connectivity) matter more, but also, in part,

because the operating systems ("OSs") underlying these products contain a significant number of

features which are continually upgraded with additional features.  The total number of features

and capabilities embodied in smartphones is ever expanding.

108.    A careful review of product manuals, third-party product reviews, consumer

reviews, and Samsung's advertising shows that the functionalities related to the patents-at-issue

are a small subset of the total features of the products-in-suit and/or that they were not a point of

emphasis in consumer purchase decisions.  As demonstrated below, few customers indicate that

specific software features motivated their purchase.  Notably, most reviews and advertisements

---

Instead, I found a device that meets the same needs yet offers increased portability."
http://gigaom.com/2011/01/21/why-i-just-dumped-the-ipad-hint-size-matters/ (viewed 9/12/2013).
[309] http://www.apple.com/pr/library/2012/10/23Apple-Introduces-iPad-mini.html;
http://www.apple.com/ipad/compare/ (both viewed 9/12/2013).  Screen sizes are measured diagonally.
[310] For example, compare Exhibit 26A, with the average 2012 accused Samsung tablet price of $330, to Exhibit 65E, with the average 2012 U.S. iPad price of approximately $500.   In addition, an April 2011 survey conducted by Oliver Wyman and Samsung found that 65 percent of respondents said that price would be a factor that would most convince them to buy one tablet over another. SAMNDCA630-07416541-601, at 582 (Benner Exhibit 9).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

are silent on the patented elements.  Instead, features such as screen size, battery life, and camera are more important drivers of demand.

### A.    Smartphones and Tablets Are Extraordinarily Complex Products with Hundreds If Not Thousands of Features and Distinct Functionalities

109.    As discussed above, smartphones and tablets are extraordinarily complex and sophisticated devices.  Manufacturers compete in part by incorporating a myriad of new features in new generations of both hardware and operating systems.  The abundance of features is reflected in Apple press releases announcing the release of new versions of iOS (its smartphone and tablet operating system) where they regularly highlight the inclusion of as many as 200 new features.[311]  For example:

- "iPhone 3GS includes the new iPhone OS 3.0, the world's most advanced mobile operating system with over 100 new features..."[312]

- "iPhone 4 comes with iOS 4, the newest version of the world's most advanced mobile operating system, which includes over 100 new features and 1500 new APIs for developers." [313]

- "With the launch of iPhone 4S also comes the launch of iOS 5, the world's most advanced mobile operating system with over 200 new features…"[314]

- "iPhone 5 comes with iOS 6, the world's most advanced mobile operating system with over 200 new features…"[315]

- "iOS 7 is completely redesigned with an entirely new user interface and over 200 new features…"[316]

---

[311] Exhibit 38 provides a more comprehensive summary of Apple press releases accompanying new iOS releases.
[312] https://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html (viewed 9/12/2013).
[313] http://www.apple.com/pr/library/2010/06/07Apple-Presents-iPhone-4.html (viewed 9/12/2013).
[314] http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html (viewed 9/12/2013).
[315] http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5.html (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

110.     Similarly, the introduction of new Android operating systems was accompanied by announcements of added and updated features, which included (among many):[317]

- One-touch word selection for copy and paste functionality; shortcuts to manage applications, internet calling, near-field communication, and optimized faster text input in the Gingerbread version.

- The additional of a system bar, action bar, and customizable homescreens, a redesigned keyboard, updated browser and updated contacts and email with two pane viewing in the Honeycomb Tablet version.

- Resizable widgets, Android beam, face unlock, quick response to incoming calls, a redesigned gallery app, and a spellchecker functionally which underlines errors and suggests replacement words in Ice Cream Sandwich.

- Predictive keyboard, Google Now, voice search, and Offline maps for the Jelly Bean version.

111.     The sheer magnitude of the features and capabilities embodied by smartphones and tablets is also reflected in the product manuals of the accused Samsung devices.[318]  For example, as shown in Exhibit 44, the Verizon version of the Samsung Galaxy S III product manual lists numerous features and functionalities.[319]  Identifying features based on the product manual chapters, section heading and subsection headings, and bold type within the text of the manual suggests that the product embodies more than 700 features and/or functionalities.  Even this approach fails to capture all of the different functionalities embodied by the phone as the

---

[316] http://www.apple.com/pr/library/2013/09/10iOS-7-With-Completely-Redesigned-User-Interface-Great-New-Features-Available-September-18.html (viewed 9/12/2013).
[317] *See* Exhibit 39.
[318] These product manuals capture many smartphones features and functionalities embodied in the respective smartphones by describing the some of the features or actions required to utilize specific features and functionalities.
[319] Exhibit 43 also shows that product manuals identify as many as roughly 850 features in the Galaxy S II, 840 in the Galaxy Note II and roughly 1,000 in the Galaxy Tab II 10.1.  *See also*, Appendix A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

importance of, and the interplay between, the features are not mentioned in the manual.  For example, the Samsung Galaxy S III manual lists "Understanding Your Phone\Entering Text\Using Samsung Keyboard\Entering Symbols and Numbers," but there are still many layers and functionality below that element such as side swiping the keyboard to switch between letters and numbers/symbols, and entering various "secret codes" on the keyboard to access additional information and settings that are not counted as features and/or functionalities here.[320]  Further, while the manual references both the processor and numerous camera functionalities, the manual count does not reflect the role of the processor in generating high quality pictures.

112.    Moreover, even the product manuals do not drill down to the level that captures the vast amount of technology required for a functional phone.  Many aspects of connectivity, for example, require significant amount of intellectual property.  In other words, it is often the case that one "feature" will rely on the technology taught by many patents.  For example, as of early 2011, there were an estimated 356,000 patents related to 3G technology held by various entities.[321]  One analyst commenting on the Apple and Samsung litigations estimated that smartphones can embody as many as 250,000 patents due to the wide range of communications and computing technologies that they utilize.[322]  Thus, the "feature" counts are a significant understatement of the patents that cover these products.  Moreover, this analysis does not reflect how well these features and functionalities work, nor the relative importance of these features in

---

[320] http://www.slashgear.com/samsung-galaxy-s-iii-review-27230300/ (viewed 9/12/2013); http://www.hiddenfeatures.info/samsung-galaxy-s3-secret-codes.html (viewed 9/12/2013).
[321] Sascha Segan, "Infographic: Smartphone Patent Wars Explained," *PC Mag*, January 19, 2012, available at http://www.pcmag.com/article2/0,2817,2399098,00.asp (viewed 9/12/2013).  Although less than 1 percent of these were declared essential to 3G standards, that would still imply many thousands of patents were require to practice 3G connectivity.
[322] Steve Lohr, "Apple-Samsung Patent Battle Shifts to Trial," *The New York Times*, July 29, 2012; Steve Lohr, "A Bull Market in Tech Patents," *The New York Times*, August 16, 2011.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

the eyes of the company or consumers.  These aspects are better captured in the promotional

materials and product reviews, which I analyze and discuss below.

### B.    Individual Operating Software Features do not appear to Motivate Customers to Purchase Smartphones and Tablets

113.    Individual software features alone do not typically motivate the purchase of

smartphones and tablets.[323]  The lack of demand driven by individual software features is

reflected in many Apple customer surveys, which show broader explanations for the purchase of

an iPhone.[324]  Summarized in Exhibit 40, examples of these surveys reveal that ██████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████

114.    Nevertheless, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████.[325]  Specific features identified as motivation for a purchase included ████████████

████████████████████████████████████████████████[326] ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████  In the most recent survey (Q2

2013), for example, ████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[323] An Apple document discusses that ████████████████████████████████████████
████████████████████████████████████████████████████████████████
APLNDC630-0000127433-38.
[324] See e.g., Exhibit 40.
[325] Exhibit 40, row [9] and [16]
[326] Exhibit 41.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███████████████████████████[327]   Many more pointed to other items

such as the "███████████████████████████

115.   ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ █ ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ █ █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

116.   In sum, many surveys assessing the reasons for product purchase have been

produced by the parties in this matter.  These contemporaneous business documents collectively

illustrate that individual granular software elements are rarely examined.  That is because

individually they are often difficult for customers to observe, and not as important as larger

elements or the overall user experience. The importance of individual product features to Apple

generally, was summed up by Phil Schiller in this way:[330]

> In Apple, we create a very unique product unto ourselves. We always have. And
> so we think the sum total experience we create for customers is what matters more
> because we can create a very unique experience, and some commodity feature

---

[327] ████████████████████████████
[328] SAMNDCA630-06701998-2014, at 2003.
[329] Nielsen Telecom Industry Insights, Q1 2013, at 20 (SAMNDCA630-07395533-77, at 52).
[330] Deposition of Phil Schiller, July 23, 2013, at 194.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

here or there really isn't what matters.  So it's a difference between how we see what matters to people and what those who make pretty much all the same stuff see and how they have to market. So that's why we've always talked about -- about -- at Apple about this -- they see it about features, where we're more about the whole experience of the product.

117.    Mr. Schiller also testified that "as a customer, we all think of many things when we buy a product, and -- and features are on the list.  I think they're lower on the list. I don't think they're nearly as important as the experience."[331] He added, that "[end-users] think about a number of features with a number of benefits and try to make a decision between all of those."[332] Consistent with this, Mr. Schiller was unable to name more than a few of the new software feature updates found in iOS versions during his deposition.[333]

118.    In the end, individual software features do not appear to motivate customers to purchase smartphones and tablets.  In the infrequent instance where such a feature matters to a customer, it is usually identified as a larger element (and not a particular ease of use improvement).  The extent to which more prominent features override the importance of more granular features is reflected in an Apple April 2013 presentation assessing the evolution of the marketplace during the last year.  Specifically, the presentation pointed to the recent expansion in the smartphone marketplace having been *entirely* driven by the fact that "consumers want what we [Apple] don't have":  phones priced above $300 with screens larger than 4 inches and phones priced below $300.[334]

---

[331] Deposition of Phil Schiller, July 23, 2013, at 195.
[332] Deposition of Phil Schiller, July 23, 2013, at 323.
[333] Schiller Deposition at 263-8.  For iOS 4, he lists multitasking, folders, mail features, enterprise, and ad support for iAd (at 263-4). He admits he cannot identify the new features in iOS 5 (at 265-8).
[334] *See e.g.*, APLNDC630-0001849558-678, at 603.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### C.   Marketplace Evidence Indicates that the Patented Features Are Not a Discernible Driver of Demand for the Accused Products

119.   The value of the patented features ultimately depends on the extent to which they influenced sales of the products that embody them, either through increased unit sales or higher prices.  In order to determine the role the patented features play in sales/demand for the accused products, I reviewed a variety of material that falls within the following categories: manufacturer promotional material and internal research, media reviews, and consumer reviews and discussion.  As discussed in more detail below, based on these materials, the patented features do not appear to be important drivers of demand.

### 1.   Samsung's Online Materials Do Not Emphasize the Functionalities Protected by Any of the Apple Patents

120.   Samsung provides detailed information about the accused smartphones on its website.  This material is typically organized into a distinct webpage that for a given model of phone provides a product overview, a list of features, specifications, a photo gallery, reviews, accessories, and support.  Marketing materials such as these reflect what those at Samsung think will be important to the consumer in making a purchase decision.[335]  Given the thousands of features within each phone, a consumer can only be fully cognizant of a smaller set of them when they make their purchase.[336]  This material provides insight into the granular features that Samsung believed customers would want to consider when buying or using its products.

121.   The Samsung "features" and "specs" pages describe the individual product features in detail.  For example, the "features" page for the Samsung Galaxy S II offered in the United States by Sprint starts by emphasizing the network, screen quality, and processor speed of

---

[335] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████ SAMNDCA630-07416541-601, at 581 (Benner Exhibit 9).
[336] I understand that this is consistent with the opinions in the Erdem Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

the phone.[337]  The official features page also describes various media related functionalities,

including the downloadable media content, camera quality, and streaming features, and business

related features.[338]  None of these feature descriptions, however, delve into the granular level of

detail associated with the functionality expressly covered by the patents that Apple accuses the

GS II of infringing.

122.    The "specs" pages provide an even more comprehensive list of distinct attributes

of the Samsung Galaxy S II.[339]  They fall into 20 categories (carrier, form factor, size, color,

battery, network, platform, CPU/processor, display, user interface, features (GPS navigation),

camera, audio, video, fun and entertainment, business and office, message options, connectivity,

memory, and calling functions) and list more than 100 phone capabilities.  As was the case with

the features page, none of the "spec" descriptions delve into the granular level of detail

associated with the functionality expressly protected by the patents that Apple accuses the GS II

of infringing.

123.    The online features and specs materials for the other Samsung accused products,

such as the Galaxy S III, Galaxy Note II, and the Galaxy Tab II 10.1 yield similar results.  Each

focuses on other Samsung features not directed to by the patents-in-suit.  In Appendix B, I show

the product pages for each accused product.  As the Appendix demonstrates, many other features

for the Samsung Galaxy S III, for example, are highlighted:

- **Jelly Bean and TouchWiz Enhancements**
- **Share Back-to-Back:**   If sharing is your thing, the Samsung
  Galaxy S® III is your phone. With S Beam™, you can share large
  HD files in seconds – just touch compatible devices back-to-back.

---

[337] See Appendix B for a copy of the Sprint Galaxy S II U.S. product page, viewed 9/12/2013.
[338] See Appendix B.
[339] *See* Appendix B.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- **Share Big:**  …with Samsung Link… you can play your music, videos and slide shows on any compatible HDTV or computer for all to see.
- **Share Photos Instantly:**  Share Shot lets you share your photos with up to five friends – as you take them.
- **Gesture Smarter:** …Special motion gestures let you do things easier and more intuitively than ever before.
- **Speak, and the Galaxy S III will Listen:** S Voice™ responds to your every voice command, acting as your on-board personal assistant to give you helpful, accurate information, dial phone numbers, send messages, open apps and more.
- **Simplify any Task:** Samsung TecTiles™ is the short-hand way to operate your Galaxy S III.
- **Memories in a Moment:**  …the camera has 8.0 megapixels and absolutely zero shutter lag… [t]ake up to 20 continuous shots in seconds with Burst Shot. The front-facing camera even has a full 1.9 megapixels, so you can get yourself into the HD action.
- **Picture-in-Everything:**  Pop Up Play [is] a picture-in-picture feature that lets you continue to watch your HD videos while you surf the web or check your email.
- **Powerful Hardware and Software**

124.    More broadly, the on-line Samsung materials highlight numerous product elements.   Although these web sites do not comprehensively list all product features, they do provide insight into whether the patents-at-issue would be expected to drive demand for the products-at-issue.  As described above, the specific protected functionalities claimed by Apple are not among the main features emphasized (or even referred to).  These conclusions hold for each of the accused products.

### 2.    Samsung's Television/Video Advertising Does Not Highlight the Functionalities Associated with any of the Apple Patents

125.    I supervised the review of a large collection of Samsung television advertisements to further determine how the accused devices were promoted as well as to determine the extent to which functionalities related to the patents-at-issue were highlighted.  Promotions such as these

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

can demonstrate the features that Samsung believed would help drive demand for its products.[340]

Specifically, commercials for the Samsung Galaxy S II, Galaxy S III, Note II, and Tab II 10.1

posted on the Samsung Mobile YouTube Channels were reviewed.[341]

126.    These commercials typically focus on just a few of the product's features, which

are usually also described in the video description associated with the YouTube video.  The

earliest of the Galaxy S II commercials, uploaded to YouTube on April 15, 2011, focuses

exclusively on the new Super AMOLED Plus display.[342]  The other six advertisements highlight

one or two features each, including the hardware, thinness,[343] Voice Talk, processor speed, and

image quality.  None of these advertisements depicted or made any specific reference to the

functionalities protected by Apple's patents.

127.    Consistent with the the Galaxy S II commercials, the 18 advertisements for the

Galaxy S III from the Samsung Mobile USA YouTube Channel each focus on a small number of

features or functionalities.[344]  The first commercial, uploaded to YouTube on June 19, 2012,

introduces the new Galaxy S III product by demonstrating the multitasking capabilities of the

---

[340] In addition, an ███████████████████████████████████████████
██████████████████████████████████████████████████████████
███ SAMNDCA630-07416541-601, at 581 (Benner Exhibit 9). ██████████████████
██████████████████████████████████████████ SAMNDCA630-06701998-2014, at 005.

[341] There were 7 Galaxy S II, 18 Galaxy S III, 8 Note II, and 4 Tab II 10.1 commercials on the Samsung Mobile USA YouTube channel that were reviewed.  See http://www.youtube.com/playlist?list=PLD069379E13CF8DE1 (viewed 9/12/2013); http://www.youtube.com/playlist?list=PLmpYZzpDQEhmuznYX54-6PNE5deHQzAab (viewed 9/12/2013); http://www.youtube.com/playlist?list=PL3F63929F54D9A90A (viewed July 18, 2013); http://www.youtube.com/playlist?list=PLBAD47C426D3057BC (viewed 9/12/2013).  Galaxy S II advertisements did not appear to be posted on the Samsung Mobile USA YouTube channel; instead, seven television ads for the Galaxy S II posted on the Samsung Mobile YouTube channel were reviewed.  See http://www.youtube.com/playlist?list=PL3F63929F54D9A90A (viewed 9/12/2013).  How-to videos, promotional demos, and launch event previews were not considered to be television advertisements and were excluded from this review.

[342] http://www.youtube.com/watch?v=bwEVV7PMn10&list=PL3F63929F54D9A90A (viewed 9/12/ 2013).

[343] http://www.youtube.com/watch?v=UIj3dFZb8HQ&list=PL3F63929F54D9A90A (viewed 9/12/ 2013).

[344] http://www.youtube.com/playlist?list=PLD069379E13CF8DE1 (viewed 9/12/ 2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

phone (*i.e.* the ability to text while watching a video).[345]  Other advertisements focus on media sharing (via AllShare Play, Buddy Photo Share, Share Shot), S Beam, S Voice, gestures, video recording capabilities, screen size, camera features, and the speed of the 4G network.  Six of the 18 advertisements feature AllShare Play, Buddy Photo Share, or Share Shot.  These advertisements highlight the ability to share files, documents, and multimedia across multiple devices, but do not illustrate email, calendar, or contact synchronization. None of these advertisements depicted or made any specific reference to the functionalities protected by Apple's patents.

128.    The results from my analysis of the Note II and Tab II 10.1 are consistent with the above.  The products advertisements highlight various features not at issue in this matter.

### 3.    Patented Functionalities Account for Negligible Attention in Product Reviews

129.    I also supervised an extensive examination of product reviews conducted by leading media outlets in order to evaluate the importance of the functionalities protected by the Apple patents-at-issue in this case.  Because many purchasers consult reviews in making a purchase decision,[346] these reviews provide insight into factors that influence demand for the products-at-issue.  These reviews are typically quite thorough, commenting on a wide range of product attributes—the selection of which is indicative of the features the reviewer likely

---

[345] Video titled "Samsung Galaxy S III – Pop Up Play," available at http://www.youtube.com/watch?v=Y-awUtf-p1U&list=PLD069379E13CF8DE1 (viewed 9/12/2013).

[346] ██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████ SAMNDCA630-06701998-2014, at 2000, 2004-5.
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
█████████ SAMNDCA630-06701998-2014, at 2005.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

believed might be of interest to potential customers.  Additionally, unlike marketing materials (which often focus on larger differentiations between products or brands), product reviews address many elements that are common across products in addition to highlighting notable differences.

130.     In particular, I examined numerous media reviews for several of the accused Samsung devices – Galaxy S II, Galaxy S III, Galaxy Note II, and the Galaxy Tab II 10.1.  For each of these products, I examined reviews from popular online sources (where popularity was based on a Google search) as well as from leading print and online technology publications identified in a survey of public relations professionals.[347]

131.     Using these reviews, the functionalities commented on by the reviewers were identified, and the frequency with which each sentence in the reviews made reference to the functionality associated with Apple's patents was determined.  Specifically, for each sentence in each review, I identified the type of product feature mentioned and classified what the feature "mentions" among the following categories: screen quality or screen size; processing capabilities; memory; the camera or photo capabilities; the battery; physical characteristics; the associated network or carriers; the specific operating system and the price.  Furthermore, I tracked sentences that mentioned features other than those captured among the explicitly tracked feature categories (*e.g.*, texting) as well as sentences that did not identify any features at all (*e.g.*, "In fact, Samsung is going to have trouble getting this one back.").[348]  Finally, I identified sentences that referenced the specific functionalities protected by Apple's patents.  The criteria

---

[347] *See,* http://www.prsourcecode.com/pdfs/news/2011_Top_Tech_Pubs_Release.pdf (viewed 9/12/2013) for leading technology publications.  Methodology for identifying popular online sources is described in notes to the Exhibits.
[348] Exhibit 42A and Exhibit 42B provide detailed notes regarding how this classification was done.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

used for identifying specific feature categories are described in Exhibits 42A and 42B.  The results are summarized in Exhibits 44 to 47.[349]

132.    Among the sentences that reference functionalities protected by Apple's patents is Sentence 167 of the GSMArena review of the Galaxy S II.  It describes the functionality associated with the '721 Patent [Image Unlock]:  "The changes brought by TouchWiz 4.0 start at the very lock screen, which you can now remove by swiping in any direction, rather than just sideways."[350]  Sentence 65 of the Galaxy Note II review from BGR, for example, references the '959 Patent [Unified Local & Internet Search]:  "Google Now is a service that examines Google searches, calendar events, location and other information and uses that data intelligently to automatically present the user with relevant data."[351]

133.    My analysis includes numerous references that are generally associated with the functionality of the patents-at-issue, even in sentences that also describe alternatives to the accused functionality or problems with the functionality.  For example, sentence 66 of the Galaxy S II review in TechRadar refers to the functionality associated with the '721 Patent [Image Unlock] as well as more secure alternatives to unlocking the GS II: "Head over to Settings > Security and you have the choice from the zero-secure 'slide to unlock' option, novelty, low-security face unlock, pattern, pin and top brass password."  And sentence 138 from the TechRadar review highlights a problem associated with the GS II's word suggestions feature: "If you've got word suggestions running it can be a problem though, as the suggested options will mask the text, which seems like something of a design oversight."[352] Both of these instances, and others like them, are counted in my tabulations.

---

[349] *See also*, Appendix C, Professional Product Reviews.
[350] *See* Appendix C.10.
[351] *See* Appendix C.54.
[352] *See* Appendix C.15.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

134.    More broadly, my methodology is designed to be over-inclusive.  For example, with respect to the '647 Patent [Links for Structures], sentence 273 of the GSMArena review of the Galaxy Tab II 10.1 was counted although it describes basic hyperlinking: "Pressing and holding a link lets you open it in a new tab."[353]   Sentence 67 from the CNET review of the Galaxy S II was flagged for the '959 Patent [Unified Local & Internet Search], even though it simply states, "There's also a to-do list and voice search."[354]  This sentence says nothing about whether that search is of both the Internet and smartphone simultaneously or if it uses multiple heuristics, both of which I understand to be criteria for practicing the '959 Patent.

135.    Similarly, sentence 125 of the Engadget review of the Samsung Galaxy S III was captured for the '760 Patent [Missed Call Management], despite discussing managing contacts rather than missed calls: "Swiping contacts left to send them a message or right to ring them became second nature after a while, because it's a lot faster than navigating sequential screens and tapping buttons."[355]  The flagging criteria also picked up references to the non-infringing "ripple" unlock, such as this one in sentence 146 of the GSMArena review of the Galaxy S III: "It's a standard 'tap and drag in any direction to unlock' deal and there're ripples accompanied by water-drop sound as you drag your finger."[356]

136.    These over-inclusions also impacted the '172 Patent [Word Recommendations] counts.  For example, sentence 311 of the GSMArena review of the Galaxy S II: "To add message recipients, just start typing the corresponding name or number and choose from the contacts offered"[357] and sentence 99 of the TechRadar review of the Galaxy S II: "Smart dialing [sic] is also included, enabling users to type in a number using predictive text on the dial pad and

---

[353] *See* Appendix C.47.
[354] *See* Appendix C.5.
[355] *See* Appendix C.24.
[356] *See* Appendix C.28.
[357] *See* Appendix C.28.

have the relevant number come up." [358] were included.  Yet neither of these descriptions fit the specific claims of the '172 Patent.

137.   Even with a methodology designed to be over-inclusive, the examination of the Galaxy S II reviews summarized in Exhibits 44 and 45A reveals very few sentences that reference the functionality associated with Apple's asserted patents.  Of the 2,149 sentences included in the 16 reviews, there were numerous references to screen size or quality (213, or 10 percent of all sentences), camera-related features (278, or 13 percent) and physical characteristics (190, or 9 percent).   These functionalities were much more prevalent than those related to the functionalities associated with Apple's asserted patents.   Those functionalities collectively had fewer than 20 mentions, representing less than 1 percent of the sentences (even with the general over-inclusion described previously).  They are:

- '647 Patent [Links for Structures]:  0 mentions  (0.0 percent)

- '959 Patent [Unified Local & Internet Search]:  3 mentions  (0.1 percent)

- '414 Patent [Asynchronous Data Synchronization]:  0 mentions   (0.0 percent)

- '760 Patent [Missed Call Management]:  0 mentions   (0.0 percent)

- '721 Patent [Image Unlock]:  9 mentions   (0.4 percent)

- '172 Patent [Word Recommendations]:  6 mentions   (0.3 percent)

138.   More generally, examination of the Galaxy S II reviews reveals extensive discussion of numerous Galaxy S II features that are unrelated to the functionality protected by Apple's patents.  Discussion of these features reflects a wide variety of features that likely factor into consumer purchase decisions.[359]  Furthermore, my examination of Galaxy S II reviews suggests that the functionalities protected by the Apple patents are of limited interest to

---

[358] *See* Appendix C.15.
[359] *See e.g.,* SAMNDCA630-06701998-2014, at 2004-05.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumers.  This contradicts the proposition that the functionality protected by the Apple patents had any discernible impact on consumer purchase decisions and sales of the accused products.

139.    The results of my Galaxy S III analysis, summarized in Exhibits 44 and 45B, are similar.  Of the 3,767 sentences included in the 22 reviews, there were numerous references to screen size or quality (319, or 8 percent), camera-related features (518, or 14 percent) and physical characteristics (380, or 10 percent).  References to functionalities associated with Apple's patents were much lower:

- '647 Patent [Links for Structures]:  0 mentions  (0.0 percent)

- '959 Patent [Unified Local & Internet Search]:  24 mentions  (0.6 percent)

- '414 Patent [Asynchronous Data Synchronization]:  1 mention   (0.0 percent)

- '760 Patent [Missed Call Management]:  2 mentions  (0.1 percent)

- '721 Patent [Image Unlock]:  22 mentions  (0.6 percent)[360]

- '172 Patent [Word Recommendations]:  1 mention (0.0 percent)

140.    A comparable analysis of the Galaxy Note II and Tab II 10.1 revealed qualitatively similar results.  These products also did not receive much attention for functionalities associated with Apple's patents.  In fact, of the 2,582 sentences included in the 17 reviews of the Note II summarized in Exhibit 44 and 45D, references to functionalities associated with Apple's patents collectively totaled 30 mentions (or 1.2 percent).  Of the 960 sentences included in the 11 reviews regarding the Tab II 10.1 summarized in Exhibit 44 and 45C, references to functionalities associated with Apple's patents totaled 5 mentions (or 0.5 percent).

---

[360] This tabulation reflects interest in the unlock feature generally, which was modified for the GS III and is not accused by Apple of infringing the '721 patent.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### 4.    Patented Functionalities Account for Negligible Attention in Consumer Reviews

141.    I also conducted an examination of product reviews written by Samsung customers in order to evaluate the importance of the functionalities protected by the Apple patents-at-issue in this case.  Because many reviewers comment on product elements which contributed to their decision to purchase (and what they believe will be of interest to the reader), these also can help determine factors that influence demand for the products-at-issue.[361]  In particular, I conducted an analysis of user comments posted on Amazon.com based on the same methodology employed in my analysis of reviews conducted by media sources.  This consumer review analysis also covered the Samsung Galaxy S II, S III, Note II, and Tab II 10.1.  The results are summarized in Exhibit 46.

142.    Like the media reviews – consumer generated reviews mention features largely distinct from those covered by Apple's patents-in-suit.  References to functionalities associated with Apple's patents were reflected in under 0.4 percent of the sentences covered in the analysis.[362]  This further demonstrates that the functionality protected by the Apple patents is of limited interest to consumers and supports the proposition that the functionality protected by the Apple patents did not have any meaningful impact on consumer purchase decisions and sales of the accused product.

### 5.    The Functionalities Associated with Apple Patents-In-Suit Received Limited Attention When First Introduced by Apple

143.    In order to further examine consumer interest in the functionalities protected by Apples patents, an examination of media and consumer reviews related to specific iPhone and

---

[361] *See e.*g., Weber Shandwick and KRC Research, "Buy It, Try It, Rate It," September 2012, at 2, 3, 7.
[362] Exhibit 46.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

iPad models was conducted.  This was done in order to capture the extent to which consumer interest might be reflected in reviews prior to the introductions of the accused products.[363]

144.     However, interpreting such an analysis requires careful consideration.  As described previously, smartphone and tablet purchasers have heterogeneous preferences; what is important to an Apple customer may not be as important to a Samsung customer, and vice versa.  For example, Samsung products do not have Siri, so any marketing of Siri by Apple (or demonstrated demand for Siri by Apple customers) would be less relevant to understanding the importance of that feature to Samsung customers.  This is because customers sufficiently motivated by a preference for Siri likely would have purchased an Apple product rather than an accused product.[364]

145.     There is no confusion, for example, that Samsung's Google Search Application is not Siri: even Apple admits that Siri and the Google Search Application are different technologies.  For example, Apple contends that Samsung uses the technology described in claims 24 and 25 of the '959 Patent, but Apple's expert only contends that Siri uses *different* technology, described in claim 34 of the '959 Patent – a patent claim that Apple does *not* accuse any Samsung device of infringing.[365]  Because Siri and the accused Google Search Application are very different technologies, the marketing/reviews of Siri are less informative of the importance of the '959 patent's impact on demand for Samsung's products.

---

[363] I note that Samsung's alleged infringement of the '959 patent predates the introduction of Siri by Apple.  Thus, reviews of the iPhone 4S (iOS 5) are not indicative of the novelty of the patented functionality.

[364] One author observed "If voice search capabilities are important to you, the iPhone 4S is the obvious choice.  While Siri is far from perfect, it is also far, far superior to the Google voice search widget on the Galaxy S III.  Siri did what I wanted it to do somewhere between 50-75% of the time, but I couldn't get the included voice app to make a call, do a web search, get directions to a particular destination, or carry out any of the other commands that it is supposed to handle."  See http://www.brighthand.com/printArticle.asp?newsID=19151 (viewed 9/12/2013).

[365] Expert Report of Dr. Alex Snoeren Concerning U.S. Patent Nos. 959 and 414, August 12, 2013, at 87-88 and 130.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

146.     Likewise, the slide-to-unlock functionality is likely viewed differently by consumers when employed in an iPhone versus a Samsung product.  In Apple's products the slide-to-unlock functionality has become more of an expression of the brand itself than a measure of the importance of the feature to consumers.[366]  This is noteworthy as accused Samsung slide-to-unlock screens look noticeably different from the screen that Apple promotes.[367]  Thus, ads for Apple's slide-to-unlock are unlikely to drive demand for Samsung's products, which have different looking unlock mechanisms. Apple's Mr. Schiller concedes that although slide-to-unlock may be one of the best examples of ease of use, one cannot determine who buys for that element in particular, expressing "I don't think customers think that way about only one feature.  They think about the entire product and all the features combined that they're choosing to buy."[368]

147.     It is my understanding that Apple first incorporated functionalities associated with '760 [Missed Call Management], '721 [Image Unlock], and '172 [Word Recommendations] patents in the original iPhone.[369]  The other three patents-at-issue were introduced into Apple products through later operating system versions.  The '414 [Asynchronous Data Synchronization] and '647 [Links for Structures] patents were allegedly included in iOS 3, and the '959 patent [Unified Local & Internet Search] was first included in iOS 5.[370]

148.     I analyzed the reviews associated with the introductions of the iPhone, iPhone 3GS, and iPhone 4S to see if these accused features were among those mentioned in the reviews

---

[366] As acknowledged by Apple, the slide-to-unlock mechanism has become "part of iPhone-ness, if you will." Rangel Transcript, April 5, 2012, at 147.
[367] In Appendix E I show screen shots of some of the accused device image unlock screens.
[368] Schiller Deposition at 196-7.
[369] Exhibit 24.
[370] Exhibit 24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

of Apple products upon their first introduction.  In doing so, I applied the same methodology that I used for my examination of the Samsung reviews described above.

149.   My examination of professional reviews related to specific iPhone models are summarized in Exhibits 48 and 49.  Reviews for the iPhone are potentially informative of the relative importance of the '760 [Missed Call Management], '721 [Image Unlock], and '172 [Word Recommendations] patents.  As the exhibit shows, professional reviews did not reference the '760 patent functionality; mentioned the '721 patent functionality in 0.1 percent of sentences, and mentioned the '172 patent functionality in 0.7 percent of sentences.  The extent to which reviewers emphasized functionalities associated with the '647 [Links for Structures] and the '414 [Asynchronous Data Synchronization] patents would be captured by reviews surrounding the introduction of iPhone 3GS/iOS3.  Looking at these reviews shows that each of these features was mentioned by 0.1 percent of the review sentences.  The iPhone 4S is what Apple claims is the first iPhone to embody the '959 patent (through Siri).  My analysis reveals that 2.6 percent of all sentences reviewed reference Siri's search capabilities.[371]  Of those, most reference functionality that does not specifically involve searches over both the internet and the device simultaneously.[372]

150.   Across all Apple product reviews, the asserted functionalities collectively had fewer than 123 mentions, representing less than 2 percent of the sentences with features (even with the general over inclusion described previously).[373]  They are:

- '647 Patent [Links for Structures]:  3 mentions  (0.0 percent)

- '959 Patent [Unified Local & Internet Search]:  88 mentions  (1.2 percent)

---

[371] Exhibit 48.
[372] See Exhibit 52 and Appendix C.91. I note that mentions of this functionality were more frequent in the 3GS reviews.
[373] Exhibit 48.  Reviews for the iPad had no mentions of any asserted functionality.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- '414 Patent [Asynchronous Data Synchronization]:  3 mentions   (0.0 percent)

- '760 Patent [Missed Call Management]:  3 mentions   (0.0 percent)

- '721 Patent [Image Unlock]:  8 mentions   (0.1 percent)

- '172 Patent [Word Recommendations]:  18 mentions   (0.2 percent)

151.    I also have summarized my analysis of consumer reviews for Apple products

from Amazon in Exhibit 50.  Consistent with the results of the professional reviews, these show

limited mentions of the asserted functionality by consumers.   Four of the functionalities-at-issue

(the '647 Patent, the '414 Patent, the '760 Patent, and the '172 Patent) received no mentions.  The

'959 patent functionality was mentioned 11 times (or in 0.2 percent of the sentences), and the

'721 patent functionality was mentioned 2 times (or in 0.0 percent of the sentences).

152.    Like Samsung's advertisements, Apple's commercials for the iPhone usually

focus on a small number of features.[374]  Although some early advertisements highlighted the

slide-to-unlock functionality, the presentation of this feature has generally declined as customers

have become more familiar and comfortable with touchscreen functionality generally.

Additionally, many iPhone 4S commercials demonstrate Siri, and show different users and

celebrities using it to schedule calendar appointments, locate nearby restaurants, set reminders,

check weather, find directions, check traffic, and play music.[375]  While several of these

commercials illustrate the ability to search the Internet or phone using Siri, many of Siri's uses

---

[374] A total of 89 advertisements for the iPhone, iPhone 3G, iPhone 3GS, iPhone 4, and iPhone 4S listed by AdWeek were reviewed; *see* http://www.adweek.com/adfreak/apples-iphone-tv-ads-complete-campaign-138229 (viewed 9/12/ 2013).  Because the iPhone 5 was released after AdWeek's article was written, the five iPhone 5 ads from Apple's YouTube Channel were reviewed; *see* http://www.youtube.com/user/Apple/videos (viewed 9/12/2013).
[375] *See, e.g.* video titled "First Apple - iPhone 4S - TV Ad - SIRI [HD]," available at http://www.youtube.com/watch?v=lyO5wNEh08g (viewed 9/12/2013), and "Apple iPhone 4S TV Ad Siri, Snow Today," available at http://www.youtube.com/watch?v=BUY8ltrPV-4 (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

do not require search of phone contents and the internet simultaneously.[376]  More generally, none of these advertisements depicted or made any specific reference to the functionalities protected by Apple's other patents.

### D.   Conclusions

153.    In summary, there are a considerable number of features in the accused products. Despite this, individual software features generally do not rise to the same importance of brand, carrier, price, and manufacturer marketing spending in driving sales.  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████[377]

Even if software were to matter to these buyers generally, there is a general lack of interest in granular feature details and distinctions across phones, as elements like the allegedly patented functionalities are not heavily promoted by Samsung or emphasized in reviews.  Thus, there are limited means by which consumers could explore and compare granular feature distinctions prior to purchase, and there is limited evidence that consumers actually do so.[378]

154.    Furthermore, although some product features appear to have relatively more importance than others, the features incorporating the patented elements are not among those that are frequently mentioned.  My analysis shows that the specific patented features are generally referenced less than one percent of the time.  In my opinion, the product reviews and advertisements indicate that the accused features are not important drivers of product demand.

---

[376] In Exhibit 52, I list many of the types of Siri searches that do not depend on the patented functionality, which are among the type shown in the commercials.
[377] Nielsen Telecom Industry Insights, Q1 2013, at 20 (SAMNDCA630-07395533-77, at 52.)
[378] I understand that this is consistent with the opinions in the Erdem Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**V.     The Vellturo Report Overstates the Importance of the Patents-at-Issue, Relying on Qualitative Evidence that Pertains to Features Significantly Broader than the Patents and Includes Elements that are Non-infringing**

155.     Despite the above-described marketplace realities, the Vellturo Report contends that demand for Samsung's accused products "is significantly influenced by the [software] features afforded by the asserted patents,"[379] and claims that demand for accused products would decrease by as much as ▮▮▮ without the accused elements[380] "even if customers may not be aware of the specific technology that enabled that [accused] functionality."[381]   To him, success of Samsung's products is and was largely dependent on access to just six patents, as they are assumed to be indispensable to a product that many customers would consider "easy to use." Yet nowhere does Dr. Vellturo independently examine all of the factors that contribute to "ease of use," a count of which Apple itself has indicated could be in thousands.

156.     Dr. Vellturo's conclusion that the asserted patents play an important role in demand is also based on an unsound analysis of qualitative document evidence, in which he equates broader references to product capabilities as evidence of demand for the specific patented functionality.  Many of his references clearly identify features that are not infringing. Moreover, Dr. Vellturo proffers no evidence that customers are even aware of (or value) the existence of many of the product features related to the patented elements at the time of purchase other than through his flawed qualitative summary of the evidence.  Dr. Vellturo, himself, provides no clear link between the patents-at-issue and customer demand for Samsung's accused products.

---

[379] Vellturo Report, at 59.
[380] Vellturo Report, at Exhibit 13 ▮▮▮▮▮▮▮▮▮  *See also*, Vellturo Report, at Exhibit 13-A.
[381] Vellturo Report, at 60.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## A.    Ease of Use is More Than the Patents-In-Suit

157.    Besides arguing that each patent's function itself matters, Dr. Vellturo states that all of these patents collectively are important in improving the phone's "ease of use."[382]  Citing to various Apple surveys in which "ease of use" is listed as a top reason for customer satisfaction and purchase, Dr. Vellturo then suggests that without these particular elements, "ease of use" would be deficient in the Samsung products.[383]  Without identifying all of the important elements of ease of use (which likely have varying importance from customer to customer), Dr. Vellturo concludes that many Samsung customers would have been unwilling to purchase the Samsung phones without each of the patented technologies.  He states that "the asserted patents positively impact functionality that customers value, which demonstrates demand for the patented inventions, even if customers may not be aware of the specific technology that enabled that functionally."[384]

158.    Although "ease of use" is revealed to be an important concept to many Apple users,[385] the meaning of such a term is highly subjective.  Apple's Art Rangel could not recall ever defining "ease of use" on a survey, and acknowledged "that [it] encompasses a whole lot of stuff to people."[386]  Mr. Rangel has "no idea how"[387] survey respondents interpret "ease of use" and it "could be whatever they think of as being what makes an iPhone easy to use" including

---

[382] Vellturo Report, at 8, 9.
[383] Vellturo Report, at 8, 9, and at 60, suggesting user experience and ease of use are of critical importance.
[384] Vellturo Report, at 60.
[385] *See, e.g.,* APLNDC630-0000127252-293, at 278; APLNDC630-0000167955-090, at 978, 979, 980; APLNDC630-0000937009-168, at 021; APLNDC630-0001233406-487, at 417; APLNDC630-0001437744-826, at 762; APLNDC630-0001438833-960, at 858; APLNDC630-0001439288-387, at 306; APLNDC630-0001466887-934, at 901 and 904.
[386] Deposition of Arthur Rangel, April 5, 2012, (the "Rangel Deposition"), at 121.
[387] Deposition of Arthur Rangel, June 25, 2013, (the "Rangel 2013 Deposition"), at 41.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

battery life, fast connectivity, and/or screen size.[388]  Mr. Rangel explained that "for each

respondent, [ease of use] probably means something different."[389]

159.    Apple's Greg Joswiak, explained "there isn't a single feature that defines ease of

use…it's the experience of our products."[390]  Apple's Phil Schiller defined ease of use as "how

the user interacts with the software, but it also can include the input devices, in case there's

buttons and switches, the interaction between hardware and software, the setup experience, the

ability to access advanced features and what are very visible and exposed versus ones you have

to study to learn to use."[391]  He explained that survey respondents connote ease of use with using

their fingers on a touchscreen, the home screen, launching applications, integration of hardware

and software, the ability to hold it with one hand and launch applications simply, not needing a

manual, the multi-touch screen, how it starts right out of the box, the applications and software,

and how you answer and make a call.[392]

160.    Although some elements may be universally viewed as easier to use, others are

highly subjective, differing from customer to customer.  Apple's Phil Schiller conceded that

some ease of use features may matter more to one customer than another.[393]  Mr. Joswiak

agreed, stating "there are lots of features in our products, not all of equal weight."[394] This is

consistent with the testimony of Vice President of Product Planning at STA, Nick DiCarlo:



---

[388] Rangel 2013 Deposition, at 40-42, 132.
[389] Rangel 2013 Deposition, at 42, 133-4.
[390] Deposition of Greg Joswiak, April 17, 2012, (the "Joswiak Deposition"), at 20.
[391] Deposition of Philip Schiller, November 2, 2012, (the "Schiller 2012 Deposition"), at 423.
[392] Schiller 2012 Deposition, at 487-9.
[393] Schiller Deposition, at 305.
[394] Deposition of Greg Joswiak, July 9, 2013, (the "Joswiak 2013 Deposition"), at 21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

161.    Apple concedes it has no way to measure the components of "ease of use." Apple has no surveys or studies which indicate the features that contribute to ease of use.[396] In fact, Apple buyer surveys do not try to assess the granularity of purchase decisions among specific ease of use components.[397] Apple has never attempted in the ordinary course of business to assess the importance of the slide to unlock feature, word recommendations, or other purported ease of use elements.[398] On the other hand, Apple has tried to investigate the importance of Siri to buyers, but the surveys would not have been capable of determining the relative importance of the '959 patented functionality itself, because Apple recognized that customers wouldn't understand what that means.[399]

162.    Apple iPhone product marketing manager Steven Sinclair testified that ease of use was an attribute of "every feature" of Apple's products, and that nearly every software feature contributed to ease of use.[400] Mr. Sinclair also noted that there were "many, many, many different features" that contributed to ease of use, estimating that "90-plus" percent of the features that Apple incorporates contribute to ease of use.[401] Mr. Sinclair could not give an approximation of how many specific features contribute to ease-of-use.[402] Mr. Rangel testified that "there's probably hundreds of features on an iPhone that make it easy to use."[403] Apple's Phil Schiller also testifies that "[v]ery many" features contribute to ease of use and that he

---

[395] Deposition of Nick DiCarlo, June 26, 2013, at 185-186.
[396] Deposition of Steven Sinclair, April 4, 2012, (the "Sinclair Deposition"), at 47, 50.
[397] Sinclair Deposition, at 57.
[398] Sinclair Deposition, at 64-66.  Rangel Deposition, at 144-7. Joswiak Deposition, at 24, 36. Joswiak 2013 Deposition, at 29-32.
[399] Sinclair Deposition, at 66.
[400] Sinclair Deposition, at 44-49, 51-2.  Mr. Sinclair noted that certain security features and customer choices and options could detract from ease of use.
[401] Sinclair Deposition, at 51, 58.
[402] Sinclair Deposition, at 59.
[403] Rangel 2013 Deposition, at 43.

"would expect there are hundreds."[404]  Greg Joswiak rhetorically responded when asked which features contribute to ease of use: "Which of the features do not contribute to ease of use?  That's a really absurd question."[405]  In a later deposition, Mr. Joswiak explained "there are lots and lots of features, if not thousands of features in our products"[406] and "the[re] are just hundreds, if not thousands, of features that are very important to use ease of use."[407]

163.    In contrast to the testimony that ease of use is influenced by hundreds, if not thousands of features, Dr. Vellturo opines that the success of Samsung's products is and was largely dependent on access to just six patents.  Without these patents, Dr. Vellturo claims that demand for Samsung phones would decline, in some cases, by more than 50 percent—implying they are virtually indispensable in the creation of a product that would be considered "easy to use."  Yet neither does Dr. Vellturo examine all of (or even many of) the factors that contribute to "ease of use," nor does Dr. Vellturo consider the extent to which customers would have been aware of these various elements at the point of purchase.

164.    In fact, a number of the documents cited by Dr. Vellturo show just how many elements impact the user interface, and thus, the perception that a product is easy to use.[408]  These documents further challenge the notion that just the six features at issue could reduce the "ease of use" enough to cause 50 percent of purchasers to buy alternative products.  Not only are there various general categories within the user interface, but there are also numerous user elements within each category.   For example, in a May 20, 2010 document called "Beat TF: UX Concept Final," Samsung divides the user interface into six categories, Home, Platform, Web,

---

[404] Deposition of Phil Schiller, July 23, 2013, at 54, 305, 313.
[405] Joswiak Deposition, at 23.
[406] Joswiak 2013 Deposition, at 23.
[407] Joswiak 2013 Deposition, at 28.
[408] SAMNDCA630-05726501-618 (translated); SAMNDCA630_04335717-808 (translated); SAMNDCA630-05407747-805 (translated); SAMNDCA10175268-310 (translated); SAMNDCA10999199-243 (translation); SAMNDCA630-00153422-451 (translated).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Media, Productivity, and Relationship.[409] The individual elements within each category

included:

Home UX: [410]
- Now Strip
  - For example, Weather/Time, News, Facebook, Calendar/Schedule, Photo frame (Flickr), YouTube, App Chart
- Menu Screen
- Live Icon
- Time Saving Features – search (local) and most used
- Landscape View- page reorder
- Edit Mode- folder creation and move icon between pages
- Smart Folder- folder support and folder package
- Lock Screen- unlock and quick memo

Platform UX:[411]
- HW Keymap
  - Simplicity is the best experience
  - Camera key (Support for half shutter function at high resolution)
  - Mute key (Alternative to pressing the volume down key a long time)
  - Slide unlock key (mechanism/reliability issue)
- Layout and Navigation
- Winsets
- Shared Gaget
- Visual Interaction
  - Implement motion that the user can easily predict
  - Make performing basic tasks more intuitive and easy to understand
  - Improve usability through seamless expansion when switching between tasks
  - Contextual Zoom in/out through pinch zoom when in an indexed list
  - Contextual Zoom in/out through pinch zoom in an unindexed list
  - Function summoning through list sweeping - implementation of visual interaction that naturally removes the list
  - Balloon Type Popup: Visual Interaction that expands using the tapped area as the standard
  - Home(List) Edit mode enter/return (Menu)
- Motion Interaction
- Voice Interactions
  - Activate voice input mode when Searching & Typing
    - Tap
    - Blow
- Multitasking

---

[409] SAMNDCA11289190 (translation).  This is included as Footnote 157 in the Velltturo Report.
[410] SAMNDCA11289190 (translation), at 200-213.
[411] SAMNDCA11289190 (translation), at 214-242.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- o  Offer a quick method of switching between the applications that are in use
- o  Offer an efficient memory management tool
- Multiple View (SPLIT)
  - o  Expansion of screen
    - ▪  Remove repetitive screen transitions (between two applications) through the use of split screen
    - ▪  Remove repetitive screen transitions (between two applications) through horizontal split screen view
- Clipboard
  - o  Expansion of copy & paste:
    - ▪  Support for multiple item clipping
    - ▪  When you open the virtual keyboard, offer your most recent text and image clipping
- Context Awareness
  - o  Smart Search Bar
    - ▪  Offer the search window and suggestion list (latest/least) together
    - ▪  Make it possible for a 3rd party take advantage of that configuration by providing it through API
- Quick Panel
  - o  Notification
  - o  Connectivity quick setting (WiFi, Bluetooth)
  - o  South profile quick setting
  - o  Rotation lock
- Settings
  - o  Expandable Structure

Web UX: [412]
- Web Browser
  - o  Main view
  - o  Most visited
  - o  Multi windows
  - o  Bookmark
  - o  Import Bookmark
  - o  Speed adaptive loading
  - o  Zoom
  - o  Adaptive Zoom
  - o  History access
  - o  Convenient Picker
  - o  Word Search

Media UX: [413]
- Gallery
  - o  Integrated media viewer

---

[412] SAMNDCA11289190 (translation), at 243-257.
[413] SAMNDCA11289190 (translation), at 258-272.

97

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- ▪ Integrated management of Images and videos
- ▪ Web album (Picasa web, Flickr) linkage
- Gallery: Videos
  - o Semantic player
  - o Search at a glance
- Music
  - o Semantic player with Rich information
  - o Fast navigation & Fast search
  - o Streaming media
- E-Book Viewer
  - o Integrated eBook viewer
  - o Real metaphor & interaction
  - o From the book to the ebook
- Quick Sharing
  - o Provide the same sharing experience for all applications
- Media Stores
  - o Music store
    - ▪ Feature integration of Playing, Information, Sommelier, Promotion & library using the store as the central point

Productivity UX: [414]
- Work & Life Balance
  - o Distinguish between work and life calendar and can manage public and private events separately
  - o Provide 'all calendars' in each category and also possible to manage event merging
- Smart Calendar
  - o Offer a similar experience to using an actual scheduler and diary
  - o Calendar landscape mode
    - ▪ Memo to calendar
  - o Instant Memo-taking
    - ▪ Instant memo
    - ▪ Memo Multiple View: thumbnail view
    - ▪ Lock screen memo

Relationship UX: [415]
- Contacts aggregation for SNS
  - o Beyond unified communication
    - ▪ Possible for the user to register people selectively instead of registering all friends
    - ▪ Possible to integrate photo, e-mail and information to contacts
    - ▪ SLP provides the API that can aggregate contacts to 3rd party
- SNS aggregation app.

---

[414] SAMNDCA11289190 (translation), at 273-283.
[415] SAMNDCA11289190 (translation), at 284-296.

98

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- o   Aggregation for meaningful friends
- Phone
  - o   Direct communication
- Contacts
  - o   Quick access to favorites
  - o   Meaningful SNS aggregation
- Message
  - o   Light & even lighter
- Share
  - o   Provide the same sharing experience from all applications

165.     Thus, there are a large number of user interface elements that contribute to ease of use in smartphones.  The patents-at-issue address, at most, only a small fraction of these.  Much of Dr. Vellturo's "evidence" that the patented features matter to users is based on documents that show Samsung has been concerned with improving its user interface in general.  For instance, the Vellturo Report cites a February 2010 email from Mr. Bong-Hee Kim summarizing an Executive Conference, which states, "I have confidence in our products' H/W, in their exterior design, and in their quality.  But when it comes to the ease of use of our UX, I lack such confidence.  Influential figures outside the company come across the iPhone, and they point out that "'Samsung is dozing off.'"[416] Similarly, in a March 2010 memo titled, "To UX Executives," Mr. Sung Sik Lee states, "We must engage in thoughtful reflection in order to create a high quality UX that will not only restore our company's faith in our UX and prove our department's worth, but also be a future market success."[417]  However, neither of these documents relate to the particular functionality enabled by the patents, nor do they comment specifically about the advantages taught by the patents.

166.     Even some of the documents Dr. Vellturo cites that purport to describe the need for the functionalities at issue, also show that other aspects of ease of use were evaluated.  For

---

[416] Vellturo Report, at 35-6; SAMNDCA10247373-78, at 77.
[417] Vellturo Report, at 36; SAMNDCA10247549-52, at 49.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

example, Dr. Vellturo criticizes the usability of the Galaxy S1 as it relates to the '647 patent

[Links for Structures] saying, ███████████████████████████████████

███████████████████████████████████████████████████ ██

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████ ██ ███

████████████████████████████████████████████

██████████████████████   This further confirms that user interface is comprised of numerous

elements, and the patents-in-suit are not tantamount to ease of use.

167.   Moreover, the "usability studies" relied upon by Dr. Vellturo which evaluated

some of the features-at-issue do not establish that improvements to ease of use lead to increased

demand for the products.[420]   Nick DiCarlo, the Vice President of Product Planning and Product

Marketing at STA, testified about a significant flaw in Samsung's system usability scores:



---

[418] SAMNDCA00203880-4010 (translation).  I discuss below how Dr. Vellturo's discussion expands the footprint of the patents.  This document is one such example, ███████████████████████████████████ Vellturo Report, at 67.

[419] SAMNDCA630-00153422-451 (translated), at 426.  Also, again Dr. Vellturo misstates the patented benefits. This document is dated July 25, 2011, which I understand post-dates the incorporation of the accused feature in the phone.  Thus, this document suggests that the "ease of use" enabled by the '414 actually is not that beneficial. Vellturo Report, at 63.

[420] See, e.g. Vellturo Report, at 73-74; SAMNDCA10993206-247; Vellturo Report, at 80; SAMNDCA00231459-502 (Hung Exhibit 3).

[421] Deposition of Nick DiCarlo, June 26, 2013, at 8, 186.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

168.    This is consistent with the marketplace evidence previously discussed, which shows that numerous other factors contribute to the buying decision and, in some cases, more than ease of use itself.[422]   Dr. Vellturo claims that "Apple studies show that ease of use is important not only to the purchasing decisions of iPhone buyers, but also to the purchasing decisions of consumers who buy other phones including Android-based phones."[423]   However, he fails to list the features other than ease of use that received high rankings of importance in those studies, including screen quality, large screen, value for price paid, and email & web access.[424]   More importantly, there is no support in those studies that just a few elements of ease of use will discernibly impact demand for the products-at-issue.

169.    The value of the patents-at-issue in making Samsung's products easy to use is also called into question by some of the materials Dr. Vellturo uses.  I understand that Samsung's Android phones included the functionality related to at least the accused Google Search Application ('959 patent), links for structures ('647 patent), and the accused type of data synchronization ('414 patent) as early as 2009.[425]   ███████████████████████████████

████████████████████████████████████████████████ ██ ███████████

---

[422] In results from a survey of iPhone purchasers included in a January 17, 2013 presentation, ████████████ (Joswiak Deposition, Exhibit 6, at 10);  Survey results from a January 11, 2011 presentation list ████████ ████████ Apple Market Research & Analysis, "Smartphone Market Study US," January 11, 2011 Presentation (APLNDC0002007608 – 704 at 694); Nielsen, "Q1 2013 Telecom Industry Insights," presentation for Samsung, at 20. (SAMNDCA630-07395533 – 577 at 552)

[423] Vellturo Report, at 24.

[424] APLNDC630-0000177658-772, at 684-696; APLNDC630-0001467057-120, at 067; APLNDC630-0000935722-792, at 738.

[425] See e.g., Mowry Report, at ¶109, agreeing with Google corporate representatives submitted declarations and testified in this case that the accused Browser functionality has existed in Android since at least version 1.5 (Cupcake), and that there have been no changes in the accused functionality at least through Android version 4.0 (Ice Cream Sandwich) that are relevant to infringement of the '647 Patent. ███████████████ ████████████████████████████ See also, Snoeren Report, paragraph 129, and Samsung's Response to Apple's Interrogatory No. 47.

[426] ibid.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████ ██ which suggests that Samsung, itself, did not intentionally copy all of Apple's features as Dr. Vellturo implies.

170.    Further, some documents Dr. Vellturo uses to establish Samsung's disadvantage in ease of use are dated *after* the features-at-issue were incorporated into the phones.  For instance, the Vellturo Report cites documents from June 2011, August 2011, October 2011, and August 2012 to establish that ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████[428]    One of these memos from October 2011 indicates the ████████████████████

████████████████████████ in its adoption—a memo written years after these accused functionalities had been incorporated in Android phones.[429]  ██████████████████████████

██████████████████████████████████████ ██ result in more than 90 percent of Dr. Vellturo's damages claim, despite the fact that their use clearly did not curtail Samsung's aspiration to improve its product user interface.[431]

171.    As late as 2012, Samsung was still concerned with its products' ease of use despite allegedly practicing each of the patented technologies.  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████[432]  As such, the documents used by Dr. Vellturo actually weaken the

---

[427] Snoeren Report, ¶ 129.
[428] Vellturo Report, at 26-7.
[429] "iPhone to Android STA POV," Oct. 17, 2011, SAMNDCA630-07415153, at 153; Vellturo Report, at 27.
[430] ████████████████████████████████████████████████████
[431] These three patents represent roughly 91.5% of the $1.024 reasonable royalty figure.  Vellturo Report, at Exhibit 31.  Each of the lost profits computations yield higher percentages associated with these patents.
[432] Vellturo Report, at 37; SAMND630-06618657-749 (DiCarlo Exhibit 16), at 715.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

assumption that the patents are essential inputs to improving ease of use of the Samsung accused devices.  Ease of use is much broader than these elements alone.

### B.     Vellturo Expands the Footprint of the Patents by using Qualitative Evidence that Largely Describes Non-Patented Features

172.    Apple contends that the patents-at-issue are "necessary to, or a core functionality of, the products" and that they "drive consumers' purchases."[433]  As a basis for that claim, Dr. Vellturo uses characterizations and descriptions of broader features, rather than the specific incremental benefit taught by the patents-at-issue.  By doing so, Dr. Vellturo vastly inflates the importance of the patents-at-issue and reaches erroneous conclusions about their impact.

173.    The Vellturo report includes roughly 30 pages of qualitative description intended to establish that the patents-at-issue are important to the demand for the accused products.[434]  For each of the patents-at-issue, Dr. Vellturo purports to point to particular evidence of demand.  However, close scrutiny of this support shows a critical oversight—Dr. Vellturo is often not describing the patents-at-issue, but is instead describing larger product features that do not require the patents-in-suit.  I describe the flaws in this evidence based, in part, on my understanding of the opinions of Samsung's technical experts.

174.    For example, in his discussion of the '647 patent [Links for Structures], Dr. Vellturo elaborates over six pages as to how the patent "enhances customer access to capabilities of the smartphone relevant to a given piece of data […] and the ease with which they can store or use that data in the appropriate application."[435]  However, Dr. Vellturo goes on to describe functionality in the accused phones (and Apple's embodying phones) which allows for something called a "short press" or "short tap"-- which Apple *does not accuse of infringement*.  For

---

[433] Apple Inc.'s Second Supplemental Objections and Responses to Samsung's Interrogatories to Apple Relating to Apple Inc.'s Motion for preliminary injunction (Nos. 1 & 3), Response to Interrogatory No. 3.
[434] *See* Vellturo Report, at 60-91.
[435] Vellturo Report, at 64.

Case 5:12-cv-00630-LHK   Document 1934-6   Filed 06/25/14   Page 151 of 290
/segment

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER
/segment

example, if one receives a message that includes a phone number and it is "short tapped," the phone will automatically take the user to the dialer.  This is not accused.[436]  If, however, the user performs a "long press" or "long tap" (*i.e.*, holding the finger on the phone number for about a second), it will give the user a menu of options.  This instead is what Apple actually accuses Samsung of infringing.

175.    The vast majority of the evidence cited by Dr. Vellturo to support demand for the '647 patent mistakenly relates to the short tap feature to perform the primary function (*e.g.*, phone number=dial, email address=send email, etc.).  For example, some of Dr. Vellturo's citations are from presentations made in 2007 (around the launch of the first iPhone) describing the tap functionality in Apple products.[437]  However, these clearly cannot describe the patent-in-suit, as they predate Apple's incorporation of the feature-in-suit into its phones by two years.[438]

176.    Other citations by Dr. Vellturo reference Google's and ████████████████ ████████████████████████████████████████████████[439]  But these are references to the short-tap feature that is not accused of infringing Apple's '647 patent.  In fact, there appears to be only one citation included in the Vellturo Report that even discusses the long tap

---

[436] *See, e.g.*, Mowry Report, at 1, 19, 20.

[437] Vellturo Report at 64-65. "For example, Apple's June 2007 iPhone Reviewer's Guide begins by noting that the 'iPhone introduces an entirely new user interface – the first in 20 years' – through which '[m]aking a call is as simple as tapping a name.'" "The "Finger Tips Guide" for the original iPhone also highlighted the ability to '[t]ap any number in … an email or SMS text message, or almost anywhere in iPhone to make a call.'"

[438] Apple contends that it first practiced the patents-in-suit in June 2009 in iOS3.  See Exhibit 24.  Also, I note that according to Apple, the original iOS, iOS 2 operating systems (which were included in the original iPhone at launch, and the iPhone 3G at launch) did not practice the '647 patent.  This further suggests that marketplace success is not reliant on this patent.  Apple Inc.'s Supplemental Objections and Responses to Samsung's Second Set of Interrogatories, May 28, 2013, at 3-8. *See also* Exhibit 23.

[439] Vellturo Report at 66-67. "On September 17, 2007, a Google employee stated: 'One of our most powerful features is the interaction of text objects, other applications on the phone. For instance, users can select a phone number, an email address or a physical address and it will launch the dialer, email editor or maps respectively.'" "As early as July 12, 2008, almost a year before Samsung launched its Android-based phones, Samsung noticed the iPhone 3G's ability to 'recognize [a] phone number and address' in email and its "function to call immediately.'"

104
/segment

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

functionality, from a document which provided a Galaxy S1 versus iPhone comparison.[440]  Thus, Dr. Vellturo's own report could only be evidence that, at most the non-infringing "short tap" functionality may impact consumer demand, but that the accused "long tap" is a less observable and discussed feature.   Dr. Vellturo's conflation of these functions only emphasizes that any consumer survey regarding the '647 patent must be carefully constructed so as not to confuse respondents by overstating the benefits taught by the patent.

177.    An overly expansive view of the patented functionalities plague the other descriptions provided by Dr. Vellturo as well.  For example:

- **The '414 patent** is depicted as allowing "users to continue to use apps while data related to those apps that is stored on their smartphones is being synchronized in the background with data stored elsewhere, on a remote computer or server."[441]

  However, Dr. Vellturo's qualitative evidence is not congruent with this description. For example, Dr. Vellturo ██████████████████████████████████████ ████████████████████████████ but these reference do not specifically refer to concurrent use and synching—the subject of the patent.  Additional citations by Dr. Vellturo confuse background syncing enabled by the patent, with syncing generally. For example, Dr. Vellturo identifies that "████████████████████████████ ████████████████████████████[443] but his document discusses syncing media files when compared to iTunes, not background sync for calendar, contacts and mail.[444]  Similarly, Dr. Vellturo identifies Samsung's testing of

---

[440] Vellturo Report at 67. "Long press displays a menu with detailed options like copy, save, etc."
[441] Vellturo Report, at 61.  *See also*, Apple Inc.'s Objections and Responses to Samsung's First Set of Interrogatories, Response to Interrogatory No. 5., at 22.
[442] Vellturo Report, at 61.
[443] Vellturo Report, at 63.
[444] Untitled presentation, SAMNDCA630-07380941, at -956.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

multitasking while synching as further evidence of demand for the patent-in-suit,[445] but again this is not related to the patent, as I understand that multitasking while syncing is not within the scope of the patent, which is related to syncing that happens while the app is being used.[446]

- ***The '959 patent*** value is overstated, as Dr. Vellturo equates this patent with all of the functionality of Siri – functionality that is not even offered on Samsung phones. The '959 patent is described as "integral to Apple's highly popular Siri feature, which has contributed to the commercial success of iOS"[447] and "the '959 patent lies at the heart of this feature's functionality."[448]  This premise is flawed, however, as Dr. Snoeren, Apple's technical expert for the '959 patent, puts forth no opinion that the Siri feature practices any of ***the asserted claims*** of the '959 patent (claims 24 and 25).[449] Accordingly, any value attributed to Siri cannot be attributed to the value of the asserted claims.  Moreover, Siri's voice recognition capabilities are often viewed as the feature's most defining functionally.[450]  Apple's Art Rangel testified that "People who love [Siri], they feel like it's their assistant, like it's their – almost – I wouldn't say their best friend, but it's definitely – you know, it's –it's – it humanizes the

---

[445] Vellturo Report, at 63-4.

[446] "Galaxy S2 for EUR (GT-I9100) OS Upgrade Performance Evaluation," Dec. 22, 2011, SAMNDCA630-07626577 (translation), at -586-87.

[447] Apple Inc.'s Objections and Responses to Samsung's First Set of Interrogatories, Response to Interrogatory No. 5, at 22. "I understand that the '959 patent is practiced by 'Siri,' the personal assistant that Apple introduced in the iPhone 4S. Through Siri, the Patented Invention allows users to request information through their iPhones in a single unified search." Vellturo Report, at 30.

[448] Vellturo Report, at 70.

[449] Expert Report of Dr. Alex Snoeren Concerning U.S. Patent Nos. 959 and 414, August 12, 2013, at 87-88 and 130.

[450] Apple's website describes Siri as: "the intelligent personal assistant that helps you get things done just by asking. It allows you to use your voice to send messages, schedule meetings, place phone calls, and more. But Siri isn't like traditional voice recognition software that requires you to remember keywords and speak specific commands. Siri understands your natural speech, and it asks you questions if it needs more information to complete a task." *See* http://www.apple.com/ios/siri/siri-faq/ (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

phone.  They love it for that.  They love it because it's really convenient to use."[451]

Furthermore, Siri is comprised of many different elements that complicate the

assertion that the patent alone (or primarily) is responsible for Siri's functionality and

popularity.[452]  Siri's uses are far broader than search, and certain popular tasks such

as updating a calendar and calling a friend using Siri do not require the patents-at-

issue.[453]  ██████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████  In addition, Siri is not even a

function on the accused phones.  Demand for the search allegedly taught by the '959

on Samsung products would be better measured by its use.  ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

- **The '760 patent** benefit is described as "a convenient user interface with which to

  manage missed calls, whereby a user may touch one portion of the screen to return a

---

[451] Deposition of Arthur Rangel, April 5, 2012, at 155-156.

[452] For example, Apple's Mr. Tchao testified that universal search is only a part of Siri. (Tchao Deposition, June 28, 2013, at 125-7.)  Mr. Tchao also indicated that he doesn't know whether consumers view universal search as important or whether it drives demand. (Tchao Deposition, June 28, 2013, at 125-7.) Apple's Arthur Rangel also testified that Siri does more than one thing. (Rangel Deposition, May 5, 2012, at 153, 155-6).

[453] *See, e.g.*, http://www.apple.com/ios/siri/siri-faq/ and http://www.engadget.com/2011/10/14/iphone-4s-review/. *See also*, Exhibit 52 which lists many Siri commands that do not use the patent-at-issue.

[454] "US iPhone 4S Siri Data from the Apple Customer Pulse," APLNDC630-0000149086, at 92, 94.

[455] ███████████████████████████████████████████████

████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

call or touch another portion of the screen to display detailed contact information."[456]
Again, it appears that Dr. Vellturo overstates the incremental benefit taught by the
patent. Here, I understand that a missed-call list alone is not the patented element,
nor is the ability to select the number of the previous contact to be dialed. Instead,
the patented invention involves the ability to have a "completely substituted" second
window with multiple options associated with it.[457] In other words, there are many
ways to manage missed calls that do not use the patent, one as simple as having the
second window not completely substitute the first (for example, through a "pop-up
window" that only partially covers the initial screen.)[458] None of Dr. Vellturo's
documentary support addressed the importance of a completely substituted second
screen.[459]

- ***The '721 patent*** discussion in the Vellturo report claims that the Apple slide-to-
  unlock feature is a core part of user experience with iPhone. This misses the point.
  Equating the general concept of using a sliding mechanism to unlock a phone to the
  patented invention is a significant overstatement. I understand that the purported
  advantage of the '721 patent relates to a gestural unlocking mechanism that helps to
  minimize risk of accidental activation by requiring movement from one
  predetermined location to another, while providing visual clues concerning the

---

[456] Vellturo Report, at 75. *See also*, Apple Inc.'s Objections and Responses to Samsung's First Set of
Interrogatories, Response to Interrogatory No. 5, at 22, where it is described as allowing "a user to perform
functions relating to missed calls directly from a missed-call list. By eliminating the need for, e.g. cumbersome re-
typing of phone numbers in order to call or send a text message to a contact who had previously called a user, this
functionality makes call management far more efficient and has in turn become a popular and highly demanded
feature of Apple's iPhone."
[457] *See* Cockburn Report at 187, ¶ 573 (conceding that an interface in which the contact information screen "does not
completely obscure the call log list" would not infringe the '760 patent).
[458] *See* Cockburn Report at 187, ¶ 573.
[459] Vellturo Report at, 75-77.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

direction of movement.[460]  Merely providing graphical and textual instruction to unlock is not covered by the patent.[461]  Simply using a finger gesture to open a phone is not subject to the patent.[462]  Numerous methods to unlock phones are not covered by the patent.[463]  For example, ███████████████████ the Galaxy S III, uses a different opening mechanism in which the user swipes his finger across the screen, resulting in a perceived water ripple, which then unlocks the phone.  Changing from the accused method to the "water ripple" method appears to have no discernible impact on the product's success.[464]

- **_The '172 patent_** discussion focuses not on the benefit of the patent, but instead on the importance of having an autocorrect feature on a touchscreen phone generally.  Dr. Vellturo explains, "…that without an autocorrect feature, widespread adoption of the iPhone's touchscreen and virtual keyboard may never have occurred."[465]  But the problem with this analysis is that the '172 patent does not teach autocorrection—it is merely directed to one way of doing autocorrection.   Notably, to establish the demand for this patent, Dr. Vellturo points to numerous Apple documents, testimony of Apple executives, and reviews of Apple iPhones which purportedly discuss the

---

[460] *See* Cockburn Report at 33-35; ¶¶ 118, 119, 123.
[461] *See* Vellturo Report, at 82.
[462] *See* Vellturo Report, at 81.
[463] Furthermore, I understand that Apple only accused the Captivate Glide, Exhibit II 4G, Galaxy S II, Galaxy S II Skyrocket, and Galaxy S II Epic 4G Touch devices under this patent for incoming call functionality, and sliding to view missed calls/texts, but did not accuse screen unlocking (i.e., the keyguard screen).  Rebuttal Expert Report of Saul Greenberg, Ph.D., Regarding Noninfringement of the Asserted Claim 8 of U.S. Patent No. 8,046,721, at ¶ 196.  Dr. Vellturo's evidence related to this aspect of the '721 patent is limited.
[464] The examination of 22 different professional reviews regarding the Galaxy S III showed only 22 mentions of the slide-to-unlock feature.  None of these were critical of the mechanism.  *See* Appendix C.  Similarly, consumer discussion of the product revealed no negative comments about the "ripple unlock".  *See* Appendix D.  Furthermore, sales of the Galaxy S III have far exceeded the sales of the Galaxy S II.  *See* Exhibit 26A.  And the changes from the Galaxy S II to the Galaxy S III (which included removing two of the patented features) resulted in "a strong upward ACSI [American Customer Satisfaction Index] trend.") http://www.macrumors.com/2013/08/01/iphone-5-topped-by-galaxy-s3-in-latest-customer-satisfaction-survey/ (viewed 9/12/2013).
[465] Vellturo Report, at 86.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

importance of the '172 patent in Apple products.[466]  However, I understand that

Apple claims that it *does not practice* the asserted patent claim in its products, which

means all Dr. Vellturo's references to Apple are unrelated to the specific functionality

at issue here.[467]  Moreover, Samsung's ███████████████ the Galaxy S III,

uses a different keyboard mechanism in which the autocorrect functionality is not

accused of infringement.  Using this type of keyboard appears to have had no

discernible impact on the product's success.[468]

### C.    Dr. Vellturo Improperly Discounts Many of Samsung's Available Design-Around Alternatives

178.    Not only does Dr. Vellturo's overstatement of the benefit of the patents-at-issue

cause him to proffer unsound qualitative evidence of demand for the patented elements, but it

also wrongly leads him to the conclusion that Samsung would not have been able to offer any

alternative product designs which would have resulted in an acceptable product for certain

patents-in-suit.  In consultation with Apple's technical experts, Dr. Vellturo lists various

challenges associated with Samsung's identified non-infringing alternatives to each of the

asserted patents.[469]  As part of this, Dr. Vellturo implicitly ignores the marketplace success of the

Samsung products which are not accused of infringement.

179.    Samsung's ability to retain its customers with an alternatively designed product

which does not infringe the patents-at-issue must be considered in any analysis.  Here, the

---

[466] Vellturo Report at 86-89.

[467] Expert Report of Professor Andrew Cockburn, August 12, 2013, at 118-9, 149.

[468] The examination of 22 different professional reviews regarding the Galaxy S III showed only 1 mention of the word recommendations feature, and it was not critical of the new keyboard relative to the prior version.  *See* Appendix C.  Similarly, consumer discussion of the product revealed no negative comments about the new keyboard relative to the prior version. *See* Appendix D. Furthermore, sales of the Galaxy S III have far exceeded the sales of the Galaxy S II.  *See* Exhibit 26A.   And the changes from the Galaxy S II to the Galaxy S III (which included removing two of the patented features) resulted in "a strong upward ACSI [American Customer Satisfaction Index] trend.") http://www.macrumors.com/2013/08/01/iphone-5-topped-by-galaxy-s3-in-latest-customer-satisfaction-survey/ (viewed 9/12/2013).

[469] *See* Vellturo Report, at Exhibit 11.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

availability of many acceptable options renders the relative importance of the patents-at-issue to be limited.  Coupled with the observation that many of the functionalities-at-issue are minor in nature (compared to both the quantity and relative importance of other features) and in consideration of the many elements that drive demand of the products more generally, the patents, here, are unlikely to drive any measurable demand for the accused Samsung products.

180.    I understand that Samsung has indicated that several non-infringing alternatives to the asserted patents exist.[470]  Some of these have been implemented by Samsung in current successful phones; others could have been incorporated if necessary.  ██████████████████
████████████████████████████████████████████████████████████
██████████████████████████████  Dr. Vellturo instead indicates a range of up to four or five months for certain patents and longer than thirty-six months for others (as he assumes that they could not be designed around).[472]   I describe some of these options below based on my understanding of the opinions of Samsung's technical experts.

---

[470] *See e.g.*, Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, First Supplemental Response to Interrogatory No. 29.
[471] *See, e.g.*, Lockheimer Deposition, at Exhibit 4.



[472] *See, e.g.*, Vellturo Report, Exhibit 26.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### 1.    The '647 Patent

181.    One alternative Samsung has proposed to the '647 patent is to give the user only one option for each type of detected structure through the "short tap" functionality, and remove the "long tap" functionality from the phones in the messenger and browser applications.[473] ███

███████████████████████████████████████████████████

█████████████████    Dr. Vellturo comments that "this limitation on functionality would be frustrating to users and would detract from the user experience."[474]  I understand, however, that in addition to the "short tap" functionality, Apple does not accuse providing a menu with options such as "copy" and "save."  Accordingly, any limitation on functionality would be minimal.[475]

182.    ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████[476] ███████████████

███████████████████████████████████████████████████

████████████████  ███████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

---

[473] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, First Supplemental Response to Interrogatory No. 29, at 111-113.  Apple's technical expert Dr. Mowry has previously opined that multiple actions are necessary to practice this patent, and that is apparently still his opinion.  Mowry Report, at ¶ 273, at 108.  But he acknowledges that the Motorola Court's construction only requires a single action. Mowry Report, at ¶ 273, at 108.
[474] Vellturo Report, at Exhibit 11.
[475] Jeffay Report at ¶¶ 115, 117.
[476] Jeffay Report at ¶¶ 496-508; Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories at 154.
[477] Jeffay Report at ¶¶ 497,502. ███████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

183.    I further understand that the '647 patent does not cover all kinds of detection and linking.  Rather, the detection and linking must be performed by an "analyzer server"—a system that uses something other than an analyzer server to detect and link data would not fall within the scope of the claims.[478]  Similarly, the '647 patent does not merely cover allowing a user to perform an action on a structure—the action must be "linked."  Systems that do not "link" actions to structures, but still allow the user to perform a task on detected data do not fall within the scope of the claims.[479]  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████[480]

### 2.    The '959 Patent

184.    ██████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████  ██  █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  ██  ████████████████████████████

█████████████████████████████████████████████████████

---

[478] Jeffay Report at ¶¶ 47-79, 108-119.
[479] Jeffay Report at ¶¶ 47-79, 108-119.
[480] Jeffay Report at ¶¶ 484-539;  *See also*, Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, First Supplemental Response to Interrogatory No. 29, at 112.
[481] Rinard Report at ¶¶ 294-341.
[482] Although Dr. Velluro claims that there was a torrent of negativity associated with this alteration, some of the documents he relies on suggest otherwise. Vellturo Report, at 74-5. David Beren, "Did Local (Universal) Search Get Restored In Galaxy S III Jelly Bean Update?," TmoNews, Nov. 15, 2012.  The author begins by stating, "In what appears to be a little known development ..." highlighting the lack of coverage or awareness of the change in the feature.

████   Dr. Vellturo identifies one potential drawback with this design, stating "This alternative would require a user to run multiple searches if she wanted to search both local and remote data sources."[484]

185.   ████████████████████████

██████████████████████ ███   I understand that this design uses a single interface to find information from different sources of information, for example, data stored on a user's smartphone as well as information found on the Internet.  When the user types into the search box, the search interface immediately provides search suggestions from the Internet.  For example, when the user types "George" in a single search box, the feature provides suggested searches that include "George," such as search suggestions for George Clooney, George RR Martin, George Lucas, and George Washington.  ████████████████

███████████████████████████████

████████████████████ ███   In fact, this design would actually improve the presentation of most search results, leading to a less cluttered display containing only the information the user was seeking.[487]

186.   If the user were looking for local results, with this design the answer would be one button press away.  The bottom of the screen includes a button which reads "SEARCH

---

[483] Samsung's Further Supplemental Reponses to Apple's Second and Third Sets of Interrogatories, First Supplemental response to Interrogatory No. 24, at 114-117.
[484] Vellturo Report, at Exhibit 11.
[485] Rinard Report at ¶¶ 320-324.

██ ██████████████████████████████████████████ ██
███████████████████████████████████

[487] Expansive results from a mobile device search are typically not ideal.  One mobile marketing company explains, "A user's behavior when searching on a mobile is different from that of a typical desktop user. Mobile users are on the move, have smaller display screens and keyboards, use short, sketchy search phrases and are not interested in too much information." http://www.digitalresultsmarketing.com/mobile-marketing/mobile-search-engine-marketing-sem/ (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

PHONE."  When the user then clicks on "SEARCH PHONE", the search interface runs a second search against only sources on the device, displaying entries from the user's contacts or from the user's music files.[488]  In this way, the user could quickly and easily gain access to a local search without retyping any query, and only then be exposed to the desired local results.  I understand that this design implementation is acknowledged by Apple not to infringe.[489]

### 3.    The '414 Patent

187.    Apple's damages experts appear to assert that the '414 patent covers all systems that "background sync," *i.e.*, where synchronization takes place while the user interface is active.[490]  This ignores systems that can "background sync" but would not infringe, by using a different programming architecture.  I understand that Samsung asserts that several non-infringing alternatives to the '414 patent exist.

188.    Among those, Samsung could have implemented an alternative software program that would provide for identical synchronization from a user's perspective.  This is the
█████████████████████████████████████████████ option described in Dr. Chase's Expert Report.[491]  Apple concedes this is non-infringing.[492]  I understand that this alternative is

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

---

[488] Rinard Report at ¶ 320.
[489] I understand that Apple has conceded that an application that searches web results in one screen and local results in another does not infringe.  (*See* Apple's July 15, 2013 Interrogatory Responses at 150: arguing Sherlock does not anticipate claim 24 because "the references cited by Samsung describe Sherlock as providing one window for searching the internet and another window for find file, ***where there is never a single input provided to both***.")
[490] Velturo Report, at 28.
[491] Chase Report at ¶¶192-197.
[492] *See* Snoeren Report, Fourth Alleged Alternative presented in ¶¶ 495-497.
[493] Chase Report at ¶ 196.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

189.    I also understand that Samsung would have had other options to design-around the '414 patent. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████ ██ ██████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ ██ ████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████ ██

190.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████[497]

**4.    The '760 Patent**

191.    I understand that Samsung has a number of design-arounds to the '760 patent.[498] The Missed Call Screen Management feature allows the user to return a missed call directly from a list of missed calls or access additional means of responding to the caller. Each item on the missed call list has two distinct interactive areas. If the user gestures on one area, such as the picture of the missed caller, John Doe, then John Doe is called back.  If the user gestures on the

---

[494] Chase Report, at ¶ 202.
[495] Chase Report, at ¶¶ 203-208.
[496] Chase Report, at ¶¶ 184-191.
[497] Chase Report, at ¶¶ 184-208.
[498] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, First Supplemental Response to Interrogatory No. 24, at 120-4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

other area, such as John Doe's name or phone number, then a new screen appears that completely obscures the list of missed calls. The new screen displays information that allows the user to contact the caller in at least two ways, for example by returning the telephone call to the caller or by texting him.



192.    One design-around

---

[499] *See* Cockburn Report, at 156; *see also* Samsung's Further Supplemental Responses to Apple's First, Third and Tenth Sets of Interrogatories at 132-133 and 177.

[500] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, First Supplemental Response to Interrogatory No. 24, at 120-124.  Other non-infringing alternatives to the '760 patent include permitting different responses through different interactions with the call display such as tap, tap and hold, or swipe for different responses.

[501] See Cockburn Report, at ¶ 573.  "To the extent the partial screen refers to a screen that does not completely obscure the call log list, I agree with Samsung that this alternative does not meet the limitations of the asserted claim of the '760 Patent in light of the Court's construction of the limitation 'completely substituting display of the list of interactive items with display of contact information" to mean "displaying at least two contact objects in place of the display of the list of interactive items.'"

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

194.    Dr. Velluro comments that "the overlapping displays would be more cognitively demanding or confusing to users...[or] result in the screens being cramped or visually cluttered, as a result of having too much information displayed on the device's limited screen size."[502] However, it appears that such confusion would be imperceptible and the display would not need to show materially more information than before, as the pop-up screen could fill virtually the entire screen display.

195.    █



### 5.    The '721 Patent

196.    I understand that Samsung asserts that several non-infringing alternatives to the '721 patent exist.  For example, █████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████  Among non-infringing alternatives   are the non-accused unlocking mechanisms currently being used in several other Samsung models of a visual effect applied to a background image like that of the Galaxy S III.[505]

197.    I understand that this option would have been available at the time of the alleged infringement, would have required minimal programming efforts, and would provide users with

---

[502] Velluro Report, at Exhibit 11.
[503] *See e.g.*, Lockheimer Deposition, at Exhibit 4.
[504] Greenberg Report, at ¶¶ 471-472.
[505] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, First Supplemental Response to Interrogatory No. 24, at 124-6.  The Galaxy S III uses a Ripple unlock. *See*, Samsung Galaxy S III Verizon User Manual at 140-1, Samsung. 2012. Available at http://downloadcenter.samsung.com/content/UM/201207/20120706131108550/VZW_SCH-i535_English_User_Manual_LG1_F5.pdf (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

a similar functionality.[506]  Dr. Vellturo discounts this design as "…suffer[ing] from a number of

drawbacks.  For example, allowing an unlock by touching anywhere and swiping anywhere

would likely result in accidental unlocks.  Additionally, it appears this alternative would lack

visual cues…[causing] users [to] be more likely to fail in their efforts to unlock the device."[507]

198.    Dr. Vellturo's concerns are unwarranted.  In fact, Dr. Vellturo points to no

convincing evidence that users of the Galaxy S III, Note, Note II, or any other device

implementing the "Circle" and "Ripple" Unlock alternatives are suffering from these issues.

Moreover, Dr. Vellturo's support regarding the same difficulties in the earlier "circle unlock"

mechanism is flawed.  ██████████████████████

████████████████████████████████████████

██████████████████ ██ ████████████████████████

██████████████ ██ ████████████████████████

████████████████████████████████████

██████████████████ ██ ████████████████████

████████████████████████████████████████

██████████████████████████████████████ ██ █

████████████████

---

[506] The first circle unlock device was available February 17, 2012.  Samsung's Further Supplemental Responses to Apple's First, Third, and Tenth Sets of Interrogatories, July 15, 2013, at 179, 192.  The Circle Unlock took 240 person hours to implement.  The Ripple unlock, which uses the same underlying design as the circle unlock, is merely a visual effect overlay (i.e., a skin) for the circle unlock.  This visual effect took 280 hours to implement.  Samsung's Further Supplemental Responses to Apple's First, Third, and Tenth Sets of Interrogatories, July 15, 2013, at 204.
[507] Vellturo Report, at Exhibit 11.
[508] Vellturo Report, at FN 456.
[509] Vellturo refers to Cockburn Ex. 11, which is a chart of Cockburn's opinions.  No objective evidence is shown.
[510] Deposition of Sung Sik Lee, July 11, 2013, at 99.
[511] Vellturo Report, at fn. 460, 463. The document discussed during the deposition (for which there is no translation) does not state explicitly that the shortcoming discussed in the deposition was a shortcoming of the water ripple

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

199.    I also understand that on Apple devices incorporating the upcoming iOS 7, unlocking the screen will not be done by swiping in a way that requires dragging any image.[512] One source explains, "Apple completely changed the iOS 7 lock screen with a new slide from anywhere design. Users can slide left to right from anywhere on the screen to unlock, so there's no need to adjust to hit the small slider at the bottom."[513]   Other comments, "This is the new lock screen. Notice how the slider switch is gone? Now you just swipe left to right to unlock your phone."[514] This further erodes the plausibility of Dr. Vellturo's contentions about the problems with such a design.

### 6.    The '172 Patent

200.    I understand that Samsung asserts that several non-infringing alternatives to the '172 patent exist.[515]   Among those, Samsung could have equipped its accused devices with the same non-infringing keyboard that is used in several other non-accused Samsung models, including the Dart and Galaxy S III.

201.    The Samsung Dart, which implements a non-accused keypad, was the first device in this case to be released.   This keyboard was not enabled by default, but was available.[516] Predicted text is displayed in first area (where the user is typing the message).  Apple agrees that this alternative is non-infringing.[517]  Samsung's earliest Android devices, including the Behold

---

unlock.  Lee testified "It does, yes, make some indication or reference to the water ripple unlock, but it actually is talking about other problems associated with the water ripple unlock itself."

[512] *See, e.g.,* http://www.cultofmac.com/231576/ios-7-will-let-you-swipe-anywhere-to-unlock-your-screen/ (viewed 9/12/2013); http://www.pcpro.co.uk/news/381931/ios-7-release-date-features-and-screenshots (viewed 9/12/2013); http://appadvice.com/appnn/2013/06/slide-to-unlock-appadvice-goes-hands-on-with-ios-7s-new-lock-screen (viewed 9/12/2013).

[513] http://www.gottabemobile.com/2013/08/23/ios-7-release-date-features-video/(viewed 9/12/2013).

[514] http://www.businessinsider.com/ios-7-screenshot-tour-2013-6#this-is-the-new-lock-screen-notice-how-the-slider-switch-is-gone-now-you-just-swipe-left-to-right-to-unlock-your-phone-1 (viewed 9/12/2013).

[515] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, First Supplemental Response to Interrogatory No. 24, at 126-8.

[516] *See, e.g.,* Dart User Manual, SAMNDCA630-00921130.

[517] *See* Cockburn Report, at ¶ 450.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

II, included a Samsung keypad that operated in this fashion.[518]  The Behold II was released in November 2009.

202.    Another option, implemented in the later Galaxy S III revisions, has both a Swype and Samsung keyboard, neither of which are accused.[519]  These show what was actually typed in the first area (where the user is typing), but do not replace when a delimiter (space or punctuation) is pressed.  Apple agrees this alternative is non-infringing.[520]

203.    I understand that these options would have required minimal programming efforts and would provide users with a similar functionally.[521]  Dr. Velturo provides no evidence that the keyboards in these products would have been unacceptable to Samsung customers more generally.

## VI.    The Vellturo Report Lost Profits Conclusion Relies Entirely on a Flawed Conjoint Analysis Performed by Another Expert

204.    The only quantitative basis for demand from the patents-at-issue is taken from a conjoint analysis performed by Professor Hauser.  However, Professor Hauser's analysis suffers several crucial flaws.  The conjoint survey was not designed in a way that allows one to accurately determine when, if ever, consumers that purchased the accused phones might have altered their purchase decision had the phone not incorporated the patented functionality, making it wholly unsuitable for marketplace predictions.

---

[518] *See* Samsung Behold II Portable Quad-Band Mobile Phone User Manual, S-ITC-000016686 at S-ITC-000016748-49 ("T9® mode automatically compares the series of keystrokes you make with an internal linguistic dictionary to determine the most likely word, thus requiring far fewer keystrokes than the traditional ABC mode.").
[519] The Samsung keyboard which works as described in alternative (ii) above was first implemented in the Galaxy S III. See Samsung Galaxy S III available at T-Mobile Portable Quad-Band Mobile Phone User Manual, SAMNDCA630-07329664. This version of the Samsung keyboard was first made available on June 15, 2012, for the Verizon wireless Galaxy S III, model number SCH-i535.
[520] *See* Cockburn Report, at ¶ 440.
[521] Wigdor Report, at  ¶¶ 146 ("This could be done in an insubstantial amount of time…."); 166 ("[T]he alleged benefits of the '172 patent are all provided by the Swype and Samsung keyboard input methods in the Samsung Galaxy S III.")

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

205.     The Hauser analysis includes overly broad and inaccurate descriptions of the patented functionalities which enhance the respondent's awareness of, and consequently valuation of, the features.  It also uses a misleading statement regarding the "outside option" alternatives and generates predictions that differ from marketplace observations.  As a result, by relying on the output from this analysis, Dr. Vellturo vastly overstates the importance of the patents-at-issue, and exaggerates damages.

### A.     Professor Hauser's Analysis is Based on Inaccurate Descriptions That Overstate The Patented Functionality (Relative To Non-Infringing Alternatives)

206.     Professor Hauser's analysis is based on two distinct surveys of Samsung smartphone and tablet owners.  Each of these surveys involves a background section in which respondents are educated about various product features, including descriptions of the functionalities enabled by the patents-in-suit and the difference between products with the accused features and without.  Each feature description included both written and video components.[522]

207.     These descriptions, however, were presented in a way that implies the patented functionalities are necessarily preferable to their alternatives—suggesting that the respondent would be making a sacrifice of some sort if the patented features were excluded from their device.  Furthermore, the descriptions do not provide the respondent with all or even among the best alternatives that were available to Samsung.[523]  Thus, like Dr. Vellturo, Professor Hauser overstates the benefits of the patents-in-suit.

---

[522] Hauser Report, at Exhibits G and H.
[523] This (and the discussion that follows) is based, in part, on my understanding of the opinions of Samsung's technical experts.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

208.    Specifically, first, the description in Professor Hauser's surveys related to the '647 [Quick Links] feature is misleading.[524]  The description does not, for example, make clear that Quick Links is not required for the single tap actions taken on automatically identified objects that, for example, directly initial a phone call, open a webpage or pull up a destination on a map. Further, Professor Hauser's description does not, for example, clarify within which applications the Quick Links functionality would be available, leaving respondents to assume it applies more globally rather than just in Samsung's Browser and Messenger applications.[525] Professor Hauser's description also mistakenly states that users "would have to manually identify and select the exact text that might be data to take actions on," which I understand is not the case.[526] ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ █████████████████████████████

█████████████████████████████

---

[524] Professor Hauser's description reads: **Quick Links.** When you are viewing text on your smartphone (for example in an email), the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder. Without this feature, if you wanted to take various actions, like calling or texting a number, you would have to manually identify and select the exact text that might be data to take actions on.  Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.

██████████████████████████████████████████████████████████████████████

[526] Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.
[527] Jeffay Report, at ¶¶422-424.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

209.    Likewise, there are several problems with the description of the '414 patent.[528] The use of the term "Background Syncing" implies that the feature includes the ability to synchronize data for an app in the background, even when that app is not running – which is a much broader functionality than I understand is covered by the asserted claims of the '414 patent. The description also misstates that, without the Background Syncing feature, users "would have to wait to use an app," which is not the case.[529] ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████.[530] In addition, Professor Hauser's description also incorrectly leads respondents to believe that synchronization with the accused devices occurs immediately.  In actuality, it occurs with a 30 second scheduled delay after an edit to the data is made.

210.    The '959 Patent (Unified Local & Internet Search) description has several shortcomings.[531]  Calling the feature "Universal Search" is misleading, because it does not

---

[528] Professor Hauser's description reads: **Background Syncing.** The Background Syncing feature allows you to continue to use an app while data related to that app that is stored on your smartphone [tablet] synchronizes with data stored elsewhere, such as on a remote computer. For example, you can access and edit data, such as the list of contacts on your smartphone [tablet], even as your phone [tablet] is sending data for those contacts to your work computer. Without this feature, you would have to wait to use an app, for example the contacts app, while the data for the app is synchronizing with a remote computer, and that wait may be long or short. Hauser Report, at ¶74.

[529] Hauser Report, at ¶74.

[530] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Chase Report, at ¶¶ 192-193.

[531] Professor Hauser's description reads: **Universal Search.** Universal Search lets you use a single search to find information from different sources of information, for example data stored on your smartphone [tablet] as well as information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find good results tailored to each source. For example, when you type "George" in a single search box, the feature searches the Internet for "George," which might yield web pages about George Washington, and at the same time searches for "George" stored on your smartphone [tablet], which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files. Without Universal Search, you would have to

accurately describe the search enabled by the patent – a search using a plurality of "heuristics" to find information on both local storage media and the Internet.  Further, based on his description, respondents may not understand that searching multiple sources on the device (*i.e.*, locally), such as email, Contacts, Calendar, music, etc. does not, according to Apple's allegations, infringe the '959 patent.[532]  In addition, Professor Hauser's description wrongly suggests that in order to search the Internet, one would have to do so "in a browser," and in order to search each application, such as Contacts or Calendar, the user would have to do so separately in each application.[533]  I understand that searching the Internet and the local applications could still be performed without having to separately open the browser and each application, such as by using a single search box and separate options to trigger a local search or an Internet search.

211.   Professor Hauser's description of the '760 patent also is problematic.[534]



[535]  Instead, Professor Hauser informs the user that

---

separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application. Hauser Report, at ¶74.

[532] Rinard Report, at ¶ 527.

[533] As discussed previously, I understand that searching the Internet and an application could still be performed without having to separately open the browser and each application through its alternative which uses of a single search box with a single field to enter the search term and separate options to trigger a local search or an Internet search.

[534] Professor Hauser's description reads: **Missed Call Screen Management.** The Missed Called Screen Management feature allows you to return a missed call or respond to the caller by listing the missed calls and providing you with two interactive areas to take further action. If you touch one area, such as the picture of the missed caller, John Doe, you call John Doe back. If you touch the other area, such as John Doe's name or phone number, then the feature takes you to a new screen that displays all of John Doe's contact information. From the new screen, you can call John Doe, text him, or email him. Without two areas you would have to remember to use different gestures to take different actions—like tapping John Doe's entry on the missed calls list to call him back but swiping his entry to view his contact information. Hauser Report, at ¶75.

[535] This screen would not fully block the initial screen.  *See* Cockburn Report at 187, ¶ 573 conceding that a partial screen "that does not completely obscure the call log list" does not infringe.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

he "would have to remember to use different gestures," suggesting to the respondent that the alternative requires additional effort or burden over the patented functionality.

212.    Professor Hauser's description of the '721 patent (Image Unlock) is biased, as it suggest to the respondent that the alternative functionality is clearly inferior to the patented functionality.[536] Telling respondents that the non-infringing alternative "may make unintentional unlocks more likely" is misleading, especially because Apple has provided no basis for such a statement.[537] Further, even if true, it does not provide respondents adequate information to be able to make an informed decision regarding the impact of this shortcoming, such as the probability that the alternative would, in fact, increase unintentional unlocks.  Further, he only identifies one of the many alternative approaches to unlocking the device, leaving respondents with an incomplete understanding of the many alternatives available.[538]

213.    Professor Hauser's description for the '172 patent fails to properly distinguish the incremental benefit associated with the patent.[539] Professor Hauser's description leads the

---

[536] Professor Hauser's description reads: **Slide to Unlock.** The Slide to Unlock feature prevents unintentional unlocks by unlocking your tablet only when you slide an image, using one continuous motion, from a specific spot on the lock screen to another specific spot on the screen. Without this feature, you would have to unlock your device using other techniques, for example by swiping the lock screen from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely. Hauser Report, at ¶76.

[537] Rebuttal Expert Report of Saul Greenberg, Ph.D., Regarding Noninfringement of the Asserted Claim 8 of U.S. Patent No. 8,046,721, September 13, 2013, at 76.

[538] For example, the Galaxy SIII has a "ripple unlock" that is not described.  Furthermore, Professor Hauser failed to survey any users on the accused functionalities of the Captivate Glide, Exhibit II 4G, Galaxy S II, Galaxy S II Skyrocket, and Galaxy S II Epic 4G Touch devices.  Dr. Hauser only surveyed tablet users on screen unlocking (i.e., the keyguard UI), which is not an accused feature for any of these devices.  Apple only accused these products of infringing the incoming call functionality, and sliding to view missed calls/texts, but did not accuse screen unlocking (i.e., the keyguard screen).  Therefore, even if the tablet survey results were applicable to smartphones, Dr. Hauser's survey results are inapplicable to many of the accused products.  See Rebuttal Expert Report of Saul Greenberg, Ph.D., Regarding Noninfringement of the Asserted Claim 8 of U.S. Patent No. 8,046,721, ¶ 196.

[539] Professor Hauser's description reads: **Automatic Word Correction.** As you type, your smartphone [tablet] displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. The Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday." Without this feature, pressing space or period would retain your original text, "birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself. Hauser Report, ¶74.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

respondent to believe that without the '172 patent, there is no way to have any automatic word correction feature on the device.  This is not the case. One alternative that was available to Samsung was very similar to the patented functionality except that the suggested text is displayed in the text area as the user is typing. With this alternative, a separate box displays both what was actually typed and the suggested text. The user could select what was actually typed or could retain the suggested text in the text area by selecting it or by pressing the space key or a period.  Another problem with Professor Hauser's description is that it does not acknowledge that the feature described in the '172 patent might actually choose an unintended alternative without the user noticing.

214.    By casting the alternatives to the patented functionalities in a negative light, Professor Hauser exposes survey respondents to a presentation of those alternatives that differs greatly from what they might be reasonably expected to encounter in the marketplace.  In reality, if Samsung were required to design-around the patented features and consumers were to become aware of the non-infringing alternatives, the features would have, in all likelihood, been presented by Samsung in far more flattering terms.  As noted above, Professor Hauser descriptions consistently highlight what would be missing without a feature.  In practice, Samsung would not highlight relative disadvantages and instead focus on the benefits provided by the alternatives to the patented functionalities. For example:

- The alternative to "Quick Links" can be described in terms of its ability to identify phone numbers, emails and locations that allow users to directly initiate a phone call, open a webpage or pull up a destination on a map.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- The alternative to "Background Syncing" could be described in terms of providing the ability to synchronize emails and contacts without describing precisely when, for example, a user's remote computer is updated.

- The alternative to "Universal Search" could be described in terms of providing search capabilities from a homescreen shortcut that allow users to search either the internet or, separately, the contents of their device.

215.    These are just illustrative examples.  There are many ways that Samsung could provide descriptions of the functionalities at issue without detracting from the phone's or tablet's capabilities.

216.    The flaws associated with Professor Hauser's inaccurate and biased descriptions of the patented features are magnified by a presentation of the patented features that serves as a highly concentrated but wholly unrealistic advertising campaign for the patented features.  The video descriptions of the features, including the patented features, amount to short television commercials unlike anything actual consumers might reasonably be expected to encounter in the actual marketplace.  As I described above, my analysis revealed no more than negligible levels of attention or focus regarding these functionalities on the Samsung website, Samsung television commercials, media reviews, or consumer reviews.  Thus, the survey artificially enhanced the respondent's awareness of the features, potentially making them more desirable than they would have been to actual smartphone and tablet purchasers.

**B.     Professor Hauser Relies on an Erroneous Assumption to Estimate the Number of People who Purchased the Accused Devices Because of Apple's Patented Technology**

217.    Dr. Velturo's damages estimates hinge on estimates provided by Professor Hauser reflecting the extent to which sales of the accused devices depended the patented

features.[540]  The estimates are captured in Professor Hauser's willingness to buy calculations.[541]

Specifically, Professor Hauser calculates a "baseline" willingness to buy share for a given phone

and a "but-for" willingness to buy share for that same phone without some combination of the

patented features.  The difference between the baseline and "but-for" shares, according to

Professor Hauser, represents Samsung customers whose purchase of the accused devices

depended on the associated patented features.

218.    These willingness to buy calculations are informed by the collection of two types

of choice responses from survey respondents.[542]  In taking the surveys, individual respondents

face 16 choice tasks with two choices each.[543]  The first is an "internal choice" for which they

pick among four hypothetical configurations of Samsung smartphones or tablets (designed to

mimic some Samsung phones (or tablets) available during the damages period at roughly the

prices at which those phones (or tablets) were sold).[544]  Immediately after respondents make the

"internal choice" they are presented with a second "external choice" or "outside option choice"

in which they indicate whether or not they would buy the smartphone or tablet they selected in

their previous response at the indicated price.[545]

219.    The language used by Professor Hauser, however, is extremely difficult to

interpret:

> In answering this question, you may wish to consider the availability of other
> smartphone [tablet computer] options in the market that may influence your
> purchase decision, including smartphones [tablet computers] by other
> manufacturers or other Samsung smartphones [tablet computers]. Given the

---

[540] Vellturo Report, at 5-6
[541] Hauser Report, at 56-62.
[542] Hauser Report, at 7-17.
[543] Hauser Report, at 17.
[544] Each respondent is presented with 16 choice screens. Hauser Report, at 17.
[545] Hauser Report, at Exhibit E.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Samsung smartphone [tablet computer] you chose as your most preferred among the alternatives shown, would you buy it at the indicated price?[546]

220.    Because Professor Hauser's survey does not reveal what caused a respondent to select the outside option, it is not appropriate to assume, as he does, that it was solely because of the absence of a patented feature.   For example, consider a respondent who answers in the survey that s/he is willing to buy the "baseline smartphone" for $199 with a 4.8 inch screen that includes the entire set of product features described in the survey.   If that respondent answers that s/he is unwilling to buy the "baseline smartphone" for $199 with a 4.8 inch screen if one of the patented features is removed, that consumer is considered "unwilling to buy" due to the patent feature removal.

221.    However, the outside option that is described in the survey includes "other smartphone options in the market… including…other Samsung smartphones."[547]   Thus, this includes the "baseline smartphone" that the respondent previously selected.  It can also include the respondent's actual smartphone.   Indeed, it can also include improved smartphones available in the marketplace that were not available when the respondent purchased his or her original smartphone. Thus by definition, the respondent would be better off picking the outside option when faced with a phone with missing features—even if the features were not particularly valuable.

222.    Rather than reflecting the choice that consumers would make in the "but for" world in which the patented features were removed from all accused Samsung smartphones and tablets, the "outside option" construct used by Professor Hauser essentially allows the respondent to choose between a Samsung product without the patented features and the identical Samsung product with the patented features.  This experiment tells us nothing about whether the same

---

[546] Hauser Report, at Exhibit E, at 21; and Exhibit F, at 18-19.
[547] Hauser Report, at Exhibit E, at 21; and Exhibit F, at 18-19.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumer would have bought a Samsung phone with a few features removed if the Samsung

phone that they actually purchased was not available.

### C.   Professor Hauser's Analysis Generates Predictions That Differ Substantially From Actual Marketplace Outcomes

#### 1.   Predictions Differ Substantially from Actual Marketplace Outcomes

223.   The unreliability of Professor Hauser's choice predictions are revealed when

measured against the actual composition of Samsung's smartphones sales.  Exhibit 54A

summarizes an extension of the choice exercises conducted by Professor Hauser on

smartphones.[548]  In particular, Exhibit 54A reflects predicted purchase shares associated with a

choice among four leading Samsung smartphones: the Samsung Galaxy S II, Galaxy S III,

Galaxy Note II and Galaxy Nexus.  The prediction shares reflected in Exhibit 54A use the same

methodology employed by Professor Hauser in developing his willingness to buy estimates and,

as a result, reflect Professor Hauser's estimates of the underlying preferences respondents have

for various configurations of Samsung smartphones.[549]

224.   As Exhibit 54A shows, the predictions generated by Professor Hauser's analysis

differ greatly from actual marketplace outcomes.  ███████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[548] Exhibit 54B presents a comparable summary of tablet predictions, and the results are similar.  In particular, he does a poor job distinguishing between the Galaxy Note 10.1 and the Galaxy Tab II 10.1
[549] Details underlying these calculations are described in the Hauser Exhibits.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████████ [550]

This highlights the lack of reliability of Professor Hauser's analysis for purposes of predicting the purchase decisions made by those that bought the accused devices.

### 2.    Predictions Differ Substantially from Survey Respondent Ownership

225.    The unreliability of Professor Hauser's choice predictions are further revealed when measured against respondents' own actual purchase history.  Among the respondents in Professor Hauser's survey that report owning the four smartphones reflected in Exhibit 54A, 61.5 percent own the Galaxy S III, 19.4 percent own the Galaxy Note II, 9.7 percent own the Galaxy S II and 9.4 percent own the Galaxy Nexus. ████████████████████████

████████████████████████████████████████████████████████

███████████████████    This further demonstrates the lack of reliability of Professor Hauser's analysis for purposes of predicting the purchase decisions made by those that bought the accused devices.

### 3.    Professor Hauser's Survey Generates Implausible Results

226.    The unreliability of Professor Hauser's analysis is further demonstrated in the implausible results related to the amounts respondents are purported to value the features incorporated in the survey.  In Exhibit 55A, I summarized the willingness to pay price premiums associated with each of the individual smartphone features in the context of a phone with a price of $149.[551]  As this exhibit shows, Professor Hauser's analysis predicts that the amount consumers would be willing to pay for the six patented features on an individual basis totals $358.  The corresponding figure for the full set of features in his analysis is $1,125.  This amount is over seven times greater than the price of the reference phone.

---

[550] Note that 71.4/20.4 = 3.5.
[551] Professor Hauser's willingness to pay price premiums depend on the device prices incorporated in his analysis. *See, e.g.,* Hauser Report, at Tables 9 and 10 and the accompanying discussion.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

227.    In Exhibit 55B, I similarly summarized the willingness to pay price premiums associated with the tablet features included in his survey at a price of $299, ███████████ ████████████████████████████████████████████████████████████████ ███████████████████.[552] According to Professor Hauser, the amount consumers would be willing to pay for all the patented features, on an individual basis, totals $246.  The corresponding figure for the full set of features in his analysis is $1,079, almost three times the price of the tablet.

228.    █████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████ I show this in Exhibit 56.

229.    The willingness to pay price premiums estimated by Professor Hauser are even more implausible upon consideration that the totals do not reflect the individual willingness to pay price premiums associated with the hundreds of other features included in the accused smartphones and tablets.  These additional features include: 1) product features that Samsung heavily promoted to consumers, 2) numerous other product attributes that Samsung discussed in its marketing and promotional materials, and 3) hundreds of functionalities described in

---

[552] Exhibit 55B.
[553] APLNDC-Y0000025460-574, at 499.
[554] APLNDC-Y0000025460-574, at 499.
[555] APLNDC-Y0000025460-574, at 499.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Samsung's product manuals.[556] By comparison, the total price premiums from these excluded features would be expected to be vastly higher than the limited, granular features tested by Professor Hauser in his conjoint study.

230.    While Professor Hauser's analysis does not provide a basis by which to estimate the price premiums for all of these excluded features, analysis provided in an earlier case involving Apple and Samsung ("Case I") provides a basis by which to estimate small portion of related features.  In that case, Professor Hauser conducted analysis that provided a basis for estimating willingness to pay price premium for the following features including: rubberband effect/tap to re-center after zoom; auto switch; 16GB or 32GB of additional memory; tethering; micro USB; HDMI; 8 MP camera and HD video recording (incremental premium from 3MP Rear Camera with Standard Video with Autofocus); and, a 2MP front camera.[557]

231.    The willingness to pay price premiums for these Case I features estimated by Professor Hauser exceed $308.[558] Combining the price premiums from Professor Hauser's Case I and Case II features suggest a total price premium for just the tested features of more than $1,547.[559] This suggests that the individual price premiums for just a very small subset of features exceed the price of the benchmark phone by nine times. Again, the amount does not reflect the individual price premiums for hundreds of other features that were not tested by Professor Hauser, including features that Samsung's internal marketing documents, third party market research, and customer and media reviews suggest are among the most important to consumers.  In sum, these price premiums show the implausibility of the Hauser survey results.

---

[556] *See, e.g.*, the previous discussion of advertising, professional reviews, and consumer reviews.
[557] See the Expert Report of John R. Hauser, March 22, 2012 for further details.
[558] Exhibit 55A.
[559] Exhibit 55A

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### 4.    Professor Hauser's Analysis Suggests that Demand for Each of the Individual Patented Features Dramatically Exceeds the Demand for Even the Most Popular Apps

232.    Professor Hauser's predicted demand for the patented features is not credible when compared to the actual demand for the most popular Android apps.  Professor Hauser bases his price and sales predictions on underlying estimates of the preferences that individual survey respondents have for each of the individual product features covered in his survey.  Those estimates allow one to derive "demand curves" for the individual features which specify the number of respondents that would buy the feature at certain prices given the assumption that the features were sold on a stand-alone basis.

233.    A vibrant marketplace for Android apps, which are sold to Samsung and other Android users on a stand-alone basis, provides a natural comparator.  I use estimates of the lifetime dollar and unit sales of the 20 most popular apps in the Google Play store.[560]  In Exhibit 95, I summarize the lifetime sales estimates of the most popular paid apps in the Google play store.[561]  Exhibit 57 illustrates the demand for the patented features, as implied by Professor Hauser's analysis, relative to estimates of the actual lifetime sales of the 20 most popular paid Android apps.   In this exhibit, I also depict the demand curves derived from the Hauser analysis for each of the patented features relative to the historical sales figures of the most popular apps.

234.    Exhibits 57A to 57C cover the demand curves for the individual features in Professor Hauser's smartphones analysis and Exhibits 58A to 58C cover the demand curves for the individual features in Professor Hauser's tablets analysis. There are three exhibits each, reflecting that each set of demand curves depends on the three prices for the devices as considered by Professor Hauser in his survey.  As these exhibits demonstrate, Professor Hauser's

---

[560] The Top 20 most popular apps are based on lifetime downloads from launch through May 2013, using Priori data.  See Exhibit 95.
[561] In particular, I have focused on paid apps (instead of free apps or apps that generate "in app" revenues).

analysis suggests that demand for each of the individual patented features dramatically exceeds the demand for even the most popular apps.

235.    Consider the '959 patent (Unified Local & Internet Search) incorporated on accused Samsung smartphones priced higher than $149.  Professor Hauser's analysis predicts that the median survey respondent would be willing to pay $47 for this feature.  ██████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████ ██ ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████ ██

236.    Furthermore, Professor Hauser's analysis suggests that over 30 percent of survey respondents would be willing to pay $150 for Universal Search.  ████████████████████

████████████████████████████████████████████████████████████

████████████████████    Professor Hauser's analysis suggests that demand for the other asserted patented features on smartphones is even greater.  Exhibit 58 presents quantitatively similar results as they relate to demand for the patented features incorporated in Professor Hauser's tablet survey.  Together, these exhibits illustrate a level of demand for the patented features that is implausible.

## VII.   Lost Profits are not Warranted Because there is No Discernible Link between the Patented Functionality and Sales

237.    As explained above, many factors other than operating system software contribute to smartphone and tablet purchase decisions.  Among the elements that impact consumer choice

---

[562] Exhibit 57C.
[563] Exhibit 57.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

in the smartphone marketplace are: (1) characteristics and behavior of the carrier; (2) operating system characteristics, including the integration with the device and the availability of applications and other ecosystem characteristics enabled by the operating system; (3) marketing efforts to enhance brand reputation; (4) device-specific characteristics, such as capabilities, hardware characteristics, and physical characteristics; and (5) retail price.  Individual software product features generally do not rise to the importance and role of brand, carrier, price, and manufacturer marketing spending in driving sales.

238.    The functionality covered by patents-at-issue constitutes only a small part of the overall software functionality in the accused products, and software functionality itself represents just a portion of the features of the accused devices.  As such, the patented functionalities reflect only a very small share of the functionalities and benefits provided by the accused devices.  There is a general lack of interest in granular feature details and distinctions across phones, as elements like the allegedly patented functionality are not heavily promoted by Samsung and not emphasized in reviews.  In fact, the patented functionalities are rarely, if at all, addressed by Samsung third party media sources and customers in describing the benefits of the accused devices.  Thus, there are limited means by which consumers could explore and compare granular feature distinctions prior to purchase and there is limited evidence that consumers actually do so.

239.    Dr. Vellturo describes the benefits of the patented features, but does not disentangle those benefits from features not protected by the patents-at-issue.  He fails to independently examine all of the factors that contribute to "ease of use," a count of which Apple itself has indicated could be in the thousands.  Dr. Vellturo's conclusion that the asserted patents play an important role in demand is also based on an unsound analysis of qualitative document evidence, in which he equates broader references to product capabilities as evidence of demand

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

for the specific patented functionality.  Many of his references clearly identify features that are not infringing.  Moreover, Dr. Vellturo proffers no evidence that customers are even aware of (or value) the existence of many of the product features related to the patented elements at the time of purchase other than through his flawed qualitative summary of the evidence.  Dr. Vellturo, himself, provides no clear link between the patents-at-issue and customer demand for Samsung's accused products.

240.    Further, Dr. Vellturo fails to provide any independent assessment of the weight consumers place on the patented functionalities relative to the rest of the benefits provided by the accused devices.  He relies only on wholly unreliable predictions provided by another expert, but these predictions do not provide any meaningful basis to determine if sales of the accused devices depend in any way on the patented functionalities.  Professor Hauser's conjoint survey was not designed in a way that allows one to accurately determine when, if ever, consumers that purchased the accused phones might have altered their purchase decision had the phone not incorporated the patented functionality, making it wholly unsuitable for marketplace predictions. It includes overly broad descriptions of the patented functionalities, a misleading statement regarding "outside option" alternatives, and advertises features of which consumers were likely previously unaware.  All of these errors inflate the reported value of the patents-at-issue.

241.    Based on my review of the evidence, there is no discernible link between the patented functionalities and sales of the accused products.  Accordingly, lost profit damages are not appropriate.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## VIII.   Critical Flaws Further Inflate the Vellturo Report Lost Profit Figures

242.    Setting aside the concern that lost profits are not appropriate in this case, there are important errors in Dr. Vellturo's lost profit calculation methodology.  Dr. Vellturo's lost profits damages calculation has four major components, each of which is significantly flawed.   His blackout period is baseless and overstates harm; his reliance on the Hauser flawed conjoint analysis significantly inflates damages; his "Mor-Flo" analysis (*i.e.* analysis of Samsung incremental sales that were diverted from Apple) does not adequately consider the drivers of demand and other options available to Samsung; he overstates Apple's applicable incremental profit rate; and he ignores Apple's actual supply limitations.  I discuss each of these below.

### A.    Blackout Period

243.    First, Dr. Vellturo assesses a time period during which Samsung would have been out of the market in order to engineer around the infringement accusations (except for one patent).  He includes various calculations in his report with 1-month and 4-month blackout periods as examples,[564] stating that should "…a different duration of these blackout periods [apply], my analyses can be adjusted accordingly."[565]  Dr. Vellturo considers all accused units produced during this "blackout" period starting in February 2012 to be available for the lost profits calculation.[566]

244.    This "blackout" period is, however, simply "hold-up" damages related to marketplace exclusion, not Apple lost profits from displaced units from use of the patented-invention.  It is unreasonable to believe that Samsung would effectively exit the market for one to four months.  Samsung technical experts confirm that non-infringing alternatives to the claimed features could be implemented in ███████████████████████████

---

[564] Vellturo Report, at 113-4.
[565] Vellturo Report, at 114.
[566] Vellturo Report, at 113-4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████[567] Samsung would thus be able to avoid being off the market for a significant amount of time.

245.   Furthermore, the Vellturo analysis assumes that during this blackout period no Samsung customers would wait for a redesigned Samsung product to come out.  Many phone buyers delay purchase until newer versions of phones are released.[568]  Apple deponents have testified that people will wait to buy until new products launch.[569]  Buyers of the accused Samsung products clearly preferred that phone to the alternatives in the marketplace.  Thus, many buyers likely would still have waited for the redesigned Samsung products to launch, even if they had to be held off the market for a number of weeks.  Even so, carriers typically hold

---

[567] 

Apple sales data show this trend.  For example, the iPhone 4S was released in October 2011 – ███████████████████ The iPhone 5 was released in September 2012, in ████████████████████████████  *See* Exhibit 65C. "The iOS decline in the second quarter aligns with the cyclicality of iPhone," says Ramon Llamas, Research Manager with IDC's Mobile Phone team. "Without a new product launch since the debut of the iPhone 5 nearly a year ago, Apple's market share was vulnerable to product launches from the competition. But with a new iPhone and revamped iOS coming out later this year, Apple is well-positioned to re-capture market share." http://www.idc.com/getdoc.jsp?containerId= prUS24257413 (viewed 9/12/2013).

[569] For example, Apple's Greg Joswiak testified that there is an "anticipation to build up the demand" before the release of a new iPhone, and that Apple generally sees lower sales for the quarter before they launch a new phone than the quarter that they launch a new phone. Deposition of Greg Joswiak, July 9, 2013, at 99-102.  He also says that, for many consumers, wanting to get the new iPhone is a factor in their decision between smartphones. Deposition of Greg Joswiak, July 9, 2013, at 50-52.

many weeks of inventory on hand, so any interruptions from Samsung's redesign may have been mitigated.[570]

246.     Moreover, Dr. Vellturo compounds the "hold-up" amount by having Samsung commence its "blackout" during a period where it can collect more damages (after notification) rather than many months before, upon the point of first infringement—in effect rewarding Apple for its failure to notify Samsung of its alleged infringement.  Simply shifting the calculation of this "blackout" period to the dates of first infringement at patent-issuance significantly reduces Dr. Vellturo's blackout "lost profits."[571]  Additionally, reducing the amount of time it would take to remove and replace infringing elements further decreases these amounts.  In Exhibit 53, I illustrate the differences in the blackout "lost profits" figures from changes in Dr. Vellturo's assumptions.

## B.     Conjoint Flaws

247.     For the period subsequent to the blackout period, Dr. Vellturo uses the estimates from Professor Hauser's conjoint study to approximate the Samsung units that were sold but would not have been sold in the "but for" world in which Samsung had implemented design-arounds.  Dr. Vellturo acknowledges that for the '721, '172 and '760 patents, "alternatives have actually been introduced and products successfully sold," so lost profits are not assessed based

---

[570] I have been advised that carriers would have been entitled to sell any "infringing" inventory they had already received prior to the notification date, and that these units would not be the subject of damages to Samsung.  Carrier inventory practices may have resulted in limited, if any, disruptions in the availability of Samsung phones during the design-around period, especially since the existing inventory could be sold while Samsung prepared its alternatives.  *See, e.g.*, A Q3 2011 Gartner analyst report indicated that distribution channels were building-up inventories of smartphones that were anticipated to last at least through the following quarter.  See, e.g., http://phandroid.com/2011/11/15/gartners-q311-smartphone-report-android-sells-more-than-half-of-global-market-share-samsung-biggest-oem/ (viewed 9/12/2013).  Samsung and Android customers are also generally aware that they get free updates to the operating system. *See, e.g.*, https://support.google.com/googleplay/answer/2589733?hl=en (viewed 9/12/2013).
[571] I understand that Dr. Vellturo's approach is inconsistent with the law, where non-infringing alternatives are examined at the point of first infringement, not the notice date.  *See e.g.*, *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1347 n.3 and (Fed. Cir. 1999) *Power Integrations, Inc. v. Fairchild Semiconductor Int'l.*, 711 F.3d 1348 (Fed. Cir. 2013)

on those patents.[572]  Thus, the entirety of the lost profits after the blackout period draws just from demand for the '414, '647 and '959 patents, and is premised on the Hauser output for those patents.

248.   Using Hauser's survey results, Dr. Vellturo projects lost units of roughly ▮ to ▮ for each accused product.[573]  As mentioned above, these figures are implausible and result from numerous study design flaws which render them useless.  Nevertheless, Dr. Vellturo uses them as the sole basis for his computations.[574]

## C.   Vellturo's Mor-Flo Approach Overstates Apple Lost Sales

249.   After estimating accused units that Samsung would have lost from the absence of the patents-at-issue in the products, Dr. Vellturo attempts to determine the percentage of those units which Apple would have sold.   To do so, Dr. Vellturo uses a "Mor-Flo" analysis.

250.   The "standard" Mor-Flo approach is an improper tool for this analysis, here, given the complex and differentiated nature of the accused devices.  When some products are much closer substitutes for each other than are other products, applying a pro-rata distribution in the absence of one to the others can be illogical.  For example, Dr. Vellturo's calculation ignores the fact that, having expressed certain preferences (*e.g.* a preference for an Android device) by choosing an accused Samsung product, a disproportionate share of the Samsung consumers in the "but-for" world likely would have instead purchased an alternative device that most resembled their original choice (*e.g.* another Android product) rather than an Apple device.[575]

---

[572] Vellturo Report, at 115.
[573] Vellturo Report, at Exhibit 13.
[574] Dr. Vellturo applies estimates for the '721 patent from Professor Hauser's tablet survey to smartphones. Vellturo Report, at 104; Hauser Report, at Exhibit N2.
[575] *See, e.g.*, Yee, Dahan,  Hauser , and Orlin, Greedoid-Based Noncompensatory Inference, *Marketing Science* (2007).   Brand can be an example of a "noncompensatory" feature that influences preferences for some consumers, and there is nothing in Vellturo's "Mor-Flo" analysis or Hauser's conjoint to help resolve this here.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

251.    This concern is illustrated in the classic "red bus/blue bus problem."[576] Suppose one has a choice of transportation between a train, a red bus and a blue bus and that half of the people take the train and half take one of the buses. Suppose, further, that the people who take the bus are indifferent to the color of the bus, so they distribute themselves equally between the red and the blue buses.[577] Suppose now the blue bus service is discontinued.  One logically might expect that all the people who used to take the blue bus would take the red bus instead, maintaining the 50% split between use of the train and bus.

252.    However, using a "Mor-Flo" style approach, one would predict that over 66% of the bus riders would instead take the train.  This is because the "Mor-Flo" style approach ignores the fact that consumers view the two buses as closer substitutes for one another than they view the train.  This critique applies similarly to the straightforward application of a "Mor-Flo" analysis to Apple and Samsung products.  If consumers view Samsung products to be more similar to some other Android devices than they are to Apple products, one would expect that removing Samsung products from the market place would lead to a disproportionate number of consumers switching to other Android products rather than to Apple products. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮

▮▮▮ ▮

---

[576] *See, e.g.*, Joel L. Horowitz and N.E. Savin, "Binary Response Models: Logits, Probits, and Semiparametrics," *The Journal of Economic Perspectives*, Vol. 15, No. 4, 2001.  This is a simple requirement that the odds of choosing alternative j over alternative k should be independent of the choice set for all pairs j,k. This property is often referred to as the axiom of independence from irrelevant alternatives. Whether or not this assumption is reasonable (and other alternatives are indeed irrelevant) depends on the nature of the choices.

[577] The choice probabilities of p = (.50, .25, .25) would be consistent with expected utilities of h = (log2, 0, 0).

[578] *See, e.g.,* APLNDC630-0001350971, at 038, 041, which is a 2012 Q4 Apple study of smartphone owners ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮   *See, e.g.,* APLNDC630-000127665, at 683, a January 2011 report which ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

253.    Dr. Velturo does not explain which specific Apple products would be sold in place of the various accused products.[580]   For example, consider the Samsung Note II which has a larger screen than any Apple product and uses a stylus unlike any Apple product.  This product was dubbed the "ultimate anti-iPhone" by cnet.com,[581] detailing the respects in which the product was differentiated from the iPhone.  The "Mor-Flo" approach effectively assumes that, if Apple's overall market share in the smartphone market (absent Samsung) is 40%, removal of the Samsung Note II from the marketplace would lead to 40% of the Note II buyers instead purchasing an Apple product.  Dr. Velturo fails to address which Apple product would replace a Note II.  Similarly, he does not identify specifically which Apple product would sell in place of less expensive base Nexus phones, which are purchased by customers that want a base Android experience, or the Stratosphere and Transform Ultra which include sliding QWERTY keyboards.  Dr. Velturo provides no basis to assume that a large percentage of customers would, in place of those products, prefer a closed-system Apple touchscreen phone.[582]

254.    This is, in part, because Dr. Velturo does not consider price and product characteristic differences between products.  In Exhibit 59, I list the accused products, their subsidized prices, the Apple product with the closest price, and key differences between the

---

[580] *See, e.g.,* SAMNDCA630-06635592-667, at 596, 599, which indicates that prior to the launch of the iPhone 5, Samsung had devices that offered various features that were absent from Apple devices, including LTE capability, larger displays with 16:9 aspect ratios and in cell touch capability, camera capabilities such as panorama shot, photo during video and 8 megapixel camera, turn by turn navigation, and the ability to reject a call with a text message.
[581] http://reviews.cnet.com/smartphones/samsung-galaxy-note-2/4505-6452.html (viewed 9/12/2013). According to cnet.com's Galaxy Note II review, "with its sheer size, its out-of-the-box stylus, and a mountain of customization options, the Note 2 is about as far from the much simpler, smaller iPhone as a premium smartphone can get."
[582] Apple's own analysis of competitive products also focuses on ███████████████████████. For example, it analyzed the competitive tablet offering in the marketplace, considering:

███████████████████████████████████████████████████████████████████ *See e.g.*, APLNDC630-0000377874-76; APLNDC0001509495; APLNDC-0001509480.  Similarly, a February 2012 Apple analysis of the competitive smartphone offerings in the marketplace analyzed ██████████████████████████████████████

APLNDC630-0000127363-395, at 380, 382, 384, 386, 388, and 390.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Samsung and corresponding Apple device.  As the exhibit shows, the Apple iPhone in many cases is not a clear substitute in light of these product differences.  Although the competitive overlap between Apple and Samsung is prevalent at the "flagship level," the importance of the "Mor-Flo" assumption is particularly apparent when considering specific Samsung products.  In many cases, HTC and/or Motorola products would be closer substitutes.[583]

255.    These differences may explain various results from consumer surveys that Dr. Vellturo overlooks.  These suggest that Dr. Vellturo significantly overstates an appropriate allocation of sales to the remaining products:



- For example, a January 2011 Apple survey noted that ████████████ ████████████[584]  Dr. Vellturo, on the other hand, assumes that more than 21 to 55 percent of Samsung customers would buy (not just consider) an iPhone.[585]  This is in part because Dr. Vellturo's analysis ignores the importance of marketing and brand.  Moreover, there are strong feelings among many customers regarding Apple and Android.[586]  To some, Apple is positive and inspires immense brand loyalty.  To others it is negative.  As discussed above, there is a stark difference in certain preferences between Samsung and Apple

---

[583] *See, e.g.*, Exhibit 59.  *See also*, "Competitive Smartphone Keyboard Product Experience Evaluation," Jan. 16, 2012, SAMNDCA630-07320934-015; "Smartphone Competitive UX Evaluation T-Mobile," Nov. 20, 2011, SAMNDCA630-07419701-786; and Email from Sang Hung to Aaron Perkins, et al., Subject: "Product Experience Research Report: Competitive Product Experience – Galaxy SII, HTC Amaze abd LG G2x (T-Mobile)" SAMNDCA630-06683901-902.  In addition, although Apple offers its older products for lower prices, many buyers care about buying the newest phone.  So it is less clear that these will be adequate substitutes for those customers.  For example, the FY Q1 2012 iPhone Buyer Survey shows that ████████████████████.  APLNDC630-0000149470-605, at 481.  *See also*, APLNDC630-0000182457-593, at 472; APLNDC630-0001233246-405, at 258.
[584] APLNDC630-000127666, at 683.
[585] Vellturo Report, at Exhibit 15.
[586] As discussed previously, brand matters to many buyers.  The divide between Apple and Android is observed in a number of sources.  *See, e.g.*, SAMNDCA11086713-917, at 743;  http://www.10news.com/money/business/apples-ios-ease-and-elegance-vs-androids-flexibility-and-openness-071513 (viewed on 9/12/2013); and http://www.businessinsider.com/smartphone-survey-results-2011-4?op=1 (viewed on 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

customers, and many purchasers of Android products (through their actions) have

revealed insufficient interest in an Apple product.

- According to a 2012 Samsung survey of early Galaxy SIII customers, ████████

  ████████████████████████████████████████████████████████████

  ████████████████████████████████ █ ███████████████████████████

  ████████████████████████████████████████████████████████████

  ██████████████████████████████████ █ Yet Dr. Vellturo's

  "Mor-Flo" analysis assumes that many of these customers would switch to a

  phone with a much smaller screen size.[589]

- Apple products prior to September 2012 did not have 4G/LTE connectivity.[590]

  According to a survey conducted in the fall of 2011, 30 percent of Android

  purchasers chose "4G data service" as one of the "Most Liked Physical Features

  on Android Smartphones."[591]  Moreover, according to Apple's own FY Q2 2013

  iPhone Buyer Survey, ████████████████████████████████████████████

  ████████████████████████████████████████████████████████████

  ████████████████████████ █ ██████████████████████████████████

---

[587] SAMNDCA630-06701998-2014, at 004

[588] *See, e.g.,* ███████
███████████████████████████████████████████████ SAMNDCA630-06701995-97, at 95; ████████████████████ SAMNDCA630-
07750368-83, at 79; ████████████████████████████████████ SAMNDCA630-07710951-71, at 67.

[589] This is also inconsistent with the results of the Hauser survey, on which Dr. Vellturo relies.  The Hauser analysis
suggests larger screens are preferred to smaller screens among Samsung customers. *See* Hauser Report, at  57 and
Exhibit M1.

[590] *See, e.g.,* http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5.html (viewed 9/12/2013);
http://www.cnet.com/iphone-5/ (viewed 9/12/2013).

[591] SAMNDCA630-07556681, at 696.

[592] APLNDC630-0001233246-05, at APLNDC630-0001233260-61.  One author for cnet noted "Admittedly, one of
the biggest letdowns from the 4S' unveiling was the lack of 4G for Verizon and Sprint."
http://reviews.cnet.com/smartphones/apple-iphone-4s-64gb/4505-6452_7-35027108.html

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████

██████[593]

- Carrier-level differences also should have been more fully considered by Dr. Vellturo.[594]  For years, Apple failed to introduce products on various carriers. There are notable differences among the customers attracted to the different carriers.[595]  This evidence suggests that relative to all smartphone users, those enrolled in Boost, Metro PCS, Sprint, and T-Mobile are more concerned with plan characteristics and price than phone characteristics and would not switch at the rate Dr. Vellturo proposes.[596]  Accordingly, it is likely that fewer than 32 percent of enrollees in these plans "select a phone first, then a carrier," suggesting that Dr. Vellturo overstates the fraction of customers who would have purchased the iPhone device in the "but-for" world.[597]

- Dr. Vellturo uses market share data which has Apple store sales embedded in it. The sales at issue occurred at carrier stores, mass merchants, and electronics store

---

[593] APLNDC630-0001233246-05, at APLNDC630-0001233260-61.

[594] Dr. Vellturo writes that he "limits the share of units of Accused Products sold while iPhones were not offered by Sprint, T-Mobile, Metro PCS, and Boost that are subject to "Mor-Flo" allocation for lost profits consideration to 32%, based on market research which finds that 32% of smartphone buyers 'select a phone first, then a carrier.'" Vellturo Report, at Exhibit 14-C, Footnote 2.

[595] For example, the Google Wireless Shopper study indicated that 41 percent of customers considered the availability of no-contract plans to be important and 19 percent of customers switched to provider plans that offered the best deal. Google Wireless Shopper Study, April 2013, at 6,7.  (APLNDC630-0001504504-36, at 9-10.)

[596] Notably, and Metro PCS offer no contract plans; and Boost, Metro PCS, Sprint, and T-Mobile plans are less expensive than Verizon and AT&T. All of these plans offer unlimited data, while AT&T and Verizon discontinued unlimited data plans in March 2012 and July 2012, respectively.   http://www.boostmobile.com/why-boost/us-vs-them/ (viewed 9/12/2013); http://www.metropcs.com/metro/simpleplans (viewed 9/12/2013); http://www.sprint.com/landings/compare/index.html (viewed 9/12/2013); http://www.t-mobile.com/cell-phone-plans/individual.html (viewed 9/12/2013).
http://www.pcworld.com/article/230798/Verizon_to_Kill_Unlimited_Data_Plans_in_July.html (viewed 9/12/2013); http://online.wsj.com/article/SB10001424052970203986604577255532947217336.html (viewed 9/12/2013). Academic research also indicates that carrier is a generally more important factor to purchase decisions than characteristics of specific handsets. *See, e.g.* Chintagunta, Pradeep K., Hongju Liu, and Ting Zhu, "Wireless Carriers' Exclusive Handset Arrangements: An Empirical Look at the iPhone," NET Institute Working Paper #11-35, October 2011, at Table 7.

[597] Google Wireless Shopper Study, April 2013, at 8. (APLNDC630-0001504504-36, at 11.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

such as Best Buy.  What is relevant is not Apple's overall share (which is influenced upward by its 100% share at Apple stores), but instead Apple's shares at specific carrier and mass merchants.  Removing Apple's store sales ███████ ███████████████████████████████████ from the data, suggest much lower market shares in the other sales channels.[598]

256.    Moreover, nowhere in his report does Dr. Vellturo adjust for the fact that many customers would not have been aware of the features-at-issue at the point of purchase.   The survey results were based, in part, on a process which educated the respondents about the features and their benefits.  No such education occurs as comprehensively in the real world, where many buyers are not exposed to the particular granularity of the patents.  By leaving out the possibility that Samsung would provide the same phones with the features-at-issue disabled (a change many buyers would not have noticed), Dr. Vellturo significantly overstates how many buyers would switch to Apple.  Many buyers would have instead purchased the heavily marketed Samsung phone that was missing the allegedly infringing elements.

257.    As a result of many of the oversights described above, should the Court find lost profits to be appropriate for some units, Dr. Vellturo's approach is not reliable.  It ignores many marketplace realities and significantly overstates Apple's losses.

### D.    Dr. Vellturo's Incremental Profit Rates for Apple Are Overstated

258.    Dr. Vellturo calculates the profits that Apple would have achieved on its lost sales by multiplying his Apple lost sales estimates by an estimate of Apple's U.S. incremental profit rate. ████████████████████████████████████████████████████ ███████████████████████████████████  Dr. Vellturo calculated this for iPhones and

---

[598] *See* Consumer Intelligence Research Partners, "From Basic to Samsung to Apple," August 12 2013, at 4.

iPads separately, deducting Apple's iPhone and iPad sales and distribution expenses from worldwide gross profits.

259.    While Dr. Vellturo contends that he used his methodology for estimating iPhone and iPad incremental profits "in order to be conservative,"[599] he fails to mention that his U.S. incremental profit rate estimates are based on *worldwide* gross profit data and on *allocations of companywide, worldwide* sales expenses and distribution expenses.   He has provided no justification for his assumptions that his calculations approximate actual U.S. incremental profits.



260.    Although Apple refused to produce comprehensive U.S. profit documents,[601]

261.    In addition, even assuming that Dr. Vellturo fails to appropriately consider product mix in his determinations, it is not reasonable to assume that Samsung's smartphone sales mix (with ASPs that range from $0 to $299), would have been replaced with Apple's

---

[599] Vellturo Report, at 121.
[600] *See e.g.,* APLNDC630-Y00008911 - 16, at 13, which shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also* Exhibits 65A and 65B.
[601] *See* ORDER DENYING MOTION TO COMPEL AND MOTION TO ENFORCE, August 14, 2013, United States Magistrate Judge  Paul S. Grewal.
[602] *See* Exhibit 60.
[603] Exhibit 61.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

average product mix (that includes a number of $399 iPhone 5 models).  This assumption results

in an overstatement of Apple's but-for profitability, as ████████████████████████

████████████████████████████████████████████████████████████[604].

Similarly, Dr. Vellturo has unjustifiably inflated iPad incremental profit estimates by assuming

that in place of Samsung tablet sales (with ASPs of roughly $300 to $400),[605] Apple would have

sold a substantial number of higher priced (up to $829, for the 4G-enabled 64GB model) fourth

generation iPad models.[606] ████████████████████████████████[607].

      262.    Furthermore, the basis for many of Dr. Vellturo's opinions regarding ████████

████████████████████████████████████ Apple employee, Mark Buckley.  Mr.

Buckley admitted in his deposition, however, that he had not given thought to which expenses

were fixed or variable.[608]  In addition, given that Dr. Vellturo has treated Apple marketing



---

[604] *See, e.g.,* APLNDC630-Y00008911 - 16, at 13, which shows that Apple expected to generate ████████████████
████████████████████████████████████████████████████  In addition, while Dr.
Vellturo states that "Apple's iPad not only competes with Samsung's tablets but also competes with 'hybrid phone-
tablet devices,' often referred to as 'phablets,' such as the Galaxy Note," he has ████████████████████
████████████████████████  *See, e.g,* APLNDC630-0001666580-92, at 82.
    See Exhibit 26E.
[606] *See, e.g.,* APLNDC630-0001666580-92, at 82, which shows that Apple expected to generate ████████████
████████████████████████████████████████████████
    *See* Exhibit 63.
[608] Vellturo Report, at 121.  According to the Buckley deposition:
      Q. A cost or an expense can be fixed and indirect; correct?
      A. I don't think of it in these ways, so . . .I don't really think about fixed or variable either, so . . .
      (Deposition of Mark Buckley, July 9, 2013, at 87.)
Mr. Buckley also testified,
      When I -- when I work with business lines and, you know, all the people I've worked with in the company,
      we talk about expenses. We talk about what they represent. What we don't do is say, hey, is that fixed, is
      that variable, is that direct or indirect. We just don't do that. (Deposition of Mark Buckley, July 9, 2013, at
      99.)

expenses as entirely non-variable, his incremental profit calculation appears to be not only speculative, but also overly aggressive.[609]

263.    In Exhibits 60 and 61, I correct for some of these errors, ███████████████

█████████████████████████████████████████████████████████████████

███████████████ ██

**E.    Dr. Vellturo's Capacity Analysis Fails to Account for Apple Supply Shortages**

264.    According to Dr. Vellturo, "through a combination of Apple's excess manufacturing capacity and inventory on hand, Apple had the ability to make and sell the additional iPhones and iPads that would have resulted from capturing sales lost to Samsung."[611] Specifically, Dr. Vellturo assumes that Apple could have made all the incremental sales that are implied by his "Mor-Flo" analysis and that any increase in production that would have been necessary would not have impacted Apple's incremental costs.

265.    While Dr. Vellturo's analysis is based on the assumption that Apple could have seamlessly increased production to make the additional sales implied by his lost sales analysis, evidence from the press, earnings calls, and internal Apple documents shows that Apple actually experienced persistent and acknowledged shortages in iPhones and iPads over the damages period.  In November 2011, more than a month after the October 2011 launch of the iPhone 4S, the Wall Street Journal reported that "the three largest wireless carriers are still struggling to keep up with customer demand," with wait times ranging from two to three weeks for the iPhone

---

[609] Dr. Vellturo appears to believe that even though firms undertake marketing activities to compete for incremental sales in the real world, they would split Samsung's lost sales in the "but-for" world, without incurring additional marketing expenses. *See* Vellturo Report, at 111.
[610] ███████████████████████████████
[611] Vellturo Report, at 110.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

4S.[612]  Shortages were also reported at Best Buy[613] and the Apple store.[614]  Following the launch

of the iPhone 5, Apple again was unable to meet demand for the recently launched iPhone

model.  The New York Times reported that, according to a financial analyst, "[t]he scarcity of

iPhone 5s is the main reason Apple's shares…have tumbled nearly 10 percent over the last

several weeks" and that the scarcity could "result in lost or delayed sales."[615]

266.    iPhone 5 shortages were driven, in part, by the complexity of the device that led

to delays in the supply chain.  According to the Wall Street Journal, Hon Hai, the parent

company of the iPhone manufacturer Foxconn indicated that the iPhone 5 is the most

complicated device that it has ever assembled,[616] and Hon Hai was unable to meet demand

because the complex design made it difficult to meet quality standards.[617]  Production difficulties

have been linked to employee shortages at Hon Hai, limiting its ability to ramp up,[618] the metal

casing's susceptibility to scratching during all phases of production, which substantially slowed

production,[619] and supply shortages for the thinner display in the iPhone 5 and the baseband chip

for LTE.[620]

267.    Similarly, Apple was routinely unable to meet demand for newly launched iPad

models.  Shortages for the iPad 2 persisted for several months following its launch in March

2011 due to difficulties filling production lines at manufacturing plants in China and shortages of

---

[612] http://blogs.wsj.com/digits/2011/11/17/would-be-iphone-customers-still-facing-weeks-long-waits/ (viewed 9/12/2013).
[613] http://news.cnet.com/8301-13579_3-20128452-37/best-buy-running-out-of-iphone-4s-analyst-says/ (viewed 9/12/2013).
[614] http://allthingsd.com/20111108/apple-prioritizing-own-stores-with-iphone-supply/ (viewed 9/12/ 2013).
[615] http://bits.blogs.nytimes.com/2012/10/09/iphone-5-shortage-spooks-apple-investors/ (viewed 9/12/ 2013).
[616] http://blogs.wsj.com/digits/2012/10/17/hon-hais-explanation-for-iphone-5-shortage/ (viewed 9/12/ 2013).
[617] http://blogs.wsj.com/marketbeat/2012/11/07/apple-shares-fall-into-bear-market-territory/tab/print/ (viewed 9/12/2013).
[618] http://blogs.wsj.com/digits/2012/10/17/hon-hais-explanation-for-iphone-5-shortage/ (viewed 9/12/ 2013).
[619] http://blogs.wsj.com/digits/2012/10/17/hon-hais-explanation-for-iphone-5-shortage/ (viewed 9/12/ 2013).
[620] http://www.bloomberg.com/news/2012-09-25/apple-use-of-thin-display-seen-driving-iphone-5-supply-shortfall.html (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

key components that were related to the 2011 tsunami in Japan.[621]  When the iPad 3 was released in March 2012, online orders through Apple's website were delayed by two to three weeks amid reports that suppliers were having difficulty producing parts for the new iPad[622] in spite of analysts' predictions for high demand for the iPad prior to its launch.[623]  In Q4 2012, Apple reportedly fell short of targeted shipments for the iPad mini because production delays from equipment manufacturers limited supplies.[624]

268.     Statements in Apple's earnings calls also indicate that Apple lacked the capacity to meet demand at several points during the damages period.  In an October 25, 2012 earnings call, Peter Oppenheimer, Apple's CFO, stated that "Demand for iPhone 5 continues to outstrip supply."[625]  Tim Cook, Apple's CEO, added that "We are in a significant state of backlog right now,"[626] and in a subsequent earnings call on January 23, 2013, Mr. Cook explained that "If you look at the iPhone sales across the quarter, we were very constrained for much of the quarter on iPhone 5.  As we began to produce more and ship more, sales went up with the production.  iPhone 4 was actually in constraint for the entire quarter, and sales remained strong."[627]  On this same earnings call, Mr. Oppenheimer added that, "We could not make enough [of the iPad mini] this quarter.  We were constrained every week.  Customers love the mini and we wish that we

---

[621] http://www.techradar.com/us/news/phone-and-communications/iphone-4-and-ipad-2-to-suffer-further-stock-shortages-955097 (viewed 9/12/2013); http://thenextweb.com/apple/2011/07/07/ipad-2-supply-shortages-easing-as-shipments-move-to-3-5-days/ (viewed 9/12/2013).

[622] www.huffingtonpost.com/2012/03/12/new-ipad-delays-wait-time-weeks-apple-website_n_1338937.html?view=print&comm_ref=false (viewed 9/12/2013); www.computerworld.com/s/article/print/9224931/Expect_shortages_of_new_iPad_say_analysts?taxonomyName=Macintosh&taxonomyId=163 (viewed 9/12/2013).

[623] http://www.computerworld.com/s/article/9224931/Expect_shortages_of_new_iPad_say_analysts (viewed 9/12/2013).

[624] http://www.digitimes.com/news/a20121127PD207.html (viewed 9/12/2013).  *See also*, Tibken, Shara, "iPad Mini sales likely hurt by supply problems, Sterne Agee says," CNET.com, December 12, 2012; wallstcheatsheet.com/stocks/apple-faces-supply-constraints-and-3-hot-stocks-moving-today.html/ (viewed 9/12/2013).

[625] Apple Inc., Q4 2012 Earnings Call Transcript, at 2.

[626] Apple Inc., Q4 2012 Earnings Call Transcript, at 6.

[627] Apple Inc., Q1 2013 Earnings Call Transcript, at 7.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

could have made more and we ended the quarter with a significant backlog."[628]   On an April 23, 2013 call, Mr. Cook noted that supply did not catch up with demand for the iPhone 4, which was sold at a lower price after the iPhone 5 launched, until late in the first quarter of 2013.[629]

269.   The deposition testimony of Rory Sexton, Vice President of Supply and Demand Management at Apple, also indicates that even though Apple "aim[s] to meet demand from the start,"[630] it consistently encountered capacity constraints during the damages period, especially around the time of product launches.  Mr. Sexton explained that "[a]t the launch of a product, it is sometimes more difficult to produce all the units that we want.  It's a complex product to ramp.  They all are.  So at launch it is – we are catching demand for a period of time," and it can take 13 to 26 weeks to catch up to demand.[631]  Mr. Sexton testified that Apple was not able to meet demand for the iPhone 4S, which was launched in late 2011, until January 2012,[632] and there were shortages of the iPhone 5 and iPad mini after the products were launched.[633]  According to Mr. Sexton, capacity constraints led to lost sales, estimating that supply chain constraints reduced "sales through" of the iPhone and iPad 2 in Q2 2012[634] and Q2 2013.[635]



[636]

---

[628] Apple Inc., Q1 2013 Earnings Call Transcript, at 9.
[629] Apple, Inc., Q2 2013 Earnings Call Transcript, at 10.
[630] Deposition of Rory Sexton, June 28, 2013 ("Sexton Deposition"), at 17.  *See also*, Sexton Deposition, at 63.
[631] Sexton Deposition, at 16-17.
[632] Sexton Deposition, at 42-45.
[633] Sexton Deposition, at 77, 86.
[634] APLNDC630-0001093579.
[635] APLNDC630-0001075325.
[636] APLNDC630-0001517051-54, at 54.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

270.    While Dr. Vellturo justifies the capacity sufficiency based in part on certain documents created for this litigation,[637] it is clear that data produced by Apple are not adequate to analyze Apple's capacity to sell additional units during the damages period.  The produced data do not appear to reflect Apple's experience, as stated in deposition and on earnings calls.



[641]

271.    As shown in multiple reports created by Mr. Sexton, capacity constraints were associated with reduced iPhone and iPad sales.  During periods of constrained capacity, consumers had the choice of purchasing a phone from another manufacturer or waiting, in some cases several weeks, to purchase a new phone.  It is not clear that all customers would choose the option of waiting, and Dr. Vellturo has offered no evidence that, faced with this choice, all or substantially all consumers would choose to wait for an iPhone instead of immediately purchasing a competing phone—especially given that the iPhone was not that consumer's actual first choice product to begin with.

272.    Dr. Vellturo further states that in the "but-for" world, "as a rational economic actor, Apple would have [increased its production capacity] as soon as it had reason to expect an

---

[637] Vellturo Report, at 109.
[638] Apple Inc., Q1 2013 Earnings Call Transcript, at 7.  In deposition, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See, Sexton Deposition, at 27.
[639] See e.g., Sexton Deposition, at Exhibit 4 (APLNDC630-Y00003613).
[640] See e.g., Sexton Deposition, at Exhibit 3 (APLNDC630-Y00003612).
[641] Sexton Deposition, at 78-80.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

increase in demand."[642]  This ignores the fact that capacity decisions are based on demand forecasts of iPhone and iPad that are made up to 12 to 24 months in advance.[643]  And even to the extent that Apple is able to increase its production capacity in as little as 13 to 26 weeks,[644] it is inconsistent with Dr. Vellturo's blackout period assumptions which imply that while Samsung would have not been able to work on its design-arounds until the day lost profits begins, Apple would have been ramping up its own production in anticipation of Samsung being out of the market.  Furthermore, Dr. Vellturo's analysis ignores that Apple capacity can be limited by the supply of components,[645] which would be more difficult for Apple to adjust plans for or to control.

273.    In Exhibit 89, I show the lost units claimed by Dr. Vellturo by quarter.  In this exhibit, I then indicate the specific quarters in which Apple was unable to meet its existing demand. ███████████████████████████████████████████████████████████

███████████████████████████

## IX.    Vellturo Report Royalty Analysis "Double Counts" Lost Profits and Contains Other Errors that Lead to An Overstated Reasonable Royalty Starting Point

274.    As discussed above, it is my opinion that the appropriate form of damages is a reasonable royalty.  That is because the patented features are not discernible drivers of demand for the accused products.  Thus, a royalty should be awarded on each infringing unit based on the patented technologies the infringing units incorporated.

275.    Dr. Vellturo also includes a royalty analysis in his report, performing two types of calculations:  1) in the case in which lost profits are awarded, a "reasonable royalty" to be added

---

[642] Vellturo Report, at 110.
[643] Sexton Deposition, at 63-66, 88-89.
[644] Furthermore, according to Mr. Sexton, it would take Apple at least 12 to 16 weeks to adjust capacity to meet increased demand.  Deposition of Rory Sexton, June 28, 2013, at 50-51.
[645] Sexton Deposition, at 51-52.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

to lost profits for those units not eligible for lost profits, and 2) a "reasonable royalty" on all units if lost profits aren't awarded.  For both of these calculations, Dr. Vellturo uses what he refers to as an "Edgeworth box" calculation based on the amount Apple would be willing to accept for licenses to practice the patents and the amount Samsung would be willing to pay.  These calculations, however, suffer from numerous flaws that I discuss below.

### A.    Overview of Vellturo's Reasonable Royalty Analysis

276.    The starting point of Dr. Vellturo's "Edgeworth Box" analysis involves determining 1) the minimum per unit royalties that Apple would have been willing to accept in a negotiation over a license to the patents-in-suit with Samsung and 2) the maximum per unit royalties that Samsung would have been willing to pay in a negotiation over a license to the patents-in-suit with Apple.[646]  Apple's willingness to accept is characterized by the per unit profits Apple would expect to lose (according to Dr. Vellturo), should Samsung continue to practice the patented inventions.  Samsung's willingness to pay is characterized by the per unit profits that Samsung earns from the sale of all accused units that Dr. Vellturo contends would have been lost by Samsung, should Samsung not practice the patented inventions.  Both of these calculations are inherently unreliable, however, as they are based entirely on the flawed Hauser conjoint results, which were generated only for this litigation.

277.    Dr. Vellturo then discusses the *Georgia Pacific* factors, concluding that each factor either suggests a higher royalty outcome or provides no guidance.[647]  As a result, he ultimately picks the highest per unit royalties from his "Edgeworth box" —the amount Apple would have been willing to accept, as it is higher than Samsung's willingness to pay.[648]  The

---

[646] Vellturo Report, at 126 -127, 174-175.
[647] Vellturo Report, at 192-193.
[648] Vellturo Report , at Exhibit 30.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

resulting combined royalty for all six patents is $42.64 per unit (and royalties on the '647, '414 and '959 patents alone sum to $35.65 per unit).[649]

### B.   Vellturo Reasonable Royalty Assessment Involves Either a Double Counting or a Back Door Collection of Apple's Lost Profits

278.     A patent holder who is able to establish liability for patent infringement is entitled to no less than "a reasonable royalty for the use made of the invention by the infringer."[650]  Reasonable royalty damages are, therefore, the statutory minimum, or, as described by the Court of Appeals for the Federal Circuit ("CAFC"), "the floor below which damages shall not fall."[651]

279.     The consideration of the profits that the patent holder makes on products that compete with the infringing product is *inappropriate* in the context of a reasonable royalty damages determination. That is, reasonable royalty damages are appropriate on sales where the patent holder is unable or unwilling to demonstrate that the infringing sales caused the patent holder to lose sales and, therefore, profits.[652]  Accordingly, reasonable royalty damages are only for infringing sales that were *not* lost by the patent holder.[653]  Under these circumstances, there are no patent holder profits that were displaced.

---

[649] His conclusion is per unit royalties of $12.49 for the '647 patent, $15.03 for the '414 patent, $8.13 for the '959 patent, $1.61 for the '721 patent, $2.84 for the '172 patent, and $2.54 for the '760 patent.   The total royalty is $40.10 without the '760 patent.

[650] 35 U.S.C. § 284.

[651] *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed. Cir. 1983).

[652] *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1576 (Fed. Cir. 1995) (Nies, dissenting in part) ("[W]here a patentee is not entitled to lost profits damages, lost profits may not, in effect, be awarded by merely labeling the basis of the award a reasonable royalty."). *See also*, "The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition," Federal Trade Commission, March 2011 ("The Evolving IP Marketplace"), at 20, 167-68, 172-73 available at http://www.ftc.gov/os/2011/03/110307patentreport.pdf ("The law must be flexible in allowing the patentee to prove its lost profits in order to provide adequate compensation.  But a patentee who has failed or chosen not to do so should not be allowed to use unproven arguments of direct losses to inflate a reasonable royalty award beyond what a willing licensee would pay.")

[653] The Evolving IP Marketplace, at 172 ("Concerns about compensating unproven lost profits damages should not be allowed to inflate a reasonable royalty damage award . . . .").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

280.    As discussed above, Dr. Vellturo ultimately does not use his (flawed) calculations of Samsung's maximum willingness to pay to license the patents-in-suit for his reasonable royalty calculations.  Instead, the proffered Vellturo royalty amounts are identical to his "Apple's willingness to accept" figures—or in other words, Apple's expected lost profits from granting a license to Samsung.  The Vellturo Report summarized the various steps that were undertaken to estimate these minimum per unit royalties that Apple would have been willing to accept.[654] Importantly, they include "determin[ing] the portion of Samsung's incremental sales [from a license] that would remain at Apple in the event that Apple does not license Samsung to the Asserted Patents" and "Assess[ing] the incremental profit per unit Apple would expect to lose that applies to each expected Apple foregone sale." [655]   In essence, Dr. Vellturo is saying that one key input to determining the reasonable royalty here is the profits that Apple would expect to lose on sales by granting a license to Samsung.[656]

281.    This is almost the same calculus (replacing ex-post lost profits with expected lost profits) that Dr. Vellturo undertook in his lost profits analysis.  I illustrate this in Exhibit 67.  As the exhibit shows, after removing the ecosystem impact step of the reasonable royalty calculation (to be discussed further below), the steps involved in calculating Dr. Vellturo's lost profits and reasonable royalty are virtually identical, with the main difference being that 1) Dr. Vellturo removes the '959 patent from lost profits calculation and 2) Dr. Vellturo's "reasonable royalty" calculation is based on Apple's "expected lost profits" prior to infringement whereas Dr. Vellturo's "lost profits" calculation is based on Apple's "actual lost profits."

---

[654] Vellturo Report, at 166-7.
[655] Vellturo Report, at 166-7.
[656] He defines this as a "key consideration" and "guiding principal" in the negotiation.  Vellturo Report, at 128.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

282.     The result is that, if the Court were to find lost profits were appropriate, Dr. Vellturo's rate would effectively represent a double counting of lost profits.[657]  And, in the event that the Court were to find that lost profits were not appropriate, Dr. Vellturo's royalty calculation would represent an inappropriate back-door claim for lost profits.[658]

### C.     Vellturo's Assessment of Apple Willingness to Accept and Samsung Willingness to Pay Includes Many Errors

283.     In addition to the fundamental flaw of double counting (or inappropriately trying to collect) lost profits through his reasonable royalty calculation, Dr. Vellturo's royalty calculations are plagued with other errors and overstatements.  Since many of these errors are very similar to those that I have already discussed in my critique of Dr. Vellturo's lost profits calculation above, I only briefly mention some of them here.

284.     Both Dr. Vellturo's analyses of Apple's willingness to accept and Samsung's willingness to pay:  1) start with overstated profit amounts for Apple and Samsung; 2) apply Professor Hauser's unsound conjoint results to estimate the percentage of profits lost or at stake; 3) use the wrong expected percentage of displaced sales flowing to Apple/or to Samsung's other products; 4) overestimate the relevant time Samsung would be off the market to implement a design-around; and 5) include speculative future damages as part of the current royalty. Specifically, some examples of these errors include:

---

[657] This is especially true in that these are units that Dr. Vellturo himself claims Apple would not have made in his lost profits scenario.  Apple is not entitled to base a reasonable royalty on unproven losses of profit on units its own expert concedes it never would have made.  Yet, Dr. Vellturo essentially "double counts" his lost profits.  He claims lost profits on units (he believes) Apple would have sold in absence of Samsung's infringement, and claims lost profits again on the units he says Apple would not have sold, by calling it "willingness to accept."

[658] A reasonable royalty scenario is appropriate because Apple has not or cannot prove entitlement to lost profits.  That is, it has failed to prove that it incurred any lost sales. As a result, Apple's incremental profits are irrelevant and any royalty would make Apple better off.  That is because those units subject to a royalty are those on which Apple would not have earned any profits.   Yet, Dr. Vellturo essentially "back doors" a lost profits calculation in his royalty-only analysis.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

- Apple's willingness to accept is based on his assumption that ███████████ ████████████████████████████████ █ ████████████████████ ████████████████████████████ Furthermore, since Dr. Vellturo uses a blended average profitability rate, it does not necessarily reflect the profitability of those products that would have been sold in place of accused Samsung units. Additionally, he understates the amount of Apple costs that are incremental to increased sales and thus overstates incremental profitability.

- ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████ █ ███████████████████████
██████████████████████████████████
███████████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████

- The Hauser results are unsound and should not be used.  As discussed above, the Hauser results are not accurate measures of buyer willingness to pay to obtain the patented functionality. ████████████████████████████
████████████████████████████ This is not consistent

[659] I note that ████████████████████████████████ *See* Vellturo Report, at Exhibit 16 showing ████████████████████████ and at Exhibit 27, showing ████████████
[660] Vellturo Report, at Exhibit 26.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

with the $10 to $25 price of Apple's entire operating system upgrades, which can include hundreds of features.[661]

- 

First they overstate the share of units that would be displaced because of the patents.[663]  Second, because Samsung's ███████████████ are not accused of including the '721 and '172 patents, the shares used to calculate royalties for those patents should be materially different than for the other patents.  Assuming infringement of just those patents, Samsung customers could have switched to a Galaxy SIII rather than purchasing a product with an allegedly infringing slide-to-unlock functionality or keyboard.

- Dr. Vellturo's calculations assume a four to five month design-around period for the '721, '172 and '760 patents and contemplate no acceptable design-around periods for the '647, '414, and/or '959 patents.[664]  The evidence suggests that Samsung perceived that design alternatives for the '721, '172 and '760 patents could be implemented much more quickly, and that design-around options for the other patents would have been perceived to be available as well.  Dr. Vellturo's

---

[661] This range for Apple's iOS prices (actual and estimated) is generally consistent with other available information on prices (for updates and otherwise) of OS software.  *See, e.g.,* Weir, Andy. "ZTE reveals cost of Windows Phone OS licensing," *Neowin.net*, January 19, 2012. *Available at*: http://www.neowin.net/news/zte-reveals-cost-of-windows-phone-os-licensing (viewed 9/12/2013); Rosenberg, Dave. "Windows Mobile licensing fees to remain intact," *CNET News,* September 30, 2008. *Available at*: http://news.cnet.com/8301-13846_3-10055120-62.html; APL630DEF-WH0007923066-79, at 78; Vellturo VirnetX Report (APL630DEF-WHVX0000591883-592072, at 023) Apple's iOS update prices and the relevance of these prices for the reasonable royalty assessment here will be discussed further below.
[662] Vellturo Report, at Exhibits 26 and 27.
[663] These loss factors suffer from the same errors described earlier in the "Mor-Flo" section to my report, in that they wrongly suppose pro-rata redistribution of Samsung's accused product customers across all marketplace offerings.
[664] Vellturo Report, at Exhibits 26 and 27.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

calculations are highly sensitive to these assumptions, and just a six month design-around time for the '647, '414, and/or '959 patent would reduce his implied royalties for those patents by approximately 85%.[665]

- Dr. Vellturo inflates his royalty figures by 30% to roughly 46% based on an "ecosystem" adjustment. However, this calculation is simply an attempt to capture speculative future lost profits on units that have not yet been sold. To the extent that future Samsung products were to incorporate the patented elements, a royalty would be paid on those sales. It is simply not appropriate to accelerate the royalty from those future products onto current products. In addition his computations include conceptual flaws, such as assuming the stickiness of the average Apple consumer would be a good proxy for the stickiness of the marginal Apple customer and confusing platform loyalty and product loyalty. [666]

285.   Furthermore, Dr. Vellturo attempts to justify his excessive royalty figures by arguing that Samsung could just raise prices to cover any royalties.[667] He states "…paying such a rate to Apple may not appear to be economically rational, but once the pricing dynamics in play at Samsung are taken into account, this apparent irrationality evaporates."[668]   ███████

████████████████████████████████████████████████████████

████████████████████████████   His calculations defy common sense, and they ignore the basic economic principle of the downward sloping demand curve.[669]   Apple's Mark Donnelly

---

[665] For example, even accepting all of Dr. Vellturo's other inputs, a 6 month design-around time for the '414 patent would reduce Apple's willingness to accept from $15.03 to $2.51, and reduce Samsung's willingness to pay from $9.18 to $1.53. Vellturo Report, at Exhibits 26 and 27.

[666] I illustrate this in Exhibit 68.

[667] Vellturo Report, at 173-5.

[668] Vellturo Report, at 174.

[669] *See, e.g.,* Paul Krugman and Robin Wells, *Economics.* (Worth Publishers 2006), at 58-59; Paul A. Samuelson and William D. Nordhaus, *Economics*, 19th Ed. (McGraw-Hill 2010), at 47.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

agreed, [670]

[671]

### D.     Failure to Consider Units for Which Apple has Previously Sought Damages

286.    Dr. Vellturo acknowledges that many accused units in this case have been previously accused by Apple to infringe other patents and that matter is ongoing.[672]  However, Dr. Vellturo is not clear whether or how he intends to avoid a double recovery for those products.  To the extent that lost profits or disgorgement remedies are awarded on those products, it would be economically unjustifiable to seek additional recovery for losses from those products in this matter.  To the extent royalties are awarded, one must consider the basis of the quantification of those royalty rates to avoid double counting.

### E.     Vellturo Consideration of Other *Georgia Pacific* Factors

287.    Dr. Vellturo claims to consider *Georgia Pacific* Factor 15 through his reasonable royalty analysis.  In doing so he concluded that each factor either suggests a higher royalty outcome or provides no guidance.  However, throughout his report, relevant evidence from several alternative royalty methodologies is downplayed or ignored, such as that from actual license agreements involving Apple and Samsung as well as observations regarding the marketplace for apps.[673]

288.    By ignoring alternative quantification approaches, Dr. Vellturo's reasonable royalty conclusions rest entirely upon the Hauser conjoint results.  Importantly, Dr. Vellturo has

---

[670] Deposition of Mark Donnelly, August 14, 2013, at 151-152; *See also*, Donnelly Exhibit 1.
[671] There is evidence that handset consumers have relatively elastic demand with respect to price. *See* Chintagunta, *et al.* (2011), at 21-22. In other words, small increases in price tend to have an even larger negative impact on demand for handsets.
[672] Vellturo Report, at 55.
[673] Vellturo Report, at 175-6, 183-5.

not presented *any* quantitative reasonableness checks as to whether Professor Hauser's estimates of willingness to pay for the accused features make economic sense. The result is that Dr. Velluro's royalty rate remains economically irrational.

289.   At roughly $42.64 per unit, ███████████████████████████████



███████████████████████████████████████████████████████ As I show below, the $42.64 per unit royalty is an order of magnitude above what legitimate economic approaches to determining a reasonable royalty indicate is reasonable. Many of these approaches have been endorsed by Dr. Velluro in expert work he has performed with Apple in the past, but were not viewed by him to be "relevant" in this matter.[674]

## X.   Reasonable Royalty Analysis

### A.   Overview of Reasonable Royalty Calculations

290.   I have approached my estimation of a reasonable royalty in a way that is consistent with the methodology described in *Georgia-Pacific Corp. v. United States Plywood Corp.* and other case precedents. One of the most common tools used in reasonable royalty analyses is the "hypothetical negotiation" construct, which frames the analysis using a hypothetical arm's length negotiation for a license to practice the patent(s)-at-issue between a willing patent owner (here, Apple) and a willing potential licensee (here, Samsung) at the point of first alleged infringement.[675] This construct is reflected in *Georgia-Pacific* Factor 15. In

---

[674] *See, e.g.* ████████████████████████████████████ Furthermore, Apple's previous assertion of the '647 patent against HTC also shows Dr. Velluro's excessiveness—a case in which Apple sought ████████ *See*, APPLE, INC. and NeXT SOFTWARE INC.,v. MOTOROLA, INC., and MOTOROLA MOBILITY, INC., Opinion and Order, May 22, 2012, at 17-19. *See also*, APPLE, INC. and NeXT SOFTWARE INC.,v. MOTOROLA, INC., and MOTOROLA MOBILITY, INC., Opinion and Order, June 22, 2012, at 23-4, discussing the availability of design-arounds for the '647 patent.

[675] *See Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) ("A 'reasonable royalty' contemplates a hypothetical negotiation between the patentee and the infringer at a time before the infringement began."). *See also*, *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983); *Lucent Technologies, Inc., et al. v. Gateway, Inc., et al.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

applying the hypothetical negotiation construct in the analysis of reasonable royalty damages, it

is assumed that the negotiation is conducted under the following assumptions:

> 1. the patent is known to be valid and enforceable at the time infringement commences;

> 2. the patent is known to be infringed;

> 3. the patent holder is willing to issue a license;

> 4. the licensee is willing to take a license; and

> 5. the appropriate relevant business facts (even subsequent to the point of negotiation) are deemed known to both parties.[676]

### 1.       Date of Hypothetical Negotiation

291.    According to the Federal Circuit, the date of a hypothetical negotiation is the date

at which infringement of a valid and enforceable patent first occurred.[677]  In this case, the earliest

of the patents-in-suit to issue did so in August 1999.[678]  The first commercial sale of an accused

product occurred in June 2011.[679]  Thus, the earliest date of the hypothetical negotiation for the

patents-at-issue is June 2011.

---

negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement. In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme. The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed."). In *Lucent*, the CAFC suggested that the hypothetical negotiation construct was an *alternative* to "the analytical method" (which focuses on the allocation of an infringer's profits attributable to the accused products) in the assessment of reasonable royalty.  *See Lucent v. Gateway*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009).  In this report, information derived from the various valuation methodologies, including the analytical method, is used in the context of the hypothetical negotiation construct to determine a reasonable royalty.

[676] *See* Paul M. Janicke, *Contemporary Issues in Patent Damages*, 42 AM. UNIV. L.R. 691, 722-24 (Spring 1993). *See also*, *Innogenetics, N.V. v. Abbott Labs.*, 578 F. Supp. 2d 1079 , 1093-94 (W.D. Wis. 2007) ("In calculating the amount of a reasonable royalty, the jury has to pretend that the parties sat down and negotiated a reasonable royalty before the day that defendant began its infringement of the plaintiff's patent.  Unlike a real negotiation, this hypothetical negotiation assumes that the infringer must agree to some amount of royalty payment; it does not have the option of walking away from the table. The jury must put itself in the shoes of the parties and look at the relevant circumstances as they were at the time the negotiations would have taken place. The reasonable royalty calculus assesses the relevant market as it would have developed before and absent the infringing activity." (*Internal citations omitted*))

[677]    *See Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993).

[678] Exhibit 23.

[679] Exhibits 26A-26J.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

292.    Each of the asserted patents has a different issue date.  The '647, '959 and '414 patents pre-date the first accused sale.[680]  Thus I have assumed the hypothetical negotiation for these patents would have occurred in or around June 2011.  The remaining patents issued in late 2011, between three and six months after what would have been the first negotiation.   Strict application of the hypothetical negotiation construct would suggest negotiation for the '760 patent on September 6, 2011, for the '721 patent on October 25, 2011, and for the '172 patent on December 6, 2011.  Dr. Vellturo and I appear to be in agreement regarding the hypothetical negotiation dates.[681]

### 2.    Parties to the Negotiation

293.    The parties to the hypothetical negotiation are the patent holder at the time of first alleged infringement and the alleged infringer(s).  For purposes of this report, I have assumed that the hypothetical negotiation would take place between Apple (the owner of the patents-in-suit) and Samsung.   Dr. Vellturo and I appear to be in agreement regarding the parties to the negotiation.[682]

### B.    Reasonable Royalty Analysis

294.    To estimate a reasonable royalty here, I first determine the appropriate form of a royalty-bearing license.  To the extent that the license involves a running royalty, I then determine the appropriate royalty base – *i.e.,* the measure of allegedly infringing activity – to which a reasonable royalty should be applied.  I next consider quantitative valuation methodologies that are commonly used by economists to determine the value of an asset or a fair or reasonable fee that a user should pay for access to that asset, which are commonly referred to

---

[680] The patents issued on 8/31/1999, 1/25/2005, and 7/20/2010, respectively. *See* Exhibit 23.
[681] Vellturo Report, at 124.
[682] Vellturo Report, at 123.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

as the Market Approach, the Income Approach, and the Cost Approach.[683]  Lastly, I choose the appropriate reasonable royalty for the patents-in-suit after considering both quantitative and qualitative evidence concerning the value contributed by the patents-in-suit, drawn, in large part, from and consistent with those factors identified in *Georgia-Pacific*.[684]

### 1.    Form of the Royalty

295.    For most real-world licenses, and almost all reasonable royalty damages awards, compensation is provided by one or both of a lump-sum payment and a running royalty fixed to the quantity or revenues associated with the manufacture, shipment, use, or sale of the products at issue.

296.    A lump-sum typically involves a one-time payment, the magnitude of which is not necessarily directly tied to the extent of alleged usage of the technology at issue by the alleged user/infringer.  A running royalty is a percentage of sales or a fee per unit, tied directly to how often the licensed invention is used by or incorporated into products of the licensee.

297.    The appropriate form of a reasonable royalty depends on several considerations, including the licensing practices of the patent holder, the alleged infringer, and the relevant industry; the nature of the benefits provided by the patented technology; and the availability and nature of the alleged infringer's design-around options.  In the present case, the appropriate form of a reasonable royalty is a lump-sum ███████████████████████████ Apple and

████████

---

[683] *See, e.g.,* Shannon P. Pratt, Robert F. Reilly and Robert P. Schweihs, *Valuing a Business:  The Analysis and Appraisal of Closely Held Companies*, 149-258 (McGraw Hill 2000) ("Pratt, *et al.* (2000)"); Gordon V. Smith and Russell L. Parr, *Valuation of Intellectual Property and Intangible Assets*, 151-173 (John Wiley & Sons 2000) ("Smith and Parr (2000)"); Robert F. Reilly and Robert P. Schweihs, *Valuing Intangible Assets*, 95-202 (McGraw-Hill 1999) ("Reilly and Schweihs (1999)").
[684] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



298.

299.

300.    A lump sum license also is supported by economic considerations.  In particular, the agreement would be for a naked license without ongoing support or benefits.  As such, it would not be important to structure the license with a running royalty in order to provide Apple

_____

[685] Exhibit 69.
[686] Exhibit 70.
[687] Deposition of Bruce Watrous, Jr., Vice President and Chief Intellectual Property Counsel for Apple, ("Watrous Deposition") July 12, 2013, at 91, 122-3.
[688] *See* Exhibits 71 and 72.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

an ongoing incentive to help commercialize Samsung's products.  In addition, Samsung would have sought a lump sum payment to avoid having to pay incremental license fees for future successes due to its own efforts.  Finally, a lump sum would avoid the need to audit ongoing sales of products.[689]

301.    Although Dr. Vellturo and I differ in this conclusion, to facilitate comparison between our opinions, I express many of my calculations on a per unit basis.[690]  Since lump-sum payments typically contemplate the expected use by the licensee, conversion from a per unit figure to a lump sum is possible using the level of infringing activity alleged here.[691]

### 2.    Royalty

#### a)    Overview

302.    As noted above, three methodologies that are commonly used to value assets and to determine a fair or reasonable fee that a user should pay for access to those assets provide insight into an appropriate royalty.  These methodologies are the Market Approach, the Income Approach, and the Cost Approach.[692]  I describe the evidence from these Approaches in the sections below.  I then determine the appropriate reasonable royalty for the patents-in-suit after considering both quantitative and qualitative evidence concerning the value contributed by the patents-in-suit, drawn, in large part, from factors identified in *Georgia Pacific*.

#### b)    Market Approach

303.    Using a Market Approach, an appropriate price for the use of the patents-at-issue can be identified through the examination of the terms of licenses and other transactions

---

[689] *See, e.g.*, Choi, Jay Pil, "Technology Transfer with Moral Hazard*," International Journal of Industrial Organization, 19 (2001), 249–266.*
[690] Dr. Vellturo argued ███████████████████████ APL630DEF-WHVX0000591883-592072, at 983.  ███████████████  *See, e.g.*, Watrous Deposition, at 42.
[692] *See, e.g.,* Pratt, *et al.* (2000), Smith and Parr (2000), Reilly and Schweihs (1999).

involving comparable technology, which can identify terms that prudent parties would (or should) accept in a hypothetical negotiation.

304.    In considering the application of the Market Approach, the Federal Circuit has emphasized that the amount of weight to be given to any particular license depends on the degree of comparability with the terms of the hypothetical license.[693]  This view recognizes that past licenses or transactions can differ from a hypothetical transaction in many important respects. My analysis below (in both the Market Approach and *Georgia Pacific* Factors analysis) incorporates the Court's guidance, including factors such as:

- parties to the transaction;

- time of the transaction;

- nature of the technology at issue;

- nature and scope of the rights transferred;

- existing and projected market conditions at the time of the transaction;

- strength of the asset/IP transferred;

- availability and costs of design-around; and

- relative bargaining strength of the parties.

### (1)    Licensing Practices in the Telecommunications Industry

305.    In application of the Market Approach, it is useful to consider the general licensing practices in the marketplace to provide context for the licenses that are being evaluated. The telecommunications industry is characterized by multi-function products and rapidly

---

[693] *See ResQNET.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("This court has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies other than the patent in suit."). *See also*, *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009) ("[A] lump-sum damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers, one of which is arguably in the ballpark of the jury's award, particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

evolving technology, with a correspondingly wide range of intellectual property held by numerous parties (some of which do not practice the technology).[694]

306.    As technology has evolved, the number of patents related to each generation of cellular communications technology has grown considerably.  One study examining the Wideband Code Division Multiple Access ("WCDMA") standard as of December 2008, for example, found that over 1,800 patent families, held by over 50 owners, were essential to implementing the standard, and that thousands more patents were claimed to be essential.[695]  As of early 2012, there were an estimated 356,000 patents related to 3G technologies held by various IP holders, less than 1 percent of which were declared essential to those standards.[696]  One analyst commenting on the Apple and Samsung litigations estimated that smartphones can embody as many as 250,000 patents due to the wide range of communications and computing technologies they utilize.[697]

307.    Given the large number of patents that can and do contribute to a cellular communications product, numerous licensing arrangements between marketplace participants have resulted.  ███████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[694] *See, e.g.*, Eric Stasik, "Royalty Rates And Licensing Strategies For Essential Patents On LTE (4G) Telecommunication Standards," *les Nouvelles*, September 2010, ("Stasik (2010)"), at Table 1; "Review of Patents Declared as Essential to WCDMA Through December, 2008," Fairfield Resources International, January 6, 2009 ("Fairfield 2009"), at Table 5; "Analysis of Patents Declared as Essential to GSM as of June 6, 2007," Fairfield Resources International, December 31, 2007 ("Fairfield 2007"), at 8; Rudi Bekkers & Joel West, "The Limits to IPR Standardization Policies as Evidenced by Strategic Patenting in UMTS," *Telecommunications Policy*, Vol. 33 (2009) ("Bekkers & West (2009)"), at Table 5 and Figure 3.

[695] Fairfield 2009, at 1, 8-9, Table 5. Such counts of patents essential to one standard with which a product is compliant reflect the total amount of IP that a designer or manufacturer of that product may be required to access. Such counts, however, do not include, for example, patents that are essential to other standards with which the product is compliant and may not include patents that cover other elements of the product, such as, in the case of mobile phones, the battery or camera.

[696] Sascha Segan, "Infographic: Smartphone Patent Wars Explained," *PC Mag*, January 19, 2012, available at http://www.pcmag.com/article2/0,2817,2399098,00.asp (viewed 9/12/2013).

[697] Steve Lohr, "Apple-Samsung Patent Battle Shifts to Trial," *The New York Times*, July 29, 2012; Steve Lohr, "A Bull Market in Tech Patents," *The New York Times*, August 16, 2011.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



### (2)     Quantitative Analysis

308.     In using the Market Approach,[701] the most useful and informative transactions and proposed transactions are those that cover the technology at issue or something reasonably close.  Other transactions may be associated with a variety of different elements of value and may be of somewhat less guidance as to the outcome of the hypothetical negotiation.

### (a)     Agreements Involving the Patents-in-Suit

309.     It is my understanding that the patents-at-issue have been licensed by Apple in a transaction with HTC.[702]  On November 11, 2012, Apple and HTC entered into a license and

---

[698] Exhibits 75 and 76.

[699] Individual patents do not convey as many rights as do portfolio licenses, especially because a license to only one patent of many does not prevent future disputes between the parties to the license.  In this way portfolio licensing can benefit the licensee (or both parties in the case of a portfolio cross-license) by allowing the licensee the freedom to design and manufacture future products without need to incur the costs associated with negotiating and acquiring additional patent rights or the costs associated with future patent infringement litigations.  As a result, rights to individual patents or small groups of patents tend to command lower royalty payments than to licenses to larger groups of patents. *See, e.g.*, U.S. Department of Justice & Federal Trade Commission, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007), at 60. ███████████████████

███████████████████████████████████████████████████████ *See also,* Exhibit 70.

[700] I discuss some of these in the following sections.

[701] The application of the Market Approach in determining reasonable royalty damages is described in *Georgia-Pacific* Factor 1 ("The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty"); *Georgia-Pacific* Factor 2 ("The rates paid by the licensee for the use of other patents comparable to the patent in suit"); and *Georgia-Pacific* Factor 12 ("The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions").  *Georgia-Pacific*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

[702] ██████████████████████████████████████ *See* APL-ITC796-0000010041-79 and APLNDC-X0000007220-355.

173

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**





HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



Vellturo Report, at 179.  *See also* Vellturo Report, at 175-176.

709 *See* APLNDC00010886-903.

710 At the time of that proposal, Samsung was roughly half to two-thirds the size of Apple in the smartphone marketplace, whereas HTC, has been roughly one-fifth to one-third the size of Apple in the smartphone marketplace. See e.g., Oppenheimer 2011 Handset Guidebook, at 25; 2012 Handset Guidebook, at 24; Oppenheimer 4Q12 Wireless Snapshot, at 25; and APLNDC00010886-903, at 896.   However, Samsung's patent portfolio has been acknowledged to be substantially more valuable than that of HTC.  RBC Capital Markets, "Communications Equipment Smartphone IP: Clash of the Titans," September 28, 2011 characterizes HTC as "without a strong patent portfolio to protect themselves," while Samsung is described as having "strong wireless communications (including LTE) and related implementation patents."  Among the top six smartphone vendors and two smartphone OS providers recognized by RBC Capital Markets, Samsung was one of the top four incumbents with the largest patent portfolios.  Specifically, RBC Capital Markets estimated that of Samsung's 45,000 U.S. patents, more than half related to mobile communications, some (or the majority) of which may be part of industry standards.  By comparison, HTC only has 300 U.S. patents (excluding S3 patents acquired in July 2011).  According to the China

175

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



Post, HTC's market value declined by nearly NT $900 billion over the April 2011-August 31, 2011 period, and that HTC's patent portfolio was "weak." *See* "Niche markets vital to HTC comeback: analysts," *The China Post*, September 3, 2012.  Available at: http://www.chinapost.com.tw/print/353004.htm (viewed 9/5/2013).

[715] In Apple's ITC complaint against HTC filed in March 2010, Apple accused HTC phones including the T-Mobile G1 (which came out in October 2008), and the HTC Hero (which came out in October 2009). *See, e.g.*, http://arstechnica.com/apple/2010/03/apples-itc-complaint-names-htc-phones-10-other-patents/ (viewed 9/12/2013); http://reviews.cnet.com/t-mobile-g1/ (viewed 9/12/2013); http://reviews.cnet.com/smartphones/htc-hero-sprint/4505-6452_7-33770450.html (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



**(b)    Offers to License the Patents-in-Suit**

318.    Although offers to license technology are not the same as consummated

agreements, they too can provide insight into the value of the underlying technology.  I

---

[716] This approach removes multiple patents with the same description.

[717] *See, e.g.*, Expert Report of Julie Davis, June 24, 2013, at Exhibit 41.1-S; Supplemental Expert Report of Terry L. Musika, CPA, May 8, 2012, at Exhibit 41.1-S.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



320.

321.

---

[718] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, Response to Interrogatory 19, at 21.
[719] APLNDC00010886–903.
[720] APLNDC00010886–903, at 900.
[721] Deposition of Boris Teksler, 3/16/2012, at 59-72. See also, APLNDC00010886-903.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

████████████████████████ █████████████████████████

███████

**(c)    Other Apple and Samsung License Agreements**

322.    ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████. These can be

useful in assessing the reasonableness of the results from other valuation approaches.[725]

323.    ██████████████████████████████████

███████████████████████████████████ I have summarized

these agreements in Exhibits 69 and 70. ███████████████████████████

---

[722] *See* S-ITC-000085099.

[723] ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ Samsung's Further Supplemental
Responses to Apple's Second and Third Sets of Interrogatories, Response to Interrogatory 19, at 21. *See also*,
Watrous Deposition, July 13, 2013, at Exhibit 9.

[724] ████████████████████████████████████████████

[725] I note that in the VirnetX v. Apple matter, Dr. Vellturo noted that other licenses which did not contain
comparable technology were still "…informative as to the form of license and amount of the reasonable royalty."
APL630DEF-WHVX0000591883-592072, at 2003-2004.

[726] Samsung's Second Set of Requests for Production of Documents and Things, Request for Production No. 92;
Samsung's Fourteenth set of Requests for Production of Documents and Things, Requests for Production Nos. 827,
829, 831, 833.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



I have summarized these agreements in Exhibits 71 and 72.

324.

325.

326.

---

[727] Samsung's Objections and Responses to Apple's Fourth Set of Interrogatories, Interrogatory No. 33; Samsung's Further Supplemental Responses to Apple's Second and Third sets of Interrogatories (Interrogatories Nos. 15, 17, 20, 24, 26, 29), Interrogatory 17.

[728] ███████████████████ *See* Exhibit 79.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

327.    Nevertheless, many of these agreements are illustrative of the amounts Apple and

Samsung are willing to pay for patent rights.  For example:



[729]  Vellturo Report, at 196 and Exhibit 31.  Dr. Vellturo's royalty excluding the '760 patent is roughly $968 million.
[730]  APLNDC-WH0000536321-331 and Lipman, Melissa.  "Emblaze Targets Apple over iPhone Video App," *Law 360.* December 2, 2009.  *Available at* http://www.law360.com/articles/136946/emblaze-targets-apple-over-iphone-video-app (viewed 9/12/2013)
[731]  APLNDC-WH0000536214-20 and Thomson United States SEC Form 20-F dated June 3, 2005 at p. 138. Available at: http://www.sec.gov/Archives/edgar/data/1080259/000117099705000025/form20f.htm
[732]  APLNDC-WH0000536400-409 and Zapata, Ron.  "Caller ID Patent Holder is Sour on Apple's iPhone." *Law360.* February 25, 2008.  *Available at:* http://www.law360.com/articles/48118/caller-id-patent-holder-is-sour-on-apple-s-iphone (viewed 9/12/ 2013).
[733]  APLNDC-WH0000536237-251 and Krazit, Tom.  "Apple settles patent suit over iPhone visual voice mail," *CNet.* June 16, 2008.  *Available at:* http://news.cnet.com/8301-13579_3-9969909-37.html (viewed 9/12/ 2013) and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- ████████████████████████████████████████████
████████████████████████████████████

█ ██████████████████████████████████████████
███████████████████████████████████████████

█ ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████

█ ████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████

328.    To better reflect the circumstance surrounding the hypothetical negotiation in this

matter, it is also instructive to examine that ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

---

Krazit, Tom.  "Apple, AT&T sued over iPhone's visual voice mail," *CNET News*, December 3, 2007.  *Available at*: http://news.cnet.com/8301-13579_3-9828078-37.html (viewed 9/12/ 2013). ████████████████████████████████
████████. I summarize those terms in Exhibit 73.
[734] APLNDC-WH0000536307-320 and Lipman, Melissa.  Apple, SanDisk Settle Texas MP3 Patent Spat. Law 360, January 26, 2009.  *Available at:* http://www.law360.com/articles/84475/apple-sandisk-settle-texas-mp3-patent-spat (viewed 9/12/2013)
[735] SAMNDCA630-07603708-20.
[736] SAMNDCA630-07603397-430.
[737] SAMNDCA630-07603890-99; Zapata, Ron, "Apple's iPhone Tapped In Suit Over Keyboard Patent,"Law 360. August 3, 2007.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



329.   As shown in Exhibit 79, ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ ██ ██████████████████.[738]

330.   As an additional refinement, ██████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

331.   ██████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████ ██ ████████████████

████████████████████████████████████████████████████

████████████████████████████ █████████████████████

██████████████████████████████████████████████████

████████████████████.[740]

---

[738] I illustrate these payments in Exhibit 80.

[739] For this illustration, I conservatively have used Samsung U.S. smartphone sales from the relevant years, and assumed ██████████████████████  The length of the agreement is also used, but is limited to ██.  *See* Exhibits 84 and 85.

[740] Exhibit 85.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

332.

333.

**(d)    Summary of Market Approaches**

[741] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
        "Haptics technology is built into devices to create tactile feedback or vibrations so a user actually feels something when touching the screen of a mobile device. For example, Immersion software combined with "actuators," such as motors, allows sensations like the feel of a button click when pressing a virtual button. It makes the product feel more real and can improve the user experience, particularly for people not used to touch screens." http://news.cnet.com/8301-1035_3-57573025-94/samsung-gets-touchy-feely-with-immersion-haptics-tech/ (viewed 9/12/2013).

[742] SAMNDCA630-07603523-45, at 25-28.

[743] Dr. Vellturo and I appear to be in agreement that licenses with royalties based on a percentage of selling price are less relevant here.

[744] ████████████████████████████████████████████████ rate.

[745] ██████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

334.    As described above, various licenses and proposals provide insight into the appropriate rates for the patents-in-suit.



c)    **Income Approach**

335.    The Income Approach provides a systematic framework for estimating the price to be paid for certain intellectual property based on the value of benefits derived from use of the subject technology.  The goal of any licensing negotiation is for the parties to find a mutually agreeable way to "share" the benefits from making, using, or selling products embodying the technology at issue.  The owner of the technology is entitled to compensation for the portion of the benefits of the product or process that is due to the intellectual property.  The licensee should retain certain benefits derived from other attributes of the product or process that incorporate the technology at issue.  The licensee should also be compensated for assuming the business risks associated with manufacturing, using or selling the product that embodies the particular technology.

(1)    **Overview of the Analytical Approach**

---

[746] Using the 100th and 95th percentiles.  Exhibit 79.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

336.    The Incremental Income/Analytical Approach is one of the most common Income Approaches. The first component of this analysis is identification of the profits for the products that incorporate the patented technology at issue. The next step is an attempt to isolate the portion of that profit due to the patents-at-issue (apart from the other elements of value), in many cases by subtracting the return associated with the next best alternative.[747] Any profits generated on products utilizing the patented technology that are in excess of the next best alternative represent an amount up to which the licensee should be willing to pay for access to the technology.

### (2)    Profitability as a Measure of Value

337.    Ideally, the performance of one product line that practices the patents-in-suit is compared to that of a product line that does not practice the patented technology but is otherwise identical.  This comparison should be made between two products that would be equally acceptable to the purchaser.  In other words, the comparison product should be able to be sold in place of the infringing product without a loss of sales.  I could not make such a comparison here because, among other reasons, I am not aware of a completely non-infringing, yet otherwise identical, product line for Samsung's accused products that are currently available for sale.

338.    It appears that the various design-around options described previously would have no discernible impact on sales or profitability when compared to the accused models.  This is supported, in part, by the observation that the Galaxy S III which does not incorporate either the "image unlock" or "word recommendations" patents ████████████████████████

---

[747] This method was endorsed in *TWM Mfg. Co., Inc. v. Dura Corp., et al.*, 789 F.2d 895 (Fed. Cir. 1986).  *See also,* Gordon V. Smith and Russell L. Parr, Valuation of Intellectual Property and Intangible Assets 238-48 (3rd ed. 2000).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████████████[748]

Thus, at least for those two patents, the analytical approach provides some insight.   It suggests

the '172 patent and '721 patent values are negligible, as the non-infringing product is ████

█████████████████████████████████ the infringing one.

339.   Dr. Vellturo's analysis suggests that a significant portion of the profit (and

accused product success) derives from the benefits of the asserted patents.  ████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

340.   Each accused product contains vastly different hardware, keyboards, screen sizes,

and versions of operating software.  As a consequence, there is tremendous variation in profits

across the accused products.[751]  This profit variation does not derive from the use of the patents-

in-suit, but instead draws from other non-patented elements.[752] ██████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

<hr/>

[748] Exhibit 86. ████████████████████████████████████████████
██████████  *See also*, Exhibit 26A.
████ Vellturo Report, at Exhibit 26.
[750] As I describe later in this report, these margins overstate the relevant profitability. For example, the average
profitability figures used by Dr. Vellturo include profits from products not accused of certain patents.
[751] ████████████████████████████████████████████████████
███████████████████████████████ *See* Exhibits 26A, 86 - 88.
█ █████████████████████████████████████████████████
██████████████████████████████████
[753] Exhibit 86.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



341.    Instead of using product profit data which clearly incorporates far more than the patents-in-suit, Dr. Vellturo could have focused on the value of the operating system of the accused devices, which is the component of the product that incorporates the accused features.  This is consistent with the approach suggested in many recent cases, in which the smallest salable unit practicing a patent is analyzed to determine the value of the patent's contribution.[754]  It is my understanding, however, that the Android operating system is open source—and is provided at no charge to its users.  Accordingly, the market price of the Android operating system itself is $0.   Apple, on the other hand, has (1) in the past, charged for operating system upgrades for certain products;[755] and (2) estimates, for GAAP accounting purposes, the market price of operating system upgrades related to its iPhone and iPad products.[756]   Using

---

[754] See, e.g., Cornell University v. Hewlett-Packard Co., 609 F.Supp.2d 279 (N.D.N.Y. 2009).

[755] Prior to 2010, Apple charged iPod Touch users $10 to upgrade to the next version of the operating system, including updates to the iPod Touch versions of the iOS 2.0 and iOS 3.0 operating systems that are used by some of Apple's practicing products in this matter. http://appleinsider.com/articles/09/06/25/upgrade_fee_sees_few _ipod_touch_users_updating_to_3_0_software;  http://www.macworld.com/article/1134502/ipodtouch.html (viewed 9/12/2013).  Of note, it was reported that only a small fraction of iPod Touch users actually purchased upgrades for $10 per unit, indicating that many iPod Touch buyers did not value the incremental functionality provided by the OS upgrade.  http://appleinsider.com/articles/09/06/25/upgrade_fee_sees_few_ipod_touch_users_updating_to_3_0_ software (viewed 9/12/2013).

[756] According to Apple's SEC filings, software upgrade rights sold with each iPhone and iPad have varied from $10 to $25 over time.  See Exhibit 91. As part of its process of creating its periodic financial filings, Apple has been required to account for a portion of the revenue generated on sales of certain of its products, including iPhones and iPads as deferred revenue to account for the fact that as part of the sales of these products, customers purchase

188

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple's operating system upgrade as a proxy for Android suggests a value of an entire operating system upgrade (which includes more than one hundred new software features) of between $10 and $25.[757]

342.    As discussed previously, according to Apple, each iOS upgrade provides users with over 100 or 200 new features.[758]  Assuming the $10 to $25 reflects the price of a single upgrade with 100 new features, the average value per feature would amount to $0.10 to $0.25. For an upgrade of 200 new features, the range would be $0.05 to $0.125 per feature.[759]  In fact, the lack of discussion in reviews and press releases of the accused features (opposed to other features) suggests they may be relatively less valuable than average.  These amounts are significantly below Dr. Vellturo's estimates that suggests each feature to be worth from $4.40

---

"unspecified and specified software upgrade rights and non-software services that are attached to hardware and software products." Apple Form 10-K for the Fiscal Year Ended September 24, 2011, at 48. To determine the appropriate amount of revenue to be deferred and allocated on a straight line basis "over the estimated lives of each of these devices, which range from 24 to 48 months," Apple determines "the best estimate selling price ('ESP')" of the unspecified and specified software upgrade rights and non-software services, which, according to Apple, "reflect[s] the Company's best estimates of what the selling prices of elements would be if they were sold regularly on a stand-alone basis." Apple Form 10-K for the Fiscal Year Ended September 24, 2011, at 27. Apple's 2011 Form 10-K also noted:

> …the Company has concluded that if it were to sell upgrade rights or access to the non-software services on a standalone basis, including those rights and services attached to iOS devices, Mac and Apple TV, the selling prices would be relatively low. Key factors considered by the Company in developing the ESPs for software upgrade rights include prices charged by the Company for similar offerings, market trends for pricing of Mac and iOS compatible software, the Company's historical pricing practices, the nature of the upgrade rights (e.g., unspecified and when-and-if-available), and the relative ESP of the upgrade rights as compared to the total selling price of the product. The Company may also consider, when appropriate, the impact of other products and services, including advertising services, on selling price assumptions when developing and reviewing its ESPs for software upgrade rights and related deliverables. The Company may also consider additional factors as appropriate, including the pricing of competitive alternatives if they exist and product-specific business objectives. When relevant, the same factors are considered by the Company in developing ESPs for offerings such as the non-software services; however, the primary consideration in developing ESPs for the non-software services is the estimated cost to provide such services over the estimated life of the related devices, including consideration for a reasonable profit margin. Apple Form 10-K for the Fiscal Year Ended September 24, 2011, at 49.

[757] Exhibit 91.
[758] *See* Exhibit 38.
[759] This calculation conservatively assumes that the entire revenue amount is profit.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

(the '959 patent) to $13.85 (the '172 patent)[760], and collectively more than $42— roughly 2 to 5 times the price of the entire operating system upgrade.[761]

### (3) Apple's Inconsistency Across Lawsuits

343.    Apple's damages experts from a prior litigation between Apple and Samsung addressed the total value of intellectual property in smartphone and tablets.  Julie Davis and Terry Musika both concluded that *all* of the intangible value (not including brand and design) was $31 per unit in Apple products, and $4 per unit in Samsung products.[762]  This value was then allocated across various asserted patents in that matter to determine a value for each patent. Although I do not agree with this methodology or its conclusions, I find that Apple's experts are being entirely inconsistent with each other when evaluating the profits (and relevant royalty) for Samsung's smartphones.

344.    Dr. Velluturo argues at least ▉ in profits in Samsung's phone comes from just six patents; Mr. Musika/Ms. Davis concluded that the entire profit associated with *all* intellectual property in Samsung's phones was limited to $4.  Further, the Musika/Davis approach implied that all of the $4  in value was attributable to 7 utility patents (not at issue in this matter) allegedly used in Samsung's products, including the Galaxy S II, which is also accused in this matter.[763]  Apple's approach if consistently applied here would suggest that there is no value from the patents-at-issue.  In other words, given that all of the intangible value was assigned to those 7 patents, there is no value left to be assigned to the patents-at-issue.

---

[760] Equals 3.99% x $110.25; and 12.56% x $110.25.  Values are before adjustments.  *See* Velluturo Report, at Exhibit 26.

[761] In the VirnetX v. Apple matter, Dr. Velluturo used information related to OS prices to inform the royalty. APL630DEF-WHVX0000591883-592072, at 1989-1995.

[762] Expert Report of Julie Davis, June 24, 2013, at 86.  *See also*, Supplemental Expert Report of Terry L. Musika, CPA, May 8, 2012, at Exhibit 41.2-S.

[763] Expert Report of Julie Davis, June 24, 2013, at Exhibit 41.1-S; Supplemental Expert Report of Terry L. Musika, CPA, May 8, 2012, at Exhibit 41.1-S. *See also* Exhibit 92.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

345.    Even if Apple's previous damages experts were to correct their methodology to include all of the intellectual property required to manufacture and sell the accused Samsung products—not just the patents that are asserted in that particular litigation—Dr. Vellturo's results would still appear excessive.  This correction is an obvious one.  Suppose there are just two patents in a phone which has an intangible value of $4.   One cannot logically say the value of the first patent is $4, and then later say the value of the other patent is $4 in another context.  This is double counting.  Instead, the value of the two patents must add to $4.

346.    More generally, this correction to the Musika/Davis analysis suggests that the value of the intangibles must be apportioned to all of the intellectual property required to produce a smartphone.[764]  When one considers all of the intellectual property required by smartphones that would be captured by the intangible value, each patent becomes noticeably less valuable.  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ Recognizing that smartphones and tablets require many thousands of patents indicates an even lower value for each patent.[766]

347.    This illustration clearly demonstrates that Dr. Vellturo's purported smartphone royalty of more than $42 for just six patents is disproportionately high, given Apple's assertion that the total intangible value in Samsung's phone is less than $4.

---

[764] *See* Exhibit 92.
[765] *See, e.g.*, APLNDC00001103-1125, at 14-18.  *See* Exhibit 92.
[766] 3,500 patents are identified in APLNDC00001103-1125, at 5.  Assuming only 400 patents were necessary, implies a value of roughly $0.01 per patent.  Using a smaller number of patents, rather than the whole portfolio is consistent with the notion that all patents do not have the same value.  *See, e.g.*, N. van Zeebroeck, "The Puzzle of Patent Value Indicators," *CEB Working Paper No.* 07/023, April 2009., at 3-4; Mark Schankerman, "How Valuable is Patent Protection?  Estimates By Technology Field," RAND Journal of Economics, 29.1 (Spring 1998), 77-107, at 77; Zvi Griliches,"Patent Statistics as Economic Indicators: A Survey," Journal of Economic Literature, XXVIII (December 1990), 1661-1707, at 1682.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### (4)    Alternative Measures Using Features

348.    The royalties resulting from the various approaches described above, while much lower than those proposed by Dr. Vellturo, are consistent with the royalties implied by attributing the value of a smartphone or tablet to its enumerated features.  Specifically, I illustrate the Vellturo calculations of Samsung's willingness to pay, replacing the Hauser conjoint results with relative feature mentions from my analysis and review of surveys, as well as making other corrections to the Vellturo calculations.

349.    First, I start with the average operating profit of the accused smartphones and tablets.  As discussed above, a license is a way to share the benefits from making, using, or selling products embodying the technology at issue.  Fully loaded operating profits are the best measure of that value, particularly in light of Apple's allegation that essentially Samsung's entire current smartphone and tablet business line uses the patents-at-issue.[767]  These profits represent the benefit that Samsung should share.  In Exhibit 93, I show these profits for the accused smartphones.  Note that as certain products are not accused of infringing various patents, the average operating profit differs for each inquiry.  ███████████████████████████
████████████

350.    Next, I allocate these profits to the various identified smartphone features using the relative mentions from professional reviews which range for these patents from 0.0 percent to 0.5 percent.  I also perform an allocation using the relative mentions from consumer reviews that range from 0.0 percent to 0.2 percent.  As my review methodology over-included feature

---

[767] Although Samsung's Galaxy S4 is not at issue in this litigation, I understand that Apple has accused that product of infringement as well.  See e.g., Apple Inc.'s List of Accused Products Pursuant to Court Order of April 24, 2013, May 13, 2013, at 1, and http://www.bloomberg.com/news/2013-06-27/apple-can-t-add-galaxy-s4-to-samsung-patent-lawsuit.html (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

mentions related to the asserted functionality, this illustration overstates the value associated

with the patents-in-suit.

351.    Exhibit 93 shows that allocating value in this way suggests that the ███████

████████████████████████████████████████████████████████████████████████████

These rates overstate the value for each patent, as they equate functionality of an entire feature

(which on average encompasses more than one patent) to a single patent.   ████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████ [768]

### (5)    Reasonableness Check with Apps

352.    To further assess the reasonableness of these approaches, I examine data from the

mobile apps marketplace.  Mobile applications are designed to provide specific functionalities to

mobile devices, and the availability of apps, in a general sense, is viewed by consumers as an

important factor in their device purchasing decisions.[769]  Apps, in some ways, are useful indicia

of the value smartphone customers place on software functionality for their devices.

353.    Apps are designed to run on specific operating systems, and developers may

design apps on multiple platforms.  Android and Apple iOS are the two dominant mobile app

platforms, accounting for 51 percent and 40 percent of total global app downloads in Q1 2013,

respectively.[770]  Apple apps are sold exclusively through the Apple iOS store.  Android Apps are

---

[768] Many reports have shown that Samsung has resorted to giving away its tablets, despite the use of the patents-in-suit. *See, e.g.,* http://news.cnet.com/8301-30685_3-20061487-264.html (viewed 9/12/2013); http://techcrunch.com/2011/08/18/this-isnt-going-to-end-well/ (viewed 9/12/2013).

[769] *See, e.g.,* APLNDC630-0000149470-605, at 480, 597; Rangel Deposition Volume 1, Exhibit 5, at 18.

[770] http://techland.time.com/2013/04/16/ios-vs-android/ (viewed 9/12/2013).  Additional app platforms include Microsoft and BlackBerry.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

predominantly sold through the Google Play store, but additional apps stores, including Amazon, GetJar, Slide ME, F-Droid, and Appoke also sell Android Apps.[771]

354.    The vast majority of Android App downloads are for "free apps", and there is substantial variation in the popularity of apps across different categories.  According to estimates of U.S. downloads in the Google Play store provided by Priori Data,[772] in February 2013 the most popular free app (Google Play services) was downloaded 69.5 million times.  The most popular paid app (Swiftkey) was downloaded 260,900 times.  Collectively, the ten most popular free apps were downloaded 122.2 million times compared to 490,700 downloads for the ten most popular paid apps, and downloads for the 50 most popular free apps totaled 168.9 million compared to 760,600 downloads for the 50 most popular paid apps.[773]

355.    Exhibit 95 summarizes estimates of cumulative downloads and payments for leading apps from their launch date through May 2013.[774]

---

[771] http://www.digitaltrends.com/mobile/android-app-stores/ (viewed 9/12/2013).
[772] Priori is a mobile app data provider that publishes intelligence reports, performs custom data projects, and engages in select third party data partnerships.  Priori data are collected in partnership with XYO, which previously provided free app download reports offered by Priori before shifting its focus towards an app recommendation services.  *See*, http://prioridata.com/about-us/ (viewed September 12, 2013); http://xyo.net/app-downloads-reports (viewed September 12, 2013).
[773] Exhibit 94.  These data exclude apps with in-app purchases.  In-app purchases allow users to purchase upgrades, extra features, or other "virtual goods" within the app.  In-app purchases are especially prominent among games, where users can purchase extra lives and access to extra levels, among other things.  Priori estimates that in May 2013, 5 percent of Android apps and 2 percent of downloads in the U.S. included apps that allowed for in-app purchases.  *See*, "Country Insights Report: USA Android Platform," Priori AppMarket Reports, May 2013, at 4.
[774] Estimated downloads are calculated from estimates of Google Play, paid app downloads in the U.S.  *See*, Exhibit 95.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



356.    Relative to the estimated number of Android smartphone users, the cumulative number of downloads for these popular paid apps is small in the context of total device ownership.  ████████████████████████████████████████████  ██████████ This is consistent with the observation that specific individual software features are of limited importance to many smartphone users.  Dr. Vellturo's analysis implies that had the features-at-issue been apps, they would be among the most popular paid apps ever.

357.    I use this app data to illustrate the average price paid across all Android users for each of the top 25 apps over the relevant period.  As I show in Exhibit 95, ████████████

██████████████████████████ ██ ██████████████████████ ██

████████████████ ████████████████████████

███████████████████████████

████████

### (6)    Summary of Income Approaches

358.    As described above, various income approaches provide insight into the appropriate rates for the patents-in-suit.

- The Analytical Approach suggest the '172 patent and '721 patent have nominal value.

- Operating software upgrade prices suggest values of $0.05 to $0.25 per feature, per product.

- Apple's Case I approach suggests no more than $0.14 per patent, per product.

---

[775] Exhibit 95.
[776] Exhibit 95.

195

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Alternative approaches using product features tend to show values between $0.00 and $0.41, per smartphone, per feature.

- Analysis of apps indicates no more than $0.24 per patent, per unit, and likely between $0.02 and $0.11 per patent, per unit.

### d)    Cost Approach

359.    The Cost Approach involves an examination of the costs required to construct or purchase an alternative technology that performs the same function as the patented technology, but which does not infringe the patent or patents-in-suit.[777]  The cost to develop and implement a non-infringing alternative technology is also called "design-around cost."  According to the Cost Approach, a user of certain patented technology would pay no more for access to that technology than its avoided costs.

360.    Many times a Cost Approach focuses on avoided out-of-pocket capital expenditures.  However, such examinations tend to underestimate the true value of assets, including intellectual property assets.  The "economic" facts that need to be considered include the costs of unsuccessful design attempts, the period of the design-around, and the going forward impacts of the alternative involving, for example, the cost associated with implementing and distributing the alternative technology.

361.    Dr. Vellturo has acknowledged that the presence of design-around alternatives would reduce the royalty rate in his calculations.[778]  For example, in his royalty analysis, Dr. Vellturo assumes it would take Samsung 4 or 5 months to successfully have implemented certain alternatives in its accused products.[779]  Doing so reduces the rate that would have otherwise be

---

[777] Reilly and Schweihs (1999), at 97.
[778] *See, e.g.*, Vellturo Report, at Exhibit 27.
[779] *See, e.g.*, Vellturo Report, at Exhibit 27.

paid (under Dr. Vellturo's construct) by as much as almost 90 percent.[780]  This is because Dr. Vellturo correctly recognizes that Samsung would have been unwilling to pay a royalty after it had been able to design-around the patents-in-suit.

362.    Samsung contends that, as of the point of the hypothetical negotiations it could have had available, non-infringing, commercially acceptable alternatives for each of the patents-in-suit.[781]   For two of the patents-in-suit (the '721 and '172 patents), Samsung introduced phones with non-infringing alternative functionalities prior to the damages period.[782]

363.



---

[780] Dr. Vellturo assumes that the royalty will be proportionally reduced to the fraction of time to design-around relative to the product life of 36 months.  Vellturo Report, at Exhibit 27.
[781] See, e.g., Samsung's Response to Apple's Interrogatory No. 29.
[782] For the '721 patent, one such design was the "glass unlock" used as the first-screen unlocking mechanism in the Galaxy S II; for the '172 patent, one such design was the Samsung keyboard available in the Dart.  See Rebuttal Expert Report of Saul Greenberg, Ph.D Regarding Noninfringement of the Asserted Claim 8 of U.S. Patent No. 8,046,721, at ¶¶ 438-440; Rebuttal Expert Report of Dr. Daniel Wigdor Concerning Non-Infringement of U.S. Patent No. 8,074,172, at ¶¶ 156-158.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



364. These estimates are generally consistent with the opinions of Samsung's technical

experts, w

[784] *See* Lee Deposition at 165:10-169:24; 76:1-77:22 and Exhibit 22.
[785] *See* Rebuttal Expert Report of Dr. Kevin Jeffay Concerning Noninfringement of U.S. Patent No. 5,946,647 at ¶¶
502, 515, 519, 523, 528 (

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

365.    Samsung would only be willing to pay a royalty during the period in which it needed the patented technology.  One way to express this concept is that Samsung would be willing to pay a royalty during the number of months it took to design-around the patents, but it would pay nothing after the alternative was implemented.[787]  The royalty payment can be adjusted to account for the relative portion of the period for which a design-around was not feasible.  Thus, the ability to design-around the patent(s) would suggest that in a hypothetical negotiation Samsung would be willing to pay less over the full time period in which Samsung is alleged to have made infringing sales.  To the extent that the Court finds Samsung's alternatives to be acceptable and available, the royalty payment should be reduced to reflect the infringing activity in the relevant period that a license would have been required.

### e)    Qualitative Factors

366.    In addition to the quantitative evidence, qualitative factors should be (and are) considered to account for differences between the Market, Income and Cost approaches and the hypothetical negotiation.  I discuss relevant qualitative factors below, which emanate from *Georgia-Pacific*.[788]

> *Georgia Pacific Factor 1 – The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.*

367.    There is no established royalty for the patents-in-suit.  The licenses (and offers to license) that include the patents-in-suit have been considered in the Market Approach.  ███████

████████████████████████████████  Adjusting the payment terms to reflect some of the facts of the hypothetical negotiation with Samsung, a royalty to the patents-in-suit

---

[787] For example, assume the royalty for use of certain technology was determined to be $1 per unit.  Samsung would pay the $1 per unit on all units until the point it could implement its alternative, at which point it would no longer owe a royalty.  If the alternative was implemented midway through the period (and sales were evenly distributed), this would indicate an effective rate of $0.50 per unit over the entire time period.

[788] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ This factor provides no additional guidance.

*Georgia Pacific Factor 2 – The rates paid by the licensee for the use of other patents comparable to the patent in suit.*

368.    As I noted in the Market Approach, Samsung produced a number of licenses

related to its consumer electronics products, many of which include rights for smartphones.

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████

369.    This provides no further guidance, as it was subsumed in the Market Approach.

*Georgia Pacific Factor 3 – The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.*

### (1)    IP Covered by License

370.    All else equal, a license that includes rights to a variety of patents, copyrights and knowhow is more valuable than one that does not (*i.e.*, a "naked" license). The hypothetical license construct used to assess reasonable royalty damages presumes a naked license that provides the licensee (*i.e.*, the alleged infringer) with permission to practice the patents-in-suit. It does not provide for the transfer of any know-how, technical assistance or any other intellectual property rights from the patent holder/licensor to the alleged infringer/licensee.

371.    ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

372.    █████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████

███████

### (2)    Exclusivity

373.    The hypothetical license construct used to assess reasonable royalty damages presumes a non-exclusive license, as it is intended to provide the hypothetical licensee only with the right to use the technology at issue and not, for example, the right or ability to prevent other parties from practicing the technology. [789]  Moreover, the patent owner cannot and should not be effectively constrained by the hypothetical license from suing or licensing any other party it deems appropriate under its patents.

374.    ████████████████████████████████████████

████████████████████████████████████████████

---

[789] In *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333 (D. Del. 1994), the court noted that "[a] patent owner may recover as a measure of damages the royalty rate established by prior actual licenses for acts comparable to those engaged in by the infringer without authority." *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1343 (D. Del. 1994). In its decision, the court drew a parallel between the hypothetical license and a non-exclusive license, noting that "[t]he rights needed by Amoco to use [the infringing] process are similar to the rights granted to the ... licensees" which was a "non-exclusive license." *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1344 (D. Del. 1994). The court also wrote that "[t]he rights infringed by Amoco were similar or 'comparable' to the rights granted under the standard license." *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1344 (D. Del. 1994).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

█████████████████████████ As a result, this has no incremental effect on the reasonable royalty rate here.

### (3)    Legal Strength of IP

375.    A patent that has been judged valid, enforceable, and infringed, or that has been readily acknowledged by the industry as such, is generally worth more than a patent for which these issues are still in doubt.  In the hypothetical negotiation construct, it is appropriate to assume that the patents-in-suit are valid, enforceable, and infringed, and that both parties are aware of these facts.  In contrast, the existing licenses produced by the parties in this proceeding were not, as a general matter, negotiated under conditions where the patents-in-suit had been conclusively found to be valid, enforceable, or infringed.  One exception is that at least one of the patents licensed by HTC were found to have been infringed by HTC.[790]

376.    This difference in legal strength between the hypothetical license and the bulk of the quantitative market evidence considered in this report suggests that the rates reflected in the existing licenses would tend to underestimate the appropriate royalty that should emerge from a hypothetical negotiation of the type that we are analyzing here.

> *Georgia Pacific Factor 4 – The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.*

377.    A hypothetical negotiation is assumed to be conducted in an environment in which the patent holder is essentially required to grant the alleged infringer permission to

---

[790] One article explained, "In a deal that caught industry watchers by surprise, Apple and HTC agreed Saturday to dismiss all their pending lawsuits and to cross license 'current and future patents' for the next decade -- thereby ending more than two and a half years of acrimony and litigation… [HTC] already lost one patent fight with Apple at the U.S International Trade Commission (ITC), leading to a temporary ban on the sale in the U.S. of two of its newest phones." *See* tech.fortune.cnn.com/2012/11/11/what-were-the-terms-of-the-apple-htc-settlement/ (viewed 9/12/2013).

practice the patents-in-suit in exchange for compensation adequate for the alleged infringer's unauthorized use of the patents-in-suit.

378.    In the present case, █████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████ █

379.    Apple's licensing approach is reflected in some of the existing licenses already considered, such as the 2012 HTC license.  As such, this has no additional effect on the royalty considered here in that context. ████████████████████████████████████████
█████████████████████████████████████████████████

> *Georgia Pacific Factor 5 – The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.*

380.    When licensing a direct competitor, a licensor may demand a relatively high royalty rate because, by granting a license, the licensor risks losing sales and market presence to the licensee.  Apple, the hypothetical licensor here, competes directly with Samsung.

381.    Around the point of the hypothetical negotiations, Samsung and third party documents showed that "the US market [was] becoming a two horse race between Apple and Samsung."[792]  Market share data confirms that both Apple and Samsung were among the

---

[791] Apple Inc.'s Second Supplemental Objections and Responses to Samsung's Interrogatories To Apple Relating to Apple Inc.'s Motion for Preliminary Injunction (No.4), at 4-5.
[792] "STA Competitive Situation Paradigm Shift: HQ CFO," Feb. 16, 2012, SAMNDCA11545927, at -934.  *See also*, Chloe Albanesius, "Smartphone Loyalty Runs Deep, Especially Among the Apple Faithful," PCMag.com, November 25, 2011 (http://www.pcmag.com/article2/ 0,2817,2396879,00.asp (viewed 9/12/2013); Tanzina Vega & Brian X. Chen, "Samsung-Apple Fight Moves to Marketing," N.Y. Times, Sept. 18, 2012, http://www.nytimes.com/2012/09/19/business/media/samsung-apple-fight-moves-to-the-marketing-arena.html (viewed 9/12/2013); "BEAT APPLE: Apple vs Samsung Consumer Insights," Dec. 9, 2011, SAMNDCA10389445, at -446, -448.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

marketplace leaders throughout the relevant period.[793]   Samsung internal documents confirm that its goal was to become the marketplace leader, surpassing Apple,[794] and recent Samsung advertising campaigns appeared to target the iPhone.[795]

382.    Samsung's growth and threat to Apple had not gone unnoticed by Apple.

383.



As such, this factor has no additional effect on the royalty considered from those documents.

*Georgia Pacific Factor 6 – The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.*

384.    In some instances, sales of products embodying the patented technology enhance the sales of related goods and services.  The existence of such sales, referred to as tag-along or convoyed sales, increases the value of the protection provided by the hypothetical license.

[793] *See, e.g.*, Exhibits 13 to 15.
[794] *See, e.g.*, "GS Choi Visit to STA," Sept. 20, 2011, SAMNDCA00258674, at -686; "STA 2012 Winning Strategy," Aug. 2011, S-ITC-500056374, at -376.
[795] Deposition of Todd Pendleton, Transcript, July 19, 2013, at 65, 76. See also, "Disrupt Summary," Sept. 17, 2012, SAMNDCA630-06698295, at -296; *See* also, Email, dated Sept. 17, 2012, SAMNDCA630-07584645, at -646-647.
[796] "iPhone Offsite," Jan. 17, 2013, APLNDC630-0001467518, at -534; See, e.g., Deposition of Phil Schiller, July 23, 2013, at 160;  Deposition of Greg Joswiak, April 17, 2012, at 33; Deposition of Stan Ng, July 2, 2013, at 18, 65.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

385. ███████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████[797]  There is also the ability to generate revenue by

the sales of applications for the phones.  Although this is part of Apple's business strategy, █

███████████████████████████████████████████████████ ██ ██

████████████████████████████████████

386.    Lastly, the data suggest that brand loyalty in the smartphone marketplace can

result in the continued purchase of future smartphones.  ██████████████████████

█████████████████████████████████████████████████████

████████████████████████████  To the extent that the patents-in-suit enhance the

experience of these customers, resulting in a higher likelihood of a repeat buy in the future, there

would be upward pressure on the royalty rate.  However, I have seen no evidence in this matter

which shows the patents themselves will promote these additional purchases (and, to the extent

that future Samsung products included the technology at issue, royalties would be paid on those

products too).  Thus, there is no additional impact here.

*Georgia Pacific Factor 7 – The duration of the patent and the term of the license.*

---

[797] ██████████████████████████████████████████████████████████
██████████████████ APLNDC630-Y00000014. ████████████████████████
██████████████████
SAMNDCA630-06642238.xlsx and Exhibit 9.
[798] One article explains that "Google gives 70% of an app's revenue to the developer. It gives 25% of that revenue to
the carrier. It keeps just 5% for itself."  None is left for Samsung. http://www.businessinsider.com/google-play-
store-revenue-2013-6.  Another source confirms the 70/30 split with the developer of the app receiving 70% of the
payment, and the remaining 30% being split between the distribution partner and operating fees (to Google).  *See*
https://support.google.com/googleplay/android-developer/answer/112622?hl=en (viewed 9/12/2013).
[799] ████████████████████████████████████████████████████████████████
██████████████████ SAMNDCA630-07424610-622, at 615. ██████████
██████████ SAMNDCA00265791-848, at 804.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

387.    The first of the patents-in-suit to expire is the '647 patent, which will be on February 1, 2016.   The last to expire will be the '172 patent, on June 7, 2030.[800] Accordingly, at the time of the hypothetical negotiation in 2011, the patents-in-suit collectively would have retained a significant portion of their patent lives.  Although I have not seen evidence that the useful life of the patented technology is expected to end prior to the expiration of the patents-in-suit, given the rapid advance in telecommunications and the frequent changes within the smartphone marketplace, the economic life of these patents likely will be for a shorter period of time.

388.    Nevertheless, the negotiation here would be for the use of the patents-at-issue in the accused products, at most through the patent lives.  As the extent of use is specifically captured in my analysis of per unit rates, this factor provides no additional guidance.  To the extent that the quantum of accused sales increases between the date of this report and trial, I expect that my royalty conclusion will change to reflect that additional use.

> *Georgia Pacific Factor 8 – The established profitability of the product made under the patent; its commercial success; and its current popularity.*

389.    As a general matter, greater commercial success of the accused products will tend to increase the amount that should be paid for access to the patents-at-issue.  In the present case, the determination of the commercial success and popularity of the accused products can be assessed based on their actual market acceptance (*i.e.*, sales and profitability).

390.    

---

[800] The expiration dates of the other patents are: the '959 patent on 1/5/20; the '414 patent on 2/25/27; the '760 patent on 8/1/29; and the '721 patent on 12/23/25.  *See* Vellturo Exhibit 6.
[801] Exhibit 26A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

391.    The profitability of the products was reflected in certain agreements analyzed in the Market Approach, such as the HTC agreement and Apple proposal. ███████

███████████████████████████████

███████████████████████████████████

███████████████████ The product profitability is expressly accounted for in the Income Approach.  Thus, this factor is neutral here relative to those data.

> *Georgia Pacific Factor 9 – The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;*
>
> *and*
>
> *Georgia Pacific Factor 10 – The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.*

392.    The utility and nature of the patents-at-issue have been described previously in this report.  The commercial embodiments of these inventions have provided some advantage over the previous methods, and do result in some incremental benefit to the users of smartphones and tablets.  This has been captured in the Income Approach.  However, Samsung contends that the value of these technologies are more limited, as it has numerous ways that it could have provided similar functionality to its products by designing around the patents.   In this respect, the Income approach overstates the value, and this factor would suggest a lower outcome.

---

[802] Profitability varies across specific models of accused products.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

393.     Similarly, the Market Approach evidence shows a range of values associated with various licensed technologies.  Part of the basis for determination of the amount of payments is the value of the technology relative to other options the licensee possesses.  Higher rates tend to suggest greater benefits and fewer alternatives; lower rates often indicate the opposite.

> *Georgia Pacific Factor 11 – The extent to which the infringer has made use of the patent; and any evidence probative of the value of that use.*

394.     ██████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████  █████

395.     ████████████████████████████████████████████████████

███████████████████████████████

> *Georgia Pacific Factor 12 – The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the patent or analogous patents.*

396.     I have not seen information regarding a customary split of profit within the smartphone or tablet businesses. To the extent that there is such a convention, it is already subsumed in the Market Approach.  Thus, this factor has a neutral effect on the outcome of the hypothetical negotiation.

> *Georgia Pacific Factor 13 – The portion of the realizable profit that should be credited to the invention as distinguished from non-patentable elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.*

397.     I understand that Apple contends that all of the patents-in-suit are required to offer a competitive smartphone or tablet product, and that without such features, a phone would not be acceptably easy to use to many buyers.  However, as discussed in detail above, a large

---

[805] *See* Exhibits 8, 9, and 26A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

number of features are included in smartphones and tablets.  These products are advanced mobile computing devices that include a multitude of features such as email, internet access, multimedia functions (music, video, gaming, etc.), cameras, and other advanced applications.[806]  Each of these product categories requires various other technologies and features that incorporate other patented inventions.

398.    For example, ensuring compatibility among wireless devices and other necessary wireless infrastructure requires coordination of technical specifications through so-called "standards-essential" patented technologies.[807]  As such, compliance with each generation of mobile communications standards requires that marketplace participants, including handset manufacturers, have access to thousands of patented technologies.[808]

399.    In addition, the products are comprised of many components, ranging from cameras, batteries, GPS, and applications (such as video, music and internet).



.[809] One analyst estimated that smartphones can embody as many as 250,000 patents due to the wide range of communications and computing technologies they utilize.[810]

---

[806] *See, e.g.,* Oppenheimer 2012 Handset Guidebook, at 93.

[807] Standards-essential patents are those disclosing technologies that are necessary for market participants to employ in their devices to comply with standards and ensure interoperability with the mobile communications networks.

[808] One study examining the WCDMA (3G) standard as of December 2008 found that over 1,800 patent families, held by over 50 owners, were essential to implementing the standard, and that thousands more patents were claimed to be essential.  Fairfield Resources International, January 6, 2009, at 1, 8-9, Table 5.  As of September 2010, the number of LTE essential patents was said to be 1,941.  Quies, Peter, "Valuing Standard Essential Patents: An Examination of Announced FRAND Royalty Rates for LTE," December 2012, available at http://www.americanbar.org/content/dam/aba/publications/litigation_committees/intellectual/012413-valuing-standard-essential-patents-memo.authcheckdam.pdf (viewed 9/12/2013).  A December 2011 study counted 2,999 patents declared essential to LTE to the European Telecommunications Standards Institute ("ETSI").  "Evaluation of LTE Essential Patents Declared to ETSI," December 2011, available at http://cybersoken.com/research/pdf/lte01EN.pdf  (viewed 9/12/2013).

[809] See Exhibit 72.

[810] Steve Lohr, "Apple-Samsung Patent Battle Shifts to Trial," *The New York Times*, July 29, 2012; Steve Lohr, "A Bull Market in Tech Patents," *The New York Times*, August 16, 2011.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

400.    Furthermore, operating systems software technology itself incorporates many features and inventions beyond those taught by the patents-in-suit.  Although I understand that the patents-in-suit are directed to six features, there are still many other product features embedded in the operating system unrelated to Apple's asserted technology.[811]

401.    On balance, this factor suggests downward pressure on the royalty relative to the Income Approach, but as it is incorporated in some of the allocation methodologies, this impact is mitigated.  However, this does support the notion that █████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

*Georgia Pacific Factor 14 – The opinion of qualified experts.*

402.    I am aware of the opinions of Dr. Kevin Jeffay (concerning the '647 patent), Martin Rinard, Ph.D. (concerning the '959 patent), Jeffrey Chase, Ph.D. (concerning the '414 patent), Saul Greenberg, Ph.D. (concerning the '721 patent), Daniel Wigdor (concerning the '172 patent), Professor Erdem, Professor Foster, and Professor Reibstein, and they are reflected in my analysis above.  These do not provide additional impact on the royalty.

*Georgia Pacific Factor 15 – The amount that a willing licensor would have agreed to accept, and that a willing licensee would have agreed to pay at the time the infringement began.*

403.    This factor subsumes much of what I have discussed previously.

404.    Evidence from the Market Approach provides guidance to the outcome of a negotiation for a license to each of the patents-in-suit (before consideration of qualitative factors that should influence the agreed-upon royalty).  █████████████████████████████████

---

[811] Exhibits 38, 39, and 44. *See also*, the previous discussion in this report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

405.     The Income Approach also provides guidance.  The analytical approach suggest

the '172 patent and '721 patent have nominal value.  Operating software upgrade prices suggest

values of $0.05 to $0.25 per feature, per product.   Apple's previous approach suggests no more

than $0.14 per patent, per product.  Alternative approaches using product features tend to show

values no more than $0.41, per feature, per smartphone. An analysis of apps indicates no more

than $0.24 per patent, per unit, and likely between $0.02 and $0.11 per patent, per unit.

406.     The Cost Approach suggests that to the extent that the Court finds Samsung's

alternatives to be acceptable and available, the royalty payment should be adjusted downward.

407.     I have considered qualitative factors that should influence the agreed-upon royalty

in my analysis of the *Georgia-Pacific* factors.  Although some factors provide upward pressure

and others provide downward pressure, this analysis generally suggests upward pressure relative

to the royalty payments considered under the Market and Income Approaches.   The presumption

of validity, enforceability, and infringement (*Georgia-Pacific* Factor 3); the observation that

Apple tends to avoid licensing its technology generally (*Georgia-Pacific* Factor 4); and the

competitive relationship between Apple and Samsung (*Georgia-Pacific* Factor 5) all provide

upward pressure on the royalty.  Downward pressure is applied, in part, because manufacturing

---

[812] Using the 95th percentile.  Exhibit 79.
[813] Using the 100th and 95th percentiles.  Exhibit 79.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and selling a mobile phone or tablet requires more than just the technology at issue here (*Georgia-Pacific* Factor 13).

408.    Based on my analysis of the evidence from the Market Approach and Income Approach and application of the *Georgia-Pacific* factors, a lump sum royalty for sales through February 2013 could be as much as $31.7 million based on a per unit royalty rate of $0.35.[814] This amount, however, fails to account a critical factor in any license negotiation: the incentive to design around the patented technologies in order to avoid a royalty payment and the ability to do so.  Should the Court find Samsung's design-around options to be available and acceptable alternatives, the royalty amount should be adjusted downward.  This is supported by analysis of *Georgia-Pacific* Factors 9 and 10, which suggests downward impact from the relatively minor improvements provided by the asserted patents.  As I discuss in the Cost Approach, the royalty payment could be reduced to reflect the infringing activity in the relevant period that a license would have been required.  Assuming that Samsung would have been able to offer acceptable non-infringing alternatives by the end of March 2012 for all of the patents-at-issue, a lump sum royalty for sales through February 2013 would be roughly $5.9 million.[815]  This amount can be adjusted downward or upward, as shown in Exhibit 98, to take into account different assumptions regarding Samsung design-around options, depending on the Court's finding regarding their availability and acceptability.

409.    Should the Court find that only certain patents are valid, enforceable, and infringed, damages would be lower and should be applied to units for each patent the Court deems relevant.[816]

---

[814] Exhibit 4 and Exhibit 98.  Should accused sales continue past February 2013, my analysis can be adjusted.
[815] Exhibit 4 and Exhibit 98.
[816] Exhibit 98.  My conclusions can be adjusted to account for the removal of certain products or fewer patents.  *See* Exhibits 99A through 99R.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

XI.    **Conclusions**

- Many factors other than operating system software contribute to smartphone and tablet purchase decisions.  The features enabled by the patents-at-issue are a small part of the accused products and their operating systems, which have hundreds if not thousands of features.  The Vellturo Report overstates the importance of the patents-at-issue, relying on qualitative evidence that discusses features significantly broader than the patents and includes elements that are not protected by the patents.  Its lost profits and reasonable royalty conclusions hinge entirely on a flawed conjoint analysis performed by another expert, Professor Hauser.

- Lost profits are not warranted because there is no demonstrated link between the patented functionality and sales.  These functionalities do not themselves discernibly drive any demand for the Samsung accused products or meaningfully influence the ease of use of the Samsung accused products.

- The Vellturo Report contains numerous errors and significantly overstates the appropriate quantum of damages here.  Critical flaws, including an over-reliance on the flawed conjoint results, the use of an unsupported "blackout period," an improper assessment of Apple's share of displaced units, and an overstatement of Apple profitability, inflate the Vellturo Report lost profits figures.   Additionally, the Vellturo Report royalty analysis "double counts" lost profits and contains numerous errors.

- The appropriate measure of damages in this case is a reasonable royalty.  Use of a number of accepted valuation methods, including the market, income and cost approaches, and a *Georgia Pacific* analysis, indicates a reasonable royalty for Samsung to

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

compensate Apple is approximately $5.9 million if all patents asserted by Apple in this matter are found to be valid, enforceable, and infringed.  The market, income, and cost approaches further demonstrate the unreasonableness of the conclusions presented in the Vellturo Report.

_____

JUDITH A. CHEVALIER

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 40**

**PRIMARY REASONS FOR PURCHASING AN IPHONE
BASED ON U.S. RESPONSE TO QUARTERLY IPHONE BUYER SURVEYS**



Notes & Sources:
Responses to the question: What were the primary [or main] reasons you purchased an iPhone at this time?
* Exact value not specified.

FY10 Q1 from APLNDC0001624594-706, at 604. (Up to one reason selected.)
FY10 Q2 from APLNDC-Y0000026687-807, at 697. (Up to one reason selected.)
FY10 Q3 from APLNDC-Y0000027136-255, at 145. (Up to three reasons selected.)
FY10 Q4 from Rangel Exhibit 6, at 10. (Up to three reasons selected.)
FY11 Q1 from APLNDC-Y0000027341-422, at 349. (Up to three reasons selected.)
FY11 Q2 from APLNDC0000036266-348, at 274. (Up to three reasons selected.)
FY11 Q3 from Rangel Exhibit 1, at 9. (Up to three reasons selected.)
FY11 Q4 from APLNDC-X000006548-647, at 557. (Up to three reasons selected.)
FY12 Q1 from APLNDC630-0000149470-605 (Wagner Exhibit HHH), at 481. (Multiple responses allowed.)
FY12 Q2 from APLNDC630-0000182457-505, at 472. (Multiple responses allowed.)
FY12 Q3 from APLNDC630-0000838351-495, at 365; APLNDC630-0000870318-456, at 332. (Multiple responses allowed.)
FY12 Q4 from APLNDC630-0001233115-245, at 126. (Multiple responses allowed.)
FY13 Q1 from APLNDC630-0000853329-411, at 341. (Multiple responses allowed.)
FY13 Q2 from APLNDC630-00012332246-405, at 257. (Multiple responses allowed.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 41**

**MOST IMPORTANT FEATURE TO IPHONE BUYERS**
**WHO WANTED A SPECIFIC FEATURE OR CAPABILITY**
**BASED ON U.S. RESPONSE TO QUARTERLY IPHONE BUYER SURVEYS**



Notes & Sources:
Responses to the question: Which iPhone feature or capability was most important?

FY 2012 - Q1 for iPhone 3GS from APLNDC630-0000149470-605, at 488.
FY 2012 - Q1 for iPhone 4 from APLNDC630-0000149470-605, at 486.
FY 2012 - Q1 for iPhone 4S from APLNDC630-0000149470-605, at 484.
FY 2012 - Q2 for iPhone 4 from APLNDC630-0000182457-593, at 477.
FY 2012 - Q3 for iPhone 4 from APLNDC630-0000838351-489, at 370.
FY 2012 - Q4 for iPhone 4 from APLNDC630-0001233115-245, at 131.
FY 2012 - Q4 for iPhone 4S from APLNDC630-0001233115-245, at 129.
FY 2013 - Q1 for iPhone 4 from APLNDC630-0000853329-411, at 351.
FY 2013 - Q2 for iPhone 4 from APLNDC630-0001233246-405, at 267.
FY 2013 - Q2 for iPhone 4S from APLNDC630-0001233246-405, at 264.
FY 2013 - Q2 for iPhone 5 from APLNDC630-0001233246-405, at 261.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 44

## SUMMARY OF PROFESSIONAL REVIEWS -  SAMSUNG PRODUCTS

| | Number of Sentences | Number of Feature Categories Mentioned | Screen Quality/Screen Size | Processor | Memory | Camera/Photos | Battery | Physical Characteristics | Network/Carrier | Operating System | Price | Other Specific Feature | No Feature Clearly Mentioned | Sum of Patent-Related Features Referenced | 647 Patent (Links for Structures) | 959 Patent (Unified Local & Internet Search) | 414 Patent (Asynchronous Data Synchronization) | 760 Patent (Missed Call Management) | 721 Patent (Image Unlock) | 172 Patent (Word Recommendations) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Feature Categories | | | | | | | Patent-Related Feature Categories | | | | | |
| **Total - All Products - 66 Reviews** | 9,458 | 10,862 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 1,099 | 425 | 279 | 1,201 | 416 | 1,061 | 595 | 726 | 223 | 4,837 | 1,059 | 103 | 3 | 52 | 1 | 2 | 34 | 11 |
| % of Sentences Discussing | | | 12% | 4% | 3% | 13% | 4% | 11% | 6% | 8% | 2% | 51% | 11% | 1.1% | 0.0% | 0.5% | 0.0% | 0.0% | 0.4% | 0.1% |
| % of Feature Categories Mentioned | | | 10% | 4% | 3% | 11% | 4% | 10% | 5% | 7% | 2% | 45% | 10% | 0.9% | 0.0% | 0.5% | 0.0% | 0.0% | 0.3% | 0.1% |
| # of Sources Discussing | | | 65 | 54 | 55 | 63 | 54 | 65 | 59 | 66 | 52 | 66 | 66 | 33 | 2 | 25 | 1 | 2 | 15 | 8 |
| % of Sources Discussing | | | 98% | 82% | 83% | 95% | 82% | 98% | 89% | 100% | 79% | 100% | 100% | 50.0% | 3.0% | 37.9% | 1.5% | 3.0% | 22.7% | 12.1% |
| **Total - Galaxy S II - 16 Reviews** | 2,149 | 2,420 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 213 | 107 | 63 | 278 | 108 | 190 | 160 | 171 | 33 | 1,097 | 245 | 18 | 0 | 3 | 0 | 0 | 9 | 6 |
| % of Sentences Discussing | | | 10% | 5% | 3% | 13% | 5% | 9% | 7% | 8% | 2% | 51% | 11% | 0.8% | 0.0% | 0.1% | 0.0% | 0.0% | 0.4% | 0.3% |
| % of Feature Categories Mentioned | | | 9% | 4% | 3% | 11% | 4% | 8% | 7% | 7% | 1% | 45% | 10% | 0.7% | 0.0% | 0.1% | 0.0% | 0.0% | 0.4% | 0.2% |
| # of Sources Discussing | | | 15 | 12 | 11 | 16 | 13 | 15 | 16 | 16 | 13 | 16 | 16 | 7 | 0 | 3 | 0 | 0 | 4 | 3 |
| % of Sources Discussing | | | 94% | 75% | 69% | 100% | 81% | 94% | 100% | 100% | 81% | 100% | 100% | 43.8% | 0.0% | 18.8% | 0.0% | 0.0% | 25.0% | 18.8% |
| **Sub-Total - Galaxy S III - 22 Reviews** | 3,767 | 4,149 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 319 | 165 | 108 | 518 | 166 | 380 | 258 | 324 | 55 | 1,856 | 491 | 50 | 0 | 24 | 1 | 2 | 22 | 1 |
| % of Sentences Discussing | | | 8% | 4% | 3% | 14% | 4% | 10% | 7% | 9% | 1% | 49% | 13% | 1.3% | 0.0% | 0.6% | 0.0% | 0.1% | 0.6% | 0.0% |
| % of Feature Categories Mentioned | | | 8% | 4% | 3% | 12% | 4% | 9% | 6% | 8% | 1% | 45% | 12% | 1.2% | 0.0% | 0.6% | 0.0% | 0.0% | 0.5% | 0.0% |
| # of Sources Discussing | | | 22 | 17 | 20 | 21 | 20 | 22 | 21 | 22 | 15 | 22 | 22 | 14 | 0 | 11 | 1 | 2 | 8 | 1 |
| % of Sources Discussing | | | 100% | 77% | 91% | 95% | 91% | 100% | 95% | 100% | 68% | 100% | 100% | 63.6% | 0.0% | 50.0% | 4.5% | 9.1% | 36.4% | 4.5% |
| **Sub-Total - Tab 2 10.1 - 11 Reviews** | 960 | 1,334 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 286 | 61 | 54 | 101 | 41 | 115 | 27 | 88 | 80 | 481 | 79 | 5 | 1 | 3 | 0 | 0 | 1 | 0 |
| % of Sentences Discussing | | | 30% | 6% | 6% | 11% | 4% | 12% | 3% | 9% | 8% | 50% | 8% | 0.5% | 0.1% | 0.3% | 0.0% | 0.0% | 0.1% | 0.0% |
| % of Feature Categories Mentioned | | | 21% | 5% | 4% | 8% | 3% | 9% | 2% | 7% | 6% | 36% | 6% | 0.4% | 0.1% | 0.2% | 0.0% | 0.0% | 0.1% | 0.0% |
| # of Sources Discussing | | | 11 | 11 | 10 | 10 | 7 | 11 | 6 | 11 | 10 | 11 | 11 | 2 | 1 | 1 | 0 | 0 | 1 | 0 |
| % of Sources Discussing | | | 100% | 100% | 91% | 91% | 64% | 100% | 55% | 100% | 91% | 100% | 100% | 18.2% | 9.1% | 9.1% | 0.0% | 0.0% | 9.1% | 0.0% |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## EXHIBIT 44

### SUMMARY OF PROFESSIONAL REVIEWS -  SAMSUNG PRODUCTS

| | Number of Sentences | Number of Feature Categories Mentioned | Screen Quality/Screen Size | Processor | Memory | Camera/Photos | Battery | Physical Characteristics | Network/Carrier | Operating System | Price | Other Specific Feature | No Feature Clearly Mentioned | Sum of Patent-Related Features Referenced | 647 Patent (Links for Structures) | 959 Patent (Unified Local & Internet Search) | 414 Patent (Asynchronous Data Synchronization) | 760 Patent (Missed Call Management) | 721 Patent (Image Unlock) | 172 Patent (Word Recommendations) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | |
| **Sub-Total - Note II - 17 Reviews** | 2,582 | 2,959 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 281 | 92 | 54 | 304 | 101 | 376 | 150 | 143 | 55 | 1,403 | 244 | 30 | 2 | 22 | 0 | 0 | 2 | 4 |
| % of Sentences Discussing | | | 11% | 4% | 2% | 12% | 4% | 15% | 6% | 6% | 2% | 54% | 9% | 1.2% | 0.1% | 0.9% | 0.0% | 0.0% | 0.1% | 0.2% |
| % of Feature Categories Mentioned | | | 9% | 3% | 2% | 10% | 3% | 13% | 5% | 5% | 2% | 47% | 8% | 1.0% | 0.1% | 0.7% | 0.0% | 0.0% | 0.1% | 0.1% |
| # of Sources Discussing | | | 17 | 14 | 14 | 16 | 14 | 17 | 16 | 17 | 14 | 17 | 17 | 10 | 1 | 10 | 0 | 0 | 2 | 4 |
| % of Sources Discussing | | | 100% | 82% | 82% | 94% | 82% | 100% | 94% | 100% | 82% | 100% | 100% | 58.8% | 5.9% | 58.8% | 0.0% | 0.0% | 11.8% | 23.5% |

Notes & Sources:
See Appendix C for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## EXHIBIT 45A

## SAMSUNG GALAXY S II
## NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN PROFESSIONAL REVIEWS

Notes & Sources: See Appendix C.1 - Appendix C.17 for supporting detail.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 45B**

**SAMSUNG GALAXY S III**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN PROFESSIONAL REVIEWS**



Notes & Sources: See Appendix C.18 - Appendix C.40 for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 45C**

**SAMSUNG GALAXY TAB 2 10.1**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN PROFESSIONAL REVIEWS**



Notes & Sources: See Appendix C.41 - Appendix C.52 for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 45D**

**SAMSUNG GALAXY NOTE II**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN PROFESSIONAL REVIEWS**



Notes & Sources: See Appendix C.53 - Appendix C.70 for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## EXHIBIT 46

## SUMMARY OF CONSUMER REVIEWS FOR SAMSUNG PRODUCTS

| | Number of Sentences | Number of Feature Categories Mentioned | Feature Categories | | | | | | | | | | | | Patent-Related Feature Categories | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Screen Quality/Screen Size | Processor | Memory | Camera/Photos | Battery | Physical Characteristics | Network/Carrier | Operating System | Price | Other Specific Feature | No Feature Clearly Mentioned | Sum of Patent-Related Features Referenced | 647 Patent (Links for Structures) | 959 Patent (Unified Local & Internet Search) | 414 Patent (Asynchronous Data Synchronization) | 760 Patent (Missed Call Management) | 721 Patent (Image Unlock) | 172 Patent (Word Recommendations) |
| **Total - Samsung Products** | 24,670 | 19,775 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 2,275 | 331 | 741 | 954 | 1,647 | 2,171 | 2,462 | 1,335 | 804 | 7,055 | 8,838 | 91 | 5 | 44 | 2 | 3 | 2 | 35 |
| % of Sentences Discussing | | | 9% | 1% | 3% | 4% | 7% | 9% | 10% | 5% | 3% | 29% | 36% | 0.4% | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% | 0.1% |
| % of Feature Categories Mentioned | | | 12% | 2% | 4% | 5% | 8% | 11% | 12% | 7% | 4% | 36% | 45% | 0.5% | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% | 0.2% |
| **GS II-Amazon** | 4,120 | 3,190 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 303 | 78 | 86 | 204 | 358 | 296 | 785 | 257 | 143 | 680 | 1,585 | 11 | 0 | 8 | 0 | 0 | 0 | 3 |
| % of Sentences Discussing | | | 7% | 2% | 2% | 5% | 9% | 7% | 19% | 6% | 3% | 17% | 38% | 0.3% | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% | 0.1% |
| % of Feature Categories Mentioned | | | 9% | 2% | 3% | 6% | 11% | 9% | 25% | 8% | 4% | 21% | 50% | 0.3% | 0.0% | 0.3% | 0.0% | 0.0% | 0.0% | 0.1% |
| **GS III-Amazon** | 6,067 | 5,800 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 576 | 93 | 211 | 351 | 565 | 608 | 894 | 375 | 108 | 2,019 | 1,543 | 41 | 0 | 19 | 2 | 3 | 1 | 16 |
| % of Sentences Discussing | | | 9% | 2% | 3% | 6% | 9% | 10% | 15% | 6% | 2% | 33% | 25% | 0.7% | 0.0% | 0.3% | 0.0% | 0.0% | 0.0% | 0.3% |
| % of Feature Categories Mentioned | | | 10% | 2% | 4% | 6% | 10% | 10% | 15% | 6% | 2% | 35% | 27% | 0.7% | 0.0% | 0.3% | 0.0% | 0.1% | 0.0% | 0.3% |
| **Tab 2 (10.1)-Amazon** | 6,637 | 4,489 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 635 | 45 | 203 | 135 | 262 | 298 | 90 | 361 | 405 | 2,055 | 2,950 | 11 | 0 | 5 | 0 | 0 | 1 | 5 |
| % of Sentences Discussing | | | 10% | 1% | 3% | 2% | 4% | 4% | 1% | 5% | 6% | 31% | 44% | 0.2% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.1% |
| % of Feature Categories Mentioned | | | 14% | 1% | 5% | 3% | 6% | 7% | 2% | 8% | 6% | 46% | 66% | 0.2% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.1% |
| **Note II-Amazon** | 7,846 | 6,296 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 761 | 115 | 241 | 264 | 462 | 969 | 693 | 342 | 148 | 2,301 | 2,760 | 28 | 5 | 12 | 0 | 0 | 0 | 11 |
| % of Sentences Discussing | | | 10% | 1% | 3% | 3% | 6% | 12% | 9% | 4% | 2% | 29% | 35% | 0.4% | 0.1% | 0.2% | 0.0% | 0.0% | 0.0% | 0.1% |
| % of Feature Categories Mentioned | | | 12% | 2% | 4% | 4% | 7% | 15% | 11% | 5% | 2% | 37% | 44% | 0.4% | 0.1% | 0.2% | 0.0% | 0.0% | 0.0% | 0.1% |

Notes & Sources:
Consumer reviews extracted from http://www.amazon.com/product-reviews
See Appendix D for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 47A**

**SAMSUNG GALAXY S II**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN AMAZON REVIEWS**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 47B**

**SAMSUNG GALAXY S III**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN AMAZON REVIEWS**



Notes & Sources: See Appendix D.3 for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 47C**

**SAMSUNG GALAXY TAB 2 10.1**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN AMAZON REVIEWS**



Notes & Sources: See Appendix D.4 for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 47D**

**SAMSUNG GALAXY NOTE II**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN AMAZON REVIEWS**



Notes & Sources: See Appendix D.5 for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 48**

**SUMMARY OF PROFESSIONAL REVIEWS - APPLE PRODUCTS**

| | Number of Sentences | Number of Feature Categories Mentioned | Screen Quality/Screen Size | Processor | Memory | Camera/Photos | Battery | Physical Characteristics | Network/Carrier | Operating System | Price | Other Specific Feature | No Feature Clearly Mentioned | Sum of Patent-Related Features Referenced | 647 Patent (Links for Structures) | 959 Patent (Unified Local & Internet Search) | 414 Patent (Asynchronous Data Synchronization) | 760 Patent (Missed Call Management) | 721 Patent (Image Unlock) | 172 Patent (Word Recommendations) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Feature Categories | | | | | | | | | | | Patent-Related Feature Categories | | | | | | |
| **Total - All Products - 41 Reviews** | **7,376** | **8,086** | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 403 | 264 | 193 | 804 | 256 | 461 | 806 | 468 | 148 | 4,283 | 922 | 123 | 3 | 88 | 3 | 3 | 8 | 18 |
| % of Sentences Discussing | | | 5% | 4% | 3% | 11% | 3% | 6% | 11% | 6% | 2% | 58% | 13% | 1.7% | 0.0% | 1.2% | 0.0% | 0.0% | 0.1% | 0.2% |
| % of Feature Categories Mentioned | | | 5% | 3% | 2% | 10% | 3% | 6% | 10% | 6% | 2% | 53% | 11% | 1.5% | 0.0% | 1.1% | 0.0% | 0.0% | 0.1% | 0.2% |
| # of Sources Discussing | | | 35 | 29 | 37 | 39 | 37 | 38 | 40 | 38 | 35 | 40 | 41 | 22 | 2 | 14 | 2 | 2 | 5 | 10 |
| % of Sources Discussing | | | 85% | 71% | 90% | 95% | 90% | 93% | 98% | 93% | 85% | 98% | 100% | 53.7% | 4.9% | 34.1% | 4.9% | 4.9% | 12.2% | 24.4% |
| **Sub-Total - iPhone - 8 Reviews** | **1,796** | **1,839** | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 92 | 4 | 36 | 82 | 61 | 101 | 120 | 23 | 13 | 1,307 | 186 | 15 | 1 | 0 | 0 | 0 | 2 | 12 |
| % of Sentences Discussing | | | 5% | 0% | 2% | 5% | 3% | 6% | 7% | 1% | 1% | 73% | 10% | 0.8% | 0.1% | 0.0% | 0.0% | 0.0% | 0.1% | 0.7% |
| % of Feature Categories Mentioned | | | 5% | 0% | 2% | 4% | 3% | 5% | 7% | 1% | 1% | 71% | 10% | 0.8% | 0.1% | 0.0% | 0.0% | 0.0% | 0.1% | 0.7% |
| # of Sources Discussing | | | 7 | 1 | 7 | 7 | 7 | 7 | 8 | 6 | 5 | 8 | 8 | 7 | 1 | 0 | 0 | 0 | 1 | 6 |
| % of Sources Discussing | | | 88% | 13% | 88% | 88% | 88% | 88% | 100% | 75% | 63% | 100% | 100% | 87.5% | 12.5% | 0.0% | 0.0% | 0.0% | 12.5% | 75.0% |
| **Sub-Total - iPhone 3GS - 10 Reviews** | **1,705** | **2,022** | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 49 | 32 | 49 | 265 | 60 | 60 | 382 | 112 | 71 | 942 | 184 | 20 | 2 | 13 | 1 | 1 | 0 | 3 |
| % of Sentences Discussing | | | 3% | 2% | 3% | 16% | 4% | 4% | 22% | 7% | 4% | 55% | 11% | 1.2% | 0.1% | 0.8% | 0.1% | 0.1% | 0.0% | 0.2% |
| % of Feature Categories Mentioned | | | 2% | 2% | 2% | 13% | 3% | 3% | 19% | 6% | 4% | 47% | 9% | 1.0% | 0.1% | 0.6% | 0.0% | 0.0% | 0.0% | 0.1% |
| # of Sources Discussing | | | 9 | 7 | 10 | 10 | 8 | 9 | 10 | 10 | 9 | 10 | 10 | 4 | 1 | 3 | 1 | 1 | 0 | 2 |
| % of Sources Discussing | | | 90% | 70% | 100% | 100% | 80% | 90% | 100% | 100% | 90% | 100% | 100% | 40.0% | 10.0% | 30.0% | 10.0% | 10.0% | 0.0% | 20.0% |
| **Total - iPhone 4S - 13 Reviews** | **2,451** | **2,668** | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 80 | 95 | 51 | 335 | 82 | 172 | 256 | 249 | 29 | 1,319 | 294 | 74 | 0 | 64 | 2 | 2 | 4 | 2 |
| % of Sentences Discussing | | | 3% | 4% | 2% | 14% | 3% | 7% | 10% | 10% | 1% | 54% | 12% | 3.0% | 0.0% | 2.6% | 0.1% | 0.1% | 0.2% | 0.1% |
| % of Feature Categories Mentioned | | | 3% | 4% | 2% | 13% | 3% | 6% | 10% | 9% | 1% | 49% | 11% | 2.8% | 0.0% | 2.4% | 0.1% | 0.1% | 0.1% | 0.1% |
| # of Sources Discussing | | | 9 | 12 | 11 | 13 | 13 | 13 | 13 | 13 | 11 | 13 | 13 | 10 | 0 | 10 | 1 | 1 | 3 | 1 |
| % of Sources Discussing | | | 69% | 92% | 85% | 100% | 100% | 100% | 100% | 100% | 85% | 100% | 100% | 76.9% | 0.0% | 76.9% | 7.7% | 7.7% | 23.1% | 7.7% |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## EXHIBIT 48

## SUMMARY OF PROFESSIONAL REVIEWS - APPLE PRODUCTS

| | Number of Sentences | Number of Feature Categories Mentioned | Screen Quality/Screen Size | Processor | Memory | Camera/Photos | Battery | Physical Characteristics | Network/Carrier | Operating System | Price | Other Specific Feature | No Feature Clearly Mentioned | Sum of Patent-Related Features Referenced | 647 Patent (Links for Structures) | 959 Patent (Unified Local & Internet Search) | 414 Patent (Asynchronous Data Synchronization) | 760 Patent (Missed Call Management) | 721 Patent (Image Unlock) | 172 Patent (Word Recommendations) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Feature Categories | | | | | | | | | Patent-Related Feature Categories | | | | |
| **Total - iPad 4 - 10 Reviews** | **1,424** | **1,557** | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 182 | 133 | 57 | 122 | 53 | 128 | 48 | 84 | 35 | 715 | 258 | 14 | 0 | 11 | 0 | 0 | 2 | 1 |
| % of Sentences Discussing | | | 13% | 9% | 4% | 9% | 4% | 9% | 3% | 6% | 2% | 50% | 18% | 1.0% | 0.0% | 0.8% | 0.0% | 0.0% | 0.1% | 0.1% |
| % of Feature Categories Mentioned | | | 12% | 9% | 4% | 8% | 3% | 8% | 3% | 5% | 2% | 46% | 17% | 0.9% | 0.0% | 0.7% | 0.0% | 0.0% | 0.1% | 0.1% |
| # of Sources Discussing | | | 10 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 10 | 9 | 10 | 1 | 0 | 1 | 0 | 0 | 1 | 1 |
| % of Sources Discussing | | | 100% | 90% | 90% | 90% | 90% | 90% | 90% | 90% | 100% | 90% | 100% | 10.0% | 0.0% | 10.0% | 0.0% | 0.0% | 10.0% | 10.0% |

Notes & Sources:
See Appendix C for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

EXHIBIT 49A

APPLE IPHONE
NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN PROFESSIONAL REVIEWS



Notes & Sources: See Appendix C.71 - C.79 Appendix for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 49B**

**APPLE IPHONE 3GS**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN PROFESSIONAL REVIEWS**



Notes & Sources: See Appendix C.80 - Appendix C.90 for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 49C**

**APPLE IPHONE 4S**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN PROFESSIONAL REVIEWS**



Notes & Sources: See Appendix C.91 - Appendix C.104 for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 49D**

**APPLE IPAD 4**
**NUMBER OF SENTENCES MENTIONING FEATURES AND PATENTS IN PROFESSIONAL REVIEWS**



Notes & Sources: See Appendix C.105 - Appendix C.115 for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 50

## SUMMARY OF CONSUMER REVIEWS FOR APPLE PRODUCTS

| | Number of Sentences | Number of Feature Categories Mentioned | Screen Quality/Screen Size | Processor | Memory | Camera/Photos | Battery | Physical Characteristics | Network/Carrier | Operating System | Price | Other Specific Feature | No Feature Clearly Mentioned | Sum of Patent-Related Features Referenced | '647 Patent (Links for Structures) | '959 Patent (Unified Local & Internet Search) | '414 Patent (Asynchronous Data Synchronization) | '760 Patent (Missed Call Management) | '721 Patent (Image Unlock) | '172 Patent (Word Recommendations) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Feature Categories | | | | | | | | | | | | Patent-Related Feature Categories | | | | | |
| **Total - Apple Products** | 7,316 | 4,276 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 375 | 50 | 170 | 168 | 278 | 297 | 849 | 249 | 379 | 1,461 | 3,850 | 13 | 0 | 11 | 0 | 0 | 2 | 0 |
| % of Sentences Discussing | | | 5% | 1% | 2% | 2% | 4% | 4% | 12% | 3% | 5% | 20% | 53% | 0.2% | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% |
| % of Feature Categories Mentioned | | | 9% | 1% | 4% | 4% | 7% | 7% | 20% | 6% | 9% | 34% | 90% | 0.3% | 0.0% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% |
| **iPhone-Amazon** | 172 | 117 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 6 | 0 | 3 | 0 | 21 | 4 | 29 | 4 | 15 | 35 | 77 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| % of Sentences Discussing | | | 3% | 0% | 2% | 0% | 12% | 2% | 17% | 2% | 9% | 20% | 45% | 0.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.0% |
| % of Feature Categories Mentioned | | | 5% | 0% | 3% | 0% | 18% | 3% | 25% | 3% | 13% | 30% | 66% | 0.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.9% | 0.0% |
| **iPhone 3GS-Amazon** | 1,700 | 1,025 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 33 | 1 | 35 | 19 | 86 | 41 | 421 | 71 | 98 | 220 | 868 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| % of Sentences Discussing | | | 2% | 0% | 2% | 1% | 5% | 2% | 25% | 4% | 6% | 13% | 51% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% |
| % of Feature Categories Mentioned | | | 3% | 0% | 3% | 2% | 8% | 4% | 41% | 7% | 10% | 21% | 85% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% |
| **iPhone 4S-Amazon** | 2,687 | 1,526 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 56 | 10 | 53 | 79 | 71 | 114 | 357 | 107 | 148 | 531 | 1,406 | 10 | 0 | 10 | 0 | 0 | 0 | 0 |
| % of Sentences Discussing | | | 2% | 0% | 2% | 3% | 3% | 4% | 13% | 4% | 6% | 20% | 52% | 0.4% | 0.0% | 0.4% | 0.0% | 0.0% | 0.0% | 0.0% |
| % of Feature Categories Mentioned | | | 4% | 1% | 3% | 5% | 5% | 7% | 23% | 7% | 10% | 35% | 92% | 0.7% | 0.0% | 0.7% | 0.0% | 0.0% | 0.0% | 0.0% |
| **iPad 4-Amazon** | 2,757 | 1,608 | | | | | | | | | | | | | | | | | | |
| # of Sentences Discussing | | | 280 | 39 | 79 | 70 | 100 | 138 | 42 | 67 | 118 | 675 | 1,499 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| % of Sentences Discussing | | | 10% | 1% | 3% | 3% | 4% | 5% | 2% | 2% | 4% | 24% | 54% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| % of Feature Categories Mentioned | | | 17% | 2% | 5% | 3% | 6% | 9% | 3% | 4% | 7% | 42% | 93% | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |

Notes & Sources:
Consumer reviews extracted from http://www.amazon.com/product-reviews
See Appendix D for supporting detail.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 57A**

## HAUSER'S ESTIMATED WILLINGNESS-TO-PAY FOR PATENT-RELATED SMARTPHONE FEATURES AT SMARTPHONE BASE PRICE $49



Notes & Sources:
Willingness-to-pay curves are calculated using Sawtooth CBC/HB and SAS (Generate Draw Level WTP Curves.sas) based on Professor Hauser's partworths trade-off approach as described in the Expert Report of John R. Hauser, August 11, 2013, at ¶130.
Google Play Top 20  most popular apps and games are based on lifetime U.S. downloads through May 2013 from Priori Data.  See Exhibit 95.
From backup to Expert Report of John R. Hauser, dated August 11, 2013.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 57B**

**HAUSER'S ESTIMATED WILLINGNESS-TO-PAY FOR PATENT-RELATED SMARTPHONE FEATURES AT SMARTPHONE BASE PRICE $99**



Notes & Sources:

Willingness-to-pay curves are calculated using Sawtooth CBC/HB and SAS (Generate Draw Level WTP Curves.sas) based on Professor Hauser's partworths trade-off approach as described in the Expert Report of John R. Hauser, August 11, 2013, at ¶130.
Google Play Top 20 most popular apps and games are based on lifetime U.S. downloads through May 2013 from Priori Data. See Exhibit 95.
From backup to Expert Report of John R. Hauser, dated August 11, 2013.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 57C**

## HAUSER'S ESTIMATED WILLINGNESS-TO-PAY FOR PATENT-RELATED SMARTPHONE FEATURES AT SMARTPHONE BASE PRICE $149



Notes & Sources:

Vertical dashed line ties to an approximate percentage of Samsung smartphone users that would pay $150 for the Universal Search feature ('959), according to Hauser's conjoint results.

Horizontal dashed line ties to an approximate percentage of Samsung smartphone users that would pay $4.38 for the SwiftKey 3 Keyboard app, according to Hauser's conjoint results.

Willingness-to-pay curves are calculated using Sawtooth CBC/HB and SAS (Generate Draw Level WTP Curves.sas) based on Professor Hauser's partworths trade-off approach as described in the Expert Report of John R. Hauser, August 11, 2013, at ¶130.

Google Play Top 20  most popular apps and games are based on lifetime U.S. downloads through May 2013 from Priori Data.  See Exhibit 95.

From backup to Expert Report of John R. Hauser, dated August 11, 2013.

# EXHIBIT 3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 3**

**SUMMARY OF DAMAGES IN JURY VERDICT FORM**
**AMENDED AND ORIGINAL VERDICT**

| Amended Verdict Damages | | | |
|---|---|---|---|
| | '647 Patent | '721 Patent | '172 Patent | Total |
| Admire | $7,599,178 | $1,372,696 | $2,655,675 | $11,627,549 |
| Galaxy Nexus | $3,158,100 | $867,281 | $1,579,050 | $5,604,431 |
| Galaxy Note | $1,677,740 | $0 | $1,166,343 | $2,844,083 |
| Galaxy Note II | $8,684,775 | $0 | $0 | $8,684,775 |
| Galaxy S II | $8,625,560 | $0 | $4,019,400 | $12,644,960 |
| Galaxy S II Epic 4G Touch | $10,165,134 | $0 | $5,849,662 | $16,014,796 |
| Galaxy S II Skyrocket | $2,467,265 | $0 | $1,178,904 | $3,646,169 |
| Galaxy S III | $52,404,721 | $0 | $0 | $52,404,721 |
| Galaxy Tab II 10.1 | $0 | $0 | $0 | $0 |
| Stratosphere | $3,908,152 | $750,648 | $1,494,716 | $6,153,516 |
| **Total** | **$98,690,625** | **$2,990,625** | **$17,943,750** | **$119,625,000** |
| *% of Total* | 82.50% | 2.50% | 15.00% | 100.00% |

| Original Verdict Damages | | | |
|---|---|---|---|
| | '647 Patent | '721 Patent | '172 Patent | Total |
| Admire | $7,599,178 | $1,372,696 | $2,655,675 | $11,627,549 |
| Galaxy Nexus | $3,158,100 | $867,281 | $1,579,050 | $5,604,431 |
| Galaxy Note | $1,677,740 | $0 | $1,166,343 | $2,844,083 |
| Galaxy Note II | $8,684,775 | $0 | $0 | $8,684,775 |
| Galaxy S II | $8,625,560 | $0 | $0 | $8,625,560 |
| Galaxy S II Epic 4G Touch | $10,165,134 | $0 | $4,019,400 | $14,184,534 |
| Galaxy S II Skyrocket | $2,467,265 | $0 | $5,849,662 | $8,316,927 |
| Galaxy S III | $52,404,721 | $0 | $0 | $52,404,721 |
| Galaxy Tab II 10.1 | $0 | $0 | $0 | $0 |
| Stratosphere | $3,908,152 | $750,648 | $2,673,620 | $7,332,420 |
| **Total** | **$98,690,625** | **$2,990,625** | **$17,943,750** | **$119,625,000** |
| *% of Total* | 82.50% | 2.50% | 15.00% | 100.00% |

Notes & Sources:
Amended Damages from Amended Jury Verdict Form, May 5, 2014, at 9.
Original Damages from Jury Verdict Form, May 2, 2014, at 9.

# EXHIBIT 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 4**

**COMPARISON OF PERCENT ALLOCATION BY PRODUCT**
**JURY VERDICT AND CHEVALIER SUMMARY EXHIBIT (DX 453A)**

| | '647 Patent | | '721 Patent | | '172 Patent | |
|---|---|---|---|---|---|---|
| | **Jury** | **Chevalier** | **Jury** | **Chevalier** | **Jury** | **Chevalier** |
| Admire | 7.70% | | 45.90% | | 14.80% | |
| Galaxy Nexus | 3.20% | | 29.00% | | 8.80% | |
| Galaxy Note | 1.70% | | - | | 6.50% | |
| Galaxy Note II | 8.80% | | - | | - | |
| Galaxy S II | 8.74% | | - | | 22.40% | |
| Galaxy S II Epic 4G Touch | 10.30% | | - | | 32.60% | |
| Galaxy S II Skyrocket | 2.50% | | - | | 6.57% | |
| Galaxy S III | 53.10% | | - | | - | |
| Stratosphere | 3.96% | | 25.10% | | 8.33% | |
| Galaxy Tab II 10.1 | - | - | - | - | - | - |
| **Total** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |

Notes & Sources:
Jury percent allocations from Amended Jury Verdict Form, May 5, 2014, at 9.
Chevalier percent allocations from DX 453A, at 11.

# EXHIBIT 5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 5

## PER UNIT ROYALTY RATES IMPLIED BY JURY AWARD

|  | Based on Chevalier Units | | | Based on Vellturo Royalty Only Units | | |
|---|---|---|---|---|---|---|
|  | '647 Patent | '721 Patent | '172 Patent | '647 Patent | '721 Patent | '172 Patent |
| Admire | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Galaxy Nexus | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Galaxy Note | [redacted] | - | [redacted] | [redacted] | - | [redacted] |
| Galaxy Note II | [redacted] | - | - | [redacted] | - | - |
| Galaxy S II | [redacted] | - | [redacted] | [redacted] | - | [redacted] |
| Galaxy S II Epic 4G Touch | [redacted] | - | [redacted] | [redacted] | - | [redacted] |
| Galaxy S II Skyrocket | [redacted] | - | [redacted] | [redacted] | - | [redacted] |
| Galaxy S III | [redacted] | - | - | [redacted] | - | - |
| Galaxy Tab II 10.1 | - | - | - | - | - | - |
| Stratosphere | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Notes & Sources:
Chevalier units from DX 453A, at 11-12 (calculated as per patent per product royalty damages divided by [redacted] ).
Vellturo units from PTX 222A (updated), at 25 
[redacted] .  *See* PX 222A (updated), at 38 for per patent royalty rates.  These units reflect
 Vellturo's ecosystem reduction and are therefore lower than accused units.