1  QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
2  Charles K. Verhoeven (Bar No. 170151)
   charlesverhoeven@quinnemanuel.com
3  Kevin A. Smith (Bar No. 250814)
   kevinsmith@quinnemanuel.com
4  50 California Street, 22nd Floor
   San Francisco, California 94111
5  Telephone: (415) 875-6600
   Facsimile: (415) 875-6700
6
   Kevin P.B. Johnson (Bar No. 177129)
7  kevinjohnson@quinnemanuel.com
   Victoria F. Maroulis (Bar No. 202603)
8  victoriamaroulis@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
9  Redwood Shores, California 94065
   Telephone: (650) 801-5000
10 Facsimile: (650) 801-5100

11 William C. Price (Bar No. 108542)
   williamprice@quinnemanuel.com
12 865 South Figueroa Street, 10th Floor
   Los Angeles, California  90017-2543
13 Telephone:  (213) 443-3000
   Facsimile:  (213) 443-3100
14
   Attorneys for SAMSUNG ELECTRONICS
15 CO., LTD., SAMSUNG ELECTRONICS
   AMERICA, INC. and SAMSUNG
16 TELECOMMUNICATIONS AMERICA, LLC

17                  UNITED STATES DISTRICT COURT
18       NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

19 APPLE INC., a California corporation,          CASE NO. 11-cv-00630-LHK

20                 Plaintiff,                     **DECLARATION OF TÜLIN ERDEM IN
                                                  SUPPORT OF SAMSUNG'S OPPOSITION
21       vs.                                      TO APPLE'S MOTION FOR
                                                  PERMANENT INJUNCTION**
22 SAMSUNG ELECTRONICS CO., LTD., a
   Korean business entity; SAMSUNG
23 ELECTRONICS AMERICA, INC., a New              Date:  July 10, 2014
   York corporation; SAMSUNG                     Time: 2:00 p.m.
24 TELECOMMUNICATIONS AMERICA,                   Place:  Courtroom 8, 4th Floor
   LLC, a Delaware limited liability company,    Judge: Honorable Lucy H. Koh
25
                  Defendants.
26                                               REDACTED VERSION OF DOCUMENT
                                                 SOUGHT TO BE SEALED
27

28

Highly Confidential - Attorneys' Eyes Only

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.   QUALIFICATIONS AND STATEMENT OF ASSIGNMENT ......................................... 1

　　A.   Qualifications ................................................................................................. 1

　　B.   Assignment .................................................................................................... 2

II.  SUMMARY OF CONCLUSIONS ................................................................................. 2

III. ANALYSIS OF DR. HAUSER'S RESEARCH ............................................................. 4

　　A.   Dr. Hauser's Research Design Is Critically Flawed as It Assumes that
　　　　Smartphone Consumers Make Decisions Using Very Granular Product
　　　　Attributes ....................................................................................................... 4

　　B.   Dr. Hauser's Research Design Is Critically Flawed as It Fails to Account for
　　　　Attributes Important for Smartphone Purchase Decision Making ........................... 7

　　C.   Dr. Hauser's Research Design Is Critically Flawed as It Fails to Simulate
　　　　the Typical Methods by Which Consumers Acquire and Process Product
　　　　and Attribute Information .................................................................................. 8

　　　　1.   Academic Research on the Use of Shortcuts ............................................. 9

　　　　2.   Evidence from Apple, Samsung, and Third Party Market Research
　　　　　　on the Use of Shortcuts ......................................................................... 10

　　　　3.   Evidence from My Own Consumer Studies Conducted for this
　　　　　　Matter on the Use of Shortcuts ............................................................... 10

IV.  ANALYSIS OF APPLE'S CLAIMS OF HARM TO BRAND AND
　　　REPUTATION .......................................................................................................... 14

　　A.   Apple Failed to Quantify the Harm to Brand and Reputation Despite
　　　　Accepted Academic Approaches to Analyzing the Value of a Company's
　　　　Brand and Reputation ...................................................................................... 15

　　B.   Apple Failed to Quantify the Harm to Brand and Reputation Despite
　　　　Accepted Industry Approaches to Analyzing the Value of a Company's
　　　　Brand and Reputation ...................................................................................... 18

　　C.   Available Information Demonstrates that the Apple Brand Has Remained
　　　　Strong ........................................................................................................... 20

　　D.   Third-Party Research Ranks Apple among the Most Valuable Brands in the
　　　　World ............................................................................................................ 21

　　E.   It Is Highly Unlikely that Apple Suffered Harm from the Claimed
　　　　Infringement of the Patented Features ................................................................ 22

02198.51981/6050000.1

**Highly Confidential - Attorneys' Eyes Only**

I, Tülin Erdem, Ph.D., declare as follows:

## I.    QUALIFICATIONS AND STATEMENT OF ASSIGNMENT

### A.    *Qualifications*

1.  I am the Leonard N. Stern Professor of Business Administration and Professor of Marketing at the Stern School of Business, New York University. I previously served as the Co-Director of the Center for Digital Economy Research and the Director of the Stern Center for Measurable Marketing.

2.  Before joining the Stern School of Business in 2006, I was the E.T. Grether Professor of Business Administration and Marketing at the Haas School of Business, University of California at Berkeley. I joined the Haas School of Business in 1993 and served as the Associate Dean for Academic Affairs and the Marketing Group Chair, the Ph.D. Director at the Haas School of Business and the Chair of the campus wide Committee on Research (COR) at the University of California, Berkeley.

3.  I have 20 years of research and teaching experience in branding and brand management. During this time, I have co-authored two book chapters on branding and branding models[1] and numerous research publications. Additionally, I have conducted numerous presentations and served as an expert witness numerous times where I have addressed topics relating to branding and brand management.

4.  My curriculum vitae, a true and correct copy of which is attached hereto as Exhibit 1, provides more biographical detail and lists my writings.

---

[1] Erdem, T. & Swait, J. (2010). Utility-Based Models of Brand Equity. In B. Loken, R. Ahluwalia, & M. Houston (Eds.). *Brands and Brand Management: Contemporary Research Perspectives* (207-229). New York, NY: Taylor & Francis Group, LLC; Erdem, T. & Swait, J. (Forthcoming). Branding and Brand Equity Models. In R. S. Winer & S. A. Neslin (Eds.). *The History of Marketing Science.* World Scientific Publishing Company, Inc.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

**Highly Confidential - Attorneys' Eyes Only**

B.    *Assignment*

5. Apple, Inc. ("Apple") has moved to permanently enjoin Samsung Electronics Co., Ltd.,

Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC

(collectively, "Samsung") from selling products sold in the U.S. that practice U.S. Patent

numbers 5,946,647 (the "647 Patent"), 8,046,721 (the "721 Patent"), and 8,074,172 (the "172

Patent"). I reviewed Apple's motion and the evidence cited therein. I submit this declaration in

support of Samsung's opposition to Apple's motion for a permanent injunction.

6. I previously submitted an expert report in this action, which was served on Apple in August

2013. A true and correct copy of that report, and selected exhibits thereto, is attached hereto as

Exhibit 2.

II.    **SUMMARY OF CONCLUSIONS**

7. The design of Dr. Hauser's conjoint survey suffers from numerous flaws yielding unreliable,

misleading and irrelevant findings which cannot be used to inform whether the features at

issue drive consumer demand for the products at issue.

8. Dr. Hauser's findings are based on an unrealistic representation of the actual purchase

environment encountered by consumers in the smartphone market.

- Dr. Hauser's survey includes four smartphone profiles for a single brand, only two of

  the many attributes that have been found to be important to consumer purchase

  decision making in the real world, and a set of other 16 granular features which are not

  typically available on popular information sources and about which Dr. Hauser

  educates the participants via text prompts and video animations.

- In contrast, the actual marketplace encountered by consumers consists of over a

  hundred smartphone options, hundreds of smartphone attributes and features, and many

  non-feature considerations (e.g., compatibility with other devices), all of which make

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR
PERMANENT INJUNCTION

**Highly Confidential - Attorneys' Eyes Only**

the decision task highly complex and much more complex than the unrealistically simple simulated environment in Dr. Hauser's survey.

- Typical online smartphone shopping and comparison websites present 5 to 92 features and granular features like the patented features typically do not appear on these websites. Similarly, Apple and Samsung internal market research identifies several smartphone attributes and features that are important to consumers in their purchase decision, e.g., operating system, and does not include granular features, such as the patented features at issue. Third-party market research is consistent with this.

9. Dr. Hauser's findings are also based on an unrealistic representation of how consumers gather and integrate information in their purchase decision making process in the smartphone market.

- An underlying premise of Dr. Hauser's conjoint survey is that participants engage in the complex process of reviewing all of the information presented to them, evaluating the tradeoffs between and among attributes and products, and integrating these tradeoffs in their decision making.

- In contrast, over 30 years of academic research on consumer decision making indicates that when consumers encounter a complex decision task such as that in the smartphone market, they are likely overwhelmed with the numerous decision factors and employ simple rules and shortcuts, i.e., decision heuristics, that limit the effort required to select a device. These shortcuts may typically include limited review of the available information, limited consideration of the limited information reviewed, and focusing on major decision factors and not on minor factors.

- Apple and Samsung internal market research, as well as third-party research, indicates that consumers use numerous shortcuts whereby they consider only a handful of product options, they base decisions on a limited set of major attributes, and few of

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

Highly Confidential - Attorneys' Eyes Only

them consider minor features.

- My own consumer studies of how consumers make decisions in a realistic shopping environment further confirm that consumers extensively rely on decision shortcuts. The findings indicate that consumers do not engage in the trade-off analysis upon which Dr. Hauser's analysis is premised; consumers instead review the product-attribute information in a limited, selective and/or non-systematic manner and consider limited information, where major, not minor, features drive their choices.

10.  As it relates to Apple's assertions of harm to its brand and reputation, Apple has identified no specific evidence that demonstrates Samsung's use of the patents-at-issue has impacted Apple's brand or reputation. Apple has also failed to demonstrate that harm to Apple's brand or reputation is likely. Had Apple's reputation sustained harm due to Samsung's use of the patents at issue, the harm could have been demonstrated and measured using one or more of the many accepted brand valuation methodologies. Available evidence suggests that no harm to brand or reputation has occurred.

## III.    ANALYSIS OF DR. HAUSER'S RESEARCH

11. Dr. Hauser conducted a conjoint study that purports to find a link between the granular patented features at issue and consumer demand. I understand that Dr. David Reibstein is also submitting a declaration and commenting on Dr. Hauser's conjoint study. Below I focus on Dr. Hauser's approach to the research design and interpretations of findings.

   **A.    *Dr. Hauser's Research Design Is Critically Flawed as It Assumes that Smartphone Consumers Make Decisions Using Very Granular Product Attributes***

12. Dr. Hauser's study design is flawed because it presents information on granular features that are not commonly available on the information sources that consumers typically use to make

**Highly Confidential - Attorneys' Eyes Only**

their decisions, such as wireless carrier, retailers, and independent reviewer websites.[2] In other words, Dr. Hauser's study design is not reflective of the actual purchasing environment encountered by consumers in the smartphone market.

13. Specifically, Dr. Hauser's smartphone conjoint study presents 18 features, consisting of screen size, price, and 16 other features, including four patented features for which Apple sought damages in this action, grouped in categories called Data Accessibility, Call Initiation and Screening, Input Assistance and Camera.[3] In contrast to Dr. Hauser's study, Apple, Samsung and third party market research on smartphone consumers recognize the reality of the market place and do not survey consumers on such granular features in their own market research. By presenting consumers with granular features that they would not likely be exposed to otherwise, Dr. Hauser's study grossly inflates the value of these features in the eyes of the participants.[4]

14. Online information sources available to consumers do not offer information on attributes as granular as those presented in Dr. Hauser's study. As is illustrated in Exhibit 2 to my expert report, typical online shopping stores (e.g., AT&T, Best Buy, etc.) only present consumers with 6-13 key attributes, while typical side-by-side comparison websites (e.g., Verizon, gdgt.com, etc.) present consumers with 25-92 attributes. Despite the numerous attributes shown to consumers on these websites, the listed attributes do not reach the level of granularity that Dr. Hauser's study presents.[5]

15. Likewise, Apple's and Samsung's own internal smartphone market research does not survey

---

[2] Exhibit 2. Rebuttal Expert Report of Tülin Erdem, September 13, 2013 ("Rebuttal Erdem Report"), ¶277, p. 118.
[3] Rebuttal Erdem Report, ¶273, pp. 116-117.
[4] Rebuttal Erdem Report, ¶278, pp. 118-119.
[5] For the list of attributes listed on on-line smartphone stores, *see* Rebuttal Erdem Report, Exhibits 6; for the list of attributes listed on side-by-side comparison websites, *see* Rebuttal Erdem Report, Exhibit 7.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

**Highly Confidential - Attorneys' Eyes Only**

1    consumers on granular features. For example, Exhibits 9, 10, 11 to my expert report show the

2    type of attributes that were included in Apple's quarterly iPhone Buyer surveys which study

3    consumer preferences for different attributes of the iPhone 4, 4S and 5. ████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ██████████████████████████████████████████████

8    ████████████████

9    16. ████████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████ as well as ████████████████,

14

15   and third-party market research.[9]

16   17. Given the collective body of information about what consumers actually encounter online and

17   which attributes/features are studied by Apple, Samsung and third party market research, it is

18   clear Dr. Hauser's survey design is not reflective of the smartphone product information that

19   consumers encounter in the real world. By presenting consumers with granular features that

20   they are likely not exposed to otherwise, Dr. Hauser's study makes these granular features

21   artificially salient to consumers, leading to demand effects (e.g., signaling consumers that

22   "these granular features must be important") and externally invalid results.[10]

23

24   18. Not only does Dr. Hauser draw attention to the granular features in ways that are unlikely to

25   _____

26   [6] Rebuttal Erdem Report, Exhibits 9.
     [7] Rebuttal Erdem Report, Exhibits 9 & 10.
     [8] Rebuttal Erdem Report, Exhibit 10.
27   [9] For extensive discussion of existing market research, *see* Section VI of Rebuttal Erdem Report.
28   [10] Rebuttal Erdem Report, ¶278, pp. 118-119.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

**Highly Confidential - Attorneys' Eyes Only**

happen on typical information sources, but he also educates the participants with animations and text prompts which are unrealistic for a typical smartphone shopper.[11] As discussed in my expert report, I reviewed online stores and side-by-side comparison websites and found that written definitions of features are at times available as pop-ups next to a given feature; however, my research shows that consumers rarely seek out those definitions on their own.[12]

19. Given the pervasiveness of these demand artifacts in the study design, Dr. Hauser's findings cannot be used to reliably predict smartphone market outcomes or consumer demand for smartphone features.

**B.** *Dr. Hauser's Research Design Is Critically Flawed as It Fails to Account for Attributes Important for Smartphone Purchase Decision Making*

20. Dr. Hauser's study design is flawed because it fails to present the study participants with the majority of the attributes of smartphones that are known to be important to the purchase decision.[13]

21. As discussed earlier, both Apple and Samsung internal documents identify many factors that may play a role in consumer decision-making concerning smartphones.

---

[11] Rebuttal Erdem Report, ¶279, p. 119.
[12] Rebuttal Erdem Report, ¶279, p. 119.
[13] Rebuttal Erdem Report, ¶¶281-282, p. 120.
[14] Rebuttal Expert Report, Exhibit 11.
[15] Rebuttal Expert Report, ¶127, p. 58.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

**Highly Confidential - Attorneys' Eyes Only**

22. As discussed in my expert report, the exclusion of important attributes in conjoint studies inflates the importance of the granular features included in the survey.[16] In particular, when 16 granular features are presented next to only two important features (screen size and price), the exclusion of other important attributes yields unreliable, misleading and irrelevant estimates of the value of the granular features.[17] Thus, Dr. Hauser's findings cannot be used to reliably predict smartphone market outcomes or consumer demand for smartphone features.

> **C.**   ***Dr. Hauser's Research Design Is Critically Flawed as It Fails to Simulate the Typical Methods by Which Consumers Acquire and Process Product and Attribute Information***

23. Dr. Hauser's study design does not reflect how consumers interact and respond to the smartphone purchasing environment. Dr. Hauser's conjoint study design presented the participants with a grid of four smartphone options (in columns) of the same brand with 18 changing attribute cells (in rows). When shown a new grid, participants had to evaluate the options on the screen and make a choice, after which they would be shown the next grid with changed attribute combinations. This study framework assumes that participants review the entire grid, note the changes from grid to grid, evaluate the inherent tradeoffs, and decide whether the changes warrant a different choice.[18]

24. Such information acquisition and processing is not a realistic representation of how consumers make decisions in a complex purchase environment such as the smartphone market, where there are many products, many attributes, and many other non-attribute considerations.[19]

---

[16] Rebuttal Erdem Report, ¶283, pp. 120-121.
[17] Rebuttal Erdem Report, ¶¶283-284, pp. 120-121.
[18] Rebuttal Erdem Report, ¶285, p. 121; Trial Transcript [Erdem], pp. 2305:18-2306:4, Apple Inc. v. Samsung Electronics Co.
[19] Rebuttal Erdem Report, Sections V.A-V.E, ¶285, p. 121.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

Highly Confidential - Attorneys' Eyes Only

### 1.    Academic Research on the Use of Shortcuts

25. As described extensively in my expert report,[20] the complexity of the decision-making environment has important implications for how consumers acquire and integrate information. When the decision-making task is complex, people are more inclined to adopt simple rules and shortcuts known as "decision heuristics" that demand less cognitive effort and allow for faster decision making. These shortcuts may consist of: 1) limited review of the available information, 2) limited consideration of the limited information reviewed, and 3) focusing on a handful of major and not on minor decision factors.[21] The impact of task complexity on consumer decision making has been studied for over 30 years, and the principle of shortcuts is well-established as one of the tenets of consumer decision making.[22]

26. Dr. Hauser states in his own academic research the importance of decision heuristics in purchase tasks that involve numerous product options and product attributes. For example, he notes that "[a]cademically, there is ample evidence in the psychology, consumer behavior, and marketing science literatures that consumers simplify consideration and/or choice with a heuristic process."[23] In a study of GPS devices, Dr. Hauser notes that "[...] in a category such as GPSs in which there are many alternatives, many features, and much information available (on the Internet) from a variety of sources, we might expect consumers to use a cognitively-simple screening heuristic to balance search/evaluation cost with the value of a higher-value 'best' product."[24]

---

[20] Rebuttal Erdem Report, Section IV.C.

[21] Rebuttal Erdem Report, ¶58, pp. 27-28.

[22] Rebuttal Erdem Report, Section IV.C; Bettman, J. R., Luce, M. F., & Payne, J. W. (1998). Constructive Consumer Choice Processes. *Journal of Consumer Research*, 25(3), 187-217, p. 188.

[23] Yee, M., Dahan, E., Hauser, J. R., & Orlin, J. (2007). Greedoid-Based Noncompensatory Inference. *Marketing Science*, 26(4), 532–549, p. 532.

[24] Hauser, J. R., Ding, M., & Gaskin, S. P. (2009). Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions. *Proceedings of the Sawtooth Software Conference*, 207-232, p. 212.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

Highly Confidential - Attorneys' Eyes Only

27. Dr. Hauser also provides insights on the use of heuristics when deciding on smartphone-like devices: "[…] think of the poor consumer who has to gather information about the characteristics for all 97 PDAs, put them in a spreadsheet, assign some weights to each characteristic, and make a choice. I am willing to bet that very few [study participants] constructed such a spreadsheet before choosing a PDA (or cell phone)."[25] In line with his opinion, Dr. Hauser found 92% of study participants in his PDA study used a decision heuristic.[26]

### 2.     Evidence from Apple, Samsung, and Third Party Market Research on the Use of Shortcuts

28. There is direct evidence from existing consumer studies that consumers rely on decision heuristics to deal with the complexity of the decision task. ██████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████

Additional examples are detailed in my expert report.[28]

### 3.     Evidence from My Own Consumer Studies Conducted for this Matter on the Use of Shortcuts

29. In order to better illustrate the flawed nature of Dr. Hauser's approach and confirm the takeaways from the academic and commercial consumer studies, I conducted my own consumer research on smartphone consumer decision making, which is extensively described in my expert report.[29] My research traces the process by which prospective consumers acquire

---

[25] Hauser, J. R. Note on Consumer Behavior. MIT Sloan Courseware, p. 4.
[26] Hauser, J. R. Note on Consumer Behavior. MIT Sloan Courseware, pp. 5-6.
[27] Rebuttal Erdem Report, ¶121, p. 55.
[28] Rebuttal Erdem Report, Section VI.B.
[29] Rebuttal Erdem Report, Section VII.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

**Highly Confidential - Attorneys' Eyes Only**

and integrate information in the purchase decision on smartphone online stores and smartphone side-by-side comparison websites. My research confirms the predictions of the existing studies and academic research -- that consumers extensively rely on decision shortcuts to arrive at their final purchase decision.

(a)     **Overview of My Survey Methodology and Design**

30. As described in my expert report,[30] my own consumer research studies address two stages of purchase decision making, the formation of a smartphone consideration set (Study 1) and the making of the final smartphone choice (Study 2). Study 1 simulates a typical online store (similar to, for example, a website hosted by a leading wireless carrier or retailer) in which survey participants navigate through webpages featuring numerous smartphones available for purchase. In Study 1, I ask participants to review information on smartphone offerings and select one or more devices they would most likely consider for purchase. I set the number of smartphones to one of two levels of complexity (i.e., a participant sees either a total of 27 or 44 devices). Study 2 simulates a typical online product comparison experience (similar to, for example, the comparison features on carrier, retailer and review websites) in which consumers evaluate a small number of smartphone brand/models that are presented in a side-by-side comparison grid. In Study 2, I ask participants to review information on the compared smartphones and choose the one device they would be most likely to purchase. I set the number of attributes and features to one of three levels of complexity (i.e., a participant sees a grid with 18, 29, or 39 attributes/features).[31] I rely on eye-tracking technology to track the participants' eyes while they review the product-attribute information in Study 1 and 2.[32]

31. My research targets two dimensions of complexity that consumers face in their decisions to

---

[30] Rebuttal Erdem Report, Section VII.A.
[31] Rebuttal Erdem Report, Section VII.A.
[32] Rebuttal Erdem Report, Sections VII.B and VII.E.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

Highly Confidential - Attorneys' Eyes Only

1   purchase smartphones: the large number of devices and the large number of attributes and

2   features. Specifically, Study 1 examines consumer decision making in an environment in

3   which there are many smartphones to consider. Study 2 examines the consumer decision

4   strategies in an environment in which each device contains a large number of attributes.[33]

5   32. In designing and implementing the survey, I followed standard scientific methods to maximize

6   the reliability of the survey instrument. My survey design adopted the scientific guidelines for

7   surveys conducted for academic, commercial, and litigation purposes.[34] The final samples

8   comprised 141 participants in Study 1 and 342 participants in Study 2.[35]

9

10

### (b)   Overview of My Survey Findings

11   33. As detailed in my expert report, my research reveals that survey participants rely extensively

12   on simple rules and shortcuts at various stages of the smartphone purchase process.[36]

13

14   34. When confronted with numerous product options on online shopping websites (Study 1), my

15   findings indicate that survey participants respond to the complexity of the purchase

16   environment by 1) reviewing limited product-attribute information; 2) extensively using

17   attribute filters to screen out product options with undesirable characteristics; and 3) selecting

18   only a handful of product options for further consideration. For example, when presented with

19   27 smartphone options (notably, far less than the over 100 unique models on websites such as

20   Best Buy[37]), survey participants reviewed only 30% of all product-attribute information.[38]

21   Furthermore, nearly 60% of the participants used filters at least once to revise the presented

22   smartphone options and screen out smartphones with undesirable characteristics.[39] Finally, the

23

24

25   [33] Rebuttal Erdem Report, ¶144, pp. 65-66.
     [34] Rebuttal Erdem Report, ¶147, p. 67.
26   [35] Rebuttal Erdem Report, ¶150, pp. 67-68.
     [36] Rebuttal Erdem Report, Section VII.E.1-2.
27   [37] Rebuttal Erdem Report, Exhibit 2.
     [38] Rebuttal Erdem Report, ¶197, p. 89.
28   [39] Rebuttal Erdem Report, ¶198, p. 89.

**Highly Confidential - Attorneys' Eyes Only**

study participants selected, on average, five smartphones for further purchase consideration, irrespective of whether they were presented with 27 or 44 smartphone options.[40]

35.   Additionally, when confronted with numerous smartphone features on online side-by-side comparison websites (Study 2), my findings indicate that survey participants respond to the complexity of the purchase environment by extensively relying on various shortcuts that collectively hinder the shoppers' ability to evaluate the inherent trade-offs among smartphone options. One of my findings shows that survey participants review a limited share of the available product-attribute information.[41] For example, when reviewing 18 features for five smartphone models (in contrast to the over 90 features available on websites such as gdgt.com[42]), survey participants reviewed, on average, only 60% of the product-attribute information before making their smartphone choice. Furthermore, the survey participants that were exposed to more complex scenarios with 29 and 39 features reviewed a smaller share of the product-attribute information, i.e., 51% and 47%, respectively.[43] My research findings also indicate survey participants considered a limited portion of the reviewed information, and that the review of major features,[44] and not the review of minor features,[45] predicts the participants' ultimate smartphone choice.[46]

36. As described in my expert report, these patterns of information acquisition and processing

---

[40] Rebuttal Erdem Report, ¶196, pp. 88-89.

[41] Rebuttal Erdem Report, ¶193, p. 87.

[42] Rebuttal Erdem Report, Exhibit 2.

[43] Rebuttal Erdem Report, ¶202, p. 91, ¶221, p. 99.

[44] Major features refer to the 18 features included in the low complexity scenario of Study 2. These features are available on most representative side-by-side comparison websites, and are thus more salient attributes of smartphones, as confirmed by internal Apple, Samsung, and third party consumer research. (Rebuttal Erdem Report, ¶200, pp. 90-91).

[45] Minor features are the incremental features included in the "medium" and "high" complexity scenarios of Study 2. These features appear on comparison websites of wireless carriers, retailers, and others less frequently than major features. (Rebuttal Erdem Report, ¶240, p. 106).

[46] Rebuttal Erdem Report, Section VII.E.7, ¶¶260-264, pp. 113-114.

Case No.  11-cv-00630-LHK

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

Highly Confidential - Attorneys' Eyes Only

provide strong evidence of the use of decision shortcuts by survey participants. These patterns demonstrate consumers do not engage in a comprehensive evaluation of trade-offs between product options. Given that consumers face far greater decision complexities in real life than those tested in my studies, it is reasonable to conclude that consumers regularly rely on decision shortcuts and typically do not engage in a full trade-off analysis before making smartphone purchase decision.[47]

37. These findings and conclusions are in stark contrast to the trade-off analysis which is assumed to be occurring by Dr. Hauser's conjoint survey design. Given that Dr. Hauser's survey ignores the realities of the consumer decision making in the smartphone market, his findings cannot be used to reliably predict smartphone market outcomes or consumer demand for smartphone features.

## IV.   ANALYSIS OF APPLE'S CLAIMS OF HARM TO BRAND AND REPUTATION

38. Apple claims its brand and reputation were harmed and will continue to be harmed as a result of Samsung's infringement of the '647, '721 and '172 patents. Apple has, however, identified no specific evidence that demonstrates that Samsung's use of the patents at issue has impacted Apple's brand or reputation. Apple has also failed to demonstrate that harm to Apple's brand or reputation is likely.

39. Had Apple's brand or reputation been harmed, such harm could have been demonstrated, and not just asserted or assumed. There are a wide range of methods available to analyze and measure a company's brand and reputation and their drivers. These methods have been developed and used both by academics and industry practitioners and are based on over 30 years of accepted academic research. This research lays out the frameworks for 1) defining company brand and reputation and their drivers; 2) estimating the overall measures of

---

[47] Rebuttal Erdem Report, ¶192, p. 87.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

**Highly Confidential - Attorneys' Eyes Only**

company brand and reputation; and 3) quantifying the degree to which various factors affect company brand and reputation. Companies and consulting firms utilize these methods to track company brand value and reputation over time and study the drivers of brand and reputation.

40.  Given the realities of the smartphone market discussed in detail in my expert report and in Section III of this declaration, it is highly unlikely that infringement of the patents at issue has had or will have any impact on Apple's reputation or brand. Indeed, publicly available third-party measures of Apple's brand value and reputation of innovation indicate that since the accused infringement began Apple has continued to be a top-ranked brand and innovator in the U.S. and worldwide.

> **A.**   *Apple Failed to Quantify the Harm to Brand and Reputation Despite Accepted Academic Approaches to Analyzing the Value of a Company's Brand and Reputation*

41. Apple's motion asserts harm to its reputation, but nowhere does it actually identify specific evidence or quantify the effect of Samsung's use of the patents at issue. Importantly, Apple ignores the existence of many accepted ways to measure brand and/or reputation.

42. Analyses and measurements of a company's brand[48] and the closely related concept, reputation,[49] are typically reflected in analyses of brand equity, a topic that is the subject of

---

[48] A "*brand*" is commonly defined as "name, term, design, symbol, or any other feature that identifies one seller's good or service as distinct from those of other sellers." (American Marketing Association. Dictionary. Retrieved June 5, 2014, from https://www.ama.org/resources/Pages/Dictionary.aspx?dLetter=B&dLetter=B).

[49] Reputation has been defined in various ways in the academic literature. One of the definitions is "the collective representation of multiple constituencies' images of a company, built up over time and based on a company's identity programs, its performance and how constituencies have perceived its behavior." Managing a company brand is tightly linked to managing its reputation, since "a corporate brand creates expectations in the minds of consumers as to what the company will deliver, meeting those expectations creates the image in the minds of consumers that a company desires, which, in turn, enhances overall reputation." (Argenti, P. A. & Druckenmiller, B. (2004). Reputation and the Corporate Brand. *Corporate Reputation Review,* 6(4), 368–374, pp. 369, 374).

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

Highly Confidential - Attorneys' Eyes Only

considerable attention and academic and industry research in marketing.[50] "Brand equity" is often defined as the added value that a brand endows a product,[51] or, similarly, as the difference between the value of the branded product to the consumer and the value of the product without that branding.[52]

43. There are various scientific approaches to measuring overall brand equity and its drivers that have emerged in the academic literature over the last 30 years.[53] A large proportion of these studies rely on three well-known conceptual frameworks of brand equity.[54] These conceptual

---

[50] Note, there is also considerable academic literature in non-marketing fields of study that provides methods for valuing corporate reputation as separate from brand equity. One commonly used method is Fortune's popular study of the 'most admired companies,' released annually by the magazine since 1982. The Fortune's corporate reputation measure is calculated from survey-based responses to eight questions ranging from investment value to social responsibility. Additionally, Ponzi, Fombrun, and Gardberg (2011) proposed a framework for measuring corporate reputation that builds on insight from numerous academic approaches. The framework is branded as "RepTrak" and builds on survey-based perceptions of stakeholders on various organizational dimensions. (Ponzi, L. J., Fombrun, C. J. & Gardberg, N. A. (2011). RepTrak ™ Pulse: Conceptualizing and Validating a Short-Form Measure of Corporate Reputation. *Corporate Reputation Review*, 14(1), 15-35, pp. 15-17).

[51] Farquhar, P. H. (1989). Managing Brand Equity. *Marketing Research*, 1(3), 24-33.

[52] McQueen, J. (1991). Leveraging the Power of Emotion in Building Brand Equity. *ARF Third Annual Advertising and Promotion Workshop*, February 5-6, p. 26.

[53] For survey of the literature, *see* Erdem, T. & Swait, J. (Forthcoming). Branding and Brand Equity Models. In R. S. Winer & S. A. Neslin (Eds.). *The History of Marketing Science*, World Scientific Publishing Company, Inc.; Shankar, V., Azar, P., & Fuller, M. (2008). Practice Prize Paper—BRAN*EQT: A Multicategory Brand Equity Model and Its Application at Allstate. *Marketing Science*, 27(4), 567-584; Srinivasan, V., Park. C. S., & Chang, D. R. (2005). An Approach to the Measurement, Analysis, and Prediction of Brand Equity and Its Sources. *Management Science*, 51(9), 1433-1448.

[54] The *first* framework was introduced by David A. Aaker in 1991 ("Aaker Framework"). Aaker Framework defined brand equity as a collection of brand assets and liabilities linked to a brand, its name and symbol, which add to or subtract from the value provided by a product or service to a firm and/or to the firm's customers. In Aaker Framework, brand awareness, perceived quality, brand associations and brand loyalty are the main components of brand equity. The *second* framework was introduced by Professor Kevin Keller in 1993 ("Keller Framework"). Keller Framework offered a cognitive psychology perspective, defining customer-based brand equity as the differential effect that brand knowledge has on consumer response to the marketing of that brand. In Keller Framework, brand knowledge has two components: brand image (based on brand associations) and brand awareness (based on brand recognition and brand recall). In his framework, Keller emphasizes the importance of uniqueness, favorability and strength of brand associations. The *third* framework was introduced by Joffrey Swait and I in 1998 ("Erdem-Swait

02198.51981/6050000.1                                                    Case No.  11-cv-00630-LHK
DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR
PERMANENT INJUNCTION

25

**Highly Confidential - Attorneys' Eyes Only**

1   frameworks share the view that the value of a company's brand and reputation is created

2   through its effect on consumers.[55] Several academic studies estimate the dollar value of brand

3   equity by tying consumer perceptions of brand with company financial metrics. For example,

4   Srinivasan, Park, and Chang ("SPC Method") estimated a dollar value of brand equity and its

5   drivers for four cell phone manufacturers: Samsung, LG, Motorola, and Qualcomm. The

6   research efforts of the authors were sponsored by one of the cell phone manufacturers,[56]

7   presumably for purposes of tracking their own brand equity. In their study, the researchers

8   found that the largest driver of brand equity for the subject cell phone firms was brand

9   awareness.[57]

10

11   44. Drawing on insight from the SPC Method as well as over a dozen of other studies that measure

12   brand equity,[58] Shankar, Azar and Fuller developed a highly regarded method ("SAF

13

---

Framework"). Erdem-Swait Framework builds on research related to "information economics" and emphasizes that brand equity is the value of a brand as a credible signal of its ability and willingness to deliver on what is promised. This value is driven by the content, clarity and credibility of the brand signal. In particular, brand investments and brand programs, communications and offerings and consistency over time are critically important in assuring and enhancing the clarity and credibility of a brand signal and, hence, the value of a brand as a credible signal. (Erdem, T. & Swait, J. (2010). Utility-Based Models of Brand Equity. In B. Loken, R. Ahluwalia, & M. Houston (Eds.). *Brands and Brand Management: Contemporary Research Perspectives* (207-229). New York, NY: Taylor & Francis Group, LLC, pp. 207-208. *See* also Aaker, D. A. (1991). *Managing Brand Equity*. New York: The Free Press; Keller, K. L. (1993). Conceptualizing, Measuring, and Managing Customer-Based Brand Equity. *The Journal of Marketing*, 1-22; Erdem, T. & Swait, J. (1998). Brand Equity as a Signaling Phenomenon, *Journal of Consumer Psychology*, 7 (2), 131-157).

[55] Erdem, T. & Swait, J. (2010). Utility-Based Models of Brand Equity. In B. Loken, R. Ahluwalia, & M. Houston (Eds.). *Brands and Brand Management: Contemporary Research Perspectives* (207-229). New York, NY: Taylor & Francis Group, LLC, p. 208.

[56] Srinivasan, V., Park, C. S., & Chang, D. R. (2005). An Approach to the Measurement, Analysis, and Prediction of Brand Equity and Its Sources. *Management Science*, 51(9), 1433-1448, p. 1444.

[57] Srinivasan, V., Park, C. S., & Chang, D. R. (2005). An Approach to the Measurement, Analysis, and Prediction of Brand Equity and Its Sources. *Management Science*, 51(9), 1433-1448, p. 1446.

[58] Shankar, V., Azar, P., & Fuller, M. (2008). Practice Prize Paper—BRAN*EQT: A Multicategory Brand Equity Model and Its Application at Allstate. *Marketing Science*, 27(4), 567-584, pp. 567-570.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

Highly Confidential - Attorneys' Eyes Only

1   Method") for estimating the dollar value of brand equity.[59] The SAF Method received an

2   INFORMS Practice Prize award,[60] is in compliance with U.S. accounting guidelines for

3   valuing intangible assets, and has been adopted by the largest publicly held personal insurance

4   company, i.e., Allstate Corporation, to track and manage its brand equity.[61]  The SPC and/or

5   SAF methods, among others, may be used to estimate the impact of consumer perceptions of

6   innovation on brand equity, to track changes in brand equity over time and to analyze how

7   changes in consumer perceptions, e.g., with respect to innovation, affect brand equity.

8

9   **B.    *Apple Failed to Quantify the Harm to Brand and Reputation Despite Accepted***

10  ***Industry Approaches to Analyzing the Value of a Company's Brand and***

11  ***Reputation***

12  45. There also are proprietary methods developed by consulting firms that estimate brand equity

13  measures on the basis of consumer perceptions of brand, and, in some cases, tie them to

14  financial metrics of the company. Three of the widely used commercial brand tracking

15  approaches are Young & Rubicam's Brand Asset Valuator, Millward Brown's BrandZ, and

16  Interbrand:[62]

17

18

19  ─────────────────

20  [59] Shankar, V., Azar, P., & Fuller, M. (2008). Practice Prize Paper—BRAN*EQT: A Multicategory Brand Equity Model and Its Application at Allstate. *Marketing Science*, 27(4), 567-584.

21  [60] The Gary L. Lilien ISMS-MSI Practice Prize is awarded yearly by the INFORMS Society for Marketing Science to an outstanding implementation of marketing science concepts and methods. The methodology used must be sound and appropriate to the problem and organization, and the work should have had significant, verifiable and, preferably quantitative impact on the performance of the client organization. (The Gary L. Lilien ISMS-MSI Practice Prize (2014). *The Institute for Operations Research and the Management Sciences*. Retrieved June 3, 2014, from https://www.informs.org/Recognize-Excellence/Community-Prizes-and-Awards/Marketing-Science-Society/Gary-L.-Lilien-ISMS-MSI-Practice-Prize).

22  [61] Shankar, V., Azar, P., & Fuller, M. (2008). Practice Prize Paper—BRAN*EQT: A Multicategory Brand Equity Model and Its Application at Allstate. *Marketing Science*, 27(4), 567-584, pp. 567, 580-581.

23  [62] Lehmann, D. R., Keller, K. L., & Farley, J. U. (2008). The Structure of Survey-Based Brand Metrics. *Journal of International Marketing,* 16(4), 29-56, p. 31; Srinivasan, V., Park, C. S., &

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

Highly Confidential - Attorneys' Eyes Only

- <u>Young & Rubicam's Brand Asset Valuator</u>:[63] Conducts brand analysis on the basis of brand perceptions of more than 700,000 surveyed consumers regarding more than 44,000 brands in 49 countries.[64]

- <u>Millward Brown's BrandZ</u>:[65] Conducts brand analysis on the basis of company financial data and brand perceptions of two million surveyed consumers and more than 10,000 different brands in over 30 countries.[66]

- <u>Interbrand</u>:[67] Conducts brand analysis on the basis of company financial data, primary research, and expert panel assessments.[68]

46. Each of these approaches yields a quantitative result which can be used to assess brand value and its drivers, and track any changes over time.

---

Chang, D. R. (2005). An Approach to the Measurement, Analysis, and Prediction of Brand Equity and Its Sources. *Management Science*, 51(9), 1433-1448, p. 1437.

[63] BrandAsset Valuator (BAV) scores brands on four brand dimensions: Differentiation, Relevance, Esteem and Knowledge. The methodology relies on surveying consumers on 55 different consumer perceptions of brands and grouping them in these dimensions. The BAV methods use a proprietary algorithm for ranking brands across all brands in a given country. (Young & Rubicam Group. BrandAsset Valuator Tool Kit, p. 4. Retrieved June 5, 2014, from http://www.yrbav.com/about_bav/bav%20blue%20book.pdf).

[64] Y&R BrandAsset™ Valuator, Retrieved June 5, 2014, from http://young-rubicam.de/tools-wissen/tools/brandasset-valuator/?lang=en.

[65] BrandZ quantifies the dollar amount a brand contributes to the overall value of a corporation. Using proprietary methods, BrandZ surveys consumers on their perceptions of the brand and ties those perceptions to company financial metrics. (Millward Brown. BrandZ Top 100 Global Brands Methodology, Retrieved June 5, 2014, from https://www.millwardbrown.com/BrandZ/Top_100_Global_Brands/Methodology.aspx).

[66] Millward Brown. BrandZ Top 100 Global Brands Methodology, Retrieved June 5, 2014, from https://www.millwardbrown.com/BrandZ/Top_100_Global_Brands/Methodology.aspx.

[67] Interbrand quantifies the dollar amount a brand contributes to the overall value of a corporation. Using proprietary methods, Interbrand surveys consumers on their perceptions of the brand, surveys industry experts on various dimensions of brand strengths, and ties the outcomes to company financial metrics. (Interbrand. Best Global Brands: Our Methodology. Retrieved June 5, 2014, from http://www.interbrand.com/en/best-global-brands/2013/best-global-brands-methodology.aspx).

[68] Interbrand. Best Global Brands: Our Methodology. Retrieved June 5, 2014, from http://www.interbrand.com/en/best-global-brands/2013/best-global-brands-methodology.aspx.

-19-

C. *Available Information Demonstrates that the Apple Brand Has Remained Strong*

47. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ Similarly, Apple's damages expert Dr. Vellturo

pointed to the continued strength of Apple's brand in his August 2013 expert report (two years

after infringement began) calling Apple the "most valuable brand in the world."[70] Greg

Joswiak, Apple's VP of Worldwide iPod, iPhone, and iOS Product Marketing, agreed that

Apple's brand was strong, testifying "[o]ur brand is still one of the most valuable and

respected in the world."[71]

48. In fact, Apple's brand and reputation appear to be immune from even widely publicized

shortcomings associated with the company and its products. According to deposition

testimony from Apple executives, even several widely publicized negative events such as

Antennagate,[72] Maps,[73] and poor publicity related to Apple's relationship with Foxconn[74] did

---

[69] ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

[70] Expert Report of Christopher A. Vellturo, August 12, 2013, ¶366, p. 139.

[71] Deposition of Greg Joswiak, July 9, 2013 ("Joswiak Deposition"), p. 86:6-86:7.

[72] Apple's redesigned antenna on the iPhone 4 originally had reception issues when held in away commonly used to hold the phone to one's ear. (Apple Issues Advice to Avoid iPhone Flaw (2010, June 25). *BBC News*, Retrieved June 5, 2014, from http://news.bbc.co.uk/2/hi/technology/8761240.stm).

[73] Apple's replacement of the Google Maps app, which came standard with iPhones previously, with its own map app, was met with an outcry over the poor quality of the app when it was included in the iOS6 launch. (Allsopp, A. (2012, September 20). Apple's iOS 6 Maps App

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

1    not have a lasting impact on Apple's brand.[75]

2

3    **D.    *Third-Party Research Ranks Apple among the Most Valuable Brands in the World***

4    49. Publicly available information also demonstrates Apple's brand has not suffered the harm

5    claimed in Apple's motion. There are at least three publicly-available sources that track and

6    report brand equity of the firms with the highest brand values: (1) Interbrand, (2) Millward-

7    Brown BrandZ and (3) Forbes.[76] According to these studies, Apple is among the most valuable

8    brands in the world.

9

10   50. Apple rose to the top position in Interbrand's 2013 rankings of the world's best and most

11   valuable brands. Apple's ranking improved in every year since 2003 and it improved from

12   number 8 to number 2 from 2011 to 2012 and then to number 1 in 2013. Exhibit 3 shows

13   Interbrand rankings from 2001 to 2013.

14

15   51. Apple held the top position in Millward Brown BrandZ rankings of the world's most valuable

16   brands from 2011 to 2013. As Exhibit 4 shows, Apple's ranking improved in every year from

17   2006 to 2011 when it reached the number 1 ranking. Apple held that spot until 2013 and then

18

---

19   Fails to Impress, Users Want Google Maps Back. *Macworld UK*, Retrieved June 5, 2014, from
20   http://www.macworld.co.uk/news/apple/apples-ios-6-maps-app-fails-impress-users-want-google-maps-back-3382583/).

     [74] There was widespread reporting after a worker's suicide at a Foxconn facility, one of the
21   companies that manufactures devices for Apple, sparking some to suggest that Apple should
     improve the poor worker conditions at its manufacturers. (Barboza, D. (2009, July 27). IPhone
22   Maker in China Is Under Fire After a Suicide. *New York Times*, Retrieved June 5, 2014, from
23   http://www.nytimes.com/2009/07/27/technology/companies/27apple.html?_r=3&sq=foxconn&st=
     cse&scp=1&pagewanted=print).

24   [75] *See,* e.g., Joswiak Deposition, pp. 81, 83-86.

25   [76] Interbrand. Best Global Brands 2013. Retrieved June 5, 2014, from
     http://www.interbrand.com/Libraries/Branding_Studies/Best_Global_Brands_2013.sflb.ashx;
26   Millward Brown. BrandZ Top 100 Most Valuable Global Brands 2014. Retrieved June 5, 2014,
     from
27   http://www.millwardbrown.com/brandz/2014/Top100/Docs/2014_BrandZ_Top100_Report.pdf;
     The World's Most Valuable Brands (2013, November). *Forbes*. Retrieved June 5, 2014, from
28   http://www.forbes.com/powerful-brands/list/.

---

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR
PERMANENT INJUNCTION

Highly Confidential - Attorneys' Eyes Only

1  dropped to number 2 in 2014 (behind Google). The dip between 2013 and 2014 was attributed

2  in the 2014 report to a "softening of the share price because of investor concern about the

3  future of the company after founder Steve Jobs, and the recent lack of breakthrough products

4  that differentiate Apple."[77] No reference was made to individual features that Apple (or

5  competitors) had put on its devices, let alone those put on devices several years prior. The

6  2014 report also stated that "consumers rate the Apple brand extremely high on being

7  different, innovative and meaningful."[78] Millward Brown's conclusion appears to be that

8  Apple is still perceived to be a highly innovative company.[79]

9

10  52. Apple is listed as the number one most valuable brand, with a brand value of $104.3 billion, in

11  a Forbes November 2013 study ranking brand value. According to that study, Apple's brand

12  value increased by 20% over the prior year.[80]

13

14       **E.**    ***It Is Highly Unlikely that Apple Suffered Harm from the Claimed Infringement***

15            ***of the Patented Features***

16  53. Because the value of a company's brand and reputation are rooted in consumer perceptions of

17  its own products and services, sales of Samsung's accused devices are highly unlikely to have

18  any meaningful effect on the value of Apple's brand and reputation. One reason is that the

19  _____

20  [77] Millward Brown. BrandZ Top 100 Most Valuable Global Brands 2014. Retrieved June 5, 2014, from

21  http://www.millwardbrown.com/brandz/2014/Top100/Docs/2014_BrandZ_Top100_Report.pdf, p. 116.

22  [78] Millward Brown. BrandZ Top 100 Most Valuable Global Brands 2014. Retrieved June 5, 2014, from

23  http://www.millwardbrown.com/brandz/2014/Top100/Docs/2014_BrandZ_Top100_Report.pdf, p. 116.

24  [79] This is consistent with rankings of perceived innovativeness published by the consulting

25  firm Strategy&, which shows Apple has ranked as the number one most innovative company since 2010. *See* Exhibit 5. Similarly, Fortune's most admired company tracker has ranked Apple as the

26  number one in both the overall measure and the innovation dimension since 2008. *See* Exhibit 6.

27  [80] Badenhausen, K. (2013, November 6). Apple Dominates List Of The World's Most Valuable Brands. *Forbes*, Retrieved June 5, 2014, from

28  http://www.forbes.com/sites/kurtbadenhausen/2013/11/06/apple-dominates-list-of-the-worlds-most-valuable-brands/.

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR
PERMANENT INJUNCTION

**Highly Confidential - Attorneys' Eyes Only**

1  functionalities associated with the patents at issue do not play a meaningful role in consumers'

2  purchase decisions.[81] Because the functionalities associated with the patented features are of

3  limited importance to consumers, they are likely to play a limited role in forming consumers'

4  perceptions of Apple products and the company that sells them.

5

6       I declare under penalty of perjury under the laws of the United States of America that the

7  foregoing is true and correct.

8       Executed June 6, 2014, at Valencia, Spain.

9

10

11 

12  _____

             Tülin Erdem

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[81] Rebuttal Erdem Report, ¶¶347-349, pp. 148-149.

-23-          Case No.  11-cv-00630-LHK

DECLARATION OF TÜLIN ERDEM IN SUPPORT OF SAMSUNG'S OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## EXHIBIT 1

## CURRICULUM VITAE

# Tülin Erdem

Leonard N. Stern Professor of Business and Professor of Marketing

Leonard N. Stern School of Business
New York University
913 Tisch Hall, 40 West Fourth Street
New York, New York 10012-1126
Tel: 212 998 0404, Fax: 212 995 4006
E-mail: terdem@stern.nyu.edu

## EDUCATION

| | |
|---|---|
| 1993 | Ph.D. Business Administration (major: Marketing), University of Alberta |
| 1989 | ABD Economics, University of Alberta |
| 1987 | M.A. Economics, University of Alberta |
| 1986 | B.A. Economics (Honors), Boğaziçi University |

## ACADEMIC POSITIONS

| | |
|---|---|
| 2006-present | Leonard N. Stern Professor of Business and Professor of Marketing<br>Stern School of Business, New York University |
| Spring 2013 | Visiting Professor at Columbia Business School, Columbia University |
| 2003-2006 | E.T. Grether Professor of Business Administration and Marketing<br>Haas School of Business, University of California at Berkeley |
| 1998-2003 | Associate Professor (with tenure)<br>Haas School of Business, University of California at Berkeley |
| 1993-1998 | Assistant Professor<br>Haas School of Business, University of California at Berkeley |
| 1989-1993 | Graduate Assistant<br>Faculty of Business, University of Alberta |
| 1986-1989 | Research/ Teaching Assistant<br>Department of Economics, University of Alberta |

## AWARDS, HONORS, GRANTS

| | |
|---|---|
| 2013 | AMA Doctoral Consortium Faculty Fellow (also in 1998, 2000, 2007-12) |
| 2008 | Finalist, John D.C. Little Best Paper Award |
| 2007-8 | Outstanding Reviewer Award, Journal of Marketing |
| 2003 | Finalist, William O'Dell Best Paper Award |
| 1998-2002 | National Science Foundation (NSF) grant, SBR-9812067, $ 178,000.00 |
| 1998 | Finalist, Paul Green Best Paper Award |
| 1996 | Winner of John D.C. Little Best Paper Award |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1996 | Winner of Frank M. Bass Best Dissertation Paper Award |
| 1995-7 | National Science Foundation (NSF) grant SBR-9511280, $ 100,000.00 |
| 1994-5 | Junior Faculty Research Grant, University of California, Berkeley |
| 1994 | Regents' Junior Faculty Fellowship, University of California, Berkeley |
| 1993 | Co-winner of the AMA John A. Howard Doctoral Dissertation Award |
| 1993 | Recipient of the Gold Medal of the Governor General of Canada, awarded for academic excellence at the graduate level at Canadian Universities |
| 1992 | AMA Doctoral Consortium Fellow |
| 1990-2 | Domtar Ph.D. Fellowship, Faculty of Business, University of Alberta |

## PROFESSIONAL ACTIVITIES

Affiliations: American Economic Association, American Marketing Association, Association for Consumer Research, Econometric Society, Institute for Operations Research and the Management Sciences, Minnesota Supercomputer Institute

Advisory Council: Journal of Marketing Research (2012-present)

Editor-in-Chief: Journal of Marketing Research (2009-2012)

Area Editor: Marketing Science (2002-2009)

Associate Editor: Quantitative Marketing and Economics (2003-present)

Associate Editor: Journal of Consumer Research (2005-2009)

Editorial Board Member: Academy of Marketing Science (2006-present), International Journal of Research in Marketing (1996-present), Journal of Consumer Research (2011-present), Journal of Marketing (2003-present), Journal of Marketing Research (1998-2009), Marketing Letters (1996-present), Marketing Science (1997-2009)

Ad-hoc Reviewer: ACR, AMA John A. Howard Doctoral Dissertation, American Economic Review, Association for Consumer Research, California Management Review, International Economic Review, Journal of Applied Econometrics, Journal of Business and Economic Statistics, Journal of Econometrics, Journal of Agricultural and Resource Economics, Journal of Economic Psychology,  Journal of Retailing and Consumer Services, OMEGA, Management Science, Marketing Science Institute, NSF, Psychometrica, Review of Economics and Statistics

President-Elect: ISMS, INFORMS Society of Marketing Science (2004, 2005)

President: ISMS, INFORMS Society of Marketing Science (2006, 2007)

Past-President: ISMS, INFORMS Society of Marketing Science (2008, 2009)

Conference Organizations:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Co-Chair, 2013 ISMS Marketing Science Conference
Co-Chair, 2010 Marketing Dynamics Conference
Co-Chair of Program Committee, Cheung Kong GSB Marketing Research
      Forum, Beijing China, June 2009
Co-Chair, 2003 and 2008 QME (Quantitative Marketing and Economics)
      Conference
Chair, Marketing Track, 2003 INFORMS International Meetings
Co-Chair, 2001 Tri-Annual Invitational Choice Symposium
Co-Chair, 1997 ISMS Marketing Science Conference

Member of the Steering Committee, 2004, 2007, 2010, 2013 Tri-Annual
      Invitational Choice Symposium
Member of Advisory Committee, 2011 Marketing Dynamics Conference
Member of Program Committee, 2006 Marketing Dynamics Conference
Member of Program Committee, 2004, 2005, 2009 QME (Quantitative
      Marketing and Economics) Conference
Member of Program Committee, 2005 ACR (Association for Consumer
      Research) Conference

Workshop Co-Chair, Tri-Annual Invitational Choice Symposium, 1998, 2004 and 2013

## RESEARCH

Interests

Advertising and Pricing, Brand Equity, Branding Strategies, Econometric Modeling, Individual Decision-Making and Choice, Marketing Science Models of Consumer Behavior and Marketing Mix Strategy, Product Management and Strategy.

Refereed Publications

Ching, Andrew, Tülin Erdem, and Michael Keane (2013), "Learning Models: An Assessment of Progress, Challenges and New Developments," forthcoming in *Marketing Science.*

Erdem, Tülin and Sue Ryung Chang (2012), "A Cross-Category and Cross-Country Analysis of Umbrella Branding for National and Store Brands," Special 40th Anniversary issue of *Journal of the Academy of Marketing Science* 40 (1), 86-101.

Shachar, Ron, Tülin Erdem, Gavan Fitzsimons, Keisha Wells (2011), "Brands: The Opiate of the Non-Religious Masses?" *Marketing Science*, 30, 92-110.

Erdem, Tülin, Michael Katz and Baohong Sun (2010) "A Simple Test for Distinguishing

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

between Internal Reference Price Theories," *Quantitative Marketing and Economics*, 8, 303-332.

Yang, Sha, Yi Zhao, Tülin Erdem, and Ying Zhao (2010), "Modeling the Intra-Household Behavioral Interaction," *Journal of Marketing Research*, 47 (3), 470-484.

Ching, Andrew, Tülin Erdem and Michael Keane (2009), "The Price Consideration Model of Brand Choice," *Journal of Applied Econometrics* 24, 3 (March-April), 393-420.

Erdem, Tülin, Michael Keane and Baohong Sun (2008), "A Dynamic Model of Brand Choice When Price and Advertising Signal Product Quality," *Marketing Science*, 27 (6), 1111-1125. (Finalist for the Little Best Paper award).

Erdem, Tülin, Michael Keane and Baohong Sun (2008), "Advertising and Consumer Price Sensitivity in Experience Goods Markets," *Quantitative Marketing and Economics*, 6 (2), 139-176.

Bronnenberg**,** Bart, Jean Pierre Dubé, Carl Mela, Paulo Albuquerque, Tülin Erdem, Brett Gordon, Dominique Hanssens, Guenter Hitsch, Han Hong, Baohong Sun (2008), "Measuring Long Run Marketing Effects and their Implications for Long Run Marketing Decisions," *Marketing Letters, 19*(3), 367-82.

Swait, Joffre and Tülin Erdem (2007) "Characterizing Brand Effects on Choice Set Formation and Preference Discrimination under Uncertainty," *Marketing Science* 26 (5), 679-697.

Chintagunta, Pradeep, Tülin Erdem, Peter Rossi and Michel Wedel (2006), "Structural Modeling In Marketing:  Review and Assessment," *Marketing Science*, 25 (6) 604-616.

Erdem, Tülin, Joffre Swait and Ana Valenzuela (2006), "Brands as Signals: A Cross-Country Validation Study," *Journal of Marketing*, 70 (1), 34-49.

Erdem, Tülin, Kannan Srinivasan, Wilfred Amaldoss, Patrick Bajari, Hai Che, Teck Ho, Wes Hutchinson,  Michael Katz, Michael Keane, Bob Meyer and Peter Reiss (2005), "Theory Driven Choice Models," *Marketing Letters*, 16 (3), 225-237.

Erdem, Tülin, Michael P. Keane, T. Sabri Öncü and Judi Strebel (2005), "Learning About Computers: An Analysis of Information Search and Technology Choice," *Quantitative Marketing and Economics* 3 (3), 207-246.

Strebel, Judi, Tülin Erdem and Joffre Swait (2004), "Consumer Search in High Technology Markets: Exploring the Use of Traditional Information Channels," *Journal of Consumer Psychology* 14, 96-103.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Erdem, Tülin and Joffre Swait (2004), "Brand Credibility and its Role in Brand Choice and Consideration," *Journal of Consumer Research* 31 (1), 191-199.

Erdem, Tülin, Ying Zhao and Ana Valenzuela (2004), "Performance of Store Brands: A Cross-Country Analysis of Consumer Store Brand Preferences, Perceptions and Risk," *Journal of Marketing Research*, 41 (1), 86-100.

Erdem, Tülin, Susumu Imai and Michael Keane (2003), "A Model of Consumer Brand and Quantity Choice Dynamics under Price Uncertainty," *Quantitative Marketing and Economics*, 1 (1), 5-64. (Lead article.)

Erdem, Tülin and Baohong Sun (2002), "An Empirical Investigation of Spillover Effects of Marketing Mix Strategy in Umbrella Branding," *Journal of Marketing Research,* 39 (4), 408-420.

Swait, Joffre and Tülin Erdem (2002), "The Effects of Temporal Consistency of Sales Promotions and Availability on Consumer Choice Behavior," *Journal of Marketing Research,* 34 (3), 304-320.

Erdem, Tülin, Joffre Swait and Jordan Louviere (2002), "The Impact of Brand Credibility on Consumer Price Sensitivities across Multiple Product Categories," *International Journal of Research in Marketing*, 19 (1), 1-19 (lead article).

Erdem, Tülin, Glenn Mayhew and Baohong Sun (2001), "Understanding the Reference Price Sensitive Shopper: A Within and Cross-Category Analysis," *Journal of Marketing Research*, 38 (4), 445-457.

Erdem, Tülin and Baohong Sun (2001), "Testing for Choice Dynamics in Panel Data," *Journal of Business and Economic Statistics*, 19 (2), 142-152.

Erdem, Tülin, Joffre Swait, Susan Broniarczyk, Dipankar Chakravarti, Jean-Noel Kapferer, Michael Keane, John Roberts, Jan-Benedict Steenkamp and Florian Zettelmeyer (1999), "Brand Equity, Consumer Learning and Choice," *Marketing Letters,* 10 (3) 301-318.

Erdem, Tülin and Russell Winer (1999), "Econometric Modeling of Competition: A Multi-Category Choice-Based Mapping Approach," *Journal of Econometrics*, 89, 159-175.

Erdem, Tülin, Michael P. Keane and Baohong Sun (1999), "Missing Price and Coupon Availability Data in Scanner Panels: Correcting for the Self-Selection Bias in he Choice Model Parameters," *Journal of Econometrics,* 89, 177-196.

Erdem, Tülin (1998), "An Empirical Analysis of Umbrella Branding," *Journal of Marketing Research*, 35 (3), 339-351 (finalist for Paul Green best paper award).

Erdem, Tülin and Joffre Swait (1998), "Brand Equity as a Signaling Phenomenon," *Journal of Consumer Psychology,* 7 (2), 131-157.

Meyer, Bob, Tülin Erdem, Fred Feinberg, Itzhak Gilboa, Wes Hutchinson, Aradhna Krishna, Steve Lippman, Carl Mela, Amit Pazgal, Drazen Prelec and Joel Steckel (1997), "Dynamic Influences on Individual Choice Behavior," *Marketing Letters,* 8 (3), 349-360.

Erdem, Tülin (1996), "A Dynamic Analysis of Market Structure based on Panel Data," *Marketing Science,* 15 (4), 359-378.

Erdem, Tülin and Michael P. Keane (1996), "Decision-Making under Uncertainty: Capturing Dynamic Choice Processes in Turbulent Consumer Goods Markets," *Marketing Science,* 15 (1), 1-20 (lead article).

Finn, Adam and Tülin Erdem (1995), "Economic Impact of Tourists Visiting a Mega-Multi Mall," *Tourism Management*, 16 (5), 367-373.

Winer, Russell, Randolph E. Bucklin, John Deighton, Tülin Erdem, Peter Fader, J. Jeffrey Inman, Hotaka Katahira, Katherine N. Lemon and Andrew Mitchell (1994), "When Worlds Collide: The Implications of Panel Data-based Choice Models for Consumer Behavior," *Marketing Letters*, 5 (4), 383-394.

Swait, Joffre, Tülin Erdem, Jordan J. Louviere and Chris Dubelaar (1993), "The Equalization Price: A Measure of Consumer-perceived Brand Equity," *International Journal of Research in Marketing,* 10 (special issue on Brand Equity), 23-45.

Other Publications

Erdem, Tülin and Joffre Swait, "Branding and Brand Equity Models," in *The History of Marketing Science,* eds. Scott Neslin and Russell Winer. Now Publishers Inc., forthcoming.

Erdem, Tülin (2010), "State of the Journal", *Editorial* in *Journal of Marketing Research,* 47 (6), 997.

Erdem, Tülin (2010), "Spanning the Boundaries", *Editorial* in *Journal of Marketing Research,* 47 (1), 1-2.

Erdem, Tülin and Joffre Swait (2010), "Utility-Based Models of Brand Equity," in *Brands and Brand Management: Contemporary Research*, 207-229, eds. Rohini Ahluwalia, Mike Houston and Barbara Loken.  Routledge, New York.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Rangaswamy, Arvind, James J. Cochran, Tülin Erdem, John R. Hauser, Robert J. Meyer (2008), "Editor-in-Chief Search Committee Report: The Digital Future is Now," *Marketing Science*, Editorial, 27,1, 1-3.

Erdem, Tülin and Russell Winer (2002), "A Brief History of Choice Modeling in Marketing," *Marketing Letters*, 13 (3), 157-162 (special issue based on the 5th Invitational Choice Symposium, guest editors T. Erdem and R. Winer).

Working Papers

Cutright, Keisha, Tülin Erdem, Gavan Fitzsimmons and Ron Shachar (2012), "Finding Brands and Losing your Religion?"

Che, Hai, Tülin Erdem and Sabri Öncü (2012), "Consumer Learning and Evolution of Consumer Brand Preferences."

Yang, Sha, Yi Zhao, Tülin Erdem and Daeyoung Koh (2012), "Modeling Consumer Choice with Dyadic Learning and Information Sharing: An Intra-household Analysis."

Swait, Joffre, Tülin Erdem and Tom Peters (2011), "Shocks to Brand Equity: An Information Economics Perspective on the US Auto Industry 2006-2010."

Shacham, Rachel, Peter Golder and Tülin Erdem (2011), "A Cigarette, a Six Pack or Porn? The Complementarity of Vices."

Ching, Andrew, Tülin Erdem and Michael Keane (2010), "How Much Do Consumers Know About the Quality of Products? Evidence from the Diaper Market."

Erdem, Tülin , Joffre Swait and Ana Valenzuela (2010) "Economic Development and Brand Credibility."

Guo, Liang and Tülin Erdem (2005) "Measuring Usage Flexibility in Wireless Tariff Choice."

Invited Presentations

*ISMS Doctoral Consortium, Özyeğin University,  Istanbul, Turkey, July 2013.*
*Measuring & Managing Brands in a Digital World,* NYU Stern Center for Measurable Marketing, May 2013.
*Marketing Research Camp,* Jones School of Management, Rice University, May 2013.
*Marketing Workshop,* Columbia Business School, Columbia University, April 2013.
*Research Seminar,* CUNY Graduate Center, April 2013.
*Marketing Workshop,* The Wharton School, University of Pennsylvania, April 2013.
*Research Seminar,* Graduate School of Management, UC Davis, March 2013

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Research Seminar,* City College of New York, March 2013.
*Research Seminar,* Oxford University, Saïd School of Business, February 2013.
*Özyeğin University Public Lecture Series,* Istanbul, Turkey, July 2012.
*ISMS Doctoral Consortium and Marketing Science Conference*, Boston, MA,
        June 2012.
*Research Seminar,* School of Business, Rutgers, Newark, April 2012.
*Distinguished Speaker Series,* Isenberg School of Management, UMASS, Amherst,
        March 2012.
*Distinguished Speaker Series,* School of Business, George Washington University,
        March 2012.
*Marketing Workshop,* Foster School of Business, University of Washington,
        November 2011.
*Marketing Workshop,* Marshall School of Business, USC, August 2011.
*Keynote Speaker, Marketing Dynamics Conference,* Jaipur, India, July 2011.
*ISMS Doctoral Consortium and Marketing Science Conference,* Houston, TX,
        June 2011.
*Research Seminar,* Department of Economics, McGill University, Montreal, Canada,
        May, 2011.
*Marketing Workshop,* Koç University, Istanbul, Turkey, March 2011.
*Speaker Series,* Carey School of Business, John Hopkins University, Baltimore, January
        2011.
*Marketing Workshop,* School of Business, University of Alberta, Edmonton, AB,
        November 2010.
*Marketing Workshop,* School of Management, Yale University, November 2010.
*Marketing Speaker Series,* Georgia Institute of Technology, Atlanta, GA, October 2010.
*London Business School Marketing Research Camp,* London, England, July 2010.
*ISMS Doctoral Consortium and Marketing Science Conference,* Cologne, Germany,
        June 2010.
*AMA Doctoral Consortium,* Texas Christian University, TX, June 2010
*Invitational Choice Symposium*, hosted by University of Miami and University of
        Technology Sydney, May 2010.
*Marketing Workshop,* Fordham University, NY, May 2010.
*Marketing Workshop,* HBS, Boston, MA, March 2010.
*Marketing Workshop,* Baruch College, NY, December 2009.
Keynote Speaker*, Marketing Dynamics Conference*, NY, NY, August 2009.
*AMA Summer Educators' Conference,* Chicago, IL, August 2009.
*Marketing Workshop,* Universidad Autónoma de Madrid, Madrid, Spain, July 2009.
*Cheung Kong GSB Marketing Research Forum,* Beijing, China, June 2009.
*Marketing Science Conference,* University of Michigan, Ann Arbor, MI, June 2009.
*AMA Doctoral Consortium,* Georgia State University, Atlanta, GA, June 2009.
*ISMS Doctoral Consortium and Marketing Science Conference,* University of Michigan,
        Ann Arbor, MI, June 2009.
*Marketing Workshop,* University of Rochester, April 2009.
*Marketing Research Camp*, Pennsylvania State University, April 2009.


Advertising Research Foundation, Marketing Modelers' Seminar Series, NY, NY,

March 2009.
*AMA Winter Educators Conference,* Tampa, Florida, February 2009.
*Özyeğin University Public Lecture Series,* Istanbul, Turkey, December 2008.
*Bilkent Research Camp,* Bilkent University, Ankara, Turkey, June 2008.
*ISMS Doctoral Consortium,* University British Columbia, June 2008.
*AMA Doctoral Consortium,* University of Missouri, June 2008.
*Marketing Research Camp,* Texas A&M University, April 2008.
*Marketing Workshop,* Duke University, December 2007.
*Marketing Workshop,* Columbia University, November 2007.
*5th QME Conference,* discussant, Chicago, IL, October 2007.
*ISMS Doctoral Consortium,* Singapore Management University, Singapore, June 2007.
*Invitational Choice Symposium*, hosted by Wharton School, May 2007/.
*AMA Doctoral Consortium*, Arizona State University, Tempe, AZ, May 2007.
Advertising Research Foundation, Marketing Modelers' Seminar Series, NY, NY, May
2007.
*4-School Colloquium,* Columbia, NYU, Wharton, Yale hosted by Wharton, April 2007.
*Marketing Research Camp,* University of Pittsburgh, February 2007.
*Marketing Science Doctoral Consortium,* University of Pittsburgh, June 2006.
*Marketing Workshop,* University of California, Riverside, June 2006.
*Marketing Workshop,* Yale University, New haven, December 2005.
*Distinguished Lectureship Series,* University of Michigan, October 2005.
*Marketing Workshop,* New York University, September 2005.
*Graduate School of Management Seminar,* Sabancı University, Istanbul, Turkey, July
2005.
*Faculty of Business Administration Seminar*, Bilkent University, Ankara, Turkey, July
2005.
*Marketing Science Doctoral Consortium,* Emory University, June 2005.
*Hightower Distinguished Lectureship Series,* Emory University, December 2004.
*IO Workshop*, Duke University, October 2004.
*ACR Doctoral Consortium*, Portland, Oregon, October 2004.
*Marketing Science Doctoral Consortium,* Erasmus University, Netherlands, June 2004.
*Invitational Choice Symposium*, hosted by University of Colorado, June 2004.
*Marketing Workshop,* Stanford University, February 2004.
*Business School Seminar Series*, San Francisco State University, October 2003.
*Marketing Science Doctoral Consortium,* University of Maryland, June 2003.
*Marketing Workshop,* Northwestern University, April 2003.
*Marketing Research Camp,* Washington University, March 2003.
*Cowles Conference on Estimation of Dynamic Demand Models*, Economics
Department, Yale University, November 2002.
*ACR Doctoral Consortium*, Atlanta, Georgia, October 2002.
*Marketing Workshop,* Yale University, May 2002.
*Marketing Workshop*, University of Colorado, April 2002.
*Marketing Workshop*, Washington University, St. Louis, May 2001.
*Marketing Workshop*, MIT, April 2001.
*Marketing Workshop,* Harvard Business School, April 2001.
*Marketing Workshop,* University of Houston, March 2001.

*AMA Summer Educators Conference Special Session on Brand Equity honoring David Aaker*, Chicago, August 2000.

*AMA Doctoral Consortium,* University of Western Ontario, August 2000.

*Marketing Workshop,* University of Toronto, March 2000.

*Marketing Workshop,* University of California, Davis, December 1999.

*Econometrics in Tel Aviv,* Dept. of Economics, Tel Aviv University, Israel, June 1999.

*Marketing Seminar Series,* UC Irvine, March 1999.

*Marketing Seminar Series,* Cornell University, February 1999.

*Marketing Research Camp,* UCLA, January 1999.

*Marketing Seminar Series,* University of Pennsylvania, December 1998.

*Marketing Seminar Series,* New York University, December 1998.

*AMA Doctoral Consortium,* University of Georgia, August 1998.

*Marketing Seminar Series,* GSIA, Carnegie Mellon University, May 1998.

*CEDA (Committee on Economic Development of Australia) Conference* on Building Brands in the Knowledge Economy, Sydney and Melbourne, Australia, September 1998.

*Invitational Symposium on Choice Modeling and Behavior*, hosted by HEC, Jouy- en-Josas, France, July 1998.

*Marketing Workshop,* Koc University, Istanbul, Turkey, June 1998.

*Applied Econometrics and Quantitative Methods Summer Workshop*, Koc University, Istanbul, Turkey, August 1997.

*Marketing Workshop*, University of Texas at Dallas, May 1997.

*Marketing Workshop*, MIT, April 1997.

*5th Annual Winter Research Retreat,* University of Florida, March 1997.

Invitational Symposium on Choice Modeling and Behavior, hosted by Columbia University, June 1996.

*Marketing Workshop*, MIT, November 1995.

*Marketing Workshop*, Ohio State University, May 1995.

*AMA Advanced Research Techniques Forum*, Beaver Creek, Colorado, June 1994.

*Marketing Workshop*, Stanford University, November 1993.

*Invitational Symposium on Choice Modeling and Behavior*, hosted by Duke University, July 1993.

Conference Presentations

*Marketing Science Conference,* Marketing Science Conference, Özyeğin University, Istanbul, Turkey, July 2013.

*EIRASS Conference,* Zagreb, Croatia, July 2008.

*Marketing Science Conference,* UBC, Vancouver, Canada, June 2008.

*Marketing Science Conference*, SMU, Singapore, June 2007.

*EIRASS Conference,* Budapest, Hungry, July 2006.

*Marketing Science Conference,* Pittsburgh, PA, June 2006.

*Marketing Dynamics Conference,* Sacramento, CA, September 2005

*Marketing Science Conference*, Atlanta, GA, June 2005.

*EIRASS Conference,* Prague, Czech Republic, July 2004.

*Marketing Science Conference,* Rotterdam, Netherlands, June 2004.

*Quantitative Marketing and Economics Conference,* Chicago, IL, October 2003.
*EURO/INFORMS Joint International Meeting,* Istanbul, Turkey, July 2003.
*Marketing Science Conference,* Washington D.C., June 2003.
*AMA Advanced Research Techniques (ART) Forum,* Monterey, CA, June 2003.
*Bayes Conference,* Columbus, Ohio, November 2002.
*Marketing Science Conference,* Edmonton, AB, Canada, June 2002.
*Marketing Science Conference,* Wiesbaden, Germany, July 2001.
*EIRASS Conference,* Sintra, Portugal, July 2000.
*Marketing Science Conference*, LA, CA, June 2000.
*Marketing Science Conference,* Syracuse, NY, May 1999.
*Marketing Science Conference,*  Fontainebleau, France, July 1998.
*INFORMS Fall Meetings*, Dallas, Texas, October 1997.
*Association for Consumer Research Conference*, Denver, CO, October 1997.
*Marketing Science Conference,* Berkeley, CA, March 1997.
*Marketing Science Conference,* Gainesville, FL, March 1996.
*INFORMS Spring Meetings*, Los Angeles, CA, April 1995.
*Marketing Science Conference*, Tucson, AZ, March 1994.
*Marketing Science Conference*, St. Louis, MI, March 1993.
*Marketing Science Conference*, London, England, July 1992.
*Marketing Science Conference*, Delaware, March 1991.
*MSI Conference on Managing Brand Equity*, Austin, TX, November 1990.
*Marketing Science Conference*, Urbana, IL, March 1990.

## TEACHING

<u>Interests</u>

Brand Management and Strategy, Marketing Management, Marketing Planning,
Marketing Strategy, Marketing Models

<u>Experience</u>

*Teaching:*
*Undergraduate*: Marketing Management, Branding, Brand Management and Strategy,
Marketing Strategy and Planning, Economic Development and International
Trade
*MBA*:  Marketing Concepts, Marketing Management, Branding/ Brand Management and
Strategy
*Ph.D.*: Empirical Modeling, Marketing Models, Choice Models, Individual Topics in
Marketing
*Executive Education*: Brand Equity, Brand Strategy, International Marketing,
Marketing Management and Strategy

*Graduate and Post-Graduate Mentorship*:
*Post-Doctoral Mentorship:*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Baohong Sun (1995-1997). Carnegie Mellon University.

*Chair of Ph.D. thesis committee:*

Sue Chang (2012) "Learning Dynamics in Product Relaunch," University of Georgia.

Rachel Shacham (2011) "Econometric Methods for Modeling the Difficult-to-1996   Observe Phenomena," University of Minnesota.

Johanna Sussman Ilfeld (2004) "Investigating Social Learning Effects in the Consumer Choice of Health Care Plan Adoption." Go-Strolling Inc.

Judi Strebel (1997) "Modeling consumer choice processes for high-tech durable goods: An investigation of consumer learning under uncertainty." University of Arizona, SFSU.

*Member of Ph.D. thesis committee:*

Marketing
Wenbo Wang (2012), HKUST
Mantian Hu (2012), Chinese University of Hong Kong
Sherif Naser (2008), Washington University, St. Louis.
Yeşim Orhun (2006), University of Chicago, University of Michigan.
Liang Guo (2003), HKUST.
Ying Zhao (2001), HKUST.
Mark Stiving (1996), OSU.

Other
Mürüvvet Çelikbas (2002, Industrial Eng. and OR)
Timothy Beatty (2001, Agricultural Economics)
Craig Mohn (1999, Agricultural Economics)
Panupol Lerssrisuriya (1998, Industrial Eng. and OR)
Alan Cooke (1997, Psychology)

*Member of several Oral Examination Committees*

Effectiveness

At Haas: Member of Club 6.0 (median 6.0 and above on a 7-point scale in regard to teaching effectiveness) in the majority of the courses taught during 1993-2006.

## ADMINISTRATIVE SERVICE

Stern School of Business

| | |
|---|---|
| 2012-present | Member of Promotion and Tenure Committee |
| 2008-2009 | Director, Stern Center for Measurable Marketing |
| 2007-2008 | Co-Director, Center for Digital Economy Research (CeDER) |

| | |
|---|---|
| 2007-2009 | Member of MBA Core Curriculum Committee |
| 2007-2009 | Member of Senior Faculty  Review Committee |
| 2007-2008 | Member of *Ad Hoc* Search Committee in Environmental Studies |
| 2006-2007 | Research Director, Center for Digital Economy Research (CeDER) |
| 2006-2007 | Member of Global Task Force |

Haas School of Business

| | |
|---|---|
| 2005-2006 | Ph.D. Program Director, Haas School of Business |
| 2005-2006 | Chair, Committee on Research (Academic Senate Committee) |
| 2005-2006 | Member of DIVCO (UC Berkeley Divisional Council) |
| 2004-2005 | Member of UCORP (University Committee on Research Policy). UC system-wide committee, UC  Berkeley Representative |
| 2004-2005 | Vice-Chair, Committee on Research (Academic Senate Committee) |
| 2004-2005 | Chair, Policy and Planning ($P^2$) Committee |
| 2003-2004 | Member of Policy and Planning ($P^2$) Committee |
| 2003-2004 | Member of Academic Affairs Advisory Council |
| 2003-2004 | Chair, Marketing Group |
| 2002-2003 | Associate Dean for Academic Affairs and Faculty Chair |
| 2001-2004 | Member of Haas School Hiring Committee |
| 2001-2004 | Member of Committee on Research (Academic Senate Committee) |
| 2001-2002 | Co-Associate Dean for Academic Affairs and Chair of Haas School Hiring Committee |
| 2001-2002 | Acting Chair, Marketing Group |
| 1999-2001 | Member of Policy and Planning ($P^2$) Committee |
| 1999-2000 | Member of Faculty and Ph.D. Computer Committee (FPCC) |
| 1999-2000 | Member of Space Allocation Committee |
| 1996 | Member of *ad hoc* Marketing Ph.D. Program Evaluation Committee |

## SELECTED CONSULTING AND LITIGATION EXPERIENCE

- *Apple Inc. vs. Samsung Electronics Co, Ltd: Samsung Electronics America; Samsung Telecommunications America, LLC.* Case No: 11-cv-00630-LHK (2013-2014). Retained by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung"). Testified by deposition and trial on consumer demand and decision making in smartphone and tablet markets. Conducted own market research to inform opinions.

- *Apple Inc. vs. Samsung Electronics Co, Ltd: Samsung Electronics America; Samsung Telecommunications America, LLC.* Case No: 11-cv-01846-LHK (2012, 2013). Retained by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung"). Testified by deposition on consumer demand in smartphone and tablet markets.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Academic Partner of Prophet (2008-2012). Prophet is a Strategic Brand and Marketing Consultancy.

- *Viacom International Inc., MTV Networks and Harmonix Music Systems Inc. v. Activision Inc., Activision Publishing Inc. and RedOctane Inc*., before JAMS Arbitration Panel, JAMS Reference No.: 1220038389 (2008-9). Retained by Kirkland & Ellis, LLP. Testified by deposition on brand equity, brand positioning, communication strategies and likelihood of consumer confusion.

- Co-authored White Paper on economic theory and empirical & econometric research on national cable ownership limits (2007). Filed in FCC cable ownership proceeding. Retained by Comcast.

- *VISA U.S.A. v. First Data Corporation, First Data Resources Inc., First Data Merchants Services Corporation*, Case No. C02-1786 (PJH) (2005-6), Northern District of California. Retained by Bingham McCutchen, LLP. Testified by deposition on brand promise, brand equity, branding strategy, trademark infringement, consumer behavior and decision-making in credit-card industry.

- *Barbara's Sales Inc. v. Intel Corporation, et. al.,* Case No. 02-L-788 (2004), Third Judicial Circuit, Madison County, Illinois. Retained by Korein Tillery. Testified by deposition on misleading positioning and advertising claims, branding strategy, consumer behavior and decision-making in high-tech product categories.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 11-cv-00630-LHK |

**REBUTTAL EXPERT REPORT OF TÜLIN ERDEM
SEPTEMBER 13, 2013**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

# Table of Contents

I.   QUALIFICATIONS AND STATEMENT OF ASSIGNMENT .............................................. 1

    A.   *Qualifications* .................................................................................................... *1*

    B.   *Assignment* ...................................................................................................... *2*

    C.   *Materials Relied Upon* .................................................................................... *3*

    D.   *Compensation* .................................................................................................. *4*

II.  OVERVIEW OF OPINION .................................................................................................. 4

III. BACKGROUND ................................................................................................................ 11

    A.   *Parties at Issue* ............................................................................................... *11*

        1.   Apple ...................................................................................................... 11

        2.   Samsung ................................................................................................. 12

    B.   *Accused Products* ........................................................................................... *14*

        1.   Smartphones .......................................................................................... 14

        2.   Tablets ................................................................................................... 14

    C.   *Patents at Issue* .............................................................................................. *15*

        1.   '647 Patent [Links for Structures] ........................................................ 15

        2.   '959 Patent [Unified Local & Internet Search] ..................................... 17

        3.   '414 Patent [Asynchronous Data Synchronization] .............................. 18

        4.   '721 Patent [Image Unlock] .................................................................. 19

        5.   '172 Patent [Word Recommendations] .................................................. 20

IV.  ANALYSIS OF CONSUMER PURCHASE DECISION MAKING: CONCEPTUAL FRAMEWORK ................................................................................................................. 21

    A.   *Product Features, Attributes, and Benefits* ................................................... *22*

    B.   *Consumer Information Acquisition and Decision Processes & Purchase Behavior* .. *23*

    C.   *Decision-Making in Complex Decision Environments and Use of Heuristics* .......... *26*

    D.   *Heuristics in Purchase Decision Making Can Be Traced and Identified Most Effectively via Eye Tracking Technology* .................................................... *31*

V.   ANALYSIS OF SMARTPHONE AND TABLET PURCHASE DECISION-MAKING: DECISION COMPLEXITY .............................................................................................. 36

    A.   *Prospective Smartphone and Tablet Consumers Are Faced with Numerous Product Offerings and Product Offerings Are Ever Changing* ................................... *37*

    B.   *Prospective Smartphone and Tablet Consumers Are Faced with Evaluating Their Own Device Needs and Benefits They Seek* .................................................... *38*

    C.   *Prospective Smartphone and Tablet Consumers Are Faced with Numerous Device Attributes and Features Consisting of Many Levels of Sub-Features and The Feature*

i

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*Offerings Are Ever Changing* ..................................................................... 43

D. *Prospective Smartphone and Tablet Consumers Are Faced with Numerous Considerations Related Specifically to the Operating System Ecosystem* .................. 45

E. *Prospective Smartphone and Tablet Consumers Are Faced with Various Considerations Related to Wireless Carriers, Networks and Data Plans* ................. 46

F. *Prospective Smartphone and Tablet Consumers May Have Difficulty Finding and Evaluating Information on Specific Attributes and Features* ..................................... 48

VI. ANALYSIS OF SMARTPHONE AND TABLET PURCHASE DECISION-MAKING: EVIDENCE OF THE KEY DEMAND DRIVERS AND OF THE USE OF HEURISTICS FROM APPLE, SAMSUNG AND ███████████ CONSUMER RESEARCH ............... 52

A. *Prospective Consumers Are Overwhelmed with Decision Task Complexity and/or Confused about Even the Most Basic Features* ............................................... 53

B. *Prospective Consumers Use Simple Rules and Shortcuts at Various Stages of the Smartphone and Tablet Purchase Process* .................................................. 55

VII. ANALYSIS OF SMARTPHONE AND TABLET PURCHASE DECISION-MAKING: EVIDENCE OF THE KEY DEMAND DRIVERS AND USE OF HEURISTICS FROM MY CONSUMER RESEARCH CONDUCTED FOR THIS CASE ........................ 63

A. *Overview of Survey Methodology and Design* ............................................ 64

B. *Eye Tracking Background* ......................................................................... 68

C. *Analysis Methodology – Processing Metrics* ............................................. 71

D. *Analysis Methodology – Visual Attention and Choice* ................................ 81

    1. Predictive Choice Models in Eye Tracking ........................................ 82

    2. Visual Attention Model Hypotheses ................................................... 83

E. *Research Findings from My Consumer Research Conducted for This Case* .............. 85

    1. My Consumer Research Confirms that Consumers Use Simple Rules and Shortcuts at Various Stages of the Smartphone and Tablet Purchase Process ..... 86

    2. My Consumer Research Confirms that Consumers Increase Their Reliance on Simple Rules and Shortcuts at Various Stages of the Smartphone and Tablet Purchase Cycle with the Increase in Decision Complexity .................................. 96

    3. My Consumer Research Confirms that Consumer Segments Defined by Current Smartphone or Tablet Devices Do Not Affect Information Search or Processing 102

    4. My Consumer Research Shows that Prospective Consumers Do Not Consider All of the Main Attributes ..................................................................... 102

    5. My Consumer Research Confirms that Consumers Do Not Consider Many of the Secondary Attributes ........................................................................ 106

    6. My Consumer Research Confirms that Selection of a Smartphone for Consideration Depends on the Loyalty and Status Quo Effect and Attention to Main Attributes ................................................................................ 107

    7. My Consumer Research Confirms that Attention to Main Attributes, but Not Secondary Attributes, Predicts Smartphone and Tablet Choice ........................ 110

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

8.   My Consumer Research Confirms that the Relevance of Secondary Attributes in Predicting Choice is a Result of Misspecification ............................................... 114

VIII.   ANALYSIS OF FUNCTIONALITIES ASSOCIATED WITH PATENTS AT ISSUE 115

A.   *The Evidence Presented in Dr. Hauser's Expert Report that the Accused Functionalities Drive Demand is Unreliable, Misleading, and Irrelevant* ............... *116*

1.   Dr. Hauser's Research Design Is Critically Flawed as It Assumes that Smartphone or Tablet Consumers Make Decisions Using Very Granular Product Attributes 118

2.   Dr. Hauser's Research Design Is Critically Flawed as It Fails to Account for Attributes Important for Smartphone or Tablet Purchase Decision Making ...... 120

3.   Dr. Hauser's Research Design Is Critically Flawed as It Fails to Simulate the Typical Methods by Which Consumers Acquire and Process Product And Attribute Information ................................................................................... 121

4.   Dr. Hauser's Study Design Is Critically Flawed as It Assumes That Smartphone and Tablet Consumers Make Decisions Using the Same, Limited Set of Product Attributes .................................................................................................... 123

5.   Dr. Hauser's Research Presents Overly Broad, Incomplete and Misleading Descriptions of the Accused Functionality Related to Each Patent and the Alternatives to Such Functionalities. ................................................................ 124

6.   Conclusion ............................................................................................. 133

B.   *The Evidence Presented in Dr. Vellturo's Expert Report that the Accused Functionalities Drive Demand is Misleading, Irrelevant and Insufficient* ............... *134*

1.   '647 Patent [Links for Structures] ................................................................ 136

2.   '959 Patent [Unified Local & Internet Search] .............................................. 137

3.   '414 Patent [Asynchronous Data Synchronization] ........................................ 143

4.   '721 Patent [Image Unlock] ........................................................................ 144

5.   '172 Patent [Word Recommendations] .......................................................... 146

6.   Conclusion ............................................................................................. 148

C.   *Consumers Do Not Base Purchase Decisions on Functionalities Associated with the Patents at Issue* .......................................................................................... *148*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

I.     QUALIFICATIONS AND STATEMENT OF ASSIGNMENT

A.   *Qualifications*

1. I am the Leonard N. Stern Professor of Business Administration and Professor of Marketing at the Stern School of Business, New York University.  I previously served as the Co-Director of the Center for Digital Economy Research and the Director of the Stern Center for Measurable Marketing.

2. Before joining the Stern School of Business in 2006, I was the E.T. Grether Professor of Business Administration and Marketing at the Haas School of Business, University of California at Berkeley.  I joined the Haas School of Business in 1993 and served as the Associate Dean for Academic Affairs and the Marketing Group Chair, the Ph.D. Director at the Haas School of Business and the Chair of the campus wide Committee on Research (COR) at the University of California, Berkeley.  I was also the Berkeley representative at the University of California system wide Committee on Research.

3. I hold a BA from Boğazici University and an MA in Economics and a Ph.D. in Business Administration, with a major in marketing and minors in economics and statistics, from the University of Alberta.  My research interests include advertising, brand management and equity, consumer behavior and choice, decision-making under uncertainty, econometric modeling, marketing mix effectiveness, marketing research and pricing.  I have published several papers in top field journals and have received best paper awards, as well as major research grants, including two major National Science Foundation (NSF) grants.

4. I served as the editor-in-chief of the Journal of Marketing Research, the preeminent academic journal of the American Marketing Association, which publishes work on consumer behavior, marketing science models, marketing strategy and marketing research

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

methodologies.  I also served as an Area Editor at Marketing Science and Associate Editor at Quantitative Marketing and Economics and the Journal of Consumer Research.  I serve as an editorial board member of many scholarly journals, including Journal of Consumer Research, Journal of the Academy of Marketing Science, Marketing Letters and International Journal of Research in Marketing.  I also was the President of the INFORMS Marketing Society (ISMS).

5.  I have 20 years of teaching experience, during which I have taught branding, brand and product management, marketing management and international marketing in undergraduate, MBA and executive education programs.  I also have taught doctoral seminars on consumer choice modeling and empirical modeling.

6.  From 2008 to 2012, I was an Academic Partner at Prophet, a branding and marketing consultancy firm. A complete list of my publications, honors, awards and professional activities is provided in my CV, attached in Appendix A.

7.  I have served as an expert witness in several cases. The list of cases where I submitted my testimony is available in Appendix B.

## B.  *Assignment*

8.  I have been retained by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung") in the above captioned case. Apple Inc. ("Apple") has alleged that Samsung infringed six U.S. patents. The patents-at-issue are U.S. Patent numbers 5,946,647 (the "'647 Patent"), 6,847,959 (the "'959 Patent"), 7,761,414 (the "'414 Patent"), 8,046,721 (the "'721 Patent"), and 8,074,172

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

(the "'172 Patent").[1]

9.  My assignment is:

- To examine the attributes and other decision factors that consumers take into account in making purchasing decisions in the smartphone and tablet markets;

-  To evaluate whether the functionalities allegedly enabled by the Apple patents have any measurable impact on consumer decision-making when compared to non-infringing alternatives; and

- To evaluate certain opinions expressed in the Expert Report of John R. Hauser[2] ("Hauser Report") and the Opening Expert Report of Christopher Vellturo[3] ("Vellturo Report") as they pertain to the two previous points.

### C.  *Materials Relied Upon*

10. In preparing this report, I have relied on information from a variety of sources including, among others: the Complaint; information produced by the parties in this litigation; deposition testimony; information from publicly-available sources such as third party consumer market research, industry reports and company websites; and my own consumer research.  A list of materials that I relied upon in reaching my conclusions is provided in Appendix C.

11. In the event I am provided with additional relevant materials, I reserve the right to supplement this declaration with additional conclusions, bases, and/or supporting material.

---

[1] Amended Complaint for Patent Infringement, August 31, 2012 ("Complaint"), at ¶ 12; Stipulation and Order Regarding Dismissal of Claims, September 6, 2013.
[2] Expert Report of John R. Hauser, August 11, 2013 ("Hauser Report").
[3] Opening Expert Report of Christopher A. Vellturo, Ph.D., August 12, 2013 ("Vellturo Report").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### D. *Compensation*

12. I am compensated at my standard rate of $900 per hour, plus expenses, for my work in this case.  In addition, I receive compensation based on the professional fees of Analysis Group, Inc., a financial and economic consulting firm, which has provided research support under my direction and supervision. My compensation is not contingent on my findings or on the outcome of this case. The opinions I express in no way are contingent on the compensation I will receive.

## II.   OVERVIEW OF OPINION

13. The process by which consumers make purchasing decisions depends greatly on the complexity of the decision task. When the decision-making task is simple, keeping everything else constant, consumers are likely to evaluate each product option and all of the attributes of those options in a systematic manner, i.e., trade off the existence or the level of one attribute for the absence or alternate level of another attribute. When the decision-making task is complex, people are more inclined to adopt simple rules and shortcuts known as "decision heuristics" that demand less cognitive effort and allow faster decision making. There are a number of factors that make a decision task more complex, including the number of product attributes and the number and range of attribute levels. In order to determine the specific factors that impact the purchase decision, it is important for a researcher to understand the complexity of the decision-making task.

14. My analysis of consumer decision-making in the smartphone and tablet market reveals that the decision task of consumers in these markets is highly complex because of the following factors:

  ▪  Prospective smartphone and tablet consumers rely on devices for a wide variety of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

needs and benefits which they may take into account when purchasing a device. The benefits that consumers perceive and seek in a device are inherently subjective and can be based on functional characteristics of a device, e.g., battery life; positive feelings associated certain characteristics, e.g. "a fun device;" and feelings of self-expression, e.g., "it's me;" and/or the combination of any of the above, e.g., such as benefits stemming from brand. The sought benefits rely on numerous factors that are not limited to smartphone and tablet attributes. Smartphone consumer look for devices that meet the expected uses, the more popular of which are web browsing, photo capabilities, personal e-mail and non-game apps. The key benefits consumers seek in tablets are very similar with video-streaming being in the top category of benefits.

- Prospective smartphone and tablet consumers are confronted with numerous attributes and features that can be further decomposed into many levels of specific sub-attributes or sub-features. For example, Apple touted that iPhone 5 software update consisted of over 200 new features and sub-features. The mix of these feature offerings is always changing due to regular technological developments involving both hardware and software. Finally, the ability to trade off various attributes is made difficult by the fact that many attributes reflect inherent trade-offs (*e.g.*, devices with a larger screen tend to have a shorter battery life.)

- A consumer decision factor that is particular to mobile devices involves the operating system. Not only is there a potentially perceived steep learning curve to adapt to the intricacies of alternative operating system platforms, but each platform is also linked to its own market for applications which deliver many of the benefits consumers seek in a device. Further, consumers may have many other devices that run on certain operating systems which may not be as easily compatible with alternative platforms.

- Another consumer decision factor unique to the purchase of a smartphone (and, at times, tablets) is the consideration of a wireless carrier. Wireless carriers differ in terms of coverage and quality of the data network, variety and cost of the data plans, and availability of devices. Further consumers often face penalties for switching carriers or are restricted to specific carriers for other reasons (e.g.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

limited coverage in rural areas).

- Prospective consumers also face numerous information sources that vary tremendously in terms of systematic presentation, completeness, subjectivity of content, and accuracy of information. The sheer volume of sources and the variability of content not only adds to the complexity of the purchase decision, but may make meaningful product and attribute comparisons nearly impossible.

15. In aggregate, the above considerations make for a purchase environment in which smartphone and tablet customers are likely overwhelmed with the full set of implications generated by their device selection. Thus, it is not surprising that shoppers employ simple rules and shortcuts, i.e., decision heuristics, that limit the effort required to, ultimately, select a device.  Costly and, at times, flawed information gathering results in some consumers having a poor understanding of even the most basic features incorporated in their smartphones and tablets. Furthermore, existing market research studies and academic research show that consumers consider only a handful of product options and base decisions on a very limited set of attributes and features. Given this evidence, it is clear that consumers do not process information in a systematic way where they engage in a comprehensive evaluation of trade-offs associated with the full set of attributes and features and numerous sub-attributes and sub-features in alternative devices.

16. My review of Apple, ███████ and █████████████ reveals a limited set of regularly-cited demand drivers that are relevant to consumer purchase decisions:

- Many of the key demand drivers have nothing to do with smartphone or tablet attributes and features. These include considerations related to wireless carriers, network coverage, and data plan costs. Other considerations relate to the operating system (OS) ecosystem, including OS compatibility with other owned devices.

- Of the consumers who are looking for a specific attribute or feature, the most

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

commonly cited drivers of demand are not related to granular features. Instead, they include primary attributes of smartphones and tablets such as brand and price, as well as others such as battery life, fast cellular connectivity, camera, weight, display, etc. These attributes and features vary in their importance to consumers.

17. In addition to the review of Apple, ███████ and ███████ consumer research, I conducted my own consumer research for this case. My consumer studies, three in total, evaluate the attributes and features that consumer take into account in the smartphone and tablet purchase process. The studies target two stages of the purchase process: 1) the selection of devices that consumers would consider from all the options that they are aware of (the "consideration stage"); and 2) the choice of a final device (the "choice stage"). My Study 1 and Study 2 examine the consideration stage and the choice stage, respectively, in the context of smartphones. Study 3 examines the choice stage in the context of tablets.

18. The findings generated by these research studies are reflective of the highly complex purchase decision task faced by consumers in smartphone and tablet markets. Even in an experimental decision task that is considerably less complex than the real market scenarios, consumers rely extensively on the simple rules and shortcuts at both the consideration and choice stages of the purchase cycle. Furthermore, the reliance on "decision heuristics" increases considerably with the complexity of the decision environment. My general findings are that:

- Consumers skip a large portion of the product-attribute information even when the attribute information is made easily available to them.
- The information that is reviewed is often processed in a highly selective manner with many more attributes of non-chosen devices being skipped relative to the attributes of the chosen devices.
- Consumers vary greatly in the number and types of attributes that they review.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- Even after limiting information to a select group of products and attributes, consumers continue to seek shortcuts in order to further simplify the decision making process.

19. Further, my analysis generates the following results:

- Prospective consumers consider only a limited portion of the "*main*" attributes and features, i.e., those attributes and features that are *commonly* cited as important to the decision making process and that *commonly* appear on wireless carrier, retailer and independent reviewer websites.

- Prospective consumers consider only a limited portion of the "*secondary*" attributes and features, i.e., those attributes and features that are *rarely* cited as important to the decision making process and that *infrequently* appear on comparison websites of wireless carriers and other sources.

- Prospective consumers apply preferential attention to certain attributes such as *brand* and *price*.

- Visual attention to "*main*" attributes and features, but not visual attention to "*secondary*" attributes and features, predict smartphone and tablet choice.

- Relevance of "*secondary*" attributes in predicting choice is a spurious demand artifact resulting from study/model misspecification.  That is, when visual attention to the "*main*" attributes and features are omitted from a model, visual attention to the "*secondary*" attributes that are correlated with the omitted main attributes appear as drivers of demand although they are not.

20. I reviewed the Expert Report of John R. Hauser, where he describes a conjoint study that attempts to estimate consumer willingness to pay for product attributes and for the features at issue. I find that Dr. Hauser's research design ignores the realities of the marketplace outlined above and, as a result, suffers from a number of critical flaws, as follows:

- Dr. Hauser designs his research on the basis of a set of very granular features that consumers are typically not exposed to in real life. By presenting these features to consumers, Dr. Hauser constructs or inflates their importance, thus creating demand

8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

effects which result in unreliable and misleading estimates. The demand effects are exacerbated further as participants are extensively educated about these features via animation videos and text prompts, which do not reflect the real world purchase experience.

- Dr. Hauser fails to include all the various attributes that have been found to be important to consumer purchase decision making.  By omitting the attributes that consumers may care about, Dr. Hauser further inflates the importance of all the features in his design. In particular, by including very granular features next to only a small set of important features, Dr. Hauser further inflates the value of the very granular features in the eyes of the survey participants.

- Dr. Hauser's conjoint method relies on an underlying premise that study participants review all of the information presented to them, evaluate the tradeoffs between and among attributes and products, and integrate these tradeoffs in their decision making. Such information acquisition and processing is not typical to prospective consumers in the complex smartphone and tablet markets. Dr. Hauser's method may further inflate the values that participants assign to the presented very granular features.

- Dr. Hauser fails to consider that every prospective consumer is unique in the number and types of attributes that they would consider in their purchase decision making because of the use of heuristics in complex decision making, and, as a result misleadingly generalizes his purported findings from a single set of granular features to the entire population of Samsung buyers.

21. In addition to the critical flaws in his research design, Dr. Hauser misrepresents the features-at-issue and the underlying accused functionalities. Furthermore, he does not provide the participants with the non-infringing alternative functionalities proposed by Samsung and not disputed by Apple. Instead, Dr. Hauser presents participants with only the option that those functionalities do not exist altogether. In doing so, Dr. Hauser makes his findings entirely irrelevant for the issues at hand.

22. The grossly flawed design of Dr. Hauser's study results in unreliable, misleading and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

irrelevant estimates which cannot be used to inform marketplace outcomes.

23. Dr. Vellturo failed to provide any evidence establishing that the features at issue drive

consumer demand over any other of the hundreds of attributes and features in a device. In

fact, given the hundreds of attributes and features on a device, as confirmed by Apple

executives, it would be practically impossible to know the relative contribution of features at

issue to ease of use. Additionally, Dr. Vellturo provides misleading, irrelevant and/or

insufficient supporting materials for how individual features at issue drive consumer demand,

as follows:

- ▪ Dr. Vellturo's purported evidence relates to features that are either defined too
  broadly or too imprecisely to fall under the narrow scope of the patented
  inventions and thus can be deemed irrelevant and/or insufficient to the issues at
  hand.

- ▪ Much of Dr. Vellturo's purported evidence relates to internal company
  commentary of the engineering/design team and does not provide a meaningful
  link between the accused functionalities and consumer demand. In the instances
  where Dr. Vellturo does rely on consumer surveys, the surveys do not address the
  functionalities that correspond to the narrowly defined scope of the patents-at-
  issue. Overall, Dr. Vellturo fails to establish the link between individual
  preferences and choice.

- ▪ Dr. Vellturo's purported evidence that Apple and Samsung executives and experts
  assert the importance of the features at issue is taken out of context and does not
  establish a link between features-at-issue and consumer demand.

24. The features associated with the patented functionalities are highly granular and are among

the many hundreds of such features available on smartphones and tablets. Consumer research

conducted by Apple, ███████ and ███████ do not survey consumers on such granular

features as drivers of demand. My own review of wireless carrier, retailer and independent

reviewer websites shows that such granular features do not commonly appear on on-line

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

information sources that consumers regularly use in their purchase decisions. The studies I
conducted for this case further confirm that consumers skip a large share of product-attribute
information and that it is the main attributes (and the visual attention to those attributes) and
not the secondary attributes that drive consumer consideration and choice of smartphones and
tablets. Based on these findings, it is implausible that the functionalities associated with the
patents-at-issue have any meaningful impact consumer demand for the accused Samsung
devices.

III.     BACKGROUND

    A.   *Parties at Issue*

        1.   **Apple**

25. Apple was incorporated in California in 1977 as a manufacturer of personal computers.[4]
According to its company filings, Apple describes its current product and service offerings as
including "iPhone, iPad, Mac, iPod, Apple TV, a portfolio of consumer and professional
software applications, the iOS and OS X operating systems, iCloud, and a variety of
accessory, service, and support offerings."[5]

26. Apple launched its first smartphone offering, the iPhone, in June 2007.[6] The iPhone, running
Apple's own operating system named iOS, was subsequently updated with several new
generations, such as the iPhone 3G launched in July 2008, the iPhone 3GS launched in June
2009, the iPhone 4 launched in June 2010, the iPhone 4S launched in October 2011, and the

---

[4] Apple Inc. Form 10-K for the fiscal year ended September 29, 2012 ("Apple 2012 10-K"), at 1.
[5] Apple 2012 10-K, at 1.
[6] "Apple Press Info - Apple Reinvents the Phone with iPhone", accessed September 11, 2013,
http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html.

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

iPhone 5 launched in September 2012.[7]  The iPhone was initially available only through

AT&T.[8] It became available through Verizon in February 2011, through Sprint in October

2011, and through T-Mobile in April 2013.[9] Apple smartphones currently remain available

through all four wireless carriers and several retailers, including Best Buy, RadioShack,

Target, and Wal-Mart stores.

27. Apple launched its first tablet offering, the iPad, in April 2010.[10] The iPad, also running

Apple's own operating system, iOS, was subsequently updated with new generations in

March 2011, March 2012, and November 2012.[11]

### 2. **Samsung**

28. Samsung Electronics America, Inc. ("SEA"), a New York corporation, and Samsung

Telecommunications America, LLC ("STA"), a Delaware limited liability corporation, are

subsidiaries of South Korea-based Samsung Electronics Co., Ltd. ("SEC").[12]  SEC is South

Korea's largest company and one of Asia's largest electronics companies.[13]  SEA was

---

[7] Release Dates of various generations of the iPhone, all accessed September 11, 2013,
http://www.apple.com/pr/library/2008/07/10iPhone-3G-on-Sale-Tomorrow.html,
http://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html, http://www.apple.com/pr/library/2010/06/07Apple-Presents-iPhone-4.html,
http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html,
http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5.html.
[8] "Apple Unveils iPhone", accessed September 11, 2013, http://www.macworld.com/article/1054769/iphone.html.
[9] Release dates of iPhone on Verizon, Sprint, and T-Mobile, all accessed September 11, 2013,
http://www.apple.com/pr/library/2011/01/11Verizon-Wireless-Apple-Team-Up-to-Deliver-iPhone-4-on-Verizon.html, http://newsroom.sprint.com/article_display.cfm?article_id=2063, http://newsroom.t-mobile.com/phoenix.zhtml?c=251624&p=irol-newsArticle&ID=1802242&highlight=.
[10] "Apple Press Info - iPad Available in US on April 3", accessed on September 11, 2013,
http://www.apple.com/pr/library/2010/03/05iPad-Available-in-US-on-April-3.html.
[11] Release dates of various generations of iPad, all accessed September 11, 2013,
http://www.apple.com/pr/library/2011/03/02Apple-Launches-iPad-2.html,
http://www.apple.com/pr/library/2012/03/07Apple-Launches-New-iPad.html,
http://www.apple.com/pr/library/2012/10/23Apple-Introduces-iPad-mini.html.
[12] Samsung Defendants' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s Complaint, April 18, 2012, ("Counterclaim"), ¶¶ 7-8.
[13] Counterclaim, ¶6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

formed in 1978 and it markets a variety of consumer electronics.[14]  STA, founded in 1996,

researches, develops, markets, and sells a variety of personal and business communication

devices in the United States including cell phones.[15]  SEA, STA, and SEC (collectively,

"Samsung") are part of the Samsung Group, which includes a variety of different companies

operating in several business areas, including electronics, chemicals, and financial services.[16]

29. Samsung entered the U.S. mobile handset business in 1997[17] and has been selling

smartphones in the U.S. since at least 2001.[18]  Having marketed smartphones incorporating a

variety of operating systems, including versions of the Palm OS and Windows Mobile

operating systems,[19] Samsung launched its first smartphone running Android in mid-2009.[20]

Samsung's first tablet, Galaxy Tab, was released in the U.S. in November 2010.[21] Currently,

Samsung's Galaxy line of smartphones and tablets run the Android operating system and

Samsung's ATIV line runs the Windows Phone 8 operating system.[22] In the U.S., Samsung

has a smartphone line up covering mid-level devices, e.g., Galaxy Express, and premium

---

[14] Counterclaim, ¶7.

[15] Counterclaim, ¶8.

[16] Description of Samsung Group, accessed on September 11, 2013,
https://www.samsung.com/us/aboutsamsung/samsung_group/affiliated_companies/.

[17] Frank Gibney Jr, "Samsung Moves Upmarket," *Time Magazine*, March 17, 2002, accessed September 11, 2013,
http://www.time.com/time/magazine/article/0,9171,218319,00.html.

[18] Samsung phone for sale in U.S., accessed on September 12, 2013,
http://www.pcmag.com/slideshow/story/309047/samsung-s-smartphone-history-from-zero-to-galaxy-s4/1.

[19] Samsung phones running Palm and Windows Mobile, accessed on September 11, 2013,
http://reviews.cnet.com/smartphones/samsung-sph-i300-sprint/4505-6452_7-7703904.html,
http://reviews.cnet.com/smartphones/samsung-blackjack-sgh-i607/4505-6452_7-32143267.html.

[20] Samsung phones run Android operating system, accessed on September 11, 2013,
http://gizmodo.com/5229244/meet-the-i7500-samsungs-first-android-phone;
http://www.brighthand.com/default.asp?newsID=15161&news=Samsung+I7500+Google+Android.

[21] "Verizon Wireless puts Samsung Galaxy Tab In Stores In November", accessed on September 11, 2013,
http://news.verizonwireless.com/news/2010/10/pr2010-10-19b.html.

[22] "Samsung goes big with Windows 8-powered Ativ line", accessed on September 11, 2013,
http://news.cnet.com/8301-1035_3-57590154-94/samsung-goes-big-with-windows-8-powered-ativ-line/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

devices, e.g., Galaxy S4.[23]

### B. *Accused Products*

30. Apple has accused certain Samsung smartphones and tablets of infringing all or a subset of its asserted patents in this matter.  I discuss each of these separately in the sections that follow.

### 1. Smartphones

31.  The industry commonly defines a smartphone as a cell phone with one of the following operating systems: Android, iOS, Blackberry, or Windows.[25]

32. Apple has accused 16 Samsung smartphone models of infringing all or a subset of the patents-in-suit, as shown in Exhibit 1.  The first of the accused products, the Dart, was launched in the U.S. in June 2011.[26]  Chart 1 shows the timeline of the accused Samsung smartphone releases into the U.S. market.

### 2. Tablets

33. A tablet computer (or "tablet") is described as the hybrid of a personal computer and a

---

[23] Mid-level to premium Samsung offerings, accessed on September 11, 2013, http://reviews.cnet.com/smartphones/samsung-galaxy-express-at/4505-6452_7-35473912.html, http://reviews.cnet.com/samsung-galaxy-s4/.
[24] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at 93.
[25] *See*, for example, "Gartner IT Glossary, Smartphone," Gartner, accessed April 17, 2013, http://www.gartner.com/it-glossary/smartphone/; "Gartner IT Glossary, Entry-Level Smartphone," Gartner, accessed April 17, 2013, http://www.gartner.com/it-glossary/entry-level-smartphone/; "North American Smartphones Market," Frost & Sullivan, December 2010, at14; and "2012 Handset Guidebook," Oppenheimer Equity Research, November 13, 2011, at 93.
[26] "Samsung Dart T499", accessed on September 11, 2013, http://www.gsmarena.com/samsung_dart_t499-4055.php.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

smartphone. It is typically a device that is portable, has a color touchscreen display that measures at least 5 inches diagonally, and is contained in a single panel.[27]   Tablets typically offer Wi-Fi connectivity,[28] and while some tablets offer cellular communication capabilities, they are not generally used for voice communications. Instead, they are primarily intended for personal uses such as reading e-books, gaming, email, and web browsing.[29]

34. Apple has accused two Samsung tablet models of infringing all or some of the patents-in-suit: Galaxy Tab II 10.1 (launched in April 2012), and Galaxy Note 10.1 (launched in July 2012), as shown in Exhibit 1. Chart 1 shows the timeline of the accused Samsung tablet releases into the U.S. market.

### C.  *Patents at Issue*

35. As discussed above and shown in Exhibit 1, Apple has accused Samsung of infringing five U.S. patents.  Each of the asserted patents purportedly relates to technologies incorporated in the Android operating software used in certain of Samsung's smartphones and tablets.   As outlined below, Apple and Samsung do not agree on the scope of the incremental benefits invoked by the patents-at-issue.  However, under either party's interpretation, Samsung claims to have had alternatives available which would not infringe Apple's patents.

### 1.  '647 Patent [Links for Structures]

36. The '647 patent was issued on August 31, 1999 and is entitled "System and Method for

---

[27] *See*, for example, "2012 Tablet Buying Guide," Consumer Electronics Association, http://www.ce.org/CorporateSite/media/CEA-Consumer-Info/Wireless%20Computing/2012-Tablet-Buying-Guide.pdf and "PCMag Encyclopedia, Tablet Computer," PCMag, accessed May 16, 2013, http://www.pcmag.com/encyclopedia/term/52520/tablet-computer.
[28] "Tablet Buying Guide," *Consumer Reports*, January 2011, accessed on September 11, 2013, http://www.consumerreports.org/cro/tablets/buying-guide.htm.
[29] iPad Tracking Study FY 12-Q2 Report (APLNDC630-0000177773 – 78021, at 77904).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Performing an Action on a Structure in Computer-Generated Data."[30]  I understand that Apple asserts that Samsung Accused Products infringe claims 1, 4, 6, 8 and 9.[31]  I understand that Apple has asserted that the '647 patent describes a feature that allows a user to select detected structures within text (*e.g.,* a written phone number) and perform multiple actions related to the detected structure (*e.g.,* dial the phone number or send a text message).[32]  I understand that the patented system comprises a set of particular components in software, as follows:

- An "*analyzer server*" which detects interesting information and links it to computer subroutine(s) which will operate on the structure [i.e., detecting and linking functionality];
- A "*user interface*" which enables the selection of detected structures and linked actions [i.e., selection functionality]; and
- An "*action processor*" for performing the linked actions on the detected structure [i.e., action functionality]. [33]

37. 

---

[30] U.S. Patent No. 5,946,647; *See also* Exhibit 1.
[31] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, at 1.
[32] Initial Expert Report of Dr. Todd C. Mowry Regarding Infringement of U.S. Patent No. 5,946,647, August 12, 2013, ("Mowry Report"), at 19, ¶¶60-61.
[33] Mowry Report, at 20, ¶62; *see also* Rebuttal Expert Report of Dr. Kevin Jeffay Concerning Noninfringement of U.S. Patent No. 5,946,647
[34] Mowry Report, at 43, ¶113; 66, ¶176.
[35] Mowry Report, at 51, ¶140.

38. Apple has accused each of the 18 products in suit of infringing the '647 patent.[36] I understand that Apple claims to practice this patent on devices running iOS 3 through 6.[37] I further understand that one cannot determine whether a device practices the claims of the '647 patent by merely operating the device. In order to determine whether a device practices, I understand one must know the underlying structure of the software.[38]

## 2.   '959 Patent [Unified Local & Internet Search]

39. The '959 patent was issued on January 25, 2005 and is entitled "Universal Interface for Retrieval of Information in a Computer System."[39] I understand that Apple has asserted that Samsung Accused Products infringe claims 24 and 25.[40] I understand that Apple's technical expert describes that patented invention as allowing a user to input a search request into a single search interface that, in turn, provides that search request to multiple "heuristics" that search for relevant information both on the Internet and on local storage media on the device.[41] Furthermore, the patented functionality requires that

- The multiple heuristics are "a search algorithm that employs some *'rule of thumb'* and does not consist solely of constraint satisfaction parameters *[emphasis added]*."[42]
- The heuristics locate information in a plurality of locations, including both *local storage media and on the Internet*.[43]

40. Apple has accused all products in suit of infringing the '959 patent, except the Galaxy Note

---

[36] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, Exhibit A; *See also* Exhibit 1.
[37] Mowry Report, at 115-116, ¶300.
[38] Rebuttal Expert Report of Dr. Kevin Jeffay Concerning Noninfringement of U.S. Patent No. 5,946,647 ("Jeffay Report "), September 13, 2013, at 39, ¶109.
[39] U.S. Patent No. 6,847,959; *See also* Exhibit 1.
[40] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, at 1. *See also* Exhibit 1.
[41] Expert Report of Dr. Alex Snoeren Concerning U.S. Patent Nos. 6,847,959 and 7,761,414, August 12, 2013 ("Snoeren Report"), at 2, ¶8.
[42] Snoeren Report, at 27, ¶97.
[43] Snoeren Report, at 2, ¶8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

10.1, Galaxy Tab 2 10.1, and Galaxy Rugby Pro.[44] ███████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████ I understand that Apple's expert puts

forth no opinion that Apple practices the asserted claims, claims 24 and 25, but only opines

that Apple practices claim 34 of the '959 patent on its Siri application on iPhone 4S and

iPhone 5.[46]

### 3.   '414 Patent [Asynchronous Data Synchronization]

41. The '414 patent was issued on July 20, 2010 and is entitled "Asynchronous Data

Synchronization Amongst Devices."[47]  I understand that Apple has asserted that Samsung

Accused Products infringe claims 11 and 20.[48]  I understand that Apple's technical expert

describes the patented invention as synchronization[49] of "data stored on two different

computing devices" that allows users to "access and modify their data while it was in the

process of being synchronized."[50] Furthermore, the patented functionality requires a very

specific implementation of the synchronization procedure:[51]

- "*One* processing thread is *a non-synchronization* processing thread that enables a user
  to be able to access and edit structured data in *a database*."

- "*A second* thread is able to operate during *an overlapping time interval* to
  synchronize data in the same structured database to *a second structured database*."

- "[A] data processing system that executes both a synchronization processing thread

---

[44] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, Exhibit A; *See also* Exhibit 1.
[45] Snoeren Report, at 3, ¶11; 39, ¶128.
[46] Snoeren Report, at 3, ¶10.
[47] U.S. Patent No. 7,761,414; *see also* Exhibit 1.
[48] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, at 1; *see also* Exhibit 1.
[49] Apple's technical expert defines synchronization as the "process of comparing two or more data sources and then updating the sources to ensure that all have the same set of data." *See* Snoeren Report, at 7-9, ¶25.
[50] Snoeren Report, at 7-8, ¶¶25-26; *see generally* Chase Report.
[51] Snoeren Report, at 8, ¶¶27-28; see also Chase Report, ¶ 49.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and a non-synchronization processing thread *concurrently*."[52]

42. Apple has accused each of the 18 products in suit of infringing the '414 patent[53]



. I understand that Apple claims to practice claim 11 of this patent with its Address Book and Calendar applications.[55]

### 4.   '721 Patent [Image Unlock]

43. The '721 patent was issued on October 25, 2011 and is entitled, "Unlocking a Device by Performing Gestures on an Unlock Image."[56] I understand that Apple has asserted that Samsung Accused Products infringe claim 8.[57] I understand that Apple's technical expert describes the patented functionality as user interface that allows a user to "unlock the device […] with a gesture on the touch-screen."[58] Specifically, the patented functionality requires "a user interface" that:

- "[D]isplays an unlock image at a predefined location on the interface,"
- "[C]ontinuously moves the unlock image on the screen in accordance with the user's finger movement on the screen,"
- "[C]ontains visual cues to direct the user where to move the unlock image to unlock the device," and

---

[52] Snoeren Report, at 8, ¶¶27-28.
[53] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, Exhibit A.
[54] Snoeren Report, at 152, ¶414; 9, ¶32; 10, ¶35; 11, ¶38.
[55] While Apple claimed to have practiced claim 11 of the '414 patent beginning in iOS 3 (*see* Apple's Response to Samsung's Interrogatory No. 42), Apple's technical expert opined only that claim 11 of the '414 patent was practiced in the Address Book and Calendar applications in iOS 6.1. Snoeren Report, at 195, ¶525.
[56] U.S. Patent No. 8,046,721; *See also* Exhibit 1.
[57] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, at 1; *See also* Exhibit 1.
[58] Expert Report of Professor Andrew Cockburn, August 12, ("Cockburn Report"), at 1-2, ¶4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

- "[U]nlocks the device when the user moves the unlock image to a predefined unlock region on the screen."[59]

44. I understand the accused feature at issue on Samsung accused devices is varied for each device.[60]   Generally there are three features accused, the keyguard user interface, the incoming call user interface, and the missed call or text message user interface.[61]   Apple has not accused the Galaxy Note, Galaxy Note II, Galaxy Rugby Pro, and Galaxy S III of infringing the '721 patent.[62]   Apple has also not accused the tablet products-in-suit. I understand that Apple claims to practice this patent on all devices running iPhone OS 1.0 through 3.0 and iOS 4 through iOS 6.[63]

## 5.   '172 Patent [Word Recommendations]

45. The '172 patent was issued on December 6, 2011 and is entitled, "Method, System, and Graphical User Interface for Providing Word Recommendations."[64]   I understand that Apple has asserted that Samsung Accused Products infringe Claim 18.[65]   I understand that Apple's technical expert describes the patented functionality as "a user interface that allows users to […] enter text on a portable electronic device."[66]   Specifically, I understand that the patented functionality requires "a user interface" that:[67]

- "[D]isplays what the user is currently typing (the "current character string") in a first area of the display,"
- "[D]isplays the current character string and a suggested replacement word or words

---

[59] Cockburn Report, at 2, ¶5.
[60] Rebuttal Expert Report of Saul Greenberg, Ph.D., Regarding Noninfringement of the Asserted Claim 8 of U.S. Patent No. 8,046,721 ("Greenberg Report"), at 7-9, ¶¶22-36; 67-76 ¶¶178-197; 83-204 ¶¶214-425.
[61] Greenberg Report, at 65-66, ¶ 178.
[62] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, Exhibit A.
[63] Cockburn Report, at 108, ¶352.
[64] U.S. Patent No. 8,074,172; *See* also Exhibit 1.
[65] Apple Inc.'s Submission on Case Narrowing Pursuant to Court Order of April 24, 2013, at 1; *See* also Exhibit 1.
[66] Cockburn Report, at 5, ¶15.
[67] Cockburn Report, at 5, ¶16.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

("suggested replacement character strings") in a second area of the display separate from the first,"

- "[R]eplaces the current character string displayed in the first area with a suggested replacement character string if the user selects a delimiter (such as a comma or a space),"

- "[P]rovides an alternative method of replacing the current character string displayed in the first area with a suggested replacement character string if the user gestures (e.g., by tapping) on the suggested replacement character string displayed in the second area," and

- "[I]nstead keeps the current character string displayed in the first area (e.g., if the user believes they have correctly spelled the word) if the user gestures on the current character string displayed in the second area." [68]

46. I understand the accused features at issue on Samsung Accused Products are the Android keyboard and Swype.[69] Apple has not accused the Dart, Illusion, Galaxy Note II, Galaxy Rugby Pro, or Galaxy S III of infringing the '172 patent.[70] Apple also has not accused either of the tablet products-in-suit.[71] I understand that Apple does not claim to practice the asserted claim of this patent.[72]

## IV.   ANALYSIS OF CONSUMER PURCHASE DECISION MAKING: CONCEPTUAL FRAMEWORK

47. My opinions discussed in this report are based on commonly accepted concepts on consumer decision making, among others, as outlined in the academic literature; my review of secondary research on the smartphone and tablet consumer shopping behavior from Apple,

---

[68] Cockburn Report, at 5, ¶16.
[69] Cockburn Report, at 120, ¶386.
[70] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, Exhibit A. *See also* Exhibit 1.
[71] Apple Inc.'s List of Accused Samsung Products and Asserted Patents, February 15, 2013, Exhibit A. *See also* Exhibit 1.
[72] Cockburn Report, at 149, ¶470.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███ and ███ consumer market research groups, as well as my own consumer research I conducted for the purposes of this litigation. This section of the report will lay out the conceptual framework on consumer decision making and shopping behavior, as well as provide the definitions of various terms I refer to in the report, as commonly accepted and cited in the academic literature.

A. *Product Features, Attributes, and Benefits*

48. Products can be conceptualized as bundles of attributes and features that provide benefits or costs (such as price) to consumers.[73]  Benefits associated with the attributes could be functional (*e.g.*, acceleration in a car), emotional/experiential (*e.g.*, how driving a certain brand of car can make the driver feel excited and exhilarated) and/or self-expressive/symbolic (*e.g.*, one consumer may express her frugality or patriotism by owning a Saturn; another consumer may express her being hip and well-to-do by owning a BMW).[74] Consumers seek many of these benefits and look for products with attributes that meet these benefits.  Attributes and features are sometimes used interchangeably but while attributes could be functional, experiential, emotional, symbolic, etc., features often refer to only functional or technical attributes. I will continue to refer to both attributes and features in the rest of this report.

49. Many of these attributes and features are composed of various elements. The symbolic attribute "status" may consist of various associations that the brand creates. A functional attribute of a smartphone such as camera quality may have sub-attributes such as ease of use of the camera, image quality, etc. In turn, image-quality may itself have many sub-features

---

[73] Lancaster, Kelvin (1966), "A New Approach to Consumer Theory," *Journal of Political Economy*, 74, 132-157; Tirole, Jean. (1990). *The Theory of Industrial Organization*. Cambridge, MA: MIT Press, at 96.
[74] Aaker, D.A. (1996). Building Strong Brands. New York: The Free Press, Ch. 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

such as megapixel, autofocus, and auto exposure.

50. Some attributes and features, such as quality, are vertically differentiated rather than being horizontally differentiated.  Vertically differentiated attributes and features of products are ones that consumers would prefer more of, *ceteris paribus* (that is, keeping everything else constant).  For example, keeping everything else including price constant, people would prefer higher quality over lower quality.  This is not true for horizontally differentiated product attributes and features.  Some people may prefer butter with popcorn, some may not; some may prefer one color over another.[75]

51. A "brand" is defined as "a name, term, sign, symbol, or design, or combination of them, which is intended to identify the goods or services of one seller or group of sellers and to differentiate them from those of competitors."[76]  Brand franchise[77] refers to consumer loyalty toward a brand.  All the products sold under the same brand name, that is, products that share the same "umbrella brand,"[78] are part of a brand's franchise since consumer loyalty is geared towards all the products under the same brand name.

### B.  *Consumer Information Acquisition and Decision Processes & Purchase Behavior*

52. The decision making process by which consumers make purchases and choices is typically conceptualized in five steps: need arousal, information search, evaluation, purchase and

---

[75] Tirole, Jean. (1990). *The Theory of Industrial Organization*. Cambridge, MA: MIT Press, at 97.
[76] Kotler, Philip (1997). *Marketing Management*. New Jersey: Prentice Hall, at 443.
[77] Franchise also has a specific meaning in channels and distribution.  It refers to the arrangement between a brand name manufacturer and a wholesaler or retailer that gives the wholesaler or retailer the exclusive right to sell the brand manufacturer's product in a specific territory. This arrangement is usually established by contractual agreement over a period of time.
[78] For example, Gucci (*e.g.*, hand bags, fashion eye glasses, watches), Dove (soap, moisturizer, liquid dishwashing detergent), and Oral-B (toothpaste, toothbrush, mouthwash, dental floss) are umbrella brands. *See* Erdem, Tülin. (1998), "An Empirical Analysis of Umbrella Branding," *Journal of Marketing Research*, 35 (3), 339-351.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

post-purchase.[79]  Consumers may not follow all of the five steps in their purchase decision making. Factors such as the degree of involvement, the type of product, and past experience affect whether certain steps are skipped or how important each step is in the decision-making process.[80]  As an extreme example, in impulse purchases, a consumer may jump from need arousal to purchase.

53. The purchase step, in turn, consists of two decision stages: the consideration stage and the choice stage. During the consideration stage, consumers decide which alternatives they would consider purchasing or selecting from all the options they are aware of, that is, they form their consideration sets,[81] which may vary across product categories, consumers, and over time.[82] At the choice stage, consumers make a choice from the set of alternatives considered immediately prior to choice ("choice set"). Thus, choice sets are more "instantaneous" in nature than consideration sets. The choice set is often defined as the products that have a non-zero probability of being chosen at the time of choice.[83] In certain

---

[79] Lilien, Gary L., Philip Kotler and K. Sridhar Moorthy (1992). *Marketing Model*s, New Jersey: Prentice Hall.

[80] Lilien, Gary L., Philip Kotler and K. Sridhar Moorthy (1992). *Marketing Model*s, New Jersey: Prentice Hall, at 30.

[81] Shocker, Allan D., Moshe Ben-Akiva, Bruno Boccara, and Prakash Nedungadi (1991), "Consideration Set Influences on Consumer Decision-Making and Choice: Issues, Models and Suggestions," *Marketing Letters*, 2 (3), 181-197. Note, the authors posit that while the description of stages may not be universal in the literature, the idea of nested sets or stages has been used to characterize consumer decision-making (*See* Shocker, Allan D., Moshe Ben-Akiva, Bruno Boccara, and Prakash Nedungadi (1991), "Consideration Set Influences on Consumer Decision-Making and Choice: Issues, Models and Suggestions," *Marketing Letters*, 2 (3), 185.

[82] At times, consideration set may vary across individual purchase occasion for the same product category and consumer (Erdem, Tülin and Joffre Swait (2004), "Brand Credibility, Brand Consideration, and Choice," *Journal of Consumer Research* 31 (1), 191-199); Shocker, Allan D., Moshe Ben-Akiva, Bruno Boccara, and Prakash Nedungadi (1991), "Consideration Set Influences on Consumer Decision-Making and Choice: Issues, Models and Suggestions," *Marketing Letters*, 2 (3), 186.

[83] In the literature some researchers used the terms consideration set and choice set interchangeably (for a review see Roberts, J. and P. Nedungadi (1995), "Studying Consideration In Consumer Decision Process: Progress And Challenges," International Journal of Research in Marketing, 12, 3-7.), while others have drawn a distinction. It should also be noted that in certain contexts there may be no separate consideration and choice stages, as in impulse buying. *See*, also, Swait, Joffre and Fred Feinberg (2012), "Deciding How to Decide: An Agenda for Multi-Stage Choice Modeling Research in Marketing," in Handbook of Choice Modeling, Stephane Hess and Andrew Daly, eds. (forthcoming).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

product categories or certain consumers, purchase may not follow two separate stages. Two-stage processes are more likely in complex decision environments.[84] Consumers evaluate products to form perceptions about product attributes and benefits, as well as to formulate their own preferences. Consumers may use multiple information sources: individual elements of a firm's marketing mix (*e.g.*, advertising), brands, their own past experiences, word of mouth, salespeople, third-party information providers, etc. Consumers develop perceptions about the levels of attributes, which are weighted according to their preferences (that is, importance weights attached to perceived attribute levels).  For example, a consumer may attach a higher importance weight to the cavity-fighting attribute of a toothpaste than to the teeth whitening attribute.  Likewise, some consumers may attach a high importance weight to (*i.e.*, have a preference for) the "organic" attribute of food products, while other consumers may not.

54. In the standard, fully rational utility maximization (neoclassical) model, the evaluation of the choice alternative, or the utility consumers derive from that choice alternative, is the sum of these perceptions weighted by their relative importance (importance weights).[85] However, consumers in real life purchasing decisions often do not review all information, do not take into account all attributes, and do not systematically tradeoff the attributes they consider.[86]

---

[84] *See*, for example, Erdem, Tülin and Joffre Swait (2004), "Brand Credibility, Brand Consideration, and Choice," *Journal of Consumer Research,* 31 (1), 191-199; Shocker, Allan D., Moshe Ben-Akiva, Bruno Boccara, and Prakash Nedungadi (1991), "Consideration Set Influences on Consumer Decision-Making and Choice: Issues, Models and Suggestions," *Marketing Letters,* 2 (3), 185.

[85] Raiffa, H. (1968). *Decision Analysis.* Addison-Wesley, Reading, Mass.  Fishbein, Martin., and Icek Ajzen,(1975). *Belief, Attitude, Intention, and Behavior: An Introduction to Theory and Research.* Reading, MA: Addison-Wesley (Available at http://people.umass.edu/aizen/f&a1975.html).

[86] There is a very large literature showing that the assumption of the standard rational neoclassical model of consumers having perfect information about all attributes and trading-off the values of these attributes do not hold, especially in complex decision-making environments. A recent review of how the assumptions of the standard neoclassical model are violated is provided in Orquin, Jacob L. and Simone-Mueller Loose (2013), "Attention and Choice: A Review on Eye Movements in Decision-Making," *Acta Psychologica*, 144, 190-216.

Thus, consumers form perceptions of attributes, and have preferences for them, but the number and type of attributes they consider and how they combine the perceptions and preferences to evaluate products often deviates greatly from the predictions of the standard neoclassical model, especially when the decision task is complex.[87]

55. Consumers face multiple decisions in the purchase process. Besides the general decisions of whether to buy, when to buy, and where to buy, there are also decisions such as how much to buy (in frequently purchased product categories), which features/attributes to consider in forming overall evaluations about options, and others. The more factors a consumer has to take into account and make decisions about, the more complex is the decision environment. As a practical matter, some of these decisions can be made simultaneously and others sequentially. Furthermore, not all consumers approach purchase decisions in the same manner, and different consumers may follow different sequences and decision rules in making purchase decisions.[88]

### C. *Decision-Making in Complex Decision Environments and Use of Heuristics*

56. When the decision-making environment is simple, consumers are likely to evaluate each product and the attributes of those products in a systematic manner. Because they review all products and all product-attributes, they can trade off the existence or the level of one attribute for the lack of or level of another attribute. A decision strategy is *compensatory* when good values on one attribute can offset poor values on another. In simple decision

---

[87] Orquin, Jacob L. and Simone Mueller Loose (2013) "Attention and Choice: A Review on Eye Movements in Decision-Making," *Acta Psychologica*, 144, 190-216.
[88] Gilbrede,Timothy J. and Greg M. Allenby (2006), "Estimating Heterogeneous EBA and Economic Screening Rule Choice Models," *Marketing Science,* 25(5), 494-509.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

environments, consumers are likely to employ compensatory strategies in decision making.[89]

Consumers are able to use compensatory strategies in simple decision environments in part

because they review each attribute value for each product and thus have the basis for a

potential tradeoff.

57. The consumer decision making process changes when the task or context is complex. A

decision task or context is more complex the higher are/is the following: i) the number of

product/alternative attributes and/or ii) the number and range of attribute levels and/or iii) the

number of alternatives iv) the number of non-dominant alternatives (alternatives that provide

similar overall utility levels) and/or v) the number of choice sets and/or vi) the number of

negatively correlated attributes.[90] An additional reason for the use of heuristics in complex

decision environments is that consumers may be uncertain about their own preferences, that

is, importance weights they attach to different attributes.[91] Many purchasing decision

environments are complex. For example, cars, computers, GPSs and mobile devices are

commonly considered as complex decision environments for most consumers since these

markets are characterized by a large number of options and many different attributes that

vary across options.[92]

58. As information load or task complexity increases, people are more inclined to employ

---

[89] *See*, for example, Payne, J. W. (1976), "Task Complexity and Contingent Processing in Decision Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366–387.
[90] Attributes are negatively correlated if they require trade-offs, e.g. big screen costs more. See, also, Swait, Joffre and Wiktor Adamowicz (2001), "The Influence of Task Complexity on Consumer Choice: A Latent Class Model of Decision Strategy Switching," *Journal of Consumer Research*, 28 (1), 135-148.
[91] Bettman, James R., Mary Frances Luce and John W. Payne (1998), "Constructive Consumer Choice Processes," *Journal of Consumer Research*, 25(3), 187-217.
[92] Hauser, John, R., Min Ding, Steven P. Gaskin (2009), "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference*.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

"decision heuristics" that demand less cognitive effort.[93] Decision heuristics are "rules of thumb" or shortcuts that simplify decision tasks relative to the cognitive effort associated with the fully rational utility maximization (neoclassical) model by: 1) simplifying the importance weights applied to reviewed attributes (for example, equal weights for all attributes); 2) reducing the share of information reviewed – skipping information; 3) reviewing information selectively such that certain salient attributes receive greater consideration; 4) reviewing information selectively such that certain products receive greater consideration; and 5) increasing pairwise comparison of attributes (rather than review of attribute values in one product before reviewing another product's attribute values). Such heuristics save on costs of thinking (information processing costs) when consumers face complex decision tasks.[94]  These heuristics allow fast decisions with acceptable deviation from the optimum (i.e., the most preferred alternative, had all the information been collected, reviewed and all trade-offs considered).[95]

59. Most of the decision heuristics used by consumers are "non-compensatory heuristics" – that is they involve selective information processing and information skipping which prevents

---

[93] *See*, for example, Payne, J. W. (1976), "Task Complexity and Contingent Processing in Decision Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366–387; Payne, John. W. and Myron L. Braunstein (1978), "Risky choice: An Examination of Information Acquisition Behavior*," Memory and Cognition*, 6, 554–561; Lussier, Denis A. and Richard W. Olshavsky (1979), "Task Complexity and Contingent Processing in Brand Choice," *Journal of Consumer Research*, 6, 154–165; Wahlers, Russell G. (1982), "Number of Choice Alternatives and Number of Product Characteristics as Determinants of the Consumer's Choice of an Evaluation Process Strategy," in *Advances in Consumer Research*, ed. Andrew Mitchell (Ann Arbor, MI: Association for Consumer Research), at 547; Payne, John. W., James R. Bettman, and Eric J. Johnson (1990), "The Adaptive Decision-Maker: Effort and Accuracy in Choice," in *Insights in Decision Making*, ed. R. M. Hogarth (Chicago, IL: University of Chicago Press); Swait, Joffre and Wictor Adamowicz (2001), "The Influence of Task Complexity on Consumer Choice: A Latent Class Model of Decision Strategy Switching," *Journal of Consumer Research*, 28 (1), 135-148; Swait, Joffre (2001), "A Non-compensatory Choice Model Incorporating Attribute Cutoffs," *Transportation Research Part B*, 35, 903–928.
[94] *See*, for example, Shugan, Steven (1980), "The Cost of Thinking," *Journal of Consumer Research*, 7(2), 99-111.
[95] *See*, for example, Payne, John. W., James R. Bettman, and Eric J. Johnson (1993). *The Adaptive Decision Maker*. Cambridge, England: Cambridge University Press; Bettman, James R., Mary F. Luce, and John W. Payne (1998), "Constructive Choice Processes," *Journal of Consumer Research*, 25(3), 187-217.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

tradeoffs between unobserved attributes, and often precludes tradeoffs even among observed attributes.[96] Only heuristics that simplify the importance weights attached to each attribute are compensatory. Importantly then, when non-compensatory heuristics are used, not all attributes are considered when a decision is made *and* not all attributes can be traded-off with one another.[97]

60. When using non-compensatory heuristics, consumers process only a subset of attribute information.[98] For example, Streufert (1970) suggested a limit of less than 10 items/attributes on the span of perceptual dimensionality, beyond which an individual's information processing ability decreases.[99] Olson and Jacoby (1972) found that consumers typically used only three to seven attributes (out of 12–15 available) to make a purchase decision.[100] Wilkie and Weinreich (1972) reported similar results.[101] Similarly, consumers often consider a small subset of all products/alternatives they are aware of and use heuristics to decide which brands to consider. For example, Hauser and Wernerfelt (1990) the mean consideration set size was between 2.6 to 8.1 options in frequently purchased packaged consumer goods markets.[102] In the US, consideration-set sizes for most consumer package goods categories are

---

[96] Tseng, L. P. Douglas and Yuan-shuh Lii (2006), "The Role of Attribute Order and Number Effects in Consumers Multiattribute Preferential Decisions," *Research in Consumer Behavior*, 10, 165-183.

[97] Payne, John. W., James R. Bettman, and Eric J. Johnson (1988), "Adaptive Strategy Selection in Decision Making," *Journal of Experimental Psychology: Learning, Memory, and Cognition*, 14, 534–552.

[98] Klein, Noreen M. (1983), "Utility and Decision Strategies: A Second Look at the Rational Decision Maker," *Organizational Behavior and Human Performance*, 31, 1–25. Tseng, L. P. Douglas and Yuan-shuh Lii (2006), "The Role of Attribute Order and Number Effects in Consumers Multiattribute Preferential Decisions," *Research in Consumer Behavior*. 10, 165-183.

[99] Streufert, Siegfried (1970), "Complexity and Complex Decision-Making: Convergences Between Differentiation and Integration Approaches to the Prediction of Task Performance," *Journal of Experimental Social Psychology*, 6, 494–509.

[100] Olson, Jerry C. and Jacob Jacoby (1972), "Cue Utilization in the Quality Perception Process," in *SV - Proceedings of the Third Annual Conference of the Association for Consumer Research*, ed. M. Venkatesan, Chicago, IL: Association for Consumer Research, at 167-179.

[101] Wilkie, William L. and Rolf P. Weinreich (1972), "Effects of the Number and Type of Attributes Included in an Attitude Model: More is Not Better," in *Proceedings, third annual conference* (College Park, MD: Association for Consumer Research), at 325–340).

[102] Hauser, John R. and Birger Wernerfelt (1990), "An Evaluation Cost Model of Consideration*," Journal of Consumer Research*, 16(4), 393-408.

approximately 1/10th of the number of brands that are available to consumers in the product category,[103] indicating extensive selectivity in information consideration.

61. In summary, consumers often use heuristics when they have limited cognitive processing capacity,[104] when they engage in a complex choice task such as facing a large choice set,[105] and when they have limited familiarity with the alternatives.[106] In most cases, the use of heuristics results in skipping of product-attribute information, and selective information processing with increased attention to particular attributes and products.

62. Furthermore, if a product has multiple features/attributes, consumers may focus only on a subset of features/attributes to evaluate and compare options, and research has shown that consumers may consider a smaller subset of options when the number of choices increases.[107]   Research in consumer behavior suggests that heuristics are likely to be used in complex decision environments in both the consideration and choice stages of the purchase process. However, consumers use different decision rules or heuristics in the consideration stage than in the choice stage, due to the sheer amount of information that consumers have to review in the early phase of a decision process.[108]

63. In one influential article, Payne (1976) asked his subjects to choose among two, six or twelve

---

[103] Hauser, John. R. (2013), "Consideration-Set Heuristics," *Journal of Business Research*, Forthcoming.

[104] *See*, for example, Payne, John W., Bettman, James R., and Johnson, Eric J. (1988), "Adaptive Strategy Selection in Decision Making*," Journal of Experimental Psychology: Learning, Memory, and Cognition*, 14, 534–552; Jedidi Kamel and Rajeev Kohli (2005), "Probabilistic Subset Conjunctive Models for heterogeneous Consumers*," Journal of Marketing Research*, 42 (November), 483-94.

[105] Bettman, John W. (1979). *An Information Processing Theory of Consumer Choice*. Reading, MA: Addison-Wesley Publishing.

[106] Roberts, J. H. and James M. Lattin (1991), "Development and Testing of A Model of Consideration Set Formation," *Journal of Marketing Research*, 28 (November), 429-40.

[107] Payne, John. W. (1976), "Task Complexity and Contingent Processing in Decision Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366–387.

[108] Hauser, John, Min Ding, Steven Gaskin (2009), "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference*, March 2009.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

hypothetical apartments.[109]  Information was available about each apartment with respect to either four, eight, or twelve attributes of the apartments such as rent, cleanliness, landlord attitude, noise level, etc.  As the number of alternatives and/or the number of attributes increased, the subjects were progressively less thorough in their inspections.  Payne's results illustrate a commonly observed characteristic of representation and evaluation of alternatives – subjects appear to review remarkably few of the alternatives' attributes.  One explanation of this phenomenon is that people have limited cognitive capacity, resulting in the use of heuristics to simplify the decision-making process.[110]

### D.  *Heuristics in Purchase Decision Making Can Be Traced and Identified Most Effectively via Eye Tracking Technology*

64. The use of heuristics in purchase decision making produce distinctive information acquisition and information processing behavior. This behavior has long been studied in process tracing literature via various process tracing methods.[111] Process tracing methods analyze the external manifestations of cognitive processes, which take place between the onset of a stimulus (e.g., information about attributes, exposure to an ad, etc.) and the decision maker's response, such as consideration and choice.[112]

65. The cognitive processes are detected via tracing of the types of information that participants accessed and evaluated and the patterns (e.g. order) in the information review, comparison and evaluation. In most process-tracing studies, stimuli are attribute values that are presented

---

[109] Payne, John W. (1976), "Task Complexity and Contingent Processing in Decision-Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366-387.

[110] Payne, John W., James R. Bettman, and Eric J. Johnson (1988). "Adaptive Strategy Selection in Decision Making," Journal of Experimental Psychology: Learning, Memory, and Cognition, 14(3), 534-52.

[111] Payne, John W., James R. Bettman, and Eric J. Johnson (1988). "Adaptive Selection in Decision Making," *Journal of Experimental Psychology: Learning, Memory, and Cognition*, 14(3), 534-52.

[112] Riedl, René, Eduard Brandstätter, and Friedrich Roithmayr (2008), "Identifying Decision Strategies: A Process and Outcome-based Classification Method," *Behavior Research Methods*, 40 (3), 795-807.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

in an information display matrix. An information display matrix consists of the array formed by two or more product options, each associated with two or more attributes. At the beginning of a choice experiment using an information display, the product-attribute values are covered with a 'box'. During the choice task, the participant selects product-attribute cells to be revealed to inform her evaluation of the alternative options and attributes. By design, only one product-attribute cell is observable at a time. Researchers analyze the sequence and share of information reviewed to evaluate information acquisition behavior, tracing their actions to infer participants' cognitive processes and, thereby, the decision strategy used.[113]

66. Such information matrices can be set as an information display board or as a Mouselab (which involves process tracing in a computerized setting and where the processes are traced through mouse placement and mouse clicks on information cells). Verbal protocols (respondents' self-reported behavior when exposed to an information display matrix and asked to make a consideration or choice) are also used alone or in conjunction with other techniques (e.g., Mouselab) to trace consumer cognitive processes.[114]

67. Decision heuristics produce distinctive patterns of information review and search, observable through process tracing of participant information acquisition on information display matrices. Specifically: decision heuristics are associated with the following observable patterns: 1) disregarding available information ("skipping"); 2) selective concentration of attention on a limited number of products, including the chosen product, among large product offerings; 3) selective concentration of attention on a limited number of attributes of complex

---

[113] Riedl, René, Eduard Brandstätter, and Friedrich Roithmayr (2008), "Identifying Decision Strategies: A Process and Outcome-based Classification Method." *Behavior Research Methods*, 40 (3), 795-807.
[114] Riedl, René, Eduard Brandstätter, and Friedrich Roithmayr (2008), "Identifying Decision Strategies: A Process and Outcome-based Classification Method." *Behavior Research Methods*, 40 (3), 795-807.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

products; 4) information processing that is not predominantly by-product (where each attribute value for a product is reviewed before proceeding to the next product) in complex environments; and 5) pairwise comparison by product attributes between products.[115] A large body of academic literature studies the processes by which consumers arrive at the final choice in complex environments and relies on process tracing methods to do so.[116]

68. Commonly used process tracing methods are set up such that information becomes available sequentially through manual inspection, such as mouse clicking or card turning. This renders the choice process in those studies more controlled and deliberate. However, commonly used product comparison websites provide all attribute information of all choice options simultaneously. Information acquisition is then fast and governed by automatic processes. The simultaneous availability of information may also allow more flexible switching between information strategies than can be detected with more traditional process tracing methods. Eye-tracking methods to trace and study cognitive processes are particularly suited to provide insights under these conditions. [117]

69. Eye movements are one external manifestation induced by cognitive processes. Evaluation of

---

[115] *See*, for example, Payne, John W., James R. Bettman, and Eric J. Johnson (1988), "Adaptive Selection in Decision Making," *Journal of Experimental Psychology: Learning, Memory, and Cognition*, 14(3), 534-52; Bettman, James R., Mary Frances Luce, and John W. Payne (1998), "Constructive Consumer Choice Processes," *Journal of Consumer Research*, 25(3), 187-217; Reisen, Nils, Ulrich Hoffrage, Fred W. Mast (2008), "Identifying Decision Strategies in a Consumer Choice Situation," *Judgment and Decision Making*, 3(8), 641-58; Russo, J. Edward and France Leclerc (1994), "An Eye-Fixation Analysis of Choice Processes for Consumer Nondurables," *Journal of Consumer Research*, 21(2), 274-90; Pieters, Rik and Luk Warlop (1999), "Visual Attention During Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16, 1-16.
[116] *See*, for example, Russo, J. Edward, "Eye Fixations as a Process Trace," in *A Handbook of Process Tracing Methods for Decision Research: A Critical Review and User's Guide*, ed. Michael Schulte-Mecklenbeck et al.(New York: Psychology Press, 2011); Reisen, Nils, Ulrich Hoffrage, Fred W. Mast (2008), "Identifying Decision Strategies in a Consumer Choice Situation," *Judgment and Decision Making*, 3(8), 641-58; Russo, J. Edward and France Leclerc (1994), "An Eye-Fixation Analysis of Choice Processes for Consumer Nondurables," *Journal of Consumer Research*, 21(2), 274-90; Pieters, Rik and Luk Warlop (1999), "Visual Attention During Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16, 1-16.
[117] Shi, S.W., Michel Wedel, F.G.M. (Rik) Pieters, "Information Acquisition During Online Decision Making: A Model-Based Exploration Using Eye-Tracking Data," *Management Science,* Articles in Advance 1-18.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumer products in both the consideration-set formation and choice decisions entails visual

focus and search to acquire information; acquisition occurs during or soon after visual focus.

Eye tracking records these eye movements permitting appraisal of visual attention and their

concordance with the stark predictions for attention associated with consumer heuristics.[118]

70. Eye tracking methods have been widely used to trace consumer information acquisition,[119]

and consideration and choice processes.[120] As early as in 1991, Bettman et al. concluded that

eye movement data may be more useful in conditions when protocols fail, such as when

studying processes that occur rapidly or that involve nonverbal representations or automated

processes.[121] Academic research has established that gaze durations and fixations to

competing advertisements correlate with later product choice,[122] predict preference[123] and

importance of product features,[124] explain attention to and evaluation/consideration of

brands.[125]

71. Eye tracking is one of the most effective process tracing method when evaluating purchase

---

[118] Reisen, Nils, Ulrich Hoffrage, Fred W. Mast (2008), "Identifying Decision Strategies in a Consumer Choice Situation*," Judgment and Decision Making*, 3(8), 641-58.

[119] Shi, Savannah Wei, Michel Wedel and F.G.M. (Rik) Pieters (2012), "Information Acquisition During Online Decision-Making: A Model-Based Exploration Using Eye-Tracking Data," *Management Science,* Articles in Advance, 1-18.

[120] A review of some of this very rich literature is in: Wedel, Michel and Rik Pieters (2006), "Eye Tracking for Visual Marketing," *Foundations and Trends in Marketing*, 1(4), 233-320.

[121] Bettman, James R., Eric J. Johnson, and John W. Payne (1991), "Consumer Decision Making," in *Handbook of Consumer Behavior,* ed. T.S. Robertson et al (Prentice Hall: New Jersey), 74.

[122] Lohse, Gerald L. (1997), "Consumer Eye Movement Patterns on Yellow Page Advertising," *Journal of Advertising*, 26, 61-73.

[123] Glaholt, Mackenzie. G., Mei-Chun Wu, and Eyal M. Reingold (2009), "Predicting Preference from Fixations," *PsychNology Journal*, 7 (2), 141-158.

[124] Du, Ping and Erin F. MacDonald (2013), "Eye-Tracking Data Predicts Importance of Product features and Saliency of Size Change," *Proceedings of the ASME 2013 International Design Engineering Technical Conferences & Computers and Information in Engineering Conference*. DETC2013-12737.

[125] Chandon Pierre, J. Wesley Hutchinson, Eric T. Bradlow, and Scott H. Young (2007), "Measuring the Value of Point-of-Purchase Marketing with Commercial Eye-Tracking Data," in *Visual Marketing: From Attention to Action*, ed. Michel Wedel et al. (Mahwah: NJ: Lawrence Erlbaum Associates), 225; Chandon Pierre, J. Wesley Hutchinson, Eric T. Bradlow, and Scott H. Young (2009), "Does In-Store Marketing Work? Effects of the Number and Position of Shelf Facings on Brand Attention and Evaluation at the Point of Purchase," *Journal of Marketing,* 73 (November), 1-17.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

decision making in complex environments for several reasons.  First, product search in complex environments involves substantial visual attention.  Second, eye tracking is non- or minimally-invasive, using unobtrusive infrared camera mounts near the stimuli that permits natural head movement.  Third, eye tracking records the primitive pattern of information acquisition, rather than a supplemental pattern of action such as verbal summary or mouse clicks. [126]  Other process tracing methods consequently impart systematic information acquisition behavior.[127] Fourth, eye tracking records the focal point of visual attention over a dozen times a second, thus producing a precise record of the information acquisition sequence. Such precision modulates investigator biases.[128] Fifth, numerous eye tracking data metrics have been validated for use in evaluating consumer search strategies, including use of consumer heuristics.[129]

72. Having outlined the conceptual framework and methods for evaluating complex decision environments, I proceed to examine the decision factors that consumers face when making smartphone and tablet purchase decisions.   I also evaluate the complexity of the decision environment.

---

[126] Renkewitz, Frank and Georg Jahn (2012), "Memory Indexing: A Novel Method for Tracing memory Processes in Complex Cognitive Tasks," *Journal of Experimental Psychology: Learning, Memory and Cognition;* Shi, Savannah Wei, Michel Wedel, and F.G.M. (Rik) Pieters (2012), "Information Acquisition During Online Decision-Making: A Model-Based Exploration Using Eye-Tracking Data," *Management Science,* Articles in Advance, 1-18.
[127] Lohse, Gerald L. and Eric J. Johnson (1996), "A Comparison of Two Process Tracing Methods for Choice Tasks," *Organizational Behavior and Human Decision Processes*, 68 (1), 28-43.
[128] Glaholt, Mackenzie G. and Eyal M. Reingold (2011), "Eye Movement Monitoring as a Process Tracing Methodology in Decision-Making Research," *Journal of Psychology, Neuroscience and Economics,* 4 (2), 125-146.
[129] Russo, J. Edward and France Leclerc (1994), "An Eye-Fixation Analysis of Choice Processes for Consumer Nondurables," *Journal of Consumer Research*, 21(2), 274-90 at 280; Russo, J. Edward, "Eye Fixations as a Process Trace," in *A Handbook of Process Tracing Methods for Decision Research: A Critical Review and User's Guide*, ed. Michael Schulte-Mecklenbeck et al. (New York: Psychology Press, 2011), 45; Lohse, Gerald L. and Eric J. Johnson (1996), "A Comparison of Two Process Tracing Methods for Choice Tasks," *Organizational Behavior and Human Decision Processes*, 68 (1), 28-43; Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16 (1), 1-16; Reisen, Nils, Ulrich Hoffrage, Fred W. Mast (2008), "Identifying Decision Strategies in a Consumer Choice Situation*," Judgment and Decision Making*, 3(8), 641-58.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## V.   ANALYSIS OF SMARTPHONE AND TABLET PURCHASE DECISION-MAKING: DECISION COMPLEXITY

73. It is well understood that consumers face many decision factors when shopping for a smartphone or a tablet and that the shopping experience can be quite overwhelming. In recognition of the difficulties that consumers may have, there are numerous smartphone buyer guides that help shoppers sort through the purchase decision making. For example, typing in "smartphone buying guide" or "tablet buying guide" into a Google search window produced about 34,900,000 and 79,500,000 result hits at time of writing, respectively.  These buying guides have a wide range of factors and approaches that consumers should consider when shopping for a device. For example, "A guide for newbies" by ZDNet, which appeared in the top 5 hits on Google Search for "smartphone buying guide" at the time of writing, tells the reader "Don't overthink your purchase" and suggests that choosing the phone based on a "decent price" or "due to its appearance" is "just fine."[130] Other buyer guides provide explicit and detailed decision factors to take into account and the order in which to consider them, for example, prioritizing 1) wireless carrier, 2) OS, 3) hardware specs, and 4) own needs and uses.[131]

74. Below I discuss all the typical factors that consumers are confronted with in their decision to purchase a smartphone. As can be seen, there are numerous factors to consider, which all make the purchase decision making highly complex.

---

[130] The article justifies its recommendation as "On any of the phones, you will be able to work with your email, tweet, surf the web, or most anything you currently do on your computer." James Kendrick, "How to buy a smartphone: A guide for newbies," *Mobile News*, June 21, 2013, accessed September 8, 2013, http://www.zdnet.com/how-to-buy-a-smartphone-a-guide-for-newbies-7000017163/.

[131] "How to buy a smartphone: a guide," *The Verge*, December 3, 2012, accessed September 8, 2013, http://www.theverge.com/2011/11/16/2565102/smartphone-buyers-guide.

36

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

A. ***Prospective Smartphone and Tablet Consumers Are Faced with Numerous Product Offerings and Product Offerings Are Ever Changing***

75. Consumers have recently faced an ever-growing number of device options to consider when making a mobile phone purchase, particularly when shopping for a smartphone. ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Today, the number of smartphones with a two year contract ranges from 25 to 32 on wireless carriers' online stores and 74-181 for big retailer online stores. The number of devices is nearly twice as large if considering no contract smartphones in addition. *See* Exhibit 2 for details.

76. The numerous device offerings available to consumers are ever changing. One reason for the change is the dynamic nature of the smartphone and tablet competitive landscape. ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████

77. Despite the increasing concentration of the smartphone market in the recent years, both the dominant and fringe manufacturers are still responsible for numerous smartphone models on the market and numerous model updates and new model releases. A Samsung executive testified that Samsung has "as many as 100 different smartphones available in the U.S. market at any given time, many of which look 'distinctly different' at the request of U.S.

---

[132] "2012 Mobile Future in Focus," comScore, February 13, 2012, at 10.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

carriers."[133] Furthermore, ███████████████████████████████████████

████████████████████████████████████████ [134]

78. Similarly, there are many, and ever-changing, options available for tablet shoppers. For example, as shown in Exhibit 2, Amazon had 166 Wi-Fi-enabled tablets for purchase at the time of writing. As another illustration of the sheer volume of devices on the market, one can try searching for keywords such as "best tablets reviews" or "best smartphones reviews" on Google search. These keywords provide a baffling number of hits of reviews, expositions, etc.  Furthermore, as shown in Exhibits 3 and 4, combing the first 20 hits for reviews of devices available in the U.S. market reveals a set of 25 top smartphones and 27 top tablets. Thus, even with such shortcuts, the number of options that consumers face is overwhelming.

79. In summary, the sheer number of the smartphone and tablets available for consideration and purchase present consumers with a complex decision making environment. The complexity is exacerbated by the fact that the product offerings consist of several dominant (e.g. more popular or heavily advertised) and numerous non-dominant (e.g. lesser known) alternatives, which introduces yet another factor to the decision-making process.

B. ***Prospective Smartphone and Tablet Consumers Are Faced with Evaluating Their Own Device Needs and Benefits They Seek***

80. Smartphones and tablets are used in a variety of contexts. ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

---

[133] Josh Lowensohn, "Samsung: Our smartphones are 'distinctly different'," *cnet*, August 6, 2012, accessed August 28, 2013, http://news.cnet.com/8301-13579_3-57487409-37/samsung-our-smartphones-are-distinctly-different, quoting Samsung's Chief Strategy Officer Justin Denison.
[134] "State of the Competition" (APLNDC630-0000128950-06, at 54).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

81. ████████████████████████████████████

82. Consumers form perceptions of the benefits associated with an individual or a group of smartphone and tablet attributes and other factors. These benefits may be defined as one or a combination of the following benefits:

- *Functional:* Benefits associated with functional characteristics of a device such as battery life;

- *Emotional/experiential:* Benefits associated with positive feelings or experiences such as a ██████████ [138]

- *Self-expressive/symbolic*: Benefits associated with an opportunity to communicate his or her self-image, e.g., "reflects who I am," often associated with brand.

83. The perceived benefits of the attributes and devices vary widely across consumers and are thus, inherently subjective. Yet, perceptions formed about functional benefits of an attribute, such as those associated with longer battery life, are less subjective than the perceptions formed for other types of benefits, such as those associated with brand, since every consumer is unique with respect to their emotions, experiences, etc. ████████████████

---

[135] "iPhone Buyer Survey, FY13 – Q2," Apple Market Research & Analysis (APLNDC630-0001233246-405, at 322); "iPad Tracking Study Q1 FY13,"Apple Market Research & Analysis (APLNDC630-0000870458-706, at 630).
[136] Nielsen, "Mobile Connected Device Report," October 2011, (APL630DEF-WH0007913654-789, at 666).
[137] Deposition of Stan Ng, July 2, 2013 ("Ng Deposition"), at 27:23-28:1.
[138] ████████████████ (SAMNDCA630-07416541-601, at 588).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

84. Consumers form perceptions on the basis of numerous factors, some of which may not even

relate to attributes of a device. However, despite the many unique factors that enter each

consumer perception, consumers may agree on the overall benefits of an attribute.

85. One is able to assess the benefits from the commonly used smartphone or tablet features.

Similarly, according to an Experian survey of adult smartphone owners, smartphone users

spent 91% of their time on the device talking, texting, visiting websites and using social

networking apps, emailing, and playing games.  Experian noted differences in the

distribution of time spend on the different activities between Android and iPhone users, but

---

[139] "Brand Research Survey," Apple Market Research & Analysis (APL630DEF-WH0007775601-654, at 641).
[140] "Brand Research Survey," Apple Market Research & Analysis (APL630DEF-WH0007775601-654, at 641).
[141] Deposition of Steven Sinclair, April 4, 2012 ("Sinclair Deposition"), at 52.
[142] ████████████████████████████ (SAMNDCA00252685-775, at 750); "Tablet UX Competitor Review," One to One Insight (SAMNDCA10030345-641, at 628).
[143] ████████████████████████████
(SAMNDCA00190144-243, at 195); "Tablet UX Competitor Review," One to One Insight (SAMNDCA10030345-641, at 628).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

both groups of users spend roughly 90% of their smartphone time on activities providing these key benefits.[144]

86. Of course, some benefits are very important to some users and not to others.  For example, while only 2% of the smartphone owners surveyed in Experian's study watched videos on their smartphones, those that did, watched more than 4 videos per day on average.  Fewer than half of the owners use the camera at all, but those who do, use it almost five times per day on average.[145] ████████████████████████████████

████████████████████████████████████████

██████ Furthermore, the importance of features can change significantly over time. ████

██████████████████████████████████████

██████████████████████████████

87. The uses and benefits of smartphones outside of the *key* benefits are too numerous to count or describe.  Both the Android and Apple application stores offer hundreds of thousands of unique applications for use in every life context. ████████████████████████

███████████████████████████████████████████

████████████████████████████████

█████████████████ Similarly, Exhibit 5 shows a large set of various features that iPhone owners use regularly.

88. The same basic story, namely that smartphones house a few key benefits and a huge number

---

[144] Fetto, John, "Americans spend 58 minutes a day on their smartphones," *Experian Marketing Services*, May 28, 2013, accessed September 9, 2013, http://www.experian.com/blogs/marketing-forward/2013/05/28/americans-spend-58-minutes-a-day-on-their-smartphones/.

[145] Fetto, John, "Americans spend 58 minutes a day on their smartphones," *Experian Marketing Services*, May 28, 2013, accessed September 9, 2013, http://www.experian.com/blogs/marketing-forward/2013/05/28/americans-spend-58-minutes-a-day-on-their-smartphones/.

[146] "ComTech United States Report Q410," Apple Market Research & Analysis (APLNDC00010809.2-9.54, at 9.49).

[147] "Mobile Future in Focus 2013," *comScore*, February 2013, at 32.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

of total benefits, holds true for tablets.  For example, according to a 2012 study by Online

Publishers Association, smartphone and tablet owners conduct similar activities on both

devices, including: accessing content/information, accessing the internet, checking email,

using a social network, listening to music, playing games, downloading and using apps,

making purchases, and reading books.[148] ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

89. Although usage contexts center around main benefit groups such as the ability to browse the

web both in tablets and smartphones, some differences in usage emerge. Most users, for

example, do not use their tablets as phones. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[148] "OPA Study Define's Today's Smartphone User," *Online Publishers Association*, August 20, 2012, accessed September 8, 2013, http://www.online-publishers.org/index.php/opa_news/press_release/opa_study_defines_todays_smartphone_user; "OPA Study Reveals Attitudes of Today's Tablet User," *Online Publishers Association*, June 18, 2012, accessed September 8, 2013, http://www.online-publishers.org/index.php/opa_news/press_release/opa_study_reveals_attitudes_of_todays_tablet_user.

[149] ██████████████████████████████ *Google Compete*, September 2012, at 9.

[150] "iPhone Buyer Survey Q2 2012," Apple Market Research & Analysis (APLNDC630-0000182457-593 at 474); "iPad Tracking Study Q2 2012," Apple Market Research & Analysis (APLNDC630-0000177773-8021 at 7920).

[151] "STA Factbook," August 2011, Samsung (S-ITC-003353288-507, at 467).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

C.  *Prospective Smartphone and Tablet Consumers Are Faced with Numerous Device Attributes and Features Consisting of Many Levels of Sub-Features and The Feature Offerings Are Ever Changing*

90. In addition to having many devices to choose from and many smartphone or tablet benefits to evaluate, consumers are confronted with numerous attributes and features which may or may not provide the benefits consumers seek. It is nearly impossible for an average consumer to identify all the attributes and features of a smartphone or a tablet. For example, gdgt.com, an independent review website, pre-selected nearly 100 features of smartphones to present on their side-by-side comparison webpage (see Exhibit 2). Similarly, the iPhone 5 boasts over 200 *new* features in its operating system alone.[153]  Furthermore, smartphone features continue to evolve via software updates after the purchase of the device.[154] For example, iPhone owners had access to hundreds of additional features once they downloaded iOS 7.[155]

91. Smartphone and tablet attributes and features can be broken down into many categories, e.g., display, wireless capabilities, operating system, etc. (*see* Exhibits 7 and 8). Each of these categories of features and attributes has numerous associated characteristics and many levels

---

[152] ███████████████████████ (SAMNDCA630-07416541-601, at 588).
[153] "Apple Introduces iPhone 5," *Apple Press Info*, accessed September 8, 2013, http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5.html.
[154] Matthew Miller, "Smartphone software updates are expected and devices are obsolete without them," *ZDNet*, January 13, 2011, accessed September 8, 2013, http://www.zdnet.com/blog/cell-phones/smartphone-software-updates-are-expected-and-devices-are-obsolete-without-them/5311.
[155] Lauren Effron and Joanna Stern, "Apple iOS 7: Sleek, Elegant Software Redesign for iPhone, iPad," *abcNews*, June 10, 2013, accessed September 8, 2013, http://abcnews.go.com/Technology/apple-ios-sleek-elegant-software-redesign-iphone-ipad/story?id=19364781#.UdTJf_mcd30.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

of sub-features. For example, display can be characterized by pixel density, screen resolution, screen size, etc., and wireless capabilities can be associated with more than 10 attributes and sub-features.[156] Similarly, smartphone and table operating system consists of numerous sub-features.[157]

92. Smartphone and tablet features may be negatively correlated, that is, a positive improvement in one feature may come at the cost of another feature. For example, smartphones or tablets with larger screens tend to have a shorter battery life than those with smaller screens.[158] Larger screens also may add additional weight to a device and increase the price in some devices, such as tablets. Similar price tradeoffs appear in phones/tablets with larger memory capacity, higher processor speeds, etc. In general, negatively correlated attributes and features create a more complex decision environment for shoppers.[159]

93. In summary, the sheer number of attributes and features available for consideration and purchase alone present consumers with a complex decision making environment. Furthermore, the attributes and features consist of many levels of sub-features and many features are negatively correlated. Finally, consumers may have to account for their own perceptions about the ease of use, good value for money, etc. All these factors guarantee a high degree of decision complexity.

---

[156] As evidenced from smartphone side-by-side comparison websites of top four wireless carriers, Best Buy, and gdgt (*See* Exhibits 7 and 8.)

[157] For example, Samsung's Director of Consumer Insights, Timothy Benner, ███████████████████████████████████████ Deposition of Timothy Benner, June 28, 2013 ("Benner Deposition"), at 65:19-23.

[158] "How to Buy Smartphones," *FindTheBest*, accessed September 8, 2013, http://smartphones.findthebest.com/#guide.

[159] *See* discussion for negatively correlated attributes and complexity in Section IV.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

D. *Prospective Smartphone and Tablet Consumers Are Faced with Numerous Considerations Related Specifically to the Operating System Ecosystem*

94. One important consideration for consumer choice of a smartphone or tablet is the operating system on which device applications run. ██████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████ ██████████ There are several mobile operating systems in the market. The two most popular smartphone operating systems that gained dominance in recent years are Google's Android and Apple's iOS, with other less prevalent OS systems being Blackberry and Microsoft's Windows Mobile/Phone[161] (*see* Chart 4 for fluctuations in shares over time). ████████████████████████████████████████ ██████████████████████████████████ █

95. There is some learning curve associated with the use of the devices on each of the operating systems which consumers may take into account in their decision making process, especially if considering a switch between operating systems.[163] Many users cite barriers to switching operating systems, such as: disruption to the current features and apps they use, having to learn to use another type of smartphone, and having to move content (music, apps, etc.) from one type of smartphone to another.[164] As a result, consumers may consider the OS platform of their previous smartphone or tablets, or the OS of other owned devices when making their

---

[160] ████████████████████████████████████████████████

[161] John Callaham, "ComScore: US smartphone OS market share nearly flat in Q1 2013," *Neowin,* May 5, 2013, accessed September 8, 2013, http://www.neowin.net/news/comscore-us-smartphone-os-market-share-nearly-flat-in-q1-2013.

[162] ████████████████████

[163] *See*, for example, http://www.slashgear.com/one-in-five-iphone-owners-would-rather-change-banks-than-smartphones-25198045/ (accessed on September 12, 2013).

[164] S*ee* http://www.slashgear.com/one-in-five-iphone-owners-would-rather-change-banks-than-smartphones-25198045/ (accessed on September 12, 2013).

purchase decisions. ██████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ ▪

96. Additionally, each of the OS platforms is associated with a rich app ecosystem that transfers
seamlessly between devices within the same ecosystem. █████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ ▪

██████████████████████████████████████████████████

████████████████████████████████████████████████ ▪

██████████████████████████████████████████████████████

█████████████████████████████████ ▪

97. The consumer choice of smartphones or tablets is made considerably more complex due to
the availability of dominant operating system platforms, the related app market, and
considerations for switching costs and compatibility with other owned devices,

    E. *Prospective Smartphone and Tablet Consumers Are Faced with Various
Considerations Related to Wireless Carriers, Networks and Data Plans*

98. ██████████████████████████████████████████████████

██████████████████████████████████████████████

---

<sup>165</sup> ██████████████████████████████████
<sup>166</sup> ██████████████████████████████████████████████.
<sup>167</sup> ██████████████████████████████████████████████
<sup>168</sup> ████████████████████████████████████████████████████

46

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



99. ███████████████████████████████████████████████████████

███████████████████████████████████████████ The wireless

carriers differentiate themselves in part via the quality of the network, as measured by speed

and coverage and the selection of data plans.[175] Additionally, it is typical for wireless carriers

to have agreements with some manufacturers to either have exclusive access to certain

---



[175] "Phone plans 101: breaking down the major carrier," *The Christian Science Monitor*, February 24, 2013, accessed September 2, 2013, www.csmonitor.com/layout/set/print/Business/Saving-Money/2013/0224/Phone-plans-101-breaking-down-the-major-carriers.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

devices or brand the devices as their own.[176] These arrangements allow wireless carriers to differentiate themselves on the basis of unique device availability. As an example, until February 2011, Apple's iPhone was only available through AT&T.[177] On the other hand, Samsung has pursued its "Galaxy-everywhere" strategy from its initial launch of Galaxy S, by allowing all major U.S. carriers, including the regional carriers, to sell its Galaxy line of smartphones.[178]

100.    Note, that in some ways, wireless data considerations are even more complicated in the tablet market.  Unlike in the smartphone market, not only must prospective tablet buyers consider the many carriers available, but they also must consider whether or not to purchase a data plan from a carrier. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

## F.   *Prospective Smartphone and Tablet Consumers May Have Difficulty Finding and Evaluating Information on Specific Attributes and Features*

101.    The number of sources that provide information on smartphones and tablets is overwhelmingly large. My review of many of these sources reveals a great variability in the quantity and quality of the provided information on smartphone and tablet attributes, as well as in the style of information presentation, both across and within sources. The sheer volume of sources and the variability of content not only add to the complexity of the purchase

---

[176] "Trio of New DROID Smartphones Coming to Verizon Wireless," *Verizon Wireless News Center,* August 20, 2013, accessed September 8, 2013, http://news.verizonwireless.com/news/2013/07/droid-mini-droid-ultra-droid-maxx.html.

[177] Shayndi Raice and Yukari Iwatani Kane, "Verizon Unwraps iPhone," *Wall Street Journal,* January 12, 2011, accessed September 2, 2013, online.wsj.com/article/SB10001424052748703791904576075681886276172.html.

[178] Geoff Duncan, "How Apple and Samsung Cornered All Smartphone Profits," *Digital Trends*, August 6, 2013, accessed September 8, 2013, http://www.digitaltrends.com/mobile/how-apple-and-samsung-cornered-all-smartphone-profits/.

[179] ████████████████████████████ (SAMNDCA630-07416541-601, at 557).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

decision, but often make meaningful product and attribute comparisons nearly impossible. I describe these topics in more detail below.

102.     When looking for information on smartphones and tablets, consumers may encounter a wide range of sources, some intentionally and some not. Shoppers may intentionally seek information in brick and mortar stores, such as wireless carrier stores or big box retailers, as well as on online stores of wireless carriers, other retailers, independent reviewers, and social media sites. ██████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████ ██  In addition to these sources, comparison websites, user opinions, professional reviews (both written and videos), sales persons, retailer and wireless carrier advertisements have been found by Apple, ███████, and ██████████████ as influential in the smartphone consumer research and purchase decisions.[181] Word of mouth also remains an important source of information.[182]

103.     Similar evidence applies to tablet consumers. ████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████[183]

---

[180] "Wireless Shopper Study," Google Compete, April 2013, at 5, 33.

[181] *See* , for example, "iPhone Owner Study" Apple Market Research & Analysis (APLNDC0002426913-7240, at 7008); "GSIII Early Customer Profile Insights – Initial Launch Report," STA (SAMNDCA630-06071998-2014, at 2005); "Smartphone purchase influencers at retail," Apple Market Research & Analysis (APLNDC630-0001321529- 94, at 61).

[182] *See*, for example, iPhone Owner Study" Apple Market Research & Analysis (APLNDC0002426913-7240, at 7008); "GSIII Early Customer Profile Insights – Initial Launch Report," STA (SAMNDCA630-06071998-2014, at 2005); "Smartphone purchase influencers at retail," Apple Market Research & Analysis (APLNDC630-0001321530- 594, at 561).

[183] ████████████████████████ SAMNDCA630-07416541-601 at 581.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

104.    Each of these sources of information has a limited number of subjectively chosen device features available for review.  For example, Exhibit 6 shows the types of attributes available for a select five smartphones[184] from smartphone "tiles" (composite product displays that nest icons displaying attribute values) of online stores. As can be seen, the "tiles" present between 6 and 13 attributes per phone, and the types of attributes shown varies not only from website to website, but also from phone to phone within a given website.

105.    As another example, Exhibit 2 shows the number of attributes available for review on side-by-side comparison websites for smartphones and tablets. As can be seen, the number of attributes available for review in smartphones varies from 5 (CNET) to 92 attributes (gdgt.com) and in tablets from 3 (CNET) to 58 (gdgt.com). ██████████████████
████████████████████████████████████ ██ █████████████████
███████████████████████████████████

106.    The presentation of the information regarding the available features for smartphones and tablets is highly varied. Exhibit 7 shows the inconsistencies in the naming of smartphone attributes across wireless carriers, Best Buy, and gdgt. For example, AT&T and gdgt refer to RAM differently from Sprint's and T-Mobile's reference to Memory. Similarly, each website presents different technologies relating to Band and Mode of the same devices.

107.    ████████████████████████████████████
████████████████████████████████
██████████████████████████████████████
██████████████████████████

108.    Those consumers who choose to pursue information have to overcome the additional

---

[184] The example pertains to the five smartphones selected for my Study 2.
[185] ████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

friction created by the lack of information standardization across websites. Different websites offer different attribute information with different attribute names (see Exhibit 7 for examples), and they often present information in different formats. For example, review websites such as CNET, often present information about phones in the form of paragraphs of text,[186] while some retailers display tile-based representations of each phone with a few attributes (see Exhibit 6 for examples). Some websites offer tabular comparisons (see Exhibit 2 for examples), while others (such as Amazon[187]) only show the technical details of phones one at a time. Manufacturer sites (such as Apple[188] and Samsung[189]) typically present detailed information across many different websites.

109.    In addition to presenting different information, popular websites display incomplete information and incorrect information to consumers. For example, BestBuy, a popular retailer, leaves critical fields like "talk time," "band and mode," and "text messaging" blank for the iPhone while displaying that information for other phones (e.g., Samsung Galaxy Note II). In addition, the site does not distinguish between blanks indicating missing data and blanks indicating that a phone lacks that feature. The site also lists Wireless Capability as "3G|4G" for the Samsung Galaxy S4, but only as "4G" for the iPhone, which is false since the iPhone also supports 3G. [190]

110.    In summary, consumers shopping for smartphones or tablet are confronted with a number of decision factors that are not prevalent in many other consumer durable markets. These

---

[186] *See* "Samsung BlackJack SGH-i607 Review", CNET, accessed September 11, 2013, http://reviews.cnet.com/smartphones/samsung-blackjack-sgh-i607/4505-6452_7-32143267.html.

[187] *See* "Amazon Smartphone and Tablet Store Fronts," Amazon, accessed June 27, 2013, http://www.amazon.com.

[188] *See* "Apple iPhone Technical Specifications," Apple, accessed April 23, 2013, http://www.apple.com/iphone/specs.html.

[189] *See* "Samsung Galaxy Note II Technical Specifications," Samsung, accessed May 24, 2013, http://www.samsung.com/us/mobile/cell-phones/SCH-R950TSAUSC-specs.

[190] "Best Buy Smartphone Side-by-Side Comparison," Best Buy, accessed May 24, 2013, http://www.bestbuy.com.

include consideration for wireless carrier networks/data plans/device availability, OS

ecosystems, an ever changing mix of product and attribute offerings. Coupled with the more

standard indicator of complexity, i.e., number of product and attribute offerings, negatively

correlated attributes, and dominant/non-dominant alternatives, the sum of these

considerations poses an overwhelming purchase decision environment.

111.    In the next section, I discuss how consumers deal with the complexity of the decision

environment

## VI.    ANALYSIS OF SMARTPHONE AND TABLET PURCHASE DECISION-MAKING: EVIDENCE OF THE KEY DEMAND DRIVERS AND OF THE USE OF HEURISTICS FROM APPLE, SAMSUNG AND THIRD-PARTY CONSUMER RESEARCH

112.    In aggregate, the numerous considerations described in Section V make for a purchase

environment in which smartphone and tablet consumers are likely overwhelmed with the full

set of implications generated by their device selection. Apple, ███████ and ███████

market research present substantial evidence that shoppers employ simple rules and

shortcuts, i.e., decision heuristics, that limit the effort required to, ultimately, select a device.

These studies show that consumers consider only a handful of product options, base

decisions on a very limited set of attributes and features, restrict information search to only a

few sources, and may settle on a purchase decisions in a matter of days. Given this evidence,

it is clear that consumers do not process information in a systematic way where they engage

in a comprehensive evaluation of trade-offs associated with the full set of attributes and

features and numerous sub-attributes and sub-features in alternative devices.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

A. *Prospective Consumers Are Overwhelmed with Decision Task Complexity and/or Confused about Even the Most Basic Features*

113.     The number of ever changing smartphone and tablet options and attributes, the numerous other consideration, the variability and inconsistency in the information available, and the high information gathering and processing costs in these markets may all contribute to consumers being very overwhelmed with the decision task.

114.     There is direct evidence that consumers are overwhelmed by the numerous considerations related to the purchase decision making. ██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

115.     Furthermore, there are indications that consumers are confused about even most basic attributes, as well as factors that differentiate major brands. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████,

---

191 ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████

192 Deposition of James Imahiro, July 2, 2013 ("Imahiro Deposition"), at 112:16-19.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



116.

117.    Similarly, Apple's own internal marketing research suggests that consumers by and large

do not understand the tablet category.[199]

118.    One indicator of consumer understanding of device features is whether or not the

consumers use the features.  There is some evidence showing that smartphone users do not

utilize even the most basic features. Around 15% of the smartphone users in the United

States in 2013 have never connected their device to internet through either mobile wireless

networks or Wi-Fi.[200] A recent Deloitte article lists "the lack of interest or ability among a

proportion of smartphone owners to use their device's smart capabilities" and "the lack of

understanding or affordability of data tariffs" as the reasons for some of the consumers

[193] "Email from James Imahiro to Arthur Rangel, July 13, 2011," (APLNDC630-0000123751-754, at 752).
[194] "Email from James Imahiro to Arthur Rangel, July 13, 2011," (APLNDC630-0001321266-73, at 69).
[195] ████████████████████████████████████ (SAMNDCA00252685-775, at 729).
[196] ████████████████████████████ (SAMNDCA630-07416541-601 at 557).
[197] "Smartphone Study," Gravitytank Collarborates with Media Arts Lab (APLNDC630-000131841-84).
[198] "Understanding Today's Mobile Device Shopper," thinktech with Google Compete, March 2011, p. 4.
[199] "iPad Consideration – Quantitative Research Among CE Buyers," Apple Market Research & Analysis (APLNDC-Y0000025460-574, at 468).
[200] "Smartphones ship a billion but usage becomes simpler," Deloitte, 2013, at 1.

limiting their usage to basic capabilities, such as making calls and sending messages.[201]

119.  ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

**B.  *Prospective Consumers Use Simple Rules and Shortcuts at Various Stages of the Smartphone and Tablet Purchase Process***

120.  There is direct evidence from existing consumer studies that prospective consumers rely on decision heuristics to deal with the complexity of the decision task.

121.  ██████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████

[201] "Smartphones ship a billion but usage becomes simpler," Deloitte, 2013, p. 2.
[202] "iPhone 4S Early Buyer Survey," Apple Market Research & Analysis (APLNDC0002172819-60 at 51).
[203] ████████████████████████████████████████████████████████
[204] ████████████████████████████████
[205] ████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████ ██

122.     Academic literature recognizes that in complex decision environments consumers focus on a limited set of attributes when making purchase decisions.  Additionally, I reviewed a large number of Apple, Samsung, and third-party research and they all indicate that most consumers rely on only a handful of attributes and features in the smartphone decision making. ██████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ █ ████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████ █

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████ █

123.     ████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

---

[206] "Smartphone Market Study," Apple Market Research & Analysis (APLNDC0002007610-704, at 690).
[207] Benner Deposition, at 62:10-12.
[208] Benner Deposition, at 102:21-103:11.
[209] *See* Deposition of Greg Joswiak, July 9, 2013, ("Joswiak 2013 Deposition"), at 74:21-23.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████

████████████████████████████████████████████

Samsung's Director of Consumer Insights Timothy Benner notes in his deposition, ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

124.    ████████ and Samsung ████████████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

125.    Given the many features/attributes of smartphones and tablets, it is not surprising that

main purchase drivers are often centered on a limited number of core benefits or core

attributes that provide such core benefits. ████████████████████████

████████████████████████████████████████

---

[210] Benner Deposition, at 62:15-19.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



[211] "Q2 FY11 iPhone Buyer Survey," Apple Market Research & Analysis (APLNDC0000036266-348, at 273).
[212] "Q2 FY10 iPhone Buyer Survey," Apple Market Research & Analysis (APLNDC-Y0000026687-807, at 696-97).
[213] "US First time smartphone buyer analysis," John Brown, Apple Mgr. Market Intelligence (APLNDC630-0000135164-83, at 79)
[214] ███████████████████████████████ (SAMNDCA00252685-775, at 719-746).
[215] "GSIII Early Customer Profile Insights – Initial Launch Report," STA July 2012 (SAMNDCA630-06701998-2014, at 004)

58

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

129.    Just as there are many differentiated devices and many potential uses of those devices, consumers vary significantly across which of the attributes and features they consider important. Surveys also reflect that there are differences in importance weights (preferences for) attached to features/attributes among different phone users.

130.    Similarly, many features/attributes contribute to consumer purchase decisions for tablets.

---

[216] "Brand Research Survey," Apple Market Research & Analysis (APL630DEF-WH0007775602-654, at 638).
[217] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (SAMNDCA00252685-775, at 760).
[218] "ComTech United States Report Q410," Apple Market Research & Analysis (APLNDC00010809.2-9.54, at 9.10).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

131.

one device over another regularly involve a consideration of factors other than specific attributes. For example, as mentioned in Section V.D,

---

[219] "iPad Tracking Study – FY11-Q1 Report," Apple Market Research & Analysis (APLNDC-Y0000023730-907, at 816).
[220] "iPad Buyer Survey: Initial US Results," Apple Market Research & Analysis (APLNDC-Y0000023361-427, at 384).
[221]
[222]

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



223

224 *See* Imahiro Deposition Exhibits 6-9; Imahiro Deposition, at 128:10-144:5.

225

226 Deposition of Phil Schiller, July 23, 2013 ("Schiller Deposition"), at 194:22-195:4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

135.    The pervasiveness of non-feature related reasons for purchasing a smartphone applies to both Apple iOS and Android-based smartphone owners. ██████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████

███████████████████████████████

████████████████████████████████

███ ██

136.    ██████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████ ██

137.    ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████ ██

138.    In summary, there is significant evidence supporting the notion that smartphone and

---

[227] Smartphone Market Study, CY12-Q1 (January, February, March 2012) (APLNDC630-0000177658-772, at 706)
[228] "Smartphone Market Study US," Apple Market Research & Analysis (APLNDC0002007608-704, at 689).
[229] iPad tracking study (APLNDC630-0000870825).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

tablet consumers consider the purchase decision making highly complex and employ heuristics to arrive at a faster purchase decision. My review of Apple, ███████ and ███ ███ documents reveals a limited set of regularly-cited demand drivers that are relevant to consumer purchase decisions.  Many of the key demand drivers have nothing to do with smartphone or tablet attributes and features. These include considerations related to integration with other products and services as well as those related to wireless carriers, network coverage, and data plan costs. Other considerations relate to the operating system ecosystem, including OS compatibility with other owned devices. Of the consumers who are looking for a specific attribute or feature, the most commonly cited drivers of demand are not related to granular features. Instead, they include primary attributes of smartphones and tablets such as brand, price, and ease of use, etc., while somewhat more secondary attributes include Siri, camera weight, display, etc. These attributes and features vary in their importance to consumers.

VII.     ANALYSIS OF SMARTPHONE AND TABLET PURCHASE DECISION-MAKING: EVIDENCE OF THE KEY DEMAND DRIVERS AND USE OF HEURISTICS FROM MY CONSUMER RESEARCH CONDUCTED FOR THIS CASE

139.     Dr. Hauser has conducted consumer research to estimate the value that consumers place on certain patented features of smartphones and/or tablets. Such research design places undue attention on very granular features with the expectation that they have a meaningful impact on consumer demand for smartphones and tablets. Dr. Hauser's approach is in stark contradiction to the academic studies and Dr. Hauser's own research on consumer decision making under task complexity which predict that consumers take into account only a handful of attributes when the purchase decision task is complex. Furthermore, smartphone/tablet

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumer surveys conducted by Apple, ███████, and ███████ confirm that consumers

consider a limited set of attributes and point to demand driving attributes being far from

granular.

140.     In order to better illustrate the predictably flawed nature of Dr. Hauser's approach and

confirm the takeaways from the academic and commercial consumer studies, I conducted my

own consumer research of smartphone and tablet consumer decision making. My research

traces the process by consumers acquire and integrate information in the purchase decision

on smartphone on-line stores and smartphone and tablet side-by-side comparison websites.

My research confirm the predictions of the existing studies, that consumers do not take into

account a large portion of the available product attribute information, even if made easily

available, and that main attributes and not the secondary attributes predict consumer choice

of smartphones or tablet

141.     I describe my research design, methodology and findings in the sections below.

A.  *Overview of Survey Methodology and Design*

142.     In preparing my report I conducted additional research to further explore how consumers

of smartphones and tablets shop for the devices. *See* Exhibit 12 for a summary of the

research.  Specifically, this research examines the number and types of devices and the

number and types of device attributes and features that consumers take into account at

different stages of the purchase decision making process.[230] Furthermore, this research

studies consumer decision rules in these markets and examines the extent to which consumer

shopping behavior is affected by the different dimensions and degrees of complexity of the

---

[230] Recall from paragraph 52 of my report that the consumer purchase decision making process is typically
conceptualized in five steps: need arousal, information search, evaluation, purchase and post-purchase. My
consumer research focuses, in part, on both the information search and evaluation stages of the purchase cycle.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

decision making environment. Finally, this research explores the differences in the shopping behavior of key segments of the smartphone and tablet consumers.

143.    My additional research addresses two stages of purchase decision making, the formation of a consideration set (Study 1) and the making of the final choice (Studies 2 and 3). Specifically, Study 1 simulates a typical on-line store (similar to, for example, a website hosted by leading wireless carrier or retailer) in which consumers navigate through webpages featuring numerous smartphones available for a purchase. In this study, I ask participants to review information on the smartphone offerings and select one or more devices that they would most likely consider for a purchase.  Studies 2 and 3 simulate a typical on-line product comparison experience (similar to, for example, the comparison features on carrier, retailer and review websites) in which consumers evaluate a small number of devices that are presented in a side-by-side comparison grid. In these Studies, I ask participants to review information on the compared smartphones (Study 2) or tablets (Study 3) and choose the one device that they would be most likely to purchase. *See* Appendix D for a detailed summary of the stage in the purchase decision process targeted in each of the studies, the stimuli for each study, and the related tasks faced by the participants.

144.    My research targets two important dimensions of complexity that consumers face in their decisions to purchase smartphones or tablets: the large number of devices and the large number of attributes and features.[231] Specifically, Study 1 examines consumer decision making in an environment in which there are many smartphones to consider. In order to isolate the effects of the large number of device offerings on the decision making of device consideration for purchase, the number of attributes and features is kept relatively small (9).

---

[231] *See* Section IV.C of the Report for the discussions of the key dimensions of task complexity as they are identified in the academic literature.

On the other hand, Studies 2 and 3 examine the consumer decision strategies in an environment in which each device lists a large number of attributes (i.e. 18+ attributes). The other key dimension of complexity, the number of devices, is kept relatively small in Studies 2 and 3 (i.e., five devices in each Study).[232] *See* Appendix D for a summary of the complexity dimensions targeted in the studies.

145.    In order to test the relationship between these dimensions of complexity and consumer behavior, I randomly vary the levels of complexity across participants using a between-subject design.[233] In Study 1, I set the number of smartphones to one of two levels of complexity (i.e., a participant sees either a total of 27 or 44 devices). In Study 2, which address smartphones, I set the number of attributes and features to one of three levels of complexity (i.e., the participant sees a grid with either 18, 29, or 39 attributes/features). In Study 3, which addresses tablets, the number of attributes and features can take one of two levels (i.e., 26 or 39 attributes/features). *See* Appendix D for a summary of the complexity levels used in the studies.

146.    Finally, this research sets out to explore differences in the shopping behavior of the key segments of smartphone and tablet consumers. Specifically, smartphone and tablet consumers are typically differentiated by whether they currently own a device and what type of a device they own.[234] *See* Exhibit 12 and Appendix D for descriptions of the participant segments targeted in the Studies.

---

[232] Note, the Studies also capture other dimensions of complexity, *e.g.* the number of dominant and non-dominant alternatives, and the number of negatively correlated attributes. However, the Studies are not explicitly designed to isolate the effects of these types of task complexities.
[233] The practice of varying the levels of complexity is common in the process tracing and task complexity literature. *See* Payne, John W. (1976), "Task Complexity and Contingent Processing in Decision-Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366-387.
[234] ███████████████████████████████████████ "Smartphone Owners," Apple Market Research & Analysis (APLNDC630-0000823351-414, at 356); and "Mobile Future in Focus 2013," ████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

147.    In designing and implementing the survey, I followed standard scientific methods to maximize the reliability of the survey instrument. My survey design adopted the scientific guidelines for surveys conducted for academic, commercial, and litigation purposes.[235]

148.    In order to implement the three Studies, I relied on the assistance of Analysis Group, Inc. Analysis Group assisted me in designing the studies and analyzing the data; Analysis Group retained Tobii Insight, a leader in eye tracking studies, to program the stimuli, recruit participants, collect data, and provide expertise in eye tracking methods.  Tobii Technologies Inc., the parent company of Tobii Insight, is a leading vendor of eye-tracking technologies and solutions, with many years of experience performing eye tracking studies for academic research as well as businesses.  *See* Appendix D for more information on the research partners assisting with the implementation of the studies.

149.    Tobii Insight and its partner organizations recruited participants from three testing locations, Washington DC, Cincinnati, and San Diego.[236]  All three locations followed the same screening guidelines, as summarized in Exhibit 12 and described in detail in Appendix D.  In all three locations, participants were randomly sampled from large, locally representative participant pools.  My study administration followed a double blind process, where neither the recruiters, the eye tracking technology operators, nor the participants were told anything about the purpose of the study or the organizations involved.  *See* Appendix D for more details regarding participant recruiting and study administration.

150.    The raw samples consisted of 169, 460, and 287 participants for Studies 1, 2, and 3 respectively.  Prior to analyzing participant data, I applied several screening criteria for the

---

[235] Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, pp. 359–423.
[236] With one exception: Study 3 was not fielded in Cincinnati.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

removal of incomplete and inconsistent responses, as well as the removal of participants with poorly tracked eye data. See Appendix D for a detailed discussion of my exclusion criteria and Appendix E for various assumptions underlying the eye tracking data generation. The final samples comprised 141, 342, and 223 participants in Study 1, 2, and 3, respectively, as shown in Exhibit 13.

### B. *Eye Tracking Background*

151.    Eye tracking is used extensively in a variety of fields and applications including academia, science, consumer research, and consumer products.  One on-line library of academic research on eye tracking cites over 600 academic papers in the areas of Animal Behavior, Cognitive & Behavioral Psychology, Developmental Research, Eye Control, Eye Tracking Technology, General Eye Tracking, HCI & Usability, Linguistics, Marketing and Market & Media Research, Medical Research, Neuropsychology, Ophthalmology & Vision Science.[237] Furthermore, the seminal eye tracking textbook contains 52 pages of references, citing the use of eye tracking methods papers published in top journals in marketing, economics, psychology, and many other disciplines, including *Marketing Science, Journal of Marketing, Advances in Consumer Research, American Economic Review, Applied Cognitive Psychology, Journal of the American Statistical Association, Nature Neuroscience*, and many more. [238]

152.    Additionally, there are numerous and wide ranging applications of eye tracking in the commercial setting. For example, the *Economist* cites a number of cutting edge eye-tracking

---

[237] *See* Appendix D for more details on Tobii Technologies, Inc.
[238] Holmqvist, Kenneth, Marcus Nyström, Richard Andersson, Richard Dewhurst, Halszka Jarodzka and Joost van de Weijer (2011). *Eye Tracking: A Comprehensive Guide to Methods and Measures*. New York: Oxford University Press, at 469-520.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

applications, such as identifying unappealing packaging design, diagnosing brain trauma, training machine operators, providing surgeons with a "third hand" to control robotic equipment, controlling TV via eye movements, simulating training flights, and drone piloting.[239] Other more standard commercial applications include usability and human computer interaction studies, advertising and packaging, cognitive psychology and medicine.[240]

153.    As noted above, eye-tracking studies have been the subject of considerable academic research.  The human brain makes use of eye movements to acquire information from visual stimuli, such as information matrices, websites, magazines ads, billboards, newspapers. A regularly relied on movement measure is eye *fixations*.[241] Fixations are the brief moments in time (typically averaging 1/5 to 1/3 of a second) that the line of sight of the eye is focused on a specific *location* of the stimulus (x,y pixel coordinate).[242] Information acquisition takes place during these eye fixations.[243]

---

[239] "Eye Tracking: The eyes have it." *The Economist*, December 1, 2012, accessed September 12, 2013, http://www.economist.com/news/technology-quarterly/21567195-computer-interfaces-ability-determine-location-persons-gaze.

[240] "Eye Tracking Studies – Tobii Customer Cases," Tobii, accessed September 12, 2103, http://www.tobii.com/en/eye-tracking-research/global/library/customer-cases/.

[241] Fixations are the most salient eye movements in eye movement signal analysis.  (*See,* for example, Duchowski, Andrew T.(2007). *Eye Tracking Methodology: Theory and Practice*, Second Edition. London: Springer-Verlag, at 138.) Additional eye movements include: *saccades (*quick, ballistic jumps that the eyes make between two consecutive fixations to relocate the line of sight to another location of the stimulus*); glissades* (a short post-saccadic movement associated with overshooting a new focal point), *smooth pursuit* (slow eye movement associated with following a moving object), *drift* (slow movement away from fixation center), *microsaccade* (short eye movement returning eye to center of focal point), and *tremor* (small eye movement likely associated with imprecise muscle control).  (*See,* Holmqvist, Kenneth, Marcus Nyström, Richard Andersson, Richard Dewhurst, Halszka Jarodzka and Joost van de Weijer (2011). *Eye Tracking: A Comprehensive Guide to Methods and Measures.* New York: Oxford University Press, at 21-23).

[242] Rayner, Keith (1998), "Eye Movements in Reading and Information Processing: 20 Years of Research." *Psychological Bulletin*, 124(3), 372-422.

[243] "The eye is our preeminent sense for acquiring information from the external environment, and nearly all such acquisition is accomplished when the eye fixates an object." Russo, J. Edward, "Eye Fixations as a Process Trace," in *A Handbook of Process Tracing Methods for Decision Research: A Critical Review and User's Guide.=*, ed. Michael Schulte-Mecklenbeck et al.(New York: Psychology Press, 2011), at 45.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

154.    People have very little, although some,[244] control over the duration of individual fixations

of the eye, yet they do have control over the number of fixations that they devote to a given

location. Therefore, *number of fixations* more so than total duration of fixations (e.g., gaze

duration or dwell time) are used as basic measures in eye movement analyses.[245] Eye

movements reflect higher-order cognitive processes, among other processes, which result in

deliberate information search and processing. Such "goal-oriented" information processing

results in preferential visual attention to portions of the information relevant to the task. [246]

155.    Specific eye movements are closely aligned with higher-order cognitive processes acting

upon the visual information fixated. That is, people process and integrate visual information

while, or close in time to, fixating the eye on that information.[247] As a result, eye movement

patterns change quickly with change in task or acquisition of highly pertinent information.

For example, the eye movements of a consumer facing a multiple-alternative purchasing

decision may change directly after fixating on a pivotal feature to her decision; the relevance

of additional information is thereafter reduced, altering the pattern of eye movements and

---

[244] Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16 (1), 1-16.

[245] The eyes need to move, among other reasons, because there are severe limits to how much visual information can be processed during a single eye fixation. Specifically, processing of visual features of the stimulus can be encoded into memory only from a very narrow window of vision For example, when reading text, people cannot process more than about 7-8 characters (letters) to the right of their fixation point and even less to the left of it. (Holmqvist, Kenneth, Marcus Nyström, Richard Andersson, Richard Dewhurst, Halszka Jarodzka and Joost van de Weijer (2011). *Eye Tracking: A Comprehensive Guide to Methods and Measures*. New York: Oxford University Press, p. 413; *See also*, Orquin, Jacob L. and Simone Mueller Loose (2013), "Attention and Choice: A Review on Eye Movements in Decision Making," *Acta Psychologica*, 144, 190-206; Reichle, Erik D., Keith Rayner and Alexander Pollatsek (2003), "The E-Z Reader Model of Eye-Movement Control in Reading: Comparison to Other Models," *Behavioral and Brain Sciences*, 26, 445-526).

[246] Orquin, Jacob L. and Simone Mueller Loose (2013). "Attention and Choice: A Review on Eye Movements in Decision Making," *Acta Psychologica*, 144, 190-206.[247] Just, Marcel A. and Patricia A. Carpenter (1980), "A Theory of Reading: From Eye Fixations to Comprehension," *Psychological Review*, 87, 329–54; Reutskaja, Elena, Rosemarie Nagel, Colin F. Camerer, and Antonio Rangel (2011), "Search Dynamics in Consumer Choice under Time Pressure: An Eye-Tracking Study," *American Economic Review*, 101, 900-906.

[247] Just, Marcel A. and Patricia A. Carpenter (1980), "A Theory of Reading: From Eye Fixations to Comprehension," *Psychological Review*, 87, 329–54; Reutskaja, Elena, Rosemarie Nagel, Colin F. Camerer, and Antonio Rangel (2011), "Search Dynamics in Consumer Choice under Time Pressure: An Eye-Tracking Study," *American Economic Review*, 101, 900-906.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

attention. [248]

156.     Modern eye tracking technology can record exact eye movements, and it does so

noninvasively. Eye tracking methodology records the sequence of focal points of the eye

numerous times a second during information acquisition and processing tasks to document

the pattern of visual attention. Contemporary tracking tools use light reflecting off the cornea

to identify gaze point on the stimulus.  Better remote eye tracking devices use infrared light

to limit interference from other light sources and to be invisible to the study participant. [249] As

remote devices – not attached to the participant head nor requiring a fixed stable point for the

chin – these techniques are noninvasive, providing recordings of eye movements under

natural conditions, [250] and with little effort for the participants and researchers. [251]

## C.  *Analysis Methodology – Processing Metrics*

157.     As discussed in Section IV.C of the Report, consumers facing relatively simple purchase

decision tasks are capable of evaluating each attribute of each available product in a

systematic manner. Systematic information processing is accomplished by processing all of

the attribute information either predominantly by-product or by-attribute. Academic studies

show that processing-by-product is most feasible and likely in simple purchase decision

---

[248] Orquin, Jacob L. and Simone Mueller Loose (2013). "Attention and Choice: A Review on Eye Movements in Decision Making," *Acta Psychologica*, 144, 190-206.

[249] The most popular eye tracking methodology … uses video cameras illuminating the eye to record corneal reflection.  Infrared light is less affected by lighting conditions, and variability in lighting during a session, from most indoor lights. Russo, J. Edward, "Eye Fixations as a Process Trace," in *A Handbook of Process Tracing Methods for Decision Research: A Critical Review and User's Guide*, ed. Michael Schulte-Mecklenbeck et al.  (New York: Psychology Press, 2011), 45; Duchowski, Andrew T. (2007). *Eye Tracking Methodology: Theory and Practice*, Second Edition. London: Springer-Verlag, at 51, 54-57.

[250] Holmqvist, Kenneth, Marcus Nyström, Richard Andersson, Richard Dewhurst, Halszka Jarodzka and Joost van de Weijer. (2011). *Eye Tracking: A Comprehensive Guide to Methods and Measures*. New York: Oxford University Press, at 25, 51-52.

[251] Holmqvist, Kenneth, Marcus Nyström, Richard Andersson, Richard Dewhurst, Halszka Jarodzka and Joost van de Weijer. (2011). *Eye Tracking: A Comprehensive Guide to Methods and Measures*. New York: Oxford University Press, at 53.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

tasks.[252] By integrating information for attributes of a product (processing-by-product) for all of the different attributes of each product and then comparing them to all the different attributes of another product, consumers increase the likelihood of finding the most optimal product choice. Consequently to achieve the optimal choice, all products and attributes should receive at least a single eye fixation to ensure that no relevant information is overlooked when seeking to secure the maximum benefits in the purchase decision (*see* Fiedler and Gloeckner 2012[253]; Pieters and Warlop 1999[254]; Reutskaja, Nagel, Camerer, Rangel 2011[255]).

158.    In complex decision environments, consumers regularly employ simplifying decision rules and shortcuts, i.e., decision heuristics, which are likely to result in a non-systematic information processing. Non-systematic information processing is likely to happen when certain product-attribute information is reviewed selectively and/or some of the information is skipped altogether because of information overload, time pressure, satisficing goals ("good enough" decision rules) or similar (Galesic, Tourangeau, Couper, and Conrad 2008,[256] Lohse and Johnson 1996,[257] Payne 1976,[258] Pieters and Warlop 1999,[259] Stüttgen, Boatwright, and

---

[252] Payne, John W. (1976). "Task Complexity and Contingent Processing in Decision-Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366-387; Bettman, James R., Mary Frances Luce, and John W. Payne (1998), "Constructive Consumer Choice Processes," *Journal of Consumer Research*, 25(3), 187-217; Reisen, Nils, Ulrich Hoffrage, and Fred W. Mast (2008), "Identifying Decision Strategies In A Consumer Choice Situation," *Judgment and Decision Making*, 3 (8), 641-658.

[253] Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16 (1), 1-16.

[254] Fiedler, Susann and Andreas Gloeckner (2012), "The Dynamics of Decision Making in Risky Choice: An Eye-Tracking Analysis," *Frontiers in Psychology / Cognitive Science*, 3, 1-18.

[255] Reutskaja, Elena, Rosemarie Nagel, Colin F. Camerer, and Antonio Rangel (2011), "Search Dynamics in Consumer Choice under Time Pressure: An Eye-Tracking Study," *American Economic Review*, 101, 900-906.

[256] Galesic, Mirta, Roger Tourangeau, Mick P. Couper, and Frederick G. Conrad (2008), "Eye-Tracking Data: New Insights on Response Order Effects and Other Cognitive Shortcuts in Survey Responding," *Public Opinion Quarterly*, 72(5): 892–913.

[257] Lohse, Gerald L. and Eric J. Johnson (1996), "A Comparison of Two Process Tracing Methods for Choice Tasks," *Organizational Behavior and Human Decision Processes*, 68 (1), 28-43.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Monroe 2012[260]).  Thus, selective information review is associated with some attributes and/or products receiving more fixations than others while skipping information is associated with the absence of eye fixations on that information altogether.[261] Furthermore, even if reviewing information in a systematic way, consumers would likely engage in less processing-by-product, and instead turn to less effortful methods, such as pair-wise comparisons of products on single attributes, i.e., processing-by-attribute (Bettman, Luce, and Payne 1998,[262] Stüttgen, Boatwright, and Monroe 2012[263]).  Such information acquisition and processing patterns are indicative of the use of heuristics.[264]

159.    As described in Section IV.D of the Report, a process by which consumers acquire information and make choices is commonly evaluated by tracing consumer attention on an information display where products are assigned to columns and their attributes are listed in rows. The cells of these information displays are referred to as "product-attribute" information cells and the display is referred to as "product-by-attribute" matrix.

160.    Figure 1 below provides two examples of such information displays, where Display A consists of 3 products by 3 attributes and Display B consists of 3 products by 6 attributes. In eye-tracking terminology, each product-attribute cell within the display is an Area of Interest

---

[258] Payne, John W. (1976), "Task Complexity and Contingent Processing in Decision-Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366-387.

[259] Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16 (1), 1-16.

[260] Stüttgen, Peter, Peter Boatwright, and Robert T. Monroe (2012), "A Satisficing Choice Model," *Marketing Science*, 31, 878-899.

[261] Reisen, Nils, Ulrich Hoffrage, Fred W. Mast (2008), "Identifying Decision Strategies in a Consumer Choice Situation," *Judgment and Decision Making*, 3(8), 641-58.

[262] Bettman, James R., Mary Frances Luce and John W. Payne (1998), "Constructive Consumer Choice Processes," *Journal of Consumer Research*, 25(3), 187-217.

[263] Stüttgen, Peter, Peter Boatwright, and Robert T. Monroe (2012), "A Satisficing Choice Model," *Marketing Science*, 31, 878-899.

[264] Bettman, James R., Mary Frances Luce and John W. Payne (1998), "Constructive Consumer Choice Processes," *Journal of Consumer Research*, 25(3), 187-217.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

("AOI") over which eye fixations are traced, as illustrated by the sequence of colored dots on the display.

161.   **Figure 1: Example of Information Displays (A and B)**



162.   Figures 1 illustrate the sequence of visual attention to each of the AOIs by two hypothetical consumers who were tasked with choosing which of the products they would purchase based on the information in Display A and B. The colored dots indicate whether or not an AOI was fixated on at least once[265] and the numbers and connecting lines indicate the order in which fixations occurred. Thus, the hypothetical consumer who evaluated Display A fixated first on the screen size of Phone 1, followed by the battery life of Phone 1, then the camera of Phone 1, etc. The asterisks denote the chosen phone for the hypothetical consumers.

163.   The information on smartphones and tablets in my Choice Studies (Study 2 and 3, respectively) is organized in a product-by-attribute format that is very common in the real

---

[265] An AOI may be fixated numerous times during the study. Eye movements include repeat fixations without leaving the AOI, for example to read or review text, or to return to the AOI (a "revisit") to further review the information.  Such revisits or refixations are excluded from the example information displays for clarity.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

world and is similar to the displays of Figure 1 above (See Appendix D for a detailed

description of the stimuli and the corresponding exhibits). Note, that information in the

consideration study (Study 1) is organized somewhat differently. In Study 1, each "column"

of the product-by-attribute matrix is a tile, which contains all the attribute information about

a product (See Appendix D for a detailed description of the stimuli and the corresponding

exhibits).

164.    One method for detecting whether consumers employ simple decision rules and shortcuts,

is to evaluate the extent to which all of the product-attribute information is reviewed by a

decision maker. In eye tracking methods, share of information reviewed is measured as the

proportion of product-attribute information cells (the AOIs) that received at least one

fixation.[266] More formally, the share of information reviewed ("Share of Information") is

calculated as:

$$Share\ of\ Information = \frac{n_R}{n_P * n_A} \qquad (1)$$

165.    In Equation (1), $n_R$ denotes the number of product-attribute cells (AOIs) that were

reviewed (i.e., received at least one fixation), $n_P$ denotes the number of products and $n_A$

denotes the number of attributes. The measure ranges from 0 (none of the cells fixated on) to

1 (all cells fixated on at least once).[267]  As an example, consider the hypothetical consumers

who viewed Display A and B in Figure 1. The consumer who observed Information Display

---

[266] *See* Lohse, Gerald L. and Eric J. Johnson (1996), "A Comparison of Two Process Tracing Methods for Choice Tasks," *Organizational Behavior and Human Decision Processes*, 68 (1), 28-43; Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16(1), 1-16. Lohse and Johnson (1996) refer to this measure as "percent information searched." Pieters and Warlop (1999) investigate the related measure of number of elements "skipped" (i.e., the share of information not reviewed).

[267] Note that multiple fixations on a cell are counted only once; that is, all that matters is that a cell is reviewed at least once.

A ("Consumer A") reviewed all 9 available information cells, i.e., she reviewed 9/9=1.00 *share of information*. The consumer who observed Information Display B ("Consumer B"), who was presented with 6 attributes for the 3 phones, reviewed 12 of 18 available information cells, i.e., he reviewed 12/18=0.67 *share of information*.

166.     In simple decision tasks, the share of information reviewed is expected to be very high, approaching one or close to one.[268] In a complex environment with many attributes and products, consumers are likely to simplify information acquisition by skipping product-attribute cells, resulting in a share of information reviewed considerably less than one.[269] Furthermore, all else equal, one would expect that, as the number of attributes and/or products increases, the share of information reviewed goes down.[270] The stylized example of Figure 1 illustrates these points. The hypothetical Consumer B, with more attributes, reviewed a smaller share of total information than the hypothetical Consumer A (0.67 vs. 1.00). Note, that the number of product-attribute information cells that was reviewed in Display B may still be higher than that in Display A.

167.     In addition to generally skipping information in complex decision tasks, consumers may be selective in the extent to which they evaluate certain products or attributes, i.e., they may screen out various products and/or attributes and focus attention on a select product(s) and/or attribute(s). For example, a commonly observed pattern in complex tasks is that consumers review a larger number of attributes of a chosen product and fewer attributes of non-chosen

---

[268] Payne, John W. (1976), "Task Complexity and Contingent Processing in Decision-Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366-387. Payne refers to "extensive" quantity of information reviewed in a compensatory decision rule. In describing the evaluation process of a particular compensatory decision rule they write: "A value, either objective or subjective, is arrived at for *each* component, or dimension of an alternative." [emphasis added]

[269] Lohse, Gerald L. and Eric J. Johnson (1996), "A Comparison of Two Process Tracing Methods for Choice Tasks," *Organizational Behavior and Human Decision Processes*, 68(1), 28-43.

[270] Swait, Joffre. and Wictor Adamowicz (2001), "The Influence of Task Complexity on Consumer Choice: A Latent Class Model of Decision Strategy Switching," *Journal of Consumer Research*, 28 (1), 135-148

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

products,[271] as illustrated for Consumer B of Figure 1. This consumer reviewed 6/6 attribute cells for chosen Phone 3, versus 2/6 for Phone 1 and 4/6 for Phone 2 (3/6 average for non-chosen phones). Similar patterns of selective information search may appear across attributes.[272] For example, Consumer B reviewed screen size and battery life for all products, but network and weight for only one product.

168.    Another approach to discern whether consumers employ simple decision rules and shortcuts in complex decision tasks, is to evaluate the extent to which consumers process product-attribute information in a systematic and/or non-systematic manner. There are two fundamentally different forms of systematic information processing, namely, processing-by-product versus processing-by-attribute.[273] These systematic processing methods translate into patterns of transitions of attention between two attributes of the same product or between two products for the same attribute, respectively. In Figure 1, these different kinds of transitions are denoted with different colors: orange for processing-by-product, green for processing-by-attribute. Consumer A primarily processes-by-product: she first fixates on Phone 1 screen size, then switches to Phone 1 battery size (i.e., by-product transition).  Later, she fixates on Phone 1 camera and then Phone 2 camera (i.e., by-attribute transition).

169.    Note, however, that not all attention transitions are by-product or by-attribute. For

---

[271] Lohse, Gerald L. and Eric J. Johnson (1996), "A Comparison of Two Process Tracing Methods for Choice Tasks," *Organizational Behavior and Human Decision Processes*, 68(1), 28-43.

[272] Reisen, Nils, Ulrich Hoffrage, Fred W. Mast (2008), "Identifying Decision Strategies in a Consumer Choice Situation," *Judgment and Decision Making*, 3(8), 641-58; Russo, J. Edward, and France Leclerc (1994), "An Eye-Fixation Analysis of Choice Processes for Consumer Nondurables," *Journal of Consumer Research*, 21(2), 274-90. Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16 (1), 1-16

[273] Payne, John W. (1976), "Task Complexity and Contingent Processing in Decision-Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366-387 (Payne refers to processing-by-product as "interdimensional", and processing-by-attribute as "intradimensional"). *See also* Bettman, James R., Mary Frances Luce and John W. Payne (1998), "Constructive Consumer Choice Processes," *Journal of Consumer Research*, Vol. 25(3), 187-217.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

example, Consumer A fixates on Phone 2 screen size and then jumps to Phone 3 camera (diagonal transition). Such transitions in attention represent non-systematic information acquisition, making it more difficult to explicitly trade-off the value of one attribute for the value of another attribute.[274]

170.    Information about attention transitions between two attributes of the same product or between two products for the same attribute can be used to establish the systematic information processing strategy in a consumer's purchasing decision. Payne (1976)[275] proposed an influential metric to capture the average systematic information processing strategy of survey participants during consideration and choice tasks (see also, e.g., Lohse and Johnson 1996).[276] The index is commonly referred to as the Payne Strategy Index (PSI) and is defined as follows:

$$PSI \quad = \quad \frac{s_P - s_A}{s_P + s_A} \qquad\qquad (4)$$

171.    Here, $s_P$ is defined as the number of attention transitions by products, i.e., processing-by-product, and $s_A$ is the number of attention transitions by attributes, i.e., processing-by-attribute. PSI ranges from -1 when participants only systematically process information by-attribute to +1 when participants only systematically process information by-product, with 0 expressing a balance between the two. For example, Consumer A in Figure 1, has six by-brand transition, but one by-attribute transition (fixation 3 to 4), thus $s_P$=6 and $s_A$=1. This

---

[274] Riedl, René, Eduard Brandstätter, and Friedrich Roithmayr (2008), "Identifying Decision Strategies: A Process and Outcome-based Classification Method," *Behavior Research Methods*, 40 (3), 795-807; Bettman, James R., Mary Frances Luce and John W. Payne (1998), "Constructive Consumer Choice Processes," *Journal of Consumer Research*, 25(3), 187-217.

[275] Payne, John W. (1976), "Task Complexity and Contingent Processing in Decision-Making: An Information Search and Protocol Analysis," *Organizational Behavior and Human Performance*, 16, 366-387.

[276] Lohse, Gerald L. and Eric J. Johnson (1996), "A Comparison of Two Process Tracing Methods for Choice Tasks," *Organizational Behavior and Human Decision Processes*, 68(1), 28-43.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

would result in a PSI = (6-1) / (6+1) = 0.71, indicating a strong processing-by-product.

Similarly, Consumer B has a PSI of (3-6)/(3+6)=-0.33, indicating processing-by-attribute.

Information processing of Consumer B involves less processing-by-product than Consumer

A, as predicted by increased use of decision heuristics in high complexity environments.

172.     A drawback of PSI is that it is not comparable across displays of varied dimensions, since

displays with varying numbers of attributes or products are likely to demand varied amount

of attention, i.e., more or fewer fixations across attributes and products.[277] Thus, for example,

the PSI for Consumer A is not directly comparable to the PSI for Consumer B given the

varied number of potential transitions among the AOIs. Furthermore, if the number of

attributes exceeds the number of products (as in Display B of Figure 1), the PSI is biased

upward in the direction of processing by-product.[278]  The second limitation of the PSI index

is that it is less likely to reflect large changes in the information processing behavior between

two scenarios, as it is bound to a narrow interval of -1 to 1.[279]

173.     The two limitations of the PSI are addressed by an alternative strategy index proposed by

Böckenholt and Hynan (1994), i.e., the BSI index.[280]  This alternative index corrects for the

upward bias of PSI if the number of attributes is larger than the number of products and

---

[277] Payne, John W. and James R. Bettman (1994), "Comment: The Costs and Benefits of Alternative Measures of Search Behavior: Comments on Bockenholt and Hynan," *Journal of Behavioral Decision Making*, 7, 119-22.

[278] Payne, John W. and James R. Bettman (1994), "Comment: The Costs and Benefits of Alternative Measures of Search Behavior: Comments on Bockenholt and Hynan," *Journal of Behavioral Decision Making*, 7, 119-22.

[279] Payne, John W. and James R. Bettman (1994), "Comment: The Costs and Benefits of Alternative Measures of Search Behavior: Comments on Bockenholt and Hynan," *Journal of Behavioral Decision Making*, 7, 119-22.

[280] BSI is a modification of the PSI that accounts for: 1) differences in the probability of transitioning by-product and by-attribute based on the relative number of products and attributes, and 2) diagonal (non-systematic) transitions, the occurrence of which similarly affects the likelihood of transitioning by product and by attribute. The BSI is defined as: $BSI = \frac{\sqrt{N}\left(\frac{n_A * n_P}{N}(s_P - s_A) - (n_A - n_P)\right)}{\sqrt{n_P^2(n_A - 1) + n_A^2(n_P - 1)}}$, where $n_P$ = number of products, $n_A$ = number of attributes, and $N$ = total

number of transitions ($s_A + s_P + s_D$), and as in PSI, $s_P$ = number of transitions between products for a given attribute, $s_A$ = number of transitions between attributes for a given product, and $s_D$ = number of transitions between different attribute and different products (Böckenholt, Ulf and Linda S. Hynan (1994), "Caveats on a Process-Tracing Measure and Remedy," *Journal of Behavioral Decision Making*, 7, 103-117).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

allows for the comparison of processing strategies across information displays of different dimensions. Similar to PSI, the negative values of BSI denote processing by-attribute and positive values denote processing by-product, however, the index is not bounded between -1 and 1. For example, using the hypothetical search patterns in Figure 1, BSI would be 2.50 for Consumer A, and the BSI would be -1.78 for Consumer B, indicating that Consumer A processes-by-product, and Consumer B by-attribute.

174.    As mentioned above, one indication that the consumer is processing information in a non-systematic way is if the transition of attention is not by-attribute or by-brand, i.e., "diagonal" attention transitions. One can calculate an index of non-systematic information processing (NSI) as the proportion of diagonal attention transitions across the product-attribute information cells, as follows:

$$NSI = \frac{s_D}{s_A + s_B + s_D} \tag{7}$$

175.    Similar to PSI, $s_P$ is defined as the number of attention transitions within products, i.e., processing-by-product; $s_A$ is the number of attention transitions within attributes, i.e., processing-by-attribute; and $s_D$ is number of diagonal fixation transitions. NSI ranges from 0, when all attention transitions reflect either processing-by-product or processing-by-attribute, to 1, when all attention transitions are diagonal. Even pure processing-by-product involves some diagonal transitions as consumers review the attribute values of a product in sequence down a column and then jump up to the first attribute for the next product. For example, Consumer A, whose gaze plot (and PSI) indicates predominant processing-by-product has an NSI of 0.13, as she has 1 diagonal transition (fixation 6 to 7) and 8 total transitions. Similarly, Consumer B who processed-by-attribute has an NSI of 0.18, as he has 2 diagonal transitions and 11 total transitions. NSIs much further from zero would be indicative of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumers employing some degree of simplifying decision strategies.

176.    It is important to note that the information from attention transitions and the metrics that rely on them, i.e., PSI, BSI, and NSI, are most informative in the context of a product-by-attribute matrix. As shown in Figure 1, such display of information enables both a by-product and by-attribute pairwise and multi-group comparisons and are, thus, an ideal environment to trace by-product and by-attribute processing without any evident biases. My Study 2 and 3 are designed to simulate side-by-side comparison websites which naturally resemble the product-attribute grids typical in academic studies. However, my Study 1 stimuli design takes after the typical layout of on-line stores for smartphones and tablets, where product attributes information is concentrated in product tiles. Such a layout enables quick information review within each product tiles, however, it makes the by-attribute processing unnatural and difficult. Given the built-in by-product bias of the Study 1 stimuli, I deem the processing indices described above not applicable to the Study 1 analysis framework. Instead, I rely on other indicators of information process, e.g., filtering information by attributes, sorting, page clicks, etc., which are natural indicators of shortcuts and decision heuristics.

177.    In addition to understanding the process by which consumers acquire information, eye movements can be used to identify product-attribute information that is important for purchase decision making. The next section describes the framework for analysis of visual attention and choice.

D.  *Analysis Methodology – Visual Attention and Choice*

178.    This section describes validated and widespread predictive modeling approaches relating visual attention to product choice.  I rely on these approaches to evaluate how visual attention to products and attributes predict product choices.  This section summarizes the design of my

81

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

predictive model for choice, and describes the variables included in that model.

1. **Predictive Choice Models in Eye Tracking**

179.    A model that relates visual attention to product choice in the eye-tracking literature is

known as a "predictive choice model."[281] Predictive choice models reflect a conceptual

framework consistent with eye-tracking theory that increased visual attention on certain

product attributes, personal characteristics, and study design elements affect device selection

in multiple alternative choice situations.  Figure 2 below represents the conceptual

framework,[282] showing the *direct* (*C*), *indirect* (*A, B*), and *conditional* (*D*) effects of the study

design characteristics.

**Figure 2: Conceptual Framework for Predictive Choice Models in Eye Tracking Research**



180.    The conceptual framework for predictive choice models accords with core marketing

tenets, namely that visual attention is a precondition to subsequent processes including

choice, and that increased visual attention increases the likelihood of choice for a product.[283]

Put differently, in visual environments such as online comparison sites, choice depends on

---

[281] These models are also known as regression models.  See Chandon, Pierre, J. Wesley Hutchinson, Eric T. Bradlow, Scott H. Young (2009), "Does In-Store Marketing Work? Effects of the Number and Position of Shelf Facings on Brand Attention and Evaluation at the Point of Purchase," *Journal of Marketing*, 72, 1-17.

[282] Image modified from: Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16(1), 1-16.  Modifications include differences in study design and the addition of personal characteristics.

[283] *See* Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16(1), 1-16.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

the distribution of visual attention as measured by eye movements over the information. Predictive choice models provide the means to quantify and assess this core marketing assumption, and to identify attribute-brand information that does or does not predict brand choice. These approaches are well-established in the academic literature.[284]

181.    As described above, my Studies 2 and 3 require that participants choose a smartphone or tablet, respectively, out of five pre-defined product options. The predictive choice model I use for these studies relies on this requirement and estimates the probability of being chosen as a function of device characteristics, study design elements, and visual attention to attributes. The model follows the validated methods used in the seminal visual attention and choice paper by Pieters and Warlop 1999[285]. The predictive choice model used to analyze Study 1 is consistent with a distinct choice task where participants may select a large number of devices from the pre-determined alternatives.[286]

182.    Model outputs include estimates of 1) the direction of impact of the independent variables, 2) the relative magnitude of the effects, and 3) the statistical significance of the impacts. *See* Appendix F for additional detail regarding the predictive choice models used in my consumer research, and the interpretation of the model results.

## 2.  **Visual Attention Model Hypotheses**

183.    The independent variables included in the predictive choice models are based on 1) theory of relevant factors, 2) study design features and limitations, and 3) statistical tests of

---

[284] *See* Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16 (1), 1-16; Chandon Pierre, J. Wesley Hutchinson, Eric T. Bradlow, and Scott H. Young (2007), "Measuring the Value of Point-of-Purchase Marketing with Commercial Eye-Tracking Data," in *Visual Marketing: From Attention to Action*, ed. Michel Wedel et al. (Mahwah: NJ: Lawrence Erlbaum Associates), at 225.
[285] Pieters, Rik and Luk Warlop (1999), "Visual Attention during Brand Choice: The Impact of Time Pressure and Task Motivation," *International Journal of Research in Marketing*, 16 (1), 1-16.
[286] Study 1 explores consideration decisions. We still call the task involved in Study 1 a choice task since consumers are choosing which brands to consider (or not consider).

fit (ANOVA).  The Study 1 model includes controls for: device brand, owner segment, complexity, and feature controls that match the filter options in the study. The model includes categorical controls for each presented feature.[287] The model for Studies 2 and 3 includes device-level controls to account for specific differences in feature values, as well as accounting for owner segment and complexity (*see* Appendix F).

184.    The predictive choice models also include visual attention measures – the number of fixations on attributes presented in the studies – to account for information acquisition and to relate information acquisition and processing with product consideration or choice.  Study 1 includes number of fixations on each included attribute (9); Studies 2 and 3 include number of fixations on brand and price, as well as groups of attributes. In addition, to account for the additional features included with complexity in Studies 2 and 3 (complexity effects in Study 1 concern the number of alternatives, not features per alternative), the predictive models include controls for exposure to the additional attribute information.  *See* Appendix F for additional detail on variable selection for and specification of the predictive choice models.

185.    Several theories provide relevant hypotheses for the variables included in the visual attention model, both for device- and participant- independent variables and for visual attention measures.  These hypotheses are:

- Consideration/Choice Hypothesis 1 ("Product Effect"):  product indicators, as control for product-specific attribute values including brand, will be jointly significant predictors of choice.  Some products will be more likely to be chosen than others.

- Consideration/Choice Hypothesis 2 ("Loyalty and Status Quo Effect"): The

---

[287] Presented feature categories in Study 1 are: price, camera megapixels, carrier, memory, network, screen size, and talk time.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

increased likelihood to select a device based on familiarity with the brand associated with current brand ownership is referred to as the "Loyalty and Status Quo" effect. This effect may be based on greater awareness of device attributes, but also may be based on idiosyncratic factors that do not concern product attributes.   Certain specific interactions are likely to be significant: Apple smartphone (SP) owner purchasing the Apple iPhone, and Samsung SP owner purchasing the Samsung SP.

- Consideration/Choice Hypothesis 3 ("Visual Attention Effect – Brand & Main Attributes"): number of fixations on brand and attributes commonly cited as impacting demand – "main" attributes (Study 2 and 3: **L** features) will positively and significantly predict product choice. Unlike for brand and "main" attributes, the predicted impact of the number of fixations on price is less definite, likely to be non-linear and dependent on participant characteristics.

- Choice Hypothesis 4 ("Attribute Importance Effect"): visual attention on brand, price, and main attributes will predict choice more than does visual attention on secondary attributes.

186.   The next section presents the findings from my consumer research conducted for this case.

### E.   *Research Findings from My Consumer Research Conducted for This Case*

187.   As discussed in sections above, the goal of my research is to analyze which product-attribute information consumers take into account when shopping for smartphone and tablets.

188.   Analysis of my consumer research indicates that consumers do not use compensatory decision making – making tradeoffs between attribute values for a product – when

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

considering smartphones or tablets for purchase. Instead, I find pervasive evidence that prospective consumers review and process attribute information using simplifying decision strategies and shortcuts, even in the simplest tested market consideration and choice scenarios. I find the following specific evidence supporting use of heuristics and against use of compensatory decision making: skipping primary and secondary attributes, selective information review, non-systematic information processing, and infrequent processing-by-product. I also find that the use of shortcuts increases significantly with the task complexity (number of features or number of products).

189.   Together, these findings indicate that prospective consumers: 1) do not review all information, 2) they do not process information systematically hampering compensatory decision making (calculation of tradeoffs among alternatives), and 3) they do not process information by-product inducing significant cognitive burden for compensatory decision making.  I provide detailed evidence in the following subsections.

190.   Analysis of the choice decisions of study participants provides additional evidence for the use of heuristics. Specifically, visual attention that predicts choice, over and above the attribute values, identifies a set of attributes that are particularly salient in the purchasing decision, consistent with increased consideration associated with selective processing.

1.   **My Consumer Research Confirms that Consumers Use Simple Rules and Shortcuts at Various Stages of the Smartphone and Tablet Purchase Process**

191.   As described below, I find that there is substantial evidence that consumers shopping for smartphones and tablets make a purchase decision without taking into account a large number attributes or products even in the least complex decision scenarios in which the product and attribute information most relevant and important to consumers (based in part on

86

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Apple internal documents) is easily available, accessible, and comparable.

192.    Specifically, my analysis reveals that even in the least complex of tested scenarios, a
significant share of the product-attribute information is skipped and ignored. Of the product-
attribute information that is *not* skipped and ignored, consumers selectively review
significantly less of the attribute information for the non-chosen products relative to the
chosen product. Furthermore, the proportion of the product-attribute information that is
*actually* reviewed is processed extensively in a non-systematic way that is not generally
consistent with evaluation of trade-offs between attribute values for each product. Finally, of
the *small* proportion of information that is reviewed and processed in a systematic way, much
of the information processing is done by-attribute, which again is not generally consistent
with comprehensive evaluation of trade-offs between devices.

> a)   *Survey Participants Skipped and Ignored a Large Amount of Product-
> Attribute Information in Consideration and Choice Tasks in Even the
> Least Complex Decision Scenarios Tested*

193.    When evaluating smartphones and tablets for purchase, my analysis findings reveal that
survey participants reviewed only a fraction of available product-attribute information before
completing their consideration or choice tasks.

194.    **STUDY 1:** When shopping for a smartphone (or a tablet), participants are confronted
with numerous models and attributes which they have to review and evaluate for a purchase,
and, if motivated, have to seek out additional information on attributes that are not available
on comparison sites. As discussed earlier, and shown in Exhibit 2, wireless carriers and
retailers have on-line shopping stores that may each present up to approximately 180
smartphone models with two-year contracts. Similarly, retailers can have up to
approximately 160 tablet models on their on-line shopping stores. In Study 1, the least

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

complex scenario provides 27 smartphone models, which is on par with the average number of models presented on wireless carrier on-line stores, but still significantly fewer models than available in the market. Furthermore, the least complex scenario in Study 1 presents smartphone models that were promoted through most retail channels at the time of the study preparation, and thus it reflects more dominant alternatives in the marketplace. Additionally, the attributes presented in Study 1 are the most common attributes presented on smartphone "tiles" of online stores, indicating that retailers consider them more salient smartphone attributes in purchasing decisions (*see* Appendix D for details).

195.   The participants in Study 1 are tasked with reviewing the product-attribute information on an online smartphone shopping store ("Study 1 Smartphone Online Store") and selecting up to 12 devices that they would consider for a purchase and would like to evaluate further. In an environment without any cognitive resource constraints, consumers should consider all the devices available in the Study 1 Smartphone Online Store.  In Study 1, this would translate into participants picking the maximum allowable number of devices, i.e., 12 smartphones. Even if a consumer has a marked preference for a particular brand, he should still obtain information on all products if cognitive effort is negligible to ensure that other attribute values do not outweigh the brand preference. Additionally, one should find that all the models and model attributes are reviewed by each participant. In an eye tracking study, this means all models and model attributes should receive at least one eye fixation.

196.   My analysis reveals that even in the least complex smartphone shopping scenario of Study 1, survey participants skip a large amount of product-attribute information. First, I find that, on average, survey participants did not select 12 smartphones. Specifically, Exhibit 14 shows that the average and median participant selected roughly 5 devices for further

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consideration. Furthermore, fewer than 3% of the survey participants picked the maximum

number of 12 smartphones for consideration, as shown in Chart 5.[288]

197.     Furthermore, even in the least complex scenario, survey participants fixated on only 79%

of the 27 smartphone models presented, as shown in Exhibit 15.  In other words, on average,

21% of the available models did not receive even one fixation on any of their attributes.

Survey participants also did not review all attributes of the products they did fixate on.

Overall, only 30% of all product-attribute information cells were reviewed by the

participants, equivalent to 3 attributes per reviewed tile, on average,[289] as shown in Exhibit

15.[290]

198.     The share of all product-attribute information reviewed is particularly low, in part,

because study participants could, and did, actively restrict product-attribute information

through the use of the website's filters. As explained in Appendix D, filters are a standard

option on nearly all modern on-line shopping stores and allow shoppers to quickly

manipulate the information on screen by limiting it based on criteria they deem relevant to

their purchasing task. As shown in Exhibit 16, in the low complexity stimuli, 59% of

consumers used filters at least once to revise the presented smartphone options. Further, of

the consumers who used filters, use was considerable (average of 6 filter uses) (*see* Exhibit

16).  Similarly, 11% of survey participants relied on the Sort Menu to re-sort the presented

smartphone models by price, brand name, or release date.  The widespread use of filters to

---

[288] Note, the number of devices included in consideration sets accords with the number of devices that on-line shopping stores usually allow consumers to select (4-6) for side-by-side comparison (in other words, for further consideration).  The limited number of devices permitted in side-by-side comparisons is consistent with on-line retailers being aware that participants will be interested in only a small subset of smartphones for review prior to purchase. (See Appendix D for further discussion and sources).

[289] Given that 21% of the tiles received zero fixations, the share of information reviewed for the remaining tiles is 32%/79% ≈ 41% or 3.7 attributes when considering that each tile had 9 attributes in total.

[290] The share of the information reviewed in Study 1 follows the calculations presented in Equation 1 of Section VII.C.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

screen information and sorting to revise presented information is further evidence for use of simple rules and shortcuts to reduce the cognitive burden resulting from the complexity of the marketplace.

199.    Similarly, only 74% of participants actually viewed more than one page of the on-line shopping website before completing their device selection task, despite the fact that the low complexity decision scenario had three pages of smartphone models available for purchase consideration, with only 10 smartphone models per page.[291]

200.    **STUDY 2 AND 3:** As discussed earlier, Study 2 (3) presents participants with a side-by-side comparison of 5 smartphones (tablets), as is common on many wireless carrier, retailer, and reviewer websites. A side-by-side comparison website of top wireless carriers, retailers and reviewers may present up to 92 (58) attributes of smartphones (tablets), as shown in Exhibit 2. The low complexity scenario in Study 2 (3) provides 18 (26) attributes, which is on par with the number of features on retailer side-by-side comparison websites, but significantly fewer than the universe of attributes of smartphones (tablets).[292] Moreover, the side-by-side comparison of models provided in the studies makes the attributes easily available, easily accessible, and easily comparable, unlike most of the information available to consumers in the real world. [293] Finally, I designed the lowest levels of decision complexity in Study 2 (3) such that the presented smartphone (tablet) attributes were available on most representative side-by-side comparison websites, and are thus more salient

---

[291] Note, I confirmed that participants who did not click on the next page turn were aware of multiple pages of smartphone offerings based on their visual attention to the relevant portions of the stimuli.

[292] Recall, for example, that the most recent release of Apple iOS is claimed to have over 200 features alone ("Apple Introduces iPhone 5", Apple Press Release, accessed June 10, 2013, http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5.html).

[293] In the real world, consumers must seek out and find comparable information on their own.  Information sources are often hard to find, of low quality, and they often do not provide directly comparable information across models. For a summary of the difficulties consumers face in finding information relevant to smartphone and tablet choice, see Section V.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

attributes of smartphones (tablets), as confirmed by internal Apple, ███████ and ████████

consumer research.[294]

201.     Survey participants in Study 2 (3) are tasked with choosing a smartphone (tablet) that

they would be most likely to purchase today. In an environment without any cognitive

resource constraints, survey participants should review every attribute and product option

presented on the stimuli, that is, every product-attribute cell should receive at least one

fixation.

202.     Similar to Study 1, my analysis of Study 2 (3) data reveals that survey participants did

not review or consider a significant portion of the product-attribute information in the choice

stages of the purchase cycle, even in the least complex of tested decision scenarios.

Specifically, survey participants reviewed only 60% (52%) of the product-attribute

information in Study 2 (3) before making their product choice, as shown in Exhibit 18 (19).

203.     Moreover, the study participants made their choice without reviewing every attribute at

least once, thus, forgoing the opportunity to understand all of the potential distinguishing

characteristics of each option.  On average, in the low complexity scenario, survey

participants skipped 13% (21%) of available smartphone (tablet) attributes entirely for all

products in making their choice in Study 2 (3), as shown in Exhibit 18 (19). This translates to

2 (5) attributes entirely skipped by smartphone (tablet) prospective buyers, on average, in

even the least complex of the tested decision scenarios.[295]

204.     The skipping product-attribute information in even the least complex of the tested

decision scenarios is a strong evidence of the use decision heuristics among prospective

consumers.

---

[294] *See* Appendix D for detailed discussion.
[295] Study 2: 2 = (13%) x 17 attributes; Study 3: 5 = (21%) x 25 attributes.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*b)  Survey Participants Skipped More of the Product-Attribute Information for Non-Chosen Products than for Chosen Products in Even the Least Complex Decision Scenarios Tested*

205.    In addition to general evidence of limited information review, my analysis reveals that survey participants reviewed an even smaller share of information for non-selected/non-chosen product options relative to the selected/chosen product options. This implies that consumers remove devices from the consideration set/choice set on the basis of an even fewer set of features than discussed in the earlier section and focus greater visual attention on the selected/chosen product option(s) as a way to confirm selection/choice. Such patterns are further evidence for decision heuristics.

206.    **STUDY 1:** Survey participants reviewed considerably more product-attribute information for selected products than non-selected products.  Specifically, participants in Study 1 reviewed 61% of information cells for their selected products on average versus only 24% for non-selected products (see Exhibit 15), a difference representing more than double the information reviewed. This means that, on average, only 2 attributes of non-selected smartphones were reviewed by survey participants (e.g., model brand and price). Moreover, survey participants did not even bother reviewing all of the features of the selected smartphones: only 5 of the 9 attributes actually received one or more eye fixations, on average.  The limited extent of information review, amplified by the extensive use of filters, provides additional evidence of the use of decision heuristics at the consideration stage of the purchase process.

207.    **STUDY 2 AND 3:** Survey participants reviewed 74% (66%) of product-attribute cells for chosen smartphones (tablets), on average, but only 56% (48%) for product-attribute cells for each of the four non-chosen smartphones (tablets), as shown in Exhibit 18 (19). This

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

represents 4 (9) attributes of a chosen smartphone (tablet) and 7 (13) attributes of each of the non-chosen smartphones (tablets) that are entirely skipped by the average participant. This selective information processing provides additional evidence for the use of heuristics in complex decision environments.

<em>c) Even When Product-Attribute Information Is Not Skipped, Survey Participants Seek Shortcuts for Processing Product-Attribute Information</em>

208.    As discussed in Section VII.C, consumers may process information in a systematic (i.e., by-product or by-attribute processing) or non-systematic manner, as evidenced by transitions of attention across the information display. My analysis findings reveal that consumers process information in a mixed way, in that they acquire information by utilizing by-product, by-attribute, and non-systematic processing. Such diversity of information processing patterns provides yet more evidence for decision heuristics in even the least complex of tested decision scenarios.

209.    **STUDY 1:** Study 1 presents all product attributes within a clearly demarcated tile, with attribute-related icons and text presented in multiple rows within the tile, as is common for smartphone on-line stores.  Since attributes for multiple products are not organized next to each other as in the typical product-by-attribute matrix, one would expect that processing by-product in Study 1 and on-line stores in general would be easier than processing by-attribute. One should find participants methodically reviewing each page of the online store until the last page is reached, given its simple format.

210.    As mentioned above, in place of a methodical review of each page of the stimuli, my analysis reveals that even participants in the least complex scenario reviewed only 30% of all the available product-information cells. Furthermore, only 74% of the participants clicked the next page button at least once. Finally, approximately 59% of survey participants applied on

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

average 6 filters to screen the product information on various characteristics, as shown in Exhibit 16. Through the use of filters, study participants adjusted the presented information to show only the products with desired attributes (e.g., Android OS) and/or levels of attributes (e.g., talk time > 15 hours).  Such explicit use of shortcuts to arrive at product options most relevant to the decision makers is a strong indication that consumers are not able to process all of the available product-attribute information even in the least complex of the tested scenarios.

211.   **STUDY 2 AND 3:** My analysis of Study 2 and 3 also reveals that survey participants seek less effortful information acquisition methods than by-product information processing even in the least complex decision scenarios tested. Among all attention transitions across the product-attribute cells of Study 2 (3) stimuli, only 50% (44%) can be classified as by-product processing of information, as shown in Exhibit 20 (21).[296]  Interestingly, half of the attention transitions are either by-attribute (28% (33%)) or non-systematic altogether (23% (23%)). Such low share of attention transitions by-product is in part due to the limited share of product-attribute information reviewed, i.e., 60% (52%), in the low complexity scenario of Study 2 (3), which results in fewer attention transitions within a product column relative to transitions across columns. However, even conditional on information review, by-product

---

[296] Note, if the decision task is simple, one would expect all the attributes and all the products to be reviewed at least once and information to be processed by-product. Recall, that the low complexity of Study 2 has 5 products by 17 attributes (=85 information cells). Consider a hypothetical scenario, where all of the 17 attributes in Study 2 are reviewed for each of the 5 product columns. A compensatory strategy would predict that an average participant should have a minimum of 16 attention transitions within a product column, in order for every attribute in the column to receive at least one fixation. Additionally, if one assumes that there is one attention transition between two product, the share of by-product (i.e., within column) transitions on the basis of total transitions should be calculated as $(16*5)/(16*5+4){\approx}95\%$. Similarly, for Study 3, the share would amount to $(24*5)/(24*5+4){\approx}97\%$, given that each product column contains 25 attributes. Note, that the share of by-product transitions would be higher if a participant had more than one transition between two attributes of the same product column, all else equal.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

processing is still lower than would be predicted by compensatory strategies.[297]

212.    As described in Section VII.C, researchers often rely on the Payne Strategy Index (PSI) and the Böckenholt Strategy Index (BSI) to further identify the mix of processing strategies employed by the survey participants. I report these metrics in Exhibit 20 (21) for Study 2 (3). My analysis reveals that the PSI is 0.28 (0.15) in the least complex decision scenario of Study 2 (3), which is indicative of a mix of by-product and by-attribute processing where the balance is slightly tipped toward by-product processing. Recall, however, that the PSI is biased toward processing by-product when the number of attributes exceeds the number of products. On the other hand, the BSI index, which corrects for the bias, is 1.84 (-0.52) in Study 2 (3). Thus, the BSI in Study 2 is still indicative of a mix of strategies tipped slightly towards processing by-product, whereas the BSI in Study 3 is showing that participants rely more on processing by-attribute than by-product.

213.    In summary, even in the least complex decision scenario in which information is easily available, accessible, and comparable, I find that prospective smartphone (tablet) consumers cut corners in their search for the best device. A significant share of the product-attribute information is skipped at both the consideration and choice stages of the purchase cycle. In particular, the product-attribute information on the non-selected/non-chosen products is skipped to a much higher extent than that for the selected/chosen products, a pattern suggesting that consumers abandon some alternatives quickly on the basis of limited attribute

---

[297] Recall, that the low complexity of Study 2 an average participant reviewed only 69% of the product-attribute information (=59 information cells). A compensatory strategy would predict that, conditional on the partial information review, an average participant reviewed 12 attributes for each of the five products (=60 information cells). Furthermore, the participant should have a minimum of 11 attention transitions within a product column, in order for every attribute in the column to receive at least one fixation. Additionally, if one assumes that there is one attention transition between two products, the share of by-product (i.e., within column) transitions on the basis of total transitions should be calculated as $(11*5)/(11*5+4) \approx 93\%$. Note, that the share of by-product transitions would be higher if a participant had more than one transition between two attributes of the same product column, all else equal.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

information (and thus stopping to look at it) while the ultimately chosen product receives continuing visual attention as it is sequential compared to other alternative. Concluding that an alternative is unacceptable on the basis of limited information is one form of heuristic. Furthermore, when processing information on the products and attributes that are not skipped, consumers seek less effortful strategies, such as by-attribute processing and non-systematic processing. As a result, a significant portion of the reviewed product-attribute information is processed in ways that hampers the comprehensive evaluation of attributes trade-offs within and across devices and limits the consumers' ability to choose the most optimal device. These findings are consistent with the extensive use of decision heuristics by prospective consumers for smartphones and tablets.  The implication of widespread use of decision heuristics is that granular features, even if available to consumers, cannot drive choice.

      2.   **My Consumer Research Confirms that Consumers Increase Their Reliance on Simple Rules and Shortcuts at Various Stages of the Smartphone and Tablet Purchase Cycle with the Increase in Decision Complexity**

214.    Given that my analysis already revealed extensive use of simple rules and shortcuts even in the least complex decision scenarios and at various stages of the smartphone and tablet purchase cycle, it is not surprising that the use of these decision rules should persist and potentially expand at higher complexity levels. The expansion of the number of products (Study 1) and the number of attributes (Study 2 & 3) is predicted to require the survey participants to invest higher cognitive effort into the purchase decision making. Recall, that the number of products and attributes is a critical and commonly accepted contributor to decision making complexity.  Moreover, the particular added products (Study 1) and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

attributes (Study 2 and 3) introduce yet another dimension of complexity, that is, by design they add into the mix a higher number of "non-dominant" alternatives,[298] i.e., less popular smartphone models[299] and more granular hardware and software attributes that are less commonly included in online shopping sources.[300]

215.   Consistent with theoretical predictions, my analysis reveals that the use of simple decision rules and shortcuts significantly increases with complexity. In particular, study participants skipped a greater share of product-attribute information, were more selective in information reviewed (i.e., considered the chosen product differentially more than the other products), and continued to use less effortful strategies during information acquisition and processing. Given that consumers face far greater decision complexities in real life than those tested in the studies, it is reasonable to conclude that consumers regularly rely on heuristics and review only a very limited amount of product-attribute information when making their smartphone and tablet purchase decisions.

---

[298] Recall, that Swait and Adamowicz (2001) succinctly described a complex choice environment as consisting of (i) a high number of product attributes/features, ii) a high number and range of attribute levels (e.g., different levels of memory), iii) a high number of dominant alternatives and non-dominant alternatives (e.g., different operating systems, many different brands and models that do not necessarily dominate each other), iv) a high number of choice sets (different consumers will face different choice sets given different ecosystems, different careers, price points, etc. and choice sets evolve quickly over time), v) a number of negatively correlated attributes (e.g., big screen costs more). Swait, Joffre and Wictor Adamowicz (2001), "The Influence of Task Complexity on Consumer Choice: A Latent Class Model of Decision Strategy Switching," *Journal of Consumer Research*, 28 (1), 135-148.

[299] For example, in Study 1, the low complexity scenario includes Motorola Droid Razr HD and MAXX HD, which are flagship Motorola models and heavily promoted Verizon models known for their long battery life. The high complexity scenario then adds Motorola Droid 4 and Motorola Photon Q, which are the less known/popular Motorola models.

[300] For example, the low complexity scenario in Study 2 consist of one attribute that relates to the smartphone display, i.e., screen size, which is known to be one of the important attribute in consumer demand for smartphones (*see* Appendix D). The medium complexity scenario adds two more display-related attributes, i.e., pixel density and screen resolution, which are considered secondary in importance to screen size (*see* Appendix D). Finally, high complexity scenario adds two additional even more granular attributes, screen type and touch screen.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

a) *Survey Participants Skipped and Selectively Reviewed More of the Product-Attribute Information in Consideration and Choice Tasks as Decision Complexity Increased*

216.    With an increase in the complexity of the purchase decision making, survey participants reviewed an even smaller share of available product-attribute information and became even more selective in their information review before completing their consideration or choice tasks relative to the least complex decision scenarios.

217.    **STUDY 1:** My analysis reveals that when the number of smartphone offerings increases from 27 models to 44 models, survey participants skip an increasingly large amount of relevant information.

218.    Specifically, participants attempted to review only 64% of the 44 models presented in high complexity scenario relative to the 79% of 27 models in low complexity, on average (see Exhibit 15). Overall, study participants reviewed only 23% of all product-attribute information in the high complexity relative to 30% in the low complexity (*see* Exhibit 15). The differences in these average shares of information reviewed are statistically significant, as shown in the analysis of variance ("ANOVA") of Exhibit 22. Despite the changes in the relative shares, participants in the high complexity scenario still reviewed the same number of attributes (4) per tile, on average, among smartphone tiles that received at least one fixation[301] as those in the low complexity scenario. In addition, the selectivity of information review increased in a statistically significant way, with non-selected devices receiving lesser visual attention in the high complexity scenario, i.e., 24% (low) vs. 18% (high) share of attributes reviewed, and selected devices receiving higher visual attention, i.e., 61% (low) vs.

---

[301] Given that 37% of the tiles received zero fixations, the share of information reviewed for the remaining tiles is $24\%/63\% \approx 38\%$ or 4 attributes when considering that each tile had 10 attributes in total.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

67% (high) share of attributes reviewed (see Exhibits 15 and 22).

219.    Furthermore, the number of smartphones included in participants' consideration sets remained roughly the same across the complexity scenarios (5.04 average in high vs. 4.78 in low; 5 median in high vs. 4 in low) despite the fact that the number of available smartphones increased substantially, as shown in Exhibit 14.  This is another indication that consumers employ shortcuts in their purchase decision making, and thus do not consider all product features, even if they were available.

220.    Finally, participants in the high complexity scenario continue to rely on filters and sort options roughly to the same extent as those in the low complexity scenario.  Prospective consumers who use these screening criteria intentionally cut corners in their information review and focus attention only on products with the desired attributes and/or attribute levels.

221.    **STUDY 2 AND 3:** Similar to Study 1, my further analysis of Study 2 and 3 data reveals that survey participants skipped a larger share of product-attribute information in scenarios where the number of attributes was higher relative to those in low complexity scenarios.[302] As shown in Exhibit 18, the average share of product-attribute information reviewed decreases with complexity: 60% (low) to 51% (medium) to 47% (high) in Study 2. The differences in these average shares are statistically significant, as shown in the analysis-of-variance results of Exhibit 23. A similar downward and statistically significant trend in information review applies to both chosen and non-chosen smartphone options, as shown in Exhibits 18 and 23. However, the gap in the scrutiny that participants apply to a chosen smartphone relative to the non-chosen smartphones widened in higher complexity scenarios.

---

[302] Recall that the medium complexity stimuli in the Smartphone Choice Task (Study 2) contains 11 more attributes relative to the low complexity stimuli, while the high complexity stimuli adds yet another 10 attributes over and above the medium complexity stimuli.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

For example, survey participants reviewed 60% of attributes (=23 attributes) of the chosen smartphones in the high complexity scenario, but only 43% of attributes (=16 attributes) of each of the four non-chosen smartphones, on average, as showing in Exhibit 18. The gap translates into a 40% higher share of information reviewed for the chosen smartphones in the high complexity scenario relative to a 32% higher share of that in the low complexity scenario.

222.    Overall, participants in higher complexity scenarios reviewed a considerably smaller share of attributes than those in low complexity scenario. As shown in Exhibit 18, participants reviewed 87% (low), 78% (medium), and 75% (high) of available attribute information for one or more product options in Study 2. This translates into 2 of 17 (low), 6 of 28 (medium), and 10 of 39 (high) attributes entirely skipped by an average smartphone prospective consumer, on average.

223.    The results for Study 3 are confirmatory, as shown in Exhibits 19 and 24.[303] Participants review a significantly smaller share of product-attribute information across all tablet options, as well as for chosen and non-chosen tablets. Overall, participants entirely skipped over 10[304] tablet attributes in the high complexity scenario relative to 5[305] attributes in the low complexity scenario.

224.    In summary, my research finds that the presence of more product options and more attribute information results in a significant reduction of the share of information reviewed and greater selectivity in information acquisition even when the number of products and

---

[303] Recall that the stimuli for Study 3 has 25 attributes in the low complexity scenario and 38 attributes in the high complexity scenario, after combining the tablet name and image into one attribute – brand.

[304] Calculated as total number of attributes in the high complexity scenario in Study 3 net of the attributes reviewed by survey participants on average, i.e., 38-38*73%, where the share of the attributes reviewed is shown in Exhibit 19.

[305] See preceding footnote.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

attributes is far fewer than those available to prospective consumers in real life.

> b) *As Decision Complexity Increases, Survey Participants Continue to Use Shortcuts for Processing Product-Attribute Information*

225.   As expected, survey participants continue to process information in a non-systematic way in high complexity scenarios.

226.   **STUDY 1:** Study participants continued to use filters to roughly the same extent in the high complexity scenario as in the low complexity scenario, as provided in Exhibit 16. Indicating that consumers continue to seek less effortful strategies in the high complexity decision tasks.

227.   **STUDY 2 AND 3:** My analysis of information processing strategies in Study 2 and 3 reveal that participants are processing less information by-product in the higher complexity relative to the low complexity scenarios. For example, among all attention transitions across the product-attribute cells of Study 2 stimuli, the share of transitions attributable to by-product processing decreased as complexity increased: 50% (low), 46% (medium), and 46% (high). Thus, over 50% of attention transitions in the high complexity scenario are by-attribute or non-systematic, as shown in Exhibit 20. Furthermore, when looking at the mix of by-product and by-attribute processing, the BSI index confirms that participants are moving towards a higher degree of by-attribute processing. This is indicated by the BSI sign's turning negative as complexity increases, as follows: 1.84 (low), -0.11 (medium), and -0.46 (high). This trend is statistically significant, as shown in the ANOVA results of Exhibit 23.

228.   Similar findings are observed from Study 3 analysis. Recall, that Study 3 participants have already been found to process information with a mix of strategies tipped towards by-attribute or non-systematic processing in the low complexity scenario, as shown in Exhibit 21. No statistically significant differences are observed in the patterns of processing as

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

complexity increases, as shown in Exhibit 24. This is likely due to the fact that the low

complexity scenario in Study 3 is designed to be more complex than the low complexity

scenario in Study 2 (26 vs. 18 attributes, respectively).

229.     These findings show that participants seek increasingly less effortful information

acquisition strategies as complexity increases. It is reasonable to conclude that during an

actual shopping experience, consumers employ an even greater degree of decision heuristics,

such as make purchases decisions on an even smaller set of attributes and compare product

options in an even less systematic way than that shown in my studies.

### 3.   My Consumer Research Confirms that Consumer Segments Defined by Current Smartphone or Tablet Devices Do Not Affect Information Search or Processing

230.     My three studies included stratified samples to evaluate differences in information search

and choice behavior by existing device ownership.  My analysis reveals, however, that these

owner segments were not significant predictors of the share of information reviewed,

selectivity of information reviewed, or the strategies by which consumers processed

information, as shown in Exhibits 22-4.[306]  Thus, it is reasonable to conclude that prospective

consumers of smartphones and tablets employ decision heuristics in face of complexity

irrespective of current device ownership.

### 4.   My Consumer Research Shows that Prospective Consumers Do Not Consider All of the Main Attributes

231.     My findings reveal that consumers skip a large share of information even for the

attributes that are found to be important to consumers and that are readily available on on-

---

[306] *See* Exhibits 25-29 for detailed descriptions of the various metrics by segment.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

line information sources. Specifically, all presented attributes in Study 1 are commonly referenced in Apple, ███ and ███ documents, and are readily available on on-line smartphone stores.[307] I find that even these attributes ("main" attributes) are not reviewed by all prospective consumers.  Furthermore, the attributes presented in low complexity scenario and then also included in the medium and high complexity scenarios of Study 2, are commonly referenced in Apple, ███ and ███ documents as important to consumer smartphone purchase decisions. These attributes are also commonly available on most representative smartphone side-by-side comparison websites.[308] I find that even these attributes ("main" attributes) are not reviewed by all prospective consumers. Finally, a majority of the attributes presented in the low complexity and then shown also in the high complexity of Study 3, are referenced in the Apple, ███ and ███ market research and are also commonly available on most representative tablet side-by-side comparison websites.[309] I find that many of these attributes ("main" attributes) are not reviewed by all prospective consumers.

232.    **STUDY 1:** As previously discussed in paragraphs 197 and 218, consumers reviewed, on average, only 3 attributes per reviewed smartphone tile in both complexity scenarios of Study 1. Furthermore, as seen in Charts 6a,b, product brand (image plus name) is the only attribute that was reviewed by nearly 100% of participants for one or more smartphone models. Even the next most viewed attributes, price and carrier, are reviewed by only 70-80% of participants. Furthermore, the least reviewed attribute, camera megapixels, was only reviewed by under 35% participants for one or more product options. One of the reasons for

---

[307] As described in detail in Appendix D.
[308] As described in detail in Appendix D.
[309] As described in detail in Appendix D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

such low attention is that over 55% of participants used filters to narrow the selection of products based on the desired attributes. As can be seen in Exhibit 17, in both low and high complexity scenarios, participants filtered on wireless carriers (47% and 43%), manufacturers (34% and 38%), pricing (27% and 28%), OS (36% and 29%), and specific levels of other features (32% and 28%), such as camera megapixels, screen size, network, and talk time.  These findings indicate, that once consumers filter on the relevant thresholds of important attributes (e.g., talk time >10hrs), consumers do not necessarily review the granular value of these attributes.

233.     Similarly, even though the attributes in Study 1 are all main attributes, less than half of the smartphone tiles are reviewed for any given attribute, on average. For example, as shown in Exhibit 30, of all the smartphone tiles presented in the low complexity scenario, any single attribute with the exception of model brand was reviewed for less than 40% of smartphone tiles. These results provide strong evidence for the use of heuristics, when even major attributes are skipped for a large number of devices.

234.     **STUDY 2 AND 3**:  Similarly, my analysis of Study 2 and 3 reveals that not all main attributes were reviewed by consumers in the choice studies.  In the smartphone choice study, the main attributes are those that appear in the low complexity scenario, as well the medium and high complexity scenarios. As noted earlier, these attributes have been found to be important for consumer purchase decision in other studies. With the exception of brand and price, I refer to these main attributes as the **L** attribute group.

235.     My analysis reveals that nearly all participants review brand and price for at least the chosen phone. For example, Charts 7a,b,c show the share of participants that reviewed each feature for at least one product option. As can be seen, brand and price are reviewed by over

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

85% of participants for the chosen phones. While that is still true for the brand of each of the non-chosen phones, over 30% of participants skipped price of each of the non-chosen phones, on average.  The skipping of the price attribute is strong evidence that consumers use a decision heuristic to exclude a phone from consideration, obviating evaluation of the tradeoff between the product's benefits (its attributes) and its cost to acquire – price.

236.    The rest of the discussion below focuses on the main attributes in the **L** attribute group.

237.    As discussed in paragraph 207 of this report, the average participant skipped 4 of the attributes of a chosen smartphone and 7 attributes of a non-chosen smartphone in the low complexity scenario of Study 2, which consists by design of only main attributes. Given that brand and price are rarely skipped, as described above, these statistics mostly apply to the attributes in the **L** attribute group.  The skipping of main attributes across various consumers increases significantly as the complexity of the decision task increases, as shown in Exhibits 23 and 31. Importantly, in the high complexity scenario, only 62% of the **L** attributes are reviewed for a chosen phone (i.e., 6 are skipped), and only 42% are reviewed for each of the non-chosen phones (i.e. 9 are skipped).

238.    Chart 7a breaks out the share of participants that reviewed each of the main attributes in Study 2. As can be seen, each of the attributes of the **L** attribute group is reviewed by only a subset of all the participants. Specifically, 20%-40% of participants skip each of the **L** attributes altogether if the attribute belongs to a chosen phone, but 35%-55% of participants skip each of the **L** attributes altogether if the attribute belongs to a non-chosen phone. As complexity increases, the share of participants skipping each of the L attributes increases, as shown in Charts 7b,c. Overall, there does not appear to be any single attribute within the attribute group that is skipped by most participants. Instead, the distribution of skipping

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

seems relatively uniform across attributes of a chosen phone and non-chosen phones. This is indicative of high heterogeneity among survey participants, given that each participant is unique in the types of the attributes that they choose to review. This provides additional evidence that consumers use idiosyncratic heuristics to simplify the complex decision environment.

239.     Similar general takeaways apply to the tablet choice study (Study 3), as shown in Exhibits 24 and 32, and Charts 8a,b.

### 5.  My Consumer Research Confirms that Consumers Do Not Consider Many of the Secondary Attributes

240.     My Studies 2 and 3 present participants with more complex decision scenarios, where main attributes (i.e., brand, price, and **L** attributes), are mixed with secondary attributes. The secondary attributes were chosen based on lower prevalence on representative side-by-side comparison websites.  I refer to these additional attributes in Study 2 as **M** attributes (11 attributes), if appearing only on the medium and high complexity scenarios, and as **H** attributes (10 attributes) if appearing only on the high complexity scenario. Similar designation applies to Study 3, which consisted only of one higher complexity scenario (i.e., **H** attributes only).

241.     As shown in Exhibit 31, participants continued to skip attributes in the secondary attribute groups. In particular, when confronted with the high complexity scenario, Study survey participants review only 61% of the **M** attributes and 60% of **H** attributes of a chosen phone, which translates into entirely skipping 4 attributes from each of the secondary groups, respectively.  Moreover, only 43% of the **M** and 43% of the **H** attributes were reviewed for each of the non-chosen smartphones, i.e., participants entirely skipped 6 attributes for each of the secondary attribute groups.

106

242.    Furthermore, Charts 7b,c break out the share of participant that reviewed each of

secondary attributes in Study 2. Focusing on the high complexity scenario (Chart 7c), there is

clear evidence that many participants skipped each of the secondary attributes at a slightly

higher rate than the main attributes in the **L** group. Once again, there does not appear to be

any single attributes within the **M** and **H** groups that are skipped by most participants.

Instead, the distribution of skipping seems relatively uniform across attributes of a chosen

phone and non-chosen phones. This is indicative of high heterogeneity among survey

participants, given that each participant is unique in the types of the attributes that he / she

chooses to review.

243.    Similar general takeaways apply to the tablet choice study (Study 3), as shown in Exhibit

32 and Charts 8a,b.

> ###     6.  **My Consumer Research Confirms that Selection of a Smartphone for Consideration Depends on the Loyalty and Status Quo Effect and Attention to Main Attributes**

244.    Survey participants undertook significant visual attention on the Study 1 stimuli,

averaging over 299 eye fixations in low complexity and 349 in high complexity scenarios, as

shown in Exhibit 33. The number of fixations is hardly sufficient to cover every product-

attribute AOI on the stimuli. As described in earlier sections, the participants skipped a

significant number of smartphone tiles, and many attributes of the reviewed products.

Furthermore, they concentrated visual attention on the products they subsequently selected

for consideration – averaging over 3.4 times more fixations per selected product versus non-

selected products in low complexity.[310] Prospective consumers were even more concentrated

in their visual attention in the high complexity scenario, averaging 5.75 times more fixations

per selected product.[311] The increased attention to selected products applies to all attributes

of these products; see Charts 9a and 9b. Prospective consumers are selective in their visual

attention, by product and by attribute, consistent with the use of decision heuristics.[312]

245.    As discussed in paragraph 196 of this report, Study 1 participants selected, on average, 5

smartphones for a purchase consideration in both complexity scenarios. Exhibit 34a presents

the share of participants by different types of consideration set composition. As can be seen,

very few participants selected only Apple phones, indicating that for most prospective

consumers screening on just the Apple brand is not a favorable shortcut. In contrast, over

10% of participants added only Samsung-branded smartphones to their consideration set.

246.    A consumer's decision to include a device in her consideration set depends on many

factors, including, among others, assessment of attributes and familiarity with the brand.  My

hypotheses for the prediction of smartphone consideration were outlined already in Section

V.D.2. I report the findings for these hypotheses below.

247.    <u>Consideration Hypothesis 1 ("Product Effect"):</u> As shown in Exhibit 35, my predictive

consideration model shows that certain brands increase the likelihood of being added to the

consideration set, and all the brand effects are jointly significant effect across all tested

models. Additionally, when not controlling for the product attributes (Model 1), many of the

---

[310] Selected products averaged 28.2 fixations per tile, on average, versus 7.9 for non-selected products; *see* Exhibit 33.
[311] Selected products averaged 31.3 fixations per tile, on average, versus 5.5 for non-selected products; *see* Exhibit 33.
[312] Moreover, fixations devoted to a given attribute were frequently not consecutive uninterrupted fixations within the same attribute AOI. Instead, participants might have fixated on the attribute initially (i.e., first visit) and then returned to the same attribute multiple times to gather further information on the attribute (i.e., second+ visits). This is confirmed by correlations of over 0.98 between fixations and visits across both complexity scenarios of Study 1. This indicates that participants were deliberate in their information review.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

individual brand indicators have a statistically significant effect on the likelihood of being considered for a purchase.

248.   Consideration Hypothesis 2 ("Loyalty and Status Quo Effect"): Exhibit 34b provides descriptive evidence for the Loyalty and Status Quo effect in consideration set composition based on current smartphone brand ownership. Specifically, the exhibit shows that some Apple smartphone (SP) owners (6%) select exclusively Apple SPs for consideration, while owners of non-Apple SPs never exclusively select Apple products. Similar evidence applies for Samsung SP owners, 22% of whom exclusively select Samsung products.[313] Furthermore, the Loyalty and Status Quo[314] independent variable is a strong predictor of product selection, indicating that Apple SP owners are more likely to select Apple products, and Samsung owners are more likely to select Samsung products (*see* Exhibit 35).

249.   Consideration Hypothesis 3 ("Visual Attention Effect – Brand & Main Attributes"): I also test whether the visual attention to the main attributes, even when controlling for the smartphone attribute values, predicts device selection in the consideration task. Model 2 of Exhibit 35 shows that predictive effects of the attribute values without the eye fixations on those attributes. In this model, price, memory, camera megapixels, and carrier categories appear to increase the likelihood of product selection in a statistically significant way. As predicted, the effect of price is non-linear indicated by the magnitude of the coefficients on each of the price ranges tested.

250.   Model 3 in Exhibit 35 includes measures of visual attention, i.e., participant fixations on brand, price and all other attributes in aggregate (8 attributes) for each smartphone. I find that

---

[313] The loyalty and status quo effect is likely to be found for other smartphone brand owners as well, however, I only test the effects for the most prominent brands in the market, i.e., Apple and Samsung, as discussed in Section V.A.
[314] Defined as Apple and Samsung SP owner interactions with Apple and Samsung brand indicators.

the number of fixations on brand (image and name), price, and all main attributes (excluding

price) all predict choice, with high statistical significance even when controlling for main

attribute values. Fixation on individual main attributes in Model 4 (9 measures) also predict

choice with high statistical significance, with the exception of visual attention to the talk time

and camera megapixels.  Overall, variation in the visual attention to main attributes across

smartphones, even when controlling for smartphone characteristics, predicts smartphone

selection.  Put differently, certain attributes receive greater visual attention, and the visual

attention to those attributes is correlated with device selection.

251.    Inclusion of visual attention measures had another notable effect beyond predicting

product selection – i.e., it significantly eliminated the predictive power of attribute values. In

Model 2 of Exhibit 35, the price, talk time, memory, camera megapixels, and carrier controls

all predicted product selection with high statistical significance. However, when accounting

for visual attention, only memory and camera megapixel attribute values predicted choice.

Put differently, it is the visual attention on specific attributes that carries the predictive

information about consideration, rather than the attribute values themselves.

### 7.    My Consumer Research Confirms that Attention to Main Attributes, but Not Secondary Attributes, Predicts Smartphone and Tablet Choice

252.    Survey participants in Study 2 (3) averaged 185-285 (216-249) information-gathering eye

fixations in low to high complexity scenarios, as shown in Exhibits 36 and 37.  This number

of eye fixations exceeds the number of product-attribute information cells.  However,

consumers did not apply equal visual attention to all available information; instead they

devoted greater attention to some attributes and products than others, and entirely skipped

some of the product-attribute information altogether, as described in earlier sections.

Moreover, fixations devoted to a given attribute were frequently not consecutive

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

uninterrupted fixations within the same attribute AOI. Instead, participants fixated on the attribute initially (i.e., first visit) and then returned to the same attribute multiple times to gather further information on the attribute (i.e., second+ visits).[315] This pattern indicates that participants were deliberate in their information review.

253.    Study participants devoted greater attention, specifically twice as many fixations, to the attributes of the device they ultimately chose relatively to the attributes of the other devices (Exhibits 36 and 37).  Thus, there is a clear link between visual attention on a device and subsequent choice of the device.

254.    Charts 10 and 11 present the average number of fixations on each attribute for the chosen device and the average number of fixations on each of the four non-chosen devices.  Brand appears to gain the most fixations across all complexity levels for both chosen and non-chosen devices. Other than brand, however, the attention of participants is not concentrated on any particular groups of attributes.  Given the extent of skipping, the use of non-systematic processing, and by-attribute processing, it is not surprising that there is a lot of heterogeneity in visual attention. Thus, one would expect that the distribution of fixations on various attributes is washed out when looking at averages.

255.    Consumer Study 2 (3) tasked participants with choosing a smartphone (tablet) that they would be most likely to purchase today. I report the choice shares for each of the presented models of Study 2 (3) in Exhibit 38 (39).  As can be seen, among the smartphone (tablet) choices, the unweighted segment totals show that Apple and Samsung products constitute over 50% of the participant choices, which is in line with the observed market shares of these

---

[315] I test whether study participants return to an AOI to further evaluate its information by calculating the correlation between the number of fixations on that AOI and the number of visits on that AOI, where visits are one or more consecutive fixations on an AOI. The correlation is over 0.98 between these measures for both Study 2 and 3, confirming that most fixations arise from revisiting an AOI, rather than multiple consecutive fixations on that AOI.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

two manufacturers (*see* Chart 2 (3)). Earlier in the report, I outlined the hypotheses for factors that predict these choices. I describe each of the hypotheses in more detail below.

256.   <u>Choice Hypothesis 1 ("Product Effect")</u>: My predictive choice model supports the product effect hypothesis, in particular, certain products are more likely to be chosen more than others but the effects differ by segments.

257.   <u>Choice Hypothesis 2 ("Loyalty and Status Quo Effect")</u>: As with the consideration study, choice patterns evidence Loyalty and Status Quo effects.  In Study 2, 46%-68% of Apple SP owners choose Apple iPhone 5, while 48%-67% of Samsung SP owners choose a Samsung Note II (see Exhibit 38). Choice shares of this magnitude are not observed for any other segments or smartphone models. Similar patterns are observed for Apple iPad 4th Generation among Apple Tablet and SP owners in Study 3 (see Exhibit 39).

258.   Furthermore, the Loyalty and Status Quo effects are evident in my predictive choice model of Exhibit 40. The interactions of Apple product with Apple segment and Samsung product with Samsung segment produce the largest and most statistically significant coefficients relative to all other product-segment interactions.

259.   <u>Choice Hypothesis 3 ("Visual Attention Effect – Brand & Main Attributes")</u>: Relative visual attention to attributes provides an indicator of what is important to consumers in their purchasing decision.  However, an additional indicator of attribute importance is whether attention to that attribute, or group of attributes, predicts the outcome of the task – device choice.  Importantly, if substantial visual attention on an attribute does not predict choice, the information acquired in that visual attention did not affect the consumer's purchase decision. The predictive choice model performs this relative comparison of visual attention on different attribute groups.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

260.    In Study 2, the number of fixations on brand, price, and **L** attributes all positively predict choice (and are highly statistically significant) in the conditional logit model, when controlling for other relevant factors: brand characteristics, participant smartphone ownership segment, and study complexity (see Exhibit 40).  Model estimates imply that increased visual attention (# of fixations) incrementally increases choice probability. These effects occur even when accounting for fixations on **M** (secondary attributes shown in medium and high complexity only) and **H** attributes (secondary attributes shown only to high complexity).

261.    Similar results occur in Study 3.  Fixations on brand, price, and the main attributes in the **L** group all positively predict tablet choice (and are highly statistically significant); see Exhibit 41. Model estimates imply that increased visual attention (# of fixations) incrementally increases choice probability. These effects occur even when accounting for fixations on **H** attributes (attributes shown only to high complexity).

262.    Choice Hypothesis 4 ("Attribute Importance Effect"): Unlike attention to main attributes and brand, visual attention on the secondary attributes in **M** and **H** do not predict choice over and above the **L** attributes as the effect of these attributes is insignificantly different from zero in the model; see Exhibit 40.  An interpretation of this insignificance is that these sets of attributes are less relevant to the complex choice task, once accounting for brand and main attributes.

263.    Similarly for tablets, fixations on **H** are not significant predictors of choice on top of fixations on **L** (see Exhibit 41).  An interpretation is that these sets of attributes are less relevant to the complex choice task, once accounting for core attributes.

264.    The results for Study 2 and Study 3 indicate that visual attention to attributes categorized as brand or main attributes according to external sources predicts device choice, but attention

113

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

to secondary attributes have no predictive effect when accounting for attention to the main attributes.  This pattern is consistent with consumers relying more on the attribute levels for the main attributes in their choice decision.

## 8.  My Consumer Research Confirms that the Relevance of Secondary Attributes in Predicting Choice is a Result of Misspecification

265.    I assess the impact of omitted variable bias on the relevance of visual attention to secondary attributes on choice by intentionally revising my predictive choice model to return an "erroneous" model. Specifically, I exclude visual attention to the attributes commonly cited as impacting demand.

266.    As detailed in the previous section, visual attention to secondary attributes is not predictive of smartphone or tablet choice in the models specified in accordance with theory. However, statistical and economic inferences regarding the relevance of these secondary attributes can be distorted, through the exclusion of measures of visual attention to the main attributes that drive demand.  Results of this distortion become demand artifacts, spurious results stemming from modeling error.

267.    Theory predicts that consumers select a brand in a complex decision environment using, at least in part and potentially primarily, information on the main attributes of the devices. When excluded, some of the impact of these main attributes is mechanically applied by the statistical model to other attributes that are correlated with the excluded main attributes – a classic *omitted variables bias* problem.  Inference in such circumstances is compromised.

268.    Exhibit 42 shows the results for the smartphone predictive choice models for Study 2. The exhibit presents several Models (5-7) that exclude the **L** attributes; I include Model 4 (from Exhibit 41 for comparison). Notably, visual attention to secondary attributes become highly significant and impactful predictors of device choice after exclusion of visual attention

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

on the main attributes. For instance, when excluding just the main attributes, the coefficient estimate on the visual attention to **M** attributes tripled and this measure became highly significant (dropping from a p-value of 0.220 to <0.001). Similar effects are evident for the secondary attributes included in the **H** attribute group. The **H** attributes even become highly significant predictors of device choice when excluding information on both main attributes (**L** attributes) and secondary attributes included in **M** attributes. However, to reiterate, neither of the measures of these secondary attributes predicted choice when correctly accounting for the main attributes (*see* Model 4 in Exhibit 42).

269.    Results for Study 3 are analogous; see Exhibit 43. When excluding visual attention on the main attributes, the visual attention to secondary attributes spontaneously appear significant, with larger magnitude coefficients.

270.    These manipulations clarify how some attributes *appear* as demand predictors, but only in a misspecified model. Excluding the most salient demand-driving factors – as established through numerous sources including Apple documents – biases the estimates, creating demand artifacts for other attributes that do not affect demand (choice) in a well-specified model.

271.    As shown here, misspecified models of consumer preference and choice, models that exclude main demand factors, can find statistical significance for granular attributes that are otherwise not supportable as relevant demand-drivers. The results of such models are suspect.

VIII.    ANALYSIS OF FUNCTIONALITIES ASSOCIATED WITH PATENTS AT ISSUE

272.    Apple's expert witnesses Dr. Hauser and Dr. Vellturo argue that each of the individual accused functionalities drive consumer choice. I reviewed both of the expert witness reports

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

and the alleged evidence and did not find them to provide convincing evidence to support

this argument. Moreover, as discussed below, I found that Dr. Hauser and Dr. Vellturo's

description of the patented inventions too broad and the provided evidence not relevant for

the functionalities at issue.  I discuss my response to the purported evidence presented by

Apple's expert witnesses below.

A. ***The Evidence Presented in Dr. Hauser's Expert Report that the Accused Functionalities Drive Demand is Unreliable, Misleading, and Irrelevant***

273.    Dr. Hauser, Apple's expert witness, conducted a conjoint study that purports to find a

link between the granular features at issue and consumer choice. Specifically, Dr. Hauser

seeks to test the preferences of Samsung smartphone owners for Samsung phones that

possess the following sets of attributes and levels of attributes:

| Smartphone Attributes[316] | | Tablet Attribute[317] | |
|---|---|---|---|
| Category | Level | Category | Level |
| Data Accessibility | Notification Bar<br>Background Syncing*<br>Quick Links*<br>Universal Search* | Data Accessibility | Status Bar<br>Background Syncing*<br>Quick Links*<br>Universal Search* |
| Call Initiation and Screening | Three-Way Calling<br>Reject Call with Message<br>Wi-Fi Calling<br>Missed Call Screen Management* | Lock Screen Interface | Lock Screen Display Customization<br>Lock Screen Shortcuts<br>Multiple Lock Screen Widgets<br>Slide to Unlock* |
| Input Assistance | Copy-Paste<br>Voice to Text<br>S Pen<br>Automatic Word Correction* | Input Assistance | Copy-Paste<br>Voice to Text<br>S Pen<br>Automatic Word Correction* |
| Screen Size | 4.0", 4.8", 5.0", 5.5" | Screen Size | 7.0", 7.7", 8.9", 10.1" |
| Camera | Panorama<br>Best Photo<br>Smile Shot<br>Buddy Photo Share | Connectivity | Wi-Fi<br>GPS<br>AllShare Play<br>IR Blaster |

---

[316] Hauser Report, Exhibit E.
[317] Hauser Report, Exhibit F.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

| Price | $49, $99, $149, $299 | Price | $199, $299, $449, $599 |
|-------|----------------------|-------|------------------------|

274.   For the reasons I detail below, I find that Dr. Hauser's study and the reported results are unreliable, misleading, and/or irrelevant for the issues in this case. I understand that Samsung retained Dr. David Reibstein to comment specifically on the conjoint study conducted by Dr. Hauser. Accordingly, I will not comment on the specifics of the method. Instead, below I focus on Dr. Hauser's approach to the research design and interpretations of findings.

275.   As described in Section V, the smartphone and tablet markets are plagued with numerous and ever changing product offerings, numerous and ever changing attribute offerings, and many sources of information that make information gathering a tedious and, at times, impossible task. Furthermore, very granular features, including in particular the ones used in Dr. Hauser's research, are not presented on popular smartphone and tablet information sources, such as side-by-side comparisons and shopping websites.  As a result, most prospective consumers are not exposed to, and are not aware of, very granular features of smartphones and tablets. Furthermore, prospective consumers skip over a significant share of readily available attributes and are unique in which of the attributes they choose to review and the extent to which they choose to review them. While the combination of reviewed features is unique to each consumer, there are numerous main attributes that may be important to the purchase decision making of various prospective consumers. Finally, in their review of selected attributes, most consumers are not likely to evaluate trade-offs among all the attributes and products due to the required cognitive effort. Instead, prospective consumers use heuristics as a shortcut to simplify the complex decision task, with the resulting selectivity in their information review and simplified selection rules.

276.   Dr. Hauser's research design ignores the realities of the marketplace outlined above and,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

as a result, suffers from at least four critical flaws, as described in detail below. In addition to these four critical flaws in his research design, Dr. Hauser's study design misrepresents the features-at-issues, the underlying accused functionalities, and the available non-infringing alternative functionalities. In summary, I find that Dr. Hauser's study yields unreliable, misleading and irrelevant estimates that cannot be used to inform the issues in this case.  I describe these and other issues in more detail below.

1. **Dr. Hauser's Research Design Is Critically Flawed as It Assumes that Smartphone or Tablet Consumers Make Decisions Using Very Granular Product Attributes**

277.    Dr. Hauser's study design is flawed because it includes information on very granular features that is not commonly available on the typical information sources that consumers rely on to make their decisions, such as wireless carrier, retailers, and independent reviewer websites. As discussed before, typical on-line shopping stores only present consumers with 6-13 key attributes,[318] while typical side-by-side comparison websites present consumers with 25-92 attributes.[319] Neither of these commonly used smartphone and tablet information sources includes attributes as granular as those presented in Dr. Hauser's study.[320] Similarly, Apple and █████ market research geared towards studying features that matter to consumers in their choices have not surveyed consumers on attributes at issue or granular attributes in general.[321]

278.    Thus, Dr. Hauser's design is not reflective of real world consumer decision making for smartphones and tablets. By presenting consumers with granular features that they would

---

[318] *See* Exhibit 6.
[319] *See* Exhibit 2.
[320] *See* Exhibits 6, 7, 8.
[321] *See* Section VI for the discussion.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

never be exposed to otherwise, Dr. Hauser's study makes these granular features artificially salient to consumers, leading to demand effects (e.g., signaling consumers that "these granular features must be important") and externally invalid results.

279.    In addition to making the very granular features available to the participants, Dr. Hauser presented participants with animations and text prompts that educate about the features. Not only does Dr. Hauser draw attention to the granular features in ways that are unlikely to happen on typical information sources, but he also educates the participants in ways that are unrealistic for a typical smartphone or tablet shopper.  Specifically, based on my review of on-line stores and side-by-side comparison websites, definitions of features are at times available as pop-ups next to a given feature.[322] My consumer research shows that when providing consumers with an option to click on definitions of various smartphone and tablet attributes, consumers rarely seek out those definitions on their own. Specifically, less than 6% (10%) of participants clicked on any attribute definition of the main attributes of smartphones (tablets) and less than 8% (0%) of participants actually clicked on any of secondary attributes in the highest complexity scenario tested in my choice studies, i.e., Study 2 (3).[323] In my consumer studies, I find that the majority of participants make a smartphone or tablet choice without accessing definitions for attributes.

280.    Thus, by drawing further attention to these granular features, Dr. Hauser's study makes these granular features artificially salient to consumers and biasing the estimated values associated with these granular features.

---

[322] *See* Appendix D for the description of feature definitions.
[323] Main attributes are those included in the **L** attribute group.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

2. **Dr. Hauser's Research Design Is Critically Flawed as It Fails to Account for Attributes Important for Smartphone or Tablet Purchase Decision Making**

281.    Dr. Hauser's research design is flawed because it fails to include important attributes of smartphones and tablets. Dr. Hauser's conjoint study included six attribute types associated with Samsung's accused products.  This set of attributes does not reflect many attributes that Apple and ▇▇▇▇▇ market research documents note as important to consumers. For example, Apple Marketing Research lists 16 attributes of the iPhone 5 in 2013 that are important to the subset of iPhone Buyers who wanted a Specific Feature or Capability.[324] Other important features are described in Section VI.

282.    Furthermore, there are many attributes listed on the on-line stores and side-by-side comparison websites of wireless carriers, retailers, and independent reviewers that are deemed important for presentation to consumers.  For example, among retailers alone, Best Buy lists 51 attributes of smartphones while Target and Wal-Mart list 21 attributes. For tablets, Best Buy lists 37 attributes, while Target and Radio Shack list 30 and 28 attributes, respectively.[325] As a result, attributes that are widely available and are commonly cited as impacting consumer demands were excluded from the study design.

283.    The exclusion of relevant information – a classic omitted variable problem – produces biased and misleading findings with inflated values of the included attributes. These theoretical biases have been shown to apply to conjoint studies. Conjoint studies lead to biased estimates for attribute/feature importance and are unreliable for predicting the sales

---

[324] Exhibit 10.
[325] Exhibit 2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

impact of features when other attributes/features are omitted.[326]

284.    By including very granular features next to only a small set of important attributes, Dr. Hauser further inflates the value of the very granular features in the eyes of the survey participants. Omitting main attributes but including such granular features leads to biased estimates.[327] Thus, the second critical flaw with Dr. Hauser's research design also yields unreliable and misleading estimates related to values of all the features in the design, and in particular values of the very granular features.

3.    **Dr. Hauser's Research Design Is Critically Flawed as It Fails to Simulate the Typical Methods by Which Consumers Acquire and Process Product And Attribute Information**

285.    Dr. Hauser's research design is flawed because it simplified the choice problem and, as a result, impacted how consumers made a decision.  In particular, an underlying premise of conjoint analysis methods, such as the one applied by Dr. Hauser, is that study participants review all of the information presented to them, evaluate the tradeoffs between and among attributes and products, and integrate these tradeoffs in their decision making. Such information acquisition and processing is not typical to prospective consumers in complex smartphone and tablet markets.

286.    My consumer studies show that in choice tasks with 18 or more attributes, consumers skip much product-attribute information in scenarios, even when presented with attributes identified in Apple and ███████ market research as important for purchase decision

---

[326] Orme, Bryan K. (2005) "Comment on Bradlow," in an unpublished draft of Eric T. Bradlow (2005), "Current Issues and a 'Wish List' for Conjoint Analysis," 19, 22;  Cattin, Philippe and Dick R Wittink (1982), "Commercial Use of Conjoint Analysis: A Survey," *Journal of Marketing*, 46(3), 44-53, at 50.

[327] Johnson, Eric J. and J. Edward Russo (1984), "Product Familiarity and Learning New Information," *The Journal of Consumer Research*, 11(1): 549; McCullough, James and Roger Best (1979), "Conjoint Measurement: Temporal Stability and Structural Reliability," *Journal of Marketing Research*, 16(1), 26-31.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

making. Furthermore, when consumers are faced with secondary attributes much less granular than those presented in Dr. Hauser's study, only 60% of all the product-attribute information was actually reviewed on average (Study 2). This percentage is only 52% in the case of tablets (Study 3). Participants in the smartphone (tablet) choice study reviewed only 74% (66%) of all information for chosen devices and 56% (48%) of information for non-chosen devices on average.  Participants' limited information processing also applies at the attribute level: on average, participants reviewed only 87% (79%) of available (less granular than the patents at issue) attributes for any product in deciding among smartphones (tablets). With the exception of main attributes such as Brand and Price, each (less granular than the patents at issue) attribute of chosen phones was reviewed by only 50%-80% of the participants in both smartphones and tablets while these numbers are lower for non-chosen devices.

287.    Dr. Hauser notes in his own prior research the relevance of heuristics in decision problems involving complex products with numerous features. In that prior work, Dr. Hauser acknowledges and identifies the use of heuristics to simplify the decision problem in complex product markets. In a study of GPS devices, Dr. Hauser notes that consumers use heuristics and shows that conjoint models yield invalid results in the presence of heuristics.[328] Dr. Hauser also has evidence of heuristic use when deciding on a *smartphone*. In that study, Dr. Hauser found substantial evidence for the use of a particular heuristic (lexicographic) that eliminates products on the basis of attribute values before reviewing all

---

[328] "[T]ested lexicographic processing on a survey to 15.810 students last year. Each student was asked to choose from a set of 32 SmartPhones that varied on 16 aspects. There were no constraints on how the choice was made. Of these students, 92% used a non-compensatory (lexicographic) process. Hauser, John, R., Min Ding, Steven P. Gaskin (2009), "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference*, at 216.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

attribute values for the eliminated product: 92% of study participants used this decision heuristic.[329]

288.    This pattern of limited and selective information review is inconsistent with Dr. Hauser's study design that provides granular features that are generally unavailable to consumers, few main attributes, and that places consumers into a hypothetical setting that encourages tradeoffs. Compounded by the issues outlined above, the research design further inflates the values that participants assign to the presented very granular features.

### 4.    Dr. Hauser's Study Design Is Critically Flawed as It Assumes That Smartphone and Tablet Consumers Make Decisions Using the Same, Limited Set of Product Attributes

289.    Dr. Hauser's study design assumes that all smartphone and tablet consumers make purchase decisions on the basis of the same combination of attributes. This assumption is untenable. As noted in the academic literature, and substantiated by my consumer research, consumers in complex markets use decision heuristics to simplify the decision task by *selectively* reviewing the product-attribute information, concentrating on the portions of information they deem relevant, and wholly skipping other product-attribute information. Dr. Hauser's design fails to acknowledge that consumers are unique in the number and type of attributes that they consider for their decision making, and instead imposes that consumers review the same limited set of information.

290.    My own consumer research shows that smartphone and tablet markets are complex and associated with use of heuristics (as discussed in detail in Section VII). My findings include that consumers: 1) skip a large share of attributes before making a decision, 2) selectively

---

[329] Hauser, John R., "Note on Consumer Behavior," MIT Sloan Courseware.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

review the information they do review by product, and 3) employ non-systematic search

patterns and a mix of within attribute and within product information acquisition. All of these

findings are strong evidence of the use of heuristics, and thus, evidence showing the

inappropriateness of Dr. Hauser's study design.

291.    Based on these reasons, I conclude that Dr. Hauser's research design is inappropriate for

evaluation of consumer willingness to pay for the attributes at issue and for evaluation of the

impact of accused devices on market outcomes. Inference from the model is accordingly

suspect.

   5.   **Dr. Hauser's Research Presents Overly Broad, Incomplete and
        Misleading Descriptions of the Accused Functionality Related to Each
        Patent and the Alternatives to Such Functionalities.**

292.    The patents at issue are about the very specific ways certain functionalities such as

unlocking a device, word spelling, etc. can be performed. In contrast, the feature at issue in

Dr. Hauser's study is very broadly defined and suggests that either these functionalities

cannot be performed at all without the described feature (e.g., without the autocorrect feature

described, no automatic correction will take place) or that the performance will be clearly

inferior without the described feature (e.g., other unlocking mechanisms leading to more

unintentional unlocks).  I understand that the patents at issue have a much narrower scope

than that presented in Dr. Hauser's study, and as a consequence, the participants are mislead

and biased as to the benefits of the tested features. Given that any study of preferences on

product attributes relies, among others, on an accurate understanding of the tested attributes,

Dr. Hauser's research generates unreliable and irrelevant estimates of consumer willingness

to pay for the features at issue. I describe the issues in more detail below.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

a)  '647 Patent [Links for Structures]

293.    Dr. Hauser presents a description of "Quick Links" [330] that is misleading and irrelevant to

the issues at hand.  As described in Section III.C., the '647 patent describes a feature with

very specific underlying software structure for detecting "structures", "linking actions" to

those "structures", and performing "linked" actions on those detected "structures."[331] In

contrast, Dr. Hauser's description of "Quick Links" does not even attempt to address the core

issue in the case that is how the feature is implemented in the underlying software.

Participants are merely surveyed to ascertain the alleged value of the overall feature without

any regard to the underlying software structure. Moreover, they are not even made aware as

to the role of the underlying software structure. In other words, they were never told that the

issue was not the presence or absence of the "Quick Links" feature. Rather, the consideration

should be given to identical or even similar features on two smartphones that only differed in

the composition of the software providing the feature. Therefore, it is my opinion that Dr.

Hauser's study sheds no light on the core issue at hand, that is the value that consumers place

on any benefits associated with the claimed software structure underlying the feature at issue.

294.    Furthermore, Dr. Hauser's description of the "Quick Links" feature is too broad and

vague to be useful. Dr. Hauser misleads the survey respondents to believe the Quick Links is

---

[330] "**Quick Links.** When you are viewing text on your smartphone (for example in an email), the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder. Without this feature, if you wanted to take various actions, like calling or texting a number, you would have to manually identify and select the exact text that might be data to take actions on." "**Quick Links.** When you are viewing text on your tablet (for example in an email), the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect an email address displayed in an email, and if you press and hold the email address, it will offer you multiple actions such as sending an email to the address or copying the address. Without this feature, if you wanted to take various actions, like sending an email to the address, you would have to manually identify and select the exact text that might be data to take actions on." (*See* Hauser Report, at 35, ¶¶75-76).

[331] *See* ¶¶36-38 of this Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

available through any application that displays text on a smartphone, where in fact only the Browser and Messenger applications are accused on Samsung devices.[332] Furthermore, Dr. Hauser specifically uses an example of detecting a phone number in an e-mail, but e-mail applications are not even accused in this case. I understand that Apple's devices similarly only use the feature embodied by the patent in select applications.[333]

295.    As already mentioned above, Dr. Hauser's description of the available alternative to the Quick Links feature is misleading. The only presented alternative is "to manually identify and select the exact text that might be data to take actions," however, I understand that there are other non-infringing alternative available to Samsung. ███████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████ ██ ████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ ██

296.    In summary, given the many issues described above, any estimates generated by Dr. Hauser's research related to the '647 patent should be deemed unreliable, misleading and irrelevant to the issues at hand.

---

[332] *See* ¶¶36-38 of this Report.
[333] Mowry Report, at 116, ¶301.
[334] Jeffay Report, at 284-288, ¶¶496-503.
[335] Jeffay Report, at 284-288, ¶¶496-503.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

b)   '959 Patent [Unified Local & Internet Search]

297.   Dr. Hauser presents a description of "Unified Search"[336] that is misleading and irrelevant to the issues at hand.  As described in Section III.C., the '959 patent describes a feature with very specific underlying functionalities of employing multiple 'rule of thumb' search algorithms and locating information on the phone (local files) and on the Internet.[337] In contrast, Dr. Hauser's description of "Universal Search" does not accurately address the core issue in the case that is how the feature is implemented in the underlying software. For example, Dr. Hauser does not clearly define which "sources of information" the Universal Search feature applies to. For example, participants are not made aware that searching through music files and contacts saved <u>locally</u> on a smartphone ("local" search only) is not infringing.[338] Similarly, searching Wikipedia and Ask.com on the internet at the same time ("remote" search only) is not infringing. Thus, survey participants may be erroneously evaluating Universal Search for multiple "local" only searches; and/or multiple "remote" only searches, and/or multiple "local" and "remote" searches, instead of focusing on just the accused functionalities.

298.   Similarly, Dr. Hauser does not clearly define the "different rules of thumb" that the Universal Search relies on. For example, Dr. Hauser fails to define what a rule of thumb is in the first place. He further biases respondents towards thinking that rules of thumb produce

---

[336] "**Universal Search.** Universal Search lets you use a single search to find information from different sources of information, for example data stored on your smartphone [tablet] as well as information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find good results tailored to each source. For example, when you type "George" in a single search box, the feature searches the Internet for "George," which might yield web pages about George Washington, and at the same time searches for "George" stored on your smartphone [tablet], which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files. Without Universal Search, you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application." (*See* Hauser Report, at 34, ¶74).
[337] *See* ¶¶39-40 of this Report.
[338] *See* ¶¶39-40 of this Report.

"good results tailored to the search," or that if there were no rules of thumb the results showed in the animation would not appear for the user. Additionally, participants are not made aware that the feature requires having two or more rules of thumb for searching information on the device (i.e., local storage media) *and* the Internet.[339]

299.    In summary, it is completely unclear what survey participants have in mind when evaluating the specific ways in which the searches are conducted, the specific locations of searches, and moreover, what in their mind constitutes good results.

300.    Furthermore, Dr. Hauser does not provide the survey participants with a clear indication of which applications on accused devices can be searched using the specific method outlined in the patent. It is noteworthy, that while Google Quick Search Box (recently rolled into a Google Now application) is accused on Samsung accused devices, ████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ ██ Survey participants are not made aware that the Universal Search feature in Dr. Hauser's study relates to Google Quick Search Box.

301.    Dr. Hauser's description is further misleading survey participants to believe that the only alternative to the specified Universal Search feature is for the user "to separately search each information source." As a result, it is possible, for example, that survey participants are under the impression that each application stored locally, e.g., Contacts, Calendar, Music Files, Photos, etc., has to be searched one at a time by going into the app and typing the entry from scratch in the search window of each of the apps.

302.    In contrast, I understand that there various alternatives that are available to Samsung. ██

---

[339] *See* ¶¶39-40 of this Report.
[340] *See* ¶¶39-40 of this Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

*303.*   In summary, given the many issues described above, any estimates generated by Dr.

Hauser's research related to the '959 patent should be deemed unreliable, misleading and

irrelevant to the issues at hand.

c)   '414 Patent [Asynchronous Data Synchronization]

*304.*   Dr. Hauser presents a description of "Background Syncing"[344] that is misleading and

irrelevant to the issues at hand. As described in Section III.C., the '414 patent describes a

very specific implementation of the synchronization procedure that relates, among others, to

having a non-synchronization and a synchronization processing thread, synchronizing two

---

[341] Rebuttal Expert Report of Martin Rinard, Ph.D. Regarding Infringement of Claims 24 and 25 of U.S. Patent No. - 6,847,959, September 13, 2013, ("Rinard Report"), at 128-129, ¶¶320-324.

[342] Rinard Report, at 125-127, ¶¶314-319.

[343] Rinard Report, at 134-138, ¶¶332-341; 74-75, ¶ 188; 80-81, ¶¶ 201-202.

[344] "**Background Syncing**. The Background Syncing feature allows you to continue to use an app while data related to that app that is stored on your smartphone [tablet] synchronizes with data stored elsewhere, such as on a remote computer. For example, you can access and edit data, such as the list of contacts on your smartphone [tablet], even as your phone [tablet] is sending data for those contacts to your work computer. Without this feature, you would have to wait to use an app, for example the contacts app, while the data for the app is synchronizing with a remote computer, and that wait may be long or short." (*See* Hauser Report, at 34.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

databases, and *concurrently* executing the two threads.[345] Similar to the descriptions of other features at issue, Dr. Hauser's description of "Background Syncing" does not even attempt to describe the specific implementation of the synchronization procedure. Participants are merely surveyed to ascertain the alleged value of the general ability to synchronize data without experiencing a pause in the phone's responsiveness. The survey does not take into account the correct scope of the claims or the functionality actually accused by Apple.

305.    Instead of accurately presenting the underlying required functionalities of the syncing feature, Dr. Hauser presents overly broad and vague descriptions that are likely to mislead participants as to the benefits and functions of the feature. Importantly, the participants may think that the described synchronization application applies to instances where synchronization takes place while the app is not running. As is evident from the required implementation of the patented invention, such basic synchronization procedure is not embodied under the claims of the patented inventions, as the invention applies only to synchronization of data while the app is being used.[346]

306.    Additionally, Dr. Hauser does not clearly define which app or apps the Background Syncing feature applies to and participants may be misleadingly evaluating the procedure as it relates to any app on a smartphone. In contrast, the accused feature on accused Samsung devices is narrowly defined as relating to "Exchange calendar, Exchange contact, Exchange mail, Google calendar, Google contact and Gmail data between the Mail, Calendar, Contacts and Gmail applications and an Exchange or Google servers."[347]

307.    Dr. Hauser's description is further misleading survey participants to believe that the only

---

[345] *See* ¶¶41-42 of this Report.
[346] *See* ¶¶41-42 of this Report; Chase Report ¶ 52.
[347] *See* ¶¶41-42 of this Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

alternative to the specified background syncing is for the user to "*have to wait to use an app*" while synchronization is in process. Additionally, Dr. Hauser is very vague about the duration of the wait in saying that the "*wait may be long or short.*"[348]  I understand that Samsung proposed several alternative implementations that are minimally or not at all reflected by Dr. Hauser's description of alternatives.

308.

309.



    d) '721 Patent [Image Unlock]

310. Dr. Hauser presents a too-broad and misleading description of "Image Unlock."[353]  Dr.

---

[348]   (*See* Expert Report of Jeffrey Chase, Ph.D. Regarding Noninfringement of the Asserted Claims of U.S. Patent No. 7,761,414, September 13, 2013 ("Chase Report"), at 22, ¶ 62).

[349] Chase Report, at 68-71, ¶¶184-191.

[350] Chase Report, at 67-70, ¶¶184-191.

[351] Chase Report, at 71-73, ¶¶192-197.

[352] Chase Report, at 71-73, ¶¶192-197.

[353] "**Slide to Unlock.** The Slide to Unlock feature prevents unintentional unlocks by unlocking your tablet only when you slide an image, using one continuous motion, from a specific spot on the lock screen to another specific

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Hauser's description of the design arounds for the Slide to Unlock feature misrepresent the operation of the design arounds and biases the user toward the Slide to Unlock feature.  The description also does not make it clear that the design around may provide visual cues to the user as to where to begin and end their contact, so long as the interaction does not include dragging an image from one predefined location to another.[354]  In addition, the last clause: "which may make unintentional unlocks more likely" is a loaded statement which biases the user against the design around.  Dr. Cockburn admits this is only the case when the minimum distance is small.[355]

*311.*    Dr. Hauser's survey ignores the numerous additional non-infringing options available for unlocking their devices.[356]

### e)   '172 Patent [Word Recommendations]

312.    Dr. Hauser presents a too broad, vague, and incomplete description of the accused functionality related to the '172 patent.[357]  Dr. Hauser fails to convey to the survey

---

[354] *See* ¶¶43-44 of this Report.

[355] *See* Expert Report of Saul Greenberg, PH.D Considering Noninfringement of the Asserted Claims of U.S. Patent No. 8,046,721, September 13, 2013 ("Greenberg Report"), at 78, ¶ 203; Cockburn Report, at 103, ¶339.

[356] One of the non-infringing alternatives is the "glass unlock" mechanism that allows a user to touch the touch-sensitive screen at any location and swipe his finger in any direction to unlock the device. The unlock action is visually represented by moving the entire screen in accordance with the movement of the user's swipe. Another alternative is the use of "circle lock" which was released by Samsung around February 17, 2012. In order to unlock a device with "circle lock", the user has to first make contact with any location on the touch screen, upon which a ring and a center circle are displayed. As the user drags the point of contact outward, a sequence of padlock images indicate the process of unlocking. (*See* Greenberg Report, at 207-211, ¶¶ 438-446; at 211-220, ¶¶447-470).

[357] "**Automatic Word Correction.** As you type, your smartphone [tablet] displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. The Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday." Without this feature, pressing space or period would retain your original text, "birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself." (*See* Hauser Report, at 35.)

---

spot on the screen. Without this feature, you would have to unlock your device using other techniques, for example by swiping the lock screen from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely. (*See* Hauser Report, at 36.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

participants three critical elements of the patented invention. First, the required separate box has to contain not just the suggested replacement text, but also the typed text in its original unmodified form.[358] Second, in addition to automatically replacing the typed text with suggested text by pressing a space or a period, the user can replace the typed text with the suggested text by touching the suggested replacement text in the separate box.[359] Third, if needed, the user can touch the original typed text in the separate box to keep the typed text.[360] Without all of these three elements, the accused system is no longer infringing. Thus, Dr. Hauser's description is misleading, because the design around is easily obtained by just removing one of the three elements. Problematically, Dr. Hauser's description of the patented feature would even cover the non-infringing alternative in such a case.[361]

313.    Dr. Hauser's survey ignores the numerous additional non-infringing options available for unlocking their devices.[362]

### 6.  Conclusion

314.    Dr. Hauser's research is not reflective of consumer decision making strategies and the types of devices and device features that they would consider in their purchase decisions. The lack of realism results in unreliable and misleading estimates of value of these features to consumers. My conclusions are supported by my review of the case materials, Apple and

---

[358] *See* ¶¶45-46 of this Report.
[359] *See* ¶¶45-46 of this Report.
[360] *See* ¶¶45-46 of this Report.
[361] Expert Report of Dr. Daniel Wigdor, Considering Noninfringement of the Asserted Claims of U.S. Patent No. 8,074,172, September 13, 2013 ("Wigdor Report"), at 13, ¶42.
[362] One of the alternatives entails the use of the Samsung and Swype input methods that are currently used in the Samsung Galaxy SIII (Model SCH-i535, Software version MB1). In this non-infringing alternative, activating a key on a keyboard associated with a delimiter causes the current character string in the first area to be kept. The "first area" is as an area of the touch screen display that displays a current character string being input by a user with the keyboard. (Wigdor Report, at 78-85, ¶¶147-155). Another non-infringing alternative suggests the use of the Samsung input methods as currently used in Samsung Dart, such that the suggested replacement character string (such as "message" if a user has typed "messaf") is displayed in the first area. (Wigdor Report, at 85-90, ¶¶156-166).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

████ internal market research, academic literature, smartphone and tablet market, and my own consumer research. Furthermore, Dr. Hauser misrepresents the scope of the features at issue, as well as the non-infringing alternatives to the features. The issues outlined above lead to estimates that are irrelevant for the issues at hand.

### B. *The Evidence Presented in Dr. Vellturo's Expert Report that the Accused Functionalities Drive Demand is Misleading, Irrelevant and Insufficient*

315.    Dr. Vellturo argues that "user experience and ease of use are of critical important to the demand for both Apple and Samsung products" and that the patented inventions make a "core contribution to the ease of use." Dr. Vellturo then concludes that this "demonstrates demand for the patented inventions."[363] I wholeheartedly disagree with Dr. Vellturo's assertions, as described in more detail below.

316.    My review of case documents and existing consumer research indicates that there is plenty of evidence to show that "ease of use" is ambiguous, in that it is subject to the consumer's own interpretations and experiences with a device, and that it may consist of hundreds of features. For example, Apple's Director of Consumer Research, Mr. Rangel said in his deposition that, "[t]here's probably hundreds of features on an iPhone that make it easy to use"[364] and that "[e]ase of use on our phones is everything about it, right. It's how you hold it. It's how you operate it. It's the fluidity of moving from one screen to another. It's the integration of the applications. It's everything."[365] Furthermore, Mr. Rangel testified that Apple has never researched the components of ease of use and how valuable each of those

---

[363] Vellturo Report, at 60, ¶162.
[364] Deposition of Arthur Rangel, June 25, 2013 ("Rangel Deposition"), at 43:16-17.
[365] Rangel Deposition, at 133:18-25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

components is relative to each other.[366]

317.    Similarly, Steven Sinclair, Apple's iPhone Product Marketing Manager, testified that all of a smartphone's features are associated with ease of use.[367] He elaborated that most features contribute positively to ease of use, but some contribute negatively.[368] Furthermore, Mr. Sinclair indicated that he has never seen a study that "[broke] down features in a way that tie[s] directly to ease of use," partly because "ease of use is…an attribute of every feature."[369] Another Apple executive, Greg Joswiak, Apple's VP of Worldwide iPod, iPhone, and iOS Product Marketing, declined to list the features that makeup ease of use because he would not be able "to even scratch the surface."[370] Given the hundreds of attributes and features on a device, as confirmed by Apple executives, it would be practically impossible to know the relative contribution of features at issue to ease of use.

318.    One Apple document characterizes "ease of use" as ease of learning, navigation ease, ease of the ecosystem:

> *Ease of learning: Taking into account both initial orientation and the learning of new features, owners view iPhone as easy to learn.*
>
> *Navigation ease: The navigation is fluid and not menu-based; nothing is many levels deep. This results in easy feature discovery for users.*
>
> *Ease of the ecosystem: Beyond the phone itself, there is an ease associated with being an owner of an Apple product. Apple provides superior service, tutorials and learning materials, and smoothly-running product and software systems. The total experience of the brand is a big part of ease of use, over and above the phone: "They take care of me."[371]*

319.    ███████████████████████████████████████████████████

---

[366] Rangel Deposition, at 43:12-21.
[367] Sinclair Deposition, at 52:2-5.
[368] Sinclair Deposition, at 52:6-8.
[369] Sinclair Deposition, at 47:20-22.
[370] Joswiak 2013 Deposition, at 23:14-20.
[371] Memo. "Key findings from iPhone owners qualitative sessions," APLNDC0002420480-84, at 82-83.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████ However, eye tracking data reveals that users do

not focus on the correct icons/buttons to solve a given task on the iPhone, and they perform

more false interactions with the iPhone in trying to see information about a missed call than

with the Samsung Galaxy S2. ██████████████████████████████████████

████████████████████ █████████ In other words, the perception of ease of use does not

seem to correlate with objective indicators of performance like the number of correct

interactions in a well-defined task.

320.     Third party research also shows that users do not appreciate even critical differences

between platforms, and perceptual differences are linked to superficial features such as

navigating between applications while features/benefits such as memory and resource

management are less visible.[373]

321.     In summary, Dr. Vellturo provided no evidence to support his point that the patented

inventions make a "core contribution" to ease of use. Without such evidence, his claim is

irrelevant and misleading.  In addition to his discussion of ease of use, Dr. Vellturo purported

to provide patent-by-patent evidence "that shows the significant contribution to demand for

Apple and Samsung devices provided by the patented features."[374] I reviewed this evidence

and find it misleading, irrelevant, and/or insufficient, as discussed in detail below.

1.  **'647 Patent [Links for Structures]**

**322.**     Dr. Vellturo's view and description of the accused functionality related to the '647 patent

---

[372] ████████████████████████████████████████████████████████
[373] Smartphone Study – Gravitytank collaborates with Media Arts Lab, June 2011 (APLNDC630-0000131841-84 at 74).
[374] Vellturo Report, at 61, ¶165.

is too broad.  Dr. Vellturo does not recognize in his analysis that Apple's expert and Dr.

Mowry contends that the '647 patent covers only a system that presents the user with

multiple options when it detects a data structure, and thus discusses a function that Apple

does not say practices the patent.

323.     Since Dr. Vellturo's sources and arguments are contrary to Apple's contentions about the

'647 patent and address an unaccused function, examples of Dr. Vellturo's misrepresentation

of the '647 patent abound.  He relies on the testimony of various witnesses, none of whom

provide evidence related to the '647 patent.  For example, Dr. Vellturo cites a deposition of

Greg Joswiak as evidence that identifying data structures is important to consumers through

ease of use.  However, in that deposition, Mr. Joswiak refers to the functionality as "dialing a

number [is] as simple as tapping the number…and not having to always go to a dialer and

type in that number."[375]   The functionality that Mr. Joswiak is describing is not covered by

the '647 patent according to Apple, and it has, in fact, been incorporated in Samsung phones

for almost a decade.  Dr. Vellturo also relies on numerous Apple- and Samsung-related

documents to substantiate the value of non-'647-patent-related data structure linking.  Dr.

Vellturo quotes Steve Jobs in unveiling the iPhone, who showed he could "make calls by

simply tapping on a phone number."[376]   Tapping on a phone number to make a call is not

covered by the '647 patent according to Apple's interpretation of the patent as well as its

accusations in this case.

## 2.   '959 Patent [Unified Local & Internet Search]

324.     Dr. Vellturo argues that the 'universal search' functionality of the '959 patent is a key

---

[375] Joswiak 2012 Deposition, at 34:17-20.
[376] Vellturo Report, at 64, ¶179.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

factor in the popularity of Siri.  He writes, without citation to experts or research, that "[a]n interactive voice-based personal assistant…is of *no value* if it cannot find the information the user seeks."[377]  In contrast, Apple's own marketing research presupposes that Siri's valuable features include  "place a call", "send texts", "set reminders," "set an alarm," "schedule a meeting," and "send an e-mail."[378]

325.    As an initial matter, Apple's technical expert, Dr. Snoeren puts forth no opinion that Siri practices the asserted claims—claims 24 and 25 of the '959 patent.  Dr. Snoeren only puts forth an opinion that Siri practices an unasserted claim (claim 34)—which does not require searching a plurality of locations which include the Internet and local storage media.  There is thus no expert opinion in the record that Siri provides the purported benefits Dr. Vellturo cites for the '959 patent—simultaneously searching remote and local sources of information using a plurality of heuristics. █████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████  ████████  ██████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████  █

326.    █████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████    Most of Dr. Vellturo's evidence concerns the value of Siri rather than the value of the alleged invention contained in claims 24 and 25 of the '959 patent.  In  the "task-based interface" description of Siri, Apple market research surveys consumers on the usage of

---

[377] Vellturo Report, at 70, ¶193 (emphasis added).
[378] US iPhone 4S Siri Data from the Apple Customer Pulse, January 2012 (APLNDC630-0000149086 – 97, at 92)
[379] ██████████████████████████
[380] ██████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

many of the tasks that Siri can perform, such as "place a call", "send texts", "find information," "set reminders," "check the weather," "set an alarm," "get directions," "find a contact," "schedule a meeting," "send an e-mail," "track your stocks," and "others." [381]   *None* of these features depends crucially on Siri's ability to search simultaneously local and remote databases using multiple, different heuristics.  As noted already, some of them do not relate to information retrieval at all.  The others, such as "track your stocks" and "find a contact," can be linked to a single database in order to perform their basic function.  "Find Information" is the closest thing to Unified Local & Internet Search described in this document, but it is not defined.  Even in the event that generically "finding information" relies heavily on searching local and remote databases, many viable alternative designs exist allowing the user to choose whether to search locally or remotely.  In summary, Dr. Vellturo argues for the most part that Siri as a whole is of value, but he does not even attempt to link the value of Siri to the value of performing simultaneous searches of both local and remote databases using multiple, different heuristics

327. 

---

[381] US iPhone 4S Siri Data from the Apple Customer Pulse, January 2012 (APLNDC630-0000149086-97, at 92).
[382] Vellturo Report, at 74, ¶202.
[383] SAMNDCA10182539-726, at 609.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

328. ███████████████████████████████

329. ███████████████████████████████

███████████ This does not support the much more narrow proposition that the alleged invention contained in claims 24 and 25 of the '959 patent is a "core feature" of Android—or a feature at all.

330.     In the instances where Dr. Vellturo relies on consumer surveys, the surveys are not relevant to the narrowly defined scope of the accused functionality.  For example, Dr. Vellturo writes "[a]n iPhone 4S user study identifies the search capabilities accessed through Siri as an important contributor to end-user satisfaction with the feature. ███████████

███████████████████████████

---

[384] Vellturo Report, at 71, ¶199.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████[385] Not only is it unclear

that these users make use of functionality covered by the '959 patent, since "finding

information" could easily be made up of separate local and remote searches, but it's also

unclear if they're satisfied with that particular functionality, much less if it was a factor

considered in their purchasing decision.

331.    Dr. Vellturo also cites overly-broad and irrelevant public sources as supportive of the

claim that Unified Internet & Local Search is of value to consumers.  For example, he cites a

*Forbes* article: "Industry observers have highlighted Siri's ability to effectively search

multiple sources of information…One observer, writing in *Forbes* magazine, found that

while 'many consider [Siri] the best voice recognition application in history,' 'its potential

really lies in its ability to revolutionize the way we search the Internet, answer questions and

consume information."[386]  Dr. Vellturo's sources say *nothing* about search multiple sources

of information simultaneously, let alone searching multiple sources some local and some

remote using multiple heuristics.  This lack of evidence is in accord with Apple's technical

expert's opinion, who similarly puts forth no opinion that Siri searches multiple sources,

including the internet and local storage, using a plurality of heuristics.  Instead, according to

Apple's, expert, Siri uses different technology contained in unasserted claim 34, which does

not contain any requirement to search local storage and the Internet simultaneously.  In

reading the Forbes article, I came away with the distinct impression that the author's

argument was that Siri is a threat to Google's dominant internet search business, not that

Siri's ability to search local and remote databases simultaneously using multiple heuristics

---

[385] Vellturo Report, at 71, ¶196.
[386] Vellturo Report, at 72, ¶198, citing "Google Isn't 'Leveraging Its Dominance,' It's Fighting to Avoid Obsolescence," Mar. 12, 2012, APLNDC630-0000149197, at 197.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

was the threat.  The second paragraph introduces the topic with a strong focus on Internet search: "This incredible pace of innovation is seen throughout the Internet, and since Google's public disclosure of its Federal Trade Commission antitrust investigation just this past June, there have been many dynamic changes to the landscape of the Internet search market. And as the needs and expectations of consumers continue to evolve, Internet search must adapt – and quickly – to shifting demand."[387]

332.    Finally, Dr. Vellturo cites an internal Samsung document that purportedly shows a "torrent of negative public reaction that ensued when Samsung temporarily removed the ability to search locally from its devices as a result of the preliminary injunction in this case."[388] ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████[389] Furthermore, expressing their concern with respect to the removal of the feature is not in itself an indicator that the '959 patent drives consumer demand.   Indeed, Dr. Vellturo cites no evidence that sales of these devices decreased when Samsung temporarily removed the ability to search locally from its devices.  Similarly, there is no evidence that consumers who purchased these devices attempted to return them after learning that Samsung temporarily removed the ability to search locally from its devices.

---

[387] "Google Isn't 'Leveraging Its Dominance,' It's Fighting to Avoid Obsolescence," Mar. 12, 2012, APLNDC630-0000149197, at 197.
[388] Vellturo Report, at 74, ¶203.
[389] "Campaign Tracking Report, Samsung Galaxy S III, Analysis of 7/09/2012 – 7/15/2012," July 18, 2012, SAMNDCA630-07517049, at 065.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### 3.  '414 Patent [Asynchronous Data Synchronization]

333.    Dr. Vellturo's description of Background Syncing patent suffers from the same issues as outlined in my critique of Dr. Hauser's report. Furthermore, I find that Dr. Vellturo's purported evidence of the alleged importance of the Patented Invention is misleading and irrelevant since it primarily pertains only to the importance of general data synchronization between devices to consumers and not the required implementation of the patented invention.

Furthermore, Dr. Vellturo cites to Michael Tchao, Apple's Vice-President of Product Marketing for the iPad, to support his claim that "allowing access to data on applications while that data is being synchronized can significantly improve user experience."[391] However, Dr. Vellturo conveniently neglects to mention that Mr. Tchao clarified in his deposition that: "I—obviously, the ability to sync is – is very important and – but specifically background syncing, I'm not certain."[392]

334.    In addition to citing evidence that pertains to a much broader functionality than the scope of the alleged patented invention, much of Dr. Vellturo's evidence relates to ▮▮▮▮

---

[390] Vellturo Report, at 61, ¶167, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 86:13-87:2.

[391] Vellturo Report, at 61, ¶168. Dr. Vellturo quotes Mr. Tchao as saying that "the ability to do background syncing is 'increasingly important in devices such as the iPad'" and "'When [Apple] didn't have that background syncing, we received more negative comments about the time it took to sync that information." (Deposition of Michael Tchao, Transcript, June 28, 2013 ("Tchao Deposition"),, at 129:2-8, 129:12-15).

[392] Tchao Deposition, at 128:22-24. Note, that Mr. Tchao defines background syncing as "the ability…to provide syncing while you're doing something else," "that the device…continue to be usable while the syncing is taking place," and "the syncing typically happens across multiple applications…at the same time,"  which is a much broader definition than the syncing defined by the '414 patent. (Tchao Depo, at 129:2-3, 129:6-8, 130:1-2.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



### 4.   '721 Patent [Image Unlock]

335.   Dr. Vellturo's description of the 'Image Unlock' patent suffers from the same issues as outlined with respect to Dr. Hauser's report.

336.   [redacted]

---

[393] Vellturo Report, at 62, ¶170.

[394] [redacted]

[396] Vellturo Report, at 84, ¶233.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



337.    Dr. Vellturo relies on the deposition of Phil Schiller to attempt to substantiate his claim that slide to unlock is of value to consumers.  He quotes from the Schiller deposition that slide to unlock is a "very important feature,"[398] but he does not finish the quotation: "I think slide to unlock is very important, and it's important because it's part of the whole ease of use, which is an experience.  I chalk up ease of use to one of the most important parts of an experience, but ease of use, I talk about the whole ease of use of the product, not one feature alone…"[399]  Schiller's point is more broadly about the value of ease of use – he does not attempt to decompose the value of ease of use into the value of sub-features including slide to unlock.[400]

338.    Dr. Vellturo cites the deposition of Greg Joswiak in April, 2012 to support that claim that slide to unlock was a "core part" of the iPhone experience.[401]  Mr. Joswiak discussed the fact that Apple's advertisements started with "a finger sliding to unlock [the phone]"[402]  However, in his 2013 deposition, Mr. Joswiak claims that he cannot say whether or not the ripple effect, an alternative to slide to unlock, is any less easy to use relative to slide-to-unlock.[403]  Dr. Vellturo cites no direct evidence, either from consumer surveys or consumer value experts, that establishes that device unlocking is a driver of demand, let alone that the

---

[397] Greenberg Report, ¶¶ 66-74; 205; 438-440.
[398] Vellturo Report, at 78, ¶214.
[399] Schiller Deposition, at 196:4-9.
[400] In response to a direct question about whether or not consumers buy iPhones because of the slide to unlock feature, Schiller equivocates by saying "I believe customers buy for ease of use, and slide to unlock is part of that ease of use.  So they buy for features like…slide to unlock that contribute to the ease of use of the product.  (Schiller Deposition, at 196:23-197:2).
[401] Vellturo Report, at 78, ¶214.
[402] Joswiak 2012 Deposition, at 26:22-25.
[403] Joswiak 2013 Deposition, at 43:25-44:7.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

narrow specification of device unlocking covered by the '721 patent is a driver of demand.

### 5.   '172 Patent [Word Recommendations]

339.    Dr. Vellturo's description of the 'Word Recommendations' patent suffers from the same issues in Dr. Hauser's report.  Notably, the patent covers only a narrow, specific implementation of what is commonly known as auto-correct.

340.    Much of Dr. Vellturo's evidence relates to internal company commentary of the engineering/design team and does not provide a meaningful link between the accused functionality and consumer demand. Furthermore, the internal company commentary is generally not relevant to the narrowly defined scope of the feature-at-issue. ███████████ ████████████████████████████████████████████████████████ ████████████████████████████ █ Dr. Vellturo neglects to mention that the '172 patent only covers a narrow, specific implementation of auto correction functions and that many non-infringing auto correction functions were available to Samsung.

341.    █████████████████████████████████████████████ ███████████████ ███████ ████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████

342.    In some cases, Dr. Vellturo grossly misrepresents the material that he is citing.  For example, Dr. Vellturo cites correspondence between █████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████

---

[404] Vellturo Report, at 89, ¶250████████████████████████████████████████, SAMNDCA630_04335717, at 797.
[405] Vellturo Report, at 89-90, ¶251.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████

████████████████████████████████████████ ██ ████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████ ██ ██████████████████████████

██████████████████████████████████ The quotation has little relevance in

valuing the '172 patent.

343.    Dr. Vellturo also relies on the deposition of Steven Sinclair in claiming the value to

consumers of the '172 patent is high.  However, Mr. Sinclair does not opine on the value of

the specific implementation of auto-correct embodied in the '172 patent.

344.    Similarly, Dr. Vellturo mischaracterizes the deposition of ████████████████████

██████████████████████████████████████████████████

███████████████████████ ██ ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ ██

345.    Dr. Vellturo cites no direct evidence, either from consumer surveys or consumer value

---

[406] Vellturo Report, at 90, ¶252 citing Email, dated Aug. 3, 2012, NUANCE 000011-48, at 018.
[407] Email, dated Aug. 3, 2012, NUANCE 000011-048, at 018
[408] Vellturo Report, at 89, ¶251.
[409] Hung Deposition, at 149:10-17.

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

experts, that establishes a link between consumer value and auto correction in general, let alone a link between consumer value and the narrow specification of auto correction covered by the '172 patent.

### 6.  Conclusion

346.   Based on all the materials I reviewed, I do not find any credible evidence that the Apple patents at issue drive consumer demand for Samsung smartphones and tablets.  Indeed, these patents do not even qualify to be a "feature/attribute" (such as "size/weight," "connectivity," etc.) upon which consumers evaluate these products in purchase decisions.  These are only five of the innumerable sub-features that are associated with the broader attributes, such as ease of use or ease of navigation using a touchscreen, that market research tests.  I conclude that consumers base their decisions on a subset of main features/attributes (rather than the set of all features and sub-features) in smartphone and tablet markets, and that the accused functionalities do not drive consumer demand for Samsung smartphones or tablets.

### C.  *Consumers Do Not Base Purchase Decisions on Functionalities Associated with the Patents at Issue*

347.   The Apple and ███████ internal market research and other materials that I have reviewed do not attempt to directly study the effect of such narrowly defined functionalities as those of the accused features on consumer choice (and, hence, demand).  In fact, Arthur Rangel, Director of Market Research and Analysis at Apple, stated that Apple has not surveyed consumers or tested consumer reactions specifically on the features at issue, such as 'link for structures' feature, the 'word recommendation/text correction/auto correct' feature, the 'slide to unlock' feature, the 'uniform search' features, and the 'missed call management

148

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

feature'.[410]  Similarly, per Senior Manager of Consumer Insights and Analytics at Samsung,

348.    My own consumer research shows that consumers do not review every single features

and subfeature of the device.

349.    Given the nature of the accused functionalities, the complexity of consumer decision

making, and the lack of information on the features at issue in product information, it is clear

that consumers do not take the individual accused functionalities into account when making

their smartphone and tablet choices.

---

[410] Rangel Deposition, at 8:8-14:22.
[411] Benner Deposition, at 119:5-6.
[412] Deposition of Nick DiCarlo, Transcript, June 26, 2013 ("DiCarlo Deposition"), at 180:17-20.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

350.    I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


_____

Signed on September 13, 2013 at New York, New York

**Exhibit 2: Count of Available Devices and Device Attributes for Smartphones and Tablets**

| | Wireless Carriers | | | | Retailers | | | | | | Reviewers | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | AT&T [a] | Verizon [b] | T-Mobile [c] | Sprint [d] | Amazon [e] | Best Buy [f] | Newegg [g] | RadioShack [h] | Target [i] | Walmart [j] | CNET [k] | gdgt [l] | The Verge [m] | PC World [n] |
| **Smartphones** | | | | | | | | | | | | | | |
| No. of Devices (2Yr-Contract) | 27 | 32 | 25 | 25 | 104 | 181 | 74 | 75 | 74 | 104 | N/A | N/A | N/A | N/A |
| No. of Devices (Unlocked) | 3 | 32 | N/A | 4 | 125 | 78 | 104 | 54 | 74 | 60 | N/A | N/A | N/A | N/A |
| No. of Attributes | 28 | 30 | 29 | 27 | N/A | 51 | N/A | N/A | 21 | 21 | 5 | 92 | 62 | 34 |
| **Tablets** | | | | | | | | | | | | | | |
| No. of Devices (WiFi Only) | 0 | 0 | 0 | 0 | 166 | 18 | N/A | 51 | N/A | 1 | N/A | N/A | N/A | N/A |
| No. of Devices (Carrier Enabled) | 11 | 7 | 1 | 3 | 8 | 56 | N/A | 13 | N/A | N/A | N/A | N/A | N/A | N/A |
| No. of Attributes | N/A | N/A | N/A | N/A | N/A | 37 | 28 | 28 | 30 | N/A | 3 | 58 | 49 | 30 |

**Notes:**

[1] The count of smartphones is based on smartphones that when filters allowed are in stock/availabile online or in-store, new, unlocked or under a 2-year contract. Unlocked smartphones include both "month-to-month contract" or "no contract" smartphones.

[2] The count of tablets is based on tablets that when filters allowed are in stock/availabile online or in-store, new, WiFi or enabled for carrier compatible.

[3] The count of smartphone attributes is from side-by-side comparison websites for Apple iPhone 5, Samsung Galaxy SII (Epic 4G Touch or other versions), SIII, SIV and Note II, if available.

[4] The count of tablet attributes is from side-by-side comparison websites for Apple iPad 4th Gen, Apple iPad Mini, Samsung Galaxy Note 10.1, and Samsung Galaxy Tab 2 10.1, if available.

[5] The device counts for Amazon and Best Buy are based on only devices selling directly though these retailers.

**Sources:**

[a] "AT&T Smartphone and Tablet Store Fronts and Side-by-Side Comparisons," AT&T, accessed June 26, 2013, http://www.att.com.

[b] "Verizon Smartphone and Tablet Store Fronts and Side-by-Side Comparisons," Verizon, accessed June 26, 2013, http://www.verizonwireless.com.

[c] "T-Mobile Smartphone and Tablet Store Fronts and Side-by-Side Comparisons," T-Mobile, accessed June 27, 2013, http://www.t-mobile.com.

[d] "Sprint Smartphone and Tablet Store Fronts and Side-by-Side Comparisons," Sprint, accessed June 27, 2013, http://shop.sprint.com.

[e] "Amazon Smartphone and Tablet Store Fronts," Amazon, accessed June 27, 2013, http://www.amazon.com.

[f] "Best Buy Smartphone and Tablet Store Fronts and Side-by-Side Comparisons," Best Buy, accessed June 27, 2013, http://www.bestbuy.com.

[g] "Newegg Smartphone and Tablet Store Fronts and Side-by-Side Comparisons," Newegg, accessed June 27, 2013, http://www.newegg.com.

[h] "RadioShack Smartphone and Tablet Store Fronts and Side-by-Side Comparisons," RadioShack, accessed June 27, 2013, http://radioshackwireless.com.

[i] "Target Smartphone and Tablet Store Fronts and Side-by-Side Comparisons," Target, accessed June 27, 2013, http://www.target.com.

[j] "Walmart Smartphone and Tablet Store Fronts and Side-by-Side Comparisons," Walmart, accessed June 27, 2013, http://wireless.walmart.com.

[k] "CNET Smartphone and Tablet Side-by-Side Comparisons," CNET, accessed June 5, 2013, http://reviews.cnet.com/4504-6454_7-0.html?id=35003062&id=35022502&id=35326378&id=35627724&id=35426722.

[l] "gdgt Smartphone and Tablet Side-By-Side Comparisons," gdgt, accessed June 6, 2013, http://gdgt.com/compare/cellphones/70327+80677+74931+77140+69942/.

[m] "The Verge Smartphone and Tablet Side-by-Side Comparisons," The Verge, accessed June 5, 2013, http://www.theverge.com/products/compare/2462/5588/6927/6024/6116.

[n] "PC World Smartphone and Tablet Side-by-Side Comparisons," PC World, accessed June 12, 2013, http://www.pcworld.com/product/compare?ids=928347&ids=1187162&ids=1250229&ids=1250271.

**Exhibit 6: Smartphone Attributes Available on "Tiles" of Select Smartphones from On-Line Stores**

| Attribute | Number of Select Smartphones with Attributes Displayed on "Tile"[2] | | | | | | | | | | Total |
| | AT&T [a] | Verizon [b] | T-Mobile [c] | Sprint [d] | Amazon [e] | Best Buy [f] | Newegg [g] | Radio Shack [h] | Target Mobile [i] | Walmart Wireless [j] | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Phone Image | 4 | 3 | 3 | 3 | 4 | 5 | 3 | 3 | 3 | 4 | **35** |
| Phone Name | 4 | 3 | 3 | 3 | 4 | 5 | 3 | 3 | 3 | 4 | **35** |
| Phone Price | 4 | 3 | 3 | 3 | 4 | 5 | 3 | 3 | 3 | 4 | **35** |
| Screen Size | | 2 | 1 | 3 | 4 | 4 | 3 | 3 | 3 | 2 | **25** |
| Carrier Availability | | | | | 4 | 5 | 3 | 3 | 3 | 4 | **22** |
| Camera Megapixels | | 1 | 3 | 3 | 4 | 3 | 2 | 2 | 1 | 2 | **21** |
| OS | | 1 | 2 | 3 | 4 | 5 | 1 | | 1 | 2 | **19** |
| Network | 4 | 3 | | | | 4 | 1 | 2 | 2 | 2 | **18** |
| User Review/Rating | 3 | | 3 | 3 | 4 | 5 | | | | | **18** |
| Shipping Availability | | | | | 4 | 5 | 3 | | | 4 | **16** |
| Battery Life/Talk Time | | 1 | | 3 | | | 1 | 1 | 1 | 1 | **8** |
| Processor/Speed | | 1 | 1 | | 4 | 1 | | | 1 | | **8** |
| Memory | 2 | 1 | 1 | 1 | | 1 | | | | | **6** |
| Color Availability | 4 | 1 | | | | | | | | | **5** |
| Model/SKU number | | | | | | 5 | | | | | **5** |
| Kevlar and Corning Gorilla Glass | | | | | | | 1 | 1 | 1 | 1 | **4** |
| Touch/Slide/Keypad | | | 1 | 3 | | | | | | | **4** |
| Wi-Fi / Ultrafast wireless | | | 1 | | | | 3 | | | | **4** |
| Bluetooth | | | | | | | 3 | | | | **3** |
| HTC BlinkFeed | | | 1 | | | | | | 1 | 1 | **3** |
| HTC Zoe | | | 1 | | | | | | 1 | 1 | **3** |
| Panorama Picture | | 1 | 1 | | | | | | | 1 | **3** |
| 2013 Consumer Reports Recommended Model | | | | | | | | | 1 | 1 | **2** |
| Global Ready | | 2 | | | | | | | | | **2** |
| HTC BoomSound | | | 1 | | | | | | 1 | | **2** |
| Audio | | | | | | 1 | | | | | **1** |
| Color touch Screen | | | | | | 1 | | | | | **1** |
| Exclusive from Verizon | | 1 | | | | | | | | | **1** |
| Internet and e-mail capabilities | | | | | | 1 | | | | | **1** |
| Lightning Connector | | | | | | 1 | | | | | **1** |
| Media Net | | | | | | 1 | | | | | **1** |
| Screen Shape | | | | | | | | | 1 | | **1** |
| Water Proof | | | | | | | | | 1 | | **1** |
| **Average Number of Attribute on "Tiles"** | **6.3** | **8.0** | **8.7** | **9.3** | **10.0** | **12.8** | **8.0** | **7.0** | **9.3** | **8.5** | **Average 8.8** |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 6: Smartphone Attributes Available on "Tiles" of Select Smartphones from On-Line Stores**

**Notes:**

[1] Tiles of Apple iPhone 5, Samsung Galaxy Note II, HTC One, Motorola Droid Razr MAXX HD, Nokia Lumia 920 are reviewed in each source's websites.

[2] The number refers to the count of smartphones for which the attribute appears on its "tile."

[3] Attributes considered in Erdem Research Study 1 are highlighted in gray.

**Sources:**

[a] "AT&T Smartphone Store Front," AT&T, accessed May 2, 2013, http://www.att.com/shop/wireless/devices/cellphones.html?source=IC00ATECS900000CL.

[b] "Verizon Smartphone Store Front," Verizon, accessed May 13, 2013,
http://www.verizonwireless.com/b2c/store/controller?item=phoneFirst&action=viewPhoneOverviewByDevice&deviceCategoryId=1.

[c] "T-Mobile Smartphone Store Front," T-Mobile, accessed May 2, 2013, http://www.t-mobile.com/shop/phones/?shape=smartphones.

[d] "Sprint Smartphone Store Front," Sprint, accessed May 2, 2013,
http://shop.sprint.com/mysprint/shop/phone_wall.jsp?filterString=smartphone&isDeeplinked=true&INTNAV=ATG:HE:Smartphones.

[e] "Amazon Smartphone Store Front," Amazon, accessed May 2, 2013,
http://www.amazon.com/s/ref=wl_nav_left_contract_pointer?ie=UTF8&bbn=2407747011&rh=i%3Amobile%2Cn%3A2335752011%2Cn%3A!2335753011%2Cn%3A2407747
011%2Cp_6%3AATVPDKIKX0DER&pf_rd_m=ATVPDKIKX0DER&pf_rd_s=left-
2&pf_rd_r=1E3F14M86DCHXMB4A9P8&pf_rd_t=101&pf_rd_p=1536856022&pf_rd_i=6290885011.

[f] "Best Buy Smartphone Store Front," Best Buy, accessed May 2, 2013,
http://www.bestbuy.com/site/olstemplatemapper.jsp?id=pcmcat209400050001&type=category&qp=cabcat0800000%23%23-1%23%23-1~~cpcmcat209400050001%23%23-
1%23%23-1~~q70726f63657373696e6774696e6d653a3e313930302d30312d3031~~f1217%7C%7C*&sp=-
bestsellingsort+skuid&remove_facetId=1004&removeLinkFacet=Carrier%24Contract+Options.

[g] "Newegg Smartphone Store Front," Newegg, accessed May 2, 2013,
http://wireless.newegg.com/mobile/?referringdomain=newegg&refcode1=EGG_9999_001_LNav_CellPhoneWService&name=cellphonesservice.

[h] "RadioShack Smartphone Store Front," RadioShack, accessed May 2, 2013,
http://radioshackwireless.com/mobile/?r=radioshack&refcode1=RSK_0000_000_CELLFAM&znt_campaign=Category_CMS&znt_medium=RSCOM&znt_source=CAT&znt_c
ontent=CT4235714.

[i] "Target Mobile Smartphone Store Front," Target Mobile, accessed May 2, 2013, http://www.targetmobilestore.com/content/shop-all/?r=targetmobile.

[j] "Walmart Smartphone Store Front," Walmart, accessed May 2, 2013, http://wireless.walmart.com/content/finder/?r=wm&feature=24.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 7: Smartphone Attributes from Side-By-Side Comparison Website

| Standardized Attributes | AT&T [a] | Verizon [b] | Sprint [c] | T-Mobile [d] | Best Buy [e] | gdgt [f] | Number of Sources | Study 2 Stimulus Complexity |
|---|---|---|---|---|---|---|---|---|
| **Price** | | | | | | | | |
| Price with 2-year Contract | 2-year contract | 2-yr Contract Price | Price | Pay today | Price | Price | 6 | L, M, H |
| Other Price(s) | Your Price | Full Retail Price \| Your Price | | Pay in full today at checkout | Reg Price | Original price | 5 | |
| Discount / Rebate | Online Discount \| Mail-in Rebate via AT&T Promotion Card | Online Discount | | | Special Offers \| Best Buy Cardholder Offers \| Financing | | 3 | |
| **Camera** | | | | | | | | |
| Camera Resolution | Rear-Facing Camera | Camera | Pictures | Camera | Camera Resolution \| Built-in Digital Camera | Camera | 6 | L, M, H |
| Records Video | Video | | Video | | | Camera features | 3 | M, H |
| Secondary Camera | Front-Facing Camera | Camera | | | | Secondary camera | 3 | M, H |
| Focus type | | | | | | Camera features | 1 | |
| **Memory** | | | | | | | | |
| Internal Memory | Internal Memory | Memory | Memory | Memory | | Internal memory \| ROM | 5 | L, M, H |
| Memory Card | Memory Format \| Expandable Memory | Removable Memory | Memory | Removable memory | | Memory card | 5 | L, M, H |
| RAM | RAM | | Memory | Memory | | RAM | 4 | L, M, H |
| **Display** | | | | | | | | |
| Pixel Density | Resolution (pixels) | | Display | | | Pixel density | 3 | M, H |
| Screen Resolution | Resolution (pixels) | | Display | | | Screen resolution | 3 | M, H |
| Screen Size | Display Size (inches) | | Display | | | Screen size | 3 | L, M, H |
| Colors (Display) | Colors | | | | Color Display | | 2 | |
| Screen Type | | | Display | | | Screen type | 2 | H |
| Touch Screen | | | | | Touch Screen | Input type | 2 | H |
| Secondary Screen | | | | | | Secondary screen \| Secondary Screen Resolution \| Secondary Screen Size \| Secondary Screen Type | 1 | |
| **Battery** | | | | | | | | |
| Standby Time | Standby Time (days) | Standby Time | | Standby time | Standby Time | Standby time (max) | 5 | L, M, H |
| Talk Time | Talk Time (hours) | | Talk time | Talk time | Talk Time | Talk time | 5 | L, M, H |
| Battery Type | | Battery | Battery information | | Battery Type | Battery type | 4 | M, H |
| Usage Time | | Usage Time | | | | | 1 | |
| **Size** | | | | | | | | |
| Product Dimensions | Size (inches) | Size | Dimensions | Dimensions | Product Depth \| Product Height \| Product Width | Height \| Width \| Depth | 6 | L, M, H |
| Product Weight | Weight (ounces) | Weight | Weight | Device weight | Product Weight | Weight | 6 | L, M, H |
| **Wireless Capabilities** | | | | | | | | |
| Band and Mode | 4G/LTE \| 3G \| 4G | 4G Technology | 3G \| 4G | 42Mbps \| 3G \| 4G \| LTE \| Supported frequency | Technology Details \| Wireless Capability \| Band and Mode | Comm standard \| GSM type \| GSM bands \| UMTS / HSPA type \| CDMA type \| CDMA bands | 6 | L, M, H |
| Bluetooth | Bluetooth | Bluetooth | Bluetooth profiles | Bluetooth | Bluetooth-Enabled | Bluetooth \| Common profiles | 5 | L, M, H |
| Built-In GPS | | VZ Navigator | GPS Navigation | | Built-In GPS | Location support | 4 | M, H |
| Mobile Hotspot Ready / Tethering capable | | Mobile Hotspot \| Mobile Broadband Capable | Mobile Hotspot | Mobile HotSpot Ready \| Tethering capable | | WiFi mobile hotspot support \| Data tethering | 4 | |
| WiFi | Wi-Fi | Wi-Fi | Wi-Fi | | | WiFi | 4 | L, M, H |
| Global Ready/International | International | Global Ready | | International | | | 3 | |
| Carrier Compatibility | | | | | Carrier Compatibility | Carriers (US) \| Carriers (Canada) | 2 | |
| Data Plan Required | Data Plan Required | | | | Data Plan Required | | 2 | |
| NFC | | Near Field Communications | | | | NFC or RFID payment | 2 | M, H |
| Isis Ready | | Isis Ready | | | | | 1 | |
| UMA Support | | | | | | UMA Support | 1 | |
| Wi-Fi Calling | | | | Wi-Fi Calling | | | 1 | |
| Wi-Fi Encryption | | | | | | WiFi encryption | 1 | |
| **Operating System (OS) and Other Features** | | | | | | | | |
| Mobile Operating System | OS | OS | Operating system | Operating System | Mobile Operating System | Operating system | 6 | L, M, H |
| Mobile Web Browsing | | HTML Web Browser | Web | Web browsing | Internet/Email Capable | Browser | 5 | |
| Supported Email | | Email | Messaging (Email & text) | Supported email \| Email | Internet/Email Capable | Email | 5 | L, M, H |
| Average User/Critic Rating | Rating \| User's Social Rating | | | | Rating | Avg. user rating \| Avg. critic rating \| gdgt score | 3 | |
| Apps (default) | | | Calendar \| Apps & Social Networking | | Phonebook | Apps (default) | 3 | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibit 7: Smartphone Attributes from Side-By-Side Comparison Website

| Standardized Attributes | AT&T [a] | Verizon [b] | Sprint [c] | T-Mobile [d] | Best Buy [e] | gdgt [f] | Number of Sources | Study 2 Stimulus Complexity |
|---|---|---|---|---|---|---|---|---|
| CPU | Processor Type \| Processor Speed | | Qualcomm&reg; Snapdragon&trade; Processor \| Processor | | | CPU \| CPU cores | 3 | M, H |
| Push-to-talk | | Push to Talk | Direct Connect | | | Push-to-talk | 3 | |
| Speakerphone | | Speakerphone | | | Speakerphone | Speakerphone | 3 | |
| Text Messages | | | | Messaging (Email & text) | Text Messaging/Instant Messaging | SMS | 3 | |
| Voice Dial | | Voice Dialing | | | Voice Activated | Voice dial | 3 | M, H |
| Color | | | | | Color Category | Colors | 2 | L, M, H |
| ECO Specs | | ECO Specs | | | | Energy Star compliant \| RoHS compliant \| EPEAT rating | 2 | |
| Local synchronization | | | | Local synchronization | | Sync PIM Data | 2 | |
| Media - Audio | | | | | MP3 Playback Capability | Media playback \| Audio | 2 | M, H |
| Media - Images | | | Pictures | | | Images | 2 | |
| MMS | | | | | MMS | MMS | 2 | H |
| Music | | Music Player | | Music | | | 2 | |
| Phone Style | | | | | Phone Style | Style | 2 | H |
| Phone Type | | | | Type | | Type | 2 | |
| Qwerty Keyboard | | Keyboard | | | QWERTY Keyboard | | 2 | M, H |
| Ring Tone | | | | | Customizable Ring Tones \| Downloadable Ringtones | Custom ringtones \| Sound profiles | 2 | |
| Vibrate Mode / Vibration Alert | | | | | Vibrate Mode \| Vibration Alert | Vibrate mode | 2 | |
| Warranty (Labor/Parts) | | | | | Warranty Terms - Parts \| Warranty Terms - Labor | Mfr. Warranty | 2 | H |
| Antenna | | | | | | Antenna | 1 | |
| Availability Status (Announced/Available/Regions) | | | | | | Availability \| Announced (US) \| Regions Offered | 1 | |
| Changeable Faceplates | | | | | | Changeable Faceplates | 1 | |
| CMAS | | | | CMAS | | | 1 | |
| Device Manufacturer | | | | | | Device Manufacturer | 1 | |
| Downloadable Games | | | | | | Downloadable Games | 1 | |
| Entertainment | | | Entertainment | | | | 1 | |
| External Caller ID | | | | | | External Caller ID | 1 | |
| External Controls | | | | | | External controls | 1 | |
| Flight Mode | | | | | | Flight mode | 1 | |
| FM Transmitter | | | | | | FM Transmitter | 1 | |
| FM Tuner | | | | | | FM Tuner | 1 | |
| GPU | | | | | Graphics | | 1 | |
| HD Voice | | | | HD Voice | | | 1 | |
| Headphone Jack | | | | | | Audio / headset jack | 1 | |
| Hearing Aid Compatible | | | | Hearing aid compatible | | | 1 | |
| Infrared Port | | | | | | Infrared port | 1 | |
| iPhone 5 | | | | | iPhone 5 | | 1 | |
| Java | | | | | | Java | 1 | |
| Kickstand | | | | | | Kickstand | 1 | |
| Media - Video | | | | | | Media playback \| Video \| OTA video | 1 | H |
| Navigation Type | | | | | | Navigation type | 1 | |
| OS Support | | | | | | OS Support | 1 | H |
| Part Number | | | | | Model \| SKU | | 1 | |
| Pictbridge | | | | | | PictBridge | 1 | |
| Ports | | | | | | USB | 1 | |
| Predictive text | | | | | | Predictive text | 1 | |
| Product Line/Model | | | | | | Product Line \| Product Model | 1 | |
| Professional Grade | | | Professional Grade | | | | 1 | |
| Released (US) | | | | | | Released (US) | 1 | H |
| Ruggedized | | | | | | Ruggedized | 1 | |
| Rumored (US Dates) | | | | | | Rumored (US) | 1 | |
| Sensors | | | | | | Sensors | 1 | |
| Speakers | | | | | | Speakers | 1 | H |
| Speed Dialing | | | | | Speed Dialing | | 1 | |
| Sprint ID \| Sprint Zone | | | Sprint ID \| Sprint Zone | | | | 1 | |
| Subscriber Identity | | | | | | Subscriber Identity | 1 | |
| Swype | | | | Swype | | | 1 | |
| T-Mobile TV | | | | T-Mobile TV | | | 1 | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 7: Smartphone Attributes from Side-By-Side Comparison Website**

| Standardized Attributes | AT&T [a] | Verizon [b] | Sprint [c] | T-Mobile [d] | Best Buy [e] | gdgt [f] | Number of Sources | Study 2 Stimulus Complexity |
|---|---|---|---|---|---|---|---|---|
| TTY / TDD | | | | | | TTY / TDD | 1 | |
| TV-Out | | | | | | TV-out | 1 | H |
| Visual Voice Mail | | Visual Voice Mail | | | | | 1 | |

**Notes:**

[1] Smartphone attributes are collected from side-by-side comparison websites for Apple iPhone 5, Samsung Galaxy Note II, HTC One, Motorola DROID RAZR, Nokia Lumia 920, based on availability.

[2] Given the variability in the names of certain attributes across websites (e.g., "Internal Memory" vs. "Memory"), the names of the attributes are standardized in order to facilitate the analysis of common attributes. Also, some attributes were consolidated into other appropriate attributes (e.g. "CPU Cores" into "CPU").

[3] Available smartphone attributes are derived from the side-by-side comparison websites of the top four wireless carriers (T-Mobile, Verizon, AT&T, and Sprint), Best Buy, and gdgt. Note that attribute names may not be identical to those on the source websites, because the same attributes shared different names across sites.

[4] See Exhibit 59 for the list of attributes included in Erdem Research Study 2. Categories here are based of those found in the same exhibit.

**Sources:**

[a] "AT&T Smartphone Side-by-Side Comparison," AT&T, accessed May 24, 2013, www.att.com/shop/wireless/devices/comparephone.html?sku=sku6510405&sku=sku6290312&sku=sku6260384&sku=sku6280720.

[b] "Verizon Smartphone Side-by-Side Comparison," Verizon, accessed May 24, 2013, www.verizonwireless.com/b2c/devicesController/viewCompareDevices.do.

[c] "Sprint Smartphone Side-by-Side Comparison," Sprint, accessed May 24, 2013, http://shop.sprint.com/mysprint/shop/phone_wall.jsp?filterString=smartphone&isDeeplinked=true&INTNAV=ATG:HE:Smartphones.

[d] "T-Mobile Smartphone Side-by-Side Comparison," T-Mobile, accessed May 24, 2013, http://www.t-mobile.com/...vices=4e39df9d-a871-4e1d-a30e-6bff79d6393e,80e3e7c4-8909-4e0f-83e0-92428e73fc0a,7441fc45-8de4-45b9-85ab-934052a7a629&manufacturer.

[e] "Best Buy Smartphone Side-by-Side Comparison," Best Buy, accessed May 24, 2013, http://www.bestbuy.com/site/olspage.jsp?id=cat13504&type=page&pageIdentity=searchDriven&useProductString=true&productString=1218792109231*1218821080734*1218870774830*1218812331323&unProductString=1218904353363*1218904353009*1218690243590*1218690263224*1218904352479*1218786216193*1218792109856*1218789786160*1218814985225*1218904334453*1218792110193*1218686512079*1218672941448*1218686516072*1218413795869*1218410277429*1218671144108*1218904353144*1218419333045*1218414809511*1218904354583*1218414809740*1218503708079*1218414809586*1218789786843*1218846429069*1218759757441*1218789739359*1218433530351*1218686567480*1218434750674*1218434750673*1218433532585*1218789790939*1218870794097*1218792107883*1218817157049*1218759757441*1218817160618*1218814980976*1218814275031*1218688218445*1218612190338*1218716261717*1218531560226&catId=&usc=abcat0800000; http://www.bestbuy.com/...9*mpl305728408*mpl305728453*mpl305728446*mpl306654294*mpl306654287*mpl305728415*mpl305728484&catId=&usc=All+Categories.

[f] "gdgt Smartphone Side-by-Side Comparison," gdgt, accessed May 24, 2013, http://gdgt.com/compare/cellphones/70327+77575+80340+77339+77828/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 9: Reasons for Purchasing an iPhone**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 10: Important Attributes for iPhone Buyers Who Wanted a Specific Attribute or Capability**

| | Percentage of iPhone Buyers by iPhone | | | | |
|---|---|---|---|---|---|
| | iPhone 4 | | iPhone 4S | | iPhone 5 |
| | 2012 | 2013 | 2012 | 2013 | 2013 |

**Important Attributes for Buyers who Wanted a Specific iPhone Attribute or Capability[2]**

**Notes:**

**Sources:**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 11: Importance of Attributes in iPhone Purchase Decision**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBITS 3-6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 3: Interbrand - Best Global Brands**

| Brand | Ranking | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Apple | 49 | 50 | 50 | 43 | 41 | 39 | 33 | 24 | 20 | 17 | 8 | 2 | 1 |
| Samsung | 42 | 34 | 25 | 21 | 20 | 20 | 21 | 21 | 19 | 19 | 17 | 9 | 8 |
| **Related Phone Brands** | | | | | | | | | | | | | |
| Blackberry | - | - | - | - | - | - | - | 73 | 63 | 54 | 56 | 93 | - |
| HTC | - | - | - | - | - | - | - | - | - | - | 98 | - | - |
| LG | - | - | - | - | 97 | 94 | 97 | - | - | - | - | - | - |
| Motorola | 66 | 74 | 81 | 76 | 73 | 69 | 77 | 87 | - | - | - | - | - |
| Nokia | 5 | 6 | 6 | 8 | 6 | 6 | 5 | 5 | 5 | 8 | 14 | 19 | 57 |
| Sony Ericsson | 36 | 71 | 80 | - | - | - | - | - | - | - | - | - | - |
| **Related Electronics Brands** | | | | | | | | | | | | | |
| Google | - | - | - | - | 38 | 24 | 20 | 10 | 7 | 4 | 4 | 4 | 2 |
| Microsoft | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 5 | 5 |

**Notes:**

[1] Brands selected by category from Interbrand's annual "Best Global Brands" rankings, which report the year's top 100 brands.

[2] Brands not included in a particular year's top 100 list are indicated with a "-".

**Source:**

[1] Interbrand Best Global Brands, available at www.interbrand.com.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 4: Millward Brown - Most Valuable Global Brands**

| Brand | Ranking | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** |
| Apple | 29 | 16 | 7 | 6 | 3 | 1 | 1 | 1 | 2 |
| Samsung | 43 | 44 | 58 | - | 68 | 67 | 55 | 30 | 29 |
| **Related Phone Brands** | | | | | | | | | |
| Blackberry | - | - | 51 | 16 | 14 | 25 | - | - | - |
| Motorola | 64 | 60 | 92 | - | - | - | - | - | - |
| Nokia | 14 | 12 | 9 | 13 | 43 | 81 | - | - | - |
| Sony | 63 | 55 | - | - | 94 | 85 | 86 | - | - |
| **Related Electronics Brands** | | | | | | | | | |
| Google | 7 | 1 | 1 | 1 | 1 | 2 | 3 | 2 | 1 |
| Microsoft | 1 | 3 | 3 | 2 | 4 | 5 | 5 | 7 | 4 |
| **Carriers** | | | | | | | | | |
| AT&T[1] | 73 | 70 | 55 | 28 | 22 | 7 | 8 | 6 | 8 |
| China Mobile | 4 | 5 | 5 | 7 | 8 | 9 | 10 | 10 | 15 |
| T-Mobile | 45 | 77 | 83 | 63 | 55 | 19 | 20 | 27 | 27 |
| Verizon Wireless | 32 | 34 | 33 | 34 | 20 | 13 | 9 | 12 | 11 |
| Vodafone | 16 | 22 | 11 | 9 | 10 | 12 | 12 | 17 | 20 |

**Notes:**

[1] Rankings for AT&T in 2006 and 2007 are rankings for Cingular, which was re-branded into the AT&T brand beginning in 2007. See Elliott, S. (2007, January 12). AT&T Prepares to 'De-Brand' the Cingular Wireless Name. *The New York Times.* Retrieved June 5, 2014, from http://www.nytimes.com/2007/01/12/technology/12phone.html?_r=2&ref=business&oref=slogin&.

[2] Brands selected by category from Millward Brown's annual "BrandZ Top 100 Most Valuable Global Brands."

[3] Millward-Brown adopted the title "BrandZ Top 100 Most Valuable Global Brands" in 2009, prior to the change the ranking was titled "BrandZ Top 100 Most Powerful Brands."

[4] Brands not included in a particular year's top 100 list are indicated with a "-".

**Source:**

[1] Millward Brown BrandZ Top 100 Most Valuable Global Brands, available at www.millwardbrown.com.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 5: Strategy& - Top Global Innovators**

| Company | Ranking | | | |
| --- | --- | --- | --- | --- |
| | **2010** | **2011** | **2012** | **2013** |
| Apple | 1 | 1 | 1 | 1 |
| Samsung | 9 | 7 | 4 | 3 |
| **Other Ranked Companies** | | | | |
| 3M | 3 | 3 | 3 | 5 |
| Amazon | - | - | 10 | 4 |
| Facebook | - | 10 | - | 10 |
| General Electric | 4 | 4 | 5 | 6 |
| Google | 2 | 2 | 2 | 2 |
| IBM | 8 | 6 | 9 | 8 |
| Intel | 10 | - | - | - |
| Microsoft | 6 | 5 | 6 | 7 |
| Procter & Gamble | 7 | 8 | 8 | - |
| Tesla Motors | - | - | - | 9 |
| Toyota | 5 | 9 | 7 | - |

**Notes:**

[1]
  Companies appeared at least once in the 10 Most Innovative Companies ranking in Strategy&'s annual "Global Innovation 1000 Study."

[2] Companies not included in a particular year's top 10 list are indicated with a "-".

**Source:**

[1] Strategy& Global Innovation 1000 Studies, The Top Innovators and Spenders, available at www.strategyand.pwc.com.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Exhibit 6: Fortune - World's Most Admired Companies Overall and in Innovation**

| Company | Ranking | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Overall Ranking[1]** | | | | | | | | | |
| Apple | - | 7 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Other Ranked Companies** | | | | | | | | | |
| Amazon.com | - | - | - | - | 5 | 7 | 3 | 3 | 2 |
| Berkshire Hathaway | 7 | 4 | 2 | 2 | 3 | 3 | 7 | 8 | 4 |
| Coca-Cola | - | - | - | - | 10 | 6 | 4 | 4 | 6 |
| Dell | 8 | - | - | - | - | - | - | - | - |
| FedEx | 2 | 6 | 7 | 7 | - | 8 | 6 | 10 | 8 |
| General Electric | 1 | 1 | 3 | 9 | - | - | - | - | 10 |
| Goldman Sachs Group | - | - | 10 | - | 8 | - | - | - | - |
| Google | - | 8 | 4 | 4 | 2 | 2 | 2 | 2 | 3 |
| IBM | - | - | - | - | - | - | 5 | 6 | - |
| Johnson & Johnson | 6 | 9 | 9 | 5 | 4 | - | - | - | - |
| McDonald's | - | - | - | - | - | 10 | - | - | - |
| Microsoft | 10 | - | - | 10 | - | 9 | - | - | - |
| Procter & Gamble | 4 | 10 | 8 | 6 | 6 | 5 | 9 | - | - |
| Southwest Airlines | 3 | 5 | - | 7 | - | 4 | 10 | 7 | 9 |
| Starbucks | 5 | 2 | 6 | - | - | - | 8 | 5 | 5 |
| Toyota Motor | 9 | 3 | 5 | 3 | 7 | - | - | - | - |
| Wal-Mart Stores | - | - | - | - | 9 | - | - | - | - |
| Walt Disney | - | - | - | - | - | - | - | 9 | 7 |
| **Innovation Ranking[2]** | | | | | | | | | |
| Apple | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Other Ranked Companies** | | | | | | | | | |
| Amazon.com | - | - | - | - | 4 | 4 | - | 2 | 2 |
| Charles Schwab | - | - | - | - | - | 5 | - | - | - |
| FedEx | - | 3 | - | - | - | - | - | - | - |
| GDF Suez | - | - | - | - | - | - | 3 | - | - |
| Genentech | - | 4 | - | - | - | - | - | - | - |
| Goldman Sachs Group | - | - | - | - | 5 | - | - | - | - |
| Google | 2 | 2 | - | 3 | 2 | 2 | - | 3 | 3 |
| Herman Miller | - | - | 5 | - | - | - | - | - | - |
| Limited Brands | - | - | - | - | - | - | 4 | - | - |
| Medco Health Solutions | - | - | 3 | 5 | - | - | - | - | - |
| Nike | - | 5 | 2 | 4 | 3 | 3 | - | - | - |
| Procter & Gamble | 4 | - | 4 | - | - | - | - | - | - |
| Qualcomm | - | - | - | - | - | - | 5 | 4 | 4 |
| Royal Dutch Shell | - | - | - | - | - | - | - | 5 | 5 |
| Sistema | - | - | - | - | - | - | 2 | - | - |
| UnitedHealth Group | 3 | - | - | - | - | - | - | - | - |
| Walt Disney | 5 | - | - | 2 | - | - | - | - | - |
| Whole Foods Market | - | - | - | - | - | - | - | 5 | 5 |

**Notes:**

[1] Companies appeared at least once in the top 10 Overall ranking in Fortune's annual "World's Most Admired Companies" list. Companies not included in the top 10 of a particular year's list are indicated with "-".

[2] Companies appeared at least once in the top 5 Best ranking in Innovation in Fortune's annual "World's Most Admired Companies" list. Companies not included in the top 5 of a particular year's list are indicated with "-".

[3] Companies that tied for a ranking are shown as both having the rank for which they tied.

**Source:**

[1] Fortune World's Most Admired Companies, available at www.fortune.com.