1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5

APPLE INC., A CALIFORNIA          )   C-12-00630 LHK
6   CORPORATION,                      )
                                      )   SAN JOSE, CALIFORNIA
7              PLAINTIFF,             )
                                      )   APRIL 21, 2014
8          VS.                        )
                                      )   VOLUME 10
9   SAMSUNG ELECTRONICS CO., LTD.,    )
    A KOREAN BUSINESS ENTITY;         )   PAGES 2335-2619
10  SAMSUNG ELECTRONICS AMERICA,      )
    INC., A NEW YORK CORPORATION;     )
11  SAMSUNG TELECOMMUNICATIONS        )
    AMERICA, LLC, A DELAWARE          )
12  LIMITED LIABILITY COMPANY,        )
                                      )
13              DEFENDANTS.           )
    _____    )

14

15

16          TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LUCY H. KOH
17          UNITED STATES DISTRICT JUDGE

18

19

20          APPEARANCES ON NEXT PAGE

21

22  OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, CRR
                                 CERTIFICATE NUMBER 8074

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

1

2    A P P E A R A N C E S:

3    FOR PLAINTIFF          MORRISON & FOERSTER
     APPLE:                 BY:  HAROLD J. MCELHINNY
4                                RACHEL KREVANS
                            425 MARKET STREET
5                           SAN FRANCISCO, CALIFORNIA  94105

6

7                           WILMER, CUTLER, PICKERING,
                            HALE AND DORR
8                           BY:  WILLIAM F. LEE
                            60 STATE STREET
9                           BOSTON, MASSACHUSETTS  02109

10                          BY:  MARK D. SELWYN
                            950 PAGE MILL ROAD
11                          PALO ALTO, CALIFORNIA  94304

12

13   FOR SAMSUNG:           QUINN, EMANUEL, URQUHART & SULLIVAN
                            BY:  JOHN B. QUINN
14                               WILLIAM PRICE
                            865 S. FIGUEROA STREET, FLOOR 10
15                          LOS ANGELES, CALIFORNIA  90017

16                          BY:  VICTORIA F. MAROULIS
                                 KEVIN B. JOHNSON
17                          555 TWIN DOLPHIN DRIVE
                            SUITE 560
18                          REDWOOD SHORES, CALIFORNIA  94065

19

20

21

22

23

24

25

1

2                          INDEX OF WITNESSES

3       DEFENDANTS'

4       **TULIN ERDEM**
              CROSS-EXAM BY MR. BENNETT (RES.)         P. 2339
5             REDIRECT EXAM BY MR. QUINN               P. 2349
              RECROSS-EXAM BY MR. BENNETT              P. 2359
6
        **JUDITH CHEVALIER**
7             DIRECT EXAM BY MR. QUINN                 P. 2362
              CROSS-EXAM BY MR. LEE                    P. 2436
8             REDIRECT EXAM BY MR. QUINN               P. 2503

9       **MICHAEL FREEMAN**
              DIRECT EXAM BY MR. JOHNSON               P. 2508
10            CROSS-EXAM BY MR. LEE                    P. 2513

11      **DANIEL SCHONFELD**
              DIRECT EXAM BY MR. JOHNSON               P. 2525
12            CROSS-EXAM BY MR. LEE                    P. 2561
              REDIRECT EXAM BY MR. JOHNSON             P. 2589
13            RECROSS-EXAM BY MR. LEE                  P. 2590

14      **KENNETH PARULSKI**
              DIRECT EXAM BY MR. JOHNSON               P. 2592
15

16

17

18

19

20

21

22

23

24

25

<pre>
1                          INDEX OF EXHIBITS

2                                    MARKED      ADMITTED

3        PLAINTIFF'S

4        208                                     2453
         201                                     2460
5        251                                     2517
         246                                     2524
6        255                                     2532

7

8        DEFENDANTS'

9        453A                                    2435
         432                                     2456
10       314A & 320A                             2467
         351A, 352A, 353A, 354A,                 2532
11            371, 490A, 491A
         499                                     2559
12

13

14       JOINT

15       39, 40, 25, 26, 52A                     2532
         45A & 46A                               2596
16

17

18

19

20

21

22

23

24

25
</pre>

```
1      SAN JOSE, CALIFORNIA                    APRIL 21, 2014

2                     P R O C E E D I N G S

3          (JURY IN AT 9:05 A.M.)

4              THE COURT:  THE WITNESS SHOULD GO AHEAD AND PLEASE

5      TAKE THE STAND.

6              WELCOME.  PLEASE TAKE A SEAT.  PLEASE COME FORWARD.  YOU

7      ARE STILL UNDER OATH.

8          (DEFENDANTS' WITNESS, TULIN ERDEM, WAS PREVIOUSLY SWORN.)

9              THE COURT:  PLEASE TAKE A SEAT.

10             MR. BENNETT:  GOOD MORNING, YOUR HONOR.

11     GOOD MORNING, EVERYBODY.

12             THE COURT:  IT'S 9:06.  GO AHEAD, PLEASE.

13                 CROSS-EXAMINATION (RESUMED)

14     BY MR. BENNETT:

15     Q.   GOOD MORNING, DOCTOR.  WELCOME BACK.

16     A.   GOOD MORNING.

17     Q.   DOCTOR, ON FRIDAY AFTERNOON, WE HAD BEEN LOOKING AT YOUR

18     EYE TRACKING STUDY.

19         DO YOU RECALL THAT?

20         AND IF WE COULD BRING UP EXHIBIT 59 TO YOUR OR THE ON

21     WHICH ON THE FAR RIGHT-HAND COLUMN YOU HAD LISTED 21 FEATURES

22     OF SMARTPHONES THAT BASED ON YOUR EYE TRACKING STUDY YOU

23     CONCLUDED WERE UNIMPORTANT TO CONSUMER DECISION MAKING.

24         FOR INSTANCE, WE TALKED ABOUT NEAR FIELD COMMUNICATION.

25         DO YOU RECALL THAT?
```

1    A.    YES.

2    Q.    AND WE TALKED ABOUT VIDEO CAMERA FEATURES, CPU, AND GPS AS

3    EXAMPLES OF THE FEATURES YOU CONCLUDED FROM YOUR EYE TRACKING

4    STUDY WERE UNIMPORTANT.

5          AND THERE ARE OTHER FEATURES, WE'VE HIGHLIGHTED THEM,

6    THERE ARE 21 FEATURES THAT YOU SO CONCLUDED FROM YOUR EYE

7    TRACKING STUDY; CORRECT?

8    A.    I CONCLUDED THAT THESE ARE NOT KEY DEMAND DRIVERS, SO I'VE

9    MADE THAT DISTINCTION.

10         BUT WE CAN ALSO TALK ABOUT WHY.  SOME OF THESE FEATURES,

11   LIKE GPS, ALL OF THE PHONES HAVE GPS.

12         MAYBE I SHOULD NOTE THAT MY PHONES IN THIS STUDY WERE ALL

13   PREMIUM PHONES, SO THEY DIDN'T REALLY DIFFER IN WHETHER THEY

14   HAD GPS OR NOT.  THEY ALL HAD GPS.

15   Q.    SO THESE FEATURES WERE NOT DIFFERENTIATORS IS WHAT YOU'RE

16   SAYING?

17   A.    YES, THEY WERE -- EVERY ONE OF THOSE HAD GPS.

18   Q.    SO THAT'S ONE REASON SOMETHING MIGHT NOT APPEAR TO BE A

19   DRIVER IF IT'S NOT A DIFFERENTIATOR; IS THAT RIGHT?

20   A.    APPEAR TO BE IS NOT CORRECT, BECAUSE IF IT IS NOT A

21   DIFFERENTIATOR, IT IS NOT A DRIVER, PERIOD.  IT DOESN'T APPEAR

22   TO BE.

23   Q.    OKAY.  LET'S LOOK AT DR. REIBSTEIN'S DEMONSTRATIVE,

24   SDX 3169 AGAIN.  IF WE CAN PULL THAT UP?

25         AND DO YOU RECALL DR. REIBSTEIN, IN HIS DEMONSTRATIVES,

```
 1     INCLUDED FEATURES HE CRITIQUED DR. HAUSER FOR NOT INCLUDING IN

 2     HIS STUDY?

 3     A.   THESE ARE LISTS OF FEATURES HE COLLECTED FROM WEBSITES

 4     LIKE MYSELF.

 5     Q.   HE BOLDED -- HE PUT A NUMBER OF THOSE FEATURES IN BOLD.

 6          DO YOU SEE THAT?

 7     A.   YEAH.  THOSE WERE MENTIONED, I THINK, LIKE THREE TIMES OR

 8     MORE IN THESE WEBSITES.

 9     Q.   AND IF WE BRING UP FROM FRIDAY'S TRANSCRIPT -- HAVE YOU

10     HAD A CHANCE TO REVIEW THE TRANSCRIPT OF THE TRIAL ON FRIDAY?

11     A.   I WAS HERE IN COURT --

12     Q.   OKAY.

13     A.   -- LISTENING TO DR. REIBSTEIN.

14     Q.   IF WE BRING UP PAGE 2150 OF THE TRANSCRIPT AT LINES 13

15     THROUGH 24, THIS IS TESTIMONY HE GAVE ABOUT THAT DX 3169.

16          AND DO YOU SEE THAT HE DESCRIBED THE FEATURES HE HAD

17     BOLDED AS FEATURES THAT WERE MORE IMPORTANT FOR CUSTOMERS AND

18     THEIR DECISION PROCESS?

19     A.   YES, I SEE THAT SENTENCE.

20     Q.   OKAY.  IF WE LOOK AT THE NEXT PAGE OF THE TRANSCRIPT,

21     2151, LINES 5 THROUGH 8, THIS WAS MR. PRICE QUESTIONING

22     DR. REIBSTEIN, AND DO YOU SEE THAT HE REFERRED TO THOSE

23     FEATURES IN BOLD AS DRIVING FEATURES?

24     A.   THAT'S -- HE SAYS THESE DRIVING FEATURES.

25     Q.   REFERRING TO THE BOLDED FEATURES FROM DR. REIBSTEIN'S
```

1    STUDY; IS THAT RIGHT?

2    A.   I DON'T KNOW THAT IT REFERS TO THAT, BUT IT DOESN'T SAY

3    KEY DEMAND DRIVERS.

4         ALSO, WHEN I WAS LISTENING TO HIM --

5    Q.   DOCTOR, THE QUESTION WAS, DO YOU SEE THAT IT REFERENCES

6    THE BOLD FEATURE AS DRIVING FEATURES?

7              MR. QUINN:  YOUR HONOR, MAY THE WITNESS FINISH HER

8    ANSWER?

9              THE COURT:  OVERRULED.

10             THE WITNESS:  I'M SORRY.  CAN YOU REPEAT IT?

11   BY MR. BENNETT:

12   Q.   SURE.  DO YOU SEE IN THIS QUESTION COUNSEL FOR SAMSUNG

13   REFERS TO THOSE FEATURES AS DRIVING FEATURES?

14   A.   I SEE THOSE DRIVING FEATURES IN THE QUESTION, YES.

15   Q.   BASED UPON YOUR EYE STUDY, YOU CONCLUDED THAT 13 OF THESE

16   FEATURES THAT DR. REIBSTEIN AND COUNSEL DESCRIBED AS DRIVING

17   FEATURES, YOU DETERMINED THAT THOSE, AGAIN, WERE UNIMPORTANT;

18   ISN'T THAT TRUE?

19             MR. QUINN:  OBJECTION.  MISSTATES THE TESTIMONY.

20             THE COURT:  OVERRULED.

21             THE WITNESS:  FIRST OF ALL, I DON'T KNOW WHAT THE

22   QUESTION SAYS IN TERMS OF DRIVING FEATURES.  I DON'T KNOW

23   WHETHER THEY ARE REFERRING TO KEY DEMAND DRIVERS.  THERE'S A

24   DIFFERENCE BETWEEN BEING A KEY DEMAND DRIVER.

25        I THINK DR. REIBSTEIN'S POINT WAS THAT THERE ARE MANY

```
 1      DIFFERENT, MORE MAJOR FEATURES LISTED IN THESE WEBSITES AND THE

 2      CONJOINT STUDY DR. HAUSER OMITS THEM.

 3          HE'S NOT SAYING THESE ARE ALL KEY DEMAND DRIVERS.  INDEED,

 4      IN HIS TESTIMONY, HE SAID THE MAIN THINGS ARE BRAND, I THINK

 5      BATTERY, OPERATING SYSTEM.

 6          HE WAS NOT SAYING THAT ALL THESE THINGS IN BOLD ARE DEMAND

 7      DRIVERS.

 8      Q.   LET'S LOOK AT -- LET'S LOOK BACK AT YOUR EXHIBIT 59.  AND

 9      IF WE JUST -- WE CAN UNDERLINE HERE, BUT AS I SAID, OF THE 21

10      FEATURES YOU SAID ARE UNIMPORTANT, 13 OF THOSE WERE IDENTIFIED

11      IN BOLD IN DR. REIBSTEIN'S CHART AND DESCRIBED BY MR. PRICE AS

12      DRIVING FEATURES.  IS THAT TRUE?

13      A.   THEY WERE DESCRIBED, OR PUT IN BOLD.

14          BUT AS I SAID, HIS TABLE DOESN'T SAY ANYTHING WHETHER

15      THESE ARE KEY DEMAND DRIVERS.  HIS TABLE ONLY REFERS TO THE

16      FACT THAT THESE BOLD THINGS APPEAR MORE IN WEBSITES, AND THEY

17      APPEAR BOLD IN MY WEBSITE COMPARISON CHART, TOO.

18      Q.   OKAY.  AND ONE OF THE FEATURES WE SAW WE TALKED ABOUT LAST

19      WEEK, NEAR FIELD COMMUNICATION, OTHERWISE KNOWN AS S BEAM; IS

20      THAT RIGHT?

21      A.   THAT IS NEAR FIELD COMMUNICATION.

22      Q.   AND HAVE YOU READ DR. -- MR. PENDLETON'S TESTIMONY --

23      EXCUSE ME -- I THINK THE HEAD OF MARKETING FOR SAMSUNG U.S.A.

24      ABOUT HOW HE CONSIDERS THAT FEATURE SIGNIFICANTLY IMPORTANT TO

25      HAVE INCLUDED IT IN A SUPERBOWL ADVERTISEMENT?
```

```
 1      A.    I DON'T RECALL THAT TESTIMONY.

 2            BUT COMPANIES DO ADVERTISE AND PROMOTE MANY OF THEIR

 3      FEATURES OBVIOUSLY TO BE INNOVATIVE.

 4      Q.    SUPERBOWL ADS ARE KIND OF EXPENSIVE, AREN'T THEY?

 5      A.    THEY ARE.

 6      Q.    DO YOU THINK THAT COMPANIES WOULD BE CAREFUL IN SELECTING

 7      THE FEATURES OF THEIR PRODUCTS THAT THEY WOULD SPEND SUPERBOWL

 8      AD TIME ON?

 9      A.    SURE.  BUT THAT DOESN'T MEAN, AGAIN, THAT THESE ARE DEMAND

10      DRIVERS.

11      Q.    OKAY.  YOU HAVEN'T TALKED TO ANYBODY AT SAMSUNG IN

12      CONNECTION WITH YOUR WORK IN THIS CASE, HAVE YOU?

13      A.    NOT THAT I RECALL.

14      Q.    YOU HAVEN'T TALKED TO ANYONE AT SAMSUNG WHO WAS INVOLVED

15      IN THE DESIGN OF THE SMARTPHONES WE'RE TALKING ABOUT HERE, HAVE

16      YOU?

17      A.    I DON'T THINK SO.

18      Q.    YOU DON'T KNOW HOW, WHEN, AND WHY THE DECISION WAS MADE TO

19      PUT THE PATENTED FEATURES IN THESE PHONES, DO YOU?

20      A.    NO.

21      Q.    YOU DON'T KNOW WHAT IMPORTANCE SAMSUNG AND THE PEOPLE WHO

22      DESIGNED THE PHONES PLACED ON THOSE FEATURES, DO YOU?

23      A.    NO.  BUT I KNOW, OF COURSE, THEIR MARKETING RESEARCH

24      DOCUMENTS, SO I KNOW WHAT THEY THINK THE CONSUMERS THINK.

25      Q.    YOU DON'T KNOW WHAT VALUE THOSE PEOPLE WHO PUT THE
```

```
1      FEATURES IN THESE PHONES ASSIGNED TO THE FEATURES, DO YOU?

2      A.   YOU MEAN THE ENGINEERS ASSIGNING VALUE TO THESE PATENTS?

3      Q.   YES, THE ENGINEERS, THE PEOPLE WHO HEADED THAT EFFORT, YOU

4      DON'T KNOW, DO YOU?

5      A.   SURE, I DON'T KNOW HOW THE ENGINEERS WOULD VALUE THESE.

6      Q.   AND YOU DON'T KNOW -- YOU DON'T KNOW, BECAUSE YOU HAVEN'T

7      TALKED TO ANYBODY AT SAMSUNG ABOUT HOW THEIR JUDGMENTS ABOUT

8      THE VALUE OF THESE FEATURES COMPARE WITH THE CONCLUSIONS YOU'VE

9      DRAWN FROM YOUR EYE TRACKING STUDY; ISN'T THAT TRUE?

10     A.   IT WOULD BE REALLY NOT RELEVANT --

11     Q.   OKAY.

12     A.   -- FOR MY ASSIGNMENT.  WHAT I'M LOOKING AT IS WHAT

13     CONSUMERS THINK AND WHAT -- FROM A CONSUMER POINT OF VIEW, WHAT

14     DRIVES DEMAND.

15     Q.   YOU HAVEN'T TALKED TO ANYBODY AT SAMSUNG ABOUT YOUR EYE

16     STUDY, ABOUT THE RESULTS OF IT, OR THE CONCLUSIONS YOU'VE

17     REACHED FROM IT; ISN'T THAT ALL TRUE?

18     A.   TRUE.

19     Q.   AND YOU DO NOT KNOW, BASED UPON YOUR CONVERSATIONS, YOU DO

20     NOT KNOW WHETHER SAMSUNG HAS EVER USED EYE TRACKING STUDIES FOR

21     THE PURPOSE FOR WHICH YOU'RE USING THEM HERE; ISN'T THAT TRUE?

22     A.   NO, I DON'T KNOW.

23     Q.   DR. ERDEM, I WANT -- A FINAL SUBJECT I WANT TO TALK WITH

24     YOU ABOUT YOUR WORK ON THIS CASE AND YOUR WORK WITH ANALYSIS

25     GROUP.
```

```
 1          YOU'VE WORKED WITH A COMPANY CALLED ANALYSIS GROUP ON THIS
 2     CASE; IS THAT RIGHT?
 3     A.   THAT'S TRUE.
 4     Q.   THEY HELPED YOU WITH YOUR STUDY; IS THAT RIGHT?
 5     A.   THEY GAVE ME LITIGATION SUPPORT FROM LOOKING UP DOCUMENTS.
 6     THEY WERE ABLE TO -- IN HELPING ME WHATEVER I NEEDED, WHATEVER
 7     I ASKED THEM.
 8     Q.   OKAY.  NOW, FOR YOUR WORK ON THE CASE, YOU'VE BILLED AND
 9     RECEIVED, THROUGH THE END OF LAST MONTH, $563,000; IS THAT
10     CORRECT?
11     A.   THAT SOUNDS TO BE CORRECT.
12     Q.   AND IN ADDITION TO THAT, ANALYSIS GROUP BILLED FOR THEIR
13     TIME; IS THAT RIGHT?
14     A.   THEY MAY HAVE.  OF COURSE, THEY ARE BILLING THEIR OWN
15     TIME.  MY TOTAL COMPENSATION WAS $563,000.
16     Q.   AND DOES THAT INCLUDE -- YOU GET 10 PERCENT OF WHAT
17     ANALYSIS GROUP BILLS ON THE CASE?
18     A.   YES.  MY $563,000 INCLUDES EVERYTHING.
19     Q.   HOW MUCH OF THE 563,000 WAS THE 10 PERCENT YOU'RE GETTING
20     THROUGH ANALYSIS GROUP?
21     A.   164 -- I BELIEVE, $164,000, $164,000.
22     Q.   IF THAT'S 10 PERCENT, THAT MEANS ANALYSIS GROUP HAS BILLED
23     ANOTHER MILLION FIVE ON TOP OF WHAT YOU'VE BILLED; IS THAT
24     RIGHT?
25     A.   I DON'T KNOW.
```

1    Q.   DOES THAT MATH SOUND APPROXIMATELY RIGHT TO YOU?

2    A.   THE MATH SOUNDS CORRECT.

3    Q.   TO YOUR KNOWLEDGE HAS ANALYSIS GROUP -- ANALYSIS GROUP IS

4    A LITIGATION SUPPORT GROUP; IS THAT RIGHT?

5    A.   THAT'S CORRECT.

6    Q.   YOU'VE WORKED WITH THEM IN THE PAST; IS THAT RIGHT?

7    A.   I WORKED WITH THEM IN THE PAST, THAT IS, FOR OTHER

8    COMPANIES.  I WORK WITH A NUMBER OF COMPANIES.

9    Q.   TO YOUR KNOWLEDGE HAS ANALYSIS GROUP EVER USED EYE

10   TRACKING STUDY, AN EYE TRACKING STUDY OR EYE TRACKING METHOD TO

11   EVALUATE THE VALUE OF OR THE DEMAND FOR A PATENTED FEATURE IN A

12   PATENT CASE?

13   A.   I DON'T THINK SO.

14   Q.   OKAY.  TO YOUR KNOWLEDGE HAS -- TO YOUR KNOWLEDGE, BEFORE

15   YOUR TESTIMONY FRIDAY AND TODAY, HAS ANYBODY IN ANY COURT IN

16   THE UNITED STATES BEFORE TODAY EVER USED EYE TRACKING STUDY AS

17   A MEANS OF DETERMINING THE DEMAND FOR A PATENTED FEATURE IN A

18   PATENT CASE?

19   A.   I'M NOT AWARE OF WHETHER OTHER PEOPLE USED IT IN A COURT

20   CASE OR LITIGATION CASE.  I DID FOR THAT PURPOSE.

21   Q.   SO AS FAR AS YOU KNOW, YOUR TESTIMONY FRIDAY AND TODAY IS

22   THE FIRST TIME THIS HAS EVER BEEN DONE IN AN AMERICAN

23   COURTROOM; IS THAT CORRECT?

24   A.   IT COULD BE.  IT'S NICE TO BE INNOVATIVE.

25   Q.   OKAY.  AND YOU'RE LISTED AS AN EXPERT WITH THE ANALYSIS

```
 1    GROUP, YOU'RE ON THEIR WEBSITE; IS THAT RIGHT?

 2    A.   I'M AFFILIATED WITH THEM.

 3    Q.   OKAY.  ONE THING THE ANALYSIS GROUP WEBSITE DOES TALK

 4    ABOUT IS CONJOINT STUDY AND SURVEYS; ISN'T THAT RIGHT?

 5    A.   CORRECT.

 6    Q.   IT TOUTS ITS EXPERIENCE IN THAT FIELD, DOESN'T IT?

 7    A.   CONJOINT IS USEFUL IN CERTAIN CONTEXTS, DEFINITELY.

 8    Q.   OKAY.  IT SPECIFICALLY TALKS ABOUT -- THE ANALYSIS GROUP

 9    WEBSITE TALKS ABOUT THE ABILITY TO USE CONJOINT ANALYSIS TO

10    MEASURE THE RELATIVE VALUE TO CONSUMERS OF PRODUCT FEATURES;

11    ISN'T THAT RIGHT?

12    A.   SURE, IT CAN GET RID OF PREFERENCES.

13    Q.   EVEN CITES SMARTPHONES AS AN EXAMPLE OF HOW YOU CAN DO

14    THAT; IS THAT CORRECT?

15    A.   I DON'T KNOW WHETHER THEY CITE IT, BUT THEY MAY HAVE.

16    Q.   AND HAVE YOU LOOKED AT THAT WEBSITE RECENTLY?

17    A.   NOT REALLY.

18    Q.   THIS IS TRUE, ISN'T IT, THAT CONJOINT STUDY CAN BE USED IN

19    A PATENT CASE TO MEASURE THE RELATIVE VALUES OF NOT JUST

20    MUST-HAVE FEATURES, BUT SECONDARY AND TERTIARY FEATURES AS

21    WELL, THAT'S WHAT IT SAYS, DOESN'T IT?

22    A.   I DON'T KNOW WHETHER THEY SAY IT, BUT I CAN COMMENT ON IT

23    IF YOU WANT.

24         MR. BENNETT:  NOTHING FURTHER.  THANK YOU, YOUR

25    HONOR.
```

```
 1                  THE COURT:  ALL RIGHT.  TIME IS 9:17.  ARE YOU READY?

 2                  MR. QUINN:  GOOD MORNING, YOUR HONOR.

 3                  THE COURT:  ALL RIGHT.  TIME IS 9:17.  GO AHEAD,

 4        PLEASE.

 5                  MR. QUINN:  GOOD MORNING, LADIES AND GENTLEMEN OF THE

 6        JURY.

 7                          REDIRECT EXAMINATION

 8        BY MR. QUINN:

 9        Q.   GOOD MORNING, DR. ERDEM.

10        A.   GOOD MORNING.

11        Q.   YOU WERE ASKED SOME QUESTIONS ABOUT DR. REIBSTEIN'S

12        TESTIMONY BY MR. BENNETT.

13             IF WE COULD PUT UP DR. REIBSTEIN'S TESTIMONY THAT

14        MR. BENNETT REFERRED TO FROM TRIAL TRANSCRIPT PAGE 2150, 13 TO

15        24.  IF WE COULD DO THAT, KEN.

16             YOU'LL RECALL THAT MR. BENNETT ASKED YOU ABOUT THIS

17        TESTIMONY WHERE HE REFERRED TO THIS SDX 3169.  AND

18        MR. REIBSTEIN WAS ASKED, "MAYBE WE CAN BLOW THIS UP.  THIS IS A

19        DEMONSTRATIVE THAT YOU DEVELOPED TO SHOW THE FEATURES THAT WERE

20        MENTIONED IN THESE COMPARISONS ON PHONES; CORRECT?

21             "ANSWER:  THIS IS A, A LIST WITH ALL THE FEATURES THAT

22        WERE IN THESE DIFFERENT COMPARISON SHOPPING SITES.

23             "AND THE ONES IN BOLD, WHAT'S THE -- WHAT ARE THOSE?

24             "THOSE ARE THE ONES THAT APPEARED IN THREE OR MORE OF THE

25        COMPARISON SITES.
```

```
1              "QUESTION:  OKAY.

2              "AND SO THOSE SITES OBVIOUSLY THOUGHT THAT THOSE WERE MORE

3      IMPORTANT FOR CUSTOMERS IN THEIR DECISION PROCESS."

4              DO YOU SEE THAT TESTIMONY BY DR. REIBSTEIN?

5      A.   YES, I DO.

6      Q.   SO DR. REIBSTEIN'S TESTIMONY WAS THAT THESE FEATURES THAT

7      WERE IN BOLD ON 3169 -- PERHAPS WE CAN PUT THAT BACK UP, 3169

8      ON THE SCREEN, KEN -- WERE MORE IMPORTANT IN THE COMPARISON

9      SHOPPING SITES; CORRECT?

10             MR. BENNETT:  OBJECTION.  LEADING.

11             THE COURT:  OVERRULED.

12             THE WITNESS:  THAT'S CORRECT.

13             THE COURT:  OVERRULED.  YOU MAY ANSWER.

14     BY MR. QUINN:

15     Q.   DO YOU UNDERSTAND THAT MORE IMPORTANT, AS USED BY

16     DR. REIBSTEIN HERE, TO MEAN THE SAME THING AS A MAJOR TERM, A

17     MAJOR FEATURE AS YOU USED THAT TERM, MAJOR FEATURE, IN YOUR

18     CHOICE STUDY?

19     A.   I THINK HE WAS REFERRING TO -- HE WAS JUST MAKING A

20     RELATIVE JUDGMENT.

21             I THINK THEY WERE TALKING ALSO ABOUT THE KIND OF FEATURES

22     DR. HAUSER HAD IN HIS STUDY.  COMPARED TO THOSE, THESE ARE

23     MENTIONED MORE OFTEN IN THESE WEBSITES, SO THEY ARE RELATIVELY

24     MORE IMPORTANT THAN OTHERS.

25             THAT'S WHY I WAS SAYING JUST A MINUTE AGO, I DON'T THINK
```

1    HE WAS SAYING THESE ARE KEY DEMAND DRIVERS.  HE WAS JUST SAYING

2    THEY ARE RELATIVELY MORE IMPORTANT THAN OTHERS THAT ARE

3    OMITTED.

4    Q.   ALL RIGHT.  AND THEN IF WE CAN LOOK AT MR. BENNETT'S

5    QUESTION TO YOU THAT HE ASKED YOU LAST FRIDAY -- AND THIS IS

6    FROM THE TRIAL TRANSCRIPT 21 -- I'M SORRY -- 2315, LINE 24 TO

7    2316, LINE 16.

8         MR. BENNETT ASKED YOU, "LET'S BRING UP SDX 316."  THAT'S

9    THAT EXHIBIT THAT WE WERE JUST LOOKING AT.  "THIS IS A GRAPHIC

10   THAT DR. REIBSTEIN SHOWED THE LADIES AND GENTLEMEN OF THE JURY

11   THIS MORNING.

12        "AND HE, IN HIS TESTIMONY, CRITIQUED DR. HAUSER FOR NOT

13   INCLUDING IN HIS STUDY THE QWERTY KEYBOARD, THE CPU, AND THE

14   GPS SAYING THAT THOSE WERE ALL MAJOR FEATURES THAT SHOULD HAVE

15   BEEN INCLUDED AND YOUR TESTIMONY IS THEY'RE MINOR, THEY'RE

16   MINOR FEATURES THAT CONSUMERS DON'T CARE ABOUT."

17        THERE WAS A QUESTION THAT WAS OVERRULED.  YOU ASKED THAT

18   THE QUESTION BE REPEATED.

19        MR. BENNETT THEN SAID "IT'S YOUR TESTIMONY THAT QWERTY,

20   CPU, AND GPS DON'T DRIVER CONSUMER DEMAND; IS THAT RIGHT?"

21        YOUR ANSWER:  "WHAT I SAID IS AS A GROUP, LIKE I SAID, I

22   DIDN'T DIFFERENTIATE BETWEEN THE DIFFERENT ATTRIBUTES ONE

23   VERSUS THE OTHER."

24        MY QUESTION TO YOU IS CAN A FEATURE BE MORE IMPORTANT IN

25   TERMS OF, IN THE SENSE THAT IT'S MENTIONED MANY TIMES ON

1    WEBSITES AND REVIEWS WITHOUT BEING A MAJOR FEATURE OR A DEMAND

2    DRIVER?

3    A.   CORRECT.  FOR EXAMPLE, I WAS SAYING GPS, IN MY STUDY, ALL

4    THE FIVE PHONES HAD GPS, SO IT'S NOT A DIFFERENTIATOR.  WE WERE

5    ALSO TALKING ABOUT QWERTY KEYBOARD, AND I WAS SAYING ON FRIDAY,

6    TOO, ALL THESE PHONES HAD THE ABILITY TO TYPE.  IT IS NOT ABOUT

7    THAT FUNCTION.

8         ACTUALLY, THE QWERTY CAN BE A PHYSICAL KEYBOARD OR A

9    TOUCHSCREEN.  MY STUDY HAD ALL THE FIVE TOUCHSCREEN OPTIONS,

10   LIKE ALL THE FIVE PHONES ARE THE TOUCHSCREEN OPTION, SO THERE

11   WAS NO DIFFERENTIATION AT ALL.

12        ALL THE PHONES HAD THIS ABILITY, AND THE TOUCHSCREEN

13   VERSION, OTHER THAN LIKE A BLACKBERRY PHONE, THE PHYSICAL

14   PHONE.  SO THEY ARE NOT DEMAND DRIVERS BECAUSE THEY DON'T

15   DIFFERENTIATE THE DIFFERENT BRANDS.

16   Q.   LET'S TAKE A LOOK AT THE DEMONSTRATIVE THAT MR. BENNETT

17   WAS QUESTIONING YOU ABOUT ON FRIDAY.  THIS IS SDX 3517.

18        AND THIS IS A COMPARISON -- IF WE HAVE A LASER, ANYBODY

19   HAVE A LASER PEN I CAN BORROW?

20        THIS IS A COMPARISON OF FIVE PHONES.  IF WE CAN SCROLL

21   DOWN FROM THE TOP, KEN, SO THE FOLKS CAN SEE WHAT WE'RE LOOKING

22   AT HERE.

23        WHERE IS THAT AT THE TOP?

24   A.   ACTUALLY, IF YOU GO TO GPS, SINCE WE ARE JUST TALKING GPS,

25   ON THE WIRELESS CAPABILITIES, IT'S THE FOURTH ROW.

1    Q.   OKAY.  BUT WE'RE TALKING ABOUT, WHAT, FIVE OWN PHONES

2    HERE?

3    A.   IN THE COMPARISON, WE HAVE FIVE OPTIONS.

4    Q.   AND WHERE DO WE SEE GPS?

5    A.   GPS IS UNDER WIRELESS CAPABILITIES, ROW FOUR, ABILITY-IN

6    GPS.  AND WE CAN LOOK AT ALL FIVE OPTIONS.

7    Q.   IF WE CAN BLOW THAT UP, KEN.  IS IT POSSIBLE TO GET ALL

8    FIVE ON THE SCREEN, OR IS THAT NOT POSSIBLE?

9         BUT IN ANY EVENT, WHAT DOES THE TABLE SHOW FOR THE FIVE

10   PHONES WITH RESPECT TO GPS?

11   A.   IT SAYS, YES, YES, YES, YES, YES.  FIVE YESES.  SO IT

12   MEANS ALL OF THEM HAVE GPS.

13   Q.   ALL RIGHT.  SO DOES THE FACT THAT CONSUMERS, THAT

14   CONSUMERS DID THAT, THAT THEY ALL HAVE GPS HAVE ANY RELEVANCE

15   TO YOU AS TO WHETHER GPS IS A DEMAND DRIVER FOR PHONES?

16   A.   YES.  GPS, IN THAT GROUP, DOESN'T COME OUT AS SIGNIFICANT

17   BECAUSE IT'S NOT A DIFFERENTIATOR.

18   Q.   ALL RIGHT.  AND THEN MR. BENNETT ALSO ASKED YOU SOME

19   QUESTIONS ABOUT THE VIDEO CAMERA, DO YOU RECALL THAT, WHETHER

20   PEOPLE CARE ABOUT IT OR WHETHER THAT'S IMPORTANT?

21   A.   YES.  AND IT HAS THE SAME ISSUE.  IF YOU GO TO THE VIDEO

22   RECORDER, I BELIEVE ALL OF THEM RECORD VIDEO.

23   Q.   ALL RIGHT.  SO IF WE CAN LOOK AT THAT, WHERE WILL WE FIND

24   THAT?  RIGHT HERE, THIS LINE (INDICATING)?

25   A.   YEAH.

1    Q.   AND I DON'T KNOW IF WE CAN BLOW THAT UP, KEN.

2    A.   YEAH.

3    Q.   BUT WHAT -- WHAT DID THEY SAY AS TO THE FIVE PHONES?

4    A.   ACTUALLY, THEY SAY THE EXACT SAME THING, 1080 FULL HD.

5    Q.   SO IS IT SURPRISING TO YOU THAT YOUR STUDY WOULD INDICATE

6    THAT FROM A MATTER OF CONSUMER CHOICE, VIDEO CAMERA WOULD NOT

7    BE A DEMAND DRIVER?

8    A.   IT WOULD BE SURPRISING BECAUSE THE THINGS THAT DON'T SHOW

9    ANY AVAILABILITY ARE NOT DIFFERENTIATORS IN THE MARKET.  THAT'S

10   PART OF A DEMAND DRIVER.  DEMAND DRIVERS ARE THINGS THAT ARE

11   MOST IMPORTANT TO CONSUMERS AND THEY VARY.

12   Q.   NOW, IS THERE -- IS THERE A DIFFERENCE BETWEEN NOT HAVING

13   A FEATURE AT ALL AND HAVING JUST -- AND HAVING ONE VERSION OF A

14   FEATURE IN TERMS OF CONSUMER CHOICE?

15   A.   I WOULD SAY THAT IN ALMOST ALL -- I MEAN IN MOST CASES,

16   WHAT CONSUMERS CARE ABOUT IS WHETHER THE FUNCTIONALITY IS THERE

17   OR NOT AND HOW -- IT'S NOT HOW THE FUNCTIONALITY IS DELIVERED.

18   Q.   ALL RIGHT.  WOULD AN EXAMPLE OF THAT BE AUTO CORRECT OR

19   WORD SUGGESTION?

20   A.   CORRECT.

21   Q.   ALL RIGHT.  CAN YOU EXPLAIN HOW THAT WOULD WORK IN TERMS

22   OF CONSUMER CHOICE?

23   A.   SURE.  ACTUALLY, THAT WAS THE, SORT OF FUNNY QUOTE THAT

24   APPLE COUNSEL WAS MAKING FROM MY DEPOSITION WHEN I SAID A

25   PERSON --

REDIRECT ERDEM

1    Q.   TECHNO GEEKS OR WHATEVER?

2    A.   YEAH, ONLY A WEIRD PERSON WOULD CARE.  THAT'S WHAT I WAS

3    REFERRING TO.

4         OBVIOUSLY PEOPLE WANT TO HAVE SOME ACCOMMODATIONS.  BUT

5    WHETHER AUTO CORRECT IS A WAY OR B WAY OR WHETHER IT REPLACES

6    THE STRING OR KEEPS THE STRING, THESE THINGS WILL DRIVER DEMAND

7    FOR THE AVERAGE CONSUMER.  THAT'S WHAT I WAS REFERRING TO, THAT

8    ONLY A VERY BIG OUTLIER WOULD EVEN NOTICE THE DIFFERENCES OR

9    CARE ABOUT IT ENOUGH, ET CETERA.  THAT WAS THE POINT.

10   Q.   YOU MEAN WHEN PEOPLE GO TO A STORE TO BUY A SMARTPHONE,

11   THEY DON'T LOOK TO SEE WHETHER AN AUTO CORRECT, THEY'VE GOT TO

12   TAP TO KEEP THE WORD IN A SECOND AREA OR TAP UP ABOVE TO ACCEPT

13   THE CORRECTION?  THAT'S NOT SOMETHING THAT FOLKS MAKE DECISIONS

14   ON?

15   A.   THAT'S TRUE.  THAT WAS WHAT I WAS SAYING IN MY DEPOSITION.

16   Q.   SO MR. BENNETT ASKED, ALSO LAST FRIDAY ASKED YOU SOME

17   QUESTIONS ABOUT QWERTY KEYBOARD, AND I'D LIKE TO SHOW YOU WHAT

18   HE ASKED YOU LAST FRIDAY.

19        WE HAVE THE TRIAL TRANSCRIPT.  AND MR. BENNETT ASKED YOU,

20   OKAY, AND SAME WITH RESPECT TO, FOR INSTANCE, SOMETHING CALLED

21   A QWERTY KEYBOARD, WHICH IS A KEYBOARD ON A SMARTPHONE THAT YOU

22   CAN USE TO TEXT AS OPPOSED TO THE OLD NINE DIGIT CELL PHONE

23   KEYBOARD, YOU CONCLUDED THAT HAVING AN ACTUAL KEYBOARD THAT YOU

24   COULD USE TO E-MAIL AND TEXT MESSAGES, THAT THAT HAD NO EFFECT

25   AND WAS NOT A DRIVER OF CONSUMER DEMAND.

1          AND THEN YOU GAVE A LONG ANSWER THERE.

2          DO YOU SEE THAT?

3     A.   YES.

4     Q.   NOW, LET'S LOOK AT THE NEXT QUESTION AND ANSWER.  THIS IS,

5     KEN, 2315, 18 TO 23.

6          MR. BENNETT SAID TO YOU, "QWERTY REFERS TO THE TYPEWRITER

7     TYPE KEYBOARD AS OPPOSED TO THE NINE DIGIT, ISN'T THAT WHAT

8     QWERTY STANDS FOR?  IT'S THE FIRST SIX LETTERS YOU SEE ACROSS

9     THE TOP OF THE TYPE WRITER KEYBOARD?

10         "ANSWER:  I THINK IT'S A SPECIFIC KEYBOARD.  THAT'S HOW

11    THE CONSUMERS INTERPRET THESE THINGS."

12         SO DID YOU UNDERSTAND THAT MR. BENNETT WAS SUGGESTING THAT

13    THIS FEATURE THAT YOU HAD FOUND DID NOT IMPACT CONSUMER CHOICE

14    WAS THE DIFFERENCE BETWEEN HAVING A NINE, A NINE KEY FEATURE

15    PHONE STYLE KEYBOARD WHERE EACH NUMBER COUNTS FOR A FEW LETTERS

16    AND HAVING THE FULL 26 LETTER KEYBOARD?

17    A.   YEAH.  I THINK I, IN THE QUESTION, I MISSED IT.  I WAS

18    THINKING, IN MY MIND, THE DIFFERENCES, AS IN MY STUDY, THEY ARE

19    DIFFERENT WAYS OF DELIVERING DATA AND ALL MY FIVE PHONES HAS A

20    TOUCHSCREEN AND YOU HAVE THE FULL KEYBOARD, OBVIOUSLY.

21         LATER ON, AFTER THIS DISCUSSION, I REALIZED WHAT I WAS

22    SAYING AND THAT'S WHY I WAS COMING BACK, AND YOU'RE NOT SHOWING

23    IT ON THE SCREEN RIGHT NOW, BUT I TOLD HIM THAT OBVIOUSLY, ALL

24    OF THESE PHONES, YOU CAN TYPE.  IT'S NOT ABOUT THE ABILITY TO

25    TYPE BECAUSE ALL THESE PHONES HAVE IT.

1          AND THEN THE MORE PRECISE DISTINCTION IS THAT THE WAY IT

2     IS, IT IS WORKED OUT IN MY STUDY, ALL THESE FIVE PHONES

3     ACTUALLY SHOWED NO FOR IT BECAUSE THEY HAD THE TOUCHSCREEN

4     VERSION, NOT THE PHYSICAL VERSION LIKE ON A BLACKBERRY.

5     Q.   ALL RIGHT.  WELL, IN FACT, IN THE INSTRUCTIONS THAT YOU

6     GAVE THE PARTICIPANTS TO YOUR STUDY, DID YOU GIVE THEM THE

7     DEFINITION OF WHAT A QWERTY KEYBOARD WAS?

8     A.   THE DESCRIPTIONS WERE THERE IF THEY WANTED TO LOOK AT

9     THEM.

10    Q.   ALL RIGHT.  SO -- AND THEN AS USED IN YOUR REPORT, DID YOU

11    HAVE A DEFINITION OF A QWERTY KEYBOARD?

12    A.   YES.

13    Q.   IF WE COULD LOOK AT EXHIBIT 60, PAGE NUMBER 107 FROM YOUR

14    REPORT, AND WE SEE A DEFINITION OF QWERTY KEYBOARD THERE.

15    A.   YEAH.  IT REFERS TO A PHYSICAL KEYBOARD WITH KEY ASSIGNED

16    IN SIMILAR FASHION TO COMPUTER KEYBOARDS.

17    Q.   SO WHAT -- AS IT WAS DEFINED AND PRESENTED TO PEOPLE IN

18    YOUR SURVEY, WHAT WAS A QWERTY KEYBOARD?

19    A.   IT'S LIKE WHAT BLACKBERRY WOULD HAVE.

20    Q.   LIKE A PHYSICAL KEYBOARD?

21    A.   PHYSICAL KEYBOARD.

22    Q.   AND DID ANY OF THOSE PHONES HERE ON THE SCREEN, ANY OF THE

23    SMARTPHONES HAVE THAT PHYSICAL KEYBOARD?

24    A.   NO, BUT, OF COURSE, YOU COULD TYPE BECAUSE IT WAS A

25    TOUCHSCREEN VERSION OF IT.  IT WAS STILL Q-W-E-R-T-Y, BUT IT

1      WASN'T THE PHYSICAL KEYBOARD.

2      Q.    OKAY.  SO YOU -- AS INDICATED IN YOUR REPORT, THE QWERTY

3      KEYBOARD WAS A PHYSICAL 26 DIGIT KEYBOARD, NOT THE NINE KEY

4      OLD-FASHIONED KIND OF TEXTING KEYBOARD WHERE YOU HAD TO USE

5      NINE KEYS TO TYPE 26 LETTERS?

6      A.    THAT'S CORRECT.

7      Q.    NOW, DID MR. BENNETT, WHEN HE WAS ASKING YOU THESE

8      QUESTIONS LAST FRIDAY, DID HE ACTUALLY HAVE A COPY OF YOUR

9      REPORT AND INCLUDING THIS PAGE?

10     A.    PROBABLY HE DID HAVE IT.

11     Q.    AND MY FINAL QUESTION TO YOU IS, IF SOMETHING LIKE A, SAY,

12     NEAR FIELD COMMUNICATIONS, THIS S BEAM, IF THIS DOESN'T

13     ACTUALLY DRIVE CONSUMER CHOICE, WHY IS IT THAT MANUFACTURERS

14     LIKE SAMSUNG WOULD USE -- INCORPORATE INNOVATIONS LIKE THAT IN

15     THEIR PRODUCTS?

16     A.    BECAUSE BEAMING IS A GOOD THING.  IT IS PART OF THE --

17     SOME OF THE BRAND IMAGE OF COMPANIES, AND THEY NEED TO CHOOSE

18     SOME, PICK SOME TO SIGNAL TO CONSUMERS THAT THEY ARE

19     INNOVATIVE, EVEN IF THE INDIVIDUAL FEATURES MAY NOT DRIVE

20     DEMAND, IT BECOMES PART OF THE HELLO EFFECT, THE BRAND IMAGE.

21     Q.    HELLO EFFECT?

22     A.    WE CALL IT HELLO EFFECT.

23     Q.    HALO?

24     A.    EXACTLY.  LIKE, YOU KNOW, 3M -- CERTAIN COMPANIES HAVE,

25     GOING BEYOND THIS CASE, LIKE 3M IS KNOWN TO BE AN INNOVATIVE

1    ACTIVE COMPANY.  HOW DO THEY CREATE THIS IMAGE?  THEY PROMOTE

2    ALL THE NEW THINGS THEY ARE DOING.

3            MR. QUINN:  THANK YOU VERY MUCH, DR. ERDEM.

4            THE COURT:  ALL RIGHT.  TIME IS NOW 9:31.

5            MR. BENNETT:  VERY BRIEFLY, YOUR HONOR.

6            THE COURT:  GO AHEAD, PLEASE.

7                          **RECROSS-EXAMINATION**

8    BY MR. BENNETT:

9    Q.   SO, DR. ERDEM, WHAT I NOW HEAR YOU SAYING IS THESE

10   FEATURES THAT YOU'VE IDENTIFIED IN YOUR REPORT FROM YOUR EYE

11   TRACKING STUDY AS NOT MAJOR OR MINOR, WHAT YOU'RE SAYING IS

12   THEY DON'T DRIVE DEMAND?  IS THAT WHAT YOU'RE SAYING NOW?

13   A.   WELL, THE ONES IN THE MAJOR GROUP, AS DEFINED IN MY STUDY,

14   WE CAN GO BACK TO IT, THEY DO DRIVE DEMAND.

15        THE ONES THAT WERE IN THE MINOR GROUP, IN THE HIGH

16   COMPLEXITY AND MEDIUM COMPLEXITY GROUP, THEY DIDN'T DRIVE

17   DEMAND.

18   Q.   LET'S TALK ABOUT GPS.  LET'S FOCUS ON GPS.  YOU'RE SAYING

19   EVERYBODY HAS GPS, SO IT DOESN'T DRIVE DEMAND.  THAT'S WHAT YOU

20   JUST SAID, DIDN'T YOU?

21   A.   IN MY STUDY, GPS WAS INCLUDED AND GPS, ALL THE FIVE PHONES

22   HAD GPS, AND AS A GROUP OF THOSE ATTRIBUTES, GPS WAS ONE OF

23   THEM.  THEY DIDN'T DRIVE DEMAND.

24   Q.   BECAUSE EVERY PHONE HAD IT?

25   A.   IN THIS CASE, THE AVAILABILITY IS AN ISSUE, OF COURSE.

```
 1    Q.   WHAT MR. QUINN JUST SHOWED US WAS EVERY PHONE HAD GPS, AND

 2    BASED ON THAT, YOU SAID IT'S NOT A DIFFERENTIATOR, IT DOESN'T

 3    DRIVE DEMAND; IS THAT RIGHT?

 4    A.   THAT'S CORRECT.

 5    Q.   THAT WOULD BE TRUE, WOULDN'T IT, DR. ERDEM, OF EVERY

 6    FEATURE THAT MANUFACTURERS OF CELL PHONES CONSIDERED TO BE

 7    MUST-HAVE FEATURES?  IN OTHER WORDS, THE CELL PHONE MUST-HAVE

 8    THIS TO SELL?

 9    A.   IF ALL PHONES HAD THOSE, THEY WON'T BE DIFFERENTIATORS.

10    Q.   WOULDN'T IT BE TRUE THAT A CELL PHONE MANUFACTURER, LIKE

11    SAMSUNG, COULD VIEW THE GPS FUNCTION AS A MUST-HAVE, WE MUST

12    HAVE THIS FEATURE IN OUR PHONE OR IT WON'T SELL?

13    A.   THEY MAY -- CONSUMERS MAY WANT THE GPS, BUT AS I SAID, IF

14    EVERY PHONE HAS GPS, IT'S A GENERAL THING.  IT'S NOT ABOUT HOW

15    THE FUNCTIONALITY IS OFFERED, BUT IT'S THE GENERAL

16    CAPABILITIES, LIKE THE ABILITY TO TYPE ON A KEYBOARD.  THESE

17    THINGS, OF COURSE, ARE MUST-HAVES.  BUT THEY ARE GIVEN.

18    Q.   AND IN THIS CASE YOU DON'T KNOW THAT SAMSUNG, MR. QUINN'S

19    CLIENT, HASN'T MADE PRECISELY THAT JUDGMENT, WE'LL JUST TALK

20    ABOUT GPS, THAT GPS IS A MUST-HAVE FEATURE, WE MUST HAVE IT IN

21    OUR PHONE TO SELL PHONES, AND YET NOTWITHSTANDING THAT, YOUR

22    CONCLUSION IS IT'S NOT A DRIVER BASED ON YOUR EYE TRACKING

23    STUDY.  THAT'S WHERE WE ARE, ISN'T IT?

24    A.   YES, BUT --

25              MR. BENNETT:  NOTHING FURTHER.  THANK YOU, YOUR
```

```
1        HONOR.

2               THE COURT:  ALL RIGHT.  TIME IS 9:33.

3               MR. QUINN:  NOTHING FURTHER, YOUR HONOR.

4               THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

5        AND IS IT SUBJECT TO RECALL OR NO RECALL?

6               MR. QUINN:  NO RECALL, YOUR HONOR.

7               THE COURT:  ALL RIGHT.  DO YOU AGREE WITH THAT,

8        MR. BENNETT?

9               MR. BENNETT:  YES, YOUR HONOR.

10              THE COURT:  ALL RIGHT.  YOU MAY BE EXCUSED.

11           (PAUSE IN PROCEEDINGS.)

12              THE COURT:  LET ME GIVE YOU TIME TO GET SET UP.

13           (PAUSE IN PROCEEDINGS.)

14              THE COURT:  ALL RIGHT.  PLEASE CALL YOUR NEXT

15       WITNESS.

16              MR. QUINN:  YOUR HONOR, SAMSUNG CALLS

17       PROFESSOR JUDITH CHEVALIER.

18              THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

19          **(DEFENDANTS' WITNESS, JUDITH CHEVALIER, WAS SWORN.)**

20              THE WITNESS:  I DO.

21              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

22           AND PULL THE MICROPHONE TOWARDS YOU AND STATE YOUR NAME,

23       PLEASE, AND SPELL IT.

24              THE WITNESS:  JUDITH CHEVALIER, J-U-D-I-T-H,

25       C-H-E-V-A-L-I-E-R.
```

```
 1                    THE CLERK:  THANK YOU.

 2                    THE COURT:  ALL RIGHT.  THE TIME IS NOW 9:36.

 3              GO AHEAD, PLEASE.

 4                    MR. QUINN:  THANK YOU, YOUR HONOR.

 5                         DIRECT EXAMINATION

 6       BY MR. QUINN:

 7       Q.   PROFESSOR CHEVALIER, WHAT POSITION DO YOU NOW HOLD?

 8       A.   I'M A PROFESSOR OF ECONOMICS AND FINANCE AT THE YALE

 9       SCHOOL OF MANAGEMENT.

10       Q.   I THINK YOU'VE PREPARED SOME DEMONSTRATIVES.  IF WE COULD

11       LOOK AT 3770.

12            HOW LONG HAVE YOU BEEN A PROFESSOR AT THE YALE SCHOOL OF

13       MANAGEMENT.

14       A.   SINCE 2001.

15       Q.   YOU'RE A TENURED PROFESSOR THERE?

16       A.   OH, YES.

17       Q.   WHAT CLASSES DO YOU TEACH?  CAN YOU GIVE US EXAMPLES.

18       A.   I TEACH COMPETITIVE STRATEGY, AND I TEACH THE ECONOMICS OF

19       THE INFORMATION ECONOMY TO THE UNDERGRADUATE STUDENTS IN THE

20       COLLEGE.

21       Q.   AND PRIOR TO JOINING THE YALE UNIVERSITY BUSINESS SCHOOL,

22       WHAT POSITION DID YOU HAVE?

23       A.   SO BEFORE THAT, I WAS A PROFESSOR OF ECONOMICS AT THE

24       UNIVERSITY OF CHICAGO GRADUATE SCHOOL OF BUSINESS; AND BEFORE

25       THAT, I WAS -- I STARTED OUT AS AN ASSISTANT PROFESSOR OF
```

1    ECONOMICS AT HARVARD.

2    Q.   AND WHAT IS YOUR OWN EDUCATIONAL BACKGROUND WHERE YOU GOT

3    YOUR DEGREES?

4    A.   SO MY PH.D. IS IN ECONOMICS AND IT'S FROM M.I.T.,

5    MASSACHUSETTS INSTITUTE OF TECHNOLOGY.

6    Q.   WHILE YOU HAVE BEEN AT YALE, HAVE YOU BEEN INVOLVED IN ANY

7    ISSUES RELATING TO TECHNOLOGY?

8    A.   OH, YES.  SO AT YALE, I CHAIRED THE COMMITTEE ON

9    COOPERATIVE RESEARCH.

10   Q.   WHAT'S THAT?

11   A.   SO THE UNIVERSITY, IN THE COURSE OF ITS, YOU KNOW, ITS

12   SCIENTISTS' ACTIVITIES GENERATES PATENTABLE INVENTIONS, BUT A

13   UNIVERSITY ISN'T GOING TO COMMERCIALIZE THOSE, AND THEY WANT TO

14   GET SOME REVENUE FROM THEM, AND THEY WANT TO MAKE SURE THEY GET

15   USED, SO THEY HAVE AN OFFICE WHICH LICENSES THOSE TECHNOLOGIES

16   TO COMPANIES THAT MIGHT WANT TO USE THEM, AND I CHAIRED THE

17   COMMITTEE THAT OVERSAW THAT OFFICE.

18   Q.   OKAY.  AND IF WE COULD TURN TO THE NEXT DEMONSTRATIVE,

19   3771.  CAN YOU GIVE US, PERHAPS, JUST SOME OF THE HIGHLIGHTS OF

20   OTHER AWARDS AND HONORS?  YOU KNOW, I DON'T WANT YOU TO BLUSH

21   OR ANYTHING, BUT JUST TELL US SOME OF THE HIGHLIGHTS OF WHAT

22   YOUR CAREER HAS BEEN IN TERMS OF THE RECOGNITION THAT YOU'VE

23   RECEIVED?

24   A.   SURE.  I GUESS I'VE RECEIVED SOME AWARDS FOR MY PAPERS AND

25   SOME GRANTS FROM THE NATIONAL SCIENCE FOUNDATION.

```
 1              I GUESS PEOPLE IN THE ACADEMY WOULD SAY PROBABLY THE

 2    BIGGEST AWARD ON THERE IS THAT I'M AN ELECTED MEMBER OF THE

 3    AMERICAN ACADEMY OF ARTS AND SCIENCES.

 4         Q.   AND WHAT IS THAT?

 5         A.   SO IT'S ON HONORARY SOCIETY THAT HONORS PEOPLE WHO HAVE

 6    MADE CONTRIBUTIONS IN ACADEMICS AND IN OTHER FIELDS.

 7         Q.   HOW MANY -- HAVE YOU WRITTEN SOME ACADEMIC ARTICLES THAT

 8    HAVE BEEN PUBLISHED?

 9         A.   OH, YES.

10         Q.   ROUGHLY HOW MANY?

11         A.   A COUPLE DOZEN.

12         Q.   CAN YOU TELL THE JURY, PLEASE, WHAT SOME OF THE SUBJECTS

13    ARE THAT YOU'VE PUBLISHED ON?

14         A.   SURE.  SO I HAVE A LOT OF WORK IN COMPETITION IN GENERAL.

15    I HAVE A LOT OF WORK IN ESTIMATING DEMAND, ESPECIALLY IN

16    INDUSTRIES CHANGED BY TECHNOLOGY; AND I ALSO HAVE A LOT OF WORK

17    ON ESTIMATING THE EFFECTS OF PRODUCT REVIEWS ON CONSUMER

18    DEMAND.

19         Q.   OKAY.  HAVE YOU BEEN ENGAGED IN THIS TYPE OF WORK BEFORE,

20    THAT IS TO SAY, WHERE YOU'VE BEEN ENGAGED BY A PARTY OR LAWYERS

21    REPRESENTING A PARTY IN CONNECTION WITH LITIGATION TO CONSULT

22    AND SERVE AS AN EXPERT WITNESS?

23         A.   YES, I HAVE.

24         Q.   AND CAN YOU TELL US ROUGHLY HOW MANY TIMES YOU'VE DONE

25    THAT?
```

```
1    A.   ABOUT A DOZEN TIMES OVER THE LAST, SAY, TEN, 12 YEARS.

2    Q.   AND HOW MANY OF THOSE TIMES ROUGHLY INVOLVED INTELLECTUAL

3    PROPERTY ISSUES?

4    A.   ABOUT HALF, MAYBE FIVE.

5    Q.   DID SOME OF THOSE INVOLVE ISSUES WHERE YOU WERE TO GIVE

6    OPINIONS REGARDING WHAT APPROPRIATE DAMAGES WOULD BE?

7    A.   YES.

8    Q.   AND ROUGHLY HOW MANY OF THOSE?

9    A.   MAYBE FOUR OF THE FIVE.

10   Q.   AND, IN FACT, HAVE THE -- HAVE EITHER OF THE LAW FIRMS

11   HERE REPRESENTING APPLE EVER SELECTED YOU TO BE AN EXPERT

12   WITNESS IN ANOTHER CASE THAT THEY HAD FOR ANOTHER PARTY IN

13   ORDER TO BE AN EXPERT IN, OR IN A PATENT CASE IN PARTICULAR?

14   A.   OH, YES.

15   Q.   SO OVER THE LAST FIVE YEARS, LET'S SAY, HAS THIS TYPE OF

16   WORK CONSTITUTED 80 TO 85 PERCENT OF YOUR INCOME?

17   A.   NO.

18   Q.   SO YOU -- HAVE YOU BEEN A FULL-TIME UNIVERSITY PROFESSOR

19   DURING YOUR ENTIRE PROFESSIONAL CAREER?

20   A.   YES.

21        MR. QUINN:  YOUR HONOR, WE WOULD OFFER DR. CHEVALIER

22   AS AN EXPERT IN ECONOMICS, IN PARTICULAR WITH RESPECT TO DEMAND

23   MODELING AND PATENT DAMAGES.

24        MR. LEE:  NO OBJECTION, YOUR HONOR.

25        THE COURT:  ALL RIGHT.  SO CERTIFIED.
```

```
 1              GO AHEAD, PLEASE.

 2      BY MR. QUINN:

 3      Q.   SO, DR. CHEVALIER, YOU'VE BEEN CERTIFIED AS AN EXPERT

 4      HERE?

 5              WHAT WAS THE ASSIGNMENT THAT YOU WERE GIVEN IN THIS CASE?

 6      A.   SO MY ASSIGNMENT WAS TO DETERMINE AN APPROPRIATE DAMAGE

 7      REMEDY AND ALSO TO EVALUATE THE EXPERT REPORT OF DR. VELLTURO.

 8      Q.   ALL RIGHT.  SO LET'S BE VERY CLEAR HERE.  DID YOU -- IN

 9      DOING THE WORK THAT YOU DID, DID YOU MAKE ANY ASSUMPTIONS

10      REGARDING WHETHER PATENTS WERE INFRINGED OR PATENTS WERE VALID?

11      A.   YES, I DID.  SO IN ALL OF THE WORK THAT I'M DOING TODAY,

12      I'M ASSUMING THAT THE PATENTS ARE VALID, ALL OF THE PATENTS ARE

13      VALID AND ALL OF THE PATENTS ARE INFRINGED.

14      Q.   OKAY.  DID YOU ACTUALLY READ THE REPORTS THAT WERE

15      PREPARED BY DR. VELLTURO AND DR. HAUSER?

16      A.   YES, I DID.

17      Q.   AS WELL AS THEIR TESTIMONY?

18      A.   YES.

19      Q.   ALL RIGHT.  AND LET'S TALK -- START WITH DR. VELLTURO.

20              HOW MANY CATEGORIES OF DAMAGES DOES DR. VELLTURO IDENTIFY?

21      A.   HE IDENTIFIES THREE CATEGORIES OF DAMAGES.

22      Q.   WHAT ARE THOSE?

23      A.   SO THE FIRST IS DIMINISHED DEMAND LOST PROFITS; THE SECOND

24      IS OFF THE MARKET LOST PROFITS; AND THE THIRD IS A REASONABLE

25      ROYALTY.
```

1    Q.   LET'S START WITH THE FIRST, THE DIMINISHED DEMAND LOST

2    PROFITS.  COULD YOU JUST REMIND THE JURY WHAT THOSE ARE?

3    A.   OKAY.  SO DIMINISHED DEMAND LOST PROFITS ARE THE PROFITS

4    THAT APPLE -- THEY ARE SUPPOSED TO REPRESENT THE PROFITS THAT

5    APPLE HAS LOST DUE TO SAMSUNG'S INFRINGEMENT.

6    Q.   ALL RIGHT.  AND HOW DOES HE ARRIVE AT THAT NUMBER?

7    A.   WELL, HE ARRIVES AT THAT NUMBER, THE FIRST KEY INPUT IS

8    DR. HAUSER'S CONJOINT STUDY.

9    Q.   AND LET'S -- IF WE COULD PERHAPS PUT UP SDX 3772.  AND LET

10   ME JUST ASK YOU, IS THIS SORT OF A SUMMARY OF HOW DR. HAUSER

11   ARRIVED AT HIS DIMINISHED DEMAND LOST PROFITS CATEGORY?

12   A.   I THINK YOU MEAN DR. VELLTURO.

13   Q.   DR. VELLTURO?

14   A.   RIGHT.  YES, IT IS.

15   Q.   ALL RIGHT.  AND YOU WERE TELLING US IT STARTS WITH?

16   A.   SO IT STARTS WITH DR. HAUSER'S CONJOINT RESULTS.

17   Q.   ALL RIGHT.

18   A.   SO THOSE RESULTS ARE WHAT HE USES TO DETERMINE HOW MUCH

19   SAMSUNG'S SALES WOULD FALL IF THEY COULDN'T PRACTICE THE

20   PATENTS, IF THEY REMOVED THE PATENTED ELEMENTS.

21   Q.   ALL RIGHT.  AND SO HE GETS THAT FROM DR. HAUSER?

22   A.   YES, HE DOES.

23   Q.   AND THEN WHAT DOES DR. VELLTURO DO WITH THAT INPUT FROM

24   DR. HAUSER, THAT IS TO SAY, HOW MUCH SAMSUNG'S SALES WOULD

25   SUPPOSEDLY FALL IF SAMSUNG WEREN'T USING THESE FIVE PATENTED

```
 1        FEATURES?  WHAT DOES DR. VELLTURO THEN DO WITH THAT?
 2        A.   OKAY.  SO HE TAKES THE DIMINISHED DEMAND FOR SAMSUNG FROM
 3        DR. HAUSER AND THEN HE USES APPLE'S MARKET SHARE WITH A CARRIER
 4        ADJUSTMENT, BUT HE USES APPLE'S MARKET SHARE AND THE ASSUMPTION
 5        THERE IS THAT APPLE WILL EARN THE SAME SHARE OF SAMSUNG'S LOST
 6        UNITS THAT IT'S EARNING OVERALL, THAT IT WOULD CAPTURE OVERALL
 7        IN THE MARKETPLACE.
 8             OKAY.  SO HE TAKES THE CONJOINT RESULTS AND THEN APPLE'S
 9        ESTIMATED SHARE, AND THAT'S -- THOSE ARE PERCENTAGES, SO HE
10        THEN MULTIPLIES THAT BY THE ACCUSED UNITS.
11             THAT GETS THE UNITS THAT HE'S CALCULATING THAT APPLE HAS
12        LOST, AND THEN HE JUST MULTIPLIED THAT BY APPLE'S WORLDWIDE
13        INCREMENTAL PROFIT RATE, THAT'S THE PROFIT RATE HE USES, AND
14        THAT GETS TO THE CLAIMED LOST PROFITS.
15        Q.   OKAY.  LET'S START WITH DR. HAUSER.  HOW MANY DIMINISHED
16        DEMAND NUMBERS, THAT IS, THE SUPPOSED REDUCTION IN SAMSUNG'S
17        SALES IF IT WEREN'T USING THOSE FIVE PATENTED FEATURES, HOW
18        MANY DIMINISHED DEMAND NUMBERS DOES DR. HAUSER PROVIDE IN HIS
19        OUTPUT TO DR. VELLTURO?
20        A.   OKAY.  SO HE PROVIDES ONE DIMINISHED DEMAND NUMBER FOR
21        EACH PATENT AND FOR EACH PRODUCT TYPE.
22        Q.   ALL RIGHT.  SO ONE NUMBER FOR EACH PATENT AND FOR EACH
23        PRODUCT?
24        A.   PRODUCT TYPE.
25        Q.   DOES HE PROVIDE ANY ALTERNATIVE NUMBERS?
```

1     A.   NO.

2     Q.   IF THOSE NUMBERS AREN'T RIGHT?

3     A.   NO.   JUST THOSE NUMBERS.

4     Q.   DOES HE PROVIDE A RANGE OF NUMBERS?

5     A.   NO.   HE PROVIDES JUST THOSE NUMBERS.

6     Q.   ALL RIGHT.   DOES DR. VELLTURO HAVE ANY QUANTITATIVE DATA

7     CONCERNING THE SALES THAT SAMSUNG SUPPOSEDLY WOULD HAVE LOST AS

8     A RESULT OF DIMINISHED DEMAND, OTHER THAN THESE RESULTS FROM

9     DR. HAUSER?

10              MR. LEE:   YOUR HONOR, I OBJECT TO THE LEADING.

11              THE COURT:   SUSTAINED.

12    BY MR. QUINN:

13    Q.   WELL, OTHER THAN -- LET ME ASK IS THIS WAY:   OTHER THAN

14    THE NUMBERS, THE DIMINISHED DEMAND NUMBERS THAT DR. HAUSER

15    PROVIDES TO DR. VELLTURO, WHAT OTHER QUANTITATIVE DATA DOES

16    DR. VELLTURO HAVE CONCERNING THE SALES THAT SAMSUNG SUPPOSEDLY

17    WOULD HAVE LOST?

18    A.   OH, HE DOESN'T HAVE OTHER QUANTITATIVE DATA THAT HE USES

19    IN HIS CALCULATION.   THIS CALCULATION IS BASED ON DR. HAUSER'S

20    CONJOINT RESULTS.

21    Q.   SOLD?

22    A.   SOLD.

23    Q.   DO EITHER DR. VELLTURO OR DR. HAUSER PROVIDE THE JURY WITH

24    ANY ALTERNATIVE DIMINISHED DEMAND NUMBERS OR LOST PROFITS

25    ATTRIBUTABLE TO DIMINISHED DEMAND?

1    A.   YOU MEAN -- JUST THE ONES BASED ON DR. HAUSER'S CONJOINT

2    STUDY.

3    Q.   ALL RIGHT.  AND DO EITHER OF THEM, DR. VELLTURO OR

4    DR. HAUSER, PROVIDE A RANGE OF DIMINISHED DEMAND LOST PROFITS

5    NUMBERS --

6    A.   NO.

7    Q.   -- UNDER THIS CATEGORY OF DAMAGES?

8    A.   NO.

9    Q.   SO IF THE JURY FINDS THAT DR. HAUSER'S STUDY IS NOT

10   RELIABLE, DOES DR. VELLTURO PROVIDE ANY OTHER QUANTITATIVE

11   MEASURES OF DIMINISHED DEMAND OR LOST PROFITS ATTRIBUTABLE TO

12   DIMINISHED DEMAND?

13            MR. LEE:  YOUR HONOR, I OBJECT TO THE LEADING.

14            THE COURT:  OVERRULED.

15        GO AHEAD.  YOU MAY ANSWER.

16            THE WITNESS:  NO, HE DOES NOT.

17   BY MR. QUINN:

18   Q.   DO YOU -- YOU TOLD US THAT YOU REVIEWED DR. HAUSER'S

19   STUDY?

20   A.   I DID.

21   Q.   DO YOU AGREE WITH IT?

22   A.   NO.  I HAVE A NUMBER OF CONCERNS ABOUT DR. HAUSER'S STUDY,

23   AND I THINK DR. ERDEM AND DR. REIBSTEIN RAISED MANY OF THOSE

24   ISSUES HERE IN COURT.

25   Q.   SO IN YOUR REPORT DID YOU ADDRESS THOSE CONCERNS THAT YOU

1      HAD ABOUT DR. HAUSER'S STUDY?

2      A.    I DID ADDRESS SOME CONCERNS ABOUT THAT.

3      Q.    SO IN THE INTERESTS OF TIME, WE'RE GOING TO MOVE AHEAD.

4      WE WON'T GO -- WE WON'T TALK ABOUT DR. HAUSER HERE ANY MORE

5      THAN THAT.

6            BUT HAVE -- LET ME ASK YOU THIS:  HAVE YOU, YOURSELF, DONE

7      ANY AFFIRMATIVE RESEARCH TO EVALUATE WHETHER, IN FACT, SAMSUNG

8      WOULD LOSE SALES IF ITS PRODUCTS DID NOT INCLUDE THE CLAIMED

9      PATENTED FEATURES?

10     A.    YES, I HAVE.

11     Q.    ALL RIGHT.  SO LET'S TALK ABOUT THE RESEARCH THAT YOU DID.

12           WHAT IS IT THAT YOU DID?  AND PERHAPS IF WE COULD BRING UP

13     DEMONSTRATIVE 3774.

14     A.    SURE.  SO FIRST I STUDIED A LOT OF INFORMATION AVAILABLE

15     TO ME THROUGH THIS CASE.  I LOOKED AT MARKETPLACE PERFORMANCE,

16     WEBSITES; I WANTED TO SEE WHAT KIND OF FEATURES THE COMPANIES

17     WERE ADVERTISING; I SPENT A LOT OF TIME ON APPLE AND SAMSUNG

18      INTERNAL MARKET RESEARCH.

19           SO I DID A -- I EXAMINED A LOT OF DOCUMENTS TO SEE WHETHER

20     THERE WAS AN INDICATION THERE THAT THOSE PATENTED FEATURES

21     DRIVE DEMAND.

22           AND THEN HAVING FOUND NONE, THE NEXT THING I DID WAS I

23     UNDERTOOK AN IN-DEPTH ANALYSIS OF PROFESSIONAL REVIEWS AND

24     CONSUMER REVIEWS.

25     Q.    ALL RIGHT.  SO COULD YOU GIVE THE JURY SOME IDEA OF THE

1    VOLUME OF MATERIALS THAT YOU REVIEWED?

2    A.   OH, THIS IS THOUSANDS OF PAGES.

3    Q.   ALL RIGHT.  SO IN TERMS OF THE PROFESSIONAL REVIEWS AND

4    THE CONSUMER REVIEWS, LET'S TALK FIRST ABOUT THE PROFESSIONAL

5    REVIEWS.

6         WOULD YOU TELL THE JURY WHAT THOSE PROFESSIONAL REVIEWS

7    ARE?  WHAT IS IT THAT YOU'RE REFERRING TO?

8    A.   OKAY.  SO PROFESSIONAL REVIEWS ARE REVIEWS ON WEBSITES,

9    PLACES LIKE CONSUMER REPORTS, BUT ALSO MANY OF THE DEDICATED

10   TECHNOLOGY WEBSITES LIKE CNET OR GDGT OR THE VERGE, AND THOSE

11   WEBSITES PRODUCE DETAILED REVIEWS OF PRODUCTS AND IN MY

12   ANALYSIS, I'M GOING TO EXAMINE THOSE DETAILED PRODUCT REVIEWS

13   IN A SYSTEMATIC WAY.

14   Q.   WHY DID YOU BELIEVE THAT THOSE PROFESSIONAL PRODUCT

15   REVIEWS WOULD BE A USEFUL SOURCE OF INFORMATION FOR DISCUSSING

16   THIS ISSUE ABOUT WHETHER THERE WERE SALES ATTRIBUTABLE TO THESE

17   PATENTED FEATURES?

18   A.   WELL, THERE'S THREE REASONS.

19        THE FIRST IS WHEN I EXAMINED APPLE AND SAMSUNG INTERNAL

20   MARKET RESEARCH, ONE OF THE THINGS I LEARNED WAS THAT APPLE AND

21   SAMSUNG HAVE DETERMINED THAT CONSUMERS USE REVIEWS IN MAKING

22   THEIR PRODUCT SELECTIONS.

23   Q.   ALL RIGHT.  AND IF I COULD JUST STOP YOU HERE AFTER THAT

24   FIRST ONE, IF WE COULD LOOK AT -- THIS IS ADMITTED, YOUR

25   HONOR -- DEFENSE DX 4576.  THIS IS UNDER SEAL, SO THIS IS A

1    CONFIDENTIAL DOCUMENT, KEN.  457-6, AND YOU -- IS THERE

2    SOMETHING HERE YOU SEE AS AN EXAMPLE OF, YOU KNOW, AN APPLE

3    DOCUMENT INDICATING THAT PROFESSIONAL REVIEWS ARE AN IMPORTANT

4    SOURCE OF INFORMATION HERE?

5    A.   YES.  SO THIS DOCUMENT SHOWS IPHONE 5 PURCHASE INFLUENCERS

6    AND THESE ARE THE TOP TWO BOX SUMMARY.

7              MR. LEE:  YOUR HONOR, SINCE THIS IS A SEALED

8    DOCUMENT, I THINK THE CAMERA CAN SEE THE SCREEN.

9              MR. QUINN:  THE CAMERA?

10             THE COURT:  DID THEY --

11             MR. LEE:  THAT'S A PROBLEM FOR THE OVERFLOW

12   COURTROOM.

13             THE COURT:  DID THEY CHANGE THE LOCATION OF THE

14   MONITOR?

15             MR. LEE:  YEAH.  I THINK WE MOVED THE MONITOR OVER

16   FOR A PURPOSE AND NOW IT'S MOVED BACK.

17             THE COURT:  OKAY.  WHY DON'T WE --

18             MR. QUINN:  CAN WE STOP THE CLOCK, YOUR HONOR, WHILE

19   WE DEAL WITH THIS, PLEASE.

20             THE COURT:  YES.  9:51.

21        PLEASE CALL -- WHO MOVED THIS?

22             MR. QUINN:  NOT ME.

23             THE COURT:  MAYBE BECAUSE OF ALL THE BINDERS, MAYBE.

24        LET'S SEE IF WE CAN -- BUT CAN YOU SEE IT?

25             THE WITNESS:  YEAH.  I MEAN, IS IT OKAY IF I'M RIGHT

```
 1      HERE?

 2              THE COURT:  OH, THAT'S FINE.  WHEREVER IS COMFORTABLE

 3      FOR YOU.  BUT CAN YOU SEE THAT COMFORTABLY?

 4              THE WITNESS:  THEN I CAN SEE, YES.

 5              THE CLERK:  DO YOU WANT ME TO GET JACKSON?

 6              THE COURT:  YES, PLEASE.  HAVE SOMEONE CHECK THE

 7      OVERFLOW ROOM AND MAKE SURE THEY CAN'T SEE THE DOCUMENT.

 8          (PAUSE IN PROCEEDINGS.)

 9              THE COURT:  I WOULD LIKE THE CAMERA TO BE ON THE

10      WITNESS.

11              MR. QUINN:  YEAH.

12              THE COURT:  JUST FOR THE OVERFLOW, THEY CAN SEE THE

13      EXHIBITS AND THEY CAN SEE THE WITNESS AND --

14              MR. QUINN:  I'M NOT SURE I CAN -- OKAY.  SMILE.

15          (LAUGHTER.)

16              THE COURT:  THANK YOU.  THANK YOU VERY MUCH.

17              MR. QUINN:  I THINK WE'RE OKAY, YOUR HONOR.

18      Q.  ALL RIGHT.  YOU WERE TELLING US --

19              THE COURT:  9:52.  GO AHEAD, PLEASE.

20              MR. QUINN:  THANK YOU.

21      Q.  -- ABOUT THE RELEVANCE OF THE 457-6, THE APPLE DOCUMENT?

22      A.  RIGHT.  SO YOU CAN SEE THERE IN THE LEFT COLUMN THAT

23      IPHONE PURCHASERS CITE ARTICLES AND REVIEWS AS A MAJOR

24      INFLUENCE IN THEIR DECISION.

25      Q.  AND THEN IF WE COULD LOOK AT DEFENSE EXHIBIT 433.8.  THIS
```

1      IS ADMITTED.  IT IS NOT CONFIDENTIAL, SO IT CAN BE DISPLAYED

2      FOR ALL.  IS THIS THEN A SAMSUNG DOCUMENT THAT SHOWED THE SAME

3      INFORMATION?

4      A.   YES.  SO --

5      Q.   WHAT ARE YOU REFERRING TO HERE?

6      A.   SO IF YOU LOOK AT THAT TOP LINE THAT -- OH, YEAH.  OKAY.

7           THIS IS LOOKING AT WHERE DO PEOPLE GET INFORMATION ABOUT

8      SMARTPHONES, AND THEN, YOU KNOW, DOES THAT INFORMATION

9      POSITIVELY INFLUENCE PURCHASE?

10          AND YOU CAN SEE THAT TECH REVIEW WEBSITES ARE A TOP

11     INFLUENCER, AND ALSO, YOU KNOW, PLAY A ROLE IN POSITIVELY

12     INFLUENCING PURCHASE FOR A SUBSTANTIAL NUMBER OF CONSUMERS

13     SURVEYED.

14     Q.   OKAY.  LET'S QUICKLY LOOK AT DEMONSTRATIVE 3775, AND I'M

15     GOING TO ASK YOU, WHAT WAS YOUR METHODOLOGY IN ANALYZING THESE

16     PROFESSIONAL REVIEWS?

17     A.   OKAY.  SO I WANTED -- IT WAS IMPORTANT TO ME THAT THIS BE

18     SYSTEMATIC, SO THE FIRST THING I DID WAS I FOUND TOP WEB --

19     SOURCES FOR TOP WEBSITES FOR REVIEWS, AND AS I SAID, THOSE WERE

20     FROM LEADING MEDIA OUTLETS, BOTH IN THE TECH SPACE

21     SPECIFICALLY, BUT ALSO MORE GENERALLY.

22          AND THEN I TOOK THOSE REVIEWS AND TURNED THEM INTO

23     INDIVIDUAL SENTENCES.  SO THEY WERE PARSED INTO INDIVIDUAL

24     SENTENCES.  SO THERE WERE 9,5 -- ROUGHLY 9,500 SENTENCES IN THE

25     REVIEWS, IN THE PROFESSIONAL REVIEWS, AND WE'RE GOING TO THINK

1        OF EACH OF THOSE SENTENCES AS BEING LIKE A DATA POINT THAT WE

2        CAN EVALUATE.

3              AND THEN I HAD A, A TEAM OF CODERS THAT I USED THAT I GAVE

4        SPECIFIC INSTRUCTIONS TO ABOUT HOW TO CLASSIFY EACH FEATURE

5        MENTIONED, EACH MENTION IN THE REVIEWS, INTO ACCUSED AND

6        NON-ACCUSED CATEGORIES.

7              SO I LOOKED AT FEATURES RELATED TO THE FIVE PATENTS AT

8        ISSUE BUT ALSO NON-ACCUSED FEATURES THAT WE KNOW ARE IMPORTANT

9        LIKE SCREEN SIZE, BATTERY LIFE, PROCESSOR, ET CETERA, AND THEN

10       COMPUTED THE NUMBER AND PERCENTAGE OF SENTENCES THAT MENTIONED

11       EACH FEATURE.

12       Q.   ALL RIGHT.  IN TERMS OF THE INSTRUCTIONS THAT YOU GAVE, I

13       THINK WE HAVE AN EXAMPLE.  IF WE COULD LOOK AT DEMONSTRATIVE

14       3776.

15       A.   OKAY.  SO THIS IS THE EXAMPLE OF THE DIRECTIONS TO THE

16       REVIEW CODERS FOR A SPECIFIC PATENT, THE '721 IMAGE UNLOCK, AND

17       THESE INSTRUCTIONS TELL THE CODER WHEN TO TICK OFF AND THEN

18       FLAG A REVIEW, A SENTENCE -- SORRY -- AND WHAT YOU'LL NOTICE

19       ABOUT THIS IS I DIDN'T HONE NARROWLY ON THE PATENTED ELEMENT.

20       Q.   WHAT DO YOU MEAN BY THAT?

21       A.   WELL, FOR EXAMPLE, YOU CAN SEE HERE THAT I CODED MENTION

22       OF SLIDE FINGER ANYWHERE TO UNLOCK AND/OR RIPPLE EFFECT, THE

23       RIPPLE EFFECT IS USED IN THE G S III, I BELIEVE THAT'S NOT

24       ACCUSED.  BUT I'M LOOKING FOR MENTIONS THAT INCLUDE EVEN THAT.

25       Q.   SO WOULD YOU COUNT RIPPLE EFFECT AS BEING A REFERENCE TO

```
 1      THE PATENT OR NOT?

 2      A.   I WOULD, YES.

 3      Q.   SO WAS THIS BEING MORE, SORT OF BEING MORE CONSERVATIVE?

 4      A.   YES.  THE IDEA IS TO BE ILLUSIVE HERE SO WE CAN, YOU KNOW,

 5      HAVE -- KNOW HOW MUCH THESE FEATURES ARE BEING DISCUSSED.

 6      Q.   SO IF WE CAN LOOK AT SDX 3778, IS THIS A SUMMARY OF YOUR

 7      FINDINGS?

 8      A.   YES, IT IS.

 9      Q.   AND COULD YOU HELP THE JURY UNDERSTAND WHAT YOU FOUND?

10      A.   SURE.  SO FIRST YOU SEE AT THE TOP, IF YOU LOOK AT THE

11      FEATURES THAT, YOU KNOW, WE TALKED ABOUT A LITTLE BIT BEFORE,

12      LIKE SCREEN QUALITY, PROCESSOR, MEMORY, YOU CAN SEE THAT THESE

13      REVIEW SITES SPEND A LOT OF SENTENCES TALKING ABOUT THESE

14      FEATURES CATEGORIES.  SO 11.6 PERCENT OF -- I'M SORRY -- 11.6

15      PERCENT OF THE SENTENCES DISCUSS SCREEN QUALITY.

16      Q.   SO WHERE DO WE SEE THAT?

17      A.   THAT'S UP THERE IN THE TOP MIDDLE.

18      Q.   RIGHT HERE (INDICATING)?

19      A.   YES.

20      Q.   OKAY.

21      A.   AND THEN AGAIN I ALSO LOOKED AT MENTIONS OF THE PATENTED

22      ELEMENTS.  THAT'S DOWN THERE AT THE BOTTOM.

23      Q.   RIGHT.

24      A.   AND YOU CAN SEE THAT LESS THAN A FRACTION OF A PERCENT OF

25      THE SENTENCES ARE DISCUSSING THESE PATENTED ELEMENTS.
```

```
 1              AND, AGAIN, I THINK IT'S USEFUL TO THINK ABOUT, YOU KNOW,

 2     WHY THIS MATTERS.  YOU KNOW, WE HEARD FROM DR. HAUSER'S SURVEY,

 3     WHICH DR. VELLTURO USES, THAT ROUGHLY 7 PERCENT OF THE PEOPLE

 4     WOULDN'T BUY A PHONE IF THE METHOD OF SLIDE TO UNLOCK WASN'T

 5     THE PATENTED ONE.

 6              AND SO IF I'M A WEB -- IF I'M WRITING A PRODUCT REVIEW OF

 7     A PHONE AND I HAVE AN INCENTIVE TO WRITE A GOOD REVIEW AND MAKE

 8     SURE THAT PEOPLE READ MY REVIEWS AND, YOU KNOW, WATCH THE ADS

 9     ON MY -- LOOK AT THE ADS ON MY WEBSITE, IF I'M INCENTIVE LIKE

10     THESE PROFESSIONAL REVIEWERS ARE TO WRITE A MEANINGFUL REVIEW,

11     I'M GOING TO BE TALKING ABOUT HOW THE PHONE UNLOCKS TO PEOPLE

12     KNOW WHEN THEY'RE GOING TO BUY THE PHONE.

13              AND YOU CAN SEE THAT SLIDE TO UNLOCK IS MENTIONED IN.36

14     PERCENT.

15     Q.   AND THAT WOULD INCLUDE NON-ACCUSED VERSIONS LIKE THE

16     RIPPLE UNLOCK?

17     A.   YES.

18     Q.   ALL RIGHT.  NOW, DID YOU ALSO -- YOU MENTIONED THAT YOU

19     ALSO LOOKED AT CONSUMER REVIEWS?

20     A.   YES, I DID.

21     Q.   AND WHAT'S THE DISTINCTION, CONSUMER REVIEWS VERSUS

22     PROFESSIONAL REVIEWS?

23     A.   OKAY.  SO PROFESSIONAL REVIEWS ARE THESE WEBSITES THAT,

24     YOU KNOW, WHERE PROFESSIONALS WRITE REVIEWS.

25              BUT ALSO, YOU KNOW, IN MY RESEARCH, I'VE SHOWN THAT
```

1    CONSUMERS -- IN MY ACADEMIC RESEARCH, NOT HERE -- I'VE SHOWN

2    THAT CONSUMER REVIEWS PLAY A ROLE IN CONSUMER DEMAND.

3         SO CONSUMER REVIEWS ARE THINGS LIKE REVIEWS ON AMAZON, AND

4    THAT'S WHAT I FOCUSSED ON HERE, SO REVIEWS THAT USERS WRITE.

5    Q.   IF WE COULD LOOK AT SDX 3780, IS THIS A SUMMARY OF YOUR

6    ANALYSIS BASED ON CONSUMER REVIEWS?

7    A.   YES, IT IS.

8    Q.   AND CAN YOU TELL US, YOU KNOW, WAS THAT SORT OF CONSISTENT

9    WITH OR HOW DID THAT AID YOUR STUDY?

10   A.   YES.  ONCE AGAIN, THESE MAJOR FEATURES ON THE TOP ARE, YOU

11   KNOW, YOU GET A LOT OF SENTENCES, AND ON THE BOTTOM, THESE

12   SENTENCES RELATED TO THE PATENTED -- THE PATENTS FLAGGED

13   ACCOUNT FOR A FRACTION OF A PERCENT OF TOTAL SENTENCES IN THE

14   REVIEWS.

15   Q.   DID YOUR RESEARCH INDICATE, GIVE YOU ANY INDICATION WHAT

16   WERE THE THINGS THAT, YOU KNOW, CAUSED PEOPLE TO BUY PHONES?

17   WHAT THE MAIN DRIVERS ARE?

18   A.   YES.

19   Q.   AND IF WE COULD LOOK AT SDX 3781, CAN YOU TELL US WHAT

20   THIS SHOWS?

21   A.   YES.  SO THESE ARE CONCLUSIONS BOTH FROM MY DOCUMENT

22   RESEARCH AND FROM MY REVIEW RESEARCH, AND I DID -- I KNOW I'VE

23   HEARD SOME OF THESE ALREADY DISCUSSED IN COURT, BUT I

24   DETERMINED THAT TOP DRIVERS OF SMARTPHONE PURCHASES, PURCHASE

25   DECISIONS ARE THE CARRIER, THE OPERATING SYSTEM PLATFORM, LIKE

 1    IOS VERSUS ANDROID, THE MARKETING AND BRANDING, THE PRICE OF

 2    COURSE, AND HARDWARE CHARACTERISTICS, LIKE SCREEN SIZE, BATTERY

 3    LIFE, THE PROCESSOR, ET CETERA.

 4    Q.   NOW, APPLE HAS SUGGESTED THAT YOU BELIEVE THAT NONE OF

 5    SAMSUNG'S SALES, NONE OF THEM, COME AT THE EXPENSE OF APPLE.

 6         IN FACT, I THINK THERE WAS A STATEMENT THAT WE'VE GOT THAT

 7    MR. MCELHINNY MADE IN OPENING STATEMENT.

 8         IF WE CAN PUT THAT UP, KEN.

 9         WHILE THEY'RE TRYING TO FIND THAT, IS THAT, IN FACT, YOUR

10    OPINION, THAT APPLE DOESN'T LOSE ANY SALES TO SAMSUNG?

11    A.   NO, OF COURSE NOT.

12    Q.   OKAY.  COULD YOU EXPLAIN THAT?

13    A.   SURE.  SO --

14    Q.   HERE WE'VE GOT THE STATEMENT.  THIS IS MR. MCELHINNY IN

15    OPENING STATEMENT, "SAMSUNG IS GOING TO TELL THAT YOU NOT ONE,

16    I'M NOT EXAGGERATING HERE, THEY'RE GOING TO TELL YOU THAT NOT

17    ONE OF THOSE 37, OVER 37 MILLION BUYERS WOULD NOT HAVE BOUGHT

18    AN APPLE PRODUCT, EVEN IF THEY COULDN'T GET THEIR SAMSUNG

19    PRODUCT."

20         NOW, WAS MR. MCELHINNY EXAGGERATING?

21    A.   YES.

22    Q.   ALL RIGHT.

23    A.   SO -- SO SAMSUNG AND APPLE ARE COMPETITORS.  YOU KNOW,

24    SAMSUNG -- I MEAN, IT'S TRUE, WHEN SAMSUNG'S MARKET SHARE

25    INCREASES, SOME OF THAT COMES -- A LOT OF THAT I THINK COMES AT

1      THE EXPENSE OF OTHER ANDROID MANUFACTURERS.

2      Q.   OTHER ANDROID MANUFACTURERS?

3      A.   RIGHT.  SO, YOU KNOW, WE'VE SEEN THAT HTC'S MARKET SHARE

4      HAS KIND OF DIMINISHED IN RECENT YEARS WHILE SAMSUNG'S HAS

5      INCREASED.

6           BUT OF COURSE APPLE AND SAMSUNG ARE COMPETITORS, SO IT'S

7      SURELY THE CASE THAT WHEN PEOPLE BUY SAMSUNG PHONES, SOME OF

8      THEM, IF THEY COULDN'T BUY A SAMSUNG PHONE, WOULD HAVE BOUGHT

9      AN APPLE PHONE.

10     Q.   LET ME ASK YOU A LITTLE BIT DIFFERENT QUESTION.  DID YOU

11     SEE ANY EVIDENCE THAT PEOPLE WERE BUYING SAMSUNG PHONES RATHER

12     THAN APPLE PHONES BECAUSE OF THE FIVE, THE PRESENCE OF THE FIVE

13     CLAIMED PATENTED FEATURES IN SAMSUNG PHONES?  DID YOU SEE ANY

14     EVIDENCE OF THAT?

15     A.   NO.

16     Q.   SO LET'S GO -- I THINK THAT CONCLUDES OUR DISCUSSION OF

17     THE FIRST BUCKET THAT MR. -- DR. VELLTURO HAS, DIMINISHED

18     DEMAND.

19          WHAT'S THE SECOND BUCKET, CATEGORY OF DAMAGES?

20     A.   OKAY.  SO THE SECOND CATEGORY OF DAMAGES IS DIMINISHED --

21     SORRY.

22          THE SECOND CATEGORY OF DAMAGES IS OFF THE MARKET LOST

23     PRODUCT, PROFITS.

24     Q.   CAN YOU EXPLAIN TO THE JURY WHAT THAT CONCEPT IS?

25     A.   SURE.  OFF THE MARKET LOST PROFITS IS THE PROFITS THAT

1    APPLE WOULD EARN IF SAMSUNG WERE FORCED TO BE OFF THE MARKET TO

2    REDESIGN -- WHILE THEY DESIGNED AROUND THE PATENTED ELEMENTS.

3    Q.   AND DID DR. VELLTURO MAKE ANY ASSUMPTIONS ABOUT HOW LONG

4    SAMSUNG WOULD BE OFF THE MARKET WHILE IT DID A SUPPOSED DESIGN

5    AROUND FOR THESE PATENTED FEATURES?

6    A.   WELL, SO IN COURT HE PRESENTED A FOUR MONTH DESIGN AROUND

7    SCENARIO.

8    Q.   AND ONLY FOUR MONTHS?

9    A.   YES.

10   Q.   THAT -- IS THAT FOR ALL THE PATENTED FEATURES THAT ARE THE

11   SUBJECT OF THIS OFF THE MARKET DAMAGES, THAT IT WOULD TAKE FOUR

12   MONTHS?

13   A.   YES, THAT'S THE -- THAT'S THE SCENARIO HE PRESENTED IN

14   COURT.

15   Q.   HOW ABOUT IN DR. VELLTURO'S ORIGINAL REPORT?  DID HE

16   PRESENT SOME ALTERNATIVES THEN?

17   A.   SO IN HIS ORIGINAL REPORT, HE SHOWED OFF THE MARKET LOST

18   PROFITS FOR BOTH A ONE MONTH DESIGN AROUND PERIOD AND FOR A

19   FOUR MONTH DESIGN AROUND PERIOD.

20   Q.   OKAY.  AND WAS THERE A -- HUNDREDS OF MILLIONS OF DOLLARS

21   DIFFERENCE BETWEEN WHAT HIS OFF THE MARKET DAMAGES WOULD BE AT

22   FOUR MONTHS AND WHAT THEY WOULD BE AT ONE MONTH?

23   A.   YES, THERE'S HUNDREDS OF MILLIONS OF DOLLARS OF DIFFERENCE

24   BETWEEN THE FOUR MONTH AND THE ONE MONTH IN HIS ORIGINAL

25   REPORT.

1    Q.   DID HE THEN SUPPLEMENT HIS REPORT?

2    A.   YES.

3    Q.   AND IN HIS SUPPLEMENTAL REPORT, WHAT TIME PERIOD OR

4    PERIODS DID HE GIVE AS THE ASSUMPTION FOR THIS OFF THE MARKET

5    DAMAGES?

6    A.   SO IN THE SUPPLEMENTAL REPORT, HE ONLY SHOWED FOUR MONTH

7    OFF THE MARKET LOST -- LOST PROFITS.

8    Q.   OKAY.  HE DIDN'T GIVE A ONE MONTH OR ANYTHING LESS THAN

9    FOUR MONTHS?

10   A.   NO, HE DIDN'T.

11   Q.   DID HE GIVE ANY EXPLANATION AS TO WHY HE WASN'T PROVIDING

12   ANYTHING OTHER THAN THE LARGER FOUR MONTH FIGURE IN HIS

13   SUPPLEMENTAL REPORT?

14   A.   NOT THAT I RECALL, NO.

15   Q.   ARE YOU AWARE OF ANY REASON WHY DR. VELLTURO, IF HE HAD

16   WANTED TO, COULD NOT HAVE CALCULATED WHAT THE OFF THE MARKET

17   DAMAGES WOULD HAVE BEEN FOR THAT ONE MONTH PERIOD IN HIS

18   SUPPLEMENTAL REPORT AS HE DID IN HIS ORIGINAL REPORT?  ARE YOU

19   AWARE OF THAT?

20        MR. LEE:  OBJECTION, YOUR HONOR.  YOU REVIEWED THIS

21   IN RESPONSE TO A HIGH PRIORITY OBJECTION.

22        MR. QUINN:  NOT THIS, YOUR HONOR.

23        MR. LEE:  NO.  SHE HAS NO OPINION ON ONE OR TWO

24   MONTH.

25        THE COURT:  SHE DOESN'T.  IT WAS NOT IN HER

1        DECLARATION, HER SUPPLEMENTAL DECLARATION.

2               MR. QUINN:  THE QUESTION WAS, YOUR HONOR, WHETHER SHE

3        IS AWARE OF ANY REASON DR. VELLTURO COULD NOT HAVE CALCULATED

4        IT.  I'M NOT TO WHAT COUNSEL IS OBJECTING TO AT THIS POINT.

5               MR. LEE:  YOUR HONOR, SHE HAS NO OPINION ON ONE OR

6        TWO MONTHS.  THAT'S BEEN EXCLUDED.  THIS IS A BACK DOOR WAY TO

7        TRY TO GET THAT TESTIMONY.

8               MR. QUINN:  IT'S A NARROWER QUESTION.

9               THE COURT:  I'M GOING TO OVERRULE THE OBJECTION TO

10       THIS SPECIFIC QUESTION.

11              MR. QUINN:  ALL RIGHT.

12       Q.   ARE YOU AWARE OF ANY REASON THAT DR. VELLTURO COULD NOT

13       HAVE CALCULATED WHAT THE OFF THE MARKET DAMAGES WOULD BE FOR

14       THE SHORTER PERIOD IN THE SUPPLEMENTAL REPORT AS HE DID IN THE

15       ORIGINAL REPORT?

16       A.   NO, I CAN'T THINK OF ANY REASON WHY NOT.

17       Q.   ALL RIGHT.  NOW, FOR THE ONE MONTH, WHAT WERE THE OFF THE

18       MARKET DAMAGES THAT DR. VELLTURO CAME UP FOR THE SLIDE TO

19       UNLOCK?

20              MR. LEE:  YOUR HONOR, THIS IS JUST ANOTHER WAY TO GET

21       IN THE EXCLUDED TESTIMONY.

22              MR. QUINN:  NO, YOUR HONOR.  AND I OBJECT.  I'M ON A

23       CLOCK HERE, YOUR HONOR.

24              MR. LEE:  WE'RE ALL ON A CLOCK, YOUR HONOR.

25              MR. QUINN:  THIS IS --

```
 1              MR. LEE:  THE SAME CLOCK.

 2              MR. QUINN:  IT'S -- SHE DID GIVE A NUMBER FOR ONE

 3     MONTH FOR THE '721 AND THE 7 -- AND THE '172.  SHE GAVE NUMBERS

 4     FOR ONE MONTH FOR BOTH OF THOSE TWO AND COUNSEL KNOWS IT.

 5              MR. LEE:  YOUR HONOR, THIS WAS EXCLUDED --

 6              THE COURT:  OKAY.  STOP, PLEASE.  I DON'T WANT THIS

 7     BEFORE THE JURY.

 8          FOR THIS QUESTION, I'M GOING TO OVERRULE THE OBJECTION.

 9          BUT I THINK WE ALL KNOW WHAT THE LIMITS ARE HERE.

10              MR. QUINN:  ALL RIGHT.

11     Q.   SO THE '721, ONE MONTH OFF THE MARKET, WHAT ARE THE

12     DAMAGES?

13     A.   SO USING HIS METHODOLOGY, THEY'RE ZERO.

14     Q.   AND HOW ABOUT THE '172?

15     A.   SO, AGAIN, USING DR. VELLTURO'S METHODOLOGY, THEY ARE

16     ZERO.

17     Q.   ALL RIGHT.

18          YOUR HONOR, SHE'S NEVER HAD A CHANCE, BECAUSE --

19              THE COURT:  OKAY.  SHOULD I EXCUSE THE JURY?  SHOULD

20     I EXCUSE THE JURY NOW SO WE CAN HAVE THIS CONVERSATION?  I'M

21     NOT GOING TO HAVE IT IN FRONT OF THE JURY.

22              MR. QUINN:  NO, I --

23              THE COURT:  OKAY.  LET'S EXCUSE THE JURY.  IT'S

24     10:07.  PLEASE GO AHEAD AND TAKE A STEP OUTSIDE AND WE CAN

25     RESOLVE THIS ISSUE WITHOUT HAVING TO DO IT IN YOUR PRESENCE.
```

```
 1            (JURY OUT AT 10:07 A.M.)

 2                THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT THE

 3       JURORS HAVE LEFT THE COURTROOM.

 4            PLEASE TAKE A SEAT.

 5            AND YOU MAY STEP DOWN.

 6            ALL RIGHT.  LET'S FIGURE OUT WHAT EXACTLY IS COMING IN,

 7       WHAT IS NOT COMING IN.

 8            OBVIOUSLY THE HIGH PRIORITY OBJECTION DID NOT CLEARLY

 9       DEMARCATE WHAT'S IN AND OUT, SO LET'S GO AHEAD.  LET'S HASH IT

10       OUT NOW.  I DON'T WANT THESE SPEAKING OBJECTIONS AND RESPONSES

11       AND EVERYTHING IN FRONT OF THIS JURY.

12            SO --

13                MR. QUINN:  YOUR HONOR, ARE --

14                THE COURT:  LET ME UNDERSTAND.  I THOUGHT THERE WERE

15       ONLY OFF THE MARKET LOST PROFITS FOR THE '647, BECAUSE AFTER I

16       GRANTED SAMSUNG'S MOTION THAT THE DAMAGE INFRINGEMENT AND NOT

17       THE DATE OF NOTICE IS THE APPROPRIATE STARTING DATE, THAT THERE

18       WERE NO LOST PROFITS FOR OFF THE MARKET -- FOR ANY PATENT OTHER

19       THAN THE '647.

20            IS THAT -- IS THAT NOT CORRECT?

21            (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

22                MR. QUINN:  FOR ONE MONTH, THAT IS CORRECT, YOUR

23       HONOR.

24                MR. LEE:  YOUR HONOR, THAT'S --

25                MR. QUINN:  THE --
```

1          THE COURT:  OKAY.  HANG ON ONE SECOND.

2        LET ME UNDERSTAND.  IS THERE ANY OFF THE MARKET LOST

3    PROFITS FOR ANY PATENT OTHER THAN THE '647?  I UNDERSTOOD THAT

4    THERE WAS NOT BASED ON MY GRANTING SAMSUNG'S MOTION THAT THE

5    RELEVANT DATE HAS TO BE THE DATE OF FIRST INFRINGEMENT AND NOT

6    THE DATE OF NOTICE.

7          MR. LEE:  NO, AND I'VE -- YOUR HONOR, THERE ARE OFF

8     THE MARKET LOST PROFITS FOR THE '172, THE '721, THE '647.

9          THE COURT:  '647.

10          MR. LEE:  AND THEY WERE BASED UPON THE FOUR MONTH

11     PERIOD THAT DR. VELLTURO USED.

12        WHAT YOUR HONOR EXCLUDED AS NOT IN HER REPORT WERE

13    OPINIONS BASED UPON WHAT THAT AMOUNT WOULD BE IF IT WERE ONE OR

14    TWO MONTHS, AND THAT WAS THE HIGH PRIORITY OBJECTION BECAUSE

15    THOSE CALCULATIONS WERE NOT IN HER REPORT.

16        AND WHAT WE'RE DOING NOW IS WE'RE MOVING OFF THE FOUR

17    MONTHS, MONTHS HE DID IN HIS DIRECT TESTIMONY.

18        SHE CAN'T REBUT, GIVEN YOUR HONOR'S RULING, BECAUSE IT'S

19    NOT IN HER REPORT BY SAYING, "NO, YOU COULD HAVE DONE ONE OR

20    TWO MONTHS.  HERE'S WHAT IT SHOULD BE."

21        INSTEAD SHE'S NOW TELLING US WHAT DR. VELLTURO DID OR

22    MIGHT HAVE DONE AND THAT'S JUST A DIFFERENT WAY TO GET IT IN.

23          MR. QUINN:  THE PROBLEM WITH THAT, YOUR HONOR, IS THE

24     SUPPLEMENTAL REPORTS WERE SERVED CONCURRENTLY, AND SO IN

25     DR. VELLTURO'S SUPPLEMENTAL REPORT, FOR THE FIRST TIME, HE

```
 1        PROVIDED OFF THE MARKET LOST PROFITS FOR THE '647.  HE HAD

 2        NEVER DONE THAT BEFORE.

 3            DR. CHEVALIER WAS REQUIRED TO SERVE HER REPORT

 4        CONCURRENTLY, SO SHE DIDN'T ADDRESS THAT.  SHE HADN'T BEEN

 5        GIVEN -- YOU KNOW, HE HADN'T PREVIOUSLY CLAIMED OFF THE MARKET

 6        LOST PROFITS FOR THE '647, SO SHE NEVER HAD A CHANCE TO RESPOND

 7        TO THAT.

 8                THE COURT:  BUT THAT'S BECAUSE YOU ALL WON ON THE

 9        DATE OF THE FIRST INFRINGEMENT, OKAY?  THAT WAS YOUR MOTION IN

10        THE DAMAGES RETRIAL, WHICH I GRANTED, WHICH ELIMINATED ABOUT

11        $300 MILLION WORTH OF DAMAGES IN THE RETRIAL.

12            AND THEN YOU ASKED ME TO ENFORCE THAT SAME RULING IN THIS

13        CASE, WHICH I DID, AND THAT'S WHAT CAUSED '647 LOST PROFITS TO

14        INCREASE, BUT THEN IT REALLY ELIMINATED FOR THE OTHER FOUR

15        PATENTS.

16            SO --

17                MR. QUINN:  YOU -- THAT'S ABSOLUTELY RIGHT, YOUR

18        HONOR.

19                THE COURT:  SO THIS IS YOUR OWN REQUEST -- WHAT?

20                MR. QUINN:  YOU'RE ABSOLUTELY RIGHT ABOUT THAT.

21                THE COURT:  I KNOW.  SO THE FACT THAT IN HER

22        SUPPLEMENTAL DECLARATION SHE DOESN'T PRESENT ANY THEORY ABOUT

23        THE BLACK OUT PERIOD AT ALL AND JUST SAYS THAT VELLTURO'S

24        NUMBERS ARE WRONG BECAUSE HE'S NOT USING THE DATE OF FIRST

25        INFRINGEMENT IN HIS SUPPLEMENTAL REPORT -- AND, YOU KNOW, I
```

```
1     FEEL LIKE YOU ALL WANT, YOU WON AT THE DAMAGES RETRIAL YOU WON

2     HERE, I'M HOLDING THAT IT HAS TO BE DATE OF FIRST INFRINGEMENT.

3     THAT'S WHAT'S CREATED THIS ISSUE.

4          MR. QUINN:  IN HER REPORT, SHE DOES GIVE OFF THE

5     MARKET NUMBERS FOR THE '172 AND THE '721, SO THE ONLY THING AT

6     ISSUE HERE IS THE '647.

7          AND IN TERMS OF WHAT HAPPENED IN THE BACKGROUND --

8          THE COURT:  OKAY.  GIVER ME THE PARAGRAPH, BECAUSE I

9     DON'T EVER SEE HER GIVING A ONE MONTH OR TWO MONTH BLACK OUT

10    THEORY.  TELL ME THE PARAGRAPH NUMBER, AND IF I AGREE WITH YOU,

11    THEN --

12         MR. QUINN:  IT'S UPDATED EXHIBIT 53A.

13         THE COURT:  I'M LOOKING AT HER EXPERT REPORT OF

14    SEPTEMBER 13TH OF 2013, AND I HAVE HER DECLARATION, HER

15    SUPPLEMENTAL DECLARATION AS WELL.  SO WHERE IS IT IN THESE TWO

16    DOCUMENTS?

17         MR. QUINN:  EXHIBIT 53A, YOUR HONOR.

18         MR. WATSON:  TO THE SUPPLEMENTAL.

19         MR. QUINN:  IT'S AN EXHIBIT TO THE SUPPLEMENTAL

20    CHEVALIER REPORT.  53A.

21         THE COURT:  NO, NO, NO.  I NEED IT IN HER

22    DECLARATION, BECAUSE I DON'T SEE IT IN.  I DON'T SEE IT IN HER

23    DECLARATION WHERE SHE HAS ANY ONE OR TWO MONTH.  SO WHERE IS IT

24    IN THE DECLARATION OR IN HER REPORT?  IS THERE A PARAGRAPH

25    NUMBER THAT I CAN LOOK TO IN EITHER ONE?
```

 1          MR. QUINN:  ONE MOMENT, YOUR HONOR.

 2          MR. WATSON:  YOUR HONOR, IF I MAY?

 3          THE COURT:  YES.  GO AHEAD, PLEASE.

 4          MR. WATSON:  WHEN DR. CHEVALIER UPDATED HER

 5  CALCULATIONS, ALL SHE DID WAS SERVE SUPPLEMENTAL EXHIBITS.  SHE

 6  DIDN'T CHANGE THE TEXT OF HER REPORT BECAUSE OUR UNDERSTANDING

 7  WAS WE WERE SIMPLY DOING NEW CALCULATIONS WITH THE UPDATED

 8  DATA.

 9       THE --

10          THE COURT:  OKAY.  I'M LOOKING AT PARAGRAPH 5 OF

11  DR. CHEVALIER'S SUPPLEMENTAL REPORT, WHICH IS ECF NUMBER

12  1420-9, AND IN PARAGRAPH 5, SHE SAYS, "USING THIS DATE AS THE

13  COMMENCEMENT DATE FOR THE DESIGN AROUND FOR THE '647 AND THE

14  METHODOLOGY PRESENTED IN THE VELLTURO SUPPLEMENTAL REPORT,

15  WHICH INCLUDES THE '647, '172, AND '721, TOTAL OFF THE MARKET

16  LOSS PROFIT DAMAGES FOR THE FULL SET OF 15 PRODUCTS ACCUSED

17  PRIOR TO THE CASE NARROWING ARE 289.1 MILLION.  THIS IS SHOWN

18  IN EXHIBIT 2 AND THAT IS A FOUR MONTH CALCULATION."

19       THAT IS USING FOUR MONTHS.  IT'S NOT USING ONE MONTH.

20  IT'S NOT USING TWO MONTHS.

21          MR. WATSON:  SO, YOUR HONOR --

22          THE COURT:  SO WHERE ARE YOU --

23          MR. WATSON:  CAN I DIRECT YOU TO THE SUPPORTING

24  EXHIBIT TO DR. CHEVALIER'S REPORT?  IT'S EXHIBIT 53A, YOUR

25  HONOR.  I HAVE A COPY HERE IF YOU'D LIKE TO SEE IT.

```
 1              THE COURT:  OKAY.  BUT I'M LOOKING AT HER
 2    SUPPLEMENTAL DECLARATION.  WHERE IS HER SUPPLEMENTAL REPORT?
 3    IT'S NOT IN THIS BINDER.
 4              MR. WATSON:  YOUR HONOR, THE SUPPLEMENTAL REPORTS
 5    WERE SERVED ON THE PARTIES.  I DON'T KNOW IF THEY WERE FILED
 6    WITH THE COURT, BECAUSE EXPERT REPORTS ORDINARILY ARE NOT.
 7              THE SUPPLEMENTAL DECLARATION WAS NARROWLY DIRECTED TO
 8    THOSE ISSUES THAT WERE BEING BRIEFED AT THAT TIME REGARDING THE
 9    APPROPRIATENESS OF ADDING THE '647 PATENT TO THIS CATEGORY OF
10    DAMAGES.
11              BUT WE SERVED ON APPLE, AT THE APPROPRIATE TIME, AN
12    UPDATED EXHIBIT 53A, AND WHAT THAT SAYS --
13              THE COURT:  LET ME SEE THE SUPPLEMENTAL REPORT.  GIVE
14    ME A COPY, PLEASE, OF THE SUPPLEMENTAL REPORT.  I WANT THE
15    WHOLE REPORT.  I DON'T WANT ONE LITTLE PAGE THAT HAS PORTIONS
16    OF TWO PARAGRAPHS.
17              THIS IS WHAT I HAVE.  I HAVE THIS OF DR. CHEVALIER'S
18    (INDICATING).  IS IT NOT IN HERE?
19              MR. WATSON:  IT IS IN THERE.
20              THE COURT:  WHERE IS IT?
21              MR. WATSON:  IF YOU TURN TO 53A, EXHIBIT 53A, YOUR
22    HONOR, YOU'LL SEE THAT IT CONTAINS THE UPDATED EXHIBIT 53A.
23              SO WHAT WE DID IS WE PROVIDED --
24              THE COURT:  I DON'T WANT THE EXHIBIT.  I WANT THE
25    SUPPLEMENTAL REPORT.
```

```
1              MR. WATSON:  SHE DID NOT PREPARE A SUPPLEMENTAL

2     REPORT, YOUR HONOR.  WHAT WE DID WAS TO UPDATE THE

3     CALCULATIONS.

4         SO IN DOING THAT -- WE DIDN'T PROVIDE A TEXTUAL REPORT.

5     REMEMBER, THE AGREEMENT WAS --

6              THE COURT:  I SEE.  SO WHAT PARAGRAPH DOES IT

7     CORRESPOND TO IN THE SEPTEMBER 13, 2013, EXPERT REPORT?

8              MR. WATSON:  IF I MAY JUST HAVE ONE MOMENT TO ANSWER

9     THAT QUESTION, YOUR HONOR?

10             THE COURT:  PLEASE.

11         (PAUSE IN PROCEEDINGS.)

12             MR. WATSON:  YOUR HONOR, IF YOU LOOK AT PARAGRAPH 246

13    OF HER REPORT --

14             THE COURT:  OKAY.

15             MR. WATSON:  -- THAT REFERS THE COURT TO EXHIBIT 53.

16         THOSE ARE THE TWO SCHEDULES, 53A AND 53B, WHICH WERE

17    SUPPLEMENTED AT THE APPROPRIATE TIME, AND IF THE COURT LOOKS --

18    53A IS A LITTLE EASIER TO MAKE HEADS OR TAILS OF.

19         IF THE COURT LOOKS AT THAT, YOU WILL SEE THAT, VERY

20    CLEARLY, DR. CHEVALIER IS COUNTING A ONE MONTH PERIOD FOR THE

21    '721 AND THE '172 PATENT AND SHOWS THAT THE BLACK OUT DAMAGES

22    FOR THAT TIME PERIOD WOULD BE ZERO.

23         DR. CHEVALIER DOES NOT PROVIDE A NUMBER FOR THE '647

24    PATENT BECAUSE AS OF THAT TIME, APPLE HAD NEVER SOUGHT THIS

25    CATEGORY OF DAMAGES ON THE '647 PATENT.
```

```
 1          IT WAS NOT UNTIL WE SIMULTANEOUSLY EXCHANGED THESE

 2   SUPPLEMENTAL REPORTS THAT APPLE HAD EVER CLAIMED THAT CATEGORY

 3   OF DAMAGES FOR THIS PATENT.

 4          AND SO DR. CHEVALIER NEVER HAD AN OPPORTUNITY TO OFFER A

 5   CALCULATION OF A ONE MONTH PERIOD UNDER APPLE'S THEORY.  WE

 6   DIDN'T KNOW THAT THEY WERE GOING TO ADD THAT.

 7              THE COURT:  I'M SORRY.  CAN YOU GIVE ME JUST ONE

 8   SECOND TO READ?  YOU'RE TALKING NON-STOP AND I JUST NEED TO

 9   READ THIS PARAGRAPH.

10              MR. WATSON:  I APOLOGIZE, YOUR HONOR.

11              THE COURT:  THAT'S OKAY.

12          (PAUSE IN PROCEEDINGS.)

13              THE COURT:  SO THE ORIGINAL 53 IS NOT IN HERE.  CAN I

14   SEE THAT?

15              MR. WATSON:  YES, YOUR HONOR.

16              THE COURT:  THE 53 THAT'S REFERENCED IN THE ACTUAL

17   REPORT --

18              MR. WATSON:  I'LL RETRIEVE MY COPY.  JUST A MOMENT,

19   YOUR HONOR.

20              THE COURT:  THANK YOU.

21          ALL RIGHT.  LET ME HEAR FROM APPLE.  THIS HAS A ONE MONTH

22   PERIOD --

23              MR. LEE:  YOUR HONOR, THESE --

24              THE COURT:  -- FOR ALL PATENTS PRIOR TO FEBRUARY 8TH

25   OF 2012.  I'M REFERRING TO 53A.
```

```
 1          WHAT'S YOUR RESPONSE TO THAT?

 2              MR. LEE:  THAT'S THE WRONG DATE.  THAT'S NOT THE DATE

 3      THAT'S CONSISTENT WITH YOUR HONOR'S DAUBERT RULING.  THIS IS

 4      THE DATE THAT WOULD HAVE BEEN CONSISTENT WITH HER THEORY

 5      BEFORE, NOT NOW.

 6              THE COURT:  THAT'S THE COMPLAINT FILING DATE FOR THE

 7      630 CASE.

 8              MR. LEE:  THAT'S RIGHT.  WHAT THEY'VE DONE IS THERE'S

 9      NO SUPPLEMENTAL REPORT.  THERE WAS THIS UPDATED EXHIBIT, BUT

10      USING THE SAME DATES AS BEFORE.

11          SO SHE'S GIVEN NO OPINION CONSISTENT WITH YOUR HONOR'S

12      DAUBERT RULING ON THIS ONE OR TWO MONTH PERIOD.

13              MR. WATSON:  YOUR HONOR, THE DAUBERT RULING DIDN'T

14      ISSUE, I DON'T BELIEVE, UNTIL AFTER THESE REPORTS WERE SERVED.

15              MR. LEE:  YOUR HONOR, HERE'S THE ORIGINAL 53A, AND

16      YOU CAN SEE THAT THE DATES ARE IDENTICAL (HANDING).

17              MR. WATSON:  AND, YOUR HONOR, THE REASON THE DATES

18      ARE IDENTICAL IS BECAUSE FOR THOSE PATENTS, THE RELATIONSHIP

19      BETWEEN THE DATE OF FIRST INFRINGEMENT AND THE NOTICE DATE

20      REMAIN THE SAME.

21          (PAUSE IN PROCEEDINGS.)

22              THE COURT:  WELL, NOT FOR THE '647.  SAMSUNG GOT

23      NOTICE OF THE '647 A YEAR -- WELL, THE INFRINGEMENT STARTED --

24      THE INFRINGEMENT OCCURRED A YEAR, ALMOST A YEAR AFTER NOTICE,

25      SO THAT WOULD NOT BE CORRECT FOR THE '647.
```

```
 1            MR. WATSON:  THAT'S CORRECT, YOUR HONOR.

 2         BUT AGAIN, WE NEVER -- WE HAD NEVER RECEIVED A CLAIM FOR

 3    THIS CATEGORY OF DAMAGES ON THE '647 UNTIL THE EXCHANGE OF

 4    THESE SUPPLEMENTAL EXHIBITS.

 5         HAD WE RECEIVED THAT EXCHANGE FROM APPLE, IT WOULD HAVE

 6    BEEN INCLUDED IN THIS.

 7            MR. LEE:  YOUR HONOR, THESE ARE NOT THE DATES THAT

 8    MR. VELLTURO USED IN HIS SUPPLEMENTAL REPORT.  THAT -- THAT

 9    EXCHANGE, IN ACCORDANCE WITH YOUR HONOR'S DAUBERT RULING,

10    OCCURRED ON FEBRUARY 17TH.

11         IT'S NOW APRIL THE 21ST.  IF THEY THOUGHT THAT THEY DIDN'T

12    HAVE A FAIR CHANCE TO RESPOND AND THEY ACTUALLY HAD DIFFERENT

13    DATES, THERE'S BEEN THREE MONTHS, TWO MONTHS, TO DO THAT.

14         HAVING IT COME IN ON THE STAND ON THE FLY, IN THE GUISE OF

15    SOMEONE COMMENTING UPON SOMEONE ELSE'S EXPERT REPORT, IT'S NOT

16    PROCEDURALLY CORRECT, BUT IT'S ALSO VERY PREJUDICIAL TO US.

17            MR. WATSON:  YOUR HONOR, WE RAISED THIS ISSUE WITH

18    DR. VELLTURO ON CROSS-EXAMINATION AND HE GENERALLY AGREED WITH

19    THE NUMBER WE PRESENTED.

20         THERE'S REALLY NO QUESTION.  THIS IS NOT THAT COMPLEX A

21    METHODOLOGY.

22            THE COURT:  YOU KNOW, MY ORDER ON DATE OF FIRST

23    INFRINGEMENT FOR LOST PROFITS CAME OUT IN NOVEMBER IN THE FIRST

24    TRIAL, SO THE FACT THAT, "OH, WE NEVER GOT AN OPPORTUNITY TO

25    RESPOND," YOU KNEW WHAT MY ORDER WAS IN NOVEMBER, AND YOU ASKED
```

```
 1        ME TO ENFORCE THAT ORDER IN THIS CASE, WHICH I DID.  I AGREED

 2        WITH YOU.

 3             THE FACT THAT YOU DIDN'T ASK TO SUPPLEMENT I THINK IS YOUR

 4        OWN PROBLEM.  RIGHT?  I MEAN, YOU KNEW THIS WAS COMING BECAUSE

 5        THAT WAS YOUR MOTION AND YOU FILED IT IN OCTOBER SAYING IT'S

 6        GOT TO BE LOST PROFITS AS OF THE DATE OF FIRST INFRINGEMENT.  I

 7        AGREED WITH YOU.

 8             AND I AGREED WITH YOU AGAIN BECAUSE YOU ASKED ME TO

 9        ENFORCE IT IN THIS CASE.

10             SO YOU ALL KNEW THIS WAS COMING, AT LEAST AS OF OCTOBER

11        WHEN YOU FILED YOUR FIRST REQUEST ASKING FOR THE DATE OF

12        INFRINGEMENT TO BE THE START DATE FOR LOST PROFITS.

13                  MR. WATSON:  YOUR HONOR, I UNDERSTAND THAT WE BRIEFED

14        THIS AND THE COURT DISAGREES WITH US.

15                  THE COURT:  YEAH.

16                  MR. WATSON:  BUT IT WAS NOT AT ALL CLEAR TO US THAT

17        IT WAS APPROPRIATE TO SEEK BLACK OUT LOST DAMAGES ON THE '647,

18        EVEN UNDER THE COURT'S UPDATED -- OR EVEN UNDER THE COURT'S

19        RULING.

20             I MEAN -- THERE'S REALLY NO PREJUDICE TO APPLE HERE, YOUR

21        HONOR.  THEY UNDERSTAND THE METHODOLOGY.

22             IF DR. VELLTURO WANTS TO, OR IF ON CROSS-EXAMINATION

23        COUNSEL WANTS TO ADDRESS IT OR DR. VELLTURO WANTS TO ADDRESS

24        IT, HE'S COMING BACK TOMORROW.  HE CAN SAY THE CALCULATION IS

25        WRONG.
```

```
1            BUT TO NOT PERMIT US TO OFFER THIS WHEN THE FIRST TIME

2    THIS HAS EVER BEEN SOUGHT IS IN THE SUPPLEMENTAL REPORT -- AND

3    YOUR HONOR, WE DIDN'T WANT TO BE IN THE BUSINESS OF JUST

4    SUPPLEMENTING REPORTS CONSTANTLY.

5            THE COURT:  OKAY.  YOU HAVE HAD NO PROBLEMS ASKING ME

6    TO DO CLAIM CONSTRUCTIONS TEN DAYS BEFORE TRIAL.  TO SAY THAT

7    YOU'VE BEEN TOO SHY TO ASK FOR A SUPPLEMENTAL ON THIS IS KIND

8    OF HARD FOR ME TO BE PERSUADED ON THAT POINT BASED ON ALL THE

9    LITIGATION IN THIS CASE SINCE 2011.

10           I MEAN, IF YOU HAD ASKED FOR IT, I WOULD HAVE ALLOWED YOU

11   TO DO IT.

12           MR. WATSON:  CAN I ASK YOU NOW, YOUR HONOR?

13           THE COURT:  WELL, I MEAN, NOW IN THE MIDDLE OF TRIAL

14   AFTER WE'VE HAD, WHAT, 32 HOURS OF 50 HOURS OF TESTIMONY IS

15   KIND OF LATE.  DON'T YOU THINK?  I MEAN, THIS IS, ALREADY,

16   WHAT, THE THIRD OR FOURTH WEEK OF TRIAL.

17           LET ME SEE -- I WANT TO SEE THE ORIGINAL REPORTS.  I DON'T

18   HAVE ALL THESE REPORTS.  AS YOU SAID, THEY DON'T GET FILED AND

19   WE JUST GET THE TINY SNIPPETS THAT YOU FILE WITH HIGH PRIORITY

20   OBJECTIONS.

21           MR. WATSON:  SO, YOUR HONOR, THE TEXT OF

22   DR. CHEVALIER'S REPORT HAS NOT CHANGED, SO YOU HAVE THAT IN

23   FRONT OF YOU.

24           THE COURT:  WELL, I DON'T HAVE 53.  I JUST HAVE TWO

25   COPIES OF 53A.  WHERE IS THE ORIGINAL 53?
```

```
1              MR. WATSON:  SO THERE IS ONLY 53A AND B, YOUR HONOR,

2       AND YOU'LL --

3              THE COURT:  BUT HER REPORT DOESN'T MENTION A 53A OR

4       B.  IT JUST SAYS 53 IN PARAGRAPH 246.  PARAGRAPH 246 JUST

5       MENTIONED AN EXHIBIT 53, AND I -- THAT -- IT DOESN'T SAY 53A OR

6       B.  SO WHERE IS THAT ONE?

7              MR. WATSON:  YOUR HONOR, LET ME DOUBLE-CHECK, BUT I'M

8       VIRTUALLY CERTAIN THAT THE REFERENCE TO 53 WAS MEANT TO BE TO A

9       AND B.  LET ME CONFIRM.

10             THE COURT:  I THOUGHT YOU JUST SAID 53A WAS A

11      SUPPLEMENTAL.  IT WASN'T FILED WITH THE SEPTEMBER 2013 REPORT.

12             MR. WATSON:  IT --

13             THE COURT:  ISN'T THAT WHAT YOU SAID, THAT 53A WAS A

14      SUPPLEMENT, THAT YOU DIDN'T DO A SUPPLEMENTAL REPORT, YOU JUST

15      UPDATED THE EXHIBIT?

16             MR. WATSON:  THAT'S CORRECT.  LET ME SHOW YOU -- IF I

17      MAY PASS UP TO THE COURT, YOUR HONOR, THE TWO COPIES OF 53A,

18      YOU'LL NOTICE THAT ONE SAYS UPDATED EXHIBIT 53A, AND THE

19      ORIGINAL JUST SAYS EXHIBIT 53A.

20          WITH THE COURT'S PERMISSION?

21             THE COURT:  OH, I SEE.  SO THERE WAS NO EXHIBIT 53?

22             MR. WATSON:  THAT'S CORRECT, YOUR HONOR.

23             THE COURT:  I SEE.  OKAY.

24          (PAUSE IN PROCEEDINGS.)

25             THE COURT:  ALL RIGHT.  WHAT ELSE DO YOU HAVE THAT
```

1    WILL BE INFORMATIVE OF THIS ISSUE?  I'M GOING TO TAKE A FIVE

2    MINUTE BREAK, TEN MINUTE BREAK.  WHAT ELSE?  ANYTHING ELSE THAT

3    I SHOULD LOOK AT?

4        LET ME SEE THE -- DO I HAVE THE ORIGINAL VELLTURO REPORT

5    AS WELL?  WHAT ARE THE RELEVANT PARAGRAPHS OF HIS OPENING

6    REPORT AND HIS SUPPLEMENTAL?

7            MR. LEE:  YOUR HONOR, I DON'T HAVE THEM RIGHT HERE,

8    BUT WE'RE GETTING THEM.

9        THE DATE HE USED, YOUR HONOR, IN THE SUPPLEMENTAL REPORT

10   FOR THE '172, I BELIEVE, IS NOVEMBER OF 2011, THE DATE OF

11   ISSUANCE OF THE PATENT, AND FOR THE '721, HE USED OCTOBER 2011.

12           THE COURT:  WELL, I WOULD LIKE THE PARAGRAPH OF HIS

13   REPORT THAT I CAN LOOK TO WHEN I'M LOOKING AT THE EXHIBITS.

14           MR. WATSON:  YOUR HONOR, CAN I DIRECT YOU TO, IN

15   DR. VELLTURO'S OPENING REPORT, PARAGRAPHS 292 AND PARAGRAPH

16   307?

17           THE COURT:  292 -- YOU SAID 292 AND 407?

18           MR. WATSON:  307, YOUR HONOR.

19           THE COURT:  307.

20           MR. LEE:  SO, YOUR HONOR, IN HIS SUPPLEMENTAL REPORT,

21   THE RELEVANT PARAGRAPHS ARE PARAGRAPHS 5 AND 6.

22           THE COURT:  WELL, I DON'T SEE ANY REASON WHY THEY

23   SHOULDN'T BE ABLE TO -- AND MAYBE IT'S APPROPRIATE MORE AS

24   CROSS OF VELLTURO THAN AS COMING IN THROUGH DR. CHEVALIER, OF

25   HIS -- I MEAN, THIS IS HIS OWN REPORT.

```
 1              MR. LEE:  RIGHT.  YOUR HONOR, THEY DID CROSS HIM ON

 2      SOME OF THIS.

 3              THE COURT:  YEAH.

 4              MR. LEE:  WE DID NOT OBJECT AT THAT TIME.  CROSSING

 5      HIM ON HIS OWN REPORT IS FINE.

 6          BUT WHEN ANOTHER EXPERT HAS BEEN EXCLUDED BECAUSE SHE

 7      HADN'T GIVEN THE OPINION, TO ALLOW THAT TO COME IN THE BACK

 8      DOOR BY SAYING, OR COMMENT ON DR. VELLTURO'S FIRST, SECOND, OR

 9      THIRD REPORT, THEY CROSSED -- YOUR HONOR, I THINK WE AGREED,

10      IT'S FAIR GAME FOR CROSS.  WE DIDN'T OBJECT DURING THE CROSS.

11          AND THE PARAGRAPHS WERE PARAGRAPHS 5 AND 6 AND

12      SUPPLEMENTAL EXHIBITS 19, 19.1, AND 21.

13              MR. WATSON:  AND YOUR HONOR, I WOULD JUST SAY

14      DR. CHEVALIER'S REPORT IS A REBUTTAL REPORT.  SHE CAN ONLY

15      RESPOND TO WHAT DR. VELLTURO HAS DONE, AND UNTIL THE

16      SIMULTANEOUS EXCHANGE WITH THE SUPPLEMENTAL REPORTS, HE HAD

17      NEVER OFFERED THIS CATEGORY OF DAMAGES ON THIS PATENT.

18              MR. LEE:  THAT, YOUR HONOR, GOES BACK TO THE SAME

19      ISSUE OF WHETHER THE TIME TO RAISE THAT ISSUE WAS IN OCTOBER OR

20      NOVEMBER OR FEBRUARY AS OPPOSED TO THE TENTH DAY OF TRIAL.

21          (PAUSE IN PROCEEDINGS.)

22              THE COURT:  AND WHAT ARE THE DATES THAT YOU'RE

23      SEEKING LOST PROFITS ON THE '721 AND '172 AND THE '647?

24              MR. OLSON:  FOR THE '721, THE OFF THE MARKET PERIOD

25      IS, AS WAS REFLECTED ON HIS SLIDES DURING HIS TESTIMONY, IS
```

 1      FEBRUARY 8TH TO FEBRUARY 21, WHICH REPRESENTS A FOUR MONTH

 2      PERIOD THAT --

 3               THE COURT:  FEBRUARY 8TH TO FEBRUARY 21?  THAT'S NOT

 4      FOUR MONTHS.

 5               MR. OLSON:  NO, CORRECT.  BECAUSE IT'S ONLY THE

 6      PERIOD THAT COMES AFTER DAMAGES CAN BE CALCULATED, RIGHT?

 7      DAMAGES CAN ONLY BE CALCULATED AFTER FEBRUARY 8TH WHEN NOTICE

 8      OCCURRED.

 9         THIS GOES BACK TO, YOU'LL REMEMBER, YOUR HONOR, HE STARTED

10      WITH A FEBRUARY 8TH DATE FOR NOTICE.  THEY THEN RAISED, THROUGH

11      THE DAUBERT, THAT IT SHOULDN'T BE THE DATE OF NOTICE, IT SHOULD

12      BE THE DATE OF FIRST INFRINGEMENT.  THAT WAS RAISED IN OCTOBER.

13         YOUR HONOR, AT THE HEARING ON THE DAUBERTS, SAID, NO,

14      WE'RE DOING DATE OF FIRST INFRINGEMENT BASED ON WHAT YOU ASKED,

15      THAT IS, WHAT SAMSUNG ASKED.

16         THE END RESULT IS WHEN HE DELIVERED HIS UPDATED REPORT ON

17      FEBRUARY 17TH, HE DID THE CALCULATIONS STARTING AT THE DATE OF

18      FIRST INFRINGEMENT, BUT OF COURSE ONLY INCLUDES DAMAGES FOR A

19      PERIOD IN WHICH APPLE IS ENTITLED TO DAMAGES, THE PERIOD AFTER

20      THE COMPLAINT OF FEBRUARY 8TH.

21         SO THAT'S WHY YOU'LL SEE THE FEBRUARY 8TH --

22               THE COURT:  AND WHAT IS THE DATE OF FIRST ALLEGED

23       INFRINGEMENT ON THE '721?

24               MR. OLSON:  IT'S THE DATE OF THE ISSUANCE OF THE

25       PATENT, WHICH I BELIEVE IS OCTOBER -- EXCUSE ME, IS -- YEAH, I

```
 1          BELIEVE OCTOBER -- WELL, THAT'S THE '172.  SORRY.

 2              '721, OCTOBER 25, 2011.  MY APOLOGIES, YOUR HONOR.

 3              FOR THE '172, THE DATE ENDS UP BEGINNING ON FEBRUARY 8TH

 4      BECAUSE THAT'S WHEN DAMAGES CAN BEGIN TO OCCUR, AND EXTENDS TO

 5      APRIL 6TH.

 6          ON THE '647 --

 7              THE COURT:  WHEN IS THE DATE OF FIRST ALLEGED

 8      INFRINGEMENT?

 9              MR. OLSON:  THE PATENT ISSUES ON DECEMBER 6TH, 2011.

10      THAT'S THE DATE OF FIRST INFRINGEMENT.

11              THE COURT:  THAT'S THE DATE OF FIRST INFRINGEMENT?

12              MR. OLSON:  CORRECT, WHEN THE PATENT ISSUES.

13          FOR THE '647 -- LET ME LET YOU GET THAT DOWN.

14              THE COURT:  OKAY.

15              MR. OLSON:  FOR THE '647, IT'S AUGUST 22ND OF 2011,

16      WHICH IS THE DATE THAT THE FIRST OF THE PRODUCTS IN THIS CASE

17      ARE SOLD, AND IT EXTENDS TO DECEMBER, AND TO BE HONEST, I

18      CAN'T -- I BELIEVE IT'S DECEMBER 19TH, BUT I'M -- MY MEMORY IS

19      IMPERFECT ON THAT.  BUT IT'S IN THE RANGE OF DECEMBER 19TH TO

20      21ST.

21          WHEN YOU'RE FINISHED, IF I COULD MAKE ONE COMMENT

22      REGARDING THE ABILITY OF SAMSUNG TO HAVE DONE A CALCULATION AND

23      PRESENTED IT TO US IF THEY WISHED TO.

24          (PAUSE IN PROCEEDINGS.)

25              THE COURT:  WHAT'S THAT?
```

1          MR. OLSON:  THEY MOVED ON THIS IN OCTOBER; THE COURT

2     HAD RULED ON IT IN 1846; AT THE HEARING IN JANUARY, THE COURT

3     REAFFIRMED ITS POSITION AND SAID YOU SHOULD DO THAT.

4          WE AFFIRMED, MS. KREVANS AFFIRMED AT THAT HEARING THAT WE

5     WOULD DO OUR SUPPLEMENTAL CALCULATION BASED ON THAT RULING,

6     BASED ON THE RULING OF THE FIRST, FIRST INFRINGEMENT, NOT FIRST

7     NOTICE.

8          THUS, TO THE EXTENT THAT SAMSUNG INTENDED OR WISHED TO

9     PRESENT A CALCULATION, ONE MONTH, FOUR MONTHS, OR ANY OTHER

10    MONTHS USING THOSE CALCULATIONS, IT COULD HAVE AND SHOULD HAVE

11    DONE SO AT THE TIME OF FEBRUARY 17TH WITH RESPECT TO THESE

12    MATTERS.

13         SO IT IS -- IT WAS KNOWN IN OCTOBER; IT WAS RULED ON BY

14    THE COURT IN NOVEMBER; RULED AGAIN IN JANUARY; WE AFFIRMED THAT

15    WE WOULD DO THAT SUPPLEMENT; AND NOW WE'RE HEARING IT --

16    LITERALLY THREE DAYS AGO WAS THE FIRST TIME WE SAW THESE

17    NUMBERS FROM DR. CHEVALIER.

18         MR. WATSON:  AND, YOUR HONOR, IF I MAY JUST ADDRESS

19    THAT LAST POINT?  AT THAT HEARING, MS. KREVANS REPRESENTED --

20    AND WE CITED THIS TO THE COURT IN OUR BRIEFING, OUR PRIOR

21    BRIEFING ON THIS ISSUE -- THAT APPLE WOULD ONLY BE SEEKING OFF

22    THE MARKET LOST PROFITS FOR TWO PATENTS, THE IMPLICATION BEING

23    IT WOULD MAINTAIN THOSE CLAIMS FOR THE '172 AND THE '721.

24         IT WAS NOT UNTIL WE RECEIVED THE SUPPLEMENTAL REPORT THAT

25    ANYONE EVER SAID A WORD ABOUT SEEKING OFF THE MARKET LOST

```
 1        PROFITS ON THE '647 PATENT.

 2              THE COURT:  RIGHT.  BUT YOU'RE HAVING DR. CHEVALIER,

 3        ON DIRECT EXAMINATION, TESTIFYING ABOUT THE '721 AND '172,

 4        WHICH YOU'RE CONCEDING YOU HAD NOTICE OF.

 5              MR. WATSON:  AND WE PRESENTED THOSE CALCULATIONS IN

 6        THE UPDATED EXHIBIT 53A.

 7          THE ONLY QUESTION HERE IS WITH REGARD TO THE '647, WHICH

 8        WE HAD NEVER BEEN ON NOTICE THAT APPLE SOUGHT THOSE DAMAGES

 9        UNTIL THE SUPPLEMENTAL REPORTS WERE SIMULTANEOUSLY EXCHANGED.

10              THE COURT:  BUT THEN WHY DIDN'T YOU ASK TO SUPPLEMENT

11        YOUR REPORT?

12              MR. WATSON:  YOUR HONOR, FRANKLY, IT DIDN'T SEEM LIKE

13        THAT CONTROVERSIAL A POINT AT THE TIME.  THE METHODOLOGY FOR --

14              THE COURT:  WELL, YOU ASKED ME TO CONSTRUE WHOLE

15        CLAIM CONSTRUCTIONS THAT YOU FILED ON MARCH 17TH, WHICH I

16        ISSUED RIGHT BEFORE TRIAL STARTED.  I MEAN, YOU ASKED ME TO

17        CONSTRUE PATENTS RIGHT BEFORE TRIAL.

18              MR. WATSON:  YOUR HONOR -- YOUR HONOR --

19              THE COURT:  I DID WHAT YOU REQUESTED.  I CONSTRUED A

20        PATENT ON, LIKE, MARCH 28TH.

21              MR. WATSON:  I APPRECIATE THAT, YOUR HONOR.

22              THE COURT:  YEAH.

23              MR. WATSON:  AND OBVIOUSLY HAD I FORESEEN THIS

24        CONVERSATION, I WOULD HAVE BROUGHT THAT MOTION.

25              BUT WE DISCLOSED THESE CALCULATIONS TO COUNSEL AT LEAST A
```

```
 1      FEW DAYS AGO.  THEY'RE NOT COMPLICATED CALCULATIONS.

 2      DR. VELLTURO HAS ALREADY TESTIFIED THAT THE NUMBER IS

 3      ESSENTIALLY CORRECT.

 4            THE COURT:  BUT YOU DON'T DISCLOSE THE CALCULATIONS

 5      UNTIL AFTER THEIR DAMAGES EXPERT HAS ALREADY TESTIFIED ABOUT A

 6      WEEK AGO?

 7            MR. QUINN:  WELL, WE CONFRONTED DR. -- WHEN I WAS

 8      CROSS-EXAMINING DR. VELLTURO, I CONFRONTED HIM WITH THE NUMBER,

 9      AND WE'VE BEEN TRYING TO FIND HIS RESPONSE, BUT IT'S

10      SOMETHING -- IT'S AN ACKNOWLEDGMENT FROM HIM THAT IT SOUNDS

11      RIGHT OR IT'S PROBABLY ABOUT RIGHT.  WE CONFRONTED HIM WITH THE

12      NUMBER, THE $17 MILLION NUMBER FOR ONE MONTH OFF, AND HE -- HE

13      DIDN'T QUIBBLE WITH IT.  HE DIDN'T -- I DON'T HAVE THE EXACT

14      TESTIMONY.

15            THE COURT:  THEN I THINK THE PREJUDICE TO YOU IS

16      MINIMAL IF YOU ALREADY GOT IT IN THROUGH APPLE'S DAMAGES

17      EXPERT.

18            MR. QUINN:  WELL, HE SAID, "I HAVEN'T DONE THE

19      CALCULATIONS MYSELF."

20          WE HAVEN'T BEEN ABLE TO FIND THE TESTIMONY, OR MAYBE WE

21      HAVE.  I GUESS WE HAVE, YOUR HONOR.

22          OKAY.  HE SAID, I ASKED HIM, IS IT -- "DOES IT, FOR OFF

23      THE MARKET THEN, FOR ONE MONTH, DOES IT COME TO 17.5 MILLION?"

24          HE SAYS, "I DON'T -- I CAN'T DO THAT MATH SITTING HERE,

25      BUT IT DOES BECOME QUITE SMALL.  THAT'S MY RECOLLECTION.
```

```
1             "QUESTION:  ALL RIGHT.  YOU HAVEN'T DONE THAT CALCULATION,

2     SIR?

3             "ANSWER:  NO.  I KNOW IT'S A SMALL NUMBER.

4             "QUESTION:  YOU KNOW IT'S A SMALL NUMBER.  IN FACT, YOU'VE

5     DONE MORE THAN ONE REPORT IN THIS CASE?"

6             AND IT GOES ON.  SO WE DON'T ACTUALLY HAVE AN

7     ACKNOWLEDGMENT THAT IT'S 17.5 MILLION.

8             I WILL SAY, YOUR HONOR, THAT THERE'S REALLY NO DISPUTE

9     HERE ABOUT THE METHODOLOGY, ABOUT HOW ANYONE WOULD GO ABOUT

10    CALCULATING THIS NUMBER.  IT'S CALCULABLE.

11            HINDSIGHT IS, IN THIS CASE, I SUBMIT 20/20.  WE DID MOVE

12    TO STRIKE.  WE SAW A PROBLEM HERE.  WE DID MOVE TO STRIKE HIS

13    CALCULATIONS REGARDING THIS PATENT, THE '647 PATENT.  THAT

14    MOTION WAS DENIED.

15            WHAT THE COURT IS POINTING OUT IS THAT WE DID NOT, AT THAT

16    POINT, MOVE TO SUPPLEMENT CHEVALIER'S REPORT TO PUT IN THE

17    $17.5 MILLION NUMBER.

18            THAT SEEMS TO ME TO BE A PRETTY, I WOULD SUBMIT, PRETTY

19    FINE THREAD FOR US TO EXCLUDE THAT NUMBER.  THEY'VE SAID THAT

20    DR. VELLTURO IS GOING TO TESTIFY TOMORROW.  IF --

21            THE COURT:  WELL, THEN, WHY CAN'T YOU GET IT ALL IN

22    THROUGH HIM?

23            MR. QUINN:  BECAUSE HE'S STILL GOING TO SAY "I

24    HAVEN'T RUN THAT NUMBER."

25            MR. LEE:  YOUR HONOR --
```

1          MR. QUINN:  WHAT WE'RE ASKING IS FOR DR. CHEVALIER TO

2     SAY THE NUMBER, AND IF HE WANTS TO ATTACK IT, TO SAY WE GOT IT

3     WRONG, HE CAN DO THAT TOMORROW.

4          THE COURT:  WELL, I MEAN, I GUESS THE REASON WHY I'M

5     DISAPPOINTED IS THAT I GRANTED THE OBJECTION TO SDX 3786

6     YESTERDAY, OR SATURDAY, AND YOU'RE STILL TRYING TO GET IN THE

7     17.4 NUMBER, WHICH I'VE ALREADY EXCLUDED.

8          MR. QUINN:  THAT SDX --

9          THE COURT:  THAT'S WHY I'M FRUSTRATED THAT THIS IS

10     EVEN HAPPENING BECAUSE I HAD ALREADY EXCLUDED THIS AND YOU'RE

11     STILL TRYING TO GET IT IN THROUGH DR. DR. CHEVALIER AFTER I'VE

12     ALREADY GRANTED THE OBJECTION.

13          MR. QUINN:  YOUR HONOR, THERE WERE TWO EXHIBITS --

14          THE COURT:  SO --

15          MR. QUINN:  THERE WERE TWO EXHIBITS.  ONE HAD ONE

16     MONTH AND TWO MONTHS.

17          THEY DID A HIGH PRIORITY OBJECTION TO THAT ONE, AND IT WAS

18     SUSTAINED.

19          THERE WAS A SEPARATE EXHIBIT THAT HAD ONLY ONE MONTH.

20     THEY DIDN'T OBJECT TO THAT.  THERE'S NOW -- SO WE'RE SITTING AT

21     THE HOTEL LAST NIGHT SCRATCHING OUR HEADS SAYING, DOES THAT

22     MEAN HER HONOR MEANS THAT WE CAN'T PRESENT THE TWO MONTH

23     NUMBER?

24          THEY DIDN'T OBJECT TO THE SLIDE THAT HAD THE ONE MONTH

25     NUMBER.

1              MR. LEE:  YOUR HONOR --

2              THE COURT:  LET ME SEE THAT SLIDE.

3              MR. LEE:  YOUR HONOR, THE ANSWER TO THAT IS WE HAVE A

4     LIMITED NUMBER OF HIGH PRIORITY OBJECTIONS TO MAKE FOR THE

5     WITNESS.  WE MADE ONE OF THEM BASED UPON THIS NOT BEING IN HER

6     EXPERT REPORT.

7          AND AS YOUR HONOR HAS SAID PREVIOUSLY, IF YOU HAVE

8     OBJECTIONS TO THE OTHERS, MAKE THEM AT THE TIME, AND THAT'S

9     WHAT WE'RE -- WELL, I ACTUALLY THINK THIS IS TRYING TO GET INTO

10    THE PART YOUR HONOR EXCLUDED.

11             THE COURT:  I CAN'T HEAR YOU.  CAN YOU SPEAK UP,

12    PLEASE?

13             MR. LEE:  SURE.  YOUR HONOR, IF I COULD FOCUS YOU ON

14    ONE THING?  THEY JUST SAID THAT THE FIRST TIME THEY GAVE THESE

15    NUMBERS TO US WAS THREE DAYS AGO.  THAT'S AFTER DR. VELLTURO

16    TESTIFIED.

17             THE COURT:  YOU ONLY OBJECTED TO ONE EXHIBIT FOR

18    DR. CHEVALIER, AND I BELIEVE YOU CAN HAVE UP TO THREE.  YOU'VE

19    CERTAINLY EXERCISED UP TO THREE AS TO OTHER WITNESSES.

20             MR. OLSON:  YOUR HONOR, WE MADE ADDITIONAL HPO

21    OBJECTIONS WHICH THEY THEN WITHDREW THE MATERIAL ON.

22          BY AGREEMENT OF THE PARTIES AND SO AS TO OVERBURDEN THE

23    COURT, THE PARTIES HAVE NOT RE-UPPED NEW ONES AS TO IT.

24          BY MAKING THE HIGH PRIORITY OBJECTION TO SDX 3786 -- AND I

25    DID DIVINE THAT THE MATERIAL IN THE RED BOX WAS NOT PREVIOUSLY

```
1         PROVIDED.
2              THAT MEANS THAT THE SAME MATERIAL IN THE RED BOX ON 3787
3    IS ALSO NOT PREVIOUSLY PROVIDED BECAUSE IT IS IDENTICAL.
4              MR. LEE:  RIGHT.  AND THAT, YOUR HONOR, IS AN
5    IMPORTANT PART OF THIS PROCESS THAT WE'RE GOING THROUGH.  WE'RE
6    EACH MAKING OUR HIGH PRIORITY OBJECTIONS, AND THEN WHEN YOUR
7    HONOR --
8              THE COURT:  THEN YOU MEET AND CONFER.  I SEE.  I SEE.
9    SDX 3793 AND 3794.
10             MR. LEE:  RIGHT.
11             THE COURT:  I SEE THAT.
12             MR. QUINN:  YOUR HONOR, APPLE HAS NEVER BEEN SHY IN
13   THEIR HIGH PRIORITY OBJECTIONS ABOUT SAYING "WE OBJECT TO THIS
14   DOCUMENT AND OTHERS LIKE IT."  YOU KNOW, IN OTHER WORDS, HAVING
15   A HIGH PRIORITY OBJECTION ADDRESS MORE THAN ONE DOCUMENT.
16             THESE ARE TWO DOCUMENTS WHICH ARE IDENTICAL, EXCEPT ONE
17   HAS TWO MONTHS AND THE OTHER ONLY HAS THE ONE MONTH.
18             I'M TRYING TO ADDRESS THE COURT'S DISAPPOINTMENT IN --
19   EXPRESSION OF DISAPPOINTMENT IN OUR NOT HAVING RESOLVED THIS,
20   BUT IF -- I WOULD HOPE THAT IF THE COURT SEES IT FROM OUR
21   STANDPOINT, WE SEE OBJECTION SUSTAINED TO THE TWO MONTHS, WE
22   THINK, OKAY, MAYBE WE UNDERSTAND THAT BECAUSE TWO MONTHS WAS
23   NEVER AT ISSUE, BUT ONE AND FOUR MONTHS HAVE ALWAYS BEEN THE
24   BRACKETED PERIODS IN THIS CASE.
25             MR. LEE:  YOUR HONOR, THE EXCLUDED EXHIBIT HAD BOTH
```

1    ONE MONTH AND TWO MONTHS ON IT.

2         MR. QUINN:  YES, THAT'S CORRECT.

3         MR. LEE:  AND SO THE EXHIBIT MR. QUINN IS TALKING

4    ABOUT HAS A SUBSET OF TWO THAT YOUR HONOR EXCLUDED.  THE IDEA

5    THAT YOUR HONOR WOULD EXCLUDE ONE MONTH AND TWO MONTHS ON SLIDE

6    SDX 3786, BUT THINK IT WOULD BE FINE FOR THE ONE MONTH TO GO IN

7    IN 3787 --

8         MR. QUINN:  WE CAN BOTH -- MR. LEE AND I CAN BOTH SAY

9    YOU SHOULD HAVE THOUGHT OF THIS OR YOU SHOULD HAVE THOUGHT OF

10   THIS, AND HINDSIGHT IS 20/20.

11        WHAT IT COMES DOWN TO IS A READILY CALCULABLE NUMBER.  WE

12   HAVE A WITNESS ON THE STAND WHO CAN TESTIFY TO IT.  WE HAVE

13   ANOTHER WITNESS TAKING THE STAND TOMORROW WHO CAN ADDRESS IT IF

14   WE GET IT WRONG.

15        MR. MCELHINNY:  YOUR HONOR, THERE ARE A LOT OF

16   READILY CALCULABLE NUMBERS, BUT HAVING THEM CALCULATED THREE

17   DAYS BEFORE A WITNESS GOES ON THE STAND AFTER OUR EXPERT HAS

18   TESTIFIED AND FOR US TO HEAR ABOUT THEM FOR THE FIRST TIME IS

19   NOT RIGHT.

20        THE COURT:  I THINK THAT IS CORRECT.  THIS SHOULD

21   HAVE BEEN -- THIS SHOULD HAVE BEEN DISCLOSED LONG BEFORE

22   WHENEVER THIS WAS DISCLOSED.  FRIDAY --

23        MR. LEE:  THAT'S CORRECT.

24        THE COURT:  -- APRIL THE 18TH?  THAT'S TOO LATE.

25   THAT'S TOO LATE.  I MEAN, APPLE'S EXPERT'S ALREADY TESTIFIED.

```
 1          NOW, YOU'RE CLEARLY FREE TO CROSS DR. VELLTURO, IF HE'S

 2   COMING BACK TOMORROW, ON THIS AND CERTAINLY ON HIS REPORT OF

 3   WHY HE'S ABANDONING THEORIES THAT HE HAD IN HIS OPENING REPORT.

 4          AND I SUGGEST THAT HE BE READY TO DO THIS CALCULATION

 5   TOMORROW.

 6          MR. LEE:  YEAH.  AND YOUR HONOR, TO BE CLEAR, WE'VE

 7   GIVEN THEM A LIST OF POSSIBLE REBUTTAL WITNESSES.  WE HAVEN'T

 8   EVEN GOTTEN THROUGH THEIR CASE YET, SO WE DON'T KNOW WHETHER

 9   HE'LL COME BACK OR NOT.

10          THE COURT:  WHETHER HE'S GOING TO BE CALLED AS A --

11          MR. LEE:  AS A REBUTTAL WITNESS.  HE TESTIFIED ON

12   DAMAGES AS TO WHICH WE HAD THE AFFIRMATIVE BURDEN, AND WE'RE

13   NOT SURE IF THERE'S ANYTHING THAT'S GOING TO BE REQUIRED.

14          MR. QUINN:  WE DON'T KNOW YET.  WE JUST GOT A

15   DISCLOSURE FROM THEM WITH HIS NAME ON IT.

16          MR. LEE:  YEAH.  WE HAD TO, YOUR HONOR, IN ORDER TO

17   GIVE THE UNIVERSE OF THE PEOPLE WE WOULD DISCLOSE.

18          MR. QUINN:  BUT I TAKE IT -- AS I UNDERSTAND, THE

19   COURT HAS SAID THAT IF HE DOES TAKE THE STAND, HE SHOULD BE

20   PREPARED TO DO THAT CALCULATION.

21          THE COURT:  DO THE CALCULATION, YES.

22          MR. LEE:  RIGHT.

23          THE COURT:  YES, HE SHOULD BE PREPARED TO DO THE

24   CALCULATION.  HE'S NOT GOING TO BE ABLE TO NOT DO THAT.

25          NOW, LET ME ASK, WITH THE '647, I THINK THAT IS TOTALLY
```

```
1    NEW.

2          WITH THE '721 AND THE '172, IF THE ORIGINAL REPORT HAD THE

3    ONE MONTH, I KNOW THE TWO MONTH IS TOTALLY BRAND NEW --

4          MR. QUINN:  WE'RE NOT OFFERING TWO MONTHS, YOUR

5    HONOR.

6          (PAUSE IN PROCEEDINGS.)

7          THE COURT:  WHAT IS YOUR CALCULATION ON THE '721?

8    FOR FEBRUARY 8TH THROUGH FEBRUARY 21?

9          MR. QUINN:  YOU'RE ADDRESSING --

10         THE COURT:  I'M ADDRESSING MR. LEE OR MR. OLSON.

11         MR. OLSON:  I APOLOGIZE, YOUR HONOR.  I DIDN'T HEAR

12   IT, SO --

13         THE COURT:  WHAT IS YOUR -- I'M LOOKING AT 53A.  THE

14   UPDATED AND THE NON-UPDATED ARE JUST -- THEY DIFFER BY ABOUT 6

15   MILLION.  WHAT IS YOUR NUMBER?

16         MR. OLSON:  SO THE -- I'M LOOKING AT UPDATED --

17         THE COURT:  YOU DON'T OBJECT TO THE FOUR MONTH

18   PERIOD?  IS THAT CORRECT?

19         MR. OLSON:  WE DO NOT OBJECT -- WE HAVE NOT OBJECTED

20   TO THE FOUR MONTH PERIOD.  IT IS IN THE SLIDES AND WE HAVE NOT

21   OBJECTED TO THAT.

22         THE COURT:  OKAY.  SO YOU'RE JUST OBJECTING TO THE

23   ONE MONTH PERIOD?

24         MR. OLSON:  ONE MONTH AND TWO MONTHS.

25         THE COURT:  WELL, TWO MONTHS IS NOT EVEN IN HER --
```

```
1    IT'S NOT IN 53A, THE ORIGINAL OR THE UPDATED, SO THAT'S CLEARLY

2    OUT.

3         WHAT I'M ASKING YOU IS AS TO THE ONE MONTH AS TO THE '721

4    AND THE '172.

5              MR. OLSON:  AND WHAT DR. VELLTURO'S NUMBER WAS?

6    THESE ARE DR. CHEVALIER'S NUMBERS.  IF YOUR QUESTION IS WHAT

7    DR. VELLTURO'S NUMBERS ARE, I BELIEVE THAT THEY ARE 189, OR

8    APPROXIMATELY THAT, AND 32.

9         BUT I CAN GIVE YOU --

10             THE COURT:  FOR A ONE MONTH PERIOD?

11             MR. OLSON:  NO.  FOR A FOUR MONTH PERIOD AS TO THE

12   '721 AND THE '172.

13             MR. LEE:  AFTER THE DAUBERTS.

14             MR. OLSON:  AFTER THE DAUBERT RULING, CORRECT.

15             MR. WATSON:  YOUR HONOR, I DON'T THINK THERE'S ANY

16   DISPUTE THAT FOR A ONE MONTH PERIOD ON THOSE TWO PATENTS, THE

17   BLACK OUT DAMAGES WILL BE ZERO.

18             THE COURT:  ALL RIGHT.  WELL, LET ME TAKE A SHORT

19   BREAK.  OKAY?  THANK YOU.

20             MR. WATSON:  THANK YOU, YOUR HONOR.

21             MR. MCELHINNY:  WHAT TIME WOULD YOU LIKE US BACK,

22   YOUR HONOR?

23             THE COURT:  IN TEN MINUTES.

24             MR. MCELHINNY:  OKAY.

25         (RECESS FROM 10:46 A.M. UNTIL 10:57 A.M.)
```

```
1              (JURY OUT AT 10:57 A.M.)

2                  THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

3          SEAT.

4              THIS IS WHAT I'M GOING TO DO:  IT'S NOW -- COUNSEL FOR

5          SAMSUNG KEEPS ARGUING THAT SAMSUNG DID NOT HAVE AN OPPORTUNITY

6          TO KNOW THAT DR. VELLTURO WAS GOING TO ASK FOR LOST PROFITS ON

7          THE '647 WHEN THEY FILED DR. CHEVALIER'S MARCH 7TH, 2014,

8          DECLARATION.

9              BUT DIDN'T YOU GET DR. VELLTURO'S FOUR MONTH '647

10         CALCULATION ON FEBRUARY 17TH WHEN THE SUPPLEMENTAL REPORT WAS

11         SERVED?

12                 MR. WATSON:  YOUR HONOR, THAT DECLARATION WAS JUST IN

13         SUPPORT OF THAT MOTION TO STRIKE.  WE WEREN'T DISCLOSING ANY

14         NEW CALCULATIONS.  THAT WASN'T THE PURPOSE OF THAT DECLARATION.

15                 THE COURT:  I KNOW.  BUT YOU WERE ON NOTICE THAT

16         DR. VELLTURO WAS GOING TO ASK FOR A FOUR MONTH OFF THE MARKET

17         LOST PROFITS ON THE '647 AS OF FEBRUARY 17TH; CORRECT?

18                 MR. WATSON:  YES, YOUR HONOR.

19                 THE COURT:  ALL RIGHT.  THANK YOU.  I WANTED TO CLEAR

20         THAT UP FOR THE RECORD BECAUSE THERE WERE A LOT OF STATEMENTS

21         ABOUT NOT BEING ON NOTICE AND HAVING TO SERVE THIS DECLARATION

22         WITHOUT THAT INFORMATION WHICH ARE JUST NOT TRUE.

23             I THINK THE SENTENCE THAT I READ MAKES IT VERY CLEAR

24         THAT -- THIS IS IN PARAGRAPH 5 OF DR. CHEVALIER'S DECLARATION

25         ON MARCH 7TH OF 2014.  PAGE 2, LINES 1 THROUGH 5 STATE, "USING
```

1    THIS DATE AS A COMMENCEMENT DATE FOR THE DESIGN AROUND FOR THE

2    '647 AND THE METHODOLOGY PRESENTED IN THE VELLTURO SUPPLEMENTAL

3    REPORT, WHICH INCLUDES THE '647, '172, AND '721 PATENTS, TOTAL

4    OFF THE MARKET LOST PROFITS DAMAGES FOR THE FULL SET OF 15

5    PRODUCTS ACCUSED PRIOR TO THE CASE NARROWING ARE 289.1

6    MILLION."

7         THIS IS SHOWN IN EXHIBIT 2, WHICH AS I SAID EARLIER, SHOWS

8    A FOUR MONTH OFF THE MARKET CALCULATION.

9         SO, YOU KNOW, SAMSUNG WAS ON NOTICE WHEN IT RECEIVED THE

10   FEBRUARY 17TH REPORT FROM DR. VELLTURO THAT HE WAS GOING TO

11   REQUEST LOST PROFITS FOR A FOUR MONTH OFF THE MARKET PERIOD FOR

12   THE '647 PATENT.

13        IN ADDITION, THE ORDER THAT STATED THAT LOST PROFITS HAD

14   TO BE CALCULATED AS OF THE DATE OF FIRST INFRINGEMENT WAS

15   ISSUED IN NOVEMBER BASED ON SAMSUNG'S MOTION IN OCTOBER.

16        AND SAMSUNG FILED A MOTION ASKING THAT THIS BE ENFORCED IN

17   THIS CASE, 12-CV-630, AND THAT DID ELIMINATE A SIGNIFICANT

18   AMOUNT OF LOST PROFITS FOR THE OTHER PATENTS, BUT IT ACTUALLY

19   HAD THE EFFECT OF CREATING MORE LOST PROFITS FOR THE '647.

20        SO I GRANTED SAMSUNG'S MOTION TO ENFORCE THE ORDER IN THE

21   DAMAGES RETRIAL REGARDING DATE OF FIRST INFRINGEMENT AS BEING

22   THE TRIGGERING DATE FOR A LOST PROFITS CALCULATION.

23        AND SAMSUNG'S BEEN ON NOTICE SINCE FEBRUARY 17TH THAT

24   DR. VELLTURO IS GOING TO MAKE THAT REQUEST FOR THAT TYPE OF OFF

25   THE MARKET LOST PROFITS.

1        SO THE FACT THAT THIS NEW NUMBER IS NOT DISCLOSED TO APPLE

2    UNTIL FRIDAY, APRIL 18TH OF 2014, WHEN TRIAL STARTED ON

3    MARCH 30TH AND DR. VELLTURO HAS ALREADY TESTIFIED, THAT IS

4    PREJUDICIAL.  IT'S TOO LATE.  IT SHOULD HAVE BEEN DISCLOSED

5    EARLIER.

6        YOU KNOW, DR. CHEVALIER'S DECLARATION OF MARCH 7TH OF

7    2014 -- CLEARLY AT THAT POINT SAMSUNG WAS AWARE THAT

8    DR. VELLTURO WAS GOING TO BE REQUESTING THESE TYPES OF OFF THE

9    MARKET DAMAGES, LOST PROFITS DAMAGES.

10        SO THAT LINE OF QUESTION REGARDING OFF THE MARKET LOST

11    PROFITS FOR THE '647 IS EXCLUDED.  IT'S SIMPLY TOO LATE AND

12    IT'S PREJUDICIAL TO APPLE AT THIS POINT.

13        NOW, WITH REGARD TO THE '721 AND THE '172, THAT IS IN --

14    THE ONE MONTH CALCULATION IS IN THE ORIGINAL EXHIBIT 53A, AS

15    WELL AS THE UPDATED 53A OF DR. CHEVALIER'S REPORTS.  THOSE DO

16    APPEAR TO HAVE BEEN TIMELY DISCLOSED, AND SO APPLE HAS SUFFERED

17    NO PREJUDICE.  YOU WERE TIMELY PUT ON NOTICE THAT THOSE

18    CALCULATIONS WERE GOING TO BE TESTIFIED TO AND OPINED BY ABOUT

19    DR. CHEVALIER.  SO THAT PART IS COMING IN.

20        NOW, WITH REGARD TO THE TWO MONTH, THAT I THINK HAS NEVER

21    BEEN DISCLOSED IN DR. CHEVALIER'S REPORTS AND FOR THE FIRST

22    TIME IT WAS DISCLOSED ON FRIDAY, APRIL 18TH, AND IT IS TOO

23    PREJUDICIAL AT THIS POINT TO INTRODUCE A TOTALLY BRAND NEW OFF

24    THE MARKET THEORY AND CALCULATION.  ALL OF THE EXPERT DISCOVERY

25    HAS ALREADY OCCURRED IN THE CASE AND APPLE'S DAMAGES EXPERT HAS

 1    ALREADY TESTIFIED, SO IT WOULD BE TOO PREJUDICIAL TO GET INTO

 2    THAT AT ALL.

 3         SO THERE SHOULD BE NO QUESTIONS AT ALL WITH REGARD TO THE

 4    TWO MONTH OFF THE MARKET PERIOD.

 5         SO IS THAT CLEAR ABOUT WHAT'S COMING IN AND WHAT'S NOT

 6    COMING IN?

 7              MR. QUINN:  YES, YOUR HONOR.

 8              MR. LEE:  IT IS, YOUR HONOR.

 9              THE COURT:  DO I NEED TO CLARIFY IT FURTHER?

10              MR. LEE:  IT'S CLEAR.

11              THE COURT:  OKAY.  SO I DON'T WANT ANY MORE FIGHTS

12    ABOUT THIS ISSUE BEFORE THE JURY.  IF YOU HAVE ANYTHING ELSE,

13    LET'S GET IT ALL OUT ON THE TABLE NOW.

14         WHAT ELSE IS THERE?  ANYTHING ELSE?  NOTHING ELSE?

15              MR. LEE:  NOTHING, YOUR HONOR.

16              THE COURT:  OKAY.  THEN I WOULD LIKE TO JUST GO UNTIL

17    NOON AND NOT TAKE A BREAK.

18         MS. SHORTRIDGE, IS THAT OKAY?

19              THE REPORTER:  YES.

20              MR. QUINN:  YOUR HONOR, CAN I ASK WHETHER -- WITHOUT

21    ASKING WHAT THE CALCULATION FOR ONE MONTH IS ON THE '647, CAN I

22    ASK WHETHER, WOULD ONE MONTH JUST BE DIVIDING THE FOUR MONTH BY

23    FOUR?

24              THE COURT:  NO.  THAT'S EXCLUDED.  THE '647 --

25              MR. QUINN:  OKAY.  I'M JUST ASKING, YOUR HONOR.

1          THE COURT:  HE SERVED THE REPORT ON FEBRUARY 17TH.

2     YOU ALL RESPONDED TO THAT REPORT ON MARCH 7TH.  YOU HAVE NEVER

3     COME UP WITH THIS CALCULATION.  I THINK IT'S PREJUDICIAL NOW TO

4     DISCLOSE IT FOR THE FIRST TIME ON FRIDAY, APRIL THE 18TH, AFTER

5     APPLE'S DAMAGES EXPERT HAS ALREADY TESTIFIED.  IT'S NOT COMING

6     IN.

7          MR. QUINN:  I UNDERSTAND.

8          THE COURT:  WHATEVER YOU GOT IN WITH DR. VELLTURO,

9     WHATEVER YOU CAN GET IN WITH HIM AGAIN IF HE TESTIFIES AS A

10    REBUTTAL WITNESS, THAT'S FAIR GAME BECAUSE IT'S IN HIS REPORT.

11       BUT IT'S NOT COMING IN WITH DR. CHEVALIER.

12         MR. QUINN:  UNDERSTOOD, YOUR HONOR.

13         THE COURT:  OKAY.  THEN LET'S BRING IN OUR JURY,

14    PLEASE.

15       (JURY IN AT 11:04 A.M.)

16         THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

17    SEAT.

18       THANKS FOR YOUR PATIENCE.  WE ARE NOT GOING TO TAKE A

19    BREAK UNTIL NOON.  OKAY?  WE'LL JUST GO STRAIGHT THROUGH FOR

20    SLIGHTLY LESS THAN AN HOUR.

21       TIME IS NOW 11:05.

22       GO AHEAD, PLEASE.

23         MR. QUINN:  THANK YOU, YOUR HONOR.

24    Q.   DR. CHEVALIER, WE'VE TALKED ABOUT THE FIRST TWO BUCKETS OF

25    DR. VELLTURO'S DAMAGES NUMBER, THE DIMINISHED DEMAND AND THE

1      OFF THE MARKET.

2          WHAT'S THE THIRD BUCKET?

3      A.   REASONABLE ROYALTIES.

4      Q.   AND HOW DOES DR. VELLTURO CALCULATE REASONABLE ROYALTY?

5      A.   OKAY.  SO HE STARTS CALCULATING A REASONABLE ROYALTY USING

6      THE HYPOTHETICAL NEGOTIATION CONSTRUCT.

7      Q.   RIGHT.  AND HOW DOES HE USE THAT?

8      A.   OKAY.  SO HE CALCULATES APPLE'S WILLINGNESS TO ACCEPT,

9      THAT'S HOW MUCH APPLE, AT MINIMUM, WOULD BE WILLING TO ACCEPT;

10     HE CALCULATES SAMSUNG'S WILLINGNESS TO PAY; AND THEN HE

11     DISCUSSES WHAT WOULD HAPPEN IN THE HYPOTHETICAL NEGOTIATION.

12     Q.   IS THERE A DIFFERENCE BETWEEN -- IS THERE A GAP BETWEEN

13     WHAT HE SAYS THIS IS WHAT APPLE WOULD ACCEPT AND THIS IS WHAT

14     SAMSUNG WOULD PAY?  IS THERE A GAP?

15     A.   OH, YES, THERE'S A BIG GAP.

16         SO WHAT APPLE IS WILLING TO ACCEPT IS ACTUALLY ABOVE WHAT

17     SAMSUNG IS WILLING TO PAY BY A LOT.

18     Q.   ALL RIGHT.  AND IN HIS HYPOTHETICAL NEGOTIATION, HOW WAS

19     THAT DEALT WITH?

20     A.   OKAY.  SO IN HIS HYPOTHETICAL NEGOTIATION, WHAT HE

21     ASSUMES, OR CONCLUDES, IS THAT WHILE APPLE'S WILLINGNESS TO

22     ACCEPT IS WELL ABOVE SAMSUNG'S WILLINGNESS TO PAY, SAMSUNG WILL

23     JUST, YOU KNOW, CAPITULATE, WILL ROLL OVER AND WILL JUST PAY

24     WHAT APPLE HAS ASKED, WHAT APPLE'S WILLINGNESS TO ACCEPT IS.

25     Q.   DOES HE ASSUME ANY COMPROMISE AT ALL IN THE NEGOTIATIONS

1    IN BETWEEN?

2    A.   NO, NO COMPROMISE AT ALL.  SAMSUNG WILL PAY, IN HIS

3    CALCULATION, APPLE'S WILLINGNESS TO ACCEPT.

4    Q.   OKAY.  I MEAN, HOW DOES HE FIGURE -- DOES HE OFFER SOME

5    THEORY AS TO HOW SAMSUNG WOULD DO THAT, OR WHY THAT WOULD BE

6    ACCEPTABLE?

7    A.   SO HE SAYS IN HIS REPORT THAT SAMSUNG CAN JUST RAISE

8    PRICES IN ORDER TO ACHIEVE THE HIGHER ROYALTY.

9    Q.   ALL RIGHT.  SO SAMSUNG -- DOES HE ASSUME THAT -- WHETHER

10   OR NOT SAMSUNG RAISING PRICES WOULD AFFECT SAMSUNG'S SALES?

11   A.   ACTUALLY, HE ASSUMES THAT RAISING SAMSUNG'S PRICES TO

12   ACCOMMODATE THE ROYALTY WOULD HAVE NO EFFECT ON SAMSUNG'S

13   SALES.

14   Q.   NOW, YOU'VE TAUGHT, I ASSUME, ECONOMICS.  YOU'VE TAUGHT

15   SUPPLY AND DEMAND AND MICROECONOMICS, THINGS LIKE THAT?

16   A.   YES, I HAVE.

17   Q.   ARE THERE SOME BASIC FUNDAMENTAL ECONOMIC RULES THAT COME

18   INTO PLAY WITH THE CONCEPT THAT YOU CAN JUST RAISE PRICES AND

19   IT WON'T AFFECT YOUR SALES?

20   A.   SO TYPICALLY WHEN YOU RAISE PRICES, YOUR SALES WILL

21   DECLINE.

22   Q.   ALL RIGHT.  DID SOMEBODY GET A NOBEL PRIZE FOR THAT, OR --

23   NEVER MIND.

24   A.   NO.

25   Q.   OKAY.  BUT SO -- HE ASSUMES THAT THERE WOULD BE NO EFFECT

1     ON SAMSUNG'S SALES FROM --

2     A.   CORRECT.

3     Q.   -- RAISING PRICES?

4          NOW, DID HE -- HOW DOES HE ARRIVE AT THE ORIGINAL NUMBERS?

5     THAT IS TO SAY, WHAT APPLE WOULD BE WILLING TO ACCEPT AND WHAT

6     SAMSUNG WOULD BE WILLING TO PAY, HOW DID HE ARRIVE AT THOSE

7     NUMBERS?

8     A.   OKAY.  BOTH THE WILLING TO ACCEPT NUMBER AND THE

9     WILLINGNESS TO PAY NUMBER ARE BASED ON DR. HAUSER'S CONJOINT

10    STUDY.

11         SO THE WILLINGNESS TO ACCEPT IS BASED ON -- IT'S VERY

12    SIMILAR TO THE LOST PROFITS CALCULATION.  IT'S BASED ON WHAT HE

13    MEASURES, OR HYPOTHESIZES THAT APPLE WOULD LOSE, AND THEN THE

14    WILLINGNESS TO PAY CALCULATION IS ALSO BASED ON DR. HAUSER'S

15    CONJOINT STUDY, AND THAT'S BASED ON WHAT SAMSUNG WOULD LOSE,

16    ACCORDING TO DR. HAUSER'S SURVEY, IF THEY COULDN'T PRACTICE THE

17    PATENTS.

18    Q.   SO WITHOUT DR. HAUSER'S INPUT, DOES DR. VELLTURO HAVE ANY

19    QUANTITATIVE BASIS FOR ARRIVING AT A REASONABLE ROYALTY THAT HE

20    OFFERS?

21    A.   NO.  SO BOTH THE WILLINGNESS TO PAY AND THE WILLINGNESS TO

22    ACCEPT AND THE REASONABLE ROYALTY HE OFFERS ARE ALL BASED ON

23    DR. HAUSER'S CONJOINT STUDY.

24    Q.   SO OF THE TOTAL OF $2.1 BILLION IN DAMAGES THAT

25    DR. VELLTURO PRESENTED ACROSS THESE THREE CATEGORIES, HOW MUCH

1    OF THAT 2.1 BILLION IS BASED ON DR. HAUSER'S SURVEY?

2    A.   1.6 BILLION.

3    Q.   OKAY.  NOW, DID YOU, YOURSELF, DO ANYTHING TO UNDERTAKE

4    ANY TYPE OF STUDY OR ANALYSIS TO ARRIVE AT WHAT YOU THINK A

5    REASONABLE ROYALTY WOULD BE?

6    A.   YES, I DID.

7         SO I USED FIVE ACCEPTED APPROACHES TO CALCULATE A

8    REASONABLE ROYALTY.

9    Q.   ALL RIGHT.  AND WE'LL GO THROUGH THOSE, BUT BEFORE WE DO,

10   COULD YOU PLEASE GIVE THE JURY THE BOTTOM LINE?  WHAT DID YOU

11   CONCLUDE, BASED UPON THESE FIVE APPROACHES, WOULD BE A

12   REASONABLE ROYALTY?

13   A.   SO I CONCLUDED THAT A REASONABLE ROYALTY WOULD BE $.35 PER

14   PATENT, PER UNIT.

15   Q.   AND PER UNIT, IF ALL FIVE PATENTS WERE USED AND INFRINGED

16   AND VALID, WHAT DID THAT COME OUT TO?

17   A.   SO THAT WOULD BE 1.75 PER UNIT FOR ALL FIVE PATENTS.

18   Q.   AND IN TERMS OF A TOTAL AMOUNT FOR THE ROYALTY, WHAT DOES

19   THAT EQUATE TO?

20   A.   SO THAT WOULD BE ROUGHLY $38.4 MILLION.

21   Q.   FOR ALL THE ACCUSED UNITS?

22   A.   FOR ALL OF THE ACCUSED UNITS, YES.

23   Q.   ALL RIGHT.  AND WOULD THAT -- IS THAT A LUMP SUM AMOUNT?

24   A.   YES.  I HAVE -- IT'S MY OPINION THAT THAT SHOULD BE A LUMP

25   SUM AMOUNT.

1    Q.   AND WHAT DID YOU BASE THAT CONCLUSION ON, THAT THE ROYALTY

2    SHOULD BE PAYABLE IN A ONE LUMP SUM AMOUNT?

3    A.   WELL, A NUMBER OF FACTORS, BUT ONE FACTOR IS THAT I

4    EXAMINED LICENSES IN THIS INDUSTRY AND LUMP SUM AMOUNTS ARE

5    VERY PREVALENT.

6    Q.   ALL RIGHT.  SO FOR THE PURPOSES OF YOUR RESEARCH ON THIS

7    POINT, HOW MANY DIFFERENT LICENSES IN THIS INDUSTRY DID YOU

8    EXAMINE?

9    A.   ROUGHLY 200.

10   Q.   OKAY.  SO LET'S GO THROUGH THE, WHAT YOU IDENTIFIED AS THE

11   FIVE METHODS.

12        AND IF WE COULD LOOK AT SDX 3791, DOES THIS IDENTIFY THE

13   FIVE DIFFERENT METHODS THAT YOU USED TO TRY TO ESTIMATE WHAT A

14   REASONABLE ROYALTY WOULD BE?

15   A.   YES.  SO THIS IDENTIFIES EACH OF THE FIVE METHODS, AND

16   THEN YOU CAN SEE THAT DOTTED LINE THERE IS MY CONCLUSION OF

17   $.35 PER PATENT, PER UNIT.

18   Q.   LET'S TALK ABOUT THE FIRST ONE.  IT SAYS ANALYTIC

19   APPROACH.  WHAT IS THAT?

20   A.   OKAY.  SO THE ANALYTIC APPROACH IS AN APPROACH IN WHICH,

21   IN ORDER TO ISOLATE THE VALUE OF THE PATENTS, YOU WOULD LOOK AT

22   THE LICENSEE'S PROFITABILITY, OR THE INFRINGER'S PROFITABILITY

23   WITH AND WITHOUT THE PATENTS.

24   Q.   ALL RIGHT.  AND IF WE COULD LOOK AT -- THIS IS UNDER SEAL,

25   YOUR HONOR -- SDX 3792.  THIS IS CONFIDENTIAL INFORMATION.

```
1          CAN YOU EXPLAIN TO THE JURY WHAT THIS SHOWS?

2     A.   YES.  SO WHAT YOU SEE HERE ARE THE PER UNIT OPERATING

3     PROFITS FOR --

4     Q.   THAT'S AT THIS TOP HALF?

5     A.   YES, THAT'S AT THAT TOP HALF, THE PER UNIT OPERATING

6     PROFITS FOR EACH OF THE PRODUCTS IN THE CASE.  YOU SEE THE

7     SMARTPHONES THERE IN BLUE AND THEN THE TABLET.

8          AND THEN BELOW YOU CAN SEE WHICH PRODUCTS HAVE BEEN

9     ACCUSED OF INFRINGING WHICH PATENTS.

10    Q.   AND HOW DID THIS ANALYSIS CONTRIBUTE TO YOUR OPINION

11    CONCERNING WHAT A REASONABLE ROYALTY WOULD BE?

12    A.   SO WHAT YOU'LL NOTICE THERE IS THAT THE TWO MOST

13    PROFITABLE PRODUCTS, THE GALAXY S III AND THE GALAXY NOTE 2,

14    ARE ACTUALLY ACCUSED OF THE FEWEST PATENTS.

15         AND SO IF WE'RE THINKING ABOUT THE DIFFERENCE IN

16    PROFITABILITY BETWEEN PRACTICING THE PATENTS AND NOT PRACTICING

17    THE PATENTS, HERE THEY'RE ACTUALLY MORE PROFITABLE WHEN THEY'RE

18    NOT PRACTICING THOSE TWO PATENTS.

19    Q.   ALL RIGHT.  AND THEN WAS THERE ANYTHING ABOUT THIS FIRST

20    APPROACH, ANYTHING ELSE ABOUT THIS FIRST APPROACH OF THIS

21    ANALYTIC APPROACH THAT CONTRIBUTED TO YOUR OPINION CONCERNING

22    WHAT A REASONABLE ROYALTY WOULD BE?

23    A.   YES.  SO WE KNOW THAT DR. HAUSER AND DR. VELLTURO'S

24    OPINIONS ARE THAT THESE FIVE PATENTS ARE A MAJOR CONTRIBUTOR TO

25    DEMAND FOR THE PRODUCTS.
```

1          YET, IF YOU LOOK ACROSS THE OTHER PRODUCTS, YOU CAN SEE

2     THERE'S A WIDE VARIABILITY IN OPERATING PROFITS FOR THOSE

3     PRODUCTS.

4          AND SO DESPITE THE FACT THAT ALMOST ALL OF THEM ARE

5     ACCUSED FOR ALL OF THE PATENTS, AND SO WE HAVE TO CONCLUDE THAT

6     THESE -- THE DIFFERENCES IN PROFITABILITY ACROSS THESE PRODUCTS

7     ARE BEING DRIVEN BY SOMETHING ELSE OTHER THAN THE PRACTICE OF

8     THESE PATENTS.

9     Q.   ALL RIGHT.  IF WE CAN GO BACK TO SDX 3791, THE SUMMARY OF

10    THE FIVE METHODS, I SEE UNDER ANALYTIC APPROACH, THE FIRST ONE

11    HERE, YOU DON'T HAVE ANY BAR AT ALL.

12    A.   YES.

13    Q.   WHY IS THAT?

14    A.   WELL, SO THIS IS ONLY ONE OF MY APPROACHES.

15         BUT THE ANALYTIC APPROACH SUGGESTS THAT THE VALUE CREATED

16    BY THESE PATENTS IS, IS REALLY NEGLIGIBLE.

17    Q.   AND THAT, AGAIN, IS BASED ON LOOKING AT THE PROFITABILITY

18    OF THE DIFFERENT DEVICES?

19    A.   EXACTLY, BASED ON LOOKING AT THE DIFFERENCE IN THE

20    PROFITABILITY IN PRACTICING THE PATENTS.

21    Q.   OKAY.

22    A.   AND THIS IS PARTICULARLY TRUE FOR THE '721 AND THE '172 IN

23    THIS ANALYSIS.

24    Q.   OKAY.  SO IF WE CAN LOOK NOW, TURN NOW TO THE SECOND

25    METHOD YOU USED, OPERATING SOFTWARE UPDATE PRICES, AND IF WE

1     COULD LOOK AT SDX 3793A, CAN YOU EXPLAIN THIS APPROACH?

2     A.   SURE.  SO THIS IS LOOKING AT, TRYING TO FIND THE VALUE OF

3     SOFTWARE FEATURES LIKE THE FEATURES IN THE PATENTS AT ISSUE,

4     AND TO DO THAT, I'M USING INFORMATION FROM APPLE.

5          SO WE KNOW THAT IF WE LOOK IN THE LEFT COLUMN, THAT APPLE

6     ISSUES UPDATES OF ITS IOS ROUGHLY EVERY YEAR.  I KNOW YOU'VE

7     HEARD SOME TESTIMONY ABOUT THE NEW FEATURES, 100 -- MORE THAN

8     100 NEW FEATURES, MORE THAN 200 NEW FEATURES.

9          WE KNOW THAT MANY FEATURES HAVE BEEN INTRODUCED THROUGH

10    IOS UPDATES, SO FEATURES LIKE TURN-BY-TURN NAVIGATION,

11    FACETIME, FIND MY IPHONE, PANORAMIC CAMERA VIEW.

12    Q.   THOSE ARE SOME OF THESE NEW FEATURES?

13    A.   YEAH, THOSE ARE SOME OF THOSE NEW FEATURES.

14    Q.   OKAY.

15    A.   SO THOSE ARE THE KIND OF FEATURES IN THESE UPGRADES.

16         AND WE ALSO HAVE SOME INFORMATION ABOUT WHAT THOSE

17    SOFTWARE UPGRADES ARE WORTH ACCORDING TO APPLE.

18    Q.   AND WHERE DO WE GET THAT INFORMATION ABOUT WHAT APPLE SAYS

19    THOSE SOFTWARE UPGRADES ARE WORTH?

20    A.   WELL, WHEN APPLE FILES ITS REPORTS WITH THE SECURITIES AND

21    EXCHANGE COMMISSION, APPLE IDENTIFIES AN AMOUNT OF THE VALUE OF

22    THE -- IT IDENTIFIES AN ESTIMATED PRICE OF THE FUTURE SOFTWARE

23    UPDATES THAT ARE ESSENTIALLY SOLD WITH EACH IPHONE OR IPAD.

24    Q.   ALL RIGHT.  THIS IS -- WHAT'S THE SECURITIES AND EXCHANGE

25    COMMISSION?

1        A.    OH.  SO THAT'S A FEDERAL GOVERNMENT REGULATORY BODY.

2        Q.    ALL RIGHT.  AND WHAT DOES THAT TELL YOU, WHAT APPLE SAYS

3    THESE SOFTWARE -- THIS SOFTWARE THAT ENABLES THESE FEATURES,

4    WHAT DOES THAT TELL YOU ABOUT THE VALUE OF THE FEATURES?

5        A.    ALL RIGHT.  SO IN THESE FILINGS, THEY SAY THAT THE VALUE

6    OF FUTURE UPGRADES IS -- ASSUMING ONE PER PHONE -- IS FROM

7    20 -- IT HAS RANGED OVER TIME, THEY'VE CHANGED IT OVER TIME,

8    FROM $25 DOWN TO $10.

9        Q.    THAT'S THE TOTAL AMOUNT FOR ALL THESE SOFTWARE UPGRADES?

10       A.    YES.  AND THEN THEY -- IF I TAKE THAT AND I DIVIDE BY THE

11   NUMBER OF NEW FEATURES, THIS SUGGESTS AN AVERAGE PRICE PER

12   NEWLY UPDATED FEATURE OF 25 -- FROM $.05 TO $.25.

13       Q.    SO IF WE CAN GO BACK TO 3791, WE'VE -- THIS IS THE -- THIS

14   OPERATING SOFTWARE UPDATE PRICES COLUMN HERE?

15       A.    RIGHT.

16       Q.    AND WHAT DATA POINT DID THAT GIVE YOU?

17       A.    OKAY.  SO THAT GIVES US A RANGE FROM $.05 TO $.25 PER

18   PATENT.

19       Q.    ALL RIGHT.  AND WHAT WAS THE NEXT METHOD THAT YOU USED TO

20   TRY TO ARRIVE AT A REASONABLE ROYALTY?

21       A.    OKAY.  THE NEXT IS THE VALUE OF INTANGIBLES.

22       Q.    SO LET'S TAKE A LOOK AT EXHIBIT 3794A, AND COULD YOU

23   EXPLAIN THIS TO US, PLEASE?

24       A.    SURE.  SO APPLE HAS PREVIOUSLY HELD THAT THE TOTAL VALUE

25   OF SAMSUNG'S INTANGIBLE ASSETS, OR THE TOTAL VALUE OF THE

1       INTELLECTUAL PROPERTY THAT SAMSUNG PRACTICES, TOTALS $4.

2       Q.   ALL RIGHT.  SO MEANING THAT -- OF APPLE'S INTELLECTUAL

3       PROPERTY?

4       A.   YES.

5       Q.   ALL RIGHT.

6       A.   ACTUALLY, THE -- THE CALCULATION IS THE TOTAL VALUE OF THE

7       INTELLECTUAL PROPERTY THAT SAMSUNG PRACTICES.

8            BUT I'M GOING TO DIVIDE THAT UP AMONG PATENTS THAT APPLE

9       HAS IDENTIFIED AS IMPORTANT IN PRODUCING CELL PHONES, INCLUDING

10      THESE FIVE PATENTS AT ISSUE IN THIS CASE.

11      Q.   AND WHAT DOES -- SO YOU'RE DIVIDING WHAT INTO WHAT?

12      A.   SO I'M DIVIDING THE $4 AMONG THESE 85 PATENTS, AND THAT

13      LEAVES IT -- THERE'S LITTLE BIT OF A WEIGHTING SCHEME, SO I

14      TREAT THESE PATENTS AT ISSUE AS PARTICULARLY IMPORTANT, AND

15      THAT GIVES A VALUE PER PATENT OF $.14 PER PATENT.

16      Q.   ALL RIGHT.  AND, AGAIN, THE $4 NUMBER, THAT CAME FROM

17      WHERE?

18      A.   SO THAT COMES FROM APPLE'S EXPERTS.

19      Q.   SO LET'S TAKE A LOOK -- LET'S GO BACK TO EXHIBIT 3791.

20      AND THAT'S THE VALUE OF INTANGIBLES COLUMN HERE?

21      A.   EXACTLY.  AND SO THAT LEADS TO A VALUE OF $.14 PER PATENT,

22      PER UNIT.

23      Q.   AND THEN THE FOURTH METHOD YOU'VE GOT HERE IS PRODUCT

24      REVIEWS AND ANALYSIS.  WHAT ARE YOU REFERRING TO THERE?

25      A.   OKAY.  SO THERE SO I -- WE TALKED ABOUT MY PRODUCT REVIEW

```
 1    ANALYSIS BEFORE, AND NOW I'M GOING TO USE MY PRODUCT REVIEW

 2    ANALYSIS TO CALCULATE VALUES FOR EACH OF THE FIVE PATENTS.

 3    Q.   AND IF WE COULD LOOK AT SDX 3795, THIS IS CONFIDENTIAL --

 4    THIS IS CONFIDENTIAL -- AND COULD YOU TELL THE JURY WHAT WE'RE

 5    LOOKING AT HERE?

 6    A.   OKAY.  SO IN THE TOP ROW YOU SEE SAMSUNG'S PER UNIT

 7    OPERATING PROFIT FOR PRODUCTS ACCUSED OF INFRINGING.

 8    Q.   THAT'S THE TOP LINE?

 9    A.   THAT'S THE TOP LINE.

10         AND THEN I TALKED BEFORE ABOUT HOW PRODUCT REVIEWS CAN

11    GIVE US A RELATIVE MEASURE OF THE IMPORTANCE OF DIFFERENT

12    FEATURES, SOME OF WHICH ARE ACCUSED AND SOME OF WHICH ARE NOT

13    ACCUSED.

14         AND WHAT I DO HERE IS I APPORTION SAMSUNG'S OPERATING

15    PROFIT TO THE ACCUSED FEATURES BASED ON THEIR FRACTION OF

16    SENTENCE MENTIONS THAT I TOLD YOU ABOUT IN MY REVIEW ANALYSIS.

17    Q.   COULD YOU GO THROUGH THAT ONE MORE TIME?  WHAT IS THE

18    ARITHMETIC THERE?

19    A.   SURE.  SO, FOR EXAMPLE, THE '647 PATENT, IF WE LOOK AT

20    PROFESSIONAL REVIEWS, HAS .03 PERCENT OF ALL OF THE SENTENCES

21    IN PROFESSIONAL PRODUCT REVIEWS.  THE '647 ACCOUNTS FOR THIS

22    FRACTION OF SENTENCES.

23         AND SO IF I TAKE THAT OPERATING --

24    Q.   THAT'S .03 PERCENT?

25    A.   YEAH, THAT'S MY .03 PERCENT.
```

1    Q.   YEP.

2    A.   AND THEN IF I TAKE THAT AND APPORTION THE OPERATING PROFIT

3    TO THAT PROPORTIONATELY, THAT LEADS TO AN ESTIMATE WHICH YOU'LL

4    SEE DOWN IN THAT BOTTOM ROW THERE OF THE TOP PANEL OF THE, THE

5    IMPLIED VALUE OF THE '647 PATENT.

6    Q.   WHAT DOES NUMBER THAT GET YOU THERE?

7    A.   SO THAT'S $.03.

8    Q.   ALL RIGHT.  AND DID YOU THEN DO THAT FOR EACH OF THE

9    FEATURES?

10   A.   EXACTLY.  I DID THAT FOR EACH OF THE PATENTS, AND I DID AN

11   ESTIMATE USING BOTH THE PROFESSIONAL REVIEWS AND CONSUMER

12   REVIEWS.

13        SO YOU CAN SEE THE HIGHEST ON THERE IS THE '959 PATENT,

14   USING JUST THE PROFESSIONAL REVIEWS, THAT COMES UP WITH $.43

15   PER PATENT VALUE.

16   Q.   OKAY.  AND THEN HOW DID THAT CONTRIBUTE TO YOUR

17   UNDERSTANDING ABOUT WHAT A REASONABLE ROYALTY WOULD BE?

18   A.   OKAY.  SO I DON'T KNOW IF YOU WANT TO GO BACK TO THE

19   CHART.

20   Q.   IF WE COULD GO BACK TO 3791.

21   A.   OKAY.  SO THESE OPERATING -- I MEAN, THESE PRODUCT REVIEWS

22   SUGGEST THE CONTRIBUTION OF THESE PATENTS IS BETWEEN, YOU KNOW,

23   AROUND A CENT AND $.43 WHERE THE $.43 IS JUST FOR THE -- IS THE

24   ESTIMATE FOR THE '959.

25        SO THE DARK BLUE TELLS YOU WHERE MOST OF THE DATA IS, BUT

1    THE $.43 FOR THE '959 IS THE ONE OBSERVATION JUST ABOVE THE

2    $.35 LINE.

3    Q.   AND THE FIFTH MENTION, METHOD THAT YOU USED WAS ANALYSIS

4    OF APPS.  WHAT'S THAT?

5    A.   YES.

6    Q.   IF WE COULD LOOK AT SDX 3796, IF YOU COULD EXPLAIN THIS

7    APPROACH TO THE JURY, PLEASE.

8    A.   SURE.  SO ONCE AGAIN, WE'RE TRYING TO GET AT THE VALUE OF

9    SOFTWARE, AND RATHER THAN ASK PEOPLE HOW MUCH THEY VALUE

10   PARTICULAR FEATURES, WE CAN GO OUT AND LOOK AT WHAT PEOPLE --

11   HOW MANY PEOPLE BUY APPS WHICH THEY DOWNLOAD ON TO THEIR PHONE

12   THAT CONTAIN SOFTWARE FUNCTIONALITY.

13        SO THERE'S A WIDE RANGE OF APPS OUT THERE, AND WHAT I

14   LOOKED AT WERE THE TOP 25 PAID ANDROID APPS, TOP 25 IN TERMS OF

15   REVENUES.  SO THESE ARE PAID APPS.

16        AND YOU CAN SEE THAT IF YOU THINK ABOUT THE REVENUE PER

17   ANDROID USER OF THESE APPS, YOU CAN SEE IT RANGES FROM A HIGH,

18   A BIG OUTLIER THERE OF $.24 DOWN TO $.02 JUST INCLUDING THE TOP

19   25 APPS.

20   Q.   AND HOW DID THAT HELP YOU INFORM YOUR REASONABLE ROYALTY

21   ANALYSIS?

22   A.   SO THIS TELLS US WHAT PEOPLE ARE WILLING TO PAY FOR

23   SOFTWARE FUNCTIONALITY.  I MEAN, THESE APPS DO A VARIETY OF

24   THINGS, BUT, YOU KNOW, THEY'RE LITTLE PROGRAMS THAT YOU CAN

25   USE, AND THESE SUGGEST A RANGE FROM $.02 PER USER TO $.24 PER

```
 1        USER.

 2        Q.   SO IF WE CAN GO BACK TO 3791, WHAT IS THE RANGE THAT

 3   YOU -- IS THAT THE RANGE THAT YOU USE HERE?

 4        A.   YES, EXACTLY.

 5        Q.   OKAY.  SO NOW, WHY DID YOU USE FIVE DIFFERENT APPROACHES

 6   TO TRY TO ESTIMATE WHAT A REASONABLE ROYALTY WOULD BE?

 7        A.   I THINK IT WOULD BE PROBLEMATIC TO RELY ON JUST ONE NUMBER

 8   HERE.  WE WANT TO GET ESTIMATES OF WHAT THESE PATENTS ARE WORTH

 9   AND THEN TRY TO USE ALL THAT DATA TO GET, YOU KNOW, AN OVERALL

10   VALUE.

11        AND, YOU KNOW, ONE THING I'M COMFORTED BY HERE IS THAT

12   EACH OF THESE APPROACHES GENERATES VALUES IN A REASONABLY TIGHT

13   RANGE.

14        Q.   AND HOW DID YOU FINALLY ARRIVE AT WHAT YOU'VE TESTIFIED AS

15   WHAT YOU THINK THE $.35 NUMBER PER PATENT, PER UNIT, HOW DID

16   YOU ARRIVE AT THAT NUMBER?

17        A.   SO I APPLIED THE GEORGIA-PACIFIC FACTORS.

18        Q.   AND REMIND US WHAT THE GEORGIA-PACIFIC FACTORS ARE.

19        A.   OKAY.  SO --

20        Q.   MAYBE WE CAN LOOK AT 3797 SO YOU DON'T HAVE TO RECITE THEM

21   FROM MEMORY.

22        A.   THAT WOULD BE A PROBLEM.

23        SO THE GEORGIA-PACIFIC FACTORS ARE FACTORS THAT COURTS

24   HAVE INSTRUCTED US THAT WE NEED TO CONSIDER IN CALCULATING A

25   REASONABLE ROYALTY.
```

1    Q.   AND DID CONSIDERATION OF THESE FACTORS CAUSE YOU TO -- TO

2    MOVE THE NEEDLE AT ALL IN TERMS OF WHAT YOU THOUGHT A

3    REASONABLE ROYALTY WOULD BE?

4    A.   YES.  SO I CONSIDERED ALL OF THESE FACTORS, AND INDEED,

5    MANY OF MY APPROACHES ALREADY ENCOMPASS THE INSTRUCTIONS FROM

6    SOME OF THESE FACTORS.

7         BUT IN PARTICULAR, TWO FACTORS THAT I WANT TO PAY SPECIAL

8    ATTENTION TO ARE FACTOR 4 AND FACTOR 5.

9    Q.   AND WHY DID YOU WANT TO PAY SPECIAL ATTENTION TO THEM?

10   A.   SO THAT'S THE LICENSOR'S ESTABLISHED LICENSING POLICY.

11        AND WE KNOW THAT APPLE IS, IN GENERAL, VERY RELUCTANT TO

12   LICENSE THEIR INTELLECTUAL PROPERTY.

13        AND THEN THE SECOND IS GEORGIA-PACIFIC 5, AND THAT'S THE

14   COMMERCIAL RELATIONSHIP BETWEEN THE LICENSOR AND THE LICENSEE.

15        WE KNOW THAT APPLE AND SAMSUNG ARE FIERCE COMPETITORS IN

16   THIS MARKET AND WE NEED TO TAKE THAT INTO ACCOUNT IN SETTING

17   THE ROYALTY.

18   Q.   ALL RIGHT.  SO TAKING THOSE INTO ACCOUNT, HOW DID THAT

19   AFFECT YOUR ESTIMATE OF WHAT A REASONABLE ROYALTY SHOULD BE?

20   A.   OKAY.  BECAUSE THESE BOTH SUGGEST, YOU KNOW, RAISING THE

21   ROYALTY, I CHOSE A ROYALTY, THIS $.35 PER PATENT, PER UNIT, IN

22   THE VERY UPPER RANGE OF WHAT ANY OF MY DATA SUGGESTS.

23   Q.   IS THAT -- IF WE CAN GO BACK TO 3791, AND THAT'S WHY THE

24   $.35 IS ABOVE MOST OF THESE BARS HERE?

25   A.   EXACTLY.  I DIDN'T WANT TO JUST TAKE AN AVERAGE, LET'S

```
1        SAY, ACROSS THE BARS.  I CHOSE HIGH IN THE RANGE.

2            AND YOU CAN SEE THE ONLY INDIVIDUAL DATA POINT ABOVE THAT

3    IS THIS ONE DATA POINT FOR PROFESSIONAL REVIEWS FOR THE '959

4    PATENT.

5    Q.   AND YOU TOLD US A LUMP SUM AMOUNT WOULD BE?

6    A.   SO I TOLD YOU A LUMP SUM AMOUNT WOULD BE ROUGHLY

7    $38.4 MILLION.

8    Q.   OKAY.  AND YOU THOUGHT A LUMP SUM AMOUNT WOULD BE

9    APPROPRIATE BASED UPON YOUR REVIEW OF ABOUT 200 LICENSES IN

10   THIS INDUSTRY?

11   A.   CORRECT.

12   Q.   DID YOU REGARD THAT NUMBER AS BEING A CONSERVATIVE NUMBER?

13   A.   YES.  I THINK THAT NUMBER IS A CONSERVATIVE NUMBER IN

14   THAT, AS I'VE SAID, I THINK MANY OF MY APPROACHES POINTED TO A

15   SOMEWHAT LOWER NUMBER.

16   Q.   OKAY.  AND IF WE COULD LOOK AT -- IF YOU HAVE IT IN YOUR

17   BOOK, YOU SHOULD HAVE IT IN YOUR BOOK, DX 453A, 453A.

18       THIS IS CONFIDENTIAL.

19   A.   I'M SORRY.  IS THAT VOLUME 2 OR 3?

20   Q.   453 -- I'M NOT SURE.

21       MAY I APPROACH, YOUR HONOR?

22           THE COURT:  YES, GO AHEAD.

23           THE WITNESS:  OH, FOUND IT.  FOUND IT.

24   BY MR. QUINN:

25   Q.   OKAY.  AND CAN YOU IDENTIFY THIS DOCUMENT FOR THE JURY?
```

1      A.    OH, YES.  SO THIS IS A DOCUMENT THAT I PREPARED

2      SUMMARIZING MY CALCULATION OF APPLE DAMAGES IF THE PATENTS ARE

3      FOUND TO BE VALID AND INFRINGED.

4            MR. QUINN:  WE'D OFFER THIS, YOUR HONOR.

5            THE COURT:  ANY OBJECTION?

6            MR. LEE:  NO OBJECTION.

7            THE COURT:  IT'S ADMITTED.

8      (DEFENDANTS' EXHIBIT 453A WAS ADMITTED IN EVIDENCE.)

9            THE COURT:  GO AHEAD, PLEASE.

10           MR. QUINN:  IF WE COULD JUST DISPLAY THAT, WE'RE NOT

11     GOING TO GO THROUGH IT, BUT SO THE JURY KNOWS WHAT IT IS.

12     Q.    AND YOU HAVE YOUR VARIOUS CALCULATIONS THERE?

13     A.    YES, I DO.

14     Q.    IF WE COULD LOOK AT SDX 3800, SDX 3800, WHAT IS THIS

15     NUMBER THAT WE'RE LOOKING AT?

16     A.    AH.  THIS IS THE SUMMARY OF MY TOTAL REASONABLE ROYALTY

17     ANALYSIS.  SO THAT'S APPLYING THAT $.35 PER PATENT, PER UNIT TO

18     EACH OF THE ACCUSED UNITS BASED ON WHICH PATENTS THEY'RE

19     ACCUSED OF INFRINGING.

20     Q.    AND WILL THE JURY FIND THIS IN DX 453A, THE CALCULATIONS

21     THAT WE'RE LOOKING AT?

22     A.    YES, THEY WILL.

23           MR. QUINN:  THANK YOU VERY MUCH.

24     NOTHING FURTHER.

25           THE COURT:  ALL RIGHT.  THE TIME IS NOW 11:28.

```
 1                    MR. LEE:  CAN WE HAVE A MINUTE, YOUR HONOR, TO SET

 2     UP?

 3                    THE COURT:  YES, GO AHEAD AND SET UP, PLEASE.

 4            (PAUSE IN PROCEEDINGS.)

 5                    THE COURT:  ARE YOU READY?

 6                    MR. LEE:  READY.

 7                    THE COURT:  ALL RIGHT.  TIME IS 11:29.

 8            GO AHEAD, PLEASE.

 9                         CROSS-EXAMINATION

10     BY MR. LEE:

11     Q.   GOOD MORNING, DR. CHEVALIER.

12     A.   GOOD MORNING.

13                    MR. LEE:  GOOD MORNING, LADIES AND GENTLEMEN.

14     Q.   DR. CHEVALIER, LET'S SEE IF WE CAN GET A FEW THINGS OUT OF

15     THE WAY EARLY ON.

16          YOU HAVE ASSUMED INFRINGEMENT BY SAMSUNG; CORRECT?

17     A.   YES.

18     Q.   YOU HAVE ASSUMED THE FIVE PATENTS ARE VALID; CORRECT?

19     A.   CORRECT.

20     Q.   AND, IN FACT, YOU KNOW THE '172 PATENT HAS ALREADY BEEN

21     DETERMINED TO BE INFRINGED; CORRECT?

22     A.   CORRECT.

23     Q.   YOU'VE MADE NO ASSUMPTIONS ABOUT WHETHER GOOGLE INFRINGES

24     ANY PATENT; CORRECT?

25     A.   NO, I HAVE NOT.
```

```
1    Q.   YOU'VE MADE NO COMPUTATION OF THE DAMAGES FOR GOOGLE;

2    CORRECT?

3    A.   NO.

4    Q.   JUST SAMSUNG; CORRECT?

5    A.   CORRECT.

6    Q.   AND THAT'S BECAUSE SAMSUNG IS THE PARTY THAT MADE, USED,

7    AND SOLD THE PRODUCTS THAT ARE AT ISSUE; CORRECT?

8    A.   CORRECT.

9    Q.   AND THEY HAVE MADE, USED, AND SOLD 37, MORE THAN 37

10   MILLION PRODUCTS WHICH YOU ASSUME TO BE INFRINGING; CORRECT?

11   A.   CORRECT.

12   Q.   AND YOU UNDERSTAND THAT UNDER THE LAW, AS HER HONOR WILL

13   INSTRUCT THE JURY, EVERY SINGLE ONE OF THOSE ACTS OF

14   INFRINGEMENT IS ENTITLED TO SOME DAMAGES; CORRECT?

15   A.   CORRECT.

16   Q.   YOU DON'T GET TO INFRINGE ONE TIME FOR FREE; CORRECT?

17   A.   CORRECT.

18   Q.   AND YOU CERTAINLY DON'T GET TO INFRINGE 37 MILLION TIMES

19   FOR FREE; CORRECT?

20   A.   CORRECT.

21   Q.   NOW, LET ME JUST ASK YOU A FEW THINGS.

22        YOU HAVE AN HOURLY RATE; CORRECT?

23   A.   I DO.

24   Q.   AND WHAT IS YOUR HOURLY RATE?

25   A.   IT'S $850 AN HOUR.
```

1    Q.   AND HOW MUCH HAVE YOU BEEN PAID IN TOTAL FOR YOUR TIME IN

2    THIS CASE?

3    A.   SO IN TOTAL FOR MY TIME IS -- SO MY TIME IS JUST SHY OF, A

4    LITTLE SHY OF 300 HOURS, SO IT'S ROUGHLY 300 -- $330,000.

5    Q.   RIGHT.  NOW, YOU'RE ANOTHER EXPERT WHO'S ALSO AFFILIATED

6    WITH THE ANALYSIS GROUP; CORRECT?

7    A.   CORRECT.

8    Q.   IN FACT, DR. ERDEM IS, DR. REIBSTEIN IS, YOU ARE, AND

9    DR. FOSTER, YOU'RE ALL ASSOCIATED WITH THE SAME ANALYSIS GROUP;

10   CORRECT?

11   A.   YES, WE ARE.

12   Q.   AND YOU'RE ENTITLED TO A 7 AND A HALF PERCENT RETURN ON

13   ALL THE WORK THE ANALYSIS GROUP HAS DONE ON YOUR PART OF THE

14   PROJECT; CORRECT?

15   A.   YES.

16   Q.   AND HOW MUCH HAS THE ANALYSIS GROUP BEEN PAID ON YOUR PART

17   OF THE PROJECT?

18   A.   I DON'T ACTUALLY KNOW, THOUGH I SUPPOSE I CAN DO THE MATH

19   AND FIGURE THAT OUT.

20   Q.   WELL, DID YOU KNOW -- YOU WERE HERE WHEN DR. VELLTURO

21   TESTIFIED; CORRECT?

22   A.   YES.

23   Q.   AND MR. QUINN ASKED HIM HOW MUCH HIS COMPANY HAD BEEN PAID

24   IN TOTAL.

25        DO YOU REMEMBER THAT?

1    A.   YES, I DO.

2    Q.   AND DO YOU KNOW WE ASKED YOUR LAWYERS, SAMSUNG LAWYERS, TO

3    HAVE YOU PREPARED TO TELL US HOW MUCH HAS THE ANALYSIS GROUP

4    BEEN PAID IN TOTAL.  DID YOU KNOW THAT?

5    A.   SORRY.  I THOUGHT I WAS SUPPOSED TO KNOW HOW MUCH I HAD

6    BEEN PAID BY THE ANALYSIS GROUP.

7    Q.   WELL, LET'S BREAK IT DOWN INTO TWO PARTS.

8         HOW MUCH HAS THE ANALYSIS GROUP BEEN PAID IN TOTAL TO HELP

9    ON THIS CASE?

10   A.   I HAVE NO IDEA.

11   Q.   IS IT A MILLION?

12   A.   I DON'T KNOW.

13   Q.   FIVE MILLION?

14   A.   I REALLY DON'T KNOW.

15   Q.   OKAY.  NOW, FOR YOUR PART OF THE CASE, HOW MUCH HAVE YOU

16   BEEN PAID FOR THE WORK THE ANALYSIS GROUP HAS DONE UNDER THIS 7

17   AND A HALF PERCENT ARRANGEMENT?

18   A.   ABOUT $130,000 THROUGH WHAT I RECEIVED BY MARCH 31ST.

19   Q.   SO THAT MEANS, AT 7 AND A HALF PERCENT, DOING THE MATH

20   ROUGHLY FOR US, HOW MUCH HAVE THEY BEEN PAID IN ADDITION TO

21   WHAT YOU'VE BEEN PAID?

22   A.   OH, BOY.  YOU WANT ME TO DO THAT ON THE STAND?

23   Q.   JUST A --

24   A.   OKAY.  SO I GUESS 1.3 MILLION ROUGHLY.

25   Q.   ALL RIGHT.  SO 1.3 MILLION FOR YOU, 1.5 MILLION FOR

1   DR. ERDEM -- YOU WERE HERE WHEN SHE TESTIFIED; CORRECT?

2   A.   YES.

3   Q.   AND WE DON'T HAVE A FIGURE FOR DR. REIBSTEIN; CORRECT?

4   A.   I DON'T REMEMBER WHETHER YOU ASKED HIM.

5   Q.   AND YOU DON'T HAVE A FIGURE IN TOTAL; CORRECT?

6   A.   I DON'T.

7   Q.   ALL RIGHT.  NOW, YOU RECALL THAT -- I THINK YOU MENTIONED

8   YOU HAVE ISSUED SOME REPORTS IN THIS CASE.  CORRECT?

9   A.   CORRECT.

10  Q.   AND YOU'VE GIVEN A DEPOSITION OR TWO IN THE CASE; CORRECT?

11  A.   I'VE GIVEN A DEPOSITION.

12  Q.   AND YOU UNDERSTAND THAT THE DEPOSITION AND THE REPORTS

13  WERE ALL PURSUANT TO ORDERS FROM HER HONOR THAT SAID WE WANT TO

14  HAVE YOUR OPINIONS ON PAPER AND HAVE A DEPOSITION SO THE OTHER

15  SIDE, APPLE, KNOWS WHAT YOUR OPINIONS ARE; CORRECT?

16  A.   CORRECT.

17  Q.   SO I WANT TO FOCUS YOU, DR. CHEVALIER, ON THE PERIOD OF

18  TIME -- WHAT YOU DID BEFORE YOU PUT YOUR OPINIONS DOWN ON PAPER

19  AND BEFORE YOU GAVE YOUR DEPOSITION.  OKAY?

20  A.   OKAY.

21  Q.   NOW, BEFORE YOU DID THAT, YOU NEVER SPOKE -- YOU NEVER MET

22  WITH ANY EMPLOYEE AT SAMSUNG; CORRECT?

23  A.   RIGHT.

24  Q.   BEFORE YOU DID THAT, YOU NEVER SPOKE BY TELEPHONE WITH ANY

25  EMPLOYEE OF SAMSUNG; CORRECT?

```
1    A.   RIGHT.

2    Q.   BEFORE YOU DID THAT, YOU NEVER SPOKE WITH -- YOU NEVER MET

3    WITH ANY FORMER EMPLOYEE OF SAMSUNG; CORRECT?

4    A.   CORRECT.

5    Q.   YOU NEVER SPOKE BY TELEPHONE WITH A FORMER EMPLOYEE OF

6    SAMSUNG; CORRECT?

7    A.   CORRECT.

8    Q.   AND IT'S ALSO TRUE THAT YOU NEVER MET AND YOU NEVER SPOKE

9    WITH ANY OF THE TECHNICAL EXPERT WITNESSES THAT SAMSUNG HAS

10   BROUGHT BEFORE THIS JURY BEFORE YOU FORMULATED YOUR OPINIONS;

11   CORRECT?

12   A.   OF COURSE I READ THEIR INFRINGEMENT -- I READ THEIR

13   REPORTS AND INTERROGATORY REPORTS.

14   Q.   RIGHT.  MY QUESTION, IF IT WAS UNCLEAR, DR. CHEVALIER, IS,

15   DID YOU MEET WITH THEM?

16   A.   NO, I DID NOT.

17   Q.   DID YOU TALK WITH THEM BY PHONE?

18   A.   I DID NOT.

19   Q.   DID YOU TALK TO ANY GOOGLE EMPLOYEE?

20   A.   RELATED TO THIS CASE, NO.

21   Q.   OKAY.  AND DID YOU TALK TO ANY GOOGLE EMPLOYEE ABOUT

22   THIS -- FORMER EMPLOYEE ABOUT THIS CASE?

23   A.   NO.

24   Q.   OKAY.  NOW, THERE ARE FIVE APPLE PATENTS INVOLVED IN THE

25   CASE; CORRECT?
```

1    A.   CORRECT.

2    Q.   THERE ARE 37, MORE THAN 37 MILLION INFRINGING UNITS;

3    CORRECT?

4    A.   CORRECT.

5    Q.   AND YOU AGREE, NOT JUST ASSUME, YOU AGREE THAT IT IS

6    SAMSUNG WHO HAS MADE AND SOLD THOSE UNITS; CORRECT?

7    A.   CORRECT.

8    Q.   AND YOU UNDERSTAND THAT UNDER OUR LAWS, IT'S THE PERSON

9    WHO MAKES AND SELLS THE UNITS THAT'S RESPONSIBLE, IF ANYBODY

10   IS; CORRECT?

11   A.   YES.

12             MR. QUINN:  OBJECTION, YOUR HONOR.  THAT JUST CALLS

13   FOR A LEGAL CONCLUSION.  MOVE TO STRIKE.  "UNDER OUR LAWS."

14             THE COURT:  SUSTAINED.  IT'S STRICKEN.

15   BY MR. LEE:

16   Q.   NOW, LET'S TALK ABOUT HOW YOU WENT ABOUT ARRIVING AT YOUR

17   DAMAGES.

18        YOU JUST TOLD THE JURY THAT YOU USED SOMETHING CALLED AN

19   ANALYTICAL APPROACH.

20   A.   YES.

21   Q.   THE ANALYTICAL APPROACH LOOKS AT THE PROFITABILITY OF

22   PRODUCTS; CORRECT?

23   A.   YES.

24   Q.   THE PROFITABILITY OF PRODUCTS THAT INCORPORATED THE

25   PATENTED TECHNOLOGY; CORRECT?

1      A.   CORRECT.

2      Q.   SO WHAT YOU DID IS YOU LOOKED AT THE PROFITABILITY OF EACH

3      OF THE ACCUSED SAMSUNG PRODUCTS; CORRECT?

4      A.   RIGHT, I LOOKED AT THE OPERATING PROFITS FOR EACH OF THE

5      SAMSUNG PRODUCTS.

6      Q.   WELL, IN ADDITION, DR. CHEVALIER, YOUR MATERIALS WOULD

7      HAVE ALLOWED YOU TO COMPUTE THE GROSS PROFITS; CORRECT?

8      A.   YES.  AND AS YOU KNOW, THERE'S AN EXHIBIT THAT DOES THAT

9      IN MY REPORT.

10     Q.   SURE.  AND I'M GOING TO SHOW YOU, A LITTLE BIT LATER, BOTH

11     THE OPERATING PROFITS AND THE GROSS PROFITS SO WE CAN COMPARE

12     THE TWO CHARTS.  OKAY?

13     A.   SURE.

14     Q.   BUT BEFORE WE GET THERE, IN ORDER TO DETERMINE

15     PROFITABILITY, YOU HAVE TO DETERMINE THE TOTAL PROFITS;

16     CORRECT?

17     A.   CORRECT.

18     Q.   AND YOU START WITH REVENUES; CORRECT?

19     A.   YES.

20     Q.   YOU SUBTRACT SOME COSTS; CORRECT?

21     A.   YES.

22     Q.   ALL RIGHT.  SO I'M GOING TO PUT ON THE SCREEN, ONLY FOR

23     YOU AND FOR THE JURORS AND HER HONOR, PDX 92.54.

24          DO YOU SEE IT ON THE SCREEN NOW?

25     A.   YES.

1    Q.   YOU'VE SEEN THIS BEFORE; CORRECT?

2    A.   YES.

3    Q.   NOW, I WANT TO BE SURE -- I'M NOT GOING TO SAY THE

4    AMOUNTS, AND I'D ASK YOU NOT TO AS WELL BECAUSE THIS IS NOT FOR

5    THE PUBLIC, BUT YOU SEE THE NUMBER OF UNITS IS MORE THAN 37

6    MILLION; CORRECT?

7    A.   YES.

8    Q.   YOU AND DR. VELLTURO AGREE UPON THAT; CORRECT?

9    A.   ROUGHLY, YES.

10   Q.   ROUGHLY.  THERE'S NOT AN ORDER OF MAGNITUDE DIFFERENCE

11   BETWEEN YOU; CORRECT?

12   A.   CORRECT.

13   Q.   NOW, THERE'S ALSO A REVENUE NUMBER ON THE SCREEN.

14        DO YOU SEE THAT?

15   A.   YES.

16   Q.   THIS IS -- YOU BASICALLY AGREE UPON THE REVENUE NUMBER;

17   CORRECT?

18   A.   YES.

19   Q.   NOW, YOU HAVE SOME DISAGREEMENT BETWEEN YOU ABOUT HOW YOU

20   COMPUTE GROSS PROFITS AND OPERATING PROFITS; CORRECT?

21   A.   WELL, ACTUALLY, IN DR. VELLTURO'S ORIGINAL REPORT, HIS

22   GROSS PROFIT CALCULATIONS ARE, I THINK, VERY SIMILAR TO MINE.

23   Q.   OKAY.  AND AS I SAID, I'LL COME BACK TO THEM.

24        BUT IN ORDER TO DO YOUR ANALYTICAL, OR INCOME APPROACH --

25   I THINK THAT'S HOW YOU DESCRIBED IT.

CROSS CHEVALIER

```
 1     A.   YES.

 2     Q.   WE NEED TO START WITH THE TOTAL REVENUES; CORRECT?

 3     A.   CORRECT.

 4     Q.   AND THERE'S NO REAL DISPUTE BETWEEN YOU THAT THIS IS THE

 5     TOTAL REVENUES THAT WE'RE TALKING ABOUT; CORRECT?

 6     A.   RIGHT.

 7     Q.   AND THIS IS THE TOTAL NUMBER OF INFRINGING ACTS THAT WE'RE

 8     TALKING ABOUT; CORRECT?

 9     A.   YES.

10     Q.   IT'S A LOT OF INFRINGING ACTS, ISN'T IT?  MORE THAN 37

11     MILLION; CORRECT?

12     A.   IT IS MORE THAN 37 MILLION, YES.

13     Q.   ALL RIGHT.  NOW, LET'S GO THROUGH EACH OF THE DIFFERENT

14     PORTIONS THAT YOU TALKED ABOUT, AND LET'S START WITH LOST

15     PROFITS.

16     A.   OKAY.

17     Q.   NOW, YOU WERE SHOWN A STATEMENT THAT MY COLLEAGUE,

18     MR. MCELHINNY, MADE IN OPENING.

19          DO YOU RECALL THAT?

20     A.   I DO.

21     Q.   AND YOU SAID, WELL, YOU THINK THAT'S A LITTLE BIT OF AN

22     EXAGGERATION; CORRECT?

23     A.   YES, I DO.

24     Q.   YOUR LOST PROFITS NUMBER, DR. CHEVALIER, IS ZERO; CORRECT?

25     A.   MY LOST PROFITS CALCULATION IS ZERO, YES.
```

```
1    Q.   RIGHT.  SO YOU HAVE GIVEN APPLE EXACTLY NO CREDIT FOR ANY

2    SALE THAT IT WOULD HAVE LOST IF SAMSUNG COULD NOT HAVE MADE

3    THESE 37, MORE THAN 37 MILLION DOLLARS IN INFRINGING ACTS;

4    CORRECT?

5    A.   A LOT -- NO LOST PROFITS CALCULATION, NOT MINE NOR

6    DR. VELLTURO'S, ASSUMES THAT THE 37 MILLION UNITS WOULDN'T HAVE

7    BEEN MADE.

8         I HAVE SAID THAT WHEN SAMSUNG SELLS A PHONE, APPLE MAY BE,

9    YOU KNOW, LOSING OUT.

10        BUT THAT IS NOT THE SAME AS SAYING THAT APPLE LOSES SALES

11   BECAUSE SAMSUNG INFRINGES APPLE'S PATENTS.

12   Q.   WE'RE GOING TO COME AND WE'RE GOING TO LOOK AT THE

13   DOCUMENTS THAT TALK ABOUT THAT.

14        SO LET ME ASK YOU -- I THINK YOU TOLD US THAT YOU LOOKED

15   AT A LOT OF DOCUMENTS.

16   A.   I DID.

17   Q.   A LOT OF APPLE DOCUMENTS?

18   A.   I DID.

19   Q.   A LOT OF SAMSUNG DOCUMENTS?

20   A.   YES.

21   Q.   YOU'VE BEEN IN THE COURTROOM FOR A NUMBER OF DAYS DURING

22   THE TRIAL; CORRECT?

23   A.   RIGHT.

24   Q.   YOU'VE HEARD THE FEATURES THAT ARE THE SUBJECT OF THESE

25   FIVE PATENTS CHARACTERIZED AS MINOR OR TRIVIAL; CORRECT?
```

```
 1      A.   I HAVE HEARD THAT, YES.

 2      Q.   CAN YOU IDENTIFY FOR THE JURY A SINGLE SAMSUNG DOCUMENT

 3      THAT DESCRIBES THESE FEATURES AS TRIVIAL OR MINOR?  A SINGLE

 4      DOCUMENT THAT WAS GENERATED BEFORE THIS LAWSUIT?  CAN YOU

 5      IDENTIFY ONE?

 6      A.   WELL, THERE ARE VERY FEW DOCUMENTS THAT IDENTIFY THESE

 7      FEATURES WHATSOEVER.

 8      Q.   WE'RE GOING TO COME AND LOOK AT SOME OF THEM.  BUT YOU

 9      KNOW THAT THERE ARE?

10      A.   YES.

11      Q.   MY QUESTION, DR. CHEVALIER, IS, CAN YOU IDENTIFY A

12      SINGLE -- YOU WILL AGREE WITH ME THAT THERE ARE SAMSUNG

13      DOCUMENTS THAT IDENTIFY THESE FEATURES; CORRECT?

14      A.   YES, THERE ARE SOME.

15      Q.   FROM THAT UNIVERSE, CAN YOU IDENTIFY FOR ME A SINGLE

16      SAMSUNG DOCUMENT, ONE, THAT DESCRIBES THESE AS MINOR OR NARROW

17      OR TRIVIAL BEFORE THIS LAWSUIT STARTED?

18      A.   I'VE NEVER SEEN A FEATURE OF ANY KIND DESCRIBED AS MINOR,

19      NARROW, OR TRIVIAL IN A SAMSUNG DOCUMENT.

20      Q.   AND IF YOU GO TO THE APPLE DOCUMENTS, IS THERE A SINGLE

21      APPLE DOCUMENT THAT DESCRIBES THESE FEATURES, THESE FEATURES

22      SUBJECT TO FIVE U.S. PATENTS, AS MINOR OR TRIVIAL?

23      A.   AGAIN, THERE ARE VERY FEW DOCUMENTS THAT ACTUALLY DESCRIBE

24      THESE FEATURES, BUT THERE IS NO DOCUMENT THAT EXPLICITLY

25      DESCRIBES THEM AS MINOR, NARROW, OR TRIVIAL.
```

1    Q.   RIGHT.  IS THERE A SINGLE DOCUMENT YOU'VE SEEN FROM

2    ANYBODY ON THE FACE OF THE EARTH, BEFORE THIS LAWSUIT STARTED,

3    THAT DESCRIBES THESE FEATURES AS MINOR OR TRIVIAL?

4    A.   AGAIN, THERE IS A LIMITED NUMBER OF DOCUMENTS CALLING OUT

5    THESE FEATURES.  BUT I HAVE NOT SEEN A DOCUMENT DESCRIBING THEM

6    AS MINOR OR TRIVIAL.

7    Q.   OKAY.  NOW, LET'S GO BACK TO THE LOST PROFITS IF WE COULD.

8    A.   SURE.

9    Q.   HOWEVER YOU INTERPRETED WHAT MR. MCELHINNY SAID, YOUR

10   ANALYSIS GIVES APPLE ZERO LOST PROFITS; CORRECT?

11   A.   YES.  MY ANALYSIS COMPENSATED APPLE THROUGH A REASONABLE

12   ROYALTY AND GIVES ZERO LOST PROFITS.

13   Q.   RIGHT.  BECAUSE ZERO LOST PROFITS; CORRECT?

14   A.   I'M SORRY.  I MISSED THAT.

15   Q.   BECAUSE YOU'VE DETERMINED THAT THERE ARE ZERO LOST

16   PROFITS; CORRECT?

17   A.   YES, I HAVE DETERMINED THAT APPLE HAS NOT LOST SALES AS A

18   RESULT OF SAMSUNG'S PRACTICE OF THE PATENTS.

19   Q.   SO IT'S YOUR BELIEF THAT IF SAMSUNG COULD NOT HAVE SOLD 37

20   MILLION UNITS OF INFRINGING PHONES, NOT A SINGLE ONE OF THOSE

21   PHONES WOULD HAVE GONE TO APPLE; IS THAT CORRECT?  IS THAT YOUR

22   BEST JUDGMENT?

23   A.   AGAIN, I THINK YOU'RE MISCHARACTERIZING WHAT I'VE SAID.

24        IF SAMSUNG SIMPLY DIDN'T SELL 37.4 MILLION PHONES, WHICH

25   IS NOT DR. VELLTURO'S LOST PROFITS THEORY -- IT'S NOT ANYBODY'S

```
 1        LOST PROFITS THEORY -- IF SAMSUNG JUST DIDN'T, YOU KNOW, EXIST

 2        IN THE MARKETPLACE AND SELL THESE PRODUCTS, I DO BELIEVE APPLE

 3        WOULD HAVE SOLD MORE UNITS.

 4             BUT THAT IS NOT THE SAME AS DID APPLE SELL FEWER UNITS

 5        BECAUSE OF SAMSUNG'S INFRINGEMENT?

 6   Q.   NOW, DR. VELLTURO ASSUMED THAT APPLE WOULD HAVE MADE 1 IN

 7        10 UNITS; CORRECT?  FOR EVERY 10 UNITS THAT SAMSUNG SOLD, APPLE

 8        WOULD HAVE SOLD 1; CORRECT?

 9   A.   THAT'S NOT COMPLETELY ACCURATE.

10   Q.   CLOSE?  IS 10 PERCENT CLOSE TO HIS NUMBER?

11   A.   AGAIN, HIS -- HIS CALCULATION WAS THAT APPLE WOULD HAVE

12        MADE 40 PERCENT, ROUGHLY 40 PERCENT OF THE SALES THAT SAMSUNG

13        COULDN'T MAKE IF IT DIDN'T PRACTICE THE PATENTS.

14   Q.   RIGHT.  AND HE CAME UP WITH A NUMBER; CORRECT?

15   A.   YES, HE DID.

16   Q.   AND YOUR NUMBER, THE NUMBER YOU'RE GIVING THE JURY, IS

17        ZERO; CORRECT?

18   A.   AGAIN, MY LOST PROFITS NUMBER IS ZERO.  I'M COMPENSATING

19        APPLE THROUGH A REASONABLE ROYALTY.

20   Q.   SO LET'S TALK A LITTLE BIT ABOUT WHAT YOU DID TO DETERMINE

21        WHETHER THERE WAS DEMAND FOR THESE PATENTED FEATURES.  OKAY?

22   A.   OKAY.

23   Q.   NOW, YOU'VE BEEN HERE THROUGH MUCH OF THE TRIAL; CORRECT?

24   A.   I'VE BEEN BACK AND FORTH TO CONNECTICUT A FAIR BIT, BUT

25        I'VE BEEN HERE FOR SOME OF THE TRIAL.
```

1    Q.   HAVE YOU SEEN A SINGLE SAMSUNG SOFTWARE ENGINEER TESTIFY

2    ABOUT WHAT'S IMPORTANT AND WHAT'S NOT?

3    A.   SO I'VE SEEN -- WELL, I SAW A TRIAL TRANSCRIPT OF

4    SAMSUNG'S SOFTWARE DESIGNER, FOR EXAMPLE.

5    Q.   ARE YOU TALKING ABOUT MS. KIM?

6    A.   YES, I AM, SORRY.  MS. KIM.

7    Q.   OKAY.  SHE ACTUALLY IS A DESIGN ENGINEER AND SHE SAID THAT

8    SHE WASN'T A SOFTWARE ENGINEER.

9    A.   OKAY.

10   Q.   SO SETTING ASIDE MS. KIM --

11   A.   OKAY.

12   Q.   LET ME JUST DO IT THIS WAY:  YOU NEVER TALKED TO A SINGLE

13   SOFTWARE ENGINEER AT SAMSUNG; CORRECT?

14   A.   CORRECT.

15   Q.   YOU NEVER ASKED THEM, ARE THESE FEATURES MINOR OR

16   IMPORTANT; CORRECT?

17   A.   CORRECT.

18   Q.   BUT YOU DO KNOW THAT MR. LOCKHEIMER -- YOU KNOW WHO

19   MR. LOCKHEIMER IS; CORRECT?

20   A.   YES, I DO.

21   Q.   HE'S FROM GOOGLE; CORRECT?

22   A.   YES.

23   Q.   HE TESTIFIED EARLIER IN THE CASE; CORRECT?

24   A.   YES.

25   Q.   YOU KNOW THAT ONE OF THE PATENTS HERE CONCERNS SOMETHING

```
1     CALLED BACKGROUND SYNC; CORRECT?

2     A.   YES, I DO.

3     Q.   AND YOU KNOW THAT, UNDER QUESTIONING BY SAMSUNG'S LAWYERS,

4     MR. LOCKHEIMER TOLD THIS JURY THAT IT WAS INCREDIBLY IMPORTANT

5     AND USEFUL; CORRECT?

6     A.   I KNOW THAT MR. LOCKHEIMER TOLD THE JURY THAT BACKGROUND

7     SYNCING IN GENERAL WAS IMPORTANT.

8          BUT MY UNDERSTANDING IS THAT EVEN -- IS THAT EVEN

9     DR. SNOEREN HAS EXPLAINED THAT THERE'S A DIFFERENCE BETWEEN

10    BACKGROUND SYNCING IN GENERAL AND THE PARTICULAR BACKGROUND

11    SYNCING PROTECTED BY THE '414 PATENT.

12    Q.   DR. CHEVALIER, YOU ASSUME THAT THE '414 PATENT IS

13    INFRINGED; CORRECT?

14    A.   I DO.

15    Q.   YOU ASSUME THAT THE PATENT, THE '414 PATENT COVERS

16    BACKGROUND SYNCING; CORRECT?

17    A.   I ASSUME THAT THE '414 PATENT IS INFRINGED, AND I ASSUME

18    THAT THE '414 PATENT COVERS A FORM OF BACKGROUND SYNCING.

19    Q.   ALL RIGHT.  SO LET'S SEE WHAT -- PRECISELY.  YOU AGREE

20    MR. LOCKHEIMER, THAT HE KNOWS WHAT HE'S TALKING ABOUT?

21    A.   YES, HE DOES.

22    Q.   OKAY.  AND HE KNOWS MORE ABOUT SOFTWARE THAN YOU OR ME;

23    CORRECT?

24    A.   A WHOLE LOT.

25    Q.   OKAY.  LET'S TAKE A LOOK AT THE TRIAL TRANSCRIPT, 1501,
```

1      LINES 16 TO 22.  NOW, THIS IS SAMSUNG'S LAWYERS ASKING THE

2      QUESTIONS.

3           "QUESTION:  AND WHY DID GOOGLE DECIDE TO INCLUDE

4      BACKGROUND SYNCHRONIZATION IN ANDROID?

5           "WELL, IT'S AN INCREDIBLY USEFUL FEATURE.  IT'S SOMETHING

6      THAT I ACTUALLY PERSONALLY HAVE A LOT OF EXPERIENCE WITH AT

7      THIS COMPANY CALLED GOOD THAT I WORK AT.  THEY DID WIRELESS

8      E-MAIL, AND YOU CAN IMAGINE SYNCHRONIZING E-MAIL IS A CORE PART

9      OF THAT OFFERING.  IT IS AN IMPORTANT FEATURE."

10          AND THEN IT GOES ON -- IF WE CAN PICK UP THE BOTTOM SO WE

11     CAN FINISH THE ANSWER -- "GOOGLE IS ALSO A CLOUD COMPANY."

12          YOU KNOW THAT THAT'S WHAT MR. LOCKHEIMER SAID; CORRECT?

13     A.   YES.

14     Q.   ALL RIGHT.  JUST SO WE'RE CLEAR, WE HAVE ANALYSIS GROUP

15     EXPERTS WHO HAVE COME IN AND CALLED THESE FEATURES MINOR AND

16     TRIVIAL; WE HAVE MR. LOCKHEIMER SAYING THEY'RE IMPORTANT AND

17     USEFUL; WE HAVE APPLE ENGINEERS SAYING THEY'RE IMPORTANT AND

18     USEFUL; AND WE HAVEN'T HEARD A THING FROM A SAMSUNG ENGINEER;

19     CORRECT?

20               MR. QUINN:  OBJECTION.  MISSTATES THE TESTIMONY.

21               THE COURT:  OVERRULED.

22          YOU MAY ANSWER.

23     BY MR. LEE:

24     Q.   IS THAT RIGHT?

25     A.   THAT WAS -- THERE WERE MANY PARTS THERE AND THERE WERE

CROSS CHEVALIER

```
 1        MANY PARTS THERE THAT WERE NOT CORRECT.

 2        Q.   WELL, ALL RIGHT.  LET'S GO SEE -- LET'S SEE IF WE CAN PUT

 3        THEM TOGETHER THEN.

 4        A.   OKAY.

 5        Q.   TURN, IF YOU WOULD, TO TAB 4 IN YOUR BINDER.  THERE ARE

 6        TWO VOLUMES, AND I'LL TRY TO GET YOU TO THE RIGHT VOLUME.  IT'S

 7        VOLUME 1, TAB 4, AND I'M GOING TO TAKE YOU TO PX 208.

 8             AND THIS IS UNDER SEAL, YOUR HONOR, SO I'M ONLY GOING TO

 9        PUT IT ON THE SCREEN FOR YOU AND THE JURY.

10        A.   TAB 4?

11        Q.   DO YOU HAVE IT?

12        A.   I THINK SO.

13        Q.   VOLUME 1, TAB 4, AND DID YOU FIND PX 208?

14        A.   YES.

15        Q.   DO YOU RECOGNIZE THIS AS A SAMSUNG DOCUMENT?

16        A.   YES, I RECOGNIZE THIS AS A SAMSUNG DOCUMENT.

17             MR. LEE:  ALL RIGHT.  YOUR HONOR, WE OFFER PX 208.

18             THE COURT:  ANY OBJECTION?

19             MR. QUINN:  NO OBJECTION, YOUR HONOR.

20             THE COURT:  IT'S ADMITTED.

21        (PLAINTIFF'S EXHIBIT 208 WAS ADMITTED IN EVIDENCE.)

22        BY MR. LEE:

23        Q.   TURN, IF YOU WOULD, TO PAGE 4, WHICH IS ON ONLY THE COURT

24        AND YOUR AND THE JURY'S SCREEN.

25             DO YOU SEE THAT BEFORE YOU?
```

1    A.    YES.

2    Q.    NOW, DO YOU SEE WHERE IT SAYS AT THE TOP, "GALAXY SALES

3    HAS REDUCED IPHONE SALES BY," AND THERE'S A NUMBER THAT I'M NOT

4    GOING TO SAY BECAUSE IT'S CONFIDENTIAL.  CORRECT?

5    A.    CORRECT.

6    Q.    AND IT SAYS IT'S REDUCED THOSE SALES SINCE THE BEGINNING

7    OF THE YEAR; CORRECT?

8    A.    CORRECT.

9    Q.    NOW, THE GALAXY SERIES OF PHONES IS ONE OF THE SERIES OF

10   PHONES THAT YOU HAVE ASSUMED, AS PART OF YOUR ANALYSIS, TO BE

11   INFRINGING; CORRECT?

12   A.    CORRECT.

13   Q.    AND WHAT THIS SAMSUNG DOCUMENT SAYS IS THESE GALAXY

14   PHONES, WHICH INCLUDE INFRINGING PHONES, IS TAKING, FROM APPLE,

15   AS MANY AS THIS NUMBER OF SALES PER WEEK; CORRECT?

16   A.    THAT'S WHAT IT SAYS.

17   Q.    NOW, YOU DIDN'T CONSIDER THIS IN FORMULATING YOUR

18   OPINIONS, DID YOU?

19   A.    I HAVE SEEN SIMILAR DOCUMENTS TO THIS DOCUMENT.  I BELIEVE

20   THIS DOCUMENT IS NOT ON THE LIST IN MY REPORT.

21   Q.    RIGHT.  IT WASN'T GIVEN TO YOU BY THE LAWYERS; CORRECT?

22   A.    YOU KNOW, AS YOU KNOW, THERE'S A MOUNTAIN OF DOCUMENTS.  I

23   DID HAVE SORTING CRITERION.  I'VE SEEN, YOU KNOW, A HANDFUL OF

24   DOCUMENTS THAT SAY THINGS LIKE THIS.  BUT I THINK THIS

25   PARTICULAR DOCUMENT WASN'T CONSIDERED IN MY REPORT.

1    Q.   HOW MANY DOCUMENTS HAVE YOU SEEN FROM SAMSUNG'S FILES THAT

2    SAID THAT THE PHONES THAT YOU'RE ASSUMING TO BE INFRINGING ARE

3    TAKING X NUMBER OF SALES PER WEEK FROM APPLE?

4    A.   I'VE SEEN PLENTY OF DOCUMENTS THAT MAKE IT CLEAR THAT

5    SAMSUNG AND APPLE ARE DIRECT COMPETITORS.

6    Q.   YEAH.   MY QUESTION WAS A LITTLE BIT MORE NARROW.

7    A.   YEAH.

8    Q.   HOW MANY DOCUMENTS HAVE YOU SEEN THAT SAY, SAMSUNG

9    DOCUMENTS -- DO YOU HAVE THOSE IN MIND?

10   A.   YES.

11   Q.   -- THAT SAY OUR PHONES, INCLUDING THE PHONES THAT ARE

12   ASSUMED TO BE INFRINGING, WE'RE TAKING X NUMBER OF SALES A WEEK

13   FROM APPLE?

14   A.   I CAN'T SAY OFFHAND.

15   Q.   BUT MORE THAN ONE; CORRECT?

16   A.   X NUMBER OF SALES PER WEEK?   I CAN'T SAY.

17   Q.   ALL RIGHT.

18   A.   I'M NOT SURE.

19   Q.   NOW, TURN, IF YOU WOULD, TO TAB 5 IN THE SAME NOTEBOOK AND

20   YOU'LL FIND DX 432.

21        DO YOU HAVE THAT BEFORE YOU?

22   A.   YES.

23   Q.   THIS IS ANOTHER SAMSUNG DOCUMENT; CORRECT?

24   A.   YES.

25             MR. LEE:   YOUR HONOR, WE OFFER DX 432.   PORTIONS ARE

1      UNDER SEAL, BUT I'M ONLY GOING TO SHOW PAGES THAT ARE NOT

2      SUBJECT TO THE SEALING ORDER.

3             MR. QUINN:  NO OBJECTION.

4             THE COURT:  IT'S ADMITTED.

5        (DEFENDANTS' EXHIBIT 432 WAS ADMITTED IN EVIDENCE.)

6             THE COURT:  GO AHEAD, PLEASE.

7      BY MR. LEE:

8      Q.   ALL RIGHT.  DO YOU SEE THE COVER PAGE ON THE SCREEN RIGHT

9      NOW?

10     A.   YES.

11     Q.   TURN, IF YOU WOULD, TO PAGE 8.

12     A.   I DON'T SEE PAGE NUMBERS.

13          OKAY.  GOT IT.  I SEE IT.

14     Q.   DO YOU HAVE IT?

15     A.   YES.

16     Q.   AND, DR. CHEVALIER, IT'S BOTH GOING TO BE IN THE HARD

17     COPY, BUT ALSO ON THE SCREEN, AND ON THE BIG SCREEN, AND YOU

18     USE WHATEVER IS EASIEST FOR YOU.  OKAY?

19     A.   OKAY.

20     Q.   NOW, I'M GOING TO TAKE YOU TO PAGE 8.  ARE WE TOGETHER?

21     A.   YES.

22     Q.   NOW, THIS IS A REFERENCE TO THE GALAXY NOTE; CORRECT?

23     A.   YES.

24     Q.   THE GALAXY NOTE IS ALSO A PHONE THAT'S BEEN ACCUSED OF

25     INFRINGING; CORRECT?

 1    A.   CORRECT.

 2    Q.   IT'S ALSO A PHONE THAT YOU ASSUMED TO BE INFRINGING FOR

 3    PURPOSES OF YOUR ANALYSIS; CORRECT?

 4    A.   CORRECT.

 5    Q.   SO ON THE LEFT-HAND SIDE OF THE PAGE, THE PURCHASERS OF

 6    THE GALAXY NOTE ARE ASKED WHAT OTHER PHONES THEY WERE

 7    CONSIDERING PURCHASING; CORRECT?

 8    A.   CORRECT.

 9    Q.   33 PERCENT OF THEM, ON THE LEFT-HAND SIDE, SAY THE APPLE

10    IPHONE 5; CORRECT?

11    A.   YES, CORRECT.

12    Q.   AND ON THE RIGHT-HAND SIDE, DO YOU SEE WHERE IT SAYS

13    GALAXY III PURCHASERS?

14    A.   YES.

15    Q.   THAT'S ALSO A PHONE ACCUSED OF INFRINGING; CORRECT?

16    A.   YES.

17    Q.   ALSO ASSUMED BY YOU TO BE INFRINGING; CORRECT?

18    A.   CORRECT.

19    Q.   AND WHAT THEY SAY IS FOR THE PURCHASERS OF THE GALAXY III,

20    37 PERCENT CONSIDERED, AS AN ALTERNATIVE, THE IPHONE 5;

21    CORRECT?

22    A.   YES, I SEE THAT.

23    Q.   NOW, YOU TOLD US THAT YOU SAW NOTHING IN SAMSUNG'S FILES

24    THAT -- OR YOU SAW LITTLE IN SAMSUNG'S FILES THAT REFERRED TO

25    THE FEATURES THAT ARE ACCUSED OF INFRINGING.  IS THAT WHAT YOU

1    SAID?

2    A.   I -- I SAW A FEW THINGS, YES, WHICH I'M SURE YOU'LL SHOW

3    ME.

4         BUT I DIDN'T SEE A LOT.

5    Q.   ALL RIGHT.  BUT YOU SAW SOME; CORRECT?

6    A.   YES.

7    Q.   ALL RIGHT.  SO LET'S LOOK AT SOME OF WHAT YOU SAW WHEN YOU

8    REVIEWED THOSE DOCUMENTS.

9         TURN, IF YOU WOULD -- LET ME GET YOU TO THE RIGHT PLACE --

10   WOULD YOU -- LET ME START HERE.  WOULD YOU AGREE WITH ME THAT,

11   IN THE DOCUMENTS YOU REVIEWED, SAMSUNG LOOKED AT THE IPHONE

12   WHEN IT WAS DESIGNING ITS ACCUSED PHONES; CORRECT?

13   A.   I WOULD SAY IT WAS CLEAR THAT SAMSUNG BENCHMARKED ITS

14   PHONES AGAINST THE IPHONE.  IT LOOKED AT THE IPHONE WHEN IT

15   WAS, YOU KNOW, EVALUATING ITS PHONES.

16   Q.   THE DOCUMENTS YOU SAW YOU CALL BENCHMARKING?

17   A.   YES.

18   Q.   DID YOU SEE BENCHMARKING AGAINST OTHER PHONES?

19   A.   YES, I DID.

20   Q.   WITH SPECIFIC RECOMMENDATIONS TO COPY FEATURES?

21   A.   I SAW SPECIFIC RECOMMENDATIONS FOR DIRECTIONS FOR

22   IMPROVEMENT, YES.

23   Q.   ALL RIGHT.  TO COPY FEATURES FROM SOMEONE ELSE'S PHONE AND

24   YOU CALL THAT BENCHMARKING?

25   A.   I DID NOT SEE SPECIFIC RECOMMENDATIONS TO COPY EXACT

1       FEATURES.  I SAW RECOMMENDATIONS ABOUT DIRECTIONS FOR

2       IMPROVEMENT.

3       Q.   ALL RIGHT.  SO LET'S LOOK AT SOME OF THE DOCUMENTS TO SEE.

4            LET ME START -- THE IPHONE WAS INTRODUCED IN JUNE OF 2007;

5       CORRECT?

6       A.   CORRECT.

7       Q.   YOU WERE HERE WHEN MR. SOHN FROM SAMSUNG SAID THAT WHEN IT

8       FIRST CAME IN THE MARKET, HE THOUGHT IT WAS GOING TO BE A NICHE

9       PRODUCT?

10           DO YOU REMEMBER THAT?

11      A.   I WASN'T HERE, BUT I SAW IT IN THE TRANSCRIPT.

12      Q.   RIGHT.  IT'S TURNED OUT TO BE MUCH MORE THAN A NICHE

13      PRODUCT; CORRECT?

14      A.   A VERY SUCCESSFUL PRODUCT.

15      Q.   IN FACT, YOU'VE DESCRIBED IT AS REVOLUTIONARY, HAVEN'T

16      YOU?

17      A.   I DON'T REMEMBER DESCRIBING IT AS REVOLUTIONARY, BUT

18      PERHAPS I DID.

19      Q.   WELL, TURN, IF YOU WOULD -- LET ME PUT ON THE SCREEN,

20      ACTUALLY -- WELL, LET ME JUST DO IT THIS WAY.

21           IN YOUR DEPOSITION, DID YOU DESCRIBE IT AS REVOLUTIONARY?

22      A.   I DON'T RECALL THAT.  I MIGHT HAVE.

23      Q.   OKAY.  IS IT A FAIR CHARACTERIZATION TO SAY THE IPHONE WAS

24      REVOLUTIONARY?

25      A.   YES, I THINK THE IPHONE INTRODUCED MANY NEW THINGS TO THE

```
 1          MARKET.

 2          Q.   WAS IT A REVOLUTION?

 3          A.   I -- I GUESS, SURE.

 4          Q.   OKAY.  SO NOW LET'S LOOK AT SOME OF THE DOCUMENTS, AND

 5     WE'RE NOT GOING TO GO THROUGH DOCUMENTS THE JURY HAS ALREADY

 6     SEEN.  I'M GOING TO SHOW YOU SOME THEY'VE SEEN AND SOME THEY

 7     HAVEN'T.

 8          A.   OKAY.

 9          Q.   TURN, IF YOU WOULD, TO TAB 8 IN YOUR BINDER AND YOU'LL

10     FIND PX 201, AND I'M GOING TO PUT IT ONLY ON THE JURY'S SCREEN

11     AND YOUR SCREEN FOR RIGHT NOW.

12               DO YOU HAVE IT BEFORE YOU?

13          A.   I DO.

14          Q.   DO YOU SEE IT'S AN APRIL 2009 PRESENTATION FROM SAMSUNG'S

15     GLOBAL STRATEGY GROUP?

16          A.   YES.

17                    MR. LEE:  YOUR HONOR, WE OFFER PX 201.

18                    THE COURT:  ANY OBJECTION?

19                    MR. QUINN:  OBJECTION.

20                    THE COURT:  IT'S ADMITTED.

21          (PLAINTIFF'S EXHIBIT 201 WAS ADMITTED IN EVIDENCE.)

22     BY MR. LEE:

23          Q.   ALL RIGHT.  NOW, THIS IS A PRESENTATION TITLED "SMARTPHONE

24     BUSINESS STRATEGY."  CORRECT?

25          A.   YES.
```

1     Q.   IT'S A SAMSUNG DOCUMENT; CORRECT?

2     A.   CORRECT.

3     Q.   NOW, BASED UPON THE WORK YOU'VE DONE AS AN ECONOMIST,

4     WOULD YOU AGREE THAT LOOKING AT WHAT PEOPLE DID AND SAID BEFORE

5     A DISPUTE HAS ARISEN IS SOMETIMES A LITTLE BIT MORE EDUCATIONAL

6     THAN WHAT THEY SAY AFTER A DISPUTE HAS ARISEN?

7     A.   YES, I -- THAT'S WHY I RELIED A LOT ON CONTEMPORANEOUS

8     DOCUMENTS RATHER THAN LOTS OF CALLS TO SAMSUNG EXECUTIVES AS

9     YOU PREVIOUSLY SUGGESTED.

10    Q.   SO LET'S LOOK AT THIS DOCUMENT THAT WAS PREPARED BEFORE

11    THERE WAS A FIGHT, OR AT LEAST BEFORE THERE WAS A LITIGATION.

12         TURN, IF YOU WOULD, TO PAGE 3.

13         NOW, YOU'LL SEE THAT -- DO YOU SEE THE REFERENCE TO A

14    STRATEGY TO INCREASE SEC'S SMARTPHONE MARKET SHARE AND

15    PROFITABILITY?

16    A.   YES.

17    Q.   ALL RIGHT.  LET'S TURN TO PAGE 5 AND SEE WHAT THAT

18    STRATEGY WAS.

19         AT THE TOP ON PAGE 5, IT SAYS "THE RECOMMENDATION IN THIS

20    PRESENTATION REFLECTS THE VIEW OF LEADING OPERATORS, SOFTWARE

21    PROVIDERS, AND SEC EXECUTIVES."

22         DO YOU SEE THAT?

23    A.   YES.

24    Q.   AND YOU UNDERSTAND THAT A LEADING OPERATOR IS A CARRIER?

25    A.   YES.

1      Q.   TURN, IF YOU WOULD, TO 17 AND LET'S LOOK AT WHAT THEIR

2      RECOMMENDATIONS ARE.

3          DO YOU RECALL REVIEWING THIS DOCUMENT IN REACHING YOUR

4      CONCLUSION ABOUT WHETHER THERE WAS DEMAND FOR THE PATENTED

5      FEATURES?

6      A.   AGAIN, I -- I HAVE SEEN A NUMBER OF STRATEGY DOCUMENTS

7      LIKE THIS.  I BELIEVE I HAVE SEEN THIS ONE.  YES, I BELIEVE I

8      HAVE.

9      Q.   AND I'LL REPRESENT TO YOU IT'S ONE OF THE DOCUMENTS THAT'S

10     IDENTIFIED IN YOUR REPORT.

11     A.   OKAY.

12     Q.   OKAY?

13     A.   LOOKS FAMILIAR.

14     Q.   DOES THAT HELP?

15     A.   YES.

16     Q.   ALL RIGHT.  LET'S TURN TO PAGE 17.  DO YOU SEE KEY

17     FINDINGS AND SUCCESS FACTORS?

18     A.   YES.

19     Q.   ALL RIGHT.  AND LET'S LOOK AT WHAT SAMSUNG SAID THE KEY

20     FINDINGS AND SUCCESS FACTORS WERE.

21         IN THE TITLE, THEY SAY "INSIGHT INTO SMARTPHONE CONSUMER

22     BEHAVIOR POINT TO TRENDS THAT INDICATE DIFFERENT DECISION

23     CRITERIA THAN IN THE PAST."

24         CORRECT?

25     A.   CORRECT.

1    Q.   SAMSUNG SAYS THERE WERE OLD TRENDS; CORRECT?

2    A.   YES.

3    Q.   AND THE OLD TRENDS WERE "HARDWARE IS THE PRIMARY BUYING

4    FACTOR."

5         DO YOU SEE THAT?

6    A.   YES.

7    Q.   THEN IT SAYS, IN ONE OF THE INSIGHTS FROM ONE OF ITS OWN

8    VICE-PRESIDENTS, WHO IS COMMENTING UPON WHAT APPLE IS DOING,

9    "APPLE USES APPLICATIONS, NOT HARDWARE, FOR SEGMENTATION."

10        CORRECT?

11   A.   CORRECT.

12   Q.   NOW, YOU UNDERSTAND THAT THE FIVE PATENTS HERE CONCERN

13   SOFTWARE; CORRECT?

14   A.   YES.

15   Q.   INCIDENTALLY, DO ANY OF THE FIVE PATENTS CONCERN AN APP?

16   A.   NOT DIRECTLY.

17   Q.   RIGHT.  APPS ARE SOMETHING THAT YOU CAN DOWNLOAD FOR YOUR

18   IPHONE OR FOR YOUR GALAXY; CORRECT?

19   A.   YES, AND THEY PROVIDE FUNCTIONALITY TO YOUR IPHONE OR

20   GALAXY.

21   Q.   RIGHT.  NONE OF THESE FIVE FEATURES ARE APPS, ARE THEY

22   NOT?

23   A.   NONE OF THESE FIVE FEATURES, AS FAR AS I KNOW, ARE

24   AVAILABLE AS APPS.

25   Q.   ALL RIGHT.  NOW, DID YOU CONSIDER PX 201 IN FORMING YOUR

```
1     OPINIONS THAT APPLE IS ENTITLED TO ZERO LOST PROFITS?

2     A.   I CONSIDERED PX 201.

3     Q.   OKAY.  TURN, IF YOU WOULD, TO PAGE 78 OF PX 201.

4          DO YOU HAVE THAT BEFORE YOU?

5     A.   DID YOU SAY 78?

6     Q.   YES.  IT'S -- DO YOU SEE IT RIGHT HERE?

7     A.   YEP.

8     Q.   IT SAYS AT THE TOP "IT IS RECOMMENDED THAT SAMSUNG

9     REDUCE."

10         DO YOU SEE THAT?

11    A.   YES.

12    Q.   NOW, YOU KNOW, BASED UPON YOUR REVIEW OF THIS DOCUMENT AND

13    OTHER DOCUMENTS, THAT BACK IN 2009 -- THAT'S THE DATE OF THIS

14    DOCUMENT; CORRECT?

15    A.   RIGHT.

16    Q.   -- SAMSUNG ACTUALLY HAD THE CHOICE OF WHAT OPERATING

17    SYSTEM IT WANTED TO PUT IN THE PHONES; CORRECT?

18    A.   CORRECT.

19    Q.   AND IT COULD HAVE PUT IN WINDOWS MOBILE; CORRECT?

20    A.   YES.

21    Q.   IT COULD HAVE PUT IN SYMBIAN; CORRECT?

22    A.   YES.

23    Q.   IT COULD HAVE PUT IN LINUX MOBILE; CORRECT?

24    A.   CORRECT.

25    Q.   IT COULD HAVE PUT IN ANDROID; CORRECT?
```

```
1    A.   YES.

2    Q.   FOR THE PHONES WHICH YOU ASSUMED TO BE INFRINGING, SAMSUNG

3    MADE THE DECISION OF WHAT SOFTWARE TO PUT IN; CORRECT?

4    A.   YES, SAMSUNG MADE THE DECISION TO USE ANDROID.

5    Q.   ALL RIGHT.  NOW --

6              THE COURT:  THE TIME IS NOON.  SHOULD WE GO AHEAD AND

7    TAKE OUR LUNCH BREAK?

8              MR. LEE:  THAT'S FINE.  THANK YOU, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  LET'S DO THAT.

10         WE'RE GOING TO BREAK FOR ONE HOUR AND WE'LL SEE YOU BACK

11   AT 1:00 O'CLOCK.

12         PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

13         THANK YOU.

14         (JURY OUT AT 12:01 P.M.)

15             THE COURT:  YOU MAY STEP DOWN.

16         (JURY OUT AT 12:01 P.M.)

17             THE COURT:  OKAY.  LET'S WAIT UNTIL ALL THE JURORS

18   HAVE LEFT.

19         ALL RIGHT.  THE RECORD SHOULD REFLECT THE JURORS HAVE LEFT

20   THE COURTROOM.

21             MR. PAK:  YOUR HONOR, VERY BRIEFLY, THIS IS FROM

22   YESTERDAY'S EXAMINATION, OR LAST FRIDAY'S EXAMINATION, BUT WE

23   HAVE DX 320A --

24             THE COURT:  OKAY.  WAIT.  THIS IS ON TIME.  THIS IS

25   NOT FOR FREE.  ANY TIME AN EXHIBIT IS COMING IN OR TESTIMONY IS
```

1      COMING IN, IT COUNTS AS TIME.  12:01.

2          GO AHEAD, PLEASE.

3              MR. PAK:  I'D LIKE TO MOVE DX 320A AND DX 314A IN

4      EVIDENCE, YOUR HONOR.  THESE ARE THE SOURCE CODE FILES.  WE MET

5      AND CONFERRED AND THERE ARE NO OBJECTIONS.

6              THE COURT:  ANY OBJECTION?  ANY OBJECTION?  THIS

7      IS -- STATE THE NUMBER AGAIN, PLEASE.

8              MR. PAK:  320A AND 314A.

9              THE COURT:  ANY OBJECTION?

10             MS. KREVANS:  I'M SORRY, YOUR HONOR.  I THINK PERHAPS

11     MR. PAK HAS BEEN DISCUSSING THIS WITH OTHERS IN OUR OFFICE AND

12     NONE OF THEM ARE HERE.

13         CAN I TALK WITH THEM OVER LUNCH BREAK AND CONFIRM THIS IS

14     WHAT WE AGREED TO, BECAUSE I DON'T KNOW AS I STAND HERE.

15             THE COURT:  ALL RIGHT.

16             MS. KREVANS:  I HAD NO NOTICE THAT HE WAS GOING TO DO

17     THIS.

18             THE COURT:  ALL RIGHT.  FINE.  IT'S 12:0 -- I'M JUST

19     GOING TO COUNT IT AS ONE MINUTE.  12:02.  THAT'S FINE.

20         ALL RIGHT.  WORK IT OUT, PLEASE.

21         (THE LUNCH RECESS WAS TAKEN FROM 12:02 P.M. TO 1:00 P.M.)

22

23

24

25

1                    **AFTERNOON SESSION**

2        (JURY OUT AT 1:00 P.M.)

3            THE COURT:  DO YOU HAVE THOSE EXHIBITS NOW?

4            MS. MAROULIS:  YES, YOUR HONOR.  APPLE CONFIRMED THAT

5    THEY DO NOT HAVE OBJECTIONS, AND WE'RE GOING TO MOVE IN 320A

6    AND 314A.

7            THE COURT:  ALL RIGHT.  THEY ARE BOTH ADMITTED.

8            MS. MAROULIS:  THANK YOU.

9            THE COURT:  AND I SAW ON THE OBJECTIONS FOR TOMORROW

10   THAT THERE'S A NEW JX 50A, AND I'M WONDERING IF WE SHOULD

11   PERHAPS CALL THAT JX 50B JUST TO KEEP SEPARATE, BECAUSE I

12   UNDERSTAND IT'S A NEW PORTION OF THE CODE THAN WHAT'S IN 50A.

13        IS THAT RIGHT?

14           MS. MAROULIS:  YOUR HONOR, WE'LL CHECK, BUT IT'S FINE

15   TO RENAME IT SOMETHING DIFFERENT.

16           THE COURT:  OKAY.  JUST SO THE RECORD IS CLEAR AS TO

17   WHAT CAME IN DURING WHAT WITNESS.

18           MS. MAROULIS:  THANK YOU, YOUR HONOR.

19           THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

20        (DEFENDANTS' EXHIBITS 314A AND 320A WERE ADMITTED IN

21   EVIDENCE.)

22           THE COURT:  ALL RIGHT.  ARE WE READY TO GO?

23           MR. LEE:  READY TO GO.

24        (JURY IN AT 1:01 P.M.)

25           THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

1     SEAT.

2          OKAY.  TIME IS NOW 1:01.  1:02.  GO AHEAD, PLEASE.

3     BY MR. LEE:

4     Q.   GOOD AFTERNOON, DR. CHEVALIER.

5     A.   GOOD AFTERNOON.

6     Q.   I'D LIKE TO KEEP MY PROMISE AND NOW COME TO SOME OF THE

7     DOCUMENTS THAT SPECIFICALLY MENTION THE FEATURES.  OKAY?

8          TURN, IF YOU WOULD, IN VOLUME 1 OF THE BINDER BEFORE YOU

9     TO TAB 10.

10         LET ME KNOW WHEN YOU'RE THERE.

11    A.   OKAY.

12    Q.   AND THIS IS ALREADY IN EVIDENCE, SO I'M GOING TO PUT THE

13    FIRST PAGE ON THE SCREEN.  THIS IS PX 146.

14         DO YOU SEE THAT?

15    A.   YES, I DO.

16    Q.   NOW, THIS IS DATED MARCH 2010; CORRECT?

17    A.   CORRECT.

18    Q.   AND YOU HAVE PREVIOUSLY SEEN THE E-MAIL THAT WE'VE CALLED

19    THE CRISIS OF DESIGN E-MAIL?

20    A.   I'VE SEEN IT.

21    Q.   YES.  SO THIS IS ABOUT THREE OR FOUR WEEKS LATER AFTER THE

22    CRISIS OF DESIGN E-MAIL; CORRECT?

23    A.   I'M NOT SURE I REMEMBER EXACTLY THE DATE FOR THE CRISIS OF

24    DESIGN E-MAIL, BUT I UNDERSTAND.

25    Q.   I'LL REPRESENT TO YOU THAT'S THE TIMEFRAME.  OKAY?

2469

```
 1      A.   OKAY.

 2      Q.   SO NOW LET'S LOOK AT, IN MARCH OF 2010, WHAT'S HAPPENING

 3   AT SAMSUNG.

 4           AGAIN, THESE ARE NOW SAMSUNG DOCUMENTS GENERATED BEFORE

 5   THIS LITIGATION; CORRECT?

 6      A.   CORRECT.

 7      Q.   A SAMSUNG DOCUMENT THAT YOU REVIEWED; CORRECT?

 8      A.   YES.

 9      Q.   NOW, IF WE TURN TO PAGE 4 OF PX 146, DO YOU SEE AT THE TOP

10   WHAT REFERS TO OVERALL COMMENTS?

11      A.   OH, WAIT.  SORRY.  I WENT TO 4 OF THE --

12      Q.   THAT'S OKAY.  TURN, IF YOU WOULD FIRST --

13      A.   OKAY, SORRY.  GOT IT.

14      Q.   ARE YOU WITH ME?

15      A.   YES.

16      Q.   AND DO YOU SEE THE OVERALL COMMENTS AND A REFERENCE TO A

17   TOTAL OF 126 ISSUES?

18      A.   YES.

19      Q.   AND IT SAYS A TOTAL OF 126 ISSUES WERE FOUND; CORRECT?

20      A.   CORRECT.

21      Q.   AND THEN IF WE FOLLOW THROUGH THE REMAINING PAGES IN THIS

22   DOCUMENT, THERE ARE A DISCUSSION OF THESE 126 ISSUES; CORRECT?

23      A.   CORRECT.

24      Q.   AND FOR EACH OF THEM AT THE BOTTOM, THERE'S SOMETHING

25   CALLED DIRECTION FOR IMPROVEMENT; CORRECT?
```

CROSS CHEVALIER

```
 1      A.   YES.

 2      Q.   TURN, IF YOU WOULD, TO PAGE 37.

 3      A.   I'M SORRY.  SAME THING AGAIN.  I WENT TO THE NUMBER 37.

 4      OKAY.

 5      Q.   THAT'S OKAY.  ARE YOU THERE?

 6      A.   YES.

 7      Q.   OKAY.  AND IT SAYS BASIC FUNCTION MEMO AT THE TOP.

 8           DO YOU SEE THAT?

 9      A.   YES.

10      Q.   AND THEN REFERRING TO S I, IT SAYS, "NO LINK FUNCTION IS

11      PROVIDED AT ALL."

12           DO YOU SEE THAT?

13      A.   YES.

14      Q.   AND IF WE LOOK ON THE RIGHT-HAND SIDE, YOU SEE THE S I;

15      CORRECT?

16      A.   YES.

17      Q.   AND THEN THERE'S A DESCRIPTION AT THE TOP FOR THE IPHONE.

18           DO YOU SEE THAT?

19      A.   YES.

20      Q.   AND IT SAYS "A LINK FOR THE URL, PHONE NUMBER, OR E-MAIL

21      ADDRESS IN THE MEMO IS PROVIDED THROUGH A TAP OR LONG PRESS."

22           CORRECT?

23      A.   CORRECT.

24      Q.   AND THEN THERE'S A DIRECTION FOR IMPROVEMENT; CORRECT?

25      A.   YES.
```

1    Q.   AND THE DIRECTION -- AND YOU REMEMBER BEFORE THE BREAK I'D

2    ASKED YOU WHETHER YOU SAW ANYTHING GIVING SPECIFIC DIRECTION AS

3    TO ANY OF THE FEATURES INVOLVED IN THE LAWSUIT.

4         DO YOU REMEMBER THAT?

5    A.   YES, I DO.

6    Q.   AND THIS ONE SAYS "NEED TO IMPROVE USABILITY BY PROVIDING

7    LINKS FOR MEMO CONTENTS SUCH AS WEB, CALL, AND E-MAIL, THAT CAN

8    BE LINKED."

9         CORRECT?

10   A.   CORRECT.

11   Q.   NOW, YOU UNDERSTAND THE '647 -- I UNDERSTAND YOU'RE NOT A

12   TECHNICAL EXPERT OR A PATENT ATTORNEY, BUT YOU UNDERSTAND THE

13   '647 PATENT COVERS THINGS LIKE LINKS; CORRECT?

14   A.   NOT ALWAYS, BUT YES, THE '647 DOES.

15   Q.   AND ALL TEN OF THE SAMSUNG PRODUCTS AT ISSUE IN THIS CASE

16   HAVE BEEN ACCUSED OF INFRINGING THE '647 PATENT; CORRECT?

17   A.   ACTUALLY, I THINK THAT'S NOT QUITE RIGHT.

18   Q.   A SUBSTANTIAL PORTION OF THEM HAS; CORRECT?

19   A.   CORRECT.

20   Q.   ALL RIGHT.  SO LET ME ASK YOU A COUPLE QUESTIONS.  YOU

21   TALKED TO THE LADIES AND GENTLEMEN OF THE JURY ABOUT DESIGNING

22   AROUND THESE PATENTS; CORRECT?

23   A.   I DID.

24   Q.   SO LET'S TALK ABOUT THE 687 -- THE '647 PATENT JUST FOR A

25   MINUTE.  OKAY?

CROSS CHEVALIER

1    A.   OKAY.

2    Q.   THE '647 PATENT RESULTS IN A LOT OF DR. VELLTURO'S

3    DAMAGES; CORRECT?

4    A.   YES, IT DOES.

5    Q.   OKAY.  NOW, NO ONE HAS EVER DESIGNED IN AN ALTERNATIVE TO

6    THE '647; CORRECT?

7    A.   BY THAT, DO YOU MEAN NO ONE AT SAMSUNG?

8    Q.   YES.

9    A.   YES.  SO MAYBE ASK AGAIN WHAT EXACTLY WHAT YOU MEAN.

10   Q.   SURE.  LET ME SEE IF I CAN BREAK IT DOWN FOR YOU.

11        YOU KNOW THAT IN AUGUST OF 2010, APPLE MET WITH SAMSUNG;

12   CORRECT?

13   A.   YES.

14   Q.   YOU KNOW THAT APPLE SPECIFICALLY MENTIONED THE '647 PATENT

15   AT THAT TIME; CORRECT?

16   A.   YES.

17   Q.   YOU KNOW THAT APPLE SAID, "PLEASE STOP INFRINGING THE '647

18   PATENT."

19        CORRECT?

20   A.   I DON'T THINK THAT'S EXACTLY WHAT IT SAID, BUT YES.

21   Q.   CLOSE ENOUGH?  THEY SAID "STOP INFRINGING."

22        CORRECT?

23   A.   I THINK THEY SAID -- WELL, YES, OKAY.

24   Q.   OKAY.  NOW, APPLE SUED IN THIS CASE IN FEBRUARY 2012;

25   CORRECT?

1     A.   YES.

2     Q.   AFTER THE AUGUST MEETING, BUT BEFORE THIS LAWSUIT STARTED,

3     SAMSUNG INTRODUCED NEW PRODUCTS THAT INFRINGED, THAT WE CLAIM

4     INFRINGE THE '647 PATENT; CORRECT?

5     A.   CORRECT.

6     Q.   AFTER THIS LAWSUIT STARTED, SAMSUNG CONTINUED TO INTRODUCE

7     NEW PRODUCTS THAT HAD THE '647 FEATURE; CORRECT?

8     A.   YES.

9     Q.   IN FACT, YOU KNOW, DR. CHEVALIER, THAT AFTER THIS LAWSUIT

10    WAS STARTED, SAMSUNG SOLD MORE THAN 30 MILLION UNITS THAT WE

11    CLAIM INFRINGE THE '647 PATENT; CORRECT?

12    A.   CORRECT.

13    Q.   NOW, YOU BELIEVE IT WOULD HAVE ONLY TAKEN ONE OR THREE

14    MONTHS TO DESIGN AROUND THAT PATENT?

15    A.   WELL, I DON'T HAVE A SPECIFIC -- I DON'T HAVE -- I'M NOT A

16    TECHNICAL EXPERT, BUT I HAVE HEARD TESTIMONY WITH REGARD TO

17    THAT, YES.

18    Q.   OKAY.  AND -- BUT THE ONE THING WE CAN AGREE UPON -- WE

19    TALKED A LITTLE BIT ABOUT LOOKING AT WHAT PEOPLE DO RATHER THAN

20    WHAT THEY SAY.

21         THE ONE THING WE CAN AGREE IS OVER A TWO-YEAR PERIOD,

22    SAMSUNG NEVER DESIGNED IN ANY ALTERNATIVE IN THESE 30 MILLION

23    INFRINGING PHONES; CORRECT?

24    A.   THAT'S CORRECT.

25    Q.   AND AS AN ECONOMIST, THAT'S AN IMPORTANT FACT TO YOU,

```
 1          ISN'T IT?

 2          A.   AS AN ECONOMIST, THERE'S A NUMBER OF EXPLANATIONS FOR

 3     THAT.

 4          Q.   RIGHT.  AND ONE EXPLANATION IS THEY THOUGHT IT WAS

 5     IMPORTANT TO HAVE IT IN THE PRODUCT; CORRECT?

 6          A.   THAT'S ONE EXPLANATION, BUT I'M NOT EVEN SURE THAT'S THE

 7     LEADING ONE.

 8          Q.   OKAY.

 9          A.   I THINK THEY DON'T WANT THEIR COMPETITOR TO DICTATE THEIR

10     FUNCTIONALITY.

11          Q.   AND DID YOU PICK UP THE PHONE AND CALL ANYBODY AT SAMSUNG

12     AND SAY, "WHAT WAS THE REASON"?

13          A.   AS I SAID BEFORE, I THINK THAT GIVEN THE MOUNTAIN OF

14     DEPOSITION TESTIMONY AND THE MOUNTAIN OF CONCURRENT DOCUMENTS,

15     A PHONE CALL ASKING SOMEONE ABOUT THEIR RETROSPECTIVE

16     RECOLLECTION STRUCK ME AS NOT ADDING VERY MUCH TO MY

17     INVESTIGATION.

18          Q.   ALL RIGHT.  WELL, LET'S LOOK AT ANOTHER DOCUMENT THAT WAS

19     PART OF THE INVESTIGATION THAT TALKED ABOUT A SPECIFIC FEATURE.

20          TURN, IF YOU WOULD, TO TAB 11 IN VOLUME 1.  IT'S PX 120,

21     WHICH IS ALREADY ADMITTED IN EVIDENCE.

22          YOU'VE SEEN THIS DOCUMENT BEFORE; CORRECT?

23          A.   YES.  JUST A SECOND.  SORRY.  JUST A SECOND.

24          Q.   SURE.  TELL ME WHEN YOU GET THERE.

25          A.   YEAH, OKAY.
```

1    Q.   AND YOU'LL SEE ON THE COVER IT SAYS, "S/W VERIFICATION

2    GROUP."

3    A.   YES.

4    Q.   THAT'S SOFTWARE VERIFICATION GROUP AT SAMSUNG; CORRECT?

5    A.   YEAH, THAT'S MY UNDERSTANDING.

6    Q.   AND THE DOCUMENT'S DATED MAY 10TH, 2010; CORRECT?

7    A.   CORRECT.

8    Q.   SO WE'VE COME FORWARD A FEW MONTHS FROM THE MARCH DOCUMENT

9    WE JUST LOOKED AT; CORRECT?

10   A.   CORRECT.

11   Q.   NOW, THIS IS ANOTHER DOCUMENT WITH SIDE-BY-SIDE COMPARISON

12   WITH THE IPHONE; CORRECT?

13   A.   YES.

14   Q.   TURN, IF YOU WOULD, TO PAGE 28, DR. CHEVALIER.

15        AND I'M NOT GOING TO GO THROUGH THIS BECAUSE WE'VE SEEN IT

16   BEFORE -- I'M NOT GOING TO GO THROUGH IT IN DETAIL BECAUSE

17   WE'VE SEEN IT BEFORE, BUT THIS SPECIFICALLY CONCERNS THE SCREEN

18   UNLOCK MECHANISM; CORRECT?

19   A.   YES, IT DOES.

20   Q.   AND THE DIRECTION FOR IMPROVEMENT -- IF WE CAN HAVE THAT

21   BLOWN UP -- IS "CONVERT TO AN UNLOCKING METHOD THAT ONLY WORKS

22   IN A SPECIFIC AREA."

23        AND THEN IT GOES ON; CORRECT?

24   A.   YES, WITH AN EXAMPLE, INCLUDING PUZZLE LOCK.

25   Q.   RIGHT.  NOW, LET'S GO BACK TO THE COVER PAGE OF THIS

```
 1        EXHIBIT, AND I WANT YOU TO LOOK AT THE DATE AGAIN.

 2             THERE HAS BEEN SOME SUGGESTION THAT THIS PROBLEM OF SLIDE

 3        TO UNLOCK HAD ALREADY BEEN SOLVED AT SAMSUNG AND THE SOFTWARE

 4        VERIFICATION GROUP JUST DIDN'T KNOW THAT.  HAVE YOU HEARD THAT?

 5        A.   YES.

 6        Q.   HAVE YOU SEEN ANY E-MAIL, ANY MEMO, ANY DOCUMENT WHERE

 7        SOMEONE AT SAMSUNG SAID, STOP, YOU DON'T NEED TO DO THESE 150

 8        PAGE COMPARISONS, WE SOLVED THESE PROBLEMS A YEAR AGO?

 9        A.   WELL, I BELIEVE THAT TESTIMONY WAS SPECIFICALLY WITH

10        REGARD TO THE SCREEN UNLOCK, AND THEY NEED TO, YOU KNOW,

11        EXAMINE THE CHARACTERISTICS OF ALL OF THEIR PRODUCTS.

12             SO I DON'T THINK THEY'RE GOING TO STOP DOING THESE LONG

13        DOCUMENTS WHERE THEY LOOK AT ALL THE FEATURES.

14        Q.   SO MY QUESTION, DR. CHEVALIER, IS, IN ALL THE DOCUMENTS

15        YOU REVIEWED AS PART OF YOUR WORK ON THE CASE, DID YOU SEE A

16        SINGLE DOCUMENT THAT SAID TO THE SOFTWARE VERIFICATION GROUP,

17        "WE SOLVED THIS PROBLEM A YEAR AGO.  DON'T WORRY ABOUT IT"?

18        A.   ARE YOU TALKING SPECIFICALLY ABOUT SCREEN LOCK?

19        Q.   SURE, LET'S TALK ABOUT SCREEN LOCK.  ARE YOU AWARE OF ANY

20        DOCUMENT THAT SAID TO THE SOFTWARE VERIFICATION GROUP, "STOP

21        WORK, FOLKS, WE SOLVED THIS PROBLEM A YEAR AGO"?

22        A.   I WOULD EVEN SAY THIS DOCUMENT KIND OF SAYS THAT BECAUSE

23        IT SAYS WE RECOMMEND PUZZLE LOCK OR A PATTERN UNLOCK, AND THEY

24        HAVE THAT.  SO I THINK, YOU KNOW, THEY'RE JUST SUGGESTING

25        SWITCHING TO -- IT SEEMS TO ME, AND MAYBE I'M NOT -- IT'S A
```

CROSS CHEVALIER

```
 1      TRANSLATED DOCUMENT, MAYBE I'M NOT READING IT CORRECTLY, BUT IT

 2      SEEMS TO ME THAT THEY'RE SUGGESTING TO SWITCH TO A DIFFERENT

 3      THING.

 4      Q.   OKAY.  THAT'S HOW YOU READ THE DOCUMENT?

 5      A.   YEAH.

 6      Q.   OKAY.  SO LET'S TALK A LITTLE BIT ABOUT THE LINE COUNTS.

 7      A.   YES.

 8      Q.   OR THE REVIEW COUNTING.  YOU DID IT WITH SOME HELP OF

 9      PEOPLE AT THE ANALYSIS GROUP; CORRECT?

10      A.   YES.

11      Q.   OKAY.  INCIDENTALLY, DO YOU KNOW OF ANY PATENT CASE WHERE

12      COUNTING LINES IN A REVIEW HAS BEEN A BASIS FOR DETERMINING

13      PATENT DAMAGES?

14      A.   NO.  EXAMINING LINES IN REVIEW IS AN ACADEMIC ACTIVITY,

15      BUT I DON'T BELIEVE IT'S BEEN USED IN A PATENT CASE.

16      Q.   ALL RIGHT.  SO LET'S -- I'D LIKE TO TALK ABOUT WHAT YOU

17      DID.  OKAY?

18      A.   SURE.

19      Q.   OKAY.  NOW, IN ADDITION TO -- WELL, LET ME ASK YOU THIS:

20      YOU SAID THAT IT'S BEEN USED ACADEMICALLY; CORRECT?

21      A.   YES.

22      Q.   IN THE ACADEMIC PUBLICATIONS THERE HAS BEEN NO PUBLICATION

23      THAT SUGGESTS THAT IT CAN BE USED TO DETERMINE CONSUMER DEMAND

24      FOR A PARTICULAR PATENTED FEATURE; ISN'T THAT TRUE?

25      A.   I BELIEVE IT HASN'T BEEN USED IN THE PATENT CONTEXT AS FAR
```

```
 1        AS I KNOW.

 2        Q.   NOT IN PUBLISHED LITERATURE, NOR IN COURT; CORRECT?

 3        A.   THERE'S A TREMENDOUS AMOUNT OF PUBLISHED LITERATURE ON

 4        REVIEWS THESE DAYS.  I DON'T KNOW IT ALL.  BUT AS FAR AS I

 5        KNOW, THERE IS NOT.

 6        Q.   OKAY.  NOW, JUST QUICKLY, YOU WENT THROUGH THESE DIFFERENT

 7        REVIEWS THAT YOU TALKED ABOUT EARLIER TODAY; CORRECT?

 8        A.   CORRECT.

 9        Q.   YOU COUNTED THE LINES OR MENTIONS; CORRECT?

10        A.   I COUNTED -- I COUNTED THE MENTIONS WITHIN A SENTENCE --

11        THE NUMBER OF SENTENCES WITH MENTIONS.

12        Q.   RIGHT.  SO IF THERE WAS A MENTION THAT SAID, YOU KNOW,

13        DR. CHEVALIER, BUT THEN THERE WERE FIVE SENTENCES, THAT GOT

14        FIVE DATA POINTS; CORRECT?

15        A.   IF THERE WERE -- IF THERE WERE FIVE SENTENCES CLEARLY

16        ABOUT THE FEATURE, YES.

17        Q.   OKAY.  AND THEN WHEN YOU COUNTED THOSE UP, YOU THEN

18        CATEGORIZED THEM INTO THE DIFFERENT CATEGORIES THAT YOU THOUGHT

19        THAT THEY FELL IN; CORRECT?

20        A.   WELL, THE -- YOU KNOW, THE CATEGORIZATIONS WERE PART OF

21        THE INSTRUCTIONS, BUT YES.

22        Q.   OKAY.  AND, INCIDENTALLY, HOW MANY PEOPLE AT THE ANALYSIS

23        GROUP HELPED YOU WITH THE EXERCISE?

24        A.   WELL, THE CODING PART, BECAUSE OF ALL OF THE CHECKING,

25        REQUIRED A LARGE NUMBER OF PEOPLE, SO THERE WERE ABOUT 12
```

1        PEOPLE THAT WERE CODING.

2            BUT THEN THERE WAS A COUPLE OF LAYERS OF SUPERVISING, WITH

3        ME SUPERVISING AT THE TOP.

4            SO, YOU KNOW, PROBABLY 18 PEOPLE DURING THIS TIME PERIOD.

5        Q.   AND DID YOU EVER MEET WITH THE CODERS YOURSELF?

6        A.   I DIDN'T, BUT I SPOKE TO THE HEAD OF THE CODING TEAM ON

7        THE PHONE VERY REGULARLY.

8        Q.   NOW, I THINK YOU TOLD ME YOU WERE LOOKING FOR MENTIONS;

9        CORRECT?

10       A.   I WAS INSTRUCTING THEM TO FLAG MENTIONS, YES.

11       Q.   RIGHT.  NOW, WHEN YOU FLAG A MENTION, IT DOESN'T MATTER IF

12       IT'S A GOOD MENTION, A BAD MENTION, OR A NEUTRAL MENTION;

13       CORRECT?  IT'S JUST A MENTION?

14       A.   THAT'S RIGHT.

15       Q.   ALL RIGHT.  SO LET'S LOOK AT HOW THIS WORKS SO THAT WE CAN

16       LOOK AT, IN A LITTLE BIT OF DETAIL, AT THE BASIS FOR THE

17       OPINIONS YOU GAVE.

18           TURN, IF YOU WOULD, TO VOLUME 2, THE SECOND VOLUME, TAB

19       16, AND YOU'RE GOING TO FIND YOUR APPENDIX C FROM YOUR REPORT.

20       A.   TAB 16?

21       Q.   YES.

22       A.   SORRY.  TAB 16.

23       Q.   TAB 16.  I THINK IT'S APPENDIX C.  IS THAT RIGHT?

24       A.   YES.

25       Q.   AND IF I TURN YOU TO PAGE 79.

1    A.   SORRY.  I DON'T HAVE 79 PAGES UNDER TAB 16.

2    Q.   OKAY.  PAGE 3.  I'M SORRY.  IT'S THE THIRD PAGE.  WHAT WE

3    DID IS WE, IN ORDER TO BURDEN YOU WITH LESS, WE PICKED OUT THE

4    PAGES WE WERE GOING TO USE.  SO GO TO THE THIRD PAGE, WHICH IS

5    THE PAGE ON THE SCREEN NOW.

6    A.   OKAY.

7    Q.   ALL RIGHT.  NOW, LOOK AT SENTENCES 18 AND 19.

8         IT SAYS, "AFTER FIVE DAYS OF USE, WALT -- WHO DID MOST OF

9    THE TESTING FOR THIS REVIEW -- WAS ABLE TO TYPE ON IT QUICKLY

10   AND ACCURATELY AS HE COULD ON THE PALM TREO HE HAS USED FOR

11   YEARS.  THIS WAS PARTLY BECAUSE OF SMART SOFTWARE THAT CORRECTS

12   TYPING ERRORS ON THE FLY."

13        DO YOU SEE THAT?

14   A.   YES.

15   Q.   NOW, DID YOU NOT COUNT THAT AS A MENTION OF THE AUTO

16   CORRECT FEATURE; CORRECT?

17   A.   YES.  NOW, OF COURSE, THIS IS AN APPLE IPHONE REVIEW.  WE

18   DIDN'T REALLY TALK ABOUT THAT WITH THE JURY, BUT, YOU KNOW, MY

19   UNDERSTANDING IS THAT THE APPLE IPHONE ACTUALLY DOESN'T

20   PRACTICE THE PATENTED CLAIMS.

21   Q.   SO DID YOU MAKE THAT JUDGMENT YOURSELF, THAT THE MANNER IN

22   WHICH THIS PHONE WAS OPERATING FELL OUTSIDE THE SCOPE OF THE

23   CLAIMS?

24   A.   SO I THINK WE GO BACK TO MY FLAGGING CRITERIA, NO.  BUT IF

25   WE GO BACK TO THE FLAGGING CRITERIA, WE CAN SEE EXACTLY WHY

```
 1    THIS, THIS PARTICULAR MENTION FELL OUTSIDE THE FLAGGING

 2    CRITERIA.

 3    Q.   LET'S SEE, IF WE BEEN CONSISTENT, LET'S GO TO PAGE 8 OF

 4    THE SAME DOCUMENT, I'LL PUT IT ON THE SCREEN, AND IF WE CAN

 5    HAVE BLOWN UP LINE -- THE LAST TWO SENTENCES ON THE PAGE.

 6    "SOFTWARE TRIES TO GUESS WHAT YOU'RE TYPING AND FIX ERRORS.

 7    OVERALL, IT WORKS."

 8         DO YOU SEE THAT?

 9    A.   YES.

10    Q.   BUT YOU COUNTED THAT ONE; CORRECT?

11    A.   YES.

12    Q.   OKAY.  NOW, LET'S LOOK AT A COUPLE OF THE INDUSTRY REVIEWS

13    YOU LOOKED AT.

14         SAME STANDARDS, MENTIONS; RIGHT?

15    A.   YES.

16    Q.   AND IF WE LOOK AT, I THINK YOU TOLD US, 24,000 SENTENCES

17    FROM AMAZON CONSUMER REVIEWS; CORRECT?

18    A.   ROUGHLY, YES.

19    Q.   TURN, IF YOU WOULD, TO TAB 17 IN VOLUME 2, WHICH IS FROM

20    YOUR APPENDIX AS WELL.

21    A.   OKAY.

22    Q.   AND I'M GOING TO PUT UP ON THE SCREEN PAGE 43, AND

23    HIGHLIGHT SENTENCES 597 TO 601.

24         DO YOU SEE THAT?

25    A.   YES.  WAIT, SORRY.  WELL, OKAY, I'LL LOOK AT IT ON THE
```

1    SCREEN.

2    Q.   OKAY.

3    A.   OKAY.

4    Q.   AND I'LL REPRESENT TO YOU THAT THESE ARE FIVE SENTENCES

5    THAT WERE INCLUDED IN YOUR COUNT.

6    A.   AGAIN, THESE ARE NOT INCLUDED IN THE COUNT I PRESENTED TO

7    THE JURY, BUT THESE ARE APPLE IPHONE REVIEWS THAT I UNDERTOOK

8    AS A CHECK.

9    Q.   RIGHT.  AND YOU INCLUDED THESE IN THE COUNT THAT'S IN YOUR

10   EXPERT REPORT; CORRECT?

11   A.    IN MY EXPERT REPORT, BUT NOT IN THE SUMMARIES THAT I

12   PRESENTED TODAY.

13   Q.   RIGHT.  BUT I'M TRYING TO GET AT THE REPORT YOU GAVE US

14   AND THE BASIS OF THE REPORT.  OKAY?

15   A.   YES.

16   Q.   AND THIS SAYS, "THIS PHONE BETRAYED ME.

17        "WHEN I WAS SLEEPING, IT SLAPPED ME AND SEEREI SAID A BAD

18   WERD," W-E-R-D, "AND THEN THE IPHONY SHUT OFF THEN, 53 MINUTES

19   AND 6.98454762574655729046 SECONDS LATER, IT SYRIE TOOK OUT A

20   GUN APPE AND SHOT ME WITH MINIGUN IN THE HEAD.

21        "I DON'T KNOW HOW I'M STILL RITIN THIS REVIEW.

22        "PLUS BLACK IS FAZTER.

23        "PEACE."

24        DO YOU SEE THAT?

25   A.   I DO.

1    Q.   AND THAT WAS COUNTED AS FIVE SENTENCES; CORRECT?

2    A.   THAT WAS COUNTED AS FIVE SENTENCES IN THE CUSTOMER

3    REVIEWS.  AND, YOU KNOW, INDEED -- BUT, OF COURSE, IT WAS

4    COUNTED -- WELL, I WOULD HAVE TO DOUBLE-CHECK THIS, BUT I

5    UNDERTOOK ACTUALLY TWO COUNTS, A COUNT OF TOTAL FEATURES AND A

6    COUNT OF SENTENCES.  PROBABLY DIDN'T EXPLAIN THIS VERY

7    CAREFULLY, BUT WHEN I WAS DOING THE REVIEW ANALYSIS, I CHOSE

8    THE MAX OF SHARE FEATURES OR SHARE OF SENTENCES IN THE

9    REASONABLE ROYALTY CALCULATION.

10        BUT, YES, IT IS OFTEN THE CASE THAT THE CUSTOMER REVIEWS

11   CAN, AS OPPOSED TO, OF COURSE, THE PROFESSIONAL REVIEWS, THE

12   CUSTOMER REVIEWS CONTAINED, YOU KNOW, NON-GRAMMATICAL

13   SENTENCES.

14   Q.   DR. CHEVALIER, WHAT I'VE JUST SHOWN YOU AND THE LADIES AND

15   GENTLEMEN OF THE JURY IS PART OF THE APPENDIX THAT ACCOMPANIED

16   YOUR REPORT AND YOU SHOWED US THE SENTENCES, SOME OF THE

17   SENTENCES THAT YOU COUNTED IN YOUR ANALYSIS; CORRECT?

18   A.   YES, THAT'S RIGHT, FOR THE CUSTOMER REVIEWS.

19   Q.   NOW --

20   A.   FOR THE IPHONE, YEAH.

21   Q.   NOW, IN COUNTING, YOU ALSO DIDN'T DISTINGUISH BETWEEN

22   COMMENTS UPON PRODUCTS AND KNOCK-OFFS OF PRODUCTS; CORRECT?

23   A.   I DID NOT SEPARATE -- I LOOKED FOR MENTIONS OF FEATURES,

24   AND SOMETIMES NOT SPECIFICALLY TIED TO THE PRODUCT.

25   Q.   RIGHT.

```
 1        A.   WHETHER THEY WERE TALKING ABOUT THE FEATURES.

 2        Q.   SO, IN FACT, YOUR ANALYSIS INCLUDED ONLINE REVIEWS THAT

 3   TALKED ABOUT FAKE PHONES; CORRECT?

 4        A.   DO YOU MEAN THE AMAZON?

 5        Q.   YES.

 6        A.   YES.  IT -- IT MAY WELL TALK ABOUT FAKE PHONES.  I CAN'T

 7   REALLY RULE THAT OUT.

 8        Q.   ALL RIGHT.  LET'S GIVE YOU AN EXAMPLE OR TWO.

 9             TURN, IF YOU WOULD, TO TAB 18, WHICH IS AGAIN PART OF YOUR

10   APPENDIX THAT YOU PROVIDED TO US WITH YOUR REPORT.

11             AND I'M GOING TO GO TO PAGE 9 AND ASK MR. LEE TO BLOW UP

12   SENTENCES 88 TO 91.

13             NOW, THIS COLLECTION OF ONLINE REVIEWS ARE FOR THE

14   GALAXY S II PHONE; CORRECT?

15        A.   YES.

16        Q.   OKAY.  AND THE REVIEW SAYS, QUOTE, "THIS WAS NOT AN

17   OFFICIAL SAMSUNG PRODUCT.  I VERIFIED WITH SAMSUNG WITH THE

18   IMIE NUMBER OFF THE PHONE.  I WAS SOLD A FAKE.  I'M STILL

19   WAITING FOR MY REFUND."

20             THAT'S THE WHOLE REVIEW; CORRECT?

21        A.   CORRECT.

22        Q.   AND THAT WAS COUNTED AS FOUR SENTENCES IN THE ANALYSIS

23   THAT YOU PROVIDED US IN YOUR REPORT; CORRECT?

24        A.   FOUR SENTENCES WITH NO CLEARLY MENTIONED FEATURE.

25        Q.   ALL RIGHT.  NOW, LET ME BRING UP SDX 37 -- LET ME GET THE
```

```
 1         EXACT RIGHT ONE -- CAN I HAVE SDX 377 FIRST.  ACTUALLY, LET'S

 2    GO TO SDX 378.

 3         THIS IS A SLIDE THAT THE LADIES AND GENTLEMEN OF THE JURY

 4    LOOKED AT WITH MR. QUINN AND YOU EARLIER TODAY; CORRECT?

 5    A.   CORRECT.

 6    Q.   AND YOU HAVE UP -- YOU PUT UP A BOX AROUND THE FIVE

 7    FEATURES THAT ARE INVOLVED IN THIS CASE; CORRECT?

 8    A.   CORRECT.

 9    Q.   NOW, LET'S JUST GO ONE STEP ABOVE THE BOX --

10    A.   YES.

11    Q.   -- AND LET'S GO TO PRICE.

12         NOW, YOU THINK PRICE IS A VERY IMPORTANT FEATURE; CORRECT?

13    A.   YES.

14    Q.   IF I GO TO SDX 3779 -- ACTUALLY, I MAY HAVE THE WRONG

15    NUMBER.  THE ONE THAT -- 3781.  I'M SORRY.  SDX 3781.

16         THIS IS A SLIDE YOU USED THIS MORNING TELLING THE JURY

17    WHAT THE TOP DRIVERS ARE; CORRECT?

18    A.   CORRECT.

19    Q.   AND ONE OF THEM IS PRICE; CORRECT?

20    A.   CORRECT.

21    Q.   SO LET'S GO BACK AND SEE WHAT THE PERCENTAGE NUMBER OF

22    MENTIONS WERE ON YOUR STUDY FOR PRICE.  IT'S IMMEDIATELY ABOVE

23    THE ANALYZER SERVER; CORRECT?

24    A.   CORRECT.

25    Q.   THE NUMBER OF MENTIONS WAS 2.36 PERCENT; CORRECT?
```

1    A.   CORRECT.

2    Q.   ALL RIGHT.

3    A.   AND AS YOU KNOW, IN THE REPORT I ALSO PRESENT THE FRACTION

4    OF REVIEWS MENTIONING IT, MENTIONING THE ITEM, AND PRICES

5    MENTIONED IN NEARLY 100 PERCENT OF REVIEWS, UNLIKE THE PATENTED

6    FEATURE.

7         I'D ALSO POINT OUT THAT PRICE IS MENTIONED, YOU KNOW,

8    DRAMATICALLY MORE THAN THE PATENTED FEATURES, EVEN USING THIS

9    METHODOLOGY.

10   Q.   PERCENT OF SENTENCES DISCUSSING IS 2.36 PERCENT; CORRECT?

11   A.   YEAH, CORRECT.

12   Q.   THAT'S AN ACCURATE STATEMENT OF YOUR FINDING; CORRECT?

13   A.   YES, IT IS.

14   Q.   NOW, THE CONSUMER REVIEWS THAT YOU LOOKED AT DIDN'T ASK

15   CUSTOMERS WHY THEY CHOSE A PARTICULAR MODEL OF PHONE; CORRECT?

16   A.   CONSUMERS, IN CONSUMER REVIEWS, WRITE WHATEVER THEY WOULD

17   LIKE TO WRITE ABOUT THEIR EXPERIENCE WITH A PHONE.  IT DOESN'T

18   ASK THEM SPECIFICALLY ABOUT WHY THEY CHOSE A PARTICULAR PHONE.

19   Q.   OKAY.

20   A.   BUT THEY DO CONVEY THE FEATURES THAT THEY'RE INTERESTED IN

21   AND THAT THEY BELIEVE OTHER CONSUMERS ARE INTERESTED IN.

22   Q.   NOW, DR. CHEVALIER, YOU WERE IN THE COURTROOM WHEN

23   DR. REIBSTEIN TESTIFIED, CORRECT, AND DR. HAUSER AND DR. ERDEM;

24   CORRECT?

25   A.   YES.  I WASN'T IN THE COURTROOM WHEN DR. ERDEM TESTIFIED.

1    Q.   ALL RIGHT.  THE JURY HAS NOW HEARD ABOUT CONJOINT STUDIES;

2    CORRECT?

3    A.   CORRECT.

4    Q.   THEY'VE HEARD ABOUT EYE TRACKING STUDIES; CORRECT?

5    A.   CORRECT.

6    Q.   THEY'VE HEARD ABOUT YOUR LINE COUNTING STUDIES; CORRECT?

7    A.   CORRECT.

8    Q.   NOW, ALL OF THIS, MUCH OF THE TESTIMONY IS DIRECTED TO

9    DR. HAUSER'S CONJOINT ANALYSIS; CORRECT?

10   A.   CORRECT.

11   Q.   AND LET ME ASK YOU THIS:  THERE'S A PORTION OF

12   DR. VELLTURO'S LOST PROFITS ANALYSIS THAT HAS NO RELATIONSHIP,

13   OR NO BASIS IN DR. HAUSER'S STUDY; CORRECT?

14   A.   THAT'S ALMOST CORRECT.

15   Q.   ALL RIGHT.  THERE IS THE OFF THE MARKET LOST PROFITS

16   DAMAGES; CORRECT?

17   A.   THE LOST -- THE OFF THE MARKET LOST PROFIT DAMAGES ARE NOT

18   DIRECTLY CALCULATED FROM DR. HAUSER'S STUDY, AS I TESTIFIED

19   EARLIER.

20   Q.   AND, AGAIN, YOU WEREN'T TRYING TO SUGGEST THAT THEY WERE.

21   THAT'S, LIKE, $500 MILLION THAT WAS NOT CALCULATED ON THE BASIS

22   OF DR. HAUSER'S STUDY; CORRECT?

23   A.   IT'S NOT CALCULATED ON THE BASIS OF DR. HAUSER'S STUDY.

24       HOWEVER, THE LOST PROFITS CLAIM WHICH ALLOWS FOR THE OFF

25   THE MARKET DAMAGES, IS, IN PART, SUPPORTED BY DR. HAUSER'S

1     STUDY.

2     Q.   DR. CHEVALIER, IN MAKING HIS COMPUTATIONS OF OFF THE

3     MARKET DAMAGES DID DR. VELLTURO USE ANY NUMBER PROVIDED BY

4     DR. HAUSER?

5     A.   NO.

6     Q.   OKAY.  NOW, I WANT TO TALK ABOUT THESE STUDIES THAT THE

7     JURY HAS HEARD ABOUT, CONJOINT, EYE TRACKING, AND CONJOINTS.

8     OKAY?

9          YOU, YOURSELF, HAVE NEVER PERFORMED A CONJOINT ANALYSIS;

10    CORRECT?

11    A.   NO.

12    Q.   YOU'VE NEVER PERFORMED AN EYE TRACKING STUDY; CORRECT?

13    A.   CORRECT.

14    Q.   BUT YOU DO KNOW THAT THERE WAS AN EXPERT WITNESS IN THIS

15    CASE BEFORE YOU NAMED MICHAEL WAGNER; CORRECT?

16    A.   YES, I DO.

17    Q.   HE WAS -- HE'S AN ACCOUNTANT; CORRECT?

18    A.   YES, HE'S AN ACCOUNTANT.

19    Q.   HE'S AN EXPERIENCED TESTIFIER IN LITIGATIONS; CORRECT?

20    A.   YES, HE IS.

21    Q.   AND HE ACTUALLY GAVE A DECLARATION IN THIS CASE, DID HE

22    NOT?

23    A.   YES.

24    Q.   AND IN HIS DECLARATION, HE SAID THAT APPLE'S DAMAGES CAN

25    BE COMPUTED USING A CONJOINT ANALYSIS, DIDN'T HE?

```
1      A.   WELL, I THINK THAT'S NOT EXACTLY CORRECT.

2      Q.   WELL, LET'S SEE WHAT HE SAID.  TURN TO TAB 2 -- I'M SORRY,

3      VOLUME 2, TAB 20.

4      A.   TAB 20.

5      Q.   YEAH.  GO TO PAGE 61, AND I'M GOING TO USE THIS JUST TO

6      REFRESH YOUR RECOLLECTION.

7           IT'S TRUE, IS IT NOT, THAT MR. WAGNER WAS TELLING THE

8      COURT THAT ANY HARM TO APPLE COULD BE QUANTIFIED; CORRECT?

9      A.   SORRY.  WHICH PARAGRAPH?

10     Q.   PARAGRAPH -- IT'S THE TITLE RIGHT ABOVE PARAGRAPH 115.

11     A.   EVEN IF APPLE COULD DEMONSTRATE THAT THE GALAXY NEXUS --

12     YES.

13     Q.   YES.  ANY HARM TO APPLE COULD BE QUANTIFIED; CORRECT?

14     A.   CORRECT.

15     Q.   AND THEN IN PARAGRAPH 16, HE SPECIFICALLY TOLD THE COURT

16     THAT ONE WAY TO DO THIS IS CONJOINT ANALYSIS; CORRECT?

17     A.   SORRY.  SO CAN YOU JUST DIRECT ME EXACTLY TO WHERE THAT

18     IS?

19     Q.   SURE.  PARAGRAPH 61, DO YOU SEE -- I'LL JUST GIVE YOU THE

20     LAST PORTION.  QUOTE, "THIS NUMBER OF CUSTOMERS CAN BE

21     CALCULATED THROUGH THE USE OF SURVEYS, CONJOINT ANALYSIS, OR

22     HEDONIC REGRESSION."

23          CORRECT?  DO YOU SEE THAT?

24     A.   YES, I SEE THAT.

25     Q.   SO JUST SO THE JURY HAS THE CHRONOLOGY DOWN, WE HAVE
```

1       MR. WAGNER ON BEHALF OF SAMSUNG SUGGESTING THAT A CONJOINT

2       ANALYSIS CAN BE USED; CORRECT?

3       A.   WELL, AMONG OTHER THINGS.

4       Q.   AMONG OTHER THINGS.  BUT CONJOINT ANALYSIS IS ONE THING HE

5       SUGGESTS; CORRECT?

6       A.   HE SUGGESTS THAT CONJOINT ANALYSIS COULD BE USEFUL.

7       Q.   RIGHT.  AND THEN DR. HAUSER DOES A CONJOINT ANALYSIS;

8       CORRECT?

9       A.   DR. HAUSER DOES A CONJOINT ANALYSIS.

10      Q.   OKAY.  NO ONE FROM SAMSUNG, OR ON SAMSUNG'S BEHALF, DOES A

11      CONJOINT ANALYSIS FOR THE FIVE FEATURES AT ISSUE IN THIS CASE;

12      CORRECT?

13      A.   CORRECT.

14      Q.   DR. REIBSTEIN COULD, BUT HE DIDN'T; CORRECT?

15      A.   WELL, NO.  I THINK DR. REIBSTEIN TESTIFIED THAT HE COULD

16      HAVE PERFORMED A CONJOINT ANALYSIS, BUT THOUGHT IT WAS

17      INAPPROPRIATE IN THIS CONTEXT.

18      Q.   I'M GOING TO ASK YOU ABOUT ITS APPROPRIATENESS IN A

19      SECOND.

20           BUT WE CAN AGREE HE DIDN'T DO IT?

21      A.   HE DID NOT DO IT.

22      Q.   AND DO YOU KNOW WHO DR. SUKUMAR IS?

23      A.   I DO KNOW WHO DR. SUKUMAR IS.

24      Q.   HE'S ANOTHER EXPERT HIRED BY SAMSUNG WHO HAS EXPERIENCE

25      WITH CONJOINT ANALYSIS.  HE DIDN'T DO ONE EITHER, DID HE?

CROSS CHEVALIER

1    A.   HE DID NOT DO ONE EITHER.

2    Q.   DO YOU KNOW WHO DR. RAO IS?

3    A.   YES, I DO.

4    Q.   HE'S ANOTHER EXPERT HIRED BY SAMSUNG WHO COULD DO CONJOINT

5    ANALYSIS; CORRECT?

6    A.   I ACTUALLY JUST KNOW WHO HE IS.  I'M NOT REALLY ACTUALLY

7    FAMILIAR WITH THE OTHER CASE, SO I DON'T -- I DON'T KNOW

8    WHETHER HE COULD DO A CONJOINT ANALYSIS.  I'LL ACCEPT YOUR VIEW

9    THAT HE COULD.

10   Q.   NO, YOU DON'T NEED TO ACCEPT MY VIEW.  WE'LL SET HIM

11   ASIDE.

12        BUT WE HAVE DR. SUKUMAR AND WE HAVE DR. REIBSTEIN.

13   A.   UM-HUM.

14   Q.   AND THE ONE THING WE CAN AGREE UPON IS YOU'VE NOT SEEN A

15   CONJOINT ANALYSIS, OR ANY OTHER TYPE OF SURVEY, BY SAMSUNG TO

16   ADDRESS THE QUESTION OF HOW VALUABLE THESE FEATURES ARE;

17   CORRECT?

18   A.   WELL, ACTUALLY, I WOULD CHARACTERIZE DR. ERDEM'S STUDY AS

19   A SURVEY WHICH DOES SPEAK TO THE QUESTION OF HOW VALUABLE

20   THESE, THESE PATENTS ARE.

21   Q.   OKAY.  FAIR ENOUGH.

22        SO ON THE ONE HAND, WE'VE DR. HAUSER DOING WHAT MR. WAGNER

23   SUGGESTED MORE THAN A YEAR AGO, A CONJOINT; WE HAVE DR. ERDEM

24   DOING THE EYE TRACKING STUDY; CORRECT?

25        DID SAMSUNG DO ANYTHING ELSE?

1    A.   YES.  SAMSUNG HAS MY STUDY; THEY HAVE DR. REIBSTEIN'S

2    STUDY.

3    Q.   NOW, LET'S TALK ABOUT THOSE STUDIES.

4         I THINK YOU TOLD ME DR. REIBSTEIN, DR. ERDEM, AND YOU ARE

5    ALL AFFILIATED WITH ANALYSIS GROUP.  CORRECT?

6    A.   CORRECT.

7    Q.   AND YOU KNOW THAT THE ANALYSIS GROUP ACTUALLY HAS A

8    WEBSITE; CORRECT?

9    A.   YES, I DO.

10   Q.   AND YOU KNOW THAT THAT WEBSITE ACTUALLY TOUTS ITS

11   EXPERIENCE WITH CONJOINT ANALYSIS; CORRECT?

12   A.   YES.

13   Q.   AND IT ACTUALLY SAYS CONJOINT ANALYSIS ARE VERY USEFUL IN

14   DETERMINING THE VALUE OF FEATURES IN, FOR EXAMPLE, A

15   SMARTPHONE; CORRECT?

16   A.   SO I HAVE READ WHAT IT SAYS AND IT, IT DOES SAY IT'S

17   USEFUL -- WELL, ACTUALLY, CAN YOU --

18   Q.   SURE.

19   A.   IT SAYS SOMETHING ABOUT RELATIVE VALUES IF I RECALL.

20   Q.   THAT'S LOOK AT EXACTLY WHAT IT SAYS.  TAB 22, IF YOU

21   WOULD.

22   A.   YES.

23   Q.   QUOTE, "CONJOINT ANALYSIS MEASURES THE RELATIVE VALUE TO

24   CONSUMERS OF PRODUCT FEATURES BY ANALYZING CHOICES CONSUMERS

25   MAKE WHEN GIVEN OPTIONS THAT VARY ALONG THOSE FEATURES.  IN A

 1      CONJOINT EXERCISE, WE PROVIDE RESPONDENTS WITH PRODUCT CHOICE

 2      SETS FROM WHICH THEY SELECT THEIR PREFERRED ALTERNATIVES.  WE

 3      THEN USE STATISTICAL ANALYSIS TO IDENTIFY THE MUST-HAVE

 4      FEATURES, TO COMPARE THE RELATIVE IMPORTANCE OF FEATURES (FOR

 5      EXAMPLE, IS IT IMPORTANT TO HAVE WI-FI OR GPS IN A SMARTPHONE?)

 6      AND TO ASSESS THE EXCHANGE RATE BETWEEN FEATURES, FOR EXAMPLE,

 7      SCREEN SIZE RELATIVE TO PRICE."

 8          DO YOU SEE THAT?

 9      A.   YES.

10      Q.   AND THEY ACTUALLY GO ON AND SAY, "USING THE RESULTS OF

11      THESE STUDIES, WE CAN PREDICT DEMAND FOR EXISTING AND

12      NON-EXISTING PRODUCTS AND MEASURE THE RELATIVE VALUES OF

13      MUST-HAVE, SECONDARY, AND TERTIARY FEATURES."

14          HAVE I READ THAT CORRECTLY?

15      A.   YOU READ IT CORRECTLY.

16      Q.   NOW, DOES THE ANALYSIS GROUP WEBSITE HAVE ANYTHING

17      COMPARABLE FOR EYE TRACKING ANALYSIS?

18      A.   I DON'T KNOW.

19          BUT I POINT OUT THAT THIS VERY CLEARLY DOES NOT ENCOMPASS

20      DR. HAUSER'S CONJOINT STUDY BECAUSE IT SPECIFICALLY SAYS IT CAN

21      CALCULATE RELATIVE VALUES FOR SECONDARY AND TERTIARY FEATURES.

22          RELATIVE VALUES, AS WE KNOW, IS DIFFERENT FROM WILLINGNESS

23      TO BUY, AND AS YOU KNOW, DR. REIBSTEIN'S CENTRAL CONCERNS, OR

24      SOME OF HIS CENTRAL CONCERNS ABOUT DR. HAUSER'S STUDY COMES

25      FROM THE FACT THAT DR. HAUSER CALCULATED WILLINGNESS TO BUY.

```
 1            AND THIS WEBSITE DOESN'T SAY THAT THEY CAN DO THAT FOR

 2      SECONDARY AND TERTIARY FEATURES.

 3      Q.   DID ANYBODY, YOU, DR. REIBSTEIN, ANYBODY ELSE THAT WORKED

 4      FOR THE ANALYSIS GROUP, DO THE ANALYSIS THAT THE ANALYSIS GROUP

 5      SAID WAS POSSIBLE, THAT IT WAS GOOD AT, THAT IT WAS EXPERT AT?

 6      DID THEY DO THAT?  DR. CHEVALIER, DID THEY DO IT?

 7      A.   YES.   THOUGH I THINK THAT THE ANALYSIS GROUP IS SUGGESTING

 8      THAT THEY HAVE EXPERT AFFILIATES WHO CAN DO THIS KIND OF

 9      ANALYSIS.

10            BUT, AGAIN, NOT THE KIND OF ANALYSIS -- THEY'RE NOT

11      SUGGESTING THE KIND OF ANALYSIS THAT DR. HAUSER DID.

12      Q.   HAVE YOU HEARD OF THE CONCEPT OF MONDAY MORNING

13      QUARTERBACKING, THAT IT'S EASY TO LOOK AT WHAT SOMEONE ELSE HAS

14      DONE --

15                 MR. QUINN:  YOUR HONOR, THIS IS JUST ARGUMENT NOW.

16                 MR. LEE:  NO, IT'S NOT.

17                 THE COURT:  OVERRULED.

18            GO AHEAD.

19      BY MR. LEE:

20      Q.   HAVE YOU HEARD OF THE CONCEPT OF MONDAY MORNING

21      QUARTERBACKING?

22      A.   YES.

23      Q.   WHAT SAMSUNG HAS DONE HAS HIRED PEOPLE TO MONDAY MORNING

24      QUARTERBACK DR. HAUSER'S STUDY, NONE OF WHOM HAVE PERFORMED ANY

25      CONJOINT STUDY OF THEIR OWN; CORRECT?
```

1      A.   BECAUSE A CONJOINT CAN'T BE DONE, CORRECT.

2      Q.   WELL, AGAIN, YOU'VE NEVER DONE A CONJOINT; CORRECT?

3      A.   I HAVE NOT.

4      Q.   OKAY.  SO LET'S GO TO YOUR REASONABLE ROYALTY COMPUTATION,

5      AND I JUST WANT TO ASK YOU A FEW QUESTIONS.

6           I WANT TO BE SURE -- FIRST, YOU'VE HEARD OF THIS

7      HYPOTHETICAL NEGOTIATION?

8      A.   OF COURSE.

9      Q.   AND I JUST WANT TO BE SURE, THE HYPOTHETICAL NEGOTIATION

10     IS SAMSUNG ON ONE HAND; CORRECT?

11     A.   CORRECT.

12     Q.   IT IS APPLE ON THE OTHER; CORRECT?

13     A.   CORRECT.

14     Q.   THE PATENTS ARE VALID AND INFRINGED IN THAT HYPOTHETICAL

15     NEGOTIATION; CORRECT?

16     A.   YES, OF COURSE.

17     Q.   AND THEN THEY'RE SITTING DOWN, IN THIS FORCED HYPOTHETICAL

18     NEGOTIATION, TO DECIDE UPON WHAT A REAL WORLD ROYALTY SHOULD

19     BE; CORRECT?

20     A.   CORRECT.

21     Q.   AND IS IT YOUR OPINION THAT IN THE HYPOTHETICAL

22     NEGOTIATION, APPLE WOULD HAVE AGREED TO $.35 PER PATENT TO ITS

23     TOP COMPETITOR AS A ROYALTY -- AS A REASONABLE ROYALTY?

24     A.   YES, THAT'S MY OPINION.

25     Q.   ALL RIGHT.  SO LET'S EXPLORE THAT.

```
 1              TURN, IF YOU WOULD, TO PX 208, WHICH IS IN VOLUME 1,

 2     TAB 4.  WE LOOKED AT THIS A LITTLE BIT EARLIER, AND I'M JUST

 3     GOING TO PUT ON THE SCREEN FOR THE JURY AND THE COURT.

 4              THE COURT:  AND ONLY PAGES 1 THROUGH 4 OF THIS

 5     DOCUMENT WERE SEALED.

 6              MR. LEE:  THAT'S CORRECT, YOUR HONOR.

 7     Q.   DO YOU SEE THE PAGE ON THE SCREEN, PAGE 1 RIGHT NOW?

 8     A.   YES.

 9     Q.   NOW, AGAIN, I'M NOT GOING TO GO THROUGH THE NUMBERS, BUT I

10     WANT TO BE SURE THAT IN THIS HYPOTHETICAL NEGOTIATION, THE

11     PATENTS ARE ASSUMED VALID; CORRECT?

12     A.   CORRECT.

13     Q.   THEY'RE ASSUMED INFRINGED; CORRECT?

14     A.   CORRECT.

15     Q.   THEY KNOW IT'S THEIR, AS YOU SAID, HEATED COMPETITORS;

16     CORRECT?

17     A.   THEY ARE DIRECT COMPETITORS, YES.

18     Q.   YOU KNOW THAT APPLE DOESN'T LICENSE ITS INTELLECTUAL

19     PROPERTY, YOU TOLD US THAT EARLIER TODAY, OR IS RELUCTANT TO

20     LICENSE ITS INTELLECTUAL PROPERTY?

21     A.   IT DOESN'T AS A MATTER OF COURSE.

22     Q.   WE KNOW THAT APPLE HAS HAD A MEETING WITH SAMSUNG WHERE IT

23     SAID "STOP COPYING" AND SAMSUNG HAS SAID "WE'RE NOT COPYING."

24     CORRECT?

25     A.   YES.
```

CROSS CHEVALIER

1    Q.   AND WE KNOW FROM THE DOCUMENTS WE'VE NOW SEEN THAT SAMSUNG

2    WOULD HAVE KNOWN JUST HOW THESE FEATURES MADE THEIR WAY INTO

3    THE PHONES; CORRECT?

4    A.   SAMSUNG WOULD HAVE KNOWN HOW THESE FEATURES MADE THEIR WAY

5    INTO THE PHONES, OKAY, YES.

6    Q.   AND YOU THINK THAT APPLE WOULD HAVE LICENSED FOR $.35 A

7    PATENT; CORRECT?

8    A.   CORRECT.

9    Q.   ALL RIGHT.  SO LET'S EXPLORE THAT.

10       DR. ERDEM TALKED THIS MORNING WHEN YOU WERE HERE ABOUT

11   NEAR FIELD COMMUNICATIONS; CORRECT?

12   A.   CORRECT.

13   Q.   YOU SAW THAT, ON HER CHART, SHE DESCRIBED IT AS A MINOR

14   FEATURE; CORRECT?

15   A.   I -- I'M -- I DON'T REMEMBER IF SHE USED EXACTLY THE TERM

16   "MINOR FEATURE."  I KNOW THERE WAS SOME DISCUSSION ABOUT THAT

17   THIS MORNING.

18   Q.   OKAY.  BUT YOU READ MR. PENDLETON'S TESTIMONY; CORRECT?

19   A.   I HAVE.

20   Q.   MR. PENDLETON TALKED ABOUT NEAR FIELD COMMUNICATION;

21   CORRECT?

22   A.   HE DID.

23   Q.   THE SAME FEATURE THAT DR. ERDEM WAS TALKING ABOUT;

24   CORRECT?

25   A.   YES.

1    Q.   AND I ASKED HIM, WOULD YOU HAVE LICENSED NEAR FIELD

2    COMMUNICATION TO ONE OF YOUR PRINCIPAL COMPETITORS FOR PENNIES

3    A UNIT?

4         DO YOU REMEMBER THAT?

5    A.   YES.

6    Q.   AND HE SAID HE WOULD NOT; CORRECT?

7    A.   YES.

8    Q.   THAT'S REAL WORLD INFORMATION ABOUT WHAT SAMSUNG WOULD

9    HAVE DONE WITH A FEATURE THAT WAS ON THE RIGHT-HAND SIDE OF

10   DR. ERDEM'S CHART; CORRECT?

11   A.   WELL, I DON'T THINK DR. ERDEM EVER CLAIMED, NOR HAVE I,

12   THAT ALL FEATURES ON THE RIGHT-HAND SIDE ARE SIMILAR.

13        SO NEAR FIELD COMMUNICATION, S BEAM, IS AN ADVERTISED

14   FEATURE, WHICH IS ONE OF THE THINGS I REVIEWED IN MY ANALYSIS.

15   SO THAT ALREADY DIFFERENTIATES IT FROM THE FEATURES AT ISSUE.

16        S BEAM IS PART OF A SUITE OF FEATURES THAT PROMOTE

17   SHARING.  THAT'S PART OF SAMSUNG'S IMAGE.

18        AGAIN, AS DISTINCT FROM THE FEATURES AT ISSUE HERE.

19        SO I AM -- I -- IT IS NOT CLEAR TO ME THAT NEAR FIELD

20   COMMUNICATION IS SOMEHOW AS OR MORE -- I MEAN, AS OR -- IT IS

21   NOT CLEAR TO ME THAT NEAR FIELD COMMUNICATION IS AT ALL OF THE

22   LEVEL THAT THE FIVE PATENTED FEATURES ARE.

23   Q.   YOU --

24   A.   BUT I THINK THE TERM "MINOR," YOU KNOW, HAS A RANGE.

25   Q.   RIGHT.  THE ANSWER IS YOU DON'T KNOW HOW IT COMPARES, DO

1      YOU?

2      A.   WELL, I HAVE SOME IDEAS BECAUSE, AS I JUST TOLD YOU, IT'S

3      AN ADVERTISED FEATURE.

4      Q.   SO HOW MANY TIMES --

5      A.   IT'S A MENTIONED FEATURE.

6      Q.   HOW MANY TIMES DID NEAR FIELD COMMUNICATIONS GET MENTIONED

7      IN YOUR LINE COUNT?

8      A.   SO FOR THE PRODUCTS THAT ACTUALLY INTRODUCED -- ACTUALLY

9      USE NEAR FIELD COMMUNICATION, THE S III AND THE NOTE 2 --

10     Q.   NO.  FOR ALL THE PRODUCTS, SAME --

11          MR. QUINN:  I'M SORRY, YOUR HONOR.  MAY SHE ANSWER

12     THE QUESTION?

13          THE COURT:  GO AHEAD.

14     YOU CAN ANSWER.

15     BY MR. LEE:

16     Q.   GO AHEAD.

17     A.   I'M -- SO NEAR FIELD COMMUNICATION WAS A NEW FEATURE, AND

18     IN THE PRODUCTS THAT USE IT, IT IS MENTIONED IN UPWARD OF 2

19     PERCENT OF SENTENCES.

20     Q.   ABOUT -- AND HOW ABOUT FOR THE WHOLE UNIVERSE OF PRODUCTS?

21     HOW OFTEN IS IT MENTIONED?

22     A.   I ACTUALLY DON'T KNOW BECAUSE, OF COURSE, IT CAME AROUND

23     LATER.

24     Q.   OKAY.

25     A.   UNLIKE THE PATENTED FEATURES.

```
 1      Q.   ALL RIGHT.  A COUPLE OTHER AREAS.

 2           CAN WE HAVE PDX 102.4 ON THE SCREEN?

 3           THIS IS SEALED, YOUR HONOR, SO I'M JUST PUTTING IT UP FOR

 4      DR. CHEVALIER, THE JURY, AND YOU.

 5           NOW, AT THE BOTTOM IS A REPRODUCTION OF YOUR CHART THAT

 6      COMPARED, PHONE BY PHONE, THE OPERATING PROFITS OF --

 7      A.   YES.

 8      Q.   -- THE DIFFERENT MODELS; CORRECT?

 9      A.   CORRECT.

10      Q.   NOW, AT THE TOP OF PDX 102.4, THE SEALED PORTION, YOU CAN

11      SEE THE GROSS MARGINS; CORRECT?

12      A.   YOU MEAN THE GROSS PROFITS, NOT THE GROSS MARGINS.

13      Q.   YES, GROSS PROFITS.

14      A.   CORRECT.

15      Q.   AND YOU HAVE NO REASON TO DISAGREE WITH THE GROSS PROFITS

16      THAT BEGIN ON THE LEFT-HAND SIDE WITH THE GALAXY S II AND

17      CONTINUE OVER TO THE GALAXY TAB 2; CORRECT?

18      A.   CORRECT.

19      Q.   ALL RIGHT.  NOW, LAST COUPLE QUESTIONS.

20           MR. QUINN ASKED YOU SOMETHING ABOUT SAMSUNG RAISING ITS

21      PRICES.

22           DO YOU REMEMBER THAT?

23      A.   YES.

24      Q.   YOU, IN FACT, HAVE LOOKED AT WHAT SAMSUNG HAS DONE WITH

25      ITS PRICES SINCE IT STARTED INFRINGEMENT; CORRECT?
```

```
1    A.   CORRECT.

2    Q.   SO LET'S LOOK AT WHAT THEY, IN FACT, DID.

3         I'M GOING TO PUT ON THE SCREEN YOUR UPDATED EXHIBIT 26A.

4    IT'S IN TAB 2C OF YOUR BINDER, BUT YOU CAN LOOK AT IT ON THE

5    SCREEN.

6    A.   SORRY.

7         OKAY.  WHICH BINDER?

8    Q.   MAYBE YOU CAN LOOK AT IT ON THE SCREEN AND YOU'LL FIND IT.

9    BUT IF YOU WANT TO SEE IT IN HARD COPY, I'M JUST GOING TO BLOW

10   UP -- LET'S DO THIS:  DO YOU SEE UP AT THE TOP UPDATED

11   EXHIBIT 26A?

12   A.   YES.

13   Q.   ALL RIGHT.  AND IT SAYS SUMMARY OF ACCUSED SAMSUNG PRODUCT

14   SALES?

15   A.   YES.

16   Q.   ALL RIGHT.  NOW, WHAT YOU DID IS, ON A PER UNIT BASIS, YOU

17   COMPUTED SAMSUNG'S PROFITS; CORRECT?

18        OR I'M SORRY, REVENUES; CORRECT?

19   A.   YES.

20   Q.   AND THERE'S A NUMBER, WHICH I'M GOING TO ASK MR. LEE TO

21   HIGHLIGHT FOR ME NOW, FOR 2011 WHICH THE JURORS CAN SEE.

22   A.   UM-HUM.

23   Q.   DO YOU SEE THAT NUMBER NOW?

24   A.   YES.

25             MR. LEE:  IS IT ON THE SCREEN FOR YOU AS WELL?
```

```
1                   JUROR:  UM-HUM.

2       BY MR. LEE:

3       Q.   LET'S LOOK AT -- THAT'S FOR 2011.  LET'S LOOK AT WHAT

4       HAPPENED TO THE AVERAGE SELLING PRICE IN 2012.

5            DO YOU SEE IT HIGHLIGHTED NOW?

6       A.   YES.

7       Q.   AND THEN LET'S LOOK AT WHAT HAPPENED TO THE AVERAGE

8       SELLING PRICE, OR THE REVENUES, IN 2013.

9            DO YOU SEE IT?

10      A.   YES.

11      Q.   IT'S HIGHLIGHTED NOW?

12      A.   YES.

13      Q.   SO PRICES WENT UP, CAME DOWN A LITTLE, BUT BY 2013, THEY

14      WERE STILL ALMOST 19 PERCENT HIGHER THAN THEY HAD BEEN IN 2011;

15      CORRECT?  BY YOUR CHART?

16      A.   THAT'S ACTUALLY NOT QUITE CORRECT BECAUSE, YOU KNOW, THESE

17      PRICES HERE ARE THE SUMMARY OF THE MIX OF ACCUSED PRODUCT SALE

18      AND PRICES, RIGHT?

19           SO IN THE EARLY PERIOD, IT INCLUDES SOME OF THE LOWER END

20      PHONES WHICH, YOU KNOW, AREN'T PART OF THE -- THOSE PHONES

21      AREN'T ALL PART OF THE CASE, AREN'T ALL IN THE LATER PERIOD.

22           SO THERE'S A PRODUCT MIX ISSUE HERE.

23      Q.   SURE.

24      A.   BUT IT'S TRUE THAT THEIR AVERAGE SELLING PRICE HAS

25      INCREASED OVER THE YEARS AS THEY'VE IMPROVED THEIR PHONES.
```

```
 1    Q.   RIGHT.  DURING THE PERIOD OF INFRINGEMENT; CORRECT?

 2    A.   DURING THE PERIOD OF INFRINGEMENT.

 3         MR. LEE:  THANK YOU.

 4         NOTHING FURTHER, YOUR HONOR.

 5         THE COURT:  ALL RIGHT.  LET ME JUST QUICKLY STATE FOR

 6    THE RECORD, FOR PX 208, ONLY PAGES 1 THROUGH 4 WERE SEALED.

 7         FOR DX 432, THE PAGES THAT WERE SEALED WERE 5 THROUGH 13,

 8    15 THROUGH 34, 40 THROUGH 42, AND 44 THROUGH 45.

 9         FOR PX 201, THE PAGES SEALED WERE 11 THROUGH 13, 79

10    THROUGH 80, AND 116.

11         ALL RIGHT.  TIME IS NOW 1:45.

12         MR. QUINN:  MAY I PROCEED, YOUR HONOR?

13         THE COURT:  YES, GO AHEAD, PLEASE.

14                        REDIRECT EXAMINATION

15    BY MR. QUINN:

16    Q.   SO IN RESPONSE TO MR. LEE'S LAST SERIES OF QUESTIONS, YOU

17    SAID COMPARING THE EARLIER PERIOD AND THE LATER PERIOD, THERE

18    WAS A PRODUCT MIX ISSUE?

19    A.   YES.

20    Q.   WHAT ARE YOU REFERRING TO THERE?

21    A.   I'M JUST NOTING THAT THIS ISN'T THE PRICE OF A GIVEN PHONE

22    GOING UP.  THIS IS A CHANGE IN THE ACCUSED -- IN THE PRODUCT

23    MIX OF ACCUSED UNITS.

24    Q.   ALL RIGHT.  AND DOES THAT -- ARE YOU SAYING THAT THERE ARE

25    MORE EXPENSIVE PHONES BEING OFFERED IN THE LATER PERIOD?
```

1    A.   THERE ARE MORE EXPENSIVE PHONES IN THE CASE AND BEING

2    OFFERED IN THE LATER PERIOD, YES.

3    Q.   CAN YOU COMPARE THE NUMBER OF PATENTS THAT THE PHONES ARE

4    BEING ACCUSED OF IN THE EARLIER PERIOD VERSUS THE LATER PERIOD?

5    A.   YES.   SO IT'S TRUE THAT THE PHONES IN THE LATER PERIOD,

6    THE PHONES THAT THEY CAN CHARGE A HIGHER PRICE FOR, ARE THE

7    PHONES THAT ARE ACTUALLY ACCUSED OF THE FEAST PATENTS.

8    Q.   ALL RIGHT.   LIKE III, WE WERE TALKING ABOUT THE GALAXY III

9    S?

10   A.   YES, EXACTLY, THE GALAXY III S AND THE NOTE 2.

11   Q.   AND THEN YOU WERE ASKED SOME QUESTIONS ABOUT CONJOINT

12   STUDIES.   WAS IT EVER YOUR OPINION THAT IT'S COMPLETELY

13   INAPPROPRIATE TO USE A CONJOINT STUDY?

14   A.   YOU MEAN IN ALL CIRCUMSTANCES?

15   Q.   YEAH.

16   A.   NO, OF COURSE NOT.

17        BUT, YOU KNOW, THIS WILLINGNESS TO BUY CALCULATION AND THE

18   WAYS IN WHICH DR. HAUSER PERFORMED HIS SURVEY INVALIDATE HIS

19   CONJOINT STUDY.

20   Q.   YOU WERE READ SOME LANGUAGE FROM THE WEBSITE FROM ANALYSIS

21   GROUP ABOUT USING CONJOINT STUDIES TO DETERMINE RELATIVE VALUE.

22        WHAT'S THE DIFFERENCE BETWEEN USING A CONJOINT STUDY TO

23   DETERMINE RELATIVE VALUE AND DETERMINE WILLINGNESS TO BUY?

24   A.   SO RELATIVE VALUE IS A SIMPLE THING.   IT'S ESSENTIALLY, DO

25   YOU LIKE THIS CUP HOLDER BETTER THAN DO YOU LIKE THAT CUP

1      HOLDER, RIGHT?  THAT'S RELATIVE VALUE.  HOW MUCH DO YOU LIKE

2      EACH ONE?

3            WHEREAS WILLINGNESS TO BUY IS, WOULD YOU BUY THIS PHONE IF

4      IT DIDN'T HAVE THIS FEATURE?

5      Q.   YOU HEARD DR. REIBSTEIN'S TESTIMONY ABOUT YOU CAN'T USE A

6      CONJOINT STUDY TO DETERMINE, SAY, WILLINGNESS TO BUY AN

7      AUTOMOBILE IF YOU'RE ONLY SURVEYING ABOUT, SAY, THINGS LIKE CUP

8      HOLDERS.

9            DO YOU RECALL THAT TESTIMONY?

10     A.   YES, EXACTLY.

11     Q.   OKAY.  CAN YOU USE A CONJOINT TO EVALUATE, HAVE RELATIVE

12     VALUES OF CUP HOLDERS?

13     A.   OH, YES, ABSOLUTELY.

14     Q.   BUT CAN YOU DO IT IN ORDER TO DETERMINE, YOU KNOW, WHAT

15     CAR SOMEBODY WOULD BUY BY JUST DOING RELATIVE VALUES OF LESS

16     IMPORTANT FEATURES?

17     A.   NO.

18     Q.   THEN YOU WERE -- COUNSEL SHOWED YOU PX 146, PAGE 37, IF WE

19     CAN LOOK AT THAT, CONCERNING THE '647 PATENT.  AND THIS RELATES

20     TO THE MEMO FUNCTION.

21           DO YOU SEE THAT AT THE TOP?

22     A.   YES.

23     Q.   AND HE ASKED YOU SOME QUESTIONS.

24           ISN'T IT TRUE THAT THE MEMO FUNCTION ISN'T EVEN ACCUSED IN

25     THIS CASE OF INFRINGING THE '647 LINKS PATENT?

1    A.   YES, THAT'S CORRECT.

2    Q.   THE FUNCTIONS THAT ARE ACCUSED ARE MESSENGER AND BROWSER?

3    A.   CORRECT.

4    Q.   AND THEN YOU WERE ASKED SOME QUESTIONS ABOUT DESIGN

5    AROUNDS, AND YOU SAID AT ONE POINT, IN RESPONSE TO ONE OF

6    MR. LEE'S QUESTIONS, THERE CAN BE MANY REASONS WHY A COMPANY

7    DOESN'T DESIGN AROUND.

8         DO YOU RECALL THAT?

9    A.   YES, I DO.

10   Q.   WHAT IS THE LEADING REASON WHY A COMPANY MIGHT NOT

11   IMPLEMENT A DESIGN AROUND OF AN ACCUSED INFRINGING FEATURE BY A

12   LEADING COMPETITOR?  WHAT'S THE LEADING REASON?

13   A.   WELL, I THINK THERE ARE TWO.

14   Q.   RIGHT.

15   A.   ONE IS BECAUSE THEY, THEY DON'T THINK THEY INFRINGE.

16        AND THE SECOND WOULD BE BECAUSE THEY DON'T WANT THEIR

17   COMPETITOR TO DICTATE WHAT FEATURES THEY PUT IN THE PHONE.

18        I MEAN, IF THEY CHANGE THE FEATURES IN RESPONSE TO A

19   COMPETITOR, I THINK THE COMPETITOR WILL ASK FOR SOME MORE.

20   Q.   DO -- IS IT -- IS IT TYPICALLY THE CASE THAT, YOU KNOW,

21   COMPETITORS WILL DESIGN AROUND FEATURES THAT ARE ACCUSED OF

22   INFRINGING IF THEY DON'T THINK THEY ACTUALLY INFRINGE?

23   A.   I DON'T THINK SO.

24   Q.   ALL RIGHT.  AND IS THERE ACTUALLY, IN THE HISTORY OF THIS

25   CASE, IS THERE ACTUALLY AN EXAMPLE OF APPLE ACCUSING A SAMSUNG

REDIRECT CHEVALIER

```
1    PRODUCT, OR FEATURE, OF INFRINGING WHERE APPLE WAS ULTIMATELY

2    TOLD "YOU'RE WRONG"?

3         MR. LEE:  YOUR HONOR, THIS IS WAY BEYOND THE SCOPE.

4    THIS GOES TO THE PRELIMINARY INJUNCTION.

5         MR. QUINN:  IT IS ABOUT THE PRELIMINARY INJUNCTION.

6         THE COURT:  OVERRULED.

7    GO AHEAD.  YOU CAN ANSWER.

8         THE WITNESS:  YES, THAT'S WHAT I UNDERSTAND.

9         MR. QUINN:  ALL RIGHT.  THANK YOU.

10   NOTHING FURTHER.

11        THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:50.

12   OH, LET ME JUST SAY THAT FOR PX 453A, THE ONLY PAGES THAT

13   WERE SEALED WERE PAGES 2 AND 12.

14   ALL RIGHT.  1:50.  DO YOU HAVE ANY --

15        MR. LEE:  NOTHING FURTHER, YOUR HONOR.

16        THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

17   AND IS IT SUBJECT TO RECALL OR NOT?

18        MR. LEE:  NOT FOR APPLE.

19        MR. QUINN:  NOT FOR APPLE.

20        THE COURT:  OKAY.  THEN YOU MAY BE EXCUSED.

21   (PAUSE IN PROCEEDINGS.)

22        MR. QUINN:  YOUR HONOR --

23        THE COURT:  YES.

24        MR. QUINN:  -- SAMSUNG RESTS ON ITS DEFENSIVE CASE

25   AGAINST APPLE'S PATENT CLAIMS.
```

```
 1                THE COURT:  OKAY.

 2                MR. LEE:  AND, YOUR HONOR, APPLE WOULD RESERVE ITS

 3      MOTIONS ACCORDING TO THE AGREEMENT OF THE PARTIES WITH THE

 4      APPROVAL OF THE COURT.

 5                THE COURT:  I'M SORRY.  SAY THAT AGAIN.

 6                MR. LEE:  WE WOULD --

 7                THE COURT:  OH, ON THE JMOL MOTION, YOU'RE RESERVING

 8      YOUR RIGHT TO BRING IT?

 9                MR. LEE:  YES.

10                THE COURT:  ALL RIGHT.  THAT'S FINE.

11           ALL RIGHT.  GO AHEAD, PLEASE.  CALL YOUR NEXT WITNESS.

12                MR. JOHNSON:  GOOD AFTERNOON, YOUR HONOR.

13           GOOD AFTERNOON, LADIES AND GENTLEMEN.  I'M KEVIN JOHNSON,

14      ONE OF THE LAWYERS FOR SAMSUNG.

15           AND SAMSUNG CALLS AS ITS NEXT WITNESS MR. MICHAEL FREEMAN.

16                THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

17           (DEFENDANTS' WITNESS, MICHAEL FREEMAN, WAS SWORN.)

18                THE WITNESS:  I DO.

19                THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE?

20                         DIRECT EXAMINATION

21      BY MR. JOHNSON:

22      Q.   GOOD AFTERNOON, MR. FREEMAN.

23      A.   GOOD AFTERNOON.

24      Q.   CAN YOU TELL US --

25                THE COURT:  WAIT A MINUTE.  HE DIDN'T SPELL HIS NAME.
```

```
 1              THE WITNESS:  I'M SORRY.  IT'S M-I-C-H-A-E-L, H.,

 2    THEN FREEMAN, F-R-E-E-M-A-N.

 3              THE COURT:  ALL RIGHT.  TIME IS 1:52.

 4         GO AHEAD, PLEASE.

 5    BY MR. JOHNSON:

 6    Q.   MR. FREEMAN, CAN YOU TELL US WHY YOU'RE HERE TODAY?

 7    A.   YES.  I'M PROUD TO BE HERE AS ONE OF THE FOUR ORIGINAL

 8    INVENTORS OF MOBILE VIDEO TRANSMISSION TECHNOLOGY, ALONG WITH

 9    MY FATHER, RICHARD C. FREEMAN; MY BROTHER, MITCHELL,

10    M-I-T-C-H-E-L-L, FREEMAN, AND MY BROTHER-IN-LAW, CHAD BOSS,

11    B-O-S-S.

12         WE DEVELOPED THIS TECHNOLOGY IN THE EARLY 1990S AND WERE

13    AWARDED A PATENT BY THE U.S. PATENT AND TRADEMARK OFFICE IN

14    1994.

15    Q.   AND THIS PATENT IS NOW OWNED BY WHOM?

16    A.   SAMSUNG.

17    Q.   SO BEFORE I ASK YOU SOME QUESTIONS ABOUT YOUR INVENTION,

18    CAN YOU TELL US A LITTLE BIT ABOUT YOURSELF.  WHERE DO YOU

19    LIVE?

20    A.   I LIVE IN TULSA, OKLAHOMA.  I WORK THERE.  I HAVE AN

21    OFFICE IN TULSA, OKLAHOMA, AND ALSO IN SOUTHERN CALIFORNIA IN

22    LAGUNA BEACH.

23    Q.   AND WHAT DO YOU DO FOR A LIVING?

24    A.   I AM THE CHIEF EXECUTIVE OFFICER AND CHIEF TECHNOLOGY

25    OFFICER OF SYMETRIX, WHICH IS A SEMICONDUCTOR DEVELOPMENT
```

1    COMPANY THAT WE'VE DEVELOPED THE MOST EFFICIENT POWER SUPPLY

2    FOR USE IN CHARGERS FOR MOBILE PHONES, LAPTOPS, TABLETS THAT

3    HAS THE SO LITTLE STANDBY LOAD THAT THE CALIFORNIA ENERGY

4    COMMISSION IS SAYING THAT THEY'RE GOING TO RATE IT AT ZERO.

5        SO WE'RE STILL SOLIDLY IN THE MOBILE INDUSTRY.

6    Q.   HOW DID YOU BECOME INTERESTED IN ENGINEERING AND

7    COMPUTERS?

8    A.   WELL, IN THE EARLY 1990S, MY DAD BOUGHT A COMPUTER COMPANY

9    CALLED P.C. DESIGNS, AND SO MY BROTHER, MY BROTHER-IN-LAW, AND

10   I ALL GREW UP BUILDING COMPUTERS.  WE HAD A 286, 386, 486, AND

11   ON TO THE PENTIUM TYPE MACHINES.

12       SO WE HAD A COMPUTER COMPANY AND WE WERE ACTUALLY BUILDING

13   COMPUTERS, PUTTING EVERYTHING TOGETHER, AND SELLING COMPUTERS.

14   Q.   SO YOU LIKE TO TAKE THINGS APART?

15   A.   YES.  I WAS USUALLY THE ONE THAT TOOK THEM APART.  MY

16   BROTHER WAS THE ONE THAT USUALLY PUT THEM ALL BACK TOGETHER.

17   Q.   OKAY.  AND YOU MENTIONED SOME FAMILY MEMBERS I THINK.

18       HOW WERE THEY INVOLVED GENERALLY IN THE INVENTION?

19   A.   WE WERE ALL -- IN THE INVENTION?  WE WERE ALL OWNERS IN

20   THE COMPANY AND WE HAD BEEN -- OUR QUEST WAS TO FIND A WAY TO

21   DO MOBILE VIDEO.  BACK IN THAT TIMEFRAME, THERE WASN'T THE

22   INTERNET LIKE IT IS NOW WHERE YOU UPLOAD VIDEO AND DOWNLOAD IT.

23       THE ONLY WAY YOU COULD ACTUALLY SEND VIDEO FROM A REMOTE

24   LOCATION WAS TO THE ROLL THE $300,000 SATELLITE TRUCK THAT

25   USUALLY HAD THE MAST UP AND THE LINE TO THE SATELLITE, AND

1     USUALLY IT HAD A MICROWAVE AND SO THAT HAD ITS LIMITATIONS,

2     TOO, BECAUSE YOU HAD TO HAVE LINE OF SIGHT AND IF YOU DIDN'T

3     HAVE LINE OF SIGHT, YOU COULDN'T GET IT THROUGH.

4          SO OUR VISION WAS TO DO MOBILE VIDEO BASICALLY USING THE

5     CELL SYSTEMS AND OTHER R.F., THE RADIO FREQUENCIES, BUT

6     BASICALLY USING THE CELL SYSTEMS.

7     Q.   DO YOU REMEMBER AN AH-HA -- YOU KNOW, AN AH-HA MOMENT WHEN

8     THE CONCEIVED OF THE INVENTION?

9     A.   YES.

10    Q.   TELL US ABOUT THAT, PLEASE.

11    A.   WE'D BEEN LOOKING TO TRY TO FIGURE OUT HOW TO DO THE

12    MOBILE VIDEO, AND ONE OF THE LIMITATIONS WAS THE CENTRAL

13    PROCESSING UNITS IN THE COMPUTERS BACK IN THOSE DAYS

14    WEREN'T WHERE YOU COULD SEND VIDEO THROUGH THEM, SO YOU

15    COULDN'T GET VIDEO ON THE COMPUTER SCREEN UNLESS IT WAS

16    SOMETHING LIKE A PRERECORDED GAME OR SOMETHING LIKE THAT.

17         AND SO INTEL -- WE HAD A TECHNOLOGY SHARING AGREEMENT WITH

18    INTEL AND ORACLE AND H-P, AND INTEL CAME TO US AND SAID, OKAY,

19    WE HAVE THIS CHIPSET THAT INTEL AND IBM HAD DEVELOPED THAT --

20    AND THEN THERE WAS A DEVELOPMENT KIT THAT INTEL AND MICROSOFT

21    HAD DEVELOPED THAT WENT WITH THIS HARDWARE AND SOFTWARE THAT

22    FOR THE FIRST TIME ALLOWED VIDEO TO BE, IN REAL TIME, CRUNCHED,

23    COMPRESSED, AND THEN BE PLAYED BACK OR USED BY THE CENTRAL

24    PROCESSING UNIT OF THE COMPUTER.

25         THAT WAS THE AH-HA MOMENT, BECAUSE WITHOUT THAT PIECE, IT

```
 1        JUST HADN'T BEEN PRACTICAL OR HADN'T BEEN POSSIBLE UNTIL THEN.

 2        Q.   SO WHAT WERE SOME OF THE PRACTICAL APPLICATIONS OF YOUR

 3        INVENTION?

 4        A.   WE SOLD IT TO THE MAJORITY OF THE 110 TELEVISION STATIONS

 5        IN THE COUNTRY.  THEY USED IT FOR SPOT NEWS.  THEY USED IT FOR

 6        WEATHER NEWS.

 7             WE SOLD IT TO THE MILITARY.  WE SOLD IT TO OIL AND GAS

 8        INDUSTRY FOR OIL SPILLS AND THINGS LIKE THAT.

 9             IT WAS USED IN AMBULANCES SO THE DOCTORS COULD SEE THE

10        PATIENT AND SEE WHAT WAS GOING ON WITH THE PATIENT BACK IN THE

11        HOSPITAL.

12             AND THEN IN 1995, WHEN WE HAD THE UNFORTUNATE OKLAHOMA

13        CITY MURDER AND BUILDING BOMBING, WE WERE CALLED UPON BY THE

14        MEMBERS OF THE EMERGENCY MANAGEMENT AUTHORITY THERE IN

15        OKLAHOMA, AND ALSO FIRE STATION 1 IN OKLAHOMA CITY, TO COME

16        DOWN TO THE BOMBING SITE, AND WE WERE ACTUALLY STREAMING VIDEO

17        FROM THE BOMBING SITE BACK TO FIRE STATION NUMBER 1 IN

18        OKLAHOMA CITY WHERE THEY WERE MAKING THE COMMAND AND CONTROL

19        TYPE DECISIONS ABOUT THE RESCUE AND RECOVERY EFFORT.

20        Q.   DID THE FIRST PRODUCT THAT YOU BUILT HAVE A NAME?

21        A.   IT WAS NAMES FIRSTLOOK VIDEO, YES.  F-I-R-S-T-L-O-O-K, ALL

22        SQUEEZED TOGETHER.

23        Q.   CAN YOU WIN ANY AWARDS FOR YOUR INVENTION?

24        A.   YES, WE DID.  IN 1994, WE WON TWO EMMY AWARDS FOR BEST

25        SPOT NEWS AND BEST TECHNOLOGICAL INNOVATION FOR TELEVISION.
```

```
1     Q.   SO HOW DID SAMSUNG COME TO OWN YOUR PATENT?

2     A.   WE WERE TRYING TO SEE WHAT WE WANTED TO DO WITH THE

3     PATENTS IN LATE 2000S AND WE HAD CONTACTED A NUMBER OF PARTIES

4     INCLUDING ACACIA, OTO, O-T-O, AND INTELLECTUAL VENTURES, AND WE

5     RECEIVED SOME BIDS AND SAMSUNG WAS THE HIGHEST BIDDER.

6     Q.   WHEN DID YOU SELL THE PATENT TO SAMSUNG?

7     A.   IT WOULD HAVE BEEN OCTOBER OF 2011.

8     Q.   AND HOW MUCH DID YOU SELL THE PATENT FOR?

9     A.   THERE WAS TWO PATENTS INVOLVED, AND WE SOLD BOTH OF THEM

10    FOR $2.3 MILLION.

11    Q.   NOW, DID YOU RETAIN ANY INTEREST IN YOUR PATENT?

12    A.   NO.

13    Q.   DO YOU HAVE ANY FINANCIAL INTEREST IN THE OUTCOME OF THIS

14    CASE?

15    A.   NO, I DO NOT.  I'M JUST A PROUD INVENTOR.

16         MR. JOHNSON:  THANK YOU, YOUR HONOR.

17         NO FURTHER QUESTIONS.

18         THE COURT:  ALL RIGHT.  THE TIME IS NOW 1:59.

19         (PAUSE IN PROCEEDINGS.)

20         THE COURT:  ALL RIGHT.  TIME IS 1:59.

21         GO AHEAD, PLEASE.

22                         CROSS-EXAMINATION

23    BY MR. LEE:

24    Q.   GOOD AFTERNOON, MR. FREEMAN.

25    A.   GOOD AFTERNOON.
```

 1        Q.   MY NAME IS BILL LEE.   I'M ONE OF THE LAWYERS REPRESENTING

 2    APPLE.

 3        A.   YES, SIR.

 4        Q.   YOU ARE -- IN ADDITION TO WHAT YOU'VE DESCRIBED TO US, YOU

 5    ARE A LAWYER; CORRECT?

 6        A.   BY TRAINING AS A LAWYER.   I'M ACTUALLY IN TECHNOLOGY AND

 7    HAVE BEEN FOR MANY, MANY YEARS.

 8        Q.   AND UNDER THE AGREEMENT THAT YOU ENTERED INTO WITH SAMSUNG

 9    THAT YOU JUST DESCRIBED TO US --

10        A.   YES.

11        Q.   -- YOU'RE PAID $275 AN HOUR FOR YOUR TESTIMONY, FOR YOUR

12    TIME AND TESTIFYING IN THIS CASE; RIGHT?

13        A.   WELL, I'M HERE TODAY VOLUNTARILY BECAUSE WE INVENTED THESE

14    PATENTS AND IT'S NEAR AND DEAR TO ME, EVEN THOUGH SAMSUNG OWNS

15    THEM.

16             I DO GET PAID FOR PREP TIME $275 AN HOUR, WHICH IS THE

17    GOING RATE IN TULSA FOR THAT.

18        Q.   OKAY.   NOW, LET'S TALK ABOUT THE WORK YOU DID THAT LED TO

19    YOUR PATENT.

20        A.   ALL RIGHT.

21        Q.   YOU FIRST CONTACTED A PATENT LAWYER IN 1992 OR 1993;

22    CORRECT?

23        A.   YES.

24        Q.   AND THE FIRST APPLICATION WAS FILED IN 1994; CORRECT?

25        A.   THAT'S CORRECT.

CROSS FREEMAN

1    Q.   THE PATENT IS NOW EXPIRED; CORRECT?

2    A.   I'M NOT SURE.  I HAVEN'T LOOKED AT IT RECENTLY.  I THINK

3    IT HAD SOME ADDED TIME ON TO IT, BUT IT'S BEEN ABOUT 20 YEARS,

4    YES.

5    Q.   I'LL REPRESENT TO YOU THAT MR. QUINN SAID IN OPENING

6    STATEMENT THAT IT'S EXPIRED.  WOULD THAT HELP YOU?

7    A.   I WASN'T HERE, SO --

8    Q.   OKAY.  NOW, YOU SOLD THE PATENT TO SAMSUNG IN SEPTEMBER OF

9    2011; CORRECT?

10   A.   YES, THAT'S CORRECT.

11   Q.   BEFORE YOU SOLD THE PATENT TO SAMSUNG, NEITHER YOU, NOR

12   ANY OF YOUR COMPANIES, HAD EVER SUED ANYBODY WHO INFRINGED YOUR

13   PATENT; CORRECT?

14   A.   NO.  WE COULDN'T AFFORD THIS KIND OF LEGAL TEAM THAT'S

15   SITTING IN THIS COURTROOM TODAY.

16   Q.   BUT THE ANSWER IS YOU HADN'T; CORRECT?

17   A.   NO, BECAUSE WE COULDN'T AFFORD TO.

18   Q.   IN FACT, YOU NEVER EVEN GAVE ANYBODY NOTICE THAT THEY WERE

19   INFRINGING YOUR PATENT, DID YOU?

20   A.   YES, WE DID SEND OUT ONE NOTICE, YES.

21   Q.   LET'S SEE WHAT YOU SAID AT YOUR DEPOSITION.

22        WOULD YOU GO TO TAB 1 OF THE NOTEBOOK BEFORE YOU?

23   A.   OKAY.

24   Q.   AND LET'S GO TO PAGE 258, LINES 11 TO 16.

25   A.   OKAY.  PAGE WHAT?  258.

1      Q.   258, LINE 11 TO 16.

2           "QUESTION:  AND AM I CORRECT THAT NEITHER YOU NOR ANYONE

3      ON YOUR BEHALF EVER GAVE NOTICE TO ANYONE THAT THEY WERE

4      INFRINGING THE '239 PATENT?

5           "ANSWER:  AGAIN, THE ANSWER IS YOU'RE EXACTLY RIGHT.  WE

6      DIDN'T WANT TO GET INTO LITIGATION THAT WE COULDN'T SUPPORT."

7           CORRECT?

8      A.   I HAVEN'T ACTUALLY FOUND THE PAGE YET, BUT I THINK IT'S UP

9      HERE.

10     Q.   THAT WAS THE QUESTION YOU WERE ASKED AND THE ANSWER;

11     CORRECT?

12     A.   YES, THAT IS THE ANSWER I GAVE ON THAT DAY.

13          I DID REMEMBER, SINCE THEN, THAT WE HAD SENT OUT ONE --

14     THAT OUR PATENT LAWYER SENT OUT ONE NOTICE.

15     Q.   ALL RIGHT.  THIS IS WHAT YOU SAID UNDER OATH AND YOU NEVER

16     CORRECTED YOUR DEPOSITION; CORRECT?

17     A.   YOU KNOW, THEY NEVER SENT IT TO ME.  I ASKED TO READ AND

18     APPLE NEVER SENT THE DEPOSITION TO ME SO I COULD READ AND SIGN

19     AND MAKE ANY CORRECTIONS, AND THERE ARE SOME ERRORS.

20     Q.   DID YOU ASK SAMSUNG FOR IT?

21     A.   I HAD AN ATTORNEY IN THE CASE.  THEY ASKED TO BE ABLE TO

22     READ AND SIGN AND I NEVER GOT THAT OPPORTUNITY.

23     Q.   SO LET'S TAKE A LOOK AT YOUR FIRST PRODUCT THAT YOU

24     DESCRIBED.

25     A.   OKAY.

1    Q.   OKAY?  CAN I HAVE PLAINTIFF'S EXHIBIT 251?

2         FIRST, NOT ON THE SCREEN YET BECAUSE IT'S NOT IN, DO YOU

3    SEE PLAINTIFF'S EXHIBIT 251?

4    A.   NO.  COULD YOU HELP ME OUT IN THE BOOK?

5    Q.   SURE.  IT'S TAB 6, MR. FREEMAN.

6    A.   TAB 6?

7    Q.   YES.

8    A.   ALL RIGHT.

9    Q.   OKAY?

10   A.   YES.

11   Q.   AND YOU RECOGNIZE THIS AS A BROCHURE FOR FIRSTLOOK VIDEO?

12   A.   I DO, YES.

13           MR. LEE:  WE OFFER PX 251.

14           MR. JOHNSON:  NO OBJECTION.

15           THE COURT:  IT'S ADMITTED.

16       (PLAINTIFF'S EXHIBIT 251 WAS ADMITTED IN EVIDENCE.)

17           THE COURT:  GO AHEAD, PLEASE.

18           MR. LEE:  COULD WE HAVE PX 251 ON THE SCREEN?

19   Q.   DO YOU SEE IT?

20   A.   YES, I DO, SIR.

21   Q.   THE COPYRIGHT IS 1993; CORRECT?

22   A.   YES.

23   Q.   IT DESCRIBES A FIRSTLOOK VIDEO SYSTEM; CORRECT?

24   A.   IT DESCRIBES THE WAY THE FIRSTLOOK VIDEO SYSTEM EXISTED IN

25   1993, YES.

1    Q.   AND THAT'S ABOUT THE TIME YOU FILED YOUR PATENT

2    APPLICATION; CORRECT?

3    A.   NO.  WE FILED THAT IN 1994 ACTUALLY.

4    Q.   ALL RIGHT.  SO A YEAR BEFORE?

5    A.   A LITTLE LESS THAN A YEAR, YES.

6    Q.   OKAY.  NOW, THE FIRSTLOOK PRODUCT THAT'S DESCRIBED IN THIS

7    BROCHURE DID NOT INCLUDE EQUIPMENT TO RECORD VIDEO, DID IT?

8    A.   IT DID NOT INCLUDE EQUIPMENT TO RECORD VIDEO?

9    Q.   YES.

10   A.   YES.  IT HAD A CONNECTION SO YOU COULD PUT A CAMERA ON IT.

11        THIS PARTICULAR CONFIGURATION, THE CAMERA IS NOT SHOWN.

12        BUT IN OUR PATENT, OF COURSE, THE CAMERA IS SHOWN.

13        NO, THERE'S NO CAMERA ON THIS PARTICULAR CONFIGURATION.

14   BUT WE HAD CONFIGURATIONS, LIKE, FOR THE RESCUE CAM THAT WAS

15   PUT IN AMBULANCES THAT DID HAVE CAMERAS ACTUALLY IN THE DEVICE,

16   AND THE MILITARY DEVICE.

17   Q.   MR. FREEMAN, LET'S LOOK AT WHAT THE DOCUMENT SAYS.

18        CAN I HAVE, AT PAGE 1, THE PORTION BLOWN UP THAT SAYS "THE

19   ONLY ADDITIONAL EQUIPMENT REQUIRED IS REMOTE VIDEO SOURCE."

20        DO YOU SEE THAT?

21   A.   YES.  THIS IS --

22   Q.   AND --

23   A.   THIS IS --

24   Q.   AND IN THE BOTTOM RIGHT-HAND CORNER OF THE FIRST PAGE,

25   THERE'S ACTUALLY A PICTURE OF SOMEONE WITH A VIDEO CAMERA;

```
 1        CORRECT?

 2        A.   YES.  THIS IS THE -- THIS IS THE VERSION OF THE FIRSTLOOK

 3        VIDEO.  THERE WERE MANY VERSIONS THAT WE SOLD TO TELEVISION

 4        STATIONS, AND THEY GENERALLY USED THEIR OWN CAMERAS AND DIDN'T

 5        WANT ONE OF OUR CAMERAS IN THE SYSTEM.

 6        Q.   NOW, THERE'S SOMETHING CALLED A REMOTE UNIT; CORRECT?

 7        A.   THERE WAS A REMOTE UNIT, YES.

 8        Q.   AND THE REMOTE UNIT IS DESCRIBED IN THE BROCHURE; CORRECT?

 9        A.   I BELIEVE IT IS.

10        Q.   IT'S ABOUT THE SIZE OF AN AIRLINE CARRY-ON LUGGAGE,

11        CORRECT?

12        A.   I'M NOT SURE IF THAT'S WHAT IT SAYS.  IT WAS A SMALL,

13        PORTABLE COMPUTER.

14        Q.   I'LL SHOW YOU WHAT IT SAYS ON THE BROCHURE.

15             COULD I HAVE THE FIRST PARAGRAPH OF THE BROCHURE BLOWN UP?

16             "THE FIRSTLOOK VIDEO SYSTEM CONSISTS OF (1) A REMOTE UNIT

17        ABOUT THE SIZE OF AIRLINE CARRY-ON LUGGAGE."

18             DO YOU SEE THAT?

19        A.   YES, SIR.

20        Q.   NOW, TURN, IF YOU WOULD, TO PAGE 2 OF YOUR BROCHURE.

21        A.   OKAY.

22        Q.   THERE'S ACTUALLY A PICTURE OF THE REMOTE UNIT; CORRECT?

23        A.   THAT'S ONE VERSION OF IT.  THAT WAS THE 1993 VERSION.

24        Q.   SURE.

25        A.   THAT WAS USED FOR TELEVISION STATIONS.  IT WASN'T THE ONLY
```

```
 1        VERSION WE EVER BUILT.

 2        Q.   AT THE BOTTOM IT SAYS "FIRST LOOK REMOTE WEIGHS 28

 3        POUNDS."  CORRECT?

 4        A.   YES, THAT'S WHAT IT SAYS.

 5        Q.   AND THE ONE THAT'S SHOWN HERE ON THIS BROCHURE HAD A

 6        LAPTOP COMPUTER; CORRECT?

 7        A.   YES.  A PORTABLE COMPUTER I WOULD SAY.

 8        Q.   OKAY.  PORTABLE COMPUTER.

 9             TWO CELL PHONES; CORRECT?

10        A.   YES.

11        Q.   TWO MODEMS; CORRECT?

12        A.   NO.  THERE'S TWO TRANSCEIVERS THAT ARE SHOWN IN THE

13        PICTURE.  THOSE TRANSCEIVERS WERE MADE BY POWER TECH AND THEY

14        ACTUALLY WERE A COMBINATION OF MODEM AND CELL PHONE.

15        Q.   SO WHERE'S THE CELL PHONE?

16        A.   THE CELL PHONE -- WELL, THE DIALLING PART OF THE CELL

17        PHONE IS WHERE YOU SEE ALL THE DIALS ON IT.

18             THE CELL PHONE ITSELF INSIDE THAT BLACK THING WITH THE

19        ANTENNA CONNECTED.  IT WAS INTEGRATED MODEM, INTEGRATED MODEM

20        AND CELL PHONE TECHNOLOGY INSIDE WHERE YOU SEE THE ANTENNA.

21        Q.   SO IT'S YOUR TESTIMONY THAT THE MODEM WAS ON THE INSIDE OF

22        THE CELL PHONE?

23        A.   WELL, IT HAD -- THIS VERSION HAD TWO MODEMS.  ONE MODEM,

24        IF YOU USED IT FOR LAND LINES, WAS INTEGRATED WITH THE CIRCUIT

25        BOARD THAT'S INSIDE OF THIS PIECE OF EQUIPMENT.
```

```
 1            AND THEN THE OTHER MODEM, IF YOU USED IT FOR CELL, WAS

 2     THAT -- WHERE YOU SEE WITH THE ANTENNA THERE, THERE WAS A

 3     COMBINED MODEM AND CELL PHONE.

 4     Q.   OKAY.  FAIR ENOUGH.

 5            NOW, LET'S LOOK AT WHAT THE BROCHURE SAYS ABOUT THE USE

 6     THAT COULD BE MADE WITH THIS.

 7            IT SAYS "THE FIRSTLOOK REMOTE UNIT ACCEPTS ANY VIDEO

 8     SIGNAL, VHS, BETA, 8 MILLIMETER."

 9            DO YOU SEE THAT?

10     A.   YES.

11     Q.   OKAY.  AND THAT WAS ACCURATE AS YOU DESCRIBED IT HERE?  IT

12     WAS ACCURATE FOR THIS VERSION OF THE FIRSTLOOK PRODUCT?

13     A.   YES, THAT'S CORRECT.

14     Q.   OKAY.  NOW, YOU TOLD US YOU STARTED SELLING THESE IN 1993;

15     CORRECT?

16     A.   THAT'S CORRECT.

17     Q.   BY 1998 OR 1999, 15 YEARS AGO OR SO, SALES WERE DWINDLING;

18     CORRECT?

19     A.   CORRECT.  THE INTERNET HAD COME UP TO SPEED AND THE --

20     THIS DEVICE IN THIS CONFIGURATION, WE WERE NOT HAVING THE SALES

21     THAT WE HAD HAD BEFORE, LOTS OF SALES BEFORE.

22     Q.   RIGHT.  AND IN TOTAL, BEFORE SALES DWINDLED, YOU HAD SOLD

23     ABOUT 300 UNITS; CORRECT?

24     A.   THAT'S -- I'M NOT SURE.  YOU SAID 300, BUT --

25     Q.   BALLPARK, SOUND ABOUT RIGHT?
```

1     A.   LESS THAN A THOUSAND, YEAH.

2     Q.   AND THEN BY 2000, YOU WEREN'T SELLING UNITS ANYMORE;

3     CORRECT?

4     A.   I THINK THERE WAS SOME UNITS -- YES, THERE WERE UNITS SOLD

5     INTO THE 2000S.  IT WAS AT THE EARLY 2000S.

6     Q.   AND SO THE JURY IS CLEAR, THE AWARDS THAT YOU MENTIONED

7     WERE FOR THE FIRSTLOOK PRODUCT, THEY WEREN'T FOR THE PATENT;

8     CORRECT?

9     A.   ACTUALLY, THEY WERE FOR THE USE OF THE PRODUCT, YES.  IT

10    WAS ACTUALLY FOR THE USE OF THE PRODUCT AND THE PRODUCT, NOT

11    THE PATENT.

12    Q.   OKAY.  SO LET'S MOVE THE MOVIE FORWARD.

13    A.   OKAY.

14    Q.   I WANT TO GO PAST THE 2000 PERIOD WHEN YOU'RE NOT SELLING

15    PRODUCT ANYMORE.

16         AT THAT POINT IN TIME, YOU WERE TRYING TO FIGURE OUT HOW

17    TO BEST MONETIZE YOUR PATENT; CORRECT?

18    A.   THAT'S RIGHT.

19    Q.   AND WHAT YOU DID IS YOU WENT TO A PATENT BROKER; CORRECT?

20    A.   WELL, FIRST I WENT TO A PATENT LAWYER, YES, AND THEN I

21    WENT TO A PATENT BROKER.

22    Q.   RIGHT.  AND SOMEONE WHO COULD SELL YOUR PATENT, OR LICENSE

23    IT FOR YOU, ONE OF THE TWO; CORRECT?

24    A.   YES.

25    Q.   AND YOU MENTIONED SOME OF THE PEOPLE YOU APPROACHED,

CROSS FREEMAN

```
 1        INTELLECTUAL VENTURES, ACACIA.

 2     A.    YES.

 3     Q.    OTO.

 4     A.    YES.

 5     Q.    THOSE ARE ENTITIES CALLED PATENT AGGREGATORS, AREN'T THEY?

 6     A.    I DON'T KNOW WHAT THEY'RE --

 7     Q.    THEY'RE PEOPLE WHO BUY PATENTS TO SUE OTHER PEOPLE;

 8     CORRECT?

 9     A.    I DIDN'T KNOW -- I DON'T KNOW THAT.

10     Q.    AND YOU DIDN'T KNOW THAT WHEN YOU APPROACHED THEM;

11     CORRECT?

12     A.    I KNOW THEY BOUGHT PATENTS.  I KNOW THAT SEVERAL OF THEM,

13     THEIR MODEL IS LICENSING, SO THAT'S WHAT I UNDERSTOOD.

14     Q.    AND NONE OF THEM BOUGHT THE PATENT; CORRECT?

15     A.    SAMSUNG BOUGHT THE PATENTS, BOTH THE PATENTS.

16     Q.    RIGHT.  BUT NEITHER -- INTELLECTUAL VENTURES DIDN'T BUY

17     IT; CORRECT?

18     A.    THAT'S RIGHT.

19     Q.    ACACIA DIDN'T BUY IT; CORRECT?

20     A.    ONLY SAMSUNG BOUGHT THE PATENTS.

21     Q.    AND NO ONE BETWEEN 2000, WHEN YOU STOPPED SELLING THE

22     PRODUCTS AND WHEN SAMSUNG BOUGHT IT IN 2011, BOUGHT THE

23     PATENTS; CORRECT?

24     A.    NO, WE DIDN'T SELL THE PATENTS UNTIL 2011.

25     Q.    OKAY.  TURN, IF YOU WOULD, TO TAB NUMBER 4 IN YOUR
```

```
 1    NOTEBOOK.

 2    A.   OKAY.

 3    Q.   THIS IS PX 246.  THIS IS YOUR PATENT PURCHASE AGREEMENT

 4    WITH SAMSUNG; CORRECT?

 5    A.   LET ME TAKE A LOOK HERE.

 6    Q.   SURE.

 7    A.   YES, THIS IS IT.

 8              MR. LEE:  WE OFFER PLAINTIFF'S EXHIBIT 246, YOUR

 9    HONOR.

10              MR. JOHNSON:  NO OBJECTION.

11              THE COURT:  IT'S ADMITTED.

12         (PLAINTIFF'S EXHIBIT 246 WAS ADMITTED IN EVIDENCE.)

13              THE COURT:  GO AHEAD, PLEASE.

14    BY MR. LEE:

15    Q.   AND SAMSUNG BOUGHT TWO PATENTS FROM YOU; CORRECT?

16    A.   THAT'S CORRECT, WHAT WE CALLED THE '716 PATENT AND THE

17    '239 PATENT.

18              MR. LEE:  THANK YOU.

19         NOTHING FURTHER, YOUR HONOR.

20              THE COURT:  ALL RIGHT.  THE TIME IS NOW 2:10.

21         ANY REDIRECT?

22              MR. JOHNSON:  NO, YOUR HONOR.

23              THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

24    AND IS IT SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

25              MR. JOHNSON:  HE MAY BE EXCUSED, NOT SUBJECT TO
```

1      RECALL.

2               MR. LEE:  NOT SUBJECT TO RECALL.

3               THE COURT:  ALL RIGHT.  THEN YOU MAY BE EXCUSED.

4               THE WITNESS:  THANK YOU.

5               MR. JOHNSON:  YOUR HONOR, SAMSUNG CALLS AS ITS NEXT

6      WITNESS DR. DAN SCHONFELD, AND IF WE COULD JUST HAVE A FEW

7      MINUTES TO SET UP?

8               THE COURT:  YES, PLEASE.

9          (PAUSE IN PROCEEDINGS.)

10              THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE?

11         **(DEFENDANTS' WITNESS, DAN SCHONFELD, WAS SWORN.)**

12              THE WITNESS:  I DO.

13              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE?

14              MR. JOHNSON:  YOUR HONOR, JUST BEFORE WE GET STARTED,

15     I WANT TO READ A ONE LINE STIPULATION INTO THE RECORD THAT

16     SAMSUNG AND APPLE HAVE STIPULATED THAT AT ALL TIMES RELEVANT TO

17     THIS LAWSUIT, SAMSUNG IS AND HAS BEEN BOTH OWNER AND ASSIGNEE

18     OF THE PATENTS IT IS ASSERTING IN THIS CASE.

19              THE COURT:  2:12.  GO AHEAD, PLEASE.

20              MR. JOHNSON:  THANK YOU.

21                       **DIRECT EXAMINATION**

22     BY MR. JOHNSON:

23     Q.  DR. SCHONFELD, CAN YOU PLEASE INTRODUCE YOURSELF TO THE

24     JURY?

25     A.  SURE.  MY NAME IS DAN SCHONFELD.  I'M A PROFESSOR OF

1    ELECTRICAL AND COMPUTER ENGINEERING AT THE UNIVERSITY OF

2    ILLINOIS AT CHICAGO.

3    Q.   NOW, DR. SCHONFELD, WHAT WERE YOU ASKED TO DO IN THIS

4    CASE?

5    A.   I WAS ASKED TO STUDY THE '239 REMOTE VIDEO TRANSMISSION

6    SYSTEM PATENT AND DETERMINE WHETHER CERTAIN IPHONE DEVICES

7    INFRINGED THE CLAIM 15 OF THE '239 PATENT.

8    Q.   AND THE '239 PATENT IS THE PATENT WE JUST HEARD ABOUT FROM

9    MR. FREEMAN?

10   A.   THAT'S CORRECT.

11   Q.   OKAY.  ARE YOU BEING COMPENSATED FOR YOUR TIME TODAY?

12   A.   I AM.

13   Q.   AND CAN YOU TELL US WHAT IS YOUR STANDARD HOURLY RATE?

14   A.   IT'S $500 AN HOUR.

15   Q.   ABOUT HOW MANY HOURS HAVE YOU SPENT ON THIS CASE SO FAR ON

16   THE '239 PATENT?

17   A.   ROUGHLY APPROXIMATELY MAYBE 250 TO 300 HOURS OVER ALL OF

18   THE CASE FOR THE '239.

19   Q.   HAVE YOU PREPARED SOME SLIDES FOR THE PURPOSES OF YOUR

20   TESTIMONY?

21   A.   I HAVE.

22   Q.   OKAY.  LET'S START A LITTLE BIT -- BEFORE WE TALK ABOUT

23   THE PATENT, LET'S TALK ABOUT YOU AND YOUR BACKGROUND.

24        CAN WE START OFF AT YOU'RE A PROFESSOR AT THE UNIVERSITY

25   OF ILLINOIS AT CHICAGO.  HOW LONG HAVE YOU BEEN THERE?

1    A.   I JOINED THE UNIVERSITY IN 1990, SO ALMOST 24 YEARS.

2    Q.   AND COULD YOU DESCRIBE YOUR EDUCATIONAL BACKGROUND,

3    PLEASE.

4    A.   SURE.  I GOT MY UNDERGRADUATE DEGREE IN 1986 IN ELECTRICAL

5    ENGINEERING AND COMPUTER SCIENCE RIGHT OVER HERE AT BERKELEY;

6    AND I GOT MY MASTER'S AND PH.D. IN 1989 AND 1990 IN ELECTRICAL

7    AND COMPUTER ENGINEERING AT JOHNS HOPKINS UNIVERSITY.

8    Q.   OKAY.  LOOKING AT THE SCREEN, IT REFERS TO THE FACT THAT

9    YOU ARE ALSO THE CO-DIRECTOR OF THE MULTIMEDIA COMMUNICATIONS

10   LABORATORY.  WHAT'S THAT?

11   A.   THAT'S OUR MAIN RESEARCH LABORATORY WHERE THE GRADUATE

12   STUDENTS DO RESEARCH, PUBLISH PAPERS.  IT COVERS ALL AREAS OF

13   MULTIMEDIA, INCLUDING AUDIO IMAGES AND VIDEO WITH PRIMARY

14   EMPHASIS IN THE AREA OF ENERGY VIDEO.

15   Q.   IT ALSO SAYS YOU'RE EDITOR-IN-CHIEF OF THE "IEEE

16   TRANSACTIONS ON CIRCUITS AND SYSTEMS FOR VIDEO TECHNOLOGY."

17   WHAT'S THAT JOURNAL?

18   A.   THIS IS THE MAIN JOURNAL FOR PUBLICATION OF ARTICLES IN

19   THE AREA OF VIDEO, AND THIS IS WHERE PEOPLE PUBLISH FUNDAMENTAL

20   RESEARCH WORK WHICH TAKES ABOUT 10, 20 YEARS, AND SOME OF IT

21   TRANSLATES TO PRODUCT MANY YEARS DOWN THE LINE.  THAT'S WHERE

22   THEY PUBLISH THEIR ORIGINAL WORK.

23   Q.   HAVE YOU PUBLISHED ANY PAPERS?

24   A.   I HAVE.

25   Q.   RELATED TO YOUR RESEARCH?

1    A.   YES, I HAVE.

2    Q.   ABOUT HOW MANY?

3    A.   I DON'T KNOW THE EXACT COUNT, BUT SOMEWHERE OVER 200.

4    Q.   OKAY.  NOW, I KNOW YOU DON'T LIKE TO TALK ABOUT YOURSELF,

5    BUT CAN YOU JUST BRIEFLY DESCRIBE SOME OF THE AWARDS THAT

6    YOU'RE MOST PROUD OF?

7    A.   SURE.  I'D BE HAPPY TO.

8         I GOT, ALONG WITH MY COLLABORATOR AND CO-AUTHORS AND

9    STUDENTS, I RECEIVED SEVERAL BEST PAPERS AWARDS IN VARIOUS

10   CONFERENCES IN MY FIELD; AND MY PEERS HAVE ELECTED ME AS FELLOW

11   OF TWO SOCIETIES, AND YOU CAN SEE ON THE BOTTOM, THAT'S THE

12   SPIE SOCIETY, THAT'S THE MAIN SOCIETY FOR IMAGING

13   INTERNATIONALLY; AND THE ONE ABOVE THAT IS THE FELLOW OF THE

14   IEEE, THAT'S THE MAIN SOCIETY INTERNATIONALLY FOR ELECTRICAL

15   ENGINEERING AND COMPUTER SCIENCE, WHICH SELECTS A SMALL NUMBER

16   OF MEMBERS FOR IEEE FELLOW.

17   Q.   WHAT'S YOUR EXPERIENCE WITH VIDEO COMPRESSION AND

18   TRANSMISSION?

19   A.   SO EVER SINCE I WAS A GRADUATE STUDENT IN 1986, I'VE BEEN

20   WORKING IN THIS GENERAL AREA, AND ESPECIALLY FROM ABOUT THE

21   MID-'90S, I DECIDED TO FOCUS PRIMARILY ON VIDEO, AND I'VE BEEN

22   WORKING AS A RESEARCHER SINCE -- UNTIL NOW, AND CONTINUE TO

23   WORK ON IT AT THE MOMENT.

24        I'VE BEEN TEACHING SINCE THE EARLY '90S IN THIS AREA,

25   VARIOUS COURSES, A LARGE NUMBER OF COURSES RELATED TO THIS

1     AREA.

2          AND IN ADDITION TO THAT, I'VE DONE JOINT RESEARCH WORK.

3     FOR EXAMPLE, I'VE HAD JOINT PROJECTS WITH A LOCAL COMPANY, FOR

4     EXAMPLE, NEO MAGIC, AND LATER ON WITH THE COMPANY CALLED

5     MOTOROLA, ALL IN THEIR VIDEO PROCESSING AND COMMUNICATIONS OVER

6     CELLULAR AND OTHER NETWORKS AS WELL.

7          IN ADDITION, I'VE DONE WORK FOR A COMPANY CALLED

8     PARARIECOMM IN THE '97 TIMEFRAME WORKING ON AUDIO IMAGE AND

9     VIDEO PROCESSING FOR CELLULAR COMMUNICATION NETWORKS.

10          MR. JOHNSON:  AT THIS POINT, YOUR HONOR, WE MOVE TO

11     QUALIFY DR. SCHONFELD AS AN EXPERT IN VIDEO COMPRESSION AND

12     TRANSMISSION.

13          MR. LEE:  NO OBJECTION.

14          THE COURT:  ALL RIGHT.  SO CERTIFIED.

15     GO AHEAD, PLEASE.

16     BY MR. JOHNSON:

17     Q.   DR. SCHONFELD, HAVE YOU REACHED ANY CONCLUSIONS AS TO

18     WHETHER APPLE INFRINGES CLAIM 15 OF THE '239 PATENT?

19     A.   YES, I HAVE.

20     Q.   AND CAN YOU BRIEFLY SUMMARIZE YOUR OPINION, PLEASE?

21     A.   SO CLAIM 15 IS INFRINGED BY THE IPHONE 4, IPHONE 4S, AND

22     IPHONE 5 FOR TWO FEATURES:  FOR THE FACETIME FEATURE; AS WELL

23     AS FOR ATTACHMENT OF VIDEO TO MESSAGES AND TO MAIL.

24     Q.   OKAY.  NOW, DO YOU HAVE AN UNDERSTANDING OF WHETHER APPLE

25     IS CHALLENGING THE VALIDITY OF THE '239 PATENT AT THIS POINT?

1    A.   NOT -- NOT AT THIS POINT, NO.

2    Q.   OKAY.  DO YOU HAVE AN UNDERSTANDING OF WHEN APPLE STOPPED

3    ASSERTING THAT THE '239 PATENT WAS INVALID?

4              MR. LEE:  YOUR HONOR --

5              THE WITNESS:  MY UNDERSTANDING IS --

6              THE COURT:  OKAY.  THERE'S AN OBJECTION.  IF THERE'S

7    AN OBJECTION, PLEASE WAIT.  OKAY?

8              MR. LEE:  THIS IS IRRELEVANT.

9              MR. JOHNSON:  YOUR HONOR, IT WAS BROUGHT UP IN

10   OPENING BY MR. LEE DURING OPENING, PUTTING THIS EXACT ISSUE IN

11   PLAY.  SAYING THAT SOMEHOW --

12             THE COURT:  I DON'T -- I DON'T AGREE.  IT'S

13   SUSTAINED.

14             MR. JOHNSON:  OKAY.

15   Q.   NOW, DR. SCHONFELD, WHAT PRODUCTS -- AND I THINK YOU

16   DESCRIBED THE PRODUCTS AND FEATURES.

17        LET ME ASK YOU, WHAT MATERIALS DID YOU REVIEW AS PART OF

18   YOUR ANALYSIS ON INFRINGEMENT?

19   A.   SO I REVIEWED A LARGE NUMBER OF MATERIALS.  FOR EXAMPLE, I

20   REVIEWED THE PATENT ITSELF, THE '239 VIDEO TRANSMISSION PATENT;

21   THE FILE HISTORY, THAT'S THE EXCHANGE WITH THE PATENT OFFICE

22   BEFORE THE PATENT IS ALLOWED; I REVIEWED DOCUMENTS DESCRIBING

23   THE MAIN APPLICATION PROCESSOR WITHIN THE IPHONE DEVICES, THE

24   USER MANUALS PROVIDED BY APPLE; I REVIEWED DOCUMENTS DESCRIBING

25   SCHEMATICS OF HOW THE IPHONE DEVICE IS PUT TOGETHER; I REVIEWED

 1    USER MANUALS DESCRIBING THE IMAGE SENSORS FOR CAMERAS IN THE

 2    IPHONE DEVICES; I REVIEWED DOCUMENTS DESCRIBING MODEMS THAT ARE

 3    USED IN THE VARIOUS IPHONE DEVICES; AND I REVIEWED SOURCE CODE

 4    PROVIDED BY APPLE FOR RUNNING ON THE APPLICATION PROCESSOR; I

 5    REVIEWED THE ACTUAL PHYSICAL DEVICES IN VARIOUS FORMS, THE

 6    IPHONE DEVICES.

 7         AND I THINK THAT SUMMARIZES THE GENERAL -- I REVIEWED BOTH

 8    THE MATERIALS, THERE WAS A VERY LARGE NUMBER OF DOCUMENTS THAT

 9    I REVIEWED IN PREPARATION FOR THIS CASE.

10         MR. JOHNSON:  SO, YOUR HONOR, MR. LEE AND I HAVE

11    CONFERRED ABOUT EXHIBITS TO MOVE INTO EVIDENCE AT THIS POINT

12    AND, YOUR HONOR, I'M GOING TO READ A LIST OF DOCUMENTS THAT THE

13    WITNESS HAS REFERRED TO JUST NOW AND IS GOING TO TESTIFY ABOUT

14    SUBSEQUENTLY, AND I BELIEVE THERE'S NO OBJECTION WITH RESPECT

15    TO PUTTING IN THE FOLLOWING EXHIBITS.

16         IF I MAY, IT'S JX 39; JX 40; PX 255; JX 25; JX 26;

17    DX 351A; DX 352A; DX 353A; DX 3 --

18              THE COURT:  353A?

19              MR. JOHNSON:  I'M SORRY, 353A.

20              THE COURT:  OKAY.

21              MR. JOHNSON:  DX 354A; DX 371; DX 490A; DX 491A; AND

22    JX 52A.

23              THE COURT:  ALL RIGHT.  ANY OBJECTION TO THOSE BEING

24    ADMITTED?

25              MR. LEE:  NO, YOUR HONOR.  WE AGREED TO THIS

```
 1        PROCEDURE, AND MR. JOHNSON HAS REPRESENTED THAT HE'LL TALK

 2        ABOUT EACH OF THEM.

 3                   THE COURT:  ALL RIGHT.  IT'S ADMITTED.

 4             THEY'RE ALL ADMITTED.  EXCUSE ME.

 5             (PLAINTIFF'S EXHIBIT 255 WAS ADMITTED IN EVIDENCE.)

 6             (DEFENDANTS' EXHIBITS 351A, 352A, 353A, 354A, 371, 490A,

 7        491A WERE ADMITTED IN EVIDENCE.)

 8             (JOINT EXHIBITS 39, 40, 25, 26, 52A WERE ADMITTED IN

 9        EVIDENCE.)

10                   THE COURT:  GO AHEAD, PLEASE.

11        BY MR. JOHNSON:

12        Q.   SO LET'S TURN TO SLIDE 3963 AND TALK A LITTLE BIT MORE

13        ABOUT THE '239 PATENT.

14             WHEN WAS IT FILED?

15        A.   THE '239 VIDEO TRANSMISSION PATENT WAS FILED

16        FEBRUARY 16, 1994.

17        Q.   AND WHAT PROBLEMS DID THE INVENTORS OF THE '239 PATENT TRY

18        TO SOLVE WITH THE '239 PATENT?

19        A.   SO AS YOU JUST HEARD FROM ONE OF THE INVENTORS,

20        MR. FREEMAN, THEY WERE TRYING TO COME UP WITH A DEVICE TO ALLOW

21        THEM TO HAVE REMOTE VIDEO TRANSMISSION IN A FLEXIBLE

22        ENVIRONMENT THAT WAS INEXPENSIVE AND FLEXIBLE.

23        Q.   AND WHAT WERE SOME OF THE OLDER WAYS THAT HAD BEEN USED TO

24        TRANSMIT VIDEO?

25        A.   SO THERE WERE TWO PRIMARY WAYS OF DOING IT PREVIOUSLY.
```

Case 5:12-cv-00630-LHK  Document 1938  Filed 07/07/14  Page 199 of 286
DIRECT SCHONFELD
1     ONE OF THEM REQUIRED SATELLITE TRANSMISSION, WHICH REQUIRED

2     USUALLY A HEAVY TRUCK WITH VERY EXPENSIVE AND HEAVY EQUIPMENT

3     THAT REQUIRED A LONG TIME TO SET UP, MAYBE HALF AN HOUR.  AND

4     THAT WAS NOT APPROPRIATE FOR THE KIND OF APPLICATIONS THAT THEY

5     WERE LOOKING FOR.

6          THE OTHER APPROACH WOULD BE USED ON A MICROWAVE RADIO

7     TRANSMISSION THAT WAS SLIGHTLY LESS EXPENSIVE EQUIPMENT AND NOT

8     AS HEAVY, BUT STILL EXPENSIVE AND STILL HEAVY, AND HAD OTHER

9     MORE SEVERE LIMITATIONS.

10         FOR EXAMPLE, IT NEEDED A DIRECT LINE OF SIGHT, SO YOU MAY

11    HAVE SEEN THOSE KIND OF VANS ON THE ROAD BY VARIOUS NEWS

12    TRUCKS.  IF THEY DON'T HAVE A DIRECT LINE OF SIGHT BETWEEN THE

13    TRUCK AND THE RECEIVER, IT DOESN'T WORK.

14         AND SO THOSE ARE THE TYPE OF ENVIRONMENTS THAT WERE

15    AVAILABLE TO THEM FOR VIDEO TRANSMISSION AT THE TIME.

16    Q.   SO WHAT WAS THE INVENTORS' SOLUTION?

17    A.   THE INVENTOR DID SOMETHING VERY SIMPLE AND VERY INGENIOUS,

18    WHICH IS TO USE THE LOCAL CELLULAR NETWORK, WHICH AT THE TIME

19    WAS JUST EMERGING IN TERMS OF DIGITAL CELLULAR NETWORK, IT WAS

20    ONLY A FEW YEARS OLD, AND TO USE CELLULAR COMMUNICATION TO

21    TRANSMIT VIDEO FOR THE FIRST TIME.

22    Q.   SO IF WE GO BACK TO THE FIRSTLOOK PRODUCT AND LOOK AT

23    SLIDE 3967, HOW DID THE INVENTORS IMPLEMENT THE '239 PATENT

24    BACK IN 1993, 1994?

25    A.   SURE.  SO YOU HEARD A LITTLE BIT OF IT FROM ONE OF THE

UNITED STATES COURT REPORTERS

1   INVENTORS JUST BEFORE ME, AND THEY TOOK A, A PORTABLE DEVICE, A

2   PORTABLE COMPUTER, THEY COMBINED CELLULAR PHONE TECHNOLOGY,

3   THEY INTEGRATED IT TOGETHER, PUT SOFTWARE, THE RIGHT SOFTWARE,

4   AND THEY HAD A DEVICE THAT WAS ABLE TO DO THIS FOR THE FIRST

5   TIME THAT WAS SIGNIFICANTLY SIMPLER, LOWER WEIGHT, AND MUCH

6   EASIER TO WORK WITH THAN THOSE BIG TRUCKS THAT THEY HAD TO WORK

7   WITH BEFORE FOR SATELLITE AND MICROWAVE.

8   Q.   SO IS THE TECHNOLOGY OF THE '239 PATENT OLD AND OBSOLETE?

9   A.   NOT IN MY OPINION, NOT AT ALL.  IT ACTUALLY PROVIDES, FOR

10  THE FIRST TIME, SOME OF THE ADDITIONAL FUNCTIONALITIES FOR CELL

11  PHONES IN THE FORM OF VIDEO.  AT THE TIME, RIGHT ABOUT THIS

12  ERA, PEOPLE WERE USING PDA AND INTEGRATING IT INTO CELL PHONES.

13  Q.   I'M SORRY.  PDA IS?

14  A.   PERSONAL DIGITAL ASSISTANTS, AND WHAT THEY DID IS

15  INTEGRATED VIDEO.

16       ALL OF THESE EARLY FORMS OF ENHANCING CELLULAR TECHNOLOGY

17  WERE PRECURSORS TO WHAT EVENTUALLY BECAME SMARTPHONE

18  TECHNOLOGY, WHICH REALLY WERE BORN A FEW YEARS LATER IN THE

19  MID-'90S THAT THEY WERE CALLED SMARTPHONES, AND THEN THEY BEGAN

20  TO REALLY TAKE OFF ABOUT A DECADE LATER.

21  Q.   NOW, YOU WERE HERE FOR THE OPENING STATEMENTS IN THE CASE;

22  RIGHT?

23  A.   I WAS IN THE OVERFLOW ROOM, YES.

24  Q.   BUT YOU HEARD THE OPENING STATEMENTS?

25  A.   I DID.

1      Q.   NOW, DID YOU -- DO YOU REMEMBER APPLE'S COUNSEL DESCRIBING

2      THE INVENTION AS FROM THE VCR/BETA MAX DAYS?

3      A.   I DID, YES.

4      Q.   DO YOU AGREE WITH THAT STATEMENT?

5      A.   NO, I DO NOT.

6      Q.   HOW COME?

7      A.   WELL, VCR AND BETA MAX COULD BE USED WITH THIS, BUT VCR

8      AND BETA MAX WERE TECHNOLOGIES OF THE MID-'70S.

9           BY THIS TIME WE'RE TALKING ABOUT THE MID-'90S, THIS WAS

10     JUST ABOUT THE TIME THAT DVD, VIDEO CD, ALL THE NEW EXCITING

11     FEATURES OF DIGITAL TECHNOLOGY CAME AROUND, AND THIS WAS AN

12     INTERESTING AGE FOR DIGITAL VIDEO.  IT WAS 20 YEARS AFTER VCR

13     AND BETA MAX.

14     Q.   SO GOING BACK TO THE '239 PATENT, WHAT DEFINES THE SCOPE

15     OF THE INVENTION?

16     A.   THE SCOPE OF THE INVENTION IS DEFINED BY THE CLAIM.

17     Q.   SO IN YOUR INFRINGEMENT ANALYSIS, DID YOU COMPARE THE

18     APPLE ACCUSED PRODUCTS TO THE ORIGINAL FIRSTLOOK PRODUCT FROM

19     1993 AND 1994?

20     A.   NO.  IN ORDER TO DO MY ANALYSIS, I DID NOT COMPARE TO THE

21     FIRST LOOK PRODUCT.  I COMPARED TO THE CLAIM AND DETERMINED

22     WHETHER EACH LIMITATION WITHIN THE CLAIM IS MET AND PRACTICED

23     BY THE ACCUSED DEVICES.

24     Q.   HERE IS CLAIM 15 FROM THE '239 PATENT.  THAT'S THE

25     ASSERTED CLAIM?

1      A.    THAT'S CORRECT.

2      Q.    OKAY.   CAN YOU DESCRIBE FOR US WHAT THESE TWO LIMITATIONS

3      ARE IN THIS CLAIM?

4      A.    SO THERE'S A PREAMBLE UP ON TOP, AND THEN THERE ARE TWO

5      LIMITATIONS.   THE PREAMBLE IS FOR THE GENERAL APPARATUS, AND

6      THE TWO LIMITATIONS, THE FIRST ONE IS THE COMPUTER, INCLUDING

7      THE VIDEO CAPTURE MODULE.   THAT'S WHAT DOES, ALL TOGETHER, THE

8      CAPTURE OF THE VIDEO AND COMPRESSION SO YOU CAN ACTUALLY SEND

9      VIDEO EFFICIENTLY OVER THE CELLULAR LINE, BECAUSE CELLULAR

10     TECHNOLOGY REQUIRED YOU TO COMPRESS THE DATA OR ELSE THE VIDEO

11     WOULD SIMPLY BE TOO BIG FOR CELLULAR COMMUNICATION.

12          AND THE SECOND ONE IS ONCE YOU HAVE IT IN COMPRESSED FORM,

13     YOU HAVE TO SEND IT OVER IN ORDER TO RECEIVE IT ON THE OTHER

14     SIDE.

15          AND THOSE ARE THE TWO LIMITATIONS REQUIRED.

16     Q.    SO HOW CAN CLAIM 15 BE PRACTICED TODAY?

17     A.    IT COULD BE PRACTICED IN ANY NUMBER OF WAYS.   ONE OF THE

18     EXCITING THINGS ABOUT THIS TECHNOLOGY IN MULTIMEDIA IS WHEN

19     THINGS ARE CONTINUING TO EVOLVE, EVERYBODY INTEGRATES THE

20     TECHNOLOGY, THINGS BECOME SMALLER, MORE EFFICIENT, AND

21     INTEGRATED.

22          AND SO, FOR EXAMPLE, TODAY, AS YOU SAW EARLIER, THE

23     FIRSTLOOK DEVICE, WHICH WAS MOUNTED AND CONNECTED TO A CAMERA

24     ON THE SIDE, THOSE, OVER TIME, ARE INTEGRATED, AND A SMARTPHONE

25     DEVICE WOULD CAPTURE BOTH OF THOSE IN ONE.

1          AND YOU COULD THEN SEND THE SMARTPHONE -- YOU COULD

2     ACTUALLY CAPTURE VIDEO, COMPRESS IT, TRANSMIT IT OVER CELLULAR

3     TO THE RECEIVER AS SHOWN AS THE RIGHT-HAND SIDE.

4     Q.   OKAY.  LET'S TALK ABOUT THE ACCUSED FEATURES OF THE

5     PRODUCTS.

6          HAVE YOU PREPARED A VIDEO THAT SHOWS HOW THE APPLE ACCUSED

7     PRODUCTS AND FEATURES WORK?

8     A.   I DID.

9     Q.   OKAY.  CAN WE TAKE A LOOK AT IT?

10         AND I HAVE A LASER POINTER IN CASE YOU WANT TO POINT TO

11    ANYTHING.

12    A.   SURE.

13              MR. JOHNSON:  MAY I APPROACH, YOUR HONOR?

14              THE COURT:  GO AHEAD, PLEASE.

15    BY MR. JOHNSON:

16    Q.   SO WHAT DO WE SEE HERE?

17    A.   SO WHAT WE SEE OVER HERE, THIS IS FACETIME OVER IPHONE 4S.

18    ON THE LEFT-HAND SIDE WE SEE AN IPHONE 4S WITH JOANNA.  SHE IS

19    TRYING TO DIAL A VIDEO ON THE RIGHT-HAND SIDE, AND AT THE

20    MOMENT, THERE IS NO VIDEO TRANSMISSION YET.

21         NOW, SHE IS CALLING ME.  ONCE WE HAVE CONTACTED, AND NOW

22    WE ARE CONNECTED, YOU CAN SEE UP IN THE UPPER LEFT-HAND SIDE,

23    AND YOU CAN SEE RIGHT THERE -- I JUST MISSED IT -- IT SAYS 4G.

24    THAT REFERS TO THE FACT THAT IT'S 4G CELLULAR NETWORK.

25         NOW THE DATA IS CAPTURED AND COMPRESSED AND SENT FROM

1   JOANNA'S PHONE ALL THE WAY TO MY LAPTOP, EXCEPT THIS HAPPENS

2   SIMULTANEOUSLY IN TWO WAYS.  SO WHILE SHE SENT HER VIDEO TO ME

3   IN COMPRESSED FORM, I SENT MY VIDEO TO HER AS WELL AT THE SAME

4   TIME.

5        SO THE CLAIM ITSELF ONLY LOOKS AT TRANSMISSION FROM ONE

6   SIDE, NOT BOTH AT THE SAME TIME.  BUT YOU CAN -- YOU CAN DO THE

7   CLAIM TWICE IN BOTH DIRECTIONS, AND THAT'S WHAT WE SEE OVER

8   HERE.

9   Q.   SO THE FIRST ACCUSED FEATURE IS FACETIME USING A CELLULAR

10  NETWORK?

11  A.   THAT'S CORRECT.

12  Q.   OKAY.  HAVE YOU PREPARED A VIDEO THAT SHOWS THE OTHER

13  ACCUSED FEATURE, NAMELY, E-MAILING OR MESSAGING A VIDEO?

14  A.   I DID.

15  Q.   OKAY.  CAN YOU EXPLAIN WHAT WE SEE HERE, PLEASE?

16  A.   SO THIS IS JOANNA AGAIN ON AN IPHONE 4S, THE SAME PHONE,

17  AND SHE'S IN SAN FRANCISCO TAKING A VIDEO OF A TROLLEY CAR.

18       AND NOW SHE'S TAKING THE PICTURE, IT'S BEING COMPRESSED,

19  AND IT'S IN THE PHONE.

20       NOW SHE GOES INTO THE CAMERA ROLL AND PHOTOS APPLICATION,

21  AND NOW SHE CAN CHOOSE BETWEEN MAIL AND MESSAGES, AND ONCE SHE

22  MAKES A SELECTION, IN THIS CASE SHE CHOSE TO MAIL IT, AND SHE'S

23  GOING TO CHOOSE MY E-MAIL ADDRESS AND SEND IT TO ME AT MY

24  E-MAIL ADDRESS IN COMPRESSED FORM OVER 4G.

25       YOU CAN SEE THE 4G UP ON TOP RIGHT HERE.  THAT'S THE

```
 1        LATEST CELLULAR NETWORK.

 2             AND I RECEIVE IT.  ONCE I RECEIVE IT, IT PLAYS IMMEDIATELY

 3        IN MY MAIL BROWSER AND I CAN ACTUALLY SEE THE VIDEO AFTER IT'S

 4        BEEN DECOMPRESSED.

 5        Q.   SO WE JUST LOOKED AT TWO VIDEOS INVOLVING THE IPHONE 4S.

 6             DO THE OTHER ACCUSED PRODUCTS OPERATE IN A SIMILAR

 7        FASHION?

 8        A.   FOR THE PURPOSE OF THIS CLAIM, THEY WORK EXACTLY THE SAME

 9        WAY.

10        Q.   AND IF YOU -- LET'S WALK THROUGH CLAIM 15 AND COMPARE IT

11        TO THE ACCUSED PRODUCTS AT THIS POINT.

12             HAVE YOU PREPARED A CHART TO DO THAT?

13        A.   I HAVE.

14             THE COURT:  IT'S 2:30 NOW.  LET'S GO AHEAD AND TAKE

15        OUR BREAK FOR THE FIRST PART OF THE AFTERNOON.

16             I'M SORRY TO INTERRUPT YOUR EXAMINATION.

17             MR. JOHNSON:  THANK YOU, YOUR HONOR.

18             THE COURT:  LET'S JUST TAKE A -- CAN WE TAKE A FIVE

19        MINUTE BREAK?  IS THAT OKAY?  MAKE UP FOR SOME OF THE TIME FROM

20        THIS MORNING?

21             OKAY.  THANK YOU.  WE'LL TAKE A FIVE MINUTE BREAK.

22             (JURY OUT AT 2:30 P.M.)

23             (RECESS FROM 2:31 P.M. UNTIL 2:38 P.M.)

24             (JURY IN AT 2:38 P.M.)

25             THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A
```

1       SEAT.

2              THE TIME IS NOW 2:38.

3              GO AHEAD, PLEASE, MR. JOHNSON.

4                  MR. JOHNSON:  THANK YOU, YOUR HONOR.

5       Q.  RIGHT BEFORE THE BREAK WE WERE GOING TO LOOK AT CLAIM 15

6       AND WALK THROUGH THE CLAIM AND COMPARE THE CLAIM TO THE ACCUSED

7       PRODUCTS.

8              SO LOOKING AT THIS CHART, IF WE LOOK AT THE FIRST PART OF

9       THE CHART, IT REFERS TO AN APPARATUS FOR TRANSMISSION OF DATA.

10             DO THE ACCUSED APPLE PRODUCTS MEET THAT LIMITATION?

11      A.   SO THE ACCUSED APPLE PRODUCTS ARE THE IPHONE DEVICES.

12      IPHONE ARE ALL APPARATUSES FOR TRANSMISSION OF DATA AS WE JUST

13      SAW IN THE VIDEO, SO THEY DO MEET AND PRACTICE THE PREAMBLE OF

14      THE CLAIM.

15      Q.   IF WE GO BACK TO YOUR CHART, CAN WE CHECK OFF THE FIRST

16      ROW?

17      A.   THAT'S CORRECT, AS WE JUST SAW IN THE VIDEO.

18      Q.   WHAT ABOUT THE NEXT LIMITATION, COMPUTER INCLUDING A VIDEO

19      CAPTURE MODULE TO CAPTURE AND COMPRESS VIDEO IN REAL TIME?  DO

20      THE ACCUSED PRODUCTS HAVE THAT?

21      A.   THEY DO.

22      Q.   CAN YOU EXPLAIN THE EVIDENCE?

23      A.   SURE.  SO THIS LIMITATION CALLS FOR A COMPUTER, INCLUDING

24      A VIDEO CAPTURE MODULE, WHICH HAS TO DO TWO THINGS:  IT HAS TO

25      CAPTURE AND COMPRESS VIDEO IN REAL TIME, SO IN THIS CASE, TO

1    SEE IT -- WE CAN ACTUALLY SEE IN THE VIDEOS MUCH OF IT ALREADY.

2    WE SAW THE VIDEO BEING CAPTURED, WE SAW THE VIDEO BEING

3    RECORDED AND THEN CAPTURED BY THE DEVICE, AND THEN WE SAW IT

4    BEING TRANSMITTED LATER ON.

5        AND WHAT WE HAVEN'T SEEN IS ONLY WHETHER IT'S IN

6    COMPRESSED FORM OR NOT.

7        AND WHAT WE HAVE HERE IS A TEAR DOWN OF THE IPHONE 5, AND

8    THE TEAR DOWN HAS TWO COMPONENTS.  ON THE BOTTOM LEFT IS THE

9    CAMERA, THAT'S THE FRONT CAMERA OF THE DEVICE IN THIS CASE.  IT

10   HAS TWO CAMERAS, A FRONT FACING AND REAR FACING CAMERA.

11       SO THE FRONT -- EITHER ONE OF THEM CAN BE SHOWN.  THE

12   FRONT FACING CAMERA IS SHOWN ON THE RIGHT.  THIS IS WHERE THE

13   DATA IS DIGITIZED, AND THEN IT IS SENT OVER TO THE MAIN PART OF

14   IT HERE, THAT'S THE LOGIC BOARD, AND IT HAS ON IT A BIG PORTION

15   CALLED AN A6 WITH AN APPLE NEXT TO IT.  THAT'S THE A6

16   APPLICATION PROCESSOR.  THAT'S WHERE THE DIGITIZED DATA GETS

17   CAPTURED AND THEN IT'S COMPRESSED AND EVENTUALLY TRANSMITTED

18   OVER THE CELLULAR NETWORK TO THE RECEIVER.

19   Q.   YOU MAY WANT TO MOVE A LITTLE BIT BACK FROM THE

20   MICROPHONE.  SOME PEOPLE HAVE THE OPPOSITE PROBLEM, LIKE I DO.

21   BUT IT'S REVERBERATING JUST A LITTLE BIT.

22       SO LET ME ASK YOU ABOUT THE APPLE DOCUMENTS.  DID YOU LOOK

23   AT ANY APPLE CONFIDENTIAL DOCUMENTS THAT ALSO ESTABLISHED THAT

24   THIS CLAIM LIMITATION IS MET?

25   A.   I HAVE.

```
1     Q.   WHAT DID YOU FIND --

2          YOUR HONOR, AT THIS POINT WE'RE GOING TO PUT -- THIS IS AN

3     APPLE CONFIDENTIAL DOCUMENT SO WE'RE JUST GOING TO PUBLISH IT

4     TO YOUR HONOR AND PUT IT ON THE SCREEN FOR THE JUNIORS.

5               THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

6               THE WITNESS:  SO THERE ARE A WHOLE ARRAY OF

7     DOCUMENTS.  THIS PARTICULAR ONE DESCRIBES THE FUNCTIONING OF

8     THAT CHIP THAT WE SAW, THE INTEGRATED CIRCUIT, THE ONE WITH THE

9     APPLE THAT SAID A6, AND THIS IS FOR THE H5P, IT'S THE IPHONE 5,

10    AND THIS DOCUMENT DESCRIBES VARIOUS THINGS ABOUT THE OPERATION

11    OF THE A6 APPLICATION PROCESSORS, AND IN PARTICULAR, IT SHOWS

12    HOW IT CAPTURES AND COMPRESSIONS THE DATA.

13    BY MR. JOHNSON:

14    Q.   AND YOU'RE LOOKING AT DX 351, PAGES 1744 AND 1746?

15    A.   I AM.

16    Q.   AND THE JURY WILL HAVE THAT IN THE JURY ROOM AS WELL?

17    A.   THAT'S MY UNDERSTANDING, YES.

18    Q.   OKAY.  NOW, WERE THERE ANY OTHER PARTS OF APPLE INTERNAL

19    DOCUMENTS THAT CONFIRMED FOR YOU THE ACCUSED PRODUCTS HAVE THIS

20    LIMITATION?

21    A.   SURE.  SO IF YOU OPEN THIS DOCUMENT, YOU WILL SEE VARIOUS

22    THINGS, AND IT REPEATEDLY DESCRIBES HOW THE VIDEO IS CAPTURED.

23    IT TALKS ABOUT THE FACT THAT THE VIDEO IS CAPTURED, AND IN

24    PARTICULAR YOU CAN SEE NEXT TO IT, IT'S NOT HIGHLIGHTED WHERE

25    IT SAYS 1080P30, YOU CAN SEE JUST TO THE LEFT OF THE YELLOW
```

1    PORTION, AND THAT REFERS TO -- YOU MAY HAVE GONE AND SEEN IN

2    THE TELEVISION STORE TV'S SOLD AS 1080P30, WHICH MEANS IT'S THE

3    HIGHEST LEVEL OF HDTV, DIGITAL TELEVISION THAT YOU CAN BUY.

4         WHAT THIS IS SAYING IS THAT YOU CAN CAPTURE THE DATA, THE

5    VIDEO AT THAT RATE, AT THE HIGHEST POSSIBLE RATE IN REAL TIME.

6    Q.   WERE THERE OTHER PORTIONS OF THE DOCUMENT THAT SHOWED YOU

7    PRECISELY HOW THE VIDEO CAPTURE AND COMPRESSION WORKS?

8    A.   YES, THERE ARE.  SO ON THIS PARTICULAR PAGE, WHAT WE SEE

9    IS A DOCUMENT SHOWING VARIOUS COMPONENTS WITHIN THE A6

10   APPLICATION PROCESSOR FOR THE IPHONE 5.

11        AND ON THE RIGHT I HIGHLIGHTED ONE COMPONENT THAT REFERS

12   TO THE MIPI, M-I-P-I ON THE LEFT, AND YOU CAN SEE THAT THERE IS

13   A -- I CANNOT POINT, BUT YOU CAN SEE THAT THERE IS A BOX

14   THAT -- A BIG WHITE BOX WITH FOUR SUBCOMPONENTS.  THE ONE ON

15   THE UPPER LEFT SAYS TWO TIMES MIPI, AND THEN IT GOES TO THE ISP

16   CORE ON THE BOTTOM RIGHT.  THAT'S THE CENTRAL PROCESSOR.

17   THAT'S WHERE THE DATA IS CAPTURED AND THE MIPI CONNECTS TO THE

18   CAMERA IMAGE SENSOR.

19        THEN FROM THERE, IT GOES OVER TO THE LEFT TO THE

20   COMPONENT, AND YOU CAN SEE FOUR BOXES, THE SECOND FROM THE

21   RIGHT IS IMG, VXE, 380 H.264 ENCODE.

22        H.264 IS WHAT YOU GET AT HOME WHEN YOU GET HDTV IN

23   COMPRESSED PHONE, THAT'S WHERE IT'S TAKING PLACE.  THAT'S WHERE

24   IT'S ENCODED.

25   Q.   WHAT'S THE PURPOSE OF COMPRESSION?

1    A.   WELL, VIDEO DATA IS VERY, VERY LARGE.   IT TAKES A LOT OF

2    SPACE IN YOUR MEMORY OR YOUR STORAGE AREA OR DISK.   IT TAKES A

3    LOT OF SPACE TO BE TRANSMITTED.

4         IF YOU COMPRESS, YOU CAN STORE MORE VIDEOS ON THE SAME

5    STORAGE AREA.   IF YOU COMPRESS, YOU CAN ACTUALLY TRANSMIT IT

6    MUCH FASTER, OR YOU CAN TRANSMIT MANY MORE VIDEOS

7    SIMULTANEOUSLY.

8         SO COMPRESSION IN THE AREA OF VIDEO IS ABSOLUTELY

9    ESSENTIAL.

10   Q.   YOU WERE LOOKING AT DEFENDANTS' EXHIBIT 351, PAGES 1755,

11   1763, AND 1774; RIGHT?

12   A.   THAT'S CORRECT.

13   Q.   DOES THE VIDEO CAPTURE MODULE HAVE TO CAPTURE ANALOG VIDEO

14   IN ORDER TO MEET THE LIMITATIONS OF CLAIM 15?

15   A.   NO, IT DOES NOT.   CLAIM 15 JUST HAS TO CAPTURE THE VIDEO.

16   IT COULD BE ANALOG VIDEO.   IT COULD BE DIGITAL VIDEO.   IT MAKES

17   NO DIFFERENCE FOR THE PURPOSE OF CLAIM 15.

18   Q.   WE TALKED ABOUT THE IPHONE 5.

19        DID YOU ALSO LOOK AT EVIDENCE FOR THE IPHONE 4S AND 4?

20   A.   I DID.   IF YOU LOOK AT IPHONE 4S, THERE IS A SIMILAR

21   DOCUMENT, ANOTHER USER MANUAL FOR THE APPLICATION PROCESSOR FOR

22   THE IPHONE 4S AND IT WORKS IN EXACTLY THE SAME WAY.

23   Q.   AND YOU'RE LOOKING AT PAGES 1517, 1523, 1529, 1540, AND

24   1550 OF DX 351?

25   A.   YES, THAT'S CORRECT.

1    Q.   OKAY.  AND WHAT ABOUT FOR THE IPHONE 4?

2    A.   THE IPHONE 4 IS ANOTHER USER MANUAL FOR AN EARLIER VERSION

3    OF THE SAME APPLICATION PROCESSOR, AND THIS TIME YOU CAN JUST

4    SEE, IT'S IN ONE COMPONENT, THE ISP WHERE THE IMAGE IS -- WHERE

5    THE VIDEO IS CAPTURED, AND THEN THE VIDEO ENCODE H.264 ON THE

6    RIGHT, THAT'S WHERE IT'S COMPRESSED AND IT WORKS IN EXACTLY THE

7    SAME WAY.

8    Q.   AND YOU'RE LOOKING AT DX 351, PAGES 1, 3, AND 26?

9    A.   THAT'S CORRECT.

10    Q.   WAS THERE ANY EVIDENCE IN THE APPLE SOURCE CODE THAT

11    SHOWED THE ACCUSED PRODUCTS MEET THIS LIMITATION?

12    A.   YES, THERE WAS.

13    Q.   AND WERE THERE ANY SOURCE CODE DIFFERENCES ACROSS THE

14    ACCUSED PRODUCTS THAT ARE RELEVANT TO YOUR ANALYSIS?

15    A.   FOR THE PURPOSE OF MY ANALYSIS OF THIS CLAIM, THE SOURCE

16    CODE WAS THE SAME FOR ALL THREE PRODUCTS.

17    Q.   OKAY.  LET'S LOOK AT SOME OF THE SOURCE CODE.

18        AND AGAIN, THIS IS APPLE HIGHLY CONFIDENTIAL INFORMATION,

19    SO WE'LL JUST PUT IT ON THE SCREENS FOR HER HONOR AND ALSO FOR

20    THE JURY.

21        LET'S LOOK AT THE CAPTURE LIMITATION AGAIN.

22        WHERE IS THAT FOUND IN THE APPLE SOURCE CODE?

23    A.   SO THIS LIMITATION HAS TWO PARTS:  CAPTURE WHERE YOU GET

24    THE DATA; AND COMPRESSION WHERE YOU COMPRESSION IT.

25        FOR CAPTURE, YOU CAN SEE FOR FACETIME, THERE'S A HIGH

1    LEVEL SOFTWARE PROCESS, AND IT REFERS TO A FUNCTION CALLED

2    VIDEO TRANSMITTER ON CAPTURE VIDEO WHERE THE VIDEO IS CAPTURED.

3         AND THEN FOR MAIL AND MESSAGES, THERE'S ANOTHER HIGH LEVEL

4    PROCESS FUNCTION CALLED VIDEO CAPTURE, AND IT'S A FUNCTION

5    CALLED START VIDEO CAPTURE.

6    Q.   WE'RE REALLY DOWN IN THE WEEDS AT THIS POINT LOOKING AT

7    THE SOURCE CODE.  IS THIS ADDITIONAL EVIDENCE THAT SHOWS THAT

8    THESE CLAIM LIMITATIONS ARE MET IN THE ACCUSED PRODUCTS?

9    A.   IT FURTHER CONFIRMS THE UNDERSTANDING YOU GET FROM THE

10   USER MANUAL THAT I SHOWED YOU EARLIER.

11   Q.   OKAY.  LET'S TALK ABOUT COMPRESSION.

12        WAS THERE ANY SOURCE CODE THAT SHOWED YOU THE ACCUSED

13   PRODUCTS MEET THAT LIMITATION?

14   A.   YEAH, THERE IS.  SO IT'S THE SAME COMPRESSION HARDWARE

15   THAT WE SPOKE ABOUT EARLIER, AND WE NEED SOME SOFTWARE PIECE

16   THAT TELLS IT TO ACTUALLY RUN AND COMPRESS.

17        AND HERE IS AN EXAMPLE FOR FACETIME, EN ENCODE FRAME,

18   ENCODE FUNCTION FOR EVP COMPRESSION AND SESSION ENCODE FRAME,

19   AND THERE ARE SIMILAR CODES FOR FUNCTIONS THROUGHOUT FOR BOTH

20   MAIL, MESSAGES, AND THEY SET OUT VARIOUS PARAMETERS BEFORE IT

21   COMPRESSES THAT ARE SHOWN IN THE CODE.

22   Q.   AND THE SOURCE CODE THAT YOU'RE LOOKING AT IS PART OF

23   JOINT EXHIBIT 52A; RIGHT?

24   A.   THAT'S CORRECT.

25   Q.   OKAY.  SO IF WE GO BACK TO YOUR CHART, WHAT'S YOUR

```
 1     CONCLUSION ABOUT WHETHER THE ACCUSED PRODUCTS MEET THE COMPUTER

 2     INCLUDING A VIDEO CAPTURE MODULE?

 3     A.   ALL THREE OF THE PRODUCTS MEET THIS LIMITATION.

 4     Q.   OKAY.  LET'S LOOK AT THE LAST LIMITATION, MEANS FOR

 5     TRANSMISSION OF SAID CAPTURED VIDEO.

 6          IS THAT LIMITATION MET BY THE ACCUSED PRODUCTS?

 7     A.   IT IS.

 8     Q.   OKAY.  CAN YOU -- BEFORE WE GET INTO THE EVIDENCE, IS YOUR

 9     UNDERSTANDING THAT THERE'S A COURT'S CONSTRUCTION FOR THIS

10     PARTICULAR LIMITATION?

11     A.   THAT'S CORRECT.

12     Q.   AND HOW DID YOU USE THE COURT'S CONSTRUCTION IN YOUR

13     ANALYSIS?

14     A.   SO THE COURT'S CONSTRUCTION FOR THE MEANS FOR TRANSMISSION

15     LIMITATION HAS TWO PARTS:  THE FIRST PART IS THE FUNCTION; AND

16     THE SECOND PART IS THE STRUCTURE.

17          AND THE WAY I USED IT IS I FIRST DETERMINED THAT THE

18     FUNCTION IS PRACTICED BY THE ACCUSED DEVICES, BY THE THREE

19     IPHONES, AND THEN I DETERMINED WHETHER THERE IS STRUCTURE

20     CORRESPONDING TO THE COURT'S CONSTRUCTION OF STRUCTURE AND

21     WHETHER THAT EXISTS IN THE IPHONE DEVICES, AND IF IT DOES,

22     WHETHER IT PRACTICES THE SAME FUNCTION FOR THIS LIMITATION.

23     Q.   SO IF WE START JUST WITH THE FUNCTION, TRANSMISSION OF

24     SAID CAPTURED VIDEO OVER A CELLULAR FREQUENCY, DO THE ACCUSED

25     PRODUCTS MEET THAT FUNCTION?
```

1    A.   THEY DO.  WE SAW THIS IN THE VIDEOS WE SAW EARLIER, FOR

2    EXAMPLE.  IN ALL THREE CASES, WE TRANSMITTED THE CAPTURED VIDEO

3    IN COMPRESSED FORM AND WE TRANSMITTED IT OVER A 4G CELLULAR

4    NETWORK.

5         AND SO THE FUNCTION IS MET BY ALL THREE DEVICES.

6    Q.   AND THE NEXT PART OF THE ANALYSIS INVOLVES LOOKING AT THE

7    STRUCTURE TO DETERMINE IF THE STRUCTURE IS CONTAINED IN THE

8    ACCUSED PRODUCTS?

9    A.   THAT'S CORRECT.

10   Q.   LET'S LOOK AT THE FIRST PART OF THE STRUCTURE, ONE OR MORE

11   MODEMS.  IS THERE A MODEM IN THE IPHONE 5 AND 4S AND 4?

12   A.   YES, THERE IS.  THE FIRST PART IS ONE OR MORE MODEMS

13   CONNECTED TO ONE OR MORE CELLULAR PHONES, AND YOU, FIRST OF

14   ALL, HAVE THE MODEM IN ALL THESE DEVICES.  MODEM REFERS TO THE

15   MODULATE AND DEMODULATE FUNCTIONALITY, AND YOU NEED TO HAVE IT

16   IF YOU WANT TO SEND DATA OVER A CELLULAR PHONE.

17        AND IN PARTICULAR, WHAT IS SHOWN ON THE BOTTOM, WE

18   HIGHLIGHTED EARLIER THE A6 APPLICATION PROCESSOR THAT IS SHOWN

19   ON THE APPLE, BUT THIS TIME WE'RE LOOKING AT A DIFFERENT

20   COMPONENT CALLED THE MOBILE DATA MODEM.  THAT'S THE MODEM THAT

21   IS CONNECTED TO THE PHONE.

22   Q.   IF YOU TURN TO DOCUMENTATION, DID YOU FIND ANY DOCUMENTS

23   THAT CONFIRMED THAT ONE OR MORE MODEMS IS ALSO IN THE ACCUSED

24   PRODUCTS?

25   A.   I DID, YES.

1    Q.   CAN YOU EXPLAIN WHERE THAT'S FOUND?

2    A.   SO WE JUST SAW THE MOBILE DATA MODEM, INTEGRATED CIRCUIT

3    OR CHIP, AND THIS IS A MANUAL DESCRIBING THE OPERATION OF THIS

4    INTEGRATED CIRCUIT.  IT'S CALLED MOBILE DATA MODEM, AND IT

5    SHOWS ON THE LEFT, YOU CAN SEE THE MODEM FUNCTIONALITY OF THAT

6    PARTICULAR CHIP.

7    Q.   AND THIS WE'RE LOOKING AT IS DX 353, PAGE 410 AND 400?

8    A.   THAT'S CORRECT.

9    Q.   AND THE FACT THAT IT'S CALLED MOBILE DATA MODEM, IS THAT

10   EVIDENCE THAT IT CONTAINS ONE OR MORE MODEMS?

11   A.   WELL, IT SUPPORTS IT.  IT'S EVIDENCE THAT IT ACTUALLY HAS

12   A REAL MODEM INSIDE.

13   Q.   OKAY.  DID YOU SEE ANY EVIDENCE THAT THERE'S A MODEM IN

14   THE IPHONE 4 AND 4S IN DOCUMENTS?

15   A.   YEAH.  THE IPHONE 4S USES THE SAME TYPE OF MOBILE DATA

16   MODEM, THE SAME CHIP.  IT'S WORKING IN VERY SIMILAR WAYS, JUST

17   AN EARLIER VERSION OF IT.

18        AND FOR THE IPHONE 4, YOU HAD, AGAIN, TWO MODEMS, ONE FOR

19   VERIZON TYPE NETWORKS AND ONE FOR AT&T NETWORKS, BUT THEY WERE

20   BOTH MODEMS THAT WORKED IN A VERY SIMILAR WAY.

21   Q.   AND THIS IS DEFENDANTS' EXHIBIT 353, PAGES 302 AND 295.

22   THESE ARE DOCUMENTS PRODUCED BY APPLE?

23   A.   THAT'S CORRECT.

24   Q.   OKAY.

25        THE COURT:  AND THEY'RE THE SAME AS 353A, RIGHT?

1          MR. JOHNSON:  YES.  THESE ARE ALL, YOUR HONOR,

2     CONTAINED WITHIN 353A.  I'M JUST TRYING TO POINT OUT THE PAGES

3     SO THAT THERE'S A RECORD OF WHERE THEY CAN BE FOUND LATER.

4          THE COURT:  OKAY, THANK YOU.  SO I JUST WANT TO MAKE

5     SURE THAT -- SO FOR ALL THE A'S, ANYTHING YOU HAVE AS THE NON-A

6     WILL BE INCLUDED.

7          MR. JOHNSON:  THAT'S CORRECT.

8          THE COURT:  OKAY, PERFECT.  THANK YOU.

9       GO AHEAD, PLEASE.

10    BY MR. JOHNSON:

11    Q.   IN THE IPHONE 4, CAN YOU SHOW US DOCUMENTATION, APPLE

12    DOCUMENTATION ON WHERE IT'S LOCATED?

13    A.   SURE.  SO THIS IS THE IPHONE 4.  IT SAYS CDMA, THAT'S THE

14    VERIZON TYPE NETWORK THAT USES CDMA CELLULAR TECHNOLOGY, AND

15    THAT USES THE SAME TYPE OF MOBILE DATA MODEM THAT WE JUST

16    LOOKED AT, BUT EVEN AN EARLIER VERSION OF THE SAME INTEGRATED

17    CIRCUIT.

18       AND FOR THE IPHONE 4, FOR GSM, THOSE ARE AT&T NETWORKS,

19    SOME OF YOU MAY KNOW THAT, AND IT'S ANOTHER TYPE OF MODEM

20    CALLED THE HIGH PERFORMANCE MODEM SOLUTION AND THIS IS USED IN

21    THAT PARTICULAR PHONE.

22    Q.   AND DID YOU -- WHAT WE WERE LOOKING AT IS 371, DEFENDANTS'

23    EXHIBIT; CORRECT?

24    A.   THAT'S CORRECT.

25    Q.   OKAY.  NOW, WHAT'S THE RELATIONSHIP BETWEEN A MODEM AND A

```
1    CELLULAR TELEPHONE?

2    A.   THE MODEM IS LOCATED, AS YOU SAW EARLIER, ON THE LOGIC

3    BOARD WHICH IS PART OF THE CELL PHONE.  THE IPHONE ITSELF IS

4    OBVIOUSLY A CELLULAR PHONE.

5         AND THE MODEM IS NEXT TO ALL OF THE FUNCTIONALITY IN THE

6    CELLULAR PHONE, WHICH IS NEXT TO IT ON THE LOGIC BOARD AS WELL.

7    Q.   OKAY.  SO IF WE GO BACK TO THE STRUCTURE, THE NEXT PART OF

8    THE STRUCTURE THAT'S REFERRED TO IS A SOFTWARE SEQUENCE.

9         DO THE ACCUSED PRODUCTS HAVE A SOFTWARE SEQUENCE?

10   A.   THEY DO, YES.

11   Q.   AND CAN YOU EXPLAIN WHERE THAT IS FOUND IN THE EVIDENCE

12   THAT YOU LOOKED AT?

13   A.   SO THE SOFTWARE SEQUENCE REFERS TO THE PROGRAMMING

14   LANGUAGE, THE PROGRAMS THAT RESIDE ON THE APPLICATION PROCESSOR

15   WHICH TAKE PLACE, AND THE COURT'S CONSTRUCTION FOR THIS

16   STRUCTURE REQUIRES VARIOUS, VARIOUS TYPES OF SEQUENCES.

17        AND SO THE FIRST ONE IS INITIALIZING ONE OR MORE

18   COMMUNICATION PORTS, AND ALL THIS IS SAYING IS YOU NEED TO BE

19   ABLE TO COMMUNICATE FROM THE APPLICATION PROCESSOR TO THE

20   MOBILE DATA MODEM.  THE TWO CHIPS, THE TWO INTEGRATED CIRCUITS

21   HAVE TO BE ABLE TO ESTABLISH COMMUNICATION, AND THE WAY YOU DO

22   IT IS YOU INITIALIZE A PORT SO THAT THEY CAN ACTUALLY ESTABLISH

23   COMMUNICATION BETWEEN THEM.  AND --

24   Q.   SO WHAT YOU'RE LOOKING FOR NOW IN THE ACCUSED PRODUCTS IS

25   SOFTWARE SEQUENCE OF INITIALIZING ONE OR MORE COMMUNICATION
```

1        PORTS?

2        A.    THAT'S CORRECT.

3        Q.    AND FOR THAT YOU TURNED TO THE SOURCE CODE?

4        A.    THAT'S CORRECT.

5        Q.    THE APPLE SOURCE CODE?

6        A.    THE APPLE SOURCE CODE FROM THE A6 APPLICATION PROCESSOR.

7        Q.    OKAY.  SO LET'S DO THAT.

8        A.    OR I SHOULD SAY ON THE APPLICATION PROCESSOR.

9        Q.    OKAY.  WHAT DO WE SEE IN SLIDE SDX 3996?

10       A.    WE KNOW WE NEED TO HAVE SOME SOURCE CODE, AND WHAT WE DO

11       IS -- WHAT WE'VE DONE HERE IS IDENTIFY --

12              MR. LEE:  YOUR HONOR, I APOLOGIZE.

13              MR. JOHNSON:  I'M SORRY.  THIS ONE IS 3995.

14       SORRY.  IT'S 3995.

15       THIS ONE WASN'T.  I JUST MISREAD THE NUMBER.

16              THE COURT:  OKAY.  GO AHEAD, PLEASE.

17              MR. JOHNSON:  WE'RE ON SLIDE 3995.  I NEED SOME

18       GLASSES.

19              THE WITNESS:  OKAY.  WHAT WE CAN SEE OVER HERE IS IT

20       SAYS CT SERVER CONNECTION CREATE WITH IDENTIFIER.

21           THIS IS A FUNCTION, A LOW LEVEL FUNCTION IN THE SOURCE

22       CODE, THE SOURCE CODE IS MADE OF LAYERS, AND THIS IS A LOW

23       LEVEL FUNCTION, WHICH MEANS IT'S A FUNCTION THAT ESTABLISHES

24       COMMUNICATION, ESPECIALLY IN PREPARATION FOR A CELLULAR

25       COMMUNICATION.

1        AND LATER ON IT CALLS ANOTHER FUNCTION, WHICH IS CT SERVER

2   CONNECTION CREATE WITH IDENTIFIER, AND THIS IS HOW THE ACTUAL,

3   THE INITIALIZATION PORT, THE PORT BEING IN THIS CASE THE

4   PHYSICAL PORT, THAT THOSE ARE THE PINS -- THE INTEGRATED

5   CIRCUITS HAVE LITTLE PINS -- AND THOSE, YOU NEED TO HAVE A LINE

6   OF CONNECTION TO THE PINS OF THE MOBILE DATA MODEM, AND THAT IS

7   THE COMMAND IN ORDER TO ESTABLISH THAT COMMUNICATION.

8        YOU ALSO HAVE OTHER LEVELS OR TYPES OF PORTS

9   INITIALIZATION.  YOU MAY HAVE HEARD OF THE TERM PORT FOR UDP OR

10  TCP FOR INTERNET.  THOSE ARE ALSO ESTABLISHED HERE, BUT FOR

11  DIFFERENT PROCESS CALLED REAL TIME TRANSPORT PROTOCOL THAT

12  ALLOWS VIDEO TO BE SENT IN REAL TIME, AND THOSE ARE ALSO

13  ESTABLISHED AT A HIGHER LEVEL.

14       SO WE SEE THE RELEVANCE TO PORT INITIALIZATION IN SEVERAL

15  DIFFERENT PLACES.

16  BY MR. JOHNSON:

17  Q.   SO IF WE LOOKED AT THE NEXT PART OF THE STRUCTURE THAT'S

18  REQUIRED, IT TALKS ABOUT OBTAINING A CELLULAR CONNECTION.  HOW

19  IS THIS PART OF THE STRUCTURE MET BY THE ACCUSED PRODUCTS?

20  A.   SO ONCE AGAIN, THE PHONE, IN ORDER TO TRANSMIT VIDEO, HAS

21  TO HAVE A CELLULAR CONNECTION.  IF IT DOESN'T HAVE A CELLULAR

22  CONNECTION, THE VIDEO WILL NOT GO THROUGH.

23       SO THE NEXT LIMITATION, WE KNOW THAT THERE IS A

24  CONNECTION, AND WHAT WE HAVE IDENTIFIED OVER HERE IS PART OF

25  THE SAME LOW LEVEL SOURCE CODE THAT I MENTIONED, AND IT CALLS

1      IT A FUNCTION CALLED CLIENT CONNECTION CELLULAR START, WHICH IN

2      TURN YOU CAN SEE THE COMMENT, DIAL THE CELLULAR SERVICE, AND

3      THEN IT CALLS THE FUNCTION CALLED CELLULAR SERVICE DIAL, THAT'S

4      THE KIND OF FUNCTIONALITY THAT IS USED IN ORDER TO BE ABLE TO

5      ESTABLISH THE CELLULAR CONNECTION ITSELF.

6      Q.   THE NEXT PART OF THE CONSTRUCTION REFERS TO OBTAINING SAID

7      CAPTURED VIDEO.  HOW DO THE ACCUSED PRODUCTS MEET THAT PART OF

8      THE SOFTWARE SEQUENCE STRUCTURE?

9      A.   SO IN -- ONCE YOU CAPTURE THE VIDEO, YOU HAVE TO BE ABLE

10     TO GET POSSESSION OF IT IF YOU'RE GOING TO SEND IT, SO THE ONLY

11     ISSUE IS IDENTIFYING WHERE THAT TAKES PLACE.

12         SO HERE'S AN EXAMPLE FROM FACETIME, AND WHAT HAPPENS IS

13     THE WAY YOU DO IT IS YOU CAPTURE THE VIDEO, YOU PUT IT IN

14     MEMORY IN A BUFFER, AND THEN YOU COMPRESS IT AND YOU PUT THAT

15     IN A BUFFER AS WELL.

16         THE BUFFER IS JUST A SECTION OF MEMORY, OF RAM, OR RANDOM

17     ACCESS MEMORY, WHERE IT RESIDES.

18         AND THIS PARTICULAR BUFFER IS WHERE THE COMPRESSION VIDEO

19     RESIDES.  IT'S CALLED PB ENCODING BUF, AND IT'S PART OF A

20     STRUCTURE CALLED DPT, AND WE ARE REFERENCING THAT PARTICULAR

21     BUFFER, AND BY REFERENCING IT, WE ACTUALLY CAPTURE SO WE CAN

22     WORK WITH IT AND USE THE DATA AS WELL.

23     Q.   YOU JUST TALKED ABOUT THE FACETIME FEATURE.

24         DO THE MAIL AND MESSENGER FEATURES ALSO MEET THIS PART OF

25     THE STRUCTURE?

1     A.    YEAH.  THEY'RE A SIMILAR TYPE OF CALLS.  FOR EXAMPLE,

2     HERE --

3     Q.    SIMILAR TYPE OF SOURCE CODE CALLS?

4     A.    YEAH, SIMILAR TYPE OF SOURCE CODE CALLS.

5           THIS IS A HIGH LEVEL PORTION OF THE CODE, AND IN HERE WE

6     SAW IN THE -- WE SAW EARLIER IN THE VIDEO, IF YOU RECALL, WHEN

7     WE READ THE CAMERA ROLL IN THE PHOTOS APPLICATION, YOU HAD A

8     CHOICE OF MAIL OR MESSAGES TO SEND YOUR VIDEO, AND SO THIS

9     CALLS OUT THE USER INTERFACE, AND IF -- WHEN YOU MAKE

10    SELECTIONS, IT ALLOWS YOU TO HAVE A FUNCTION CALLED SHOW MAIL

11    COMPOSITION FOR VIDEO OR SHOW MPEPS, MPEPS REFERRING TO

12    MESSAGES, AND MPEPS COMPOSITION FOR VIDEO WHICH, IN TURN, GO TO

13    LOWER LEVEL PORTIONS OF THE CODE THAT ACTUALLY EXTRACT THE

14    COMPRESSED VIDEO FROM A BUFFER.

15    Q.    AND ALL -- AGAIN, ALL THE SOURCE CODE THAT YOU'RE TALKING

16    ABOUT IS APPLE SOURCE CODE LOCATED AT JX 52A?

17    A.    THAT'S CORRECT, IN THE APPLICATION PROCESSOR.

18    Q.    OKAY.  THE LAST LIMITATION, LAST PART OF THIS, IS

19    TRANSMITTING SAID CAPTURED VIDEO.  HOW IS THIS SOFTWARE

20    LIMITATION MET BY THE ACCUSED PRODUCTS?

21    A.    SO NOW THAT WE HAVE THE CAPTURED VIDEO, NOW THAT WE HAVE

22    THE COMPRESSED VIDEO, WE WANT TO SEND IT, SO WE KNOW THAT IT'S

23    BEING SENT, SO AGAIN, WE EXPECT YOU TO FIND A COMMAND THAT'LL

24    TELL US TO SEND THE VIDEO.

25          AND WE SEE THE COMMAND THAT IS -- FOR EXAMPLE, IN THE CASE

1    OF FACETIME, AND WE SAW EARLIER THE HIGHLIGHTED PORTION ON THE

2    RIGHT, PVT, PV ENCODING BUF, THAT'S WHERE THE VIDEO IS CAPTURED

3    AND NOW IT'S SENT AS PART OF THE FUNCTION CALLED VIDEO

4    TRANSMITTER TRANSMIT, WHICH CALLS ANOTHER FUNCTION, A LOWER

5    LEVEL FUNCTION, WHICH IS SEND RTP.

6         RTP IS THE REAL TIME TRANSPORT PROTOCOL I MENTIONED

7    EARLIER.  THAT'S WHERE IT ACTUALLY GOES OVER THE CELLULAR PHONE

8    IN SMALL LITTLE CHUNKS ALL THE WAY TO THE RECEIVER.

9    Q.   YOU TALKED ABOUT FACETIME.  HOW ABOUT FOR MAIL AND

10   MESSAGES?

11   A.   SO IN THE CASE OF MAIL AND MESSAGES, IT WORKS IN A VERY

12   SIMILAR WAY, EXCEPT THIS TIME IT SENDS -- IT DOESN'T USE THE

13   RTP PROTOCOL, IT USES A DIFFERENT MESSAGING SERVICE.  AND IT

14   USES THE SAME FUNCTION, SEND VIA E-MAIL AND SEND VIA MPEPS.

15        REMEMBER EARLIER WE SAW ON THE PHONE THE ACTUAL MESSAGES

16   AND MAIL, THE CHOICES TO TRANSMIT YOUR DATA.  THIS IS WHEN THIS

17   COMES UP.

18        AND ONCE YOU MAKE YOUR SELECTION, IT CALLS LOWER LEVEL

19   PROCESSES THAT ACTUALLY ULTIMATELY TRANSMIT THE DATA OVER THE

20   CELLULAR NETWORK TO THE RECEIVER.

21   Q.   SO IF WE GO BACK TO SLIDE 4002 -- PLEASE, KEN -- WHAT'S

22   YOUR CONCLUSION?  WE'VE TALKED A LOT ABOUT THE DETAILS AND

23   LOOKED AT THE SOFTWARE CODE DOWN AT THE LOWEST LEVEL.

24        WHAT'S YOUR CONCLUSION ABOUT WHETHER EACH OF THESE

25   LIMITATIONS IS PRESENT IN THE ACCUSED PRODUCTS AND FEATURES?

1     A.   SO FOR THE FACETIME FEATURE, IT IS MET FOR IPHONE 5 AND

2     IPHONE 4S.

3          FOR MAIL AND MESSAGES, IT IS MET FOR IPHONE 5, IPHONE 4S

4     AND IPHONE 4.

5     Q.   NOW, DR. SCHONFELD, DO YOU REMEMBER DURING APPLE'S OPENING

6     STATEMENT THAT APPLE'S COUNSEL SAID SAMSUNG WAS ACCUSING ITS

7     OWN COMPONENTS OF INFRINGING CLAIM 15?

8     A.   I DID HEAR THAT, YES.

9     Q.   DO YOU AGREE WITH THAT?

10    A.   I'M NOT SURE WHICH COMPONENT, BUT I DO NOT.

11    Q.   WHY NOT?

12    A.   BECAUSE THE -- PRESUMABLY THE A6 APPLICATION PROCESSOR IS

13    WHAT IS BEING REFERRED TO, AND THIS IS JUST ONE OF MANY

14    COMPONENTS THAT YOU CAN SEE ON THE INTEGRATED CIRCUIT.  YOU SAW

15    IT EARLIER ON THE TEAR DOWN VISUAL.

16    Q.   CAN YOU PUT UP PLAINTIFF'S EXHIBIT 255, PAGE 7.

17         IS THAT THE APPLICATION PROCESSOR A6 THAT WE SEE ON THE

18    SCREEN?

19    A.   THAT'S CORRECT.

20    Q.   OKAY.

21    A.   AND SO YOU NEED TO BE ABLE TO -- FIRST OF ALL, YOU HAVE TO

22    INTEGRATE ALL THE VARIOUS COMPONENTS TOGETHER AND JUST -- WHEN

23    SOMEBODY SELLS ONE INTEGRATED CIRCUIT, THAT DOES NOT DO IT.

24    YOU HAVE TO INTEGRATE AND DESIGN THE ENTIRE PHONE, INCLUDING

25    THE ENTIRE LOGIC BOARD.

1          SECONDLY, THE INTEGRATED CIRCUIT BY ITSELF IS JUST

2     HARDWARE.  IT DOESN'T ACTUALLY DO ANYTHING.  YOU MUST WRITE

3     YOUR OWN SOURCE CODE AND TELL IT WHAT TO DO, HOW TO DO IT, WHEN

4     TO DO IT, AND THAT'S ALL SOURCE CODE WRITTEN BY APPLE.

5          AND FINALLY, THE A6 APPLICATION PROCESSOR IS NOT EXACTLY

6     THE SAMSUNG CHIP IN THE SENSE THAT APPLE SPECIFIES WHAT IT

7     WANTS.  IT HELPS THEM DESIGN VARIOUS COMPONENTS.

8          SAMSUNG USES APPLE SPECIFICATION AND APPLE'S DESIGNS, GETS

9     OTHER DESIGNS OF LARGE PORTIONS OF IT FROM OTHER VENDORS, THIRD

10    PARTY VENDORS, PUTS IT ALL TOGETHER ACCORDING TO APPLE'S

11    REQUIREMENTS, AND GIVES IT TO APPLE TO INTEGRATE INTO THEIR

12    SYSTEM.

13    Q.   DR. SCHONFELD, DID YOU SEE ANY EVIDENCE THAT APPLE

14    ANALYZED SAMSUNG'S VIDEO TRANSMISSION TECHNOLOGY WHILE

15    DEVELOPING ITS OWN FACETIME OVER CELLULAR TECHNOLOGY?

16    A.   I DID, YES.

17    Q.   CAN YOU TURN IN YOUR BOOK TO DX 499?

18    A.   YES.

19    Q.   OKAY.  WHAT'S THIS?

20    A.   THIS IS AN INTERNAL E-MAIL BETWEEN APPLE EMPLOYEES AND IT

21    HAS -- IT'S AN E-MAIL BETWEEN VARIOUS EMPLOYEES AND IT HAS AN

22    ATTACHMENT TO IT, AND THE ATTACHMENT IS A PRESENTATION CALLED

23    FACETIME OVER CELLULAR.

24          MR. JOHNSON:  YOUR HONOR, WE OFFER DEFENDANTS'

25    EXHIBIT 499.

```
 1              MR. LEE:  NO OBJECTION.

 2              THE COURT:  IT'S ADMITTED.

 3         (DEFENDANTS' EXHIBIT 499 WAS ADMITTED IN EVIDENCE.)

 4              THE COURT:  GO AHEAD, PLEASE.

 5              MR. JOHNSON:  NOW, APPLE HAS SAID THIS DOCUMENT, THE

 6    WHOLE DOCUMENT IS SEALED IN ITS ENTIRETY, SO WE'LL ONLY SHOW IT

 7    TO YOUR HONOR AND TO THE JURY.

 8    Q.   CAN YOU TELL US, WHAT IS THIS PRESENTATION?

 9    A.   SO THIS PRESENTATION IS APPLE'S EFFORTS TO ANALYZE THE

10    PERFORMANCE OF FACETIME OVER CELLULAR, AND IN PARTICULAR IT

11    SAYS THAT THERE IS A CERTAIN REFERENCE MODULE, A BENCHMARK IF

12    YOU WILL, THAT NEEDS TO BE -- THAT NEEDS TO BE USED -- AS A

13    REFERENCE FOR VIDEO CALLING APPLICATIONS, AND ITS ONLY

14    REFERENCE DEVICE NAMED HERE IS SAMSUNG GALAXY S II DEVICE.

15    Q.   WHAT DID THIS PRESENTATION TELL YOU?

16    A.   IT TOLD ME THAT APPLE WAS AWARE OF THE SAMSUNG DEVICE AND

17    THE PERFORMANCE AND LOOKED INTO ITS PERFORMANCE AS A BENCHMARK

18    TO ANALYZE ITS OWN PERFORMANCE.

19    Q.   AND BY "THE SAMSUNG DEVICE," YOU'RE REFERRING TO THE

20    SAMSUNG GALAXY S II THAT'S REFERENCED ON THIS APPLE INTERNAL

21    DOCUMENT?

22    A.   THAT'S CORRECT.

23              MR. JOHNSON:  NO FURTHER QUESTIONS, YOUR HONOR.

24              THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:05.

25              I'D LIKE TO PLACE ON THE RECORD JUST THAT THE PX 246, ONLY
```

```
 1    THE HIGHLIGHTED PORTIONS OF PAGES 1, 2, 4, 5, 6, AND 15 ARE

 2    SEALED.

 3         PX 255 IS NOT SEALED; CORRECT, MR. JOHNSON?  THAT'S THE

 4    TEAR DOWN?

 5              MR. JOHNSON:  THIS IS AN APPLE DOCUMENT.  I DON'T

 6    THINK IT'S SEALED.

 7              THE COURT:  ALL RIGHT.

 8              MR. JOHNSON:  BUT THIS IS AN APPLE TEAR DOWN.

 9              THE COURT:  DX 351A IS SEALED IN ITS ENTIRETY.

10         DX 352A, DX 353A, DX 354A, DX 371, DX 491A, AND JX 52A ARE

11    ALL SEALED IN THEIR ENTIRETY; CORRECT?

12              MR. JOHNSON:  AGAIN, THESE ARE APPLE DOCUMENTS.  I

13    THINK THAT YOUR HONOR IS CORRECT.

14              MR. LEE:  THAT'S CORRECT.

15              THE COURT:  OKAY.  NOW, DX 490A, I DID NOT SEE ANY

16    SEALING ORDER.  THAT'S THE IPOD TOUCH USER GUIDE.

17              MR. JOHNSON:  WE DIDN'T, EITHER.

18              THE COURT:  I'M SORRY?

19              MR. JOHNSON:  I DIDN'T, EITHER.  WE DON'T THINK IT'S

20    SEALED.

21              MR. LEE:  THERE IS NO SEALING ORDER.

22              THE COURT:  NO SEALING AS TO THAT.  OKAY.

23         AND 499, WHERE IS THAT SEALING ORDER?

24              MR. JOHNSON:  AGAIN, THIS IS AN APPLE DOCUMENT.

25              MR. SELWYN:  YOUR HONOR, IT'S 1730.
```

```
 1                    THE COURT:  1730, AND IT WAS SEALED IN ITS ENTIRETY?

 2                    MR. SELWYN:  YES, YOUR HONOR.

 3                    THE COURT:  OKAY.  THANK YOU.

 4               (PAUSE IN PROCEEDINGS.)

 5                    THE COURT:  ALL RIGHT.

 6               GO AHEAD, PLEASE.  IT'S 3:07.

 7                    MR. LEE:  THANK YOU, YOUR HONOR.

 8                            CROSS-EXAMINATION

 9      BY MR. LEE:

10      Q.   GOOD AFTERNOON, DR. SCHONFELD.

11      A.   GOOD AFTERNOON.

12      Q.   I WANT TO ASK YOU A QUESTION ABOUT THE EXHIBIT YOU JUST

13      ENDED ON, EXHIBIT 499.

14           DO YOU REMEMBER THAT?

15      A.   YEAH, I DO REMEMBER IT.

16      Q.   WHAT'S THE DATE OF THE DOCUMENT?

17      A.   THE ATTACHED DOCUMENT IS DATED APRIL 2, 2012.

18      Q.   OKAY.  SO AFTER THE ACQUISITION OF THESE PATENTS; CORRECT?

19      A.   I DON'T REMEMBER.

20      Q.   WELL, MR. FREEMAN JUST TESTIFIED THAT THE DATE OF

21      ACQUISITION WAS IN 2011.  YOU WERE IN THE COURTROOM; CORRECT?

22      A.   I'M SORRY.  CAN YOU REPEAT THAT, PLEASE?

23      Q.   MR. FREEMAN TESTIFIED AND SAID THAT THE PATENTS WERE

24      ACQUIRED IN 2011.

25           DO YOU REMEMBER THAT?
```

1    A.   THAT'S CORRECT, YEAH.

2    Q.   OKAY.  SO THIS IS DATED AFTER THE ACQUISITION OF THE

3    PATENTS BY SAMSUNG; CORRECT?

4    A.   THIS PARTICULAR VERSION OF THIS DOCUMENT IS DATED AFTER.

5    Q.   THERE'S NO MENTION OF THE '239 PATENT IN THAT DOCUMENT, IS

6    THERE, SIR?

7    A.   IT DOES NOT MENTION THE '239 IN THIS DOCUMENT.  BUT I'VE

8    SEEN OTHER APPLE PATENTS THAT SPECIFICALLY --

9    Q.   DOCTOR, MY QUESTION IS --

10            MR. JOHNSON:  YOUR HONOR, COULD WE LET THE WITNESS

11   FINISH HIS ANSWER.

12            MR. LEE:  YOUR HONOR, HE'S --

13            THE COURT:  NO.  OVERRULED.  JUST -- LET'S DO IT.

14       GO AHEAD.

15   BY MR. LEE:

16   Q.   CAN YOU ANSWER THIS QUESTION:  DOES THE DOCUMENT REFER TO

17   THE '239 PATENT, SIR?  YES OR NO?

18   A.   THE DOCUMENT DOES NOT REFER TO THE '239 PATENT.

19   Q.   DOES IT REFER TO THE FREEMANS; YES OR NO?

20   A.   IT ONLY REFERS TO THE GALAXY S III, NOT TO THE FREEMANS.

21   Q.   OKAY.  IT SAYS NOTHING ABOUT THE '239 PATENT WHATSOEVER,

22   DOES IT, SIR?

23   A.   WELL, IT TALKS ABOUT FACETIME OVER CELLULAR, SO IT TALKS

24   ABOUT THE SAME AREA.  BUT IT DOES NOT MENTION THE '239 PATENT.

25   Q.   OKAY.

1      A.   IN THIS DOCUMENT, IT DOESN'T.

2      Q.   DOCTOR, CAN YOU TRY TO FOCUS ON MY QUESTION?  I WAS TRYING

3      TO FOCUS ON THIS DOCUMENT.  THAT'S THE ONE YOU GAVE THE JURY;

4      RIGHT?

5      A.   YEAH, THAT'S THE ONE I TALKED TO THEM ABOUT IN FRONT OF

6      THE JURY.

7      Q.   DR. SCHONFELD, YOU'VE BEEN IN THE FIELD SINCE THE 1980S,

8      HAVE YOU NOT?

9      A.   THAT'S CORRECT, YES.

10     Q.   NOW, IN YOUR EXPERT REPORT -- YOU FILED AN EXPERT REPORT

11     PURSUANT TO HER HONOR'S ORDERS; CORRECT?

12     A.   I DID, YES.

13     Q.   AND IN YOUR EXPERT REPORT, YOU DESCRIBED THIS PATENT AS

14     REVOLUTIONARY AND GROUNDBREAKING; CORRECT?

15     A.   I DON'T REMEMBER HOW I DESCRIBED IT.  BUT I THINK THAT'S

16     ACCURATE TO BE THE FIRST TO PUT A VIDEO OVER CELLULAR IS AN

17     IMPRESSIVE ACCOMPLISHMENT.

18     Q.   SIR, YOUR VIEW IT IT'S REVOLUTIONARY AND GROUNDBREAKING;

19     CORRECT?

20     A.   I DON'T REMEMBER.

21     Q.   WELL, LET ME SHOW YOU WHAT YOU SAID.  TURN, IN VOLUME 2 OF

22     THE BOOKS WE GAVE YOU, TO TAB 2.  TURN, IF YOU WOULD, TO

23     PARAGRAPH 90 -- 201 ON PAGE 96 OF YOUR REPORT.

24     A.   2 --

25     Q.   201.  PAGE 96, PARAGRAPH 201.

1        DO YOU HAVE IT BEFORE YOU?  "IN FACT, AS EXPLAINED BELOW,

2    THE '239 INVENTION WAS SO REVOLUTIONARY," AND THEN YOU GO ON.

3        CORRECT?

4    A.   YEAH.  IT TALKS ABOUT THE FACT THAT IT WAS REVOLUTIONARY

5    IN THE SENSE THAT PEOPLE WERE SKEPTICAL, THEY DIDN'T BELIEVE

6    THAT THE PATENT WOULD BE POSSIBLE AT THE TIME, AND THAT'S

7    UNDERSTANDABLE BECAUSE --

8    Q.   DR. SCHONFELD, DID YOU USE THAT WORD?

9    A.   WHAT I WAS DESCRIBING IS DESCRIBING OTHER PEOPLE'S

10   IMPRESSIONS.  BUT I THINK IT'S ACCURATE.

11   Q.   OKAY.

12   A.   IT IS A REVOLUTIONARY IDEA TO PUT VIDEO OVER FACETIME --

13   SORRY -- OVER CELLULAR, EVEN THOUGH THAT'S NOT WHAT IS

14   DESCRIBED IN THIS PARTICULAR PORTION OF MY REPORT.

15   Q.   SO DR. SCHONFELD, SINCE THIS PATENT WAS REVOLUTIONARY, IN

16   YOUR 20 YEARS IN THE FIELD, HAD YOU HEARD OF THE '239 PATENT

17   BEFORE A LAWYER HANDED IT TO YOU AS PART OF THIS CASE?

18   A.   SO I DON'T USUALLY LOOK AT PATENTS --

19   Q.   DR. SCHONFELD, MY QUESTION IS, IN YOUR 20 YEARS, HAD YOU

20   SEEN OR HEARD OF THIS PATENT BEFORE SOMEONE HANDED IT TO YOU?

21   A.   I -- IN MY WORK, I DID NOT.

22        BUT OTHER PEOPLE DID, INCLUDING APPLE.

23   Q.   DR. SCHONFELD, I'M ASKING YOU ABOUT YOU.

24   A.   I DID NOT.

25   Q.   ALL RIGHT.  HAD YOU HEARD OF ANY OF THE NAMED INVENTORS

 1    DURING YOUR 20 YEARS IN THE FIELD?

 2    A.   I DID NOT.  BUT IT IS NOT COMMON FOR ME TO KNOW PATENTS

 3    UNLESS I WORK WITH THEM DIRECTLY OR IT'S MY OWN PATENT.

 4    Q.   DR. SCHONFELD, HAD YOU HEARD OF THE FIRSTLOOK PRODUCT

 5    BEFORE THE LAWYERS TOLD YOU ABOUT IT?

 6    A.   AND THE SAME ANSWER I JUST GAVE.  I DON'T NORMALLY FOLLOW

 7    WHAT'S GOING ON IN THE CONSUMER MARKET OTHER THAN TECHNICAL

 8    WORK AND TECHNOLOGY IN TERMS OF APPLICATIONS.  SO I DID NOT.

 9    Q.   OKAY.  AND YOU HAD NOT EVER SEEN THE FIRSTLOOK PRODUCT,

10    EITHER A PICTURE OF IT OR A BROCHURE OR ANYTHING ABOUT THIS

11    REVOLUTIONARY PRODUCT, UNTIL IT WAS GIVEN TO YOU BY THE

12    LAWYERS; CORRECT?

13    A.   WELL, THAT'S CORRECT, EXCEPT FOR THE FACT THAT I SAW THE

14    IMPACT IT HAD THE FIELD IN TERMS OF TECHNOLOGY CHANGES THAT I

15    PARTICIPATED IN.  BUT I DID NOT SEE THAT PRODUCT.

16    Q.   DR. SCHONFELD, MY QUESTION WAS, DID YOU SEE THE PRODUCT?

17    A.   I DID NOT SEE THE PRODUCT.

18    Q.   OKAY.  NOW, DR. SCHONFELD, LET'S -- YOU TALKED A LOT ABOUT

19    FACETIME AND THE IPHONE PRODUCTS.

20         WE DIDN'T LOOK VERY MUCH AT WHAT THE PATENT SAID, SO I'D

21    LIKE YOU TO HELP TAKE THE JURY THROUGH ACTUALLY WHAT THE PATENT

22    SAYS.  OKAY?

23         SO LET'S BRING UP JX 25, IF WE CAN.

24         AND IT'S AT VOLUME 3, TAB 10 IF THAT'S EASIER FOR YOU.

25         ALL SET?

1    A.   I JUST NEED TO PUT MY GLASSES ON.

2    Q.   ALL RIGHT.  GO AHEAD.  LET ME KNOW WHEN YOU'RE READY TO

3    GO.

4    A.   GO AHEAD, PLEASE.

5    Q.   ALL RIGHT.  NOW, IF WE START WITH THE TITLE, THE PATENT'S

6    ENTITLED A "REMOTE VIDEO TRANSMISSION SYSTEM."  CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   NOW, YOU AGREE, DO YOU NOT, THAT IT IS IMPORTANT TO

9    UNDERSTAND THE TECHNOLOGY AVAILABLE IN 1993 AND HOW IT IS

10   DIFFERENT FROM THE TECHNOLOGY TODAY; CORRECT?

11   A.   I THINK IT IS IMPORTANT TO KNOW WHAT THE TECHNOLOGY WAS

12   BACK THEN, YES.

13   Q.   AND HOW DIFFERENT IT IS FROM THE TECHNOLOGY TODAY;

14   CORRECT?

15   A.   I'M NOT SURE I UNDERSTAND WHAT YOU MEAN BY THAT.

16   Q.   LET'S BRING UP YOUR REBUTTAL EXPERT REPORT, PARAGRAPH 196,

17   PAGE 93, AND LET'S SEE WHAT YOU SAID IN THE REPORT THAT YOU DID

18   FOR THE COURT.  OKAY?

19   A.   OKAY.

20        MR. JOHNSON:  YOUR HONOR, IF HE'S GOING TO ASK ABOUT

21   VALIDITY REPORTS, I JUST WANT TO POINT OUT --

22        MR. LEE:  I'M NOT GOING TO ASK ABOUT THE VALIDITY.

23        MR. JOHNSON:  -- I DIDN'T ASK ABOUT VALIDITY.

24        MR. LEE:  I'M NOT GOING TO ASK ABOUT VALIDITY.  I'M

25   ONLY ASKING HIM ABOUT STATEMENTS HE MADE THAT ARE RELEVANT TO

```
 1          THE INFRINGEMENT QUESTION, YOUR HONOR.

 2               THE COURT:  LET'S SEE WHAT THE QUESTION IS.

 3               MR. LEE:  RIGHT.

 4     Q.  DO YOU SEE WHERE IT YOU SAY "IT IS IMPORTANT TO UNDERSTAND

 5     THE TECHNOLOGY AVAILABLE IN 1993 AND HOW DIFFERENT IT IS FROM

 6     THE TECHNOLOGY TODAY"?

 7     A.  I DID SAY THAT, YES.

 8     Q.  NOW, LET'S GO BACK TO THE PATENT AND LET'S GO TO COLUMN 4,

 9     LINE 31 TO 33.  YOU AGREE THAT WHAT THE PATENT SAYS IN WORDS IS

10     IMPORTANT; CORRECT?

11     A.  THAT'S CORRECT.

12     Q.  AND LET'S LOOK AT WHAT IT SAYS ABOUT THIS QUESTION OF

13     ANALOG SIGNALS THAT YOU TALKED ABOUT.

14          THE PATENT ACTUALLY SAYS, "THE VIDEO SIGNAL RECEIVED BY

15     THE REMOTE UNIT CAN BE OF ANY GENERALLY KNOWN FORMAT, SUCH AS

16     NTSC, PAL, OR Y/C VIDEO OR S VIDEO."

17          CORRECT.

18     A.  IT DOES SAY THAT.

19     Q.  YOU KNOW THAT TO BE ALL ANALOG TELEVISION SIGNALS;

20     CORRECT?

21     A.  THAT'S NOT CORRECT.

22     Q.  ARE THEY ALL ANALOG SIGNALS?

23     A.  NO.  AT THE TIME IT TALKS ABOUT GENERALLY KNOWN FORMATS,

24     AND THERE WERE MANY GENERALLY KNOWN FORMATS OF DIGITAL VIDEO

25     SINCE THE TIME OF THE '70S.  THE OTHER ONES, NTSC, PAL, AND THE
```

CROSS SCHONFELD

```
 1        REST OF THEM ARE ANALOG.

 2             BUT GENERALLY KNOWN FORMATS INCLUDE MANY DIGITAL FORMATS.

 3        Q.   LET'S SEE WHAT YOU SAID IN YOUR REPORT.

 4             CAN I HAVE PAGE 35 OF HIS INFRINGEMENT REPORT AT NOTE 8.

 5             "ANALOG TELEVISION STANDARDS SUCH AS NTSC, PAL, AND SECAM

 6        RELY ON INTERLACED VIDEO DISPLAY."

 7             DO YOU SEE THAT?

 8        A.   THAT'S CORRECT.

 9        Q.   THAT'S ACCURATE, IS IT NOT?

10        A.   THAT'S CORRECT.

11        Q.   ALL RIGHT.  NOW, LET'S GO BACK TO THE PATENT AND LOOK A

12        LITTLE BIT MORE AT WHAT THE PATENT SAYS.

13             CAN I GO TO COLUMN 2, LINES 59 TO 61?

14             YOU'VE READ THE PATENT CAREFULLY, HAVE YOU NOT?

15        A.   I HAVE.

16        Q.   IT SPECIFICALLY REFERS TO A VIDEO CAMERA AT A REMOTE

17        LOCATION, DOES IT NOT?

18        A.   WHAT COLUMN ARE YOU ON?

19        Q.   COLUMN 2, LINE 59 TO 61.

20        A.   THAT'S CORRECT.

21        Q.   ALL RIGHT.  IT ALSO REFERS TO A VIDEO CASSETTE RECORDER;

22        CORRECT?  DO YOU SEE THE REFERENCE TO A VIDEO CASSETTE

23        RECORDER?  IT'S RIGHT AFTER VIDEO CAMERA?

24        A.   YOU'RE ON COLUMN 2, YOU SAID?

25        Q.   COLUMN 4 -- LET'S GO TO COLUMN 4, LINES 28 TO 32.
```

```
 1              DO YOU SEE THAT?

 2    A.   I DON'T KNOW IF YOU'RE LOOKING AT ONE SITE OR TWO SITES.

 3    I HAVE LOST THEM.

 4    Q.   ALL RIGHT.  LET'S RESTART.  COLUMN 4, LINE 28 TO 32.

 5              OKAY.  DO YOU SEE THE REFERENCE TO A VIDEO CAMERA?

 6    A.   THAT'S CORRECT, YES.

 7    Q.   VIDEO CASSETTE RECORDER PLAYER?

 8    A.   THAT'S CORRECT.

 9    Q.   LASER DISC PLAYER?

10    A.   I DO SEE THAT.

11    Q.   NOW, THERE'S NO MENTION OF SMARTPHONES IN THE '239 PATENT;

12    CORRECT?

13    A.   NO, IT DOES NOT MENTION SMARTPHONES.  BUT --

14    Q.   DR. SCHONFELD, THERE'S NO MENTION OF SMARTPHONES; CORRECT?

15    A.   THAT'S CORRECT.

16    Q.   THERE'S NO MENTION OF TABLET COMPUTERS; CORRECT?

17    A.   I'M SORRY?

18    Q.   THERE'S NO MENTION OF TABLET COMPUTERS; CORRECT?

19    A.   THOSE TERMS CAME MUCH LATER.  THESE ARE PRECURSORS TO THE

20    TECHNOLOGIES THAT EVENTUALLY BECAME SMARTPHONES.  THERE WERE

21    SMARTPHONES --

22    Q.   DR. SCHONFELD, DOES IT MENTION TABLET COMPUTERS?

23    A.   IT -- THE WORD WAS NOT EVEN COINED YET.

24    Q.   ALL RIGHT.  HOW ABOUT E-MAIL?

25    A.   I'M SORRY?
```

1      Q.   DID IT MENTION E-MAIL?

2      A.   I DON'T REMEMBER IF IT MENTIONS E-MAIL PER SE.

3      Q.   DOES IT MENTION TEXT MESSAGES?

4      A.   I DON'T RECALL IF IT MENTIONS TEXT MESSAGES.

5      Q.   DOES IT MENTION TWO-WAY VIDEO CONFERENCING?

6      A.   IT DEFINITELY INCLUDES IT BECAUSE IT ALLOWS FOR REAL TIME

7      VIDEO STREAMING IS ONE OF THE APPLICATIONS, AND THE

8      SPECIFICATION, THERE ARE TWO APPLICATIONS, ONE WHERE YOU SEND

9      THE WHOLE VIDEO TOGETHER AS AN ATTACHMENT, COULD BE JUST LIKE

10     MAIL.

11          THE OTHER ONE IS WHERE YOU SEND IT IN SMALL CHUNKS, JUST

12     LIKE WE SAW EARLIER, WHICH IS USED IN VIDEO CONFERENCING.

13          BUT THE PATENT ONLY DESCRIBES ONE WAY.

14     Q.   DR. SCHONFELD, DOES IT MENTION TWO-WAY VIDEO CONFERENCING;

15     YES OR NO?

16     A.   IT DOES NOT MENTION BY NAME.

17     Q.   NOW, COULD I HAVE PX 251?

18          I WANT TO ASK YOU ABOUT MR. JOHNSON'S QUESTIONS ABOUT VHS

19     AND BETA MAX.

20          YOU'VE SEEN THIS BEFORE; CORRECT?

21     A.   I HAVE.

22     Q.   TURN, IF YOU WOULD, TO PAGE 2, IF WE COULD, AND LET'S GO

23     TO THE PORTION THAT SAYS "THE FIRSTLOOK REMOTE UNIT ACCEPTS ANY

24     VIDEO SIGNAL," AND THEN IT SAYS VHS, BETA, 8 MILLIMETER.

25          CORRECT?

1    A.   YES.

2    Q.   THAT'S WHAT THE BROCHURE SAYS.  HAVE YOU SEEN THE BROCHURE

3    FOR ANY OTHER PRODUCTS?

4    A.   IN GENERAL?

5    Q.   NO, FOR FIRSTLOOK PRODUCTS, OR IS THIS THE ONLY ONE YOU'VE

6    SEEN?

7    A.   I DON'T REMEMBER.  I MAY HAVE SEEN ONLY THIS ONE.

8    Q.   OKAY.  YOU CAN'T RECALL ANY OTHER BROCHURES FOR A

9    FIRSTLOOK PRODUCT COVERED BY THE CLAIMS OTHER THAN THIS ONE;

10   CORRECT?

11   A.   I SAW MAYBE A NEWSPAPER ARTICLE ABOUT THEM, BUT NOT A

12   BROCHURE BY THE COMPANY.

13   Q.   ALL RIGHT.  SO NOW LET'S LOOK AT THE FIGURES OF THE

14   PATENT.  THE FIGURES OF THE PATENT ARE IMPORTANT AS WELL, ARE

15   THEY NOT?

16   A.   THE FIGURES ARE USEFUL, YES.

17   Q.   SO LET'S LOOK AT FIGURE 1, WHICH MR. JOHNSON DIDN'T

18   DISCUSS, AND I'D LIKE TO TALK ABOUT IT A LITTLE BIT HERE.

19        THE PATENT TELLS US THAT THIS IS A BLOCK DIAGRAM OF ONE

20   EMBODIMENT OF THE INVENTION; CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   NOW, LET'S MAKE SURE THAT WE UNDERSTAND WHAT THE PARTS

23   ARE.

24        NUMBER 1 IS A VIDEO CAMERA; CORRECT?

25   A.   THAT'S CORRECT.

1    Q.   NUMBER 2 IS THE REMOTE UNIT; CORRECT?  THAT'S WHAT THE

2    PATENT TELLS US?

3    A.   YES, NUMBER 2 IS THE REMOTE UNIT.

4    Q.   NOW, CLAIM 15 IS DESCRIBING THE REMOTE UNIT, IS IT NOT?

5    A.   CLAIM 15 IS DESCRIBING APPARATUS IN GENERAL.

6    Q.   RIGHT.

7    A.   IT DOES NOT USE THE WORD "REMOTE UNIT."

8    Q.   BUT THE REMOTE UNIT IS AN EXAMPLE OF CLAIM 15, IS IT NOT?

9    A.   WELL, THE APPARATUS COULD BE A GENERAL APPARATUS.  WHETHER

10   IT'S A REMOTE UNIT TO COMBINE WITH THE CAMERA AS IT WAS IN THE

11   FIELD, OR WHETHER THE CAMERA WAS NOT INCLUDED, IT MAKES NO

12   DIFFERENCE.  YOU MEET CLAIM 15 AS LONG AS YOU MEET THE

13   LIMITATIONS.

14   Q.   DR. SCHONFELD, MY QUESTION WAS DIFFERENT.  IN THE PATENT,

15   IN THE WORDS THAT THE INVENTORS PUT DOWN ON PAPER AND GAVE TO

16   THE PATENT OFFICE -- YOU UNDERSTAND THAT'S WHAT THEY DID;

17   CORRECT?

18   A.   I DO.

19   Q.   THEY DESCRIBED THE REMOTE UNIT AS DIFFERENT FROM THE VIDEO

20   CAMERA, DIDN'T THEY?  IN THE WORDS THEY PUT DOWN ON THE

21   APPLICATION; CORRECT?

22   A.   IF YOU LOOK IN THE SECTION WE JUST SAW ON THE

23   SPECIFICATION, IT DESCRIBES HOW THE VIDEO CAMERA IS CONNECTED

24   TO THE REMOTE UNIT.

25        IN CLAIM 15, IT DOES NOT SPECIFY WHETHER THE CAMERA SHOULD

1    BE EXCLUDED OR INCLUDED IN THE APPARATUS CLAIMED IN CLAIM 15.

2    Q.   DR. SCHONFELD, MY QUESTION, I HOPE, IS SIMPLER:  IN THE

3    PATENT, IN THE WORDS THE PATENT THE INVENTORS USED, THEY

4    DESCRIBED THE REMOTE UNIT AS SOMETHING SEPARATE FROM THE VIDEO

5    CAMERA.  CORRECT OR NOT CORRECT?

6    A.   IT'S NOT COMPLETELY PRECISELY CORRECT BECAUSE IT DESCRIBES

7    CONNECTION, INTEGRATION OF THE VIDEO CAMERA FOR LIVE VIDEO

8    STREAMING TO THE REMOTE UNIT.

9    Q.   WELL, LET'S SEE WHAT THE PATENT ACTUALLY SAYS.  ACTUALLY,

10   LET'S SEE WHAT YOU SAID IN YOUR -- LET'S DO BOTH.  LET'S LOOK

11   AT COLUMN 4, LINES 6 TO 9.

12   A.   WHAT IS IT AGAIN FOR THE PATENT?

13   Q.   SURE.  COLUMN 4, LINES 6 TO 9.

14        DO YOU HAVE IT BEFORE YOU?

15   A.   WHAT IS THE TAB FOR THE PATENT?

16   Q.   THE PATENT IS VOLUME 3, TAB 10.

17   A.   10.

18   Q.   OKAY?  ARE YOU THERE?

19   A.   I AM.

20   Q.   ALL RIGHT.  ARE YOU THERE?

21   A.   I AM, YES.

22   Q.   OKAY.  AND WHAT IT SAYS IS, "THE DRAWINGS REPRESENT THE

23   PRESENT INVENTION WHEREIN FIGURE 1 DEPICTS THE REMOTE UNIT 2,

24   WHEREIN THE INPUT SIGNAL IS CAPTURED, COMPRESSED, DIGITIZED AND

25   TRANSMITTED TO THE HOST UNIT 3."

```
1              CORRECT?

2    A.   IT DOES SAY THAT, YES.

3    Q.   AND IF WE GO BACK TO FIGURE 2 -- IN FIGURE 1, ITEM NUMBER

4    2 IS THE REMOTE UNIT, NOT THE VIDEO CAMERA; CORRECT?

5    A.   WELL, EXCEPT FOR THE SECTION YOU JUST READ EARLIER

6    DESCRIBES HOW THE VIDEO CAMERA IS ATTACHED TO THE REMOTE UNIT

7    2.

8    Q.   DR. SCHONFELD, PLEASE, COULD YOU ANSWER MY QUESTION, WHICH

9    WAS, IN THE FIGURE, THE REMOTE UNIT IS 2, NOT 1; CORRECT?

10   A.   THE REMOTE UNIT IS 2, NOT 1, THAT'S CORRECT.

11   Q.   OKAY.  NOW, LET'S SEE WHAT THE PATENT SAYS ABOUT THIS

12   VIDEO CAPTURE MODULE THAT YOU TALKED ABOUT.

13        THAT'S LANGUAGE THAT'S IN CLAIM 15; CORRECT?

14   A.   THE VIDEO CAPTURE MODULE IS LANGUAGE IN CLAIM 15 IN THE

15   FIRST LIMITATION.

16   Q.   NOW, YOU WOULD AGREE THAT THE VIDEO CAPTURE MODULE IS A

17   COMPONENT OF A VIDEO CARD; CORRECT?

18   A.   VIDEO CAPTURE MODULE?

19   Q.   CORRECT.

20   A.   IT DOES NOT HAVE TO BE, NO.

21   Q.   WELL, LET'S SEE WHAT YOU SAID IN YOUR REPORT.

22        COULD I HAVE PARAGRAPH 1726 OF YOUR REPORT AT PAGE 1020?

23        DO YOU SEE THAT?  AND DO YOU SEE THE SENTENCE THAT BEGINS,

24   "IN FACT"?

25        "IN FACT, THE VIDEO CAPTURE MODULE IS A COMPONENT OF THE
```

```
 1        VIDEO CARD."

 2             THAT'S WHAT YOU WROTE IN YOUR REPORT; CORRECT?

 3        A.   SO THERE'S A DISTINCTION.  I UNDERSTOOD YOUR QUESTION TO

 4        BE ABOUT THE CLAIM, AND I THINK NOW YOU'RE REFERRING TO A

 5        PORTION OF MY EXPERT REPORT ABOUT THE SPECIFICATION.

 6             IN THE SPECIFICATION, THERE IS A SEPARATE VIDEO CARD AND A

 7        SEPARATE VIDEO CAPTURE MODULE, TWO DISTINCT ENTITIES.

 8             IN THE CLAIM, THERE IS NO MENTION OF THE VIDEO CARD.  IT

 9        IS ONLY ABOUT --

10        Q.   DR. SCHONFELD MY QUESTION WAS, IS THAT WHAT YOU WROTE?

11        A.   YEAH, BUT IT HAS TO BE UNDERSTOOD.

12        Q.   OKAY.  NOW, YOU ALSO WROTE THAT WHEN ANALOG SIGNALS ARE

13        PROVIDED, THE DIGITAL VIDEOS'S OBTAINED USING A VIDEO CAPTURE

14        CARD, DID YOU NOT?

15        A.   IN WHAT CONTEXT?

16        Q.   IN YOUR REPORT AGAIN, PARAGRAPH 241 AT PAGE 68.

17        A.   SO --

18        Q.   NOW -- OKAY?  JUST IN THE INTERESTS OF MOVING ALONG,

19        MR. JOHNSON IS GOING TO HAVE A CHANCE TO ASK YOU ADDITIONAL

20        QUESTIONS.

21             YOU WROTE, QUOTE, "WHEN ANALOG VIDEO SIGNALS ARE PROVIDED,

22        DIGITAL VIDEO IS OBTAINED USING A VIDEO CAPTURE CARD THAT

23        SAMPLES AND QUANTIZES THE ANALOG SIGNAL AND CONVERTS IT INTO A

24        DIGITAL VIDEO SIGNAL.  THE VIDEO CAPTURE CARD WILL THEN ENCODE

25        THE DIGITAL VIDEO SIGNAL INTO A DIGITAL VIDEO FORMAT."
```

1          THAT'S WHAT YOU WROTE; CORRECT?

2     A.   WE'RE NOT TALKING ABOUT THE VIDEO CAPTURE MODULE NOW.

3     WE'RE TALKING ABOUT THE VIDEO CAPTURE CARD.

4     Q.   DR. SCHONFELD, IS THAT WHAT YOU WROTE?

5     A.   YEAH, BUT --

6     Q.   DR. SCHONFELD, IS THAT WHAT YOU WROTE?

7     A.   IT IS WRITTEN, THAT'S CORRECT.

8     Q.   LET'S LOOK AT WHAT THE INVENTORS SAID A LITTLE BIT

9     FURTHER, COLUMN 4, LINE 40 TO 42.

10         THE PATENT SAYS, "THE VIDEO" INPUT "SIGNAL INPUT INTO THE

11    REMOTE UNIT IS RECEIVED BY A VIDEO CARD HAVING A CAPTURE MODULE

12    THEREIN.  SUCH A CARD IS AVAILABLE COMMERCIALLY FROM

13    INTEL/IBM."

14         DO YOU SEE THAT?

15    A.   I DO.

16    Q.   AND IN FACT, THE INVENTORS TOLD -- WITHDRAWN.

17         AND, IN FACT, THE PATENT SPECIFICALLY DESCRIBES THE TYPE

18    OF VIDEO CARDS THAT YOU COULD GET FROM IBM AND INTEL; CORRECT?

19    A.   IT DOESN'T DESCRIBE IN THE PATENT THE SPECIFIC CARD, NO.

20    Q.   OKAY.  LET'S SEE WHAT IT DOES SAY.  COLUMN 4, LINE 40 TO

21    42.  "THE VIDEO SIGNAL INPUT INTO THE REMOTE UNIT IS RECEIVED

22    BY A VIDEO CARD HAVING A CAPTURE MODULE THEREIN.  SUCH A CARD

23    IS AVAILABLE COMMERCIALLY FROM INTEL/IBM."

24         CORRECT?

25    A.   THAT'S CORRECT.

1    Q.   AND, IN FACT, AN EXAMPLE OF THE TYPE OF CARD THAT YOU

2    COULD HAVE BOUGHT AT THE TIME IS AN ACTION MEDIA 2; CORRECT?

3    A.   THAT'S NOT DESCRIBED IN THE PATENT.

4    Q.   NO, NO.  I'M JUST ASKING WHETHER THAT'S AN EXAMPLE.

5    A.   IT'S ONE OF MANY CARDS THAT YOU COULD BUY AT THE TIME.

6    Q.   RIGHT.  NOW, LET ME ASK YOU THIS:  YOU GAVE THE OPINION TO

7    THE JURY THAT APPLE'S PRODUCTS HAVE A VIDEO CAPTURE MODULE;

8    CORRECT?

9    A.   I DID, YES.

10   Q.   DID YOU REVIEW THE BILLS OF MATERIALS FOR THE APPLE

11   PRODUCTS YOU'VE ACCUSED OF INFRINGING?

12   A.   I DID, YES.

13   Q.   OKAY.  AND TURN, IF YOU WOULD, IN VOLUME 3, TO TAB 21.

14        DO YOU HAVE THAT BEFORE YOU?

15   A.   I DO.

16   Q.   DO YOU RECOGNIZE THESE ARE THE BILLS OF MATERIALS?

17        NOW, THESE ARE SEALED, SO I'M NOT GOING TO PUT THEM ON THE

18   SCREEN, BUT THEY ARE EXHIBIT 354A, YOUR HONOR.

19        CORRECT?

20        354A, YOUR HONOR.

21             THE COURT:  OKAY.

22             MR. LEE:  WE OFFER PX 354A.

23             THE COURT:  THIS SAYS DX, THOUGH.

24             MR. LEE:  DX 354A.  MY APOLOGIES.

25             THE COURT:  DX 354A.  ANY -- ACTUALLY, I'VE ALREADY

1    ADMITTED DX 354A.

2              MR. JOHNSON:  YES, YOUR HONOR.  I MOVED IT IN.

3              MR. LEE:  OKAY.  I'M SORRY.

4    Q.   YOU SEE 354A ON THE SCREEN NOW?

5    A.   I DO.

6    Q.   THESE ARE THE BILLS OF MATERIALS; CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   DID YOU LOOK THROUGH THE BILLS OF MATERIALS TO SEE IF

9    THERE IS A VIDEO CAPTURE MODULE IDENTIFIED ON THE BILLS OF

10   MATERIALS FOR THE PARTS FOR THE PHONES YOU ACCUSE OF

11   INFRINGEMENT?

12   A.   SO WHEN I REVIEWED THE BILLS OF MATERIALS, I DID NOT LOOK

13   TO MATCH THE CLAIM LANGUAGE.

14        I LOOKED FOR DEVICES THAT MEET THE FUNCTIONALITY OF THE

15   CLAIM LANGUAGE, AND INDEED, THE H5P, WHICH IS LISTED IN THE

16   BILLS OF MATERIALS, IS THE APPLICATION PROCESSOR, AND I SHOWED

17   YOU DOCUMENTS DESCRIBING THE APPLICATION PROCESSOR AND IT

18   DESCRIBED IT AS A DEVICE THAT IS FOR CAPTURING VIDEO AND IT'S A

19   MODULE OF ITSELF.

20        THERE IS ANOTHER DOCUMENT THAT'S PROVIDED AS AN EXHIBIT,

21   TO THE MILLET, M-I-L-L-E-T, DEPOSITION, THAT SHOWS THE VIDEO

22   CAPTURE FUNCTIONALITY IN THE H5P, WHICH IS ON THE BILLS OF

23   MATERIALS.

24   Q.   DID YOU FIND THE WORDS "VIDEO CAPTURE MODULE," "VIDEO

25   CAPTURE CARD," "VIDEO CAPTURE" ANYWHERE ON THE BILLS OF

```
 1        MATERIALS?

 2        A.   SO I FOUND --

 3        Q.   DR. SCHONFELD, JUST YES OR NO?  DID YOU FIND THEM OR NOT?

 4        A.   THE SPECIFIC WORDS USED IN THE CLAIM ARE NOT USED BY APPLE

 5        TO DESCRIBE THE VARIOUS COMPONENTS.

 6             THE FUNCTIONALITY IS THE SAME, NOT THE WORDS.

 7        Q.   OKAY.  NOW, A COUPLE OTHER SUBJECTS QUICKLY.

 8             YOU GAVE SOME TESTIMONY ABOUT EXHIBIT 499.  BASED UPON THE

 9        WORK YOU'VE DONE IN THIS CASE, YOU HAVE NO EVIDENCE THAT

10        APPLE'S DESIGNERS OF THE IPHONE OR FACETIME EVEN KNEW ABOUT THE

11        '239 PATENT WHEN YOU WERE DOING THEIR WORK; CORRECT?

12        A.   YEAH.  I TRIED TO TALK ABOUT IT EARLIER.  THERE ARE

13        ACTUALLY A SERIES OF REAL TIME VIDEO --

14        Q.   DOCTOR -- DR. SCHONFELD, LET ME SEE IF I CAN -- IN THE

15        INTERESTS OF TIME, DO YOU HAVE A SINGLE DOCUMENT THAT SHOWS

16        THAT WHEN MR. GARCIA OR MR. MILLET SAT DOWN TO DESIGN THE

17        PRODUCT, THEY HAD -- TO DESIGN THE PRODUCT, THEY HAD THE

18        FIRSTLOOK PRODUCT BEFORE THEM?

19        A.   SO I DON'T KNOW THE EXACT DATES, BUT --

20        Q.   DID THE FIRSTLOOK PRODUCT -- DO YOU HAVE ANYTHING THAT

21        SAYS THE FIRSTLOOK PRODUCT WAS BEFORE THEM?

22        A.   THE REFERENCE -- THEY CITED TO THE '239 PATENT IN THEIR

23        OWN INVENTIONS FOR REAL TIME VIDEO STREAMING, AND I DON'T KNOW

24        AT WHAT TIME IT OCCURRED RELATIVE TO THE WORK OF THE PEOPLE

25        WORKING ON FACETIME, WHETHER IT WAS BEFORE OR AFTER.
```

1    Q.   RIGHT.  SO THE ANSWER IS YOU HAVE NO INFORMATION THAT

2    ANYBODY WHO DESIGNED FACETIME OR THE IPHONE HAD BEFORE THEM THE

3    '239 PATENT, THE FIRSTLOOK DEVICE AT ALL; CORRECT?

4    A.   I HAVE INFORMATION ABOUT PATENTS CITING THE FREEMAN, TEN

5    OF THEM, BY APPLE CITING THE '239 PATENT.

6         BUT I WOULD HAVE TO GO BACK AND CHECK THE DATES AND TO

7    COMPARE TO THE TIMES THAT FACETIME STARTED, PEOPLE STARTED

8    WORKING ON FACETIME.  I HAVE NOT DONE THAT.

9    Q.   SO THE ANSWER IS YOU DON'T HAVE ANYTHING; CORRECT?

10   A.   I HAVEN'T DONE THAT ANALYSIS.

11   Q.   OKAY.  FAIR ENOUGH.

12        THE COURT:  IT'S 3:31.  I'M SORRY TO INTERRUPT YOUR

13   EXAMINATION, BUT I'D LIKE TO GO AHEAD AND TAKE OUR TEN MINUTE

14   BREAK NOW.

15        OKAY.  WE'LL JUST TAKE A TEN MINUTE BREAK AND GO UNTIL

16   4:30 TODAY.

17        OKAY.  THANK YOU.  PLEASE DON'T RESEARCH OR DISCUSS THE

18   CASE.

19        (JURY OUT AT 3:32 P.M.)

20        THE COURT:  ALL RIGHT.  WE'RE GOING TO TAKE OUR

21   BREAK.  THANKS.

22        (RECESS FROM 3:32 P.M. UNTIL 3:43 P.M.)

23        (JURY OUT AT 3:43 P.M.)

24        THE COURT:  I HAVE ONE ISSUE I WANTED TO ADDRESS

25   OUTSIDE THE PRESENCE OF THE JURY, AND THAT IS THIS QUESTION

1    ABOUT WHETHER -- YOU MAY HAVE A SEAT, PLEASE -- WHETHER AN

2    ATTORNEY CAN ASK ONE OF THESE TECHNICAL EXPERTS WHEN CERTAIN

3    ASPECTS OF THE CASE WERE WITHDRAWN.

4        SO I HAVE TWO THOUGHTS ABOUT IT.  ON THE ONE HAND, THE

5    EXPERT GENERALLY ONLY KNOWS BECAUSE THE LAWYERS HAVE GENERALLY

6    TOLD THEM, RIGHT?  SO WHO'S REALLY TESTIFYING HERE?  IS IT THE

7    ATTORNEY OR IS IT THE EXPERT WHO'S JUST REPEATING WHAT THE

8    LAWYER TOLD THEM?

9        SECOND QUESTION IS, WHERE DOES IT STOP?

10       LET'S SAY WE GET INTO THE FACT OF WHEN APPLE WITHDREW ITS

11   VALIDITY CHALLENGE TO THESE TWO SAMSUNG PATENTS, AND I THINK

12   IT'S ONLY FAIR THAT APPLE GETS TO EXPLAIN WHY.

13       AND THEN WHAT'S YOUR EXPLANATION?  THEY WANT TO TALK ABOUT

14   THE THREE PATENTS THAT SAMSUNG DROPPED FROM THE CASE BECAUSE

15   YOU DIDN'T FEEL YOUR NON-INFRINGEMENT ARGUMENTS WERE STRONG

16   ENOUGH AND YOU WANTED TO CHALLENGE REALLY THE OTHER THREE.

17       WHEN DOES THAT WHO DROPPED WHAT STOP AND DOES THAT OPEN

18   THE DOOR THEN FOR OTHER THINGS THAT HAVE BEEN DROPPED FROM THE

19   CASE TO NOW BE COMING IN, AND HOW DOES THAT COME IN?

20       THESE WITNESSES, I ASSUME, DON'T HAVE FIRST-HAND

21   KNOWLEDGE, UNLESS THEY'RE GOING TO BE QUOTING FROM LEGAL

22   DOCUMENTS FILED ON ECF.  SO WHERE DOES THAT STOP?

23       NOW, I GUESS YOU COULD SAY, "WELL, APPLE OPENED THE DOOR

24   IN THEIR OPENING BY SAYING WE'RE NOT CHALLENGING VALIDITY," BUT

25   IF YOU RAISE THAT, THEN I'M GOING TO ALLOW THEM TO RESPOND AS

```
 1        TO WHY THEY DID ACTUALLY DROP IT?  AND WHICH WITNESS ARE THEY

 2        GOING TO CALL TO ADDRESS THAT ISSUE?  IT WOULD HAVE TO BE A

 3        LAWYER.

 4             SO THAT'S MY RELUCTANCE.  SO WE DON'T HAVE TO GO INTO THIS

 5        DEEPLY TODAY.  MAYBE I SHOULD JUST GIVE YOU A PAGE TO BRIEF

 6        THIS TONIGHT, AND I CAN -- I THINK I'M GOING TO HAVE TO

 7        PROBABLY RULE ON THIS BY TONIGHT, RIGHT, BECAUSE IT MAY COME UP

 8        TOMORROW IN YOUR DEFENSIVE CASE?  OR NOT?

 9                  MR. LEE:  YOU KNOW, I DON'T KNOW WHETHER IT WILL OR

10        NOT, YOUR HONOR.

11             BUT THERE'S ANOTHER RAMIFICATION TO IT.  THEY DROPPED A

12        WHOLE BUNCH OF PRODUCTS LAST FRIDAY.  IF THE RULE IS YOU CAN GO

13        INTO ANYTHING THAT'S BEEN DROPPED, THERE'S NO TECHNICAL

14        DISTINCTION IN HOW THE PRODUCTS OPERATE FOR PURPOSES OF THEIR

15        INFRINGEMENT CASE FOR SOME OF THE PRODUCTS THEY DROPPED LAST

16        FRIDAY AND WHAT THEY NOW ACCUSE OF INFRINGEMENT.

17             IF WE'RE GOING TO OPEN UP THIS DOOR -- THAT'S WHY I

18        OBJECTED.  IF WE'RE GOING TO OPEN UP THIS DOOR, IT'S A DOOR

19        THAT OUGHT TO BE OPENED TO BOTH OF US.  AND --

20                  THE COURT:  WELL, IT WILL BE OPENED UP ON BOTH SIDES.

21        BUT THEN WHEN DOES IT STOP?  HOW DEEPLY ARE BOTH SIDES GOING TO

22        GET INTO WHO DROPPED WHAT, WHEN, AND WHY?

23                  MR. JOHNSON:  THE REAL DISTINCTION IS WHEN MR. LEE

24        MADE HIS OPENING, HE SAID THAT ONLY SAMSUNG IS GOING TO COME

25        HERE, I'M QUOTING FROM THE TRANSCRIPT, PAGE 341, "ONLY SAMSUNG
```

1        IS GOING TO TELL YOU THAT THE PATENT OFFICE MADE A MISTAKE.

2        ONLY SAMSUNG IS GOING TO TELL YOU THAT THEY MADE A MISTAKE FIVE

3        TIMES.  ONLY SAMSUNG IS GOING TO TELL YOU THAT --"

4                THE COURT:  OKAY, THAT'S FINE.  LET'S SAY I ALLOW YOU

5        TO QUESTION THAT.

6            THEY'RE GOING TO COME UP AND SAY, "WELL, MY INFRINGEMENT

7        CASE ON THESE TWO PATENTS WAS REALLY STRONG, SO I DIDN'T THINK

8        I NEEDED TO, AND SAMSUNG ORIGINALLY ACCUSED US OF THESE THREE

9        OTHER PATENTS AND THEY DROPPED THOSE."

10           DO YOU WANT US TO GET INTO THAT?  DO YOU WANT US TO GET

11       INTO THAT?  BECAUSE I THINK IF IT'S GOING TO COME UP, THEN I

12       THINK THE OTHER SIDE HAS TO BE ABLE TO RESPOND.

13           AND THAT'S THE SAME FOR IF APPLE IS GOING TO BRING UP --

14       NOW, THE PROBLEM WITH THE IPAD PRODUCTS IS IT IS IN THE

15       PRELIMINARY JURY INSTRUCTIONS.  THE PRELIMINARY JURY

16       INSTRUCTIONS SAY CERTAIN IPAD PRODUCTS THAT SAMSUNG ARGUES ARE

17       COVERED BY CLAIM 15 OF THE '239 PATENT.  SO THAT DOES RAISE A

18       QUESTION.

19           I MEAN, THESE JURORS ALREADY HAVE THE PRELIMINARY JURY

20       INSTRUCTIONS.  THAT'S ALREADY BEEN READ TO THEM.  SO THAT

21       CREATES AN ISSUE AS WELL.

22           EITHER WAY, ON THIS QUESTION OF VALIDITY, AT SAMSUNG'S

23       REQUEST, I HAVE MADE A RULING THAT THAT ISSUE ONLY COMES UP

24       WHEN THE MOVING PARTY PRESENTS ITS CASE.

25           SO ANY VALIDITY ISSUE AS TO '239 SHOULDN'T BE COMING UP

```
 1        NOW ANYWAY.  IT SHOULD BE COMING UP IN APPLE'S DEFENSIVE CASE.

 2               MR. LEE:  AND IT WON'T, YOUR HONOR.

 3               THE COURT:  BUT I'M JUST WONDERING, HOW ARE WE GOING

 4     TO DEAL WITH THIS ISSUE?  BECAUSE I THINK MR. JOHNSON HAS A

 5     VALID POINT.

 6          MR. LEE, YOU MADE THIS AN ISSUE IN OPENING, SO I COULD USE

 7     THAT AS A WAY TO DISTINGUISH THIS ISSUE FROM PERHAPS OTHER

 8     WITHDRAWALS AND DROPPING OF CLAIMS.

 9               MR. JOHNSON:  THAT'S THE POINT.

10               THE COURT:  BUT THEN THEY'RE GOING TO RESPOND AND I'M

11     NOT GOING TO CUT IT OFF IF THEY WANT TO GET INTO, "WELL,

12     SAMSUNG DROPPED THREE PATENTS AGAINST US AND WE THOUGHT WE

13     DON'T WANT TO GO ON VALIDITY ANYMORE."

14               MR. JOHNSON:  I GUESS EVEN IF THEY'RE NOT CHALLENGING

15     VALIDITY, WHEN THEY BRING THEIR EXPERT, DR. STORER --

16               THE COURT:  YEAH.

17               MR. JOHNSON:  -- THE QUESTION IS GOING TO BE -- I

18     MEAN, THEY'RE TAKING THE POSITION THAT NOBODY EVER CHALLENGES

19     THAT THE PTO MAKES MISTAKES.

20          SO THE QUESTION IS, YOU KNOW, SHOULD I BE ALLOWED TO ASK

21     THEM, "DIDN'T YOU BELIEVE, WHEN YOU DID A REPORT, THAT THE

22     PATENTS HERE, THAT THE PTO MADE A MISTAKE AND THAT THE PATENTS

23     WERE INVALID?"

24          SO IS IT JUST SORT OF -- AND YOU'RE RIGHT, MAYBE A

25     ONE-PAGE BRIEF TONIGHT, YOUR HONOR, IS THE WAY TO GO SO WE CAN
```

```
 1      ALSO THINK ABOUT IT ON OUR SIDE WITH THE TEAM BECAUSE IT DOES

 2      HAVE A RIPPLING EFFECT THROUGHOUT THE CASE.

 3              THE COURT:  IT DOES.  AND THEN WHERE DO I DRAW THE

 4      LINE?

 5              MR. JOHNSON:  I UNDERSTAND THAT.

 6              THE COURT:  THAT'S MY CONCERN.  I DON'T WANT TO OPEN

 7      UP THE FLOODGATES ON YOU DROPPED THIS AND YOU DROPPED THAT.

 8              MR. JOHNSON:  I THINK WE NEED TO GIVE IT A LITTLE BIT

 9      MORE THOUGHT ON OUR SIDE.

10              THE COURT:  SURE.  AND I NEED TO KNOW, ARE YOU GOING

11      TO BE MAKING THE IPAD DROP A BIG ISSUE?

12              MR. LEE:  NO, WE HAD NOT INTENDED TO.

13              THE COURT:  OKAY.

14              MR. LEE:  BUT, YOU KNOW, IF THEY'RE GOING TO -- IF

15      THE DOOR OPENS, IT'LL OPEN UP THAT ISSUE AS WELL.

16              THE COURT:  ALL RIGHT.  SO THEN WHY DON'T WE DO THIS?

17      I DON'T WANT TO KEEP THE JURY WAITING ANY LONGER.  COULD YOU

18      ALL BRIEF THIS -- IS IT GOING TO COME UP TODAY IN THE NEXT 45

19      MINUTES?

20              MR. JOHNSON:  NO.

21              MR. LEE:  I DON'T THINK SO.

22              THE COURT:  OKAY.  SO AT 4:30, LET'S TALK ABOUT A

23      BRIEFING SCHEDULE, AND I WILL -- I THINK I NEED TO GET YOU A

24      RULING TONIGHT, RIGHT, BECAUSE THIS MAY COME UP ON TUESDAY?

25              MR. JOHNSON:  I THINK IT MAY.  IT'LL COME UP IN THE
```

```
1      CROSS-EXAMINATION POTENTIALLY OF DR. STORER.

2              THE COURT:  OKAY.  WHICH I ASSUME IS COMING TOMORROW.

3              MR. LEE:  I THINK SO.

4              THE COURT:  ALL RIGHT.  THEN I NEED TO RULE ON IT

5      TONIGHT.  SO WHY DON'T YOU THINK AND AT 4:30 I'LL ASK WHAT KIND

6      OF SCHEDULE WE SHOULD HAVE.

7              MR. LEE:  THANK YOU.

8              THE COURT:  ALL RIGHT.  THANKS.  LET'S BRING OUR JURY

9      IN.

10         (JURY IN AT 3:49 P.M.)

11             THE COURT:  ALL RIGHT.  THE TIME IS 3:50.  PLEASE

12     TAKE A SEAT.

13         GO AHEAD, PLEASE, MR. LEE.

14             MR. LEE:  THANK YOU, YOUR HONOR.

15     Q.   LET ME GO TO A DIFFERENT AND FINAL TOPIC.  OKAY?

16     A.   SURE.

17     Q.   YOU HAD TALKED ABOUT SOME COMPONENTS THAT YOU SAY ARE PART

18     OF THE INFRINGING APPARATUS.

19         DO YOU REMEMBER THAT?

20     A.   I DESCRIBED VARIOUS COMPONENTS IN MY ANALYSIS, YES.

21     Q.   OKAY.  AND ONE OF THOSE COMPONENTS WAS A VIDEO ENCODER;

22     CORRECT?

23     A.   THAT'S CORRECT.  A PORTION OF THE COMPRESSION TAKES PLACE.

24     Q.   ONE OF THEM WAS AN IMAGE SIGNAL PROCESSOR; CORRECT?

25     A.   THAT'S CORRECT.
```

1    Q.   IT'S TRUE, IS IT NOT, THAT SAMSUNG ACTUALLY SUPPLIES THE

2    VIDEO ENCODERS THAT ARE USED IN SOME APPLE ACCUSED PRODUCTS;

3    CORRECT?

4    A.   IT IS ACTUALLY DONE BY A COMPANY CALLED IMAGINATION

5    TECHNOLOGY, WHICH IS A THIRD PARTY COMPANY.  THEY USED TO DO IT

6    LONG TIME AGO IN SOME OF THE OLDER MODELS, BUT NOT IN THE

7    CURRENT ONES.

8    Q.   WELL, LET'S SEE WHAT YOU SAID IN YOUR EXPERT REPORT.

9         CAN I HAVE PARAGRAPH 851, PAGES 505 TO 506.

10        "THE APPLICATION PROCESSOR USES THE AUDIO SUBSYSTEMS TO

11   COMPRESS AND DECOMPRESS AUDIO."

12        DO YOU SEE THAT?

13        AND IF WE GO TO THE NEXT PAGE, "THE COMPRESS VIDEO AND

14   VIDEO DECODER -- IMAGINATION TECHNOLOGIES --" DO YOU SEE THE

15   REFERENCE TO THAT?  DID YOU SEE THAT?

16   A.   YES.

17   Q.   ALL RIGHT.  NOW, LET'S GO TO PAGE 505 AND 506 IF WE COULD,

18   PARAGRAPH 851 AT THE TOP.

19        SO WE HAVE THE SENTENCE AT THE BOTTOM OF -- THERE WE GO.

20   AT THE BOTTOM OF -- PUT TOGETHER.

21        "THE APPLICATION PROCESSOR USING THE VIDEO ENCODER --

22   EITHER IMAGINATION TECHNOLOGIES OR SAMSUNG -- TO COMPRESS THE

23   VIDEO AND VIDEO DECODER -- IMAGINATION TECHNOLOGIES -- TO

24   DECOMPRESS THE VIDEO."

25        DO YOU SEE THAT?

1       A.   WE ARE TALKING ABOUT A WHOLE ARRAY OF PRODUCTS.

2       Q.   DR. SCHONFELD, IS THAT WHAT YOU SAID IN YOUR EXPERT

3       REPORT?

4       A.   YEAH, THAT'S EXACTLY WHAT I SAID A SECOND AGO, YES.

5       Q.   YEAH.  AND YOU SPECIFICALLY MENTION VIDEO ENCODER FROM

6       SAMSUNG; CORRECT?

7       A.   IN THE OLD IPHONE 4.

8       Q.   RIGHT.  AND, NOW, LET ME ASK YOU THIS:  THE PATENT WAS

9       ACQUIRED BY SAMSUNG IN SEPTEMBER 2011.

10           DO YOU HAVE THAT IN MIND?

11      A.   OKAY.

12      Q.   SAMSUNG SUED APPLE ON THE '239 PATENT IN ABOUT APRIL OF

13      2012.

14           DO YOU HAVE THAT IN MIND?

15      A.   OKAY.

16      Q.   IN THE PERIOD BETWEEN SEPTEMBER AND APRIL 2012, DID

17      SAMSUNG TELL APPLE ABOUT THE '239 PATENT?

18      A.   I HAVE NO IDEA.  I DON'T -- I HAVE NO KNOWLEDGE ABOUT

19      THESE KIND OF FACTS.

20      Q.   AND HOW MANY BILLIONS OF DOLLARS OF PRODUCT DID SAMSUNG

21      SELL TO APPLE DURING THAT PERIOD WHEN IT OWNED THE PATENT?  DO

22      YOU KNOW?

23      A.   I HAVE NO IDEA ABOUT THE FINANCES INVOLVED.

24           MR. LEE:  OKAY.

25           NOTHING FURTHER, YOUR HONOR.

```
 1              THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:53.

 2              MR. JOHNSON:  KEN, CAN YOU PUT UP PARAGRAPH 1726,

 3      PLEASE.

 4              THE COURT:  OKAY.  3:54.

 5          GO AHEAD, PLEASE.

 6                      REDIRECT EXAMINATION

 7      BY MR. JOHNSON:

 8      Q.   DR. SCHONFELD, APPLE'S COUNSEL ASKED YOU QUESTIONS ABOUT

 9      THIS PARTICULAR PARAGRAPH, AND REMEMBER HE ASKED YOU ABOUT THE

10      PART ABOUT THE VIDEO CAPTURE MODULE IS A COMPONENT OF THE VIDEO

11      CARD?

12      A.   THAT'S CORRECT, YES.

13      Q.   AND HE KEPT INTERRUPTING YOU.  HE WOULDN'T LET YOU FINISH

14      THE ANSWER.

15      A.   THAT'S CORRECT.

16      Q.   RIGHT.  SO IF YOU LOOK AT THE VERY NEXT SENTENCE, HE

17      DIDN'T SHOW YOU THAT SENTENCE; RIGHT?

18      A.   THAT'S MY RECOLLECTION.

19      Q.   OKAY.  SO WHAT'S THE SIGNIFICANCE OF THE VERY NEXT

20      SENTENCE?

21      A.   THAT --

22      Q.   CLAIM 15 SPECIFICALLY DOES NOT CLAIM A VIDEO CARD?

23      A.   SO THE PATENT DESCRIBES VIDEO CARDS AND VIDEO CAPTURE

24      MODULES, TWO SEPARATE COMPONENTS.

25              THE CLAIM, CLAIM 15, IS ONLY ABOUT THE VIDEO CAPTURE
```

```
1    MODULE, AND THE SPECIFICATION DESCRIBES THAT THAT, THAT THAT

2    COMPONENT IS DONE EXCLUSIVELY ON DIGITAL DATA AND NOT ON ANALOG

3    DATA AS IT RELATES TO CLAIM 15.

4    Q.   AND WHAT'S THE SIGNIFICANCE OF THE NEXT PART OF THE

5    SENTENCE, "CLAIM 15 WAS AMENDED SO THAT IT DID NOT CLAIM A

6    VIDEO CARD"?

7    A.   SO IN PARTICULAR, IT WAS MEANT TO BE MUCH BROADER SO IT

8    COULD BE ON A VIDEO CARD OR WITHOUT A VIDEO CARD.  IT COULD BE

9    WITH DIGITIZATION OR WITHOUT DIGITIZATION, AND THE VIDEO

10   CAPTURE MODULE COULD BE A CHIP OR A SOFTWARE MODULE, AND WE SAW

11   BOTH OF THEM IN MY ANALYSIS EARLIER.

12   Q.   SO DOES CLAIM 15 REQUIRE A VIDEO CARD?

13   A.   IT DOES NOT, NO.

14         MR. JOHNSON:  NO FURTHER QUESTIONS.

15         THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:55.

16   IS THERE ANY RECROSS?

17         MR. LEE:  JUST ONE QUESTION.

18                   RECROSS-EXAMINATION

19   BY MR. LEE:

20   Q.   DR. SCHONFELD, IS THERE A SINGLE EXAMPLE IN THE PATENT OF

21   A VIDEO CAPTURE MODULE THAT IS NOT PART OF A VIDEO CAPTURE

22   CARD?  IS THERE ONE SINGLE EXAMPLE?

23   A.   THE VIDEO CAPTURE MODULE IS DESCRIBED IN CONNECTION WITH

24   THE VIDEO CARD, BUT SOMETIMES THE VIDEO CARD IS WITHOUT THE

25   VIDEO CAPTURE MODULE.
```

```
 1                  MR. LEE:  THANK YOU.

 2                  THE COURT:  ALL RIGHT.  THE TIME IS 3:56.

 3             MY THIS WITNESS BE EXCUSED, AND IS IT NOT SUBJECT TO

 4      RECALL?

 5                  MR. JOHNSON:  THIS WITNESS MAY BE EXCUSED, NOT

 6      SUBJECT TO RECALL.

 7                  THE COURT:  DO YOU AGREE WITH THAT, MR. LEE?

 8                  MR. LEE:  I DO, YOUR HONOR.

 9                  THE COURT:  OKAY.  ALL RIGHT.  YOU ARE EXCUSED.

10                  THE WITNESS:  THANK YOU.

11                  MR. JOHNSON:  YOUR HONOR, SAMSUNG CALLS AS ITS NEXT

12      WITNESS KEN PARULSKI, AND IF WE CAN JUST HAVE A MINUTE TO SET

13      UP?

14                  THE COURT:  YES, PLEASE, I'LL GIVE YOU A MINUTE TO

15      GET SET UP.

16             (PAUSE IN PROCEEDINGS.)

17                  THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE?

18             (DEFENDANTS' WITNESS, KENNETH PARULSKI, WAS SWORN.)

19                  THE WITNESS:  YES, I DO.

20                  THE CLERK:  WOULD YOU PULL THE MICROPHONE TOWARDS YOU

21      AND STATE YOUR NAME, PLEASE, AND SPELL IT FOR THE RECORD.

22                  THE WITNESS:  MY NAME IS KENNETH PARULSKI, SPELLED P,

23      LIKE IN PETER, A-R-U-L-S-K-I.

24                  THE CLERK:  THANK YOU.

25                  THE COURT:  ALL RIGHT THE TIME IS 3:57.  GO AHEAD,
```

1      PLEASE.

2              MR. JOHNSON:  THANK YOU, YOUR HONOR.

3                      **DIRECT EXAMINATION**

4      BY MR. JOHNSON:

5      Q.   MR. PARULSKI, WHAT ARE YOU HERE TO TALK ABOUT TODAY?

6      A.   I'M HERE TO TALK ABOUT SAMSUNG'S '449 VIDEO ALBUMS PATENT.

7      Q.   SO THIS IS THE SECOND SAMSUNG PATENT?

8      A.   YES, IT IS.

9      Q.   OKAY.  GENERALLY SPEAKING, WHAT'S THE SUBJECT OF THE '449

10     PATENT?

11     A.   THE PATENT IS A DIGITAL CAMERA THAT CAPTURES BOTH VIDEOS

12     AND PHOTOS, AND INCLUDES A DISPLAY THAT ALLOWS THE VIDEOS AND

13     PHOTOS TO BE CLASSIFIED INTO ALBUMS OR FOLDERS.

14     Q.   LET'S TALK A LITTLE BIT ABOUT YOU, AND LET ME ASK YOU, CAN

15     YOU DESCRIBE YOUR EDUCATIONAL BACKGROUND?

16     A.   YES.  I RECEIVED MY BACHELOR'S AND MASTER'S DEGREES FROM

17     M.I.T. IN 1980.  MY MASTER'S THESIS RELATED TO DIGITAL IMAGE

18     COMPRESSION.  I WAS WORKING IN MOTOROLA'S CORPORATE RESEARCH

19     LABS DURING THAT TIME.

20     Q.   AND YOUR BACHELOR'S AND MASTER'S DEGREE WAS IN ELECTRICAL

21     ENGINEERING?

22     A.   IN ELECTRICAL ENGINEERING.

23     Q.   OKAY.  AFTER YOU FINISHED YOUR MASTER'S DEGREE, WHAT DID

24     YOU DO?

25     A.   I JOINED KODAK RESEARCH LABS IN 1980.  I SOON BEGAN

```
 1    WORKING ON DIGITAL CAMERA TECHNOLOGY.

 2         IN 1986, MY TEAM DEVELOPED A COLORED DIGITAL CAMERA, AND

 3    PRINTS FROM THE SYSTEM THAT WE DEVELOPED WERE DEMONSTRATED IN

 4    PUBLICLY IN KODAK'S FIRST DEMONSTRATION OF ITS DIGITAL

 5    TECHNOLOGY, OR DIGITAL CAMERA TECHNOLOGY.

 6    Q.   SO WERE YOU PART OF THE TEAM THAT DEVELOPED THE WORLD'S

 7    FIRST DIGITAL CAMERA?

 8    A.   FIRST COLOR DIGITAL CAMERA.

 9    Q.   OKAY.  AND WERE YOU THE LEADER OF THAT TEAM?

10    A.   YES, I WAS.

11    Q.   SO HOW LONG WERE YOU AT KODAK?

12    A.   FOR 32 YEARS.

13    Q.   LET'S PUT UP -- HAVE YOU PREPARED SOME SLIDES FOR YOUR

14    TESTIMONY?

15    A.   YES, I HAVE.

16    Q.   OKAY.  LET'S PUT UP SDX 3692.

17         NOW, DID YOU RECEIVE ANY AWARDS WHILE YOU WERE AT KODAK?

18    A.   YES.  KODAK RECEIVED AN EMMY AWARD FOR WORK I DID TO

19    DEVELOP AN HD PRODUCTION STANDARD THAT'S USED IN HOLLYWOOD.

20         I ALSO RECEIVED AN EASTMAN AWARD, KODAK'S TOP TECHNICAL

21    HONOR, FOR MY CONTRIBUTIONS TO DIGITAL CAMERAS.

22         AND I WAS THE FIRST PERSON TO RECEIVE AN AWARD FROM A

23    PHOTO MARKETING DISTRIBUTION ASSOCIATION FOR CONTRIBUTIONS TO

24    DIGITAL CAMERAS AS OPPOSED TO TRADITIONAL FILM CAMERAS AND

25    TECHNOLOGY.
```

1    Q.   HAVE YOU AUTHORED ANY PUBLICATIONS ON DIGITAL PHOTOGRAPHY?

2    A.   YES.  I'VE AUTHORED THREE BOOK CHAPTERS RELATING TO

3    DIGITAL CAMERAS, AND MORE THAN 60 PUBLICATIONS AND

4    PRESENTATIONS ON DIGITAL CAMERAS AND DIGITAL PHOTOGRAPHY.

5    Q.   ARE YOU THE INVENTOR --

6         BLESS YOU.

7              THE COURT:  THANK YOU.

8    BY MR. JOHNSON:

9    Q.   ARE YOU THE INVENTOR ON ANY PATENTS?

10   A.   YES.  I HAVE MORE THAN 200 ISSUED PATENTS DEALING WITH

11   DIGITAL CAMERAS AND DIGITAL PHOTOGRAPHY SYSTEMS.

12   Q.   AND MOST OF THOSE ARE FROM YOUR WORK WHEN YOU WERE AT THE

13   EASTMAN KODAK COMPANY IN ROCHESTER?

14   A.   YES.

15             MR. JOHNSON:  YOUR HONOR, WE MOVE TO QUALIFY

16   MR. PARULSKI AS AN EXPERT IN DIGITAL CAMERAS, IMAGE PROCESSING

17   AND DIGITAL PHOTOGRAPHY.

18             MR. LEE:  NO OBJECTION.

19             THE COURT:  SO CERTIFIED.

20        GO AHEAD, PLEASE.

21   BY MR. JOHNSON:

22   Q.   WHAT WERE YOU ASKED TO DO IN THIS CASE?

23   A.   I WAS ASKED TO REVIEW THE '449 PATENT AND CERTAIN APPLE

24   PRODUCTS IN ORDER TO DETERMINE WHETHER THEY INFRINGE CLAIM 27

25   OF THE '449 PATENT.

```
 1    Q.   WHAT ARE THE MATERIALS THAT YOU REVIEWED AS PART OF YOUR

 2    ANALYSIS?

 3    A.   I REVIEWED THE PATENT; THE FILE HISTORY; DETAILED APPLE

 4    DOCUMENTATION; CONFIDENTIAL DOCUMENTATION DESCRIBING THE

 5    PRODUCTS; THE BILL OF MATERIALS; THE PROPRIETARY CHIPS THAT ARE

 6    INSIDE THE PRODUCT; I REVIEWED SOURCE CODE FOR BOTH IOS

 7    VERSIONS 5 AND 6; AND I REVIEWED DEPOSITION TESTIMONY FROM

 8    APPLE EMPLOYEES AND FROM EMPLOYEES OF SUPPLIERS.

 9    Q.   NOW, WERE THERE ANY DIFFERENCES BETWEEN IOS 5 AND 6 FOR

10    PURPOSES OF YOUR ANALYSIS ON THE CLAIM?

11    A.   FOR THE PURPOSES OF MY ANALYSIS, THERE WERE NO DIFFERENCES

12    BETWEEN THE VERSIONS, AND THIS WAS CONFIRMED BY APPLE'S

13    CORPORATE REPRESENTATIVE WHO'S RESPONSIBLE FOR THE CAMERA AND

14    PHOTOS APPS THAT ARE USED IN THESE PRODUCTS.

15    Q.   YOU READ THAT IN THE DEPOSITION OF THE CORPORATE

16    REPRESENTATIVE?

17    A.   YES, I READ THE DEPOSITION.

18    Q.   OKAY.  DID YOU ALSO ANALYZE PHYSICAL EXAMPLES OF THE

19    DEVICES?

20    A.   YES.  I PERSONALLY USED EACH OF THE DEVICES IN ORDER TO

21    CONFIRM MY FINDINGS.

22    Q.   AND WHAT ARE THE DEVICES THAT ARE ACCUSED?

23    A.   THE ACCUSED DEVICES THAT I FOUND TO INFRINGE ARE THE

24    IPHONE 5, THE IPHONE 4, 4S, AND THE FOURTH AND FIFTH GENERATION

25    IPOD TOUCH PRODUCTS.
```

DIRECT PARULSKI

```
 1              MR. JOHNSON:  YOUR HONOR, WE MOVE TO ADMIT JX 45A AND

 2    46A.  THOSE ARE THE FIFTH -- FOURTH AND FIFTH GENERATION IPODS.

 3              THE COURT:  ANY OBJECTION?

 4              MR. LEE:  NO OBJECTION, YOUR HONOR.

 5              THE COURT:  THEY'RE ADMITTED.

 6         (JOINT EXHIBITS 45A AND 46A WERE ADMITTED IN EVIDENCE.)

 7              THE COURT:  GO AHEAD, PLEASE.

 8    BY MR. JOHNSON:

 9    Q.   ARE YOU BEING COMPENSATED FOR YOUR WORK IN THIS CASE?

10    A.   YES, I AM.  MY RATE IS $500 PER HOUR FOR ANALYSIS, AND

11    $650 PER HOUR FOR TESTIMONY.

12    Q.   ABOUT HOW MANY HOURS DID YOU SPEND ANALYZING THE APPLE

13    MATERIALS AND WORKING THIS CASE?

14    A.   JUST UNDER 500 HOURS.

15    Q.   OKAY.  NOW, LET'S LOOK AT SLIDE 3693 IN JX 22.

16         WHAT DO WE SEE HERE?

17    A.   THIS IS THE '449 PATENT.

18    Q.   OKAY.  AND WHEN WAS IT FILED?

19    A.   IT WAS FILED IN THE UNITED STATES IN APRIL OF 1997 BY

20    HITACHI.

21    Q.   WHO OWNS -- DO YOU HAVE AN UNDERSTANDING OF WHO OWNS THE

22    PATENT NOW?

23    A.   YES.  IT IS OWNED BY SAMSUNG.

24    Q.   AND WHAT PROBLEMS WAS THE '449 PATENT TRYING TO SOLVE?

25    A.   THIS SLIDE SHOWS THAT AT THE TIME, IF YOU WANTED TO
```

DIRECT PARULSKI

```
 1      CAPTURE BOTH VIDEOS AND PHOTOS, YOU NEEDED TO CARRY TWO

 2      DEVICES, A CAMCORDER TO RECORD THE VIDEOS ON TAPE, AND A STILL

 3      CAMERA, EITHER A FILM OR A DIGITAL CAMERA, IN ORDER TO TAKE

 4      PHOTOS.

 5           AND, OF COURSE, THEN IT BECAME VERY DIFFICULT TO ORGANIZE

 6      THE IMAGES FROM THE SAME TRIP OR EVENT LATER BECAUSE THEY WERE

 7      STORED ON DIFFERENT MEDIA.

 8      Q.   SO HOW DID THE '449 PATENT SOLVE THIS PROBLEM?

 9      A.   IN THIS SLIDE WE SEE TO THE LEFT THE FIGURE 2 FROM THE

10      PATENT, SO THE INVENTORS OF THE '449 PATENT DEVELOPED A SINGLE

11      DIGITAL CAMERA THAT COULD STORE BOTH VIDEOS AND PHOTOS AND

12      RECORD BOTH OF THEM IN THE SAME DEVICE, AND THEY USED DIFFERENT

13      COMPRESSION METHODS FOR PHOTOS AND VIDEOS.

14           SO AS YOU'LL SEE WHEN WE SHOW THE NEXT SLIDE, IF YOU CAN

15      TAKE A STILL PHOTO AND THAT'S COMPRESSED USING JPEG

16      COMPRESSION -- YOU MAY BE FAMILIAR WITH THE .JPG IMAGE FILES

17      THAT YOU GET OVER AN E-MAIL, FOR EXAMPLE.

18      Q.   SO WHEN AN E-MAIL SAYS .JBJ -- SORRY -- JPG, THAT'S A JPEG

19      FILE?

20      A.   THAT'S A JPEG FILE.

21      Q.   THAT'S BEEN COMPRESSED?

22      A.   THAT'S BEEN COMPRESSED.  SO THE COMPRESSION BASICALLY

23      REMOVES REDUNDANT INFORMATION SO THE FILE IS SMALLER AND YOU

24      CAN STORE MORE IMAGES AND CONTINUE ON RECORDING.

25           THE '449 PATENT ALSO DESCRIBES COMPRESSING VIDEOS USING A
```

1      DIFFERENT METHOD, SO-CALLED MPEG COMPRESSION, AND IN THIS CASE

2      YOU COMPRESS NOT ONLY WITHIN A FRAME, BUT YOU COMPRESS THE

3      REDUNDANT INFORMATION BETWEEN FRAMES IN ORDER TO EFFICIENTLY

4      MAKE THE FILE FROM THE VIDEO SMALLER.

5           SO THIS ALLOWS YOU TO STORE A LARGE NUMBER OF STILL PHOTOS

6      AND VIDEOS, THOUSANDS ACTUALLY, IN THIS RECORDING.

7      Q.   SO DID THIS NEW COMPRESSION TECHNOLOGY CAUSE PROBLEMS?

8      A.   THE PROBLEM NOW IS ACTUALLY THAT YOU CAN STORE SO MANY

9      DIFFERENT PHOTOS AND VIDEOS THAT IT MAY BE DIFFICULT TO FIND

10     THE ONES YOU'RE INTERESTED IN.

11          AND SO THE INVENTORS OF THE '449 PATENT DEVELOPED THE

12     ABILITY, FROM THE DISPLAY, TO CLASSIFY THE IMAGES INTO

13     DIFFERENT FOLDERS, IF YOU WILL, OR ALBUMS.

14          SO, FOR EXAMPLE, AS SHOWN HERE, THE IMAGES THAT YOU MIGHT

15     HAVE TAKEN AT A SOCCER GAME COULD BE CLASSIFIED DIFFERENTLY

16     THAN THE IMAGES THAT YOU TOOK OF A DOG.

17          AND IN THE NEXT SLIDE, YOU'LL SEE THAT THE DIGITAL -- THIS

18     WAS CLASSIFICATION THAT WAS DONE ON THE ACTUAL DIGITAL CAMERA,

19     AND NOW YOU CAN USE THIS CLASSIFICATION IN ORDER TO QUICKLY

20     RETRIEVE THE IMAGES OF INTEREST.

21     Q.   SO DOES THE '449 SOLUTION HAVE ANYTHING TO DO WITH THE

22     EASE OF USE OR THE USER EXPERIENCE?

23     A.   YES.  I ACTUALLY USED THE PRODUCT THAT'S DESCRIBED IN THE

24     PATENT IN 1997 TO TAKE VIDEOS AND PHOTOS OF MY FAMILY.  IT MADE

25     IT EASIER TO USE THAN USING TWO SEPARATE DEVICES, AND IT WAS

1    VERY EASY TO FIND SPECIFIC IMAGES THAT I CLASSIFIED INTO THESE

2    FOLDERS.

3    Q.   IS THE TECHNOLOGY OF THE '449 PATENT OLD OR OBSOLETE?

4    A.   NO.   THIS IS A FUNDAMENTAL INVENTION THAT'S WIDELY USED

5    TODAY.

6    Q.   SO LET'S LOOK AT THE CLAIM OF THE '449 PATENT, CLAIM 27.

7         CAN YOU TELL US, WHAT TYPE OF CLAIM IS THIS?

8    A.   THIS IS A DEPENDENT CLAIM, AND SO TO INFRINGE CLAIM 27,

9    YOU MUST MEET ALL OF THE LIMITATIONS OF CLAIM 25, WHICH IS AN

10   IMAGING DEVICE, AS WE'LL TALK ABOUT IN A MINUTE, AS WELL AS THE

11   LIMITATIONS OF DEPENDENT CLAIM 27.

12   Q.   CAN YOU DESCRIBE FOR US JUST GENERALLY WHAT CLAIM 27

13   COVERS?

14   A.   YES.   THE CLAIM HAS SOME HARDWARE RELATED LIMITATIONS,

15   SUCH AS A LENS, AN A TO D CONVERTER, A COMPRESSOR.

16        AND THEN IT ALSO HAS SOME SOFTWARE RELATED LIMITATIONS, A

17   DISPLAY WHICH INCLUDES A SEARCH MODE AND A CLASSIFICATION MODE

18   AND THE ABILITY OF THE USER TO CHANGE CLASSIFICATIONS.

19   Q.   HOW DID YOU GO ABOUT DETERMINING WHETHER CLAIM 27 IS

20   INFRINGED BY THE APPLE ACCUSED PRODUCTS?

21   A.   SO FIRST I STUDIED THE PATENT AND THE FILE HISTORY IN

22   ORDER TO UNDERSTAND THE PLAIN AND ORDINARY MEANING OF THE TERM

23   AS ONE OF NORMAL SKILL IN THE ART WOULD UNDERSTAND.

24        AND THEN I REVIEWED EACH OF THE LIMITATIONS AND THE

25   EVIDENCE THAT I DISCUSSED EARLIER TO SEE IF THE, IF EACH OF THE

1      ACCUSED PRODUCTS MET EVERY ONE OF THE LIMITATIONS.

2      Q.   AND HAVE YOU PREPARED ANY VIDEOS THAT SHOW THE ACCUSED

3      FEATURES AND THE ACCUSED PRODUCTS?

4      A.   YES, I HAVE.

5      Q.   KEN, CAN WE PULL THOSE UP?

6           AND MR. PARULSKI, CAN YOU WALK US THROUGH WHAT THE FIRST

7      VIDEO SHOWS, PLEASE?

8      A.   YES.  SO THIS IS A VIDEO OF AN IPHONE 5.  YOU'LL SEE THE

9      USER JUST UNLOCKED THE SCREEN BY GOING -- PUSHING UP THE CAMERA

10     ICON AND NOW THEY'RE PUSHING THE MIDDLE BUTTON AND THEY'RE

11     TAKING A NUMBER OF PHOTOS.  THIS HAPPENS TO BE AT THE GOLDEN

12     GATE BRIDGE.

13     Q.   AND IF WE TURN TO THE SECOND VIDEO, WHAT DOES THE SECOND

14     VIDEO SHOW?

15     A.   SO THIS SHOWS NOW THEY'VE MOVED TO A SECOND LOCATION,

16     THEY'VE SWITCHED TO VIDEO MODE, PRESSED THE RECORD BUTTON, AND

17     THEY'RE NOW TAKING A SHORT VIDEO OF TASTING TEA IN CHINATOWN.

18     Q.   SO THE VIDEO IS ALSO THEN STORED ON THE CAMERA ROLL?

19     A.   SO BOTH OF THESE VIDEOS, AS YOU'LL SEE IN A MINUTE, ARE

20     STORED IN THE MEMORY OF THE DEVICE AND IN THE CAMERA ROLL.

21     Q.   SO LET'S GO TO THE THIRD VIDEO.  WHAT DO WE SEE HERE?

22     A.   SO NOW THE USER IS INTERESTED IN ORGANIZING THE IMAGES, SO

23     THEY TOUCH THE PHOTOS APP, AND YOU'LL SEE IT BRINGS UP THIS

24     ALBUM VIEW, AND IN ADDITION TO THE CAMERA ROLL WHERE THE IMAGES

25     ARE STORED, THE USER CAN TYPE IN THE NAME OF AN ALBUM, THEY'RE

1    GOING TO TYPE IN GOLDEN GATE, TO CREATE A USER ALBUM AND

2    THEY'LL GO TO THE CAMERA ROLL AND SELECT A NUMBER OF PHOTOS AND

3    VIDEOS, AND WHEN THEY CLICK DONE, YOU'LL SEE AN ALBUM CALLED

4    GOLDEN GATE HAS BEEN CREATED WITH 20 IMAGES THAT WE JUST SAW.

5    Q.   AND THEN FINALLY, IF WE LOOK AT THE FOURTH VIDEO, WHAT DO

6    WE SEE IN THE FOURTH VIDEO?

7    A.   THIS VIDEO WILL SHOW, AGAIN, THE ALBUM VIEW, THEY'VE

8    CREATED A FEW MORE ALBUMS, AND NOW THEY'RE GOING TO CHANGE THE

9    CLASSIFICATION OF A PARTICULAR VIDEO.

10        YOU SEE THEY'VE SELECTED THAT VIDEO, THEY'RE GOING TO

11   SELECT REMOVE FROM ALBUM, AND NOW WHEN THEY RETURN TO THE ALBUM

12   VIEW, YOU'LL SEE THERE'S 19 PHOTOS AND VIDEOS IN THE GOLDEN

13   GATE ALBUM.

14   Q.   SO HOW DOES THE FUNCTIONALITY THAT WE'VE SEEN IN THE VIDEO

15   RELATE TO CLAIM 27 IN THE '449 PATENT?

16   A.   IT IS THE FUNCTIONALITY THAT'S CLAIMED.  I WILL STEP

17   THROUGH IN A MINUTE THE DETAILED CLAIMS ANALYSIS THAT WILL

18   DEMONSTRATE THAT.

19   Q.   AND FOR PURPOSES OF YOUR ANALYSIS, DO THE OTHER ACCUSED

20   PRODUCTS ALSO OPERATE THE SAME WAY?

21   A.   YES.  ALL OF THE -- ALL OF THE OTHER PRODUCTS YOU SEE

22   LISTED HERE OPERATE IN THE SAME WAY FOR THE PURPOSES OF MY

23   ANALYSIS, AND APPLE'S CORPORATE REPRESENTATIVE HAS CONFIRMED

24   THAT.

25   Q.   AND IF WE GO BACK NOW TO CLAIM 27, THERE ARE A LOT OF

1      WORDS IN CLAIM 25 AND 27.

2          HAVE YOU PREPARED ANY MATERIALS TO HELP THE JURY

3      UNDERSTAND YOUR ANALYSIS AND FOLLOW YOUR ANALYSIS?

4      A.   YES.  WHAT I'VE DONE IS TO MAKE A CHART LISTING EACH OF

5      THE LIMITATIONS OF THE CLAIM, AND YOU'LL SEE AN A, B, C, D, AND

6      SO ON ON THE LEFT.

7          AND THEN THE FIVE APPLE PRODUCTS ARE EACH IN THEIR

8      SEPARATE COLUMNS.

9      Q.   SO IF WE START WITH THE FIRST PART OF THE CLAIM, THE

10     PREAMBLE AND THE FIRST LIMITATION, THE LENS, CAN YOU EXPLAIN

11     HOW THE IPHONES AND IPODS MEET THIS LIMITATION?

12     A.   YES, I CAN.

13         THE LIMITATION IS A DIGITAL CAMERA THAT COMPRISES A LENS.

14         AS YOU'VE SEEN, EACH OF THESE IS A DIGITAL CAMERA.  IT CAN

15     CAPTURE STILLS AND VIDEOS.  AND I'VE HIGHLIGHTED IN YELLOW THE

16     LENS ON THE IPHONE 5.  THERE ACTUALLY ARE TWO LENSES, ONE AT

17     FRONT AND ONE ON THE REAR OF THE CAMERA.

18     Q.   AND DO THE IPHONE 4S, 4, AND IPODS FOURTH AND FIFTH

19     GENERATION ALSO MEET THESE LIMITATIONS?

20     A.   YES, THEY DO.  AS YOU'LL SEE, I'VE HIGHLIGHTED IN YELLOW

21     THE LENS ON THE FRONT FACING CAMERA ON EACH OF THESE PRODUCTS.

22     Q.   SO IF WE GO BACK TO YOUR CHART, CAN WE CHECK OFF THE FIRST

23     TWO ROWS?

24     A.   YES.

25     Q.   OKAY.  WHAT ABOUT THE NEXT LIMITATION, AN IMAGING DEVICE?

1    IS THAT LIMITATION IN THE ACCUSED PRODUCTS?

2    A.   YES, IT IS.

3    Q.   CAN YOU EXPLAIN WHERE YOU FOUND THAT EVIDENCE?

4         AND FOR THIS, YOUR HONOR, WE'RE GOING TO PUT UP A

5    CONFIDENTIAL DOCUMENT THAT WILL BE SHOWN TO YOUR HONOR AND ALSO

6    TO THE JURY, BUT NOT TO THE REST OF THE COURTROOM.

7              THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

8              THE WITNESS:  SO LIMITATIONS B AND C OF CLAIM 25 ARE

9    FIRST AN IMAGING DEVICE THAT'S A SENSOR THAT CONVERTS AN

10   OPTICAL IMAGE INTO AN ANALOG SIGNAL, AND THEN AN A TO D

11   CONVERTER THAT CONVERTS AN ANALOG SIGNAL INTO A DIGITAL SIGNAL.

12        AND WHAT YOU'RE SEEING IS A HIGHLY CONFIDENTIAL DOCUMENT,

13   IT'S FROM OMNIVISION, WHICH IS THE SUPPLIER OF THE CMOS IMAGE

14   SENSOR AND THE FRONT FACING CAMERA.

15        AND IF I COULD ADVANCE TO THE NEXT SLIDE, THIS IS A BLOCK

16   DIAGRAM ON ONE DOCUMENT OF THAT DOCUMENT, AND I'VE ENLARGED IN

17   THE LOWER RIGHT A PORTION OF THE DIAGRAM.

18        AND YOU CAN SEE, FIRST OF ALL, THE CLAIM REQUIRES AN

19   IMAGING DEVICE, AND THE IMAGING DEVICE IS THE IMAGE ARRAY

20   THAT'S OUTLINED IN GREEN.

21        SO THE LENS FOCUSES THE SCENE, IN THIS CASE THE GOLDEN

22   GATE BRIDGE, ON TO THAT IMAGE ARRAY, AND THE IMAGE ARRAY

23   PRODUCES AN ANALOG SIGNAL WHICH IS SHOWN IN RED.

24   Q.   AT A HIGH LEVEL, WHAT ARE THESE TWO LIMITATIONS

25   DESCRIBING?

1    A.   THESE DESCRIBE, AT A HIGH LEVEL, A DEVICE WHICH BASICALLY

2    TAKES A PHOTO.  THIS IS WHAT CONVERTS THE LIGHT FIRST INTO AN

3    ANALOG SIGNAL AND THEN INTO A DIGITAL SIGNAL.

4    Q.   OKAY.  IF WE LOOK AT THE NEXT SLIDE, HOW DOES THAT AFFECT

5    YOUR ANALYSIS?

6    A.   SO THE NEXT -- LIMITATION C IS AN ANALOG TO DIGITAL

7    CONVERTER WHICH CONVERTS THAT ANALOG SIGNAL TO A DIGITAL

8    SIGNAL.  I'VE HIGHLIGHTED THAT IN ORANGE.

9         YOU CAN SEE THE DIGITAL SIGNAL IN BLUE.  THAT HAPPENS TO

10   BE A 10 BIT A TO D CONVERTER IN THIS CASE.

11   Q.   SO YOU'RE COMPARING THE LANGUAGE ON THE LEFT-HAND SIDE TO

12   WHAT IS FOUND IN THE APPLE DOCUMENTS?

13   A.   SO TO WHAT'S FOUND ON THE OMNIVISION.

14        MR. LEE:  YOUR HONOR, CAN I ASK MR. JOHNSON TO

15   IDENTIFY THE SLIDE BY NUMBER?  WE HAVE TO FOLLOW ALONG ON THE

16   HARD COPY.

17        MR. JOHNSON:  SURE.

18        MR. LEE:  THAT ALLOWS US TO FOLLOW ALONG IN HARD

19   COPY.

20        MR. JOHNSON:  I'M HAPPY TO.  THAT WAS SLIDE 3724.

21   SORRY.  3723.

22   Q.   NOW, IF WE TURN TO THE NEXT SLIDE, DO THE IPHONE 4, 4S,

23   AND IPODS ALSO MEET THESE LIMITATIONS?

24   A.   YES.  AGAIN, THE LIMITATION OF AN IMAGING DEVICE WHICH

25   CONVERTS AN ANALOG SIGNAL TO A DIGITAL SIGNAL, THAT I'VE

 1    OUTLINED IN GREEN, YOU SEE THESE ARE A PORTION OF THE HIGHLY

 2    CONFIDENTIAL SPECIFICATION SHEET FOR THE CMOS INNER SENSORS

 3    THAT ARE FOUND IN EACH OF THESE AND OTHER DEVICES.

 4         SO LIMITATION B IS MET BY THE GREEN IMAGE ARRAY AND THE

 5    OUTPUT ARROW IN RED.

 6         AND THEN LIMITATION C HAS AN A TO D CONVERTER, AGAIN, I'VE

 7    HIGHLIGHTED THAT IN ORANGE, AND THAT CONVERTS THE ANALOG SIGNAL

 8    TO A DIGITAL SIGNAL WHICH IS SHOWN IN BLUE.

 9    Q.   AND THE DOCUMENTS WE WERE JUST LOOKING AT ARE FROM DX 491?

10    A.   YES, THEY ARE.

11    Q.   SO IF WE GO BACK TO YOUR CHECKLIST, CAN WE CHECK OFF THE

12    NEXT LIMITATIONS, B AND C?

13    A.   YES, WE CAN.

14    Q.   OKAY.  WHAT ABOUT THE NEXT LIMITATION, A COMPRESSOR WHICH

15    COMPRESSES?  IS THAT PRESENT IN THE APPLE ACCUSED PRODUCTS?

16    A.   YES, IT IS.  THE LIMITATION REQUIRES A COMPRESSOR THAT

17    TAKES THE DIGITAL SIGNAL AND USES DIFFERENT COMPRESSING METHODS

18    FOR PHOTOS AND VIDEOS.

19         AND REMEMBER, I MENTIONED THAT EARLIER ON IN THE

20    DEMONSTRATION -- THIS SHOWS HIGHLY CONFIDENTIAL INFORMATION

21    CONCERNING THE APPLE A6 CHIP.  THIS IS A CHIP THAT'S IN THE

22    IPHONE 5.  IT'S DESCRIBED IN WHAT'S CALLED AN H5P USER'S

23    MANUAL.  IT'S A HIGHLY CONFIDENTIAL APPLE DESIGN DOCUMENT THAT

24    DESCRIBES THEIR DESIGN OF THIS CHIP.

25         AND AS YOU'LL SEE IN THE NEXT SLIDE --

```
 1     Q.   SORRY.  THAT'S ALSO DEFENDANTS' EXHIBIT 351?

 2     A.   YES, IT IS.  SO THAT'S 351.

 3          AND THEN IF I CAN SEE THE NEXT SLIDE, PLEASE, WHICH IS 351

 4     AT 1755, WHAT YOU SEE IS A BLOCK DIAGRAM THAT APPLE HAS DRAWN.

 5     THIS IS A BLOCK DIAGRAM OF THE ENTIRE CHIP.

 6          AND THEN FINALLY, IN THE NEXT SLIDE, WHICH IS AT 1774,

 7     YOU'LL SEE THE ONE UNIT OF THAT BLOCK DIAGRAM.

 8          ON THE LEFT YOU SEE THE CLAIM.  THE CLAIM REQUIRES A

 9     COMPRESSOR THAT COMPRESSES THE DIGITAL SIGNAL OUTPUT FROM

10     THE -- AGAIN, IT USES DIFFERENT COMPRESSING METHODS FOR MOVING

11     IMAGES AND STILL IMAGES.

12          AND IN GREEN YOU SEE THE COMPRESSING METHOD FOR MOVING

13     IMAGES, THAT'S H.264, AND ALSO KNOWN AS MPEG 4, PART 10, AND

14     THE COMPRESSING METHOD FOR STILL IMAGES IS JPEG, AND THAT'S

15     SHOWN IN BLUE.

16     Q.   OKAY.  NOW, IF YOU LOOK TO THE OTHER ACCUSED PRODUCTS IN

17     SLIDE 3730, DO THE OTHER PRODUCTS ALSO HAVE THIS LIMITATION?

18     A.   YES.  THIS SLIDE SHOWS A PORTION OF THE BLOCK DIAGRAM FOR

19     THE PROCESS -- FOR THE CHIP THAT'S USED IN EACH OF THE OTHER

20     DEVICES, AND YOU'LL SEE AGAIN I'VE HIGHLIGHTED IN RED THE

21     COMPRESSOR, AND I'VE HIGHLIGHTED IN GREEN THE H.264 COMPRESSING

22     METHOD FOR VIDEOS, FOR MOVING IMAGES, AND I'VE HIGHLIGHTED IN

23     BLUE THE JPEG COMPRESSING METHOD FOR STILL IMAGES.

24     Q.   SO IF WE GO BACK TO YOUR CHECKLIST, WHAT DO WE DO WITH THE

25     COMPRESSOR LIMITATION D?
```

1      A.   WE CAN CHECK THAT LIMITATION.

2      Q.   ALL RIGHT.  NOW, WHAT ABOUT THE NEXT LIMITATION, A

3      RECORDING CIRCUIT?  IS THAT FOUND IN THE ACCUSED PRODUCTS?

4      A.   YES, IT IS.

5      Q.   CAN YOU EXPLAIN WHERE?

6      A.   YES.  THE NEXT SLIDE SHOWS THE LIMITATION.  YOU CAN SEE A

7      RECORDING CIRCUIT -- RECORDING CIRCUIT IS JUST A MEMORY.  IT'S

8      JUST WHERE YOU STORE THE VIDEOS AND THE PHOTOS.

9      Q.   SO WHEN I TAKE A PHOTOGRAPH OR A VIDEO, THIS IS WHERE IT

10     GETS STORED?

11     A.   PRECISELY.

12          AND WHAT YOU SEE IN THE TOP IS THE MAIN CIRCUIT BOARD FROM

13     THE IPHONE 5, AND I'VE IDENTIFIED IN RED WHAT'S CALLED A NAND

14     PACKAGE.  THAT'S THE RECORDING CIRCUIT.

15          AND BENEATH IT ARE SOME EXCERPTS FROM THE HIGHLY

16     CONFIDENTIAL BILL OF MATERIALS FOR THE IPHONE 5.  THIS HAPPENS

17     TO BE A 16 GIGABYTE MODEL.

18          AND BELOW IT IS THE EXCERPT FROM THE ACTUAL BILL OF

19     MATERIALS -- THE BILL OF MATERIALS LISTS EVERY SINGLE COMPONENT

20     FROM THE CIRCUIT BOARD AND OTHERWISE FOUND IN THE PRODUCT --

21     AND YOU CAN SEE I'VE HIGHLIGHTED A 16 GIGABYTE NAND MEMORY.  SO

22     THAT'S THE MEMORY THAT'S USED TO STORE THE COMPRESSED VIDEOS

23     AND PHOTOS.

24     Q.   AND THE EXHIBITS THAT YOU'RE REFERRING TO ON THIS SLIDE

25     ARE PX 255 AT PAGE 5, AS WELL AS DX 354, 371, 639, 510, AND

```
 1        502; RIGHT?

 2        A.   YES.  AND THOSE LATTER ONES IDENTIFY THE LINES ON THE BILL

 3        OF MATERIALS FOR THESE OTHER PRODUCTS.

 4        Q.   DOES APPLE ACTUALLY DISPUTE WHETHER IT MEETS THIS

 5        LIMITATION?

 6        A.   NO.

 7        Q.   SO IF WE GO BACK TO YOUR CHECKLIST AND THE RECORDING

 8        CIRCUIT, CAN WE CHECK OFF ELEMENT -- LIMITATION E?

 9        A.   YES.

10        Q.   WHAT ABOUT THE NEXT LIMITATION, A DECOMPRESSOR?

11        A.   SO A DECOMPRESSOR IS SORT OF THE FLIP SIDE OF THE

12        COMPRESSOR.  IF YOU COMPRESS THE IMAGE USING JPEG, YOU NEED TO

13        DECOMPRESS IT USING JPEG.

14             AND IF YOU CAN SHOW THE NEXT SLIDE, AGAIN, THIS IS THE

15        SAME CHIP WE DISCUSSED EARLIER AND THE SAME HIGHLY CONFIDENTIAL

16        APPLE DESIGN DOCUMENT.

17             AND IN THE NEXT SLIDE, YOU'LL --

18        Q.   AND NOW WE'RE GOING TO SLIDE 3737, DX 351 AT 1774?

19        A.   THAT'S CORRECT.

20        Q.   WHAT DOES THIS SHOW US?

21        A.   SO, AGAIN, THIS IS ONE UNIT FROM THE BLOCK DIAGRAM THAT

22        APPLE DREW WHEN THEY DESIGNED THIS CHIP, AND YOU'LL SEE THE

23        LIMITATION ON THE LEFT IS A DECOMPRESSOR WHICH USES A DIFFERENT

24        DECOMPRESSING METHOD FOR MOVING IMAGES AND FOR STILL IMAGES.

25             WE SEE I'VE IDENTIFIED THE UNIT IN RED, I'VE IDENTIFIED
```

 1    THE DECOMPRESSING METHOD FOR MOVING IMAGES, THAT'S THE H.264

 2    DECODER, AND I'VE IDENTIFIED THE DECOMPRESSING METHOD FOR STILL

 3    IMAGES, THAT'S JPEG.

 4    Q.    OKAY.  WHAT ABOUT THE OTHER ACCUSED PRODUCTS?  DO THEY

 5    ALSO MEET THIS LIMITATION?

 6    A.    YES, THEY DO.  HERE AGAIN I'VE IDENTIFIED THE SECTION OF

 7    THE APPLE BLOCK DIAGRAM FOR THE CHIPS THAT ARE USED IN THE

 8    OTHER PRODUCTS.  I'VE IDENTIFIED THE DECOMPRESSOR IN RED, THE

 9    COMPRESS -- THE DECOMPRESSING METHOD, H.264 USED FOR MOVING

10    IMAGES, AND THE DECOMPRESSION METHOD, JPEG, USED FOR STILL

11    IMAGES.

12    Q.    AND THAT'S LOCATED ALSO IN DX 351?

13    A.    YES.

14    Q.    SO IF WE GO BACK TO YOUR CHECKLIST, CAN WE CHECK OFF THE

15    DECOMPRESSOR?

16    A.    YES, WE CAN.

17    Q.    NOW, THE NEXT LIMITATION INVOLVES A REPRODUCING CIRCUIT.

18    DO THE ACCUSED PRODUCTS HAVE THAT?

19    A.    YES, THEY DO.

20    Q.    CAN YOU SHOW US WHERE?

21    A.    THIS SHOWS --

22    Q.    FIRST START BY TELLING US, WHAT IS A REPRODUCING CIRCUIT?

23    A.    WELL, A REPRODUCING CIRCUIT IS BASICALLY A PLAYBACK

24    CIRCUIT.  AFTER YOU DECOMPRESS, FOR EXAMPLE, THE VIDEO, YOU

25    NEED TO BE ABLE TO VIEW IT ON DISPLAY AND LISTEN TO THE SOUND.

```
 1              SO THE REPRODUCING CIRCUIT REPRODUCES -- ACCORDING TO THE

 2      CLAIM, THE REPRODUCING CIRCUIT REPRODUCES THE MOVING IMAGE

 3      SIGNAL, THE VIDEO, THE SOUND SYNCHRONIZED WITH IT, SO THE RIGHT

 4      SOUND PLAYS AT THE RIGHT TIME, AND THE STILL IMAGE SIGNALS.

 5      Q.   AND DO THE ACCUSED PRODUCTS HAVE THAT?

 6      A.   YES, THEY DO.  AGAIN, I'VE IDENTIFIED FOR THE IPHONE 5

 7      THE -- THIS IS THE MANUAL THAT DESCRIBES THAT A6 CHIP YOU SAW

 8      EARLIER.

 9              EACH OF THIS HAS A DISPLAY RELATED BLOCK SHOWN IN THE

10      UPPER RIGHT THAT IS USED TO REPRODUCE THE MOVING IMAGES AND THE

11      STILL IMAGES, AND DOWN BELOW AN AUDIO CIRCUIT THAT'S USED TO

12      REPRODUCE THE SOUND.

13              AND APPLE DOES NOT DISPUTE THAT THEY HAVE A REPRODUCING

14      CIRCUIT IN EACH OF THESE PRODUCTS.

15      Q.   NOW, WHAT ABOUT FOR THE OTHER ACCUSED PRODUCTS, THE

16      IPHONE 4, 4S, AND IPODS?

17      A.   THIS IS GOING TO BE KIND OF AN EYE TEST.

18              THIS IS A SECTION FROM EACH OF THE USER MANUALS, THE APPLE

19      USER MANUALS FOR THE CHIPS THAT ARE USED IN THESE OTHER

20      PRODUCTS.

21              BUT YOU CAN SEE THERE'S ALSO A DISPLAY CIRCUITRY THAT I'VE

22      IDENTIFIED AND AUDIO CIRCUITRY THAT I'VE IDENTIFIED, AND THIS

23      IS THE REPRODUCING CIRCUIT IN THE OTHER PRODUCTS.

24      Q.   OKAY.  SO, AGAIN, DOES APPLE DISPUTE WHETHER IT HAS A

25      REPRODUCING CIRCUIT?
```

1     A.   NO, THEY DON'T.

2     Q.   SO IF WE GO BACK TO YOUR CHECKLIST, CAN WE CHECK OFF THE

3     REPRODUCING CIRCUIT?

4     A.   YES, WE CAN.

5     Q.   SO WHAT ABOUT THE NEXT LIMITATION, A DISPLAY WHICH

6     DISPLAYS, A SEARCH MODE AND A CLASSIFICATION MODE?  DO THE

7     ACCUSED PRODUCTS HAVE THAT?

8     A.   YES, THEY DO.

9     Q.   CAN YOU SHOW US WHERE?

10    A.   YES, I WILL.  AND I'M GOING TO STEP THROUGH THIS IN A FEW

11    PIECES.

12         SO THE FIRST LIMITATION IS A DISPLAY, AND OF COURSE ALL OF

13    THE PRODUCTS HAVE DISPLAYS.  WE'VE SEEN THAT.

14         AND THE DISPLAY DISPLAYS THE MOVING IMAGES, NAMELY THE

15    VIDEOS, AND THE STILL IMAGES, THE PHOTOS.

16         AND THIS JUST SHOWS FOR THE IPHONE 5 IN THE CENTER IS THE

17    DISPLAY OF A PHOTO, AND TO THE RIGHT, IF YOU PRESS THE PLAY

18    BUTTON, THAT WOULD PLAY BACK A VIDEO.

19         SO APPLE DOES NOT DISPUTE THAT THESE PRODUCTS ALL HAVE A

20    DISPLAY THAT DISPLAYS PHOTOS AND VIDEOS.

21    Q.   OKAY.  HOW ABOUT THE NEXT PART OF THE LIMITATION?

22    A.   SO THE NEXT PART OF THE LIMITATION IS A DISPLAY WHICH

23    DISPLAYS A LIST OF THE MOVING IMAGE SIGNALS AND THE STILL IMAGE

24    SIGNALS AS A SEARCH MODE.

25    Q.   AND WHAT'S A LIST?

1        A.   A LIST IS JUST A SET OF ITEMS, AND IN THIS CASE -- I

2   DON'T -- I'LL TRY TO POINT AT IT FROM HERE.

3        SO THIS IS A LIST, IT'S A SET OF ITEMS, AND THE MOVING

4   IMAGE SIGNALS ARE A COUPLE OF THESE -- ACTUALLY, WHAT'S BEING

5   DEMONSTRATED IN THE VIDEO CLIP IS NOW SEARCHING THROUGH THAT

6   LIST TO FIND THE SPECIFIC VIDEO OR STILL.

7        AND THE LIST INCLUDES A THUMBNAIL IMAGE, AND IF THE

8   THUMBNAIL HAS A LITTLE MOVIE ICON AND A TIME, THEN IT'S A

9   VIDEO, THAT IS, IT'S A MOVING IMAGE SIGNAL.

10       AND IF ALL YOU SEE IS THE THUMBNAIL, THEN IT'S A PHOTO, OR

11   A STILL IMAGE SIGNAL.

12       SO THIS IS THE LIST OF IMAGE SIGNALS, AND YOU JUST SAW THE

13   USER SEARCHING TO FIND A VIDEO, FOR EXAMPLE, THEY'RE INTERESTED

14   IN LOCATING.

15       Q.   DO THE IPHONE 4S, 4, AND IPODS ALSO MEET THIS LIMITATION?

16       A.   YES, THEY DO.  I'VE USED ALL OF THESE DEVICES MYSELF AND

17   CONFIRMED THAT THEY OPERATE IN THE SAME WAY FOR THE PURPOSES OF

18   MY ANALYSIS.

19       Q.   SO WERE YOU HERE FOR THE OPENING STATEMENTS IN THE CASE?

20       A.   YES, I WAS.

21       Q.   DO YOU REMEMBER APPLE'S COUNSEL PUTTING UP FIGURE 7 OF THE

22   '449 PATENT AND SAYING --

23       AND YOUR HONOR, IF WE COULD, WE'LL PUT UP PAGE 345 FROM

24   THE TRIAL TRANSCRIPT --

25       HE SAID THE TECHNOLOGY OF THAT DAY WOULDN'T ALLOW YOU TO

```
 1      DISPLAY ALL OF THE PHOTOS YOU HAD TAKEN IN A WAY WHERE YOU

 2      COULD SIMPLY LOOK AT THEM AND SCROLL THROUGH THEM.

 3           DO YOU REMEMBER THAT?

 4      A.   YES, I DO.

 5      Q.   DO YOU AGREE WITH HIS STATEMENT?

 6      A.   NO, I DON'T AGREE WITH IT AT ALL.  THE TECHNOLOGY AT THE

 7      TIME CERTAINLY ALLOWED YOU TO DISPLAY ALL OF THE IMAGES AS

 8      THUMBNAILS AND SCROLL THROUGH THEM.  IN FACT, THAT IS DESCRIBED

 9      IN THE PATENT.

10      Q.   WHERE IS IT DESCRIBED IN THE PATENT?

11      A.   WELL, THIS IS -- THIS IS FIGURE 7.

12           ON THE SAME PAGE, ACTUALLY, JUST BELOW IT, IS FIGURE 8

13      FROM THE PATENT.  THIS SHOWS FIGURE 8, AND WHAT YOU SEE HERE

14      ARE THREE THUMBNAIL IMAGES, THEY'RE CALLED REDUCED IMAGES IN

15      THE PATENT, BUT THEY'RE THREE THUMBNAILS.

16           THIS IS A THUMBNAIL OF A MOVING IMAGE, A MOVIE CLIP, AND

17      WE KNOW IT'S A VIDEO BECAUSE OF THE MOVIE CAMERA ICON HERE.

18           THIS IS A THUMBNAIL OF A STILL IMAGE WITH SOUND, A PHOTO

19      WITH SOUND, AND THIS IS A THUMBNAIL, THE PERSON TOOK A

20      PHOTOGRAPH OF A SAILBOAT, AND THIS IS THE THUMBNAIL FOR THAT

21      STILL PHOTO.

22           AND YOU ALSO SEE THAT THERE IS A SELECTION OF UP/DOWN

23      ARROWS HERE ON -- ON THE DIGITAL CAMERA THAT'S DESCRIBED IN THE

24      PATENT, THERE IS A FOUR-WAY CONTROLLER, AND IF YOU HOLD DOWN

25      THE BUTTON, THE DOWN BUTTON, IT'LL SELECT FIRST THIS ONE AND
```

```
 1     THEN THIS ONE, AND IF YOU KEEP HOLDING IT DOWN, IT WILL SELECT

 2     THE NEXT PAGE.

 3          THERE'S ACTUALLY -- THIS IS THE FIRST OF SIX PAGES OF

 4     THUMBNAIL IMAGES, AND IF YOU HOLD THAT BUTTON DOWN, IT WILL GO

 5     DOWN AND SELECT ALL OF THE IMAGES.

 6          AND I KNOW THIS BECAUSE IN 1997, I USED, I PERSONALLY USED

 7     THE PRODUCT THAT'S DESCRIBED IN THE PATENT, AND I CAPTURED

 8     STILL AND VIDEO IMAGES AND USED THIS TYPE OF -- I USED EXACTLY

 9     THIS DISPLAY IN ORDER TO SEARCH FOR AND THEN LOCATE VIDEOS AND

10     PHOTOS THAT I WAS INTERESTED IN VIEWING.

11     Q.   NOW, APPLE'S COUNSEL ALSO, DURING OPENING -- AND BY THE

12     WAY, DID APPLE'S COUNSEL PUT UP FIGURE 8 DURING HIS OPENING

13     STATEMENT?

14     A.   NO.

15     Q.   OKAY.  NOW, APPLE'S COUNSEL ALSO PUT UP SLIDE 57 DURING

16     HIS OPENING, AND HE REFERENCED THE SEARCH FEATURE ON THE

17     RIGHT-HAND SIDE.

18          DO YOU REMEMBER THAT?

19     A.   YES, I DO.

20     Q.   NOW, IS THIS THE SEARCH MODE THAT IS ACCUSED OF INFRINGING

21     THE '449 PATENT?

22     A.   NO, NOT AT ALL.  THIS IS WHAT YOU WOULD CALL A WORD

23     SEARCH.  IF YOU WERE LOOKING FOR A DOCUMENT THAT CONTAINED A

24     PARTICULAR WORD, FOR EXAMPLE, YOU'D USE THE KEY PAD TO TYPE IN

25     THE WORD OR WORDS AND IT WOULD FIND THE DOCUMENT.
```

1          BUT THAT'S NOT AT ALL WHAT'S DESCRIBED IN THE '449 PATENT.

2     THAT'S NOT AT ALL WHAT'S CLAIMED.

3          WHAT'S CLAIMED IS A LIST OF MOVING IMAGE SIGNALS AND STILL

4     IMAGE SIGNALS THAT YOU'RE GOING TO USE AS A SEARCH MODE, AND

5     THAT'S WHAT'S OVER HERE.

6          THIS IS A LIST, AND THIS IS A MOVING IMAGE SIGNAL, THE ONE

7     HERE WITH THE MOVIE ICON, AND THIS, FOR EXAMPLE, IS THE STILL

8     IMAGE SIGNAL.

9     Q.   OKAY.  SO LET'S MOVE TO THE NEXT PART OF THE LIMITATION.

10    DO THE ACCUSED PRODUCTS HAVE A LIST OF CLASSIFICATIONS AS A

11    CLASSIFICATION MODE?

12    A.   YES, THEY DO.  AND AS YOU SEE HERE IN THE ALBUMS VIEW,

13    THERE'S A LIST OF CLASSIFICATIONS STARTING AT THE BOTTOM, A

14    FAMILY CLASSIFICATION, THESE ARE ALBUMS THAT THE USER HAS

15    CREATED, AS WELL AS A CAMERA ROLL AT THE TOP.

16    Q.   DOES APPLE DISPUTE THAT ITS PRODUCTS HAVE A CLASSIFICATION

17    MODE?

18    A.   NO, THEY DON'T.

19    Q.   SO IF WE GO BACK TO YOUR CHECKLIST, CAN WE CHECK OFF

20    LIMITATION H?

21    A.   YES, WE CAN.

22    Q.   NOW, WHAT ABOUT THE NEXT LIMITATION?

23    A.   THE NEXT LIMITATION IS A, IS A RECORDING CIRCUIT --

24    REMEMBER, THE RECORDING CIRCUIT WAS THE NAND MEMORY THAT STORED

25    THE VIDEOS AND THE PHOTOS, AND THE LIMITATION IS THAT IT STORES

1        THOSE VIDEOS AND PHOTOS WITH CLASSIFICATION, AND THE

2        CLASSIFICATION DATA TELLS YOU WHICH IMAGES ARE IN THE CAMERA

3        ROLL AND THE OTHER USER ALBUMS.

4            AND APPLE'S CORPORATE REPRESENTATIVE HAS CONFIRMED -- AND

5        I INSPECTED THE SOURCE CODE AS WELL, AND IT CONFIRMED THAT

6        THERE'S A SINGLE DATABASE IN THE IPHONE 5, AS WELL AS THE OTHER

7        PRODUCTS THAT STORES NOT ONLY THE PHOTOS AND VIDEOS, BUT

8        STORES, FOR EXAMPLE, WHICH IMAGES ARE IN THE CAMERA ROLL AND

9        THE OTHER ROLLS.

10       Q.   SO IF WE GO BACK TO YOUR CHECKLIST, CAN WE CHECK OFF THAT

11       LIMITATION FOR ALL OF THE ACCUSED PRODUCTS?

12       A.   YES, WE CAN.

13       Q.   OKAY.  NOW, WHAT ABOUT LIMITATION J?

14           THE COURT:  THE TIME IS 4:30.  SHOULD WE GO AHEAD AND

15       CONCLUDE TODAY, OR IS THAT A RELATIVELY -- I ASSUME THAT'S

16       GOING TO TAKE A LITTLE LONGER THAN A FEW SECONDS.

17           LET'S GO AHEAD.

18           MR. JOHNSON:  THAT'S FINE, YOUR HONOR.

19           THE COURT:  OKAY.  THANK YOU.

20       THE TIME IS NOW 4:30.  WE'RE GOING TO EXCUSE YOU FOR THE

21       DAY.  WE'LL SEE YOU TOMORROW MORNING AT 9:00.

22           WE ARE STILL ON TRACK TO FINISH THE EVIDENCE PORTION OF

23       THE TRIAL FRIDAY MORNING.  WE STILL PLAN, AT THIS POINT -- I

24       CAN GIVE YOU MORE UPDATED INFORMATION AT THE END OF TOMORROW --

25       BUT WE STILL PLAN TO EXCUSE YOU EARLY ON FRIDAY AND TO HAVE THE

```
1        FINAL JURY INSTRUCTIONS READ AND THE CLOSING ARGUMENTS ON

2    MONDAY.

3            BUT I CAN GIVE YOU MORE UPDATED INFORMATION TOMORROW.

4            ALL RIGHT.  THANK YOU.  PLEASE DON'T RESEARCH OR DISCUSS

5    THE CASE.  THANK YOU FOR YOUR SERVICE AND YOUR PATIENCE.

6            (JURY OUT AT 4:31 P.M.)

7                THE COURT:  YOU MAY STEP DOWN.

8                THE WITNESS:  THANK YOU.

9                THE COURT:  OKAY.  THE RECORD SHOULD REFLECT THE

10   JURORS HAVE LEFT THE COURTROOM.

11           PLEASE TAKE A SEAT.

12           I'D LIKE TO GIVE YOU YOUR TIME TOTALS.

13           AND HAVE YOU HAD AN OPPORTUNITY TO CONFER ABOUT THE

14   DROPPED CLAIMS?  WOULD YOU LIKE A MINUTE TO DO THAT NOW WITH

15   YOUR TEAMS?

16           (DISCUSSION OFFER THE RECORD BETWEEN COUNSEL.)

17               MR. JOHNSON:  YOUR HONOR, IF WE COULD HAVE UNTIL 8:00

18   O'CLOCK TONIGHT TO SUBMIT A ONE-PAGE BRIEF?  BECAUSE I THINK WE

19   NEED TO GO BACK, AND WE ALSO NEED TO CONFER AMONGST OURSELVES

20   AND ALSO WITH THE CLIENT.

21               THE COURT:  OKAY.  ALL RIGHT.  SO IT'LL BE A

22   SIMULTANEOUS FILING.  8:00 O'CLOCK IS SORT OF LATE, BUT IF

23   THAT'S WHAT YOU NEED -- COULD IT BE DONE ANY EARLIER?  COULD IT

24   BE 7:30?

25               MR. JOHNSON:  7:30 IS FINE.
```

```
 1              MR. LEE:  7:30 IS FINE.

 2              THE COURT:  WILL ONE PAGE BE ENOUGH?  OKAY.  ALL

 3       RIGHT.  LET'S HAVE A ONE-PAGE SIMULTANEOUS SUBMISSION AT 7:30

 4       P.M.

 5              AND EARLIER I HAD ASKED YOU TO USE THE NEXT JX 50 LETTER

 6       IN SEQUENCE, AND 50B HAS ALREADY BEEN ADMITTED, AND I'VE

 7       ALREADY ISSUED A SEALING ORDER AS TO 50C.  I DON'T BELIEVE IT'S

 8       BEEN ADMITTED YET, BUT I GUESS YOU'LL NEED TO USE THE NEXT

 9       LETTER IN SEQUENCE FOR THE INITIAL CODE.

10              MS. MAROULIS:  YES, YOUR HONOR.

11              THE COURT:  ALL RIGHT.  THANK YOU.

12       LET ME GIVE YOU YOUR TIME TOTALS.  JUST GIVE ME ONE

13       MINUTE, PLEASE.

14          (PAUSE IN PROCEEDINGS.)

15              THE COURT:  OKAY.  TODAY APPLE USED 2 HOURS AND 14

16       MINUTES, SO THE TOTAL USED IS 19 HOURS AND 54 MINUTES.  YOU

17       HAVE 5 HOURS AND 6 MINUTES LEFT.

18          OKAY.  TODAY SAMSUNG USED, FOR ITS DEFENSIVE CASE, AN HOUR

19       AND 18 MINUTES, SO THE TOTAL FOR THE DEFENSIVE CASE IS 22 HOURS

20       AND 27 MINUTES; AND FOR THE AFFIRMATIVE CASE, IT WAS 1 HOUR AND

21       31 MINUTES, FOR A TOTAL OF 23 HOURS AND 58 MINUTES, SO YOU HAVE

22       1 HOUR AND 2 MINUTES LEFT.

23          SO I THINK WE ARE DEFINITELY GOING TO BE FINISHING ON

24       FRIDAY MORNING.

25          OKAY.  ANYTHING ELSE FOR TODAY?
```

1          MR. LEE:  NOTHING, YOUR HONOR.

2          THE COURT:  NO?  OKAY.

3          MR. JOHNSON:  NO, YOUR HONOR.

4          THE COURT:  ALL RIGHT.  THEN THANK YOU.  WE'LL SEE

5     YOU TOMORROW MORNING.

6          (THE EVENING RECESS WAS TAKEN AT 4:34 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____

      LEE-ANNE SHORTRIDGE, CSR, CRR

17    CERTIFICATE NUMBER 9595

18         DATED:  APRIL 21, 2014

19

20

21

22

23

24

25