# EXHIBIT A



FOCUS - 10 of 15 DOCUMENTS



Caution
As of: Jul 14, 2014

**CHURCH & DWIGHT CO., INC., Plaintiff, v. ABBOTT LABORATORIES, Defendant.**

**Civ. No. 05-2142 (GEB) (JJH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2008 U.S. Dist. LEXIS 49587**

**June 23, 2008, Decided
June 24, 2008, Filed**

**NOTICE:** NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Motion granted by Church & Dwight Co. v. Abbott Labs., 2008 U.S. Dist. LEXIS 49588 (D.N.J., June 23, 2008)

**PRIOR HISTORY:** Church & Dwight Co. v. Abbott Labs., 2008 U.S. Dist. LEXIS 49581 (D.N.J., June 23, 2008)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent owner sued defendant alleged infringer, asserting infringement of three patents related to over the counter pregnancy tests. The matter was before the court after a jury trial upon the Fed. R. Civ. P. 50(b) motion of the alleged infringer for judgment as a matter of law (JMOL) that the asserted claims were invalid, not infringed or willfully infringed, and that the patent owner was not entitled to an award of damages (JMOL).

**OVERVIEW:** The court's claim construction was not contested in the motion. Therefore, the court needed only to assess whether a reasonable jury could have found that the patent owner failed to prove that the alleged infringer's products contained each and every limitation in the relevant claims of the patents. The court found that there was sufficient evidence for the jury's conclusions. Next, the alleged infringer argued that a reasonable jury could only have found that it had provided clear and convincing evidence that the patents were invalid: (1) as anticipated by prior art, (2) as obvious, and (3) as failing to meet the best mode and written description requirements of 35 U.S.C.S. § 112. The court disagreed. Moving on, the court concluded that there was sufficient evidence from which a jury reasonably could find by clear and convincing evidence that the alleged infringer willfully infringed. Additionally, it concluded that the jury's damages determination related to lost profits and royalties was supported by sufficient evidence. Finally, it denied the alleged infringer's request for JMOL that the patent owner was barred by laches from recovering damages.

Case 5:12-cv-00630-LHK   Document 1946-1   Filed 07/16/14   Page 3 of 13

Page 2
2008 U.S. Dist. LEXIS 49587, *

**OUTCOME:** The motion was denied.

**COUNSEL:** [*1] For **CHURCH & DWIGHT CO., INC.,** Plaintiff: **JUDSON L. HAND, WANDA L. ELLERT,** *LEAD ATTORNEYS,* PROSKAUER ROSE, LLP, NEWARK, NJ.

For **ABBOTT LABORATORIES,** Defendant: **JAMES S. RICHTER,** *LEAD ATTORNEY,* **MELISSA STEEDLE BOGAD,** WINSTON & STRAWN, LLP, NEWARK, NJ.

For **ABBOTT LABORATORIES,** Counter Claimant: **JAMES S. RICHTER,** *LEAD ATTORNEY,* WINSTON & STRAWN, LLP, NEWARK, NJ.

For **CHURCH & DWIGHT CO., INC.,** Counter Defendant: **JAMES S. RICHTER,** *LEAD ATTORNEY,* WINSTON & STRAWN, LLP, NEWARK, NJ; **WANDA L. ELLERT,** *LEAD ATTORNEY,* **JUDSON L. HAND,** PROSKAUER ROSE, LLP, NEWARK, NJ.

**JUDGES:** GARRETT E. BROWN, JR., U.S.D.J.

**OPINION BY:** GARRETT E. BROWN, JR.

**OPINION**

### MEMORANDUM OPINION

#### BROWN, Chief Judge

This matter comes before the Court upon the motion of defendant Abbott Laboratories ("Abbott") for Judgement as a Matter of Law that the Asserted Claims are Invalid, Not Infringed or Willfully Infringed, and that Plaintiff is Not Entitled to an Award of Damages ("JMOL") (Docket No. 256). The Court has decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reason set forth below the Court denies Abbott's JMOL motion.

### I. BACKGROUND

This case involves three patents owned by Church & Dwight Co., Inc. ("C&D") related [*2] to over the counter pregnancy tests: U.S. Patent Nos. 5,714,389 ("the '389 Patent"), 5,989,921 ("the '921 Patent"), and 6,485,982 ("the '982 Patent") (collectively, the "Charlton Patents"). The Charlton Patents were issued on February 3, 1998, November 23, 1999, and November 26, 2002, respectively. C&D alleged that from 1998 to September 2003, Abbott infringed the Charlton Patents by selling a line of products under the brand name Fact Plus (the "Accused Products"). Three companies manufactured the Accused Products sold by Abbott: Abbott, Wyntek and ABI. C&D alleged that the products manufactured by Abbott, Wyntek and ABI infringed claims 1, 5, 6, 7, and 10 of the '389 Patent; claims 8 and 9 of the '921 Patent; and claims 7 and 19 of the '982 Patent. C&D also alleged that the ABI-manufactured test infringed claim 9 of the '389 Patent.

A trial was held from January 17, 2008 to February 15, 2008. The jury found that C&D proved by a preponderance of the evidence that Abbott literally infringed, contributed to the literal infringement of, or induced literal infringement of the Charlton Patents as outlined above. Moreover the jury found that Abbott had not proven by clear and convincing [*3] evidence that any of the claims at issue were invalid. The jury also found that C&D showed by a preponderance of the evidence that it was entitled to recover: (1) lost profits in the amount of $ 10,250,000.00; and (2) a reasonable royalty of $ 4,350,000.00 for infringing sales. Finally, the jury found that C&D proved by clear and convincing evidence that Abbott's infringement was willful. On March 7, 2008, Abbott filed the present motion.

### II. DISCUSSION

#### A. Standard of Review

A motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) "should be granted only if, viewing the evidence in the light most favorable to the non movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993); Mandile v. Clark Material Handling Co., 131 Fed. Appx. 836, 838 (3d Cir. 2005). "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." Lightning Lube, at 1166, citing [*4] Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 190 (3d Cir.1992).

"The question is not whether there is literally no evidence supporting the party against whom the motion is

directed but whether there is evidence upon which the jury could properly find a verdict for that party." Lightning Lube, 4 F.3d at 1166, (quoting Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978)); see also Raiczyk v. Ocean County Veterinary Hosp., 377 F.3d 266, 268 (3d Cir. 2004) ("A judge may overturn a jury verdict only when, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.") (quotations omitted).

**B. Infringement**

Patent infringement entails a two-step process. Research Plastics, Inc. v. Fed. Packaging Corp., 421 F.3d 1290, 1295 (Fed. Cir. 2005). The first step, claim construction, involves the determination of the scope and meaning of the patent claims. Id. Claim construction is a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). Second, the allegedly infringing device must be compared against the properly construed claim. Research Plastics, 421 F.3d at 1295. [*5] In order to succeed on a claim of literal infringement, the patentee must prove by a preponderance of evidence that an accused device contains "each and every limitation set forth in a claim." Frank's Casing Crew & Rental Tools, Inc., v. Weatherford Int'l Inc., 389 F.3d 1370, 1377 (Fed. Cir. 2004). This step requires a factual determination. Id.

After a two-day hearing, this Court construed the disputed claims terms identified by the parties in a Markman Order, dated August 27, 2007. The Court's construction is not contested in the present motion. Therefore, the Court need only assess whether a reasonable jury could have found that C&D failed to prove that Abbott's products contain each and every limitation in the relevant claims of the Charlton Patents.

Abbott argues that the Accused Products do not infringe the '389 and the '921 Patents because they do not contain a "Separate Control Site" or a "Control Site." Abbott also argues that the Accused Products do not infringe claims 5 and 10 of the '389 Patent for the additional reason that they do not contain a "Solution Consisting Essentially of Said Conjugate" or a "Dried Reagent Consisting Essentional [sic] of a Conjugate." [1] On the [*6] other hand, C&D contends that the evidence supports a finding that the Accused Products contain each and every element of the claims.

[1] Abbott does not contest the infringement of claims 7 and 19 of the '982 Patent. (Jan. 29, 2008 a.m Tr. at 21:25-22:15.)

**a. "Separate Control Site"**

The term "separate control site" is found in claims 1, 5, 6, 7, 9 and 10 of the '389 Patent. The Court construed the term "separate control site" to mean "a location on a test strip, set apart from the test site, that, through chemical and/or biological reaction, indicates whether the development of color at the test site is a true indication of the presence or absence of the ligand or an artifact caused by non-specific sorbtion." (Markman Order, Docket No. 101, P 8.) The term "control site" is found in Claims 8 and 9 of the '921 Patent. The Court construed the term "control site" to mean "a location on a test strip that, through chemical and/or biological reaction, indicates whether the development of color at the test site is a true indication of the presence or absence of the ligand." (Markman Order, Docket No. 101, P 19.)

Abbott argues that a "control site" shows a true indication by immobilizing the protein [*7] hCG at the site, thereby providing information about whether the conjugate recognized hCG in a specific way. Abbott argues that the Accused Products manufactured by Abbott and ABI contain a "procedural control," which does not provide a "true indication," but instead binds an "anti-mouse antibody" to the site and provides the user with "some information in terms of whether or not for example [the user has] applied enough urine to the test." (Abbott Br. at 37-38.) According to Abbott, the Accused Product manufactured by Wyntek "contains a site with an antibody to another protein, called BSA, that is irrelevant to hCG." (Id.) Therefore, according to Abbott, the Accused Products provide an "unrelated signal" that tells a user only that enough urine has been added to the test to move another protein to that site. (Abbott Br. at 39.) Abbott also argues that any control site on the accused product is not "set apart from the test site." (Id. at 45-46.)

C&D responds by arguing that Abbott is attempting to improperly limit the term "control site" to "a control containing an authentic sample of hCG." (C&D Br. at 38.) C&D presented evidence, in the form of Abbott's documents and the testimony [*8] of Dr. Lawrence J. Stern, that supports a finding that the Accused Products contain a "Control Site." Dr. Stern specifically stated that particular points of the test strips in the Accused Products functioned as "a location on a test strip, set apart from the

test site, that, through chemical and/or biological reaction indicates whether the development of color at the test site is a true indication of the presence of absence of the ligand or an artifact caused by non-specific sorbtion." (Jan. 23, 2008. Tr. (sealed) at 95:1-18.) Dr. Stern presented evidence that a control site was formed in the Abbott- and ABI-manufactured tests by anti-mouse antibodies and that anti-BSA constitutes the control site in the Wyntek-manufactured tests. (Jan. 22, 2008 p.m. Tr. at 88:9-16.) Dr. Stern stated that the Accused Products have a control site because "[w]e [*9] can have some confidence that what we see at the test site is a true indication of the presence or absence of hCG. That is we don't see anything at the test site, there's no hCG . . . in the urine, you're not pregnant. If there is something in the test site since the test worked it's a valid indication of the presence of . . . hCG in the urine." (Jan. 22, 2008 p.m. Tr. at 48: 6-12.) C&D presented evidence to support a finding that such control sites are consistent with the construction and the context of the asserted claims of the '389 and '921 Patents. (Jan. 22, 2008 p.m. Tr. at 95:16-99:17; Jan. 23, 2008. Tr. (sealed) at 9:11-23; 16:19-22; PTX 1; PTX 2.)

On the basis of the evidence cited by C&D, the Court concludes that when viewing the evidence in the light most favorable to C&D and giving it the advantage of every fair and reasonable inference, there is sufficient evidence from which a jury reasonably could find by a preponderance of the evidence that the accused product infringed with respect to the "control site" limitation.

Abbott also argues that the products it manufactured did not contain a "separate" control site. But Abbott admits that "there is a slight physical separation" [*10] between the positive and negative bar (Abbott Br. at 46), which compose the test site and control site on its product. On this basis, C&D argues that the evidence showed that "the Abbott-manufactured tests arranged in the plus/minus configuration are set apart." (C&D Br. at 41.) C&D notes that "Abbott conceded at trial that the negative bar (control site) and positive bar (test site) are physically and visually distinct." (Id. at 42.) The Court concludes that the jury could have reasonably agreed and found that C&D showed by a preponderance of the evidence that Abbott's product contained a "separate" control site.

**b. "Solution Consisting Essentially of Said Conjugate" or a "Dried Reagent Consisting Essentional [sic] of a Conjugate"**

The Court construed the claim term "solution consisting essentially of said conjugate," as found in Claim 5 of the '389 Patent and in the language "consisting essential[sic] of a conjugate" in claim 10 of the '389 Patent, to mean "a solution, including the conjugate and any other material that does not materially affect the basic and novel properties of the invention." (Markman Order, Docket No. 101, P 13.)

Abbott argues that the evidence "demands the conclusion [*11] that the accused products do contain materials that affect the basic and novel properties of the invention, and that these claims are not infringed." (Abbott Br. at 46-47.) Abbott points to testimony from its expert that the accused products contain an additional ingredient called a "meta-soluble protein" that "aid[s] in the 'resolubization' of the conjugate," which was described in Abbott's "Ching patents." Abbott also notes that "Dr. Charlton's attorneys argued during prosecution that the inclusion of the claim term 'consisting essentially of' was intended solely 'to exclude [such] metasoluble material.'" Thus, Abbott argues that C&D's argument is "directly contradicted by Dr. Charlton's own representations to the patent office." (Id. at 48.)

C&D counters that "the overwhelming evidence at trial established that the casein used in the Accused Products is not a metasoluble protein that materially affects the basic and novel properties of the invention." (C&D Br. at 42.) C&D has presented evidence that the term "metasoluble protein" has no technical meaning, but only appears in the Ching patent. (Jan. 29, 2008 a.m. Tr. at 60:10-14; 63:4-18; DTX 196.) C&D has also presented evidence [*12] that indicates that the casein used in the Accused Products is not treated in the manner taught by the Ching patent. (Jan. 23, 2008 a.m. Tr. (sealed) at 86:17-88:13.) Additionally, C&D has presented evidence that the casein used in the Accused Products does not materially affect the basic and novel properties of the invention. (Id. at 44:1-50:12.) Thus, the jury could have reasonably found that the Accused Products do not contain a metasoluble protein that materially affects the basic and novel properties of the invention.

The Court concludes that, viewing the evidence in the light most favorable to the C&D and giving it the advantage of every fair and reasonable inference, there is sufficient evidence from which a jury reasonably could find by a preponderance of the evidence that the Accused

Products infringed with respect to this term.

### C. Validity

Abbott argues that a reasonable jury could only have found that it has provided clear and convincing evidence that the Charlton Patents are invalid: (1) as anticipated by prior art; (2) as obvious; and (3) as failing to meet the best mode and written description requirements of 35 U.S.C. § 112. The Court disagrees.

#### 1. Anticipation

Under 35 U.S.C. § 102, [*13] a person is entitled to a patent unless "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Similarly, a person is entitled to a patent unless "the invention was described in . . . a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent." 35 U.S.C. § 102(e). To prove anticipation, a party must show by clear and convincing evidence that a "single prior art reference . . . expressly or inherently describes each and every limitation set forth in" the asserted claims. Trintec Indus., Inc. v. Top-U.S.A. Corp., 295 F.3d 1292, 1295 (Fed. Cir. 2002). Whether a patent is anticipated by a prior art reference is a question of fact. Schumer v. Lab. Computer Sys., 308 F.3d 1304, 1315 (Fed. Cir. 2002).

Abbott argues that the asserted claims are anticipated in light of the Mochnal, Ching, May and Rosenstein References. More specifically, Abbott argues that the Ching and May Patents anticipate the '389 and '921 patents and the Mochnal [*14] and Rosenstein References anticipate the '982 Patent. (Abbott Br. at 24.)

For reasons discussed below, the Court, in viewing the evidence in the light most favorable to the C&D and giving it the advantage of every fair and reasonable inference, concludes that a jury reasonably could find that Abbott had not proven anticipation by clear and convincing evidence. The jury was presented with evidence demonstrating that the USPTO previously considered and rejected the invalidity arguments put forward by Abbott. (Jan. 30, 2008 a.m. Tr. at 61:15-65:13). Further, as discussed below, the jury was presented with evidence indicating that the alleged pieces of prior art did not qualify as prior art and did not disclose all limitations of the asserted claims.

#### a. Effective Prior Art Dates

##### (1) Charlton Patents

Central to Abbott's anticipation argument is its contention that C&D did not meet its burden of proving a date of invention prior to June 1988 for any asserted claim. Sufficient evidence was presented for the jury reasonably to conclude that the '982 Patent was conceived and reduced to practice as early as September 1986. Such evidence includes: trial testimony and declarations from Dr. Charlton [*15] and his laboratory assistant, Ms. Margaret Mazzeo, the notebook entries of Ms. Mazzeo, a September 1986 memorandum discussing the Charlton invention, and the decisions within the USPTO that the Charlton claims from the '982 Patent were reduced to practice in September 1986. (Jan. 18, 2008 a.m. Tr. 19:14-34:22, 38:15-70:23; Jan. 18, 2008 p.m. Tr. 33:1-43:2, 47:3-55:5; PTX 156 at 33; PTX 182; PTX 489.) Abbott contends that the September 1986 experiment did not work properly because, as Dr. Graham testified, there was nonspecific binding "of those colloidal gold used that day on that test site to give you color." (Jan 30, 2008 a.m. Tr. at 24:20-23.) But the jury could reasonably reject Dr. Graham's conclusion, because it was contradicted by the testimony and the notebook of Ms. Mazzeo. (Jan. 18, 2008 p.m. Tr. 47:3 - 51:1; PTX 156 at 33.)

Similarly, the same sources provide sufficient evidence for the jury to conclude that elements the '389 and '921 Patents, including the "housing," were conceived and reduced to practice as early as April 1, 1987. (Jan. 18, 2008 a.m. Tr. at 51:2-61:11; Jan. 18, 2008 p.m. Tr. at 51:2-52:9; PTX 156 at 49.)

##### (2) Mochnal Application

Abbott argues that the asserted [*16] claims of the '982 Patent are anticipated by the Mochnal Application, U.S. Patent Application No. 06/872,357. Abbott repeats its argument that the Mochnal Application should be considered prior art as of its June 9, 1986 filing date. (Abbott Br. at 25-32.) This Court previously ruled that the jury should be instructed that the earliest date on which the Mochnal Application could be considered prior art is December 23, 1987. Indeed, the Court ruled twice on this issue. On February 7, 2008, the Court ruled that the jury should be instructed that the Mochnal

Application could not be considered prior art prior to December 23, 1987, when the European Mochnal Application was published. Abbott moved for reconsideration and the Court denied that motion on February 13, 2008. The Court issued an Opinion on February 29, 2008, which provided the Court's reasoning. (Memorandum Opinion, Docket No. 247.) Abbott fails to address this opinion in its JMOL motion. Thus, the Court will not revisit its decision. The Court concludes that there is sufficient evidence for the jury to determine that the invention date of the '982 Patent is prior to the relevant date pertaining to the Mochnal Application.

Additionally, [*17] the jury heard testimony from Dr. Deutsch that supported a finding that the Mochnal Application did not contain the limitation from the '982 Patent requiring a dried colored particle conjugate on the test strip. (Jan. 31, 2008 a.m. Tr. at 4-6.) Thus, even if the Mochnal Application was prior art, the jury could have reasonable held that it did not anticipate the '982 Patent.

### (3) The May Patent

The Court instructed the jury that the May Patent did not qualify as invalidating prior art as a matter of law. The Court ruled that the prior art date relevant for Section 102(e) is February 27, 1989. The Court ruled that the effective prior art date for Section 102(b) was November 3, 1988, the date on which the May application was published. Thus, even if the Court accepted Abbott's proposed date of invention for the Charlton Patents, June 1988, the May Patent could not be prior art. Abbott contends that this decision was legal error and that the proper prior art date for the May Patent is April 1988. (Abbott Br. at 24.) On this basis, Abbott contends that the May Patent anticipated the '389 and '921 Patents. (Id.) The Court disagrees for the reasons it previously explained. (Feb. 7, 2008 a.m. [*18] Tr. (sidebar) at 16-19). The Court sees no reason to revisit its decision.

### (4) The Ching Patent

The parties agree that the effective prior art date of the Ching Patent is July 13, 1987. (Abbott. Br. at 24; C&D Br. at 19.) Abbott argues that the asserted claims of the '389 and the '921 Patent are anticipated by the Ching Patent. As discussed above, there is sufficient evidence for the jury to find that the '389 and '921 Patents had an invention date of April, 1987. Moreover, the jury heard testimony that the co-inventors of the Ching Patent had not contemplated the "housing" or "casing" limitation disclosed in the '389 and '921 Patents. (Jan. 28, 2008 a.m. Tr. 69:24-70:5.) Therefore, for these two reasons, the jury could reasonable find that the Ching Patent did not anticipate the '389 and '921 Patents.

### (5) The Rosenstein Patent

The parties also agree that the effective prior art date of the Rosenstein Patent is March 27, 1987. (Abbott Br. at 25; C&D Br. at 19.) Thus, for the reasons discussed above, there is sufficient evidence for the jury to determine that the invention date of the '982 Patent was not anticipated by the Rosenstein Patent. [2]

> [2] Abbott does not argue that the Rosenstein Patent [*19] anticipates the '389 and the '921 Patents.

### 2. Obviousness

Pursuant to 35 U.S.C. § 103(a):

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103(a). Courts "thus consider whether a person of ordinary skill in the art would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so." Dystar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356, 1360 (Fed. Cir. 2006).

Obviousness depends on: (1) "the scope and content of the prior art"; (2) the "differences between the prior art and the claims"; (3) "the level of ordinary skill in the pertinent art"; and (4) "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure [*20] of others, etc." KSR Int'l Co. v. Teleflex Inc., et al., 550 U.S. 398, 127 S.Ct. 1727, 1734, 167 L. Ed. 2d 705 (2007), citing Graham v. John Deere Co., 383

U.S. 1, 17, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966). Given the presumption of validity surrounding a patent granted by the PTO, invalidity of the patent through obviousness must be proven by clear and convincing evidence. PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235, 1243 (Fed. Cir. 2002).

The Federal Circuit previously applied a test to determine obviousness, known as the "teaching, suggestion or motivation" test (the "TSM test"). Id. at 1734-35. Under this test, a "patent claim is only proved obvious if 'some motivation or suggestion to combine the prior art teachings' can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art." Id. at 1734. The continuing validity of the TSM test was called into question in KSR. Id. While the Supreme Court did not reject the TSM test outright, it did reject the Federal Court of Appeals' rigid application of the test. Id. at 1739. The KSR Court instructed courts to evaluate the four Graham factors using a "broad inquiry" and employing a "common sense" approach. See id. at 1741-43. The Court explained [*21] that "common sense" dictates that "familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." Id. at 1742. The Court also cautioned against "distortion caused by hindsight bias and . . . arguments reliant upon ex post reasoning." Id.

Abbott argues that the asserted claims of the '389 and '921 Patents are obvious in view of Mochnal Application and a "number of prior art references containing 'housings' or 'casings' as disclosed in the Charlton claims." Based on the above discussion regarding the date of invention for the Charlton Patents, the Court concludes that there was sufficient evidence for the jury to reject Abbott's characterization of the Mochnal application as prior art. Moreover, the jury was presented with sufficient evidence upon which it could conclude that the prior art did not disclose a "housing" or "casing" similar to that in the '389 and '921 Patents and did not disclose the dried colored particle conjugate requirement. (Jan. 17, 2008 p.m. Tr. at 86:24-89:7, Jan. 18, 2008 a.m. Tr. at 36:16, 38:25; PTX 579; Jan. 31, 2008 a.m. [*22] Tr. at 4:14-6:23.) Additionally, there was sufficient evidence upon which the jury could decline to find that a person of ordinary skill would have found the Charlton Patents obvious (Jan. 28, 2008 a.m. Tr. at 37:2-8; 41:2-44:2, 52:4-53:8; Jan. 30, 2008 a.m. Tr. at 103:18-106:25.) Specifically, the jury heard testimony that accomplished scientists working in the field, such as Dr. Graham, Dr. Gordon, Dr. Ching and Dr. Deutsch, did not put together all the components of the Charlton Patents. Moreover, the jury heard evidence regarding the secondary considerations, such as the commercial success of products incorporating the Charlton Patents and the failure of competing products. The jury was also free to weigh the credibility of Abbott's expert, Dr. Graham, with respect to his statement that the Charlton Patents were obvious even assuming that the Mochnal Application was not prior art. Therefore, contrary to Abbott's position, the Court is not persuaded that the jury's failure to fully credit Dr. Graham's testimony requires the Court to rule that the jury's validity determination should be reversed. Therefore, the Court concludes that the jury could reasonably find that Abbott had not [*23] proven obviousness by clear and convincing evidence. Thus, the Court will not grant judgment as a matter of law for Abbott on this issue.

### 3. Written Description and Best Mode

Abbott argues that the jury should have found the Charlton Patents invalid because they allegedly fail to meet the written description and best mode requirements of 35 U.S.C. § 112. The Court disagrees. The written description and best mode requirements are set forth in 35 U.S.C. § 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112.

#### a. Written Description

Courts have interpreted the written description requirement of 35 U.S.C. § 112 to require that the "disclosure as originally filed must convey with reasonable clarity to those skilled in the art that [another] was in possession of the invention." In re Reiffin, No.

Case 5:12-cv-00630-LHK   Document 1946-1   Filed 07/16/14   Page 9 of 13

Page 8
2008 U.S. Dist. LEXIS 49587, *23

06-1063, 199 Fed. Appx. 965, 2006 U.S.App. LEXIS 25246, at *5 (Fed. Cir. Oct. 6, 2006) [*24] (citations omitted).

Abbott argues that the written description requirement has been violated because the claims of the '982 patent do not require any housing or casing, despite the fact that the specification describes only devices and methods that utilize a "housing" or "casing."

However, C&D argues that there is sufficient evidence in the record for the jury to have found the Charlton claims valid, especially in light of the testimony of Abbott's expert, Dr. Graham. C&D argues that Dr. Graham conceded that the written description requirement was satisfied when he admitted that the USPTO Board of Patent Interferences did not make a mistake by concluding that Charlton was entitled to claim the strip without the casing or housing. (Jan. 30, 2008 a.m. Tr. at 79:1-10.) Moreover, C&D argues that Dr. Graham admitted that the '982 Patent contained sufficient information to convey to persons of skill in the art that Dr. Charlton was in possession of a test strip without a housing. (Jan. 30, 2008 a.m. Tr. at 79:21-25.)

The Court agrees with C&D. The issue is whether a skilled person in the art would understand that the applicant possessed a device without a casing, not whether the '982 required [*25] a device without a casing. Viewing the evidence in the light most favorable to the C&D and giving it the advantage of every fair and reasonable inference, the Court concludes that there is sufficient evidence from which a jury could reject Abbott's written description argument.

### b. Best Mode

A two step test is used to determine whether the best mode requirement has been met: "first, whether, 'at the time of filing the application, the inventor possessed a best mode for practicing the invention;' and second, whether the inventor's disclosure was 'adequate to enable one of ordinary skill in the art to practice the best mode of the invention.'" Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc., 518 F.3d 1353, 1364 (Fed. Cir. 2008) (quoting Bayer AG v. Schein Pharms., Inc., 301 F.3d 1306, 1320 (Fed. Cir. 2002)). The first step is "subjective and focuses on the inventor's state of mind at the time the application is filed." Id. The second step is "'objective and depends upon the scope of the claimed invention and the level of skill in the relevant art.'" Id. (citing Bayer AG, 301 F.3d at 1320). The best mode requirement "demand[s] disclosure of an inventor's preferred embodiment of the claimed [*26] invention. However, it is not limited to that." Id. (internal citations omitted). The Federal Circuit has "recognized that best mode requires inventors 'to disclose aspects of making or using the claimed invention [when] the undisclosed matter materially affect[s] the properties of the claimed invention.'" Id. (citations omitted).

Abbott argues that Dr. Charlton subjectively knew of a best mode of practicing his invention, but failed to disclose it in the patent application. (Abbott Br. at 34-35.) Specifically, Abbott claims that Dr. Charlton knew of a "type of buffer that yielded 'excellent product performance.'" Id. (quoting DTC 140; DTX 141).

C&D argues that the Charlton Patents satisfied the best mode requirement in light of Dr. Charlton's testimony. Specifically, Dr. Charlton testified that the buffer was not part of his inventions and that he did not consider the buffer to be part of the invention. (Jan. 18, 2008 a.m. Tr. at 85:4-88:11.) Dr. Charlton stated that he looked at many buffers and none of the buffers stood out as the best buffer. (Jan. 18, 2008 a.m. Tr. at 85:4-88:11; Jan. 18, 2008 p.m. tr. at 22:9-24:1.)

Viewing the evidence in the light most favorable to the C&D and [*27] giving it the advantage of every fair and reasonable inference, there is sufficient evidence from which a jury reasonably could find that Abbott did not prove its best mode argument by clear and convincing evidence.

### D. Willful Infringement

As discussed above, the jury found that C&D proved by clear and convincing evidence that Abbott's infringement was willful. Pursuant to In re Seagate Technology, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007), for a jury to properly find that Abbott willfully infringed, it must make two determinations by clear and convincing evidence. First, the jury must determine that after receiving notice of infringement, Abbott infringed "despite an objectively high likelihood that its actions constituted infringement of a valid patent." Id. Next, the jury must conclude that the "objectively-defined risk . . . was either known or so obvious that it should have been known to" Abbott. Id.

Abbott attacks both points. First, Abbott argues that

Case 5:12-cv-00630-LHK   Document 1946-1   Filed 07/16/14   Page 10 of 13

Page 9
2008 U.S. Dist. LEXIS 49587, *27

C&D failed to establish an "objectively high likelihood" of infringement. Second, Abbott argues that C&D failed to prove that an objectively high risk of infringement was or should have been known to Abbott. Finally, Abbott also argues [*28] that its conduct was consistent with standards of fair commerce and was reasonable.

The Court concludes that viewing the evidence in the light most favorable to the C&D and giving it the advantage of every fair and reasonable inference, there is sufficient evidence from which a jury reasonably could find by clear and convincing evidence that Abbott willfully infringed.

First, the Court concludes that the jury was presented with evidence that would support a finding of an "objectively high likelihood that [Abbott's] actions constituted infringement of a valid patent." Seagate, 497 F.3d at 1371. Specifically, the jury was shown evidence that: (1) the Charlton patents, because they were issued, were presumptively valid; (2) Abbott's invalidity defenses were not very strong and were previously rejected by the USPTO; (3) that Abbott did not contest infringement of the '982 Patent at trial; and (4) its infringement arguments as to the other patents were not convincing. (Jan. 30, 2008 a.m. at 61-70; PTX 1; PTX 2; PTX 3; PTX 4; PTX577.)

Second, the Court concludes that the jury was presented with evidence that would support a conclusion that the "objectively-defined risk . . . was either known [*29] or so obvious that it should have been known to" Abbott. Seagate, 497 F.3d at 1371. Specifically, the jury was shown evidence that: (1) C&D put Abbott on notice of its infringement of the Charlton Patents; (2) C&D's predecessor notified Abbott that "it was very difficult to sell visually readable lateral flow test strips without infringing" on the Charlton Patents; (3) Abbott knew that its infringement was an issue; (4) Abbott was "not going to change" until it could "investigate and do otherwise;" (5) Abbott sought to "insure" itself against liability exposure via indemnifications; and (6) Abbott sold its Diagnostics unit in part to avoid current and potential intellectual property issues. (Jan. 24, 2008 a.m. (sealed) Tr. at 8; Jan. 31, 2008 p.m. Tr. at 74-79; Jan. 31, 2008 p.m. Tr. at 49:6-50:8, 56:5-57:21; Feb. 2, 2008 a.m. Tr. at 4:16-20; PTX 16; PTX 17; PTX 40; PTX 41; PTX 43; PTX 580; DTX 75.) In light of this, the jury could reasonably have found by clear and convincing evidence that Abbott's infringement was willful.

For these reasons the Court will not overturn the jury's verdict on willfulness.

**E. Damages**

Abbott argues that the damages award was not supported by the evidence. [*30] Abbott also argues that C&D is not entitled to damages under the doctrine of laches.

**1. Evidentiary Support for Damages Award**

**a. Lost Profit**

The Court instructed the jury that a patent holder has demonstrated a loss of profits when all of the factors identified in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978) are met. (Feb. 14, 2008 a.m. Tr. at 40:16-24). The Panduit Court identified the following factors that a patent owner must prove by a preponderance of the evidence: "(1) demand for the patented product, (2) absence of acceptable non-infringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." Id. at 1156.

Abbott argues that C&D did not demonstrate that it is entitled to lost profits for three reasons: (1) C&D did not establish demand for the patented feature; (2) C&D did not establish the absence of non-infringing alternatives; and (3) C&D did not establish the amount of profit it would have made absent the alleged infringement. C&D argues that the jury's damages award is sufficiently supported by the evidence.

The Court agrees with C&D. First, there was sufficient [*31] evidence of demand for the patented technology. The jury was presented with testimony that the Charlton Patents represented a "breakthrough" and a "quantum leap in simplicity and use[r] friendliness and convenience." The jury also saw evidence that when the products using the technology from the Charlton Patents came onto the market, they entirely replaced the products incorporating the prior technology and that the market for over the counter pregnancy test kits grew significantly as a result of the Charlton Patents. Indeed, the jury was presented with evidence showing that all other over the counter pregnancy test kits on the market, other than patented C&D products, used the technology disclosed in the Charlton Patents. (Jan. 22, 2008 a.m. Tr. at 67:18-68:1, 70:24, 75:9-75:20.)

Case 5:12-cv-00630-LHK   Document 1946-1   Filed 07/16/14   Page 11 of 13

Page 10
2008 U.S. Dist. LEXIS 49587, *31

Second, C&D presented sufficient evidence for the jury to find an absence of non-infringing alternatives. (Id.) Abbott appears to argue that one non-infringing alternative would be to infringe on a separate C&D patent. The Court rejects this argument because there is no evidence to support a finding that Abbott could legally use that technology. (See Jan. 22, 2008 a.m. Tr. at 75:21-75:24.) Next, Abbott argues [*32] that a non-infringing alternative would result if it substituted the control site with a pH indicator. But, C&D presented evidence sufficient for the jury to conclude that the lack of a control site would not be acceptable to the marketplace. (PTX 90; Jan 22, 2008 a.m. Tr. at 94:16-95:12; Jan. 23, 2008 Tr. at 118:3-118:21; Jan. 24, 2008 a.m. Tr. at 53:9-53:18.)

Third, C&D presented sufficient evidence for the jury to determine an amount of profit it would have made if the Accused Products had not been on the market. C&D presented evidence indicating that the market was divided into a premium segment and a price/value segment, and that in the absence of the Accused Products, some customers would have chosen a different premium product. (Jan. 23, 2008 Tr. at 98:22 - 109:15, 126:21-129:25; Jan. 25, 2008 a.m. Tr. at 30:15-32:19, 34:4-35:1). Specifically, the testimony of Ms. Feldman and Dr. Bell, as supported by the evidence introduced during their testimony, indicates that customers that purchased Abbott's premium product would likely have purchased another premium product, such as C&D's product, if Abbott's premium product were not on the market. Dr. Bell then calculated the lost profits [*33] based upon the various market shares of the non-infringing premium products. Based on the testimony of these experts and the related exhibits, the jury had sufficient evidence to determine an amount of lost profits. (Jan. 25, 2008 a.m. Tr. at 41:4-51:4.)

### b. Royalties

Abbott argues that C&D did not establish that it was entitled to a reasonable royalty rate higher than 5% because C&D's damages expert used an improper methodology. Abbott contends that Dr. Bell's analysis is flawed because Dr. Bell ignored factor 2 of the test for determining a reasonable royalty set forth in Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Abbott also argues that Dr. Bell "utilized a faulty methodology" because his "analysis fails to establish a foundation for drawing any sustainable conclusions about a reasonable royalty allegedly owed by Abbott" and is improperly "mechanistic." (Abbott Br. at 58.) Abbott requests that the Court limit the royalties to 5%.

The Court concludes that there is sufficient evidence to support the royalties awarded by the jury. The Court rejects Abbott's argument that Dr. Bell ignored factor 2 of the Georgia-Pacific analysis. Factor [*34] 2 is "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit." Dr. Bell stated that he "considered all rates that Abbott either paid or received." (Jan. 25, 2008, Sealed, at 15:7-9.) Dr. Bell explained that he "used the Georgia-Pacific factors to figure out where in that range . . . the hypothetical negotiation the two parties would have agreed. [The upper limit] isn't the result of using Factor 2. It's just the upper end of the range." (Id. at 23:10-14.) The Court concludes that based on this testimony, Dr. Bell did not improperly ignore factor 2.

Similarly, the Court rejects Abbott's argument that Dr. Bell's analysis was somehow faulty or overly mechanistic. Abbott fails to cite any portion of the record supporting its argument in this regard. Moreover, it appears that Abbott may be simply repeating its Daubert argument regarding Dr. Bell, which was previously rejected by the Court. (Jan. 24, 2008 Tr. (Sidebar) at 39:22-40:16; Docket No. 137.) Abbott does not address this prior ruling, much less direct the Court to any error in its prior analysis.

Therefore, the Court concludes that the jury's damages determination was supported by sufficient [*35] evidence.

### 2. Doctrine of Laches

"Laches is an equitable defense which, if successful, bars recovery of damages for infringement which occurred prior to the filing of suit." Stryker Corp v. Zimmer, Inc., 741 F. Supp. 509, 512 (D.N.J. 1990). "The laches defense has two underlying elements: first, the patentee's delay in bringing suit must be 'unreasonable and inexcusable,' and second, the alleged infringer must have suffered 'material prejudice attributable to the delay.'" Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289 (Fed. Cir. 2004) (citing A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992)). As the defense of laches has its "origins in equity, a determination of laches is not made upon the

application of 'mechanical rules.'" A.C. Aukerman, 960 F.2d at 1032. Instead, the Court "must look at all of the particular facts and circumstances of each case and weigh the equities of the parties." Id.

"The length of time that may be deemed unreasonable has no fixed boundaries, but rather depends on the circumstances of the case." Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1371 (Fed. Cir. 2001) (quoting A.C. Aukerman, 960 F.2d at 1030). However, "[a] presumption [*36] of laches arises 'where a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity.' " Intirtool, 369 F.3d at 1297 (quoting A.C. Aukerman, 960 F.2d at 1028). This presumption requires the Court to infer unreasonable delay and resulting prejudice. The plaintiff then has the burden of coming forward with sufficient evidence to raise a genuine factual issue respecting the reasonableness of the delay or prejudice. A.C. Aukerman, 960 F.2d at 1037-39. This burden is a burden of production; the presumption may be eliminated even if the evidence introduced by the plaintiff is ultimately found not persuasive. Id. Once the presumption is overcome, the defendant is required to affirmatively prove both elements of laches. Hemstreet v. Computer Entry Systems Corp., 972 F.2d 1290, 1293 (Fed. Cir. 1992); Aukerman, 960 F.2d at 1037.

A patentee may have a valid excuse for delaying litigation where it was busy enforcing its rights elsewhere. Hemstreet, 972 F.2d at 1293. Negotiations between the parties can "push back the running of the time in a laches defense." A.C. Aukerman Co. v. Miller Formless Co., Inc., 693 F.2d 697, 700 (7th Cir. 1982). [*37] "[T]he negotiations must ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delay." Id.; see also Essilor Intern. v. Nidek Co., Ltd., Nos. 98-1558, 98-1587, 1999 U.S. App. LEXIS 28426, 1999 WL 989071, at *5 (Fed. Cir. Oct. 29, 1999) (negotiation to avoid litigation can be excusable delay).

With respect to the '389 Patent, Abbott argues that it is entitled to judgment as a matter of law that C&D is barred by the doctrine of laches from recovering any damages for the alleged infringement of the '389 Patent. Abbott claims that C&D has not overcome the presumption of laches that arises after six years. According to Abbott, C&D was aware or should have been aware of Abbott's infringing activities by February 1998, but C&D did not file suit until April, 2005. Abbott acknowledges that three letters were sent from C&D's predecessor to Abbott, but Abbott argues that the contacts during that period do not constitute the type of negotiations that are "continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays." (Abbott Br. at 48-51.)

C&D argues that it has rebutted the presumption of laches because it provided notice [*38] to Abbott of its infringement and engaged in negotiations with Abbott during the alleged period of delay. C&D also argues that its predecessor was busy enforcing its rights elsewhere. (C&D Br. at 44-46.) Additionally, C&D claims that Abbott suffered no prejudice as a result of the delay and that the Laches defense is precluded by Abbott's own inequitable conduct. (C&D Br. at 47-48.)

The Court will deny Abbott's request for judgement as a matter of law that C&D is barred by laches from recovering damages for the infringement of the '389 Patent. The Court concludes that C&D has rebutted the presumption of laches because it met its burden of coming forward with sufficient evidence to raise a genuine factual issue respecting the reasonableness of the delay. Specifically, the evidence supports a finding that C&D was enforcing its rights on the Charlton Patent against three parties between 2003 and 2005. (Jan. 24, 2008 a.m. Tr. 61:2-23; Jan. 24, 2008 (sidebar) Tr. 18:14-20:16; PTX 47). Moreover, there is evidence that C&D was in negotiations with Abbott during the delay. On February 27, 1998, C&D's predecessor sent notice of the '389 Patent to Abbott and stated that it was "interested in [*39] exploring the licensing of this new patent." (PTX 38.) In a letter dated, August 24, 1998, Abbott wrote to C&D's predecessor referencing a "phone conversation on June 5, 1998" and stating that Abbott "would appreciate getting a copy" of the proposed license terms. (DTX 493.) Abbott admits that it "restarted the negotiations by contacting [C&D's predecessor] in 2000 and 2001." (Abbott Br. at 9.) A series of contacts between the parties occurred between April and September 2001 relating to the licensing of the Charlton Patents. (PTX 167; DTX 1036; DTX 1039; Jan. 31, 2008 p.m. Tr. at 45:16-51:1.) There is also evidence that from February 2, 2004 to the time that C&D filed suit on April of 2005, the parties were attempting to settle the matter. (Jan. 24, 2008 Tr. (sidebar) at 19:21- 35:17; PTX 42 at 5; PTX; PTX 556-562.) On the basis of this evidence, the Court concludes that there is, at least, a genuine factual issue

regarding reasonableness of the delay.

Because the laches defense was not part of the jury trial, Abbott has not presented evidence demonstrating that C&D's delay with respect to the '389 Patent was otherwise unreasonable and inexcusable, or that Abbott suffered material [*40] prejudice attributable to the delay. Therefore, the Court will deny Abbott's motion in this respect, with leave to re-file after the presentation of evidence in support of Abbott's laches defense. Similarly, with respect to the '921 and '982 Patents, Abbott has not presented evidence to support its laches defense. Therefore the Court will deny its motion at the present time.

### III. CONCLUSION

For the foregoing reasons, Abbott's JMOL (Docket No. 256) is denied.

Dated: June 23, 2008

/s/ Garrett E. Brown, Jr.

GARRETT E. BROWN, JR., U.S.D.J.