United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

APPLE, INC., a California corporation,

           Plaintiff,

      v.

SAMSUNG ELECTRONICS CO., LTD, A
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New York
corporation; SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC,
a Delaware limited liability company

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 12-CV-00630-LHK

ORDER DENYING APPLE'S MOTION
FOR PERMANENT INJUNCTION

**[REDACTED]**

Apple, Inc. ("Apple") owns U.S. Patent Nos. 5,946,647 (the "'647 patent"); 8,046,721 (the "'721 patent"); and 8,074,172 (the "'172 patent"), which each cover features that Apple contends are related to the ease of using smartphones. Apple asserted these three patents and two others against Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung"). On summary judgment, the Court found that Samsung infringed the '172 patent. A jury then found that Samsung also infringed the '647 and '721 patents, and awarded damages for all infringed patents. Apple now moves, based only on these three patents, to enjoin Samsung from making, selling, developing, or advertising infringing features in its products. *See* ECF No. 1895-4 ("Proposed Order"). Apple's motion is fully briefed, and the Court heard oral arguments on July 10, 2014. Having considered the parties'

United States District Court
For the Northern District of California

1  arguments, the briefing, the relevant law, and the record in this case, the Court concludes that

2  Apple has not established that it is entitled to the permanent injunction it seeks.  Apple's Motion

3  for a Permanent Injunction is therefore DENIED.

4  **I.      TECHNOLOGICAL BACKGROUND**

5        Because the particular features claimed by the patents-in-suit are relevant to the Court's

6  conclusions, the Court begins by briefly reviewing the claimed features.

7        The '647 patent, entitled "System and Method for Performing an Action on a Structure in

8  Computer-Generated Data" and colloquially called the "quick links" patent, discloses "a system

9  and a method [that] causes a computer to detect and perform actions on structures identified in

10  computer data."  '647 patent Abstract.  The application for the '647 patent was filed on February 1,

11  1996, and the patent issued on August 31, 1999.  Asserted claim 9 depends from claim 1.  Both

12  claims recite:

13      1.   A computer-based system for detecting structures in data and performing
14         actions on detected structures, comprising:
          an input device for receiving data;
15         an output device for presenting the data;
          a memory storing information including program routines including
16            an analyzer server for detecting structures in the data, and for linking actions
              to the detected structures;
17            a user interface enabling the selection of a detected structure and a linked
              action; and
18            an action processor for performing the selected action linked to the selected
              structure; and
19         a processing unit coupled to the input device, the output device, and the
             memory for controlling the execution of the program routines.

20      9.   The system recited in claim 1, wherein the user interface enables selection of an
21         action by causing the output device to display a pop-up menu of the linked
          actions.

22  *Id.* cls.1, 9.  The '647 patent discloses a system and method for recognizing when certain patterns

23  or "data structures" are present in a data set, and automatically providing optional actions for a user

24  to perform on the data structures.  *See id.* col.2 ll.21-54.  For example, the system may scan a

25  Microsoft Word document and recognize when phone numbers or email addresses appear in the

26  document.  *See id.* col.1 ll.24-35; *see also id.* col.2 ll.42-53.  Then, the system may link actions to

27  these structures and allow the user to select an action.  *Id.*  As an example, when an e-mail address

28  is detected in a document, the system may automatically give the user the options to send an e-mail

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1    to the identified address or to store the e-mail address in an electronic address book.  *Id.* at col.5

2    ll.5-18.  As another example, when a phone number is detected in a document, the system may give

3    the user the option to place a call to that phone number or to place the number in an electronic

4    telephone book.  *Id.*

5        For infringement of the '647 patent, Apple accused the Messenger (also referred to as

6    "Messaging" by the parties) and Browser applications in the Gingerbread, Ice Cream Sandwich,

7    and Jelly Bean versions of the Android operating system, as implemented on nine accused

8    Samsung products: the Admire, Galaxy Nexus, Galaxy Note, Galaxy Note II, Galaxy S II, Galaxy

9    S II Epic 4G Touch, Galaxy S II Skyrocket, Galaxy S III, and Stratosphere.  *See* Tr. at 833:5-8,

10    839:1-6, 841:23-842:14.  The jury found that all nine accused products infringe the '647 patent.

11    *See* ECF No. 1884 at 9.

12        The '721 patent, entitled "Unlocking a Device by Performing Gestures on an Unlock

13    Image" and nicknamed the "slide to unlock" patent, is generally directed to devices with touch-

14    sensitive displays that users can unlock by performing certain gestures.  *See* '721 patent Abstract.

15    The '721 patent claims priority to an application filed on December 23, 2005, and issued on

16    October 25, 2011.  Asserted claim 8 depends from claim 7.  Both claims recite:

17          7.  A portable electronic device, comprising:
18              a touch-sensitive display;
              memory;
19              one or more processors; and
              one or more modules stored in the memory and configured for execution by the
20                 one or more processors, the one or more modules including instructions:
              to detect a contact with the touch-sensitive display at a first predefined location
21                 corresponding to an unlock image;
              to continuously move the unlock image on the touch-sensitive display in
22                 accordance with movement of the detected contact while continuous contact
                with the touch-sensitive display is maintained, wherein the unlock image is
23                 a graphical, interactive user-interface object with which a user interacts in
                order to unlock the device; and
24               to unlock the hand-held electronic device if the unlock image is moved from the
                first predefined location on the touch screen to a predefined unlock region
25                 on the touch-sensitive display.

26          8.  The device of claim 7, further comprising instructions to display visual cues to
              communicate a direction of movement of the unlock image required to unlock
27               the device.

28

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1    *Id.* cls.7, 8.  Thus, the patent generally discloses ways to unlock a smartphone by sliding a finger

2    (for example) across the screen to "continuously move" an image to an unlocking position.

3            For infringement of the '721 patent, Apple accused the touchscreen-based unlocking

4    mechanisms on six accused Samsung products: the Admire, Galaxy Nexus, Galaxy S II, Galaxy S

5    II Epic 4G Touch, Galaxy S II Skyrocket, and Stratosphere.  *See* Tr. at 650:14-16, 658:17-659:4.

6    The jury found that the Admire, Galaxy Nexus, and Stratosphere infringe the '721 patent, but that

7    the Galaxy S II, Galaxy S II Epic 4G Touch, and Galaxy S II Skyrocket did not infringe.  *See* ECF

8    No. 1884 at 9.

9            The '172 patent, entitled "Method, System, and Graphical User Interface for Providing

10   Word Recommendations" and colloquially called the "auto correct" patent, discusses systems for

11   suggesting replacements for text as a user types.  *See* '721 patent Abstract.  The application for the

12   '721 patent was filed on January 5, 2007, and the patent issued on December 6, 2011.  Asserted

13   claim 18 recites:

14           18. A graphical user interface on a portable electronic device with a keyboard and a
                 touch screen display, comprising:
15           a first area of the touch screen display that displays a current character string
                 being input by a user with the keyboard; and
16           a second area of the touch screen display separate from the first area that
17               displays the current character string or a portion thereof and a suggested
                 replacement character string for the current character string;
             wherein;
18           the current character string in the first area is replaced with the suggested
                 replacement character string if the user activates a key on the keyboard
19               associated with a delimiter;
20           the current character string in the first area is replaced with the suggested
                 replacement character string if the user performs a gesture on the suggested
21               replacement character string in the second area; and
             the current character string in the first area is kept if the user performs a gesture
22               in the second area on the current character string or the portion thereof
                 displayed in the second area.

23   *Id.* cl.18.  The '172 patent discloses a method, system, and interface for providing word

24   recommendations to users inputting text into a portable communication device and for allowing the

25   user to select the recommended words.  *See generally id.* at Abstract.

26           For infringement of the '172 patent, Apple accused the word recommendation feature of the

27   Messenger application in Android as implemented on seven accused Samsung products: the

28   Admire, Galaxy Nexus, Galaxy Note, Galaxy S II, Galaxy S II Epic 4G Touch, Galaxy S II

                                                    4

Skyrocket, and Stratosphere.  *See* ECF No. 1884 at 9; ECF No. 1151 at 9, 11 n.3.  Before trial, the Court granted summary judgment that the accused products infringe the '172 patent, ECF No. 1151 at 14, and the jury awarded damages for that infringement, *see* ECF No. 1884 at 9.

## II.        PROCEDURAL BACKGROUND

Apple's current motion follows multiple rulings regarding preliminary and permanent injunctions in the two patent lawsuits between Apple and Samsung in this Court, including three opinions from the Federal Circuit.  In its March 6, 2014 order denying Apple's request for a permanent injunction in the first lawsuit, this Court summarized the relevant proceedings in both litigations, the appeals to the Federal Circuit regarding injunctions, and the Federal Circuit's guidance regarding the proper analysis for assessing injunctive relief in patent cases.  *See* Order Denying Apple's Renewed Mot. for Permanent Injunction at 5-14, *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK (N.D. Cal. Mar. 6, 2014) (ECF No. 3015, "1846 Injunction Order").  Of particular relevance are the Federal Circuit's opinions in "*Apple I*" (678 F.3d 1314 (Fed. Cir. 2012)), "*Apple II*" (695 F.3d 1370 (Fed. Cir. 2012)), and "*Apple III*" (735 F.3d 1352 (Fed. Cir. 2013)).[1]

Apple filed the instant lawsuit on February 8, 2012, alleging that Samsung infringed several Apple patents not asserted in the first lawsuit.  On the same day, Apple moved for a preliminary injunction, seeking to enjoin Samsung's accused Galaxy Nexus smartphone based on four asserted patents.  *See* ECF No. 10.  This Court granted Apple's motion as to the so-called "unified search" patent, No. 8,086,604 (the "'604 patent," which is no longer asserted), but denied Apple's motion as to the other three patents, and entered a preliminary injunction.  *See* ECF No. 221.  Samsung appealed this Court's ruling as to the '604 patent.  On appeal, the Federal Circuit reversed the Court's finding that Samsung's alleged infringement of the '604 patent caused Apple irreparable harm and concluded that "the causal link between the alleged infringement and consumer demand for the Galaxy Nexus is too tenuous to support a finding of irreparable harm."  *See Apple II*, 695 F.3d at 1376.  This Court subsequently dissolved the preliminary injunction.  *See* ECF No. 1383.

---

[1]        In the 1846 Injunction Order, the Court referred to *Apple III* as "*Apple IV*."  Because the parties now refer to this Federal Circuit decision as "*Apple III*," the Court follows suit.

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1    At the summary judgment stage, the Court held that Samsung infringed the '172 patent.

2    ECF No. 1151 at 14.  This case then proceeded to trial.  On May 5, 2014, a jury returned a verdict

3    that nine of ten accused Samsung products infringed one or both of Apple's '647 and '721 patents.

4    *See* ECF No. 1884 at 9.  Apple sought approximately $2.1 billion in damages for infringement of

5    all five of its asserted patents, but the jury awarded Apple a total of $119,625,000.00 for

6    infringement of the three patents at issue.  *Id.* at 8.  Both parties filed motions for judgment as a

7    matter of law, challenging various portions of the jury's verdict.

8    In accordance with the Court's schedule for post-trial motions and briefing, Apple filed the

9    present motion on May 23, 2014.  ECF No. 1895-3 ("Mot.").  Samsung filed an Opposition on June

10   6, 2014.  ECF No. 1907-3 ("Opp'n").  Apple filed a Reply on June 13, 2014.  ECF No. 1918

11   ("Reply").  The Court held a hearing on July 10, 2014.

## III.    LEGAL STANDARD

13   The Patent Act provides that in cases of patent infringement a court "may grant injunctions

14   in accordance with the principles of equity to prevent the violation of any right secured by patent,

15   on such terms as the court deems reasonable."  35 U.S.C. § 283.  A patentee seeking a permanent

16   injunction must make a four-part showing:

17        (1) that it has suffered an irreparable injury; (2) that remedies available at law, such
          as monetary damages, are inadequate to compensate for that injury; (3) that,
18        considering the balance of hardships between the plaintiff and defendant, a remedy
          in equity is warranted; and (4) that the public interest would not be disserved by a
19        permanent injunction.

20   *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Though injunctions were once

21   issued in patent cases as a matter of course, the U.S. Supreme Court ruled in 2006 that "broad

22   classifications" and "categorical rule[s]" were inappropriate in analyzing whether to grant a

23   permanent injunction.  *Id.* at 393.  "An injunction is a drastic and extraordinary remedy, which

24   should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S.

25   139, 165 (2010).

26   The Court evaluates each of the four *eBay* factors in light of the Federal Circuit's guidance

27   and determines whether, on balance, the principles of equity support issuance of a permanent

28   injunction in this case.

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

*United States District Court*
For the Northern District of California

## IV. DISCUSSION

### A. Irreparable Harm

"[T]o satisfy the irreparable harm factor in a patent infringement suit a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple II*, 695 F.3d at 1374. The Federal Circuit has explained that "the purpose of the causal nexus requirement is to show that the patentee is irreparably harmed *by the infringement*. Without such a showing, it is reasonable to conclude that a patentee will suffer the same harm with or without an injunction, thus undermining the need for injunctive relief in the first place." *Apple III*, 735 F.3d at 1363 (emphasis in original). This test "reflects general tort principles of causation and applies equally to the preliminary and permanent injunction contexts." *Id.* at 1361.

With respect to the first prong of the irreparable harm standard, Apple asserts two forms of irreparable harm. Apple argues that it will suffer irreparable damage to its reputation as an innovator, similar to the harm suffered by the patentee in *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344-45 (Fed. Cir. 2013). Apple also contends that it will suffer irreparable harm from sales-based losses.

With respect to the second prong of the irreparable harm standard, Apple argues that trial evidence demonstrated a causal nexus between the alleged sales-based harm and Samsung's infringing behavior. Mot. at 12. Apple argues, however, that when reputational harm is alleged, the second prong of the irreparable harm test falls away and no separate proof of causal nexus is required. Reply at 2. Despite *Apple II*'s seemingly unambiguous language ("a patentee must establish both of the following requirements"), Apple argues that in *Douglas Dynamics*, the Federal Circuit "did not require separate proof of a causal nexus—because irreparable harm to the patentee's reputation ***necessarily flows*** from infringement[.]" *Id.* (emphasis in original).

#### 1. Causal Nexus and Reputational Harm

The Court first addresses Apple's assertions that, under *Douglas Dynamics*, reputational harm is not subject to the "causal nexus" requirement. As set forth below, the Court finds no

reason to depart from the Federal Circuit's guidance that a patentee must demonstrate a causal nexus between infringement and any alleged irreparable harm—including injury to reputation.

The Federal Circuit has repeatedly stated that the causal nexus inquiry is required to show irreparable harm.  In *Apple II*, the Federal Circuit stated that "although the irreparable harm and the causal nexus inquiries may be separated for the ease of analysis, they are *inextricably related concepts*."  695 F.3d at 1374 (emphasis added).  In *Apple III*, the Federal Circuit further observed:

> Apple proposes that because no single equitable factor in the injunction analysis is dispositive, "[a] strong showing of irreparable harm should offset comparatively weak evidence of causal nexus, and vice-versa."  Apple Br. 60.  Like Apple's first argument, this argument seems to be premised on the mistaken notion that the causal nexus is a separate factor from irreparable harm.  As we have explained, however, *the causal nexus requirement is part of the irreparable harm factor. Without a showing of causal nexus, there is no relevant irreparable harm*.  In other words, *there cannot be one without the other*.

735 F.3d at 1363 (emphases added).  Furthermore, without the causal nexus requirement, a court cannot distinguish "between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition."  *Id.* at 1361; *see also* Hon. Kathleen O'Malley, *Interesting Times at the Federal Circuit*, 63 Am. U.L. Rev. 949, 956 (2014) ("[W]e have explained – and outlined the contours of the requirement – that there must be some causal nexus between an infringed feature in a product and the consumer demand for that product before a permanent injunction barring that product can issue.").

There is no reason to forego this analysis in the context of reputational harm.  Even if harm will be done to Apple's reputation, Apple is not entitled to an injunction if that harm originates from some source *other than Samsung's infringing behavior*.  For example, it is possible that Apple's reputation as an "innovator" could be harmed if Samsung's *noninfringing* features are perceived as innovative, but that would not justify an injunction.

Apple argues that the Federal Circuit did not require proof of causal nexus in *Douglas Dynamics*, "presumably because that type of reputational harm flows directly from the mere fact of infringement."  Mot. at 5.  In *Douglas Dynamics*, however, the defendant did not challenge the existence of a causal nexus between the infringing behavior and the alleged harm.  Indeed, the Federal Circuit concluded that the patentee "has suffered irreparable injury *from [defendant's]*

8

**United States District Court**
For the Northern District of California

1    *infringement.*" 717 F.3d at 1345 (emphasis added).  Apple mistakenly asserts that the defendant

2    there "argued that the patentee could not prove irreparable harm because the patents 'cover only

3    some components of the accused snowplow assemblies.'"  Reply at 3 (quoting *Douglas Dynamics*,

4    717 F.3d at 1343).  Apple relies on language from the *Douglas Dynamics* opinion that did not

5    concern causal nexus.  It appears that the "some components" argument to which the Federal

6    Circuit referred did not dispute the *cause* of the alleged harm to the patentee, but rather the *degree*

7    of that harm.  *See Douglas Dynamics*, 2012 WL 2375012 at *48 (Defendant Cross-Appellant's

8    Brief) ("[Patentee] cannot demonstrate that it is suffering significant—much less irreparable—

9    harm from sales of [infringer's] snowplows.").  Because the issue was not raised, the fact that the

10   Federal Circuit did not explicitly address causal nexus in *Douglas Dynamics* cannot be interpreted

11   as an abrogation of the causal nexus requirement in the context of alleged reputational harm.

12          Later, in *Apple III*, the Federal Circuit implicitly confirmed this interpretation of *Douglas*

13   *Dynamics*, observing that causal nexus was not raised in *Douglas Dynamics*.  In *Apple III*, Apple

14   argued that the causal nexus requirement should not be applied in the context of a permanent

15   injunction, citing a number of cases, including *Douglas Dynamics*.  735 F.3d at 1361-62.  The

16   Federal Circuit rejected Apple's argument, listing the cases cited by Apple and observing: "there is

17   no indication that any of the infringers in *those cases* challenged the existence of a causal nexus

18   between their infringement and the patentees' alleged harm."  *Id.* at 1362 (emphasis added).  Apple

19   points to the portion of the *Apple III* opinion where the Federal Circuit distinguished *Douglas*

20   *Dynamics* specifically on the grounds that damage to reputation was "a type of harm not asserted

21   by Apple" in *Apple III*.  *Id.*  Apple argues that because it *does* assert damage to reputation in the

22   instant case, *Apple III*'s distinction of *Douglas Dynamics* is inapposite.  Apple errs, however, in

23   presuming that this is the *only* basis on which *Apple III* distinguishes *Douglas Dynamics.* The

24   language on which Apple relies is from a portion of the Federal Circuit's opinion that distinguishes

25   *Douglas Dynamics* from the facts in *Apple III* "on other grounds *as well.*"  *Id.* (emphasis added).

26   In *Apple III*, the Federal Circuit rejected Apple's reading of *Douglas Dynamics* for the same reason

27   that the instant Court rejects it today—in *Douglas Dynamics*, causal nexus was never in dispute.

28   Moreover, Apple argues that *Douglas Dynamics* implicitly abrogated the causal nexus requirement,

1   despite the court's express guidance that causal nexus and irreparable harm "are inextricably

2   related." It is highly unlikely that the Federal Circuit intended to eliminate an "inextricable"

3   requirement without comment, further analysis, or argument by the parties.

4        Apple's claim that "the mere fact of infringement" demonstrates irreparable reputational

5   harm also suggests the type of "categorical rule" that the U.S. Supreme Court rejected.  *See eBay*,

6   547 U.S. at 393.  For injury relating to either lost sales or reputation, Apple must demonstrate that

7   it will suffer irreparable harm if an injunction does not issue, *and* demonstrate that there is a causal

8   nexus between the alleged harm and Samsung's infringement of Apple's patents.

9                        **2.    Harm to Apple's Reputation**

10       Apple argues that, absent an injunction, it will suffer the same type of irreparable harm to

11  "reputation and brand" that warranted an injunction in *Douglas Dynamics.*  Mot. at 5.  Specifically,

12  Apple argues that Samsung's infringement erodes Apple's reputation in multiple respects,

13  "including by tainting Apple's reputation as an innovator, by leading customers and competitors to

14  believe that Apple is not entitled to enforce its patent rights (even when it prevails on its

15  infringement claims), and by disrupting Apple's attempts to maintain exclusivity over its patented

16  inventions."  *Id.* at 11.  Samsung disputes both irreparable harm and causal nexus, and further

17  argues that Apple's claim for damage to its reputation has been waived by Apple.  *See* Opp'n at 8.

18  This Court finds that Apple did not waive its arguments regarding reputational harm, but

19  determines that Apple has not met its burden to show irreparable harm to its reputation or goodwill

20  without an injunction, and has not demonstrated a causal nexus between Samsung's infringement

21  and any alleged reputational injury.

22                        **a.    Waiver**

23       In Apple's previous motion for a preliminary injunction in this matter, Apple argued that

24  Samsung's infringement of "key distinguishing features" diluted the "critical distinctiveness of

25  Apple's products and goodwill associated with those products."  Apple Mot. for Preliminary

26  Injunction (ECF No. 10) at 24.  In response to that motion, this Court observed that "[l]oss of

27  goodwill, as well as damage to reputation, can support a finding of irreparable harm."  ECF No.

28  221 at 76 (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)).

**United States District Court**
For the Northern District of California

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1   However, this Court found that even if Apple could establish a "reputation for innovativeness," a

2   likelihood of irreparable harm had not been shown at that time because "Apple has presented no

3   evidence explaining how the presence in the market of an infringing product . . . erodes that

4   goodwill." *Id.* at 77.

5         Despite Apple's arguments during the preliminary injunction phase, Samsung asserts that

6   Apple has since waived any claim for irreparable harm based on loss of goodwill or damage to

7   Apple's reputation as an "innovator." Opp'n at 8. Samsung relies on Apple's alleged failure to

8   include reputational harm in Apple's response to Samsung's Interrogatory No. 10, which requested

9   "the complete factual and legal basis" for Apple's claim to injunctive relief, including "what

10  irreparable injury APPLE has suffered . . . ." Fazio Decl. Ex. 2 (ECF No. 1907-10) at 65. Even

11  assuming that Apple needed to re-raise its preliminary injunction arguments regarding reputational

12  harm, Samsung's waiver argument fails because Apple referenced reputational harm in its response

13  to Samsung's Interrogatory No. 10. Specifically, Apple's response to Interrogatory No. 10

14  incorporates "by reference as if fully set forth herein all facts and evidence contained or identified

15  in Apple's Motion for Preliminary Injunction. . . ." *Id.* at 66-67. This incorporation notified

16  Samsung that Apple intended to continue asserting the same type of harm that was alleged during

17  the preliminary injunction phase, including reputational harm.

18        Even if this reference was not sufficient to preserve Apple's claim, Apple also served a

19  "Third Supplemental Response to Interrogatory No. 10," in which Apple provided "[a]dditional

20  evidence to show Apple's entitlement to injunctive relief, including the irreparable injury Apple

21  has suffered. . . ." *Id.* at 73. Apple stated that such harm is the subject of various expert opinions,

22  listed in the Supplemental Response and "incorporated by reference." *Id.* at 74. Apple

23  incorporated by reference the "Declaration of Christopher Vellturo, PH.D., dated February 8, 2012

24  and all exhibits, appendices, errata, and supplementations thereto." *Id.* That Declaration, provided

25  initially in support of the motion for a preliminary injunction, discloses the "Irreparable Injury Due

26  to Harm to Apple's Goodwill Resulting from Samsung's Infringement." Vellturo 2012 Decl. (ECF

27  Nos. 12-14) ¶¶ 96-98 (discussing the "goodwill Apple has built with end users," relying on surveys

28  and reports in the popular press). Samsung argues that these paragraphs are merely "conclusory"

11

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1   and are "insufficient to cure Apple's waiver by failing to raise this theory in response to Samsung's

2   Interrogatory." Opp'n at 8 n.10. While Samsung is correct that these paragraphs standing alone do

3   not suffice to prove that Apple will *in fact* suffer irreparable harm, these references were sufficient

4   to preserve the issue. The Court rejects Samsung's waiver argument.

**b.      Evidence of Reputational Harm**

6          To demonstrate irreparable reputation-based harm, Apple must first demonstrate that it has

7   goodwill or reputation that could be the subject of damage. Apple argues that it established a

8   reputation among consumers as an "innovator." Mot. at 6. Dr. Vellturo opined that the "distinctive

9   user experience Apple created and nurtured . . . is a critical determinant in the value of the Apple

10  brand," and cited survey evidence indicating that ███████████████████████████

11  ████████████████████████████████████████ Vellturo 2012 Decl. ¶ 96.

12  Dr. Vellturo further noted popular press articles ranking Apple first in a list of the world's most

13  innovative firms. *Id.* ¶ 97. Samsung leaves this contention largely unrebutted. Indeed, Samsung's

14  counsel acknowledged in his opening statement at trial that "Apple is an amazingly innovative

15  company." Tr. at 360:1-2. Accordingly, the Court finds that, like the plaintiff in *Douglas*

16  *Dynamics*, Apple has demonstrated an undisputed "reputation as an innovator." 717 F.3d at 1344.

17         However, Apple must still demonstrate that it will likely suffer irreparable reputational

18  harm absent an injunction, and that there is a causal nexus between that harm and Samsung's

19  infringement. Apple again relies extensively on *Douglas Dynamics*, arguing that all of the factors

20  discussed by the Federal Circuit in that case are present here as well. Specifically, Apple points to

21  the appearance of Apple's patented innovations in competing and allegedly inferior products;

22  Apple's reputation for enforcement of intellectual property rights; and Apple's general refusal to

23  license its patents. *See* Mot. at 5-11. In *Douglas Dynamics*, the Federal Circuit identified similar

24  facts and concluded the patentee's reputation would suffer irreparable harm from the infringing

25  behavior. 717 F.3d at 1345. Apple is incorrect, however, in arguing that *Douglas Dynamics*

26  demands a finding of irreparable harm whenever those factors are present.

27         In *Douglas Dynamics*, the district court concluded there was no injury to the patentee's

28  reputation because "there was no evidence that interested consumers confused the [patentee and

*United States District Court*
For the Northern District of California

12

infringer]." *Id.* at 1344.  The Federal Circuit rejected this finding, concluding that harm to a

company's reputation can occur "even absent consumer confusion." *Id.*  The factors identified by

the *Douglas Dynamics* court are listed as *examples* of damage to reputation that can exist outside of

the customer confusion context.  *Id.* at 1344-45 ("As just one example. . . .").  Apple's

interpretation of *Douglas Dynamics* would essentially create a *per se* rule in cases where the

patentee is an innovative company, forcing a finding of irreparable harm wherever the infringer is a

direct competitor.[2]  This is at odds with the flexible and equitable nature of the irreparable harm

inquiry.  *See eBay*, 547 U.S. at 391-92; *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142,

1149 (Fed. Cir. 2011).  In *Douglas Dynamics*, the factors cited by the court were context-specific

examples, and the court's ultimate conclusion relied on "evidence submitted by [the patentee]."

717 F.3d at 1345.  While the factors cited by Apple may form part of the analysis, *Douglas

Dynamics* does not alter the need to weigh all relevant evidence in conducting the irreparable harm

inquiry.  The Court now turns to Apple's specific arguments regarding reputational harm.

### i.    Presence of Patented Features in Competing Products

Apple argues that its reputation as an innovator is damaged when "customers [find] the

same 'innovations' appearing in competitors' [products]," including products considered less

prestigious and innovative.  Mot. at 6 (quoting *Douglas Dynamics*, 717 F.3d at 1345), 9.  Apple

argues that the harm to its reputation is "particularly acute" for the '647 and '721 patents because

Apple practices those patents in its own products.[3]  *Id.* at 7.  Furthermore, even if Apple does not

currently practice all of the patents at issue, Apple argues that it continues to sell products that

*compete* with infringing Samsung products.  *See Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d

1159, 1171 (Fed. Cir. 2014) ("[A] party that does not practice the asserted patent may still receive

an injunction when it sells a competing product.").

To establish harm, Apple relies on trial testimony from various witnesses about Apple's

reputation and the competition between Apple and Samsung.  Philip Schiller, Apple's Senior Vice

United States District Court
For the Northern District of California

---

[2]    At times, Apple's argument goes even further, suggesting that "reputational harm flows
directly from the mere fact of infringement," Mot. at 5, and that "irreparable harm to the patentee's
reputation **necessarily flows** from infringement," Reply at 2 (emphasis in original).
[3]    Samsung disputes that Apple in fact practices the '647 and '721 patents.  Opp'n at 13.

13

1   President of Worldwide Marketing, testified that he believes Apple values its reputation for

2   innovation: "I think it's really important to the very DNA of Apple that we're an innovator who

3   creates unique differentiations in our products that customers value."  Tr. at 451:8-452:9.

4   Mr. Schiller further stated that Samsung's alleged infringement and copying of Apple's intellectual

5   property "diminishes the value that we're bringing to customers" and "confuses customers about

6   the source of those things, whether Apple is being [an] innovator and doing these things or whether

7   Samsung or someone else is innovating," and that "[Samsung's infringement] has caused people to

8   question some of the innovations that we've created and Apple's role as the innovator."  *Id.* at

9   469:15-470:18, 473:25-474:21.  Additionally, Apple highlights statements from Samsung's

10  corporate witnesses, including Dale Sohn, who noted the importance of "know[ing] who my

11  competitors are," *id.* at 1633:20-25, and Todd Pendleton, who admitted that Samsung has been

12  perceived as a "fast follower" and "not an innovator," *id.* at 1696:2-1698:11.  Apple also points to

13  alleged admissions by Samsung's damages experts regarding competition.  Dr. Judith Chevalier

14  acknowledged that "Apple and Samsung are fierce competitors in this market."  *Id.* at 2433:9-17.

15  Dr. Tülin Erdem testified that certain unaccused features—such as video cameras and GPS—do not

16  differentiate smartphones in consumers' eyes.  *See id.* at 2340:5-22.  Finally, Apple cites internal

17  Samsung documents indicating that Samsung considered Apple a major rival.  *See* PX216 at 3

18  (Samsung document: "Beating Apple is no longer merely an objective, it is our survival strategy.");

19  DX431 at 5 (Samsung document: "Overcome Fast Follower Status & Establish Samsung as

20  Challenger Brand to Apple").

21          Apple further argues that its reputation suffers because its patented innovations have

22  appeared in Samsung products that are perceived as "less prestigious and innovative."  *See* Mot. at

23  9 (quoting *Douglas Dynamics*, 717 F.3d at 1345).  As evidence, Apple points to the statements

24  above by Mr. Pendleton regarding perceptions of Samsung as a "fast follower" and "not an

25  innovator."  *Id.* (quoting Tr. at 1696:2-1698:11).  Apple asserts that consumers may begin to

26  "associate Apple's patented features with a company viewed by many as 'not an innovator.'"  *Id.*

27          While Apple has presented significant evidence about the strength of its reputation and the

28  intensity of the parties' competition, the Court finds that Apple has not satisfied its burden of

14

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1    establishing irreparable reputational harm due to Samsung's infringing use of patented features. A

2    number of factors not present in *Douglas Dynamics* weigh against finding Apple suffered

3    irreparable harm to its reputation stemming from the appearance of Apple's patented features in

4    Samsung's products. First, Apple has provided only limited persuasive evidence of such actual

5    injury. The testimony above tends to show that Apple is recognized for innovation, and that

6    Samsung and Apple are "fierce" competitors. However, this evidence does not indicate that

7    Apple's reputation suffered as a result of Samsung's infringement. While Mr. Schiller testified that

8    Samsung's actions generally harm Apple's brand, this is true of competitors generally, and

9    Mr. Schiller did not link any harm to infringement of the three patented features in question. At

10    oral argument, Apple's counsel did not identify any other evidence of reputational harm. Apple

11    does not provide (for example) any surveys to establish that consumers have begun to question

12    Apple's role as an innovator or have difficulty differentiating Samsung and Apple products due to

13    the infringing features.

14          Second, Samsung argues persuasively that Apple's reputation has proved extremely robust,

15    *see* Opp'n at 11, weakening Apple's claim that it has suffered or will suffer irreparable harm to its

16    reputation from infringement of only three patents. Dr. Chevalier cites evidence that Apple's

17    reputation derives from products and features other than the three patents at issue. *See* Chevalier

18    Decl. (ECF No. 1907-5) ¶ 61 ("[T]here is no evidence that Apple's reputation as an innovator was

19    meaningfully connected to these patents prior to infringement."). Additionally, Apple executives

20    testified that highly publicized problems with its hardware and software have had little or no effect

21    on Apple's reputation. *See* Joswiak 7/9/13 Depo. Tr. (Fazio Decl. Ex. 3, ECF No. 1907-11) at

22    80:17-81:20 (stating that "AntennaGate" did not have "much of an impact on [Apple's] brand at

23    all"); Schiller 7/23/13 Depo. Tr. (Fazio Dec. Ex. 4, ECF No. 1907-12) at 87:24-88:7 (noting that

24    the "long-term effect of Antennagate was negligible"); Tr. at 514:7-20 (Schiller noting that the

25    iPhone did "extremely well" despite highly criticized "Maps" application in iOS 6). While not

26    dispositive, Apple's demonstrably robust reputation makes it less likely to be irreparably harmed

27    by the appearance of Apple's three patented features in Samsung's products.

28

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1    Third, Apple fails to demonstrate harm stemming from consumer association of Apple's

2    patented innovations with Samsung's allegedly "less prestigious" products.  In *Douglas Dynamics*,

3    the Federal Circuit noted the risk that consumers would associate the patentee's innovations with

4    less innovative products, and the patentee's reputation as an innovator would suffer as a result.  *See*

5    717 F.3d at 1344-45.  Apple asserts that same harm here, disparaging Samsung's perception as a

6    "fast follower" as opposed to an innovator.  *See* Mot. at 9.  However, Samsung's expert

7    Dr. Chevalier argues that these statements are taken out of context because this testimony

8    concerned only Samsung's reputation in the past.  *See* Chevalier Decl. ¶ 63.  To establish

9    Samsung's reputation as it stands today, Dr. Chevalier points to recent innovations in "large-

10   screened products, [Samsung's] Note product line, products using a stylus, and with respect to near

11   field communication," and to a 2013 survey that "listed Samsung as the second most innovative

12   company (behind only Apple)."  *Id.* ¶¶ 63-64.  Thus, the record indicates that Samsung's products

13   are also reputable.  Apple has not identified specific evidence that Samsung's infringing *products*

14   are perceived as "less prestigious," or that Samsung's products have been marketed as "[Apple's]

15   at half the price."  *Douglas Dynamics*, 717 F.3d at 1344, 1345.  By contrast, the infringing products

16   in *Douglas Dynamics* were of substantially inferior quality to those sold by the patentee.  *See id.* at

17   1348 (Mayer, J., dissenting) ("[S]nowplow distributors viewed Douglas' plows as very high quality

18   products, but saw Buyers' plows as low quality products."); *see also In re: BRCA1- and BRCA2-*

19   *Based Hereditary Cancer Test Patent Litig.*, No. 2:14-MD-2510, 2014 U.S. Dist. LEXIS 31345, at

20   *112 (D. Utah Mar. 10, 2014) (distinguishing *Douglas Dynamics* and denying preliminary

21   injunction where "Plaintiffs here offer no clear evidence suggesting that the public would view

22   Defendant's testing products as less prestigious or innovative.").

23   Fourth, as discussed in greater detail below, Apple has licensed ███████████ to

24   competing companies in the smartphone market.  Apple notes that it "has licensed the ███████

25   to IBM, Nokia, HTC, and Microsoft, and has licensed the ████████████ to IBM and HTC."

26   Mot. at 16.  In *Douglas Dynamics*, the patentee had "never licensed the infringed patents," 717

27   F.3d at 1345, so it was reasonable to conclude that an injunction would prevent those features from

28   appearing in competitors' products and eroding the patentee's reputation for innovation.  Here,

16

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1   Apple's claim for irreparable harm to its reputation as an innovator would be undermined by the

2   presence of the patented features in non-Apple products regardless of an injunction.  Consumers

3   are unlikely to understand that certain features appear in competing products due to licenses as

4   opposed to unauthorized infringement.

5           Fifth, Apple has not met its burden to establish a causal nexus between the patents at issue

6   and any alleged harm.  Apple must demonstrate that the features that infringe the '647, '721, and

7   '172 patents in Samsung's products are a significant factor causing any reputation-based harm.  *See*

8   *Apple I*, 678 F.3d at 1324 (reasoning that if the patented feature does not drive the alleged harm, a

9   likelihood of irreparable harm cannot be shown).  Here, the patents at issue cover three features in

10  complex smartphones that contain many different patented inventions.  *See* Chevalier Decl. ¶ 20;

11  Tr. at 1372:5-19 (Velluro testimony: "Q. . . . You've seen estimates that there are as many as

12  250,000 patents in a smartphone? . . . A. I've seen some estimates like that, yes.").  Apple argues

13  that *Douglas Dynamics* "enjoined entire snowplow assemblies" even though the patent covered

14  "'only some components of the accused snowplow assemblies.'"  Reply at 3 (quoting 717 F.3d at

15  1343).  This argument was answered in *Apple III*, where the Federal Circuit observed that where a

16  product is relatively simple, "the impact that the infringing features had on demand for the products

17  may never have been in doubt."[4]  735 F.3d at 1362.  Here, in contrast to *Douglas Dynamics,* there

18  is considerable disagreement whether any harm to Apple's reputation as an innovator shares a

19  causal nexus with the infringing features of Samsung's products.  Dr. Chevalier concluded that

20  "individual software features rarely impact consumer purchases, and some of the same evidence

21  suggests that individual software features would not drive Apple's reputation as an innovator."

22  Chevalier Decl. ¶ 62.  As noted above, Samsung's infringement consists of infringing three

---

23  [4]       *Apple III* did not specifically identify *Douglas Dynamics* as a "simple" case, but the thrust
24  of the court's holding was that "the causal nexus requirement applies regardless of the complexity
    of the products.  It just may be more easily satisfied (indeed, perhaps even conceded) for relatively
25  'simple' products."  735 F.3d at 1362.  *Douglas Dynamics* fits into this "simple" category of cases,
    in that causal nexus was not challenged.  While it is true that the product at issue in *Douglas*
26  *Dynamics* (a detachable snowplow) is likely more complicated than the "simple" products cited by
    the Federal Circuit in *Apple III* (*e.g.*, windshield wiper blades in *Robert Bosch*, 659 F.3d at 1145,
27  and orthopedic nails in *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1326 (Fed. Cir. 2008)), even
    a relatively complicated snowplow assembly stands in stark contrast to the extraordinarily complex
28  and multi-featured smartphones at issue here.

                                                    17

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

patented features out of many unaccused hardware and software components in smartphones and tablets.  At trial, Mr. Schiller conceded that he did not know if the patent claims at issue were used in Apple's products, or if any industry praise for Apple's products was related to the patented features.  *See* Tr. at 485:5-486:2.  Moreover, Apple does not contend that it practices the '172 patent, and Apple has not tied its reputation to infringement of that invention.  Accordingly, Apple has not demonstrated that the inclusion of three infringing features in Samsung's products irreparably damages Apple's reputation.

### ii.        Reputation for Enforcing Intellectual Property

Next, Apple argues that without an injunction, others might believe Apple "did not enforce its intellectual property rights." Mot. at 9 (quoting *Douglas Dynamics*, 717 F.3d at 1345).  Apple relies again on *Douglas Dynamics* to assert that a patentee's reputation is *necessarily* harmed if "customers and business partners" believe the patentee does not enforce its intellectual property rights.  *Id.*  This misstates *Douglas Dynamics.* While Apple points to its reputation among "customers and business partners," the *Douglas Dynamics* court focused only on the effect that intellectual property enforcement might have on "dealers and distributors" of the patentee's products.  717 F.3d at 1345.  *Douglas Dynamics* did not rely on consumers' perceptions of intellectual property enforcement.  Apple provides no evidence that smartphone consumers make purchasing decisions based on Apple's reputation for enforcing its intellectual property rights.

It is more plausible to suppose Apple's "business partners" are aware of Apple's reputation for enforcement of intellectual property rights.  However, Apple cannot demonstrate irreparable harm merely by reciting *Douglas Dynamics* and asserting that the same harm will occur without proof.  The *Douglas Dynamics* court relied on evidence established at trial, specifically citing an admission made by the defendant's expert.  *Id.* ("Furthermore, as Buyers's expert agreed, Douglas's reputation would be damaged if its dealers and distributors believed it did not enforce its intellectual property rights.").  Here, Apple's claims regarding a diminished reputation for patent enforcement are unconvincing.  Apple has engaged in vigorous patent litigation in this Court and others throughout the country.  *See Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK (N.D. Cal.); *Apple Inc. v. Motorola, Inc.*, No. 2012-1548, 2014 WL 1646435 (Fed. Cir. Apr. 25,

18

1  2014) (asserting '647 patent); *Certain Personal Data and Mobile Communc'ns Devices and*

2  *Related Software*, Inv. No. 337-TA-710, (USITC July 15, 2011) (asserting '647 patent); *Apple Inc.*

3  *v. High Tech Computer Corp.*, No. CA 10-166-GMS, 2011 WL 124446 (D. Del. Jan. 14, 2011);

4  *Apple Inc. v. Motorola Mobility, Inc.*, No. 3:11-CV-00178 (W.D. Wis.).  Apple accuses Samsung

5  of "relentlessly criticiz[ing] Apple for attempting to enforce its patent rights," and provides

6  examples of statements to that effect made by Samsung's counsel to the press.  Mot. at 9-10.  The

7  Court finds there is little established risk that any customers or business partners will believe that

8  Apple does not enforce its patent rights.  Apple has not demonstrated any causal nexus between

9  infringement of the three patents at issue and any perception of Apple's failure to enforce its

10  intellectual property rights.

11                                iii.      **Apple's Licenses**

12            Apple argues that its general refusal to license patents favors finding irreparable

13  reputational harm.  *Id.* at 10.  In *Douglas Dynamics*, the court concluded that the patentee had

14  "never licensed the infringed patents . . . so that it could maintain market exclusivity."  717 F.3d at

15  1345.  That exclusivity "is an intangible asset that is part of a company's reputation," the loss of

16  which irreparably harmed the patentee.  *Id.*  As noted above, Apple "has licensed the ▮▮▮▮▮ to

17  IBM, Nokia, HTC, and Microsoft, and has licensed the ▮▮▮▮▮▮▮▮▮ to IBM and HTC."

18  Mot. at 16.  Apple argues that the circumstances of these licenses diminish their relevance here,

19  because those licenses occurred in the context of cross-license agreements ▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮; were executed before the licensee entered the smartphone

21  market; or involved litigation settlements.  *Id.* at 16-17.

22            These circumstances are relevant in evaluating the evidentiary value of licenses as they

23  pertain to the sufficiency of money damages in a patent infringement case.  In addressing the

24  adequacy of legal remedies (*eBay* factor 2), this Court previously concluded in the first lawsuit

25  between the parties (Case No. 11-CV-1846) that "Apple's past licensing behavior demonstrates a

26  reluctance to license the utility patents-in-suit to Samsung, and several factors distinguish Apple's

27  licenses to IBM, HTC, and Nokia from the present circumstances."  1846 Injunction Order at 37;

28  *see also Apple III*, 735 F.3d at 1370 ("these factors are relevant to whether monetary damages will

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1   adequately compensate Apple for Samsung's infringement of the asserted patents"); *Acumed*, 551

2   F.3d at 1328 ("The fact of the grant of previous licenses, the identity of the past licensees, the

3   experience in the market since the licenses were granted, and the identity of the new infringer all

4   may affect the district court's discretionary decision concerning whether a reasonable royalty from

5   an infringer constitutes damages adequate to compensate for the infringement.").

6        In evaluating the harm to Apple's reputation as an innovator, however, these circumstances

7   are less relevant.  Apple provides no reason why consumers would be likely to appreciate or care

8   about the licensing origins of the myriad patented features on their smartphones or tablets.  *Cf.*

9   Chevalier Decl. ¶ 14 (describing features that drive consumer demand for smartphones).  For

10  example, if the patented features appear in smartphones from several licensed companies, it is

11  unlikely that consumers will associate those features exclusively with Apple, regardless of the

12  reasons why Apple granted those licenses.  Apple cannot argue that Samsung's use of patented

13  features will damage Apple's reputation for exclusivity if these features are not in fact exclusive to

14  Apple, due to licenses to competitors.  *Cf. Douglas Dynamics*, 717 F.3d at 1345 (observing the

15  patentee had "never" licensed the patents at issue, whether for monetary or non-monetary

16  compensation).  Therefore, after affording due consideration to the circumstances around Apple's

17  licenses, those licenses nevertheless suggest that Apple's reputation as an innovator among

18  consumers will not be irreparably harmed without an injunction.

19                    **3.      Harm From Lost Sales**

20        In addition to reputational harm, Apple contends that it suffered sales-based losses that

21  independently establish irreparable harm and entitlement to a permanent injunction.  Apple argues

22  that it has lost market share and downstream sales due to Samsung's infringement, as this Court

23  found in the first litigation between the parties.  Relying on survey data from its expert Dr. John

24  Hauser, Apple then contends that Apple provided direct evidence that consumers value the features

25  claimed in the '647, '721, and '172 patents.  Apple also argues that both parties greatly valued the

26  infringing features, and Samsung deliberately copied Apple's products.  Samsung disputes Apple's

27  characterization of the record, and further claims that Apple suffered no sales-based losses because

28

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1   the verdict shows that the jury awarded no lost profits.  The Court addresses these arguments in

2   turn.

3          Initially, Apple argues that it lost market share and downstream sales to Samsung, citing as

4   support this Court's ruling in the first lawsuit and certain trial testimony in the instant case.  *See*

5   Mot. at 11 (citing *Apple III*, 735 F.3d at 1360).  Samsung does not address these arguments.

6   Indeed, as detailed above, it is undisputed that Apple and Samsung compete directly in the market

7   for smartphones and tablets.  *See, e.g.*, Tr. at 557:22-558:9 (Schiller testimony); PX216 at 3

8   (Samsung document: "Beating Apple is no longer merely an objective, it is our survival strategy.").

9   It is also undisputed that this competition affects downstream sales because of so-called

10  "ecosystem" effects, where one company's customers will continue to buy that company's

11  products and recommend them to others.  *See* Tr. at 448:12-449:4 (Schiller testimony); *see also*

12  1846 Injunction Order at 15 ("Apple has also been harmed by its loss of downstream sales, as

13  network compatibility and brand loyalty cause many consumers to be 'locked in' to either Apple or

14  Samsung after their initial purchase.").

15         The Federal Circuit observed that "[w]here two companies are in competition against one

16  another, the patentee suffers the harm—often irreparable—of being forced to compete against

17  products that incorporate and infringe its own patented inventions."  *Douglas Dynamics*, 717 F.3d

18  at 1345.[5]  Here, the record establishes that the competition between Apple and Samsung was

19  "fierce."  Tr. at 2433:9-17 (Chevalier testimony).  Indeed, evidence established that Apple was

20  Samsung's "largest smartphone competitor" in the U.S. market.  PX3002 (DiCarlo deposition, ECF

21  No. 1920 at 3).  The presence of direct competition between Apple and Samsung in the smartphone

22  market weighs in favor of finding irreparable harm.  *See Presidio Components, Inc. v. Am.*

---

23  [5]    Apple erroneously relies on this quote from *Douglas Dynamics* to support an argument for

24  harm to Apple's reputation for innovation.  While the Federal Circuit concluded that the patentee
    had suffered reputation-based harm, that was not the only type of harm identified.  Rather than

25  establishing any particular type of irreparable harm, the *Douglas Dynamics* opinion's "direct
    competition" analysis appears to bear on the question of irreparable harm more generally, or with

26  respect to sales-based losses.  *See, e.g., Trebro*, 748 F.3d at 1171 ("Trebro and FireFly are direct
    competitors selling competing products in this market.  Thus the record strongly shows a

27  probability for direct harm."); *Broadcom Corp. v. Qualcomm Inc.*, 543 U.S. 683, 703 (Fed. Cir.
    2008) ("Qualcomm has previously conceded. . . indirect competition. . . . Thus, Broadcom

28  provided evidence of irreparable harm.").

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1    *Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same

2    market is certainly one factor suggesting strongly the potential for irreparable harm . . . .").

3    However, Apple must still provide specific evidence of causal nexus between any such harm and

4    Samsung's infringement.

                        a.        **Evidence of Consumer Demand**

6                To show that consumers value the infringing features, Apple relies on a conjoint study from

7    Dr. Hauser and faults Samsung for not offering comparable survey data of its own.  Samsung

8    responds that Apple's conjoint survey is flawed, based on rebuttal opinions from its experts

9    Dr. David Reibstein and Dr. Erdem.  *See* Reibstein Decl. (ECF No. 1907-7); Erdem Decl. (ECF

10   No. 1907-6).

11               In the first lawsuit between these parties (Case No. 11-CV-1846), the Court analyzed a

12   similar conjoint survey from Dr. Hauser that purported to show demand for the patented features in

13   that case.  *See* 1846 Injunction Order at 16.  Following the Federal Circuit's guidance in *Apple III*,

14   this Court evaluated Dr. Hauser's survey in combination with Apple's additional evidence

15   regarding copying and ease of use, for purposes of determining whether to enter a permanent

16   injunction.  The Court identified numerous potential flaws with that conjoint analysis, finding that

17   the survey could not account for actual market prices, provided little information about the

18   significance of any price increases supposedly attributable to the patented features, and inflated the

19   value of the patents by overemphasizing the relevant features while inadequately presenting

20   noninfringing alternatives.  *See generally id.* at 16-29.  As a result, the Court concluded that

21   "Dr. Hauser's survey results simply do not allow the Court to determine whether the patented

22   features meet [the] test" for causal nexus.  *Id.* at 29.

23               In the instant case, the Court previously reviewed Dr. Hauser's current survey (as disclosed

24   in his expert report) in the context of a *Daubert* challenge by Samsung.  *See* ECF No. 1326.  The

25   Court summarized Dr. Hauser's methodology in the instant case and compared it to Dr. Hauser's

26   survey in the first lawsuit between the parties (Case No. 11-CV-1846).  The Court noted that his

27   methods in the instant case were "identical" with respect to his analysis of "willingness to pay" in

28   the first lawsuit, but different in that Dr. Hauser added a second set of survey options in the instant

22

**United States District Court**
For the Northern District of California

1    case to measure the number of Samsung customers who would not have purchased Samsung

2    products without the patented features.  *See id.* at 24-27.  In the current litigation, the Court

3    declined to exclude Dr. Hauser's testimony under Federal Rule of Evidence 702, partly because

4    Samsung failed to brief the issue of the accuracy of the survey's descriptions of the asserted

5    patents.  *See id.* at 36.

6          Against this background in both lawsuits regarding Dr. Hauser's conjoint survey

7    techniques, Apple's instant motion makes only cursory arguments about how the conjoint survey

8    evidence demonstrates causal nexus.  Apple devotes only two paragraphs in its opening brief to

9    Dr. Hauser's conjoint study, one of which targets Samsung's lack of comparable survey evidence.

10   *See* Mot. at 12-13.  On the other hand, Samsung points to extensive critiques of Apple's conjoint

11   study by two of its experts, both at trial and in declarations submitted for purposes of this motion.

12         At trial, Dr. Reibstein testified that Dr. Hauser's conjoint study was flawed because the

13   study "omitted the major factors and major drivers of sales."  Tr. at 2071:15-2072:10.  Dr.

14   Reibstein testified that none of the patented technologies appeared in an independent review of

15   online smartphone advertising.  *See id.* at 2073:4-2074:11; *see also* Reibstein Decl. ¶¶ 53-55.

16   Dr. Reibstein also testified that he performed an independent "pretest" in which he screened

17   another set of participants "in the same way that Professor Hauser did," but also tested for

18   participant confusion as to Dr. Hauser's questions, and found that each participant expressed

19   confusion about at least one patented feature.  Tr. at 2080:3-2086:19; *see also* Reibstein Decl.

20   ¶¶ 34, 45-47 (describing pretest).  Dr. Reibstein opined that the conjoint study produced

21   nonsensical results, such as the conclusion that the patented word correction feature (corresponding

22   to the '172 patent) was worth about $102 on a phone that cost $149.  *Id.* at 2100:17-2101:16.  Dr.

23   Reibstein acknowledges that these dollar figures corresponding to willingness to pay are "not

24   strictly additive" because the aggregate willingness to pay may be "either higher or lower than the

25   sum of the willingness to pay estimates for the individual features," but maintains that these results

26   are "unreasonably large."  Reibstein Decl. ¶ 92 n.130.  Additionally, Dr. Reibstein and Samsung's

27   technical experts testified that the descriptions of the patented features in Apple's conjoint study

28   overstated the scope of the claimed features and improperly included noninfringing alternatives.

United States District Court
For the Northern District of California

23

1    *See id.*. ¶¶ 13-24, 53 ("Professor Hauser's conjoint surveys here did not include numerous features

2    that Samsung prominently highlighted to consumers."); Tr. at 1798:9-1801:14 (Jeffay testimony on

3    survey description of the '647 patent), 1978:15-1982:1 (Greenberg testimony on survey description

4    of the '721 patent), 2029:8-2031:2 (Wigdor testimony on survey description of the '172 patent).

5         Apple insists that conjoint studies are generally reliable and widely used, and that Samsung

6    should have tested Dr. Hauser's results with Samsung's own conjoint studies.  *See* Reply at 8.

7    Apple further notes that Dr. Reibstein admitted at trial that he could not explain why certain

8    participants in his pretest were "confused" about descriptions of patented features in Dr. Hauser's

9    survey.  *See* Tr. at 2136:10-20; Reply at 8.  Dr. Reibstein also admitted that he did not disclose

10   statistical validity tests for his pretest.  *See* Tr. at 2142:10-2143:10.  These admissions cast some

11   doubt on Dr. Reibstein's pretest and conclusions regarding confusion.  Moreover, during the

12   preliminary injunction proceedings in the instant case, Samsung's expert Michael Wagner

13   criticized Apple for *not* putting forth "conjoint analyses" to quantify customer demand for the

14   infringing features.  Wagner Decl. (ECF No. 131) ¶ 116 ("Apple has put forth no surveys, conjoint

15   analyses, or hedonic regressions to prove this critical link."); *see also* Tr. at 2488:14-2490:20

16   (Chevalier testimony: "Q. So just so the jury has the chronology down, we have Mr. Wagner on

17   behalf of Samsung suggesting that a conjoint analysis can be used, correct?  A. Well, among other

18   things.").

19        Apple also argues that Samsung's alternative consumer studies were unreliable.  *See* Reply

20   at 8.  The Court agrees that Samsung's alternative studies were not convincing.  Dr. Chevalier

21   conducted a "sentence-counting" exercise that involved taking online reviews of smartphones,

22   converting them to individual sentences, and counting the number of references to patented and

23   unpatented features.  *See* Tr. at 2375:14-2380:3.  From the results, she concluded that the "top

24   drivers of smartphone purchases" are unpatented features such as phone carrier, price, and battery

25   life.  *Id.* at 2379:19-2380:3.  Dr. Erdem performed an "eye-tracking" study where she "tracked the

26   movements of the eyes of consumers" as they viewed a mimicked shopping website for

27   smartphones.  *Id.* at 2295:6-2298:13.  Dr. Erdem concluded that "major attributes" affected

28   consumer choices, not "minor attributes."  *Id.* at 2304:5-19.

**United States District Court**
For the Northern District of California

24

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1    However, both of these Samsung studies had significant problems.  Dr. Chevalier's study

2    tallied "mentions" of features without attempting to distinguish positive and negative statements.

3    *Id.* at 2479:11-14.  Dr. Chevalier's study also counted spurious "reviews" that were unintelligible

4    (*e.g.*, *id.* at 2482:16-25: "This phone betrayed me.  When I was sleeping, it slapped me and Seerei

5    said a bad werd.") or for fake products (*id.* at 2484:2-21: "I was sold a fake.").

6    Dr. Erdem's study did not include any of Apple's patented features, and attempted only to

7    estimate how consumers view "major" and "minor" attributes.  *See id.* at 2301:7-2302:2, 2321:2-

8    11.  Dr. Erdem concluded that Samsung's near-field communication capability was a minor phone

9    feature, yet Samsung views this feature as important.  *See id.* at 2317:13-2318:15.  Dr. Erdem's

10   study also identified 21 features that were supposedly unimportant, but Dr. Reibstein stated that 13

11   of those same features appeared often on consumer websites.  *See id.* at 2343:8-17.  Moreover, both

12   Drs. Chevalier and Erdem conceded that, to their knowledge, no court in the United States has

13   approved their respective study methodologies.  *See id.* at 2477:11-15 (Chevalier), 2347:14-24

14   (Erdem).  Overall, the Court does not find Samsung's competing consumer research persuasive.

15   However, the flaws in Samsung's studies do not relieve Apple of its burden to demonstrate

16   consumer demand for the patented features, or remedy the limitations of Apple's conjoint study.

17   Apple's criticisms of the analyses of Drs. Reibstein, Chevalier, and Erdem do not rebut Samsung's

18   critiques of Dr. Hauser's techniques or show that Apple's conjoint study in this case establishes a

19   causal nexus.  The weight of the evidence shows that Apple's conjoint study fails to demonstrate

20   that the features claimed in the '647, '721, and '172 patents drive consumer demand for Samsung's

21   infringing products.

22                    **b.      The Parties' Perceptions of the Patented Features**

23   Next, Apple claims that the evidence shows that both Samsung and Apple viewed the

24   patented features as important to customers.  Apple argues that causal nexus exists because

25   "Samsung views the patented features as important to consumers" and "Samsung's own conduct

26   confirms that the patented features are important to consumers," citing evidence that Samsung

27   copied and praised the infringing features.  Mot. at 13, 14.  Similarly, Apple argues that it "views

28

25

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

1    its patented features claimed in the '647 and '721 patents as critical elements of an Apple user's

2    unique experience."  *Id.* at 14.

3          The Federal Circuit has previously observed, in connection with Apple's allegations of

4    copying by Samsung, that: "While the evidence that Samsung's employees believed it to be

5    important to incorporate the patented feature into Samsung's products is certainly relevant to the

6    issue of nexus between the patent and market harm, it is not dispositive.  That is because the

7    relevant inquiry focuses on the objective reasons as to why the patentee lost sales, not on the

8    infringer's subjective beliefs as to why it gained them (or would be likely to gain them)."  *Apple I*,

9    678 F.3d at 1327-28; *see also Apple III*, 735 F.3d at 1367 ("Apple's evidence of copying by

10   Samsung may be relevant, but it is insufficient by itself to establish the requisite causal nexus.").

11   Thus, the parties' subjective beliefs about what drives consumer demand are relevant to causal

12   nexus, but do not independently satisfy the inquiry.

13         Turning to Apple's specific allegations, Apple first claims that Samsung's internal pre-

14   litigation documents reveal Samsung's valuation of the infringing features.  For the '647 patent,

15   Apple cites an internal Samsung report that shows iPhone screens and notes the "[n]eed to improve

16   usability by providing Links for memo contents" (PX146 at 37); an internal Samsung document

17   that copied a figure from the publication of one of the '647 patent's inventors (PX107 at 52); and

18   Samsung's user manuals (PX233 at 362; PX237 at 823).  Regarding the '721 patent, Apple points

19   to other internal Samsung documents showing that Samsung tried to create unlocking designs

20   based on the iPhone (*e.g.*, PX119; PX121); testimony from Samsung engineer Youngmi Kim

21   regarding the value of designs for unlocking (Tr. at 1729:3-11); and Samsung e-mails noting that

22   certain carriers disapproved of the noninfringing "circle lock" alternative (PX181 at 5).  Moreover,

23   the jury found that Samsung willfully infringed the '721 patent.  ECF No. 1884 at 7.  As to the

24   '172 patent,[6] Apple refers to feedback documents indicating that some users criticized certain

25   Samsung keyboard and word-correction designs (PX168 at 4; PX169 at 4; PX219 at 104).

26

27   _____

[6]      For purposes of this litigation, Apple does not claim that it practices the '172 patent, and
28   does not claim that Samsung copied any features from the '172 patent.

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1    Apple's cited evidence indicates that Samsung paid close attention to, and tried to

2    incorporate, certain iPhone features.  While indicative of copying by Samsung, this evidence alone

3    does not establish that the infringing features drove customer demand for Samsung's smartphones

4    and tablets.  *See Apple III*, 735 F.3d at 1367.  Some of the cited Samsung documents show that

5    Samsung valued numerous other noninfringing features.  For example, Apple refers to one page

6    from a Samsung manual as an example of Samsung instructing customers on how to use a feature

7    that infringes the '647 patent.  PX233.  However, that manual is over 1300 pages and describes

8    dozens of unaccused features.  Thus, the existence of instructions for an individual feature does not

9    necessarily show that the feature drives demand.

10    Next, Apple argues that Samsung continued to use the infringing features in Samsung

11    products, despite receiving notice of the '647, '721, and '172 patents and the filing of this lawsuit.

12    According to Apple, "Samsung's unwillingness to remove the infringing features from its products

13    only further reinforces the value of, and consumer demand for, Apple's patented inventions."  Mot.

14    at 14.  While Samsung has continued to sell infringing products following the start of this

15    litigation, Samsung might have had other reasons for doing so.  Samsung has maintained that it did

16    not need to remove any features because it reasonably believed that it did not infringe any valid

17    patents.  Before, during, and after trial, Samsung vigorously contested validity and infringement of

18    all three patents at issue here.  Moreover, as explained above, Samsung's subjective beliefs are not

19    dispositive of causal nexus.  As this Court found before, "though evidence that Samsung attempted

20    to copy certain Apple features may offer some limited support for Apple's theory, it does not

21    establish that those features actually drove consumer demand."  *Apple, Inc. v. Samsung Elecs. Co.*,

22    909 F. Supp. 2d 1147, 1156 (N.D. Cal. 2012).

23    Apple also argues that its own use of the patented features in its products and

24    advertisements demonstrates that the features are important to consumers.  *See* Mot. at 14-15.

25    Apple identifies only evidence relating to the '647 and '721 patents.  For the '647 patent, Apple

26    cites a few lines of testimony from Apple engineer Thomas Deniau, who described his work on

27    "data detectors" and stated that "[m]ost of Apple's products use data detectors."  Tr. at 791:15-18.

28    However, Mr. Deniau was not presented as an expert witness and did not directly equate asserted

27

**United States District Court**
For the Northern District of California

1    claim 9 of the '647 patent with "data detectors."  Moreover, his testimony that most Apple products

2    use this feature does not establish that data detectors drive consumer demand.  For example, most

3    of Apple's products also use batteries, but that does not mean that batteries drive demand for those

4    products.  *See Apple II*, 695 F.3d at 1376 (noting laptop battery as an example of a necessary

5    feature that does not drive demand).  For the '721 patent, Apple cites testimony from Apple Vice

6    President Gregory Christie and Senior Vice President of Worldwide Marketing Philip Schiller, who

7    noted that Apple has featured "slide-to-unlock" in its marketing efforts.  *See* Tr. at 600:23-601:15

8    (Christie, saying he personally considered slide-to-unlock "pretty important"), 432:20-433:18

9    (Schiller, describing decision to feature slide-to-unlock at beginning of advertisement).  This

10   testimony is probative of the value of the slide-to-unlock feature, but as with Apple's other

11   evidence, it does not demonstrate demand by consumers for Samsung's infringing products.

12                                  c.      **Lost Profits**

13          Samsung argues that Apple cannot show irreparable harm from lost sales because the jury's

14   damages verdict implicitly rejected Apple's claim for lost profits.  Samsung's theory is that the jury

15   must have rejected Apple's demands for lost profits and chosen a lump sum royalty instead

16   because it awarded only a small percentage of what Apple requested.  Samsung also makes the

17   related argument that Dr. Vellturo "effectively conceded" a lack of causal nexus for the '172 and

18   '721 patents because he did not seek diminished-demand lost profits.  Opp'n at 7-8.

19          Samsung invites the Court to deconstruct the verdict to determine whether the jury awarded

20   lost profits to Apple, which may provide information about harm due to lost sales.  The parties

21   dispute whether such an exercise is appropriate for purposes of this motion.  "[W]hen equitable

22   claims are joined with legal claims and have factual questions in common, the judge's

23   determination of the equitable claims can not deprive the litigants of their right to a jury trial on

24   factual questions."  *Therma-Tru Corp. v. Peachtree Doors Inc.*, 44 F.3d 988, 994-95 (Fed. Cir.

25   1995) (characterizing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11 (1959)).  If the jury

26   in fact rejected Apple's claims for lost profits, the Court would be bound by that factual

27   determination for the purposes of determining equitable relief, such as a permanent injunction.

28

1    Apple argues that the jury's verdict is not binding on the question of lost sales harm

2    because the verdict did not explicitly reject Apple's lost profits claims, and that the Court is not

3    permitted as a matter of law to "deconstruct" the jury's findings.  Reply at 6.  However, the jury's

4    factual findings need not be explicit in order to be binding.  The *Therma-Tru* court overturned the

5    district court's judgment based on the need to avoid "conflict with the *implied* findings underlying

6    the jury verdicts[.]"  44 F.3d at 995 (emphasis added); *see also Miller v. Fairchild Indus., Inc.*, 885

7    F.2d 498, 507 (9th Cir. 1989) ("the Seventh Amendment requires the trial judge to follow the

8    jury's implicit or explicit factual determinations").  Apple cites to *Telcordia Technologies, Inc. v.*

9    *Cisco Systems, Inc.*, 612 F.3d 1365 (Fed. Cir. 2010), claiming that "parties cannot read findings

10   into [a] jury verdict 'in the absence of an express statement in the verdict.'"  Reply at 6 (quoting

11   *Telcordia*, 612 F.3d at 1378).  This twists the holding in *Telcordia*, where the Federal Circuit held:

12   "District courts have broad discretion to interpret an ambiguous verdict form, because district

13   courts witness and participate directly in the jury trial process.  The district court was in a position

14   to assess whether the verdict figure represented past infringement as well as ongoing

15   infringement."  612 F.3d at 1378.  The *Telcordia* trial court interpreted the jury's verdict, and the

16   language quoted by Apple merely reflects the Federal Circuit's unwillingness to overturn that

17   interpretation on appeal.  *Id.* ("In the absence of an express statement in the verdict, this court

18   cannot determine whether the jury compensated Telcordia for all of Cisco's infringing activities . . .

19   the district court did not abuse its discretion in interpreting the verdict form.").  Apple's two other

20   cases are inapposite because they addressed deconstruction or "reverse engineering" of a jury

21   verdict, but in the context of a motion for judgment as a matter of law, not the binding effect of a

22   jury verdict on a court's fact finding for the purposes of equitable relief.  *See Yeti by Molly, Ltd. v.*

23   *Deckers Outdoor Corp.*, 259 F.3d 1101, 1107-08 (9th Cir. 2001); *DDR Holdings, LLC v.*

24   *Hotels.com, L.P.*, 954 F. Supp. 2d 509, 530 (E.D. Tex. 2013).

25   While it may be legally permissible to dissect the verdict under certain circumstances, the

26   Court declines Samsung's invitation to do so here for purposes of evaluating lost sales harm.

27   Samsung insists that the jury awarded a lump-sum royalty to compensate Apple for all future

28   infringement based on calculations by its expert Dr. Chevalier.  Dr. Chevalier claims that the jury's

29

**United States District Court**
For the Northern District of California

1  allocation of damages between the '647, '721, and '172 patents and between the accused products

2  for each patent, and the fact that the jury did not grant a uniform per-unit royalty for all products,

3  demonstrates a lump-sum verdict.  *See* Chevalier Decl. ¶ 67.  She also claims that the fact that the

4  jury reallocated the total damages number when calculating damages for the Galaxy S II products

5  further indicates a lump sum.  *See id.* ¶ 68.  However, Dr. Chevalier's analysis is speculative at

6  best.  The verdict form did not require the jury to denote which damages theories it applied.  *See*

7  ECF No. 1884 at 9-10.  Moreover, Dr. Chevalier's analysis assumes that the jury applied the same

8  theory to all products for all patents.  Apple also notes that the jury could have chosen not to award

9  lost profits because it could not ascertain them with reasonable certainty, and not because Apple

10  did not actually lose sales to Samsung.  Apple's expert Dr. Vellturo also submits a declaration

11  contesting Dr. Chevalier's conclusion that the jury awarded a lump sum.  *See* Vellturo Decl. (ECF

12  No. 1919-4) ¶ 17 ("It is not possible to state definitively how the jury arrived at its damages award

13  of $119.625 million.").

14        Moreover, even if Samsung's hypothesis about a lump-sum royalty were correct, such a

15  finding does not dispose of the irreparable harm inquiry.  Samsung asserts that "there can be no

16  irreparable harm due to lost sales because there are no lost sales."  Opp'n at 4.  This misstates the

17  law.  As Apple notes, a jury finding of lost profits is not a prerequisite for finding irreparable harm.

18  *See Mytee Prods., Inc. v. Harris Research, Inc.*, 439 F. App'x 882, 887 (Fed. Cir. 2011) ("We have

19  never held, however, that in order to establish irreparable harm a patentee must demonstrate that it

20  is entitled to lost profits."); *see also Apple*, 909 F. Supp. 2d at 1159-60 ("The fact that the jury was

21  able to put a number on the harm Apple has suffered in terms of sales already lost directly to

22  Samsung does not necessarily mean that those damages captured the full extent of Apple's harm.

23  Indeed, if this were the case, no Court would ever award both damages and an injunction for the

24  same infringement, but Courts do so routinely.").  Where lost sales did not form either an explicit

25  or implicit part of the jury's verdict, the Court would not be barred from finding lost sales for the

26  purposes of fashioning equitable relief.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861

27  (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011) (affirming permanent injunction based on lost

28  market share where the jury awarded royalty damages).  Irrespective of a jury's factual finding

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1   with respect to lost sales, a court might still find irreparable harm that stems from sources other

2   than lost sales.  *See Mytee Prods.*, 439 F. App'x 882 at 888 (finding irreparable harm to patentee

3   because "the market share enjoyed by [the patentee's] franchisees would be threatened by the

4   presence of a competitor using the same technology."); *Douglas Dynamics*, 717 F.3d at 1344-45

5   (finding irreparable harm to patentee's reputation from infringement).  Furthermore, a factual

6   finding that Apple did not lose sales *in the past* does not necessarily mean that Apple will not lose

7   sales *in the future*.

8          However, the Court need not deconstruct the verdict as Samsung proposes, for Apple has

9   not shown the requisite irreparable harm, as discussed above.  After considering all of Apple's

10  evidence in combination, *see Apple III*, 735 F.3d at 1368, the Court concludes that Apple has failed

11  to demonstrate irreparable harm due to lost sales, nor any causal nexus between Samsung's

12  infringement and the alleged harm.

13                 **4.     Summary of Irreparable Harm**

14         After careful examination of all the evidence, the Court concludes that Apple fails to prove

15  that "the infringing feature[s] drive[] consumer demand for the accused product[s]."  *Apple II*, 695

16  F.3d at 1375.  Apple's argument that the causal nexus requirement does not apply to reputational

17  harm overextends *Douglas Dynamics* and contravenes the Federal Circuit's guidance on

18  irreparable harm.  Apple has not demonstrated that it will suffer irreparable harm to its reputation

19  or goodwill as an innovator without an injunction.  Nor has Apple shown that it will suffer lost

20  sales specifically due to Samsung's infringement of the three patents at issue.  For these reasons,

21  the irreparable harm factor favors Samsung and disfavors an injunction.

22                 **B.     Adequacy of Legal Remedies**

23         "This factor requires a patentee to demonstrate that 'remedies available at law, such as

24  monetary damages, are inadequate to compensate' the patentee for the irreparable harm it has

25  suffered."  *Apple III*, 735 F.3d at 1368 (quoting *eBay*, 547 U.S. at 391).

26                 **1.     Whether Alleged Harms Can be Quantified**

27         First, the parties disagree about whether it is possible to measure monetary damages for

28  Apple's alleged lost sales and reputational injuries.  As to reputational harm, Samsung accuses

31

1    Apple of relying only on attorney argument, and cites Dr. Erdem's declaration, which states that

2    there are accepted industry techniques for assigning monetary values to "brand equity."  *See* Erdem

3    Decl. ¶¶ 41-43.  In response, Apple cites cases that have found money damages inadequate to

4    remedy reputation-related harms.  *See* Reply at 10.  In *Douglas Dynamics*, the court found damages

5    inadequate "for at least the reputation loss Douglas has suffered from Buyers's infringement," in

6    light of evidence regarding the parties' relative market share.  717 F.3d at 1345.  In *Southern Snow*

7    *Manufacturing Co. v. SnoWizard Holdings, Inc.*, a district court followed *Douglas Dynamics* and

8    found legal remedies inadequate for "reputation loss" that the patentee had shown was the result of

9    the infringement in question.  No. 06-9170, 2014 WL 1652436, at *7 (E.D. La. Apr. 24, 2014).

10   Similarly, in *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, another district court determined that

11   the patentee established irreparable harm to its reputation, and then found "the loss of customer

12   goodwill cannot be compensated by a reasonable royalty payment."  No. 2:07-cv-00331, 2013 WL

13   3043668, at *7-8 (D. Nev. June 17, 2013).  However, these cases share a common denominator: in

14   each case, the patentee provided evidence to support the court's conclusion.  By contrast, in the

15   instant case, Apple offers no evidence that its alleged reputational harm cannot be remedied.

16        As to lost sales, Samsung notes that courts in other contexts have found that monetary

17   remedies can adequately compensate harm due to lost revenues.  Samsung also claims that the fact

18   that Apple's damages expert Dr. Vellturo was able to estimate damages for downstream sales and

19   ecosystem effects shows that any such harm is quantifiable.  *See* Opp'n at 16.  Samsung's

20   arguments are unpersuasive.  Samsung does not tie the facts of the cases it cites to the

21   circumstances here.  Samsung's contention that Apple's request for damages precludes injunctive

22   relief suggests that damages and an injunction can never be awarded simultaneously—a

23   proposition that has been rejected.  *See Apple*, 909 F. Supp. 2d at 1160.  This also contradicts

24   Samsung's earlier argument that Apple cannot demonstrate irreparable harm due to lost sales

25   unless the jury awards lost profits, which requires the jury to place a number on such harm.  *Cf.*

26   ECF No. 221 at 78 n.9 (noting inherent tension between showing likelihood, but also

27   incalculability, of lost market share).  Here, Apple has cited evidence tending to show that lost

28   market share and downstream sales may be difficult to quantify.  *See* Tr. at 448:8-449:4 (Schiller

32

United States District Court
For the Northern District of California

1    testimony on ecosystem effects).  Dr. Vellturo has explained that he was not able to completely

2    quantify ecosystem effects in his damages models.  *See* Vellturo Decl. ¶ 22.  Additionally, this

3    Court has previously found that Apple's alleged lost sales would be hard to quantify and remedy

4    with damages.  *See* ECF No. 221 at 70 (noting that loss of market share to Samsung "would be

5    difficult to quantify or recapture"); 1846 Injunction Order at 37 (finding Apple's alleged lost sales

6    "difficult to quantify").

7            Accordingly, the Court determines that Apple has not shown that its supposed reputational

8    injury cannot be compensated by damages, but Apple has shown that its alleged lost sales harm

9    would be difficult to calculate and remedy.

10                    **2.      Apple's Licenses**

11           Samsung points out that Apple previously offered to license the asserted patents to

12   Samsung and other competitors, and argues that this activity demonstrates that money damages are

13   adequate.  *See* Opp'n at 16-18.  A patentee's willingness to license its technology is relevant to the

14   adequacy of legal remedies.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d

15   1312, 1339 (Fed. Cir. 2012).  However, the Federal Circuit has cautioned that evaluation of a

16   patent owner's licensing efforts must account for "any relevant differences from the current

17   situation," such as whether the licensees were Apple's competitors in the smartphone market, and

18   whether the licenses involved agreements to settle litigation.  *Apple III*, 735 F.3d at 1370.

19           As explained above, Apple granted rights to ▮▮▮▮▮▮▮▮▮▮ to competitors in the

20   smartphone market, licensing the ▮▮▮▮▮ to Nokia and HTC, and the ▮▮▮▮▮▮▮▮▮▮ to

21   HTC.[7]  *See* ECF Nos. 1895-12 (HTC), 443-19 (Nokia).  In the prior litigation, Samsung used these

22   same licenses as evidence that Apple was willing to license the asserted patents in that case, and

23   was therefore willing to accept monetary compensation for those inventions.  This Court stated:

24           Both the Nokia and HTC agreements resulted from litigation settlements.
             Moreover, the Nokia license "was a 'provisional license' for a limited 'standstill'
25           period, and the HTC agreement excluded HTC products that were 'clones' of
             Apple's products."  Because of these special conditions, the Nokia-Apple and HTC-
26

27   [7]      Apple preemptively addressed two additional licenses of ▮▮▮▮▮▮▮▮▮ to IBM and
     Microsoft.  *See* Mot. at 16.  Samsung does not rely on those licenses in its Opposition, so the Court
28   does not address them.

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

> Apple licenses provide little insight into whether Apple would be willing to provide Samsung unencumbered access to the patented features for money.  Therefore, the Court holds that Apple's other licenses do not support a finding that damages are an adequate remedy.

1846 Injunction Order at 36 (citations omitted).  Samsung does not argue that any of this analysis has changed for ███████████████, and acknowledges this Court's finding that the litigation settlement context of those two licenses "diminishes their probative value."  Opp'n at 18.  At oral argument, Samsung's counsel confirmed that this Court's prior analysis (with which Samsung disagrees) would be the same in this case.  *See* July 10, 2014 Hearing Tr. (ECF No. 1949) at 73-74.  Furthermore, Samsung's expert Dr. Chevalier acknowledged at trial that "Apple is, in general, very reluctant to license their intellectual property."  Tr. at 2433:9-17.  The Court finds no reason to depart from its previous analysis of the same licenses.

Samsung also contends that Apple offered to license the '647 patent to Samsung in August 2010, prior to this litigation, when Apple presented a slideshow that listed the '647 patent and stated: "Samsung needs a license to continue to use Apple patents in infringing smartphones."  PX132 at 15, 23.  In response, Apple notes that the same presentation stated that "Apple has not authorized the use of any of these patents" (*id.* at 10), and there is no other evidence that Apple presented licensing terms to Samsung, or that Apple would have included the '647 patent among other patents identified.  In *Apple III*, the Federal Circuit noted that any offers by Apple to license asserted patents to Samsung "may be quite relevant to the injunction analysis."  735 F.3d at 1370 n.7.  Here, the Court finds that Apple's presentation provides some indication that Apple might have been willing to license Samsung, but did not amount to a formal licensing offer.  Apple's references to a "license" and "Samsung's choice to use Android *without a license*" (PX132 at 2 (emphasis added)) suggest that Apple might have been willing to discuss licenses to at least some of its intellectual property.  The presentation is also labeled "Provided for Information and Business Settlement Purposes Only."  However, Apple did not identify license terms or specific patents for licensing to Samsung.  The presentation is also consistent with a demand to cease and desist from infringement.  Even to the extent that the August 2010 presentation reveals some willingness by Apple to negotiate a license, this does not outweigh the additional evidence and this Court's prior findings that Apple is reluctant to license its patents.

34

United States District Court
For the Northern District of California

3.      **Summary of Adequacy of Monetary Remedies**

The Court concludes that damages for Apple's alleged irreparable harm in connection with alleged lost sales are difficult to quantify.  As the Court determined in the 1846 Injunction Order, Apple's past licensing behavior demonstrates a reluctance to license Apple's patents to Samsung, and several factors distinguish Apple's licenses to HTC and Nokia from the present circumstances. Moreover, Samsung has not established that Apple offered to license the '647 patent to Samsung in August 2010.

However, this determination does not overcome Apple's failure to demonstrate a causal nexus between its alleged harm and Samsung's infringement.  As before, the Court will not issue a permanent injunction based on irreparable harm that Samsung's infringement did not cause, even if monetary remedies will not compensate Apple for that irreparable harm.  *See* 1846 Injunction Order at 37.  Apple bears the burden of showing that legal remedies are inadequate to compensate for the specific alleged irreparable harm.  *See eBay*, 547 U.S. at 391 (listing as the first two factors a patentee must show for an injunction "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for *that injury*") (emphasis added); *Apple III*, 735 F.3d at 1371 ("Of course, if, on remand, Apple cannot demonstrate that demand for Samsung's products is driven by the infringing features, then Apple's reliance on lost market share and downstream sales to demonstrate the inadequacy of damages will be substantially undermined.").  To award an injunction to Apple in these circumstances would ignore the Federal Circuit's warning that a patentee may not "leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant."  *Id.* at 1361 (quoting *Apple II*, 695 F.3d at 1375) (internal quotation mark omitted).  The Court ultimately finds that—despite Apple's apparent unwillingness to license the patents-in-suit to Samsung—monetary remedies would more appropriately remedy Samsung's infringement than would an injunction. Accordingly, the second *eBay* factor favors Samsung.

C.      **Balance of Hardships**

The balance of hardships factor "assesses the relative effect of granting or denying an injunction on the parties."  *i4i*, 598 F.3d at 862.  An injunction "may deter future harm, but it may

35

1  not punish." *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 969 (N.D. Cal. 2009).

2  Here, Samsung's admissions at trial about the ease of removing or designing around the infringing

3  features, combined with the relatively narrow scope of, and sunset provision in, Apple's requested

4  injunction, show that Samsung will not face any hardship from the injunction.  Accordingly, the

5  balance of hardships favors Apple and the entry of an injunction.

6      The parties focus their arguments on Samsung's likely hardships in light of the scope of

7  Apple's proposed injunction.  In the first lawsuit between these parties (Case No. 11-CV-1846),

8  Apple sought an "extremely broad" injunction that would "prevent the sale of 26 specific

9  products."  *Apple*, 909 F. Supp. 2d at 1162.  Here, however, Apple seeks a narrower injunction

10  against only "Infringing Features," defined as:

11      (1) for the '647 patent, the data detection/linking feature accused at trial as
    implemented in Samsung's Admire, Galaxy Nexus, Galaxy Note, Galaxy Note II,
12      Galaxy S II, Galaxy S II Epic 4G Touch, Galaxy S II Skyrocket, Galaxy S III, and
    Stratosphere products;
13
    (2) for the '721 patent, the slide-to-unlock feature accused at trial as implemented in
14      Samsung's Admire, Galaxy Nexus, and Stratosphere products; and

15      (3) for the '172 patent, the autocorrect feature accused at trial as implemented in
    Samsung's Admire, Galaxy Nexus, Galaxy Note, Galaxy S II, Galaxy S II Epic 4G
16      Touch, Galaxy S II Skyrocket, and Stratosphere products.

17  Proposed Order at 1.  The injunction would apply only to activities involving the "software or code

18  capable of implementing any Infringing Feature," and not smartphone or tablet products in their

19  entirety.  *Id.* at 2.  Additionally, the injunction includes a 30-day "sunset provision" to delay its

20  effect: "the enforcement of this Permanent Injunction shall be stayed until thirty (30) days after

21  entry of this Order."  *Id.*  Apple claims that the injunction is narrowly tailored to avoid "seeking to

22  bar entire product lines from the marketplace."  Mot. at 17.

23      Given the scope of Apple's proposed order, Apple claims that Samsung faces no hardship

24  at all because Samsung said that it can easily remove or design around the infringing features.  *Id.*

25  at 17-18.  The Court agrees with Apple.  At trial, Samsung's witnesses repeatedly told the jury that

26  design-arounds would be simple or already exist.  For the '172 patent's "slide-to-unlock"

27  invention, Samsung explained that it already has alternatives such as the "puzzle" and "ripple"

28  unlock interfaces, and is "selling lots of these phones without using any Apple slide to unlock

36

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1   feature." Tr. at 399:22-400:18.  As to the '721 patent's "autocorrect" feature, Samsung represented

2   at trial that Samsung has already developed a "non-infringing keyboard" that has "since been

3   installed on many Samsung phones" and has been "an option on five of the phones that Apple

4   accuses in this case." *Id.* at 384:8-14.  Regarding the '647 patent, Google engineer Dianne

5   Hackborn said that "it shouldn't take more than a day" to remove the accused pop-up menu, *id.* at

6   1587:25-1588:11, and Samsung's expert Dr. Kevin Jeffay agreed that such a change would take

7   "on the order of a day," *id.* at 1797:21-1798:8.  Then, at closing argument, Samsung's counsel

8   addressed the amount of time needed to design around the asserted patents for purposes of

9   estimating damages, and told the jury: "And we wouldn't need four months.  You know, we're

10  talking about Samsung, one of the, you know, greatest, largest, most important technology

11  companies in the world.  They could do these changes, if they had to do it, in one month." *Id.* at

12  3336:2-5.

13       Additionally, Apple claims that the one-month sunset provision further limits any hardship

14  to Samsung because the delay matches the time that Samsung told the jury it would need to

15  implement design-arounds.  *See* Mot. at 19; Tr. at 3336:2-8.  The Federal Circuit has observed that

16  "a delayed injunction may be more likely to prevent only infringing *features* rather than the sale of

17  entire *products*, because the defendant would have time to implement a noninfringing alternative."

18  *Apple III*, 735 F.3d at 1363; *see also Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1339 (Fed.

19  Cir. 2013) (affirming injunction with 18-month sunset period); *Broadcom Corp. v. Qualcomm,

20  Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (same, for 20-month sunset period).  Thus, the sunset

21  period in Apple's proposed injunction further limits any possible hardship to Samsung.

22       Samsung does not attempt to rebut Apple's arguments regarding ease of design-arounds.

23  Nor does Samsung dispute that it could accomplish all relevant design-arounds within the sunset

24  period.  In light of these repeated admissions, Samsung fails to demonstrate that it would suffer any

25  hardship.  *See, e.g.*, *Douglas Dynamics*, 717 F.3d at 1345 ("If indeed Buyers had a non-infringing

26  alternative which it could easily deliver to the market, then the balance of hardships would suggest

27  that Buyers should halt infringement and pursue a lawful course of market conduct."); *Brocade*,

28  2013 WL 140039, at *5 ("A10's witnesses also stated at trial that A10 could easily design around

37

United States District Court
For the Northern District of California

1   Brocade's patented claims.  The hardship A10 would suffer, therefore, is minimal."); *Halo Elecs.*,

2   2013 WL 3043668, at *10 (finding little hardship to defendant that "testified at trial that it could

3   switch to a different, non-infringing design to meet its customers' needs").

4         Despite these admissions, Samsung asserts that the injunction "lacks specificity, is overly

5   broad and extends beyond the permissible scope of an injunction under Federal Circuit case law."

6   Opp'n at 19.  These arguments are unpersuasive.  Apple's proposed injunction targets only specific

7   features, not entire products.  Other courts have applied similar injunctions.  *See, e.g.*, *i4i*, 598 F.3d

8   at 862 (affirming finding that infringer's hardship was minimal because the injunction affected

9   only "one of thousands of features"); *Brocade*, 2013 WL 140039, at *5 (holding that an injunction

10  against practice of features that "do not drive demand" was not overly burdensome).

11        Samsung also claims the injunction is "not limited to the specific adjudicated software at

12  trial such as, for [the] '647 patent, the Messenger and Browser applications."  Opp'n at 19.

13  Samsung is correct that Apple's proposed injunction lists only the features accused at trial "and/or

14  any feature not more than colorably different" without mention of specific applications.  However,

15  Samsung has failed to show why this omission renders Apple's proposed injunction overly broad.

16  Apple has limited the scope of the injunction to use of infringing features as accused at trial.

17  Moreover, focusing on specific features rather than existing applications may reasonably prevent

18  future infringement.  *See Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1293

19  (Fed. Cir. 2012) (holding that an injunction against "otherwise infringing the asserted claims" was

20  not overly broad); *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1359 (Fed. Cir. 1999) (holding

21  injunction against "any further infringement" was not overly broad).

22        Samsung also fears that Apple will initiate contempt proceedings and force Samsung to

23  demonstrate that future products are "colorably different."  Opp'n at 19.  However, the "not more

24  than colorably different" provision is standard in injunctions.  *See TiVo Inc. v. EchoStar Corp.*, 646

25  F.3d 869, 882 (Fed. Cir. 2011) ("Thus, the party seeking to enforce the injunction must prove both

26  that the newly accused product is not more than colorably different from the product found to

27  infringe and that the newly accused product actually infringes.").  Therefore, Samsung fails to

28

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION

United States District Court
For the Northern District of California

1    identify any likely hardship specific to Apple's proposed order, only the general inconvenience and

2    uncertainty that results from any injunction.

3         Samsung additionally argues that beyond the use of specific features, the injunction

4    improperly prevents Samsung from "implementing," "advertising," or providing "assistance" for

5    its infringing features. Opp'n at 19. However, an injunction need not be limited only to the sale of

6    infringing products. *See NLRB v. Express Pub'g Co*, 312 U.S. 426, 435 (1941) ("A federal court

7    has broad power to restrain acts which are of the same type or class as unlawful acts which the

8    court has found to have been committed or whose commission in the future, unless enjoined, may

9    fairly be anticipated from the defendant's conduct in the past."); *Broadcom Corp. v. Emulex Corp.*,

10   2012 U.S. Dist. LEXIS 129524, at *30 (C.D. Cal. Mar. 16, 2012) ("The Court rejects the notion

11   that the injunction must be limited to the type of conduct which was found to infringe; namely,

12   selling infringing devices."). Samsung has admitted that it can easily remove or design around the

13   infringing features, and has not shown that it faces any hardship refraining from related advertising

14   or other activity. Samsung argues that Apple's proposed injunction would disrupt Samsung's

15   contractual relationship with carriers and consumers. Opp'n at 19. However, Apple represents that

16   its proposed injunction would not apply to end users or others not acting in concert with Samsung.

17   *See* Reply at 14. Moreover, this Court has previously held that third-party retailers "assumed the

18   risk of this type of disruption" and "should not be protected . . . when they have been benefitting

19   from Samsung's infringement." *See Apple*, 909 F. Supp. 2d at 1161-62; *see also Telebrands Direct*

20   *Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1179 (D.N.J. 1992).

21        Finally, Samsung argues that Apple's proposed injunction "includes no carve-out for

22   repairs." Opp'n at 19. However, Apple represents that the proposed injunction does not enjoin

23   repairs for products already included in the jury's damages award, and that Apple would be

24   "willing to make clear that the injunction does not preclude Samsung from performing repairs on

25   those devices." Reply at 15. Based on these representations, Samsung's objection appears moot.

26        As to Apple's hardships, Apple contends that "Apple has been forced to compete against

27   products that contain its own patented technologies." Mot. at 17. The Federal Circuit has held that

28   requiring a patentee to "compete against its own patented invention . . . places a substantial

39

1    hardship" on the patentee, for purposes of the balance of hardships factor.  *Robert Bosch*, 659 F.3d

2    at 1156; *see also Sealant Sys. Int'l v. TEK Global S.R.L.*, No. 5:11-CV-00774-PSG, 2014 U.S. Dist.

3    LEXIS 31528, at *102 (N.D. Cal. Mar. 7, 2014) ("AMI faces substantial hardship because it must

4    compete with its own patented invention in the marketplace.").  As noted above, it is undisputed

5    that Apple and Samsung have been "fierce" direct competitors in the smartphone market.  While

6    Apple's likely hardship from Samsung's continued infringement does not rise to the level of

7    irreparable harm, *see Apple II*, 695 F.3d at 1375 (noting that causal nexus requires "that the

8    infringing feature drives consumer demand for the accused product"), Samsung faces no hardship,

9    as explained above.

10        Samsung repeatedly told the jury that designing around the asserted claims of the three

11   patents at issue would be easy and fast.  In light of those admissions, and the narrow tailoring of,

12   and sunset provision in, the requested injunction, Samsung has failed to articulate any hardship.  As

13   the Federal Circuit has held, if the infringer "had a non-infringing alternative which it could easily

14   deliver to the market, then the balance of hardships would suggest that [the infringer] should halt

15   infringement and pursue a lawful course of market conduct."  *Douglas Dynamics*, 717 F.3d at

16   1345.  For the above reasons, the balance of hardships favors Apple.

17        **D.       Public Interest**

18        "This factor requires a plaintiff to demonstrate that 'the public interest would not be

19   disserved by a permanent injunction.'"  *Apple III*, 735 F.3d at 1371 (quoting *eBay*, 547 U.S. at

20   391).  Courts have recognized that "the touchstone of the public interest factor is whether an

21   injunction, both in scope and effect, strikes a workable balance between protecting the patentee's

22   rights and protecting the public from the injunction's adverse effects."  *i4i*, 598 F.3d at 863.

23        Apple repeats its argument from the parties' prior lawsuit that an injunction will promote

24   the public's interest in enforcing patents against a direct competitor, and will benefit the public by

25   "encouraging investment in innovation."  Mot. at 19.  As before, the Court agrees with Apple that

26   the public interest does favor the enforcement of patent rights to promote the "encouragement of

27   investment-based risk."  *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006);

28   *see also Apple*, 909 F. Supp. 2d at 1162 (quoting *id.*); *Douglas Dynamics*, 717 F.3d at 1346

**United States District Court**
For the Northern District of California

40

1   (finding public interest disserved by an infringer "competing in the marketplace using a

2   competitor's patented technology").  However, as the Federal Circuit observed, "the public's

3   interest in enforcing patent rights must also be weighed with other aspects of the public interest."

4   *Apple III*, 735 F.3d at 1372 (citing *ActiveVideo*, 694 F.3d at 1341).

5           Samsung claims that an injunction will "depriv[e] the public of product choices created by a

6   thriving level of competition."  Opp'n at 20.  The Federal Circuit has stated that it is appropriate to

7   "consider the scope of Apple's requested injunction relative to the scope of the patented features

8   and the prospect that an injunction would have the effect of depriving the public of access to a

9   large number of non-infringing features."  *Apple III*, 735 F.3d at 1372-73.  In *Apple III*, Apple

10  sought broadly to enjoin sales of over two-dozen products.  *Id.* at 1372.  Here, as explained above,

11  Apple's proposed injunction is narrower and targets only "software and code" for the "Infringing

12  Features" accused at trial.  Thus, there is substantially less risk that the injunction will deprive the

13  public of access to "a large number of non-infringing features," particularly given Samsung's

14  representations about the ease and speed of designing around the patents at issue.

15          Samsung claims that enjoining the accused features may at least temporarily restrict

16  consumers' choices of smartphones or smartphone features.  However, any such effect would be

17  minimal because of Apple's proposed sunset provision and Samsung's repeated representations at

18  trial about the ease and speed with which Samsung could implement design-arounds.  Moreover, as

19  this Court noted in connection with the much broader permanent injunction that Apple previously

20  requested, "[c]onsumers will have substantial choice of products, even if an injunction were to

21  issue.  Apple and Samsung, despite being direct competitors, are not the only suppliers of mobile

22  phones in the market, nor are Samsung's infringing phones the only phones Samsung offers."

23  *Apple*, 909 F. Supp. 2d at 1162.  Furthermore, Apple predicts that an injunction will promote

24  product diversity by forcing Samsung to design around the patents.  *See* Mot. at 20.  Samsung itself

25  stated repeatedly at trial that Samsung could offer multiple design-arounds in lieu of Apple's

26  patented features.  *See* Tr. at 3336:2-5.  Thus, an injunction may prompt introduction of new

27  alternatives to the patented features.

28

United States District Court
For the Northern District of California

41

Case No.: 12-CV-00630-LHK

As before, Samsung argues that an injunction would create an administrative burden on the Court, as it would require the Court's continuing supervision to enforce. *See* Opp'n at 20. This is likely true, though on its own, it does not carry significant weight. *See Apple*, 909 F. Supp. 2d at 1163. Moreover, the relatively narrow scope of Apple's proposed injunction reduces the likelihood of burdensome enforcement efforts. Balancing all of the considerations that the parties have identified, the Court concludes that the public interest factor favors Apple.

### E.      Summary

Weighing all of the factors, the Court concludes that the principles of equity do not support a permanent injunction here. First and most importantly, Apple has not satisfied its burden of demonstrating irreparable harm and linking that harm to Samsung's exploitation of any of Apple's three infringed patents. Apple has not established that it suffered significant harm in the form of either lost sales or reputational injury. Moreover, Apple has not shown that it suffered any of these alleged harms *because* Samsung infringed Apple's patents. The Federal Circuit has cautioned that the plaintiff must demonstrate a causal nexus between its supposed harm (including reputational harm) and the specific infringement at issue. Apple has not demonstrated that the patented inventions drive consumer demand for the infringing products.

Furthermore, the balance of the remaining *eBay* factors do not warrant an injunction here. Apple has not demonstrated that money damages are inadequate compensation for the infringement in this case. Although the public interest factor favors Apple and Apple's narrowly tailored injunction request tilts the balance of hardships in Apple's favor, the Court determines that these factors do not overcome the lack of irreparable harm. Apple's motion is DENIED.

**IT IS SO ORDERED.**

Dated: August 27, 2014

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No.: 12-CV-00630-LHK
ORDER DENYING APPLE'S MOTION FOR PERMANENT INJUNCTION