QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-CV-00630-LHK (PSG)<br><br>**SAMSUNG'S NOTICE OF MOTION AND MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS**<br><br>Date:  January 23, 2014<br>Time:  1:30 p.m.<br>Place: Courtroom 8, 4th Floor<br>Judge: Honorable Lucy H. Koh<br><br>REDACTED VERSION |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 23, 2014, at 1:30 p.m., or as soon as the matter may be heard by the Honorable Lucy H. Koh in Courtroom 8, United States District Court for the Northern District of California, Robert F. Peckham Federal Building, 280 South 1st Street, San Jose, CA 95113, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung") shall and hereby do move the Court for an order excluding the testimony of expert witnesses designated by Apple: Dr. Christopher Vellturo, Dr. John Hauser, Dr. Todd Mowry, Dr. Alex Snoeren, and Dr. James Storer.

PLEASE TAKE FURTHER NOTICE that Samsung requests an evidentiary hearing pursuant to Fed. R. Evid. 104 on the admissibility of the testimony of each of the experts prior to any testimony by that expert at trial. This Motion is made pursuant to the Federal Rules of Evidence 403 and 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) on the grounds that the testimony Apple seeks to elicit from these experts is not relevant to any issue in this matter, and is otherwise unreliable, incorrect, and unhelpful. This motion is based on the following Memorandum, supporting declarations, the record, and such other matters that may be presented at or before the hearing on the motion.

DATED:  October 10, 2013

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By

Charles

/s/ Victoria F. Maroulis

K. Verhoeven
Kevin P.B. Johnson
Victoria F. Maroulis
William C. Price
Michael L. Fazio

Attorneys for
SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC.,
and SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..................................................................................... i

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

I. APPLE'S        DAMAGES CALCULATIONS REST ON DR. HAUSER'S
    UNRELIABLE CONJOINT SURVEY USED IN A MANNER NEVER
    PREVIOUSLY ACCEPTED ................................................................................... 1

    A.    No Court Has Allowed The "Willingness To Buy" Results of A Conjoint
        Survey To Be Used As The Central Basis For Calculating Patent Damages ........... 1

    B.    Apple's Damages Calculations Rest on Dr. Hauser's Conjoint Survey.................... 6

    C.    Dr. Hauser's Conjoint Analysis Measures An Impermissibly Larger
        Footprint Than The Patented Features ..................................................................... 8

    D.    The Methodology Used Results In Unreasonable and Unreliable
        Calculations ........................................................................................................... 10

    E.    Dr. Hauser's Outside Option Cannot Account For The Role Of The Tested
        Features In Consumer Purchase Decisions ............................................................ 11

II.    DR. VELLTURO'S ANALYSIS CONTAINS MULTIPLE, ADDITIONAL
      INDEPENDENT FLAWS............................................................................................ 12

    A.    Dr. Vellturo's Reasonable Royalty Is an Impermissible Attempt To Recover
        Lost Profits on Units For Which Apple Cannot Satisfy The *Panduit* Test ............ 12

    B.    Dr. Vellturo Incorrectly Uses the Notice Date To Set The Design Around
        Period for Lost Profit Damages................................................................................ 13

    C.    Dr. Vellturo's Calculations Rest on Counter-Factual Assumptions and Fail
        To Consider Relevant Evidence .............................................................................. 13

III.    THE COURT SHOULD EXCLUDE THE OPINIONS OF APPLE'S '647
      PATENT EXPERT, DR. TODD MOWRY ................................................................ 15

    A.    Failure to Disclose and Consistently Apply Principles to the Facts Renders
        an Expert's Opinion Unhelpful and Inadmissible ................................................... 16

    B.    Dr. Mowry Applies Two Separate Sets of Claim Interpretations to
        Infringement and Invalidity..................................................................................... 17

    C.    Dr. Mowry Is Willing To Change His Opinions To Suit His Needs,
        Illustrating His Inconsistent Application of Claim Interpretations and
        Exacerbating His Failure to Consistently Apply His Claim Requirements ........... 19

IV.    THE COURT SHOULD EXCLUDE THE PURE *IPSE DIXIT* OPINIONS OF
      DR. ALEX SNOEREN REGARDING APPLE'S ALLEGED PRACTICE OF THE

'414 PATENT ...................................................................................................... 21

V.      THE COURT SHOULD EXCLUDE THE OPINIONS OF DR. JAMES STORER
        REGARDING CLAIM CONSTRUCTION FOR THE '239 AND '449 PATENTS. ........ 23

CONCLUSION .................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

### Cases

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
135 F. Supp. 2d 1031 (N.D. Cal. 2001) ...................................................................14

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)..............................................................................16

*Amstar Corp. v. Envirotech Corp.*,
730 F.2d 1476 (Fed. Cir. 1984)................................................................................9

*Apple, Inc. v. Motorola, Inc.*,
2012 WL 1959560 (N.D. Ill. May 22, 2012) ...........................................................11

*DSU Med. Corp. v. JMS Co.*,
296 F. Supp. 2d 1140 (N.D. Cal. 2003) ..................................................................21

*DataQuill Ltd. v. Handspring, Inc.*,
2003 WL 737785 (N.D. Ill. Feb. 28, 2003)..............................................................17

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..........................................................................................1, 3, 21

*Diviero v. Uniroyal Goodrich Tire Co.*,
114 F.3d 851 (9th Cir. 1997)...................................................................................22

*Dynetic Design Solutions, Inc. v. Synopsys, Inc.*,
Case No. 5:11-CV-05973-PSG, 2013 WL 4537838 (N.D. Cal. Aug. 22, 2013) ....................23

*EZ Dock, Inc. v. Schafer Sys.*,
2003 U.S. Dist. LEXIS 3634 (D. Minn. 2003)........................................................23

*Elder v. Tanner*,
205 F.R.D. 190 (E.D. Tex. 2001)........................................................................21, 22

*Fail-Safe, LLC v. A.O. Smith Corp.*,
744 F. Supp. 2d 870 (E.D. Wis. 2010) ....................................................................14

*Gable v. Nat'l Broad. Co.*,
727 F. Supp. 2d 815 (C.D. Cal. 2010) *aff'd sub nom.*
*Gable v. Nat'l Broad. Co., Inc.*, 438 F. App'x 587 (9th Cir. 2011) ..........................21

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ................................................................................................21

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
185 F.3d 1341 (Fed. Cir. 1999) ...............................................................................13

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ................................................................................................21

*Laser Dynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ...................................................................................14

*NTP, Inc. v. R.I.M., Ltd.*,
    2003 U.S. Dist. LEXIS 14338 (E.D. Va. May 23, 2003) ..........................................24

*Oracle Am., Inc. v. Google, Inc.*,
    798 F. Supp. 2d 1111 (N.D. Cal. 2011) ..........................................................1, 4, 5, 6

*Oracle Am., Inc. v. Google Inc.*,
    2012 WL. 850705 (N.D. Cal. Mar. 13, 2012) .............................................................5

*Oxford Gene Technology Ltd. vs. Mergen Ltd.*,
    345 F. Supp. 2d 431 (D. Del. 2004) ...................................................................17, 19

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l*,
    711 F.3d 1348 (Fed. Cir. 2013) ..................................................................................13

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995) ....................................................................................12

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
    926 F.2d 1161 (Fed. Cir. 1991) ..................................................................................12

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ..................................................................................23

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................................................9

## **Statutes**

Fed. R. Evid. 104 ................................................................................................................ i

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.**   **APPLE'S DAMAGES CALCULATIONS REST ON DR. HAUSER'S UNRELIABLE CONJOINT SURVEY USED IN A MANNER NEVER PREVIOUSLY ACCEPTED**

    **A.**   **No Court Has Allowed The "Willingness To Buy" Results of A Conjoint Survey To Be Used As The Central Basis For Calculating Patent Damages**

No court has allowed patent damages to be calculated based on "willingness to buy" results of a conjoint survey, much less one riddled with design problems that produce facially irrational results. *Daubert* exists to prevent exactly this  Faulty methodology, largely inscrutable to a jury, used to post massive damages numbers.[1]  Dr. Hauser's survey should be excluded.

Dr. Hauser's conjoint survey purports to measure the relative value of the patented features and a non-infringing alternative by showing survey participants phones and asking questions about their preferences.  The survey respondents were first shown a series of videos supposedly illustrating the patented features, as well as other videos of the so-called "distraction" features in an attempt to mask the intention of the survey.  (Hauser Report ¶¶ 45, 79-80, Ex. A to the Declaration of Michael Fazio, filed concurrently herewith ("Fazio Dec.").)  After reviewing the videos, respondents were presented with a series of choices.  *Id.* ¶¶ 82-84, Fazio Dec. Ex. A.)  In each choice, a respondent saw four hypothetical smartphones, with a complex grid of icons indicating some features of each phone. An example of one choice task is presented below:

---

[1]   Where a damages methodology involves "complex mathematical formulas and equations that would surely be incomprehensible to the average juror," courts must be careful to avoid permitting a "miscarriage of justice" to be hidden behind an "impenetrable façade of mathematics."  *Oracle Am., Inc. v. Google, Inc.*, 798 F. Supp. 2d 1111, 1120 (N.D. Cal. 2011).

| | Phone 1 | Phone 2 | Phone 3 | Phone 4 |
|---|---|---|---|---|
| **Price (with 2-year service contract)** | Price $299 | Price $99 | Price $49 | Price $149 |
| **Camera** | Panorama | Panorama, Best Photo, Smile Shot | Panorama, Best Photo, Smile Shot, Buddy Photo Share | Panorama, Best Photo |
| **Call Initiation and Screening** | Three-Way Calling, Reject Call with Message, Missed Call Screen Management | Three-Way Calling, Reject Call with Message | Three-Way Calling | Three-Way Calling, Reject Call with Message, Missed Call Screen Management, Wi-Fi Calling |
| **Input Assistance** | Copy-Paste, Voice To Text | Copy-Paste, Voice To Text, Automatic Word Correction, S Pen | Copy-Paste | Copy-Paste, Voice To Text, Automatic Word Correction |
| **Screen Size** | Size 5.5" | Size 5.0" | Size 4.0" | Size 4.8" |
| **Data Accessibility** | Notification Bar | Notification Bar, Background Syncing, Quick Links | Notification Bar, Background Syncing | Notification Bar, Background Syncing, Quick Links, Universal Search |
| **With all other features on your most recent Samsung smartphone** | All *other* features on your most recent Samsung smartphone | All *other* features on your most recent Samsung smartphone | All *other* features on your most recent Samsung smartphone | All *other* features on your most recent Samsung smartphone |
| | ○ | ○ | ○ | ○ |

*(Id.* Ex. G, Fazio Dec. Ex. B.)  Respondents were asked to select the "phone" they preferred, and were asked if they would *buy* that hypothetical phone at the indicated price, taking into account other (unspecified) alternatives in the market (the "outside option). ( *Id.* ¶ 85, Fazio Dec. Ex. A.)  Each respondent did this 16 times for various configurations of hypothetical phones. (*Id.*)

As discussed in more detail below, this process omits the vast majority of features of a smartphone, mentioning only a few, specific (mostly minor) ones.  It also lacks major real-world purchase influencers like advertising, sales personnel and in-store merchandising.[2]  And because

---

[2]  APLNDC630-0000062640, Fazio Dec. Ex. NN (internal Apple email discussing how "motivations to push Android over iPhone" was a "big threat" to Apple); APLNDC630-0001591037, Fazio Dec. Ex. BBB (internal Apple email recognizing that Samsung's marking campaigns "have been effective in developing brand awareness since it has launched"); APLNDC630-0001313179, Fazio Dec. Ex. OO (Apple internal document stating that "Samsung's advertising and promotion (footnote continued)

1   respondents watch videos about the patented features immediately before making their choices, the

2   process necessarily calls attention to the features being tested.  *See* Reibstein Rpt. ¶¶157-162, Fazio

3   Dec. Ex. C.)

4           Dr. Hauser crunches the resulting survey responses using the Sawtooth software and reaches

5   two kinds of conclusions:  First, a "willingness to pay" number that purports to value in dollars the

6   consumer preference associated with  each patent .  Second, p ercentages reflecting the decreased

7   "willingness to buy" Samsung devices that would supposedly result from the removal of the patented

8   features.[3]  (Hauser Rpt. ¶¶ 115-124, Fazio Dec. Ex. A.)  Apple's damages expert, Dr. Vellturo, then

9   simply applied these to sales and market share data to calculate damages.

10          The absurd results of Apple's methodology are illustrated by the willingness to pay numbers

11  Dr. Hauser's survey generates. The survey reports that on a $149 smartphone, consumers would pay

12  price premia of $69 for the '414 patent, $56 for the '647 patent, $44 for the '959 patent and $102 for

13  the '172 patent (he did not test the '721 patent for smartphones).  (Hauser Rpt. ¶129, Fazio Dec. Ex.

14  A; Reibstein Rpt. ¶¶ 37 and following table, Fazi o Dec. Ex. C.)  Thus, Dr. Hauser's methodology

15  reports a willingness of consumers to pay $271 dollars for just thos e four features on a phone that

16  costs nearly half that amount. While willingness to pay numbers are not strictly additive, these results

17  are so facially implausible they provide strong  evidence that Dr. Hauser's entire m ethodology is

18  flawed.

19          The Court allowed Apple to present a conjoint survey in the prior trial because it was explicitly

20  offered for an entirely different purpose.  Th ere, as Apple argued in opposing Sam sung's *Daubert*

21  motion, the conjoint was merely being used "to confirm 'there is demand for the specific patented

22  features in suit and that their presence (or absen ce) will affect consum er decision making,' not to

23  calculate a specific market share or a precise value for the patented feature in suit."  (Case No. 11-cv-

24  1846 (LHK), Dkt. No. 991-3, at 13.)  Then Apple expressly *disclaimed* precisely what it now seeks to

25  _____

    campaigns are driving a rise in brand  recognition); APLNDC630-0000135098, Fazio Dec. Ex. PP
26  (internal Apple email stating that "[s]piffs at point of sale" influence consumers").
    [3]   Dr. Hauser estimated percentage declines in willingness to buy resulting from the simultaneous
27  removal of all five of the patent-related features included in the smartphone survey of between 43%
    (for 5.0" or 5.5" s martphones at $49) to 74% (for  4.0" smartphones at $299).  (Hauser Rpt. ¶ 121,
28  Fazio Dec. Ex. A.)

1  do: use such survey results to forecast a hypothetical decline in Samsung market share if the features

2  were absent.  (*Id.*)  It is one thing to use the artificial construct of a conjoint survey to show there is an

3  generalized preference for a phone feature; it is something entirely different to use that same survey to

4  project a lost market share and a $1.9 billion damages claim.  This is an unprecedented and improper

5  use of conjoint methodology.[4]

6       In explaining why the *Oracle* ruling did not bar Dr. Hauser's conjoint survey in the prior

7  action, this Court noted that "Dr. Hauser's conjoint analysis is used for a willingness to pay analysis,

8  not to predict market share, and Samsung has not separately attacked 'the conjoint study's own

9  irrational results,' as was the case in *Oracle*."  (Case No. 11-cv-1846 (LHK), Dkt. No. 1157, at 14.)

10 Neither of these qualifications now applies.  Samsung emphatically objects to the irrational results of

11 the Hauser survey.  And, the survey *is* being used to predict market share to calculate damages,

12 despite established authority that conjoint analysis should not be used for this purpose.  *Getting*

13 *Started With Conjoint Analysis*, a book written by Bryan Orme, the President of Sawtooth Software --

14 the software which Dr. Hauser used to crunch the survey results and arrive at his forecasts (Hauser

15 Rpt. p. 23 n.27, Fazio Dec. Ex. A) -- states that "[c]onjoint models do not predict market share due to

16 a variety of reasons," including because "[c]onjoint analysis cannot fully account for differences in

17 awareness developed through advertising and promotion."  (Hauser Dep. Ex.11 at 26, Fazio Dec. Ex.

18 G; *see also* Orme Comment to *Current Issues and a "Wish List' for Conjoint Analysis* (2005), Fazio

19 Dec. Ex. H ("Conjoint analysis cannot capture many real-world effects that influence actual market

20 shares. It assumes (among other things) equal information, availability, time on the market,

21 effectiveness of sales force—not to mention the critical question of whether we've included all

22 relevant attributes that affect buyer behavior. Thus, validation in terms of correspondence to market

23 share is a difficult proposition.").

24       Mr. Orme's comment is particularly apt here: there is overwhelming evidence that Samsung's

25 advertising has been a major factor in its success.  (*See, e.g.*, Joswiak Dep. Ex. 12 at 3-7, Fazio Dec.

26 Ex. I; Ng Dep. Tr. at 136:9-13, Fazio Dec. Ex. J; Schiller Dep. Ex. 3, Fazio Dec. Ex. K.)  Dr. Hauser

---

27  [4]  Dr. Hauser followed the same methods for his tablet survey and it should thus be excluded for
28 the same reasons.

SAMSUNG'S MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS

1   acknowledged that the Orme book is "fairly authoritative" (Hauser Trial Tr. at 1938:10-1939:6, Fazio

2   Dec. Ex. L), and conceded that using his conjoint model alone to predict market share would be

3   "inappropriate" (Hauser Dep. Tr. at 152:4-153:9, Fazio Dec. Ex. F).   The impact of advertising on

4   consumer choice cannot be modeled in a survey response in which a respondent is asked to pick

5   between Phone A and Phone B in a vacuum.

6          Dr. Hauser's conjoint survey has the very same flaws that led Judge Alsup to exclude a

7   conjoint survey in *Oracle v. Google* .  That survey was offered to allegedly estimate "Android's

8   increase in market share due to infringement," (*Oracle Am., Inc. v. Google Inc*, 2012 WL 850705, at

9   *9 (N.D. Cal. Mar. 13, 2012)), the mirror image of what Apple does here.  Judge Alsup excluded the

10  survey because it tested too few features, did not test "important product features, such as battery life,

11  WiFi, weight, and cellular network" and the expert "had no reasonable criteria for choosing the four

12  non-patented features to test." *Id.* at *10-11.  Judge Alsup recognized that by focusing respondents on

13  a limited number of small features of devices that have hundreds of features, conjoint surveys yield

14  unreliable results.  *Id.* ("If the conjoint analysis had been expanded to test more features that were

15  important to smartphone buyers (instead of the four non-patented features selected for litigation

16  purposes), then the study participants may not have placed implicit attributes on the limited number of

17  features tested.")[5]  So here.  The evidence in this case has uniformly shown that consumer decision-

18  making in smartphones is focused on the host of macro features omitted from Dr. Hauser's survey.

19  (*See, e.g.,* Apple Q4 FY2010 iPhone Buyer Survey, APLNDC0002734025, Fazio Dec. Ex. DDD;

20  Apple Q4 FY2011 iPhone Buyer Survey, APLNDC-X0000006548, Fazio Dec. Ex. EEE; Apple Q4

21  FY2012 iPhone Buyer Survey, APLNDC630-0001233115, Fazio Dec. Ex. FFF; Apple Q2 FY2013

22  iPhone Buyer Survey, APLNDC630-0001233246, Fazio Dec. Ex. GGG; *see also* Chevalier Rpt. at ¶¶

23  66, 67, 107-108, 113-115, Fazio Dec. Ex. D.)

24          Here, Dr. Hauser tested respondents' preferences for the six allegedly patented features and

25

26     [5]   In finding the *Oracle* conjoint results "irrational," Judge Alsup noted that "one quarter of all
    participants preferred (9%), or were statistically indifferent between (16%), a smartphone costing
27  $200 to a theoretically identical smartphone costing $100." *Oracle*, 2012 WL 850705, at *11.  Dr.
    Hauser's flawed conjoint here produced similar irrational results, with 68 percent of respondents
28  reflecting an irrational preference for higher prices.  (Reibstein Rpt. ¶¶ 232-237, Fazio Dec. Ex. C.)

1   three "distraction" functionalities.[6]  According to Dr. Hauser he had "no way of knowing" what the

2   important features were in these marketplaces and so he "made some guesses as to what would be the

3   best distraction features."  (Hauser Dep. Tr. at 303:  17-304:22, Fazio Dec. Ex. F;  *see also id.* at

4   304:22-307:18.)  Like the expert in *Oracle*, Dr. Hauser failed to include "important product features

5   such as battery life, WiFi, weight, and cellular network" as distraction features, and instead chose less

6   important features, such as the panorama camera feature.  (Hauser Rpt., at Exs. G, H, Fazio Dec. Exs.

7   B, E.)  This kind of feature selection is exactly what the *Oracle* opinion rejected.

8        **B.      Apple's Damages Calculations Rest on Dr. Hauser's Conjoint Survey[7]**

9        Apple's $1.9 billion damages claim rests on Dr. Hauser's conjoint survey for both the lost

10   profit and reasonable royalty calculations.  At  the heart o f Apple's $ 980 m illion lost profits

11   calculation is an estimate of the sales Samsung supposedly *would not have made but for* the alleged

12   use of five Apple patents.  (Vellturo Rpt. at ¶ 325, Exs. 3, 19A, Fazio Dec. Exs. M-O.[8])  To estimate

13   the amount of the sales Samsung would have lost due to not using the patented features, Dr. Vellturo,

14   took the "w illingness to buy"  results of Hauser's conjoint study and simply translated them  into

15   Samsung market share declines.[9]  For example, according to Dr. Vellturo, sales of the Galaxy Note II

16   would decrease by as much as 33.86% without the alleged '414, '647 and '959 patented features – a

17   dramatic claimed decrease based on the removal of just 3 minor feature patents.  (Vellturo Rpt., Ex.

18   13, Fazio Dec. Ex. Q.)  Dr. Vellturo then assumes that Apple would capture Samsung's reduced sales

19   in direct proportion to Apple's market share and concludes that Apple would incur up to $980 million

20

21        [6]  *See* Hauser Rpt. Exs. G & H, Fazio Dec. Ex. B, E.
          [7]  Given the length of the Ve llturo report and the volum e of confidential Apple and Sa msung
22   financial information contained therein, and to  avoid burdening the court with an unnecessarily
     complex and burdensome sealing procedure, Samsung has submitted only excerpts in connection with
23   this motion, but will submit the full report if the Court believes doing so would aid its consideration of
     the motion.
24        [8]  Vellturo Dep. Tr. at 93:19-95:7 ("what Dr. Hauser's survey identifies is percentage changes and
     willing to buy, and I use that information to evaluate percentage change in sales"), 99:2-100:1 (the
25   only quantitative inputs into Dr. Vellturo's reduction in sales analysis are the output from Hauser
     survey and actual Samsung sales information), 103:17-104:25 ("Dr. Hauser's results are a necessary
26   input to those calculations . . . with regard to the diminished demand aspect of lost profits."), Fazio
     Dec. Ex. P.
27        [9]  Even Dr. Vellturo's "black out" damages (lost profits he contends Apple is entitled to during a
     design around period) rely on the conjoint, as it is the basis for Dr. Vellturo's conclusion that *Panduit*
28   factor one is met.

1  in lost profits by virtue of Samsung's alleged infringement.

2        Dr. Hauser's survey is also the foundation of Apple's reasonable royalty numbers.[10]  In his

3  reasonable royalty analysis, Dr. Vellturo concludes Apple would not license the patents unless it

4  received a payment that compensated it for its expected lost profits.  As Dr. Vellturo explains his

5  reasonable royalty calculation, he first purports to estimate the extent to which Samsung's sales would

6  have declined if Samsung did not practice the patents, a number which "is based on results of Dr.

7  Hauser's survey and conjoint analysis."  (Vellturo Rpt. ¶395, Fazio Dec. Ex. M.)  Dr. Vellturo asserts

8  that Apple's posture at the hypothetical negotiation would then be driven by two factors – "(1)

9  assessing the incremental sales Samsung would gain as a result of the license (which is, of course, the

10  direct analog to what Samsung would expect to lose absent that license); and (2) what proportion of

11  the incremental sales Samsung would make that would come at Apple's expense, and what Apple

12  would expect to lose in profits as a result of such ceded sales."  (*Id.* at ¶ 415, Fazio Dec. Ex. M.)

13  Thus, Dr. Vellturo's reasonable royalty analysis once again rests on the Hauser conjoint analysis to

14  calculate market share impact of the patents and he derives his number directly from the conjoint

15  results.[11]  Ultimately, Dr. Vellturo concludes that Apple would require a *per smartphone license of*

16  $40.10 *for just the 5 patents at issue. Id.* at Table 7.[12]  This, he concedes, is substantially more than

17  Samsung would have been willing to pay (which he calculates at $24.48 per unit), but ultimately he

18  concludes Samsung would *simply raise its prices* and accede to Apple's demand.  (*Id.* at ¶431, Fazio

19  Dec. Ex. M.)  None of the *Georgia Pacific* factors caused Dr. Vellturo to make any further

20  adjustments to his numbers.  (Vellturo Dep. Tr. at 160:14-161:16, 174:21-175:7, Fazio Dec. Ex. P.)

21  ████████████████████████████████████

22  ████████████████████████████████████  (Vellturo Rpt.

23  ¶¶ 440-41, Fazio Dec. Ex. M.)[13]

---

[10]  Vellturo Dep. Tr. at 180:10-13, 181:22-182:11, Fazio Dec. Ex. P.

[11]  Dr. Vellturo also adjusts Apple's minimum willingness to accept number upward to account for what he calls "ecosystem" impacts – expected lost future sales flowing from anticipated lost sales derived from Dr. Hauser's survey.  (Vellturo Rpt. ¶¶ 421-26, Fazio Dec. Ex. M.)

[12]  This number subtracts the value Dr. Vellturo found for the '760 patent as it is no longer being asserted for infringement.  For tablets, the per unit number is $31.99.  (*Id.*)

[13]  Dr. Vellturo followed the same procedures for evaluating damages for tablets and his opinions (footnote continued)

## C.  Dr. Hauser's Conjoint Analysis Measures An Impermissibly Larger Footprint Than The Patented Features

Dr. Hauser's descriptions of the alleged patented features shown in his conjoint survey are over broad,[14] rendering the survey results useless to show demand for the patented functionality.[15] Moreover, his descriptions of the reasonable non-infringing alternative are hopelessly biased and confusing,[16] implying that the non-infringing alternative is not able to do major tasks if the patented functionality is missing.[17]  The improperly broad footprint that Dr. Hauser's conjoint survey tests renders Dr. Vellturo's calculations useless: they do not properly apportion value between the patented

---

should be excluded for the same reasons.

[14] Samsung's technical experts have described the inaccuracies in Dr. Hauser's descriptions of the accused features and non-infringing alternatives. Jeffay Report ¶¶ 108-110, Fazio Dec. Ex. R ('647); Chase Report ¶¶ 46-62, Fazio Dec. Ex. S ('414); Rinard Report ¶¶ 524-535, Fazio Dec. Ex. T ('959); Greenberg Report ¶¶ 199-209, Fazio Dec. Ex. U ('721); Wigdor Report ¶¶ 41-43, Fazio Dec. Ex. V ('172).  Apple's technical experts have also conceded that Dr. Hauser's purported descriptions of the patented features and non-infringing alternatives are broader than the patented features.  (See, e.g., Snoeren Dep. Tr. at 133:1-2, 135:3-19, Fazio Dec. Ex. W ; see also id. at 130:20-131:5; 134:11-14 ('959) (conceding Dr. Hauser's description was not "the patent specification language" and that the language used "has not encompassed the full spectrum of the requirements of claim 24[.]"); Cockburn Dep. Tr. at 155:20-156:1, 157:8-11, Fazio Dec. Ex. X ('172) (Hauser's non-infringing alternative description suggests that autocorrection is not available to the user; that there is a means of correction, but it is not autocorrection, which is a far broader footprint than the patent, which does not cover all means of "autocorrect functionality").)

[15] Dr. Reibstein conducted a pretest of Dr. Hauser's survey which asked open-ended questions to 26 survey respondents to determine their understanding of the features described in Dr. Hauser's survey.  (Reibstein Rpt. ¶¶ 99-104, Fazio Dec. Ex. C.  Even though respondents claim ed that they generally understood the features, when asked to describe them, every single respondent exhibited misunderstanding or a lack of sufficient understand regarding at least one of the patented features. (Id. at ¶¶ 109, 140.)  Moreover, with respect to the "quick links" description (Dr. Hauser's purported description of the '647 Patent), 96% of respondents misunderstood the feature; 85% misunderstood Dr. Hauser's description of the "background syncing" feature (his purported description of the '414 Patent); and 69% m isunderstood the description of the "autom atic word correction" feature (his purported description of the '172 Patent).  (Id. at ¶ 140.)  A survey that is incomprehensible to respondents cannot yield admissible results.  (See Hauser Dep. Ex. 9 at 387-88, Fazio Dec. Ex. Y.)  Thus, even if the descriptions had been accurate in descri bing the patented technology, the fundamental problem of respondent confusion of the features being tested would remain.

[16] For example, Dr. Hauser's description of the non-infringing alternative to the "background syncing" patented feature states that "[w]ithout this feature, you would have to wait to use an app…while the data for the app is synchronizing with a remote computer, and that wait may be long or short."  (Hauser Rpt. ¶74, Fazio Dec. Ex. A.)  Dr. Hauser does not define what a long or short wait is in terms of elapsed time, or how frequently the wait would be long versus short. This information, which was not provided by Dr. Hauser, is important for a respondent to be able to accurately assess the choice presented. In another example, in describing the non-infringing alternative to the "slide to unlock" patented feature, Dr. Hauser states that the alternative "may make unintentional unlocks more likely."  (Id. at ¶¶ 76. 81.)

[17]  (Reibstein Rpt. ¶¶ 37,40, 41, 48, 49, 53, 54, 56, 58, 62, 64, 65, 68, 70, 71, 79-83, Fazio Dec. Ex. C.)

SAMSUNG'S MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS

1   and non-patented features of the products.

2        Dr. Hauser also f ails to test the des irability of the cla ims asserted f or infringement.[18]  For

3   example, claim 11 of the '414     Patent is broadly directed     to what A pple calls "background

4   synchronization" – the alleged ability to "allow[] users to use and interact with an application while

5   data from the same application is being synchronized."  (Vellturo Report ¶¶ 404-05, Fazio Dec. Ex.

6   M.)  Claim 20 is much narrower.  It only covers synchronizing *multiple* classes of data using at least

7   three distinct, class-specific software components.[19]  Indeed, Apple's technical expert says claim 20 is

8   very narrowly limited to a "plug-in model architecture."[20]  Apple is no longer asserting claim 11 – the

9   broader claim[21] – and instead is now asserting only narrow claim 20.  Despite this, Dr. Hauser asked

10   survey participants about claim 11's "background synchronization" functionality – not the narrower

11   functionality described in claim 20.[22]  Dr. Hauser conducted *no test at all* for whether, or how much,

12   consumers care about the im plementation details of claim 20 – Apple's so-called "plug-in m odel

13   architecture" – as opposed to the much broader scope of claim 11, which can be implemented without

14   any use of claim 20.  (Hauser Rpt. ¶ 74, Fazio Dec. Ex. A.)  Yet Dr. Vellturo relies on Dr. Hauser's

15   survey to assert Apple is owed lost profits for Samsung's alleged infringement of claim 20 of the '414

16   Patent.  (*See, e.g.*, Vellturo Rpt. ¶¶ 164, 255-58, 280-88, 293, 310-17, 324, Fazio Dec. Ex. M.)  A

17   survey testing a patent claim not asserted for infringement is useless and inadmissible.[23]

18

_____

19     [18]  *See, e.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (Fed. Cir. 1996) ("A

20   literal patent infringement analysis involves two steps:  the proper construction of the *asserted* claim and a determ ination as to whether the accused m ethod or product infrin ges the  *asserted* claim as properly construed.") (emphasis added); *cf. Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482

21   (Fed. Cir. 1984) ("Thus an accu sed product could not be found non-infringing because it lacked a flared outlet feed pipe, that elem ent being irrelevant because it is present only in   *non-asserted*

22   claim.").
  [19]  *See, e.g.*, Snoeren Opening Rpt. ¶¶ 404-05, 416, Fazio Decl. Ex. Z.

23     [20]  *See* Snoeren Rebuttal Rpt. ¶¶ 449, 530, Fazio Decl. Ex. AA.
  [21]  On October 4, 2013, Apple dropped its infringement allegations for claim 11.  Dkt. No. 786.

24     [22]  Dr. Vellturo analysis of *Panduit*'s first factor repeatedly conflates claim 20's narrow alleged "plug-in" technology, which Apple *does not* practice, with claim 11's "background sync" feature,

25   which Apple *dropped* from the case.  Vellturo Rpt. ¶ 168, Fazio Decl. Ex. M.
  [23]  This is a pervasive error that extends beyond the '414 Patent:  Apple's damages are based on

26   allegations that its products practice claims *not* asserted for infringement.  For the '959 Patent, Dr. Vellturo's *Panduit* analysis relies heavily on consumer demand for Apple's "Siri" software.  (*See, e.g.*,

27   Vellturo Rpt. ¶¶ 192,  196, 197, 206, Fazio Dec. E x. M.)  But by Apple's own adm ission, its S iri software does not practice claim 24 of the '959 Patent.  At best, Siri practices claim 34:  a different

28   claim describing a different search technology that does not require simultaneous internet and local
         (footnote continued)

1    In another independent failure, Dr. Hauser did not include the '721 Patent in his smartphone

2    study survey at all – it was only tested in the tablet survey.  (Hauser Rpt. ¶ 19, Fazio Dec. Ex. A.)

3    Nonetheless, Dr. Vellturo used the results from the tablet survey to assess damages on accused

4    smartphones.  (Vellturo Rpt. at 104, n.508, Fazio Dec. Ex. M.)

**D.    The Methodology Used Results In Unreasonable and Unreliable Calculations**

6    Dr. Hauser failed to perform any external test of the validity of his conjoint model to determine

7    how well it could predict the real world.  When such a test was performed by Samsung's expert, the

8    predictions in Dr. Hauser's model were found to be wildly different than actual sales in the real world.

9    (See Reibstein Rpt. ¶¶248-251, Fazio Dec. Ex. C; Chevalier Rpt. ¶¶223-224, Fazio Dec. Ex. D.)  For

10   example, Professor Hauser's conjoint analysis predicted that ███████████████████

11   ████████████████████████████████████████████████████

12   ████████    (Id.)  Dr. Vellturo also did no quantitative external validity or reasonableness checks

13   to assess whether the irrational numbers produced by Dr. Hauser's survey were reliable.  (Vellturo

14   Dep. Tr. at 305:4-306:21, Fazio Dec.  Ex. P.)  Dr. Vellturo ignored, for example, the parties' prior

15   licensing negotiations as well as licenses between Apple and another Android manufacturer licensing

16   the patents at issue.  Instead, Dr. Vellturo's analysis relies only on the Hauser conjoint analysis to the

17   exclusion of all other methodologies, including those Apple employed (and continues to employ) in

18   the predecessor action and other cases involving the same patents.  A comparison of reasonable

19   royalty calculations highlights the inappropriate methodology Apple offers here.

20   The unreasonableness of the Hauser conjoint analysis (and Dr. Vellturo's use of it) is also

21   shown by Dr. Vellturo's conclusion as to what would be a reasonable royalty for the '647 Patent –

22   $12.49 per unit.  (Vellturo Rpt.  ¶ 428, Fazio Dec. Ex. M. )  This is more than *20 times* the royalty

23   search, and instead uses a "global heuristic" to "selectively" identify areas of inquiry.  (Snoeren
     Opening Rpt. ¶¶360-67, Fazio Dec. Ex. ZZ ('959 Patent).)  For the '172 Patent, Dr. Hauser's survey
24   did not test whether consumers care about the specific requirements of claim 18.  (See Hauser Rpt.
     ¶ 74, Fazio Dec. Ex. A; Cockburn Dep. Tr. at160:22-161:7; 170:15-171:13, Fazio Dec. Ex. X.) Dr.
25   Vellturo relied on Dr. Hauser's survey as well as on consumer demand for Apple products that
     purportedly practice the '172 patent.  (See, e.g., Vellturo Rpt. ¶¶ 164, 241-246, 256-258, 330, 470-
26   471, 480, Fazio Dec. Ex. M. But Apple does not claim to practice claim 18 of the '172 patent; it only
     asserts that its products practice claim 27, which is *not* asserted for infringement.  (Cockburn Opening
27   Rpt. ¶ 470, Fazio Dec. Ex. HHH.)

28

1   Apple's expert in the Motorola litigation   attached to the '647 Patent – 60 cents.   *Apple, Inc. v.*

2   *Motorola, Inc*. 2012 WL 1959560, at *10 (N.D. Ill. May 22,   2012).  In excluding that expert's

3   opinion, Judge Posner found that even the 60 cents per device royalty was "senseless."  (*Id.*)[24]

4          Apple's behavior in the real world  confirms the unreliability  of Apple's present dam ages

5   calculations.  In October 2010, Apple offered to license a portfolio of its smartphone utility patents to

6   Samsung for $30 per smartphone and $40 per tablet.  (APLNDC00010886, Fazio Dec. Ex. DD.)[25] █

7   ███████████████████████████████████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████████████████████████████

10  █████████████████████████████████████████          (APLNDC-Y0000408242-383, at 255,

11  Fazio Dec. Ex. EE.)  These real world licensing negotiations show that Dr. Hauser's survey results are

12  nonsensical.

13          **E.     Dr. Hauser's Outs ide Option Cannot A  ccount For The Role Of The Tested**
                    **Features In Consumer Purchase Decisions**

14

15          Dr. Hauser's conclusion that   respondents' picking the ou   tside op tion necessa rily were

16  influenced by the absence of a tested feature  on the hypothetical survey s martphone is baseless.

17  (Hauser Rpt. ¶¶ 114-116, Fazio Dec. Ex. A.)  This failure is significant because Dr. Hauser relies on

18  the "outside option"—the fact that respondents did not select one of the four hypothetical phones—as

19  evidence that these features actually cause consumers to select Samsung products over other phones in

20  the marketplace.  (*Id.*)  But by failing to properly construct the option, Dr. Hauser's survey simply

21  provides no insight on this issue.

22          After respondents have made a selection between the four hypothetical smartphones presented

23  ─────────────────

24  [24]  Apple's damages experts in the 1846 action, Mr. Musika and Ms. Davis, both concluded that
    *all* of the intangible value (not including brand and design) was $31 per unit in Apple products, and $4
    per unit in Samsung products, and split that entire amount across the seven utility patents asserted in
    that case.  (Davis Rpt. at 86, Fazio Dec. Ex. BB; *see also* Suppl. Musika Rpt., Ex. 41.2-S, Fazio Dec.
    Ex. CC.)  Here, reliance on the Hauser conjoint analysis generates a per unit royalty of $40.10 for just
    five patents.  (Vellturo Rpt. ¶ 428, Fazio Dec. Ex. M.)

25  [25]  In earlier licensing negotiations with Samsung (less than two months before Apple offered the
    $30 per unit number), Apple met with Samsung and alleged it believed that Samsung was infringing at
    least 75 of its patents.  (APLNDC00001103-1125, Fazio Dec. Ex. II.)  Thus at a minimum, Apple's
    offer two months later was for a portfolio that included these 75 patents – far more than the five
    valued here.

26

27

28

1  in the survey, they then are aske d to indicate whether they prefer  that sm artphone to an "outside

2  option"—a smartphone not included in the conjoint survey choice set. (Hauser Rpt. ¶¶  36, 85-86,

3  Fazio Dec. Ex. A.)  For the outside option, they are instructed to consider all Samsung smartphones

4  when deciding whether to choose to buy the hypotheti cal smartphone presented in the survey or to

5  choose the outside option instead.  (Id. at ¶ 113, Exs. G & H, Fazio Dec. Exs. A, B, E.)  The "outside

6  option" thu s included th e accused p roducts, wh ich Dr. Hauser's screen ing criteria ensured th e

7  respondents already owned, and newer Samsung smartphones that were on the market at the time the

8  survey was conducted.  Respondents picking the outside option (i.e., the choice to not buy the featured

9  phone in the survey question) could merely be expressing a preference for a new phone or the phone

10  they already have.  Dr. Hauser did not account for that and, as a consequence, is unable to determine if

11  the patented features influenced consumer purchase decisions. (Chevalier Rpt. ¶¶ 218-222, Fazio Dec.

12  Ex. D; Reibstein Rpt. ¶¶ 150-156, Fazio Dec. Ex. C.)

13  **II.    DR. VEL   LTURO'S ANALYSIS CONT        AINS MULTIPL   E, ADDI    TIONAL**
   **INDEPENDENT FLAWS**

14

15        **A.    Dr. Vellturo's Reasonable Royalty Is an Impermissible Attempt To Recover Lost**
         **Profits on Units For Which Apple Cannot Satisfy The _Panduit_ Test**

16        Dr. Vellturo calculates a reasonable royalty on all infringing sales that he concludes are not

17  eligible for lost profits dam ages.  This includes sales of Sam  sung products that even the Hauser

18  conjoint analysis concludes would not be impacted by the removal of the allegedly patented features,

19  and thus do not meet the requirement of _Panduit_ factor one.    (Chevalier Rpt. ¶¶ 279-282, Fazio Dec.

20  Ex. D).  Yet, as explain ed above, Dr. Vellturo proceeds to calculate a reasonable royalty that is

21  entirely based on "what Apple would expect to lose in profits" from licensing to Samsung.  (Vellturo

22  Rpt. ¶ 415, Fazio Dec. Ex. M; _see also_ Vellturo Dep. Tr. at 166:12-168:4, Fazio Dec. Ex. P.)  In so

23  doing, he dispenses with consideration of the _Panduit_ factors for these units. As a matter of law, this

24  is improper.  _See Rite-Hite Corp. v. Kelley Co._, 56 F.3d 1538, 1576 (Fed. Cir. 1995) (Nies, dissenting

25  in part) ("[W]here a patentee is not entitled to lost profits damages, lost profits may not, in effect, be

26  awarded by merely labeling the basis of the award a reasonable royalty."); _SmithKline Diagnostics,_

27  _Inc. v. Helena Labs. Corp._, 926 F.2d 1161, 1165, 1168 (Fed. Cir. 1991) (rejecting a party's proposed

28  use of its lost profits figure as a reasonable royalty, stating that "SKD sought actual damages based on

1  lost profits…SKD used the same purported lost profit figure translated into a percent of Helena's sales

2  to yield a reasonable royalty figure of 48%.  The district court found SKD's profit figures incredible in

3  either context.").   Apple cannot avoid the    *Panduit* requirements by simply asserting that in a

4  hypothetical negotiation Apple would not agree to    any number less than its own estimate of its

5  expected lost profits.

### B.   Dr. Vellturo Incorrectly Uses the Notice Date To Set The Design Around Period for Lost Profit Damages

6

7         One component of Dr. Vellturo's lost profits damages is a time period when he assumes

8  Samsung will simply be forced to remove its products from the market in order to implement design

9  arounds—a "blackout period."  Dr. Vellturo more than doubles Apple's off-the-market lost profits

10  damages by incorrectly commencing the design-around period at the notice date.  This is contrary to

11  the law: when calculating lost profits, courts look to whether non-infringing design arounds are

12  available *starting on the date of first infringement* – even if it is earlier than the notice date.  *Grain*

13  *Processing Corp. v. Am. Maize-Prods. Co.,*  185 F.3d 1341, 1347 n.3 (Fed.  Cir. 1999) (upholding

14  denial of lost profits because the design around would have been complete before notice); *see also*

15  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*  , 711 F.3d 1348, 1379 (Fed. Cir. 2013)

16  ("while the marking statute precludes . . . damages for pre-notice infringement, we must assess

17  damages for post-notice infringement relative to  market conditions at the point in time   when

18  infringement began.").  The impact of this legally improper choice has on the lost profits damages

19  number is staggering – by changing start date of the design around periods and the corresponding lost

20  profits periods to start later, Dr. Vellturo increases Apple's claimed lost profits for a four-month

21  design around period by more than $200 million (████████████████████), and increases

22  Apple's lost profits from a one-month design around period ███████████.  (Vellturo Rpt.

23  Exs. 21A, 22A, Fazio Dec. Exs. FF, GG; Chevalier Rpt. Ex. 53A, Fazio Dec. Ex. HH.)  Dr. Vellturo's

24  failure to use the date of first infringement for his lost profits calculations is improper under *Grain*

25  *Processing* and *Power Integrations*, and his opinions on lost profit damages in the post-notice design

26  around periods should be excluded.

### C.   Dr. Vellturo's Calculations Rest on  Counter-Factual Assumptions and Fail To Consider Relevant Evidence

27

28

1    Experts cannot rely on counter-factual assumptions or turn a blind eye to contradictory

2  relevant evidence.  *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041

3  (N.D. Cal. 2001) ("[W]hen an expert opinion is not supported by sufficient facts to validate it in the

4  eyes of the law, or when indisputable record facts contradict or otherwise render the opinion

5  unreasonable, it cannot support a jury's verdict.") (internal citations omitted); *Fail-Safe, LLC v. A.O.*

6  *Smith Corp.*, 744 F. Supp. 2d 870, 889-90 (E.D. Wis. 2010) (finding expert unreliable for various

7  reasons, including because of how he "uniformly treated all evidence that undermined his underlying

8  conclusion: unwarranted dismissal of the evidence or outright blindness to contrary evidence" and

9  noting that fact that he "all but 'cherry picked' the data he wanted to use[] provid[es] the court with

10  another strong reason to conclude that the witness utilized an unreliable methodology").  Dr.

11  Vellturo's opinions are contrary to undisputed facts.  His refusal to consider relevant evidence that

12  undercuts his findings or that would have required him to adjust his calculations downwards renders

13  them unreliable.

14    There is undisputed evidence of prior negotiations between the parties whereby Apple made an

15  offer to license smartphone utility patents to Samsung.  (APLNDC00010886-903, Fazio Dec. Ex. EE;

16  Teksler Dep. Tr., Mar. 16, 2012 at 59-72, Fazio Dec. Ex. JJ.)  Dr. Vellturo made no mention of this

17  offer in his report other than to list the bates of the document in an exhibit to his report providing his

18  list of documents "considered."  (Vellturo Dep. Tr. at 183:16-25, Fazio Dec. Ex. P.)  He

19  acknowledged that he "gave it essentially no weight" and that it had no impact on his royalty

20  calculations.  (*Id.* at 182:12-184:9.)  The only reasons he could provide for why he found it had no

21  probative value and gave it no weight was that it was not for the exact same patents at issue here and

22  that he did not believe it technically "constituted an offer."  (*Id.* at 184:1-17.)

23    Dr. Vellturo also ignored █████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████.  According to him, it

26  provided "no useful information to my assessment of a reasonable royalty."  (*Id.* at 163:12-16;

27  Vellturo Rpt. ¶¶ 434, 441, Fazio Dec. Ex. M.)  Dr. Vellturo's willful refusal to consider evidence

28  suggesting his royalty numbers are inflated warrants excluding his opinion. *See Laser Dynamics, Inc.*

1    *v. Quanta Computer, Inc*, 694 F. 3d 51, 79-80 (Fed. Cir. 2012) (excluding expert's reasonable royalty

2    testimony on the grounds that he relied on "irrelevant evidence to the exclusion of many licenses

3    expressly for the [patent at issue]" which "served no purpose other than 'to increase the reasonable

4    royalty rate above rates more clearly linked to the economic demand for the claimed technology.").

5         Dr. Vellturo also ignored evidence that directly contradicts his conclusion that *Panduit* factor

6    three was met, which requires evidence Apple had capacity to manufacture the sales it claims to have

7    lost.  Dr. Vellturo states that his review of the data "indicates that Apple has historically had sufficient

8    excess manufacturing capacity to exploit the additional demand for its products that Apple would have

9    experienced, but for Samsung's infringement." (Vellturo Rpt. ¶ 301, Fazio Dec. Ex. M.)  He claims

10   this is "a highly conservative assessment of Apple's manufacturing capacity" and that he saw "no

11   evidence that the supply of any resource required to expand production could not be increased quickly

12   enough to allow Apple to exploit additional demand." (*Id.*)  This conclusion is contradicted by

13   undisputed evidence of Apple's repeated supply constraints – constraints widely reported in the press

14   and acknowledged by Apple in this litigation.[26]  Again, Dr. Vellturo's willful disregard of undisputed

15   facts warrants exclusion.

16   **III.   THE COURT SHOULD EXCLUDE THE OPINIONS OF  APPLE'S '647 PATENT
         EXPERT, DR. TODD MOWRY**

17

18        Apple's expert on the '647 patent, Dr. Todd Mowry, should be excluded under Rule 702

19   because he fails to apply consistent claim interpretations for the disputed claim elements, making his

20   reports and testimony unhelpful to the trier of fact.

21        [26]   Apple's Vice President of Supply and Demand Management, on who Dr. Vellturo purportedly
22   relies for evaluation of this Panduit factor, (*see* Vellturo Rpt. ¶ 297, Fazio Dec. Ex. M), acknowledged
     Apple's repeated supply constraints over the relevant period.  (Sexton Dep. Tr. at 16:2-10, Fazio Dec.
23   Ex. KK (failed to meet demand for iPhone 4 during launch month);   *id.* at 62:18-21 (iPhone 4S
     shortages at launch); *id.* at 62:22-63:1, 76:9-11 (iPhone 5 shortages through first launch quarter) *id.*
24   at 78:10-12 (iPad 2 shortages at launch);   *id.* at 86:6-8 (iPad mini shortages at launch).)  ████████
     ███████████████████████████████████████████████████████████████████████████████████  *Id.*
25   at 51:6-16.)  Apple's CEO has discussed Apple's supply constraints on earnings calls, responding to
     investors concerns.  (*See, e.g.,* Q1 FY 2013 Earnings Call Transcript Sexton Dep. Ex. 7, at p. 7, Fazio
26   Dec. Ex. LL ████████████████████████████████████████████████████████████████████████
     ██████████████████████████████████████████████████████████████████████████████████████
27   ██████████████████████████████████████████████████  (*See, e.g.,* Sexton Dep. Ex. 11, Fazio Dec. Ex.
     MM) (Tim Cook email asking `
28   ████████████████████████████).)

1    Dr. Mowry has applied two sets of claim interpretations in forming his opinions in this case—

2 one for infringement, another for invalidity.  In analyzing invalidity, Dr. Mowry applied a slew of

3 negative and alternative claim interpretations to distinguish the prior art. Yet Dr. Mowry never even

4 mentions his restrictive interpretations in analyzing infringement, let alone applies them to the accused

5 products.  This inconsistent analysis, detailed  below and in Ex. UU, renders Dr. Mowry's opinion

6 unhelpful and unreliable under Rule 702.

7    Making matters worse, Dr. Mowry told this Court, in his sworn Reply Declaration during the

8 PI phase of this case ("PI Reply Declaration"), that certain "requirements" were "written in the claim

9 limitation[s]" of the '647 patent and required by the "plain language."  *See, e.g.*, Ex. WW (Mowry PI

10 Reply), ¶¶ 25, 140-141, 217.)  Dr. Mowry distinguished prior art based on these "requirements."  (*Id.*)

11 And the Court relied on Dr. Mowry's validity opinions in issuing its Preliminary Injunction Order.

12 Dkt. #221 at 37-42.  Yet at his sworn deposition, when asked whether these were requirements of the

13 claims, Dr. Mowry stated they were not.  *See* Section C *infra*.  Then, when confronted with his PI

14 Reply Declaration, Dr. Mowry testified that his prior statements to the Court about these requirements

15 were an "error."  (Ex. XX (Mowry Dep.) 128:2-141:8).

16    The record, however, demonstrates that Dr. Mo wry did not m ake an "error."  Rather, Dr.

17 Mowry changed his testimony about  what is "written in the claim  limitations" and required by the

18 claims' "plain language" because S amsung's new "Jelly Bean" products, introduced after th e PI

19 phase, plainly do not meet the claim requirements Dr. Mowry originally relied on and later tried to

20 disavow.  This exposes his opinion for what it is—the opinion of an unreliable expert who will change

21 his sworn testimony to suit Apple's needs.  Dr. Mowry should not be allowed to testify at trial, given

22 his willingness to ignore the consistency, reliability, and open disclosure that is required of an expert

23 under the Federal Rules.

### A.    Failure to Disclose an d Consistently Apply Principles to the Facts Renders an Expert's Opinion Unhelpful and Inadmissible

24

25    The first step in a patent infringem ent or vali dity analysis is to dete rmine the scope of the

26 claims, followed by an element-by-element comparison of each claim to the accused product or prior

27 art.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).  Claims

28

1    are not to be treated "like 'a nose of wax,' to be twisted one way to avoid anticipation and another to

2    find infringement." *Id*. (citation omitted).  Instead, "claims must be interpreted and given the same

3    meaning for purposes of both validity and infringement analyses." *Id*.

4            Because of this requirement, courts have previously found that failure to disclose and apply

5    clear and consistent claim interpretations as part of a technical expert's analysis renders an expert's

6    testimony "less than helpful to the trier of fact, in contravention of Federal Rule of Evidence 702," and

7    have excluded testimony on this ground.  For instance, in *DataQuill Ltd. v. Handspring, Inc.*, 2003

8    WL 737785, at *4 (N.D. Ill. Feb. 28, 2003), the court granted a motion to strike a technical experts

9    report under Rule 702 in part because it was not clear what or whose interpretation of the claims the

10   expert applied in his analysis, and because he failed to state the basis and reasons for his opinion under

11   Rule 26(a)(2)(B).  Similarly, in *Oxford Gene Technology Ltd. vs. Mergen Ltd*, 345 F. Supp. 2d 431,

12   436-37 (D. Del. 2004), the court granted a motion to strike an expert's testimony in part because the

13   expert applied a set of "negative or alternative constructions" to the prior art and because the expert

14   failed to then take the second step of the analysis an element-by-element comparison of the claims to

15   the facts.  *Id*.

16       **B.     Dr. Mowry Applies Two Separate Sets of Claim Interpretations to Infringement
                  and Invalidity**

17

18           Violating the requirement that "claims must be interpreted and given the same meaning for

19   purposes of both validity and infringement analyses," Dr. Mowry's Rebuttal Report applies a slew of

20   negative and alternative claim requirements to distinguish the prior art. The following table sets forth

21   a few examples of "requirements" of the claims applied by Dr. Mowry.  Dr. Mowry did not disclose a

22   *single* one of these requirements in his Opening Report:

| Mowry's Alleged Claim Requirements | Mowry's Statement Distinguishing Prior Art Based on Alleged Claim Requirements |
|---|---|
| "Selection of a detected structure" in Claim 1 requires th   at a detected structure can be chosen from a set of structures. | "First, the 'selection of a detected structure,' as written in the claim  lim itation, requires th  at a particular detected structure can be chosen from  a set of structures." Ex. YY (Mowry Rebuttal) ¶ 151. |
| "Structures" in Claim 1 requires multiple  *types* of structures to be detected, not just multiple structures. | "[T]he '647 patent discloses, and claim 1 claims, a system able to detect multiple types of structures in da ta." *Id*. at ¶ 144. |
| "Structures" in Claim  1 m ust have "semantic significance." | "The '647 patent claims cover the detection of recognizable structures with  *semantic sign ificance*." *Id*. at  ¶¶ 37 (emphasis in original), 52, 165, 168, 292, 340. |

| Claim 4 is lim ited to a spec ific definition of "grammar." | "The term 'grammar' as understood by one of ordinary skill at the time of the inv ention of the '647 patent is generally synonymous with 'context-fre e grammar,' such as a grammar that can be written in Backus-Naur form." *Id.* at ¶ 367. |
| Claim 6 is lim ited to a spec ific definition of "string search." | "String search involves com paring a sequence of input characters against a target sequence of multiple characters that are literal constants." *Id.* at ¶¶ 157, 281. |

Of the limitations listed above, ***none*** are applied in Dr. Mowry's infringement report in this case.  For instance, in his Rebuttal Report, Dr . Mowry distinguished the art by using a highly technical, restrictive definition of grammar:  "The term 'grammar' as understood by one of ordinary skill at the tim e of the inventi on of the '647 Patent is gen erally synony mous with 'context-free grammar,' such as a grammar that can be written in Backus-Naur form."  Ex. YY (Rebuttal Report) ¶ 367.  Dr. Mowry's Opening Report, on the other hand, contains absolutely no analysis on whether the code he accuses of being a grammar is a "context-free grammar" or whether it is written in "Backus-Naur form."  Indeed, those concepts appear nowh ere in his infringem ent report.  Ex. ZZ (Mowry Opening) ¶¶ 166, 217.  Sim ilar examples abound throughout Dr. Mowry's Reports.  *See* Ex. UU (collecting examples of inconsistent claim interpretation).

Dr. Mowry's canned response at deposition to inquiri es about his inconsistent approach was to claim that he applied the sam e set of constructions for infringement as he did invalidity, regardless of the actual analysis in his reports. *See, e.g.,* Ex. XX at 210:20-211:23.  This renders cross-examination of Dr. Mowry an unsatisfactory solution, because Dr. Mowry merely claims to have applied these restrictive constructions in evaluating infringement, despite not disclosing any of the alleged analysis in his report.  But without Dr. Mowry's alleged analysis – that is, regardless of whether Dr. Mowry applied these constructions in his head – Dr. Mowr y's failure to d isclose any ana lysis (or even a recitation of the alleged claim requirem ents) in his infringem ent reports renders his opinions impossible to evaluate or cross-examine, and thus necessarily unreliable.[27]  Dr. Mowry is required by

---

[27]   As just one exam ple, Dr. Mowry alleges th roughout his analysis of the prior art that for "detection" to be perform ed, the structures detected m ust have "sem antic significance."  Ex. YY (Mowry Rebuttal) ¶¶ 37, 52, 165, 168, 292, 340.  Despite th e lack of any analysis of this requirement in his opening report (the word "sem antic" is used once in a background section), when asked whether he applied his requirem ent of "sem antic signi ficance," Dr. Mowry claim ed that was part of his infringement analysis.  *See* Ex. XX at 210:20-211:23.  Dr. Mowry should not be able to rely on unsupported analysis and blanket statements to mask the inconsistencies in his approach.

SAMSUNG'S MOTION TO EXCLUDE OPINIONS OF CERTAIN OF APPLE'S EXPERTS

1  the Federal Rules to disclose the full basis for his opinions, which, in the patent context means clearly

2  setting out the claim constructions he is applying and his analysis under those constructions. *Oxford*

3  *Gene Technology Ltd. vs. Mergen Ltd.*, 345 F. Supp. 2d 431, 436-37 (D. Del. 2004).  He has failed to

4  do so.

5          **C.**      **Dr. Mowry Is Willing To Change His Opinions To Suit His Needs, Illustrating His Inconsistent Application of Claim Interpretations and Exacerbating His Failure to Consistently Apply His Claim Requirements**

6

7          Nothing illustrates the unreliability of Dr. Mowry's opinion as well as comparing Dr. Mowry's

8  PI Reply Declaration with his September 2013 Rebuttal Report and recent deposition testimony.  The

9  table below collects, in the column on the left, statements Dr. Mowry made in his sworn PI Reply

10  Declaration to the Court regarding requirements "written in the claim limitation" or "required" by "the

11  plain language of claim 1" that he   used to distinguish the prior   art.  The Court relied on this

12  Declaration in issuing its Preliminary Injunction Order.  Dkt. #221, 37-42.  The column on the right

13  collects Dr. Mowry's recent swor n deposition testimony disavowing his opinion that these are

14  requirements of the claim:

| Mowry's PI Reply Declaration | Mowry's Sworn Deposition Testimony |
| --- | --- |
| "The 'selection of a detected structure,' as written in the claim limitation, necessarily requires that a particular detected structure can be chosen from a set of detected structures…. At no point does Sidekick allow a user to select from a multitude of detected structures" Ex. WW (PI Reply) at ¶ 140. | Q. For [the user interface] limitation you agree that multiple structures are first detected after which a user can choose any one of which to perform an operation via the user interface; right? A. …. "[Claim 1] does not say a particular structure out of a set of detected structures." Ex. XX (Mowry Dep.) 125:2-14. |
| This, again, is contrary to the teachings of the '647 Patent, in which multiple structures are detected, after which a user can choose any one on which to perform an operation via the user interface. …. This argument makes no sense in view of the plain language of claim 1, which, as explained, requires that the user be able to pick or choose a detected structure ***after*** the system identifies such structures for the user.  Ex. WW (PI Reply) at ¶ 140-141. | Q. For that limitation you agree that multiple structures are first detected after which a user can choose any one of which to perform an operation via the user interface; right? A. "It does not say -- you said multiple detected structures -- multiple structures are detected ahead of time.  The claim language doesn't say that…. Claim 1 does not require what you said.  It does not require that multiple structures be detected prior to any selections beginning." Ex. XX (Mowry Dep.) 108:21-110:2. |

25          The full-text of these exchanges, including Dr Mowry's further equivocation regarding other

26  requirements of the claims, is included in Ex. XX (Mowry Dep.) at,  *e.g.*, 108:21-110:2; 113:1-21;

27  121:5-126:8; 128:2-141:8; 150:17-152:7; 154:17-164:2.

28

1    Dr. Mowry appears to have changed his opinions because Samsung changed its products.

2    After the PI phase, Samsung released the "Jelly Bean" version of its Browser application.  As detailed

3    in Samsung's concurrently filed Motion for Summary Judgment, that Jelly Bean Browser application

4    does not infringe the claims of the '647 patent because, among other things, it does not detect

5    "structures" prior to selection by the user, nor does it ever present a set of detected structures to the

6    user.  *See* Samsung Motion for Summary Judgment, Section III.A.2 & III.B.2.

7    Dr. Mowry's change in opinion about the "requirements" of the claim is further borne out by

8    changed opinions set forth in his Rebuttal Report.   For instance, in his PI Reply Declaration, Dr.

9    Mowry attempted to distinguish the Sidekick prior art reference by claiming that the '647 patent

10   taught that "multiple structures are detected, after which a user can choose any one on which to

11   perform an operation via the user interface."  *Id.* at ¶141 (*see also* ¶217 (stating this is required by

12   language of the claim).  In his Rebuttal Report, however, Dr. Mowry removed this argument entirely.

13   *See* Ex. AAA (illustrating changes to Sidekick opinion).  Similarly, Dr. Mowry opined in his PI Reply

14   Declaration that selection must occur from a "set of ***detected*** structures" (Ex. WW (Mowry Reply

15   Decl.) ¶ 140 (emphasis added)), but modified that opinion in his Rebuttal Report to state only that

16   selection must occur from a "set of structures," regardless of whether they have been detected.  Ex.

17   YY (Mowry Rebuttal) ¶ 151 (removing related opinion that art must "allow a user to select from a

18   multitude of detected structures.").  Again, despite having told the Court—under oath—what was

19   required by the words "written in the claim limitation," Dr. Mowry is demonstrably willing to change

20   that opinion in order suit his infringement read.

21   Yet, despite the plain difference between his PI opinions pre-Jelly Bean and his recent

22   opinions post-Jelly Bean, at deposition and under oath, Dr. Mowry refused to acknowledge *any*

23   changes at all.  Rather, Dr. Mowry referred to his earlier sworn declaration as an "error," claimed he

24   should have been more "precise," and that he somehow was merely distinguishing the prior art from a

25   ***preferred embodiment*** of the '647 patent rather than the claim limitation itself.  Ex. XX (Mowry

26   Dep.) 128:2-141:8. [28]  Dr. Mowry's change of opinion regarding claim 1—and his refusal to

27

28   ──────────────────────────────
     [28]  Dr. Mowry admitted that his PI Reply Declaration was submitted as a draft to Apple's
     (footnote continued)

1    acknowledge that change—is a window into the fundamental unreliability of his opinions in this case.

2    His testimony should be excluded from trial.

3    **IV.    THE COURT SHOULD EXCLUDE THE PURE *IPSE DIXIT* OPINIONS OF DR. ALEX SNOEREN REGARDING APPLE'S ALLEGED PRACTICE OF THE '414 PATENT**

4

5    Dr. Snoeren's opinion on Apple's alleged practice of claim 11 of the '414 Patent is supported

6    by nothing but Dr. Snoeren's say-so, and will not help the jury.  Expert testimony that consists of

7    conclusory opinions, supported by no explanation or analysis beyond an expert's say-so, should be

8    excluded under *Daubert* as insufficiently reliable under Rule 702.   *See*, *e.g.*, *Kumho Tire Co. v.*

9    *Carmichael*, 526 U.S. 137, 157 (1999) (stating that the expert "himself claimed that his method was

10   accurate, but, as we pointed out in *Joiner*, 'nothing in either *Daubert* or the Federal Rules of Evidence

11   requires a district court to admit opinion evidence that is connected to existing data only by the *ipse*

12   *dixit* of the expert'" (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))); *DSU Med. Corp. v.*

13   *JMS Co.*, 296 F. Supp. 2d 1140, 1158-59 (N.D. Cal. 2003)   (excluding expert testimony on patent

14   damages where the expert's "analytic process" was "classic *ipse dixit*"); *Gable v. Nat'l Broad. Co.*,

15   727 F. Supp. 2d 815, 830-31 (C.D. Cal. 2010) *aff'd sub nom. Gable v. Nat'l Broad. Co., Inc*, 438 F.

16   App'x 587 (9th Cir. 2011) (excluding expert testimony where the expert  had "not identified the

17   principles and methods that he used to form his opinion, making it impossible for the court to evaluate

18   whether such methods are reliable," and where the expert testimony was "entirely unsupported and

19   conclusory"); *Elder v. Tanner* , 205 F.R.D. 190, 194 (E.D. Tex. 2001)    (excluding expert reports

20   opining on infringement, anticipation, and obviousness; reports listed evidence and authorities relied

21   upon, but contained no "elaboration or reasoning," and would "not assist the trier of fact").

22   Like the expert reports in *DSU Med. Corp.*, *Gable*, and *Elder*, Dr. Snoeren's "opinion" is four

23   short paragraphs that contain no citations to     any evidence. Ex. __ (Opening Snoeren Report

24   (8/12/13)) ¶¶ 525-28.) [29]  Dr. Snoeren admitted these paragraphs set forth his complete opinion

25   regarding how Apple allegedly practices claim 11. Ex. __ (Snoeren Deposition Tr. (9/25/13)) at 24:1-

26   attorneys for review prior to submission to the Court.  Ex. XX (Mowry Dep.) 144:24-148;14.

27   [29]   In his rebuttal report, served on September 13, 2013, Dr. Snoeren simply refers back to his opening report for the proposition that Apple practices claim 11. Ex. __ (Snoeren Rebuttal Report) ¶ 627.

28

14 ("[T]o the extent that I was ask [sic] to provide an opinion regarding whether a particular Apple product practiced a particular claim   or claim s of a given patent, I provide  d an opinion on that particular matter.  And, as with al the opinions in my repot, I attempted to provide an explanation of the basis of how I formed the opinions expressed in the report.").)

Rather than provide any reasoning the jury could evaluate, Dr. Snoeren simply asserts that he reviewed source code before forming this opinion (Ex. __ (Opening Snoeren Report (8/12/13)) ¶ 525) – yet Dr. Snoeren does not nam  e a single source c ode file, or iden tify a  single line of code, as allegedly corresponding to *any* limitations in claim 11.  *Id.*  Instead, he asserts without explanation that "[i]t is my opinion that version 6.1 of iOS practices claim 11 of the '414 Patent." *Id.*  Dr. Snoeren then claims that the "Calendar" and "Contacts" applications in iOS version 6.1 "provide[] a user-level non-synchronization processing thread that enables the user to access and edit structured data" and "store information in a SQLite database on the iPhone" that users can access and edit.  Ex. __ ¶ 526. Dr. Snoeren likewise opines that iOS version     6.1 "provides separate s ynchronization software components for each ap plications th at prov ide a se parate sy nchronization processin g thread that operates concurrently with the non-synchronization pocessing thread for contacts and calendars that synchronizes structured data from the SQLite databases on the iPhone with structured data in a remote database."  Ex. __ ¶ 527.  This simply parrots the claim language, with no explanation as to *why* iOS practices the claim – including what source code Dr. Snoeren believes corresponds to the "user-level non-synchronization processing th read," or the "synchronization     software com ponent," or the "synchronization processing thread," or the "remote database," or other limitations of claim 11.  *See id.* ¶¶ 526-27.

Dr. Snoeren's *ipse dixit* assertion that Apple practices claim 11 of the '414 Patent should be excluded.  Dr. Snoeren disclosed no "elaborati on or reasoning" to buttress his claim.    *Elder*, 205 F.R.D. at 194.  His opinions will be of no assistace to the jury, and cannot be fairly evaluated by the jury.  Under these circumstances, they should not be admitted under Rule 702.  *Id.*; *see also Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) ("The district court has the obligation to ensure that the testimony is reliable and will help the trier of fact.  Rule 702 demands that expert testimony relate to scientific,   technical or other specialized   knowledge, which does not include

1    unsubstantiated speculation and subjective beliefs.").

2    **V.**

3

4

5

6

7

8         Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
             Withdrawal of Daubert Issues related to Samsung Patents, D.I. 1145

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

[30]   Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
         Withdrawal of Daubert Issues related to Samsung Patents, D.I. 1145

27

28

1

2

3

4

Portion is withdrawn by agreement of the parties, as indicated in the Stipulation and Order regarding
Withdrawal of Daubert Issues related to Samsung Patents, D.I. 1145

5

6

7

8

9

10

11                                            **<u>CONCLUSION</u>**

12          For the foregoing reasons, Samsung respectfully asks the Court to grant its Motion to Exclude

13   Opinions of Certain of Apple's Experts in its entirety.

14   DATED:  October 10, 2013                  QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP
15

16   By                                        */s/ Victoria F. Maroulis*
17   Charles                                        K. Verhoeven
                                                Kevin P.B. Johnson
18                                              Victoria F. Maroulis
                                                William C. Price
19                                              Michael L. Fazio

20                                              Attorneys for
21                                              SAMSUNG ELECTRONICS CO., LTD.,
                                                SAMSUNG ELECTRONICS AMERICA, INC.,
22                                              and SAMSUNG TELECOMMUNICATIONS
                                                AMERICA, LLC
23

24

25

26

27

28