# EXHIBIT D
## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Highly Confidential – Attorneys' Eyes Only
Subject to Protective Order

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>     Plaintiff,<br><br>  vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>     Defendants. | CASE No. 12-cv-00630-LHK |

## EXPERT REPORT OF JUDITH A. CHEVALIER, PH.D.

### SEPTEMBER 13, 2013

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

65.     "Vertical product differentiation" is used to describe a situation in which all consumers would prefer a product with a given attribute.[160]  For example, for smartphones, everything else equal, all consumers (likely) would prefer a product with longer battery life.   If two products were available at equivalent prices and all other features were equivalent, we would expect consumers to choose the product with the longer battery life.[161]  However, consumer heterogeneity generally still plays a role in determining the market position of products that differ in vertical quality dimensions.  For example, different consumers will differ in their willingness to pay for better battery life.  When comparing smartphones with a different mix of features, some consumers will put more weight on the battery life of the phone and some consumers will put less weight on the battery life; consumers who put little weight on the battery life will be willing to buy a phone with shorter battery life if the phone has other features that the consumer views as more desirable.

66.     For smartphones, there are myriad vertical and horizontal product characteristics that affect consumer demand for the products.  As detailed below, the availability and relative importance of smartphone characteristics have changed over time.  And, as in many technologically evolving industries, some product features are desired by so many consumers and offered by so many providers that they eventually become expected or standard features of the products.[162]  Firms compete to introduce new product varieties that contain new features that

---

[160] *See, e.g.,* Pepall, Lynne, Daniel J. Richards, and George Norman, Industrial Organization: Contemporary Theory & Practice, 3rd ed, Thomson South-Western, 2005, at 133.

[16] ██████████████████████████████████████████████████████████████████████

[162]     *See, e.g.,* Giachetti, Claudio and Gianluca Marchi, (2010) "Evolution of firms' product strategy over the life cycle of technology-based industries: A case study of the global mobile phone industry, 1980–2009," *Business History*, 52(7) 1123–1150. ("Because some of the most requested features by consumers, such as SMS, no longer distinguished mobile vendors, consumers purchased phones that suited their different lifestyles.")  Theo Downes-LeGuin of consulting firm Market Strategies reported in a June 2010 email to Apple that "[c]ertain features that even a year ago were considered advanced have become commonplace requirements."  APLNDC630-0000124145-46, at 45.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

some consumers will value highly.  As the overall market expands, introducing products that

contain features that will only be desired by a subset of consumers becomes more attractive.[163]

In effect, as the market expands, the number of varieties expands so that consumers can buy

products that are more tailored to each consumer's particular demand.  The literature in

competitive strategy, marketing, and economics refers to this process as the "product lifecycle"

or "industry lifecycle."[164]  While this is a descriptive term that may not characterize all markets,

it provides a useful description of market evolution in the smartphone marketplace.[165]

       67.    Among the elements that impact consumer choice in the smartphone marketplace

are: (1) characteristics and behavior of the carrier; (2) operating system characteristics, including

the integration with the device and the availability of applications and other ecosystem

characteristics enabled by the operating system; (3) marketing efforts to enhance brand

reputation; (4) device-specific characteristics, such as capabilities, hardware characteristics, and

physical characteristics; and (5) retail price.  The importance these factors on consumer choice is

highlighted in research studies conducted by and for both Apple and ████████████████

████████████████████████████████████████████████████████████

████████████████████████████ nalyses of securities analysts, promotional and

instructional materials created by the manufacturers, and product reviews authored by consumers

and professional reviewers.

---

[163] *See, e.g.,* Klepper, S. (1996). "Entry, Exit, Growth, and Innovation Over the Product Life Cycle," *American Economic Review*, 86(3), 562–583; and Abernathy, W.J., & Utterback, J.M. (1978) "Patterns of Innovation in Technology," *Technology Review*, 80(7), 40-47.

[164] *See, e.g.,* Klepper, S. (1996) "Entry, Exit, Growth, and Innovation Over the Product Life Cycle," *American Economic Review*, 86(3), 562–583; and Abernathy, W.J., & Utterback, J.M. (1978) "Patterns of Innovation in Technology," *Technology Review*, 80(7), 40-47.

[165] For a discussion of the relevance of product/industry lifecycle models to the mobile phone industry from 1980 to 2009, *see* Giachetti, Claudio and Gianluca Marchi, (2010) "Evolution of firms' product strategy over the life cycle of technology-based industries: A case study of the global mobile phone industry, 1980–2009," *Business History*, 52(7) 1123–1150.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

with a 7.9-inch screen, emulating the competition which had previously introduced smaller tablets earlier.[309]  Pricing also has been an important component of tablet competition, with the more successful Apple competitors undercutting the iPad's price.[310]

## IV.     The Features Enabled by the Patents-at-Issue are a Small Part of the Accused Products and their Operating Systems

107.     The functionality protected by patents-at-issue constitute only a small part of the overall software functionality in the accused products, and software functionality itself represents just a portion of the features of the accused devices.  Indeed, the evidence indicates that specific software features are typically insignificant in driving demand for the accused products.  This is, in part, because other phone characteristics (such as size, screen size, battery life, display definition, storage capacity, camera type, price, and connectivity) matter more, but also, in part, because the operating systems ("OSs") underlying these products contain a significant number of features which are continually upgraded with additional features.  The total number of features and capabilities embodied in smartphones is ever expanding.

108.     A careful review of product manuals, third-party product reviews, consumer reviews, and Samsung's advertising shows that the functionalities related to the patents-at-issue are a small subset of the total features of the products-in-suit and/or that they were not a point of emphasis in consumer purchase decisions.  As demonstrated below, few customers indicate that specific software features motivated their purchase.  Notably, most reviews and advertisements

---

Instead, I found a device that meets the same needs yet offers increased portability."
http://gigaom.com/2011/01/21/why-i-just-dumped-the-ipad-hint-size-matters/ (viewed 9/12/2013).
[309] http://www.apple.com/pr/library/2012/10/23Apple-Introduces-iPad-mini.html;
http://www.apple.com/ipad/compare/ (both viewed 9/12/2013).  Screen sizes are measured diagonally.
[310] For example, compare Exhibit 26A, with the average 2012 accused Samsung tablet price of $330, to Exhibit 65E, with the average 2012 U.S. iPad price of approximately $500.  In addition, an ███████████████████████████
████████████████████████████████████
███████████████████████    SAMNDCA630-07416541-601, at 582 (Benner Exhibit 9).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

are silent on the patented elements.  Instead, features such as screen size, battery life, and camera are more important drivers of demand.

### A.      Smartphones and Tablets Are Extraordinarily Complex Products with Hundreds If Not Thousands of Features and Distinct Functionalities

109.     As discussed above, smartphones and tablets are extraordinarily complex and sophisticated devices.  Manufacturers compete in part by incorporating a myriad of new features in new generations of both hardware and operating systems.  The abundance of features is reflected in Apple press releases announcing the release of new versions of iOS (its smartphone and tablet operating system) where they regularly highlight the inclusion of as many as 200 new features.[311]  For example:

- "iPhone 3GS includes the new iPhone OS 3.0, the world's most advanced mobile operating system with over 100 new features..."[312]

- "iPhone 4 comes with iOS 4, the newest version of the world's most advanced mobile operating system, which includes over 100 new features and 1500 new APIs for developers." [313]

- "With the launch of iPhone 4S also comes the launch of iOS 5, the world's most advanced mobile operating system with over 200 new features…"[314]

- "iPhone 5 comes with iOS 6, the world's most advanced mobile operating system with over 200 new features…"[315]

- "iOS 7 is completely redesigned with an entirely new user interface and over 200 new features…"[316]

---

[311] Exhibit 38 provides a more comprehensive summary of Apple press releases accompanying new iOS releases.
[312] https://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet html (viewed 9/12/2013).
[313] http://www.apple.com/pr/library/2010/06/07Apple-Presents-iPhone-4.html (viewed 9/12/2013).
[314] http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html (viewed 9/12/2013).
[315] http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5 html (viewed 9/12/2013).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

the eyes of the company or consumers.  These aspects are better captured in the promotional

materials and product reviews, which I analyze and discuss below.

### B.     Individual Operating Software Features do not appear to Motivate Customers to Purchase Smartphones and Tablets

113.     Individual software features alone do not typically motivate the purchase of

smartphones and tablets.[323]  The lack of demand driven by individual software features is

reflected in many Apple customer surveys, which show broader explanations for the purchase of

an iPhone.[324]  Summarized in Exhibit 40, examples of these surveys reveal that the combination

of music, email, games and apps was most commonly the primary motivator—followed by a

general preference for Apple products.

114.     Nevertheless, demand for a particular iPhone feature or capability was identified

by between 16 and 28 percent of respondents as the primary basis factor in the purchasing

decision.[325]  Specific features identified as motivation for a purchase included broader features,

such as iCloud, Facetime or Siri (rather than individual user interface elements).[326]  Hardware

features such as the weight of the device and characteristics of the camera typically were more

important than the broad software features that were identified.  In the most recent survey (Q2

2013), for example, 1,007 of the 6,194 people surveyed (16.3 percent) pointed to a specific

feature as a primary motivation for purchase and, of those, fewer than 60 listed the most recent

---

[323] An Apple document discusses that in some cases, one feature may help drive a purchase decision, but it references larger, non-software elements, "Surprising how 1 feature can convince them to purchase a certain model (tips them over)…4G, door on power outlet, and missing that one feature on iPhone, iPhone feature advantages may be more 'Hidden' or discovered through use"; "if they latch on to 1 feature, no investigation regarding quality of feature…" APLNDC630-0000127433-38.
[324] See e.g., Exhibit 40.
[325] Exhibit 40, row [9] and [16]
[326] Exhibit 41.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

operating system (iOS 6) as the most important feature.[327]  Many more pointed to other items

such as the "8 megapixel camera with improved optics" and battery life.

115.    Samsung buyers, too, indicate limited preference for specific software

functionality.



No specific software features other than

"mail" were listed.  Again, the lack of attention given to granular aspects of specific software

functionality suggests that any individual software elements, particularly individual convenience

functionalities, are less likely to motivate demand.

116.    In sum, many surveys assessing the reasons for product purchase have been

produced by the parties in this matter.  These contemporaneous business documents collectively

illustrate that individual granular software elements are rarely examined.  That is because

individually they are often difficult for customers to observe, and not as important as larger

elements or the overall user experience. The importance of individual product features to Apple

generally, was summed up by Phil Schiller in this way:[330]

> In Apple, we create a very unique product unto ourselves. We always have. And
> so we think the sum total experience we create for customers is what matters more
> because we can create a very unique experience, and some commodity feature

---

[327] $(115*.07)+(452*.05)+(440*.06)=57.05$

[328]

[32■] ████████████████████████ at 20 (SAMNDCA630-07395533-77, at 52).

[330] Deposition of Phil Schiller, July 23, 2013, at 194.

features.[540]  The estimates are captured in Professor Hauser's willingness to buy calculations.[541]

Specifically, Professor Hauser calculates a "baseline" willingness to buy share for a given phone

and a "but-for" willingness to buy share for that same phone without some combination of the

patented features.  The difference between the baseline and "but-for" shares, according to

Professor Hauser, represents Samsung customers whose purchase of the accused devices

depended on the associated patented features.

218.    These willingness to buy calculations are informed by the collection of two types

of choice responses from survey respondents.[542]  In taking the surveys, individual respondents

face 16 choice tasks with two choices each.[543]  The first is an "internal choice" for which they

pick among four hypothetical configurations of Samsung smartphones or tablets (designed to

mimic some Samsung phones (or tablets) available during the damages period at roughly the

prices at which those phones (or tablets) were sold).[544]  Immediately after respondents make the

"internal choice" they are presented with a second "external choice" or "outside option choice"

in which they indicate whether or not they would buy the smartphone or tablet they selected in

their previous response at the indicated price.[545]

219.    The language used by Professor Hauser, however, is extremely difficult to

interpret:

> In a nswering t his qu estion, you m ay w ish t o c onsider the availability of ot her
> smartphone [ tablet c omputer] opt ions in t he m arket t hat m ay i nfluence you r
> purchase d ecision, i ncluding s martphones [ tablet c omputers] by ot her
> manufacturers or ot her S amsung smartphones [ tablet c omputers]. G iven the

---

[540] Vellturo Report, at 5-6
[541] Hauser Report, at 56-62.
[542] Hauser Report, at 7-17.
[543] Hauser Report, at 17.
[544] Each respondent is presented with 16 choice screens. Hauser Report, at 17.
[545] Hauser Report, at Exhibit E.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

Samsung smartphone [tablet computer] you chose as your most preferred among the alternatives shown, would you buy it at the indicated price?[546]

220.    Because Professor Hauser's survey does not reveal what caused a respondent to select the outside option, it is not appropriate to assume, as he does, that it was solely because of the absence of a patented feature.   For example, consider a respondent who answers in the survey that s/he is willing to buy the "baseline smartphone" for $199 with a 4.8 inch screen that includes the entire set of product features described in the survey.   If that respondent answers that s/he is unwilling to buy the "baseline smartphone" for $199 with a 4.8 inch screen if one of the patented features is removed, that consumer is considered "unwilling to buy" due to the patent feature removal.

221.    However, the outside option that is described in the survey includes "other smartphone options in the market… including…other Samsung smartphones."[547]   Thus, this includes the "baseline smartphone" that the respondent previously selected.   It can also include the respondent's actual smartphone.   Indeed, it can also include improved smartphones available in the marketplace that were not available when the respondent purchased his or her original smartphone. Thus by definition, the respondent would be better off picking the outside option when faced with a phone with missing features—even if the features were not particularly valuable.

222.    Rather than reflecting the choice that consumers would make in the "but for" world in which the patented features were removed from all accused Samsung smartphones and tablets, the "outside option" construct used by Professor Hauser essentially allows the respondent to choose between a Samsung product without the patented features and the identical Samsung product with the patented features.   This experiment tells us nothing about whether the same

---

[546] Hauser Report, at Exhibit E, at 21; and Exhibit F, at 18-19.
[547] Hauser Report, at Exhibit E, at 21; and Exhibit F, at 18-19.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

consumer would have bought a Samsung phone with a few features removed if the Samsung

phone that they actually purchased was not available.

### C. Professor Hauser's Analysis Generates Predictions That Differ Substantially From Actual Marketplace Outcomes

#### 1. Predictions Differ Substantially from Actual Marketplace Outcomes

223.    The unreliability of Professor Hauser's choice predictions are revealed when

measured against the actual composition of Samsung's smartphones sales.  Exhibit 54A

summarizes an extension of the choice exercises conducted by Professor Hauser on

smartphones.[548]  In particular, Exhibit 54A reflects predicted purchase shares associated with a

choice among four leading Samsung smartphones: the Samsung Galaxy S II, Galaxy S III,

Galaxy Note II and Galaxy Nexus.  The prediction shares reflected in Exhibit 54A use the same

methodology employed by Professor Hauser in developing his willingness to buy estimates and,

as a result, reflect Professor Hauser's estimates of the underlying preferences respondents have

for various configurations of Samsung smartphones.[549]

224.    As Exhibit 54A shows, the predictions generated by Professor Hauser's analysis

differ greatly from actual marketplace outcomes.  Professor Hauser's analysis suggests the Note

II would account for a share of 40 percent, the Galaxy S III a share of 29 percent, and the Galaxy

S II and Nexus with 16 percent shares each. ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Thus, Professor Hauser's

analysis suggests, for example, that the Galaxy Note II would outsell the Galaxy S III when,

---

[548] Exhibit 54B presents a comparable summary of tablet predictions, and the results are similar.  In particular, he does a poor job distinguishing between the Galaxy Note 10.1 and the Galaxy Tab II 10.1
[549] Details underlying these calculations are described in the Hauser Exhibits.

instead, ████████████████████████████████████████████████████

This highlights the lack of reliability of Professor Hauser's analysis for purposes of predicting the purchase decisions made by those that bought the accused devices.

### 2.    Predictions Differ Substantially from Survey Respondent Ownership

225.    The unreliability of Professor Hauser's choice predictions are further revealed when measured against respondents' own actual purchase history.  Among the respondents in Professor Hauser's survey that report owning the four smartphones reflected in Exhibit 54A, 61.5 percent own the Galaxy S III, 19.4 percent own the Galaxy Note II, 9.7 percent own the Galaxy S II and 9.4 percent own the Galaxy Nexus.  The figures much more closely approximate the actual sales compositions of these devices than the prediction shares generated by Professor Hauser's analysis.  This further demonstrates the lack of reliability of Professor Hauser's analysis for purposes of predicting the purchase decisions made by those that bought the accused devices.

### 3.    Professor Hauser's Survey Generates Implausible Results

226.    The unreliability of Professor Hauser's analysis is further demonstrated in the implausible results related to the amounts respondents are purported to value the features incorporated in the survey.  In Exhibit 55A, I summarized the willingness to pay price premiums associated with each of the individual smartphone features in the context of a phone with a price of $149.[551]  As this exhibit shows, Professor Hauser's analysis predicts that the amount consumers would be willing to pay for the six patented features on an individual basis totals $358.  The corresponding figure for the full set of features in his analysis is $1,125.  This amount is over seven times greater than the price of the reference phone.

---

[550] Note that 71.4/20.4 = 3.5.
[551] Professor Hauser's willingness to pay price premiums depend on the device prices incorporated in his analysis. *See, e.g.,* Hauser Report, at Tables 9 and 10 and the accompanying discussion.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

resulting combined royalty for all six patents is $42.64 per unit (and royalties on the '647, '414 and '959 patents alone sum to $35.65 per unit).[649]

### B.    Velturo Reasonable Royalty Assessment Involves Either a Double Counting or a Back Door Collection of Apple's Lost Profits

278.    A patent holder who is able to establish liability for patent infringement is entitled to no less than "a reasonable royalty for the use made of the invention by the infringer."[650]  Reasonable royalty damages are, therefore, the statutory minimum, or, as described by the Court of Appeals for the Federal Circuit ("CAFC"), "the floor below which damages shall not fall."[651]

279.    The consideration of the profits that the patent holder makes on products that compete with the infringing product is *inappropriate* in the context of a reasonable royalty damages determination. That is, reasonable royalty damages are appropriate on sales where the patent holder is unable or unwilling to demonstrate that the infringing sales caused the patent holder to lose sales and, therefore, profits.[652]  Accordingly, reasonable royalty damages are only for infringing sales that were *not* lost by the patent holder.[653]  Under these circumstances, there are no patent holder profits that were displaced.

---

[649] His conclusion is per unit royalties of $12.49 for the '647 patent, $15.03 for the '414 patent, $8.13 for the '959 patent, $1.61 for the '721 patent, $2.84 for the '172 patent, and $2.54 for the '760 patent.   The total royalty is $40.10 without the '760 patent.

[650] 35 U.S.C. § 284.

[651] *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed. Cir. 1983).

[652] *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1576 (Fed. Cir. 1995) (Nies, dissenting in part) ("[W]here a patentee is not entitled to lost profits damages, lost profits may not, in effect, be awarded by merely labeling the basis of the award a reasonable royalty."). *See also*, "The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition," Federal Trade Commission, March 2011 ("The Evolving IP Marketplace"), at 20, 167-68, 172-73 available at http://www.ftc.gov/os/2011/03/110307patentreport.pdf ("The law must be flexible in allowing the patentee to prove its lost profits in order to provide adequate compensation.  But a patentee who has failed or chosen not to do so should not be allowed to use unproven arguments of direct losses to inflate a reasonable royalty award beyond what a willing licensee would pay.")

[653] The Evolving IP Marketplace, at 172 ("Concerns about compensating unproven lost profits damages should not be allowed to inflate a reasonable royalty damage award . . . .").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

280.    As discussed above, Dr. Vellturo ultimately does not use his (flawed) calculations of Samsung's maximum willingness to pay to license the patents-in-suit for his reasonable royalty calculations.  Instead, the proffered Vellturo royalty amounts are identical to his "Apple's willingness to accept" figures—or in other words, Apple's expected lost profits from granting a license to Samsung.  The Vellturo Report summarized the various steps that were undertaken to estimate these minimum per unit royalties that Apple would have been willing to accept.[654] Importantly, they include "determin[ing] the portion of Samsung's incremental sales [from a license] that would remain at Apple in the event that Apple does not license Samsung to the Asserted Patents" and "Assess[ing] the incremental profit per unit Apple would expect to lose that applies to each expected Apple foregone sale."[655]   In essence, Dr. Vellturo is saying that one key input to determining the reasonable royalty here is the profits that Apple would expect to lose on sales by granting a license to Samsung.[656]

281.    This is almost the same calculus (replacing ex-post lost profits with expected lost profits) that Dr. Vellturo undertook in his lost profits analysis.  I illustrate this in Exhibit 67.  As the exhibit shows, after removing the ecosystem impact step of the reasonable royalty calculation (to be discussed further below), the steps involved in calculating Dr. Vellturo's lost profits and reasonable royalty are virtually identical, with the main difference being that 1) Dr. Vellturo removes the '959 patent from lost profits calculation and 2) Dr. Vellturo's "reasonable royalty" calculation is based on Apple's "expected lost profits" prior to infringement whereas Dr. Vellturo's "lost profits" calculation is based on Apple's "actual lost profits."

---

[654] Vellturo Report, at 166-7.
[655] Vellturo Report, at 166-7.
[656] He defines this as a "key consideration" and "guiding principal" in the negotiation.  Vellturo Report, at 128.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

282.    The result is that, if the Court were to find lost profits were appropriate, Dr. Vellturo's rate would effectively represent a double counting of lost profits.[657]  And, in the event that the Court were to find that lost profits were not appropriate, Dr. Vellturo's royalty calculation would represent an inappropriate back-door claim for lost profits.[658]

### C.    Vellturo's Assessment of Apple Willingness to Accept and Samsung Willingness to Pay Includes Many Errors

283.    In addition to the fundamental flaw of double counting (or inappropriately trying to collect) lost profits through his reasonable royalty calculation, Dr. Vellturo's royalty calculations are plagued with other errors and overstatements.  Since many of these errors are very similar to those that I have already discussed in my critique of Dr. Vellturo's lost profits calculation above, I only briefly mention some of them here.

284.    Both Dr. Vellturo's analyses of Apple's willingness to accept and Samsung's willingness to pay:  1) start with overstated profit amounts for Apple and Samsung; 2) apply Professor Hauser's unsound conjoint results to estimate the percentage of profits lost or at stake; 3) use the wrong expected percentage of displaced sales flowing to Apple/or to Samsung's other products; 4) overestimate the relevant time Samsung would be off the market to implement a design-around; and 5) include speculative future damages as part of the current royalty. Specifically, some examples of these errors include:

---

[657] This is especially true in that these are units that Dr. Vellturo himself claims Apple would not have made in his lost profits scenario.  Apple is not entitled to base a reasonable royalty on unproven losses of profit on units its own expert concedes it never would have made.  Yet, Dr. Vellturo essentially "double counts" his lost profits.  He claims lost profits on units (he believes) Apple would have sold in absence of Samsung's infringement, and claims lost profits again on the units he says Apple would not have sold, by calling it "willingness to accept."

[658] A reasonable royalty scenario is appropriate because Apple has not or cannot prove entitlement to lost profits. That is, it has failed to prove that it incurred any lost sales. As a result, Apple's incremental profits are irrelevant and any royalty would make Apple better off.  That is because those units subject to a royalty are those on which Apple would not have earned any profits.   Yet, Dr. Vellturo essentially "back doors" a lost profits calculation in his royalty-only analysis.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

compensate Apple is approximately $5.9 million if all patents asserted by Apple in this matter are found to be valid, enforceable, and infringed.  The market, income, and cost approaches further demonstrate the unreasonableness of the conclusions presented in the Vellturo Report.


_____

JUDITH A. CHEVALIER