# EXHIBIT 2

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

FILED-SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

MAR 13 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT

MAR 14 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS ARMANDO AMADO, <br><br> Plaintiff, <br><br> v. <br><br> MICROSOFT CORPORATION, <br><br> Defendant. | CASE NO. SA CV 03-242 DOC (ANx) <br><br> **O R D E R** [1] DENYING DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT, [2] GRANTING DEFENDANT'S MOTION TO DISSOLVE THE PERMANENT INJUNCTION, AND [3] GRANTING IN PART PLAINTIFF'S MOTION FOR AN ORDER AWARDING PLAINTIFF $2.00 PER UNIT FOR INFRINGING SALES FROM JUNE 6, 2005 THROUGH DECEMBER 3, 2006 |

Before the Court are (1) Defendant Microsoft's Motion for Relief from Judgment, (2) Microsoft's Motion to Dissolve the Permanent Injunction, and (3) Plaintiff Carlos Amado's Motion for an Order Awarding Plaintiff $2.00 per Unit for Infringing Sales from June 6, 2005 through December 3, 2006 ("Escrow Motion"). After considering the moving, opposing, and replying papers, as well as oral arguments, the Court hereby (1) DENIES Microsoft's Motion for Relief from Judgment, (2) GRANTS Microsoft's Motion to Dissolve the Permanent Injunction, and (3) GRANTS IN PART Amado's Escrow Motion.

\ \ \

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

## I. BACKGROUND

### A. General Overview and Time line

Plaintiff Carlos Armando Amado ("Amado") holds a number of United States patents related to the interaction between computer database and spreadsheet programs. Defendant Microsoft Corp. ("Microsoft") develops and sells computer software, including database and spreadsheet programs. In March 2003, Amado filed a complaint alleging that Microsoft programs infringed three of his patents. After claim construction, the case was narrowed to the alleged infringement of one patent: United States Patent Number 5,293,615 ("the '615 patent").

After trial, the jury returned a unanimous verdict on June 6, 2005. The jury found that Access 95 and Excel 95, and Office Professional 95, which includes Access 95 and Excel 95, and all subsequent forms of those products infringe claim 21 of the '615 patent both literally and under the doctrine of equivalents. The jury found that Microsoft was liable for direct infringement (35 U.S.C. § 271(a)), inducing infringement (35 U.S.C. § 271(b)), contributory infringement (35 U.S.C. § 271(c)), and infringement for shipping components outside the United States (35 U.S.C. §§ 279(f)(1) and 279(f)(2)). The other asserted claims of the '615 patent were found not to be infringed. Claim 21 was found not to be invalid for obviousness. The jury also found that Microsoft's infringement was not willful. The parties had previously stipulated that the number of licenses sold between March 7, 1997 and July 31, 2003 were 109,872,000 in the United States and 113,937,800 in foreign markets. The jury awarded damages for the period from March 7, 1997 through July 31, 2003 in the amount of $4,400,000 for domestic sales and $4,560,000 for foreign sales.

On August 2, 2005, the Court found laches, which barred Amado from recovering damages during the laches period, i.e. prior to March 7, 2003. Because the damages found by the jury reflected a per unit royalty of four cents, the Court awarded Amado a four cent per unit royalty for sales of the infringing products beginning on March 7, 2003.[1] This resulted in an

---

[1] If the sales figures are rounded to the nearest million, they are 110 million for sales in the United States, and 114 million for foreign sales. With these rounded sales

1  award of $5,911,269.[2]  At this time, the Court also entered a permanent injunction, upon

2  Amado's motion, enjoining the sale and distribution of:

3           any version of Microsoft's Access software or any version of
           Microsoft's Office suite of programs that includes Access, that
4           includes the capability of, when loaded on a computer, connecting a
           spreadsheet program to a database program in a manner that would
5           infringe claim 21 of the '615 patent.

6  Aug. 2, 2005 Order at 27:23-28.  However, the Court stayed the injunction pending the

7  resolution of any appeal in the case.  Under the terms of the injunction, during the pendency of

8  the stay, Microsoft was ordered to deposit two dollars per unit for sales of the infringing

9  products into an interest bearing escrow account from June 6, 2005 onward.  *Id.* at 28:13-15.

10 The Court noted that "[t]he ultimate fate of the money paid into this account will depend on

11 subsequent developments in this case, including a potential negotiated settlement between the

12 parties, or an appeal to the Federal Circuit."  *Id.* at 27:14-16.

13         The parties cross appealed the jury verdict and this Court's judgment to the Federal

14 Circuit.  On June 14, 2006, the Federal Circuit affirmed this Court's judgment "in all respects"

15 in a per curium opinion.  *See Amado v. Microsoft Corp.*, 185 Fed. Appx. 953 (Fed. Cir. 2006).

16 However, the Federal Circuit explicitly stated that it did not view the August 2, 2005 Order as

17 having determined the ultimate disposition of the funds Microsoft was required to deposit into

18 the escrow account during the pendency of the stay.  *Id.*  Thus, the Federal Circuit returned the

19 issue of distributing the escrow funds to this Court.  On August 23, 2006, after rejecting

20 Microsoft's petition for a rehearing *en banc*, the Federal Circuit issued its mandate.

21         On September 12, 2006, Plaintiff moved to enforce the injunction on the grounds that it

22 had become effective on August 30, 2006 and that Microsoft's continued sales of the same discs

23

24 figures, the damages figures returned by the jury corresponds *precisely* to a four cent per

25 unit royalty.

26         [2]  Amado received this $5,911,269 damages award, plus interest in December
   2006, after the Court ordered the clerk to close the damages escrow account and transfer
27 the final balance to Amado.  The balance as of the date of that order, December 12, 2006,
28 was $6,145,302.79.

                                        3

the jury found infringed the '615 patent along with a separate Service Pack 2 "fix" did not remove the capability of infringement from the products. The Court denied Amado's motion as premature because Microsoft's appeal was still pending as it had petitioned the Supreme Court for a writ of certiorari.

On October 2, 2006, Amado brought a motion for contempt for Microsoft's failure to make escrow deposits for Software Assurance and Recurring licenses. These license-types were included in the stipulated sales figures upon which the jury verdict was based. By entering into the stipulation as to the total sales of the accused products, Microsoft avoided having to produce the discovery Amado sought into its unit sales and revenue data. Microsoft agreed to the use of the stipulated sales figures at trial and for purposes of the accounting. Due to the stipulation, neither the Court nor the jury made a determination as to whether Software Assurance and Recurring licenses represent "sales of the infringing products." At the October 23, 2006 hearing on this motion, the parties reached a compromise, whereby Microsoft would make additional escrow deposits to bring the amount in the escrow account in line with Amado's expectations based on the stipulated sales figures. Consequently, the Court withheld any ruling as to whether Software Assurance and Recurring licenses represent sales of the infringing products such that Amado is entitled to a royalty for these license types during the escrow period.

On November 27, 2006, the Supreme Court denied certiorari. Accordingly, under the terms of the injunction, the injunction would have gone into effect on December 4, 2006. However, on December 1, 2006, the Court ordered that the stay remain in effect pending the resolution of the parties' motions relating to the escrow and the injunction. On December 5, 2006, the Court scheduled all such motions for hearing on February 5, 2007 and provided that the stay would remain in effect until seven days after the Court's ruling on these motions.

### B. The Reexamination

Following over two years of litigation, the jury's verdict finding the '615 patent valid and that Microsoft Office and Access infringed claim 21 of this patent, and the Court's denial of Microsoft's motion for judgment as a matter of law and motion for a new trial, Microsoft petitioned the Patent and Trademark Office ("PTO") to reexamine claim 21 of the '615 patent.

The petition was based on two prior art references: (1) a user's guide to a spreadsheet program called SuperCalc and (2) an article by Judy Duncan describing the Q+E software program. Microsoft relied upon the Duncan article at trial. Microsoft was also aware of the existence of a program called SuperCalc because the '615 patent, a copy of which was attached to Amado's Complaint, describes SuperCalc as prior art. However, Microsoft claims that it did not know the details of SuperCalc's functionality until after trial when it first located the SuperCalc User's Guide.

Microsoft's reexamination petition was granted on September 21, 2005 and the PTO preliminarily rejected claim 21 as anticipated by both the Duncan article and SuperCalc in a non-final office action on April 26, 2006. The PTO examiner concluded that claim 21 was anticipated by the SuperCalc User's Guide and the Duncan article. On July 26, 2006, Amado responded to the preliminary rejection of claim 21. The parties dispute whether Amado's response was consistent with this Court's claim construction or limited the scope of claim 21 in a way that contradicts the evidence and arguments presented at trial. As of the parties' briefing, there has been no final determination by the PTO regarding the validity of claim 21.

## C. License Counts

As discussed above, the jury's verdict and the Court's subsequent rulings were based on the parties' stipulation regarding total sales of the accused products. For example, the jury's damages award was based on the parties' stipulation that 109,872,000 licenses were sold in the United States and 113,937,800 in foreign markets during the relevant time period, March 7, 1997 through July 31, 2003. These figures were based on spreadsheets prepared by Price Waterhouse on behalf of Microsoft and produced by Microsoft during discovery. The spreadsheet figures reflect total license counts for the accused products without any elaboration regarding what types of licenses were included in the total count.

The August 2, 2005 Order required Microsoft to "pay into [escrow] two dollars per unit for sales of the infringing products from June 6, 2005 onward." Aug. 2, 2005 Order at 28:14-15. At the hearing on this Motion, Microsoft agreed with the Court's prediction that assuming monthly sales of the infringing products were in line with the stipulated sales figure, the average

sales per month would be five million licenses, resulting in an average monthly escrow deposit of $10 million. However, when Microsoft began making escrow deposits, Amado noticed that the sales numbers were lower than predicted and that Microsoft was reporting "net" license counts, instead of "total" licenses. On November 14, 2005, Amado requested an explanation. In response, Microsoft informed Amado that it was excluding Software Assurance and Recurring licenses because these license types did not represent "sales of the infringing products."

As discussed above, the parties first informed the Court of this dispute in October 2006, when Amado moved to hold Microsoft in contempt for its failure to make escrow deposits for Software Assurance and Recurring licenses. At that time, Microsoft told the Court that Software Assurance licenses and Recurring licenses are accounting mechanisms from its MS Sales database used to record additional revenue related to prior sales. *See* Decl. of James Borgman in Supp. of Def. Microsoft's Opp'n to Amado's Mot. for Contempt Re: Microsoft's Failure to Make Escrow Deposits Required by Ct. Order ("Borgman Decl."), ¶ 9. Thus, rather than representing sales of products, Microsoft explained, Software Assurance Licenses are multi-year maintenance agreements and Recurring Licenses represent installment payments. *Id.* ¶¶ 6, 8. According to Microsoft, Recurring licenses relate to the second and third installments payments under volume licenses called Enterprise Agreements. These Enterprise customers purportedly receive the right to make all copies of the licensed software at the time of the first payment, such that Recurring licenses do not correspond to the delivery of additional units of Microsoft products. However, Microsoft concedes that there are circumstances in which a customer with a Software Assurance agreement is eligible to receive new releases of software. Nevertheless, Microsoft asserts that since June 6, 2005 it has not issued a new release of the infringing products, Microsoft Office and Access, and its distribution of Service Pack 2 to Software Assurance customers included a "fix" that removed the functionality found to infringe Amado's '615 patent. Thus, under these circumstances, Microsoft avers that any copy of the infringing products received by Software Assurance customers has been accounted for under other license types included in the judgment or the escrow payments. *Id.* ¶ 7.

Amado's present Motion for distribution of the stay-related escrow funds asserts that

Microsoft's calculations as to total licenses, net licenses and even Software Assurance and Recurring licenses have changed numerous times during the escrow period.

On November 14, 2005 Microsoft presented Amado with a spreadsheet in response to his request about the lower than expected license counts. The spreadsheet contained license counts for sales from June 6, 2005 through October 28, 2005. Specifically, the spreadsheet disclosed 28,393,892 "total" licenses (an average of 5.67 million units per month) and 16,032,866 "net" licenses, which excluded Software Assurance and Recurring licenses (an average of 3.2 million units per month). Ex. R to Oct. 2, 2006 Decl. of Scott Moore in Supp. of Pl.'s Mot for Contempt ("Oct. 2, 2006 Moore Decl."). This spreadsheet also disclosed 6,944,751 Software Assurance licenses and 5,416,275 Recurring licenses. *Id.* Of the 12,361,026 licenses excluded from the "net" license count, 56.2 percent were Software Assurance licenses and 43.8 percent were Recurring licenses.

On June 13, 2006, Microsoft provided spreadsheets for June 2005 through April 2006, showing total license counts of 60,041,098 (an average of 5.46 million units per month) and net licenses of 33,286,920 (an average of 2.94 million units per month). *See* Ex. AA to Oct. 2, 2006 Moore Decl. These spreadsheets did not include a breakdown of either Software Assurance or Recurring licenses. On August 18 and September 20, 2006, Microsoft provided updated spreadsheets showing only total and net license counts; again there was no breakdown of Software Assurance or Recurring licenses. *See* Exs. DD, EE to Oct. 2, 2006 Moore Decl. According to Amado the "total" license counts for the same eleven month time period (June 2005 through April 2006) "inexplicably" changed. The total licenses increased by 18,073,978 licenses or 30.10%,[3] whereas the "net" license counts remained approximately the same (increasing by only 17,924 or 0.05%).[4]

---

[3] The June 13, 2006 spreadsheet shows 60,041,098 total licenses, whereas the August 18, 2006 spreadsheet shows 78,115,076 for the same time period (June 2005 through April 2006).

[4] The June 13, 2006 spreadsheet shows 33,286,920 net licenses, whereas the August 18, 2006 spreadsheet shows 33,304,844 for the same time period (June 2005

On October 30, 2006, Microsoft informed Amado that it "may have over-counted certain types of licenses in the license counts previously provided to you." Ex. 6 to Jan. 15, 2007 Decl. of Nicole Smith ("Smith Decl.). On November 16, 2006, Microsoft informed Amado that approximately 23 million licenses had been incorrectly added to the total license counts to all months through June 2006 because Academic licenses had been added to totals that already included these licenses. Ex. 7 to Smith Decl.

In November and December 2006, Microsoft submitted Notices of Deposit to the Court, which included spreadsheets that purportedly show the number of Software Assurance and Recurring licenses excluded by Microsoft throughout the escrow period. According to Amado, these spreadsheets show that Microsoft changed its methodology yet again following the October 2006 contempt hearing at which the Court expressed more concern about Software Assurance licenses than Recurring licenses. For the period June 2005 through October 2005, the Software Assurance and Recurring license allocations changed "radically" between the November 14, 2005 and the November 20, 2006 spreadsheets. In the 2006 version, the Recurring license count doubles, whereas the Software Assurance license count decreases by 50% from the counts in the 2005 spreadsheet covering the same five-month period of time (June through October 2005).[5]

Finally, according to Microsoft's December 2006 Notice of Deposit, it sold 102,117,579 "total" licenses during the eighteen-month escrow period and 52,292,108 "net" licenses, whereas the Notices of Deposit reports actually filed with the Court, according to Amado's calculation, reported 55,310,507 "net" licenses. See Smith Decl. ¶ 5. These figures did not include sales between November 25, 2006 through December 3, 2006 and consequently, on January 24, 2007,

---

through April 2006).

[5] The November 2005 spreadsheet shows 6,944,751 Software Assurance licenses and 5,416,275 Recurring licenses, whereas the November 2006 spreadsheet shows 2,881,238 Software Assurance licenses and 10,171,879 Recurring licenses for the same five-month period (June through October 2005). See Pl. Mot. for $2.00 per Unit of Infringing Sales at 11:3-8; Oct. 2, 2006 Moore Decl., Ex. R; Notice of Escrow Deposit, filed Dec. 26, 2006, Ex. B.

1   Microsoft wrote to Amado to update the total license counts to include the sales for these days.

2   "Microsoft admits that it has sold 103,115,257 Total licenses from the beginning of the escrow

3   period through December 3, 2006." Jan. 29, 2007 Decl. of Scott Moore ("Moore Decl.") ¶ 3

4   (internal quotations omitted).

5   **D.   Microsoft's Fix**

6   Microsoft continues to sell versions 2002 (XP) and 2003 of Office Professional and

7   Access, which the jury found infringed Amado's '615 patent. However, during the pendency of

8   its appeal, Microsoft designed, implemented, and released a software fix to remove the

9   infringing functionality from its products. Microsoft began to release the fix in the fall of 2005.

10  As of February 2006, Microsoft included an additional Service Pack 2 ("SP2") disc in all of its

11  distributions of the infringing products. One of the programs on SP2, shim DLL disables the

12  infringing feature by making an open Excel spreadsheet read-only when functioning in

13  conjunction with Access, thereby making it impossible for a user to send changed data from an

14  Access linked table back to an open Excel spreadsheet. Decl. of Andrew M. Warden, ¶ 7,

15  Micallef Decl., Ex. N. In addition, if a user attempts to delete the reference to the shim DLL in

16  the Windows registry, the SP2 code will detect this and re-write the shim DLL reference. *Id.* ¶

17  7. Amado asserts that adding the SP2 disc to the packaging of unmodified, infringing software

18  does not avoid infringement or comply with the Court's injunction.

19  SP2 contains software wholly unrelated to the accused functionality, including updates

20  that address potential security risks. In addition, every purchaser of Access and Office is now

21  required to install SP2 as a condition of its license agreement. On the other hand, the shim DLL

22  fix is not automatically installed when the user installs Office or Access, even though Microsoft

23  could have made the fix automatic. For example, before a user can install Microsoft Outlook,

24  they are required to install Service Pack 1. Sept. 11, 2006 Decl. of Richard Taylor ("Taylor

25  Decl."), ¶ 9.[6] By contrast, a user can install Office and Access without installing SP2.

26

27

28

___

[6] There is sufficient space on the disc containing the domestic version of Office and Access to include all of SP2 on that disc. Sept. 11, 2006 Taylor Decl. ¶ 14.

9

1  Moreover, when a user inserts the disc labeled "Service Pack 2," instead of installing the

2  program, the disc displays a document titled "Office 2003 Service Pack 2 CD Installation." *Id.* ¶

3  12.

4        Microsoft distributes Access and Office through three distribution channels to three

5  different types of customers - retail, original equipment manufacturers ("OEM") and volume or

6  enterprise licensees. First, with regard to retail customers, the SP2 CD on its face states that its

7  installation is a mandatory part of installation of the overall product. Moreover, an addendum to

8  the retail customer's end user license agreement requires that these customers install all discs

9  contained in the package in order to have a valid license to use the software. Second, OEMs

10  install Microsoft's Office and Access software onto the computers they manufacture prior to

11  shipping the computers to their customers. As to this distribution channel, Microsoft notified its

12  OEM licensees that SP2 was a required supplement under the terms of their license agreements

13  and made installation of SP2 mandatory for all OEM licensees by the end of February 2006.[7]

14  Finally, Microsoft has shipped the SP2 disc to both new and existing volume licensees, who also

15  received other communications indicating that installation of SP2 was mandatory to remain in

16  compliance with the terms of their volume licenses.[8] Consequently, any user that failed to install

17  SP2 by the end of February 28, 2006 is breaching its licensing agreement with Microsoft.

18  

19      [7] According to Microsoft, the OEMs use a master disc from Microsoft to create a

20  master image of the software. This master image of Office and Access is then copied
   onto the computers the OEMs manufacture. Therefore, once the OEMs installed the SP2

21  disc onto the master image, used to produce the computers, the master, as well as the
   copies, became a "fixed" version of Office and Access. Consequently, the end users of

22  the OEMs' computers received their computers with SP2 already installed. However, at

23  least some OEMs send users back-up discs of Office and Access and SP2, which can be
   re-installed if necessary.

24  

25      [8] Volume or Enterprise licensees are business entities and other organizations.
   According to Microsoft, the information technology departments of these licensees will

26  install the software in one of two ways - most likely they create a master image, like the

27  OEMs, which is then installed on the individual computers in the office, but they may
   alternatively use the discs from Microsoft to install the software on each computer

28  individually.

1    On the other hand, Amado has uncovered evidence that at least some fraction of

2   Microsoft customers are actively seeking ways to avoid or uninstall the fix so that they can

3   continue to use the live-link feature that was found to infringe Amado's patent.  Amado has

4   presented fourteen messages posted on various internet websites in which users discuss the fact

5   that SP2 removes the live-link functionality between Access and Excel due to a legal issue and

6   seek advice about how to retain this functionality.[9]  Jan. 13, 2007 Decl. of Richard Taylor ¶ 17.

7   At least some of these users state that they plan not to install SP2 or have in fact reinstalled the

8   software without installing SP2 in order to keep the live-link feature.  According to Microsoft, a

9   user cannot selectively install SP2; thus, if someone desires to get around the fix, they must

10   avoid installing SP2 at all.

11   **II.    DISCUSSION**

12       **A.    Microsoft's Rule 60(b) Motion for Relief From Judgment**

13    Federal Rule of Civil Procedure 60(b) allows a court to relieve a party or its legal

14   representative from a final judgment in certain circumstances.  The appropriate reasons for relief

15   from the judgment are: "(1) mistake, surprise, or excusable neglect; (2) newly discovered

16   evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6)

17   'extraordinary circumstances' which would justify relief."  *Sch. Dist. No. 1J, Multnomah Cty. v.*

18   *Acands, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (quoting *Fuller v. M.G. Jewelry*, 950 F.2d 1437,

19   1442 (9th Cir. 1991)).

20    In addition to the grounds for relief set forth in clauses (1) through (5), Rule 60(b)(6)

21   allows the court to relieve a party from a final judgment or order for "any other reason justifying

22   relief from the operation of the judgment."  Fed. R. Civ. P. 60(b)(6).  The Supreme Court has

23   interpreted this catch-all provision narrowly, requiring the moving party to show "extraordinary

24   circumstances suggesting that the party was faultless in the delay."  *Pioneer Inv. Servs. v.*

25   *Brunswick Assocs.*, 507 U.S. 380, 393, 113 S. Ct. 1489, 1497 (1993).  Relief under Rule

26

27    ─────────────

28    [9] Microsoft has objected to this evidence on the grounds of lack of authentication,
     hearsay and prejudice.  These objections are OVERRULED.

60(b)(1), (2), or (3) may not be brought more than one year after the judgment was entered. Fed. R. Civ. P. 60(b). By contrast, there is no time limitation for bringing a motion under Rule 60(b)(6). However, the standard for setting aside a judgment under this provision is much higher than that for Rule 60(b)(1) through (5). *See Pioneer Inv. Servs.*, 507 U.S. at 393. Moreover, a Rule 60(b)(6) motion may not be premised "on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863, 108 S. Ct. 2194 (1988). The extraordinary circumstances requirement of Rule 60(b)(6) prevents the clause "from being used to circumvent the 1-year limitations period that applies to clause (1), [(2), and (3)]." *Id.* at 863 n.11; Fed. R. Civ. P. 60(b). Finally, although Rule 60(b)(6) does not delineate the specific factors that justify relief, the Supreme Court has observed that it provides courts with authority "to vacate judgments whenever such action is appropriate to accomplish justice." *Id.* at 863-64 (quoting *Klapprott v. United States*, 335 U.S. 601, 614-615, 69 S. Ct. 384 (1949) (internal quotations omitted)).

Microsoft purports to bring its Motion for Relief from Judgment under Rule 60(b)(6), asserting that Amado narrowed the claims of his '615 patent in arguments made to the PTO during the reexamination that Microsoft initiated after the entry of judgment in this case. Microsoft contends that it could not have brought its Motion under any other clause of Rule 60(b) because the context of "a patentee disclaiming a portion of his patent rights in order to distinguish prior art during the reexamination proceedings" is not covered by Rule 60(b)(1) through (5). Def. Mem. of P. & A. in Supp. of Mot. for Relief from J. 10:22-23. Presumably, Microsoft brings this Motion under Rule 60(b)(6) to avoid the one-year time limitation for bringing motions under the other subsections of Rule 60(b) because the judgment in this case was entered over a year ago on August 2, 2005. Amado argues that Microsoft is attempting to disguise its Rule 60(b)(2) motion based on the new evidence gleaned from the reexamination proceedings as a Rule 60(b)(6) motion. Microsoft responds by arguing that the evidence does not qualify as "newly discovered" because it was not in existence at the time of trial. *See Jones v. Aero/Chem. Corp.*, 921 F.2d 875, 878 (9th Cir. 1990) (Rule 60(b)(2) requires movant to show that "the evidence (1) existed at the time of trial, (2) could not have been discovered through due

1  diligence, and (3) was 'of such magnitude that production of it earlier would have been likely to

2  change the disposition of the case'").

3      Microsoft is technically correct that Amado had not made the three statements in response

4  to the non-final office action finding claim 21 invalid as anticipated by SuperCalc and the

5  Duncan article at the time of trial.  Nevertheless, the prior art upon which Microsoft's

6  reexamination petition and the non-final office action are based, was in existence at the time of

7  trial.  Microsoft was aware of SuperCalc throughout this litigation as it was cited in the '615

8  patent, which was attached as an exhibit to Amado's March 7, 2003 Complaint.  In addition,

9  Microsoft was aware of the Q+E program that was the subject of the Duncan article at least since

10 early 2004 as indicated by its Response to Supplemental Interrogatory No. 3, stating that

11 Microsoft provided its expert with a copy of Q+E.  In fact, the jury specifically found that the

12 Duncan article regarding Q+E did not invalidate Amado's '615 patent.  Moreover, the Court is

13 skeptical as to Microsoft's claim that it could not have uncovered the SuperCalc User's Guide

14 through the exercise of due diligence during the trial.  *See* Decl. of Joseph Micallef in Supp. of

15 Microsoft's Mot. for Relief from J. ¶ 2.  Microsoft filed its Petition for Reexamination on

16 August 11, 2006, nine days after the Court entered judgment and only two months after the trial.

17 Given that Microsoft was able to find the User's Guide so quickly after trial, it is likely that

18 Microsoft could have uncovered it prior to trial through the exercise of due diligence.  Microsoft

19 had a full and fair opportunity to litigate its invalidity case both at the summary judgment stage

20 and at trial, but was unsuccessful.  Microsoft failed to appeal either the Court's denial of

21 summary judgment or the jury's verdict rejecting its invalidity defense.  Instead, Microsoft

22 waited until the Court entered its final judgment after over two years of litigation to seek a

23 second bite at the invalidity apple through its Request for Reexamination.  Microsoft's late

24 reexamination petition lead to the newly discovered evidence of Amado's statements to the PTO

25 in response to the non-final office action.  Rule 60(b)(2) motion based on newly discovered

26 evidence must have been brought by August 2, 2006.  Thus, Microsoft's Motion for Relief from

27 Judgment filed on December 4, 2006 was four months too late.

28      Even if the Court were to entertain Microsoft's Motion under Rule 60(b)(6), the present

13

circumstances are not of the extraordinary variety dictating that the judgment in this case be vacated to accomplish justice. "'Extraordinary circumstances' do not include situations in which 'a litigant who has let the normal appeals channels lapse seeks to have a second bite at the apple.'" *Spacey v. Burgar*, 207 F. Supp. 2d 1037, 1048 (C.D. Cal. 2001) (quoting *United States v. Wyle*, 889 F.2d 242, 250 (9th Cir.1989)). Microsoft litigated its invalidity defense at trial and the jury's special verdict specifically rejected Microsoft's contention that claim 21 of the '615 patent was invalid because it was obvious in light of prior art. *See* Special Verdict Form, Dkt. no. 432, ¶ 7 (finding Claim 21 valid). As other courts have concluded "parties should not be permitted to abuse the [reexamination] process by applying for reexamination after protracted, expensive discovery or trial preparation." *Freeman v. Minnesota Mining & Mfg. Co.*, 661 F. Supp. 886, 888 (D. Del. 1987) (quoting *Digital Magnetic Systems, Inc. v. Ansley*, 213 U.S.P.Q. 290 (W.D. Okla. 1982)). Given that Microsoft waited until after the judgment in this case to file its Petition for Reexamination, while simultaneously failing to appeal the jury's finding of validity, Microsoft was not faultless in the delay and justice does not require overturning a jury verdict at this late stage based on statements made to the PTO. Because the Court finds that Microsoft has not satisfied the requirements of either Rule 60(b)(2) or (6), the Court declines to examine the three statements Amado made to the PTO that purportedly narrow the scope of his patent.

The present Motion is distinguishable from that addressed by the Fifth Circuit in *Bros, Inc. v. W.E. Grace Mfg., Co.*, 320 F.2d 594 (1963).[10] In *Bros*, the issue was whether the patented invention had been described in a preprinted publication more than a year prior to the patent application. *Id.* at 606. The patent at issue was involved in three different suits in various circuits and the judgment from which the defendant sought relief in the Fifth Circuit was a grant of summary judgment on the basis of res judicata in light of findings of infringement and validity in another case. *Id.* at 602. In the related case, an employee of the patentee had

---

[10] The Fifth Circuit later reversed the district court's order granting relief under Rule 60(b)(6), finding that an essential part of the patented invention was not disclosed in the brochure. *Bros, Inc. v. W. E. Grace Mfg. Co.*, 351 F.2d 208, 217-18 (5th Cir. 1965).

previously averred in his affidavit that the brochure describing the patented machine in detail had not been prepared or distributed until long after the road show at which the patented machine was displayed. *Id.* at 603. It was later discovered that the brochure had been distributed at the road show which occurred more than a year prior to the patent application. *Id.* Although the motion for relief from judgment could be viewed as a motion under Rule 60(b)(2) for newly discovered evidence or under Rule 60(b)(3) for fraud, the Fifth Circuit concluded that equitably the district court should consider the motion under Rule 60(b)(6) because what had occurred was "something more" than simply newly discovered evidence or fraud. *Id.* at 609.

Unlike in *Bros*, there is no evidence of fraud. Moreover, unlike the patentee in *Bros* who deliberately put the defendant off-track by averring that the brochure had not been distributed at the road show, Amado disclosed both prior art references to Microsoft. Microsoft had ample opportunity to find the SuperCalc User's Guide and could have filed its Request for Reexamination anytime during the two years that elapsed between the Complaint and the trial. Instead, Microsoft waited until two months after trial to seek reexamination. In addition, even if Amado's statements to the PTO are "something more" than newly discovered evidence, they do not meet the extraordinary circumstances necessary to justify relief under Rule 60(b)(6). Justice does not dictate relief from a judgment based on statements made in a reexamination proceeding initiated by Microsoft over two years after the filing of Amado's complaint and two months after the jury found claim 21 of the '615 patent to be valid. Microsoft cannot circumvent the enforcement of Amado's valid patent through its Rule 60(b) Motion.

Finally, Amado asks the Court to award him costs and attorney's fees associated with briefing and arguing this Motion. The Court declines to make such an award.

### B. Dissolving the Injunction

Microsoft also seeks an order dissolving the permanent injunction entered on August 2, 2005 on the ground that *eBay v. MercExchange*, 126 S. Ct. 1837 (2006), changed the law regarding the issuance of permanent injunctions in patent cases. On May 15, 2006, the Supreme Court overruled the Federal Circuit's "general rule" that "a permanent injunction will issue once infringement and validity have been adjudged." *Id.* at 1841. The Supreme Court held "only that

the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* The Supreme Court opinion in *eBay* does not specifically address the presumption of irreparable harm relied upon by Amado and this Court in issuing the instant injunction. However, such a presumption contradicts the explicit wording of the four-factor test the Supreme Court instructs district courts to apply and unduly constrains the equitable discretion that *eBay* confers. In particular, to obtain an injunction under well-established principles of equity " [a] plaintiff must demonstrate: (1) that it has suffered irreparable injury." *eBay*, 126 S. Ct. at 1839.

While the Court applied the traditional four factor test[11] in determining whether to grant injunctive relief in this case, the Court's analysis was colored by the "general rule" of "infringement equals permanent injunction" overruled in *eBay. See* Aug. 2, 2005 Order at 22:6-11. Moreover, in its analysis of irreparable harm, the Court relied on the presumption of irreparable harm that arose, pre-*eBay*, when a patent was found to be both valid and infringed, rather than placing the burden on Amado to show irreparable injury. *Id.* at 20:21-24; *cf. eBay*, 126 S. Ct. at 1839 (the "plaintiff must demonstrate: (1) that it has suffered irreparable injury"). In addition, the Court's analysis of the public interest noted that there would be significant costs to the parties bound by an injunction that would likely be borne, ultimately, by the public. Aug. 2, 2005 Order at 21:21-28. Finally, in balancing the hardships, the Court expressed concern about the ramifications and scope of the permanent injunction, but noted the Federal Circuit's "hard line on denial of injunctive relief based on damage to businesses found to be infringers." *Id.* at 22:6-8. Thus, while the Court applied the traditional equitable factors, its decision to grant an injunction was influenced by the controlling Federal Circuit law at that time, which required a

---

[11] "(i)Whether the plaintiff would face irreparable injury if the injunction did not issue, (ii) whether the plaintiff has an adequate remedy at law, (iii) whether granting the injunction is in the public interest, and (iv) whether the balance of hardships tips in the plaintiff's favor." *See* Aug. 2, 2005 Order at 20:2-8 (quoting *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 794 (E.D. Va. 1998) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S. Ct. 1798, 1803 (1982))).

1    case to be "exceptional to justify the denial of a permanent injunction." *MercExchange, LLC v.*

2    *eBay, Inc.*, 401 F.3d 1323, 1339 (Fed. Cir. 2005), *overruled by eBay v. MercExchange*, 126 S. Ct.

3    1837 (2006).

4           Microsoft requests that the Court reexamine and dissolve the injunction previously

5    entered in this case on the ground that *eBay* changed the law governing the issuance of a

6    permanent injunction in a patent case by, *inter alia*, requiring the plaintiff to show irreparable

7    injury and that public interest would not be disserved by an injunction. *See z4 Techs., Inc. v.*

8    *Microsoft Corp.*, 434 F. Supp 2d 437, 440-441 (E.D. Tex. 2006) (refusing to apply a

9    presumption of irreparable harm because plaintiff could not cite to any Supreme Court or

10   Federal Circuit case requiring the application of a rebuttable presumption of irreparable harm

11   with regard to a permanent injunction); *Keg Techs., Inc. v. Laimer*, 436 F. Supp. 2d 1364, 1371

12   (N.D. Ga. 2006) (finding that the evidence adequately demonstrated irreparable injury).

13   Microsoft argues that Amado cannot show irreparable harm because he is not in the business of

14   selling any software that practices claim 21 of the '615 patent, is not a competitor of Microsoft,

15   and has never sold a license of his patent or otherwise successfully commercialized it.  In

16   response, Amado argues that *eBay* did not change the law.  Amado also contends that Microsoft

17   has waived any right to challenge the injunction by failing to challenge it during the first appeal.

18   Amado further argues that the law of the case bars this belated attack on the injunction because

19   the Federal Circuit mandate controls.

20          Although *eBay* only explicitly overruled the Federal Circuit's "general rule" that a finding

21   of patent infringement required the issuance of a permanent injunction absent special

22   circumstances, it also altered the proper application of the traditional four-factor test in patent

23   cases.  For instance, in its discussion of the well-established principles of equity that the courts

24   must follow in determining whether to issue a permanent injunction, the Supreme Court placed

25   the burden on the plaintiff seeking a permanent injunction to prove that he has suffered

26   irreparable injury. *eBay*, 126 S. Ct. at 1839 (referencing the test from a non-patent case,

27   *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12, 102 S. Ct. 1798 (1982) and concluding

28   that "[t]hese familiar principles of equity apply with equal force to disputes arising under the

Patent Act"). Consequently, by requiring that the application of this four-factor test in patent cases be consistent with its application in non-patent cases, *eBay* eliminates the presumption of irreparable harm that this Court relied on in issuing the permanent injunction in this case. Several district courts, who have applied this four factor test post-*eBay*, have refused to apply the presumption of irreparable harm relied upon by Amado and the Court. *See, e.g z4 Techs., Inc.*, 434 F. Supp 2d at 440-441; *Voda v. Cordis Corp.*, No. CIV-03-1512-L, 2006 WL 2570614, at * 5 (W.D. Okla. Sept. 5, 2006); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211-DF, 2006 WL 2385139, at * 4 (E.D. Tex. Aug. 16, 2006).

A court may revisit an equitable order upon changed circumstances. *Gilmore v. California*, 220 F.3d 987, 1007 (9th Cir. 2000) ("long-established principle of equity practice that a court may, in its discretion, take cognizance of changed circumstances and relieve a party from a continuing decree"). Contrary to Amado's assertion that the Federal Circuit mandate ties this Court's hands, "[a]n appellate mandate does not turn a district judge into a robot, mechanically carrying out orders that become inappropriate in light of subsequent factual discoveries or changes in the law." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005) (internal citations and quotations omitted); *see also Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 466 F.3d 391, 395 (6th Cir. 2006) ("an equitable remedy should be enforced only as long as the equities of the case require"). Rather, a court may exercise its discretion to reconsider a previously decided issue when there has been an intervening change in law. *See, e.g. Wopsock v. Natchees*, 454 F.3d 1327, 1333 (Fed. Cir. 2006) ("law-of-the-case principles do not bar a court from departing from earlier rulings when there is 'an intervening change of controlling legal authority'"). Thus, because *eBay* represents an intervening change in law, the Court finds it appropriate to revisit the propriety of the injunction in this case.

An injunction is warranted if Amado proves the following four factors:

> (1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by

1 | a permanent injunction.

2 | *eBay*, 126 S. Ct. at 1839. After *eBay*, Amado cannot rely on a presumption of irreparable injury.

3 | Such a presumption conflicts with the Supreme Court's reasoning that the right to exclude does

4 | not automatically justify the issuance of injunction in every patent case. *Id.* Thus, post-*eBay*

5 | Amado must prove irreparable injury. *See, e.g. z4 Techs., Inc.*, 434 F. Supp 2d at 440-441;

6 | *Voda*, 2006 WL 2570614, at * 5; *Paice LLC*, 2006 WL 2385139, at * 4. Irreparable harm exists

7 | only where an injury cannot be remedied by monetary damages. *See, e.g. Abbott Labs. v. Andrx*

8 | *Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) ("in light of arguable sufficiency of

9 | monetary damages, [plaintiff] has not established that irreparable harm supports the grant of the

10 | [preliminary] injunction"). In moving for a permanent injunction, Amado relied on the now

11 | defunct presumption of irreparable harm. The Court accepted this argument because at that

12 | time, this presumption was the accepted law. *See* Aug. 2, 2005 Order 20:21-24 (citing

13 | *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1247 (Fed. Cir. 1989).

14 | In his Opposition to Microsoft's Motion to Dissolve the Permanent Injunction, Amado's

15 | only argument as to irreparable harm is that Microsoft "took Amado's invention, incorporated it

16 | into its products," and "precluded him from entering the market." Pl.'s Opp'n to Microsoft's

17 | Mot. to Dissolve the Permanent Inj. at 22:16-20. However, as Microsoft points out in its Reply,

18 | these are the same allegations of willful infringement that Amado presented to the jury, this

19 | Court and the Federal Circuit, who have all rejected this argument. By contrast the evidence at

20 | trial demonstrated that Amado does not compete with Microsoft, does not sell a product covered

21 | by the patent and is no longer even attempting to commercialize or license the patent. Moreover,

22 | Amado's patent only covers a very small component of the infringing products - claim 21, the

23 | only claim that the jury found Microsoft Office and Access infringed, covers a single feature

24 | linking Access and Excel. *See eBay*, 126 S. Ct. at 1842 (Kennedy, J. concurring) ("When the

25 | patented invention is but a small component of the product the companies seek to produce and

26 | the threat of an injunction is employed simply for undue leverage in negotiations, legal damages

27 | may well be sufficient to compensate for the infringement and an injunction may not serve the

28 | public interest"). Thus, Amado's injury can be adequately compensated through monetary

1   damages.

2       As to the public interest, even prior to *eBay*, the Court found that the public interest was

3   disserved by granting an injunction in this case. *See* Aug. 2, 2005 Order at 21:19-28. Thus,

4   because Amado has not proven irreparable injury, money damages are adequate to compensate

5   any future injury and the public interest is not served by an injunction, the injunction previously

6   issued in this case is hereby dissolved.

7       Finally, Amado asks the Court to order Microsoft to pay his costs and attorney's fees

8   pursuant to Local Rules 11-9 and 83-7. The Court declines to make such an award.

9       **C.   Distribution of the Stay-Related Escrow Funds**

10      As to the disposition of the funds in the stay-related escrow account, the parties' positions

11  could not be further apart. Microsoft contends that Amado should receive an award of

12  $1,013,110. Def.'s Opp'n 20:7. Microsoft calculates this figure based on a four cent per unit

13  royalty and sales of 25,327,766 (for net licenses excluding Software Assurance and Recurring

14  licenses) between June 6, 2005 and February 28, 2006. By contrast, Amado seeks an award of

15  $206,230,514. Amado's calculation is based on a two dollar per unit royalty and sales of

16  103,115,257 (for the total licenses, including Software Assurance and Recurring licenses) sold

17  between June 6, 2005 and December 3, 2006. Jan. 29, 2007 Moore Decl. ¶ 3; Pl.'s Reply 3:26.

18      Microsoft concedes that Amado should receive an award for the net licenses sold between

19  June 5, 2005 and February 28, 2006. Thus, the following issues must be resolved by the Court:

20  (1) Should the escrow award be based upon the net license counts or the total license counts?

21  (2) Are the units sold after February 28, 2006 "sales of the infringing products" such that Amado

22  should receive an award for licenses sold between February 28, 2006 and December 3, 2006?

23  and (3) How much should Amado receive per unit?

24      **1.   Net Licenses v. Total Licenses**

25      Throughout this case, the jury's and court's findings were based upon the number of total

26  licenses because Microsoft stipulated that these total license counts represented sales of the

27  accused, and ultimately infringing, products. During discovery, Microsoft refused to

28  authenticate the unit sales and revenue data it had produced. Consequently, to resolve this

discovery dispute and obviate the need to produce additional sales and revenue data to Amado, Microsoft stipulated that the total license counts in the spreadsheets, prepared by Price Waterhouse on behalf of Microsoft and produced by Microsoft during discovery, represented sales of the accused products. The spreadsheets contained total license counts for sales of Office and Access without indicating what types of licenses were included in the total count. However, the total license counts included Software Assurance and Recurring licenses. In addition, Microsoft was aware that Software Assurance and Recurring licenses were included in these figures during discovery because these license types were discussed at the deposition of Microsoft 30(b)(6) designee Richard Smith.[12] Judicial estoppel, or the doctrine of preclusion of inconsistent positions, "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996). Microsoft gained an advantage by stipulating to the total license counts during discovery because this stipulation enabled Microsoft to avoid producing the detailed revenue and unit sales information requested by Amado. Microsoft allowed the jury to reach a verdict based on the stipulated figures that included Software Assurance and Recurring licenses. Microsoft, likewise, did not object when the Court used figures that included Software Assurance and Recurring licenses for the accounting.

Now, eighteen months after the judgment was entered in this case, Microsoft seeks to base the escrow award on the net license counts, rather than the total license counts used at trial and in the accounting without objection, because Microsoft contends that Software Assurance and Recurring licenses do not represent "sales of the infringing products." According to Microsoft, Recurring licenses are accounting mechanisms to track installment payments and Software Assurance licenses represent maintenance agreements. However, Software Assurance licenses entitle customers to software updates. Microsoft 30(b)(6) designee Thomas Bailey

---

[12] Smith testified that "in excess of 90 percent" of the revenue reflected in the sales summaries Microsoft produced was attributable to the sale of the product license, and not the Software Assurance component." Dep. Tr. of Richard Smith at 23:1-6, Moore Reply Decl., Ex. I.

testified that Software Assurance licenses allow customers to "get the newest version" of Office Professional 2003 "automatically." Dep. of Thomas Bailey at 46:3-20, Decl. of Scott Moore in Supp. Pl.'s Undercount Mot., Ex. F, Docket No. 583. Consequently, any Software Assurance licensee who purchased version 2002(XP) of the infringing products had the right to upgrade to version 2003. If these customers upgraded to version 2003 during the escrow period, then their Software Assurance licenses do indeed represent "sales of the infringing products." Moreover, as Amado points out, a Software Assurance license entitles the entity licensee to give each seat (i.e. employee) an additional free copy of the software for his or her home use such that each license actually represents installation of the infringing products on two computers, even though it is only counted as a single license.

In addition, as discussed above, the parties first brought this issue of net licenses versus total licenses to the Court's attention in October 2006. At the hearing on Amado's contempt motion, the Court expressed concern over the exclusion of the Software Assurance licenses from Microsoft's escrow payments, but did not question the exclusion of Recurring licenses. Following this October 23, 2006 hearing, the number of Software Assurance licenses reported by Microsoft dropped precipitously, whereas the number of Recurring licenses increased dramatically in comparison to the numbers previously reported for the same five-month time period. Specifically, the November 2005 spreadsheet shows 6,944,751 Software Assurance licenses and 5,416,275 Recurring licenses for June 2005 through October 2005, whereas the November 2006 spreadsheet shows 2,881,238 Software Assurance licenses and 10,171,879 Recurring licenses for the same period. *See* Pl. Mot. for $2.00 per Unit of Infringing Sales at 11:3-8; Oct. 2, 2006 Moore Decl., Ex. R; Notice of Escrow Deposit, filed Dec. 26, 2006, Ex. B.

Microsoft's Opposition largely ignores Amado's evidence about its constantly changing license counts. Microsoft's only response is a footnote stating that its MS Sales database from which it derives the license and revenue information provided to Amado and the Court is a live

database, which is constantly updated.[13] Def.'s Opp'n to Pl.'s Mot. 18:20-28. At the February 5, 2007 hearing, the Court asked Microsoft why the licenses counts kept changing to the benefit of Microsoft. Counsel for Microsoft reiterated that MS Sales was a live database. Counsel further claimed that MS Sales was designed to track revenue and not count licenses. This explanation is inadequate. The fact that MS Sales is a live database does not explain the drastic changes in license counts for the same historical periods of time.

Microsoft stipulated to sales figures that included Software Assurance and Recurring licenses at trial and during the accounting. The jury verdict and the Court's judgment are both based on these stipulated sales figures. At no point prior to the entry of judgment, did Microsoft object to the use of these figures or in any way alert Amado or the Court to any inaccuracy or unfairness in using the stipulated sales figures, which included Software Assurance and Recurring licenses. Microsoft is correct that the question of whether Software Assurance licenses and Recurring licenses represent "sales of the infringing products" was not raised at trial. The parties stipulation as to the sales figures obviated any need for the jury to determine which licenses were properly included as "sales of the infringing products." While Microsoft has a plausible argument that Recurring licenses do not represent additional sales or installations of the infringing products, the same cannot be said with regard to Software Assurance licenses. Thus, the Court might be willing to exclude Recurring licenses from the license counts for purposes of the stay escrow, despite the inclusion of these licenses in the jury's award. However, in light of the constantly changing license counts and the fact that following the October 23, 2006 contempt hearing, Microsoft provided "updated" license counts, in which 4,063,513 Software Assurance licenses present in a prior spreadsheet for the same five month period vanished and 4,755,604 Recurring licenses not present in that prior spreadsheet appeared, the Court cannot confidently accept either of these counts as accurate. The inference is too

---

[13] This footnote also explains that there was an error in the creation of some spreadsheets provided to Amado because Academic licenses were double counted. However, this error is not relevant to the changes in the counts for Software Assurance and Recurring licenses because it did not affect these licenses.

1   strong that the disappearing Software Assurance licenses reappeared as Recurring licenses.

2      Doubts as to damages are resolved against the infringer. *See Sensonics, Inc. v. Aerosonic*

3   *Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996) ("[I]f actual damages can not be ascertained with

4   precision because the evidence available from the infringer is inadequate, damages may be

5   estimated on the best available evidence, taking cognizance of the reason for the inadequacy of

6   proof and resolving doubt against the infringer"); *Kori Corp. v. Wilco Marsh Buggies &*

7   *Draglines*, 761 F.2d 649, 655 (Fed. Cir. 1985) ("Fundamental principles of justice require us to

8   throw any risk of uncertainty upon the wrongdoer rather than upon the injured party").

9   Specifically, "[w]hen the calculation of damages is impeded by incomplete records of the

10   infringer, adverse inferences are appropriately drawn." *Sensonics, Inc.*, 81 F.3d at 1572 (citing

11   *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065, 219 U.S.P.Q. 670, 675 (Fed. Cir.

12   1983)). In contrast to the unreliable counts for Software Assurance and Recurring licenses (net

13   licenses), the total license counts have not changed and therefore, the Court can confidently use

14   these total licenses as the basis of the escrow award.

15      Finally, Amado objects to the use of the reduced "net" license counts on the ground that

16   these counts and the underlying summary spreadsheets are inadmissible because they violate the

17   Best Evidence Rule and do not fall within any exception to the hearsay rule.[14] Under the Best

18   Evidence Rule, a party must generally produce the original document to prove the contents of a

19   "writing" or "recording." Fed. R. Evid. 1002. The MS Sales database qualifies as a "writing" or

20   "recording." *See* Fed. R. Evid. 1001(1). Because Microsoft has never submitted the original MS

21   Sales database to the Court, for the Court to rely on its reduced "net" license counts, Microsoft

22   must submit materials that satisfy an exception to the Best Evidence Rule. *See* Fed. R. Evid.

23   1003-1007. However, none of these exceptions permit Microsoft to introduce its reduced license

24   counts. Rule 1003 is inapplicable because Microsoft has never submitted a duplicate of the MS

25   Sales database. Fed. R. Evid. 1003. Rule 1004 is inapplicable because the original database has

26   not been lost or destroyed and is not in the possession of a party opponent. Fed. R. Evid. 1004.

27

---

28      [14] Microsoft did not respond to these evidentiary objections.

Rule 1005 is inapplicable because the MS sales database is not a public record. Fed. R. Evid. 1005. Rule 1007 permits the introduction of written admissions of a party opponent in lieu of the original. Fed. R. Evid. 1007. Microsoft cannot invoke this exception to introduce its reduced "net" license counts. However, this exception permits Amado, Microsoft's party opponent, to introduce the "total" license counts. Finally, while Rule 1006 permits the introduction of summaries in lieu of originals for voluminous writings or recordings "which cannot be conveniently examined in court," to invoke this exception the originals or duplicates must be made available to the other party. Fed. R. Evid. 1006. Microsoft has never made the MS Sales database available to Amado, despite Amado's requests for discovery of the MS Sales database before and after trial.[15] Consequently, Rule 1006 is likewise inapplicable and the Court sustains Amado's objection to the reduced "net" license counts on the basis of the Best Evidence Rule. The Court also sustains Amado's hearsay objection to the "net" license counts. These summary spreadsheets were prepared solely for purposes of this lawsuit and therefore are not admissible under the business records exception to the hearsay rule. *See, e.g., Palmer v. Hoffman*, 318 U.S. 109, 113-15 63 S. Ct. 477 (1943) (reports prepared for use in court are not considered records of regularly conducted business); *United States v. Miller*, 771 F.2d 1219, 1238 (9th Cir. 1985) (summaries "prepared in response to litigation rather than in the regular course of business" are not admissible under Fed. R. Evid. 803(6)).

Therefore, for the reasons set forth above, the Court will base the escrow award on the same methodology used at trial and during the accounting - the total license counts, 103,115,257.

### 2. Sales of the Infringing Products

The Injunction entered in this case bars Microsoft from:

> making, using, selling, or importing any version of Microsoft's Access software or any version of Microsoft's Office suite of programs that includes Access, that *includes the capability of, when*

---

[15] In the fall of 2003 Amado filed a motion to compel discovery into the MS Sales database, which resulted in the parties' stipulation to use the Price Waterhouse spreadsheets as to "total licenses," which Amado could rely on at trial as sales of the accused products.

> *loaded on a computer, connecting a spreadsheet program to a database program in a manner that would infringe claim 21 of the '615 patent*

Aug. 2, 2005 Order 27:23-28 (emphasis added). Under the explicit terms of the Injunction, a violation occurs once Office or Access software is loaded onto a computer with the capability of connecting a spreadsheet program and database program in a manner that infringes claim '21 of the '615 patent. Microsoft does not deny that the Office 2003 versions of Office and Access are the same versions of the software that the jury found infringed claim 21 of Amado's '615 patent. Nor does Microsoft deny that after February 28, 2006, the installation process requires that the user first install Office and Access before inserting the separate SP2 disc to install the fix that removes the infringing functionality. Therefore, even if the user upholds its obligations under its licensing agreement with Microsoft and installs the SP2 disc, infringement has already occurred when the user installs the SP2 disc because the Injunction is violated as soon as the first disc containing Office or Access is installed onto a computer.

Microsoft argues at length in its Opposition that Amado should be required to submit new evidence of infringement. These arguments ignore the jury's verdict finding that the 2003 versions of Office and Access infringe claim 21 of Amado's 615 patent. The law of the case doctrine precludes a court from "reexamining an issue previously decided by the same court, or a higher court, in the same case." *U.S. v. Smith*, 389 F.3d 944, 948 (9th Cir. 2004); *accord Exxon Corp. v. United States*, 931 F.2d 874, 877 (Fed. Cir. 1991). Thus, because jury found that the 2003 versions of Office and Access infringed claim 21 of the '615 patent, this determination, already upheld on appeal, is not open to reexamination.

Microsoft continued to sell the infringing 2003 versions of Office and Access after February 28, 2006. There is only one difference between sales prior to February 28, 2006 and those after that date: sales of Office and Access after February 28, 2006 include a separate SP2 disc that contains, *inter alia*, a fix to remove the infringing functionality. However, this fix is not automatically installed when the user installs Office or Access. Instead, to remove the infringing functionality, the user must install the separate SP2 disc. Moreover, when a user inserts the disc labeled "Service Pack 2," instead of installing the files, the disc displays a

document titled "Office 2003 Service Pack 2 CD Installation," describing the SP2 files, without indicating that the user is required to install these files. Jan. 13, 2007 Taylor Decl. ¶ 11. According to Amado's expert, Dr. Richard Taylor, a user must manually navigate to the shim DLL file on the SP2 disc and then manually install it in order to removed the infringing functionality from Office and Access. Jan. 13, 2007 Decl. ¶ 12. Thus, Microsoft relies on both the user's decision to install SP2 and his or her technological sophistication to figure out how to manually install the files to ensure that the infringing functionality is removed. Accordingly, rather than ensuring its software is no longer "capable" of infringing Amado's '615 patent, Microsoft places the burden on its customers to remove the infringing functionality after the software containing the infringing live link-feature is already installed.

By contrast, Microsoft could have made the SP2 fix a mandatory part of the installation process, such that a user could not install Office or Access without installing the SP2 shim DLL fix. Microsoft has made at least one prior fix a mandatory part of the installation process: before a user can install Microsoft Outlook, they are required to install Service Pack 1. Sept. 11, 2006 Taylor Decl., ¶ 9. In addition, according to Microsoft, the 2007 version of Office and Access contains a modified code disabling the infringing functionality in a single disc that is automatically installed when the customer installs Office or Access. Microsoft has, however, given the user two incentives to install SP2: (1) the SP2 disc contains software, wholly unrelated to the accused functionality, that addresses potential security risks and (2) installation of SP2 is required under Microsoft's licensing agreement with each Office and Access user. Nevertheless, these incentives fail to ensure that Office and Access are not capable of infringing. Unlike a mandatory fix that the customer must install as part of the installation process for Office or Access, the infringing software is already installed before it is even possible to install the voluntary fix.

Amado argues that Microsoft's voluntary "fix" is insufficient as a matter of Federal Circuit law because Microsoft cannot shift the burden of complying with the court order to its customers. In *Stryker Corp. v. Davol Inc.*, 234 F.3d 152 (Fed. Cir. 2001), the Federal Circuit affirmed the district court's contempt finding where the infringer continued to sell the infringing

1  product with slight modifications that relied on its customers to use the product as instructed. *Id.*

2  at 1260. The defendant modified the spike that previously supported the infringing surgical

3  irrigator, added clips to the device, and instructed its customers to use the support clips and not

4  the spike alone to support the irrigator. At the contempt hearing, the defendant submitted an

5  expert opinion that it would be unreasonable to use the modified device without the clips. *Id.* at

6  1256. In response, the plaintiff submitted test results showing that the modified spike alone

7  could support the irrigator and anecdotal evidence that hospitals were using the modified device

8  without the clips. *Id.* at 1260. This evidence was sufficient to hold the defendant in contempt.

9  Similarly, Amado has submitted anecdotal evidence that customers are ignoring their

10  license agreement with Microsoft and deliberately avoiding installing the SP2 fix or uninstalling

11  it to retain the infringing functionality. In addition, Dr. Taylor's unrefuted expert opinion is that

12  it would not be unreasonable for customers not to install SP2, thereby avoiding the fix.

13  Moreover, infringement occurs by default when Office or Access is installed and thus, regardless

14  of whether the user ultimately disables the infringing functionality, infringement has occurred as

15  soon as the software is downloaded, which by Microsoft's design occurs before the user can

16  install the shim DLL fix on the SP2 disc.

17  Finally, the Court is aware that the above analysis is more applicable to retail and volume

18  licensees than OEMs.[16] The Court is also aware that the IT departments of some volume

19  licensees will create a master image of the software onto which the SP2 fix is downloaded prior

20  to installing the software and use this non-infringing master to copy the software onto other

21  computers in the organization similar to the process used by OEMs. However, there is no way to

22  know what percentage of volume licensees install the software by using this type of master

23  image and what percentage install the discs one by one (Office/Access, then SP2) on each

24  computer in the organization. Moreover, the Court does not know what percentage of

25  Microsoft's licenses are attributable to each of its three distribution channels. When the Court

26

27  [16] Yet, some OEMs send discs of the software along with the computers containing
the software and therefore, at least some OEM customers could uninstall Office or Access

28  and re-install the software without the SP2 fix.

inquired at the February 5, 2007 hearing as to the breakdown of these numbers, Microsoft
responded that MS Sales did not separate licenses by distribution channel. Counsel for
Microsoft gave the Court a rough estimate that retail likely accounted for ten percent, OEMs for
thirty percent, and volume licensees for sixty percent. In response, counsel for Amado told the
Court that he had seen a spreadsheet tracking OEMs licenses for 2003 showing that these
licenses only accounted for 4.45 percent of worldwide sales (significantly lower than the thirty
percent estimate). Finally, as discussed in more detail above, during the escrow period
Microsoft's license counts have continually changed. In light of these ever-changing numbers,
the Court is inherently skeptical as to the accuracy of the figures presented by Microsoft.
Consequently, the Court is not breaking out the OEM licenses or some portion of the volume
licenses from the license counts because there is not any reliable information on which to do this.

For the reasons set forth above, the Court finds that the voluntary SP2 shim DLL "fix" is
ineffective. The 2003 versions of Office and Access sold along with a separate SP2 disc, like
the 2003 versions sold without the SP2 disc, infringe claim 21 of the '615 patent. Accordingly,
Amado is entitled to an award from the escrow account for the entire period of time sought in his
Motion: June 6, 2005 through December 3, 2006.

### 3. Per Unit Award

As a condition of the stay of the Injunction, the Court ordered Microsoft to pay into an
escrow account "two dollars per unit for sales of the infringing products." Aug. 2, 2005 Order
28:13-19. As the Federal Circuit correctly noted in its *per curium* opinion, the August 2, 2005
Order did not determine the ultimate disposition of the escrow funds. In ordering the two dollar
per unit escrow payments, the Court ensured that Microsoft set aside the upper limit of any
eventual stay-related escrow award. The Court never indicated that Amado would receive two
dollars per unit; rather the Court left the determination of how much Amado should receive per
unit for another day, observing that this issue could be rendered moot by subsequent
developments in the case. However, the parties have not reached a negotiated settlement and the
Federal Circuit has affirmed the jury verdict and this Court's judgment "in all respects," while
explicitly carving out the disposition of the escrow money as a remaining issue not covered by

1  its appellate mandate. The question of the disposition of the money in the stay-related escrow
2  account, therefore, has been returned to this Court.

3    Amado moves the Court for an order awarding him the full two dollars per unit. By
4  contrast, Microsoft argues that Amado should receive the reasonable royalty found by the jury -
5  four cents per unit. The Court begins its analysis with the jury verdict. The jury was instructed
6  that the amount of damages must be "adequate to compensate for the infringement" and not "less
7  than a reasonable royalty for the use made of the invention by the infringer." Jury Instruction
8  No. 49, Ex. D to Jan. 22 Decl. of Joseph Micallef; *see* 35 U.S.C. § 284. Amado argued at trial
9  that he was entitled to a reasonable royalty of two dollars per unit. The jury disagreed and
10  awarded Amado an amount that equaled precisely four cents per unit. In its August 2, 2005
11  Order, the Court denied Amado's motion for judgment as a matter of law on the issue of
12  damages, finding that substantial evidence supported the jury's determination of damages. Aug.
13  2, 2005 Order 5:26, 6:6-8. The Court also found that the jury's award was the "appropriate
14  measure of damages" for the accounting period, rejecting Amado's proposed two dollars per unit
15  alternative. *Id.* at 17:26-27, 18:3. Amado is now asking, yet again, for an award of two dollars
16  per unit, despite the jury's award of four cents per unit.

17    Amado vehemently argues that this Court cannot award him anything less than two
18  dollars per unit. His arguments misunderstand the Court's intention in awarding two dollar per
19  unit escrow payments. The Court ordered escrow payments representing the upper limit of any
20  potential award if the verdict was upheld on appeal to protect against any under-counting of
21  licenses, as in fact occurred. Amado argues that an award of anything less than two dollars per
22  unit would result in an impermissible compulsory license, thereby constituting an
23  unconstitutional taking and violating his Seventh Amendment right to a jury trial on post-verdict
24  sales. In support of this proposition, Amado cites a Supreme Court case discussing Congress'
25  rejection of legislation that would have given courts the "power to cancel a patent which has
26  been used as an instrument to violate antitrust laws." *Hartford-Empire Co. v. United States*, 323
27  U.S. 386, 416-17, 65 S. Ct. 373 (1945) (concluding that antitrust law does not permit a court to
28  fashion a remedy whereby the antitrust violators lose their rights over their patents and

1   modifying decree to permit the reservation of reasonable royalties for the licensing of the

2   patents). Amado also cites another Supreme Court case construing 35 U.S.C. § 271(c) and (d)

3   and concluding that the patent holder did not engage in patent misuse and was not barred from

4   seeking relief against contributory infringement, even though it refused to license its method

5   patent to allow competitors to sell a nonstaple commodity, propanil, which had no use except as

6   a herbicide (the patented method). *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 199,

7   201-02, 215, 100 S. Ct. 2601 (1980) ("Compulsory licensing is a rarity in our patent system, and

8   we decline to manufacture such a requirement out of § 271(d)").

9         Although theses cases show a general disfavor for compulsory licenses, they do not

10  establish a categorical rule, barring any type of compulsory license. In fact, contrary to Amado's

11  assertion, this Court has the authority to issue a "compulsory" license by staying an injunction

12  pending appeal, as recognized by the Federal Circuit. *See Standard Havens Prods. v. Genor

13  Indus.*, 897 F.2d 511, 512 (Fed. Cir. 1990) (discussing the traditional four factors considered

14  when determining whether to grant a stay of an injunction pending appeal). Thus, even if the

15  stay, in effect, results in a compulsory license, there is no prohibition against allowing such a

16  "compulsory license" pending appeal when, as in the instant case, the Court determines that such

17  a stay is appropriate after evaluating the four factors. *See* Aug. 2, 2005 Order 22-27. In

18  addition, the Supreme Court recently held that not all patentees are entitled to an injunction

19  against post-trial infringement. *eBay*, 126 S. Ct. at 1841. As Justice Kennedy noted in his

20  concurrence, damages may be sufficient compensation where the patented invention represents

21  only a small component of the infringing product and the patentee licenses the patent, instead of

22  using it to produce and sell. *Id.* at 1842 (Kennedy, J. concurring). District courts applying *eBay*

23  and following the guidance of Justice Kennedy's concurrence have awarded monetary damage

24  for future infringement based on the jury's reasonable royalty calculation. *See, e.g. z4 Techs.,

25  Inc.*, 434 F. Supp. 2d at 44.

26        Courts granting stays pending appeal often condition the stay upon the payment of an

27  amount equal to the reasonable royalty found by the jury. *See, e.g. In re Hayes Microcomputer

28  Prods.*, 766 F. Supp. 818, 823 (N.D. Cal. 1991) (conditioning stay on defendants' depositing the

1.75% royalty, awarded by the jury for sales of the infringing products, into a savings account); *Moxness Prods. v. Xomed, Inc.*, 7 U.S.P.Q. 2d 1877, 1988 U.S. Dist. LEXIS 16060, at *16 (M.D. Fla. 1988) (awarding a twenty percent royalty to plaintiff during the stay, which was the rate determined by the jury to be reasonable); *cf. Shiley, Inc. v. Bentley Labs., Inc.*, 601 F. Supp 964, 966, 971 (C.D. Cal. 1985) (ordering defendant to pay plaintiff an increasing royalty amount during a six-month transition period, beginning at twelve percent which was the reasonable royalty found by the jury, and increasing to fifteen and finally eighteen percent). Instead of awarding a specific royalty to plaintiff during the stay period, the August 2, 2005 Order directed Microsoft to pay a certain amount into escrow for each sale of Office or Access, but reserved the issue of the ultimate disposition of those funds for a later date. In addition, unlike the payments ordered as conditions of the stays in these other cases, the two dollars collected in the escrow was fifty (50) times greater than the four cent reasonable royalty the jury awarded based on the evidence at trial. The Court ordered payment of this higher sum, without determining what percentage would ultimately be awarded to Amado, because it represented the maximum amount Amado might ultimately be awarded and thereby ensured that there would be sufficient funds to cover any eventual award. Now that the jury's verdict and this Court's judgment have been affirmed by the Federal Circuit, the issue of the disposition of these escrow funds must be resolved.

To determine how much to award Amado per sale, the Court starts with the jury's reasonable royalty of four cents. At a minimum, Amado is entitled to receive what the jury found to be a reasonable royalty. In light of the fact that following the jury's verdict and the Court's denial of its motion for judgment as a matter of law, Microsoft was aware that Office and Access infringed claim 21 of Amado's '615 patent, Amado may be entitled to more than the four cents reasonable royalty for infringement during the stay-related escrow period. Thus, because the jury found that Microsoft had infringed Amado's patent, Microsoft was aware that it would ultimately have to pay Amado some amount for each sale of the infringing products during the escrow period if the verdict was upheld on appeal. Moreover, while Microsoft argues that the SP2 "fix" adequately removed the infringing feature, Amado had notified Microsoft that

1  an acceptable fix would be distributed on the same disc as the infringing products and would

2  remove the infringing functionality automatically as part of the installation. Microsoft choose to

3  ignore this request and distribute a voluntary fix such that the products continued to be "capable

4  of infringement." Thus, although Microsoft's pre-trial infringement was not willful, the same

5  cannot be said about its post-trial infringement. Under 35 U.S.C. § 284, damages may be trebled

6  for willfulness. While not directly applicable to this post-trial stay pending appeal, the Court

7  uses this trebling for willfulness as a guideline. Moreover, the trebling of the four cent royalty

8  awarded by the jury represents the upper limit of any potential future jury award for infringement

9  during the escrow period. Given that Microsoft was on notice of its infringement and chose to

10 implement a "fix" that relied upon its customers to remove the infringing functionality, the Court

11 finds that Amado is entitled to receive twelve cents per unit.

12 **III.   DISPOSITION**

13       For the reasons set forth above, the Court makes the following rulings:

14            1.     Microsoft's Motion for Relief from Judgment is DENIED;

15            2.     Microsoft's Motion to Dissolve the Permanent Injunction is GRANTED;

16            3.     Amado's Motion for an Order Awarding him a Royalty for Sales of the

17                   Infringing Products from June 6, 2005 to December 3, 2006 is GRANTED

18                   IN PART.

19       The Clerk is ORDERED to close the stay-related escrow account and transfer

20 $12,895,348.99 to an account identified by counsel for Amado. This amount represents a twelve

21 cent per unit royalty for the 103,115,257 total licenses sold between June 6, 2005 and December

22 3, 2006, together with post-judgment interest required by 28 U.S.C. § 1961 at the statutory rate

23 of 3.77%. After transferring this amount to Amado, the Clerk is ORDERED to transfer all

24 remaining funds in the escrow account to an account identified by counsel for Microsoft.

25 \ \ \

26 \ \ \

27 \ \ \

28 \ \ \

1  IT IS SO ORDERED.

2  DATED: March 13, 2007

3

4  _David O. Carter_

5  DAVID O. CARTER
   United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Appendix A

The twelve cent per unit royalty for sales of the infringing products from June 6, 2005 through December 3, 2006 and the statutory post-judgment interest through December 3, 2006 were calculated as follows:

| Period | Sales | Royalty | Beginning Balance | Interest | Ending Balance |
|--------|-------|---------|-------------------|----------|----------------|
| June-05 | 12,743,534 | $1,529,224.08 | $1,529,224.08 | $4,738.50 | $1,533,962.58 |
| July-05 | 3,202,651 | $384,318.12 | $1,918,280.70 | $6,142.18 | $1,924,422.88 |
| August-05 | 2,875,953 | $345,114.36 | $2,269,537.24 | $7,266.87 | $2,276,804.11 |
| September-05 | 5,353,874 | $642,464.88 | $2,919,268.99 | $9,045.73 | $2,928,314.72 |
| October-05 | 4,218,985 | $506,278.20 | $3,434,592.92 | $10,997.28 | $3,445,590.21 |
| November-05 | 3,184,682 | $382,161.84 | $3,827,752.05 | $11,860.79 | $3,839,612.84 |
| December-05 | 8,557,666 | $1,026,919.92 | $4,866,532.76 | $15,582.24 | $4,882,114.99 |
| January-06 | 5,122,022 | $614,642.64 | $5,496,757.63 | $17,600.17 | $5,514,357.80 |
| February-06 | 3,380,622 | $405,674.64 | $5,920,032.44 | $17,121.06 | $5,937,153.50 |
| March-06 | 6,767,586 | $812,110.32 | $6,749,263.82 | $21,610.59 | $6,770,874.41 |
| April-06 | 4,655,696 | $558,683.52 | $7,329,557.93 | $22,711.59 | $7,352,269.51 |
| May-06 | 4,838,779 | $580,653.48 | $7,932,922.99 | $25,400.57 | $7,958,323.56 |
| June-06 | 16,930,220 | $2,031,626.40 | $9,989,949.96 | $30,955.16 | $10,020,905.12 |
| July-06 | 3,901,423 | $468,170.76 | $10,489,075.88 | $33,585.16 | $10,522,661.04 |
| August-06 | 3,546,867 | $425,624.04 | $10,948,285.08 | $35,055.51 | $10,983,340.59 |
| September-06 | 5,320,121 | $638,414.52 | $11,621,755.11 | $36,011.52 | $11,657,766.63 |
| October-06 | 4,866,449 | $583,973.88 | $12,241,740.51 | $39,197.05 | $12,280,937.56 |
| November-06 | 2,650,449 | $318,053.88 | $12,598,991.44 | $39,039.61 | $12,638,031.05 |
| December-06 | 997,678 | $119,721.36 | $12,757,752.41 | $3,953.16 | $12,761,705.57 |

In addition, Plaintiff is entitled to post-judgment interest on the $12,761,705.57 ending balance as of December 3, 2006 from December 4, 2006 through today, March 13, 2007, in the amount of $133,643.42. Thus, the total award is $12,895,348.99.

# NOTICE PARTY SERVICE LIST

**Case No.**  SACV03-242 DOC(ANx)    **Case Title**  CARLOS ARMANDO AMADO -V- MICROSOFT

**Title of Document**  ORDER

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9th Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| ✓ | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | Interpreter Section |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |

| | |
|---|---|
| | Statistics Clerk |
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

**ADD NEW NOTICE PARTY**
(if sending by fax, mailing address must also be provided)

Name:

Firm:

Address (include suite or floor):

*E-mail:

*Fax No.:

* For CIVIL cases only

**JUDGE / MAGISTRATE JUDGE (list below):**

**Initials of Deputy Clerk**