UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

|  |  |  |
|---|---|---|
| APPLE INC. | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CASE NO.12-cv-00630-LHK |
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

# OPENING EXPERT REPORT OF
# CHRISTOPHER A. VELLTURO, PH.D.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

I.     OVERVIEW ................................................................................................................. 2

    A.   QUALIFICATIONS AND EXPERIENCE ................................................................................ 2
    B.   MY PREVIOUS WORK IN THIS MATTER ........................................................................... 2
    C.   STATEMENT OF ASSIGNMENT ...................................................................................... 3
    D.   DOCUMENTS/MATERIALS RELIED UPON ........................................................................ 4
    E.   SUMMARY OF OPINIONS ............................................................................................ 4

II.    RELEVANT BACKGROUND ......................................................................................... 8

    A.   PARTIES ................................................................................................................. 9
        1.   Apple ........................................................................................................... 9
        2.   Samsung ..................................................................................................... 11
    B.   HISTORY OF THE SMARTPHONE MARKET AND THE IMPACT OF THE IPHONE ........................ 14
    C.   HISTORY OF THE TABLET MARKETPLACE ....................................................................... 20
    D.   THE CENTRAL ROLE OF USER EXPERIENCE IN APPLE'S SUCCESS ........................................ 22
    E.   APPLE'S PATENTS .................................................................................................... 27
        1.   U.S. Patent No. 7,761,414 ("the '414 Patent") ............................................. 28
        2.   U.S. Patent No. 5,946,647 ("the '647 Patent") ............................................. 29
        3.   U.S. Patent No. 6,847,959 ("the '959 Patent") ............................................. 30
        4.   U.S. Patent No. 8,014,760 ("the '760 Patent") ............................................. 30
        5.   U.S. Patent No. 8,046,721 ("the '721 Patent") ............................................. 31
        6.   U.S. Patent No. 8,074,172 ("the '172 Patent") ............................................. 32
    F.   SAMSUNG'S RESPONSE TO APPLE'S SUCCESS ............................................................... 32
        1.   The Shift in Samsung's Design Strategy ........................................................ 32
        2.   Samsung's Substantial Smartphone and Tablet Marketing Efforts ................. 37
        3.   Samsung's Competition with the iPhone ....................................................... 37
        4.   Samsung's Competition with the iPad ........................................................... 49

III.   DAMAGES ANALYSIS: LOST PROFITS PLUS REASONABLE ROYALTIES ...................... 54

    A.   SAMSUNG'S ACCUSED PRODUCTS ............................................................................... 56
    B.   ASSESSMENT OF LOST PROFITS DUE TO APPLE'S LOST SALES ........................................... 58
        1.   Panduit Factor 1: Demand for the Patented Product ..................................... 59
        2.   Panduit Factor 2: Absence of Acceptable Non-Infringing Substitutes for the Patented Inventions .......... 93
        3.   Panduit Factor 3: Manufacturing/Marketing Capability to Exploit Demand ......................................... 108
        4.   Panduit Factor 4: Amount of Lost Profits .................................................... 111
    C.   REASONABLE ROYALTY DAMAGES ON INFRINGING SALES ON WHICH LOST PROFITS ARE NOT CLAIMED............. 123
        1.   Initial Conditions and Parameters ............................................................... 123
        2.   Edgeworth Box: Georgia-Pacific Factor 15 .................................................. 126
        3.   Consideration of the Remaining Georgia-Pacific Factors .............................. 175
        4.   Conclusions from the Georgia-Pacific Analysis and Reasonable Royalty Damages ......... 192
    D.   SUMMARY AND CONCLUSION ON LOST PROFITS PLUS REASONABLE ROYALTIES ..................... 194

IV.    COMPUTATION OF REASONABLE ROYALTY DAMAGES, SHOULD THE TRIER OF FACT FIND THAT APPLE IS
       ENTITLED ONLY TO REASONABLE ROYALTIES ....................................................... 196

V.     PERMANENT INJUNCTION ........................................................................................ 197

VI.    CONCLUSION ........................................................................................................... 199

## I.    OVERVIEW

### A.  Qualifications and Experience

1.      I am the founder and president of Quantitative Economic Solutions, LLC, an economic consulting firm.  I also teach economics on occasion in the Graduate School of Management at Boston University.  I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology in Cambridge, Massachusetts in 1989.  My fields of specialization include industrial organization and econometrics.  My *curriculum vitae*, which identifies the cases in which I have testified over the last four years, and all of my publications, is attached as **Exhibit 1**.

2.      I have extensive experience in the valuation of intellectual property and in the assessment of economic injury/damages sustained as a result of patent, copyright, trademark, and/or infringement.  Industries that I have studied in this context include: digital entertainment products, computer hardware and software (including smartphones, tablets, and related products), semiconductors, chemicals and derivative products, consumer products, pharmaceutical products, and medical devices and instruments.  I have also designed licensing programs for patents and other intellectual property relating to a number of industries, including consumer products, medical devices, legal publishing, and biotechnology.

### B.  My Previous Work in this Matter

3.      I was retained by Gibson Dunn, counsel for the plaintiff Apple Inc. ("Apple"), in connection with this litigation.  In my previous work in this matter, I was asked to consider the likely economic ramifications (including harm sustained by Apple) if Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung"), were permitted, absent the entry of a preliminary injunction, to continue to import into the U.S., offer to sell, and sell Samsung's Galaxy Nexus "smartphone" during the pendency of this lawsuit.  Apple's motion for a preliminary injunction was based on the alleged infringement by the Nexus of four patents asserted by Apple in this litigation.

4.      In a Declaration that I submitted on February 8, 2012, ("my Original Declaration" or "Original Declaration"), and a Reply Declaration that I submitted on May 14, 2012, I found that, absent the entry of a preliminary injunction, the continued importation and sale after

importation, through 2013, of the Galaxy Nexus would cause Apple to suffer significant and irreparable harm in the form of a permanent loss of market share in the smartphone market and future lost sales in many other aspects of Apple's business, including, for example, sales of smartphone applications and accessories, digital content, Apple iPods, iPads and related accessories, and Apple desktop and laptop computers.[1]

### C.  Statement of Assignment

5.      At present, I have been asked by Apple's counsel, Gibson Dunn, to perform an economic and financial analysis to assess an appropriate measure and amount of damages to be awarded in the event a trier of fact determines that one or more of the following six of Apple's U.S. patents have claims that are not invalid, are enforceable, and are infringed by Samsung:

- U.S. Patent No. 7,761,414 ("the '414 Patent");
- U.S. Patent No. 5,946,647 ("the '647 Patent");
- U.S. Patent No. 6,847,959 ("the '959 Patent");
- U.S. Patent No. 8,014,760 ("the '760 Patent");
- U.S. Patent No. 8,046,721 ("the '721 Patent"); and
- U.S. Patent No. 8,074,172 ("the '172 Patent").

6.      I refer to the '414, '647, '959, '760, '721, and '172 Patents collectively as the "Asserted Patents."  I use the term "Asserted Claims" to refer collectively to the asserted claims of the Asserted Patents and refer colloquially to the alleged inventions covered by the Asserted Claims as the "Patented Inventions" and to the accused product features covered by the Asserted Claims as the "Accused Features."  I provide relevant background information about the Asserted Patents in Section II.E below.

7.      I understand that Apple asserts that its Patented Inventions relate generally to enhancing the user experience on smartphones, tablet computers ("tablets"), and other mobile devices by improving the accessibility of data, management of calls, inputting of text, and ease of locking/unlocking the screen.  Apple accuses 18 Samsung smartphone and tablet computer models (collectively, "Samsung's Accused Products" or "the Accused Products") of infringing

---

[1] Declaration of Christopher Vellturo, Ph.D., Feb. 8, 2012, No. Case 12-cv-00630, N.D. California; Reply Declaration of Christopher Vellturo, Ph.D., May 14, 2012, No. Case 12-cv-00630, N.D. California.

the Asserted Patents.  I provide relevant background information about the Accused Products in Section III.A, below.

8.      For the purpose of performing my damages analysis, I assume that the Asserted Patents are valid and enforceable and that Samsung's Accused Products infringe the Asserted Patents.  I provide no opinions or conclusions as to the accuracy of these assumptions.

9.      I expect to testify in this matter, at trial or by deposition, consistent with the opinions set forth in this report, if called upon to do so by the Court or counsel for Apple.[2]

### D.  Documents/Materials Relied Upon

10.      In connection with this matter, I, or others working under my direction, have considered information from the following sources:

- Documents produced in this matter by Apple, Samsung, and third parties;
- Publicly available information;
- Deposition testimony;
- Court filings and orders;
- Interviews with Apple employees Mark Buckley and Rory Sexton; Apple's technical experts Professor Alex C. Snoeren, Dr. Todd Mowry, and Professor Andrew Cockburn; and Apple's survey expert, Dr. John Hauser.
- Survey results from surveys performed by Dr. John R. Hauser;
- Documents produced, expert reports, deposition and trial testimony, and court filings and orders in a previous litigation between Apple and Samsung in this court, Case No. 11-CV-01846 ("the 1846 Case").

A more detailed list of the information I considered in forming my opinions can be found in **Exhibit 2** to this report.

### E.  Summary of Opinions

11.      In my opinion, Apple sustained lost profits on lost sales of its smartphones and tablets that compete with infringing smartphones and tablets sold by Samsung, along at least two dimensions:

---

[2] QES is being compensated at $700/hour for time I spend on this matter.

- in a "but for" world in which infringement is not an available option, Samsung would have been unable to sell any of the Accused Products for some period of time, during which period Samsung presumably would have sought to design around the Asserted Patents. Reconstructing the relevant markets to reallocate sales of Samsung's infringing devices during the time period that Samsung would have been off the market would have resulted in Apple making more sales, and thus more profits, than it did in the real world during the period of infringement. In my analysis of "off the market" lost profits, I consider the '414, '959, '760, '721, and '172 patents;

- in a "but for" world in which Samsung eventually would have implemented non-infringing substitutes for its accused infringing products, there would have been lower demand for the non-infringing substitutes than there was for Samsung's infringing devices, because a percentage of Samsung's customers would have considered the non-infringing alternative devices to be unacceptable by virtue of the removal or redesign of the patented feature. Reconstructing the relevant markets to reallocate sales of Samsung's infringing devices throughout the entire period of infringement to account for the portion of Samsung's real world sales of infringing devices that would not have been made in the "but for" world would have resulted in Apple making more sales, and thus more profits, than it did in the real world during the period of infringement. In my analysis of "diminished demand" lost profits, I consider only the '414, '647 and '959 patents.

12. In estimating the duration of the design-around period during which Samsung would have been off the market in the "but for" world, it is reasonable to consider real world facts regarding the extent to which Samsung actually implemented non-infringing alternative designs, and the time it took Samsung to implement those designs. But the length of the "off the market" lost profits period and the amount of Apple's lost profits on lost sales during that period should be shortened/reduced or lengthened/increased depending on Samsung's evidence at trial and the jury's conclusions in regard to the same.

13. In considering the extent to which Apple sustained lost profits relating to the diminished demand for Samsung's theoretical non-infringing substitutes in the "but for" world, it is reasonable to use consumer survey data measuring consumer preferences, as generated and analyzed in accordance with generally accepted methodologies in the field of statistics and marketing generally, and as to the conduct of conjoint studies specifically. In this regard, I have been provided with data and information from a conjoint study performed under the direction of John Hauser, Ph.D., and I have relied on the results of this study in the formation of my opinions and the calculations of "diminished demand" lost profits. It is my opinion that Dr. Hauser's study was conducted in accordance with reliable principles and methods and yielded information

of a type reasonably relied upon by experts in the field of economics to estimate lost profits with reasonable certainty.

14.     Apple sustained damages in an amount not less than a reasonable royalty on all infringing sales that are not compensated through a lost profits consideration.  This reasonable royalty is determined through an economic analysis of a hypothetical negotiation at the time of first infringement of a license to the Asserted Patents, granted by Apple to Samsung, under the presumption that both parties would recognize the Asserted Patents to be valid and infringed by Samsung's Accused Products.  I am of the opinion that the parties would have considered a broad array of facts and circumstances regarding the market for smartphones and tablets at the time of the hypothetical negotiations, including the intense competition between Samsung and Apple; the benefits to Apple and the harms to Samsung that would have resulted in the event that Samsung did not obtain a license to practice the patented inventions (including the expectation that Samsung would have lost sales in the marketplace), and related economic consequences of Samsung's sales at Apple's expense, such as ecosystem effects, including on the sales of complementary products.

15.     Consistent with these opinions, and as more fully set forth herein and in the attached exhibits, I have prepared what I believe to be reasonably reliable calculations of Apple's damages from Samsung's infringement of the Asserted Patents during the damages period through February of 2013[3] as follows:

---

[3] My damages calculations presented herein are limited to the period for which the parties have thus far produced the required sales and financial data.  I intend to update my calculations before trial, based upon additional data produced by that time.

| Damages Scenario | Amount |
|---|---|
| Off the Market Lost Profits[4] + Diminished Demand Lost Profits[5] + Reasonable Royalties on Non-Lost-Profits Units | $1,878,177,897 |
| Diminished Demand Lost Profits + Reasonable Royalties on Non-Lost-Profits Units | $1,591,943,145 |
| Off the Market Lost Profits + Reasonable Royalties on Non-Lost-Profits Units | $1,422,657,545 |
| Reasonable Royalties on All Infringing Units | $1,024,025,137 |

16.     These damages represent a "mixed" award, in which I determined a conservative measure of lost profits that Apple sustained in its device sales (iPhones and iPads) on a portion of Samsung's infringing units, and applied a reasonable royalty (as a damages floor) to the remaining Samsung infringing units. A summary of the lost profits and reasonable royalty damages is provided in **Exhibit 3**.[6]

17.     Although these damages provide a measure of compensation to Apple for Samsung's infringement, that amount of compensation is by no means adequate to compensate Apple for all of the harm that has resulted, and that will result, from Samsung's infringement. As I explained in my two declarations submitted in support of Apple's Motion for a Preliminary

---

[4] "Off the Market Lost Profits" assumes that Samsung would be off the market for four months while implementing non-infringing alternatives. As discussed below, to the extent this period is found to be different than four months, the aggregate measure of lost profits damages would change accordingly.

[5] "Diminished Demand Lost Profits" are based on the diminished demand for the Accused Products that Samsung would have suffered due to reliance on its inferior alleged non-infringing alternatives.

[6] I have assessed damages for Samsung's infringement of the Asserted Patents by all of the Accused Products. I understand that, by the time of trial, at least one of these patents will be removed from this case, pursuant to an order by the Court limiting each of the parties to five asserted claims at trial, and that Apple and Samsung will each have to reduce the number of accused products to 10. As explained below, my damages computations can readily be adjusted to account for the removal of Asserted Patents and Accused Products. Similarly, my computations can be adjusted if not all the remaining Asserted Patents are found to be valid and infringed by all the Accused Products, or if the length of the damages period changes for certain products, etc.

Injunction in this case (which I incorporate here by reference), Samsung's infringement has caused and will continue to cause Apple to suffer numerous incalculable and irreparable harms that could not possibly be accounted for by an award of damages.

18.     My findings are based on the information available to me at this point.  To the extent additional information comes to light in this matter, either through additional fact discovery or through additional opinions/analyses put forward by Samsung's experts, I may revise and supplement my findings if allowed to do so by the court.

## II.     RELEVANT BACKGROUND

19.     This litigation concerns (among other issues) the alleged infringement by Samsung of patents owned by Apple that are practiced by wireless mobile devices, principally smartphones and tablets.  I provide context for my damages assessment here by briefly reviewing the histories of Apple and its innovations and of Samsung and its Accused Products.  Then I provide background on the development of the smartphone and tablet markets, the impact of Apple's iPhone and iPad on those markets, and the central role ease of use and the user experience play in that development.  I also provide a description of the Asserted Patents and explain how they contribute to improving the ease of use of these products.

20.     In short, the smartphone marketplace was hindered with difficult-to-use devices throughout the first half of the 2000s.  Apple's introduction of the iPhone in 2007 was a revolutionary event—the iPhone's user-friendly interface and seamless integration of media player, cell phone, and web browser represented a seminal paradigm shift in the industry—and consumers responded accordingly.  Similarly, in 2010, Apple introduced the iPad, which filled the void between the smartphone and laptop computer with a similar user-friendly experience and achieved a similarly positive consumer response.

21.     Having borne witness to this fundamental shift, Samsung sought to "catch up" to Apple before the central wave of first time adopters (forecast to arrive in the 2011-2013 time frame) "locked in" to the Apple iOS platform and related ecosystem.  Samsung recognized that its central shortcoming in its smartphones was their inferior user experience and their relative difficulty of use.  To better position itself to capture the anticipated incoming wave of first-time smartphone buyers, Samsung mimicked the user experience of the iPhone (and, subsequently,

the iPad).  Its infringing devices became the central competitive alternative to Apple's iPhone and iPad.

22.     The innovations of the Asserted Patents played a central role in the ease of use of Apple's iPhone and iPad, and in Samsung's ability to mount an effective competitive challenge to these devices with its own line of smartphones and tablets.

**A.  Parties**

**1.  Apple**

23.     Apple produces a broad line of digital electronic products, including computers and tablet computers, portable digital media players, and multi-functional mobile phones with internet access.  In polls concerning the world's most innovative firms, Apple consistently ranks first.[7]  It is credited with "consistently combining clever technology with simplicity and ease of use" and "inspires an almost religious fervor among its customers."[8]

24.     Apple's brand is built on providing high-quality products that are innovative and easy to use, and Apple designs and markets its products with those goals in mind.  Stan Ng, Apple's Senior Director of iPhone and iPod Product Marketing, testified that "simplicity and ease of use has always been a hallmark and part of what we do from a product perspective at Apple."[9]  To Apple, a great product means providing a "holistic experience" that combines "great design, great ease of use and simplicity."[10]  As Apple's Senior Vice President of

---

[7] "Innovation 2010," Boston Consulting Group, Apr. 2010, at p. 16 (http://www.bcg.com/documents/file42620.pdf); "BCG Names the World's 50 Most Innovative Companies," Boston Consulting Group, Jan. 10, 2013 (http://www.bcg.com/media/ PressReleaseDetails.aspx?id=tcm:12-125372): "The tech and telecom industries continued to take the lead on innovation, earning seven of the top ten places on BCG's list.  Many of these companies have demonstrated impressive staying power in the top rankings:  Apple has been number one every year since 2005."; TJ McCue, "Apple #1, Google #2 – 50 Innovative Companies Ranked by 1,500 Execs," Forbes, Jan. 1, 2013 (http://www.forbes.com/sites/tjmccue/2013/01/10/apple-1-google-2).

[8] "Innovation: Lessons from Apple," *Economist*, June 7, 2007.

[9] Deposition of Stan Ng, Transcript, July 2, 2013, at 25:10-16.

[10] Deposition of Stan Ng, Transcript, July 2, 2013, at 54:13-16.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

Worldwide Marketing, Phil Schiller, testified, developing creative and innovative ways to make products easy to use "adds up to the whole experience you expect from Apple."[11]

25.     Apple started as a computer company, releasing its first personal computer in 1976.[12]  After Apple released several subsequent models of its personal computers, Apple launched its "Macintosh" computer product line in 1984.[13]

26.     Over time, through constant innovation and investment, Apple has reinvented itself, shifting from a computer company to a pre-eminent consumer electronics firm.[14]  In recognition of this shift, Apple changed its name from Apple Computer, Inc. to Apple Inc. in January 2007.[15]

27.     With its introduction of the iTunes music management service and the release of the iPod in October 2001, as well as its 2003 launch of the iTunes Music Store (later, iTunes Store), Apple revolutionized the digital media player and content marketplaces.[16]  Prior to the iPod's introduction, "[d]igital music players were either big and clunky or small and useless."[17] The highly intuitive, user-friendly interface of the iPod, combined with its ability to store significant volumes of digital media, turned digital audio players into everyday devices across a broad consumer base.[18]  Moreover, the user-friendly nature of iTunes and the iTunes Store

---

[11] Deposition of Phil Schiller, Transcript, July 23, 2013, at 196:12-16.

[12] "Factbox:  Apple's history and milestones," Reuters, Oct. 6, 2011 (http://www.reuters.com/article/2011/10/06/us-apple-history-idUSTRE7950NI20111006).

[13] "Factbox:  Apple's history and milestones," Reuters, Oct. 6, 2011 (http://www.reuters.com/article/2011/10/06/us-apple-history-idUSTRE7950NI20111006).

[14] "Innovation: Lessons from Apple," *Economist*, June 7, 2007.

[15] Apple Inc., Form 8-K, Jan. 9, 2007 (http://www.sec.gov/Archives/edgar/data/320193/000110465907001648/a07-1512_18k.htm).

[16] Julianne Pepitone & David Goldman, "The evolution of iTunes," CNNMoney, Apr. 28, 2003 (http://money.cnn.com/gallery/technology/2013/04/25/itunes-history/index.html).

[17] Leander Kahney, "Straight Dope on the iPod's Birth," Wired, Oct. 17, 2006 (http://www.wired.com/gadgets/mac/commentary/cultofmac/2006/10/71956?currentPage=all).

[18] Rob Walker, "The Guts of a New Machine," *New York Times*, Nov. 30, 2003 (http://www.nytimes.com/2003/11/30/magazine/30IPOD.html).

transformed the sale of digital media, and as of 2010, iTunes has become the largest music retail outlet globally.[19]

28.     As detailed more fully below, Apple's introductions of the iPhone and iPad represented similar episodes in which Apple fundamentally transformed an industry.  With the iPhone, Apple revolutionized the smartphone sector by replacing clunky, unintuitive devices with an easy to use device that provided powerful functionality immediately – right out of the box.[20]  With the iPad, Apple created a new device that filled a gap in consumer demand between phones and netbook computers that few realized existed, reviving and reinventing a moribund tablet market.

### 2. Samsung

29.     As discussed above in Section I.B, throughout this report I will refer to the following entities collectively as Samsung:

- Samsung Electronics Co., Ltd. ("SEC"), headquartered in Suwon, South Korea;[21]

- Samsung Electronics America, Inc. ("SEA"), headquartered in Ridgefield Park, New Jersey;[22] and

- Samsung Telecommunications America, LLC ("STA"), headquartered in Dallas, Texas.[23]

30.     These three entities, which constitute the defendants in this matter, ultimately fall under the South Korean conglomerate Samsung Group.  Samsung Group's affiliated companies

---

[19] "iTunes Store Tops 10 Billion Songs Sold," Apple Inc., Feb. 25, 2010 (http://www.apple.com/pr/library/2010/02/25iTunes-Store-Tops-10-Billion-Songs-Sold.html).

[20] Indeed, the iPhone was provided in its retail box with only Spartan, basic operating instructions, rather than the typical User's Guide tome.

[21] "Samsung: Articles of Incorporation," Article 3 (Location) (http://www.samsung.com/us/aboutsamsung/investor_relations/corporate_governance/articlesofincorporation/IR_ArticlesChapter1.html).

[22] "Samsung: U.S. Divisions" (http://www.samsung.com/us/aboutsamsung/samsung_electronics/us_divisions/).

[23] "Samsung: U.S. Divisions" (http://www.samsung.com/us/aboutsamsung/samsung_electronics/us_divisions/).

participate in numerous industries including electronics, machinery & heavy industries, chemical industries, and financial services, among others.[24]

31.     Samsung Group considers SEC its "flagship company."[25]  In 2012, SEC reported a profit of more than $22 billion on revenues of almost $188 billion.[26]  SEC's businesses are categorized into three areas: consumer electronics, IT & mobile communications, and device solutions.[27]  Its consumer electronics business includes televisions, appliances, printers, and medical equipment.[28]  Its IT & mobile communications business includes mobile phones, tablets, cellular network equipment, and digital cameras.[29]  Finally, SEC's device solutions business includes computer memory, large scale integrated chips, and light emitting diodes.[30]

32.     I understand that SEC imports into the United States, sells, and offers to sell smartphones and tablets to SEA, STA, and others.[31]  SEA is a wholly-owned subsidiary of SEC, and STA is a wholly-owned subsidiary of SEA.[32]  In addition to importing smartphones and tablets from SEC into the United States, STA and SEA sell and offer to sell smartphones and

---

[24] "Samsung: Affiliated Companies" (http://www.samsung.com/us/aboutsamsung/samsung_group/affiliated_companies/).

[25] "About Samsung" (http://www.samsung.com/us/aboutsamsung/).

[26] "2012 Samsung Electronics Annual Report," at p. 48 (http://www.samsung.com/us/aboutsamsung/investor_relations/financial_information/downloads /2013/SECAR2012_Eng_Final.pdf).

[27] "2012 Samsung Electronics Annual Report," at p. 6 (http://www.samsung.com/us/aboutsamsung/investor_relations/financial_information/downloads /2013/SECAR2012_Eng_Final.pdf).

[28] "2012 Samsung Electronics Annual Report," at pp. 8-17 (http://www.samsung.com/us/aboutsamsung/investor_relations/financial_information/downloads /2013/SECAR2012_Eng_Final.pdf).

[29] "2012 Samsung Electronics Annual Report," at pp. 20-27 (http://www.samsung.com/us/aboutsamsung/investor_relations/financial_information/downloads /2013/SECAR2012_Eng_Final.pdf).

[30] "2012 Samsung Electronics Annual Report," at pp. 32-39 (http://www.samsung.com/-us/aboutsamsung/investor_relations/financial_information/downloads/2013/SECAR2012_Eng_F inal.pdf).

[31] See, e.g., Deposition of Joonkyo (Joseph) Cheong, Transcript, June 24, 2013, at 19:4-20:23, 66:18-69:3, 76:24-77:8; "STA Financial Statements," Dec. 31, 2012 and 2011, SAMNDCA630-06643293, at -302; Deposition of Justin Denison, Transcript, July 18, 2013, at 24:10-18.

[32] "STA Financial Statements," Dec. 31, 2012 and 2011, SAMNDCA630-06643293, at -302.

tablets in the United States.  In particular, STA imports, sells, and offers to sell (1) mobile phones and (2) tablets that are connected to a cellular network, while SEA imports, sells, and offers to sell tablets that are not connected to a cellular network (*i.e.,* WiFi-only).[33]



33.     As their ultimate parent company, it is my understanding that SEC exercises control over STA and SEA.  SEC gives what "could be construed as directions" to STA about STA's mobile phone products.[35]  For example, in 2011, SEC's CEO told STA that "STA must respond with a plan to beat Apple" in the near future.[36]

34.     In practice, SEC, SEA, and STA are deeply intertwined.

[33]

[34]

[35] Trial Testimony of Justin Denison, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at 796:14-18.

[36] Trial Testimony of Justin Denison, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at 810:6-812:25.

[37]

[38]

[39]

██████████████████████████████████████ █████████

██████████████████████████████████████████████████████

███████████████████████████

### B.  History of the Smartphone Market and the Impact of the iPhone

35.     Throughout the early to mid-2000s, "smartphones" (cellular devices having advanced software that are able to perform many of the functions of a computer, including web browsing[42]) largely filled various market niches, such as serving large enterprises, but failed to catch on as mainstream consumer devices.  Industry research firm IDC estimated that a total of roughly 80 million smartphones were shipped worldwide in 2006, with Finnish company Nokia accounting for nearly 50% of the market and Research in Motion (RIM) accounting for the second most shipments, at 7.5% of the market.[43]  In 2007, the year Apple launched the iPhone, total smartphone shipments rose 60% to 125 million units worldwide.[44]  In the U.S., iPhone amassed 17.4% of the smartphone market despite being on sale only for the last six months of the year.[45]

36.     It took approximately four years of intense effort for Apple to develop the iPhone. In 2003, Apple began working on tablet devices (which later became the iPad), researching various ways to develop a touchscreen computer.[46]  In 2004, Apple decided that the "flip

---

[40] Deposition of Justin Denison, Transcript, July 18, 2013, at 20:7-23.

[41] Deposition of Timothy Sheppard, Transcript, Dec. 21, 2011, at 168:3-169:8.

[42] "Smartphone," Oxford Dictionaries, 2013 (http://oxforddictionaries.com/us/definition/american_english/smartphone).

[43] Jo Best, "Nokia Tops in 2006 Smartphone Sales," BusinessWeek, Feb. 27, 2007 (http://www.businessweek.com/stories/2007-02-27/nokia-tops-in-2006-smartphone-salesbusinessweek-business-news-stock-market-and-financial-advice).

[44] Brad Stone, "The smartphone war:  Blackberry girds for iPhone's assault," *New York Times*, Apr. 27, 2008 (http://www.nytimes.com/2008/04/27/business/worldbusiness/27iht-27rim.12366842.html?pagewanted=all&_r=0).

[45] Brad Stone, "The smartphone war:  Blackberry girds for iPhone's assault," *New York Times*, Apr. 27, 2008 (http://www.nytimes.com/2008/04/27/business/worldbusiness/27iht-27rim.12366842.html?pagewanted=all&_r=0).

[46] Trial Testimony of Scott Forstall, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at 738:12-739:1.

phones" then existing were not as good as they could be, and wondered if it could apply the touch technology it was developing for tablets to phones.[47]  Steve Jobs told the leader of the user interface team, Scott Forstall, that he could recruit anyone he wanted from Apple to the iPhone team.  These hand-picked "superstar" engineers worked on the secret iPhone project for three years until its launch in 2007.[48]  Mr. Forstall testified: "The investment in building a user interface that could work on this size device with your fingers and touch was immense.  I know I personally devoted years of my life to this as did hundreds of people on this team.  And it was very, very difficult."[49]

37.    The iPhone was unlike anything the smartphone market had seen previously.  Apple reinvented the concept of a mobile phone by combining three products into one small lightweight device: (i) a widescreen iPod with touch controls; (ii) an Internet communications device with email, web browsing, maps, etc.; and (iii) a mobile phone.[50]  Introducing the iPhone at the MacWorld Conference January 9, 2007, Steve Jobs explained:

> The most advanced phones are called smart phones, so they say. And they typically combine a phone plus some e-mail capability, plus they say it's the Internet. It's sort of the baby Internet, into one device, and they all have these little plastic keyboards on them. And the problem is that they're not so smart and they're not so easy to use, and so if you kind of make a Business School 101 graph of the smart axis and the easy-to-use axis, phones, regular cell phones are right there, they're not so smart, and they're not so easy to use. But smart phones are definitely a little smarter, but they actually are harder to use. They're really complicated. Just for the basic stuff people have a hard time figuring out how to use them.  Well, we don't want to do either one of these things. What we want to do is make a leapfrog product that is way smarter than

---

[47] Trial Testimony of Scott Forstall, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at 739:2-740:9; Trial Testimony of Phil Schiller, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at 596:3-597:2.

[48] Trial Testimony of Scott Forstall, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at 742:8-743:15.

[49] Trial Testimony of Scott Forstall, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at 751:6-11.

[50] "Apple Reinvents the Phone with iPhone," Apple, Jan. 9, 2007 (http://www.apple.com/pr/library/2007/01/09iphone.html).

any mobile device has ever been, and super-easy to use. This is what iPhone is.[51]

38.      One of the core differences between the iPhone and its predecessors is the iPhone's intuitive interface and simplicity.  At the launch event, Mr. Jobs touted how easy the iPhone is to use, pointing to the ease of unlocking the phone with a slide of the finger, scrolling through music and photos, and making calls by tapping on a contact or tapping a phone number on a web site.[52]  Industry commentators shared Mr. Jobs' view, highlighting the iPhone as user-friendly, intuitive, and distinctive in how users interacted with the device.[53]

39.      In short, the iPhone revolutionized the mobile phone industry.  As one commentator noted: "As we look toward the future of mobile, it's important to remember how quickly and completely things can change.  There's no better example of that than Apple's iPhone introduction in 2007, which totally flipped the mobile industry upside down.  It changed

---

[51] Transcript of January 9, 2007, MacWorld Conference, APLNDC630-0000171023 at -029.

[52] Transcript of January 9, 2007, MacWorld Conference, APLNDC630-0000171023 at -029-38.

[53] See, e.g., Walter S. Mossberg & Katherine Boehret, "Testing Out the iPhone," *Wall Street Journal*, June 27, 2007 (http://online.wsj.com/article/SB118289311361649057.html):"'[S]mart phones' have had lousy software, confusing user interfaces and clumsy music, video and photo playback. And their designers have struggled to balance screen size, keyboard usability and battery life…[T]he iPhone is, on balance, a beautiful and breakthrough handheld computer."; Lev Grossman, "Invention of the Year: The iPhone," *Time*, Nov. 1, 2007 (http://www.time.com/time/specials/2007/article/0,28804,1677329_1678542_1677891,00.html): referring to the iPhone as "the phone that has changed phones forever" based on five reasons: (1) "The iPhone is pretty," (2) "It's touchy-feely," (3) "It will make other phones better," (4) "It's not a phone, it's a platform," and (5) "It is but the ghost of iPhones yet to come"; David Pogue, "The iPhone Matches Most of Its Hype," *New York Times*, June 27, 2007 (http://www.nytimes.com/2007/06/27/technology/circuits/27pogue.html?pagewanted=2&_r=1& hp):"[T]he iPhone is still the most sophisticated, outlook-changing piece of electronics to come along in years."; John Markoff, "Apple, Hoping for Another iPod Introduces Innovative Cellphone," *New York Times*, Jan. 10, 2007, at p. C6: "[I]t was the ability to fuse [music player, camera, Web browser and e-mail tool as well as phone] with a raft of innovations and Apple's distinctive design sense that had the crowd here buzzing."; Jon Swartz, "Apple Unveils All-in-One iPhone: Combines Net, Music, Phone," *USA Today*, Jan. 10, 2011, at p. 1: "New technology, called Multi-Touch, lets consumers use their fingers to make calls, play content and troll the Web."; Li Yuan & Pui-Wing Tam, "Apple Storms Cellphone Field," *Wall Street Journal*, Jan. 10, 2007, at p. A3: "[T]he iPhone…allows users to download and play iTunes music, browse the Web, send email and make calls."

---

everything about phones, forever, at a crucial point in their development."[54]  The iPhone was featured on the cover of Time Magazine as the "Invention of the Year" and heralded as "the phone that has changed phones forever."[55]  Apple's hallmark simplicity and ease of use have helped make the iPhone successful.[56]

40.    In subsequent generations of the iPhone, Apple continued to develop novel and innovative features to captivate consumers while keeping the iPhone fun and easy to use.[57] Apple's iPhone 3G, introduced in June 2008, offered a variety of new features including built-in GPS and 3G networking, which was twice as fast as the first generation iPhone.[58]  In June 2009, Apple released the iPhone 3GS with an autofocus camera and video recording.[59]  The iPhone 4 followed in June 2010, with FaceTime video calling, Retina Display, a five-megapixel camera and HD video recording.[60]  Next came the iPhone 4S in October 2011, with full 1080p HD resolution video recording, and Siri – Apple's intelligent "virtual assistant" functionality that

---

[54] Dan Frommer, "History Lesson: How the iPhone Changed Smartphones Forever," Business Insider, June 6, 2011 (http://www.businessinsider.com/iphone-android-smartphones-2011-6)

[55] Lev Grossman, "Invention of the Year: The iPhone," *Time*, Nov. 1, 2007 (http://www.time.com/time/specials/2007/article/0,28804,1677329_1678542_1677891,00.html), APLNDC-Y0000146961; Trial Testimony of Phil Schiller, Case No. 11-1846, N.D. California, Aug. 3, 2012, at 608:23-609:4.

[56] Deposition of Stan Ng, Transcript, July 2, 2013, at 25:10-16; Trial Testimony of Phil Schiller, Case No. 11-1846, N.D. California, Aug. 3, 2012, at 625:11-19.

[57] John Cox, "Survey: iPhone 4S Owners Are Very Satisfied with the Device," Network World, Dec. 1, 2011 (http://www.macworld.com/article/163965/2011/12/survey_iphone_4s_ owners_are_very_satisfied_with_the_device.html#lsrc.rss_main): "Apple's bet on Siri has paid off…it is the best-liked feature of the new phone.  Siri was ranked as the best-liked feature by 49 percent of these owners."; see also "Apple Announces iPhone 4 Sold 1.7 Million in First Three Days," AppleInsider, June 28, 2010 (http://www.appleinsider.com/articles/10/06/28/ apple_announces_iphone_4_sold_1_7_million_in_first_three_days.html): reporting that it took Apple 74 days to sell 1 million units of the iPhone in 2007, but only 3 days to sell 1 million units of the iPhone 3G and only 3 days to sell 1.7 million units of the iPhone 4.

[58] "Apple Introduces the New iPhone 3G," Apple, June 9, 2008 (http://www.apple.com/pr/library/2008/06/09iphone.html).

[59] "Apple Announces the New iPhone 3GS," Apple, June 8, 2009 (https://www.apple.com/pr/library/2009/06/08Apple-Announces-the-New-iPhone-3GS-The-Fastest-Most-Powerful-iPhone-Yet.html).

[60] "Apple Presents iPhone 4," Apple, June 7, 2010 (http://www.apple.com/pr/library/2010/06/07iphone.html).

allows users to quickly obtain information from multiple different sources via voice-recognized searches.[61]  Then in September 2012, Apple introduced the iPhone 5, with its new aluminum design, Retina display, and faster wireless connectivity.[62]

41.   As it has introduced new generation iPhones, Apple has continued to sell prior generation phones in a tiered product structure based on various consumer value segments.  With the introduction of iPhone 4, Apple reduced the selling price of the iPhone 3GS.  With the introduction of the iPhone 4S, Apple reduced the price of the iPhone 4, and further reduced the price of the iPhone 3GS so that it was "free" to end users (with a minimum service contract), on most carriers.  In similar fashion, with the introduction of the iPhone 5, Apple reduced the prices on the iPhone 4S and 4 further, and retired the iPhone 3GS.  Through this tiering approach, Apple provided iPhones to all value segments of the consumer marketplace.

42.   Apple's innovations, investments, and milestones related to the iPhone have been extensive:

- In September 2007, Apple announced that customer satisfaction scores for the iPhone were higher than Apple had ever experienced for any previous Apple product;[63]

- Also in September 2007, Apple sold its one millionth iPhone, 74 days after the phone's introduction;[64]

- In November 2007, Time Magazine named the iPhone the Invention of the year, referring to it as "the phone that has changed phones forever;"[65]

- In November 2012, Popular Science included the iPhone in its list of the Top 25 Innovations of the Last 25 Years.[66]

---

[61] "Apple Launches iPhone 4S, iOS 5 & iCloud," Apple, Oct. 4, 2011, (http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html).

[62] "Apple Introduces iPhone 5," Apple, Sept. 12, 2012 (http://www.apple.com/pr/library/2012/09/12Apple-Introduces-iPhone-5.html).

[63] "Apple Sets iPhone Price at $399 for this Holiday Season," Apple, Sept. 5, 2007 (http://www.apple.com/pr/library/2007/09/05iphone.html).

[64] "Apple Sells One Millionth iPhone," Apple, Sept. 10, 2007 (http://www.apple.com/pr/library/2007/09/10iphone.html).

[65] Lev Grossman, "Invention of the Year: The iPhone," *Time*, Nov. 1, 2007 (http://www.time.com/time/specials/2007/article/0,28804,1677329_1678542_1677891,00.html), APLNDC-Y0000146961.

43.     The iPhone has been a highly successful product.  **Exhibit 4** shows total U.S. dollar and unit sales and profits for iPhones.  Since the launch of the first generation iPhone in June 2007, iPhones have generated more than ████████ in revenue and more than ████████ in standard profit on sales of ████████████ in the United States.

44.     Apple's innovations first pioneered in the iPhone have also opened up a new source of demand for smartphones, tablets, and related products:  "the consumerization of IT," i.e., the adoption of what were formerly seen as consumer products for business use, driven by consumers who see their personal devices as more useful than those provided by their employers.[67]  As industry observers have noted:

> What really gave the consumerization of IT a big push was Apple with their game-changing iPhone and iPad.  Apple took the concept of a smartphone and raised it to a new level.  Additionally, it launched the mobile apps trend, which also started as a consumer oriented offering rather than a business one.  Now, with an iPhone or iPad, consumers could have a true multimedia computer in their hand.  Of course, competitors quickly came and launched even more consumer oriented powerful tools, making the trend grow quickly.[68]

45.     The advances in mobile computing technology represented by the iPhone (and later the iPad, as discussed below) have in turn impacted the traditional corporate computing sector.  For example, "Microsoft's corporate Windows business is losing ground to Apple," as "products based on Apple operating systems — including Macintosh computers, iPads and iPhones — are increasing in demand."[69]

---

[66] "Gallery: The Top 25 Innovations of the Last 25 Years," *Popular Science*, Nov. 15, 2012 (http://www.popsci.com/technology/gallery/2012-11/gallery-top-25-innovations-last-25-years?image=20).

[67] Daniel Burrus, "Four Ways to Transform the Consumerization of IT into Competitive Advantage," Big Think, May 28, 2013 (http://bigthink.com/flash-foresight/four-ways-to-transform-the-consumerization-of-it-into-competitive-advantage).

[68] Daniel Burrus, "Four Ways to Transform the Consumerization of IT into Competitive Advantage," Big Think, May 28, 2013 (http://bigthink.com/flash-foresight/four-ways-to-transform-the-consumerization-of-it-into-competitive-advantage).

[69] Scott Martin, "Apple Makes Move Into Offices," *USA Today*, Jan. 29, 2012 (http://usatoday30.usatoday.com/tech/news/story/2012-01-28/apple-enterprise-business-market/52827366/1).

### C. History of the Tablet Marketplace

46.     Prior to the introduction of the iPad in 2010, the portable computing market
consisted primarily of notebook computers and "netbooks," or "sub-compact portable
computers."[70]  For industry observers, netbooks—which sold for as little as $300 to $350—
appealed to customers' desires simply for "so-called 'good-enough' computing'" without the
power of a larger notebook or laptop.[71]  Apple, however, famously dismissed the netbook
market, believing that customers would be uninterested in this market space over the long term.[72]
Specifically, Apple recognized that "many of [its] competitors were making notebooks that were
of a cheaper quality than [Apple] would be willing to make to get to really affordable price
points."[73]  Apple therefore "decided . . . to create a new category of device, something below the
price point of a notebook, something beautiful, easy to use."[74]

47.     In January 2010, Apple introduced the iPad, a device between the size of an
iPhone and a typical computer, but unlike a traditional computer in that it employed a
touchscreen. The iPad offered a new category of device which would be more intuitive for
certain consumers.[75]  Among other things, the iPad allows users to browse the web, read and
send email, views photos, watch videos, listen to music, play games, and read e-books, among

---

[70] Philip Elmer-DeWitt, "Netbook sales will soar to 22 million in 2009 – IDC," Fortune, May
4, 2009 (http://tech.fortune.cnn.com/2009/05/04/netbook-sales-will-soar-to-22-million-in-2009-idc).

[71] Philip Elmer-DeWitt, "Netbook sales will soar to 22 million in 2009 – IDC," Fortune, May
4, 2009 (http://tech.fortune.cnn.com/2009/05/04/netbook-sales-will-soar-to-22-million-in-2009-idc).

[72] Philip Elmer-DeWitt, "Netbook sales will soar to 22 million in 2009 – IDC," Fortune, May
4, 2009 (http://tech.fortune.cnn.com/2009/05/04/netbook-sales-will-soar-to-22-million-in-2009-idc).

[73] Trial Testimony of Phil Schiller, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at
617:18-21.

[74] Trial Testimony of Phil Schiller, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at
617:22-618:3.

[75] "Apple Lanches iPad," Apple, Jan. 27, 2010
(http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html).

numerous other activities.[76]  It is also thinner and lighter than any laptop or netbook.[77]  The iPad runs the same iOS operating system as the iPhone.

48.      iPad reinvented the moribund tablet product category by creating a tablet that was genuinely easy and fun to use.  Time Magazine noted that while "[i]n theory, the iPad is merely a follow-up to such resoundingly unpopular slate-style computers as Microsoft's Tablet PC," in practice, "when [Apple] calls it 'magical' and 'revolutionary' it's distorting reality only slightly."[78]  The iPad began a "new era of touch-screen computing."[79]  Consumers swarmed Apple's stores the day of iPad's release with lines at Apple's flagship stores stretching for blocks.[80]

49.      Walter Mossberg, writing for *The Wall Street Journal*, stated in his review of the iPad that "this beautiful new touch-screen device from Apple has the potential to change portable computing profoundly."  He touted the iPad's ability to run "sophisticated" software through a "simple interface," stating that "it's far more than a big iPhone, even though it uses the same easy-to-master interface."[81]  Other commentators attributed the iPad's success to it being "fun, simple, stunning to look at and blazingly fast."[82]

---

[76] "Apple Lanches iPad," Apple, Jan. 27, 2010 (http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html).

[77] "Apple Lanches iPad," Apple, Jan. 27, 2010 (http://www.apple.com/pr/library/2010/01/27Apple-Launches-iPad.html).

[78] Harry McCracken, "The 50 Best Inventions of 2010," *Time*, Nov. 11, 2010, APLNDC-Y0000233376; Edward Baig, "Verdict is in on Apple iPad: it's a Winner," *USA Today*, Apr. 2, 2010, APLNDC-Y0000233386: describing how "for more than a decade, nobody, not even a deep-pocketed company like Microsoft, has successfully cracked the tablet market."

[79] Ryan Kim, "Apple Unveils Its Tablet Computer, the iPad," *San Francisco Chronicle*, Jan. 28, 2010 (http://www.sfgate.com/news/article/Apple-unveils-its-tablet-computer-the-iPad-3274607.php).

[80] Brad Stone, "Across the Country, Fans Gather for iPad," *New York Times*, Apr. 3, 2010 (http://www.nytimes.com/2010/04/04/technology/04ipad.html?_r=0).

[81] Walter S. Mossberg, "Laptop Killer? Pretty Close," *Wall Street Journal*, Apr. 1, 2010, APLNDC-Y0000233381.

[82] Edward Baig, "Verdict is in on Apple iPad: it's a Winner," *USA Today*, Apr. 2, 2010, APLNDC-Y0000233386, at -387.

50.   Apple followed up its initial iPad launch with subsequent generations:  the iPad 2 and the third and fourth generation iPads.[83]  In October 2012, Apple introduced the iPad mini, a redesigned iPad with a smaller display to increase portability.[84]

51.   The iPad has been a runaway commercial success.  **Exhibit 5** shows total U.S. dollar and unit sales and profits for iPads.  Since the introduction of the first generation iPad in the second quarter of 2010, iPads have earned more than ████████ in revenue and more than ██ ████ in standard profit on sales of ████████████ in the United States.

### D.  The Central Role of User Experience in Apple's Success

52.   Part of Apple's identity is its reputation for making sophisticated yet simple and easy to use products that "just work."  Rather than focusing on individual features to differentiate its products, it attempts to create unique products that provide users with a unique overall experience.[85]  To Apple, this "holistic experience" is more important than "one specific feature over another."[86]  In providing great products, Apple focuses on great design, simplicity, and ease of use.[87]  Indeed, Greg Joswiak, Apple's Vice President, iPhone, iPod and iOS Product Marketing, stated that ease of use is probably Apple's "most important priority":[88]

> As I said, it is at the heart of what we do.  That is the experience that we're trying to create with our products.  Everything we think about is about how to make our products easy to use and a great experience for our products.[89]

53.   Before Apple introduced the iPhone, smartphones containing sophisticated operating systems were generally designed for business users, and focused on voice calls, email, text messaging, voicemail, and applications such as calendars.  These phones generally used hard

---

[83] "Apple Launches iPad 2," Apple, Mar. 2, 2011 (http://www.apple.com/pr/library/2011/03/02Apple-Launches-iPad-2.html).

[84] "Apple Introduces iPad mini," Apple, Oct. 23, 2012 (http://www.apple.com/pr/library/2012/10/23Apple-Introduces-iPad-mini.html).

[85] Deposition of Phil Schiller, Transcript, July 23, 2013, at 194:18-195:4.

[86] Deposition of Stan Ng, Transcript, July 2, 2013, at 54:9-23.

[87] Deposition of Stan Ng, Transcript, July 2, 2013, at 25:10-16.

[88] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 21:18-19.

[89] Deposition of Greg Joswiak, Transcript, Apr. 17, 2012, at 21:6-10.

keyboards and/or a stylus for navigation and were relatively complicated.[90]  The more advanced non-smartphone cell phones, called feature phones, included basic cameras and Internet access with limited graphics.  Digital audio and video capabilities were accessed mainly through other handheld devices such as mp3 players.[91]

54.     When Apple designed the iPhone, it sought to combine these features into one device that would comprise a reinvented phone, the Internet in the consumer's pocket, and the best iPod Apple has ever made.[92]  The iPhone triggered the initial significant wave of adoption of smartphones by mainstream consumers by bringing together and enhancing the multiple capabilities of smartphones, feature phones, and other handheld devices, and making these capabilities "accessible and exciting to normal people for the first time."[93]  Integral to the iPhone's success was its ability to merge these capabilities while at the same time simplifying the device so that it is easy and fun to use for the ordinary consumer.

55.     The materials that I have reviewed demonstrate that



---

[90] Examples of such devices include the Palm Treo 700w and the RIM BlackBerry Pearl 8100.  Lisa Gade, "Palm Treo 700w," Mobile Tech Review, Jan. 19, 2006 (http://www.mobiletechreview.com/Treo-700w.htm); Sascha Segan, "RIM BlackBerry Pearl 8100," PC Mag, Sep. 7, 2006 (http://www.pcmag.com/article2/0,2817,2009810,00.asp).

[91] Edward C. Baig, "New Blackberry, Nokia Smartphones Offer Capable Choices," USA Today, Sept. 6, 2006 (http://usatoday30.usatoday.com/tech/columnist/edwardbaig/2006-09-06-nokia-blackberry_x.htm).

[92] Trial Testimony of Phil Schiller, Case No. 11-cv-1846, N.D. California, at 596:3-15, 598:7-21.

[93] Dan Frommer, "History Lesson: How the iPhone Changed Smartphones Forever," Bus. Insider, June 6, 2011 (http://www.businessinsider.com/iphone-android-smartphones-2011-6).

[94] "iPhone Buyer Survey," FY13 Q2, APLNDC630-0000937009, at -021; "iPhone Buyer Survey," FY13 Q1, APLNDC630-0001233406, at -417.

56.     The most recent iPhone Buyer Surveys also show that █████████████



57.     I have also reviewed Apple surveys conducted when ███████████████ These surveys again show that ████████████████████████████████████████████████████████████████████████████████████████

58.     Additional Apple studies show that ████████████████████████████████████████████████████████████████████████████████████████

59.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

⁹⁵ "iPhone Buyer Survey," FY13 Q2, APLNDC630-0000937009, at -021.

⁹⁶ See, e.g., "iPhone Buyer Survey," FY13 Q2, APLNDC630-0000937009 at -032; "iPhone Buyer Survey," FY13 Q1, APLNDC630-0001233406, at -429, -430, -431; "iPhone Buyer Survey," FY12 Q2, APLNDC630-0000167955, at -978, -979-980; "iPhone Buyer Survey," FY11 Q4, APLNDC630-0001439288, at -306; "iPhone Buyer Survey," FY11 Q1, APLNDC630-0001437744, at -762; "iPhone Buyer Survey," FY10 Q1, APLNDC630-0001438833, at -858. "iPhone Buyer Survey," FY09 Q2, APLNDC-Y0000026257, at -270; "iPhone 5 Early Buyer Survey," Nov. 2012, APLNDC630-0001466887, at -901, -904.

⁹⁷ "iPhone 5 Early Buyer Survey," Nov. 2012, APLNDC630-0001466887 at -901, -904; "iPhone 4S Early Buyer Survey," Nov. 2011, APLNDC630-0000127252, at -278.

⁹⁸ "Smartphone Market Study," Q1 2012, APLNDC630-0000177658, at -684-85; "Smartphone Buyers," Q4 2012, APLNDC630-0001467057, at -067; "Smartphone Purchase Influencers at Retail," Sept. 2011, APLNDC630-0000935722, at -738.

⁹⁹ ████████████████████████████████████████████████████████████████



60.    Apple's iPhone Owner Surveys show that, ███████████████

████████████████████████████████████████████████████████

███

61.    Additionally, Apple focuses on the simplicity and ease of use of its products in its promotional messaging, often by *demonstrating*, rather than simply stating, how easy it is to use its products.[102]  For example, documents from Apple's advertising agency show Apple's ███████

████████████████████████████████████████████████████████

███████  As an indication of the dedication and effort Apple has directed towards ease of use, it is noteworthy that Apple does not include an instruction manual with the iPhone or iPad.

62.    Apart from its ███████████████ Apple itself considers ease of use to be among the key contributors to the iPhone's success.[104]  Apple focuses on ease of use because it believes, consistent with the data that I have seen, that ease of use is among the top features consumers are looking for in a smartphone.[105]  Greg Joswiak testified that "ease of use drives the purchase of products, Smartphones.  It drives the purchase of ours and drives the purchase of [Samsung's]."[106]

63.    I understand that the iPad runs the same operating system, iOS, as the iPhone and thus contains similar user interface features.  Apple attributes the success of the iPad to the same

---

[100] ████████████████████████████████████████████████████████████████

[101] "iPhone Owner Study," June 2012, APLNDC630-0000177067, at -110.

[102] For example, the ███████████████████████████████████████ (APLNDC630-0001506122: 2ⁿᵈ paragraph).  Similarly, in an April 2011 Apple web site advertising discussion, ███████████ ████████████████████████████████████████ (APLNDC630-0000844702).

[103] Advertising presentation, MAL-000071803, at -803.

[104] Trial Testimony of Phil Schiller, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at 625:11-626:4; Deposition of Stan Ng, Transcript, July 2, 2013, at 25:10-16.

[105] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 13:8-17.

[106] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 34:23-35:3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

reasons as the success of the iPhone: its beautiful design, easy to use software, and seamless integration.[107]

64.    Indeed, the documents and testimony that I have reviewed show that ███████



65.    Additionally, ████████████████

66.    Samsung recognized that ease of use, software, and user experience were extremely important and a driving factor behind Apple's success, and that advanced hardware capabilities and sophistication were not sufficient to drive smartphone demand. ████████

---

[107] Trial Testimony of Phil Schiller, Case No. 11-cv-1846, N.D. California, Aug. 3, 2012, at 626:7-19.

[108] "iPad Tracking Study, FY12-Q4 Report," Nov. 2012, APLNDC630-0000870714, at -841; see also "iPad Tracking Study, FY12-Q2 Report," May 2012, APLNDC630-0000177773, at -896; "Apple iPad Report," Changewave Research, May 18, 2010, APLNDC630-0000803288, at -290: ease of use is the second best liked feature of the iPad (behind screen quality).

[109] "Mac Buyer Tracking Study, Q2 2013 Report," May 2013, APLNDC630-0001897067, at -142-145; see also "Mac Buyer Tracking Study, FY 2012 Year End Report," Nov. 2012, APLNDC630-0001896704, at -836; "Mac Buyer Tracking Study, Q1 2012 Report," Feb. 2012, APLNDC630-0000056522, at -770-71, -776.

[110] ███████████████████

[111] ██████████████████████████



67.

### E. Apple's Patents

68.     In this Section, I provide basic information about the Asserted Patents and the Patented Inventions.  For ease of reference, **Exhibit 6** displays the titles, Asserted Claims, issue dates, and expiration dates of the Asserted Patents.

69.     I have obtained my understanding of the Patented Inventions and the benefits they provide to users of smartphones and tablets based on my review of the technical declarations and briefs submitted during the preliminary injunction phase of the case, preliminary conversations



with counsel about the patents, my review of the deposition testimony of Apple witnesses,[119] conversations with technical experts retained by Apple in this matter,[120] and through my own use of the iPhone and the iPad, and the patented features as they exist on those products.[121]   My discussion of these features in the subsection below is based on the understanding I received from these sources; I do not express any independent opinion about the scope or meaning of the patent claims.

70.      I understand the Patented Inventions relate to enhancing the user experience on smartphones, tablet computers, and other mobile devices.  As the information in this Section demonstrates, each of the Patented Inventions delivers distinct benefits to consumers and, thus, enhances the user interface and enriches the user experience in a variety of ways.

### 1.  U.S. Patent No. 7,761,414 ("the '414 Patent")

71.      The '414 Patent issued on July 20, 2010, to Apple.  The patent is titled "Asynchronous Data Synchronization amongst Devices."  I understand that Apple accuses Samsung of infringing claims 11 and 20 of the '414 Patent.

72.      I understand that the Patented Invention of the '414 Patent allows users to continue to use applications ("apps", as they are commonly labeled) while data related to those apps that are stored on their smartphones is synchronized in the background with data stored elsewhere, on a remote computer or server.  For example, the Patented Invention allows a user to

---

[119] See, e.g., Deposition of Greg Joswiak, Transcript, Apr. 17, 2012; Deposition of Greg Joswiak, Transcript, Jul. 9, 2013; Deposition of Arthur Rangel, Transcript, Apr. 5, 2012; Deposition of Arthur Rangel, Transcript, June 25, 2013; Deposition of Michael Tchao Transcript, June 28, 2013; Deposition of Phil Schiller, Transcript, July 23, 2013; Deposition of Stan Ng, Transcript, July 2, 2013; Trial Testimony of Phil Schiller, Case No. 11-cv-1846, N.D. Cal., Aug. 3, 2012.

[120] Conversation with Professor Alex C. Snoeren; Conversation with Dr. Todd Mowry; Conversation with Professor Andrew Cockburn.

[121] I understand that an Order by the Court requires each party to assert at trial no more than five claims in total, which can be from five or fewer Asserted Patents.  Since I understand that Apple has not yet selected the patents it will assert at trial, I consider all six patents that it is currently asserting in my analysis.  I can readily adjust my damages calculations for the purposes of my testimony at trial after Apple announces which of the Asserted Patents it will not assert at trial.  Should any change in my damages analysis be required by the reduction in Asserted Claims for trial, I intend to supplement my analysis as needed.

access and edit a list of contacts on her smartphone while the phone is sending information about those contacts to the user's work computer. Without this feature, a user would either have to wait to use the app in question while data is being synchronized or forgo synchronization while using an app.

73.     As a reminder of the claimed benefit of this Patented Invention, I sometimes refer to it below as the "background synchronization" patent.

74.     I understand that Apple's iPhone, iPad, and iPod Touch products with iOS 3 and later practice the '414 Patent by allowing users to use and interact with an application while data from the same application is being synchronized.[122]

### 2.  U.S. Patent No. 5,946,647 ("the '647 Patent")

75.     The '647 Patent issued on August 31, 1999, to Apple. The patent is titled "System and Method for Performing an Action on a Structure in Computer-Generated Data." I understand that Apple accuses Samsung of infringing claims 1, 4, 6, 8, and 9 of the '647 Patent.

76.     I understand that the Patented Invention of the '647 Patent enables automatic detection of certain types of data within documents and enables users to choose among multiple actions to perform on the selected data. For example, when users view text on their smartphones (for example in a text message), the Patented Invention enables phone numbers or email addresses displayed in the text message to be detected automatically and offers users multiple actions such as calling or texting the numbers, emailing the addresses shown, or adding the information to the user's contacts folder. I understand that this Patented Invention enhances the user's ability to easily recognize and select data such as email addresses, phone numbers, and postal addresses in the text of a web page, email, or documentand store or use that data in an appropriate application.

77.     As a reminder of the claimed benefit of this Patented Invention, I sometimes refer to it below as the "data structures" patent.

78.     I understand that Apple's iPhone, iPad, and versions of the iPod Touch after iOS 3 practice the '647 Patent, allowing users to tap on data structures such as phone numbers in order to undertake multiple actions such as using or storing the data.[123]

---

[122] Apple's Supplemental Response to Samsung's Interrogatory No. 25, served July 15, 2013.

### 3. U.S. Patent No. 6,847,959 ("the '959 Patent")

79.     The '959 Patent issued on January 25, 2005, to Apple.  The patent is titled "Universal Interface for Retrieval of Information in a Computer System."  I understand that Apple accuses Samsung of infringing claims 24 and 25 of the '959 Patent.

80.     I understand that the Patented Invention of the '959 Patent allows users to use a single search interface to find information from different sources of information, for example data stored on their smartphones as well as information on the internet, by providing the search request to software modules that apply various rules of thumb for searching the different sources to find desirable results.

81.     I understand that the '959 Patent is practiced by "Siri," the personal assistant that Apple introduced in the iPhone 4S.[124]  Through Siri, the Patented Invention allows users to request information through their iPhones in a single unified search.[125]

82.     As a reminder of the claimed benefit of this Patented Invention, I sometimes refer to it below as the "universal search" patent.

83.     I understand that Apple's iPhone 4S and later models, the New iPad (the fourth generation iPad) and iPad Mini, and iPod Touch running iOS 6 practice the '959 Patent.[126]

### 4. U.S. Patent No. 8,014,760 ("the '760 Patent")

84.     The '760 Patent issued on September 6, 2011, to Apple.  The patent is titled "Missed Telephone Call Management for a Portable Multifunction Device."  I understand that Apple accuses Samsung of infringing claim 10 of the '760 Patent.

85.     I understand that the Patented Invention of the '760 Patent provides smartphone users with a more intuitive and transparent user interface for managing missed calls.  I understand generally that it provides a missed call list containing two interactive portions of the screen corresponding to each missed call. Performing a gesture on one area, such as a picture of the missed caller, calls the missed caller back; performing a gesture on the other area, such as the

---

[123] Apples' Supplemental Response to Samsung's Interrogatory No. 25, served July 15, 2013.

[124] Conversation with Professor Alex C. Snoeren.

[125] Conversation with Professor Alex C. Snoeren.

[126] Apple's Supplemental Response to Samsung's Interrogatory No. 25, served July 15, 2013.

missed caller's name or phone number, takes the user to a new screen that displays all of the missed caller's contact information.[127]  From the new screen, the user can call, text, or email the missed caller.[128]  I understand that this provides a convenient user interface for managing missed calls.

86.    As a reminder of the claimed benefit of this Patented Invention, I sometimes refer to it below as the "missed called management" patent.

87.    Since this patent specifically concerns the management of phone calls, it – unlike the other Asserted Patents, which are practiced by both smartphones and tablets – is practiced only by smartphones.  I understand that all versions of Apple's iPhone practice the asserted claims of the '760 Patent.[129]

### 5.  U.S. Patent No. 8,046,721 ("the '721 Patent")

88.    The '721 Patent issued on October 25, 2011, to Apple.  The patent is titled "Unlocking a device by performing gestures on an unlock image."  I understand that Apple accuses Samsung of infringing claim 8 of the '721 Patent.

89.    I understand that the Patented Invention of the '721 Patent enables users to prevent unintentional use or activation of their smartphones by unlocking the touchscreen interface only when they slide an image from a specific position on the lock screen to another specific position on the screen.[130]  The Patented Invention thus provides a simple and easy way for a user to unlock their phone.

90.    As a reminder of the claimed benefit of this Patented Invention, I sometimes refer to it below as the "slide-to-unlock" patent.

91.    I understand that all versions of Apple's iPhone, iPad, and iPod Touch practice the '721 Patent.[131]  The products practice the '721 Patent through the iconic slide-to-unlock

---

[127] Conversation with Professor Andrew Cockburn.

[128] Conversation with Professor Andrew Cockburn.

[129] Apple's Supplemental Response to Samsung's Interrogatory No. 25, served July 15, 2013.

[130] Conversation with Professor Andrew Cockburn.

[131] Apple's Supplemental Response to Samsung's Interrogatory No. 25, served July 15, 2013.

feature found on the lock screen of all Apple devices whereby users can unlock the device by sliding a tab from left to right across the bottom of the display.

### 6.  U.S. Patent No. 8,074,172 ("the '172 Patent")

92.     The '172 Patent issued on December 6, 2011, to Apple.  The patent is titled "Method, System, and Graphical User Interface for Providing Word Recommendations."  I understand that Apple accuses Samsung of infringing claim 18 of the '172 Patent.

93.     I understand that the Patented Invention of the '172 Patent allows users to replace text they typed with automatically recommended text when, for example, they press a delimiter, such as the space key,[132] to move on to the next word they want to type or enter a period to end a sentence.[133]  I understand that this Patented Invention makes it easier and faster for a user to enter words and other text using the touchscreen keyboard because typographical errors are automatically corrected.[134]

94.     As a reminder of the claimed benefit of this Patented Invention, I sometimes refer to it below as the "automatic word correction" or "autocorrect" patent.

95.     I understand that all versions of Apple's iPhone, iPad, and iPod Touch practice the '172 Patent.[135]  In **Exhibit 7**, I list the Samsung products that Apple accuses of infringing this patent.

### F.  Samsung's Response to Apple's Success

#### 1.  The Shift in Samsung's Design Strategy

96.     The introduction of the iPhone had a profound effect on Samsung.  Samsung soon realized that the iPhone had rendered all of its past smartphones obsolete, as one Samsung usability study after another showed marked consumer preference for the iPhone.  Samsung reacted by changing its entire design strategy from one that had previously focused on offering a diverse array of features, to one emulating the iPhone, and focusing on simplicity, ease of use,

---

[132] By "key," I mean here the virtual keys that comprise the keyboards of touchscreen devices.

[133] Conversation with Professor Andrew Cockburn.

[134] Conversation with Professor Andrew Cockburn.

[135] Apple's Supplemental Response to Samsung's Interrogatory No. 25, served July 15, 2013.

**Highly Confidential – Attorneys' Eyes Only**
**Subject to Protective Order**

and the overall end user experience.  As discussed below, Samsung used the iPhone as a key design benchmark throughout that process.  Samsung evaluated the iPhone user interface extensively, criticized its own phones as inferior in comparison, and did everything it could to emulate the iPhone experience.

97.    Samsung took exceptional note of the iPhone launch and the reception the iPhone received in the technology community and with consumers







103.    By 2010, Samsung was still coming up short in its efforts to challenge the iPhone user experience.  In his February 2010 email summarizing an Executive Conference, Mr. Bong Hee Kim and others stated:

> I hear things like this: Let's make something like the iPhone.
>
> - When everybody (both consumers and the industry) talk about UX, they weigh it against the iPhone. The iPhone has become the standard. That's how things are already.
>
> Do you know how difficult the Omnia is to use? When you compare the 2007 version of the iPhone with our current Omnia, can you honestly say the Omnia is better? If you compare the UX with the iPhone, it's a difference between Heaven and Earth.[153]
>
> * * *
>
> - For goodness sake let's get things done while working within the realm of common sense. When it comes to UX, fix things that make sense first. I've always said this, haven't I? A UX that can be



[153] Email from Bong-Hee Kim, dated Feb. 11, 2010, SAMNDCA10247373 (translation), at -374.

used by anyone from six year olds to senior citizens. Ease of use is the answer.[154]

\* \* \*

I have confidence in our products' H/W, in their exterior design, and in their quality. But when it comes to the ease of use of our UX, I lack such confidence.

Influential figures outside the company come across the iPhone, and they point out that "Samsung is dozing off."

All this time we've been paying all our attention to Nokia, and concentrated our efforts on things like Folder, Bar, Slide, yet when our UX is compared to the unexpected competitor Apple's iPhone, the difference is truly that of Heaven and Earth.

**It's a crisis of design**.[155]

104.    Similarly, in a March 2010 memo "to UX Executives," Mr. Sung Sik Lee, lead UX designer at SEC, asserted that consumers were losing patience with old, hard to use designs that took many steps and that user experience was more important than having many features.[156]



**2. Samsung's Substantial Smartphone and Tablet Marketing Efforts**

108.    Samsung has also devoted substantial resources to marketing its smartphone and tablet devices to consumers in the United States. ██████████████████████████████ ████████████████████████████████████████████ ██████████████████.

109.    Based on financial data provided by Samsung, Samsung's research and development (R&D) expenses allocated for the Accused Products sold in the United States was approximately ████████████████████████ ██████ █ ████████████████████████████████████ █ ████████████████████████████████████ ███████████████ █████.

**3. Samsung's Competition with the iPhone**

110.    ████████████████████████████████████ ██████████████ █  In fact, the competition between them has only intensified in the past 15 months, as demonstrated by documents from both Samsung and Apple as well as market share data.

111.     Samsung currently offers a broad array of smartphones that primarily run on Google Inc.'s Android platform.[164]   Android is a Linux-based operating system developed for mobile devices that Google releases under an open-source license.[165]   The first Android-based phone was released in October 2008.[166]   As of the fourth quarter of 2012, Android was the most widely used smartphone platform in the U.S.[167]   Samsung launched its first Android smartphone, known as the Samsung Galaxy or the Samsung i7500, in June 2009.[168]   At the time, Lee Young-hee, Samsung's head of marketing for its mobile division, explained that in an effort to gain a higher share of smartphone sales, Samsung would put [its] whole focus and strategy on smartphones" and would "probably be the number one in delivering the biggest portfolio of smartphones to the market next year."[169] Since then, Samsung has introduced a broad line of Android smartphones at various price points, including the 16 smartphone models accused in this matter.  This broad line of smartphones include at least 21 models from the "Galaxy" line of products,[170] which includes one of Samsung's most popular series of smartphones, the "Galaxy S" series.  The Galaxy S series is considered Samsung's high-end series of

---

[164] The majority of Samsung's devices run Android, but Samsung also sells certain non-Android models.  See, e.g., "Samsung Focus," Samsung.com (http://www.samsung.com/us/mobile/cell-phones/SGH-I917ZKAATT).

[165] "Android, the world's most popular mobile platform," Google Inc. (http://developer.android.com/about/index.html); "Licenses," Google Inc. (https://source.android.com/source/licenses.html).

[166] "T-Mobile Android HTC Dream Launch Details," Gizmodo (http://gizmodo.com/5039741/t+mobile-android-htc-dream-launch-details-oct-13-199-w-2+year-contract-only).

[167] "IDC CQ4 2012 Mobile Phone and Smartphone Market Share by Country," Feb. 15, 2013, APLNDC630-0001319732, at -732.

[168] Simon Hill, "A history of Samsung's Galaxy phones and tablets, from the S1 to the S4," Digital Trends, Mar. 14, 2013 (http://www.digitaltrends.com/mobile/history-of-samsungs-galaxy-phones-and-tablets/).

[169] "Samsung feels the heat from iPhone," Financial Times, Nov. 30, 2009 (http://www.ft.com/intl/cms/s/0/bc40300c-dddb-11de-b8e2-00144feabdc0.html).

[170] Dan Rowinski, "A Brief History of the (Samsung) Galaxy," Readwrite, Apr. 26, 2012 (http://readwrite.com/2012/04/26/a-brief-history-of-the-samsung-galaxy).

smartphones[171] and includes two of its best-selling accused models, the Galaxy S II and the
Galaxy S III.

112.    Samsung positions its smartphones, including the Galaxy and Galaxy S lines, as
alternatives to the iPhone.[172]  This strategy has proved profitable for Samsung whose previously
struggling smartphone business has improved significantly since 2009.  From the year prior to
the second quarter of 2013, Samsung reported a 50 percent rise in profit to 7.77 trillion won, or
6.9 billion U.S. dollars.[173]  As the documents and data below demonstrate, much of Samsung's
success has intentionally been to the detriment of Apple, and Samsung continues to be a
formidable competitor in the smartphone market.

### a.  Samsung Targets the iPhone

113.    In 2011 and early 2012, Samsung's documents showed that "the US market [is]
becoming a two horse race between Apple and Samsung"[174] that spans "across Smartphones,
Tablets, [and] Accessories."



---

[171] Zachary Lutz, "Samsung debuts new Galaxy lineup, refines naming strategy along the
way," Engadget, Aug. 24, 2011 (http://www.engadget.com/2011/08/24/samsung-debuts-new-
galaxy-lineup-refines-naming-strategy-along/).

[172] Tanzina Vega & Brian X. Chen, "Samsung-Apple Fight Moves to Marketing," *N.Y. Times*,
Sept. 18, 2012 (http://www.nytimes.com/2012/09/19/business/media/samsung-apple-fight-
moves-to-the-marketing-arena.html).

[173] Eric Pfanner, "Samsung's Profit Rises, but So Does the Competition," *N.Y. Times,* July 25,
2013 (http://www.nytimes.com/2013/07/26/technology/samsungs-profit-rises-but-so-does-the-
competition.html).

[174] "STA Competitive Situation Paradigm Shift: HQ CFO," Feb. 16, 2012,
SAMNDCA11545927, at -934.





114.     Samsung viewed Apple not only as one competitor among many but as a singular threat to Samsung's smartphone business.





118. 

119.    It is not surprising that Samsung targets Apple so heavily because Apple is Samsung's largest smartphone competitor in the U.S. market.[197]  And the two companies compete against each other in every segment of the smartphone market.

---

[196]

[197] Deposition of Nick DiCarlo, Transcript, June 26, 2013, at 19:6-16.





121.    STA's VP of Product Planning and Product Marketing confirmed that Apple and Samsung compete at the entry, mass, and premium tier levels and that Samsung tries to be competitive along all three tier levels.[201]

### b. Apple's Recognition of Samsung as a Top Competitor in the Smartphone Market

122.    A review of Apple's documents and deposition testimony from its executives and managers confirms that Apple views Samsung as a top competitor.  For example, a 2013 internal Apple iPhone presentation lists ███████████████████████████████████

███████  ███████████████████████████████████████

---

[201] Deposition of Nick DiCarlo, Transcript, June 26, 2013, at 272:18-274:12, 274:25-275:8, 278:12-14, 280:5-7.

[202] "iPhone Offsite," Jan. 17, 2013 APLNDC630-0001467518, at -534.



123.    Additionally, Apple surveys of iPhone buyers show that since the end of 2011,

[204] See, e.g., "iPhone Buyer Survey," FY13 Q2, APLNDC630-0000937009, at -048; "iPhone Buyer Survey," FY13 Q1, APLNDC630-0001233406, at -440; "iPhone Buyer Survey," FY12 Q4, APLNDC630-0001233115, at -140; "iPhone Buyer Survey," FY12 Q1, APLNDC630-0000149470, at -497.

[205] "Smartphone Buyers," FY12 Q4, APLNDC630-0001467057, at -075-76, -119-120.







███████ █ Greg Joswiak, Apple's Vice President, iPhone, iPod and iOS Product Marketing, testified that ██████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████

125.    Importantly, Apple's documents illustrate that ██████████████ ████████████████████████████████████████████████ ███████████████████████████████████ ██ █████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

126.    Apple ████████████████████████████████████████ ████████████████████████ █████████████████████ ████████████████ █████ ████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ ████████████████████

---

[207] Email from Stan Ng to Kaiann Drance and others, dated Jan. 20, 2012, APLNDC630-0000135098, at -099.

[208] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 35:16-21.



[211] "iPhone Competitive Tracker," May 16, 2013, MAL-000081879, at -879-80, -884; "iPhone Competitive Tracker," Dec. 26, 2011, APLNDC630-0000128163, at -0163, -0165; "Samsung's Brand Update," Dec. 2012, APLNDC630-0001313179 at *82; "Advertising Update," APLNDC630-0001599759, at -790-92; "Smartphone Market Context," MAL-000072130, at -132.

[212] "Advertising Update," APLNDC630-0001599759, at -790-92.

[213] "Advertising Update," APLNDC630-0001599759, at -790-92; "Smartphone Market Context," MAL-000072130 at -132.

███████████████████████████████████

███████████████████████████████████

### c. The Smartphone Market Becomes a "Two-Horse Race"

127.    Consistent with the documents cited above, smartphone sales information compiled by industry experts IDC confirm that the smartphone market has become a "two-horse race," with Apple and Samsung significantly outdistancing other participants.

128.    **Exhibit 8** presents quarterly industry data on Apple and Samsung's U.S. smartphone shares (measured by units shipped) from mid-2009, when Samsung introduced its first Android smartphone,[215] through the fourth quarter of 2012.  As this data shows, Samsung has experienced a significant increase in market share since it launched its first Android-powered phones.  **Exhibits 8-A** and **8-B** provide more detail regarding Samsung's dramatic rise in market share over this time and include shares of other smartphone suppliers that Samsung has outpaced.  As **Exhibit 8-B** shows, Apple and Samsung have been number one and two, respectively, in share of smartphone shipments each quarter from the fourth quarter of 2011 through the fourth quarter of 2012.

129.    Other third-party reports support these conclusions and note that Apple and Samsung have become the two primary players in the smartphone market.  A February 2011 industry report stated that "[t]he US mobile market is looking more and more like a two-horse race between Apple and Android, as BlackBerry's lead slips away."[216]  The following year, a January 26, 2012, report by Strategy Analytics stated that "[w]ith global smartphone shipments nearing half a billion units in 2011, Samsung is now well positioned alongside Apple in a two-horse race at the forefront of one of the world's largest and most valuable consumer electronics

---

[214] "Galaxy Brand Audit," Aug. 20, 2012, APLNDC630-0001421150, at -163.

[215] See, e.g., "Samsung's First Android-Powered Phone, Samsung Moment with Google, Coming Soon to America's Most Dependable 3G Network," Sprint.com, Oct. 7, 2009 (http://newsroom.sprint.com/article_display.cfm?article_id=1253).

[216] "Smart and Getting Smarter: Key Mobile Device Trends for Marketers," eMarketer, Feb. 2011, at p. 2.

markets."[217]  Later in 2012, other market observers noted that "[m]ore and more, the smartphone sector is looking like a two-horse race between Apple and Samsung."[218]

130.    According to IDC, in the fourth quarter of 2012, ████████████████ ████████████████████████████████████████████████ ██ ███████████ ████████████████████████████████████████████████

131.    The same is true with respect to profits from U.S. smartphone sales.  In the first quarter of 2013, Canaccord Genuity, a research firm, estimated that Apple captured 57% of global smartphone industry profits, which "left 43 percent for the taking.  And Samsung . . . took all of it—leaving nothing for BlackBerry, Nokia, or anyone else competing for the currently

---

[217]  Chloe Albanesius, "Smartphone Loyalty Runs Deep, Especially Among the Apple Faithful," PCMag.com, November 25, 2011 (http://www.pcmag.com/article2/ 0,2817,2396879,00.asp). See also Rolfe Winkler, "Apple Pulls Ahead of Samsung by a Nose," Wall Street Journal, Jan. 27, 2012 (http://blogs.wsj.com/overheard/2012/01/27/apple-pulls-ahead-of-samsung-by-a-nose/): "Apple and Samsung have turned the smartphone war into a two-horse race"; Sarah Perez, "Apple Overtakes Samsung as World's Largest Smartphone Vendor in Q4," Jan. 27, 2012 (http://techcrunch.com/2012/01/27/apple-overtakes-samsung-as-worlds-largest-smartphone-vendor/): relying on Strategy Analytics report to reach same conclusion, and noting that "Apple won the quarter, not the year"; see also Dwight Silverman, "Has Samsung Robbed Apple of Its Cool?," Houston Chron. TechBlog, Dec. 15, 2011 (http://blog.chron.com/techblog/2011/12/has-samsung-robbed-apple-of-its-cool-3/); Lance Whitney, "Samsung Outshines Apple in Smartphone Shipments, Market Share," CNET News, Nov. 4, 2011 (http://news.cnet.com/8301-13579_3-57318644-37/samsung-outshines-apple-in-smartphone-shipments-market-share/): "Among all smartphone manufacturers, Samsung earned the top spot . . . . Samsung's strong lineup of Android phones drove overall demand…"; Miyoung Kim, "Nimble Apple Rivals Building Momentum; Departure Opens Door to Samsung," Ottawa Citizen, Aug. 26, 2011, at p. F3: "Hong Won-pyo, executive vice president of Samsung's mobile division, told his team this week he was confident Samsung could soon overtake Apple in the smartphone market…"; Ingrid Lunden, "Updated: Samsung Rules Smartphone Shipments; Nokia Still Tops Overall in Q3," paidContent.org, Oct. 28, 2011 (http://paidcontent.org/article/419-strategy-analytics-samsung-has-taken-the-smartphone-crown-from-apple/).

[218] Eric Savitz, "Apple and Samsung Over 100% of Total Smartphone Profits," Forbes, July 30, 2012 (http://www.forbes.com/sites/ericsavitz/2012/07/30/apple-and-samsung-over-100-of-total-smartphone-profits).

[219] IDC Mobile Phone and SmartPhone Market Share by Country, CQ4 2012, APLNDC630-0001319732, at -732.

mythical title of 'third smartphone platform.'"[220]  In the second quarter of 2013, Samsung continued to gain ground.  While Apple's estimated share of industry profits decreased to 53%, Samsung's share increased to 50%, meaning the two companies accounted for over 100% of industry profits after deducting the losses of other companies such as Nokia, Blackberry, and Motorola.[221]

132.  As the above indicates, other smartphone suppliers have lagged behind.  In the first quarter of 2012, Nokia—which for years shipped more mobile phones than any other company[222]—ceded the top spot in worldwide mobile phone market share to Samsung, largely as a result of Samsung's gains in the smartphone market in particular.[223]  In terms of smartphone shipments in that quarter, Samsung held the top spot with 29.1% of the global market share, while Apple garnered 24.2%; no other smartphone maker individually held more than Nokia's 8.2%.[224]  The same is true in the United States.  In the three-month period from February to May 2013, smartphone makers HTC, Motorola, LG, and BlackBerry (formerly RIM) all experienced declines, with none achieving 10% market share.[225]

---

[220] John Paczkowski, "Apple, Samsung Share of Handset Industry Profits Declines to 10 Percent," AllThingsD, May 7, 2013 (http://allthingsd.com/20130507/apple-samsung-share-of-smartphone-industry-profits-declines-to-100-percent).

[221] Patrick Seitz, "Apple leads in smartphone profit, but Samsung gaining," Investors.com, July 31, 2013 (http://news.investors.com/technology-click/073113-665880-apple-leads-in-smartphone-profit-unit-share-slips.htm).

[222] IDC, "Worldwide Smartphone Market Continues to Soar, Carrying Samsung Into the Top Position in Total Mobile Phone and Smartphone Shipments, According to IDC," May 1, 2012 (http://www.idc.com/getdoc.jsp?containerId=prUS23455612).

[223] IDC, "Worldwide Smartphone Market Continues to Soar, Carrying Samsung Into the Top Position in Total Mobile Phone and Smartphone Shipments, According to IDC," May 1, 2012 (http://www.idc.com/getdoc.jsp?containerId=prUS23455612).

[224] IDC, "Worldwide Smartphone Market Continues to Soar, Carrying Samsung Into the Top Position in Total Mobile Phone and Smartphone Shipments, According to IDC," May 1, 2012 (http://www.idc.com/getdoc.jsp?containerId=prUS23455612).

[225] Joan E. Solsman, "Smartphone market share consolidates at top, study shows," CNet.com, June 28, 2013 (http://news.cnet.com/8301-1023_3-57591582-93/smartphone-market-share-consolidates-at-top-study-shows).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

133.   As discussed above, Samsung business documents echo the sentiment that the
█████████████████████████████████████████████████████   ████████
███████████████████████████████████   ██████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████

134.   The same is true with respect to competition among Apple's iOS mobile platform
and Google's Android platform, used on Samsung's Android devices.   █████████████
████████████████████████████████████████████████████████████████
█████████████████████   █████████████████████████████████████████
████████████

   **4.  Samsung's Competition with the iPad**

      **a.  Samsung Targets the iPad**

135.   As in the smartphone market, Samsung pays great attention to Apple in the tablet
market and aims to take away market share from Apple.   ████████████████████████
█████████████████████████   ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████   █████████████████████████████
█████████████████████████████████████████████████████████

─────────────────────────

█   ████████████████████████████████████████████████████
█   ████████████████████████████████████████████████████
██
█   ████████████████████████████████
█   ████████████████████████████████
█   ████████████████████████████████
█   ███████████████████████████████████████
█   ████████████████████████████████████████████████



137.    In the marketplace, Apple and Samsung tablets compete across multiple price points.

### b.  Apple's Recognition of Samsung as a Top Competitor in the Tablet Market

138.    Apple recognizes Samsung as an increasingly competitive threat in the tablet market.  An Apple report analyzing Samsung's brand recognizes that



139. Other internal documents similarly show ███████████████

140. Like Apple's surveys of iPhone buyers, Apple's recent surveys of iPad buyers show ███████████████

141. The quintessential economic indication that one supplier's products represent relatively strong competition for those of another supplier is that ██████████ ████████████████████████████ And indeed it is the case here, as Apple identifies ████████████████████

---

241 "Samsung's brand update," Dec. 2012, APLNDC630-0001313179, at -181.

242 iPad Offsite, Feb. 1, 2013, APLNDC630-0001313979, at -4017-18, -4020-21.

243 Email from Michael Tchao to team, dated Mar. 22, 2011, APLNDC630-0001043240: ████████████████████████.

244 Deposition of Michael Tchao, Transcript, June 28, 2013, at 46:16-17, 59:3-5.

245 See, e.g., "iPad Tracking Study, FY13-Q2 Report," May 2013, APLNDC630-0001896300, at -388-390; "iPad Tracking Study, FY13-Q1 Report," Feb. 2013, APLNDC630-0000870458, at -547-549; "iPad Tracking Study, FY12-Q4 Report," Nov. 2012, APLNDC630-0000870714, at -817-818; "iPad Tracking Study FY12-Q3 Report," Aug. 2012, APLNDC630-0000177303, at -310, -402-403.

246 See, e.g., "iPad Tracking Study," FY13 Q2, APLNDC630-0001896300, at -391-392.

247 "Good Technology Device Activations Report," Q4 2012, APLNDC630-0001313206, at -207, -214.

248 See, e.g., ████████████████████████
████████████████████████

### c. Apple's Share of the Tablet Market Has Declined in Light of Competing Android Tablets, Including Samsung's

142.  **Exhibit 9** presents quarterly industry data on Apple's and Samsung's U.S. tablet shares (measured by units shipped) from the second quarter of 2010  through the fourth quarter of 2012.[249]  **Exhibits 9-A** and **9-B** provide more detail, including the shares of other suppliers of tablets.

143.  As **Exhibit 9** demonstrates, Apple has been the clear leader in tablet shipments since it launched the iPad in April 2010.[250]  In the fourth quarter of 2012, for example, Apple commanded a ████████ of media tablet sales.[251]  Apple's tablets include the iPad mini, iPad 2, and iPad with Retina display,[252] which all run iOS.[253]  Through the Apple store, the iPad mini is priced from $329, the iPad 2 from $399, and the iPad with Retina display from $499.[254]  AT&T, Verizon, and Sprint also carry Apple tablets.[255]

144.  Since the introduction of the iPad, which led to a significant expansion of tablet sales in the United States,[256] other vendors have introduced their own tablet products.  According

---

[249] Samsung began selling Android tablets in the latter part of 2020, See, *e.g.*, Rory Cellan-Jones, "Galaxy Tab unveiled as Samsung's first tablet computer," BBC, Sept. 2, 2010 (http://www.bbc.co.uk/news/technology-11163687).

[250]  Brad Stone, "Across the Country, Fans Gather for iPad," *New York Times*, Apr. 3, 2010 (http://www.nytimes.com/2010/04/04/technology/04ipad.html?_r=0).

[251] See **Exhibit 9-A**.

[252] "Shop iPad," Apple (http://store.apple.com/us/ipad/compare).

[253] "iOS – The world's most advanced mobile operating system," Apple (http://www.apple.com/ipad/ios).

[254] "Shop iPad," Apple (http://store.apple.com/us/ipad/compare).

[255] "Shop iPad," Apple (http://store.apple.com/us/ipad/compare).

[256] "Apple Sells Over 300,000 iPad First Day," Apple, Apr. 5, 2010 (http://www.apple.com/pr/library/2010/04/05Apple-Sells-Over-300-000-iPads-First-Day.html); See also, e.g., Tim Worstall, "iPad: One of the Most Successful Products Ever," Forbes, July 2, 2011 (http://www.forbes.com/sites/timworstall/2011/07/02/ipad-one-of-the-most-successful-products-ever).

to IDC, in the fourth quarter of 2012, sales made by ████████████████████████
████████████████████████████████████████████████

145.    Over this time, Samsung has risen to become the second-largest seller of tablets in the world.  As of the second quarter of 2013, Samsung had achieved a 21.6% global tablet market share behind Apple's 42.7%, representing a 295% year-over-year growth for Samsung compared to Apple's 14.2% year-over-year decline.[258]  Samsung also has achieved significant growth in the United States, increasing its tablet market share to ████ in the fourth quarter of 2012 from ████ in the fourth quarter of 2011, according to IDC.[259]  Generally priced between $300 and $500, i.e., comparably to iPads, Samsung's tablets include certain Accused Products (the Galaxy Note 10.1 and the Galaxy Tab II 10.1), the Samsung ATIV Smart PC, and other Galaxy Note and Galaxy Tab devices.[260]  Samsung tablets typically run the Android operating system and are offered through cellular carriers, such as AT&T, Verizon, Sprint, and T-Mobile, or through retailers.[261]  According to Apple's FY 12-Q3 iPad Tracking Study Report from August 2012, ████████████████████████████████████████████████████
████████████████████████ ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

---

[257] IDC Q4 2012 Media Tablet Market Share Report, Feb. 11, 2013, APLNDC630-0001314083, at -083.

[258] "Small tablets drive big share gains for Android," Canalys, Aug. 1, 2013 (http://www.canalys.com/newsroom/small-tablets-drive-big-share-gains-android).

[259] IDC Q4 2012 Media Tablet Market Share Report, Feb. 11, 2013, APLNDC630-0001314083, at -083.

[260] See, e.g., Galaxy Tabs, Samsung (http://www.samsung.com/us/mobile/galaxy-tab/all-products).

[261] See, e.g., Galaxy Tabs, Samsung (http://www.samsung.com/us/mobile/galaxy-tab/all-products).

[262] "iPad Tracking Study FY12-Q3 Report," Aug. 2012, APLNDC630-0000177303, at -402.

[263] "iPad Tracking Study FY12-Q3 Report," Aug. 2012, APLNDC630-0000177303, at -404.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## III.   DAMAGES ANALYSIS: LOST PROFITS PLUS REASONABLE ROYALTIES

146.   I understand that U.S. patent law seeks to compensate the patent holder for financial harm incurred as a result of the alleged infringement.  Specifically, Section 284 of the Patent Act (35 U.S.C. § 284) provides that, when a patent has been found to be valid and infringed, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

147.   I understand that, to prove it sustained lost profits damages, Apple must demonstrate that Samsung's infringement was a cause of Apple's losses; that is, Apple must demonstrate a reasonable likelihood that, "but-for" Samsung's conduct, Apple would have made sales that Samsung made with its infringing products.

148.   In my opinion, Apple sustained lost profits in the form of lost sales as a result of Samsung's infringement of the Asserted Patents.  To form my lost profits opinion, I applied  an economic analysis under the standards for lost profits on lost sales as set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*[264]  It is my understanding that under the *Panduit* test, a patentee is entitled to lost profits if it can establish four factors: 1) existing demand for the patented product; 2) an absence of acceptable non-infringing substitutes for the patented inventions; 3) manufacturing and marketing capacity to exploit demand for the product; and 4) the amount of lost profit that the patentee would have made.

149.   In my opinion, these factors are all satisfied in the current instance with respect to Samsung's infringement of the Asserted Patents for a *portion* of Samsung's accused sales.  I find that Apple has suffered damages in the form of lost profits on lost sales of $653.7 million; that is, "but for" Samsung's infringement, Apple would have made ██████████████████████ ████████████████████████████████████████████████████████████

These lost profits damages extend from the beginning of the damages period, which is June 15,

---

[264] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F. 2d 1152 (6th Cir. 1978).

2011, for the '647 Patent[265] and February 8, 2012, for the other Asserted Patents,[266] through February, 2013, the date through which data have been produced.

150.    For those infringing Samsung sales for which I do not apply lost profits damages, I compute damages based on a "reasonable royalty" (as I understand the law requires).  To determine the applicable reasonable royalty, I analyze hypothetical licensing negotiations between Apple and Samsung with respect to the Asserted Patents and the Accused Products and also refine this analysis by considering the economic and financial considerations espoused in *Georgia-Pacific Corporation v. United States Plywood Corporation*.[267]  I determine reasonable royalty damages on Samsung infringing sales for which lost profits do not apply to total $838.2 million.

151.    Therefore, it is my opinion that Apple sustained damages as a result of Samsung's infringement of the Asserted Patents, through its sales of the accused products, is no less than $1,591.9 million.  This figure comprises ████████████████████████ and $938.2 million in reasonable royalty damages on units for which lost profits do not apply.

152.    Lost profits on Apple's lost sales (and Apple's damages in this case, more generally) are restricted along a number of important dimensions.  First, to the extent Apple obtains its lost profits, or a disgorgement of Samsung's profits, as a result of Samsung's infringement in the 1846 case, those sales may to some extent be removed from the damages base in this case.  Because the judgment in the 1846 case is on appeal and has yet to be satisfied, I have not yet made any adjustment to account for that effect.  Further, if Apple lost profits due to Samsung's infringement of one Asserted Patent, Samsung's infringing sales are removed when calculating damages owed on other Asserted Patents.  This approach ensures that lost

---

[265] June 2011 is the earliest month for which Samsung has provided sales data for the Accused Products in this litigation, though Samsung's sales data does not specify dates within particular given month.  Further, I understand that public records indicate that the Samsung Dart accused smartphone was released on June 15, 2011.  See, e.g., "Samsung Dart," PhoneArena.com (http://www.phonearena.com/phones/Samsung-Dart_id5542).

[266] This is the date on which Apple filed its Complaint in this matter, which is, I understand, the date Apple has been found to have given Samsung notice of infringement of all the Asserted Patents other than the '647 Patent, for which Apple gave notice on August 4, 2010.

[267] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

profits on lost sales are applied no more than once, and that Apple does not also receive reasonable royalty damages on Samsung units for which lost profits on lost sales have already been claimed.

### A.  Samsung's Accused Products

153.    As an initial matter, I identify the following Samsung products that, I understand, Apple currently accuses of infringing the Asserted Patents (collectively, "Samsung's Accused Products" or "the Accused Products"):

- Smartphones:
    - Admire, launched on August 22, 2011;[268]
    - Captivate Glide, launched on November 20, 2011;[269]
    - Conquer 4G, launched on August 21, 2011;[270]
    - Dart, launched on June 15, 2011;[271]
    - Galaxy Exhibit II 4G, launched on October 27, 2011;[272]
    - Galaxy Nexus, launched on November 17, 2011;[273]
    - Galaxy Note, launched on October 28, 2011;[274]
    - Galaxy Note II, launched on October 24, 2012;[275]

---

[268] "Samsung Admire now on MetroPCS shelves, can be yours for $130," Engadget.com, Aug. 22, 2011 (http://www.engadget.com/2011/08/22/samsung-admire-now-on-metropcs-shelves-can-be-yours-for-130).

[269] "Samsung Captivate Glide to AT&T," Phonedog.com (http://www.phonedog.com/2011/11/20/samsung-captivate-glide-to-at-t).

[270] "Sprint Makes It More Affordable to Experience 4G with the Aug. 21 Availability of SAMSUNG Conquer 4G," Samsung, Aug. 5, 2011 (http://www.samsung.com/us/news/19904).

[271] "Samsung Dart," PhoneArena.com (http://www.phonearena.com/phones/Samsung-Dart_id5542).

[272] "Samsung Exhibit II 4G," PhoneArena.com (http://www.phonearena.com/phones/Samsung-Exhibit-II-4G_id6488).

[273] "Samsung GALAXY Nexus," PhoneArena.com (http://www.phonearena.com/phones/Samsung-GALAXY-Nexus_id5595).

[274] "Samsung GALAXY Note," PhoneArena.com (http://www.phonearena.com/phones/Samsung-GALAXY-Note_id6116).

[275] "Samsung Galaxy Note II arrives at T-Mobile," PhoneArena.com, Oct. 24, 2012, (http://www.phonearena.com/news/Samsung-Galaxy-Note-II-arrives-at-T-Mobile_id35863).

- o  Galaxy Rugby Pro, launched on October 21, 2012;[276]

- o  Galaxy S II, launched on October 2, 2011;[277]

- o  Galaxy S II Epic 4G Touch, launched on September 16, 2011;[278]

- o  Galaxy S II Skyrocket, launched on November 6, 2011;[279]

- o  Galaxy S III, launched on June 21, 2012;[280]

- o  Illusion, launched on November 23, 2011;[281]

- o  Stratosphere, launched on October 13, 2011;[282]

- o  Transform Ultra, launched on October 7, 2011;[283]

- • Tablets:

- o  Galaxy Tab 2 10.1, launched on May 13, 2012;[284]

- o  Galaxy Note 10.1, launched on August 16, 2012;[285]

---

[276] Jessica Dolcourt, "Samsung Galaxy Rugby Pro toughens up AT&T for $100, CNet.com, Oct. 19, 2012 (http://reviews.cnet.com/8301-19736_7-57536232-251/samsung-galaxyrugby-pro-toughens-up-at-t-for-$100).

[277] "Samsung Galaxy S II makes its AT&T debut October 2nd for $199 on contract," Engadget.com, Sept. 21, 2011 (http://www.engadget.com/2011/09/21/samsung-galaxy-s-ii-makes-its-atandt-debut-october-2nd-for-199-on).

[278] "Samsung Galaxy S II Epic 4G Touch," TheVerge.com (http://www.theverge.com/products/galaxy-s-ii-epic-4g-touch/2462).

[279] "Samsung Galaxy S II Skyrocket unveiled: AT&T's take on 4G LTE," PhoneArena.com (http://www.phonearena.com/news/Samsung-Galaxy-S-II-Skyrocket-unveiled-AT-Ts-take-on-4G-LTE_id23358).

[280] "Samsung Galaxy S III Comes to Sprint, the Only Wireless Carrier to Offer the Device with Unlimited Data Pricing Plans and Google Wallet Pre-Loaded, on June 21," Sprint, June 4, 2012 (http://newsroom.sprint.com/article_display.cfm?article_id=2301).

[281] "Simplicity Meets Style With the Samsung Illusion from Verizon Wireless," Verizon Wireless, Nov. 22, 2011 (http://news.verizonwireless.com/news/2011/11/pr2011-11-22a.html).

[282] "First 4G LTE Smartphone With QWERTY Keyboard For Verizon Wireless; The SAMSUNG Stratosphere," Samsung (http://www.samsung.com/us/news/19927).

[283] "'Transform' Your Communications with the New Android-Powered Slide-Out QWERTY Phone from Boost Mobile and Samsung," Sprint, Sept. 15, 2011(http://newsroom.sprint.com/article_display.cfm?article_id=2042).

[284] Eliane Fiolet, "Samsung Galaxy Tab 2 1.1 Review," Ubergizmo.com, May 13, 2012 (http://www.ubergizmo.com/2012/05/samsung-galaxy-tab-2-10-1-review).

[285] "SAMSUNG GALAXY Note 10.1 Has Arrived; Game-Changing Device Hits U.S. Store Shelves Tomorrow," Samsung, Aug. 15, 2012 (http://www.samsung.com/us/news/20228).

154.    **Exhibit 10** reports Samsung's U.S. dollar and unit sales for these Accused Products and Samsung's total gross and incremental profits for them, with sub-totals for each Accused Product.  As mentioned above, **Exhibit 7** depicts which Accused Products are accused of infringing which Asserted Patents and the time periods during which Apple asserts that this infringement has taken place.

155.    I understand that the above is not a complete list of Samsung products that Apple contends infringe the Asserted Patents.  I understand further that, pursuant to an Order by the Court requiring Apple and Samsung to limit the number of products they are each accusing, Apple has removed certain products from its list of Accused Products, although Apple continues to contend that they infringe Asserted Patents.[286]

156.    I also understand that, pursuant to the Court requiring Apple and Samsung to limit the number of products they are each accusing, Apple (like Samsung) may be required to reduce the number of Accused Products to 10 before trial.  Since Apple has not yet determined the 10 Accused Products for which it will seek to prove infringement at trial, I assess damages for the full set of Accused Products listed above in this report.  Moreover, I understand that even when Apple does select 10 products, those products may be deemed representative of the dropped products, allowing Apple to still seek damages for the full set of Accused Products above.  In any event, because I assess damages on a product-by-product basis, it would be straightforward to revise my damages calculations, if necessary, to include only a subset of the currently Accused Products.

## B.  Assessment of Lost Profits Due to Apple's Lost Sales

157.    In this Section, I evaluate whether Apple lost sales, and, thus, profits, as a result of Samsung's infringement.  In this context, I undertake a "but for" analysis – that is, "but for" Samsung's alleged infringement, would Apple have made additional sales and profits?  One analytical framework under which to assess the suitability and quantum of lost profits is the *Panduit* test, mentioned above.  Under the *Panduit* test, a patentee is entitled to lost profits if it can establish four factors: 1) existing demand for the patented product; 2) an absence of acceptable non-infringing substitutes for the patented inventions; 3) manufacturing and

---

[286] I understand that, pursuant to the Court's Order, Apple has removed the Galaxy Player 4.0 and 5.0, and the Galaxy Tab 7.0 Plus and 8.9 from its list of Accused Products.

marketing capacity to exploit demand for the product; and 4) the amount of lost profit that the patentee would have made.  I have undertaken a *Panduit* test here, and determine that Apple lost profits due to a portion of Samsung's accused infringing sales.  For the sales for which lost profits do not apply, I assess and apply a reasonable royalty later in this Section.

### 1. *Panduit* Factor 1: Demand for the Patented Product

158.    Under this Factor, I identify the unit and dollar sales of products sold that incorporate the Patented Inventions, both Apple's and Samsung's.  I also assess the significance that the Patented Inventions have in consumer demand for Apple's products that incorporate the patents ("Patented Products") and for Samsung's Accused Products.  I find that commercial sales of Apple's Patented Products and Samsung's Accused Products have been extraordinarily high, and in my opinion, demand for these products is significantly influenced by the features afforded by the Asserted Patents.

### a. Sales of Products Incorporating the Asserted Patents

159.    Demand for Apple's Patented Products and Samsung's Accused Products in the present matter is exceptionally high:

- **Exhibit 10** depicts Samsung's total U.S. revenues and gross profits from its Accused Products for the period June 2011 through February 2013 and also separately for smartphones and tablets.

- **Exhibits 4** and **4-A** show that Apple's U.S. revenues from iPhones and iPod touches, which practice the Asserted Patents, total ████████████ from the second quarter of 2007 through the fourth quarter of  2012;

- **Exhibit 5** illustrates that Apple's U.S. revenues from iPads, which practice the Asserted Patents, total ████████████████ from the second quarter of 2010 through the fourth quarter of  2012;

- **Exhibits 4, 4-A and 5** together demonstrate that Apple's U.S. revenues from iPhones, iPod touches, and iPads total ████████████ from the second quarter of 2007 through 2012.

160.     As mentioned, Apple and Samsung are the largest sellers of smartphones in the

U.S., with combined shares of quarterly unit shipments in these categories ranging from ███████

██████████  of smartphones.  (See **Exhibit 8**.) ██████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████  (See **Exhibit 9-A**.)

### b.  The Asserted Patents Significantly Influence Demand

161.     The evidence I set forth above in Sections II.D and II.F shows that user

experience and ease of use are of critical importance to the demand for both Apple and

Samsung's products.  That same evidence further shows that both parties view user experience to

be at the heart of the undisputedly intense competition that I discuss in Sections II.F.3 and II.F.4.

162.     These facts alone – demand for the products as a whole, undisputed competition

between Apple's Patented Products and Samsung's Accused Products, and the clear connection

between demand and the user experience enabled by the patents – are sufficient to meet *Panduit*

factor 1.  In my opinion, the asserted patents positively impact functionality that customers

value, which demonstrates demand for the patented inventions, even if customers may not be

aware of the specific technology that enabled that functionality.[287]

163.     Here, Apple's patents clearly contribute to the user experience and ease of use of

both Apple's products and Samsung's Accused Products.  As discussed below, Apple sees its

Patented Inventions as making a core contribution to the ease of use that consumers look for in a

smartphone and that drives demand for Apple's products.[288]  Similarly, Samsung recognized that

its implementations of the Asserted Patents helped solve important ease-of-use and user-interface

issues that had plagued Samsung's ability to effectively compete in the modern smartphone (that

is, after the introduction of the iPhone) and tablet marketplaces.

---

[287] See, e.g., *Bose Corp. v. JBL, Inc.*, 112 F. Supp. 2d 138 (D. Mass. 2000).  In *Bose*, the value
consumers placed on speaker sound quality was deemed relevant to demand for the patent
(relating to a circuit design), even where they were not aware of the patent's role in the delivery
of that benefit.

[288] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 5:19-6, 7:10-13, 34:23-35:7.

164.    Finally, although specific evidence of consumer preference for the Patented Inventions is not required, that evidence nevertheless exists in this case.  As discussed below, Dr. John Hauser, a Professor of Marketing at the Sloan School of Management at Massachusetts Institute of Technology, conducted a rigorous survey that shows demand for each of Apple's patented features (or the price premium users would be willing to pay for those features) as well as the clear connection between each of Apple's Patented Inventions and demand for smartphones and tablets (or consumers' willingness to buy smartphones and tablets due to the incorporation of those Patented Inventions).[289]

### (1) Qualitative Evidence of the Importance of the Patented Features

165.    In this Section, I review additional evidence from Apple, Samsung, ▮▮▮▮ and other third parties that shows the significant contribution to demand for Apple and Samsung devices provided by the patented features.

### (a) Background Synchronization ('414 Patent)

166.    As mentioned in Section II.E above, I understand that the Patented Invention of the '414 Patent allows users to continue to use apps while data related to those apps that is stored on their smartphones is being synchronized in the background with data stored elsewhere, on a remote computer or server.

167.



168.    The invention of the '414 Patent allowing access to data on applications while that data is being synchronized can significantly improve user experience.  In his deposition, Michael Tchao, Apple's Vice-President of Product Marketing for the iPad, explained that the ability to do background syncing is "increasingly important in devices such as the iPad, … where people store a lot of information, [so] that the device [can] continue to be usable while the

---

[289] Expert Report of John R. Hauser, Aug. 11, 2013, Exhs. N1-2, O1-2, P, Q.

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

synching is taking place."[292]  He noted that "when [Apple] didn't have that background synching, we received more negative comments about the time it took to sync that information."[293]

169.    I understand from a conversation with Professor Alex C. Snoeren, a professor of computer science, that the invention of the '414 Patent helps prevent the user interface from being blocked when synchronization occurs.



---

[292] Deposition of Michael Tchao, Transcript, June 28, 2013, at 129:2-8.

[293] Deposition of Michael Tchao, Transcript, June 28, 2013, at 129:12-15.

[294]

[295]                                                               Deposition of Michael Tchao, Transcript, June 28, 2013, at 85:19-25: a fast and fluid experience is important to customers.

[296]

[297]

[298]





██████████████████████████████████████

███████████████

176.    As shown above, the ability to synchronize information in the background, as opposed to interrupting the user, is an important feature for consumers, as seen by Samsung, ██████ and Apple.

### (b) Data Structures ('647 Patent)

177.    As mentioned in Section II.E above, I understand that the Patented Invention of the '647 Patent enhances customer access to capabilities of the smartphone relevant to a given piece of data such as an email address, phone number and postal address, and the ease with which they can store or use that data in the appropriate application.[306]

178.    The functionality described in the '647 Patent was a primary theme of Apple's original marketing efforts for the iPhone.  For example, Apple's June 2007 iPhone Reviewer's Guide begins by noting that the "iPhone introduces an entirely new user interface – the first in 20 years" – through which "[m]aking a call is as simple as tapping a name."[307]  It continues by noting that "any phone number that appears in an email, SMS text message, or web page can be called instantly by tapping on it."[308]  The "Finger Tips Guide" for the original iPhone also highlighted the ability to "[t]ap any number in … an email or SMS text message, or almost anywhere in iPhone to make a call."[309]

179.    During his keynote presentation for the unveiling of the iPhone, Steve Jobs showed off the iPhone's ability to detect phone numbers in a web browser and make calls by simply tapping on a phone number:

> Directions to Sushi Ron for tonight's dinner.  Now, iPhone of course parses out phone numbers and you can see there's a phone

---

305 █████████████████████████████████████████

[306] Conversation with Dr. Todd Mowry; Expert Declaration of Dr. Todd C. Mowry Concerning U.S. Patent No. 5,946,647, Feb. 8, 2012, ¶¶ 22-24, 87.

[307] "iPhone Reviewers Guide," June 2007, APLNDC630-0000128231, at -233.

[308] "iPhone Reviewers Guide," June 2007, APLNDC630-0000128231, at -240.

[309] "Finger Tips," APLNDC630-0000056520, at -520.

number in blue. I can just touch it, and boom, I'm going to call this place.[310]

180. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████ █ ████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

181. Vice President of iPad Marketing Michael Tchao similarly stated that the functionality described in the '647 Patent contributes to ease of use.[314] ████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████ █ Arthur Rangel, Apple's Director of Product Marketing Research and Analysis, similarly conveyed how important linking to data structures was for iPhone users:



---

[310] "Complete Transcript of Steve Jobs, Macworld Conference and Expo, Jan. 9, 2007," APLNDC630-0000171023, at -035; see also "Complete Transcript of Steve Jobs, Macworld Conference and Expo, Jan. 9, 2007," APLNDC630-0000171023, at -037: Mr. Jobs finds local Starbucks shops on a map and taps on a phone number to call one.

[311] Memorandum re: "Key findings from iPhone owners qualitative sessions," Oct. 12, 2010, APLNDC0002420480, at -480.

[312] Deposition of Greg Joswiak, Transcript, Apr. 17, 2012, at 34:10-36:3.

[313] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 177:13-17.

[314] Deposition of Michael Tchao, Transcript, June 28, 2013, at 124:12-18.

[315] See, e.g., "iPhone Share Your Story Submissions," APLNDC630-0001725702, at -703█

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████



182.     This discussion highlights not only the importance of product features, such as the ability to act on data structures with a touch screen, that contribute to ease of use, but also how such features combine to enhance the user experience.  For example, in the excerpt above, Mr. Rangel pointed out how ease of search (to which the '959 Patent contributes as discussed below) combines with ease of acting on data structures using the invention taught by the '647 Patent.

183.



---

[316] Deposition of Arthur Rangel, Transcript, Apr. 5, 2012, at 123:19–124:8.





186.     On March 2, 2010, Samsung compared its S1 phone and iPhone side-by-side, and noted that, in its S1 phone, "when a memo contains URL, phone number or Email, no Link is provided."  In contrast, in the iPhone, "with a single tap on the URL, phone number or email in the memo, [it] immediately moves to the corresponding web page, outgoing call window, or E-mail composing window.  Long press displays a menu with detailed options like copy, save, etc."  Samsung concluded that it "need[ed] to improve usability by providing links for memo contents such as [w]eb, [call], and [e]-mail, that can be linked."[323]

187.





[323] "Relative Evaluation Report on S1, iPhone," Mar. 2, 2010, SAMNDCA00203880 (translation), at -915.





191.    Further, it is important to recognize the economic relevance of a particular feature may not be fully assessed simply by looking at the frequency with which consumers identify the feature as a key distinguishing characteristic that governs their preference for various smartphone models.[336]  While users may not cite the inclusion of a common feature as influencing their



[336] For example, the presence of air conditioning in an automobile is rarely cited as an important factor in consumer purchase decisions among cars, but this is because all cars in the modern era have air conditioning.  It would be very wrong as a matter of economics to assume

decision to purchase a particular product, the widespread adoption and use of linking to different data structures is a strong indicator of the impact that it has on the usability of the Apple and Samsung devices and thus of its importance in demand for those products.

### (c)  Universal Search ('959 Patent)

192.    Apple introduced the universal search capability claimed in the '959 Patent October 2011 when it first offered the Siri personal assistant on the iPhone 4S.  Siri has been hailed as "the standout feature" of the iPhone 4S that has to "be tried to be believed."[337]

193.    An interactive voice-based personal assistant (as well as the non-voice based infringing search capabilities on Samsung's Accused Products) is of no value if it cannot find the information the user seeks.  By broadening the scope of the search for materials sought by the user, the '959 Patent lies at the heart of this feature's functionality.  In other words, the voice-based interaction merely provides user-friendly access to the capability end users really seek: information derived from multiple potential data sources.

194.    To illustrate this point, think of a human personal assistant, as opposed to a "virtual personal assistant."  If an individual asked a human assistant to find a friend's phone number, and the assistant used only the Internet and not an available personal contacts list to perform that search, the individual would always have to check the accuracy of the information that the assistant retrieved.  Similarly, if the individual asked her assistant to find the number for a particular airline, and the assistant searched only the individual's personal contacts list, this may not generate the information needed to change a flight reservation to accommodate a last-minute scheduling change.  The ability to intelligently search multiple data sources for the most pertinent information is crucial for the success of any assistant—human or virtual.

195.    According to Greg Joswiak, Apple customers share the views above.  As Mr. Joswiak explained, "[f]inding information is very important to [Apple's] customers", but "[p]art

---

that a car without air conditioning would not meet with sharply limited demand were it to be marketed and sold today.

[337] Brian X. Chen, "Apple iPhone 4S," *Wired*, Oct. 11, 2011 (http://www.wired.com/reviews/ 2011/10/iphone4s/): "Siri is the reason people should buy this phone."; Walt Mossberg, "The iPhone Finds Its Voice," *All Things D*, Oct. 11, 2011 (http://allthingsd.com/20111011/the-iphone-finds-its-voice/): labeling Siri the "standout feature" of the iPhone, which is so astonishing that it "has to be tried to be believed."

**Highly Confidential – Attorneys' Eyes Only**
**Subject to Protective Order**

of the magic, … if you will, of Siri and our products in general is not explaining to the customer the entire way something works.  The magic is they just ask Siri a question, and Siri comes back with the appropriate response.  They didn't . . . have to understand that there's unified search going on…. They just asked a question.  The answer came back.  We know finding information is very important to them."[338]

196. ████████████████████████████████



197.    It is also evident that Siri has been a material driver of user demand for the iPhone 4S.  In a customer survey, Siri has been cited as the best-liked feature of the iPhone 4S by 49% of iPhone 4S owners.[340]

---

[338] Deposition of Greg Joswiak, Transcript, Apr. 17, 2012, at 43:24–44:11.

[339] "US iPhone 4S Siri Data from the Apple Customer Pulse," Jan. 9, 2012, APLNDC630-0000149086, at -092, -094.

[340] John Cox, "Survey: iPhone 4S Owners Are Very Satisfied with the Device," Macworld, Dec. 1, 2011 (http://www.macworld.com/article/1163965/survey_iphone_4s_owners_are_very_satisfied_with_the_device.html): "Apple's bet on Siri has paid off: ... it is the best-liked feature of the new phone.  Siri was ranked as the best-liked feature by 49 percent of these owners."

[341] "iPhone Buyer Survey," FY2012 Q1, APLNDC630-0000149470, at -490.

[342] "iPhone Buyer Survey," FY2012 Q1, APLNDC630-0000149470, at -481, -483-84.



198.    Industry observers have highlighted Siri's ability to effectively search multiple sources of information as a prominent threat to Google and, by extension, Samsung phones that utilize the infringing search capabilities found in Android.  Google's CEO, ███████████ ████████████████████████ considered Siri a "significant development" in search.[346] One observer, writing in *Forbes* magazine, found that while "many consider [Siri] the best voice recognition application in history," "its potential really lies in its ability to revolutionize the way we search the Internet, answer questions and consume information."[347]  The writer then cites another *Forbes* contributor as concluding that Siri "may even be a 'Google killer.'"[348]

199.    ████████████████████████████████████████████████████████ ███████████████████████████████, which I understand to be an accused functionality in Samsung devices with respect to the '959 Patent.  ████████████████████████ ███████████████████████████████████████████

---

[343] "iPhone Buyer Survey", FY2013 Q1, APLNDC630-0001233406, at -420-22; "iPhone Buyer Survey," FY2013 Q2, APLNDC630-0000937009, at -023-27; "iPhone Buyer Survey," FY2012 Q2, APLNDC630-0000167955, at -970-72.

[344] "iPhone Owner Study," June 2012, APLNDC630-0000177067, at -193-95; Siri presentation, Dec. 1, 2011, APLNDC630-0001427164, at -167; see also Email, dated Nov. 22, 2011, APLNDC630-0000757048, at -048: Changewave survey finds Siri as the top feature of the iPhone 4S, right above "ease of use"; Email, dated Oct. 22, 2012, APLNDC630-0000832896, at -896: Siri was used 1 billion times between September and October 2012.

[345] Siri presentation, Dec. 1, 2011, APLNDC630-0001427164, at -189.

[346] See, e.g., Email, dated Nov. 6, 2011, APLNDC630-0000129438, at -439; see also Email, dated Jan. 20, 2012, APLNDC630-0000135098, at -098; "UBS Investment Research, Key Call: Apple Inc.," Oct. 14, 2011, APLNDC630-0001465329, at -329: "Siri seen as key driver of iPhone 4S."

[347] "Google Isn't 'Leveraging Its Dominance,' It's Fighting to Avoid Obsolescence," Mar. 12, 2012, APLNDC630-0000149197, at -197.

[348] "Google Isn't 'Leveraging Its Dominance,' It's Fighting to Avoid Obsolescence," Mar. 12, 2012, APLNDC630-0000149197, at -197; see also Email, dated Nov. 5, 2011, APLNDC630-0000127110, at -110.

███████████████████████████████████████████

████████████████████████

200.    Later, Android developer documents touted "a redesigned search framework that provides a quick, effective, and consistent way for users to search across multiple sources – such as browser bookmarks & history, contacts, and the web – directly from the home screen."[350]

███████████████████████████████████████████

███████████████████████████████████████████

██████████████

201.    Other Android developer documents describe search as "a *core user feature on Android*" through which "[u]sers should be able to search *any data that is available to them,* whether the content is located on the device or the Internet."[352]  Finally, third party commentators have noted that the quick search box feature could help drive Android sales device *at Apple's expense*: "this update may seem small, but its implications are huge. It adds a whole new layer of functionality to Android that completely obliterates the iPhone's functionality.  And with Android launching on more carriers, this type of addition could help it *win new customers, even ones with iPhones*."[353]

202.    █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[349] ████████████████████████████████████

[350] "Android 1.6 Platform Highlights," APLNDC630-0000149209, at -209.

[351] ████████████████████████████████████

[352] "Search," Android Developers (http://developer.android.com/guide/topics/search/index.html) (emphasis added).

[353] Ben Parr, "Google Android Search Just Became Awesome," Mashable, Oct. 9, 2009 (http://mashable.com/2009/10/09/android-quick-search-box/) (emphasis added).

[354] ████████████████████████████████████



204.    On November 15, 2012, after universal search was restored in the U.S., one commentator stated, "This is an awesome feature for Android and [its] removal back in August



was disheartening.  Seeing it return is wonderful."[363] 

205.    Samsung documents also promote the Google Now application, which I understand to be another accused functionality in Samsung devices with respect to the '959 Patent.  On September 12, 2012, Samsung believed Google Now to be the "highlight feature" of the then-upcoming Jelly Bean version of Google's Android operating system, partly due to its "smart"/"intelligent search."[366]

206.    As the above documents convey, universal search functionality has been an important element of both Apple and Samsung smartphone development.  Users are drawn to the Siri-based functionality of the iPhone 4S because it can obtain relevant information quickly, from a variety of sources.  If Apple's Siri feature could not reliably obtain relevant information from different sources, its utility as a voice-based "personal assistant" and its importance as a driver of consumer demand would be critically diminished.

### (d)  Missed Call Management ('760 Patent)

207.    The "missed call management" feature that I understand is described in the '760 Patent has contributed to enhancing the ease of use of the iPhone.  As stated in Section II.E.4, I understand this feature provides a convenient user interface with which to manage missed calls, whereby a user may touch one portion of the screen to return a call or touch another portion of the screen to display detailed contact information.

---

[363] David Beren, "Did Local (Universal) Search Get Restored In Galaxy S III Jelly Bean Update?," TmoNews, Nov. 15, 2012 (http://www.tmonews.com/2012/11/did-local-universal-search-get-restored-in-galaxy-s-iii-jelly-bean-update/).

[364] "Campaign Tracking Report, Samsung Galaxy S III, Analysis of 7/23/2012 – 7/29/2012," Aug. 1, 2012, SAMNDCA630-07488605, at -622; see also Deposition of Timothy Benner, Transcript, June 28, 2013, at 196:13-197:14.

[365] Deposition of Timothy Benner, Transcript, June 28, 2013, at 195:13-23.

[366] "iPhone 5: The biggest thing to happen to iPhone since – Really?," Sept. 12, 2012, SAMNDCA630-06635592, at -662, -664.

208.     Apple highlighted missed call management in its iPhone Reviewer's Guide for the original iPhone.[367]  The missed call management feature was also mentioned in the iPhone Guided Tour Video highlighting the convenience of tapping on the missed button to show a list of just the missed calls, tapping on the name to return a call, or tapping on the blue arrow to see all the contact information for that person.[368]

209.     From speaking with Professor Andrew Cockburn, a professor of computer science and software engineering at the University of Canterbury, I understand that the missed call management system of the Patented Invention achieves a simple, uncluttered, and easy to use display where detailed contact information can be retrieved by a simple touch but is otherwise out of the way.  At the same time, calls can be placed by one touch without having to navigate a series of menus.  I understand that this user interface is overall more effective and appealing than interfaces that lack these attributes.



---

[367] "iPhone Reviewers Guide," June 2007, APLNDC630-0000128231, at -241.

[368] "iPhone Guided Tour Video," June 20, 2007, APLNDC630-0000176995, at -7000; Video available at
http://www.youtube.com/watch?v=S0Si_EldGJ8&list=PL151367C4704CDA94&index=1.



212.    On March 2, 2010, Samsung performed a side-by-side comparison of its S1 phone with the iPhone.  It concluded that the S1 was "inconvenient" because "[y]ou can only make a call after selecting the number on the Call log screen and then pressing the call key again on the number screen."  The iPhone, however, was "convenient because you can make a call by touching the number once from the Call log screen."  Under "Directions for Improvement," Samsung concluded that it "need[ed] to add a function for making calls from the Call log screen with just one touch."[374]  On May 10, 2010, Samsung made similar observations and recommendations to adopt iPhone's one-touch call method in the call log for Samsung's Behold3 phone.[375] ████████████████████████████████████

213.    As the evidence above demonstrates, Apple, Samsung, and the public considered the features of the '760 patent to be important.

### (e)  Slide-to-Unlock ('721 Patent)

214.    The "slide-to-unlock" feature that I understand is described in the '721 Patent has been widely highlighted as contributing to the easy and fun-to-use nature of the iPhone and other



[374] "Relative Evaluation Report on S1, iPhone," Mar. 2, 2010, SAMNDCA00203880 (translation), at -927.

[375] "[Behold3] Usability Evaluation Results," May 10, 2010, SAMNDCA00508318 (translation), at -395.



iOS devices and has been promoted by Apple since the launch of the original iPhone.  Prior to the iPhone's launch, Apple was concerned with "how to prevent the device from playing music or making a call accidentally when it was jangling in your pocket"—a problem exacerbated by the iPhone's full touchscreen interface.[377]  "The solution was 'Swipe to Open,' the simple and fun on-screen slider that activated the device when it had gone dormant."[378]  Apple's Senior Vice-President of Worldwide Marketing, Phil Schiller, stated that slide-to-unlock is a "very important feature," and Apple "worked very hard" on it.[379]  As Apple's head of iPhone product marketing, Greg Joswiak, stated in his deposition, "[a]ll of [Apple's] commercials for quite a period of time for the iPhone started with a finger sliding to unlock it at the beginning of each commercial as we demonstrated that feature."[380]  Slide-to-unlock thus became "somebody's introduction, both in ad and in reality[,] in using the iPhone" and a "core part" of the iPhone experience.[381]  In fact, Apple received many emails from iPhone users touting how intuitive the slide-to-unlock feature is.[382]

215.    Arthur Rangel, director of product marketing research and analysis at Apple, reiterated the fundamental contributions slide-to-unlock made to the iPhone's success, believing

---

[377] Walter Isaacson, *Steve Jobs* (2011), APLNDC630-0000171014, at -022.

[378] Walter Isaacson, *Steve Jobs* (2011), APLNDC630-0000171014, at -022; see also Vincent Nguyen, "Complete Transcript of Steve Jobs, Macworld Conference and Expo, January 9, 2007," Feb. 23, 2007, APLNDC630-0000171023, at -031 (http://www.iphonebuzz.com/ complete-transcript-of-steve-jobs-macworld-conference-and-expo-january-9-2007-23447.php): "[T]o unlock the phone I just take my finger and slide it across. . . . We wanted something that you couldn't do by accident in your pocket. Just slide it across. Boom."

[379] Deposition of Phil Schiller, Transcript, July 23, 2013, at 196:2-197:2, 310:6-311:6.

[380] Deposition of Greg Joswiak, Transcript, Apr. 17, 2012, at 26:22-25; see also Deposition of Greg Joswiak, Transcript, July 9, 2013, at 6:4-8.

[381] Deposition of Greg Joswiak, Transcript, Apr. 17, 2012, at 27:1-3; Deposition of Greg Joswiak, Transcript, July 9, 2013, at 6:4-8.

[382] Email to Steve Jobs, dated Mar. 22, 2010, APLNDC630-0001728395, at -395; Email to Steve Jobs, dated May 15, 2010, APLNDC630-0001728661, at -661; Email to Steve Jobs, dated May 16, 2010, APLNDC630-0001728664, at -664; Email to Steve Jobs, dated June 13, 2010, APLNDC630-0001728785, at -785; Email to Steve Jobs, dated July 15, 2010, APLNDC630-0001729114, at -114.

it to be "part of iPhone-ness, if you will," and a factor that "goes with ease of use and just what people assume an iPhone does."[383]

216.    Smartphone market observers connected the need for a reliable method of unlocking a phone with overall usability.  As one analyst report explained before the iPhone was first introduced:  "The primary threat to existing vendors [presented by an Apple phone] is in the user interface.  If Apple builds a phone that is easy and genuinely pleasurable to use, the company will have a winner no matter how it is priced or sold.  Why hasn't anyone designed a bar phone with a slide lock/unlock switch found on every iPod (other than the shuffle) since its launch?  It's not that Apple has a lock – forgive the pun – on good ideas …."[384]  The iPhone's elegant slide-to-unlock solution has since become an iconic component of the iPhone user experience and a contributing factor to the phone's success.  I further understand that because slide-to-unlock is the first action a user performs on the touchscreen when using an iPhone, the feature helped educate users on the iPhone's touchscreen interface, particularly since swiping and sliding actions are used elsewhere in the iPhone.[385]

217.    It is clear that the slide-to-unlock feature that I understand to be taught by the '721 Patent was not only an important component of the overall usability of iPhones, but also a key area of interest for Samsung in its development of the Galaxy line of smartphones, including the Accused Devices.

218.    Numerous documents from Samsung show that it considered Apple's slide-to-unlock important and noteworthy for a multitude of reasons, including its simplicity, ability to avoid accidental unlocking, creativity, and intuition. ██████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████

---

[383] Deposition of Arthur Rangel, Transcript, April 5, 2012, at 147:15-19.  Other Apple executives testified that slide to unlock is important to the ease of use of the iPhone.  See, e.g., Deposition of Phil Schiller, July 23, 2013, at 196:4-16, 196:23-197:2, 310:22-311:3; Deposition of Steven Sinclair, Transcript, Apr. 4, 2012, at 57:11-15, 60:24-62:6; Deposition of Greg Joswiak, Transcript, Apr. 17, 2012, at 27:1-3; Deposition of Greg Joswiak, Transcript, July 9, 2013, at 6:4-8, 177:10-13.

[384] Email, dated Jan. 4, 2007, APLNDC0001324274 at -275.

[385] Conversation with Professor Andrew Cockburn.

219.     Prior to the launch of the SGH-a867 in January 2009,[386] Samsung stated that "[t]he SCH-u940 through Verizon, also known as the Glyde, has a [maintenance release] tentatively planned which incorporates *a slide lock feature which is similar to iPhone*. This countermeasure addresses concerns with end users complaining about how easy the screen was becoming unlocked while in a pocket or purse."[387]



---

[386] "Samsung A867 Eternity," GSMArena (http://www.gsmarena.com/samsung_a867_eternity-2607.php).

[387] "Pre-Launch Report, SGH-a867 (Eternity)," SAMNDCA11077704, at -711 (emphasis added).







229. 

230.     On May 10, 2010, Samsung conducted a side-by-side comparison between its Behold3 phone and the iPhone. Samsung noted that, for its Behold3 phone, "the sliding action works on any part of the screen," which leads to a "high probability of malfunction." In contrast, in the iPhone, "the sliding action [is] applied to a specific button." Samsung recommended to "[c]onvert to an unlocking method that only works in a specific area" as an "[i]mprovement."[410] Samsung also commented on the lack of instructions to unlock, compared to the iPhone.[411]

231.     On May 31, 2010, Samsung conducted a side-by-side comparison between its Victory phone and the iPhone. Samsung found that its Victory phone "requires more than one try to unlock when holding the device with one hand and swiping with the thumb because a fixed area/distance to swipe isn't indicated." Meanwhile, the iPhone was "[e]asy to unlock on the first try by swiping the fixed area/distance (Slider)."



---

[410] "[Behold3] Usability Evaluation Results," May 10, 2010, SAMNDCA00508318 (translation), at -344.

[411] "[Behold3] Usability Evaluation Results," May 10, 2010, SAMNDCA00508318 (translation), at -400.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**



238.    A document created by Samsung's European Telecommunication Operation dated June 7, 2011, noted iOS 5's ability to "[c]heck voicemail with a swipe from the Lock screen." Samsung recommended that "[d]irect access to call voicemail (missed call) is a feature [that] we should implement into our lock screen."[424]

239.    As the above evidence shows, Apple considered its iconic slide-to-unlock functionality to be extremely important to users, and Samsung considered it worthy of emulation along multiple dimensions and deemed the unlock mechanism on its devices to have inferior functionality.

**(f)   AutoCorrect ('172 Patent)**

240.    Documents I have reviewed indicate that the ease and speed enabled by the autocorrect feature described in the '172 Patent has contributed directly to the success of the iPhones and Galaxy products.  In fact, these materials indicate that without an autocorrect feature, widespread adoption of the iPhone's touchscreen and virtual keyboard may never have occurred.

241.    The '172 Patent's autocorrect feature was critical in overcoming a key sticking point in the iPhone's widespread adoption: the transition for most users from a conventional push-button text-entry system to one based on a virtual keyboard.  According to Steven Sinclair, an iPhone product marketing manager at Apple, when Apple first launched the iPhone, "there was a very concerted effort by the company to overcome this belief that a … phone that didn't have a keypad, a physical hard keyboard, was really usable.  So we spent a lot of effort to educate consumers about the fact that you could use a touch screen and still be very accurate, and the ability to correct and suggest words is a very important element of that capability."[425]  An email between Steven Sinclair to Lauren Becker, Apple's Producer, Video and Motion Graphics, showed competitive messaging emphasizing the utility of the keyboard to educate consumers.[426]

---

[424] "European Telecommunication Operation, iOS 5, New Features," June 7, 2011, Deposition of Sung Sik Lee, Exh. 12, July 11, 2013, SAMNDCA630-05707782, at -786-87; Deposition of Sung Sik Lee, Transcript, July 11, 2013, at 144:23-146:8.

[425] Deposition of Steven Sinclair, Transcript, Apr. 4, 2012, at 65:7-16.

[426] Email, dated June 6, 2008, APLNDC630-0000129659, at -660-61.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**

242.    An Apple iPhone Reviewer's Guide from 2007 confronts this user skepticism directly, touting the iPhone's virtual keyboard with autocorrect functionality by claiming that in "less than a week you'll likely be typing faster on iPhone than on any other small keyboard – especially if you trust the intelligence of the keyboard."[427]  Similarly, Apple product guides, e.g., the Finger Tips Guide for the original iPhone and the iPod Touch Reviewers Guide showed the text corrections in action.[428]

243.    In addition, third-party reviewers of the initial iPhone specifically credited the phone's autocorrect feature with enabling use of its virtual keyboard.  As one reviewer noted,

> Tapping the skinny little virtual keys on the screen is frustrating, especially at first.  Two things make the job tolerable.  First, some very smart software offers to complete words for you, and, when you tap the wrong letter, figures out what word you intended. In both cases, tapping the Space bar accepts its suggestion.[429]

244.    Another reviewer noted that the keyboard was the iPhone's most controversial feature but that the user was able to type as quickly and accurately as he could on a Palm Treo thanks to the autocorrect feature.[430]  On January 11, 2007, a *New York Times* review called iPhone's autocorrect "beautiful."[431]

245.    Similarly, Greg Joswiak explained during his deposition:

> I can point you back, for example, to the original iPhone where we made a January introduction in 2007.  Obviously, understanding the keyboard was something we would have to get people to understand and made a big deal out of auto correction.
>
> That said, when I delivered the -- one of the first iPhones to Walt Mossberg, one of our reviewers, in June, one of the first things that he said to me, and unfortunately said publicly before the review of

---

[427] "iPhone Reviewers Guide," June 2007, APLNDC630-0000128231, at -238.

[428] "Finger Tips," APLNDC630-0000056520, at -521; "iPod Touch Reviewer's Guide," Jan. 2008, APL-ITC796-0000436056, at -063.

[429] David Pogue, "The iPhone Matches Most of Its Hype," *N.Y. Times*, June 27, 2007, APLNDC630-0000171819, at -821.

[430] Walter S. Mossberg, "Testing Out the iPhone," *The Wall Street Journal*, June 27, 2007, APLNDC-Y0000234932.

[431] David Pogue, "Apple Waves Its Wand at the Phone," *N.Y. Times*, Jan. 11, 2007, APLNDC-Y0000235973, at -974.

this product, is that he thought we had made a mistake with the glass keyboard and not doing a chiclet keyboard.

And he had a little bit less than . . . two weeks to test the product. And in his review and in his experience, he called out the fact that using it, including having auto correction, made it as good or better than any keyboard he had ever used on a small type of device.

So I would say that's very important data to the fact that we had done something very well with auto correction in our keyboards.[432]

246.    Mr. Joswiak later added that correcting words typed on glass keyboard is a "huge part of ease of use"[433] and that without autocorrect, tapping on a glass keyboard would be a "horrible experience."[434]  He considered the feature so important that he instituted a rule that there should be autocorrect and a dictionary for every language.[435]  Phil Schiller also agreed that the virtual keyboard adds to ease of use.[436]

247.    Samsung's documents also demonstrate the importance of auto correction on Apple and Samsung devices.  On May 30, 2010, in a "Critical Findings Brief," Samsung concluded that "the iphone3GS was rated better than other devices in overall design, life needs and values, touchscreen, general usability and user[] satisfaction"[437] and noted the central importance of text entry to consumers: "For most of [Samsung's] Galaxy S devices, improvements to touch performance and *text entry* should be made to compete with iphone3GS

---

[432] Deposition of Greg Joswiak, Transcript, Apr. 17, 2012, at 30:2-22.  In the subsequent review prepared by Mr. Mossberg's team, they stated that "[t]he iPhone's most controversial feature, the omission of a physical keyboard in favor of a virtual keyboard on the screen, turned out in our tests to be a nonissue, despite our deep initial skepticism. After five days of use, Walt — who did most of the testing for this review — was able to type on it as quickly and accurately as he could on the Palm Treo he has used for years. This was partly because of smart software that corrects typing errors on the fly."  Walter Mossberg, "The iPhone Is a Breakthrough Handheld Computer," All Things D, June 26, 2007, APLNDC630-0000171814, at -815.

[433] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 28:4-9.

[434] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 177:22-178:6.

[435] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 177:22-178:6.

[436] Deposition of Phil Schiller, Transcript, July 23, 2013, at 311:17-312:5.

[437] "Competitive UX Evaluation of Atlas, Victory, Supersonic and Vegas with HTC Incredible and Apple iPhone 3GS," May 30, 2010, SAMNDCA00238251, at -254.





252.   I understand that

253.   In sum, the documents and testimony above show that the features of the '172 patent are considered important by Apple, Samsung, and third parties alike.

### (g) Summary of Qualitative Evidence as to the Significance of the Patented Features

254.   The evidence presented above provides a consistent picture with respect to each of the Apple Asserted Patents:

- Apple end users found the Patented Feature a material contributor to ease of use and functionality in the iPhone/iPad;



- Samsung ultimately selected the infringing implementation and ran into consumer pushback when inferior designs were used instead.

255.   Thus, in my opinion, the evidence in this Section demonstrates that the implementation of the Asserted Patents by Apple contributed materially to demand for its devices and, once installed by Samsung in its devices, ameliorated Samsung's comparative competitive disadvantage vis-à-vis Apple.  My opinion in this regard I further supported by the consumer research performed by Dr. Hauser, discussed below.

### (2) Survey-Based Evidence of the Impact of the Patented Features on Demand

256.   To consider the role of the Asserted Patents with respect to demand for the accused products quantitatively, I have studied the results of consumer surveys prepared by Dr. John Hauser.[449]  Dr. Hauser used conjoint analysis, a widely studied and applied form of quantitative consumer preference measurement,[450] to determine the impact of the features covered by the Asserted Patents on demand for smartphones and tablets by Samsung smartphone and tablet owners, relative to their demand for similar products without those features.  I discuss the results and relevance of these surveys extensively below, in consideration of *Panduit* Factor 2.  These surveys provide considerable evidence that the patented features contributed significantly to the demand for smartphones and tablets at Samsung (since the surveys were directed at Samsung users) and that a material portion of purchasers of Samsung smartphones and tablets would not purchase devices that did not incorporate each of the patented features.  As a result, these survey results demonstrate that each of the patented features has a significant positive impact on demand.

---

[449] Expert Report of John R. Hauser, Aug. 11, 2013, Exhs. N1-2, O1-2, P, Q.

[450] Expert Report of John R. Hauser, Aug. 11, 2013, ¶ 16.  In response to my Opening Declaration and Apple's motion for a preliminary injunction in this matter, Samsung's damages expert, Mr. Michael Wagner, endorsed surveys and conjoint analysis as suitable methods for proving the link between patented features and consumer demand for products, and for calculating the number of Samsung customers who made their decision to purchase a Samsung smartphone based on features enabled by Apple's patented inventions (Declaration of Michael J. Wagner in Support of Samsung's Opposition to Apple's Motion for a Preliminary Injunction, June 7, 2012 ("Wagner Declaration"), ¶ 116).

257.    In addition to making possible an assessment of the sales Samsung would have lost without the Accused Features, Dr. Hauser's survey makes possible a determination of the price premium that Samsung consumers are willing to pay for the tested features that are covered by the Asserted Patents.  The following Table 1 summarizes estimates by Dr. Hauser of the price premium (which is sometimes referred to as Willingness to Pay) for the Asserted Patents in tablets and smartphones.

| Table 1 | | |
|---|---|---|
| Price Premium for Patent-Related Features | | |
| Market Simulation Approach[451] | | |
| Patent | Smartphones (Retail price without Accused Feature: $149) | Tablets (Retail price without Accused Feature: $299) |
| '414 | $69 | $62 |
| '647 | $56 | $56 |
| '959 | $44 | $33 |
| '760 | $87 | Not Applicable |
| '721 | Not Tested | $32 |
| '172 | $102 | $63 |

258.    These results of Dr. Hauser's survey and conjoint analysis support the conclusion that there is demand for the Accused Features that practice the inventions taught by the Asserted Patents.

---

[451] Expert Report of John R. Hauser, Aug. 11, 2013, Exh. P.  The market simulation approach compares products that differ only with respect to a particular feature.  The conjoint analysis uses estimates of respondents' "partworths" (the partial contribution of a level of a feature to consumers' utility from a product) to estimate the price premium for the product with the feature at which 50% of the respondents will choose the product with the feature and 50% will choose it without the feature.  See Expert Report of John R. Hauser, Aug. 11, 2013, ¶¶ 125-131.  Exhibit Q to the Hauser Report reports similar results for an alternative method of estimating the price premiums associated with the Accused Features.

## 2. *Panduit* Factor 2: Absence of Acceptable Non-Infringing Substitutes for the Patented Inventions

259.    Under this *Panduit* Factor, I assess whether there exist acceptable, available, non-infringing alternatives—that is, non-infringing designs that provide a sufficiently similar user experience to the patented inventions such that there is no meaningful difference in demand for products between the patented and non-patented designs.  From an economic standpoint, a logical approach to this question is to assess whether at least a significant segment of consumers would be willing to pay a price premium for the patented feature over any of the available non-infringing options or, alternatively, would elect to purchase a different phone as a result of the inferiority of those non-infringing alternatives.  I undertake such an approach here.  More specifically, I determine the extent to which there are consumers who would alter their purchase decision and no longer purchase a Samsung Accused Product in the world "but for" infringement.

260.    Of course, these issues are to some degree coincident with the analyses provided under *Panduit* Factor 1, where the relevance of the patented feature to customer demand is assessed.  I incorporate those findings here as well.  In this Section, I extend the analyses to focus on the claimed available, non-infringing alternatives asserted by Samsung (where identified) and discuss availability and acceptability of these alternatives.  I have not seen any evidence that the claimed non-infringing alternatives are acceptable to a meaningful (and quantifiable) set of Samsung customers, and have seen a significant amount of evidence suggesting that these alternatives were either unavailable or unacceptable.

### a. Conceptual Issues Surrounding Non-Infringing Alternatives

261.    At a general level, there are three ways that producers of infringing products can cease infringement: 1) by withdrawing the infringing products from the market; 2) by removing the infringing feature from the product; and/or 3) by reengineering the infringing product to introduce it with the relevant feature where it no longer practices the claimed invention.  I understand that a lost profits assessment assumes that infringers would, "but-for" their actual infringement, have implemented whichever of these alternatives was both available to and most preferred by them at each point during the damages period.  Accordingly, a lost profits assessment should be considered in the context of any evidence as to the availability and

acceptability of such alternatives put forward by the alleged infringer with respect to each of these three alternatives.

262.     The availability of each of these options can vary over time and across features (and potentially products).  In the world "but for" infringement, the infringer must cease infringement from the first day of notice of such alleged infringement.  At this time in the "but for" world, the infringer cannot sell its existing stock of product, and must seek to remove the feature and/or develop and implement an alternative.  At the outset, there would appear to be some initial period of time that the infringer would be off the market entirely while it determined how to remove the claimed feature or how to implement a non-infringing alternative.  From this point forward, the infringer could elect to remove the feature temporarily or permanently, or it could immediately implement a non-infringing alternative design.  In the event of a temporary feature removal, this stage could then be followed at some future time with the implementation of a non-infringing alternative design.

263.     At each stage, the relevant question from an economic and damages standpoint is to assess whether the alternative is available or unavailable, and/or acceptable or unacceptable to an identifiable portion of the infringer's (here, Samsung's) customers.  If these alternatives are not available and acceptable, then these customers become candidates for a lost profits consideration, since they would not purchase Samsung's infringing devices in the "but for" world.

### b.  Non-Infringing Alternatives As Asserted By Samsung

264.     In the present matter, Apple served interrogatories on Samsung, requesting that it identify each non-infringing alternative for each Asserted Patent.[452]  ███████████████

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[452] Interrogatory No. 29 of Apple's Third Set of Interrogatories, August 13, 2012.

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

265.     I understand that if Samsung contends that in the "but for" world it would have introduced non-infringing substitutes that were not on the market in the real world, then it is Samsung's burden to provide evidence as to the availability and acceptability of the theoretical, non-infringing alternatives that it contends would have allowed Samsung to retain its real world infringing sales.  I have reviewed Samsung's interrogatory responses in this case, and I have not seen any evidence that Samsung's theoretical non-infringing alternatives would have been available to Samsung at the time of infringement, or that they would have been acceptable substitutes for the Accused Products.

266.     I have nonetheless made an effort to investigate all of Samsung's proposed non-infringing alternatives myself.  After I reviewed Samsung's interrogatory responses, I conducted interviews with Apple's technical experts Professor Andrew Cockburn, Dr. Todd Mowry, and Professor Alex C. Snoeren.  Apple's experts explained that each of Samsung's proposed alternatives that are actually non-infringing were unavailable at the time of infringement, have significant drawbacks over the accused technology, or both.  Apple's technical experts explained that in many cases, these alternatives would decrease a device's ease of use, which, as I discussed above, is central to consumer demand and commercial success.  My specific understandings as to the nature of each of Samsung's proposed non-infringing alternatives, based on these conversations with Apple's technical experts, are described in **Exhibit 11**.

### c.   Samsung's Conduct with Respect to Its Alleged Non-Infringing Alternatives

267.     Samsung's conduct with respect to certain of its proposed non-infringing alternatives is instructive as to their degrees of availability and acceptability. ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████Where Samsung has implemented a proposed alternative, I have considered the facts and circumstances

_____

██ ██████████████████████████████████████████████████████

surrounding that effort, including the time it took Samsung to implement the alternative, Samsung's own documents discussing the alternative, and the public reaction to that alternative. My specific understandings are described below.

### (1) '414 and '647 Patents

268.   I am not aware of any evidence that these alternatives would have been available or acceptable at the hypothetical negotiation. My understanding as to the acceptability of these hypothetical alternatives is discussed in **Exhibit 11**.

### (2) '721 Patent

269.     Samsung has identified two purportedly non-infringing alternatives that it has implemented with respect to the '721 Patent: circle unlock and ripple unlock.[454] Samsung claims the first alternative, circle unlock, was implemented in the Galaxy S II Skyrocket as early as February 17, 2012.[455] However, I understand circle unlock lacked certain advantages and benefits of the '721 Patent.[456] For example, I understand circle unlock would be prone to accidental unlocks.[457]

---

[454] Samsung's Second Supplemental Response to Apple's Interrogatory No. 29, served July 15, 2013.

[455] Samsung's Second Supplemental Response to Apple's Interrogatory No. 29, served July 15, 2013.

[456] **Exhibit 11**; Conversation with Professor Andrew Cockburn.

[457] Conversation with Professor Andrew Cockburn.



I have not seen any evidence from Samsung suggesting this alternative was acceptable to its customers.

270.

[464] Conversation with Professor Andrew Cockburn.

[465] "[Victory] Usability Evaluation Results," May 31, 2010, S-ITC-500042803 (translation), at -828; see also "[Galaxy Tab] US Field Usability Evaluation Result," Sept. 15, 2010, SAMNDCA630_04335717 (translation), at -727.

████████████████████████████████████████████████

████████████████████████████████████████████████

### (3) '172 Patent

271.    With respect to the '172 Patent, Samsung has identified three purportedly non-infringing alternatives that it has incorporated in its products.[466]  The first of these alternatives is described as a manner of text input in which a suggested replacement character string, instead of the user's current character string, is displayed in a first area.[467]  I am informed that this alternative had been utilized by some of Samsung's products since before this suit but was not implemented in any of its flagship products as the only default, pre-installed keyboard until the Galaxy S III was released in the United States in June 2012.[468]  I understand that Samsung has subsequently moved away from this alternative, instead leaving its users with the second alternative, described below, in updates to its flagship devices.[469]

272.    The second implemented alternative to the '172 Patent identified by Samsung is described as a manner of text input in which a user's current character string is input when a user selects a delimiter.[470]  In other words, the keyboard no longer automatically corrects a user's errors; the text that a user has actually typed is input when a user presses the space or period keys, for example, regardless of whether the device has determined that text to be erroneous.[471]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████        ████████████████████████████

---

[466] Samsung's Second Supplemental Response to Apple's Interrogatory No. 29, served July 15, 2013.

[467] Samsung's Second Supplemental Response to Apple's Interrogatory No. 29, served July 15, 2013.

[468] Conversation with Professor Andrew Cockburn.

[469] Conversation with Professor Andrew Cockburn.

[470] Samsung's Supplemental Responses to Apple's Interrogatory No. 29.

[471] Conversation with Professor Andrew Cockburn.

[472] Conversation with Professor Andrew Cockburn.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

███████████████████████████████████████████████████████

████████████████████████████████████████████

273.     The third, and final, implemented alternative to the '172 Patent identified by Samsung is described as a manner of text input in which a user's current character string is not displayed at all, instead using swipe-based gestures for text input.[474]  Samsung identifies the T-Mobile Galaxy S III, released on June 21, 2012, as the first Samsung device utilizing this alternative.[475]

274.     █████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████  Moreover, I am informed that all three of the alternatives lack at least some of the benefits of the '172 Patent and are therefore not wholly acceptable substitutes.[476]  By way of example, I am informed that the first alternative is confusing to users, as the text typed by the user does not appear in the first display area.[477] █

██████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████  I understand that the second alternative lacks the ability to autocorrect text, likely increasing errors and the time needed to type.[479]  The third alternative, like the first, does not present users with the text they type as they input characters, which could result in a higher error rate and slower input.[480]  I have not seen any evidence indicating that

---

[473] Conversation with Professor Andrew Cockburn.

[474] Samsung's Second Supplemental Response to Apple's Interrogatory No. 29, served July 15, 2013.

[475] Samsung's Second Supplemental Response to Apple's Interrogatory No. 29, served July 15, 2013.

[476] Conversation with Professor Andrew Cockburn; **Exhibit 11**.

[477] Conversation with Professor Andrew Cockburn; **Exhibit 11**.

[478] "Eating our own Dog food! Wave and Galaxy S," July 5, 2010, SAMNDCA11290440, at -496.

[479] Conversation with Professor Andrew Cockburn; **Exhibit 11**.

[480] Conversation with Professor Andrew Cockburn; **Exhibit 11**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER