users would view these keyboards as acceptable replacements for a keyboard implementing the patented technology.

### (4) '760 Patent

275.  

I understand that this alternative was first implemented in July 2012.[483]  I am informed that this alternative is a substantial technological step backwards, and lacks advantages that even feature phones (i.e., non-smartphones) were likely to offer.[484]  For example, users cannot return phone calls directly from the call log list, a feature that is central to the patented invention.[485]

The limited adoption of this alternative further suggests to me that it may not be an acceptable substitute to the '760 Patent.

276.

---

[483] Samsung's Second Supplemental Response to Apple's Interrogatory No. 29, served July 15, 2013.

[484] Conversation with Professor Andrew Cockburn; **Exhibit 11**.

[485] Conversation with Professor Andrew Cockburn; **Exhibit 11**.

██████████████████████████████████████ Further, I am
informed that this alternative lacks the advantages of and is not a wholly-acceptable substitute
for the '760 Patent.[490]  For example, this alternative requires users to memorize a different
gesture for each action they may want to execute.[491]

277.    I understand that the first implemented alternative (i.e., lacking the ability to
return a call) has significant drawbacks over the patented invention.[492] ███████████████
████████████████████████████████████████████████
███████████████████████████████████

**(5) '959 Patent**

278.    ███████████████████████████████████
██████████████████████████ █████████████████████
█████████████████████████████████████████
████████████████████████ In essence, this alternative is simply the
removal of the patented invention. █████████████████████████
█████████████████████████ ███████ ████████████████
████████████████████████████████████████████
████████████████████████ █ ████████████████████
████████████████████████████ █████████

---

[489] Samsung's Second Supplemental Response to Apple's Interrogatory No. 29, served July
15, 2013.

[490] Conversation with Professor Andrew Cockburn.

[491] Conversation with Professor Andrew Cockburn.

[492] Conversation with Professor Andrew Cockburn.

[493] Conversation with Professor Andrew Cockburn.

██ ███████████████████████████████
██ ███████████████████████████████
██ ████████████████████████████████
██ ██████████████████████████████
██ ██████████████████████████████

The alternative first began appearing on Samsung devices in early July 2012,[499] 

279.     I am informed that this alternative lacks the core advantages of the '959 Patent in that it does not provide search results from both the web and local data.[500]

This series of events strongly suggests that the alternative is not wholly acceptable as a substitute for the '959 Patent.  I am not aware of any evidence suggesting that this alternative would be acceptable to any customer that desired a universal search feature.

### d.  Acceptability: Dr. Hauser's Surveys and Conjoint Analysis

280.     Dr. Hauser's surveys quantify the changes in demand between the imperfect non-infringing alternatives for the Asserted Patents and their patented counterparts.  Dr. Hauser does so both by defining the feature in the terms of the patent and by incorporating into the survey certain descriptions of the features or level of functionality respondents claim they would (or did) have if the patented technology were used.[502]  I understand that Dr. Hauser tested certain

---

[499] http://www.androidcentral.com/sprints-galaxy-s-iii-update-removes-local-search-abilities; http://www.ibtimes.com/samsung-galaxy-s3-sprint-confirms-ota-update-disabling-universal-search-att-follows-suit-722264; http://www.theverge.com/2012/7/11/3153912/att-galaxy-s-iii-ota-update-removes-on-device-search.

[500] Conversation with Professor Alex C. Snoeren; **Exhibit 11**.

[501] Email, dated July 13, 2012, SAMNDCA630-07441315, at -315; "Campaign Tracking Report, Samsung Galaxy S III, Analysis of 7/09/2012 – 7/15/2012," July 18, 2012, SAMNDCA630-07517049, at -050, -055, -065; "Campaign Tracking Report, Samsung Galaxy S III, Analysis of 7/23/2012 – 7/29/2012," Aug. 1, 2012, SAMNDCA630-07488605, at -622; David Beren, "Did Local (Universal) Search Get Restored In Galaxy S III Jelly Bean Update?," TmoNews, Nov. 15, 2012 (http://www.tmonews.com/2012/11/did-local-universal-search-get-restored-in-galaxy-s-iii-jelly-bean-update/).

[502] Expert Report of John R. Hauser, Aug. 11, 2013, Exh. E, at pp. 7-17 (smartphones), Exh. F, at pp. 7-16 (tablets).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

purported alternatives implemented by Samsung where it has done so in at least one product, or posited by Samsung in interrogatory responses where it has not.[503]

281.    It was not, of course, possible for Dr. Hauser to test in his surveys all of the 50-odd different "alternatives" that Samsung has posited.  Given that, to my knowledge, Samsung has never contended that any one of their alleged "alternatives" was more acceptable than another, it is my opinion that Dr. Hauser's approach was both reasonable and provides a valuable metric for assessing the impact of non-infringing alternatives.

282.    Dr. Hauser's research allows me to estimate the percentage reduction in the share of customers who would purchase a product with the Patented Features but would not purchase a comparably equipped product with non-infringing alternatives in place of each of the Accused Features or any combination of Accused Features.  In this report, I refer to these reductions in share as changes in consumers' "Willingness to Buy" a product based on the presence or absence of the relevant features.[504]  Essentially, the survey results allow me to measure the contraction in demand (graphically, a leftward shift of the demand curve) for a product associated with removing one or more Accused Features and placing in its stead the posited non-infringing alternative.

283.    The survey results allow me to estimate changes in Willingness to Buy over a wide range of prices ($49 to $299) paid by consumers for their smartphones upon commencing (or renewing) cellular service contracts.  The result further allows me to evaluate the difference in the Willingness to Buy effect for smartphone and tablet screen sizes.[505]  The fact that the surveys cover ranges of price and screen size and the fact that separate surveys were performed for smartphones and tablets substantially enrich my analysis, as the data show that effects of

---

[503] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories, May 2, 2013, pp. 105-131, Objections and Response to Interrogatory No. 29.

[504] As is typical in surveys performed for conjoint analysis, a variety of product features were studied in addition to the Accused Features.

[505] For convenience, I refer to the prices consumers pay upon commencing a contract for a new smartphone and the prices they pay upon purchasing tablets as the "retail prices" of these devices.

Accused Features on Willingness to Buy vary depending on the price of the device and its screen size and on whether the device is a smartphone or a tablet.[506]

284.    Dr. Hauser's research demonstrates that there are significant numbers of Samsung customers who do not find the posited non-infringing alternatives acceptable.[507]  The following illustrative Table 2, based on the responses to Dr. Hauser's survey, reports the estimated average percentages of Samsung customers who would not have purchased Samsung's accused smartphones and tablets if the Accused Features were replaced with non-infringing alternatives, assuming the smartphones and tablets had screen sizes of 4.8 inches and 10.1 inches, and prices of $149 and $499, respectively.

| Table 2 | | |
|---|---|---|
| **Willingness to Buy Accused Features** | | |
| **Estimated Average Reductions in Purchases of Accused Products with Non-Infringing Alternatives in Place of Accused Features[508]** | | |
| **Patent** | **Smartphones** (Retail price: $149; Screen Size: 4.8") | **Tablets** (Retail price: $499; Screen Size: 10.1") |
| '414 | 9% | 14% |
| '647 | 8% | 12% |
| '959 | 5% | 6% |
| '760 | 11% | Not Applicable |
| '721 | 9% | 6% |
| '172 | 16% | 15% |

[506] The "slide-to-unlock" Accused Feature associated with the '721 Patent was studied only in the tablet survey.  (Conversation with Dr. John R. Hauser.)  For this patent only, I therefore apply survey results from the tablet survey to smartphones.

[507] Dr. Hauser's research also demonstrates that the patented inventions play a material role in demand for the Samsung smartphones.

[508] Expert Report of John R. Hauser, Aug. 11, 2013, Exhs. N1, N2.  The result shown for the '721 Patent in smartphones is estimated from the results of the survey Dr. Hauser performed regarding tablets. See **Exhibit 13**.

285.    The survey results also show that the cumulative impact on Willingness to Buy of replacing combinations of Accused Features, e.g., the Accused Features covered by the '414, '647, and '959 Patents collectively, with non-infringing alternatives exceeds the sum of the effects of replacing these Accused Features individually.  This is an economically sensible result, as the competitive positioning of, say, a phone that purports to be a high-end smartphone may be only modestly affected if it lacks one or two expected features but substantially affected if it lacks multiple expected features.  Because the survey provides actual data showing the impact of removing more than one feature, I use that data, rather than simply adding the individual values, when determining lost profits damages for products that infringe more than one patent.

286.    Table 3 illustrates –for smartphones and tablets with screen sizes of 4.8 inches and 10.1 inches, and prices of $149 and $499, respectively, as in Table 2 – the fact that the effect on demand of removing combinations of Accused Features exceeds the sum of the effects of removing features individually.

| Table 3 | | |
|---|---|---|
| **Willingness to Buy Accused Features ("WtB")** | | |
| **Estimated Average Reductions in Purchases of Accused Products with Non-Infringing Alternatives in Place of Accused Features[509]** | | |
| **Patents** | **Smartphones** (Retail price: $149; Screen Size: 4.8") | **Tablets** (Retail price: $499; Screen Size: 10.1") |
| **'414, '647, '959** | | |
| '414 | 9% | 14% |
| '647 | 8% | 12% |
| '959 | 5% | 6% |
| Sum of Individual Reductions in WtB | 22% | 32% |
| Combined Effect | 25% | 34% |

---

[509] Expert Report of John R. Hauser, Aug. 11, 2013, Exh. N1 at 1-3, Exh. N2 at 1-3, Exh.O1 at 7, and Exh. O2 at 7.

287.     The impact of the absence of acceptable non-infringing substitutes for the patented inventions among a significant portion of Samsung customers is understated by Dr. Hauser's survey because the survey does not consider the time required to implement the non-infringing alternatives.  Thus the survey does not account for the fact that, as detailed in Section III.B.4.a below, a quantifiable minimum amount of time ("design-around period") would be required to implement a non-infringing alternative to each Accused Feature.  During these design-around periods, Samsung could not have sold its Accused Products without infringing one or more Asserted Patents and would thus have had to remove the feature immediately or stop selling the Accused Products.

288.     As I explain under *Panduit* Factor 4 in Section III.B.4.b below, with these data and industry data on the shares of smartphones sold by different manufacturers I am able to quantify reliably a conservatively low estimate of Apple's lost profits, consistent with a "market share apportionment" approach for determining lost profits damages in a market in which both non-infringing and infringing products compete with those of the patentee.[510]

### e.   Conclusion

289.     The analysis provided above indicates that Samsung's proposed non-infringing alternatives were not acceptable to at least a significant subset of Samsung customers with respect to each of Apple's Asserted Patents. Thus, *Panduit* Factor 2 is established with respect to each Asserted Patent.

290.     For all patents with the exception of the '647 patent, I compute lost profits based on the amount of time that Samsung would be off the market in order to remove the patented feature or implement a design change. Any effort by Samsung to do so would necessarily take some time.  Samsung's ██████████ own history in attempting to design around Apple's patents, discussed above in Section III.B.2.c, indicates that a design alteration in response to a patent infringement claim requires time to: 1) conceive of a design change after obtaining notice of a patent, 2) time to implement the design change, 3) time to introduce the change throughout

---

[510] *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1577, 12 U.S.P.Q.2d 1026, 1028 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990).

the cellular carriers, 4) time to obtain carrier approval, and 5) time to include the design change in a software release. [511]

291.    Samsung has not disclosed how long any such alternative implementation/ introduction would have taken in the "but-for" world with respect to any of its posited alternatives, and I do not express a specific opinion as to the amount of time Samsung would be off the market in this report. ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

292.    Accordingly I have used these two observed design and implementation periods as benchmarks for this "blackout" period, and evaluated lost profits damages in scenarios in which Samsung's accused products remain off the market entirely during design-around periods of: 1) one month and 2) four months. █████████████████████████████████████

████████████████████████████████████████████████████████████

my lost profits model allows for the flexibility to alter this design around period and recalculate damages accordingly.

293.    ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

In these instances, I assess the portion of Samsung customers who would find non-infringing alternatives unacceptable to be in accordance with the demand contraction proportions as derived from Dr. Hauser's conjoint studies.  These actual Samsung customers, would not be Samsung

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[512] Samsung's Responses to Apple's Interrogatory No. 45, Served July 15, 2013, at p. 184.

customers in the "but for" world, and are thus candidates for a lost profits consideration.  I also account for and assess lost profits for Samsung customers during the period in which Samsung would be off the market to remove the infringing feature, as described below.

294.   For the '172, '721, and '760 Patents, I assess lost profits damages for the period when Samsung would be entirely off the market during the time required to implement a design change, as described above, but I do not otherwise assess lost profits on a portion of sales after that period ends. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████   In this context, with respect to all of the patents with the exception of the '647,[513] there remains the question as to what period (immediately after the date Samsung was put on notice of its infringement but prior to the implementation of the (inferior) claimed non-infringing design) Samsung would be unable to sell any accused product, since no alternative would have yet been available.  I discuss my treatment of this question below.

295.   All damages for units sold outside the blackout period for these patents are assessed using a reasonable royalty approach.

### 3. *Panduit* Factor 3: Manufacturing/Marketing Capability to Exploit Demand

296.   Establishing this *Panduit* Factor requires a determination that Apple had sufficient manufacturing and marketing capacity to make the sales it lost to Samsung's Accused Products.  Note that this analysis naturally relates to an evaluation of the "but for" world— that is, "but for" Samsung's infringement, would Apple (facing the demand from carriers and consumers inherent in the "but for" world) have been able to plan for and accommodate the additional demand it would have faced, given such additional demand would have been anticipated to exist absent Samsung's conduct.  Fundamentally, this assessment evaluates whether any inherent barrier to

---

[513] I do not include the '647 in this analysis because Samsung had notice of that patent before infringement began.  Consequently the starting point of any "off the market" period would predate the damages period in this case.

capacity expansion would have existed that would have left Apple unable to meet additional demand, even if such additional demand were anticipated well in advance.[514]

297.   To evaluate this question, I have studied a



298.

---

[514] Of course, should the ability to meet this additional demand have required additional expenditures (on, say additional plant or equipment) beyond those historically disbursed by Apple, such expenditures would be reflected in the incremental costs deducted from lost revenues to asses lost profits.

[515] "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 3, APLNDC630-Y00003612; "iPhone Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 4, APLNDC630-Y00003613; "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 5, APLNDC630-0001120880; "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 6, APLNDC630-0001120881.

[516] "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 3, APLNDC630-Y00003612; "iPhone Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 4, APLNDC630-Y00003613; "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 5, APLNDC630-0001120880; "iPad Supply and Sales," 2010-2012, Deposition of Rory Sexton, June 28, 2013, Exh. 6, APLNDC630-0001120881; "iPhone Supply and Sales," 2010-2012, Deposition of Mark Buckley, Jul. 9, 2013, Exh. 20, APLNDC630-Y00003613.  Conversation with Rory Sexton.

[517] Conversation with Rory Sexton.

[518] APLNDC630-Y00003612; APLNDC630-Y00003613; APLNDC630-0001120880; APLNDC630-0001120881.  As Mr. Sexton explained during his deposition, 

Deposition of Rory Sexton, June 28, 2013, at 133:19-23.

[BLACK REDACTION BOX]

[BLACK REDACTION BOX]

[BLACK REDACTION BOX]

[BLACK REDACTION BOX]

[BLACK REDACTION BOX]

299.   In **Exhibits 12** and **12-A**, I report ███████████████████████████ ███████████████████████████ I find that, overall, ███████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

███ As shown below under *Panduit* Factor 4 (where the quantum of lost Apple sales is fully developed), ███████████████████████████████████████████████████ ███████████████████████████████

300.   As I describe in more detail below, my lost profits exhibits[520] provide a comparison of the number of additional units for which lost profits would be calculated and the available capacity in existing or available inventory.  I find that through a combination of Apple's excess manufacturing capacity and inventory on hand, Apple had the ability to make and sell the additional iPhones and iPads that would have resulted from capturing sales lost to Samsung.

301.   My review of the above data indicates that ████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████ As a rational economic actor, Apple would have done so as soon as it had reason to expect an increase in demand. Fundamentally, I see no evidence that the supply of any resource required to expand production

---

[519] Conversation with Rory Sexton.

[520] See **Exhibits 17-A**, **18-C**, **19-A**, **20-A**, **21-A** and **22-A**.

[521] Deposition of Rory Sexton, Transcript, June 28, 2013, at 20, 57-58.  Moreover, ████████ ███████████████████████████████████████████████████████ Deposition of Rory Sexton, Transcript, June 28, 2013, at 75:1-11.

could not be increased quickly enough to allow Apple to exploit additional demand for its products of the magnitude discussed in my quantification of Apple's lost profits below.

302.     *Panduit* Factor 3 also requires consideration of marketing capacity.  I am unaware of any suggestion in this case or in the 1846 case that Apple would have been limited by marketing capacity in its ability to exploit additional demand for its products.  Promotional efforts through the media would not have required any additional capacity – in fact, Apple's need to promote its products in competition with those of Samsung would, if anything, have been reduced by the less intense competition from Samsung that would have occurred if it were not infringing Apple's patents.  Further, sales representatives at the outlets of carriers and other retailers that offered both Apple and Samsung devices would simply have sold more Apple and other non-Samsung devices in place of Samsung's infringing products.  Thus, there is no reason to believe that Apple's ability to exploit additional demand for its products, but for Samsung's infringement, would have been impeded by limits on its marketing capacity.

### 4.  *Panduit* Factor 4: Amount of Lost Profits

303.     Based on my findings that the first three *Panduit* Factors are met with respect to Samsung customers of the accused devices, I turn now to a quantification of lost profits sustained by Apple as a result of Samsung's infringement.  This analysis proceeds in three steps:

- Determine the Samsung infringing sales that are candidates for a lost profits consideration—that is, sales Samsung made in the actual world that it would not have made in the world "but for" infringement;

- Determine which of these candidate diminished Samsung sales would have been Apple sales, but-for infringement; and

- Determine the lost revenues and lost profits sustained by Apple as a result of these lost sales.

304.     As a general matter, the fact that Samsung competes directly with Apple using the Accused Products is, in my opinion, indisputable in light of an economic analysis of the marketplace and the competitive dynamics involving smartphones and tablets presented in Section II.F above.

### a.   Samsung Sales That Are Candidates For Lost Profits

### (1) Samsung's Actions in the "But For" World

305.     As noted above in my consideration of *Panduit* Factor 2, the amount by which Samsung's sales of Accused Products would have decreased had Samsung not infringed the Asserted Patents (that is, "but for" infringement) depends on the following:

- The amount of time Samsung would have been off the market while either removing a patented feature from the Accused Products or implementing a non-infringing alternative; and

- The number of sales that Samsung would have lost due to diminished demand for its product occasioned by the removal of the patented feature, or by the inferiority associated with a non-infringing alternative that was not acceptable to all customers.

306.     As mentioned in my discussion of *Panduit* Factor 2, in the actual world, Samsung has taken different actions with respect to different Asserted Patents.  I summarize in the following Table 4 whether and (if applicable) when Samsung has actually introduced claimed non-infringing alternatives in its Accused Products.  Since I understand that (assuming the relevant technology was available at the time) the earliest date on which Samsung would have begun development of these alternatives was when it received notice of infringement of the Asserted Patents, I also report in this table the length of the design-around period from the notice date for each patent:

| Patent | Earliest Date an Accused Product Contained a Non-Infringing Alternative | Time from Notice Date to First Product with a Non-Infringing Alternative |
|---|---|---|
| '414 | ██ | ████████ |
| '647 | ██ | ███████ |
| '959 | ███ | █████████ |
| '760 | ██ ██ / ████ | ████████ |
| '721 | ██ ██ / ████ | ███████ |
| '172 | ██ ██ / █████ | ████████ |

**Table 4**

**Actual Time to Introduce Non-Infringing Alternatives for Asserted Patents**

**(2) Lost Profits During the Design-Around "Blackout" Period**

307.　　As noted above, it is unrealistic to assume that, in the world "but for" infringement, Samsung would have been able to instantaneously implement a design around for its infringing products, even where a part of this design-around strategy would have been an interim production where the accused feature was simply disabled.  I have been able to evaluate lost profits damages (and damages more generally) in the event there is a material "blackout" period during which Samsung is unable to sell its accused devices as it identifies and implements alternatives.  I computed damages in this context for blackout periods spanning one month and

---

[522] I understand that the accused universal search feature was removed from the Galaxy Nexus in July 2012, shortly after the Court granted a motion for a preliminary injunction against this product, and was restored beginning in October 2012 after the injunction was vacated on appeal.

[523] See discussion in Section III.B.2, above.

[524] See discussion in Section III.B.2, above.

[525] As discussed above in Section III.B.2c.3, Samsung had, in certain earlier infringing products, non-infringing keyboards provided as an option along with infringing keyboards.  I understand that the first time these non-infringing keyboards were provided alone and in a Samsung flagship phone was with the release of the Galaxy S III.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

four months.  Should Samsung prove a different duration of these blackout periods, my analyses can be adjusted accordingly.[526]

308.    During the blackout period, *all* of Samsung's accused sales become candidates for lost profits, and Samsung has no acceptable alternative forms of its accused products to provide to any of its customers for those products.[527]  Note that this period applies in the event *any* patent is found valid and infringed and a blackout period is assumed—this includes the patents that were actually designed around by Samsung ███████████████████████████████

███████████████████████████████████

309.    There is one exception to the modeling provisions put forward here with respect to the '647 patent.  I do not seek off the market lost-profits for that patent because I understand that Samsung had prior notice of infringement of that patent (with respect to earlier infringing products that are not at issue in this case) on August 4, 2010, more than nine months before the first Accused Product was introduced.

310.    In sum, the Samsung accused sales that are candidates for Apple lost profits consist of the following:

- During a "blackout period" (presently assessed as being either one or four months from the infringement notice date in different scenarios), Samsung is unable to produce and sell any accused devices, and thus all of its accused unit sales are candidates for Apple lost profits;[528] and

- For the period subsequent to any blackout period, Samsung accused sales that are candidates for lost profits reflect the demand diminution associated with each claimed alternative as reflected in Dr. Hauser's conjoint studies; ███
████████████████████████████████████████████

███████████████████████████████████████████

---

[527] Note that my model allows Samsung to still retain some of these customers through its non-accused devices, as specified in the market share allocation methodology detailed below.

[528] Again, this blackout date applies only once, and is not repeatedly considered as multiple patents are found valid and infringed.  Also, this consideration is suspended for the '647 patent, which has an earlier date at which the "but for" world commences.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### (3) Diminution in Samsung Sales of Accused Products With Non-Infringing Designs Implemented

311.    To determine the diminished sales at Samsung in the "but for" world that are candidates for lost profits at Apple during periods where the claimed alternatives would have been implemented and commercialized by Samsung, I utilize results of the survey and conjoint analysis conducted by Dr. Hauser.[529]  As mentioned in my discussion of *Panduit* Factor 2 above, Dr. Hauser's survey and conjoint analysis allow me to estimate demand curves for the Accused Products with the Accused Features and with non-infringing alternatives in their stead and effectively observe the shifts in those demand curves associated with replacing an Accused Feature with a non-infringing alternative (*i.e.*, the decreases in Willingness to Buy Samsung's Accused Products) at any given price level, among those who have historically been Samsung smartphone and tablet owners.  This allows me to estimate the diminished unit sales Samsung would have faced by replacing Accused Features with non-infringing alternatives for each Asserted Patent

312.    In my opinion, the appropriate measure of Samsung's loss of unit sales from replacing Accused Features with non-infringing alternatives is the distance of the leftward shift in the demand curve for each Accused Product derived from the conjoint analysis, holding the price at which it was sold to consumers fixed at its actual historical level.[530]  This is because prices to consumers of devices such as smartphones and tablets are typically set at "focal" price

---



[529]

[530] Strictly speaking, this statement refers to the inverse demand curve, in which quantity is represented as the independent variable and price as the dependent variable.  This corresponds to the standard textbook graphical depiction of a demand curve, which makes it convenient to describe demand curves in this manner.  In reality, suppliers of differentiated products such as smartphones and tablets consider prices and quantities jointly, along with promotional efforts, in seeking to maximize profits.

levels (such as $199 or $299).[531]  Within the range of possible price changes relevant to my analysis, suppliers of these devices would expect to generate too small an increase in unit sales by reducing their prices from these focal levels to offset the loss of revenue per unit and would, thus, leave prices unchanged.[532]

     313.    In assessing the impact on Willingness to Buy of removing more than one Accused Feature, I also adjust for the overlap in demand reductions associated with the absence of each individual feature (or reduction in the quality of the feature).  For example, if replacing a feature covered by one Asserted Patent with a non-infringing alternative at a given price level would reduce the share of Samsung customers who would purchase that product by 5% and replacing a feature covered by a second Asserted Patent with its non-infringing alternative would reduce the share who would purchase it by 3%, and the demand for each feature is not dependent on the presence of any other feature (that is, demand for the two features are independent), then replacing both Accused Features would reduce the share who would purchase it by 7.85% in total.[533]

---

[531] ███████████████████████████████

[532] Recognizing that the Accused Products were not as attractive without the Accused Features, Samsung might well seek to mitigate their losses by enhancing these products in other ways.  However, such enhancements would be costly and their effect on demand is entirely speculative; since there is no basis for expecting that they would materially reduce Samsung's losses, I do not attempt to estimate their impact.

[533] 100% - 5% = 95%; 100% - 3% = 97%; 95% X 97% = 92.15%; 100% - 92.15% = 7.85%. Note that, in this calculation, because the reduction in share of those who would purchase an Accused Product that is attributable to removal of any Accused Feature is expressed as a percentage, the absolute incremental reduction in units purchased due to removal of any Accused Feature will depend on the initial number of units used in the calculation.  As a result, the incremental reduction in units purchased associated with removal of any individual Accused Feature depends on the order in which Accused Features were removed.  Thus, when considering the impact of simultaneous removal of multiple Accused Features, only the total impact of removing the Accused Features is economically meaningful.  It is appropriate to calculate the incremental reduction in units purchased associated with removal of any individual Accused Feature only for the purpose of studying the impact of removing that Accused Feature, given a starting point in which Accused Products are assumed to embody a specific set of Accused Features.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

314.     Here too, I implement a conservative adjustment that simplifies the assessment of damages associated with different combinations of Accused Features:  I calculate the combined impact on Willingness to Buy of removing or replacing all the Accused Features in the manner just described (which adjusts for overlap) and attribute to each Asserted Patent a share of the combined impact on Willingness to Buy equal to its share of the sum of the individual impact on Willingness to Buy of each Asserted Patent.  This adjustment, which I refer to as a "linearization" of the weights given to each Asserted Patent, implies that the estimate of the effect on Willingness to Buy of the Accused Feature associated with any individual Asserted Patent that I use in my damages analysis will be less than it actually would have been unless all the Asserted Patents are found to be valid and infringed.[534]

315.     Because of the patent-specific and additive nature of the results derived from the conjoint analysis, I am able to adjust my calculation of the diminished unit sales had Samsung not infringed the Asserted Patents and implemented alternative designs, to reflect the fact that the Asserted Patents being infringed by Accused Products vary over time (because the notice date of the '647 Patent is earlier than that of the other Asserted Patents and because, at certain points during the damages period, Samsung has removed Accused Features from some of its Accused Products or introduced new products that do not embody the Accused Features).  (See **Exhibit 7**.)  For the same reasons, the results of the conjoint analysis can be used to recalculate damages as needed to address any outcome at trial regarding which Asserted Patents the Accused Products are found to have infringed.

316.     The results of Dr. Hauser's surveys provide an additional important data point that indicates that the demand-diminishing impact of removing the patented features associated with the '414, '647, and '959 patents and replacing them with the proposed design-arounds *collectively* is greater than the arithmetic sum of the effects of removing the three patents taken individually.  This result is unsurprising, as consumers who might be willing to live with the absence of one or two features are unwilling to purchase devices where several layers of functionality have been compromised.  I include this additional lost profits permutation in the calculations in the damages analyses of this Section.

---

[534] As discussed below, **Exhibits 13** and **14** provide the results of the linearization calculation. **Exhibits 13-A** and **14-A** provide the corresponding strict results.

317.     In this report, I assume that the Accused Products are found to have infringed each of the Asserted Patents in accordance with Apple's infringement contentions.  In **Exhibits 13** and **14**, I report the resulting estimates of the amounts by which Samsung's sales of each of the Accused Products would have been diminished (*i.e.*, the impact on Willingness to Buy) during the time it would have replaced each of the products' Accused Features with non-infringing alternatives.[535]  These calculations in the exhibit are averages that account for the fact that, in the conjoint survey results, the effects of replacing Accused Features on end users'

---

[535] In **Exhibits 13** and **14**, I report my estimates of the average retail prices of each of the Accused Products that determine, along with screen size, which estimated effects on Willingness to Buy results from the conjoint analysis are applied to each Accused Product for each Asserted Patent.  Given that the estimated effects of removing Accused Features tend to increase with the price of the product being considered by respondents, my assessment of the relevant prices of the Accused Products is conservative in that, where rebates off retail prices were offered to purchasers of smartphones, I assume that they were universally available and were redeemed by purchasers.  I have calculated the average retail price of each of the Accused Products based on the retail prices ("R/P") reported in the U.S. Weekly Smart Phone Sales Reports created by STA (see Deposition of Justin Denison, Transcript, Sept. 21, 2011, at 332:2-334:3; "Weekly US Smart Phone Report," Deposition of Justin Denison, Exh. 243, Sept. 21, 2011).  I have determined these retail prices to be net of any available rebates, considering that the prices net of rebates reported in publicly available sources align with the retail prices in the Weekly Smart Phone Sales Reports for a given device during comparable time periods.  See, e.g., the prices reported for the Samsung Conquer 4G (Sprint) in Week 35 2011 (www.samsung.com/us/news/19904) and Week 36 2011 (SAMNDCA630-06447120); the Samsung Stratosphere in Week 42 2011 (www.samsung.com/us/news/19927, SAMNDCA00279225); the Samsung Exhibit II 4G (T-Mobile) in Week 44 2011 (www.androidcentral.com/t-mobile-gets-its-first-no-contract-4g-smartphone-samsung-exhibit-ii-4g, SAMNDCA630-06615629); the Samsung Transform Ultra (Sprint) in Week 49 2011 (reviews.cnet.com/smartphones/samsung-transform-ultra-sprint/4505-6452_7-35059781.html, SAMNDCA10374507); the Samsung Admire (Metro PCS) in Week 10 2012 (web.archive.org/web/20120305120753/http:/www.metropcs.com/metro/detail/Samsung+Admire/SCHR720ZAAM, SAMNDCA630-06044074); the Samsung Galaxy S III (T-Mobile) in Week 25 2012 (www.tmonews.com/2012/06/t-mobile-breaks-up-galaxy-s-iii-launch/, SAMNDCA630-06625315); and the Samsung Galaxy S II Epic 4G Touch (Sprint) in Week 26 2012 (http://web.archive.org/web/20120628090213/http://shop.sprint.com/mysprint/shop/phone_details.jsp?prodId=dvc5890001prd&deviceSKUId=58900014&flow=AAL&planSKUId=null&tabId=dt_phones&ptn=,SAMNDCA630-06358839). See also the prices reported for the HTC Amaze 4G (T-Mobile) in Week 42 2011 (www.phonearena.com/news/T-Mobile-officially-announces-the-release-date-for-the-HTC-Amaze-4G-and-Samsung-Galaxy-S-II_id22429, SAMNDCA00279225) and the LG myTouch (T-Mobile) in Week 45 2011 (www.engadget.com/2011/11/01/lg-mytouch-mytouch-q-available-on-t-mobile-november-2nd-for-79/) and Week 47 2011 (SAMNDCA630-07554129).

Willingness to Buy vary with the price and screen size of the device in question.  In the next step of my damages analyses, I estimate the portion of the reductions in Samsung's sales reported in **Exhibit 10** that would have been made by Apple during the damages period.

### b.   Computation of Apple's Lost Sales

318.    In the previous Section, I estimated the sales of Accused Products that Samsung would not have made had it not infringed the Asserted Patents.  Adopting the language of the previous Sections, for convenience, I refer to these as Samsung's "diminished" sales but for infringement, or as "candidates" for lost profits.

319.    In this Section, I explain my method for estimating the share of Samsung's diminished sales that Apple would have made, which provides the unit sales that constitute lost sales at Apple caused by Samsung's infringement.  My method is known as an adjusted market-share based allocation (or "*Mor-Flo*" analysis, as it is based on the widely used method accepted by the Federal Circuit in *State Industries, Inc. v. Mor-Flo Industries, Inc.* ("*Mor-Flo*")).[536] Under this approach, diminished sales of the infringer in the "but for" world are removed from the market and apportioned among competing products in proportion to their relative market shares.  Of course, no sales are permitted to return to the accused Samsung devices, as customers by definition find such products unacceptable at prevailing prices.  In the present analysis, I apportion Samsung's foregone sales but for infringement among the remaining products in the market in proportion to their relative market shares as shown in **Exhibit 15**.[537]

320.    A central decision in implementing a "market" share allocation is, of course, which products to include in the "market" where, as here, there are significant points of differentiation among the products.  In my analysis, I have included all competing brands of smartphones and tablets.  This is a highly conservative assumption, for two reasons:

---

[536] *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1577 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990).

[537] I also perform a Mor-Flo analysis for tablets in **Exhibit 15-A**.

- First, many of the products I am treating as alternatives that Samsung's customers could have purchased instead of the Accused Products employ the Android platform, and likely infringe Apple's patents. With respect to the '414, '647, and '959 Patents, including all other Android suppliers' devices in the *Mor-Flo* analysis is especially conservative because the features covered by these patents are, as mentioned, embodied in the Android operating system and are thus common to Android suppliers' devices unless these suppliers specifically modify them, which, to my knowledge, has not occurred.[538]

- ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (See **Exhibit 7**.)  My allocation of accused sales to all other smartphone and tablet market participants thus accounts in a conservative manner for major consumer demand factors such as price and consumers' preferences for carriers, operating systems, brands, and other features of competing products.

321.    As mentioned, the parties are each required under a Court Order to reduce to 10 the number of products they are accusing before trial, and I will remove Accused Products from my damages calculations accordingly. However, I understand that, in my assessment of damages based on what would have occurred "but for" infringement, Samsung Accused Products that are dropped before trial are not to be treated as being available to consumers for purchase instead of the Accused Products that remain in this case. Accordingly, Samsung Accused Products that are dropped before trial are not included in my *Mor-Flo* analysis.[539]

---

[538] Conversation with Professor Alex C. Snoeren; Conversation with Dr. Todd C. Mowry.

[539] I have made one additional conservative assumption in my analysis. For the overwhelming majority of the damages period in this action, Samsung and Apple devices were available through each of the significant wireless providers in the U.S. – AT&T, Verizon, and Sprint. iPhone availability at Sprint began with the iPhone 4S in October, 2011 (http://www.apple.com/pr/library/2011/10/04Apple-Launches-iPhone-4S-iOS-5-iCloud.html). iPhone availability at smaller participants (e.g. Virgin Mobile) began in 2012, and in April 2013 at T-Mobile (http://www.macworld.com/article/2032069/iphone-arrives-at-t-mobile-on-april-12.html). As a conservative approach, I limit the share of units of Accused Products sold while iPhones were not offered by Sprint, T-Mobile, Metro PCS, and Boost that are subject to *Mor-Flo* allocation for lost profits consideration to 32%, based on market research which finds that 32% of smartphone buyers "select a phone first, then a carrier." "Google Wireless Shopper Study," Apr. 2013, APLNDC630-0001504504, at -511. I assess no lost profits to Apple for Samsung sales to these carriers during the period when the iPhone is not available. See **Exhibit 14-C**.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

### c.  Apple Lost Profits on Lost Sales

322.    In **Exhibits 16** and **16-A**, I show Apple's incremental profit margin earned on Apple's iPhones and iPads.  Apple's incremental sales margin was determined by deducting Apple's sales expense and distribution expense from the gross profit for Apple's iPhones and iPads.  This deduction is made in order to be conservative and based on my conversation with and previous deposition testimony of Mr. Mark Buckley, who stated that the ████████████ ██████████████████    Also, I have used Apple's average incremental profit for all iPhones and iPads as opposed to individual models ████████████████████████ ██████████████████████    Additionally, Mr. Mark Buckley testified that ██████████████████████████████    To be conservative, ██████████████████████████ and, subsequently, have deflated Apple's product revenue and, in turn, its margins.

### d.  Summary of Lost Profits Damages

323.    My calculation of lost profits sustained by Apple as a result of Samsung's infringement of the Asserted Apple patents proceeds in three steps, as detailed above:

- Quantify the volume of Samsung infringing unit sales of infringing devices that are candidates for lost profits – that is, sales Samsung historically made of accused devices that it would not have made "but for" infringement;
- Determine the portion of these candidate sales that would have likely been sales of Apple's corresponding devices, thus determining the number of Apple lost sales; and
- Apply an appropriate incremental profit margin based on Apple's revenues and costs, and apply this margin to Apple's lost unit sales.

324.    As mentioned above, Dr. Hauser's survey results confirm the economic intuition that Samsung's loss of sales if its product lacked multiple Accused Features would exceed the

---

[540] Deposition of Mark Buckley, Feb. 23, 2012, at 125-126; Conversation with Mark Buckley.

[541] Conversation with Mark Buckley.

[542] Deposition of Mark Buckley, Transcript, July 9, 2013, at 56, 69-70, 131-132; "Line of Business Reporting," 2007-2011, Deposition of Mark Buckley, Exh. 3, July 9, 2013, APLNDC630-Y00000015.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

sum of the losses associated with a lack of Accused Features each considered on their own.  In that discussion, I reported that, whereas the sum of individual reductions in Willingness to Buy for the '414, '647, and '959 Patents was 22%, the combined effect of removing the Accused Features covered by these patents, considered collectively, was 25%.  In **Exhibit 17-A**, I generate Apple lost profits due to diminished demand for the '414, '647, and '959 Patents considered collectively.  Total lost profits damages in this scenario are $653.7 million.  (Note that I compute lost profits damages due to diminished demand (as opposed to products being taken off the market) only for the '414, '647, and '959 Patents.  Note also that these calculations take account of the fact that not all Accused Products have infringed all three of these patents, or have not done so at all times: where not all three of the '414, '647, and '959 Patents are infringed, the calculations apply individual per-patent impacts on demand estimated from Dr. Hauser's conjoint analysis.)[543]

325.    I generate Apple lost profits due to lost sales in the scenario where Samsung faces a four-month blackout period beginning in February 2012, followed by diminished demand for its redesigned products in 2012 - 2013.  Lost profits sustained by Apple under this four-month blackout scenario are $980.6 million.  (See **Exhibit 19-A**.)[544]

326.    Lastly, I generate Apple lost profits due to lost sales in the scenario where Samsung faces a four-month blackout period beginning in February 2012, followed by no diminished demand for its redesigned products.  As shown in **Exhibit 21-A**, I compute lost profit damages under this scenario of $455.2 million.[545]

---

[543] In general, my computations of lost profits due to diminished demand incorporate the combined, collective effect on demand of the '414, '647, and '959 Patents.  However, in **Exhibit 18-C**, I report the results of an alternative lost profits calculation, in which I consider only the individual per-patent impacts on demand of these patents.  In this scenario, lost profits damages total $573.8 million.  In terms of lost profits, the combined effect on demand of the features covered by the '414, '647, and '959 Patents thus exceeds the sum of individual effects by about $79.9 million.

[544] In **Exhibit 20-A**, I report the results of an alternative scenario in which Samsung faces a *one*-month blackout period beginning in February 2012, followed by diminished demand for its redesigned products in 2012 - 2013.  In this scenario, lost profits damages total $733.7 million.

[545] In **Exhibit 22-A**, I report the results of an alternative scenario in which Samsung faces a one-month blackout period beginning in February 2012, followed by no diminished demand for its redesigned products.  In this scenario, lost profits damages total $109.2 million.

327.    Under each scenario, Samsung infringing sales for which Apple lost profits do not apply are subjected to the application of a reasonable royalty.  Total damages owed under each scenario are the sum of lost profits damages plus the corresponding measure of reasonable royalty damages.  I turn now to the assessment of the appropriate reasonable royalty.

### C. Reasonable Royalty Damages on Infringing Sales on Which Lost Profits Are Not Claimed

328.    As stated in the introduction to my damages analysis, reasonable royalty damages are due on those sales of Samsung's Accused Products where Apple does not claim lost profits due to lost sales.

329.    I understand that a reasonable royalty is determined by executing a hypothetical licensing negotiation between the patentee and infringer at the time of initial infringement.  I determine the reasonable royalty rates for each Asserted Patent (expressed in dollars per unit) that are applicable to sales of Samsung's Accused Products during the damages period.  I have applied these reasonable royalty rates to Samsung's unit sales of the Accused Products during the damages period on which lost profits damages are not claimed.

### 1. Initial Conditions and Parameters

330.    The overriding consideration governing a license by Apple to Samsung is the intensely competitive relationship between the parties, coupled with the importance of the product features covered by the Asserted Patents for consumer demand, as discussed in my lost profits consideration above.  For this reason, royalties under such a license must account for the losses of sales and harm to its reputation as an innovator and, thus, its brand that Apple would have anticipated from granting such a license to its chief rival, and the corresponding gains in competing with Apple and other smartphone and tablet manufacturers that Samsung would have anticipated.

331.    Given the importance of these strategic bargaining considerations to the determination of a reasonable royalty, I evaluate the last of the *Georgia-Pacific* Factors first, then consider the other Factors.  The 15th *Georgia-Pacific* Factor identifies the "willing licensee" and "willing licensor" paradigm under which the parties to the hypothetical negotiation

recognize that the license should be economically rational for both parties to undertake.[546] Having determined the range of possible royalties within which a license would be economically rational, I determine the most likely royalty outcome within this range by assessing the remaining *Georgia-Pacific* Factors.

### a.  Dates of Negotiation and Notice Dates

332.    I understand that, under the assumptions that govern the hypothetical negotiation of a reasonable royalty, the hypothetical negotiation is assumed to take place before the first infringement of the Asserted Patents (although reasonable royalty damages only begin to accrue for each patent (other than the '647) at a later date).  I understand further that Apple asserts that Samsung began infringing the '414, '647, and '959 Patents on June 15, 2011, when Samsung released the first Accused Product in the U.S., and that Samsung began infringing the remaining Asserted Patents when they issued later in 2011:  September 6, 2011, for the '760 Patent; October 25, 2011, for the '721 Patent; and December 6, 2011, for the '172 Patent.  I therefore assume that the hypothetical negotiation for a license to each Asserted Patent would have occurred just before the date that patent was first infringed.

333.    The date of hypothetical negotiation, being based on when infringement began, is distinct from the dates on which Samsung was given notice of the Asserted Patents.  I understand that the damages period for any infringed patent begins on the later of the date it was first infringed and its notice date.  As mentioned above, I understand that the notice date for the '647 Patent was August 4, 2010, before the date of first infringement of this patent, whereas the notice date for the other Asserted Patents was February 8, 2012, after each of those patents was first infringed.

### b.  Nature of License

334.    In constructing the hypothetical negotiation, I seek to create a licensing scenario that is consistent with what an actual negotiation at the time of initial acts of infringement

---

[546] By considering under this Factor the amount the infringer would have been willing to pay, given its profitability, I also address the "analytical approach" described in *TWM Manufacturing Co., Inc. v. Dura Corp.,* 789 F.2d 895 (Fed. Cir. 1986) ("*TWM v. Dura*").  Under the analytical approach, the infringer's usual or acceptable net profit is subtracted from its anticipated net profit from sales of infringing devices (*TWM v. Dura*, p. 6).

relevant to the hypothetical negotiation would have looked like and with the actual relationship between the hypothetical licensor and licensee. However, I understand that the hypothetical negotiation construct requires that a reasonable royalty be determined even when the patentee would not in fact have been willing to license the infringer, which I understand to be the case here. Under these conditions, I seek to create a licensing scenario that is as consistent as possible with the actual relationship between the parties at the time of the hypothetical negotiation, subject to the requirement that I determine a reasonable royalty rate adequate to compensate Apple.

335.     In the current instance, I find that Apple and Samsung would have negotiated a non-exclusive license.

### c.  Patent Validity, Enforceability and Infringement

336.     Since damages are to be assessed only if the Asserted Patents are found to be valid and infringed, the hypothetical licensing scenario assumes that the parties arrive at the negotiating table with a common understanding that the Asserted Patents are valid and enforceable and that Samsung's Accused Products would, absent a license, infringe the asserted claims. (For simplicity, I refer below to the validity and infringement of the Asserted Patents and implicitly assume their enforceability.)

### d.  Full Information, Reasonable Foresight, and Consistency of Forecasts

337.     The hypothetical licensing analysis seeks to reflect the expectations that can reasonably be imputed to the parties at the date of the hypothetical negotiation. For this purpose, contemporaneous financial projections by the parties may provide useful information. Further, the parties are assumed to have had full information and reasonable foresight as to trends in the marketplace. The assumption of full information does not imply that the parties to the hypothetical negotiation know the future, but rather that the parties "put their cards on the table," *i.e.*, they have access to the same information, so that neither can exploit an informational advantage over the other in the bargaining process.[547]

---

[547] See, e.g., Jonathan D. Putnam and Andrew B. Tepperman, "Bargaining and the Construction of Economically Consistent Hypothetical Negotiations." *The Licensing Journal*, Aug. 2004, pp. 8-15 at p. 12.

338.     Since details of what the parties actually expected at the time of the hypothetical negotiation are often lacking, the assumption that the parties had reasonable foresight allows actual data be used if they are in line with what the parties could reasonably have expected. Given full information and reasonable foresight, I assume that Apple and Samsung would have had common expectations regarding the demand for the Accused Functionalities.  Without this assumption, the hypothetical negotiation construct could break down even though, given full information, reasonable foresight, and agreement that the patent in question is valid and infringed, the parties would rationally have been able to negotiate a royalty, as they are required to do in a reasonable royalty damages assessment.

## 2.   Edgeworth Box: *Georgia-Pacific* Factor 15[548]

339.     As noted earlier, I begin my assessment of the *Georgia-Pacific* Factors with Factor 15.  Before proceeding to the details of my analysis of Factor 15 in the present case, I explain my general approach to analyzing this Factor and the impact of the circumstances of the present case on this analysis.

340.     The likely price at which an agreement can be struck between two parties to exchange a good or asset is bounded by the expected valuations each party anticipates if the transaction does not take place.  These valuations are commonly referred to in economics as forming the boundaries of an "Edgeworth Box," a bargaining range that governs economic interactions between the parties.[549]  As the licensor, the patentee takes into consideration that it would generally not be in its economic interest to accept less in royalty fees than the expected financial cost of granting such a license.[550]  Correspondingly, as the licensee, the infringer would

---

[548] This Factor is "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license."

[549] The Edgeworth Box concept was pioneered in the late nineteenth century.  See Edgeworth, F.Y. (1881) *Mathematical Psychics* (Keegan Paul, London).

[550] Economists sometimes refer to this figure as the "bottom" of the Edgeworth Box.  See Jerry A. Hausman and Gregory K. Leonard, "Real Options and Patent Damages: The Legal

consider the license fee relative to the expected additional value it would have anticipated realizing as a direct result of having access to the technology taught by the asserted patent.[551] Reasonable parties at the negotiating table would have considered these figures as important benchmarks in the likely outcome of their licensing negotiations.

341.     From an economics standpoint, the minimum amount that the patentee will accept could, in certain situations, be higher than the most the licensor would be willing to pay. This is particularly likely in situations (such as the one here) where the licensor patentee and licensee infringer are direct competitors, as the increased competition resulting from the granting of a license might cause the losses that the licensor would expect from granting a license to exceed the profits the licensee would expect to gain.[552]  I address this situation in paragraph 431 and its accompanying footnote.

342.     As mentioned, I assume that a hypothetical negotiation would have taken place on the eve of the first infringement of each Asserted Patent by an Accused Product, *i.e.*, shortly before the dates between June 15 and December 6, 2011, mentioned in Section III.C.1.a above. The parties to the hypothetical negotiation would be Apple as licensor and Samsung as licensee.

### a.  Overview of the Hypothetical Negotiation

343.     Before launching into an assessment of Samsung's maximum willingness to pay and Apple's minimum acceptable rate, it is important to understand the significance of the

---

Treatment of Non-Infringing Alternatives and the Incentives to Innovate," *Journal of Economic Surveys*, Vol. 20, No. 4 (2006).

[551] Economists sometimes refer to this amount as the "top" of the Edgeworth Box.  See Jerry A. Hausman and Gregory K. Leonard, "Real Options and Patent Damages: The Legal Treatment of Non-Infringing Alternatives and the Incentives to Innovate," *Journal of Economic Surveys*, Vol. 20, No. 4 (2006).

[552] This phenomenon reflects the basic idea that the negotiation takes into account expected prices and profits on the products to be licensed, which is commonly derived from real world data and forecasts where no royalty was paid, or no royalty was expected to be paid.  Thus, the prices on the accused products derived from these data do not reflect the added marginal costs of a royalty under the license.  From an economic standpoint, one would expect the licensee to have its prices reflect the higher costs under the license, which would expand the licensee's willingness to pay, and commonly eliminates this phenomenon.  As such, the licensor's minimum acceptable royalty can once again be seen as an effective floor on the likely outcome of the hypothetical negotiation.

negotiation itself and its ramifications as to subsequent industry structure and the "bigger picture" (rather than just the financial calculus) for both parties.

344.    In that context, I raise several key considerations in this preamble:

- The proposed license would require Apple to enable a direct and able competitor to deprive Apple of significant sales in two marketplaces that Apple had essentially created through its pioneering innovation and investments in the previous five years;

- Samsung faced a critical juncture in its strategic trajectory during the relevant time period – with the license from Apple, it would have the prospect of leapfrogging other second-tier device suppliers; without the license, it would be relegated to continue its second-tier status;

- The timing of the license would be particularly important, as the smartphone marketplace was entering into a critical phase wherein vast numbers of first-time smartphone buyers would be committing to a device supplier and operating platform;

- The economic ramifications of licensed sales extended well beyond mere sales of smartphones and tablets, as consumer "stickiness" ensures that initial device sales provide substantial assurance that the consumers will remain with that manufacturer and platform for subsequent purchases;

- The immediately preceding factor is extended and expanded by supplier/platform ecosystem effects, whereby consumers are locked in to their platform for smartphone and device sales, and also acquire content, accessories, services, and, critically, other devices and hardware, all within a common platform;

345.    All of these factors are highly relevant in considering the likely outcome of a hypothetical negotiation to the Asserted Patents in the 2011 time frame.  Collectively, they indicate several key guiding principles that would have strongly governed the negotiating positions of the parties at the hypothetical negotiations in 2011:

- Samsung, at the time of the hypothetical negotiation, would have (at a minimum) been faced with the proposition of having to remove the patented features from its products and release inferior products in their place, thereby suffering a loss of customers at a critical time of transition in the smartphone market.

- Customers would be expected to become entrenched in their platforms of choice, and, thus, initial competition for them would have had wide-ranging and long-lasting effects on future smartphone purchases and the associated content, accessories and device purchases;

- Samsung would have been aware of these facts, and would have been motivated to do whatever it could—including paying a high royalty rate in the short term—to avoid losing these customers and the long-term benefits that would flow from them.

- Apple would have been equally aware of these marketplace dynamics, and would have been reluctant to agree to any license at all—even one that would enable it to capture its short-term immediate losses to Samsung's infringing sales.

### (1) What Apple Would Confer in a License to Samsung

346.    Apple would recognize the above financial ramifications of granting a license to Samsung to the Asserted Patents in mid-2011, and those considerations are evaluated in the appropriate Edgeworth Box calculus detailed in the next Section.  However, the grant of a license to Samsung would have not only significant financial ramifications due to the loss of current and replacement smartphone and tablet sales and their associated ecosystem sales but also significant reputational effects that would carry significant weight as well.  As of 2011, Apple had indisputably revolutionized four industries in the prior decade:

- Digital portable music players;
- Digital content/media;
- Cellular phones; and
- Portable computers/tablets.

347.    Each of these accomplishments required the expenditure of major investments and assumption of substantial risk to even bring the products to market.  These accomplishments further depended on an effective campaign of consumer education and marketing to develop and expand general consumer demand for these products.

348.    By granting a license to Samsung, Apple would be inviting a direct rival to share in the *ex post* gains associated with those investments spent and risks taken.  Importantly, the license would grant Samsung access to the two markets with the greatest potential for continued growth in 2011, as well as products that sat at the center of Apple's overall user experience and complementary set of hardware, software, content, and services.  In this sense, Apple would expect a royalty that captured not only potential concrete pecuniary aspects of letting in a major rival, but also the reputational degradation associated with sharing two key markets revolutionized by Apple with another major competitor.

## (2) Samsung at a Crossroads

349.     Samsung recognized that it needed to distance itself from conventional smartphone producers by 2011 and make a serious, continued run at a top-tier position in competition with Apple.  Armed with the Android platform and financial commitment to throw significant marketing dollars at its smartphone and tablet launches, Samsung was poised to pursue a top-tier slot in the U.S. smartphone and tablets marketplaces.  Indeed, as I discuss above in Section II.F.3.c, 2011 was a critical year for Samsung, as it sought to outpace other smartphone manufacturers that had been flagging and solidify a top spot in the marketplace alongside, or even beyond, Apple. ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

350.     Given the network effects that reinforce established products with a broad base of owners/users and a broad base of developers and available content, it would have been entirely possible in 2011 that Samsung would have recognized that only one top-tier slot along with Apple was effectively available to the marketplace and that mid-2011 represented a singular opportunity for Samsung to "grab the brass ring."[554]  Academic research on network-based industries demonstrates that first and second movers gain material (and often insurmountable) advantages over late entrants.[555]

351.     In mid-2011, Samsung recognized that it faced a time-critical opportunity to take advantage of other smartphone makers' recent declines before they implemented changes to regain smartphone market share in the U.S. and beyond.  For example, as market research company NPD observed in 2011, "[f]ew companies have felt the impact of the shift to touch user interfaces and larger screen sizes as negatively as RIM," which had fallen in smartphone market

---

██ ███████████████████████████████████████████████

█████████████████████████████

[554] The terms "brass ring" and "grab the brass ring" are based on the prize that carousel riders attempt to grab as they pass an operational ring arm that dispenses metal rings, only one of which, the "brass ring," is the winner.  "Grab the brass ring" refers to "the opportunity to compete for a grand prize" and "[b]rass ring came to have the figurative sense of a prize, in particular one that was hard to gain.  See, e.g., http://www.worldwidewords.org/qa/qa-bra4.htm.

[555] Lieberman, Marvin B., and David B. Montgomery, "First-Mover Advantages," Research Paper No. 969, Oct. 1987 (https://gsbapps.stanford.edu/researchpapers/library/rp969.pdf).

share from roughly 50% in the second-quarter of 2006 to a mere 8% by the third-quarter of 2011.[556]  As NPD noted, however, RIM was poised in 2011 and going into 2012 to make strategic shifts in an effort to reverse its decline, "beginning anew with a strong technical foundation" and preparing "to introduce smartphones on its next-generation platform."[557]  Similarly, "[o]ne of the biggest news stories of [2011] was Nokia's agreement with Microsoft to use the Windows Phone operating system on its smartphones."[558]  This agreement marked a key opportunity for Nokia, which, along with Microsoft, had to "build from almost nothing to carve out success between the consistency of the iPhone and the flexibility of Android."[559]  Motorola also was poised in 2011 to improve its stature in the smartphone market.  Although a major force in the mobile phone market in the 1980s and 1990s, Motorola's share had fallen from 21.9% in 2006 to only 2.4% in 2010.[560]  By 2011, then, Motorola and others recognized that Motorola's "challenge is to distinguish [itself] from companies such as Samsung and HTC that also use Android."[561]

352.    In light of the above, Samsung's best opportunity to become the only other top-tier provider of smartphones, tablets, and potentially other hardware, software, and related products that formed a "system" of Samsung products very likely lay before it in mid-2011.  This would have placed additional time pressure on Samsung to execute a license at that time, for fear that time wasted or elapsed in designing, testing, and commercializing alternatives (for example)

---

[556] "For Once-Strong Smartphone Makers, 2011 Was the Year of New Beginnings," NPD, Dec. 13, 2011 (https://www.npd.com/wps/portal/npd/us/news/press-releases/pr_111213/).

[557] "For Once-Strong Smartphone Makers, 2011 Was the Year of New Beginnings," NPD, Dec. 13, 2011 (https://www.npd.com/wps/portal/npd/us/news/press-releases/pr_111213/).

[558] "For Once-Strong Smartphone Makers, 2011 Was the Year of New Beginnings," NPD, Dec. 13, 2011 (https://www.npd.com/wps/portal/npd/us/news/press-releases/pr_111213/).

[559] "For Once-Strong Smartphone Makers, 2011 Was the Year of New Beginnings," NPD, Dec. 13, 2011 (https://www.npd.com/wps/portal/npd/us/news/press-releases/pr_111213/).

[560] Hugo Miller, "Motorola Mobility Revival Means Weighing Google Alternatives," Bloomberg, Mar. 25, 2011 (http://www.bloomberg.com/news/2011-03-25/motorola-mobility-s-atrix-led-revival-means-weighing-alternative-to-google.html).

[561] Hugo Miller, "Motorola Mobility Revival Means Weighing Google Alternatives," Bloomberg, Mar. 25, 2011 (http://www.bloomberg.com/news/2011-03-25/motorola-mobility-s-atrix-led-revival-means-weighing-alternative-to-google.html).

would afford its other tier-two rivals the opportunity to leapfrog Samsung, and snatch the brass ring away.

### (3) The Impending Onslaught of First-Time Purchasers

353.     Although the iPhone had been introduced four years earlier, there was still a large set of consumers as of 2011 that had yet to acquire their first smartphone.[562]  That was expected to change dramatically between 2011 and 2013.  In my Original Declaration in 2012, I undertook a series of econometric analyses to assess where smartphone market penetration stood.  Those analyses indicated that smartphone penetration was at its absolute crucial "inflection point" – the time of most rapid new adoption – in this period.  Indeed, my estimated diffusion curves indicated that, by 2013, quarterly smartphone unit sales among U.S. consumers were expected to level off.[563]

354.     With the benefit of hindsight, I can evaluate what has transpired since mid-2011. In early 2012, of course, I did not have estimates of smartphone sales/penetration for the ensuing year, but I used my diffusion analyses to project these volumes.  Now I have data with which to assess actual quarterly and cumulative smartphone unit sales in the U.S. through the fourth quarter of 2012, and compare them with diffusion curves projections I made using actual data through 2011 and the implied forecasts through 2012.[564]  In **Exhibits 23** and **23-A**, I compare these forecasts and actuals.  The actual data closely track my predictions and corroborate the projection I made in my Original Declaration.  These data indicate that first-time purchaser entries into the U.S. smartphone marketplace entered into a critical crescendo in the mid-2011 to early 2012 time frame, which has become more attenuated in late 2012 and early 2013 and is expected to further taper off in 2014.

---

[562] Samsung noted in early 2011 that "Over two-thirds of the U.S. population still [had] a basic feature phone." Victor Godinez, "Samsung Sees a Brigh Future in Smart Phones, Tablet Computers," The Dallas Morning News, January 7, 2011, (http://www.dallasnews.com/business/technology/headlines/20110107-samsung-sees-a-bright-future-in-smart-phones-tablet-computers.ece). Moreover, data from Nielsen for the first quarter of 2011 indicate that 50% of consumers who purchased a smartphone in the previous three months were first-time smartphone buyers. Nielsen Purchase Map, SAMNDCA630-07397373, Table 1.

[563] Original Declaration, pp. 18-21; Attachment H.

[564] See ¶¶ 30-32 of my Original Declaration for a discussion of diffusion analysis.

355.    With respect to tablets, the potential demand acceleration in the 2011-2013 time period was also extreme and, if anything, more pronounced than in smartphones.  Using data from tablets, I sought to create diffusion/penetration analyses similar to those I created for smartphones in 2012.  Tellingly, I was unable to estimate these "S-shaped curves," as the algorithm commonly used to estimate such curves did not converge.  I have often encountered this issue in practice, and it has a common cause: Estimating diffusion curves is often untenable if the adoption curve has yet to reach its critical point of inflection.  That is indeed the case here.  What this means is that the key adoption period for tablets was just arriving in late 2012, and is likely upon us right now.  Of course, the parties in 2011 would have had reasonable foresight to see this coming boom and its magnitude because the iPad had met with such strong demand from the outset and they had already observed the rapid and continued adoption of iPhones.

356.    Greg Joswiak testified that first time customers still exist, but as of his deposition in July 2013, "there are more people who have aligned themselves with a platform than there are first time people" and that  "the pendulum has moved" to an increasing fight over switchers.[565]

357.    Completely consistent with my discussion of the evolution of the characteristics of demand and of the marketplace for smartphones, Samsung has recognized the period of alleged infringement in this case as a critical one, given the number of first-time smartphone buyers and the "stickiness" of smartphone customers once they have adopted a brand or platform:



---

[565] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 127:12-24, 128:7-24.



**(4) Platform Stickiness and Subsequent Sales Lock-In**

359.    Unlike most licensing negotiations, the hypothetical license negotiation under consideration would influence far more than just sales of the licensed products during the tenure of the license.  Sales of smartphones and tablets on a particular platform enable user familiarity with that platform, and in turn an installed base of digital content, including applications, digital media, and various accessories and accoutrements.  These factors not only generate consumer loyalty and familiarity with the brands they currently use, but also introduce substantial switching costs that form a barrier limiting the ability of rival platforms to win over these users with respect to devices, content, accessories and service.[572]  For example, iOS apps and Android apps are not interchangeable, and, thus, to switch between an iPhone and an Android smartphone, a user would need to purchase new apps.  In the personal digital device industry, this concept has many names, but is quite commonly referred to as "stickiness."  Both Apple and



[572] Emma Woollacott, "iPhone Users Most Loyal (Now, There's a Surprise), "TG Daily, Nov. 28, 2011(http://www.tgdaily.com/mobility-features/59873-iphone-users-most-loyal-now-theres-a-surprise). See also "STA-HQ: 2012-2013 Product workshop," SAMNDCA630-07355658, at -665-668.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**
**SUBJECT TO PROTECTIVE ORDER**

████████████    The parties would have arrived at the negotiating table in 2011 with these financial considerations squarely in mind.

360.   For example, a 2012 analysis by Goldman Sachs summarizing the results of a survey of iPhone and iPad owners estimates the costs of switching from the iOS platform to another platform averaged \$122 to \$301 per device.[574] This study also concluded that switching costs "increase when users own more than one device" and "iCloud is creating another layer of switching costs."[575] Moreover, this study found that iPad and iPhone users require an average device discount of 49% to switch platforms.[576] ████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

361.   User loyalty and switching costs exist for a variety of reasons, not the least of which is that applications and digital content across smartphone and tablet platforms are commonly non-transferrable.[578]  As a result of these switching costs, some current smartphone users have said it is easier to switch banks or utility services rather than switching to a new smartphone.[579]  The results of a consumer survey on user experience and loyalty in the digital

███████████████████████████████████████████

[574] Goldman Sachs Company Update on Apple Inc., June 29, 2012, APLNDC630-0000250774, at 786.

[575] Goldman Sachs Company Update on Apple Inc., June 29, 2012, APLNDC630-0000250774, at 776.

[576] Goldman Sachs Company Update on Apple Inc., June 29, 2012, APLNDC630-0000250774, at 777, 787.

████████████████████████████

[578] The situation is similar to that of personal computers, where programs designed to run on the Windows operating system are incompatible with the Apple Mac operating system.

[579] Emma Woollacott, "iPhone Users Most Loyal (Now, There's a Surprise)," TG Daily, Nov. 28, 2011 (http://www.tgdaily.com/mobility-features/59873-iphone-users-most-loyal-now-theres-a-surprise).

ecosystem by GfK Group confirm these switching costs:  "As consumers build digital ecosystems and their own world of content on handsets, the [GfK] study shows that their loyalty to their smartphone brand increases with the number of apps and services they use.  The research reveals that the tipping point for loyalty is when a consumer uses seven or more services on their device," with consumers in the U.S. being the most likely to use seven or more services.[580] Furthermore, this study indicates that 33% of respondents cited disruption to apps and services as a reason to stick with their current platform, while 29% were worried about having to learn to use a different type of smartphone and 28% did not want to have to move their music, videos, books, and apps from one type of smartphone to another.[581] ███████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████ Moreover, a number of

---

[580] Amanda Wheeler, *Loyalty to Smartphone Brand Increases with Greater Use of Digital Content*, GfK Group, Nov. 25, 2011 (http://www.gfk.com/gfkdaphne/news/international_news/009051/index.en.print.html); see also Allan Swann, *No Surprise That Smartphone Loyalty Is Tied to Apps and Services*, CBR Rolling Blog, Nov. 28, 2011 (http://www.cbronline.com/blogs/cbr-rolling-blog/no-surprises-that-smartphone-loyalty-is-tied-to-apps-and-services28.11.11): "Consumer 'lock in' through their app and service eco-system may do more to keep customers' loyalty than any other concern. . . . Apple users in particular have said they would find it harder to change their smartphones than it would be to change power companies."

[581] Amanda Wheeler, *Loyalty to Smartphone Brand Increases with Greater Use of Digital Content*, GfK Group, Nov. 25, 2011 (http://www.gfk.com/gfkdaphne/news/international_news/009051/index.en.print.html); see also Allan Swann, *No Surprise That Smartphone Loyalty Is Tied to Apps and Services*, CBR Rolling Blog, Nov. 28, 2011 (http://www.cbronline.com/blogs/cbr-rolling-blog/no-surprises-that-smartphone-loyalty-is-tied-to-apps-and-services28.11.11): "It also requires a measure of tech savvy-ness to convert video and music to another company's file format. Apple's iTunes of course will do all this for you without any tech knowhow.  I know I have podcasts and music dating back to my first iPod in 2003 in Apple's AAC format.  I am not going to spend an entire weekend converting them to MP3."

█████████████████████████████████████████████████████████ █████████████████████████████████

commentators have noted that specific iPhone features, including Siri – an Apple feature that, I understand, practices the '959 Patent – further enhance the stickiness of iOS.[583,584]

362.    Customer loyalty is particularly strong for users who choose the iOS and Android platforms.



Android platform loyalty is comparable to iOS loyalty as well.  For example, an Apple analysis of the

---

[583] Nigam Arora, "Siri is Apple's Post-Jobs Ticket to $1,000," Forbes, Oct. 23, 2011 (http://www.forbes.com/sites/greatspeculations/2011/10/23/siri-is-apples-post-jobs-ticket-to-1000/): "Siri increases stickiness of Apple phones.  High stickiness means that once someone starts using Siri they are unlikely to switch.  When asked to call my wife, Siri responded with question wanting to know which one of my contacts was my wife.  After about 10 minutes, when I again asked Siri to call my wife, it knew who my wife was.  Imagine Siri learning about you and what you do for two years and then giving up Siri for an Android phone that does not know you!"



[585] "iPhone Owner Study," May 2011, APLNDC-Y0000025024, at -094.  See also Neil Hughes, "Apple's Recurring Revenue Stream: 77% of iPhone 4 Sales Were Upgrades," Appleinsider.com, June 25, 2010 (http://www.appleinsider.com/articles/10/06/25/apples_recurring_revenue_stream_77_of_iphone_4_sales_were_upgrades.html): "'Apple is effectively building a recurring revenue stream from a growing base of iPhone users that upgrade to the newest version every year or two.' It's the three years of brand loyalty that Apple has built in the market that has become key to its success"; and Nick Bilton, "BITS: Android Phones Outpace Apple's," N.Y. Times, Aug. 9, 2010 (http://query.nytimes.com/gst/fullpage.html?res= 940CE0DE1E3CF93AA3575BC0A9669D8B63): noting that iPhone customers have a loyalty rate of 90%.  This relationship between different components of the Apple family of products has been amply demonstrated by industry research.  One April 2010 study, for example, concluded that of early iPad buyers, 74% owned Macintosh computers and 66% had iPhones.  Philip Elmer-DeWitt, "Piper Jaffray Survey of iPad Buyers: 74% Owned Macs; 66% Had iPhones," CNNMoney, Apr. 5, 2010 (http://tech.fortune.cnn.com/2010/04/05/piper-jaffray-survey-of-ipad-buyers-74-owned-macs-66-owned-had-iphones/).

[586] "iPhone Owner Study," May 2011, APLNDC-Y0000025024, at -095-096.

[587] "iPhone Owner Study," June 2012, APLNDC630-0000177067, at -220, -222.

---



363.    Industry studies have also found a high degree of loyalty for both iPhone and Android.  A Nielsen Company report from 2010 showed that 80% of iPhone owners and 70% of Android users said they would stick with that platform for their next purchase,[590] while a Yankee Group study from 2011 found that 88% of iPhone users and 78% of Android users would stick with that platform for future purchases.[591]

---

[588] "Smartphone Market Study," Jan.-Mar. 2012, APLNDC630-0000177658, at -763.

[589] "Smartphone Owners," Oct.-Dec. 2012, APLNDC630-0001350971, at -038, -041. Moreover, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  See Apple Market Research & Analysis, *iPhone Buyer Survey, FY13-Q1,* APLNDC630-0001233406 at APLNDC630-0001233433 ▮▮▮▮▮▮▮▮▮▮▮▮

[590] Don Kellogg, "iPhone vs Android," nielsenwire, June 4, 2010 (http://blog.nielsen.com/ nielsenwire/online_mobile/iphone-vs-android/); see also "Android Soars, But iPhone Still Most Desired As Smartphones Grab 25% of U.S. Mobile Market," nielsenwire, Aug. 2, 2010 (http://blog.nielsen.com/nielsenwire/online_mobile/android-soars-but-iphone-still-most-desired- as-smartphones-grab-25-of-u-s-mobile-market).

[591] Yankee Group 2011 U.S. Consumer Survey, Dec. 2011. Similarly, a November 25, 2011, email ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (APLNDC0001793932); see also APLNDC630-0000128922 at -936 ▮▮▮▮

[592] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 35:22-36:5.



364.    Apple is well aware of the stickiness of the market.  Greg Joswiak testified that fighting to attract first-time smartphone buyers is important because "once you get them you're more likely to keep them."[594]

365.    ████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████

366.    Apple generated strong customer loyalty by developing innovative and high quality products that are intuitive and easy to use.[597]  As a result too, Apple has become the most valuable brand in the world.[598] Moreover, Apple experiences high measures of overall satisfaction among iPhone buyers, which generates strong customer loyalty for this brand. For example, iPhone Buyer Surveys ███████████████████████████████████



[594] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 128:16-24, 35:15-36:5.

[597] See, e.g., "Lessons from Apple: What Other Companies Can Learn from California's Master of Innovation," *Economist*, June 7, 2007.

[598] See, e.g., "BrandZ Top 100: Most valuable global brands," 2013, Millward Brown, at p. 25 (http://www.millwardbrown.com/brandz/Top_100_Global_Brands.aspx); "BrandZ Top 100: Most valuable global brands," Millward Brown, 2011, at p. 41 (http://www.millwardbrown.com/Libraries/Optimor_BrandZ_Files/ 2011_BrandZ_Top100_Report.sflb.ashx).

[599] For example, an iPhone Buyer Survey from 2011 ██████████████████████████
████████████████████████████████████████  See Apple Market Research & Analysis, *iPhone Buyer Survey, FY11-Q1,* APLNDC630-0001437744 at pp. 41-42; see also Apple Market Research & Analysis, *iPhone Buyer Survey, FY13-Q1,* APLNDC630-0001233406 at p. 61

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

367.    The existence of strong customer loyalty among those who have adopted a smartphone brand and its operating system make competition between brands for new users of smartphones particularly important, as adoption of a smartphone tends to convert a consumer without a strong attachment to a smartphone brand and operating system into a loyal customer who has such an attachment, and thus becomes resistant to switching.[601]

368.



[600] For example, research from the first quarter of 2012 indicates that ████████████████ ████████████████ See Change Wave Research, "New Apple iPad Owners Survey," March 28, 2012, APLNDC630-0001311648 at -648-649.

[601] Importantly, the relevant period at issue in this matter was a critical period for large numbers of first time smartphone buyers. ███████████████████████ See "iPhone Buyer Survey," FY11 Q4, APLNDC630-0001439288, at -315-16; see also "Smartphone Market Study," 2012 Q1, APLNDC630-0000177658, at -683: first smartphone for approximately 50% of buyers.







370.

371.





**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### (5) Ecosystem Effects and Sales of Complementary Products, Content, and Services

375.   As alluded to in the previous Section, platform stickiness has far more significant reach than the likelihood that a first-time purchaser of a Samsung smartphone is more likely to purchase their next smartphone (or even just smartphone-related content) from the same supplier. Both Apple and ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████  For example, Apple senior executives testified:

> "When we talk about the Apple ecosystem, we're referring to the complete set of products that a customer might use in the experience of using an Apple product, not only the Apple hardware and software and applications, but third-party applications, accessories, a whole range of products that [all together], you might include in your experience with the product."[626]

> [The Apple Ecosystem is] the set of products that we create that work together with each other, as well as the products that work with those. And I'll put some meat on the bones there in a second.



[626] Deposition of Phil Schiller, Transcript, July 23, 2013, at 250:4-10.

So for example, our ecosystem would include the iPhone, the 12:25 iPad, the iPod Touch, the iOS devices. They would include the apps that work with them, both the set of apps that we create that work with them, the set of apps that third parties create, accessories that third parties create that work with them. It's almost a community of products, if you will, that there's some compatibility between them. There's some familiarity in the experience between them. There's an investment that a customer makes and starts to build around that compatibility and familiarity.[627]

So anytime a customer purchases one of those devices [such as the Samsung Note], it's very rare that they're going to carry a second smartphone around so they don't buy an iPhone. And so -- and not only they don't an iPhone, they don't buy apps from the apps store, they don't buy music from the iTunes store, they don't buy an iPad, they don't buy a Mac. Because there's definitely an experience that they have with their first Apple product that convinces them or has some motivation to them to buy another Apple product. And so when you asked about whether it's a high threat or not, they're all threats that have impact to not only just the iPhone, but many of our businesses as well.[628]

376.    In response to questioning about whether Samsung is trying to create its own ecosystem,



---

[627] Deposition of Greg Joswiak, Transcript, July 9, 2013, at 103:3-2.

[628] Deposition of Stan Ng, Transcript, July 2, 2013, at 134:11-25

377.     Some of these ecosystem effects are plainly evident.   These complementary purchases are most evident in the meteoric rise of revenues earned on the iTunes Store offered by Apple as the installed base of iOS devices has risen.[630]   For example, as of July 2011, over 15 billion apps had been downloaded from Apple iTunes App Store by worldwide iPhone, iPad and iPod touch users.  As of that date, the iTunes App Store offered more than 425,000 apps, and Apple had paid developers more than $2.5 billion in revenues related to purchases of these apps.[631]  Moreover, data compiled by Apple as of July 2013 indicate that



The importance of this revenue stream to Apple has also been recognized by industry analysts:

> "The popularity of the [iPhone] coupled with its restrictive user interface has maximised the post-sale revenue stream potential. This has sustained sales of the iTunes store despite slowing iPod sales and generated a revenue stream from sales of content and applications from the company's App Store."[634]

379.     These demand complementarities extend beyond the digital media offerings found on the iTunes store and the applications that are available in the iTunes App Store and include

---

[630] Pascal-Emmanuel Gobry, "Apple Will Generate $13 Billion in iTunes Revenue in 2013, Says Analyst," BusinessInsider, July 5, 2011 (http://articles.businessinsider.com/2011-07-05/tech/30072341_1_app-store-itunes-apple), noting that the "main reason" for the growth in iTunes platform revenue is "[a]ll those iPhones and iPads Apple is selling."

[631] "Apple's App Store Downloads Top 15 Billion," Apple Press Info, July 7, 2011 (http://www.apple.com/pr/library/2011/07/07Apples-App-Store-Downloads-Top-15-Billion.html).

[632] Spreadsheet, APLNDC630-0001861446

[633] "iPhone Owner Study," May 2011, APLNDC-Y0000025024, at -105.

[634] "Mobile Phones: Winning Strategies and Pitfalls," Euromonitor International, Feb. 2011, at p. 13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

other products and devices within the Apple ecosystem.  For example, iPhone and iPad

purchases generate significant purchases in accessories: ██████████████████████

████████████████████████████████████████████████████████████████████

380.   Apple device purchases also influence the purchase of other Apple devices. For

example, in a 2011 study, ████████████████████████████████████████████████

████████████████████████████████████████████████████████

Similarly, ███████████████████████████████████████████████████████████

████████████████     In addition, iOS features like iCloud encourage iPhone buyers to buy other

iOS products (*i.e.*, the iPad and iPod touch) because they enhance the ability of these devices to

share data and communicate with each other.[638]

381.   Other documents and data, produced by Apple in this case, corroborate the

existence and impact of ecosystem effects.  For example, ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████     ██████████████████████████████████

---

[635] iPad Offsite, Feb. 1, 2013, APLNDC630-0001313979, at -4010.

[636] "iPhone Owner Study," May 2011, APLNDC-Y0000025024, at -131 ████████████

████████████████████████████████████████████████████████████

[637] "iPhone Owner Study," May 2011, APLNDC-Y0000025024, at -131.

[638] "Apple's iCloud To Provide Stickiness to Other 'Connected Devices,'" IB Times, Sept. 20,
2011 (http://www.ibtimes.com/articles/216898/20110920/apple-inc-icloud-stickiness-iphone-
ipad-ipod-mac-apple-tv-android-google-inc-microsoft-windows-black.htm): "[']We are
becoming firm believers in Apple's iCloud initiative. With the elimination of device-to-device
sync and addition of cloud storage, we expect all of Apple's 'connected devices' to benefit,[']
says Scott Sutherland, an analyst at Wedbush Securities. He expects continued growth in iPhones
and iPads, share gains in Macs, good demand for the iPod Touch, and for Apple TV (connected
TV) to move beyond hobby status. … He … expects the iCloud to go full-throttle this Fall. He
expects this to keep interest going strong for iPhones, iPads, Macs, and iPod Touches, while
likely moving Apple TV from hobby to another key product category in the connected TV space.
Apple already has sold 222 million iOS devices, which he expects to grow robustly given the
iCloud connectivity."

[639] APLNDC630-0001861446. ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER



---

[640] APLNDC630-0001861446.

[641] APLNDC630-0001861446.

[642] "Mac Buyer Tracking Study: FY 2011 Year End Report," APLNDC630-0000062843, at -973.  See also "Mac Buyer Tracking Study," Q2 2013, APLNDC630-0001897067, at -142-145, -157-58; "Mac Buyer Tracking Study," Year End 2012, APLNDC630-0001896704, at -788, -790, -806-807, -836;; Email from M. Sammons, dated Feb. 28, 2012, APLNDC630-0000129570: A MacWorld article entitled "Analysis: Halo effect moves from iPod to iPhone" embedded in the email cites Apple's Tim Cook stating: "What is clearly happening now is that the iPhone is creating a halo for the Macintosh….The iPhone has also created a halo for iPad.")

[643] "Mac Buyer Tracking Study: Q1 2012 Report," APLNDC630-0000056522, at -805.

██████████████████████ Similarly, iPhone users are loyal to the Apple platform when choosing a tablet computer.[645]

383.    The value of the ecosystem effects is recognized by Apple, Samsung, and industry analysts.  Mr. Chip Lutton, a Senior Director at Apple, testified as follows on this topic:

> Q What do you mean by "the ecosystem"?
>
> A … [B]y "ecosystem," I mean generally … the set of services and related products that are sold either by Apple or by third parties that are made to work with or on iPhone devices.
>
> Q What are some of the examples of those other Apple products and services … as part of the ecosystem?
>
> A So for Apple, it would be iTunes, iAdd [???], the App store. For third parties, it would be third party apps that run on the iPhone or other iOS devices, and in competing for attention from those third-party App developers, one of the key things that matters to them is the vitality and market share of the platform.  So sales that go to a different platform instead of to Apple's iPhone platform damage Apple … in that way, too.[646]

384.    Industry analysts have recognized Apple's pioneering role in developing and demonstrating the value of a fully functioning ecosystem:

---

[644] "Mac Buyer Tracking Study," Q1 2012, APLNDC630-0000056522 at pp. -770-771 ████████████████████████████████████████████████████ see also APLNDC630-0001043351, a July 13, 2011, email from Todd Wilder to Tim Cook and others states: "Bloomberg and CNNMoney write that the Mac has benefited from a halo effect coming from iPhone and iPad."; "Mac Buyer Tracking Study," 2012 Q3, APLNDC630-0000177553 at -639-641: ████████████████████████████████████████████████████████████████████████████████████████████████ "Mac Buyer Tracking Study," 2013 Q2, APLNDC630-0001897067, at -143-145: ████████████████

[645] "Smartphone, Tablet Owners Show Brand Loyalty," Lenovo, Sept. 21, 2011 (http://www.lenovo.com/articles/us/en/news/smartphone-tablet-owners-show-brand-loyalty.html).

[646] Deposition of Chip J. Lutton, Jr., Transcript, July 26, 2011, at 328:25-329:17.

- "Before the advent of coordinated systems, executives at consumer technology companies babbled endlessly about connected homes and convergence. They tried to make that happen, but no one had the pieces of hardware and content that would fit together seamlessly. The pioneer – and perhaps the inspiration – was Steven P. Jobs, the late Apple chief executive who made creating devices look easy with the iPad and iPhone. Dream them up, then make the software complement the hardware, outsource the production, sell at a premium and watch your company become the most valuable on earth."[647]

- "It's not about brands or devices or platforms anymore. … It's about the ecosystem. The idea is to get consumers tied into that ecosystem as tightly as possible so they and their content are locked into one system."[648]



---

[647] David Streitfeld, "Erasing the Boundaries," *N.Y. Times,* Feb. 2, 2012 (http://www.nytimes.com/2012/02/13/technology/keeping-consumers-on-the-digital-plantation.html).

[648] David Streitfeld, "Erasing the Boundaries," *N.Y. Times,* Feb. 2, 2012 (http://www.nytimes.com/2012/02/13/technology/keeping-consumers-on-the-digital-plantation.html).



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER







**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**

389 

**b. Perspective of the Hypothetical Licensee (Samsung)**

391.    Samsung would have recognized at a hypothetical negotiation in June 2011 that it was facing its most serious competitor in selling mobile devices and that the Asserted Patents cover valuable features that would, unless Samsung obtained a license, differentiate Apple's products from those of Samsung.  Thus, Samsung would have considered not only the profits it would lose on sales that it would forego, but also the opportunity it would lose to narrow the gap between its reputation and that of Apple as an innovator in mobile devices, if it did not obtain a

license.  This concern would have been amplified by the fact that the smartphone marketplace was entering the explosive growth stage of mass adoption by first-time buyers who could well become loyal Apple customers if Apple were not to license Samsung, leaving Samsung in a weaker competitive position.

392.    For each of the Asserted Patents, I determine the maximum royalty per unit that Samsung would have been willing to pay—*i.e.*, the upper bound of the Edgeworth Box within which bargaining could take place—based on Samsung's reasonable expectations at the time of the hypothetical negotiation regarding its financial position under a hypothetical license to the Asserted Patents against its financial position without use of the Asserted Patents.  As with actual licensing negotiations, Samsung (as well as Apple) would have undertaken its best efforts to identify and quantify expected marketplace developments into the future, recognizing the inherent uncertainties associated with such tasks.  Furthermore, unlike the detailed assessment of financial effects (in the form of lost profits) actually incurred by Apple in my lost profits assessment provided above, the hypothetical negotiation—while focused on similar economic issues and dynamics—would have necessarily and practically taken on a more general/holistic view of the implications (financial and otherwise) of the proposed license.  In this context, I find that the general strategic and marketplace implications of the license being provided by Apple to Samsung at the critical juncture that is mid-2011 as discussed in the preamble to this evaluation to be of particular relevance.

393.    Lastly, I note that the parties would approach the hypothetical negotiation with a set of expectations about how a license to the Asserted Patents would affect the respective parties' profitability prospects.  Considerations made by the parties relate to the effect of a license on the competitive dynamics of the smartphone marketplace, including considerations of future profitability and market shares.  As I am not aware of useful projections made by the parties in the mid-2011 time frame, I use the profitability and unit shares experience in the actual world as a proxy for what the parties could have reasonably expected at the time of the negotiation.  Specifically, I compute these metrics for the one-year period starting in mid-2011,

spanning Q3 2011 – Q2 2012.  I refer to this period as the baseline period for the reasonable royalty hypothetical negotiation.[664]

394.    With these understandings in place, I execute the following sequence of steps to evaluate Samsung's maximum willingness to pay (and a corresponding set for Apple's minimum willingness to accept in the next Section).  I list them briefly here and then provide details below.

1.  I estimate the percentage by which Apple and Samsung would have expected Samsung's unit sales of the Accused Products to decline if Samsung lacked a license to implement the Patented Inventions in the Accused Features;

2.  I make estimates of the time period the parties would have expected Samsung to need to come up with an acceptable design-around of the Asserted Patent in question, expressed as a share of the economic life of the Accused Products.  Those estimates benefit Samsung because they are based on the time it took Samsung, in the real world, to implement unacceptable (to many) and inferior design-arounds, as discussed above.  I then multiply the expected percentage decline of Samsung's sales during the design-around period by the share of the economic life of the Accused Products that the parties would have expected Samsung to require.  This generates the share of Samsung's total sales on which it would owe royalties under the license that are sales Samsung would not have expected to make if it did not obtain the license;

3.  I estimate Samsung's expected incremental profit per unit on its accused smartphones and tablets.[665]  I then multiply the share of Samsung's total infringing unit sales represented by the units that Samsung would not have expected to make if it did not obtain a license by Samsung's expected incremental profit per unit for smartphones; the result of this calculation is Samsung's expected gain—expressed as dollars per unit of Accused Products—that would result from Samsung obtaining a license from Apple;

---

[664] The use, where contemporaneous information is inadequate, of relevant information that post-dates the hypothetical negotiation in assessing a reasonable royalty is well-established and is known as a "book of wisdom" approach (see, for example, *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (Fed. Cir. 2009)).

[665] Consistent with standard licensing practice, I avoid undue complexity by studying the average incremental profitability of Samsung's smartphones and tablets, respectively, as two classes of products.  I do not seek to develop separate royalty rates for each Accused Product.

4.  I consider and estimate (as a percentage of the expected gain to Samsung just described) a lower bound on an additional consideration which reflects "ecosystem effects," *i.e.*, the value of incremental subsequent sales that Samsung would have expected to make as a result of its incremental initial sales that it expected to make under the posited hypothetical license;

5.  The additional profits associated with these ecosystem effects are then added on to Samsung's willingness to pay. This is the maximum Samsung would have been willing to pay, expressed as a royalty rate.[666]

### (1) Step 1: Samsung's Contraction in Sales Absent a License

395.    As to the first step, my estimate of the percentage by which Apple and Samsung would have expected Samsung's unit sales of the Accused Products to decline if they lacked the access to the Patented Inventions for the Accused Features is based on results of Dr. Hauser's survey and conjoint analysis discussed above. In the context of the hypothetical negotiation, I assume that Apple and Samsung would have applied an estimate for a "representative" product, rather than undertaking the laborious task of pinning down likely effects on various product lines Samsung was considering for commercial releases at that time. In this context, the smartphone I have identified for this purpose is the Galaxy S II Epic 4G Touch, which has an intermediate screen size and typical retail price ██████████████████████████████████ ███████████████████████████████████ and which Apple accuses of infringing all the Asserted Patents. As shown in **Exhibit 13**, the estimated percentages by which Samsung's sales would have declined absent access to the Asserted Patents for use in the Accused Features for this representative product are:

- 7.39% for the '414 Patent;
- 6.14% for the '647 Patent;
- 3.99% for the '959 Patent;
- 8.98% for the '760 Patent;
- 7.11% for the '721 Patent; and
- 12.56% for the '172 Patent.[667]

---

[666] The phrase "maximum willingness to pay," although often used by economists is actually a misnomer in the context of this case, as discussed below in paragraph 431.

[667] See **Exhibit 13**.

396.    As stated in my discussion of the conjoint analysis results in Section III.B above, these figures are similar for tablets. (See also **Exhibit 14**.)[668]

397.    Once I identify the percentage of accused product units that would not have been sold if Samsung had not taken a license to the Asserted Patents, I adjust this percentage decline to recognize that some consumers who would choose not to purchase a Samsung accused product offered with designed around features may elect to purchase an unaccused Samsung smartphone. I proceed with this calculation by considering unaccused Samsung units as a percentage of total smartphone units, excluding Samsung's accused units, over the baseline period.

### (2) Step 2: Adjustment Factor for Contraction Period Relative to License Period

398.    As the sequence of steps listed above indicates, the ultimate effect of the relevant measure of impact on Willingness to Buy on Samsung's overall expected Accused Sales (which is the base on which it would owe the hypothetical royalty) with respect to any given patent depends on whether Samsung would have perceived, at the hypothetical negotiation, that it could have developed a fully acceptable design-around to the patent, and, if so, what period of time elapsed (relative to the economic life of the products covered by that patent) as such design-around efforts were being undertaken.  Since Samsung would owe royalties for the duration of these products' expected lives, but would expect (potentially) only to sustain losses with the license for a portion of the licensed period (that is, prior to the introduction of the acceptable design around), an adjustment would be considered to reflect the disparity in these bases.

399.    

---

[668] These estimated percentages incorporate the linearization of the weights given to each Asserted Patent discussed in Section III.B.4 above which, as mentioned, implies that the estimate of the effect on Willingness to Buy of the Accused Feature associated with any individual Asserted Patent will be less than it actually would have been unless all the Asserted Patents are found to be valid and infringed.

400.    Alternatively, my analysis of this adjustment factor with respect to the '760, '721, and '172 patents accounts for Samsung's expectation that, while the royalties owed under the license would apply to sales made for the entire practical life, the contraction in demand associated with lack of access to a license would last only while an acceptable design-around was in development.[669]  In this sense, the adjustment factor would account for a contraction lasting only for the duration of the design around development.

---

[669] This is an extremely conservative assumption that lowers Samsung's willingness to pay (and correspondingly, lowers Apple's willingness to accept).  During the design-around period, the claimed feature would be unavailable at all; the demand contraction applied relates to the contraction observed between the infringing feature and the designed-around feature, which is a necessarily smaller contraction than that associated with the features' absence altogether.





By multiplying the demand contractions estimated from the conjoint analyses by this adjustment factor for the '760, '721 and '172 patents, I have the expected contraction in demand for each patent expressed as a percentage of demand for accused Samsung products in total – that is, for which a royalty would be owed.

### (3) Step 3: Applying Samsung's Incremental Expected Profit Rate to Expected Sales Contractions

402.    Step 3 entails estimating Samsung's expected incremental profit rate on its accused product sales because these are the profits at risk on its incremental sales contractions should it not obtain a license.  Here, I base my calculations on actual data from the baseline period that I find to be in line with what the parties might reasonably have expected at the time of the hypothetical negotiation.

403.    At the hypothetical negotiation, Samsung would assess the profits it would forego absent a license from Apple as a result of the diminished demand it would realize for its products absent access to the Patented Features.  The relevant measure here is an *incremental* profit since the sales at issue would be incremental to Samsung's baseline level of smartphone sales it would expect to retain with or without the license.

---

[671] To estimate the economic life of the set of Accused Products, I use unit sales data for Accused Devices with relatively early release dates to project the sales trends of Accused Devices which continued to have considerable sales in the first quarter of 2013.

[672] Consistent with a hypothetical negotiation in mid-2011, I consider the forward-looking one-year period of Q3 2011 – Q2 2012.

404.    In **Exhibits 24** and **24-A**, I show Samsung's incremental profit margin earned on its accused smartphones and tablets.[673]



### (4) Step 4: Partial Assessment of Samsung's Additional Expected Gains Due to Ecosystem Effects

405.    In a licensing negotiation with Apple, Samsung would undoubtedly have considered the gain in profits that it would expect from the initially purchased incremental smartphones and tablets that it expected to sell under a license from Apple, but it also would have been fully cognizant of the additional gain in profits that it would expect from replacement Samsung device purchases that would likely follow from those initial purchases.  Such a consideration of "ecosystem effects" would also include gains in profits from incremental sales of associated content, accessories, and device purchases within the ecosystem (to the extent such sales inured to Samsung). These additional gains stem from the inherent "stickiness" of purchasers of Samsung products and the associated ecosystem effects that reinforce the

---

[673] Samsung did not sell its accused tablets during the three quarters after the hypothetical negotiation.  Therefore, I have used Samsung's 10.1 inch tablets for which I had data as a proxy for the profitability of the accused tablets.

stickiness, discussed in Sections III.C.2.a.(4) and III.C.2.a.(5) above.  As smartphone and tablet device manufacturers continue to develop their ecosystems (as Apple has so successfully done, which Samsung documents fully acknowledge, and Samsung has been working to replicate), the additional replacement and ecosystem purchases further entrench customers in their chosen platform and, thus, enhance the stickiness associated with the initial device purchase. Consequently, Samsung would consider that customers gained as a result of a license to the Asserted Patents would likely lead to further sales at Samsung (and lost sales at Apple) as these customers become entrenched with (and thus "stuck to") their smartphone and operating system choices.  Samsung would factor this dynamic into a consideration of its willingness to pay for a license to the Asserted Patents.

406.    In order to quantify a meaningful component of the value of ecosystem effects that Samsung would have expected in a hypothetical negotiation with Apple, I assess the profits Samsung would have expected to make (that takes into account the value of the sale(s) and the probability they will occur) in the event customers to whom Samsung gained an initial sale would subsequently have replaced their initially purchased device with another Samsung device. Due to the lack of data for estimating the value of ecosystem purchases that would only have been made as a result of the initial Samsung device purchase, I am unable to estimate the full quantum of such additional ecosystem effects.  This is fully consistent with my previous opinion that Apple would suffer (and has now suffered) irreparable harm due to Samsung's continued infringement and demand complementarities between smartphones and related products. Consequently, my estimate of Samsung's willingness to pay for a license to the Asserted Patents is conservatively low since it does not provide for the full measure of such incremental ecosystem sales.  Samsung would have been fully aware that this value was a significant understatement of the true ecosystem effects and would have been willing to pay an even higher amount for a license to the Asserted Patents than the one I derive here.  Thus, while I refer to the result of my analysis as "Samsung's maximum willingness to pay," the value that I derive is in fact an understatement of Samsung's true maximum willingness to pay.

407.    To account for Samsung's expectation of an ecosystem effect, I calculate a percentage increase that Samsung would reasonably agree to pay per licensed unit compared to a consideration that only accounts for incremental profits due to licensed units.  This calculation is depicted in **Exhibit 25**.

408.    Since not all Samsung smartphone owners will purchase another Samsung smartphone as their replacement device, I start with the percent of Samsung Android smartphone owners who repurchase another Samsung Android smartphone; ████████████████████ ████████████████████████  However, I must account for the fact that some customers who did not purchase a Samsung smartphone as their initial device would purchase a Samsung smartphone as their next device.  Again, I turn to the Nielsen data for this statistic. However, since the data do not provide that statistic specifically with respect to Samsung Android smartphones, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ ████████████████████████ ███████████████████████████ of Samsung's lost initial sales in the case where it does not take a license will result in lost sales of replacement units for Samsung.[679]  However, under a license to the Asserted Patents, Samsung would be expecting to more closely emulate Apple and, thus, one can imagine that the rate of purchasing their smartphones would be more closely aligned to that of Apple. ██████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████  Since this is the more conservative measure as it pertains to estimating Samsung's willingness to pay for the Asserted Patents, I use this measure.  This figure is the proper measure because it accounts for multiple dynamics of the smartphone marketplace.  As an example, consider 100 smartphone buyers that buy their initial smartphone from Samsung, under a license from Apple, but would not have purchased that Samsung phone had no license been granted.  Among those 100, 51 of them would have made their subsequent smartphone purchase a Samsung smartphone. ██████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████

---

██ ██████████████████████████████████████████████
██ ██████████████████████████████████████████████

[679] See **Exhibit 25**.

██████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

409.    The calculations in **Exhibit 25** take into account an additional factor: the inherent uncertainty of the smartphone/tablet business and the general discount such uncertainty implies as to the expected value of future sales.  To account for this additional uncertainty, I apply a discount factor over the expected economic life of the Accused Products and the subsequent period of two years over which I evaluate ecosystem effects in the form of incremental replacement purchases. For this purpose, I apply to Samsung's expected changes in sales and profits (and expected base of sales upon which a royalty would be paid) an implicit discount rate of 12.75%.[680]  This factor is derived from reported costs of capital estimated for large firms in the electronic computer industry as of mid-2011.[681]

410.    I perform steps (1) through (4) for smartphones in **Exhibit 26**.[682]  My analysis of the maximum Samsung would have been willing to pay is conservative because my estimates of the incremental sales of smartphones and tablets that Samsung would have expected to make under a license to use the Patented Inventions account for only lost initial sales and the first round of sales of replacement units (including only replacements that Samsung would reasonably have expected).  These estimates are conservative in that they do not include any subsequent rounds of replacement sales beyond the first replacement, nor do they account for the sales of other products, such as accessories, digital content, and other devices, that Samsung undoubtedly would have expected to make, but which would not have been reasonably quantifiable.

411.    Naturally, Samsung's willingness to pay for a license to the Asserted Patents would not reflect the entire expected revenue from such additional ecosystem-related sales, but only the incremental profit Samsung anticipated from those sales.  Therefore, I multiply these additional ecosystem sales by Samsung's expected incremental profit rate as derived above.

---

[680] Weighted Average Cost of Capital for SIC 3571, Electronic Computers, MorningStar, as of June 30, 2011.

[681] Weighted Average Cost of Capital for SIC 3571, Electronic Computers, MorningStar, as of June 30, 2011.

[682] I provide a corresponding calculation for tablets in **Exhibit 26-A**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

### (5) Step 5: Conclusion on the Maximum Samsung Would Have Been Willing to Pay

412.     My assessment of Samsung's willingness to pay accounts for incremental profits Samsung would expect to earn as a result of obtaining a license from Apple to the Asserted Patents.  Under this approach, Samsung would compare these incremental profits to the royalties it would owe as a result of a per unit royalty assessed on all of its expected sales of accused products over the relevant lifetime.

413.     Table 5 depicts the maximum per unit royalties that Samsung would have been willing to pay for each of the Asserted Patents.

| Table 5 Maximum Royalties Samsung Would Have Been Willing to Pay (Dollars Per Unit) | | |
|---|---|---|
| Patent | Smartphones | Tablets |
| '414 | $9.18 | $9.59 |
| '647 | $7.63 | $7.78 |
| '959 | $4.96 | $3.34 |
| '760 | $1.55 | -- |
| '721 | $0.98 | -- |
| '172 | $1.73 | -- |

### c.  Perspective of the Hypothetical Licensor (Apple)

414.     At a hypothetical negotiation with Samsung in June 2011, Apple would have recognized that it was sitting across the table from its most serious competitor for mobile devices and that the Asserted Patents cover valuable features intended to differentiate Apple's products from those of its competitors.  Thus, Apple would have considered the profits it would lose on sales that would go to Samsung if it granted a license and the customers it would lose as a result. For Apple as for Samsung, this concern would have been amplified by the fact that the smartphone marketplace was entering the high-growth stage of mass adoption by first-time buyers that Apple could win to its ecosystem were it not to license Samsung (that would naturally "tip" more toward Samsung/Android under Samsung's licensed rights).  Importantly,

Apple also would have considered the potential dilution of its reputation as an innovator from allowing the features covered by the Asserted Patents to appear in a competitor's products.  For Apple, the question would be whether Samsung would make enough sales in addition to those it captured from Apple <u>and</u> pay a sufficiently high royalty to more than offset the profits Apple expected to lose by granting to Samsung a license to the Asserted Patents.

415.    Apple's analysis at the hypothetical negotiation would have consisted of two broad strokes: (1) assessing the incremental sales Samsung would gain as a result of the license (which is, of course, the direct analog to what Samsung would expect to lose absent that license); and (2) what proportion of the incremental sales Samsung would make that would come at Apple's expense, and what Apple would expect to lose in profits as a result of such ceded sales.

416.    As to the first broad issue—Samsung's expected incremental sales under the license—Apple's assessment would proceed identically to Steps 1-3 under Samsung's assessment.  This is due to the condition imposed on the hypothetical negotiation that both parties have a common set of information at their disposal at the hypothetical negotiation.  Thus, the magnitude of incremental sales that Apple would anticipate Samsung making as a result of receiving a license to the Asserted Patents is the same as that anticipated by Samsung.

417.    As a result, to determine Apple's minimum willingness to accept, I need complete only the following additional  steps that specifically relate to Apple's expected losses stemming from Samsung's expected additional sales under the license:

- Step A-4: Determine the portion of Samsung's incremental sales that would remain at Apple in the event Apple does not license Samsung to the Asserted Patents;

- Step A-5: Assess the incremental profit per unit Apple would expect to lose that applies to each expected Apple forgone sale;

- Step A-6: Assess the expected additional losses (revenues and profits) in Apple sales of device and other products and services as a result of losses of customers with Apple's ecosystem; and

- Step A-7: Calculate Apple's overall minimum willingness to accept.

418.    I provide details as to each of these remaining steps below.

**(1) Step A-4: Effect of Samsung Licensed Device Sales on Apple Device Sales**

419.     The first Apple-specific task in assessing Apple's minimum acceptable royalty is to determine Apple's expectations as to its forgone sales and profits as a result of the additional sales that it expects Samsung to make under the license. My estimate of the share of any sales of the Accused Products that Apple would have expected to make if it did not license Samsung is based on a share apportionment consideration based on share expectations as they would have been evaluated in mid-2011.[683]

**(2) Step A-5: Incremental Profit Per Unit on Apple Forgone Sales**

420.     Having identified the expected unit sales Apple would forgo by granting Samsung a license to the Asserted Patents, I next turn to estimating the incremental profit that Apple would have expected to lose on those forgone sales. I am not aware of financial projections produced by Apple that contain estimates of the incremental profit per unit that Apple expected for iPhones and iPads or the total number of units of each Accused Product that Apple expected Samsung to sell during the damages period. Therefore, I base my calculations as to Apple's incremental profits on actual historical data that I find to be in line with what the parties might reasonably have expected at the time of the hypothetical negotiation.[684]

---

[683] This differs markedly from the lost profits assessment above, where actual share data are used for apportionment.

[684] Consistent with my treatment of the parties' expectations thus far, I use the one-year period following the hypothetical negotiation. When contemporaneous information is inadequate, the use of relevant information that post-dates the hypothetical negotiation in assessing a reasonable royalty is well-established and is known as a "book of wisdom" approach (see, for example, *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (Fed. Cir. 2009)).

### (3) Step A-6: Partial Valuation of Apple's Expected Losses Due to Ecosystem Effects

421.     My method of valuing Apple's expected losses due to ecosystem effects is the same as that for valuing the ecosystem effects of Samsung's expected gains of replacement units, which I discussed in detail above, with some different parameters to account for differences between customers' stickiness to Apple relative to Samsung.

422.     Detailed in **Exhibit 28**, my analysis proceeds in a manner similar to that described for Samsung in the previous Section.  Since not all iPhone owners will purchase another iPhone as their replacement device, ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████ ██ ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████

423.     As with **Exhibit 25**, in the calculations in **Exhibit 28**, I take into account the inherent uncertainty of the smartphone/tablet business and the general discount such uncertainty implies as to the expected value of future sales by applying a discount factor over the expected economic life of the Accused Products and the subsequent period of two years over which I

███ ██████████████████████████████

evaluate ecosystem effects in the form of incremental replacement purchases.  For this purpose, I apply to Apple's expected changes in sales and profits (and expected base of sales upon which a royalty would be paid) an implicit discount rate of 12.75%,[686] which is derived from reported costs of capital estimated for large firms in the electronic computer industry as of mid-2011.[687]

424.    I perform steps (1) through (4) for smartphones in **Exhibit 27**.[688]  My valuation of ecosystem effects is highly conservative because it includes, for each iPhone on which Apple expects to forgo a sale as a result of its license to Samsung, only one lost replacement iPhone by the share of customers who would have made such a purchase.  Although there is other data, cited in Section III.C.2.a.(5),[689] showing that Apple's customers typically purchase a stream of Apple products and accessories to those products, determining the total number of those sales attributable to the initial lost sale of an iPhone to Samsung is exceedingly difficult.  Accordingly, my damages computations do not include any subsequent replacement purchases of smartphones or tablets (beyond the first smartphone replacement) or any of the other Apple devices, accessories, software, and content from the iTunes Store that Apple's customers typically purchase.[690]  The difficulty of estimating reliably the full amount of lost sales and profits from ecosystem effects was one of the main bases for my conclusion in my Original and Reply

---

[686] Weighted Average Cost of Capital for SIC 3571, Electronic Computers, MorningStar, as of June 30, 2011.

[687] Weighted Average Cost of Capital for SIC 3571, Electronic Computers, MorningStar, as of June 30, 2011.

[688] I provide a corresponding calculation for tablets in **Exhibit 27-A**.

[689] As explained above, I do not assume that every unit of Apple's lost sales would have led to a lost replacement sale.  Rather, I adjust for customers' "stickiness," i.e., their propensity to continue purchasing Apple products after they make an initial purchase of an Apple product.

[690] My exclusion of these related content and ecosystem sales should not be construed as an admission that Apple would not have considered these lost sales in considering an appropriate license fee.  Rather, the complexity of estimating such sales supports my previous opinion that Apple would suffer irreparable harm from Samsung's infringement due to demand complementarities between smartphones and related products.  Because of the demand complementarities between smartphones and related products, as well as the long-term effects associated with the loss of share in smartphones, there will be additional, incalculable harm to Apple in the form of both immediate and long-term reduced sales and profits with respect to related aspects of its business, including sales of digital media, applications and other devices/computers.

Declaration that Samsung's continued sale of the Galaxy Nexus would cause Apple irreparable harm.[691]

425.    An illustration of the harm to Apple that is not captured in my valuation of Apple's ecosystem effects is its lost sales of accessories generated by sales of smartphones and tablets.  Samsung strategic documents corroborate this relationship.  A Samsung strategy presentation states that "Smart Phones Drive Higher Accessory Purchases" and notes that Apple sold 50 million iPhones through the first quarter of 2010, which generated "~$7.5B in aftermarket accessories sales" in three years, *i.e.*, $150 per iPhone, and sold 450 thousand iPads in the first weekend following their release, which generated "~$54M in Accessory Sales,"[692] i.e., $120 per iPad.  Given potential timing differences between initial purchases of devices and subsequent purchases of accessories, I have not calculated Apple's total loss due to its inability to sell accessories to customers who purchased Samsung's Accused Products.  Calculations using Apple data, in which ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ (See **Exhibits 29** and **29-A**.)

426.    Apple's willingness to grant a license to the Asserted Patents in this hypothetical context would not reflect the entire forgone expected revenue from such additional ecosystem-

---

[691] While Mr. Wagner expressed skepticism over the existence of convoyed sales or sales of other Apple products attributable to sales of iPhones and iPads (Wagner Declaration, ¶ 120) during the preliminary injunction phase of this matter, he expressed confidence that such sales could be quantified reliably.  In his declaration, Mr. Wagner stated: "an experienced damage expert can use studies that have been conducted about customer loyalty and churn to calculate how many of these customers will be repeat customers at both Samsung and Apple.  Apple has demonstrated a propensity to gather the data that would be needed for these types of surveys, and it has the ability to retain survey experts to gather data that could be relied on if the data is not already in the record.  If Apple has lost any convoyed sales related to its lost sales, there will be evidence of the types of purchases Apple customers normally make, in what quantities, at what prices, and at what profit to Apple.  Apple has produced data on these types of convoyed sales …. [D]ata [already being gathered by Apple], as well as supplemental data that could be gathered from the types of surveys frequently conducted by Apple, could be used to calculate the lost profits on convoyed sales related to lost iPhone sales.  These are types of analyses that experienced damage experts perform all the time" (Wagner Declaration, ¶¶ 121-22); see also Deposition of Michael Wagner, Transcript, May 4, 2012, at 150-51.

[692] "2011 Smartphone Portfolio Strategy," May 2010, SAMNDCA00530591, at -612.

related sales, but only the incremental profit Apple anticipated from those sales.  Therefore, I multiply these additional ecosystem sales by Apple's expected incremental profit rate as derived above.

### (4) Step A-7: Conclusion on the Minimum Apple Would Have Been Willing to Accept

427.    My assessment of Apple's minimum acceptable royalty from Samsung for the rights to the Asserted Patents under a hypothetical negotiation in mid-2011 accounts for the incremental profits Apple would expect to forgo as a result of such a license.  Under this approach, Apple would compare these forgone profits to the royalties it would earn as a result of a per unit royalty assessed on all of Samsung's expected sales of accused products over the relevant lifetime.

428.    In Table 6, I provide the minimum per unit royalties that Apple would have been willing to accept, for each of the Asserted Patents, on Samsung's sales of smartphones and tablets.  These rates are averages calculated over the accused smartphones and tablets, respectively, to account for the fact that, as mentioned, the effects of Accused Features on Willingness to Buy varies with the retail prices and screen sizes of the Accused Products.  These averages allow me to avoid an undue degree of complexity in the royalty rate schedule, while accounting for the richness of the underlying data.



### d. Conclusion from Edgeworth Box Analysis Regarding the Reasonable Royalty for the Asserted Patents

429.    The minimum per-unit royalties that Apple would have been willing to accept and the maximum Samsung would have been willing to pay are the bottom and top of the Edgeworth Box for each Asserted Patent, for smartphones and tablets, within which Apple and Samsung would rationally agree on a royalty.  These values are shown in **Exhibit 30** and provided for reference in Table 7.

| Table 7: Edgeworth Box | | | |
|---|---|---|---|
| Royalty Rates Apple and Samsung Would Have Been Willing to Accept and Pay, Based on *Georgia-Pacific* Factor 15 Analysis | | | |
| Smartphone Royalty Rates (Dollars Per Unit) | | | |
| Patent | Apple's Willingness to Accept | Samsung's Willingness to Pay | Samsung's Willingness to Pay w/ $50 ASP Increase |
| '414 | $15.03 | $9.18 | |
| '647 | $12.49 | $7.63 | |
| '959 | $8.13 | $4.96 | |
| '760 | $2.54 | $1.55 | |
| '721 | $1.61 | $0.98 | |
| '172 | $2.84 | $1.73 | |
| Total | $42.64 | $26.03 | $44.98 |

| Tablet Royalty Rates (Dollars Per Unit) | | | |
|---|---|---|---|
| Patent | Apple's Willingness to Accept | Samsung's Willingness to Pay | Samsung's Willingness to Pay w/ $100 ASP Increase |
| '414 | $14.81 | $9.59 | |
| '647 | $12.02 | $7.78 | |
| '959 | $5.16 | $3.34 | |
| '760 | $-- | $-- | |
| '721 | $-- | $-- | |
| '172 | $-- | $-- | |
| Total | $31.99 | $20.71 | $35.41 |

430.     These results suggest an "inverted" Edgeworth Box—one in which Apple's minimum acceptable rate exceeds the maximum acceptable rate to Samsung.  This result is not uncommon in hypothetical negotiations involving direct rivals with respect to commercially important patents and is consistent with the general proposition—which is clearly true here—that patentees with important patents that they commercialize through their own line of products are

loathe to license this key technology to direct rivals.  Moreover, this result is magnified here, where Apple's incremental profit rate per device is considerably higher than those realized by Samsung.

431.    In such circumstances, I find, as a matter of economics, that the governing benchmark rate from the Edgeworth Box analysis is the minimum acceptable rate to the patentee—here, Apple.[693]  From an economic standpoint, this makes sense.  Samsung's willingness to pay stems from an important economic limitation.  The hypothetical negotiation, based on historic expectations and data, assumes and seeks to determine what Samsung would pay for a license to the Patented Inventions.  These financials are, by necessity, based on Samsung financials where it used the Patented Inventions *but did not pay for that use*.  Under the hypothetical license, Samsung would have recognized its obligations to pay running royalties to Apple on each licensed sale.  The royalty would thus have represented an ongoing marginal cost to Samsung, and its prices would have been raised to reflect its higher costs.  At these higher prices, Samsung could very well have been in a position to earn higher profits under the license than absent the license, even at Apple's minimum acceptable rate.  In the actual world, at lower prices, paying such a rate to Apple may not appear to be economically rational, but once the pricing dynamics in play at Samsung are taken into account, this apparent irrationality evaporates.

---

[693] Indeed, I understand that governing legal principles accord with economic principles on this point.  See *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554-55 (Fed. Cir. 1995): affirming district court's reasonable royalty that was based not on infringer's profits, but on patentee's unwillingness to license for anything less than one-half of forgone per-unit profits; *State Industries., Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989): "The determination of a reasonable royalty, however, is based not on the infringer's profit margin, but on what a willing licensor and licensee would bargain for at hypothetical negotiations on the date infringement started. … There is no rule that a royalty be no higher than the infringer's net profit margin." (internal citations omitted); *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed. Cir. 1983): royalty need not be less than price of infringing unit.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  After accounting for this increase, Samsung's maximum willingness to pay exceeds the minimum Apple would have been willing to accept, and the conventional results associated with an Edgeworth Box analysis (i.e., a licensee with a greater maximum willingness to pay compared to the licensor's minimum willingness to accept) is restored.

432.    With this in mind, I determine that the Edgeworth Box analysis identifies Apple's minimum willingness to accept as a benchmark reasonable royalty associated with a hypothetical negotiation between Apple and Samsung on the Asserted Patents that would have taken place in mid-2011. In the remainder of my reasonable royalty analysis, I assess whether the *Georgia-Pacific* Factors identify any basis upon which this benchmark rate should be adjusted before it is applied as the reasonable royalty rate.

### 3.   Consideration of the Remaining *Georgia-Pacific* Factors

433.    I now consider the remaining *Georgia-Pacific* Factors to determine whether they indicate an increase or decrease from the benchmark reasonable royalty rates I determined under Factor 15.

**Factor 1: The royalties received by the patentee for the licensing of the Asserted Patents, proving or tending to prove an established royalty**

434.    I have reviewed the patent licenses granted by Apple that have been produced in this matter. ████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████  For reasons

---

[695] In addition to Nokia, HTC, and Microsoft, Apple has licensed two other smartphone makers that compete with Apple, namely ████████████████  However, these licenses and licensees have characteristics that readily show them to be uninformative regarding a hypothetical negotiation between Apple and Samsung. ██████████████████████████
████████████████████████████ (APLNDC-WH0000682934).
█████████████████████████████ (APLNDC-WH0000536268).
██████████████████████████████████████████████████████
██████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

discussed below, I conclude that these three licenses provide no useful information proving or tending to prove an established royalty for the Asserted Patents.

### a.  Apple and Nokia

435.    On June 12, 2011, Apple and Nokia Corporation ("Nokia") entered into a "Patent License Agreement," which is ████████████████ ██████ ████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████ ███  ████████
████████████████████████████ ████

436.    ████████████████████████████████████

██████████████████████████████████████████████████████████
████████  ████████████████████████ I conclude that the Apple-Nokia

agreement provides no useful information proving or tending to prove an established royalty

because the ████████████████████████████████████████████████

████  It is not, therefore, indicative of a license that Apple and Samsung would have

negotiated in 2011 covering ████████████████████████████████  Further, unlike

---

[696] "Apple-Nokia License Agreement," June 12, 2011, APLNDC-X0000007220, at -221, -225.



[698] "Apple-Nokia License Agreement," June 12, 2011, APLNDC-X0000007220, at -228, -230-31.

[699] ████████████████████████████████████████ "Apple-Nokia License Agreement," June 12, 2011, APLNDC-X0000007220, at -355.



The situation with Samsung was entirely different in 2011. At that time, Samsung had already begun its ascent in the smartphone market and was seeking to continue this trajectory to achieve top-tier status alongside Apple.[701] Apple, recognizing the substantial threat Samsung posed in what was becoming a two-player market, would have approached negotiations with Samsung in a very different manner and, in my opinion, would have negotiated a very different license with Samsung than it did with Nokia at that time.

### b. Apple and HTC



---

[700] "For Once-Strong Smartphone Makers, 2011 Was the Year of New Beginnings," NPD, Dec. 13, 2011 (https://www.npd.com/wps/portal/npd/us/news/press-releases/pr_111213/).

[701] I discuss this critical point in time for Samsung above in Section II.F.

 It appears that Apple asserted the '647, '760, '721, and '172 patents against HTC.[704]

439.

---

[703] "Apple-HTC Licensing Agreement," Nov. 11, 2012, APLNDC-Y0000408242, at -250-52.

[704] HTC's First Amended Answer, Affirmative Defenses, and Counterclaims to Defendant and Counterclaim Plaintiff Apple Inc.'s Counterclaims to First Amended Complaint, July 17, 2012, at pp. 22, 25; Notice of the Commission's Final Determination Finding a Violation of Section 337; Issuance of a Limited Exclusion Order; Termination of the Investigation, at p. 2.



[706] "Apple-HTC License Agreement," Nov. 11, 2012, APLNDC-Y0000408242, at -244.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████   ██████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████   For this reason alone, this license provides no useful information proving, or tending to prove, an established royalty in this case.

441.   I conclude that this agreement provides no useful information proving or tending to prove an established royalty in this case also because, as with the Apple-Nokia agreement, ███ ██████████████████████████████████████████████████████ ██████████████

442.   Finally, because the Apple and HTC agreement ██████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████

such as the hypothetical license between Apple and Samsung under consideration here.

███████████████████████████████████████████████

█   ██████████████████████████████████████████████████

█   ████████████████████████████████████████████████████████

█

### c. Apple and Microsoft

443.    On August 5, 1997, Apple and Microsoft entered into a "Patent Cross License Agreement" and, concurrently, into a "Common Stock Purchase Agreement" and a "Technology Agreement."[712]  Under the Patent Cross License Agreement, the parties granted each other a worldwide, nonexclusive right and license under the Apple and Microsoft Licensed Patents.[713] Apple's and Microsoft's Licensed Patents include all worldwide utility patents and design patents issued or issuing on any application filed prior to the Capture Date specified in the agreement of August 5, 2002, and, thus, I understand that they include the '959 and '647 Patents.[714]  Licensed Products under the agreement is defined in part as "any and all machines, articles of manufacture, compositions of matter and any other products which are designed, developed, duplicated, manufactured, acquired or rendered by or for a party and which are transferred by or made available from a party," excluding Clone Products and Foundry Products.[715]

444.    As a consideration for the license, Microsoft agreed to pay Apple $93,076,924.[716] All licenses and other rights granted by Microsoft to Apple and vice-versa are fully paid-up and royalty-free.[717]  Apple also agreed to pay back to Microsoft 52.5% of the total payment made by

---

[712] "Apple-Microsoft License Agreement," Aug. 5, 1997, APL-ITC796-0000010019, at -019-020.

[713] "Apple-Microsoft License Agreement," Aug. 5, 1997, APL-ITC796-0000010019, at -024.

[714] "Apple-Microsoft License Agreement," Aug. 5, 1997, APL-ITC796-0000010019, at -020-021.

[715] "Apple-Microsoft License Agreement," Aug. 5, 1997, APL-ITC796-0000010019, at -021. Clone Product is defined as a new product that is designed or acquired after the effective date and is designed to be and is an identical or substantially identical replacement in functionality and/or user experience of a then existing commercial product of the other party.  "Apple-Microsoft License Agreement," Aug. 5, 1997, APL-ITC796-0000010019, at -022.  Foundry Product is defined as a product which is either (i) owned or designed by a third party without substantial input from one party ("the "Acting Party") and transferred from the Acting Party to that third party or customers on an exclusive basis; or (ii) transferred through or by the Acting Party for the purpose of circumventing any patent right of the other party to this Agreement. "Apple-Microsoft License Agreement," Aug. 5, 1997, APL-ITC796-0000010019, at -022.

[716] "Apple-Microsoft License Agreement," Aug. 5, 1997, APL-ITC796-0000010019, at -027.

[717] "Apple-Microsoft License Agreement," Aug. 5, 1997, APL-ITC796-0000010019, at -027.

Microsoft to Object Technology Licensing Corporation (OTLC),[718] less one-half of any costs OLTC incurred with Microsoft patent activities.[719]  Apple also agreed to send a letter to OTLC stating that it no longer had any financial interest in the resolution of any OTLC claims against Microsoft.[720]

445.    The agreement is effective until the expiration of the last-to-expire of the licensed patents.[721]

446.    This agreement is far too old to be probative of a license that Apple would enter into at the time of the hypothetical negotiation with Samsung, particularly in light of the fact that it predates by a decade Apple's entry into the smartphone and tablet markets.  The agreement also is a broad cross license that includes a host of intellectual property that is unrelated to the Apple Asserted Patents here.  Thus, I conclude that this agreement also provides no useful information proving or tending to prove an established royalty in this case.

### d.  Apple and IBM





451.    I conclude that these agreements also provide no useful information proving or tending to prove an established royalty in this case. ██████████████████ ████████████████████ Nonetheless, that agreement is far too old to be probative of a license that Apple would enter into at the time of the hypothetical negotiation with Samsung, particularly in light of the fact that it predates Apple's entry into the smartphone and tablet markets.  Moreover, the ████████████████████████████████████████ ████████████████████ Finally, IBM is not currently a competitor of Apple in the wireless device industry, nor was IBM a competitor at the time of the cross license.

---

[725] "Amendment to Apple-IBM License Agreement," Apr. 1, 1996, APL-ITC796-0000010080.

[726] "Apple-IBM License Agreement," Oct. 25, 2002, APL-ITC796-0000329139 at -139, -169.

[727] "Apple-IBM License Agreement," Oct. 25, 2002, APL-ITC796-0000329139, at -160.

[728] "Apple-IBM License Agreement," Oct. 25, 2002, APL-ITC796-0000329139, at -140-41, -145,-147.

[729] "Amended License Agreement," Mar. 31, 2006, APL-ITC796-0000010115.

[730] "Amended License Agreement," Mar. 31, 2006, APL-ITC796-0000010115.

### e. Conclusion

452.    It is my opinion that Apple's license agreements with Nokia, HTC, Microsoft, and IBM do not provide relevant comparable reference rates for the Asserted Patents. ████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████ Furthermore, IBM does not compete in the wireless device industry, an important characteristic when establishing a rate as comparable. Finally, the Microsoft license is a broad cross license also covering patents that are unrelated to Apple's Asserted Patents in this case.  The Microsoft and IBM agreements are also particularly old, predating even Apple's initial entry into the smartphone and tablet markets.  Thus, I conclude that this *Georgia-Pacific* Factor provides no material insight into the appropriate reasonable royalty rates.

### Factor 2: The rates paid by the licensee for the use of other patents comparable to the Asserted Patents

453.    I have reviewed the licenses that Samsung has produced in this matter and determined that none is informative as to royalties that Samsung would agree to pay Apple for licenses to the Asserted Patents.



**Highly Confidential – Attorneys' Eyes Only**
**Subject to Protective Order**



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

457.     My consideration of this Factor has disclosed no rates paid by Samsung for the use of other intellectual property comparable to Apple's Asserted Patents.  As a result, this Factor is neutral regarding the level of a reasonable royalty in the present matter.

**Factor 3:  The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold**

458.     As mentioned in my introduction to this reasonable royalty analysis, because Apple practiced the Asserted Patents at the time of the hypothetical negotiation and has continued to do so, I find that Apple and Samsung would have negotiated a non-exclusive license.  In general, non-exclusivity implies a lower royalty rate than exclusivity.  However, this aspect of the hypothetically negotiated license is already accounted for in my analysis of *Georgia-Pacific* Factor 15, and it, therefore, does not indicate any change from the reasonable royalty rates I determined through that analysis

459.     Since the hypothetically negotiated license must cover the sales of the Accused Products that have actually taken place, it would not have contained any restriction with respect to whom the manufactured product may be sold.  In general, the absence of such restrictions implies a higher royalty rate than where they are present.  However, like the non-exclusivity of the hypothetically negotiated license, this aspect is already accounted for in my analysis of *Georgia-Pacific* Factor 15, and it, therefore, does not indicate any change from the reasonable royalty rates I determined through that analysis.

460.     I understand that the present matter concerns only the application of U.S. law and only sales of the Accused Products in the U.S.  The territory of a hypothetically negotiated license by Apple to Samsung is thus limited to the U.S.  While this territorial limitation indicates that total royalties owed to Apple under the hypothetically negotiated agreement license should be less than under a worldwide license, I consider it to be neutral with respect to royalty rates.

**Factor 4: The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly**

461.     Based on my review of the licenses produced in this matter covering the Apple Asserted Patents, Apple has not licensed any of the Asserted Patents individually.  Rather, Apple has licensed these patents only via agreements made pursuant to litigation settlement or broad

cross-licenses involving large patent portfolios and anti-cloning provisions.  Consistent with the very limited scope of Apple's licensing out of its intellectual property, I am not aware of any established or written policy concerning Apple's licensing of intellectual property to others, except regarding the licensing of technology declared essential to certain standards.

462.    In my discussion of *Georgia-Pacific* Factor 15, I mentioned that Apple, in its hypothetical negotiation with Samsung, would have had reason to be concerned over risks to its competitive position and reputation from licensing Samsung, which go beyond the loss of sales captured in my reasonable royalty analysis under that Factor.  Apple's licensing practices confirm that Apple recognizes these risks and would therefore not voluntarily license Samsung.  Therefore, this Factor indicates higher reasonable royalty rates than those I derived under Factor 15.

**Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are the inventor and promoter**

463.    As I have shown in Section II.F above, Apple and Samsung are certainly competitors in the same territory in the same line of business.  Indeed, they are each other's primary competitors in smartphones and tablets.  This Factor fundamentally affects the rates at which Apple would license Samsung and would, in fact, make it unwilling to grant a license at all.  Like Factor 4, this one indicates higher reasonable royalty rates than those I derived under Factor 15.

**Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales**

464.    As mentioned in my discussion of *Georgia-Pacific* Factor 15 above, my estimates of the minimum royalties Apple would have been willing to accept are conservative in that they do not include any replacement sales beyond the first round of such sales or any sales of other products such as computers, accessories, and digital content that Apple would have expected to lose by granting a license to Samsung.  Similarly, my estimates of the maximum royalties Samsung would have been willing to pay do not account for the corresponding incremental sales that Samsung would have expected to make.  Thus, to the extent that Samsung's sale of the

Accused Products will generate further rounds of replacement sales or has generated sales of other Samsung products and revenues from accessories, apps, and digital content for those products, and has deprived Apple of such derivative or convoyed sales, this indicates an increase over the benchmark royalty rates I derived under Factor 15.

465.    In light of my discussion in Section III.C.2, especially III.C.2(5) above, there is no doubt that the sale of Accused Products has generated significant derivative sales not accounted for in my benchmark royalty rates.  The challenge is to quantify the derivative sales that are attributable to Samsung's infringement of the Asserted Patents with sufficient reliability for damages purposes.  I have conservatively elected to estimate only the first round of replacement sales of the Accused Products that I forecast will occur after the damages period to date, based on the sales that have already occurred.[738]  However, given the acknowledged importance of derivative sales in the present matter, this Factor indicates higher reasonable royalty rates than those I derived under Factor 15.

**Factor 7: The duration of the patent and the term of the license**

466.    I report the dates on which the Asserted Patents will expire in **Exhibit 6**.  The information presented there shows that, at the time of the hypothetical negotiation, there were roughly between four years, eight months and 19 years remaining until the Asserted Patents expire.

467.    If the remaining time until a patent will expire is short enough, a potential licensee has the option of not taking a license and delaying the date on which it begins to practice the patented invention until the patent has expired.  Similarly, if an inexpensive close substitute for the patented invention is expected to become available within a sufficiently short time, potential licensees have the option not to take a license and to adopt the substitute – in which case, the remaining economic life of the patent in products that require a license is short, even if its remaining legal life is long.  In such cases, the fact that potential licensees have the option to

---

[738] As mentioned, Samsung's expert Mr. Wagner took a more sanguine view of the possibility of being able to estimate derivative or convoyed sales in his testimony during the preliminary injunction phase of this case (see footnote 694 above).  However, he testified in a previous litigation that he agreed that "the decision to purchase one Apple iPhone may have repercussions that could lead to future lost customers and future lost sales that cannot be recovered" (cited by the Court in the 1846 Order at p. 32).

delay their adoption of new technology and not take a license to the patent would tend to reduce the royalty that a potential licensee would be willing to pay.

468.   These considerations do not apply here. ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Where Samsung had implemented non-infringing alternatives, as with the '721 Patent, it continued to offer the Accused Features on other products for some time afterward.  Moreover, even where, as with the '172 Patent, Samsung replaced the Accused Feature in at least some products within a relatively short time, the survey evidence discussed in Sections III.B.1 and III.B.2 demonstrates that non-infringing alternatives are less preferred than the patented ones. Thus, even when Samsung has shown that it has non-infringing alternatives, the economic life of the Patented Inventions as embodied in products that require a license has continued beyond that point in time, given the advantages of these inventions over the alternatives.

469.   My reasonable royalty analysis under *Georgia-Pacific* Factor 15 above accounts for the economic life of the products that require a license, *i.e.*, the Accused Products, as would have been expected at the time of the hypothetical negotiation.[739]  However, while the Edgeworth Box analysis provided above reflects the fact the Apple and Samsung are competitors and partially quantifies the ecosystem effects associated with winning new customers, it does not fully capture the critical nature of the time period over which the hypothetically negotiated license would have been in place.  In my overview of the hypothetical negotiation, I explained that in 2011 Samsung had a critical, time-sensitive opportunity to outpace other smartphone manufacturers and "grab the brass ring" of a top-tier position alongside, or even beyond, Apple, and that access to the Asserted Patents was a key requirement for Samsung to execute this strategy.  These considerations, though central to the views of both Apple and Samsung at the hypothetical negotiation, were not incorporated in the model by which I derived Apple's willingness to accept and Samsung's willingness to pay.  In light of these considerations, this

---

[739] My consideration of the expectations of the parties at a the hypothetical negotiation for a license to the Accused Products does not preclude the possibility that, should more recently launched products be found to infringe the Asserted Patents, a new, updated consideration of the expected economic life of those products and the periods for which they would require a license would be indicated.

*Georgia-Pacific* Factor 7, under which I assess the term over which the Accused Products would require a license, indicates a significant upward adjustment to the benchmark reasonable royalty rates I derived under Factor 15.

**Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity**

470.    The exceptional popularity, commercial success, and profitability of Apple's iPhones, iPads, and, more recently, Samsung's Accused Products is documented in the Exhibits cited in my discussion of *Panduit* Factor 1 (Demand for the Patented Product) in Section III.B.1.a, above.  Data show that both companies have produced high profit margins. ████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ **Exhibit 10** shows a Samsung gross profit margin of █

██████████████████████████████████████

██████████████████ **Exhibit 10** shows a Samsung gross profit margin of ████████████

████████████████████████████████████████

██████

471.    **Exhibit 8** contains Apple and Samsung's U.S. smartphone market shares.  Since the first quarter of 2011 to the fourth quarter of 2012, ███████████████████

██████████    By the fourth quarter of 2012, ███████████████████

████████████████████████████████████

████    **Exhibit 9**, which depicts Apple's and Samsung's U.S. tablet market shares,

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████

---

[740] See **Exhibit 8-A**.

[741] See **Exhibit 8-A**.

[742] See **Exhibit 9-A**.

472.     The profitability of Samsung's Accused Products supports my assessment of royalty rates under *Georgia-Pacific* Factor 15 based on the incremental contribution of the Patented Inventions to the profitability of the Accused Products.  The fact that these products have in fact been profitable indicates higher royalty rates than the benchmark rates I determined through my analysis of *Georgia-Pacific* Factor 15.

**Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results**

**and**

**Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention**

473.     Because of their close relationship, I discuss *Georgia-Pacific* Factors 9 and 10 together.

474.     I have described each of the Patented Inventions, their commercial embodiments, and their benefits over previously available alternatives in Section III.B above.  I have also provided a quantitative assessment of the value of the Patented Inventions to Apple (on a per-unit basis) in my discussion of *Panduit* Factor 1 in Section III.B.4.b, discussed qualitative evidence of their value in Section III.B.4.b, and provided a quantitative assessment of their value to Samsung (on a per-unit and aggregate basis) under *Georgia-Pacific* Factor 15.

475.     These Sections of my report show that the commercial embodiments of the Patented Inventions have advantages over older models that give them considerable value in the marketplace.  In sum, they contribute significantly to the enhanced user experience for which Apple is known.  As the analyses provided above are reflected in my benchmark reasonable royalty rates, no further adjustment of these rates is indicated here.

**Factor 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use**

476.     Under the assumption of validity and infringement of the Asserted Patents that underlies my entire damages analysis, Samsung has made very extensive use of the Patented Inventions.

477.    Under *Georgia-Pacific* Factors 9 and 10 immediately above, I pointed out the main Sections of this report in which I provided evidence probative of the value of Samsung's use of the Patented Inventions.  I concluded that, as the analyses referenced there are reflected in my benchmark reasonable royalty rates, no further adjustment of these rates was indicated under those Factors.

478.    The present Factor, however, raises considerations that go beyond those addressed in the Sections of my report referenced under *Georgia-Pacific* Factors 9 and 10.  Samsung's use of the Patented Inventions has been so extensive, and the Patented Inventions are sufficiently valuable, that I find it reasonable to believe that Samsung's infringement has contributed materially to blurring and reducing consumers' perceptions of the advantages of Apple's products due to Apple's innovations.  As a result, I conclude that this Factor indicates an increase over the benchmark reasonable royalty rates I derived under *Georgia-Pacific* Factor 15.

**Factor 12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions**

479.    I am not aware of any evidence that there is a portion of the profit or selling price that may be customary in the smartphone and tablet businesses or in comparable businesses—in particular, laptop and desktop computers—to allow for the use of any of the Patented Inventions or analogous inventions.

**Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer**

480.    My derivation of reasonable royalties is based on conjoint analysis, which is designed as a scientific method for determining the portion of the profit from products with multiple features that should be credited to individual features.  Thus it is an appropriate tool for

---

[744] See **Exhibits 8-B**, **9-B**, and **10**.

precisely the task of determining the portion of the profit from the Accused Products that should be credited to the Patented Inventions as distinguished from non-patented elements. Since this was the analysis I set forth under *Georgia-Pacific* Factor 15, no further adjustment is required to account for the Factor now under consideration.

**Factor 14: The opinion testimony of qualified experts**

481.   I provide my testimony herein. As mentioned, I have considered the results of conjoint surveys performed under the direction of Dr. John Hauser, Apple's survey expert in this matter. I have also spoken with Dr. Hauser to clarify my understanding of his methods and opinions. Further, I have studied the expert reports of the damages experts retained by counsel for Apple and Samsung in the 1846 case. The results of my consideration of these expert reports and conversations are reflected in my analysis above. They give rise to no additional adjustment of my royalty assessment here.

**Factor 15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license**

482.   I considered this Factor, which corresponds to the Edgeworth Box concept I explained above, before considering the remaining Factors. No further consideration of this Factor is required here.

### 4. Conclusions from the *Georgia-Pacific* Analysis and Reasonable Royalty Damages

483.   My analysis of the *Georgia-Pacific* Factors began with an analysis of Factor 15 based on the Edgeworth Box concept I explained earlier, from which I concluded that the benchmark rates for the Asserted Patents Apple's minimum willingness to accept since my Factor 15 analysis resulted in an inverted Edgeworth Box. This analysis accounted for a number of the considerations raised under *Georgia-Pacific*. Factors 3, 9, 10, 13, and 14 are neutral and did not indicate any adjustment to the benchmark royalty rates I developed under Factor 15.

Further, Factors 2 and 12 are neutral with respect to reasonable royalty rates, as I found no relevant information relating to these Factors.

484.     I found that the remaining *Georgia-Pacific* Factors all indicate an increase over the benchmark rates I derived under Factor 15.  Factors 2, 4, and 5 collectively indicate an increase in reasonable royalty rates over the benchmark rates, based on Apple's practice of not licensing patents to competitors (except in cross-licenses of patent portfolios or for pools of standards-essential patents) because of the risks to its brand and competitive positioning associated with granting such licenses.  Factor 6 also indicates an increase in rates, given the well-established, though difficult to quantify, impact of sales of mobile devices on sales of accessories, digital content, and computers.  Factor 8 indicates an increase in rates because not only have the Patented Inventions contributed to the commercial success of the Accused Products, but those products have garnered substantial profits.  Factor 11 also indicates an increase in rates because Samsung's use of the Patented Inventions has been so extensive that they are likely to have had a material effect on perceptions of Samsung's competitiveness with Apple.

485.     My analysis of the *Georgia-Pacific* Factors thus indicates reasonable royalties greater than the benchmark rates I determined through my consideration of the Edgeworth Box in Section III.C.2.  However, as discussed there, the Edgeworth Box based on Apple's minimum willingness to accept and Samsung's maximum willingness to pay at actual historical prices is inverted, i.e., the minimum Apple would accept exceeds the maximum Samsung would be willing to pay; it is only if Samsung were to raise its price significantly that the maximum Samsung would be willing to pay would exceed the minimum Apple would accept.  Despite the indication of my analysis of the *Georgia-Pacific* Factors that reasonable royalties should be greater than the benchmark rates, I conservatively limit reasonable royalty rates to the minimum Apple would have been willing to accept, consistent with the goal of compensating Apple for Samsung's infringement.

486.     The reasonable royalty rates I have determined through my analysis of the *Georgia-Pacific* Factors are applicable to sales of the Accused Products during the damages period to which lost profits do not apply.  My calculations account for which Asserted Patents each Accused Product is accused of infringing and for those instances in which an Accused Feature was removed from an Accused Product at a certain point.  These calculations result in

total reasonable royalty damages due to Apple on infringing Samsung units on which lost profits are not claimed of $916.6 million.  **Exhibit 17-B** presents my calculations, including the reasonable royalty damages for each Accused Product and Asserted Patent.  It would be straightforward to remove Accused Products or Asserted Patents from these calculations as needed or to adjust them for any changes in the damages period.

### D.  Summary and Conclusion on Lost Profits Plus Reasonable Royalties

487.    Based on the data available to me, I have determined that, through February, 2013, Apple sustained the following damages due to Samsung's infringement:

- Lost profits from lost sales totaling $653.7 million;
- Reasonable royalty damages on sales for which lost profits are not due totaling $938.2 million;

488.    Thus, I find that Apple has sustained total damages of $1,591.9 million as a result of Samsung's infringement through February, 2013.  (See **Exhibit 17**.)

489.    My damages calculations are based on rigorous survey evidence of the value of the Accused Features that is attributable to each of the Patented Inventions.  These calculations are conservative in some important respects:

- Even though Dr. Hauser's survey and conjoint analysis show that the effects of removing multiple Accused Features together exceed the sum of the effects of removing each Accused Feature individually, my calculations incorporate only a simple additive treatment of value of each Accused Feature to Samsung customers.  In fact, my linear approximation of the correct weights further reduces damages for a combination of infringing patents by removing overlap demand effects.  The possibility that the Accused Features—which, as discussed in Section III.B.1.b above, enhance the user experience in a variety of common uses of the Accused Products—have a cumulative value to users that exceeds the sum of their individual values is thus not captured in my damages analysis, which leads to a material understatement of damages owed;

- My lost profits calculations include only sales of the Accused Products and the resulting lost sales of iPhones and iPads during the damages period.  They do not account for Apple's loss of subsequent replacement sales of iPhones and iPads or its lost sales of other devices, apps, or digital content for those devices that, as my analysis of demand and competition in Section III.C.2.a above and my assessment of reasonable royalties below show, are of great value to smartphone and tablet manufacturers;

- Like my lost profits calculations, my determination of reasonable royalty rates and damages does not account for Apple's lost sales of products other than iPhones and iPads.  In addition, my reasonable royalty rates do not account for a consideration that would have weighed heavily in Apple's reluctance to license Samsung at any price, namely that doing so would increase the risk that network effects would begin to drive the marketplace toward a tipping point from Apple/iOS to Samsung/Android.

490.    These aspects of harm to Apple that are not captured in my lost profits analysis correspond to the reasons I provided in my Reply Declaration as to why a survey and conjoint analysis would not be able to provide Apple with full recovery.  As I stated there, at the time of trial, the trier of fact would need evidence to assess several elements of damages:

- The likelihood that purchasers of infringing Samsung products would have selected an Apple iPhone in a "but for" world (and which iPhone model they would have purchased);

- The likelihood that these end users in the "but for" world would purchase next-generation Apple iPhones; and

- The likelihood that these end users would purchase additional Apple products, including iPads, Macs, digital content, *etc.*[745]

491.    While a carefully designed and executed survey may capture some elements of these tendencies, there are elements of these questions that are unlikely to be addressed reliably.[746]  Importantly, the respondents who actually purchased an infringing Samsung phone will likely be invested in the Android platform at the time of survey, and this will bias their response in favor of selecting another Android device.[747]  Moreover, assessing the likelihood of additional purchase will depend on the conditions of the state of the world provided to the respondent that will be in place at the time of a future purchase.

---

[745] Reply Declaration of Christopher Vellturo, Ph.D., May 14, 2012, Case 12-cv-00630, N.D. California, at ¶ 139.

[746] I do not mean to imply that a conjoint analysis, hedonic regression, or some other statistical analysis is necessary to seek lost profits.  Rather, these are just tools that may be used to support a lost profits case.  Here, they would be insufficient to provide Apple with full recovery for the reasons discussed below.

[747] In my experience, taking consumers "back in time" to their selection of the infringing smartphone and asking them to reconsider their choice based on the information and preferences they had *at that time* is a fruitless exercise.  Yet, such a hypothetical would be essential to avoiding the result bias I identify here.

492.     Leaving aside these methodological and bias issues, there are much broader issues associated with Samsung's infringement and the damages sustained by Apple that surveys will not be able to capture, including, for example, the impact on the purchase of additional Android phones (both Samsung and others) due to network effects from the greater installed base of Android phones generated as a result of Samsung's infringement.  Such effects do not lend themselves to survey-based analysis because they relate to the feedback effects associated with platform adoption.  Indeed, I am unaware of any survey evidence that has captured these effects reliably in a patent damages context.

## IV.    COMPUTATION OF REASONABLE ROYALTY DAMAGES, SHOULD THE TRIER OF FACT FIND THAT APPLE IS ENTITLED ONLY TO REASONABLE ROYALTIES

493.     As I have explained in Section III above, it is my opinion that Apple is entitled to lost profits damages in this matter (assuming that Asserted Patents are found valid, enforceable, and infringed by Samsung) and that such damages can be assessed reliably.  Therefore, I find that Apple's claim for reasonable royalty damages is limited to sales of the Accused Products during the damages period to which lost profits do not apply.  However, should the trier of fact find that Apple is entitled only to reasonable royalty damages, these damages would be due on all infringing sales during the damages period.

494.     My computation of reasonable royalty damages here proceeds in the same way as I explained in Section III.C – only the royalty base is different.  I have applied the reasonable royalty rate for each Asserted Patent to Samsung's unit sales of each Accused Product accused of infringing that patent, accounting for any instances in which an Accused Feature was removed from an Accused Product.  These calculations result in total reasonable royalty damages of $1,024.0 million.  **Exhibit 31** presents my calculations, including the reasonable royalty damages for each Accused Product and Asserted Patent.  It would be straightforward to remove Accused Products or Asserted Patents from these calculations as needed, or to adjust them for any changes in the damages period.[748]

---

[748] In **Exhibits 17-B, 18-B, 19-B, 20-B, 21-B**, and **22-B**, I provide estimates of reasonable royalty damages corresponding to the damages scenarios discussed in Section III.B.4.

## V.    PERMANENT INJUNCTION

495.    As I have noted above, I have been asked by counsel for Apple to determine the amount of damages, if any, that would be adequate to compensate Apple as a result of Samsung's infringement of Apple's Asserted Patents, which I assume to be true for purposes of this report.  My opinions set forth herein are consistent with this objective.  Moreover, I arrive at my conclusions to a reasonable degree of certainty.  Nonetheless, the damages that I have calculated and express in this report do not represent the full amount of harm—monetary or otherwise—that Apple has and will continue to face as a result of Samsung's conduct.  For this reason, I further conclude that absent a permanent injunction barring Samsung's infringement of Apple's Asserted Patents, the harms incurred by Apple in the future will not be capable of adequate compensation through an award of monetary damages.

496.    As discussed above, I previously submitted an Opening Declaration and Reply Declaration in support of Apple's motion for a preliminary injunction in this case.  In those declarations, I provide detail concerning the irreparable harm Apple would face absent a preliminary injunction to prevent Samsung's infringement of certain of the Apple Asserted Patents in this case.  My opinions as set forth in those declarations remain unchanged, and apply to the broader set of Apple Asserted Patents and Samsung products at issue in this case.

497.    Specifically, as a result of Samsung's infringement, Apple has and will continue to suffer significant and irreparable harm, in the form of both a permanent loss of market share in the smartphone and tablet markets and future lost sales in many other aspects of Apple's business, including, for example, sales of smartphone applications and accessories, Apple iPods, iPads and related accessories, and Apple desktop and laptop computers.

498.    Moreover, as I explained in my prior declarations and describe in detail above, significant portions of these losses will not be capable of recapture by Apple because of the inherent "stickiness" of the smartphone and tablet markets, as well as network effects.  The full measure of these losses could never be fully calculated in this, or a later, patent infringement case.  Although for purposes of this report I have taken into account certain elements of the impact of Samsung's infringement on Apple's broader "ecosystem," this report does not fully quantify those effects, and indeed the harm to Apple as a result of them cannot be fully compensated by a lost profits or reasonable royalty award.

499.    I also conclude that the impact associated with Samsung's capture of first-time buyers by virtue of its infringement of Apple's patents—a phenomenon I identified in my prior declarations—remains a factor exacerbating Apple's irreparable harm.  For example, recent third-party data suggests that roughly one-third of first-time smartphone buyers purchase an iPhone, while roughly 30% of first-time smartphone buyers purchase a Samsung phone.[749] Further, "[b]oth Samsung and Apple tend to get repeat business from slightly more than three-quarters of their customers when it is upgrade time."[750]  Thus, capturing first-time buyers remains of critical importance to both Apple and Samsung, particularly given the high repeat-customer retention rate for both parties.

500.    Moreover, I have determined, based on both qualitative evidence set forth in my prior declarations and above, as well quantitative evidence, including conjoint survey data provided by Dr. Hauser and discussed herein, that Samsung's infringement of the Asserted Patents bears a direct causal nexus to, and indeed drives, consumer demand for Samsung's products.  In particular, as the survey data provided by Dr. Hauser show, there is at least some direct nexus between each individual patent and consumer demand.  The degree of this nexus varies by patent and is not 100% for any one patent (i.e., the Patented Features do not drive demand for 100% of all Samsung smartphone or tablet purchasers).  But in no case do I find that monetary damages alone can be quantified in a way to fully and fairly compensate Apple for infringement of any one patent at issue in this case.  In addition, as the results of Dr. Hauser's survey show, the combined impact on demand of all of the Asserted Patents together exceeds the sum of the impact of all individual patents.  As discussed above, Samsung's use of the Patented Features provides Samsung with substantial value and has formed a key foundation of Samsung's competition strategy, particularly vis-à-vis Apple, in the smartphone and tablet markets and beyond.[751]

---

[749] Ina Fried, "Apple Faces Hurdles Attracting First-Time Smartphone Buyers," All Things D, Aug. 7, 2013 (http://allthingsd.com/20130807/apple-faces-hurdles-attracting-first-time-smartphone-buyers/).

[750] Ina Fried, "Apple Faces Hurdles Attracting First-Time Smartphone Buyers," All Things D, Aug. 7, 2013 (http://allthingsd.com/20130807/apple-faces-hurdles-attracting-first-time-smartphone-buyers/).

[751] As noted above, I also understand that Samsung contends that it could implement non-infringing alternatives for certain of the Apple Asserted Patents within a short period of time and

## VI.   CONCLUSION

501.   The analysis above is based on the information I have obtained to date.  I expect to supplement this report when Samsung produces updated financial information relating to the Accused Products.  Moreover, after Apple reduces its number of Asserted Patents to 5, I expect to supplement this report to set forth damages scenarios involving the infringement of those five patents.  I may also present the Court and the jury with demonstrative exhibits at trial to illustrate how these damages should be calculated if fewer than all Asserted Patents are found valid and infringed, if fewer than all products are found to infringe, or both, or, in that event, perform additional calculations, after any partial verdict of liability, to present that information. Additionally, I may supplement and adjust the above in the event additional facts come to light. Finally, I will provide the Court with whatever calculations are necessary to determine pre-judgment interest, post-judgment interest, attorneys' fees, costs, or any other remedy over and above Apple's base damages award.

August 12, 2013                                          Dr. Christopher A. Vellturo

---

with minimal effort.  Putting aside the accuracy of that position, if it were true, then Samsung would face little by way of hardship in avoiding infringement of Apple's Asserted Patents, whereas Apple faces substantial hardship due to Samsung's infringement, as discussed herein.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER