Exhibit 5

1   Luke L. Dauchot (S.B.N. 229829)
    luke.dauchot@kirkland.com
2   Alexander F. MacKinnon (S.B.N. 146883)
    alexander.mackinnon@kirkland.com
3   Nimalka R. Wickramasekera (S.B.N. 268518)
    nimalka.wickramasekera@kirkland.com
4   Kirkland & Ellis LLP
    333 South Hope Street
5   Los Angeles, California 90071
    Telephone: (213) 680-8400
6   Facsimile: (213) 680-8500

7   Attorneys for Plaintiff/Counterclaim
    Defendants/Counterclaimants

8

9              UNITED STATES DISTRICT COURT

10           SOUTHERN DISTRICT OF CALIFORNIA

11  WARSAW ORTHOPEDIC, INC.,            )  CASE NO. 3:08-CV-01512-MMA (MDD)
                                        )
12                   Plaintiff,         )  **MEMORANDUM OF POINTS AND**
              vs.                       )  **AUTHORITIES IN SUPPORT OF**
13                                      )  **WARSAW ORTHOPEDIC, INC.'S**
    NUVASIVE, INC.,                     )  **MOTION FOR A PERMANENT**
14                                      )  **INJUNCTION**
                     Defendant.         )
15  ─────────────────────────────────  )  Judge: Honorable Michael M. Anello
    NUVASIVE, INC.,                     )  Courtroom: 5, 3rd Floor
16                                      )  Date: December 19, 2011
                  Counterclaimant,      )  Time: 2:30 pm
              vs.                       )
17                                      )
    MEDTRONIC SOFAMOR DANEK USA, INC.;  )
18  WARSAW ORTHOPEDIC, INC.; MEDTRONIC  )
    PUERTO RICO OPERATIONS CO., and     )
19  MEDTRONIC SOFAMOR DANEK            )
    DEGGENDORF, GmbH,                   )
20                                      )
              Counterclaim Defendant.   )
21  ─────────────────────────────────  )
    AND RELATED COUNTERCLAIMS           )
22  ─────────────────────────────────  )

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................1

II.   BACKGROUND ..................................................................................................2

    A.   Warsaw Owns A Portfolio Of Intellectual Property And Manufactures And Sells Spinal Devices Using That Technology..........................................................2

    B.   NuVasive's Infringing Products Compete Against Warsaw's Products..................3

    C.   NuVasive's Infringement Continues......................................................................5

III.   THE LEGAL STANDARD FOR A PERMANENT INJUNCTION .................................6

IV.   THE COURT SHOULD PERMANENTLY ENJOIN NUVASIVE FROM INFRINGING THE '973, '933, AND '586 PATENTS ................................................7

    A.   Warsaw Has Suffered—And Will Continue To Suffer—Irreparable Harm As A Result Of NuVasive's Infringement. ..................................................................7

    B.   Monetary Damages Are Inadequate To Compensate Warsaw. ............................11

    C.   The Balance Of Hardships Weighs In Favor Of An Injunction............................12

    D.   The Public Interest Would Be Served By A Permanent Injunction......................13

V.   CONCLUSION..................................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acumed LLC v. Stryker Corp.*,
   551 F.3d 1323 (Fed. Cir. 2008) .................................................................. 7, 11, 13, 14

*Becton Dickinson and Co. v. Tyco Healthcare Grp. LP*,
   2008 WL 4745882 (D. Del. Oct. 29, 2008) ........................................................... 13

*Black & Decker Inc. v. Robert Bosch Tool Corp*,
   2006 WL 3446144 (N.D. Ill. 2006) ..................................................................... 11

*Broadcom Corp. v. Qualcomm Inc.*,
   543 F.3d 683 (Fed. Cir. 2008) .......................................................................... 8, 12

*Commonwealth Scientific and Indus. Research Org. v. Buffalo Tech. Inc.*,
   492 F. Supp. 2d 600 (E.D. Tex. 2007) ............................................................. 11, 14

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ............................................................................... 6, 7, 11, 13

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
   2008 WL 928496 (N.D. Cal. Apr. 4, 2008) ........................................................ 9, 10

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ....................................................................... passim

*Johnson & Johnson Vision Care, Inc., v. CIBA Vision Corp.*,
   712 F. Supp. 2d 1285 (M.D. Fl. 2010) .................................................................. 14

*Muniauction, Inc. v. Thomson Corp.*,
   502 F. Supp. 2d 477 (W.D. Pa. 2007) ................................................................... 10

*Mytee Products, Inc. v. Harris Research, Inc.*,
   2011 WL 3875232 (Fed. Cir. Sept. 2, 2011) ........................................................... 9

*Novozymes A/S v. Genencor Int'l, Inc.*,
   474 F. Supp. 2d 592 (D. Del. 2007) ....................................................................... 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   2007 WL 869576 (E.D. Tex. 2007) ........................................................................ 9

*Pozen Inc. v. Par Pharm, Inc.*,
   2011 WL 3439527 (E.D. Tex. Aug. 5, 2011) .......................................................... 13

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) ............................................................................... 8

*Robert Bosch LLC v. Pylon Manuf. Corp.*,
   --- F.3d ---, 2011 WL 4834266 (Fed. Cir. Oct. 13, 2011) ..................................... passim

*Shiley, Inc. v. Bentley Laboratories, Inc.*,
   601 F. Supp. 964 (C.D. Cal. 1985) .................................................................. 13, 14

*Smith & Nephew, Inc. v. Synthes (U.S.A),*
    466 F. Supp. 2d 978 (W.D. Tenn. 2006) ....................................................................................... 13

*Smith and Nephew, Inc. v. Arthrex, Inc.,*
    2010 WL 2522428 (E.D. Tex. Jun. 18, 2010) ................................................................. 13, 14, 15

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.,*
    2006 WL 3813778 (S.D. Tex. Dec. 27, 2006) ............................................................................ 11

*Verizon Services Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007) ................................................................................................... 8

**STATUTES**
35 U.S.C. §271(d)(4) ..................................................................................................................... 8

**CONSTITUTIONAL PROVISIONS**
U.S. Const. art. I, § 8, cl. 8.............................................................................................................. 6

## I.    INTRODUCTION

Plaintiff Warsaw Orthopedic, Inc. ("Warsaw") submits this memorandum in support of its motion to permanently enjoin Defendant NuVasive, Inc. ("NuVasive") from making, using, offering to sell, selling, or importing the CoRoent XL[1] implants that infringe claims 24, 41, 42, 57, and 61 of the U.S. Patent No. 5,860,973 (the "'973 patent"); the MaXcess II and MaXcess III retractors that infringe claims 21, 57, and 66 of U.S. Patent No. 6,945,933 (the "'933 patent"); and the Helix and Helix Mini Anterior Cervical Plating ("ACP") Systems that infringe claims 78, 148, and 167 of U.S. Patent No. 6,592,586 (the "'586 patent").

After a 10-day jury trial, the jury found that (1) none of the asserted claims of the '973 patent are invalid; (2) all of the asserted claims of the '933 patent are infringed; and (3) all of the asserted claims of the '586 patent are infringed.  Based on NuVasive's financial data through June 2010, the jury awarded Warsaw more than $101 million, including both lost profits and a reasonable royalty, for NuVasive's infringing conduct.  Notwithstanding the jury's verdict, NuVasive continues to offer and sell its infringing products to customers throughout the United States.  And Warsaw continues to suffer irreparable harm.

As the evidence at trial demonstrated, the traditional equitable factors all favor an injunction.  Warsaw manufactures and sells, and its sister company distributes to doctors and hospitals, products that directly compete with NuVasive's infringing products.  Since the trial finished, NuVasive's CEO, Alex Lukianov, has publicly trumpeted that NuVasive will continue its infringement and that NuVasive's "market share taking machine is very much in order."  (Ex. A, 9/26/11 transcript of post-verdict call with Lukianov, at 13.)[2]  Thus, Warsaw continues to suffer irreparable harm in the form of lost sales and market share, lost opportunities to sell other services and products, and harm to goodwill and reputation.  NuVasive has also touted the availability of alleged alternatives to its

---

[1] The infringing CoRoent XL implants include the CoRoent XL Standard, CoRoent XL Lordotic, CoRoent XL-Wide Standard, CoRoent XL-Wide Lordotic, CoRoent XL-Coronal Tapered Standard, CoRoent XL-Coronal Tapered Lordotic, CoRoent XL-Fixation, CoRoent XL-Keeled, and CoRoent XL-Thoracic.

[2] Unless otherwise noted, all cited documents and transcript pages in this memorandum are attached to the Declaration of Nimalka Wickramasekera in Support of Warsaw Orthopedic, Inc.'s Motion for a Permanent Injunction.

infringing products, both at trial and in post-verdict statements. (*Id.* at 11.)  Accordingly, and as elaborated below, an injunction will protect Warsaw's exclusive rights to the '973, '933, and '586 patents without hardship to the public.  The only equitable conclusion to this phase of the case is an injunction against NuVasive's ongoing infringement.

## II.  BACKGROUND

### A.  Warsaw Owns A Portfolio Of Intellectual Property And Manufactures And Sells Spinal Devices Using That Technology.

Warsaw owns a portfolio of intellectual property that includes the '973, '933 and '586 patents.  (Ex. B ("Trial Tr.") at 884:20-25 (Burrage); 891:19-892:16 (Burrage).)  Warsaw does not license its '973 and '933 technology (except to its affiliated companies) and has a policy of not granting competitors the right to use its patented technology.  (Trial Tr. at 1020:11-25 (Neels).)  Annually, Warsaw invests between $100 and $120 million in research and development to further develop its intellectual property portfolio.  (Trial Tr. at 897:3-21 (Burrage).)  Its activities in this area are two-fold.  First, Warsaw performs research and development, including fabricating prototypes and modifying product designs.  (Trial Tr. at 895:11-897:21 (Burrage).)  Second, through an R&D agreement, Warsaw reimburses its affiliate Sofamor Danek for research and development performed at Warsaw's request.  (*Id.*; PX2381.)  These research and development efforts depend upon relationships and goodwill with surgeons.  As Tony Melkent (a co-inventor on the '933 patent) testified, engineers typically design instruments and implants with the collaboration of spine surgeons.  (Trial Tr. at 593:25-594:4 (Melkent).)  In fact, the '933 inventions resulted from the collaboration of Sofamor Danek engineers with two noted spine surgeons, Drs. Kevin Foley and Charles Branch.

Warsaw also owns and operates a large manufacturing facility for spinal implants and instruments.  (Trial Tr. at 879:15-880:16 (Burrage); PX1586.)  These include anterior cervical plate products and a broad array of fixation devices, such as screws and rods.  (Trial Tr. at 879:19-880:16 (Burrage).)  Warsaw runs its manufacturing plant at approximately 85 percent capacity and is able to increase its manufacturing capability to meet increasing customer demand.  (Trial Tr. at 878:15-23 (Burrage); 900:7-901:14 (Burrage); PX1586.)  Further, Warsaw contracts with a Deggendorf

1    Germany facility to manufacture Capstone L and Clydesdale implants for lateral surgery that are

2    covered by the '973 patent.  (Trial Tr. at 888:15-889:8 (Burrage); 907:1-23 (Burrage).)  As is

3    common in the orthopedic industry, Deggendorf manufactures spinal devices on Warsaw's behalf

4    pursuant to a contract manufacturing agreement with Warsaw.  (Trial Tr. at 889:11-891:10

5    (Burrage); PX0266.)  Under that agreement, Warsaw owns all of the intellectual property and

6    dictates the type, number, and price of the devices Deggendorf manufactures, as well as whether the

7    devices are shipped directly from Deggendorf to Warsaw or Sofamor Danek, Warsaw's contract

8    distributor.  (Trial Tr. at 889:11-891:10 (Burrage).)[3]

9           On behalf of Warsaw, Sofamor Danek typically sells spinal products to hospitals and

10   surgeons in the form of "loaner kits," containing different implants and instruments.  (Trial Tr. at

11   946:23-950:6 (Beckham).)  If hospitals and surgeons purchase less from Sofamor Danek, then

12   Sofamor Danek purchases less from Warsaw.  (Trial Tr. at 972:14-974:11 (Neels).)  Sofamor

13   Danek's sales representatives typically form continuing relationships with the same surgeons and,

14   given their understanding of the type of procedure those surgeons perform, order loaner kits with

15   particular implants and instruments for particular surgeries.  (*Id*.)  Sofamor Danek then invoices

16   surgeons and hospitals based upon the number of Warsaw products used during the surgery and the

17   number returned in the kits.  (Trial Tr. at 949:19-950:16 (Beckham).)

18        **B.    NuVasive's Infringing Products Compete Against Warsaw's Products.**

19          NuVasive's eXtreme Lateral Interbody Fusion ("XLIF") is sold as a suite of products that

20   include as key components the infringing CoRoent XL implants and MaXcess retractors.  (Trial Tr.

21   at 366:12-22 (Smith).)  Indeed, NuVasive emphasizes the benefits of the inventions of the '973 and

22   '933 patents and promotes those benefits as crucial to the safety and reproducibility of the XLIF

23   procedure.  (Trial Tr. at 979:4-982:23 (Neels); 1028:22-1030:17 (Neels); PX1732 at 21-22;

24   PX1703.)  With respect to the CoRoent XL implant, NuVasive's marketing literature emphasizes the

25   benefits and features discussed in the '973 patent, including dimension, size, and placement on the

26   vertebra, as well as the benefits that flow from these features, such as maximizing fusion surface

27   _____

28   [3] NuVasive similarly contracts with other corporations to manufacture and distribute its products.
     (Trial Tr. at 2000:14-2002:18 (Sullivan).)

1    area and minimizing the risk of subsidence.  (Trial Tr. at 979:4-982:23 (Neels); PX1732 at 21-22.)

2    Thus, successful XLIF procedures utilize the technology of the '973 and '933 patents.

3         Warsaw (via its expert Dr. Kevin Neels) presented evidence at trial of two market scenarios

4    for sales of the infringing CoRoent XL implants.  (Trial Tr. at 984:14-990:3 (Neels); PX2085;

5    PX2090.)  In the "multi-procedure market," all spine surgery approaches compete with one another.

6    Under this view, direct lateral approaches (primarily DLIF and XLIF) accounted for 5.4 percent of

7    all spinal fusions, which also included anterior approaches ("ALIF") and posterior approaches

8    ("TLIF" and "PLIF").  (Trial Tr. at 984:14-990:3 (Neels).)  Alternatively, in the "two procedure

9    market," DLIF procedures (which includes the Capstone L and Clydesdale implants that embody the

10   '973 patent) compete exclusively with NuVasive's XLIF procedure.  (Trial Tr. at 611:25-615:19

11   (Melkent); 1233:21-1234:4 (Valentine); 1105:11-1106:6 (Neels); PX1056 at 6; JX0001 at ¶ 21.)

12   DLIF also utilizes retractors, disc preparation instruments, fixation devices, and disposables.  (*Id.*)

13   In this market scenario, XLIF has taken 90 percent of the lateral surgery market as compared with

14   DLIF's 10 percent.  (PX2085; PX2090.)

15        Warsaw submitted substantial evidence of its lost sales and lost market share under both

16   scenarios.  (Trial Tr. at 995:19-998:9 (Neels); PX2085; PX2090.)  NuVasive's sales of the infringing

17   CoRoent XL implants for XLIF procedures have grown rapidly from $2.5 million at the start to $100

18   million by 2010.  (Trial Tr. at 979:4-980:7 (Neels); PX2077.)  These XLIF procedures, which utilize

19   infringing NuVasive products, have led to substantial lost DLIF sales to Sofamor Danek and

20   Warsaw.  DLIF products are manufactured by or on Warsaw's behalf and sold to Sofamor Danek for

21   distribution to doctors and hospitals.  (Trial Tr. at 895:11-896:10 (Burrage); 919:3-22 (Burrage).)

22   As Dr. Neels explained, when Sofamor Danek loses sales to NuVasive, Warsaw, in turn, suffers lost

23   revenue in at least three forms: (1) lost sales to Sofamor Danek; (2) lost royalties from Warsaw's

24   licensees and contract manufacturers; and (3) lost payments from the transfer pricing "true-ups."

25   (Trial Tr. at 1010:1-1012:1 (Neels); PX2116.)  Thus, regardless of which market view the jury

26   ultimately adopted, its award of lost profits confirmed that NuVasive's infringing CoRoent XL sales

27   substantially harmed Warsaw.

28        Use of NuVasive's infringing retractors have also increased rapidly from 2,000 procedures in

2006 to over 16,000 in 2010.  (PX2019; PX2119.)  NuVasive's XLIF sales literature also touts the '933 patented features and benefits found in the infringing MaXcess II and III retractors, such as the importance of pivoting the retractor blades to increase access to the surgical site to produce the safest and most reproducible result.  (Trial Tr. at 821:4-822:5 (Donahoe); 1028:22-1030:17 (Neels); PX1703.)  Using the same market share approach described above, Warsaw presented evidence of lost DLIF procedures as a result of the use of NuVasive's infringing retractors.  (Trial Tr. at 1030:21-1032:13 (Neels).)  Again, Dr. Neels presented evidence at trial of the lost sales and the resulting loss in profits to Warsaw as a result of NuVasive's infringing MaXcess II and III retractors. (Trial Tr. at 1032:23-1037:5 (Neels); PX2082; PX2098; PX2091; PX2121; PX2118; PX2125.)

Warsaw's anterior cervical plate products similarly compete directly with NuVasive's Helix and Helix Mini ACP Systems that infringe the asserted claims of the '586 patent.  (Trial Tr. at 330:20-335:21 (Sharp); JX0001 at ¶ 19.)  As with the other infringing products, NuVasive's sales of the Helix ACP Systems are driven by demand for the patented features and grew rapidly over a two-year period from $2 million to over $10 million, despite the presence of numerous players in the market.  (Trial Tr. at 1040:22-1041:24 (Neels); PX0015; PX2077.)  At trial, Warsaw presented evidence of loss in market share and sales as a result of the sales of NuVasive's infringing Helix and Helix Mini ACP Systems.  (Trial Tr. at 1042:3-1045:20 (Neels).)

In addition, sales of NuVasive's infringing products drive sales of related products to surgeons and hospitals, including disposables, supplemental fixation, and biologics.  (Trial Tr. at 998:10-1008:4 (Neels); 1184:5-1185:15 (Valentine); PX1056 at 6; PX2081; PX2090; PX2096.) Lateral spine procedures are most commonly carried out using products supplied by one company. (Trial Tr. at  998:21-999:7 (Neels).)  The same is true of NuVasive's infringing Helix and Helix Mini ACP sales, which drive the sales of cervical implants, screws, instruments, and disposables. (Trial Tr. at 334:12-335:21 (Sharp).)

**C.     NuVasive's Infringement Continues.**

It is undisputed that NuVasive continues to make and sell the infringing products.  Even today, NuVasive's website provides surgeons sales information regarding the infringing CoRoent XL, MaXcess II and III, and Helix and Helix Mini products.  (Dkt. 408-6 (images from NuVasive's

website).)  And Mr. Lukianov has told investors that NuVasive has no plans to try to design around the '973 patent.  (Ex. A at 11.)  Although 50 percent of the company's revenues come from XLIF procedures, with 20 percent attributable to the infringing CoRoent XL implants, Mr. Lukianov has stressed that NuVasive's overall strategy has been to "take market share and to grow excellent penetration and that is not going to change."  (Ex. A at 7.)  Indeed, Sofamor Danek's sales and marketing force has seen no change in the market place with respect to NuVasive's infringing sales.  (*See* Decl. of J. Blackwell at ¶¶ 1-3.)  As a result, Sofamor Danek's sales representatives (selling products made by Warsaw) are forced to continue to compete with Warsaw's own patented technology in NuVasive's infringing products.

## III.    THE LEGAL STANDARD FOR A PERMANENT INJUNCTION

In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), the Supreme Court directed district courts to apply the established four-factor equitable test in evaluating requests for injunctive relief in patent cases.  Under that test, Warsaw must show,

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.*; *Robert Bosch LLC v. Pylon Manuf. Corp.*, --- F.3d ---, 2011 WL 4834266, at *4 (Fed. Cir. Oct. 13, 2011).

The Federal Circuit has recently emphasized that "[a]lthough *eBay* abolishes our general rule that an injunction normally will issue when a patent is found to have been valid and infringed, it does not swing the pendulum in the opposite direction."  *Id.* at *5.  The Federal Circuit added that in assessing injunctive requests in patent cases, courts need to consider the fundamental nature of patents as providing a right to exclude:

> In other words, even though a successful patent infringement plaintiff can no longer rely on presumptions or other short-cuts to support a request for a permanent injunction, *it does not follow that courts should entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude.*  Indeed, this right has its roots in the Constitution, as the Intellectual Property Clause of the Constitution itself refers to inventors' "exclusive Right to their respective . . . Discoveries."  U.S. Const. art. I, § 8, cl. 8 (emphasis added).  Although the Supreme Court disapproved of this court's absolute reliance on the patentee's right to exclude as a basis for our prior rule favoring injunctions, that does not mean that the nature of

6

patent rights has no place in the appropriate equitable analysis. *See eBay*, 547 U.S. at 392, 126 S.Ct. 1837 ("According to the Court of Appeals, this statutory right to exclude alone justifies its general rule in favor of permanent injunctive relief. But the creation of a right is distinct from the provision of remedies for violations of that right."). ***While the patentee's right to exclude alone cannot justify an injunction, it should not be ignored either.*** *See Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) (finding in a post-*eBay* decision that, "[i]n view of that right [to exclude], infringement may cause a patentee irreparable harm not remediable by a reasonable royalty").

*Id.* (emphasis added). The Court of Appeals further explained that district courts have "inherent discretion to fashion equitable relief," but that "[d]iscretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike." *Id.* Applying that standard, the Federal Circuit in *Bosch* held that that district court abused its discretion in denying a permanent injunction where the patentee and the adjudged infringer both practiced the patented technology.

## IV. THE COURT SHOULD PERMANENTLY ENJOIN NUVASIVE FROM INFRINGING THE '973, '933, AND '586 PATENTS

As set forth below, all four *eBay* factors favor entry of an injunction in this case. Indeed, the vast majority of courts that have applied the traditional four-factor test since *eBay* have granted injunctive relief in cases such as this—where a patentee seeks to permanently enjoin sales of competing products after an infringement verdict. This Court should likewise grant a permanent injunction against NuVasive's continuing infringement.[4]

### A. Warsaw Has Suffered—And Will Continue To Suffer—Irreparable Harm As A Result Of NuVasive's Infringement.

Under the first prong of the *eBay* inquiry, courts must consider whether the plaintiff has suffered irreparable injury as a result of the defendant's infringing conduct. While the ultimate basis for asserting irreparable injury in the patent context lies in the patent holder's statutory right to exclude others from practicing the patent, courts should also look to the nature of the businesses of both the patentee and infringer. *See Bosch*, 2011 WL 4834266, at *6; *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010). Where, as here, a plaintiff can show that infringement caused a loss of value in business that is difficult to quantify, the plaintiff has been irreparably

---

[4] Should the Court deny Warsaw's Motion for a Permanent Injunction, Warsaw would seek the imposition of an ongoing royalty for sales of the infringing products.

harmed.  *See i4i*, 598 F.3d at 861 (finding "past harm to a patentee's market share, revenues, and brand recognition" sufficient  evidence of irreparable harm); *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1311 (Fed. Cir. 2007) (affirming grant of permanent injunction where plaintiff provided evidence that infringement resulted in "lost sales," "price erosion," and "lost opportunities to sell other services to the lost customers").  At trial, Warsaw introduced substantial evidence of direct competition, lost sales, lost market share, lost access to potential customers, lost goodwill, and harm to reputation caused by NuVasive's infringement that entitles Warsaw to an injunction.

*First*, it is undisputed that Warsaw's products compete directly with NuVasive's infringing products for the same business among surgeons.  Through its own manufacturing facility, and via contract manufacturing and license agreements, Warsaw manufactures and sells spinal implants and instruments to Sofamor Danek for distribution to hospitals and surgeons.  These products include the DLIF spinal implants (Capstone L and Clydesdale) that embody the asserted claims of the '973 patent.  Warsaw also manufactures and/or sells to Sofamor Danek other DLIF products,  as well as anterior cervical plating system products, that compete directly with NuVasive's infringing MaXcess II and III retractors and Helix and Helix Mini ACP Systems.[5]  (Trial Tr. at 972:14-974:11 (Neels).)  Courts routinely find irreparable harm, and therefore grant permanent injunctions where, as here, the products of the infringer and the patentee are in direct competition.[6]  *See Bosch*, 2011 WL 4834266, at *8-11; *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2008 WL 928496, at *3 (N.D.

---

[5]  Warsaw is irreparably harmed by NuVasive's infringing sales despite the fact that Warsaw's competing retractor and anterior cervical plate products do not embody the '933 or '586 patented technology.  *See Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 702-03 (Fed. Cir. 2008) (patentee suffered irreparable harm despite fact that it did not practice claimed inventions because it suffered market loss and fewer sales of its competing technology); *cf. Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1546 (Fed. Cir. 1995) (patent holder entitled to lost profits caused by infringing sales that competed with its non-patented product); *see also* 35 U.S.C. §271(d)(4) (stating that no patent owner otherwise entitled to relief for infringement shall be denied relief for refusal to license or use any rights to the patent).

[6]  Irreparable harm exists even where there are other market competitors.  "It is well-established that the fact that other infringers may be in the marketplace does not negate irreparable harm."  *Bosch*, 2011 WL 4834266, at *7 (internal quotation omitted).  A "patentee need not sue all infringers at once. . . . [citation omitted] Picking off one infringer at a time is not inconsistent with being irreparably harmed."  *Id.*  Consequently, "the absence of a two-supplier market does not weigh against a finding of irreparable harm."  *Id.*

1   Cal. Apr. 4, 2008), *rev'd on other grounds* (validity), *Fresenius USA, Inc. v. Baxter Int'l., Inc.*, 582

2   F.3d 1288, 1304 (Fed. Cir. 2009); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 2007 WL

3   869576, *2 (E.D. Tex. 2007) (granting permanent injunction based on the "high value of intellectual

4   property when it is asserted against a direct competitor in the plaintiff's market"), *rev'd on other*

5   *grounds* (claim construction), *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d

6   1351, 1366 (Fed. Cir. 2008); *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 613 (D.

7   Del. 2007) (granting permanent injunction and noting that "[the patentee] has a right, granted by

8   Congress, not to assist its rival with the use of proprietary technology").

9           ***Second***, it is undisputed that Warsaw suffers lost revenue when hospitals and surgeons

10   purchase fewer Warsaw products from Sofamor Danek.  (*Id.*)  Sales lost by a patentee as a result of

11   competition between a patentee's distributor and the infringer establish irreparable harm.  *See Mytee*

12   *Products, Inc. v. Harris Research, Inc.*, 2011 WL 3875232, at *4-5 (Fed. Cir. Sept. 2, 2011) (finding

13   irreparable harm to patentee where patented technology was almost exclusively used by its

14   franchisees).  Similarly, in *Novozymes*, the court granted a permanent injunction upon finding

15   irreparable injury where the patentee licensed its patents to its subsidiary not only in exchange for a

16   40 percent royalty, "but also with the expectation that the value of its subsidiary will increase with

17   the successful marketing of the licensed technology."  474 F. Supp. 2d at 613.  The court further

18   noted that the patentee "expects its patents to exclude competitors from marketing" infringing

19   products.  *Id*. at 612.  Warsaw similarly expects its patents to exclude infringing products in the

20   direct lateral market that compete with Warsaw's DLIF products.  And Warsaw is similarly entitled

21   to a permanent injunction.

22           ***Third***, as discussed in Section II, *supra*, Warsaw presented substantial evidence at trial of its

23   lost market share under two scenarios, the "multi-procedure" market that includes direct lateral

24   procedures (DLIF and XLIF), as well as ALIF, PLIF, and TLIF procedures, and the "two procedure"

25   market, where DLIF competes exclusively with XLIF.  Even were the Court to adopt the later

26   market, where NuVasive was the first in the lateral market with its infringing XLIF products,

27   Warsaw is entitled to an injunction.  The Federal Circuit has affirmed the grant of an injunction in a

28   similar case where the infringer, Microsoft, was the first to market.  *See i4i*, 670 F. Supp. 2d at 599-

600. There, the Federal Circuit explained that "there was a void in the custom XML market that Microsoft filled with infringing products," and that "[s]imply because i4i adapted to a market where Microsoft fills 80% of the market space does not mean that i4i has not suffered an irreparable injury." The Court further noted that i4i's injury was both incalculable and irreparable where "the evidence show[ed] that i4i lost a, perhaps irretrievable, opportunity in the early days of the custom XML market" as a result of Microsoft's infringement. *Id*.

**Fourth**, NuVasive's infringement has affected relationships with surgeons and hospitals that are significant to the sale of Warsaw's products used in lateral surgery and the development of Warsaw's intellectual property. (Trial Tr. at 975:2-14 (Neels).) For example, Dr. William Smith testified that he was formerly one of Sofamor Danek's "top ten surgeons, as far as volume, in the United States." (Trial Tr. at 1390:2-7 (Smith).) Dr. Smith became a NuVasive consultant after using NuVasive's XLIF procedure, including its infringing CoRoent XL implants and MaXcess retractors. (Trial Tr. at 365:20-366:6 (Smith).) As a result, he declined the opportunity to consult with Sofamor Danek regarding development of DLIF. (Trial Tr. at 367:12-368:1 (Smith).) Similarly, NuVasive's Director of Marketing, Mr. Ojeda, testified that NuVasive sales representatives have converted Sofamor Danek ACP users to NuVasive users. (Trial Tr. at 1898:12-22 (Ojeda).) And NuVasive's expert, Dr. Sullivan, testified that "you can't expect a rep to compete with NuVasive when a surgeon is trained on NuVasive." (Trial Tr. at 1990:12-23 (Sullivan).)

Sofamor Danek relies on surgeon relationships to develop and improve Warsaw's intellectual property portfolio, and Warsaw is irreparably and immeasurably harmed by NuVasive's infringing sales. (Trial Tr. at 593:25-594:4 (Melkent).) NuVasive's executive, Mr. Lukianov, boasts that NuVasive continues to take Sofamor Danek's sales representatives, along with their surgeon relationships. (Ex. A at 8 ("But I can tell you that we have been building the very best sales force in spine. I can also tell you that there is quite a few reps that have come over from Medtronic and from some of the other players that are now working with us.").) It is well-established that such harm is irreparable injury "not compensable by damages." *See Fresenius*, 2008 WL 928496, at *3 (finding that harm to reputation as an innovator is a basis for injunctive relief); *Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477, 483 (W.D. Pa. 2007) ("such a harm [to reputation] is not compensable

10

in damages, and is irreparable, making equitable relief appropriate"), *vacated on other grounds* (infringement and validity), 532 F.3d 1318, 1330 (Fed. Cir. 2008); *Black & Decker Inc. v. Robert Bosch Tool Corp*, 2006 WL 3446144 at *4 (N.D. Ill. 2006) (reputation as an innovator harmed by continued sales of infringing product).

   *Finally*, Warsaw's injuries are particularly significant because of its established policy against licensing its core technology to competitors, and its substantial investments in commercializing its technology and developing its intellectual property.  (Trial Tr. at 1020:11-25 (Neels).)  Moreover, the features covered by Warsaw's patents are core technologies that have created a market for direct lateral procedures.  This weighs strongly in favor of an injunction.  *See, e.g., Commonwealth Scientific and Indus. Research Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 606 (E.D. Tex. 2007) (granting injunction where, among other things, the infringing product related to the "essence of the technology" and not just a "small component"); *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, 2006 WL 3813778, at *5 (S.D. Tex. Dec. 27, 2006) (granting injunction where patented features related to infringing product's "core functionality").

   **B.      Monetary Damages Are Inadequate To Compensate Warsaw.**

   In the patent context, the second prong of the *eBay* test (adequacy of money damages) is generally treated in tandem with the first prong.  *See Acumed*, 551 F.3d at 1327-29 (analyzing the prongs together).  Accordingly, Warsaw refers to and incorporates its discussion of irreparable harm above.  Although future damages in lieu of an injunction may compensate Warsaw for an approximate loss from continuing infringement, such approximation does not make future damages adequate.  *See Bosch*, 2011 WL 4834266, at *11 (recognizing that future infringement may have market effects never fully compensable with money) (citations omitted).  As discussed above, Warsaw makes and sells products that compete directly with NuVasive's infringing products.  Sales of these products to doctors and hospitals depend, in part, on surgeon relationships, goodwill, and market share, as well as continued development of intellectual property.  The loss associated with any of these key attributes is particularly difficult to quantify.  *See i4i*, 598 F.3d at 862.  And difficulty in determining monetary damages is strong evidence that remedies at law are inadequate.

1    *Id.; Broadcom*, 543 F.3d at 703-04.

2          **C.      The Balance Of Hardships Weighs In Favor Of An Injunction.**

3          Without an injunction, Warsaw will face the hardship of continued loss of sales and market

4    share.  NuVasive's ongoing infringement will also inexorably lead to loss of good will, reputation,

5    and surgeon relationships for research and development of future Warsaw products.  Indeed, that is

6    exactly what NuVasive intends to accomplish by continuing its infringement.  (Ex. A at 9.)

7    Moreover, Warsaw will have to compete against its own patented inventions—an undeniable and

8    unfair hardship.  *Bosch*, 2011 WL 4834266, at *12.

9          By contrast, most of the hardship that NuVasive will face from an injunction derives from

10   NuVasive's inability to sell infringing products in the future.  That hardship, however, is not

11   cognizable in the injunction balance.  *See i4i*, 598 F.3d at 863 ("[N]either commercial success, nor

12   sunk development costs, shield an infringer from injunctive relief.  [The defendant] is not entitled to

13   continue infringing simply because it successfully exploited its infringement.") (internal citations

14   omitted); *Broadcom Corp.*, 543 F.3d at 704 ("At the outset, we note that one who elects to build a

15   business on a product found to infringe cannot be heard to complain if an injunction against

16   continuing infringement destroys the business so elected.") (internal quotation omitted).  Indeed,

17   NuVasive's CFO, Mr. Valentine, testified that NuVasive marketed its infringing CoRoent XL

18   implants after specifically considering the '973 patent.  (Trial Tr. at 1194:11-1195:21 (Valentine).)

19   Put simply, NuVasive is not entitled to continue infringing simply because it successfully exploited

20   its infringement in the past.

21         Any hardship that NuVasive might claim is belied by its presentation of evidence at trial of

22   alleged alternatives to its infringing XLIF products.  (Trial Tr. at 1983:10-1984:14 (Sullivan).)

23   NuVasive's expert Dr. Sullivan testified at length that ALIF, PLIF, and TLIF implants are available

24   and acceptable alternatives to NuVasive's infringing CoRoent XL implants.  (*Id*.)  NuVasive itself is

25   already marketing and selling ALIF, PLIF, and TLIF devices, and can continue to do so without sale

26   or use of the infringing products.  (PX0006; Dkt. 408-6.)  Dr. Sullivan also testified that NuVasive's

27   solid MaXcess retractors (not accused of infringement) are acceptable alternatives to NuVasive's

28   infringing pivoting MaXcess retractors.  (*Id.*)  Tellingly, following the trial, Mr. Lukianov assured

1    investors that the jury's infringement verdict on the accused products would not have a large impact

2    on NuVasive's business, with only three percent of NuVasive's business being in the ACP area and

3    only 20 percent subject to the '973 patent.  (Ex. A at 5.)

4              **D.        The Public Interest Would Be Served By A Permanent Injunction.**

5              The fourth *eBay* factor requires a patentee to demonstrate "that the public interest would not

6    be disserved by a permanent injunction."  *eBay, Inc.*, 547 U.S. at 391.  Of course, "[t]he public has

7    an interest in a strong patent system and it is generally in the public interest to uphold patent rights

8    against an adjudicated infringer . . . . Permanent injunctions help serve that interest."  *Smith and*

9    *Nephew, Inc. v. Arthrex, Inc.*, 2010 WL 2522428, at *3 (E.D. Tex. Jun. 18, 2010) (granting

10   permanent injunction to prevent future sales of infringing graft fixation devices), *vacated on other*

11   *grounds* (noninfringement), 2011 WL 2438633 (Fed. Cir. Jun. 20, 2011).  Thus, the Federal Circuit

12   has instructed that "the touchstone of the public interest factor is whether an injunction, both in

13   scope and effect, strikes a workable balance between protecting the patentee's rights and protecting

14   the public from the injunction's adverse effects."  *i4i*, 598 F.3d at 863 (internal citation omitted).

15             Permanent injunctions are routinely granted in patent cases involving medical products.[7]  The

16   fundamental inquiry is whether an adequate alternative to the infringing product is available should

17   the injunction issue.  For example, in *Acumed LLC*, the Federal Circuit rejected the defendant's

18   contention that the public interest would be disserved if its infringing orthopedic nail was pulled off

19   the market.  551 F.3d at 1331.  The Court discussed the district court's finding that the patentee sold

20   a competing orthopedic nail and concluded that the record lacked sufficient evidence that the

21   competing product was inferior such that the injunction would harm the public interest.  *Id*.  Instead,

22   the Court noted that there were other noninfringing alternatives available to the public.  *Id*.

---

23   [7] *See, e.g., Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1331 (Fed. Cir. 2008) (affirming decision

24   to permanently enjoin sale of products relating to treatment of orthopedic fractures after finding of
     infringement); *Smith & Nephew, Inc. v. Synthes (U.S.A)*, 466 F. Supp. 2d 978, 985 (W.D. Tenn.

25   2006) (permanently enjoining sale of products relating to treatment of femoral fractures after finding
     of infringement); *Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*, 2008 WL 4745882, at * 4

26   (D. Del. Oct. 29, 2008) (permanently enjoining sale of products relating to safety needle technology
     after finding of infringement); *Pozen Inc. v. Par Pharm, Inc.*, 2011 WL 3439527, at *26-27 (E.D.

27   Tex. Aug. 5, 2011) (permanently enjoining sale of products relating to pharmaceutical treatment of
     migraines after finding of infringement); *see also Shiley, Inc. v. Bentley Laboratories, Inc.*, 601 F.

28   Supp. 964, 970 (C.D. Cal. 1985) (enjoining sales of infringing blood oxygenators would not disserve
     public interest).

---

Similarly, in *Shiley, Inc.*, the district court rejected the defendant's argument that the public would be harmed if its infringing blood oxygenators were removed from the market. 601 F. Supp. at 970. There, the defendant had filed declarations on behalf of numerous hospital personnel stating that these individuals used the defendant's product exclusively and suggesting that the defendant's product was superior to plaintiff's oxygenator. *Id.* The court rejected the defendant's public interest argument, finding that "no credible evidence in the trial record support[ed] any finding that either [oxygenator] is objectively superior in performance or that either is defective or unsafe in any way or does not properly perform as intended and required in the operating room. The evidence amounts to no more than a mere expression of preference." *Id.* Indeed, circumstances in which an injunction would be contrary to a significant public interest are "rare and limited," *Commonwealth Scientific and Indus. Research Organisation*, 492 F. Supp. 2d at 607, and require credible evidence of tangible harm to the public. *See, e.g., Johnson & Johnson Vision Care, Inc., v. CIBA Vision Corp.*, 712 F. Supp. 2d 1285 (M.D. Fl. 2010) (denying motion for permanent injunction where infringing contact lenses were largest-selling in the United States and expert testified that the 5.5 million Americans who wore the infringing lenses would be forced to return to an eye-care professional (potentially multiple times) to be fitted for noninfringing lenses and each pay between $50 and $125 in the process).

Here, as in *Acumed LLC* and *Shiley, Inc.*, the trial record contains numerous examples of available alternatives to NuVasive's infringing XLIF and Helix systems. The DLIF system offered by Sofamor Danek using Warsaw products is available to directly replace XLIF as a direct lateral procedure. Further, other interbody fusion procedures and products (ALIF, PLIF, TLIF) are available alternatives as well. NuVasive presented no credible evidence that its XLIF products are medically superior to Warsaw's products.[8] Regarding anterior cervical plates, Warsaw and NuVasive both have other plating systems which serve as alternatives to NuVasive's infringing

---

[8] Even if it had, the fact that an infringing medical product is superior to other products is not sufficient to deny a permanent injunction. *See Arthrex, Inc.*, 2010 WL 2522428, at *3 (holding that the public interest would not be disserved by permanently enjoining sales of an infringing medical product even though the infringing product arguably had better features than the plaintiff's product because the alternative "would essentially preclude all injunctions on medical devices where the adjudicated infringer sold an infringing, yet improved, product").

1  Helix systems.  In addition, other spine companies offer alternatives to NuVasive's infringing

2  products, a fact emphasized by NuVasive at trial.  With numerous alternatives to NuVasive's

3  infringing products available, the public would not be disserved by an injunction preventing

4  continuing infringement by NuVasive.

5      Further, as described above, Warsaw invests heavily in research and development related to

6  spinal technology.  Enjoining NuVasive's infringement of Warsaw's patents supports this substantial

7  R&D investment and serves the public interest for this reason as well.  *Commonwealth Scientific and*

8  *Indus. Research Organisation*, 492 F. Supp. 2d at 607 ("[T]he public interest is advanced by

9  encouraging investment by research organizations into future technologies and serves to promote the

10  progress of science and the useful arts.").

11      Finally, any potential harm to the public will be minimized by a narrowly tailored injunction

12  that only prohibits future acts of infringement and does not remove the already-sold infringing

13  products from the marketplace.  *See Arthrex, Inc.,* 2010 WL 2522428, at *3; *i4i*, 598 F.3d at 863

14  (tailoring scope of injunction to exclude users who purchased or licensed infringing products before

15  injunction's effective date mitigated negative effects on the public).

16  **V.      CONCLUSION**

17      For all of the foregoing reasons, Warsaw respectfully requests that the Court enter a

18  permanent injunction against NuVasive's continuing infringement of the '973, '933, and '586

19  patents.

21  DATED:  November 2, 2011                    Respectfully submitted

23                                     */s/ Nimalka R. Wickramasekera*
                                       Luke L. Dauchot
24                                     Alexander F. MacKinnon
                                       Nimalka R. Wickramasekera
25                                     KIRKLAND & ELLIS LLP

26                                     Attorneys for Plaintiff/Counterclaim
                                       Defendants/Counterclaimants,
27                                     WARSAW ORTHOPEDIC, INC.; MEDTRONIC
                                       SOFAMOR DANEK USA, INC.

# CERTIFICATE OF SERVICE

I am employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within entitled action; my business address is 333 South Hope Street, Los Angeles, California 90071.

On November 2, 2011, true and correct copies of the foregoing document were served to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any other counsel of record will be served by electronic mail, facsimile, U.S. Mail and/or overnight delivery.

☒ FEDERAL: I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 2, 2011, in Los Angeles, California.

_/s/ Nimalka R. Wickramasekera_
Nimalka R. Wickramasekera