# EXHIBIT 7
# (Part 2 of 2)

## Redacted Version of
## Document Sought to Be Sealed

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

(explaining that a Huffman encoder "is used in conjunction with other processes *in a variety of compression methods*, including some image compression methods. . . . In my experience, generally Huffman encoding can be used with various types of compression. . . . In general, I believe the images could be – that are compressed could be part of a motion sequence. . . .") (emphasis added).  Recording a moving image signal essentially involves the repeated recording of a still image signal at a regular interval.   Thus, given the similarities between capturing and compressing still and moving image signals on a digital camera, a person of ordinary skill in the art at the time of the alleged '449 invention would have found adding the ability to record and compress moving images to the Casio QV-10 digital camera trivial and obvious.

378.    Second, digital cameras with moving image recording capability were well-known prior to the alleged '449 invention.  For example, the Ricoh RDC-1 allowed users to record both still images and full motion video.  *See, e.g.*, Cheifet Dep. at 33:25-34:16; Video of Fall 1995 Comdex Trade Show at APL630DEF-WH-A0000034381; Byte Magazine, Jan. 1996 [APL630DEF-WH-A0000018 997] at APL630DEF-WH-A0000018 998 ("Ricoh's RDC-1 Digital Camera was voted Best Input Device.  This color camera also captures audio and video clips."); RDC-1 Brochure at RICOH00002 ("3x Zoom Digital Camera with Full Motion Video and Sound"); RDC-1 Brochure [RC 0430] at RC 0430 ("3x Zoom Digital Camera with Full Motion Video and Sound. . . . Ricoh's super-fast color image compression algorithm works at a full 30 frames-per-second, making the RDC-1 the world's first digital camera to record full motion video with sound.").  Thus, it would have been obvious for a person of ordinary skill in the art at the time of the alleged '449 invention to add moving image recording capability to the Casio QV-10 digital camera.

195

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

379.    A person of ordinary skill in the art would have been motivated to add moving image capture and compression capability to the Casio QV-10 digital camera to provide users with the added functionality of efficiently storing moving images in addition to still images.  The additional moving image recording capability would have allowed a camera manufacturer to charge a higher price for the device, providing yet additional motivation to add moving image functionality to the Casio QV-10.  *Compare* Ricoh RDC-1 (approximately $1700-1800) *with* Casio QV-10 (no video functionality, $600-700).  *See* Ricoh Dep. at 80:22-81:10; RDC-1 Press Release, Feb. 22, 1996 [APL630DEF-WH-A0000035282] at APL630DEF-WH-A0000035282; MacUser article, Mar. 1996 [APL630DEF-WH-A0000019001] at APL630DEF-WH-A0000019005); Casio QV-10 Press Release, Jan. 6, 1995 [APL630DEF-WH-A0000034377] at APL630DEF-WH-A0000034377; Denver Post article, Jan. 9, 1996 [APL630DEF-WH-0000020926] at APL630DEF-WH-0000020927-20928).  Such modifications would have been well within the technical knowledge of a person of ordinary skill in the art and would have amounted to no more than an available design choice depending on the functionality the person of ordinary skill desired the camera to include.

380.    Furthermore, the "compressor" limitation would have been obvious in view of the Casio QV-10 in combination with at least the Ricoh RDC-1.  As discussed above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), the Ricoh RDC-1 digital camera records both still and moving images and includes "a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals."  It would have been obvious to add the moving image recording and compression functionality of the Rich RDC-1 to the Casio QV-10.  As discussed above in Section V.G (Background of the Technology Relevant to the

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

'449 Patent), various compression methods were well-known and used in digital cameras—including the Ricoh RDC-1—such that a person of ordinary skill in the art could have applied the methods and technology used in one digital camera to another.

381.    To the extent that Samsung intends to suggest that the JPEG compression method used for still images and the video-JPEG compression method used for moving images in the Ricoh RDC-1 are not "different" as required by claim 25, I disagree for the same reasons set forth above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio).

382.    Regardless, for the same reasons set forth in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), it would have been obvious to implement *any* of the moving image compression methods that were well-known to persons of ordinary skill in the art at the time of the alleged '449 invention—*e.g.*, MPEG-1 or MPEG-2—into the Casio QV-10 digital camera to compress moving images.

         **f)**     **"a recording circuit which records compressed data, said
compressed data including a moving image signal, and a still
image signal"**

383.    The Casio QV-10 digital camera, in view of the Ricoh RDC-1 digital camera, renders obvious "a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal."  For example, the Casio QV-10 digital camera includes circuitry that allows users to record images, including a "Digital PCB" section:

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**DIGITAL PCB**



Digital PCB is composed Microprocessor (IC600), D RAM (IC601), Flash Memory (IC602), Gate Array (IC700), and V RAM (IC701).

Microprocessor controls the CCD, D RAM, Flash Memory and key operation. Gate array compresses data for the color and the luminance from the CCD to increase the number of memory, and up to 96 images can be stored in flash memory. The color and the luminance data are mixed in the gate array to make the video signal.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Casio QV-10A Service Manual [CASIO 000197] at CASIO 000203-204.

199

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Casio QV-10A Service Manual [CASIO 000197] at CASIO 000200 (annotation added).

③ V RAM
It is used for encoder function.

④ Flash Memory
Up to 96 images can be stored in memory. Flash memory does not require electrical power to store data, so image data is retained in memory even when you turn camera power off.
If batteries go dead, simply load a set of new batteries or connect the AC adaptor and you will be able to view images in camera memory.

Memory Map

| Header record | Image data Max; 96 images | Color Information |
|---|---|---|

⑤ D RAM
There is area of work space that the microprocessor uses for storing temporary data , the intermediate results of calculations, and all sorts of pieces of information that the  system needs to remember.

Casio QV-10A Service Manual [CASIO 000197] at CASIO 000207; *see also id.* at 206.



Casio QV-10A Service Manual [CASIO 000197] at CASIO 000228.

**Flash Memory**
The camera features flash memory for storage of images. Flash memory does not require electrical power to store data, so image data is retained in memory even when you turn camera power off. If batteries go dead, simply load a set of new batteries or connect the AC adaptor and you will be able to view images in camera memory.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 00141.



**Recording Images**

The following procedure provides the basic steps for recording an image.

**To record an image**

**1. Enter the Record Mode.**
- Slide the function switch to the REC position.

**2. Turn on the camera.**
- Slide the POWER switch in the direction indicated by the arrow.
- The POWER switch automatically slides back to its original position when you release it.
- When power comes on, the image of the object that is in front of the camera's lens appears on the LCD.
- You can perform steps 1 and 2 in either order (1 then 2, or 2 then 1).

**3. Set the NORMAL/MACRO switch to the NORMAL position.**
- If the object whose image you are recording is about 15 centimeters from the lens (about 6 inches), set the NORMAL/MACRO switch to MACRO. See page 25 for details on using this switch.

**Note**
- The camera is designed to refresh the image on the LCD about seven times per second. Because of this, you may experience a feeling of jerkiness in the changing image if you move the camera quickly. This is normal and does not indicate malfunction.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 00145-46.

384.    I understand that Samsung contends that the Casio QV-10 "does not disclose a digital camera capable of capturing both still images and video" and therefore "does not disclose a recording circuit which records both still images and video in memory." *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 54.  Nevertheless, as discussed above in connection with the "compressor" limitation, it would have been obvious to a person of ordinary skill in the art to add the ability to record moving images to the Casio QV-10 digital camera.

385.    A person of ordinary skill in the art would be motivated to add moving image recording capability to the Casio QV-10 digital camera for the same reasons discussed above in connection with the "compressor" limitation (*e.g.*, added functionality, ability to charge higher price).

386.    Furthermore, the limitation would have been obvious in view of the Casio QV-10 in combination with at least the Ricoh RDC-1.  As discussed above in Section V.H.1 (Ricoh

202

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

RDC-1 + ArcSoft PhotoStudio), the Ricoh RDC-1 discloses "a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal."  It would have been obvious to add the moving image recording functionality of the Ricoh RDC-1 to the Casio QV-10, as both were contemporaneous consumer digital cameras, and recording moving images simply involves the repeated recording of still images at a regular interval.  As discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), circuits for recording still and moving images to memory were well-known and used in digital cameras—including the Ricoh RDC-1—such that a person of ordinary skill in the art could have applied the circuits and technology used in one digital camera to another.

> g) **"a decompressor which decompresses said compressed data by using a different decompressing method according to whether said recorded compressed data is a moving image signal or a still image signal"**

387.    The Casio QV-10 digital camera, in view of the Ricoh RDC-1 digital camera, renders obvious "a decompressor which decompresses said compressed data by using a different decompressing method according to whether said recorded compressed data is a moving image signal or a still image signal."  For example, the Casio QV-10 digital camera includes circuitry for decompressing compressed images:

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**



Casio QV-10A Service Manual [CASIO 000197] at CASIO 000203 (annotation added).



Casio QV-10A Service Manual [CASIO 000197] at CASIO 000206.

388.    I understand that Samsung contends that the QV-10 "does not disclose a digital

camera capable of capturing both still images and video" and therefore "does not disclose a

204

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

decompressor which decompresses images or video using different methods." *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 54. However, as discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), it would have been obvious to add moving image playback and decompression functionality to the Casio QV-10 digital camera.

389. As the '449 patent explains, "[t]he MPEG compression data process and the JPEG compression data process have the same common points, so that the use of both the data formats may effectively save the circuit scale." '449 patent at 4:16-19. The same applies for decompression, which is simply the reverse process of compression. Thus, given the similarities between decompressing still and moving image signals on a digital camera, a person of ordinary skill in the art at the time of the alleged '449 invention would have found adding the ability to decompress moving images on the Casio QV-10 digital camera to be trivial and obvious.

390. A person of ordinary skill in the art would be motivated to add the ability to decompress and play back moving images to the Casio QV-10 digital camera for the same reasons the person of ordinary skill in the art would have been motivated to add the ability to capture and compress moving images, as discussed above in connection with the "compressor" limitation. For example, a person of ordinary skill in the art would have been motivated to add the ability to decompress and play back moving images to the Casio QV-10 to compete more directly with, for example, the Ricoh RDC-1, which included the ability to decompress and play back moving images. Further, a person of ordinary skill in the art would have been motivated to add the ability to decompress and play back moving images on the Casio QV-10 to provide potential customers with this added capability.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

391.    Furthermore, the "decompressor" limitation would have been obvious in view of the Casio QV-10 in combination with at least the Ricoh RDC-1.  As discussed above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), the Ricoh RDC-1 includes "a decompressor which decompresses said compressed data by using a different decompressing method according to whether said recorded compressed data is a moving image signal or a still image signal."  It would have been obvious to use the same decompression methods used by the Ricoh RDC-1 with the Casio QV-10.  As discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), various compression (and therefore decompression) methods were well-known and used in digital cameras—including the Ricoh RDC-1—such that a person of ordinary skill in the art could have applied the methods and technology used in one digital camera to another.

392.    To the extent that Samsung intends to suggest that the JPEG decompression method used for still images and the video-JPEG decompression method used for moving images in the Ricoh RDC-1 are not "different" as required by claim 25, I disagree for the same reasons set forth above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio).

393.    Regardless, for the same reasons set forth above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), it would have been obvious to implement *any* of the moving image decompression methods that were well-known to persons of ordinary skill in the art at the time of the alleged '449 invention—*e.g.*, MPEG-1 or MPEG-2—into the Casio QV-10 digital camera to decompress moving images during playback.

206

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

h) **"a reproducing circuit which reproduces a moving image signal, a sound signal synchronous to said moving image signal, and a still image signal"**

394.   The Casio QV-10 digital camera, in view of the Ricoh RDC-1, renders obvious "a reproducing circuit which reproduces a moving image signal, a sound signal synchronous to said moving image signal, and a still image signal."  For example, the Casio QV-10 digital camera includes circuitry in a "Linear PCB" section that allows users to view previously-stored images on an LCD:



③ Linear PCB:  It generates the tricolor and controls the LCD display.

Casio QV-10A Service Manual [CASIO 000197] at CASIO 000200.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**LINEAR PCB**

IC300 generates the tricolor (red, green and blue) from the video signal, and IC400 controls the TFT-LCD display.

**Power Supply**

| Terminal | Voltage | Purpose |
|---|---|---|
| VCC2 | 4.3 ~ 4.7 (V) | Logic circuit |
| VCC4 | 9.5 ~ 11.0 (V) | Display |
| VEE2 | -7.0 ~ -8.0 (V) | Display |
| VEE4 | -16.5 ~ -17.9 (V) | Display |

**IC300**



**IC400**



CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### TFT-LCD



Each picture element electrode is controlled by a transistor. To the gate electrodes, the gate pulse is applied timesharing. VCOM voltage is applied to the common electrodes.

The above figure shows the operation of TFT-LCD. If the gate pulse is not applied to the gate electrodes, the transistors do not operate even when the potential difference is given between the common electrodes and source electrodes, and no effect is given to the liquid crystal. If the gate pulse is applied to Y1, the transistor T1 is in operation during a priod of t1, and voltage of source electrode of Va is applied to the LCD layer of picture element A, then electric charges are stored in the picture element of A. After the period of t1, T1 is turned off, and voltage in the LCD layer of A is held until next gate pulse comes, but it drops little by little through off leak resistance of TFT and leak resistance of LCD itself.

Casio QV-10A Service Manual [CASIO 000197] at CASIO 000208-210.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Casio QV-10A Service Manual [CASIO 000197] at CASIO 000229.





Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 000158-159.

395.    I understand that Samsung contends that the Casio QV-10 "does not reproduce

video" and therefore fails to meet this limitation.  *See* Samsung's Supp. Response to

Interrogatory No. 38, July 15, 2013, at 54.  Nevertheless, for the same reasons discussed above in

210

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

connection with the "compressor," "recording circuit," and "decompressor" limitations, it would have been obvious to a person of ordinary skill in the art to add the ability to reproduce moving images to the Casio QV-10 digital camera.

396.    Furthermore, the limitation would have been obvious in view of the Casio QV-10 in combination with at least the Ricoh RDC-1.  As discussed above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), the Ricoh RDC-1 discloses a reproducing circuit that reproduces previously-recorded video with synchronous sound and still images.  It would have been obvious to add the moving image reproducing functionality of the Ricoh RDC-1 to the Casio QV-10, as both are contemporaneous consumer digital cameras, and reproducing moving images simply involves the repeated reproduction of still images at a regular interval.  As discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), circuits for reproducing still and moving images were well-known and used in digital cameras—including the Ricoh RDC-1—such that a person of ordinary skill in the art could have applied the circuits and technology used in one digital camera to another.

> i)    **"a display which displays said moving image signals and still image signals outputted from said reproducing circuit"**

397.    The Casio QV-10 digital camera, in view of the Ricoh RDC-1, discloses or renders obvious "a display which displays said moving image signals and still image signals outputted from said reproducing circuit."  For example, the Casio QV-10 digital camera includes an LCD that displays previously-stored images:

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**



Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 00135 (annotation added).

Monitor.................61,380-pixel 1.8-inch TFT low-glare color LCD;
                       doubles as finder

Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 00194.

| 18. Monitor | 61,380-pixel 1.8-inch TFT low-glare color LCD |
|---|---|

Casio QV-10A Service Manual [CASIO 000197] at CASIO 000199.



Casio QV-10A Service Manual [CASIO 000197] at CASIO 000200 (annotation added).

212

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

Playing Back Images

## Producing a Multi-Page Display

Four or nine memory pages can be displayed at the same time. This feature can be used to display multiple memory pages on the camera's built-in LCD, or on the screen of a connected TV.

**1.** Enter the Playback Mode and turn on the camera.

**2.** Switch to multi-page display.



- Press the MODE button to change between the different display formats.



- Each press of MODE changes the display format in the following sequence.

- You cannot use the multi-page display while protected memory pages are hidden (page 49).



* The memory page that is shown on the screen when you change to the 4-page or 9-page format is in the first (upper left) position in the multi-page display.

**3.** Scroll through the pages on the display.

- Use [+] (forward) and [–] (back) to scroll through the memory pages. Pages are scrolled one, four, or nine at a time, depending on the display format you are using.



Unused pages are colored gray.

Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 000162-163.

398.    Further, the Casio QV-10 could be connected to Macintosh and PC computers and televisions, on which users could view previously-stored images and videos:

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**Connecting to a Computer using a Connection Kit**

Optionally available personal computer connection kits are available to allow transfer of digital data with a personal computer. Each kit includes special connecting cables, and software, and makes it possible to send images from the camera to a personal computer and vice versa. Images are transferred as digital data, which minimizes loss of image quality.

For details on connecting to your computer and how to use the software, see the user documentation that comes with the connection kit.

**Computer (Video Capture)** `VIDEO`

You can use the special video cable that comes with the camera to connect directly to the VIDEO IN terminal of a personal computer equipped with video capture capabilities.

**To transfer camera images to a personal computer (video capture)**

1. Use the special video cable that comes with the camera to connect to the VIDEO IN terminal of the computer.
2. Enter the camera Playback Mode and display the image you want to send.
3. Perform the required operation on the computer.
• Consult the owner's guide that comes with the computer or its video capture board for details about how to set up to capture images.

Casio QV-10A Owner's Manual at CASIO [CASIO 000126] 000186-187; *see also id.* at CASIO 000160.

399.    I understand that Samsung contends that the "QV-10A does not reproduce video" and therefore does not meet this limitation.  *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 54.  Nevertheless, as discussed above with respect to the "compressor," "recording circuit," "decompressor," and "reproducing circuit" limitations, it would have been obvious to a person of ordinary skill in the art to add the ability to display moving images to the Casio QV-10 digital camera.

400.    A person of ordinary skill in the art would be motivated to add the ability to display moving images to the Casio QV-10 digital camera for the same reasons discussed above in connection with the "compressor," "recording circuit," "decompressor," and "reproducing circuit" limitations.

214

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

401.    Furthermore, the limitation would have been obvious in view of the Casio QV-10 in combination with at least the Ricoh RDC-1.  As discussed above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), the Ricoh RDC-1 discloses "a display which displays said moving image signals and still image signals outputted from said reproducing circuit."  It would have been obvious to add the Ricoh RDC-1's ability to display moving images to the Casio QV-10.  As discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), digital cameras— including the Ricoh RDC-1—that could reproduce and display both still and moving images were well-known, such that a person of ordinary skill in the art could have applied the methods and technology used in one digital camera to another.

> **j)**    **"a list of said moving image signal and still image signal as a search mode"**

402.    As discussed below in Section V.J (Invalidity for Lack of Written Description), this limitation lacks adequate written description support.  Under Samsung's apparent construction of the limitation "a list of said moving image signal and still image signal as a search mode" as set forth in its infringement contentions, and as discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), the Casio QV-10 digital camera discloses or renders obvious this limitation.  For example, the Casio QV-10 digital camera allows users to view and browse through multiple thumbnail images on a screen:

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Playing Back Images

## Producing a Multi-Page Display

Four or nine memory pages can be displayed at the same time. This feature can be used to display multiple memory pages on the camera's built-in LCD, or on the screen of a connected TV.

**1.** Enter the Playback Mode and turn on the camera.

**2.** Switch to multi-page display.



- Press the MODE button to change between the different display formats.



- Each press of MODE changes the display format in the following sequence.

- You cannot use the multi-page display while protected memory pages are hidden (page 49).



* The memory page that is shown on the screen when you change to the 4-page or 9-page format is in the first (upper left) position in the multi-page display.

**3.** Scroll through the pages on the display.

- Use [+] (forward) and [–] (back) to scroll through the memory pages. Pages are scrolled one, four, or nine at a time, depending on the display format you are using.



Unused pages are colored gray.

Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 000162-163.  Further, the Casio QV-10A could be connected to Macintosh and PC computers and televisions, on which users could view previously-stored images:

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

## Connecting to a Computer using a Connection Kit

Optionally available personal computer connection kits are available to allow transfer of digital data with a personal computer. Each kit includes special connecting cables, and software, and makes it possible to send images from the camera to a personal computer and vice versa. Images are transferred as digital data, which minimizes loss of image quality.

For details on connecting to your computer and how to use the software, see the user documentation that comes with the connection kit.

## Computer (Video Capture) [VIDEO]

You can use the special video cable that comes with the camera to connect directly to the VIDEO IN terminal of a personal computer equipped with video capture capabilities.

### To transfer camera images to a personal computer (video capture)

1. Use the special video cable that comes with the camera to connect to the VIDEO IN terminal of the computer.

2. Enter the camera Playback Mode and display the image you want to send.

3. Perform the required operation on the computer.

• Consult the owner's guide that comes with the computer or its video capture board for details about how to set up to capture images.

Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 000186-187; *see also* Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 000160.  The Casio QV-10 allows users to scroll through multiple images on the LCD screen and select a desired image:

### Selecting a Memory Page in a Multi-Page Display

You can use the following procedure to select one of the memory pages in a multi-page display. Then when you return to the 1-page display, the memory page you selected will be the one displayed. The following procedure uses the 4-page display as an example, but you can use the same procedure with the 9-page display.

**1.** In the Playback Mode, press the MODE button.



• This changes to the 4-page display.

*In this example, we will select this page.*



**2.** Press the DISP button.

• This causes a white line to appear under the first (upper left) page. This white line indicates the memory page that is currently selected.

• If you do not perform any operation for about 10 seconds, the white line disappears from the display.

217

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Casio QV-10A Owner's Manual [CASIO 000126] at CASIO 000164-165.

403.    I understand that Samsung contends that the QV-10 "does not disclose the claimed search mode or classification mode, nor anything equivalent" and that the "'multi-page display' feature" allegedly does not meet this limitation because Samsung does not understand "how" Apple contends the feature is disclosed.  *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 55.  Samsung further appears to contend that this limitation is not met because the QV-10 "does not reproduce video."  *Id.*  I disagree on both counts.

404.    First, the multi-page display of the Casio QV-10 digital camera—consisting of up to nine thumbnail images on a display—functions in exactly the same way as the Camera Roll feature Samsung accuses in its infringement contentions.  *See, e.g.*, Samsung's Third Amended Infringement Contentions, July 4, 2013, at 6 (accusing "Camera Roll"); *see also* Samsung's Further Supp. Response to Interrogatory No. 15, May 2, 2013, at 12 ("The invention also includes a 'search mode' that enables the user to, for example, browse through a list of thumbnail images representing the photos and videos in the camera, regardless of their classification.").

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Thus, under Samsung's own infringement contentions, the Casio QV-10 digital camera meets this claim limitation.

405.    Second, with respect to Samsung's contention that the Casio QV-10 digital camera "does not reproduce video," a person of ordinary skill in the art would have known how, and have been motivated, to add the ability to reproduce moving images to the Casio QV-10 digital camera.  *See supra* (discussing "compressor," "recording circuit," "decompressor," "reproducing circuit" and "display" limitations).  A person of ordinary skill in the art would have been motivated to modify the Casio QV-10 digital camera to reproduce moving images to compete more directly with the Ricoh RDC-1 and to provide potential customers of the Casio QV-10 with the added ability of displaying moving images.

406.    Furthermore, it would have been obvious to implement Apple's PhotoFlash software on the Casio QV-10 digital camera for the reasons set forth in Section V.G (Background of the Technology Relevant to the '449 Patent).  Under Samsung's apparent construction of the limitation "a list of said moving image signal and still image signal as a search mode" as set forth in its infringement contentions, and as discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash), Apple PhotoFlash discloses this limitation.

407.    I understand that Samsung contends that "PhotoFlash further fails to disclose displaying a search mode or a classification mode" and that "[t]o the extent Apple contends that PhotoFlash discloses a 'search mode' because it allows the user to search for images by, for example, searching for specific file names, that search functionality fails to disclose or suggest displaying the claimed list of moving and still image signals."  *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 55.  Samsung further contends that "the various versions and functionalities of PhotoFlash fail to disclose or suggest the claimed lists of images and

classifications." *Id.* Samsung does not explain its basis for these contentions but, in any event, I disagree for the same reasons set forth above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash).

408.    I understand that Samsung further contends that PhotoFlash does not meet the "display which displays said moving image signals and still image signals" limitation because it purportedly "fails to disclose support for videos." *See* Samsung's Response to Interrogatory No. 38, July 15, 2013, at 54-55.  It would have been obvious to use PhotoFlash with moving images in addition to still images.  Indeed, it was well-known that any number of file types could be organized into various files or folders. *See, e.g.*, The Way Windows 95 Works, 1995, at MSFT-00630-011299; see also Windows 95 User's Manual [APL630DEF-WH0000027571] at APL630DEF-WH0000027611.  PhotoFlash itself stored image files "just like other Macintosh documents," making no particular distinction between file types. *See* Apple PhotoFlash User's Guide [APL630DEF-WH00000008151] at APL630DEF-WH0000008185 ("Images are stored as files, just like other Macintosh documents.").  It would have thus been trivial to organize other file types, such as moving images (which are simply a series of still images), using PhotoFlash.

409.    A person of ordinary skill in the art would have been motivated to add support for moving images to provide the user with greater diversity in the types of files the PhotoFlash software would work with.

410.    Further, as explained below in Section V.J (Invalidity Based on Lack of Written Description), in the event that the Court interprets the term "search mode" consistently with the way in which a person of ordinary skill in the art understands the term "search," (*e.g.*, the ability to specify some sort of attribute to retrieve a subset of items possessing that attribute), this

220

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

limitation is met by Apple PhotoFlash as demonstrated above in Section V.G (Background of the Technology Relevant to the '449 Patent).

### k)  "a list of classifications as a classification mode"

411.   As discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash), Apple's PhotoFlash discloses "a list of classifications as a classification mode."

412.   I understand that Samsung contends that "PhotoFlash fails to disclose displaying a search mode or a classification mode" and that "the various versions and functionalities of PhotoFlash fail to disclose or suggest the claimed lists of images and classifications."  *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 55.  Samsung does not explain its basis for this contention but, in any event, I disagree for the same reasons set forth in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash).

### l)  "wherein said recording circuit records each one of said plurality of image signals with classification data"

413.   I understand that Samsung contends that the association of an image with a default location in memory satisfies the "records … with classification data" limitation.  *See* Samsung's Third Amended Infringement Contentions, July 4, 2013, at 7 (arguing that the recording circuit records the identification of the album that contains a particular image when the image is recorded).  I disagree.

414.   Expanding the scope of "classification data" to include a default location where *all* images are stored would render this limitation superfluous.  An interpretation of "classification data" to include the container where all images are stored does not further the stated goal of the alleged '449 invention, which is to enhance the ease of retrieval of a particular image from among many images.  *See, e.g.*, '449 patent at 10:54-56 ("Hence, since the user classifies the data item for each destination, the ease of use of the retrieval may be surprisingly

221

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

enhanced.").  Claim 25 requires the digital camera to "record[] a moving image signal, and a still image signal."  Thus, the limitation requiring the images to be recorded "with classification data" requires more than storing images in a default memory location.  Among the data recorded with images in the alleged '449 invention are (1) the date and time an image is recorded (*see* '449 patent at 8:6-7 ("The imaging status of the user such as the recording date and time and the data type are automatically recorded. . . .")) and (2) the particular album to which an image is assigned.  *See also* Samsung's Motion to Amend Infringement Contentions, Apr. 30, 2013, Ex. G at 10 ("Additional album and classification data stored by the recording circuit include … date, time …, and other data pursuant to the Exchangeable Image File Format ("Exif").").

415.   Nevertheless, the Casio QV-10 digital camera includes a default structure in memory in which images are placed when recorded and from which they can be reproduced during playback.  Thus, the QV-10 meets this limitation even under Samsung's apparent construction as set forth in its infringement contentions.

416.   Furthermore, it would have been obvious to record images in the Casio QV-10 digital camera together with EXIF data in view of the Ricoh RDC-1 digital camera.  As explained above in Section V.G (Background of the Technology Relevant to the '449 Patent), EXIF defines the information (often called "metadata") associated with a particular image in a digital camera's memory.  EXIF data was commonly used in digital cameras—including the Ricoh RDC-1—prior to the alleged '449 invention, and would have been obvious to use with the Casio QV-10.  *See, e.g.*, Ricoh Dep. at 129:16-130:19 ("Q. Could you explain using the Exif header how that process happens.  [A.] All images have a certain format that allows for additional information, such as, you know, time and date, to be stamped in the data of – the

222

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

header of the image itself, the raw data.  And every time an image is recorded, it's a part of the standard, I guess, to imprint date and time that an image is captured.").

417.    I understand that Samsung contends that the Casio QV-10 does not disclose this limitation because Samsung does not understand what Apple "contends is recorded with each image, or the components of QV-10A that it contends comprise the claimed recording circuit." *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 56.  I disagree.  As explained above, the Casio QV-10 discloses a recording circuit that records images to a location in memory from where they can be accessed, which, while incorrect, is what Samsung accuses as the claimed "classification data" in its infringement contentions.  *See* Samsung's Third Amended Infringement Contentions, July 4, 2013, Ex. G at 7 ("[T]he recording circuit records the identification of the album or albums that contain particular image signal, for each moving image signal and still image signal that is stored.").  Further, in view of the Ricoh RDC-1, it would have been obvious to record EXIF data with images in the Casio QV-10 digital camera.

418.    Finally, as discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), numerous patents disclose storing additional information with images when they are recorded, and it would have been obvious to use any one of these well-known techniques with the Casio QV-10 since it would have provided additional functionality to the QV-10.  *See, e.g.*, Matsumoto at 3:16-22 ("In the image storage/display unit, the received picture and attribute data are once stored."), 3:36-38 ("In the first aspect of the invention, each time a picture image is shot, its date and time are previously recorded as attribute data."), 3:56-65 ("In the third aspect, when a picture image is shot, its shooting place is previously recorded as its attribute data."), 8:18-19 ("Album data is created on the basis of the picture and attribute data received at the storage unit 109."); *see also* Parulski at Abstract, 2:32-47, 2:51-60 ("When the

223

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

user selects a particular category, the category name is stored along with the image data in the

image file. . . .”), 4:66-5:8 (“After the user selects a particular category, the image is captured

and the category information is stored in the removable storage device along with the image data

in the image file. . . .”), 5:9-18, 6:44-59, 6:60-7:7 (“[W]hen the shutter button 21 is pressed, the

selected category (tag) is associated with the digital image data (steps 62, 63).”), Fig. 4.

419.    Apple PhotoFlash, as described in the User’s Guide, similarly discloses storing

information regarding each image:



Apple PhotoFlash User’s Guide [APL630DEF-WH0000008151] at APL630DEF-
WH0000008196.

420.    Samsung contends that PhotoFlash does not meet the “records … with

classification data” limitation because it does not “disclose or suggest a recording circuit” or

“capturing and recording images, with or without classification data.”  *See* Samsung’s Supp.

Response to Interrogatory No. 38, July 15, 2013, at 56.  However, as explained below in the

section regarding Other Obviousness Considerations, it would have been obvious to implement

the PhotoFlash software on the Casio QV-10 digital camera, which discloses the claimed

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

"recording circuit" and which could record the data displayed by PhotoFlash when it records images.

> **m)** **"said display lists a plurality of classifications and a number of images belonging to each classification"**

421.     As explained above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash), Apple's PhotoFlash displays the number of files belonging to each catalog or album and therefore meets this limitation.

422.     I understand that Samsung contends that PhotoFlash does not meet this limitation because "[t]he fact that the software can be manipulated to display several windows on the screen does not teach or suggest the limitation to a person of ordinary skill in the art." *See* Samsung's Supp.  Response to Interrogatory No. 38, July 15, 2013, at 55-56.   I disagree for the same reasons discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash).

423.     I understand that Samsung contends that "[o]ne of ordinary skill would not have combined the teachings of the QV-10[] and PhotoFlash" because "PhotoFlash is a personal computer software program [and] does not teach or suggest how to incorporate the functionality of the software into a digital camera supporting audio, video, still images, and classifications as claimed." *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 53.  I disagree.  A person of ordinary skill in the art would have been motivated to implement software for organizing images (such as Apple's PhotoFlash) on a digital camera (such as the Casio QV-10) to solve the problem of retrieving, grouping, and deleting image data recorded by the digital camera, as described in the '449 patent.  The algorithm for counting and displaying the number of files, whether they are images, videos, or otherwise, is simple, and it would not be difficult for a person of ordinary skill in the art to write.  Further, a person of ordinary skill in the art would be motivated to modify the Casio QV-10 digital camera in this manner for the same reasons

225

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Apple's PhotoFlash software displays the number of images in each album.  For example, it provides users with the convenience of knowing how many images are in a particular folder, which allows the user to gauge how difficult it might be to find a particular image within the folder.

n)    **Claim 27: "A digital camera according to claim 25, wherein said classification is able to change by a direction of a user"**

424.    As discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash), Apple's PhotoFlash meets this limitation.

425.    I understand that Samsung contends that "PhotoFlash does not disclose or suggest that a user can direct a change in classification using only the claimed digital camera."  *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 56.  I disagree for the same reasons discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash).

o)    **Other Obviousness Considerations**

426.    I understand that Samsung contends that "[o]ne of ordinary skill would not have combined the teachings of the QV-10[] and PhotoFlash" because "PhotoFlash is a personal computer software program [and] does not teach or suggest how to incorporate the functionality of the software into a digital camera supporting audio, video, still images, and classifications as claimed."  *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 53.  I disagree.

427.    As explained above in Section V.G (Background of the Technology Relevant to the '449 Patent), it would have been obvious to implement PhotoFlash on a digital camera.  As with ArcSoft's PhotoStudio, PhotoFlash was implemented on several different platforms, including various versions of Mac and Windows computers.  In addition, the idea of running photo organization software on digital cameras was well-known prior to the alleged '449

226

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

invention.  A person of ordinary skill in the art would have been motivated to implement software for organizing images (such as Apple's PhotoFlash) on a digital camera (such as the Casio QV-10) in order to solve the problem of retrieving, grouping, and deleting image data recorded by the digital camera, as described in the '449 patent.

428.   Further, photo organization software that ran on digital cameras was well-known. *See, e.g.,* Matsumoto, Figs. 5, 8, 9:53-56 ("When the operation of the image storage/display unit starts, there appears such a book-shelf type initial screen as shown in FIG. 5.  Picture images are classified into an album 501 which is then arranged in a book shelf 502."), 10:25-27 ("The picture screen 801, immediately after the album list is generated, has pictures arranged in a preset array as shown in FIG. 8.  This is sufficient for usual picture appreciation."); Yamada, ¶ 12 ("By displaying a track map in this manner, it is easy to look for tracks on which a desired classification code is recorded.  Note that it is also possible to display the track map on the LCD 7."); Parulski at 2:32-43 ("[A]n electronic camera [that] captures images representing a variety of subjects and categorizes the image according to subject matter. . . . A ***processor in the camera*** has the capability of assigning the plurality of categories to the images captured by the camera, with each category providing subject classification of one or more images.") (emphasis added); *see also* Parulski Dep. at 145:19-146:6 ("Q. So a processor in the digital camera itself is capable of assigning categories to images according to subject classification; correct?  [A.] As I understand the '678, the specific sentences that you've pointed me to, that the processor ***is in the camera***. . . . And it says the processor in the camera has the capability of assigning the plurality of categories to images captured by the camera.") , 176:12-177:23 ("[T]here is a processor that I believe … had some programmable capability, and there was some firmware that was used as part of the processes that that processor would perform in order to enable the camera to capture

227

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

images and to store images along with categorization information.").  Thus, it would have been obvious to implement Apple's PhotoFlash software on the Casio QV-10 digital camera.

### 6.    U.S. Patent No. 5,633,678 ("Parulski") + Apple PhotoFlash + Ricoh RDC-1 (Exhibit 6)

#### a)    Claim 25:  "A digital camera"

429.    Parulski discloses a digital camera.  Parulski at Abstract ("An electronic camera captures images representing a variety of subjects and categorizes the image according to subject matter."), 1:6-8 ("This invention pertains to the field of electronic imaging systems, and in particular to a digital electronic still camera of the type that is used with a host computer."), 1:25-32 ("FIG. 1 shows a known electronic still photography system useful for inputting images to a computer. The system includes an electronic camera 1 with an electronic sensing section 1a, a digital processing section 1b, a memory card slot 2, and a removable memory card 3; and a host computer 4 with a built-in memory card reader 5, a printer 6a, a display 6b, a keyboard data entry device 7 and a disk drive 8.").

430.    For example, in Figure 1, Parulski discloses a typical digital camera known in the prior art:



FIG. 1
(prior art)

228

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Parulski at Fig. 1 (annotation added); *see also id.* at 3:48-49 ("FIG. 2 shows an electronic still camera capable of categorizing images as taught by the invention."), 8:45-9:26.  I understand that Samsung does not dispute that Parulski discloses a "digital camera."

> **b)**  **"a lens"**

431.  Parulski discloses a digital camera that includes "a lens":



Parulski at Fig. 1 (annotation added).  I understand that Samsung does not dispute that Parulski discloses "a lens."

> **c)**  **"an imaging device which converts an optical image into an analog signal"**

432.  Parulski discloses "an imaging device which converts an optical image into an analog signal."  Parulski discloses a digital camera with a CCD image sensor that converts optical images—*i.e.*, light—into an analog signal:

229

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Parulski at Fig. 1 (annotation added); *see also id.* at Abstract ("The camera comprises an ***image sensor*** for capturing an image. . . ."), 1:11-12 ("As understood in the prior art, a digital electronic still camera is a device which uses an electronic sensor to capture an image. . . ."), 3:51-53 ("The input section A includes an exposure section 10 for directing image light from a subject (not shown) toward an ***image sensor 12***.") (emphasis added), 3:58-4:2 ("***The sensor 12, which includes a two-dimensional array of photosites corresponding to picture elements of the image, is a conventional charge-coupled device (CCD)*** using, e.g., either well-known interlinetransfer or frame transfer techniques.  The sensor 12 is exposed to image light to capture a particular image; accordingly, analog image charge information corresponding to the particular image is generated in respective photosites.  The charge information is applied to an output diode 14, which converts the charge information to analog image signals corresponding to respective picture elements of the particular image captured.") (emphasis added), Fig. 2.  I understand that Samsung does not dispute that Parulski discloses "an imaging device which converts an optical image into an analog signal."

230

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**d)**    **"an A/D converter which converts said analog signal from said imaging device to a digital signal"**

433.    Parulski discloses "an A/D converter which converts said analog signal from said imaging device to a digital signal."  Parulski discloses a digital camera that includes an analog-to-digital converter that converts the analog signals received from the separate CCD image sensor into digital signals:



Parulski at Fig. 1 (annotation added).



Parulski, Fig. 2 (annotation added); *see also id.* at Abstract ("The camera comprises … a *converter stage for converting the image into digital image data*. . . .") (emphasis added), 4:3-5 ("The analog image signals are applied to an *A/D converter 16*, which generates digital image

231

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

data from the analog input signals for each picture element.") (emphasis added).  I understand that Samsung does not dispute that Parulski discloses an analog-to-digital converter which converts analog signals from the CCD image sensor to digital signals.

   e) **"a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals"**

  434. Parulski, in view of the Ricoh RDC-1 digital camera, renders obvious a digital camera that includes "a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals."  Parulski discloses a digital camera that compresses still images, including using "the well-known JPEG (Joint Photographic Experts Group) discrete cosine transformation-based compression algorithm."  Parulski at 4:23-37; *see also id.* at 1:18-19 ("For instance, U.S. Pat. No. 5,016,107 describes *an electronic still camera utilizing image compression*. . . .") (emphasis added).  For example, Parulski discloses a "compression and recording section" of the digital camera:



FIG. 2

232

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Parulski at Fig. 2 (annotation added); *see also id.* at 3:48-51 ("FIG. 2 shows an electronic still camera capable of categorizing images as taught by the invention. The electronic still camera is divided generally into an input section A and a compression and recording section B.").

435.    I understand that Samsung contends that "Parulski does not disclose a digital camera capable of capturing both still images and video [or] a compressor that uses a different compression method for moving image signals (video) and for still images."  Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 57.  Instead, Samsung contends that "Parulski uses a single compression method, JPEG."  *Id.*

436.    However, Parulski does not disclose only JPEG compression, but rather teaches that "***any one of a number of known image compression algorithms***" may be used.  Parulski at 4:29-34 (emphasis added); *see also* Parulski Dep. at 196:17-197:1 ("Q. So it was left to the person trying to build the camera as described by the '678 patent to determine which compression algorithm he or she wanted to use, correct?  A. Generally, I think that there … are a number of different known image compression algorithms that could be used, and JPEG is an example of an algorithm that could be used, but it's not necessary to use JPEG compression."), 197:20-198:8 ("…[I]t's my understanding that there are other known compression algorithms that could have been used an that JPEG was not required.").  Further, as discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), it would have been obvious to modify the digital camera disclosed in Parulski to include moving image recording capabilities, including using a video compression method that is different from JPEG, such as Motion-JPEG or MPEG.

437.    First, as the '449 patent explains, "[t]he MPEG compression data process and the JPEG compression data process have the same common points, so that the use of both the data

233

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

formats may effectively save the circuit scale." '449 patent at 4:16-19.  Indeed, as the inventor

of this patent (who is Samsung's consultant in this case) conceded, the same components are

used to implement a variety of compression methods, including methods performed on moving

images.  *See* Parulski Dep. at 94:13-96:6 (explaining that a Huffman encoder "is used in

conjunction with other processes **in a variety of compression methods**, including some image

compression methods. . . . In my experience, generally Huffman encoding can be used with

various types of compression. . . . In general, I believe the images could be – that are compressed

could be part of a motion sequence. . . .") (emphasis added).  Recording a moving image signal

essentially involves the repeated recording of a still image signal at a regular interval.  Thus,

given the similarities between capturing still image signals and moving image signals on a digital

camera, persons of ordinary skill in the art would have found adding the ability to record and

compress moving images to the digital camera disclosed by Parulski trivial and obvious.

438.    Second, digital cameras with moving image recording capability were well-

known prior to the alleged '449 invention.  For example, the Ricoh RDC-1 allowed users to

record both still images and full motion video.  *See, e.g.*, Cheifet Dep. at 33:25-34:16; Video of

Fall 1995 Comdex Trade Show at APL630DEF-WH-A0000034381; Byte Magazine, Jan. 1996

[APL630DEF-WH-A0000013586] at APL630DEF-WH-A0000013586 ("Ricoh's RDC-1 Digital

Camera was voted Best Input Device.  This color camera also captures audio and video clips.");

RDC-1 Brochure [RICOH00002] at RICOH00002 ("3x Zoom Digital Camera with Full Motion

Video and Sound"); RDC-1 Brochure [RC 0430] at RC 0430 ("3x Zoom Digital Camera with

Full Motion Video and Sound. . . . Ricoh's super-fast color image compression algorithm works

at a full 30 frames-per-second, making the RDC-1 the world's first digital camera to record full

motion video with sound.").  Thus, it would have been obvious for a person of ordinary skill in

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

the art at the time of the alleged '449 invention to add moving image recording capability to the digital camera taught by Parulski.

439.   A person of ordinary skill in the art would have been motivated to add moving image capture and compression capability to the digital camera of Parulski to provide users with the added functionality of efficiently storing moving images in addition to still images.  The additional moving image recording capability would have allowed a camera manufacturer to charge a higher price for the device, providing yet additional motivation to add moving image functionality to Parulski.  *Compare* Ricoh RDC-1 (approximately $1700-1800) *with* Casio QV-10 (no video functionality, $600-700); *see also* Ricoh Dep. at 80:22-81:10; RDC-1 Press Release, Feb. 22, 1996 [APL630DEF-WH-A0000035282] at APL630DEF-WH-A0000035282; MacUser article, Mar. 1996 [APL630DEF-WH-A0000019001] at APL630DEF-WH-A0000019005); Casio QV-10 Press Release, Jan. 6, 1995 [APL630DEF-WH-A0000034377] at APL630DEF-WH-A0000034377; Denver Post article, Jan. 9, 1996 [APL630DEF-WH-0000020926] at APL630DEF-WH-0000020927-20928).  Such modifications would have been well within the technical knowledge of a person of ordinary skill in the art and would have amounted to no more than an available design choice depending on the functionality the person of ordinary skill desired the camera to include.

440.   Furthermore, the "compressor" limitation would have been obvious in view of Parulski in combination with at least the Ricoh RDC-1 digital camera.  As discussed above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), the Ricoh RDC-1 digital camera includes "a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals."  It would have been obvious to add the moving image recording and

**CONTAINS INFORMATION DESIGNATED AS**
**THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

compression functionality of the Rich RDC-1 to the digital camera disclosed in Parulski.  As discussed above and in Section V.G (Background of the Technology Relevant to the '449 Patent), various compression methods were well-known and used in digital cameras—including the Ricoh RDC-1—such that a person of ordinary skill in the art could have applied the methods and technology used in one digital camera to another.

441.    To the extent that Samsung intends to suggest that the JPEG compression method used for still images and the video-JPEG compression method used for moving images in the Ricoh RDC-1 are not "different" as required by claim 25, I disagree for the same reasons set forth above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio).

442.    Regardless, also for the same reasons set forth in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), it would have been obvious to implement *any* of the moving image compression methods that were well-known to persons of ordinary skill in the art at the time of the alleged '449 invention—*e.g.*, MPEG-1 or MPEG-2—into the digital camera disclosed in Parulski to compress moving images.

> f)    **"a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal"**

443.    Parulski, in view of the Ricoh RDC-1 digital camera, renders obvious a digital camera that includes "a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal."  Parulski discloses a digital camera that includes a recording circuit for recording images in memory.  For example, Parulski discloses a digital camera with a "compression and recording section" consisting of, among other components, a "card interface" and "memory card":

236

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



FIG. 2

Parulski at Fig. 2 (annotations added); *see also id.* at 3:49-51 ("The electronic still camera is divided generally into an input section A and a ***compression and recording section*** B."), 4:34-37 ("The processor 22 applies the compression algorithm from the memory 28 to the digital image data, and ***sends the compressed data to a removable storage device*** via a signal port 26."), 4:41-55 ("In this example, the ***signal port 26 is a card interface and the removable storage device is a memory card 24***. While a memory card 24 is shown in this system as the storage device, other devices may be used, such as a floppy disk magnetic medium, a small hard drive, or optical storage (in the latter cases, suitable conventional reading/writing apparatus would be provided in the camera, e.g., magnetic or optical read/write head, etc.). A representative memory card is a card adapted to the PCMCIA card interface standard, such as described in the PC Card Standard, Release 2.0, published by The Personal Computer Memory Card International Association, Sunnyvale, Calif., September 1991. The memory card 24 accordingly contains solid state memory 24a, such as Flash EPROM memory, which the card uses to store image data files.") (emphasis added).

237

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

444.    I understand that Samsung contends that Parulski does not disclose "a recording circuit which records both still images and video in memory." *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 57.  Nevertheless, as discussed above in connection with the "compressor" limitation, it would have been obvious to a person of ordinary skill in the art to add the ability to record moving images to the digital camera disclosed in Parulski.

445.    A person of ordinary skill in the art would have been motivated to add moving image recording capability to the digital camera disclosed in Parulski for the same reasons discussed above in connection with the "compressor" limitation (*e.g.*, added functionality, ability to charge higher price).

446.    Furthermore, the limitation would have been obvious in view of Parulski in combination with at least the Ricoh RDC-1.  As explained above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), the Ricoh RDC-1 digital camera includes "a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal."  It would have been obvious to add the moving image recording functionality of the Ricoh RDC-1 to the digital camera disclosed in Parulski, as Parulski was filed around the time that the RDC-1 was announced, and recording moving images simply involves the repeated recording of still images at a regular interval.  As discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), circuits for recording still and moving images to memory were well-known and used in digital cameras—including the Ricoh RDC-1—such that a person of ordinary skill in the art could have applied the circuits and technology used in one digital camera to another.

238

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

g) **"a decompressor which decompresses said compressed data by using a different decompressing method according to whether said recorded compressed data is a moving image signal or a still image signal"**

447.    Parulski, in view of the Ricoh RDC-1 digital camera, renders obvious a digital camera that includes "a decompressor which decompresses said compressed data by using a different decompressing method according to whether said recorded compressed data is a moving image signal or a still image signal."

448.    Parulski discloses a digital camera that decompresses previously-stored compressed images.  A person of ordinary skill in the art would have recognized that the digital camera of Parulski—which teaches compressing images "according to any one of a number of known image compression algorithms, such as the well-known JPEG … algorithm" (Parulski at 4:29-34)—would also include a method to decompress the compressed images to be played back on, *e.g.*, a display attached to the camera. *See, e.g.*, Parulski at 1:64-2:2 ("The Kodak Professional Digital Camera System (model DCS-100) included a digital camera tethered by cable to a separate digital storage unit (DSU).  The DSU, similar to the computer 4 of FIG. 1, contained a hard drive for storing images, a small image display, and a keypad for manipulating the images.").

449.    I understand that Samsung contends that Parulski "does not disclose a digital camera capable of capturing both still images and video" and therefore does not meet this limitation. *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 57. However, as discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), it would have been obvious to add moving image playback and decompression functionality to the digital camera disclosed in Parulski.

239

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

450.    As the '449 patent explains, "[t]he MPEG compression data process and the JPEG compression data process have the same common points, so that the use of both the data formats may effectively save the circuit scale." '449 patent at 4:16-19.  The same applies for decompression, which is simply the reverse process of compression.  Thus, given the similarities between decompressing still and moving image signals on a digital camera, a person of ordinary skill in the art at the time of the alleged '449 invention would have found adding the ability to decompress moving images on the digital camera disclosed in Parulski to be trivial and obvious.

451.    A person of ordinary skill in the art would have been motivated to add the ability to decompress moving images to the digital camera disclosed in Parulski for the same reasons the person of ordinary skill in the art would have been motivated to add the ability to capture moving images, as discussed above in connection with the "compressor" limitation.  For example, a person of ordinary skill in the art would have been motivated to add the ability to decompress and play back moving images to enable the digital camera disclosed by Parulski to compete more directly with, for example, the Ricoh RDC-1, which included the ability to decompress and play back moving images.  Further, a person of ordinary skill in the art would have been motivated to add the ability to decompress and play back moving images on the digital camera disclosed in Parulski to provide potential customers with this added capability.

452.    Furthermore, the limitation would have been obvious in view of Parulski in combination with at least the Ricoh RDC-1.  As discussed above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), the Ricoh RDC-1 includes "a decompressor which decompresses said compressed data by using a different decompressing method according to whether said recorded compressed data is a moving image signal or a still image signal."  It would have been obvious to use the same decompression methods used by the Ricoh RDC-1 with Parulski.  As discussed

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

above in Section V.G (Background of the Technology Relevant to the '449 Patent), various compression (and therefore decompression) methods were well-known and used in digital cameras—including the Ricoh RDC-1—such that a person of ordinary skill in the art could have applied the methods and technology used in one digital camera to another.

453.    To the extent that Samsung intends to suggest that the JPEG decompression method used for still images and the video-JPEG decompression method used for moving images in the Ricoh RDC-1 are not "different" as required by claim 25, I disagree for the same reasons set forth above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio).

454.    Regardless, for the same reasons set forth above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), it would have been obvious to implement *any* of the moving image decompression methods that were well-known to persons of ordinary skill in the art at the time of the alleged '449 invention—*e.g.*, MPEG-1 or MPEG-2—into the digital camera disclosed in Parulski to decompress moving images during playback.

> **h)**     **"a reproducing circuit which reproduces a moving image signal, a sound signal synchronous to said moving image signal, and a still image signal"**

455.    Parulski, in combination with the Ricoh RDC-1 digital camera, renders obvious a digital camera that includes "a reproducing circuit which reproduces a moving image signal, a sound signal synchronous to said moving image signal, and a still image signal."  Parulski discloses a digital camera that includes circuitry for reproducing images on a display screen, such as a computer monitor or a Display Storage Unit that is attachable to the digital camera (*e.g.*, used with the Kodak Professional Digital Camera System (model DCS-100)):

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Parulski at Fig. 1 (annotations added) (see components identified in pink); *see also id.* at 1:64-2:2 ("The Kodak Professional Digital Camera System (model DCS-100) included a ***digital camera tethered by cable to a separate digital storage unit (DSU).  The DSU, similar to the computer 4 of FIG. 1***, contained a hard drive for storing images, ***a small image display***, and a keypad for manipulating the images.") (emphasis added).



Parulski at Fig. 2 (annotations added) (see components identified in pink); *see also id.* at 8:13-33 ("According to the invention shown in FIG. 2, the images are transferred from the camera to the

242

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

computer via the removable memory, rather than a cable interface.  Therefore, the camera does

not have to be in the same location as the computer.  This makes it possible to view the images

from the camera in many different locations, on many different computers, as long as the

computer has the ability to both accept the removable memory and correctly process the image

data.  Since the removable memory can be used to store code for processing the image data in the

computer, this code can include the processing algorithms needed to download the stored images

according to the stored categories.  The advantage of storing the processing algorithms on the

removable memory is that it eliminates the need for a separate means of supplying the code, such

as the floppy disk.  Supplying the algorithms along with the images on the removable memory,

such as a PCMCIA card, makes it possible for any computer capable of reading the image data

from the card to also download and utilize the algorithms needed to process the image data in

order to create one or more files of categorized images.”).

456.    I understand that Samsung contends that Parulski “does not disclose a digital

camera capable of capturing or reproducing both still images and video, or of reproducing

sound.”  *See* Samsung’s Supp. Response to Interrogatory No. 38, July 15, 2013, at 57.

Nevertheless, for the same reasons discussed above in connection with the “compressor,”

“recording circuit,” and “decompressor” limitations, it would have been obvious to a person of

ordinary skill in the art to add the ability to reproduce moving images to the digital camera

disclosed in Parulski.

457.    Furthermore, the limitation would have been obvious in view of Parulski in

combination with at least the Ricoh RDC-1.  As discussed above in Section V.H.1 (Ricoh RDC-1

+ ArcSoft PhotoStudio), the Ricoh RDC-1 digital camera includes “a reproducing circuit which

reproduces a moving image signal, a sound signal synchronous to said moving image signal, and

243

**CONTAINS INFORMATION DESIGNATED AS**
**THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

a still image signal."  It would have been obvious to add the moving image reproducing functionality of the Ricoh RDC-1 to the digital camera disclosed in Parulski, as Parulski was filed around the time that the RDC-1 was announced, and reproducing moving images simply involves the repeated reproduction of still images at a regular interval.  As discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), circuits for reproducing still and moving images were well-known and used in digital cameras—including the Ricoh RDC-1—such that a person of ordinary skill in the art could have applied the circuits and technology used in one digital camera to another.

       i)      **"a display which displays said moving image signals and still image signals outputted from said reproducing circuit"**

458.    Parulski, in view of the Ricoh RDC-1 digital camera, discloses renders obvious a digital camera that includes "a display which displays said moving image signals and still image signals outputted from said reproducing circuit."  Parulski discloses a digital camera with a detachable display, and the camera could also be connected to a computer display for displaying previously-stored images:

244

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Parulski at Fig. 1 (annotations added) (see Display Screen in yellow box above); *see also id.* at 1:64-2:2 ("The Kodak Professional Digital Camera System (model DCS-100) included ***a digital camera tethered by cable to a separate digital storage unit (DSU).  The DSU, similar to the computer 4 of FIG. 1***, contained a hard drive for storing images, ***a small image display***, and a keypad for manipulating the images."), 1:24-32.

459.    I understand that Samsung contends that Parulski "discloses an external computer including a display screen" and therefore does not meet this limitation.  *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 57.  I disagree.

460.    Parulski expressly discloses using its claimed invention with a camera similar to the Kodak DCS-100, which Parulski describes as having a Digital Storage Unit to which the camera could be tethered and on which images could be displayed.  Parulski at 1:64-2:2 ("The Kodak Professional Digital Camera System (model DCS-100) included a digital camera tethered by cable to a separate digital storage unit (DSU).  The DSU, similar to the computer 4 of FIG. 1,

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

contained a hard drive for storing images, a small image display, and a keypad for manipulating the images.").  The DCS-100 and DSU operate together as a single device.

461.    Further, it would have been obvious to a person of ordinary skill in the art to modify the digital camera disclosed by Parulski to include an LCD display screen on the digital camera itself for several reasons.  First, one of the patent inventors (who is Samsung's consultant in this case) conceded that "[I]t's possible that the camera, 1, could have had a display screen. . . ."  Parulski Dep. at 212:12-213:1.  Second, digital cameras with various types of integrated displays were well-known prior to the alleged invention.  *See, e.g.*, Section V.G (Background of the Technology Relevant to the '449 Patent) above (describing, *e.g.*, Casio QV-10, Sony DSC-F1 and Ricoh RDC-1 digital cameras).  Third, numerous patents similarly taught digital cameras with their own LCD display screens.  *See, e.g.*, Section V.G (Background of the Technology Relevant to the '449 Patent) above (describing, *e.g.*, Fukuoka and Matsumoto).  Thus, a person of ordinary skill in the art would have known how to add an LCD display to the digital camera disclosed by Parulski.

462.    A person of ordinary skill in the art would have been motivated to add a fully integrated display to the digital camera disclosed by Parulski to provide its users with the convenience of viewing still and moving images immediately after they were captured, rather than having to wait to view them when a television was available and the digital camera could be connected.

463.    Furthermore, the "display" limitation would have been obvious in view of Parulski in combination with at least the Ricoh RDC-1.  As discussed above in Section V.H.1 (Ricoh RDC-1 + ArcSoft PhotoStudio), the Ricoh RDC-1 digital camera discloses " a display which displays said moving image signals and still image signals outputted from said

246

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

reproducing circuit."  It would have been obvious to add the Ricoh RDC-1's ability to display moving images to the digital camera disclosed in Parulski.  As discussed above in Section V.G (Background of the Technology Relevant to the '449 Patent), digital cameras— including the Ricoh RDC-1—that could reproduce and display both still and moving images were well-known, such that a person of ordinary skill in the art could have applied the methods and technology used in one digital camera to another.  Thus, it would have been obvious to play back moving images on either the DSU display of the digital camera disclosed in Parulski or on an integrated display similar to the Ricoh RDC-1 or Casio QV-10.

### j)    "a list of said moving image signal and still image signal as a search mode"

464.    As discussed below in Section V.J (Invalidity for Lack of Written Description), this limitation lacks adequate written description support.  Under Samsung's apparent construction of the limitation "a list of said moving image signal and still image signal as a search mode" as set forth in its infringement contentions, and as discussed above in Section V.H.1 (Ricoh RDC-1 + Apple PhotoFlash), Apple PhotoFlash discloses this limitation.

465.    I understand that Samsung contends that "PhotoFlash further fails to disclose displaying a search mode or a classification mode" and that "[t]o the extent Apple contends that PhotoFlash discloses a 'search mode' because it allows the user to search for images by, for example, searching for specific file names, that search functionality fails to disclose or suggest displaying the claimed list of moving and still image signals."  *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 58.  Samsung further contends that "the various versions and functionalities of PhotoFlash fail to disclose or suggest the claimed lists of images and classifications."  *Id.*  Samsung does not explain its basis for these contentions but, in any event, I disagree for the same reasons stated above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash).

247

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

466.   I understand that Samsung further contends that PhotoFlash does not meet the "display which displays said moving image signals and still image signals" limitation because it purportedly "fails to disclose support for videos."   *See* Samsung's Response to Interrogatory No. 38, July 15, 2013, at 57-58.  It would have been obvious to use the software described in Apple PhotoFlash with moving images in addition to still images.  Indeed, it was well-known that any number of file types could be organized into various files or folders.  *See, e.g.*, The Way Windows 95 Works, 1995 [MSFT-00630-011242] at MSFT-00630-011299; see also Windows 95 User's Manual [APL630DEF-WH0000027571] at APL630DEF-WH0000027611. PhotoFlash itself stored image files "just like other Macintosh documents," making no particular distinction between file types.  *See* Apple PhotoFlash User's Guide [APL630DEF-WH00000008151] at APL630DEF-WH0000008185 ("Images are stored as files, just like other Macintosh documents.").  It would have been trivial to allow other file types, such as moving images (which are simply a series of still images), to be organized using PhotoFlash.

467.   A person of ordinary skill in the art would have been motivated to add support for moving images to provide the user with greater diversity in the types of files with which the PhotoFlash software would work.

468.   Further, as explained below in Section V.J (Invalidity Based on Lack of Written Description), in the event that the Court interprets the term "search mode" consistently with the way in which a person of ordinary skill in the art understands the term "search" (*e.g.*, the ability to specify an attribute to retrieve a subset of items possessing that attribute), this limitation is met by Apple PhotoFlash as demonstrated above in Section V.G (Background of the Technology Relevant to the '449 Patent).

248

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### k)  "a list of classifications as a classification mode"

469.    As discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash),

Apple's PhotoFlash discloses "a list of classifications as a classification mode."

470.    I understand that Samsung contends that "PhotoFlash fails to disclose displaying a

search mode or a classification mode" and that "the various versions and functionalities of

PhotoFlash fail to disclose or suggest the claimed lists of images and classifications." *See*

Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 58.  Samsung does not

explain its basis for this contention but, in any event, I disagree for the same reasons discussed

above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash).

### l)    "wherein said recording circuit records each one of said plurality of image signals with classification data"

471.    Parulski discloses a digital camera that includes a "recording circuit" that "records

each one of said plurality of image signals with classification data."  For example, Parulski

discloses a digital camera that records images "with classification data," by assigning

classifications to images as the images are captured:

> The camera comprises … a memory for storing *a plurality of categories providing
> classification of the images by subject*.  A processor in the camera has the capability of
> *assigning the plurality of categories to the images captured by the camera*, with each
> category providing a subject classification for the images. A user selects one or more
> categories for a plurality of images prior to capture, and an output image signal is then
> generated including the digital image data corresponding to a captured image and the
> particular category selected by the user. The categories can be default identifiers stored in
> the memory, or can be names, text (i.e., account number), and/or graphics overlays (i.e.,
> company logo) entered via a host computer and uploaded to the camera memory before
> the pictures are taken.

Parulski at Abstract (emphasis added).

> Briefly summarized, according to one aspect of the present invention, *an electronic
> camera captures images representing a variety of subjects and categorizes the image
> according to subject matter*. The camera comprises an image sensor for the images, a
> converter stage for converting the images into digital image data, and a memory for

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

storing a plurality of categories providing classification of the images by subject. A processor in the camera has the capability of ***assigning the plurality of categories to the images captured by the camera***, with each category providing subject classification of one or more images. A user then interacts with a user control on the camera in order to select one or more of the categories for the images, and an output image signal is then generated including the digital image data corresponding to the images and the one or more categories selected by the user control.

Parulski at 2:32-47.

According to this invention, a digital camera includes a display-based "tag" icon/feature which the user can set to an appropriate category before taking a group of pictures. The category names can be defaults, or can be names and optional text (i.e., account number) and/or graphics overlays (i.e., company logo) entered via a host computer and uploaded to the camera before the pictures are taken. ***When the user selects a particular category, the category name is stored along with the image data in the image file***, and any text and graphics logo, as appropriate, are overlaid onto the image.

Parulski at 2:51-65 (emphasis added).

According to this invention, ***the digital camera includes a categorization feature which enables a user to establish an appropriate category, providing classification of the images by subject, before taking a group of pictures***. The category information can be default code symbols (A,B,C, etc.), or can be externally-generated category information, such as names and optional text (i.e., account numbers) and/or graphics overlays (i.e., company logos), which is entered via a host computer and uploaded to the camera through the signal port 26 before the pictures are taken or via cable connection. ***After the user selects a particular category, the image is captured and the category information is stored in the removable storage device along with the image data in the image file***, and any text and graphics logo, as appropriate, are overlaid onto the image. When downloading the images to a host computer, the user can select a particular category and download only the images which have a particular category identifier, or the images can all be downloaded and stored in file folders labeled with each category name.

Parulski at 4:56-5:8 (emphasis added).

Consequently, the memory card 24 contains additional memory to store header files 24b containing category information helpful in providing classification of the images by subject matter. . . . The header files 24b can also contain strings of text that identify particular images and separate graphics images that signify or otherwise identify subject matter.

Parulski at 5:9-18.

The process for categorizing images according to default parameters is shown in FIG. 4. . . . Referring first to FIG. 4, when the camera is first turned on, the "tag" icon 52a will be

250

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

shown only in outline form (step 60). The inner part of the "tag" icon 52a will fill to indicate when the user has positively selected the tag feature by activation of the user control switches 29. In the default mode, there are a predetermined plurality of possible categories, for example, five alphabetic categories A,B,C,D,E and NONE (or OFF). With the tag icon 52a activated, the user will select categories A,B,C,D,E,NONE (repeat sequence A,B, etc.) by pressing the toggle switch 54 (step 61). Each press of the switch 54 causes a different tag code to be displayed on the alphanumeric segment 52b.

Parulski at 6:44-59.



FIG. 4

Parulski at Fig. 4.

After the tag is selected, the user can activate other icons by use of the select button 56. Then, **when the shutter button 21 is pressed, the selected category (tag) is associated with the digital image data (steps 62, 63)**. Then the steps 62, 63 are repeated for any additional images in the same category. If a new category is desired, the process reverts to step 61. When all the images are captured, the user connects the camera (by cable) or the memory card 24 to a host computer (step 64), such as the host computer 4 illustrated in FIG. 1. Using software supplied by the camera manufacturer, the user opens a camera application and chooses the desired category (step 65). Then the images from appropriate categories stored in the camera, or the memory card 24, are downloaded to proper file folders according to the category data stored with the digital image data in each file (step 66).

Parulski at 6:60-7:7.

472.    I understand that Samsung does not dispute that Parulski meets this limitation.

251

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

m)      **"said display lists a plurality of classifications and a number of images belonging to each classification"**

473.     As discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash), Apple's PhotoFlash displays the number of files belonging to each catalog or album and therefore meets this limitation.  I understand that Samsung contends that PhotoFlash does not meet this limitation because "[t]he fact that the software can be manipulated to display multiple catalog windows does not teach or suggest the limitation to a person of ordinary skill in the art." *See* Samsung's Supp.  Response to Interrogatory No. 38, July 15, 2013, at 55-56.  Samsung does not provide a basis for this contention but, in any event, I disagree for the same reasons discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash).

n)      **Claim 27: "A digital camera according to claim 25, wherein said classification is able to change by a direction of a user"**

474.     As discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash), Apple's PhotoFlash meets this limitation.

475.     I understand that Samsung contends that "PhotoFlash does not disclose that a user can direct a change in classification using only the claimed digital camera."  *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 59.  I disagree for the same reasons discussed above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash).

o)      **Other Obviousness Considerations**

476.     I understand that Samsung contends that "[o]ne of ordinary skill would not have combined the teachings of Parulski and PhotoFlash" because "PhotoFlash is a personal computer software program [and] does not teach or suggest how to incorporate the functionality of the software into a digital camera supporting audio, video, still images, and classifications as

252

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

claimed." *See* Samsung's Supp. Response to Interrogatory No. 38, July 15, 2013, at 56.  I

disagree.

477.    As explained above in Section V.H.2 (Ricoh RDC-1 + Apple PhotoFlash), it

would have been obvious to adapt Apple's PhotoFlash software to work on a digital camera.

PhotoFlash was adaptable to different computer platforms, having been developed to work with

various versions of Mac and Windows computers.  In addition, the idea of running photo

organization software on digital cameras was well-known prior to the alleged '449 invention.  A

person of ordinary skill in the art would have been motivated to combine the digital camera

hardware with software programs, such as Apple's PhotoFlash, that organize multimedia images

of the digital camera disclosed in Parulski to further improve the disclosed functionality of

categorizing images according to subject matter.

478.    Indeed, the photo organization software of the digital camera disclosed in Parulski

ran on a processor within the digital camera itself, and it would have been obvious to add

additional, similar software, such as the classification feature of PhotoFlash, to that processor.

*See* Parulski at 2:40-43 ("A processor ***in the camera*** has the capability of assigning the plurality

of categories to the images captured by the camera, with each category providing subject

classification of one or more images."); *see also* Parulski Dep. at 145:19-146:6 ("Q. So a

processor in the digital camera itself is capable of assigning categories to images according to

subject classification; correct?  [A.] As I understand the '678, the specific sentences that you've

pointed me to, that the processor ***is in the camera***. . . . And it says the processor in the camera

has the capability of assigning the plurality of categories to images captured by the camera.") ,

176:12-177:23 ("[T]here is a processor that I believe … had some programmable capability, and

there was some firmware that was used as part of the processes that that processor would

253

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

perform in order to enable the camera to capture images and to store images along with

categorization information.").

479.    Further, as explained above in Section V.G (Background of the Technology

Relevant to the '449 Patent), it would have been obvious to implement PhotoFlash on a digital

camera.  As with ArcSoft's PhotoStudio, PhotoFlash was implemented on several different

computer platforms, having been developed to work with various versions of Mac and Windows

computers.  In addition, the idea of running photo organization software on digital cameras was

well-known prior to the alleged '449 invention.  A person of ordinary skill in the art would have

been motivated to combine the digital camera hardware with software programs, such as Apple's

PhotoFlash, that organize multimedia images of Parulski to solve the alleged problem of

retrieving, grouping, and deleting image data recorded in a digital camera, as described in the

'449 patent.

480.    Finally, as discussed above in Section V.G (Background of the Technology

Relevant to the '449 Patent), numerous other patents disclosed photo organization software that

ran on a digital camera.  *See, e.g.*, Matsumoto at Figs. 5, 8, 9:53-56 ("When the operation of the

image storage/display unit starts, there appears such a book-shelf type initial screen as shown in

FIG. 5.  Picture images are classified into an album 501 which is then arranged in a book shelf

502."), 10:25-27 ("The picture screen 801, immediately after the album list is generated, has

pictures arranged in a preset array as shown in FIG. 8.  This is sufficient for usual picture

appreciation."); Yamada at ¶ 12 ("By displaying a track map in this manner, it is easy to look for

tracks on which a desired classification code is recorded.  Note that it is also possible to display

the track map on the LCD 7.").  Thus, it would have been obvious to implement Apple's

PhotoFlash software on the Ricoh RDC-1 digital camera.

254

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### 7.   U.S. Patent No. 6,104,430 ("Fukuoka") + U.S. Patent No. 5,796,428 ("Matsumoto") + Windows 95 (Exhibit 7)

#### a)   Claim 25: "A digital camera"

481.   As discussed above in Section V.H.3 (Fukuoka + Matsumoto + PhotoFlash), Fukuoka discloses a digital camera that can record both still and moving images, and therefore meets this limitation.

482.   I understand that Samsung does not dispute that Fukuoka discloses a "digital camera" but contends that the disclosed digital camera is not capable of recording video. *See* Samsung's Supp. Response to Interrogatory no. 38, May 13, 2013, at 128-129.  I disagree for the same reasons discussed above in Section V.H.3 (Fukuoka + Matsumoto + PhotoFlash).

#### b)   "a lens"

483.   As discussed above in Section V.H.3 (Fukuoka + Matsumoto + PhotoFlash), Fukuoka discloses a digital camera that includes a lens, and therefore meets this limitation.

484.   I understand that Samsung does not dispute that Fukuoka discloses "a lens."

#### c)   "an imaging device which converts an optical image into an analog signal"

485.   As discussed above in Section V.H.3 (Fukuoka + Matsumoto + PhotoFlash), Fukuoka discloses a digital camera with a CCD or CMOS image sensor that converts optical images—*i.e.*, light—into an analog signal, and therefore meets this limitation.

486.   I understand that Samsung does not dispute that Fukuoka discloses "an imaging device which converts an optical image into an analog signal."

#### d)   "an A/D converter which converts said analog signal from said imaging device to a digital signal"

487.   As discussed above in Section V.H.3 (Fukuoka + Matsumoto + PhotoFlash), Fukuoka discloses a digital camera that includes an analog-to-digital converter that converts the

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

analog signals received from the separate CCD image sensor into digital signals, and therefore meets this limitation.

488.   I understand that Samsung does not dispute that Fukuoka discloses "an A/D converter which converts said analog signal from said imaging device to a digital signal."

e)   **"a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals"**

489.   As discussed above in Section V.H.3 (Fukuoka + Matsumoto + PhotoFlash), Fukuoka discloses or renders obvious a digital camera that includes "a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals."

490.   I understand that Samsung contends that Fukuoka does not "disclose a compressor that implements two methods and uses a different method for images or video." *See* Samsung's Supp. Response to Interrogatory No. 38, May 13, 2013, at 134.  I disagree for the same reasons discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple PhotoFlash)

f)   **"a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal"**

491.   As discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple PhotoFlash), Fukuoka discloses or renders obvious a digital camera with "a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal."

492.   I understand that Samsung contends that the digital camera of Fukuoka does not disclose the claimed "recording circuit" because it "does not disclose a digital camera capable of capturing both still images and video." *See* Samsung's Supp. Response to Interrogatory No. 38,

256

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

May 13, 2013, at 134.  I disagree for the reasons discussed above in Section V.H.3 (Fukuoka +

Matsumoto + Apple PhotoFlash).

> **g)** **"a decompressor which decompresses said compressed data by using a different decompressing method according to whether said recorded compressed data is a moving image signal or a still image signal"**

493.    As discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple

PhotoFlash), Fukuoka discloses or renders obvious a digital camera with "a decompressor which

decompresses said compressed data by using a different decompressing method according to

whether said recorded compressed data is a moving image signal or a still image signal."

494.    I understand that Samsung contends that the digital camera of Fukuoka does not

disclose the claimed "decompressor" because it "does not disclose a digital camera capable of

capturing both still images and video" and therefore "does not disclose a decompressor which

decompresses images or video using different methods."  *See* Samsung's Supp. Response to

Interrogatory No. 38, May 13, 2013, at 135.  I disagree for the same reasons discussed above in

Section V.H.3 (Fukuoka + Matsumoto + Apple PhotoFlash).

> **h)** **"a reproducing circuit which reproduces a moving image signal, a sound signal synchronous to said moving image signal, and a still image signal"**

495.    As discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple

PhotoFlash), Fukuoka discloses or renders obvious a digital camera "a reproducing circuit which

reproduces a moving image signal, a sound signal synchronous to said moving image signal, and

a still image signal."

496.    I understand that Samsung does not dispute that Fukuoka meets this claim

limitation.  *See* Samsung's Supp. Response to Interrogatory No. 38, May 13, at 128-131.

257

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

i) **"a display which displays said moving image signals and still image signals outputted from said reproducing circuit"**

497.   As discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple PhotoFlash), Fukuoka discloses or renders obvious a digital camera that includes "a display which displays said moving image signals and still image signals outputted from said reproducing circuit."

498.   Further, as also discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple PhotoFlash), Matsumoto[10] similarly describes a digital camera with an optionally detachable display.

499.   I understand that Samsung contends that Fukuoka and Matsumoto do not include the claimed "display" because they disclose a digital camera with an "external, optional" display that may be detached from the body of the camera.  I disagree for the same reasons discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple PhotoFlash).

---

[10]   In its Supplemental Response to Interrogatory No. 38, Samsung contends (with respect to the Casio QV-10 + PhotoFlash in view of Ricoh RDC-1 and U.S. Patent No. 5, 633,678 + Apple PhotoFlash in view of Ricoh RDC-1 combinations) that PhotoFlash does not meet the "display which displays said moving image signals and still image signals" limitation because it purportedly "fails to disclose support for videos."  *See* Samsung's Response to Interrogatory No. 38, July 15, 2013, at 54-55, 58.  Samsung did not assert argument with respect to the Fukuoka + Matsumoto + Windows 95 combination.  In the event that Samsung is permitted to present this additional theory as to why the Fukuoka + Matsumoto + Windows 95 combination does not meet the "display" limitation, I disagree.  It would have been obvious to use the software described in Matsumoto with moving images in addition to still images.  Indeed, it was well-known that any number of file types could be organized into various files or folders.  *See, e.g.*, The Way Windows 95 Works, 1995, at MSFT-00630-011299; *see also* Windows 95 User's Manual [APL630DEF-WH0000027571] at APL630DEF-WH0000027611.  It would have been trivial to allow other file types, such as moving images (which are simply a series of still images), to be organized using the software disclosed in Matsumoto.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**j)** **"a list of said moving image signal and still image signal as a search mode"**

500.    As discussed below in Section V.J (Invalidity for Lack of Written Description), this limitation lacks adequate written description support.  Under Samsung's apparent construction of the limitation "a list of said moving image signal and still image signal as a search mode" as set forth in its infringement contentions, and as discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple PhotoFlash), Matsumoto discloses this limitation.

501.    Microsoft's Windows 95 software could similarly display still and moving images and other files in a "list" view:



The Way Windows 95 Works, 1995 [MSFT-00630-011242] at MSFT-00630-011269.

502.    In addition, Windows 95 provided advanced search capabilities for locating a variety of files or folders:

259

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

# Finding Something on Your Computer

If you don't know where a document or folder is, you can use the Find command to find and open it.

## To find something





◄ 1 Click the Start button, and then point to Find.

◄ 2 Click Files Or Folders.

**TIP**
**You can also use the Find command to search for a computer on the network.**

▼ 3 Click the Named box, and then type the name of the file or folder you want to find.



▶ 4 To specify where to search, click the arrow next to the Look In box, or click Browse.

▶ 5 To start the search, click Find Now.

Microsoft Windows 95 User's Manual, 1995 [APL630DEF-WH0000027571] at APL630DEF-WH0000027603.

260

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



*See, e.g.*, The Way Windows 95 Works, 1995 [MSFT-00630-011242] at MSFT-00630-011347-11348.

503.    Further, as explained below in Section V.J (Invalidity Based on Lack of Written Description), in the event that the Court interprets the term "search mode" consistently with the way in which a person of ordinary skill in the art understands the term "search" (*e.g.*, the ability to specify some sort of attribute to retrieve a subset of items possessing that attribute), this limitation is met by Microsoft Windows 95 as demonstrated above in Section V.G (Background of the Technology Relevant to the '449 Patent).

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**k)**     **"a list of classifications as a classification mode"**

504.     As discussed above in Section V.H.3  (Fukuoka + Matsumoto + Apple PhotoFlash), Matsumoto discloses a digital that displays "a list of classifications as a classification mode," and therefore meets this limitation.

505.     Windows 95 similarly used a folder-based structure that allowed users to easily organize and view their computers' contents, including images.  *See, e.g.*, Windows 95 User's Manual [APL630DEF-WH0000027571] at APL630DEF-WH0000027587 ("What's new in Windows 95? … Windows Explorer is a powerful way to browse through and manager your files, drives, and network connections."), APL630DEF-WH0000027611 ("Opening Windows Explorer gives you a view of your computer's contents as a hierarchy, or 'tree.'  You can easily see the contents of each drive and folder on your computer. . . .").

506.     Using Windows 95's folder structure, users could organize still and moving image files into folders, just as they had done with photo albums and video cassettes a decade earlier:




### Viewing the Contents of a Folder

1   At the moment the right-hand pane displays the contents of your hard disk — folders as well as some "loose" files. This is indicated in the title bar as *Exploring - [C:]*. To view the contents of another folder, you click on the folder icon next to its name in the left-hand pane. Click on the icon for the **Windows** folder.

2   The right-hand pane now displays all the subfolders and files contained in the **Windows** folder. The title bar now reads *Exploring – Windows*. To look through the list of files, drag the scroll box within the scroll bar in the right-hand pane.





**CONTAINS INFORMATION DESIGNATED AS**
**THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

*See, e.g.*, The Way Windows 95 Works, 1995 [MSFT-00630-011242] at MSFT-00630-011299-300; *see also* Windows 95 User's Manual [APL630DEF-WH0000027571] at APL630DEF-WH0000027611.



Windows 95 Screenshots at APL630DEF-WH-A0000038997.  In the screen shot above, the folder called "Images" has sub-folders labeled "Cat," "Nature," "Space," and "Vacation." Clicking on the folder labeled "Cat" shows the contents of that sub-folder:

264

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**



Windows 95 Screenshot at APL630DEF-WH-A0000036846; *see also id.* at 36847.  The "Cat" sub-folder includes three objects, including a .png image, a .jpg image of cats getting married, and a video file.  The other folders similarly can contain photo and video files organized by subject matter.  *See, e.g.*, Windows 95 Screenshots at APL630DEF-WH-A0000039011-39012, 39200.

> **l)**    **"wherein said recording circuit records each one of said plurality of image signals with classification data"**

507.    As discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple PhotoFlash), Matsumoto discloses a digital camera that records images "with classification data," including the time and date the image was recorded, the location where the image was recorded, and the classification for the album to which the image will be assigned, and therefore meets this limitation.

508.    I understand that Samsung does not contest that Matsumoto meets this limitation.

**CONTAINS INFORMATION DESIGNATED AS**
**THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

m) **"said display lists a plurality of classifications and a number of images belonging to each classification"**

509.   It would have been obvious to modify Matsumoto in light of the prior art to display a number of images belonging to each album.  For example, the software could be modified such that the number of images in each album on the book shelf screen of Figure 5 is displayed next to the title of each album.  Similarly, the screen showing the thumbnail images within an album could be modified to display the number of images in that album.

510.   Microsoft's Windows 95 software confirms that a person of ordinary skill would have known that the software of Matsumoto could be modified to display the number of images in an album.  As shown below, software algorithms for determining and displaying the number of files within a particular folder were well-known prior to the alleged '449 invention:



**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**



Windows 95 Screenshots at APL630DEF-WH-A0000039011-39012 (annotations added); *see also id.* at 36846-36847, 39200; Windows 95 User's Manual [APL630DEF-WH0000027571] at APL630DEF-WH0000027611, APL630DEF-WH0000027627.

511.     Thus, it would have been obvious to a person of ordinary skill in the art to modify the displays of the digital camera described by Matsumoto to similarly include an algorithm for counting the number of images in each folder and displaying that number on the book-shelf and album screens. *See also* Section V.G (Background of the Technology Relevant to the '449 Patent) above (describing other examples of software for counting an displaying the number of images in an album or folder, including ArcSoft's PhotoStudio and Apple's PhotoFlash).

512.     I understand that Samsung contends that "[o]ne of ordinary skill would not have combined the teachings of Fukuoka, Matsumoto and Windows 95" because "Windows 95 is a personal computer operating system unrelated unsuitable [sic] for a digital camera [and] does not teach or suggest how to incorporate the functionality of the software into a digital camera supporting audio, video, still images and classifications as claimed." *See* Samsung's Supp.

267

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Response to Interrogatory No. 38, May 13, 2013, at 133-134.  I disagree.  The algorithm for counting and displaying the number of files—whether they are still images, videos, or otherwise—is simple, and it would have been relatively easy for a person of ordinary skill in the art to write.  Further, a person of ordinary skill in the art would have been motivated to modify Matsumoto in this manner to provide users with the convenience of knowing how many images are in a particular folder, which allows the user to gauge how difficult it might be to find a particular image within the folder.

> **n)** **Claim 27: "A digital camera according to claim 25, wherein said classification is able to change by a direction of a user"**

513.   As discussed above in Section V.H.3 (Fukuoka + Matsumoto + Apple PhotoFlash), Matsumoto discloses a digital camera that allows users to assign classifications to images, and "wherein said classification is able to change by a direction of a user."

514.   Microsoft's Windows 95 also allows classifications to change at the direction of a user.  For example, Windows 95 allowed users to move any type of file, including still and moving image files, from one folder to another, thereby changing the file's classification, in three steps:

268

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION









The Way Windows 95 Works, 1995 [MSFT-00630-011242] at MSFT-00630-011301; *see also id.* at MSFT-00630-011301- MSFT-00630-011302.





Windows 95 User's Manual [APL630DEF-WH0000027571] at APL630DEF-WH0000027613.

269

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



Windows 95 User's Manual [APL630DEF-WH0000027571] at APL630DEF-WH0000027626.

### o)   Other Obviousness Considerations

515.   I understand that Samsung contends that a person of ordinary skill in the art would not have combined Fukuoka and Matsumoto because "Fukuoka is directed at an input/output interface to a camera which can be used to communicate with external equipment," and "Matsumoto is directed at a photography system which consists of a storage and display unit external to the camera. . . ." *See* Samsung's Supp. Response to Interrogatory No. 38, May 13, 2013, at 133-134.  I disagree.  A person of ordinary skill in the art would have combined the teachings of Fukuoka and Matsumoto for several reasons.

516.   First, both Fukuoka and Matsumoto are directed to the same type of device, namely, a digital camera with an optionally detachable LCD screen.  Both teach numerous common components and functionality, including lenses, CCD image sensors, compression and

270

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

expansion/decompression of images, and LCD screens for viewing stored images.  It would have been obvious to take the teachings of these two similar devices and combine their teachings in a single device.

517.     Second, a person of ordinary skill in the art would have been motivated to combine Fukuoka and Matsumoto to take advantage of the photo organization software included on the digital camera disclosed in Matsumoto and the hardware components of the digital camera disclosed in Fukuoka, including the ability to record still and moving images, and to compress those files using JPEG and MPEG, respectively.  Further, as explained above, a person of ordinary skill in the art would have been motivated to apply the algorithm for counting and displaying the number of images in a particular album as taught by Microsoft's Windows 95 to the photo organization software of the digital camera disclosed by Matsumoto to provide users with information regarding the number of files in a particular album.

518.     I further understand that Samsung contends that "[o]ne of ordinary skill would not have combined the teachings of Fukuoka, Matsumoto and Windows 95" because "Windows 95 is a personal computer operating system unrelated unsuitable [sic] for a digital camera [and] does not teach or suggest how to incorporate the functionality of the software into a digital camera supporting audio, video, still images and classifications as claimed."  *See* Samsung's Supp. Response to Interrogatory No. 38, May 13, 2013, at 133-134.  I disagree for the same reasons set forth above in connection with the "number of images" limitation.

## I.     Secondary Considerations Of Non-Obviousness

519.     As set forth above, it is my opinion that the asserted claims are invalid as obvious. Further, the asserted claims are not nonobvious because of secondary considerations of nonobviousness.

271

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

1994 [APLNDC630-0000117688] at APLNDC630-117696; Apple QuickTake 150 User's Guide for Macintosh [APL630DEF-WH0000007069]; MacWorld, Aug. 1995 [APLNDC630-0000207071] at APLNDC630-207238, 207243; MacWorld, Dec. 1995 [APLNDC630-0000210019] at APLNDC630-210162, 210287), and has continued to be a leader and innovator in digital camera component technology as demonstrated by the success of the accused products.

### 5.    No Unexpected Results

531.    Samsung neither alleges nor cites any evidence that the alleged '449 invention yielded any unexpected results.  Indeed, the hardware components recited in the claimed digital camera behave exactly as those components were designed.  Each of the hardware components was well-known, as were the various compression and decompression standards.  These components and standard compression methods worked exactly as intended.  Further, the software for classifying and manipulating images worked exactly as well-known photo organization software, including Apple's PhotoFlash was intended.  Thus, there was nothing unexpected about the operation or results of the alleged '449 invention.

### J.    Invalidity Based On Lack Of Written Description

532.    Asserted claims 25 and 27 of the '449 patent are invalid for a lack of written description because the term "search mode" is unsupported by the specification.

533.    Neither the term "search" nor the phrase "search mode" appears anywhere in the specification of the '449 patent.  Although the application for the '449 patent was filed April 17, 1997, it wasn't until September 10, 1999 that the word "search" appeared in the claims.  The applicants amended the term "display" to "search display" in application claim 43, which issued as asserted claim 25:

276

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

43.  An image recording and reproducing apparatus comprising:

a recording circuit which records a moving image signal, and a still image signal;

a reproducing circuit which reproduces a moving image signal, a sound signal in synchronous to said moving image signal, and a still image signal;

a <u>search</u> display which displays <u>a screen indicating the classification of a plurality of image signals, said image signals including</u> said moving image signal and still image signal [outputted from said reproducing circuit];

wherein said recording circuit records <u>each one of said plurality of</u> image signals with classification data, and said <u>screen</u> displayed by said search display <u>lists a</u> plurality of classifications and a number of images belonging to each classification.

'449 File History, Amend., Sept. 10, 1999, at 3.

534.   In response to an Office Action rejecting the claims as obvious over Cruz and other prior art, the applicants conceded that Cruz "discuss[ed] a search **process**," although not in the "list" format required by the claims.  *See* '449 File History, Amend., July 31, 2000, at 18; *see also id*. at 17 ("In particular, the display and searching method in Cruz is for a multimedia recording session and it is inappropriate for use on the display of a single digital camera.").  To further distinguish the "search process" of Cruz, the applicants again amended the claim:  instead of a "search display," the amended claim recited "a display which displays … said moving image signal and still image signal as a search **mode**":

277

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

25 45.    A[n image recording and reproducing apparatus] digital camera comprising:

a lens,

an imaging device which converts an optical image into an analog signal;

an A/D converter which converts said analog signal from said imaging device to a digital signal;

a compressor which compresses said digital signal outputted from said A/D converter, and generates compressed data by using a different compressing method for moving image signals and for still image signals;

a recording circuit which records compressed data, said compressed data including a moving image signal, and a still image signal;

a decompressor which decompresses said compressed data by using a different decompressing method according to whether said recorded compressed data is a moving image signal or a still image signal;

a reproducing circuit which reproduces a moving image signal, a sound signal in synchronous to said moving image signal, and a still image signal; and

a [search] display which displays [a screen indicating the classification of a plurality of image signals] said moving image signals and still image signals outputted from said reproducing circuit, and a list of [, said image signals including] said moving image signal and still image signal as a search mode, and a list of classifications as a classification mode;

wherein said recording circuit records each one of said plurality of image signals with classification data, and

said screen displayed by search display lists a plurality of classifications and a number of images belonging to each classification.

*See* '449 File History, Amend., July 31, 2000, at 10-11

278

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

535.     This new claim language was never described and, as mentioned above, does not appear anywhere in the specification of the '449 patent.

536.     Although contemporaneous extrinsic evidence informs what it means to "search" in the context of photo organization software, the '449 patent provides no written description support for the claimed "search mode."

537.     To a person of ordinary skill in the art, "search" typically implies the ability to specify some sort of attribute to retrieve a subset of items possessing that attribute.[11]  For example, Apple's PhotoFlash used the term "search" to refer to a mode where the user could input caption text, a file name, or other image attributes, and the software would return images matching the input by the user:

## Searching for images

You can use commands in the Search menu to search for images in one catalog or in all of your open catalogs by name, by caption text, or by resemblance to other images or a rough sketch.

## Searching for images by caption text

To search for images by caption text, make sure the catalogs you want to search are open, then follow these steps:

1   Choose Caption Text from the Search menu.

---

[11]     To the extent that the Court interprets the term "search mode" consistently with the discussion in this section, but nevertheless finds that it is supported by the written description, the "search mode" limitation would be met by the prior art as specified in the obviousness combinations above for the "list of said moving image signal and still image signal as a search mode" limitation, and as further specified in the "search" section in the discussion of the Background of the Technology Relevant to the '449 Patent.

279

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

The Search Caption Text dialog box appears.



Type the text you want to find here.

Click here to request a search of all open catalogs.

Click here to request a new catalog that contains copies of the matching thumbnails.

**2**   Type the text you want to find.

Capitalization and diacritical marks don't matter. PhotoFlash looks for images with captions that include the text you specify.

**3**   Select the search options you want.

The default settings cause PhotoFlash to search only one catalog and to highlight the selected images in that catalog.

**4**   Click OK or press Return.

When the search is complete, PhotoFlash selects the matching thumbnails in their original catalogs or, if you selected the Put Results in New Catalog checkbox, creates a new untitled catalog containing copies of all matching thumbnails.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

## Searching for images by filename

To search for images by filename, make sure the catalogs you want to search are open, then follow these steps:

**1** Choose Filenames from the Search menu.

The Search Filenames dialog box appears.



Type the filename you want to find here.

Click here to request a search of all open catalogs.

Click here to request a new catalog that contains copies of the matching thumbnails.

**2** Type the filename or a portion of the filename you want to find.

Capitalization and diacritical marks don't matter. PhotoFlash looks for images with filenames that include the text you specify.

**3** Select the search options you want.

The default settings cause PhotoFlash to search only one catalog and to highlight the selected images in that catalog.

**4** Click OK or press Return.

When the search is complete, PhotoFlash selects the matching thumbnails in their original catalogs or, if you selected the Put Results in New Catalog checkbox, creates a new untitled catalog containing copies of all matching thumbnails.

## Searching for similar images

You can use the Similar Images command in the Search menu to search for catalog images that resemble a specific image. The Similar Images command can identify general similarities based on color, but may not always be able to locate an individual image. However, it's worth trying if you don't know anything about the image's caption or filename. It's also useful if you want to identify several images with similar colors or compositions.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Apple PhotoFlash User's Manual, 1994 [APL630DEF-WH00000008151] at APL630DEF-WH0000008178-8184; *see also id*. (searching for images that resemble a sketch).



Apple PhotoFlash Screenshot at APL630DEF-WH-A0000015615.



Apple PhotoFlash Screenshot at APL630DEF-WH-A0000015616.

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**



Apple PhotoFlash Screenshot at APL630DEF-WH-A0000015617.



Apple PhotoFlash Screenshot at APL630DEF-WH-A0000015621.

283

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

538.     ArcSoft's PhotoStudio similarly used the term "search" to describe a mode of

operation in which a user could retrieve a subset of images by specifying desired attributes:



**Adding Keywords to Images**
In addition to traditional sorting and searching by name, date and file type, the
PhotoStudio Browser offers keyword capabilities similar to those found in professional
image databases. To take full advantage of its keyword capabilities, you should try to put
the same type of information in the same text field for each image.
  For example:
  **1st Field:** Name of photographer or publisher
  **2nd Field:** Date
  **3rd Field:** Potential uses (newsletters, ads, brochures, etc.)
  **4th Field:** Particular information (copyrights, image formats, etc.)

**Search by Example:**
To find an image, click on the PhotoStudio Browser's magnifier icon to display the
following dialog:

*Figure 2.6*

Enter your criteria, then click on Find. At the end of its search, the PhotoStudio Browser
will tell you how many images were found, and display them at the top of the file.

Ricoh PhotoStudio Version 2.0, 1996, Rev. 4/97 [APL630DEF-WH-A0000014950] at

APL630DEF-WH-A0000014968.

539.     Microsoft's Windows 95 also used the term "search" to refer to a mode of

operation whereby the user could specify file attributes for the software to retrieve from among

the files on the system:

284

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

# Finding Something on Your Computer

If you don't know where a document or folder is, you can use the Find command to find and open it.

## To find something



◄ **1** Click the Start button, and then point to Find.

◄ **2** Click Files Or Folders.



**TIP**
You can also use the Find command to search for a computer on the network.

▼ **3** Click the Named box, and then type the name of the file or folder you want to find.



▶ **4** To specify where to search, click the arrow next to the Look In box, or click Browse.

▶ **5** To start the search, click Find Now.

Microsoft Windows 95 User's Manual, 1995 [APL630DEF-WH0000027571] at APL630DEF-WH0000027603.

285

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



The Way Windows 95 Works, 1995 [MSFT-00630-011242] at MSFT-00630-011347-11348.

540.    Finally, as of the time of the alleged '449 invention, numerous patents similarly described advanced software algorithms for searching for particular images or videos. *See, e.g.*,

286

**CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

U.S. Patent No. 5,802,361 to Wang (filed Sept. 30, 1994) at 1:7-10, 2:18-32, 2:33-41, 2:59-63, 4:42-46, 4:63-5:10, 8:5-8, 25:3-15, Fig. 2a.

541.    The '449 patent neither describes nor supports the "search" functionality embodied in the prior art discussed above.

542.    Samsung identifies, among other things, Figures 5-9 and 16 of the '449 patent as written description support for "search mode."  *See* Samsung's Response to Interrogatory No. 37, June 21, 2013, at 7.  But none of these figures, nor the cited portions of the specification, describes anything more than a display showing a collection of files without regard to how a user may retrieve particular files based on desired attributes.

543.    Samsung also points to the English translation of Japanese Patent Application Publication No. 08-095498 (to which the '449 patent claims priority), but it too fails to recite "search" or "search mode" and similarly fails to provide adequate written description support.

544.    Accordingly, it is my opinion that claims 25 and 27 are invalid for failure to satisfy the written description requirement.

**K.    Conclusion**

545.    For the reasons described above and in the attached claim charts, it is my opinion that claims 25 and 27 of the '449 patent are invalid as obvious over the prior art and that claims 25 and 27 are invalid for lack of written description.

287

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### F.    Claim Constructions Used in This Expert Report

655.    I have been informed and understand that the Court has construed two claim terms of the asserted claims of the '239 patent.  I also understand that I am to apply those claim terms in my analysis.

656.    I understand that the Court construed the term "means for capturing, digitizing, and compressing at least one composite signal" as "an audio capture card, and a video card having a capture module."

657.    I understand that the Court construed the term "means for transmitting the composite signal" as "one or more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file."

658.    I understand that the two claim terms discussed above are the only claim terms construed by the Court for the '239 patent.   The asserted claims contain six other means plus function terms that have not yet been construed.

659.    For purposes of my analysis in this report, I have applied what I believe one of ordinary skill in the art would understand to be the claimed function and disclosed structure for carrying out the claimed function of each of the unconstrued means plus function terms.  I understand that means plus function claim terms must be construed to cover the structure disclosed in the specification that carry out the claimed function and equivalents.

660.    Based on the positions taken by Samsung in its infringement contentions and elsewhere, it appears that Samsung is applying a different understanding of the unconstrued means plus function terms than I have.  Accordingly, where there are differences, I have

334

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

attempted to note those differences, and (where possible) analyze the patent claims under both my understanding of the claims and Samsung's apparent understanding.

661.    I understand that ultimately the question of claim construction is one for the Court to decide.  To the extent that the Court issues a claim construction that varies with the constructions I have used in this report, I reserve the right to modify, amend, and supplement my analysis as appropriate.

662.    Apple's constructions of the non-construed means-plus-function claim terms at issue are listed below.  As set forth below, I agree with those constructions.

663.    Claim 1 of the '239 patent recites "means for storing said composite signal."  It is my opinion that the function in this limitation is "storing said composite signal." I have reviewed the specification, and it is my opinion that the structure disclosed in the specification for performing the claimed function is a hard disk drive and the software identified at 3:1-5, 4:52-57, and 6:14-16.

664.    My construction is supported by the claims, the specification (*see* '239 patent at 3:1-5, 4:19, 4:52-57, 5:46-48, 6:14-16, 6:27-30, 8:23-25), the file history (*see* '239 File History, 7/2/95 Amend. [SAMNDCA630-00832500] at SAMNDCA630-00832606; 4/28/96 Amend. [SAMNDCA630-00832500] at SAMNDCA630-00832640), and extrinsic evidence such as the inventors' statements about their invention (Plaintiffs' 9/21/95 Summary Judgment Brief [APL630DEF-WH-A0000004704] at APL630DEF-WH-A0000004713; Plaintiffs' Proposed Findings of Fact and Conclusions of Law [APL630DEF-WH-A0000004734] at APL630DEF-WH-A0000004736).  For example, the '239 patent specification states: "Once digitized and compressed, the data file is captured in the computer's memory by a capture module on the video

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

capture card.  A software sequence then instructs the computer central processing unit to store the captured data file on the computer's hard disk drive."  '239 patent at 3:1-5.

665.    Claim 1 of the '239 patent also recites "means for receiving at least one composite signal transmitted by the remote unit."  It is my opinion that the function in this limitation is "receiving at least one composite signal transmitted by the remote unit," and the structure disclosed in the specification that performs the claimed function is one or more modems corresponding to the number of modems used in the remote unit and connected to one or more cellular telephones, telephone lines, and/or radio transmitters and File Reception Software Sequence E as described in the'239 patent at 10:33-61, 11:18-12:8.

666.    My construction is supported by the claims, the specification (*see* '239 patent at 2:52-55, 3:26-30, 8:23-34; 10:27-52, 11:11-61), the file history, and extrinsic evidence such as the inventors' statements about their invention (Plaintiffs' 9/21/95 Summary Judgment Brief [APL630DEF-WH-A0000004704] at APL630DEF-WH-A0000004713; Plaintiffs' Proposed Findings of Fact and Conclusions of Law [APL630DEF-WH-A0000004734] at APL630DEF-WH-A0000004736).  For example, the '239 patent specification states: "File reception software sequence S automates each telephone line end modem of host unit 3 to obtain communication with each cellular telephone of remote unit 2 and receive the transmitted data file in 10K files and recombine the data file for storage on the hard disk drive of playback unit 4."  '239 patent at 11:18-24.

667.    Claim 1 of the '239 patent recites "means for exchanging data with said host unit."  It is my opinion that the function in this limitation is "exchanging data with said host unit," and the structure disclosed in the '239 patent specification for performing the function is a

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

16-bit Ethernet card, Novell Netware Lite software, and Host Boot Software Sequence D identified at 10:62-11:24.

668.   My construction is supported by the claims, the specification (*see* '239 patent at 3:35-41, 10:52-11:24), the file history, and extrinsic evidence such as the inventors' statements about their invention (Plaintiffs' 9/21/95 Summary Judgment Brief [APL630DEF-WH-A0000004704] at APL630DEF-WH-A0000004713; Plaintiffs' Proposed Findings of Fact and Conclusions of Law [APL630DEF-WH-A0000004734] at APL630DEF-WH-A0000004736). For example, the '239 patent specification states: "Data files received from remote unit 2 are stored on hard disk drive of playback unit 4. Host unit 3 and playback unit 4 are networked together. A pier-to-pier [sic] network, such as 'Novell LiteTM' by Novell® is particularly suitable for this purpose." '239 patent at 10:55-59.

669.   Claim 1 of the '239 patent recites "means for storing the composite signal received by the host unit." It is my opinion that the function in this limitation is "storing the composite signal received by the host unit," and the structure disclosed in the '239 patent specification for performing the function is a hard disk drive.

670.   This construction is supported by the claims, the specification (*see* '239 patent at 11:65-66, 3:35-36, 3:43-46, 10:55-57, 11:19-24, 12:15-34, 12:47-51), the file history, and extrinsic evidence such as the inventors' statements about their invention (Plaintiffs' 9/21/95 Summary Judgment Brief [APL630DEF-WH-A0000004704] at APL630DEF-WH-A0000004713; Plaintiffs' Proposed Findings of Fact and Conclusions of Law [APL630DEF-WH-A0000004734] at APL630DEF-WH-A0000004736). For example, the '239 patent specification states: "The F: drive is a subdirectory of the hard disk drive of playback unit 4 for storage of data files." '239 patent at 12:49-51.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

671.    Claim 1 of the '239 patent recites "means for decompressing said composite signal."  It is my opinion that the function in this limitation is "decompressing said composite signal," and the structure disclosed in the specification for performing the claimed function is a video decompression card and an audio decompression card.

672.    The construction above is supported by the claims, the '239 patent specification (*see* '239 patent at 3:49-54, 12:3-4, 12:37-42), the file history, and extrinsic evidence.  For example, the '239 patent specification describes the playback unit as containing a "video decompression card" and "audio decompression card."  '239 patent at 12:3-4.

673.    Claim 15 of the '239 patent recites "means for transmission of said captured video over a cellular frequency."  It is my opinion that the claimed function in this limitation is "transmission of said captured video over a cellular frequency," and the structure disclosed in the '239 patent specification for performing the function is one or more modems connected to one or more cellular telephones, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file.

674.    The construction above is supported by the claims, the specification (*see* '239 patent at 6:50-61, 9:25-65), the file history, and extrinsic evidence such as the inventors' statements about their invention (Plaintiffs' Summary Judgment Brief [APL630DEF-WH-A0000004704] at APL630DEF-WH-A0000004713; Plaintiffs' Proposed Findings of Fact and Conclusions of Law [APL630DEF-WH-A0000004734] at APL630DEF-WH-A0000004736).  For example, the '239 patent specification states: "The remote unit also has up to four computer interfaces such as modems, each connected to a cellular telephone."  '239 patent at 4:25-27.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### G.     Prior Art Renders the Asserted Claims of the '239 Patent Obvious

675.     In Section VI.D above, I provided a general background description of the state of the art at the time of the alleged invention disclosed in the '239 patent, as it would have been known to a person of ordinary skill in the art.

676.     The alleged invention of the '239 patent is directed to an apparatus for capturing, digitizing, compressing, storing, and transmitting video.  This alleged invention would have been obvious for several reasons.

677.     First, the alleged invention consists of nothing more than the combination of well-known, commercially available components.  The patent does not suggest that the named inventors invented any of the components or any functions performed by those components.  The '239 patent also does not describe any modifications to these known components, nor are the claims directed to any unexpected feature created by the combination of these components by the inventors.  Moreover, the claims and specification do not describe any improvements the inventors allegedly made to these known components.  In fact, the claims do not even contain any specific information, such video capture speed, transmission rate, file sizes, compression formats or methods, or video resolution.  The only structures described in the specification and that correspond to the many means plus function limitations are known components.

678.     Second, all the components were used by the named inventors in the manner for which they were intended.  For example, a video card having a video capture module, like those described in Section VI.D, was used exactly in the manner described in the marketing materials in the inventors files:  to capture, digitize, and compress a composite signal.  Similarly, the hard disk drive disclosed in the '239 patent was used to store video data files captured by the video capture cards and audio capture cards, which is how such drives were designed to be used.  The

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

same is true for the modems connected to cellular telephones or telephone lines: these were known components used to transmit files of all descriptions. Even the "real time" capture and compression feature of claim 15 that the inventors touted during prosecution of the patent application was not invented by the named inventors. Rather, "real time" capture and compression was a feature incorporated into the commercially available video capture cards. *See, e.g.*, ActionMedia II Delivery Board Product Brief [SAMNDCA630-00830181] at SAMNDCA630-00830182; Intel RT Video Developer's Kit [SAMNDCA630-00831193].

679.     Finally, many methods and means for transmitting video and other data were known to persons of ordinary skill in the art at the time of the alleged invention. As shown above, data could be transmitted over fiber optic lines, Ethernet, telephone lines, cellular frequencies, satellite frequencies, and microwave frequencies. In fact, the named inventors argued to the examiner that any means of transmission could be used to transmit video with their invention, thus acknowledging that merely substituting a cellular telephone could not have been an inventive feature. *See* '239 File History, 2/2/96 Amend. [SAMNDCA630-00832596] at 7 ("Telemetric frequencies, as used in the present application, includes any frequency over which a composite signal can be transmitted."). Moreover, the '239 patent states that transmission of computer files using cellular technology was known in the art. '239 patent at 2:6-11. There is nothing special about transmitting a file containing a video, nor does the patent describe a video file as unique in any way, other than size. The alleged invention addressed the size issue by splitting the file into multiple 10K files, but that feature is neither novel nor present in the asserted claims.

680.     Video transmission using cellular modems was not novel at the time of the alleged '239 invention. A person of ordinary skill in the art, when seeking methods of

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

transmitting data from remote locations, would have known about cellular telephones and modems and that they can be used to transmit any type of data.  The patent does not describe any barriers to transmitting video that were unique to cellular frequencies, nor does it describe anything the named inventors of the '239 patent did to overcome any such barriers.  In fact, other than that they can be used in remote locations and that an additional antennas can be used to improve transmission quality (which is not claimed), the patent never mentions a single feature of cellular telephones, much less how they worked.  *See, e.g.*, '239 patent at claim 3 ("the composite signal is transmitted over telephone lines, cellular, radio or other telemetric frequencies").  Nothing in the patent suggests that there was anything new or unique about using cellular frequencies to transmit video, and as discussed in more detail below, that use was not new or unique.

1.    **U.S. Patent No. 4,963,995 to Lang in View of the Knowledge of a Person of Ordinary Skill in the Art or in Combination with U.S. Patent No. 4,825,457 to Lebowitz Renders Obvious Claims 1, 7, and 15 of the '239 Patent**

681.    As detailed in the claim chart attached as Exhibit 8 and below, it is my opinion that the Lang '995 patent  renders obvious the asserted claims 1, 7, and 15 of the '239 patent in light of the knowledge of a person of ordinary skill in the art.

682.    In addition, as detailed in the claim chart attached as Exhibit 9 and below, it is my opinion that the Lang '995 patent in combination with the Lebowitz '457 patent  renders obvious the asserted claims 1, 7, and 15 of the '239 patent.

a)    **"An apparatus for transmission of data" (claim 1)**

683.    To the extent that "[a]n apparatus for transmission of data" is a limitation of claim 1, the Lang '995 patent discloses that limitation.  For example, the Lang '995 patent discloses "[a]n improved video recorder/transmitter with expanded functionality including a capability for

341

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

editing and/or copying from one video tape to another using only a single tape deck. . . .  The

recorder/transmitter has capabilities to transmit and receive program information in either a

compressed or decompressed format over fiber optic lines."  Lang '995 patent at Abstract.  The

Lang '995 patent also discloses the "transmission and reception of a digitized audio/video

program over telephone lines or by other external digital means such as satellite transmission or

reception."  *Id.* at 2:48-51.

    684.    Figure 2 of the Lang '995 patent (reproduced below) depicts a high-level circuit

diagram of the digital transmission system:



*FIG. 2*

    685.    Specifically, Figure 2 depicts "fiber optic input/output port 18."  *Id.* at 8:3-4; *see

also id.* at 7:45-46 ("fiber optic port 18 incorporates a fiber optic transceiver/receiver").

According to the specification, the fiber optic port 18 "provides a capability for two-way

communication between high speed data bus 34 and a fiber optic signal line."  *Id.* at 7:49-51.

This port "provides a capability for receiving audio/video signals from or delivering audio/video

signal to the fiber optic line. . . ."  *Id.* at 7:52-55.   Other disclosures in the Lang '995 patent

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

illustrate the data transmission apparatus.  *See, e.g.*, *id.* at claims 60 and 78 ("audio/video transmitter/receiver means compresses a modem for coupling a telephone transmission line").

686.   I understand that Samsung contends that "the '995 patent does not disclose '[a]n apparatus for transmission of data' as disclosed in the '239 patent."  Samsung's Supplemental Responses to Apple's Fifth Set of Interrogatories (No. 38) ("Samsung's Validity Response") at 209.  I disagree.  First, Samsung provides no explanation or basis for this conclusory assertion. In any event, as discussed above and below, the Lang '995 patent discloses an apparatus for transmission of audio/video data over multiple media including fiber optic lines, telephone lines, and satellite.

### b)   "a mobile remote unit" (claim 1)

687.   The Lang '995 patent discloses "a mobile remote unit."  For example, the Lang '995 patent discloses a VCR-ET that "can be constructed so as to be portable."  Lang '995 patent at 10:50-51.  The VCR-ET "could be carried to a location along with a video camera where it is desired to record a program, and then taken to another location where it is used to edit the program."  *Id.* at 10:51-54.

688.   It is also evident from Figure 1 of the Lang '995 patent (reproduced below) that the disclosed unit is mobile and able to be carried from location to location.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



689.    I understand that Samsung contends that "[t]he '995 patent merely discloses a

unit; there is no disclosure of a unit that may be operated in a mobile remote fashion."

Samsung's Validity Response at 209.  It is unclear what Samsung means by "a unit that may be

operated in a mobile remote fashion," or how that is relevant to a determination of whether the

Lang '995 patent discloses a "mobile remote unit."

690.    To the extent Samsung argues that the Lang '995 patent does not disclose a

mobile unit because the term "mobile" connotes small size, I disagree that the term "mobile"

requires a small unit.  Nothing in the patent, including the claims, requires the apparatus to be of

any particular size.  In fact, the patent states that "remote unit 2 could be a desktop computer"

and could be used with telephone lines, which would have tethered it during operation.  '239

patent at 4:36-37, 9:33-37.  Moreover, as discussed above, the applicants added the term

"mobile" during prosecution and argued that the invention was distinguishable from Yurt, Gattis

and Palmer because "the remote unit could operate by battery or by a power source supplied by a

vehicle (direct current)."  '239 File History, 5/21/96 Amend. [SAMNDCA630-008326132] at 10.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Nothing in that argument suggests any limitation other than the ability to move the unit from one location to another, and the applicants did not argue that the mobile remote unit must be of any particular size.  Any desktop computer at the time of the alleged invention could have used a 12-volt adapter to plug into a motor vehicle.  *See, e.g.*, PVII-200 Brochure [SAMNDCA630-07218229] ("Highly portable '*take* anywhere' remote system gives you the flexibility of sending a news clip in from any distance as long as you have AC power and two telephone or cellular lines"); FoNet Quick Start Guide [SAMNDCA630-00832075] at SAMNDCA630-00832089 (using a 12-volt adapter to plug into the cigarette lighter); '239 patent at 9:55-57 ("an inverter could be installed in the vehicle to convert DC from its battery to AC to be used by the remote unit").  The named inventors' practicing product itself was the size of carry-on luggage and weighed twenty-eight pounds.  FirstLook Video Brochure [SAMNDCA630-00828677] at 1-2.

691.    In any event, it would have been obvious in view of the knowledge of a person of ordinary skill in the art to implement the data transmission components disclosed by the Lang '995 patent on a laptop computer.  A person of ordinary skill in the art would have been well aware of laptop computers, which were widely and commercially available at the time of the alleged invention of the '239 patent.  Laptops were smaller than desktop computers but had the same capabilities, and used batteries.  It would have been a trivial matter for a person of ordinary skill in the art to simply use a laptop computer to implement the VCR-ET (which is about the size of a VCR) of the Lang '995 patent.  The '239 patent itself describes the use of a commercially available "portable personal computer."  '239 patent at 4:17-25; *see also* '239 File History, 2/2/96 Affidavit [SAMNDCA630-00832590] at Ex. D (depicting a portable computer).

c)  **"means for capturing, digitizing, and compressing at least one composite signal" (claim 1)**

692.   The Court has identified the function of this limitation as "capturing, digitizing, and compressing at least one composite signal."  In addition, the Court has determined that the corresponding structure disclosed in the specification to carry out the recited function is "an audio capture card, and a video card having a video capture module."  As explained below, the Lang '995 patent discloses the functions and structure for "capturing, digitizing, and compressing at least one composite signal."

693.   The Lang '995 patent discloses the function of capturing a composite signal ─ ███

████████████████████████████████████████████████████████████

████████████████████████████████   *See* '239 patent at Abstract, Fig. 1, 1:21-23, 2:59-3:3, 4:7-12, 4:28-33; *see also id*. at 4:39-45, 4:62-63, 5:39-46, 6:9-13, 6:66-67; '239 File History, 2/2/96 Aff. Ex. A [SAMNDCA630-00832500] at SAMNDCA630-00832590.[13]   For example,

─────────────────────────────

[13] ████████████████████████████████████████████████████████████ Intel Smart Video Recorder Installation Guide [ZINGERMANNDCA630-00000149]; Intel Documentation [SAMNDCA630-00830181-92]; Ready For Action: Five Video-Capture Boards Bring Motion Video to Your PC (Feb. 1994) [APL630DEF-WH-A0000032339] at APL630DEF-WH-A0000032341; Multimedia PC (Feb. 1993) [APL630DEF-WH-A0000032199-201];  Microsoft Goes Hollywood with Video for Windows (Jan. 12, 1993) [APL630DEF-WH-A0000020896]; VideoLinx: NTSC Video Display and Capture Card [SAMNDCA630-00829683-84]; M&M Pro: Real-Time Video, Compression, VGA, and Audio [SAMNDCA630-00829773];Ventek Model VIP 630C Color Video Image Processor [SAMNDCA630-00829896-97]; SuperVIA: High Resolution Real Time Color Imaging [SAMNDCA630-00829903]; Intel ActionMedia II Products [SAMNDCA630-00831181; SAMNDCA630-00831182; SAMNDCA630-00831185-88; SAMNDCA630-00831190]; Pro Movie Spectrum Video Capture Card [SAMNDCA630-00831474 and 78]; Intel Smart Video Recorder Advertisement [SAMNDCA630-00831775]; QuickVia Digital Video Recorder [SAMNDCA630-00832131]; Intel Smart Video Recorder [SAMNDCA630-00832153-59]; FirstLook Video Brochure (1993) [SAMNDCA630-00828677-78]; FirstLook Video Brochure (1994) [SAMNDCA630-00828679-80]; MICROSOFT CORP., VIDEO FOR WINDOWS USER'S GUIDE (1992)  [APL630DEF-WH-A0000004783-940]; Pls.' Brief ISO Motion for Partial MSJ [APL630DEF-WH-A0000004704] at APL630DEF-WH-A0000004713; Pls.' Proposed Findings of Fact and Conclusions of Law ISO Motion for Preliminary Injunction

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

the Lang '995 patent uses a video line input in the VCR-ET to "receive" – or "capture" – "an input signal from a source such as a television camera, a conventional VCR, a television tuner, or another VCR." Lang '995 patent at 7:1-4.

694.    The video line input is "in the form of standard television composite signal," such as "NTSC, PAL, SECAM, HDTV, or any American or European broadcast signal standard[]." The Lang '995 patent at 7:4-11. The Lang '995 patent describes the composite signal as follows:

> An NTSC composite signal is defined as the analog signal that carries the chrominance (color), luminance (brightness), synchronization (timing) and audio signals that make up the video signals received an displayed by television and video cassette recorders. These four components are combined into one signal by modulating the components in different ways. (Amplitude modulation and phase modulation are examples.) The standard video line signal is such a composite signal and may be received at input line 15 from one of the above-mentioned sources.

*Id.* at 7:12-22.

695.    The Lang '995 patent also discloses the functions of digitizing and compressing the composite signal. For example, after capture, the VCU digitizes the composite signal. "As a first step," the VCU isolates picture frames by decoding the composite signal "sync signals." *Id.* at 4:28-31. "The video signals defining each frame may then be converted to a red analog signal, a green analog signal, and a blue analog signal in a conventional manner." *Id.* at 4:32-34. These signals are "then converted to digital form by the analog to digital converter (ADC) 24." *Id.* at 4:34-37. This frame is divided into pixels. *Id.* In this fashion, the capture and digitization steps are completed. *See generally id.* at 4:19-27 ("The VCU comprises an analog to digital converter (ADC) 24, a digital to analog converter (DAC) 25, a compressor/decompressor 26, a controller

---

[APL630DEF-WH-A0000004734] at APL630DEF-WH-A0000004736. *See generally* Section VI.D.2.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

27, a central processing unit (CPU) 28 and a random access memory (RAM) 29. VCU 12, using these elements, accomplishes the digitization and compression of analog signals as well as the reverse process in which the compressed digital signals are decompressed and converted back to analog signals."), 4:27-62.

696.     Next, the VCU compresses the digital frame information.  "Compression of the digital data defining a video frame . . . [is] accomplished by compressor/decompressor 26." Lang '995 patent at 4:63–4:65.  The VCU uses "[v]arious algorithms" in the compression process, such as "CCITT Group IV," "which enable the representation of a series of numbers by a reduced number of digits."  *Id.* at 4:65–5:2.  The Lang '995 patent discloses that existing compression algorithms, including CCITT Group IV, are available in hardware such as a "compression/decompression circuit on a single integrated circuit."  *Id.* at 5:2-9.  The Lang '995 patent also discloses other, more effective compression algorithms, such as those that "simply record data corresponding to only those pixels which change color from one frame to the next." *Id.* at 5:10-24.

697.     The Lang '995 patent also discloses capturing, digitizing and compressing the audio portion of the composite signal.  For example, the Lang '995 patent explains that "the audio portion of the program is periodically sampled and digitized by digital to analog conversion. *Id.* at 5:28-30.  In one embodiment, this is done at a sample rate of 88,000/second, one byte per sample, to yield CD quality sound. The sampling rate could be dropped to reduce memory requirements. Also, the audio data can be compressed with conventional algorithms, e.g., a Fibonacci delta compression algorithm."  Lang '995 patent at 5:30-35.

698.     It would have been obvious to a person of ordinary skill in the art to implement the capture, digitization, and compression of the composite signal disclosed in the Lang '995

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

patent using an audio capture card and a video card having a video capture module.  As

discussed above, the VCU

> comprises an analog to digital converter (ADC) 24, a digital to
> analog converter (DAC) 25, a compressor/decompressor 26, a
> controller 27, a central processing unit (CPU) 28 and a random
> access memory (RAM) 29. VCU 12, using these elements,
> accomplishes the digitization and compression of analog signals as
> well as the reverse process in which the compressed digital signals
> are decompressed and converted back to analog signals.

Lang '995 patent at 4:17-27.  As shown below, this circuitry is contained in a single component

– VCU 12 – as shown in Figure 2 below:



699.     The Lang '995 patent demonstrates the need for products that capture analog

composite signals from external video sources, digitize the signal for use in a computer, and

compress the signal to save storage space and reduce transmission time was well recognized long

before the alleged invention.  For example, the patent describes some of the objects of the

invention as follows:

349

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

- An "object of the invention is to provide in such an improved audio/video recorder a capability for accepting various forms of analog or digital audio and video input signals and for converting the analog input signals to digital form when appropriate.   Lang '995 patent at 2:18-22;

- "A still further object of the invention is to provide an improved audio/video recorder which maximizes a given storage capacity, through the use of a data compression technique." *Id*. 2:42-45; and

- "A still further object of the invention is to provide an audio/video recorder utilizing a data compression technique for efficient storage, transmission, and reception of a digitized audio/video program over telephone lines or by other external digital means such as satellite transmission or reception." *Id*. at 46-51.

As discussed above in Section VI.D, between the time of the filing of the Lang '995 patent in 1988 and the time of the alleged invention of the '239 patent in approximately 1993, cards for capturing, digitizing, and compressing composite signals became widely available.  These advancements in technology were well known, and it would have been common sense to incorporate such cards into a laptop or desktop computer to perform the claimed functions as these were the intended functions of the cards.

700.    Samsung argues the Lang '995 patent does not "teach or suggest 'means for capturing, digitizing, and compressing at least one composite signal."  Samsung Validity Response at 209-210.  I disagree.  As discussed above, the Lang '995 discloses this limitation.  Even if the Lang '995 patent does not literally describe "an audio capture card and video card with capture module" (as Samsung asserts), it would have been obvious in view of the

350

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

knowledge of a person of ordinary skill in the art, who would have been well aware of commercially available video cards with capture modules and audio capture cards, for the reasons just discussed.

701.    Samsung also contends that "[t]he '995 patent does not disclose the formation of a composite signal as required by the '239 patent."  Samsung's Validity Response at 210.  First, it is unclear what Samsung means by the word "formation," which does not appear in the claims.  Second, the asserted claims only require the capture of an existing composite signal from an external device such as a VCR or video camera.  The patent never mentions how that composite signal is "formed."  As described above, the Lang '995 patent explicitly discloses the capture, digitization, and compression of composite signals, including "NTSC, PAL, SECAM, HDTV, or any American or European broadcast signal standards."  Lang '995 patent at 7:10-11.

### d)    "means for storing said composite signal" (claim 1)

702.    As discussed above in Section VI.F, it is my understanding that this term is a means-plus-function term, and that the claimed function is "storing said composite signal" and the structure to perform that function is a hard disk drive and the software identified in the patent at 3:1-5, 4:52-57, and 6:14-16.  Although Samsung has not identified any structure in the '239 patent specification for performing this function, based on Samsung's infringement contentions, it appears that Samsung has not limited the structure to any specific type of device for "storing" the composite signal.

703.    The Lang '995 patent disclose the claimed function of "storing said composite signal."  For example, the Lang '995 patent discloses storing the digitized and compressed composite signal in memory:

> As the recording media is played back, the analog signals from the
> from the recording media (video and/or audio) are dispatched to

351

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

> VCU 12 via connection 47.  The analog signals are converted to
> digital signals by ADC 24, compressed by
> compressor/decompressor 26 and the compressed digital signals
> are stored in memory 13.  The foregoing operations are
> accomplished under the control of control 27 and CPU 28.

*Id.* at 9:9-18.  *See also id.* at 9:55-68.

704.    Under Apple's construction of this limitation, which requires a hard disk and

software to perform the storing, this structure would have been obvious in view of the knowledge

of a person of ordinary skill in the art, who would have been aware of commercially available

hard disk drives.  The Lang '995 patent discloses several forms of persistent storage, including

magnetic tape, CD-ROM, and optical disk, and suggests the possible use of "[e]merging memory

technologies," which would include a hard disk drive at the time of the alleged '239 invention.

*See, e.g.*, Lang '995 patent at 2:13-17 (discloses "an effective and efficient means for

intermediate storage of the audio/video program in digital memory as a means for achieving the

transfer of the audio/video program from one tape or storage medium to another."); 6:17-22

("Another type of memory is the above mentioned optical disc memories.  Emerging memory

technologies may also prove advantageous with capabilities for mass data storage in even

smaller physical dimensions."); claims 33, 38-48, 64-68.

705.    Further, the Lang '995 patent discloses software for storing composite signals into

memory:

> As the recording media is played back, the analog signals from the
> from the recording media (video and/or audio) are dispatched to
> VCU 12 via connection 47.  The analog signals are converted to
> digital signals by ADC 24, compressed by
> compressor/decompressor 26 and the compressed digital signals
> are stored in memory 13.  The foregoing operations are
> accomplished under the control of control 27 and CPU 28.

*Id.* at 9:9-18.  *See also id.* at 9:55-68.  It would have been trivial for a person of ordinary skill in the art at the time of the alleged invention to use the same method to store the compressed video on a hard disk drive.  In addition, operating systems such as Microsoft Windows, which was well known at the time of the alleged invention, contained built-in software functions for storing data on any type of media, including hard disks.

706.    Samsung's apparent construction of corresponding structure makes no distinction between persistent storage and non-persistent storage, and does not require software.  I disagree with this construction.  In any event, the Lang '995 patent discloses this limitation under Samsung's apparent construction, for the same reasons discussed above under Apple's construction.

707.    I disagree with Samsung's assertion that "[t]he '995 patent discusses storage in the context of the transferring signals from one tape to another.  This discussion does not correspond to the function or structure of this limitation in the '239 patent."  Samsung Validity Response at 210.  First, Samsung does not identify the function or structure of the limitation, and indeed, to date has not offered a construction of this term.  In addition, it is unclear what Samsung means by "transferring signals from one tape to another."  In any event, as discussed above, the Lang '995 patent provides numerous disclosures that correspond to the claimed function and structure in the '239 patent under Samsung's construction.  Under Apple's construction, the Lang '995 patent discloses persistent storage.  As discussed above, it would have been obvious to exchange the persistent storage components disclosed by the Lang '995 patent with a hard disk drive and software to store the composite signal on that hard disk drive.

708.    I also disagree with Samsung's assertion that Lang '995 patent  "does not disclose storing a composite signal as required by the '239 patent."  Samsung's Validity Response at 210.

353

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

As discussed above, the Lang '995 patent discloses storing a composite signal, and indeed, discloses two of the same types of composite signals as the '239 patent – NTSC and PAL.  The VCU captures, digitizes, and compresses that composite signal, then stores the captured, digitized, and compressed composite signal in persistent storage in the same manner as the '239 patent.

### e)      "means for transmitting said composite signal" (claim 1)

709.     The Court has identified the function of this limitation as "transmitting said composite signal."  In addition, the Court has determined that the corresponding structure disclosed in the specification to carry out the recited function is "one or more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file."

710.     The Lang '995 patent discloses the function of transmitting said composite signal. For example, the Lang '995 patent explains that

> the modem may be used to communicate an audio/video program over conventional phone lines. . . . The term modem is derived directly from its functionality as a modulator-demodulator which allows transfer of the audio/video signal over the standard telephone line.  Modems are commonly available for computers and are currently available in the form of a single integrated circuit.

Lang '995 patent at 8:29-39.

711.     The Lang '995 patent also discloses structure required to perform the function of transmitting the composite signal.  For example,

> VCR-ET 10 includes audio/video transmitter/receiver 22 which is typically a modem.  Advantageously, the modem may be used to communicate an audio/video program over conventional phone lines in a manner similar to that described above with respect to

354

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

> optical fibers.  The term modem is derived directly from its
> functionality as a modulator-demodulator which allows transfer of
> the audio/video signal over the standard telephone line. Modems
> are commonly available for computers and are currently available
> in the form of a single integrated circuit.  As an example, Sierra
> Semiconductor offers a 2400 baud single chip modem under its
> part number SC111006. Representative manufacturers of these
> single modem IC's can be found in the Apr. 14, 1988 issue of
> Engineering Design News (EDN), pages 124-125.

Lang '995 patent at 8:29-44.  Figure 2 depicts the placement of modem 22 in the apparatus

(outlined in purple):



Fig. 2

The modem 22 is connected to a telephone line:  "Output port 46 of transmitter/receiver 22

connects directly to the telephone line."  *Id*. at 8:49-50; *see also id*. at claim 78.

712.    Another structure for transmitting a composite signal includes the "[f]iber optic

port 18" which "provides a capability for receiving audio/video signals from or delivering

355

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

audio/video signals to the fiber optic line such as a fiber optic telephone line."  Lang '995 patent at 7:45-55.  The Lang '995 patent also disclose wireless transmission of the composite signal: "[A]n audio/video recorder . . . for . . .transmission, and reception of a digitized audio/video program over telephone lines or by other external digital means such as satellite transmission or reception."  *Id.* at 2:46-51.

713.    To the extent Samsung asserts that the Lang '995 patent does not disclose the software required by the Court's claim construction, such software would have been obvious in view of the knowledge of a person of ordinary skill in the art, who would have been well aware that transmission of data over a modem required the software sequence, would have known how to write a script or other program to perform them, and would have known of commercially available software to perform them.  For example, communications software such as ProComm Plus for Windows, which is expressly disclosed in the '239 patent as known and used for this purpose (see '239 patent at 4:21-22, 8:32-34), and was commercially available at the time of the alleged invention, operated to initialize communications ports on the remote unit (which was required to operate the modem), obtain a stored data file, and transmit a stored data file. ProComm Plus and similar software packages were designed to run on processors to perform these functions and would be used for their intended purpose with no unexpected results.

714.    I disagree with Samsung's contention that "the '995 patent does not disclose transmitting the composite signal as required by the '239 patent."  Samsung Validity Response at 210.  As mentioned above, the Lang '995 patent discloses transmitting a digitized, compressed composite signal in the same manner as the '239 patent.

356

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

### f) "a host unit including means for receiving at least one composite signal transmitted by the remote unit" (claim 1)

715.    As discussed above, it is my understanding that this claim limitation includes a means-plus-function term and that the claimed function is "receiving at least one composite signal transmitted by the remote unit."  It is my opinion that the corresponding structure disclosed in the specification that performs this function is one or more modems corresponding to the number of modems used in the remote unit and connected to one or more cellular telephones, telephone lines, and/or radio transmitters and File Reception Software Sequence E as described in the '239 patent at 10:33-61, 11:18-12:8.

716.    The Lang '995 patent discloses "a host unit including means for receiving at least one composite signal transmitted by the remote unit."  For example, the Lang '995 patent discloses a "first VCR-ET" connected to a "second VCR-ET" and the transmission of video programs between the two VCR-ETs.  Lang '995 patent at 7:58-66.

717.    As discussed in Section VI.G.1.e, the Lang '995 patent discloses the "means for transmitting at least one composite signal" limitation through its use of modems connected to telephone lines.  These same hardware components in the "host unit" transceiver are used for receiving the composite signal transmitted by the "remote unit" transceiver.  The VCR-ET can receive data from a variety of sources by using fiber optic ports, modems connected to telephone lines, and wirelessly.  *See* Lang '995 patent at 7:51-55 ("The incorporation of fiber optic port 18 in the VCR-ET provides a capability for receiving audio/video signals from or delivering audio/video signals to the fiber optic line such as a fiber optic telephone line."), 9:55-62 ("In still another operating mode a program stored in media 23 of AVRU 11 or being received by AVRU 11 from input line 15 (as from a video camera) may be digitized and compressed by VCU 12 and routed via bus 34, to memory 13.  The data from memory 13 is then routed to line 43,

357

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

transmitter/receiver 22 and to a telephone line. At the other end of the telephone line the signals received are processed by another VCR-ET."), 8:49-50 ("Output port 46 of transmitter/receiver 22 connects directly to the telephone line."), 2:46-52 ("other external digital means such as satellite transmission or reception.").  For example, the Lang '995 patent explains:

> It follows, of course, that digitized video and audio signals from the remote VCR-ET at the far end of the telephone line may be received at line 46, entered into memory 13 via transmitter/receiver 22, converted to analog signals by VCU 12, and recorded on media 23 and then viewed, if desired, on a television set connected at output 41.

*Id*. at 10:14-21.

718.   To the extent  "a host unit including means for receiving at least one composite signal transmitted by the remote unit" is not disclosed in the Lang '995 patent, this limitation would have been obvious in view of the knowledge of a person of ordinary skill in the art to use these same components to receive the composite signal.  The Lang '995 patent repeatedly refers to the modem as an example of the "audio/video transmitter/receiver 22," thereby suggesting that a modem connected to a telephone line should be used to receive the composite signal.  In addition, a person of ordinary skill in the art at the time of the alleged '239 patent invention would have been well aware that modems could be used for both transmitting and receiving data.

719.   It also would have been obvious to a person of ordinary skill in the art to add the file reception software sequence described in the '239 patent to the disclosures of the Lang '995 patent.  File Reception Software Sequence E describes a software sequence used in typical modem communications.  A person of ordinary skill in the art would have known to use the standard software sequences required for modems at the time of the alleged '239 invention as described above in Section VI.G.1.e.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

720.     Samsung's apparent construction of this limitation does not require any specific components, but instead assumes that any component that receives a video meets this limitation. Under that construction, the Lang '995 patent discloses this limitation or renders it obvious for the same reasons discussed above.

721.     Samsung's argument that "[t]he '995 patent does not disclose a host unit different from a playback unit that meets the required functions" is unclear.  Samsung Validity Response at 210.  For example, this argument appears to contradict Samsung's infringement contentions, in which Samsung has asserted that single Mac or iOS device is both a host unit and a playback unit.  In any event, the Lang '995 patent discloses both a combined host and playback unit, and a separate host and playback unit.  The Lang '995 patent allows for the ability to transmit from one VCR-ET to another VCR-ET and then to a third VCR-ET for playback.

> g)     **"a playback unit" (claim 1)**

722.     The Lang '995 patent discloses "a playback unit."  For example, the Lang '995 patent discloses that the VCR-ET optionally includes "a flat panel video display." Lang '995 patent at 6:39-40.   The VCR-ET also "deliver[s] output signals in different forms or formats including a standard RF modulated output signal for viewing on a television set, a digital output signal for viewing on a high-resolution monitor, and audio output signals for a speaker system." *Id*. at 2:52-58.  The Lang '995 patent also discloses that received video and audio signals may be viewed "on a television set connected at output 41."  *Id.* at 10:20-21.

723.     As previously discussed, Samsung's argument that "[t]he '995 patent does not disclose a playback unit different from a host unit that meets the required functions" is unclear, and contradicts Samsung's infringement contentions.  In any event, the Lang '995 patent discloses both a combined host and playback unit, and a separate host and playback unit.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**h)**      **"means for exchanging data with said host unit" (claim 1)**

724.    As discussed above, it is my understanding that this term is a means-plus-function term and that the claimed function is "exchanging data with said host unit."  It is my opinion that the structure disclosed in the '239 patent specification for performing the function is a 16-bit Ethernet card, Novell Netware Lite software, and Host Boot Software Sequence D described in the '239 patent at 10:63 -11:24.

725.    Under Apple's construction, for configurations in which the host unit and playback unit are separate VCR-ETs, this limitation would have been obvious in view of the knowledge of a person of ordinary skill in the art, who would have been well aware of using an Ethernet card and Novell Netware Lite software to allow two VCR-ET units to exchange data.  At the time of the alleged '239 invention, Ethernet was a common way to connect two computers in a network, and Novell was a developer of different versions of popular Netware networking software that had been available for years before the alleged '239 invention.  The very purpose of the Ethernet card in combination with Novell Netware Lite was to connect two computers and allow file sharing between them.  Thus, a person of ordinary skilled in the art who wanted to playback a video on another computer at the time of the alleged '239 invention would have naturally looked to connecting the two computers via Ethernet using an Ethernet card and Novell Netware software.

726.    Under Samsung's apparent construction of corresponding structure in which the "host unit" and "playback unit" are in the same device, the Lang '995 discloses this claim limitation.  The Lang '995 patent discloses communication between components within the VCR-ET.  As illustrated in Figure 2 of the Lang '995 patent (reproduced below), "digitized video and audio signals from the remote VCR-ET at the far end of the telephone line may be

360

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

received at line 46, entered into memory 13 via transmitter/receiver 22, converted to analog

signals by VCU 12, and recorded on media 23 and then viewed, if desired, on a television sent

connected at output 41." Lang '995 patent at 10:15-21.  Transmitter/receiver 22 is connected to

the remainder of the system via data bus 34.  *See id.* at Fig. 2.



727.    I disagree with Samsung's assertion that "[t]he '995 patent does not disclose this

limitation and actually teaches away from it." Samsung Validity Response at 211.  Specifically,

Samsung asserts that the Lang '995 demonstrates communication to and from the host unit, but

not between the host unit and playback unit.  As I stated above, Samsung's assertion is unclear,

especially in light of its infringement contentions in which Samsung accuses a single combined

host unit and playback unit and Samsung's broad construction of the limitation.  Nor does

Samsung provide any explanation as to how the Lang '995 patent purportedly teaches away from

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

this limitation.  In any event, as discussed above, this limitation is disclosed by the Lang '995 patent under Samsung's construction and obvious under Apple's construction.

728.   Samsung also claims that because data can be "viewed directly from memory," the Lang '995 patent "teaches away from the need to transmit data to the playback unit." Samsung Validity Response at 211.  Samsung cites nothing from the Lang '995 patent to support its assertion that the Lang '995 teaches away from the means for exchanging data.  I also understand that the mere mention that a system is capable of performing a task does not equate to teaching away from other tasks that it might also perform.  For the reasons I discuss above, the Lang '995 patent discloses this limitation.

> i)    **"means for storing the composite signal received by the host unit" (claim 1)**

729.   As discussed above, it is my understanding that this term is a means-plus-function term, and that the claimed function is "storing the composite signal received by the host unit" and the structure for performing the function is a hard disk drive.  Although Samsung has not identified any structure identified in the specification for performing this function, based on Samsung's infringement contentions, it appears that Samsung has not limited the structure to any specific type of device for "storing" the composite signal.

730.   The Lang '995 patent disclose the claimed function of "storing said composite signal."  For example, the Lang '995 patent discloses storing the digitized and compressed composite signal in memory:

> As the recording media is played back, the analog signals from the
> from the recording media (video and/or audio) are dispatched to
> VCU 12 via connection 47.  The analog signals are converted to
> digital signals by ADC 24, compressed by
> compressor/decompressor 26 and the compressed digital signals
> are stored in memory 13.  The foregoing operations are
> accomplished under the control of control 27 and CPU 28.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

*Id.* at 9:9-18.  *See also id.* at 9:55-68.

731.    For the same reasons discussed above in Section VI.G.1.d in connection with the limitation "means for storing said composite signal," the Lang '995 patent renders the structure required under Apple's construction of this limitation obvious.  The Lang '995 patent discloses several forms of persistent storage, including magnetic tape, CD-ROM, and optical disk, and suggests the possible use of "[e]merging memory technologies," which would include a hard disk drive at the time of the claimed invention.  *See, e.g.*, Lang '995 patent at 2:13-17, 6:20-23.  Furthermore, a person of ordinary skill in the art would have found it desirable to store the received data file in order to play and replay the data file.

732.    Under Samsung's apparent construction (which makes no distinction between persistent storage and non-persistent storage, does not require software), the Lang '995 patent discloses this limitation for the same reasons discussed above in Section VI.G.1.d.  As discussed above, in the means for storing for the mobile remote unit, the Lang '995 patent discloses both persistent storage and non-persistent storage, such as RAM.

733.    I disagree with Samsung's argument that "[t]he '995 patent does not disclose a playback unit different from a host unit that meets the required functions."  Samsung Validity Response at 211.  As mentioned before, Samsung does not explain the basis for this statement, nor does Samsung appear to apply this limitation to its own infringement contentions.

734.    Samsung also contends that "[t]he '995 patent also never discloses storing the composite signal received by the host unit in a memory of the playback unit."  Samsung Validity Response at 211.  I disagree.  The Lang '995 patent makes just such a disclosure: "Once received in the second VCR-ET's memory 13, the digitized program can then either be viewed directly

363

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

from memory or transferred to storage medium 23, either in its entirety or in random segments, based on user preference."  Lang '995 patent at 10:1-5.

j)        **"means for decompressing said composite signal" (claim 1)**

735.    As discussed above, it is my understanding that this term is a means-plus-function term and that the claimed function is "decompressing said composite signal."  It is my opinion that the  structure disclosed in the specification for performing the claimed function is a video decompression card and an audio decompression card.

736.    The Lang '995 patent discloses the function of "decompressing said composite signal."  For example, the Lang '995 patent explains that

> [t]he VCU comprises an analog to digital converter (ADC) 24, a
> digital to analog converter (DAC) 25, a compressor/decompressor
> 26, a controller 27, a central processing unit (CPU) 28 and a
> random access memory (RAM) 29. VCU 12, using these elements,
> accomplishes the digitization and compression of analog signals as
> well as the reverse process in which the compressed digital signals
> are decompressed and converted back to analog signals.

Lang '995 patent at 4:17-27.  *See also id.* at Fig. 2.  "Controller 27, CPU 28 and RAM 29 serve in the same manner during . . . decompression and digital to analog conversion.  Decompression is first accomplished in compressor/decompressor 26.  The decompressed digital signal is then converted to an analog signal by digital to analog converter (DAC) 24 (assuming its destination requires an analog form)."  *Id*. at 5:57-63.

737.    For the same reasons as discussed above in connection with "means for capturing, digitizing, and compressing," it would have been obvious to a person of ordinary skill in the art at the time of the '239 patent invention to implement the decompression function using commercially available video and audio cards.

364

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

738.    Although Samsung has not identified any structure identified in the specification for performing this function, based on Samsung's infringement contentions, it appears that Samsung has not limited the structure to any specific type of component for "decompressing" the composite signal.  For the same reasons as discussed above, the Lang '995 patent discloses this limitation under Samsung's apparent construction.

739.    I disagree with Samsung's assertion that "[t]he '995 patent does not disclose a playback unit different from a host unit that meets the required functions."  Samsung Validity Response at 212.  As previously mentioned, the basis for Samsung's argument is unclear, and contradicts Samsung's infringement contentions that accuse Apple devices as combination playback units and host units.  I also disagree with Samsung's argument that "[t]he decompressor, to the extent it is disclosed, is part of the host unit instead of the playback unit."  Samsung Validity Response at 212.  The VCR-ET is a combination host unit and playback unit and a separate host unit and playback unit.  When the VCR-ET is a combination host unit and playback unit, the decompressor is part of the playback unit (as evidenced by Figure 2 of the Lang '995 patent).

740.    I also disagree with Samsung's assertion that "[t]he '995 patent also does not disclose decompressing the composite signal as required by the '239 patent."  Samsung Validity Response at 212.  As discussed above, the Lang '995 patent discloses decompressing the composite signal, which is described in the Lang '995 patent in the same way as the '239 patent.

> **k)**    **"An apparatus according to claim 1 wherein the composite signal is transmitted over telephone lines, cellular, radio or other telemetric frequencies" (claim 3)**

741.    The Lang '995 patent discloses or renders obvious "[a]n apparatus according to claim 1 wherein the composite signal is transmitted over telephone lines, cellular, radio or other

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

telemetric frequencies."  For the same reasons as discussed above in connection with the "means

for transmitting" limitation above, the VCR-ET discloses transmitting the composite signal over

telephone lines.  *See, e.g.,* Lang '995 patent at 9:55-62 ("In still another operating mode a

program stored in media 23 of AVRU 11 or being received by AVRU 11 from input line 15 (as

from a video camera) may be digitized and compressed by VCU 12 and routed via bus 34, to

memory 13. The data from memory 13 is then routed to line 43, transmitter/receiver 22 and to a

telephone line. At the other end of the telephone line the signals received are processed by

another VCR-ET.").

742.    Samsung contends that "[t]he '995 patent does not disclose software that

initializes a communication port on the remote unit, obtains the stored data file, or transmits the

stored data file."  Samsung Validity Response at 212.  I disagree that such software is a

limitation of claim 3, and Samsung has not explained why it should be.  Samsung also contends

that "[t]he '995 patent does not disclose any transmission utilizing cellular, radio, or other

telemetric frequencies."  Samsung Validity Response at 212.  I understand that only one of the

frequencies listed in the claim needs to be disclosed by the Lang '995 patent for invalidity

purposes, as evidenced by the use of the term "or."  As discussed above (see Section VI.G.1.e),

the Lang '995 patent expressly discloses transmission via telephone lines.

> **l)**     **"An apparatus according to claim 3 wherein the means for
> transmitting the composite signal includes: at least one
> interface installed in conjunction with said remote unit; a
> cellular telephone connected to each said interface" (claim 7)**

743.    As already discussed above, the Lang '995 patent discloses or renders obvious the

limitations of claim 3.

744.    The limitation "the means for transmitting the composite signal includes: at least

one interface installed in conjunction with said remote unit; a cellular telephone connected to

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

each said interface" also would have been obvious in view of the knowledge of a person of ordinary skill in the art, who would have been aware of various devices and methods for transmitting composite signals using cellular modems.  As discussed in Section VI.D.5 above, persons of ordinary skill in the art were aware of commercially available cellular modems designed to operate with personal computers for data transmission, and would have known how to use them to transmit video over cellular frequencies.  A person of ordinary skill in the art working on video transmission using a modem (an "interface installed in conjunction with said remote unit") who wanted to ensure that the apparatus could be used in a remote location would have known that a cellular interface – a modem or adapter – and cellular telephone could be used.  Those persons of ordinary skill in the art looking to solve the problem of mobile video transmission would have naturally looked to cellular transmission.

745.    In addition, it would have been obvious to a person of ordinary skill in the art to combine the cellular transmission components of the Lebowitz '457 patent with the Lang '995 patent in order to transmit the composite signal via cellular.  The Lebowitz '457 patent discloses that by using "readily available" components, "data can be transmitted over a cellular phone network to a cellular site computer." Lebowitz '457 patent at 1:12-30.

746.    Figure 3 of the Lebowitz '457 patent (reproduced below) illustrates the concept of using cellular telephones to transmit video images:



FIG. 3

367

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

747.    The Lebowitz '995 patent discloses capture and digitization of video signals in Figure 3: "one or more TV cameras 51-53 may be installed at the subscriber's premises . . . . These cameras 51-53 are connected to a commercially available video transmitter 56 which digitizes BW video images and stores them in memory."  Lebowitz '457 patent at 7:8-16.  The captured and digitized video signals are then transmitted from the remote unit to a host unit via a "cellular interface" connected "in turn to a cellular transceiver having an antenna" – *i.e.*, a cellular telephone.  *Id*. at 3:27-30.  The Lebowitz '457 patent explains that "such a cellular interface is readily available from Motorola under the trademark 'CELLULAR CONNECTION'."  *Id*. at 4:38-41.  The Lebowitz '457 patent explains that:

> Cellular interface 24 provides a telephone line tone and voltage to the digital communicator 16 and digital dialer 17 and, upon receiving the electronic signal (that comprises the telephone number to be dialed) from the digital dialer 17, that signal and an electronic 'send' signal are then electronically entered into the transceiver 26 by means of conductors 27.  The cellular interface provides a path of communication between the digital communicator 16 and digital dialer 17, and the cellular transceiver 26.

*Id*. at 4:42-51; *see also id*. at 7:31-44, 9:24-35.  The Motorola Cellular Connection interface was an adapter that could be connected to a standard modem attached to a computer, and was also connected a cellular telephone.  This configuration allowed a standard modem to be used to transmit data over a cellular network.  *See, e.g., id*. at 7:20-25 ("The video transmitter 56 is connected to the cellular interface 24 as in the manner of the digital communicator 16.")

748.    A person of ordinary skill in the art who wanted to transmit a video from a remote location would have known to use the components described in the Lebowitz '457 patent in combination with the device and modem disclosed in the Lang '995 patent to do so.  Both patents disclose a desire for a mobile system (Lang '995 patent at 10:50-54), and in fact, the

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Lebowitz '457 patent describes the purpose of using a cellular connection is to make the system "readily portable for use in movable structures such as aircraft, railroad cars, etc. so as to be completely operable at each location to which the structure is moved."  Lebowitz '457 at 2:47-53; *see also id*. at 3:4-7 ("Still another object of the present invention is to provide a new and novel method of monitoring premises using a cellular network in a manner such that the monitored areas can be moving from place to place.").  The '239 patent explains that cellular technology had already been used to transmit computer files.  A person of ordinary skill in the art at the time of the alleged '239 patent invention would have recognized that a video file could have been transmitted over a cellular network using cellular components in the same manner as a standard modem and telephone lines could be used.  Indeed, the asserted claims of the '239 patent does not describe any purported challenge to transmission over cellular frequencies that were unique to video and distinguished video from any other computer file.

> **m)**    **"An apparatus for transmission of data, comprising: a computer including a video capture module to capture and compress video in real time" (claim 15)**

749.    For the same reasons as discussed above in Section VI.G.1.e in connection with claim 1, to the extent that "[a]n apparatus for transmission of data" is a limitation of claim 15, the Lang '995 patent discloses this limitation.

750.    The Lang '995 patent also discloses real-time capture and compression of video as it is described in the '239 patent and file history – in other words, the frames received by the remote unit from the separate video recording device are compressed as they are being received, rather than only after the entire video is received and stored in persistent storage.  *See* '239 patent at Abstract, Fig. 1, 1:21-23, 2:59-3:3, 4:7-12, 4:28-33 ("A signal is input into remote unit 2 from any device having the capacity to output a video signal 1, such as a video camera, video cassette

369

recorder/player, laser disc player, etc.  The video signal received by the remote unit can be of any generally known format, such as NTSC, PAL, and Y/C video (or S video)"), 4:39-45, 4:62-63, 5:39-46, 6:9-13, 6:66-67; '239 File History, 2/2/96 Aff. Ex. A [SAMNDCA630-00832500] at SAMNDCA630-00832590.  For example, the Lang '995 patent discloses that the VCU is able to process (including compress) the video as it is being captured.  The Lang '995 patent describes the ability to first rapidly digitize the frames:

> If each frame includes 90,000 pixels (300 x 300), and each pixel is defined by 21 bits (7 bits per primary color), the digital representation of a single video frame utilizes a sizable block of digital information (i.e., 1.89 megabits/frame) which must be processed very rapidly. (Approximately 30 frames/second are received from AVRU 11.)  Fortunately the analog to digital conversion of these signals may be accomplished at the desired speed using commercially available analog to digital converted integrated circuits.  The analog to digital converter 24 (ADC) is a high-speed, high-accuracy, A to D 'flash' converter available as a single IC (integrated circuit).

Lang '995 patent, 4:48-60.

751.    Thereafter, at most two uncompressed frames are stored in RAM:

> The process of converting either from analog to digital or from digital to analog requires memory for intermediate storage. . . . RAM 29 should have sufficient capacity to store at least two full uncompressed frames (e.g., about 472 KB).

Lang '995 patent at 5:36 -45.

752.    Each frame is then taken from the RAM 29 and compressed using a real-time algorithm such as CCITT Group IV (*id.* at 4:67-5:2), thereby allowing the capture and compression to occur in "real time," i.e., as the composite signal is being received and without an intermediate step of storing the entire video in persistent storage.  *See id.* at 4:19-26 ("The VCU comprises an analog to digital converter (ADC) 24, a digital to analog converter (DAC) 25, a compressor/decompressor 26, a controller 27, a central processing unit (CPU) 28 and a random

370

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

access memory (RAM) 29.  VCU 12, using these elements, accomplished the digitization and

compression of analog signals as well as the reverse process in which the compressed digital

signals are decompressed and converted back to analog signals.").  *See also id.* at claim 60

("means for compressing digital audio/video source information received at said input means or

said corresponding digital audio/video source information received from said analog to digital

converter means into a time compressed representation of said digital or corresponding digital

audio/video source information, said time compressed representation having an associated time

period that is shorter than a time period associated with a real time representation of said digital

or corresponding digital audio/video source information").

753.    To the extent that Samsung asserts that the Lang '995 patent fails to disclose this

limitation, this limitation would have been obvious in view of the knowledge of a person of

ordinary skill in the art, who would have been well-aware of publicly available video cards with

optional video capture modules with real-time capture and compression functionality.   As

discussed above in Section VI.B.3, the applicants added the term "real time" to this claim during

prosecution, and explained that the term meant that the video was being compressed as it was

being received.  In other words, the video is not saved in persistent storage before it is

compressed.  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████    *See* Section VI.D.2.  As discussed in

connection with "means for capturing" in claim 1, by the time of the alleged '239 invention,

these capture cards were well known.  It would have been common sense for a person of

ordinary skill in the art to use them for their intended purpose to perform video capture and

compression.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

754.    Samsung asserts that  "[t]he '995 patent does not disclose a video capture module" and that "[e]ven if there is a video capture module, the '995 patent does not disclose that it captures and compresses video in real time."  Samsung Validity Response at 213.  As discussed above, the Lang '995 patent discloses or renders obvious both limitations.

n)    **"means for transmission of said captured video over a cellular frequency" (claim 15)**

755.    It is my opinion that based on the specification, the structure for "means for transmission of said captured video over a cellular frequency" is more limited than the "means for transmission" of claim 1.  The only structure disclosed is "one or more modems connected to one or more cellular telephones, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file."  Thus, for the same reason discussed above in connection with "means for transmitting," the Lang '995 patent alone, in combination with the knowledge of a person of ordinary sill in the art, and/or in combination with the Lebowitz '457 patent discloses this limitation.  As explained above in Section VI.G.1.l, the Lang '995 patent renders obvious a means for transmission that uses modems connected to cellular telephones because persons of ordinary skill in the art would have been aware of commercially available cellular modems, and would have been motivated to combine those cellular modems with the Lang '995 patent for the reasons discussed above.  Additionally, persons of ordinary skill in the art would have combined the Lang '995 patent (which teaches video transmission over fiber optic, telephonic, and satellite medium) with the Lebowitz '457 patent (which teaches still video transmission over cellular networks).

756.    Based on its infringement contentions, Samsung appears to assume that any structure that transmits video meets this limitation.  Under that apparently construction, the Lang

372

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

'995 patent discloses this limitation for the same reasons discussed in connection with "means

for transmitting" in claim 1.

### o)   Reasons to Combine the Lang '995 Patent and the Lebowitz '457 Patent

757.   In my opinion, the Lang '995 patent renders claim 1 of the '239 patent obvious

based on the combinations and reasons set forth below and in the claim charts attached as

Exhibits 8 and 9.  A person of ordinary skill in the art would have known to combine the Lang

'995 patent with the Lebowitz '457 patent because both are directed to data transmission

apparatuses for video transmission.  Indeed, the Lang '995 patent solves the very same problem

the '239 patent sought to solve, i.e., providing high speed transmission of audio / video data in

digital format.  Any element allegedly missing from the Lang '995 patent would have involved

an insubstantial change to the disclosed embodiments by using known concepts and elements

that already existed in the prior art for their intended purpose, and that would have achieved

predictable results.

758.   Both the Lang '995 patent and the Lebowitz '457 patent are directed to the

capture and transmission of composite signals.  As explained in detail above, the Lang '995

patent is directed to the capture, digitization, and compression of composite video, and the

subsequent transmission of that composite video over various transmission medium, including

telephone lines attached to modems.  The Lebowitz '457 patent is directed to a system that uses

an analog closed circuit television camera to capture images from a video (a composite signal)

and transmits those images over a cellular network using cellular telephones attached to cellular

interfaces such as modems.  A person of ordinary skill in the art seeking to transmit composite

signals from a remote location would have incorporated the teachings of the Lang '995 patent

and would have looked to the Lebowitz '457 patent to provide cellular transmission of that

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

video.  This is especially true given that the asserted claims of the '239 patent provide no additional way to solve cellular video transmission.

759.     Both the Lang '995 patent and the Lebowitz '457 patent are also directed to portable methods of transmitting video.  The Lang '995 patent explains that the disclosed "VCR-ET can be constructed so as to be portable."  Lang '995 patent at 10:50-51.  It also discloses transmission of video via satellite.  *Id.* at 2:46-51 ("A still further object of the invention is to provide an audio/video recorder utilizing a data compression technique for efficient storage, transmission, and reception of a digitized audio/video program over telephone lines or by other external digital means such as satellite transmission or reception.").  In addition to disclosing cellular transmission of video images, the Lebowitz '457 patent explains both that an "object of the invention is to provide a new and novel location monitory system which may be simply and easily moved to a new location at virtually no expense and in a simple and easy manner" (Lebowitz '457 patent at 2:43-47), and that another "object of the invention is to provide a new and novel monitoring system using a cellular network which is readily portable for use in movable structures such as aircraft, railroad cars, etc. so as to be completely operable at each location to which the structure is moved" (*id.* at 2:48-53).  A person of ordinary skill in the art seeking to enhance the portable unit disclosed in the Lang '995 patent would have looked to the Lebowitz '457 patent for the specific teaching of cellular transmission.

> **2.     Kodak SV9600 in View of the Knowledge of a Person with Ordinary Skill in the Art or Combined with ActionMedia II Renders Obvious Claims 1, 7, and 15 of the '239 Patent**

760.     As detailed in the claim chart attached as Exhibit 10 and below, it is my opinion that the Kodak SV9600 and the Hadley article render obvious the asserted claims 1, 7, and 15 of the '239 patent in light of the knowledge of a person of ordinary skill in the art.

374

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

761.    In addition, as detailed in the claim chart attached as Exhibit 11 and below, it is

my opinion that the SV9600 in combination with ActionMedia II renders obvious the asserted

claims 1, 7, and 15 of the '239 patent.

### a)    "An apparatus for transmission of data" (claim 1)

762.    To the extent that "[a]n apparatus for transmission of data" is a limitation of claim

1, the SV9600 meets this limitation.  For example, the Hadley article discloses that

> [t]he Kodak SV9600 Still Video Transceiver is designed to
> electronically transmit and receive high quality video images over
> standard telephone lines. The transceiver captures a full frame of
> video, digitizes and stores it in memory for manipulation and
> display of the image data. The data is compressed using a highly
> sophisticated algorithm developed at Kodak.  The compressed
> image data is transferred to a built-in modem for high-speed
> communication over standard telephone lines.

Hadley article [APL630DEF-WH0000014630] at 238.  The figure on page 238 of the Hadley

article illustrates the apparatus for transmission of data, which is shown as "video":



763.    I disagree with Samsung's assertion that the "SV9600 does not disclose '[a]n

apparatus for transmission of data' as described in Claim 1 of the '239 patent."  Samsung's

Validity Response at 185.  First, Samsung provides no explanation or basis for this assertion.  In

375

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

any event, as discussed above and below, the SV9600 is designed to "electronically transmit and receive high quality video images over standard telephone lines." Video images are data, and transmitting those video images over telephone lines is transmission of that data.

### b)   "a mobile remote unit" (claim 1)

764.   The SV9600 is a mobile remote unit. The Hadley article discloses several uses of the SV9600 that are not stationary or tied to a location with an AC outlet. For example, the Hadley article describes "some of the applications that have been developed with the Kodak SV9600 Still Video Transceiver," including:

- industrial uses in which "[a] field service engineer sends images back to a central location to help determine the cause of a failure";

- news gathering in which "[a] TV news crew captures an image off a video tape and sends it via a cellular phone to the studio";

- law enforcement in which "[a] surveillance team sends an image to the police station for identification of a criminal":

- medical uses in which "[a] laboratory evaluating slides under a microscope can retrieve similar images from a remote central library for comparison"; and

- government uses in which "[t]he FBI, Army, Navy, Air Force all have a need to send images from a remote location to some central facility such as the Pentagon."

Hadley article [APL630DEF-WH0000014630] at 245. *See* Sasson 7/31/13 Tr. at 125:18-127:2 (used for remote transmissions).

765.   Samsung asserts that the SV9600 "merely disclose[s] a unit. SV9600 does not disclose a unit that may be used in a mobile remote fashion; the reference does not disclose a

376

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

mobile remote unit as set forth in the '239 patent."  Samsung's Validity Response at 186.  It is unclear what Samsung means by "a unit that may be used in a mobile remote fashion," or how that is relevant to a determination of whether the SV9600 is a "mobile remote unit."

766.     To the extent Samsung argues that the SV9600 is not a mobile unit because the term "mobile" connotes small size, I disagree that the term "mobile" requires a small unit. Nothing in the '239 patent, including the claims, requires the apparatus to be of any particular size.  In fact, the '239 patent states that "remote unit 2 could be a desktop computer" and could be used with telephone lines, which would have tethered it during operation.  '239 patent at 4:36-37, 9:33-37.  Moreover, as discussed above, the applicants added the term "mobile" during prosecution and argued that the invention was distinguishable from Yurt, Gattis and Palmer because "the remote unit could operate by batter or by a power source supplied by a vehicle (direct current)."  '239 File History, 5/21/96 Amend. [SAMNDCA630-00832618] at 10. Nothing in that argument suggests any limitation other than the ability to move the unit from one location to another, and the applicants did not argue that the mobile remote unit must be of any particular size.  Any desktop computer at the time of the alleged '239 invention could have used a 12-volt adapter to plug into a motor vehicle.  *See, e.g.*, PVII-200 Brochure [SAMNDCA630-07218229] ("Highly portable '*take* anywhere' remote system gives you the flexibility of sending a news clip in from any distance as long as you have AC power and two telephone or cellular lines"); FoNet Quick Start Guide [SAMNDCA630-00832075] at SAMNDCA630-00832089 (using  a 12-volt adapter to plug into the cigarette lighter); '239 patent at 9:55-57 ("an inverter could be installed in the vehicle to convert DC from its battery to AC to be used by the remote unit").  The named inventors' practicing product itself was the size of carry-on luggage and weighed twenty-eight pounds.  FirstLook Video Brochure [SAMNDCA630-00828677] at 1-2.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

767.     In any event, it would have been obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged '239 invention to implement the functionalities of the SV9600 on a laptop computer.  A person of ordinary skill in the art would have been well aware of laptop computers, which were widely and commercially available at the time of the alleged invention of the '239 patent.  Laptops were smaller than desktop computers but had the same capabilities, and used batteries.  It would have been a trivial matter for a person of ordinary skill in the art to simply use a laptop computer to implement the SV9600.  I note that the '239 patent itself describes the use of a commercially available "portable personal computer."  '239 patent at 4:17-25; *see also* '239 File History, 2/2/96 Affidavit [SAMNDCA630-00832590] at Ex. D (depicting a portable computer).

c)     **"means for capturing, digitizing, and compressing at least one composite signal" (claim 1)**

768.     The Court has identified the function of this limitation as "capturing, digitizing, and compressing at least one composite signal."  In addition, the Court has determined that the corresponding structure disclosed in the specification to carry out the recited function is "an audio capture card, and a video card having a video capture module."   As explained below, the SV9600 performs the claimed function using the required corresponding structure.

769.     The SV9600 performs the claimed function of capturing at least one composite signal.  The SV9600 "captures a full frame of video" from "any source of NTSC composite or RGB in still or motion form."  Hadley article [APL630DEF-WH0000014630] at 238.

770.     The SV9600 also digitizes and compresses the composite signal.  After the image is captured, the SV9600 then "digitizes [the image] and stores it in memory."  *See, e.g.*, Hadley article [APL630DEF-WH0000014630] at 238.  "This data is then compressed using highly

378

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

sophisticated image compression techniques to minimize the transmission time and storage requirements." *Id.*

771.    The Hadley article describes and illustrates the hardware in the figure shown above and software used by the SV9600 to capture, digitize, and compress at least one composite signal.  For example, the analog video board captures and converts the NTSC composite signal to luminance and color difference analog video signals.  The framestore board digitizes these signals and stores the values in memory.  *Id.* at 239.  The microprocessor in the computer board and a TMS32020 Digital Signal Processor work together to "execute the compression algorithm on the image data in the framestore and store the compressed image data in memory."  *Id.* at 239, 242.

772.    The Hadley article also discloses the Discrete Cosine Transform compression algorithm used by the SV9600.  For example, the algorithm is described as "based on the Discrete Cosine Transform.  A 16 x 16 block of image data is used as the input to the discrete cosine transform. This 16 x 16 block can either represent original image data, or it can be the result of a 64 x 64 block of image data that has been averaged and subsampled.  The discrete cosine transform is used to reduce the correlation between pixels, it can be quickly executed, and it avoids the spurious spectral components associated with a Discrete Fourier Transform."  Hadley article [APL630DEF-WH0000014630] at 241.  Other details of the algorithm are also disclosed.  *See id.*

773.    The figure on page 241 of the Hadley article (reproduced below) shows the image compression algorithm utilized by the SV9600.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



774.    The figure on page 242 illustrates the hardware architecture for performing the

compression and expansion algorithm used by the SV9600.



775.    It would have been obvious in view of the knowledge of a person of ordinary skill

in the art at the time of the alleged '239 invention to use the SV9600 to capture multiple frames

per second from the composite signal as a video.  As discussed above in Sections VI.E.3 and

VI.G.2.c, the SV9600 was designed to capture  and compress high-quality images from a

composite signal, and used a compression algorithm based on Discrete Cosine Transform, which

was essentially JPEG.  Because the goal was to achieve a virtually lossless image, the SV9600

did not compress the image as small as it could have.  Moreover, even years later at the time of

the alleged '239 invention, a person of ordinary skill in the art would have known that due to

380

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

memory constraints and communication speeds, it was more common to capture and transmit video at lower resolutions – such as 160 x 120 – and at slower frame rates such as 7 or 15 frames per second. *See, e.g.*, Quick Start Guide [SAMNDCA630-00832075] at SAMNDCA630-00832077 ("[Y]ou will probably find seven (7) frames per second for weather shots and fifteen (15) frames per second for walking motion will give you good news video and reduce the transmission time considerably."); RT Video Developer's Kit [SAMNDCA630-00831193] at SAMNDCA630-00831195 ("Input capture resolutions of up to 160 x 120 pixels"); Video for Windows Manual [APL630DEF-WH-A0000004783] at 2-15 to 2-16 (describing options to set frame size to be captured, including 160 x 120), 2-23 (describing the option to set frame per second rate, which includes "decimal values (such as 0.1) and integer values (such as 15)"); FirstLook Video Brochure [SAMNDCA630-00828677] at SAMNDCA630-00828677 (brochure of inventors' commercial embodiment  describing capture as "Variable 1 to 30 frames per second imaging" and field test results using 7 and 24 frames per second); '239 patent at 6:66-7:4 ("The video card is capable of capturing an input video signal at a selected number of frames per second" which "generally ranges between one (1) and thirty (30) frames/second.")  A person of ordinary skill in the art would have known that the SV9600 could have captured a composite video signal by adjusting these parameters.  And indeed, the '239 patent does not mention or claim any specific frames-per-second rate at which frames should be captured, any specific frame size or quality, or any specific compression method or format.  A person of ordinary skill in the art also would have known that because the compression is performed on blocks independently of other blocks, other parallel processors like those described in the Hadley article could have been added to the SV9600 to process more blocks at a time.  *See, e.g.*, Hadley article [APL630DEF-WH0000014630] at 241-242.  Thus, even in the mid-1980s, several years before

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

the alleged 39 invention, the SV9600 would have been able to capture video using its existing hardware.

776.   By the time of the alleged '239 invention, however, significant advances in technology had produced both less expensive memory of much greater capacity and speed and modems with much faster transmission speeds.  Given these advances – which, under Moore's law, would have been an improvement of around a factor of 5 – a person of ordinary skill in the art at the time of the alleged '239 invention would have expected that the same system could have been implemented to be much faster and to handle higher resolution and faster video, if desired.  Even at that time, however, it was common to use smaller resolutions and less than a 30 frames per second rate, as shown by the documents just cited.  Steve Sasson's testimony confirms that the SV9600 was designed to easily accommodate the speed of the 9600 baud modem that required 41 seconds to transmit a compressed, high-quality visually lossless image. *See, e.g.*, Sasson 7/31/13 Tr. at 102:19-103:24.   The hardware compressed the image at a rate of less than 8 ms per block.  For a 10-second video clip at 7 frames per second, using quarter size frames (with 1/16 the number of 1,162 blocks the SV9600 used), compressing at a rate of 8 ms per block using the SV9600 hardware described by the Hadley article implemented with 1993 technology (at least 5 times faster) would be compressed in less than 8 seconds:  10 * 7 * (1,152/16) * (8/1000) / 5 seconds = 8 seconds.   An another example, taking the '239 patent's teaching that a low quality video may have 1 frame a second ('239 patent at 7:3), and again assuming that technology at the time of the alleged '239 invention was at least 5 times faster, the time to compress 10 seconds of video would be less than 1.15 seconds:  10 * 1 * (1,152 / 16)  * (8 / 1000)  / 5 second = 1.15 seconds.  Thus one of ordinary skill in the art would understand that

382

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

the Hadley article teaches how to compress a video of 10 seconds in less than 10 seconds by using technology available at the time of the filing of the '239 patent.

777.    It also would have been obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged '239 invention, who was aware of commercially available video cards with capture modules, to use such a card to perform the claimed functions. As the Hadley article demonstrates, the need for products that capture analog composite signals from external video sources, digitize the signal for use in a computer, and compress the signal to save storage space and reduce transmission time was well recognized long before the alleged '239 invention. *See, e.g.*, Hadley article [APL630DEF-WH0000014630] at 238 ("The objective of the Kodak SV9600 Still Video Transceiver is to develop and market a system for electronically transmitting and receiving NTSC-quality color video images using the public dial-up telephone network. . . . This data is then compressed using highly sophisticated image compression techniques to minimize the transmission time and store requirements.").  The only barrier to adding capture, digitization, and compression of full-motion video was the cost of memory of sufficient capacity and speed to handle video. *See, e.g.*, Sasson 7/31/13 Dep. Tr. at 176:25-177:24.  As discussed above in SectionVI.D, between the time the SV9600 was developed in the late 1980s, and the time of the alleged '239 invention, as memory became much smaller and less expensive but with much greater capacity, cards for capturing, digitizing, and compressing composite signals were developed, and had become widely available.  Moreover, the Discrete Cosine Transform compression method, which the SV9600 compression algorithm uses, is also the basis for JPEG and MPEG compression methods that had become popular by the time of the alleged '239 invention and were used by the known video capture cards. *See, e.g., id.* at 97:1-98:2.  These advancements in technology were well known, and it would have been

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

common sense to incorporate such cards into a laptop or desktop computer to perform the claimed functions.

778.    The same is true for the required "audio capture card."  The addition of audio capture cards to the SV9600 would have also been obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged '239 invention, who would have been aware of commercially available audio capture cards.  The SV9600 discloses a device that accepts a composite signal, which included an audio signal.  Because it was well known that the audio information was available to the SV9600, it would have been common sense at the time of the alleged '239 invention for a person of ordinary skill in the art to use a commercially available audio capture card to capture, digitize, and compress that audio information.  *See, e.g., id.* at 177:25-178:24.  Audio signals have lower bandwidth  and lower sampling requirements such that adding the ability to capture, digitize and compress audio would have been a minor task.  *Id.*  For example, a typical resolution for a reasonable quality speech audio track (such as a news reporter talking) is 12,000 bytes per second uncompressed (and fewer bytes are needed for low quality).  This is, for example, fewer bytes to process than one quarter size frame as discussed above: 294,912  bytes / 16 = 18,432 bytes.  Thus, if any asserted claims of the '239 are understood to require audio, it would be well understood by one of ordinary skill in the art at the time that standard available audio encoding technology could be added to the Kodak SV9600 system in a straightforward way to yield predictable results.

779.    For these same reasons, it would have been obvious to use ActionMedia II with the SV9600 to capture, digitize, and compress the composite signal.  ActionMedia II is a combined video and audio card with an optional capture module designed to be used in personal computers.  ActionMedia II Product Brief [SAMNDCA630-00830181] at SAMNDCA630-

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

00830184; *see also* DVI Article [SAMNDCA630-00830339] at SAMNDCA630-00830343 ("IBM PS/2® ActionMedia II boards can be deployed on Intel386 and Intel486 Micro Channel® PS/2s and on the ISA-bus PS/2 Models 35SX and 40SX.  For both bus standards, the products consist of a singleslot playback adapter and an optional snapon 'daughter card' for realtime capture of multimedia content.'").  The ActionMedia II Delivery Board requires a PC with an "Intel 386SX 16MHz Processor or better" with an expansion slot for insertion of the board.  The board has a "capture connector" for attaching the capture module, which shipped with cables and product documentation.  ActionMedia II Product Brief [SAMNDCA630-00830181] at SAMNDCA630-00830182, SAMNDCA630-00830186.  *See also* DVI Article [SAMNDCA630-00830339] at SAMNDCA630-00830343  ("IBM PS/2® ActionMedia II boards can be deployed on Intel386 and Intel486 Micro Channel® PS/2s and on the ISA-bus PS/2 Models 35SX and 40SX. For both bus standards, the products consist of a single slot playback adapter and an optional snap on "daughter card" for realtime capture of multimedia content.").

780.    ActionMedia II provides the structure and performs the claimed functions of "capturing, digitizing, and compressing at least one composite signal."  For example, the capture module of ActionMedia II "'captures' audio, high-resolution still images, and motion video from live or recorded sources and transfers the information to the ActionMedia II Delivery Board for compression, storage or display."  ActionMedia II Product Brief [SAMNDCA630-00830181] at SAMNDCA630-00830185.  "The ActionMedia II Capture Module digitizes analog audio and video analog signals."  *Id*.  "Audio can be captured and compressed as well, and synchronized with video."  *Id*. at SAMNDCA630-00830186.  *See also id*. at SAMNDCA630-00830182 ("The i750 video processor performs real-time compression, decompression and manipulation of digital video data and screen control."); SAMNDCA630-00830183 (describing audio capture and

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

compression); SAMNDCA630-00830181 (input devices are VCR, camera or scanner).  "The

delivery board . . . can perform still and motion video (with audio) compression, decompression,

video manipulation and graphics functions.  This complete multimedia playback solution is

available as a single add-in board. . . .  The ActionMedia II Delivery Board is used in both

development and playback(end-user) systems.  For application development and for those

applications which require capture of video or audio, a daughter module can be added to digitize

video and audio information from a VCR, camera or scanner."  ActionMedia II Product Brief

[SAMNDCA630-00830181]; *see also id*. at SAMNDCA630-00830185 – 87 (describing the

daughterboard).

781.    Just like the '239 patent, the ActionMedia II capture module "accepts input from a

live camera or video recording equipment" in the form of NTSC or PAL composite, RGB, or S-

VHS signals.  *Id*. at SAMNDCA630-00830182.  The module then "converts analog video and

audio signals into digital information which the Delivery Board can compress."  *Id*. at

SAMNDCA630-00830186.  ActionMedia II then performs "[r]eal-time, 30 fps motion video

compression (when used with the ActionMedia II Capture Module)."  *Id*. at SAMNDCA630-

00830182.

782.    The ActionMedia II product literature describes the various capture, digitization,

and compression features of ActionMedia II including:  "RTV (Real Time Video) or PLV

(Production Level Video) compression algorithms .  . . Powerful Multi-Standard Multi-Format

Capture Architecture (optional) . . . Improved RTV (Real Time Video) Capture . . . Full NTSC

and PAL support . . . Capture in one standard, playback in another . . . Programmable Audio

DSP."  ActionMedia II Product Brief [SAMNDCA630-00830181] at SAMNDCA630-00830182;

*see also id*. at SAMNDCA630-00830186.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

783.    A person of ordinary skill in the art at the time of the alleged '239 patent invention who wanted to capture and transmit full-motion video (with audio) would have been well aware of ActionMedia II (and the other similar cards on the market at the time described above in Section VI.D.2), and would have been motivated to combine ActionMedia II with the SV9600 to perform those functions.  The SV9600 already was capable of receiving a composite signal, and capturing, digitizing, and compressing a frame from that signal, as well as storing and transmitting multiple frames (of video) from that composite signal.  The only constraint to capturing, digitizing, and compressing a full motion video using the SV9600 was the cost of memory of sufficient capacity and speed.  By the time of the alleged '239 invention, such memory was widely available, as were cards such as ActionMedia II.  It would have been common sense for a person of ordinary skill in the art to take advantage of these advancements in technology to add video capabilities to the SV9600.

784.    Samsung also argues that the SV9600 does not capture, digitize, and compress a "composite signal."  I disagree.  As discussed above, the input into the SV9600 is any source of NTSC composite signal, which represents a full color, full motion video signal – the same input signal disclosed in the '239 patent.  *See, e.g.*, '239 patent at 4:31-33.  A person of ordinary skill in the art who wanted to capture, digitize, and compress all or part of the full video would have known to use an off-the-shelf video capture card to do so.  To the extent Samsung contends that the SV9600 does not capture of a full-motion video, as also discussed above, it would have been obvious in view of the knowledge of a person of ordinary skill in the art at the time of the '239 invention, to use the commercially available video capture cards in the SV9600 to capture full motion video.

387

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

785.     Samsung asserts that the "SV9600 also does not disclose a single structure for performing compression."  It is unclear what Samsung means by this statement.  Moreover, Samsung cites nothing in the '239 patent to support such a "single structure" limitation.

786.     I also disagree with Samsung's assertion that ActionMedia II does not meet this limitation because "ActionMedia II does not disclose using a separate audio capture card and video card having video capture module."  First, the Court's construction does not require a "separate" cards.  Second, even if the Court's construction did require separate cards (which it does not), separate cards would have been obvious to a person of ordinary skill in the art, who would have been well aware of the separate audio capture cards and video capture cards on the market.   Third, ActionMedia II contains dedicated processors for video and audio, rendering any differences between a single structure and multiple structures trivial.  ActionMedia II Product Brief [SAMNDCA630-00830181] at SAMNDCA630-00830181 (delivery board has Intel's i750 Video Processor), SAMNDCA630-00830183 (audio is processed through "a separate on-board digital signal processor (DSP)").  Fourth, Samsung points to no benefit to having separate structures, nor does the '239 patent discuss any reason to use separate cards.  In fact, the ActionMedia II combination card is an improvement over separate cards because it uses only a single expansion slot in the computer.   Finally, Samsung points to no disclosure in the '239 patent requiring the audio capture card and video card with capture module be separate structures.  In fact, ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

787.     Samsung also contends that the "SV9600 does not disclose the formation of a composite signal as required by the '239 patent" and that "ActionMedia II also does not disclose the formation of a composite signal as required by the '239 patent."  Samsung's Validity

388

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Response at 196.  First, it is unclear what Samsung means by the word "formation," which does not appear in the claims.  Second, the '239 patent only discloses the capture of an existing composite signal from and formed by an external device, such as a VCR or video camera.  The patent never mentions how that composite signal is "formed," nor is the device that creates the composite signal claimed  To the extent that Samsung's argument is based on the fact that the SV9600 captures, digitizes and compresses a single frame rather than a full-motion video, I have already addressed that argument above.  I have also already explained how the SV9600, either alone or in combination with ActionMedia II, renders this limitation obvious.

788.    Samsung also contends that ActionMedia II "actually teaches away from this element because it suggests using a single structure to allegedly perform some of the required functionalities for both audio and video components.  It also suggests utilizing multiple structures to perform certain of the required functionalities of capture, digitize, and compress.  For example, it teaches away from a video card having a video capture module that captures, digitizes, and compresses."  It is not clear what Samsung asserts is the single structure for "some of the required functionalities" nor is it clear what Samsung asserts are "multiple structures" to "perform certain of the required functionalities."  At minimum, Samsung's argument appears to be internally inconsistent.  In any event, as described above, ██████████████████ ███████████████████████████ – is a combined audio and video card with a capture module (for audio and video capture) that uses a single expansion slot in a PC and performs the claimed functions.   As discussed above, nothing in the Court's construction requires separate cards for video and audio.

389

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

**d)**     **"means for storing said composite signal" (claim 1)**

789.     As discussed above, it is my understanding that this term is a means-plus-function term, and that the claimed function is "storing said composite signal" and the structure to perform that function is a hard disk drive and the software identified in the patent at 3:1-5, 4:52-57, and 6:14-16.  Although Samsung has not identified any structure identified in the specification for performing this function, based on Samsung's infringement contentions, it appears that Samsung has not limited the structure to any specific type of device for "storing" the composite signal.

790.     The SV9600 performs the claimed function of "storing said composite signal." For example, the Hadley article discloses that after [t]he transceiver captures a full frame of video," the transceiver "stores it in digital form in memory for purposes of manipulation and display of the image data."  Hadley article [APL630DEF-WH0000014630]  at 238; *see also id.* at 239 ("The framestore board contains the A/D converters which digitize these signals and store the values in memory.  The memory contents are converted back to analog luminance and color difference signals. . . .  The microprocessor along with a digital signal processor execute the compression algorithm on the image data in the framestore and store the compressed image data in memory.").

791.     Under Apple's construction of this limitation, which requires a hard disk and software to perform the storing, it would have been obvious in view of the knowledge of a person of ordinary skill in the art, who would have been aware of commercially available hard disk drives.  The SV9600 could be attached to an external computer, allowing storage of the images on a persistent storage device, such as a diskette or hard drive.  *See, e.g., id.* at 239 (the SV9600 includes an "[e]xternal computer interface allowed for storage of images in compressed

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

digital form on a PC diskette."); Kodak SV9600 User's Manual [Kodak1195] at 3, 5, 12.  It also

would have been obvious to add a hard disk drive and the required software to the SV9600.

Hard disk drives were ubiquitous by the time of the alleged '239 invention.  In addition,

operating systems such as Microsoft Windows, which was well known at the time of the alleged

'239 invention, contained built-in software functions for storing data on any type of media,

including hard disks.

792.     It also would have been obvious for the reasons discussed above in Sections VI.D

and VI.G.1 for a person of ordinary skill in the art at the time of the alleged '239 invention to use

ActionMedia II with the SV9600 to perform the storing function using a hard disk drive and

storing software.  The ActionMedia II product literature explains that ActionMedia II is designed

to be installed in an expansion slot in a personal computer and is designed to store captured and

compressed composite signals on a hard disk in that computer.  For example, ActionMedia II

provides "[a]udio/[v]ideo [c]apture for the [p]ersonal [c]omputer" and "transforms a PC into a

powerful, interactive authoring platform."  ActionMedia II Product Brief [SAMNDCA630-

0830181] at SAMNDCA630-0830185; *see also id*. at SAMNDCA630-00830184 (requiring a

personal computer with Intel processor).  The literature also explains that "[t]he compressed

video/audio sequences can be stored on a hard disk or transmitted across a network."  *Id*. at

SAMNDCA630-00830186.  These compressed video/audio sequences are stored on the hard

disk as data files.  *See, e.g.*, DVI Article [SAMNDCA630-00830339] at SAMNDCA630-

00830349.

793.     Samsung's apparent construction of corresponding structure makes no distinction

between persistent storage and non-persistent storage, and does not require software.  I disagree

with this construction.  In any event, the SV9600 includes memory that it used to store

391

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

compressed frames of video.  For example, the Hadley article discloses that after [t]he

transceiver captures a full frame of video," the transceiver "stores it in digital form in memory

for purposes of manipulation and display of the image data."  Hadley article [APL630DEF-

WH0000014630]  at 238; *see also id*. at 239 ("The framestore board contains the A/D converters

which digitize these signals and store the values in memory.  The memory contents are converted

back to analog luminance and color difference signals.  . . .The microprocessor along with a

digital signal processor execute the compression algorithm on the image data in the framestore

and store the compressed image data in memory.").

794.     The figure on page 239 of the Hadley article—reproduced below—discloses the

structure for storage (e.g., framestore) in the SV9600.



795.     The Hadley article explains that the "framestore board, which has a total capacity

of 512 kbytes, includes memory space for the compressed image data.  The original

uncompressed image occupies 384 kbytes of memory, therefore 128 kbytes are available to be

used as the compressed image buffer."  *Id*. at 240.

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

796.    I disagree with Samsung's assertion that the "SV9600 does not teach or suggest 'means for storing said composite signal.'" Samsung Validity Response at 186. As discussed above, the SV9600 discloses or renders obvious this limitation under either party's construction.

797.    I disagree with Samsung's contention  that the "ActionMedia II does not disclose means for storing said composite signal with the structure required by the '239 patent." Samsung's Validity Response, at 196. First, Samsung has failed to identify the structure "required" by the '239 patent. In fact, it is my understanding that Samsung has never explained its construction of this limitation. In any event, as discussed above, ActionMedia II performs the claimed function using the structure required by Apple's construction.

798.    I also disagree with Samsung's argument  that the "ActionMedia II does not disclose storing the composite signal as required by the '239 patent." Samsung's Validity Response, at 196. As described above, ActionMedia II stores the captured, digitized, and compressed a composite signal input into the card.

### e)    "means for transmitting said composite signal"  (claim 1)

799.    The Court has identified the function of this limitation as "transmitting said composite signal." In addition, the Court has determined that the corresponding structure disclosed in the specification to carry out the recited function is "one or more modems connected to one or more cellular telephones, telephone lines, and/or radio transmitters, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file." As explained below, the SV9600 performs the claimed function using the required corresponding structure.

800.    The SV9600 performs the claimed function of transmitting the composite signal. For example, the Hadley article explains that after the composite signal is captured, digitized,

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

compressed and stored, "[t]he compressed data is then transmitted via a high-speed modem to another transceiver over standard voice-grade dial-up telephone lines."  Hadley article [APL630DEF-WH0000014630] at 238.

801.    The SV9600 also uses the required structure for performing the claimed function. For example, the Hadley article explains that "[t]he compressed data is then transmitted via a high-speed modem to another transceiver over standard voice-grade dial-up telephone lines."  *Id*. The modem used to transmit the compressed data is show in the figure on page 239 of the Hadley article:



802.    The Hadley article explains that the modem board "has an interface to the microprocessor which is used to configure the modem to the different data rates and obtain diagnostic information from the modem."  Hadley article [APL630DEF-WH0000014630] at 239. In a section entitled "Communication Hardware," the SV9600 modem board is described as "a synchronous serial 9600 bps (CCITT Recommendations V.29) modem that is designed for half-duplex operation over the public switched telephone network" that included an "Intel 8274 Serial Communication Controller to control the operation of the internal modem.  A variation of the bit-oriented SDLC, Synchronous Data Link Control, protocol is used which sends data in frames

394

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

with a check sum added for error detection. . . .   A microprocessor interface is provided so the

microprocessor can access registers which are on the modem. . . .   The data rate of the modem,

its transmit level, equalizers and other parameters are changed by writing to these registers.

Hadley article [APL630DEF-WH0000014630] at 243.

803.    The figure on page 243 of the SV9600—reproduced below—illustrates in greater

detail the modem, and the communications sequence utilized by the SV9600.



804.    The SV9600 uses the required software sequence to perform the claimed function.

For example, the microprocessor had an interface to the modem and was programmed with

software to configure the data rate of modem and set parameters, i.e., "initialize the

communications port." *See* Hadley article [APL630DEF-WH0000014630] at 239, 243-44.  This

software then obtains the data file containing the digitized and compressed composite signal,

breaks the file into packets, and transmits them. *See, e.g.*, *id.* at 244-45 ("After the receiving unit

selects a data rate, the transfer of image data is begun.  Image data is sent at the selected data rate

in packets which consist of several frames of compressed image data."); Sasson 7/31/13 Tr. at

118:18-119:9.  *See also* Hardware / Software Interface [Kodak1218] at 24-29.

395

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

805.    Samsung asserts that the SV9600 does not disclose the software as required by the Court's claim construction.  As discussed above, the Hadley article does disclose software.  As discussed above, the SV9600 discloses a microprocessor interfacing with the modem that is used to configure the modem.  Hadley article [APL630DEF-WH0000014630] at 239 ("the modem has an interface to the microprocessor which is used to configure the modem to the different data rates and obtain diagnostic information from the modem.").  A person of ordinary skill in the art would have recognized that the microprocessor would have been executing software to perform the required sequence.

806.    Samsung also argues that the SV9600 did not transmit a "composite signal."  As discussed above, it would have been obvious to a person of ordinary skill in the SV9600 was capable of capturing, digitizing, and compressing a composite signal.  It also would have been obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged '239 invention to use the faster modems available at the time to the SV9600 to transmit the composite video signal.  The Hadley article discloses the transmission of frames of video information, and the automatic transmission of queued frames of information.  *See, e.g.*, Hadley article [APL630DEF-WH0000014630] at 239 ("External computer interface also permits auto sequencing of images in batch form, auto-dial, auto-answer, storage of uncompressed digital images, and different modes of transmission"); Kodak SV9600 User's Manual [Kodak1195] at 12.  The transmission of sequenced images was a precursor to transmission of video.  Transmission of frames every few moments is in effect very slow frame-rate video.  Thus, transmission of video was already suggested in the article, years before the alleged invention.  Moreover, the asserted claims of the '239 patent do not require any specific transmission rate.

396

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

807.     As discussed above, by the time of the alleged '239 invention, capture of full motion video was possible using commercially available video capture cards and audio capture cards.  These cards were designed to compress video to save storage and to enable faster transmission speeds, just as the Hadley article describes the goals of the compression method used by the SV9600.  In other words, the '239 patent merely describes the use of newer technology to perform the same function as the SV9600, for the same reasons.  A person of ordinary skill in the art at the time of the alleged '239 invention would have known that the use of video capture cards to compress the composite signal and modems with faster transmission speeds combined to enable the transmission of a full motion video composite signal.

808.     I disagree with Samsung's assertion that "[t]he SV9600 also teaches away from the inventions of the '239 patent because it discloses switching from voice to data mode, thus disabling the audio transmission capability."  Samsung provides no explanation or citation to the Hadley article to show how this alleged SV9600 disclosure teaches away from any claim limitation of claim 1.  In any event, a digitized and compressed audio signal is data, not voice, and is transmitted using data mode.  Thus, switching the modem to data mode is enabling, not disabling audio transmission.

f)     **"a host unit including means for receiving at least one composite signal transmitted by the remote unit" (claim 1)**

809.     As discussed above, it is my understanding that this claim limitation includes a means-plus-function term and that the claimed function is "receiving at least one composite signal transmitted by the remote unit." It is my opinion that the corresponding structure disclosed in the specification that performs this function is one or more modems corresponding to the number of modems used in the remote unit and connected to one or more cellular telephones,

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

telephone lines, and/or radio transmitters and File Reception Software Sequence E as described

in the '239 patent at 10:33-61, 11:18-12:8.

810.    The SV9600 discloses a host unit.  The '239 patent generally describes the "host

unit" as "automated to receive a data file transmitted from remote unit 2."  '239 patent at 10:26-

27.  The Hadley article discloses such a device.  For example, one SV9600 still video transceiver

(e.g., a remote unit shown in red below) can connect to another SV9600 still video transceiver

(e.g., a host unit shown in green below), and "the compressed data is then transmitted via a high-

speed modem to another transceiver via a high-speed modem."  Hadley article [APL630DEF-

WH0000014630] at 238.  The figure on page 238 reproduced below illustrates this:



811.    As discussed above in Section VI.G.2.e, the SV9600 has a "means for

transmitting at least one composite signal" limitation through its use of a modem connected to a

telephone line.  These same components in a second "host unit" transceiver are used for

receiving the composite signal transmitted by the "remote unit" transceiver."  Hadley article

[APL630DEF-WH0000014630] at 238, 244-245; *see also* Sasson 7/31/13 Tr. at 163:14-18

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

(sending and receiving SV9600 units were identical).  Thus, the SV9600 has a "means for receiving at least one composite signal transmitted by the remote unit."

812.   To the extent that Samsung argues that the SV9600 does not receive a "composite signal," this limitation would have been obvious in view of the knowledge of a person of ordinary skill in the art for the same reasons discussed above in connection with "means for transmitting."

813.   Samsung's apparent construction of this limitation does not require any specific components, but instead assumes that any component that receives a video meets this limitation. Under that construction, the SV9600 discloses this limitation for the same reasons discussed above in connection with "means for transmitting."

814.   Samsung's argument that the "SV9600 does not disclose a host unit because there is no host unit different from the playback unit" is unclear.  Samsung Validity Response at 187. For instance, it appears to contradict Samsung's infringement contentions that Macs and iOS devices are a combined host unit and playback unit.  In any event, SV9600 discloses both a combined host and playback unit, and a separate host and playback unit, as discussed below.

g)    "a playback unit" (claim 1)

815.   To the extent the limitation "a playback unit" requires the ability to play video, the SV9600 discloses video playback as indicated by the video output in the figure on page 238 highlighted in blue:

399

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION



816.   The Hadley article also describes the SV9600 as having video playback functionality.  For example, after the image is transmitted, "[a]t the receiving transceiver, the compressed image is expanded [decompressed] and converted back to an analog video signal for display on a video monitor."  Hadley article [APL630DEF-WH0000014630] at 238.

817.   As previously discussed, Samsung's argument that the "SV9600 does not disclose a playback unit because it does not disclose a playback unit different from the host unit" is unclear, and contradicts Samsung's infringement contentions.  In any event, the SV9600 includes a playback unit.

818.   I disagree with Samsung's argument that "the host unit and playback units have not been identified in the SV9600 disclosure."  Samsung Validity Response at 188.  The SV9600 includes both a combined host and playback unit, and two transceivers can be used as a separate host and playback unit, as discussed above.

h)      "means for exchanging data with said host unit" (claim 1)

819.   As discussed above, it is my understanding that this term is a means-plus-function term and that the claimed function is "exchanging data with said host unit."  It is my opinion that the structure disclosed in the '239 patent specification for performing the function is a 16-bit

Ethernet card, Novell Netware Lite software, and Host Boot Software Sequence D as described at 10:53 to 11:24 in the '239 patent.

820.   Under Apple's construction, for configurations in which the host unit and playback unit are separate SV9600 transceivers, this limitation would have been obvious in view of the knowledge of a person of ordinary skill in the art, who would have been well aware of using an Ethernet card and Novell Netware Lite software to allow the two transceivers to exchange data.  At the time of the alleged '239 invention, Ethernet was a common way to connect two computers in a network, and Novell was a developer of different versions of popular networking software that had been available for years before the alleged invention.  The very purpose of the Ethernet card in combination with Novell Netware Lite was to connect two computers and allow videos to be shared between them.  *See, e.g.,* DVI Technology [SAMNDCA630-00830339] at SAMNDCA630-00830343; *see also id.* ("ActionMedia II products deliver the best of all worlds. . . .  [V]ideo can also be shared economically among workgroups via a local area network (LAN) server."), SAMNDCA630-00830349 ("With DVI multimedia, application content will now be able to be stored on network servers for shared use by many individuals. . . . When supported by fast digital networks, ActionMedia II cards will even allow desk-to-desk videoconferencing, through such products as IBM's Person to Person/2 solution. Such desktop videoconferencing provides face-to-face interaction between individuals in remote offices, with simultaneous display of documents or photographic images.").

821.   Under Samsung's apparent construction of corresponding structure in which the "host unit" and "playback unit" are in the same device, the SV9600 satisfies this limitation.  For example, the SV9600 allows the display of the compressed image on a video monitor ("the playback unit") on the "receiving transceiver" (the "host unit") after the receiving transceiver has

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

"expanded [decompressed] and converted [the image] back to an analog video signal."  Hadley

article [APL630DEF-WH0000014630] at 238.  The conversion back to an analog video signal is

performed by the analog video board.  *Id.* at 239.  That board is connected to the video monitor,

as shown in the figure below:



*See also id.* at 240 ( "The device used to control the video display and dynamic memory of the

framestore allows the host microprocessor to directly address all the framestore memory

locations or indirectly address the framestore by automatically adjusting the address during each

access to the framestore for the next access.").

822.    I disagree with Samsung's contention that "the citation provided relates to the

interaction of the device with the framestore memory, and is thus unrelated to exchange of data

between the required components, if there were any disclosed."  Samsung has never defined

what the "required components" are and therefore it is impossible to fully respond to Samsung's

argument.

**i)      "means for storing the composite signal received by the host
unit" (claim 1)**

823.    As discussed above, it is my understanding that this term is a means-plus-function

term and that the claimed function is "storing the composite signal received by the host unit."

402

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

Although Samsung has not identified any structure identified in the specification for performing this function, based on Samsung's infringement contentions, it appears that Samsung has not limited the structure to any specific type of device for "storing" the composite signal.

824.    Under Apple's construction, for the same reasons discussed above in connection with the limitation "means for storing said composite signal," the SV9600 performs the claimed function of this limitation – i.e., storing the composite signal received by the host unit.  In addition, the structure that performs the function is rendered obvious by the SV9600.  The playback unit transceiver stores a received image in the same manner a remote unit transceiver stores an image, using the same components.  The images can be stored on the hard disk of an external computer attached to the serial port of the SV9600.

825.    Under Samsung's construction (which does not distinguish between persistent and non-persistent storage and does not require a data file), the limitation is disclosed because (as discussed above) the SV9600 stores the composite signal in memory (the framestore).

826.    I disagree with Samsung's assertion that the "SV9600 does not disclose a memory that is used to store the digital, compressed data received after transmission."  First, Samsung has not explained what it means by "memory."  In fact, it is my understanding that Samsung has not yet identified any structure for performing the claimed function in this limitation.  As discussed above, the Hadley article describes how the microprocessor and digital signal processor "perform the expansion [decompression] algorithm on the compressed image data and "store the resulting image in the framestore."  Hadley article [APL630DEF-WH0000014630] at 239.  The framestore is a memory.  *Id*.  In addition, the compressed digital image can be stored on a PC diskette.  *Id*.  Finally, Samsung has not explained the basis for the requirement that the "means

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

for storing" must store "the digital, compressed data."  The claim expressly requires storage of a composite signal, which is analog uncompressed data.

827.    To the extent that Samsung argues that the SV9600 does not store a "composite signal," this limitation would have been obvious in view of the knowledge of a person of ordinary skill in the art for the same reasons discussed above in connection with "means for transmitting" and "means for capturing, digitizing, and compressing."

### j)    "means for decompressing said composite signal" (claim 1)

828.    As discussed above, it is my understanding that this term is a means-plus-function term and that the claimed function is "decompressing said composite signal."  It is my opinion that the  structure disclosed in the specification for performing the claimed function is a video decompression card and an audio decompression card.

829.    The SV9600 performs the function of decompressing the composite signal.  For example, the Hadley article discloses that the SV9600 "perform[s] an expansion algorithm on the compressed image data."  *Id*. at 239.  "Expansion" means "decompression," as shown by the fact that the expansion is performed on compressed data just before it is converted back to analog for display.  *Id*. at 238.  As it did with compression, the SV9600 performs this decompression using the microprocessor and the digital image processor.  *See, e.g.*, Hadley article [APL630DEF-WH0000014630] at 239, 242 ("COMPRESSION/EXPANSION HARDWARE . . .The TMS32020 Digital Signal Processor (DSP) is used as a parallel-processing element on the computer board.  It performs a portion of the image compression/expansion algorithm while the microprocessor performs the remaining portion of the algorithm.").

830.    The use of a video decompression card and an audio decompression card would have been obvious in view of the knowledge of a person of ordinary skill in the art at the time of

404

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

the alleged '239 invention, who would have been aware of  commercially available video cards that perform video and audio decompression, to use such a card to perform the claimed function. As discussed above in Section VI.D, by the time of the alleged invention of the '239 patent in approximately 1993, add-on video and audio cards for displaying or playing multimedia files, including video with audio, had become widely available.  These cards necessarily performed decompression of video and audio (as well as converting the digital signal to analog) because playback devices can only display or playback decompressed signals.  These advancements in technology were well known, and it would have been common sense to incorporate such cards into a laptop or desktop computer to perform the claimed functions.

831.    It also would have been obvious for the same reasons discussed above in Sections VI.D and VI.G.2.c to use ActionMedia II, which was a combination video and audio card, with the SV9600 to perform the decompression of the full-motion composite signal.  The ActionMedia II product literature repeatedly explains that ActionMedia II performs both audio and video decompression.  For example, "[t]he delivery board is based on Intel's i750 Video Processor and can perform still and motion video (with audio) compression, decompression, video manipulation and graphics functions."  ActionMedia II Product Brief [SAMNDCA630-00830181]; *see also id*. at SAMNDCA630-00830182 ("The i750 video processor performs real-time compression, decompression and manipulation of digital video data and screen control."), SAMNDCA630-00830183 ("High-fidelity mono or stereo, decompression, and playback is provided through a separate on-board digital signal processor (DSP).  The ActionMedia II Delivery Board supports up to four streams of audio, dynamically mixed down to two output channels.  Sampling rates, up to 125 KB per second are software controlled for a maximum frequency response of 16 kHZ over an 85 dB dynamic range. . . . The Delivery Board performs

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

audio compression using ADPCM software algorithms.  Compressed audio data can be interleaved with video data on the same media."); DVI Article [SAMNDCA630-00830339] at SAMNDCA630-00830343-45 ("Attempting to solve the storage problem, Intel and IBM have engaged in a partnership to develop the revolutionary compression and decompression technology of DVI multimedia, and its implementation in ActionMedia II products. . . .  In addition to the programmable video chipset, ActionMedia products provide programmable audio capture and playback through an on board digital signal processor (DSP).").

832.    Under Samsung's apparent construction of this claim term (which does not require cards), the SV9600 discloses the function and structure for "means for decompressing said composite signal" for the same reasons discussed above.

833.    Samsung contends that "[t]here is not a single structure for performing decompression."  It is unclear what Samsung means by "single structure."  In any event, Samsung has failed to cite anything from the '239 patent to show that "a single structure for performing decompression" is a requirement of the claims.  It is also my understanding that Samsung has not yet identified any structure for performing the claimed function in this limitation.  In fact, based on its infringement contentions, Samsung does not appear to be limiting the required structure to "a single structure."  I reserve my right to respond, should Samsung clarify its argument.

834.    To the extent that Samsung argues that the SV9600 does not decompress a "composite signal," this limitation would have been obvious in view of the knowledge of a person of ordinary skill in the art or in combination with ActionMedia II for the same reasons discussed above in connection with "means for capturing, digitizing, and compressing."

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

835.     I disagree with Samsung's argument that "ActionMedia II does not disclose means for decompressing said composite signal as required by the '239 patent."  Samsung Validity Response at 198-99.  First, Samsung does not explain what is "required" by the '239 patent.  In any event, as discussed above, ActionMedia II is a card specifically designed for audio and video decompression.  Indeed, video and audio decompression, conversion of the digital signal to analog, and playback were the essential for video decompression and playback at the time of the alleged '239 invention because personal computers did not have such functionality built in at that time, and instead were shipped with expansion slots to add cards that could perform those functions.

            **k)**       **"An apparatus according to claim 1 wherein the composite signal is transmitted over telephone lines, cellular, radio or other telemetric frequencies." (claim 3)**

836.     The SV9600 discloses "[a]n apparatus according to claim 1 wherein the composite signal is transmitted over telephone lines, cellular, radio or other telemetric frequencies."  For the same reasons as discussed above in connection with the means for transmitting, the SV9600 could transmit over telephone lines.  *See, e.g.,* Hadley article [APL630DEF-WH0000014630] at 238 ("The transceiver captures a full frame of video and stores it in digital form in memory for purposes of manipulation and display of the image data. This data is then compressed using highly sophisticated image compression techniques to minimize the transmission time and storage requirements. The compressed data is then transmitted via a high-speed modem to another transceiver over standard voice-grade dial-up telephone lines. At the receiving transceiver, the compressed image is expanded and converted back to an analog video signal for display on a video monitor."), 239, 243, 244-245 ("News

407

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

gathering: A TV news crew captures an image off a video tape and sends it via cellular phone to the studio.").

837. I disagree with Samsung's contention that "The SV9600 also does not disclose wireless transmission." First, the claim does not require "wireless transmission." I understand that only one of the transmission mediums listed in the claim is required for invalidity purposes. *See also* '239 File History, 2/2/96 Amend. [SAMNDCA630-00832596] at 2, 7-8 (changing "and" in the claim to "or" to overcome a rejection). Second, even if wireless transmission were required by the claim, as discussed above in connection with "means for transmitting," the SV9600 was developed for use with a cellular telephone. Hadley article [APL630DEF-WH0000014630] at 245 ("News gathering: A TV news crew captures an image off a video tape and sends it via cellular phone to the studio.").

> l)      **"An apparatus according to claim 3 wherein the means for transmitting the composite signal includes: at least one interface installed in conjunction with said remote unit; a cellular telephone connected to each said interface"  (claim 7)**

838. As discussed above, the SV9600 has or renders obvious the limitations of claim 3.

839. In addition, the "means for transmitting" in the SV9600 includes "at least one interface installed in conjunction with said remote unit." The only "interface" disclosed in the patent is a modem. *See, e.g.*, '239 patent at 4:25-27, 8:40-41, 8:61-63; Claim Constr. Order at 60. As discussed above in connection with "means for transmitting," the SV9600 discloses the use of a modem. *See, e.g.*, Hadley article [APL630DEF-WH0000014630] at 239. That modem is internal to the SV9600 and therefore is "installed in conjunction with said remote unit," which is the SV9600 transceiver. *Id*. at 239, 243.

840. The SV9600 "includes a cellular telephone connected to each said interface." The Hadley article explains that the SV9600 could be connected to the modem in place of a telephone

408

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

line to allow the SV9600 to communicate over a cellular network.  For example, one of the

applications that had been developed for the SV9600 was "[n]ews gathering," which involved

"[a] TV news crew captur[ing] an image off a video tape and send[ing] it via cellular phone to

the studio."  Hadley article [APL630DEF-WH0000014630] at 245.  CBS actually used a

cellphone connected to a Motorola Cellular Connection, which was in turn connected to the

modem in the SV9600, to transmit images from Tiananmen Square in 1989.  At a minimum, it

would have been obvious in view of the knowledge of a person of ordinary skill in the art to

connect the cellular telephone to the modem for this transmission because the only way to

transmit from a computer-like device was using a modem connected to a device (telephone line,

cellular telephone) that could connect to the recipient.

841.    I disagree with Samsung's arguments that the "SV9600 does not disclose any type

of interface connected to a cellular telephone" and that the "SV9600 does not disclose wireless

transmission."  As discussed above, the SV9600 discloses a modem connected to a telephone

line and to a cellular phone.  In any event, this limitation would have been obvious to a person of

ordinary skill in the art at the time of the invention, for the same reasons discussed above in

connection with "means for transmitting."

> **m)**   **"An apparatus for transmission of data, comprising: a
> computer including a video capture module to capture and
> compress video in real time" (claim 15)**

842.    For the same reasons discussed above in connection with "means for capturing,

digitizing, and compressing" in claim 1, the SV9600 is "[a]n apparatus for transmission of data,

comprising: a computer including a video capture module to capture and compress video."  To

the extent that Samsung argues that the SV9600 fails to disclose this limitation, it would have

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

been obvious in view of the knowledge of a person for the same reasons discussed above in connection with "means for capturing, digitizing, and compressing" in claim 1.

843. To the extent that Samsung argues that the SV9600 does not capture and compress video in "real time," this limitation would have been obvious in view of the knowledge of a person of ordinary skill in the art. As discussed above in Section VI.B.3, the applicants added the term "real time" to this claim during prosecution, and explained that the term meant that the video was being compressed as it was being received. In other words, the video is not saved in persistent storage before it is compressed. This was a feature of the video capture cards known at the time of the invention and used by the inventors in their commercial embodiment of the '239 patent. *See* Section VI.D. As discussed in connection with "means for capturing" in claim 1, by the time of the '239 invention, these capture cards were well known. It would have been common sense for a person of ordinary skill in the art to use them to perform video capture and compression.

844. For these same reasons, it would have been obvious to use ActionMedia II in the SV9600 to perform real-time capture and compression of video. The ActionMedia II product brief repeatedly describes the compression and capture of video in "real time." *See, e.g.* ActionMedia II Product Brief [SAMNDCA630-00830181] at SAMNDCA630-00830182 ("The i750 video processor performs real-time compression, decompression and manipulation of digital video data and screen control."); SAMNDCA630-00830186 ("The ActionMedia II Capture Module and Real-Time Video (RTV) software make real-time compression of full-motion video at the desktop possible."). Indeed,

410

**CONTAINS INFORMATION DESIGNATED AS**
**THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION**

845.    It is unclear what Samsung means by the assertion that "SV9600 discloses a unit that is capable of interacting with another unit of the same nature, which is contrary to the invention of the '239 patent."  To the extent that Samsung means that the units must be of different types, that assertion directly contradicts Samsung's infringement accusations against iOS devices that interact with other iOS devices.  Moreover, there is no such requirement in claim 15 of the '239 patent.  I reserve my right to respond, should Samsung clarify its statement.

846.    I also disagree with Samsung's contention  that "even if [the SV9600] did disclose capture and compression, there is not a single structure that does so and it does not do so in real time."  It is unclear what Samsung means by "single structure."  In any event, Samsung has failed to cite anything from the '239 patent to show that "a single structure" for capture and compression is a requirement of the claims.  In fact, based on its infringement contentions, Samsung does not appear to be limiting its application of this term to "a single structure."  I reserve my right to respond, should Samsung clarify its argument.

n)    **"means for transmission of said captured video over a cellular frequency" (claim 15)**

847.    It is my opinion that based on the specification, the structure for "means for transmission of said captured video over a cellular frequency" is more limited than the "means for transmission" of claim 1.  The only structure disclosed is "one or more modems connected to one or more cellular telephones, and software performing a software sequence of initializing one or more communications ports on the remote unit, obtaining the stored data file, and transmitting the stored data file."  For the same reason discussed above in connection with "means for transmitting," the SV9600 satisfies this limitation or renders it obvious.

411

CONTAINS INFORMATION DESIGNATED AS
THIRD PARTY HIGHLY CONFIDENTIAL INFORMATION

848.    Samsung appears to assume that any structure that transmits video meets this limitation.  Under that apparent construction, the SV9600 discloses this limitation for the same reasons discussed above in connection with "means for transmitting" in claim 1.

o)    **Reasons to Combine the Kodak SV9600 and ActionMedia II**

849.    Given the teachings of the SV9600 and ActionMedia II, and the alleged nature of the problem to be solved by the '239 patent, there were clear reasons for a person of ordinary skill in the art at the time of the alleged '239 invention to combine ActionMedia II and the SV9600.

850.    Both ActionMedia II and the SV9600 patent are directed to the capture, digitization, and compression of composite signals.  As I explained above, the SV9600 is directed to the capture, digitization, and compression of a frame from a composite video signal, and the subsequent transmission of that composite video over various transmission media, including telephonic transmission and cellular transmission.  ActionMedia II  is a card that provides the ability to the capture, digitize, and compress of composite video in real time when installed in a personal computer.  The ActionMedia II product documentation suggests that a user may transmit video data files over networks, once the video data file has been captured, digitized, and compressed.  A person of ordinary skill in the art seeking to transmit composite video would have utilized ActionMedia II and would have looked to the SV9600 to provide cellular transmission of that video.  This is especially true given that the asserted claims of the '239 patent provide no additional way to solve cellular video transmission.

H.    **Secondary Considerations of Non-Obviousness**

851.    I understand that Samsung may seek to rely on so-called "secondary considerations" of non-obviousness to argue that the asserted claims of the '239 patent would not