JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone: (650) 849-5300
Facsimile: (650) 849-5333

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

HAROLD J. McELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
JACK W. LONDEN (CA SBN 85776)
jlonden@mofo.com
RACHEL KREVANS (CA SBN 116421)
rkrevans@mofo.com
RUTH N. BORENSTEIN (CA SBN 133797)
rborenstein@mofo.com
ERIK J. OLSON (CA SBN 175815)
ejolson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation, | Case No.    12-cv-00630-LHK (PSG) |
| Plaintiff, | **APPLE'S MOTIONS IN LIMINE** |
| v. | Date:  March 5, 2014 |
| SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, | Time:  2:00PM<br>Place:  Courtroom 8, 4th Floor<br>Judge:  Hon. Lucy H. Koh |
| Defendants. | |

1

**TABLE OF CONTENTS**

2

Page

3    I.    MOTION NO. 1:  EXCLUDE SAMSUNG'S "COMPILATION" EXHIBITS
          WHICH COMPRISE MULTIPLE UNRELATED DOCUMENTS.................................. 1

4
     II.   MOTION NO. 2:  EXCLUDE EVIDENCE OR ARGUMENT REGARDING
          FINDINGS AND RULINGS AND EVENTS FROM APPLE'S LAWSUITS
5         WITH OTHER PARTIES.................................................................................................. 4

6    III.  MOTION NO. 3:  EXCLUDE EVIDENCE REGARDING PATENT
          REEXAMINATION PROCEEDINGS CONCERNING PATENTS-IN-SUIT ................ 5

7    IV.   MOTION NO. 4:  EXCLUDE "DEMONSTRATION SYSTEMS" CREATED BY
          SAMSUNG'S EXPERTS RELATED TO ALLEGED PRIOR ART ............................... 8
8
     V.    MOTION NO. 5:  EXCLUDE PURPORTED PRIOR ART DOCUMENTS THAT
9         DO NOT QUALIFY AS PRIOR ART .............................................................................. 11

10   VI.   MOTION NO. 6:  EXCLUDE EVIDENCE AND TESTIMONY THAT A
          PURPORTEDLY NONINFRINGING VERSION OF GOOGLE QUICK
11        SEARCH BOX HAS BEEN IMPLEMENTED IN ANY SAMSUNG ACCUSED
          PRODUCT ...................................................................................................................... 14

12   VII.  MOTION NO. 7:  EXCLUDE TESTIMONY OR EVIDENCE REGARDING
          DESIGN AROUND TIMES BY SAMSUNG................................................................. 17

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

3
**Page(s)**

**CASES**

4

5
*Am. Cas. Co. v. Baker*,
227 F.3d 880 (9th Cir. 1994).................................................................................................. 17

6
*Amphenol T&M Antennas, Inc. v. Centurion Int'l, Inc.*,
No. 00 C 4298, 2002 U.S. Dist. LEXIS 822 (N.D. Ill. Jan. 17, 2002)..................................... 6

7

8
*Apple Inc. v. Motorola, Inc.*,
No. 1:11-cv-08540, 2012 WL 1959560 (N.D. Ill. May 22, 2012), *appeal docketed*,
9
Nos. 2012-1548, -1549 (Fed. Cir.) (oral argument heard Sept. 11, 2013)................................ 3

10
*Baker v. Delta Airlines, Inc.*,
6 F.3d 632 (9th Cir. 1993)...................................................................................................... 10

11

12
*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009)................................................................................................. 6

13
*Cardinal v. Buchnoff*,
14
No. 06-CV-0072, 2010 U.S. Dist. LEXIS 86523 (S.D. Cal. August 23, 2010)....................... 4

15
*Conceptus, Inc. v. Hologoc, Inc.*,
771 F. Supp. 2d 1164 (N.D. Cal. 2010) ................................................................................. 18

16

17
*Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*,
291 F.3d 1317 (Fed. Cir. 2002).............................................................................................. 11

18
*CreAgri, Inc. v. Pinnaclife, Inc.*,
19
11-CV-6635-LHK, 2013 WL 6673676 (N.D. Cal. Dec. 18, 2013) ..................................... 5, 6

20
*Hoechst Celanese Corp. v. BP Chems., Ltd.*,
78 F.3d 1575 (Fed. Cir. 1996)................................................................................................... 5

21

22
*i4i Ltd. P'ship v. Microsoft Corp.*,
670 F. Supp. 2d 568 (E.D. Tex. 2009) ..................................................................................... 5

23
*Ierardi v. Lorillard, Inc.*,
No. 90-7049, 1991 WL 66799 (E.D. Pa. April 15, 1991)....................................................... 20

24

25
*In re Bayer*,
568 F.2d 1357 (C.C.P.A. 1978) .............................................................................................. 11

26
*In re Cronyn*,
27
890 F.2d 1158 (Fed. Cir. 1989).............................................................................................. 11

28

*In re Fritch*,
   972 F.2d 1260  (Fed. Cir. 2009) .......................................................................... 8

*In re Lister*,
   583 F. 3d 1307 (Fed. Cir. 2009) ................................................................... 11, 13

*Mendenhall v. Cedarapids, Inc.*,
   5 F.3d 1557 (Fed. Cir. 1993) ............................................................................... 4

*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011) ......................................................................................... 5

*Net MoneyIN, Inc. v. Verisign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008) ....................................................................... 7, 8

*Oracle USA, Inc. v. SAP AG*,
   265 F.R.D. 541 (N.D. Cal. 2009) ...................................................................... 16

*QBE Ins. Corp. v. Jorda Enters., Inc.*,
   277 F.R.D. 676 (S.D. Fla. 2012) ....................................................................... 20

*Rainey v. American Forest and Paper Ass's, Inc.*,
   26 F. Supp. 2d. 82 (D.D.C. 1998) ..................................................................... 20

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
   647 F. Supp. 2d 323 (D. Del. 2009) .................................................................... 5

*Synqor, Inc. v. Artesyn Techs., Inc.*,
   709 F.3d 1365 (Fed. Cir. 2013) ..................................................................... 9, 18

*United States v. Sine*,
   493 F.3d 1021 (9th Cir. 2007) ............................................................................. 4

*Voter Verified, Inc. v. Premier Election Solutions, Inc.*,
   698 F. 3d 1374 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 2804 (2013) ..................... 11, 12, 14

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) ........................................................................... 17

*Z4 Techs., Inc. v. Microsoft Corp.*,
   507 F.3d 1340 (Fed. Cir. 2007) ........................................................................... 6

**STATUTES**

35 U.S.C. § 102 ................................................................................................. 11, 12

**OTHER AUTHORITIES**

Fed. R. Civ. P.
    Rule 26(e)(1)(A).................................................................................................... 16
    Rule 30(b)(6) ......................................................................................................... 17
    Rule 37(c)(1) ......................................................................................................... 16

Fed. R. Evid.
    Rule 402 ................................................................................................................ 11
    Rule 403 ................................................................................................................ 11
    Rule 1002 .............................................................................................................. 12
    Rule 1006 ................................................................................................................ 2

## I.   MOTION NO. 1:  EXCLUDE SAMSUNG'S "COMPILATION EXHIBITS" WHICH COMPRISE MULTIPLE UNRELATED DOCUMENTS

The Court's Case Management Order limits each party's exhibit list to "no more than 200 exhibits each."  (Dkt. 1158 at 2.)  Samsung seeks to evade this limitation by including on its exhibit list at least 22 "compilation exhibits" that each consists of multiple unrelated documents. Samsung has included a total of 325 individual documents—with just a small number of duplicates—within these 22 exhibits.  As a result, Samsung's exhibit list actually contains at least 503 documents, well over twice the allowed number of exhibits.  (*See, e.g.*, Dkt.1267-4, Exs. 317 (3 documents), 333 (14), 334 (6), 350-58 (151), 360 (5), 372 (14), 375 (19), 406 (4), 457 (14), 458 (6), 478 (48), & 489-91 (41).)  Interpreting the Court's Order to permit this "compilation" and "anthology" approach—which neither party used for the trials in the 1846 case—would significantly prejudice Apple, which winnowed its exhibit list in accordance with the Court's Order.  Samsung's improper "compilation exhibits" should be excluded for at least the following reasons.

*First*, the documents in Samsung's 22 "compilation exhibits" are unrelated to each other and could only properly be listed separately on Samsung's exhibit list.  For example, DX333 purports to be a "Summary of the State of the Art for [the] '647 Patent," but it actually consists of 14 different documents, produced by different parties (11 of which are manuals and books for 7 different products, and 3 of which are patents issued to different inventors).

The remaining 21 "compilation exhibits" similarly comprise groups of documents that (1) concern different products or components; (2) were produced or published by different sources; (3) are different types; and/or (4) have different dates or date ranges:

| Exhibits | Included Documents |
|---|---|
| 317, 360 | 8 articles from different sources and with different dates (Dkt. 1267 at 2, 6) |
| 334, 406 | multiple different emails (*id.* at 3, 10) |
| 357 | articles from different publications, a draft press release, and a printout of the Heartland Emmy page, produced by different parties (11 documents in total) (*id.* at 6) |

| Exhibits | Included Documents |
|---|---|
| 358 | 56 documents, some of which purportedly represent different orders for the '239 patent commercial embodiment (*id.*) |
| 350 | 5 different product brochures (*id.* at 4) |
| 352 | 20 schematics for different parts of different Apple products (*id.*) |
| 353, 355, 356, 372, 491 | groups of datasheets (55 datasheets in total) for different models of components (such as the image sensors) in Apple's products (*id.* 5-7, 14) |
| 351, 354, 375, 490 | collections of 5 processor manuals, 30 Bills of Materials, 19 test reports, and 11 user guides for different Apple products (*id.* at 4, 5, 8, 14) |
| 457, 458 | collections of 14 iPhone buyer surveys and 6 iPad tracking surveys taken during different time periods |
| 478 | an "anthology" of 48 different letters (*id.* at 13) |
| 489 | a purported "Summary of Apple materials regarding competitive analysis," comprising 13 different documents (*id.* at 14) |

Apple does not object to the appropriate use of compilation or summary exhibits, such as the four source code compilations on the parties' joint exhibit list (different compilations for Samsung Android source code, Google Android source code, Apple source code, and Android Open Source Project source code), and compilations of accused products by model. But Apple does object to exhibits that combine unrelated and different types of documents about different products or components that would more than double the allotted number of exhibits. Consistent with the parties' agreed-to joint exhibits, each of Apple's PX230 through PX240 is a set of related documents; each contains user guides for a single Samsung product. In addition, PX 266 and PX267 will be Federal Rule Evidence 1006 summaries of certain terms of selected Apple and Samsung licenses (comparable to Samsung's DX630, which was admitted in the first 1846 trial). But these exhibits are not a collection of copies of the licenses themselves.

*Second*, Samsung's "compilation exhibits" would be unworkable at trial. Because each exhibit contains unrelated documents, the admissibility, and in some instances, the publication date of each document in an exhibit would need to be separately demonstrated. For example, the "Summary of the State of the Art for [the] '647 Patent" (DX333) discussed above contains

several publications from different publishers about different products that would require multiple

admissibility decisions for this "single" exhibit.  Moreover, Samsung apparently intends to rely

on the documents in DX333 to establish the state of the art of the '647 patent, which would

necessarily require separately establishing the publication date of each document.  The Court's

limit on the number of exhibits for each party prevents precisely this problem.

    **Third**, no rule permits Samsung to group documents as exhibits in this manner.  Federal

Rule of Evidence 1006 allows parties to use summaries, charts, or calculations at trial "to prove

the content of voluminous writings, recordings, or photographs that cannot be conveniently

examined in court."  But Samsung's 22 "compilation exhibits" are not summaries.  Rather, each

exhibit is a set of documents or excerpts of documents.  Samsung characterizes only 3 of the 22

compilation exhibits as summaries (DX333, DX334, and DX489), but those exhibits contain

separate, complete documents, some of which are manuals or books hundreds of pages in length.

    All 22 "exhibits" should be excluded.

## II.    MOTION NO. 2:  EXCLUDE EVIDENCE OR ARGUMENT REGARDING FINDINGS AND RULINGS AND EVENTS FROM APPLE'S LAWSUITS WITH OTHER PARTIES

    Samsung's exhibit list includes an order from another court in a lawsuit between Apple

and Motorola, as support for its defense to Apple's damages claims.  (Dkt. 1267-4 (DX449).)

The order discusses Apple's damages expert's report in that case concerning the '647 patent.

*Apple Inc. v. Motorola, Inc.*, No. 1:11-cv-08540, 2012 WL 1959560, at *9-10 (N.D. Ill. May 22,

2012), *appeal docketed*, Nos. 2012-1548, -1549 (Fed. Cir.) (oral argument heard Sept. 11, 2013).

The Court should exclude the *Motorola* order, as well as any reference to rulings, findings, or

other developments in cases not involving both parties to this action.

    In fact, *Samsung itself* successfully moved to exclude from the 1846 case the *very order*

that it now seeks to present to the jury in this case.  (Case No. 11-CV-01846 ("1846") Dkt. 1267

at 2 (granting Samsung's motion in limine to exclude "evidence that Michael Wagner's opinions

were excluded in the Motorola case").)  The Court should once again exclude the *Motorola* order,

even though this time Samsung is its proponent.

That ruling also would be consistent with multiple other orders that the Court issued in the 1846 case that excluded evidence or testimony from other cases.  For example, the Court granted motions in limine to exclude "evidence of how other courts or tribunals have construed or ruled on any Apple or Samsung patents" (*id*. at 3 ¶ 6) and "reference to findings or rulings in other proceedings not involving the patents at issue in this case" (*id*. at 4 ¶ 14).  Similarly, the Court sustained objections to the introduction of Apple expert Dr. Balakrishnan's declaration from an ITC investigation involving HTC (1846 Dkt. 1596 at 6); Apple expert Dr. Singh's ITC deposition transcript (1846 Dkt. 1657 at 2); Apple expert Mr. Musika's prior testimony in the *UniRam* case (1846 Dkt. 1668 at 3); Samsung expert Mr. Bederson's claim construction report from the ITC case (1846 Dkt. 1690 at 3); Samsung expert Dr. Van Dam's ITC hearing transcript (1846 Dkt. 1749 at 1-2); and a pleading from a UK case (1846 Dkt. 1749 at 4).  These orders ruled that the risk of confusion outweighed the probative value of these materials.  The same result applies here.

The Federal Circuit also has recognized the risk of jury confusion resulting from "exposing the jury to another judge's statements on the law" or of the application of that law to the facts of another case.  *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1574-75 (Fed. Cir. 1993).  Any mention of other courts' decisions should also be excluded as inadmissible hearsay.  *See, e.g.*, *United States v. Sine*, 493 F.3d 1021, 1036 (9th Cir. 2007) ("A court judgment is hearsay 'to the extent that it is offered to prove the truth of the matters asserted in the judgment.'  It is even more plain that the introduction of discrete judicial factfindings and analysis underlying the judgment to prove the truth of those findings and that analysis constitutes the use of hearsay.") (internal citations omitted)).  Judicial opinions and judicial fact-finding do not fall under the public records exception to the hearsay rule.  *Cardinal v. Buchnoff*, No. 06-CV-0072, 2010 U.S. Dist. LEXIS 86523, at *7 (S.D. Cal. Aug. 23, 2010).

Accordingly, the *Motorola* order, and any reference to rulings, findings, or other developments in cases not involving both parties to this action should be excluded.

1

2

### III.    MOTION NO. 3:  EXCLUDE EVIDENCE REGARDING PATENT REEXAMINATION PROCEEDINGS CONCERNING PATENTS-IN-SUIT

3

4

5

6

7

8

The Court granted Apple's motion to "Exclude Evidence Regarding Patent Reexamination Proceedings" from the 1846 damages retrial.  (1846 Dkt. 2552 at 2.)  Yet Samsung has signaled its intent to rely on a recent decision ordering an *ex parte* reexamination of certain claims of the '172 patent in an attempt to establish invalidity of that patent.  (Dkt. 1267-4 (DX349).)  The Court should once again exclude reexamination records regarding any patent-in-suit, as well as any testimony from any witness about reexamination proceedings regarding any patent-in-suit.

9

10

11

12

13

14

15

16

17

18

That result is particularly appropriate for records concerning the '172 reexamination proceedings, which are at the earliest stage, as the examiner has merely granted a petition that reexamination take place.  (Dkt. 1234-1 at 14 ("Those claims will be reexamined.").)  An examiner's grant of a request for reexamination "is not probative of unpatentability." *Hoechst Celanese Corp. v. BP Chems., Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996).  And as this Court has noted, reexamination proceedings do not apply a presumption of invalidity or a clear and convincing standard to prove invalidity, and this "difference in standard of proof significantly reduces the relevance of the PTO's conclusions." *CreAgri, Inc. v. Pinnaclife, Inc.*, 11-CV-6635-LHK, 2013 WL 6673676, at *5 (N.D. Cal. Dec. 18, 2013) (citing *In re Swanson*, 540 F.3d 1368, 1377 (Fed. Cir. 2008); *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1428 (Fed Cir. 1988)).

19

20

21

22

23

24

25

26

27

In addition, any probative value the reexamination records may have is outweighed by undue prejudice to Apple.  *See*, *e.g.*, *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 647 F. Supp. 2d 323, 356 (D. Del. 2009) ("Absent unusual circumstances . . . non-final decisions made during reexamination are not binding, moreover, they are more prejudicial (considering the overwhelming possibility of jury confusion) than probative of validity."); *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 583 (E.D. Tex. 2009) ("[T]he simple fact that a reexamination decision has been made by the PTO is not evidence probative of any element regarding any claim of invalidity . . . . Even if it were, the evidence was substantially more prejudicial than probative.").

28

1    Informing the jury that the PTO is reexamining the '172 patent would create a high risk of

2    confusing and misleading the jury to erroneously conclude that the patent is invalid or no longer

3    entitled to a presumption of validity.  *See Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331,

4    1343 (Fed. Cir. 2009) (noting that "non-final re-examination determinations were of little

5    relevance to the jury's independent deliberations on the factual issues underlying the question of

6    obviousness," but the "risk of jury confusion if evidence of the non-final PTO proceedings were

7    introduced was high"); *Amphenol T&M Antennas, Inc. v. Centurion Int'l, Inc.*, No. 00 C 4298,

8    2002 U.S. Dist. LEXIS 822, at *5 (N.D. Ill. Jan. 17, 2002) ("[T]elling the jury that the patent has

9    been called into question by the Patent Office may significantly influence the jury's application of

10   the presumption of validity and significantly prejudice [the patentee].  The prejudicial potential of

11   this evidence far outweighs any probative value it may have.").  Informing the jury about the non-

12   final reexamination would also unnecessarily complicate this already complex litigation by

13   forcing the parties and the Court to explain the PTO's reexamination procedures to the jury to

14   mitigate potential confusion.  This would inevitably lead to disputes on how to characterize the

15   reexamination process and how to explain the substantive positions taken by the parties and the

16   PTO in the reexaminations.  Such disruption will be avoided if references are excluded.

17       The same reasoning supports exclusion of reference to reexamination proceedings as to

18   any patent-in-suit.  The '647 patent is also undergoing reexamination proceedings, which are

19   currently the subject of an appeal to the Federal Circuit.  *In re: Apple Inc*., No. 14-1002 (Fed. Cir.

20   Oct. 1, 2013).  Because "the PTO's conclusions are 'final' in name only" when they are "still

21   subject to substantial review" on appeal, *CreAgri*, 2013 WL 6673676, at *5-6, the same problems

22   discussed above regarding lack of probative value, undue prejudice, risks of confusing and

23   misleading the jury, and disruptive disputes would occur if there were evidence or testimony

24   about the '647 proceedings.  Indeed, those problems would be exacerbated by the fact that the

25   examiner's statements about the '647 claim language contradicts this Court's claim constructions

26   and Samsung's admissions in this case.  (*Compare* Declaration of Nathan B. Sabri ("Sabri Decl.")

27   Ex. 1 (12/16/11 PTO Final Rejection '647 patent at 13) (examiner's statement that "[w]here

28   Applicants acted as their own lexicographer in explicitly defining an analyzer server, 'linking' is

narrowed to an implementation using conventional pointers"), *with* Dkt. 221 at 36 (order stating "disclosure of linking through conventional pointers in the specification's description of the preferred embodiment does not limit the broader claim language") *and* Dkt. 854-3 at 4-5 (Samsung admitting that "linking" does not require a pointer).)  The issues would be further complicated by the need to inform the jury about the appeals process and the fact that the reexamination proceedings and appeal include arguments concerning a prior art reference (the Nokia reference) that Samsung abandoned in the claims narrowing process.

Accordingly, the Court should exclude all evidence, argument, testimony or reference to any reexamination proceeding regarding any patent-in-suit.

## IV.    MOTION NO. 4:  EXCLUDE "DEMONSTRATION SYSTEMS" CREATED BY SAMSUNG'S EXPERTS RELATED TO ALLEGED PRIOR ART

The Court should preclude Samsung from arguing or relying on the "demonstration systems" its experts generated solely for the purpose of litigation, purportedly to demonstrate alleged prior art to the '959 and '414 patents.  Samsung's '959 patent expert, Dr. Martin Rinard, created supposed "demonstration systems" for the "WAIS system" and the "AppleSearch system."[1]  Similarly, Samsung's '414 patent expert, Dr. Chase, created such "systems" with components he claims to be prior art versions of Evolution and Windows Mobile.[2]

These built-for-litigation "demonstration systems"—made using the Asserted Patents as guides—are not themselves prior art; they were created in 2013.  Samsung does not contend otherwise.  It has not included *any* demonstration system on its exhibit list, because none is evidence on which the jury can rely to establish the prior art.  Samsung should be precluded from referencing or showing these "demonstration systems" in the trial.  Samsung has no evidence that these "systems"—as Samsung's experts configured them—actually existed in the critical time period.  They are improperly based on speculation and after-the-fact assumptions.  *See Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1369-70 (Fed. Cir. 2008) (improper to use claim

---

[1]  (Dkt. 882-12, 882-16; Dkt. 854, Rinard Decl. Exs. 1-2 (opinions and video demonstrations of Dr. Rinard).)

[2]  (Dkt. 882-7, 882-15 (opinions and video demonstrations of Dr. Chase).)

to piece together different portions of single reference as basis to argue anticipation); *cf. In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("It is impermissible to use the claimed invention as an instruction manual or 'template' to piece together the teachings of the prior art[.]").

Despite Samsung's arguments to the contrary, Dr. Rinard's "systems" were not simple "installations" of prior art software.  To generate his WAIS "system," Dr. Rinard had to do the following:

1) On a *first* computer:

   a.   Compile freeWAIS-sf source code executable software by selecting certain options to include certain features such as the ability to have a server local to the client;

   b.   Generate a database of information;

   c.   Create a synonym file for use with the database; and

   d.   Index the database using certain options and referencing the synonym file created;

2) On a *second* computer:

   a.   Compile source code into a second, different executable by selecting *other* options to turn off the local searching;

   b.   Generate a second database of information;

   c.   Create a synonym file for the second database of information; and

   d.   Index the database using certain options and referencing the second synonym file;

3) Connect the two computers using a network switch;

4) Configure an XWAIS client on the first computer to communicate with the local freeWAIS-sf server; and

5) Configure an XWAIS client on the first computer to communicate with the freeWAIS-sf server on the second computer over an Internet connection.

(Dkt. 882-12 ¶¶ 480-485, 882-16.)  Similarly, to create his AppleSearch "system," which is based on his WAIS system, Dr. Rinard had to do the following:

1) On a *first* computer:

   a.   Install an AppleSearch server;

   b.   Build and index a database for the AppleSearch server;

   c.   Install an AppleSearch client on the same computer as the AppleSearch server; and

   d.   Configure the AppleSearch client to communicate with the AppleSearch server contrary to its intended configuration;

2) On a *second* computer:

   a.   Compile freeWAIS-sf source code into a second, different executable by selecting options to turn off the local searching;

b.  Generate a second database of information;

c.  Create a synonym file for the second database of information; and

d.  Index the database using certain options and referencing the synonym file;

3)  Connect the two computers using a network switch; and

4)  Configure the AppleSearch client to communicate with the FreeWAIS-sf server running on the second computer.

(*Id*. ¶¶ 486-491, 882-16.)

Samsung claims that these systems—spanning multiple computers and pieces of software—were merely configured "as described in the included installation guide and other freeWAIS-sf documentation."  (Dkt. 854 at 19 (citing freeWAIS-sf Installation Guide, Dkt. 854-16).)  But Samsung has been unable to point to any portion of the installation guides for freeWAIS-sf or Apple Search—or any other available documentation—that instructed a user to install these multiple pieces of software in these diverse configurations on multiple computers with the specific combinations of options that Dr. Rinard chose.  That is because no such instructions existed at the time.  Rather, Dr. Rinard—armed with the teachings and disclosures of the '959 patent in 2013—created a never-before-seen "system" that Samsung wants to pass off as prior art.  It should not be permitted to do so.

Similarly, Dr. Chase, in his report, demonstrates how his 2013-created systems might have worked during the prior art time period by creating emails, calendar entries and contacts and videotaping what he claims to be the behavior of the Evolution and Windows Mobile with ActiveSync.  (*See* Dkt. 882-7, 882-15.)

Whatever probative value these "demonstration systems" may have is outweighed by the serious risk they present of misleading the jury and causing undue prejudice to Apple.  *Synqor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1380 (Fed. Cir. 2013) (not abuse of discretion to exclude evidence more prejudicial then probative).  Apple anticipates that Samsung will rely heavily on these "systems" to give the jury the false impression that Samsung's litigation-spawned "systems" are demonstrations of what was actually known or used at the critical time.  Presenting these "systems" to the jury for the purpose of demonstrating prior art would almost certainly mislead the jury into believing that they are actual evidence of what did exist at the time.

Moreover, Samsung would have the jury believe that these systems were created by simply installing the prior art software out of the box—which would be familiar to jurors who will likely have experience putting a CD into a computer and installing software with step-by-step guidance. In reality, Samsung's experts spent numerous hours building these systems using multiple computers, building separate databases, and selecting different compiling options—none of this done with instructions sold with the prior art systems themselves, but instead using the Asserted Patents in an impermissible hindsight exercise.

The misleading effect of presenting the jury with a fiction masquerading as reality would cause undue prejudice to Apple.  Samsung should not be permitted to present misleading "demonstration systems" in its opening statement and through its experts and require Apple to waste its trial time in an attempt through cross-examination to undo their misleading effect.  Use of these "systems" also would lead to a disruptive sideshow of disputes about what the jury should be told about the means by which Samsung's created these irrelevant and misleading "systems," including disputes about the need for curative instructions and objections arising from the fact that these are not systems that actually existed but are only the experts' attempts to demonstrate what they believe someone at the time could have created.  (1846 Dkt. No. 2673 at 8-9 (excluding evidence in part due to risk of "confusing the issues" and "wasting time")); *Baker v. Delta Air Lines*, *Inc.*, 6 F.3d 632, 643 (9th Cir. 1993) (district court within discretion to exclude evidence under Rule 403 where side issues and debates over proposed evidence "might have consumed considerable time and distracted the jury").  Allowing Samsung to reference or rely on these "systems" would permit Samsung to present under the guise of "demonstratives" evidence of prior art systems in configurations that Samsung has no proof ever existed.

## V.     MOTION NO. 5:  EXCLUDE PURPORTED PRIOR ART DOCUMENTS THAT DO NOT QUALIFY AS PRIOR ART

Apple moves to preclude Samsung from relying on references that do not qualify as prior art under 35 U.S.C. § 102.  Samsung bears the burden of proving—by clear and convincing evidence—that alleged prior art "printed publications" were "sufficiently accessible to the public interested in the art" before the critical date.  *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989)

1  (quotation marks omitted).  Public accessibility is an issue of law based on underlying factual

2  determinations.  *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc*., 291 F.3d 1317, 1321

3  (Fed. Cir. 2002).  Samsung cannot meet its burden for at least two references—the "Tung Thesis"

4  (DX304) and the "Neonode Quick Start Guide" (DX342).  Because these references are not prior

5  art as a matter of law, they should be excluded under Rules 402 and 403.

6       For library-based references such as the Tung Thesis, the absence of shelving, cataloging,

7  and sufficient indexing indicates that a reference was not "publicly available to those interested in

8  the art."  For example, the Federal Circuit's predecessor in *In re Bayer*, 568 F.2d 1357, 1360-62

9  (C.C.P.A. 1978), found that a graduate thesis in a university library was not publicly available

10  because it was not catalogued or placed on the shelves.  Similarly, in *In re Cronyn*, the thesis was

11  only indexed alphabetically by the author's name; there was no ability to search the index by

12  subject matter to locate the thesis.  890 F.2d at 1161.  In contrast, in *In re Lister*, 583 F. 3d 1307

13  (Fed. Cir. 2009), addressed a manuscript entitled "Advanced Handicap Alternatives for Golf,"

14  that was indexed on two online catalogues that allowed keyword searches of titles.  The Federal

15  Circuit held that the manuscript was sufficiently indexed to allow an interested researcher to

16  locate the manuscript using general search terms related to the invention, and therefore was

17  publicly available, because "a reasonably diligent researcher" who was "interested in ways to

18  expedite the game of golf and make it easier for casual players" would have attempted searches

19  using general keywords ("golf" and "handicap") found in the manuscript's title.  *Id.* at 1315; *see

20  also Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F. 3d 1374, 1381 (Fed. Cir.

21  2012) (finding an online publication publicly available because, among other things, it was

22  retrievable using general search terms pertinent to the relevant art), *cert. denied*, 133 S.Ct. 2804

23  (2013).

24       The Tung Thesis does not meet the Federal Circuit's standard for a "printed publication"

25  for several reasons.

26       ***First***, Samsung's *only* source of evidence on the Tung Thesis's public availability comes

27  from a deponent with *no first-hand knowledge* of the circumstances surrounding the alleged

28  publication.  Samsung relies entirely on the deposition of Norbert Gövert, the deputy director of

1   the library at the Technical University of Dortmund in Germany where the thesis was supposedly

2   stored.  According to Mr. Gövert, an inventory record that supposedly relates to Tung Thesis

3   indicates that the Tung Thesis was entered into the library's non-public inventory system on

4   October 7, 1997.  (Sabri Decl. Ex. 2 (7/15/13 Gövert Dep. Tr. at 25:1-24, 28:23-29:5, 31:24-

5   32:6).)[3]  Mr. Gövert testified that the Tung Thesis itself was not available online, but that

6   information contained in the inventory record (*e.g.*, author and title) was made available to the

7   general public through the library's Online Patron Access Catalog ("OPAC").  (*Id.* at 32:19-18.)

8          Mr. Gövert *admitted* that he had no first-hand knowledge regarding the alleged

9   publication of the Tung Thesis' inventory information; he could only state that, based on his

10  knowledge as "deputy director of the library," the "business process" for acquisition and

11  cataloging was that "those things which are inventorized are made publicly available

12  immediately."  (*Id.* at 33:19-35:1; 139:7-141:23.)  But Mr. Gövert did not start his position as

13  deputy director of the library *until 2004*—well after the critical date.[4]  He acknowledged that that

14  he had *no personal basis* for knowing that such procedures were followed before 2004, and that

15  he could *not* testify as to whether the inventory record information became publicly available

16  through OPAC.  (*Id.* at 141:24-142:17.)  Indeed, although he was able to retrieve the non-public

17  inventory record from the library records in June 2013, Mr. Gövert testified that *he tried to search*

18  *the public OPAC database for the Tung Thesis record*, *but was not able to find it*.  (*Id.* at 138:6-

19  139:6.)

20         ***Second***, there is no evidence that the Tung Thesis exhibit is a true and correct copy of the

21  document supposedly stored in the University of Dortmund library.  Mr. Gövert was never shown

22  *any* purported copy of the Tung Thesis during his deposition and his library no longer has a copy.

23  (*Id.* at 23:7-20, 24:5-26:25.)  The inventory record that Mr. Gövert discussed did not contain a

24

25  [3]  Samsung did not include this critical inventory record in its exhibit list.  For that reason alone,
    the Court should exclude any argument or testimony regarding this inventory record under

26  Federal Rule of Evidence 1002 (requiring an original writing in order to prove its content).

27  [4]  While Mr. Gövert testified that prior to 2004 he worked in the computer science department
    and was the "contact person" to the library, there is no evidence that he had first-hand knowledge
    of the libraries policies and procedures before 2004.  (*Id*. at 27:20-28:12.)

28

1   copy of the Thesis.  In other words, there is no evidence that the document Samsung intends to

2   submit into evidence (DX304) is the same document that may or may not have available for

3   inspection in the University of Dortmund library.

4        **Third**, even assuming that admissible evidence existed confirming that bibliographic

5   information such as the title had been publicly available (which it does not), there is no evidence

6   that a reasonably diligent researcher interested in the problems solved by the '959 patent would

7   have been able to discover the Tung Thesis.  The document is entitled "Extension of the Free-

8   WAIS server."  (*Id.* at 35:7-18.)  The '959 patent, by contrast, is directed to "convenient access to

9   items of information that are related to various descriptors input by a user, by means of a unitary

10  interface which is capable of accessing information in a variety of locations."  (JX4 '959 Patent,

11  Abstract.)  No number of keyword searches using any combination of relevant terms (*e.g.*,

12  "universal interface," "database," "search," or any other term in the patent or file history) would

13  yield the Tung Thesis' bibliographic record.  Indeed, Mr. Gövert testified that he couldn't find

14  any record of the Tung Thesis on OPAC, *even though he knew the author and exact title*.  (Sabri

15  Decl. Ex. 2 (7/5/13 Gövert Dep. Tr. at 138:6-139:6).)  Because the Tung Thesis could not be

16  "'located by persons interested and ordinarily skilled in the subject matter or art exercising

17  reasonable diligence,'" it is not a "printed publication" or other proper form of prior art and

18  should be excluded.  *In re Lister*, 583 F. 3d at 1315 (quoting *Kyocera Wireless Corp. v. ITC*,

19  545 F.3d 1340, 1350 (Fed. Cir. 2008)).

20       Samsung also has no evidence of the public availability of the Neonode Quick Start Guide

21  (DX342), which was directed to a phone that was never sold in the United States before the

22  critical date.  Thus, Samsung cannot establish that the Quick Start Guide for that phone was made

23  publicly available through U.S. sales distribution channels—in fact, Samsung has no evidence

24  that anyone in the United States had even heard of the Neonode before the critical date.  Nor does

25  Samsung have evidence that the Neonode Quick Start Guide was ever part of any journal,

26  database, catalog, repository, or any other source known to anyone interested in the art.  Rather,

27  Samsung's only "evidence" of public availability is the declaration of Chris Butler, office

28  manager at the Internet Archive.  Mr. Butler's testimony establishes—at most—that the Neonode

1    Quick Start Guide was available on the Internet prior to the critical date at the website

2    http://www.neonode.com/pdf/N1_Quick_Start_Guide.pdf.  (*See* Sabri Decl. Ex. 3 (Aff. of Chris

3    Butler & Ex. A).)  Thus, the entirety of Samsung's evidence is that the Quick Start Guide was

4    available on one website "on the Internet."

5           The Federal Circuit requires more.  The "key inquiry" in considering whether a document

6    is a printed publication is "whether the reference was made sufficiently accessible *to the public*

7    *interested in the art* before the critical date."  *Voter Verified*, 698 F. 3d at 1380 (emphasis added)

8    (quotation omitted).  For example, the reference in *Voter Verified* was available on an online

9    digest that a person of ordinary skill would have been "independently aware of . . . as a prominent

10   forum for discussing [relevant] technologies."  *Id.* at 1381.  But Samsung has presented no

11   evidence that anyone skilled in the relevant art even knew about Neonode (which was not

12   available in the U.S. before the critical date), would have had any reason to search for information

13   on Neonode, or would have been capable of finding any such information on any available

14   Internet search engine or database.  There is no evidence that the Neonode Quick Start Guide was

15   publicly available, it is not prior art, and it should be excluded from evidence.

16   **VI.    MOTION NO. 6:  EXCLUDE EVIDENCE AND TESTIMONY THAT A**
     **PURPORTEDLY NONINFRINGING VERSION OF GOOGLE QUICK**
17   **SEARCH BOX HAS BEEN IMPLEMENTED IN ANY SAMSUNG**
     **ACCUSED PRODUCT**
18
19          As this Court has repeatedly held, information and theories not timely disclosed during

20   discovery may not be raised for the first time at trial.  (*See, e.g.*, 1846 Dkt. 1519 at 1 (excluding

21   proposed impeachment document in light of earlier order excluding untimely disclosed invalidity

22   theories); 1846 Dkt.1749 at 6 (excluding document not disclosed in interrogatory responses).)

23   Consistent with those rulings, Apple moves to exclude testimony and other evidence that an

24   allegedly noninfringing version of the Google Quick Search Box[5] code that Samsung claims ▓

25   �as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  and was made publicly available in August 2013 has

26   been implemented in any Samsung product.

27          [5] Quick Search Box is also known as Google Search Application, and has been referred to
28   as QSB or GSA in various expert reports and discovery responses.

1      Apple's '959 infringement analysis relies in part on how the Google Quick Search Box

2  code, which Samsung receives from Google and incorporates into its products, uses locally stored

3  search history.  The Quick Search Box module that locates information in the Internet uses a rule

4  of thumb that involves and incorporates information from the user's local search history.

5      In Samsung's September 13, 2013, noninfringement expert report, Samsung's expert Dr.

6  Rinard asserts that Google removed local search history entirely from a version of the Quick

7  Search Box ████████████████████████.  (Sabri Decl. Ex. 4 (Rinard Rebuttal

8  Noninfringement Expert Report ¶¶ 196-200, 338.) ████████████████████████

9  ████████████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████.  (*Id.*)  This opinion appears to be intended

13 to enable Samsung to present a noninfringement argument relating to Quick Search Box versions

14 2.7 and up.

15     Samsung produced no information during discovery—or to this very day—that ties Quick

16 Search Box versions 2.7 or later to any Samsung product.

17     *First*, Samsung never supplemented its response to Apple's interrogatory seeking source

18 code versions for each Accused Product to include Quick Search Box versions 2.7 and up.

19 Apple's Interrogatory No. 41 sought source code versions for each Accused Product, including all

20 post-release updates of source code.  Samsung served its final supplemental response to this

21 interrogatory on July 15, 2013.  Samsung did not mention the changes to the Quick Search Box

22 ████████████████████████████, and Samsung listed

23 only Android versions released well before August 2013 that could therefore not have included

24 Quick Search Box version 2.7.  Samsung never sought to supplement this interrogatory further,

25 even after the August 2013 date that Dr. Rinard asserts Quick Search Box version 2.7 became

26 publicly available or after service of Dr. Rinard's report.  (Sabri Decl. Ex. 5 (Samsung's Resp. to

27 Interrogatory No. 41).)

28

1    **Second,** Samsung never supplemented its response to Apple's interrogatory seeking the

2    basis for Samsung's noninfringement positions (Interrogatory No. 24) to identify Quick Search

3    Box version 2.7 code.  (Sabri Decl. Ex. 6 (Samsung's Response to Interrogatory No. 24).)

4    Samsung served its final supplemental response to this interrogatory on October 4, 2013—nearly

5    one month after Samsung's noninfringement expert report; nearly two months after Google

6    allegedly made Quick Search Box version 2.7 code publicly available; ███████████████████

7    ████████████████████████████████████    Yet Samsung did not mention Quick Search Box

8    version 2.7 code or this issue at all.

9    **Third,** even in his rebuttal report that raised Quick Search Box code version 2.7, Dr.

10   Rinard did not seek to tie Quick Search Box versions 2.7 and up to any Samsung product.  Rather,

11   Dr. Rinard discusses the alleged noninfringing alternative independently of any product,

12   explaining that he downloaded this version of the Quick Search Box code to ████████████

13   ████████████████████████    (Sabri Decl. Ex. 4 (Rinard Rebuttal Noninfringement Expert Report

14   ¶¶ 196-200).)

15   Having produced no evidence during discovery that Quick Search Box code versions 2.7

16   and up were actually implemented in a Samsung product, Samsung cannot make such a showing

17   for the first time at trial.  Fed. R. Civ. P. 26(e)(1)(A) (obligating party to supplement discovery

18   responses upon learning of new material information); Fed. R. Civ. P. 37(c)(1) (mandating

19   preclusion of undisclosed evidence unless failure to disclose substantially justified or harmless);

20   1846 Dkt. 1545 at 6 (upholding ruling precluding Samsung from relying on untimely disclosed

21   evidence and theories); *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 544 (N.D. Cal. 2009)

22   (emphasizing that "Rule 37 *mandates* that a party's failure to comply with [initial disclosure

23   obligations or duty to supplement discovery responses] results in that party being precluded" from

24   use of information at trial) (emphasis in original); *see also Yeti by Molly, Ltd. v. Deckers Outdoor

25   Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (exclusion under Rule 37 appropriate even where no

26   specific court order violated and no showing of bad faith); *Am. Cas. Co. v. Baker*, 22 F.3d 880,

27   886 (9th Cir. 1994) (district court within discretion to preclude expert testimony for failure timely

28   to supplement interrogatory responses).  Samsung cannot justify failing to provide such evidence

1    (if it exists), as Samsung knew of Quick Search Box version 2.7 and its noninfringement claim *at*

2    *least* in advance of its September 2013 noninfringement report, if not months in advance of its

3    July 2013 interrogatory responses ███████████████████████████ and Samsung

4    should know what Quick Search Box code version ships in its own products.  Moreover, Apple

5    would be severely prejudiced if Samsung were permitted to ambush Apple with such new

6    evidence at trial.  If Samsung were to elicit testimony from a witness at trial that Quick Search

7    Box version 2.7 was actually implemented in a Samsung product, Apple would have been

8    deprived of the opportunity to properly investigate and challenge any such claim in cross-

9    examination or through other conflicting evidence.  Apple also would have had no opportunity to

10   obtain further information such as timing of implementation in order to calculate alternative

11   damages numbers.

12       Accordingly, Apple respectfully requests that the Court prevent Samsung from arguing or

13   presenting evidence at trial that the allegedly noninfringing Quick Search Box code version 2.7 or

14   later has actually been implemented in a Samsung product.

15   **VII.   MOTION NO. 7:  EXCLUDE TESTIMONY OR EVIDENCE REGARDING**
         **DESIGN AROUND TIMES BY SAMSUNG**
16

17       Apple moves to exclude testimony or evidence from Samsung experts and witnesses

18   related to the total elapsed time it took Samsung to implement a design-around for the '172

19   patent, '721 patent and '959 patent, and the total time it would have taken Samsung to implement

20   any proposed design around for the '647 patent and '414 patent, because its corporate

21   representatives were not prepared to address the issue.  Apple served a Rule 30(b)(6) deposition

22   notice asking for Samsung to identify any alleged design arounds/noninfringing alternatives and

23   the time needed to implement those designs.  (*See* Sabri Decl. Ex. 7 (Plaintiff & Counterclaim

24   Defendant Apple Inc.'s Tenth 30(b)(6) Deposition Notice).)  One factor that affects the

25   calculation of lost profits is whether an actual or hypothetical design around exists and how long

26   it would take to implement that design around in lieu of Samsung's infringement of the patent.

27   To be a meaningful non-infringing substitute for a product being sold to the public, this period

28   must incorporate both the time needed to identify and create a non-infringing alternative and the

1   time needed to implement it in software actually operating on Samsung phones being sold in the

2   United States.  This time period necessarily includes the time to (1) create a design around, (2)

3   implement that design around in software, (3) test the design around, (4) provide the design

4   around to the U.S. carriers for testing, (5) install the design around on Samsung phones, and (6)

5   have those phones available for sale in the United States.  It is that entire time period, from

6   beginning to end, that is relevant to determine the "off the market" time period at issue in the

7   competing opinions offered by the parties' damages experts.  (Dkt No. 1156-03, Vellturo Expert

8   Report ¶¶ 290-292, 294, 394, 398-401, 416; Sabri Decl. Ex. 8 (Chevalier Rep. ¶¶ 243-244).)  *See*,

9   *e.g.*, *Synqor*, 709 F.3d at 1382 (defendant must establish that noninfringing alternatives were

10  available for commercial use); *Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1178-79

11  (N.D. Cal. 2010) (granting judgment as a matter of law that there no acceptable and available

12  non-infringing alternatives during relevant period where defendant failed to "point to any

13  research-and-development documentation, deposition testimony, or sworn declarations that might

14  demonstrate [its] capacity to 'implement' noninfringing alternatives").

15          At their depositions, however, Samsung's designated corporate witnesses were not able to

16  testify as to the full time period needed for any actual alleged design arounds or proposed non-

17  infringing alternatives for any of the Asserted Patents.  At most, Samsung's witnesses testified as

18  to the time involved in *one* of the steps to a design around, but not the totality of time needed or

19  the time for *all* of the steps.

20          For example, for the '959 patent, Samsung's designee, Sunggeun Park, testified that █

21  ███████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████████████████

24  ███████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████

26  ███████)

27          On the '172 patent, Samsung's designee, Daewoon Myoung, testified that ████████

28  ██████████████████████████████████████████████████████████████████████

1

2

3

4

5                                                                                  (Sabri Decl. Ex.10 (6/7/13

6   Daewoon Myoung Dep. Tr. at 76-77, 92 and 129).)

7           On the '721 patent, Samsung's corporate designee, Youngmi Kim, testified

8                              but not the entire time for implementation.  (Sabri Decl Ex. 11 (6/20/13

9   Youngmi Kim Dep. Tr. at 105-109, 146, 152-155).)  Mr. Kim offered testimony

10

11

12                              (*Id.*)

13          On the '647 patent, Samsung's initial designee, Jinhyung Kim, testified that

14

15

16          (Sabri Decl. Ex. 12 ( 6/6/13 Jinhyung Kim Dep. Tr. at 183-95 and 239).)  Samsung then

17   offered a second designee on the Tenth Deposition Notice, but that witness, Huijae Lee, could not

18   fill in the gaps.  Mr. Lee identified

19

20          (Sabri Decl. Ex. 13 (7/5/13 Huijae Lee Dep. Tr. at 138-144).)

21

22                              (*Id.*)

23          Mr. Lee was also designated as Samsung's witness on the '414 patent.  On that patent,

24

25                                          (*Id.* at 86, 94.)

26

27

28

1    ███████████████   (*Id.* at 97-105 and 118.)  In other words, he was not able to provide testimony

2    on the full amount of time it would take to implement a design around on the '414 Patent.

3       Samsung is bound by the testimony of its corporate representatives who lacked knowledge

4    of the total time required for Samsung to implement a design around.  *See*, *e.g.*, *Rainey v. Am.*

5    *Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 94 (D.D.C. 1998) (precluding testimony at trial of

6    a theory that differed from one offered by the 30(b)(6) designee); *QBE Ins. Corp. v. Jorda*

7    *Enters., Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012) (corporate designee's "'we-don't-know'

8    response can be binding on the corporation and prohibit it from offering evidence at trial on those

9    points . . . . the lack of knowledge answer is itself an answer which will bind the corporation at

10   trial"); *Ierardi v. Lorillard, Inc.*, No. 90-7049, 1991 WL 66799, at *3 (E.D. Pa. April 15, 1991) (if

11   party's 30(b)(6) witness, because of lack of knowledge or failing memory, provides a "don't

12   know" answer, then "that is itself an answer" and the corporation "will be bound by that

13   answer").")

14      Accordingly, because Samsung's corporate witnesses were not prepared to testify about

15   the total amount of time required to implement a design-around for any of the asserted Apple

16   patents, Samsung should be precluded from presenting testimony from its expert or fact witnesses

17   about either the amount of time required to implement a design-around for any of the asserted

18   Apple patents, or about any step in the design-around process as to which a 30(b)(6) designee did

19   not have knowledge.

20   Dated:  February 18, 2014    MORRISON & FOERSTER LLP

21

22             By:   */s/ Rachel Krevans*

23               RACHEL KREVANS

24               Attorneys for Plaintiff and
                 Counterclaim-Defendant

25               APPLE INC.

26

27

28