# EXHIBIT 2

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

### Before the Honorable Lucy H. Koh
### Federal District Court Judge

| | |
|---|---|
| APPLE, INC, a California corporation, Plaintiff<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company, Defendants. | CASE NO. 12-CV-00630-LHK |

## EXPERT REPORT OF SAUL GREENBERG, PH.D., REGARDING THE VALIDITY OF THE ASSERTED CLAIM 8 OF U.S. PATENT NO. 8,046,721

EXPERT REPORT OF SAUL GREENBERG RE THE VALIDITY
OF THE ASSERTED CLAIM OF US PATENT NO. 8.046.721

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION | 1 |
| II. | | BASIS FOR OPINIONS | 1 |
| | A. | Qualifications. | 1 |
| | B. | Materials Considered. | 6 |
| | C. | Level of Ordinary Skill in the Art. | 6 |
| III. | | UNDERSTANDING OF RELEVANT LEGAL STANDARDS | 7 |
| | A. | Legal Standard for Prior Art | 7 |
| | B. | Legal Standard for Anticipation | 8 |
| | C. | Legal Standard for Obviousness | 9 |
| | D. | Person of Ordinary Skill in the Art | 12 |
| | E. | Legal Standard for Written Description and Enablement | 13 |
| | F. | Legal Standard for Claim Construction | 13 |
| | G. | Legal Standard for Indefiniteness | 17 |
| | H. | Legal Standard for Inventorship | 18 |
| | I. | Legal Standard for Conception, Diligence and Reduction to Practice | 19 |
| | J. | Legal Standard for Priority Date | 20 |
| | K. | Incorporation By Reference | 20 |
| IV. | | SUMMARY OF OPINIONS | 22 |
| V. | | TECHNOLOGY BACKGROUND | 23 |
| | A. | Terminology | 23 |
| | | A.1. "touch screens" vs. "touch pads": | 23 |
| | | A.2. "stylus" vs. "un-instrumented touch": | 24 |
| | | A.3. "gesture" | 24 |
| | | A.4. "mouse emulation" | 24 |
| | | A.5. "Interaction techniques" | 25 |
| | B. | Touch screens and the application of touch screen technology | 25 |
| | C. | Interface Design Considerations | 31 |
| | | C.1. Norman's concepts | 31 |

| | | C.2. | Direct manipulation | 32 |
| | | C.3. | Feedback | 33 |
| | | C.4. | Labels, instructions and other visual cues | 35 |
| | | C.5. | Metaphors | 36 |
| | | C.6. | Consistency | 38 |
| | | C.7. | Drag and Drop | 39 |
| | D. | | Evaluation and Iterative Design | 43 |
| | | D.1. | Gestures, and the choice of gestures to use | 44 |
| | E. | | Accidental Activation / Accidental Touch | 53 |
| | | E.1. | Keylock functions | 54 |
| | | E.2. | Legal vs. illegal input actions: | 55 |
| | | E.3. | Guard regions: | 56 |
| | | E.4. | Sequences: | 56 |
| | | E.5. | Recognized gesture: | 59 |
| | | E.6. | Preventable feedback: | 62 |
| | | E.7. | Explicit confirmations: | 63 |
| | | E.8. | Lift-off/Take-off: | 63 |
| | | E.9. | Mechanical covers: | 63 |
| | | E.10. | Reducing the cost of accidental touches: | 64 |
| | | E.11. | Other methods | 64 |
| | | E.12. | Choice of Methods | 64 |
| | F. | | Example 1: the Graphical Switch and Unlocking: From Physical to Touch-based Graphical Controls | 65 |
| | G. | | Example 2: Systems relating to accidental activation and/or unlocking | 70 |
| | | G.1. | Activation via drag-and-drop interfaces | 70 |
| | | G.2. | Gestural Patterns for Unlocking | 72 |
| VI. | | | THE '721 PATENT | 74 |
| | A. | | Disclosure of the Claimed Invention | 74 |

B.  Asserted claim. ..................................................................... 77

C.  File History. ......................................................................... 78

C.1.  The '849 Application. ............................................ 78

C.2.  References Cited During Prosecution ..................... 82

D.  Priority Date. ........................................................................ 84

E.  Conception .......................................................................... 84

F.  Diligence .............................................................................. 88

VII.  CONSTRUCTION OF CLAIM TERMS OF THE '721 PATENT ................... 89

A.  The Unlock Image. ............................................................... 89

B.  "to unlock" ........................................................................... 90

C.  "To continuously move" ....................................................... 90

D.  "visual cues" ........................................................................ 91

VIII.  ANTICIPATION OF THE ASSERTED CLAIM OF THE '721 PATENT ....... 92

A.  Exhibit 1 – WO 03/038569 A2 ("Hyppönen") .......................... 92

IX.  OBVIOUSNESS COMBINATIONS FOR THE ASSERTED CLAIM OF THE
'721 PATENT ............................................................................................. 110

A.  The Scope and Content of the Prior Art ................................. 110

A.1.  Tokkonen ................................................................. 112

A.2.  Neonode ................................................................... 115

A.3.  Plaisant. ................................................................... 116

A.4.  Rytivaara .................................................................. 120

B.  Limitation-by-Limitation Analysis, Including Differences, if Any. ..................... 125

B.1.  The combination of Neonode and Tokkonen establishes obviousness
of Claim 8 of the '721 Patent. ................................... 128

B.2.  The combination of Neonode and Plaisant establishes  obviousness
of Claim 8 of the '721 Patent. ................................... 150

B.3.  The combination of Neonode and Hyppönen establishes
obviousness of Claim 8 of the '721 Patent. ................ 170

B.4.  The combination of Rytivaara and Plaisant establishes  obviousness
of Claim 8 of the '721 Patent. ................................... 190

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

B.5.   The combination of Neonode, Plaisant, and Tokkonen establishes obviousness of Claim 8 of the '721 Patent..................................... 210

C.   Level of Ordinary Skill in the Pertinent Art............................................. 212

D.   Claim 8 Is a Predictable Combination of Prior Art Elements Yielding Expected Results ............................................................................ 212

D.1.   The Combination of Elements in the '721 Patent is Predictable.............. 212

D.2.   The Combination of Elements Does Not Yield Any Unpredictable or Unexpected Results ............................................................... 213

E.   Secondary Considerations Support A Finding of Obviousness ........................... 214

E.1.   No Commercial Success of the Claimed Subject Matter: ......................... 214

E.2.   No Praise and Acclaim for the Claimed Subject Matter. .......................... 217

E.3.   No Skepticism Concerning the Claimed Subject Matter. ......................... 218

E.4.   No Unexpected Results. .............................................................. 218

E.5.   No Copying .............................................................................. 219

E.6.   Numerous Non-Infringing Alternatives Were and Are Readily Available. ............................................................................ 235

E.7.   No Teaching Away from the Claimed Subject Matter:............................. 235

E.8.   No Long felt need........................................................................ 236

E.9.   Lack of Visual cues:.................................................................... 243

E.10.  No Failure of Others.................................................................... 250

X.   INVALIDITY OF THE '721 PATENT UNDER 35 USC § 112 .................................. 250

A.   Indefiniteness ................................................................................. 250

A.1.   "touch screen" ........................................................................... 250

A.2.   "hand-held electronic device" ..................................................... 250

A.3.   unlocking .................................................................................. 250

XI.   ADDITIONAL COMMENTS ....................................................................... 257

## LIST OF APPENDICES AND EXHIBITS

| NO. | DESCRIPTION |
| --- | --- |
| Appx. 1 | List of Materials Considered |
| Appx. 2 | Greenberg Curriculum Vitae |
| Exhibit 1 | Hyppönen Invalidity Chart |
| Exhibit 2 | Neonode + Tokkonen Invalidity Chart |
| Exhibit 3 | Plaisant + Neonode Invalidity Chart |
| Exhibit 4 | Neonode + Plaisant Invalidity Chart |
| Exhibit 5 | Rytivaara + Plaisant Invalidity Chart |
| Exhibit 6 | Neonode + Plaisant + Tokkonen |

1  402 is to be dragged similar to a groove along which a slider switch moves; and one or more

2  arrows 406 indicating the direction of the gesture/movement." ('721 Patent, Col. 12:25).

3  **VIII.   ANTICIPATION OF THE ASSERTED CLAIM OF THE '721 PATENT**

4    286.    It is my opinion that all of the references discussed in this report anticipate or render

5  obvious the asserted claim.

6    287.    It is my opinion that the asserted claim 8, which is dependent on claim 7, is

7  anticipated by the following reference:

8      •    WO 03/038569 A2 to Hyppönen ("Hyppönen")

9    288.    In the following sections, I provide a narrative of my opinions concerning invalidity

10 based on the prior art.  I have also attached as Exhibits 1-6 detailed charts identifying the

11 invalidating disclosures for the prior art references discussed below.

12   **A.    Exhibit 1 – WO 03/038569 A2 ("Hyppönen")**

13   289.    WO 03/038569 ("Hyppönen") is an international patent application titled "Method

14 and Apparatus for Selecting a Password" which was published on May 8, 2003.  I understand

15 Hyppönen is prior art because it was published before the Critical Date.

16   290.    Hyppönen identifies problems associated with creating and entering passphrases on a

17 touchscreen mobile device, such as PDAs or smart phones that do not include a physical keyboard.

18 To solve these problems, Hyppönen proposes a method that uses sliding images on a touch screen

19 called the 'Discrete Element Password'.  (Hyppönen page 7, lines 7-8).  The method uses multiple

20 sets, where each set contains elements (or values) within a common domain (*e.g.* colors, names of

21 cities).  A passphrase made up of multiple elements is constructed by choosing an element from

22 each set—the specific elements are later selected by moving an image on a touch screen.

23   291.    Figure 1 of Hyppönen depicts a block diagram of a mobile computing device (PDA

24 with "mobile (cellular) telephone functionality, *e.g.* GSM or third generation (*e.g.* 3G)") 1

25 implementing the Discrete Element Password, having a microprocessor 3, ROM memory 4, and

26 RAM memory 5:

27

28

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY



292.    Hyppönen describes allowing a user to select the elements that comprise the passphrase via touch: "the display of the system is a touch sensitive display, and the graphical interface is operated by a pen, stylus, or the like." (Hyppönen, page 7 line 7).

293.    As the name implies, the Discrete Element Password is comprised of a sequence of different elements.  For example, a sample four-element Discrete Element Password might use as elements: 1.) the name of a city; 2.) the name of a country; 3.) the name of an animal species; and 4.) the first names of a person.  *See* Hyppönen, page 11, lines 20-29.  A user may then enter, for example, a password:  "Acapulco, Albania, Aardvark, Aaron" via a graphical input device.  This provides a passphrase that is both cryptographically strong and easy to remember.  Hyppönen page 5 line 21 to page 6, line 6.  Hyppönen contemplates that the number of potential values for each element, for example, the number of cities to choose from, can range from very high to very low.

294.    The strength of the password is based in part on the number of potential values for each element.  (Hyppönen, page 13, lines 15-20).  Hyppönen does not limit the minimum number of distinct values in each element, and in fact discloses variations of this embodiment that advantageously cover using very few values: "During the day, it is sufficient to ask for the simple shorter password at regular intervals or after a predetermined idle time, *e.g.* when a screensaver is activated. The shorter password is only used for authentication and may be a truncated version of the long password, for example three of the values of the long password" (Hyppönen page 18, lines 24-27).

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

295.     Hyppönen provides various embodiments for selecting the elements of the Discrete Element Password:  Two particular embodiments are described below.  Both use graphical sliders to let a user easily select element values to unlock a device.

(a)     Multiple Slider Embodiment

296.     One embodiment is to use a separate slider for each set of elements of the Discrete Element Password.  This is illustrated in Hyppönen Figures 2a and Figures 2b, reproduced below in Figure 38 left and right. The left figure illustrates the interface before the interaction begins, while the right figure illustrates after the interaction begins. As evident in Figure 38, the user interface is a graphical interface with multiple sliders, one for each set of elements.  A user interacts with each slider by moving the "knob of that slider"[6] (*see* page 13, 9-10 "the knob of the slider" and Figures 2a and 2b: "please enter your password by sliding the knobs.") along the vertical bar of the slider to choose an element of the passphrase from that slider.  Each slider may contain multiple values, with each value corresponding to a particular position on the slider.  In Figure 38 right, the user has set the first slider to the element "Toronto."

 

**Figure 38. Reproduction of Figures 2a (left) and 2b (right) of Hyppönen**

297.     The initial positions of the knobs on the vertical bar of the sliders is at a predefined location (Hyppönen page 13, line 2; Hyppönen Figure 2a reproduced above in Figure 10 shows all

---

[6]   Hyppönen uses "knob of the slider", "slider knob", and "selector 7" interchangeably.  I refer to these as "slider knob."

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1  knobs at their predefined locations, set by a default in the software that places the knobs at a

2  specified location). To operate the slider, the user must touch and continuously move the knob

3  icon to the predefined region (*i.e.*, a particular location on the slider) that corresponds with that

4  particular element of the Discrete Element Password. The user completes the movement (and thus

5  selects that particular element) by lifting off from the screen: "After selecting this value for the

6  first slider (*e.g.* by lifting the pen from the screen)…" (Hyppönen page 13, line 8). Hyppönen

7  Figure 2b, reproduced above as Figure 38 right, illustrates the position of the slider knob of the

8  first slider after the user has selected this value.  The user repeats this process, selecting the correct

9  element value on each slider until all the sliders are at the correct location, at which point the

10  device unlocks.  *See* step 5 of Hyppönen Figure 3 ("repeat for each further slider"), reproduced

11  below:

12



13

14

15

16

17

18

19

20

21

22

23

24

25  298.    Moving the knob of the last slider to the correct position unlocks the device (see the

26  last step of Hyppönen Figure 3 above).   The last slider operates in the same manner as the '721

27  patent: the user touches an image at a predefined location, drags the image to a predefined region

28  on the touch screen representing the correct password value, and lifts his or her finger to unlock

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1    the device.  Every element of claims 7 and 8 of the '721 patent is taught by Hyppönen, and

2    Hyppönen therefore anticipates asserted claim 8.

3        299.    The slider knobs in Hyppönen move continuously.  As previously discussed,

4    continuous animation and reversible actions are common techniques of providing visual feedback

5    in direct manipulation user interfaces, including those that involve dragging actions, and

6    Hyppönen recognizes the importance of providing continual feedback (in this case visual) to the

7    user.  (Hyppönen page 2, lines 26-28).  Hypponen's invention provides this visual feedback by

8    continuously moving the slider knob as the user drags it.  Hyppönen states the device is configured

9    to "animate the slider going to the right value" (page 16, line 7) when the user moves "a selector 7

10    on each slider 6 with the pen or other pointer.  (Page 11, lines 10-12.  Hyppönen uses "selector"

11    and "knob" interchangeably.)  In my opinion, a Skilled Person reading these disclosures would

12    understand that the slider knobs (selector 7) of Hyppönen move continuously in accordance with

13    the movement of the detected contact.

14                    (b)    Single-Slider Embodiment

15        300.    Hyppönen also discloses an embodiment where a single slider is used to select the

16    elements of the Discrete Element Password.  In the single-slider embodiment, the user would

17    make multiple selections with a single slider to select the prescribed sequence of element values in

18    order to unlock the device.

19        301.    Hyppönen discloses that one benefit of the single slider embodiment is to save screen

20    space:  "If the screen size doesn't allow for a large enough number of sliders . . . In one extreme,

21    one single slider or list box can be re-used several times to let the user choose the correct values

22    for multiple value categories" (Hyppönen page 17, lines 16-18).  In other words, the user

23    manipulates a first slider by continuously moving the slider knob to a location corresponding to

24    the first element of the password, selects the first element, then repeats the process for the

25    remaining elements.  The "predefined location" is the position of the slider knob when set to the

26    previous correct element value in the passphrase.  The act of dragging the slider knob to the

27    position corresponding to the last element of the password practices claim 8 of the '721 patent—

28    the device detects contact with the touchscreen at a predefined location corresponding to the slider

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1  knob (the "unlock image"), continuously moves it under the user's touch as he or she drags it to

2  the final position, and unlocks when the user makes the final selection.

3  302.  Hyppönen additionally allows a configuration of a single slider that holds only 2

4  values.  For instance, Hyppönen teaches that shorter passwords may be used where security is less

5  of a concern.  ("during the day, it is sufficient to ask for the simpler shorter password at regular

6  intervals or after a predetermined idle time, *e.g.* when a screensaver is activated.  The shorter

7  password is only used for authentication and may be a truncated version of the long password, for

8  example three of the values of the long password" Hyppönen page 18, lines 24-27.)  Therefore,

9  one possible configuration of this slider included in Hyppönen, and would have been readily

10  apparent to a Skilled Person reading Hyppönen, was to make the predefined region to unlock the

11  last possible position on the slider and to have only one required predefined region such that the

12  user would have to slide the slider the entire length of the slider path once before the devices

13  unlocks.  In such an embodiment, the predefined starting position of the slider knob must be at the

14  end of the slider and the position corresponding to the correct element value at the other end.

15  303.  This configuration would advantageously allow a user to rapidly unlock the device

16  from a state where authentication is not required (*e.g.*, from a screensaver state), for example, by

17  moving a knob of the slider representing two values from one end to the other.

18  304.  As set forth in the claim chart (which provides a detailed element by element

19  comparison with specific references to  Hyppönen) and as summarized below, it is my opinion

20  that Hyppönen discloses all elements of Claim 8.

21  (c)  **Claim 7**

22  *(7a) A portable electronic device*

23  305.  Hyppönen discloses a portable electronic device.  Hyppönen discloses an invention

24  applicable to a variety of portable electronic device including: mobile devices, palmtop or laptop

25  computers, mobile telephones, smart phones, and stylus driven PDAs.  Hyppönen, (page 8 line

26  27).  ("The computer system may be, for example, a PDA, a palmtop or laptop computer, mobile

27  telephone, or smart phone.")

28

Case No. 12-CV-00630-LHK
EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

306.    *See also* Hyppönen Fig. 1 and page 1, lines 5-7:  "The present invention relates to a method and apparatus for selecting a password, and is applicable, in particular . . . ***to mobile devices*** which lack a physical keyboard, such as one-hand controlled ***smart phones***."



*7(b)a touch-sensitive display*

307.    Hyppönen discloses portable devices that include a touch-sensitive display. (Hyppönen, page 7 lines 7-8:  "More preferably, the display of the system is a touch sensitive display."  *See also* page 10 line 15.  ("The PDA has a large display screen 2 which is touch sensitive to provide a mechanism for entering data into the device)"); page 23, lines 2-4: ("a selection may be made . . . by touching an icon when the display is touch sensitive"); and claim 16: ("wherein the display of the system is a touch sensitive display").

    *7(c) memory*

308.    Hyppönen discloses memory.  Hyppönen discloses a portable electronic device having both a ROM 4 and RAM 5.  *See* Hyppönen, page 10, line 19:  "PDA 1 comprises a microprocessor 3, a ROM memory 4, and a RAM memory 5."  *See also* page 8, lines 19-21:  "a memory storing a plurality of sets of values"; page 10, lines 21-24: "[t]he RAM 5 is arranged to store both program files and user data.  Stored in the RAM 5 (or possibly ROM 4) is program code for encrypting data"; page 27, lines 2-5 (same); page 25, line 18: "storing a plurality of sets of values in a

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

memory of the system"; page 27, lines 13-14 ("store a plurality of sets of values in a memory of the system.")

### 7(d) one or more processors

309.     Hyppönen discloses portable electronic devices having one or more processors. *See* Fig. 1, page 10, lines 18-19: ("The PDA 1 comprises a **microprocessor 3**").  Additionally, the use of the term "electronic device" inherently discloses the inclusion of one or more processors to a Skilled Person.

### 7(e) one or more modules stored in the memory and configured for execution by the one or more processors, the one or more modules including instructions

310.     Hyppönen discloses one or more modules stored in the memory and configured for execution by the one or more processors, the one or more modules including instructions. Hyppönen discloses that the invention provides "a computer storage medium having stored thereon a computer program for causing a computer system to" display and accept input to the unlock user interface. *See,* Hyppönen, page 8 lines 31 to 33. *See also* page 10, lines 21-24: ("the RAM 5 is arranged to store both program files and user data.  Stored in the RAM 5 (or possibly ROM 4) is program code for encrypting data . . .which is run by the microprocessor 3.") *See also* page 8 line 19 ("a memory storing a plurality of sets of values," page 8 line 31 ("a computer storage medium").  These program files are necessarily instructions for execution by the processor.

311.     In addition, the Skilled Person would have known that portable electronic devices as disclosed by Hyppönen comprise at least one module stored in the memory with instructions configured for execution by at least one processor.  Furthermore, the Skilled Person would have known that such a configuration was typical for presenting the interactive user interfaces as discussed by Hyppönen.

### (7f) to detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image;

312.     Hyppönen discloses instructions to detect a contact with the touch-sensitive display at a first predefined location corresponding to an unlock image.  As an initial matter, Hyppönen

discloses a portable electronic device in a locked state, and transitioning that device to an unlocked state; *i.e.*, unlocking, and therefore discloses an "unlock image."  Hyppönen discloses a method for entering a password or passphrase in a computer system, which one skilled in the art would know is often applied to unlock a device (*e.g.*, through an initial password screen, or from screen savers that are also known to serve as lock screens). Hyppönen also discloses unlocking a device, including from a screensaver which locks the device.  *See, e.g.*, page 18, lines 24-26: ("it is sufficient to ask for the simple shorter password at regular intervals or after a predetermined idle time, *e.g. w*hen a screensaver is activated.")  *See also* page 19, lines 18-20: ("authentication is used for example when the screen has been locked because of a screensaver turning on, *i.e.* after a*n idle ti*me limit has triggered"); page 22, lines 20-21: ("the device is protected and will be locked automatically when not in use.")

313.    "Unlock image."  Hyppönen discloses an unlock image with which a user interacts to unlock the device.  Hyppönen discloses a system (pages 11 line 5 – page 18 line 31) wherein the user selects values one by one using a set of slider controls, and where the final slider knob positions are combined to form the password (a cryptographic key) and thus unlock the system. The last slider knob that the user moves to unlock the device is the "unlock image."



314.    "First predefined location."  Hyppönen discloses that the initial positions of the knobs on the vertical bar of a slider, including the "unlock image," are set at a default location at which the user must touch: "The interface initially shows the sliders at their default locations (Figure 2a)" (Hyppönen page 13, line 2; Hyppönen Figure 2a is reproduced as Figure 38 left). Thus the

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1  initial position of the unlock image (the knob) of a slider is at a first predefined location as it is

2  known ahead of time.

3      315.    "Detecting contact with the touch-sensitive display." Hyppönen discloses that the

4  slider depicted in Figure 38 above enables a user to move the selector of a slider in accordance

5  with the point of contact on the touch screen (*e.g.*, (Hyppönen page 11, line 5)). Hyppönen also

6  discloses touching the icon itself.  *See* page 23, lines 2-4: ("a selection may be made . . . by

7  touching an icon when the display is touch sensitive.")  This movement therefore *beg*ins by initially

8  detecting a contact on the selector/slider knob.

9      316.    In the multiple slider embodiment, moving the knob of the final slider to the correct

10  position, after the selector/slider knobs of the preceding sliders were also set to the correct

11  positions, would unlock the device. Therefore the knob of the final slider is an "unlock image," *i.e.*

12  "a graphical, user-interface object with which the user interacts in order to unlock the device" (see

13  claim element 7H of the Patent).

14      317.    In the single-slider embodiment discussed above, the user continuously moves the

15  slider knob to select a first value, and repeats the process, using the same slider, for subsequent

16  values. *See* page 17, lines 15-19: ("one single slider or list box can be re-used several times to let

17  the user choose the correct values for multiple value categories.")  The last selection unlocks the

18  device. In this case, the knob of the single slider is an unlock image.  The "predefined location" is

19  the position of the preceding selected element in the Discrete Element Password.  This location is

20  predefined because it corresponds with the location for the previous element in the password, and

21  is therefore set in advance.

22      318.    Thus Hyppönen discloses to detect a contact with the touch-sensitive display at a first

23  predefined location corresponding to an unlock image.

24          *(7g) to continuously move the unlock image on the touch-sensitive*
           *display in accordance with movement of the detected contact while*
25          *continuous contact with the touch-sensitive display is maintained,*

26      319.    Hyppönen discloses to continuously move the unlock image on the touch-sensitive

27  display in accordance with movement of the detected contact while continuous contact with the

28  touch-sensitive display is maintained.  As described in Paragraph 313 above, the knob of that final

-101-

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

slider is an "unlock image." Figure 39 and Figure 40 below depict an annotated version of Hyppönen illustrating the unlock image at its first predefined location, and just after it has been moved to the predefined region (in this example, corresponding to the element "USA"):



**Figure 39.  The unlocking operation of Hyppönen (modified & annotated)**



**Figure 40.  Unlocking—immediately upon the unlock image reaching the predefined unlock region (modified and annotated)**

320.     In the example above, the user has already positioned sliders 1-5 at their correct position (indicated by the asterisk at the top of each slider).  The last slider knob, the "unlock image" begins at a predetermined location as determined by the system software.  The user then touches on the slider, which is detected by the system software through the touch screen, and the

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1   user drags the unlock image to the correct position by maintaining continuous contact with the

2   touch screen and moving the contact upwards on the touch screen.  The image is continuously

3   rendered at the location of the detected touch, giving the appearance that the user is "moving" the

4   object on the touchscreen.  Finally, when the user moves it to the correct location (*i.e.*, the

5   "predefined unlock region") and releases the contact, the device unlocks.

6       321.    Hyppönen discloses that the graphical user interface moves the knob (the "unlock

7   image") in accordance with the movement of the detected contact.  ("The graphical user interface

8   enables a user to move a selector 7 on each slider 6 with the pen or other pointer.") Hyppönen,

9   page 11, line 5).  Additionally, a person of ordinary skill in the art would have known, without

10  further explanation, that the sliders depicted in Figure 2 and reproduced above in Figure 38, when

11  presented within a touch-based graphical user interface, could be operated by a touch and drag

12  operation, *i.e.*, by an initial touch contact on the knob, and by directly moving (dragging) the

13  selector knob; this is how touch-based sliders worked at the time of both the Hyppönen and prior

14  to the Critical Date of the '721 Patent.  This was a commonly used and well known aspect of user

15  interfaces.

16      322.    The slider knobs in Hyppönen move continuously.  As previously discussed,

17  continuous animation and reversible actions are common techniques of providing visual feedback

18  in direct manipulation user interfaces, including those that involve dragging actions, and

19  Hyppönen recognizes the importance of providing continual feedback (in this case visual) to the

20  user.  (Hyppönen page 2, lines 26-28).  Furthermore, Hyppönen discloses in Figures 2a-c how the

21  graphical user interface includes the textual directions "Please enter your password by sliding the

22  knob," which describes a continuous motion of the knob.  Additionally, Hyppönen discloses a

23  tutorial mode in which entry of the password is demonstrated to the user.  *See* page 16, lines 5-11:

24  "In order to teach the user the password, the device may show the first element of the password on

25  the screen, *animate the slider going to the right value*, and then ask the user to repeat the process

26  by entering that value."  In my opinion, a Skilled Person reading these disclosures would

27  understand that the slider knobs (selector 7) of Hyppönen move continuously in accordance with

28

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1  the movement of the detected contact. Thus, Hyppönen discloses that the movement of the knob or

2  selector on the slider is continuous.

3      323.    I understand that Apple argues that Hyppönen does not disclose "continuous

4  movement." *See* Apple's First Supplemental response to Samsung's Interrogatory No. 26.

5  ("Samsung has failed to demonstrate that any movement of this slider away from its initial

6  location is accordance with movement of the contact while continuous contact with the

7  touchscreen is made, rather than in a discontinuous manner.")  As discussed above, the sliders are

8  dragged via the user's continuous contact.  To the extent Apple means to say the movement of the

9  sliders is not continuous because each position in a slider is a discrete step, I disagree with this

10 interpretation of Hyppönen.  Figures 2(a-c) of Hyppönen display the pointer of the knob in

11 between the discrete hash marks on each slider.  Hyppönen teaches moving fluidly and

12 continuously up and down the slider, just as one turns up and down the volume on a stereo or

13 equalizer fader knob.  It does not disclose stopping at each hash mark, but instead moving from

14 one hash mark to another in a continuous motion.  Moreover, even, to the extent that Apple argues

15 that each space between the hash marks on the sliders is a "discrete position," one of ordinary skill

16 would understand that whether movement of an object rendered on a display is "continuous"

17 depends on its visual appearance.  Here, a handheld PDA having a series of discrete steps would

18 still be visually continuous.  Furthermore, Hyppönen discloses "animat(ing) a slider going to the

19 right value" (Hyppönen, page 16, lines 5-11).  Well before the Critical Date, a Skilled Person

20 would understand that animating a slider is a continuous animation.  The "unlock image" therefore

21 moves continuously according to both the single and multiple slider embodiments of Hyppönen.

22          *(7h) wherein the unlock image is a graphical, interactive user-*
           *interface object with which a user interacts in order to unlock the*
23         *device; and;*

24      324.    Hyppönen discloses that this unlock image is "a graphical, user-interface object with

25 which the user interacts in order to unlock the device."  For example, Hyppönen discloses that the

26 knob is a "graphically displayed slider" and the "display of the system is a touch sensitive display,

27 and the graphical interface is operated by a pen, stylus, or the like."  Hyppönen also discloses that

28 the knob, or selector, can be moved via user input, and is therefore interactive.  *See* page 11, lines

Case No. 12-CV-00630-LHK
EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1   10-12. ("The graphical user interface enables a user to move a selector 7 on each slider 6 with the

2   pen or other pointer.")  Thus the knob, or selector 7, on the final slider, is a "graphical interactive

3   user interface object with which the user interacts in order to unlock the device."

4       325.    To the extent Hyppönen does not disclose that the last slider knob or selector is a

5   "graphical, interactive user-interface object with which a user interacts in order to unlock the

6   device," the Skilled Person reading Hyppönen prior to the Critical Date would understand that the

7   slider knob, whether implemented as a widget itself, or a portion of a larger interactive widget, is

8   an interactive graphical user interface object with which the user interacts to unlock the device.

9   Programming icons or sliders that react to user input as interactive GUI objects was well-known at

10  the Critical Date.

11              *(7i) to unlock the hand-held electronic device if the unlock image is*

12              *moved from the first predefined location on the touch screen to a*
                *predefined unlock region on the touch-sensitive display;*

13      326.    Hyppönen discloses to unlock the hand-held electronic device if the unlock image is

14  moved from the first predefined location on the touch screen to a predefined unlock region on the

15  touch-sensitive display.  Hyppönen discloses a graphical user interface having sliders that permit a

16  user to move the knob of the final slider and select a value associated with a particular position of

17  the knob by lifting the point of contact off the screen, thus moving the unlock image to a

18  predefined unlock region on the touch sensitive display.

19      327.    "Predefined unlock region." The position of the knob of the final slider required to

20  unlock the device is predefined, as only that position will select the correct value necessary to

21  unlock the device.  *See* page 13, lines 5-10:  "the second screen of Figure 2b shows the user

22  moving the first slider to the 'Toronto' position . . . After selecting this value for the first slider

23  (*e.g.* by lifting the pen from the screen), the value in the display window 8 is replaced by an

24  asterisk . . . The user then sets the value for the second slider, etc."  *See also* Figure 3 ("Repeat for

25  each further slider.")

26      328.    In the multiple slider embodiment described above and depicted graphically in Figure

27  40, the position of the right-most slider corresponding to the element value "USA" is predefined.

28  The user must drag the slider knob from its predefined starting location (*i.e.,* default location

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1 determined in advance by the security application) to the predefined "USA" position, at which

2 point the device unlocks.

3      329.    In the single slider embodiment, the correct position on the slider for the final element

4 of the Discrete Element Password is predefined, as only that position will select the correct value

5 necessary to unlock the device. *See* Hyppönen Figure 3.

6      330.    "Unlocking." Hyppönen discloses unlocking from a screen saver, which would unlock

7 the device. For example: "During the day, it is sufficient to ask for the simple shorter password at

8 regular intervals or after a predetermined idle time, *e.g.* when a screensaver is activated."

9 ((Hyppönen page 18, line 25), and "…authentication is used for example when the screen has been

10 locked because of a screensaver turning on, *i.e.* after an idle time limit has triggered." (Hyppönen

11 page 19, line 18). *See also* page 23, lines 3-6: ("A selection may be made . . . by touching an icon

12 when the display is touch sensitive . . .  Assuming that the user selects correctly, the device is

13 activated"); page 22, lines 25-28: "Once the security mechanism has been activated and a

14 password chosen, the user will have to enter the full password correctly, using the textual lists,

15 when the device is next turned on. ***Assuming that this is done correctly, the device can be used***,

16 until such time as a screensaver is activated."

17      331.    I understand Apple has argued that "Hyppönen does not disclose that the device

18 unlocks, without further action, after the user properly enters the device passcode." *See* Apple's

19 First Supplemental Response to Samsung's Interrogatory No. 26 at pp. 124-125.  I disagree; the

20 slider embodiment(s) of Hyppönen do not require any further action to unlock the device after the

21 final slider is moved to the correct position and the password generated. The graphical interface

22 containing the slider embodiment as illustrated in Figure 2 does not show any user interface

23 control (such as an unlock button) that would enable such a further action, nor does the text

24 describing that embodiment state anywhere within it that such further action is required.

25 Furthermore, Hyppönen does not describe any embodiments where entry of the last slider differs

26 from entry of any of the preceding sliders, where selection is performed by terminating a drag

27 gesture via lifting the contact. *See* page 13, lines 5-10:  "the second screen of Figure 2b shows the

28 user moving the first slider to the 'Toronto' position . . . After selecting this value for the first slider

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1   (*e.g.* by lifting the pen from the screen), the value in the display window 8 is replaced by an

2   asterisk . . . The user then sets the value for the second slider, etc." *See also* Figure 3 ("Repeat for

3   each further slider.")  Furthermore, I understand that a claim may still be anticipated if the prior art

4   discloses all limitations of the claim as well as unclaimed subject matter.

5                                    (d)      **Claim 8**

6                    *The device of claim 7, further comprising instructions to display*
                     *visual cues to communicate a direction of movement of the unlock*
7                    *image required to unlock the device.*

8           332.    Hyppönen discloses instructions to display visual cues to communicate a direction of

9    movement of the unlock image required to unlock the device.  Hyppönen discloses visual cues

10   which communicate a direction to move a slider knob ("unlock image') to unlock the device as

11   graphics rendered on screen.  As previously discussed, Hyppönen discloses that the security

12   program is an application running on software in memory—thus Hyppönen discloses instructions

13   to render these visual cues on-screen.  "According to a third aspect of the present invention there is

14   provided a computer storage medium having stored thereon a computer program for causing a

15   computer system to:…" (page 8 line 31-33).  *See also* page 20, lines 18-20: "When the user starts

16   **the application** and the relevant (.INI) file does not contain a password, an initiation dialog box is

17   shown. This indicates that **the security application** will help keep data private by locking the

18   device when it is not in use."

19          333.    Hyppönen discloses a variety of visual cues.  As a first example, Hyppönen discloses

20   in his Figure 2 (reproduced in part in Figure 38 above) sliders in the slider embodiment that

21   contain several visual cues to communicate a direction. As described at Paragraph 313 above, the

22   knob of the final slider is an unlock image required to unlock the device. Each slider displays a

23   vertical line (a "channel") that communicates that a vertical direction of movement the slider knob

24   is to be used, *i.e.*, up or down but not in any other direction. Furthermore, each slider knob is

25   shaped to point to tick marks along the vertical line of the slider, which also indicate that the slider

26   knob is to be moved up or down relative to those tick marks. One skilled in the art would know

27   that both these visual cues are 'visual constraints' that constrain the direction of movement.

28

334.     As a second example, Hyppönen discloses in his Figure 2 (reproduced in part in Figure 38 above) that the graphical user interface of the slider embodiment can include textual information to communicate a direction of movement. In his embodiment, the text is "Please enter your password by sliding the knobs" as shown at the top of the graphical interfaces. The text is thus a further visual cue that instructs the user to slide the selector knob in either the up or down direction on the slider bar.

335.     As a third example, Hyppönen teaches that the element values of each set are in sorted order: "a value category should be sortable to enable the user to find the correct value fast. The obvious sort orders include alphabetical, numeric and chronological…" (Hyppönen page 14, lines 17-19). For the slider embodiment, the display windows at the tops of the respective sliders display selected names (*i.e.*, the 'values') as the user is moving the slider (see Hyppönen Figure 2, reproduced in part in Figure 10 above), where the sorted order of values enable the user to find the correct value fast. Thus the direction of movement is further indicated by whether the values are getting closer to or further away from the desired value. That is, the feedback presented by the displayed element's value as one moves the selector knob further indicates if one should be moving in either the up or down direction, *i.e.*, up or down the sorted list to reach the desired value. In addition, Hyppönen describes how a list of modifications to the above scheme would include putting the first value in the (sorted) value category not at the top of the list, but in a random position. Thus the original embodiment described would contain the first value at the top of the list (*i.e.*, in the slider embodiment at the top of the slider). Thus the user would again be able to infer the correct direction to move from the visual cue offered by the first value displayed during the slider movement

336.     As a fourth example, the Skilled Person would have known that the selector knobs would stay positioned over the slider bar during movement, as this is how sliders in graphical user interfaces behaved during the time of, and in fact well before, the Hyppönen  Patent and the '721 patent in many graphical operating systems. Thus the visual animation of the selector knob, which is constrained to an up/down movement (especially one with a visible track), would serve as a further visual cue that the allowable directions are only up or down.

discussed in 424.  In the combination of Neonode which includes the continuously moving icon of Tokkonen, the icon image would necessarily constitute an "unlock image," and the text "right sweep to unlock" would necessarily constitute visual cues to communicate a direction of movement of the unlock image required to unlock the device.  Thus the combination of Neonode and Tokkonen discussed above with reference to Claim 7 also includes instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device, as required by claim 8.

457.   Furthermore, the prior art is replete with software applications to display visual cues instructing a user to perform a gesture, or any other action.  The most basic drag-and-drop interfaces included such instructions, such as the Macintosh Desktop in the 1980's (where the visual affordance of a trash can gave users instructions to drag unwanted files to it).  The inclusion of such instructive visual cues are wholly obvious and merely a design choice—it is completely at the interface designer's discretion to determine how much, if any, visual instruction to give users.

B.2.   The combination of Neonode and Plaisant establishes  obviousness of Claim 8 of the '721 Patent.

458.   In my opinion, Neonode in combination with Plaisant establishes obviousness of Claim 8 of the '721 Patent.  Any differences between Neonode or Plaisant and the subject matter of claim 8 was nothing more than the arrangement of known elements with predictable results.

459.   A person of ordinary skill would have been motivated to combine Neonode with Plaisant because they are both portable touchscreen user interfaces capable of toggling between two states.  A Skilled Person before the Critical Date seeking to improve a touchscreen user interface would have looked to existing touchscreen user interfaces, such as that described in the background and scope and content of the prior art (sections V and IX.A above), and would have been motivated to combine elements of that technology to create a further improved touchscreen user interface.

(a)   **Claim 7**

*(7a) A portable electronic device, comprising:*

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

460.    I understand that this element of the claim is called the "preamble."  I also understand that the preamble of a patent claim may or may not be limiting depending on certain legal principles as well as the court's construction of the claim.  I understand that the court determines whether or not the preamble is limiting.  In any event, as set forth below, it is my opinion that the combination of Neonode and Plaisant discloses the language set forth in the preamble.

461.    Plaisant discloses an electronic device (a computer running MS-DOS (*see* Plaisant paper at page 667, Col.2, ¶2: "the color, graphical screen displays are implemented under MS-DOS in VGA mode.").  At the time of the '721 Patent, the Skilled Person would have known that contemporary computers running later versions of MS-DOS (*i.e.*, Microsoft Windows) would be available at least as a tablet PC, which is a portable electronic device. Although the particular test environment used in the Plaisant Video and Paper related to a home automation system, one of ordinary skill would understand that Dr. Plaisant's system could apply equally to many different form factors, including portable.  Dr. Plaisant verified that, even in 1991, they tested the toggles on different form factors, including portable tablets.  (Plaisant Dep. Tr. at 75:10-24.)  Furthermore, portable touchscreen devices were well-known far before the Critical Date, as discussed in Section V.B.  Thus the notion that the electronic device could be a portable device is inherent in Plaisant's descriptions when applied to computers that are contemporary with the '721 Patent.

462.    Neonode N1 Quick Start Guide discloses a portable electronic device.  Neonode N1 Quick Start Guide discloses a smart phone, *e.g.*, as illustrated in (Neonode N1 Quick Start Guide, SAMNDCA630-00966510). It also discloses a variety of typical smart phone functions, such as making a call (Neonode N1 Quick Start Guide, SAMNDCA630-00966523), entering numbers or text (Neonode N1 Quick Start Guide, SAMNDCA630-00966517), scrolling through text lists (Neonode N1 Quick Start Guide, SAMNDCA630-00966521), sending SMS messages (Neonode N1 Quick Start Guide, SAMNDCA630-00966524), playing MP3 music or videos (Neonode N1 Quick Start Guide, SAMNDCA630-00966525), taking photos (Neonode N1 Quick Start Guide, SAMNDCA630-00966521), and locking and unlocking the device (Neonode N1 Quick Start Guide, SAMNDCA630-00966514). The size of the screen relative to the finger as illustrated in (Neonode N1 Quick Start Guide, SAMNDCA630-00966519) (reproduced in Figure 44a above)

1   also indicates that this is a small device and thus portable.  Additionally, the reference discloses a

2   battery (Neonode N1 Quick Start Guide, SAMNDCA630-00966512), and therefore portable.

3      463.      To the extent Plaisant does not disclose a **portable** electronic device, it would have

4   been obvious to a Skilled Person at the Critical Date to implement the toggles of Plaisant on a

5   portable electronic device, based on the background knowledge of a Skilled Person at the Critical

6   Date.  Additionally, it would have been obvious to a Skilled Person at the Critical Date to

7   implement the toggles of Plaisant on a portable electronic device, as taught by Neonode.  The

8   motivation for such a modification is clear; as portable computers are more convenient, more

9   mobile, and may be self-powered.  Even in the exemplary environment in which Dr. Plaisant's

10  toggles were tested, a home automation environment, the motivation to combine is common

11  sense—a user may control various devices from any location.  I reiterate, however, that I in no

12  way believe Dr. Plaisant's teachings are limited to the specific embodiment in which they were

13  tested.

14     464.      Plaisant and Neonode are analogous prior art from the same field of endeavor—

15  touchscreen user devices that use a secure **gesture** to toggle between two states.  Implementing

16  Plaisant's touchscreen toggles on a the portable electronic devices taught by Neonode is simply the

17  combination of prior art elements according to known methods to yield predictable results.

18  Implementing the toggles on a portable touchscreen is predictable—the toggles function exactly as

19  they did on a MS-DOS workstation, with the exception of potentially smaller screen space.  There

20  is nothing unpredictable about implementing Plaisant on a portable touchscreen device.  This

21  modification is a simple substitution of one known element for another to obtain predictable

22  results.  Furthermore, portable devices bring with them several advantages, including increased

23  mobility and decreased reliance on external power.  The implementation of Plaisant on a portable

24  electronic device is simply the use of a known technique to improve similar devices in the same

25  way.  Furthermore, electronic devices at the Critical Date generally fell into only one of two

26  categories: portable, battery-powered devices, and stationary devices requiring an external power

27  supply.  It would have been, at a minimum, obvious to try implementing the touch screen toggles

28  of Plaisant on a portable electronic device, as taught by Neonode.  Furthermore, a Skilled Person

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1  would understand that the computing device disclosed by Tokkonen had been improved by its

2  portability, and would recognize that the portable touchscreen toggle system as described by Dr.

3  Plaisant would also be improved in the same manner.

4  465.    To the extent Apple argues Plaisant teaches away from a portable electronic device, I

5  disagree, as discussed above in paragraph 461.

6              *(7b) a touch-sensitive display;*

7  466.    Both Plaisant and Neonode disclose a touch-sensitive display.

8  467.    Plaisant discloses an electronic device having a touch-sensitive display.  Plaisant

9  discloses "The touchscreen used returns a continuous flow of coordinates allowing the dragging of

10  objects, the identification of sliding motion and the use of a lift-off strategy for selection (4)"

11  (Plaisant Paper, pp. 667, Col. 2, ¶2).

12  468.    The Neonode N1 Quick Start guide discloses a touch-sensitive display.  Neonode N1

13  Quick Start Guide discloses how "only a light touch on the screen" is needed to operate the device

14  (Neonode Quick Start, SAMNDCA630-00966515), and provides many examples illustrating

15  touch operations on the touch sensitive display, *e.g.*, taps (Neonode N1 Quick Start Guide,

16  SAMNDCA630-00966516), and touch moves such as the right sweep touch as illustrated in

17  Figure 44a (Neonode N1 Quick Start Guide, SAMNDCA630-00966519).

18              *(7c) memory;*

19  469.    Both Plaisant and Neonode disclose a memory.

20  470.    Plaisant discloses a touch-screen electronic device having memory.  Plaisant discloses

21  that her work concerns "Computer based toggle switches" (Plaisant Paper, pp. 667, Col. 1, ¶1) and

22  that "The color, graphical screen displays are implemented under MS-DOS in VGA mode."  The

23  Skilled Person would have known that computers and such an implementation on MS-DOS

24  inherently requires memory.  In addition, such a configuration is typical for presenting the

25  interactive user interfaces as discussed by Plaisant at the time of both Plaisant and the '721 Patent,

26  and even now.

27

28

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

471.     The Neonode N1 Quick Start Guide discloses a portable touch-screen electronic device having a memory.  The Quick Start guide states the Neonode device includes an SD card, and therefore has memory.  *See* SAMNDCA630-00966511 below:

## INSERT THE SD CARD

Follow these steps to insert your SD card:

1. Make sure your SD card is aligned according to the image below (facing text upwards).
2. Insert the SD card.
3. Make sure the SD card is fully inserted. (You will hear a click sound when the card is fully inserted).



472.     *See also* SAMNDCA630-00966507, 509, 525, 526, and 528.

> *(7d) one or more processors;*

473.     Both Plaisant and Neonode disclose one or more processors.

474.     Plaisant discloses a touch-screen electronic device having one or more processors. Plaisant discloses that her work concerns "Computer based toggle switches" (Plaisant Paper, pp. 667, Col. 1, ¶1) and that "The color, graphical screen displays are implemented under MS-DOS in VGA mode."  The Skilled Person would have known that computers and such an implementation on MS-DOS inherently requires a computational device comprising at least one processor. In addition, such a configuration is typical for presenting the interactive user interfaces as discussed by Plaisant at the time of both Plaisant and the '721 Patent, and even now.

475.     The Neonode N1 Quick Start Guide discloses one or more processors.  As mentioned in paragraph 356, the Neonode N1 Quick Start Guide discloses that the device is a Smart Phone. The Neonode N1 Quick Start Guide discloses a portable handset that can make calls (SAMNDCA630-00966523), send SMS text messages (SAMNDCA630-00966524), take photos (SAMNDCA630-00966526), run applications (SAMNDCA630-00966515-516, 522), and play videos (SAMNDCA630-00966525.)  Such operations require one or more processors.  The Skilled

Case No. 12-CV-00630-LHK
EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1  Person would have known that smart phones that existed at the time of the Neonode N1 Quick

2  Start Guide and the '721 Patent (and that still exist) are handheld computers that comprise at least

3  one processor. In addition, such a configuration is typical for presenting the interactive user

4  interfaces and for enabling smart phone functions as disclosed in the Neonode N1 Quick Start

5  Guide.

6          *(7e) and one or more modules stored in the memory and configured*
        *for execution by the one or more processors, the one or more*
7          *modules including instructions:*

8          476.    Both Plaisant and Neonode disclose one or more modules stored in the memory and

9  configured for execution by the one or more processors, the one or more modules including

10  instructions.

11          477.    Plaisant discloses one or more modules stored in the memory and configured for

12  execution by the one or more processors, the one or more modules including instructions.  Plaisant

13  discloses that her work concerns "Computer based toggle switches" (Plaisant Paper, pp. 667, Col.

14  1, ¶1) and that "The color, graphical screen displays are implemented under MS-DOS in VGA

15  mode."  The Skilled Person would have known that computers and such an implementation on

16  MS-DOS inherently requires a computational device comprising at least one module stored in the

17  memory with instructions (the implementation) configured for execution by at least one processor.

18  In addition, such a configuration is typical for presenting the interactive user interfaces as

19  discussed by Plaisant at the time of both Plaisant and the '721 Patent, and even now.

20          478.    The Neonode N1 Quick Start Guide discloses one or more modules stored in the

21  memory and configured for execution by the one or more processors, the one or more modules

22  including instructions.  As mentioned in paragraphs 356-357, the Neonode N1 Quick Start Guide

23  discloses that the device is a Smart Phone. The Neonode N1 Quick Start Guide discloses a handset

24  with access to multiple applications:

25  Using Neno is easy. You will have to learn a few basic
   moves, that you can use in every application. Always
26  remember that only a light touch on the screen is
   needed, thanks to the patented zForce technology.
27  **[SAMNDCA630-00966515, emphasis added]**

28

The start menu is where you find the applications that
are installed on your N1:

**[SAMNDCA630-00966516, emphasis added]**

* Examples of applications or views containing Tabs:
• Media Player
• Messaging

**[SAMNDCA630-00966522, emphasis added]**

479.    The Skilled Person would have known that smart phones that existed at the time of the

Neonode N1 Quick Start Guide and the '721 Patent (and that still exist) are handheld computers

that comprise at least one module stored in the memory with instructions configured for execution

by at least one processor. In addition, such a configuration is typical for presenting the interactive

user interfaces and for enabling smart phone functions as disclosed in the Neonode N1 Quick Start

Guide.

> *(7f) to detect a contact with the touch-sensitive display at a first*
> *predefined location corresponding to an unlock image;*

480.    Plaisant discloses instructions to detect a contact with the touch-sensitive display at a

first predefined location corresponding to an image (the image being the pointer of the slider

toggle, or the lever handle of the lever toggle).  This is more clearly depicted at 2:55 of the

Plaisant video:



481.    "Unlock image."  Plaisant discloses a transition from one user-interface state to

another.  Transitioning a device from a lock state to an unlock state is simply one particular

example of such a state change.  In Dr. Plaisant's implementation, she has chosen to label these

two states as "on/off," but the labels do not matter: her work  applies equally to transitions

between *any* two states, including "lock/unlock."  I also note that 'unlocking' a device is one form

of turning that device 'on' (*e.g.*, many devices now have multiple 'off' modes with various names:

powered down, hibernation, sleep mode, standby mode, screen saver mode, and lock mode.)  A

Case No. 12-CV-00630-LHK
EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1  skilled person would understand that a toggle for transitioning between "on" and "off" user

2  interface states could also be used for transitioning between "locked" and "unlocked" user

3  interface states.   In fact, at least one of the named inventors of the '721 patent uses these terms

4  interchangeably:

5         Q.  Okay.  Were you aware in -- back in 2005 portable music
       players could be *locked*?

6

7         A.  There was a physical hardware button that could turn them *off*
       and I believe a physical hardware button to turn them *on*.

8         Forstall 3/29/13 Dep. Tr. at 23:15-19.

9      482.    Dr. Plaisant's invention also applies to *any* underlying functionality whose user-

10  interface state change is controlled by toggle switches.  This is clearly articulated in the Abstract

11  of Dr. Plaisant's paper:  "This video describes and compares six different touchscreen based toggle

12  switches to be used by novice or occasional users to control two state (on/off) devices in a

13  touchscreen environment."

14      483.    "First predefined location." Plaisant discloses the first predefined location as being the

15  left or right side of the toggle or the left or right position of the lever, depending the current setting

16  of the toggle. *e.g.*: "Slider toggle:  In this toggle a sliding/dragging movement is required to

17  change the position of the yellow pointer from one side of the toggle to the other. … A simple

18  three step animation shows the movement of the pointer along the slide. If the device is ON the

19  pointer is on the ON side. Users can then grab the pointer and slide it to the other side. If the finger

20  is released before reaching the other side the pointer springs back to its previous position"

21  (Plaisant Paper, pp. 668, Col. 1, ¶5). Her figures display the 'Off' position on the right side, and

22  the 'On' position on the left side. In her particular implementation, turning a device or

23  transitioning an interface from 'Off' to 'On' would have the predefined first location on the right

24  side of the toggle.  Plaisant discloses that the predefined location for the lever is similar.

25      484.    "Detecting contact." Plaisant discloses that the slider detects a contact as the finger

26  landing on the first predefined location: "Another advantage of the sliding movement is that it is

27  less likely to be done inadvertently therefore making the toggle very secure (the finger has to land

28  on and lift off the right locations)." (Plaisant, pp. 668, Col. 2, ¶1). The Plaisant Video also shows a

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

user operating the sliders and levers, where it begins with an initial touch on the slider's pointer (*i.e.*, the knob) (Plaisant Video, from 3:14) or on the lever's handle (Plaisant Video, from 4:26). The Skilled Person would also know that touch-based sliding movements as described by Plaisant typically begins with detecting a contact, as this is how touch-based slider interfaces worked at the time of both Plaisant and the '721 Patent (as also explained at Paragraph 125 of this report).

485.     The Neonode N1 Quick Start Guide discloses instructions to detect a contact with the touch-sensitive display at a first predefined location.

486.     Neonode discloses unlocking a portable electronic device through a touchscreen gesture.  The Neonode N1 Quick Start Guide discloses a "right sweep to unlock" movement to unlock the device.



**KEYLOCK - LOCKING THE UNIT**
Keylock is automatic on the N1, to save battery and to make sure no unintentional calls are made. If you want to lock your unit manually, use the "Lock" symbol in the start menu

**KEYLOCK - UNLOCKING THE UNIT**

The ON/OFF switch is located on the left side of the N1, below the screen.

1. Press the power button once.
2. The text "Right sweep to unlock" appears on the screen. Sweep right to unlock your unit.

NOTE! If you wait too long, the N1 automatic keylock feature activates keylock (the screen turns dark) Look on next page to see how to unlock your unit.

**Figure 55.  Neonode N1 Quick Start Guide**
**SAMNDCA630-00966513**

**Figure 56.  Neonode N1 Quick Start Guide**
**SAMNDCA630-00966514**

487.     The Neonode N1 Quick Start Guide discloses instructions to detect a contact with the touch-sensitive display at a first predefined location.  As shown above at SAMNDCA630-00966514, the Neonode software detects an accept sweep to unlock.  A Skilled Person would understand that the software applications and functions disclosed by the Neonode N1 Quick Start Guide are necessarily computer instructions for execution by one or more processors.

488.     "Detecting contact." The Neonode N1 Quick Start Guide discloses detecting a contact (the initial light touch, (Neonode N1 Quick Start Guide SAMNDCA630-00966515)).  The user initiates a right-sweep move beginning at a first predefined location (the left side of the screen) in

Case No. 12-CV-00630-LHK
EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1    order to unlock the device.  Neonode N1 Quick Start Guide SAMNDCA630-00966519 and

2    SAMNDCA630-00966514.  *See also* Figure 44a and Figure 44b above.

3        489.    "Detecting contact." The Neonode N1 Quick Start Guide discloses contact is via "a

4    light touch on the screen" (Neonode N1 Quick Start Guide SAMNDCA630-00966515). The

5    illustration of the right-sweep gesture shows this contact being detected at a first predefined

6    location (Neonode N1 Quick Start Guide SAMNDCA630-00966519), where such a right-sweep

7    gesture is used to unlock the device (Neonode N1 Quick Start Guide SAMNDCA630-00966514).

8    The Skilled Person would also know that movements such as a right sweep typically begins with a

9    touch down contact (as explained at Paragraph 125 of this report), as this is how touch-based

10   movements and gestures worked at the time of both the Neonode N1 Quick Start Guide and '721

11   Patent.

12       490.    "First predefined location." The Neonode N1 Quick Start Guide discloses a first

13   predefined location, where the right sweep used to unlock the device must begin at the left side of

14   the screen (Neonode N1 Quick Start Guide SAMNDCA630-00966519 and SAMNDCA630-

15   00966514) (see Figure 44a, reproduced below, and Figure 44b above).  The left side of the screen

16   is a "first predefined location."

17       491.    To the extent Plaisant does not disclose an unlock operation, and therefore an "unlock

18   image" with which contact is detected, in my opinion, it would have been obvious at the time of

19   invention to a Skilled Person to use the touchscreen toggles of Plaisant to toggle locking or

20   unlocking input to the touch screen.  Dr. Plaisant's paper merely explores *which toggles are more*

21   *user friendly* for changing between any two states, not *what those two states are*.  Indeed, limiting

22   Dr. Plaisant's work to only the disclosed features, such as turning on and off lights, is an

23   artificially narrow view of the scope of her teachings.  Dr. Plaisant testified that, in fact, the

24   toggles she designed didn't actually control anything—she provided Custom Command Systems

25   with toggles that could toggle between *any* two states, and Custom Command actually

26   programmed their function.  (*See* Plaisant Dep. Tr. at 175:2-11; 13-176:1; 177:24-178:5.)

27   Furthermore, touch screen devices having a locked state and unlocked state were well-known in

28

Case No. 12-CV-00630-LHK

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1   the prior art at the time of invention.  (*See, e.g.,* HP Jornada 520, McKeeth, GridLock, JotLoc,

2   Neonode N1 Quick Start Guide, Dell Axim X50, Sony Ericsson P800/900.)

3        492.      To the extent Plaisant does not disclose an unlock operation, and therefore an "unlock

4   image" with which contact is detected, in my opinion, it would have been obvious at the time of

5   invention to one of ordinary skill in the art to use the Plaisant toggles to switch between a locked

6   and unlocked state, as disclosed by Neonode.

7        493.      Using Plaisant's touchscreen toggles to toggle between a locked and unlocked state as

8   taught by Neonode is simply the combination of prior art elements according to known methods to

9   yield predictable results.  First, Plaisant and Neonode are in the same field of endeavor— they

10  both pertain to touchscreen user interfaces that employ a secure left-to-right gesture that is less

11  prone to accidental activation to toggle between two user interface states.  A Skilled Person

12  searching for potential actions to be carried out via the Plaisant toggles would naturally look to

13  other two-state touchscreen devices.  Furthermore, a Skilled Person looking for potential

14  applications of Plaisant's slider toggle, specifically, would look for actions that require greater

15  security and decrease the chance of accidental activation, such as removal of keylock functions as

16  found in Neonode.  Toggling between locked and unlocked states using Plaisant's toggles is

17  predictable—Dr. Plaisant actually discusses that the sliding toggles are more secure, and thus

18  prevent accidental activation.  (*See* paragraph 222, *see also* Sears' "lift-off" strategy, paragraph

19  V.E.8).  There is nothing unpredictable about implementing Plaisant to toggle between a locked

20  and unlocked state.  This modification is a simple substitution of one known element for another

21  to obtain predictable results.  Furthermore, a locked state brings with it several advantages,

22  including, as discussed in the background of the '721 patent, preventing accidental or unauthorized

23  use.  Specifically, the Neonode N1 Quick Start Guide states that the keylock is used to prevent

24  "unintentional calls."  The implementation of Plaisant to toggle between a locked and unlocked

25  state is simply the use of a known technique to improve similar devices in the same way.

26  Furthermore, accidental activation in touch environments was a known problem.  (See Section

27  V.E.)  It would have been, at a minimum, obvious to try implementing the touch screen toggles of

28  Plaisant to toggle between a locked and unlocked user interface state as disclosed by Neonode.

Case No. 12-CV-00630-LHK

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1   Furthermore, one of ordinary skill would understand that Neonode had been improved through the

2   use of a locked and unlocked state to prevent accidental input through the touch panel, and would

3   easily recognize that Plaisant could be improved via the same technique.

4        494.     To the extent Neonode does not disclose an "unlock image," in my opinion it would

5   have been obvious to a Skilled Person at the Critical Date to combine the unlock user interface of

6   Neonode with the touchscreen toggles of Plaisant.  The slider knob image, in combination with

7   Neonode, would necessarily constitute an "unlock image," and the left edge of the screen where

8   the gesture ends would necessarily constitute a "first predefined location."

9        495.     As discussed above, Plaisant and Neonode are analogous prior art from the same field

10   of endeavor—they both pertain to touchscreen electronic devices which may be toggled between

11   two states.  Additionally, Neonode and Plaisant utilize the same continuous horizontal gesture in

12   order to prevent accidental input and increase security, as disclosed by Plaisant.  The combination

13   of Neonode and Plaisant is a predictable combination of prior art elements.  As an initial matter,

14   both Plaisant and Neonode are in the same field of touch screen user interfaces.  A person

15   attempting to improve upon Neonode would look to other touchscreen user interfaces, particularly

16   those relating to toggling between binary states and avoiding accidental activation.  The addition

17   of such an image yields predictable results—the user receives more visual feedback that the device

18   is registering his or her gesture.  A person of ordinary skill in the art would appreciate that nothing

19   unpredictable results from combining Neonode and a moving image that follows the user's contact

20   in the manner claimed in the '721 patent.  The claim elements merely apply well-known

21   techniques of direct manipulation (Section V.C.2) and visual feedback (Section V.C.3) to reinforce

22   metaphors of real-world sliding toggles.  (Section V.C.5.)   There is nothing unpredictable about

23   this scenario because, in part, and as explained above, displaying an image which tracks the user's

24   point of contact was well-known and common in the prior art, for example, in drag-and-drop user

25   interfaces (Section V.C.7.).  The combination of prior art elements used in the '721 patent yield no

26   unexpected or unpredictable results.  The '721 patent provides no indication that the inclusion of

27   an image that followed a user's gesture was an inventive or unusual arrangement.  Furthermore, at

28   the Critical Date, the prior art disclosed a finite number of methods of conveying visual feedback,

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

as discussed in Sections V.C.3.)  At a minimum, it would have been obvious to try rendering an image under the point of contact on a touch screen to provide greater visual feedback for a gestural interface, and to reinforce the metaphor of a physical sliding toggle, as taught by Plaisant. Furthermore, a Skilled Person would understand that Plaisant had improved on touchscreen toggles by animating a slider knob underneath the user's finger, thereby providing greater feedback during the toggle action, and would have understood that the Neonode could be improved via the same technique.

> *(7g) to continuously move the unlock image on the touch-sensitive display in accordance with movement of the detected contact while continuous contact with the touch-sensitive display is maintained,*

496.     Plaisant discloses instructions to continuously move the pointer image (also the lever image) on the touch-sensitive display in accordance with movement of the detected contact while continuous contact with the touch-sensitive display is maintained, wherein the pointer image (also the lever image) is a graphical, interactive user-interface object with which a user interacts in order to toggle an on/off state of the device or interface. As Plaisant states: "- Slider toggle:  In this toggle a sliding/dragging movement is required to change the position of the yellow pointer from one side of the toggle to the other. A simple three step animation shows the movement of the pointer along the slide. If the device is ON the pointer is on the ON side. Users can then grab the pointer and slide it to the other side. If the finger is released before reaching the other side the pointer springs back to its previous position. - Lever toggle: Same "behavior" as the slider. Only the graphical appearance is different" (Plaisant, pp. 668, Col. 1, ¶5).  The Plaisant video illustrates this disclosure in various places. For example, the three frames in Figure 57 below show the user interacting with the pointer image while maintaining continuous contact with the display.



**Figure 57. 3 frames from (Plaisant Video, ~3:17)**

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

497.    Additionally, the Skilled Person would have known without further explanation that sliders, when presented within a touch-based graphical user interface, could be operated by a continual touch and drag operation: this is how sliders worked at the time of, and well before, the '721 Patent.

498.    Apple has argued that the three-step animation of Dr. Plaisant's slider is not "continuously moving."  *See* Apple's First Supplementary Response to Interrogatory No. 26 at p.136.  Plaisant teaches using animation to give the appearance of the slider's yellow pointer knob moving fluidly and continuously across the slider, just as one turns up and down the volume on a stereo or equalizer fader knob.  In her implementation, a 3 step animation suffices to do this. Plaisant does not disclose using a 3 step animation to highlight discontinuous movement. Moreover, as I discussed in paragraph 154, whether an animation is "continuous" depends on the user's *visual perception* of moving an object.  As one of the inventor of the '721 patent readily admitted, digital systems cannot truly display continuously (*See* Christie 4/20/12 PI Dep. Tr. at 89:19-90:15) – rather, whether the user perceives the animation to be smooth to mimic moving a physical object is the important factor.  *See* Van Os 6/19/13 Dep. Tr. at 258:10-259:13.  ("it's a perception that is described in the—it's a continuous movement perception.")  It is my opinion that, given the small distance moved in the slider toggle (approximately an inch), and speed at which users move the toggle (under a second), 3 frames of animation was perceived as continuous at the time the paper was published in 1991.  In my own viewing of the video, for example, I did not perceive the motion of the slider as discontinuous, and only became aware of it being down as a 3-step animation after reading the paper.  Thus, in my opinion, the slider knob of the Plaisant sliding toggle is "continuously moving."  To the extent it is not, a Skilled Person at the Critical Date would understand that adding more frames to an animation to improve smoothness is obvious and trivial at best.

499.    Apple also appears to make the argument that Plaisant does not teach continuous contact with the touch screen display.  *See* Apple's First Supplementary Response to Interrogatory No. 26 at p.136: ("Samsung has failed to demonstrate that any movement of this slider away from its initial location is in accordance with movement of the contact while continuous contact with

Case No. 12-CV-00630-LHK
EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

the touchscreen is maintained . . . or without contact being maintained.")  Plaisant expressly discloses that the security of the slider and rocker toggles is attributed to the fact that the user must slide while contact is maintained:  "another advantage of the sliding movement is that it is less likely to be done inadvertently therefore making the toggle more secure (the finger has to land on and lift off the right locations.)"  (Plaisant, p.668, Col.1, ¶1.)  Dr. Plaisant additionally notes that "Valk showed that users were confused by a design which showed a slider switch where only touches on the end of the slider were permitted, but 'sliding' was not possible."  *Id.* at p.667, Col. 1, ¶2.)  Finally, Dr. Plaisant in fact later made a *modified version* of the rocker toggle that did not require continuous contact, and noted that the toggle was "less secure."  (Plaisant Video at 4:38: "we allowed direct touch on the opposite side of the toggle.  It's important to note that this last change allowed easier switch of the toggle, but this last change makes the toggle less secure.") Plaisant thus teaches that a continuous sliding movement, and explicitly notes its superiority for applications designed to avoid accidental input.

500.    Neonode N1 Quick Start Guide discloses movement of the detected contact while continuous contact with the touch-sensitive display is maintained in order to unlock the device. The Neonode N1 Quick Start Guide discloses a "right sweep to unlock" movement to unlock the device. Thus it detects contact while continuous contact with the touch-sensitive display is maintained (Neonode N1 Quick Start Guide SAMNDCA630-00966519), where such a right-sweep gesture is used to unlock the device (Neonode N1 Quick Start Guide SAMNDCA630-00966519 and SAMNDCA630-00966514) (see Figure 44a and Figure 44b above).

501.    Additionally, the Skilled Person would have known without further explanation that a touch-based graphical user interface recognizing gestural movements detects contact while continuous contact with the touch-sensitive display is maintained: this is how such interfaces worked at the time of both the Neonode N1 Quick Start Guide and '721 Patent (as explained at Paragraph 125 of this report).

502.    To the extent Plaisant does not disclose an unlock operation, and therefore an "unlock image" with which contact is detected, in my opinion it would have been obvious at the time of invention to one of ordinary skill in the art to use the Plaisant toggles to switch between a locked

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1   and unlocked state, as disclosed by Neonode, for the reasons discussed in paragraph 493.  In such

2   a combination the yellow slider pointer necessarily constitutes an "unlock image" which moves

3   continuously in accordance with movement of the detected contact.

4       503.   To the extent Neonode does not disclose an "unlock image," in my opinion it would

5   have been obvious to a Skilled Person at the Critical Date to combine the unlock user interface of

6   Neonode with the touchscreen toggles of Plaisant, as discussed in paragraph 495.  The slider knob

7   image, in combination with Neonode, would necessarily constitute an "unlock image," and the left

8   edge of the screen where the gesture ends would necessarily constitute a "first predefined

9   location."

10          *(7h) wherein the unlock image is a graphical, interactive user-*
    *interface object with which a user interacts in order to unlock the*

11          *device; and;*

12      504.   Plaisant discloses that the images are graphical interactive user interface objects with

13  which a user interacts in order to change the state of a device.  As the toggles were programmed in

14  C (*See* Plaisant Dep. Tr. at 74:17-22) and can be toggled through the continuous inputs from the

15  touch screen, they are interactive GUI objects.

16      505.   To the extent Plaisant does not disclose an unlock operation, and therefore an "unlock

17  image" with which the user interacts in order to unlock the device, in my opinion, it would have

18  been obvious at the time of invention to one of ordinary skill in the art to use the Plaisant toggles

19  to switch between a locked and unlocked state, as disclosed by Neonode, for the reasons discussed

20  in paragraph 493.  In such a combination the yellow slider pointer necessarily constitutes an

21  "unlock image" with which a user interacts in order to unlock the device.

22      506.   To the extent Neonode does not disclose an "unlock image," in my opinion it would

23  have been obvious to a Skilled Person at the Critical Date to combine the unlock user interface of

24  Neonode with the touchscreen toggles of Plaisant, as discussed in paragraph 495.  The slider knob

25  image, in combination with Neonode, would necessarily constitute an "unlock image" that is "a

26  graphical, interactive user-interface object with which the user interacts in order to unlock the

27  device."

28

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1

> *(7i)     to unlock the hand-held electronic device if the unlock image*
> *is moved from the first predefined location on the touch screen to a*
> *predefined unlock region on the touch-sensitive display;*

2

3       507.     Plaisant discloses to transition the electronic device from one state to another if the

4   image is moved from the first predefined location on the touch screen to a predefined unlock

5   region on the touch-sensitive display.  Plaisant discloses a transition from one user-interface state

6   to another, which would include unlocking to a person of ordinary skill at the time of invention.

7       508.     "Predefined region." Plaisant discloses the image is moved from the first predefined

8   location on the touch screen (as described above in paragraph 483 to 484) to a predefined region.

9   The predefined region is the left or right side of the toggle or the left or right position of the lever,

10   depending the current setting of the toggle. *e.g.*: "Slider toggle:  In this toggle a sliding/dragging

11   movement is required to change the position of the yellow pointer from one side of the toggle to

12   the other. … If the device is ON the pointer is on the ON side. Users can then grab the pointer and

13   slide it to the other side." (Plaisant Paper, pp. 668, Col. 1, ¶5). In addition, Plaisant discloses:

14   "Another advantage of the sliding movement is that it is less likely to be done inadvertently

15   therefore making the toggle very secure (the finger has to land on and lift off the right locations)"

16   (Plaisant, pp. 668, Col. 2, ¶1). Figure 2 of the Plaisant Paper, reproduced above as Figure 45,

17   display the 'Off' position on the right side, and the 'On' position on the left side. Furthermore, the

18   three frames of the Plaisant Video reproduced above in Figure 57 show the user moving the

19   pointer image to a predefined location. In her particular implementation, turning a device 'On'

20   from 'Off' would have the predefined region on the left side of the toggle.  Plaisant discloses that

21   the predefined region for the lever is similar.

22       509.     Neonode teaches instructions to unlock the hand-held electronic device if the *contact*

23   movement is from the first predefined location on the touch screen to a predefined unlock region

24   on the touch-sensitive display.  As previously discussed, the manual discloses unlocking the

25   device upon detection of a "right sweep" gesture.  *See* SAMNDCA630-00966514 above.

26       510.     This right sweep gesture requires three steps:  1.) touching down on the left side of the

27   touch screen; 2.) continuously moving, while the finger is still down, across the width of the

28

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

touchscreen; and 3.) lifting the finger at the right side of the touch screen, as described below on SAMNDCA630-00966519:



511.    Thus, the gesture requires that the *contact* is moved continuously.

512.    "Predefined unlock region." The Neonode N1 Quick Start Guide discloses a predefined unlock region, where the right sweep used to unlock the device beginning at the first predefined location must end at the right side of the screen in order to unlock the device. (Neonode N1 Quick Start Guide SAMNDCA630-00966519 and SAMNDCA630-00966514) (see Figure 44a and Figure 44b above). The right side of the screen is a predefined unlock region.

513.    To the extent Plaisant does not disclose an unlock operation, and therefore unlocking if the unlock image moves to an unlock region, in my opinion, it would have been obvious at the time of invention to one of ordinary skill in the art to use the Plaisant toggles to switch between a locked and unlocked state, as disclosed by Neonode, for the reasons discussed in paragraph 493. In such a combination the yellow slider pointer necessarily constitutes an "unlock image," and the device unlocks when the slider moves to the side of the toggle associated with the unlock state; *i.e.*, the "predefined unlock region."

514.    To the extent Neonode does not disclose an "unlock image," in my opinion it would have been obvious to a Skilled Person at the Critical Date to combine the unlock user interface of Neonode with the touchscreen toggles of Plaisant, as discussed in paragraph 495. The slider knob image, in combination with Neonode, would necessarily constitute an "unlock image," and the right side of the touchscreen necessarily constitutes a "predefined unlock region."

(b)    **Claim 8**

*The device of claim 7, further comprising instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device.*

515.    Both Plaisant and Neonode disclose instructions to display visual cues to communicate a direction of movement.

516.    Plaisant discloses instructions to display visual cues to communicate a direction of movement of the image required to toggle between states.

517.    For the slider (for example, see Figure 2 of the Plaisant Paper, reproduced above as Figure 45), visual cues include the initial position of the pointer on an end of the channel (a cue that it can only be moved towards the other end of the channel), the horizontal channel of the slider (a cue where the pointer can only be moved in the horizontal direction towards the other end of the channel), and the oval shape at the end(s) of the channel (a cue that the pointer direction is towards that oval shape). Furthermore, rendering the toggles as a switch on the screen in and of itself is a visual cue as to how to move the slider knob. *See* paragraphs 142-143 on "affordances" and "visual constraints."

518.    For the lever, visual cues include the initial position of the lever handle on an end of the rectangular channel containing it (a cue that it can only be moved towards the other end of the channel), the horizontal channel of the lever (a cue where the lever handle can only be moved in the horizontal direction towards the other end of the channel). The lever itself is a visual literal metaphor of horizontally-mounted everyday physical toggles, and thus serves as a further cue that the lever must be moved from the current location in the horizontal direction.

519.    For the slider and lever, the animation of the movement of the pointer and of the lever handle further shows that that movement is constrained to the channel and thus serves as an additional cue that the pointer and the lever handle can be moved only in the horizontal direction.

520.    Neonode discloses instructions to display visual cues to communicate a direction of movement required to unlock the device. It does this through the text "Right sweep to unlock" on the lock screen (Neonode N1 Quick Start Guide SAMNDCA630-00966514) (see Figure 44b above). The Skilled Person would have known without further explanation that instructions are

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1    required to draw this text, as this is how such devices displayed interfaces at the time of both the

2    Neonode N1 Quick Start Guide and '721 Patent, and is still done today.

3         521.    To the extent Plaisant does not disclose an unlock operation, and therefore visual cues

4    that communicate the direction of a unlock image required to unlock the device, in my opinion, it

5    would have been obvious at the time of invention to one of ordinary skill in the art to use the

6    Plaisant toggles to switch between a locked and unlocked state, as disclosed by Neonode, for the

7    reasons discussed in paragraph 493. In such a combination the yellow slider pointer necessarily

8    constitutes an "unlock image," and visual cues (the slider track and text labels) communicate the

9    direction of movement in which the unlock image is required to move to toggle to the unlocked

10   state.

11        522.    To the extent Neonode does not disclose an "unlock image," in my opinion it would

12   have been obvious to a Skilled Person at the Critical Date to combine the unlock user interface of

13   Neonode with the touchscreen toggles of Plaisant, as discussed in paragraph 495. The slider knob

14   image, in combination with Neonode, would necessarily constitute an "unlock image," and the

15   text "right sweep to unlock" would necessarily communicate the direction of movement in which

16   the unlock image must move in order to unlock the device.

17        523.    As discussed above, it is my opinion that both Neonode and Plaisant disclose visual

18   cues. To the extent both the text displayed in Neonode and that various cues displayed in Plaisant

19   do not constitute visual cues, it would have been obvious to a Skilled Person to include visual cues

20   to convey a direction the user must move the unlock image to unlock the device. The prior art is

21   replete with software applications to display visual cues instructing a user to perform a gesture, or

22   any other action. The most basic drag-and-drop interfaces included such instructions, such as the

23   Macintosh Desktop in the 1980's (where the visual affordance of a trash can gave users

24   instructions to drag unwanted files to it). The inclusion of such instructive visual cues are wholly

25   obvious and merely a design choice—it is completely at the interface designer's discretion to

26   determine how much, if any, visual instruction to give users.

27

28

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1   text "swipe screen to unlock." I note this is similar text to the instruction found in the Neonode

2   N1 Quick Start Guide. Like all the documents cited by Apple regarding visual cues, this merely

3   suggests the benefit of including visual cues. I disagree with any assertion that Apple invented

4   visual cues.

5          E.10.        No Failure of Others.

6          824.        Apple has failed to produce any evidence that others attempted to solve the problem

7   of accidental activation and failed. *See* Anzures 6/25/13 Dep. Tr. at 114:9-14, 119:23-120:4;

8   Ording 4/4/13 Dep. Tr. at 245:8-13 (unaware of anyone else working on the problem). As

9   discussed above, the solutions available before the invention of the '721 patent were perfectly

10  acceptable, and in fact solved the problem of accidental or unauthorized activation.

11  **X.     INVALIDITY OF THE '721 PATENT UNDER 35 USC § 112**

12     **A.     Indefiniteness**

13          A.1.        "touch screen"

14          825.   Claim 7 requires "to unlock the hand-held electronic device if the unlock image is

15  moved from the first predefined location on the **touch screen** to a predefined unlock region on the

16  touch-sensitive display." The term "touch screen" lacks antecedent basis in the claim. For the

17  purposes of this report, I consider "touch-sensitive display" and "touch screen" to be the same

18  claim term.

19          A.2.        "hand-held electronic device"

20          826.   Claim 7 requires "to unlock the **hand-held electronic device** if the unlock image is

21  moved from the first predefined location on the touch screen to a predefined unlock region on the

22  touch-sensitive display." The term "hand-held electronic device" lacks antecedent basis in the

23  claim. For the purposes of this report, I consider "hand-held electronic device" and "portable

24  electronic device" to be the same claim term.

25          A.3.        unlocking

26          827.   As previously discussed in Section III.G, I have been informed that a claim is

27  indefinite if it is "insolubly indefinite," or if they do not reasonably apprise those skilled in the

28

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1    relevant art of the applicant's intended scope of the invention when read in light of the

2    specification.

3        828.    In my opinion, to the extent Apple takes the position that "locked" means anything

4    other than "fully locked," the term "unlocking" is indefinite, because the term "locked state" does

5    not reasonably apprise those skilled in the art of the applicant's intended scope.  For the purposes

6    of my anticipation and obviousness analysis in this report, I have applied the definition of

7    "locked" under the plain and ordinary meaning of the term; *i.e.*, fully locked.

8        829.    The specification defines the "locked state" but is ambiguous as to what operations

9    may be performed in this state:

10                   In the user-interface lock state (hereinafter the "lock state"), the
                     device **100** is powered on and operational but ignores ***most, if not***
11                   ***all, user input***. That is, the device **100** takes no action in response to
                     user input ***and/or*** the device **100** is prevented from performing a
12                   predefined set of operations in response to the user input. The
                     predefined set of operations may include navigation between user
13                   interfaces and activation or deactivation of a predefined set of
                     functions.''721 patent, 7:64-8:4.

14
         830.    The specification does not further define this "predefined set of operations," but
15
     heavily implies that, during the "locked state," the device only responds to the unlock action, or an
16
     attempt to turn off the device:
17
                     In embodiments where the device **100** includes the touch screen **126**,
18                   while the device **100** is locked, a predefined set of operations, such
                     as navigation between user interfaces, is prevented from being
19                   performed in response to contact on the touch screen **126** when the
                     device **100** is locked. ***In other words, when the contact is being***
20                   ***ignored by the locked device 100, the touch screen may be said to***
                     ***be locked.*** A locked device **100**, however, may still respond to a
21                   limited class of contact on the touch screen **126**. The limited class
                     includes contact that is determined by the device **100** to correspond
22                   to an attempt to transition the device **100** to the user-interface unlock
                     state.
23
                     *Id.* at 8:22-33.
24
         831.    The specification does make clear, however, that in some embodiments navigation
25
     between user interfaces and entry of data is prohibited in the locked state:
26
                     While the device is locked, the user may still make contact on the
27                   touch screen. However, the locked device is prevented from
                     performing a predefined set of actions in response to any detected
28                   contact until the device is unlocked. ***The prevented predefined set of***

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

*action may include navigating between user interfaces and entry
of data by the user.*

> *Id.* at 10:43-58.

832.    Therefore, because the "predefined set of operations" is never defined, it is unclear from the specification of the '721 patent whether a device is in the "locked" state, and therefore, whether transitioning to another state by moving an image comprises "unlocking."

833.    Both the named inventors of the '721 patent and Apple's own expert have struggled with this distinction.  I have reviewed the deposition transcripts of both the named inventors as well as Dr. Balakrishnan; each one of these individuals has given a slightly different answer that sheds no clarity as to how to objectively determine whether a device is in a "locked state."

834.    Marcel Van Os testified that a device in a locked state was "the state where to try to avoid – have the user avoid accidental interactions as much as possible."  Van Os. Dep. Tr. at 196:4-11.  However, he was unable to articulate what a device was capable or incapable of doing in the locked state.  A device prompting a user to enter a password, for example, could still allow accidental interactions.  (*Id.* at 221:8-222:12.)  Mr. Van Os also testified that the unlocked state was "a state where we would not prevent accidental interactions at all *or as much*" (*id.* at 164:14-19; 196:12-17; 196:18-197:14.)  Thus a device could still be unlocked and preventing accidental activations, or be locked and permit accidental activations.

835.    Freddy Anzures testified that in an unlocked state, "most if not all functionality of the device is available" (Anzures 6/25/13 Dep. Tr. at 103:4-8), but admitted that the set of operations available in the locked state was based off what the Apple team had determined "don't have as many privacy implications on them."  (*Id.* at 103:9-104:7.)  Mr. Anzures also testified that the boundaries between the locked and unlocked states "really depends on the user."  (*Id.* at 105:7-12.)  Further complicating the issue, Mr. Anzures testified that the locked and unlocked states may have sub states and interstitial states between the two.  (*Id.* at 166:13-17; 170:4-24.)

836.    Mr. Christie testified that there was no wholly objective method of determining whether a device was locked or unlocked.  (Christie 4/20/12 PI Dep. Tr. at 144:2-146:3.)  Mr. Christie also believed that a locked device does not respond to anything but the unlock action

Case No. 12-CV-00630-LHK
EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1   (Christie 5/14/13 Dep. At 69:18-70:3), and testified that he personally believed that a device that

2   allows changing a music track with a single key press is not locked.  (*Id.* at 141:24-143:13.)

3        837.    During the Preliminary Injunction phase, Dr. Balakrishnan testified that what

4   functions make up the "predetermined set" of functions is determined by the subjective intent of

5   the programmers or the users.  *See* Balakrishnan 4/6/12 PI Dep. Tr. at 123:10-22; 129:16-130:7;

6   136:9-137:14; 139:20-140:18.

7        838.    In my opinion, the patent is clear as to the boundaries of the "locked state" and

8   "unlocked state" at the extreme boundaries.  For example, the patent makes it unambiguous that a

9   device which only responds to the unlock action is in the locked state, in other words, "fully

10  locked."  The patent is also clear that, when all functions of the device are accessible by the user, it

11  is in an "unlocked state," in other words, "fully unlocked."  However, it is impossible to tell, based

12  on the specification of the '721 patent, whether a device in between these two extremes is in a

13  "locked" or "unlocked" state.

14       839.    For example, is a device that only has one option, such as the legal disclaimer in an

15  automotive navigation system, in a locked state?  I believe most people of ordinary skill would say

16  yes, as there is only one action available to the user; to unlock the device.  However, I note that

17  only one region is accepting user input, the "Accept" button, and the rest of the screen is a "guard

18  region."  Based on the specification of the '721 patent, this device is ignoring "most, if not all"

19  user input (touches to the guard region are ignored).

20

21

22

23

24

25

26

27

28

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY



**Figure 69.  Example "Lawyer Screen" in an automotive navigation system (retrieved from: http://zeckhausen.com/images/Navigation/lawyer_warning.jpg)**

840.    However, this operation becomes less and less clear as more functionality is added to a particular user interface.  Take, for example, an ATM prompting a user to enter his or her PIN, as shown below.  Is the device locked or unlocked?  The user certainly cannot access the full functionality of the device, but can hit the "cancel" button" to return to the previous screen.  It is unclear from the specification whether this form of "navigating between user interfaces" is part of the "predefined set of functions."

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY



**Figure 70.  Bank of America ATM PIN prompt (retrieved from:**
**http://webmedia.bankofamerica.com/infocenter/assets/20081223-72521341-1015174/ch1.jpg)**

841.    To further illustrate, some ATMs permit users to change the language of the device

prior to entering a PIN:

**Figure 71.  Language selection screen (retrieved from:**
**http://2.bp.blogspot.com/_fCBUkSjCqro/TUXtppLUoYI/AAAAAAAAAEQ/kGoN_HLx8h0/s1600/bankofthew**

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

est.jpg)

842.     Is this device in a locked or unlocked state as described by the '721 patent?  The user cannot access the full functionality of the device, such as requesting transactions.  However, the user may access each of three available options.  Is the device ignoring "most, if not all, user input?"  To the extent that accessing the English, Spanish, or Chinese menus is within a "predefined set of operations," the device above may or may not be locked.

843.     I also note that Apple was only able to obtain an allowance over *Keller* by distinguishing between the locked and unlocked state.  In *Keller*, Apple argued the user interface is in an unlocked state because other operations could be performed.  As such, outside of a "fully locked" or "fully unlocked" device, there is no way to determine whether a device is a locked or unlocked state according to the specification of the '721 patent.

844.     Thus, to the extent Apple asserts that a device in the "locked state" may still access various applications, navigate between user interfaces, activate or deactivate functions, or enter data, it is my opinion that the term is indefinite, and therefore "unlocking" is also indefinite.

EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY

1   **XI.     ADDITIONAL COMMENTS**

2        845.    My opinions are subject to change based on additional opinions that Apple's experts

3   may present and information I may receive in the future, or additional work I may perform.  With

4   this in mind, based on the analysis I have conducted and for the reasons set forth below, I have

5   preliminarily reached the conclusions and opinions in this report.

6        846.    At trial and as discussed above, I may rely on visual aids and may rely on analogies

7   concerning elements of the '721 patent, the accused products, the prior art referenced in this

8   report, or any related technologies.

9        847.    In connection with my anticipated testimony in this action, I may use as exhibits

10  various documents produced in this case that refer or relate to the matters discussed in this report.

11  I have not yet selected the particular exhibits that might be used.  In addition, I may create or assist

12  in the creation of certain demonstrative evidence to assist me in testifying, and I reserve the right

13  to do so, such as demonstrating working computer systems to further support the positions in this

14  report.

15  Date: August 12, 2013

16

17                                                      Saul Greenberg

18

19

20

21

22

23

24

25

26

27

28

Case No. 12-CV-00630-LHK
EXPERT REPORT OF SAUL GREENBERG RE: THE VALIDITY OF CLAIM 8 OF US PATENT NO. 8,046,721
HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY