JOSH A. KREVITT (CA SBN 208552)
jkrevitt@gibsondunn.com
H. MARK LYON (CA SBN 162061)
mlyon@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, California  94304-1211
Telephone:  (650) 849-5300
Facsimile:  (650) 849-5333

HAROLD J. McELHINNY (CA SBN 66781)
hmcelhinny@mofo.com
JAMES P. BENNETT (CA SBN 65179)
jbennett@mofo.com
JACK W. LONDEN (CA SBN 85776)
jlonden@mofo.com
RACHEL KREVANS (CA SBN 116421)
rkrevans@mofo.com
RUTH N. BORENSTEIN (CA SBN 133797)
rborenstein@mofo.com
ERIK J. OLSON (CA SBN 175815)
ejolson@mofo.com
Morrison & Foerster LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

WILLIAM F. LEE (*pro hac vice*)
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

MARK D. SELWYN (CA SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

*Attorneys for Plaintiff and Counterclaim-Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 12-cv-0630-LHK (PSG)<br><br>**DECLARATION OF CHRISTOPHER A. VELLTURO, PH.D, IN SUPPORT OF APPLE'S BRIEF REGARDING ONGOING ROYALTY RATES**<br><br>**DOCUMENT SUBMITTED UNDER SEAL** |

I, CHRISTOPHER A. VELLTURO, hereby declare as follows:

1.     I have been retained by counsel for the plaintiff Apple Inc. ("Apple") in connection with this litigation.  In my previous work in this matter, I submitted an affirmative expert report on damages for Apple ("Vellturo Expert Report" or my "Original Report", dated August 12, 2013).  That report discussed the results of my damages analysis through February 2013, the last month for which financial and/or industry data were available at that time.  It reflected my calculation of the profits Apple lost due to Samsung's infringement and, alternatively, a reasonable royalty based on a hypothetical negotiation occurring in 2011.  Using the same methods and financial data up to December 31, 2013, I supplemented the damages calculations in a Supplemental Report submitted on February 17, 2014 ("Vellturo Supplemental Report" or my "Supplemental Report").  I was deposed in this matter on September 25, 2013 ("Vellturo Deposition"), and testified at trial in April 2014.

2.     On June 13, 2014, I submitted a declaration in which I assessed and disagreed with the claim by Samsung's damages expert, Dr. Judith A. Chevalier, in her Declaration in Opposition to Apple's Motion for Permanent Injunction,[1] that the jury's damages award in this matter is consistent with a fully-paid lump sum award covering past and future infringing sales, rather than a reasonable royalty award calculated by multiplying accused units by a constant per-patent royalty rate ("PI Declaration"). [2]

3.     I have attached a current version of my *curriculum vitae* as **Exhibit 1**.

4.     On May 5, 2014, the jury awarded a total of $119,625,000.00 in damages to Apple for infringement of three asserted patents: U.S. Patent Nos. 5,946,647 (the "'647 patent"), 8,046,721 (the "'721 patent") and 8,074,172 (the "'172 patent").  In separate orders entered September 8 and 9, the Court denied the motions of both parties to set aside the jury's verdict.[3] The Court also denied Apple's motion for a permanent injunction, concluding that "monetary

---

[1] Declaration of Judith A. Chevalier, Ph.D. in Opposition to Apple's Motion for Permanent Injunction, June 6, 2014 ("Chevalier Declaration"), Dkt. 1907-5.

[2] Chevalier Declaration, ¶ 67.

[3] Dkt 1962, 1965.

DECLARATION OF CHRISTOPHER A. VELLTURO ISO APPLE'S BRIEF REGARDING ONGOING ROYALTY RATES
CASE NO. 12-CV-0630-LHK
sd-648835

1

1  remedies would more appropriately remedy Samsung's infringement than would an injunction."[4]

2  Apple has appealed that ruling and Apple has now sought an ongoing royalty for post-verdict

3  infringement by Samsung to obtain a partial monetary remedy with respect to Samsung's

4  continuing infringement.

5       5.     I have been asked by counsel for Apple to do the following:

6       •   identify the best explanation for the jury's per product, per patent and total

7          verdict; and

8       •   evaluate the appropriate rate for ongoing royalties in light of changes in the

9          economic circumstances of the parties since the date of the hypothetical

10          negotiations and the verdict.

11  **Summary of Opinions**

12       6.     My opinions are summarized as follows:

13       •   It is my opinion that the best explanation for the jury's verdict is that the jury

14          sought to calculate a per-unit reasonable royalty separately for each patent

15          using the following rates: $2.75 for the '647 patent; $2.30 for the '172 patent,

16          and $1.41 for the '721 patent.

17       •   It is my opinion that developments since the original hypothetical negotiation

18          in 2011, including changes following the verdict, would put upward pressure

19          on the ongoing royalty rates in a new hypothetical negotiation.  These

20          developments include:

21          o  A continually growing smartphone market in which the parties have

22            become the two main competitors; and

23          o  Samsung's continued use of the '647 patent after the jury's verdict that

24            Samsung infringes Apple's patents, despite Samsung's many

25            statements that a change would be quick and easy to implement and

26            despite the launch of new products.

27

28       [4] Dkt. 1953 at 35:23-24.

- I understand that Apple has decided to seek imposition of the per-unit amounts defined above.  In my opinion, this amount is conservative and more than justified by the present circumstances either as an expression of the jury's conclusion or as a rate justified by the present economic circumstances.

7.     I explain these opinions in the remainder of my Declaration below.

## I.     BACKGROUND

8.     I understand that a *Paice* or ongoing royalty applies to continued infringement by products adjudged infringing or no more than colorably different from those products.[5]

9.     Based on my examination of the market, Samsung continues to sell at least the Galaxy S3, one of the products adjudged as infringing by the jury in this case.  Based on research undertaken by QES at my direction, the Galaxy S3 is presently available for sale by Sprint,[6] Best Buy,[7] and Radio Shack[8] in their stores.  Based on searches done by QES, the Galaxy S3 can also be purchased online from Sprint,[9] AT&T,[10] Best Buy,[11] Walmart,[12] and Target.[13]

10.     Also based on research by QES, I understand the Galaxy Note II, another one of the products adjudged as infringing by the jury in this case, is presently available for sale by

---

[5] *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007).

[6] Based on in-person visit made at my direction by QES staff on September 2, 2014.

[7] Based on in-person visit made at my direction by QES staff on September 13, 2014.

[8] Based on in-person visit made at my direction by QES staff on September 13, 2014.

[9] http://shop.sprint.com/mysprint/shop/phone_details.jsp?deviceSKUId= 82600215&question_box=galaxy%20s3&id16=galaxy%20s3.  I have included printouts of this web page and all others cited below in this Declaration as **Exhibit 5**.

[10] http://www.att.com/cellphones/samsung/galaxy-s-iii.html#fbid=cGMDxUpibC_?sku=sku6100231

[11] http://www.bestbuy.com/site/samsung-galaxy-s-iii-4g-with-16gb-mobile-phone-pebble-blue-at-t/5606621.p;jsessionid=F069A5F51CD39566D999E9A68320DB89.bbolsp-app04-146?id=1218672941448&skuId=5606621&st=galaxy%20s%20iii&cp=1&lp=1&contract_desc=

[12] http://www.walmart.com/ip/Univision-Samsung-Galaxy-S-III-LTE-16GB-Prepaid-Smartphone-Titanium-Gray-Marble-White-w-50-Bonus-Gift-Card/39090734#Item+Description

[13] http://www.target.com/p/brightspot-samsung-galaxy-siii-cell-phone-white-t999l/-/A-14791715#prodSlot=medium_1_1&term=samsung+galaxy+s+iii

DECLARATION OF CHRISTOPHER A. VELLTURO ISO APPLE'S BRIEF REGARDING ONGOING ROYALTY RATES
CASE NO. 12-CV-0630-LHK
sd-648835

3

Radio Shack and Best Buy Mobile in their stores.[14]  Further, the Galaxy Note II can be purchased online on websites such as Best Buy.[15]

11.     As discussed below, the infringing Samsung devices run the Android mobile operating system developed by Google.[16]  Since the jury's verdict in this case, two versions of Android have been released by Google, versions 4.4.3 and 4.4.4.[17]  I understand that as of the time of this Declaration, Samsung has updated neither the S3 nor the Note II to these newest versions of Android.[18]  The operating systems listed with the versions of these products available for sale on the web include 4.0[19] through 4.4.[20]

12.     I understand that courts have frequently used three factors to determine an ongoing royalty.  They evaluate what the jury awarded and the best explanations for that verdict.  They evaluate whether that figure should change due to differences in the circumstances after the

---

[14] Based on in-person visit made at my direction by QES staff on September 13, 2014.

[15] http://www.bestbuy.com/site/samsung-galaxy-note-ii-4g-cell-phone-marble-white-verizon-wireless/6963055.p?id=1218817160618&skuId=6963055&st=galaxy%20note%20ii&cp=1&lp=1&contract_desc=

[16] http://www.android.com/.

[17] http://arstechnica.com/gadgets/2014/06/google-releases-android-4-4-3-to-nexus-devices/; http://www.droid-life.com/2014/06/19/whoa-android-4-4-4-factory-images-posted-as-build-kut84p/.  Both versions were originally rolled out in Google's Nexus devices in June 2014.

[18] Samsung began pushing out Android 4.4.2 updates to S III devices in May 2014.  It has also rolled out Android 4.4.2 to Note II devices in 2014.  See http://www.gottabemobile.com/2014/08/22/galaxy-s3-kitkat/.  However, the Android 4.4.3 and 4.4.4 updates have not yet been announced for the Galaxy S III or Galaxy Note II in the United States.  See http://www.gottabemobile.com/2014/08/18/samsung-galaxy-android-4-4-kitkat-update/.

[19] http://www.bestbuy.com/site/samsung-galaxy-s-iii-4g-with-16gb-mobile-phone-pebble-blue-at-t/5606621.p;jsessionid=F069A5F51CD39566D999E9A68320DB89.bbolsp-app04-146?id=1218672941448&skuId=5606621&st=galaxy%20s%20iii&cp=1&lp=1&contract_desc=

[20] http://shop.sprint.com/mysprint/shop/phone_details.jsp?deviceSKUId=82600215&question_box=galaxy%20s3&id16=galaxy%20s3.  Sprint does not specify which iteration of Android 4.4 comes with the Galaxy S III.  As noted above, versions 4.4.3 and 4.4.4 are not yet available with any S III devices in the US.

verdict in comparison to the date of the hypothetical negotiation.  Courts have also evaluated whether the defendants' continued infringement was willful.[21]

## II.      THE ROYALTY RATES REFLECTED IN THE JURY'S VERDICT

13.    The Amended Final Jury Verdict is not clear on its face as to how the jury arrived at the amounts stated in questions 9, 10a and 10b.[22]  Given this, I have used the following criteria to determine the best economic, mathematical and logical explanation for the jury's award:

- Can the approach be applied consistently across the answers provided by the jury in the various parts of the verdict form?

- How much of the verdict form does the approach reasonably explain?

- Is the approach tied to evidence available to the jury at trial that was intended to address the issue of damages?

- Is the approach simple and consistent, such that it could easily be implemented by lay jurors?

14.    Samsung has previously argued that the jury verdict is a lump sum that was designed to address both past and future infringement and the Court has rejected this position in its prior orders.[23] As discussed in those orders and in my prior declaration, Samsung's position is not consistent with the calculations prepared by both parties.  It is not consistent with the evidence, both testimonial evidence and exhibits, provided to the jury by both parties, and there is nothing in the verdict form that suggests that the jury intended its award to address both past and future infringement.  I incorporate by reference the discussion of this issue contained in my June 13, 2014 declaration.

15.    Using the criteria stated in paragraph 13 above, I believe the best explanation of the jury's damages calculation is a separate per-unit royalty applied for each patent in the

---

[21] This final task falls outside the role of economic damages analysis.

[22] Amended Final Verdict, Dkt. 1884.

[23] E.g., Dkt. 1962 at 19-22; Dkt. 1953 at 29-31.

1  following amounts: $2.75 for the '647 patent, $2.30 for the '172 patent, and $1.41 for the '721

2  patent.[24]

3      16.     My analysis starts with the jury's answer to question 10a, which reflects the most

4  detailed breakdown of their damages, including a separate damages figure for each product and

5  each patent as well as totals derived from the per-product, per-patent totals.  The damages

6  amounts in each of the per-product and per-patent damages reflect a consistent ratio between the

7  amount awarded by the jury and the amount of the "Reasonable Royalty on All Infringing Units"

8  damages included at page 24 of the summary of my damages calculations (PX222A1). ██████

9  ████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████[25]

12 This ratio and its consistency are reflected in **Exhibit 2**.  No other analysis, whether tied to my or

13 Dr. Chevalier's royalty rates or damages summary, provides an explanation that is as consistent

14 or as comprehensive as this analysis of the verdict form.

15      17.     The significance of these percentages and their usefulness in explaining the jury's

16 calculation is enhanced by evaluating the relationship between these percentages, my proposed

17 royalty rates (which were included in PX222A1 at page 37) and a potential per-unit royalty

18 awarded by the jury.  I have applied the percentages identified above to the royalty rates that I

19 included in PX222A1.37 to identify a per-unit royalty implied by the ratios identified in **Exhibit**

20 **2** as follows:

21      • '647 Patent: ████████████████████████ equals $2.75 per unit.

22 _____

23 [24] Although I recognize that the jury's award serves as the starting point in evaluating the
   amount of an ongoing royalty after trial, I have separately testified regarding my opinion of the

24 higher royalty rate the parties would have reached in a hypothetical negotiation for a license to
   these three patents in 2011.  I continue to hold those opinions and believe that much higher rates

25 should apply based on the *Georgia-Pacific* analysis included in my reports and trial testimony.

26 [25] Stratosphere is the one exception to this pattern. ████████████████████████
   ██████████████████████████████████████████████████ The jury

27 appears to have modified the Stratosphere to obtain figures that would result in a "round" number
   for its final total $119,625,000, which is included in the response to question number 9.  This

28 explains the deviations with respect to the Stratosphere.

- '172 Patent:  ███████████████████  equals $2.30 per unit.
- '721 Patent:  ███████████████████  equals $1.41 per unit.[26]

Notably, this approach yields per-unit royalties for two patents that reflect "round" figures, consistent with the type of analysis that a lay jury might undertake.

18.     These calculations suggest that the jury's damages verdict is best explained by the following steps:  (1) the jury reached agreement on per-unit royalties for each patent, (2) the jury calculated the ratio between its rates and my royalty rates; (3) the jury applied those ratios to the reasonable royalty damages for each product provided at PX222A1.24, which was discussed during closing arguments;[27] and (4) the jury modified the amount in the last line ("Stratosphere") to obtain a round total damages figure to be included in the answer to question 9 on the Amended Final Verdict.

19.     I have examined and cannot identify any consistent relationship between any single per-unit royalty figures, such as the $0.35 royalty rate proposed by Dr. Chevalier, and the jury's responses to questions 9, 10a and 10b. [28]  I have examined and cannot identify any consistent relationship between any single per-unit royalty and the unit sales figures provided to the jury by me and Dr. Chevalier.  I have examined and cannot identify any consistent relationship between the jury's responses to questions 9, 10a, and 10b and Dr. Chevalier's reasonable royalty damages summary.[29]

20.     Given that the result can be applied consistently, that it explains nearly all the answers in questions 9 and 10a, and that it is fairly simple to apply for a lay jury, I conclude that the best explanation for the damages award is that the jury sought to award Apple the following

---

[26] While this per-unit figure is not a "round" number like the prior two figures, the 88% may reflect a decision to approximate a number that is seven-eighths of the royalty rate I proposed.

[27] Trial Tr. at 3217:8-16.

[28] See my analysis on this point in the PI Declaration, at ¶ 20.

[29] DX453A at 2.

DECLARATION OF CHRISTOPHER A. VELLTURO ISO APPLE'S BRIEF REGARDING ONGOING ROYALTY RATES
CASE NO. 12-CV-0630-LHK
sd-648835

7

per-unit royalties for each patent:  '647 patent – $2.75 per unit; '172 patent – $2.30 per unit; '721 patent – $1.41 per unit.

21.    In reaching my conclusion that the above-described calculation is the most likely explanation for how the jury came to its damages award, I examined whether the damages amounts (taken from the answer to question 10a) divided by the infringing units taken from portions of PX142 provides a better explanation for the verdict.  **Exhibit 3** reflects this calculation.  To approximate the total infringing units, I used the monthly unit sales data available to the jury in PX-142, adjusted to reflect the notice dates and the "assertion end dates" provided at page 7 of PX-222A1 for the '721 Patent and '172 Patent, each of which was infringed for only part of the period during which products were sold.  As reflected in **Exhibit 3,** this exercise results in per-unit rates that vary for each product, ███████████████████████████████

████████████████████████████████████████████████████████[30]

22.    I find this approach unpersuasive as an explanation for the jury's actions.  There is no reason to believe that the jury would adopt a different royalty rate for each different combination of a patent and a product.  No witness ever suggested such an approach.  No lawyer argued in favor of it, and it is not suggested by anything in the jury instructions.  The per-unit rate differences reflected in **Exhibit 3** and the fact that they lack any basis in the testimony, exhibits, or instructions make this approach less persuasive than the explanation that results in a consistent reduction from my reasonable royalty damages figures and the three per-unit royalty rates discussed above.

## III.    FACTORS RELEVANT TO A POST-VERDICT HYPOTHETICAL NEGOTIATION.

### A.    Approach

23.    The Court instructed the jury that any reasonable royalty should reflect the royalty rate that would have been agreed to in a hypothetical negotiation between the parties at the time

---

[30] Unit sales of infringing products are summarized in PX-142 at 3-6, 8.  As discussed in the exhibit and above, the infringing units for the '721 and '172 Patents are less than the total units sold for some products because of the different notice dates and end assertion dates involved.

Declaration of Christopher A. Vellturo ISO Apple's Brief Regarding Ongoing Royalty Rates
Case No. 12-cv-0630-LHK
sd-648835

8

1  that infringement began.[31]  The testimony at trial was consistent that infringement began in

2  August 2011.  I therefore take the jury's award as reflecting their assessment of events starting in

3  August 2011, supplemented by and consistent with the testimony of both myself and Dr.

4  Chevalier at trial.

5       24.     To examine whether the rate awarded by the jury should change in the context of

6  an ongoing royalty, I examine factors that would be important to the parties in light of changes

7  that occurred after August 2011, including changes that occurred after the verdict.  For the

8  reasons discussed below, I believe those factors would put upward pressure on the royalty rates

9  implied by the jury's responses to questions 9 and 10a in the Amended Final Jury Verdict.

10       **B.**     **Significant Changes After the 2011 Hypothetical Negotiation.**

11       25.     The opinions presented in my prior reports and testimony provide a thorough

12  analysis of a hypothetical negotiation between Apple and Samsung for a license to the asserted

13  patents as of 2011.  As noted above, the determination of an appropriate ongoing royalty rate

14  requires an analysis of a hypothetical negotiation as of summer or fall 2014.   Nearly all of the

15  *Georgia Pacific* factors discussed in my prior analysis would continue to play a role in a

16  negotiation in 2014 and many of the facts considered by the hypothetical negotiators would be

17  similar between the two periods.  Indeed, I testified regarding how certain developments after

18  2011 reflect information that would have been known, would have been forecast or would have

19  affected the hypothetical negotiators as of 2011.  Thus, I focus below on how changes in events

20  would influence the rate resulting from a later hypothetical negotiation.[32]

21       **1.**     **Continued Growth and Competition Between Apple and**
22                     **Samsung in the Smartphone Market Since 2011 (*Georgia-***
                   ***Pacific* Factor No. 5)**

23       26.     Both the relationship between the parties and Samsung's market share are

24  important factors that would be considered in a hypothetical negotiation between Apple and

25  Samsung.  This is because increases in the scope and intensity of competition (as shown, for

26

27      [31] See Jury Instruction No. 41, Dkt. 1848 at 52.

28      [32] I also studied market events since 2011 in the context of assessing lost profits.

DECLARATION OF CHRISTOPHER A. VELLTURO ISO APPLE'S BRIEF REGARDING ONGOING ROYALTY RATES
CASE NO. 12-CV-0630-LHK
sd-648835

9

example, by gains in market share by one of the parties) generally place upward pressure on royalty rates where the royalty is owed by one rival to the other (as is the case here).

27.     In the 2011 hypothetical negotiation, Apple and Samsung were competing for customers in a growing United States smartphone market.  While both parties likely expected the market to continue its strong growth, any uncertainty surrounding those expectations has been eliminated as we have observed the actual market growth since 2011.  IDC reported that in 2011, roughly 105 million smartphones were sold in the US.  In 2012, this number jumped to 120 million, and by 2013 reached almost 137 million.[33]

28.     Samsung's market share (within a growing market) has grown consistently since 2011 to the point that Samsung has become entrenched as the primary competitor to Apple.  This was forecast by Samsung's internal documents in 2011 but became more and more certain as time passed since 2011.

29.     As discussed in my Original Report, the hypothetical negotiations for the '647, '721, and '172 patents were assumed to have occurred in August, October, and December 2011.[34] Exhibit 8-A to my Supplemental Report shows the evolution of Apple's and Samsung's market shares from this point in 2011 to the end of 2013.  Apple and Samsung's combined market share of U.S. smartphone shipments reached almost 40% by the third quarter of 2011, but increased sharply during the damages period, ultimately settling around 70% during 2013.   This increase was due to increases in both manufacturers' individual shares over the same period.  Samsung itself commanded almost 20% of U.S. smartphone shipments in the third quarter of 2011, but grew its share to roughly 30% by 2013.

30.     Samsung's Galaxy S3 product has been a significant contributing factor to the intensified competition between Apple and Samsung in this time period.  After the hypothetical negotiation in 2011, the Galaxy S3 emerged as Samsung's best-selling, flagship product.  As shown in Exhibit 10 to my Supplemental Report, the Galaxy S3 sold significantly more units and

---

[33] See Exhibit 8-B to my Supplemental Report.

[34] Vellturo Original Expert Report at III.C.1.a, p. 124; Vellturo Supplemental Expert Report at p. 4.

Declaration of Christopher A. Vellturo ISO Apple's Brief Regarding Ongoing Royalty Rates
Case No. 12-cv-0630-LHK
sd-648835

10

generated significantly more revenue and incremental profit than the Galaxy S2 during the

damages period.  Samsung sold roughly ███████ units of all of the S2 models combined,

generating about ██████ in revenue and ████████ in incremental profit.  Over the same

period, Samsung sold more than ███████ units of the S3, generating more than ████████ in

revenue and roughly ███████ in incremental profit.  Samsung also earned more incremental

profit per unit on the S3 █████ than it did on the S2 ██████  Samsung's ongoing sale of the

Galaxy S3, therefore, represents a relatively greater competitive injury to Apple in comparison to

Samsung's sales of the average of all the products found by the jury to infringe.

      31.    The dominance of the U.S. smartphone market by Apple and Samsung continued

into 2014.  In August 2014, the results of a Counterpoint report were published which indicated

that Apple and Samsung have controlled two-thirds of the US smartphone market for the last ten

quarters.[35]  The report also noted that in the second quarter of 2014, Samsung commanded 36%

of U.S. smartphone shipments, a further increase from its 2013 levels, while Apple trailed with

30%.[36]  I note that the smartphone market can often be sensitive to new product introductions.  I

understand both Apple and Samsung are planning major smartphone releases in the next few

months, so I would expect this trend to continue through the end of 2014.[37]  Further, because of

customer stickiness and other "ecosystem" effects,[38] these 2014 market developments will likely

have a lasting impact in the years to come.

      32.    To further evaluate the state of the smartphone market in the U.S., I consider the

share of smartphone subscribers corresponding to either Apple or Samsung devices.  While

smartphone shipments information provides a useful measure of the smartphone sales made in a

---

[35] http://www.patentlyapple.com/patently-apple/2014/08/samsung-temporarily-beats-apple-in-us-smartphone-shipments.html

[36] http://www.patentlyapple.com/patently-apple/2014/08/samsung-temporarily-beats-apple-in-us-smartphone-shipments.html

[37] See https://www.apple.com/pr/library/2014/09/09Apple-Announces-iPhone-6-iPhone-6-Plus-The-Biggest-Advancements-in-iPhone-History.html, http://www.phonearena.com/news/Samsung-Galaxy-Alpha-price-and-release-date-cheaper-than-an-S5_id59297

[38] The concept of smartphone customer "stickiness" and "ecosystem effects" are discussed in my Original Report.  See Vellturo Expert Report at Section III.C.2.a.

DECLARATION OF CHRISTOPHER A. VELLTURO ISO APPLE'S BRIEF REGARDING ONGOING ROYALTY RATES
CASE NO. 12-CV-0630-LHK
sd-648835

11

1   given quarter or period of time, the share of smartphone subscribers can provide a more general

2   measure of the state of the smartphone market which is not as sensitive to quarterly fluctuations

3   in smartphone shipments due to product launches and other market events.  As mentioned above,

4   the fact that smartphone customers tend to stick with their current smartphone manufacturer when

5   making new purchases (customer "stickiness")[39] means that this metric also provides insight on

6   what the smartphone market is likely to look like in the future.  Comscore reported these metrics

7   for the three-month periods ended February and May 2014.  For both periods, Apple and

8   Samsung commanded almost 70% of smartphone subscribers in the U.S.[40]

9          33.    As Samsung has grown more dominant, the possibility that HTC or other

10  manufacturers of Android handsets would play a more meaningful role in the smartphone market

11  has diminished.[41]  For instance, as reported by IDC, both Samsung and HTC had roughly a 16%

12  share of smartphone unit sales in 2011 in the United States.  By 2013, Samsung's share had

13  grown to nearly 30% while HTC's share had fallen to less than 3%.[42]  Indeed, Samsung gained an

14  increasing share of unit sales in the US as nearly all other major players (with the exception of

15  Apple) were struggling.  The top four manufacturers (other than Apple and Samsung) by US unit

16  smartphone sales in 2011 included HTC, LG, Motorola, and Research in Motion (now

17  Blackberry).  In 2011, these four manufacturers combined for a roughly 42% share of US unit

18  smartphone sales, but this number fell to less than 20% in 2012 and less than 17% by 2013.[43]

19

20

21  _____

22      [39] The concept of smartphone customer "stickiness" is discussed in my Original Report.
    See Velluro Expert Report at Section III.C.2.a.

23      [40] https://www.comscore.com/Insights/Market-Rankings/comScore-Reports-May-2014-

24  U.S.-Smartphone-Subscriber-Market-Share

25      [41] Here, the concept of customer "stickiness" has the opposite effect of that described
    above – *i.e.*, HTC and other struggling smartphone manufacturers will find it more difficult to

26  build momentum in the face of customer stickiness to the entrenched brands of Apple and
    Samsung.

27      [42] See Exhibit 8-B to my Supplemental Report.

28      [43] See Exhibit 8-B to my Supplemental Report.

34.     I previously discussed the importance of the competitive relationship between the parties when determining a royalty rate.[44]  This unique competitive relationship has only grown more intense since 2011.  The increase in intensity would place upward pressure on the royalty rate that would apply in 2014 as compared to 2011.

> **2.     Samsung's Continued Use of the Patented Technology Despite the Possibility of Switching to Non-Infringing Alternatives. (*Georgia-Pacific* Factor Nos. 9, 10, and 11)**

35.     A fundamental factor in determining an appropriate royalty rate is the extent of the parties' use of the patented technology and the alleged or actual availability of other acceptable alternatives, which is reflected in *Georgia-Pacific* factor Nos. 9, 10 and 11.  As I discussed at trial, a choice to continue using a patented technology despite alternatives that are inexpensive and easy to implement reveals a manufacturer's belief about the value of that technology. Continued use of an infringing technology under those circumstances will on balance place upward pressure on the royalty rate the parties would reach in a hypothetical negotiation.

36.     My interpretation of Samsung's continued use of the patented technology despite the possibility of switching to other substitutes is a straightforward application of the economic theory of revealed preference, which states that economic actors reveal their preference patterns by their market behavior.[45]

37.     As of summer 2014, the hypothetical negotiators would know that Samsung's use of the '647 technology has continued despite rulings by the Federal Circuit and the PTO that foreclose arguments Samsung might have otherwise made to challenge the verdict:

- Claim 9 of the '647 patent being confirmed following a reexamination at the United States Patent and Trademark office;

---

[44] Vellturo Expert Report at Section II.F and p. 186; *see also* Dkt. 1715 at 1306:1-11. Factor 5 of the *Georgia Pacific* factors looks explicitly to the degree to which the parties are competitors when evaluating a royalty rate, *e.g.*, "Commercial relationship between licensor and licensee, such as whether they are competitors or inventor and promoter."

[45] Paul A. Samuelson, "Consumption Theory in Terms of Revealed Preference," *Economica*, November 1948, 243 – 253.

- The Federal Circuit providing claim interpretations for the '647 patent, which were applied by the jury in finding infringement.

38.    Samsung's conduct might be explained economically if there was no technical way or no opportunity to remove the '647 patent technology, or if Samsung did not have the means or legal ability to remove it.  This however is plainly not the case.

39.    Starting solely with events after trial, Samsung has continued to sell the Galaxy S3 without implementing any alternative to the '647 patent's technology even though both Google and Samsung have introduced new Android versions in various products since May 5, 2014. Specifically, two updates to the current Android mobile operating system (Android 4.4 or "KitKat"), versions 4.4.3 and 4.4.4 were originally rolled out in Google's Nexus devices in June 2014.[46]  Despite a delay between the original rollout to certain Google devices and a rollout to Samsung devices, I understand Samsung devices are beginning to receive these June 2014 updates as of the filing of this Declaration in September 2014.[47]

40.    Samsung asserts that removal of the infringing feature would allegedly be a *de minimis* task and strongly emphasized this claim to the jury.  Samsung's witnesses testified at trial that it would be an easy task to remove the technology of the '647 patent.  Diane Hackborn, a Principal Software Engineer at Google, testified that a change to remove the accused feature "shouldn't take more than a day for an engineer."[48] Samsung's technical expert, Dr. Jeffay, also agreed regarding the proposed design-around "that it's not a big change, you know, it's certainly

---

[46] http://arstechnica.com/gadgets/2014/06/google-releases-android-4-4-3-to-nexus-devices/; http://www.droid-life.com/2014/06/19/whoa-android-4-4-4-factory-images-posted-as-build-kut84p/

[47] See, *e.g.*, http://argyllfreepress.com/2014/09/13/samsung-galaxy-s5-android-4-4-4-kitkat-update-released/, http://www.gsmarena.com/tmobiles_samsung_galaxy_s4_gets_android_444_kitkat_update-news-9619.php

[48] Trial Tr. 1585:9-1588:11 (Dkt. 1716).

1    on the order of a day. So it's not a big deal."[49]  Nonetheless, no witness ever identified any

2    circumstance in which this change was actually made between 2011 and the present.[50]

3        41.    To the contrary, Dr. Mowry's testimony shows that Samsung made a conscious

4    decision to reintroduce the '647 patent technology when Google modified the base version of the

5    relevant Android code in connection with the introduction of Ice Cream Sandwich and Jelly Bean

6    before trial.  Dr. Mowry testified, with no challenge from Samsung, that Google modified the

7    generic Android source code to change the functionality relevant to infringement of the '647

8    patent.  He further testified, without any challenge from Samsung, that Samsung rewrote the

9    relevant code provided by Google so that Samsung's phones, running the Ice Cream Sandwich

10   and Jelly Bean code modified by Samsung, continued to infringe Apple's patent.[51]

11       42.    Despite its demonstrated ability to do so, despite opportunities to make changes

12   when new products were introduced, and despite numerous legal and related developments,

13   including the jury's verdict, that gave Samsung reasons to make a change, Samsung chose to

14   continue infringing the '647 patent in its products, including through the ongoing sale of the

15   Galaxy S3.  Samsung's continued sale of products that include the '647 patent's technology in

16   spite of the alternatives suggested by witnesses called by Samsung (and Apple) show even more

17   significantly the value of this technology.  These decisions reflect a high internal valuation by

18   Samsung that would again put upward pressure on the royalty rate that would result from a

19   negotiation with Apple.  This choice reflects an economic judgment that the value of the '647

20   patent is very significant and sufficient to justify a substantial payment to Apple for use of the

21   technology.

22

23   _____

24       [49] Trial Tr. 1797:21-1798:8  (Dkt. 1716).

25       [50] Samsung demonstrated that it can and was willing to remove certain features from its
     phones in other circumstances.  For example, Samsung removed the accused functionality of the
26   '721 and '172 patents from newly introduced smartphones after this lawsuit was filed (although it
     did not modify existing devices to remove the technology).   Samsung also made an interim
27   change to its universal search feature, which was accused by Apple of infringing the '959 patent.
     Plainly, a change was technically possible.

28       [51] Trial Tr. at 863:18-864:23 (Dkt. 1624).

43.     In a negotiation, these factors would tend to have a significant upward effect on the ongoing royalty rate for the '647 patent.

44.     As noted above, Samsung did choose to remove the technology of the '721 and '172 patents in new product releases following the filing of the lawsuit.  If Samsung continues this practice, it would not pay an ongoing royalty for either of these patents.  The rate that should apply on an ongoing basis however must reflect the fact that Samsung's payment would only arise after it chose to reintroduce the infringing technology.  Economically, this would demonstrate that Samsung places significant additional value on the technology of the '721 and '172 patents.  In that case, all of the factors discussed above with respect to the '647 patent would also apply to place upward pressure on the ongoing royalty rates for the '172 and '721 patents.

### 3.     There Are No Post-Verdict Licenses Relevant to a Hypothetical Negotiation in 2014 (*Georgia-Pacific* Factor 1).

45.     In my prior report, I discussed potentially relevant licenses entered into by the parties before February 2014 and explained why they did not inform the royalty rate that would apply.  Since then, I understand that Apple has not entered into any licenses for the patents at issue, nor has Apple entered into any other patent licenses.  I discuss below two agreements that Apple has announced that temporarily resolve certain outstanding litigation, but that do not grant any license or release with respect to Apple's patents, and conclude that neither agreement is relevant to my analysis of the appropriate ongoing royalty rate.

46.     **Apple/Samsung Worldwide Stand-Down:**  I understand that in August 2014, Apple and Samsung announced that they would drop all litigation between the companies outside the U.S.[52]  The parties have stated that the agreement did not include any grants of patent rights by either party.[53]  Specifically, in a joint statement, the parties announced, "[t]his agreement does not involve any licensing arrangements" related to patents or otherwise.[54]  The agreement applies

---

[52] "Apple and Samsung call a truce in their patent war. sort of," *Washington Post*, August 6, 2014, available at http://www.washingtonpost.com/blogs/the-switch/wp/2014/08/06/apple-and-samsung-call-a-truce-in-their-patent-war-sort-of

[53] *Id.*

[54] *Id.*

only outside the United States and offers no substantive rights to use any patents.  Given this, I do not find it would have any effect on the ongoing royalty rate.

47.     **Apple Agreement with Google/Motorola Mobility:** I understand that in May 2014, Apple entered into an agreement with Google (and its subsidiary Motorola Mobility)[55] that resulted in the dismissal without prejudice of all U.S. patent lawsuits between Apple and Google/Motorola Mobility related to smartphone technology.[56]  I understand that this agreement did not include any release, covenant not to sue, or any right to use patents by either side with respect to any of their respective patents.[57]  Because it does not include any substantive rights to use any patented technology and because it involves different parties and products, I conclude that this agreement would not have any effect on an ongoing royalty rate.

48.     In both the Apple/Samsung worldwide stand-down agreement and the Apple agreement with Google/Motorola Mobility, no values were placed on any specific intellectual property.  As a result, there is no data from these agreements that can be brought to bear on a royalty in this case.

## IV.     CONCLUSION

49.     It is my opinion that the jury's verdict is best explained as the result of an award of the following per-unit royalty rates for each of the patents infringed by Samsung: $2.75 for the '647 patent, $2.30 for the '172 patent, and $1.41 for the '721 patent.

50.     I have been instructed that Apple's motion will seek an ongoing royalty that is consistent with the jury's royalty award in the following amounts: $2.75 for the '647 patent, $2.30 for the '172 patent, and $1.41 for the '721 patent.  An ongoing royalty in these amounts would reflect no enhancement of the jury's royalty rates.  I believe those rates reflect a

---

[55] Google acquired Motorola Mobility in August 2011, while the lawsuits between Apple and Motorola were already ongoing (they began in October 2010).

[56] "Apple, Google settle smartphone patent litigation," Reuters, May 16, 2014, available at http://www.reuters.com/article/2014/05/16/us-apple-google-settlement-idUSBREA4F0S020140516; *Apple Inc. v. Motorola Mobility Inc.*, No. 1:111-cv-8540, Dkt. 1060 (E.D. Ill. May 27, 2014).

[57] *Id.*

DECLARATION OF CHRISTOPHER A. VELLTURO ISO APPLE'S BRIEF REGARDING ONGOING ROYALTY RATES
CASE NO. 12-CV-0630-LHK
sd-648835

17

1   conservative assessment of what the parties would reach in a hypothetical negotiation in summer

2   2014, represent a conservative ongoing royalty rate for Samsung's continued infringement, and

3   are consistent with or conservative in light of the results in other cases in which an ongoing

4   royalty was awarded.[58]

5          I declare under penalty of perjury that the foregoing is true and correct and that this

6   Declaration was executed this 22nd day of September 2014, at Boston, Massachusetts.

7

8

9                                            _____
                                             CHRISTOPHER A. VELLTURO

---

[58] I list the ongoing royalty rates awarded by various courts and their relationship to the jury's award in **Exhibit 4**.

1

**ATTESTATION OF E-FILED SIGNATURE**

2        I, Rachel Krevans, am the ECF User whose ID and password are being used to file this

3    Declaration.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Christopher A

4    Vellturo has concurred in this filing.

5    Dated:   September 22, 2014                    */s/ Rachel Krevans*
                                                    Rachel Krevans
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28