CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Charles K. Verhoeven (Bar No. 170151)
charlesverhoeven@quinnemanuel.com
Kevin A. Smith (Bar No. 250814)
kevinsmith@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Bar No. 108542)
williamprice@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 12-CV-00630-LHK (PSG)<br><br>**DECLARATION OF DAVID REIBSTEIN, Ph.D. IN OPPOSITION TO APPLE'S MOTION FOR PERMANENT INJUNCTION**<br><br>Date:  July 10, 2014<br>Time:  2:00 p.m.<br>Place:  Courtroom 8, 4th Floor<br>Judge: Honorable Lucy H. Koh<br><br>REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED |

# <u>TABLE OF CONTENTS</u>

I. **INTRODUCTION** ...................................................................................................... 1

    A. ASSIGNMENT ............................................................................................... 1

    B. QUALIFICATIONS ......................................................................................... 1

    C. SUMMARY OF CONCLUSIONS ...................................................................... 2

II. **OVERVIEW OF PROFESSOR HAUSER'S ANALYSIS** ................................... 6

III. **ANALYSIS OF HAUSER REPORT** ...................................................................... 8

    A. PROFESSOR HAUSER'S ANALYSIS IS UNRELIABLE FOR PREDICTING MARKETPLACE OUTCOMES BECAUSE HIS SURVEYS DID NOT ACCURATELY INFORM RESPONDENTS ABOUT THE DIFFERENCE BETWEEN THE PATENTED FEATURES AND SAMSUNG'S NON-INFRINGING ALTERNATIVES. ........................................................................ 8

        1. Professor Hauser's surveys provided respondents with inaccurate descriptions of the patented features that overstated their advantages relative to the non-infringing alternatives. ....................................................................... 8

        2. The choice tasks shown to respondents taking the surveys incorrectly suggested that products without a patented feature would contain no alternative feature at all. .............................................................................................. 13

    B. CONJOINT ANALYSIS IS UNRELIABLE FOR PREDICTING THE DEMAND IMPACT OF THE PATENTED FEATURES BECAUSE IT PRESUPPOSES THAT CONSUMERS WOULD HAVE BEEN AWARE OF THE PATENTED FEATURES, THE NON-INFRINGING ALTERNATIVES, AND THE EXTENT TO WHICH PHONES AND TABLETS IN THE MARKETPLACE POSSESSED THESE FEATURES. ......................................................................................... 26

        1. Unlike in the real world, Professor Hauser's surveys educated respondents about the patented features and whether smartphones or tablets possessed these features. ....................................................................................... 26

        2. Marketplace evidence suggests consumers rarely explore and become aware of feature details at the granular levels that distinguish the patented functionalities from other alternatives. ..................................................... 27

        3. Conjoint research has shown that if respondents are unaware of attributes used in the survey, the estimated values associated with those attributes will be inflated. ..................................................................................... 30

        4. Unlike Professor Hauser's conjoint study in this case, academic research, including Professor Hauser's own prior studies, focuses on major features that are well known to consumers, not minor features. ............................. 31

    C. RESULTS FROM PROFESSOR HAUSER'S CONJOINT STUDY ARE UNRELIABLE BECAUSE THEY FAILED TO ACCOUNT FOR KEY CHARACTERISTICS INHERENT IN THE REAL WORLD PURCHASE ENVIRONMENT. ........................................................................... 33

        1. Researchers have consistently noted that conjoint studies should entail realistic

i

purchase decisions that mimic the actual purchase environment. .................... 33

2. Professor Hauser's surveys excluded numerous features associated with the accused products ........................................................................................ 34

    a. Professor Hauser's surveys do not include numerous product features that Samsung highlighted to consumers ............................................. 34

    b. Major product features must be included in a conjoint analysis in order to estimate the demand for products that contain patented features. ... 35

3. Respondents noted that parts of Professor Hauser's survey were unrealistic and inconsistent with aspects of the real world purchase decision. ........................ 36

4. Professor Hauser's conjoint study failed to account for the real-world process used by consumers to make purchase decisions when faced with incomplete information involving complex products. ........................................................ 37

5. Professor Hauser failed to account for the fact that respondents do not make their marketplace choices independently of word-of-mouth and other social effects. ............................................................................................................... 41

6. The reliability of the output generated by Professor Hauser's survey is undermined by risks of survey fatigue and overly taxing choice tasks. ........... 41

D. PROFESSOR HAUSER'S ANALYSIS IS ILL-SUITED TO PREDICT THE IMPACT THAT REMOVAL OF THE PATENTED FEATURES WOULD HAVE ON SALES OF THE ACCUSED DEVICES BECAUSE HIS ANALYSIS RELIES ON UNFOUNDED ASSUMPTIONS REGARDING RESPONSES TO HIS SURVEY. ...................................................................................................... 42

1. Professor Hauser assumes that respondents who select "not to buy" the hypothetical phone presented in a survey choice task express a preference for something different than an accused Samsung phone. ..................................... 42

2. Professor Hauser's analysis does not adequately account for the role of competing brands in consumer purchase decisions. .......................................... 43

3. The "no buy" choice upon which Professor Hauser bases his sales estimates are inherently unreliable. ....................................................................................... 44

E. THE RESPONSES GENERATED BY PROFESSOR HAUSER'S SURVEY ARE NOT REFLECTIVE OF THE ACTUAL MARKETPLACE ENVIRONMENT THAT PROFESSOR HAUSER PURPORTS TO ANALYZE ..................................................................................................... 45

1. Professor Hauser's survey generated numerous irrational responses. .............. 45

2. Respondents demonstrate substantial insensitivity to price. ........................... 47

F. THE DEFECTS IN PROFESSOR HAUSER'S CONJOINT ANALYSIS ARE CONFIRMED BY THE MARKETPLACE PREDICTIONS IT GENERATES. ................................................... 48

1. Professor Hauser's survey analysis is implausible with respect to the amount respondents value just the features incorporated in the survey. ....................... 48

2. Professor Hauser's conjoint study performs poorly in predicting respondent's actual choices. ................................................................................................. 51

3. Predictions generated by Professor Hauser's analysis related to the composition of Samsung sales differ substantially from actual marketplace outcomes. ....... 53

-ii-

4. A simple feature counting model explains respondents' choices at least as well as Professor Hauser's model which is based on the unique functionality of each patented feature. ............................................................................ 54

IV. CONCLUSION ................................................................................................ 56

-iii-

I, David Reibstein, Ph.D., declare as follows:

## I.     INTRODUCTION

### A.     Assignment

1.          I submit this declaration on behalf of Samsung Electronics Company, Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Telecommunications America, LLC ("STA") (collectively, "Samsung") in the above captioned case.  I submitted a rebuttal expert report in this matter on September 13, 2013.[1] I also provided trial testimony regarding this matter on April 18, 2014.[2] Since then, I have reviewed Apple's motion for permanent injunction.[3] In this declaration, I have been asked to set forth certain opinions regarding Apple's reliance on Dr. Hauser's survey in connection with its motion for a permanent injunction.

### B.     Qualifications

2.          I am the William Stewart Woodside Professor, and Professor of Marketing at the Wharton School of Business at the University of Pennsylvania. I have been teaching Marketing classes at the graduate level for more than 25 years. Classes that I have taught include Marketing Strategy and Marketing Research in the Wharton MBA Program, as well as Competitive Marketing Strategy, Marketing Metrics, Pricing Strategies, and various other

---

[1] Rebuttal Expert Report of David Reibstein, September 13, 2103 ("Reibstein Report"). In that report, I provided an opinion regarding the conjoint study conducted by Professor Hauser involving the features claimed in U.S. Patent Nos. 5,946,647 (the "'647 Patent"), 6,847,959 (the "'959 Patent"), 7,761,414 (the "'414 Patent"), 8,046,721 (the "'721 Patent"), and 8,074,172 (the "'172 Patent").  A true and correct copy of my report, with selected exhibits, is attached as Exhibit 1.

[2] Transcript of Proceedings before the Honorable Lucy H. Koh United States District Judge, volume 9, April 18, 2014.

[3] Apple Inc.'s Motion for a Permanent Injunction, May 23, 2014.

-1-

programs for Wharton's Executive Education Program. I am currently teaching the Introductory Marketing classes for first-year MBA students at Wharton and for Wharton's Executive MBA Program.

3.        My research focuses on competitive marketing strategies, marketing metrics, and product line decisions, among other issues. My research on competitive marketing strategies addresses competitors' reactions to marketing actions, offering companies insight into ways to anticipate these reactions and use them to develop effective strategies. I have authored or co-authored over 40 articles which have been published in top-tier academic journals including *Marketing Science*, *Journal of Marketing Research*, *Journal of Consumer Research, Harvard Business Review, Marketing Letters, Journal of Marketing,* and the *International Journal of Research in Marketing*. I am also the author or co-author of numerous books and chapters in books on subjects including competitive marketing strategy, global branding, and marketing performance measurement, among others. I have published numerous papers on conjoint analysis, including several papers evaluating the validity and reliability of conjoint analysis. I have also applied conjoint analysis in practice through consulting engagements with major corporations.

4.        More details on my qualifications can be found in my curriculum vita, a true and correct copy of which is attached as Exhibit 2.

### C.        Summary of Conclusions

5.        Professor Hauser's analysis and conclusions are fundamentally flawed and wholly unreliable for purposes of predicting consumer behavior related to the presence or absence of the patented features or any assessment of the marketplace impact of those features. In particular, Professor Hauser's analysis cannot be used to evaluate the impact the claimed

-2-

functionalities in Apple's patents have on consumer demand for the accused Samsung products. Specifically, Dr. Hauser's analysis cannot be used to determine whether Apple's claimed functionalities have any impact on the sales, price or desirability of the accused Samsung products. Specific flaws in Professor Hauser's analysis include the following:

a.      The responses to Professor Hauser's survey are unreliable due to respondent misunderstanding. I replicated Professor Hauser's survey and conducted a series of qualitative interviews in order to assess the degree to which the respondents comprehended the smartphone features investigated by Professor Hauser. These interviews revealed a widespread lack of understanding among respondents and across the features related to the patents at issue. This lack of understanding reflected confusion caused by: 1) Professor Hauser's biased, inaccurate, and incomplete presentations of the patented features, 2) the very subtle differences that exist between the patented features and the non-infringing alternatives available to Samsung, and 3) the way the alternative choices were represented in the conjoint exercise conducted by Professor Hauser. These interviews revealed that the survey responses generated by Professor Hauser cannot be relied upon to make any meaningful inferences regarding the impact the features associated with the patents had on consumer purchase decisions or marketplace outcomes.

b.      In particular, my interviews revealed that 25 of 26 participants exhibited confusion or lacked sufficient understanding regarding the functionality associated with the '647 patent as Professor Hauser described it in his survey. Similarly, 18 of 26 participants exhibited confusion or lacked sufficient understanding regarding Professor Hauser's description the functionality associated with the '172 patent.[4]

c.      Professor Hauser's analysis failed to account for major characteristics of the actual environment faced by people that purchased the accused devices. In

---

[4]  Professor Hauser's smartphone survey did not include the functionality associated with the '721 patent. Reibstein Report, at Exhibit 11.

-3-

particular, Professor Hauser's analysis failed to account for numerous features that Samsung promoted to consumers and discussed in its marketing and promotional materials. It is inappropriate to use conjoint analysis to predict consumer's "willingness to pay" and "willingness to buy" when major features which differ across the choices are omitted from the choice exercise. Professor Hauser's analysis also failed to account for the real world process used by consumers to make purchase decisions when faced with incomplete information involving complex products, such as the use of heuristics, where consumers omit the consideration of specific product features in the process of purchasing complex products.

d.   Professor Hauser's analysis also presupposes that consumers would have been aware of the patented features and the extent to which phones in the marketplace possessed these features. In contrast to actual purchase environments, the hypothetical purchase decisions faced by respondents to Professor Hauser's surveys are preceded by detailed written descriptions and video presentations describing what Professor Hauser asserts are the consumer benefits associated with patented functionalities. Marketplace evidence, however, suggests that consumers rarely explore or become aware of the granular feature details that distinguish the patented functionalities from other alternatives.

6.   The errors in Professor Hauser's analysis are reflected in the responses provided by those that participated in his survey. The responses generated by Professor Hauser's surveys revealed, implausibly, that respondents are widely insensitive to price or preferred a higher price over a lower price, all else equal. Respondents further indicated a preference for phones that were inferior, based on feature availability, to phones that were available on the market at a lower price, and for phones that were inferior, based on feature availability, to those that they currently owned. Hence, Professor Hauser's results lack face validity. These responses are inconsistent with assumptions underlying Professor Hauser's analysis and suggest that the survey responses are not reflective of the actual marketplace environment that Professor

-4-

Hauser intended to analyze. The reliability of the responses generated by Professor Hauser's survey is further undermined by risks of survey fatigue and overly taxing choice tasks.

7.        The errors in Professor Hauser's analysis are further reflected in the output it generated. Professor Hauser's survey results are implausible with respect to the value respondents place on just the features incorporated in the survey. The sum of the willingness to pay price premiums estimated by Professor Hauser for just the patent-related features on smartphones is $358. The sum of the willingness to pay price premiums estimated by Professor Hauser for just the small portion of smartphone features included in his study is $1,125.[5] This amount, which is seven times greater than the price of the reference phone, is unreasonably and implausibly high – particularly in light of the fact that it does not include hundreds of other important smartphone features that are more heavily promoted by Samsung and discussed by third parties, including calling, emailing, texting, web-browsing, camera and video capabilities, processor, memory, and battery.[6]

8.        Professor Hauser's conjoint study also performs poorly in predicting respondents' known actual choices. Predictions generated by his analysis regarding respondents' choices differ greatly from the actual choices made by these respondents related to their relative purchase of Samsung's accused products.[7] Further, based on Professor Hauser's prediction tool, only rarely are survey respondents predicted to buy the phone they actually own.[8] Finally, based on the internal validity checks that Professor Hauser presents in his report, there is no convincing evidence that Professor Hauser's model, which he claims values the difference

---

[5] Reibstein Report, at Exhibit 29.
[6] Reibstein Report, at ¶¶166-168.
[7] Reibstein Report, at Exhibit 34 and ¶251.
[8] Reibstein Report, at ¶244.

-5-

between the features at issue and the non-infringing alternatives, is more accurate at predicting consumer choice than a model based largely on a simple count of the number of feature icons.[9] This suggests that the predictive ability of Professor Hauser's model is highly suspect and unlikely to yield usable results.

## II.    OVERVIEW OF PROFESSOR HAUSER'S ANALYSIS

9.        Professor Hauser designed and conducted two surveys – one for smartphones and one for tablets. Professor Hauser purports to use the surveys to: a) determine what effect the features associated with the patents at issue have on Samsung consumers' willingness to buy Samsung smartphones and tablets, and b) to determine the price premium that Samsung consumers are willing to pay for the features associated with the patents at issue.[10] While no Samsung tablets were found to infringe Apple's patents in this case, I include a discussion of Professor Hauser's tablet survey because results from this survey are the basis for his conclusions regarding the value of the '721 patent, which was not tested for smartphones.

10.       Professor Hauser concluded that, for both smartphones and tablets, the patent-related features at issue, individually and collectively, have substantial effects on Samsung consumers' willingness to buy the accused Samsung products.[11] Professor Hauser presented a range of predictions for the decline in the portion of consumers' willing to buy the accused smartphones due to the removal of the patent-related features. These ranges, summarized below, are based upon different screen sizes and prices.[12]

---

[9] Reibstein Report, at Exhibit 41 and ¶262..
[10] Expert Report of John R. Hauser, August 11, 2013 ("Hauser Report"), at ¶7.
[11] Hauser Report, at ¶14.
[12] Hauser Report, at Exhibits N1 and O1.

-6-

| Willingness to Buy Accused Samsung Smartphones | | |
| --- | --- | --- |
| | Percentage Decline | |
| | Low | High |
| Background Syncing ('414) | 4% | 17% |
| **Quick Links ('647)** | **5%** | **16%** |
| Universal Search ('959) | 3% | 12% |
| Missed Call Screen Management ('760) | 7% | 24% |
| **Automatic Word Correction ('172)** | **10%** | **26%** |
| All Features | 43% | 74% |

11.     Professor Hauser also presents a range of predictions for the decline in consumers' willing to buy the accused tablets due to the removal of the patent-related features. These ranges, summarized below, are similarly based upon different screen sizes and prices.[13]

| Willingness to Buy Accused Samsung Tablets | | |
| --- | --- | --- |
| | Percentage Decline | |
| | Low | High |
| Background Syncing ('414) | 5% | 23% |
| **Quick Links ('647)** | **4%** | **23%** |
| Universal Search ('959) | 2% | 16% |
| **Slide to Unlock ('721)** | **1%** | **14%** |
| **Automatic Word Correction ('172)** | **6%** | **24%** |
| All Features | 28% | 76% |

12.     Professor Hauser also concluded that Samsung consumers would be willing to pay a substantial price premium in order to obtain the patent-related features.[14] These price premiums

---

[13] Hauser Report, at Exhibits N2 and O2.

[14] Hauser Report, at ¶129.

-7-

for a Samsung smartphone with a base price of $149 and a Samsung tablet with a base price of $299 are listed below:[15]

#### WTP Price Premiums Associated with Tested Features

| | Base Price (Without Patent-Related Features) | |
|---|---|---|
| | Smartphone $149 | Tablet $299 |
| Background Syncing ('414) | $69 | $62 |
| **Quick Links ('647)** | **$56** | **$56** |
| Universal Search ('959) | $44 | $33 |
| **Automatic Word Correction ('172)** | **$102** | **$63** |
| Missed Call Screen Management ('760) | $87 | N/A |
| **Slide to Unlock ('721)** | N/A | **$32** |
| Total | $358 | $246 |

### III.   ANALYSIS OF HAUSER REPORT

   **A.    Professor Hauser's Analysis is Unreliable for Predicting Marketplace Outcomes Because His Surveys Did Not Accurately Inform Respondents About the Difference Between the Patented Features and Samsung's Non-infringing Alternatives.**

   **1.    *Professor Hauser's surveys provided respondents with inaccurate descriptions of the patented features that overstated their advantages relative to the non-infringing alternatives.***

13.      As part of his survey, Professor Hauser provided definitions of each of the tested features. These definitions were provided in text and through individual videos for each feature.[16] These descriptions overstate the benefits of the patented features relative to alternatives that are available to Samsung. The descriptions lead the respondents to believe that

---

[15] Hauser Report, at ¶128. The actual average prices that respondents in the surveys reported that they paid for their Samsung smartphones and tablets were $175 and $350, respectively.

[16] Hauser Report, at Exhibits G and H, Backup to Expert Report of John R. Hauser, dated August 11, 2013.

-8-

having the patented functionalities is necessarily preferred to not having them (i.e., that the absence of the patented features necessarily involves some kind of sacrifice). In addition, these descriptions do not provide the respondent with all, or even the best alternative, non-infringing functionalities that are  available to Samsung.

14.      For example, Professor Hauser provided the following description of Quick Links, which purportedly reflects functionality associated with the '647 patent:[17]

> **Quick Links.** When you are viewing text on your smartphone (for example in an email), the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder. Without this feature, if you wanted to take various actions, like calling or texting a number, you would have to manually identify and select the exact text that might be data to take actions on.[18]

15.      Professor Hauser's Quick Links description is faulty in several ways. First, the text description and video do not clarify within which applications the Quick Links functionality would be available. I understand this functionality is only accused in two applications -- Samsung's Browser and Messenger applications.[19] I understand that it is not accused in any

---

[17] The subsequent discussion related to Professor Hauser's Quick Links description draws directly from Reibstein Report, at ¶¶60-65.

[18] Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.

[19] Rebuttal Expert Report of Dr. Kevin Jeffay Concerning Noninfringement of U.S. Patent No. 5,946,647 ("Jeffay Report"),  at ¶¶138-140.

-9-

email application present on Samsung's devices notwithstanding that the example used by Professor Hauser in his description is of the email application.[20]

16.        I further understand that Professor Hauser's description of the non-infringing alternative is inaccurate. For example, Professor Hauser suggested that, without the patented feature, users "would have to manually identify and select the exact text that might be data to take actions on."[21] I understand that this is not the case because one non-infringing alternative available to Samsung would allow the user, not the system, to detect an instance of a structure of interest.[22]

17.        Professor Hauser's description of Automatic Word Correction, which purportedly reflects functionality associated with the '172 patent, is also problematic.[23] Professor Hauser provided the following description of this feature:

> **Automatic Word Correction.** As you type, your smartphone [tablet] displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. The Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday." Without this feature, pressing space or period would retain your original text,

---

[20]  Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.

[21] Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.

[22] Jeffay Report, at ¶¶510-511. My Report includes a more extensive discussion of these errors. *See* Reibstein Report, at ¶¶61-63.

[23] The subsequent discussion related to Professor Hauser's Automatic Word Correction description draws directly from Reibstein Report, at ¶¶39-41.

-10-

"birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself.[24]

18.    Professor Hauser's text description and video demonstration related to this feature are flawed in several respects. First, they use leading and biasing language to suggest that the alternative functionality is clearly inferior to the patented functionality. For example, the use of the clause "you would need to" rather than the more neutral "you would" suggests that the alternative requires additional effort or burden. It is my experience that such leading and biasing language tends to inflate the value of the difference between two tested levels by suggesting to the respondent that one is clearly inferior.

19.    Another problem with this description is that it leads the respondent to believe that without the patented functionality there is no way to have any Automatic Word Correction feature on your device. The description suggests that any change of the original text to the suggested text would have to be done manually rather than automatically (i.e., by selecting the suggested text yourself).

20.    In fact, I understand that one non-infringing alternative Samsung has used is the implementation in its Dart and Galaxy S III smartphones. With this alternative, the suggested text is displayed in the first area when you are typing your message.[25] The suggested text and original text are both displayed in a second box alongside the text box that, in this alternative,

---

[24] Hauser Report, at ¶74.
[25] Rebuttal Expert Report of Dr. Daniel Wigdor Concerning Non-Infringement of U.S. Patent No. 8,074,172 ("Wigdor Report"), at ¶¶155-157.

-11-

displays the suggested text.[26] The original text in the second box can be selected to replace the suggested text in the text area.[27]

21.     Another alternative available to Samsung is the version of Automatic Word Correction used in both Swype and the Samsung keyboards used in later versions of the Galaxy S III.[28] With this alternative, the original text is displayed in the first area where you are typing your message and both the suggested text and a copy of the original text are displayed in the second box alongside the text box.[29] With this alternative, the original text is not replaced by the suggested text when a space or punctuation is pressed.[30]

22.     Professor Hauser's description of the Slide to Unlock feature, which purportedly reflects functionality associated with the '721 patent (and was only included the tablet survey), also fails to  accurately depict the difference between the patented feature and Samsung's non-infringing alternatives:[31]

> **Slide to Unlock.** The Slide to Unlock feature prevents unintentional unlocks by unlocking your tablet only when you slide an image, using one continuous motion, from a specific spot on the lock screen to another specific spot on the screen. Without this feature, you would have to unlock your device using other techniques, for example by swiping the lock screen from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely.[32]

---

[26] Wigdor Report, at ¶¶156-157.
[27] Wigdor Report, at ¶¶156-157.
[28] Wigdor Report, at ¶117.
[29] Wigdor Report, at ¶117.
[30] Wigdor Report, at ¶117.
[31] The subsequent discussion related to Professor Hauser's Slide to Unlock description draws directly from Reibstein Report, at ¶¶78-81.
[32] Hauser Report, at ¶76.

-12-

23.       As with the other descriptions discussed above (*see* paragraph 18) this description uses leading and biasing language to suggest to the respondent that the alternative functionality is inferior to the patented functionality. For example, the use of the clause "you would have to" rather than the more neutral "you would" suggests that the alternative requires additional effort or burden.

24.       Moreover, Professor Hauser's description telling respondents that the non-infringing alternative "may make unintentional unlocks more likely" does not provide respondents adequate information to make an informed decision regarding the impact of this shortcoming. Professor Hauser does not describe the likelihood that the alternative would, in fact, make unintentional unlocks more likely. He also does not define what he means by "more likely." There is a big difference between the alternative causing an unintentional unlock once a month versus once a day. In my experience, surveys should equip respondents with all the information needed to make an educated choice.

> **2.    *The choice tasks shown to respondents taking the surveys incorrectly suggested that products without a patented feature would contain no alternative feature at all.***

25.       After showing the videos describing all of the features and levels included in each survey, Professor Hauser presented respondents with a series of 16 tables each describing four different hypothetical products from which respondents were to choose their most preferred smartphone or tablet.[33] Each of the four columns of this table represented a different product.

---

[33] The subsequent discussion related to Professor Hauser's display of the non-infringing alternatives in his survey draws directly from Reibstein Report, at ¶¶84-87.

-13-

Each of the seven rows of this table represented a different feature category. An example of this table is shown below.[34]



| | Phone 1 | Phone 2 | Phone 3 | Phone 4 |
|---|---|---|---|---|
| Price (with 2-year service contract) | Price $299 | Price $99 | Price $49 | Price $149 |
| Camera | Panorama | Panorama, Best Photo, Smile Shot | Panorama, Best Photo, Smile Shot, Buddy Photo Share | Panorama, Best Photo |
| Call Initiation and Screening | Three-Way Calling, Reject Call with Message, Missed Call Screen Management | Three-Way Calling, Reject Call with Message | Three-Way Calling | Three-Way Calling, Reject Call with Message, Missed Call Screen Management, Wi-Fi Calling |
| Input Assistance | Copy-Paste, Voice To Text | Copy-Paste, Voice To Text, Automatic Word Correction, S Pen | Copy-Paste | Copy-Paste, Voice To Text, Automatic Word Correction |
| Screen Size | Size 5.5" | Size 5.0" | Size 4.0" | Size 4.8" |
| Data Accessibility | Notification Bar | Notification Bar, Background Syncing | Notification Bar, Background Syncing, Quick Links | Notification Bar, Background Syncing, Quick Links, Universal Search |
| With all other features on your most recent Samsung smartphone | All other features on your most recent Samsung smartphone | All other features on your most recent Samsung smartphone | All other features on your most recent Samsung smartphone | All other features on your most recent Samsung smartphone |

26.        As this table illustrates, for a given feature category, Professor Hauser includes an icon describing the presence of the feature if the feature is assumed to be part of the hypothetical product and leaves the box blank if the feature is not included. No icon is used to

[34] Hauser Report, at Exhibit G.

-14-

represent the non-infringing alternative feature that Samsung would have included in the smartphone or tablet if the patented feature could not be used. This suggests to respondents that the choices available to respondents are between a product with the patented feature and a product with no feature.

27.        An example of how the choice screen in Professor Hauser's surveys depicted the Data Accessibility feature options available is shown below.[35] Note the very different manner in which the bottom left quadrant of the grid displays the presence of the Quick Links features versus the presence of the non-infringing alternative. Phones 3 and 4 contain the Quick Links icon. Phones 1 and 2 are empty boxes with no icons.



28.        This depiction may suggest to respondents that Phones 1 and 2 are necessarily inferior because they have fewer functionalities compared to Phones 3 and 4. This is not the case. In reality, all four hypothetical phones have the same number of capabilities. They are just different capabilities, accomplished in different ways. As described more fully below, as part of my work on this case, I performed qualitative interviews, replicating Professor Hauser's descriptions and questions to the respondents, to assess the design of his survey. The results of these interviews showed that many respondents appeared to associate an empty box

---

[35] Hauser Report, at Exhibit G.

in this table with the absence of a feature, rather than just an alternative feature. When asked what the product in the survey would have if it did not have the patented feature, many respondents described the absence of any similar functionality.[36] My report includes a more extensive discussion of similar responses.[37]

29.        The problem with such extensive respondent misunderstanding where respondents assume the absence of the icon means no feature at all is that this will greatly inflate the value of the feature Professor Hauser purports to measure. Figure 1 below illustrates this point. Professor Hauser should, and purports to be, measuring the difference between the value of the patented feature (the first bar) and the value of the non-infringing alternative (the second bare) when that difference is small.[38] If respondents assume the absence of an icon is no feature at all, Professor Hauser is measuring the difference between the first and third bars, a much larger difference. This type of confusion biases and inflates any measures of feature importance Professor Hauser reports.

---

[36] DX454A.011,.012, .023, .026.

[37] Reibstein Report, ¶¶88-93.

[38] There is no way to know the size of this difference because there is no way to identify within Professor Hauser's survey which respondents had an incorrect versus correct understanding of the meaning of the absence of an icon and eliminate them from the sample. My parallel pretest indicates this misunderstanding was frequent.

-16-



**Illustrative Relative Utility Measurements from Dr. Hauser's Conjoint**

30.      Survey research textbooks and reference guides emphasize the importance of pretests, recommending them as a way to determine whether survey questions are clear and unambiguous.[39] Even if a single respondent expresses confusion or a lack of understanding during the pretest, that confusion and the reasons for that confusion should be carefully

_____

[39] S. Payne, *The Art of Asking Questions* (Princeton: Princeton University Press, 1951); Schaeffer, N., and S. Presser, "The Science of Asking Questions," *Annual Review in Sociology* 29 (2003): 81; Converse, J., and S. Presser, *Survey Questions: Handcrafting the Standardized Questionnaire* (Beverly Hills, CA: Sage Publications, 1986): 55; D. Dillman, *Mail and Telephone Surveys: The Total Design Method* (United States: John Wiley & Sons, Inc., 1978): 156; and Sudman, S., and N. Bradburn, *Asking Questions: A Practical Guide to Questionnaire Design* (San Francisco: Jossey-Bass Publishers, 1982): 123, 140.  The *Reference Guide on Survey Research* states, during the pretest, the interviewers should observe the respondents for any confusion or difficulties respondents may have with the questions and probe for the source of any such confusion or difficulties. Questions subject to any such confusion or difficulties should then be rephrased before the full-scale survey is launched. Pretests can improve the quality of a survey by increasing clarity and correcting misunderstandings. S. Diamond, *Reference Guide on Survey Research* (Washington, DC: The National Academies Press, 2011): 249.

considered.[40] *The Art of Asking Questions*, a textbook Professor Hauser recommends as a "must read" in the syllabus for his research seminar in marketing, states that "if you are ever to write or critique a questionnaire:"

> Every objection that may be raised about the phrasing should be carefully considered, because that problem may occur many times over in the full-scale survey. If even a single test interview or comment from one of our associates implies any fault in the question, that fault should not be passed over. How many people in the final survey will stumble over the same obstacle?[41]

31.      While Professor Hauser did conduct a pretest in this case, there are several reasons that his pretest was inadequate for purposes of determining whether respondents understood his purported descriptions of the functionality associated with the patented features and how this functionality differed from the tested non-infringing alternatives.

32.      First, he did not provide a video of the pretest or provide transcripts with the detailed responses of the respondents. Not having this material precludes those that did not participate in conducting the pretest from directly evaluating whether respondents actually understood the features and what their understanding was regarding the advantages of the features over Samsung's non-infringing alternatives.

33.      Second, Professor Hauser's pretest was inadequate for purposes of determining whether respondents understood the question, features, levels, or tasks put before them because it only asked closed-ended questions. While the 23 respondents that took Professor Hauser smartphone pretest were deemed by the pretest moderator to have sufficient

---

[40] S. Payne, *The Art of Asking Questions* (Princeton: Princeton University Press, 1951): 16.
[41] S. Payne, *The Art of Asking Questions* (Princeton: Princeton University Press, 1951): 16; J. Hauser, "15.838 Research Seminar in Marketing," *MIT Sloan School of Management* (2011).

-18-

understanding,[42] closed-ended questions do not get at the heart of what needs to be determined – which is whether respondents accurately understood the distinction between the patented features and the non-infringing alternatives. Rather, these questions merely determine whether respondents "think" that they understood the questions and features.[43]  Examples of these questions are provided below.

[RESPONDENT VIEWS VIDEO] Upon viewing this video, do you feel like you understand the Smartphone feature called [All Name of Feature] that is described in the video?

☐  Yes [Go to 1A]
☐  No [Go to Q2]
☐  Unsure [Go to Q2][44]

Did you have difficulty understanding the questions and instructions?

☐  Yes
☐  No
☐  Unsure[45]

Did the animations help you to understand the various features of the Smartphones?

☐  Yes
☐  No
☐  Unsure[46]

---

[42] For 11 of the 12 respondents who were asked the first question, the yes box was checked for each video; and for each of 11 respondents who were asked the second and third questions, the no box was checked for the second question and the yes box was checked for the third question. *See* Hauser Report, at Exhibit I1.

[43] *See* Hauser Report, at Exhibit I1 and I2. For both the smartphone and tablet surveys, Professor Hauser provided the closed-ended pretest questionnaire for the evaluation of videos and dry-run of the programmed survey. He provided handwritten pretest interview notes but did not provide transcripts, videos, or audio files of the pretest interviews.

[44] Hauser Report, at Exhibit I1.

[45] Hauser Report, at Exhibit I1.

-19-

34.        Closed-ended questions, such as the ones asked by Professor Hauser in his pre-test, do not establish actual understanding. In order to determine if respondents appropriately understood Professor Hauser's descriptions of the patented features and non-infringing alternatives, I conducted my own parallel pretest of Professor Hauser's smartphone survey. To do so, I closely replicated Professor Hauser's survey by using his smartphone survey questionnaire, the screenshots of his programmed survey, the same graphics and feature demonstration videos that were used in his survey, and a comparable sample of Samsung smartphone owners.[47]

35.        I worked with Schlesinger Associates ("Schlesinger"), a well-known and well-respected market research firm, to perform the pretest. Pretest participants were identified using the same screening questions used by Professor Hauser.[48] Respondents were asked to go through the first part of the survey, which describes each feature that would be evaluated in the conjoint and which involves both written and video descriptions of the at-issue and distraction features, without interruption from the moderator. After completing that part of the survey, respondents were asked two initial questions, consistent with the questions Professor Hauser asked in his own pretest. Specifically, respondents were asked if they had any difficulty understanding the questions or instructions and if they found the animations helpful in understanding the features of the smartphones.

---

[46] Hauser Report, at Exhibit I1.

[47] *See* Hauser Report at Exhibits E and G, and Backup to Expert Report of John R. Hauser, dated August 11, 2013. The smartphone survey questionnaire and screen shots of the programmed survey are Exhibits E and G, respectively. Graphics, including feature image icons, and feature demonstration videos were provided in backup materials.

[48] Reibstein Report, at ¶104.

-20-

36.         After these initial questions, respondents proceeded into the conjoint exercise. Respondents were allowed to complete three initial choice screens without follow-up questioning. After completing the third choice screen, respondents were asked a series of questions that asked them to explain, in their own words, what the presence of various feature icons in the conjoint exercise indicated the phone had in terms of feature functionality. Respondents were then asked what the absence of a feature icon in the table indicated and what functionality the phone would have in that situation. Following this discussion, respondents were asked to complete the remainder of the survey (the next 13 choice tasks) and the interview ended with questions about the overall survey.

37.         In Professor Hauser's pretest and in my parallel pretest, when asked if they understood the features and if the video descriptions were helpful, respondents generally responded affirmatively.[49] This notwithstanding, my parallel pretest of Professor Hauser's surveys revealed that, when probed with open-ended questions to explore the respondents' understanding of the features, a substantial portion of respondents did not understand the patented features and how they were different from the non-infringing alternative presented. It is clear to me, based upon my review of the pretest videos and transcripts, that an overwhelming majority of the pretest respondents were confused about the described features.[50]

---

[49] *See, e.g.*, Hauser Report, at ¶51, at Exhibit I. *See also* Parallel Pretest Transcripts for Philadelphia, Phoenix, Chicago-1, and Chicago-2.

[50] In fact, of the 26 respondents, only two respondents clicked on the link to play an animation again during the choice exercise task. Among the two respondents, one respondent, Chicago-1 Respondent 2, clicked on the Screen Size video while viewing the first choice exercise task. Another respondent, Philadelphia Respondent 5, clicked on the Quick Links video on the first choice exercise task and after the third choice exercise task.

-21-

38.          For example, confusion or misunderstanding was evident regarding the Automatic Word Correction feature, as the following exchange reflects:

> Q:    And the Automatic Word Correction, tell me what that icon means?
>
> A:    Well, it I guess predicts, like predictive texting, where it predicts the word that you're trying to type out. I hate that function, by the way. Auto-correction of any sort I turn off right away.
>
> Q:    So if the phone does not have that icon, I know you'll be happy, but what does that then mean? What does the phone have instead of the Automatic Word Correction? Or how do you handle that?
>
> A:    To be honest, before any of that stuff started coming around, I think what I ended up doing was maybe going online to make sure that I got my words correct or spelled them correctly.[51]

39.          The respondent appears to confuse Automatic Word Correction with predictive text and states that the alternative would be no spell check or word suggestions at all. This description of the non-infringing alternative is inaccurate because the respondent fails to identify that, according to Professor Hauser's description, the alternative would still provide word and spelling suggestions for unrecognized words. The respondent appears to have not understood that the primary difference between the patented feature and non-infringing alternative described by Professor Hauser had to do with whether the suggested text would automatically replace the original text or whether the user would have to select the suggested text manually in order for it to be replaced.

---

[51] DX454A.013 (Phoenix: Respondent 4).

-22-

40.        Other respondents were similarly confused about the Automatic Word Correction feature. Transcripts of these responses can be found in DX454A.001-036.

41.        My parallel pretest revealed similar misunderstanding regarding the Quick Links feature. For example, one respondent stated:

> Q:        Quick Links, tell me what that icon means to you.
>
> A:        Quick Links, that's where it's detecting phone numbers, like in your e-mail address and stuff. You basically click on it, like on the phone number or on the e-mail too and compose the e-mail or call.
>
> Q:        If your phone does not have the Quick Links icon, what would you be doing instead?
>
> A:        Probably write down that phone number and enter it into your phone afterwards. Same with the e-mail.[52]

42.        Here, the respondent has not grasped the main difference between the patented feature and the non-infringing alternative. The respondent appears to equate the patented feature with automatically detecting information, such as phone numbers and email addresses, and being able to take an action on this information. No mention is made regarding the ability to take multiple actions on a given piece of information. The respondent also mistakenly assumes that without the patented feature, the user would need to manually write down information and enter it into the smartphone in order to take action on that information. This is different than the alternative described by Professor Hauser, which allowed actions to be taken on this information automatically after the information had been manually identified by the user.

---

[52] DX454A.013 (Phoenix: Respondent 4).

-23-

43.        Other respondents expressed similar confusion regarding this feature. According to one respondent:

> Q:    That's totally fine. Quick Links in that same row. What does that feature mean to you?
>
> A:    Oh, basically how I can get to, for example, put something in and get to enter my contact, people I have on Facebook, Twitter, anything in my contacting listings.
>
> Q:    You - just say a little bit more. I want to make sure I'm following what you're, exactly what you're saying.
>
> A:    For example, I wanted to link up with somebody and get their email and get their link with them very quickly or do something in that sort of feature. Basically, with my phone I know I have my contacts from Facebook in there and I have my contacts from Twitter in there. All their emails go in, everything's in my contact list.[53]

44.        This respondent appears to associate the patented Quick Links functionality with being able to "link up" contact information from various sources, such as Facebook and Twitter, into the user's Contacts. This description is at odds with the description provided by Professor Hauser, which involved being able to automatically detect certain information and choose from among multiple actions to perform on that information. DX454A sets forth transcripts of additional confusion.  *See* DX454A.001-036.

45.        The lack of understanding demonstrated in these excerpts is far from anomalous. The table below shows that respondents exhibited confusion or a lack of understanding across all five features examined by Professor Hauser in his smartphone survey for which Apple was seeking damages.[54]

---

[53] DX454A.007 (Philadelphia: Respondent 6).
[54] Reibstein Report, at Exhibit 11.

-24-

| | | Total Number of Respondents | Respondents That Exhibit Lack of Understanding Regarding Hauser Description | |
| --- | --- | --- | --- | --- |
| | | | Number of Respondents | Percent of Total |
| Missed Call Screen Management ('760) | | 26 | 24 | 92% |
| **Automatic Word Correction ('172)** | | **26** | **18** | **69%** |
| Background Syncing ('414) | | 26 | 22 | 85% |
| **Quick Links ('647)** | | **26** | **25** | **96%** |
| Universal Search ('959) | | 26 | 4 | 15% |
| Any Features | | 26 | 26 | 100% |

46.     As the table shows, confusion or misunderstanding was widespread with respect to the functionalities associated with the two patents-at-issue included in Professor Hauser's smartphone survey that are the subject of Apple's motion for a permanent injunction.  Among the 26 respondents, 18 demonstrated confusion or failed to identify functionality critical to the Automatic Word Correction feature and 25 demonstrated confusion regarding the Quick Links feature. Every single respondent exhibited misunderstanding or a lack of sufficient understand regarding at least one of the features that Apple claimed were covered by its patents.[55]

47.     Note that these data only indicate whether the respondents understood Professor Hauser's descriptions of these features, not whether they understood the correctly defined features and non-infringing alternatives. This summary does not imply that the rest of the responses reflected a clear understanding by respondents.

---

[55] Reibstein Report, at Exhibit 11.

-25-

48.     My Report includes a more extensive discussion of the confusion and lack of understanding revealed in my parallel pretest.[56]

**B.      Conjoint Analysis Is Unreliable For Predicting The Demand Impact Of The Patented Features Because It Presupposes That Consumers Would Have Been Aware Of The Patented Features, The Non-Infringing Alternatives, And The Extent To Which Phones And Tablets In The Marketplace Possessed These Features.**

**1.      *Unlike in the real world, Professor Hauser's surveys educated respondents about the patented features and whether smartphones or tablets possessed these features.***

49.     Professor Hauser devoted a substantial portion of the surveys to purportedly teaching respondents about the patented features and how they were different from the tested non-infringing alternative.[57] This was done through three different methods: videos, text, and icons. In effect, Professor Hauser created a set of "super consumers" equipped with much more information about detailed aspects of smartphones and tablets than the vast majority of consumers in the marketplace. Consumers in the real world typically do not have access to the same tutorial given by Professor Hauser prior to making their purchase decisions.

50.     This was confirmed by my parallel pretest of Professor Hauser's survey. Many of these consumers noted that they learned a lot about the features in the surveys.[58] For example, one respondent noted:

> Q:      Got it. Did you feel that you learned anything new about smartphones from taking the survey?

---

[56] Reibstein Report, at ¶¶110-141.
[57] Hauser Report, at Exhibits G and H.
[58] This is consistent with evidence from Professor Hauser's own pretest. Professor Hauser's notes from the interviews stated that, according to one respondent: "The last two features taught her something new she did not realize." *See* Hauser Report, at Exhibit I1.

-26-

A:      Yeah. I probably won't pick up the directions again, because it did give me a very good description.

Q:      Was there - what - anything in particular that you feel you learned from this?

A:      Yeah. The icon thing. I learned to investigate the features I have on my phone.

Q:      Got it.

A:      Because, I probably don't know half of what I have.[59]

51.      My expert report provides a more extensive discussion of similar responses.[60]

   **2.      *Marketplace evidence suggests consumers rarely explore and become aware of feature details at the granular levels that distinguish the patented functionalities from other alternatives.***

52.      Implicit in Professor Hauser's conjoint analysis – where respondents sit through what are effectively television commercials for the patented features before making their choice selections – is the assumption that, in the real world, consumers would have been aware of and have been able to distinguish between the presence of the patented features and the non-infringing alternatives. Professor Hauser has provided no credible evidence that this is the case. In fact, there is much evidence to the contrary. The patented features that were the subject of Professor Hauser's study are minor features that are rarely, if ever, mentioned by Samsung or third parties in media and customer smartphone reviews or information from online retailers.[61] It is highly unlikely that the presence or absence of these features would have been noticed by typical consumers.

---

[59] Reibstein Report, at ¶159.
[60] Reibstein Report, at ¶¶158-162.
[61] Rebuttal Expert Report of Tülin Erdem, September 13, 2013, ¶24.

-27-

53.        As part of my review of materials in this case, I examined manufacturer promotional material,[62] media and customer smartphone reviews,[63] and information from online retailers.[64] ███████████████████████████████████████████

██████████████████ My review suggests that the granular functionalities allegedly enabled by the patents-at-issue play an extremely limited role, if any, in informing people's purchase decisions. While the larger feature categories, of which the patented features are a part, are sometimes highlighted the specific aspect of the feature covered by the patents-in-suit did not

---

[62] *See, e.g.*, LeBron's Day with the Samsung Galaxy Note II (1:31) https://www.youtube.com/watch?v= Ie0mAnjz1Oc (viewed September 6, 2013); LeBron's Day with the Samsung Galaxy Note II (1:01)  http://www.youtube.com/watch?v=lB8586Qu0eY (viewed September 6, 2013); Samsung Next Big Thing Super Bowl Full Ad with Seth Rogen, Paul Rudd, and Lebron James (2:01)  http://www.youtube.com/watch?v=dLtysG4 O0ak (viewed September 6, 2013); The Next Big Thing is Already Here - Samsung Galaxy S III (1:31) https://www.youtube.com/watch?v=nf5-Prx19ZM (viewed September 6, 2013).

[63] *See, e.g.*, http://www.amazon.com/product-reviews/B00891P3QI (viewed September 11, 2013); Geller, Jonathan S., "Samsung Galaxy S III review," BGR.com, 6/20/2012, available at http://bgr.com/2012/06/20/samsung-galaxy-s-iii-review/ (viewed September 5, 2013); Crush, Jamison, "Samsung Galaxy S III Review: Universally Excellent Android Smartphone," Brighthand.com, 6/19/2012, available at http://www.brighthand.com/printArticle.asp?n ewsID=19018 (viewed September 5, 2013); Dolcourt, Jessica, "Samsung Galaxy S III," CNET.com, 6/16/2012, available at http://reviews.cnet.com/smartphones/samsung-galaxy-s-iii/4505-6452_7-35326378.html (viewed September 5, 2013); Sakr, Sharif, "Samsung Galaxy S III review," Engadget.com, 5/25/2012, available at http://www.engadget.com/2012/05/25/samsung-galaxy-s-iii-review (viewed September 5, 2013).

[64] *See, e.g.*, http://www.bestbuy.com/site/Samsung-Galaxy/Samsung-Galaxy-S-III/pcmcat305200050006.c?id= pcmcat305200050006 (viewed September 5, 2013); http://www.verizonwireless.com/b2c/vzwfly (viewed September 5, 2013); http://www.target.com/sb/phones-with-plans-cell-electronics/-/N-5xte5#navigation=true&vi ewType=medium&sortBy=bestselling&minPrice=from&maxPrice=to&isleaf=true&navigationPat h=5xte5&parentCategoryId=9975824&facetedValue=/-/N-5xte5Z5y4wr&RatingFacet=0&categoryId=4581 (viewed September 5, 2013).

[65] *See, e.g.*, 2013 Google Wireless Shopper Study, at 3, 12, 15, 18, 28;   2011 Google Mobile Device Shopper, at 11.

2010 Google Wireless Shopper Study, at 11, 15; 2012 Google Portable PC Shopper, at 11, 19.

-28-

generally appear in these sources. Professor Hauser's conjoint surveys here did not include numerous features that Samsung prominently highlighted to consumers.[66]

54.     One source frequently used by consumers to compare competing smartphones and tablets is side-by-side product comparisons available from various online sources. I analyzed these side-by-side product comparisons available from the top four wireless carriers (T-Mobile, Verizon, AT&T, and Sprint), various retailers (Best Buy, Target Mobile, and Walmart Wireless), and independent reviewers (CNET, gdgt, The Verge, and PC World). Using websites associated with these sources, I identified all of the features upon which the following smartphones could be compared: Samsung Galaxy S II, Samsung Galaxy S III, Samsung Galaxy S IV, Samsung Note II, and Apple iPhone 5.[67]

55.     From my examination of these 11 side-by-side comparisons, I found that the features upon which the smartphones were compared were different across sources, though there was overlap. Combined, across all of these sources, there were a total of 114 different feature categories upon which smartphones were compared.[68] The specific, granular functionalities made possible by the patents-at-issue did not appear to be discussed in any of these 114 feature categories. Without this type of information, it is not clear how consumers would be able to make a product choice based on these features, as Professor Hauser's analysis assumed would be the case and as respondents in Professor Hauser's conjoint exercise were instructed to do.

---

[66] Reibstein Report, at ¶¶185-198.
[67] Reibstein Report, at ¶¶166-168.
[68] Reibstein Report, at ¶¶166-168.

-29-

**3.** ***Conjoint research has shown that if respondents are unaware of attributes used in the survey, the estimated values associated with those attributes will be inflated.***

56.        Research has shown that if respondents are unaware of the attributes shown in the conjoint survey, then the estimated values associated with the attribute will be inflated.[69] Professor Hauser pointed out this very limitation in his own prior writings. For example, in a 2004 article entitled, *Conjoint Analysis, Related Modeling, and Applications*, he noted there is a need for further research in order to account for the difference between conjoint analysis, which informs respondents about product attributes, and the real world, where such attributes may not be known:

> Conjoint analysis is based on measurements that inform respondents about product features. However, in real markets such information diffuses and does not happen instantaneously. Thus, we expect further development of methods that combine the diffusion of information among customers with models of how customers will choose based on that information.[70]

---

[69] According to one author, "[e]valuation tasks intentionally force respondents to attend to attributes that they might otherwise not notice. In doing so, attention can elevate the importance of particular attributes to a level that is greater than would occur in the marketplace. For example, featuring the attribute 'surge protector' may make this attribute salient even though it may not be salient in actual choices." J. Huber, "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," *Sawtooth Software Conference Proceedings* (1997): 244.

[70] Hauser, J., and V. Rao, "Conjoint Analysis, Related Modeling, and Applications," in Wind, J. and P. Green (eds.), *Advances in Market Research and Modeling: Progress and Prospects* (Boston, MA: Kluwer Academic Publishers, 2004):18 available at http://web.mit.edu/hauser/www/Papers/Hauser_Rao%20Conjoint%20Analysi s%20Green%20Festschrift%202002.pdf (viewed July 1, 2013).

**4.    *Unlike Professor Hauser's conjoint study in this case, academic research, including Professor Hauser's own prior studies, focuses on major features that are well known to consumers, not minor features.***

57.    Conjoint analysis that is the subject of academic research has generally focused on product attributes that are more widely understood to be important to consumers and are, therefore, more likely to factor in to the consumer's decision making process. Based upon my review of 75 conjoint studies appearing in the top six marketing journals from 2005 through 2013,[71] I found that researchers generally included features that were relatively well known to consumers.[72] At the very least, the features that were included were ones consumers would readily recognize the product as possessing.[73]

58.    Professor Hauser, in his academic research, also has focused on relatively important product attributes when conducting conjoint analyses. In preparing this report, I conducted a review of all of the conjoint studies appearing in any of the publications identified on Professor Hauser's CV. As my report shows, the conjoint studies conducted by Professor Hauser that are the subject of academic research, which included products such as automobiles, mobile phones, and instant cameras, examined features that were relatively important to consumers, and generally more well-known than the patented features he focused on in this case.[74]

---

[71] My search included conjoint studies published in the Journal of Marketing, Journal of Marketing Research, Journal of Consumer Research, Marketing Science, Journal of the Academy of Marketing Science, and Marketing Letters from January 1, 2005 to May 21, 2013. *See* Reibstein Report, at Exhibit 19.

[72] Reibstein Report, at Exhibit 19.

[73] Reibstein Report, at Exhibit 19.

[74] Reibstein Report, at Exhibit 20.

-31-

59.     For example, in a 2007 article appearing in the journal, *Marketing Science*, Professor Hauser described a conjoint study he conducted involving smartphones.[75] The features examined were price, brand, form, operating system, network, keyboard, and size.[76] Professor Hauser also conducted at least one other conjoint study involving mobile phones, in 2011 in the *Journal of Marketing Research*.[77] The features examined in that study were brand, color, screen size, thickness, camera resolution, style, and base price level.[78] The features Professor Hauser included in these studies are much less granular than the patented features at issue here and appear among the features listed prominently in comparison websites.[79]

60.     Based on my review, I am unaware of situations in which Professor Hauser's academic work explores the prospective impact of features as granular as those considered here.

———————————————

[75] Yee, M., Dahan, E., Hauser, J., and J. Orlin, "Greedoid-Based Noncompensatory Inference," *Marketing Science* 26, no. 4 (2007): 541; Hauser, J., Dahan, E., Yee, M. and J. Orlin, ""Must Have" Aspects vs. Tradeoff Aspects in Models of Consumer Decisions," *Proceedings of the Sawtooth Software Conference* (2006): 169-181.

[76] Reibstein Report, at Exhibit 20. The levels reported for these features included: Price: $99, $199, $299, $499; Manufacturer: Sony, Samsung, Nokia, BlackBerry; Form: flip, brick; Operating System: Palm, Microsoft; Carrier: Verizon, Cingular, Sprint, Nextel; Keyboard: mini, none; Size: small, large. (Hauser, J., Dahan, E., Yee, M. and J. Orlin, ""Must Have" Aspects vs. Tradeoff Aspects in Models of Consumer Decisions," *Proceedings of the Sawtooth Software Conference* (2006): 169-181.)

[77] Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011).

[78] Reibstein Report, at Exhibit 20. The levels reported for these features included: Brand: Motorola, Lenovo, Nokia, Sony-Ericsson; Color: black, blue, silver, pink; Screen Size: small, large; Thickness: slim, normal; Resolution: .5MP, 1.0MP, 2.0MP, 3.0MP; Style: bar, flip, slide, rotational; Base Price: HK $1080, HK $1280, HK $1480, HK $1680. Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011).

[79] Reibstein Report, at ¶¶166-168.

-32-

61.     While conjoint analysis is an established tool in both academia and business, the manner in which Professor Hauser has implemented his analysis here is not an implementation of conjoint analysis that has been established as a standard within the academic community.

### C.     Results From Professor Hauser's Conjoint Study Are Unreliable Because They Failed To Account For Key Characteristics Inherent In The Real World Purchase Environment.

#### 1.     *Researchers have consistently noted that conjoint studies should entail realistic purchase decisions that mimic the actual purchase environment.*

62.     The claimed goal of Professor Hauser's conjoint study is to predict consumers' purchase behavior in a world where Samsung is unable to utilize the patented features and offers non-infringing alternative features instead. Professor Hauser uses a survey construct in a purported attempt to mirror the real world process whereby consumers consider a set of phones with different features and select one of the phones to purchase.[80] Rather than seeking to replicate this decision process closely, Professor Hauser has constructed an artificial exercise that reflects the purchase process actually experienced by consumers in only a very limited way.

63.     Researchers have noted that exercises so severely divorced from the actual decision process have reduced reliability and applicability.[81] Professor Hauser himself has previously

---

[80] More technically, researchers refer to the first phase as construction of the consideration set and the second stage as the choice. Shocker, D., Ben-Akiva, M., Boccara, B., and P. Nedungadi, "Consideration Set Influences on Consumer Decision-Making and Choice: Issues, Models, and Suggestions," *Marketing Letters* 2, no. 3 (1991): 183-185.

[81] Allenby, G., Fennell, G., Huber, J., Gilbride, T., Horsky, D., Kim, J., Lenk, P., Johnson, R., Offek, E., Orme, B., Otter. T., and J. Walker, "Adjusting Choice Models to Better Predict Market Behavior," *Marketing Letters* 16, no. 3/4 (2005): 200. The authors state, "[c]ompared with marketplace behavior, information about choices is presented in ways that facilitate a rational choice among the alternatives. In conjoint studies, characteristics are arrayed in a grid cleanly

-33-

written that "conjoint analysis accurately represents how consumers will behave when faced with new products" if "the stimuli are realistic."[82] As further described below, and outlined fully in my report, Professor Hauser's task is very unrealistic.

## 2. *Professor Hauser's surveys excluded numerous features associated with the accused products*

### a. **Professor Hauser's surveys do not include numerous product features that Samsung highlighted to consumers.**

64.     Professor Hauser's smartphone and tablet surveys included 18 different features (treating price and screen size levels as just one feature each).[83] Professor Hauser's surveys did not, however, include numerous other features that Samsung prominently highlighted to consumers, including many that were touted on its website. These features were described more fully in my expert report.[84]

---

displaying comparable information about each option. By contrast, in the marketplace, attribute information about options may be hard to find and often is not comparable across alternatives." (Allenby, G., Fennell, G., Huber, J., Gilbride, T., Horsky, D., Kim, J., Lenk, P., Johnson, R., Offek, E., Orme, B., Otter. T., and J. Walker, "Adjusting Choice Models to Better Predict Market Behavior," *Marketing Letters* 16, no. 3/4 (2005): 199.)

[82] J. Hauser, "Note on Conjoint Analysis," *MIT Sloan Courseware* (2007): 13. Professor Hauser's other research also mentions the importance of realism in conjoint design.  For instance, he ensured that respondents found the tasks realistic through pretests. *See* Yee, M., Dahan, E., Hauser, J. and J. Orlin, "Greedoid-Based Noncompensatory Inference," *Marketing Science* 26, no. 4 (2007): 541; Hauser, J., Toubia, O., Evgeniou, R., and D. Dzyabura, "Disjunctions of Conjunctions, Cognitive Simplicity, and Consideration Sets*," Journal of Marketing Research* 47 (2010): 489. Professor Hauser also finds that high-design-quality conjoints induce higher realism. *See* Selove, M., and J. Hauser, "The Strategic Importance of Predictive Uncertainty in Conjoint Design" (2011):21.

[83] Hauser Report, at ¶19.

[84] Reibstein Report, at ¶¶184-201. *See also* SDX 3169-3170

-34-

b.     **Major product features must be included in a conjoint analysis in order to estimate the demand for products that contain patented features.**

65.         Academic research conducted by Peter Rossi, an expert retained by Apple in this case and others, highlights specific aspects of conjoint surveys that are essential when estimating the role patented features play in product demand.[85] Specifically, Professor Rossi and his co-authors list several "criteria [that] must be met" in order "[t]o undertake a rigorous conjoint survey for the purpose of estimating demand for patented features." Among them is that "[m]ajor product features must be included in the design."[86] Professor Rossi and his co-authors further state:

> There are cases in which conjoint designs have been used which only test patented product features *and do not include other important product features*. Not only does this *invite the respondents to make attributions which are not correct* but it also *calls attention to the patented features*. There is no doubt that this can lead to *an overstatement of feature value.*[87]

---

[85] Dr. Rossi filed a report on behalf of Apple in this matter Rebuttal Expert Report of Peter E. Rossi, Ph.D., September 13, 2013. My own published work also emphasizes the fundamental importance of including all important product features. A book I co-authored, *Marketing Metrics: The Definitive Guide to Measuring Performance*, states: "To complete a sales volume projection, it is necessary to have a full conjoint analysis. This analysis must include all the important features according to which consumers make their choice... The greatest potential error in this process would be to exclude meaningful attributes from the conjoint analysis." Bendle, Neil T., Pfeifer, Phillip E., Reibstein, David, Farris, Paul W. *Marketing Metrics: The Definitive Guide to Measuring Marketing Performance*, 2nd Edition, 2010, pp. 150-151.

[86] *See* Allenby, Greg M. and Brazell, Jeff and Howell, John R. and Rossi, Peter E., Valuation of Patented Product Features (November 2013), at pp. 13-14. A true and correct copy of that article is attached hereto as Exhibit 3.

[87] *See* Allenby, Greg M. and Brazell, Jeff and Howell, John R. and Rossi, Peter E., Valuation of Patented Product Features (November 2013), at pp. 17. Emphases added.

-35-

### 3.   *Respondents noted that parts of Professor Hauser's survey were unrealistic and inconsistent with aspects of the real world purchase decision.*

66.      Many of the participants in my parallel pretest of Professor Hauser's survey indicated that they believed that the choices they were being asked to make between phones were unrealistic. A frequently cited example of the survey's lack of realism was the random, nonsensical relationship between the features included in a phone option and its price.[88] For example, one respondent stated:

> Q:    In terms of the - each time it gave you one phone, two - did you feel like the phone choices were realistic?
>
> A:    That's a difficult one. At times I thought that they were - that the features didn't match the price, especially the higher price ones and I was looking at previous screen, previous options and then when they added the icons and the price together it didn't make sense. I would get the same thing for $49 and then the next screen it was almost identical for $299.[89]

67.      Another respondent stated:

> Q:    Got it. So, the table itself, how are you feeling about the clarity of what they're showing you in the table? Is there anything confusing or -
>
> A:    It's just confusing to me why the cheapest phone has more features than the most - the highest priced phone. The 299 phone should offer things like WiFi calling, Universal Search, all the camera options. The universal - the 399 phone should be the biggest size, not a five inch phone, it should be the 5.5 inch phone.[90]

---

[88] Reibstein Report, at Exhibit 12.
[89] Reibstein Report, at Exhibit 12 (Philadelphia Respondent 2).
[90] Reibstein Report, at Exhibit 12 (Chicago-1 Respondent 1).

-36-

68.     My Report provides more extensive discussion of similar responses where respondents indicated that Professor Hauser's survey choices were unrealistic.[91]

**4.     *Professor Hauser's conjoint study failed to account for the real-world process used by consumers to make purchase decisions when faced with incomplete information involving complex products.***

69.     Consumers regularly buy products where competing alternatives vary dramatically in terms of scope and complexity. As the complexity of the product and/or the number of market alternatives increases, so does the level of effort required for the consumer to research and evaluate the choices fully. When choice complexity reaches a certain level, consumers begin to use simplifying heuristics. The exact simplification that is employed may vary, but the common element is that consumers consider less than the full range of features or product choices in making a decision. This simplification process is a characteristic of real decisions made in real markets with complex products.[92]

70.     The academic literature on market research refers to a set of these heuristics as non-compensatory decision processes. In a compensatory decision process, a product that does not have the most desired level of one feature can *compensate* for it with another feature. In a non-compensatory process, a product may be completely eliminated from further consideration because it does not have a certain feature level regardless of the other features the product might have.[93]

---

[91] Reibstein Report, at ¶204 and Reibstein Report, at Exhibit 12.

[92] Shocker, D., Ben-Akiva, M., Boccara, B., and P. Nedungadi, "Consideration Set Influences on Consumer Decision-Making and Choice: Issues, Models, and Suggestions," *Marketing Letters* 2, no. 3 (1991): 185; Reibstein Report, at ¶205.

[93] Johnson, E., Meyer R., and S. Ghose, "When Choice Models Fail: Compensatory Models in Negatively Correlated Environments," *Journal of Marketing Research* 26 no. 3 (1989): 255;

-37-

71.     According to Professor Hauser's academic research, products may have "must have" features, such as brand, that may be so important that consumers may not actually consider products without these features, regardless of what other smaller features the product may possess.[94] In a 2006 article, he wrote:

> In each of these cases the managerial challenge is to identify the "must have" (or "must not have") features that determine the consideration sets of consumers. Must-have features are non-compensatory in the sense that a product with must-have features is preferred to a product without these must-have features even if the product without the must-have features is better on all other features. The identification of must-have features is related to the conjoint-analysis goal of identifying the most important features…[95]

72.     One example of a determining factor (and simplifying heuristic) in the purchase decision is brand. For example, one third party analysis found the presence of an anti-Apple bias among some smartphone consumers. One analyst noted that Apple was a "very polarizing brand, generating high levels of both positivity and negativity" among smartphone users.[96] Another analyst noted that ███████████████████████████████

███████████████████████████████████████████████████

██████████████████████████[97]

---

Reibstein Report, at ¶206.

[94] Reibstein Report, at ¶208.

[95] Hauser, J., Dahan, E., Yee, M. and J. Orlin, ""Must Have" Aspects vs. Tradeoff Aspects in Models of Consumer Decisions," *Proceedings of the Sawtooth Software Conference* (2006): 169-170. While "must have" features are not strictly incompatible with an additive utility framework (e.g., when the feature partworths follow a geometric series), "must have" features are compatible with a simplifying heuristics framework.

[96] SAMNDCA11086731.

[97] APLNDC630-0000124145; Reibstein Report, at ¶209.

-38-

73.        Professor Hauser, in his prior research, noted that simplifying heuristics were more likely to be used in cases with complex products with numerous features.[98] For example, in a 2010 article, he wrote:

> In complex product categories, research suggests that at least some consumers use noncompensatory decision processes when evaluating many products and/or products with many features (e.g., Payne, Bettman, and Johnson 1988, 1993).[99]

74.        In fact, Professor Hauser's prior research reports that consumers use simplifying heuristics when purchasing smartphones.[100] In one article he wrote:

> Noncompensatory methods are slightly better in unfamiliar categories (e.g., smart phones, global positioning systems). Research suggests that approximately one-half to two-thirds of the respondents are fit better with noncompensatory than compensatory methods and that the percentage is higher when respondents are asked to evaluate more profiles.[101]

75.        In his course materials, Professor Hauser noted:[102]

> As an illustration, we tested lexicographic processing on a survey to 15.810 students last year. Each student was asked to choose from a set of 32 SmartPhones that varied on 16 aspects. There were no constraints on how the choice was made. Of these students, 92% used a non-compensatory (lexicographic) process.[103]

---

[98] Reibstein Report, at ¶210.

[99] Hauser, J., Toubia, O., Evgeniou, T., Befurt, R., and D. Dzyabura, "Disjunctions of Conjunctions, Cognitive Simplicity, and Consideration Sets," *Journal of Marketing Research* 47 (2010): 486.

[100] Yee, M., Dahan, E., Hauser, J., and J. Orlin, "Greedoid-Based Noncompensatory Inference," *Marketing Science* 26, no. 4 (2007); Reibstein Report, at ¶212.

[101] Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011): 117-118.

[102] Reibstein Report, at ¶213.

[103] J. Hauser, "Note on Consumer Behavior," *MIT Sloan Courseware* (2005): 5.

-39-

76.        Professor Hauser's own conjoint study involving GPS devices illustrates the inconsistency in results when assuming a compensatory instead of a non-compensatory decision process:[104]

> On average the Magellan brand had higher partworths, thus in any additive-partworth market simulator a switch from Garmin to Magellan would improve market share. However, when non-compensatory models were estimated, the researchers found that 12% of the respondents screened on brand and, of those, 82% preferred Garmin. For the other 88% (100% − 12%), brand had no impact on consideration. If this model was correct (and it did predict a holdout task better), then a switch from Garmin to Magellan would reduce market share – exactly the opposite of that predicted by an additive-partworth model.[105]

77.        Despite the findings in his academic publishing, Professor Hauser provides no evidence that he even considered whether any non-compensatory decision process could be at work in estimating the extent to which Samsung sales may have been driven by the patented functionalities. Professor Hauser's use of a choice-based conjoint assumes a compensatory decision process, which his own writings suggest may be inappropriate in situations involving complex products. The evidence indicates the purchase decision process for smartphones and tablets exhibits non-compensatory characteristics. Professor Hauser's conjoint analysis, which fails to take that into account, is flawed and unreliable, and may lead to results that are "exactly the opposite" of those that actually exist.[106]

---

[104] Reibstein Report, at ¶214.

[105] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216.

[106] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216; Reibstein Report, at ¶220.

-40-

**5.      Professor Hauser failed to account for the fact that respondents do not make their marketplace choices independently of word-of-mouth and other social effects.**

78.      Even had Professor Hauser accounted for the manner in which consumers account for features in complex products, his survey would still be missing key drivers of the complex decision process. The actual purchase decision process for smartphones is influenced by factors beyond straightforward product characteristics, such as gigabytes of storage memory or screen size. Factors such as a desire to have the "latest and greatest" smartphone or the model phone selected by one's peer group illustrates this complexity. ████████████ ████████████████████████████████████████ ███████████████████████████████████████ █████████ ██████████████████████████████████████████ ████████████████████████████ Not considering these types of attributes could have significant impacts on the choices made by the respondent.[109]

**6.      The reliability of the output generated by Professor Hauser's survey is undermined by risks of survey fatigue and overly taxing choice tasks.**

79.      Researchers have shown that a typical survey should last no more than 30 minutes, and that surveys lasting longer than 30 minutes are highly susceptible to respondent fatigue.[110] When respondents become fatigued, they pay less attention to the task in front of them and

---

[107] Deposition of Art Rangel, April 5, 2012, at Exhibit 4, at 17.
[108] APLNDC630-0001315480.
[109] Reibstein Report, at ¶221.
[110] Galesic, M. and M. Bosnjak. "Effects of Questionnaire Length on Participation and Indicators of Response Quality in a Web Survey," *Public Opinion Quarterly*, 73 no. 2 (2009): 349-360.

-41-

DECLARATION OF DAVID REIBSTEIN

increase their response speed as the survey length increases.[111] Professor Hauser's smartphone survey – which included 16 tasks and took over an hour, on average, to take -- is highly susceptible to poor quality responses which would undermine the usefulness of his analysis. This survey fatigue is discussed more extensively in ¶¶224-227 of my report.[112]

**D.** **Professor Hauser's Analysis is Ill-suited to Predict the Impact That Removal of the Patented Features Would Have on Sales of the Accused Devices Because His Analysis Relies on Unfounded Assumptions Regarding Responses to His Survey.**

    **1.** *Professor Hauser assumes that respondents who select "not to buy" the hypothetical phone presented in a survey choice task express a preference for something different than an accused Samsung phone.*

80.    Other flaws aside, Professor Hauser's conjoint analysis is unusable because his survey is unable to determine when respondents would have purchased an actual alternative to the accused devices. Professor Hauser "provides an estimate of the percentage of Samsung consumers who would buy a smartphone with the tested features … but not without it [sic]."[113] His calculations suggest that he has identified respondents that would have changed their actual purchase decisions by selecting a competing smartphone actually available in the marketplace over the accused devices without the patented feature. Given the instructions that Professor Hauser provided in his survey, however, this is not the case.

81.    In Professor Hauser's survey "not buying" a specific hypothetical smartphone reflects a preference for actual marketplace alternatives, including Samsung smartphones and,

---

[111] Krosnick J., and S. Presser, "Question and Questionnaire Design," in Marsden, P. and J. Wright (eds.), *Handbook of Survey Research*, 2nd edition, (Bingley, UK: Emerald Group Publishing Limited, 2010): 292.
[112] Reibstein Report, at ¶224.
[113] Hauser Report, at ¶116.

-42-

specifically, the accused Samsung smartphones.[114] Thus, based on his own survey instructions, Professor Hauser's predictions that respondents would "not buy" a given Samsung smartphone "without the accused features" reflects the possibility, and indeed likelihood, that respondents exhibited a preference for the actual accused device with the features over both: 1) an identical one without those features, and 2) other actual marketplace alternatives available at the time (which they did not buy when given the chance).  His analysis does not, however, hone in further and predict whether respondents would have purchased a competing product actually available in the marketplace if the accused functionality were not available in the accused Samsung devices. That is, Professor Hauser's survey design alone prevents him from determining if the patented functionalities are important enough to respondents to have influenced their decisions to purchase the accused Samsung smartphones instead of a other marketplace alternatives.  I describe this observation in detail in my report at ¶¶145-156.

> **2.    *Professor Hauser's analysis does not adequately account for the role of competing brands in consumer purchase decisions.***

82.    Apple expert Peter Rossi and co-authors also described the essential role competing products play in relying on conjoint analysis to predict the demand for products incorporating specific patented functionalities. Among the criteria they listed as that which "must be met" in order "[t]o undertake a rigorous conjoint survey for the purpose of estimating demand for patented features" was that "[t]he 'outside' or 'no choice' option must be included" and that

---

[114] When asking respondents to indicate whether they would actually purchase their preferred smartphone, Professor Hauser instructs them to "consider the availability of other smartphone options in the market that may influence [their] purchase decision, including smartphones by other manufacturers or other Samsung smartphones." *See* Hauser Report, at Exhibit E.

-43-

'[t]he major set of competitive brands must be included."[115] Professor Hauser included the former, but not the latter. The only brand that Professor Hauser explicitly included in his analysis is Samsung.[116] Professor Rossi further describes the importance of accounting for major brands, stating that "[w]ithout a realistic demand system for all of the major brands in the market, it is not possible to calculate a meaningful new industry equilibrium for the world without the infringing products."[117]

### 3. The "no buy" choice upon which Professor Hauser bases his sales estimates are inherently unreliable.

83.        As described above, Professor Hauser's calculations of the portion of Samsung's accused products that are driven by the patents-at-issue rest critically on the share of respondents that Professor Hauser calculates would "not buy" the baseline and but-for phones. Sawtooth Software, the suppliers of the "gold standard" software Professor Hauser uses to conduct his conjoint analysis, however, cautions heavily against relying on calculations associated with the "no buy" survey responses.[118] A Sawtooth Software research paper comments on using the "no buy" option, which it refers to as the "None" option:

> Some researchers like to include a "None" category in simulations, as an aid in estimating how category volume would expand or shrink as products become more attractive. We recommend caution in doing this, for these reasons:

---

[115] Allenby, Greg M. and Brazell, Jeff and Howell, John R. and Rossi, Peter E., Valuation of Patented Product Features (November 2013), at pp. 13-14.

[116] Hauser Report, at ¶84.

[117] Allenby, Greg M. and Brazell, Jeff and Howell, John R. and Rossi, Peter E., Valuation of Patented Product Features (November 2013), at pp. 20.

[118] Transcript of Proceedings before the Honorable Lucy H. Koh United States District Judge, volume 5, April 8, 2014, at p.1116: 6-10.

-44-

…

- Although choices of "None" are probably indicative of disliked alternatives, there is little reason to believe their frequency will accurately reflect the actual proportion of respondents refusing to purchase products in the real world.

In summary, we usually suggest including the "None" option in choice tasks, but *then paying less attention to or even neglecting it in the analysis*.[119]

**E.    The Responses Generated By Professor Hauser's Survey Are Not Reflective Of The Actual Marketplace Environment That Professor Hauser Purports To Analyze**

**1.    *Professor Hauser's survey generated numerous irrational responses.***

84.    A fundamental assumption of conjoint analysis, including the one applied by Professor Hauser in the present case, is that respondents make rational decisions that are consistent with economic theory. Specifically, it is assumed that respondents seek to maximize their utility by selecting choices with features they value, and trade off with price, as well as compare against their outside option (choosing to buy nothing or something else in the market). As a test of the reliability of Professor Hauser's estimates, I examined the choices respondents made in the survey itself, to evaluate if the survey responses were consistent with the underlying premises of conjoint analysis.

85.    Specifically, I examined the responses generated by the 267 respondents that reported owning a Samsung Galaxy S III.[120] In particular, I looked to see if any of these respondents ever indicated that they would buy a less preferred smartphone than the Galaxy S

---

[119] Sawtooth Software, Research Paper Series, Getting the Most from CBC, Rich Johnson and Bryan Orme, Sawtooth Software, Inc., at 4 (emphasis added).
[120] Reibstein Report, at ¶229.

-45-

III, as reflected in it having at least one fewer feature than is available on the Galaxy S III, at a higher price than they could purchase a Galaxy S III.

86.         Professor Hauser fielded his smartphone survey between July 6, 2013 and July 15, 2013 and, at that time, the Samsung Galaxy S III was available in the market for between $50 to $100, depending on the carrier.[121] Of the 267 respondents that own a Samsung Galaxy S III, 262 of them were presented with a choice exercise that included a phone option with a 4.8" screen, a price greater than or equal to $149, and with at least one feature fewer than the features contained in an actual Samsung Galaxy S III.[122] As my report shows, 65 of these respondents chose this phone as part of their inside option; 46 of these respondents indicated that they would purchase this product over their outside option.[123] This suggests that 71 percent of the 65 respondents appear to have made irrational choices (*i.e.*, to purchase a product that was inferior to the Galaxy S III, which they owned, at a higher price than they could purchase the Galaxy S III for at that time).

87.         This example shows the survey respondents are behaving in a manner inconsistent with the underlying assumptions of Professor Hauser's conjoint analysis. More generally, it demonstrates that choices provided by respondents do not accurately characterize actual marketplace choices.

_____

[121] Vellturo Report, at Exhibit 13-B. Survey completion dates from Backup to Hauser Report, at "Smartphone Final Survey Data Set.xlsx."
[122] Reibstein Report, at Exhibit 24.
[123] Reibstein Report, at Exhibit 24.

-46-

## 2.  *Respondents demonstrate substantial insensitivity to price.*

88.       An underlying conceptual premise of any demand analysis is that consumers do not prefer higher prices. Economic theory and common sense tell us that consumers would prefer to receive the same good at a lower price versus a higher price, all else equal.

89.       In his conjoint analysis, Professor Hauser externally imposes a monotonicity constraint. Specifically, he restricts his estimates of respondent preferences to be such that they prefer to pay less rather than more (*i.e.*, that preferences are monotonic in price). To evaluate the impact of Professor Hauser's monotonicity assumption regarding price, I looked at the results generated by Professor Hauser's model when the monotonicity constraint is removed. For a more detailed discussion, *see* ¶¶228–236 of the my report.[124]

90.       Re-estimation of Professor Hauser's smartphone model without the monotonicity constraint suggests that Professor Hauser's assumption masks substantial price insensitivity reflected in the survey responses. As the table below illustrates, 346 out of the 507 smartphone survey respondents appear to have a positive preference for a higher price at some level.[125] This means that 68 percent of the respondents that took the survey, for whatever reason, made choices that were consistent with an irrational preference for higher prices. This phenomenon appears to have been present at all price levels. This widespread insensitivity to price suggests that the survey responses are not reflective of the actual marketplace environment Professor Hauser purports to analyze.[126]

---

[124] Reibstein Report, at ¶¶228-236.
[125] Reibstein Report, at ¶236.  *See also*, Reibstein Report, at Exhibits 27 and 28.
[126] Respondents are considered insensitive to price changes if, absent the imposed monotonicity constraint, they prefer higher prices to lower prices.

-47-

| Price Sensitivity Analysis – Smartphones | | | |
|---|---|---|---|
| Price Change | Total Number of Respondents | Number of Respondents Insensitive to Price Change | Percent of Respondents Insensitive to Price Change |
| $49 vs. $99 = $50 | 507 | 263 | 52% |
| $49 vs. $149 = $100 | 507 | 181 | 36% |
| $49 vs. $299 = $250 | 507 | 70 | 14% |
| $99 vs. $149 = $50 | 507 | 142 | 28% |
| $149 vs. $299 = $150 | 507 | 60 | 12% |
| Any | 507 | 346 | 68% |

91.     In Professor Hauser's deposition, he argued that these inconsistencies in price sensitivity are not statistically significant.[127] I examined the distribution of price sensitivities for the $49 vs. $99 price change and found that, for the majority of the respondents, the price sensitivity is not statistically different from zero.[128] This implies that over 95 percent of the respondents do not exhibit a statistically significant preference for a $49 smartphone compared to an identical $99 smartphone, which is completely nonsensical.

**F.     The Defects in Professor Hauser's Conjoint Analysis Are Confirmed By The Marketplace Predictions it Generates.**

**1.     *Professor Hauser's survey analysis is implausible with respect to the amount respondents value just the features incorporated in the survey.***

92.     Professor Hauser's survey generates implausible results related to the amounts respondents value just the features incorporated in the survey. In the table below, I summarize the willingness to pay price premiums associated with each of the individual smartphone

---

[127] Deposition of John Hauser, September 27, 2013, at 315:6-316:8.
[128] Exhibit 4.

-48-

features in the context of a phone with a price of $149.[129] As this table shows, the sum of the willingness to pay price premiums for the patent-related features is $358 and the sum of the willingness to pay price premiums for all the modeled conjoint features is $1,125,[130] an amount seven times greater than the price of the reference phone.[131]

---

[129] The $149 base price reported for smartphones was selected, consistent with Professor Hauser's Exhibit P. *See* Hauser Report, at Exhibit P. Willingness to pay must be calculated at a specific price point as each price level is associated with a different parameter estimate and thus the willingness to pay will vary by the chosen base price.

[130] As Professor Hauser suggests in his report, the willingness to pay for individual features is not strictly additive because correlation between participant's valuation of individual features and varying price sensitivity outside of the modeled conjoint price range may result in the aggregate willingness to pay to be either higher or lower than the sum of the willingness to pay estimates for the individual features. For example, at a reference price of $49, the willingness to pay for the Quick Links feature is $96 and the willingness to pay for the Universal Search feature is $82, but the willingness to pay for both features is $142, which is less than the sum of the two individual features ($178). On the other hand, at a reference price of $149, the willingness to pay for the Automatic Word Correction feature is $102 and the willingness to pay for the S-Pen feature is $38, but the willingness to pay for both features is over $150, which exceeds the sum of the individual willingness to pay estimates ($140). I cannot perform this exact calculation for all features jointly because their joint willingness to pay amounts quickly exceeds the range of prices presented in Professor Hauser's survey. While the willingness to pay for individual features is not perfectly additive, the order of magnitude of the presented willingness to pay amounts clearly suggest that the willingness to pay for the entire set of features is unreasonably large.

[131] This is based on a $149 priced phone with a 5.0" screen.

-49-

**WTP Price Premiums[132]**
**Individual Smartphone Features**
**(Based on $149 Priced Phone with a 5.0" Screen)**

| Price Premiums: | |
|---|---|
| _Patented Features_ | |
| Background Syncing | $69 |
| Quick Links | $56 |
| Universal Search | $44 |
| Automatic Word Correction | $102 |
| Missed Call Screen Management | $87 |
| _Sum_ | _$358_ |
| _Other Features_ | |
| WiFi Calling | $54 |
| Voice to Text | $138 |
| Reject Call with Message | $134 |
| S Pen | $38 |
| Screen Size (4.8" vs. 4.0") | $113 |
| Screen Size (5.0" vs. 4.8") | $57 |
| Best Photo | $114 |
| Smile Shot | $72 |
| Buddy Photo Share | $47 |
| _Sum_ | _$767_ |
| Sum | $1,125 |

93.     These willingness to pay price premiums estimated by Professor Hauser are even more implausible upon consideration that they do not reflect the individual willingness to pay price premiums associated with the hundreds of other features included in the accused smartphones and tablets, many of which appear to be much more important features than those he did include. Professor Hauser's surveys do not include 1) product features that Samsung promoted to consumers, 2) numerous other product attributes that Samsung discussed in its marketing and promotional materials, and 3) hundreds of functionalities described in

---

[132] Reibstein Report, at Exhibit 29.

-50-

Samsung's product manuals.[133] Additionally, Professor Hauser does not include numerous product features discussed on side-by-side comparison websites. By comparison, the price premiums from these excluded features would be expected to be vastly higher than the granular features tested by Professor Hauser in his conjoint study.

### 2. Professor Hauser's conjoint study performs poorly in predicting respondent's actual choices.

94.     Professor Hauser has provided no evidence that his model is reliable for predicting real market outcomes.[134] To test the reliability of Professor Hauser's choice predictions, I measured them against respondents' own actual purchase history. I did this by examining the choices predicted by Professor Hauser's conjoint model if respondents were presented with the choice of: 1) purchasing one of the accused devices (comprised of the features they included when each was first released), or 2) the outside option.[135]

95.     My analysis is summarized in my report.[136] Of the 507 respondents upon which Professor Hauser's conjoint analysis is based, 42 reported owning the Galaxy Note II.[137] However, as my report shows, based on my extension of Professor Hauser's choice predictions, only 30 percent of the 42 respondents owning the Galaxy Note II would be

---

[133] *See, e.g.,* Samsung Galaxy Note AT&T User Manual; Samsung Galaxy Note II Verizon User Manual; Samsung Galaxy S II AT&T User Manual; Samsung Galaxy S II T-Mobile User Manual; Samsung Galaxy S II Epic 4G Touch Sprint User Manual; Samsung Galaxy S II Skyrocket AT&T User Manual; Samsung Galaxy Nexus User Manual; Samsung Admire User Manual; Samsung Captivate Glide AT&T User Manual; Samsung Galaxy Rugby Pro AT&T User Manual; Samsung Illusion Verizon User Manual; Samsung Stratosphere Verizon User Manual; Samsung Conquer 4G Sprint User Manual; Samsung Dart User Manual; Samsung Exhibit II 4G T-Mobile User Manual; and Samsung Transform Ultra Sprint User Manual.

[134] Hauser Report, at ¶¶98-104.
[135] Reibstein Report, at ¶244.
[136] Reibstein Report, at ¶244.
[137] Reibstein Report, at ¶229.

-51-

predicted to purchase the Galaxy Note II.[138] Variants of the Galaxy S II are predicted to account for a 21 percent purchase share.[139] The Galaxy Nexus and Galaxy S III are predicted to account for purchase shares of one percent and four percent respectively. Contrary to these predictions, we know that in the real world, 100 percent of these 42 respondents chose to purchase the Galaxy Note II.

96.        My report also predicts purchase shares for the 267 respondents underlying Professor Hauser's survey analysis that report owning a Galaxy S III.[140] Of those respondents, only nine percent are predicted to purchase the Galaxy S III over Samsung's other accused devices or instead of not buying it at all.[141] The more recently released Galaxy Note II is predicted to account for a 14 percent share. Variants of the Galaxy S II are predicted to account for a 29 percent share.[142] The Galaxy Nexus is predicted to account for a two percent share.[143] The original Galaxy Note and the Galaxy Rugby Pro are predicted to account for nine percent and three percent shares, respectively.[144] Contrary to these predictions, we know that in the real world, 100 percent of these 267 respondents chose to purchase the Galaxy S III.[145]

---

[138] Reibstein Report, at ¶244.
[139] Reibstein Report, at ¶244.
[140] Reibstein Report, at ¶244.
[141] Reibstein Report, at ¶244.
[142] Reibstein Report, at ¶244.
[143] Reibstein Report, at ¶244.
[144] Reibstein Report, at ¶244.
[145] Reibstein Report, at ¶244.

DECLARATION OF DAVID REIBSTEIN

97.　　　　Professor Hauser is relying on a prediction tool to estimate the impact of removing a feature from a phone on purchase decisions, even though the tool does a poor job of predicting phone choices of the survey respondents.[146]

**3.　Predictions generated by Professor Hauser's analysis related to the composition of Samsung sales differ substantially from actual marketplace outcomes.**

98.　　　　The unreliability of Professor Hauser's choice predictions are further revealed when measured against the actual composition of Samsung's smartphones sales. My report summarizes a second extension of the choice exercises conducted by Professor Hauser.[147] This analysis compares the relative demand for four Samsung smartphones implied by Professor Hauser's analysis with the actual relative demand based on Samsung's historical sales. The four phones examined include the Galaxy S III, the Galaxy S II, the Galaxy Note II, and the Galaxy Nexus (comprised of the features they included when each was first released).[148] I have summarized the results of this analysis in the table below.[149]

---

[146] Reibstein Report, at ¶247 presents a comparable summary of tablet predictions, and the results are similar. In particular, the prediction tool does a poor job distinguishing between the Galaxy Note 10.1 and the Galaxy Tab 2 10.1.

[147] Reibstein Report, at Exhibit 34.

[148] Reibstein Report, at ¶248. *See also* Reibstein Report, at ¶229.

[149] Reibstein Report, at Exhibit 34.

-53-

**Relative Smartphone Demand – Top Four Samsung Models**

| Model | Based on Hauser Prediction | Based on Actual Units Sold | Based on Respondents' Purchases |
|---|---|---|---|
| Galaxy S III | 29% | | 61.5% |
| Galaxy S II | 16% | | 19.4% |
| Galaxy Note II | 40% | | 9.7% |
| Galaxy Nexus | 16% | | 9.4% |
| Total | 100% | 100% | 100% |

99.     As this table shows, Dr. Hauser's survey does a very poor job of predicting actual market choices.[150]

**4.    *A simple feature counting model explains respondents' choices at least as well as Professor Hauser's model which is based on the unique functionality of each patented feature.***

100.    As an additional reasonableness test, I modified Professor Hauser's conjoint analysis by imposing an assumption that allows me to examine whether Professor Hauser's survey responses reflect preferences for more features rather than specific features. Specifically, I added a single simplifying assumption to Professor Hauser's framework: that individual consumers value equally each of the individual feature levels among the Data Accessibility, Call Initiation and Screening, Input Assistance and Camera feature categories. That is, I assumed that, while preferences for these features may vary from person to person, a given respondent would value each of the individual features identically.  I refer to this modified framework as the "feature count" model.

---

[150] Reibstein Report, at ¶¶249-251.

-54-

101.     As described extensively in my report, this feature count model performs as well in predicting respondent choices as Professor Hauser's conjoint analysis.[151] Specifically, Professor Hauser evaluates the "fit and predictive ability" of his analysis based on two criteria: a $U^2$ measure and a "hit rate" measure.[152] The count model outperforms Professor Hauser's conjoint analysis in terms of the $U^2$ measure, which Professor Hauser describes as the "more technical" of the two measures, but not the "hit rate" measure.[153] The implication is that the demand Professor Hauser attributes to the patents-at-issue is just as likely to be driven by respondent preferences for *more* features and not the specific functionality associated with the patents-at-issue (as presented by Professor Hauser).[154]

102.     There is no convincing evidence that Professor Hauser's model, which he claims values the difference between the features at issue and the non-infringing alternatives, is more accurate at predicting consumer choice than a model based largely on a simple count of the number of feature icons. This suggests that the predictive ability of Professor Hauser's model is highly suspect and unlikely to yield usable results.

---

[151] Reibstein Report, at ¶¶261-263.
[152] Hauser Report, at ¶98.
[153] Hauser Report, at ¶99; Reibstein Report, at ¶¶262-263.
[154] Reibstein Report, at ¶263.

DECLARATION OF DAVID REIBSTEIN

## IV.   __CONCLUSION__

103.      Based on all the foregoing evidence, I would never rely on a model, such as this, with all of its shortcomings discussed above, in either in my academic work or my work in industry.


I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed on June 6, 2014 at Philadelphia, Pennsylvania.

_____

David Reibstein

-56-

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

# EXHIBIT 1

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

APPLE INC., a California Corporation,

       Plaintiff (Counterclaim-Defendant),

  v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG ELECTRONICS
AMERICA, INC., a New York corporation;
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC, a Delaware limited liability
company,

       Defendants (Counterclaim-Plaintiffs).

Civil Action No. 12-cv-00630-LHK

**REBUTTAL EXPERT REPORT OF**

**DAVID REIBSTEIN**

**September 13, 2013**

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

## Table of Contents

I.      INTRODUCTION ..................................................................................................1

    A.      ASSIGNMENT ...............................................................................................1

    B.      SUMMARY OF CONCLUSIONS .........................................................................2

    C.      QUALIFICATIONS ..........................................................................................5

    D.      COMPENSATION ...........................................................................................7

    E.      EVIDENCE CONSIDERED .................................................................................7

II.     BACKGROUND ..................................................................................................8

    A.      PARTIES ......................................................................................................8

        1.      Apple ...............................................................................................8

        2.      Samsung ...........................................................................................9

    B.      PATENTS-IN-SUIT .......................................................................................10

        1.      '647  Patent .....................................................................................10

        2.      '959 Patent .....................................................................................11

        3.      '414 Patent .....................................................................................11

        4.      '721 Patent .....................................................................................12

        5.      '172 Patent .....................................................................................12

III.    OVERVIEW OF HAUSER REPORT ................................................................13

    A.      OVERVIEW .................................................................................................13

    B.      METHODOLOGY ..........................................................................................14

    C.      RESULTS ....................................................................................................22

IV.     ANALYSIS OF HAUSER REPORT ..................................................................29

    A.      PROFESSOR HAUSER'S ANALYSIS IS UNRELIABLE FOR PREDICTING MARKETPLACE
        OUTCOMES BECAUSE HIS SURVEYS DID NOT ACCURATELY INFORM RESPONDENTS
        ABOUT THE DIFFERENCE BETWEEN THE PATENTED FEATURES AND SAMSUNG'S NON-
        INFRINGING ALTERNATIVES. ......................................................................29

        1.      Professor Hauser's surveys provided respondents with inaccurate descriptions

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

of the patented features that overstated their advantages relative to the non-infringing alternatives.............................................................................29

2.   The choice tasks shown to respondents taking the surveys incorrectly suggested that products without a patented feature would contain no alternative feature at all. ................................................................56

3.   The characteristics of the patented features compared with Samsung's non-infringing alternatives, as described by Professor Hauser, were widely misunderstood by respondents taking the survey. .........................................64

4.   Widespread inaccuracies, confusion, lack of understanding and presentation bias render Professor Hauser survey responses useless for purposes of making any inferences regarding consumer behavior as it relates to the patented functionalities. ................................................................93

B.   PROFESSOR HAUSER'S ANALYSIS IS ILL-SUITED TO PREDICT THE IMPACT THAT REMOVAL OF THE PATENTED FEATURES WOULD HAVE ON SALES OF THE ACCUSED DEVICES BECAUSE HIS ANALYSIS RELIES ON UNFOUNDED ASSUMPTIONS REGARDING RESPONSES TO HIS SURVEY. .........................................................94

C.   PROFESSOR HAUSER'S CONJOINT ANALYSIS IS UNRELIABLE FOR PREDICTING THE SALES IMPACT OF THE PATENTED FEATURES BECAUSE IT PRESUPPOSES THAT CONSUMERS WOULD HAVE BEEN AWARE OF THE PATENTED FEATURES, THE NON-INFRINGING ALTERNATIVES, AND THE EXTENT TO WHICH PHONES AND TABLETS IN THE MARKETPLACE POSSESSED THESE FEATURES. ...........................................101

1.   Unlike in the real world, Professor Hauser's surveys educated respondents about the patented features and whether smartphones or tablets possessed these features. ................................................................101

2.   Marketplace evidence suggests consumers rarely explore and become aware of feature details at the granular levels that distinguish the patented functionalities from other alternatives......................................................105

3.   Conjoint research has shown that if respondents are unaware of attributes used in the survey, the estimated values associated with those attributes will be inflated. ................................................................111

4.   Unlike Professor Hauser's conjoint study in this case, academic research, including Professor Hauser's own prior studies, focuses on major features that are well known to consumers, not minor features. .....................................113

D.   RESULTS FROM PROFESSOR HAUSER'S CONJOINT STUDY ARE UNRELIABLE BECAUSE THEY FAILED TO ACCOUNT FOR KEY CHARACTERISTICS INHERENT IN THE REAL WORLD PURCHASE ENVIRONMENT. ................................................................117

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

1.        Researchers have consistently noted that conjoint studies should entail realistic purchase decisions that mimic the actual purchase environment. ..117

2.        Professor Hauser's surveys excluded numerous features associated with the accused products......................................................................................119

    a.       Professor Hauser's surveys do not include numerous product features that Samsung heavily promoted to consumers.................................119

    b.       Professor Hauser's surveys excluded numerous other product attributes that Samsung discussed in its marketing and promotional materials. ......................................................................................128

3.        Respondents noted that parts of Professor Hauser's survey were unrealistic and inconsistent with aspects of the real world purchase decision...............130

4.        Professor Hauser's conjoint study failed to account for the real-world process used by consumers to make purchase decisions when faced with incomplete information involving complex products. ...................................................131

5.        Professor Hauser failed to account for the fact that respondents do not make their marketplace choices independently of word-of-mouth and other social effects. ......................................................................................................141

6.        Professor Hauser's failure to account for critical aspects associated with the purchase of complex products renders his analysis unreliable....................143

7.        The reliability of the output generated by Professor Hauser's survey is undermined by risks of survey fatigue and overly taxing choice tasks. .......143

E.    THE RESPONSES GENERATED BY PROFESSOR HAUSER'S SURVEY ARE NOT REFLECTIVE OF THE ACTUAL MARKETPLACE ENVIRONMENT THAT PROFESSOR HAUSER PURPORTS TO ANALYZE ...............................................................................................146

    1.        Professor Hauser's survey generated numerous irrational responses...........146

    2.        Respondents demonstrate substantial insensitivity to price. ........................148

F.    THE DEFECTS IN PROFESSOR HAUSER'S CONJOINT ANALYSIS ARE CONFIRMED BY THE MARKETPLACE PREDICTIONS IT GENERATES. ..........................................................152

    1.        Professor Hauser's survey analysis is implausible with respect to the amount respondents value just the features incorporated in the survey. ...................152

    2.        Professor Hauser's conjoint study performs poorly in predicting respondent's actual choices. .............................................................................................160

    3.        Predictions generated by Professor Hauser's analysis related to the composition of Samsung sales differ substantially from actual marketplace

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

outcomes.................................................................................................163

4.     A simple feature counting model explains respondents' choices at least as
       well as Professor Hauser's model which is based on the unique functionality
       of each patented feature.............................................................................165

**V.     CONCLUSION.................................................................................................173**

v

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

## I.      Introduction

### A.      Assignment

1.      I, David Reibstein, submit this expert report on behalf of Samsung Electronics Company, Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Telecommunications America, LLC ("STA") (collectively, "Samsung") in the above captioned case. I have been retained to provide expert analysis and testimony, if necessary, regarding the Expert Report of John R. Hauser.[1] In particular, I have been asked to evaluate whether the conjoint study conducted by Professor Hauser demonstrates that the features claimed in U.S. Patent Nos. 5,946,647 (the "'647 Patent"), 6,847,959 (the "'959 Patent"), 7,761,414 (the "'414 Patent"), 8,046,721 (the "'721 Patent"), and 8,074,172 (the "'172 Patent") drive consumer demand for Samsung smartphones and tablets.[2]

2.      This report summarizes the opinions that I have formed to date. I may modify my opinions, if necessary, based on further review and analysis of information provided to me subsequent to the filing of this report.

---

[1] Expert Report of John R. Hauser, August 11, 2013 ("Hauser Report").
[2] In addition to the features related to these patents, Professor Hauser also analyzed another feature allegedly made possible by U.S. Patent No. 8,014,760 (the "'760 patent"). Since Professor Hauser submitted his report, Apple has dismissed, without prejudice, its allegations of patent infringement based on all claims of the '760 patent. *See* Stipulation and Order Regarding Dismissal of Claims, at 2. For purposes of assessing the reliability of Professor Hauser's work in this case, I have evaluated Professor Hauser's analysis and conclusions related to all of the tested features, including the feature related to the '760 patent.

1

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**B.      Summary of Conclusions**

3.      My review of the evidence in this case reveals that Professor Hauser's analysis and conclusions are fundamentally flawed and wholly unreliable for purposes of predicting consumer behavior related to the presence of the patented features or any assessment of the marketplace impact of those features. Specific flaws include the following:

- The responses to Professor Hauser's survey appear to be filled with respondent misunderstanding. I directed a series of qualitative interviews in order to assess the degree to which the respondents targeted by Professor Hauser's survey comprehended the smartphone features investigated by Professor Hauser. These interviews revealed a lack of understanding that was widespread among respondents and across the features related to the patents at issue. This lack of understanding reflected confusion caused by 1) Professor Hauser's biased, inaccurate, and incomplete descriptions of the patented features, and 2) very subtle differences that exist between the patented features and the non-infringing alternatives that were available to Samsung. These interviews revealed that the survey responses generated by Professor Hauser cannot be relied upon to make any meaningful inferences regarding the impact the features associated with the patents had on consumer purchase decisions or marketplace outcomes.

- Professor Hauser's survey design cannot be used to determine if sales of the accused products depended on the patented features. Other flaws aside, Professor Hauser purports to predict the would-be impact of having excluded the patented features from the accused devices. But he is unable to make such an assessment for the simple reason that his survey is not constructed in a way that allows him to

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

determine when, if ever, survey responses imply a preference for an actual marketplace alternative other than the accused devices.

- Professor Hauser's analysis presupposes that consumers would have been aware of the patented features and the extent to which phones and tablets in the marketplace possessed these features. In contrast to actual purchase environments, the hypothetical purchase decisions faced by respondents to Professor Hauser's surveys are preceded by detailed written descriptions and video presentations describing what Professor Hauser asserts are the consumer benefits associated with patented functionalities. Marketplace evidence, however, suggests that consumers rarely explore or become aware of the granular feature details that distinguish the patented functionalities from other alternatives.

- Professor Hauser's analysis failed to account for other characteristics of the actual environment faced by people that purchased the accused devices. In particular, Professor Hauser's analysis failed to account for numerous features that Samsung heavily promoted to consumers and discussed in its marketing and promotional materials. Professor Hauser's analysis also failed to account for the real world process used by consumers to make purchase decisions when faced with incomplete information involving complex products, such as the use of heuristics, where consumers omit the consideration of specific product features in the process of purchasing complex products.

4.     The errors in Professor Hauser's analysis are reflected in the responses provided by those that participated in his survey. The responses generated by Professor Hauser's surveys revealed, implausibly, that respondents are widely insensitive to price or preferred a higher price over a lower price, all else equal. Respondents further indicated a preference for phones that

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

were inferior, based on feature availability, to phones that were available on the market at a lower price, and for phones inferior, based on feature availability, to those that they currently owned. Hence, Professor Hauser's results lack face validity. These responses are inconsistent with assumptions underlying Professor Hauser's analysis and suggest that the survey responses are not reflective of the actual marketplace environment that Professor intended to analyze. The reliability of the responses generated by Professor Hauser's survey is further undermined by risks of survey fatigue and overly taxing choice tasks.

5.     The errors in Professor Hauser's analysis are further reflected in the output it generated. Professor Hauser's survey results are implausible with respect to the value respondents place on just the features incorporated in the survey. The sum of the willingness to pay price premiums estimated by Professor Hauser for just the patent-related features on smartphones and tablets is $358 and $246, respectively. The sum of the willingness to pay price premiums estimated by Professor Hauser for just the small portion of smartphone and tablet features included in his study is $1,125 and $1,079, respectively. These amounts, which are seven times greater than the price of the reference phone and three times greater than the price of the reference tablet, are unreasonably, and implausibly high – particularly in light of the fact that they do not include hundreds of other important smartphone and tablet features that are more heavily promoted by Samsung and discussed by third parties, including calling, emailing, texting, and web-browsing (for smartphones), and camera, video capabilities, and camera, processor, memory, battery, and wireless capabilities (for tablets).

4

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

6.      Professor Hauser's conjoint study also performs poorly in predicting respondents' actual choices that are known. This should be a test of the forecasting ability of his model against actual exhibited behavior. Predictions generated by his analysis differ greatly from the actual composition of Samsung's sales of the accused devices. Further, based on Professor Hauser's prediction tool, only rarely are survey respondents predicted to buy the phone they actually own. Finally, based on the measures of fit that Professor Hauser presents in his report, there is no convincing evidence that Professor Hauser's model, which he claims values the difference between the features at issue and the non-infringing alternatives, is more accurate at predicting consumer choice than a model based largely on a simple count of the number of feature icons. This suggests that the predictive ability of Professor Hauser's model is highly suspect and unlikely to yield usable results.

### C.      Qualifications

7.      I am the William Stewart Woodside Professor, and Professor of Marketing at the Wharton School of Business at the University of Pennsylvania. I have been teaching Marketing classes at the graduate level for more than 25 years. Classes that I have taught include Marketing Strategy and Marketing Research in the Wharton MBA Program, as well as Competitive Marketing Strategy, Marketing Metrics, Pricing Strategies, and various other programs for Wharton's Executive Education Program. I am currently teaching the Introductory Marketing classes for first-year MBA students at Wharton and for Wharton's Executive MBA Program. Over the course of my teaching career, I have been honored with more than 30

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

teaching awards. For several years I was the Vice Dean of the Wharton School of Business at the University of Pennsylvania and the Director of the Graduate Division.

8.      My research focuses on competitive marketing strategies, marketing metrics, and product line decisions, among other issues. My research on competitive marketing strategies addresses competitors' reactions to marketing actions, offering companies insight into ways to anticipate these reactions and use them to develop effective strategies. I have authored or co-authored over 40 articles which have been published in top-tier academic journals including *Marketing Science*, *Journal of Marketing Research*, *Journal of Consumer Research, Harvard Business Review, Marketing Letters, Journal of Marketing,* and the *International Journal of Research in Marketing*. I am also the author or co-author of numerous books and chapters in books on subjects including competitive marketing strategy, global branding, and marketing performance measurement, among others. I have published numerous papers on conjoint analysis, including several papers evaluating the validity and reliability of conjoint analysis. I have also applied conjoint analysis in practice through consulting engagements with major corporations.

9.      I have been on the Board of the American Marketing Association for the last several years, most recently the Chairman and I remain on the Executive Committee of the Board. I am a former Executive Director of the Marketing Science Institute, and consult extensively on marketing issues with companies worldwide, including GE, Pfizer, Johnson & Johnson, Google, British Airways, Rohm and Haas, and many others. Topics on which I have

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

been asked to consult in the past include marketing strategy, marketing resource allocation, marketing metrics, sales force planning and incentives, branding, product line extensions, marketing research, and other marketing activities.

10.     I received my Ph.D. from Purdue University and B.S. and B.A. degrees from the University of Kansas. In 2005, I received the John S. Day Distinguished Alumni Academic Service Award from Purdue University's Krannert School of Management, an honor given to a graduate whose service within the academic community reflects the spirit and service of former Krannert Dean John Day. More details on my qualifications can be found in my curriculum vita in Exhibit 1.

### D.     Compensation

11.     I have billed Samsung on a time-and-materials basis for my work. My hourly billing rate is $1,000. My compensation is not contingent on my findings, testimony rendered or on the outcome of this litigation.

### E.     Evidence Considered

12.     In undertaking my analysis, I have considered information from a variety of sources, each of which has been identified in Exhibit 2. These sources include, among other things, Professor Hauser's report, Samsung and Apple marketing materials, various academic articles involving conjoint research, and third party industry analysis relating to smartphones and tablets. I also have relied upon my professional judgment and expertise, gathered from many

7

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

years of marketing and survey analysis in a variety of industries. In addition, some of the analysis that supports the opinions expressed in this report was performed by staff members at Analysis Group working under my direction and supervision.

## II.    Background

### A.    Parties

#### 1.    Apple

13.    Apple Inc. ("Apple") designs, manufactures, and markets mobile communication devices, personal computers, and portable music players, and sells a variety of related content, software, and applications.[3] Apple's products include, among others, the iPhone, iPad, iPod, and Mac.[4] Apple also sells digital content and applications through the iTunes Store, App Store, iBookstore, and Mac App Store.[5]

14.    Headquartered in Cupertino, California, and incorporated in the state of California in 1977, Apple sells its products worldwide.[6] As of September 29, 2012, Apple had approximately 72,800 full-time equivalent employees, and an additional 3,300 full-time equivalent temporary employees and contractors.[7] For the fiscal year ended September 29, 2012,

---

[3] Apple Inc. 2012 Form 10-K, at 1.
[4] Apple Inc. 2012 Form 10-K, at 1.
[5] Apple Inc. 2012 Form 10-K, at 1.
[6] Apple Inc. 2012 Form 10-K, at 1, 20; http://investor.apple.com/faq.cfm?FaqSetID=6 (viewed August 29, 2013).
[7] Apple Inc. 2012 Form 10-K, at 9.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Apple generated worldwide net sales of $156.5 billion and reported net income of $41.7 billion,[8] while U.S. net sales reached $60.9 billion.[9]

### 2.    Samsung

15.    Samsung Electronics Co., Ltd. ("SEC"), headquartered in Suwon, South Korea, is South Korea's largest company.[10] SEC manufactures, distributes, and sells finished electronic products and device solutions worldwide.[11] SEC's products include, among others, mobile phones, tablets, televisions, digital cameras, home appliances, and personal computers.[12] As of the end of 2011, SEC employed 221,726 people.[13] For the year ended December 31, 2012, SEC generated worldwide net sales of ████████████████████████████████████[14]

16.    SEC is the parent company of Samsung Electronics America, Inc. ("SEA"), a New York corporation formed in 1978, and Samsung Telecommunications America, LLC ("STA"), a Delaware limited liability company formed in 1996. SEA offers and markets a full range of consumer electronics and IT products, and focuses on expanding Samsung's position in

---

[8] Apple Inc. 2012 Form 10-K, at 43.
[9] Apple Inc. 2012 Form 10-K, at 73.
[10] http://www.samsung.com/us/aboutsamsung/ir/corporategovernance/articlesofincorporation/IR_ArticlesChapter1.html (viewed September 10, 2013); Samsung Defendants' Answer, Affirmative Defenses, and Counterclaims to Apple Inc.'s Complaint, April 18, 2012, ("Counterclaim") at ¶6.
[11] http://investing.businessweek.com/research/stocks/snapshot/snapshot.asp?ticker=005930:KS (viewed August 29, 2013).
[12] http://investing.businessweek.com/research/stocks/snapshot/snapshot.asp?ticker=005930:KS (viewed August 29, 2013).
[13] http://www.samsung.com/us/aboutsamsung/sustainability/sustainabilityreports/download/2012/2012_Facts_ and_ Figures_FINAL.pdf, at 53 (viewed September 10, 2013).
[14] Capital IQ, Income Statement of Samsung Electronics Co. Ltd. (2008-2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

the U.S. market.[15] STA researches, develops, and markets a variety of personal and business communications products throughout North America.[16] SEC, SEA, and STA are part of Samsung Group, a conglomerate with companies in electronics, machinery & heavy industries, chemical industries, financial services, among others.[17] Samsung Group accounts for 17 percent of South Korea's gross domestic product ("GDP") and employs 370,000 people in more than 80 countries.[18]

### B.    Patents-in-Suit

#### 1.    '647 Patent

17.    Issued on August 31, 1999, the '647 patent is entitled "System and Method for Performing an Action on a Structure in Computer-Generated Data."[19] I understand that Apple has asserted that the '647 patent enables a feature in certain Samsung products that allows a user to select specific information in the text (e.g., a written phone number) and perform multiple actions related to the information (e.g., dial the phone number or send a text message).[20] Apple has accused 16 Samsung smartphones and two Samsung tablets of infringing the '647 patent.[21]

---

[15] Counterclaim, at ¶ 8; http://www.samsung.com/us/aboutsamsung/samsung_electronics/us_divisions/ (viewed September 10, 2013).
[16] Counterclaim, at ¶ 8; http://www.samsung.com/us/aboutsamsung/samsung_electronics/us_divisions/ (viewed September 10, 2013).
[17] http://www.samsung.com/us/aboutsamsung/samsung_electronics/us_divisions/ (viewed September 10, 2013).
[18] http://www.businessweek.com/articles/2013-03-28/how-samsung-became-the-worlds-no-dot-1-smartphone-maker#p2 (viewed September 10, 2013).
[19] U.S. Patent No. 5,946,647.
[20] Initial Expert Report of Dr. Todd C. Mowry Regarding Infringement of U.S. Patent No. 5,946,647, August 12,

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

### 2.    '959 Patent

18.    Issued on January 25, 2005, the '959 patent is entitled, "Universal Interface for Retrieval of Information in a Computer System."[22] I understand that Apple has asserted that the '959 patent allows users to search multiple locations at once (e.g., the Internet and local storage) by using a plurality of "heuristics" to search those locations.[23] I understand that the feature in Samsung's phones that is accused is the Google Search Application (also known as the "Quick Search Box" or "Google Now") when it is programmed to perform both local and Internet searches in response to a single query by the user. Apple has accused 16 Samsung smartphones and two Samsung tablets of infringing the '959 patent.[24]

### 3.    '414 Patent

19.    Issued on July 20, 2010, the '414 patent is entitled "Asynchronous Data Synchronization Amongst Devices."[25] I understand that Apple has asserted that the '414 patent allows for synchronization among devices, where the synchronization allows the user to continue

---

2013 ("Mowry Report"), at ¶¶ 2, 60-61.  Professor Hauser referred to this feature as the "Quick Links" feature. *See* Hauser Report, at ¶42. For ease of discussion, I will follow this convention in this report.

[21] Exhibit 3.

[22] U.S. Patent No. 6,847,959.

[23] Expert Report of Dr. Alex C. Snoeren Concerning U.S. Patent Nos. 6,847,959 and 7,761,414, August 12, 2013 ("Snoeren Report"), at ¶8. Professor Hauser referred to this feature as the "Universal Search" feature. *See* Hauser Report, at ¶42. For ease of discussion, I will follow this convention in this report.

[24] Exhibit 3.

[25] U.S. Patent No. 7,761,414.

11

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

using the application being synched.[26] Apple has accused 16 Samsung smartphones and two

Samsung tablets of infringing the '414 patent.[27]

### 4.      '721 Patent

20.      Issued on October 25, 2011, the '721 patent is entitled, "Unlocking a Device by

Performing Gestures on an Unlock Image."[28] I understand that Apple has asserted that the '721

patent allows users to unlock a device by moving an image on a screen from one predefined

location to another predefined location.[29] Apple has accused 12 smartphone products of

infringing the '721 patent.[30] Apple has not accused Samsung's Galaxy Note, Galaxy Note II,

Galaxy Rugby Pro, and Galaxy S III smartphones or any of Samsung's tablets of infringing the

'721 patent.[31]

### 5.      '172 Patent

21.      Issued on December 6, 2011, the '172 patent is entitled, "Method, System, and

Graphical User Interface for Providing Word Recommendations."[32] I understand that Apple has

---

[26] Snoeren Report, at ¶¶27-28. Professor Hauser referred to this feature as the "Background Syncing" feature. *See* Hauser Report, at ¶42. For ease of discussion, I will follow this convention in this report.
[27] Exhibit 3.
[28] U.S. Patent No. 8,046,721.
[29] Expert Report of Professor Andrew Cockburn, August 12, 2013 ("Cockburn Report"), at ¶5. Professor Hauser referred to this feature as the "Slide to Unlock" feature. *See* Hauser Report, at ¶43. For ease of discussion, I will follow this convention in this report.
[30] Exhibit 3.
[31] Exhibit 3.
[32] U.S. Patent No. 8,074,172.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

asserted that the '172 patent allows for a particular combination of features in a device's keyboard and messaging interface that allows users to select word recommendations to replace typed text.[33] Apple has accused 11 Samsung smartphone products of infringing the '172 patent.[34] Apple has not accused Samsung's Dart, Galaxy Note II, Galaxy Rugby Pro, and Galaxy S III smartphones or any of Samsung's tablets of infringing the '721 patent.[35]

## III.    Overview of Hauser Report

### A.    Overview

22.    Professor Hauser designed and conducted two surveys – one for smartphones and one for tablets. Professor Hauser purports to use the surveys to a) determine what effect the features associated with the patents at issue have on Samsung consumers' willingness to buy Samsung smartphones and tablets and b) to determine the price premium that Samsung consumers are willing to pay for the features associated with the patents at issue.[36] Below, I have identified the specific features that are alleged to have been made possible by certain Apple patents that were examined by Professor Hauser in each of his two surveys.[37] I understand that the features allegedly covered by the patents-in-suit is under dispute by the parties. By

---

[33] Cockburn Report, at ¶16. Professor Hauser referred to this feature as the "Automatic Word Correction" feature. *See* Hauser Report, at ¶42. For ease of discussion, I will follow this convention in this report.
[34] Exhibit 3.
[35] Exhibit 3.
[36] Hauser Report, at ¶7.
[37] Hauser Report, at ¶¶12, 42-43.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

identifying these features and using Professor Hauser's proffered names for these features, I am not offering any opinions on the technology or the scope of the patents.

### Patented Features Examined in Hauser Conjoint Analysis[38]

| Patent | Feature | Smartphone Survey | Tablet Survey |
|---|---|---|---|
| '647 Patent | "Quick Links" | X | X |
| '959 Patent | "Universal Search" | X | X |
| '172 Patent | "Automatic Word Correction" | X | X |
| '721 Patent | "Slide to Unlock" | | X |
| '414 Patent | "Background Syncing" | X | X |
| '760 Patent | "Missed Call Screen Management" | X | |

## B.   Methodology

23.   Professor Hauser utilized a Choice-Based Conjoint ("CBC") analysis to conduct his two surveys.[39] There were two parts to Professor Hauser's survey exercise. First, survey respondents were presented with a series of four hypothetical products as choice options, which were constructed based on certain feature categories.[40] The respondents were asked to choose the

---

[38] The patents-in-suit include the '647 patent, the '959 patent, the '172 patent, the '721 patent, and the '414 patent. As noted above, in addition to the features related to these patents, Professor Hauser also analyzed another feature allegedly made possible by '760 patent. Since Professor Hauser submitted his report, Apple has dismissed, without prejudice, its allegations of patent infringement based on all claims of the '760 patent. *See* Stipulation and Order Regarding Dismissal of Claims, at 2, September 9, 2013. For purposes of assessing the reliability of Professor Hauser's work in this case, I have evaluated Professor Hauser's analysis and conclusions related to all of the tested features, including the feature related to the '760 patent.

[39] Hauser Report, at ¶20.

[40] Professor Hauser gave each respondent sixteen choice tasks where in each choice task the respondent was asked to choose among four different hypothetical products. *See* Hauser Report, at ¶28.

14

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

product that they most preferred among the hypothetical alternatives presented (i.e., their "inside option").[41] Second, survey respondents were asked whether they would buy the hypothetical alternative selected in the first stage at the indicated price[42] In this part of the survey, respondents were asked to take into account other alternatives in the market that might influence their decision, meaning that they were implicitly asked whether they would buy the alternative selected in the first stage as opposed to purchasing some other product available on the market, or no phone at all (i.e., their "outside option" or "buy or not" choice).[43]

24.     The feature categories used in the *smartphone* survey were: a) Data Accessibility, b) Call Initiation and Screening, c) Input Assistance, d) Screen Size, e) Camera, and f) Price.[44] The Data Accessibility, Call Initiation and Screening, and Input Assistance categories were designed to incorporate both the patent-related features and distraction features so as to disguise the purpose of the survey.[45] The Screen Size and Camera categories were included for distraction purposes.[46]

---

[41] Hauser Report, at ¶20.
[42] Hauser Report, at ¶21.
[43] Hauser Report, at ¶21.
[44] Hauser Report, at ¶19.
[45] Hauser Report, at ¶45.
[46] Hauser Report, at ¶45.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

25.     Each of these feature categories included four different levels of these features.

The levels associated with the distinct feature categories are identified below.[47]

Data Accessibility

1)  Notification Bar
2)  Notification Bar and Background Syncing
3)  Notification Bar, Background Syncing, and Quick Links
4)  Notification Bar, Background Syncing, Quick Links, and Universal Search

Call Initiation and Screening

1)  Three-Way Calling
2)  Three-Way Calling and Reject Call with Message
3)  Three-Way Calling, Reject Call with Message, and Missed Call Screen Management
4)  Three-Way Calling, Reject Call with Message, Missed Call Screen Management, and WiFi Calling

Input Assistance

1)  Copy-Paste
2)  Copy-Paste and Voice to Text
3)  Copy-Paste, Voice to Text, and Automatic Word Correction
4)  Copy-Paste, Voice to Text, Automatic Word Correction, and S Pen

Screen Size

1)  4.0"
2)  4.8"
3)  5.0"
4)  5.5"

---

[47] Hauser Report, at Exhibit G.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Camera

1) Panorama
2) Panorama and Best Photo
3) Panorama, Best Photo, and Smile Shot
4) Panorama, Best Photo, Smile Shot, and Buddy Photo Share

Price

1) $49
2) $99
3) $149
4) $299

26.     The feature categories used in the *tablet* survey were a) Data Accessibility, b) Lock Screen Interface, c) Input Assistance, d) Screen Size, e) Connectivity, and f) Price.[48] The Data Accessibility, Lock Screen Interface, and Input Assistance categories were designed to incorporate both the patent-related features and distraction features so as to disguise the purpose of the survey.[49] The Screen Size and Connectivity categories were included for distraction purposes.[50]

27.     Each of these feature categories included four different levels of these features. The levels associated with the other feature categories used in the tablet survey are identified below.[51]

---

[48] Hauser Report, at ¶19.
[49] Hauser Report, at ¶45.
[50] Hauser Report, at ¶45.
[51] Hauser Report, at Exhibit H.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Data Accessibility

1)  Status Bar
2)  Status Bar and Background Syncing
3)  Status Bar, Background Syncing, and Quick Links
4)  Status Bar, Background Syncing, Quick Links, and Universal Search

Lock Screen Interface

1)  Lock Screen Display Customization
2)  Lock Screen Display Customization and Lock Screen Shortcuts
3)  Lock Screen Display Customization, Lock Screen Shortcuts, and Multiple Lock
    Screen Widgets
4)  Lock Screen Display Customization, Lock Screen Shortcuts, Multiple Lock Screen
    Widgets, and Slide to Unlock

Input Assistance

1)  Copy-Paste
2)  Copy-Paste and Voice to Text
3)  Copy-Paste, Voice to Text, and Automatic Word Correction
4)  Copy-Paste, Voice to Text, Automatic Word Correction, and S Pen

Connectivity

1)  WiFi
2)  WiFi and GPS
3)  WiFi, GPS, and AllShare Play
4)  WiFi, GPS, AllShare Play, and IR Blaster

Screen Size

1)  7.0"
2)  7.7"
3)  8.9"
4)  10.1"

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Price

1) $199
2) $299
3) $449
4) $599

28.     The products presented to the respondents as part of the first stage of the surveys were intended to represent hypothetical Samsung smartphones or tablets.[52] Respondents were asked to assume that in addition to the various features and levels shown in each choice task, each of the four hypothetical smartphones or tablets had all other features and levels that were on their most recent Samsung smartphone or tablet.[53] Respondents were informed that one in twenty respondents would be selected at random to win the option of receiving a smartphone or tablet and that the smartphone or tablet offered to the winning respondent would be based on the choices each winning respondent made in the surveys with regard to the feature categories in the surveys.[54]

29.     Using each of the respondent's choices in the first part of his conjoint study (where respondents are asked to choose among four hypothetical products), Professor Hauser estimated the contribution of each level within a feature category relative to the other levels of

---

[52] Hauser Report, at ¶46.
[53] Hauser Report, at ¶46.
[54] Hauser Report, at ¶70. Respondents were also told that the features with regard to other features not in the survey would be as close as possible to those of the smartphone or tablet they otherwise would have chosen in the marketplace. Respondents were informed that if the smartphone or tablet offered to a winning respondent was priced below $300 and $600 respectively, and if the respondent chose the offered smartphone or tablet, the respondent would also get the difference in cash.

19

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

the feature category.[55] These partial contributions are called partworths. Using each of the respondent's choices in the second part of the surveys (where respondents are asked whether they would buy the product that they selected for the internal choice), Professor Hauser estimated the partworth of the outside option.[56] This was done in order to determine the minimum level of attractiveness for a respondent to purchase a product, at a given price.[57]

30.     Professor Hauser uses Hierarchical Bayes for Choice-Based Conjoint ("HB CBC") to estimate the market-level distribution of partworths across individual consumers that best describe the first and second stage choices that he observes among the respondents in each survey.[58] With HB CBC, the distribution of partworths for a subset of respondents is informed by the data of choices by all respondents whose choices are used in the estimation.[59] Using the HB CBC partworth estimates, Professor Hauser performs a series of choice simulations, called Randomized First Choice ("RFC") Simulations, to estimate how consumers' willingness to buy a smartphone or tablet is affected by removing one or more of the patent-related features that he

---

[55] Hauser Report, at ¶¶24-26.
[56] Hauser Report, at ¶36. Using the HB techniques Professor Hauser applied, partworths for both the features and outside option are estimated simultaneously.
[57] Hauser Report, at ¶36.
[58] Hauser Report, at ¶37.
[59] Hauser Report, at ¶38.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

tested.[60] This is done by using the predicted choice of all survey respondents between buying and not buying the product.[61]

31.     To calculate the effect of removing a particular feature on consumers' willingness to buy a product, Professor Hauser first performs a choice simulation using a baseline product that includes the full set of features included in the survey.[62] Using the partworths that he previously estimated, he predicts the "baseline" share of consumers that would buy the smartphone or tablet with these features over the outside option.[63] Professor Hauser then performs the same exercise for a product that includes all of the same features as in the baseline product except the patent-related features being tested.[64] From this, he simulates the "but-for share" of consumers that would buy the smartphone or tablet without these features.[65] According to Professor Hauser, the difference in percentage between the baseline share and but-for share provides an estimate of the percentage of Samsung consumers who would buy a smartphone or tablet with the tested features but not without it.[66]

---

[60] Hauser Report, at ¶¶112-113. Under RFC Simulation, a consumer chooses the product that gives him or her the highest utility among the alternative choices. The consumer will choose this product if the utility he or she gets from choosing the product is larger than the utility of choosing the outside option.
[61] Hauser Report, at ¶112.
[62] Hauser Report, at ¶114.
[63] Hauser Report, at ¶114.
[64] Hauser Report, at ¶115.
[65] Hauser Report, at ¶115.
[66] Hauser Report, at ¶116.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

32.     Professor Hauser also calculates what he refers to as a price premium that individuals are willing to pay for the patent-related features included in the two surveys. He did this by performing a "market" simulation using the HB CBC partworth estimates to determine how Samsung consumers trade off price and these features.[67] Specifically, he tests how respondents choose between Samsung products with the patent-related features and Samsung products without these features, at varying prices.[68] In performing these simulations, Professor Hauser holds all other feature categories, except price, at the same level in the two products.[69] His simulations increase the price of the product with the patent-related features until the price reaches a level at which the model predicts that the respondents are indifferent between the two products.[70] According to Professor Hauser, the difference between the two prices that results in equal market shares is the price premium for the allegedly infringing feature in question.[71]

## C.     Results

33.     Professor Hauser concluded that, on average, respondents in the smartphone and tablet surveys place positive value on the patent-related features that were tested.[72] As evidence of this value, Professor Hauser pointed to the differences between partworths of different levels

---

[67] Hauser Report, at ¶125.
[68] Hauser Report, at ¶125.
[69] Hauser Report, at ¶126.
[70] Hauser Report, at ¶126.
[71] Hauser Report, at ¶126.
[72] Hauser Report, at ¶¶107,110-111.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

of a feature category (i.e., the relative partworths).[73] I have identified, below, the utility implied by the differences in the average market level means of the relative partworths of the different levels of each feature category in the smartphone survey calculated by Professor Hauser.[74]

---

[73] Hauser Report, at ¶106.
[74] Calculated using partworth distribution from Hauser Report, at Exhibit M1. *See also*, Exhibits 4 and 5.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## Partworth Summary – Smartphone Survey

| Patent-Related Features | Utility | Other Features | Utility |
|---|---|---|---|
| Data Accessibility | | Price | |
| Background Syncing | 22.6 | $99 vs. $49 | -5.4 |
| Quick Links | 20.3 | $149 vs. $99 | -20.3 |
| Universal Search | 16.2 | $299 vs. $149 | -50.1 |
| Call Initiation and Screening | | Call Initiation and Screening | |
| Missed Call Screen Management | 30.3 | Reject Call with Message | 43.5 |
| | | WiFi Calling | 22.6 |
| Input Assistance | | Input Assistance | |
| Automatic Word Correction | 34.4 | Voice to Text | 45.9 |
| | | S Pen | 14.5 |
| | | Screen Size | |
| | | 4.8" vs. 4.0" | 39.0 |
| | | 5.0" vs. 4.8" | 20.5 |
| | | 5.5" vs. 5.0" | -5.1 |
| | | Camera | |
| | | Best Photo | 38.5 |
| | | Smile Shot | 26.8 |
| | | Buddy Photo Share | 16.7 |

Minimum Level of Attractiveness   71.58

Note: Amounts measured in units of utility, or "utils."

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

34.     I have calculated, below, the utility implied by the differences in the average market level means of the relative partworths of the different levels of each feature category in the tablet survey.[75]

_____

[75] Calculated using partworth distribution from Hauser Report, at Exhibit M2. *See also*, Exhibits 6 and 7.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Partworth Summary – Tablet Survey**

| Patent-Related Features | Utility | Other Features | Utility |
|---|---|---|---|
| Data Accessibility | | Price | |
| Background Syncing | 23.8 | $299 vs. $199 | -11.8 |
| Quick Links | 20.5 | $449 vs. $299 | -52.2 |
| Universal Search | 13.5 | $599 vs. $449 | -26.8 |
| Lock Screen Interface | | Lock Screen Interface | |
| Slide to Unlock | 12.4 | Lock Screen Shortcuts | 10.8 |
| | | Multiple Lock Screen Widgets | 12.4 |
| Input Assistance | | Input Assistance | |
| Automatic Word Correction | 24.5 | Voice to Text | 38.8 |
| | | S Pen | 29.5 |
| | | Screen Size | |
| | | 7.7" vs. 7.0" | 17.1 |
| | | 8.9" vs. 7.7" | 46.6 |
| | | 10.1" vs. 8.9" | 38.4 |
| | | Connectivity | |
| | | GPS | 61.0 |
| | | AllShare Play | 26.2 |
| | | IR Blaster | 22.6 |

Minimum Level of Attractiveness    103.87

Note: Amounts measured in units of utility, or "utils."

35.    Based upon the relative partworths that he estimated, Professor Hauser concluded that, for both smartphones and tablets, the patent-related features at issue, individually and

26

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

collectively, have substantial effects on Samsung consumers' willingness to buy the accused Samsung products.[76] Professor Hauser presents a range of predictions for the decline in consumers' willingness to buy the accused smartphones due to the removal of the patent-related features. This range is based upon different screen sizes and prices.[77] I have summarized the range of these predictions below.

**Willingness to Buy Accused Samsung Smartphones**

|  | Percentage Decline | |
| --- | --- | --- |
|  | Low | High |
| Background Syncing | 4% | 17% |
| Quick Links | 5% | 16% |
| Universal Search | 3% | 12% |
| Missed Call Screen Management | 7% | 24% |
| Automatic Word Correction | 10% | 26% |
| All Features | 43% | 74% |

36.    Professor Hauser also presents a range of predictions for the decline in consumers' willingness to buy the accused tablets due to the removal of the patent-related features. This range is based upon different screen sizes and prices.[78] I have summarized the range of these predictions below.

---

[76] Hauser Report, at ¶14.
[77] Hauser Report, at Exhibits N1 and O1.
[78] Hauser Report, at Exhibits N2 and O2.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

**Willingness to Buy Accused Samsung Tablets**

|  | Percentage Decline | |
|---|---|---|
|  | Low | High |
| Background Syncing | 5% | 23% |
| Quick Links | 4% | 23% |
| Universal Search | 2% | 16% |
| Slide to Unlock | 1% | 14% |
| Automatic Word Correction | 6% | 24% |
| All Features | 28% | 76% |

37.     Professor Hauser also concluded that Samsung consumers would be willing to pay a substantial price premium in order to obtain the patent-related features.[79] Below, I have shown these price premiums at prices that are closest to the actual average prices that respondents in the surveys reported that they paid for their Samsung smartphones and tablets.[80]

---

[79] Hauser Report, at ¶129.
[80] Hauser Report, at ¶128. The actual average prices that respondents in the surveys reported that they paid for their Samsung smartphones and tablets were $175 and $350, respectively.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

### WTP Price Premiums Associated with Tested Features

|  | Base Price (Without Patent-Related Features) | |
|---|---|---|
|  | Smartphone $149 | Tablet $299 |
| Background Syncing | $69 | $62 |
| Quick Links | $56 | $56 |
| Universal Search | $44 | $33 |
| Automatic Word Correction | $102 | $63 |
| Missed Call Screen Management | $87 | N/A |
| Slide to Unlock | N/A | $32 |
| Total | $358 | $246 |

## IV.  Analysis of Hauser Report

### A.  Professor Hauser's Analysis is Unreliable for Predicting Marketplace Outcomes Because His Surveys Did Not Accurately Inform Respondents About the Difference Between the Patented Features and Samsung's Non-infringing Alternatives.

#### 1.  *Professor Hauser's surveys provided respondents with inaccurate descriptions of the patented features that overstated their advantages relative to the non-infringing alternatives.*

38.    As part of his survey, Professor Hauser provided definitions of each of the tested

features. These definitions were disclosed to respondents in the surveys in separate videos for

each feature.[81] These descriptions overstate the benefits of the patented features relative to

alternatives that were available to Samsung. The descriptions lead the respondent to believe that

---

[81] Hauser Report, at Exhibits G and H.

29

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

having the patented functionalities is necessarily preferred to not having them (i.e., that the absence of the patented features necessarily involves some kind of sacrifice). In addition, these descriptions do not provide the respondent with all, or even the best alternative, non-infringing functionalities that were available to Samsung.

39.     For example, Professor Hauser provided the following description of the Automatic Word Correction feature in his smartphone and tablet survey:

> **Automatic Word Correction.** As you type, your smartphone [tablet] displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. The Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday." Without this feature, pressing space or period would retain your original text, "birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself.[82]

40.     Professor Hauser's text description and video demonstration related to this feature are flawed in several respects. First, they use leading and biasing language to suggest to the respondent that the alternative functionality is clearly inferior to the patented functionality. For example, the use of the clause "you would need to" rather than the more neutral "you would"

---

[82] Hauser Report, at ¶74.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

suggests to the respondent that the alternative requires additional effort or burden. It is my experience that such leading and biasing language tends to inflate the value of the difference between two tested levels by suggesting to the respondent that one is clearly inferior.

41.     Another problem with Professor Hauser's description is that it leads the respondent to believe that without the patented functionality, there is no way to have any Automatic Word Correction feature on your device. The description suggests that any change of the original text to the suggested text would have to be done manually rather than automatically (i.e., by selecting the suggested text yourself). ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████

42.     This alternative, ██████████████████████████████ is similar to the Auto Correct feature in Microsoft Word. Microsoft describes its Auto Correct feature as follows:

> You can use the AutoCorrect feature to do the following:
>
> **Automatically detect and correct typos and misspelled words**

---

[83] Expert Report of Dr. Daniel Wigdor Concerning Non-Infringement of U.S. Patent No. 8,074,172, September 13, 2013 ("Wigdor Report"), at ¶42.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> For example, if you type teh plus a space, AutoCorrect replaces what you typed with the. Or if you type This is theh ouse plus a space, AutoCorrect replaces what you typed with This is the house. typed with the. Or if you type This is theh ouse plus a space, AutoCorrect replaces what you typed with This is the house.[84]

43.   I understand that another alternative that Samsung could have used is the implementation that is used in its Dart and Galaxy S III smartphones. With this alternative, the suggested text is displayed in the first area when you are typing your message.[85] The suggested text and original text are both displayed in a second box alongside the text box that, in this alternative, displays the suggested text.[86] The original text in the second box can be selected to replace the suggested text in the text area.[87]

44.   Another alternative available to Samsung is the version of Automatic Word Correction used in both Swype and the Samsung keyboards used in later versions of the Galaxy S III.[88] With this alternative, the original text is displayed in the first area where you are typing your message and both the suggested text and a copy of the original text are displayed in the

---

[84] http://office.microsoft.com/en-us/word-help/autocorrect-spelling-and-insert-text-and-symbols-HA010354277.aspx (viewed September 13, 2013).
[85] Wigdor Report, at ¶¶156-157.
[86] Wigdor Report, at ¶¶156-157.
[87] Wigdor Report, at ¶¶156-157.
[88] Wigdor Report, at ¶117.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

second box alongside the text box.[89] With this alternative, the original text is not replaced by the suggested text when a space or punctuation is pressed.[90]

45.     Another flaw in Professor Hauser's description of the Automatic Word Correction feature is that he failed to note that, on occasion, the feature might replace the intended word with an unintended alternative, without the user noticing. If the user types on the keyboard without looking at the suggested text that is replacing the original text, an email or text message may be inadvertently sent with words that are different than the ones intended by the user. This is a very common and well known problem with this feature. For example, one author wrote:

> The feature is meant to make typing easier, but often has annoying consequences. A popular web site, DamnYouAutoCorrect.com, exists solely to document the victims: "Don't worry," a woman tells a friend in one text, "He's crazy about you … you're the first girl he ever thought about the führer with." (She meant "future.")[91]

46.     Another author similarly noted:

> Ever since the iPhone launched almost five years ago, we've been struggling with its auto correct feature. Sometimes, it works great, figuring out what we mean as if by magic. Other times it frustratingly won't let us type what we want, no matter how many times we try. It stinks. And we're not alone. You've probably seen

---

[89] Wigdor Report, at ¶117.
[90] Wigdor Report, at ¶117.
[91] http://tech.fortune.cnn.com/2012/01/13/autocorrect-iphone-problems/ (viewed September 13, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> Damn You Auto Correct, an entire site dedicated to the auto correct's failures.[92]

47.     Clearly, there are multiple outcomes that are possible with this feature – mostly positive, but some negative. To more accurately describe this feature, Professor Hauser could have used a description that did not lead the respondent to believe that it always resulted in replacement of text that was meant to be replaced.[93] Unlike the description used in Professor Hauser's survey, a more balanced description would not have suggested that the feature's impact on the user was always necessarily positive, but rather that a positive outcome was one possibility.

48.     As an example, I have provided alternative descriptions of the Automatic Word Correction feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above.[94] In these descriptions, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if he or she was unable to have the patented feature, as is suggested by Professor Hauser's description. My description seeks to avoid leading the respondent to think that the

---

[92] http://www.businessinsider.com/how-to-fix-iphone-auto-correct-2012-2?op=1 (viewed September 13, 2013).
[93] In fact, I myself have experienced the negative side of this feature on many occasions by sending messages with words that I had never meant to type. In these situations, the Automatic Word Correction feature automatically inserted the wrong text, without me noticing.
[94] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

patented feature is necessarily preferred over the alternative – which is something Professor Hauser did not do in his description.

49.     Presenting the non-infringing alternative as a separate feature with its own advantages, albeit different, than the advantages associated with the patented feature, is important because this most closely mirrors the real world purchase environment that would have existed if Samsung could not use the patented feature. That is, if Samsung could not offer the patented feature, it would market the alternative feature in a positive light, similar to how it would market the patented feature. Samsung would never describe the alternative feature in terms of what it could not do relative to other features that Samsung could not offer.

50.     In my alternative descriptions, below, I have identified how they differ from Professor Hauser's descriptions. Version 1 is a description of the patented feature. Version 2 is a description of one of Samsung's non-infringing alternatives.

> **Automatic Word Correction (Version 1).** As you type, your smartphone [tablet] displays text you typed in a text box, and at the same time provides suggested replacement text in a separate box alongside the text box that displays what you actually typed. ~~The~~ This version of the Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday."

> **Automatic Word Correction (Version 2).** ~~Without this feature, pressing space or period would retain your original text, "birfday"; if you want to replace your original text, you would need to select the suggested "birthday" yourself.~~ As you type, your smartphone

35

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> [tablet] displays text you typed in a text box. This version of the Automatic Word Correction feature allows you to automatically replace your original text with suggested text when, for example, you press space to move on to the next word you want to type, or you press period to end the sentence. For example, if you type "birfday" and then press space or period, you will automatically replace it with "birthday." In this version of Automatic Word Correction, the suggested text does not appear in a separate box but rather appears when it replaces the original text.

51.     This is a very different presentation of a non-infringing alternative version of the Automatic Word Correction feature than the one used by Professor Hauser in his surveys. It presents the alternative in a positive light, as something that the user gets, rather than has to settle for if he or she was unable to obtain the patented feature. It also makes clear that the alternative allows for automatic, rather than just manual word correction when using the devices.

52.     I understand that the description used by Professor Hauser related to the Background Syncing feature also does not accurately describe the feature allegedly made possible by the '414 patent. Professor Hauser provided the following description of this feature in his smartphone and tablet survey:

> **Background Syncing.** The Background Syncing feature allows you to continue to use an app while data related to that app that is stored on your smartphone [tablet] synchronizes with data stored elsewhere, such as on a remote computer. For example, you can access and edit data, such as the list of contacts on your smartphone [tablet], even as your phone [tablet] is sending data for those contacts to your work computer. Without this feature, you

36

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

would have to wait to use an app, for example the contacts app, while the app is synchronizing with a remote computer, and that wait may be long or short.[95]

53.     There are several problems with this description and the corresponding video. First, the use of the term "Background Syncing" itself is misleading, because the term "Background Data" often is used in Android to refer to ███████████████████████ ██████████████████████████████████████████████[96] The user manuals for the accused Samsung devices specify that when "Background Data" is enabled under "General Sync Settings," "all accounts can sync, send and receive data *at any time*, in the background."[97] Therefore, the use of the term "Background Syncing" to refer to the feature allegedly made possible by the '414 patent overstates the scope of the feature by implying that it includes the ability of the phone or tablet to synchronize data for an application even when that application is not running. As discussed below in this Report, my parallel pretest of Professor Hauser's survey confirms that users did in fact misinterpret the scope of "Background Syncing" in this manner.

54.     Second, by telling respondents that, without this feature, they "would have to wait to use an app," Professor Hauser is incorrectly leading respondents to believe that they would

---

[95] Hauser Report, at ¶74.
[96] Expert Report of Jeffrey Chase, Ph.D. Regarding Noninfringement of the Asserted Claims of U.S. Patent No. 7,761,414 ("Chase Report"), at ¶52.
[97] *See, e.g.*, SAMNDCA630-00920057.

37

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

necessarily be deprived of using an application when they otherwise wanted to use it. In fact, I understand that one non-infringing alternative that Samsung could have implemented would have involved automatically syncing the device at an opportune time, such as upon the user exiting the application or switching to another application.[98] In this case, the user's ability to use an application would not be affected at all (i.e., the user would not have to "wait to use an app," as stated in the Hauser description).[99]

55.     I understand that another non-infringing alternative available to Samsung would have been completely "under the hood" and, therefore, would not have involved any visible change in functionality to the user.[100] This alternative would allow users to make changes to an application, but rather than immediately saving these changes on the local database, they would save them to a transaction log, which would synchronize them with a remote database.[101] Once the remote database is synchronized, then the local database would be updated or synchronized from the remote database rather than directly from the user's inputs into the application.[102]

56.     Another problem with Professor Hauser's description is that it suggests that the wait while syncing "may be long or short" but does not define what a long or short wait is in terms of actual elapsed time, or how frequently the wait would be long versus short. This

---

[98] Chase Report, at ¶187.
[99] Chase Report, at ¶¶190-191.
[100] Chase Report, at ¶¶192-196.
[101] Chase Report, at ¶¶192-196.
[102] Chase Report, at ¶¶192-196.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

information is critical in order for a respondent to be able to accurately determine the value of the patented feature versus the non-infringing alternative. The alternative functionality shown in Professor Hauser's video involves the task of updating a contact's name and then having that change synchronize with a remote source. The elapsed time in the video from when the change is saved until when the device finally responds to input is over four seconds.[103] Without more information, respondents are left to believe that this kind of a wait is typical without the Background Syncing feature.

57.     A further problem with Professor Hauser's video demonstrating the "Background Syncing" is that it depicts a local edit to a contact being synchronized with a remote device immediately after the edit is saved. I understand that in actuality, the Samsung products accused in this investigation would not schedule synchronization to take place until at least 30 seconds after the edit was saved. Therefore, Professor Hauser's survey provides users with an incorrect explanation of how synchronization takes place in the accused devices. This suggests that users do not receive instant sync operations, which would make the first non-infringing alternative discussed above more acceptable, where automatic synchronization of the device occurs at an opportune time, such as upon the user exiting the application or switching to another application.

-------

[103] Backup to Expert Report of John R. Hauser, dated August 11, 2013 ("Hauser Report Backup").

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

58.     I have provided, as examples, alternative descriptions of the Background Syncing feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above.[104] In these descriptions, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if it was unable to have the patented feature. In my descriptions, below, I have identified how they differ from Professor Hauser's descriptions. Version 1 is a description of the patented feature. Version 2 is a description of the non-infringing alternative.

> **Background Syncing (Version 1).** ~~The~~ This version of the Background Syncing feature allows you to continue to use an app while data related to that app that is stored on your smartphone [tablet] synchronizes with data stored elsewhere, such as on a remote computer. For example, you can access and edit data, such as the list of contacts on your smartphone [tablet], ~~even~~ as your phone [tablet] is sending data for those contacts to your work computer.
>
> **Background Syncing (Version 2).** ~~Without this feature, you would have to wait to use an app, for example the contacts app, while the data for the app is synchronizing with a remote computer, and that wait may be long or short.~~ This version of the Background Syncing feature allows your smartphone [tablet] to synchronize data related to an app that is stored on your smartphone [tablet] with data stored elsewhere, such as on a remote computer, once you switch to a different app or when you stop using your smartphone [tablet]. For example, data from your

---

[104] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. As noted previously, another non-infringing alternative is "under the hood" and would not have a discernible effect on user experience. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> list of contacts will be synchronized with your work computer
> automatically and in the background after you switch to another
> app, such as your email, or when you stop using your smartphone
> [tablet].

59.     This is a very different presentation of Samsung's non-infringing alternative version of the Background Syncing feature than the one presented by Professor Hauser. It provides a more accurate and complete description of an alternative available to Samsung by making clear that the user is not inconvenienced by having to wait to use an application, but rather it is the synchronization that might have to undergo a brief delay. This language more clearly identifies the difference between the patented feature and the non-infringing alternative, and as a result, is much less biasing to the respondent.

60.     The description in Professor Hauser's surveys related to the Quick Links feature is also problematic. The smartphone survey provided the following description of this feature:

> **Quick Links.** When you are viewing text on your smartphone (for example in an email), the Quick Links feature automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder. Without this feature, if you wanted to take various actions, like

41

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> calling or texting a number, you would have to manually identify
> and select the exact text that might be data to take actions on.[105]

61.    Professor Hauser's description is faulty in several ways. First, both the text description and video do not clarify within which applications the Quick Links functionality would be available. Respondents may assume that Quick Links functionality is universally available in all applications on the smartphone. It is my understanding, however, that this is not the case. I understand that Apple's devices similarly only use this feature in certain applications.[106] I understand that this functionality is only accused in Samsung's Browser and Messenger applications.[107] I understand that it is not accused in any email application present on Samsung's devices – notwithstanding the fact that the example used by Professor Hauser in his description is of the email application.[108]

62.    I further understand that Professor Hauser's description of the alternative that Samsung would have used if it could not use this feature is inaccurate. In his description, Professor Hauser suggested that, without the patented feature, users "would have to manually

---

[105] Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.

[106] Mowry Report, at ¶¶300-305.

[107] Rebuttal Expert Report of Dr. Kevin Jeffay Concerning Noninfringement of U.S. Patent No. 5,946,647 ("Jeffay Report"), at ¶¶138-140.

[108] Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.

42

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

identify and select the exact text that might be data to take actions on."[109] I understand that this is not the case. For example, I understand that one non-infringing alternative that was available to Samsung would allow the user, not the system, to detect an instance of a structure of interest.[110] The user would visually detect the structure on the display and point to the structure on the screen by pressing their finger to the screen and releasing their finger. After the user has pressed and released the screen, only then does the software begin to interpret the user's action. The software would attempt to find and identify the structure that the user detected and then display a fixed menu of processing options that is not based on the structure the user detected or that the system identified.

63. With this alternative, the system would display the same menu of processing actions no matter what structure the user detected.[111] The user interaction, specifically, the user's detecting structures of interest, is exactly the same as in the present accused Browser application(s).[112] While the menu of processing options would be different than in the accused devices (because the menu would be the same for all detected structures), I note that such a menu would add additional value not presently found in the accused devices, such as presenting an email processing option for a user-detected phone number to enable the user to send an email to

---

[109] Hauser Report, at ¶75. The tablet survey provided a similar description except that the example involved an email address instead of a phone number. *See* Hauser Report, at ¶76.
[110] Jeffay Report, at ¶¶510-511.
[111] Jeffay Report, at ¶¶518-521.
[112] Jeffay Report, at ¶¶150-153.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

the person or organization associated with the phone number if that phone number were in the user's contacts database.

64.     I have provided, for illustrative purposes, alternative descriptions of the Quick Links feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above and are less biasing.[113] I again have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if it was unable to have the patented feature, as is suggested by Professor Hauser's description. Version 1 is a description of the patented feature. Version 2 is a description of the non-infringing alternative.

> **Quick Links (Version 1).** When you are viewing text on your smartphone ~~(for example in an email)~~, <u>this version of</u> the Quick Links feature ~~automatically detects certain types of data (such as phone numbers or email addresses) and enables you to choose among multiple actions to perform on that data. For example, this feature will automatically detect a phone number displayed in an email, and if you press and hold the phone number, it will offer you multiple actions such as calling or texting the number, or adding it to your contacts folder.~~ <u>enables you to perform a particular gesture on a piece of text, such as a phone number or email address, which then allows you to take certain actions on the selected text. For example, if you press and hold a phone number, it will offer you the ability to take certain actions on that phone number, such as dialing the number or adding it to your contacts folder.</u>

---

[113] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> **Quick Links (Version 2).** ~~Without this feature, if you wanted to take various actions, like calling or texting a number, you would have to manually identify and select the exact text that might be data to take actions on.~~ When you are viewing text on your smartphone, this version of the Quick Links feature enables you to perform a particular gesture on a piece of text, such as a phone number or email address, which then allows you to take a universal set of actions on the selected text, such as dialing, emailing, copying, and selecting, regardless of what type of text is selected. For example, if you press and hold a phone number, it will offer you the ability to take a set of actions, such as dialing that phone number, e-mailing the person to whom the phone number belongs, or adding the phone number to your contacts folder.

65.    This is a very different presentation of the alternative version of the Quick Links feature than the one used by Professor Hauser. It provides a more complete and less biasing description of an alternative feature available to Samsung. Among other things, the description makes clear that the non-infringing alternative involves no more of a laborious task than the patented feature in that, in both cases, the user can act on text without difficulty. This description more accurately identifies the distinction between the two features and, therefore, is less biasing to the respondent.

66.    Professor Hauser's description of the Universal Search feature is similarly problematic. The smartphone and tablet surveys provided the following description of this feature:

> **Universal Search.** Universal Search lets you use a single search to find information from different sources of information, for example data stored on your smartphone [tablet] as well as information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

good results tailored to each source. For example, when you type "George" in a single search box, the feature searches the Internet for "George," which might yield web pages about George Washington, and at the same time searches for "George" stored on your smartphone [tablet], which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files. Without Universal Search, you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application.[114]

67.     There are several problems with this description. First, the use of the term "Universal Search" itself is misleading, because the term does not describe the type of search that must be conducted – a search using a plurality of "heuristics" to find information on both local storage media and the Internet. Dr. Hauser's description suggests to the respondent that searches involving multiple sources, regardless of the source, require the feature in the '959 patent, and, absent this feature, searches must be conducted separately in each and every source. I understand that this is not the case. I understand that searching multiple sources on the device (i.e., locally), such as Contacts, Calendar, and email, is not accused of using the '959 patent.[115] Rather, as I understand it, it is only the combination of a local search and an Internet search using a plurality of heuristics that is accused.[116] The description also is problematic in that it states that

---

[114] Hauser Report, at ¶74.

[115] Samsung's Further Supplemental Responses to Apple's First, Third, and Tenth Sets of Interrogatories, July 15, 2013, at 174-175 (Interrogatory Nos. 4, 5, 6, 8, 20, 23, 24, 27, 29, 45).

[116] Samsung's Further Supplemental Responses to Apple's First, Third, and Tenth Sets of Interrogatories, July 15, 2013, at 174-175 (Interrogatory Nos. 4, 5, 6, 8, 20, 23, 24, 27, 29, 45).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

searching locally and on the Internet is an "example" of Universal Search, rather than what, I understand, to be a requirement.

68.     Moreover, I understand that Professor Hauser's suggestion that, in order to search the Internet, you would have to do so in a browser and, in order to search an application, such as your Contacts, you would have to do so in that application, is incorrect.[117] I have been informed that searching the Internet and the application could still be performed without having to separately open the browser and each application. For example, one alternative that was available to Samsung was the use of a single search box with a single field to enter the search term and separate options to trigger a local search or an Internet search.[118] In this case, the search could still be conducted using a single search field, represented by a widget on the home screen of the device, as is done with many of the accused devices.

69.     Another problem with Professor Hauser's definition is that it refers to "different rules of thumb for searching the different sources in order to find good results tailored to each source."[119] Professor Hauser's description suggests that having different rules of thumb is a distinct advantage, but it fails to provide the respondent with any information regarding what the

---

[117] Samsung's Further Supplemental Responses to Apple's First, Third, and Tenth Sets of Interrogatories, July 15, 2013, at 174-175 (Interrogatory Nos. 4, 5, 6, 8, 20, 23, 24, 27, 29, 45).
[118] Samsung's Further Supplemental Responses to Apple's First, Third, and Tenth Sets of Interrogatories, July 15, 2013, at 174-175 (Interrogatory Nos. 4, 5, 6, 8, 20, 23, 24, 27, 29, 45); Rebuttal Expert Report of Martin Rinard, Ph.D. Regarding Infringement of Claims 24 and 25 of U.S. Patent No. 6,847,959, at ¶¶320-321.
[119] Hauser Report, at ¶74.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

advantages might be. For example, no information is given regarding what the specific rules of thumb are and why they might lead to a better search result. Further, Professor Hauser also provides no information regarding the level of the incremental improvement in the search results if a rule of thumb is used, and whether the improvement would even be noticed by consumers. It is not clear from the video in Professor Hauser's survey how "rules of thumb" are being used, if at all, or how the search results would be different if the same search was run using no "rules of thumb." Without this information, the respondent is not provided adequate information to make an educated choice regarding the value of this feature.

70.    I have provided, as examples, alternative descriptions of the Universal Search feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above.[120] As with the Background Syncing and Quick Links features discussed above, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if it was unable to have the patented feature, as is suggested by Professor Hauser's description. Version 1 is a description of the patented feature. Version 2 is a description of the non-infringing alternative.

> **Universal Search (Version 1).** <u>This version of the</u> Universal Search <u>feature</u> lets you use a single search to ~~find~~ <u>retrieve</u> information from ~~different sources of information, for example~~

---

[120] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

~~data stored on~~ your smartphone [tablet] as well as information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find ~~good~~ results tailored to each source. For example, when you type "George" in a single search box, the feature searches the Internet for "George," which might yield web pages about George Washington, and at the same time searches for "George" stored on your smartphone [tablet], which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files.

**Universal Search (Version 2).** ~~Without Universal Search, you would have to separately search each information source, for example searching the Internet in a browser or for your contacts within your contacts application.~~ <u>This version of the Universal Search feature lets you enter your search terms in a single search box and gives you the option of clicking one of two buttons to either search information from data stored on your smartphone [tablet] or search information found on the Internet. Universal Search uses different rules of thumb for searching the different sources in order to find results tailored to each source. For example, when you type "George" in a single search box, this feature allows you to either search the Internet for "George," which might yield web pages about George Washington, or to separately search for "George" stored on your smartphone [tablet], which might retrieve "George Adams" from your contacts or songs by "George Michael" from your music files.</u>

71.     This is a very different presentation of Samsung's non-infringing alternative version of the Universal Search functionality than the one used by Professor Hauser. It provides a more complete and less biasing description of an alternative feature available to Samsung. Among other things, it makes it clear to the respondent that performing searches is no more difficult or time-consuming with the non-infringing alternative than the patented feature, as the user does not need to separately go to the browser to search the Internet and to each specific

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

application to search the application, as is erroneously suggested in Professor Hauser's description.

72.     I understand that the Missed Call Screen Management description in Professor Hauser's surveys also overstates the benefits of the patented functionality over the non-infringing alternative. Professor Hauser provided the following description of this feature in his smartphone survey:

> **Missed Call Screen Management.** The Missed Called Screen Management feature allows you to return a missed call or respond to the caller by listing the missed calls and providing you with two interactive areas to take further action. If you touch one area, such as the picture of the missed caller, John Doe, you call John Doe back. If you touch the other area, such as John Doe's name or phone number, then the feature takes you to a new screen that displays all of John Doe's contact information. From the new screen, you can call John Doe, text him, or email him. Without two areas you would have to remember to use different gestures to take different actions—like tapping John Doe's entry on the missed calls list to call him back but swiping his entry to view his contact information.[121]

73.     Professor Hauser's text description and video demonstration is flawed in several ways. First, the use of the clause "you would have to remember to use different gestures" rather than the more neutral "you would use different gestures" suggests to the respondent that the alternative requires additional effort or burden over the patented functionality. This, too, is the

---

[121] Hauser Report, at ¶75.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

type of leading and biasing language that, in my experience, tends to inflate the perceived benefits of one feature over another by suggesting to the respondent that one is clearly inferior.

74.     Moreover, Professor Hauser's description of what users "would have to remember" is treated unevenly for the patented feature versus the non-infringing alternative. For example, for the non-infringing alternative, he informs respondents that they "would have to remember to use different gestures to take different actions." However, in his description of the patented feature, he does not tell respondents that they "would have to remember" that touching one portion of the missed call would lead to one thing (i.e., calling the missed caller) while touching another portion of the missed call would lead to something else (i.e., taking you to the contact screen). In other words, that feature, too, requires that they "would have to remember" where to touch to get the desired result.

75.     I understand that there were several other non-infringing alternatives available to Samsung besides the one mentioned by Professor Hauser. One alternative available to Samsung would have been identical to the patented feature except that the new screen that displays the missed caller's contact information that you are taken to when you "touch the other area" is not a full screen.[122] Instead, it would be a pop-up screen that does not fully block the screen showing all of the user's missed calls.[123]

---

[122] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories (Interrogatory

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

76.     I have provided alternative descriptions of the Missed Call Screen Management feature along with Samsung's non-infringing alternative. These descriptions correct at least some of the flaws discussed above.[124] As with the other features discussed above, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if it was unable to have the patented feature. Version 1 is a description of the patented feature. Version 2 is a description of the non-infringing alternative.

**Missed Call Screen Management (Version 1).** ~~The~~ This version of the Missed Called Screen Management feature provides you with a missed call list containing two interactive portions of the display corresponding to each missed call. ~~allows you to return a missed call or respond to the caller by listing the missed calls and providing you with two interactive areas to take further action.~~ If you touch one portion of the display related to a particular missed call ~~area~~, such as the picture of the missed caller, John Doe, you call John Doe back. If you touch the other area, such as John Doe's name or phone number, then the feature takes you to a new screen that displays ~~all of John Doe's contact information~~ at least two ways to contact John Doe. From the new screen, you can call John Doe, as well as text him~~,~~ or email him.

**Missed Call Screen Management (Version 2).** ~~Without two areas you would have to remember to use different gestures to take different actions – like tapping John Doe's entry on the missed calls list to call him back but swiping his entry to view his contact~~

---

Nos. 15, 17, 20, 24, 26, 29), May 2, 2013, at 120-121.

[123] Samsung's Further Supplemental Responses to Apple's Second and Third Sets of Interrogatories (Interrogatory Nos. 15, 17, 20, 24, 26, 29), May 2, 2013, at 120-121.

[124] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

~~information.~~ This version of the Missed Called Screen Management feature provides you with a list of your missed calls. If, for a given missed call from John Doe, you make a swipe gesture on the portion of the display showing John Doe's name or phone number, you call John Doe back. If you tap the same portion of the display showing John Doe's name or phone number, the feature takes you to a new screen that displays at least two ways to contact John Doe. From the new screen, you can call John Doe as well as text or email him.

77.     This is a very different presentation of Samsung's non-infringing alternative version of the Missed Call Screen Management feature. It is more accurate than the one used by Professor Hauser and is less biasing. In particular, it avoids leading respondents to believe that Samsung's non-infringing alternative is necessarily inferior to the patented feature. It does this through use of more neutral language rather than the biasing language used in Professor Hauser's description.

78.     I understand that the description of the Slide to Unlock feature included in Professor Hauser's surveys similarly does not accurately depict the difference between the patented feature and Samsung's non-infringing alternatives. Professor Hauser provided the following description of this feature in his tablet survey:

> **Slide to Unlock.** The Slide to Unlock feature prevents unintentional unlocks by unlocking your tablet only when you slide an image, using one continuous motion, from a specific spot on the lock screen to another specific spot on the screen. Without this feature, you would have to unlock your device using other

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

techniques, for example by swiping the lock screen from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely.[125]

79.     There are problems with Professor Hauser's text description and video demonstration of this feature. As with many of the other descriptions discussed above, this description uses leading and biasing language to suggest to the respondent that the alternative functionality is clearly inferior to the patented functionality. For example, the use of the clause "you would have to" rather than the more neutral "you would" suggests to the respondent that the alternative requires additional effort or burden.

80.     Additionally, Professor Hauser's use of the clause "which may make unintentional unlocks more likely" in describing the alternative feature is unbalanced. It describes the disadvantage of the alternative functionality without a comparable statement about the disadvantage of the patented functionality. To make the statements more balanced, Professor Hauser either could have omitted that phrase or made a comparable statement regarding a potential disadvantage of the patented feature, such as indicating that the more restrictive motion with the patented feature "may make unlocking the device more difficult."

81.     Moreover, Professor Hauser's description telling respondents that the non-infringing alternative "may make unintentional unlocks more likely" does not provide

---

[125] Hauser Report, at ¶76.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

respondents adequate information to be able to make an informed decision regarding the impact of this shortcoming.[126] Professor Hauser does not tell respondents the probability that the alternative would, in fact, make unintentional unlocks more likely. He also does not define what he means by "more likely." There is a big difference between the alternative causing an unintentional unlock once a month versus once a day. In my experience, surveys should equip respondents with all the information needed to make an educated choice regarding the alternatives.

82.     I have provided illustrative alternative descriptions of the Slide to Unlock feature along with Samsung's non-infringing alternative, below. These descriptions correct at least some of the flaws discussed above.[127] As with the other features discussed above, I have presented the non-infringing alternative as an alternative feature rather than what the user would get (i.e., have to settle for) if it was unable to have the patented feature. Version 1 is a description of the patented feature. Version 2 is a description of the non-infringing alternative.

> **Slide to Unlock (Version 1).** ~~The~~ This version of the Slide to Unlock feature ~~prevents~~ helps to prevent unintentional unlocks by unlocking your tablet only when you slide an image, using one

---

[126] I also understand that Apple has presented no evidence that the non-infringing alternative is more likely to result in accidental unlocks. Expert Report of Saul Greenberg, Ph.D., Regarding Noninfringement of the Asserted Claim 8 of U.S. Patent No. 8,046,721, September 13, 2013 ("Greenberg Report"), at ¶¶203, 459.

[127] Note that there are several different ways that one can correct this description to make it more accurate, less biased, and more complete. I have provided only one illustrative example.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

continuous motion, from a specific spot on the lock screen to another specific spot on the screen.

**Slide to Unlock (Version 2).** This version of the Slide to Unlock feature helps to prevent unintentional unlocks by unlocking your tablet only when you swipe ~~Without this feature, you would have to unlock your device using other techniques, for example by swiping~~ the lock screen, starting from any desired spot, a minimum distance, in any direction ~~from any random spot on the screen to any other random spot that was far enough away, which may make unintentional unlocks more likely~~.

83.     This is a very different presentation of the non-infringing alternative version of the Slide to Unlock feature. It is more accurate than the description used in Professor Hauser's tablet survey because it makes clear to the respondent that, like the patented feature, the alternative also helps to prevent unintentional unlocks. The description also avoids vague and biasing language regarding the possibility of making unintentional unlocks more likely.

    **2.**    ***The choice tasks shown to respondents taking the surveys incorrectly suggested that products without a patented feature would contain no alternative feature at all.***

84.     After showing the videos describing all of the features and levels included in each survey, Professor Hauser presented respondents with a series of 16 tables each describing four different hypothetical products from which respondents were to choose their most preferred smartphone or tablet. Each of the four columns of this table represented a different product. Each

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

of the seven rows of this table represented a different feature category. An example of this table is shown below.[128]

---

[128] Hauser Report, at Exhibit G.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**



| | Phone 1 | Phone 2 | Phone 3 | Phone 4 |
|---|---|---|---|---|
| Price (with 2-year service contract) | Price $299 | Price $99 | Price $49 | Price $149 |
| Camera | Panorama | Panorama, Best Photo, Smile Shot | Panorama, Best Photo, Smile Shot, Buddy Photo Share | Panorama, Best Photo |
| Call Initiation and Screening | Three-Way Calling, Reject Call with Message, Missed Call Screen Management | Three-Way Calling, Reject Call with Message | Three-Way Calling | Three-Way Calling, Reject Call with Message, Missed Call Screen Management, Wi-Fi Calling |
| Input Assistance | Copy-Paste, Voice To Text | Copy-Paste, Voice To Text, Automatic Word Correction, S Pen | Copy-Paste | Copy-Paste, Voice To Text, Automatic Word Correction |
| Screen Size | Size 5.5" | Size 5.0" | Size 4.0" | Size 4.8" |
| Data Accessibility | Notification Bar | Notification Bar, Background Syncing | Notification Bar, Background Syncing, Quick Links | Notification Bar, Background Syncing, Quick Links, Universal Search |
| With all other features on your most recent Samsung smartphone | All other features on your most recent Samsung smartphone | All other features on your most recent Samsung smartphone | All other features on your most recent Samsung smartphone | All other features on your most recent Samsung smartphone |

85.     As this table illustrates, for a given feature category, Professor Hauser includes an icon describing the presence of the feature if the feature is assumed to be part of the hypothetical product and leaves the box blank if the feature is not included. No icon is used to represent the non-infringing alternative feature that Samsung would have included in the smartphone or tablet

58

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

if the patented feature could not be used. This suggests to respondents that the choice available to respondents in the surveys are between a product with the patented feature and a product with no feature.

86.     For example, below is an example of how the choice screen in Professor Hauser's surveys depicted the Data Accessibility feature options available to respondents taking the surveys.[129] Note the very different manner in which the bottom left quadrant of the grid displays the presence of the Quick Links features versus the presence of Samsung's non-infringing alternative. Phones 3 and 4 contain the Quick Links icon. Phones 1 and 2 are empty boxes with no icons.



87.     This depiction may suggest to respondents that Phones 1 and 2 are necessarily inferior because they have fewer functionalities compared to Phones 3 and 4. This is not the case. In reality, all four hypothetical phones have the same number of capabilities. They are just different capabilities, accomplished in different ways. As described more fully below, as part of

---

[129] Hauser Report, at Exhibit G.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

my work on this case, I performed qualitative interviews, replicating Professor Hauser's instructions to the respondents, to assess the design of his survey. The results of these interviews showed that many respondents appeared to associate an empty box in this table with the absence of a feature, rather than just an alternative feature. When asked what the product in the survey would have if it did not have the patented feature, many respondents described the absence of any similar functionality.

88.     For example, according to one respondent:

> Q:     … So if that [Background Syncing] icon is not present, what does that tell you about the phone in terms of how that would work instead? Or what it has instead?

> A:     You would have to go through a process of changing that on your own. It's not going to be picked up, it's not going to be done as soon as you're changing it, like on the phone. You'd have to go and change it two different times, you know?[130]

89.     According to another respondent:

> Q:     … So when the phone does not have that [Missed Call Screen Management] icon present, what do you think the phone does instead? Meaning how would you handle - what would it - how would you handle missed calls or how would the phone handle missed calls if that icon was not present?

---

[130] Exhibit 8 (Phoenix: Respondent 1).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

A:    I don't - I have no idea how it would do that, because I only know what mine has. So I don't - maybe - you know what, the old phone would say, "one missed call," "two missed calls," but it wouldn't tell me who they were from. I had to usually go back in and go through who the last calls were. That's how the other one was.

Q:    So if it didn't have that icon, you'd have to go within -

A:    Yeah, I'd have to go in and find - go through the log-in, see who the last one called.[131]

90.    Another respondent stated:

Q:    … So, what would you-so, if the-if a phone does not have that [Automatic Word Correction] icon, then what would it have, instead? Like, what would you-

A:    I'd have misspelled words. [LAUGHTER] A lot of misspelled words. You know, and taking longer to text a message.

Q:    So, then-so, if it doesn't have the "Automatic Word Correction," then would the phone have some other feature instead, or not? I just want to make sure I'm clear about what you're saying.

A:    Yeah. I wouldn't think that it would have anything else, instead. It would either have a misspelled word, or you have to type out everything individually. No abbreviations, or…-[132]

91.    According to another respondent:

---

[131] Exhibit 8 (Philadelphia: Respondent 7).
[132] Exhibit 8 (Phoenix: Respondent 2). Note, the trailing ellipsis in the final response indicates that the respondent stopped speaking, leaving the thought incomplete, rather than any truncation of the quote.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Q:    What if you don't have a Quick Links icon on your phone. How do you make that happen or how do you accomplish that?

A:    Well, with the voicemail again I find a piece of paper, write down the name of the person and phone number, [INAUDIBLE], make a big [INAUDIBLE] but even then I have to try and find it first somewhere and then we'll decide on something and then write it down and try to e-mail.[133]

92.    Another respondent noted:

Q:    So what - if a phone doesn't have that [Automatic Word Correction] icon, what do you assume that it does have, then? How would you go about doing that?

A:    I think it if didn't have it, you would probably just have to correct it yourself, or just proofread everything before you send it out if it didn't have the correction on there probably.

Q:    Do you feel like you have to proofread it anyway in case it's correcting-

A:    I don't.[134]

93.    According to another respondent:

Q:    For a phone that doesn't have that [Missed Call Screen management] - let's say this one, what would that have instead?

A:    Maybe just a notification of a missed call only. Not something you can just put - push and it would call back right away.

---

[133] Exhibit 8 (Chicago-1: Respondent 3).
[134] Exhibit 8 (Chicago-2: Respondent 2).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> Q:     Is it more of a list of a missed call or would you be able to take action on it?
>
> A:     Probably a list.[135]

94.     An alternative and preferred presentation would have been to include icons in all four boxes. Phones 3 and 4 would have Professor Hauser's patented Quick Links icon, just as it did in the actual survey. Phones 1 and 2 would have an Alternative Quick Links icon depicting Samsung's non-infringing alternative instead of a blank space. An example of this type of presentation is given below.



95.     Doing this for all of the patented features would present a very different choice to respondents.[136] An example of what this choice box would have looked like for the Data Accessibility feature category is shown below.

---

135 Exhibit 8 (Chicago-2: Respondent 7).
136 *See, e.g.,* Bettman, J., Johnson, E., and J. Payne, "Consumer decision making," in Robertson, T., and H. Kassarjian (Eds.), *Handbooks of Consumer Theory and Research* (Prentice-Hall, 1991).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER



96.     This alternative presentation would have given survey respondents a very different set of information to use when making their choice of alternative smartphones or tablets. While respondents were given very short (often one sentence) descriptions of what the hypothetical product would have looked like without the patented features, these descriptions (and related videos) were shown much earlier in the survey and were not part of the choice screen containing the table of four hypothetical products from which respondents were to choose their preferred option.

> **3.**     ***The characteristics of the patented features compared with Samsung's non-infringing alternatives, as described by Professor Hauser, were widely misunderstood by respondents taking the survey.***

97.     Survey research textbooks and reference guides recommend pretests as a way to determine whether survey questions are clear and unambiguous.[137] Shari Diamond states in the

---

[137] S. Payne, *The Art of Asking Questions* (Princeton: Princeton University Press, 1951); Schaeffer, N., and S. Presser, "The Science of Asking Questions," *Annual Review in Sociology* 29 (2003): 81; Converse, J., and S. Presser, *Survey Questions: Handcrafting the Standardized Questionnaire* (Beverly Hills, CA: Sage Publications, 1986): 55; D. Dillman, *Mail and Telephone Surveys: The Total Design Method* (United States: John Wiley & Sons, Inc., 1978): 156; and Sudman, S., and N. Bradburn, *Asking Questions: A Practical Guide to Questionnaire Design* (San Francisco: Jossey-Bass Publishers, 1982): 123, 140.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

*Reference Guide on Survey Research* that, in a pretest, the proposed survey should be administered to a sample of twenty-five to seventy-five respondents. During the pretest, the interviewers should observe the respondents for any confusion or difficulties respondents may have with the questions and probe for the source of any such confusion or difficulties. Questions subject to any such confusion or difficulties should then be rephrased before the full-scale survey is launched.[138] Pretests can improve the quality of a survey by increasing clarity and correcting misunderstandings.[139]

98.     Even if a single respondent expresses confusion or a lack of understanding during the pretest, that confusion and the reasons for that confusion should be carefully considered.[140] *The Art of Asking Questions*, a textbook Professor Hauser recommends as a "must read" in the syllabus for his research seminar in marketing, states that "if you are ever to write or critique a questionnaire:"

> Every objection that may be raised about the phrasing should be carefully considered, because that problem may occur many times over in the full-scale survey. If even a single test interview or comment from one of our associates implies any fault in the question, that fault should not be passed over. How many people in the final survey will stumble over the same obstacle?[141]

---

[138] S. Diamond, *Reference Guide on Survey Research* (Washington, DC: The National Academies Press, 2011).
[139] S. Diamond, *Reference Guide on Survey Research* (Washington, DC: The National Academies Press, 2011): 249.
[140] S. Payne, *The Art of Asking Questions* (Princeton: Princeton University Press, 1951): 16.
[141] S. Payne, *The Art of Asking Questions* (Princeton: Princeton University Press, 1951): 16; J. Hauser, "15.838

65

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

99.     While Professor Hauser did conduct a pretest in this case, there are several reasons why his pretest was inadequate for purposes of determining whether respondents understood the functionality of the patented features and how this functionality differed from Samsung's non-infringing alternatives. First, he did not provide a video of the pretest or provide transcripts with the detailed responses of the respondents. Not having this material precludes those that did not participate in the pretest (on the administration side) from directly evaluating whether respondents actually understood the features and what their understanding was regarding the advantages of the features over Samsung's non-infringing alternatives.

100.     Second, Professor Hauser's pretest also was inadequate for purposes of determining whether respondents understood the question, features, levels, or tasks put before them because of the format of the questions. The questions used by Professor Hauser are presented as closed-ended questions. Examples of these questions are provided below.

> [RESPONDENT VIEWS VIDEO] Upon viewing this video, do you feel like you understand the Smartphone feature called [All Name of Feature] that is described in the video?
>
> □  Yes [Go to 1A]
> □  No [Go to Q2]
> □  Unsure [Go to Q2][142]

---

Research Seminar in Marketing," *MIT Sloan School of Management* (2011).
[142] Hauser Report, at Exhibit I1.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Did you have difficulty understanding the questions and instructions?

□ Yes
□ No
□ Unsure[143]

Did the animations help you to understand the various features of the Smartphones?

□ Yes
□ No
□ Unsure[144]

101.   While the 23 respondents that took Professor Hauser smartphone pretest were deemed by the pretest moderator to have sufficient understanding as it relates to the three questions,[145] closed-ended questions, such as these, do not get at the heart of what needs to be determined – which is whether respondents accurately understood the distinction between the patented features and the non-infringing alternatives. Rather, these questions merely determine whether respondents "think" that they understood the questions and features. No information is gleaned regarding what their understanding was regarding the features and questions and

---

[143] Hauser Report, at Exhibit I1.
[144] Hauser Report, at Exhibit I1.
[145] For 11 of the 12 respondents who were asked the first question, the yes box was checked for each video; and for each of 11 respondents who were asked the second and third questions, the no box was checked for the second question and the yes box was checked for the third question. *See* Hauser Report, at Exhibit I1.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

whether this understanding was accurate. To get at this, one would need open-ended questions, which Professor Hauser does not appear to have used.[146]

102.   While the use of open-ended questions is not necessarily preferred to closed-ended questions in every situation, they are especially useful when you are asking subjects to explain things in their own words and when you are not trying to quantify results. Researchers have specifically stated that the "perhaps most important use of open questions is in pretesting questions when the investigator wants to explore many dimensions of a topic and is unsure exactly what questions to ask. Extensive use of open questions with small samples may allow the investigator to develop better closed questions which, when used on larger samples, will yield the best results."[147] Furthermore, one author concluded:

> The main advantage of open questions is that they allow respondents to answer in their own frames of reference, entirely uninfluenced by any specific alternatives suggested by the interviewer. They also reveal what is most salient to respondents, what things are foremost in their minds. Closed questions do not permit this.[148]

---

[146] *See* Hauser Report, at Exhibit I1 and I2. For both the smartphone and tablet surveys, Professor Hauser provided the closed-ended pretest questionnaire for the evaluation of videos and dry-run of the programmed survey. He provided handwritten pretest interview notes but did not provide transcripts, videos, or audio files of the pretest interviews.

[147] N. Bradburn, "Response Effects," in Rossi, P., Wright, J., and A. Anderson (Eds.), *Handbook of Survey Research* (San Diego: Academic Press, 1983): 302.

[148] P. Sheatsley, "Questionnaire Construction and Item Writing," in Rossi, P., Wright, J., and A. Anderson (Eds.), *Handbook of Survey Research* (San Diego: Academic Press, 1983): 206.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

103.    In order to determine if respondents appropriately understood the patented features and non-infringing alternatives that were the subject of Professor Hauser's survey, I conducted my own parallel pretest of Professor Hauser's smartphone survey. To do so, I closely replicated Professor Hauser's survey by using his smartphone survey questionnaire, the screenshots of his programmed survey, and the same graphics and feature demonstration videos that were used in his survey.[149]

104.    I worked with Schlesinger Associates ("Schlesinger"), a well-known and well-respected market research firm, to perform the pretest.[150] I asked Schlesinger to identify respondents for the pretest using the same screening questions used by Professor Hauser in his survey.[151] Consistent with Professor Hauser's survey, respondents were recruited from a panel of participants that expressed a willingness to participate in market research. I developed a pretest questionnaire, to be used by Schlesinger, based upon open-ended questions that were clear, easy

---

[149] *See* Hauser Report at Exhibit Es and G, and  Backup to Expert Report of John R. Hauser, dated August 11, 2013. The smartphone survey questionnaire and screen shots of the programmed survey are Exhibits E and G, respectively. Graphics, including feature image icons, and feature demonstration videos were provided in backup materials.
[150] http://www.schlesingerassociates.com/our_purpose/professional_affiliations.aspx (viewed September 4, 2013). Schlesinger is a member of several organizations that promote reliability and quality standards, including the American Marketing Association ("AMA") and the Council of American Survey Research Organizations ("CASRO").
[151] Exhibit 9.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

to understand, and neutral.[152] I asked Schlesinger to administer this questionnaire to 26 respondents across three different cities.[153]

105.     Prior to the interviews, I provided input into the training and instruction of the moderator regarding how to administer the questionnaire. I personally watched some of the interviews as they were being conducted and asked that all of the interviews with each of the respondents be video recorded for my subsequent review.[154] I also asked that a written transcript of each interview be prepared for my later study. These materials allowed me to thoroughly assess the perceptions of those that participated in my parallel pretest.

106.     As part of my parallel pretest of Professor Hauser's survey, I invited qualified respondents to come into a local Schlesinger test facility location in Phoenix, Philadelphia, and Chicago and to complete a replicated version of Professor Hauser's smartphone conjoint study. Respondents were initially screened by telephone using the same screening criteria that Professor Hauser utilized in his smartphone survey. The pretest began with respondents being informed that the purpose of the pretest study was to obtain comments on a survey related to smartphones,

---

[152] Exhibit 10.
[153] Twenty-nine respondents participated in the pretest interviews, of which three respondents were dropped, resulting in a final sample of 26 respondents. Two respondents, Chicago-1 Respondent 5 and Chicago-2 Respondent 1, were dropped because they failed to complete at least half of the questions associated with the third choice exercise task in the time allotted for the qualitative interview. One additional respondent, Phoenix Respondent 3, was dropped because he did not own a Samsung smartphone in the past 12 months.
[154] It is standard practice in the industry to record in-person interviews.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

and that they would be taking the survey on the computer and the moderator would ask follow-up questions at various points throughout the survey.

107.    Respondents were asked go through the first part of the survey, which describes each feature that would be varied in the conjoint and which involves both written and video descriptions of the at-issue and distraction features, without interruption from the moderator. After completing the educational portion of the survey and watching the approximately 12 minutes of video demonstrations, respondents were asked two initial questions, consistent with the questions Professor Hauser asked in his own pretest. Specifically, respondents were asked if they had any difficulty understanding the questions or instructions and if they found the animations helpful in understanding the features of the smartphones.

108.    After these initial questions respondents proceeded into the conjoint exercise. Respondents were allowed to complete three initial choice screens without follow-up questioning. After completing the third choice screen, respondents were asked a series of questions that asked them to explain, in their own words, what the presence of various feature icons in the conjoint exercise indicated the phone had in terms of feature functionality. Respondents were then asked what the absence of a feature icon in the table indicated and what functionality the phone would have in that situation. Following this discussion, respondents were asked to complete the remainder of the survey (the next 13 choice tasks) and the interview ended with questions about the overall survey.

71

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

109.     Out the outset, it is worth noting that, both in Professor Hauser's pretest and in my parallel pretest, when asked if they understood the features and if the video descriptions were helpful, respondents generally responded affirmatively.[155] This notwithstanding, my parallel pretest of Professor Hauser's surveys revealed that, when probed with open-ended questions, a substantial portion of respondents did not understand the patented features and how they were different from Samsung's non-infringing alternatives. It is clear to me, based upon my review of the pretest videos and transcripts, that a significant number of the respondents in the pretest were confused about the features. They were unable to describe the patented features or the non-infringing alternatives shortly after presentation of the written and video descriptions of the features used in Professor Hauser's survey. Even after prompting, many respondents were unable to describe what features would be present if the products did not possess the patented functionalities.[156]

110.     For example, confusion or misunderstanding was evident regarding the Automatic Word Correction feature, as the following exchange reflects:

> Q:     And the Automatic Word Correction, tell me what that icon means?

---

[155] *See, e.g.*, Hauser Report, at ¶51, at Exhibit I. *See also* Parallel Pretest Transcripts for Philadelphia, Phoenix, Chicago-1, and Chicago-2.

[156] In fact, of the 26 respondents, only two respondents clicked on the link to play an animation again during the choice exercise task. Among the two respondents, one respondent, Chicago-1 Respondent 2, clicked on the Screen Size video while viewing the first choice exercise task. Another respondent, Philadelphia Respondent 5, clicked on the Quick Links video on the first choice exercise task and after the third choice exercise task.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

A:    Well, it I guess predicts, like predictive texting, where it predicts the word that you're trying to type out. I hate that function, by the way. Auto-correction of any sort I turn off right away.

Q:    So if the phone does not have that icon, I know you'll be happy, but what does that then mean? What does the phone have instead of the Automatic Word Correction? Or how do you handle that?

A:    To be honest, before any of that stuff started coming around, I think what I ended up doing was maybe going online to make sure that I got my words correct or spelled them correctly.[157]

111.    The respondent appears to confuse Automatic Word Correction with predictive text and states that the alternative would be no spell check or word suggestions at all. This description of the non-infringing alternative is inaccurate because the respondent fails to identify that, according to Professor Hauser's description, the alternative would still provide word and spelling suggestions for unrecognized words. The respondent appears to have not understood that the primary difference between the patented feature and non-infringing alternative described by Professor Hauser had to do with whether the suggested text would automatically replace the original text or whether the user would have to select the suggested text manually in order for it to be replaced.

---

[157] Exhibit 8 (Phoenix: Respondent 4).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

112.    Other respondents were similarly confused about the Automatic Word Correction

feature. One respondent stated:

> Q:    The Automatic Word Correction: what does that feature do?
>
> A:    I absolutely love that feature. It's saved me from making a fool of myself many times.
>
> Q:    What does it do?
>
> A:    Basically it will add, you can program the right spelling of the word in there, so any time you're starting to misspell it, the word will come up or other words close to it; instead of having to finish typing, you just press right on it and the word goes right in there. Very convenient.
>
> Q:    What if you make a mistake in your typing? You just type -
>
> A:    The new word will appear that, if you put it in there correctly the first time with the spelling; also, you can make a mistake and program the wrong spelling in there, too, which I've done before by accident, so as long as you're very careful and make sure everything is correct when you're saving those, that's a really good feature.
>
> Q:    Let's say your phone does not have the Automatic Word Correction feature but you make a typo. What do you have instead? What do you have to do?
>
> A:    Pretty much you have to go to Google and make sure your spelling is correct [INAUDIBLE] because to me, sending something, spelling is very important to me and I always find, and I don't like to sound snobbish or nothing, but even when people send me things that are misspelled or whatever, I always notice that. Not that I, whatever, I just don't want to be represented that way. I like when my

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> spelling is correct and punctuation; words are where they're supposed to be.[158]

113.    In this case, the respondent appears confused about both the patented feature and the non-infringing alternative. The respondent describes the patented feature as if it is the non-infringing alternative proposed by Professor Hauser (i.e., the suggested text replaces the original text if the user presses on the suggested text). No mention is made of the automatic nature of the word correction, which is the key distinction of the patented feature described by Professor Hauser. The respondent incorrectly describes the alternative as the absence of any spell check or word correction.

114.    Another respondent described the Automatic Word Correction feature as follows:

> Q:    That Automatic Word Correction, tell me how you use that today? What's that feature on the phone [CROSSTALK] described here?
>
> A:    That's one of the - it's when probably - I'm probably texting too fast and spell the word, the phone knows what word I'm really trying to say, I'm really trying to spell so it corrects it for me.
>
> Q:    What if you don't have that?
>
> A:    I have to proofread everything I text before I send it.[159]

---

[158] Exhibit 8 (Philadelphia: Respondent 6).
[159] Exhibit 8 (Chicago-1: Respondent 1).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

115.    Here, the respondent is confused about the functionality of the non-infringing alternative to Automatic Word Correction. The respondent incorrectly describes the alternative as the absence of word correction. This description of the non-infringing alternative is inaccurate because the respondent fails to identify that, according to Professor Hauser's description, the alternative would still provide word and spelling suggestions for unrecognized words. The respondent appears to have not understood that the primary difference between the patented feature and non-infringing alternative described by Professor Hauser had to do with whether the suggested text would automatically replace the original text or whether the user would have to select the suggested text manually in order for it to be replaced.

116.    Respondents in my parallel pretest also had incorrect understandings regarding the Background Syncing feature. According to one respondent:

> Q:    Data accessibility row, Background Syncing. Tell me about that one.
>
> A:    It's - somehow, as long as you get it tied into your laptop or desktop computer, it'll take stuff that you put into your phone and coordinate it with the spots in your computer.
>
> Q:    And anything else?
>
> A:    Then when I - I knew what they were trying to - I don't - my phone does it automatically. I don't know how it does it, but. Yeah, you know, with any of them, maybe that was a little shaky because I just don't know how they do it. The other ones, I really understood good, because -
>
> Q:    But it's essentially a - ?
>
> A:    Just a timesaver. You don't have to type it in to each piece of equipment.

76

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> Q:  So if you've got the phone that doesn't have that icon, then what would that then mean?
>
> A:  You just have to manually put in email information or background or with anything into each separate piece of equipment. It just saves time. You just input it once and it goes to all your other devices.[160]

117.   This respondent appears to equate the Background Syncing feature with the ability to synchronize your mobile device with your personal computer, which is a clear overstatement of the functionality allegedly made possible by the '414 patent. The respondent also mistakenly believes that the synchronization must be done through a wired connection. For the non-infringing alternative, the respondent incorrectly assumes that information would need to be entered manually into each device (i.e., that there would be no automatic synchronization at all without the patented feature). It is clear that this respondent has not understood the distinction between the patented feature and the non-infringing alternative described by Professor Hauser.

118.   Other respondents were similarly confused about this feature. For example, one respondent offered the following description of this feature:

> Q:  The Background Syncing icon.
>
> A:  Well, from what it told me on here earlier, it was to sync from your phone to the computer and it can do it back and forth. What happened to me, that nobody told me about and somebody was setting mine up, and they said, "Oh, you want everything to sync." Well what it did was it grabbed

---

[160] Exhibit 8 (Phoenix: Respondent 7).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

everybody in my contacts and flipped it over to Facebook and all those people got notices wanting to be my friend. But some of the phone numbers in there said do not answer. [LAUGHTER] So I really don't like any type of syncing because of that reason. So that would be a very thing I would not want.

Q:   So, just so I'm clear, in terms of your understanding of what it does, can you say a little bit more about that?

A:   Well, what I'm talking it does is it combines all your information to all the different areas that you have on your phone along with the computer that might be available to be synced with it. So to me, it took all my contacts and combined it with Facebook because I put Facebook on this phone. So it synced it all together.

Q:   Got it. Let's see. How do I ask this question? And then you - did you say that it also puts the information on your computer too? Is that another aspect of it?

A:   From what I understand, that's what it will do. I've never understood how it does that, but that's what I understand is the capability. And I believe my phone has that capability also.

Q:   Let's go with that part of what you said about the syncing. So if you have a phone that doesn't have that, then what - what would you assume it has or how you - how that gets accomplished.

A:   I would think it would be better. You would actually have to go from your - look at your phone stuff and manually enter it into your computer. And vice versa.[161]

119.   The respondent appears to mistakenly assume that the Background Syncing

feature involves not only synchronizing information across devices but also across applications,

---

[161] Exhibit 8 (Phoenix: Respondent 8).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

such as Contacts and Facebook. Furthermore, the respondent appears to believe that without this feature, there could be no automatic synchronizing at all (i.e., the alternative would involve having to manually enter information from the smartphone to the computer). The respondent has clearly misunderstood the key distinction between the patented feature and non-infringing alternative provided in Professor Hauser's survey.

120. Other respondents either could not recall the Background Syncing feature at all or gave completely erroneous descriptions of its functionality. For example, one respondent gave the following description:

> Q:   So let's look at the data accessibility and for this one let's talk about the Background Syncing. How would you explain that, the Background Syncing?
>
> A:   I forget that one, I forget what that does, to tell you the truth.
>
> Q:   I appreciate your candor. So if -
>
> A:   Wanna go back there and take a look or just let it go?
>
> Q:   Well, we're gonna let it go for now. But I'm curious about is there anything in the name itself that implies what it might be?
>
> A:   I'm getting the idea that it's - Background Syncing, I think of it looking, searching for connections, whether you're syncing with your data in the location, so say I've gone from here to Pittsburgh on a plane and you've gotta pick up another network. That's what I get from Background Syncing and I don't think that was really applicable to that.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> Q:     So we're not necessarily clear on that one then?
>
> A:     Right.[162]

121.     In this case, based on the name of the feature, the respondent appears to believe that Background Syncing enables a phone to search for local network connections as the user moves among locations. The respondent fails to understand the key aspect of Professor Hauser's description of this feature, which has to do with being able to use an application while a synchronization is occurring. This level of confusion among respondents that have just listened to the video descriptions and read the text descriptions of the patented features suggests that there is a fatal problem with Professor Hauser's descriptions themselves and/or that the nature of the features and Samsung's alternatives are too subtle and nuanced for respondents to understand.

122.     My parallel pretest revealed similar misunderstanding regarding the Quick Links feature. One respondent stated:

> Q:     Quick Links, tell me what that icon means to you.
>
> A:     Quick Links, that's where it's detecting phone numbers, like in your e-mail address and stuff. You basically click on it, like on the phone number or on the e-mail too and compose the e-mail or call.
>
> Q:     If your phone does not have the Quick Links icon, what would you be doing instead?

---

[162] Exhibit 8 (Chicago-2: Respondent 6).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> A:      Probably write down that phone number and enter it into
>         your phone afterwards. Same with the e-mail.[163]

123.    Here, the respondent has not grasped the main difference between the patented

feature and the non-infringing alternative. The respondent appears to equate the patented feature

with automatically detecting information, such as phone numbers and email addresses, and being

able to take an action on this information. No mention is made regarding the ability to take

multiple actions on a given piece of information. The respondent also mistakenly assumes that

without the patented feature, the user would need to manually write down information and enter

it into the smartphone in order to take action on that information. This is different than the

alternative described by Professor Hauser, which allowed actions to be taken on this information

automatically after the information had been manually identified by the user.

124.    Other respondents expressed similar confusion regarding this feature. According

to one respondent:

> Q:      That's totally fine. Quick Links in that same row. What
>         does that feature mean to you?
>
> A:      Oh, basically how I can get to, for example, put something
>         in and get to enter my contact, people I have on Facebook,
>         Twitter, anything in my contacting listings.
>
> Q:      You - just say a little bit more. I want to make sure I'm
>         following what you're, exactly what you're saying.

---

[163] Exhibit 8 (Phoenix: Respondent 4).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

A:      For example, I wanted to link up with somebody and get their email and get their link with them very quickly or do something in that sort of feature. Basically, with my phone I know I have my contacts from Facebook in there and I have my contacts from Twitter in there. All their emails go in, everything's in my contact list.[164]

125.    This respondent appears to associate the patented Quick Links functionality with being able to "link up" contact information from various sources, such as Facebook and Twitter, into the user's Contacts. This description is at odds with the description provided by Professor Hauser in his survey, which involved being able to automatically detect certain information and choose from among multiple actions to perform on that information. There is clear confusion by this respondent regarding the nature of the patented feature.

126.    Another respondent described the Quick Links as follows:

Q:      Ok. Quick Links. What - how would you describe Quick Links?

A:      Ok, Quick Links, that's with the drop down? Is that with the drop down, where you can just go to the link? Ok, Quick Links. Do I have Quick Links on my phone? No. Ok, a quick link, I do have some Quick Links I think, on my phone. I can go to that one particular thing.

Q:      So when you were looking at that as one of the features that it either had or that you were giving up, what were you thinking about Quick Links and what that meant that you would either get or not?

---

[164] Exhibit 8 (Philadelphia: Respondent 6).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

A:    Well, I kind of wanted it. Yeah, I kind of wanted it and that was one of the things I was looking at, also with the notification. I could - the background and the Universal Search I could kind of like live without, but the Quick Links are different. You know, the links that I usually go to a lot. I go there and I kind of wanted that in there.

Q:    And those links might be to?

A:    Different - I got games on there, on my screen, and different things on there, [INAUDIBLE] just click right on it, an icon, yeah. YouTube and things like that.[165]

127.    This respondent credits the Quick Links functionality with enabling a user to open applications by clicking on icons on the phone's home screen. Such a description bears no resemblance to the description of the Quick Links feature used by Professor Hauser in his survey. The respondent failed to identify any aspect of the description used by Professor Hauser, such as being able to take multiple actions on information such as phone numbers or email addresses automatically identified by the phone.

128.    My parallel pretest suggests that respondents also did not adequately understand the Universal Search feature. One respondent stated:

Q:    That's alright. That's totally fine. Universal Search. What does that one mean to you?

A:    That one is basically if wherever you're at, whether it's if you're out of cellular service and with WiFi you can basically search anything and it should pick up the signal

---

[165] Exhibit 8 (Chicago-1: Respondent 2).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> and if you put in, I don't know, just F, it's going to bring up all the Fs, but it's not going to give you-if it's in your-it's hard to explain. If it's in your phone already, it's not going to take you through every F, just it'll take you to something that the phone is familiar with. Does that make sense?[166]

129.    This respondent appears to believe that the patented Universal Search functionality involves being able to get a signal to be able to make searches. The respondent also relates the patented functionality to the nature of the search results, such as the fact that the results only identify information that is already in your phone. Neither of these things were mentioned in the description of this feature used by Professor Hauser. Moreover, the respondent failed to identify any aspect of the description used by Professor Hauser, such as being able to use a single search to find information from different sources. The respondent further fails to understand that the feature requires a search of information on the Internet as well as locally.

130.    Other respondents were similarly confused about this feature. According to one respondent:

> Q:    Excuse me. Universal Search: what does that feature do?
>
> A:    That - I like that feature because for example, you're going on Google and, for example, see the last thing I texted was [COMPANY] and I started putting the s, you know, starting it off and then [INAUDIBLE] -
>
> Q:    This little cough. Excuse me.

---

[166] Exhibit 8 (Philadelphia: Respondent 3).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

A:     No problem. Basically that'd be like, for example, I'm starting to put in [COMPANY] and [COMPANY] will come up and also my friend Sam will come up as soon as I put the s in from my contact list and also Sara [ph] from Twitter, so I do like that feature, actually, but I've also found that sometimes where I'm looking for something specific and it does bring all these other things up and it's not what I'm looking for, so I have to continue spelling out the whole word. I felt like some of them could be so close, all the way down to the last couple of letters.

Q:     Let's say that you have a smart phone that does not have the Universal Search feature. What would it have instead? In other words, how would you go about accomplishing the same as -?

A:     Basically you'd have to just go into your contact and scroll through and I know, me, I have over 400 contacts in there and now these people have all their Facebook contact and everything and it takes a lot to go through all your scrolling, so I do find that convenient, too.[167]

131.    This respondent does not understand the distinction between the patented feature and the non-infringing alternative. In particular, the respondent appears to believe that, without the Universal Search functionality, the device will not perform searches. The respondent described the non-infringing alternative as requiring the user to scroll through his or her information manually in order to find information that he or she is looking for. This is very different from the alternative described by Professor Hauser in his survey, which allowed for

---

[167] Exhibit 8 (Philadelphia: Respondent 6).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

searches, just not of multiple sources using a single search. The respondent further fails to understand that the feature requires a search of information on the Internet as well as locally.

132.    Another participant in my parallel pretest gave the following description of the Universal Search feature:

Q:    And then what about Universal Search?

A:    Oh my God. Was I really not paying attention? Were they really talking about all these things?

Q:    Trust me, it's not good or bad that you don't remember. But what I'm curious about is how you would go about reminding yourself. If you wanted to as you were making these choices. I'm more interested in-

A:    I would have to go back and [INAUDIBLE].

Q:    And hit the Back button.

A:    And go to the Back button to go to that. Because now I'm really aggravated with myself, because the Universal Search, I'm trying to think. Like I know that the search, it has to do with when you go on the Internet. And when you're Googling stuff. I mean what I do on my-I just go right to my search thing, and I type in what-wait that was one thing. That's right. They were showing, weren't they showing something where it would pop up, the different names, like "George"? Was it under that one? So George, either George Michaels, or George Washington. So it was that one. Maybe it's cool. I don't know if my phone-I don't think my phone does that, to be honest. Because I don't remember it like, typing in something and all those things coming up. I don't think it does. So now wait a minute, so if

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> I can think about that one, I gotta think what this one means.[168]

133.    This respondent does not understand the patented feature. The respondent appears to believe that the Universal Search functionality at issue in the survey refers to searching the Internet using Google. The respondent described the patented feature as allowing her to type in a search box and search the Internet. This is very different than the patented feature described by Professor Hauser in his survey, which allowed simultaneous searches within the smartphone and on the Internet.

134.    Confusion or misunderstanding regarding the Missed Call Screen Management feature is evident from the following respondent's description of this feature:

> Q:    So number two. Now we're going to go to this row. Call initiation and screening. Can you tell me what Missed Call Screen Management means to you in terms of what that feature is?
>
> A:    As of what this is telling me?
>
> Q:    Yes.
>
> A:    If someone calls and I'm on the phone, I can either pre-hit I'm busy, I'm at school, I'm in class, or I can actually type in a message call you later or whatever, but it should have that. In fact, I think it does have that in there. I can't talk now.
>
> Q:    Let's say you have a smart phone that does not have that particular feature, the Missed Call Screen Management.

---

[168] Exhibit 8 (Chicago-2: Respondent 4).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

What would you-what do you think the phone would have instead if you missed a call?

A:   Probably an answering device. Either mechanical or your own voice.

Q:   But I mean, if-but if you miss the call and it didn't have this particular Missed Call Screen Management feature, what would it have with regard to missed calls? What would you expect it to have if it didn't have all of that?

A:   Well, with my present phone, it goes to a voicemail. I don't know. I mean, I am-

Q:   So if it didn't have that feature, you would expect that the call would just go to voicemail.

A:   Voicemail. Yeah.[169]

135.   This respondent appears to confuse Missed Call Screen Management with some variant of the Reject Call with Message distraction feature that Professor Hauser included in his survey. The respondent is unable to describe any aspect of the patented feature, such as the ability to reply to missed calls or the ability to respond to callers by using two interactive areas to take further action on a missed call. The respondent inaccurately states that, without the Missed Call Screen Management feature, the call would go to voicemail and fails to identify that the alternative would provide a list of missed calls and an interactive area that would allow you to view contact information and make a call. This excerpt demonstrates that the respondent does not understand the patented feature or the non-infringing alternative.

---

[169] Exhibit 8 (Philadelphia: Respondent 3).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

136.    Other respondents in my parallel pretest were similarly confused regarding the

Missed Call Screen Management feature. For example, another respondent noted:

> Q:    If we look at Call Initiation and Screening, now-so, the "Missed Call Screen Management":  what does that icon mean to you, as far as what it does?
>
> A:    It tells me that you missed a call from a certain person.
>
> Q:    Anything else?
>
> A:    No.
>
> Q:    If you-so, if you have a phone that does not have that icon, what [CROSSTALK]-
>
> A:    Mine just has a red phone. You know, when I make the calls, the-it has a picture of a red phone.
>
> Q:    So, it would just have a picture?
>
> A:    So-yeah. It would just be hit-or-miss, you know?
>
> Q:    So, with the "missed screen call management," what does it-tell me-forgive me. Tell me a little bit more about what it does. What it tells you, when you place a call.
>
> A:    It tells you that you've missed a call from a certain person, and it gives you the opportunity to call them back or send a text message-whatever.
>
> Q:    Got it. How would you do-so- And if that icon wasn't there, on your phone-whatever phone you had-how would it-how would you expect the phone to be different? What would it have, instead?
>
> A:    You'd actually have to go through a log, and see if you missed anything.[170]

---

[170] Exhibit 8 (Phoenix: Respondent 2).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

137.   The respondent appears to equate the Missed Call Screen Management feature with the ability to be notified of a missed call or the ability to call or text the missed caller back when information regarding the missed call is received. The respondent does not understand that the non-infringing alternative also provides for both of these things. The respondent mistakenly believes that the non-infringing alternative involves manually going through a call log to see if there is a missed call. No mention is made of the role of the two interactive areas or the use of gestures to take different actions discussed in Professor Hauser's description of the patented feature and non-infringing alternative. This suggests clear confusion regarding the key distinction between the patented feature and the non-infringing alternative.

138.   Another respondent's perception of the the Missed Call Management feature is reflected in what follows:

> Q:   So let me ask you again about Missed Call Screen Management, what was that one, again?
>
> A:   The screen management where you can take it or not take it or take it and just send a standard message or not take it and text something[…]
>
> Q:   So what's the difference between the Missed Call Screen Management and the reject call with message?
>
> A:   Well, the reject call is what you're doing automatically. You know, you have the two buttons, you hit it, and it goes to send a message. You have the option. This one here, it gives you multiple options to do what you wanna do; you can email 'em or do various other functions. That's what my understanding was.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> Q:   What if you don't have that, what if you don't have the Missed Call Screen Management - like over here they don't - what would you assume this phone has instead of this?
>
> A:   Again, the standard phone. Like they said, this is gonna have your standard phone, you know, you get the call reject. You get the incoming call, you get the message, you get the missed call message, voice message, that they left a message, the notification, and that's all you're gonna get is your standard.[171]

139.   This respondent confuses Missed Call Screen Management with a variant of the Reject Call with Message distraction feature that Professor Hauser included in his survey. The respondent is unable to describe any aspect of the patented feature, such as the ability to reply to missed calls or the ability to respond to callers by using two interactive areas to take further action on a missed call. The respondent inaccurately states that, without the Missed Call Screen Management feature, the call would go to voicemail and the user would be notified of the missed call. The respondent fails to identify that the alternative would provide a list of missed calls and an interactive area that would allow you to view contact information and make a call. This excerpt demonstrates that the respondent does not understand the patented feature or the non-infringing alternative.

---

[171] Exhibit 8 (Chicago-2: Respondent 6).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

140.    The lack of understanding demonstrated in these excerpts is far from anomalous. The table below shows that respondents exhibited confusion or a lack of understanding across all features at issue.[172]

| | Total Number of Respondents | Respondents That Exhibit Lack of Understanding Regarding Hauser Description | |
| --- | --- | --- | --- |
| | | Number of Respondents | Percent of Total |
| Missed Call Screen Management | 26 | 24 | 92% |
| Automatic Word Correction | 26 | 18 | 69% |
| Background Syncing | 26 | 22 | 85% |
| Quick Links | 26 | 25 | 96% |
| Universal Search | 26 | 4 | 15% |
| Any Features | 26 | 26 | 100% |

141.    As the table shows, among the 26 respondents, 24 demonstrated confusion or failed to identify functionality critical to the Missed Call Screen Management feature; 18 demonstrated confusion or failed to identify functionality critical to the Automatic Word Correction feature. Twenty-two of the 26 respondents demonstrated a clear lack of understanding of the Background Syncing feature and 25 demonstrated confusion regarding the Quick Links feature. Among the 26 respondents, four demonstrated confusion or failed to identify functionality critical to the Universal Search feature. Every single respondent exhibited

_____

[172] Exhibit 11.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

misunderstanding or a lack of sufficient understand regarding at least one of the patented features.[173]

142.    Note that these data only indicate whether the respondents understood Professor Hauser's descriptions of these features, not whether they understood the correctly defined features and non-infringing alternatives. This summary does not imply that the rest of the responses reflected a clear understanding by respondents. In fact, that is far from the case. Some of these other responses reflect something less than clear-cut misunderstanding, such as dispositive mistakes. Yet, many failed to identify the salient differences between the accused features and the non-infringing alternatives, as described in Professor Hauser's survey.

> **4.**    ***Widespread inaccuracies, confusion, lack of understanding and presentation bias render Professor Hauser survey responses useless for purposes of making any inferences regarding consumer behavior as it relates to the patented functionalities.***

143.    Conjoint analysis *can be* an effective tool for measuring peoples preferences for a given feature and how they vary from one individual to the next. However, conjoint analysis is not intended to measure the extent to which people's preference vary based on widely varying, and often, in this case, inaccurate, perceptions of the underlying features. Very granular features, such as those at issue in the present case, need to be very accurately and precisely described if there is to be hope that survey data generated from such descriptions will reflect accurate

---

[173] Exhibit 11.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

consumer perceptions regarding particular advantages of patented functionalities versus non-infringing alternatives. As described above, Professor Hauser's descriptions are inaccurate and imprecise and consequently measure the wrong consumer perceptions. This measurement error is further compounded by the biased and unbalanced presentation of the alternatives which indicate a larger functionality difference between the infringing and non-infringing alternatives.

144.    My parallel pretest, from an equivalent sample universe of respondents, indicates that respondents fell far short of demonstrating acceptable levels of understanding of the subtle distinctions between the patented features and the non-infringing alternatives. Based on my review, it is not clear that features with such subtle distinctions as those differentiating the patented features from the non-infringing alternatives can be described in a way that allows reliable measurement using conjoint analysis. Whatever the case, the descriptions in the surveys presented here did not provide respondents with descriptions adequate to make meaningful choices regarding the features that were tested. As a result, the output from the survey cannot be relied upon in any meaningful way.

**B.      Professor Hauser's Analysis is Ill-suited to Predict the Impact That Removal of the Patented Features Would Have on Sales of the Accused Devices Because His Analysis Relies on Unfounded Assumptions Regarding Responses to His Survey.**

145.    Other flaws aside, Professor Hauser's estimates of the sales affected by specific patented features is unusable because those estimates rely on unfounded assumptions regarding responses to his survey.  Consider, for example, Professor Hauser's prediction that sales of

94

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Samsung smartphones with 4.8" screens priced at $199 would have been 11 percent lower had those smartphones not included the Background Syncing function.[174]   Professor Hauser's 11 percent prediction stems from comparing two distinct calculations related to what he refers to as consumer willingness-to-buy ("WTB") shares.

146.    Professor Hauser refers to his first WTB share as the baseline share. This baseline share is generated by an RFC simulation that predicts the portion of the 507 survey respondents that, based on Professor Hauser's analysis, would "choose to buy the baseline product."[175] In this case, the baseline product resembles the Galaxy S III in terms of price ($199) and screen size (4.8") and is otherwise assumed to include all of the other features covered in Professor Hauser's survey.[176] As Exhibit N1 of his report shows, Professor Hauser's prediction tool suggests that 72 percent of the 507 survey respondents would choose to buy the baseline phone.[177]

147.    Professor Hauser refers to his second WTB share as the but-for share.  The but-for share calculation differs from the first in only one respect. The product underlying the but-for calculation, or the "but-for smartphone," is identical to the baseline phone except that the former does not include Background Syncing. The two products are otherwise identical in that each is priced at $199, each has a 4.8" screen and, except for Background Syncing, each has all the rest

---

[174] Hauser Report, at Exhibit N1.
[175] Hauser Report, at ¶114.
[176] Hauser Report, at Exhibit N1.
[177] Hauser Report, at Exhibit N1; *See also*, Hauser Report, at ¶114.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

of the features covered in Professor Hauser's smartphone survey. As Exhibit N1 of his report

shows, Professor Hauser's prediction tool suggests that 64 percent of the 507 survey respondents

would choose to buy this second but-for phone.[178]

148.    According to Professor Hauser, the "difference between the baseline and but-for

shares provides an estimate of the percentage of Samsung consumers who would buy a

smartphone with the tested features (Background Syncing in this example) but not without it."[179]

He adds:[180]

> For example… the baseline share for a smartphone with a screen
> size of 4.8" and a price of $199 (and other features) is 72%. The
> but-for share for the same smartphone without the Background
> Syncing patent-related feature is 64%. In this example, the absence
> of the Background Syncing feature lowers willingness to buy by
> 8% (8% = 72% − 64%).  Another way to present these results is to
> say that the change in the share is 11% (11% = (72% − 64%) ÷
> 72%).

149.    That is, Professor Hauser's estimate that Background Syncing was responsible for

11 percent of Samsung's $199, 4.8" screen smartphone sales is based on these comparisons.

Professor Hauser is mistaken, however, to assume that the eight percentage point difference

between his baseline and but-for WTB shares reflects people whose purchase of the accused

devices depended on the Background Syncing feature. This follows from Professor Hauser's

---

[178] Hauser Report, at Exhibit N1; *See also*, Hauser Report, at ¶115.
[179] Hauser Report, at ¶116.
[180] Hauser Report, at ¶116.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

inability to determine what not "buying a phone" represents. Recall that each respondent faces 16 choice tasks with two choices each. The first choice, or "internal choice," involves selecting the most preferred of four hypothetical smartphone alternatives. The second choice, or "external choice," elicits whether or not the respondent "would buy" the smartphone or tablet selected among the four considered in the immediately preceding internal choice.[181]

150.    The implications of the second choice to "buy or not" depends critically on the instructions given to survey respondents in making that choice. In describing that choice, Professor Hauser instructed respondents that they "may wish to consider the availability of other smartphone options in the market that may influence your purchase decision…" and expressly stated that they should consider "smartphones by other manufacturers *or other Samsung smartphones*."[182] However, Professor Hauser does not inquire further into what may have motivated a respondent's decision "not to buy" when faced with the second external option choice. As a result, Professor Hauser is unable to characterize what, among a variety of different alternatives, is represented by respondents' selections to "not buy" the preferred hypothetical alternative.

151.    One possibility is that respondents select "not to buy" the preferred internal option because newer, more preferred alternatives were available in July 2013, when Professor Hauser

---

[181] *See, e.g.*, Hauser Report, at Exhibits E and F.
[182] *See, e.g.*, Hauser Report, at Exhibit E.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

conducted his surveys. Recall that respondents were screened based on owning accused devices, some of which have been on the market since June 15, 2011 and the most recent of which was introduced on November 29, 2012.[183] Further, recall that respondents were instructed to assume that, unless otherwise specified, the hypothetical smartphones (or tablets) encountered in the first choice task had all the "other features on your most recent Samsung smartphone (tablet computer)."[184]  A respondent from my own parallel pretest observed the dated nature of the hypothetical phones presented in the first internal choice task:

> Q:     Did you feel that the smart phone options that they were giving you, that they were realistic?
>
> A:     Yeah, for the most part.
>
> Q:     Tell me - say more about that. "For the most part."
>
> A:     Because some of these new phones now are much more tech - they have a lot more new advances. I think this was about two years old as far as technology-wise. My phone is already pretty much considered outdated. At the same time, I had a majority of what they were offering.[185]

152.    Thus, selecting "not to buy" the preferred choice among the hypothetical alternatives may simply reflect a preference to upgrade to a more recently introduced smartphone (or tablet).  In terms of the eight percent differential referenced above, removing Background Syncing may simply reflect a reordering of the accused device in the presence of newer models.

---

[183] Opening Expert Report of Christopher A. Vellturo, August 12, 2013 ("Vellturo Report"), at Exhibit 13-B.
[184] Hauser Report, at Exhibits E and F.
[185] Exhibit 12 (Phoenix: Respondent 6).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

It does not imply a preference for a good on the market at the time the accused device was purchased.

153.    A second possibility is that respondents select "not to buy" the preferred hypothetical option because it does not measure up to the actual marketplace alternative that they presumably know best, the accused device that they actually own. This is especially relevant in the context of estimating the but-for share upon which Professor Hauser's diminished sales predictions are founded. This but-for WTB share is predicated on whether or not a respondent would buy a device modeled after the accused device, but without a specific feature.  In that case, it is only natural to assume that a respondent's "not buy" selection could very well be motivated by the fact that they already have a better smartphone and would not actually want to buy something inferior, or by their understanding that the "not buy" selection includes the option to buy that same phone with the feature at the same price because it is actually currently available on the market.

154.    The absurdity of not accounting for the accused device as a driving factor in the "not buy" selections is reflected in careful consideration of the baseline and but-for shares in the context of removing Background Syncing from an accused device. As noted above, with respect to $199 smartphones with 4.8" screens, Professor Hauser's predicted baseline share is 72 percent and the predicted but-for share is 64 percent. Because the accused device is among those available in the marketplace, Professor Hauser's 64 percent but-for share prediction is fairly interpreted as saying that 64 percent of survey respondents prefer the accused device without

99

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Background Syncing to the actual accused device with Background Syncing. The implication is that those 64 percent do not associate Background Syncing with any benefits at all.[186]

155.   More importantly, however, in terms of determining the impact that Background Syncing had on sales of the accused devices is the inference regarding the eight percent difference between the baseline and but-for shares. One cannot presume, as Professor Hauser does, that the eight percent would prefer some device *other than the accused device* to the but-for device (i.e., the accused device with Background Syncing removed). The eight percent may simply reflect preferences for the accused device over a hypothetical one without Background Syncing.  Professor Hauser's characterization of the outside option does not allow him to assess how different real world alternatives stack up to one another (e.g., the accused device versus actual marketplace alternatives).

156.   Ultimately, Professor Hauser's predictions regarding the impact of removing patented features are dependent on the assumption that the difference between his baseline and but-for WTB calculations reflect people choosing not to buy the accused devices. However, he fails to account for the extent to which that difference reflects survey respondents' preferences for 1) devices that were not available at the time they purchased their accused devices and 2) accused Samsung devices that were preferred to the hypothetical ones presented in the survey.

---

[186] In effect Professor Hauser has constructed a choice task that results in a market basket of competing products that includes both the accused and non-infringing alternatives of each Samsung phone. Such a market basket is unusable in measuring any damages in this case. *See* Exhibit 13.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Because he cannot account for these two factors, Professor Hauser is unable to identify respondents who might have bought an *alternative to the accused Samsung device* that was *available at the time* they purchased the accused device had it not incorporated any of the patented functionalities. Other criticisms aside, this renders his analysis ill-suited to predict the impact that removal of the patented features would have on sales of the accused devices.

### C. Professor Hauser's Conjoint Analysis is Unreliable for Predicting the Sales Impact of the Patented Features Because it Presupposes That Consumers Would Have Been Aware of the Patented Features, the Non-infringing Alternatives, and the Extent to Which Phones and Tablets in the Marketplace Possessed These Features.

#### 1. *Unlike in the real world, Professor Hauser's surveys educated respondents about the patented features and whether smartphones or tablets possessed these features.*

157.    Professor Hauser devoted a substantial portion of the surveys to purportedly teaching respondents about the patented features and how they were different from Samsung's next best alternative.[187] This was done through three different media or methods: videos, text, and icons. In effect, Professor Hauser created a set of "super consumers" equipped with much more information about detailed aspects of smartphones and tablets than the vast majority of consumers in the marketplace. Consumers in the real world would not have access to the same tutorial given by Professor Hauser prior to making their purchase decisions.

---

[187] Hauser Report, at Exhibits G and H.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

158.     This was confirmed by my parallel pretest of Professor Hauser's survey. Many of these consumers noted that they learned a lot about the features in the surveys and that they wished that they had received this information when they purchased their smartphones.[188] For example, one respondent noted:

> Q:     You commented that you learned some things about smartphones tonight. Anything you can add to that - about anything that you learned about smartphones?
>
> A:     I learned about the three-way calling which I didn't know. I learned it had other features with the pen and it also with the email - the email, the mobile phone and the address all in one and you can pull them up - I learned that, which I didn't know, which I may have. So certain things on the phone I learned that I didn't know.
>
> Q:     Anything else that stood out to you that you feel you learned?
>
> A:     I learned it has a lot of good features on the phone. So it has features for certain people that - I don't need this, I don't need that. But those that want - I want this, I want that - it had all the features. It had those features for what you feel that you use in your daily life with the phone.[189]

159.     Another respondent stated:

> Q:     Got it. Did you feel that you learned anything new about smartphones from taking the survey?

---

[188] This is consistent with evidence from Professor Hauser's own pretest. Professor Hauser's notes from the interviews stated that, according to one respondent: "The last two features taught her something new she did not realize." *See* Hauser Report, at Exhibit I1.
[189] Exhibit 14 (Philadelphia: Respondent 7).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> A:   Yeah. I probably won't pick up the directions again, because it did give me a very good description.
>
> Q:   Was there - what - anything in particular that you feel you learned from this?
>
> A:   Yeah. The icon thing. I learned to investigate the features I have on my phone.
>
> Q:   Got it.
>
> A:   Because, I probably don't know half of what I have.[190]

160.   According to another respondent:

> Q:   Did you feel that you learned anything new about smartphones from the survey?
>
> A:   Yeah, I do.
>
> Q:   Like what?
>
> A:   Learned some different-what different things mean, like tapping a picture would bring it up to call the person, instead of just sliding it-you know, and doing it something like that. So, I think I picked up a few things that were-
>
> Q:   Anything else that you remember, that you feel you learned?
>
> A:   Well, that there's a lot of phones out there.[191]

161.   Another respondent stated:

> Q:   Did you feel that you learned anything new about smartphones from the survey?
>
> A:   Yes. Like you say -

---

[190] Exhibit 14 (Philadelphia: Respondent 2).
[191] Exhibit 14 (Phoenix: Respondent 2).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Q:   Tell me more.

A:   I'll probably go play with my phone now and see what some of that stuff is, because I see it on there, but I just never know what it is and I've never had any use for it, so it'd be nice to know if it's there. [192]

162.   According to another respondent:

Q:   I love it. [CROSSTALK] It's perfect. The - do you feel that - well, I know you did but I have to ask the question anyway and then we'll follow through. Do you feel you learned anything about smartphones from the survey?

A:   Oh yes, I did. I can't wait to go and start opening mine and looking going, does mine do this? 'Cause I don't know.

Q:   Anything in particular that stood out to you that you learned? I know you mentioned things, you know, along the way.

A:   I would love to know if mine has the smile feature. I don't know if that's even come out yet, you know. And I know mine has the WiFi, but I don't know what all it does on there. It'll be kind of interesting to see.

Q:   Anything else that you kind of learned aside from some of the features?

A:   I think that was about it. Some of the different features that mine might have. [193]

---

[192] Exhibit 14 (Phoenix: Respondent 7).
[193] Exhibit 14 (Phoenix: Respondent 8).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

2.    *Marketplace evidence suggests consumers rarely explore and become aware of feature details at the granular levels that distinguish the patented functionalities from other alternatives.*

163.    Implicit in Professor Hauser's conjoint analysis – where respondents sit through what are effectively television commercials for the patented features before making their choice selections – is the assumption that, in the real world, consumers would have been aware of and have been able to distinguish between the presence of the patented features and Samsung's non-infringing alternatives in the accused smartphones and tablets. Professor Hauser has provided no credible evidence that this is the case. In fact, there is much evidence to the contrary. The patented features that were the subject of Professor Hauser's study are minor features that were rarely, if ever, mentioned by Samsung or third parties. It is highly unlikely that the presence or absence of these features would have been noticed by typical consumers of the accused products.

164.    As part of my review of materials in this case, I examined manufacturer promotional material,[194] media and customer smartphone reviews,[195] and information from online

---

[194] *See, e.g.*, LeBron's Day with the Samsung Galaxy Note II (1:31) https://www.youtube.com/watch?v= Ie0mAnjz1Oc (viewed September 6, 2013); LeBron's Day with the Samsung Galaxy Note II (1:01) http://www.youtube.com/watch?v=lB8586Qu0eY (viewed September 6, 2013); Samsung Next Big Thing Super Bowl Full Ad with Seth Rogen, Paul Rudd, and Lebron James (2:01)  http://www.youtube.com/watch?v=dLtysG4 O0ak (viewed September 6, 2013); The Next Big Thing is Already Here - Samsung Galaxy S III (1:31) https://www.youtube.com/watch?v=nf5-Prx19ZM (viewed September 6, 2013).

[195] *See, e.g.*, http://www.amazon.com/product-reviews/B00891P3QI (viewed September 11, 2013); Geller, Jonathan S., "Samsung Galaxy S III review," BGR.com, 6/20/2012, available at http://bgr.com/2012/06/20/samsung-galaxy-s-iii-review/ (viewed September 5, 2013); Crush, Jamison, "Samsung Galaxy S III Review: Universally Excellent Android Smartphone," Brighthand.com, 6/19/2012, available at http://www.brighthand.com/printArticle.asp?n ewsID=19018 (viewed September 5, 2013); Dolcourt, Jessica, "Samsung Galaxy S III," CNET.com, 6/16/2012,

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

retailers.[196] █████████████████████████████████████████████████

████████ My review suggests that the granular functionalities allegedly enabled by the patents-in-suit play an extremely limited role, if any, in informing people's purchase decisions. While the larger feature categories, in which the patented features are a part, are sometimes highlighted (i.e., syncing), the specific aspect of the feature made possible by the patents-in-suit did not generally appear in these sources.

165.    One source frequently used by consumers to compare competing smartphones and tablets is side-by-side product comparisons available from various online sources. In order to assess the degree to which consumers would be aware of the granular features allegedly enabled by the patents-in-suit in smartphones, I analyzed side-by-side product comparisons available from the top four wireless carriers (T-Mobile, Verizon, AT&T, and Sprint), various retailers (Best Buy, Target Mobile, and Walmart Wireless), and independent reviewers (CNET, gdgt, The Verge, and PC World). Using websites associated with these sources, I identified all of the

---

available at http://reviews.cnet.com/smartphones/samsung-galaxy-s-iii/4505-6452_7-35326378.html (viewed September 5, 2013); Sakr, Sharif, "Samsung Galaxy S III review," Engadget.com, 5/25/2012, available at http://www.engadget.com/2012/05/25/samsung-galaxy-s-iii-review (viewed September 5, 2013).
[196] *See, e.g.*, http://www.bestbuy.com/site/Samsung-Galaxy/Samsung-Galaxy-S-III/pcmcat305200050006.c?id= pcmcat305200050006 (viewed September 5, 2013);  http://www.verizonwireless.com/b2c/vzwfly (viewed September 5, 2013); http://www.target.com/sb/phones-with-plans-cell-electronics/-/N-5xte5#navigation=true&vi ewType=medium&sortBy=bestselling&minPrice=from&maxPrice=to&isleaf=true&navigationPath=5xte5&parentC ategoryId=9975824&facetedValue=/-/N-5xte5Z5y4wr&RatingFacet=0&categoryId=4581 (viewed September 5, 2013).
[197] █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

features upon which the following smartphones could be compared: Samsung Galaxy S II, Samsung Galaxy S III, Samsung Galaxy S IV, Samsung Note II, and Apple iPhone 5.[198]

166.     From my examination of these 11 side-by-side comparisons, I found that the features upon which the smartphones were compared were different across sources, though there was overlap. Combined, across all of these sources, there were a total of 114 different feature categories upon which smartphones were compared.[199] Most of these feature categories were identified in less than half of the sources (e.g., 89 were identified in five or fewer sources).[200] Of the feature categories that were identified in more than half of the sources:

- 1 was available in all 11 sources (product weight);

- 4 were available in 10 of the sources (band and mode; mobile operating system, product dimensions, and front-facing camera);

- 1 was available in 9 of the sources (other price(s));

- 6 were available in 8 of the sources (battery type; built-in GPS; internal memory; talk time; WiFi; and price with 2-year contract);

---

[198] Exhibits 15 and 16.
[199] Exhibits 15 and 16.
[200] Exhibits 15 and 16.

107

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- 9 were available in 7 of the sources (average user/critic rating; memory card; mobile hotspot ready/tethering capable; mobile web browsing; screen resolution; screen size; secondary camera; standby time; and supported email); and

- 4 were available in 6 of the sources (RAM; screen type; touch screen; and Bluetooth).[201]

167.    It does not appear that the specific, granular functionalities made possible by the patents-in-suit are discussed in any of these 114 feature categories. As a result, consumers that used these 11 different product comparison websites to compare features associated with various smartphones on the market would be unlikely to be aware of the presence or absence of the patented features. Without this type of information, it is not clear how consumers would be able to make a product choice based on these features, as Professor Hauser's analysis assumed would be the case and as respondents in Professor Hauser's conjoint exercise were instructed to do.

168.    I performed a similar analysis using side-by-side product comparison websites for tablets. For this analysis, I considered information from eight different sources: four different retailers (Best Buy, RadioShack, Newegg, and Target Mobile) and four different independent reviewers (CNET, gdgt, The Verge, and PC World). I used these sources to identify the features upon which the following tablets could be compared: Apple iPad 4th Gen, Apple iPad Mini,

---

[201] Exhibits 15 and 16.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

Samsung Galaxy Note 10.1, and Samsung Galaxy Tab 2 10.1).[202] Combined, across all of these sources, there were a total of 93 different feature categories upon which tablets were compared.[203]

169.    Most of these 93 feature categories were identified in less than half of the sources (e.g., 66 were identified in three or fewer sources).[204] Of the feature categories that were identified in 50 percent or more of the sources:

- 1 was available in all 8 sources (price);

- 7 were available in 7 of the sources (operating system; product dimensions; product weight; screen size (measured diagonally); rear-facing camera pixels; screen type; and average user/critic rating);

- 7 were available in 6 of the sources (Bluetooth-enabled; front-facing camera pixels; speakers; screen resolution; storage capacity; system memory (RAM); and WiFi built in);

- 8 were available in 5 of the sources (battery life; battery type; color category; GPS enabled; processor brand; processor speed; SD card slot; and ports (other); and

---

[202] Exhibits 17 and 18.
[203] Exhibits 17 and 18.
[204] Exhibits 17 and 18.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- 4 were available in 4 of the sources (charging options; headphone jack; processor cores; and TV out)[205]

170.     It does not appear that the specific, granular functionalities made possible by the patents-in-suit are discussed in any of these 93 feature categories. As a result, if consumers relied exclusively on these eight different product comparison websites to compare features associated with various tablets on the market, they would be unlikely to be aware of the presence or absence of the patented features. So, to the extent that consumers do approach the purchase decisions by making the types of systematic comparisons that underlie Professor Hauser's conjoint analysis, the sources that make such comparisons easy for consumers to conduct do not provide the type of detailed information that covers distinctions between Apple's patented functionalities and other alternatives. Further, based on my research, gathering the amount of information required to make systematic comparisons at the granular level of detail of the patented features would be prohibitive or impractical for the vast majority of consumers.

---

[205] Exhibits 17 and 18.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> **3.**     ***Conjoint research has shown that if respondents are unaware of attributes used in the survey, the estimated values associated with those attributes will be inflated.***

171.    Research has shown that if respondents are unaware of the attributes shown in the conjoint survey, then the estimated values associated with the attribute will be inflated. According to one author:

> Evaluation tasks intentionally force respondents to attend to attributes that they might otherwise not notice. In doing so, attention can elevate the importance of particular attributes to a level that is greater than would occur in the marketplace. For example, featuring the attribute 'surge protector' may make this attribute salient even though it may not be salient in actual choices.[206]

> Simply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choices.[207]

172.    Professor Hauser pointed out this very limitation associated with conjoint analysis in his own prior writings. For example, in a 2004 article entitled, *Conjoint Analysis, Related Modeling, and Applications*, he noted that there is a need for further research in order to account for the difference between conjoint analysis, which informs respondents about product attributes, and the real world, where such attributes may not be known. He wrote:

---

[206] J. Huber, "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," *Sawtooth Software Conference Proceedings* (1997): 244.

[207] J. Huber, "What We Have Learned from 20 Years of Conjoint Research: When to Use Self-Explicated, Graded Pairs, Full Profiles or Choice Experiments," *Sawtooth Software Conference Proceedings* (1997): 252.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> Conjoint analysis is based on measurements that inform respondents about product features. However, in real markets such information diffuses and does not happen instantaneously. Thus, we expect further development of methods that combine the diffusion of information among customers with models of how customers will choose based on that information.[208]

173.   Including features that customers are not currently aware of may not be a problem in every conjoint analysis. Such an approach is necessary with new products or products with new attributes in which survey respondents have not yet had real world experience in the marketplace. This deviation from reality is justified where respondents will be exposed to marketing or other communication such that at some point in the future the consumers are expected to be as informed about the product features as the survey respondents were when completing the exercises.

174.   In this case, however, the patented features are not unknown because they are new, but rather because they are minor features that the companies marketing the products and others evaluating the products consider relatively unimportant. As such, there is no expectation that the awareness of these features would change if the patented features were unavailable and design-around alternatives were offered instead. Simply put, consumers in the actual market can

---

[208] Hauser, J., and V. Rao, "Conjoint Analysis, Related Modeling, and Applications," in Wind, J. and P. Green (eds.), *Advances in Market Research and Modeling: Progress and Prospects* (Boston, MA: Kluwer Academic Publishers, 2004):18 available at http://web.mit.edu/hauser/www/Papers/Hauser_Rao%20Conjoint%20Analysi s%20Green%20Festschrift%202002.pdf (viewed July 1, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

only react to information that they are aware of, and my review suggests that very few would be aware of the patented features.

4. *Unlike Professor Hauser's conjoint study in this case, academic research, including Professor Hauser's own prior studies, focuses on major features that are well known to consumers, not minor features.*

175. Conjoint analysis that is the subject of academic research has generally focused on product attributes that are more widely understood to be important to consumers and are, therefore, more likely to factor in to the consumer's decision making process. Based upon my review of 75 conjoint studies appearing in the top six marketing journals from 2005 through 2013,[209] I found that researchers generally included features that were relatively well known to consumers.[210] At the very least, the features that were included in these conjoint studies were features that consumers would readily recognize the product as possessing.[211]

176. For example, in one study in *Marketing Science*, Narayan, Rao, and Saunders (2011) described a conjoint study that was conducted on cell phones.[212] The features in this study consisted of four product attributes: GPS capabilities, MP3 capabilities, video capabilities, and

---

[209] My search included conjoint studies published in the Journal of Marketing, Journal of Marketing Research, Journal of Consumer Research, Marketing Science, Journal of the Academy of Marketing Science, and Marketing Letters from January 1, 2005 to May 21, 2013. See Exhibit 19.

[210] Exhibit 19.

[211] Exhibit 19.

[212] Narayan, V., Rao, V., and C. Saunders, "How Peer Influence Affects Attribute Preferences: A Bayesian Updating Mechanism," *Marketing Science* 30, no. 2 (2011).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

price.[213] In another study that appeared in the *Journal of Marketing Research*, Otter, Allenby, and Van Zandt (2008) reported the results of a conjoint study on televisions.[214] The features examined in this study consisted of brand name, screen size, sound system, channel blackout, picture-in-picture, and price.[215] Another conjoint study conducted by Völckner, Rühle, and Spann (2012) that was published in *Marketing Letters* focused on wine.[216] The features that were included in this analysis consisted of price, vintage, and wine region.[217]

177.     Professor Hauser, in his own academic research, also has focused on relatively important product attributes when conducting conjoint analyses. In preparing this report, I implemented a review of all of the conjoint studies appearing in any of the publications identified on Professor Hauser's CV. As Exhibit 20 shows, the conjoint studies conducted by Professor Hauser that are the subject of academic research, which included products such as automobiles, mobile phones, and instant cameras, examined features that were relatively important to consumers, and generally more well-known than the patented features that he focused on in this case.

---

[213] Exhibit 19.
[214] Otter, T., Allenby, G., and T. Van Zandt, "An Integrated Model of Discrete Choice and Response Time," *Journal of Marketing Research* 45 (2008).
[215] Exhibit 19.
[216] Völckner, F., Rühle, A., and M. Spann, "To Divide or Not to Divide? The Impact of Partitioned Pricing on the Informational and Sacrifice Effects of Price," *Marketing Letters* 23 (2012).
[217] Exhibit 19.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

178.    For example, in a 2007 article appearing in the journal, *Marketing Science*, Professor Hauser described a conjoint study that he conducted involving smartphones.[218] The features that were examined in this study consisted of price, brand, form, operating system, network, keyboard, and size.[219] Professor Hauser also conducted at least one other conjoint study involving mobile phones, in 2011 in the *Journal of Marketing Research*.[220] The features examined in the 2011 study were brand, color, screen size, thickness, camera resolution, style, and base price level.[221] The features that Professor Hauser included in these studies are much less granular than those included in this case, and appear among the features listed prominently in the comparisons websites.[222]

179.    In addition to Professor Hauser's conjoint studies relating to smartphones, his other conjoint studies involving complex products also focused on relatively important and well

---

[218] Yee, M., Dahan, E., Hauser, J., and J. Orlin, "Greedoid-Based Noncompensatory Inference," *Marketing Science* 26, no. 4 (2007): 541; Hauser, J., Dahan, E., Yee, M. and J. Orlin, ""Must Have" Aspects vs. Tradeoff Aspects in Models of Consumer Decisions," *Proceedings of the Sawtooth Software Conference* (2006): 169-181.

[219] Exhibit 20. The levels reported for these features included: Price: $99, $199, $299, $499; Manufacturer: Sony, Samsung, Nokia, BlackBerry; Form: flip, brick; Operating System: Palm, Microsoft; Carrier: Verizon, Cingular, Sprint, Nextel; Keyboard: mini, none; Size: small, large. (Hauser, J., Dahan, E., Yee, M. and J. Orlin, ""Must Have" Aspects vs. Tradeoff Aspects in Models of Consumer Decisions," *Proceedings of the Sawtooth Software Conference* (2006): 169-181.)

[220] Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011).

[221] Exhibit 20. The levels reported for these features included: Brand: Motorola, Lenovo, Nokia, Sony-Ericsson; Color: black, blue, silver, pink; Screen Size: small, large; Thickness: slim, normal; Resolution: .5MP, 1.0MP, 2.0MP, 3.0MP; Style: bar, flip, slide, rotational; Base Price: HK $1080, HK $1280, HK $1480, HK $1680. Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011).

[222] Exhibits 15 and 16.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

known product attributes. For example, in 2012 and 2011 articles appearing in the *Journal of Product Innovation Management* and the *Journal of Marketing Research*, Professor Hauser described a conjoint study that he conducted on automobiles.[223] This study focused on the following product features: brand, body type, EPA mileage, glass package, transmission, trim level, quality of workmanship rating, crash-test rating, power seat, engine, and price.[224] Similarly, in an article published in the *Journal of Marketing Research*, Professor Hauser described a conjoint study that he conducted that involved handheld GPS devices.[225] The features examined in this study were weight, display brightness, display resolution, acquisition time, battery life, backlit keyboard, price, size of device, ability to float on water, mini-USB port, track log, accuracy, reception, brand, screen size, screen color.[226]

180.    Based on my review, I am unaware of situations in which Professor Hauser's academic work explores the prospective impact of features as granular as those considered here. Further, while conjoint analysis is an established tool in both academia and business, the manner in which Professor Hauser has implemented his analysis here, one that focuses on the

---

[223] Hauser, J., Dong, S., and M. Ding, "Self-Reflection and Articulated Consumer Preferences," *Journal of Product Innovation Management (Forthcoming)* (2012); Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011).
[224] Exhibit 20.
[225] Hauser, J., Toubia, O., Evgeniou, R., and D. Dzyabura, "Disjunctions of Conjunctions, Cognitive Simplicity, and Consideration Sets," *Journal of Marketing Research* 47 (2010).
[226] Exhibit 20.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

marketplace impact of granular feature differences, is not an implementation of conjoint analysis that has been established as a standard within the academic community.

### D.   Results from Professor Hauser's Conjoint Study Are Unreliable Because They Failed to Account for Key Characteristics Inherent in the Real World Purchase Environment.

#### 1.   *Researchers have consistently noted that conjoint studies should entail realistic purchase decisions that mimic the actual purchase environment.*

181.   The claimed goal of Professor Hauser's conjoint study is to predict consumers' purchase behavior in a world where Samsung is unable to utilize the patented features and offers non-infringing alternative features instead. Professor Hauser uses a survey construct in an attempt to mirror the real world process whereby consumers consider a set of phones with different features and select one of the phones to purchase.[227] Rather than seeking to replicate this decision process closely, Professor Hauser has constructed an artificial exercise that reflects the purchase process actually experienced by consumers in only a very limited way.

182.   Exercises so severely divorced from the actual decision process have reduced reliability and applicability. Researchers argue that by their nature experimental choices differ from the real marketplace "with respect to the options available, the type and accessibility of

---

[227] More technically, researchers refer to the first phase as construction of the consideration set and the second stage as the choice. Shocker, D., Ben-Akiva, M., Boccara, B., and P. Nedungadi, "Consideration Set Influences on Consumer Decision-Making and Choice: Issues, Models, and Suggestions," *Marketing Letters* 2, no. 3 (1991): 183-185.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

information presented on those options, and the ability and motivation to make a good choice."[228] Professor Hauser himself has previously written that "conjoint analysis accurately represents how consumers will behave when faced with new products" if "the stimuli are realistic."[229] Other researchers have cautioned about the need for realistic purchase decisions in conjoint studies, stating:

> To some extent questionnaire design is an art; consequently it is difficult to list rules that guarantee generation of good data. However, some general rules can be applied: survey instruments always should be worded in as simple and straightforward a manner as possible to help ensure respondent comprehension; choice tasks should be designed to be realistic and natural, approximating as closely as possible the actual choice context; and the choices offered should be credible.[230]

---

[228] Allenby, G., Fennell, G., Huber, J., Gilbride, T., Horsky, D., Kim, J., Lenk, P., Johnson, R., Offek, E., Orme, B., Otter. T., and J. Walker, "Adjusting Choice Models to Better Predict Market Behavior," *Marketing Letters* 16, no. 3/4 (2005): 200. The authors state, "[c]ompared with marketplace behavior, information about choices is presented in ways that facilitate a rational choice among the alternatives. In conjoint studies, characteristics are arrayed in a grid cleanly displaying comparable information about each option. By contrast, in the marketplace, attribute information about options may be hard to find and often is not comparable across alternatives." (Allenby, G., Fennell, G., Huber, J., Gilbride, T., Horsky, D., Kim, J., Lenk, P., Johnson, R., Offek, E., Orme, B., Otter. T., and J. Walker, "Adjusting Choice Models to Better Predict Market Behavior," *Marketing Letters* 16, no. 3/4 (2005): 199.)

[229] J. Hauser, "Note on Conjoint Analysis," *MIT Sloan Courseware* (2007): 13. Professor Hauser's other research also mentions the importance of realism in conjoint design.  For instance, he ensured that respondents found the tasks realistic through pretests. *See* Yee, M., Dahan, E., Hauser, J. and J. Orlin, "Greedoid-Based Noncompensatory Inference," *Marketing Science* 26, no. 4 (2007): 541; Hauser, J., Toubia, O., Evgeniou, R., and D. Dzyabura, "Disjunctions of Conjunctions, Cognitive Simplicity, and Consideration Sets*," Journal of Marketing Research* 47 (2010): 489. Professor Hauser also finds that high-design-quality conjoints induce higher realism. *See* Selove, M., and J. Hauser, "The Strategic Importance of Predictive Uncertainty in Conjoint Design" (2011):21.

[230] Carson, R., Louviere, J., Anderson, D., Arabie, P., Bunch, D., Hensher, D., Johnson, R., Kuhfeld, W., Steinberg, D., Swait, J., Timmermans, H., and J. Wiley, "Experimental Analysis of Choice," *Marketing Letters* 5, no. 4 (1994): 355. Toubia et al. (2012) found that, "There is a growing concern that the amount of effort and attention spent by consumers when filling out preference measurement questionnaires is lower than when making real-life purchasing

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

183.    Another artificial aspect of the Hauser study is that it misses how the availability of smartphones in stores affects choice. In estimating shares and sales, one important question is whether all of the options are available from all sources, such as carriers.[231] It may be the case that, in some stores or for some carriers, not all phone options were available (i.e., the iPhone was not always available on carriers other than AT&T).[232] This may be an issue because choices are constrained to what is available and what the customer can see. Conjoint analysis assumes awareness of the attributes and availability of the choices.[233]

      **2.**    ***Professor Hauser's surveys excluded numerous features associated with the accused products.***

          **a.**    **Professor Hauser's surveys do not include numerous product features that Samsung heavily promoted to consumers.**

184.    Professor Hauser's conjoint analysis was limited to six categories of features. The feature categories used in the smartphone survey were Data Accessibility, Call Initiation and Screening, Input Assistance, Screen Size, Camera, and Price.[234] The feature categories used in the

---

decisions, and practitioners have called for preference measurement methods that increase respondents' level of involvement." (Toubia, O., de Jong, M., Stieger, D., and J. Füller, "Measuring Consumer Preferences Using Conjoint Poker," *Marketing Science* 31, no. 1 (2012): 138.)

[231] B. Orme, "Understanding the Value of Conjoint Analysis," *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research* (Madison, Wis.: Research Publishers LLC, 2010): 26.

[232] Helft, Miguel, "Apple Plans to Offer iPhone on Verizon," The New York Times, October 8, 2010, available at http://www.nytimes.com/2010/10/09/technology/09phone.html?_r=0&pagewanted=print (viewed September 13, 2013).

[233] B. Orme, "Understanding the Value of Conjoint Analysis," *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research* (Madison, Wis.: Research Publishers LLC, 2010): 26.

[234] Hauser Report, at ¶19.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

tablet survey were Data Accessibility, Lock Screen Interface, Input Assistance, Screen Size, Connectivity, and Price.[235] As described above, each of these feature categories included four different levels of these features. Altogether, Professor Hauser's smartphone and tablet surveys included 18 different features (treating price and screen size levels as just one feature each).[236]

185.    Professor Hauser's surveys did not, however, include numerous other features that Samsung prominently highlighted to consumers. For example, on Samsung's website, the "Features" page for the Galaxy S III smartphone promoted many other features that appear to be broader in scope and functionality than the granular capabilities allegedly enabled by the patents-in-suit.[237] The "Feature" page of Samsung's Galaxy S III website started by generally highlighting the updates to the Samsung TouchWiz user interface. I understand that these updates include numerous functionalities that are unrelated to the patented features at issue in this case.[238] According to Samsung, the added TouchWiz features made the product "easier, faster, and more beautiful" than prior versions of the product:

---

[235] Hauser Report, at ¶19.
[236] The Smartphone features included Notification Bar, Background Syncing, Quick Links, Universal Search, Three-Way Calling, Reject Call with Message, Missed Call Screen Management, WiFi Calling, Copy-Paste, Voice to Text, Automatic Word Correction, S Pen, Screen Size, Panorama, Best Photo, Smile Shot, Buddy Photo Share, and Price. The Smartphone features included Status Bar, Background Syncing, Quick Links, Universal Search, Lock Screen Display Customization, Lock Screen Shortcuts, Multiple Lock Screen Widgets, Slide to Unlock, Copy-Paste, Voice to Text, Automatic Word Correction, S Pen, WiFi, GPS, AllShare Play, IR Blaster, Screen Size, and Price.
[237] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-features (viewed September 5, 2013).
[238] http://android.appstorm.net/general/opinion/android-skin-review-samsung-touchwiz/ (viewed September 11, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

### Jelly Bean and TouchWiz Enhancements

The Samsung Galaxy S® III is now easier, faster and even more beautiful than before. Experience the innovative features of Android™ 4.1, Jelly Bean. With new ways to share stories and discover music; camera enhancements for more creative photos; TecTile technology that adds a new level of functionality; and much more.[239]

186.    Samsung also touted various aspects of the sharing capabilities of the Galaxy S III on the "Features" page, including its S Beam, Samsung Link, and Share Shot features, none of which were part of Professor Hauser's survey:

### Share Back-to-Back

If sharing is your thing, the Samsung Galaxy S® III is your phone. With S Beam™, you can share large HD files in seconds – just touch compatible devices back-to-back. S Beam™ takes full advantage of NFC (Near-Field Communication) and Wi-Fi Direct technology, making it quick and easy for you to share photos, videos, documents, calendars, contacts and more. And you don't even need Wi-Fi® or a cellular signal.

### Share Big

As much as you like a crowd huddled around admiring your new phone, it won't be necessary with Samsung Link. Because now, you can play your music, videos and slide shows on any compatible HDTV or computer for all to see. Go big.

### Share Photos Instantly

Share Shot lets you share your photos with up to five friends – as you take them. What does this mean? You don't have to remember to share later;

---

[239] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-features (viewed September 5, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

just share on the spot and forget it. Sharing has never been so much fun, so fast or so hassle-free.[240]

187.   The "Features" page associated with Samsung's Galaxy S III webpage also promoted a number of features related to the product's camera functionalities, including the number of megapixels of the camera, its zero shutter lag, its Burst Shot feature, and its front-facing camera, most of which were excluded from Professor Hauser's analysis:

**Memories in a Moment**
The Galaxy S III is as powerful as it is stylish. For starters, the camera has 8.0 megapixels and absolutely zero shutter lag, so you can catch memories the moment you press the shutter. Want more? Take up to 20 continuous shots in seconds with Burst Shot. The front-facing camera even has a full 1.9 megapixels, so you can get yourself into the HD action.[241]

188.   The "Features" page also touted certain special motion gestures that allowed the user to "do things easier and more intuitively than ever before" that were left out of Professor Hauser's survey:

**Gesture Smarter**
The Galaxy S III goes beyond swiping and pinching. Special motion gestures let you do things easier and more intuitively than ever before. For example, to capture a screen shot, just swipe your hand across the screen. To get to the top of a list, just tap the top of your phone. Or if you're

---

[240] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-features (viewed September 5, 2013).
[241] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-features (viewed September 5, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

texting someone and want to call them, just put the phone to your ear. It doesn't get any smarter than that.[242]

189.    Samsung also highlighted different aspects of its S Voice feature on the "Features" page of its Galaxy S III webpage which were not part of Professor Hauser's conjoint analysis:

### Speak, and the Galaxy S III will Listen

S Voice™ responds to your every voice command, acting as your on-board personal assistant to give you helpful, accurate information, dial phone numbers, send messages, open apps and more. It will follow your commands and answer your questions quickly and intelligently. You can tell your phone to wake you up, take a photo, answer a call, send a text message or play your favorite song. In fact, thanks to S Voice, you might never talk to real people again.[243]

190.    Another attribute not included in Professor Hauser's survey that was touted on Samsung's "Features" page was its TecTiles technology, which allows the user to program certain repetitive actions to simplify the overall user experience with the product:

### Simplify any Task

Samsung TecTiles™ is the short-hand way to operate your Galaxy S III. Just program your "tiles" to automatically handle repetitive actions, like changing settings or performing certain tasks. After that, all you'll need is

---

[242] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-features (viewed September 5, 2013).
[243] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-features (viewed September 5, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

a simple tap of your phone. It can launch apps, connect you to Facebook®
or Twitter® or share a contact with any NFC-enabled phone.[244]

191.    Also excluded from Professor Hauser's analysis is Samsung's picture-in-picture

feature of the Galaxy S III, which Samsung similarly highlighted on the "Features" page of its

website:

> **Picture-in-Everything**
>
> The display is so bright and beautiful on the Galaxy S III, you won't ever
> want to stop watching. With Pop Up Play, you won't have to. It's a
> picture-in-picture feature that lets you continue to watch your HD videos
> while you surf the web or check your email. It's multitasking to the max.[245]

192.    Samsung's "Feature" page also touted the hardware and software that is part of

the Galaxy S III, including its Android operating system, which was not part of Professor

Hauser's conjoint study:

> **Powerful Hardware and Software**
>
> The Galaxy S III gives you powerful hardware and software. First of all,
> there's a 1.5 GHz dual-core processor to make sure everything works
> quickly and smoothly. Second of all, there's the Android™ 4.1, Jelly Bean
> platform. It's great for everything you need.[246]

193.    In his survey related to Samsung's accused tablets, Professor Hauser similarly

excluded many important features that were heavily promoted by Samsung. For example, on the

---

[244] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-features (viewed September 5, 2013).
[245] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-features (viewed September 5, 2013).
[246] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-features (viewed September 5, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Features" page of Samsung's website, Samsung prominently highlighted the customizable home screens, resizable widgets, and intuitive touch screen interface of its Galaxy Tab 2 10.1, none of which were a part of Professor Hauser's survey:

### A personal interaction with your tablet interface

Make your tablet uniquely yours with highly customizable home screens and resizable widgets. You choose what goes where so you have faster access to the functions you use most. And an intuitive touch screen interface lets you multi-task between applications with ease.[247]

194.    The "Features" page of the Galaxy Tab 2 10.1 also touted various entertainment related capabilities, such as Media Hub, the integrated IR blaster, the Smart Remote app, and the ability to use hands-free headsets and keyboards with Bluetooth® 4.0., most of which were omitted by Professor Hauser in his analysis:

### All your entertainment is at your fingertips

Watch thousands of movies and TV shows with Media Hub™. Read thousands of books with Kindle™ for Android™ and magazines with Zinio®. Download at lightning speeds with the dual-core processor and 4G LTE capability. Control home entertainment with the integrated IR blaster and Smart Remote app. And use hands-free headsets and keyboards with Bluetooth® 4.0.[248]

195.    Samsung also touted several office-related features that it believed were important that were left out of Professor Hauser's survey. These features included Mobile Device

---

[247] http://www.samsung.com/us/mobile/galaxy-tab/SGH-I497ZSAATT-features (viewed September 5, 2013).
[248] http://www.samsung.com/us/mobile/galaxy-tab/SGH-I497ZSAATT-features (viewed September 5, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Management (MDM), Virtual Private Networks (VPN), on-device encryption (ODE), and the preloaded Polaris® Office app:

> **The world is your office**
>
> Stay on the ball while on the road with Mobile Device Management (MDM). Stay connected to company email, calendars and contacts with Virtual Private Networks (VPN). Work securely thanks to on-device encryption (ODE). And open, view and edit both Microsoft® and Google™ documents with the preloaded Polaris® Office app.[249]

196.    Samsung's "Features" page also promoted a number of photo and video chat capabilities associated with the Galaxy Tab 2 10.1 that were not included in Professor Hauser's conjoint survey:

> **You and your pictures have never looked so good**
>
> Take vibrant, crisp photos and enjoy clear, sharp video chat using the high-quality rear- and front-facing cameras. The handy 'Limit for Email' recording mode makes sure your videos are the right size for sending in an email. Keep all your favorite pics and videos close at hand with an expandable 32GB memory card (optional accessory). And share them all on your other DLNA devices with AllShare® Play.[250]

197.    The "Features" page similarly highlighted Samsung's S Suggest application, which allows users to more quickly search and find the exact application that they are looking for

---

[249] http://www.samsung.com/us/mobile/galaxy-tab/SGH-I497ZSAATT-features (viewed September 5, 2013).
[250] http://www.samsung.com/us/mobile/galaxy-tab/SGH-I497ZSAATT-features (viewed September 5, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

and access to Google Mobile™ Services, neither of which were part of Professor Hauser's survey:

### There's an app for finding the right app

With the Samsung S Suggest app at your disposal, you can now search and find the exact app you want faster. From a live widget on your home screen, it will search for the appropriate app you're looking for, saving you time searching through thousands and thousands of unwanted apps. With Facebook® integration, you can also discover what apps your friends are using.

### Stay connected to all your Google services

With Android 4.0, Ice Cream Sandwich, you always have easy and seamless access to Google Mobile™ Services. Just signing in to your Gmail™ signs you in to your Google Account, giving you immediate access to all your Gmail, to start a conversation on Google Talk™ and to everything Google Play™ has to offer.[251]

198.    Professor Hauser similarly omitted features that were promoted on the "Features" pages of Samsung's website related to the other accused smartphones (e.g., Galaxy S II and Galaxy Note II) and tablets (Galaxy Note 10.1 and Galaxy Tab 7.0 Plus) that were used by respondents that participated in Professor Hauser's survey.[252] The features discussed above, as well as those related to the other accused products, are the features that Samsung, itself, believes

---

[251] http://www.samsung.com/us/mobile/galaxy-tab/SGH-I497ZSAATT-features (viewed September 5, 2013).

[252] *See, e.g.*, http://www.samsung.com/us/mobile/cell-phones/SCH-I605TSAVZW-features (viewed September 5, 2013); http://www.samsung.com/us/mobile/galaxy-tab/GT-N8013EAVXAR-features (viewed September 5, 2013); http://www.samsung.com/us/mobile/galaxy-tab/GT-P6210MAYXAR-features (viewed September 5, 2013); and http://www.samsung.com/us/mobile/cell-phones/SCH-R760IBAXAR-features (viewed September 10, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

are most useful and important to consumers. By choosing to allocate limited space to promoting these product attributes, and not the myriad of others, including the granular features allegedly made possible by the patents-in-suit, Samsung is communicating its view regarding which features are most important to consumers and which features are most likely to impact product choice, which is Samsung's ultimate objective.

          **b.**     **Professor Hauser's surveys excluded numerous other product attributes that Samsung discussed in its marketing and promotional materials.**

199.     While Samsung heavily emphasized the features discussed above on its website in promoting the accused smartphones and tablets, it also brought to consumers' attention numerous other features associated with these products that are broader in scope and functionality than the patented features. For example, the "Specs" page associated with the Galaxy S III identified approximately 100 product attributes, grouped in the following twenty categories: Carrier; Form Factor; Size; Color; Battery; Network; Platform; CPU/Processor; Display; User Interface; Features; Camera; Audio; Video; Fun and Entertainment; Business & Office; Messaging Options; Connectivity; Memory; and Calling Functions.[253] Almost all of these features were excluded from Professor Hauser's survey.

---

[253] http://www.samsung.com/us/mobile/cell-phones/SCH-I535ZKBVZW-specs (viewed September 5, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

200.    Samsung's "Specs" page on its Galaxy Tab 2 10.1 tablet website also brought to consumers' attention a number of features it believed were important in the purchase decision, almost all of which were not part of Professor Hauser's analysis. For example, in its "Specs" page, Samsung identified approximately 50 different product attributes, grouped into the following 16 categories: Carrier; Form Factor; Operating System; Camera; Dimensions; Weight; Battery; Memory; Network; CPU; Display; User Interface; Audio; Video; Fun and Entertainment; and Messaging Options.[254] Based upon their inclusion on the list of specifications and the exclusion of the granular features allegedly enabled by the patents-in-suit, Samsung appeared to believe these features were more important to consumers than the patented features.

201.    Professor Hauser similarly omitted features that were discussed on the "Specs" pages of Samsung's website related to the other accused smartphones (e.g., Galaxy S II and Galaxy Note II) and tablets (Galaxy Note 10.1 and Galaxy Tab 7.0 Plus) used by respondents who participated in Professor Hauser's survey.[255] The features on these "Specs" pages were deemed important enough to Samsung for inclusion into its website. This is particularly significant in light of the many features associated with the accused products that are not even mentioned on Samsung's website.

---

[254] http://www.samsung.com/us/mobile/galaxy-tab/SGH-I497ZSAATT-specs (viewed September 5, 2013).

[255] *See, e.g.*, http://www.samsung.com/us/mobile/cell-phones/SCH-I605TSAVZW-specs (viewed September 5, 2013); http://www.samsung.com/us/mobile/galaxy-tab/GT-N8013EAVXAR-specs (viewed September 5, 2013); http://www.samsung.com/us/mobile/galaxy-tab/GT-P6210MAYXAR-specs (viewed September 5, 2013); and http://www.samsung.com/us/mobile/cell-phones/SCH-R760IBAXAR-specs (viewed September 10, 2013).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

3.    ***Respondents noted that parts of Professor Hauser's survey were unrealistic and inconsistent with aspects of the real world purchase decision.***

202.   Many of the participants in my parallel pretest of Professor Hauser's survey indicated that they believed that the choices they were being asked to make between phones were unrealistic. A frequently cited example of the survey's lack of realism was the random, nonsensical relationship between the features included in a phone option and its price.[256] For example, one respondent stated:

> Q:   In terms of the - each time it gave you one phone, two - did you feel like the phone choices were realistic?
>
> A:   That's a difficult one. At times I thought that they were - that the features didn't match the price, especially the higher price ones and I was looking at previous screen, previous options and then when they added the icons and the price together it didn't make sense. I would get the same thing for $49 and then the next screen it was almost identical for $299.[257]

203.   Another respondent stated:

> Q:   Got it. So, the table itself, how are you feeling about the clarity of what they're showing you in the table? Is there anything confusing or -
>
> A:   It's just confusing to me why the cheapest phone has more features than the most - the highest priced phone. The 299 phone should offer things like WiFi calling, Universal

---

[256] Exhibit 12.
[257] Exhibit 12 (Philadelphia Respondent 2).

130

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> Search, all the camera options. The universal - the 399 phone should be the biggest size, not a five inch phone, it should be the 5.5 inch phone.[258]

204.   According to another respondent:

> A:   […]It's just weird that, and then when I'm looking at it, that is weird the way that they have it set up too. Why would the most expensive phone not have all four of those features? Why would it be missing one and the cheapest phone had all four? You know what I mean? Just for the first example, that doesn't make sense. I'm sure this has nothing to do with what we're supposed to be […] Why would the cheapest phone have more of the features than the one that's more, and I'm not saying that just because it's more expensive it's better, but I know that my phone was expensive and it has a lot of features that other peoples' phones don't have, so I don't understand why the cheapest - because usually when you get a free phone or a cheaper phone, it's not - not all the time it's not that great, but sometimes it's not as good as the more expensive phone, so that is why I was just kind of like why does it no have all the, but I'm sorry, but no, you're supposed to pick out the features that you like on each one of those phones.[259]

### 4.   *Professor Hauser's conjoint study failed to account for the real-world process used by consumers to make purchase decisions when faced with incomplete information involving complex products.*

205.   Consumers regularly buy products where competing alternatives vary dramatically in terms of scope and complexity. As the complexity of the product and/or the

---

[258] Exhibit 12 (Chicago-1 Respondent 1).
[259] Exhibit 12 (Chicago-2 Respondent 4).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

number of market alternatives increases, so does the level of effort required for the consumer to research and evaluate the choices fully. When choice complexity reaches a certain level, consumers begin to use simplifying heuristics. The exact simplification that is employed may vary, but the common element is that consumers consider less than the full range of features or product choices in making a decision. This simplification process is a characteristic of real decisions made in real markets with complex products.[260]

206.    The academic literature on market research refers to a set of these heuristics as non-compensatory decision processes. In a compensatory decision process, a product that does not have the most desired level of one feature can *compensate* for it with another feature. In a non-compensatory process, a product may be completely eliminated from further consideration because it does not have a certain feature level regardless of the other features the product might have. According to one author:

> In [...] consumers' choice strategies, one assumes that consumers make tradeoffs between all the relevant attributes of a product and form overall evaluations of each alternative. Such decision rules are termed *compensatory* because good features of an alternative can compensate for the bad. If we listen to people describing how they make choices, however, a very different picture emerges. People talk about eliminating alternatives because of objectionable attributes and picking an alternative not because it has the best overall evaluation, but because it is the best on the most important

---

[260] Shocker, D., Ben-Akiva, M., Boccara, B., and P. Nedungadi, "Consideration Set Influences on Consumer Decision-Making and Choice: Issues, Models, and Suggestions," *Marketing Letters* 2, no. 3 (1991): 185.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> attribute. Even the most casual examination of consumers' verbal reports indicates that decisions are based, at least in part, on noncompensatory strategies that do not involve tradeoffs. Supporting evidence for the use of such heuristics pervades the literature, including studies using information display boards (e.g., Bettman and Jacoby 1976; Lussier and Olshavsky 1979; Payne 1976), eye movements (Russo and Dosher 1983), and even in-store verbal protocols (Payne and Ragsdale 1978).[261]

207.    One way that consumers use simplifying heuristics is to use a two-stage decision process whereby they screen on certain features, such as brand or other prominent product features, as a way to limit the set of products they ultimately consider in the purchase decision. Professor Hauser has described this phenomenon as follows:

> The basic idea is that when choosing to make a purchase, consumers use at least a two-stage process. That is, consumers faced with a large number of brands use a simple heuristic to screen the brands to a relevant set called the consideration set (Alba and Chattopadhyay 1985). Purchase or consumption decisions are then made from brands in this set (see hypotheses in Belonax and Mittelstaedt 1978; Howard and Sheth 1969; Parkinson and Reilly 1979; see also a related discussion in Wright 1975). […] For our purposes, we are most concerned that at any given consumption occasion consumers do not consider all of the brands available (e.g., there are more than 30 shampoos and more than 160 autos available), but rather consider seriously a much smaller set-a median of four shampoos (Urban 1975) or two to five

---

[261] Johnson, E., Meyer R., and S. Ghose, "When Choice Models Fail: Compensatory Models in Negatively Correlated Environments," *Journal of Marketing Research* 26 no. 3 (1989): 255.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

autos (Gronhaug 1973/1974; Hauser, Urban, and Roberts 1983; Ostlund 1973).[262]

208.    According to Professor Hauser, products may have "must have" features, such as brand, that may be so important that consumers may not actually consider products without these features, regardless of what other smaller features the product may possess. In a 2006 article, he wrote:

> In each of these cases the managerial challenge is to identify the "must have" (or "must not have") features that determine the consideration sets of consumers. Must-have features are non-compensatory in the sense that a product with must-have features is preferred to a product without these must-have features even if the product without the must-have features is better on all other features. The identification of must-have features is related to the conjoint-analysis goal of identifying the most important features…[263]

209.    One example of a determining factor (and simplifying heuristic) in the purchase decision is brand. For example, one third party analysis found the presence of an anti-Apple bias among some smartphone consumers. ███████████████████████████████████

███████████████████████████████████████████████████████████████ [264] Another

---

[262] Hauser, J. and B. Wernerfelt, "An Evaluation Cost Model of Consideration Sets," *Journal of Consumer Research* 16, no. 4 (1990): 393.
[263] Hauser, J., Dahan, E., Yee, M. and J. Orlin, ""Must Have" Aspects vs. Tradeoff Aspects in Models of Consumer Decisions," *Proceedings of the Sawtooth Software Conference* (2006): 169-170. While "must have" features are not strictly incompatible with an additive utility framework (e.g., when the feature partworths follow a geometric series), "must have" features are compatible with a simplifying heuristics framework.
[264] SAMNDCA11086731.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

analyst noted that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████

210.     Professor Hauser, in his prior research, noted that simplifying heuristics were more likely to be used in cases with complex products with numerous features. For example, in a 2010 article, he wrote:

> In complex product categories, research suggests that at least some consumers use noncompensatory decision processes when evaluating many products and/or products with many features (e.g., Payne, Bettman, and Johnson 1988, 1993).[266]

211.     In a 2009 article, he similarly noted:

> For complex technical business-to-business products, such as a high speed printer, in which there are relatively few alternatives, we might expect a buying center to evaluate all alternatives using a full-information compensatory decision process. On the other hand, in a category such as GPSs in which there are many alternatives, many features, and much information available (on the Internet) from a variety of sources, we might expect consumers to use a cognitively-simple screening heuristic to balance search/evaluation cost with the value of a higher-value "best" product.[267]

---

[265] APLNDC630-0000124145.

[266] Hauser, J., Toubia, O., Evgeniou, T., Befurt, R., and D. Dzyabura, "Disjunctions of Conjunctions, Cognitive Simplicity, and Consideration Sets," *Journal of Marketing Research* 47 (2010): 486.

[267] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009):211.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

212.    In fact, Professor Hauser's prior research reports that consumers use simplifying heuristics when purchasing smartphones.[268] In one article he wrote:

> Noncompensatory methods are slightly better in unfamiliar categories (e.g., smart phones, global positioning systems). Research suggests that approximately one-half to two-thirds of the respondents are fit better with noncompensatory than compensatory methods and that the percentage is higher when respondents are asked to evaluate more profiles.[269]

213.    In his course materials, Professor Hauser noted:

> As an illustration, we tested lexicographic processing on a survey to 15.810 students last year. Each student was asked to choose from a set of 32 SmartPhones that varied on 16 aspects. There were no constraints on how the choice was made. Of these students, 92% used a non-compensatory (lexicographic) process.[270]

214.    Professor Hauser's own conjoint study involving GPS devices illustrates the inconsistency in results when assuming a compensatory instead of a non-compensatory decision process:

> On average the Magellan brand had higher partworths, thus in any additive-partworth market simulator a switch from Garmin to Magellan would improve market share. However, when non-compensatory models were estimated, the researchers found that

---

[268] Yee, M., Dahan, E., Hauser, J., and J. Orlin, "Greedoid-Based Noncompensatory Inference," *Marketing Science* 26, no. 4 (2007).

[269] Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011): 117-118.

[270] J. Hauser, "Note on Consumer Behavior," *MIT Sloan Courseware* (2005): 5.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> 12% of the respondents screened on brand and, of those, 82% preferred Garmin. For the other 88% (100% − 12%), brand had no impact on consideration. If this model was correct (and it did predict a holdout task better), then a switch from Garmin to Magellan would reduce market share – exactly the opposite of that predicted by an additive-partworth model.[271]

215.    Professor Hauser has both observed that the underlying decision process for smartphones is non-compensatory and that the assumption of compensatory instead of a non-compensatory decision process matters.[272] This is consistent with information gleaned from my parallel pretest of his survey. My results indicate that consumers do use non-compensatory simplifying heuristics when shopping for smartphones. For example, one respondent stated:

> Q:      If you can go back for a second. No biggie, but I have a couple questions at this point. Exercise number 16, how easy or difficult did you find this one?
>
> A:      This one was a little more difficult because what I basically narrowed in on for all the ones previously were my two biggest things that I wanted, which were WiFi calling and Voice to Text. Usually if I had WiFi calling it had all the other options, which three-way is also a big thing for me. There wasn't any that had WiFi that didn't have three-way. On this one there wasn't an option available for WiFi and Voice to Text. So I went with one and hit WiFi. I currently don't have either of those options. And I feel like I text just fine without it.

---

[271] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216.

[272] J. Hauser, "Note on Consumer Behavior," *MIT Sloan Courseware* (2005): 5; Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Q:   Did your decision-making process change from the first time you did it through to the 16th time? Did it change at all?

A:   Yeah. I think - yeah, it did. When I had a bunch to go I realized that if I used the same decision-making process that I used the first couple of times for the next 12 that we'd probably be here until it was dark outside.

Q:   How so?

A:   Because I systematically went through and I thought about for the first couple I thought about how I use my phone and I thought about what each of these options meant, if I would use them, how much I would use them, would I miss not having them. And also - so that whole process kind of allowed me to pick a phone. I was a little more confident in those decisions. When I had a bunch left and I wanted to do it a little quicker, I narrowed in what I really wanted, and I also thought more about what my phone currently has. I think I mentioned that at some point I kind of forgot to remember that first decision making - the first couple of options, you know, what does my phone currently do because it does give you some of these things already, so it's - they're all on here so it makes it look like if you get a really empty one, it kind of makes it feel like I'm getting a crappy phone if I get that one. But that might not be the case if your phone might already have all the other capabilities, looking at personal signature, Quick Links I already have, three-way calling I already have. So it's-[273]

216.   Another respondent stated:

Q:   Did your decision-making process change at all across the 16 choice process?

---

[273] Exhibit 21 (Philadelphia: Respondent 5).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

A:      It did because at first I was looking at - my main thing I was looking for was WiFi. If something was missing WiFi - I don't know if you noticed, I was always looking for the WiFi and that made a major factor and of course, price. I went to the top priced first because I always think that that's the best, the higher the price, but as you see with the last phone, the cheapest phone, happened to be the one I chose and some things I can live without, and I knew that, but some features, like the pen, I don't like the pen. I mean the Voice to Text, I use it, but I like Skype, not Skype, Slate. I'm really a fan of that and screen size is important, also. When they were too small, that made me very hesitant because I don't like a real tiny screen, either, and also the camera was important to me. Now, these features -

Q:      But did your process change? Did you find that the process or -

A:      I noticed that throughout them all, I was pretty consistent on picking the same type of phone. I did notice that regardless of price or anything, I was going for certain things and if it didn't have it, I immediately went to the next phone regardless of price.[274]

217.    According to another respondent:

A:      My thing, the more I thought about it, and thought about what I was using, probably the most important thing to me is the screen size. So I looked at the two top screen sizes and then went from there and went on the price.

Q:      When you think about, you know, the 16 times that you did it, do you feel that your decision making process changed throughout the 16 times or did it stay pretty consistent? Or something else?

---

[274] Exhibit 21 (Philadelphia: Respondent 6).

139

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

A:   I think my thing are the size, the price, and I was going more over what I would buy. You know, whether it had this or whether it didn't have this wasn't as important to me as the size and the price.[275]

218.   Another respondent stated:

A:   But I keep clicking on - because for the purpose of the survey, there's nothing in here that would make or break whether or not, hypothetically, I would buy this phone. Honestly, when you go to the store, it comes down to this shuffle of features anyway, and the price range, so.

Q:   OK.

A:   Ultimately, this is what you end up doing at the store. Halfway through here. On the Voice to Text feature is one of my sticking points, for deciding. And for the price here, I would say I would sacrifice it, because you could always get a program that does it. So it's something you can add as a feature later.[276]

219.   In sum, Professor Hauser has conducted research which describes smartphones as complex products due to the large number of choices and the vast number of features available on each device. His research further finds that a large share of respondents (92% in the case of smartphones) may use some form of non-compensatory decision processes when faced with complex products, as in the present case. Professor Hauser's own research has also shown that not accounting for a non-compensatory decision process, when one exists, can lead to results that

---

[275] Exhibit 21 (Phoenix: Respondent 8).
[276] Exhibit 21 (Philadelphia: Respondent 4).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

are, as he says, "exactly the opposite of that predicted by an additive-partworth model," such as the additive-partworth model he assumed in this case.[277]

220.    Yet, despite the findings in his academic publishing, Professor Hauser provides no evidence that he even considered whether any non-compensatory decision process could be at work in estimating the extent to which Samsung sales may have been driven by the patented functionalities. Professor Hauser's use of a choice-based conjoint is based on an underlying assumption of a compensatory decision process, which in his own writings, he suggests may be inappropriate in situations involving complex products. If, as the evidence indicates, the purchase decision process used to purchase smartphones and tablets exhibits non-compensatory characteristics, then Professor Hauser's conjoint analysis, which fails to take that into account, is flawed and unreliable, and may lead to results that are "exactly the opposite" of those that actually exist.[278]

5.    *Professor Hauser failed to account for the fact that respondents do not make their marketplace choices independently of word-of-mouth and other social effects.*

221.    Even had Professor Hauser accounted for the manner in which consumers account for features in complex products, he would still be missing key drivers of the complex decision

---

[277] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216.

[278] Hauser, J., Ding, M., and S. Gaskin, "Non-Compensatory (and Compensatory) Models of Consideration-Set Decisions," *Proceedings of the Sawtooth Software Conference* (2009): 216.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

process. The actual purchase decision process for smartphones is influenced by factors beyond straightforward product characteristics, such as gigabytes of storage memory or screen size. Factors such as a desire to have the "latest and greatest" smartphone or the model phone selected by one's peer group illustrates this complexity. ██████████████

████████████████████████████████████████

████████████████████████  ████████████████

████████████████████████████████████████

████████████████

222.    Moreover, the model phone selected by one's peer group also is a factor that is considered in the purchase decision. It has been shown that smartphones are network goods.[281] A network good is one where the value a consumer derives from the product increases as the number people in their network who adopt the product increases. Professor Hauser did not include any attribute in his surveys related to the smartphones or tablets selected by the respondent's peer group. This could have significant impacts on the choices made by the respondent.

---

[279] Deposition of Art Rangel, April 5, 2012, at Exhibit 4, at 17.
[280] APLNDC630-0001315480.
[281] Sundsøy, P., Bjelland, J., Canright, G., and K. Engo-Mønsen, "Product Adoption Networks and Their Growth in a Large Mobile Phone Network," *IEEE Advances in Social Network Mining and Analysis* (2010); Bjelland, J., Canright, G., Engo-Mønsen, K., and P. Sundsøy, "A Social Network Study of the Apple vs. Android Smartphone Battle," *Proceedings of the 2012 International Conference on Advances in Social Networks Analysis and Mining* (2012).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

6. *Professor Hauser's failure to account for critical aspects associated with the purchase of complex products renders his analysis unreliable.*

223. Ultimately, Professor Hauser's analysis is based on the assumption that respondents would care about and be extraordinarily well-informed about the functionalities associated with the patented features. In fact, the evidence suggests the contrary. Smartphone consumers have limited means by which to understand the granular distinctions associated with the patented functionalities and academic research suggests that consumers do not employ the type of systematic feature comparison upon which his conjoint analysis is based. In effect, Professor Hauser has skipped steps by assuming that the patented functionalities would have entered into consumer purchase decisions without haven taken any meaningful steps to verify that such was the case. Given evidence to the contrary, his analysis does not provide a meaningful basis by which to make inferences about actual marketplace behavior.

7. *The reliability of the output generated by Professor Hauser's survey is undermined by risks of survey fatigue and overly taxing choice tasks.*

224. Researchers have shown that a typical survey should last no more than 30 minutes, and that surveys lasting longer than 30 minutes are highly susceptible to respondent fatigue.[282] When respondents become fatigued, they pay less attention to the task in front of them

---

[282] Galesic, M. and M. Bosnjak. "Effects of Questionnaire Length on Participation and Indicators of Response Quality in a Web Survey," *Public Opinion Quarterly*, 73 no. 2 (2009): 349-360.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

and increase their response speed as the survey length increases.[283] Specifically, responses to questions positioned later in the survey tend to be quicker, with less consideration given to the task, and more uniform than responses to questions positioned near the beginning of the survey.[284] Thus, data quality can suffer as survey length increases. Because in Professor Hauser's survey, his choice exercise with 16 tasks is at the very end of the survey, it is susceptible to quicker and poorer quality responses.

225.    For each respondent in Professor Hauser's survey, I reviewed statistics for how long it took for the respondent to complete the survey from start to finish. Professor Hauser indicated that he dropped the fastest 10 percent and slowest 10 percent of respondents, among other criteria, in order to eliminate respondents with potentially low response quality. This resulted in a final sample of 507 respondents for smartphones and 459 for tablets.[285] With respect to the final smartphone sample, the mean completion time was 61 minutes and median completion time was 38 minutes.[286] Of the 507 respondents in Professor Hauser's smartphone sample, 455 completed the survey in more than 30 minutes.[287] Further, 62 completed the survey

---

[283] Krosnick J., and S. Presser, "Question and Questionnaire Design," in Marsden, P. and J. Wright (eds.), *Handbook of Survey Research*, 2nd edition, (Bingley, UK: Emerald Group Publishing Limited, 2010): 292.

[284] Galesic, M. and M. Bosnjak. "Effects of Questionnaire Length on Participation and Indicators of Response Quality in a Web Survey," *Public Opinion Quarterly*, 73 no. 2 (2009): 349-360.

[285] Hauser Report, at ¶¶89-90.

[286] Exhibit 22.

[287] Exhibit 22. Results are comparable for the tablet survey with 433 of 459 respondents completing in greater than 30 minutes and 89 of 459 completing in more than 60 minutes.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

in more than 60 minutes.[288] Such completion times suggest respondent fatigue may have influenced the responses to the choice tasks encountered at the end of the smartphone survey.

226.   Concerns are compounded by the complexity of the choice tasks. After reviewing background information and the feature descriptions, which lasts a minimum of 15 minutes given the lengths of the videos, each respondent faced 16 choice tasks. Each of these choice tasks involved four phones that included a total of 18 specific levels of features each.[289] Thus, after accounting for a minimum of 15 minutes spent on the screening questions, the introduction text, the feature descriptions and videos, and choice exercise tutorial, respondents that finished in 30 minutes would have had only 15 minutes to process 32 choices (16 inside choices and 16 outside choices) covering the 1,152 features (18*4*16). Even if a respondent spent the entire 15 minutes on the 16 choice exercise tasks, this would imply that each choice exercise task was completed in less than one minute.

227.   ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████   This raises further concerns that respondents did not have time to process their choices sufficiently. Together, the design and complexity of Professor Hauser's survey may

---

[288] Exhibit 22.
[289] Hauser Report, at Exhibit G.
[290] ████████████████████████████████

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

have been excessively demanding by 1) requiring too much time to take the survey and 2) providing too little time to address the survey's complexity.

> ### E. The Responses Generated by Professor Hauser's Survey Are Not Reflective of the Actual Marketplace Environment That Professor Hauser Purports to Analyze

> #### 1. *Professor Hauser's survey generated numerous irrational responses.*

228. A fundamental assumption of conjoint analysis, including the one applied by Professor Hauser in the present case, is that respondents make rational decisions that are consistent with economic theory. Specifically, it is assumed that respondents seek to maximize their utility by selecting choices with features they value, and trade off with price, as well as compare against their outside option (choosing to buy nothing or something else in the market). As a test of the reliability of Professor Hauser's estimates, I examined the choices respondents made in the survey itself, to evaluate if the survey responses were consistent with the underlying premises of conjoint analysis.

229. Specifically, I examined the responses generated by the 267 respondents that reported owning a Samsung Galaxy S III.[291] My analysis examined whether there was evidence of irrational choices made by these respondents. In particular, I looked to see if any of these respondents ever indicated that they would buy a less preferred smartphone than the Galaxy S

---

[291] Exhibit 23.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

III, as reflected in it having at least one fewer feature than is available on the Galaxy S III, at a higher price than they could purchase a Galaxy S III.

230.    Professor Hauser fielded his smartphone survey between July 6, 2013 and July 15, 2013 and, at that time, the Samsung Galaxy S III was available in the market for between $50 to $100, depending on the carrier.[292] Of the 267 respondents that own a Samsung Galaxy S III, 262 of them were presented with a choice exercise that included a phone option with a 4.8" screen, a price greater than or equal to $149, and with at least one feature fewer than the features contained in an actual Samsung Galaxy S III.[293] As Exhibit 24 shows, 65 of these respondents chose this phone as part of their inside option; 46 of these respondents indicated that they would purchase this product over their outside option. This suggests that 71 percent of the 65 respondents appear to have made irrational choices (i.e., to purchase a product that was inferior to the Galaxy S III, which they owned, at a higher price than they could purchase the the Galaxy S III for at that time).

231.    This example shows that survey respondents are behaving in a manner inconsistent with the underlying assumptions of Professor Hauser's conjoint analysis. More generally, this analysis demonstrates that choices provided by respondents to Professor Hauser's survey do not accurately characterize actual marketplace choices.

[292] Velluro Report, at Exhibit 13-B. Survey completion dates from Backup to Hauser Report, at "Smartphone Final Survey Data Set.xlsx."
[293] Exhibit 24.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

### 2. *Respondents demonstrate substantial insensitivity to price.*

232.    An underlying conceptual premise of any demand analysis is that consumers do not prefer higher prices. Economic theory and common sense tell us that consumers would prefer to receive the same good at a lower price versus a higher price, all else equal. Conjoint analyses, such as that conducted by Professor Hauser, treat price as a feature of the product, similar to screen size or other physical dimensions of the product. The different price levels tested within the conjoint analysis are associated with individual partworth utility estimates. For the price term to have validity, it would be expected that with each increasing level of price, the partworth utility estimate is constantly decreasing. Professor Hauser refers to this condition as monotonicity, or the property that as the price increases, the partworth always moves in one direction, downward.

233.    Underlying Professor Hauser's estimates of the willingness to pay for the patented features is a comparison of the partworth utilities of the patented feature and the partworth utilities of the price (again, tested as just another feature).[294] Conceptually, what Professor Hauser is measuring is how much negative utility from the price feature would be needed to balance out the positive utility of the patented feature. This tradeoff exercise concept makes clear that Professor Hauser must have a negative utility associated with price, and a positive utility

---

[294] Professor Hauser calculates the overall willingness to pay value utilizing a simulation procedure, but conceptually it is just a comparison of utility on the price term and the patented feature term.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

associated with the patented feature if he hopes to compute a meaningful willingness to pay value.

234.    To guarantee this is the case, Professor Hauser externally imposes the assumption in his conjoint analysis that consumers prefer to pay less rather than more (i.e., that preferences are monotonic in price). His rationalization for doing this is that incorporating prior information known about consumer behavior makes his model estimates more precise and that ignoring this information would result in a model that does not use all of the available data.[295] According to Professor Hauser, a model that does not use all of the available data "would be a less reliable description of consumer behavior and a less reliable summary of the available data."[296]

235.    To evaluate the impact of Professor Hauser's monotonicity assumption regarding price, I looked at the results generated by Professor Hauser's model when the monotonicity constraint is removed. Specifically, I examined the partworths associated with price that resulted from Professor Hauser's model estimation at the different test prices to determine if the partworths associated with higher prices were less than partworths associated with lower prices. This would be the case if Professor Hauser's monotonicity assumption was borne out (i.e., that prices are monotonic) in the actual choices made by respondents (if respondents preferred lower prices to higher prices).

---

[295] Hauser Report, at ¶¶30, 103.
[296] Hauser Report, at ¶103.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

236.     Re-estimation of Professor Hauser's smartphone model without the monotonicity constraint suggests that Professor Hauser's assumption masks substantial price insensitivity reflected in the survey responses. As the table below illustrates, 346 out of the 507 respondents that participated in Professor Hauser's smartphone survey appear to have a positive preference for a higher price at some level.[297] This means that 68 percent of the respondents that took the survey, for whatever reason, made choices that were consistent with an irrational preference for higher prices. This phenomenon appears to have been present at all price levels. This widespread insensitivity to price suggests that the survey responses are not reflective of the actual marketplace environment that Professor Hauser purports to analyze.[298]

---

[297] Exhibit 25.  *See also*, Exhibits 27 and 28.
[298] Respondents are considered insensitive to price changes if, absent the imposed monotonicity constraint, they prefer higher prices to lower prices.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Price Sensitivity Analysis – Smartphones**

| Price Change | Total Number of Respondents | Number of Respondents Insensitive to Price Change | Percent of Respondents Insensitive to Price Change |
|---|---|---|---|
| $49 vs. $99 = $50 | 507 | 263 | 52% |
| $49 vs. $149 = $100 | 507 | 181 | 36% |
| $49 vs. $299 = $250 | 507 | 70 | 14% |
| $99 vs. $149 = $50 | 507 | 142 | 28% |
| $149 vs. $299 = $150 | 507 | 60 | 12% |
| Any | 507 | 346 | 68% |

237. Re-estimation of Professor Hauser's tablet model without the monotonicity constraint generates similar results. As the table below shows, 194 out of the 459 respondents that participated in Professor Hauser's tablet survey appear to be insensitive to price at some level.[299] This means that 42 percent of the respondents that took the survey, for whatever reason, did not make choices consistent with Professor Hauser's monotonicity assumption (i.e., did not prefer lower prices to higher prices). This phenomenon appears to have been present at all price levels and further suggests that the survey responses are not reflective of the actual marketplace environment that Professor Hauser purports to analyze.

---

[299] Exhibit 26.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Price Sensitivity Analysis – Tablets**

| Price Change | Total Number of Respondents | Number of Respondents Insensitive to Price Change | Percent of Respondents Insensitive to Price Change |
|---|---|---|---|
| $199 vs. $299 = $100 | 459 | 145 | 32% |
| $199 vs. $449 = $250 | 459 | 56 | 12% |
| $199 vs. $599 = $400 | 459 | 27 | 6% |
| $299 vs. $449 = $150 | 459 | 53 | 12% |
| $449 vs. $599 = $150 | 459 | 39 | 8% |
| Any | 459 | 194 | 42% |

### F. The Defects in Professor Hauser's Conjoint Analysis Are Confirmed by the Marketplace Predictions It Generates.

#### 1. *Professor Hauser's survey analysis is implausible with respect to the amount respondents value just the features incorporated in the survey.*

238.    Professor Hauser's survey generates implausible results related to the amounts respondents value just the features incorporated in the survey. In the table below, I summarize the willingness to pay price premiums associated with each of the individual smartphone features in the context of a phone with a price of $149.[300] As this table shows, the sum of the willingness to pay price premiums for the patent-related features is $358 and the sum of the willingness to

---

[300] The $149 base price reported for smartphones was selected, consistent with Professor Hauser's Exhibit P. *See* Hauser Report, at Exhibit P. Willingness to pay must be calculated at a specific price point as each price level is associated with a different parameter estimate and thus the willingness to pay will vary by the chosen base price.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

pay price premiums for all the modeled conjoint features is $1,125,[301] an amount seven times greater than the price of the reference phone.[302]

---

[301] As Professor Hauser suggests in his report, the willingness to pay for individual features is not strictly additive because correlation between participant's valuation of individual features and varying price sensitivity outside of the modeled conjoint price range may result in the aggregate willingness to pay to be either higher or lower than the sum of the willingness to pay estimates for the individual features. For example, at a reference price of $49, the willingness to pay for the Quick Links feature is $96 and the willingness to pay for the Universal Search feature is $82, but the willingness to pay for both features is $142, which is less than the sum of the two individual features ($178). On the other hand, at a reference price of $149, the willingness to pay for the Automatic Word Correction feature is $102 and the willingness to pay for the S-Pen feature is $38, but the willingness to pay for both features is over $150, which exceeds the sum of the individual willingness to pay estimates ($140). I cannot perform this exact calculation for all features jointly because their joint willingness to pay amounts quickly exceeds the range of prices presented in Professor Hauser's survey. While the willingness to pay for individual features is not perfectly additive, the order of magnitude of the presented willingness to pay amounts clearly suggest that the willingness to pay for the entire set of features is unreasonably large.

[302] This is based on a $149 priced phone with a 5.0" screen.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**WTP Price Premiums[303]**
**Individual Smartphone Features**
**(Based on $149 Priced Phone with a 5.0" Screen)**

| | |
|---|---|
| Price Premiums: | |
|   Patented Features | |
|     Background Syncing | $69 |
|     Quick Links | $56 |
|     Universal Search | $44 |
|     Automatic Word Correction | $102 |
|     Missed Call Screen Management | $87 |
|     *Sum* | *$358* |
|   Other Features | |
|     WiFi Calling | $54 |
|     Voice to Text | $138 |
|     Reject Call with Message | $134 |
|     S Pen | $38 |
|     Screen Size (4.8" vs. 4.0") | $113 |
|     Screen Size (5.0" vs. 4.8") | $57 |
|     Best Photo | $114 |
|     Smile Shot | $72 |
|     Buddy Photo Share | $47 |
|     *Sum* | *$767* |
|   Sum | $1,125 |

239.    I similarly summarize, below, the willingness to pay price premiums associated with each of the individual tablet features in the context of a tablet with a price of $299, which is the price that is closest to the actual average price that respondents in the surveys reported that they paid for their Samsung tablets.[304] As this table shows, the sum of the willingness to pay

---

[303] Exhibit 29.

[304] The $299 base price reported for tablets was selected, consistent with Professor Hauser's Exhibit P. *See* Hauser

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

price premiums for the patent-related features is $246 and the sum of the willingness to pay price premiums for all the modeled conjoint features is $1,079, which is over three times the price of the reference tablet.[305]

---

Report, at Exhibit P.
[305] This is based on a $299 priced tablet with a 10.1" screen.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**WTP Price Premiums[306]**
**Individual Tablet Features**
**(Based on $299 Priced Tablet with a 10.1" Screen)**

Price Premiums:

Patented Features

| | |
|---|---|
| Background Syncing | $62 |
| Quick Links | $56 |
| Universal Search | $33 |
| Automatic Word Correction | $63 |
| Slide to Unlock | $32 |
| *Sum* | *$246* |

Other Features

| | |
|---|---|
| IR Blaster | $56 |
| Voice to Text | $108 |
| GPS | $197 |
| S Pen | $68 |
| Screen Size (7.0" vs. 7.7") | $45 |
| Screen Size (8.9" vs. 7.7") | $137 |
| Screen Size (10.1" vs. 8.9") | $86 |
| Lock Screen Shortcuts | $30 |
| Multiple Lock Screen Widgets | $32 |
| AllShare Play | $74 |
| *Sum* | *$833* |
| Total | $1,079 |

240.  ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ ███████

---

[306] Exhibit 30.
[307] APLNDC-Y0000025499.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

[309] APLNDC-Y0000025499.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

241.    These willingness to pay price premiums estimated by Professor Hauser are even more implausible upon consideration that they do not reflect the individual willingness to pay price premiums associated with the hundreds of other features included in the accused smartphones and tablets, many of which appear to be much more important features than those he did include. As discussed above, Professor Hauser's surveys do not include 1) product features that Samsung heavily promoted to consumers, 2) numerous other product attributes that Samsung discussed in its marketing and promotional materials, and 3) hundreds of functionalities described in Samsung's product manuals.[310] By comparison, the price premiums from these excluded features would be expected to be vastly higher than the granular features tested by Professor Hauser in his conjoint study.

242.    While Professor Hauser's analysis does not provide a basis by which to estimate the price premiums for all of these excluded features, analysis provided in an earlier case involving Apple and Samsung ("Case I") provides a basis by which to estimate a small portion of related features. In that case, Professor Hauser conducted an analysis that provided a basis for estimating willingness to pay price premiums for the following features:

---

[310] *See, e.g.,* Samsung Galaxy Note AT&T User Manual; Samsung Galaxy Note II Verizon User Manual; Samsung Galaxy S II AT&T User Manual; Samsung Galaxy S II T-Mobile User Manual; Samsung Galaxy S II Epic 4G Touch Sprint User Manual; Samsung Galaxy S II Skyrocket AT&T User Manual; Samsung Galaxy Nexus User Manual; Samsung Admire User Manual; Samsung Captivate Glide AT&T User Manual; Samsung Galaxy Rugby Pro AT&T User Manual; Samsung Illusion Verizon User Manual; Samsung Stratosphere Verizon User Manual; Samsung Conquer 4G Sprint User Manual; Samsung Dart User Manual; Samsung Exhibit II 4G T-Mobile User Manual; and Samsung Transform Ultra Sprint User Manual.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

- rubberband effect;

- tap to re-center after zoom;

- autoswitch;

- reliable touch;

- 64GB of memory;

- 600,000 apps

- tethering;

- micro USB;

- HDMI;

- 8 MP camera and HD video recording (incremental premium from 3MP Rear Camera with Standard Video with Autofocus); and

- 2 MP front camera.[311]

243.     The sum of the willingness to pay price premiums for these features estimated by Professor Hauser is $422.[312] Together, the price premiums from Professor Hauser's Case I and Case II features suggest that the willingness to pay price premiums for all of the tested features in these cases is unreasonably, and implausibly, large. Again, these amounts do not reflect the individual price premiums for hundreds of other features that were not tested by Professor

---

[311] See the Expert Report of John R. Hauser, March 22, 2012 for further details.
[312] Exhibit 29.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Hauser, including features in Samsung's promotional material, online retailer websites, and customer and media smartphone reviews.[313]

### 2.  *Professor Hauser's conjoint study performs poorly in predicting respondent's actual choices.*

244.    Professor Hauser has provided no evidence that his model is reliable for predicting real market outcomes.[314] It is well known by researchers that translating from the hypothetical conjoint exercise to real market demand forecasts is challenging, and particularly unreliable if major features have been omitted.[315] To test the reliability of Professor Hauser's

---

[313] *See, e.g.*, LeBron's Day with the Samsung Galaxy Note II (1:31) https://www.youtube.com/watch?v= Ie0mAnjz1Oc (viewed September 6, 2013); LeBron's Day with the Samsung Galaxy Note II (1:01) http://www.youtube.com/watch?v=lB8586Qu0eY (viewed September 6, 2013); Samsung Next Big Thing Super Bowl Full Ad with Seth Rogen, Paul Rudd, and Lebron James (2:01)  http://www.youtube.com/watch ?v=dLtysG4O0ak (viewed September 6, 2013); The Next Big Thing is Already Here - Samsung Galaxy S III (1:31) https://www.youtube.com/watch?v=nf5-Prx19ZM (viewed September 6, 2013); http://www.amazon.com/product-reviews/B00891P3QI (viewed September 11, 2013); Geller, Jonathan S., "Samsung Galaxy S III review," BGR.com, 6/20/2012, available at http://bgr.com/2012/06/20/samsung-galaxy-s-iii-review/ (viewed September 5, 2013); Crush, Jamison, "Samsung Galaxy S III Review: Universally Excellent Android Smartphone," Brighthand.com, 6/19/2012, available at http://www.brighthand.com/printArticle.asp?newsID=19018 (viewed September 5, 2013); Dolcourt, Jessica, "Samsung Galaxy S III," CNET.com, 6/16/12, available at http://reviews.cnet.com/smartphones/samsung-galaxy-s-iii/4505-6452_7-35326378.html (viewed September 5, 2013); Sakr, Sharif, "Samsung Galaxy S III review," Engadget.com, 5/25/2012, available at http://www.engadget.com/2012/05/25/samsung-galaxy-s-iii-review (viewed September 5, 2013); http://www.bestb uy.com/site/Samsung-Galaxy/Samsung-Galaxy-S-III/pcmcat305200050006.c?id=pcmcat305200050006 (viewed September 5, 2013);  http://www.verizonwireless.com/b2c/vzwfly (viewed September 5, 2013); http://www.targ et.com/sb/phones-with-plans-cell-electronics/-/N-5xte5#navigation=true&viewType=medium&sortBy=bestselling &minPrice=from&maxPrice=to&isleaf=true&navigationPath=5xte5&parentCategoryId=9975824&facetedValue=/-/N-5xte5Z5 y4wr&RatingFacet=0&categoryId=4581 (viewed September 5, 2013).
[314] Hauser Report, at ¶¶98-104.
[315] Wittink, D., and T. Bergestuen, "Forecasting with Conjoint Analysis," in J. Armstrong (ed.), *Principles of Forecasting* (New York: Springer, 2001): 153-154; Cattin, P., and D. Wittink, "Commercial Use of Conjoint Analysis: A Survey," *Journal of Marketing* 46, no. 3 (1982): 50.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

choice predictions, I measured them against respondents' own actual purchase history. I did this by examining the choices predicted by Professor Hauser's conjoint model if respondents were presented with the choice of 1) purchasing one of the accused devices (comprised of the features they included when each was first released), or 2) the outside option.[316] Such a choice environment captures the many smartphone alternatives faced by consumers at the time they purchased their accused smartphones.[317]

245.    My analysis is summarized in Exhibit 31. Consider, for example, the Galaxy Note II, the most recently released of Samsung's accused smartphones at issue here.[318] Of the 507 respondents upon which Professor Hauser's conjoint analysis is based, 42 reported owning the Galaxy Note II.[319] However, as Exhibit 31 shows, based on my extension of Professor Hauser's RFC choice predictions, only 30 percent of the 42 respondents owning the Galaxy Note II would be predicted to purchase the Galaxy Note II. Variants of the Galaxy S II are predicted to account for a 21 percent purchase share. The Galaxy Nexus and Galaxy S III are predicted to account for purchase shares of one percent and four percent respectively. Contrary to these predictions, we

---

[316] Exhibit 31.

[317] Not all of the accused Samsung Smartphones were available at the time each of the accused devices was purchased. Further, the prices and screen sizes do not always match up, precisely, with Professor Hauser's specifications. To address this latter concern, I have relied on assumptions employed by Dr. Vellturo in specifying how the screen size and price best approximate the accused devices in terms of Professor Hauser's features specifications. *See, e.g.*, Vellturo Report, at Exhibit 13.

[318] Vellturo Report, at Exhibit 13-B.

[319] Exhibit 23.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

know that in the real world, 100 percent of these 42 respondents chose to purchase the Galaxy Note II.

246.    Exhibit 31 also predicts purchase shares for the 267 respondents underlying Professor Hauser's survey analysis that report owning a Galaxy S III. Of those respondents, only nine percent are predicted to purchase the Galaxy S III over Samsung's other accused devices or instead of not buying it at all (the outside option). The more recently released Galaxy Note II is predicted to account for a 14 percent share. Variants of the Galaxy S II are predicted to account for a 29 percent share. The Galaxy Nexus is predicted to account for a two percent share. The original Galaxy Note and the Galaxy Rugby Pro are predicted to account for nine percent and three percent shares, respectively. Contrary to these predictions, we know that in the real world, 100 percent of these 267 respondents chose to purchase the Galaxy S III.

247.    Based on the phone ownership reflected in Professor Hauser's surveys, Galaxy Note II owners stand out as being the most likely, based on my extension of Professor Hauser's RFC prediction model shown in Exhibit 31, to purchase the phones they actually own. Yet, of the Galaxy Note II owners in Professor Hauser survey, only 30 percent are predicted to buy a Galaxy Note II.  Beyond that, the portion of respondents predicted to buy their own phone exceeds 10 percent in only two additional instances. Thus, Professor Hauser is relying on a

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

prediction tool to estimate the impact of removing a feature from a phone, even though the tool does a poor job of predicting phone choices of the survey respondents.[320]

> **3.**     ***Predictions generated by Professor Hauser's analysis related to the composition of Samsung sales differ substantially from actual marketplace outcomes.***

248.     The unreliability of Professor Hauser's choice predictions are further revealed when measured against the actual composition of Samsung's smartphones sales. Exhibit 34 summarizes a second extension of the choice exercises conducted by Professor Hauser. This analysis compares the relative demand for four Samsung smartphones implied by Professor Hauser's analysis with the actual relative demand based on Samsung's historical sales. The four phones examined include the Galaxy S III, the Galaxy S II, the Galaxy Note II, and the Galaxy Nexus (comprised of the features they included when each was first released).[321] I have summarized the results of this analysis in the table below.[322]

---

[320] Exhibit 32 presents a comparable summary of tablet predictions, and the results are similar. In particular, the prediction tool does a poor job distinguishing between the Galaxy Note 10.1 and the Galaxy Tab 2 10.1.
[321] Exhibit 33. *See also*, Exhibit 23.
[322] Exhibit 34.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Relative Smartphone Demand – Top Four Samsung Models**

| Model | Based on Hauser Prediction | Based on Actual Units Sold | Based on Respondents' Purchases |
|---|---|---|---|
| Galaxy S III | 29% | ███ | 61.5% |
| Galaxy S II | 16% | ██ | 19.4% |
| Galaxy Note II | 40% | ██ | 9.7% |
| Galaxy Nexus | 16% | | 9.4% |
| Total | 100% | 100% | 100% |

249.   As this table shows, the RFC prediction tool relied on by Professor Hauser suggests that the Galaxy Note II would account for a 40 percent share, the Galaxy S III would account for a 29 percent share, the Galaxy S II would account for a 16 percent share, and the Galaxy S Nexus would account for a 16 percent share. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

250.   A similar comparison can be made of the relative demand for these smartphones implied by Professor Hauser's analysis and the relative demand implied by the phones actually

---

[323] The Galaxy Note II was released between October 24, 2012 and November 29, 2012. *See* Vellturo Report, at Exhibit 13-B.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

owned by the respondents taking Professor Hauser's survey. As the table above shows, the relative demand for the four smartphones implied by the number of phones owned by the respondents is at odds with the predictions implied by Professor Hauser's model. ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

251.    These comparisons demonstrate the lack of reliability of Professor Hauser's analysis for purposes of predicting the purchase decisions made by those that bought the accused devices.[324]

> **4.    *A simple feature counting model explains respondents' choices at least as well as Professor Hauser's model which is based on the unique functionality of each patented feature.***

252.    To further assess the reasonableness of Professor Hauser's conjoint analysis, I tested an alternative model, based on different assumptions, to determine if it better explains the responses generated from Professor Hauser's survey compared to the model put forth by Professor Hauser. In my alternative model, I employed a single simplifying assumption regarding consumer preferences – that individual consumers value equally each of the individual feature levels among the Data Accessibility, Call Initiation and Screening, Input Assistance and

---

[324] Exhibit 36 presents a comparable analysis for two tablets. *See also*, Exhibit 35.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

Camera feature categories. That is, I assumed that, while preferences for these features may vary from person to person, a given respondent would value each of the individual features identically.[325]

253.    I compared the results from this alternative model specification to the specification used by Professor Hauser, which assumes that respondents in the survey made smartphone choices by weighing the unique value of each feature separately based upon the descriptions provided by Professor Hauser. My alternative model examines whether respondents used a simplifying heuristic in making their choices and selected the phone or tablet in the choice exercise that had the most features, as represented by the number of icons in the boxes in the survey choice screen. In effect, this alternative approach examines the extent to which survey respondents select their preferred smartphones or tablets based on "feature specifications" (as analyzed by Professor Hauser) or "feature counts" (as explored in this variant analysis).

254.    Responses generated by my parallel pretest suggest that respondents did make choices based upon the number of features offered in the smartphones. For example, one respondent noted that it may be more important to have "more" features than the "right" features:

> Q:    All right. A little pause there, and then I've just got an ending question for you. Talking about the decision process that you used - so you went through it 13 times. Do you

---

[325] In my alternative specification, price and screen size are treated in the same manner as in Professor Hauser's model.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

feel like your decision process stayed the same, or do you feel like it changed or evolved as you were going through the 13 times? Tell me what you think about that.

A:      I think it changed a little bit slightly, but mainly overall I look for the right price along with the right features, and maybe not necessarily the right features, but the more features. Because obviously the more features that you have, the more useful your phone ends up being. Sometimes I have no idea what an app or a certain thing does, but then I realize how useful it is later on.[326]

255.    Another respondent stated that what he liked about his phone choice was that it had "all of the features:"

Q:      And when you mentioned right off this one has all the features, is that what you liked about this particular phone that you selected in this case or was it something else that really drove this choice?

A:      Just all of the features. I didn't see anything missing in the white. The only thing that I will say I didn't necessarily care for was the phone size. But at $100, it could be 4.8 inches. Can't really be mad at that.[327]

256.    Another respondent acknowledged that he based his choices in the survey on which phone had more features:

Q:      What would you say your main decision criteria would be? We got through three or four of these screens. What was it that you were making your decision on? This is the thing

---

[326] Exhibit 37 (Phoenix: Respondent 4).
[327] Exhibit 37 (Chicago-1: Respondent 1).

167

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

that made me prefer this phone over the other three. What was that?

A:   The more features that I could get. But then this is to me it's, I already have some of the features and they're saying at the bottom all other features on your most recent Samsung phone. But some of these are already on here. I would like to see the new features, upgrades or enhancements. Because I've got to know for sure. Three way calling I have, so I can take their call. I need to know what's new and what would be added to that phone.[328]

257.   Another respondent noted:

Q:   Think about your decision-making process that you used through the 16 exercises. Did it change? Did your decision-making process change, or not, as you moved through the 16 exercises?

A:   Well, after you stopped me the first time, I did pay more attention to this at the bottom here. But mostly, no. I like the smaller phones and as many features as I can get, I'll take, and price was a big thing for me.[329]

258.   Another respondent stated that he was "hesitant" about choosing a phone with less features:

Q:   What were you basing your decisions on? So what were-?

A:   If it had everything I was looking for.

Q:   What are those key features?

---

[328] Exhibit 37 (Chicago-1: Respondent 5).
[329] Exhibit 37 (Phoenix: Respondent 7).

168

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

> A:  Everything that they mostly listed, I want to say almost I found on #4. Everything that they tell me about in the video is something that I would look for in the phone, so the ones that have less of what they talked about in the previous videos are the ones I - is the one I'm hesitant like - or maybe last choice, so like price had nothing to do with it or screen size didn't matter. It was more the other features.

> Q:  So are you saying that you're really looking to see which of these has the most of these squares filled in?

> A:  Yes.

> Q:  Because you're looking for the most features.

> A:  Right.[330]

259.   Similarly, another respondent stated that he made choices based on which phone in the column had the most feature icons:

> A:  And to me what I'm looking for is just which column has the most options. I'm not even looking at price or the screen size.

> Q:  So just the number of little squares that are filled in?

> A:  Mm-hmm.[331]

260.   Finally, another respondent stated that the critical thing he wanted in a phone was the most number of feature capabilities, as expressed by the phone in the column with the greatest number of feature icons:

---

[330] Exhibit 37 (Chicago-2: Respondent 2).
[331] Exhibit 37 (Chicago-2: Respondent 3).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Q:      What were the critical pieces of what you wanted that helped you make those choices between the - what you want of the four?

A:      I think honestly the one with the most capabilities.

Q:      The higher number of the icons in the column -

A:      Yes.

Q:      Or was it specific features?

A:      Higher number of icons and also if it wasn't the smallest screen size because I really don't like small screens. Then I think even the price - if there was one that had everything I would pay money for something that had a lot of things on it - everything that I wanted. But I'd probably - I would choose this one because it has more icons - it's also not the smallest size. I don't like small phones.  That's the one thing I do go off of is not picking the smallest screen.[332]

261.    The results of this alternative feature count analysis are presented in Exhibit 38 for smartphones and Exhibit 39 for tablets. These results show that the price premiums and WTB estimates are comparable in magnitude to those associated with Professor Hauser's "feature specification" analysis. In fact, the sales associated with removing a smartphone feature, regardless of what the feature is, are predicted to fall by between six percent and 17 percent (depending on price and screen size), compared to a range in Professor Hauser's model across features of three percent to 26 percent. Exhibit 40 graphs the diminished sales ranges estimated by Professor Hauser's analysis as well as the high and low estimates from my simple count

---

[332] Exhibit 37 (Chicago-2: Respondent 7).

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

model. The predicted diminished sales values from my feature count model are at least as large as those corresponding to the removal of Background Syncing, Quick Links, and Universal Search, based on Professor Hauser's predictions.

262.   My alternative feature count specification can be assessed in terms of the measures of fit and predictive ability relied on by Professor Hauser in assessing his analysis. I conducted the same tests used by Professor Hauser and the results are presented in Exhibit 41. My results show that the highly simplified alternative model predicts respondent choice in holdout tasks better than Professor Hauser's more complex model based on the $U^2$ statistic (0.28 versus 0.22).[333] Professor Hauser puts significant weight on the $U^2$ measure citing it as justification for the reliability of his model. Professor Hauser writes:

> Because $U^2$ statistics for the holdout samples, which were not used to estimate the model, indicate the model correctly predicts consumer choices with substantial probability even out of sample, the HB CBC model can form a reliable basis for forecasts and predictions of consumer behavior.[334]

263.   A second measure of fit and predictive ability relied on by Professor Hauser is the hit rate on a holdout sample of choice tasks (i.e., the portion of choices predicted accurately). On

---

[333] Exhibit 41. Exhibit 41 also reports the in-sample $U^2$ statistic for Professor Hauser's feature specification and my simplified feature counts specification. The $U^2$ statistics are 0.74 and 0.42 for the Hauser feature specific model and my feature count model, respectively. While Professor Hauser's model has a higher fit in-sample, this is expected given the greater degrees of freedom in his model. Given that Professor Hauser's model is being used to predict behavior beyond the specific 507 respondents included in his survey, it is the out of sample fit that is relevant for comparison. *See also*, Exhibit 42.
[334] Hauser Report, at ¶100.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

this measure the more complex specification Professor Hauser utilized performed better than the alternative feature count simplified model (52% versus 44% hit rate).[335] Given these mixed results, one cannot say that Professor Hauser's feature specification model is preferred over a more simple feature count model. The general implication is that, based on a comparison of the two different models, it is not clear that the specific functionalities evaluated in Professor Hauser's analysis matter to consumers. An alternative explanation of respondent behavior, that seems at least as well supported by the data, is that respondents just prefer more icons on the choice card to fewer.

264.     There is no convincing evidence that Professor Hauser's model, which he claims values the difference between the features at issue and the non-infringing alternatives, is more accurate at predicting consumer choice than a model based largely on a simple count of the number of feature icons. This suggests that the predictive ability of Professor Hauser's model is highly suspect and unlikely to yield usable results. Based on this evidence, I would never rely on

---

[335] Professor Hauser reported a $U^2$ of 0.42 for the sample used to estimate his model in smartphone survey and a $U^2$ of 0.50 for the tablet survey sample. *See* Hauser Report, at ¶99. For the holdout analysis, Professor Hauser found a $U^2$ of 0.22 for the smartphone holdout sample and 0.25 for the tablet holdout sample. This drop may indicate that the model is overfitting (predicting noise in the data). Professor Hauser's model may be overly complex such that his predictions are predicting some of the random noise in the data, hence a strong fit within that data, but missing the general trend or relationship and hence not fitting as well on the hold out data. An overfit model will not provide reliable estimates when applied to predict behavior outside of the specific respondents surveyed. Professor Hauser attempts to generalize to the overall market for Samsung smartphone and an overfit model is not reliable for that purpose.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

a model, such as this, with all of its shortcomings discussed above, in either in my academic work or my work in industry.

## V.      Conclusion

265.    My opinions may change before trial if additional information from any of the parties-in-suit or their experts becomes available.  I, therefore, reserve the right to supplement my report accordingly.

David Reibstein

**Exhibit 11: Summary of Pretest Responses Related to Patented Features/Non-Infringing Alternatives**

| | Exhibits Misunderstanding/Lacks Sufficient Understanding Regarding Professor Hauser's Description | | | | | |
|---|---|---|---|---|---|---|
| Respondent | Missed Call Screen Management ('760) | Automatic Word Correction ('172) | Background Syncing ('414) | Quick Links ('647) | Universal Search ('959) | At Least One Feature |
| PHIL - Respondent 1 | Y | Y | Y | Y | N | Y |
| PHIL - Respondent 2 | Y | Y | Y | Y | N | Y |
| PHIL - Respondent 3 | Y | N | Y | Y | Y | Y |
| PHIL - Respondent 4 | Y | Y | Y | Y | N | Y |
| PHIL - Respondent 5 | Y | Y | Y | Y | N | Y |
| PHIL - Respondent 6 | Y | Y | Y | Y | Y | Y |
| PHIL - Respondent 7 | Y | Y | Y | Y | Y | Y |
| PHX - Respondent 1 | Y | Y | Y | Y | N | Y |
| PHX - Respondent 2 | Y | Y | Y | Y | N | Y |
| PHX - Respondent 4 | Y | Y | Y | Y | N | Y |
| PHX - Respondent 5 | Y | N | N | Y | N | Y |
| PHX - Respondent 6 | Y | Y | Y | Y | N | Y |
| PHX - Respondent 7 | Y | Y | Y | Y | N | Y |
| PHX - Respondent 8 | Y | Y | Y | Y | N | Y |
| CHI1 - Respondent 1 | Y | Y | N | N | N | Y |
| CHI1 - Respondent 2 | N | N | Y | Y | N/A | Y |
| CHI1 - Respondent 3 | Y | Y | N | Y | N/A | Y |
| CHI1 - Respondent 4 | Y | N | Y | Y | N/A | Y |
| CHI1 - Respondent 6 | N | Y | N | Y | N | Y |
| CHI2 - Respondent 2 | Y | Y | Y | Y | N/A | Y |
| CHI2 - Respondent 3 | Y | N | Y | Y | N | Y |
| CHI2 - Respondent 4 | Y | N | Y | Y | Y | Y |
| CHI2 - Respondent 5 | Y | N | Y | Y | N | Y |
| CHI2 - Respondent 6 | Y | Y | Y | Y | N | Y |
| CHI2 - Respondent 7 | Y | N | Y | Y | N | Y |
| CHI2 - Respondent 8 | Y | Y | Y | Y | N | Y |
| **Total** | **24** | **18** | **22** | **25** | **4** | **26** |

*Note:*
[1] Twenty-nine respondents participated in the pretest interviews, of which three respondents were dropped, resulting in a final sample of 26 respondents. Two respondents, CHI1 - Respondent 5 and CHI2 - Respondent 1, were dropped because they failed to complete at least half of the questions associated with the third choice exercise task in the time allotted for the qualitative interview. One additional respondent, PHX - Respondent 3, was dropped because he did not own a Samsung smartphone in the past 12 months.

*Source:*
Parallel pretest conducted in Philadelphia ("PHIL") on August 20, 2013, Phoenix ("PHX") on August 22, 2013, Chicago on August 28, 2013 ("CHI1"), and Chicago on August 29, 2013 ("CHI2").

**Exhibit 12: Example Pretest Responses Related to Lack of Realism in Professor Hauser's Survey**

| Respondent | Excerpt | Source |
|---|---|---|
| PHIL - Respondent 1 | Q: As far as the choices that this was asking you make, how closely did you feel it mirrors the kind of choices you would make if you were really going shopping for a phone?<br>A: Yeah.<br>Q: Or not. [CROSSTALK].<br>A: There are a few other things that I personally consider in terms of the tech specs of a phone. The first things I look at are CPU and the memory of the phone and only afterwards I started looking for these features.<br>Q: So this is missing some of the things you would be addressing.<br>A: Yeah. To buy this phone, I traded off the camera to have a better, to have better CPU and memory. | [02:31:02]-<br>[02:31:40] |
| PHIL - Respondent 2 | Q: In terms of the - each time it gave you one phone, two - did you feel like the phone choices were realistic?<br>A: That's a difficult one. At times I thought that they were - that the features didn't match the price, especially the higher price ones and I was looking at previous screen, previous options and then when they added the icons and the price together it didn't make sense. I would get the same thing for $49 and then the next screen it was almost identical for $299.<br>Q: Got it.<br>A: So they were unrealistic.<br>Q: Did the combination - if we take price out for a moment, did the combination of features seem realistic?<br>A: Yes. | [04:03:56]-<br>[04:04:50] |
| PHX - Respondent 5 | Q: Did you feel that the smartphone options that it was basically giving you when you checked buy this phone that the options were realistic?<br>A: Some of them not necessarily.<br>Q: Tell me why not.<br>A: Mainly because of price on some of them.<br>Q: Too high or too low?<br>A: Some of them it seemed too low, because more and more now phone companies aren't really giving you that great of a deal on these phones unless you sign a new two-year contract, and even then, don't get me started on T-Mobile. So I was saying I wished that that could have been the case. I could get exactly what I wanted for about $100. Are you kidding me? I'd sign that contract right now.<br>Q: How closely did you feel that the choice options would - this question is not an intuitive question, so I'm trying to ad lib it, and I'm butchering it. So how closely did the smartphone choice options portray the smartphones that you would choose from and the choices you would make in the real world?<br>A: There were a lot of similarities. There was also a lot of obvious randomness where it was just trying to switch things up or whatever for me, and that was kind of obvious, mainly on the price and also the fact that most higher-end smartphones cost about the same, and they all pretty much do about the same nowadays. So if anything, it was more random choices to be made. It was just a very selective way to view it. It was a little strange but mostly good. | [09:49:03]-<br>[09:50:19] |
| PHX - Respondent 6 | Q: Go ahead and hit "next." [PRESENTATION PLAYS] [PAUSE] So, was this video helpful in explaining the choices?<br>A: Yeah. A little bit confusing.<br>Q: Tell me - tell me about that.<br>A: What I looked at it is - the way they had it set up, with the different sections and - kind of expected it to go in order, you know what I mean? As far as price-wise, size, and - and most likely nowadays you're real likely - the phones - the bigger they are, the more expensive they get, and that didn't make sense. Usually when the higher prices you're going to get more options, so I didn't get - kind of a little off. | [10:35:09]-<br>[10:39:00] |
| PHX - Respondent 6 | Q: Did you feel that the smart phone options that they were giving you, that they were realistic?<br>A: Yeah, for the most part.<br>Q: Tell me - say more about that. "For the most part."<br>A: Because some of these new phones now are much more tech - they have a lot more new advances. I think this was about two years old as far as technology-wise. My phone is already pretty much considered outdated. At the same time, I had a majority of what they were offering. | [11:24:58]-<br>[11:25:15] |

*CONFIDENTIAL - ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER*

**Exhibit 12: Example Pretest Responses Related to Lack of Realism in Professor Hauser's Survey**

| Respondent | Excerpt | Source |
|---|---|---|
| PHX - Respondent 7 | Q: [...] Did you feel that the smartphone options that the survey was giving you, did you feel that they were realistic?<br>A: Um-hmm. Yeah.<br>Q: Can you say why you feel that?<br>A: The only one I think - some of them, like I say a lot of them I don't use, but the packages that they did put together and the different phones would be helpful for somebody who uses them all the time, I guess. I don't know; what I'm trying to say is - Can you ask me the question again?<br>Q: Yeah, absolutely. We want to get a sense for when they would give you the different smartphone options to choose from, did you feel that the options they were giving you were realistic?<br>A: Oh, I see, OK. Some of them maybe not, because why would you get one option and not another one; like the picture package, why would you only get the one option. It didn't seem to make sense. Stuff like that.<br>Q: If you think about - well, so how closely did the smartphone options that they portrayed here, how closely do you feel that they - that that was like the experience that you had in the real world of choosing a smartphone?<br>A: I don't think it was very realistic, because I think most phones come with pretty much all those options. The one I've got, I'm pretty sure I've got at least 90 percent of those options on there. | [13:27:04]-<br>[13:28:43] |
| CHI1- Respondent 1 | Q: Got it. So, the table itself, how are you feeling about the clarity of what they're showing you in the table? Is there anything confusing or -<br>A: It's just confusing to me why the cheapest phone has more features than the most - the highest priced phone. The 299 phone should offer things like WiFi calling, Universal Search, all the camera options. The universal - the 399 phone should be the biggest size, not a five inch phone, it should be the 5.5 inch phone. It only has a three-way calling option. It has all of the input assistance but what is that? Because at the end of the day you're not doing me favors. Copying and pasting is something I can get on any phone. Voice to text is OK but I don't need it. Spell check. Every phone has that. S Pen, I can do without. You're not doing me - panoramic.<br>Q: Than the more expensive.<br>A: Yeah, in the more expensive phone. You're going to pay - you're making the cheapest phone more of a buy or a draw than the phone you tend to make the most money off of, the most profit. | [01:45:50]-<br>[01:47:04] |
| CHI1 - Respondent 4 | Q: The choices, the combinations that they were putting together in the columns, did those, where they realistic combinations of features? For the most part?<br>A: For the most part, yes.<br>Q: Which were the ones that just seemed unrealistic?<br>A: The one where it's just sort of nothing. But those are like plain old phones that you used to just fold up and put in your pocket. So those ones that had pretty much nothing, just the answer the phone and nothing else there.<br>Q: Very few features.<br>A: Very, yes.<br>Q: Listed then. Why isn't that realistic anymore?<br>A: For, I guess for, mom is 70, she sits at home, she doesn't, she's not on the phone all the time. So for that reason. But I mean, depending on age makes a difference. I mean I didn't get mine until I was, last year. 45, my kids are 25, 27 and they've had theirs for five years. | [08:20:38]-<br>[08:21:19] |
| CHI1 - Respondent 6 | Q: Yes, thank you. Were you surprised to see this table again? Did you think that was just going to be a one time choose between the four from the instructions earlier?<br>A: I did. I did think it was going to be a one-time. Maybe I'm going out on a limb here but I feel like if I had a list of these things and I was able to drag each one of these things that I needed into a thing and then have them tell me what phone would be best for me would be really easy. Instead of saying - instead of like saying I definitely need voice to text and trying to find - well now I have this but now I don't have this so now I need to find one with this and this, so I mean a quick thought would just be to kind of drag them into a centralized thing and then have them recommend something for me. It would be the fastest way, I think at least - | [13:06:00]-<br>[13:06:22] |

*CONFIDENTIAL - ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER*

**Exhibit 12: Example Pretest Responses Related to Lack of Realism in Professor Hauser's Survey**

| Respondent | Excerpt | Source |
|---|---|---|
| CHI2 - Respondent 4 | Q: So let's talk about that. What does it feel like they're telling you you're going to be doing?<br>A: Well, because I was a no, but I mean they're having you look and, you know, I understand that. You're looking to see what each phone, what features it's going to have of all the features that we just saw, and then you're supposed to select which one that you would want but - I'm, like I said--I wouldn't pick that phone. But anyway, so you're supposed to just pick which one -<br>Q: You wouldn't have picked which phone? What do you mean?<br>A: The example that they picked.<br>Q: Oh the [CROSSTALK]<br>A: I wouldn't have done it. It's just weird that, and then when I'm looking at it, that is weird the way that they have it set up too. Why would the most expensive phone not have all four of those features? Why would it be missing one and the cheapest phone had all four? You know what I mean? Just for the first example, that doesn't make sense. I'm sure this has nothing to do with what we're supposed to be -<br>Q: No, it does. Because if it's hanging you up and in your mind you're thinking about why -<br>A: Why would the cheapest phone have more of the features than the one that's more, and I'm not saying that just because it's more expensive it's better, but I know that my phone was expensive and it has a lot of features that other peoples' phones don't have, so I don't understand why the cheapest - because usually when you get a free phone or a cheaper phone, it's not - not all the time it's not that great, but sometimes it's not as good as the more expensive phone, so that is why I was just kind of like why does it no have all the, but I'm sorry, but no, you're supposed to pick out the features that you like on each one of those phones. | [05:26:47]-<br>[05:27:43] |
| CHI2 - Respondent 6 | Q: Well, let's go do that, so go ahead and hit "Next".<br>A: Oh, I see, the prices are - I expected the pricing to go from lowest to highest and it would make it easier to take a - 'cause most people want which is the cheapest one first. Now, maybe they wanted to do that for a reason so you're not going into that type of thought process right away, but it confused me right at first until I actually looked and I said OK. I'm going, well, this one I didn't notice the pricing right away and I'm going why has this one got more of this? And I expected 290, you know, the high-priced spread to be on this side, as that's the way people normally look at - can we make this screen one side just a little so I could see all - well, you can sorta. This one looks to be the best deal 'cause you're getting the most options. | [08:36:52]-<br>[08:39:48] |
| CHI2- Respondent 7 | A: So they've switched it around a bit.<br>Q: Tell me how you noticed that or what brought that to your attention?<br>A: Well, when I was looking at it before, I guess I was like "I like camera settings." But I was really confused because I was like "But that was up there and now it's -." So I guess how I was beginning to familiarize myself, it totally changed. That's weird to me why they would do that.<br>Q: We're wondering about that.<br>A: Yeah. I know I have to - I think the other thing I don't like, and maybe this is just how I think, I think of price point starting the lowest to the highest. So they start from high, low and then kind of middle. But when I buy a phone I usually like to - the price is a big factor for me. This is a really hard decision. This [INAUDIBLE] because - I don't know why. Well, I do know why. Do you want me to explain why I chose this or - | [10:34:04]-<br>[10:34:39] |
| CHI2 - Respondent 8 | A: The information that was in the grid itself that you were using, that table. Did all of that seem realistic, the choices that they were giving you? Let's talk about just the features themselves. Did all of them seem realistic?<br>A: They did. Yeah.<br>Q: What about the combinations of them? We think about them, what you were finding down the column, did they seem reasonable and practical? Or did any of them seem, boy that would never happen?<br>A: No I guess as the - when I was going on, I'm thinking well why wouldn't we just give it - why wouldn't you just include that? Why would some have it, some not? I think there was confusion. I'm thinking well why can't you just offer voice text or things like that? Why would you take that away? I mean I guess I could understand on - if you were paying $49 for a phone, ultimately I believe you get what you pay for, but in some instances, some of the more expensive ones, the 299s didn't have things that I think well you're paying $300 for this phone, why don't I have this feature? | [12:41:58]-<br>[12:42:34] |

*Source:*
Parallel pretest conducted in Philadelphia ("PHIL") on August 20, 2013, Phoenix ("PHX") on August 22, 2013, Chicago on August 28, 2013 ("CHI1"), and Chicago on August 29, 2013 ("CHI2").

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**Exhibit 19: Summary of Conjoint Analyses in Top Six Marketing Journals (2005-Present)[1]**

| | Product(s) Tested | Number of Attributes Tested | List of Attributes Tested | Year | Conjoint Type | | Source |
|---|---|---|---|---|---|---|---|
| 1. | Apartments | 2 | floor (dictated by apartment number), price | 2008 | CBC; Ranking | | [a] |
| 2. | Automobiles | 3 | price, performance, labor practices of the manufacturer | 2009 | Ranking | | [b] |
| 3. | Automobiles | 4 | powertrain technology, economy & emissions, 0-100kph acceleration, collision safety rating | 2013 | Rating | | [c] |
| 4. | Automobiles | 11 | brand, body type, EPA mileage, glass package, transmission, trim level, quality of workmanship rating, crash test rating, power seat, engine, price | 2011 | Ranking | | [d] |
| 5. | Bikes | 6 | front suspension, rear suspension, weight, brake type, tires, gear | 2012 | Ranking | | [e] |
| 6. | Cell phone plans | 6 | access fee, per-minute rate, plan minutes, service provider, internet access, rollover of unused minutes | 2008 | CBC | | [f] |
| 7. | Cell phones | 3 | warranty, labor practices, delivery time | 2005 | Rating | | [g] |
| 8. | Cell phones | 4 | brand, price (with plan), text messaging, built-in camera | 2009 | CBC | | [h] |
| 9. | Cell phones | 4 | capabilities, MP3 capabilities, video capabilities, price | 2011 | CBC | | [i] |
| 10. | Cell phones | 7 | MP3 player, video recorder/player, web-enabled functionality, GPS support service, loudspeaker, camera upgrade, price | 2010 | CBC | | [j] |
| 11. | Cell phones | 15 | brand, display, battery, camera, design, size, music features, onboard memory, wlan, bluetooth, video player, case material, hands-free function, tv-enabled, mobile navigation | 2010 | ACA; PCPM [2] | | [k] |
| 12. | Cell phones & service plans | 8 | brand, price (with plan), text messaging, built-in camera, service provider, monthly fee (with free anytime minutes), contract length, coverage area | 2009 | CBC | | [h] |
| 13. | Chinese meals | 8 | soup, rice/noodles, sauce, vegetables, meat, spring roll, quantity, price | 2005 | CBC; ICBC [3] | | [l] |
| 14. | Cleaning products | 5 | brand, color, durability, cleaning power, price | 2011 | CBC; ICBC | | [m] |
| 15. | Consumer electronic devices | 20 | not stated | 2008 | CBC (dual response) | | [n] |
| 16. | Corn chips | 12 | not stated | 2012 | CBC (multiple choice) | | [o] |
| 17. | Delivered pizza | 4 - 16 | type of pizza, price, quality, delivery time, crust, number of sizes, temperature, open until, delivery charge, store type, baking method, manners, vegetarian option, delivery time guaranteed, distance, variety | 2008 | CBC | | [p] |
| 18. | Digital cameras | 2 | imaging sensor resolution, image storage capacity | 2008 | CBC | | [q] |
| 19. | Digital cameras | 3 | price, picture quality, optical zoom | 2011 | CBC | | [r] |
| 20. | Digital cameras | 4 | resolution, zoom, image capacity, price | 2007 | CBC; Ranking | | [s] |
| 21. | Digital cameras | 12 | brand, battery life, built-in memory, camera size, lcd size, light sensitivity, optical zoom, price, resolution, shot lag, video clip, warranty | 2011 | ASE, ACA & FPM [4] | | [t] |
| 22. | Documentary films | 7 | documentary title, media, packaging, two disguised attributes, promotion, price | 2006 | CBC | | [u] |
| 23. | DVD movie rentals by mail | 4 | service provider, number of movies offered at a time, monthly price, blu-ray movie availability | 2012 | CBC | | [v] |
| 24. | Electronic book readers | 6 | brand, price, weight, screen resolution, number of books available for download, storage | 2011 | CBC | | [i] |
| 25. | Food product | 6 | brand, calories, price, type of green irritative, two proprietary attributes | 2011 | CBC | | [w] |
| 26. | GPS (handheld) | 16 | weight, display brightness, display resolution, acquisition time, battery life, backlit keyboard, price, size of GPS, floats on water, mini-USB port, track log, accuracy, reception, brand, screen size, screen color | 2010 | Ranking | | [x] |
| 27. | Handheld power tools | 6 | brand, price, amp rating, life of product, switch type, actuator type | 2007 | CBC | | [y] |
| 28. | Handheld power tools | 6 | shape, switch type, weight, price, perceived power, perceived comfort | 2008 | Rating | | [z] |
| 29. | Hotel rooms | 4 | price, room size, location, availability of health/fitness area | 2008 | CBC | | [aa] |
| 30. | Instant noodles | 3 | price, flavor, brand | 2012 | Rating | | [ab] |
| 31. | iPhone apps | 2 or 9 | based on product type | 2012 | CBC | | [ac] |
| 32. | iPod Nano and accessories | 8 | ipod storage capacity, case/holder, headphones, speakers, car audio, power, warranty, price | 2007 | CBC | | [ad] |
| 33. | iPod Shuffle and accessories | 8 | ipod storage capacity, case/holder, headphones, speakers, car audio, power, warranty, price | 2007 | CBC | | [ad] |
| 34. | Island holiday | 4 - 16 | price, type of destination, airline, length of stay, meal inclusion, local tours available, season, type of accommodation, length of trip, cultural activities, distance from hotel to attractions, swimming pool, helpfulness, type of holiday, beach availability, brand | 2008 | CBC | | [p] |
| 35. | Laptop bags | 10 | handle, price, logo, closure, mesh pocket, pda holder, cell phone, color, size, boot | 2005 | CBC; ACA | | [ae] |
| 36. | Laptop computers | 5 | price, memory, brand, processor, hard drive | 2007 | Rating | | [af] |
| 37. | Laptop computers | 6 | brand, microprocessor, size, pointing device, memory, price | 2006 | CBC | | [ag] |
| 38. | Laptop computers | 6 | color, warranty, security software, hard drive, accessory, price | 2012 | CBC; Conjoint Poker [5] | | [ah] |
| 39. | Laptop computers | 14 | brand, battery life, built-in web camera, cd/dvd, computer weight, computer width, hard drive, included software, memory (ram), price, processor speed, screen resolution, screen size, warranty | 2011 | ASE, ACA & FPM | | [t] |
| 40. | Laptop computers | 2 or 10 | based on product type | 2012 | CBC | | [ac] |
| 41. | Laptop computers | 2 or 10 | Hedonic attributes: graphics, sound, external colors available, display color quality, exterior design; Utilitarian attributes: processor type, memory capacity, antivirus and security features, wireless connectivity features, type of DVD combo | 2012 | CBC | | [ac] |
| 42. | LCD televisions | 2 | screen size, horizontal viewing angle | 2008 | CBC | | [q] |
| 43. | Long distance telephone call plans | 6 | price-discount plan, time of savings, level of savings, geographic coverage of savings, phone numbers covered, minimum threshold | 2005 | not stated | | [ai] |

**Exhibit 19: Summary of Conjoint Analyses in Top Six Marketing Journals (2005-Present)** [1]

| | | | | | | |
|---|---|---|---|---|---|---|
| 44. | MBA admissions | 8 | total enrollment (revenues), average gmat score, class average potential, percentage of the class with an overall assessment score ≤4, average interview score, percentage of class with interview grades of ≤4, percentage female, percentage foreigners | 2012 | ACA | [aj] |
| 45. | Mobile phone contracts | 4 | contract cost, length of contract (mo.), cost per call ($/min.), amount of free calls under contract | 2006 | CBC | [ak] |
| 46. | Mobile phones | 7 | brand, color, screen size, thickness, camera resolution, style, base price level | 2011 | Ranking | [d] |
| 47. | Movie distribution | 4 or 5 | channel of consumption, timing of availability, price, additional content, (language options) | 2007 | CBC | [al] |
| 48. | MP3 players | 10 | brand name, size, presence or absence of an fm radio, presence or absence of a voice recorder, presence or absence of a rechargeable battery, amount of memory, memory device, battery life, price, lines of display | 2006 | CBC | [ag] |
| 49. | Music download services | 4 | price, advertising intensity, restrictions through drm, catalog size | 2011 | CBC | [am] |
| 50. | Netbooks | 5 | brand, main memory, display size, hard drive, price | 2012 | CBC | [an] |
| 51. | Not stated | 3 | brand, not stated, not stated | 2009 | CBC | [ao] |
| 52. | Not stated | 16 (full profile) or 9 (partial profile) | brand, price, durability, + 13 more not stated | 2006 | CBC | [ap] |
| 53. | PDA | 4 | memory, resolution, weight, price | 2007 | CBC; Ranking | [s] |
| 54. | Power tool | 6 | brand, price, power amp, product life, switch type, girth type | 2011 | CBC | [aq] |
| 55. | Prepaid phone cards | 4 | brand name, price, two unstated attributes | 2006 | Ranking | [ar] |
| 56. | Printers/media players | 2, 5 or 10 | Media player: display resolution, weight, capacity, color, supported standards, dimensions, connections, media integration, radio, battery life; Printer: screen type, sheet capacity, printing resolution, design, speed, dimensions, PC connection, and 3 additional features | 2012 | CBC | [ac] |
| 57. | Refrigerators | 2 | annual energy cost, capacity | 2008 | CBC | [q] |
| 58. | Service plans | 4 | service provider, monthly fee (with free anytime minutes), contract length, coverage area | 2009 | CBC | [h] |
| 59. | Smartphones | 7 | price, brand, form, os, network, keyboard, screen | 2007 | Ranking | [as] |
| 60. | Smartphones | 2 or 8 | Hedonic attributes: multimedia formats supported, video recording capabilities, graphics quality, music sound quality, exterior design, exterior color availability, music and video storage capacity, display quality; Utilitarian attributes: keyboard type, e-mail services supported, word processing and spreadsheet software, additional productivity software included, internal GPS, talk time, standby time, and built-in utilities such as calendar, alarm | 2012 | CBC | [ac] |
| 61. | Snack combo | 5 | drink, cookie, Korean cereal bar, fruit, price | 2005 | CBC; ICBC | [l] |
| 62. | Soft drinks | 2 | drink size, price | 2008 | CBC | [at] |
| 63. | Summer vacation | 10 | leisure activities, room category, catering, location, type of building, outside facilities, sightseeing, security concerns, climate, beach | 2010 | ACA; PCPM | [k] |
| 64. | Tariff development | not stated | base fee, image, free minute package | 2008 | CBC | [au] |
| 65. | Televisions | 4 | screen technology, annual energy cost, screen resolution, screen size | 2013 | Rating | [c] |
| 66. | Televisions | 6 | brand name, screen size, sound system, channel blackout, picture-in-picture, price | 2008 | CBC | [av] |
| 67. | Toothbrush | 8 | price, softness of bristles, head size, bristle design, angle of head, grip design, perceived effectiveness, perceived comfort | 2008 | Rating | [z] |
| 68. | Toothpaste | 11 | medical benefits, taste, abrasiveness, resulting appearance, resulting breath, price, ingredients, packaging, interests, social, maintenance | 2011 | Ranking | [aw] |
| 69. | University news web pages | 5 | weather forecast, university news, general news, business news, online coupon | 2008 | Rating | [ax] |
| 70. | University news web pages | 5 | weather report, university news, online coupon, general news, business news | 2008 | Rating | [ay] |
| 71. | Wii Video Games | 6 | game genre, number of players, reviews, effort, online, price | 2011 | Ranking | [az] |
| 72. | Wine | 3 | price, vintage, wine region | 2012 | CBC | [ba] |
| 73. | Wine | 5 | closure type, type of wine, origin, vintner, price range | 2007 | ACBC; CBC | [6] | [bb] |
| 74. | Wooden desk and chair set | 4 | workmanship, comfort, wood source, price | 2005 | Rating | [g] |
| 75. | Yogurt | 3 | brand name, price, flavor | 2009 | CBC | [bc] |

**Total number of conjoint studies:** **75**

*Notes:*

[1] Includes conjoint studies published in the *Journal of Marketing, Journal of Marketing Research, Journal of Consumer Research, Marketing Science, Journal of the Academy of Marketing Science* and *Marketing Letters* from January 1, 2005 to May 21, 2013. The top six marketing journals were identified as a combination of the rankings of the top five marketing journals found in Hofacker, C., Gleim, R., and S. Lawson, "Revealed Reader Preference for Marketing Journals," *Journal of the Academy of Marketing Science* (2009) and Hult, G., Reimann, M., and O. Schilke, "Worldwide Faculty Perceptions of Marketing Journals: Rankings, Trends, Comparisons, and Segmentations," *Global Edge Business Review* 3, no. 3 (2009).

[2] Incentive-aligned preference measurement (PCPM) is based on the collection of paired comparisons of attributes and attribute levels that are integrated into ratio preference networks. *See* Source [k].

[3] Incentive-aligned choice-based conjoint (ICBC) analysis is an indirect approach for determining actual willingness-to-pay (WTP) in which participants are also obligated to make a purchase based on WTP inferred from their revealed preference. In this study, the authors used the Becker–DeGroot–Marschak (BDM) mechanism as a direct approach to elicit actual WTP. Participants in a BDM study are obligated to purchase a product if the price drawn from a lottery is less than or equal to his or her stated WTP before the lottery. *See* Source [l].

[4] Adaptive self-explication (ASE) replaces the importance measurement stage of the self-explicated method (SEM) by ranking attribute improvements and adaptive constant-sum paired comparisons of attribute improvements. Adaptive conjoint analysis (ACA) combines the self-explicated approach with graded paired comparisons of partial profiles. Paired comparison questions are chosen adaptively to maximize utility balance. Fast polyhedral method (FPM) combines the self-explicated approach with graded paired comparisons of partial profiles chosen adaptively on the basis of the analytic center approach. *See* Source [h].

[5] In conjoint poker, each card represents a product defined by a combination of features. "Hands" are defined similarly to regular poker (e.g., a pair is a hand in which two products have one feature in common). The preference data revealed by respondents during this game are comparable to ICBC data. *See* Source [ah].

[6] Adaptive choice-based conjoint (ACBC) leverages both aspects of CBC and ACA by using polyhedral methods to adaptively select questions in choice-based conjoint analysis. Adaptive CBC is best applied for conjoint-type problems in which there are about five or more attributes. *See* Source [bb].

**Exhibit 19: Summary of Conjoint Analyses in Top Six Marketing Journals (2005-Present)[1]**

*Sources:*

[a]   Hsee, C., Dubé, J., and Y. Zhang, "The Prominence Effect in Shanghai Apartment Prices," *Journal of Marketing Research* 45 (2008).

[b]   Irwin, J., and Naylor, R., "Ethical Decisions and Response Mode Compatibility: Weighting of Ethical Attributes in Consideration Sets Formed by Excluding Versus Including Product Alternatives," *Journal of Marketing Research* 46 (2009).

[c]   E. Olson, "It's Not Easy Being Green: the Effects of Attribute Tradeoffs on Green Product Preference and Choice," *Journal of the Academy of Marketing Science* 41 (2013).

[d]   Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011).

[e]   Goedertier, F., Geskens, K., Geuens, M., and B. Weijters, "Increasing Choice Satisfaction through Goal-Based Labeling," *Marketing Letters* 23 (2012).

[f]   Iyengar, R., Jedidi, K., and R. Kohli, "A Conjoint Approach to Multipart Pricing," *Journal of Marketing Research* 45 (2008).

[g]   Ehrich, K., and J. Irwin, "Willful Ignorance in the Request for Product Attribute Information," *Journal of Marketing Research* 42, no. 3 (2005).

[h]   Aribag, A., and N. Foutz, "Category-Based Screening in Choice of Complementary Products," *Journal of Marketing Research* 46 (2009).

[i]   Narayan, V., Rao, V., and C. Saunders, "How Peer Influence Affects Attribute Preferences: A Bayesian Updating Mechanism," *Marketing Science* 30, no. 2 (2011).

[j]   Aribag, A., Arora, N., and M. Kang, "Predicting Joint Choice Using Individual Data," *Marketing Science* 29, no. 1 (2010).

[k]   Scholz, S., Meissner, M., and R. Decker, "Measuring Consumer Preferences for Complex Products: A Compositional Approach Based on Paired Comparisons," *Journal of Marketing Research* 47 (2010).

[l]   Ding, M., Grewal, R., and J. Liechty, "Incentive-Aligned Conjoint Analysis," *Journal of Marketing Research* 42, no. 1 (2005).

[m]   Miller, K., Hofstetter, R., Krohmer, H., and Z. Zhang, "How Should Consumers' Willingness to Pay Be Measured? An Empirical Comparison of State-of-the-Art Approaches," *Journal of Marketing Research* 48 (2011).

[n]   Gilbride, T, Lenk, P, and J. Brazell, "Market Share Constraints and the Loss Function in Choice-Based Conjoint Analysis," *Marketing Science* 27, no. 6 (2008).

[o]   Hasegawa, S., Terui, N., and G. Allenby, "Dynamic Brand Satiation," *Journal of Marketing Research* 49 (2012).

[p]   Louviere, J., Islam, T., Wasi, N., Street, D., and L. Burgess, "Designing Discrete Choice Experiments: Do Optimal Designs Come at a Price?" *Journal of Consumer Research* 35, no. 2 (2008).

[q]   De Wilde, E., Cooke, A., and C. Janiszewski, "Attentional Contrast During Sequential Judgments: A Source of the Number-of-Levels Effect," *Journal of Consumer Research* 45 (2008).

[r]   Rooderkerk, R., Van Heerde, H., and T. Bijmolt, "Incorporating Context Effects into a Choice Model," *Journal of Marketing Research* 48 (2011).

[s]   T. Kramer, "The Effect of Measurement Task Transparency on Preference Construction and Evaluations of Personalized Recommendations," *Journal of Marketing Research* 44, no. 2 (2007).

[t]   Netzer, O., and V. Srinivasan, "Adaptive Self-Explication of Multiattribute Preferences," *Journal of Marketing Research* 48 (2011).

[u]   Gilbride, T., and G. Allenby, "Estimating Heterogeneous EBA and Economic Screening Rule Choice Models," *Marketing Science* 25, no. 5 (2006).

[v]   Iyengar, R., and K. Jedidi, "A Conjoint Model of Quantity Discounts," *Marketing Science* 31, no. 2 (2012).

[w]   Parker, J., and R. Schrift, "Rejectable Choice Sets: How Seemingly Irrelevant No-Choice Options Affect Consumer Decision Processes," *Journal of Marketing Research* 48 (2011).

[x]   Hauser, J., Toubia, O., Evgeniou, T., Befurt, R., and D. Dzyabura, "Disjunctions of Conjunctions, Cognitive Simplicity, and Consideration Sets," *Journal of Marketing Research* 47 (2010).

[y]   Luo, L., Kannan, P., and B. Ratchford, "New Product Development under Channel Acceptance," *Marketing Science* 26, no. 2 (2007).

[z]   Luo, L., Kannan, P., and B. Ratchford, "Incorporating Subjective Characteristics in Product Design and Evaluations," *Journal of Marketing Research* 45 (2008).

[aa]   F. Volckner, "The Dual Role of Price: Decomposing Consumers' Reactions to Price," *Journal of the Academy of Marketing Science* 36 (2008).

[ab]   Stüttgen, P., Boatwright, P., and R. Monroe, "A Satisficing Choice Model," *Marketing Science* 31, no. 6 (2012).

[ac]   Sela, A., and J. Berger, "How Attribute Quantity Influences Option Choice," *Journal of Marketing Research* 49 (2012).

[ad]   M. Ding, "An Incentive-Aligned Mechanism for Conjoint Analysis," *Journal of Marketing Research* 44, no. 2 (2007).

[ae]   Hauser, J., and O. Toubia, "The Impact of Utility Balance and Endogeneity in Conjoint Analysis," *Marketing Science* 24, no. 3 (2005).

[af]   Kohli, R., and K. Jedidi, "Representation and Inference of Lexicographic Preference Models and Their Variants ," *Marketing Science* 26, no. 3 (2007).

[ag]   Brazell, J., Diener, C., Karniouchina, E., Moore, W., Séverin, V., and P. Uldry, "The No-Choice Option and Dual Response Choice Designs," *Marketing Letters* 17 (2006).

[ah]   Toubia, O., de Jong, M., Stieger, D., and J. Füller, "Measuring Consumer Preferences Using Conjoint Poker," *Marketing Science* 31, no. 1 (2012).

[ai]   Roberts, J., Nelson, C., and P. Morrison, "A Prelaunch Diffusion Model for Evaluating Market Defense Strategies," *Marketing Science* 24, no. 1 (2005).

[aj]   Belloni, A., Lovett, M., Boulding, W., and R. Staelin, "Optimal Admission and Scholarship Decisions: Choosing Customized Marketing Offers to Attract a Desirable Mix of Customers," *Marketing Science* 31, no. 4 (2012).

[ak]   Rose, J., and I. Black, "Means Matter, but Variance Matter Too: Decomposing Response Latency Influences on Variance Heterogeneity in Stated Preference Experiments," *Marketing Letters* 17 (2006).

[al]   Hennig-Thurau, T., Henning, V., Sattler, H., Eggers, F., and M. Houston, "The Last Picture Show? Timing and Order of Movie Distribution Channels," *Journal of Marketing* 71 (2007).

[am]   Papies, D., Eggers, F., and N. Wlömert, "Music for Free? How Free Ad-Funded Downloads Affect Consumer Choice, " *Journal of the Academy of Marketing Science* 39 (2011).

[an]   Schlereth, C., Eckert, C., and B. Skiera, "Using Discrete Choice Experiments to Estimate Willingness-to-Pay Intervals," *Marketing Letters* 23 (2012).

[ao]   Lenk, P., and B. Orme, "The Value of Informative Priors in Bayesian Inference with Sparse Data," *Journal of Marketing Research* 46 (2009).

[ap]   Gilbride, T., and Allenby, G., and J. Brazell, "Models for Heterogeneous Variable Selection," *Journal of Marketing Research* 43, no. 3 (2006).

[aq]   Luo, L., "Product Line Design for Consumer Durables: An Integrated Marketing and Engineering Approach," *Journal of Marketing Research* 48 (2011).

[ar]   F. Voelckner, "An Empirical Comparison of Methods for Measuring Consumers' Willingness to Pay," *Marketing Letters* 17 (2006).

[as]   Yee, M., Dahan, E., Hauser, J., and J. Orlin, "Greedoid-Based Noncompensatory Inference," *Marketing Science* 26, no. 4 (2007).

[at]   Sharpe, K., Staelin, R., and J. Huber, "Using Extremeness Aversion to Fight Obesity: Policy Implications of Context Dependent Demand," *Journal of Consumer Research* 35, no. 3 (2008).

[au]   Natter, M., Mild, A., Wagner, U., and A. Taudes, "Planning New Tariffs at tele.ring: The Application and Impact of an Integrated Segmentation, Targeting, and Positioning Tool," *Marketing Science* 27, no. 4 (2008).

[av]   Otter, T., Allenby, G., and T. Van Zandt, "An Integrated Model of Discrete Choice and Response Time," *Journal of Marketing Research* 45 (2008).

[aw]   Chandukala, S., Edwards, Y., and G. Allenby, "Identifying Unmet Demand," *Marketing Science* 30, no. 1 (2011).

[ax]   Liechty, J., Fong, D., Huizingh, E., and A. De Bruyn, "Hierarchical Bayesian Conjoint Models Incorporating Measurement Uncertainty," *Marketing Letters* 19 (2008).

[ay]   De Bruyn, A., Liechty, J., Huizingh, E., and G. Lilien, "Offering Online Recommendations with Minimum Customer Input Through Conjoint-Based Decision Aids," *Marketing Science* 27, no. 3 (2008).

[az]   Dahan, El., Kim, A., Lo, A., Poggio, T., and N. Chan, "Securities Trading of Concepts (STOC)," *Journal of Marketing Research* 48 (2011).

[ba]   Völckner, F., Rühle, A., and M. Spann, "To Divide or Not to Divide? The Impact of Partitioned Pricing on the Informational and Sacrifice Effects of Price," *Marketing Letters* 23 (2012).

[bb]   Toubia, O., Hauser, J., and R. Garcia, "Probabilistic Polyhedral Methods for Adaptive Choice-Based Conjoint Analysis: Theory and Application," *Marketing Science* 26, no. 5 (2007).

[bc]   Ferjani, M., Jedidi, K., and S. Jagpal, "A Conjoint Approach for Consumer- and Firm-Level Brand Valuation," *Journal of Marketing Research* 46 (2009).

*CONFIDENTIAL - ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER*

**Exhibit 20: Summary of Conjoint Analyses in Professor Hauser's CV, April 2013[1]**

| | Product(s) Tested | Number of Attributes Tested | List of Attributes Tested | Year | Conjoint Type | Source(s) |
|---|---|---|---|---|---|---|
| 1. | Automobiles | 11 | brand, body type, EPA mileage, glass package, transmission, trim level, quality of workmanship rating, crash test rating, power seat, engine, price | 2011; 2012 | Ranking; CBC | [a]; [b] |
| 2. | Crossover vehicles | 7 | 0-60 MPH, seats, price, horse power, towing capacity, MPG, cargo space | 2002 | Ranking | [c] |
| 3. | Electric vehicle | 6 | brand, body style, price, range, battery recharge time, battery replacement cost | 1996 | ACA | [d] |
| 4. | Electric vehicle | not stated | not stated | 1996 | not stated | [d] |
| 5. | Executive education programs | 8 | program focus, program format, classmates' background, classmates' age, classmates' geographic composition, classmates' organizational sponsorship, classmates' company size, program tuition | 2004; 2007 | ACBC; CBC [2] | [e]; [f] |
| 6. | GPS (handheld) | 16 | weight, display brightness, display resolution, acquisition time, battery life, backlit keyboard, price, size of GPS, floats on water, mini-USB port, track log, accuracy, reception, brand, screen size, screen color | 2007; 2010 | CBC; Rating; [2] ACBC; Ranking | [f]; [g]; [h] |
| 7. | Instant camera | 7 | picture taking, styling covers, slides open, light selection, picture ejection, image quality, price | 2002 | Ranking | [c] |
| 8. | Laptop bags | 10 | handle, price, logo, closure, mesh pocket, PDA holder, cell phone, color, size, boot | 2003; 2005 | ACA; polyhedral ACA; CBC; CA | [i]; [j] |
| 9. | Laptop bags | not stated | price, handle, mesh pocket, not stated | 2007 | Metric Paired Comparison | [f] |
| 10. | Mobile phones | 7 | brand, color, screen size, thickness, camera resolution, style, base price level | 2011 | | [a] |
| 11. | Narrow band video telephones | 4 | resolution, accessibility, hard copy, transmission time | 1981; 1984; 1987; 1993 | Ranking | [k]; [l]; [m]; [n] |
| 12. | Smartphones | 7 | price, brand, form, os, network, keyboard, size | 2006; 2007 | Ranking | [o]; [p] |
| 13. | Smartphones | not stated | price, not stated | 2007 | Ranking | |
| 14. | Student apparel | 4 | price, school logo, color, type of clothing | 2010; 2011 | CBC | [q]; [r] |
| 15. | Telephone, personal visit, teletype, NVBT, CCTV, and fax | 2 | effectiveness, ease-of-use | 1977 | Rating | [s] |
| 16. | Wine | 5 | closure type, type of wine, origin, vintner, price range | 2007 | ACBC; CBC [2] | [t]; [u] |
| 17. | Wine | 5 | wine type, region, closure type, price range, type of winery | 2007 | CBC | [f] |

**Total number of conjoint studies:**     **17**

*Notes:*

[1]   The following items were reviewed from Professor Hauser's April 2013 resume: all journal publications, published notes and commentaries, papers in edited volumes and/or proceedings, magazine articles, and teaching notes were reviewed; working papers, including draft and classic papers, and research reports available online were also reviewed. Versions posted on Professor Hauser's website were used when available. *See* http://web.mit.edu/hauser/www/Hauser%20Articles/JHauser_Vita_April_2013.pdf.

[2]   Adaptive choice-based conjoint (ACBC) leverages both aspects of CBC and ACA by using polyhedral methods to adaptively select questions in choice-based conjoint analysis. *See* Sources [e], [f], and [g].

*Sources:*

[a]   Ding, M., Hauser, J., Dong, S., Dzyabura, D., Yang, Z., Su, C., and S. Gaskin, "Unstructured Direct Elicitation of Decision Rules," *Journal of Marketing Research* 48 (2011).

[b]   Hauser, J., Dong, S., and M. Ding, "Self-Reflection and Articulated Consumer Preferences," *Journal of Product Innovation Management* (forthcoming) (2012).

[c]   Dahan, E., and J. Hauser, "The Virtual Customer," *The Journal of Product Innovation Management* 19 (2002).

[d]   Urban, G., Weinberg, B., and J. Hauser, "Premarket Forecasting of Really-New Products," *Journal of Marketing* 60, no. 1 (1996).

[e]   Toubia, O., Hauser, J., and D. Simester, "Polyhedral Methods for Adaptive Choice-Based Conjoint Analysis," *Journal of Marketing Research* 41, no. 1 (2004).

[f]   J. Hauser, "Note on Conjoint Analysis," MIT Sloan Courseware (2007).

[g]   Gaskin, S., Evgeniou, T., Bailiff, D., and J. Hauser, "Two-Stage Models: Identifying Non-Compensatory Heuristics for the Consideration Set then Adaptive Polyhedral Methods Within the Consideration Set," *Proceedings of the Sawtooth Software Conference* (2007).

[h]   Hauser, J., Toubia, O., Evgeniou, T., Befurt, R., and D. Dzyabura, "Disjunctions of Conjunctions, Cognitive Simplicity, and Consideration Sets," *Journal of Marketing Research* 47 (2010).

[i]   Toubia, O., Simester, D., Hauser, J. and E. Dahan, "Fast Polyhedral Adaptive Conjoint Estimation," *Marketing Science* 22, no. 3 (2003).

[j]   Hauser, J., and O. Toubia, "The Impact of Utility Balance and Endogeneity in Conjoint Analysis," *Marketing Science* 24, no. 3 (2005).

[k]   Hauser, J., and P. Simmie, "Profit Maximizing Perceptual Positions: An Integrated Theory for the Selection of Product Features and Price," *Management Science* 27, no. 1 (1981).

[l]   J. Hauser, "Consumer Research to Focus R&D Projects," *Journal of Product Innovation Management* 2 (1984).

[m]   Urban, G., Hauser, J., and N. Dholakia, *Essentials of New Product Management* (Prentice Hall, 1987).

[n]   Urban, G., and J. Hauser, *Design and Marketing of New Products* (Prentice-Hall, 1993).

[o]   Hauser, J., Dahan, E., Yee, M., and J. Orlin , "Must Have" Aspects vs. Tradeoff Aspects in Models of Customer Decisions," *Proceedings of the Sawtooth Software Conference* (2006).

[p]   Yee, M., Dahan, E., Hauser, J. and J. Orlin, "Greedoid-Based Noncompensatory Inference," *Marketing Science* 26, no. 4 (2007).

[q]   Selove, M., and J. Hauser, "How Does Incorporating Price Competition into Market Simulators Affect Product Design Decisions?" *Proceedings of the Sawtooth Software Conference* (2010-0

[r]   Selove, M., and J. Hauser, "The Strategic Importance of Predictive Uncertainty in Conjoint Design," Working Paper (2011).

[s]   Hauser, J., and S. Shugan, "Extended Conjoint Analysis with Intensity Measures and Computer Assisted Interviews: Applications to Telecommunications and Travel, " *Advances in Consumer Research* 5 (1977).

[t]   Garcia, R., Rummel, P., and J. Hauser, "Validating Agent-Based Marketing Models through Conjoint Analysis," *Journal of Business Research* 60 (2007).

[u]   Toubia, O., Hauser, J., and R. Garcia, "Probabilistic Polyhedral Methods for Adaptive Choice-Based Conjoint Analysis: Theory and Application," *Marketing Science* 26, no. 5 (2007).

CONFIDENTIAL - ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

**Exhibit 24: Analysis of Irrational Survey Responses**

| | Number of Respondents | | | Number of Choices | | |
|---|---|---|---|---|---|---|
| Category | Facing Inside Option Choice | Choosing Among Four Inside Options | Choosing to Purchase Over Outside Option | Inside Option Choices | Over Inside Options | Over Outside Option |
| Choices by Owners of Galaxy S III | 267 | 267 | 262 | 4,539 | 4,272 | 3,263 |
| Smartphone with 4.8" Screen | 267 | 247 | 228 | 4,539 | 1,037 | 821 |
| Smartphone with 4.8" Screen and at least 1 feature < Galaxy S III | 267 | 134 | 103 | 1,828 | 199 | 153 |
| Smartphone with 4.8" Screen, Price >= $149 and at least 1 feature < Galaxy S III | 262 | 65 | 46 | 1,037 | 75 | 53 |
| Smartphone with 4.8" Screen, Price = $299 and at least 1 feature < Galaxy S III | 230 | 27 | 14 | 625 | 29 | 16 |

*Notes:*

[1] The SAS code "5.1 - Smartphones Irrational Survey Responses.sas" extracts the choices presented to each respondent as well as their choice from the .CHO files provided by Professor Hauser.

[2] Galaxy S III owners were identified from "Smartphone Final Survey Data Set.xlsx" provided with Professor Hauser's backup.

*Source:*

Backup to Expert Report of John R. Hauser, August 11, 2013.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



**Exhibit 27:**
**Difference Between $99 and $149 Price Partworths**
**Constrained Professor Hauser Smartphone Model**

*Note:* The difference between the $149 and $99 partworth is shown against the average price of smartphone selected across 16 tasks for each of the 507 respondents.
*Source:* Backup to Expert Report of John R. Hauser, August 11, 2013.

*CONFIDENTIAL - ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER*



**Exhibit 28:**
**Difference Between $99 and $149 Price Partworths**
**Unconstrained Professor Hauser Smartphone Model**



*Notes:* [1] The difference between the $149 and $99 partworth is shown against the average price of smartphone selected across 16 tasks for each of the 507 respondents.

[2] Professor Hauser's smartphone model was re-estimated without the price monotonicity constraints.

*Source:* Backup to Expert Report of John R. Hauser, August 11, 2013.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Exhibit 29: Willingness-to-Pay Price Premiums - Smartphones**

| Case I[a] | | Case II[b] | |
|---|---|---|---|
| **Price Premiums[1]** | | **Price Premiums[2]** | |
| Patent Related Features | | Patent Related Features | |
| Rubberband, Tap to Re-center After Zoom | $75 | Background Syncing ('414) | $69 |
| Autoswitch | $39 | Quick Links ('647) | $56 |
| | | Universal Search ('959) | $44 |
| | | Automatic Word Correction ('172) | $102 |
| | | Missed Call Screen Management ('760) | $87 |
| Other Features | | Other Features | |
| Reliable Touch | $65 | Reject Call with Message | $134 |
| 16 GB Memory | $19 | WiFi Calling | $54 |
| 32 GB Memory (incremental 16GB) | $8 | Voice to Text | $138 |
| 64 GB Memory (incremental 32GB) | $4 | S Pen | $38 |
| 300,000 Apps | $11 | Best Photo | $114 |
| 450,000 Apps (incremental 150,000 Apps) | $1 | Smile Shot | $72 |
| 600,000 Apps (incremental 150,000 Apps) | $1 | Buddy Photo Share | $47 |
| Size and Weight (4.0", 5 oz. vs. 3.5", 4 oz.) | $28 | Screen Size (4.8" vs. 4.0") | $113 |
| Size and Weight (4.3", 5.3 oz. vs. 4.0", 5 oz.) | -$2 | Screen Size (5.0" vs. 4.8") | $57 |
| Size and Weight (4.5", 6 oz. vs. 4.3", 5.3 oz.) | $5 | Screen Size (5.5" vs. 5.0") | -$10 |
| Tethering | $33 | | |
| Micro USB (in addition to tethering) | $28 | | |
| HDMI (in addition to tethering and Micro USB) | $7 | | |
| 8 MP Camera and HD Video Recording (incremental premium from 3MP Rear Camera with Standard Video with Autofocus) | $79 | | |
| 2 MP Front Camera | > $21 | | |
| Zoom | unknown | | |
| **Sum of Modeled Price Premiums[3]** | **up to $422** | **Sum of Modeled Price Premiums[4]** | **up to $1,125** |

*Notes:*

[1] Price premiums refer to the estimated willingness-to-pay price premiums with a smartphone base price of $199 reported in the Declaration of Yoram (Jerry) Wind, October 19, 2012, at Exhibits 17 and 20.

[2] Price premiums refer to the estimated willingness-to-pay price premiums with a smartphone base price of $149 reported in the Expert Report of John R. Hauser, August 11, 2013, at Exhibit P. Calculations are based on the backup of the Expert Report of John R. Hauser, August 11, 2013.

[3] Calculations are based on all tested features.

[4] Calculations are based on all tested features assuming a 5.0" screen size.

*Sources:*

[a]  Declaration of Yoram (Jerry) Wind, October 19, 2012.

[b] Backup to Expert Report of John R. Hauser, August 11, 2013.

**Exhibit 34: Relative Smartphone Demand - Top Four Samsung Models**

| | Professor Hauser's Prediction[4] | Actual Sales | | Respondent Ownership | |
| --- | --- | --- | --- | --- | --- |
| | | Unit Sales (11/2012-2/2013)[1],[a] | Share of Total (11/2012-2/2013) | Respondents Owning[2],[b] | Share of Total |
| Galaxy S III[3] | 29% | ███ | ██ | 267 | 61.5% |
| Galaxy S II[3] | 16% | ███ | ██ | 84 | 19.4% |
| Galaxy Note II[3] | 40% | ███ | ██ | 42 | 9.7% |
| Galaxy Nexus[3] | 16% | ███ | ██ | 41 | 9.4% |
| **Total** | 100% | | 100% | | 100% |

*Notes:*

[1] Reflects the sum of units sold by Samsung Electronics America (SEA) and Samsung Telecommunications America (STA) from November 2012 to February 2013.

[2] If only one Samsung smartphone was owned, then the response to QS7b in the Expert Report of John R. Hauser, August 11, 2013, at Exhibit E, was used. If more than one Samsung smartphone was owned, then the response to QS7d was used, which asked which Samsung smartphone was purchased most recently among those owned in past 12 months.

[3] *See* Exhibit 33 for feature mapping for Galaxy S III, Galaxy S II, Galaxy Note, and Galaxy Nexus.

[4] Results based on choice simulations using Sawtooth SMRT and approach as described in the Expert Report of John R. Hauser, August 11, 2013, at ¶113.

*Sources:*

[a] From SAMNDCA630-06642237.

[b] Backup to Expert Report of John R. Hauser, August 11, 2013.

*CONFIDENTIAL - ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER*

**Exhibit 41: Comparison of Professor Hauser's Model to Feature Counts Model - Smartphones**

| Constrained Model[1] | Professor Hauser's Model Hold Out Task | | | | Feature Counts Model[2] Hold Out Task | | | |
|---|---|---|---|---|---|---|---|---|
| | 4 | 8 | 12 | Average | 4 | 8 | 12 | Average |
| $U^2$ Measure[3] | | | | | | | | |
| In-Sample Fit $U^2$ | 0.74 | 0.74 | 0.74 | 0.74 | 0.42 | 0.42 | 0.41 | 0.42 |
| In-Sample DFCF $U^2$ (adjusted for number of parameters) | 0.42 | 0.42 | 0.42 | 0.42 | 0.33 | 0.33 | 0.32 | 0.33 |
| *Holdout (out of sample)* | *0.16* | *0.24* | *0.27* | ***0.22*** | *0.21* | *0.29* | *0.32* | ***0.28*** |
| Hit Rate | | | | | | | | |
| In-sample Fit | 0.82 | 0.82 | 0.83 | 0.82 | 0.52 | 0.52 | 0.51 | 0.52 |
| *Holdout (out of sample)* | *0.52* | *0.50* | *0.52* | ***0.52*** | *0.39* | *0.45* | *0.48* | ***0.44*** |

*Notes:*

[1] The average number of effective parameters estimated per respondent is nine for Professor Hauser's model and three for the feature counts model.

[2] The feature counts model estimates four parameters for price and screen size each and one combined parameter for data, input, call, and camera.

[3] The feature counts model was estimated using Sawtooth CBC/HB using the same settings as Professor Hauser's model.  The SAS code "4.2 - Fit.sas" calculates the $U^2$ and hit rate measures.

*Source:*

Backup to Expert Report of John R. Hauser, August 11, 2013.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

# EXHIBIT 2

**Exhibit 2: Curriculum Vitae**

June 2014

# DAVID J. REIBSTEIN

The Wharton School                                    942 Roscommon Road
University of Pennsylvania                          Bryn Mawr, PA  19010
Philadelphia, PA  19104                                    (610) 520-0969
(215) 898-6643

---

**EDUCATION**

Doctor of Philosophy in Industrial Administration,  Herman C. Krannert Graduate School of Industrial
Administration, Purdue University, West Lafayette, Indiana.

- Major Area:  Marketing – Major emphasis on the application of quantitative methods and
  econometric techniques to marketing problems, marketing research, model building, contemporary
  marketing theory and consumer behavior.
- Minor Area:  Behavioral Science – Course work in simulation models of decision making,
  experimental design, experimental laboratory methods for research in social behavior, uses of the
  laboratory method and decision theory.
- Research Methodology – Course work in multivariate statistics, multidimensional scaling,
  numerical taxonomy and nonparametric statistics.

Doctoral Dissertation:

   *An Empirical Study of Brand Choice and Switching Behavior*

Dissertation Chairman:

   Frank M. Bass
   Eugene McDermott Professor of Management
   The University of Texas
   Richardson, TX 75080

Honorary Master of Science (1982), The Wharton School, University of Pennsylvania, Philadelphia,
Pennsylvania.

Attended Masters of Business Administration Program (1971-1972), Graduate Business School, Tulane
University, New Orleans, Louisiana.

Bachelor of Science in Business Administration (1971), University of Kansas, Lawrence, Kansas.  Bachelor of
Arts in Statistics and Political Science, University of Kansas (1971).

**ACADEMIC EMPLOYMENT**

   The Wharton School, 1980-Present
      The William S. Woodside Professor, July 1992-Present
      The Julian Aresty Professor, July 1988-1992
      Vice Dean and Director of the Wharton Graduate Division, University of Pennsylvania,
        January 1987-1992
      Director of Wharton /PIMS Strategy Research Center, 1985-1989
      Numerous other committees
      Academic Director of Wharton Executive Seminars: Marketing Metrics, Competitive Marketing
        Strategy, New Research Techniques in Marketing; New Product Development and
        Management; and others.

**Exhibit 2: Curriculum Vitae**

Other Academic Appointments

    Visiting Professor at Stanford Business School, Palo Alto, California, 1987.

    Visiting Professor, INSEAD, Fontainebleau, France, Summer 1984, 1985.

    Assistant Professor of Marketing, Harvard Business School, July 1975-June 1980.

    Research Assistant for Professor Frank M. Bass, Purdue University, West Lafayette, Indiana, Spring 1974.

    Graduate Instructor in Industrial Administration, Purdue University, September 1972-August 1974.

    Research Assistant for Professor John O. Tollefson, Kansas University, Lawrence, Kansas, Summer 1972

    Executive Director, The Marketing Science Institute, July 1999-2001

    Academic Trustee, Marketing Science Institute, Cambridge Massachusetts, 1993-1999, 2001-2005.

    Research Associate, Marketing Science Institute, Cambridge, Massachusetts, 1975-1980

Other

    Indian School of Business (ISB), Hyderabad, Marketing Metrics, November-December 2005

    Chinese European Business School (CEIBS), Shanghai, Beijing, Competitive Marketing Strategy, Executive MBA (EMBA), 2003, 2004, 2005

    Interdisciplinary Center (IDC), Herzalia, Israel, Competitive Marketing Strategy, June 2003, December 2005.

    Singapore Management University (SMU), Singapore, Competitive Marketing Strategy, July 2003, 2004, 2005.

    Member of Executive Committee, Marketing Science Institute, Cambridge, Massachusetts, 2001-2005.

    Member of Executive Director Council, Marketing Science Institute, Cambridge Massachusetts, 2005-present

# TEACHING

The Wharton School, University of Pennsylvania, July 1980-present.

    Marketing Management (MBA Program and Executive MBA Program)
    Marketing Research (MBA Program)
    Research for Strategic Decisions in Marketing (MBA Program)
    Pro-Seminar (Ph.D. Program)
    Marketing Strategy (MBA and Executive MBA Program)
    Core Marketing MBA
    Marketing Metrics (MBA Program and Executive Education Program, Academic Director and Faculty)
    Competitive Marketing Strategies (Executive Education Program, Academic Director and Faculty)
    Essentials of Marketing (Executive Education Program, Faculty)
    Pricing (Executive Education Program, Faculty)
    CFO (Executive Education Program, Faculty)
    Numerous Company Specific Programs

Stanford Business School, September 1987-January 1988

    Marketing Research (MBA Program), September 1987-January 1988.
    Senior Management Program (1988, 1989, 1990)

INSEAD, April 1984-June 1984, May-June 1985

    Marketing Strategy (MBA Program), April 1984-June 1984, May-June 1985.
    Advanced Industrial Marketing Strategy, most every year since 1985-2002 (Executive Program)

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**Exhibit 2: Curriculum Vitae**

Harvard Business School, July 1975-June 1980.

    First-Year Marketing (MBA Program)
    Marketing Research and Information Systems (MBA Program)
    Marketing Research Methodology (DBA Program)
    Research Design and Data Collection Methods (DBA Program)

Purdue University, September 1972-August 1974.

    Marketing Principles:  Undergraduate
    Marketing Management:  Undergraduate
    Advertising Effectiveness:  Undergraduate

Committee Work - Department and University

    Ad hoc committee on WEMBA
    Ad hoc committee on Cross-functional Integration
    MBA Curriculum Committee
    MBA Executive Committee
    MBA Graduation Committee
    University Communications Committee
    University Classroom Facilities Committee
    X-Functional Committee
    Committee on Academic Freedom and Responsibility
    Vice Dean Search Committee
    Future of Advertising Committee
    Knowledge @ Wharton Committee
    Marketing Curriculum Committee
    Numerous other committees, too many to list

Conference Work

    Co-hosted 2002 and 2003 CMO Summit at Wharton
    Track Chair, AMA Winter Educators' Conference (2003)

Doctoral Dissertation Committees:

| Candidate | Employer |
|---|---|
| Marjorie Adams | University of Virginia |
| John Bateson | London School of Business |
| William Boulding | Duke University |
| Cynthia Fraser | Columbia University |
| Steve Goldberg | University of Texas |
| Louis Gutentag | American Hospital Supply |
| Yogesh Joshi | University of Maryland |
| Rowland Moriarty | Harvard Business School |
| William Moult | BASES |
| Erica Okada | University of Washington |
| Philip Parker | INSEAD |
| Edward Popper | Federal Trade Commission |
| Carsten Poulsen | Aalborg University |
| John Quelch | Harvard Business School |
| Venkat Ramaswamy | University of Texas |
| Sanjay Rao | Synergic Resources Corporation |
| Dan Sarel | University of Miami of Florida |
| Emine Sarigollu | McGill University |
| Robert Young | Northeastern University |

**Exhibit 2: Curriculum Vitae**

Honors:

Marketing Metrics:  50+ Metrics Every Executive Should Master  (2006) was named as the
"Best Business Book:  Marketing"  by Strategy & Business in 2007.
Wharton Class of 2008, *"Goes above and beyond the call of duty"* Award
Wharton Class of 2007, *"Goes above and beyond the call of duty"* Award
WEMBA Excellence in Teaching Award, 1995, 1996, 1997, 1998.
The Helen Kardon Moss Anvil Award for Excellence in Teaching in the Graduate Division, 1995.
Miller-Sherrerd MBA Core Teaching Award , 1993-1999, 2004, 2005, 2007, 2008
Named "The Pick of the B-school Crop," Business Week, 1993.
Selected by Fortune magazine as one of the nation's eight "Most Favorite Business School Professors" (the
only one selected in marketing), January 22, 1982.
University of Pennsylvania Lindback Award Nominee (1981-82 – selected by faculty).
The Class of 1984 award (for the best teaching rating at Wharton for the preceding two years) 1987,1995
Wharton Excellence in Teaching Award, 1982, 1984 -1988, 1993-1999, 2006.
Wharton Anvil Award Finalist (1981, 1982, 1983, 1984, 1985, 1986, 1987 – selected by students).
The Outstanding Graduate Instructor at Purdue University, The Krannert School (1973-74 – selected by
students).
An Outstanding Graduate Instructor at Purdue University, The Krannert School (1973-74 – selected by
students and faculty).
John S. Day Distinguished Alumni Academic Service Award at Purdue University, 2005.
And, numerous others.

## REVIEWING AND EDITING

Co-Editor, special issue on B2B Research, *Marketing Letters,* forthcoming
Co-edited a special issue of *Marketing Science* on "Competitive Responsiveness" (Winter 2005)
Editorial Review Board
    International Journal of Research in Marketing
    Marketing Management
    Marketing Letters
Reviewing
    *Marketing Science*
    *Management Science*
    *Journal of Marketing*
    *Journal of Marketing Research*
    *International Journal of Marketing Research*
    *Marketing Letters*
    *Marketing Management*
MSI
    Dissertation competition
    Special issue of *Journal of Marketing*

## RESEARCH PUBLICATIONS

**Refereed Journal Articles:**

"Turf Wars:  Product Line Strategies in Markets With Preference Based Segmentation," with Yogesh Joshi
and John Zhang, *Marketing Science*, 2012 (Under revision).

"Crisis Diagnostics:  Assessing Brand Damage, Restoring Brand Equity," with James R. Gregory and
Richard S. Levick, *Marketing Management* 21.1 (2012):  29.

"Introduction to the Special Issue on B2B Research" with Sandy Jap, *#Springer Science+Business Media*,
LLC 2010.  Published on-line 16 March 2010.

"Metrics that Matter – to Marketing Managers," with Neil Bendle, Paul Farris and Phillip Pfeifer, *Journal
of Research and Management*, January 2010, Vol., 6, pp. 18-23.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**Exhibit 2: Curriculum Vitae**

"Dashboards as a Service: Why, What, How and What Research is Needed?" with Koen Pauwels, Tim Ambler, Bruce H. Clark, Pat LaPointe, David Reibstein, Bernd Skiera, Berend Wierenga and Thorsten Wiesel, *Journal  of Service Research***,** Vol. 12. No., 175-189.

"Is Marketing Academia Losing Its Way?" with George Day and Jerry Wind, *Journal of Marketing,* Vol. 73, July 2009, editorial.

"A Broader Perspective of Network Effect," *Journal of Marketing Research,* April 2009, Vol. 46, No. 2.

"Optimal Entry Timing in Markets with Social Influence," with Yogesh Joshi and John Zhang, *Management Science,* 2009, Vol. 55, Issue 6, pp. 926-939.  Backlash:  How Early Adopters React When the Mass Market Embraces a New Brand.

"Choosing the Right Metrics to Maximize Profitability and Shareholder Value", with J. Andrew Petersen, Leigh McAlister, Russell S. Winer, V. Kumar and Geoff Atkinson, *Journal of Retailing*, Volume 85, Issue 1, 2009.

"Competitor See, Competitor Do: Incumbent Entry in New Market Niches," with M. Debruyne, *Marketing Science*, Winter 2005, Vol. 23, No. 1

"Learning by Doing" *International Journal of Marketing Education*, 2005, Vol. 1 Issue 1, pp. 1-15.

"Why Five is a Crowd in the Market Share Attraction Model," with P. Farris, P. Pfeifer and E. van Neirop, *Journal of Research and Management*, 2005, Vol. 1, Issue 1, pp. 29-45.

"Competitive Responsiveness," with Dick R. Wittink, *Marketing Science*, Winter 2005, Vol. 24, No. 1, pp. 8-11.

"House of Brands vs. Branded House," *Economist*, *Global Agenda*, Winter 2005.

"Rational Exuberance: The Wireless Industry's Killer "B," with Venkatesh Shankar and Tony Driscoll, *Strategy +Business* Issue 31 Summer 2003, pp 68-77.

"What Attracts Customers to Online Stores, and What Keeps Them Coming Back?," *Journal of the Academy of Marketing Science*, 2002, Vol. 30, No. 4, pages 465-473.

"The Impact of Business Objectives and the Time Horizon of Performance Evaluation on Pricing Behavior," with Dick Wittink and S.K. Keil, *International Journal of Research in Marketing*, April 2001, Vol. 18, No. 1-2, 67-81.

"Performance Measurement in Marketing," with Sven Reinecke, *Koshenrechnumgspraxis*, 46, Jg., 2002, H.1, 18-25.

"Brand Equity and Vertical Product Line Extent," with Taylor Randall and Karl Ulrich, *Marketing Science*, Vol. 17, No.4, 1998, pp. 356-379.

"Competitive Simulations" with Mark Chussil, *Marketing Research,* Special Issue, May 1998.

"Market Share and Distribution: A Generalization, a Speculation, and Some Implications," with Paul Farris, Special Issue *Marketing Science*, Vol 14, No. 3 (Summer 1995), pp. 190-202.

"Do Marketing Expenditures to Gain Distribution Cost the Customer?" with Paul Farris, *European Management Journal*, November 1994.

"Competitive Marketing Behavior in Industrial Markets," with Venkatram Ramaswamy and Hubert Gatignon, *Journal of Marketing*, Vol. 58 (April 1994), pp. 45-55.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Exhibit 2: Curriculum Vitae**

"Effectiveness of Brand-Related 15-Second Commercials," with Scott Ward and Terence A. Oliva, *Journal of Consumer Marketing*, Vol. 11 (2), 1994, pp. 38-44.

"An Empirical Pooling Approach for Estimating Marketing Mix Elasticities with PIMS Data" with Venkatram Ramaswamy, Wayne S. DeSarbo, and William T. Robinson, *Marketing Science*, Vol. 12, No. 1, Winter, 1993. pp. 103, 22.

"The Effect of Differences in the Number of Attribute Levels on Conjoint Results," with Dick R. Wittink, Lakshman Krishnamurthi, *Marketing Letters*, Vol. 1, June 1990, pp. 113-123.

"Conjoint Reliability Measures," with Dick Wittink, William Boulding, John E. G. Bateson, and John W. Walsh, *Marketing Science*, Vol. 8, No. 4, Fall 1989, pp. 371-380.

"Conjoint Analysis Reliability:  Empirical Findings," with John Bateson and William Boulding, *Marketing Science*, Vol. 7, Summer 1988, pp. 271-286.

"Pooling Logit Models," with Hubert Gatignon, *Journal of Marketing Research*, Vol. 23, August, 1986, pp. 281-285.

"New Goldmines and Minefields for Market Researchers," with Leonard Lodish, *Harvard Business Review*, Jan.-Feb., 1986, pp. 168-182.

"Challenging Traditional Segmentation Bases," with Rowland Moriarty, *Journal of Business Research*, Winter, 1986.

"Forecasting the Impact of Socio-Economic and Demographic Change on Product Demand," with John M. McCann, *Journal of Marketing Research*, Vol. 22, November, 1985, pp. 415-423.

"An Investigation into the Order of the Brand Choice Process," with Frank M. Bass, Moshe Givon, Manu Kalwani, and Gordon Wright, *Marketing Science*, Fall 1984, Vol. 3, No. 4, pp. 267-287.

"Optimal Product Line Pricing: The Influence of Elasticities and Cross-Elasticities," with Hubert Gatignon, *Journal of Marketing Research*, August 1984, Vol. XXI, No. 3, pp. 259-267.

"Overcontrol in Advertising Experiments," with Paul W. Farris, *Journal of Advertising Research*, June/July 1984, Vol. 24, No. 3, pp. 37-47.

"Robustness of Linear Models in Dynamic Multivariate Predictions," with Herbert Moskowitz, Doyle Weiss, and Kah Kee Chung, *Omega*, Vol. 10, No. 6, 1983, pp. 647-61.

"Factors Affecting Coupon Redemption Rates," with Phyllis A. Traver, *Journal of Marketing*, Fall, 1982, pp. 109-20.

"An Analysis of Interdependent Decisions," with Herbert Moskowitz, *Omega*, Vol. 9, No. 3, 1981, pp. 267-79.

"The Directions of Causality Between Perception, Affect, and Behavior: An Application to Travel Behavior," with Christopher H. Lovelock and Ricardo de P. Dobson, *Journal of Consumer Research*, Vol. 6, No. 4, March 1980, pp. 370-6.

"How Prices, Ad Expenditures, and Profits Are Linked," with Paul W. Farris, *Harvard Business Review*, November-December, 1979, pp. 173-84.

"Structural Models for the Analysis of Traveler Attitude-Behavior Relationship," with R. Dobson, F. Dunbar, C. Lovelock, and C. Smith, *Transportation*, December 1978, Vol. 7, pp. 351-63.

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Exhibit 2: Curriculum Vitae

"Market Research Corporation of America's Market Share Data," *Antitrust Law Journal*, American Bar Association, Vol. 47, Issue 3, August 1978, pp. 1041-1076.

"The Prediction of Individual Probabilities of Brand Choice," *Journal of Consumer Research*, Vol. 5, No. 3, December 1978, pp. 163-168.

"Number of Choices as a Factor in Consumer Satisfaction: An Empirical Study," with Stuart Youngblood and Howard Fromkin, *Journal of Applied Psychology*, 1975, Vol. 60, No. 4, pp. 434-437.


**Books and Chapters in Books:**

"Jerry Wind on The Future of Marketing," A Commentary honoring Yoram (Jerry) Wind, Forthcoming 2013.

"Jerry Wind on Marketing Strategy," Volume 8 of the Legends of Marketing series, honoring the Contributions of Yoram (Jerry) Wind, Forthcoming 2013.

"Product Positioning," edited by Barry Bayus, *Wiley International Encyclopedia of Marketing*, John Wiley and Sons, West Sussex UK, 2011.

"Marketing Metrics The Definitive Guide to Measuring Marketing Performance", 2nd ed,, with Ferris, Paul W., Neil T. Bendle, Phillip E. Pfeifer and David J. Reibstein. *Wharton School Publishing*, February 2010.

"Challenges in Measuring Return on Marketing Investment:  Combining Research and Practice Perspectives," with Koen Pauwels, Sixth ANNUAL REVIEW OF MARKETING RESEARCH, edited by Ed Naresh Malhotra, ME Sharpe, Inc., (pp 107-124) Irvine, CA, 2009.

"Innovation Metrics," edited by Barry Bayus, *Wiley International Encyclopedia of Marketing*, John Wiley and Sons, West Sussex UK, 2009.

"Distribution and market share, " with Paul Farris and Kenneth C. Wilbur, *Empirical Generalizations about Marketing Impact*, edited by Mike Hanssens, 2009.

*Marketing Management*, with Koen Pauwels, edited by Rajiv Grover and Naresh Malholtra, McGraw-Hill, 2009.

"Marketing Metrics and Financial Performance," with Donald R. Lehmann, *Marketing Science Institute*, 2006.

*Fifty + Metrics Every Marketer Should Know*, with P. Farris, N. Bendle and P. Pfeifer, *Wharton School Publishing*, 2006.

"Global Branding," with George Day, in *The Alliance on Globalizing*, Gatignon and Kimberly (eds.), Cambridge University Press, 2005.

"Marketing Costs and Prices: An Expanded View," with Paul Farris and Yogesh Joshi, in *PIMS in Retrospect and Prospect*, Farris and Moore (eds.), Oxford Press 2004.

*Measuring and Allocating Marcom Budgets: Seven Expert Points of View,* with Rajeev Batra, " MSI Monograph, January 2003.

"The Internet Buyer," in J. Wind and V.J. Mahajan, *Digital Marketing*, (pp 201-225), New York, NY John Wiley & Sons, Inc., 2001.

"Technology-Driven Demand: Implications for the Supply Chain," with Marshall Fisher, in J. Wind and V.J. Mahajan, *Digital Marketing*, (pp 285-309), New York, NY, John Wiley & Sons, Inc., 2001.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**Exhibit 2: Curriculum Vitae**

"Marketing Performance Measurement," *Handbuch Marketing Controlling,* edited by Sven Reinecke and David Reibstein, Universitat St. Gallen, 2001.

"Managing Product Variety:  A Study of the Bicycle Industry," with Karl Ulrich, Taylor Randall, and Marshall Fisher, *Managing Product Variety,* Kluwer (August 1998).

*Wharton on Dynamic Competitive Strategies*, edited with George Day; John Wiley & Sons, 1997.

"Formulating Competitive Strategies," with Hubert Gatignon, *Wharton on Dynamic Comptetitive Strategies*, edited by George Day and David Reibstein; John Wiley & Sons, 1997.

"Simulating Competitive Strategies," with Mark J. Chussil,  *Wharton on Dynamic Competitive Strategies*, edited by George Day and David Reibstein; John Wiley & Sons, 1997.

"Managing Competitive Interactions Through Competitive Market Signaling," with Oliver Heil and George S. Day, *Wharton on Dynamic Competitive Strategies*, edited by George Day and David Reibstein; John Wiley & Sons, 1997.

"Manufacture Prices, Retail Prices, Relative Prices, Absolute Prices," with Paul Farris, *The Blackwell Encyclopedic Dictionary of Business Ethics*, edited by Edward Freeman and Patricia Werhane; Blackwell Publishers, 1996.

*Strategy Analysis with ValueWar*, with Mark J. Chussil, The Scientific Press, 1994.

"Conjoint Analysis Reliability and Validity:  A Framework for Future Research," with John Bateson and William Boulding, *Review of Marketing*, 1987, pp. 451-477.

*Marketing: Concepts, Strategies, and Decisions*, Prentice-Hall, Inc., 1985.

"Evidence on the Value of Strategic Planning in Marketing or How Much Planning Should a Marketing Planner Plan?" with J. Scott Armstrong, Chapter 2.1 in *Strategic Marketing and Management*, edited by H. Thomas and D. Gardner, John Wiley and Sons, Ltd., 1984, pp. 73-87.

*Cases in Marketing Research*, with F. Stewart DeBruicker, Prentice-Hall, 1983.

"Incorporating Marketing into Corporate Planning Models," with John M. McCann, in *Simulation in Business Planning and Decision Making*, edited by Thomas N. Naylor, Simulated Councils, Inc., Chapter 10, Volume 9, Number 1, 1981, pp. 89-98.

"Attitude Measures and Brand Choice Frequency – Some Pitfalls To Be Avoided,"" with Joel C. Huber, in *Attitude Research Plays for High Stakes*, edited by John C. Maloney and Bernard Silverman, 1977, pp. 148-164.


**Conferences and Proceedings:**

Keynote Speaker on "Competitive Marketing Strategies," AMA Mexico City Chapter Event, Mexico City, Mexico, September 12, 2013

Key panelist, Digital Marketing Forum, Seoul, Korea, August 20, 2013

Honorary Co-Chair and Keynote Speaker, 2013 Annual Conference of China Marketing Science, Tsinghua University, Beijing, The People's Republic of China, August 16-18, 2013

Exhibit 2: Curriculum Vitae

AMA Thought Leader, Panel member to share thoughts on "MOOCS and the Changing Nature of the University," AMA summer Educators' Conference, Boston, Massachusetts, August 9-11, 2013

35th ISMS Marketing Science Conference, Istanbul, Turkey, July 11-13, 2013

Member of the Organizing Committee and Discussant for "Valuing Brand Strategies: A Real Options Approach" paper, Marketing Strategy meets Wallstreet III Conference, Goethe-University Frankfurt, Frankfurt am Main, Germany, July 7-9, 2013

Presenter on "Effective Instruction" and Discussant, 48th AMA Sheth Foundation Doctoral Consortium, Ann Arbor, Michigan, June 6-9, 2013

Presenter on "A Marketer's Perspective on Emerging Growth Businesses," 2013 SGE CEO Summit, Bala Cynwyd, Pennsylvania, June 4, 2013

Speaker, "Cross Industry, What Works and Does Not?", MSI Marketing Resources Allocation Conference, Darden Consortium, Charlottesville, Virginia, May 21-22, 2013

AMA Marketing Summit, Chicago, Illinois, April 26-28, 2013

AMA 2013 Winter Marketing Educators' Conference, Las Vegas, Nevada, February 15-17, 2013

MASB Winter Board Meeting & Summit 2013, Las Vegas, Nevada, February 14, 2013

AMA Mid Atlantic Regional Retreat, Baltimore, Maryland, February 1-2, 2013

MSI Young Scholars Program, January 10-13, 2013

Governing Body Co-Chair, CMO Collective, New York, New York, December 17-18, 2012

Speaker, Presentation of Parlin Award, AMA 2012 Annual Marketing Research and Strategy Summit, Las Vegas, October 1-3, 2012

AMA 2012 Summer Marketing Educators' Conference, Chicago, Illinois, August 16-19, 2012

Speaker, "Chinese Brands in the Global Market," CEIBS, Beijing, China, July 27, 2012

Keynote Speaker, Teaching Plenary Session, 47th AMA Sheth Foundation Doctoral Consortium, University of Washington, Seattle, Washington, June 13-16, 2012

34th INFORMS Marketing Science Conference, Boston University, Boston, Massachusetts, June 6-9, 2012

Theory and Practice in Marketing, Harvard Business School, Boston, Massachusetts, May 4-7, 2012

AMA 2012 Leadership Summit, Chicago, Illinois, April 27-29, 2012

Expert Panelist, Session on "The Future of Branding and Intellectual Property in Marketing: A Panel Discussion," UNC Branding Conference, Chapel Hill, North Carolina, April 12-13, 2012

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**Exhibit 2: Curriculum Vitae**

Chair, Expert Panel**,** AMA 2012 Winter Marketing Educator's Conference, St. Petersburg, Florida, February 17-19, 2012

Speaker, MASB Winter Board Meeting & Summit 2012, St. Petersburg, Florida, February 16-17, 2012

9th PSI Conference, Salt Lake City, Utah, February 2-5, 2012

Speaker, "Survive and Thrive in Today's Economy:  Do You Have What it Takes?," Annual Toolbox Series, Main Center for Creativity, Portland, Maine, January 11-12, 2012

Main Center for Creativity, Portland, Maine, Innovation presentation, November 16, 2011

CMO Collective, New York, New York, November 7-9, 2011

AMA/Sheth Doctoral Consortium, Stillwater, Oklahoma, June 15-18, 2011

MSI:  "Marketing Meets Wall Street II," Boston, Massachusetts, May 12-14, 2011

MSI:  "Fifty Years Ahead," Boston, Massachusetts, April 25-27, 2011

AMA 2011 Winter Marketing Educator's Conference, Austin, Texas, February 18-21, 2011

MASB Winter Board Meeting & Summit, "The Next Three Years:  Changing the Game," Austin, Texas, February 17-18, 2011

University of Utah 8th Annual Product and Service Innovation Conference, Salt Lake City Utah, February 2-5, 2011

University of Utah 7th Annual Product and Service Innovation Conference, "Marketing Operations," Salt Lake City, Utah, February 4 – 6, 2010

MSI The Practice & Impact of Marketing Science, Cambridge, MA January 15-16, 2010

Fifth International Conference on Brand Management**,** Asian Centre for Brand Management at the Hong Kong Polytechnic University, Hong Kong, November 30 – December 1, 2009

Estee Lauder, CLV Group – New York, New York, July 21, 2009

AMA Sheth Doctoral Consortium, Robinson College of Business, Firm and Strategy," Track Session Participant, Atlanta, Georgia, June 13-14, 2009.

Estee Lauder, CFO Group – New York, New York, June 1, 2009

"Ubiquitous Marketing in a Fragmented Age," Forresters Marketing Forum, Orlando, Florida, April 25, 2009

MSI Young Scholars Program – Park City, Utah, March 5-8, 2009

University of Utah 5th Annual Product and Service Innovation Conference, "Measuring Innovation", Salt Lake City, Utah, February 5 – 7, 2009

"Measured Thoughts:  Assessing New Media and Marketing Choices," Navigating the New Marketsphere, Orlando, Florida, January 26 - 27, 2009

Kimberly Clark University – Las Vegas, NV January 18-20, 2009

"Measuring Innovation," with George Day and Venky Shankar, *Managing and Measuring Innovation,* The Mack Center Conference, November 7, 2008

"Marketing Metrics and their Financial Implications," Australia Marketing Institute Annual Conference, October 22 - 23, 2008

MSI Meeting, Marketing Metrics for the Connected Organization, "Product Innovation Metrics," Austin, Texas, September 10 - 12, 2008

Evidence-Based Marketing Mix Resource Allocation and Planning (AMA-sponsored), Atlanta, Georgia, July 9 - 11, 2008

"Marketing Metrics," Executive Analytics Conference, Cary, North Carolina, June 10 - 11, 2008

"Retail Metrics," Thought Leadership Conference, Babson College, April, 2008

MSI Young Scholars Program, Park City, Utah, March 2008

Wharton MBA Marketing Conference, Philadelphia, PA, Oct. 26 – 27, 2007

The Practice & Impact of Marketing Science, Philadelphia, Oct. 14 – 16, 2007

2007 INFORMS Marketing Science Conference, Singapore, June 28 – 30, 2007

2007 AMA Sheth Foundation Doctorial Consortium, Phoenix, AZ, May 18, 2007

University of Arizona's "3rd Annual Thinking Forward: Leadership & Innovation Conference", Tucson, AZ, March 23, 2007

4th Annual Product and Service Innovation Conference, University of Utah, Salt Lake City, Utah, Feb. 7 – 11, 2007

MSI's 2007 Young Scholars Program, Park City, UT, Jan. 4-7, 2007

MSI's December Conference on "Marketing Metrics and Financial Performance", Boston, MA, December 6-8, 2006

Golden Gate University Presentation, San Francisco, CA, November 7, 2006

Northwestern University Presentation, Chicago, IL, July 14, 2006

Reunion of the 2001 Marketing Science Institute Young Scholars, Santa Fe, NM, May 18-21, 2006

Yale Center for Customer Insight's 2nd Annual Conference on "Collaborative & Multidisciplinary Research", New Haven, CT, May 4-6, 2006

Third Annual PSI Conference, Park City, Utah, February 9-11, 2006

HSM in the Mexico World Marketing Forum, Mexico City. November 10, 2005

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**Exhibit 2: Curriculum Vitae**

"Marketing Management: A Strategic Perspective" MSI Asian Marketing Conference, Singapore Management University, July 25-26, 2005.

Panel Member: "Customer Value- Co-Creation +Quality" Service Innovations and New Service Business Models Workshop, Penn State University, June  21-22, 2005.

"Optimal Product Variety Over Time," INFORMS Marketing Science Conference, Emory University June 16-18, 2005.

"Marketing Dashboards: A Decision Support System for Assessing Marketing Productivity,"  INFORMS Marketing Science Conference, Emory University,  June 16-18, 2005.

Chair, "Marketing Metrics" session, INFORMS Marketing Science Conference, Emory University June 16-18, 2005.

"Marketing Dashboards" 2005 AMA Winter Educators Conference, San Antonio, TX Feb. 11-13, 2005

2005 Product and Service Innovation Conference, Park City, Utah Feb, 10-11, 2005

MSI Young Scholars Conference, Park City, Utah.  Jan. 6-9, 2005

"Optimal Product Variety," with Yogesh Joshi, Winter Product and Process Innovation Conference, Utah, February 2004.

"Contagion in Product Line Expansion," with Marion Debruyne, TIMS Conference, Atlanta, GA, October 2003.

"Doing Research on Who's Buying on the Internet," The Wharton Marketing Club, Philadelphia, PA, February 11, 1999.

"Advertising Budgeting: A Report from the Field," with Paul Farris and Erv Shames, MSI-MAX Project, New York, NY, November 18-19, 1998.

"The Digital Era: Implications for the Supply Chain," with Marshall Fisher, The Digital Marketing Conference, Philadelphia, PA, October 23, 1998.

"Marketing Strategies That Make a Difference," Equipment Leasing Association, Atlanta, GA, October 18-20, 1998.

"Building Cross-Institutional Bridges," with Paul Root, International Academy of Management (IAM), New York, NY, May 28-29, 1998.

"Obstacles to Variety,"  Wharton Fishman-Davidson Variety Workshop, The Wharton School, January 8, 1997.

"Product Variety: Industry Applications," Product variety Management Conference, Center for Technology Management at the University of California at Los Angeles, January 31 - February 1, 1997.

"Competitive Marketing Strategy,"  CEO Speaker Series, Taipei, Taiwan, January 21, 1997.

"The Dynamics of Competitive Marketing Strategies,"  Interdisciplinary Center for the Study of Business, Law, and Technology, December 21 - January 3, 1997.

"Internet Links on the Cuffs of Other Websites,"  with Ronald C. Goodstein, Marketing Science Conference, Berkeley, CA  March 21-24, 1997.

**Exhibit 2: Curriculum Vitae**

"Marketing Strategy in a Dynamically Changing Environment," International Forum, Steinberg Conference Center, September 13, 1997.

"Budget Allocation Process for Media, Products, and Geographics," (moderator) Marketing Science Institute, Workshop on Managing Advertising Expenditures (MAX), Boston, MA, September 17-19-, 1997.

"When &*!# (Bad Stuff) Happens to Good Companies," Association for Consumer Research, Denver, CO., October 17-19, 1997.

"Consumer Brand Loyalty's Impact on the Relationship Between Distribution and Market Share," with Paul Farris, Marketing Science Conference, University of Florida, Gainesville, Fl, March 1996.

"Managing Product Variety: A Study of the U.S. Bicycle Industry," with Karl Ulrich, Taylor Randall, and Marshall Fisher, INFORMS, Washington, D.C. , May 1996.

"The Influence of Product Line Extent of Brand Equity," with Karl Ulrich, Taylor Randall, and Marshall Fisher, 1996 Manufacturing and Service Operations Management Conference, Institute for Operations Research and the Management Sciences, Dartmouth College, Hanover, NH, June 24-25, 1996.

"Decision Support Systems for Managerial Decisions," NYU/Columbia Choice Symposium, June 1996.

"Marketing in a Fast Cycle Environment/Time to Market," Software Development and Marketing for Competitive Advantage Program, IC$^2$ Institute, The University of Texas at Austin, March 20-22, 1996.

"Product Variety: Industry Applications," Product Variety Management Conference, Center for Technology Management at the University of California at Los Angeles, January 31-February 1, 1997.

"Marketing Pedagogy," Marketing Doctoral Consortium, Boulder, CO, University of Colorado, July 1996.

"How Managers Reach their Pricing Decisions (and How They Should)." Presented at The Seventh Annual U.S. Pricing Conference, Chicago, Illinois, April 18-21, 1994.

"Processes for Developing Integrative/Cross Disciplinary Courses." Presented at the 1994 Summer Marketing Educators' Conference, San Francisco, California, August 6-9, 1994.

1994 Summer Marketing Educators' Conference, Track Chair for the Education Track, August 6-9, 1994, San Francisco, California.

"Impact of Availability/Access (Information and Distribution)," with Paul Farris. Paper presented at the Value of Marketing Conference, Stanford, California, August 9, 1994.

"Making the Most of Your Marketing Dollars," presented at the Drive Marketing Excellence: Evaluate Marketing Effectiveness Through Measurement & Analysis, Institute for International Research, Chicago, November, 1994.

"How Managers Make Pricing Decisions," presented at the Pricing Advisor's Pricing Conference and Seminar, Chicago, November, 1994.

"The Relationship between Distribution (Retail Availability) and Market Share," with Paul Farris. Presented at the Empirical Generalizations in Marketing Conference, The Wharton School, February 16-18, 1994.

"Are There Strategic Laws or Principles?" Marketing Science Conference, Seattle, Washington, March 1988.

"Factors Affecting Competitive Reactions," with Hubert Gatignon and Venkat Ramaswamy, Marketing Science Conference, Seattle, Washington, March 1988.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**Exhibit 2: Curriculum Vitae**

"Marketing Pedagogy," Summer Educator's Conference, American Marketing Association, Chicago, Illinois.

"Commercial Clutter:  Effects of 15-Second Television Ads on Consumer Recall," with Scott Ward, Terence A. Oliva, and Victoria Taylor, Association for Consumer Research, *Advances in Consumer Research*, Hawaii, October 1988.

"An Empirical Analysis of the Determinants of Competitive Rivalry," with Hubert Gatignon and Venkatram Ramaswamy, ORSA/TIMS Conference, Seattle, Washington, March 1988.

"Developing A Promotion Expert System," Marketing Science Conference, with John M. McCann, Paris, France 1987 .

"Conjoint Analysis Reliability:  Empirical Findings," with John Bateson and William Boulding, Association for Consumer Research, Toronto, Ontario, October 1986.

"Marketing Techniques of Japanese Firms with Operations in the U.S." with Toshi Taga, ORSA/TIMS, Brisbane, Australia, August 1986.

"Holistic Conjoint," with Caroline Henderson, *Association for Consumer Research Proceedings*, Volume XIII, Ed. Richard Lutz, Vegas, October 1985, pp. 282-285.

"Definition and Nature of Advertising-Price Interactions," with Paul W. Farris, American Marketing Association, Washington, August 1985.

"Using PIMS Data for Strategic Decision Making," with William Boulding, ORSA/TIMS, Atlanta, November 1985.

"Testing an Optimal Control Model of Promotion Response," with Steve Garrett, ORSA/TIMS Conference, Houston, Texas, November 1984.

"Structural Solutions to Strategic Problems," with William Boulding, Marketing Science Conference, Chicago, Ill., March 1984.

"Structural Solutions to Strategic Issues," with William Boulding, Marketing Science Conference, Chicago, Illinois, February 1984.

"The Impact of Price Levels on Product Line Demand," with Hubert Gatignon, *AMA Causal Modeling Conference Proceedings*, 1983, Sarasota, Florida, pp. 120-8.

"The Advertising Frequency Response Function: Testing Differences Across Brands," with Hubert Gatignon, ORSA/TIMS National Meetings, November 1983.

"An Optimal Control Approach to Response to Promotions," with Stephen E. Garrett and Shiv K. Gupta, ORSA/TIMS National Meetings, November 1983.

"Organizing Organizational Choice," with Robert J. Thomas and Rowland Moriarty, presented at ORSA/TIMS Market Measurement Conference, March 1982.

"Estimating Consumer Response to Advertising from Cross-Sectional Survey Data," with Paul W. Farris and William Moult, ORSA/TIMS, Toronto, May 1981.

"Projecting Served Market Growth for Strategic Planning Decisions," with John McCann, *Marketing Strategy – Controlling the Marketing Effort*, 7th International Research Seminar in Marketing, Senanque, France, June 1980, pp. M.1-M.17.

Exhibit 2: Curriculum Vitae

"Consistency in Relative Advertising and Relative Pricing Strategies:  A Cross-Sectional Analysis of the PIMS Data," with Paul W. Farris, *Marketing Measurement and Analysis, Proceedings of ORSA/TIMS Special Interest Conference*, edited by David B. Montgomery and Dick R. Wittink, March 26-28, 1979, pp. 35-54.

"Averaging Individual Probabilities for the Prediction of Brand Switching Behavior," ORSA/TIMS, Hawaii, June 1979.

"Developing Marketing Strategy for Public Transportation:  Insights for Attitude-Behavior Research," with Christopher H. Lovelock, International Seminar in Marketing, Senanque, France, June 1978.

"Robustness of Unit and Equal Weighting Linear Models for Dynamic Multivariate Decisions," with Herbert Moskowitz, Doyle L. Weiss and Kah Kee Chung, *Modeling and Simulation; Proceedings of the Ninth Annual Pittsburgh Conference*, Vol. 9, Part 2, University of Pittsburgh, 1978, pp. 575-582.

"Analysis of Dynamic Product Planning via the Principle of Optimality," with Herbert Moskowitz, *Modeling and Simulation; Proceedings of the Ninth Annual Pittsburgh Conference*, Vol. 9, Part 2, University of Pittsburgh, 1978, pp. 583-591.

"Can the Multi-Attribute Attitude Model Be Utilized to Predict Probabilities of Brand Choice?" *Advances in Consumer Research*, Vol. IV, 1976, pp. 111-16

"A Method for Analyzing Interdependent Decisions – Marketing Applications," with Herbert Moskowitz, *AIDS Proceedings*, 1976 National AIDS meeting, November 10-12, 1976.

"Conditional Versus Unconditional Analysis of Dynamic Decisions," with Herbert Moskowitz, Institute Paper No. 450, Institute for Research in the Behavioral, Economic and Management Sciences, Krannert Graduate School of Industrial Administration, Purdue University, April 1974.  Presented at the Midwest AIDS Conference, May 1974.

"Halo Effects in Brand Belief Measurement:  Implications of Attitude Model Development," with William L. Wilkie and John M. McCann, *Proceedings, Fourth Annual Conference*, Association for Consumer Research, November 1973.

## Working Papers

"Reinventing Training for the Global Information Age," with Jerry Wind

"Incumbents' response to competitive innovation: The role of competitors' behavior in determining response time" with Marion Debruyne, October 2001.

"Mobile e-Business: Disruptive Technology or Untethered Extension of Business as Usual?" with Tony O'Driscoll and Venkatesh Shankar, under review, *Sloan Management Review*.

"Market Share and Distribution:  A Generalization, A Speculation, and Some Implications" with Paul Farris, April 1994.

"An Empirical Pooling Approach For Estimating Marketing Mix Elasticities With PIMS Data," with Venkatram Ramaswamy, Wayne S. DeSarbo, and William T. Robinson, University of Michigan, Working Paper, January 1992.

"Conjoint Analysis Reliability's Empirical Findings," with John Bateson and William Boulding, Wharton Working Paper.

"The Determinants of Strategic Marketing Rivalry:  An Empirical Investigation," with Hubert Gatignon and Venkatram Ramaswamy, Wharton  Working Paper.

Exhibit 2: Curriculum Vitae

"Conjoint Analysis Reliability and Validity:  A Framework for Future Research," with John Bateson and William Boulding, Wharton Working Paper.

"Pooling Logit Models," with Hubert Gatignon, Wharton Working Paper, 1985.

"Do Advertising Frequency Response Functions Differ by Brand and Segment," Wharton Working Paper, 1985.

"Do Traditional Forms of Segmentation Yield Benefit Segments - An Industrial Application," with Rowland Moriarty, MSI Working Paper, 1981.

"Using a Nonlinear Response Function in Estimating Advertising's Carry-Over Effects," with Paul W. Farris, Marketing Science Institute Technical Report, Cambridge, Massachusetts, August 1978.  Report #79-107.

"Incorporating Marketing into Corporate Planning Models," with John M. McCann, Marketing Science Institute Technical Report, Cambridge, Massachusetts, August 1978.  Report #79-111.

"The Prediction of Individual Probabilities of Brand Choice," Harvard Business School Working Paper, August 1976.

"On Analyzing Interdependent Decisions in Marketing," with Herbert Moskowitz, Harvard Business School Working Paper, July 1976.

"Linking Market Segments Based on Derived Importance Weights to Household  Characteristics," with Dick R. Wittink, Working Paper, August 1976.

"Market Segmentation via Derived Importance Weights," with John M. McCann and Dick R. Wittink, Institute Paper No. 518, Institute for Research in the Behavioral, Economic and Management Sciences, Krannert Graduate School of Industrial Administration, Purdue University, June 1976.

**Other Publications**

"Innovation Metrics," *Wiley International Marketing Encyclopedia Product & Innovation Management,* with Venkatesh Shankar, 2011, Vol 5. P.. 91-96.

"Product Positioning," *Wiley International Marketing Encyclopedia Product & Innovation Management,* 2011, Vol 5. P. 203-204.

"Metrics for Linking Marketing to Financial Performance," *Marketing Science Institute Special Report*, with R. Srivastava, Winter 2005, p. 85-109

"Putting the Lesson Before the Test," with Mark Chussil, *Competitive Intelligence Review,* 1998.

"Roundtable Discussion: Business Strategy and Decision Making" with Harry First, Brian R. Henry, David J. Reibstein, Michael L. Weiner, Dennis A. Yao and Edward J. Zajac., 12:8, Antitrust Magazine (ABA), Spring 1998.

**Cases and Notes**

Kindle Fire (Wharton Case)
Piel Cosmetic (Wharton Case)
Viagra (Wharton Case)
Note on Marketing Research:  Process and Methods (9-579-136)*
Marketing Research and Information Systems, Technical Note:  Computer-Based Simulation of Hinesbury Mills (4-579-097)*

---

* Intercollegiate Case Clearing House, Soldiers Field, Boston, MA  02163

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

Exhibit 2: Curriculum Vitae

Marketing Research and Information Systems, Technical Note:  Cross-tabulation and the Chi-Square Test (9-574-001)*

MassNORML (A)  (9-578-060)*

MassNORML (B)  (1-579-106)*

MassNORML 8  (9-579-017)*

Olympia Brewing Company:  Market Forecasting (A)  (9-580-027)*

Olympia Brewing Company:  Market Forecasting (B)  (9-580-028)*

Olympia Brewing Company:  Market Forecasting (C)  (9-580-029)*

The Strategic Planning Institute:  Marketing and the Briefing Session (A)*

The Strategic Planning Institute:  Marketing and the Briefing Session (B)*

The Strategic Planning Institute:  Marketing and the Briefing Session (C)*

Attitude Research Project (A) and (B) Cases in *Marketing Research*, Hart, Reinholt and Winston, Chicago, 1975.

## Media Coverage

### 2003

"At the Intersection," Teradata Magazine Interview together with Rick Staelin, Hugh Watson and Mark Jeffrey.1Q 2003. pp. 26-31.

"When Art Meets Science: The Challenge of ROI Marketing"  *Knowledge@Wharton*, Business+Strategy, http://knowledge.wharton.upenn.edu/s+b/121603.html.

Article in the Sino-Manager (Chinese magazine) regarding speaking at a joint meeting WEMBA students and CEIBS students, pp.126-132.

Article in *Business+Strategy* on Marketing Metrics

Several citations in *Wall Street Journal, New York Times, Sports Illustrated, Knowledge@Wharton*

### 2013

"Nuts & Bolts – Attribution:  In Your Face, Last Clickers!" Target Marketing Mag, http://www.targetmarketingmag.com/article/marketing-attribution-think-long-term-say-google-wharton-professor/1#

"A look at Philly's sneaker culture," Philly.com, http://articles.philly.com/2013-08-12/news/41337351_1_air-jordan-sneaker-fans-shoes

"Global Digital Marketing Forum Kicks off," MBCNEWS Korea, http://inews.imbc.com/replay/nwtoday/article/3328386_5782.html

"The CMO.com Interview:  Wharton's Dr. David Reibstein," CMO.com, http://cmo.com/content/cmo-com/home/articles/2013/8/8/wharton_the_cmocom_interview.html

## Knowledge@Wharton

When a Black Tee Shirt Is More than a Black Tee Shirt: Why Brands Aren't Losing Their Luster

The Price Is Right, but Maybe It's Not, and How Do You Know?

Blu-ray vs. HD-DVD: Knocking Each Other Out?

Brand It Like Beckham: Can the Soccer Star Sustain the Hype?

Verizon's High-Speed Network: If They Build It, Will You Come?

Marketing for the Bottom Line

Death in the Middle: Why Consumers Seek Value at the Top and Bottom of Markets

Marketing Metrics and Financial Performance

Finding New Opportunities to Market 'Lost' and Other TV Shows

Burgers and Other Goods in the Blink of an Eye: How Effective Are Short Ads?

The Coffee Wars Heat Up: New Strategies to Jolt the Caffeine-Conscious Consumer

Farewell, Peter Drucker: A Tribute to an Intellectual Giant

When Art Meets Science: The Challenge of ROI Marketing

Why the Red Sox Brand Keeps Hitting Home Runs

Managing Brands in Global Markets: One Size Doesn't Fit All

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Exhibit 2: Curriculum Vitae**

Million Dollar Booboo, Or Are the Oscars Still Golden?
Boy Meets Girl: Gillette and P&G Hood up Their Brands
The $2.4 Million Question: What is the ROI for Super Bowl Ads?
James Bond's BMW and Other Product Placements: New, Racier Ways to Advertise
Connecting Marketing Metrics to Financial Consequences:
Executives Trade Stories on the Challenges of Doing Business in a Global Economy
Whither Global Inequality? Reviving an Old Debate
Companies Must Learn to Achieve the Price Advantage (or Pay the Price)
Low-carb, High-arg: What's a Baker/Pasta Maker to Do?
When the CEO is the Brand, but Falls from Grace, What's Next?
Darn Those Pop-Up Ads! They're Maddening, but Do They Work?
Finding a Link between Shareholder Value and Social Good
In Service Businesses, Does Growth Always Lead to Profits? Think Again
Is the Happy Meal over for McDonald's?
Marketers Turn to Metrics to Measure the Impact of Their Initiatives
What's in a Name? Not Much Without a Branding Strategy
Will Commission Cuts Kill the Small Travel Agent?
The Failure of Customization: Or Why People Don't Buy Jeans Online
The Microsoft Settlement: A Remedy That Pleases Almost No One
Will Consumers Be Willing to Pay for their Formerly Free Lunch on the Internet?
Can Priceline Remain Profitable?
How Companies Sponsor, Listen In and Learn from Chat Rooms
Starting a Business Today: Less Competition But Also Less Cash
Despite a Turbulent Take-off, Orbitz Is in Demand
Can You Learn Anything from These Sites' XXXpertise?
Winners and Losers in the E-Commerce Shakeout
The Problem with Priceline
Just-in-Time Education: Learning in the Global Information Age
What's Behind the Food Industry's Appetite for Mergers
How to Keep Customers In Line for Your Online Business
Christmas E-tailers: Will It Be Ho-Ho or So-So?
Who's Buying on the Internet? (See also the full article as published)
Market Share and Distribution: A Generalization, A Speculation, and Some Implications
Introduction to the Special Issue on B2B Research
Backlash:  How Early Adopters React When the Mass Market Embraces a New Brand
Market Segmentation:  Connecting Data to Decisions with Customer Analytics

**PROFESSIONAL AFFILIATIONS**

American Marketing Association
Association for Consumer Research
Beta Gamma Sigma Society
Marketing Science Institute, Executive Directors Council
ORSA/TIMS

**INDUSTRIAL EMPLOYMENT**

Hoffman-LaRoche Pharmaceuticals, Sauter Laboratories, Clifton, New Jersey, Summers, 1970 and 1971:
Marketing Department; major responsibilities consisted of training of salesmen, merchandising and sales.

Management Education:

More than 300 companies.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**Exhibit 2: Curriculum Vitae**

Consulting:

Marketing Consulting Activities have involved a variety of firms, such as:

AT&T, Basking Ridge, New Jersey
General Electric, Fairfield, Connecticut
Hewlett Packard, Palo Alto
Intercontinental Hotels, New York, New York
Rohm and Haas, Philadelphia
Merck Pharmaceuticals, NY, NY
Dow Chemical, Midland, Michigan
British Airways, London, England
Johnson & Johnson
Novartis
SCJohnson
Shell Oil

Boards:

General Information, Philadelphia, Pennsylvania, Board of Directors, 1982-1986
American Councils, National Board of Senior Advisors, 1991 – Current
MEE Productions, Board of Directors, 1991-1997
Fleisher Art Memorial, Board of Directors, 1997-2006
And1, Board of Directors, 1993-2006
Advanced Competitive Strategies, Inc., 1985-2001
Bizrate/Shopzilla, Board of Directors, 1996-2006
Xmpie, Board of Directors, 2001-2006
CMO Partners, 2004 – Current
Charles Coolidge Parlin, Board of Governors, 2007 – Current
Marketing NPV, Managing Partner, 2007 – Current
American Marketing Association, Board of Directors, 2007 – Current
American Marketing Association, VP Treasurer/Secretary, 2009 – Current
Marketing Accountability Standards Board, Charter Director, 2010 – Current
SEI
Site Intelligence/iJento, 2010-2012
International Commerce Review Board, 2010 – Current
Marketing Science Institute
mAdtivity Board of Directors, 2012 - Current

Advisory Boards

IPSS
ISBM
BazaarVoice
VoiceStar
Hooja
BuySafe
Merchant Circle
PetSmart
Mentor Tech
IPSS
Wharton Publishing
Knowledge@Wharton
Camileonheels
LandRoller
Commission on Graduates of Foreign Nursing Schools
Fallon, McElligott & Rice Advertising Agency, Minneapolis, Minnesota Board of
Consultants, 1982 - 1986

**Exhibit 2: Curriculum Vitae**

American Council of Teachers of Russian, American Council for Collaboration in Education and Language Study (ACTR-ACCELS); Board of Senior Advisors

Senior Homes

MarketShare

## LIST OF LITIGATION-RELATED CONSULTING WORK IN THE LAST FIVE YEARS

| | **Case** | **On Behalf Of** | **Testimony** |
|---|---|---|---|
| 1 | POM v. FTC | POM | Trial |
| 2. | POM v. Ocean Spray Cranberry | POM | Deposition |
| 3. | POM v. Class Action | POM | Deposition |
| 4. | Shire v. GSK | Shire | None |
| 5. | Apple v. Samsung | Samsung | Trial |

## LIST OF NON-LITIGATION CONSULTING WORK IN THE LAST FIVE YEARS

1. Synergy Communications
2. Google
3. General Electric
4. Market Share Partners
5. Marketing NPV
6. Rohm and Haas
7. Dow Chemicals
8. HSM
9. Major League Baseball
10. TransAmerica
11. Vinci
12. Accenture
13. Aringo
14. The Hartland Group
15. Disney
16. WL Gore
17. Harrah's Casino
18. ITT
19. SAS
20. Teradata
21. Global Praxis
22. Best Buy
23. Philadelphia Eagles
24. KFC
25. Kimberly Clark
26. Medtronics
27. Merck
28. Sanofi
29. Xylem
30. Zero Hora
31. Pepsi Cola Corporation
32. Radius

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

# EXHIBIT 3

CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

# Valuation of Patented Product Features[*]

Greg M. Allenby        Jeff Brazell        John R. Howell

*Fisher College of Business*     *The Modellers*     *Smeal College of Business*

*Ohio State University*                  *Pennsylvania State University*

Peter E. Rossi

*Anderson School of Management*

*UCLA*

November 2013

## Abstract

Ultimately, patents have value to the extent to which the product features enabled by the patents have economic value in the marketplace. That is, products which are enhanced by inclusion of patented features should generate incremental profits to the firm offering the enhanced product. Measures of incremental profits should be at the heart of damage estimates in patent litigation. Incremental profits can only be assessed by considering demand for products with patented features and contrasting that demand to demand for the same product without the patent feature. Profit calculations must be based on valid estimates of demand as well as assumptions about how competitive forces affect demand. This requires a set of equilibrium calculations in which profits are measured by considering the competitive response to introduction of the product with the enhanced feature. A special variety of survey analysis called conjoint analysis can be used to estimate demand. Recently, conjoint methods have been applied in the patent setting but the measures of value used are not based on equilibrium profits. The Willingness To Pay and Willingness To Buy methods used by conjoint practitioners do not measure the economic value of a patented product feature. We illustrate our method using the market for digital cameras and show that current methods can overstate the value of the patent.

Keywords: patent valuation, patent damages, competitive equilibrium, conjoint surveys, Bayesian methods.

---

[*]Rossi would like to acknowledge the Collins Chair, Anderson School of Management, UCLA for research funding. Allenby thanks the Fisher College of Business at Ohio State University for generous research support. All correspondence may be addressed to the authors at the UCLA, Anderson School of Management, 110 Westwood Plaza, Los Angeles, CA 90095; or via e-mail at perossichi@gmail.com.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

# 1   Introduction

Many patents derive their primary value from the product features which are enabled by practicing the patent. For example, consider a patent which can be construed to cover the so-called "smart" gestures features of smartphone operating systems[1] (such as various ways of navigating and zooming in/out using finger swipes of various kinds). This patent only has value to the extent to which this feature is valued by consumers and not achievable by other methods with similar functionality which do not infringe the patent. This is nothing more than an application of the principle that demand elasticity (and hence market power) is driven by the extent to which competing products are substitutable for the focal product.

However, even in the case in which the product feature or functionality can only be achieved through practice of the patent, there is still a open question as to the market value of this product feature. Clearly, only a portion of the demand for this product can be attributed to the product feature. Even if there is no way to enable comparable smart gestures without infringing the product, only a portion of the total value of a smartphone should be ascribed to the patented feature. It is not just the lack of non-infringing alternatives that drives the value of the patented feature but also the extent of competition in the marketplace. If the focal product is in a "crowded" space of products, then margins in the industry will be lower and the profit generated by the addition of the patented feature will be lower than in a market with less competition.

A valid and economically coherent approach to patent valuation must be based on the economic value of the patent to the firms which practice it. That is, in a world in which the firm either owns or licenses the patent, the firm will enhance their products with feature (s) enabled by the patent. The value of these patented features will be determined both by the demand for these features by customers but also by cost and competitive considerations. If the patented feature is valued by customers and there are limited alternatives with the desired functionality, then the firm practicing the patent will achieve higher profitability then in a world without the patent. This incremental profit calculation must be at the heart of

---

[1]To take an example from recent patent litigation between Apple and Samsung (C 11-1846).

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

the patent valuation problem. Firms may earn incremental profits from patented product features either by charging a price premium or via increased sales or both. Profit calculations will, of course, consider both factors and incorporate them in a natural way.

A comparison between the world in which a firm practices the patent and a world without the patent must also consider the response of competing firms. That is, if the patented feature enhances demand for the product, we would expect higher profits than in the world without the patented feature enhancement. However, it would be a mistake to assume that other firms in the market would not adjust their prices in response to the introduction of a product enhanced by the patented feature. To take another example from consumer electronics, if Nikon introduces a new point and shoot camera that features a "professional" style swivel display panel and this feature is protected by a patent, then the other players in the digital point and shoot camera market (e.g. Sony, Panasonic, and Canon) will have no choice but to adjust their prices downward in response. This process of adjustment of prices (and, therefore, market shares) will result in a new industry equilibrium. The response of Nikon's competitors will lower the profits that are achievable from the introduction of the swivel display feature. Therefore, any calculation of the incremental profits which can be attributed to the introduction of a patented product feature must be based on a comparison of the industry equilibrium with and without the feature.

The process by which product features are enhanced or new feature are added is a form of product differentiation. Most consumer goods and services markets are not commodity like markets where standard perfectly competitive notions of equilibrium apply. Instead, there are typically a relatively small number of firms competing on the basis of non-identical or differentiated products. Patents play a vital role in the process of product differentiation as they are designed to enable the firm practicing the patent to establish some market power by offering a unique feature. For these reasons, equilibrium calculations should be based on equilibrium concepts defined for oligopolist markets with price competition and differentiated products. Practical methods for undertaking such equilibrium calculations have been introduced into the empirical I/O literature (see, for example, Berry, Levinsohn, and Pakes

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

(1995)), but, heretofore, have not been used for product feature valuation.

Our view is that the only sensible measure of value is the incremental profits that accrue to the firm with a valued patented feature. This concept can be applied both to the problem of valuation of a patent in the patent marketplace as well as to the problem of assessing damages due to patent infringement. It is well known that it is socially efficient to allow patents to be sold. This is one way of insuring that patents will be owned by firms whose products can benefit the most from the features enabled by the patent. The market clearing price for a patent must be based (along with considerations of the validity and enforcement costs) on the highest incremental value to firms practicing the patent. Again, the profit metric is the only sensible metric to establish value to the firm.

Assessment of damages from patent infringement has become a very high stakes problem without any clear and compelling theory of damages. While courts have rejected some methods (such as the entire product rule) which don't make any economic sense, there is no clear paradigm for damage calculations. Currently, there are two types of damages calculations: 1. a "reasonable" royalty calculation and 2. a lost profits. In a reasonable royalty analysis, some value is assessed for the product (typically based on adjustments of prevailing royalty rates, if relevant) and then a hypothetical bargaining session is assumed to take place between the licensee and licensor. Clearly, the value being split in the hypothetical negotiation is the least well defined aspect of this paradigm. Our approach would clearly define the total value which the patent can produce and does not require heroic assumptions regarding the applicability of other royalty rates.

For situations in which the patent holder practices the patent in their own product portfolio, a lost profits damages analysis is often conducted. A lost profits analysis hinges on some estimate of what the patent holder's product sales would be if the infringing products were taken off the market. From these lost sales, it is usually fairly straightforward to compute lost profits. The problem here is that there is no recognized and valid way of estimating the amount of lost sales. Certainly, any analysis which holds prices fixed will be misleading. During the period of infringement, the firm holding the patent will certainly adjust their prices

4

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

to respond to competition from the infringing products. Accounting for these changes in equilibrium prices must be a part of any valid lost profits analysis. Even if price adjustments were not accounted for, it is very difficult to use actual sales data to estimate what would have happened in the counterfactual world in which the infringing products were withdrawn from the marketplace. Thus, any valid lost profits methodology must incorporate an explicit model for the demand for product features as well as some notion of equilibrium.

We are at the early stage of using quantitative methods and demand analysis in patent valuation. Survey-based methods of calibrating demand systems are beginning to assume a role in some damage analyses (see, for example, Samsung V. Apple and Motorola V. Microsoft). One source of the appeal of survey methods has been the lack of useful marketplace data on the demand for products both with and without patented features. Typically, the marketplace data is only available for products with patented features (and, hence, the subject of the litigation) and not for these same products without the features. The attraction of survey-based methods is to simulate what demand would have been without patented product features. In this early work, only pure demand-based measures of product feature value have been used. For example, it is possible to compute the change in average Willingness To Pay (WTP) as a patented feature is added to a product. CWTP is a pure demand-based measure and is only indirectly related to incremental firm profits. In addition, average WTP can dramatically overstate the value of patents and result in upward biased demand estimates. Similarly, the so-called Willingness To Buy analysis of the gains/losses in market share attributed to patented product features is fundamentally flawed as it does not consider price response to the introduction of new products with the patented features.

In summary, we advocate using equilibrium outcomes (both price and shares) to determine the incremental economic profits that would accrue to a firm as a product is enhanced. In comparison, WTP measures will typically overstate the change in equilibrium price and profits and the WTB measure will overstate the change in equilibrium market share. We illustrate this using a conjoint survey for digital cameras and the addition of a swivel screen display as the object of the valuation exercise.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

To compute equilibrium outcomes, we will have to make assumptions about cost, the nature of competition, and the set of competitive offers. Conjoint studies have to be designed with this in mind. In particular, greater care to include an appropriate set of competitive brands, handle the outside option appropriately, and estimate price sensitivity precisely must be exercised.

## 2   Defining and Measuring Demand for Product Features

Clearly, any valid paradigm for patent valuation must measure demand in the relevant market. The demand schedule facing any firm's product can be constructed from the distribution of preferences across the population of consumers. We take a characteristics view of products; that is, products are simply bundles of features or characteristics. Firms pick a particular bundle of features which can be thought of as a point in the space of possible product configurations. The competitive structure of the industry is defined not only by the number of competing products but also by the positions of those products in the characteristics or product feature space. Given a set of products with associated demand, a competitive equilibrium can be computed, enabling our valuation of patents as the incremental profits flowing to the firm offering a product with patented features.

We use a standard model for the demand for differentiated products. Each product is made up of a set of characteristics. Consumers choose only one product at any one purchase occasion and may elect to not purchase any product at all. A firm introduces a product into the marketplace by announcing a particular configuration of product features/characteristics and a price. The demand schedule facing this firm is the expected sales of the product given the price, configuration and the distribution of preferences across consumers. For example, a digital camera product might consist of a brand name (e.g. Sony), particular resolution (measured in megapixels), a particular level of zoom performance, a style of display (swivel screen or not), etc. The firm announces a price for this product. Consumers evaluate this product and compare it to other products in the marketplace. Each consumer makes a choice and these choices add up to total demand for the product. Each consumer is represented by

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

a specific utility function which is specified by a set of weights on the product characteristics. A choice model will predict the probability that a consumer will pick a specific product in a set of products based on the characteristics of each product and the weights which represent that consumer's preferences for features.

## 2.1    The Standard Choice Model for Differentiated Product Demand

The consumer faces a marketplace that consists of $J$ products each specified by a characteristics vector, $x_j$, and a price, $p_j$. If there are $k$ characteristics, then the characteristics vector specifies the specific values of each of the $k$ characteristics. In our example, $x_j =$ (Sony, 16 mp, 10x zoom, without swivel screen). Many characteristics have only a discrete set of possibly unordered values. For these characteristics (like the presence or absence of a swivel screen Display), we would introduce a set of binary indicator or dummy variables into the characteristics vector. For example, if there are four major brands in the market place, then four indicator (0/1) variables[2] would be included in the characteristics vector.

The utility derived from the purchase and use of any product is modeled via what has become a standard random utility model (McFadden (1981)) for choice applications. The observed characteristics and price enter the utility for the $j$th brand in a linear fashion. An error term is introduced to account for unobserved factors which influence choice. The error term is often interpreted as representing unmeasured characteristics which influence choice-specific utility.

$$u_j = \beta' x_j - \beta_p p_j + \varepsilon_j \tag{2.1}$$

$x_j$ is a $k \times 1$ vector of attributes of the product, including the feature that requires valuation. For mathematical convenience, it is assumed that the error terms have an extreme value type I or Gumbel distribution. Consumers are assumed to know the realization of the error term and simply choose the alternative with maximum total utility.

To derive the standard choice model, we must calculate the probability that the $j$th

---

[2]Unlike standard regression models, a characteristics model doesn't really have an intercept.

alternative has the maximum utility, employing the assumption that the error terms have a Gumbel distribution with a scale parameter of 1. That is, since we do not observe the error terms but only the deterministic portion of utility, there is an entire region of possible errors which are consistent with the choice of a specific alternative. To derive the choice probability, we have to integrate over this region of possible values of the errors using the joint distribution of the errors. The fact that the error terms have positive support (can take on, in theory, any value in the interval $(-\infty, \infty)$) means that any choice alternative is possible even if the deterministic portion of utility for that choice alternative is small relative all other alternatives. The Gumbel distribution produces a standard logit model for the choice of products.

$$\Pr(j) = \frac{\exp\left(\beta' x_j - \beta_p p_j\right)}{\sum_{j=1}^{J} \exp\left(\beta' x_j - \beta_p p_j\right)} \tag{2.2}$$

It should be noted that utility is measured only on an interval scale with an arbitrary origin. That is, the same number can be added to the utility of all $J$ alternatives without altering which alternative has maximum or the choice. This property is nothing more than the statement that only relative utility matters in choice models. We can arbitrary sign one of the product as the "base" alternative and express utility relative to this base alternative. In most situations, it is reasonable to assign the "outside" option as the base alternative. That is, one of the possibilities is that consumer decides not to purchase one of the $J$ products and spends his/her money on other types of goods. For example, not everyone has a point and shoot digital camera, in this model this is because the base utility for non-purchase is higher for some than the utility they obtain net of price. It is common, therefore, to assign a utility of 0 to the "outside" option. This means that the utility for each of the J products is expressed relative to the outside option of non-purchase. Thus, model with the outside option or possibility of non-purchase of any of the $J$ products can be written

$$
\begin{aligned}
\Pr(j) &= \frac{\exp\left(\beta' x_j - \beta_p p_j\right)}{1 + \sum_{j=1}^{J} \exp\left(\beta' x_j - \beta_p p_j\right)} \\
\Pr(no\ purchase) &= \frac{1}{1 + \sum_{j=1}^{J} \exp\left(\beta' x_j - \beta_p p_j\right)}
\end{aligned} \tag{2.3}
$$

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

Of course, most firms do not observe the choice decisions of individual consumers. Instead, firms face the aggregate demand for their products which is the sum of the quantities demanded of each possible consumer. In most product markets, there are a very large number of potential customers. It is well documented that consumers differ dramatically (Allenby and Rossi (1999)) in their preferences. In the context of our choice model, this means that consumers have very different utility weights, $\beta$. For example, some consumers are very price sensitive and regard all digital cameras as roughly equivalent in terms of performance/features. For these consumers, choice is a matter of locating the lowest priced alternative. Others may be less price sensitive and more loyal to specific brands. In terms of product features, some consumers assess little or no value to the patented feature, while others may accord it substantial value. The best way to think about this is that there is a continuum of preferences for any one characteristic rather than there are only a small number of "segments" or types of consumers. In this situation, the consumer population is best thought in terms of the distribution of preferences. The fact that there are a very large number of different types of consumers (each with different preferences) means that we can think of there being a continuous distribution of consumer preferences. This continuous distribution is represented by a density, $p(\beta, \beta_p)$. To "sum" over all possible consumers to create aggregate demand is the same as averaging the choice probabilities with respect to the density of consumer preferences.

$$Sales_j = M \times \int \Pr(j|\beta, \beta_p)\, p(\beta, \beta_p)\, d\beta d\beta p \tag{2.4}$$

M is the total size of the market (the number of total potential customers). The choice probability averages over the distribution of preferences is the market share that the firm can expect to attain given the configuration of the product characteristics and price. In this model where consumers only buy at most one product, market share is equivalent to unit sales.

Product features have value to the extent to which consumers obtain utility from the feature. For example, if the first product characteristic is a patented product feature, then demand for that feature depends on the distribution of the first element of the $\beta$ vector over the population of potential customers. If most consumers place positive and "large" weight on

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

the patented feature, then the firm can increase sales by adding the feature while keeping price constant or maintain sales with a higher price. Economic valuation of any product feature will require estimation of the demand system given by (2.2) and (2.4).

## 2.2   Estimating Demand

We have seen that valuation of a product feature must be driven, on the demand side, by the utility weight accorded that feature and the distribution of these utility weights across individuals. Thus, a critical, but not the only, component of patent valuation is to estimate the demand system. In particular, we must estimate the distribution of utility weights for the patented product feature which requires observing demand for products with and without this particular feature. We should start by delineating the set of features which determine demand for this type of products or product category. This list might be very extensive. For example, new versions of a smartphone may incorporate changes to over 1000 different features, only some of which are we interested in valuing for patent purposes. If we could specify a list of the product features or characteristics, we would then, in an ideal world, conduct controlled experiments in which product features and prices are varied in according to a randomized orthogonal design. We would also like to observe individual demand or choice decisions. With this panel data structure (multiple observations for the same consumer), we could, in principle, estimate the utility weights for a sample of consumers. This would provide an estimate of the distribution of preference parameters and allow us to construct an estimate of aggregate demand. From this aggregate demand estimate, we could then undertake some sort of equilibrium analysis to compare firm profits with and without the patented feature.

From a practical point of view, the estimation of demand for patented features appears to require data not available to us. Typically, we have access only to aggregate sales or market share data for a small number of time periods. With a great deal of aggregate share data, it is possible, in principle, to estimate the distribution of utility weights but with only a number number of observations these estimates are apt to be unreliable. More importantly, we typically do not have access to data in which the same product (in terms of brand and

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

other relevant characteristics) is sold both with and without the patented feature. Without variation in the inclusion of the patented feature, no amount of data, at either the aggregate or consumer level, will allow us to estimate the utility weights accorded the patented feature.

In some cases, we can observed aggregate sales of a product in a time series in which the feature is added at some point during the time series. Again, we might consider using this time series variation as a way of identifying the value of the patented feature. However, such analysis must also control for other changes in the market such as the feature composition of competing brands. Moreover, for many consumer products, there is very little time series variation in prices. Without variation in prices, we will not be able to determine how consumers might trade off the utility they obtain for the patented feature against an increase in price. For example, consider the addition of the 4G feature to smartphones. There are times series of aggregate sales for smartphones both before and after the introduction of the 4G feature. However, the prices of smartphones do not vary much over time, making it difficult to determine what sort of price premium the 4G feature could command.

In observational data, we also face the problem of omitted product characteristics and price endogeneity (see, for example, Berry, Levinsohn, and Pakes (1995)). No matter what set of characteristics we able to measure and add to our demand model, one can always make the argument that there are omitted or unmeasured product characteristics which drive demand. If this is the case, then we might expect that firms set price, in part, with reference to these omitted characteristics. This means that prices are not exogenous and, typically, the utility weight on price, $\beta_p$, would be biased downward. In general, there may be unobserved drivers of demand which are correlated with price and, thus, we cannot use all of the variation in price (however small in the first place) to estimate the price coefficient.

In summary, standard observational data is inadequate for valuation of patented features for four reasons: 1. we often do not observe the same product with and without the patented feature, 2. we only have a short time series of aggregate data, 3. there is often little or no price variation, and 4. what price variation we observe may be confounded with unobserved or unmeasured product characteristic, resulting in various endogeneity biases.

To overcome the shortcomings of observational data, the only real option would be to collect experimental demand data at the consumer level. This might appear impractical in the context of patent litigation. It certainly would require time and a level of resources typically not available in the litigation process. Instead, we can employ a survey-based experimental method called conjoint analysis to conduct what amounts to controlled, but simulated experiments, on the consumer level. With modern Bayesian statistical methods, this data can be used to obtain estimates of the distribution of consumer preferences and aggregate demand that can then be used to compute a profit-based measure of product value.

## 2.3   Conjoint Surveys and Demand Estimation

While it may be impractical to conduct field experiments in which patented features are added and removed from products to assess demand, it is possible to devise a survey-based simulation which achieves the same end. In a choice-based conjoint survey, products are described as bundles of characteristics. A survey respondent is recruited (typically from an internet panel) and confronted with a sequence of choice tasks. In each task, the respondent is asked to choose from a menu of two to four hypothetical products described by their characteristics. Figure 1 shows a typical choice task from a survey designed to measure demand for digital cameras. The respondent is asked to choose between four hypothetical cameras and has the option not to purchase. Each hypothetical camera is described by seven characteristics. Each characteristic is described by a number of different values or levels. For example, price has four possibilities which are spread over the range from $79 to $379, while there are only two possibilities for the swivel screen feature (present or not). In addition, the respondent was given the option of electing not to purchase any of the products offered in each choice task screen.

The respondent is faced with a small number of choice tasks (in this survey there were 16 choice tasks or "screens"). The conjoint choice task is designed to simulate a marketplace in which products are described by their features. In making choices, respondents are reveal their preferences for each of the product characteristics (including the patented feature) in the same

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*



Figure 1: Conjoint Survey Choice Task Screen

way as they would in the marketplace. Thus, conjoint data is designed to measure preferences in the spirit of revealed preference theory. That is, we are not asking each respondent directly – what is the maximum you would be willing to pay for this camera or how important is feature A relative to feature B? Instead, we are deducing what these preferences are via simulated choice behavior. The assumption is that the preferences respondents reveal in the conjoint exercise are the same as the preferences which dictate behavior in the marketplace. There is a long history of successful application of conjoint methodology and surveys in the forecasting of demand for new products and in forecasting customer response to price changes (see Orme (2009) for many examples).

### 2.3.1   Conjoint Design

To undertake a rigorous conjoint survey for the purpose of estimating demand for patented features, the following criteria must be met:

- A representative sample must be used

- Major product features must be included in the design

- Product features/characteristics must be described in terms meaningful to the respondents

13

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

- A proper randomized experimental design must be used to select the combinations of characteristics and levels used in the conjoint survey

- The "outside" or "no choice" option must be included

- The major set of competitive brands must be included

## Sampling Procedure

In any survey, we are extrapolating or projecting from the sample to the relevant population. In the application of conjoint surveys to patent valuation, the relevant population is the population of potential customers for the product category. The best way to insure representativeness for this population is to start with a representative sample of all consumers in the US and then screen this sample to those who are in the market for the products in consideration. The only sampling procedures that can guarantee representativeness are random sampling procedures. For example, if we have a list of all US residents, we would select respondents at random (each respondent is equally likely) for the screening portion of the survey.

Unfortunately, much survey work today is done with internet panels that are not random samples. An internet panel is a group of potential respondents who have indicated a willingness to take surveys using web-based methods. Invitation emails are sent to a random sample of the internet panel with a link to the survey. The problem with most internet panel providers is that the internet panelists are "harvested" via display ads and email lists. This what statisticians call a convenience sample, in that the sample is collected by any means necessary and is not designed to be representative of any population. The fact that only a random sample of the entire internet panel is invited does not mean that the final sample of screened respondents is a random sample of the population of potential customers. Yeager, Krosnick, Chang, Javitz, Levendusky, Simpser, and Wang (2011) document that non-random internet panels can yield biased estimates of population quantities. There are internet providers who attempt a close approximation to random samples. If at all possible, higher quality providers should be used.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

If the survey sample is not obtained via high quality, screened random samples, then it is still possible to use the sample but only if checks for representativeness are made. The typical check that for representativeness is to compare the demographic characteristics of the pre-screened sample (this requires asking demographic questions prior to screening) with census-based demographics. This assures representativeness only if the product preferences of consumers are highly correlated with demographics. For example, we could find that our sample collected by non-scientific methods is representative on the basis of the sex demographic variable. That is, the sample proportion of women is the same as the population proportion. This doesn't, however, guarantee that the views of our sample with respect to a specific product feature are representative of the relevant population. This would only be true if preferences for the product feature are closely related to the sex of the consumer. Clearly, for most products, demographics cannot explain very much of the variation in brand and feature preferences. Our recommendation is that variables more closely related to the product category be used. For example, if we were doing a survey of smartphones, we might insert questions on ownership of smartphones by make or model and compare the market shares of our survey with those known in the US market.

Considerations of sample representativeness are critical to the reliability and generalizability of any survey, conjoint or otherwise. No survey evidence should be considered admissible or relevant unless evidence of representativeness is provided.

**Inclusion of Product Features**

The heart of the demand for product features is a specific of the relevant product characteristics. For many products, the numbers of features are so large it would seem impractical to ever attempt to partial out the portion of utility or demand which can be ascribed to any one feature. One reaction is that this makes any characteristics approach to demand impractical. However, the logit choice model of demand (2.3) has an important property called the Irrelevance of Irrelevant Alternatives (IIA) (see, for example, Train (2003)). This property implies that any set of characteristics which are constant across choice alternatives drop out of the

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

choice probabilities. For example, partition the characteristics vector into two parts, $(x_0, x_1)$. $x_0$ is varies across choice alternatives while $x_1$ does not.

$$\Pr(j) = \frac{exp\left(\beta_0' x_{0,j} + \beta_1' x_1\right)}{\sum_j exp\left(\beta_0' x_{0,j} + \beta_1' x_1\right)} = \frac{exp\left(\beta_0' x_{0,j}\right)}{\sum_j exp\left(\beta_0' x_{0,j}\right)} \tag{2.5}$$

The IIA property of logit[3] means that if consumers assume that only a subset of the characteristics are varies while all other characteristics are constant across choice alternatives, then we can construct valid demand estimates by testing only a subset of relevant product characteristics. This greatly enhances the power of a choice-based conjoint survey. In theory, as long as we assume the logit model of demand is correct, we only have to examine a subset of product features. We will have to instruct respondents to assume, in making their choices, that all other features are constant. This is common in conjoint surveys.

In contrast, aggregate demand modeling with observational data does not hold the unobserved characteristics constant across products. If we do not observe important product features, then we might find that prices are determined, in part, by the unobserved features, creating a so-called endogeneity bias problem. We would have to find variables, called instruments, that move prices but are uncorrelated with the unobserved characteristics. It can be difficult to identify such variables. In theory, this is not a problem in a conjoint survey because the respondents are specifically instructed to assume that all features/characteristics other than those varied in the survey are constant across alternatives.

Taken literally, the IIA property means we could conduct a conjoint survey with only two characteristics - the patented feature and price. In this extreme case, we are constructing a very unrealistic simulation of the marketplace.[4] For example, if one of the hypothetical products in the choice task has a very high price, it is difficult to expect that the respondents will "hold constant" other features. Their natural inclination is to assume that, perhaps, the high price indicates that this hypothetical product as very important features missing from other alternatives. This violation of the "hold constant" instruction is much less likely if other

---

[3]It should be noted that although we are assuming that IIA holds at the individual consumer level, this does not mean that IIA holds as a property of the aggregate demand system.

[4]As Orme (2009) puts it, "realism begets better data."

important features are included in the conjoint survey design. This means that, even though we may only wish to test a small number of patented features, we must include many of the other important features in the product. This, of course, does not mean you have to include all features of the product, a "generic" criticism of conjoint methods. All scientific models are abstractions which attempt to capture the important aspects of the problem. For example, when *Consumer Reports* provides comparisons of cars, smartphones, televisions, or other consumer products, they do not list all features, but, instead, concentrate on the important features. It is important to undertake research prior to the conjoint survey design to determine what are the major and most important features of the product.

There are cases in which conjoint designs have been used which only test patented product features and do not include other important product features. Not only does this invite the respondents to make attributions which are not correct but it also calls attention to the patented features. There is no doubt that can lead to an overstatement of feature value.

## Description of Features

A general principle of conjoint survey design is that the product characteristics must be defined in terms that are understandable and meaningful to the respondents. For example, smartphone battery capacity should be specified in terms of battery life in use rather than in units of capacity such as milliamperes. This is a particularly challenging problem with patented features. Patents often specify a very specific apparatus or, in the case of a method patents, a specific set of steps which must be undertaken to practice the patent. For example, it might be impossible to obtain a patent for a generic functionality such as transmitting pictures in emails, but there may be patents which describe a specific method for attaching a picture file to an email. A conjoint survey that construes this patented feature as "the ability to send pictures via email" would overstate the value of the patent. It may well be the case that it is possible to send pictures via email via a method which does not infringe upon the specific patent in question. If this non-infringing alternative provides the same functionality to the user, then there is no point in doing a conjoint survey. However, if alternatives to

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

the patent provide inferior functionality, then the conjoint survey must be designed to value this specific functionality. For example, if the patented technology provides greater speed or reliability of transmission, then the challenge in the conjoint survey is to describe diminished speed or reliability to the survey respondent.

For patent litigation, it is important the the conjoint survey relate as closely as possible to the actual specifications or construals of the patent. If there are non-infringing alternatives, then the conjoint survey must be designed to test the relative value of the patented feature to the non-infringing alternatives. Features and functionality must be describe to the respondent in simple and meaningful terms. This may involve the use of graphics and video descriptions. Certainly, the conjoint feature descriptions must be pre-tested (for a discussion on surveys and pre-testing see Sheatsley (1983)).

### Experimental Design

Conjoint surveys are properly viewed as experiments in which the products considered in the simulated choices are designed for maximum discrimination between features. Once a set of characteristics/features (called attributes in the conjoint literature) are selected, then the levels of these attributes must be selected. For example, if we include megapixels as a characteristics or attribute of digital cameras then we need to select the specific values (e.g. 10, 16, etc. mp). Given the set of attributes and the possible levels for each attribute, the conjoint design task then consists of "creating" hypothetical products as bundles of these attributes and specific levels. While this is a highly technical subject (see, for example, Box and Draper (1987), chapters 4 and 5), the central intuition is that we must vary each attribute independently of the other attributes in order to learn about the utility weights for each attribute. That is, we can't always have those products with the patented feature be priced more than those hypothetical products without the feature.

There are well-known and reliable ways of automatically generating choice tasks that will yield maximum informative and balanced choice task designs. It is this experimental design that makes conjoint surveys especially valuable as these designs create hypothetical

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

products with configurations that are designed for the purpose of revealing survey respondents preferences.  In the real marketplace, we tend to see less independent variation of product features and price.

**The Outside Option**

In the real marketplace, not all potential customers purchase one of the available products. Although the penetration of digital cameras is high, not everyone has one. This means that, in order to be realistic, the conjoint study must include the "outside option" or "none-of-the-above" to allow respondents to opt-out of purchase.  This is especially important in the evaluation of new product features. Firms invest in the development of new patented features in order to compete for customers not only with existing products but also with the hope of attracting new customers into the market. For example, the design features incorporated into the first iPad greatly expanded the market for tablet computers. If the outside option is not included in the conjoint study, then demand can only come at the expense of competing products with no growth in the overall market.

Practitioners of conjoint have found that it makes a difference how the "outside" option is included in the conjoint study.  Just adding a column for "none of these" has been found to cause respondents to be overstate their purchase intentions (Brazell, Diener, Karniouchina, Moore, Severin, and Uldry (2006)).  One possible explanation for this "over optimistic" behavior is that respondents don't pay sufficient attention to the price attribute.  Another is that respondents sometimes feel awkward rejecting products they believe the conjoint survey designers has a personal stake in. It is common to use what is called a "dual response" mode of incorporating the outside option. In the choice task, respondents are forced to choose one option which is their preferred option.  Then the respondents are asked explicitly if they would purchase their preferred product at the stated price.

**The Set of Competing Brands**

Our method of valuing a patented feature is to compute the incremental profits that the patent holder would earn from including the patented feature in their product. This depends on the structure of competition in the market. Competition is defined both by the number of competitors but also by the position of their products in the marketplace. Unless competing brands are included in the conjoint analysis, it will be impossible to make realistic estimates of the profits that can be realized from the patented feature.

This point seems to be lost on some involved in patent damages calculations. If a firm is accused of infringement, there is the natural inclination to focus on the value of the feature for the products accused of infringement. The evolution of thought in patent damages is that not all of the sales of the accused infringing products are due entirely to the contribution of the infringing feature. For this reason, the emphasis has been on decomposing the value of the feature in terms of what incremental sales are attributed to the infringement. This has contributed to the attraction to conjoint methods which offer the possibility of decomposing demand. However, it is clear that if the infringing products were removed from the market, the patent holder's products that practice the patent would only garner some of the sales of the infringing product. Furthermore, the prices in the market would be expected adjust to the withdrawal of the infringing products. Without a realistic demand system for all of the major brands in the market, it is not possible to calculate a meaningful new industry equilibrium for the world without the infringing products

In summary, conjoint surveys when properly designed, pre-tested and applied to representative samples can be used to estimate industry demand for patented product features. However, a proper valuation of patented features does not end with the production of conjoint data. This data must be analyzed to produce reliable estimates of aggregate demand for the relevant firms and we must undertake equilibrium calculations. Before we discuss equilibrium computations, we will briefly review some of the measures of product feature value used today and explain why these are not usable for patent valuation.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

# 3    Willingness To Pay and Willingness To Buy

Valuation of product and product features is currently conducted via either a Willingness To Pay (WTP) or Willingness to Buy (WTB) analysis. A WTP analysis should be define as the monetary amount that I must compensate a consumer for the loss of product value. For example, WTP for a product is the amount on income I must give a consumer so that the consumer achieves the same utility from the product as without the product but with the extra income. WTP for a patented product feature can be defined as the difference in WTP for a product with the enhance feature minus the WTP for a product that is identical in every way except that the product no longer has the feature. Willingness to Buy is often defined as the increase in product sales or market share that can be obtained by the addition of the feature to an existing product but holding prices constant.

As such, the WTP and WTB measure cannot be measures of the market value of a product feature[5] as they do not directly relate to what incremental profits a firm can earn on the basis of the product feature. WTP and WTB can be calculated only on the basis of demand side information and are independent of costs or the competitive structure of the industry. That is to say, WTP will be the same no matter how strong the competition is for the focal firms customer base. WTB holds prices fixed and does not allow the industry to adjust to a new pricing equilibrium.

## 3.1    WTP

What is called "WTP" in the conjoint literature is one attempt to convert the part-worth of the focal feature, $f$, to the dollar scale. Using a standard dummy variable coding, we can view the part-worth of the feature as representing the increase in *deterministic* utility that occurs when the feature is turned on.[6] If the feature part worth is divided by the price

---

[5]Ofek and Srinivasan (2002) define what they call the "market value of an attribute improvement" as the amount by which a firm can raise price when the feature is added to a product and still command the same market share. This is a WTP measure, although slightly different than the average WTP measure in that the Ofek and Srinivasan MVAI measure is a slightly different sort of average and uses weighting.

[6]For feature enhancement, a dummy coding approach would require that we use the difference in part-worths associated with the enhancement in the "WTP" calculation.

21

coefficient, then we have converted to the ratio dollar scale. Some call this a WTP for the product feature.

$$\text{WTP} \equiv \frac{\beta_f}{\beta_p} \qquad (3.1)$$

This WTP measure is often justified by appeal to the simple argument that this is the amount by which price could be raised and still leave the "utility" for choice alternative J the same when the product feature is turned on. Others define this as a "willingness to accept" by giving the completely symmetric definition as the amount by which price would have to be lowered to yield the same utility in a product with the feature turned off as with a product with the feature turned on. Given the assumption of a linear utility model and a linear price term, both definitions are identical.[7] In the literature (Orme (2001)), WTP is sometimes defined as the amount by which the price of the feature-enhanced product can be increased and still leave its market share unchanged. In a homogeneous logit model, this is identical to (3.1).

The WTP measure is properly viewed simply as a scaling device. That is, WTP is measured in dollars and is on a ratio scale so that valid inter and cross respondent comparisons can be made. However, the WTP is not a measure of Willingness To Pay as defined in economics literature. WTP is usually defined as the reservation price or maximum amount a customer would pay for a product. As such, WTP should properly be interpreted as an estimate of the change in WTP from the addition of the feature.

$$\Delta\text{WTP} = \text{WTP}_{f*} - \text{WTP}_f \qquad (3.2)$$

Here $\text{WTP}_{f*}$ is the WTP for the product with the feature and $\text{WTP}_f$ is the WTP for the product without the feature. The measure of WTP used describe here is what is commonly used by conjoint practitioners and has been used to inform damages analyses in several patent case. However, this measure of WTP is not the standard measure of WTP for an enhanced choice set or an product innovation as defined in the economics literature (see Trajtenberg

---

[7]In practice, reference price effects often make WTA differ from WTP, see Viscusi and Huber (2012) but, in the standard economic model ,these are equivalent.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

(1989)). In a companion paper (Allenby, Brazell, Howell, and Rossi (2013)), we compute the standard WTP measure which should be interpreted as a measure of the consumer surplus generated by feature enhancement. Of course, welfare or consumer surplus measures are not the same as incremental firm profits, the relevant measure for patented feature valuation.

## 3.2   WTB

In some analyses, product features are valued using a "Willingness To Buy" concept. WTB is the change in market share that will occur if the feature is added to a specific product.

$$WTB \equiv MS\left(j|p, A^*\right) - MS\left(j|p, A\right) \qquad (3.3)$$

MS($j$) is the market share equation for product j. The market share depends on the entire price vector and the configuration of the choice set. (3.3) holds prices fixed as the feature is enhanced or added. The market share equations are obtained by summing up the logit probabilities over possibly heterogeneous (in terms of taste parameters) customers. The WTB measure does depend on which product the feature is added to (even a world with identical or homogeneous customers) and, thereby, remedies one of the defects of the pseudo-WTP measure. However, WTB assumes that firms will not alter prices in response to a change in the set of products in the marketplace as the feature is added or enhanced. In most competitive situations, if a firm enhances its product and the other competing products remain unchanged, we would expect the focal firm to be able to command a somewhat higher price, while the other firms' offerings would decline in demand and therefore, the competing firms would reduce their price.

## 3.3   Why WTP and WTB are Inadequate

Both WTP and WTB do not take into account equilibrium adjustments in the market as one of the products is enhanced by addition of a feature. For this reason, we cannot view pseudo-WTP as what a firm can charge for a feature-enhanced product nor can we view WTB as the market share than can be gained by feature enhancement. Computation of changes in the market equilibrium due to feature enhancement of one product will be required to develop

a measure of the economic value of the feature. In many cases, WTP will overstate the price premium afforded by feature enhancement and WTB will also overstate the impact of feature enhancement on market share. Equilibrium computations in differentiated product cases are difficult to illustrate by simple graphical means. In this section, we will use the standard demand and supply graphs to provide a informal intuition as to why WTP and WTB will tend to overstate the benefits of feature enhancement.

Figure 2 shows a standard industry supply and demand set-up.p.[8] The demand curve is represented by the blue downward sloping lines. "D" denotes demand without the feature and "D*" denotes demand with the feature. The vertical difference between the two demand curves is the change in WTP as the feature is added. We assume that addition of the feature may increase the marginal cost of production (note: for some features such as those created purely via software, the marginal cost will not change). The cost curves are marked as "C" and "C*", respectively. It is easy to see that, in this case, the change in WTP exceeds the change in equilibrium price.

The analogous situation is shown for WTB in figure 3. We have the same cost and demand curves, but we illustrate the WTB exercise which is to compute the change in quantity sold assuming prices do not change. WTB clearly overstates the changes in equilibrium quantity demanded. The figures show very clearly that both WTP and WTB are purely demand-based quantities which do not take into account changes in prices and costs as the feature is enhanced and a new industry equilibrium is achieved.

## 3.4   WTP in the Case of Heterogeneous Customers

Even in the case of homogeneous customers, we have seen that WTP should not be regarded as a proper measure of economic value. In the case of heterogeneous consumers, additional problems are associated with the WTP concept. In almost all choice-based conjoint settings, Hierarchical Bayes methods are used to estimate the choice model parameters. In the Hier-

---

[8]Here we consider the case of a competitive industry to provide an intuition for why WTP and WTB measure are not equilibrium quantities. In the case of imperfect competition or oligopoly, it is not possible to represent the equilibrium in this manner.



Figure 2: Difficulties with WTP



Figure 3: Difficulties with WTB

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

archical Bayes approach (see for example, chapter 5 and Appendix A of Rossi, Allenby, and McCulloch (2005)), each respondent may have different logit parameters, $\beta$ and $\beta_P$, and the complete posterior distribution is computed for all model parameters, including individual respondent level parameters. The problem, then, becomes how to summarize the distribution of WTP which is revealed via the HB analysis. The concept of WTP provides no guidance as to how this distribution should be summarized. One natural summary would be the expectation of WTP where the expectation is taken over the distribution of model parameters.

$$\mathbb{E}\left[\text{WTP}\right] = \int \frac{\beta_f}{\beta_p} p\left(\beta_f, \beta_p | Data\right) d\beta_f d\beta_p$$

However, there is no compelling reason to prefer the mean over any other scalar summary of the distribution of WTP. Some propose using a median value of WTP instead. Again, there are no economic arguments as to why the mean or median or any other summary should be preferred. The statistical properties of various summaries (e.g. mean vs. median) are irrelevant as we are not considering the sampling performance of an estimator but rather what is the appropriate summary of a population distribution. A proper economic valuation will consider the entire demand curve as well as competitive and cost considerations. Equilibrium quantities will involve the entire distribution via the first order conditions for firm profit-maximization. These quantities cannot be expressed as a function of the mean, median or any other simple set of scalar summaries of the distribution of WTP.

However, it is possible to provide a rough intuition as to why the mean of WTP may be a particularly poor summary of the distribution for equilibrium computations. It is the marginal rather than the average consumer that drive the determination of equilibrium prices. Exactly where, in the distribution of WTP, will the marginal customer be is determined by nature of the distribution as well as where supply factors that "slice" into the distribution of WTP. It is possible to construct cases where the average WTP vastly overstates the WTP of the marginal customer. This is one of the main points of Orme (2001). If the bulk of the market has a low value of WTP and there is a small portion of the market with extremely high WTP (the Howells in Orme's Gilligan's Island metaphor), then a profit maximizing firm may

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

set price much lower than average WTP so as to sell to the majority of potential customers who have relatively low WTP. There are situations where the greater volume from low WTP consumers outweighs the high margins that might be earned from the high WTP segment. In these cases, mean WTP will vastly overstate the price premium a firm will charge over cost for a product. It is more difficult, but possible, to construct similar scenarios for median WTP.

One of the major problems with using any measure of the central tendency of the distribution of WTP (either mean, median, or mode) is that this includes consumers whose WTP is insufficient to be in the market. That is, our surveys should qualify respondents to be in the "market" for the products (with a screening question such as "do you plan to buy a digital camera in the next six months). However, simply averaging WTP over all survey respondents averages in those whose WTP for the product as a whole is below the market price of any products (e.g. someone whose WTP for a digital camera is only $50 would not purchase any digital cameras offered in a conjoint survey). This is a downward bias for WTP computations.

Rather than debating whether a particular WTP computation is upward or downward biased for feature valuation, we should discard the WTP concept as simply not relevant for valuation of patented features and move on to a more sensible economic quantity.

# 4   Equilibrium Calculations

The value of a patent is ultimately derived from the profits that accrue to firms who practice the patent by developing products that utilize the patented technology. In fact, standard economic argument for allowing patent holders to sell their patents is that, in this way, patents will eventually find their way into the hands of those firms who can best utilize the technology to maximize demand and profits. For these reasons, we believe that the only sensible measure of the economic value of feature enhancement is the incremental profits that the patented feature will generate.

$$\Delta \pi = \pi \left( p^{eq}, m^{eq} | A^* \right) - \pi \left( p^{eq}, m^{eq} | A \right) \tag{4.1}$$

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

$\pi$ is the profits associated with the industry equilibrium prices and shares given a particular set of competing products which is represented by the choice set defined by the attribute matrix. $A^*$ refers to the set of competing products, one of which has been enhanced by addition of the patented feature; $A$ refers to the set of products without feature enhancement. This definition allows for both price and share adjustment as a result of feature enhancement, removing some of the objections to the WTP and WTB concepts.

In order to compute incremental profits as in (4.1), we will have to make assumptions about the demand for product features, costs and competitive structure. Finally, we will use the standard Nash price equilibrium concept to compute a equilibrium prices. Specifically, we will assume

1. Demand Specification: A standard heterogenous logit demand that is linear in the attributes (including price)

2. Cost Specification: Constant marginal cost

3. Single product firms

4. Feature Exclusivity: The feature can only be added to one product

5. No Exit: Firms cannot exit or enter the market after product enhancement takes place

6. Static Nash Price Competition

Assumptions 2, 3, 4 can be easily relaxed. Assumption 1 can be replaced by any valid or integrable demand system. Assumptions 5 and 6 cannot be relaxed without imparting considerable complexity to the equilibrium computations

The standard static Nash equilibrium in a market for differentiated products is a set of prices such that simultaneously satisfy all firms profit-maximization conditions. Each firm chooses price to maximize firms profits, given the prices of all other firms. These conditional demand curves are sometimes called the "best response" of the firm to the prices of other firms. An equilibrium, if it exists,[9] is a set of prices that is simultaneously the best response

---

[9]There is no guarantee that a Nash equilibrium exists for heterogeneous logit demand.

or profit maximizing for each firm given the others.

In a choice setting, the firm demand is

$$\pi\left(p_j|p_{-j}\right) = M\mathbb{E}\left[Pr\left(j|p, A\right)\right]\left(p_j - c_j\right). \tag{4.2}$$

M is the size of the market, $p$ is the vector of the prices of all $J$ firms in the market, $c_j$ is the marginal cost of producing the firms product. The expectation is taken with respect to the distribution of choice model parameters. In the logit case,[10]

$$\mathbb{E}\left[\Pr\left(j|p, A\right)\right] = \int \frac{\exp\left(\beta' a_j - \beta_p p_j\right)}{\sum_j \exp\left(\beta' a_j - \beta_p p_j\right)} p\left(\beta, \beta_p\right) d\beta d\beta_p. \tag{4.3}$$

The first order conditions of the firm are

$$\frac{\partial \pi}{\partial p_j} = \mathbb{E}\left[\frac{\partial}{\partial p_j}\Pr\left(j|p, A\right)\right]\left(p_j - c_j\right) + \mathbb{E}\left[\Pr\left(j|p, A\right)\right] \tag{4.4}$$

The Nash equilibrium price vector is a root of the system of nonlinear equations which define the F.O.C. for all $J$ firms. That is if we define

$$h\left(p\right) = \begin{bmatrix} h_1\left(p\right) = \frac{\partial \pi}{\partial p_1} \\ h_2\left(p\right) = \frac{\partial \pi}{\partial p_2} \\ \vdots \\ h_J\left(p\right) = \frac{\partial \pi}{\partial p_J} \end{bmatrix} \tag{4.5}$$

then the equilibrium price vector, $p^*$, is a zero of the function $h\left(p\right)$. There are computational issues in both evaluating the firm first order conditions and in computing the root of the system of equations given in (4.5). We refer the reader to Allenby, Brazell, Howell, and Rossi

---

[10]We do not include a market wide shock to demand as we are not trying to build an empirical model of market shares. We are trying to approximate the firm problem. In a conjoint setting, we abstract from the problem of omitted characteristics as the products we use in our market simulators are defined only in terms of known and observable characteristics. Thus, the standard interpretation of the market wide shock is not applicable here. Another interpretation is that the market wide shock represents some sort of marketing action by the firms (e.g. advertising). Here we are directly solving the firm pricing problem holding fixed any other marketing actions. This means that the second interpretation of the market wide shock as stemming from some unobservable firm action is not applicable here.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

(2013) for details.

# 5   An Illustration Using the Digital Camera Market

To illustrate our proposed method for patent valuation and to contrast our method with standard WTP methods, we consider the example of the digital camera market. We designed a conjoint survey to estimate the demand for features in the point and shoot submarket. This is a consumer electronics category which is very similar to the product categories in which there has been patent litigation (smartphones, tablets, and gaming consoles).

We considered the following seven features with associated levels:

1. Brand: Canon, Sony, Nikon, Panasonic

2. Pixels: 10, 16 mega-pixels

3. Zoom: 4x, 10x optical

4. Video: HD (720p), Full HD (1080p) and mike

5. Swivel Screen: No, Yes

6. WiFi: No, Yes

7. Price: $79-279

In this exercise, we chose the swivel screen feature as the focus of our analysis. This feature is illustrated in Figure 4. We consider the problem of valuing a patent which covers the swivel screen feature.[11]

The conjoint design was a standard fractional factorial design in which each respondent viewed sixteen choice sets, each of which featured four hypothetical products. A dual response mode was used to incorporate the outside option. Respondents were first asked which of the four profiles presented in each choice task was most preferred. Then the respondent was

---

[11] We are not aware of a specific patent related to the swivel screen apparatus, but this feature is representative of many patented features.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

asked if they would buy the preferred profile at the stated price. If no, then this response is recorded as the "outside option" or "none of the above." Respondents were screened to only those who owned a point and shoot digital camera and who considered themselves to be a major contributor to the decision to purchase this camera.

The survey was fielded to the Sampling Surveys International internet panel in August 2013. We received 501 completed questionnaires.[12] We recorded time to complete the conjoint portion of the survey. The median time to complete is 220 seconds or about 14 seconds per conjoint task. The 25th percentile is 151 seconds and the 75th percentile is 333 seconds. To check sensitivity to time spent on the survey, we conducted analyses deleting the bottom quartile of the respondents and found little change. It is a common and well-accepted practice to remove respondents who "straight-line" or always select the same option (such as the left most choice). The idea is that these "straight-liners" are not putting sufficient effort into the choice task. Of our 501 complete questionnaires, only 2 respondents displayed straight-line behavior and were eliminated. We also eliminated 6 respondents who always selected the same brand and two respondents who always selected the high price brand. Our reasoning is that these respondents did not appear to be taking the trade-offs conjoint exercise seriously. We also eliminated 23 respondents who always selected the outside option as their part-worths are not identified without prior information. Thus, our final sample size was 468 out of an original size of 501.

To analyze the conjoint data, we use a Bayesian hierarchical model and inference procedure. The hierarchical model we employed assumes that the conjoint price-worths are normally distributed. We can compute the posterior predictive distribution of part-worths as follows:

$$p\left(\beta|data\right) = \int \phi\left(\beta|\mu, V_\beta\right) p\left(\mu, V_\beta|data\right) d\mu \, dV_\beta \tag{5.1}$$

(5.1) reflects the influence of both the model (the normal random coefficient distribution) and

---

[12] This study was part of a wave of four other very similar conjoint studies on digital cameras each with the same screening criteria. For all studies in the wave, 16,185 invitations were sent to panelists, 6,384 responded. Of those who responded to the invitation, 2,818 passed screening and of those passing screening 2,503 completed the questionnaire. Thus, the overall completion rate is 89 per cent which is good by survey standards.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**LCD screen tilts and can be swung away from the camera body.**



Figure 4: Swivel Screen Attribute

the data through the posterior distribution of the normal hyper-parameters. The resulting distributions will be symmetric but of fatter tails that the normal. We also impose the constraint that the price coefficient is strictly negative.[13] For more information on Bayesian computations and hierarchical models, consult Rossi, Allenby, and McCulloch (2005).

Aggregate demand is found by taking the expectation of choice probabilities with respect to the distribution of preference parameters over the population. The distribution of the part-worths is the correct predictive distribution of preferences. In order to shed some light as to the substitution structures found in aggregate demand, we compute the posterior distribution of the market share elasticity matrix.

$$\frac{\partial MktShare(i)}{\partial lnp_j} = \frac{\partial}{\partial lnp_j} \int Pr\left(i|\beta\right) p\left(\beta|\mu, V_{beta}\right) d\beta \qquad (5.2)$$

We note that the elasticities in (5.2) are functions of the normal distribution hyper-parameters. We average the elasticities with respect to draws from the posterior distribution of the hyper-parameter to obtain the posterior mean of these elasticities is presented in Table 1. These own price elasticities are quite reasonable and imply a reasonably high markup of about three times cost. The cross-price elasticities are also quite high, showing a high degree of substitution between these brands.

---

[13]See Allenby, Brazell, Howell, and Rossi (2013) for details.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

| Price\Mkt Share | MktShare$_{Nikon}$ | MktShare$_{Canon}$ | MktShare$_{Sony}$ | MktShare$_{Panasonic}$ |
|---|---|---|---|---|
| $P_{Nikon}$ | -1.56 | .39 | .40 | .28 |
| $P_{Canon}$ | .37 | -1.79 | .53 | .44 |
| $P_{Sony}$ | .36 | .50 | -1.69 | .34 |
| $P_{Panasonic}$ | .34 | .55 | .46 | -1.73 |

Table 1: Posterior Mean of Aggregate Demand Elasticities

## 5.1   Changes in Equilibrium Prices and Shares

We have argued that economic value of a patented feature should be the incremental profits that accrue to the firm that practices the patent by incorporating the patented feature. Before showing changes in profits, we first explore changes in equilibrium prices and associated market shares. We can compute equilibrium prices with and without patented feature to provide an idea of how much of a price premium a firm can charge and how market shares will adjust in the new industry equilibrium.

Unlike the WTP computations, any equilibrium calculation will depend, as it should, on which brand and product configuration is being enhanced by addition of the patented feature. Here we consider the change in equilibrium outcomes from adding the swivel screen display to the Nikon base product (a Nikon brand camera with all attributes turned to their "lowest" value except, of course, price which is not constrained). The value conferred by the addition of the swivel screen with also depend on the configuration of other competing products. For illustration purposes only, we considered a competitive set that consists of three other brands (Canon, Nikon, and Panasonic) all similarly configured at the "base" level of attributes without the swivel screen feature. We set the marginal cost of product for all brands to be $75. When the swivel screen feature is added, marginal cost is increased by $5 to $80.

Table 2 presents the posterior means of the equilibrium prices computed with and without the swivel screen addition to the Nikon product. Adding the swivel screen gives the Nikon brand more effective market power relative to the other branded competitors who do not have the feature. Not only does Nikon find it optimal to raise price, the stronger competition and diminished value of the other brands forces them to lower prices in equilibrium.

Table 3 displays the equilibrium market shares for each of the four branded products and

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

|        | Nikon    | Canon    | Sony     | Panasonic |
|--------|----------|----------|----------|-----------|
| W/O SS | $211.44  | $188.44  | $173.68  | $182.40   |
| W SS   | $268.55  | $186.72  | $172.98  | $179.45   |
| Δ      | $57.11   | -$1.72   | -$0.70   | -$2.95    |

Table 2: Changes in Equilibrium Prices

|        | Nikon | Canon | Sony  | Panasonic | Outside Good |
|--------|-------|-------|-------|-----------|--------------|
| W/O SS | 10.7% | 13.0% | 13.1% | 10.2%     | 53%          |
| W SS   | 10.9% | 13.1% | 13.1% | 10.4%     | 52.5%        |

Table 3: Equilibrium Shares

the outside good calculated with and without the swivel screen display. Only very minor share changes are observed. The Nikon product with the swivel screen gains share, primarily from the outside alternative. As we have seen, the other brands reduce their prices in equilibrium, compensating for the greater desirability of the Nikon product. These share results are much different from a WTB analysis in which prices are not allowed to adjust. A WTB analysis will overstate the share gain for Sony from feature enhancement as the prices in a WTB analysis are not allowed to equilibrate in the new structure of competing products.

## 5.2   Changes in Equilibrium Profits

Our entire perspective on patent valuation is based on the incremental profits that accrue to a firm whose products include the patented feature. Obviously, the absolute dollar levels of profits depend on the size of the market. In order to present incremental profit in an interpretable manner, we will report the posterior distribution of the percentage change in profits. That is, we will again consider the addition of the swivel screen to the base Nikon product.

$$\%\Delta\pi = \frac{\pi_{\text{Nikon}}\left(p_{\text{SS}}^{*}\right) - \pi_{\text{Nikon}}\left(p_{\text{w/o SS}}^{*}\right)}{\pi_{\text{Nikon}}\left(p_{\text{w/o SS}}^{*}\right)}$$

To compute the posterior distribution of the percentage change in Nikon profits, we re-compute the price and share equilibria for each draw from the posterior distribution of the normal distribution hyper-parameters, $(\mu, V_{\beta})$. Figure 5 shows this posterior distribution

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

which is centered over about a 40 per cent increase in equilibrium profits due primarily to the price premium Nikon is now able to charge for the product. It should be emphasized that our equilibrium computations take into account the adjustments that will occur in the market after the introduction of the enhanced Nikon product. A 95 per cent posterior interval for per cent change in profit is quite wide, extending from about 26 per cent to 58 per cent. This reflects an important finding that, even with 500 respondents, we do not have a great deal of precision in the estimates of quantities relevant to patent valuation.

### 5.3   A Damages Point of View

The problem of calculating damages due to patent infringement can also be solved by application of our principle of economic valuation with incremental profits. Consider the case where Nikon owns the patent for the swivel screen technology. Sony infringes on this patent by introducing a Sony point of shoot camera with the same swivel screen feature. How has Nikon been injured by this act of infringement? The answer is clearly that Nikon is injured only to the extent that Nikon profits are lower than in the case where Sony does not infringe. Our demand models and equilibrium calculations allow us to calculate this loss of profits. Profits in the counterfactual where Sony does not infringe can be computed simply from the equilibrium prices and shares shown above. We then add the swivel screen to both the Nikon and Sony models and compute the associated price equilibrium. The percentage change in profits for Nikon represents the damages that can be attributed to the Sony infringement.

$$\%\Delta\pi_{Nikon} = \frac{\pi_{Nikon}\left(p^*_{\text{Nikon, Sony SS}}\right) - \pi_{Nikon}\left(p^*_{\text{Nikon only SS}}\right)}{\pi_{Nikon}\left(p^*_{\text{Nikon only SS}}\right)} \tag{5.3}$$

Here the notation, $p^*$, refers to the equilibrium prices. These equilibrium computations take into account that if Sony were to infringe Nikon might be forced to lower prices which is often termed the problem of price erosion. In sum, this method take full account of all of the different ways in which Sony's infringement might harm Nikon.

Figure 6 shows how Nikon profits will decline in the face of stiffer competition from the

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*



Figure 5: Posterior Distribution of Change in Nikon Equilibrium Profits from Addition of a Swivel Screen

Sony product with the infringing feature. The posterior mean is about a 13 per cent reduction in Nikon profits. When Sony adds the SS to its product, demand for the Sony product increases dramatically. If Nikon were to keep its price at the equilibrium price that would prevail with only the Nikon product having the swivel screen, then Nikon would lose significant share to Sony. However, we would not expect Nikon to simply stand by and not react to the more formidable competition from Sony. In response to the upgrade of the Sony product, Nikon would be forced to reduce price significantly. In the end, the new equilibrium results in Nikon reducing its price from $268.55 to $221.93 and maintaining about the same share as before the entry of the swivel screen Sony product. This illustrates the importance of undertaking equilibrium calculations rather than simply holding prices or shares constant.

## 5.4   WTP

As indicated in Section 3, the most common practice in product and feature valuation is a WTP analysis. We can easily use our digital camera data to reproduce this analysis for the swivel screen feature. WTP is a consumer-specific concept. Therefore, any WTP analysis for a set of consumers will have to summarize the distribution of WTP across consumers. A sensible summary would be to estimate the expected, or population average WTP, $\mathbb{E}[\text{WTP}]$. $\mathbb{E}[\text{WTP}]$ is the mean WTP across the population represented by our normal model of preferences.

$$\mathbb{E}[\text{WTP}|\mu, V_\beta] = \int \frac{\beta_f}{\beta_p} p(\beta_f, \beta_p | \mu, V_\beta) \, d\beta_f \, d\beta_p \tag{5.4}$$

To construct the posterior distribution of $\mathbb{E}[\text{WTP}]$, we use the draws from the posterior distribution of $(\mu, V_\beta)$. For each draw of the hyper-parameter, a very large number of draws are made from the Normal distribution of preferences (we used 10,000) to approximate the integral in (5.4). We do this for each draw from the posterior of the hyper-parameters to build up the posterior predictive distribution of the mean WTP.

Figure 7 shows the posterior distribution of the WTP. This distribution is centered over very large dollar values (mean of $63.21 and median of $62.80). There is a great deal of posterior uncertainty in the posterior in spite of the relatively large sample size (around 500)

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*



Figure 6: Posterior Distribution of the Change in Nikon Profits from Sony Infringement

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

and the orthogonal design with prices varying from \$79 to \$279. This suggests that vastly more informative studies would be required if the WTP concept were required to produce precise estimates. Of course, larger and more informative data would not overcome the conceptual limitations of WTP as a method of valuation.

The WTP analysis provides an estimate of the expected WTP which is larger than the equilibrium price premium reported in Table 2, according with the intuition that this is apt to be the case for situations in which the WTP of the marginal consumer is different than the average WTP.[14]

## 5.5   WTB

There are two possible WTB analyses which are relevant to patent valuation. The value of the patent to the firm practicing the patent (under the assumption of no infringement) might be informed by a WTB analysis in which we measure the gain in market share for a firm that adds the patented feature to an existing product. WTB would be computed simply by enhancing the product while holding the prices constant. If we take the example of adding the swivel screen feature to a Nikon product, then we have already seen that the primary source of value in an equilibrium analysis is not the gain in share made possible by the patented feature, but rather the increased price premia. Figure 8 shows a WTB analysis for the simple case of the addition of the swivel screen to the Nikon product. The WTB analysis shows that a very large increase in Nikon market share of almost 5 percentage points. This is a misleading estimate for two reasons: 1. Nikon will not find it profit-maximizing to keep price constant when the swivel screen feature is added and 2. competing brands will adjust their prices downward. We have already seen that the change in equilibrium shares is minimal when these price adjustments are made.

The second WTB analysis which could be undertaken is one to examine the loss of Nikon market share when Sony enters the market with an infringing product. That is, we consider

---

[14]While the difference between the equilibrium price premium and average WTP is relatively small in this example, if you add the swivel screen feature to the Sony brand the price premia will only be about one half of the $\mathbb{E}[\text{WTP}]$ estimate.



Figure 7: Posterior Distribution of $\mathbb{E}\left[\text{WTP}\right]$ ($)

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*



Figure 8: Posterior Distribution of Change in Nikon Share from Addition of the Swivel Screen Feature

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

the market share of the Nikon product in a market where all other competitors do not have the patented swivel screen feature and compare this with the market share of the Nikon product in a market where the Sony product also has the swivel screen feature. All share computations hold the price of the Nikon product constant at the equilibrium price that would prevail in the market prior to Sony infringement. In other words, Nikon does not respond by lowering price in the face of the Sony entry. This shows the flaw in the WTB analysis; it takes a static and non-equilibrium view. In recent, Apple V. Samsung litigation this method of an WTB analysis was employed. Figure 9 shows the posterior predictive distribution of the decline in Nikon share that can be attributed to the Sony infringement. The distribution is centered on about a 2 per cent decline in Nikon share. Equilibrium computations show no appreciable change in Nikon share because Nikon finds it optimal to lower its price in response to the Sony infringement as detailed in section 5.3.

# 6   Conclusions

Our perspective is that a patent for a product feature has value only to the extent to which firms can earn incremental profits from the addition of the patented feature. Incremental profits are determined not only by the value which individual consumers place on the patented feature but also on the nature and extent of competition in the relevant market. This means that in order to implement our economic paradigm for patent valuation, we will need to be able to estimate demand for product features and model competitive behavior. In many situations, observational data on the products, prices and quantity demanded will not be sufficient to estimate demand for patented features. In particular, the ideal data for demand estimation is consumer level data where product features are manipulated in an experimental fashion.

A conjoint survey attempts to simulate marketplace purchase behavior for a sample of consumers. Product features are manipulated according to an experimental design and the respondents are asked to choose from among hypothetical products define by product features. This eliminates many of the drawbacks of using observational data which is frequently

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*



Figure 9: Posterior Distribution of Change in Nikon Share when Sony Infringes

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

insufficiently informative to be useful in patent valuation. However, conjoint studies must be designed specifically for demand and profit calculations. In particular, the set of competitive brands available in the marketplace must be included and the choice tasks must include the "outside option."

While conjoint studies have been used in recent patent litigation, we are not aware of any conjoint analysis which has been supplemented by the appropriate equilibrium and profit calculations. Instead, Willingness To Pay and Willingness To Buy analyses are performed. In many instances, these analyses are misleading and do not well-approximate the true value of the product feature. WTP and WTB will typically overstate the price and share effects from the introduction of a patented product feature.

We illustrate our approach with conjoint data obtained from a survey on digital cameras. We find that WTB analyses and, to a lesser extent, WTP analyses do overstate the value of patented feature.

Finally, while we have demonstrated that conjoint data can be used to value patented features, the demands are greater on the design and analysis of conjoint data if the data is to be used for patent valuation. We have shown that the standard size samples are inadequate to precisely estimate profit-based measures of patent value. Further, a conjoint study must be designed specifically for profit and equilibrium calculations. This imposes requirements not often met by in standard industry applications of conjoint.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

# References

ALLENBY, G. M., J. D. BRAZELL, J. P. HOWELL, AND P. E. ROSSI (2013): "Economic Valuation of Product Features," Discussion paper, SSRN.

ALLENBY, G. M., AND P. E. ROSSI (1999): "Marketing Models of Consumer Heterogeneity," *Journal of Econometrics*, 89, 57–78.

BERRY, S., J. LEVINSOHN, AND A. PAKES (1995): "Automobile Prices in Market Equilibrium," *Econometrica*, 63(4), 841–890.

BOX, G. E. P., AND N. R. DRAPER (1987): *Empirical Model-Building and Response Surfaces*. John Wiley & Sons.

BRAZELL, J., C. DIENER, E. KARNIOUCHINA, W. MOORE, V. SEVERIN, AND P.-F. ULDRY (2006): "The No-Choice Option and Dual Response Choice Designs," *Marketing Letters*, 17(4), 255–268.

MCFADDEN, D. L. (1981): "Econometric Models of Probabilistic Choice," in *Structural Analysis of Discrete Choice*, ed. by M. Intrilligator, and Z. Griliches, pp. 1395–1457. North-Holland.

OFEK, E., AND V. SRINIVASAN (2002): "How Much Does the Market Value an Improvement in a Product Attribute," *Marketing Science*, 21(4), 398–411.

ORME, B. K. (2001): "Assessing the Monetary Value of Attribute Levels with Conjoint Analysis," Discussion paper, Sawtooth Software, Inc.

ORME, B. K. (2009): *Getting Started with Conjoint Analysis*. Research Publishers, LLC.

ROSSI, P. E., G. M. ALLENBY, AND R. E. MCCULLOCH (2005): *Bayesian Statistics and Marketing*. John Wiley & Sons.

SHEATSLEY, P. (1983): "Questionnaire Construction and Item Writing," in *Handbook of Survey Research*, ed. by P. H. Rossi, J. D. Wright, and A. B. Anderson, chap. 6, pp. 195–230. Academic Press, New York.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

Train, K. E. (2003): *Discrete Choice Methods with Simulation.* Cambridge University Press.

Trajtenberg, M. (1989): "The Welfare Analysis of Product Innovations, with an Application to Computed Tomography Scanners," *Journal of Political Economy*, 97(2), 444–479.

Viscusi, W. K., and J. Huber (2012): "Reference-dependent Valuations of Risk: Why willingness-to-accept exceeds willingness-to-pay," *Journal of Risk and Uncertainty*, 44, 19–44.

Yeager, D. S., J. A. Krosnick, L. Chang, H. S. Javitz, M. S. Levendusky, A. Simpser, and R. Wang (2011): "Comparing the Accuracy of RDD Telephone Surveys and Internet Samples Conducted with Probability and Non-Probability Samples," *Public Opinion Quarterly*, 75(4), 709–747.

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

# EXHIBIT 4

*CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER*

**Exhibit 4: Distribution of Price Preference for $49 vs. $99 Smartphone**

Source: Backup to Expert Report of John R. Hauser, dated August 11, 2013 ("Hauser Report Backup").