QUINN EMANUEL URQUHART & SULLIVAN, LLP
Charles K. Verhoeven (Cal. Bar No. 170151)
charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Kevin P.B. Johnson (Cal. Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Cal. Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

William C. Price (Cal. Bar. No. 108542)
williamprice@quinnemanuel.com
Michael L. Fazio (Cal. Bar No. 228601)
michaelfazio@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for SAMSUNG ELECTRONICS
CO., LTD., SAMSUNG ELECTRONICS
AMERICA, INC. and SAMSUNG
TELECOMMUNICATIONS AMERICA, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br>                    Plaintiff,<br>          vs.<br>SAMSUNG ELECTRONICS CO., LTD., a<br>Korean corporation; SAMSUNG<br>ELECTRONICS AMERICA, INC., a New<br>York corporation; SAMSUNG<br>TELECOMMUNICATIONS AMERICA,<br>LLC, a Delaware limited liability company,<br>                    Defendants. | CASE NO. 12-CV-00630-LHK<br><br>**DECLARATION OF JUDITH A.<br>CHEVALIER, PH.D.**<br><br>Date:   December 18, 2014<br>Time: 1:30 p.m.<br>Place:   Courtroom 8, 4th Floor<br>Judge: Honorable Lucy H. Koh |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................... 1

    A. Qualifications ............................................................................................ 1

    B. Assignment ............................................................................................... 1

    C. Summary of Conclusions ......................................................................... 2

II. INFERENCES FROM JURY'S DAMAGES AWARD ........................................ 3

III. ANALYSIS OF CHANGED CIRCUMSTANCES ............................................... 7

    A. Factors Addressed by Dr. Vellturo ......................................................... 7

        1. *Georgia Pacific* Factor 5 – The Commercial Relationship between the Licensor and the Licensee ................................................ 8

        2. *Georgia Pacific* Factors 9, 10, and 11 – The Advantages and Benefits of the Patent and the Extent of Use by the Infringer .................... 10

    B. Additional Relevant Factors Not Addressed by Dr. Vellturo ................ 12

        1. *Georgia Pacific* Factors 8 and 12 – Commercial Success and Profitability of the Accused Products ........................................... 14

        2. *Georgia Pacific* Factor 6 – Effect of Selling the Patented Specialty in Promoting Sales of Other Products of the Licensee .............................. 16

        3. *Georgia Pacific* Factor 4 – Apple's Patent Policy ...................................... 17

        4. *Georgia Pacific* Factor 13 – Portion of Profits Attributable to Patents-at-Issue .......................................................................... 19

IV. ONGOING ROYALTY RATE .............................................................................. 20

i

I, Judith A. Chevalier, declare as follows:

# I.    INTRODUCTION

## A.    Qualifications

1.    I am the William S. Beinecke Professor of Economics and Finance at the Yale University School of Management.   I also hold a joint courtesy appointment at the Yale Department of Economics.   I received my undergraduate degree in Economics from Yale University in 1989 and my Ph.D. in Economics from the Massachusetts Institute of Technology in 1993.   My curriculum vitae, a true and correct copy of which is attached as Exhibit 1, gives more biographical details and lists my writings.   I previously submitted an expert report in this case (the "Chevalier Initial Report")[1] and testified at trial in April 2014.[2]

## B.    Assignment

2.    Apple Inc. ("Apple") has moved to have the Court order Samsung Electronics Company, Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Telecommunications America, LLC ("STA") (collectively, "Samsung") to pay ongoing royalties related to U.S. Patent Number 5,946,647 (the "'647 Patent"), U.S. Patent Number 8,046,721 (the "'721 Patent"), and U.S. Patent Number 8,074,172 (the "'172 Patent").   I have reviewed Apple's Brief Regarding Ongoing Royalty Rates[3] and the Declaration of Christopher Vellturo ("Vellturo Declaration")[4] cited therein.

---

[1]  Expert Report of Judith A. Chevalier, September 13, 2013.   Certain underlying calculations to my report were updated on February 17, 2014; I refer to updated versions of these exhibits as "Updated Exhibits."   I also submitted two declarations dated March 7, 2014 and May 23, 2014.

[2]  Trial Transcript, at 2361-2507.   I have also submitted a declaration related to the permanent injunction proceedings.   Declaration of Judith A. Chevalier, Ph.D. in Opposition to Apple's Motion for Permanent Injunction, June 6, 2014 ("Permanent Injunction Declaration").

[3]  Apple's Brief Regarding Ongoing Royalty Rates, September 22, 2014.

[4]  Declaration of Christopher A. Vellturo, Ph.D., in Support of Apple's Brief Regarding Ongoing Royalty Rates, September 22, 2014 ("Vellturo Declaration").   Dr. Vellturo previously submitted an expert report in August 2013 and a supplemental report in February 2014.   Expert Report of Christopher A. Vellturo, Ph.D., August 12, 2013 ("Vellturo Initial Report"); Supplemental Expert Report of Christopher A. Vellturo, Ph.D.,   February 17, 2014 ("Vellturo Supplemental Report").   Dr. Vellturo also testified at trial in April 2014.   Trial Transcript, at 1198-1440.

3.      I submit this declaration in support of Samsung's Opposition to Apple's Motion for Ongoing Royalties.  In particular, I have been asked to address the opinions provided in the Vellturo Declaration, including those opinions Dr. Vellturo offered as to the form of damages reflected in the jury verdict and as to the impact of changed circumstances on the appropriate ongoing royalties on the '647, '721, and '172 patents.

**C.      Summary of Conclusions**

4.      Dr. Vellturo has concluded that the jury verdict reflects running royalty rates of $2.75 for the '647 patent, $2.30 for the '172 patent, and $1.41 for the '721 patent and were derived, in part, based on the royalty opinion he presented to the jury.  He also has opined that "developments since the original hypothetical negotiation in 2011…would put upward pressure on the ongoing royalty rates in a new hypothetical negotiation," and finds that an ongoing royalty rate of $2.75 for the '647 patent, $2.30 for the '172 patent, and $1.41 for the '721 patent would be "conservative."[5]

5.      I do not agree that the jury verdict implies an award of a running royalty rate. Instead, it is more plausible that the jury's verdict reflects a lump sum reasonable royalty. Moreover, Dr. Vellturo's explanation of the jury verdict contains several flaws; it does not explain how the jury derived the damages figures and it does not account for steps the jury evidently did take in reaching the damages award.

6.      Further, I do not agree with Dr. Vellturo's conclusion that developments since the hypothetical negotiation in 2011 would "put upward pressure on the ongoing royalty rates" in a hypothetical negotiation occurring in late 2014.  First, Dr. Vellturo's analysis of changed economic circumstances relies largely on evidence that was not only incorporated in his original analysis but was also emphasized to the jury at trial, and is thus already reflected in the verdict. Second, Dr. Vellturo fails to consider other developments since the hypothetical negotiation in 2011 – and since the jury verdict in May 2014 – that would put downward pressure on the ongoing royalty rates.   These include the fundamentally changed nature of the U.S. smartphone

---

[5] Vellturo Declaration, at ¶ 6.

2

marketplace as ownership has become widespread, the declining profitability of products incorporating the technology at issue, and the continued expansion of the set of features incorporated in a smartphone.

7.    Even assuming the jury award does reflect running royalty rates that are related to the royalty numbers presented by Dr. Vellturo at trial, simply adjusting Dr. Vellturo's model to account for the passage of time and some of the accompanying changed circumstances would result in royalty rates of no more than $0.68 to $1.12 on the '647 patent, $0.37 to $0.60 on the '721 patent, and $0.60 to $0.98 on the '172 patent.[6]   These downward adjustments, however, do not account for the recent shift in Apple's patent policy.   They also do not account for Samsung's demonstrated ability to introduce successful smartphones that do not infringe the '721 and '172 patents; the implementation of these non-infringing alternatives prior to the 2014 hypothetical negotiation implies that ongoing royalty rates for the '721 and '172 patents should be *de minimis*.

## II.    INFERENCES FROM JURY'S DAMAGES AWARD

8.    Dr. Vellturo concludes that the "best explanation for the jury's verdict is that the jury sought to calculate a per-unit reasonable royalty separately for each patent using the following rates: $2.75 for the '647 patent, $2.30 for the '172 patent, and $1.41 for the '721 patent."[7]   He further adds that:

> the jury's damages verdict is best explained by the following steps: (1) the jury reached agreement on per-unit royalties for each patent, (2) the jury calculated the ratio between its rates and my royalty rates; (3) the jury applied those ratios to the reasonable royalty damages for each product provided at PX222A1.24, which was discussed during closing arguments; and (4) the jury modified the amount in the last line ("Stratosphere") to obtain a round total damages figure to be included in the answer to question 9 on the Amended Final Verdict.[8]

Dr. Vellturo's explanation, however, contains several flaws.   In particular, his explanation does not explain the actual damages figures in the jury verdict or certain steps that the jury appears to have taken.

---

[6]  Exhibits 4 and 5.
[7]  Vellturo Declaration, at ¶ 6.
[8]  Vellturo Declaration, at ¶ 18.

9.      One flaw is that applying the steps proposed by Dr. Vellturo does not generate the numbers on the jury's final verdict form.[9]   Consider, for example, the first entry on the jury verdict for question 10a – the damages associated with the Admire's infringement of the '647 patent.[10]   According to the steps described by Dr. Vellturo, damages for the Admire's infringement of the '647 patent would have been calculated as follows:

$$= \left[\left(\begin{array}{c}\text{jury agreed per} \\ \text{unit royalty rate} \\ \text{for '647 patent}\end{array}\right) \Big/ \left(\begin{array}{c}\text{Dr. Vellturo's per} \\ \text{unit royalty rate} \\ \text{for '647 patent}\end{array}\right)\right] * \left[\begin{array}{c}\text{damages figure for} \\ \text{Admire on '647 patent} \\ \text{from PX222A1}\end{array}\right]$$

$$= \left[(\$2.75/\text{unit})/(\$12.49/\text{unit})\right] * \left[\$34,096,139\right]$$

$$= \$7,507,156.31$$

10.     The corresponding damages award provided by the jury, however, is $7,599,178, a difference of greater than $90,000.   Exhibit 2 shows the implementation of these steps for each of the individual damages awards presented in question 10a of the jury verdict form.   Dr. Vellturo's proposed steps do not generate a single match.   The differences, depending on the specific patent and product combination, are as much as $1 million for a single patent and product (*e.g.*, the Galaxy S III on the '647 patent).

11.     The differences between the jury's damages figures and those generated by Dr. Vellturo's suggested steps are not attributable to rounding of the ratio calculated in his step two. In his report, Dr. Vellturo refers to the number associated with step two of the '647 calculations as "22%."[11]   The more precise figure, when rounded to the eighth decimal place is 22.017614% ([$2.75/unit]/[12.49/unit]).   However, as shown in Exhibit 2, following the steps described by Dr. Vellturo and employing different methods of rounding (*e.g.*, rounding to the first decimal place, the second decimal place, etc., up to the sixth decimal place) do not lead to the actual damages figures calculated by the jury for even one of the patent-product combinations listed in question

---

[9]  Amended Verdict Form, May 5, 2014, pp. 8-9.

[10]  Amended Verdict Form, May 5, 2014, pp. 9.

[11]  Vellturo Declaration, at ¶ 17 and Exhibit 2.

4

10a of the jury verdict form.   Thus, despite his claims, the steps proffered by Dr. Vellturo do not explain the very precise damages numbers in the jury's verdict form.

12.   A second flaw with Dr. Vellturo's assessment is he does not explain certain steps that the jury appears to have taken.   As I described in my Permanent Injunction Declaration,[12] certain calculations made by the jury do not require speculation regarding rounding.   For example, of the $119,625,000 in total damages awarded, the $98,690,625 associated with the '647 patent is *precisely* 82.5% (without any rounding).   Similarly, the $2,990,625 in damages for the '721 patent is *precisely* 2.5% of the total and the $17,943,750 in damages for the '172 patent is *precisely* 15.0% of the total.   The natural inference is that the jury started with a total damages number, allocated that total across patents and then, in order to fill out Question 10a of the jury verdict form, allocated across the specific devices they found to infringe.[13]   Dr. Vellturo's suggestion that the jury started by independently choosing royalty rates for each of the three patents (in his step 1) is entirely at odds with the precise apportionment of the damages total across the three patents.

13.   As I stated at trial, the analysis summarized in my expert report revealed that the large majority of license agreements in the industry include lump sum payments and not running royalties.   This evidence suggests a lump sum payment would be appropriate here.   Further, as

---

[12] Permanent Injunction Declaration, ¶¶ 66-68.

[13] Another problem with Dr. Vellturo's assessment of what the jury did to calculate damages is that his fourth and final step does not serve any evident purpose.   As noted above, Dr. Vellturo suggests that the fourth step was the following:   "the jury modified the amount in the last line ("Stratosphere") to obtain a round total damages figure to be included in the answer to question 9 on the Amended Final Verdict."   Vellturo Declaration, at ¶ 18. This step, however, raises an obvious question.   If the jury calculated damages by starting with a specific royalty rate for each patent and multiplying this rate by the number of infringing units (or an approximation thereof), why modify the Stratosphere line to get "a round total damages figure"?   Doing so does not save any mathematical steps.   Dr. Vellturo's inclusion of this step implies that the jury was somehow motivated to have a damages total that was a round number.   He does not, however, explain why. The jury did not receive any such instruction or recommendation in the Final Jury Instructions and neither damages expert presented round damages numbers at trial.   Final Jury Instructions, April 27, 2014.   Regardless, the suggestion that the jury rounded would imply that the jury was not, ultimately, driven by the principle that royalty payments associated with a given patent should be awarded based on a constant per-unit royalty rate.

stated in my Permanent Injunction Declaration,[14] certain inferences from the jury's verdict suggest that the damages award was most likely a lump sum royalty. First, as described above, the jury appears to have used a top-down approach to allocate damages by starting with a total damages award and then allocating that total across patents and products. Second, the jury calculated damages on the Stratosphere as a residual – a point on which Dr. Vellturo and I appear to agree.[15] Such a calculation is consistent with a lump sum, top-down approach but is not easily reconciled with a damages calculation based on specific per-unit royalty rates, like the theory proposed by Dr. Vellturo. Third, as acknowledged by Dr. Vellturo, the jury's verdict does not provide a uniform per-unit royalty rate for any of the three patents.[16] This is again consistent with a top-down approach and suggests that the per-patent, per-product amounts were not calculated by multiplying accused units by a constant per-patent royalty rate. The jury's revision of its original damages award, which was not addressed by Dr. Vellturo in his Declaration, provides further evidence that the award was a lump sum payment. Upon having been informed that it failed to calculate damages for one product for one patent, the jury simply reallocated across products to keep its damages total the same.[17] Consistent with a lump sum award, the jury did not change either the total damages award or the damages allocated to the '172 patent to reflect the unit sales associated with the Galaxy S II (JX32) that were not allocated damages in the jury's initial verdict.

14. In sum, Dr. Vellturo has not demonstrated that the jury determined damages using patent-specific running royalty rates. Instead, it is more plausible that the jury's verdict reflects a lump sum reasonable royalty, consistent with the instructions provided to the jury that the royalty could be "a one-time lump sum payment that the infringer would have paid at the time of the

---

[14] *See* Permanent Injunction Declaration, at ¶¶ 66-68.

[15] Vellturo Declaration, at ¶ 18; Permanent Injunction Declaration, at ¶ 67 (footnote 95).

[16] Exhibit 3. *See also,* Permanent Injunction Declaration, at ¶¶ 66-68, Exhibit 5. Dr. Vellturo admits that the per-patent, per-product amounts were not calculated by multiplying accused units by a constant per-patent royalty rate, as implied by a running royalty calculation. Vellturo Declaration, at ¶¶ 19-22 ("I have examined and cannot identify any consistent relationship between any single per-unit royalty and the unit sales figures provided to the jury by me or Dr. Chevalier.").

[17] *See* Original Verdict Form, pp. 8-9 and Amended Verdict Form, pp. 8-9. *See also* Permanent Injunction Declaration, at ¶¶ 66-68.

hypothetical negotiation for a license covering all sales of the licensed product both past and future."[18]

## III.   ANALYSIS OF CHANGED CIRCUMSTANCES

15.     As stated above, I do not agree with Dr. Velluro's conclusion that the jury determined royalty rates for each of the patents and thus that these can be used as a starting point for calculating ongoing royalty rates.   Nevertheless, even if one were to accept the rates Dr. Vellturo proposes as a starting point, I disagree with his analysis of changed circumstances.

16.     At trial, the jury was told that the hypothetical negotiations for the patents-in-suit would have occurred in or around August 2011.[19]   The final jury verdict is dated May 5, 2014.[20] I understand that the final judgment in this matter may occur in late 2014.[21]   Dr. Vellturo's analysis of ongoing royalties is largely based on the impact of "changes in the economic circumstances of the parties since the date of the hypothetical negotiations and the verdict."[22]   In particular, Dr. Vellturo examined "factors that would be important to the parties in light of changes that occurred after August 2011, including changes that occurred after the verdict."[23]   In my analysis described below, I address Dr. Vellturo's conclusions regarding the changed economic circumstances for Samsung and Apple between 2011 and late 2014 and analyze additional relevant factors not considered by Dr. Vellturo.

### A.     Factors Addressed by Dr. Vellturo

17.     Having argued that the final jury verdict reflects per unit royalty rates of $2.75 for the '647 patent, $2.30 for the '172 patent, and $1.41 for the '721 patent, and that these rates were

---

[18] *See* Final Jury Instructions, at Jury Instruction No. 41 ("A second way to calculate a royalty is to determine a one-time lump sum payment that the infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product both past and future…When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and future infringing sales.").

[19] *See, e.g.,* Trial Transcript, at 1218; PDX92.8.

[20] Amended Verdict Form, May 5, 2014.

[21] Order Re: Samsung's Motion for Extension of Time," September 16, 2014.   Dr. Vellturo stated that the hypothetical negotiation would be in the summer or fall of 2014.   My analysis is not sensitive to when in 2014, after trial, the hypothetical negotiation occurs.

[22] Vellturo Declaration, at ¶ 5.

[23] Vellturo Declaration, at ¶ 24.

based in part on the reasonable royalty opinion offered by him at trial, Dr. Vellturo opined that "developments since the original hypothetical negotiation in 2011…would put upward pressure on the ongoing royalty rates in a new hypothetical negotiation,"[24] and that an award of the same per unit amounts going forward would be "conservative and more than justified by the present circumstances either as an expression of the jury's conclusion or as a rate justified by the present economic circumstances."[25]   Those conclusions were based in part on Dr. Vellturo's analysis of *Georgia Pacific* Factors 5, 9, 10, and 11.

### 1. *Georgia Pacific* Factor 5 – The Commercial Relationship between the Licensor and the Licensee[26]

18.   Among the factors that Dr. Vellturo deems significant to the determination of the appropriate ongoing royalties is the increase in the degree of competition between Apple and Samsung since 2011.[27]   However, evidence of this was largely presented at trial.

19.   According to the Vellturo Declaration "[t]he increase in intensity [in competition] would place upward pressure on the royalty rate that would apply in 2014 as compared to 2011."[28] In support of that assertion, Dr. Vellturo relies for the most part on 2011 to early 2014 data showing increases in Samsung U.S. sales and smartphone market shares and increases in combined Apple-Samsung U.S. market shares.[29]   He implies that this information would not have been fully considered as of the 2011 hypothetical negotiation considered by the jury.[30]

20.   However, evidence presented by Dr. Vellturo at trial already made it clear to the jury he believed actual competition through trial between Samsung and Apple was relevant.

---

[24]   Vellturo Declaration, at ¶ 6.
[25]   Vellturo Declaration, at ¶ 6.
[26]   *Georgia Pacific* Factor 5: The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
[27]   Vellturo Declaration, at ¶¶ 26-34.
[28]   Vellturo Declaration, at ¶ 34.
[29]   Vellturo Declaration, at ¶¶ 27-29.
[30]   *See, e.g.*, Vellturo Declaration, at ¶ 28.   ("Samsung's market share (within a growing market) has grown consistently since 2011 to the point that Samsung has become entrenched as the primary competitor to Apple. This was forecast by Samsung's internal documents in 2011 but became more and more certain as time passed since 2011.")

For example, according to Dr. Velluro's trial testimony, one of the four "key factors that lead to the [over] $2 billion of damages" that Dr. Velltura opined was due to Apple for accused sales through April 2014 was that "**Apple and Samsung have been head-to-head direct competitors during this period**, and, in fact, most of the other competitors have taken a very secondary role…"[31]   Likewise, in discussing this *Georgia Pacific* factor at trial, Dr. Velltura testified, "What we've seen here is that there's not only a substantial and direct competition, it's been characterized by Samsung as a two horse race….**So there's a lot of competition between the parties here, and that would play an important role in the negotiation.**"[32]   In addition, I testified at trial that "[w]e know that Apple and Samsung are fierce competitors in this market and we need to take that into account in setting the royalty…"[33]   Despite what Dr. Velltura insinuates in the Velltura Declaration,[34] the jury was presented with ample evidence regarding the competition and market performance of Apple and Samsung through the end of 2013 and was not told to ignore this information when considering the outcome of a hypothetical negotiation in 2011.   To the contrary, all testimony at trial suggested that they should take this into account.

21.   In summary, there is no meaningful change in the relative competitiveness between Apple and Samsung from the period considered by the jury and this hypothetical negotiation date.[35]

---

[31] Trial Transcript 1213-14. (emphasis added).

[32] Trial Transcript 1306. (emphasis added).

[33] Trial Transcript 2433. (emphasis added).

[34] Dr. Velltura opines "[w]hile both parties likely expected the market to continue its strong growth, any uncertainty surrounding those expectations has been eliminated as we have observed the actual market growth since 2011," suggesting that the jury did not consider, or considered as an uncertain projection, Apple and Samsung's actual market growth through 2013.   Velltura Declaration, at ¶ 27.

[35] The Velltura Declaration presented some "new" evidence regarding the state of the smartphone market in late 2014.   However, this evidence is not substantially different from the evidence presented at trial.   For example, the Velltura Declaration states that "in the second quarter of 2014, Samsung commanded 36% of U.S. smartphone shipments, a further increase from its 2013 levels…"   Velltura Declaration, ¶ 31.   This is not substantially different from Dr. Velltura's testimony at trial that "[Samsung's] share really increases substantially as we get into the period of 2011, '12, and '13" and his accompanying demonstrative that showed Samsung's U.S. market share at close to 35% in Q2 2012 and Q2 2013.   Trial Transcript, at 1242; PDX92.8. Dr. Velltura also points to evidence that, in May 2014, Apple and Samsung "commanded almost

9

1

        2.      *Georgia Pacific* **Factors 9, 10, and 11 – The Advantages and Benefits of
                the Patent and the Extent of Use by the Infringer**[36]

2

3       22.     At trial, Dr. Vellturo introduced the concept of "revealed preference" in describing

4   his royalty analysis, implying that his opined reasonable royalty was supported by  Samsung's

5   continued use of the '647 patent, instead of alternative technologies.[37]   Dr. Vellturo reiterated this

    assertion in the Vellturo Declaration, stating that:

6

7       As I discussed at trial, a choice to continue using a patented technology despite
        alternatives that are inexpensive and easy to implement reveals a manufacturer's
8       belief about the value of that technology. Continued use of an infringing
        technology under those circumstances will on balance place upward pressure on the
9       royalty rate the parties would reach in a hypothetical negotiation.

10      My interpretation of Samsung's continued use of the patented technology despite
        the possibility of switching to other substitutes is a straightforward application of
11      the economic theory of revealed preference, which states that economic actors
        reveal their preference patterns by their market behavior.[38]

12

13

14

---

15  70% of smartphone subscribers in the U.S."   Vellturo Declaration, at ¶ 32.   However, this was
    already considered at trial and in Dr. Vellturo's analysis.   *See, e.g.,* Trial Transcript, at 1242 ("the
16  industry has basically become a two horse race between [Samsung] and Apple and that's where
    the competition really resides.").   In addition, this combined share is not dramatically different
17  than it was in 2013.   *See* https://www.comscore.com/Insights/Press-Releases/2013/6/comScore-
    Reports-May-2013-US-Smartphone-Subscriber-Market-Share (viewed 10/2/2014).

18  [36] *Georgia Pacific* Factor 9: The utility and advantages of the patent property over the old
    modes or devices, if any, that had been used for working out similar results.  *Georgia Pacific*
19  Factor 10: The nature of the patented invention; the character of the commercial embodiment of it
    as owned and produced by the licensor; and the benefits of those who have used the invention.
20  *Georgia Pacific* Factor 11: The extent to which the infringer has made use of the invention; and
    any evidence probative of the value of that use.
21  [37] Trial Transcript, at 1250-52.
    [38] Vellturo Declaration, at ¶¶ 35-36.   Dr. Vellturo also stated:
22
        Despite its demonstrated ability to do so, despite opportunities to make changes
23          when new products were introduced, and despite numerous legal and related
            developments, including the jury's verdict, that gave Samsung reasons to make a
24          change, Samsung chose to continue infringing the '647 patent in its products,
            including through the ongoing sale of the Galaxy S3. Samsung's continued sale
25          of products that include the '647 patent's technology in spite of the alternatives
            suggested by witnesses called by Samsung (and Apple) show even more
26          significantly the value of this technology. These decisions reflect a high internal
            valuation by Samsung that would again put upward pressure on the royalty rate
27          that would result from a negotiation with Apple. Vellturo Declaration, at ¶ 42.

28

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

23.     First, I understand that Samsung asserts that it has redesigned the accused browser and messenger applications in the products that were found to infringe the '647 patent, and contends that the redesigned products do not infringe.[39]

24.     Second, Dr. Vellturo continues to misapply the concept of revealed preference. According to Dr. Vellturo, the concept of revealed preference is that "when you look at the economic decisions that people make and that companies make, what they actually do tells you something important…that they believe that what they actually choose to do is better than the alternatives they could have selected."[40]   From that, he incorrectly concludes that Samsung's continued use of the '647 technology implies that this technology is "better for [Samsung] than the alternatives that had been identified"[41] and is "an important feature that [Samsung] **needed to continue to use to remain in business**."[42]

25.     Dr. Vellturo's reasoning is flawed because he has failed to account for other factors that could explain Samsung's decision not to employ alternative designs.   I understand that Samsung's infringement remains in dispute pending appeals.   As was stated in trial, Samsung may continue to use the technology covered by the '647 patent not because it is "far better" than the available non-infringing alternatives, but because "they don't think they infringe" and "they don't want their competitor to dictate what features they put in the phone."[43]   Acquiescing to the demands of a competitor may open the door for future demands, which could prove prohibitively

[39] *See* Declaration of Kevin Jeffay, Ph.D. in Support of Samsung's Opposition to Apple's Brief Regarding Ongoing Royalty Rates for U.S. Patent No. 5,946,647, October 5, 2014.

[40] Trial Transcript at 1250-51.   The Samuelson paper cited by Dr. Vellturo is an analysis of consumer preferences.   Samuelson demonstrates that consumer preferences can be inferred from the information that is revealed when a consumer chooses not to buy a good in his or her budget set.   Firms have neither preferences nor budget sets and Samuelson's mathematical proof in the cited paper has nothing to do with drawing inferences from firm behavior.   Dr. Vellturo is confusing the concept of "revealed preference" with the idea of assuming a firm is pursuing profit maximization and then making inferences from observations of the firm's behavior.   Samuelson, Paul A. "Consumption Theory in Terms of Revealed Preference," *Economica*, November 1948, 243-253.

[41] Trial Transcript, at 1252.

[42] Trial Transcript, at 1253 (emphasis added).

[43] Trial Transcript, at 2506.   *See also,* Trial Transcript, at 2474.

11

expensive due to the expanding number of technologies embodied in modern smartphones.[44] Consequently, Dr. Vellturo's claim that Samsung continues to use the '647 functionality, even if true, would not imply "a high internal valuation" by Samsung.[45]

26.     In addition, I understand there are no Samsung products currently being sold that are accused of infringing the '172 and '721 patents and I have seen no marketplace evidence that products sold without this technology are less acceptable to consumers.  While Dr. Vellturo incorrectly asserts that any future use of the technology covered by the '172 and '721 patents would imply that "Samsung places significant additional value"[46] on this technology, Samsung's demonstrated success using alternative technologies suggests the opposite.[47]

**B.     Additional Relevant Factors Not Addressed by Dr. Vellturo**

27.     In addition to the flaws associated with Dr. Vellturo's analysis of the *Georgia Pacific* factors described above, Dr. Vellturo failed to address other relevant factors that are affected by the changed circumstances since the original 2011 hypothetical negotiation.

28.     According to Dr. Vellturo, one of the "key factors" that was "highly relevant in considering the likely outcome of a hypothetical negotiation to the Asserted Patents in the 2011 time frame"[48] was that the smartphone marketplace was, from August 2011 through the end of 2013, in a "critical period of competition" for determining future market share in the smartphone industry.[49]  In both the Vellturo Initial Report and at trial, Dr. Vellturo opined that this "critical period" would drive reasonable royalty damages higher at a hypothetical negotiation between Apple and Samsung in 2011.[50]  For example, Dr. Vellturo testified at trial that the statement from

---

[44]  Trial Transcript, at 2506.

[45]  Vellturo Declaration, at ¶ 42.

[46]  Vellturo Declaration, at ¶ 44.

[47]  In addition, given demonstrated evidence regarding Samsung's ability to implement non-infringing alternatives to the '172 and the '721 patents, Dr. Vellturo should have modified his assumption that it would take four months to implement alternatives for these patents going forward.  Vellturo Initial Report, at Exhibits 26-27.

[48]  Vellturo Initial Report, at ¶ 345.

[49]  Trial Transcript, at 1214.  Declaration of Christopher Vellturo [Preliminary Injunction phase], February 8, 2012, at ¶ 50.  *See also* ¶¶ 5, 19, 37-38.

[50]  Dr. Vellturo stated in the Vellturo Initial Report:

an internal Samsung document from September 2011 that "carriers will compete to capture the 60 million U.S. customers who will buy their first smartphone in 2012" was significant to his analysis:

> Because, of course, [2012] is the time period where the competition between Samsung and Apple's about to intensify because the accused units now are being launched into the marketplace. And the competition for first-time buyers is particularly important because once they buy their first phone, they're very likely, it's not guaranteed, but they're very likely to make their next purchase from a similar manufacturer, and maybe potentially even buy other products and services from that manufacturer too.   So that first sale is absolutely critical.[51]

29.     Essentially, Dr. Vellturo's argument regarding first-time buyers is that the patented technologies would be particularly valuable to Samsung to use and particularly costly to Apple to license because the technologies could boost Samsung's sales in a market heavily comprised of first-time buyers.   Those first-time buyers would then, due to this initial purchase of a Samsung product, be less likely to purchase Apple products in the future.   This argument is also fundamental to Dr. Vellturo's ecosystem adjustment, which further increases the royalty rates that he opined were reasonable at trial.[52]

30.     While I disagree with the analysis Dr. Vellturo presented at trial, and specifically disagree that the patented functionalities cause consumers to purchase Samsung smartphones, an updated version of Dr. Vellturo's *Georgia Pacific* analysis clearly should reflect the changed

---

"Thus, Apple would have considered the profits it would lose on sales that would go to Samsung if it granted a license and the customers it would lose as a result. For Apple as for Samsung, this concern would have been amplified by the fact that the smartphone marketplace was entering the high-growth stage of mass adoption by first-time buyers that Apple could win to its ecosystem were it not to license Samsung…"   Vellturo Initial Report, at ¶ 414.
Dr. Vellturo also presented this opinion in his preliminary injunction declaration.  *See, e.g.,* Declaration of Christopher Vellturo [Preliminary Injunction phase], February 8, 2012, at ¶¶ 50, 66, 73.

[51] Trial Transcript, at 1234-35.   Also, in the Vellturo Initial Report, Dr. Vellturo opined that "key considerations [of the 2011 hypothetical negotiation]" included "[t]he timing of the license would be particularly important, as the smartphone marketplace was entering into a critical phase wherein vast numbers of first-time smartphone buyers would be committing to a device supplier and operating platform." Vellturo Initial Report, at ¶¶ 343-345.

[52] *See, e.g.,* Vellturo Initial Report, at Exhibit 27; Trial Transcript, at 1310, 1317; PDX92.59.

13

characteristics of the marketplace.  However, in the Vellturo Declaration, Dr. Vellturo failed to account for the fact that, by the second half of 2014, the smartphone product lifecycle would be moving beyond what Dr. Vellturo has called the "critical period of competition."[53]  I discuss these changes and their implications for Dr. Vellturo's analysis below.

### 1. *Georgia Pacific* Factors 8 and 12 – Commercial Success and Profitability of the Accused Products[54]

31.     In describing *Georgia Pacific* Factors 8 and 12 at trial, Dr. Vellturo reiterated that a damages analysis should take into account his assertion that "the fall of 2011 is an extremely important time in this marketplace because the market is growing very fast for smartphones and a lot of people are buying their first smartphone."[55]  Dr. Vellturo implied that this would have put upward pressure on the reasonable royalty agreed to at a hypothetical negotiation around this time.[56]

32.     However, Dr. Vellturo's own analysis shows that a much smaller proportion of smartphone buyers going forward from the date of trial will be first-time smartphone buyers than at the time of the original hypothetical negotiation in 2011.[57]  That is, what he called the "absolutely crucial" first sale, which represented a substantial fraction of buyers looking forward

---

[53] Declaration of Christopher Vellturo [Preliminary Injunction phase], February 8, 2012, at ¶ 50.  *See also* ¶¶ 5, 19, 37-38.

[54] *Georgia Pacific* Factor 8:   The established profitability of the product made under the patent; its commercial success; and its current popularity. *Georgia Pacific* Factor 12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

[55] Trial Transcript, p. 1307 and PDX92.45.

[56] Trial Transcript, at 1214 [describing the period from August 2011 through the end of 2013 as "a particularly significant period for Samsung…to have come in and competed by infringing with Apple"].

[57] *See* Vellturo Initial Report, Exhibit 23-A showing the number of first-time smartphone adopters is projected to decline substantially in 2014.   The Vellturo Initial Report also observed the "first-time purchaser entries into the U.S. smartphone marketplace entered into a critical crescendo in the mid-2011 to early 2012 time frame, which has become more attenuated in late 2012 and early 2013 **and is expected to further taper off in 2014**." Vellturo Initial Report, ¶ 354 (emphasis added).   *See also*, Declaration of Christopher Vellturo [Preliminary Injunction phase], February 8, 2012, at ¶¶ 34-36.

14

1  from the 2011 hypothetical negotiation date, will be expected to represent a much smaller fraction

2  of buyers looking forward from a hypothetical negotiation date in 2014.

3        33.    Dr. Vellturo also emphasized at trial that an important factor affecting a

4  hypothetical negotiation in 2011 was that this period was a particularly crucial time for Samsung

5  to establish itself as a leader in the smartphone industry.[58]  Similarly, Dr. Vellturo asserted in his

6  expert report that in 2011 "Samsung faced a critical juncture in its strategic trajectory during the

7  relevant time period – with the license from Apple, it would have the prospect of leapfrogging

8  other second-tier device suppliers; without the license, it would be relegated to continue its

9  second-tier status."[59]  However, with Samsung now firmly established as a top-two player

10  worldwide and in the U.S. marketplace in 2014, it is clearly no longer the case (if it ever were) that

11  Samsung would be "relegated to continue its second-tier status" without a license from Apple.[60]

12        34.    Despite these clearly changed circumstances, Dr. Vellturo fails to acknowledge that

13  this "critical period," for the smartphone market as a whole and for Samsung in particular, has

14  already passed by the time of a hypothetical negotiation in late 2014.  Thus, as Dr. Vellturo's

15  initial analysis clearly implies that the "extremely important time in this marketplace"

16  characterizing the hypothetical negotiation in 2011 should lead to increased royalties, this analysis

17  should be updated for a hypothetical negotiation in 2014 to reflect the fact that this "critical time"

18  has passed.  Dr. Vellturo failed to consider this in the Vellturo Declaration.

19        35.    Also relevant to Dr. Vellturo's initial reasonable royalty analysis was the

20  profitability of Apple's and Samsung's products allegedly using the patents-at-issue.  In Dr.

21  Vellturo's presentation at trial, the profitability of these products would have been considered at

22  the hypothetical negotiation in 2011: "[s]o they would have factored in the value of those [lost]

23  sales into the negotiation, and this number is that per unit expected profit number they would have

24

---

25      [58] For example, Dr. Vellturo testified "…starting in 2010, 2011, and a central aspect of
[Samsung's strategy] was improving the user interface and all of these were important … at this

26  time.  What that indicates is that these patented inventions were an important part of the strategy
that Samsung used to get into the two horse race and stay there…" Trial Transcript, p. 1262.

27      [59] Vellturo Initial Report, at ¶ 344.

28      [60] Vellturo Initial Report, at ¶ 344.

had in mind at the table."[61]   In fact, Dr. Vellturo's calculations explicitly rely on per-unit profitability metrics for Apple and Samsung "for the one-year period starting in mid-2011, spanning Q3 2011 – Q2 2012" as the "baseline period" for the hypothetical negotiation in 2011.[62]

36.   Since this "baseline period," the profitability of the Samsung products found to incorporate the technology covered by the patents-at-issue and the Apple products that compete with them have declined for both Apple and Samsung.   For example, ██████████ ████████████████████████████████████████████████████████████████████ ████████ ████ [63] ██████████████████████████████████████████████ █████████████████████████████ ████ .[64]   Industry commentators expect smartphone profit margins to continue falling.[65]   Prices of Samsung's accused smartphones have also generally trended downward over this period.[66]   Falling prices and ██████ on the accused smartphones, including formerly-flagship models such as the Galaxy S III and the Note II, reflect continued innovation in the mobile device sector since their introduction and, even more so, since the 2011 hypothetical negotiation.

### 2.   *Georgia Pacific* Factor 6 – Effect of Selling the Patented Specialty in Promoting Sales of Other Products of the Licensee[67]

37.   Dr. Vellturo's "critical phase" analysis also played a direct role in his presentation of *Georgia Pacific* Factor 6 to the jury and the "ecosystem adjustment" used in his reasonable royalty calculation.   In particular, the reasonable royalty rates advocated by Dr. Vellturo at trial

---

[61]   Trial Transcript, at 1317-1319.   This is consistent with Dr. Vellturo's initial report: "Considerations made by the parties relate to the effect of a license on the competitive dynamics of the smartphone marketplace, including considerations of future profitability and market shares." Vellturo Initial Report, at ¶393.

[62]   Vellturo Initial Report, at ¶393.

[63]   Vellturo Supplemental Report, Exhibit 16; Vellturo Initial Report, Exhibit 27.   Reflects incremental profit per unit.

[64]   Chevalier Initial Report, Updated Exhibit 26A.

[65]   UBS, "Apple Inc. Apple Watch: The Paradox of High Prices While Still Attacking From Below," September 18, 2014, at pp. 2, 7.

[66]   Chevalier Initial Report, Updated Exhibit 26E.

[67]   *Georgia Pacific* Factor 6: Effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales

were calculated by multiplying his estimate of Apple's willingness to accept by ███████, a number derived from a 2011 document.   According to Dr. Vellturo, this adjustment was justified because:

> [the] existence of strong customer loyalty among those who have adopted a smartphone brand and its operating system [makes] competition between brands for new users of smartphones particularly important, as adoption of a smartphone tends to convert a consumer without a strong attachment to a smartphone brand and operating system into a loyal customer who has such an attachment, and thus becomes resistant to switching."[68]

38.    Furthermore, an analysis presented in the Initial Vellturo Report predicts that the fraction of smartphone sales accounted for by first-time buyers will fall by 85 percent in the Q4 2014 to Q4 2015 period as compared to the Q3 2011 to Q1 2014 period.[69]   Given this substantial change in the makeup of smartphone buyers, it is inappropriate for Dr. Vellturo to apply this ecosystem adjustment going forward,[70] yet the Vellturo Declaration makes no adjustment to his analysis to account for this.[71]

### 3.    *Georgia Pacific* Factor 4 – Apple's Patent Policy[72]

39.    In support of his original reasonable royalty opinion, Dr. Vellturo pointed to Apple's licensing policy of not actively licensing out its intellectual property.[73]   Both in his report and his trial testimony,[74] Dr. Vellturo described Apple's unwillingness to license its patented

---

[68] Vellturo Initial Report, at ¶ 367.   *See also* Vellturo Initial Report, at ¶465.

[69] Vellturo Initial Report, at Exhibits 23 and 23-A.   *See also*, Declaration of Christopher Vellturo [Preliminary Injunction phase], February 8, 2012, at Attachments I and J.

[70] Dr. Vellturo's Supplemental Report calculations suggest that even he does not believe that it is appropriate to apply for each unit a ███████ ecosystem adjustment to Apple's willingness to accept after June 2013.   Vellturo Supplemental Report, at Exhibit 32, 32-A.

[71] By the same logic, it would not be appropriate for Dr. Vellturo to apply his ecosystem adjustment to his Samsung's willingness to pay analysis going forward.

[72] *Georgia Pacific* Factor 4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

[73] Trial Transcript, at 1305; PDX92.45.

[74] *See, e.g.,* Trial Transcript, at 1305 [**Q:** It's not Apple's business model to monetize its – it's not a driving part of its business model, monetizing its patents, is that right? **A:** That's right.]; Trial Transcript, at 1314 ["Apple has to face the reality that it has now a principal competitor having its patents."]; Vellturo Initial Report, at ¶ 334 ["However, I understand that the

technology to Samsung and other competitors around the time of the hypothetical negotiation in 2011, concluding that the degree of competition between the parties "fundamentally affects the rates at which Apple would license Samsung and would, in fact, make it unwilling to grant a license at all."[75]

40.    Recently, Apple appears to have somewhat relaxed its stance with respect to its patent policy.  In August 2014, Apple and Samsung announced a "global ceasefire" with their agreement to dismiss all patent litigation outside the United States.[76]  Commentators have noted that this de-escalation marks "an easing of tensions between the bitter rivals of the smartphone wars"[77] and that "the whole industry paradigm is changing."[78]  Although the agreement between Apple and Samsung does not cover U.S. patent rights, it does reflect an agreement not to enforce protection abroad, at present, without any royalty payment for the use of any patented, or claimed, technologies.

41.    Apple's shift in its patent policy with regard to competitors is further reflected in its May 2014 agreement with Google and Motorola Mobility.[79]  While this agreement does not include an explicit cross-license, ███████████████████████████████████ ███████████████████████████████████.

42.    Apple's recent "stand downs" with two rivals, Samsung and Google, reflect a lessening of tensions between competitors in the "smartphone wars" as compared to the period

---

hypothetical negotiation construct requires that a reasonable royalty be determined even when the patentee would not in fact have been willing to license the infringer, which I understand to be the case here."]; Velluturo Initial Report, at ¶ 462 ["Apple's licensing practices confirm that Apple…would therefore not voluntarily license Samsung."].

[75] Velluturo Initial Report, at ¶ 463.

[76] *See* http://www.reuters.com/article/2014/08/06/us-samsung-elec-apple-idUSKBN0G605920140806 (viewed 9/29/2014); http://online.wsj.com/articles/apple-samsung-call-patent-truce-outside-u-s-1407291456 (viewed 10/5/2014).

[77] http://online.wsj.com/articles/apple-samsung-call-patent-truce-outside-u-s-1407291456 (viewed 10/5/2014).

[78] http://www.businessweek.com/printer/articles/217673-the-totally-unsurprising-apple-samsung-patent-truce (viewed 9/29/2014).

[79] http://www.cnet.com/news/truce-time-apple-motorola-dismiss-patent-suits-against-each-other/ (viewed 10/5/2014); http://www.reuters.com/article/2014/05/16/us-apple-google-settlement-idUSBREA4F0S020140516 (viewed 10/5/2014).

18

from 2011 through trial and suggest an increased willingness to reach agreements with competitors.  In his Declaration, Dr. Vellturo dismissed these agreements as irrelevant because they included no explicit licensing arrangements.[80]  Yet these "stand downs" represent a distinct shift in Apple's patent policy from that presented at trial.

### 4. *Georgia Pacific* Factor 13 – Portion of Profits Attributable to Patents-at-Issue[81]

43.  Since the hypothetical negotiation in 2011, Samsung's products have continued to incorporate an increasing number of hardware and software features.  In parallel, Google has introduced several major updates to its Android operating system, each with an array of new and updated features.  Such software updates provide Samsung owners with a wider selection of software features today than in 2011, regardless of whether or not they purchase a new device.

44.  For example, since its launch in summer 2012, the Galaxy S III has been updated from Android 4.0 (Ice Cream Sandwich) to Android 4.1 (Jelly Bean) and, most recently, to Android 4.4 (Kit Kat).[82]  Android 4.4 (Kit Kat) boasts dozens of new features for Galaxy S III owners, including:[83]

- New lock screen shortcuts and controls
- Video player closed captioning

---

[80]  Vellturo Declaration, at ¶¶ 46-48.

[81]  *Georgia Pacific* Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

[82]  Android 4.1 (Jelly Bean) became available for Galaxy S III models in late 2012 and Android Kit Kat 4.4.2 became available for Galaxy S III models starting in mid-2014.  *See*, *e.g.*, http://www.verizonwireless.com/news/article/2012/12/samsung-galaxy-s-III-android-jelly-bean.html (viewed 9/29/2014); http://www.cnet.com/news/sprint-approves-kitkat-update-for-more-samsung-smartphones/ (viewed 9/29/2014); http://www.samsung.com/us/support/SupportOwnersFAQPopup.do%3Ffaq_id%3DFAQ00050358%26fm_seq%3D55362 (viewed 9/29/2014); http://www.androidcentral.com/kitkat-starts-rolling-out-att-galaxy-s-iii-owners (viewed 9/29/2014).

[83]  http://www.androidcentral.com/kitkat-starts-rolling-out-att-galaxy-s-iii-owners (viewed 9/29/2014); http://www.samsung.com/us/support/SupportOwnersFAQPopup.do%3Ffaq_id%3DFAQ00050358%26fm_seq%3D55362 (viewed 9/29/2014).

- Expanded Emoji icons
- Wireless printing
- Copy & paste improvements
- Keyboard enhancements
- Restyled status and navigation bars
- Phone/dialer user interface enhancements
- Unified location menu
- Media controls
- Immersive mode
- SMS App Chooser

45.     As the number of features included in the Android operating system continues to grow with each software update, the portion of the overall software functionality covered by the patents-at-issue can only decrease.  Further, as the software functionality itself represents only a portion of the features incorporated in the accused smartphones, the functionalities covered by the '647, '172, and '721 patents can be credited with, at most, a small and decreasing fraction of the overall value of the features and capabilities embodied in a smartphone.

## IV.     ONGOING ROYALTY RATE

46.     Even if the jury had awarded a per unit royalty, the facts and circumstances surrounding the later hypothetical negotiation suggest that lower royalty rates are appropriate for any ongoing royalty.  As described above, Dr. Vellturo ignored key changes in the marketplace that would drive the royalty rates downward even using his own model.[84]

47.     As stated above, I do not agree with Dr. Vellturo's conclusion that the jury verdict is based on royalty rates that can serve as a valid starting point for calculating an ongoing

---

[84] My analysis presented here is premised on Dr. Vellturo's interpretation of the jury award and an assumption that the jury award serves as the starting point in evaluating the amount of an ongoing royalty after trial.  Notwithstanding the foregoing, based on the information I have received to date, I continue to hold the opinions that I presented at trial.  Should the court find an ongoing royalty to be appropriate, I believe that much lower rates, if any, should apply based on the analysis presented in my reports and trial testimony, as well as the changed circumstances since the trial.

reasonable royalty.   However, if one were to take the royalty rates proposed by Dr. Vellturo as a starting point, some of the "changed circumstances" discussed above can be accounted for through simple adjustments to the royalty calculations presented by Dr. Vellturo in his initial report.[85] Specifically, the impact of updating Dr. Vellturo's calculation of Apple's "willingness to accept" – which underlies the royalty rates he presented in trial[86] – is shown in Exhibits 4 and 5.   The adjustments account for the following:

- the ███████████████████████ using 1) projected 2014 incremental profits, or 2) the profitability of the lowest-priced, and most likely to compete with the Galaxy S III, iPhone model;

- the decline in price of the Galaxy S III using the corresponding input from Dr. Hauser;[87] and

- the diminishing share of first-time buyers going forward from a 2014 hypothetical negotiation as compared to a 2011 hypothetical negotiation by reducing Dr. Vellturo's ecosystem adjustment.

As Exhibits 4 and 5 show, just making these adjustments reduces Dr. Vellturo's original royalty rates by 57 to 75 percent.   Proportionally reducing the royalty rates that Dr. Vellturo claims are implied by the jury verdict results in ongoing royalty rates of $0.68 to $1.12 on the '647 patent, $0.37 to $0.60 on the '721 patent, and $0.60 to $0.98 on the '172 patent.   In other words, Dr.

---

[85] *See* Vellturo Initial Report, at Exhibits 26 and 27; Trial Transcript, at 1315-1320; PDX 92.59.

[86] As highlighted to the jury and in his initial report, Dr. Vellturo emphasized that his calculation of Apple's willingness to accept would have been the likely royalty outcome.   Trial Transcript, at 1315-1320; PDX 92.59.   *See also,* Vellturo Initial Report, at ¶¶ 431-432.   Dr. Vellturo also presented Samsung's willingness to pay numbers, ████████████████████████████████████████████████████████.   *See* PDX 92.61.

[87] Dr. Vellturo's willingness to accept calculations are based on the flawed premise that Dr. Hauser's results are accurate.   As described in my initial report and the reports and testimony of Dr. Reibstein and Dr. Erdem, these inputs are critically flawed.   At minimum, Dr. Hauser's inputs would need to be updated to incorporate the changes in the marketplace.   For example, Dr. Hauser's results depend explicitly on the price of the phone.   An updated analysis based on Dr. Vellturo's model should at least adjust the reliance on Dr. Hauser's results to reflect the falling prices of Samsung's accused smartphones.

Vellturo's failure to adjust for these changes results in royalty rates that are overstated, even by his own methodology, by 234 to 402 percent.

48.     Even these royalty rates – which are based on a flawed starting point – are overstated because they do not account for all of the substantive changes in circumstances since the 2011 hypothetical negotiation.   In particular, they do not reflect that Samsung has since supplied smartphones that do not incorporate the technology covered by the '721 and '172 patents and, in fact, are more successful than other products that were found to incorporate the patented technology.   Accounting for Samsung's successful non-infringing alternative technology suggests that the ongoing royalty rate for these two patents should be nominal.[88]   Further, the above rates do not reflect the recent shift in Apple's patent policy.   As discussed above, Apple has reached "stand down" agreements with two rivals, Samsung and Google, neither of which involved royalty payments.   Further adjustments for these changed circumstances would result in even lower royalty rates than those described above.

49.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 6, 2014, at New Haven, CT.

_Judith A Chevalier_

JUDITH A. CHEVALIER

---

[88] Dr. Vellturo's calculations of Apple's willingness to accept and Samsung's willingness to pay depend directly on the amount of time necessary to develop an acceptable non-infringing alternative for each patent.   Given Samsung's demonstrated availability of successful alternatives for the '721 and '172 patents, it follows that the royalty rates for these two patents that result from Dr. Vellturo's own analysis would approach zero. Vellturo Initial Report, at ¶¶ 398-401 and Exhibits 26 and 27.

**EXHIBIT 1**

**Curriculum Vitae**
Judith A. Chevalier

**Home:**
236 Edwards St.
New Haven, CT 06511
(203) 787-6518

**Email:** judith.chevalier@yale.edu

**Office:**
School of Management
Yale University
135 Prospect Street
New Haven, CT 06520
(203) 432-3122

**Primary Positions:**

February 2005-present, William S. Beinecke Professor of Economics and Finance, Yale School of Management.

September 2007-June 2009, Deputy Provost for Faculty Development, Yale University.

June 2001- February 2005, Yale University School of Management, Professor of Finance and Economics.

July 1999-May 2001, University of Chicago, Graduate School of Business, Professor of Economics.

July 1997-June 1999, University of Chicago, Graduate School of Business, Associate Professor of Economics.

July 1994-June 1997, University of Chicago, Graduate School of Business, Assistant Professor of Economics.

July 1993 - June 1994, Harvard University, Department of Economics, Assistant Professor of Economics.

**Other Positions:**

Organizing Committee, Econometric Society Winter Meetings, 2014-2015.

Provost's Review Committee, Columbia Business School, 2013.

Honors and Awards Committee, American Economic Association, 2012-.

Presidential Search Committee, Yale University, 2012.

Honors and Awards Committee, American Economic Association, 2012- .

Co-editor, *Rand Journal of Economics*, May 2009-March 2013.

Prize committee, Fisher Black Prize, American Finance Association, 2008.

National Science Foundation, Economics Review Panel, 2007-2009.

Editorial Board, *Journal of Industrial Economics*, 2006-2011.

Nominating Committee, American Economic Association, 2007-2008.

Nominating Committee, American Academy of Arts and Sciences, 2006, 2009, 2010.

**EXHIBIT 1**

Co-Editor, *American Economic Review*, November 2004-June 2007.

Yale University Budget Committee, Co-chair, 2012-

Steering Committee, Committee on Yale College Education, 2010- .

Advisory Board, Journal of Economic Perspectives, 2009-2012.

Chair, Faculty Section and Steering Committee, Committee on Yale Reaccreditation, 2008-2010.

Search Committee, American Economics Association committee for the editor of the AEA Journal of Microeconomics, Fall 2006.

Executive Committee, American Economic Association, January 2005- January 2008. Member of the finance committee, audit committee, and ad hoc committee on journals.

Visiting Committee, MIT Economics Department, February 2005, February 2007, March 2011.

Member, Dean Search Committee, Yale School of Management, 2004- 2005, 2009-2010.

Chair, Yale University Committee on Cooperative Research, 2003-2006.  Member, 2002-2003.

Member, Provost's Committee on Sexual Misconduct, 2009-2010

Member, Council of the Women's Faculty Forum, Yale University, 2003-2009.

Member, Board of the Chief Executive Leadership Institute, 2005-present.

January 2002-December 2004. Board member, Committee on the Status of Women in the Economics Profession (CSWEP), American Economic Association.

January 2002-present.  Fellow, Davenport College, Yale University.   Member, Summer 2005, search committee for Davenport College Dean.

February 2003- October 2004.  Editor, The B.E. Journals in Economic Analysis and Policy.

AEA Search Committee for Editor of the Journal of Economic Literature, 2003.

January 2002-2009.  Advisory Board, *Quantitative Marketing and Economics*.

January 2001-July 2002.  Associate Editor, *American Economic Review*.

March 2000-September 2004. Associate Editor, The *Journal of Finance*.

American Finance Association nominating committee, 1999.

July 1999 – July 2002, Associate Editor, *Review of Financial Studies*.

January 1999 – December 2003, Associate Editor, *Quarterly Journal of Economics*.

January 1999 – December 2003, Associate Editor, *Journal of Economic Perspectives*.

**EXHIBIT 1**

July 1997-October 2004, Associate Editor, *Journal of Industrial Economics.*

January 1996-October 2004, Associate Editor, *Rand Journal of Economics.*

September 1999-present, Research Associate, National Bureau of Economic Research.

September 1993-September 1999, Faculty Research Fellow, National Bureau of Economic Research.

Consortium Faculty, Cardean University, Unext.com, 1999-2001.  Consulted on design of web-based strategy course.

**Research Interests:**

Time use.  Competition in high technology industries and telecommunications. Competition and regulation in retail industries; implications of retail pricing behavior for macroeconomics.  Competition on the Internet and for information goods.  The problems facing durable goods manufacturers.  The interaction between firm capital structure and product market competition.  The impact of liquidity constraints on markup, inventory, and capital expenditure cyclicality.   Testing models of agency and career concerns.  The impact of "noise traders" on financial markets.  Cross-subsidization of activities within conglomerate firms.

**Education:**

May, 1993, Ph.D., Economics, Massachusetts Institute of Technology.

May, 1989, B.A., *summa cum laude*, Yale University, Distinction in the Major, Economics.

**Honors and Awards:**

Elected Fellow, Econometric Society, 2013.

National Science Foundation research grant for 2011-2014, SBR 1128322, "Strategic Shoppers."

William F. O'Dell Award*, Journal of Marketing Research*, 2011.  For paper published in the *Journal of Marketing Research*, August 2006.

Elected member, American Academy of Arts and Sciences, 2006-present.

nominated paper, Smith Breeden prize, Journal of Finance, 1999.  For paper published in the Journal of Finance, June 1999.

recipient, first annual Elaine Bennett Research Prize.  This prize is intended to recognize research by a young woman in any area of economics.  The prize is administered by the American Economic Association Committee on the Status of Women in the Economics Profession.  Presented January 1999.

Alfred P. Sloan Foundation, Sloan Research Fellow, Awarded for 1997-1998, and 1998-1999 academic years.

Smith Breeden "Distinguished Paper" prize, *Journal of Finance*, 1995.  Prize awarded for paper published in the *Journal of Finance*, September 1995.

**EXHIBIT 1**

National Science Foundation research grant SBR 94-14141 for 1994-1996.

Review of Economic Studies tour (one of seven doctoral students presenting work at conferences in Europe and Israel), Summer, 1993.

National Science Foundation Graduate Fellowship, 1989-1992.

Dickerman Prize, Yale University, for Best Senior Thesis in Economics, 1989.


**Publications:**

With Dina Mayzlin and Yaniv Dover, "Promotional Reviews: An Empirical Investigation of Online Review Manipulation", *American Economic Review,* 2014.

With Jonathan Baker, "The Competitive Consequences of Most Favored Nations Provisions", *Antitrust Magazine*, Spring 2013.

With Keith Chen, "Are Women Overinvesting in Education? Evidence from the medical profession," *Journal of Human Capital,* Summer 2012.

With Austan Goolsbee, "Are Durable Goods Consumers Forward Looking?  Evidence from  the College Textbook Market", *Quarterly Journal of Economics* vol 124, November 2009.

With Keith Chen, "The Taste for Leisure, Career Choice, and the Returns to Education", *Economics Letters*  Vol. 99, May 2008, 353-356.

With Fiona Scott Morton, "State Casket Seller Restrictions:  A Pointless Undertaking?", *Journal of Law and Economics*, August 2008.

With Dina Mayzlin, "The Effect of Word of Mouth on Sales:  Online Book Reviews", *Journal of Marketing Research*, August 2006.

"What Do We Know About Cross-subsidization? Evidence from Merging Firms.", *Advances in Economic Analysis & Policy* 2004: Vol. 4: No. 1, Article 3.
http://www.bepress.com/bejeap/advances/vol4/iss1/art3

with Austan Goolsbee,  "Valuing Internet Retailers:  Amazon and Barnes and Noble", *Advances in Applied Microeconomics* 12:  Organizing the New Industrial Economy, 2003.

with Austan Goolsbee, "Measuring prices and price competition online:  Amazon vs. Barnes and Noble," *Quantitative Marketing and Economics* I (2), June 2003.

with Anil Kashyap and Peter Rossi, "Why don't price rise during periods of peak demand? Evidence from scanner data," *American Economic Review,* March 2003.

with Dennis Carlton, "Free riding and sales strategies on the internet," *Journal of Industrial Economics*, December 2001.

with Chris Avery, "Identifying Investor Sentiment from Price Paths:
The Case of Football Betting," *Journal of Business*, October 1999.

with Glenn Ellison, "Are Some Mutual Fund Managers Better than Others?  Cross-sectional Patterns in Behavior and Performance", *Journal of Finance*, June 1999.

**EXHIBIT 1**

with Chris Avery, "Herding over the Career," *Economics Letters*, June 1999.

with Glenn Ellison, "Career Concerns of Mutual Fund Managers," *Quarterly Journal of Economics*, May 1999.

with Chris Avery and Scott Schaefer, "Why Do Managers Undertake Acquisitions?:  an Analysis of Internal and External Rewards to Acquisitiveness",  *Journal of Law, Economics, and Organization*, April 1998.

with Glenn Ellison, "Risk Taking by Mutual Funds as a Response to Incentives," *Journal of Political Economy*, December 1997.  Reprinted in P.L. Joskow and M. Waterson, eds., *Empirical Industrial Organization*, Edward Elgar, 2004.

with David S. Scharfstein, "Capital Market Imperfections and Countercyclical Markups:  Theory and Evidence," *American Economic Review*, September 1996.

"Do LBO Supermarkets Charge More?  An Empirical Analysis of the Effects of LBOs on Supermarket Pricing," *Journal of Finance*, September 1995.

"Capital Structure and Product Market Competition:  Empirical Evidence from the Supermarket Industry," *American Economic Review*, June 1995.  Reprinted in P.L. Joskow and M. Waterson, eds., *Empirical Industrial Organization*, Edward Elgar, 2004.

with David S. Scharfstein, "Liquidity Constraints and the Cyclical Behavior of Markups," *American Economic Review Papers and Proceedings*, May 1995.


**Working Papers/Work in Progress:**

With Veronica Guerrieri and Anil Kashyap, "Consumer Search and Monetary Policy Non-Neutrality", work in progress.

With Chris Avery and Richard Zeckhauser, "The CAPS Prediction System and Stock Market Returns",   NBER Working Paper 17298,  May 2013.  In revision.

With Anil Kashyap, "Best Prices:  Implications for Price Measurement", February 2014, Prior version: NBER Working Paper 16680.

With Fiona Scott Morton and David Harrington, "Regulating Direct Cremations:  The Cost of Seemingly Small Regulatory Changes", January 2011.

With Fiona Scott Morton and David Harrington, "Differentiated to Death?  Examining the Roles of Proximity and Preference in the Patronage of Co-Ethnic Businesses", Yale School of Management  working paper, February 2013.

with Austan Goolsbee, "Entry and Market Size:  The College Textbook Market."


**Popular Publications/ Teaching Cases:**

With Dina Mayzlin and Yaniv Dover, "Who Gave that Hotel Five Stars? The Concierge", *Harvard Business Review*, September 2012.

**EXHIBIT 1**

With Keith Chen, "Is Medical School a Worthwhile Investment for Women?", the Atlantic Online Edition, July 23 2012.

With Jaan Elias, "Potash Corporation of Saskatchewan", Yale Case 11-031, October 2011.

*New York Times*, "A Carbon Cap that Starts in Washington", 12/16/07.

*New York Times*, "In Search of Wireless Wiggle Room", 10/21/07.

*New York Times*, "Welcome Stranger, Here's a Speeding Ticket", 9/2/07.

*Slate*, "Oversell" 12/12/06.

*Financial Times*, ."The Pros and Cons of Entering a Market," *Financial Times Mastering Strategy Series*, November 1, 1999. Reprinted in Mastering Strategy, Prentice Hall, 2000

*Financial Times*, "When it Can be Good to Burn your Boats," *Financial Times Mastering Strategy Series*, October 25, 1999. Reprinted in Mastering Strategy, Prentice Hall, 2000

**Teaching:**    "Competitor", Core class, Yale School of Management, Fall 2011, Fall 2012, Fall 2013.

"Technology Strategy", Yale School of Management, Fall 2009.

"Business, Public Policy, and the Information Economy", Yale School of Management, Spring 2012, Fall 2010, Spring 2007, Spring 2006, Spring 2005.

Undergraduate "Business, Public Policy, and the Information Economy", Yale University, Spring 2013, Spring 2012, Spring 2010, Spring 2008, Spring 2007, Spring 2006, Spring 2005, Spring 2004.

PhD. level Industrial Organization, Yale Economics Department, Spring 2003.

Competitive Strategy, Yale School of Management. 2002-2011.

Competitive Strategy, Graduate School of Business, University of Chicago. Two sections, Winter 2001. Three sections, Winter 2000. Two sections, Autumn 1996; three sections, Autumn 1997; three sections, Autumn 1998.

Competitive Strategy, Executive MBA Program (XP), University of Chicago. One section, Winter 2001.

PhD. Industrial Organization, Graduate School of Business, University of Chicago. Co-taught with Dennis Carlton and Josef Perktold, Autumn 1996 and Winter 1997.

Economics of the Firm, Graduate School of Business, University of Chicago, Executive MBA course. Taught in domestic executive program in Autumn 1995, taught in international executive program in Barcelona, July-August 1996.

Microeconomics, Graduate School of Business, University of Chicago, MBA course. Seven sections, 1994-1995. One section, Autumn 1999.

**EXHIBIT 1**

Industrial Organization, Department of Economics, Harvard University, Ph.D. course, Spring, 1994.  Co-taught with Glenn Ellison.

Corporate Finance, Department of Economics, Harvard University, Ph.D. course, Spring, 1994.  Co-taught with Andrei Shleifer.

Corporate Control and Governance, Department of Economics, Harvard University, Undergraduate Course, Spring, 1994.

Strategy teaching for the Business Advisor program for RSM McGladrey, Inc., Graduate School of Business, University of Chicago.  Autumn 1999, Spring 2001, Spring 2002.

**Non-academic positions:**

Board member, the Foote School, 2005-present.  Co-Treasurer and Chair of Audit Committee, 2006- 2008.  Treasurer and Chair of Finance Committee, 2009-present.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 2**

**VELLTURO METHODOLOGY DOES NOT GENERATE DAMAGES NUMBERS ON THE JURY VERDICT FORM**

**[1] Actual Jury Verdict Finding**

| | '647 Patent | '721 Patent | '172 Patent |
|---|---|---|---|
| Admire | | | |
| Galaxy Nexus | | | |
| Galaxy Note | | | |
| Galaxy Note II | | | |
| Galaxy S II | | | |
| Galaxy S II Epic 4G Touch | | | |
| Galaxy S II Skyrocket | | | |
| Galaxy S III | | | |
| Galaxy Tab II 10.1 | | | |
| Stratosphere | | | |
| Total | $98,690,625 | $2,990,625 | $17,943,750 |

**[2] Vellturo Reasonable Royalty Damages (PX222A, page 25)**

| | '647 Patent | '721 Patent | '172 Patent |
|---|---|---|---|
| Admire | | | |
| Galaxy Nexus | | | |
| Galaxy Note | | | |
| Galaxy Note II | | | |
| Galaxy S II | | | |
| Galaxy S II Epic 4G Touch | | | |
| Galaxy S II Skyrocket | | | |
| Galaxy S III | | | |
| Galaxy Tab II 10.1 | | | |
| Stratosphere | | | |
| Total | $449,634,092 | $3,404,134 | $22,127,986 |

**[3] Jury Royalty Rate (per Vellturo)**
**[4] Vellturo Royalty Rate**

**[5] Implied Jury Award by Vellturo Methodology (No Rounding)**

| Ratio | 22.0176% | 87.5776% | 80.9859% | | | |
|---|---|---|---|---|---|---|
| | Implied Jury Award | | | Difference from Actual Jury Award | | |
| | '647 Patent | '721 Patent | '172 Patent | '647 Patent | '721 Patent | '172 Patent |
| Admire | | | | | | |
| Galaxy Nexus | | | | | | |
| Galaxy Note | | | | | | |
| Galaxy Note II | | | | | | |
| Galaxy S II | | | | | | |
| Galaxy S II Epic 4G Touch | | | | | | |
| Galaxy S II Skyrocket | | | | | | |
| Galaxy S III | | | | | | |
| Galaxy Tab II 10.1 | | | | | | |
| Stratosphere[1] | | | | | | |
| Total | $98,690,625 | $2,990,625 | $17,943,750 | | | |

**[6] Implied Jury Award by Vellturo Methodology (Rounded to the Nearest Percent)**

| Ratio | 22.0000% | 88.0000% | 81.0000% | | | |
|---|---|---|---|---|---|---|
| | Implied Jury Award | | | Difference from Actual Jury Award | | |
| | '647 Patent | '721 Patent | '172 Patent | '647 Patent | '721 Patent | '172 Patent |
| Admire | | | | | | |
| Galaxy Nexus | | | | | | |
| Galaxy Note | | | | | | |
| Galaxy Note II | | | | | | |
| Galaxy S II | | | | | | |
| Galaxy S II Epic 4G Touch | | | | | | |
| Galaxy S II Skyrocket | | | | | | |
| Galaxy S III | | | | | | |
| Galaxy Tab II 10.1 | | | | | | |
| Stratosphere[1] | | | | | | |
| Total | $98,690,625 | $2,990,625 | $17,943,750 | | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 2**

**VELLTURO METHODOLOGY DOES NOT GENERATE DAMAGES NUMBERS ON THE JURY VERDICT FORM**



**[7]** Implied Jury Award by Vellturo Methodology (Rounded to the Nearest Tenth of a Percent)

Ratio

Admire
Galaxy Nexus
Galaxy Note
Galaxy Note II
Galaxy S II
Galaxy S II Epic 4G Touch
Galaxy S II Skyrocket
Galaxy S III
Galaxy Tab II 10.1
Stratosphere[1]

| Total | $98,690,625 | $2,990,625 | $17,943,750 |

**[8]** Implied Jury Award by Vellturo Methodology (Rounded to the Nearest Hundredth of a Percent)

Ratio

Admire
Galaxy Nexus
Galaxy Note
Galaxy Note II
Galaxy S II
Galaxy S II Epic 4G Touch
Galaxy S II Skyrocket
Galaxy S III
Galaxy Tab II 10.1
Stratosphere[1]

| Total | $98,690,625 | $2,990,625 | $17,943,750 |

**[9]** Implied Jury Award by Vellturo Methodology (Rounded to the Nearest Thousandth of a Percent)

Ratio

Admire
Galaxy Nexus
Galaxy Note
Galaxy Note II
Galaxy S II
Galaxy S II Epic 4G Touch
Galaxy S II Skyrocket
Galaxy S III
Galaxy Tab II 10.1
Stratosphere[1]

| Total | $98,690,625 | $2,990,625 | $17,943,750 |

**[10]** Implied Jury Award by Vellturo Methodology (Rounded to the Nearest Ten-Thousandth of a Percent)

Ratio

Admire
Galaxy Nexus
Galaxy Note
Galaxy Note II
Galaxy S II
Galaxy S II Epic 4G Touch
Galaxy S II Skyrocket
Galaxy S III
Galaxy Tab II 10.1
Stratosphere[1]

| Total | $98,690,625 | $2,990,625 | $17,943,750 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 2**

**VELLTURO METHODOLOGY DOES NOT GENERATE DAMAGES NUMBERS ON THE JURY VERDICT FORM**

<u>Notes & Sources</u>:

[1]  For each patent, damages for the Stratosphere are calculated as the per-patent total from the final jury verdict minus the sum of other per-product damages.
     Blacked out patent-product combinations were not eligible for damages.
     Greyed out combinations were assigned a finding of non-infringement by the jury.

[1] From Amended Verdict Form, May 5, 2014, at Question 10a.

[2] From PX222A, at p. 25.

[3] From Vellturo Declaration, at p. 2.

[4] From PX222A1, at p. 38.  See also, Vellturo Declaration, at p. 6.

[5]-[10] 'Ratio' = [3] / [4], rounded to different thresholds.

     'Implied Jury Award' is calculated as Vellturo's reasonable royalty damages for each product from [2] multiplied by 'Ratio', consistent with the
     methodology set forth in the Vellturo Declaration, at p. 7.
     'Difference from Actual Jury Award' = 'Implied Jury Award' - [1].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## EXHIBIT 3

### PER UNIT ROYALTY RATES IMPLIED BY JURY AWARD

| | Based on Chevalier Units | | | Based on Vellturo Royalty Only Units | | |
|---|---|---|---|---|---|---|
| | '647 Patent | '721 Patent | '172 Patent | '647 Patent | '721 Patent | '172 Patent |
| Admire | | | | | | |
| Galaxy Nexus | | | | | | |
| Galaxy Note | | | | | | |
| Galaxy Note II | | | | | | |
| Galaxy S II | | | | | | |
| Galaxy S II Epic 4G Touch | | | | | | |
| Galaxy S II Skyrocket | | | | | | |
| Galaxy S III | | | | | | |
| Galaxy Tab II 10.1 | | | | | | |
| Stratosphere | | | | | | |

Notes & Sources:
Chevalier units from DX 453A, at 11-12
Vellturo units from PTX 222A (updated), at 25
See PX 222A (updated), at 38 for

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 4**

**UPDATED VELLTURO ANALYSIS: APPLE'S WILLINGNESS TO ACCEPT (SMARTPHONES)[1]**
**SCENARIO 1: USING PROJECTED 2014 IPHONE PROFITS, MODIFIED HAUSER INPUT, AND MODIFIED ECOSYSTEM ADJUSTMENT**

| | Reference Period | | | | Royalty Rates | | |
|---|---|---|---|---|---|---|---|
| | 2014 Q1 | 2014 Q2 | 2014 Q3 | 2014 Q4 | '647 Patent | '721 Patent | '172 Patent |
| [1] Apple U.S. iPhone Units Sold (per Apple) | ▮ | ▮ | ▮ | ▮ | | | |
| [2] Apple's Incremental Profit Per Unit | ▮ | ▮ | | ▮ | | | |
| [3] *Weighted Average - 1 year* | | | | ▮ | ▮ | ▮ | ▮ |
| [4] Percentage of Accused Product Units That Would Not Have Been Sold If Offered with Non-Infringing Alternatives | | | | | 5.86% | 7.11% | 12.56% |
| [5] Total U.S. Smartphone Units Sold After Removal of Accused Samsung Sales (per IDC) | 22,793 | 28,733 | 24,461 | 20,271 | | | |
| [6] Apple's Share of Infringing Units That Samsung Would Not Have Sold, but for Infringement | 21.09% | 51.36% | 43.83% | 42.28% | | | |
| [7] *Weighted Average - 1 year* | | | | 40.37% | 40.37% | 40.37% | 40.37% |
| [8] Perceived Design Around Time Adjustment | | | | | N/A | 4 | 4 |
| [9] # of Months of Economic Life of the Accused Set of Products | | | | | 36 | 36 | 36 |
| [10] *Design Around Adjustment* | | | | | 100% | 11% | 11% |
| [11] Apple's Ecosystem Adjustment | | | | | ▮ | ▮ | ▮ |
| [12] **Apple's Willingness To Accept Rate** | | | | | $5.09 | $0.69 | $1.21 |
| [13] Percent of Vellturo Original Royalty Rate | | | | | 41% | 43% | 43% |
| [14] **Implied Ongoing Royalty Rate** | | | | | $1.12 | $0.60 | $0.98 |

Notes & Sources:
[1] Calculated according to the methodology set forth in Vellturo Initial Report, Exhibit 27.  As I discussed in my Initial Report (Expert Report of Judith A. Chevalier, September 13, 2013) and at trial, there are several flaws with Dr. Vellturo's methodology and calculations.  Notwithstanding those flaws, this exhibit updates incremental profit (lines [1]-[3]), the percentage of units that would not have been sold (line [4]), and Apple's ecosystem adjustment (line [11]) for the passage of time.
[1]-[3] Calculated based on projection models from Exhibit 6.
[4] From Vellturo Supplemental Report, Exhibits 13 and 13-A.  Percentage for the '647 patent reflects the linearized impact on demand for the closest conjoint result for Galaxy S III, assuming price of the Galaxy S III has decreased to $0.  Galaxy S II Epic 4G Touch used as representative product for the '721 and the '172 patents.  See Exhibit 7.
[5]-[7] From Vellturo Initial Report, Exhibit 27; reflects values for Q3 2011 – Q2 2012 reference period.
[8]-[10] From Vellturo Initial Report, Exhibit 27.
[11] = (▮) calculated as the ratio of the share of first-time buyers over the period Q4 2014 – Q4 2015 to the share of first-time buyers over the period Q3 2011 – Q1 2014.  Share of sales to first-time smartphone buyers through Q4 2013 estimated as the total smartphone sales in a given quarter minus the smartphone sales 8 quarters prior, consistent with the methodology set forth by Dr. Vellturo in Declaration of Christopher Vellturo, Ph.D. [Preliminary Injunction phase] February 8, 2012, at 20.  Total smartphone shipments through Q4 2013 from IDC (APLNDC-Z0000000004 and APLNDC630-Y00009015).  Share of sales to first-time smartphone buyers from Q1 2014 – Q4 2015 estimated using Dr. Vellturo's 'Estimated Cumulative Net Shipments' prediction model and adjusting to be non-cumulative.  See Vellturo Initial Report, at Exhibits 23 and 23-A, and backup to Vellturo Initial Report, at '23.xlsx'.
[12] = [3] * [4] * [7] * [10] * [11].
[13] = [12] / royalty rates presented in Vellturo Initial Report, Exhibit 27 ▮
[14] = [13] * royalty rates set forth in the Vellturo Declaration, at paragraph 6 ▮

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 5**

**UPDATED VELLTURO ANALYSIS: APPLE'S WILLINGNESS TO ACCEPT (SMARTPHONES)[1]**
**SCENARIO 2: USING PROFITS OF LOWEST-PRICED IPHONE, MODIFIED HAUSER INPUT, AND MODIFIED ECOSYSTEM ADJUSTMENT**

| | Reference Period | | | | Royalty Rates | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | '647 Patent | '721 Patent | '172 Patent |
| [1] Apple's Adj. Gross Profit Per Unit | | | | ▮ | ▮ | ▮ | ▮ |
| [2] Percentage of Accused Product Units That Would Not Have Been Sold If Offered with Non-Infringing Alternatives | | | | | 5.86% | 7.11% | 12.56% |
| [3] Total U.S. Smartphone Units Sold After Removal of Accused Samsung Sales (per IDC) | 22,793 | 28,733 | 24,461 | 20,271 | | | |
| [4] Apple's Share of Infringing Units That Samsung Would Not Have Sold, but for Infringement | 21.09% | 51.36% | 43.83% | 42.28% | | | |
| [5] *Weighted Average - 1 year* | | | | 40.37% | 40.37% | 40.37% | 40.37% |
| [6] Perceived Design Around Time Adjustment | | | | | N/A | 4 | 4 |
| [7] # of Months of Economic Life of the Accused Set of Products | | | | | 36 | 36 | 36 |
| [8] *Design Around Adjustment* | | | | | 100% | 11% | 11% |
| [9] Apple's Ecosystem Adjustment | | | | | ▮ | ▮ | ▮ |
| **[10] Apple's Willingness To Accept Rate** | | | | | **$3.11** | **$0.42** | **$0.74** |
| [11] Percent of Velltturo Original Royalty Rate | | | | | 25% | 26% | 26% |
| **[12] Implied Ongoing Royalty Rate** | | | | | **$0.68** | **$0.37** | **$0.60** |

Notes & Sources:

[1] Calculated according to the methodology set forth in Velltturo Initial Report, Exhibit 27.  As I discussed in my Initial Report (Expert Report of Judith A. Chevalier, September 13, 2013) and at trial, there are several flaws with Dr. Velltturo's methodology and calculations.  Notwithstanding those flaws, this exhibit updates incremental profit (lines -[1]), the percentage of units that would not have been sold (line [2]), and Apple's ecosystem adjustment (line [9]) for the passage of time.

[1] From APLNDC630-Y00008911-16, at 913.  Reflects Adj GM for the 8 GB iPhone 4 (the lowest-priced phone at the time).  The 8 GB iPhone 4 was available for sale for $0 with a two-year contract around the time of the source document.  *See, e.g.,* http://www.businessinsider.com/apple-iphone-5-event-2012-9 (viewed 10/6/2014); http://techland.time.com/2012/09/18/apple-iphone-5-review-its-all-about-refinement/ (viewed 10/6/2014).

[2] From Velltturo Supplemental Report, Exhibits 13 and 13-A.  Percentage for the '647 patent reflects the linearized impact on demand for the closest conjoint result for Galaxy S III, assuming price of the Galaxy S III has decreased to $0.  Galaxy S II Epic 4G Touch used as representative product for the '721 and the '172 patents.  See Exhibit 7.

[3]-[5] From Velltturo Initial Report, Exhibit 27; reflects values for Q3 2011 – Q2 2012 reference period.

[6]-[8] From Velltturo Initial Report, Exhibit 27.

[9] = (▮▮▮▮▮▮▮▮▮▮▮ calculated as the ratio of the share of first-time smartphone buyers over the period Q4 2014 – Q4 2015 to the share of first-time smartphone buyers over the period Q3 2011 – Q1 2014.  Share of sales to first-time smartphone buyers through Q4 2013 estimated as the total smartphone sales in a given quarter minus the smartphone sales 8 quarters prior, consistent with the methodology set forth by Dr. Velltturo in Declaration of Christopher Velltturo, Ph.D. [Preliminary Injunction phase] February 8, 2012, at 20.  Total smartphone shipments through Q4 2013 from IDC (APLNDC-Z0000000001 and APLNDC630-Y00009015).  Share of sales to first-time smartphone buyers from Q1 2014 – Q4 2015 estimated using Dr. Velltturo's 'Estimated Cumulative Net Shipments' prediction model and adjusting to be non-cumulative.  See Velltturo Initial Report, at Exhibits 23 and 23-A, and backup to Velltturo Initial Report, at '23.xlsx'.

[10] = [1] * [2] * [5] * [8] * [9].

[11] = [10] / royalty rates presented in Velltturo Initial Report, Exhibit 27 (▮▮▮▮▮▮▮▮▮▮).

[12] = [11] * royalty rates set forth in the Velltturo Declaration, at paragraph 6 (▮▮▮▮▮▮▮▮▮▮▮▮▮).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

## EXHIBIT 6

### APPLE PROJECTION MODELS
### INCREMENTAL PROFIT AND UNITS

| Dependent Variable | Estimation Period | # Obs | Adj R-Sq | Coefficients (*t-stats*) Constant | Coefficient |
|---|---|---|---|---|---|
| iPhone Incremental Profit Per Unit | Q1 2011 – Q4 2013 | ▪ | ▬ | ▬ *(20.94)* | ▬ *(-4.85)* |
| log(iPhone Units) | Q1 2011 – Q4 2013 | ▪ | ▬ | ▬ *(46.60)* | ▬ *(3.38)* |

<u>Notes & Sources</u>:

Estimated consistent with the methodology set forth in Vellturo Supplemental Report, Exhibit 34.

Model estimated using quarterly OLS using data from Vellturo Supplemental Report, Exhibit 16.  The following two specifications were run and the model with the higher adjusted R-squared was selected:

Dependent Variable = $B_0 + B_1*(quarter_t) + error_t$

$log$(Dependent Variable) = $B_0 + B_1*(quarter_t) + error_t$

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 7**

**LINEARIZED IMPACTS ON DEMAND OF
REMOVING PATENTED FEATURES IMPLIED BY CONJOINT RESULTS[1]**

| Device | Actual | | Closest Conjoint Result | | Linearized Impact on Demand | | |
|---|---|---|---|---|---|---|---|
| | Screen Size | Price | Screen Size | Price | 647 | 721 | 172 |
| [1] Galaxy S III | 4.8 | $0 | 4.8 | $49 | 5.86% | | |
| [2] Galaxy S II Epic 4G Touch | 4.5 | $158 | 4.8 | $149 | 6.14% | 7.11% | 12.56% |

Notes & Sources:

[1] As I discussed in my Initial Report (Expert Report of Judith A. Chevalier, September 13, 2013) and at trial, and as described in the reports and testimony of Dr. Reibstein and Dr. Erdem, there are several flaws with the conjoint analysis presented by Dr. Hauser. Notwithstanding these flaws, the results shown in this exhibit follow from what appears in Vellturo Supplemental Report, Exhibits 13 and 13-A.

[1] Galaxy S III calculated according to the methodology set forth in Vellturo Supplemental Report, Exhibits 13 and 13-A, using a price of $0. *See* http://shop.sprint.com/mysprint/shop/phone_details.jsp?prodId=dvc8260001prd&deviceSKUId=82600215&flow=AAL&planSKUId=&ptn=&tabId=dt_phones&defaultContractTerm= (viewed 10/5/2014); http://www.att.com/cellphones/samsung/galaxy-s-iii.html#fbid=vZ_h9nPzRsZ?sku=sku6100231 (viewed 10/5/2014).

[2] Galaxy S II Epic 4G Touch from Vellturo Supplemental Report, Exhibit 13 and 13-A.