# EXHIBIT D

## Unredacted Version of Document Sought to be Sealed

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

APPLE INC., a California corporation,

      Plaintiff,

    vs.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

      Defendants.

CASE NO. 12-cv-00630-LHK

**EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF
U.S. PATENT NO. 5,946,647**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

the API."  (2:20-24.).  Clayton also taught the use of a separate monitor program that operated on incoming data and passed it out to other applications.



**FIG. 1**

Clayton '424, Fig. 1.  Similarly, programs that ran in the background, such as Mogilevseksy and Sidekick worked on what would generally be considered a client-server type model, depending on the details of implementation, and the client-server model was well known in hypertext systems. (Mogilevsky at 11:48-12:19.).  *See also*, John L. Leggett and John L. Schnase, Communications of the Association for Computing Machinery, Vol. 37, No. 2, February 1994, pp. 77-86; "Light Hypermedia Link Services: A Study of Third Party Application Integration," Hugh C. Davis, Simon Knight and Wendy Hall, ECHT '94 Proceedings, September 1994 ("Davis").

## VII.   CLAIM CONSTRUCTION

283.    The Court in this matter has issued one claim construction, for the term "action processor."  I understand the Court found that the correct construction of that term is ""program routine(s) that perform the selected action on the detected structure."  I have applied that construction throughout my analysis.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

284.    I understand the District Court for the Northern District of Illinois (Judge Posner) has previously issued claim construction rulings in *Apple v. Motorola*, Case No. ND-IL-08540, that construe the terms "an analyzer server" and "linking actions to the detected structures."  I understand that those constructions are currently being appealed by Apple to the Federal Circuit.  I have reviewed those constructions, and I address them, along with Apple's interpretation of them, below.  Additionally, I understand that the U.S. International Trade Commission has previously construed certain terms in the '647 patent.  It is my understanding that those constructions are not binding as a matter of law.  I have, however, reviewed them as part of preparing this report.

## A.    "an analyzer server"

285.    Judge Posner construed the phrase "analyzer server" as "a server routine separate from a client that receives data having structures from the client."  Motorola had proposed this construction.  Apple had proposed an alternative construction that was rejected:  "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure."  Judge Posner found that Apple's interpretation rendered the term "server" superfluous, and described only an "analyzer":

> Under Apple's interpretation, any set of routines that performs structure detection and linking would be an analyzer server. But that is just a definition of an "analyzer." "Server" becomes superfluous, as Apple's expert implicitly acknowledges by stating that "the inventors used ['server'] in a generic sense intending to describe a *service* that includes various functionalities." That understanding renders any piece of code a "server."

*Apple Inc. v. Motorola*, Order of March 19, 2012, Case No. 1:11-cv-08540, at 9.  In rejecting this construction, Judge Posner made it clear that the construction he was adopting required that the that the analyzer server not be "integrated into the application," but rather be "separate":  "Had the patent intended the analyzer server to be integrated into the application, rather than separate, the program box would logically appear inside the application box in Figure 1."  *Id*.

286.    Apple has subsequently made a number of arguments about what constitutes an "analyzer server" under Judge Posner's construction.  For instance, in reviewing Dr. Todd

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

Mowry's previous reports on the '647 patent applying this construction, it is apparent that Apple argues that code which can be reused or shared by applications—such as a "shared library"—constitutes code that is "separate from a client," regardless of whether that code actually executes in its own process during runtime, and regardless of whether that code ever actually "receives data having structures from the client." *Apple Inc. v. Motorola*, Order of March 19, 2012, Case No. 1:11-cv-08540, at 9.  Apple is clear that it believes that under Judge Posner's construction, code that executes as part of a "client" application's process can still be an analyzer server.

287.    I note that this understanding of a shared library as an "analyzer server" is contrary both to Judge Posner's construction and the understanding of the inventors themselves.  A shared library, generally, is specifically intended to provide code that will be executed as part of an application process during run time and as such is integrated into the application.  The only significant difference between code in a shared library and code that is part of an application's executable file from the beginning is the time at which the code becomes part of the application:  a shared library is merely loaded at load or run time, rather than when the executable file is created.  Accordingly, Apple and Dr. Mowry are incorrect when they argue that a shared library can satisfy Judge Posner's construction, because a shared library is necessarily part of a client application, and thus cannot be considered "separate" from it—nor can it "receive data" from it.

288.    The inventors of the '647 patent understood this distinction, and in fact eventually recognized only after filing the '647 application that a shared library model for performing detection and linking would be superior.  But they did not claim this in the '647 patent, as they only discovered it nearly a year after filing for the '647 patent.  The '647 patent was filed on February 1, 1996.  In an email dated November 26, 1996, Thomas Bonura, one of the co-inventors, mentioned his dissatisfaction with the performance of the "analyzer server" model as it related to one of the two projects through which Apple claims the '647 patent was developed—LiveDoc.  Thomas Bonura noted that LiveDoc demonstrated "poor performance" because the analyzer server model required extensive data passing and communication:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

From:       Tom Bonura <bonura@taurus.apple.com>
Sent:       Tuesday, November 26, 1996 5:31 PM (GMT)
To:         Jim Miller <jmiller@taurus.apple.com>
Cc:         Dave Wright <dwright@taurus.apple.com>; Hulteen, Eric <hulteen@apple.com>; Bob
            Strong <Bob_Strong@atg.apple.com>; Tom Bonura <bonura@taurus.apple.com>
Subject:    Update on Performance of LiveDoc

I suspect the major contributor to the poor performance of LiveDoc, as
compared with "raw" Data Detectors, lies in the AppleEvent traffic passing
between 3 applications. Specifically, the Analyzer Server is in the
background and gets an AppleEvent from LiveSimpleText. It then passes the
data off to Data Detectors Engine, also running in the background, which
then passes found structures back to the Analyzer Server which then passes
the data back to LiveSimpleText for display. I've profiled a fair chunk of
the analyzer server code and all the calls are in the range of about 2-10
microseconds with the exception of the code which calls the DD engine which
is about 2 orders of magnitude greater and it is in this code that much of
the AppleEvent traffic happens.

Solutions? I really don't know. Everything that I've been thinking
regarding LiveDoc employs a client/server model and hence is strongly
dependent upon AppleEvents. LiveDoc could be recast as simply being data
detectors with a different user interface (indeed some people erroneously
think this *is* what constitutes LiveDoc). We would eliminate an analyzer
server app and the overhead it brings.

I'm certainly open to suggestions if anyone has any. I wish that we could
say this will all be fixed when we get a real multitasking OS but I fear
that when it does come around, the other capabilities which are needed to
pull off a LiveDoc won't be there (like scripting and AppleEvents and
scriptable applications).

MILLER00000064/APLNDC630-0000133392.

289.    David Wright, another co-inventor, then responded that he was working on a "shared library version of Data Detectors that… will eliminate the speed problem of calling Data Detectors." He specifically noted that there would be no speed hit because with a shared library—rather than an "analyzer server"—"it all happens in the same process." Data Detectors was the second of the projects that Apple argues lead to the invention of the '647 patent:

From:       David J. Wright <dwright@taurus.apple.com>
Sent:       Tuesday, November 26, 1996 6:08 PM (GMT)
To:         Tom Bonura <bonura@taurus.apple.com>; Jim Miller <jmiller@taurus.apple.com>
Cc:         Hulteen, Eric <hulteen@apple.com>; Bob Strong <Bob_Strong@atg.apple.com>; Tom
            Bonura <bonura@taurus.apple.com>
Subject:    Re: Update on Performance of LiveDoc

Hi Tom,

Soon, I will have a shared library version of Date Detectors. This will
eliminate the speed problem of calling Date Detectors, I hope. Also, I
can have the shared library install an event handler in its host
application's Apple Event dispatch table, so you won't have to write one
of those foreign function descriptors (I forget what they're called).
Since my code will be in the _current process_, the Apple Event handler
will be looked up in the dispatch table directly and then be called.
There is no speed hit since it all happens in the same process.

Dave

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

1   MILLER00000065/APLNDC630-0000133393.

2       290.    Following up, Thomas Bonura wrote on December 18, 1996, that he had performed

3   more investigation into the LiveDoc speed problem and concluded that he would implement the

4   detection routines as a shared library, rather than a server.  He noted that "this should greatly

5   improve the overall performance of livedoc and should also decrease its memory footprint, since

6   no interface functionality will be required."  He further noted that the "redesign is going to be non-

7   trivial" and would "take several months to nail down but is probably worth doing nonetheless."

8   This is further evidence that the inventors also considered an "analyzer server" model to be

9   significantly different from a shared library model—and significantly less desirable than a shared

10  library model, given that the process was so labor intensive, but was considered worth doing.   In

11  addition, Dr. Bonura distinguished code linked into the application from the analyzer server. A

12  person of ordinary skill in the art would understand the former to include shared libraries. The e-

13  mail in question is reproduced below:

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

From:       Tom Bonura <bonura@apple.com>
Sent:       Wednesday, December 18, 1996 6:31 PM (GMT)
To:         JimMiller <jmiller@taurus.apple.com>
Cc:         Tom Bonura <bonura@taurus.apple.com>
Subject:    December Status Report

I know. It's early.

LiveDoc - More investigations into performance of the analyzer server. I
am currently planning to implement all of the livedoc manager as a shared
library. Currently live simple text has livedoc code linked into the
application and also uses another application to dispatch content to
various analyzers (this is the analyzer server). I am looking into
implementing the server as a shared library rather than as a first class
application. This should greatly improve the overall performance of
livedoc and should also decrease its memory footprint since no interface
functionality will be required. I believe that this will also make it
simpler to incorporate livedoc into Cyberdog and other OD parts. I
estimate that this redesign is going to be non-trivial and will take me
several months to nail down but is probably worth doing nonetheless.

KR - Check out my personal pages. You will see some work emerging on the
mapping of structures stored on the shared info server onto my
knowledgebase/blackboard. More on this work will appear over the next few
weeks.

Other - I spoke recently to Phil Cohen about the work they are doing at
OGI. Looks like our own Michael Johnson is reimplimenting the unification
architecture of their agent control language (ACL). Phil is doing a great
deal of work with Pentium based "hand held" machines (he calls them lunch
boxes because of the heat/power requirements of the Pentium machine). He
would absolutely love to get his hands on a message pad 2000 as one of his
platforms. Given the visibility that his work has gotten, particularly
with the Army, I think we should really try to seed him with some of these
devices and try to break the MicroTel stranglehold.

Phil and I spoke of another visit with Bran and Austin and Jed for sometime
in February. I mentioned this to Austin and he's up for it. I think the
goal should be to really see if anything in his ACL might be useful in the
context of our knowledge management strategy, particularly as it might
relate to MCF. Another area for potential collaboration might be in dialog
modeling since he faces similar issues to Telassist in terms of what the
user might say to the machine and how clarification would work. If things
look potentially good we might be able to seed him with some of the new
Newtons.

Finally, I signed up for a OD programming course in late January.

Tom

MILLER00000133/APLNDC630-0000098807.

     291.   Accordingly, Apple's interpretation of Judge Posner's construction of "analyzer

server" is also inconsistent with the understanding of the inventors, who distinguished between an

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

"analyzer server" model on one hand and a shared library model, with detection and linking code executing in the same process as an application, on the other.

292.    I note, further, to the extent Apple interprets the "analyzer server" claim term, and not just Judge Posner's construction of it, to cover shared libraries or other code that runs in an application's process, it is similarly inconsistent with the understanding a person of ordinary skill in the art would have of use of the term "server" in the claims[5] and with the inventors' clear understanding that an "analyzer server" was distinct from a "shared library" operating in the application's process.

293.    Indeed, as discussed above in Section V, the inventors explained the invention to the PTO by distinguishing it from applications that detected structures and linked them to actions via code internal to the application:  "In addition, Applicants' invention is a system-wide service that can be used to enable cooperating systems to detect recognizable structures in their data." May 1, 1998 Statement, p. 3.

> In contrast, Applicants' specification and claims use the term "structure" to mean a recognizable pattern having "semantic significance such as phone numbers, e-mail addresses, post-office addresses, zip codes and dates" (page 1, lines 12-13 and lines 21-24).  These structures can appear in any document or file and are generated *externally* to Applicants' system.  In addition, Applicants' invention is a system-wide service that can be used to enable cooperating systems to detect recognizable structures in their data.

*Id*.

### B.    "linking actions to the detected structures"

294.    Judge Posner construed the phrase "linking actions to the detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure."

---

[5]    The '647 applicants submitted a prior art reference during '647 patent's prosecution  that illustrates this understanding of a client-server relationship at the time of the invention. *See* K. Shoens et al. "The Rufus System: Information Organization for Semi-Structured Data," Procs. of the 19th VLDB Conf. (Dublin 1993).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

Motorola had proposed this construction.  Apple had proposed an alternative construction that was rejected:  "associating detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are associated."  As Judge Posner noted, the parties constructions differed as to the meaning of "linking" and as to the number of actions that must be linked.

295.    As to "linking," Judge Posner noted that the difference between the parties' constructions as to "linking" was that Motorola's required a "specified connection" while Apple's required only an "association."  Judge Posner noted that the specification discussed the use of "conventional pointers" which "stores a computer memory address" for the action in question.  No. *Apple Inc. v. Motorola*, Order of March 19, 2012, Case No. 1:11-cv-08540, at 10.  As he stated, "Linking by pointers thus entails storing the memory address of the code that performs the action relevant to the recognized."  *Id*.  Judge Posner thus found that Motorola's construction was correct.

296.    As to the number of actions that must be linked, Judge Posner rejected Apple's argument that two or more actions must be linked to each structure.  He specifically noted that Figure 4 of the patent contemplates only a single linked action as to a structure.  No. *Apple Inc. v. Motorola*, Order of March 19, 2012, Case No. 1:11-cv-08540, at 10.  *See, e.g.*:



FIG. 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

'647 patent, Fig. 4 (annotation added).  Judge Posner further noted that "the ability to link a structure to a single action still comports with the patent's plural reference, so long as other structures are linked to other actions. An analyzer that links dates to the calendar and phone numbers to the phone book still "links structures to actions."

### C.   "an action processor"

297.   The Court in this matter has issued a claim construction for the term "action processor."  I understand the Court found that the correct construction of that term is "program routine(s) that perform the selected action on the detected structure."  Additionally, the Court rejected Samsung's proposed construction, which I understand was "a program routine separate from a client that performs the selected action on the detected structure."  Specifically, I understand that the Court rejected Samsung's contention that the "action processor" must be separate from client applications.  Dkt. #447 at 15-16.  As I noted above, I have applied the Court's construction throughout my analysis.

## VIII.   TERMS NOT CONSTRUED

### A.   "actions"/"structures"

298.   Apple contends as to much of the art that it does not anticipate the claims of the '647 patent because the particular system either only detects one type of structure or only associates one type of action with the detected structures.  Apple's Supplemental Objections and Responses to Samsung's Interrogatory No. 26.

299.   I addressed Judge Posner's construction regarding the number of actions that must be linked above, in Section VII.  I agree with Judge Posner that the '647 patent does not require more than one action be linked to a structure, for the reasons noted by Judge Posner.  Additionally, I note that the '647 patent also states that the "present invention" can incorporate an "open-ended number and type… of candidate actions":

> The present invention has significant advantages over previous systems, in that the present system may incorporate an open-ended number and type of recognizable patterns, an open-ended number and type of pattern analysis units, and further that the system may enable an open-ended number and

type (i.e. scripts, macros, code fragments, etc.) of candidate actions to associate with, and thus perform, on each identified structure.

'647 patent, 2:12-20.  The patent thus makes clear that any number of actions may be incorporated into the system, and that they need not be of the same "type"—i.e. there need only be one, but if there are multiple actions, they can be "scripts, macros, code fragments, etc."

300.   Similarly, the excerpt discussed above demonstrates that the patentees (1) distinguished between number and type, which Apple does not do in its arguments regarding the number of structures or actions disclosed by various systems; and (2) understood that an "open-ended number" of structures could be detected under the scope of the patent.  As to (1), in trying to distinguish the prior art, Apple argues that more than one "type" of structure must be detected. But this is in contradiction to the patentee's understanding as expressed in the specification— where they distinguished between the number and type of structures that would be detected by patterns and pattern analysis units.  If the patent claims are read to require multiple "structures" be detected, the multiple structures need not be of different types.  If the '647 inventors wanted to require that the analyzer server detect not just multiple structures, multiple "types" of structures, they would have drafted the claims to express this—they understood the distinction from the specification.  As to (2), the patentee's expressed their clear understanding in the specification that *any* number of structures could be detected—i.e., an "open-ended" number—and still be covered by the patent.  This is similarly contrary to Apple's position.

**B.    "fast string search function"**

301.   In my opinion, the term "fast string search function" does not point out and distinctly claim the subject matter covered by claim 6 of the '647 patent.   The language does not make it clear what subject matter claim 6 encompasses, because a person of ordinary skill in the art would not be reasonably apprised of the scope of the invention.  In particular, the use of the term "fast" renders the claim's scope indefinite.  I understand that a claim term that implicates a subjective judgment—such as what constitutes "fast"—can be indefinite.  There is no guidance in the '647 patent as to what would constitute a "fast" string search function, as opposed to any other

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

form of string search function, or even what metrics should be used when assessing "fastness." Moreover, the subjective term "fast" would vary based on the hardware and other details over time.  A string search function not considered "fast" in 1994 may be considered "fast" in 2013, or may perform in a manner a person of ordinary skill in the art would deem "fast" in some situations but not in others.  In fact, because of algorithmic advances, a "fast" string search function in 1994 no longer be considered "fast" in 2013. Accordingly, claim 6 does not distinctly claim the subject matter covered, and in my opinion is indefinite.

302.    To the extent Apple contends that "fast string search function" has a particular meaning in the art, that meaning is not disclosed in the '647 patent and Apple's contentions make clear that Apple has not limited their contentions to any such particular definition of the term. Numerous algorithms were available in the art for searching strings.  The performance of these algorithms can be compared against other algorithms for accomplishing the same task, and conclusions drawn about whether one algorithm is "faster" or "better" than another.  However, just as there is no one algorithm that must be used for searching strings, there is no one string search function that is referred to as a "fast string search function".  Accordingly, the term "fast string search function" is indefinite.

## IX.    ANTICIPATION OF THE ASSERTED CLAIMS

303.    In Sections IX A-E, I provide an overview of my opinions relating to anticipation of the '647 patent by the Sidekick system, the Sidekick Handbook, the Perspective system, Mosaic/MHonArc, and Embedded Buttons.  Additionally, for the reasons stated in each section, I understand that these systems and references are prior art to the '647 patent.

### A.    Sidekick System

304.    Sidekick was a software program sold by Borland International in the mid 1980s. *See, e.g.,* SAMNDCA630-00963745 ("Copyright © 1985 by BORLAND INTERNATIONAL Inc.").  The Sidekick system was used as a "Desktop Organizer" that was advertised as "Just a Keystroke Away" because it operated as a "Terminate and Stay Resident" ("TSR") program that could run in the background while any other main application program ran.  *See, e.g.,*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

1.      **The Sidekick System Renders The Asserted Claims of the '647 Patent**
**Invalid as Obvious**

675.    I incorporate by reference my discussion of the Sidekick system in the anticipation section (*See* paragraphs 304-348).  In my opinion, as set forth below, the Sidekick system also renders obvious the asserted claims of the '647 patent.

676.    As set forth above, it is my opinion that the Sidekick system anticipates the asserted claims of the '647 patent.  In the alternative, to the extent that any limitation is found not to be explicitly or inherently disclosed, particularly as Apple argues, a person of ordinary skill in the art at the time of the alleged invention would have found that limitation obvious based on the Sidekick system and the state of the art at the time of the invention.[16]

(a)    Claim 1

(i)    "an analyzer server for detecting structures in the data, and for linking actions to the detected structures"

677.    I understand that Apple argues that Sidekick does not disclose an "analyzer server for detecting structures in the data, and for linking actions to the detected structures."  Apple argues that this limitation is not disclosed because Sidekick detects one type of structure—phone numbers—and links one type of action to them—Dial. *See* Apple's Supplemental Response to Interrogatory No. 26, at 99-133, 282-282, and documents cited therein. As an initial matter, for the reasons set forth above in Section VII, I do not agree that the '647 patent requires the detection of multiple structures and multiple actions.  As a matter of grammar, and as disclosed in the specification, the claims only require the detection of one type of structure and only require linking one type of action.  See, for instance, Figure 4 of the '647 patent:

---

[16]   Only a subset of the limitations of the asserted claims and the possible interpretations of those limitations are discussed herein.  Any claim limitation or interpretation not discussed is invalid for other reasons enumerated elsewhere in this Report, including in my anticipation section.

368, Sidekick Handbook discloses a user interface enabling the selection of a detected structure and a linked action. To the extent the Sidekick Handbook does not disclose the use of a pop-up menu, this can be attributed to the graphical capabilities of MS-DOS programs such as the the software described in Sidekick Handbook. Sidekick Handbook was written in the 1980s. The MS-DOS operating system and the programs that ran on that operating system had significantly more limited graphical capabilities than those that existed at the time of the alleged invention of the '647 patent. By that time, it was well-known to a person of ordinary skill in the art to use pop-up menus. Additionally, the use of a menu for options at the bottom of the screen was merely a design choice, likely to minimize disruption since Sidekick was intended to run in the background.

### 3. Embedded Buttons Renders The Asserted Claims of the '647 Patent Invalid as Obvious

704. I incorporate by reference my discussion of the Embedded Buttons prior art in the anticipation section (*See* paragraphs 502-589). In my opinion, as set forth below, the Embedded Buttons prior art also renders obvious the asserted claims of the '647 patent.

705. As set forth above, it is my opinion that the Embedded Buttons prior art anticipates the asserted claims of the '647 patent. In the alternative, that to the extent any limitation is found not to be explicitly or inherently disclosed, particularly as Apple argues, a person of ordinary skill in the art at the time of the alleged invention would have found that limitation obvious based on the Embedded Buttons prior art and the state of the art at the time of the invention.[18]

(a) Claim 1

(i) "an analyzer server for detecting structures in data and linking actions to the detected structures"

---

[18] Only a subset of the limitations of the asserted claims and the possible interpretations of those limitations are discussed herein. Any claim limitation or interpretation not discussed is invalid for other reasons enumerated elsewhere in this Report, including in my anticipation section.

 HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

_____          _____August 12, 2013_____
             Kevin Jeffay                                    Date

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING INVALIDITY OF U.S. PATENT NO. 5,946,647

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

APPLE INC., a California corporation,

          Plaintiff,

     vs.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

          Defendants.

CASE NO. 12-cv-00630-LHK

**REBUTTAL EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING
NONINFRINGEMENT OF U.S. PATENT NO. 5,946,647**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

1   appear to be universal context menu options that Dr. Mowry does not claim are "linked actions."

2   And, again, without knowing the underlying composition of the code providing the functions

3   being compared, there is no way for Dr. Vellturo to assert that Samsung was making any value

4   judgment regarding anything claimed in the '647 patent.

5        118.   As to Dr. Vellturo's alleged descriptions and analysis of the noninfringing

6   alternatives to the '647 patent in Exhibit 11 to his Report, Dr. Vellturo misstates both the form of

7   the alternatives I understand have been proposed and the alleged benefits of the '647 patent (i.e.

8   that "multiple actions" is an explicit benefit).  I have set forth a rebuttal to the type of analysis Dr.

9   Vellturo provides (which is essentially repeated in Dr. Mowry's report) in Section XII of this

10  report.

11       119.   I also note that Dr. Vellturo did not address Judge Posner's finding regarding the

12  "ease of designing around the patent claims at issue" (including claim 1, from which all claims in

13  this case depend), as I discuss below in paragraph 128.  *See Apple v. Motorola*, Case: 1:11-cv-

14  08540, Dkt. # 1038 (06/22/12) at 24.

15  **VI.**   **CLAIM CONSTRUCTION**

16       120.   As I set forth in my initial report, the Court in this matter has issued one claim

17  construction, for the term "action processor."  I understand the Court found that the correct

18  construction of that term is ""program routine(s) that perform the selected action on the detected

19  structure."  I have applied that construction throughout my analysis.

20       121.   I understand the District Court for the Northern District of Illinois (Judge Posner)

21  has previously issued claim construction rulings in *Apple v. Motorola*, Case No. ND-IL-08540,

22  that construe the terms "an analyzer server" and "linking actions to the detected structures."  I

23  understand that those constructions are currently being appealed by Apple to the Federal Circuit.  I

24  have reviewed those constructions, and I address them, along with Apple's interpretation of them,

25  below.  I note that in Dr. Mowry's analysis, he refers to "Apple's Proposed Construction" and

26

27

28

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

"Samsung's Proposed Construction" to refer to the constructions Judge Posner rejected and those he ruled were correct, respectively. *See, e.g.*, Mowry paragraph 68.

122.    Additionally, I understand that the U.S. International Trade Commission has previously construed certain terms in the '647 patent.   It is my understanding that those constructions are not binding as a matter of law.   I have, however, reviewed them as part of preparing this report.

### A.    "an analyzer server"

123.    Judge Posner construed the phrase "analyzer server" as "a server routine separate from a client that receives data having structures from the client."   Motorola had proposed this construction.   Apple had proposed an alternative construction that was rejected:   "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure."   Judge Posner found that Apple's interpretation rendered the term "server" superfluous, and described only an "analyzer":

> Under Apple's interpretation, any set of routines that performs structure detection and linking would be an analyzer server. But that is just a definition of an "analyzer." "Server" becomes superfluous, as Apple's expert implicitly acknowledges by stating that "the inventors used ['server'] in a generic sense intending to describe a *service* that includes various functionalities." That understanding renders any piece of code a "server."

*Apple Inc. v. Motorola*, Order of March 19, 2012, Case No. 1:11-cv-08540, at 9.   In rejecting Apple's construction, Judge Posner made it clear that the construction he was adopting required that the analyzer server not be "integrated into the application," but rather be "separate":   "Had the patent intended the analyzer server to be integrated into the application, rather than separate, the program box would logically appear inside the application box in Figure 1."   *Id.*

124.    I note that Judge Posner explicitly found the "ease of designing around the patent claims at issue" (including claim 1, from which all claims in this case depend), based on his construction in that case.   *Apple v. Motorola*, Case: 1:11-cv-08540, Dkt. # 1038 (06/22/12) at 24. Judge Posner specifically found that:

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

> Given my claim construction of the '647 patent, Motorola could design around simply by creating copies of the code that performs structure detection and linking for each particular program rather than by using a common-code module for all programs; for without a common code there is no 'analyzer server,' as required by the patent claim.

*Id.*

125.   I set forth in my initial report my analysis regarding these constructions.  I further address briefly Dr. Mowry's discussion of these constructions below:

126.   From paragraphs 70-73, Dr. Mowry argues that the "analyzer server" must consist of multiple routines in software.  As far as I am aware, no party to this litigation has taken the position that the "analyzer server" must consist of a single routine, and Judge Posner's construction does not limit the "analyzer server" to a single routine.

127.   In paragraphs 74-78, Dr. Mowry argues against the Judge Posner's construction of "analyzer server," and appears to attack arguments that I understand Samsung has never made in this case.  I note that Judge Posner apparently rejected the same arguments Dr. Mowry now repeats, and rejected the construction Dr. Mowry is advocating for in these paragraphs.

**B.     "linking actions to the detected structures"**

128.   Judge Posner construed the phrase "linking actions to the detected structures" as "creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure." Motorola had proposed this construction.  Apple had proposed an alternative construction that was rejected:  "associating detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are associated."  As Judge Posner noted, the parties constructions differed as to the meaning of "linking" and as to the number of actions that must be linked.

129.   As to "linking," Judge Posner noted that the difference between the parties' constructions as to "linking" was that Motorola's required a "specified connection" while Apple's required only an "association."  Judge Posner noted that the specification discussed the use of

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

"conventional pointers" which "stores a computer memory address" for the action in question. *Apple Inc. v. Motorola*, Order of March 19, 2012, Case No. 1:11-cv-08540, at 10.  As he stated, "Linking by pointers thus entails storing the memory address of the code that performs the action relevant to the recognized." *Id.*  Judge Posner thus found that Motorola's construction was correct.

130.    As to the number of actions that must be linked, Judge Posner rejected Apple's argument that two or more actions must be linked to each structure.  He specifically noted that Figure 4 of the patent contemplates only a single linked action as to a structure.  *Apple Inc. v. Motorola*, Order of March 19, 2012, Case No. 1:11-cv-08540, at 10.  *See, e.g.:*



FIG. 4

'647 patent, Fig. 4 (annotation added).  Judge Posner further noted that "the ability to link a structure to a single action still comports with the patent's plural reference, so long as other structures are linked to other actions. An analyzer that links dates to the calendar and phone numbers to the phone book still "links structures to actions."

131.    I set forth in my initial report my analysis regarding these constructions.  I further address Dr. Mowry's discussion of these constructions below:

132.    In paragraphs 79-80, Dr. Mowry purports to identify evidence he says supports what he terms "Apple's proposed construction."  I note that of the evidence in paragraphs 79 and 80, none of it appears to relate to the two core differences between the constructions Dr. Mowry

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1  addresses:  "associating" versus "creating a specified connection" and whether the asserted claims

2  only cover  systems that link multiple actions, or also covers systems that link single actions.

3        133.    In paragraph 81-83, Dr. Mowry criticizes the portion of Judge Posner's construction

4  that construes "linking" to mean "creating a specified connection."  Dr. Mowry says that the patent

5  uses "link" and "associate" interchangeably, but in each piece of evidence he cites, there is no

6  interchangeable use—just examples of the use of "association" in the patent.  Dr. Mowry does not

7  address the specification's description of "conventional pointer" in creating links, nor does he

8  address the difference between the constructions regarding the linking of multiple or single

9  actions.

10        **C.**    **"an action processor"**

11        134.    The Court in this matter has issued a claim construction for the term "action

12  processor."  I understand the Court found that the correct construction of that term is "program

13  routine(s) that perform the selected action on the detected structure."  Additionally, the Court

14  rejected Samsung's proposed construction, which I understand was "a program routine separate

15  from a client that performs the selected action on the detected structure."  Specifically, I

16  understand that the Court rejected Samsung's contention that the "action processor" must be

17  separate from client applications.  Dkt. #447 at 15-16.  As I noted above, I have applied the

18  Court's construction throughout my analysis.  I further note that while Dr. Mowry states he applies

19  this analysis in general (paragraph 66), Dr. Mowry does not appear to apply the Court's

20  constructing in his analysis, and quotes only the claim language instead.  *See* Mowry paragraphs

21  159-161; 213-214.

22  **VII.**   **TERMS NOT CONSTRUED**

23        **A.**    **"actions"/"structures"**

24        135.    I set forth my agreement in my opening report with Judge Posner, that the '647

25  patent does not require more than one action be linked to a structure.  I further expressed my

26

27

28

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1    opinion that multiple *types* of structures need not be detected—a position with which I understand

2    Apple and Dr. Mowry disagree.

3        136.    I note that Dr. Mowry expresses that in his opinion, linking only a single action

4    does not infringe the '647 patent.  *See, e.g.* Mowry paragraphs 19, 273.  I also note, however, that

5    Dr. Mowry opines that devices that he acknowledges only link a single action infringe the '647

6    patent.  Mowry, fns. 10 and 11.  And, as I noted in my opening report, Apple contends that much

7    of the prior art does not anticipate the claims of the '647 patent because the particular system either

8    only detects one type of structure or only associates one type of action with the detected structures.

9    Apple's Supplemental Objections and Responses to Samsung's Interrogatory No. 26.  I disagree as

10   set forth in my opening report.

11       **B.    "fast string search function"**

12       137.    I expressed my opinion in my opening report that the term "fast string search

13   function" does not point out and distinctly claim the subject matter covered by claim 6 of the '647

14   patent, and is thus indefinite.  I incorporate that discussion here.  I note that Dr. Mowry nowhere

15   actually identifies a "fast string search function" in the Accused Devices, instead pointing to

16   general functions that perform string searching. *See* Mowry paragraphs 167-169, 218-219.  I also

17   note that in paragraph 265 of his report, Dr. Mowry states that the "fast string search function"

18   term "do[es] not carry any special meaning in the '647 patent."

19   **VIII.   OVERVIEW OF THE ACCUSED SAMSUNG PRODUCTS**

20       138.    I understand that Dr. Mowry (and Apple) is accusing a number of Samsung

21   Android phones and tablets running Android versions Froyo through Jelly Bean of infringing the

22   asserted claims of the '647 patent.  In paragraph 93 of his Report, Dr. Mowry provides the

23   following list of accused products, which he calls the "Accused Browser Products": Admire,

24   Captivate Glide, Conquer 4G, Dart, Exhibit II 4G, Galaxy Nexus, Galaxy Note, Galaxy Note II,

25   Galaxy Rugby Pro, Galaxy S II, Galaxy S II Epic 4G Touch, Galaxy S II Skyrocket, Galaxy S III,

26   Illusion, Stratosphere, and Transform Ultra.

27

28

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

determine whether his analysis in that case was the same.   Additionally, it is apparent from reviewing those redacted reports that Dr. Mowry was applying constructions that he has not adopted or advocated for in this case, and which I understand do not apply.   As just one example, I understand the Court in this matter has adopted a construction of "action processor" which was not adopted by the ITC.   Moreover, Judge Posner adopted the constructions I addressed above in Section VI, rejecting the constructions the ITC was applying in that case.

261.    Based on my review of the materials that are available in the case and cited by Dr. Mowry, I cannot conclude that there is any basis for Dr. Mowry's opinion that findings regarding the HTC Browser have any relevance here.

262.    Regardless, to the extent Dr. Mowry is correct, I note that a review of his reports shows that Dr. Mowry in the ITC advocated for the validity of a number of claims that have now been rejected by both the ITC and the Patent Office.

263.    I further note that Dr. Mowry includes no mention in his analysis that the District Court for the Northern District of Illinois found that Apple was incapable of showing any damages relating to the '647 patent, and further rejected both of the constructions Dr. Mowry suggests he continues to stand by in this case.

264.    For the reasons set forth below, it is my opinion that the Accused Devices with Browser do not infringe claim 1 of the '647 patent.

1.    **Browser (Froyo, Gingerbread, and Ice Cream Sandwich) Does Not Satisfy Claim 1 Because Browser Does Not Have "An Analyzer Server for Detecting Structures in the Data and for Linking Actions to Detected Structures"**

265.    In paragraphs 132-134, 138-143, 227, 229, and 231, Dr. Mowry opines that Froyo, Gingerbread, Ice Cream Sandwich Accused Devices with Browser satisfy the limitation "an analyzer for detecting structures in the data and for linking actions to the detected structures."   For the reasons set forth below, I disagree.   I understand that Apple proposes that the claim term

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1  "analyzer server" be construed to mean "a program routine(s) that receives data, uses patterns to

2  detect structures in the data, and links actions to the detected structures."  I understand Judge

3  Posner rejected this construction.  I discuss Dr. Mowry's analysis under both constructions in this

4  section, and the construction adopted by Judge Posner more specifically in the section following.

5      266.   As an initial matter, Dr. Mowry nowhere squares his analysis with the fact he does

6  not identify anything a person of ordinary skill in the art would consider a "server."  Dr. Mowry's

7  entire analysis is premised on first finding the presence of functions for "analyzing" (*e.g.*,

8  functions for detecting and linking) and then simply calling whatever it is he found a "server."

9  That is, Dr. Mowry appears to believe that if the functions of an "analyzer" are present then an

10 analyzer server is necessarily present.  Never does Dr. Mowry actually identify any server

11 functions or other indicia of a "server" in the Accused Devices as that term would be understood

12 by a person of ordinary skill in the art.  I do not believe Dr. Mowry has applied any objective

13 criteria that would be accepted by persons in the community of experts to determine whether there

14 is a server that is the claimed "analyzer server" in the Accused Devices.

15     267.   Moreover, Dr. Mowry's opinion in paragraph 229 that "one of ordinary skill in art

16 would understand the shared libraries [he] identified above to satisfy the 'server' limitation of

17 claim 1" is wrong.  Tellingly, Dr. Mowry cites no evidence that this is the case and provides no

18 explanation why this is the case.  A person of ordinary skill in the art would not find that a "shared

19 library" is a "server."  "Shared libraries" and "servers" are different, well-known concepts in

20 computer science, and even a computer science major (for instance, a student of Dr. Mowry's at

21 Carnegie Mellon University) would not confuse the two. Shared libraries exist solely as a

22 convenience to the programmer.  A shared library is a collection of routines that provide functions

23 that are expected to be used in multiple applications. And when an application uses a shared

24 library, the code of that library is integrated into the application and becomes part of the

25 application. In particular, at run-time code in a shared library used by an application is

26 indistinguishable from any other piece of application code. Shared libraries save the programmer

27

28

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

the effort of having to write routines to implement common functions. Beyond this time saving convenience (that can be achieved in other ways without using a shared library), there is no functional benefit to using a shared library. For example, had the programmer not used a shared library and had instead written or incorporated routines found in a shared library as part of her application, then one could not tell the difference between one program using routines from the shared library and another program using the same routines that were part of the application. As such, the use of shared libraries (versus code placed in the application directly) adds no value to the user experience. Moreover, a shared library is passive; it does nothing by itself. Until the library is integrated into the application and used by the application, the code in the shared library does nothing (and is incapable of doing anything).

268.    In contrast, a server is an active component of a computer system. It is the execution of program that communicates with (provides services to) and is separate from, programs interacting with the server. *The Authoritative Dictionary of IEEE Standard Terms* (7th Ed., 2000) at 1031 (entry for "server"(5)).  A server is a program whereas a shared library is a part of a program. Without a program to execute a shared library, a shared library is not capable of performing any function; a server, however, provides functions on its own. I note that in the computer science field in September 1994, as well as today, computer science and engineering students would typically first encounter the concept of a "server" in an operating systems or networking/distributed systems course. I taught such courses in September 1994 and I know that texts commonly used in that period, such as Abraham Silberschatz & Peter Galvin, *Operating System Concepts*, Addison Wesley (4th Ed. 1994), Andrew S. Tanenbaum, *Distributed Operating Systems*, Prentice Hall (1994), Douglas E. Comer, *Internetworking with TCP-IP: Principles, Protocols and Architecture* (1988), all described a server in manner consistent with the IEEE Dictionary and my explanations here. ***None*** of these texts teach or suggest that a shared library is ever considered a server.  It is a basic error to conflate a shared library with a server.

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

269.    Accordingly, it is my opinion Dr. Mowry's analysis is insufficient to show an "analyzer server" under any construction.  Dr. Mowry has failed to apply any discernible, objective criteria that would be accepted by persons in the community of experts in the field to determine if there is an "analyzer server" in the Accused Devices.  His entire analysis appears to be driven by a search for functionality without any application of the sort of expertise that would be available to a person operating in this field.  Merely citing to functions in code and related functionality does not demonstrate the existence of an "analyzer server," and my own analysis— set forth above in Sections VIII.C.1, VIII.C.2 and VIII.F—demonstrates that in fact there is no indicia of an "analyzer server" in the Accused Devices.  Rather, there is only evidence that there is a single, unitary Browser application that contains detection routines and provides the user with a menu of options—but does not actually perform any linking.

270.    I further note that Apple's construction, in stating that the analyzer server "links actions to the detected structure" appears to require that multiple actions be linked to a detected structure.  For the reasons set forth in Sections IX.A.3 and IX.A.4 below, under Dr. Mowry's own analysis only one action is ever "linked" to a detected structure because the "action" Dr. Mowry identifies is a runtime instance of the startActivity() method after it receives an Intent, and thus only one "action" ever exists as "linked" (according to Dr. Mowry) with a detected structure at a time.  In fact, according to Dr. Mowry's analysis it is *impossible* in the Accused Devices that the system "links actions [plural] to the detected structure," because only one "action" (StartActivity) is ever "linked" during runtime. And when StartActivity executes, only one "link" to a user-visible action will ever be created after the user selects an item on a menu. Once this user-specified action is completed, any "link" to that action is removed and the system returns to the state wherein no user-visible actions are linked to any structure and StartActivity is the only "linked action" (and even this "action" is not "linked to the detected structures"). Thus, it is not possible for the Accused Devices to "links actions [plural] to the detected structure." Dr. Mowry nowhere

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

linked to detected structures.  Accordingly, the accused products perform substantially different functions in substantially different ways to achieve a substantially different result from the claimed "analyzer server" of the asserted claims.

## 2. Browser (Jelly Bean) Does Not Satisfy Claim 1 Because Browser Does Not Have "An Analyzer Server for Detecting Structures in the Data and for Linking Actions to Detected Structures"

293.    In paragraphs 132, 135-137, 138-143, 227, 229 and 231, Dr. Mowry opines that Jelly Bean Accused Devices with Browser satisfy the limitation "an analyzer for detecting structures in the data and for linking actions to the detected structures."  For the reasons set forth below, I disagree.  I understand that Apple proposes that the claim term "analyzer server" be construed to mean "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structures."  I understand Judge Posner rejected this construction.  I discuss Dr. Mowry's analysis under both constructions in this section, and the construction adopted by Judge Posner more specifically in the section following.

294.    As an initial matter, as with pre-Jelly Bean products, Dr. Mowry nowhere squares his analysis with the fact he does not identify anything a person of ordinary skill in the art would consider a "server."  Dr. Mowry's entire analysis is premised on first finding the presence of functions for "analyzing" (*e.g.*, functions for detecting and linking) and then simply calling whatever it is he found a "server." That is, Dr. Mowry appears to believe that if the functions of an "analyzer" are present then an analyzer server is necessarily present. Never does Dr. Mowry actually identify any server functions or other indicia of a "server" in the Accused Devices as that term would be understood by a person of ordinary skill in the art.  I do not believe Dr. Mowry has applied any objective criteria that would be accepted by persons in the community of experts to determine whether there is a server that is the claimed "analyzer server" in the Accused Devices.

295.    Moreover, Dr. Mowry's opinion in paragraph 229 that "one of ordinary skill in art would understand the shared libraries [he] identified above to satisfy the 'server' limitation of

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

claim 1" is wrong.  Tellingly, Dr. Mowry cites no evidence that this is the case and provides no explanation why this is the case.  A person of ordinary skill in the art would not find that a "shared library" is a "server."  "Shared libraries" and "servers" are different, well-known concepts in computer science, and even a computer science major at Carnegie Mellon university would not confuse the two. A shared library is a collection of routines that provide functions that are expected to be used in multiple applications. And when an application uses a shared library, the code of that library is integrated into the application and becomes part of the application. In particular, at run-time code in a shared library used by an application is indistinguishable from any other piece of application code. Shared libraries exist solely as a convenience to the programmer. Shared libraries save the programmer the effort of having to write routines to implement common functions. Beyond this time saving convenience (that can be achieved in other ways without using a shared library), there is no functional benefit to using a shared library. For example, had the programmer not used a shared library and had instead written or incorporated routines found in a shared library as part of her application, then one could not tell the difference between one program using routines from the shared library and another program using the same routines that were part of the application.  As such, the use of shared libraries (versus code placed in the application directly) adds no value to the user experience.  Moreover, a shared library is passive; it does nothing by itself. Until the library is integrated into the application and used by the application, the code in the shared library does nothing (and is incapable of doing anything).

296.   In contrast, a server is an active component of a computer system. It is the execution of program that communicates with (provides services to) and is separate from, programs interacting with the server. *The Authoritative Dictionary of IEEE Standard Terms* (7th Ed., 2000).  A server is a program whereas a shared library is a *part* of a program. Without a program to execute a shared library, a shared library is not capable of performing any function; a server, however, provides functions on its own. I note that in the computer science field in September 1994, as well as today, computer science and engineering students would typically first

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1  encounter the concept of a "server" in an operating systems or networking/distributed systems

2  course. I taught such courses in September 1994 and I know that texts commonly used in that

3  period, such as Abraham Silberschatz & Peter Galvin, *Operating System Concepts*, Addison

4  Wesley (4th Ed. 1994), Andrew S. Tanenbaum, *Distributed Operating Systems*, Prentice Hall

5  (1994), Douglas E. Comer, *Internetworking with TCP-IP: Principles, Protocols and Architecture*

6  (1988), all described a server in manner consistent with the IEEE Dictionary and my explanations

7  here. ***None*** of these texts teach or suggest that a shared library is ever considered a server.  It is a

8  basic error to conflate a shared library with a server.

9      297.    Accordingly, it is my opinion Dr. Mowry's analysis is insufficient to show an

10  "analyzer server" under any construction.   Dr. Mowry has failed to apply any discernible,

11  objective criteria that would be accepted by persons in the community of experts in the field to

12  determine if there is an "analyzer server" in the Accused Devices.  His entire analysis appears to

13  be driven by a search for functionality without any application of the sort of expertise that would

14  be available to a person operating in this field.  Merely citing to functions in code and related

15  functionality does not demonstrate the existence of an "analyzer server," and my own analysis—

16  set forth above in Sections VIII.D.1, VIII.D.2 and VIII.F—demonstrates that in fact there is no

17  indicia of an "analyzer server" in the Accused Devices.  Rather, there is only evidence that there is

18  a single, unitary Browser application that contains detection routines and provides the user with a

19  menu of options—but does not actually perform any linking.

20      298.    I further note that Apple's construction, in stating that the analyzer server "links

21  actions to the detected structure" appears to require that multiple actions be linked to a detected

22  structure.  For the reasons set forth in Sections IX.A.3 and IX.A.4 below, under Dr. Mowry's own

23  analysis only one action is ever "linked" to a detected structure because the "action" Dr. Mowry

24  identifies is a runtime instance of the startActivity() method after it receives an Intent, and thus

25  only one ever exists as "linked" (according to Dr. Mowry) with a detected structure at a time.  In

26  fact, according to Dr. Mowry's analysis it is *impossible* in the Accused Devices that the system

27

28

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**

EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

## X.    SAMSUNG ACCUSED PRODUCTS WITH MESSENGER DO NOT INFRINGE THE ASSERTED CLAIMS OF THE '647 PATENT

393.    For the reasons set forth below, it is my opinion that Samsung Accused Products with Messenger do not infringe the asserted claims of the '647 patent.  I further incorporate here my discussion of Dr. Mowry's reliance on his work in an ITC investigation in which he participated involving HTC.  *See* Section IX.A.

### A.    Samsung Accused Products with Messenger Do Not Infringe Claim 1

394.    In my opinion, the Samsung Accused Products with Messenger do not infringe claim 1, for the reasons set forth below:

#### 1.    Messenger (All Versions) Does Not Satisfy Claim 1 Because Messenger Does Not Have "An Analyzer Server for Detecting Structures in the Data and for Linking Actions to Detected Structures"

395.    In paragraphs 192-208, 227, 229, and 231, Dr. Mowry opines that Accused Devices with Messenger satisfy the limitation "an analyzer for detecting structures in the data and for linking actions to the detected structures."   For the reasons set forth below, I disagree.   I understand that Apple proposes that the claim term "analyzer server" be construed to mean "a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structures."  I understand Judge Posner rejected this construction.  I discuss Dr. Mowry's analysis under both constructions in this section, and the construction adopted by Judge Posner more specifically in the section following.

396.    As an initial matter, Dr. Mowry nowhere squares his analysis with the fact he does not identify anything a person of ordinary skill in the art would consider a "server."  Dr. Mowry's entire analysis is premised on first finding the presence of functions for "analyzing" (*e.g.*, functions for detecting and linking) and then simply calling whatever it is he found a "server."  That is, Dr. Mowry appears to believe that if the functions of an "analyzer" are present then an analyzer server is necessarily present.  Never does Dr. Mowry actually identify any server

242

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE

functions or other indicia of a "server" in the Accused Devices as that term would be understood by a person of ordinary skill in the art.  I do not believe Dr. Mowry has applied any objective criteria that would be accepted by persons in the community of experts to determine whether there is a server that is the claimed "analyzer server" in the Accused Devices.

397.    Moreover, Dr. Mowry's opinion in paragraph 229 that "one of ordinary skill in art would understand the shared libraries [he] identified above to satisfy the 'server' limitation of claim 1" is wrong.  Tellingly, Dr. Mowry cites no evidence that this is the case and provides no explanation why this is the case.  A person of ordinary skill in the art would not find that a "shared library" is a "server."  "Shared libraries" and "servers" are different, well-known concepts in computer science, and even a computer science major (for instance, a student of Dr. Mowry's at Carnegie Mellon University) would not confuse the two. A shared library is a collection of routines that provide functions that are expected to be used in multiple applications. And when an application uses a shared library, the code of that library is integrated into the application and becomes part of the application. In particular, at run-time code in a shared library used by an application is indistinguishable from any other piece of application code. Shared libraries exist solely as a convenience to the programmer. Shared libraries save the programmer the effort of having to write routines to implement common functions. Beyond this time saving convenience (that can be achieved in other ways without using a shared library), there is no functional benefit to using a shared library. For example, had the programmer not used a shared library and had instead written or incorporated routines found in a shared library as part of her application, then a user could not tell the difference between one program using routines from the shared library and another program using the same routines that were part of the application. As such, the use of shared libraries (versus code placed in the application directly) adds no value to the user experience. Moreover, a shared library is passive; it does nothing by itself. Until the library is integrated into the application and used by the application, the code in the shared library does nothing (and is incapable of doing anything).

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

398.    In contrast, a server is an active component of a computer system. It is the execution of program that communicates with (provides services to) and is separate from, programs interacting with the server. *The Authoritative Dictionary of IEEE Standard Terms* (7th Ed., 2000) at 1031 (entry for "server"(5)).  A server is a program whereas a shared library is a part of a program. Without a program to execute a shared library, a shared library is not capable of performing any function; a server, however, provides functions on its own. I note that in the computer science field in September 1994, as well as today, computer science and engineering students would typically first encounter the concept of a "server" in an operating systems or networking/distributed systems course. I taught such courses in September 1994 and I know that texts commonly used in that period, such as Abraham Silberschatz & Peter Galvin, *Operating System Concepts*, Addison Wesley (4th Ed. 1994), Andrew S. Tanenbaum, *Distributed Operating Systems*, Prentice Hall (1994), Douglas E. Comer, *Internetworking with TCP-IP: Principles, Protocols and Architecture* (1988), all described a server in manner consistent with the IEEE Dictionary and my explanations here. ***None*** of these texts teach or suggest that a shared library is ever considered a server.  It is a basic error to conflate a shared library with a server.

399.    Accordingly, it is my opinion Dr. Mowry's analysis is insufficient to show an "analyzer server" under any construction.  Dr. Mowry has failed to apply any discernible, objective criteria that would be accepted by persons in the community of experts in the field to determine if there is an "analyzer server" in the Accused Devices.  His entire analysis appears to be driven by a search for functionality without any application of the sort of expertise that would be available to a person operating in this field.  Merely citing to functions in code and related functionality does not demonstrate the existence of an "analyzer server," and my own analysis— set forth above in Sections VIII.E.1, VIII.E.2, VIII.E.4, VIII.E.5, VIII.F—demonstrates that in fact there is no indicia of an "analyzer server" in the Accused Devices.  Rather, there is only evidence that there is a single, unitary Messenger application that contains detection routines and provides the user with a menu of options—but does not actually perform any linking.

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**
EXPERT REPORT OF DR. KEVIN JEFFAY CONCERNING NONINFRINGEMENT OF U.S. PATENT 5,946,647

1

2

3   DATED:  September 13, 2013

4   _____

Kevin Jeffay

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

303

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'
EYES ONLY – SOURCE CODE**