CHRISTOPHER A. VELLTURO, PH.D. - CONFIDENTIAL/AEO

Page 1

PAGES 1 - 240

EXHS. 1 - 3

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

```
* * * * * * * * * * * * * * * *
VirnetX Inc.                    *
                                *
v.                              *
                                *
Cisco Systems, Inc.,            *    Civil Action
Apple Inc., Aastra USA, Inc.,   * No. 6:10-cv-417-LED
Aastra Technologies Ltd.,       *
NEC Corporation, and            *
NEC Corporation of America      *
                                *
* * * * * * * * * * * * * * * *
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Video Deposition of Christopher A. Vellturo, Ph.D.
Thursday, August 23, 2012
W Hotel
100 Stuart Street
Boston, Massachusetts 02116

----------   J. Edward Varallo, RMR, CRR   ---------
Registered Professional Reporter
HG LITIGATION SERVICES ~ DALLAS, TEXAS
1-888-656-3376

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                APL630DEF-WHVX0000589652

CHRISTOPHER A. VELLTURO, PH.D. - CONFIDENTIAL/AEO

Page 118

1    A.   Well, they would get it after they buy the
2  phone, but the option value of having that
3  potentially available to them would factor into
4  their decision to buy the phone to begin with.
5    Q.   Do you know how much money Apple makes off
6  the App Store per phone?
7    A.   No.  I don't believe Apple knows that
8  specific number either.
9    Q.   Do you know how much Apple makes on a
10 yearly basis off the App Store?
11   A.   I have a general understanding of the
12 stand-alone profit and loss numbers for the iTunes
13 store, but that's not reflective of the overall
14 contribution of the iTunes store to Apple
15 profitability.
16   Q.   So what is that number you're talking
17 about that you're aware of?
18   A.   Well, I'm talking about two numbers.
19 Right?  One of the numbers is the fact that the
20 iTunes store enhances demand for the devices and
21 therefore enhances profitability through the sale of
22 more devices.  In terms of what Apple makes on
23 content on the store itself, I think I've seen some
24 public numbers on that that are in the 10 to 12
25 percent of revenue range.  That's what I recall.

Page 119

1    Q.   Companywide?
2    A.   I don't know what that means, companywide.
3    Q.   Well, 10 to 12 percent of what is what I'm
4  asking?
5    A.   Of the revenues specifically earned at the
6  iTunes store, that the difference between those
7  revenues and the cost associated with the iTunes
8  store, that discrepancy I think is in the 10 to 15
9  percent range.  But, as I said, that doesn't capture
10 the true contributory value of the iTunes store to
11 Apple.
12   Q.   You're saying Apple gets a 10 to 15
13 percent profit margin off of the iTunes store?
14   A.   I'm saying for every dollar of revenue
15 that directly -- Every dollar of revenue that is
16 generated by customer purchases of digital media off
17 of the iTunes store, I believe Apple makes about
18 10 to 15 cents on each of those dollars as an out-
19 of-pocket profit.  But the store itself contributes
20 much more in terms of demand complementaries to
21 other aspects of Apple's business.  So Apple doesn't
22 think about the iTunes store in a stand-alone way
23 like that.
24   Q.   Now, when you say iTunes store, are you
25 including the App Store in that?

Page 120

1    A.   Generally I do.
2    Q.   Do you know how much revenue Apple has
3  made in any way off of the App Store?
4    A.   I've seen some numbers about App Store
5  revenue, yes.
6    Q.   What were those numbers?
7    A.   I am not sure whether those are part of
8  this litigation or not.  I've seen them in other
9  contexts.  I'm not sure I would be violating
10 protective orders by talking about those numbers
11 here.
12   Q.   Well, you've seen Apple documents talking
13 about Apple app revenue?
14   A.   In the context of other cases I've worked
15 for Apple on, yes.
16        MR. CASSADY:  I don't see why there's a
17 protective-order issue for you to answer questions
18 about Apple if it's about Apple documents.
19        MR. KIM:  I mean, if they haven't been
20 produced in this case, I mean, I would have to go
21 back and look at those other protective orders to be
22 sure.  If you want to go off the record for a
23 second, we can think about it.
24        MR. CASSADY:  Yeah.  Let me just keep
25 going and then if we get to a point like that, we'll

Page 121

1  stop.
2  BY MR. CASSADY:
3    Q.   So you think you're aware of revenues that
4  Apple gets off the iTunes store or the App Store?
5  Which one are you talking about?
6    A.   I mean, I don't have the numbers literally
7  memorized as I sit here, but I believe I've seen
8  revenue numbers that reflect overall iTunes store
9  and also revenues under that that would be specific
10 to apps.
11   Q.   And with regard to those numbers, Apple
12 gets two benefits.  Right?  They get the revenue
13 from the App Store and iTunes sales, but they also
14 get the extra benefit of value, increased value to
15 iPhone?
16   A.   That's part of it, yes.
17   Q.   Did you take that revenue into account in
18 doing your royalty base?
19   A.   What revenue?
20   Q.   The revenue from the App Store and from
21 the iTunes store.
22   A.   No.  Don't relate to the patented
23 inventions even remotely.
24   Q.   Let's assume for the moment that FaceTime
25 does drive the purchase of iPhones.

31 (Pages 118 to 121)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                              APL630DEF-WHVX0000589682

CHRISTOPHER A. VELLTURO, PH.D. - CONFIDENTIAL/AEO

Page 122

1    A.   So this is contrary to Mr. Weinstein's
2  statement to the opposite?
3    Q.   I actually don't think Weinstein said
4  that, but Mr. Weinstein -- Let's just stick with
5  what I'm saying.  Assume for the moment that
6  FaceTime does drive the purchase of iPhones.
7  Assuming that's true, doesn't that mean that the
8  additional revenue from the App Store is related to
9  those sales?
10   A.   I'm not following what you mean by iPhone
11 sales are driven by Facebook.  Facebook!  By
12 FaceTime.
13   Q.   Let me make it more simple.  Bob goes to
14 the Apple store and he buys an iPhone 4S because he
15 wants FaceTime.  That's why he buys it.  That drove
16 his purchase decision.  Okay?  With me?
17   A.   So absent FaceTime on the 4S, he would not
18 have bought the -- ?
19   Q.   He would not have bought it.  With me so
20 far?
21   A.   Not really.  I'm just -- I don't see --
22 I'm trying to identify the characteristics of such a
23 buyer.  I guess hypothetically if you want to posit
24 such a person --
25   Q.   No, I'm not saying you know Bob.  I'm

Page 123

1  saying Bob goes to the store; the reason he wants an
2  iPhone is he wants FaceTime.  Okay?  Let's say he
3  has a long-distance relationship and he wants to do
4  videoconferencing on his phone.  Fair enough?
5    A.   Okay.
6    Q.   Well, you know people have long-distance
7  relationships.  Right?
8    A.   I do.
9    Q.   Sometimes maybe they'd like to use
10 FaceTime.  Right?  I mean, you're not saying people
11 don't use FaceTime.  Right?
12   A.   I'm not saying people don't use FaceTime.
13   Q.   Okay, so let's get back to it.  Bob goes
14 there; he wants an iPhone 4S because it has
15 FaceTime.  That's why he wants it.  Okay?  So he
16 buys the phone.  In that context, you would agree
17 that the entire sale in that context would not have
18 occurred had Apple not had FaceTime on an iPhone.
19 Right?
20   A.   Well, that's the hypothetical you built
21 and that's your -- You need me to answer your
22 question.  You gave the conditions that necessarily
23 imply that.
24   Q.   Okay.  And then let's say Bob goes home
25 and starts downloading music on iTunes and

Page 124

1  purchasing apps from the App Store and Apple gets
2  this revenue from those purchases.  Similarly those
3  purchases wouldn't have occurred and that revenue
4  wouldn't have come to Apple if Apple hadn't included
5  FaceTime on the iPhone.  Right?
6    A.   No, that's not necessarily true.
7    Q.   Why?
8    A.   What else does Bob have at his house?
9    Q.   He only has an iPhone.
10   A.   So he has no other Apple device?
11   Q.   No.  And he doesn't have iTunes otherwise.
12   A.   As an initial point, I'm not aware of
13 there being significant Bobs out there.  But in your
14 hypothetical of this, an individual who fits that
15 exact set of conditions, again, by the very
16 construction of your hypothetical, since he doesn't
17 buy an Apple product without FaceTime under your
18 construction, he wouldn't go to the Apple store and
19 buy materials either because they don't work on
20 other devices.
21   Q.   But --
22   A.   But, again, that has the presumption that
23 he has no other Apple devices and no one else in his
24 household has other Apple devices.
25   Q.   I understand.  In that context it would be

Page 125

1  reasonable to take into account the fact that Apple
2  gained additional sales from things other than the
3  accused feature into the patent license
4  conversation.  Correct?
5    A.   In this case?
6    Q.   Well, in the context of the hypothetical
7  I'm talking about.
8    A.   In this case?  With respect to FaceTime?
9    Q.   No.  I'm talking about, let's say we've
10 got the patent; FaceTime cannot be provided without
11 this patent.  In the context of that scenario, Apple
12 can't have FaceTime without the patent --
13   A.   That's new.  That's --
14   Q.   I know.  I'm working with you here; I'm
15 just going down the line.
16   A.   Okay.
17   Q.   In the context of the Bob scenario there,
18 you would agree that you should take into account
19 the additional sales in the licensing scenario
20 there.  Right?
21   A.   Well, there's nothing to agree or disagree
22 with.  Right?  You've imposed a set of conditions
23 that necessitates a conclusion.  There's no
24 agreement.  You're answering your own question by
25 completely defining the only possible outcome.

32 (Pages 122 to 125)

HG LITIGATION SERVICES
HGLITIGATION.COM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                           APL630DEF-WHVX0000589683

CHRISTOPHER A. VELLTURO, PH.D. - CONFIDENTIAL/AEO

Page 126

1  Right?  You've said that there is a patent; that
2  without the patent there can be no FaceTime; that
3  the individual assumedly again would not have bought
4  a phone from Apple without the FaceTime app and then
5  they wouldn't have bought other products.  I mean,
6  you're -- There's nothing for me to tell you.
7  I mean, you've defined your own answer.
8      Q.   No.  Are the additional sales that Bob or,
9  sorry, that Apple got from Bob's other purchases
10 around his iPhone relevant to a patent licensing
11 circumstance in that hypothetical I just talked
12 about?
13     A.   Not necessarily.
14     Q.   Why?
15     A.   It would depend on -- In that context,
16 you've posited a world where Apple does not provide
17 FaceTime and I guess you've asked, there's another
18 implicit assumption there, in that Apple provides no
19 other possible way for Bob to use his iPhone for his
20 long-distance relationship in your hypothetical.  So
21 the question is, are you asking me to make that
22 assumption too, that Apple looks at the fact that it
23 can't have FaceTime and says I'm not going to
24 provide any kind of technology along those lines at
25 all that may not practice your hypothetical patent?

Page 127

1  Because I need that additional assumption too.
2  Because if I don't have that, then I've got to
3  factor in how that other technology, whatever it
4  might be, would factor into the calculation.
5      Q.   Add to the hypothetical here, we're
6  talking about that there is no acceptable non-
7  infringing alternative to FaceTime for Apple.
8      A.   So in a world where Apple does not offer
9  FaceTime?
10     Q.   Mm-hmm.
11     A.   To anybody, not just Bob?  Apple does
12 nothing to try and develop some alternative approach
13 to the patent that you're positing, not the patents
14 in this case?
15     Q.   Yes.
16     A.   Then again you've answered your question.
17 Right?  That all that value is inextricably and
18 completely related to that patent under your
19 hypothetical.
20     Q.   Yes.  And in that hypothetical you would
21 agree with me that you would take into account the
22 additional value to Apple of Bob making these other
23 purchases, for a song, an app, other things on his
24 iPhone?
25     A.   For what purpose?

Page 128

1      Q.   To use on his iPhone.
2      A.   No.  I meant for what purposes?  For the
3  purposes of the hypothetical negotiation?
4      Q.   Yes.
5      A.   That's possible.  I mean, we still haven't
6  gotten enough conditions in place.
7      Q.   What else do you need to know?
8      A.   Well, let's go back to all of the
9  assumptions we had.  And Bob also has no other
10 products of Apple's --
11     Q.   Yes.
12     A.   -- and no intention of buying any other
13 products?
14     Q.   Right.
15     A.   And none of the members of his household
16 have any Apple products.
17     Q.   Right.
18     A.   So that this patent is absolutely
19 essential to the only feature that drove Bob's
20 purchase.
21     Q.   Mm-hmm.
22     A.   Well, in that case one would think about
23 the difference in the amounts of dollars that Apple
24 would obtain between Bob buying FaceTime and not
25 buying -- between Bob buying a phone and not buying

Page 129

1  a phone, and that could include other revenues.  But
2  that's just not even remotely close to what's going
3  on here.
4      Q.   I understand.  But the point is, even if
5  Bob uses the phone for other things besides the
6  infringement, it's still relevant that the reason he
7  wanted the phone was FaceTime.  Right?
8      A.   Well, now you've imposed something much
9  more dramatic than that, which is FaceTime is so
10 important to your hypothetical Bob that he's willing
11 to eschew all the other values that the phone would
12 provide to him and not buy it.  And that's very
13 different from the question you just posed, and you
14 need that condition.
15     Q.   He's willing to buy a different product
16 that's not an Apple product.  He's not eschewing all
17 the other things.  He could buy another cell phone.
18 I didn't say in the hypothetical he's not going to
19 get to buy another cell phone; I said he's not going
20 to buy an Apple iPhone.
21     A.   And what other phone does he buy that may
22 have FaceTime?
23     Q.   He may not have FaceTime.
24     A.   I thought that's what he was looking for
25 in buying a cell phone.

33 (Pages 126 to 129)

HG LITIGATION SERVICES
HGLITIGATION.COM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                APL630DEF-WHVX0000589684

CHRISTOPHER A. VELLTURO, PH.D. - CONFIDENTIAL/AEO

Page 130

1    Q.   The reason he's going to buy an iPhone,
2  the reason he's going to spend all the money on an
3  iPhone is to get FaceTime.  If it doesn't have
4  FaceTime, he's not buying an iPhone.  I'm just
5  trying to understand in the context there, you'd
6  agree that other revenues not necessarily related to
7  the accused feature are relevant to the patent
8  hypothetical negotiation?
9    A.   As I said, that's conceivable, but you
10  still haven't circumscribed a set of conditions
11  sufficient to necessarily imply that.
12    Q.   But in this case you'll agree that
13  FaceTime is included in the $29 operating system
14  proxy that you use, right, the software is?
15    A.   Right, that FaceTime is part of the
16  software that one gets with an iPhone, right.
17    Q.   But you'll agree with me that that
18  FaceTime application doesn't do anything without the
19  hardware.  Right?
20    A.   I don't know what that question means.
21  I mean --
22    Q.   Well, the FaceTime application won't do
23  anything without a front-facing camera?
24         MR. KIM:  Objection, form.
25    A.   One would need a front-facing camera

Page 131

1  typically to use FaceTime.  It would be very awkward
2  otherwise.
3    Q.   You didn't include the front-facing camera
4  in the royalty base that you did, did you?
5    A.   No.
6    Q.   You just included the operating system
7  that was a proxy from the Microsoft products or,
8  sorry, the Macintosh products.  Right?
9    A.   And to be clear, this is in my corrected
10  assessment or my consistent assessment of the
11  approach Mr. Weinstein took with respect to the
12  Macintosh.  Right?  I mean, we could do the entire
13  hypothetical you've just done with me over the last
14  fifteen minutes and let's go over and do it on the
15  Macintosh.  Right?  Same things apply there.  Right?
16  And yet in that instance Mr. Weinstein reaches the
17  conclusion that the royalty applies only to the
18  identified underlying value of the software.
19         And all of it, everything you just did
20  with me from a hypothetical standpoint would apply
21  with equal force to Bob in the event that he
22  wouldn't buy an iMac, and yet Mr. Weinstein takes a
23  fundamentally different approach there.  And if one
24  consistently applies that, one should consistently
25  apply that to the iPhones.

Page 132

1    Q.   Well, let's start there.  Does Apple sell
2  the iOS operating system by itself?
3    A.   I don't believe they do.
4    Q.   You don't know?
5    A.   My recollection is they don't.  But I'm
6  not absolutely sure everywhere in the world that's
7  true.
8    Q.   So we know Apple does not sell the iPhone
9  operating system by itself.  Right?
10    A.   Subject to what I answered in the last
11  question.
12    Q.   And the $29 proxy you used, we know that
13  is the upgrade price of the Macintosh operating
14  system.  Right?
15    A.   Well, that was the upgrade price for the
16  system at that point that would have had FaceTime as
17  part of it or would have made FaceTime possible as
18  part of it.
19    Q.   But that's not the overall operating
20  system price, that's the price to upgrade from one
21  version of operating system for Apple to another.
22    A.   Okay.  It's the one Mr. Weinstein uses
23  with respect to the Macs.
24    Q.   I understand.  I just want to make sure
25  we're on the same page.  Right?  It's an upgrade

Page 133

1  from one operating system to another.  It's not --
2  You're not going to the store and buying a full
3  operating system from Apple?
4    A.   That's my recollection.
5    Q.   You're buying an upgrade?
6    A.   Right; an upgrade that now makes FaceTime
7  possible.
8    Q.   Apple doesn't sell operating systems by
9  themselves for the Mac or for the iOS.  Right?
10    A.   That's my recollection.
11    Q.   Did you talk to anybody at Apple about how
12  much they sell the iOS operating system for?
13    A.   No, I don't recall having that
14  conversation.
15    Q.   Do you know whether or not Apple believes
16  that its operating system creates the largest share
17  of product value for its iPhone?
18    A.   I don't think Apple thinks of it that way,
19  no.
20    Q.   Do you think Apple believes that software
21  creates the largest share of its product value?
22    A.   I don't think it thinks of it that way,
23  no.
24    Q.   And you used the software as the royalty
25  base in your analysis.  Right?

34 (Pages 130 to 133)

HG LITIGATION SERVICES
HGLITIGATION.COM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                           APL630DEF-WHVX0000589685

CHRISTOPHER A. VELLTURO, PH.D. - CONFIDENTIAL/AEO

Page 134

1    A.   I used the $29 price that Mr. Weinstein
2  identified was the appropriate unit in the Macintosh
3  computers to apply the royalty rate to in an
4  analogous fashion with respect to the iOS-based
5  devices.
6    Q.   And the $29 price that you used is the
7  price of the operating system, which is software.
8  Right?
9    A.   The price of the upgrade from one
10 operating system that allowed for the inventions
11 compared to the one that didn't.  Now, at the end of
12 the day with respect to FaceTime my ultimate opinion
13 relates to the ability to provide an equivalent
14 FaceTime with an alternative configuration.  So this
15 is part of what I considered, but there are other
16 parts that also corroborate these kinds of numbers.
17   Q.   Would you agree with me that FaceTime
18 helps sell the iPhone?
19   A.   Which one?
20   Q.   4 and above.
21   A.   I think it provided some help with respect
22 to the 4.  I don't think it's provided much help
23 with respect to the 4S.
24   Q.   You don't think anybody who buys a 4S
25 cares about having FaceTime?

Page 135

1    A.   That's not what I said at all.
2    Q.   Well, that's what I'm asking.  So you're
3  not saying that people who buy a 4S don't care if it
4  has FaceTime or not?  You're not saying that?
5    A.   I'm not saying that.
6    Q.   Okay.  When you say you think it provided
7  some help with respect to the 4, are you saying it
8  drove some sales with respect to the iPhone 4?
9    A.   I don't think I'd characterize it that
10 way.  I think it was a contributory factor, but
11 there were so many new things about the 4 that it
12 was just one of many.  And isolating it as the
13 absolute make or break reason for the purchase, I
14 haven't seen a lot of information that indicates
15 that was substantial.
16   Q.   Your understanding is that FaceTime along
17 with other features is the reason people buy
18 iPhones, lots of other features but other features?
19   A.   It's much more complicated than that.
20 Much, much more complicated.  It is not simply a
21 function of the features the phone has.  It's not.
22   Q.   So it's not a function of the features the
23 phone has, that's the reason that people buy a
24 phone?
25   A.   That's not what I said.

Page 136

1    Q.   Then what did you say?
2    A.   I said that's not the only reason people
3  would buy the phone.
4    Q.   Let me get off necessarily the reason to
5  buy a phone and let's talk about people who are
6  going to use features on the phone.  So whether or
7  not you bought the phone for iPhone, I mean for
8  FaceTime, and you used FaceTime, you'd agree that
9  there's value in that use.  Right?
10   A.   In what use?
11   Q.   Of FaceTime.
12   A.   If someone buys an iPhone 4, for example,
13 and uses FaceTime, is that individual deriving some
14 value from using FaceTime?
15   Q.   Yes.
16   A.   That's possible, sure.
17   Q.   And you know that's happened.  Right?
18   A.   My understanding is that people have used
19 the FaceTime capability to execute and complete
20 video calls.
21   Q.   Do you know how many Apple iPhone users
22 have used FaceTime?
23   A.   I've seen some surveys that talk about
24 that.  I think it varies.  Strictly iPhones?  I
25 can't remember the number as I sit here.  I want to

Page 137

1  say about a third is my recollection.  Between
2  20 percent and a third, that's my recollection.  But
3  I have some of those numbers in my report.
4    Q.   Is it your opinion that FaceTime didn't
5  drive the sale of any iPhone?
6    A.   Had no contributory -- ?  You're asking me
7  if it's my opinion that Facebook was not a factor in
8  any purchase decision?
9    Q.   FaceTime.
10   A.   Did I say Facebook again?
11   Q.   You said Facebook again.
12   A.   Let me make sure I understand your
13 question.  So you're asking me if it's my opinion
14 that FaceTime was not a contributing element in any
15 consumer's decision to buy an iPhone?
16   Q.   Yes.
17   A.   That's not my opinion.
18   Q.   It is your opinion that FaceTime was a
19 contributory factor in the purchase decision to buy
20 an iPhone.  Right?
21   A.   To some degree, along with many, many
22 other things.
23   Q.   Now, similarly is the fact that FaceTime
24 is secure a contributory factor in the purchase of
25 some iPhones?

35 (Pages 134 to 137)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    APL630DEF-WHVX0000589686

CHRISTOPHER A. VELLTURO, PH.D. - CONFIDENTIAL/AEO

Page 138

1  A.  I didn't see evidence that indicated that.
2  Q.  Do you believe that there are no iPhone
3  purchases where the fact that FaceTime is secure
4  contributed to the purchase of it?
5  A.  I can't say it's literally none.  But in
6  terms of all the evidence I've seen in this case as
7  to reviews of the products, the nature of the uses
8  of the products, nature of the satisfaction with the
9  products, nature of the overall marketing and
10 promotion of the products, I just didn't see that as
11 a material factor in demand.
12 Q.  But you're not going to tell the jury that
13 no iPhones were driven by the fact that FaceTime was
14 provided with security.  Right?
15 A.  I can't literally say that number is zero.
16 But that is sufficiently far removed from my
17 understanding of the drivers of demand for Apple's
18 products, including its iPhone, that it has a very,
19 very small effect, if any at all.
20 Q.  Then with the VPN On Demand, you're not
21 going to tell the jury that no purchase of iPhones
22 were driven or contributed -- Strike that.
23     You're not going to tell the jury that VPN
24 On Demand did not contribute to the purchase of a
25 single iPhone.  Right?

Page 139

1  A.  I would say it's a similar answer.  That
2  is, I can't literally rule it out, that there isn't
3  a single instance somewhere in the United States
4  where that drove someone's decision.  But the
5  evidence indicates that to the extent that happened
6  at all, it happened in a minuscule number.  I can't
7  literally say that never happened.  But looking at
8  all the information available in this case, I think
9  that that's extremely unlikely that that happened to
10 any material degree.  And of course the patents
11 don't even cover that.  Right?  They cover a
12 convenience method associated with VPN On Demand.
13 Q.  Did you talk to Apple about a non-
14 infringing alternative being offshoring the FaceTime
15 servers?
16 A.  I don't think so.
17 Q.  Does your opinion rely on the fact that
18 Apple could offshore its FaceTime servers to avoid
19 infringement?
20 A.  No.  That's not one of the binding
21 constraints on the alternatives in my opinion.
22     MR. KIM:  Jason, can we take a break when
23 you get to a good stopping point?
24     MR. CASSADY:  Yes.  This is a good spot.
25     THE VIDEOGRAPHER:  Going off the record at

Page 140

1  12:38.
2     (Luncheon recess at 12:38 p.m.)
3  ---------------------------------------------------
4            AFTERNOON SESSION
5               1:32 p.m.
6  ---------------------------------------------------
7     THE VIDEOGRAPHER:  Back on the record.
8  The time is 1332.
9  BY MR. CASSADY:
10 Q.  Good afternoon.  You know you're still
11 under oath.  Right?
12 A.  Yes.
13 Q.  In this case are you relying on Dr. Kelly
14 with regard to the scope of what would and would not
15 infringe?
16 A.  I relied upon Dr. Kelly to indicate to me
17 whether certain alternatives wouldn't practice the
18 claims as they were being asserted by VirnetX.
19 Q.  Do you rely on Dr. Kelly to understand
20 what the problem is that the VirnetX patents are
21 solving?
22 A.  I don't think I'd characterize it quite
23 that way, no.
24 Q.  How would you characterize it?
25 A.  Well, I received some general

Page 141

1  understanding as to the nature of the claims.  But,
2  as I said, what I relied more centrally on Dr. Kelly
3  for was understanding the alternatives that would
4  not practice the claims for the purposes of
5  assessing royalty.
6  Q.  Do you know what the problem is that the
7  VirnetX patents solve?
8  A.  I'm not sure I would characterize it that
9  way.  I have a very general layperson's
10 understanding of what the asserted claims' nature of
11 the inventions are.
12 Q.  But do you know what the problem is that
13 they solve or purport to solve?
14 A.  To some degree based on the nature of the
15 asserted claims, it tells me that.
16 Q.  Who would have a better idea of what the
17 problem is that the VirnetX patents solve, you or
18 Dr. Kelly?
19 A.  I would expect -- I don't have any
20 technical capabilities in this area, so I would
21 expect Dr. Kelly would be more qualified to talk
22 about the technical specifics.
23 Q.  As you sit here today, what is your
24 understanding of what the problem is that VirnetX's
25 patents attempted to solve?

36 (Pages 138 to 141)

HG LITIGATION SERVICES
HGLITIGATION.COM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                      APL630DEF-WHVX0000589687