# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

APPLE INC., a California Corporation,

Plaintiff,

v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

Defendants.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation, and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability
company,

Counterclaim-Plaintiffs,

v.

APPLE INC., a California corporation,
Counterclaim-
Defendant.

CASE NO. 12-cv-00630-LHK (PSG)

**INITIAL EXPERT REPORT OF
DR. TODD C. MOWRY
REGARDING INFRINGEMENT OF
U.S. PATENT NO. 5,946,647**

**HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY – SOURCE CODE**

**GOOGLE'S HIGHLY CONFIDENTIAL—
OUTSIDE ATTORNEYS' EYES ONLY—
SOURCE CODE**

Gibson, Dunn &
Crutcher LLP

INITIAL EXPERT REPORT OF DR.TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-00630-LHK (PSG)

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY
SOURCE CODE

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

claim 1, meaning that to be infringed an accused product must meet each limitation of claim 1 as well as the additional limitations of claims 4, 6, 8, and 9.

### C.  Person of Skill in the Art

64.     I may offer testimony regarding the level of ordinary skill in the art relevant to the '647 Patent.  I understand that the relevant person of ordinary skill is the person of ordinary skill as of invention date of the patent.  For present purposes that person is no different whether the invention date is September of 1994 (as I understand that Apple is asserting), or the filing date of the application that resulted in the '647 Patent, February 1, 1996.

65.     It is my opinion that person of ordinary skill in the art relevant to the '647 Patent is a person with at least a Bachelor's of Science degree in computer science or equivalent coursework and at least two years of experience in the field.  I meet the aforementioned criteria and consider myself a person with at least ordinary skill in the art pertaining to the '647 Patent.  I was also at least one of ordinary skill as of September of 1994.

### D.  Claim Analysis

66.     In this section I present my understanding of the asserted claims of the '647 Patent. I understand that claim construction is a matter of law, and I reserve the right to provide additional analysis or opinions should the Court provide constructions of any terms of the '647 Patent.  I understand that the Court has adopted Apple's construction of the "action processor" term, which is "program routine(s) that perform the selected action on the detected structure."  I agree with this construction, and apply it in my analysis.

67.     I am also informed that the Samsung has taken a position on the construction of other terms not construed by the Court.  I have been asked to provide my opinion regarding how one of ordinary skill would understand these terms.

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

68.     I understand that the parties dispute the construction of two claim terms that are part of the same "analyzer server" claim limitation: an **analyzer server** for detecting structures in the data, and for **linking actions to the detected structures**.  The parties' proposed constructions are as follows:

| Term | Apple's Proposed Construction | Samsung's Proposed Construction |
|---|---|---|
| analyzer server | a program routine(s) that receives data, uses patterns to detect structures in the data, and links actions to the detected structure | a server routine separate from a client that receives data having structures from the client |
| linking actions to the detected structures | associating detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are associated | creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure |

### 1.     "analyzer server"

69.     Based on my review of the intrinsic and extrinsic evidence, it is my opinion that Apple's construction is correct because one of ordinary skill in the art would consider Apple's construction consistent with how the "analyzer server" functionality is described in the intrinsic record of the '647 Patent.  In particular, for example, consistent with Apple's construction, the Summary of the Invention describes what the analyzer server does: it detects the data, parses the data to detect structures and links actions to the detected structure.  '647 Patent at 2:28-31.

70.     The function of "detecting structures" is distinct from the function of "linking actions" thereto, and one of skill in the art would recognize that the preferred manner for implementing these two functionalities would be with multiple program routines.  A person of ordinary skill in the art would understand based on the description of the "analyzer server" in the specification of the '647 Patent that the "analyzer server" requires that a large amount of functionality be embodied in software.  Further, for example, in the more detailed description of the preferred embodiment, the

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

specification describes the detection step as potentially using multiple pattern analyses units. '647 Patent at 3:61-64. ("Analyzer server 220 comprises one or more pattern analysis units, such as a parser and grammars or a fast string search function and dictionaries, which uses patterns to parse document 210 for recognizable structures.")  Any person of skill in the art who has written a parser, for example, would realize that it is a large and complex piece of software.  Further, Figure 10 shows structure detection occurring through grammars, string matching, and "other pattern analysis."  *See id.* at Fig. 10 and accompanying text.  Therefore, the detection piece alone is quite complex, and on top of that linking detected structures to actions is another complex task for the software, and it is different from pattern matching.  Therefore, one of ordinary skill in the art would understand that the multiple functionalities required of the analyzer server cannot be reasonably embodied in a single software subroutine.

71.     In addition, something that a lay person may not appreciate, but a person of ordinary skill in the art would necessarily understand, is that large pieces of software must be broken up into separate modules in order for the programming task to be tractable.  In my opinion, writing a single procedure that does everything described for the analyzer server without calling other procedures would be unthinkable for a person of ordinary skill.

72.     Further, the specification for the 647 Patent does not limit the "analyzer server" to a single program or software routine.  The claim language of the limitation in which the term "analyzer server" is found—"an analyzer server for detecting structures in the data and for linking actions to the detected structures"—shows that the analyzer server must include multiple software routines or subroutines because it performs multiple functions.  '647 Patent at claim 1.  Further, the specification consistently describes the analyzer server as a service that performs these multiple functions, and one of ordinary skill in the art would understand such service to involve much more than a single program

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

routine.  That is, the intrinsic record makes it clear that by "server" the inventors used this term in a generic sense intending to describe a service that includes various functionalities (such as, receiving the data, detecting the structure, and linking them to the candidate actions).  In fact, the claimed invention does not draw upon a narrow sub-field of computer science, but rather it brings together diverse computer science technologies that are rarely combined (*e.g.*, parsing, user interfaces, launching other applications via the operating system) and does so in a unique way.  Therefore, one of ordinary skill in the art would certainly read the description of the "analyzer server" and conclude that more than a single program routine is required for its claimed functionality of detecting and linking.

73.     The mention of plural program subroutine(s) in Apple's construction is also helpful because a lay person may not understand that the reference to a singular "program routine" in fact includes not only that specific routine, but also the code that that routine invokes while it executes.

74.     In addition to improperly limiting "analyzer server" to a single routine, I understand that Samsung has proposed that "analyzer server" be construed to mean "a server routine separate from a client."  As I describe above, the specification consistently describes the analyzer server as a service that performs the claimed functions.  The term "client" never appears in the entirety of the intrinsic record.

75.     To the extent that Samsung relies on Figure 1 to support its construction, specifically the separate boxes depicting the "program" containing the analyzer server and the "application," I note that this Figure depicts an embodiment of the invention, and I understand that claims are not properly limited to figures or abstract arrangements of boxes in figures.  Indeed, claim 1 makes no mention of an "application" at all; rather, dependent claims 3 and 10 claim the concurrent running of the application and the analyzer server.   I also note that in this case, Samsung relied on this very

INITIAL EXPERT REPORT OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-00630-LHK (PSG)          24

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

argument based on Figure 1 to construe "action processor" as being "separate from a client," and the Court rejected that construction and reasoning.

76.     To the extent that Samsung relies on statements during prosecution to support its construction, Samsung has misunderstood the intrinsic record.  During the prosecution, the Examiner rejected several then-pending claims as being anticipated by U.S. Patent No. 5,574,843 to Gerlach et al. ("Gerlach"). April 28, 1998 Response ("Response") at 2.  Gerlach described a computer system for editing multimedia presentations in which the user was able to select icons on the screen to control the order and content of a presentation that is produced as a result of the user's editing. *Id.*  In response to the Examiner's rejection, Apple distinguished this piece of prior art by explaining repeatedly that the critical distinction between Gerlach and the '647 Patent's specification was that "structures" detected by the '647 Patent were entirely different from the "data structures" added to media files in Gerlach.  *Id.* at 1-6.  The Gerlach system involved adding "data structures" to media files, whereas linked list "data structures," which were internal to the Gerlach system, consisted of computer source code that specified the attributes of a media object and the manner of presenting the object, and the term "data structure" had the conventional meaning given to it in computer programming.  *See* Gerlach '843 Patent, at 36:12-14 ("Each data structure contains information describing one object and its attributes (e.g., coordinates for positioning on the display screen, width, height, and color)."); *Id.* at 3:36-45 ("Each one of the data structure includes an action identifier and a plurality of attributes. The process includes receiving a one of the plurality of data structures of the presentation, analyzing the received data structure to determine an action to be performed in response to the action identifier of the data structure, and performing the action corresponding to the action identifier in accordance with a plurality of the attributes of the received data structure"); *see also* Gerlach '843 Patent at 21:11-19 ("These icons are represented internally by event structures.  All

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

icons which cannot contain children are defined internally by command structures.  Command and event structures are similar with event structures being superset of the command structures.  While the complete details of these structures need not be described here the primary members are the parent list, the child list, the reference list, and the specific data pointer.")

77.      Apple explained that the Gerlach "data structures are generated and interpreted by, and totally internally to, Gerlach's system."  Response at 3.  The '647 Patent, however, uses the term "structures" in a different way, to instead refer to data with semantic significance to the user such as phone numbers, email addresses, post-office addresses, zip codes and dates, which come from an email or Word document and are analyzed by the patented system.  *See e.g.*, '647 Patent at 1:13-16 ("recognizable structures that have semantic significance such as phone numbers, email addresses, post office addresses, zip codes and dates").  That is, the '647 Patent's "structures can appear in any document or file and are generated externally to Applicants' system."  Response at 3, *see also id*. at 3-4, ("In fact ,the structures described in the claim language cited by the Examiner are internal linked list data structures that are never seen by the user and are therefore incapable of selection.  The selection process in Gerlach is directed to selecting files, icons and menus, not structures (*see* Figure 24, column 6 lines 31-32 and lines 48-49).  As discussed above, there is no teaching of detected structures as the term is used in Applicant's specification."); *id*. at 4 ("Figure 24 clearly shows that it is the icon, not a detected structure, that is selected and that the structure is generated in response to the icon selection. This is quite different from selecting a pre-existing structure detected from within externally generated data."); *id*. at 5, ("First, as discussed above, the structures used in Gerlach are linked lists that are internally generated and understood by the system. There is no concept of a detected structure in Gerlach.")

78.      The distinction Apple made is entirely consistent with my reading of the specification:

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

the textual data received by the analyzer server is received from external sources and is not "internal" to the analyzer server.  That, however, does not mean by any stretch that the application like Word or email is a "client" and the analyzer server is a "server" in the traditional sense of client/server architectures in distributed systems.  I also note that in this case Samsung relied on this very argument based on the file history to construe "action processor" as being "separate from a client," and the Court rejected that construction and reasoning.

### 2.    "linking actions to the detected structures"

79.    It is my opinion that Apple's construction for "linking actions to the detected structures" is consistent with the intrinsic record.  I agree with Apple that such construction should be helpful to the jury and that the intrinsic record makes clear that the meaning of this term is indeed "associating detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are associated."  *See* '647 Patent at 2:31-34 ("Each action is a computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked."); *see also id*. at 1:31-34; 2:36-41. Further, Apple's construction defines "actions" directly from the "Summary of Invention" section of the specification of the patent.  '647 Patent at 2:30-41 ("Upon detection of a structure, the analyzer server links actions to the detected structure. Each action is a computer subroutine that causes the CPU to perform a sequence of operations on the particular structure to which it is linked. An action may specify opening another application, loading the identified structure into an appropriate field, and closing the application. An action may further include internal actions such as storing phone numbers in an electronic phone book, addresses in an electronic address book, appointments on an electronic calendar, and external actions such as returning phone calls, drafting letters, sending facsimile copies and email, and the like.").

INITIAL EXPERT REPORT OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-00630-LHK (PSG)          27

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

80.     Further, Apple relied upon this definition of an action during the prosecution history. In particular, Apple distinguished the claimed invention from prior art directed to linking data strings to other data strings, explaining "[t]he linked actions [in the 647 Patent] enable execution of an action (page 16, line 22 to page 17, line 1), which is a computer subroutine causing a CPU to perform a sequence of operations." Mar. 15, 1999 Response to Office Action, at 8.  Apple therefore defined an action consistently in the specification and the prosecution history and this definition should govern.

81.     Samsung's construction—"creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure"— imports a specific, narrow, and improper requirement for how linking must be performed.  Specifically, Samsung adds the requirement that "linking" means "creating a specified connection."  One of ordinary skill in the art would not read this limitation into the claims.  The '647 Patent does not use the word "link" to mean create a "specified" or "direct" connection."  Instead, the '647 Patent consistently and repeatedly uses the words "link" and "associate" interchangeably.  *See, e.g.*, '647 Patent at 1:66-2:2 (Description of the Background Art) ("Therefore, a system is needed that identifies structures, associates candidate actions to the structures, enables selection of an action and automatically performs the selected action on the structure."); 2:4-9 (Summary of the Invention) ("The present invention overcomes the limitations and deficiencies of previous systems with a system that identifies structures in computer data, associates candidate actions with each detected structure, enables the selection of an action, and automatically performs the selected action on the identified structure."); 2:12-20 (Summary of the Invention) ("The present invention has significant advantages over previous systems, in that the present system may incorporate an open-ended number and type of recognizable patterns, an open-

HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE
GOOGLE'S HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY—SOURCE CODE

ended number and type of pattern analysis units, and further that the system may enable an open-ended number and type (i.e. scripts, macros, code fragments, etc.) of candidate actions to associate with, and thus perform, on each identified structure."); 3:38-44 (Detailed Description of the Preferred Embodiment) ("The program 165 of the present invention is stored in RAM 170 and causes CPU 120 to identify structures in the data presented by application 167, to associate actions with the structures identified in the data, to enable the user to select a structure and an action, and to automatically perform the selected action on the identified structure."); 4:34-38 (Detailed Description of the Preferred Embodiment) ("For example, in an audio environment, user interface 240 may present the structures and associated actions to the user using voice synthesis and may enable selection of a pattern and action using voice or sound activation.").

82. To the extent that a connection is required, that connection is merely an association between a detected structure and candidate actions to be performed on that structure. For example, the specification explains that "[u]pon identification of a structure in the text, parser 310 links the actions associated with the grammar to the identified structure . . . upon selection of the identified structure, user interface 240 can locate the linked actions."). '647 Patent at 4:64-5:5. Thus, the only linking that is required is between the detected structure and the candidate actions.

83. Despite the disagreement regarding the proper construction of the Asserted Claims, as I explain below, the Samsung Accused Devices infringe under both Samsung's and Apple's constructions. I reserve the right to provide further opinions regarding other claim terms should Samsung assert they have a particular meaning.

### E. Importance of the Patented Technology

84. As I described above, the invention of the '647 Patent is particularly useful in today's mobile devices, which often prevent multiple applications from being shown simultaneously.

1   I declare under penalty of perjury that the foregoing is true and correct.

2

3   Dated:   August 12, 2013

4   Todd C. Mowry

INITIAL EXPERT REPORT OF DR .TODD C.
MOWRY CONCERNING U.S. PATENT NO.
5,946,647 – CASE NO. 12-cv-00630-LHK (PSG)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

APPLE INC., a California Corporation,

        Plaintiff,

    v.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation; and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability company,

        Defendants.

SAMSUNG ELECTRONICS CO., LTD., a
Korean corporation; SAMSUNG
ELECTRONICS AMERICA, INC., a New
York corporation, and SAMSUNG
TELECOMMUNICATIONS AMERICA,
LLC, a Delaware limited liability
company,

        Counterclaim-Plaintiffs,

    v.

APPLE INC., a California corporation,

        Counterclaim-
        Defendant.

CASE NO. 12-cv-00630-LHK (PSG)

**REBUTTAL EXPERT REPORT OF
DR. TODD C. MOWRY
REGARDING VALIDITY OF
U.S. PATENT NO. 5,946,647**

**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

articles.  *See. e.g.*, J. Miller 7/8/2013 Dep. Tr. at 115:20-120:22.  The insinuation that Dr. Miller was aware of the Embedded Buttons project and used that information in his work is reckless and inaccurate.  Given the complete lack of any mention of the Embedded Buttons project in the voluminous emails and documents produced by the inventors, it is much more likely that Mr. Miller had no familiarity with any details of the Embedded Buttons project that would have related to his work on the inventions claimed in the '647 patent.  I understand that Apple objects to any attempt to insinuate that Mr. Miller was aware of the Embedded Buttons project or improperly used that knowledge in his work.

78.     Finally, Dr. Jeffay provides a section entitled "Architecture" in his analysis of the state of the art.  Jeffay Validity Report, ¶¶ 279-282.  Dr. Jeffay describes "two core design patterns are the use of a separate 'analyzer server' that can be accessed by all applications without running the detection and linking code in any particular application's process, and the use of code, such as shared libraries or DLLs, that executes as part of an application."  *Id.* at 279.  Notably, Dr. Jeffay provides no support for his conclusory statement that the claimed "analyzer server" must be "separate" code that "can be accessed by all applications without running the detection and linking code in any particular application's process."  This is because there is no such support in the entirety of the intrinsic record.  As I explained in my Opening Report, as well as below, the inventors implemented several different versions of their invention, including using shared libraries.

**VIII.   CLAIM ANALYSIS**

79.     I incorporate by reference the description of my understanding of the legal principles governing claim construction from Section IV.A of my '647 patent Opening Report.  I provided my opinions regarding the competing constructions in my '647 patent Opening Report.  For all claim terms in the asserted claims 1, 4, 6, 8 and 9 of the '647 patent, I have analyzed the prior art under either party's construction of those terms, and have concluded that the art cited by Samsung would not anticipate the '647 patent or make the claimed invention obvious to one of ordinary skill in the art at the time of the invention under any of the proposed constructions.

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                                    26

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

### A.    Disputed '647 Patent Terms and Constructions

80.     As I stated in Section IV.A of my '647 patent Opening Report, it is my understanding that the parties dispute the meaning of "analyzer server," but that the Court has not construed this term.  I incorporate my analysis of this term from Section IV.A of my '647 patent Opening Report, and  I also address below a few of Dr. Jeffay's arguments.

81.     First, Dr. Jeffay erroneously states that a "shared library" architecture fails to satisfy the construction of "analyzer server" from *Apple Inc. v. Motorola*, Case No. 1:11-cv-08540 (N.D. Ill.), March 19, 2012 Order, at 8-11.  I have already noted the reasons I believe this construction is erroneous, so I do not repeat those here.  But even if that construction is correct, Dr. Jeffay's argument is contrary to subsequent rulings in that case, namely the April 9, 2012 Order denying Motorola's summary judgment motion of non-infringement.  Motorola argued that because "the Android system stores code to perform the pattern recognition and linking functions claimed by '647 in Android common libraries," these shared libraries cannot be part of the "analyzer server."  April 9, 2012 Order, at 4-5.  The Court disagreed, stating that though "some of the code responsible for each task is intertwined with the client applications," much of the code "appears separate from and reused across the client applications."  *Id.* at 5.  Thus, the Court rejected the argument that "shared libraries" cannot satisfy its construction of "analyzer server."

82.     I also disagree with Dr. Jeffay's statement that "[t]he only significant difference between code in a shared library and code that is part of an application's executable file from the beginning is the time at which the code becomes part of the application."  Jeffay Validity Report, ¶ 287.  The purpose of the shared library is just that—it allows services to be "shared" across several different applications or processes.  Dr. Jeffay also erroneously states that "a shared library is necessarily part of a client application."  *Id.*  As I have explained previously, the fact that a shared library may run in an application's process does not mean that it is "part of a client application" as it relates to the '647 patent.

83.     Dr. Jeffay asserts that "Apple and Dr. Mowry are incorrect when they argue that a shared library can satisfy Judge Posner's construction, because a shared library is necessarily part of a client application, and thus cannot be considered 'separate' from it—nor can it 'receive data" from

Gibson, Dunn &
Crutcher LLP

it.'"  Jeffay Validity Report, ¶ 287.  '' In paragraph 657 of his report, Dr. Jeffay goes on to say, "For the sort of detection and linking routines discussed above, two core design patterns are the use of a separate "analyzer server" that can be accessed by all applications without running the detection and linking code in the application's process, and the use of shared libraries or DLLs that could execute as part of an application's process… . "  I disagree with Dr. Jeffay, and he appears to be confused about how a shared library or DLL works.

84.     For example, on the Microsoft Developer Network web site, the following page (entitled "DLLs in Visual C++", ) describes how DLLs work: http://msdn.microsoft.com/en-us/library/1ez7dh12.aspx.  Here is the first paragraph on that page, describing DLLs:

> A *dynamic-link library (DLL)* is an executable file that acts as a *shared library* of functions. Dynamic linking provides a way for a process to call a function that is *not part of its executable code*. The executable code for the function is located in a DLL, which contains one or more functions that are *compiled, linked, and stored separately from the processes that use them*. DLLs also facilitate the sharing of data and resources. *Multiple applications can simultaneously access the contents of a single copy of a DLL in memory.*" (emphasis added.)

85.     Dr. Jeffay's assertion that a shared library or DLL is "necessarily part of a client application" is incorrect, and it directly contradicts the description of DLLs from Microsoft (the company that coined the term "DLL").  Although a DLL can be accessed by multiple applications, there is just a single copy of a DLL in memory.  Just because an application can *access* a DLL does not make the DLL "part of" that application.  Indeed, this same technique of having just a single copy of shared libraries in memory and allowing them to be accessed by multiple applications is utilized in Android for the "core library dex files," as described by Dan Bornstein in his presentation entitled, "Dalvik VM Internals" (https://sites.google.com/site/io/dalvik-vm-internals/; starting at 14:45 in the video, and on slides 24-26 of the Presentation Slides (https://14b1424d-a-62cb3a1a-s-sites.googlegroups.com/site/io/dalvik-vm-internals/2008-05-29-Presentation-Of-Dalvik-VM-Internals.pdf?attachauth=ANoY7coZHgoisapFnzoQIpVQ46ibIr1Ce2d258X3zjIkZ-mlP0OORJpOzdFel-vwF5sxtrKjFy0aUlbAWlqKvIk2HygOBmfh7HsieTE9SUyUP411LQXsV8uPIO-etZcnibdE_G0L4v9bZIVtbZm3SrpsGAdKSKmQ00TA_BZAOb-

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                          28

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

1  DrrlJ_FtdK509mj9nC42PzNgvwqFqVUV3CIkNpEetCffvVtQfZ9yg3AM3Kjoly_pRHAq5EnsI_Dg4

2  JMYt4TawI7jdnFfdVB0xLWshIo8TAwcaY48gBKD7bw%3D%3D&attredirects=0)).

3    86.    I note that Dr. Jeffay relies almost exclusively on mischaracterizations of inventor

4  documents and testimony to support Samsung's construction that the analyzer server must be

5  "separate from a client."  His lack of citation to the intrinsic evidence on this point is telling—there is

6  none to cite.  And he mischaracterizes the extrinsic inventor statements.  For example, he cites a

7  November 26, 1996 email from Thomas Bonura, one of the '647 patent inventors, which mentions an

8  "analyzer server."  *See* Jeffay Validity Report, ¶ 288 (citing MILLER00000064/APLNDC630-

9  0000133392.)[1]  Nothing in this email indicates that the "analyzer server" was necessarily

10 implemented as a "client-server" model.  At most, it indicates that one particular implementation of

11 the analyzer server was so implemented.  This correspondence does not indicate that the "analyzer

12 server" could not be implemented in different ways, including as a shared library.  Indeed, as cited by

13 Dr. Jeffay, David Wright, another inventor, suggested a shared library implementation.  *Id.*, ¶ 289

14 (citing MILLER00000065/APLNDC630-0000133393).  Mr. Wright's correspondence indicated that

15 he was previously aware of the shared library model, had already been working on a shared library

16 implementation, and did not consider it to be outside the scope of their project.  Indeed, the final

17 email cited by Dr. Jeffay contradicts his argument that the "analyzer server" cannot be a shared

18 library.  In a December 18, 1996 email, Mr. Bonura states that "I am looking into *implementing the

19 server as a shared library rather than a first class application*."  MILLER00000133/APLNDC630-

20 0000098807 (emphasis added).  Thus, the inventors recognized that the "analyzer server" could be

21 implemented in a number of ways, including a shared library.  I note that Dr. Jeffay omits any

22 citations to the depositions of these inventors.  This is likely because the inventors contradicted his

23 reading of these emails and they explained that their ideas were not limited to any particular

24 implementation of the analyzer server.  *See, e.g.*, 4/6/2012 Wright Dep. Tr. 120:10-122:2; 138:16-24;

---

[1]  My discussion of inventor emails and testimony should not be construed as an admission that I believe such evidence is proper or helpful in construing the claims of the '647 patent.  I provide some discussion, however, to point out where Dr. Jeffay has mischaracterized the extrinsic evidence on which he relies.

REBUTTAL EXPERT REPORT OF TODD C. MOWRY REGARDING VALIDITY OF U.S. PATENT NO. 5,946,647

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

29

Gibson, Dunn & Crutcher LLP

1    11/13/2012 Wright Dep. Tr. 12:4-17; 76:20-78:9; 12/11/2012 Bonura Dep. Tr. 66:16-67:13; 69:5-25;

2    71:1-73:4.  I find it especially odd and inconsistent that Dr. Jeffay would allege that the inventors

3    only "discovered" the shared library model after they filed their patent application, when Dr. Jeffay

4    also opines that both shared library and client-server architectures were well known in the part prior

5    to the filing date.  *See* Jeffay Validity Report, ¶¶ 279-282, 288.

6         87.      The only intrinsic evidence Dr. Jeffay appears to cite does not support the argument

7    that the "analyzer server" must be "separate from a client" and run in a separate process.  First, in a

8    footnote, Dr. Jeffay mentions a reference that was disclosed, but not discussed, during prosecution.

9    *See* Jeffay Validity Report, ¶ 292, n.5 (citing "The Rufus System: Information Organization for Semi-

10   Structured Data," Procs. of the 19th VLDB Conf. (Dublin 1993) ("Rufus")).  Dr. Jeffay provides no

11   explanation of the supposed "client-server relationship" discussed in this reference or why it should

12   be used to limit the claims.  Such an argument would be unfounded, since this concept was not

13   discussed at all during prosecution.  Moreover, this publication also discusses shared libraries.  *See*

14   Rufus, at 105 ("Access to Rufus server functions is provided through a client-callable library of

15   routines.").

16        88.      Second, Dr. Jeffay relies on the statement during prosecution that I explained in my

17   Opening Report regarding the invention being a "system-wide service."  *See* Jeffay Validity Report,

18   ¶ 293; Opening Report, ¶ 229.  I incorporate my analysis here that this statement in no way means

19   that the invention is restricted to a "client-server" model.  As I mentioned in my Opening Report,

20   such an understanding would be contrary to one of ordinary skill, as evidence by discussion of

21   Google's own engineers using this exact "system-wide service" phrase.  In addition, the Android

22   Developer's Website has an entry entitled "Service" that explains that while a "service" can "supply

23   functionality for other applications to use ," "[a] Service is **not** a separate process.  The Service object

24   itself does not imply it is running in its own process; unless otherwise specified, it runs in the same

25   process as the application it is part of."  APLNDC630-0001903467-95, at *67.  Thus, Dr. Jeffay's

26   reliance on the word "service" to require a separate server, running in a separate process, is contrary

27   the understanding of one of ordinary skill.

28

REBUTTAL EXPERT REPORT OF TODD C.                  HIGHLY CONFIDENTIAL
MOWRY REGARDING VALIDITY OF U.S.             ATTORNEYS' EYES ONLY
PATENT NO. 5,946,647                      30

89.     As I stated in Section IV.A of my '647 patent Opening Report, it is my understanding that the parties dispute the meaning of "linking actions to the detected structures," but that the Court has not construed this term.  As I stated in paragraph 24 of my '647 patent Opening Report, it is my opinion that Apple's constructions of these terms as meaning "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked" is correct and reflect what a person of ordinary skill in February 1996 would have understood when considering the terms in the context of the '647 patent.

90.     I understand that in the Initial Determination by Administrative Law Judge Carl C. Charneski in Inv.  No. 337-TA-710 ("the 710 Investigation") dated July 15, 2011, between Apple and HTC, the Judge construed this term in accordance with Apple's proposed construction in the 710 Investigation and in this Action, to mean "linking detected structures to computer subroutines that cause the CPU to perform a sequence of operations on the particular structures to which they are linked." ITC 337-TA-710 Initial Determination, at 127-130.

91.     It appears that Dr. Jeffay construes "linking actions to detected structures" to require the use of conventional pointers.  *See*, *e.g.*, ¶¶ 327-328 (discussing Apple's allegedly "broad" interpretation that does not require pointers).  I disagree that "linking" as claimed in the '647 patent requires conventional pointers.  The only mention of pointers is in a description of a preferred embodiment.  *See* '647 patent, 3:52-67.  I also note that the Court has found that "linking" does not require the use of "pointers."  June 29, 2012 Order, at 35-36 ("While it is clear that linking for purposes of the '647 Patent may be accomplished by pointers, the Court finds nothing in the '647 Patent that requires the use of pointers.").

92.     I note that Dr. Jeffay has opined that the asserted '647 patent claims require linking of only a single linked action.  I disagree. Claim 1 requires that multiple actions appear in a pop-up menu, associated with a detected structure.  The claim term indicates this by using plural "linking actions to the detected structures."  This is further repeatedly confirmed by the Summary of the Invention in at least the following statements:

> "Upon detection of a structure, the analyzer server links **actions** to the detected structure."

> and

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.
PATENT NO. 5,946,647                                    31

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

Gibson, Dunn &
Crutcher LLP

1    "Upon selection of a detected structure, the user interface presents and enables selection of

2        candidate **actions**."

3    '647 Patent at 2:30-31; 2:49-51 (Summary of the Invention).  This is in contrast to claim 15, which

4    requires one or more actions to be associated with each detected structure. 647 Patent at claim 15

5    (means for "linking at least one action to the detected structure").  It also contradicts claim 9, which

6    states that the user interface must enable selection of an action using a "pop-up menu of the linked

7    **actions**."  The only antecedent basis for "the linked actions" (plural) is the multiple linked actions

8    required by parent claim 1.  Since claim 9 is not indefinite for lack of antecedent basis, claim 1 must

9    therefore require multiple actions.  Figure 4 does not contradict this reading, at least because it shows

10   multiple actions linked to other structures (e.g., phone numbers, email addresses, etc.).  In addition,

11   claim 15 explicitly requires only a single linked action, in contrast to the language of claim 1.

12       93.      I also note that Dr. Jeffay further opines that they only require detection of a single

13   "type" of structure.  This is contrary not only to the intrinsic evidence, but also to the claim

14   construction opinions in the *Motorola* litigation.  For example, Dr. Jeffay attempts to argue that the

15   patent distinguishes between number and "type."  But the section Dr. Jeffay cites relates to *actions*,

16   not structures.  It is clear that one of the goals of the invention was to overcome problems in prior art

17   systems, such as those that identified only phone numbers.  '647 patent, 1:52-65.  In the 710

18   Investigation the Administrative Law Judge found that there must be multiple actions linked to a

19   detected structure.  ITC 337-TA-710 Initial Determination, at 130-131.  In the Commission's

20   Opinion, it noted that it was not reviewing that finding, but that an "alternative reading" could be to

21   have "multiple actions across multiple structures."  ITC 337-TA-710 Commission Opinion, at 28, n.

22   21.  In either case, the Commission upheld the validity of claim 1 over Perspective, which detected

23   only a single type of structure.  In addition, the court in the *Motorola* litigation found that "the ability

24   to link a structure to a single action still comports with the patent's plural reference, *so long as other*

25   *structures are linked to other actions*.  An analyzer that links dates to the calendar and phone

26   numbers to the phone book still "links structures to actions."  March 19, 2012 Order, at 10-11.  The

27   court explicitly identified multiple types of structures as required by claim 1.

28

REBUTTAL EXPERT REPORT OF TODD C.                           HIGHLY CONFIDENTIAL
MOWRY REGARDING VALIDITY OF U.S.                            ATTORNEYS' EYES ONLY
PATENT NO. 5,946,647                          32

Gibson, Dunn &
Crutcher LLP

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Dated:    9/13/13

3                                                            Todd C. Mowry

REBUTTAL EXPERT REPORT OF TODD C.
MOWRY REGARDING VALIDITY OF U.S.

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY