JAMES P. BENNETT (CA SBN 65179)
jbennett@mofo.com
ERIK J. OLSON (CA SBN 175815)
ejolson@mofo.com
NATHAN B. SABRI (CA SBN 252216)
nsabri@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

Attorneys for Plaintiff and
Counterclaim-Defendant APPLE INC.

WILLIAM F. LEE
william.lee@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

MARK D. SELWYN (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| APPLE INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,<br><br>Defendants. | Case No. 12-cv-630-LHK<br><br>**APPLE INC.'S BRIEF IN SUPPORT OF MOTION REGARDING ONGOING ROYALTIES**<br><br>Date:    January 11, 2018<br>Time:    1:30pm<br>Place:    Courtroom 8, 4th Floor<br>Judge:    Hon. Lucy H. Koh<br><br>**FILED UNDER SEAL** |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................... 2

III.    LEGAL STANDARDS......................................................................................... 5

IV.     ARGUMENT ........................................................................................................ 6

        A.      Apple Is Entitled to Ongoing Royalties for Samsung's DA1-A Products. ............. 7

                1.      Samsung's DA1-A Browser Products are not more than colorably
                        different from the Adjudicated Products...................................................... 7

                2.      Samsung's DA1-A Messenger Products are not more than
                        colorably different from the Adjudicated Products.................................... 10

                3.      Samsung's DA1-A Products infringe claim 9 of the '647 patent. ............ 12

        B.      Apple Is Entitled to Ongoing Royalties for Samsung's DA1-B Products. ............ 14

                1.      Samsung's DA1-B Products are not more than colorably different
                        from the Adjudicated Products. ................................................................. 14

                2.      Samsung's DA1-B Products infringe claim 9 of the '647 patent.............. 15

        C.      Apple Is Entitled to Ongoing Royalties for Samsung's DA2 Products. ............... 15

                1.      Samsung's DA2 Products are not more than colorably different
                        from the Adjudicated Products. ................................................................. 17

                2.      Samsung's DA2 Products infringe claim 9 of the '647 patent.................. 20

                        a.      The resolver activity pop-up menu is "a pop-up menu of the
                                linked actions."................................................................................ 21

                        b.      The resolver activity pop-up menu "enable[es] the selection
                                of … a linked action." ..................................................................... 22

                        c.      Samsung's DA2 Products contain the same "action
                                processor" as the Adjudicated Products......................................... 24

        D.      The Court Should Award $117,118,673 in Ongoing Royalties. ........................... 24

V.      CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

*Acosta v. City of Costa Mesa,*
    718 F.3d 800 (9th Cir. 2013)................................................................8

*Aevoe Corp. v. AE Tech Co.,*
    C.A. No. 12-0053, 2012 WL 1559768 (D. Nev. May 2, 2012) ....................................6, 14

*Apple Inc. v. Motorola Inc.,*
    757 F.3d 1286 (Fed. Cir. 2014)..........................................................3, 22

*Apple Inc. v. Samsung Electronics Co.,*
    839 F.3d 1034 (Fed. Cir. 2016) (*en banc*)................................................23

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.,*
    C.A. No. 13-0134, 2013 WL 1149230 (M.D. Pa. Mar. 19, 2013)................................5, 20

*Buck v. Berryhill,*
    869 F.3d 1040 (9th Cir. 2017)................................................................8

*Chamberlain Group, Inc. v. Techtronic Indus. Co.,*
    C.A. No. 16-6097, 2017 WL 368027 (N.D. Ill. Jan. 23, 2017) ....................................6, 14

*Creative Internet Advertising Corp. v. Yahoo! Inc.,*
    674 F. Supp. 2d 847 (E.D. Tex. 2009) ........................................................6

*I/P Engine, Inc. v. AOL Inc.,*
    C.A. No. 11-0512, 2014 WL 243157 (E.D. Va. Jan. 21, 2014)........................................6

*Masimo Corp. v. Mallinckrodt Inc.,*
    18 F. App'x 852 (Fed. Cir. 2001)  ........................................................22

*Omega Engineering, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003)........................................................22

*Proveris Scientific Corp. v. Innovasystems, Inc.,*
    739 F.3d 1367 (Fed. Cir. 2014)................................................................5, 19

*TiVo Inc. v. EchoStar Corp.,*
    646 F.3d 869 (Fed. Cir. 2011) (*en banc*)................................................5, 6, 9, 18

1    **I.     INTRODUCTION**

2            This Court previously ordered that Samsung must "pay ongoing royalties for any

3    continuing infringement" for both "products adjudicated to infringe" and "products 'not more

4    than colorably different therefrom.'"  Dkt. 2076.  It is undisputed that even after the November

5    2014 judgment, Samsung continued to sell nearly ▮▮▮▮▮▮ products that incorporated the exact

6    same "quick links" functionality found to infringe Apple's U.S. Patent No. 5,946,647 ("the '647

7    patent").  *See* Dkt. 2197-2 at 1; Declaration of Marylee Robinson in Support of Apple Inc's

8    Motion Regarding Ongoing Royalties ("Robinson Decl.") at Exhibit 3B.  Samsung also sold more

9    than ▮▮▮▮▮ units across 83 different products that it alleges "design around" the '647 patent.

10   Robinson Decl. at Exhibit 1.  But those alleged design-arounds amount to nothing more than

11   trivial changes that Samsung's own expert admits were the result of "an obvious approach."  Ex.

12   A, Jeffay Dep. 34:4-14.[1]  And they have little, if any, effect on user experience.  In one alleged

13   design-around, Samsung's only change was to switch the user gesture that calls the infringing

14   functionality from a long press (i.e., a touch of longer than one second) to a short tap (i.e., a touch

15   of less than one second).  In another, Samsung also made a minor code modification so that

16   certain functions are now called when the user lifts a finger up from the touchscreen instead of

17   when putting a finger down on the touchscreen.  And in a third, Samsung merely removed a pop-

18   up menu that presents the user with linked actions such as "Send email" in favor of a pop-up

19   menu of actions such as "Send email with Gmail."

20           None of Samsung's alleged design-arounds involves significant modifications; none

21   renders the alleged design-around products more than colorably different from the products

22   adjudicated to infringe; and none avoids infringement of claim 9 of the '647 patent.  Samsung's

23   arguments to the contrary ignore the findings made by the jury, fail to apply the Court's claim

24   construction, and seek to rely on technicalities that have no basis in the law.  By making only

25   trivial changes to its products, Samsung chose not to take responsible measures to end its

26

27   ─────────────
     [1]      Exhibits referred to as "Ex." are attached to the Declaration of Sarah R. Frazier in Support

28   of Apple Inc.'s Motion Regarding Ongoing Royalties filed herewith.

widespread infringement but instead opted to expand the scope of its infringement—in fact, Samsung sold ***more*** infringing products following the entry of judgment than were included in the jury's damages award.  Apple therefore requests that the Court award ongoing royalties for Samsung's infringing post-judgment sales in the amount of $117,118,673.[2]

## II.    FACTUAL BACKGROUND

The '647 patent covers Apple's "quick links" or "data detectors" feature.  The patent describes a system that detects "structures" (e.g., email addresses) in text such as email messages, text messages, and webpages, generates "links" to specific actions that can be performed for each type of detected structure (e.g., sending an email), and provides a "pop-up menu" allowing the user to select a linked action.  Asserted claim 9, which depends from claim 1, requires:

> 1.  A computer-based system for detecting structures in data and performing actions on detected structures, comprising:
> (a) an input device for receiving data;
> (b) an output device for presenting the data;
> (c) a memory storing information including program routines including
> > (1) an analyzer server for detecting structures in the data, and for linking actions to the detected structures;
> > (2) a user interface enabling the selection of a detected structure and a linked action;
> > (3) an action processor for performing the selected action linked to the selected structure; and
> (d) a processing unit coupled to the input device, and the memory for controlling the execution of the program routines.
> 9.  The system recited in claim 1, wherein the user interface enables selection of an action by causing the output devices to display a pop-up menu of the linked actions.

JTX-1, '647 patent at 7:8-24, 7:53-55 (red annotations added).

As relevant here, following the Federal Circuit's opinion in an unrelated case involving the '647 patent, the Court construed "linking actions to the detected structures" to mean "creating

---

[2]    If the Court were to determine that Samsung's alleged design-arounds are more than colorably different from the products already found to infringe, Apple would be required to file a new lawsuit to receive compensation for Samsung's continued infringement.

a specific connection between each detected structure and *at least one* computer subroutine that causes the CPU to perform a sequence of operations on that detected structure," and instructed the jury in this case accordingly.  Dkt. 1848 at 30-31 (emphasis added); *see also Apple Inc. v. Motorola Inc.*, 757 F.3d 1286, 1304 (Fed. Cir. 2014), *overruled in part on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (*en banc*).

Apple's expert Dr. Todd Mowry explained at trial how the Browser and Messaging applications in nine Samsung products ("the Adjudicated Products") infringed claim 9. Samsung's Galaxy S III product is representative of the Adjudicated Products.  Dkt. 1624 at 841:12-875:8; Ex. D, Mowry Opening Rpt. ¶¶ 28-45; Ex. A, Jeffay Dep. 12:25-13:6.  In the Messaging application of the Galaxy S III, relevant data structures—phone numbers, e-mail addresses, website URLs, and postal addresses—are pre-detected and underlined in blue font for the user.  Dkt. 1624 at 850:11-852:3, 862:13-19; Ex. D, Mowry Opening Rpt. ¶¶ 34, 36.  When a user *short taps* (i.e., places a finger down for less than a second) on a relevant structure (e.g., an email address), a *contextual pop-up menu* appears displaying different actions linked to the detected structure (e.g., "Send email," "Add to Contacts").  Dkt. 1624 at 863:2-17, 864:20-23, 874:12-875:2; Ex. D, Mowry Opening Rpt. ¶¶ 37-39.  The content of the pop-up menu changes depending on the type of structure detected.  For example, a short tap on a phone number yields actions including "Dial number," whereas a short tap on a postal address yields actions including "Get directions."  When the user selects an action from the pop-up menu, the device launches an application to perform the action and passes along the information from the detected structure. Dkt. 1624 at 854:14-856:10, 857:21-858:10; Ex. D, Mowry Opening Rpt. ¶ 35.

In the Browser application of the Galaxy S III, data structures are *not pre-detected or underlined*.  Dkt. 1624 at 867:9-18, 868:15-869:12; Ex. D, Mowry Opening Rpt. ¶ 42.  The user selects a relevant data structure by *long pressing* (i.e., placing a finger down for more than a second) on the structure.  On "finger down," the phone begins detecting the structure underneath the user's finger and sets a timer.  If the user's finger stays on the relevant data structure for longer than one second, a *contextual pop-up menu* appears.  Dkt. 1624 at 869:13-870:8, 872:8-

873:7; Ex. D, Mowry Opening Rpt. ¶ 43.  As in the Messaging application, the contextual pop-up

menu presents different actions linked to the detected structure, and the content of the menu

changes depending on the type of structure that has been detected.  For example, if an email

address is selected, the contextual pop-up menu includes actions such as "Send email" or "Add to

contacts."  Ex. D, Mowry Opening Rpt. ¶¶ 93, 96.  If the user selects an action (e.g., "Send

email") and the device has a choice of multiple applications to execute the action, a ***resolver***

***activity pop-up menu*** appears presenting a list of more specific actions (e.g., Send email with

Gmail or Send email with AT&T Mail).  *Id.* ¶ 86.[3]

    The jury found that claim 9 was not invalid and was infringed by all nine Adjudicated

Products.  Dkt. 1877 at 2.  In post-trial proceedings, in lieu of a permanent injunction (Dkt. 1954),

the Court determined that "Apple is entitled to ongoing royalties for any continuing infringement"

of the '647 patent, starting after the entry of judgment on November 25, 2014.  Dkt. 2075 at 36;

*see* Dkt. 2076.  The Court ordered that "[t]hose royalties shall apply to products adjudicated to

infringe" the '647 patent at the per-unit rates set forth in the Court's Order, and to "products 'not

more than colorably different therefrom'" at the rate of $2.71 per unit.  Dkt. 2075 at 36.[4]

    After the *en banc* Federal Circuit affirmed the judgment in this case, the Court set a

schedule for discovery and briefing to determine the amount of ongoing royalties that Samsung

owes for its continued infringement of the '647 patent.  Dkt. 2201.  Samsung agreed that it owes

$6,494,252 (plus interest) for post-judgment sales of products containing the identical features

found to infringe at trial, but alleged that it had designed around the '647 patent for other products

that it sold following judgment.  Dkt. 2197-2 at 1.  Specifically, Samsung claimed that it had

implemented three design-arounds—referred to as "DA1-A," "DA1-B," and "DA2"—across 83

---

[3]     At trial, Dr. Mowry pointed to the contextual pop-up menu to prove infringement.  *E.g.*,
Dkt. 1624 at 856:1-10, 860:8-16, 861:24-862:12, 863:2-17, 866:21-868:11, 872:15-873:2; Ex. D,
Mowry Opening Rpt. ¶¶ 41, 43-45.  He did not address the resolver activity pop-up menu because
there was no reason to point to a second pop-up menu, as claim 9 only requires a single menu.
[4]     Although the Court later entered a permanent injunction in 2016 (Dkts. 2157, 2158), it did
not take effect until shortly after the '647 patent expired.  Thus, Samsung was never enjoined
from selling products that infringe the '647 patent and Apple's only remedy for Samsung's
continued post-judgment infringement is that Samsung must pay ongoing royalties.

1   different products ("the Design-Around Products").  *Id.*  The parties then engaged in fact and

2   expert discovery regarding Samsung's purported design-arounds.

3         Based on this discovery, and as described below, it is apparent that Samsung's three

4   alleged design-arounds make only minor modifications that do not meaningfully change

5   Samsung's products with respect to the infringing features.  Accordingly, Apple seeks ongoing

6   royalties for Samsung's post-judgment sales of all Design-Around Products.

7   **III.   LEGAL STANDARDS**

8         A patentee is entitled to post-judgment relief on an infringer's redesigned product if the

9   product (1) "is not more than colorably different from the product found to infringe" and (2)

10   "actually infringes" the relevant claims.  *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed.

11   Cir. 2011) (*en banc*).  To determine whether a redesigned product is "not more than colorably

12   different from the product found to infringe," a court should focus on "those aspects of the

13   accused product that were previously alleged to be, and were a basis for, the prior finding of

14   infringement, and the modified features of the newly accused product."  *Id.*  Even if the infringing

15   party has modified or removed one or more of the elements previously found to infringe, the

16   resulting product is not more than colorably different from the infringing product unless such

17   modification or removal is "significant."  *Id.*; *see Proveris Scientific Corp. v. Innovasystems, Inc.*,

18   739 F.3d 1367, 1371 (Fed. Cir. 2014).  A change is not significant if the redesigned product is

19   "functionally identical" to the infringing product, *Proveris*, 739 F.3d at 1371, or "the substantial

20   equivalent of" that product, *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2013 WL 1149230,

21   at *3 (M.D. Pa. Mar. 19, 2013).  The latter is the case when the redesigned product "performs

22   substantially the same function in substantially the same way with substantially the same result"

23   as the infringing product.  *Id.*  Moreover, a modification is less likely to be significant if it

24   "merely employs or combines elements already known in the prior art in a manner that would

25   have been obvious to a person of ordinary skill in the art at the time the modification was made."

26   *TiVo*, 646 F.3d at 882.

27

28

To determine whether the redesigned product still infringes the patent at issue, "the court is required to evaluate the modified elements of the newly accused product against the asserted claim, on a limitation by limitation basis." *Id.* at 883.  The court "is bound by any prior claim construction that it had performed in the case." *Id.*  A patentee may prove infringement by a redesigned product either literally or under the doctrine of equivalents, even when the court's initial determination was one of literal infringement. *See Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 2017 WL 368027, at *4 (N.D. Ill. Jan. 23, 2017); *Aevoe Corp. v. AE Tech Co.*, 2012 WL 1559768, at *3-*6 (D. Nev. May 2, 2012).

As this Court has noted, "[t]he Federal Circuit has not addressed the burden of proof for ongoing royalties." Dkt. 2075 at 4.  The authority that does exist, however, supports requiring the patentee to prove entitlement to relief by a preponderance of the evidence. *See Creative Internet Advert. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 855 (E.D. Tex. 2009); *I/P Engine, Inc. v. AOL Inc.*, 2014 WL 243157, at *2 (E.D. Va. Jan. 21, 2014) (noting that the *Creative Internet* court "implied that a preponderance standard should apply in the ongoing royalties context"), *vacated on other grounds*, 2016 WL 9667228, at *1 (E.D. Va. Jan. 29, 2016).

## IV.   ARGUMENT

Samsung's Design-Around Products reflect nothing more than trivial and obvious modifications to the features found to infringe in the Adjudicated Products.  Each of the Design-Around Products mirrors the Adjudicated Products in every important respect, and thus none is more than colorably different from the Adjudicated Products.  Moreover, all clearly continue to infringe claim 9 of the '647 patent.  Accordingly, and regardless of whether the appropriate standard of review is for preponderance of the evidence or clear and convincing evidence, Apple is entitled to ongoing royalties for sales of all of Samsung's Design-Around Products.

Moreover, because Apple demonstrated infringement through both the Messenger and Browser applications of the Adjudicated Products at trial, Samsung was obligated to design around the '647 patent in ***both*** applications.  If this Court finds that Samsung's design-arounds fall short for ***either*** its Browser or Messenger application for any particular Design-Around

Product, then Samsung owes ongoing royalties on that product.  Because Samsung chose to implement two purported design-arounds across most of its Design-Around Products—it put DA1-A in 75 of the 83 Design-Around Products, and DA-2 in 78 of the 83 Design-Around Products—a finding against Samsung on either of those design-arounds would cover nearly all of the products at issue and require ongoing royalties of over ███████.

  **A.**  **Apple Is Entitled to Ongoing Royalties for Samsung's DA1-A Products.**

   Samsung implemented DA1-A in the Browser application of 73 Design-Around Products and in the Messenger application of 5 Design-Around Products.  Ex. D, Mowry Opening Rpt. ¶¶ 62, 74.  Thus, a finding that DA1-A does not successfully design around the '647 patent would require Samsung to pay ongoing royalties on the vast majority of the 83 Design-Around Products.

   Just like the Adjudicated Products, the DA1-A Products detect data structures, link actions to those structures, and present the user with the ***same contextual pop-up menu*** when the user selects a detected structure as in the Adjudicated Products.  Ex. A, Jeffay Dep. 53:4-11, 104:5-12, 148:11-20.  The user can then select an action from this menu and the device automatically performs the selected action on the detected structure.  *Id.* at 53:12-19.  Samsung made only a few modifications—all inconsequential—to the type of user gesture that "selects" the data structure and to the timing of the detection functions relative to the user's input gesture.  As explained below, these minor changes do not render the DA1-A Products more than colorably different from the Adjudicated Products or non-infringing.

  **1.**  **Samsung's DA1-A Browser Products are not more than colorably different from the Adjudicated Products.**

   In the DA1-A Browser Products—as in the Browser application of the infringing Galaxy S III—after the user places a finger on a data structure, that structure is detected and a contextual pop-up menu presenting actions (e.g., "Call," "Add to contacts") linked to the structure appears:



2014 Trial Phone -
Galaxy SIII

Design Around
Phone - Galaxy S5

Ex. D, Mowry Opening Rpt. ¶¶ 63, 96, 97; Ex. E, Jeffay Rpt. ¶¶ 164, 182; Ex. A, Jeffay Dep. 148:11-20.  The only two modifications that Samsung made in the DA1-A Browser Products are that:  (1) the gesture that calls the contextual pop-up menu has been switched from a "long press" to a "short tap"; and (2) the functions that detect the structure are now called when the user lifts a finger up from the touchscreen, rather than puts a finger down on the touchscreen.  Ex. D, Mowry Opening Rpt. ¶ 97; Ex. E, Jeffay Rpt. ¶¶ 165, 182-183, 234; Ex. F, Mowry Reply Rpt. ¶ 26.  Neither of these minor changes renders the DA1-A Browser Products more than colorably different from the Adjudicated Products.

*First*, the change from a long press to a short tap in the Browser application is both irrelevant and insignificant.  Claim 9 requires only that the user "select" a structure; it does not require any specific type of gesture to complete that selection.  Indeed, as Dr. Mowry explained at trial—and the jury agreed—the Adjudicated Products use *both* short taps and long presses to infringe.  Dkt. 1624 at 863:2-17, 872:8-873:7 (short tap calls pop-up menu in infringing Messenger application of Adjudicated Products, and long press calls pop-up menu in infringing Browser application of Adjudicated Products).  The jury finding binds this Court to conclude that a short tap is sufficient to infringe.  *See Acosta v. City of Costa Mesa*, 718 F.3d 800, 829 (9th Cir. 2013) (noting that a court ruling on an equitable claim after a jury has reached a verdict on legal claims is required by the Seventh Amendment to "follow the jury's implicit or explicit factual determinations"); *Buck v. Berryhill*, 869 F.3d 1040, 1050 (9th Cir. 2017) ("Under the law of the case doctrine, a court is generally precluded from reconsidering an issue that has already been

1   decided by the same court, or a higher court in the identical case." (internal quotation marks

2   omitted)).  Even if that were not the case, the change from a long press to a short tap—a form of

3   gestured already recognized in the Adjudicated Products—is nothing more than an "obvious"

4   modification and thus not significant.  *See TiVo*, 646 F.3d at 882.

5            Moreover, as Apple's expert Dr. Mowry has explained, the difference between using a

6   long press or a short tap on a touchscreen device is akin to the choice between a right click or left

7   click on a computer mouse.  Ex. F, Mowry Reply Rpt. ¶ 29.  In both instances, the user is making

8   an intentional selection and indicating through the choice of input the desired result.  *Id*.; *see also*

9   Ex. A, Jeffay Dep. 146:19-147:2 (agreeing that a short tap is an "intentional gesture" that, like a

10  long press, still "indicates some intent on the part of the user").  "From the user experience

11  perspective, the difference … can literally be a difference of only a tiny fraction of a second.  For

12  example, a touch of 1.01 seconds on a relevant structure will yield a contextual menu in the

13  Infringing Galaxy S III while a touch of 0.99 second will yield the same contextual menu in the

14  DA1-A Browser products."  Ex. F, Mowry Reply Rpt. ¶ 32.  And from the coding perspective,

15  the modification necessary to implement the change from a long press to short tap "is trivial" and

16  "amounts to little more than adjusting the calls to the functions to generate and display the

17  contextual pop-up menu from a timer-based determination that there has been a long press to a

18  timer-based determination that there has been a short tap."  Ex. F, Mowry Reply Rpt. ¶ 27; *see*

19  *also* Ex. B, Mowry Dep. 104:14-105:8.  For these reasons, the change from a long press to a short

20  tap in the Browser application cannot be considered a colorable difference as compared to the

21  Adjudicated Products.

22           ***Second***, the fact that the detection functions are now called when the user lifts a finger up,

23  rather than when the user puts a finger down, is also not a significant modification.  On any

24  touchscreen device, to have a "finger up" action, there must first be a "finger down" action.

25

26                                                          Thus, the process that leads to the detection of

27  the data structure always begins when the user puts a finger down on the touchscreen.  Ex. B,

28

Mowry Dep. 111:7-17, 112:4-13, 113:5-21; Ex. F, Mowry Reply Rpt. ¶ 30.  Whether the detection function in the software is called on "finger down" or "finger up" does not present any meaningful difference from a functional perspective.

There is also no noticeable difference from the user's perspective.  Because of the speed with which structures are detected in the devices, "the display of the contextual pop-up menu in the DA1-A products is as instantaneous, from a users' perspective, as in the infringing Galaxy S III."  Ex. D, Mowry Opening Rpt. ¶ 99. ███████████████████████████

████████████████████████████████████████████████████████     Samsung's expert Dr. Jeffay—who agrees that user experience is relevant to the colorable differences analysis where, as here, the claim at issue "is a user interface claim" (Ex. A, Jeffay Dep. 139:15-23)—does not dispute that from the user's perspective the DA1-A Products are "functionally equivalent" to the Adjudicated Products.  Ex. E, Jeffay Rpt. ¶ 236.  In fact, when pressed to identify any differences in the user's experience for the DA1-A Browser Products, Dr. Jeffay pointed only to the "different input method[s]"—i.e., "long press versus short tap."  Ex. A, Jeffay Dep. 140:11-20.  But as discussed above, the type of gesture that calls the infringing functionality is irrelevant—from the user's perspective both are intentional gestures, and the difference between the two can be a tiny fraction of a second.

Further, the code modification to move the call to the detection functions from "finger down" to "finger up" "is minor."  Ex. D, Mowry Opening Rpt. ¶ 98. █████████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████     Ex. A, Jeffay Dep. 143:15-19.  The modification was simply to change "when the detection functions are called … from the trigger being finger down to the trigger being finger up."  *Id.* at 143:20-24.  That is not a colorable difference.

### 2.     Samsung's DA1-A Messenger Products are not more than colorably different from the Adjudicated Products.

Samsung's implementation of DA1-A in the Messenger application also does not render its Design-Around Products more than colorably different.  In the DA1-A Messenger Products—

as in the Messaging application of the Adjudicated Products—the user still selects relevant structures via a short tap, and the result of that short tap is the display of a contextual pop-up menu of linked actions.  Ex. D, Mowry Opening Rpt. ¶¶ 58, 93.  As implemented in the Messenger application, DA1-A contains only two minor modifications:  First, the relevant data structures are no longer pre-detected and underlined.  *Id.* ¶¶ 57, 91.  Second, the functions that "detect" the structures are now invoked when the user lifts a finger up.  *Id.* ¶ 58.  Neither of those modifications is a colorable difference from the infringing features in the Adjudicated Products.

*First*, the removal of the pre-detected and underlined structures from the Messenger application is not a relevant difference because some of the infringing features in the Adjudicated Products likewise did not pre-detect or underline structures.  As Dr. Mowry explained at trial— and the jury agreed—pre-detection or underlining a structure is not required by the asserted claim.  Dkt. 1624 at 867:9-18, 868:15-869:12; Ex. D, Mowry Opening Rpt. ¶¶ 57, 91; *see* Ex. A, Jeffay Dep. 120:19-121:14 (admitting "[t]he jury in their verdict essentially agreed" that the claims do not require pre-detection); *id.* at 178:14-24.  Indeed, the result of removing the pre-detection and underlining in the Messenger application of the DA1-A Messenger Products results in displaying those structure to the user in the ***same way*** structures are displayed in the Browser application of the Galaxy S III, which the jury found to infringe.  Ex. A, Jeffay Dep. 181:6-15; Ex. D, Mowry Opening Rpt. ¶ 91; Ex. F, Mowry Reply Rpt. ¶ 21.  Accordingly, this modification cannot render the DA1-A Messenger Products more than colorably different from the Adjudicated Products.[5]

*Second*, the fact that the detection functions are now called when the user lifts a finger up, rather than when the user puts her finger down, is not a significant modification for the same reasons as in the DA1-A Browser Products.  This trivial modification presents no meaningful difference in terms of functionality, user experience, or code modification.  *See supra* pp. 9-10.

---

[5]     While Dr. Jeffay has opined that the removal of pre-detecting and underlining in the Messenger application is a "significant change from the user's perspective," he does not claim that it renders the DA1-A Messenger Products more than colorably different from the Adjudicated Products.  Ex. E, Jeffay Rpt. ¶ 245; *see* Ex. A, Jeffay Dep. 121:17-24.  Nor could he, for the reasons stated above.

### 3.      Samsung's DA1-A Products infringe claim 9 of the '647 patent.

Samsung's minor modifications to the DA1-A Products also do not render those products non-infringing.  Samsung concedes that its DA1-A Products continue to satisfy nearly every limitation required by claim 9.  Ex. A, Jeffay Dep. 13:16-14:18, 20:14-21.  It contends only that the DA1-A Products do not satisfy claim limitation 1(c)(2), which requires "a user interface enabling the selection of a detected structure and a linked action."  *See* Ex. C, Samsung Interrogatory Response at 58, 75.  But the DA1-A Products satisfy this limitation, and therefore infringe claim 9, under the doctrine of equivalents.

As a preliminary matter, two of Samsung's three modifications in the DA1-A Products—changing from a long press to a short tap in the Browser application, and removing pre-detecting and underlining of data structures in the Messenger application—cannot possibly serve as a basis for non-infringement.  As explained above, the jury found that using a short tap gesture and not pre-detecting or underlining structures in the Adjudicated Products infringed claim 9, and that finding now binds this Court.  *See supra* pp. 3-4, 8.

Samsung is thus left to argue that its trivial code modification whereby detection functions are called when the user lifts a finger up, rather than when the user puts a finger down, makes the DA1-A Products non-infringing.  It does not.  The claim limitation requiring "a user interface enabling the selection of a detected structure and a linked action" offers the user a way to select data structures that are detected from a larger body of text and presents the user with one or more linked actions to perform on that structure.  In Samsung's DA1-A Products, the user can select a data structure on the user interface using a short tap gesture.  The device ██████████ ██████████████████ where the user has tapped and presents the user with a contextual pop-up menu of actions linked to that structure.  *See supra* pp. 7-8.

While the functions that detect the structure are not invoked in the DA1-A Products until the user lifts a "finger up," as opposed to when the user puts a "finger down," the DA1-A Products still perform substantially the same function in substantially the same way as the claim requires (and as the Adjudicated Products do).  As Samsung's own representative conceded, the

process of identifying that the "finger up" action has occurred—and therefore invoking the detector functions—necessarily begins with the "finger down" action.  Ex. G, Song Dep. 36:2-8; *see also* Ex. B, Mowry Dep. 104:14-105:8, 112:4-13, 113:5-21; Ex. F, Mowry Reply Rpt. ¶ 30. In the DA1-A Products as in the claim limitation, it is the user's intentional gesture of momentarily touching the device's screen at the location where the structure is displayed that causes the device to detect the structure and display the pop-up menu of actions linked to that structure.  Ex. D, Mowry Opening Rpt. ¶¶ 136-137; Ex. A, Jeffay Dep. 104:5-12 (agreeing "there is a display of a contextual pop-up menu after a short tap … ***because*** the user has selected a structure (emphasis added)).  And the result is the same:  the user may select from the pop-up menu one of the actions linked to the detected structure for the device to then perform.  Ex. D, Mowry Opening Rpt. ¶ 138.

Dr. Jeffay has opined that because the detection process is not completed in the DA1-A Products until after the user lifts a finger up, there can be no selection of a ***detected*** structure.  Ex. E, Jeffay Rpt. ¶¶ 258-259, 270.  But Dr. Jeffay admits that the DA1-A Products have "a user interface that allows you to select a structure" and that the "user interface … enables the selection of things like email addresses and telephone numbers ***that will be detected*** after the selection has fully completed."  Ex. A, Jeffay Dep. 179:7-13, 180:2-8.  Whether that detection process is completed on "finger up" or "finger down"—a distinction that is unnoticeable to the user and has no impact on the "quick links" function performed by the device—is at most an insubstantial difference.  Ex. F, Mowry Reply Rpt. ¶¶ 52, 60-63.  Samsung's DA1-A Products therefore infringe claim 9 under the doctrine of equivalents.

Finally, Samsung has suggested that its Design-Around Products cannot be found to infringe under the doctrine of equivalents because Apple contended at trial—and the jury found— that the Adjudicated Products literally infringed claim 9.  That is incorrect as a matter of law. Samsung cannot escape its obligation to pay ongoing royalties for products that are not more than colorably different from the Adjudicated Products and are still infringing simply because they now infringe under the doctrine of equivalents.  This is especially true where Samsung has made

only the most trivial modification—calling the detecting function on "finger up" rather than "finger down"—in an effort to avoid paying for its continuing infringement.  *See Chamberlain*, 2017 WL 368027, at *4 (holding that it was sufficient if the redesigned product infringed under the "alternative" theory of the doctrine of equivalents, even though the preliminary injunction had issued based on a literal-infringement determination); *Aevoe*, 2012 WL 1559768, at *6 (concluding that redesigned product infringed under the doctrine of equivalents even though court previously had issued preliminary injunction based on a literal-infringement determination).

**B.    Apple Is Entitled to Ongoing Royalties for Samsung's DA1-B Products.**

Samsung implemented DA1-B in the Browser application of five Design-Around Products, and it is in no way a "design-around."  Just as in the Adjudicated Products, the DA1-B Products detect data structures upon the "finger down" action, link actions to those structures, and present the user with a contextual pop-up menu of actions linked to the detected structure.  Ex. D, Mowry Opening Rpt. ¶¶ 75-79, 104.  DA1-B contains only a single, irrelevant modification of the Browser application:  the user gesture that calls the contextual pop-up menu upon selection of a relevant structure is now a short tap rather than a long press.  Ex. D, Mowry Opening Rpt. ¶ 101; Ex. F, Mowry Reply Rpt. ¶¶ 35-36.  That single modification—which the Messaging application of the Adjudicated Products included—does not make the DA1-B Products more than colorably different from the Adjudicated Products and does not render the DA1-B Products non-infringing.

**1.    Samsung's DA1-B Products are not more than colorably different from the Adjudicated Products.**

The change in the type of gesture used to call the infringing pop-up menu—from a long press to a short tap—does not render the DA1-B Products more than colorably different from the Adjudicated Products.  As discussed above, this modification is irrelevant because the jury found that the use of a short tap in the Messaging application of the Adjudicated Products infringed. *See supra* pp. 3-4, 8.  This modification is also insignificant in terms of user experience and code modifications.  *See supra* p. 9.  Changing the user gesture from a long press to a short tap in the Browser application of the DA1-B Products is thus not a colorable difference as compared to the

1  Adjudicated Products.

2  **2.   Samsung's DA1-B Products infringe claim 9 of the '647 patent.**

3  The switch from a long press to a short tap in the DA1-B Products also does not render

4  those products non-infringing.  As discussed above, the asserted claim only requires the selection

5  of a structure; it does not require that any particular gesture be used to make that selection and, in

6  fact, the short tap gesture was previously found to infringe in the Adjudicated Products.  It

7  therefore cannot provide a basis for non-infringement now.  *See supra* pp. 3-4, 8.

8  Nevertheless, Samsung has contended that the DA1-B Products do not infringe because

9  "detection does not occur until after a user has completed selecting a structure."  Ex. C, Samsung

10  Interrogatory Responses at 68, 74.  But as Dr. Jeffay agrees, the timing of the call to the detection

11  functions in the DA1-B Products is the ***same*** as in the Adjudicated Products—in both cases,

12  "[t]he process of detecting a selected structure starts upon finger down."  Ex. A, Jeffay Dep.

13  116:7-16; *see also* Ex. D, Mowry Opening Rpt. ¶ 150 (explaining that "the timing of the detection

14  functions in the DA1-B products operates ***the same way*** in which the Infringing Galaxy S III"

15  operates); *id.* ("The detection function in the DA1-B Products starts immediately upon 'finger

16  down' and is called even before 'finger up' occurs.  The user is therefore selecting a detected

17  structure.").  The DA1-B Products therefore literally infringe claim 9 in the same manner as the

18  Adjudicated Products did.  *See* Ex. D, Mowry Opening Rpt. ¶¶ 150-154.[6]

19  **C.   Apple Is Entitled to Ongoing Royalties for Samsung's DA2 Products.**

20  Samsung implemented DA2 in the Messenger application of 78 Design-Around Products.

21  A finding that DA2—which involves a single modification that only affects which pop-up menu

22  is initially displayed to the user after selecting a detected structure—does not successfully design

23

24  _____

25  [6]     Even if Samsung were correct (it is not) that detection is not "complete" in the DA1-B
Products until after the user lifts a finger up, the DA1-B Products would still infringe claim 9

26  under the doctrine of equivalents for the same reasons as the DA1-A Products—i.e., detecting the
structure simultaneous to or immediately after selection performs substantially the same function

27  in substantially the same way and with the same result as the claim requires (and as the
Adjudicated Products did).  *See supra* pp. 12-13; *see also* Ex. B, Mowry Opening Rpt. ¶¶ 155-

28  157.

around the '647 patent would therefore require Samsung to pay ongoing royalties on nearly all of the 83 Design-Around Products.

As in the infringing Galaxy S III, structures in the Messenger application of the DA2 Products are still pre-detected and underlined, a short tap on a detected structure still yields a pop-up menu, the pop-up menu still contains choices of linked actions, and the content of the pop-up menu changes depending on the type of data structure that has been detected.  Ex. D, Mowry Opening Rpt. ¶¶ 122-124, 128.  The *sole* difference between DA2 and the Adjudicated Products is the specific list of options provided by the pop-menu that is first displayed to the user, but that difference is not colorable.  In the Adjudicated Products, a contextual pop-up menu initially presented certain actions (e.g., Send email, Add to contacts) linked to the detected structure (e.g., an email address).  If the user chose an action that could be completed by multiple applications, a resolver activity pop-up menu would then appear displaying more specific actions (e.g., Send email with Gmail, Send email with AT&T Mail) linked to the same action.  *Id.* ¶¶ 52, 86.  In the DA2 Products, Samsung removed the contextual pop-up menu so that when the user selects a detected structure, the *first* pop-up menu that appears is the resolver activity pop-up menu.  Like the contextual pop-up menu (shown below on the left), the resolver activity pop-up menu (shown below on the right) still presents a list of actions linked to the detected structure (*id.* ¶¶ 52-53, 128, 130):



2014 Trial Phone - Galaxy SIII

Design Around Phone - Galaxy S5

The source code used to generate the resolver activity pop-up menu in the DA2 Products is based on Android code.  Ex. D, Mowry Opening Rpt. ¶¶ 54, 126.  The undisputed evidence is that Samsung could have disabled or removed the resolver activity pop-up menu from its DA2

Products, but it chose not to do so.  *Id.* ¶ 87; Ex. A, Jeffay Dep. 82:8-16.  As explained below, Samsung's removal of the contextual pop-up menu—only to leave the resolver activity pop-up menu to take its place—is an insignificant modification that does not render the DA2 Products more than colorably different from the Adjudicated Products or avoid infringement of claim 9.

> **1.      Samsung's DA2 Products are not more than colorably different from the Adjudicated Products.**

A simple comparison of the contextual pop-up menu in the Adjudicated Products with the resolver activity pop-up menu in the DA2 Products—where the facts of how they operate are not disputed—demonstrates that there is no colorable difference.  As discussed above (p. 3), Apple's expert Dr. Mowry explained at trial that the Messaging application in Samsung's Adjudicated Products infringed in the following manner.  First, the application utilized server routines to detect and underline relevant data structures within a text message, enabling a user (through a short tap) to select one of those structures.  Dkt. 1624 at 850:11-852:3, 862:13-19; 863:2-17; Ex. D, Mowry Opening Rpt. ¶¶ 34, 36.  Upon the user's selection of that detected structure, the application brought up a pop-up menu with a set of linked actions from which the user could choose.  Dkt. 1624 at 863:2-17, 864:20-23, 874:12-875:2; Ex. D, Mowry Opening Rpt. ¶¶ 37, 39.  For example, if the user short-tapped on an e-mail address, the user then would see a tailored pop-up menu of linked actions that the user could perform with that e-mail address.  Dkt. 1624 at 863:2-17; Ex. D, Mowry Opening Rpt. ¶¶ 34-35.  The user could then choose one of those actions, and the action would take place—an application would launch and fields within that application would be populated (e.g., an email browser would launch and the "to" address would be filled in).  Dkt. 1624 at 854:14-856:10; Ex. D, Mowry Opening Rpt. ¶ 38.

The DA2 Products follow this exact same pattern.  Indeed, Samsung's expert Dr. Jeffay concedes that the DA2 Products still pre-detect and underline structures in text messages, allow users to select those detected structures with a short tap, display a pop-up menu upon that short tap, and launch an application after the user chooses an item listed in the pop-up menu.  Ex. A, Jeffay Dep. 59:1-3, 148:21-149:13.  The ***only*** difference is the content of the pop-up menu that

1  appears after the user selects a detected structure.  The Adjudicated Products display a

2  "contextual pop-up menu," which gives the user the choice whether, for example, to send an

3  e-mail to the selected e-mail address or to add it to the user's list of contacts.  The DA2 Products

4  display a "resolver activity pop-up menu," which gives the user the choice whether, for example,

5  to send an e-mail via Gmail or to send an e-mail via some other mail client.  *See supra* p. 6.  In

6  both instances:  (1) the actions presented in the pop-up menu are linked to the detected structure;

7  (2) ██████████████████████████████████████████████████████████

8  ████████████████████████████████████  and (3) the actions vary depending on the

9  type of structure that is selected.  Ex. D, Mowry Rpt. ¶¶ 35, 80, 88-89, 126.

10      There is no real dispute between the parties' experts that Samsung's DA2 modification

11  was simple and obvious.  *See TiVo*, 646 F.3d at 882-883.  Samsung simply modified the source

12  code in the DA2 Products to disable and bypass the contextual pop-up menu.  But Samsung did

13  not also disable or bypass the resolver activity pop-up menu—even though it easily could have.

14  The end result of its efforts is thus an asserted "design-around" of a claim covering a pop-up

15  menu of linked actions that still includes a pop-up menu of linked actions.  There is no colorable

16  difference between the Adjudicated Products and the DA2 Products.

17      In an effort to avoid the obvious consequences of its decision to use the resolver activity

18  pop-up menu in place of the contextual pop-up menu in the DA2 Products, Samsung has claimed

19  that the resolver activity pop-up menu cannot support a finding that the DA2 Products are not

20  more than colorably different from the Adjudicated Products because that feature existed in the

21  Adjudicated Products but was not previously accused of infringement.  Samsung's argument is

22  wrong as a matter of law.  The colorability analysis is directed to the elements of the adjudicated

23  products that were previously found to infringe and an assessment of whether the modification or

24  removal of those elements was "significant."  *TiVo*, 646 F.3d at 882.  Whether the DA2 Products

25  satisfy that standard necessarily depends on the functionality of the resolver activity pop-up

26  menu, which has taken the place of the contextual pop-up menu.  In other words, this Court must

27  analyze the resolver activity pop-up menu not as a result of any role it played in the Adjudicated

28

Products, but because it is now the appropriate analogue to the contextual pop-up menu. It is thus irrelevant whether Apple previously accused the resolver activity pop-up menu of infringement.[7]

Relatedly, Dr. Jeffay has opined that "DA2 … is more than colorably different from the functionality accused of infringing because the accused context menu functionality was removed entirely." Ex. E, Jeffay Rpt. ¶ 247. But the Federal Circuit has made clear that modifying an infringing device by removing an accused feature is not alone sufficient to render the redesigned product more than colorably different. Rather, the key inquiry is whether a modification—such as removing a feature—is "significant." As the Federal Circuit explained in *Proveris*:

> Innova claims to have removed that feature from the ADSA product. Thus, following the *TiVo* analysis, Innova argues that the ADSA product is more than colorably different from the OSA as a matter of law. Innova's position is based on a misreading of *TiVo*. Even if it were true that this particular feature was a basis for the prior finding of infringement … , *TiVo* makes clear that the court must still determine whether that modification was ***significant***.

*Proveris*, 739 F.3d at 1371 (emphasis added). It is thus incorrect to assume—as Dr. Jeffay has—that removal of an infringing feature in and of itself renders the modification significant. *See* Ex. A, Jeffay Dep. 27:9-12 ("If the difference was that the accused component or function had been removed from … a product, I would consider that to be significant."); *id.* at 38:15-17 ("[I]f you remove a feature that was accused to infringe, to my way of thinking, that's a substantial change."); *id.* at 40:6-10 ("I believe the removal in cases of functions means that a claim limitation is no longer met. And, in my view, that makes it a significant modification.").

Here, Samsung's removal of the contextual pop-up menu is insignificant, because Samsung has simply replaced that pop-up menu with the resolver activity pop-up menu, which is substantially the same as the removed contextual pop-up menu. Just like the contextual pop-up

---

[7]     In any event, Apple was not required to accuse each successive instance of infringement by Samsung's devices; demonstrating infringement by the first pop-up menu in the Adjudicated Products was sufficient to prove Apple's case. In the Messaging application of the Adjudicated Products, the first menu to appear when the user short tapped a detected structure was the contextual pop-up menu. The resolver activity pop-up menu appeared later only if the action chosen from the contextual pop-up menu could not be performed without more specific information about which application the user wished to use. Now, in the DA2 Products, the resolver activity pop-up menu appears first, in place of the contextual pop-up menu.

menu, the resolver activity pop-up menu appears after the user has selected a detected structure and enables the user to choose from one or more actions that are linked to that structure.  Thus, it "performs substantially the same function in substantially the same way with substantially the same result" as the contextual pop-up menu.  *See Arlington*, 2013 WL 1149230, at *3.

Dr. Jeffay has also suggested that the DA2 Products are more than colorably different from the Adjudicated Products because the resolver activity pop-up menu allows the user to choose from a set of applications (e.g., Gmail, AT&T Mail), each of which allegedly performs the *same* linked action (e.g., send email).  Ex. E, Jeffay Rpt. ¶ 250.  As an initial matter, it is irrelevant whether the pop-up menu provides the user with multiple linked actions because claim 9 only requires a single linked action for each detected structure.  *See infra* pp. 21-22.  But even if multiple linked actions were required, the resolver activity pop-up menu *does* present the user with multiple linked actions from which to select—indeed, that is the entire purpose of providing a "menu" of options.  For example, after selecting a detected e-mail address, the user can choose whether to send an e-mail via Gmail or via another e-mail client.  A person of ordinary skill in the art would recognize these to be two separate linked actions.  Ex. F, Mowry Reply Rpt. ¶ 18.  Tellingly, Dr. Jeffay admits that "if you have a single linked action, there's not going to be a need for a pop-up menu," and yet agrees "there's a need for" the resolver activity pop-up menu in the DA2 Products.  Ex. A, Jeffay Dep. 99:10-19.  Thus, even if the pop-up menu were required to display multiple linked actions (it is not), the resolver activity pop-up menu does exactly that.

### 2.  Samsung's DA2 Products infringe claim 9 of the '647 patent.

Samsung does not dispute that the DA2 Products satisfy claim limitations 1(a), 1(b), and 1(d) of the '647 patent.  Ex. D, Mowry Opening Rpt. ¶¶ 107-113, 120; Ex. F, Mowry Reply Rpt. ¶ 41; *see generally* Ex. E, Jeffay Rpt.  Samsung also concedes that the DA2 Products contain "an analyzer server for detecting structures in the data, and for linking actions to the detected structures" and "a user interface enabling the selection of a detected structure," and thus satisfy claim limitation 1(c)(1) and the first part of claim limitation 1(c)(2).  *See* Ex. E, Jeffay Rpt. ¶¶ 297-298, 301-314.  Samsung's non-infringement assertions apply to the three remaining claim

elements, but, as explained below, they ignore the jury's verdict and fail to apply this Court's claim construction.  None provides a basis for non-infringement.

### a. The resolver activity pop-up menu is "a pop-up menu of the linked actions."

Claim 9 requires that "the user interface enables selection of an action by causing the output device to display a pop-up menu of the linked actions."  That Samsung's DA2 Products satisfy this claim limitation is straightforward:  the DA2 Products contain a "user interface" that displays the resolver activity pop-up menu, which contains one or more linked actions (e.g., Send email with Gmail, Send email with AT&T mail) and thereby enables the user to select at least one action for a detected structure (e.g., an email address).  *See supra* pp. 15-16.

Samsung nonetheless argues that the DA2 Products do not meet the limitation added by claim 9 because, according to Dr. Jeffay, claim 9 requires the pop-up menu to display multiple linked actions for a detected structure (even though he claimed at his deposition not to be offering any claim constructions) and the resolver activity pop-up menu purportedly provides only a choice of applications.  Ex. E, Jeffay Rpt. ¶ 250; Ex. A, Jeffay Dep. 71:6-15.  Dr. Jeffay is wrong as a matter of fact and as to claim construction.  Even if claim 9 were construed to require multiple linked actions within the pop-up menu, the resolver activity pop-up menu does provide multiple linked actions (e.g., Send email with Gmail, Send email with AT&T Mail) from which a user may choose.  *See supra* p. 20.  User selection of any one of these choices will cause the action to occur, i.e., the application to launch and fields to be populated.  Indeed, as Dr. Jeffay admits, "there's a need for" the resolver activity pop-up menu, which would not exist "if you have a single linked action."  Ex. A, Jeffay Dep. 99:10-19.

Even more fundamentally, however, Dr. Jeffay's non-infringement opinion must be rejected because it is inconsistent with the claim construction provided by the Federal Circuit and given to the jury by this Court.  That claim construction makes clear that a single linked action for a detected structure is sufficient to infringe.  The claims recite in relevant part:

> (1)(c)(1) an analyzer server for detecting structures in the data, and for *linking actions* to the detected structures; …

9.  The system recited in claim 1, wherein the user interface enables selection of an action by causing the output device to display a pop-up menu of *the linked actions*.

JTX-1, '647 patent at 7:8-24, 7:53-55 (red annotations and emphases added).  The Federal Circuit and this Court construed "linking actions to the detected structures" as requiring only that each detected structure be linked to "at least one" action.  *Motorola*, 757 F.3d at 1304 (construing "linking actions to the detected structures" to mean "creating a specified connection between each detected structure and *at least one* computer subroutine that causes the CPU to perform a sequence of operations on that detected structure" (emphasis added)); Dkt. 1848 at 30-31 (same). Dr. Jeffay concedes that the governing construction of "linking actions to the detected structures" does not require more than one linked action.  Ex. A, Jeffay Dep. 70:1-6, 76:20-23.

There is no basis for Dr. Jeffay's assertion that "linked actions" should be interpreted differently in the context of claim 9.  *See* Ex. E, Jeffay Rpt. ¶ 73; Ex. A, Jeffay Dep. 70:16-78:21. Indeed, "the linked actions" recited in claim 9 must refer to the *same* "linked actions" recited in claim 1 because the antecedent basis for "the linked actions" in claim 9 comes from claim 1.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent … carries the same construed meaning."); *Masimo Corp. v. Mallinckrodt Inc.*, 18 F. App'x 852, 856 (Fed. Cir. 2001) (holding that where one term provided antecedent basis for another "those claim terms must be construed to mean the same thing"); *see also* Ex. B, Mowry Dep. 60:7-16, 80:25-81:13.  Samsung did not challenge this construction on appeal.  It is therefore the law of the case that the construction applies to both claim 1 and claim 9.  Thus, even if it were correct that the resolver activity pop-up menu presents only a single linked action as Dr. Jeffay contends, that difference would be immaterial.  Claim 9 only requires enabling the selection of "one or more" linked actions.

   b.   **The resolver activity pop-up menu "enable[es] the selection of … a linked action."**

The second part of claim limitation 1(c)(2) recites "a user interface enabling the selection of … a linked action."  Just as the contextual pop-up menu in the Adjudicated Products satisfied

this limitation, so does the resolver activity pop-up menu in the DA2 Products. Ex. D, Mowry Opening Rpt. ¶¶ 37, 124. After the user selects a detected structure in a text message, the resolver activity pop-up menu—a computer-generated user interface—appears and gives the user the option to (1) send an e-mail via one of the available e-mail applications (if the detected structure was an e-mail address); (2) view a postal address via one of the available map or navigation applications (if the detected structure was a postal address); or (3) view a web page via one of the available web browsers (if the detected structure was a website URL). *Id.* ¶ 128. The resolver activity pop-up menu thus enables the user to select from multiple actions, such as sending an email with Gmail or sending an email with another mail client. That plainly meets the limitation.

In his expert report, Dr. Jeffay asserts that the resolver activity pop-up menu "does not creat[e] a specified connection between each detected structure and at least one" action. Ex. E, Jeffay Rpt. ¶ 311. The claim limitation that requires the creation of a specified connection between a detected structure is 1(c)(1), which recites "an analyzer server … for linking actions to the detected structures." *See* Dkt. 1848 at 30 (claim construction). Dr. Jeffay, however, does not dispute that the DA2 Products contain an "analyzer server" that fulfills that function. *See* Ex. A, Jeffay Dep. 75:24-76:7; *see also* Ex. D, Mowry Opening Rpt. ¶¶ 115, 117. In any case, the "specified connection" exists in the DA2 Products "between detected structures and *the computer subroutine that causes the CPU to perform the operations*." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1046 (Fed. Cir. 2016) (*en banc*). Just as in the Accused Products, selection from the resolver activity pop-up menu causes the CPU to perform a series of operations including the launching of an application and the passing of "intent objects." Ex. D, Mowry Opening Rpt. ¶ 44. Thus, the resolver activity pop-up menu does "creat[e]" the specified connection between a detected structure and an action. *Id.*; *see also Apple*, 839 F.3d at 1046 ("Our claim construction, however, does not require a specified connection between detected structures and the applications that perform operations on them. It requires a specified connection between detected structures and *the computer subroutine that causes the CPU to perform the operations*.").

      c.       **Samsung's DA2 Products contain the same "action processor" as the Adjudicated Products.**

Claim limitation 1(c)(3) requires "an action processor for performing the selected action linked to the selected structure."  The action processor routines in the DA2 Products are the ***same*** as in the Adjudicated Products:  the startActivity() method of the ContextImpl class, the resolveActivity() method of the Intent class, and the resolveActivity() method of the PackageManager class.  Ex. D, Mowry Opening Rpt. ¶ 119.  Those routines, in combination, cause the launching of a selected action to take place.  *Id.*  Within the Messaging application, the routines collectively launch the action that is linked to the selected structure.  Because that remains as true in the DA2 products as it was for the Adjudicated Products, the DA2 Products continue to satisfy this claim element.

Even though Samsung made no changes to the action processor in the DA2 Products, Dr. Jeffay contended in his report that the change from the contextual pop-up menu to the resolver activity pop-up menu somehow renders this element no longer infringed.  Ex. E, Jeffay Rpt. ¶¶ 313-314.  But the action processor is separate from any pop-up menu, and the specific type of pop-up menu has no bearing on whether an action processor is present.  The action processor software has not changed, and that software continues to be used for performing a selected action linked to the selected structure.  The claim requires no more.

**D.**      **The Court Should Award $117,118,673 in Ongoing Royalties.**

Samsung admits that after the November 2014 judgment it sold nearly █████████ units that implemented no design-arounds, and it has agreed that the royalties it owes on those products are $6,494,252, plus interest.  Dkt. 2197-2 at 1.  As shown in the table below, Dr. Mowry has categorized the 83 Design-Around Products into six groupings based on the information produced by Samsung.  Ex. D, Mowry Opening Rpt. ¶ 47.  If the Court finds that Samsung's Design-Around Products are not more than colorably different from the Adjudicated Products and infringe claim 9 of the '647 patent, then the royalties owed on those products (before interest) are:

| Products Sold Post-Judgment | Units Sold Post-Judgment[8] | Ongoing Royalties |
|---|---|---|
| 70 products implement DA1-A in Browser and DA2 in Messenger | ███████ | ███████ |
| 4 products implement DA2 in Messenger and contain no Samsung Browser | ███████ | ███████ |
| 4 products implement DA1-B in Browser and DA2 in Messenger | ███████ | ███████ |
| 1 product implements DA1-A in Messenger and DA1-B in Browser | ███████ | ███████ |
| 3 products implement DA1-A in Messenger and DA1-A in Browser | ███████ | ███████ |
| 1 product implements DA1-A in Messenger and contains no Samsung Browser | ██████ | ██████ |
| Products with no design arounds implemented (agreed to by Samsung) | ███████ | $6,494,252 |
| TOTAL: | ███████ | $117,118,673 |

Should the Court determine that some, but not all, of Samsung's purported design-arounds fail to implement colorable differences and infringe claim 9, then the products on which royalties are due may be determined based on the product groupings in this table.  Specifically, the Court should award ongoing royalties for any Design-Around Product where **either** the Browser or Messenger application is not more than colorably different from the Adjudicated Products and also infringes claim 9, as the presence of either such application makes the Design-Around Product infringing.  In other words, Samsung's products would avoid infringement only if they successfully "designed around" both the infringing Browser and Messenger applications.

## V.   CONCLUSION

For the foregoing reasons, Apple respectfully requests that the Court:  (1) determine that Samsung's Design-Around Products are not more than colorably different from the Adjudicated Products and continue to infringe claim 9 of the '647 patent, and (2) order Samsung to pay ongoing royalties for all Design-Around Products at the rate previously set by the Court.

---

[8]    The units in each category were calculated by adding up the unit sales from the spreadsheet produced by Samsung.  *See* Robinson Decl.  Because Samsung did not implement the purported design-arounds in some products immediately after judgment, the unit numbers listed in Samsung's spreadsheet by product have been reduced so as not to count any units already included in the agreed-upon amounts for products containing no alleged design-arounds.  *Id.*

Dated: November 13, 2017

WILMER CUTLER PICKERING HALE AND
DORR LLP


By: */s/ Mark D. Selwyn*
    MARK D. SELWYN

    Attorneys for Plaintiff
    APPLE INC.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on November 13, 2017 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.


*/s/ Mark D. Selwyn*
Mark D. Selwyn