# EXHIBIT F

## (Filed Under Seal)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

APPLE INC., a California corporation,

       Plaintiff,

    vs.

SAMSUNG ELECTRONICS CO., LTD., a Korean business entity; SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation; SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, a Delaware limited liability company,

       Defendants.

Case No. 12-cv-00630-LHK

**REPLY EXPERT REPORT OF DR. TODD C. MOWRY IN CONNECTION WITH ONGOING ROYALTIES**

**HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL'S EYES ONLY—SOURCE CODE**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

## TABLE OF CONTENTS

Page

I.    INTRODUCTION.................................................................................................1

II.   MATERIALS CONSIDERED...............................................................................2

III.  THE DESIGN-AROUND DEVICES ARE NOT MORE THAN COLORABLY DIFFERENT ......................................................................................................2

    A.    Samsung's Design-Arounds Do Not Employ Non-Obvious Modifications............2

    B.    Messenger – DA2 ......................................................................................2

    C.    Messenger - DA1-A ...................................................................................7

    D.    Browser – DA1-A ......................................................................................8

    E.    Browser - DA1-B .....................................................................................11

IV.   THE DESIGN-AROUND DEVICES CONTINUE TO INFRINGE...........................13

    A.    All Design-Around Products – Claim 1 preamble, 1(a), 1(b), 1(c)(1), 1(c)(3), 1(d) ...........................................................................................................13

    B.    DA2 – Messenger – Infringement of Claims 1(c)(2) and 9 ..................................13

    C.    DA1-A – Messenger – Infringement of Claims 1(c)(2) and 9.............................16

    D.    DA1-A – Browser – Infringement of Claims 1(c)(2) and 9.................................17

    E.    DA1-B – Browser – Infringement of Claim 1(c)(2) and 9 ..................................20

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

## I.     INTRODUCTION

1.     This report contains my response to opinions set forth in the Rebuttal Expert Report of Dr. Kevin Jeffay In Connection With Ongoing Royalties Of U.S. Patent No. 5,946,647 ("Dr. Jeffay's Rebuttal Report" or "Jeffay 2017 Rpt.").

2.     I have reviewed Dr. Jeffay's Rebuttal Report and documents cited therein.  With one exception relating to ███████████████ in DA1-A Messenger products, which I discuss below, nothing in Dr. Jeffay's report changes the opinions set forth in my Initial Expert Report In Connection with Ongoing Royalties, dated September 1, 2017 ("Initial Report").

3.     For the reasons set out in detail below and in my Initial Report, my opinion remains that the Design-Around Products are not more than colorably different than the Infringing products, in either the Messenger or Browser applications, and that the Design-Around Products continue to infringe claims 1 and 9 of the '647 patent.

4.     I note that with few exceptions, discussed below, Dr. Jeffay does not disagree with my opinion regarding how the Design-Around products operate or how the Design-Arounds are implemented.

5.     Dr. Jeffay also does not dispute that:

- The number and identification of products implementing each of the alleged-design arounds set forth in my Initial Report (¶ 47) is correct;

- The 79 "non-representative" Design-Around Products implement DA1-A, DA1-B, and DA2 in Messenger and Browser in the same manner as in the Representative Design-Around Products;

- The DA2 Products satisfy the elements in the claim 1 preamble and limitations 1(a), 1(b), and 1(d);

- The DA1-A and DA1-B Products satisfy the elements in the claim 1 preamble and limitations 1(a), 1(b), 1(c)(1), 1(c)(3), 1(d); and

- The DA1-A and DA1-B Products satisfy the limitation of claim 9.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

## II.    MATERIALS CONSIDERED

6.    In addition to the materials cited and considered in connection with my Initial Report, in forming the opinions set forth in this report, I considered Dr. Jeffay's Rebuttal Report, including the exhibits and appendices and the materials cited.  I also reviewed certain source code produced by Samsung in connection with Dr. Jeffay's Rebuttal Report (SAMNDCA630-AC00077814 - SAMNDCA630-AC00078338).

## III.   THE DESIGN-AROUND DEVICES ARE NOT MORE THAN COLORABLY DIFFERENT

### A.    Samsung's Design-Arounds Do Not Employ Non-Obvious Modifications

7.    I understand the law allows for consideration of whether modifications are obvious as part of the not colorably different analysis, and that design-arounds that employ a non-obvious design-around are more likely to be more than colorably different than design arounds that are the result of obvious modifications.

8.    I note that Dr. Jeffay does not argue that any of the modifications implemented in Samsung's design-arounds are non-obvious.

9.    As explain in my Initial Report and below, the technical modifications Samsung implemented in its design-arounds are insignificant changes.  In my opinion, these simple modifications – including such modifications as changing the instances by which detection functions are called from finger down to finger up, resetting the call of the contextual pop-up menu from a determination of long press to a determination of short tap, and disabling the contextual pop-up menu (but not the resolver activity pop-up menu) – would have been obvious to a person of ordinary skill at the time they were used by Samsung.

### B.    Messenger – DA2

10.    As discussed in my Initial Report, Samsung's modifications to the DA2 Messenger products substituted the user experience of viewing a contextual pop-up menu immediately after a short tap of a structure in Messenger with viewing a resolver activity pop-up

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

1  menu immediately after a short tap.  I disagree with Dr. Jeffay that this modification renders the

2  DA2 Messenger products more than colorably different from the Infringing Products.

3      11.    Dr. Jeffay does not appear to disagree that the DA2 Messenger products: (i) still

4  pre-detect and highlight structures in messages, (ii) still allow users to select those structures

5  using a short tap, (iii) display a pop-up menu in the form of a resolver activity menu in instances

6  where the user has selected a structure in a message such as an email or web-page, and (iv)

7  launch applications such as web-browsers and email applications upon user selection from the

8  resolver activity pop-up menu.  Dr. Jeffay also does not appear to dispute that Samsung could

9  have, but did not, remove the resolver activity pop-up menu from its design-around products in

10  addition to removing the contextual pop-up menu.  These undisputed facts demonstrate that the

11  DA2 Messenger products maintain features that are very similar to infringing features of the

12  Infringing Products, and support my opinion that the DA2 Messenger products are not more than

13  colorably different from the Infringing Products.

14      12.    Dr. Jeffay asserts that the "DA2 Messenger application is more than colorably

15  different from the functionality accused of infringing because the accused context menu

16  functionality was removed entirely."  Jeffay 2017 Rpt., at ¶ 247.  I disagree.  While it is true that

17  the display of the contextual pop-up menu has been removed from the DA2 Messenger products,

18  the "accused functionality" – i.e., enabling the selection of an action by causing the output device

19  to display a pop-up menu of the linked actions – is met by the resolver activity pop-up menu.  As

20  I explained in paragraphs 80-89 of my Initial Report, simply removing the contextual pop-up

21  menu from the DA2 Messenger products does not end the inquiry because the DA2 Messenger

22  devices continue to display a pop-up menu after user selection of a detected structure, and that

23  pop-up menu (the resolver activity pop-up menu) is not more than colorably different from the

24  contextual pop-up menu of the Infringing Products.

25      13.    Dr. Jeffay argues that the resolver activity pop-up menu "is significantly different

26  from the adjudicated functionality."  Jeffay 2017 Rpt., at ¶ 250.  But the only differences that Dr.

27

28

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

Jeffay identifies between the resolver activity and contextual pop-up menus are that the resolver activity pop-up menu does not "provide a context menu of actions linked to a detected structure," and that it "may not appear in certain instances based on user selection."  Jeffay 2017 Rpt., at ¶ 250 (quoting Initial Report, at ¶ 85).  I addressed both of these arguments in my Initial Report, and explained why a person of ordinary skill in the art would not understand either of these two differences to be significant.  Initial Report, at ¶¶ 84-85.  Dr. Jeffay's Report does not change my opinion.

14.     *First*, I have explained that even though the resolver activity pop-up menu presents fewer actions for the user to choose from than the contextual pop-up menu, this difference is not significant in the context of claims 1 and 9 of the '647 patent, especially in light of the term "linking actions to the detected structures" being construed as requiring only one or more actions be linked to a particular structure.  Simply moving from a pop-up window with four actions, for example, to a pop-up window with three actions, two actions, or a single action is not a "more than colorably different" modification because all such pop-up windows are covered by claim 9 of the '647 patent.

15.     Dr. Jeffay argues that claim 9 should be construed to require multiple linked actions per structure, despite the Federal Circuit's claim construction for "linking actions to the detected structures."  Jeffay 2017 Rpt., at ¶ 73.  I disagree.  While I was of the initial opinion that claims 1 and 9 both required multiple actions per structure, I understand that the Federal Circuit's decision must be followed now.  A person of ordinary skill in the art would understand that "the linked actions" of claim 9 takes as its predicate "linking actions" from claim 1 – and would further understand that if "linking actions" in claim 1 requires no more than one action per structure, then the same is true for "the linked actions" in claim 9.

16.     Dr. Jeffay asserts that I have previously opined that claim 9 requires multiple actions per structure.  Jeffay 2017 Rpt., at ¶ 141.  But, the statements Dr. Jeffay relies upon were from my 2013 Rebuttal Report in which I provided opinions that *both claims 1 and 9* required

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

1    multiple actions per structure.  In fact, as can be seen from the first passage of my 2013 Rebuttal

2    Report relied on by Dr. Jeffay, I specifically noted that "the only antecedent basis for 'the linked

3    actions' (plural) is the multiple linked actions required by claim 1."  Mowry 2013 Reb. Rpt., at

4    p. 32.  Given that claim 1 has been construed to allow for one or more actions per structure, then

5    it follows that claim 9 should be so construed as well.

6        17.  Dr. Jeffay further asserts that my discussion of the Sidekick reference in my 2013

7    Rebuttal Report supports the notion that I agree that claim 9 requires multiple actions per

8    structure.  But as I explained on the last day of trial on April 28, 2014 after the Federal Circuit's

9    decision in *Apple v. Motorola* had been issued and the jury had been updated on the claim

10    construction for "linking action to the detected structures," claim 1 of the '647 patent requires

11    more than one type of structure and more than one total type of action, and Sidekick only

12    discloses one type of structure (telephone number) and one type of action (making a phone call).

13    Dkt. 1928 at 3100-3104.  Accordingly, Sidekick does not invalidate claims 1 or 9 of the '647

14    patent.

15        18.  Further, even under Dr. Jeffay's construction for claim 9, it is not the case that the

16    resolver activity pop-up menu in the DA2 Messenger presents a single action in the form of

17    single choice to the user.  Instead, it presents multiple choices in the form of applications that can

18    be used to perform an action such as launching a web-browser.  Each of those choices is a

19    different linked action that opens separate applications.  A person of ordinary skill in the art

20    would understand that the resolver activity pop-up menu thus presents "a menu of the linked

21    actions" even if claim 9 is construed contrary to claim 1 to require more than one action per

22    structure.  It is instructive to examine the difference between the DA2 Messenger devices and the

23    Sidekick reference.  As I noted in my 2013 Rebuttal Report, "since Sidekick discloses at most a

24    single alleged linked action (i.e., dialing a phone number), there is no need for a pop-up menu of

25    linked actions, since there are no other allegedly linked actions to choose."  Mowry 2013 Reb.

26    Rpt., at p. 60 (quoted by Jeffay 2017 Rpt., at ¶ 141).  In the DA2 Messenger devices, on the other

27

28

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

1   hand, there *is* a need for a pop-up menu of linked actions, because there are multiple linked

2   actions to choose from (e.g., open with Gmail, open with email, etc.).

3       19.    **Second,** Dr. Jeffay argues that the resolver activity pop-up menu is more than

4   colorably different from the contextual pop-up menu because the resolver activity pop-up menu

5   "may not appear in certain instances based on user selection." Jeffay 2017 Rpt., at ¶ 250

6   (quoting Initial Report, at ¶ 85). I addressed this argument in paragraph 85 of my Initial Report,

7   including explaining the many instances in which the resolver activity pop-up menu *will* be

8   displayed. Dr. Jeffay does not dispute that this pop-up menu will be displayed in the instances I

9   described. A person of ordinary skill in the art would not find a device that displays an

10  infringing pop-up menu some of the time, rather than all of the time, is more than colorably

11  different.

12      20.    Finally, Dr. Jeffay discusses the startActivity() method, and asserts that "Dr.

13  Mowry was clear in his August 12, 2013 expert report: the invocation of startActivity, prior to

14  the creation of the ResolverActivity menu, is the action." Jeffay Rep., at ¶ 251. It is not entirely

15  clear whether Dr. Jeffay is arguing that this fact this makes the resolver activity pop-up menu

16  more than colorably different from the contextual pop-up menu, or why if so. In any event, it is

17  not in fact the case that I only identified those portions of startActivity() existing prior to the

18  resolver activity functions as the "action." Instead, I identified the entire startActivity() method

19  of the ContextImpl class, the resolveActivity() method of the Intent class, and the

20  resolveActivity() method of the PackageManager class as the subroutines that constitute the

21  action processor for performing the selected action. Further, Dr. Jeffay's prior criticism

22  regarding the Infringing Products appears to have been that the implicit Intent arguments passed

23  to startActivity() based on selection from the contextual pop-up menu did not contain a sufficient

24  level of detail regarding the action to be performed. I explained previously why the level of

25  detail in that instance satisfied the "linked" requirements of the claims. 2013 Mowry

26  Infringement Rpt., at ¶¶ 239-241. It is the case now that the user's selection from the resolver

27

28

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

1   activity pop-up window ████████████████████████regarding which

2   application to open to perform the action.  The more specific linking instructions from selection

3   from the resolver activity pop-up window does not make that window more than colorably

4   different from the contextual pop-up window.

5   **C.    Messenger - DA1-A**

6       21.    As discussed in my Initial Report, Samsung's modification to the DA1-A

7   Messenger products was to remove the pre-detection and highlighting of structures.  To the

8   extent that Dr. Jeffay alleges that this minor change renders the DA1-A Messenger products

9   more than colorably different from the Infringing Products, I disagree.  Pre-detection was not

10  present in the Infringing Galaxy S III either.

11      22.    In the case of ████████████████ I previously opined (based in part on

12  testimony from Samsung's 30(b)(6) witness Daewoong Kim) that to the extent the DA1-A

13  Messenger products perform more like the DA1-B Browser products, they are not more than

14  colorably different from the Infringing Products for the same reasons that the DA1-B Browser

15  products are not more than colorably different.  In his report, Dr. Jeffay alleges for the first time

16  that ███████████████████████ Because I do not have

17  a present basis to rebut that assertion, for the purposes of this report, I accept Dr. Jeffay's

18  characterization that ████████████████████████ For the

19  reasons explained below, this does not change my opinion that the DA1-A Messenger products

20  are not more than colorably different.

21      23.    For messages other than ████████████ the DA1-A Messenger products

22  display a contextual pop-up menu upon a short tap of the relevant structures.  This is the same

23  type of contextual pop-up menu as in the Infringing Products.

24      24.    I explain below why the process of detection in DA1-A Browser products,

25  including the timing of that process, is not more than colorably different from the process in the

26  Infringing Galaxy S III product.  I incorporate that analysis and conclusions for the DA1-A

27

28

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

Messenger products as well.  Given the absence of pre-detection in the DA1-A Messenger products, those products perform structure detection in the same general manner as the DA1-A Browser products, and my opinion is that the DA1-A Messenger products are not more than colorably different for the same reasons that the DA1-B Browser products are not more than colorably different.

25.    Because devices implementing DA1-A in Messenger function the same as the Infringing Galaxy S III with respect to presenting structures, pop-up menus, and linked actions, my opinion remains that the DA1-A Messenger devices are not more than colorably different from the Infringing Galaxy S III and other Infringing Products.

**D.    Browser – DA1-A**

26.    As discussed in my Initial Report, Samsung made two minor modifications to the DA1-A Browser products:  (1) the completion of the detection of the relevant structure now occurs after the user lifts his or her finger up, instead of before the user lifted his or her finger up; and (2) the contextual pop-up menu now appears on a short tap, rather than a long press. Nothing in Dr. Jeffay's report changes my opinion that these minor modifications do not render the DA1-A Browser products more than colorably different from the Infringing Galaxy S III.

27.    Dr. Jeffay alleges that Samsung "removed the accused functionality—namely, the context menu containing entries related to a selected structure, generated as a result of a user performing a long press gesture" from the DA1-A Browser products.  Jeffay 2017 Rpt., at ¶ 151. I disagree.  The infringing functionality in the Infringing Galaxy S III was the contextual pop-up menu containing entries related to a selected structure, generated as a result of a user selecting that structure.  Samsung did not remove that functionality, but simply moved it so that the same contextual pop-up menu now appears on a short tap, rather than a long press.  This change is trivial - it amounts to little more than adjusting the calls to the functions to generate and display the contextual pop-up menu from a timer-based determination that there has been a long press to

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

a timer-based determination that there has been a short tap - and it does not render the DA1-A Browser products more than colorably different from the Infringing Galaxy S III.

28.     I also disagree with Dr. Jeffay's allegation that moving the contextual menu from a long press to a short tap in the DA1-A Browser products is a significant change because the long press is allegedly necessary to "select" a detected structure in the Infringing Galaxy S III and DA1-A Browser products where there is no pre-detection of structures.  My testimony at the 2014 trial described how, in the Infringing Galaxy S III, the long press gesture selected the detected structure.  The short tap gesture in the DA1-A Browser products performs the same function.  In both cases, the user is making a conscious decision to select the relevant data structure using a finger gesture, either by pressing and holding (in the Infringing Galaxy S III) or by tapping and releasing (in the DA1-A Browser products), and in both cases the same contextual pop-up menu appears.

29.     The claims do not require that the user's selection be performed with any specific gesture.  Using a long press gesture versus a short tap gesture on a touch screen is like using a right click versus a left click on a PC mouse.  Both situations present two different options for "selecting," and in both cases the user's choice of input indicates to the device what result it is seeking.  Just as it would be an insignificant change to reverse the "right click" and "left click" functionalities on a PC mouse, it is insignificant that the DA1-A Browser products call the contextual menu on a short tap instead of a long press.

30.     The fact that the detection of the relevant structure is not complete in the DA1-A Browser products until the user lifts his or her finger up also does not render the DA1-A Browser products more than colorably different.  As explained in my Initial Report, in both the Infringing Galaxy S III and the DA1-A Browser products, the detection process begins upon a "finger down" event, which starts a timer.  Whether the contextual pop-up menu appears depends on whether "finger up" occurs before the timer or not.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

31.     Dr. Jeffay claims that "[t]he purpose of the timer is merely to determine whether or not the user's interaction is a short tap or a long press." Jeffay 2017 Rpt., at ¶ 235.  That is incorrect.  The timer is also used to determine whether other types of gestures have been used (e.g., a swipe).  But when a user selects a data structure and leaves his or her finger on that structure (i.e., does not move it to elsewhere on the screen), the timer's determination of whether the finger is there for a long press or a short tap dictates whether the contextual menu will appear.  The only difference is that in the Infringing Galaxy S III phones, a long press (i.e., leaving a finger down for longer than a second) will result in the contextual menu, whereas in the DA1-A Browser products a short tap (i.e., leaving a finger down for less than a second) will result in the contextual menu.

32.     From the user experience perspective, the difference between a long press and short tap is irrelevant and can literally be a difference of only a tiny fraction of a second.  For example, a touch of 1.01 seconds on a relevant structure will yield a contextual menu in the Infringing Galaxy S III while a touch of 0.99 seconds on a relevant structure will yield the same contextual menu in the DA1-A Browser products.  In both scenarios, the user is making a deliberate decision to select the relevant structure and, because of the speed at which structures are detected in the devices, the display of a contextual pop-up menu in the DA1-A Browser products is as instantaneous as in the Infringing Galaxy S III.  Therefore, from the user experience perspective, DA1-A is functionally equivalent to the Infringing Galaxy S III phone.

33.     I note that Dr. Jeffay does not disagree that, from the user experience perspective, DA1-A is functionally equivalent to the Infringing Galaxy S III phone.  Instead, he suggests that "user experience alone is irrelevant." Jeffay 2017 Rpt., at ¶ 236.  I understand that user experience can be informative of whether a modification is colorably different or not.  In my opinion, where there is no material difference from the user perspective, that weighs in favor of the products being not more than colorably different.  This is especially the case given that a person of ordinary skill in the art would recognize that the "selection of a detected structure"

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

element is found in the limitation describing the "*user interface*." User experience matters in a user interface limitation. And how the user interfaces with the Browser screen – i.e., finger selection of a non-highlighted structure, display of the contextual pop-up menu for that structure, selection of an action from the contextual pop-up menu – is the same in the Jelly Bean Infringing Products and in the DA1-A Browser products. In any event, my opinion that the DA1-A Browser products are not more than colorably different from the Infringing Galaxy S III is not based on user experience alone. As discussed in my Initial Report, the changes made to the code for the DA1-A Browser products are insignificant and support my opinion that those products are not more than colorably different from the Infringing Galaxy S III.

34.     Because devices implementing DA1-A in Browser function the same as the Infringing Galaxy S III with respect to presenting structures, pop-up menus, and linked actions, my opinion remains that the DA1-A Browser devices are not more than colorably different from the Infringing Galaxy S III and other Infringing Products.

**E.     Browser - DA1-B**

35.     As discussed in my Initial Report, Samsung made one relevant modification to the DA1-B Browser products: It changed the type of user selection that calls a contextual pop-up menu from a long press to a short tap. Nothing in Dr. Jeffay's report changes my opinion that this single, minor modification does not render the DA1-B Browser products more than colorably different from the Infringing Galaxy S III.

36.     Dr. Jeffay alleges that Samsung "removed the accused long press context menu functionality" and that this "is itself a significant change that alone renders the DA1-B design around more than colorably different." Jeffay 2017 Rpt., at ¶¶ 237, 239. I disagree. The infringing functionality in the Infringing Galaxy S III was the contextual pop-up menu containing entries related to a selected structure, generated as a result of a user's selection of that structure. Samsung did not remove that functionality, it simply moved it so that the same contextual pop-up menu now appears on a short tap rather than a long press. This change is

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

trivial and does not render the DA1-B Browser products more than colorably different from the Infringing Galaxy S III.

37.     I also disagree with Dr. Jeffay's allegation that moving the contextual menu from a long press to a short tap in the DA1-B Browser products is a significant change because the long press is allegedly necessary to "select" a detected structure in the Infringing Galaxy S III and DA1-B Browser products where there is no pre-detection of structures.  My testimony at the 2014 trial described how, in the Infringing Galaxy S III, the long press gesture selected the detected structure.  Dkt. 1634 at 865-866.  In the DA1-B Browser products, the short tap performs the same function of selecting the detected structure. In both cases, the user is making a conscious decision to select the relevant data structure using a finger gesture, either by pressing and holding (in the Infringing Galaxy S III) or by tapping and releasing (in the DA1-B Browser products); and in both cases the same contextual pop-up menu appears.

38.     From the user experience perspective, the DA1-B Browser products are functionally equivalent to the Infringing Galaxy S III phone.  In both cases, the user selects a structure by placing his or her finger on a structure and then lifting it off, and the result in both cases is a contextual pop-up menu.  As discussed above in connection with the DA1-A Browser products, the difference between the two experiences can be a small fraction of a second, which would be undetectable to a user.

39.     I note that Dr. Jeffay does not disagree that, from the user experience perspective, DA1-B is functionally equivalent to the Infringing Galaxy S III phone.  Instead, he suggests that "user experience alone is irrelevant."  Jeffay 2017 Rpt., at ¶ 243.  I understand that user experience can be informative of whether a modification is colorably different or not.  In my

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

opinion, where there is no material difference from the user's perspective, that weighs in favor of the products being not more than colorably different.  In any event, my opinion that the DA1-B Browser products are not more than colorably different than the Infringing Galaxy S III is not based on user experience alone.  As discussed in my Initial Report, the changes made to the code for the DA1-B Browser products are insignificant and support my opinion that those products are not more than colorably different than the Infringing Galaxy S III.

40.     Because devices implementing DA1-B in Browser function the same as the Infringing Galaxy S III with respect to presenting structures, pop-up menus, and linked actions, my opinion remains that the DA1-B Browser devices are not more than colorably different than the Infringing Galaxy S III and other Infringing Products.

## IV.     THE DESIGN-AROUND DEVICES CONTINUE TO INFRINGE

### A.     All Design-Around Products – Claim 1 preamble, 1(a), 1(b), 1(c)(1), 1(c)(3), 1(d)

41.     Other than two exceptions relating to DA-2 (Jeffay 2017 Rpt., at ¶¶ 311-313), Dr. Jeffay does not allege that any of the Design-Around Products fail to satisfy anything other than claim limitation 1(c)(2) and claim 9.  This confirms my understanding that Samsung is not claiming that any other limitations are not met by the DA1-A or DA1-B products.  My opinion remains that the Design-Around products meet these other limitations for the same reasons the Infringing Products meet them.

### B.     DA2 – Messenger – Infringement of Claims 1(c)(2) and 9

42.     Dr. Jeffay contends that "claim 9 requires 'a pop-up menu of the linked actions.' But in the DA2 design around, there is no pop-up menu, let alone a pop-up menu with multiple linked actions."  Jeffay 2017 Rpt., at ¶ 297.  However, the resolver activity pop-up menu is of course a pop-up menu, and I have explained above (see ¶¶ 12-19) why claim 9 does not require "multiple linked actions," and why the resolver activity pop-up menu of the DA2 Messenger

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

1    devices nonetheless display multiple linked actions.  Thus, claims 1(c)(2) and 9 are literally met

2    by the resolver activity pop-up menu.

3        43.    Dr. Jeffay appears to argue that the resolver activity pop-up menu apparently

4    cannot be covered by claim limitations 1(c)(2) or 9 because it is invoked after startActivity,

5    which I have identified as the "action."  Jeffay 2017 Rpt., at ¶¶ 307-310.  However, Dr. Jeffay

6    does not deny that ██████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ███████████████████████████    In any event, a person of ordinary skill in the art is not going to understand

10   the claims to require a strict ordering of operation of the limitations.  So long as the user

11   interface enables selection of an action by causing the output device to display a pop-up menu of

12   the linked actions, it is covered.

13       44.    Dr. Jeffay further argues that the resolver activity pop-up menu does not infringe

14   claim 9 because it purportedly "does not 'creat[e] a specified connection between each detected

15   structure and at last one computer subroutine that causes the CPU to perform a sequence of

16   operations on that detected structure.'"  Jeffay 2017 Rpt., at ¶ 311.  This is essentially the same

17   flawed argument that Dr. Jeffay has made previously and that was rejected by the District Court

18   and the Federal Circuit.  The "specified connection" continues to be the series of methods that

19   perform a series of operations on the detected structure and enable the viewer to perform the

20   desired action.  This series of operations starts with startActivity(), continues through the display

21   of the resolver activity pop-up menu and the further call to startActivity(), and results in the

22   launching of the desired application.  It cannot reasonably be disputed that the resolver activity

23   pop-up menu "enables selection" of actions - indeed, that is its very purpose.

24       45.    Dr. Jeffay further argues that the resolver activity pop-up menu lacks an action

25   processor.  Jeffay 2017 Rpt., at ¶¶ 313-314.  However, the claims do not require that the *pop-up*

26   *menu* contain an action processor.  Instead, the action processor is a set of program routines that

27

28

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

perform the selected action linked to the selected structure.  I have identified the startActivity() method of the ContextImpl class, the resolveActivity() method of the Intent class, and the resolveActivity() method of the PackageManager class as the action processor of the DA2 Messenger products, along with the Infringing Products.  In other words, the action processor software has not been changed and still continues to be covered by the claims.  That has not changed based on the change in the design of the phones to display a resolver activity pop-up menu first rather than a contextual pop-up menu.

46.     Dr. Jeffay argues at length that the resolver activity pop-up menu functionality existed in the Infringing Products and yet was not accused.  Jeffay 2017 Rpt., at ¶¶ 98-121, 142-144, 306.  I have addressed this argument in my Initial Report at paragraphs 86-87.  As I noted, in the Infringing Products, the *first* menu to appear upon user selection of a detected structure was the contextual pop-up menu.  There was no instance in Messenger where the resolver activity pop-up menu appeared first.  Samsung's modification makes the resolver activity pop-up menu relevant for infringement because the resolver activity pop-up menu in the DA2 Messenger products is the first pop-up menu to appear after the user's selection.

47.     Dr. Jeffay further relies on the fact that I included snapshots of resolver activity pop-up menus for six Samsung phones in my 2013 Infringement Report at Exhibit 3D to assert that I had previously accused the resolver activity pop-up menu with respect to claim 1 before withdrawing those assertions at trial.  But as can be seen in the figures reproduced at paragraph 142 of Dr. Jeffay's Rebuttal Report, in each instance there is an *intervening* pop-up menu that appears before the resolver activity pop-up menu that includes actions for all of the structures included within the message being tapped.  Again, this does not demonstrate an instance in Messenger in which the *first* pop-up window after user selection of a structure is the resolver activity pop-up menu.  In addition, with respect to these phones, and with respect to the use of the resolver activity menu in short tap in the Browser application, it was unclear before trial whether the claims were going to be construed to require more than one action per structure or

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

not, and thus I did not provide infringement opinions in instances where only one action per structure was included.  Ultimately, we learned at trial that the claims *were* to be construed as allowing for one or more action per structure such that Messenger products with only one action per structure are covered (so long as there are multiple types of structures and of actions).  This is the construction that governs analysis of the claims now and the DA2 Messenger products.

### C.      DA1-A – Messenger – Infringement of Claims 1(c)(2) and 9

48.      Dr. Jeffay contends that "[t]he DA1-A design around does not infringe claim 9 of the '647 patent because the user interface does not enable the selection of a detected structure" because "no detection occurs prior to selection."  Jeffay 2017 Rpt., at ¶ 282.  I disagree.

49.      In the case of ███████████████       I previously opined (based in part on testimony from Samsung's 30(b)(6) witness Daewoong Kim) that to the extent the DA1-A Messenger products perform more like the DA1-B Browser products, they infringe the asserted claims for the same reasons that the DA1-B Browser products infringe.  In his report, Dr. Jeffay alleges for the first time that ████████████████████████████████  Because I do not have a present basis to rebut that assertion, for the purposes of this report, I accept Dr. Jeffay's characterization that ███████████████████████████  ████  For the reasons explained below, this does not change my opinion that the DA1-A Messenger products infringe.

50.      For messages other than ████████████  it is my opinion that the DA1-A Messenger products are covered by this limitation 1(c)(2) under the doctrine of equivalents for the same reasons I set out for the DA1-A Browser products below.[1]

51.      With respect to claim 9's additional requirement of displaying a pop-up menu of linked options, Dr. Jeffay does not dispute that for messages other than ████████████  the DA1-A Messenger products display a pop-up menu of linked options—namely the contextual

---

[1] As explained in my Initial Report (¶ 132, n.15) while the functionality and analysis is the same in the DA1-A Browser products and DA1-A Messenger products (for messages other than ████████ ████████████), the software routines are slightly different.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

pop-up menu, which is the same as the pop-up menu found to infringe in the Infringing Galaxy S III.  My opinion remains that the DA1-A Messenger products infringe this limitation for the same reason, i.e., the contextual pop-up menu of the DA1-A Browser Product is a pop-up menu of the linked actions.

### D.   DA1-A – Browser – Infringement of Claims 1(c)(2) and 9

52.   Dr. Jeffay contends that "[t]he DA1-A design around does not infringe claim 9 of the '647 patent because the user interface does not enable the selection of a detected structure" because "no detection occurs prior to selection."  Jeffay 2017 Rpt., at ¶ 259.  I disagree.  It is my opinion that the DA1-A products meet this limitation at least under the doctrine of equivalents.

53.   This opinion consistent with my prior opinions.  In the DA1-A Browser products, just as in the Infringing Galaxy S III, there is no pre-detection of structures.  And in both cases, detection either coincides with or occurs immediately after selection.  As explained in my Initial Report, the automatic detection that results from selection in the DA1-A Browser products satisfies claim limitation 1(c)(2) at least under the doctrine of equivalents.

54.   As explained in my Initial Report (¶ 136), my opinion has always been that detection coinciding with, or immediately after, selection satisfies this limitation under the doctrine of equivalents because the limitation and the corresponding components in Samsung's products are insubstantially different.

55.   In my opinion, the DA1-A Browser products infringe claim 9 at least under the doctrine of equivalents because the components in the DA1-A Browser products that correspond to the components in the Infringing Galaxy S III perform substantially the same function, in substantially the same way, and yield substantially the same result.  In both cases, the user can select structured data detected from a larger body of text and can select an action to perform on that selected data.  In both cases, the user selects data using a gesture—either a long press (Infringing Galaxy S III) or short tap (DA1-A Browser products)—the gesture invokes the

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

detection functions; and detection occurs instantaneously, resulting in a menu of actions linked to the detected structure from which the user can select.

56.     Contrary to Dr. Jeffay's claims, the fact that DA1-A Browser products use a short tap rather than a long press to invoke the contextual menu does not render the DA1-A Browser products non-infringing.   As is the case with the Infringing Galaxy S III, the user is making a conscious decision to select the relevant data structure using a finger gesture, either by pressing and holding (in the Infringing Galaxy S III) or by tapping and releasing (in the DA1-A Browser products).   The short tap gesture in the DA1-A Browser products performs the same function as does the long press gesture in the Infringing Galaxy S III.

57.

58.     This functionality is not "just like the functionality disclosed in Pandit that [I] indicated does not satisfy claim 1," as Dr. Jeffay alleges.   Jeffay 2017 Rpt., at ¶ 261.   As a preliminary matter, Pandit is not prior art to the '647 patent, nor did Samsung assert it as prior art at the 2014 trial.   As I have previously stated, the inventors of the '647 patent conceived and reduced to practice their claimed invention well before the filing of the Pandit application.   Mowry 2013 Reb. Rpt., at ¶ 59.   This was confirmed in re-examination proceedings regarding the '647 patent when the examiner found that the patent owner established an invention date for at least claims 1-12 and 14 of the '647 patent that predated Pandit.   Id. at ¶ 419.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

59.     Contrary to Dr. Jeffay's suggestion (Jeffay 2017 Rpt., at ¶ 261), detection does not occur after selection of a structure in Pandit.  As explained in my Rebuttal Report regarding the validity of the '647 patent, Pandit does not satisfy the limitations of claim 1 of the '647 patent because Pandit does not disclose detecting structures at all.  Mowry 2013 Reb. Rpt., at ¶¶ 59-60.  Instead, Pandit requires a user to first find and accent a structure before Pandit's system operates on that piece of text.  Id.  This eliminates the need for any recognition by the computer.  Id.  Rather, in Pandit it is the user that detects a relevant structure by selecting and accenting the structure in full.  Id. at ¶¶ 60, 411.  The fact that Pandit requires that the user manually select the entire structure before Pandit attempts to recognize it is a material distinction because it reverses the steps of the claim limitation *in a way that eliminates detection of the data structures as required by the claims*.  The same is not true of the DA1-A Browser products, as to which the user's short tap gesture, beginning with "finger down," triggers the automatic detection of the relevant data structure by the device.

60.     For the same reason, I disagree with Dr. Jeffay that my opinion reads out the word "detected" from the claim limitation.  Jeffay 2017 Rpt., at ¶ 272.  The claim requires detecting structures, and the DA1-A Browser products (unlike Pandit) do detect structures.  Any suggestion that, because the detection process in the DA1-A Browser products is not complete until after "finger up," those products do not detect structures, is incorrect.  In the DA1-A Browser products, unlike in Pandit, the user selects structures that are detected not by the user but by the analyzer server of the Samsung code.

61.     Because Pandit does not disclose detecting structures (and is not even prior art), my opinion that the DA1-A Browser products infringe under the doctrine of equivalents does not "extend the scope of the claim to cover the prior art."  Jeffay 2017 Rpt., at ¶ 267.

62.     Dr. Jeffay is also incorrect to suggest that the "DA1-A design around is antithetical to and the opposite of the claimed limitation" because "Claims 1 and 9 of the '647 patent require that a structure be detected prior to selection, so that a user might know which

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

structures in, for example a web page, might be interacted with." Jeffay 2017 Rpt., at ¶ 269. This suggestion that the structure must be detected and highlighted or otherwise shown to the user is inconsistent with the jury's conclusion that pre-detection is not necessary for infringement. Even if the claims did require pre-detection (they do not), they do not require indicating for the user what has been detected so that the "user might know which structures" can be interacted with.

63.     Nor does DA1-A "prevent[] a user from selecting a detecting structure" in the manner Dr. Jeffay suggests. Jeffay 2017 Rpt., at ¶ 270. Users of the DA1-A Browser products are able to select the same structures as users of the Infringing Galaxy S III and yield the same contextual menu with actions linked to those structures. The minor difference in the way that the selection occurs (i.e., short tap versus long press) does not render the DA1-A Browser products non-infringing. Rather, as explained in my Initial Report, they still perform substantially the same function in substantially the same way to achieve substantially the same result.

64.     With respect to claim 9's additional requirement of a displaying a pop-up menu of linked actions, Dr. Jeffay does not dispute that the DA1-A Browser products display a pop-up menu of linked actions—namely the contextual pop-up menu, which is the same as the pop-up menu found to infringe in the Infringing Galaxy S III. My opinion remains that the DA1-A Browser products infringe this limitation for the same reason, i.e., the contextual pop-up menu of the DA1-A Browser Product is a pop-up menu of linked actions.

## E.     DA1-B – Browser – Infringement of Claim 1(c)(2) and 9

65.     Dr. Jeffay contends that the DA1-B Browser products do not infringe claim 9 "because the user interface does not enable the selection of a detected structure," which he asserts is the case because "when a user places a finger on the screen, there has been no detection" and "because detection is initiated by a short press … there is no 'conscious decision to select [a] structure.'" Jeffay 2017 Rpt., at ¶ 273. I disagree. In my opinion, the DA1-B Browser products literally infringe claim 9.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

66.     The fact that the detection process does not begin before "finger down" in the DA1-B Browser products does not render these products non-infringing.  The timing of detection in the DA1-B Browser products is the same as the timing of detection in the Infringing Galaxy S III.  In both cases, the detection process does not begin until "finger down," and in both cases the detection function is called before "finger up."

67.     The fact that DA1-B Browser products use a short tap rather than a long press to invoke the contextual menu also does not render those products non-infringing.   As is the case with the Infringing Galaxy S III, the user is making a conscious decision to select the relevant data structure using a finger gesture, either by pressing and holding (in the Infringing Galaxy S III) or by tapping and releasing (in the DA1-B Browser products).  Because the asserted claims require only that the user "select" a data structure, and do not differentiate between the type of selection (i.e., long press versus short tap), this minor modification does not render the DA1-B Browser products non-infringing.

68.     Dr. Jeffay alleges that I have offered "no evidence that the detection process is complete by the time of completion of the short tap" in the DA1-B Browser products and therefore am wrong to suggest the timing of the detection functions in the DA1-B Products operates in the same manner as the Infringing Galaxy S III products.  Jeffay 2017 Rpt., at ¶ 275. I disagree.  In both the Infringing Galaxy S III and the DA1-B Browser products, the FindTappedContent() method is invoked on "finger down."  The detection process in the Infringing Galaxy S III products is complete by the time of completion of the long press, a fact that Dr. Jeffay does not dispute.  Given that such is the case, in an Infringing Galaxy S III the detection process must necessarily be complete before the timer expires signaling a long press (i.e., in less than one second).  Running the same detection functions does not take longer to complete in the DA1-B Browser products.  Thus, it is certainly the case that detection will be complete before the completion of many short tap instances (e.g. , a short tap that approaches, but does not exceed, one second in length).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

69.     From the user experience perspective, the difference between a long press and short tap may be undetectable.  A touch of 1.01 seconds on a relevant structure will yield a contextual menu in the Infringing Galaxy S III, while a touch of 0.99 seconds on a relevant structure will yield the same contextual menu in the DA1-B Browser products.  In both scenarios, the user is making a deliberate decision to select the relevant structure and, because of the speed at which structures are detected in the devices, the display of a contextual pop-up menu in the DA1-A Browser products is as instantaneous as in the Infringing Galaxy S III.  Therefore, from the user experience perspective, DA1-B is functionally equivalent to the Infringing Galaxy S III phone.

70.     Because detection occurs before "finger up" in the DA1-B Browser products, Dr. Jeffay's allegation that my opinion that DA1-B infringes is inconsistent with Pandit because Pandit allegedly enables detection after selection is irrelevant.  Jeffay 2017 Rpt., at ¶ 274.  Even if my opinion regarding Pandit were relevant, for the same reasons discussed above in connection with the DA1-A Browser products, it is consistent with my opinion that the DA1-B Browser products do not infringe.  Pandit does not enable detection after selection because Pandit does not enable detection at all.  Pandit requires that the user select and highlight the complete data structure, which removes any need for "detection" of the structure as required by the claim limitation.  By the time the computer is acting on the selected structure, it has already been identified by the user.

71.     For the reasons above and in my Initial Report, it remains my opinion that the DA1-B Browser products literally infringe claim limitation 1(c)(2) for the same reasons as does the Infringing Galaxy S III.  To the extent the DA1-B Browser products do not literally infringe this limitation, they at least infringe it under the doctrine of equivalents.

72.     In my opinion, DA1-B infringes claim 9 at least under the doctrine of equivalents because the components in the DA1-B products that correspond to the components in the Infringing Galaxy S III perform substantially the same function, in substantially the same way,

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

and yield substantially the same result.  In both cases, the user can select structured data detected from a larger body of text and can select an action to perform on that selected data.  In both cases, the user selects data using a gesture—either a long press (Infringing Galaxy S III) or short tap (DA1-B Browser products)—the detector functions are invoked as a result of the selection; and detection results in a menu of actions linked to the detected structure from which the user can select.

73.     Dr. Jeffay is asserts that the "DA1-B design around is substantially different from the claimed limitation" because "Claims 1 and 9 of the '647 patent require that a structure be detected prior to selection, so that a user might know which structures in, for example a web page, might be interacted with."  Jeffay 2017 Rpt., at ¶ 278.  I disagree.  This suggestion that the structure must be detected and highlighted or otherwise shown to the user is inconsistent with the jury's conclusion that pre-detection is not necessary for infringement.  Even if the claims did require pre-detection (they do not), they do not require indicating for the user what has been detected so that the "user might know which structures" can be interacted with.

74.     Nor does DA1-B "prevent[] a user from selecting a detecting structure" in the manner Dr. Jeffay suggests.  Jeffay 2017 Rpt., at ¶ 279.   Users of the DA1-B Browser products are able to select the same structures as are users of the Infringing Galaxy S III and yield the same contextual menu with actions linked to those structures.  The minor difference in the way that the selection occurs (i.e., short tap versus long press) is immaterial and does not render the DA1-B Browser products non-infringing.

75.     With respect to claim 9's additional requirement of displaying a pop-up menu of linked actions, Dr. Jeffay does not dispute that the DA1-B Browser products display a pop-up menu of linked options—namely the contextual pop-up menu, which is the same as the pop-up menu found to infringe in the Infringing Galaxy S III.  My opinion remains that the DA1-B Browser products infringe this limitation for the same reason, i.e., the contextual pop-up menu of the DA1-B Browser Product is a pop-up menu of linked actions.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SOURCE CODE

Date:  October 9, 2017

Todd C. Mowry